## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and On Behalf of All Others Similarly Situated, | **Case No.** |
| Plaintiff, | **COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | **DEMAND FOR JURY TRIAL** |
| CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, and DAVID M. GARFINKLE, TODD J. MULLENGER, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff Nikki Bollinger Grae ("Plaintiff"), individually and on behalf of all other persons similarly situated, by her undersigned attorneys, for her complaint against Defendants, alleges the following based upon personal knowledge as to herself and her own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through her attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Corrections Corporation of America ("CCA" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

1

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired CCA securities between February 27, 2012 and August 17, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      CCA, together with its subsidiaries, owns and operates privatized correctional and detention facilities in the United States. The Company owns, operates, and manages prisons and other correctional facilities, and provides inmate residential and prisoner transportation services for governmental agencies.  As of 2015, CCA was the largest private corrections company in the United States, and manages more than 65 correction and detention facilities in 19 states and the District of Columbia.

3.      CCA was founded in 1983 and is headquartered in Nashville, Tennessee.  The Company's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "CXW."

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CCA's facilities lacked adequate safety and security standards and were less efficient at offering correctional services than the Federal Bureau of Prisons' ("BOP") facilities; (ii) CCA's rehabilitative services for inmates were less effective than those provided by BOP; (iii) consequently, the U.S. Department of Justice ("DOJ") was unlikely to renew and/or extend its

2

contracts with CCA; and (iv) as a result of the foregoing, CCA's public statements were materially false and misleading at all relevant times.

5.      On August 18, 2016, Deputy Attorney General Sally Yates ("Yates") announced the DOJ's decision to end its use of private prisons, including those operated by CCA, after officials concluded that the facilities are both less safe and less effective at providing correctional services than those run by the federal government.  In a memorandum addressed to the Acting Director of the Federal Bureau of Prisons, entitled "Reducing our Use of Private Prisons," Deputy Attorney General Yates stated, in part:

> Private prisons served an important role during a difficult period, but ***time has shown that they compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources***; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, ***they do not maintain the same level of safety and security***.  The rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource—and these services are essential to reducing recidivism and improving public safety.
>
> For all these reasons, I am eager to enlist your help in beginning the process of reducing—and ultimately ending—our use of privately operated prisons.  As you know, all of the Bureau's existing contracts with private prison companies are term-limited and subject to renewal or termination.  I am directing that as each contract reaches the end of its term, the Bureau should either decline to renew the contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population.

6.      On this news, CCA's share price fell $9.65, or 39.45%, to close at $17.57 on August 18, 2016.

7.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

3

## JURISDICTION AND VENUE

8. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

10. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as Defendant CCA is headquartered within this District.

11. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

12. Plaintiff, as set forth in the attached Certification, acquired CCA securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

13. Defendant CCA is incorporated in Maryland, and the Company's principal executive offices are located at 10 Burton Hills Boulevard, Nashville, Tennessee 37215. CCA's common stock trades on the NYSE under the ticker symbol "CXW."

14. Defendant Damon T. Hiniger ("Hiniger") has served at all relevant times as the Company's Chief Executive Officer, President, and Director.

15. Defendant David M. Garfinkle ("Garfinkle") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since May 2014.

4

16.     Defendant Todd J. Mullenger ("Mullenger") served as the Company's CFO and Executive Vice President from March 2007 to May 2014.

17.     The Defendants referenced above in ¶¶ 14-16 are sometimes referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

18.     CCA, together with its subsidiaries, owns and operates privatized correctional and detention facilities in the United States.  The Company owns, operates, and manages prisons and other correctional facilities, and provides inmate residential and prisoner transportation services for governmental agencies.  As of 2015, CCA was the largest private corrections company in the United States, and manages more than 65 correction and detention facilities in 19 states and the District of Columbia.

### Materially False and Misleading Statements Issued During the Class Period

19.     The Class Period begins on February 27, 2012, when CCA filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2011 (the "2011 10-K").  For the quarter, CCA reported net income of $40.52 million, or $0.36 per diluted share, on revenue of $437.08 million, compared to net income of $43.71 million, or $0.34 per diluted share, on revenue of $432.20 million for the same period in the prior year.  For 2011, CCA reported net income of $162.51 million, or $1.36 per diluted share, on revenue of $1.72 billion, compared to net income of $157.60 million, or $1.22 per diluted share, on revenue of $1.68 billion for 2010.  In the 2011 10-K, CCA advised investors that:

> For the years ended December 31, 2011, 2010, and 2009, federal correctional and detention authorities represented 43%, 43%, and 40%, respectively, of our total

5

revenue. Federal correctional and detention authorities primarily consist of the Federal Bureau of Prisons, or the BOP, the United States Marshals Service, or the USMS, and the U.S. Immigration and Customs Enforcement, or ICE.

20.     In the 2011 10-K, CCA further stated, in part:

Pursuant to the terms of our management contracts, we are responsible for the overall operations of our facilities, including staff recruitment, general administration of the facilities, facility maintenance, security, and supervision of the offenders. . . .

We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA [American Correctional Association], The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. Our facilities not only operate under these established standards (we have sought and received accreditation for 56 of the facilities we operated as of December 31, 2010) but are consistently challenged by management to exceed these standards. This challenge is presented, in large part, through an extensive, comprehensive Quality Assurance Program. We intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process.

Our Quality Assurance Department independently operates under the auspices of, and reports directly to, the Company's Office of General Counsel. . . . The Company has devoted significant resources to the Quality Assurance Department, enabling us to monitor compliance with contractual requirements, outside agency and accrediting organization standards. Quality Assurance closely monitors all efforts by our facilities to deliver the exceptional quality of services and operations expected.

. . .

**Business Strategy**

Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. . . .

6

> *Own and Operate High Quality Correctional and Detention Facilities.* We believe that our government partners choose an outsourced correctional service provider based primarily on availability of beds, price, and the quality services provided. Approximately 85% of the facilities we operated as of December 31, 2010 are accredited by the ACA, an independent organization of corrections industry professionals that establishes standards by which a correctional facility may gain accreditation. ***We believe that this percentage compares favorably to the percentage of government-operated adult prisons that are accredited by the ACA.*** We have experienced wardens managing our facilities, with an average of 25 years of corrections experience and an average tenure of 14 years with us.

(Emphasis added.)

21. The 2011 10-K contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

22. On May 7, 2012, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2012 (the "Q1 2012 10-Q"). For the quarter, CCA reported net income of $31.68 million, or $0.28 per diluted share, on revenue of $435.31 million, compared to net income of $40.33 million, or $0.33 per diluted share, on revenue of $425.18 million for the same period in the prior year.

23. In the Q1 2012 10-Q, CCA stated, in part:

> Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE") continues to be a significant component of our business. Our federal customers generated approximately 43% of our total revenue for both the three months ended March 31, 2012 and 2011, increasing 3.8%, from $182.4 million during the three months ended March 31, 2011 to $189.3 million during the three months ended March 31, 2012.

24. The Q1 2012 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the Q1

2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

25.    On August 9, 2012, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2012 (the "Q2 2012 10-Q"). For the quarter, CCA reported net income of $37.33 million, or $0.37 per diluted share, on revenue of $442.87 million, compared to net income of $42.42 million, or $0.39 per diluted share, on revenue of $429.94 million for the same period in the prior year.

26.    In the Q2 2012 10-Q, CCA stated, in part:

> Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE"), continues to be a significant component of our business. Our federal customers generated approximately 43% of our total revenue for both the six months ended June 30, 2012 and 2011, increasing $13.1 million, or 3.6%, from $368.3 million during the six months ended June 30, 2011 to $381.4 million during the six months ended June 30, 2012. Federal revenues increased $6.1 million, or 3.3%, from $185.9 million for the three months ended June 30, 2011 to $192.0 million for the three months ended June 30, 2012.

27.    The Q2 2012 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.    On November 8, 2012, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 10-Q"). For the quarter, CCA reported net income of $42.34 million, or $0.37 per diluted share, on revenue of $435.73 million, compared to net income of $39.24 million, or $0.33 per diluted share, on revenue of $432.14 million for the same period in the prior year.

8

29.     In the Q3 2012 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the USMS, and U.S. Immigration and Customs Enforcement ("ICE"), continues to be a significant component of our business. Our federal customers generated approximately 42% of our total revenue for the three months ended September 30, 2012 and 44% for the same period in 2011, increasing $0.4 million, from $188.4 million during the three months ended September 30, 2011 to $188.9 million during the three months ended September 30, 2012.

30.     The Q3 2012 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

31.     On February 27, 2013, CCA filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2012 (the "2012 10-K"). For the quarter, CCA reported net income of $45.41 million, or $0.40 per diluted share, on revenue of $427.68 million, compared to net income of $40.52 million, or $0.36 per diluted share, on revenue of $437.08 million for the same period in the prior year. For 2012, CCA reported net income of $156.76 million, or $1.37 per diluted share, on revenue of $1.72 billion, compared to net income of $162.51 million, or $1.36 per diluted share, on revenue of $1.72 billion for 2011. In the 2012 10-K, CCA advised investors that:

For each of the years ended December 31, 2012, 2011, and 2010, payments by federal correctional and detention authorities represented 43% of our total revenue. Federal correctional and detention authorities primarily consist of the Federal Bureau of Prisons, or the BOP, the United States Marshals Service, or the USMS, and the U.S. Immigration and Customs Enforcement, or ICE.

32.     In the 2012 10-K, CCA further stated, in part:

Pursuant to the terms of our customer contracts, we are responsible for the overall operations of our facilities, including staff recruitment, general administration of

the facilities, facility maintenance, security, and supervision of the offenders. . . .
Approximately 85% of the facilities we operated at December 31, 2012 were
accredited by the American Correctional Association Commission on
Accreditation. . . .

Outside agency standards, such as those established by the ACA, provide us with
the industry's most widely accepted operational guidelines. We have sought and
received accreditation for 57 of the facilities we operated as of December 31,
2012 . . . . We intend to apply for ACA accreditation for all of our eligible
facilities that are not currently accredited where it is economically feasible to
complete the 18-24 month accreditation process.

Beyond the standards provided by the ACA, our facilities are operated in
accordance with a variety of company and facility-specific policies and
procedures. These policies and procedures reflect the high standards generated by
a number of sources, including the ACA, The Joint Commission, the National
Commission on Correctional Healthcare, the Occupational Safety and Health
Administration, federal, state, and local government codes and regulations,
established correctional procedures, and company-wide policies and procedures
that may exceed these guidelines. Our facilities not only operate under these
established standards, but they are consistently challenged by management to
exceed them. This challenge is presented, in large part, through our extensive and
comprehensive Quality Assurance Program.

Our Quality Assurance Division independently operates under the auspices of,
and reports directly to, the Company's Office of General Counsel. The Company
has devoted significant resources to the Quality Assurance Division, enabling us
to monitor our facilities' compliance with contractual requirements, as well as
outside agency and accrediting organization standards and guidelines.

33.     The 2012 10-K contained signed certifications pursuant to SOX by Defendants

Hiniger and Mullenger, stating that the financial information contained in the 2012 10-K was

accurate and disclosed any material changes to the Company's internal control over financial

reporting.

34.     On May 9, 2013, CCA filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended March 31, 2013

(the "Q1 2013 10-Q").  For the quarter, CCA reported net income of $181.09 million, or $1.57

per diluted share, on revenue of $416.72 million, compared to net income of $31.68 million, or $0.28 per diluted share, on revenue of $435.31 million for the same period in the prior year.

35. In the Q1 2013 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the USMS, and U.S. Immigration and Customs Enforcement ("ICE") continues to be a significant component of our business. Our federal customers generated approximately 42% and 43% of our total revenue for the three months ended March 31, 2013 and 2012, respectively, decreasing 5.9%, from $189.3 million during the three months ended March 31, 2012 to $178.2 million during the three months ended March 31, 2013.

36. The Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the Q1 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

37. On August 8, 2013, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2013 (the "Q2 2013 10-Q"). For the quarter, CCA reported net income of $20.43 million, or $0.19 per diluted share, on revenue of $425.01 million, compared to net income of $37.33 million, or $0.33 per diluted share, on revenue of $442.87 million for the same period in the prior year.

38. In the Q2 2013 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the USMS, and U.S. Immigration and Customs Enforcement ("ICE"), continues to be a significant component of our business. Our federal customers generated approximately 43% of our total revenue for the three months ended June 30, 2013 and 43% for the same period in 2012, but decreasing $4.3 million, from $192.0 million during the three months ended June 30, 2012 to $187.7 million during the three months ended June 30, 2013. Federal revenues decreased $15.5 million, or 4.1%, from $381.4 million for the six months ended June 30, 2012 to $365.8 million for the six months ended June 30, 2013.

11

39. The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40. On November 7, 2013, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2013 (the "Q3 2013 10-Q"). For the quarter, CCA reported net income of $51.84 million, or $0.44 per diluted share, on revenue of $421.47 million, compared to net income of $42.34 million, or $0.37 per diluted share, on revenue of $435.73 million for the same period in the prior year.

41. In the Q3 2013 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the USMS, and U.S. Immigration and Customs Enforcement ("ICE"), continues to be a significant component of our business. Our federal customers generated approximately 43% of our total revenue for both the three months ends September 30, 2013 and 2012, but decreased $7.6 million, from $188.9 million during the three months ended September 30, 2012 to $181.3 million during the three months ended September 30, 2013. Federal revenues decreased $23.1 million, or 4.1%, from $570.2 million for the nine months ended September 30, 2012, to $547.1 million for the nine months ended September 30, 2013.

42. The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

43. On February 27, 2014, CCA filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K"). For the quarter, CCA reported net income of $47.47

12

million, or $0.41 per diluted share, on revenue of $431.10 million, compared to net income of $45.41 million, or $0.40 per diluted share, on revenue of $427.68 million for the same period in the prior year. For 2013, CCA reported net income of $300.84 million, or $2.70 per diluted share, on revenue of $1.69 billion, compared to net income of $156.76 million, or $1.37 per diluted share, on revenue of $1.72 billion for 2012. In the 2013 10-K, CCA advised investors that:

> For each of the years ended December 31, 2013, 2012, and 2011, payments by federal correctional and detention authorities represented 44% of our total revenue. Federal correctional and detention authorities primarily consist of the Federal Bureau of Prisons, or the BOP, the United States Marshals Service, or the USMS, and the U.S. Immigration and Customs Enforcement, or ICE.

> 44.    In the 2013 10-K, CCA further stated, in part:

> Pursuant to the terms of our customer contracts, we are responsible for the overall operations of our facilities, including staff recruitment, general administration of the facilities, facility maintenance, security, and supervision of the offenders. . . . Approximately 93% of the facilities we operated at December 31, 2013, excluding owned facilities that were idle, were accredited by the American Correctional Association Commission on Accreditation. . . .

> Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 53 of the facilities we operated as of December 31, 2013, excluding owned facilities that were idle. We intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process.

> Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines.

> . . .

13

Our facilities not only operate under these established standards, policies, and procedures, but they are consistently challenged by our management to exceed them. This challenge is presented, in large part, through our extensive Quality Assurance Program. Our Quality Assurance Division independently operates under the auspices of, and reports directly to, our Office of General Counsel. We have devoted significant resources to our Quality Assurance Division, as well as outside agency and accrediting organization standards and guidelines.

45.     The 2013 10-K contained signed certifications pursuant to SOX by Defendants Hiniger and Mullenger, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

46.     On May 8, 2014, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2014 (the "Q1 2014 10-Q"). For the quarter, CCA reported net income of $51.74 million, or $0.44 per diluted share, on revenue of $404.22 million, compared to net income of $181.09 million, or $1.57 per diluted share, on revenue of $416.72 million for the same period in the prior year.

47.     In the Q1 2014 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE") continues to be a significant component of our business. Our federal customers generated approximately 42% and 43% of our total revenue for the three months ended March 31, 2014 and 2013, respectively, decreasing 4.3%, from $178.2 million during the three months ended March 31, 2013 to $170.5 million during the three months ended March 31, 2014.

48.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

14

49.     On August 7, 2014, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2014 (the "Q2 2014 10-Q").  For the quarter, CCA reported net income of $55.73 million, or $0.48 per diluted share, on revenue of $410.69 million, compared to net income of $20.43 million, or $0.19 per diluted share, on revenue of $425.01 million for the same period in the prior year.

50.     In the Q2 2014 10-Q, CCA stated, in part:

> Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE") continues to be a significant component of our business. Our federal customers generated approximately 43% and 44% of our total revenue for the three months ended June 30, 2014 and 2013, respectively, decreasing 5.1%, from $187.7 million during the three months ended June 30, 2013 to $178.1 million during the three months ended June 30, 2014. Federal revenues decreased $17.2 million or 4.7% from $365.8 million for the six months ended June 30, 2013, to $348.6 million for the six months ended June 30, 2014.

51.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

52.     On November 5, 2014, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2014 (the "Q3 2014 10-Q").  For the quarter, CCA reported net income of $57.55 million, or $0.49 per diluted share, on revenue of $408.47 million, compared to net income of $51.84 million, or $0.44 per diluted share, on revenue of $421.47 million for the same period in the prior year.

53.     In the Q3 2014 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the Federal Bureau of Prisons ("BOP"), the United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE") continues to be a significant component of our business. Our federal customers generated approximately 44% and 43% of our total revenue for the three months ended September 30, 2014 and 2013, respectively, decreasing 0.9%, from $181.3 million during the three months ended September 30, 2013 to $179.6 million during the three months ended September 30, 2014. Federal revenues decreased $19.0 million or 3.5% from $547.1 million for the nine months ended September 30, 2013, to $528.1 million for the nine months ended September 30, 2014.

54.     The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     On February 25, 2015, CCA filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2014 (the "2014 10-K").  For the quarter, CCA reported net income of $30.01 million, or $0.25 per diluted share, on revenue of $423.48 million, compared to net income of $47.47 million, or $0.41 per diluted share, on revenue of $431.10 million for the same period in the prior year.  For 2014, CCA reported net income of $195.02 million, or $1.66 per diluted share, on revenue of $1.65 billion, compared to net income of $300.84 million, or $2.70 per diluted share, on revenue of $1.69 billion for 2013.  In the 2014 10-K, CCA advised investors that "business from our federal customers, including primarily the BOP, USMS, and ICE, continues to be a significant component of our business. The BOP, USMS, and ICE were the only federal partners that accounted for 10% or more of our total revenue during the last three years."

56.     In the 2014 10-K, CCA further stated, in part:

16

Pursuant to the terms of our customer contracts, we are responsible for the overall operations of our facilities, including staff recruitment, general administration of the facilities, facility maintenance, security, and supervision of the offenders. . . .

***We are committed to equipping offenders in our care with the services, support, and resources necessary to return to the community as productive, contributing members of society.*** To that end, we provide a wide range of evidence-based re-entry programs and activities at our facilities. At most of the facilities we manage, offenders have the opportunity to enhance their basic education from literacy through the acquisition of the high school equivalency diploma endorsed by the respective state and, in some cases, postsecondary educational achievements. . . .

Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 47 of the eligible facilities we operated as of December 31, 2014.

Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines.

. . .

Our facilities not only operate under these established standards, policies, and procedures, but they are consistently challenged by our management to exceed them. This challenge is presented, in large part, through our extensive Quality Assurance Program. Our Quality Assurance Division, or QAD, independently operates under the auspices of, and reports directly to, our Office of General Counsel. We have devoted significant resources to meeting outside agency and accrediting organization standards and guidelines. Our QAD provides governance for all efforts by our facilities to deliver high quality services and operations, with a commitment to continuous quality improvement.

The QAD collects and analyzes performance metrics across multiple databases. Through rigorous reporting and analyses of comprehensive, comparative statistics across disciplines, divisions, business units and our company as a whole, ***the QAD provides timely, independently generated performance and trend data to senior management.***

. . .

The QAD management team coordinates overall operational auditing and compliance efforts across all CCA facilities. In conjunction with subject matter experts and other stakeholders having risk management responsibilities, the QAD management team develops performance measurement tools used in facility audits. The management team also provides governance of the corporate plan of action process which helps to ensure swift resolution of issues identified through internal and external facility reviews. Our QAD also contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities and to help ensure that our facilities are operating at the highest possible levels. Similarly, the QAD coordinates the work of certified PREA auditors to help ensure that all facilities operate in compliance with these important regulations.

. . .

**Business Strategy**

Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. We intend to consider opportunities for growth, including potential acquisitions of businesses within our line of business and those that provide complementary services, provided we believe such opportunities will broaden our market and/or increase the services we can provide to our government partners.

*Own and Operate High Quality Correction and Detention Facilities.* We believe that our government partners choose an outsourced correctional service provider based primarily on availability of beds, price, and the quality of services provided. Approximately 90% of the eligible facilities we operated as of December 31, 2014 are accredited by the ACA, an independent organization of corrections industry professionals that establishes standards by which a correctional facility may gain accreditation. ***We believe that this percentage compares favorably to the percentage of government-operated adult prisons that are accredited by the ACA***. We have experienced wardens managing our facilities, with an average of 28 years of corrections experience and an average tenure of 16 years with us.

(Emphases added.)

57.     The 2014 10-K contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

18

58.     On May 7, 2015, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"). For the quarter, CCA reported net income of $57.28 million, or $0.49 per diluted share, on revenue of $426.00 million, compared to net income of $51.74 million, or $0.44 per diluted share, on revenue of $404.22 million for the same period in the prior year.

59.     In the Q1 2015 10-Q, CCA stated, in part:

> Business from our federal customers, including primarily the Federal Bureau of Prisons, or BOP, the United States Marshals Service, or USMS, and ICE, continues to be a significant component of our business. Our federal customers generated approximately 49% and 44% of our total management revenue for the three months ended March 31, 2015 and 2014, respectively, increasing $28.7 million, or 16.4%.

60.     The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.     On August 6, 2015, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2015 (the "Q2 2015 10-Q"). For the quarter, CCA reported net income of $65.30 million, or $0.55 per diluted share, on revenue of $459.30 million, compared to net income of $55.73 million, or $0.48 per diluted share, on revenue of $410.69 million for the same period in the prior year.

62.     In the Q2 2015 10-Q, CCA stated, in part:

> Business from our federal customers, including primarily the BOP, the United States Marshals Service, or USMS, and ICE, continues to be a significant component of our business. Our federal customers generated approximately 53% and 45% of our total management revenue for the three months ended June 30, 2015 and 2014, respectively, increasing $58.1 million, or 32.6%. Our federal customers generated approximately 51% and 44% of our total management

19

revenue for the six months ended June 30, 2015 and 2014, respectively, increasing $86.8 million, or 24.6%.

63. The Q2 2015 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

64. On November 5, 2015, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"). For the quarter, CCA reported net income of $50.68 million, or $0.43 per diluted share, on revenue of $459.96 million, compared to net income of $57.55 million, or $0.49 per diluted share, on revenue of $408.47 million for the same period in the prior year.

65. In the Q3 2015 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the BOP, the United States Marshals Service, or USMS, and ICE, continues to be a significant component of our business. Our federal customers generated approximately 53% and 45% of our total management revenue for the three months ended September 30, 2015 and 2014, respectively, increasing $59.1 million, or 32.9%. Our federal customers generated approximately 51% and 44% of our total management revenue for the nine months ended September 30, 2015 and 2014, respectively, increasing $145.9 million, or 27.4%.

66. The Q3 2015 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q3 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

67. On February 25, 2016, CCA filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended

December 31, 2015 (the "2015 10-K"). For the quarter, CCA reported net income of $48.60 million, or $0.41 per diluted share, on revenue of $447.84 million, compared to net income of $30.01 million, or $0.25 per diluted share, on revenue of $423.48 million for the same period in the prior year. For 2015, CCA reported net income of $221.85 million, or $1.88 per diluted share, on revenue of $1.79 billion, compared to net income of $195.02 million, or $1.66 per diluted share, on revenue of $1.65 billion for 2014. In the 2015 10-K, CCA advised investors that "[p]ayments by federal correctional and detention authorities represented 51%, 44%, and 44% of our total revenue for the years ended December 31, 2015, 2014, and 2013, respectively.

68. In the 2015 10-K, CCA further stated, in part:

Pursuant to the terms of our customer contracts, we are responsible for the overall operations of our facilities, including staff recruitment, general administration of the facilities, facility maintenance, security, and supervision of the offenders. We are required by our customer contracts to maintain certain levels of insurance coverage for general liability, workers' compensation, vehicle liability, and property loss or damage. We are also required to indemnify our customers for claims and costs arising out of our operations and, in certain cases, to maintain performance bonds and other collateral requirements. Approximately 92% of the eligible facilities we operated at December 31, 2015, excluding our community corrections facilities, were accredited by the American Correctional Association Commission on Accreditation. The American Correctional Association, or ACA, is an independent organization comprised of corrections professionals that establishes accreditation standards for correctional and detention institutions.

***We are committed to equipping offenders in our care with the services, support, and resources necessary to return to the community as productive, contributing members of society.*** To that end, we provide a wide range of evidence-based re-entry programs and activities at our facilities. At most of the facilities we manage, offenders have the opportunity to enhance their basic education from literacy through the acquisition of the high school equivalency diploma endorsed by the respective state and, in some cases, postsecondary educational achievements. . . .

Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 44 of the eligible facilities we operated as of December 31, 2015, excluding our community corrections facilities.

21

Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines.

. . .

Our facilities operate under these established standards, policies, and procedures, and also are subject to audits by our Quality Assurance Division, or QAD, which works independent from Operations management under the auspices of, and reports directly to, our Office of General Counsel. We have devoted significant resources to meeting outside agency and accrediting organization standards and guidelines.

. . .

The QAD management team coordinates overall operational auditing and compliance efforts across all CCA facilities. In conjunction with subject matter experts and other stakeholders having risk management responsibilities, the QAD management team develops performance measurement tools used in facility audits. The QAD management team provides governance of the corporate plan of action process for issues identified through internal and external facility reviews. Our QAD also contracts with teams of ACA certified correctional auditors to evaluate compliance with ACA standards at accredited facilities. Similarly, the QAD coordinates the work of certified PREA auditors to help ensure that all facilities operate in compliance with these important regulations.

. . .

**Business Strategy**
Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities. We may acquire additional correctional and re-entry facilities as well as other real estate assets used to provide mission critical governmental services primarily in the criminal justice sector, that we believe have favorable investment returns and increase value to our stockholders. We will also consider opportunities for growth, including, but not limited to, potential acquisitions of businesses within our line of business and those that provide complementary services, provided we believe such opportunities will broaden our market share and/or increase the services we can provide to our customers.

22

*Own and Operate High Quality Correctional and Detention Facilities.* We believe that our government partners choose an outsourced correctional service provider based primarily on availability of beds, price, and the quality of services provided. Approximately 92% of the eligible facilities we operated as of December 31, 2015, excluding our community corrections facilities, are accredited by the ACA, an independent organization of corrections industry professionals that establishes standards by which a correctional facility may gain accreditation. ***We believe that this percentage compares favorably to the percentage of government-operated adult prisons that are accredited by the ACA.*** We have experienced wardens and administrators managing our facilities, with an average of 26 years of corrections experience.

(Emphases added.)

69.     The 2015 10-K contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

70.     On May 5, 2016, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2016 (the "Q1 2016 10-Q"). For the quarter, CCA reported net income of $46.31 million, or $0.39 per diluted share, on revenue of $447.39 million, compared to net income of $57.28 million, or $0.49 per diluted share, on revenue of $426 million for the same period in the prior year.

71.     In the Q1 2016 10-Q, CCA stated, in part:

Business from our federal customers, including primarily the BOP, the United States Marshals Service, or USMS, and ICE, continues to be a significant component of our business. Our federal customers generated approximately 53% and 48% of our total revenue for the three months ended March 31, 2016 and 2015, respectively, increasing $32.5 million, or 16.0%.

72.     The Q1 2016 10-Q contained signed certifications pursuant to SOX by Defendants Hiniger and Garfinkle, stating that the financial information contained in the Q1

2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

73. On August 4, 2016, CCA filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended June 30, 2016 (the "Q2 2016 10-Q"). For the quarter, CCA reported net income of $57.58 million, or $0.49 per diluted share, on revenue of $463.33 million, compared to net income of $65.30 million, or $0.55 per diluted share, on revenue of $459.30 million for the same period in the prior year.

74. In the Q2 2016 10-Q, CCA stated, in part:

> Business from our federal customers, including primarily the BOP, the United States Marshals Service, or USMS, and ICE, continues to be a significant component of our business. Our federal customers generated approximately 52% and 51% of our total revenue for the three months ended June 30, 2016 and 2015, respectively, increasing $6.3 million, or 2.7%. Our federal customers generated approximately 53% and 50% of our total revenue for the six months ended June 30, 2016 and 2015, respectively, increasing $38.8 million, or 8.8%.

75. The Q2 2016 10-Q contained signed certifications pursuant to SOX by the Individual Defendants, stating that the financial information contained in the Q2 2016 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

76. The statements referenced in ¶¶ 19-75 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) CCA's facilities lacked adequate safety and security standards and were less efficient at offering correctional services than BOP facilities; (ii) CCA's rehabilitative services for inmates were less effective than those provided by the BOP; (iii) consequently, the DOJ was unlikely to

24

renew and/or extend its contracts with CCA; and (iv) as a result of the foregoing, CCA's public statements were materially false and misleading at all relevant times.

## The Truth Emerges

77. On August 18, 2016, Deputy Attorney General Yates announced the DOJ's decision to end its use of private prisons, including those operated by CCA, after officials concluded that the facilities are both less safe and less effective at providing correctional services than those run by the federal government. In a memorandum addressed to the Acting Director of the BOP, entitled "Reducing our Use of Private Prisons," Deputy Attorney General Yates stated, in part:

> Private prisons served an important role during a difficult period, but ***time has shown that they compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources***; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, ***they do not maintain the same level of safety and security***. The rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource—and these services are essential to reducing recidivism and improving public safety.
>
> For all these reasons, I am eager to enlist your help in beginning the process of reducing—and ultimately ending—our use of privately operated prisons. As you know, all of the Bureau's existing contracts with private prison companies are term-limited and subject to renewal or termination. I am directing that as each contract reaches the end of its term, the Bureau should either decline to renew the contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population.

(Emphases added.)

78. As a result of this news, CCA's share price fell $9.65, or 39.45%, to close at $17.57 on August 18, 2016.

79. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired CCA securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

81.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, CCA securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by CCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

82.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of CCA;

- whether the Individual Defendants caused CCA to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of CCA securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

85.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

86.     Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

27

- CCA securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold CCA securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

87. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

88. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of
### Section 10(b) And Rule 10b-5 Promulgated Thereunder)

89. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

90. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

91. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions,

practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of CCA securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire CCA securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

92. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for CCA securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about CCA's finances and business prospects.

93. By virtue of their positions at CCA, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made,

although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

94. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of CCA securities from their personal portfolios.

95. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of CCA, the Individual Defendants had knowledge of the details of CCA's internal affairs.

96. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of CCA. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to CCA's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of CCA securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning CCA's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired CCA securities at artificially inflated prices and relied upon the price of the securities, the integrity of

the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

97.     During the Class Period, CCA securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of CCA securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of CCA securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of CCA securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

98.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

99.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the
Exchange Act Against The Individual Defendants)**

100.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

101.    During the Class Period, the Individual Defendants participated in the operation and management of CCA, and conducted and participated, directly and indirectly, in the conduct of CCA's business affairs.  Because of their senior positions, they knew the adverse non-public information about CCA's misstatement of income and expenses and false financial statements.

102.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to CCA's financial condition and results of operations, and to correct promptly any public statements issued by CCA which had become materially false or misleading.

103.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which CCA disseminated in the marketplace during the Class Period concerning CCA's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause CCA to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of CCA within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of CCA securities.

104.    Each of the Individual Defendants, therefore, acted as a controlling person of CCA.  By reason of their senior management positions and/or being directors of CCA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

CCA to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of CCA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

105. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by CCA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: August 23, 2016

Respectfully submitted,

**s/*Paul Kent Bramlett***
PAUL KENT BRAMLETT
TN #7387/MS #4291
ROBERT PRESTON BRAMLETT
TN #25895
40 Burton Hills Blvd., Suite 200

33

P. O. Box 150734
Nashville, TN 37215
Telephone:    615.248.2828
Facsimile:    866.816.4116
E-mails:
PKNASHLAW@aol.com
Robert@BramlettLawOffices.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
          ahood@pomlaw.com
          mgorrie@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**GOLDBERG LAW PC**
Michael Goldberg
Brian Schall
1999 Avenue of the Stars
Suite 1100
Los Angeles, CA 90067
Telephone: 1-800-977-7401
Fax: 1-800-536-0065
Email:  michael@goldberglawpc.com
Email:  brian@goldberglawpc.com

*Attorneys for Plaintiff*