

LAWRENCE BLITZ, Plaintiff, vs. AGFEED INDUSTRIES, INC, et al., Defendants.

CASE NO. 3:11-0992 CONSOLIDATED CLASS ACTION

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

2012 U.S. Dist. LEXIS 49849

April 10, 2012, Filed

**SUBSEQUENT HISTORY:** Magistrate's recommendation at *Blitz v. Agfeed Indus.*, 2014 U.S. Dist. LEXIS 135257 (M.D. Tenn., Sept. 5, 2014)

**COUNSEL:** [*1] For Lawrence Blitz, on Behalf of Himself and All Others Similarly Situated, Plaintiff: T. Harold Pinkley, LEAD ATTORNEY, Miller & Martin PLLC, Nashville, TN; Brian J. Robbins, Conrad B. Stephens, Gregory E. Del Gaizo, Robbins Umeda LLP, San Diego, CA; James A. Crumlin, Jr., Keith C. Dennen, Bone, McAllester & Norton, PLLC, Nashville, TN; Leigh Robbin Handelman, Pomerantz, Haudek, Grossman & Gross, LLP (Chicago), Chicago, IL.

For Kevin Sopuch, individually and on behalf of all others similary situation, Consol Plaintiff: Jeremy A. Lieberman, Marc I. Gross, Pomerantz, Haudek, Grossman & Gross, LLP, New York, NY ; Patrick V. Dahlstrom, Pomerantz, Haudek, Block, Grossman & Gross, LLP, Chicago, IL; Paul Kent Bramlett, Robert P. Bramlett, Bramlett Law Offices, Nashville, TN.

For Lawrence R. Rosen, Consol Plaintiff: Catherine J. Kowalewski, Darren J. Robbins, David C. Walton, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Douglas S. Johnston, Jr., George Edward Barrett, Timothy L. Miles, Barrett Johnston, LLC, Nashville, TN.

For June W. Dougherty, Consol Plaintiff: Brian D. Long, Seth D. Rigrodsky, Rigrodsky & Long, P.A., Wilmington, DE; Paul Kent Bramlett, Robert P. Bramlett, Bramlett Law [*2] Offices, Nashville, TN; Scott J. Farrell, Timothy J. MacFall, Rigrodsky & Long, P.A., Garden City, NY.

For Michael Fajen, Consol Plaintiff: Adrienne O. Bell, Kessler Topaz Meltzer & Check, LLP, Radnor, PA; D. Seamus Kaskela, David M. Promisloff, Schiffrin, Barroway, Topas & Kessler, LLP, Radnor, PA; Paul Kent Bramlett, Robert P. Bramlett, Bramlett Law Offices, Nashville, TN.

For Joseph Felcher, Consol Plaintiff: Kenneth Ray Jones, Jr., Jones Hawkins & Farmer, PLC, Nashville, TN; Stuart W. Emmons, William B. Federman, Federman & Sherwood, Oklahoma City, OK.

For AgFeed Industries, Inc., Gerard Daignault, Edward Pazdro, Defendants: Overton Thompson, III, LEAD ATTORNEY, Bass, Berry & Sims (Nashville), Nashville, TN; J. Christian Word, Michele E. Rose, William R. Baker, III, Latham & Watkins, Washington, DC.

For Raymond M. Cesca, Clay Marshall, John A. Stadler, Consol Defendants: Overton Thompson, III, LEAD ATTORNEY, Bass, Berry & Sims (Nashville), Nashville, TN; J. Christian Word, Michele E. Rose, William R. Baker, III, Latham & Watkins, Washington, DC.

For Ramon Gobbo, Interested Party: Kenneth Ray Jones, Jr., Jones Hawkins & Farmer, PLC, Nashville, TN; Stuart W. Emmons, William B. Federman, [*3] Federman &

Sherwood, Oklahoma City, OK.

For Agfeed Investor Group, Interested Party: Paul Kent Bramlett, Bramlett Law Offices, Nashville, TN.

For Justin R. Metz, Jane Riggle, Interested Parties: George Edward Barrett, Barrett Johnston, LLC, Nashville, TN.

For Thomas Snodgrass, Tanya Snodgrass, Interested Parties: T. Harold Pinkley, LEAD ATTORNEY, Miller & Martin PLLC, Nashville, TN; Jeffrey A. Berens, Dyer & Berens LLP, Denver, CO.

**JUDGES:** E. Clifton Knowles, United States Magistrate Judge.

**OPINION BY:** E. Clifton Knowles

**OPINION**

<u>**ORDER**</u>

<u>**A. Introduction and Background**</u>

This matter is before the Court upon four similar Motions seeking to have the respective movants appointed as Lead Plaintiffs and seeking approval of their selections of Lead and Liaison Counsel. Docket Nos. 23, 25, 28, 30. Judge Campbell has referred these Motions to the undersigned for decision. Docket No. 33. The movants are putative class members, or sets of putative class members, in five consolidated cases, [1] brought pursuant to the Private Securities Litigation Reform Act ("PSLRA"), *15 U.S.C. § 78u-4*. These actions essentially allege that Defendants committed securities fraud.

> 1 The Court originally consolidated six cases, but Plaintiff in one of those [*4] cases has filed a Notice of Voluntary Dismissal. Docket No. 38.

The moving Plaintiffs are: (1) Raymond Gobbo; (2) Thomas and Tanya Snodgrass ("T&T"); (3) the AgFeed Investor Group ("AIG"), composed of Ginger Haubeck-McCaffery, William McCaffery, Joseph Boccuti, Larry Ewing, and Stephen Arsenault (Docket No. 29-1, p. 2); and (4) Justin Metz and Jane Riggle ("M-R"). Subsequently, each of the movants filed a Response in Opposition to the competing Motions. Docket Nos. 41, 44, 46, 47. Thereafter, each of the movants filed Replies in further support of their initial Motions. Docket Nos. 57, 68, 59, 61.

The appointment of a lead Plaintiff in cases such as these is governed by *15 U.S.C. § 78u-4(a)(3)*, which is part of the PSLRA and which provides in relevant part as follows:

> (3) Appointment of lead plaintiff. (A) Early notice to class members. (i) In general. Not later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business -- oriented publication or wire service, a notice advising members of the purported class --
>
>> (I) of the pendency of the action, the claims asserted therein, and the purported [*5] class period; and
>>
>> (II) that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.
>
> . . .
>
> (B) Appointment of lead plaintiff. (i) In general. Not later than 90 days after the date on which a notice is published under subparagraph (A)(i), the court shall consider any motions made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff" in accordance with this subparagraph.

. . .

(iii) Rebutable presumption. (I) In general. Subject to subclause (II) for purposes of clause (i), the court shall adopt a presumption that the most adequate plaintiff in any private action arising under this title is the person or group of persons that --

(aa) has either filed a complaint or made a motion in response to a [*6] notice under subparagraph (A)(i);

(bb) in the determination of the court has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

(II) Rebuttal evidence. The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff --

(aa) will not fairly and adequately protect the interests of the class; or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

. . .

(v) Selection of lead counsel. The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class.

As discussed above, the PSLRA provides that when a class action is brought under its provisions, the Plaintiff or Plaintiffs must give notice within 20 days of the pendency of the action, the claims asserted therein, and the purported Class Period. The Notice must also advise that, not later than 60 days after publication of the Notice, any member of the purported class may move the Court to serve as lead Plaintiff.

On October [*7] 19, 2011, a notice was published over *Business Wire* pursuant to *15 U.S.C. § 78u-4(a)(3)(A)(I)* of the PSLRA, which announced that a securities class action had been filed against Defendants herein and advised investors that they had until December 19, 2011, to file a Motion to be appointed as Lead Plaintiff. All four movants filed the instant Motions on December 19, 2011.

Thus, the "technical" requirements of *15 U.S.C. § 78u-4(a)(3)* pertaining to timely notice and timely filings of the Lead Plaintiff Motions have been met. The question, therefore, becomes which of the moving Plaintiffs is "most capable of adequately representing the interests of class members . . . ." This question turns on which of the movants "has the largest financial interest in the relief sought by the class . . . ."

The Court believes that the parties' positions can be best understood if the Court focuses upon their arguments in a chronological fashion.

**B. The Movants' Filings**

1. Motions

As discussed above, the statutory scheme requires that a Motion to be appointed as Lead Plaintiff be filed on or before 60 days after the Notice is published, and each of the Motions was filed on the sixtieth day. Each Motion essentially [*8] sets forth the basis of the lawsuit, the applicable statutory provisions, and each alleges, generally, to the best of movant's or movant's counsel's knowledge, that the movant has the largest financial interest in the relief sought by the class. Each of the Motions also states a specific amount that that movant suffered, each of which is cited to a certification submitted by the movant.

The Fourth Edition of the Manual for Complex Litigation provides the following guidance with regard to Lead Plaintiff Motions:

> The PSLRA does not require courts to hold a hearing on lead plaintiff motions . . . .
>
> Where the movant is a single investor or institution, the court's task is fairly straight forward. In identifying the plaintiff with the largest financial interest,

courts have considered factors such as the number of shares purchased or sold during the class period, the net number of shares purchased, the net funds spent, and approximate losses suffered by the plaintiff. These factors courts have found helpful "because they look to relatively objective indicators . . . rather than to the ultimate question of images." One option in assessing the merits of competing lead plaintiff petitions is [*9] to have those parties seeking lead plaintiff status file a joint submission setting forth their clam financial interests in comparing their financial stakes in litigation, preferably through an agreed on method. Such an approach allows the court to assess the merits of competing parties' positions without expending significant judicial resources wading through or reconstructing underlying figures on which the calculations are based. In addition, the court may find it difficult to reconcile damage calculations based on different methodologies.

Manual for Complex Litigation (Fourth Ed.) § 31.31, p. 535-36.

Thus, Mr. Gobbo stated that he purchased 15,000 shares of AgFeed common stock during the Class Period, retained 14,400 net shares acquired during that Class Period, expended $257,280 in net funds during the Class Period, and suffered losses of $248,208. Docket No. 24, p. 10. T&T stated that they jointly purchased 11,400 shares of AgFeed stock and suffered losses of $162,263. Docket No. 26, p. 4. AIG stated that it purchased 1,134,741 shares of AgFeed stock, spent $4,583,513 for those shares, retained 237,315 shares at the end of the Class Period, and suffered losses of $879,890. M-R [*10] stated that they expended "more than $322,000 purchasing more than 52,000 shares of AgFeed common stock (in addition to options) and suffered approximately $256,000 in losses . . . ." Docket No. 31, p. 5.

Thus, simply on the basis of these stated losses alone, the ranking of largest losses would be (from most to least): AIG, M-R, Raymond Gobbo, and T&T.

2. Responses

As discussed above, moving parties filed their Responses to the instant Motions on the same day, January 5, 2012.

a. Mr. Gobbo

In that round of filings, Mr. Gobbo recognized that both AIG and M-R claimed larger aggregate losses than did he. Mr. Gobbo's main argument against them is that both AIG and MR are (or appear to be) a group of unrelated class members who have been "cobbled together" by lawyers. While Mr. Gobbo concedes that the Sixth Circuit has not spoken on the issue, he cites a number of cases from other districts essentially stating that a "cohesive movant group" can appropriately be appointed Lead Plaintiffs, but that a "lawyer-driven movant group" cannot. Docket No. 44, p. 6. These district court cases are based primarily upon the legislative history of the PSLRA. For example, Mr. Gobbo cites *In Re Cardinal Health, Inc. Sec. Litig., 226 FRD 298, 307* [*11] for the proposition that:

> [A] stated goal of Congress in passing the PSLRA was to prevent lawyer-driven litigation . . . . Congress recognized that if lawyers could gather a group of unrelated plaintiffs and aggregate their financial losses, then lawyers would be encouraged to commence and direct the litigation, leaving the plaintiffs with little control.

Docket No. 44, p. 7.

Mr. Gobbo further notes that, while M-R presented some evidence of how the group intended to communicate independent of counsel or how the group would render joint decisions on behalf of the class, AIG did not. *Id.*, p. 8. Mr. Gobbo states that AIG proposes two law firms to act as Lead Counsel, law firms that had worked independently of each other in filing the instant action and in filing a similar but independent action in the United States District Court for the District of Colorado. 2 *Id.*, p. 9. Mr. Gobbo proposes only one law firm to act as Lead Counsel.

> 2  PACER shows that four similar actions against AgFeed and other defendants were filed in the District of Colorado, and that all have been voluntarily dismissed.

Mr. Gobbo next avers that he "has the Largest

Financial Stake in the Litigation." Docket No. 44, p. [*12] 14. He refers to two different accounting methods for calculating losses: (1) the FIFO method (First In, First Out) and (2) the LIFO (Last In, First Out) method. [3] He argues that LIFO is the preferred method for calculating losses of Lead Plaintiff movants under the PSLRA in district courts within the Sixth Circuit. *Id.*, p. 15. After making this argument, however, Mr. Gobbo does not discuss the LIFO losses of any of the moving parties other than his own. Instead, Mr. Gobbo cites *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*, for the proposition that "losses suffered prior to a corrective disclosure in a *Rule 10(b)* case were not compensable because such an investor was 'in and out' before the fraud was revealed." Docket No. 44, p. 15. *Dura,* however, was not a case involving the appointment of a Lead Plaintiff under the PSLRA, and *Dura* does not discuss FIFO or LIFO losses.

> 3   For reasons that will become apparent, an in depth discussion of FIFO and LIFO is unnecessary.

In *Dura*, the Court considered the requirement that a plaintiff in a securities fraud case brought under the PSLRA allege (and ultimately prove) "loss causation," as required by *15 U.S.C. § 78u-4(b)(4)*. In *Dura,* [*13] Plaintiffs had alleged only that "the price [of the stock] on the date of purchase was inflated because of the misrepresentation." *554 U.S. at 342* (italics and citation omitted). The *Dura* Court concluded that such an allegation did not show "loss causation." The Court stated in relevant part as follows:

> For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase payment is offset by ownership of a share that *at that instant* possesses equivalent value. Moreover, the logical link between the inflated share purchase price and any later economic loss is not invariably strong. Shares are normally purchased with an eye toward a later sale. But if, say, the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss. If the purchaser sells later after the truth makes its way into the marketplace, and initially inflated purchase price *might* mean a later loss. But that is far from inevitably so. When the purchaser subsequently resells such shares, even at a lower price, the lower price may reflect, not the earlier misrepresentation, but changed [*14] economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price. . . . Other things being equal, the longer the time between purchase and sale, the more likely that this is so, *i.e.*, the more likely that other factors cause the losses.

*554 U.S. at 342-43*.

Mr. Gobbo argues that the purported losses from both AIG and M-R "include losses from shares that were sold *prior to any corrective disclosure.*" Docket No. 44, p. 15. Mr. Gobbo states that he "retained a financial consultant to prepare both LIFO and FIFO loss analyses -- applying *Dura* principles -- for the McCafferys' transactions [*not* AIG's transactions] in AgFeed securities." *Id.*, p. 18. The McCafferys, however, have not sought to be Lead Plaintiffs -- they are simply two members of AIG. In fact, Mr. Gobbo argues that the Court cannot consider the individual members of AIG as potential Lead Plaintiffs, because the individual members of AIG did not timely file Motions seeking to be appointed as Lead Plaintiff. Mr. Gobbo does not provide the Court with a direct comparison of his losses versus [*15] AIG's losses (excluding the *Dura* losses) under either LIFO or FIFO. Mr. Gobbo does argue that, applying the *Dura* loss theory, M-R's losses are $221,728.47, which are less than his losses of $247,242. [4] *Id.*, p. 17.

> 4   As discussed above, Mr. Gobbo stated in his Motion that he lost $248,208. Docket No. 23, p. 3. In his Response, however, Mr. Gobbo states, "When [his] losses are recalculated to eliminate losses excluded by *Dura*, [his] losses are reduced by the *de mimus* amount of $960, leaving [him] with $247,242 losses under both LIFO and FIFO." Docket No. 44, p. 18. The Court notes, however, that $248,208 minus $960 is $247,248, not $247,242.

Finally, with regard to and T&T, Mr. Gobbo argues that their combined losses are well below those of Gobbo and the other movants.

b. T&T

T&T agree that AIG and M-R are unrelated individual investors, brought together by their counsel for the sole purpose of aggregating their financial interest, and, thus, they are not proper Lead Plaintiffs. Docket No. 41, p. 1. T&T assert two main "technical" arguments regarding Mr. Gobbo. First, raising questions about Mr. Gobbo's certification (Docket No. 24-2), they argue that *if* he resides outside the United States, [*16] his certification is not a proper sworn certification under *28 U.S.C. § 1746(1)*. T&T further argue that, if Mr. Gobbo resides outside the U.S., he could not establish his adequacy "in a case of this magnitude." T&T, however, cite no authority for that proposition. With the other three movants eliminated, T&T would have the largest financial interest in the relief sought by the class.

c. AIG

In its Response, AIG argues in part that the McCafferys (husband and wife) alone have the largest individual losses of any competing individual or group before the Court. Docket No. 46, p. 2. (As discussed above, however, this fact is irrelevant since Mr. and Ms. McCaffery have not applied to be Lead Plaintiff either individually or as a couple.) AIG notes that *15 U.S.C. § 78u-4(a)(3)(B)* specifically provides that a "group of persons," may be an appropriate Lead Plaintiff. Docket No. 46, p. 6. It further argues that the McCafferys and Mr. Boccuti have a pre-litigation relationship going back more than 40 years for Mr. McCaffery and more than 20 years for Ms. Haubek-McCaffery. *Id.*, p. 7. Additionally, the members of AIG have submitted their own Declarations, which "evince their desire and ability to [*17] work together to oversee the litigation on behalf [of] and for the benefit of the Class." *Id.*, p. 8.

d. M-R

M-R argue in their opposition that AIG "is comprised of geographically dispersed strangers who have failed to provide *any* evidence demonstrating they are a real, cohesive group controlled by its members, able to supervise counsel and not merely 'assembled by lawyers for the purpose of aggregating their losses' to attain Lead Plaintiff status." Docket No. 47, p.7. MR argue that, with AIG eliminated, they have the largest financial interest ($257,070, as compared to Mr. Gobbo's $248,208). Docket No. 47, p. 4. M-R makes what appears to be a half-hearted argument in a footnote, that AIG's "estimated losses are a tad inflated because certain members, the McCafferys and Mr. Boccuti, were 'in-and-out' well before any alleged disclosure of the fraud began in August 2011 . . . ." *Id.*, p. 9. But M-R never argues that, even considering *Dura* losses, their losses are more than those of AIG.

M-R argues that AIG did not submit, with their initial Motion, materials showing how they would be prepared to work together to manage the litigation. They argue that there is nothing in the record contravening [*18] the appearance that the two law firms representing AIG were not the driving force behind the formation of the group. In fact, one of the law firms allegedly issued no less than four advertisements reminding investors of the Lead Plaintiff deadline in this action. *Id.*, p. 13.

Finally, M-R notes that they submitted a timely Joint Declaration confirming that they "decided to file a Joint Motion for Appointment as Lead Plaintiff as [they] believe that [their] combined overside as both common stock and options investors will provide a balanced prospective for the class within creating an unwieldy or inefficient oversight apparatus." *Id.*, p. 6. M-R argue that they do not have any conflicts with class members (but they fail to argue that any of the other three movants does). They argue that they are only two investors, a "manageable number" and have only one law firm representing them.

3. Replies

> In his Reply, Mr. Gobbo again focuses on the argument that both AIG and M-R are artificial groupings that lack independent existences. Docket No. 59, p. 1-7. Mr. Gobbo argues that because AIG and M-R as unrelated and non-cohesive groups are not entitled to the PSLRA's presumption, the Court should consider [*19] the plaintiff with the next largest financial stake, which is Mr. Gobbo. *Id.*, p. 7.

Mr. Gobbo repeats his contention that, applying *Dura* losses, he has the most significant financial interest

of any of the *individuals* involved in any of the groups. Once again, however, this fact is simply irrelevant. Mr. Gobbo also addresses the arguments of T&T regarding his foreign residency.

In their Reply, T&T also argue that AIG and M-R "are unrelated groupings of individual investors cobbled together by their counsel." Docket No. 57, p. 1. They also reiterate the argument that Mr. Gobbo should be disqualified based upon his questionable foreign residency.

In its Reply, AIG argues essentially that Mr. Gobbo is playing fast and loose with his *Dura* calculations, and that they are "a cohesive group of five investors who have committed to prosecute this action together." Docket No. 61, p. 3-4, 6-8. AIG further argues that they have the largest losses, adjusted for *Dura* losses, on an individual and a collective basis.

M-R states:

> All of the parties agree on the order in which the Court must assess the movants' qualifications for appointment as lead plaintiff: (1) [AIG]; (2) [M-R]; (3) [Mr. Gobbo]; and (4) [*20] [T&T].

Docket No. 58, p. 7.

M-R claim that AIG did not raise any arguments at all against them in its Response. It is obvious, however, that AIG contends that its own losses are larger than those of M-R. Docket No. 46, p. 3 (Table). M-R further argues that the "statute contains no requirement mandating that the members of a proper group be 'related' in some manner; it only requires that any such group 'fairly and adequately protect the interests of the class.'" Docket No. 58, p. 8 *citing In Re Cendant Corp. Litig., 264 F.3d 201, 266 (3rd Cir. 2001)*. While this argument might benefit AIG, M-R explains that AIG did not submit timely evidence supporting the cohesiveness of their purported group. Docket No. 58, p. 11. M-R argues that such evidence should have been submitted with AIG's initial Motion. Docket No. 58, p. 12.

### III. Analysis

The parties have cited numerous cases from other federal district courts for various propositions. None of these cases is binding on this Court. The Sixth Circuit has not had occasion to discuss the appointment of Lead Plaintiff provision of the PSLRA.

Furthermore, a number of courts have discussed the fact that, of the four factors set forth in the Manual for [*21] Complex Litigation, the most important factor is the approximate losses suffered by the plaintiff. *See In re Comverse Technology, Inc. Securities Litigation, 2007 U.S. Dist. LEXIS 14878, 2007 WL 680779 (E.D. N.Y.) at *3; Takara Trust v. Molex, Inc., 229 FRD 577, 579 (N.D. Ill. 2005); In re Vicuron Pharms., Inc. Sec. Litig., 225 F.R.D. 508, 510-11 (E.D. P.A. 2004)*.

Moreover, the Court is mindful of the fact that "[T]he method used and the factors considered in determining each movant's financial interest remain fully within the discretion of the district court." *Garden City Employees' Retirement System v. Psychiatric Solutions., Inc., 2010 U.S. Dist. LEXIS 42915, 2010 WL1790763 at *3 (M.D. Tenn.) citing Pirelli Armstrong Tire Corp. Retiring Med. Benefits Trust v. LaBranche & Co., 229 FRD 395, 406-7 (S.D.N.Y. 2004)*.

The Ninth Circuit considered some of these same issues in *In Re Cavanaugh, 306 F.3d 726 (9th Cir. 2002)*, which this Court finds persuasive. In *Cavanaugh*, a five member group (the Cavanaugh group) seeking to be named as Lead Plaintiff claimed to have lost more money on the stock at issue there than the other two candidates combined. The district court first found that the Cavanaugh group was presumptively the most adequate plaintiff because [*22] it had the largest stake in the controversy. The district court went on, however, to conclude that one of the other candidates had rebutted the presumption that the Cavanaugh group was the most adequate plaintiff by showing "significant differences in potential attorney fees," and the district court appointed that candidate as Lead Plaintiff.

The Cavanaugh group petitioned for a writ of mandamus, arguing that it should have been appointed Lead Plaintiff. The Ninth Circuit agreed, setting out a three-step "clear path that the district court must follow in selecting the Lead Plaintiff." *306 F.3d at 729*. The *Cavanaugh* Court stated:

> The [PSLRA] provides a simple three-step process for identifying the Lead Plaintiff pursuant to these criteria [of *15 U.S.C. § 78u-4(a)(3)(B)(I)*]. The first step consists of publicizing the pendency of the

action, the claims made and the purported class period.

. . .

In step two, the district court must consider the losses allegedly suffered by the various plaintiffs before selecting as the "presumptively most adequate plaintiff" -- and hence the presumptive Lead Plaintiff -- the one who "has the largest financial interest in the relief sought by the class" and "otherwise [*23] satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)*.

. . .

The third step of the process is to give other plaintiffs an opportunity to rebut the presumptive Lead Plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements. *15 U.S.C. § 78u-4(a)(3)(B)(iii)(II)*.

*Id. at 730* (footnote omitted).

Significantly, the *Cavanaugh* Court then stated as follows:

At step two of the process, when the district court makes its initial determination, it must rely on the presumptive Lead Plaintiff's complaint and sworn certification; there is no adversary process to test the substance of these claims.

. . .

The [district] court started on the right foot by identifying the Cavanaugh group and each of its members as the plaintiffs with the largest financial stake in the litigation. The Court quickly went off the statutory track, however, by failing to give effect to the presumption that the Cavanaugh group would be Lead Plaintiff unless it failed to satisfy *Rule 23(a)*'s typicality or adequacy requirement. The court discounted the significance of the statutory presumption based on its understanding that "the presumption was an [*24] effort by Congress to encourage the involvement of institutional investors in securities class actions.

. . .

This, of course, was error. Congress enacts statutes, not purposes, and courts may not depart from the statutory text because they believe some other arrangement would better serve the legislative goals. Here, the [PSLRA] provides in categorical terms that the *only* basis on which a court may compare plaintiffs competing to serve as Lead is the size of their financial state in the controversy. Once it determines which plaintiff has the biggest stake, the court must appoint that plaintiff as Lead, unless it finds that he does not satisfy the typicality or adequacy requirements.

*Id. at 731-32* (footnote and citations omitted, italics in original).

As this Court noted above, simply on the basis of the losses stated in their initial Motions, AIG has the largest financial interest. While some parties opposing AIG have attempted to raise doubts as to this fact, discussing *Dura* losses and LIFO/FIFO calculations, none of the opposing parties has successfully shown that their losses are greater than the losses of AIG.

The major argument against AIG appears to be the argument that it is a "cobbled [*25] together," unrelated group that may end up being controlled by its lawyers. In this regard, the Court agrees with the analysis of the Ninth Circuit in *Cavanaugh.* There is simply nothing in the plain language of the PSLRA to support an argument that, even a "cobbled together" group should not be appointed Lead Plaintiff, if it has the largest financial interest in the relief sought by the Class. In fact, the PSLRA specifically provides that "members" of the class may be appointed as Lead Plaintiff (*15 U.S.C. § 78u-4(a)(3)(B)(I)*) and it refers to the presumption "that the most adequate plaintiff in private action arising under this title is the person *or group of persons* that . . . has the largest financial interest in the relief sought by the class"

(*15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)* (emphasis added))."

Furthermore, to the extent that legislative history and Congressional purpose should be considered, the *Cavanaugh* Court noted a number of changes had been brought about in the PSLRA that lessened the likelihood that securities fraud cases will be "lawyer-driven." *306 F.3d 737-38*. The *Cavanaugh* Court stated in part:

> In passing the [PSLRA], Congress made some very significant changes in **[*26]** the way securities class actions are to be litigated, among the most important being the following: It imposed a heightened pleading standard for securities fraud cases . . . ; added a requirement that the plaintiff who first files suit publish a notice explaining the nature of his claim and advising other potential plaintiffs that they may move to be appointed lead plaintiff . . . ; added a requirement that plaintiff submit sworn certificates stating that they did not purchase the security in question at the direction of their lawyers or in order to participate in the action . . .; commanded that the plaintiff with the greatest financial stake in the outcome of the case be appointed lead plaintiff, provided he satisfies the requirements of Rule 23; precluded the same party (except with the approval of the court) from serving as lead plaintiff in more than five securities class actions over a three-year period . . . ; and authorized the district court to ratify the lead plaintiff's appointment of counsel . . . .
>
> Each of these provisions serves the purposes disclosed in the [PSLRA's] legislative history, and together they're calculated to achieve the very goals the legislative history **[*27]** discusses. Thus, the requirement that the plaintiff with the largest stake in the outcome of the case serve as lead plaintiff will doubtless promote the goal of attracting institutional investors, and discourage opportunistic lawsuits by shareholders with a tiny position in the security which is the subject of the litigation. The requirement that plaintiffs certify that they did not buy the security at the direction of their lawyers or for purposes of litigation, as well as the prohibition against professional plaintiffs, will diminish the risk of lawyer-driven lawsuits. The notice requirement will broaden the plaintiffs who get involved and seek lead plaintiff status by assuring potential plaintiffs that they still have a chance to take control of the case, even though they have lost the "race to the courthouse." And so on. In construing any of these provisions, it may be appropriate to consult the [PSLRA's] legislative history. But it is not appropriate to rely on legislative history to add provisions Congress did not put into the statute or ignore provisions Congress did put there.
>
> . . .
>
> We are bound by what Congress did, and we may not add to the statute terms that Congress omitted **[*28]** even if we believe they would serve the statutory purpose.

*306 F.3d at 737-38* (citations and footnote omitted).

Section *78u-4(a)(3)(B)(iii)(I)* requires the Court to adopt a presumption, subject to rebuttal, that the most adequate Plaintiff in an action arising under the PSLRA is the person who: (1) has filed a complaint or made a motion in response to a notice under the PSLRA; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure. As discussed above, AIG has met the first two of these requirements. Fed. R. Civ. P. 23 requires in part that "the claims or defenses of the representative parties are typical of the claims or defenses of the class . . ." and that "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(3)* & (4). None of the opposing parties has argued that AIG does not otherwise satisfy the requirements of Rule 23.

For the foregoing reasons, the rebutable presumption set forth in *§ 78u-4(a)(3)(B)(iii)(I)* is triggered. The presumption can be rebutted:

only upon proof by a member of the purported plaintiff class **[\*29]** that the presumptively most adequate plaintiff --

(aa) will not fairly and adequately protect the interests of the class;

or

(bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

There is no evidence that AIG will not fairly and adequately protect the interests of the class, nor is there any evidence to show that AIG is subject to unique defenses that render it incapable of adequately representing the class, so the presumption has not been rebutted.

AIG also seeks the approval of Pomerantz Haudek Grossman & Gross LLP and the Rosen Law Firm, P.A. as Co-Lead Counsel and Paul Kent Bramlett as Liaison Counsel. The Court must consider whether the proposed counsel are qualified, experienced, and generally able to conduct the litigation. *Stout v. J. D. Byrider, 228 F.3d 709, 717 (6th Cir. 2000)*. Those firms have submitted resumes (Docket Nos. 29-5, 29-6, 29-7) showing that the proposed counsel are qualified, experienced, and generally able to conduct the litigation.

### D. Conclusion

For the foregoing reasons, the Motion of AgFeed Investor Group (Docket No. 28) is GRANTED and AgFeed Investor Group is hereby appointed as Lead Plaintiff in these cases. **[\*30]** The three opposing Motions (Docket Nos. 23, 25, 30) are DENIED. AIG's selection of Co-Lead Counsel and Liaison Counsel to represent the Class is APPROVED.

IT IS SO ORDERED.

/s/ E. Clifton Knowles

E. Clifton Knowles

United States Magistrate Judge