# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,<br><br>      Plaintiff,<br><br> vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, and HARLEY G. LAPPIN,<br><br>      Defendants. | Civil Action No. 3:16-cv-02267<br><br>Honorable Aleta A. Trauger<br><br><u>CLASS ACTION</u><br><br>CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br><u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

**Page**

I.      Introduction ................................................................................................1

II.     Jurisdiction and Venue .............................................................................4

III.    Parties ........................................................................................................5

IV.     Sources of Allegations .............................................................................8

V.      Background to Defendants' Fraudulent Statements and Course of Conduct .....................8

VI.     CCA Ran Unsafe, Low Quality Prisons that Caused Multiple Deaths and Did Not Save Money for the BOP or Taxpayers .................................................10

        A.      Adams County Correctional Center ..............................................12

        B.      Cibola County Correctional Center ...............................................22

        C.      Eden Detention Center ..................................................................32

        D.      McRae Correctional Facility .........................................................39

VII.    Defendants Made Numerous Fraudulent Statements and Omissions During the Class Period .................................................................................41

        A.      Misstatements and Omissions in Quarterly and Annual Reports .........................42

        B.      Misstatements and Omissions in Conference Calls, Proxy Statements, Investor Presentations and Media Articles .........................................47

VIII.   The Relevant Truth About CCA's Misleading and Injurious Course of Business ...........55

IX.     Additional Evidence in Support of a Strong Inference of Scienter .................................56

        A.      The Individual Defendants Knew of or Recklessly Disregarded the Significant Deficiencies Identified by the BOP and the OIG Throughout the Class Period ...................................................................56

        B.      Defendants Acknowledged Their Duty to Disclose Deficiencies Identified in Operational Performance Audits but Did Not Disclose Them and Instead Fought to Avoid Publishing Objective Data .............................................59

        C.      Defendants Knew Their Comparisons of CCA Costs to BOP Costs Were Misleading ...................................................................60

X.      Additional Allegations of Reliance, Materiality, Loss Causation and Damages ..............61

        A.      Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine ..........62

        B.      Plaintiff Suffered Damages When CCA's Stock Price Dropped as Information Concealed by Defendants' Fraud Was Revealed to the Market ........63

Case 3:16-cv-02267   Document 57   Filed 03/13/17   Page 2 of 75 PageID #: 653

XI.    Additional Control Person Allegations ............................................................................64

XII.    Class Action Allegations .................................................................................................66

Count I ...........................................................................................................................................67

Count II ..........................................................................................................................................68

XIII.    Prayer for Relief ..............................................................................................................68

XIV.    Jury Demand ....................................................................................................................68

1242260_1

## I. Introduction

1. This is a securities class action on behalf of purchasers of CoreCivic, Inc.[1] ("CCA" or the "Company") securities between February 27, 2012 and August 17, 2016, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. CCA, a publicly traded real estate investment trust ("REIT"), is an owner of private correctional, detention and residential reentry facilities and one of the largest prison operators in the United States. Five of its facilities were operated pursuant to contracts with the Federal Bureau of Prisons ("BOP"), for which CCA housed approximately 8,000 inmates and from which CCA received 11%-15% of its revenue throughout the Class Period.

3. Throughout and prior to the Class Period, defendants engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to investors regarding CCA's business and operations, including by falsely stating that: (i) the outsourcing of correctional services to CCA resulted in improving correctional services for government agencies, including the BOP; (ii) CCA's facilities were operated "in accordance with" applicable policies, procedures and contractual requirements; (iii) CCA's renewal rate on contracts was and would remain high because of the "quality" of services it provided to government customers; and (iv) the outsourcing of correctional services to CCA resulted in significant costs savings for government agencies, including the BOP.

4. The truth was very different from what defendants led investors to believe. Throughout the Class Period, the BOP had uncovered and notified CCA of numerous violations of BOP policies and of the facility-specific contracts between the BOP and CCA. For example, the BOP told CCA that a deadly riot in May 2012 could be "directly attributed" to failures by CCA management, including understaffing and underqualified staff. The issue was far from isolated. For example, four years later, CCA still had not remedied the understaffing problem that was blamed for

---

[1] The Company was known as Corrections Corporation of America throughout the Class Period. In late October 2016, the Company announced a rebranding effort, which included changing the Company's name to CoreCivic, Inc.

the death of a CCA correctional officer. In fact, the prison was frequently even more understaffed after the riot than it was at the time of the riot.

5.     In addition, throughout the Class Period, the BOP regularly raised concerns with CCA's understaffing of facilities and failure to provide adequate health care to its inmates, due in significant part to CCA's short-staffing of the health services departments at its facilities. For example, a March 13, 2015 BOP audit report for Adams County Correctional Center ("Adams") notified CCA of a "significant finding" that the prison had "inadequate controls in the clinical care area of Health Services," including multiple violations of BOP policies and contractual requirements which had contributed to the deaths of five inmates at that facility. The report stated that corrective action was necessary "in order to avoid additional deaths."

6.     At Cibola County Correctional Center ("Cibola") and Eden Detention Center ("Eden"), CCA failed to staff a single full-time doctor, in clear violation of BOP policy and contractual requirements, for most of a year or longer. At both prisons, among the many resulting failures to provide adequate health services, CCA failed to follow up properly on treatment of inmates who tested positive for exposure to tuberculosis. At Eden, after CCA was warned twice about this specific problem, an inmate who tested positive for exposure to tuberculosis died because of complications that might have been prevented if, as required by BOP policy, a doctor had seen the inmate. The BOP's examiner uncovered CCA's failure to treat another inmate at this facility after months of inaction by CCA's medical staff. The inmate had HIV (another condition CCA was repeatedly warned about failure to treat or follow up on in a timely manner), Hepatitis C, Syphilis and latent tuberculosis.

7.     At Cibola, the BOP notified CCA of the failure to properly follow up on treatment of inmates who tested positively for exposure to tuberculosis four times in four consecutive annual facility audits, and also cited several other health-services failures. One such failure, in part, led to the death of an inmate because he did not receive the necessary early interventions after entering cardiac arrest – at the time, the facility, with more than 1,100 inmates, had only one member of medical staff on duty. The BOP threatened to terminate the Cibola contract early due to the egregious violations.

- 2 -

1242260_1

8. In another failure, CCA breached BOP policy on screening new inmates for mental illness and suicidal tendencies. The result was that an inmate who had been on suicide watch at his previous facility received no such attention and, within a few days of arrival, hanged himself. CCA's widespread failure to provide adequate services is borne out by the fact that CCA had the highest rate of suicide attempts and self-mutilations of all BOP private prison operators, at a rate 37.5% higher than BOP facilities.

9. CCA failed to provide inmates with basic care, exposing them to health and safety risks. For example, inmates at Eden were exposed to drinking water with levels of radioactive contamination that exceeded the maximum allowable contaminant level, potentially increasing inmates' risks of cancer—a prospect made all the more troubling because CCA's prisons also had a history of failing to follow up in a timely manner with inmates in oncology clinics, as they were required to do. As described below in §VI, CCA was cited throughout and before the Class Period for these and other failures related to basic health, safety and care of the inmates for whom CCA was paid to provide "quality" services. Defendants' strategic cost cutting boosted profits to the detriment of providing services that were not only promised but also essential.

10. CCA's senior executives consistently had access to and notice of each of these notices and reports from the BOP. BOP policies and procedures required that these communications be conveyed to senior management, and CCA's disclosures confirm that CCA had "Quality Assurance" systems in place throughout the Class Period ensuring that any identified issues were brought to the attention of senior management and received management attention. A former employee of CCA confirms that, in fact, these types of notices and reports were routinely entered into CCA's systems and sent to its most senior executives, including defendants Damon T. Hininger ("Hininger), CCA's chief executive officer ("CEO"), Todd J. Mullenger ("Mullenger"), CCA's chief financial officer ("CFO"), and Harley G. Lappin ("Lappin"), CCA's chief corrections officer ("CCO"). This supports a strong inference that the Individual Defendants had actual knowledge or recklessly disregarded the Company's significant and material deficiencies.

11. Contrary to their representations to investors, defendants knew or recklessly disregarded: (i) that outsourcing correctional services to CCA **did not** result in higher quality

- 3 -

services to the BOP; (ii) that CCA's facilities emphatically *were not* operated in accordance with the BOP's policies and contractual requirements; (iii) that CCA did not provide the BOP "quality" services that would cause it to continue to renew its contracts with CCA; and (iv) that CCA did not create cost savings for the BOP.

12.     Consistent with the facts that had been continuously reported to defendants throughout the Class Period, on August 11, 2016, the U.S. Department of Justice ("DOJ") Office of the Inspector General ("OIG") issued a report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "Review"), which found that "in most key areas, contract prisons [specifically including CCA] incurred more safety and security incidents per capita than comparable BOP institutions." CCA was provided with a copy of the Review prior to its publication and did not dispute any of the data contained therein.

13.     A week later, on August 18, 2016, Deputy Attorney General Sally Q. Yates ("Yates") issued a memorandum entitled "Reducing our Use of Private Prisons" ("Yates Memorandum"), which stated that contract prisons operated lower-quality facilities without saving substantially on costs and that the BOP should reduce the use of private prisons.

14.     Following these revelations, which began to uncover the relevant truth that had previously been concealed from investors, CCA's stock price collapsed, dropping 53% in less than a week from a close of $27.56 per share on August 10, 2016 to an intraday low of $13.04 per share on August 18, 2016.

15.     This stock price decline caused hundreds of millions of dollars in losses to CCA investors, who suffered damages when the truth began to be revealed. Plaintiff seeks to recover these losses on behalf of the investors who purchased or otherwise acquired CCA securities during the Class Period.

## II.     Jurisdiction and Venue

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.

- 4 -

17. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

18. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this District, defendants are subject to personal jurisdiction in this District, many of the false and misleading statements were made in or issued from this District and CCA's executive officers are located in this District, where each of the Individual Defendants is employed.

19. In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

III. Parties

20. Plaintiff Amalgamated Bank, as Trustee for the LongView Collective Investment Fund ("plaintiff"), as set forth in its certification (Dkt. No. 40-2, incorporated herein by reference), purchased the stock of CCA during the Class Period and has been damaged thereby.

21. Defendant CCA, based in Nashville, Tennessee, is a publicly traded REIT and one of the largest prison operators in the United States. During the Class Period, CCA common stock traded under the ticker symbol "CXW" on the NYSE, an efficient market. As of July 29, 2016, CCA had more than 117.5 million shares of common stock issued and outstanding.

22. Defendant Hininger is, and was at all relevant times, a member of the CCA Board of Directors ("Board") and its CEO, having been named as CEO in August 2009. As CEO, Hininger is charged with overseeing and directing the day-to-day business of CCA. Among his previous positions at CCA, Hininger served as Vice President ("VP") of Federal and Local Customer Relations from June 2002 to September 2007, and then as Senior VP of Federal and Local Customer Relations from September 2007 to July 2008, before becoming President and Chief Operating Officer and then President and CEO. As described below, throughout the Class Period, Hininger signed each of the Company's filings with the U.S. Securities and Exchange Commission ("SEC") at

- 5 -

issue in this action, and he participated in each of the conference calls and presentations described below where material misrepresentations or omissions were made.

23.     Defendant David M. Garfinkle ("Garfinkle") is and has served as CCA's Executive VP and CFO since May 1, 2014.  Garfinkle, a certified public accountant ("CPA"), joined CCA in 2001 as VP of Finance and Controller.  Before that, he had been VP and Controller for a publicly traded $1 billion real estate investment trust and a senior manager in the audit practice at KPMG Peat Marwick LLP.  Since becoming CCA's CFO in May 2014, Garfinkle has signed many of the Company's SEC filings and participated in each of the conference calls and presentations described below where material misrepresentations or omissions were made.

24.     Defendant Mullenger was, from March 16, 2007 to May 1, 2014, CCA's Executive VP and CFO.  Mullenger, a CPA, joined CCA as a VP and Controller in August 1998 and then served as VP and Treasurer before becoming CFO.  Before joining CCA, Mullenger worked for GE, American Medical International, Arthur Andersen and Service Merchandise.  From the beginning of the Class Period until his retirement as CFO, effective May 1, 2014, Mullenger signed the Company's SEC filings and participated in the conference calls and presentations described below where material misrepresentations or omissions were made.

25.     Defendant Lappin is, and was at all relevant times, CCA's Executive VP and CCO. Lappin joined the Company as CCO in June 2011.  As CCO, Lappin is responsible for oversight of facility operations, health services and inmate rehabilitation programs, among other things.  Before joining CCA, Lappin served as the Director of the BOP from 2003 until May 2011, having served with the BOP since 1985. As Director of the BOP, Lappin had oversight and management responsibility for 116 federal prisons, 14 large private contract facilities and more than 250 contracts for community correction facilities, in total comprising more than 215,000 inmates.  Lappin is former chair of the Standards Committee of the American Correctional Association ("ACA"), a former board member of both the National Institute of Corrections and the Federal Prison Industry Board and a former chair of the Prison Industry Committee of the American State Correctional Administrators Association.

- 6 -

26.     The defendants referenced above in ¶¶20-25 are collectively referred to herein as the "Individual Defendants."

27.     During the Class Period, the Individual Defendants, as senior executive officers and/or directors of CCA, were privy to confidential, proprietary information concerning CCA, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning CCA, as discussed in detail below. Because of their positions with CCA, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

28.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of CCA's business.

29.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports, presentations and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

- 7 -

30.     As senior executive officers and/or directors and as controlling persons of a publicly traded company whose stock was, and is, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to CCA's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of CCA stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

31.     Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of CCA stock. The scheme: (i) deceived the investing public regarding CCA's business, operations and management and the intrinsic value of CCA securities; (ii) caused plaintiff and members of the Class to purchase CCA securities at artificially inflated prices; and (iii) resulted in losses to plaintiff and the members of the class as it was disclosed as alleged herein.

## IV.     Sources of Allegations

32.     Plaintiff's allegations are based upon information contained in SEC filings by CCA, other regulatory filings and reports, government records and reports of CCA's operations, press releases and media reports about the Company, reports of securities analysts about the Company, transcripts of conference calls and analyst presentations by CCA or its officers and other reports of oral or written statements made by defendants. The allegations contained herein are also based upon an investigation conducted at the direction and under the supervision of lead counsel, including information obtained from the BOP and former employees of CCA.

## V.     Background to Defendants' Fraudulent Statements and Course of Conduct

33.     As of December 31, 2016, CCA purported to be the nation's largest owner of privatized correctional and detention facilities and one of the largest prison operators in the United States. The Company is structured as an REIT, specializing in owning, operating and managing prisons and other correctional facilities and providing residential, community reentry and prisoner

- 8 -

transportation services for governmental agencies. CCA began operating as an REIT for federal income tax purposes effective January 1, 2013. CCA provides correctional services and conducts other operations through taxable REIT subsidiaries.

34. CCA's customers are federal, state and local correctional and detention authorities. Federal authorities, which included the BOP, U.S. Marshal Service and Immigration and Customs Enforcement, were critical to CCA throughout the Class Period. Payments by those authorities represented 51%, 44% and 44% of the Company's total revenue for the years ended December 31, 2015, 2014 and 2013, respectively, and 43% of the Company's total revenue for each of the years ended December 31, 2012, 2011 and 2010. The BOP alone accounted for 11% of the Company's revenue in 2015, 13% in 2014, 13% in 2013, 12% in 2012, 12% in 2011 and 15% in 2010. As of June 30, 2016, CCA reported that the BOP inmate populations within its facilities were primarily criminal aliens incarcerated for immigration violations.

35. As a for-profit prison company, CCA's business model depended on its ability to convince its clients that its facilities could deliver services of equal or greater quality to government-run facilities at lower prices. CCA consistently stressed the purportedly higher quality and lower cost of its services to its shareholders (as well as to its prospective customers) throughout the Class Period, as described in more detail below. For example, at the very beginning of the Class Period (and several times later in the Class Period), the "Business Strategy" section of CCA's annual report on SEC Form 10-K began with the statement that "Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities." Nearer the end of the Class Period, Hininger's annual letter to shareholders, dated March 30, 2016, emphasized: "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we have experienced more than three decades of continued growth and contract retention rates in excess of 90 percent." The letter also stated that it was "CCA's value proposition to our government partners [that] continue[d] to make [it] the premier provider in the industry and an ideal solution for correctional systems seeking new or replacement facilities." The letter went on:

- 9 -

We take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners. To maintain this confidence CCA is focused on our long-term performance. This requires we provide our facilities and staff with the necessary resources to operate the best corrections, detention and residential reentry facilities. It is only through our commitment to our long-term performance that CCA will drive future growth and increase shareholder value.

36. As described below, defendants consistently conveyed these messages to shareholders – that the Company provided better services at a lower cost than government-run facilities and, as a result, was well positioned to continue to maintain a high rate of renewal of its government contracts and to win expanded future business. What defendants did not tell shareholders was that, at least with respect to BOP prisons that were among the most significant in the Company's portfolio, the BOP had repeatedly told CCA that it was providing inadequate services and that its cost-saving shortages of staff were causing serious and, on several occasions, deadly problems, which called into question the continuation of BOP contracts and the viability of CCA's entire business model.

## VI. CCA Ran Unsafe, Low Quality Prisons that Caused Multiple Deaths and Did Not Save Money for the BOP or Taxpayers

37. From the beginning of the Class Period and even before, the prisons CCA ran for the BOP were plagued with material deficiencies. The BOP repeatedly cited the prisons for violations of contracts and BOP policies in audit reports and Notices of Concern. The BOP raised, *inter alia*, issues about: (i) inadequate staffing that led to serious safety and security concerns for both inmates and staff; (ii) poor health services that repeatedly contributed to the deaths of inmates even though the BOP had previously warned CCA of similar issues; and (iii) numerous other systemic failures to comply with contractual requirements and generally ensure that the services CCA provided to the BOP were of appropriate quality and kept inmates, safe, secure and healthy.

38. On August 11, 2016, the OIG issued the Review. It noted that in "recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer" and, after a comprehensive examination, concluded that "in most key areas, contract prisons [specifically including CCA] incurred more safety and security incidents per capita than comparable BOP institutions."

39. The Review specifically found that contract prisons (including CCA) "incurred more safety and security incidents per capita than comparable BOP institutions" as they "had more

- 10 -

frequent incidents of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances" and was unable to conclude that contract prisons offered any cost savings compared to BOP institutions. The Review found that, among private prison companies that contract with the BOP, from fiscal year 2011 through fiscal year 2014, CCA's prisons had the highest rates of inmate fights (at a rate 35% higher than BOP institutions), the most inmate assaults on other inmates (at a rate 64% higher than BOP institutions), the most sexual assaults by inmates on staff (at a rate 7.5 times higher than BOP institutions), the most suicide attempts and self-mutilations (at a rate 37.5% higher than BOP institutions) and the most safety- and security-related inmate grievances (at a rate more than ten times higher than other private prison operators). Of all private prisons, CCA's McRae Correctional Facility ("McRae") had "the highest rate of inmate suicide attempts and self-mutilation, the second highest rate of positive drug tests, and the third highest rates of cell phones found and inmate grievances." In addition, a single CCA facility in Adams County, Mississippi had over twice as many cell phone confiscations during the review period as all 14 comparable BOP institutions selected for the Review, *combined*.

40. Fieldwork for the Review was conducted from April 2014 through February 2015 and included interviews of prison staff such as wardens, assistant wardens, chiefs of security, intelligence staff and others, as well as site visits to Eden. CCA was provided with a copy of the Review prior to its publication and did not dispute any of the data contained therein.

41. In the Yates Memorandum, specifically citing the Review, Yates stated that contract prisons operated lower quality facilities without saving substantially on costs:

> [T]ime has shown that [private prisons] compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security. The rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource – and these services are essential to reducing recidivism and improving public safety.

42.    The DOJ's conclusion is consistent with internal documentation maintained by the BOP, which demonstrates systemic and recurrent problems at Criminal Alien Requirement ("CAR") facilities managed by CCA on behalf of the BOP throughout the Class Period, as described below.[2]

## A.    Adams County Correctional Center

43.    CCA has owned and operated Adams in Natchez, Mississippi since 2008. The facility was built for CCA at a cost of approximately $128 million. CCA's contract with the BOP to operate the Adams facility was originally announced in April 2009 and currently expires in July 2017, subject to one remaining two-year renewal option. As of June 2016, Adams was the DOJ's third-largest contract in terms of dollars obligated ($468 million) since fiscal year 2009. As of April 7, 2016, Adams housed 1,906 prisoners. Adams is classified as a low-security prison, housing non-resident aliens who have been convicted of federal charges in the United States. The vast majority of the inmates had been convicted of non-violent crimes, including immigration violations and drug offenses, and the median length of sentence at the facility was 73 months, with the median inmate spending 436 days at the facility. The majority of the inmate population consists of Mexican nationals.

44.    Adams was the scene of a riot in May 2012 that turned deadly when a CCA correctional officer was killed. The riot began on May 20, 2012 when inmates initiated a disturbance in an attempt to bring concerns with conditions at the Adams facility to the attention of the Adams administration and to have those conditions addressed. The disturbance lasted over 12 hours. In addition to the homicide of the correctional officer, the riot resulted in significant injuries to other staff and to inmates, hostages being taken and property destruction encompassing the majority of the facility and totaling more than a million dollars of damage.

45.    According to an affidavit dated July 17, 2014 by correctional officer Deborah Temple ("Ms. Temple") who was assaulted along with the correctional officer who was killed, CCA not only knew about the staffing shortages but deliberately concealed them from the BOP:

---

[2]    CCA also operated the Northeast Ohio Correctional Center during the Class Period. That contract expired on May 31, 2015, and the BOP declined to renew it.

Case 3:16-cv-02267   Document 57   Filed 03/13/17   Page 15 of 75 PageID #: 666

Prior to the Riot, the Prison was short staffed and there were not enough Prison employees to adequately control the prisoners. My co-workers and I informed Prison officials on numerous occasions that there were not enough Prison employees to adequately control the prisoners and that insufficient staffing created a dangerous work environment for the Prison employees.

My co-workers and I were told not to worry about it and to "suck it up." In fact, I was told to "put my big girl panties on and get back to work." Prison officials ignored the fact that the Prison was short staffed and that the prison employees were in danger of physical harm due to the short staffing. Prison officials knew the Prison was short staffed. When the Bureau of Prisons would perform their audits at the Prison, Prison officials would call in all possible Prison employees so it would appear as though the Prison was adequately staffed, even though it was not.

Prisoners who were also gang leaders at the Prison were given special privileges by the Prison officials. The gang leaders were allowed to access areas of the Prison where prisoners should not been allowed to enter. Also, the gang leaders were allowed to have cell phones that they used to talk to Prison officials.

46. Ms. Temple's affidavit went on to detail that the riot was a direct result of the staffing shortages:

On the day of the Riot I reported to work and was in a meeting with various Prison officials when Captain Fleming told me that **Prison officials had been told by the prisoners that something big was going to happen that day** at the Prison. I was also told that **the prisoners had made a hit list that included on it the names of Prison guards**. I asked if I was on the hit list and was then told "yes." I asked why the Prison was not placed on lock down. Captain Fleming told me the Warden had made the decision not [to] go on lock down. **The Prison was short staffed again this day. There were probably not more than 20 Prison employees at the facility**.[3]

Near lunch time on the day of the Riot I was at my car on break when I heard an alert on the Prison radio stating that the prisoners were blocking the gates. I returned to my post and was told by Assistant Chief London to get on the roof of one of the buildings to help watch the prisoners. Although I was not trained to do this type of job, I complied.

I obtained the keys to the roof hatches and got on the roof of the building with my co-worker Smith. We observed about 1200 to 1500 prisoners gathered at the prison gates demanding to speak to the Warden. The prisoners at that time gave Prison officials a list of Prison employees who were on the hit list. My name was on the hit list as was the name of Catlin Carithers. Catlin joined us on the roof of the building.

We had been on the roof for about 1 hour when my co-worker Smith left Catlin and I alone on the roof. Catlin had been called in from his day off. He started laying out all the gas canisters and began explaining to me what each how to use them [sic].

The next thing I saw was a Prison maintenance man on a tractor hauling a ladder, going to the back of the building across from Carithers and I. The Prison

---

[3]    Emphasis added throughout, unless stated otherwise.

maintenance man on the tractor returned from the back of the building without the ladder. My co-workers Lofton and Stevens used the ladder left by the Prison maintenance man to get on the roof of the building across from Carithers and I. Next, I saw prisoners running across the yard with the same ladder that Lofton and Stevens had just used to get on the roof.

I then heard an alert on the Prison radio that the prisoners had taken the ladder used by Lofton and Stevens, and that Catlin and I were then instructed to deploy the gas. That is when all hell broke loose. Carithers and I threw the gas into the crowd of prisoners as instructed, hoping they would disburse [sic]. Instead, the prisoners began throwing the canisters of gas back onto the roof where we were located. They were also throwing at us garbage cans and rocks and anything else they could find. Catlin was a short distance away from me and I saw him trying to dodge food trays that were also being thrown at us. I then saw a head come over the side of the roof of the building that we were on. Two prisoners then appeared and confronted us. They asked for my keys and my radio. I could see that other prisoners were coming up the ladder onto the roof. Before I could respond about my keys and radio a prisoner began beating me with a metal pan and a food tray. I blacked out and I remember next seeing Catlin lying motionless on the roof near me. I called out to him but he never verbally responded.

47.     Consistent with Ms. Temple's affidavit, press accounts also reported that, before the riot began, an inmate had e-mailed CCA's chief of security at Adams to warn him of the potential disturbance and had specifically provided him the "hit list" of correctional officers that would be targeted by the inmates. The correctional officer who was killed was on that list.

48.     The BOP commissioned an "After-Action Report" to determine the causes of the riot and to make recommendations to avoid such a catastrophe being repeated. The report, which was dated July 27, 2012, expressly stated that the riot could be "***directly attributed to actions taken by the [Adams] administration leading up to the event***." It concluded that a lack of effective intelligence operations directly contributed to the inability to prevent the riot. The report found deficiencies in communication between staff and inmates, in staffing and in CCA's intelligence systems. The report also specifically stated that a lack of Spanish-speaking staff and staff inexperience, particularly in the Adams facility's Intelligence Office, had an adverse effect on communication and intelligence gathering at the prison, which contributed to the failure of the CCA staff at the facility to "grasp the severity and degree of the Mexican national inmates' intent to orchestrate a meeting with approximately 1,700 Mexican national inmates and to escalate the situation to include violence toward staff if their demands were not met." The report concluded with a list of "several areas of concern . . . requiring immediate attention" and made 15 recommendations.

- 14 -

49.     The Federal Bureau of Investigation also investigated the incident. An August 8, 2012 affidavit by Special Agent Casey Markovitz shows that the riot was at least in part attributable to the fact that "[m]any within the inmate population [had become] disgruntled with what the inmates perceived to be inadequate or substandard food, medical conditions and disrespectful staff members at [Adams]." On September 19, 2012, the BOP sent CCA a Notice of Concern stating that "[r]eview of the incident by the Bureau of Prisons revealed several significant incidents of non-conformance" with the terms and conditions of the contract between the BOP and CCA relating to the Adams facility and demanded that CCA report on the actions it would take to correct the identified deficiencies. The Notice of Concern cited "Vital Function #7 and #9" in Correctional Services among the contractual requirements with which CCA had not conformed. Those functions are, respectively, that "Intelligence information related to security concerns is gathered for dissemination to appropriate contract and BOP staff" and "An adequate level of emergency readiness is maintained to respond to institution emergencies."

50.     The reports on the May 2012 riot were neither the first nor the last times these and similar issues were raised with CCA. Throughout and before the Class Period, the BOP sent numerous "Notices of Concern"[4] to CCA, raising many issues and contract violations at the facility, as well as providing annual "Contract Facility Monitoring Final Reports."

51.     On March 31, 2011 the BOP sent CCA a report of contract facility monitoring conducted at the Adams facility March 15-17, 2011. The report notified CCA that, in health services, there was a "repeat repeat deficiency" (*i.e.*, a deficiency that had been repeated twice) involving failure to conduct important blood tests for HIV-positive inmates in a timely fashion, as well as five health services "deficiencies," including that "[m]edical management of an inmate's condition prior to death was not in accordance with policy and standards of care." The report also listed three deficiencies in the facility's correctional programs.

---

[4]     According to a July 2013 U.S. Government Accountability Office ("GAO") report entitled "Timelier Reviews, Plan for Evaluations, and Updated Policies Could Improve Inmate Mental Health Services Oversight," a Notice of Concern is filed when a facility fails to comply with a corrective action plan (itself necessitated by a deficiency identified through a Contract Facility Monitoring (CFM) review), and such notices are a "rare occurrence."

52.     On April 6, 2012, the BOP sent CCA a report of the contract facility monitoring conducted March 27-29, 2012.  In this report, issued less than two months before the deadly riot, the BOP noted four deficiencies in correctional programs, one deficiency in correctional services, one in education and recreational services, two in food service (including that food temperatures were not maintained and serving procedures for the religious diet program were not followed), one in inmate services and an astonishing *nine* deficiencies in health services.  Of the health services deficiencies, one was described as a repeat deficiency:  CCA had violated policy and standards of care in its "[m]edical management of an inmate's condition prior to death."  The deficiencies and policy violations described in the report foreshadowed the concerns that would be cited just weeks later by the inmates as they rioted and ultimately took the life of a CCA correctional officer.

53.     The staffing issues that contributed to the deadly riot were not fixed after the riot.  On August 10, 2012, the BOP sent CCA a Notice of Concern regarding non-conformance at the Adams facility.  The Notice of Concern stated:

> The facility failed to maintain the [minimum staffing requirements] eleven months out of a total of sixteen months during the period of April 2012 through July 2012.  The referenced eleven months in which your facility failed to meet the minimum staffing requirements are as follow: April 2011, May 2011, June 2011, July 2011, September 2011, October 2011, November 2011, April 2012, May 2012, June 2012 and July 2012.

54.     On November 14, 2012, the BOP sent another Notice of Concern regarding non-conformance at the Adams facility to CCA.  The Notice of Concern identified the non-conformance as follows: "The staffing levels submitted by the [Adams facility] were reviewed and revealed the facility [failed to meet minimum staffing requirements] for August and September of 2012."

55.     Another Notice of Concern, sent to CCA on February 22, 2013, identified insufficient staffing levels "for October and December of 2012."

56.     On February 27, 2013, the BOP sent a report of the contract facility monitoring conducted January 8-10, 2013.  Again, there was a repeat deficiency related to the inadequate provision of health services.  In addition, the report noted one deficiency in correctional programs, two in correctional services, two in education, 19 (not including the repeat deficiency) in health services and four in safety.

- 16 -

57.     The staffing issues continued into 2013.  A Notice of Concern sent to CCA on May 16, 2013 identified insufficient staffing levels "for January – March, 2013."

58.     On May 23, 2013, the BOP sent a letter regarding "Award Fee Determination" for the Adams facility to Jeb Beasley ("Beasley"), Senior Director and Managing Director at CCA, in the Company's Nashville headquarters.  The letter reported:

> I have reviewed the recommendation of the Performance Evaluation Board based upon the performance monitoring information and the self-assessment submitted by Corrections Corporation of America (CCA).  After a thorough review of this information, an award fee has not been authorized for the aforementioned performance period.
>
> Adams County Correctional Center received one repeat deficiency and twenty-one deficiencies during the February 2013 CFM Review.  Additionally, six Notice of Concerns (NOC) were issued for contract noncompliance (failure to follow security procedures).  Specifically, the NOC's were issued for CCA's failure to maintain staffing levels and failure to properly [redaction] in the Special Housing Unit (SHU).  On May 20, 2012, Adams County experienced a large scale inmate disturbance resulting in substantial property loss, staff assaults and a staff fatality.  Review of the incident by the Bureau of Prisons (BOP) revealed several instances of non-conformance.  Correctional Services has had some issues with staff turnover, inmate accountability, and supervisors/correctional officers failing to properly follow policies and post orders within the SHU.
>
> Deficiencies have increased with the contractor's quality control component.  Additionally, the contractor provided limited information in their self-assessment on program weaknesses despite the government's observations during this performance period.

59.     On January 24, 2014, the BOP sent a report of the contract facility monitoring conducted January 7-9, 2014.  The report noted ***three*** repeat deficiencies, each relating to health services: CCA failed to discuss antiviral drug treatment plans or to evaluate and manage inmates with hepatitis, CCA failed to conduct HIV counseling and CCA failed to properly immunize diabetic inmates.  In addition, the report noted 11 other deficiencies relating to health services, one in correctional programs and one in safety and environmental health.

60.     On June 9, 2014, the BOP sent another Notice of Concern to CCA identifying more deficiencies with staffing levels.

61.    On March 13, 2015, the BOP sent a report of the contract facility monitoring conducted January 6-8, 2015.  The report identified one "significant finding"[5] and a "repeat deficiency."  The significant finding, relating to health services, was described in terms that made clear the grave implications of the Company's failures:

**SIGNIFICANT FINDING**

HEALTH SERVICES

Condition and Effect:

>    There were inadequate controls in the clinical care area of Health Services to ensure compliance with established procedures and practices.  These inadequacies created a lack of appropriate intervention, treatment and programs to promote a healthy, safe and secure environment. Additionally, corrective action plans in regard to mortality reviews were not completed as required.

Evidence:

1.    **Preventive care baseline evaluations were not completed in accordance with policy. This deficiency was identified in the previous monitoring, making it a repeat deficiency**.

>                    *        *        *

b.    A review was conducted of 10 inmate records to determine if prevention baseline visits were completed in accordance with the BOP CPG [Clinical Practice Guidelines], to include lab tests and studies.  Nine out of ten inmates did not receive preventive baseline evaluations in accordance with the BOP CPG.  Examples are referenced in working papers 6.9.20, pp 1-12.

c.    A Failure to complete preventive baseline evaluations within 60 days of arrival can lead to the discovery of more serious health concerns, as well as risk the spread of infectious diseases.

2.    **Review of records revealed management of five inmates prior to their death was not in accordance with policy and standards of care**.

>                    *        *        *

b.    A review of five mortality cases was completed.  The first case resulted in an incomplete examination and documentation to the inmate's record.  The second inmate developed cardiorespiratory arrest.  Medical management was not in accordance with policies and CPR protocols were not followed.  Documentation is incomplete, to include conflictive information on the timing of CPR and defibrillation, the date of death was incorrectly documented in the local mortality

---

[5]    According to the OIG's Review, a "significant finding" is the highest level of deficiency that can be issued in a Contract Facility Monitoring audit report.  This type of finding "generally consists of a series of related deficiencies that, taken together, constitute a failure of the program component.  A significant finding can also be caused by a single event that results in a systemic program failure."

- 18 -

report, and there were no memos submitted from staff who participated in the administration of CPR. The third inmate had influenza like symptoms. He was admitted to observation; however, physician's orders were ambiguous and documented treatment was very vague. The inmate developed cardiorespiratory arrest before the ambulance arrived to the institution. However, documentation in records is incomplete as to the time of death and series of events. The fourth inmate was morbidly obese and developed flu like symptoms. He was not isolated and received conservative treatment. He developed respiratory distress with a saturation as low as 47 percent. Physician orders were not accurate regarding maintaining oxygen saturation. Despite being high risk, the inmate did not receive a flu vaccine. There was a delay in identifying the severity of the inmate's condition. The fifth inmate had uncontrolled diabetes and he was not managed as per policy. Insulin treatment was not started timely and labs were not monitored regularly. Extremely elevated blood glucose levels were not properly treated with insulin. Inmate showed several signs of decompensation; however, symptoms were not identified and managed in a timely manner. Examples are referenced in working papers 6.9.19, pp 1-406.

c.      Inadequate medical management can cause decompensation of the inmate's medical condition, ultimately resulting in death. ***Corrective action and proper follow-up measures must be taken in order to avoid additional deaths***.

62.      On June 1, 2015, the BOP sent a letter regarding "Award Fee Determination" for the

Adams facility to Beasley. The letter reported:

> I have reviewed the recommendation of the Performance Evaluation Board (PEB) based upon the performance monitoring information and the self-assessment submitted by Corrections Corporation of America (CCA). After a thorough review of this information, it has been determined that ***the overall performance of the facility by the PEB is in the "Unsatisfactory" range*** for determining an award fee, and I concur with their assessment. Therefore, an award fee at this time is not warranted.
>
> Adams County Correctional Center received a significant finding in Health Services. The finding was for inadequate controls in the area of clinical care which included a repeat deficiency. There were thirteen other deficiencies in various disciplines in addition to nine Notices of Concerns (NOCs), which several were repetitive. Two were for lack of [redaction] and two were for failing to restrain inmates in SHU before opening the cell door. Other various NOC's include: inadequate [redaction]; untimely processing of treaty transfers; not maintaining Health Services staffing levels; failing to address concerns over use of a spit guard/mask during a calculated use of force; and for staff with expired NACI clearances assessing Sentry.
>
> Correctional Services continues to struggle with a high turnover rate for both correctional officers and supervisory correctional staff. The turnover rate and the high number of correctional staff with no prior corrections experience has been a challenge for the contractor.
>
> Another major concern has been the lack of bilingual staff members. This continues to be a problematic issue considering the majority of the inmate population is comprised of Mexican nationals.

- 19 -

63. Meanwhile, in May 2015, the OIG had begun an audit of CCA's compliance with the contract to house inmates in the Adams facility covering the period April 1, 2012 through March 31, 2015. According to the OIG, "[d]uring this audit, we provided our staffing findings to both the BOP and [CCA]," and CCA expressed objections to the OIG's staffing-related findings "in May 2016." CCA sent a letter to the OIG dated November 23, 2016, in which it provided extensive comments on the OIG's then-draft audit report.

64. On December 20, 2016, the OIG released the report on its audit of the Adams contract. The audit found that CCA's "execution of the contract's requirements did not fully accomplish the BOP's program goals in several respects." The audit report noted the May 2012 riot and the deficiencies cited in the BOP's after-action report. The audit report continued:

> Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing. In 19 of the 38 months following the riot, we found [CCA] staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage. Yet [CCA]'s monthly reports to the BOP, which were based on simple headcounts, showed that correctional staffing levels had improved in 36 of those 38 months. With regard to Spanish-speaking staff, while the BOP's post-riot after-action plan recommended adding to the contract minimum requirements for bilingual staff, we found that the BOP did not modify the contract to include this requirement until June 2015, subsequent to the start of our audit. Moreover, the contract modification does not define the level of speaking proficiency required and has no deadline or target date for compliance. As of July 2015, the facility's inmate population consisted of approximately 2,300 aliens, predominately Mexican-nationals, yet only 4 of 367 staff spoke fluent Spanish. By February 2016, [CCA] officials told us the number of fluent Spanish-speaking staff actually dropped to three people, and [CCA]'s January 2016 job announcements for correctional officers stated no preference for bilingual applicants. In addition, the BOP told us that it does not validate the contractor's staff for Spanish-speaking skills, and has not established any validation criteria for doing so.

> We also found lower qualification levels and significantly higher staffing turnover rates for Adams County correctional officers and believe these factors contributed to the facility's lack of experienced staff, which the BOP identified in its after-action report as a systemic problem in the area of safety and security at the facility. We reviewed [CCA]'s hiring practices and determined the facility employs correctional officers with qualifications that would have been insufficient for employment at BOP-managed institutions. For example, the BOP requires entry-level correctional officers to have either a 4-year college degree or equivalent work experience, while [CCA] does not require education beyond high school. Additionally, we found significantly higher turnover rates at the facility than those at comparable BOP institutions and believe it likely results from the substantially lower pay and benefits provided by [CCA]. We found [CCA] pays significantly lower wages and offers less time off than the BOP, and provides fewer career advancement opportunities. For example, the BOP pays entry-level correctional officers $18.69 per hour, 48 percent higher than the $12.60 per hour paid by [CCA]. The State of

- 20 -

Mississippi also offers its correctional officers more generous wages and paid time off than [CCA]. Furthermore, the BOP offers new correctional officers noncompetitive promotion potential to $26.91 an hour, while [CCA] pays correctional officers, throughout their careers, only the required prevailing wage rates set forth by the Department of Labor's Service Contract Act wage determinations. The BOP's contract with [CCA] does not address either correctional officer qualification requirements or staff pay and benefits. We believe the BOP should evaluate the extent to which employee qualification levels and turnover rates impact safety and security concerns, and whether its contractual terms should be modified to address those concerns.

*    *    *

We also found that, beginning in December 2012, [CCA] excluded from its required staffing reports the status of five critical health services positions identified in the approved staffing plan, namely two dentists, two physicians, and one advanced registered nurse practitioner. As a result, the BOP, which was not notified of and did not identify the change, was unable to assess the effect of any vacancies on service provision or invoice amounts. We believe that this gap in oversight had a negative effect on [CCA]'s ability to provide quality health care at the Adams County facility. In fact, we found that *between December 2012 and September 2015, the Adams County facility was staffed with only a single physician for 434 days (43 percent of the time) and a single dentist for 689 days (69 percent of the time), resulting in inmate-to-provider ratios that were about double those specified in BOP program statements*.

65.    The audit report also made clear that "the core issue of [its] staffing finding" was "the effect that these insufficient staffing levels have had on the safety and security of the Adams County facility. A 2005 analysis performed internally by the BOP found a direct relationship between staffing levels and institutional safety." The OIG reported that "[d]uring our review, five of the seven [CCA] correctional services staff we interviewed expressed concerns about the low staffing levels at the facility, and two of those five also expressed concerns for their own personal safety due to the low staffing levels." The audit report also revealed that CCA's actual staffing levels were even worse than reflected in the Notices of Concern because CCA had been reporting staffing based on total headcounts regardless of how much time each employee was actually on the job. Counting "full-time equivalent" staffing levels would have shown even lower staffing levels.

66.    With respect to the Adams facility's turnover rate, the OIG "found that the turnover rate at the Adams County facility was much higher than that of comparable BOP facilities." Importantly, the OIG explained that:

The high turnover rate at the Adams County facility is not a new problem. The BOP's after-action report for the May 2012 riot stressed the importance of staff continuity and noted that the BOP had previously cited the contractor's high turnover

- 21 -

rates in Oversight Facility Summary reports as far back as April 2011. Additionally, as recently as May 2016, [CCA] acknowledged to us that 48 percent of its employees at the Adams County facility had been employed for one year or less. As described below, we believe that the high turnover at Adams County is the result of inadequate retention efforts, including lower wages, fewer benefits, and a lack of advancement opportunities within the correctional officer occupation.

*　　　*　　　*

According to the BOP's oversight report for the period April 2014 through March 2015, the contractor has struggled with a significant number of correctional staff with no previous corrections experience and a high turnover rate for correctional officers. [CCA]'s technical proposal for the contract stated, "To help ensure that vacancies are filled in a timely manner, we use every available option to recruit qualified employees." While we acknowledge that the wage rates and benefits offered by [CCA] are permissible under the applicable Department of Labor wage determination for these positions, and although the Adams County contract does not require [CCA] to impose education or work experience requirements on prospective correctional officers, we believe and the BOP confirmed to us that the lack of contract provisions results in the contractor hiring correctional officers who would not be eligible for employment in BOP-managed facilities, paying them lower wage rates, and providing them with fewer benefits. We also believe that these conditions contribute to the contractor's inability to hire and retain the required number of correctional officers, and that they inhibit the contractor's ability to attract and retain qualified staff.

We believe that [CCA]'s inability to retain qualified correctional officers may have had a negative effect on the safety and security of the Adams County facility.

67.　　In addition to these issues, the OIG's August 2016 report also identified Adams as having the second-highest number of cell phone confiscations of the 14 contract prisons used by the BOP, with 983 cell phones having been found at the facility from fiscal year 2011 through fiscal year 2014. For comparison, the private facilities with the third-highest through the lowest numbers of cell phones found totaled 868 cell phones, and the 14 comparable BOP institutions collectively found only 400 cell phones.

**B.　　Cibola County Correctional Center**

68.　　CCA has owned and operated Cibola in Milan, New Mexico since 1994. CCA's contract with the BOP to operate the Cibola facility was scheduled to expire on September 30, 2016. On July 29, 2016, the BOP notified CCA that it had elected not to renew its contract at that facility, although it had not determined when it would begin transferring inmates out of the facility. As of April 2015, Cibola housed 1,178 inmates, most of whom were non-residents who had been sentenced for federal charges, and was classified as a low-security facility. Earlier in the Class

Period, in 2011 and 2012, Cibola was used exclusively as release site beds for the Institutional Hearing Program, which was a program designed to remove criminal aliens from the United States as soon as they got out of prison. As of 2015, the vast majority of inmates at Cibola were Mexican nationals, and 51% of the inmates had been convicted of illegal entry or reentry to the United States. Another 41.5% had been convicted of drug offenses. The median sentence at Cibola was only 18 months, and the median inmate spent only 113 days at the facility.

69. During and prior to the Class Period, CCA received numerous Notices of Concern detailing the poor quality of its operations at Cibola, including those leading to the death of an inmate.

70. On March 25, 2011, the BOP sent a Notice of Concern to CCA. The Notice stated that:

> [An inmate] was serving a sentence at the Cibola County Correctional Center and died December 17, 2010, as a result of Adenocarcinoma of the stomach with metastasis to lungs, adrenals, pericardium and abdominal lymph nodes, bilateral pleural effusions and cachexia.
>
> Following a review by our medical subject matter expert, it was determined that *the medical care provided in this case was not adequate*. Specifically, the doctor was not directly involved in the care of the inmate for several months despite a gradual deterioration of the inmate's condition since July 2010. When the doctor first evaluated the inmate on November 2, 2010, he did not address the respiratory symptoms in the assessment and plan. The doctor did not evaluate the inmate during his placement in observation from November 24, 2010 until December 3, 2010. Since he was not responding to treatment within the facility, he should have been sent to the hospital sooner for further evaluation and treatment. Although Biaxin, Rifampin and Ethambutol were ordered on November 19, 2010, MAR's indicates that they were not started until November 30, 2010. Regarding the contractor generated mortality review, it is stated that the inmate was followed closely by a physician and that his condition was stable when he was sent to the hospital. However, the medical record reflects the doctor evaluated him only a few times and the inmate was in respiratory distress when transferred to the hospital. In summary, the severity and deteriorating course of the inmate's condition required more direct involvement by the onsite doctor and an earlier referral for off-site care.

71. On April 25, 2012, the BOP sent to CCA a contract facility monitoring final report for monitoring that had been conducted at Cibola April 17-19, 2012. The report noted two repeat deficiencies. As an initial matter, it was

> noted that this institution has been without a physician for a year. The nurse practitioner and nurses are working without the clinical guidance of a physician. This situation can cause the nurse practitioner to work outside the scope of practice because she is making all the clinical decisions at the facility. When an off-site

- 23 -

physician recommends a medical treatment, she has no other choice but to accept it even if it is against policy because if she refuses to follow those recommendations, she will be countermanding a physician's order. Even though chronic care clinics have been conducted, they are in violation of local policy because it requires that a physician evaluates all patients in the chronic care clinics.

72. Unsurprisingly, given CCA's failure to staff a physician at the facility, the two repeat deficiencies related to health services, with inmates who arrived at the institution with positive results on the purified protein derivative ("PPD") skin test used to test for exposure to tuberculosis "not receiving follow-up and treatment as per policy" and with no physician "involved in the management and follow-up of off-site care (hospital and emergency room visits)." The report also cited 11 other health services-related deficiencies, as well as one about information systems and security and three on correctional programs.

73. Despite the notice, CCA did not address important health-related issues. On May 2, 2013, the BOP sent to CCA a contract facility monitoring final report for monitoring that had been conducted April 23-25, 2013. The report noted "one repeat repeat deficiency and three repeat deficiencies." The "repeat repeat deficiency" was that inmates who arrived at the institution with positive results on the PPD skin test were still "not receiving follow-up and treatment as per policy." In addition, the report noted two other "repeat deficiencies" relating to health services and one relating to correctional programs, as well as 14 other health services-related deficiencies, two other deficiencies in correctional programs, one in correctional services, one in education, two in food services, at least one in information systems and security and 18 in safety and environmental health.

74. Inadequate staffing continued to be a problem at Cibola. On May 22, 2013, the BOP sent a Notice of Concern to CCA, explaining that "[t]he staffing levels at the Cibola County Correctional Center were [inadequate] for the months of January-March, 2013." On August 6, 2013, the BOP sent CCA another Notice of Concern, stating, "[t]he staffing levels at the Cibola County Correctional Center were [inadequate for the] months of April-June, 2013. It should be noted that this is the second Notice of Concern issued this fiscal year regarding staffing levels in Correctional Services." On October 3, 2013, the BOP sent yet another Notice of Concern, saying, "[t]he staffing levels at the Cibola County Correctional Center were [inadequate] for the months of July-September, 2013. It should be noted that this is the third Notice of Concern issued this fiscal year regarding

- 24 -

staffing levels in Correctional Services."  On January 2, 2014, the BOP again sent a Notice of Concern, telling CCA that "[t]he staffing levels at the Cibola County Correctional Center were [inadequate] for the months of October-December, 2013.  It should be noted that this is the fourth Notice of Concern issued this fiscal year regarding staffing levels in Correctional Services."

75.     Having failed to maintain appropriate staffing levels for a single month in 2013, CCA did not remedy the problem.  On April 8, 2014, the BOP sent a Notice of Concern, stating, "[t]he staffing levels at the Cibola County Correctional Center were [inadequate] for the months of January-March, 2014."  On July 7, 2014, the BOP sent another Notice of Concern, stating, "[t]he staffing levels at the Cibola County Correctional Center were [inadequate] for the months of April-June, 2014."  On September 23, 2014, the BOP sent yet another Notice of Concern, notifying CCA that "[t]he staffing levels at the Cibola County Correctional Center were below the minimum staffing requirements of 90% in Correctional Services and 85% in Health Services for the months of July and August 2014."

76.     On May 5, 2014, the BOP sent CCA a contract facility monitoring final report for monitoring that had been conducted April 22-24, 2014.  The report identified "one significant finding, one repeat repeat repeat deficiency, two repeat repeat deficiencies, and ten repeat deficiencies."  The "significant finding" cited by the BOP was for health services and related to "Administration and Patient Care."  The BOP described the "Condition and Effect" as follows:

> There were inadequate controls in clinical care, administration and staffing of Health Services to ensure compliance with established procedures and practices. These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment.  Many issues from previous monitoring's [sic] have not been corrected.  Medical needs and documentation were incomplete, including reports.

77.     As evidence, the report listed the 13 repetitive deficiencies and 15 other deficiencies in health services.  The "repeat repeat repeat deficiency" was that inmates who arrived at the institution with positive results on the PPD skin test used to test for exposure to tuberculosis were *still* "not receiving follow-up and treatment as per policy."  The BOP listed the following causes:

  ·     Lack of knowledge and oversight of the Health Services department by responsible management staff.

- Lack of controls to ensure compliance with patient care, policy compliance, and proper administration of health records by the physician.

- The Health Services department is currently under staffed by three nurses. A new doctor was hired approximately two months ago, but he is still in new employees' training.

78.     Six months later, the BOP conducted another review to see whether CCA had addressed these important shortcomings. A Notice of Concern sent by the BOP to CCA on November 21, 2014 explained that the issues had not been remedied:

> The specific concerns are based on the recent Contract Facility Monitoring (CFM) Review, conducted October 21-23, 2014. The initial CFM Review was conducted in April 2014. The six month CFM follow-up in October 2014, demonstrated that the facility has not put an effective Plan of Action (POA) in place to address the serious issues in Health Services.

> The monitoring was a comprehensive examination of the Cibola County Correctional Center (CIB) Health Services Department, with attention given to the vital functions identified in the Performance Requirements Summary Table (PRST).

> This Notice of Concern is based on the following findings which were previously identified during the April 2014 CFM review;

**REPEAT REPEAT REPEAT REPEAT DEFICIENCY**

Inmates arriving at the institution with positive PPD's were not receiving follow-up and treatment as per policy. (CCA 13-63; P6190.03; BOP Clinical Practice Guidelines) 6.1.1

**REPEAT REPEAT REPEAT DEFICIENCY**

Health appraisals were not completed as per policy. (CCA 13-63; P6031.03; BOP Clinical Practice Guidelines) 6.3.4

**REPEAT REPEAT DEFICIENCY**

Treatment for HIV inmates is not completed in accordance with policy. (CCA 13-6; CCA 13-71; BOP Clinical Practice Guidelines for HIV; BOP National Formulary) 6.9.5

**REPEAT DEFICIENCIES**

Not all Medication Administration Records (MARS) are accurate. SOW; CCA 13-70; CCA 13-71) 6.9.14

Preventive care evaluations are not completed as per policy. (CCA 13-64) 6.9.20

**DEFICIENCIES**

Not all diabetic inmates were screened for microalbuminuria. (CCA 13-6; BOP Clinical Practice Guidelines) 6.9.2

Not all pages in medical records had inmate full name and register numbers. (CCA 13-58; P6090.03) 6.2.1

Not all errors in medical records were corrected as required by policy. (CCA 13-68; P6090.03) 6.2.1

Medical management prior to an inmate's death was not in accordance with policy. (SOW; CCA 13-34) 6.9.19

79.    On January 9, 2015, the BOP sent a "Cure Notice"[6] to CCA addressed to Natasha K. Metcalf, the VP of Partnership Development, at the Company's headquarters in Nashville. The Cure Notice stated:

**CURE NOTICE**

CCA is notified that the Government considers the failure to perform in the area of Health Services a condition that is endangering performance of the contract. The government will utilize the CFM scheduled for April 21, 2015 through April 23, 2015 to aid the government in determining if the non-conformance has been cured. Therefore, unless the conditions are cured by April 21, 2015 the Government may terminate this contract under the terms and conditions of FAR 52.249-8 Default.

The Cibola County Correctional Center has ***numerous and repetitive items of critical non-conformance in the area of Health Services***, specifically, Patient Care, and include the following:

1.    **Inmates arriving at the institution with positive PPDs, are not receiving follow-up and treatment as per policy.    (CCA 13-63; P6190-03; BOP Clinical Practice Guidelines**).

*        *        *

·    A review of 10 medical records of inmates arriving at the institution with positive or converted PPDs revealed that in four cases, the proper clinical follow-up was not completed.   Clearance for general population and appropriate therapy were not always completed per policy.   Examples are referenced in working papers 6.1.1 pp 1-115.

·    This deficiency was identified in the four previous reviews, resulting in a four time repeat deficiency.

·    There continues to be significant, repeat deficits in the treatment of active TB, positive TB conversion, and TB treatment, which can jeopardize inmate and staff health.   In the May 2011 CFM review, 4 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician and 1 of 10

---

[6]    According to the OIG's Review, a "cure notice" may be issued in cases of "numerous 'repeat repeat' or significant deficiencies that go uncorrected over time, . . . to indicate to the contractor that the BOP may terminate the contract if the problem is not corrected." According to one privatization field manager, these notices mean that "the BOP is on the brink of ending the contract."   As a technical matter, Federal Acquisition Regulation 49.607 specifies that a cure notice is required when a contract is to be terminated for default before the delivery date.

inmates did not receive HIV testing. In the April 2012 review, 9 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician and 2 of 10 inmates did not receive X-Ray testing after converting to a positive PPD. In the April 2013 review, 4 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician. In the April 2014 CFM review and six month follow-up review conducted October 2014, 4 of 10 inmates did not receive appropriate follow-up and/or treatment by the physician.

2. **Health appraisals are not completed as per policy**.

\* \* \*

- This deficiency was identified in the three previous reviews, resulting in a three time repeat deficiency.

- The review of 10 files revealed that 4 health appraisals were not completed within the required time frame of 14 days of arrival to the facility. Examples are referenced in working papers 6.3.4 pp 1-41.

- Failure to complete health appraisals within the timeframes required can significantly jeopardize inmate and staff health. In the April 2012 CFM review, 7 of 10 newly committed inmates did not have health appraisals completed within 14 days. In the April 2013 review, 3 of 10 newly committed inmates did not have health appraisal completed within 14 days. In the April 2014 review, 7 of 10 newly committed inmates did not have health appraisals completed within 14 days. In the October 2014 follow-up review, 4 of 10 newly committed inmates did not have health appraisal completed within 14 days.

\* \* \*

3. **Treatment for HIV inmates is not completed in accordance with policy**.

\* \* \*

- This deficiency was identified in the two previous reviews, making it a two time repeat deficiency.

- A review of four records of inmates with HIV revealed that in three cases treatment was not in accordance with policy. Examples are referenced in working papers 6.9.5 pp 1-56.

\* \* \*

4. **Not all Medication Administration Records (MAR) are accurate**.

\* \* \*

- This deficiency was identified in a previous review, making it a repeat deficiency.

\* \* \*

5.   **Preventive care evaluations are not completed as per policy**.

                    *        *        *

·    This deficiency was identified in a previous review, making it a repeat deficiency.

·    A random review of 10 inmate records revealed 7 of 10 cases where the prevention baseline evaluations were not completed in accordance with policy. Examples are referenced in working papers 6.9.20 pp.1-22.

                    *        *        *

6.   **Documentation in HIV health records is poor**.

                    *        *        *

·    These discrepancies can jeopardize inmate health care by not clearly providing accurate and complete information to staff and community health care providers.

7.   **Medical management prior to an inmate's death was not in accordance with policy**.

                    *        *        *

·    There was one death at Cibola since the previous CFM monitoring. In this case, emergency medical care prior to an inmate's death was not provided by on-site medical staff as required by policy. Several issues in the medical management of this inmate were identified: (1) the response time by medical staff was not documented. It is not known at what time medical staff arrived at scene. It is essential that medical staff arrive within four minutes in order to perform life saving measures; (2) the only medical staff on duty left the scene during CPR and did not return. She should have remained at the scene during the CPR administration. (3) the on-site nurse did not start an IV access. An IV access was started by EMS personnel 26 minutes after CPR was started. Earlier placement of an IV access by onsite nurse would have facilitated earlier administration of emergency medications; (4) documentation is not specific in regard to what the inmate was doing prior to the incident, *e.g.*, assaulted, or engaged in physical activity; (5) the names of the officers who provided CPR are not documented, and they did not provide memos of their participation in the CPR. Examples are referenced in working papers 6.9.19 pp.1-22.

·    Early intervention is crucial in the management of cardiac arrest cases. In addition to saving the subject inmate's life, it is vital that the inmate population believe competent emergency medical care will be provided to them when necessary.

                    *        *        *

     Failure to provide proper healthcare in accordance with the contract requirements can seriously jeopardize inmate, staff, and public health. The failure of CCA in correcting the deficiencies, some of which have been noted deficient back to

2011 are cause for the Federal Bureau of Prisons to issue this Cure Notice, and is considered appropriate at this time.

Unless these conditions are cured by April 21, 2015 **the Government is considering a termination for default of this contract** under the terms and conditions of FAR 52.249-8 Default. CCA must notify the BOP of how it plans to address these performance issues by January 19, 2015.

80.     On April 6, 2015, the BOP sent another Notice of Concern CCA, again telling CCA that "[t]he staffing levels at the Cibola County Correctional Center were [inadequate] for the months of January through March of 2015."

81.     On June 2, 2015, the BOP sent to CCA a facility monitoring final report for monitoring conducted April 21-23, 2015. Although the BOP did not proceed with early termination of the Cibola contract at this time, as it had warned it might do, the report noted one "repeat deficiency" in health services and one in information security, as well as another eight deficiencies in health services, another one in information security, one in human resources and two in safety and environmental health. The repeat deficiency in health services was that:

**2.     Medical management of an inmate's condition resulting in death was not in accordance with policy and standards of care. This deficiency was identified in the previous monitoring, making it a repeat deficiency.**

\*     \*     \*

b.     A review of the medical record pertaining to inmate #30360-408 revealed that CCA policy was not followed with regard to intake screening for prior and existing mental illness and suicidal tendency. ***The inmate's record revealed that he was placed on suicide watch at his previous facility less than a month prior to his arrival at Cibola County Correctional Center***. Upon the inmate's arrival at Cibola, intake screening was conducted by a nurse on March 6, 2015. However, ***the nurse did not make note of the inmate's recent suicidal history, nor did she refer the inmate for mental health treatment***. On March 12, 2015, a referral to mental health was requested by the nurse practitioner.

Between March 12 and March 18, 2015, there was no clinical intervention noted within the inmate's medical record.

***On March 18, 2015, the inmate was found hanging by his neck within his cell***. CPR was initiated, however, the oxygen delivery was not adequate (only 2 liters/minute), and therefore did not meet community standards. Emergency Medical Services (EMS) staff arrived at the scene and pronounced the inmate deceased. Supporting documentation is referenced in working papers 6.9.19, pp 1-36.

This incident is a repeat deficiency because, during the Contract Facility Monitoring conducted October 2014, it was determined that the medical management of inmate # 52109-080, which also resulted in death, was not in accordance with policy and standards of care, and constituted a deficiency. In that case, the inmate

was found unresponsive; during review it was revealed intravenous (IV) access was not started timely by institution staff, as was required. Instead, EMS personnel began the IV access 26 minutes after CPR began. Supporting documentation is referenced in working papers 6.9.19, pp 1-22, October 23, 2014.

c.     Proper mental health evaluations ensure staff are aware of mental health conditions experienced by an inmate which alert staff to the need for clinical intervention.

82.     Among the eight other health services deficiencies, the BOP reported several deficiencies with potentially dire consequences. First, it noted failures to manage diabetic inmates in accordance with policy and ensure appropriate management, which "can lead to serious consequences, such as organ failure or death." Second, it reported failure to diagnose, manage and follow up on inmates in the oncology clinics in a timely manner, which led to delay in treatment for multiple inmates who developed cancer, and which the BOP noted "can lead to interruption in diagnosis and management, thus leading to serious conditions or death." Third, the BOP reported that CCA failed to conduct initial psychological assessments by licensed mental health professionals of inmates housed in the Special Housing Unit at least every 30 days, as required by BOP policy, which the BOP noted "can lead to successful suicides." The BOP also noted that CCA failed to evaluate or follow up on risk of sexual abusiveness and sexual victimization within 14 days of arrival at the facility, as required by BOP policy. The BOP noted that this evaluation and follow-up is important to "prevent inmate sexual assault."

83.     Also, as a human resources deficiency, the BOP reported that two members of the facility's full-time medical staff had not received discipline-specific training required under the Prison Rape Elimination Act ("PREA"). As a result, "medical staff may not detect and assess signs of sexual abuse and harassment."

84.     On August 4, 2015, the BOP sent a letter regarding "Award Fee Determination" to Beasley relating to the period July 1, 2014 to June 30, 2015. The letter reported:

> I have reviewed the recommendation of the Performance Evaluation Board based upon the performance monitoring information and the self-assessment submitted by Corrections Corporation of America (CCA). After a thorough review of this information, ***CCA received an overall rating of unsatisfactory***. Therefore, an award fee will not be authorized for the aforementioned performance period.

85.     Although the August 4 letter acknowledged that the BOP had opted to lift the Cure Notice on May 18, 2015, it also stressed that CCA's performance was still "considered less than acceptable as they improved their Health Services operation only after a Cure Notice was issued."

86.     Of course, when they received the 2014 and 2015 Notices of Concern, audit reports, cure notice and negative fee determination, CCA and the Individual Defendants were well aware that the contract with the BOP for the Cibola facility was due to expire on September 30, 2016, as they reported in the 2014 and 2015 annual reports filed with the SEC. Given the numerous serious violations described above and CCA's repeated failure to address concerns that were raised by the BOP, it cannot have come as a surprise to defendants when, on July 29, 2016, the BOP elected not to renew its contract with CCA to manage the Cibola facility.

## C.     Eden Detention Center

87.     CCA has owned and operated Eden in Eden, Texas, since 1995. CCA's contract with the BOP to operate the Eden facility currently expires in April 2017. As of the end of fiscal year 2014, the prison housed an average of 1,458 inmates daily. At the time of the OIG's review, the staff-to-inmate ratio was 1:6, and the Correctional Officer ratio was 1:9. Eden is classified as a low security facility. As of June 27, 2015, 41% of the inmates at Eden were being held for illegal entry or reentry offenses, while 49% of inmates were being held for drug-related offenses.

88.     The Review by the OIG found numerous significant deficiencies at Eden during the Class Period, including pervasive failures to ensure "basic inmate healthcare" and "a lack of appropriate intervention, treatment and programs to promote a healthy, safe and secure environment":

> During our site visit to [Eden], we learned there was no full-time physician, as required by its approved staffing plan, for the 8-month period between December 2013 and August 2014. The dentist position was also vacant for approximately 6 weeks during this time. We found that despite these vacancies, which we believe are critical for ensuring basic inmate healthcare, the onsite monitor's checklists showed that the prison was in compliance with all health services observation steps. However, the BOP's annual CFM review at this prison in August 2014 resulted in a significant adverse finding in health services, with 11 deficiencies in administration and patient care, including 6 repeat deficiencies from the previous year. The CFM results stated:
>
> > There were inadequate controls in the clinical care and staffing area of Health Services to ensure compliance with established procedures and practices.

These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. Many issues from previous [monitoring] have not been corrected. Medical needs and documentation were incomplete, including reports.

Specific health services deficiencies cited in the CFM review included failing to provide prescribed antiviral therapy for inmates with hepatitis C, not following up with inmates with positive tuberculosis test results, missing preventive care evaluations and dental exams, and failing to provide some immunizations.

89. The August 2014 contract facility monitoring report described in the Review, in explaining the "significant finding" quoted above, cited one repeat repeat repeat deficiency, that inmates arriving with positive PPD results were "not receiving follow-up and treatment as per policy"; one repeat repeat deficiency, that "[h]ealth appraisals were not conducted as per policy"; eight repeat deficiencies; and seven deficiencies, as evidence supporting this significant finding in health services. The Review also cited a repeat deficiency in safety and environmental health.

90. On April 9, 2015, the BOP sent to CCA a contract facility monitoring follow-up report, following up on the significant finding in health services described above. The report stated: "Based on the follow-up monitoring, the course of action taken in specific areas proved to be ***inadequate to prevent recurrence***. One repeat deficiency was not corrected, resulting in a two time repeat deficiency. In addition, eight new deficiencies were identified during this follow-up monitoring." The uncorrected repeat deficiency had the gravest of consequences:

1. Medical management of an inmate's condition prior to his death was not in accordance with policies. This deficiency was identified in the two previous reviews, making it a two time repeat deficiency.

\*  \*  \*

b. A review of the mortality case revealed that an inmate arrived at Eden Detention Center (EDN) with positive Purified Protein Derivative (PPD). ***This inmate was not seen by a physician***; instead, he was evaluated by a physician assistant who ordered treatment for latent TB and enrolled him in chronic care clinics. Follow up in clinics were not conducted. The nurses administered 78 doses of INH instead of the 48 doses as ordered by the physician assistant (i.e., nurses did not follow orders). On two occasions, this inmate developed lesions that could have been suggestive of side effect of INH. However, ***it was not investigated and the inmate was not evaluated by a physician***. After 8 months of therapy the inmate became visibly sick with yellow skin and other signs suggestive of active hepatitis, but he was not isolated. Labs were not ordered as "stat" (i.e., immediately). Three days later, the lab reports revealed severe abnormalities and he was sent to the hospital. He was diagnosed with hepatitis. He was treated and released to EDN. Two days later he was sent back to the hospital due to decompensation. ***He developed brain death and eventually pronounced dead*** on October 10, 2014. ***This deficiency was observed in the 2013,***

*2014, and 6-month follow-up monitoring*. Documentation is referenced in working papers 6.9.19, pp 1-91.

c. The inmate *was not evaluated by a physician as required by policy*. Evaluation by a physician in clinics would have allowed earlier identification of signs and symptoms of hepatitis and earlier medical management. The inmate was not isolated, which could have exposed other inmates to acute hepatitis. Labs should have been ordered stat when inmate presented jaundice and scleral icterus. The delay in obtaining labs resulted in delayed treatment. In addition, the nurses did not follow the provider's orders and administered more medications than what was ordered. The excess doses of medications could have predisposed the inmate to side effects and eventually hepatitis.

91.     Among the eight other deficiencies listed, the BOP noted poor management of inmates with diabetes, which "can cause many health complications, such as non-healing ulcers, loss of vision, and organ failure, such as kidney failure, and can eventually cause the death of the patient"; improper medical management of one inmate with HIV, which could have led to an "[o]pportunistic infection" which in turn "can cause the death of inmates"; improper management of an inmate with HIV, Hepatitis C, Syphilis, and latent tuberculosis, who had not received any treatment or in-clinic evaluation despite having been diagnosed months earlier, and presumably would not have received such treatment or evaluation if the BOP examiner had not identified the issue—the BOP noted that "[l]ack of medical management of this case could have caused the inmate's death."

92.     Numerous Notices of Concern sent to Eden by the BOP during the Class Period show similar deficiencies and contractual violations.[7]  On August 23, 2012, the BOP sent Eden a Notice of Concern finding that Eden "failed to maintain the minimum 85% staffing requirement in Health Services the month of May 2012."  The Notice of Concern went on to say that Eden's "efforts to resolve the issue have met with negative results.  Additionally, the facility failed to meet the minimum 85% staffing requirement for the months of June 2012, July 2012, and August 2012."

93.     On October 1, 2014, the BOP sent Eden a Notice of Concern finding that Eden "failed to maintain the minimum 85% staffing requirement in Health Services for the month of September, 2014."  The Notice of Concern went on to say that Eden's "efforts to resolve the issue have fallen

---

[7]     CCA also received numerous pre-Class Period Notices of Concern that are not discussed in detail here.

1242260_1

short," and that "the facility failed to meet minimum 85% staffing requirement for the month of August, 2014" as well.

94.     On December 10, 2014, the BOP sent Eden a Notice of Concern finding that Eden "failed to maintain the minimum 85% staffing requirement in Health Services for the month of November, 2014." The Notice of Concern went on to say that Eden's "efforts to resolve the issue have fallen short" and that "the facility failed to meet the minimum 85% staffing requirement for the months of August, September and October, 2014." In addition, "the facility failed to maintain the minimum 90% staffing requirement in Security for the month of November, 2014," as well as "July, August, September and October, 2014."

95.     These deficiencies continued unabated. On March 11, 2015, the BOP sent Eden a Notice of Concern finding that Eden:

> [F]ailed to maintain the minimum 85% staffing requirement in Health Services for the months of January and February, 2015. Additionally, the facility failed to meet the minimum 85% staffing requirement in Health Services for the months of August, September, October, November, and December 2014. Furthermore, the facility failed to maintain the minimum 90% staffing requirement in Security for the months of January and February, 2015. Additionally, the facility failed to meet the minimum 90% staffing requirement for the months of July, August, September, October, November, and December, 2014. Finally, the facility failed to meet the 85% staffing requirement in the all other category during the month of February, 2015. The facility's efforts to resolve the issue have fallen short.[8]

96.     In addition to failing to provide necessary health care and adequate staffing levels during the Class Period, the BOP found numerous other contractual violations and serious quality of care deficiencies at Eden during the Class Period.

97.     On May 29, 2012, the BOP sent Eden a Notice of Concern regarding non-conformance with Eden's contract with the BOP. Specifically, staff at Eden were required to prepare an incident report and enter the incident report into SENTRY[9] whenever they "witness or

---

[8]     A December 2014 Oversight Checklist also reported that the Health Services Department at Eden was "greatly understaffed."

[9]     According to the BOP, "SENTRY is a real-time information system consisting of various applications for processing sensitive but unclassified (SBU) inmate information and for property management. Data collected and stored in the system includes information relating to the care, classification, subsistence, protection, discipline, and programs of federal inmates. SENTRY was

reasonably believe that a violation of Bureau regulations has been committed." However, the BOP's review found that Eden staff routinely failed to comply with these requirements:

> A review of reportable inmate incidents (fights, use of force, and assaults) over the previous six month period revealed the contractor failed to initiate inmate discipline in over 50% of incidents.

The following list which is not all inclusive identifies examples of deficiencies:

- Multiple inmates fighting, without all parties to the fight receiving discipline.

- Incident reports written, without being entered into SENTRY.

- SIS concluded an investigation finding inmates were not fighting, although the incident was observed by staff.

- Incident reports not initiated and/or annotated on the (583/586) report.

- Requests for separation following an incident without incident reports initiated.

- SIS investigations concluded prohibited acts occurred without incident reports initiated.

- Only 49% of suspects who were actively involved in incidents of violence received an incident report.

98.     Less than two months later, on July 19, 2012, the BOP sent Eden another Notice of Concern, this time regarding deficiencies related to the use of force which BOP oversight staff had determined to be "systemic in nature." As the BOP stated:

> An AD-Hoc review was Conducted of Uses of Force at the Eden Detention Center from February 17, 2012, thru June 26, 2012. A comparison between contractor after action reviews and reviews of oversight staff revealed the following:

- Supervisor actively participated in the Use of Force.

- Briefing/debriefing were not conducted or conducted improperly on numerous occasions.

- Unprofessional conduct (staff cursing).

- No medical assessments or restraint checks conducted on numerous occasions.

- No confrontation avoidance conducted.

- No justification given for authorization of chemical agents.

---

developed and implemented in 1981 and continues to be updated to reflect new requirements. SENTRY has also been modernized to take advantage of web-based technologies."

As prescribed in the Statement of Work the contractor is to adhere to the requirements outlined in BOP P.S. 5566.06. The deficiencies outlined above are clearly delineated in the policy. Oversight staff have determined the above listed deficiencies to be systemic in nature and the contractor failed to take sufficient corrective action.

99. On May 4, 2015, the BOP sent Eden another Notice of Concern, this time reporting that Eden personnel had apparently attempted to hack into a BOP-related server and alter the security settings in what the BOP described as a "significant security violation." The BOP noted that "the severity of such an attempted breach of network security protocols cannot be [overstated], as the potential impact could have devastating results system wide."

100. Consistent with the OIG's findings, monthly Large Secure Adult Contract Oversight Checklists ("Oversight Checklists") during the Class Period also reported that Eden failed to provide adequate programming for inmates, noting that there were "still significant numbers of inmates who have neither work nor education assignments."[10] These findings were reported in Oversight Checklists almost every month between February 2013 and December 2013, as well as between June 2014 and September 2014.

101. Further, as found by the OIG, Eden also violated ACA and BOP policies during the Class Period by housing all newly received inmates in administrative segregation (the "Special Housing Unit" or "SHU") due to a lack of available bed space. According to the OIG, "[t]he placement of general population inmates in the SHU due to lack of bed space is inconsistent with the ACA standard that states that an inmate may be placed in administrative segregation if the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or the security or orderly running of the institution." Such conduct is also "inconsistent with parallel BOP policies, which explicitly state that 'when placed in the SHU, you [an inmate] are

---

[10] An Oversight Checklist contains approximately 70 observation steps relating to the eight operational areas, which BOP onsite monitors must observe and document every month. Onsite monitors at each contract prison document their observations on the checklist and rate each operational area as "compliant" or "non-compliant." However, the Oversight Checklists do not include numerous "important BOP policy and contract requirements in the areas of health services and correctional services."

- 37 -

either in administrative detention status or disciplinary segregation status.'"[11] CCA acknowledged that these "inmates had not engaged in any conduct that warranted their placement in the SHU."

102.     A report by the American Civil Liberties Union (the "ACLU") entitled "Warehoused and Forgotten" corroborates these findings and adds still more. After having been stonewalled repeatedly in their attempts to meet with inmates at Eden and having privileged legal mail intercepted and read by Eden staff, the ACLU visited Eden twice, in 2011 and January 2014, meeting with numerous inmates and receiving first-hand accounts of their experiences. The ACLU's report contains disturbing details regarding the mistreatment of inmates at Eden and deficiencies in the care provided by CCA.

103.     First, the ACLU found that CCA staff at Eden interfered with prisoners' access to counsel and sent them to the SHU for complaining or helping other inmates file grievances or lawsuits. Inmates reported being sent to the SHU for trying to "help a new prisoner get oriented" and "help[ing] another prisoner file a motion to reduce his sentence." Inmates also faced resistance from CCA staff when "trying to arrange for unmonitored attorney visits" or trying to "arrange unmonitored legal calls." The ACLU also reported that staff at Eden opened legal mail in violation of BOP policy and "read privileged communications." A warden, Keith Hall, who denied the ACLU space for confidential interviews in 2011 and "stonewalled [the ACLU's] 2013 visit was subsequently promoted by CCA to a managing director position," overseeing all of CCA's BOP facilities.

104.     Second, the ACLU reported that 10% of Eden's "contract beds" were required to be used for isolated confinement and that Eden filled up these beds at rates far higher than BOP-run facilities. CCA would cram three or four inmates into an SHU cell designed to hold no more than two people. These small rooms contain a metal door with a tray slot for food, a tinted window with no view to the outside and a toilet that sometimes lacks toilet paper. Inmates are confined in these

---

[11]     Separately, a June 10, 2014 Notice of Concern reported "systemic" deficiencies and failures of "quality control procedures" regarding the monitoring and control of inmates in the SHU, while noting that "[p]hysical accountability of inmates is a primary function of institution operations." A separate May 2014 Oversight Checklist reported "[n]umerous concerns" regarding SHU operations almost every day during a week-long observation.

cells for 23 hours a day with one hour of outdoor recreation per day. Showers are not offered every day; and when they are offered, it was reported to be at 1:00 a.m.

105.    Third, CCA kept Eden overcrowded, housing as much as 115% of the prison's originally contracted capacity, with inmates living in squalid conditions. Inmates reported beds lining the halls of the facility and beds in dormitories packed so tightly you "'can reach out and touch the bunk next to you.'" Inmates reported that "the smell of urine and feces often permeates the rooms," with an inmate stating, "'I sleep next to the bathroom so it's like I'm sleeping in the toilet. I feel like my head is in the toilet.'" Mice, cockroaches and even a scorpion contribute to the unsanitary conditions at Eden, with inmates contending that such conditions led to scabies outbreaks.

106.    Fourth, inmates at Eden were exposed to drinking water that "contained unacceptable levels of radioactive contamination that exceeded the maximum contaminant level" allowed by the U.S. Environmental Protection Agency, potentially causing an "'increased risk of getting cancer.'" While signs at Eden warned inmates not to drink the water, "the only alternative was for prisoners to buy bottled water through the prison commissary" at 80 cents per bottle.

107.    Fifth, the ACLU reported that Eden routinely failed to provide adequate medical care to inmates. Dental care was reportedly limited to tooth extractions; many ailments were only treated with ibuprofen; and medical staff responsible for triaging requests for medical assistance only spoke English, resulting in difficulty for Spanish-speaking inmates to receive care. Numerous inmates reported having to wait days or weeks to refill prescriptions, inmates with hernias reported being denied medical treatment and diabetic inmates reported inadequate accommodations for their condition.

### D.    McRae Correctional Facility

108.    CCA has owned and operated McRae in McRae, Georgia since 2000. CCA's contract with the BOP to operate Eden currently expires in November 2018. As of June 27, 2015, the prison housed 2,066 inmates. As of June 27, 2015, 20% of the inmates at McRae were being held for illegal entry or reentry offenses, while 61% of inmates were being held for drug-related offenses.

109.    The Review by the OIG found that of all BOP facilities, both private and government managed, McRae had the highest rate of inmate suicide attempts and self-mutilations, the second-

highest rate of positive drug tests and the third-highest rates of cell phones found and inmate grievances between fiscal year 2011 and fiscal year 2014. Further, of the three private prison operators, CCA facilities had the highest rate of suicide attempts and self-mutilations (37.5% higher than BOP facilities).

110.    In an August 8, 2011, letter from the ACLU to the BOP, the ACLU documented repeated violations of constitutional and BOP standards regarding the treatment of inmates at McRae.

111.    First, the ACLU reported that McRae violated BOP Program Standards related to placing inmates in the SHU. The ACLU found that inmates were placed in the SHU without being given a timely notification of the reason for placement, sometimes waiting months for a notification or a hearing to be provided in violation of Program Statement P5270.09/P5270.10. Similar to the conduct reported at Eden, McRae staff engaged in "capricious or retaliatory" disciplinary action in violation of 28 C.F.R. §541.1 and BOP Program Statement P5270.09 by placing inmates in the SHU for filing grievance reports against the facility, providing legal assistant to other inmates or both.

112.    Second, the ACLU reported indifference to inmates' medical needs by McRae staff, in violation of Eighth Amendment protections, as well as BOP Program Standards, specifically P6031.01. The ACLU letter included the following examples: (i) an inmate being arbitrarily taken off epilepsy medication, suffering seizures and subsequently being given less medication than the hospital doctor demanded; (ii) an inmate being diagnosed with a hernia and recommended for surgery, only to have his request for surgery denied for months until finally receiving treatment after numerous complaints; and (iii) inmates suffering from food poisoning who had to wait almost a week for treatment.

113.    Third, the ACLU reported that, based in part on memoranda obtained from McRae employees, McRae failed to comply with BOP Program Statements regarding the Institution Hearing Program, needlessly increasing an inmate's time in custody, "imposing an additional penalty on the inmate and increasing federal government's detention costs, but ensuring continued financial benefit for CCA."

- 40 -

114. Numerous Notices of Concern sent to McRae by the BOP during the Class Period also show repeated deficiencies and contractual violations, including: (i) Notices for failure to secure sensitive non-public information in February 2011, May 2012 and June 2012; and (ii) Notices for failure to properly secure and release inmates in the SHU in August 2013.

## VII. Defendants Made Numerous Fraudulent Statements and Omissions During the Class Period

115. During the Class Period, defendants materially misled investors, thereby inflating the price of CCA securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements not false and misleading.

116. First, defendants made numerous materially false and misleading statements and omissions regarding the quality and performance of their facilities and operations. As set forth herein, defendants asserted: (i) that "the quality of [CCA's] operations" was an important reason for the renewal of its contracts with government entities, including the BOP; (ii) that providing "quality corrections services" was their "primary business strategy"; and (iii) that CCA's facilities were operated in accordance with all facility-specific policies and contractual requirements. These statements were materially and objectively false and misleading because defendants failed to disclose and omitted to state that CCA's CAR facilities were not high quality, their services were poor and they consistently violated BOP policies and contractual requirements with often dire and deadly consequences. As the Review by the OIG concluded, and as described above, CCA's CAR facilities, "in most key areas, . . . incurred more safety and security incidents per capita than comparable BOP institutions" and were cited for multiple "safety and security related deficiencies" because of policy violations that "affect[ed] the quality of service provided under the contract," some of which were "serious or systemic in nature." Indeed, throughout the Class Period, CCA was constantly found to have been in violation of its basic contractual obligations.

117. Second, defendants made numerous materially false and misleading statements and omissions regarding the cost savings associated with their facilities. As set forth herein, defendants asserted that cost savings and "efficiencies" were a critical component of their ability to attract and retain their government contracts and the Company's long-term growth. These statements were

- 41 -

materially false and misleading because they failed to disclose and omitted to state that CCA's CAR facilities did not result in any significant cost savings to the BOP, undermining a critical rationale for their utility. Instead, as the Review by the OIG concluded and other sources have shown, costs are comparable, at best, with BOP facilities; and any savings result not from "efficiencies" but from understaffing and hiring underqualified staff, thus contributing to the serious safety and security issues at these facilities.

## A. Misstatements and Omissions in Quarterly and Annual Reports

118. Throughout the Class Period, CCA issued numerous quarterly reports and annual reports, as described below. From the beginning of the Class Period to May 1, 2014, each annual and quarterly report was signed by Hininger and Mullenger and contained the Sarbanes-Oxley Act of 2002 ("SOX") certifications also signed by Hininger and Mullenger. From May 1, 2014 through the end of the Class Period, each annual and quarterly report was signed by Hininger and Garfinkle and contained SOX certifications also signed by Hininger and Garfinkle. Each of these certifications falsely stated, among other things, that the undersigned had reviewed the SEC Form 10-Q or SEC Form 10-K and that the form contained no materially untrue statements or omissions, fairly represented in all material respects the financial condition of CCA, was accurate in all material respects and disclosed any material changes to the Company's internal control over financial reporting.

119. On February 27, 2012, CCA filed with the SEC its 2011 annual report on Form 10-K for the fiscal year ended December 31, 2011 ("2011 Annual Report").

120. CCA's 2011 Annual Report falsely represented that "Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities." Substantially similar versions of this misleading statement were repeated by defendants in all subsequent annual reports in the Class Period, filed with the SEC on Form 10-K ("annual reports") on February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016.

121.    The statements in ¶119-120 above were materially false and misleading because, as described herein, CCA did not provide quality corrections services or provide a compelling value to its customers.

122.    The 2011 Annual Report also falsely represented that "[w]e believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."  Defendants repeated the same statement in CCA's 2012 through 2015 annual reports filed on February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016.[12]

123.    In addition, CCA's 2011 Annual Report misleadingly stated:

> Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase.  We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue.  Our competitive cost structure offers prospective customers a compelling option for incarceration.

124.    CCA repeated this identical false statement in its 2012 annual report for the year ended December 31, 2012 filed on February 27, 2013 ("2012 Annual Report").  CCA's 2013 through 2015 annual reports filed on February 27, 2014, February 25, 2015 and February 25, 2016 repeated slightly modified but substantially similar versions of the same false statement.

125.    The statements in ¶¶122-124 above were materially false and misleading because, as described herein, CCA did not offer a cost-effective alternative or competitive cost structure to its government partners or reduce correctional services costs.

126.    CCA's 2011 Annual Report also falsely represented that:

> We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services.

---

[12]    In case there was any doubt as to whom CCA was comparing its costs and services when describing them as "competitive," "cost-effective" and as reflecting "compelling value," CCA went on to explain in its 2011 Annual Report that "[w]e compete with government entities and other private operators on the basis of bed availability, cost, quality, and range of services offered, experience in managing facilities and reputation of management and personnel."  CCA repeated this identical statement in its 2012 Annual Report and made a substantially similar statement in its 2013, 2014 and 2015 annual reports, filed on February 27, 2014, February 25, 2015 and February 25, 2016.

We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system.

127. CCA repeated substantially the same false statement in its 2012 through 2015 annual reports filed on February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016. The 2011 through 2014 annual reports filed on February 27, 2012, February 27, 2013, February 27, 2014 and February 25, 2015 also went on to say: "We believe these advantages translate into significant cost savings for government agencies."

128. The statements in ¶¶126-127 above were materially false and misleading because, as described herein, CCA did not allow governments to control correctional costs while improving correctional services and quality, nor did defendants believe as much because of the adverse material facts known or recklessly disregarded by defendants and concealed from investors.

129. The 2011 Annual Report also falsely represented that:

We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry.

130. CCA made identical false statements in its 2012 and 2013 annual reports filed on February 27, 2013 and February 27, 2014, and in its quarterly reports filed on Form 10-Q with the SEC ("quarterly reports") on May 7, 2012, August 9, 2012, November 8, 2012, May 9, 2013, August 8, 2013 and November 7, 2013. CCA made slightly modified, but substantively identical, statements in its quarterly reports filed on May 8, 2014, August 7, 2014, November 5, 2014, May 7, 2015, August 6, 2015, November 5, 2015, May 5, 2016 and August 4, 2016, and its 2014 and 2015 annual reports filed on February 25, 2015 and February 25, 2016.

131. The statements in ¶¶129-130 above were materially false and misleading because, as described herein, CCA did not provide efficiency or savings opportunities to its government partners. CCA also did not provide solutions to the correctional needs of its government partners while helping them manage their correctional costs, nor did defendants believe as much because of

- 44 -

the adverse material facts known or recklessly disregarded by defendants and concealed from investors.

132. In discussing the renewal or non-renewal of facility management contracts, the November 4, 2011 quarterly report filed on Form 10-Q with the SEC ("3Q11 report") falsely stated:

> We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

133. CCA repeated this identical false statement in its 2011 through 2015 annual reports filed on February 27, 2012, February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016, and in its quarterly reports filed on May 7, 2012, August 9, 2012, November 8, 2012, May 9, 2013, August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 5, 2014, May 7, 2015, August 6, 2015, November 5, 2015, May 5, 2016 and August 4, 2016.

134. The statements in ¶¶132-133 above were materially false and misleading because, as described herein, the quality of CCA's operations was in fact subpar and thus did not contribute to renewals. In fact, CCA failed to disclose that its contracts were at risk of being terminated or not renewed because of the poor quality of its facilities. Because of the adverse material facts known or recklessly disregarded by defendants, they had no basis to believe the quality of CCA's operations was contributing to contract renewal.

135. As to the Company's compliance with applicable standards, including contractual requirements and accreditation requirements, the 2011 Annual Report falsely stated that:

> We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 58 of the facilities we operated as of December 31, 2011, and we intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process. Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program.

Our Quality Assurance Division independently operates under the auspices of, and reports directly to, the Company's Office of General Counsel. . . . The Quality Assurance Division oversees all efforts by our facilities to deliver high quality services and operations, with an absolute commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section.

. . . The Audit and Compliance Systems Section consists of two full time audit teams comprised of subject matter experts from all major disciplines within institutional operations, as well as management staff that oversee the process. . . . In addition, our Quality Assurance Division contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities. Our teams of auditors are deployed several times a year as well (in advance of contractually mandated ACA accreditation audits) to help ensure that our facilities are operating at the highest possible levels.

136. CCA's 2012 annual report for the fiscal year ended December 31, 2012 filed on February 27, 2013 contained a substantially similar false statement.

137. As described below, the 2013, 2014 and 2015 annual reports repeated the same misleading statement with some modifications and additions:

(a) The 2013 annual report for the fiscal year ended December 31, 2013 filed on February 27, 2014 likewise contained a similar statement, this time adding PREA to the list of requirements with which CCA claimed to comply.

(b) CCA's 2014 annual report for the fiscal year ended December 31, 2014 filed on February 25, 2015 ("2014 Annual Report") repeated substantially the same statement, with the only notable changes being to abbreviate "Quality Assurance Division" to QAD, to reflect that the QAD no longer operated through two separate sections but instead one unitary division and to reflect that the QAD also "coordinates the work of certified PREA auditors to help ensure that all facilities operate in compliance with these important regulations."

(c) The 2015 annual report CCA filed for the fiscal year ended December 31, 2015 on February 25, 2016 ("2015 Annual Report") mirrored the 2014 Annual Report, except that CCA no longer claimed that its facilities were "challenged by our management to exceed" applicable standards, but instead stated only that "Our facilities operate under these established standards, policies, and procedures, and also are subject to audits by our Quality Assurance Division, or QAD, which works independent from Operations management under the auspices of, and reports directly to, our Office of General Counsel."

138.    The statements in ¶¶135-137 above were materially false and misleading because, as described herein: (i) CCA did not operate its facilities in accordance with applicable policies and procedures; and (ii) CCA did not have an absolute commitment to quality improvements.  In fact, defendants' facilities were plagued with deficiencies.

139.    On November 5, 2015, CCA filed with the SEC its quarterly report ("3Q15 report") for the three months ended September 30, 2015.  In addition to the repetition of statements described in ¶¶130 and 133 above, the 3Q15 report falsely stated:

> Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years.  Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses.  However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses.

140.    CCA repeated this false statement in its 2015 Annual Report filed, and in its quarterly reports filed on May 5, 2016 and August 4, 2016, with the only alteration being to change the second sentence to state: "Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses."

141.    The statements in ¶¶139-140 above were materially false and misleading because, as described herein, defendants had no basis to believe that the reduction in BOP inmate populations would not impact CCA's facilities, and failed to disclose that the poor quality of CCA's BOP facilities put their contracts with the BOP at material risk.

**B.    Misstatements and Omissions in Conference Calls, Proxy Statements, Investor Presentations and Media Articles**

142.    On March 5, 2012, the *Lewiston Morning Tribune* in Idaho ran an article entitled, "Can private prisons be run cheaper?: In Idaho, no one has actually done the math to find out."  The article questioned whether or not private prisons in fact save taxpayers any money.  In an e-mail, a CCA spokesman falsely asserted that the Company is highly motivated to comply with its contracts, meets its own standards of excellence and always

do[es] better than the competition. . . .  As a business we are able to provide taxpayers an essential government service at equally high standards of quality and efficiency. . . .  Competitive private-sector entities are motivated to move swiftly, evaluate and refine success each day, and maintain the highest operating standards at least cost.[13]

143.    The statement in ¶142 above was materially false and misleading because, as described herein, CCA did not provide services at an equally high standard of quality or efficiency as its government partners, nor did CCA maintain the highest operating standards at the least cost.

144.    On March 30, 2012, CCA filed with the SEC a definitive proxy statement for its annual meeting of stockholders, which was scheduled to be held on May 10, 2012.  The proxy statement was signed by Hininger and by the Chairman of CCA's Board, John D. Ferguson ("Ferguson").

145.    In connection with the upcoming May 12, 2012 stockholders' meeting, one stockholder had submitted a proposal requesting that the Company provide biannual reports to stockholders describing Board oversight of the Company's efforts to reduce prisoner sexual abuse and including statistical data related to such allegations at the Company's facilities.  After failing to obtain permission from the SEC to exclude the proposal from the proxy statement, CCA opposed the proposal.  In explaining its opposition to this proposal, CCA falsely represented that:

---

[13]    Not long before this media statement and shortly before the beginning of the Class Period, on February 9, 2012, CCA convened a conference call to discuss its financial results for the three months and the 12 months ended December 31, 2011.  Hininger and Mullenger participated in the conference call on behalf of CCA.  During the call, Hininger stated:

[W]e see this past year as a defining moment for CCA.  What has helped us build that momentum?  Several factors were key.

*         *         *

The reason for this momentum is our continued focus on providing innovative, high-quality, cost-effective solutions to our partners.

. . . [C]ritics of the Company and industry will continue to discount the cost savings with irrational and incorrect claims.  This year we observed an enhanced appreciation of the significant cost savings we can provide our partners, especially at the state level.

These discussions validate that our solutions are compelling from a cost and quality perspective.

- 48 -

- CCA takes a "zero tolerance" approach to prisoner sexual abuse. Since the creation of proposed national standards to eliminate prison sexual assaults, CCA has taken a leadership position on this important public policy issue. Even though the proposed standards have not yet been mandated and remain under consideration by the Department of Justice ("DOJ"), CCA has proactively adopted – and in some cases exceeded – many of the national PREA (Prison Rape Elimination Act) standards and best practices.

  Key features of CCA's sexual abuse prevention program include:

  · Regular oversight by our Board of Directors, including quarterly review of key program information;

  · Management oversight of the program through a PREA committee consisting of high level company officers and health care, legal, and corrections professionals;

  · Comprehensive sexual assault prevention and incident reporting policies and procedures;

  · 24 hour access by inmates to toll free telephone numbers for reporting allegations of sexual harassment or abuse;

  · Training for inmates and employees, as well as other awareness efforts that emphasize our zero tolerance approach and encourage employees and inmates to report allegations of sexual assault or harassment, such as posters conspicuously placed throughout our facilities;

  · Review by the PREA committee of every allegation of sexual abuse at a CCA facility – from receipt of the incident report through investigation and enforcement of applicable policies, as well as referral to law enforcement where appropriate; and

  · Auditing of compliance with our standards and procedures by CCA's Quality Assurance team.

146. The statements in ¶¶144-145 above were materially false and misleading because, as described herein. CCA did not in fact follow, much less exceed, PREA standards, for example because it did not properly evaluate or follow up on risk of sexual abusiveness and sexual victimization as is necessary to prevent inmate sexual assaults.

147. On February 14, 2013, CCA convened a conference call to discuss its financial results for the three months and the 12 months ended December 31, 2012. Defendants Hininger and Mullenger participated on behalf of CCA. As part of his prepared remarks, Hininger falsely told investors and analysts that "We're observing a very much enhanced appreciation to the significant operational cost savings we can provide our partners at the state level. . . . So I would say that states

- 49 -

and other stakeholders are looking at more closely their actual cost of corrections." Citing a report that asserted that certain states understated the true taxpayer cost of prisons in their corrections budgets, Hininger falsely claimed: "With all these costs factored in, which clearly has not been [sic] the case in the past, when cost comparisons are done between us and the public sector, our value proposition grows even further."

148. The statements in ¶147 above were materially false and misleading because, as described herein CCA did not provide any cost savings to its government partners, and specifically the BOP.

149. On October 2, 2013, CCA held a "2013 Analyst Day" to market itself to investors and analysts, particularly those interested in REIT investments in light of the Company's then-recent conversion to an REIT structure. Hininger, Mullenger and Lappin each participated in the presentations to investors and analysts. Among other things, CCA falsely asserted that use of its services generates "[a]nnual costs savings of 12% or more," which savings "can fund programs to reduce population growth and recidivism." The presentation claimed that CCA's total cost per 1,000 beds was $55 to $65 million, with an average length of construction of one to three years, whereas government's total cost was $80 to $250 million, with an average length of construction of three to seven years. The presentation also falsely claimed that use of CCA's services would "improve safety & inmate quality of life." CCA misleadingly described this as a "[c]ompelling value proposition [that] has driven privatized market penetration higher." The presentation also falsely claimed that CCA achieves an "[o]ptimal balance between . . . meeting or exceeding customer and [American Correctional Association] quality standards[,] minimizing construction cost per bed[,] minimizing operating and maintenance costs[,] maximizing desirability of beds (competitive per diem, location suitable for multiple customers, ability to house various security levels and multiple customers, 'just-in-time' availability)[, and] exceeding ROI hurdle rates."

150. The statements in ¶149 above were materially false and misleading because, as described herein: (i) CCA did not provide any cost savings to its government partners, including the BOP; (ii) it did not properly provide programs to reduce recidivism; (iii) use of CCA's services did

not improve safety and inmate quality of life; and (iv) CCA did not meet or exceed quality standards of its customers, including the BOP.

151.     The 2013 Analyst Day presentation also falsely proclaimed that "Quality, in the form of Operational Excellence, is a core value and essential guiding principle for CCA." "Audits are typically conducted for each facility annually; more frequently if necessary." "In addition to a comprehensive Quality Assurance Process conducted through our Legal department, it is worth noting that our governmental partners maintain on-site monitors at the facilities – in essence providing daily inspection of the facilities." "When eligible, facilities are also audited by the American Correctional Association, an independent third party and considered the gold standard in the corrections industry."

152.     The statements in ¶151 above were materially false and misleading because, as described herein, CCA did not provide quality correctional services to its customers, including the BOP, and because CCA did not disclose that the auditing procedures had revealed numerous serious deficiencies that were not cured for years.

153.     CCA also falsely stated that it provided a solution for public prison overcrowding and historically low public sector prison development because it had "[v]acant beds available at lower operational cost, avoids need for large capital investment by government," because "[u]sing CCA stems growth in unfunded pensions," and because "CCA provides cost savings of 12% or more." CCA also reported that it was "educating" governments interested in selling their prisons to CCA that such sales "benefit[] our our [sic] government partners" by providing, among other things, "[o]ngoing operational cost savings without the loss of operational quality."

154.     The statements in ¶153 above were materially false and misleading because, as described herein, CCA did not provide any cost savings to its government partners, including the BOP.

155.     On May 5, 2014, the Chattanooga *Times Free Press* ran an article entitled "Critics point finger at CCA: For-profit prison operator taken to task for campaign giving, operations." The article reported on a statewide campaign being run by the ACLU against CCA, arguing that CCA was improperly trying to direct public policy in its favor through lobbying and campaign

- 51 -

contributions and that it had "broken its pledge to run jails better, and cheaper, than government." CCA rejected the ACLU campaign; and its spokesman, Jonathan Burns ("Burns"), cited the industry-funded study (without noting the industry's role in the study) in a prepared statement on behalf of CCA, taking the position that for-profit prisons save taxpayers 17% in corrections costs. Said Burns: "Those [savings] are funds that can be used for additional rehabilitation programming and other public safety priorities . . . .  With this misguided effort, the ACLU is advocating for higher taxpayer costs and reduced flexibility for state leaders to manage their inmate populations in a safe, secure and humane way."  Burns added that "[a]ll of [CCA's] facilities comply with our federal, state and local government partners' reporting requirements."

156.    The statements in ¶155 above were materially false and misleading because, as described herein, CCA did not provide any cost savings to its government partners, including the BOP.

157.    On June 5, 2014, CCA gave a presentation at REITWeek: NAREIT's Investor Forum. Hininger and Garfinkle led the presentation.  In his prepared remarks, Hininger told the prospective investors in attendance, among other things, that "we've . . . been able [to] provide great solutions for the government by providing cost savings and we have the unique dynamic in our industry where we can build facilities in locations that have a reasonable rational cost structure relative to construction, but also salary and wages."  He concluded that "we are clearly well positioned to help correctional systems around the country to deal with this growth in overcrowding, but also have great reentry facilities to help them deal on the back end and provide appropriate programs to help with recidivism."

158.    The statements in ¶157 above were materially false and misleading because, as described herein, CCA did not provide any cost savings to its government partners, including the BOP, and because CCA did not provide programs to help with recidivism that were appropriate or that were as effective as the BOP's own programs.

159.    On November 7, 2014, CCA published a "Third Quarter 2014 Investor Presentation," which was provided to investors and posted on the "Investor Relations" section of the Company's website (the "3Q14 Presentation").  In that false and materially misleading presentation, CCA

emphasized to its investors an industry-funded report claiming that "short- and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality." CCA cited the same report in its "Fourth Quarter 2014 Investor Presentation," published February 24, 2015 (the "4Q14 Presentation"); its "First Quarter 2015 Investor Presentation," published May 19, 2015 (the "1Q15 Presentation"); its "Second Quarter 2015 Investor Presentation," published August 21, 2015 (the "2Q15 Presentation"); its "Third Quarter 2015 Investor Presentation," published November 12, 2015 (the "3Q15 Presentation"); its "Fourth Quarter 2015 Investor Presentation," published February 24, 2016 (the "4Q15 Presentation"); and its "First Quarter 2016 Investor Presentation," published May 17, 2016 (the "1Q16 Presentation"). In each of those presentations (except the 4Q14 Presentation, which used the phrasing of the original presentation), CCA just slightly modified the wording to state that "Short-and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality."

160. Specific to the BOP, CCA falsely claimed in the 3Q14 Presentation that it could generate "Operational Cost Savings" of 18.1% relative to the operating cost and real estate costs of BOP facilities. Similar claims were made in each of the subsequent investor presentations, with the specific amount of claimed savings being 17% in the 4Q14 Presentation, 15% in the 1Q15 Presentation, 9.2% in the 2Q15 Presentation, 17.9% in the 3Q15 Presentation, 17.3% in the 4Q15 Presentation and 14.4% in the 1Q16 Presentation.

161. CCA also misrepresented in the 3Q14 Presentation that "adding competition has been found to lowers [sic] costs and improve performance." This statement (with the typographical error corrected) was repeated in the 4Q14 Presentation, the 1Q15 Presentation, the 2Q15 Presentation, the 3Q15 Presentation, the 4Q15 Presentation and the 1Q16 Presentation,

162. CCA also claimed in the 3Q14 Presentation that the "SOLUTION[S]" it offers include: "Vacant beds available at lower operational cost, avoids need for large capital investment by government," that "CCA provides short- and long-term savings to government partners" and that "Selling government prisons provides cash + cost savings." The 4Q14 Presentation, 1Q15 Presentation, 2Q15 Presentation and 3Q15 Presentation similarly listed the offered solutions to include: "CCA provides short- and long-term savings"; "Selling government prisons provides cash

- 53 -

and cost savings for use in other public works"; and "Modern, state-of-the-art facilities that improve safety, security and cost efficiencies." The 4Q15 Presentation and the 1Q16 Presentation included these same solutions, just changing the last one to read that "CCA's modern, state-of-the-art facilities improve safety, security and generate cost efficiencies."

163.    Each of the statements in ¶¶159-162 above created an impression that CCA services were cost-effective. The statements were materially false and misleading because, as described herein, CCA did not provide any cost savings to its government partners, including the BOP, and because CCA's prisons did not provide improved safety or security as compared to BOP prisons.

164.    The 3Q14 Presentation also claimed that "Safety & Security is our **First** priority" and that CCA "Perform[s] quality services for our government partners and the offenders entrusted in our care." This statement was repeated in the 4Q14 Presentation, the 1Q15 Presentation, the 2Q15 Presentation, the 3Q15 Presentation, the 4Q15 Presentation and the 1Q16 Presentation.

165.    The statement in ¶164 above was false and misleading because, as described herein, CCA did not ensure the safety and security of its inmates or staff, instead prioritizing reduction of its own costs over safety and security, and because CCA did not perform quality services for its government partners, including the BOP, or for the offenders entrusted in its care.

166.    On May 5, 2016, CCA convened a conference call to discuss its financial results for the three months ended March 31, 2016. Hininger and Garfinkle participated on behalf of CCA. In response to a question about the political climate with respect to the private prisons industry, Hininger misled investors regarding CCA's "high quality operations" and "great value," which he said allowed CCA to be successful regardless of the leaders in power:

>     We have had tremendous success at the state and federal level with either at state-level governor's being a democrat or being a republican, or a president being a democrat or republican. We've been able to have really good operations, perform very, very well, and provide great value to our partners regardless of who's in the White House or who's in the Governor's residence in a respective state. And that's our focus, just to make sure that we continue to do a great job every day, have high quality operations, and then provide great value back to the taxpayers of that respective jurisdiction.

167.     The statement in ¶166 above was false and misleading because, as described herein, CCA did not provide high quality services to its customers, including the BOP, and because CCA did not provide great value in the form of costs savings for its customers, including the BOP.

168.     On June 8, 2016, CCA gave a presentation at REITWeek: NAREIT's Investor Forum. Hininger and Garfinkle participated on behalf of CCA. In response to a question about the political climate with respect to private prisons, Hininger falsely stated:

> One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. We have operationally made sure that we are providing high quality and standard and consistent services to our partners and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama. And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings both on capital voids, but also cost savings in our services, then I think we'll be just fine.

169.     The statement in ¶168 above was false and misleading because, as described herein, CCA did not provide high quality services to its customers, including the BOP, and because CCA did not provide cost savings for its customers, including the BOP.

## VIII. The Relevant Truth About CCA's Misleading and Injurious Course of Business

170.     The statements referenced above in §VII were each materially false and misleading when made because they misrepresented and failed to disclose the following adverse facts, which were known to, or recklessly disregarded by, defendants:

(a)     The outsourcing of correctional services to CCA did not result in improving correctional services for government agencies, including the BOP. Rather, as shown above (§VI), the correctional services offered by CCA compared poorly to BOP facilities, did not provide the same level of correctional services, programs and resources and did not maintain the same level of safety and security with the result of CCA's facilities having significantly more serious incidents relating to safety and security as compared to BOP-operated facilities.

(b)      CCA's facilities were not operated "in accordance with" applicable policies, procedures and contractual requirements; and neither CCA's QAD nor anybody else "ensure[d]" that the Company complied with applicable standards, policies, procedures and contractual requirements. Rather, as shown above (§VI), CCA repeatedly violated applicable contractual requirements and BOP policies and was repeatedly warned of those violations, many of which had fatal consequences for inmates or staff. These violations were not isolated but systemic and negatively impacted CCA's core business.

(c)      The "quality" of services that CCA provided to its government customers, and in particular the BOP, was poor and was not supportive of the Company's renewal rate being and remaining high. Instead, the real facts were that the serious quality issues described above (§VI), involving many significant violations of contract and policy, failure to take appropriate steps to resolve major deficiencies even when the BOP notified CCA of those deficiencies, and endangerment of the safety, security and health of inmates and staff, strongly supported the conclusion that CCA was likely in the future to have a low renewal rate at least on BOP contracts.

(d)      The outsourcing of correctional services to CCA did not result in significant costs savings for government agencies, including the BOP. Rather, as described above (§VI), annual per capita costs for housing inmates at CCA facilities were comparable to, if not higher than, the annual per capita costs for housing inmates in BOP prisons.

(e)      Based on the foregoing, defendants lacked a reasonable basis for their positive statements about the Company's business and financial prospects during the Class Period.

## IX.    Additional Evidence in Support of a Strong Inference of Scienter

### A.    The Individual Defendants Knew of or Recklessly Disregarded the Significant Deficiencies Identified by the BOP and the OIG Throughout the Class Period

171.    Defendants had actual knowledge of, or were at least deliberately reckless with respect to, the Notices of Concern, Contract Facility Monitoring Reports, After Action Reports and other information alleged above in §VI, which rendered their Class Period statements and omissions materially false and misleading.

- 56 -

172.     Defendants themselves acknowledged in CCA's annual reports that the Company had extensive systems and controls in place to monitor the quality of the services provided by CCA's facilities.  According to the 2011 Annual Report, the Company's QAD included a Research and Analysis Section that collects and reports performance metrics to "senior management" and an Audit and Compliance Systems Section that audited CCA facilities to determine issues in need of "management attention":

> The Research and Analysis Section collects and analyzes performance metrics across multiple databases.  Through rigorous reporting and analyses of comprehensive, comparative statistics across disciplines, divisions, business units and the Company as a whole, the Research and Analysis Section provides timely, independently generated performance and trend data to senior management.  The Audit and Compliance Systems Section consists of two full time audit teams comprised of subject matter experts from all major disciplines within institutional operations, as well as management staff that oversee the process.  The Audit and Compliance Systems Section coordinates the development of performance measurement tools with subject matter experts and other stakeholders having risk management responsibilities.  Routinely, these two audit teams conduct *rigorous, on site annual evaluations of each facility we operate with no advance notice*.  Highly specialized, discipline- specific audit tools, containing over 1,600 audited items across eleven major operational areas, are employed in this detailed, comprehensive process.  The results of these on site evaluations are *used to discern areas of operational strength and areas in need of management attention*.  The audit findings also comprise a *major part of our continuous operational risk assessment and management process*.  Audit teams are also available to work with facilities on specific areas of need, such as meeting requirements of new partner contracts or providing detailed training of new departmental managers.  In addition, our Quality Assurance Division contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities.  Our teams of auditors are deployed several times a year as well (in advance of contractually mandated ACA accreditation audits) to help ensure that our facilities are operating at the highest possible levels.

173.     Although the organization of the QAD evolved during the Class Period, its function did not change.  As of December 31, 2015, QAD, still "work[ed] independent from Operations management under the auspices of, and reports directly to, our Office of General Counsel." According to the 2015 Annual Report:

> The QAD employs a team of full-time auditors, who are subject matter experts from all major disciplines within institutional operations.  Annually, without advance notice, QAD auditors conduct on site evaluations of each facility we operate using specialized operational audit tools, often containing more than 1,000 audited items across all major operational areas.  In most instances, these audit tools are tailored to facility and partner specific requirements.  Audit teams are also made available to work with facilities in specific areas of need, such as meeting requirements of new partner contracts or providing detailed training of new departmental managers.

- 57 -

The QAD management team coordinates overall operational auditing and compliance efforts across all CCA facilities. In conjunction with subject matter experts and other stakeholders having risk management responsibilities, the QAD management team develops performance measurement tools used in facility audits. The QAD management team provides governance of the corporate plan of action process for issues identified through internal and external facility reviews. Our QAD also contracts with teams of ACA certified correctional auditors to evaluate compliance with ACA standards at accredited facilities. Similarly, the QAD coordinates the work of certified PREA auditors to help ensure that all facilities operate in compliance with these important regulations.

174.    In addition to these extensive systems and controls described by CCA, a former CCA employee ("FE1"), who worked at one of CCA's BOP facilities for over ten years, including for most of the Class Period, reported how senior CCA officers became aware of deficiencies in CCA's facilities. For most of that time, and until FE1 left CCA, FE1 acted as a Quality Assurance ("QA") Manager. As QA Manager, FE1 was a direct liaison to the BOP regarding the facility's compliance with BOP standards and requirements.

175.    According to FE1, CCA facilities were regularly audited by the BOP, and CCA would be aware of the questions and items to be examined. FE1 reported that CCA had an audit tool that was given to the facilities, which enabled the facilities to know what would be examined during the audit and thereby help prepare for it. In addition, if a facility experienced that the BOP was looking at a particular area, then the facility would send the individual from the facility who was responsible for that area to the other facilities so they could benefit from this advance knowledge.

176.    The results of the audits of the various BOP facilities were disseminated by e-mail to the other QA Managers at CCA's BOP facilities. The results of the audits were also entered into and available in two databases. One database was used for deficiencies related to the facilities. Another database was used to document specific incidents at the facilities. According to FE1, the results of every audit of CCA's prisons were required to be entered into and available in these two systems, and reports were generated on a monthly basis. According to FE1, the QA Managers at the facilities entered the data into the system, and an individual at the corporate headquarters was in charge of data tracking related to the systems. The QA Managers also reported into the systems any and all contacts they had with BOP personnel.

177. According to FE1, the QA Managers were also responsible for auditing all of the six key operating areas of their prisons (*e.g.*, security, medical and human resources, among others). Each month a different operating area would be audited by the QA Managers so that every six months they would begin looking at the same areas again. The results of these QA Manager audits were also entered into the systems.

178. According to FE1, in addition to the BOP's regular audits (the results of which were entered into the systems), the BOP also conducted *ad hoc* inspections. These *ad hoc* inspections could result in Notices of Concern, which were also entered into the systems.

179. According to FE1, all of the information related to audits, both by the BOP and by CCA, that was entered into the systems would go to senior executives at CCA headquarters, including defendants Hininger, Mullenger and Lappin. According to FE1, BOP policy required that CCA senior executives receive the results of facility audits.

### B. Defendants Acknowledged Their Duty to Disclose Deficiencies Identified in Operational Performance Audits but Did Not Disclose Them and Instead Fought to Avoid Publishing Objective Data

180. Further supporting the strong inference of scienter is the fact that CCA and the Individual Defendants have actively fought to avoid providing shareholders with objective information about the quality, safety, security and cost effectiveness of CCA's prisons.

181. For example, on November 23, 2016, a CCA shareholder submitted a proposal for inclusion in the Company's 2017 proxy statement so that CCA's shareholders could vote on whether to require the Company to subject its facilities to a biannual operational audit by a qualified independent organization and disclose the final audit reports to the Company's shareholders. The Company fought the proposal, even refusing to let shareholders decide whether they wanted this oversight to take place and whether they wanted to know about any deficiencies at the Company's facilities. By letter dated January 10, 2017, the Company asked the SEC to let it exclude the proposal from the proxy statement. On February 13, 2017, the SEC granted the requested no-action relief.

182. In justifying their refusal to supply shareholders with objective data on the operational performance of CCA facilities, CCA specifically conceded that it was already required to

- 59 -

disclose significant deficiencies identified at its facilities by the BOP, the OIG or internal audits. CCA represented that

> to the extent operational performance audits conducted by the Company's QA Division, its customer or any of the numerous independent oversight institutions that audit the Company's facilities reveal deficiencies of a magnitude to create a disclosure obligation under the federal securities laws or the NYSE listing rules, the Company would disclose those deficiencies by the designated means.

183. Thus, defendants knew they were required to disclose significant problems taking place at CCA's facilities to shareholders but fought to avoid disclosing objective data on the operational performance of those facilities.

184. Similarly, when the Company opposed the 2012 shareholder proposal requesting the Company to provide biannual reports describing Board oversight of the Company's efforts to reduce prisoner sexual abuse, the Company justified its opposition in part on the grounds that "because other operators would not be required to disclose the same level of information, the data could easily be misconstrued or taken out of context and thus be used to the Company's detriment." That is, defendants did not want to disclose information about sexual assaults in its prisons because they believed that truthful information about prisoner sexual assault would adversely affect the market's perception of the Company, *i.e.*, by significantly altering the total mix of information available about the Company.

185. The Company's positions on these shareholder proposals makes clear that, throughout the Class Period, defendants knew information about the operational shortcomings at the Company's facilities, including the deficiencies described above at the BOP facilities, would be material to shareholders and that they would be perceived negatively. That is why they concealed the information described above.

### C. Defendants Knew Their Comparisons of CCA Costs to BOP Costs Were Misleading

186. As noted above, CCA repeatedly represented to investors that CCA generated cost savings for government customers. In its investor presentations, CCA quoted specific percentages of savings that it claimed to generate for the BOP. Defendants, however, knew that these comparisons were, at best, misleading.

- 60 -

187. As the Review explained, it was not possible to conduct a direct comparison of the overall costs of incarceration between BOP institutions and contract prisons, in part because private operators like CCA do not provide sufficient information to allow for a direct comparison. Similar concerns were expressed in December 2013 in a report by the GAO. Defendants were aware of this issue but did nothing to rectify it or to provide more detailed information to the public or to policymakers to permit a direct comparison precisely because they knew such a comparison would not be favorable to CCA.

188. Moreover, as detailed above, defendants were well aware throughout the Class Period that the BOP spent significant time and resources on oversight and monitoring of CCA prisons and knew that, as a result, the BOP incurred additional costs beyond CCA's *per diem* payments in order to house inmates in CCA facilities. If one were to adjust the costs CCA quoted to its investors in touting the purported cost savings it generated for the BOP to account for management expenses of this magnitude, the purported cost savings would be substantially reduced, if not eliminated. Defendants knew this but deliberately touted to investors purported savings that "adjusted" BOP costs to account for additional imputed real estate costs of $12 per day, which often accounted for the majority, if not the entirety, of the purported savings compared to CCA costs. For example, in the 2Q15 Presentation, "Operating Cost Per Day in Government Facility" was $76.00, whereas "CCA Average Owned Per Diem" was $79.91; but the presentation cited 9.2% savings because of the real estate adjustment, without making any adjustment to the cost of housing inmates in CCA prisons to account for other costs to the BOP of such arrangements.

189. Further, to the extent CCA did provide any cost savings to the BOP, which it did not, such savings were only due to CCA's short-staffing and failure to provide basic services in violation of its contractual obligations.

## X. Additional Allegations of Reliance, Materiality, Loss Causation and Damages

190. A Class-wide presumption of reliance is appropriate in this action under the United States Supreme Court's holdings in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972) (with respect to material omissions) and *Basic Inc. v. Levinson*, 485 U.S. 224, 226 (1988) (with respect to materially false and misleading statements).

191. Plaintiff's claims for securities fraud are asserted, in part, under the fraud-on-the-market theory of reliance. The market price of CCA securities, including common stock regularly traded on the NYSE market, was artificially inflated by the false and misleading statements and omissions complained of herein, including CCA's misleading and incomplete statements about the quality of its operations, its compliance with its contractual obligations and the costs associated with its operations, as well as the other matters complained of herein. Defendants' false statements and omissions inflated the price of CCA securities both before and during the Class Period.

192. The Class Period inflation in CCA's stock price was eliminated when the financial conditions, business risks and other information concealed by defendants' fraud was revealed to the market. The information did not reach the market all at once but through several partial disclosures, each of which partially corrected the market price of CCA's securities. The partial disclosures on which plaintiff's damage theory is based include stock price declines accompanying and resulting from: (a) the Review by the OIG of the BOP's Monitoring of Contract Prisons; and (b) the Yates Memorandum, which collectively were the first time the government had publicly reported that CCA's prisons compared poorly to government-run prisons and did not allow the government to save substantially on costs.

**A. Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine**

193. At all relevant times, the market for CCA's common stock was an efficient market for the following reasons, among others:

(a) CCA's stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient and automated market;

(b) During the Class Period, the average trading volume of the CCA common stock traded on the NYSE was approximately 950,000 shares per day;

(c) As a regulated issuer, CCA filed periodic public reports with the SEC and NYSE;

(d) CCA regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the

- 62 -

national circuits of major newswire services, publications on its website and other Internet sites and other wide-ranging public disclosures, such as conference calls, communications with the financial press and other similar reporting services;

(e)     During the Class Period, CCA was followed by securities analysts employed by major brokerage firms, including Wells Fargo Securities, LLC and SunTrust Robinson Humphrey Capital Markets.  Analysts employed by these and other firms regularly wrote reports based on the publicly available information disseminated by defendants about CCA.  These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f)     CCA had substantial institutional ownership during the Class Period.  Each of these institutions regularly analyzed and reported on the publicly available information about CCA and its operations.

194.     Through the foregoing mechanisms, the information publicly disseminated by defendants about CCA and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in CCA stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of CCA's publicly traded securities.

195.     As a result of the foregoing, the market for CCA's common stock promptly digested current information regarding CCA from publicly available sources and reflected such information in CCA's stock price.  Under these circumstances, all purchasers of CCA's common stock during the Class Period suffered similar injury through their purchase of CCA's common stock at artificially inflated prices and its subsequent decline in value, and a presumption of reliance applies.

**B.     Plaintiff Suffered Damages When CCA's Stock Price Dropped as Information Concealed by Defendants' Fraud Was Revealed to the Market**

196.     The business conditions and risks concealed from investors by defendants' scheme to defraud reached the market through a series of partial disclosures.

197.     On August 11, 2016, the OIG released the Review.  As discussed herein, the Review revealed that, "in most key areas, contract prisons [including specifically CCA] incurred more safety

- 63 -

and security incidents per capita than comparable BOP institutions."  In addition, the OIG was unable to conclude that the use of contract prisons was less expensive than BOP institutions.

198.    On August 18, 2016, citing the OIG report, the Yates Memorandum stated that private prisons

> compare poorly to [BOP] facilities.  They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do no not maintain the same level of safety and security.

Yates also directed that the BOP should reduce its own of private prisons in a manner consistent with the overall decline of the BOP's inmate population.[14]

199.    As a result of these disclosures, CCA common stock declined from a close of $27.56 per share on August 10, 2016 to an intraday low of $13.04 per share on August 18, 2016 – a staggering decline of 53%.

200.    The timing and magnitude of these price declines in CCA securities negate any inference that the loss suffered by plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate the prices of CCA securities and the subsequent significant decline in the value of CCA securities when defendants' prior misrepresentations and fraudulent conduct were revealed.

## XI.    Additional Control Person Allegations

201.    Defendants Hininger, Mullenger, Garfinkle and Lappin acted as controlling persons of CCA within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high level positions, participation in and awareness of the Company's operations and their intimate knowledge of the false statements and omissions made by CCA and disseminated to the investing public, defendants had the power to influence and control and did influence and control, directly or

---

[14]    In a memorandum dated February 21, 2017 and released on February 23, 2017, Attorney General Jefferson Sessions stated that the BOP should disregard Yates' directive to reduce the use of private prisons but did not dispute the conclusions regarding the poor quality of private prisons.  CCA's stock price did not react materially to this announcement, decreasing $0.06 per share from a close of $34.06 per share on February 21, 2017 to a close of $34.00 per share on February 23, 2017.

indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading. Defendants participated in conference calls with investors and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements, alleged by plaintiff to be misleading, prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected. To the extent any statements were made through spokespeople, defendants had control over those spokespeople and over the statements they made.

202.    CCA's bylaws provide that the CEO (defendant Hininger) "shall have responsibility for implementation of the policies of the Corporation, as determined by the Board of Directors, and for the administration of the business affairs of the Corporation." Hininger is subject only to the oversight of CCA's Board, of which Hininger is a member, and, until May 12, 2016, the Executive Chairman of which was the former CEO and Hininger's former colleague, Ferguson.

203.    During the Class Period, Mullenger (before May 1, 2014), Garfinkle (beginning May 1, 2014) and Lappin each reported directly to Hininger; and each was the top executive overseeing his respective department. As such, each of the Individual Defendants had direct and supervisory involvement in CCA's day-to-day operations, was directly involved in the provision of information for inclusion in the Company's public statements and SEC filings, was personally involved in resource allocation decisions that caused the understaffing and related problems that contributed to the Company's repeated violations of BOP policies and contracts and was personally informed each time the BOP or OIG notified CCA of the results of a contract facility monitoring audit or sent a Notice of Concern or a Cure Notice relating to a CCA facility.

204.    As set forth above, defendants violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's publicly traded securities during the Class Period.

## XII. Class Action Allegations

205. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired CCA securities during the Class Period (the "Class") and were damaged thereby. Excluded from the Class are: (a) CCA, its parents, subsidiaries and any other entity owned or controlled by CCA; (b) the Individual Defendants; (c) all other executive officers and directors of CCA or any of its parents, subsidiaries or other entities owned or controlled by CCA; (d) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and step-relations of similar degree; and (e) all predecessors and successors in interest or assigns of any of the foregoing.

206. The members of the Class are so numerous that joinder of all members is impracticable. CCA has more than 100 million shares of stock outstanding, owned by hundreds, if not thousands, of persons. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

207. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual Class members include:

     (a)     Whether the Exchange Act was violated by defendants;

     (b)     Whether defendants omitted and/or misrepresented material facts;

     (c)     Whether defendants' statements omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

     (d)     Whether defendants acted with scienter;

     (e)     Whether defendants' fraudulent misrepresentations and omissions affected the market price for CCA securities; and

     (f)     The extent of damage sustained by Class members and the appropriate measure of damages.

208. Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

1242260_1

209.    Plaintiff will adequately protect the interests of the Class and have retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests that conflict with those of the Class.

210.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## Count I

### Violation of §10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder

### (Against All Defendants)

211.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

212.    During the Class Period, defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

213.    Defendants: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon the purchasers of CCA securities during the Class Period.

214.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for CCA securities.  Plaintiff and the Class would not have purchased CCA securities at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by defendants' misleading statements.

215.    As a direct and proximate result of defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of CCA securities during the Class Period.

**Count II**

**Violation of §20(a) of the Exchange Act**

**(Against the Individual Defendants)**

216. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

217. The Individual Defendants acted as controlling persons of CCA within the meaning of §20(a) of the Exchange Act as alleged herein. By reason of their positions as officers and/or directors of CCA and their ownership of CCA stock, the Individual Defendants had the power and authority to cause CCA to engage in the wrongful conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act.

**XIII. Prayer for Relief**

WHEREFORE, plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B. Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Awarding such other and further relief as the Court may deem just and proper.

**XIV. Jury Demand**

Plaintiff hereby demands a trial by jury.

DATED: March 13, 2017

                  ROBBINS GELLER RUDMAN & DOWD LLP
                  CHRISTOPHER M. WOOD, #032977
                  CHRISTOPHER H. LYONS, #034853

                                     s/ Christopher M. Wood
                                  CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 13, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 13, 2017.

s/ Christopher M. Wood
_____
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
   & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA  94104
Telephone:  415/288-4545
415/288-4534 (fax)
E-mail: cwood@rgrdlaw.com

1242260_1

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,smcclenahan@barrettjohnston.com,tellis@barrettjohnston.com,nchanin@barrettjohnston.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Nathan M. Saper**
  nathan.saper@lw.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,ptiffith@rgrdlaw.com,hdeshmukh@rgrdlaw.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`