# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually   )
and on Behalf of All Others Similarly   )
Situated,   )
  )
Plaintiff,   )        Case No. 3:16-cv-02267
  )
v.   )        Judge Aleta A. Trauger
  )
CORRECTIONS CORPORATION OF   )
AMERICA, DAMON T. HININGER,   )
DAVID M. GARFINKLE, TODD J.   )
MULLENGER, and HARLEY G. LAPPIN   )
  )
Defendants.   )

**DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

I.      INTRODUCTION ......................................................................................................1

II.     STATEMENT OF FACTS ......................................................................................3

        A.      The Parties ....................................................................................................3
        B.      The Alleged Conditions in Certain CC Facilities ....................................4
        C.      The Alleged False Statements.....................................................................5
        D.      The OIG Review and the Yates Memorandum..........................................6
        E.      The Events Following the OIG Review and the Yates Memorandum ...................7

III.    LEGAL STANDARDS ..........................................................................................9

IV.     ARGUMENT ........................................................................................................13

        A.      Plaintiff Has Failed to Plead Any False or Misleading Statements With
                Factual Particularity ...............................................................................13
                1.      Statements About CC's Quality and "Improvements" are
                        Statements of Corporate Optimism Which Were Not False When
                        Made ................................................................................................13
                2.      Statements About "Contract Renewals" are Forward-Looking
                        Statements Protected by Federal Law ........................................15
                3.      Statements About Costs Savings are "Mere Puffery" and are Not
                        Actionable .......................................................................................17
                4.      Statements About Policy Violations Constitute Generalized
                        Optimism and Were Not False When Made ................................18
        B.      Plaintiff Has Failed to Plead Particularized Facts Giving Rise to a "Strong
                Inference" of Scienter ...............................................................................19
                1.      The Individual Defendants' Alleged Access to Information Does
                        Not Give Rise to a "Strong Inference" of Scienter ...................20
                2.      Defendants' Alleged Resistance to Certain Shareholder Proposals
                        Does Not Give Rise to a "Strong Inference" of Scienter.........21
                3.      Plaintiff's Allegations About Defendants' Cost Savings Statements
                        are Conclusory ...............................................................................22
                4.      Numerous Facts Demonstrate That an Inference of Nonfraudulent
                        Intent is Far More "Cogent and Compelling"...........................23
        C.      Plaintiff Has Failed to Plead Loss Causation..........................................24

V.      CONCLUSION.....................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Bovee v. Coopers & Lybrand C.P.A.*,
   272 F.3d 356 (6th Cir. 2001) ...................................................16

*In re Cardinal Health Sec. Litig.*,
   426 F. Supp. 2d 688 (S.D. Ohio 2006) .........................................20

*In re Comshare, Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) ..................................................12

*D.E. & J. Ltd. P'ship v. Conaway*,
   284 F. Supp. 2d 719 (E.D. Mich. 2003) .......................................24

*Doshi v. General Cable Corp.*,
   823 F.3d 1032 (6th Cir. 2016) ................................11, 12, 20, 23

*Dura Pharmaceuticals, Inc. v. Broudo*,
   544 U.S. 336 (2005) ..................................................... *passim*

*In re F & M Distribs., Inc. Sec. Litig.*,
   937 F. Supp. 647 ( E.D. Mich. 1996) ..........................................17

*Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*,
   964 F. Supp. 2d 875 (N.D. Ohio 2013) .....................................12, 24

*Frank v. Dana Corp.*,
   646 F.3d 954 (6th Cir. 2011) ..................................................11

I*n re Fritz Cos. Sec. Litig.*,
   282 F. Supp. 2d 1105 (N.D. Cal. 2003) ........................................10

*Helwig v. Vencor, Inc*.,
   251 F.3d 540 (6th Cir. 2001) (en banc) .................................12, 19, 23

*James v. Gerber Prods. Co.*,
   587 F.2d 324 (6th Cir. 1978) ..................................................18

*Katt v. Titan Acquisitions, Ltd.*,
   133 F. Supp. 2d 632 (M.D. Tenn. 2000) .........................................6

*In re Keithley Instruments, Inc. Secs. Lit*.,
   268 F. Supp. 2d 887 (N.D. Ohio 2002) .........................................24

*Kuyat v. BioMimetic Therapeutics, Inc.*,
   747 F.3d 435 (6th Cir. 2014) ...........................................................................21

*Miller v. Champion Enters., Inc.*,
   346 F.3d 660 (6th Cir. 2003) ...............................................................11, 12, 17

*Mulvaney v. GEO Group, Inc.*,
   No. 16-CV-81494, 2017 WL 887193 (S.D. Fla. Feb. 23, 2017) ..............8, 9, 21, 23

*Oklahoma Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
   873 F. Supp. 2d 1070 (D. Minn. 2012)...............................................................24

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ................................................................. *passim*

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...............................................................20, 24

*Pub. Sch. Teachers Pension & Retirement Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*,
   381 F.3d 563 (6th Cir. 2004) ...............................................................14, 15

*Tellabs Inc. v. Makor Issues & Rights Ltd.*,
   551 U.S 308 (2007).................................................................... *passim*

*Weiner v. Klais and Co., Inc.*,
   108 F.3d 86 (6th Cir. 1997) ..............................................................................6

*Wilson v. HSBC Bank, N.A.*,
   594 F. App'x 852 (6th Cir. 2014) .......................................................................9

*In re Yum! Brands, Inc. Sec. Litig.*,
   73 F. Supp. 3d 846 (W.D. Ky. 2014).................................................................9

## STATUTES

15 U.S.C. § 78j(b)..............................................................................................9

15 U.S.C. § 78u–4..............................................................................................9

15 U.S.C. § 78u-4(b)(1)(B)...............................................................................10

15 U.S.C. § 78u-4(b)(2)....................................................................................11

15 U.S.C. § 78u-4(b)(3)(A)...............................................................................12

15 U.S.C. § 78u-5(c) (2006) ............................................................................11

## RULES

Fed. R. Civ. P. 8(a) ..................................................................................................1

Fed. R. Civ. P. 9(b) ...........................................................................................1, 9, 10

Fed. R. Civ. P. 12(b)(6)............................................................................................1

## REGULATIONS

17 C.F.R. § 240.10b-5..............................................................................................9

## OTHER AUTHORITIES

Corrections Corporation of America, *Who We Are* (2013), *available at*
    http://www.cca.com/who-we-are ..............................................................4

H.R. Conf. Rep. No. 104-369 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730 ....................9, 10, 15

Case 3:16-cv-02267   Document 61   Filed 05/12/17   Page 5 of 31 PageID #: 737

Pursuant to Federal Rules of Civil Procedure 8(a), 9(b), and 12(b)(6), Defendants CoreCivic ("CC" or the "Company"),[1] Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin (collectively, "Defendants") respectfully submit this memorandum in support of their Motion to Dismiss Lead Plaintiff Amalgamated Bank's Consolidated Amended Class Action Complaint for Violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Complaint" or "Compl.").

## I.  INTRODUCTION

The Company takes the care and well-being of the inmates at its facilities very seriously. But at the outset, it is worth noting that this is not a civil rights case brought by a plaintiff on behalf of correctional facility inmates.  This is a securities fraud class action brought by an institutional investor (and repeat plaintiff in securities cases) on behalf of shareholders who purchased or acquired stock in the Company between February 27, 2012, and August 17, 2016. As a matter of controlling precedent, this requires Plaintiff to plead, with factual particularity, that Defendants made materially false or misleading statements (and explain why each such statement was false or misleading at the time it was made), that Defendants had the required state of mind at the time they made the statements (*e.g.*, intent to defraud), and that the alleged fraud was the cause of the losses that the shareholders allegedly sustained.  Here, Plaintiff falls far short of pleading each of these essential elements.

With respect to the element of falsity, Plaintiff challenges four general categories of false statements:  (i) statements about CC's quality and improvements; (ii) statements about contract renewals; (iii) statements about costs savings; and (iv) statements about operating "in accordance with" policy.  Compl. ¶¶ 116-17.  However, none of these alleged disclosures constitutes a

---

[1] On October 28, 2016, Corrections Corporation of America rebranded the Company as "CoreCivic."

1

materially false or misleading statement under the federal securities laws.  Statements about CC's quality and improvements are inactionable statements of corporate optimism that cannot be deemed false by the small handful of alleged infractions at four out of CC's 80-plus owned or operated facilities.  Statements about CC's anticipated contract renewals are forward-looking statements that are expressly protected by federal law.  Statements about costs savings are "puffery," which do not constitute a false statement as a matter of law.  Finally, statements about CC operating in accordance with policy are far too general, and also constitute inactionable corporate "puffery."

With respect to the separate element of scienter—*i.e.*, intent to defraud or deliberate recklessness—Plaintiff is required to plead *particularized facts* that establish a "strong inference" that Defendants acted with scienter.  Under the Supreme Court's seminal decision in *Tellabs Inc.  v. Makor Issues & Rights Ltd*., this inference of scienter must be more than merely plausible or reasonable:  it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent.  551 U.S 308, 314 (2007).  Plaintiff comes nowhere close to satisfying these stringent requirements.  Plaintiff does not and cannot contend that the one former employee identified in the Complaint (who purportedly worked at CC during some unspecified 10-year period) ever spoke with any of the Defendants, much less has personal knowledge of their scienter at any point in time.  Plaintiff does not and cannot plead that any Defendant engaged in suspicious sales at a time when CC's stock was purportedly trading at artificially inflated prices.  Further, Plaintiff pleads facts that support the opposite inference:  CC employed a qualified and experienced executive leadership team and had implemented extensive internal controls designed to ensure compliance with CC's contractual duties and legal obligations.  There is no inference of scienter here whatsoever, much less the "strong inference" required by law.

Finally, Plaintiff must plead loss causation. Under controlling Supreme Court precedent, this requires Plaintiff to plead facts demonstrating that the revelation of the alleged falsity of the class period statements caused the damages Plaintiff seeks to recover, as opposed to losses caused by "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Here, the alleged "corrective disclosures" consist of a Review by the Department of Justice's Office of Inspector General, and a memorandum from former Deputy Attorney General Sally Yates. However, neither of these disclosures corrected nor revealed the falsity of any of CC's alleged class period statements (in fact, the Yates Memorandum does not even mention CC). Moreover, far from suggesting that these disclosures contained Company-specific facts that revealed that Defendants engaged in securities fraud, following the OIG Review and Yates Memorandum, the entire industry suffered a stock price decline. CC cannot be held liable under the federal securities laws for such price declines resulting from industry forces. Powerfully illustrating the point, another federal district court issued a decision dismissing securities fraud allegations against a CC competitor that were virtually identical to the accusations asserted here; the Yates Memorandum was thereafter retracted; and CC's stock rebounded and has since traded at a 52-week high.

For all of these reasons, as discussed in greater detail below, the Complaint should be dismissed in its entirety.

## II.     STATEMENT OF FACTS

### A.     <u>The Parties</u>

Lead Plaintiff Amalgamated Bank is an institutional investor and repeat plaintiff in securities class actions based in New York, NY. Lead Plaintiff claims to have purchased or

acquired roughly 159,000 shares of CC stock during the class period. Dkt. 39 (Memorandum in Support of Motion to Appoint Counsel and for Appointment as Lead Plaintiff) at 5.

CC designs, builds, manages, and operates private prisons, jails, detention centers, and residential reentry centers on behalf of federal corrections agencies and individual states and counties across the United States. In addition to numerous state and local partners, CC currently works with all three federal corrections agencies: the Federal Bureau of Prisons ("BOP"), the U.S. Marshals Service, and Immigration and Customs Enforcement. CC is the fifth-largest corrections system in the country, housing nearly 70,000 inmates in 89 facilities across twenty states. *See* Corrections Corporation of America, *Who We Are* (2013), *available at* http://www.cca.com/who-we-are.

Mr. Hininger joined the company in 1992 and has been its President and CEO since 2009. Compl. ¶ 22. He began his career as a correctional officer and held multiple operational roles before ascending to CEO. Mr. Garfinkle has served as CFO since 2014 and has worked in CC's finance organization since 2001. Compl. ¶ 23. He is a Certified Public Accountant with extensive audit and real estate investment experience. *Id.* Mr. Mullenger worked for the Company full-time in various finance roles from 1998 until 2014, serving as CFO from 2007 to 2014. *Id.* ¶ 24. Mr. Lappin, who joined CC in 2011 as its Chief Corrections Officer, has more than 25 years of corrections experience, including serving as the Director of the BOP from 2003 until 2011. *Id.* ¶ 25.

## B.  The Alleged Conditions in Certain CC Facilities

Plaintiff alleges that CC violated certain contract and policy terms during the class period at four of CC's 89 facilities (Adams County Correctional Center, Cibola County Correctional Center, Eden Detention Center, and McRae Correctional Facility). The Complaint alleges instances of insufficient medical care, understaffing, underqualified staff, inadequate controls,

4

and failures to comply with certain provisions of CC's contracts with the BOP. *See* Compl. ¶¶ 37-114. The Complaint does not allege, however, any particularized facts suggesting that any individual Defendant knew about or received reports documenting these alleged infractions. Plaintiff identifies a single former employee ("FE1") who worked at CC during some unspecified 10-year period of time. However, Plaintiff does not allege that FE1 ever spoke to any individual Defendant at any point in time, much less about the alleged infractions at the four facilities at issue during the class period.

### C. The Alleged False Statements

According to Plaintiff, Defendants defrauded CC investors by making statements that were materially false or misleading by virtue of the handful of infractions described above. These alleged false or misleading statements fall into four general categories:

- **Statements about CC's quality and improvements.** The Complaint identifies statements that outsourcing of correctional services to CC resulted in improved correctional services for government agencies, including the BOP;

- **Statements about contract renewals.** The Complaint cites statements in which CC reported that it anticipated that its contract renewal rate would remain high because of the "quality" of services it provided to government customers;

- **Statements about costs savings**. The Complaint describes statements where Defendants reported that outsourcing of correctional services to CC resulted in significant cost savings for government agencies, including the BOP; and

- **Statements about operating "in accordance with" policy**. The Complaint quotes statements where CC reported that its facilities were operated "in accordance with" applicable policies, procedures, and contractual requirements.

Notably, Plaintiff does not allege that any Defendant sold stock during the class period, *i.e.*, at a time when the alleged false statements artificially inflated CC's stock price, or that any individual Defendant benefitted in any way by virtue of these alleged false or misleading statements. To the contrary, the Complaint describes an extensive set of internal controls, including a "research and Analysis Section that collects and reports performance metrics" and an

5

"Audit and Compliance System," designed to help ensure CC's compliance with its contractual and legal obligations, as well as the accuracy of its financial reporting. Compl. ¶ 172.

### D.  The OIG Review and the Yates Memorandum

On August 11, 2016, the U.S. Department of Justice Office of the Inspector General issued a report entitled, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* (the "OIG Review" or "Review").[2] The OIG analyzed data from 14 contract prisons and 14 BOP institutions. On one hand, as Plaintiff points out, the OIG Review found that contract prisons incurred more safety and security incidents per capita than comparable BOP institutions. Compl. ¶ 116. On the other hand, as Plaintiff ignores, that same Review found that contract prisons had fewer positive drug tests and sexual misconduct incidents than BOP prisons. McGee Decl. Ex. 1 (OIG Review) at 25-27. Perhaps most noteworthy, the BOP "caution[ed] against drawing comparisons of contract prisons to BOP operated facilities as the different nature of the inmate populations and programs offered in each facility limit such comparisons." OIG Review at Appendix 8.

On August 18, 2016, a week after the OIG Review was published, then-Deputy Attorney General Sally Yates issued a two-page memorandum entitled, *Reducing our Use of Private Prisons*.[3] The Yates Memorandum stated that "for the first time in decades, the federal prison population has begun to decline, from nearly 220,000 inmates in 2013 to fewer than 195,000 inmates today," due, in part, to "the retroactive application of revised drug sentencing guidelines, new charging policies for low-level, non-violent drug offenders, and the Administration's

---

[2] A true and correct copy of the OIG Review is submitted herewith as Exhibit 1 to the Declaration of Milton S. McGee, III. The Court may take judicial notice of documents referred to, relied upon, or central to the complaint. *Weiner v. Klais and Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997); *Katt v. Titan Acquisitions, Ltd.*, 133 F. Supp. 2d 632, 637 (M.D. Tenn. 2000).

[3] A true and correct copy of the Yates Memorandum is submitted herewith as Exhibit 2 to the McGee Declaration. The Court may take judicial notice of this document. *See supra* at fn. 2.

6

ongoing clemency initiative."  McGee Decl. Ex. 2 (Yates Memorandum) at 1.  Ms. Yates also

observed that private prisons compare unfavorably to the BOP's own facilities in terms of the

level of correctional services, programs, and resources, and that private prisons do not save on

costs "substantially."  *Id*.  Ms. Yates directed the BOP to reduce its use of privately operated

prisons by either declining to renew contracts upon expiration or substantially reducing their

scope.  *Id.*  at 2.  Critically, neither the OIG Review nor the Yates Memorandum announced or

recommended that a single contract governing CC's facilities had been terminated or not

renewed due to alleged performance issues or non-compliance with contractual requirements.

Instead, as the Yates Memorandum explained, the policy change was driven by the declining

federal prison population, not by anything CC did or did not do.

     **E.**     **The Events Following the OIG Review and the Yates Memorandum**

Following the Yates Memorandum, the stock prices of companies that privately operate

correctional facilities suffered losses.  Plaintiff alleges that CC's common stock declined from a

close of $27.56 per share on August 10, 2016, to an intraday low of $13.04 per share on August

18, 2016.  Compl. ¶ 199.  Lawsuits against these public companies, like this one, soon followed.

For instance, another shareholder plaintiff brought a securities class action against GEO Group,

another public company in the industry, asserting claims nearly identical to those asserted here:

- The GEO Group "failed to adhere to the guidelines BOP uses to run its own
  facilities," and GEO's institutions featured "shoddy medical care, understaffing,
  and overall poorer prison conditions for prisoners as compared to those housed in
  public BOP run prisons."  McGee Decl. Ex. 5 (GEO Compl.) ¶ 3.

- The GEO Group falsely represented that it had "developed long-term
  relationships with our federal, state and other governmental customers, which we
  believe enhance our ability to win new contracts and retain existing business" and
  "[w]e operate each facility in accordance with our company-wide policies and
  procedures and with the standards and guidelines required under the relevant
  management contract."  *Id.* ¶ 68.

7

- The complaint against the GEO Group also cited the OIG Review and the Yates Memorandum as the two primary alleged corrective disclosures resulting in the stock drop and alleged damages to shareholders. *Id.* ¶¶ 126-135.

In *Mulvaney v. GEO Group, Inc.*, No. 16-CV-81494, 2017 WL 887193 (S.D. Fla. Feb. 23, 2017), in a 27-page decision, the district court dismissed the complaint in its entirety for failure to plead falsity and scienter. First, the court found that the defendants' "general statements about . . . revenue, and the relationships and contracts generating that revenue . . . are conclusory, but apparently accurate" and "do not convey a false impression about the underlying factors affecting Defendants' contractual relationships." 2017 WL 887193 at *8. The court concluded that such general allegations "do not impose a duty to disclose the quality of conditions in Defendants' prisons, or the likely effect of such conditions on Defendants' contractual relationships." *Id.* The court further held that certain negative information contained in facility audits and confidential witness statements did not render GEO's statements about policy compliance false. *Id.* at *8-9.

The court also found that the plaintiff failed to plead the requisite "strong inference" that GEO's executives acted with scienter:

> The only allegation that comes anywhere close to showing the Individual Defendants had a role in the fraud was a confidential witness statement that corporate headquarters directed facilities to maintain staff vacancies to increase profits. However, this allegation does not provide that any of the Individual Defendants issued, or even knew about, this directive. Neither does low staffing necessarily mean that GEO Group would be unable to maintain adequate prison conditions.

*Id.* at *12. Moreover, the court reasoned that the fact that GEO had provided services to the BOP for decades and had obtained several new contracts and contract renewals during the class period (just like CC) supported "an alternate inference that the Individual Defendants reasonably believed GEO Group had a strong relationship with the BOP, and that there was not a significant

8

risk that the DOJ would phase out BOP's use of contractors due to conditions in GEO Group's prisons."[4] *Id*. at *13.

Finally, and in any event, on February 21, 2017, the Attorney General's office rescinded the Yates Memorandum. *See* McGee Decl. Ex. 3 (Sessions Memorandum) at 1.[5] CC's stock price has since fully recovered, and at one point traded at a 52-week high.

### III.    LEGAL STANDARDS

To state claim under Section 10b of the Securities Exchange Act of 1934, Plaintiff must allege: (1) a material misrepresentation; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *In re Omnicare, Inc. Sec. Litig*., 769 F.3d 455, 469 (6th Cir. 2014); *see also* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. A securities fraud claim arising under § 10(b) must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). *In re Yum! Brands, Inc. Sec. Litig.*, 73 F. Supp. 3d 846, 858 (W.D. Ky. 2014). To comply with Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Wilson v. HSBC Bank, N.A.*, 594 F. App'x 852, 856 (6th Cir. 2014) (citations omitted).

Moreover, "a securities fraud claim must meet the more exacting pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ["PSLRA" or the "Reform Act"], 15 U.S.C. § 78u–4." *In re Yum! Brands*, 73 F. Supp. 3d at 858. Congress enacted the Reform Act to stem the proliferation of meritless securities class action lawsuits. H.R. Conf.

---

[4] Having found that the plaintiffs failed to plead a material misrepresentation or scienter, the GEO court declined to reach the issue of whether they alleged loss causation. *See* 2017 WL 887193 at *13 n.12.

[5] A true and correct copy of this document is submitted herewith as Exhibit 3 to the McGee Declaration. As noted above, the Court may take judicial notice of this document. *See supra* at fn. 2.

9

Rep. No. 104-369, at 41 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 740.  Congress sought to end the "routine filing of lawsuits . . . whenever there is a significant change in an issuer's stock price, without regard to any underlying culpability of the issuer, and with only faint hope that the discovery process might lead eventually to some plausible cause of action."  *Id*. at 31.  Thus, Congress "implement[ed] needed procedural protections to discourage frivolous litigation."  *Id*. at 31, 41.  The PSLRA fundamentally altered the evaluation of a complaint on a motion to dismiss.  These heightened pleading requirements have been described by the Sixth Circuit as an "elephant-sized boulder" aimed at preventing meritless claims.  *In re Omnicare, Inc. Sec. Litig*., 769 F.3d 455, 461 (6th Cir. 2014).

First, the Reform Act significantly raised the bar for pleading falsity.  I*n re Fritz Cos. Sec. Litig.*, 282 F. Supp. 2d 1105, 1111 (N.D. Cal. 2003) (Reform Act strengthened prior Rule 9(b) pleading requirements).  Under the Reform Act, a complaint must "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading" with factual particularity.  15 U.S.C. § 78u-4(b)(1)(B); *see also* Fed. R. Civ. P. 9(b).  Where such allegations are made on information and belief rather than personal knowledge, the complaint must "state with particularity all facts on which that belief was formed."  *Id*.  "When an alleged misrepresentation concerns hard information—typically historical information or other factual information that is objectively verifiable—it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading," but "[w]hen an alleged misrepresentation concerns soft information, which includes predictions and matters of opinion, a plaintiff must additionally plead facts showing that the statement was made

10

with knowledge of its falsity." *In re Omnicare*, 769 F.3d at 470 (quotation marks and citations omitted).[6]

*Second*, Plaintiff must "state with particularity facts giving rise to a *strong* inference that Defendants acted with the required state of mind" in violating the securities laws "with respect to *each* act or omission alleged." 15 U.S.C. § 78u-4(b)(2) (emphasis added); *see also Tellabs, Inc.*, 551 U.S. at 313. Scienter is defined as a "knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness." *Doshi v. General Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citations omitted). "Recklessness is . . . highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011) (citations omitted). It requires more than negligence and is "akin to conscious disregard." *Id.* (citation omitted). Courts in the Sixth Circuit generally apply a "non-exhaustive list of nine factors" to determine whether a plaintiff has adequately pled scienter:

(1)    insider trading at a suspicious time or in an unusual amount;

(2)    divergence between internal reports and external statements on the same subject;

(3)    closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4)    evidence of bribery by a top company official;

(5)    existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6)    disregard of the most current factual information before making statements;

---

[6] Importantly, as discussed below, the PSLRA also immunizes "forward-looking" statements unless a plaintiff can demonstrate that they are (1) material, (2) not accompanied by meaningful cautionary statements, and (3) made with actual knowledge that the prediction is false. *See* 15 U.S.C. § 78u-5(c) (2006); *see also Miller v. Champion Enters., Inc.*, 346 F.3d 660, 672 (6th Cir. 2003).

(7)     disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8)     the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9)     the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039-40 (citing *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001) (en banc), *overruled in part on other grounds by Tellabs*, 551 U.S. at 314.

Furthermore, a "strong inference" of scienter "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 324. Unlike traditional pleading standards, this requires courts to consider "plausible opposing inferences," *id*. at 323, and review "all the allegations holistically[.]" *Id*. at 326. The PSLRA mandates, as the Sixth Circuit has acknowledged, that a complaint failing to satisfy these heightened pleading requirements "shall" be dismissed. *See* § 78u-4(b)(3)(A); *Doshi*, 823 F.3d at 1041-43; *Omnicare*, 769 F.3d 481-84; *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 686 (6th Cir. 2003) (affirming dismissal for failure to pass muster "under the heightened pleading requirements of the PSLRA"); *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999) (same).

*Third*, the Complaint must plead loss causation, "*i.e.*, that a causal connection exists between the alleged material misrepresentation and the plaintiffs' loss." *Fla. Carpenters Reg'l Council Pension Plan v. Eaton Corp.*, 964 F. Supp. 2d 875, 890 (N.D. Ohio 2013) (citing *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 341 (2005)). To plead loss causation in the Sixth Circuit, mere "boilerplate language" is manifestly insufficient. *Eaton*, 964 F. Supp. 2d at 890. Instead, a plaintiff must plead and prove that disclosure of the alleged fraud caused its damages, rather than "changed economic circumstances, changed investor expectations, *new industry-*

12

*specific* or firm-specific facts, conditions, or other events, which taken separately or together

account for some or all of that lower price." *Dura*, 544 U.S. at 343 (emphasis added).

## IV.     ARGUMENT

Plaintiff has failed as a matter of law to plead with the required factual particularity the

elements of falsity, scienter, and loss causation in accordance with federal law, controlling

Supreme Court jurisprudence, and Sixth Circuit precedent.  The Complaint should be dismissed

in its entirety.

### A.     Plaintiff Has Failed to Plead Any False or Misleading Statements With Factual Particularity

As noted above, Plaintiff challenges four categories of class period statements as

materially false or misleading at the time they were made.  Each of these categories is addressed,

in turn, below.

#### 1.     Statements About CC's Quality and "Improvements" are Statements of Corporate Optimism Which Were Not False When Made

Plaintiff alleges numerous "misstatements" regarding the quality of CC's operations,

including statements where CC opined that the outsourcing of correctional services to CC

resulted in improving correctional services for government agencies.  These statements

include—as a representative sample—the following:

- "Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities."  Compl. ¶ 35.

- "As a business we are able to provide taxpayers an essential government service at equally high standards of quality and efficiency. . . . Competitive private-sector entities are motivated to move swiftly, evaluate and refine success each day, and maintain the highest operating standards at least cost."  *Id*. ¶ 142.

- "Quality, in the form of Operational Excellence, is a core value and essential guiding principle for [CC]."  *Id*. ¶ 151.

13

*See also id.* ¶¶ 116, 120, 149, 164, 166, 168.

Plaintiff contends that these statements were materially false and misleading when made because "CC did not provide quality corrections services."  Compl. ¶ 121.  As noted above, Plaintiff's theory of liability is based upon a small handful of reports of "inadequate staffing," "poor health services," and "systemic failures[]" at four of the 80-plus facilities CC owned or operated during the class period.  *See Id.* ¶ 37.

As a preliminary matter, Plaintiff cites the OIG Review, which found that contract prisons "incurred more safety and security incidents per capita than comparable BOP institutions."  Compl. ¶ 116.  But the OIG's observation does not render CC's class period statements regarding the "quality" and "improvements" of its services materially false or misleading.  In any event, Plaintiff's argument is based upon a false predicate:  that private correctional facilities can be accurately compared to BOP facilities using the same criteria and data.  Laying to rest any remaining dispute, as noted, the BOP "caution[ed] against drawing comparisons of contract prisons to BOP operated facilities as the different nature of the inmate populations and programs offered in each facility limit such comparisons."  McGee Decl. Ex. 1 (OIG Review) at Appendix 8.

Moreover, that "quality" is "a core value and essential guiding principle of CC" and part of CC's "primary business strategy" is corporate puffery and inactionable hyperbole.  The Sixth Circuit has observed that reasonable investors do not view such statements as "significantly changing the general gist of available information, and thus, are not material, even if they were misleading."  *Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co. (In re Ford Motor Co. Sec. Litig.)*, 381 F.3d 563, 570 (6th Cir. 2004).  Indeed, as the Sixth Circuit succinctly stated in

14

*In re Ford Motor Co. Sec. Litig.*, "[a]ll public companies praise their products and their objectives." *Id.*[7]

### 2. Statements About "Contract Renewals" are Forward-Looking Statements Protected by Federal Law

Plaintiff next alleges that CC made several alleged false or misleading forward-looking statements regarding its potential for future contract renewals. These statements include—as a representative sample—the following:

- "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs." Compl. ¶ 129.

- "We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide." *Id.* ¶ 129.

- "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations." *Id.* ¶ 132.

  *See also id.* ¶¶ 117, 130, 133, 139-140.

According to Plaintiff, these statements are materially false and misleading because "the 'quality' of services that [CC] provided to its government customers, and in particular the BOP, was poor and was not supportive of the Company's renewal rate being and remaining high." *Id.* ¶ 170. But as Congress made clear in expressly protecting forward-looking statements under the Reform Act, "a company's own assessment of its future potential [is] among the most valuable information shareholders and potential investors could have about a firm." H.R. Conf. Rep. No. 104-369, at 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 742. All of the contract renewal disclosures Plaintiff attacks here were accompanied by meaningful cautionary language. Indeed,

---

[7] Nor are these statements rendered false by the alleged BOP policy violations that Plaintiff selectively cites in the Complaint.

CC cautioned investors that the statements were forward-looking and subject to risks that could materially affect future business prospects, and referred shareholders and potential investors to more specific disclosures in CC's SEC filings. *See* McGee Decl. Ex. 7 (2011 Form 10-K) at 1-2, 5, 17, 20-30, 37, 41-42, 47, 60, 66; McGee Decl. Ex. 8 (2012 Form 10-K) at 1, 7, 10, 23, 26-46, 52-53, 57, 62, 76, 82; McGee Decl. Ex. 9 (2013 Form 10-K) at 3-4, 6, 22-23, 25-40, 48, 52, 57, 68, 74; McGee Decl. Ex. 10 (2014 Form 10-K) at 3-4, 6, 20, 22-38, 42, 46; McGee Decl. Ex. 11 (2015 Form 10-K) at 3-4, 6, 24, 27-41, 43-48, 54, 58, 65, 80, 88.[8]

In addition, CC provided extensive risk disclosures in its class period SEC filings that placed Plaintiff—and every other shareholder and potential investor—on notice of the risks of adverse consequences if the U.S. Government decided to terminate or not renew its private correctional facility contracts with the Company. The DOJ's abrupt shift in policy on its future use of private correctional facilities was one of the risks CC explicitly disclosed to investors:

- "We depend on a limited number of governmental customers for a significant portion of our revenues. We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. The loss of, or a significant decrease in, business from the BOP, ICE, USMS, or various state agencies could seriously harm our financial condition and results of operations." 2014 Form 10-K at 27.

- "Our growth is generally dependent upon our ability to obtain new contracts to develop and manage correctional and detention facilities. This possible growth depends on a number of factors we cannot control, including . . . governmental and public acceptance of privatization." 2015 Form 10-K at 30-31.

- "The industry in which we operate is subject to extensive federal, state, and local regulations. . . . We may not always successfully comply with these regulations and contract requirements, and failure to comply can result in material penalties, including financial penalties,

[8] Select portions of CC's class period Forms 10-K are submitted herewith as Exhibits 7-11 to the McGee Declaration. The Sixth Circuit has held that courts "may consider the full text of SEC filings, prospectuses, analysts' reports and statements 'integral to the complaint,' even if not attached, without converting the motion to one for summary judgment…." *Bovee v. Coopers & Lybrand C.P.A.*, 272 F.3d 356, 360-361 (6th Cir. 2001).

16

non-renewal or termination of facility contracts, and suspension or debarment from contracting with certain government entities." 2013 Form 10-K at 27-28.

In light of these robust risk disclosures, Plaintiff's alleged misstatements regarding contract renewals were not false or misleading to shareholders. *In re F & M Distribs., Inc. Sec. Litig.*, 937 F. Supp. 647, 656 ( E.D. Mich. 1996). In any event, the Sixth Circuit has held that a company "is not required to detail every facet or extent of that risk to have adequately disclosed the nature of the risk." *Miller v. Champion Enters., Inc*., 346 F.3d 660, 678 (6th Cir. 2003) (finding that general disclosures regarding the "over supply of retail inventory of homes" provided sufficient meaningful cautionary language). In the end, Plaintiff was on notice, throughout the class period, of the very risks that it now contends render the statements about contract renewals false or misleading. *See* 2011 10-K at 2, 17, 20-24, 60, 66; 2012 10-K at 3, 7, 23, 26-30, 76, 82; 2013 10-K at 3-4, 6, 22, 25-29, 68, 74; 2014 10-K at 3-4, 6, 23-27, 64, 70; 2015 10-K at 3-4, 6, 24, 27-34, 80, 88.

### 3. Statements About Costs Savings are "Mere Puffery" and are Not Actionable

Plaintiff identifies purported "misstatements" regarding the cost savings CC offers, citing instances where Defendants stated that outsourcing of correctional services resulted in significant cost savings for government agencies, including the BOP. These statements include—as a representative sample—the following:

- "We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds." Compl. ¶ 122.

- "We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services." *Id*. ¶ 126.

17

- "We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system." *Id.* ¶ 126.

  *See also id.* ¶¶ 123, 124, 127, 129-130, 147, 149, 153, 155, 157, 159-162, 168.

In furtherance of this argument, Plaintiff cites the OIG Review for the proposition that CC's facilities "did not result in any significant cost savings to the BOP, undermining a critical rationale for their utility." *Id.* ¶ 117. But the OIG Review does not support Plaintiff's contention. The OIG Review stated that it was "unable to compare the overall costs of incarceration between BOP institutions and contract prisons in part because of the different nature of the inmate populations and programs offered in those facilities." OIG Review at 11. Notwithstanding that inherent limitation, the OIG nevertheless found that "the average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively." OIG Review at 12. In short, Plaintiff's allegations are undercut by the very support upon which they rely. Regardless, CC's cost saving statements (again) are nothing more than inactionable puffery. As the Sixth Circuit has made clear, "sales figures, projections, forecasts and the like only rise to the level of materiality when they can be calculated with substantial certainty." *James v. Gerber Prods. Co.*, 587 F.2d 324, 327 (6th Cir. 1978).

### 4. Statements About Policy Violations Constitute Generalized Optimism and Were Not False When Made

Finally, Plaintiff alleges that CC made materially false or misleading statements about the fact that its facilities were operated "in accordance with" applicable policies, procedures, and contractual requirements. These statements include—again, as a representative sample—the following:

- "We operate our facilities in accordance with both company and facility-specific policies and procedures." Compl. ¶ 135.

18

- "Our facilities not only operate under [] established standards, but they are consistently challenged by management to exceed them." *Id.* ¶ 135.

- CC "is highly motivated to comply with its contracts [and] meets its own standards of excellence." *Id.* ¶ 142.

  *See also id.* ¶¶ 136-137, 144-145.

Plaintiff's allegations fail as a matter of law. These statements are far too general to be proven false by a handful of cherry-picked violations at a small number of facilities alleged in the Complaint. In any event, these alleged false or misleading statements are simply CC's "opinions, motives and instructions, or general statements of optimism, which constitute no more than puffery and are understood by reasonable investors as such." *Helwig*, 251 F.3d at 567-568.[9]

In sum, Plaintiff has failed to plead an actionable false or misleading statement with factual particularity. The analysis can and should end there.

### B. Plaintiff Has Failed to Plead Particularized Facts Giving Rise to a "Strong Inference" of Scienter

Most fundamentally, Plaintiff does not even attempt to plead particularized facts demonstrating that any Defendant knew (or was "deliberately reckless" in not knowing) that any class period statement was materially false or misleading. Without any particularized factual support, Plaintiff concludes that Defendants "had actual knowledge of, or were at least deliberately reckless with respect to," the facility audit reports discussed in the Complaint. Compl. ¶ 171. But that is, in essence, all Plaintiff alleges: Plaintiff does not identify which Defendant had access to which report, when any Defendant had access to any report, the contents of any such report, the discrepancy between the reports and Defendants' contemporaneous public statements (if any), or explain why those contents support a "strong inference" of scienter with

---

[9] Notably, Plaintiff fails, on many occasions, to even identify when the alleged violations took place, which further undercuts any argument that the statements at issue were false when made.

19

respect to any class period statement. *Tellabs*, 551 U.S. at 314. Nor does Plaintiff allege any particularized facts to suggest why any Defendant would be motivated to commit securities fraud—*e.g.*, there are no facts alleged that any Defendant stood to benefit individually by engaging in securities fraud, that any Defendant paid or received bribes, or that any individual Defendant engaged in suspicious trading at the time CC's stock was purportedly selling at artificially inflated prices. *Doshi*, 823 F.3d at 1039-40. To the contrary, the Complaint, and the sole former employee it identifies, describe a competent and experienced senior executive team, and robust internal controls upon which CC's senior executives could rely. Compl. ¶¶ 22-25; 172-79.

        **1.**      **The Individual Defendants' Alleged Access to Information Does Not Give Rise to a "Strong Inference" of Scienter**

Plaintiff alleges "that the Company had extensive systems and controls in place to monitor the quality of the services provided by [CC]'s facilities," including a group "that collects and reports performance metrics to 'senior management' and an Audit and Compliance Systems Section that audited [CC] facilities to determine issues in need of 'management attention.'" Compl. ¶ 172. As noted above, Plaintiff identifies one former employee, "FE1," who worked at CC during some undefined 10-year period of time, who never claims to have ever spoken to any Defendant (about the allegations in this case—or anything else) and who claims that information related to facility audits would be entered into two databases and subsequently made available to unnamed officers. *Id.* ¶¶ 174-79. These allegations fail as a matter of law. *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004); *see also In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) ("Fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.").

In fact, the court in the GEO case correctly rejected virtually identical allegations on these same grounds:

Although Plaintiffs allege that "problems" were brought to the attention of [the individual defendants], they do not allege the content of the information that the Individual Defendants received or the reasonable conclusions that they drew from this information. Similarly, a compliance director, who stated that the compliance directors distributed a monthly report of the results of contract compliance audits to GEO Group's executives, did not provide any information as to the content of these reports. The absence of allegations detailing the reports' contents, when Plaintiffs had access to a director who compiled the reports, gives rise to the alternate inference that the reports did not give the Individual Defendants notice of inadequate prison conditions that could jeopardize GEO Group's contracts.

*Mulvaney v. Geo Grp., Inc.*, No. 16-cv-81494, 2017 WL 887193, at *12 (S.D. Fla. Feb. 23, 2017). This same reasoning applies with equal if not greater force in this case.

### 2.  Defendants' Alleged Resistance to Certain Shareholder Proposals Does Not Give Rise to a "Strong Inference" of Scienter

Plaintiff further contends that the Company's rejection of two shareholder proposals supports a "strong inference" of scienter. This allegation can be laid to rest in short order.

The first proposal was dated November 23, 2016—*after* the publication of the OIG Review and the Yates Memorandum—and after the end of the class period. If adopted, this proposal would have "require[d] the Company to subject its facilities to a biannual operational audit by a qualified independent organization and disclose the final audit reports to the Company's shareholders." Compl. ¶ 181. Defendants' rejection of this proposal says nothing about their alleged scienter regarding alleged false and misleading statements that, according to Plaintiff, were made (and then allegedly corrected) long before the proposal. Courts routinely have recognized that facts arising "at the end of the class period and well after the allegedly misleading statements were made" have "little bearing on what the company did or did not know at the time the allegedly misleading statements were made," and therefore "do[] not support a strong inference of scienter." *Kuyat v. BioMimetic Therapeutics, Inc.*, 747 F.3d 435, 442 (6th Cir. 2014). Simply stated, Plaintiff does explain how Defendants' rejection of a post-class

period shareholder proposal is in any way indicative of an intent to engage in a securities fraud that purportedly had been revealed months earlier.

The second proposal, dated in 2012, allegedly requested that CC "provide biannual reports describing Board oversight of the Company's efforts to reduce prisoner sexual abuse." Compl. ¶ 184. But Plaintiff concedes that the Company opposed the proposal for competitive reasons, and in any event, that the Company already had internal monitoring and quality-control systems in place. *Id.* ¶¶ 174-79. [10] Again, Plaintiff does not provide any particularized factual support for the proposition that the rejection of this shareholder proposal supports a "strong inference" of scienter with respect to any Defendant. The far more "cogent" and "compelling" inference is that CC did not want to place itself at a competitive disadvantage, the consequences of which would actually harm its shareholders.

### 3. Plaintiff's Allegations About Defendants' Cost Savings Statements are Conclusory

Plaintiff attempts to allege scienter by claiming that some of Defendants' claimed "cost savings" rely on adding an imputed cost for real estate when measuring BOP operating costs in order to conclude that the Company's operating costs were lower. Compl. ¶ 188. This argument fails for numerous reasons. First, Plaintiff has pled nothing to suggest that the methodology behind this disclosure is unreasonable, misleading or improper. Second, the fact that Plaintiff has pled specific facts about this adjustment—down to the imputed cost per inmate per day—demonstrates conclusively that Defendants were transparent at all relevant times regarding the methodology employed for calculating, adjusting, and comparing costs. Compl. ¶ 188. Third, and in any event, as noted, the OIG repeatedly "caution[ed] against drawing comparisons of

---

[10] Indeed, it is worth noting that the OIG Review found that contract prisons had fewer incidents of sexual misconduct than BOP prisons. OIG Review at 25-27.

contract prisons to BOP operated facilities as the different nature of the inmate populations and programs offered in each facility limit such comparisons." OIG Review at Appendix 8. Finally, and perhaps most importantly, Plaintiff fails to explain how these statements support a finding that any Defendant intended to defraud CC's shareholders during the class period. To the contrary, the OIG Review, notwithstanding the stated limitations on comparisons between BOP and privately operated facilities, suggested that Defendants' statements about "cost savings" were true. *See* OIG Review at 12 ("[T]he average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively.")[11]

### 4. Numerous Facts Demonstrate That an Inference of Nonfraudulent Intent is Far More "Cogent and Compelling"

The Court is required to consider competing, "non-fraudulent" inferences. *Tellabs*, 551 U.S. at 314. Here, the competing, nonfraudulent inferences are far more cogent and compelling than any inference that Defendants intended to defraud CC's shareholders. CC has operated BOP facilities and provided contract corrections services to the federal government for decades. *See* Compl. ¶¶ 43, 68, 87, 108. BOP frequently audited CC's operations, long before the alleged class period, without canceling any of CC's contracts for failing to comply with BOP policies. *Id*; *see also id.* ¶ 37. CC also renewed multiple contracts with the federal government *before, during, and after* the class period. As noted, Plaintiff does not and cannot allege that any Defendant engaged in suspicious stock sales or stood to benefit individually in any manner from any purported securities fraud. *See Doshi*, 823 F.3d at 1042 (citing absence of suspicious trading as a factor undermining any inference of scienter); *Helwig*, 251 F.3d at 552 (same). Finally, as the Complaint acknowledges, CC maintained extensive internal controls and reporting systems

---

[11] Regarding Plaintiff's claim that any cost savings were only attributable to staff shortages, the *Geo* court correctly rejected the same allegation. *Mulvaney*, 2017 WL 887193, at *12.

designed to identify and prevent the types of infractions and false or misleading disclosures alleged in the Complaint, which is indicative of good corporate governance, not fraud.[12]

### C. <u>Plaintiff Has Failed to Plead Loss Causation</u>

Finally, the Complaint fails to plead anything that could establish "a causal connection . . . between the alleged material misrepresentation and the plaintiffs' loss." *Eaton*, 964 F. Supp. 2d at 890. Plaintiff's alleged losses were due to the industrywide reaction to the OIG Review and the Yates Memorandum. On August 18, 2016—when the Yates Memorandum was released—CC's stock price dropped by 35%. But that very same day, the stock price of CC's closest publicly traded competitor, the GEO Group, dropped by 40% from the previous day's close. *See* McGee Decl. Ex. 6 (GEO Group Stock Price).[13] Thereafter, CC's stock price, and that of its competitors, rebounded, when the Yates Memorandum was rescinded. In short, this is not securities fraud, but instead the result of a short-term policy shift that impacted an entire industry. *Dura*, 544 U.S. at 343; *see also Oklahoma Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1084-86 (D. Minn. 2012) (no loss causation where company's stock price declined "in reaction to governmental announcements that signaled a likely change in the regulation of [the entire] industry.").[14]

## V. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss Plaintiff's Complaint in its entirety.

---

[12] Plaintiff's failure to plead scienter as to the individual Defendants under the facts alleged here means that scienter cannot be imputed to the Company. *In re Omnicare*, 769 F.3d at 476.

[13] The Court may take judicial notice of CC's trading value. *See D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 (E.D. Mich. 2003), aff'd, 133 F. App'x 994 (6th Cir. 2005); *In re Keithley Instruments, Inc. Secs. Lit.*, 268 F. Supp. 2d 887, 896 (N.D. Ohio 2002).

[14] Since Plaintiff has failed to state a claim against CC for liability under section 10(b), its claim for control person liability under section 20(a) must be dismissed as a matter of law. *See PR Diamonds*, 364 F.3d at 697.

24

Respectfully submitted:


_/s/ Steven A. Riley_____
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com


David J. Schindler
Brian T. Glennon
Anna E. Berces (*pro hac vice to be filed*)
Morgan E. Whitworth (*pro hac vice to be
     filed*)
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
anna.berces@lw.com
morgan.whitworth@lw.com


*Attorneys for Defendants Corrections
Corporation of America, Damon T.
Hininger, David M. Garfinkle, Todd J.
Mullenger, and Harley G. Lappin*

25

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars, Suite 100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

This the 12th day of May, 2017.

s/ Steven A. Riley

26