# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JOHN J. MULVANEY, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>THE GEO GROUP, INC., GEORGE C. ZOLEY, BRIAN R. EVANS, JOHN HURLEY, and DAVID DONAHUE<br><br>Defendants. | Case No. 9:16-cv-8149 -DMM<br><br>AMENDED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS<br><br><br>CLASS ACTION<br><br><br>DEMAND FOR JURY TRIAL |

## AMENDED CLASS ACTION COMPLAINT

Lead Plaintiffs Brian A. Hellings and the Ann Hellings 2012 Trust[1] ("Plaintiffs"),
individually and on behalf of all other persons similarly situated, by their undersigned attorneys,
for their complaint against defendants, alleges the following based upon personal knowledge as
to themselves and their own acts, and information and belief as to all other matters, based upon,
*inter alia*, the investigation conducted by and through their attorneys, which included, among
other things, a review of the defendants' public documents, conference calls and announcements
made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire
and press releases published by and regarding The GEO Group, Inc. ("GEO" or the "Company"),
analysts' reports and advisories about the Company, and information readily obtainable on the
Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set
forth herein after a reasonable opportunity for discovery.

---

[1] The Ann Hellings 2012 Trust ("Hellings Trust") was mistakenly referred to as the Ann Hellings 2016
Trust in the Lead Plaintiff motion papers filed on October 24, 2016, Dkt. No. 40, and in the Court's subsequent
Order appointing Lead Plaintiffs on November 21, 2016, Dkt. No. 53.  All other information regarding the Hellings
Trust contained in the Lead Plaintiff motion papers and accompanying certification is accurate.

1

**NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of a class consisting of all persons other than defendants who purchased or otherwise acquired GEO securities between March 1, 2012, and August 17, 2016, both dates inclusive (the "Class Period"), seeking to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      GEO provides government-outsourced services specializing in the management of correctional, detention, and re-entry facilities, and the provision of community based services and youth services in the United States, Australia, South Africa, the United Kingdom, and Canada.  The Company operates through four segments: U.S. Corrections & Detention, GEO Community Services, International Services, and Facility Construction & Design.

3.      At issue here are the private prison facilities GEO owns and manages pursuant to contracts with the Federal Bureau of Prisons ("BOP"), the component of the Department of Justice ("DOJ") responsible for incarcerating all federal defendants sentenced to prison.  Placing profit concerns above the well-being of the immigrant inmates housed in those facilities, GEO failed to adhere to the guidelines BOP uses to run its own facilities.  At all relevant times this resulted in shoddy medical care, understaffing, and overall poorer prison conditions for prisoners as compared to those housed in public BOP run prisons.  As a result of constant BOP audits, regular meetings with prison wardens by GEO management, including hands on CEO Defendant Zoley, and prisoner complaints (both officially lodged and those expressed through prison riots), Defendants' had full awareness of the troubling issues plaguing its private BOP contracted

2

facilities.  These pervasive issues created an unreasonable risk of regulatory scrutiny and BOP contract cancellations that ultimately materialized, as described below.

4.     Nevertheless, throughout the Class Period, Defendants issued materially misleading statements regarding GEO's BOP contracted private prisons.  Specifically, having opted to speak about the GEO prisons run pursuant to private contract with the BOP, Defendants were duty bound to disclose that: (i) GEO's BOP contracted private facilities lacked adequate safety and security standards and were less efficient at offering correctional services than BOP facilities; (ii) GEO's BOP contracted private facilities often failed to adhere to their contractual obligations in running those prisons; (iii) a significant risk existed that the DOJ would recommend phasing out BOP's contracts with GEO; and (iv) consequently, a risk also existed that the Department of Homeland Security or other governmental agencies in contract with GEO would similarly choose to investigate its private run prisons.

5.     The years during which GEO failed to divulge the growing risk that subpar conditions in its private BOP contracted prisons would invite regulatory scrutiny came to a head in August 2016. Specifically, beginning on August 11, 2016, the Evaluation and Inspections Division of the DOJ Office of the Inspector General ("OIG") published its Review of the Federal Bureau of Prisons' ("BOP") Monitoring of Contract Prisons, Evaluation and Inspections Report 16-06 ("OIG Report").  The OIG initiated Report 16-06 to assess how the BOP monitors contract prisons, which accounted for approximately 12% of the BOP's total inmate population as of December 2015.  Fourteen BOP contract prisons were operated by three corporations: GEO, Corrections Corporation of America ("CCA"); and Management and Training Corporation ("MTC").  The OIG's review looked at contract prisons during FY 2011 through FY 2014.

3

6.      The OIG Report found that BOP's private contracted facilities, and in particular GEO's facilities, had higher incidents of contraband finds, assaults—including assaults on staff, guilty findings on inmate discipline charges, lockdowns, positive drug results, sexual misconduct, and understaffing.  The OIG Report also noted that GEO's D. Ray James facility was issued a cure notice by BOP in the fall of 2012 related to "significant performance issues on its contract."  The BOP only issues such notices when issues are so severe that it is "on the brink of ending the contract."

7.      GEO, which had been advised of the results of the OIG Report, downplayed the significance of the data and attributed its poor findings generally to population demographics (without explaining what those differences actually were) and purported differences in oversight in the contract facilities versus BOP run facilities but didn't address facility specific findings from the OIG Report such as those pertaining to the D. Ray James facility in Georgia or the Rivers Correctional Institution in North Carolina.  Indeed, the OIG made clear that upon reviewing GEO's responses to the contents of its report, "the OIG has determined that the contractors' responses do not affect our analysis or the conclusions reached in this report."

8.      Then, on August 18, 2016, DOJ publicly announced the results of the investigation undertaken of the BOP facilities under private contract.   The DOJ expressed concerns over the quality of operations at BOP contracted facilities and directed the BOP to evaluate the future renewals of private contracts, in order to reduce the use of privately operated facilities over time.

9.      Specifically, Deputy Attorney General Sally Yates ("Yates") announced the DOJ's decision to end its use of private prisons, including those operated by GEO, after officials concluded that the facilities are both less safe and less effective at providing correctional services

4

than those run by the federal government.  In a memorandum addressed to the Acting Director of the Federal Bureau of Prisons, entitled "Reducing our Use of Private Prisons," Deputy Attorney General Yates stated, in part:

> Private prisons served an important role during a difficult period, but ***time has shown that they compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources***; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, ***they do not maintain the same level of safety and security***.  The rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource—and these services are essential to reducing recidivism and improving public safety.
>
> For all these reasons, I am eager to enlist your help in beginning the process of reducing—and ultimately ending—our use of privately operated prisons.  As you know, all of the Bureau's existing contracts with private prison companies are term-limited and subject to renewal or termination.  I am directing that as each contract reaches the end of its term, the Bureau should either decline to renew the contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population.

10.     On this news, GEO's share price fell $12.78, or 39.58%, to close at $19.51 on August 18, 2016.

11.     Having placed a glaring spotlight on the problems plaguing the privately run prisons as compared to BOP run prisons, the DOJ investigation prompted action by the Department of Homeland Security ("DHS"). On August 29, 2016, DHS Secretary Jeh Johnson released a statement saying he is directing the Homeland Security Advisory Council's chair, Judge William Webster, to establish a subcommittee to "review our current policy and practices concerning the use of private immigration detention and evaluate whether this practice should be eliminated." Immigration and Customs Enforcement (ICE), a division of DHS, currently uses detention facilities run GEO.

5

12.     Following the issuance of the DHS Report of the Subcommittee on Privatized Immigration Detention Facilities, dated December 1, 2016, the Homeland Security Advisory Council (a nonpartisan expert council of law enforcement, national security, military, and corporate leaders) voted 17-5 to shift away from using private prisons to detain immigrants.

13.     GEO has earned $1.18 billion from contracts with ICE since 2008, about 35 percent of its total revenue from government contracts. Loss of those contracts would represent a major hit to GEO's bottom line.

14.     As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

15.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

17.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b), as defendant GEO is headquartered within this District.

18.     In connection with the acts, conduct and other wrongs alleged in this Complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

6

## PARTIES

19.     Plaintiffs, as set forth in the attached Certifications attached to the Lead Plaintiff motion papers filed on October 24, 2016, acquired GEO securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant GEO is incorporated in Florida, and the Company's principal executive offices are located at 621 Northwest 53rd Street, Suite 700, Boca Raton, Florida 33487. GEO's common stock trades on the NYSE under the ticker symbol "GEO."  GEO was founded in 1984 and is headquartered in Boca Raton, Florida.  The Company's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "GEO."

21.     Defendant George C. Zoley ("Zoley") has served at all relevant times as the Company's Chairman and Chief Executive Officer.

22.     Defendant Brian R. Evans ("Evans") has served at all relevant times as the Company's Chief Financial Officer and Senior Vice President.

23.     Defendant John Hurley ("Hurley") served as Senior Vice President of Operations and President of GEO Corrections and Detentions at all relevant times until February 2016.

24.     Defendant David Donahue ("Donahue") has served as President of GEO Corrections and Detentions since February 2016.

25.     The defendants referenced above in ¶¶ 21-24 are sometimes referred to herein as the "Individual Defendants."

7

## SUBSTANTIVE ALLEGATIONS

### Background

26.     Once prosecuted, non-citizen federal prisoners are mostly segregated into thirteen "Criminal Alien Requirement" (CAR) prisons.  The CAR prisons are some of the only federal prisons operated by for-profit companies instead of being run as federal institutions by the BOP. Essentially, to help alleviate overcrowding in BOP institutions and respond to congressional mandates, in 1997 the BOP began contracting with privately operated institutions (often referred to as "contract prisons"), at first on a smaller scale and later more extensively, to confine inmates who are ***primarily low security***, criminal alien adult males.   Many of the inmates incarcerated in these contract prisons are Mexican nationals with convictions for immigration offenses who have 90 months or less remaining to serve on their sentences.   As of December 2015, contract prisons housed roughly 22,660 of these federal inmates, or approximately 12 percent of the BOP's total inmate population. These prisons were operated by three private corporations: Corrections Corporation of America (CCA); GEO; and Management and Training Corporation (MTC).

27.     For the last three decades, GEO has partnered with the federal government by providing services for the federal bureau of prisons, ("BOP"), U.S. immigration and customs enforcements ("ICE"), and the U.S. Marshal Service.  Stemming as far back as the mid-1980s, GEO has also owned or managed correctional facilities for 10 states, including, Florida, Georgia, Louisiana, Oklahoma, Arizona, New Mexico, California, Vermont, Virginia and Indiana.

28.     At all relevant times, GEO owned and managed five federal prisons on behalf of the BOP, totaling approximately 11,000 beds.  According to the BOP, the private contract prisons operated by The GEO Group include: 1) Big Springs, Texas; 2) D. Ray James, Georgia; 3) Moshannon Valley, Pennsylvania; 4) Reeves Correction Institution, Texas; 5) Reeves Detention Center, Texas; and 6) Rivers, North Carolina.  In December 2014, the BOP entered

8

into a new contract with GEO to operate the Great Plains Correctional Facility in Oklahoma. Operations at this contract prison began in June 2015.

29.     According to a report released last year by the Center for American Progress, federal contracts, including those from the Bureau of Prisons and ICE, rose from 27 percent of the GEO Group's revenues in 2005 to 42 percent in 2014.

## GEO's BOP Contracts

30.     The BOP's contracting process is governed by the Federal Acquisition Regulations (FAR) and the Justice Acquisition Regulations. The BOP's acquisition policy supplements the FAR and the Justice Acquisition Regulations and provides uniform acquisition procedures. Contractors must comply with all applicable federal, state, and local laws and regulations, as well as all applicable executive orders, case laws, and court orders. In addition, contractors must follow a number of BOP policies and requirements as defined in their contracts. One specific requirement applicable to all contract prisons is obtaining and maintaining accreditation from the American Correctional Association (ACA) and the Joint Commission on Accreditation of Healthcare Organizations. Contractors also must meet 29 functions that the BOP has identified as vital to contract performance. The vital functions can range from creating an adequate security inspection system to providing nutritionally adequate meals and ensuring inmates have access to healthcare. The 29 vital functions fall under operational areas, each of which is assigned a percentage that correlates with contractor performance: 1) Administration (10 percent); 2) Correctional Programs (10 percent); 3) Correctional Services (20 percent); 4) Food Service (15 percent); 5) Health Services (15 percent); 6) Human Resources (10 percent); 7) Inmate Services (15 percent), and 8) Safety and Environmental Health (5 percent).

9

31.     ***BOP contracts place the responsibility for quality control on the contractor, e.g., GEO, rather than on the BOP***. GEO is obligated to maintain a quality control program with audit tools that incorporate all of its contractual requirements. A Quality Assurance Specialist and a trained team of contract staff are supposed to conduct audits monthly or every other month based on their prison's specific audit tools. GEO is then supposed to provide the audit results to its corporate headquarters and the BOP. GEO's corporate headquarters is also supposed to conduct an annual audit of its prisons and provide the results to the BOP. If GEO identifies a deficiency, which generally is considered to be a deviation from the contract, a weakness in internal controls, or an instance of nonconformance with an ACA standard affecting the quality of service provided, the contract staff is supposed to generate a corrective action plan to monitor and resolve areas of nonconformance, which it is supposed to send to the BOP within 30 days following a notice of deficiency.  Onsite monitors and contract staff are supposed to oversee the implementation of corrective actions until deficiencies are resolved.

## GEO Private Prisons' Abysmal Conditions

32.     For years, GEO has run its BOP private prisons with maximizing profit as its foremost motivation, regardless of its contractual obligations and regardless of whether its cost cutting measures resulted in appalling conditions for its detainees.

33.     As the August 2016 OIG Report states, "In recent years, disturbances in several contract prisons [including GEO prisons] have resulted in extensive property damage, bodily injury, and the death of a Correctional Officer."  As a result of these disturbances, as well Defendants' access to BOP monitoring reports, Defendant Zoley's meetings with prison wardens, among other things, Defendants knew, or were reckless in not knowing, long before Deputy Attorney General Sally Yates wrote in August of 2016 that private prisons "simply do

not provide the same level of correctional services, programs, and resources," "do not save substantially on costs," and "do not maintain the same level of safety and security" as facilities operated by the BOP.  Rampant issues in GEO's prisons include, but are not limited to, deficient internal quality control, deplorable medical care, understaffing, security lapses, high rates of assault and use of force, overuse of isolation in specialized housing units, insufficient policies (or no policies) in place for determining when an inmate should be segregated with restricted movement, positive drug test results, and sexual misconduct.

34.    The OIG Report provides troubling examples of the types of "disturbances" that have plagued GEO's BOP contracted facilities in particular:

•        In December 2008 and January 2009, the Reeves County Detention Center had a riot on its Compound III and Compounds I and II, respectively. A 2015 Office of the Inspector General (OIG) audit of the Reeves Detention Center Compounds I and II cited a BOP After-Action Report from the 2009 riot: "While low staffing levels alone were not the direct cause of the disturbances, they directly affected Security and Health Services functions."  This disturbance was also detailed in the OIG's  *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas*, to Operate the Reeves County Detention Center I/II, Pecos, Texas, Audit Report 15-15 (April 2015), iii ("OIG 2015 Audit").

•        In February 2011, inmates at the Big Springs Correctional Center physically assaulted prison staff. The contractor reported that the inmates were dissatisfied with the staff's response to a medical emergency on the compound that resulted in the death of an inmate.

11

- The OIG 2015 Audit of Reeves also found that the contractor had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control. The audit identified almost $3 million in costs that were either unallowable or unsupported or funds that should be put to better use.

- The OIG 2015 Audit of Reeves further found that had significant issues meeting its minimum staffing requirement in health services. Additionally, the audit identified areas that needed improvement relating to internal quality control, such as fully documenting monitoring activities and tracking corrective action plans for significant deficiencies.

- The OIG 2015 Audit also found that contract prison officials at Reeves County had converted a general population housing unit into a "modified monitoring unit" that was being used to isolate and restrict movement of inmates whose behavior they believed was jeopardizing the safety of staff and other inmates. A review of the modified monitoring unit showed that there was a lack of specific policies and procedures to address inmate placement in and release from this unit, as well as its operation, and to ensure inmate due process and other rights were preserved.

35.     Even before the publication of the OIG Report, advocates for immigrants occupying GEO's private BOP prisons have long accused the Company of withholding proper mental health and medical care from detainees to boost profits.

36.     An in depth report written by Seth Freed Wessler for by *The Nation* earlier this year (in an article updated following the DOJ's August 18, 2016 announcement) corroborates

12

those claims.  Wessler obtained thousands of pages of medical records following two years of negotiations with the BOP both in and out of federal court, which included records for 103 of at least 137 people who have died in these BOP private contract prisons through the end of 2014. The documents include nurse and doctor notes, records from hospital visits, psychological files, autopsies, and secret internal investigations.  Wessler had each case file "reviewed by at least two independent doctors who rendered opinions on the adequacy of the medical care provided."

37.     According to Wessler's report, prisoners in GEO's BOP private prisons receive substandard medical care often administered by a licensed vocational nurse ("LVN").  LVN's receive only a year of training and are supposed to be support staff rather than a primary medical care provider. Failure to pay heed to serious symptoms and administer proper care has resulted in many casualties in GEO's private prisons.  Indeed, the Reeves facility—one of GEO's five BOP private prisons-- has seen many prison riots involving prisoners protesting the placement of ill inmates into solitary confinement for extended periods of times where they failed to receive adequate care.  One such riot protested the death of an inmate suffering from epilepsy left in solitary confinement without adequate care for a month who then suffered a fatal seizure.

38.     Another inmate of the Reeves facility, Claudio Fagardo-Saucedo, "arrived at Reeves with records indicating that he had tested positive for latent tuberculosis and had complained of headaches. BOP rules require that TB positive inmates also be tested for HIV, but an HIV test was never performed." Indeed, over the next two years, Fagardo-Saucedo was not seen by a medical doctor a single time. "After three weeks in Reeves, he began to show up in the clinic complaining of pain—first tooth pain, then headaches, then nausea and back pain. Over two years, Fagardo-Saucedo went to the clinic 18 times." He was seen on nearly all of these occasions by one of a rotating group of LVNs. Usually, the LVN sent him back to his bed with a

13

prescription for Tylenol or ibuprofen. Meanwhile, his body was signaling a fatal breakdown, something that doctors who later reviewed his case said should have been caught by the facility's care providers. He ultimately died from a HIV related infection in his brain.

39.   Wessler reports that another Reeves inmate, Martin Acosta, began complaining of abdominal pain late in the summer of 2010. Records reflect that over four and half months, he went to the clinic more than 20 times. Other than a doctor's visit a month after his complaints began, he saw only nursing staff until the last two weeks of his incarceration; on 14 of those occasions, he saw only LVNs. Notes in the handwritten medical logs and nursing templates reveal a plethora of missed signs indicating serious illness according to the independent doctors who reviewed the files. Acosta was sent back to his room with nothing but Maalox nine times.

40.   According to Wessler, physicians who later reviewed the files said the nurses appear to have missed the larger story of a protracted medical condition.  In significant discomfort on one of his many trips to plead for help, Acosta told an LVN that he'd vomited a dark substance and had seen blood in his stool. He asked to be sent to a hospital, and the LVN took a stool sample.  The records reviewed by The Nation suggest that the LVN eyeballed the stool sample and deemed it unremarkable. There's no indication in the files that lab tests were performed or a doctor was called. When Acosta finally saw a physician at Reeves he could no longer eat. He was transferred to a hospital, where a massive tumor was found in his abdomen. Acosta was ultimately diagnosed with severe metastatic stomach cancer.

41.   Wessler's report included many other examples of inexcusable deficiencies in medical care provided or withheld in other GEO facilities subject to private BOP contracts aside from Reeves, which had the same tragic results.

42.     As confidential witness statements below confirm, though BOP monitors visited the facilities regularly, that oversight had little effect.  For example, each time the BOP monitors returned to Reeves, they found that the same problems persisted.  Indeed, the BOP monitors wrote that, "The lack of an internal system of administrative and clinical controls has contributed to the provision of less than adequate medical care."  Those reports cited deficiencies in the healthcare at GEO's prisons for years.  Right before the start of the Class Period, the head of the BOP's Privatization Management Branch—the office responsible for the routine monitoring of contract facilities—wrote an e-mail to staff reference the BOP monitors' inspections: "[W]e have been informed they have identified serious issues in health care—specifically their infectious disease program."  In fact, Reeves's medical clinic was so deficient that the BOP finally had to consider whether to renew its contract with Reeves County altogether. In weighing the pros and cons of closing the facility, the BOP noted *230 citations* and *$2 million in penalties* for compliance failures at the Reeves facility, as well as a lack of healthcare that has "greatly impacted inmate health and well-being." BOP officials also questioned whether the contract was saving them any money at all: "While contract price appears reasonable, the oversite [sic] involved reduces the reasonableness."

43.     As the confidential witness accounts corroborate, the Individual Defendants would have had knowledge of the BOP monitor reports, which were not made public during the Class Period.

44.     Further, a report drafted by the American Civil Liberties Union ("ACLU") in June 2014, titled "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," the culmination of a four year investigation, details the appalling conditions in two of GEO's   BOP   contracted   facilities   in   Texas:   Reeves   and   Big   Spring.

15

https://www.aclu.org/other/warehoused-and-forgotten-immigrants-trapped-our-shadow-private-prison-system?redirect=warehoused-and-forgotten-immigrants-trapped-our-shadow-private-prison-system.

45.     For example, the ACLU report describes how, in the summer of 2013, prisoners started a petition to protest crowded conditions, bad food, and lack of medical care. When prison staff learned of the petition, they reportedly sought out the protest organizers, tear-gassed their dormitories, shot at them with rubber bullets, and then locked in isolation cells both the organizers and bystanders who objected to being tear-gassed. Interview with Samuel, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Ruben, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Humberto, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas).

46.     The ACLU report further stated: "Several prisoners have died in recent years...BOP's own monitors have found numerous deficiencies that could let them out of the contract—expressing frustration in 2010 that GEO  Group "shows little signs of improvement" and "is unable to successfully achieve their own plans of action to correct deficient areas"… Throughout our investigation, prisoners reported that they are often denied necessary medical treatment, frequently put in isolation cells, and are forced to live in cramped, overcrowded conditions."

47.     The ACLU report details many instances of medical neglect at GEO's Reeves facility similar to those described in Wessler's report.  But, the troubling issues at Reeves were not only medical.  The ACLU report details reports abusive use of isolation cells known as the "SHU" (Special Housing Units), based in large part on interviews with numerous Reeves inmates.  For example, following the aforementioned 2013 petition in which inmates protested

16

the conditions at Reeves, they were hit with tear gas, shot at with rubber bullets, thrown on the ground and cuffed and more than 100 of the prisoners were forced to spend two days in isolation in the SHU.  They were locked up four to a cell even though the cells were only designed to hold two prisoners at a time, and were forced to sleep on the ground with no pillows, blankets, or showers.  GEO is contractually required to allocate 10% of its bed space to the SHU, which means that in Reeves more than 300 people can be placed in isolation on any given day--- double the percentage of prisoners kept in isolated confinement in BOP-managed facilities.

48.     In fact, one prisoner told the ACLU that he was kept in isolation for months without either a disciplinary hearing or periodic status review hearings (which BOP regulations require within the first seven days in isolation and then every 30 days of continuous isolation, regardless of whether the isolation is for disciplinary or administrative reasons). One prisoner we spoke to told us that "anything" could get him sent to SHU.  One prisoner said he complained about a painful ankle and instead of receiving medical treatment, he was sent to the SHU for six months. The ACLU also received additional reports that sick and mentally ill prisoners are placed in SHU without access to treatment and medication.

49.     The injustices at Reeves do not end there.  Though it is a low security facility, prisoners reported to the ACLU that their movements are "severely restricted" and that "they are frequently body searched."  Prisoners report severe overcrowding described as "chicken coops" which are full of bunk beds placed close together, many near bathrooms where there is a constant smell of feces.

50.     The ACLU report details similar stories of inadequate medical care and unreasonable delay of medical treatment (In once such instance, a prisoner was denied treatment for a neurological condition for over a year even though a doctor noted months prior that he

needed a medical intervention "as soon as possible" to prevent partial paralysis), overuse of extreme isolation in the SHU for even minor or nonexistent infractions (one prisoner was sent to the SHU for a week after using a soda machine when he was not supposed to while another was sent to the SHU for 89 days while staff investigated whether he had a cell phone).

51.     Complaints filed by inmates in GEO's facilities provide further accounts of the horrid conditions.  Examples include: 1) *Ronald Greenland v. United States of America, et al*., Case No. 3:13-cv-272-KRG-KAP filed on April 16, 2014 in the Western District of Pennsylvania alleging the withholding of medical care at GEO's Moshannon Valley Correctional Center for a severe hernia needing corrective surgery for four years which, as a result, became strangulated and forced the plaintiff to endure severe debilitating pain; 2) *Mario Naranjo v. Correct Care Solutions, GEO Group, Inc., et al*., Case No. SA-15-CA-586-FB (HJB) filed on September 23, 2015 in the Western District of Texas alleging that following an injury incurred due to icy conditions at Reeves, plaintiff received pain medications that led to abdominal pain, inability to eat or move his bowels, and black hard stool which went ignored by medical staff--- ultimately, plaintiff was rushed to the hospital where the emergency room physician ordered a blood transfusion and indicated that plaintiff had been losing blood for an extended period of time and was close to death as a result of the pain medication issued to him by Reeves; and 3) *Manuel Tijerina v. United States of America, et al*., Case No.: 4:14-cv-00043, filed on July 24, 2014 in the Western District of Texas, alleging that Reeves denied plaintiff medical attention and medication for 28 days needed to prevent a heart attack and that plaintiff was placed in segregation after defending himself from a vicious attack by another prisoner and then returned to the same unit as his attacker.

18

52.     In addition, the Justice Department's inspector general, Michael Horowitz, performed an audit of the Reeves facility in April 2015. The audit found that Reeves's medical contractor at the time, Correctional Healthcare Companies ("CHC"), had failed to meet contractual staffing obligations in the medical unit for at least 34 of the 37 months from 2010 to 2013. The BOP financial penalties for failing to fill open LVN positions were so modest that it cost CHC less simply to leave them vacant.  Horowitz wrote in his audit report: "Why was it happening for 34 to 37 months? Why wasn't that caught before we showed up?"  Equally as important to investors is why it was not fixed thereafter or publicly disclosed.

53.     Shockingly, the above recitations are simply a sampling of the egregious conditions that plagued GEO's BOP contracted facilities during the Class Period, often in direct disregard for BOP and other contractual policies and guidelines.

## Confidential Witness Allegations

54.     Confidential Witness ("CW") 1 CW1 worked as a Vice President of Contract Compliance at the Company's Boca Raton, Florida office from June 2013 to June 2014 and reported to the Executive Vice President of Contract Compliance.  CW1's responsibilities included overseeing all contracts, offering input on and approval of all outgoing correspondence regarding contract violations that were brought by local, state, federal and foreign government customers.  According to CW1, CW1 quit after working at the Company for only a year because CW1's discomfort with the service the Company was providing was too great to justify staying. In particular, CW1 stated that the Company was reactive to compliance issues rather than proactive.  CW1 stated that the business model focused on cutting costs wherever possible to increase profits.  For example, staffing levels were routinely subpar.  Moreover, CW1 explained that the situation at the private prisons were "more volatile" with "hostage situations,

19

disturbances, lock downs." CW1 also recalled being "shocked by the increased number of rapes occurring at the privately run facilities," like GEO facilities. CW1 stated that a BOP representative worked at each GEO Group facility and alerted the Company's headquarters to at least 4-14 contract violations per week. CW1 explained that violations included "security features not being out and in place, staff ratios quotas not being met, excessive use of force, issues with the disciplinary process." Commenting on the services GEO provided as compared to those provided by the BOP, CW1 stated, "There's no comparison; I don't think private prisons should even exist. In 2008, I thought they were working good, but now that I've seen both sides of the fence, there's no reason to have them." CW1 also explained that, "The reason you don't hear so much about the private prisons is that [the inmates] aren't part of a congressional district -- their family members are overseas," noting that the BOP inmates at GEO contract prisons "don't have a voice in society to draw attention to their plight."

55. CW2 worked as a warden for GEO from July 2009 to July 2012 in the Rivers Correctional Institution in Winton, North Carolina. CW2 reported to the Regional Director of Operations, who reported to the Senior Vice President of Operations, who reported directly to Defendant Zoley. Prior to working for GEO, CW2 worked for the BOP as Senior Executive Service Warden for 26 years. According to CW2, each BOP facility GEO operated reported information to corporate headquarters daily. Indeed, "major events" were reported to headquarters within as little as three minutes. CW2 explained that Defendants found out about major events occurring at a contract facility almost immediately. CW2 stated that, "I would call my boss who would call John Hurley [the Senior Vice President of Operations] who would walk into Zoley's office and tell him…That would take three minutes."

20

56.    CW2 stated that Defendant Zoley would visit the contract facilities a few times a year and meet with the wardens each year.  During the warden meetings, each warden would give a 15 minute presentation to Zoley regrading "what was going wrong and right" at the facility.  These presentations, attended by 15 of the top executive staff of GEO, were followed by questions and typically took an hour to complete.

57.    CW2 stated in that late 2011 or early 2012, the BOP was going to close a GEO facility in Pennsylvania.  In the end, the BOP kept the facility open but reduced the number of inmates and price per inmate.

58.    CW3 worked as a Corrections Officer for GEO from May 2013 to February 2014 based in Big Spring, Texas during which time CW3 supervised inmates.  CW3 left GEO for a job working for the BOP.  CW3 stated that the BOP prisons were far more secure that GEO's prisons because the BOP prisons had more correctional officers on the floor at all times.  CW3 stated that at Big Spring, inmates frequently assaulted correctional officers and noted that the facility always seemed to be short staffed.  Moreover, CW3 stated that GEO did not follow the BOP dictates for what institutions should feed the inmates for each meal instead choosing to service rice and beans every day.  CW3 stated that there was talk that the DOJ would revoke private prison contracts before renewal, explaining that "safety, security and budget were all factors."

59.    CW3 noted that there were annual audits by the ACA to maintain accreditation but that they were always scheduled in advance so the facility had plenty of time to prepare.

60.    CW4 was a Director of Contract Compliance at The Geo Group's Boca Raton, Florida headquarters from 2010 to 2016 and reported to the Executive Vice President of Contract Compliance.  CW4 stated that GEO had an employee stationed at each contract correctional

21

facility tasked with ensuring compliance with BOP contracts. That employee performed ongoing audits of the facility and sent everything that came through their office directly to the contract compliance department at the Company's corporate headquarters. CW4 explained that contract compliance directors compiled a monthly report based off the documents they received from the facilities and distributed those reports to the Company's executives. CW4 stated that, in addition to the reports, problems at the facilities were also brought to the attention of the executives during monthly board meetings. CW4 made clear that CEO George Zoley and CFO Brian Evans attended those meetings.

61.     CW5 worked as a Regional Human Resources Specialist for the Company in Charlotte, North Carolina from March 2011 to May 2015. CW5 reported to the Human Resources Director for the Eastern Region. CW5 corroborated statements by CW4 that each facility received monthly visits from someone in the corporate office's legal or contract compliance department performing an audit and preparing a report. CW5 also stated that Defendant Zoley met with the wardens from each facility at an annual conference held in California just after Labor Day. CW5 explained that there was very high turnover of guards in the facilities as a result of "poor working conditions."

62.     CW6 worked as a Proposal Coordinator at GEO's Boca Raton, Florida headquarters from November 2013 to May 2015 and reported to the Director of Proposal Development. CW6's first assignment at the Company came from Dave Meehan, Defendant Zoley's son-in-law, who served as the Company's Director of Business Development. Meehan asked CW6 to research whether certain companies were profit or not for profit. Meehan told CW6 that the impetus for the assignment was that private prison companies could be "losing business soon."

22

63.     CW7 worked at the Company as a compliance coordinator, secretary to the assistant warden of security, human resources assistant, and human resources specialist on site at the New Castle Correctional Facility from January 2009 to February 2014.  CW7 stated that GEO made money by routinely keeping staffing levels below those required to run the facility optimally.  The directive to maintain vacancies in order to keep profits up came directly from corporate headquarters.  This resulted in a discontent staff that was overworked and at greater risk of harm.  CW7 made clear that finding qualified applicants was not difficult but GEO made it seem that corrections officers were difficult to find and retain so that they it maintain its profit strategy.

64.     CW8 worked at the Company as a Risk Management Claims Assistant from November 2011 to January 2014 based in the Boca Raton, Florida headquarters.  CW8 reported to the Director of Claims Management.  CW8's office processed all work injury claims which were often triggered by an injury to a correctional officer.  According to CW8, correctional officers got injured a lot by inmates and that a guard was injured daily.  Indeed, CW8 confirmed that the rate of injures at GEO's facilities was far higher than at publicly operated correctional facilities.  The correctional officers at GEO facilities were between the ages of 19 and 25 and received salaries between $10-12 an hour.  CW8 stated that injured employees constantly complained that their facilities were woefully understaffed and that employees were overworked.  CW8 stated that the Company took great pains to deny legitimate injured worker cases because the Company looked better if cases were kept at a minimum.

65.     CW9 was a Records Analyst in GEO's Records Compliance division at the Company's Boca Raton, FL headquarters from February 2013 until July 2014.  CW9 reported to the Vice President Corporate Counsel and Assistant Secretary.  CW9 had the task of maintaining

23

the necessary documents to keep the Company in compliance with its contracts and served as a liaison between corporate headquarters and the company's contract facilities. According to CW9, GEO's executives were always sensitive to the possibility of losing contracts. From an operational standpoint there were always questions amongst the staff about contract compliance. CW9 stated that the person in charge at each facility was the warden, who reported to Vice President of Operations Blake Davis (beginning in October 2013). Davis reported directly to Defendant Zoley.

### Materially Misleading Statements Issued During the Class Period

66.    Throughout the Class Period, while touting GEO's long standing relationship with the BOP, and adherence to contractual policies and procedures for running BOP private prisons, Defendants failed to disclose that in fact GEO's private prisons did not provide the same level of service and security as other BOP prisons, thus creating a high risk of regulatory scrutiny and prison closures.

67.    The Class Period begins on March 1, 2012, when GEO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2011 (the "2011 10-K"). In the 2011 10-K, GEO advised investors that:

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. Of our governmental clients, four customers accounted for over 50% of our consolidated revenues for the year ended January 1, 2012. In addition, three federal governmental agencies with correctional and detention responsibilities, the Bureau of Prisons, ICE, and the U.S. Marshals Service, accounted for 39.9% of our total consolidated revenues for the year ended January 1, 2012, with the Bureau of Prisons accounting for 16.0% of our total consolidated revenues for such period, ICE accounting for 13.4% of our total consolidated revenues for such period, and the U.S. Marshals Service accounting for 10.5% of our total consolidated revenues for such period.

24

68.     In the 2011 10-K, GEO further stated, in part:

We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract. For many facilities, the standards and guidelines include those established by the American Correctional Association, or ACA.  The ACA is an independent organization of corrections professionals, which establishes correctional facility standards and guidelines that are generally acknowledged as a benchmark by governmental agencies responsible for correctional facilities. Many of our contracts in the United States require us to seek and maintain ACA accreditation of the facility. We have sought and received ACA accreditation and re-accreditation for all such facilities.   We achieved a median re-accreditation score of 99.8% as of January 1, 2012

. . .

**Competitive Strengths**

. . .

***Long-Term Relationships with High-Quality Government Customers***

We have developed long-term relationships with our federal, state and other governmental customers, ***which we believe enhance our ability to win new contracts and retain existing business.*** We have provided correctional and detention management services to the United States Federal Government for 25 years . . . .

(Emphasis added.)

69.     The 2011 10-K contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

70.     On May 10, 2012, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended April 1, 2012 (the "Q1 2012 10-Q").

71.     The Q1 2012 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q1 2012 10-

25

Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

72.     On August 9, 2012, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended July 1, 2012 (the "Q2 2012 10-Q").

73.     The Q2 2012 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q2 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

74.     On November 8, 2012, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended September 30, 2012 (the "Q3 2012 10-Q").

75.     The Q3 2012 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q3 2012 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

76.     On a February 21, 2013 earnings call for the quarter and year ended December 31, 2012, attended by Defendants Zoley and Evans, Defendant Hurley stated in relevant part:

> I'd like to address select publicly known business development opportunities in our key segments starting with the federal market in the 3 federal government agencies that we serve. We have long-standing partnerships with the Federal Bureau of Prisons, the United States Marshals Service and the United States Immigration and Customs Endorsement or ICE. And we provide cost-effective solutions for them at a number of facilities across the country. We continue to see meaningful opportunities for us to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget.

26

> The Federal Bureau of Prisons continues to face capacity constraints coupled with a growing offender population.

Defendant Hurley also discussed recent solicitations from the BOP, and the other federal agencies, for additional private prison housing.

77.     On March 1, 2013, GEO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2012 (the "2012 10-K"). In the 2012 10-K, GEO advised investors that:

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. Of our governmental clients, four customers accounted for 50% of our consolidated revenues for the year ended December 31, 2012. In addition, three federal governmental agencies with correctional and detention responsibilities, the Bureau of Prisons, ICE, and the U.S. Marshals Service, accounted for 45.8% of our total consolidated revenues for the year ended December 31, 2012, with the Bureau of Prisons accounting for 17.0% of our total consolidated revenues for such period, ICE accounting for 17.3% of our total consolidated revenues for such period, and the U.S. Marshals Service accounting for 11.4% of our total consolidated revenues for such period.

78.     In the 2012 10-K, GEO further stated, in part:

**Competitive Strengths**

. . .

***Long-Term Relationships with High-Quality Government Customers***

We have developed long-term relationships with our federal, state and other governmental customers, ***which we believe enhance our ability to win new contracts and retain existing business.*** We have provided correctional and detention management services to the United States Federal Government for 26 years, the State of California for 25 years, the State of Texas for approximately 25 years, various Australian state government entities for 21 years and the State of Florida for approximately 19 years. These customers accounted for approximately 64.4% of our consolidated revenues for the fiscal year ended December 31, 2012. The acquisitions of Cornell and BI have increased our business with our three largest federal clients: the Federal Bureau of Prisons, U.S. Marshals Service and ICE.

. . .

27

> We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract. For many facilities, the standards and guidelines include those established by the American Correctional Association, or ACA. The ACA is an independent organization of corrections professionals, which establishes correctional facility standards and guidelines that are generally acknowledged as a benchmark by governmental agencies responsible for correctional facilities. Many of our contracts in the United States require us to seek and maintain ACA accreditation of the facility. We have sought and received ACA accreditation and re-accreditation for all such facilities. We achieved a median re-accreditation score of 99.6% as of December 31, 2012.

(Emphasis added.)

79.     The 2012 10-K contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

80.     On a May 8, 2013 earnings call regarding Q1 2013 results, attended by Defendants Zoley and Evans, Defendant Zoley represented:

> Specifically, as it relates to our current idle facilities and inventory, we are currently participating in nonpublic procurements in California and Michigan and at the federal level, which are expected to have contract awards and may result in the reactivation of several of our idle facilities later this year.

Defendant Hurley also repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

81.     On May 10, 2013, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the quarter ended March 31, 2013 (the "Q1 2013 10-Q").

82.     The Q1 2013 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q1 2013 10-

Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

83.     On an August 7, 2013 earnings call for the quarter ended June 30, 2013 (the "Q2 2013 10-Q") attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

84.     On August 8, 2013, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the Q2 2013 10-Q.

85.     The Q2 2013 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q2 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

86.     On a November 6, 2013 earnings call regarding the quarter ended September 30, 2013 (the "Q3 2013 10-Q"), attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

87.     On November 8, 2013, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the Q3 2013 10-Q.

88.     The Q3 2013 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q3 2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

89.     On a February 19, 2014 earnings call for the quarter 2013 ("Q4 2013") attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

90.     On March 3, 2014, GEO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and year ended December 31, 2013 (the "2013 10-K"). In the 2013 10-K, GEO advised investors that:

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. Of our governmental clients, four customers, through multiple individual contracts, accounted for 48.6% of our consolidated revenues for the year ended December 31, 2013. In addition, three federal governmental agencies with correctional and detention responsibilities, the Bureau of Prisons, ICE, and the U.S. Marshals Service, accounted for 44.6% of our total consolidated revenues for the year ended December 31, 2013 through multiple individual contracts, with the Bureau of Prisons accounting for 16.8% of our total consolidated revenues for such period, ICE accounting for 16.7% of our total consolidated revenues for such period, and the U.S. Marshals Service accounting for 11.1% of our total consolidated revenues for such period; however, no individual contract with these clients accounted for more than 5.0% of our total consolidated revenues.

91.     In the 2013 10-K, GEO further stated, in part:

> We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract. For many facilities, the standards and guidelines include those established by the American Correctional Association, or ACA. The ACA is an independent organization of corrections professionals, which establishes correctional facility standards and guidelines that are generally acknowledged as a benchmark by governmental agencies responsible for correctional facilities. Many of our contracts in the United States require us to seek and maintain ACA accreditation of the facility. We have sought and received ACA accreditation and re-accreditation for all such facilities. We achieved a median re-accreditation score of 99.7% as of December 31, 2013. Approximately 91.4% of our 2013 U.S. Corrections & Detention revenue was derived from ACA accredited facilities for the year ended December 31, 2013. In January 2012, we also received accreditation at our Blackwater River Correctional Facility and at Hudson Correctional Facility. We have also achieved and maintained accreditation by The Joint Commission (TJC), at three of our correctional facilities and at nine of our

30

youth services locations.  We have been successful in achieving and maintaining accreditation under the National Commission on Correctional Health Care, or NCCHC, in a majority of the facilities that we currently operate.  The NCCHC accreditation is a voluntary process which we have used to establish comprehensive health care policies and procedures to meet and adhere to the ACA standards.  The NCCHC standards, in most cases, exceed ACA Health Care Standards and we have achieved this accreditation at six of our U.S. Corrections & Detention facilities and at two youth services locations.  Additionally, B.I. Incorporated ("BI") has achieved a certification for ISO 9001:2008 for the design, production, installation and servicing of products and services produced by the Electronic Monitoring business units, including electronic home arrest and domestic violence intervention monitoring services and products, installation services, and automated caseload management services.

. . .

**Competitive Strengths**

. . .

***Long-Term Relationships with High-Quality Government Customers***

We have developed long-term relationships with our federal, state and other governmental customers, ***which we believe enhance our ability to win new contracts and retain existing business.*** We have provided correctional and detention management services to the United States Federal Government for 27 years, the State of California for 26 years, the State of Texas for approximately 26 years, various Australian state government entities for 22 years and the State of Florida for approximately 20 years. These customers accounted for approximately 62.7% of our consolidated revenues for the fiscal year ended December 31, 2013.

92.     The 2013 10-K contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the 2013 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

93.     On an April 29, 2014 earnings call for the quarter ended March 31, 2014 (the "Q1 2014 10-Q") attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

31

94.     On May 6, 2014, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the Q1 2014 10-Q.

95.     The Q1 2014 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q1 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

96.     On an August 6, 2014 earnings call for the quarter ended June 30, 2014 (the "Q2 2014 10-Q") attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

97.     On August 8, 2014, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the Q2 2014 10-Q.

98.     The Q2 2014 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q2 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

99.     On earnings call held on November 6, 2014 for the quarter ended September 30, 2014 (the "Q3 2014 10-Q"), attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.

100.    On November 10, 2014, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the Q3 2014 10-Q.

101.    The Q3 2014 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q3 2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

102.    On a February 18, 2015 earnings call for the quarter and year ended December 31, 2014 (the "2014 10-K"), attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76. Defendant Hurley also stated:

> During the second quarter, we expect to begin in-take at 1,940-bed company-owned Great Plains Correctional Facility in Oklahoma, under a new 10-year contract with the Federal Bureau of Prisons.
>
> Additionally, we were recently awarded a new 10-year contract by the Bureau of Prisons, for the continuing management of our 1,878 bed company-owned Moshannon Valley Correctional Center in Pennsylvania. This new contract will commence in the second quarter of 2016 following the expiration of the current contract. Under our new 10-year contracts with Bureau of Prisons, these two important company-owned facilities are expected to generate approximately $76 million in combined annualized revenues.

103.    On February 26, 2015, GEO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the 2014 10-K. In the 2014 10-K, GEO advised investors that:

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. Of our governmental clients, four customers, through multiple individual contracts, accounted for 42.5% of our consolidated revenues for the year ended December 31, 2014. In addition, three federal governmental agencies with correctional and detention responsibilities, the Bureau of Prisons, ICE, and the U.S. Marshals Service, accounted for 41.9% of our total consolidated revenues for the year ended December 31, 2014 through multiple individual contracts, with the Bureau of Prisons accounting for 15.8% of our total consolidated revenues for such period, ICE accounting for 15.6% of our total consolidated revenues for such period, and the U.S. Marshals Service accounting for 10.5% of our total consolidated

33

revenues for such period; however, no individual contract with these clients accounted for more than 5.0% of our total consolidated revenues.

104.    In the 2014 10-K, GEO further stated, in part:

We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract. For many facilities, the standards and guidelines include those established by the American Correctional Association, or ACA.  The ACA is an independent organization of corrections professionals, which establishes correctional facility standards and guidelines that are generally acknowledged as a benchmark by governmental agencies responsible for correctional facilities. Many of our contracts in the United States require us to seek and maintain ACA accreditation of the facility.  We have sought and received ACA accreditation and re-accreditation for all such facilities.

. . .

**Competitive Strengths**

. . .

***Long-Term Relationships with High-Quality Government Customers***

We have developed long-term relationships with our federal, state and other governmental customers, ***which we believe enhance our ability to win new contracts and retain existing business***. We have provided correctional and detention management services to the United States Federal Government for 28 years, the State of California for 27 years, the State of Texas for approximately 27 years, various Australian state government entities for 23 years and the State of Florida for approximately 21 years. These customers accounted for approximately 66.2% of our consolidated revenues for the fiscal year ended December 31, 2014.

(Emphasis added)

105.    The 2014 10-K contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

106.    On an April 30, 2015 earnings call for the quarter ended March 31, 2015 (the "Q1 2015 10-Q"), attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S.

34

Marshalls Service, and BOP bid solicitations, as set forth above in paragraph 76.  Defendant Zoley also stated in relevant part:

> This company-owned facility was awarded a 10-year contract with the Federal Bureau of Prisons and we expect to start intake in June.

Defendant Hurley further stated:

> During the second quarter, we expect to begin intake at our 1,940-bed Company-owned Great Plains Correctional Facility in Oklahoma under a new 10 year contract with the Federal Bureau of Prisons, which is expected to generate approximately $35 million in annualized revenues.

107.   On May 7, 2015, GEO filed a Quarterly Report on Form 10-Q with the SEC, announcing the Company's financial and operating results for the Q1 2015 10-Q.

108.   The Q1 2015 10-Q contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the Q1 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

109.   On an August 4, 2015 earnings call for the quarter ended June 30, 2015 ("Q2 2015 10-Q") attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service as set forth above in paragraph 76.  Defendant Zoley further stated in relevant part:

> As we look into the third quarter, we have several reasons to be optimistic. First, the 1,940 bed company owned Great Plains Correctional Facility in Oklahoma intake began in June under a new 10-year contract with the U.S. Bureau of Prisons and is expected to be completed by October 1, at which time a fixed monthly payment will begin from the duration of the 10-year contract.

> You may recall that this contract was won under CAR team along with Moshannon Valley facility rebid which was also awarded a 10-year contract as the only Northeast U.S. car facility for the BOP.

Defendant Hurley further stated:

35

In early June, we activated our 1,940-bed Company-owned Great Plains Correctional Facility in Oklahoma under a new 10 year contract with the Federal Bureau of Prisons, which is expected to generate approximately $35 million in annualized revenues. We expect to complete intake on October 1

The Oklahoma contract was under the Car [ph] 15 procurement by the BOP and will house criminal aliens.

***

With respect to the Bureau of Prisons, as we have previously discussed GEO won both awards under the CAR 5 procurement which included rebid of our company-owned 1000 inner bed Moshannon Valley facility in Pennsylvania and our company-owned 1,940 bed Great Plains Correctional Facility in Hinton, Oklahoma. Both of these facilities have a new 10-year contract with the U.S. Bureau of Prisons.

More recently, the Bureau of Prisons has issued criminal alien requirement 16 or better known CAR-16. The CAR-16 procurement involves a rebid of several contract facilities totaling more than 10,000 beds with contracts that expired during 2017.

A restriction under CAR-16 limits any single contract not to exceed 1,800 beds, although the facility may propose and be awarded more than one contract. The CAR-16 procurement includes our company-owned 3,500-bed Big Spring Correctional Center and Big Spring Texas, this detention complex comprised of several buildings has been providing services to the BOP since 1997 and will necessitate that GEO Smith two separate 1,800-bed proposals.

CAR-16 also includes the 3,600-bed Reeves County Detention Complex which is owned by Reeves County, Texas. Reeves County has two separate contracts with the BOP involving the 3,600 beds.

GEO is a sub-contractor to Reeves County and provides management services under a fee only arrangement for the provision of approximately two dozen management positions. All other employees with the Reeves Complex are employees of Reeves County.

CAR-16 proposals were submitted in June of this year with contract awards expected in late 2016 and with new contracts to go into effect in the first half of 2017. In Texas there was a rebid involving five facilities, two of which were GEO managed facility, the Lockhart Correctional facility to 1000 and Cleveland Correctional facility of 500 beds, unfortunately we did not retain these managed only facilities.

110.    On August 7, 2015, GEO filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the Q2 2015 10-Q.

36

111.    The  Q2  2015  10-Q  contained  signed  certifications  pursuant  to  SOX  by Defendants Zoley and Evans, stating that the financial information contained in the Q2 2015 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

112.    On a November 5, 2015 earnings call for the quarter ended September 30, 2015 (the "Q3 2015 10-Q"), attended by Defendants Zoley and Evans, Defendant Hurley repeated the same statements regarding GEO's federal market, the services provided to the BOP, ICE, and U.S. Marshalls Service as set forth above in paragraph 76.  Defendant Zoley also stated in relevant part:

> During this third quarter and the first part of the fourth quarter, we accomplished several important operational milestones with the activation of more than 4,300 owned beds and we also achieved a number new contract wins. First, at our 1,940 bed company-owned Great Plains Correctional Facility in Oklahoma, we have completed the intake process under a new 10-year contract with the Federal Bureau of Prisons and are now operating under a fixed monthly payment.
>
> This contract was awarded under the CAR-15 procurement along with our Moshannon Valley facility rebid, which was also awarded a 10-year contract as the only Northeast U.S. CAR facility for the BOP.

Defendant Hurley further stated in relevant part:

> With respect to our recent project activations and new contract wins in early June, we activated our 1,940-bed company-owned Great Plains Correctional Facility in Oklahoma, under a new 10-year contract with the Federal Bureau of Prisons, which is expected to generate approximately $35 million in annualized revenue.
>
> This important contract was part of the CAR-15 procurement by the Bureau of Prisons and houses criminal aliens.
>
> ***
>
> With respect to the Bureau Prisons, as we have previously discussed, GEO won both awards under the CAR-15 procurement, which included a rebid of our company-owned 1,800-bed Moshannon Valley Facility in Pennsylvania and our company-owned 1,940-bed Great Plains Correctional Facility in Hinton, Oklahoma. Both of these facilities have new 10-year contracts with the Federal Bureau of Prisons. Several months ago, the Bureau of Prisons issued criminal

37

alien requirement 16 or better known as CAR-16. The CAR-16 procurement involves the rebid of several contract facilities, totaling more than 10,000 beds with contracts that expire during 2017.

The procurement includes our company-owned 3,500-bed Big Spring Correctional Center and Big Spring Texas. CAR-16 also includes the 3,600-bed Reeves County Detention Complex, which is owned by Reeves County, Texas. Reeves County has two separate contracts with the Bureau of Prisons involving the 3,600 beds.

GEO is a sub-contractor to Reeves County and provides management services under a fee only arrangement for the provision of approximately two dozen management positions. All other employees with the Reeves Complex are employees of Reeves County. CAR-16 proposals were submitted in June of this year with contract awards expected in late 2016 and with new contracts to go into effect in the first half of 2017.

With respect to future growth opportunities, we currently have approximately 3,000 beds in idle facility and have several active efforts to redeploy this available capacity. There are number of publicly known opportunities in the U.S. and overseas. We are currently pursuing totaling several thousand beds and we are also exploring the number of non-public opportunities that relate to both new project development and potential asset purchase.

113.    On November 6, 2015, GEO filed a Quarterly Report on Form 10-Q with the

SEC, announcing the Company's financial and operating results for the Q3 2015 10-Q.

114.    The Q3 2015 10-Q contained signed certifications pursuant to SOX by

Defendants Zoley and Evans, stating that the financial information contained in the Q3 2015 10-

Q was accurate and disclosed any material changes to the Company's internal control over

financial reporting.

115.    On a February 17, 2016 earnings call for the quarter and year ended December 31,

2015 (the "2015 10-K"), attended by Defendants Zoley and Evans, Defendant Zoley stated in

relevant part:

We are very pleased with our strong fourth quarter results and our outlook for 2016 which reflect the continued organic growth of our diversified business segments of GEO Corrections & Detention and GEO Care.

*** 

38

> Our 1940-bed Great Plains correctional facility in Oklahoma opened in June under a 10-year contract with the Federal Bureau of Prisons.

Defendant Donahue (who replaced Defendant Hurley earlier that same month) stated in relevant part:

> GEO is the largest detention operator for the U.S. federal government agencies, including the Federal Bureau of Prisons, U.S. Immigration and Customs Enforcement, more commonly referred to as ICE and the U.S. Marshals Service. Our business relationships with these three federal agencies now spans three decades.
>
> ***
>
> Moving now to major contract rebids, as we've previously discussed, the Bureau of Prisons had issued Criminal Alien Requirement 16 or better known as CAR 16. The CAR 16 procurement involves the rebid of several contract facilities totaling more than 10,000 beds, with contracts that expire during 2017. The procurement includes our company-owned 3,500-bed Big Spring correctional center in Big Spring, Texas.
>
> CAR 16 also includes the 3,600-bed Reeves County detention complex which is owned by Reeves County, Texas. Reeves County has two separate contracts with the Bureau of Prisons involving 3,600 beds. GEO is a subcontractor to Reeves County and provides management services under a fee-only arrangement for the provision of approximately two dozen management positions. All other employees of the Reeves complex are employees of Reeves County. CAR 16 proposals were submitted last June and contract awards are expected in late 2016, with new contracts to go into effect in the first half of 2017.
>
> With respect to future growth opportunities, we currently have approximately 3,000 beds in idle facilities and have several active efforts to redeploy this available capacity. There are a number of publicly known opportunities in the U.S. and overseas we are currently pursuing, totaling several thousand beds.

116.   On February 26, 2016, GEO filed an Annual Report on Form 10-K with the SEC, announcing the Company's financial and operating results for the 2015 10-K.  In the 2015 10-K, GEO advised investors that:

> We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. Of our governmental partners, four customers, through multiple individual contracts, accounted for 45.5% of our consolidated revenues for the year ended December 31, 2015. In addition, three federal governmental agencies with correctional and detention

39

responsibilities, the Bureau of Prisons, ICE, and the U.S. Marshals Service, accounted for 44.9% of our total consolidated revenues for the year ended December 31, 2015 through multiple individual contracts, with the Bureau of Prisons accounting for 15.6% of our total consolidated revenues for such period, ICE accounting for 17.7% of our total consolidated revenues for such period, and the U.S. Marshals Service accounting for 11.6% of our total consolidated revenues for such period; however, no individual contract with these clients accounted for more than 5.0% of our total consolidated revenues.

117.    In the 2015 10-K, GEO further stated, in part:

We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract. For many facilities, the standards and guidelines include those established by the American Correctional Association, or ("ACA"). The ACA is an independent organization of corrections professionals, which establishes correctional facility standards and guidelines that are generally acknowledged as a benchmark by governmental agencies responsible for correctional facilities. Many of our contracts in the United States require us to seek and maintain ACA accreditation of the facility. We have sought and received ACA accreditation and re-accreditation for all such facilities. We achieved a median re-accreditation score of 99.8% as of December 31, 2015. Approximately 79.5% of our 2015 U.S. Corrections & Detention revenue was derived from ACA accredited facilities for the year ended December 31, 2015. We have also achieved and maintained accreditation by The Joint Commission at four of our correctional facilities and at nine of our youth services locations. We have been successful in achieving and maintaining accreditation under the National Commission on Correctional Health Care, or ("NCCHC"), in a majority of the facilities that we currently operate. The NCCHC accreditation is a voluntary process which we have used to establish comprehensive health care policies and procedures to meet and adhere to the ACA standards. The NCCHC standards, in most cases, exceed ACA Health Care Standards and we have achieved this accreditation at nine of our U.S. Corrections & Detention facilities and at two youth services locations. Additionally, BI has achieved a certification for ISO 9001:2008 for the design, production, installation and servicing of products and services produced by the electronic monitoring business units, including electronic home arrest and electronic monitoring technology products and monitoring services, installation services, and automated caseload management services.

118.    The 2015 10-K contained signed certifications pursuant to SOX by Defendants Zoley and Evans, stating that the financial information contained in the 2015 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

40

119.    On an April 28, 2016 Q1 2016 earnings call attended by Defendants Zoley and

Evans, President of GEO Corrections & Detention Donahue stated in relevant part:

> GEO was the largest detention operator for the US federal government agencies
> including the Federal Bureau of Prisons, US Immigration and Customs
> Enforcement, more commonly referred to as ICE and the US Marshals Service.
>
> ***
>
> As we have previously discussed, the BOP had issued Criminal Alien
> Requirement 16 or better known as CAR 16. The CAR 16 procurement involves
> the rebid of several contracting facilities totaling more than 10,000 beds with
> contracts that expire during 2017. The procurement includes our company-owned
> 3,500 bed Big Spring Correctional Center and Big Spring Texas.
>
> CAR 16 also includes a 3,600 bed Reeves County Detention Complex which is
> owned by Reeves County Texas. Reeves County has two separate contracts with
> the Bureau of Prisons involving 3,600 beds. GEO is a subcontractor to Reeves
> County and provides management services under a fee-only arrangement for the
> provision of approximately two dozen management positions. All other
> employees of the Reeves County complex are employees of Reeves County. CAR
> 16 proposals were submitted last June and contract awards are expected in late
> 2016 with new contracts going into effect in the first quarter of 2017.
>
> With respect to future growth opportunities, we currently have approximately
> 3,000 beds in idle facilities and have several active efforts to redeploy this
> available capacity.
>
> ***
>
> We believe that our unique platform of correctional and rehabilitation services
> better positions GEO to capture future growth, which will enhance value for our
> shareholders and allow us to continue to grow our earnings, cash flows and
> dividend payments.

120.    On May 3, 2016, GEO filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended March 31, 2016

(the "Q1 2016 10-Q").

121.    The Q1 2016 10-Q contained signed certifications pursuant to SOX by

Defendants Zoley and Evans, stating that the financial information contained in the Q1 2016 10-

41

Q was accurate and disclosed any material changes to the Company's internal control over

financial reporting.

122.    On an August 2, 2016 Q2 2016 earnings call, attended by Defendants Zoley and

Evans, President of GEO Corrections & Detention David Donahue stated in relevant part:

> GEO is the largest detention operator for the U.S. Federal Government agencies,
> including the Federal Bureau of Prisons, U.S. Immigration and Customs
> Enforcement, more commonly referred to as ICE and the U.S. Marshal Service.
> Our business relationship with these three federal agencies now spans three
> decades.
>
> ***
>
> Moving now to major contract rebids, as we have previously discussed, the BOP
> had issued Criminal Alien Requirement 16 or better known as CAR 16. The CAR
> 16 procurement involves the rebid of several contract facilities totaling more than
> 10,000 beds with contracts that expire during 2017. The procurement includes our
> company-owned 3500-bed Big Spring Correctional Center in Big Spring Texas.
> CAR 16 also includes the 3600-bed Reeves
>
> Reeves County has two separate contracts with the Bureau of Prisons involving
> the 3,600 beds. GEO is a subcontractor to Reeves County and provides
> management services under a fee-only arrangement for the provision of
> approximately two dozen management positions. All other employees of the
> Reeves Complex are employees of Reeves County. Proposals were submitted in
> June of 2015 and a decision on the CAR 16 procurement is expected sometime
> during the third or fourth quarter of 2016.
>
> ***
>
> As it relates to CAR 16, we are optimistic that our projects will be reviewed
> favorably for continued use. We have a very good relationship with the Bureau of
> Prisons and our seven facilities with the 15,000 beds operational performances at
> the appropriate levels and exceeding our expectations and the client's
> expectations. So we have no reason to believe that they the client will not view
> them appropriately on a going forward basis.

123.    On August 5, 2016, GEO filed a Quarterly Report on Form 10-Q with the SEC,

announcing the Company's financial and operating results for the quarter ended June 30, 2016

(the "Q2 2016 10-Q").

124.    The  Q2  2016  10-Q  contained  signed  certifications  pursuant  to  SOX  by Defendants Zoley and Evans, stating that the financial information contained in the Q2 2016 10-Q  was  accurate  and  disclosed  any  material  changes  to  the  Company's  internal  control  over financial reporting.

125.    The  statements  referenced  in  ¶¶  67-124  were  materially  misleading.    Having opted to speak about the GEO prisons run pursuant to private contract with the BOP, Defendants were  duty  bound  to  disclose  that:  (i)  GEO's  BOP  contracted  private  facilities  lacked  adequate safety and security standards and were less efficient at offering correctional services than BOP facilities; (ii) GEO's BOP contracted private facilities often failed to adhere to their contractual obligations  in  running  those  prisons;  (iii)  a  significant  risk  existed  that  the  DOJ  would recommend phasing out BOP's contracts with GEO; and (iv) consequently, a risk also existed that the Department of Homeland Security or other governmental agencies in contract with GEO would similarly choose to investigate its private run prisons.

**The Truth Emerges**

126.    The  truth  began  to  emerge  on  August  11,  2016,  when  the  Evaluation  and Inspections Division of the DOJ OIG published its Review of the BOP Monitoring of Contract Prisons, Evaluation and Inspections Report 16-06 ("OIG Report").  The OIG initiated Report 16-06, covering the 2011 to 2014 timeframe, to assess how the BOP monitors its private contract prisons, which accounted for approximately 12% of the BOP's total inmate population as of December 2015.  Fourteen BOP contract prisons were operated by three corporations: GEO, Corrections  Corporation  of  America  ("CCA");  and  Management  and  Training  Corporation ("MTC").

43



**Figure 1**
**Location and Population of BOP Contract Prisons**[13]

| Private Contract Prisons | |
|---|---|
| 1. Adams County, Mississippi | CCA |
| 2. Big Springs, Texas | GEO |
| 3. Cibola, New Mexico | CCA |
| 4. D. Ray James, Georgia | GEO |
| 5. Dalby, Texas | MTC |
| 6. Eden, Texas | CCA |
| 7. McRae, Georgia | CCA |
| 8. Moshannon Valley, Pennsylvania | GEO |
| 9. Northeast Ohio, Ohio | CCA |
| 10. Reeves Correction Institution, Texas | GEO |
| 11. Reeves Detention Center, Texas | GEO |
| 12. Rivers, North Carolina | GEO |
| 13. Taft, California | MTC |
| 14. Willacy, Texas | MTC |

**LEGEND**
● Private Prisons
▼ Inmate Population

Source: BOP

_____

[13] Figure 1 reflects the contract prisons and their population at the time of our fieldwork. In January 2007, the BOP awarded a contract to Reeves County, Texas, to operate the Reeves County Detention Center compounds R1 and R2 (RCDC I/II). Reeves County subcontracted operation of RCDC I/II to the GEO Group, Inc. Figure 1 reflects the combined population for these two facilities that are operated under two separate contracts.

127.    As part of this review, the OIG also "assessed whether contractor performance meets certain inmate safety and security requirements and analyzed how contract prisons and similar BOP institutions compare with regard to inmate safety and security data." The OIG found "that, in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions and that the BOP needs to improve how it monitors contract prisons in several areas," Report 16-06 explained that "contract prisons [] had higher rates of assaults, both by inmates on other inmates and by inmates on staff."

44

128.     Consistent with the accounts set forth in paragraphs 32-53 above, Report 16-06 also found that contract prisons were improperly segregating new inmates in the SHU. Specifically, Report 16-06 stated:

> These new inmates had not engaged in any of the behaviors cited in American Correctional Association standards and BOP policies that would justify being placed in such administrative or disciplinary segregation. When the OIG discovered this practice during the course of our fieldwork, we brought it to the attention of the BOP Director, who immediately directed that these inmates be removed from the SHUs and returned to the general population.

129.     Report 16-06 noted various failures of prison oversight related to GEO-managed facilities, including several "disturbances" that "resulted in extensive property damage, bodily injury, and the death of a Correctional Officer." For example, in "February 2011, inmates at the Big Springs Correctional Center physically assaulted prison staff. The contractor reported that the inmates were dissatisfied with the staff's response to a medical emergency on the compound that resulted in the death of an inmate."  Other examples included those detailed in the OIG's April 2015 audit report, described above.

130.     The August 2016 OIG Report concluded that "contract prisons had more safety and security related incidents per capita than BOP institutions for most of the indicators we analyzed," including, "more frequent incidents per capita of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances."  With regard to GEO in particular, Report 16-06 stated:

> ***Overall, the GEO Group's (GEO) contract prisons had more incidents per capita compared to those operated by the Corrections Corporation of America (CCA) and the Management and Training Corporation (MTC) for contraband finds, several types of reports of incidents, lockdowns, guilty findings on inmate discipline charges, positive drug test results, and sexual misconduct***;

> ***

> ***Among the contract prisons, the Rivers Correctional Institution (GEO), D. Ray James Correctional Institution (GEO)***, and McRae Correctional Institution

45

(CCA) *most often had more incidents per capita in the categories of data we analyzed*, though again the number of categories and extent of the differences varied.

* * *

With regard to inmate-on-staff assaults, we found that the contract prisons reported well more than twice as many such incidents each month on average as compared to the BOP institutions: 4.2 assaults monthly, on average, in the contract prisons versus 1.6 in the BOP institutions. *One contract prison, D. Ray James, accounted for 155 of 526 (29 percent) of the assaults on staff in all contract prisons from FY 2011 through 2014, including 114 assaults on staff in FY 2012 alone. A PFA told us that D. Ray James, operated by GEO in Folkston, Georgia, was having significant performance issues on its contract during this period and that the BOP had issued a cure notice in the fall of 2012.*

*The PFA stated that a cure notice is issued to a contract prison that is not meeting the vital functions of its contract and indicates that the BOP is on the brink of ending the contract.* Federal Acquisition Regulation 49.607 specifies that a cure notice is required when a contract is to be terminated for default before the delivery date. *In FY 2012, D. Ray James received 47 notices of concern (NOC), more than double the highest number of NOCs that any other contract prison received in a 1-year period during the 4-year period of our review.*

(Emphasis added)

131.     Published as Appendix 9 to the OIG Report were the written responses of GEO and its peers MTC and CCA to the report, submitted prior to the OIG Report's publication.  In a letter dated August 9, 2016 and signed by Defendant Zoley, GEO downplayed the results of the report and attributed its poor findings generally to purported differences in population demographics (without explaining what those differences actually were) and purported differences in oversight in the contract facilities versus BOP run facilities but didn't address facility specific findings from the OIG Report such as those pertaining to the D. Ray James facility in Georgia or the Rivers Correctional Institution in North Carolina.  Indeed, the OIG made clear that upon reviewing GEO's responses to the contents of its report, "the OIG has

46

determined that the contractors' responses do not affect our analysis or the conclusions reached in this report."

132.    On August 18, 2016, the risk of regulatory action further materialized when GEO's Deputy Attorney General Yates announced the DOJ's decision to end its use of private prisons, including those operated by GEO, after officials concluded that the facilities are both less safe and less effective at providing correctional services than those run by the federal government.  In a memorandum addressed to the Acting Director of the BOP, entitled "Reducing our Use of Private Prisons," Deputy Attorney General Yates stated, in part:

> Private prisons served an important role during a difficult period, but ***time has shown that they compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources***; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, ***they do not maintain the same level of safety and security***.  The rehabilitative services that the Bureau provides, such as educational programs and job training, have proved difficult to replicate and outsource—and these services are essential to reducing recidivism and improving public safety.
>
> For all these reasons, I am eager to enlist your help in beginning the process of reducing—and ultimately ending—our use of privately operated prisons.  As you know, all of the Bureau's existing contracts with private prison companies are term-limited and subject to renewal or termination.  I am directing that as each contract reaches the end of its term, the Bureau should either decline to renew the contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population.
> (Emphases added)

133.    As a result of this news, GEO's share price fell $12.78, or 39.58%, to close at $19.51 on August 18, 2016.  The DOJ investigation and results announced also raised the risk that states and other federal organizations might start pulling out of their contracts, too.

134.    Moreover, on August 29, 2016, spurred by the results of the DOJ investigation, the Department of Homeland Security ("DHS") announced its own investigation into private prisons.  Specifically, Department of Homeland Security Secretary Jeh Johnson released a

47

statement saying he is directing the Homeland Security Advisory Council's chair, Judge William Webster, to establish a subcommittee to "review our current policy and practices concerning the use of private immigration detention and evaluate whether this practice should be eliminated."

135.    Following the issuance of the DHS Report of the Subcommittee on Privatized Immigration Detention Facilities, dated December 1, 2016, the Homeland Security Advisory Council (a nonpartisan expert council of law enforcement, national security, military, and corporate leaders) voted 17-5 to shift away from using private prisons to detain immigrants.

136.    Immigration and Customs Enforcement (ICE), a division of DHS, currently uses detention facilities run GEO.  GEO has earned $1.18 billion from contracts with ICE since 2008, about 35 percent of its total revenue from government contracts.  Loss of those contracts would represent a major hit to GEO's bottom line.

137.    As a result of defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## NO SAFE HARBOR

138.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly misleading statements pleaded in the Amended Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those misleading forward-looking statements because at the time that each of those forward-looking statements were made, the

48

particular speaker knew that the particular forward-looking statement was misleading, and/or the forward-looking statement was authorized and/or approved by an GEO executive officer who knew that those statements were misleading when made.

### LOSS CAUSATION/ECONOMIC LOSS

139.    The market for GEO shares was open, well-developed, and efficient at all relevant times.  During the Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market, which artificially inflated GEO shares and operated as a fraud or deceit on Class Period purchasers of the Company's shares by misrepresenting the material facts detailed herein.  As detailed above, at the end of the Class Period, when Defendants' prior misrepresentations and/or omissions became known to the public, the price of GEO's shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of GEO shares during the Class Period, Lead Plaintiff and the other Class members suffered economic loss—damages—under the federal securities laws.

140.    During the Class Period, Defendants presented a misleading picture of GEO's BOP contracted private prisons.  Defendants' false and misleading statements and omissions had the intended effect and caused GEO's shares to trade at artificially inflated prices throughout the Class Period and until the truth was revealed to the market.

141.    In response to the curative revelation, the price of GEO shares dropped dramatically on high volume, as detailed herein.  This drop removed inflation from the price of GEO's shares, causing real economic loss to investors who had purchased the Company's shares during the Class Period.

142.    The decline was a direct result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in GEO shares negates any inference that the loss suffered by Lead Plaintiff and the other Class members

49

was caused by changed market conditions, macroeconomic factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

143.    The economic loss—damages—suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate GEO's share price and the subsequent significant decline in the value of the Company's shares when Defendants' prior misrepresentations and omissions were revealed.

## RELIANCE PRESUMPTION

144.    At all relevant times, the market for GEO shares was efficient for the following reasons, among others: (a) for most of the Class Period, the Company met the requirements for listing, was listed, and actively traded on the NYSE under ticker symbol "GEO," a highly efficient and automated market; (b) during the Class Period, numerous shares of the Company's shares were traded on a daily basis, demonstrating an active and broad market for the Company's shares and permitting a strong presumption of an efficient market; (c) as a regulated issuer, the Company filed periodic public reports with the SEC; (d) the Company regularly communicated with public investors through established market-communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; (e) the Company was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period; and (f) unexpected material news about the Company was rapidly reflected and incorporated into the Company's stock price during the Class Period.

145.    As a result of the foregoing, the market for GEO shares promptly digested current information regarding the Company from all publicly available sources and reflected such

information in the prices of the shares.  Under these circumstances, all purchasers of GEO shares during the Class Period suffered similar injury through their purchases of GEO shares at artificially inflated prices, and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

146.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired GEO securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

147.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GEO securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by GEO or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

148.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

51

149.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

150.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by defendants' acts as alleged herein;

- whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GEO;

- whether the Individual Defendants caused GEO to issue misleading financial statements during the Class Period;

- whether defendants acted knowingly or recklessly in issuing misleading financial statements;

- whether the prices of GEO securities during the Class Period were artificially inflated because of the defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

151.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

152.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- GEO securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold GEO securities between the time the defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

153.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

154.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Against All Defendants For Violations of Section 10(b) And Rule 10b-5 Promulgated Thereunder)

155.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

156.    This Count is asserted against defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

53

157.     During the Class Period, defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GEO securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire GEO securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

158.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for GEO securities.  Such reports, filings, releases and statements were materially misleading in that they failed to disclose material adverse information and misrepresented the truth about GEO's finances and business prospects.

159.     By virtue of their positions at GEO, defendants had actual knowledge of the materially misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, defendants acted

with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially misleading nature of the statements made, although such facts were readily available to defendants.   Said acts and omissions of defendants were committed willfully or with reckless disregard for the truth.  In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

160.    Defendants were personally motivated to omit material information necessary to make the statements not misleading in order to personally benefit from the sale of GEO securities from their personal portfolios.

161.    Information showing that defendants acted knowingly or with reckless disregard for the truth is peculiarly within defendants' knowledge and control.  As the senior managers and/or directors of GEO, the Individual Defendants had knowledge of the details of GEO's internal affairs.

162.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of GEO.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GEO's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned misleading reports, releases and public statements, the market price of GEO securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning GEO's business and financial condition which were concealed by defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired GEO securities at

55

artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by defendants, and were damaged thereby.

163.    During the Class Period, GEO securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially misleading statements described herein, which the defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of GEO securities at prices artificially inflated by defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of GEO securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of GEO securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

164.    By reason of the conduct alleged herein, defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

165.    As a direct and proximate result of defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the
### Exchange Act Against The Individual Defendants)

166.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

167.    During the Class Period, the Individual Defendants participated in the operation and management of GEO, and conducted and participated, directly and indirectly, in the conduct of GEO's business affairs.  Because of their senior positions, they knew the adverse non-public information about GEO's BOP contracted facilities.

168.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GEO's financial condition and results of operations, and to correct promptly any public statements issued by GEO which had become materially misleading.

169.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GEO disseminated in the marketplace during the Class Period concerning GEO's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GEO to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GEO within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GEO securities.

170.    Each of the Individual Defendants, therefore, acted as a controlling person of GEO.  By reason of their senior management positions and/or being directors of GEO, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause,

57

GEO to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of GEO and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

171.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GEO.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.   Requiring defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: December 21, 2016

Respectfully submitted,

POMERANTZ LLP

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein (FL Bar No.: 144088)
1792 Bell Tower Lane, Suite 203
Weston, Florida 33326

58

Telephone:  (954) 315-3454
Facsimile:  (954) 315-3455
Email:  jagoldstein@pomlaw.com

**POMERANTZ LLP**
Tamar A. Weinrib
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  taweinrib@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
Telephone:  (312) 377-1181
Facsimile:  (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ
& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 21, 2016, I electronically filed the foregoing Amended

Complaint with the Clerk of the Court using the CM/ECF system which will automatically send

email notification of such filing to the attorneys of record registered with the CM/ECF system.


*/s/ Jayne A. Goldstein*
Jayne A. Goldstein

60

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| JOHN J. MULVANEY, Individually and On Behalf of All Others Similarly Situated, | ) ) ) |
| *Plaintiff* | ) |
| v. | ) ) Civil Action No.   9:16-cv-81499 |
| THE GEO GROUP, INC., GEORGE C. ZOLEY, and BRIAN R. EVANS, | ) ) |
| *Defendant* | ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*   David Donahue
c/o THE GEO GROUP, INC.
621 Northwest 53rd Street
Suite 700
Boca Raton, Florida 33487

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jayne A. Goldstein
Pomerantz LLP
1792 Bell Tower Lane, Suite 203
Weston, FL  33446

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.  9:16-cv-81499

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒  I returned the summons unexecuted because _____ ; or

❒  Other *(specify):*

.

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____0.00_____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

Print      Save As...      Reset

AO 440 (Rev. 12/09)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| JOHN J. MULVANEY, Individually and On Behalf of<br>All Others Similarly Situated,<br>*Plaintiff*<br><br>v.<br><br>THE GEO GROUP, INC., .et al,<br><br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Civil Action No.   9:16-cv-81499

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  John Hurley

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Jayne A. Goldstein
Pomerantz LLP
1792 Bell Tower Lane, Suite 203
Weston, FL  33446

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 12/09)  Summons in a Civil Action (Page 2)

Civil Action No.  9:16-cv-81499

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒  I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❒  I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒  I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❒  I returned the summons unexecuted because _____ ; or

❒  Other *(specify):*

_____ .


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                                                  *Server's signature*

                                                                      _____
                                                                                  *Printed name and title*

                                                                      _____
                                                                                  *Server's address*

Additional information regarding attempted service, etc:

Print          Save As...                                                                 Reset