# EXHIBIT 9

# FORM 10-K



America's Leader in Partnership Corrections

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
## WASHINGTON, D.C. 20549

## FORM 10-K

|X| ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934
**For the fiscal year ended December 31, 2013**
OR
| | TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d)
OF THE SECURITIES EXCHANGE ACT OF 1934

**Commission file number: 001-16109**

## CORRECTIONS CORPORATION OF AMERICA
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **MARYLAND** | **62-1763875** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**10 BURTON HILLS BLVD., NASHVILLE, TENNESSEE 37215**
(Address and zip code of principal executive office)

## REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (615) 263-3000

## SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value per share | New York Stock Exchange |

## SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes [X] No [ ]

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15 (d) of the Act. Yes [ ] No [X]

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes [ X ] No [ ]

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

| | |
|---|---|
| Large accelerated filer [X] | Accelerated filer [ ] |
| Non-accelerated filer [ ] (Do not check if a smaller reporting company) | Smaller reporting company [ ] |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.). Yes [ ] No [X]

The aggregate market value of the shares of the registrant's Common Stock held by non-affiliates was approximately $3,868,995,909 as of June 30, 2013  based on the closing price of such shares on the New York Stock Exchange on that day.  The number of shares of the registrant's Common Stock outstanding on February 18, 2014  was 115,954,124.

### DOCUMENTS INCORPORATED BY REFERENCE:

Portions of the registrant's definitive Proxy Statement for the 2014 Annual Meeting of Stockholders, currently scheduled to be held on May 15, 2014, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Case 3:16-cv-02267     Document 62-9     Filed 05/12/17     Page 3 of 29 PageID #: 1030

This Annual Report on Form 10-K contains statements that are forward-looking statements as defined within the meaning of the Private Securities Litigation Reform Act of 1995. Forward-looking statements give our current expectations of forecasts of future events. All statements other than statements of current or historical fact contained in this Annual Report, including statements regarding our future financial position, business strategy, budgets, projected costs, and plans and objectives of management for future operations, are forward-looking statements. The words "anticipate," "believe," "continue," "estimate," "expect," "intend," "may," "plan," "projects," "will," and similar expressions, as they relate to us, are intended to identify forward-looking statements. These forward-looking statements are based on our current plans and actual future activities, and our results of operations may be materially different from those set forth in the forward-looking statements. In particular these include, among other things, statements relating to:

- general economic and market conditions, including the impact governmental budgets can have on our per diem rates and occupancy;

- fluctuations in our operating results because of, among other things, changes in occupancy levels, competition, increases in costs of operations, fluctuations in interest rates, and risks of operations;

- changes in the privatization of the corrections and detention industry and the public acceptance of our services;

- our ability to obtain and maintain correctional facility management contracts, including as the result of sufficient governmental appropriations, inmate disturbances, and the timing of the opening of new facilities and the commencement of new management contracts as well as our ability to utilize current available beds and new capacity as development and expansion projects are completed;

- increases in costs to develop or expand correctional facilities that exceed original estimates, or the inability to complete such projects on schedule as a result of various factors, many of which are beyond our control, such as weather, labor conditions, and material shortages, resulting in increased construction costs;

- changes in government policy and in legislation and regulation of the corrections and detention industry that adversely affect our business, including, but not limited to the impact of a government shutdown, California's utilization of out-of-state private correctional capacity, and the impact of any changes to immigration reform laws;

- our ability to meet and maintain qualification for taxation as a real estate investment trust ("REIT"); and

- the availability of debt and equity financing on terms that are favorable to us.

Any or all of our forward-looking statements in this Annual Report may turn out to be inaccurate. We have based these forward-looking statements largely on our current expectations and projections about future events and financial trends that we believe may affect our financial condition, results of operations, business strategy and financial needs. They can be affected by inaccurate assumptions we might make or by known or unknown risks, uncertainties and assumptions, including the risks, uncertainties and assumptions described in "Risk Factors."

In light of these risks, uncertainties and assumptions, the forward-looking events and circumstances discussed in this Annual Report may not occur and actual results could differ materially from those anticipated or implied in the forward-looking statements. When you consider these forward-looking statements, you should keep in mind the risk factors and other cautionary statements in this Annual Report, including in "Management's Discussion and Analysis of Financial Condition and Results of Operations" and "Business."

3

Our forward-looking statements speak only as of the date made. We undertake no obligation to publicly update or revise forward-looking statements, whether as a result of new information, future events or otherwise. All subsequent written and oral forward-looking statements attributable to us or persons acting on our behalf are expressly qualified in their entirety by the cautionary statements contained in this Annual Report.

income tax purposes. A REIT is not permitted to retain earnings and profits accumulated during the periods it was taxed as a C-corporation, and must make one or more distributions to stockholders that equal or exceed those accumulated amounts. To satisfy this requirement, on April 8, 2013, our Board of Directors declared a special dividend to stockholders of $675.0 million, or $6.66 per share of common stock to distribute our accumulated earnings and profits attributable to tax periods ending prior to January 1, 2013. We paid the special dividend on May 20, 2013 to stockholders on record as of April 19, 2013. The special dividend was composed of cash and shares of our common stock, at each stockholder's election, subject to a cap on the total amount of cash equal to 20% of the aggregate amount of the special dividend, or $135.0 million. The balance of the special dividend was paid in the form of 13.9 million additional shares of our common stock.

## Operations

### Management and Operation of Correctional and Detention Facilities

Our customers consist of federal, state, and local correctional and detention authorities. For each of the years ended December 31, 2013, 2012, and 2011, payments by federal correctional and detention authorities represented 44% of our total revenue. Federal correctional and detention authorities primarily consist of the Federal Bureau of Prisons, or the BOP, the United States Marshals Service, or the USMS, and the U.S. Immigration and Customs Enforcement, or ICE.

Our customer contracts typically have terms of three to five years and contain multiple renewal options. Most of our facility contracts also contain clauses that allow the government agency to terminate the contract at any time without cause, and our contracts are generally subject to annual or bi-annual legislative appropriations of funds.

We are compensated for providing prison bed capacity and correctional services at an inmate per diem rate based upon actual or minimum guaranteed occupancy levels. Occupancy rates for a particular facility are typically low when first opened or immediately following an expansion. However, beyond the start-up period, which typically ranges from 90 to 180 days, the occupancy rate tends to stabilize. For the years 2013, 2012, and 2011, the average compensated occupancy of our facilities, based on rated capacity, was 85%, 88%, and 90%, respectively, for all of the facilities we owned or managed, exclusive of facilities where operations have been discontinued.

### Operating Procedures

Pursuant to the terms of our customer contracts, we are responsible for the overall operations of our facilities, including staff recruitment, general administration of the facilities, facility maintenance, security, and supervision of the offenders. We are required by our customer contracts to maintain certain levels of insurance coverage for general liability, workers' compensation, vehicle liability, and property loss or damage. We are also required to indemnify our customers for claims and costs arising out of our operations and, in certain cases, to maintain performance bonds and other collateral requirements. Approximately 93% of the facilities we operated at December 31, 2013, excluding owned facilities that were idle, were accredited by the American Correctional Association Commission on Accreditation. The American Correctional Association, or ACA, is an independent organization comprised of corrections professionals that establishes accreditation standards for correctional and detention institutions.

We provide a variety of rehabilitative and educational programs at our facilities. Inmates at most facilities we manage may receive basic education through academic programs designed to improve literacy levels and the opportunity to acquire GED certificates. We also offer vocational training to inmates who wish to obtain marketable job skills. Our construction vocational training programs are accredited by the National Center for Construction Education and Research. This foundation provides training curriculum and establishes industry standards for over 4,000 construction and trade organizations in the United States and several foreign countries. In addition, we offer life skills transition-planning programs that provide inmates with job search skills, health education, financial responsibility training, parenting training, and other skills associated with becoming productive citizens. At many of our facilities, we also offer counseling, education and/or treatment to inmates with alcohol and drug abuse problems through our "Strategies for Change" and Residential Drug

6

*Health Insurance Portability and Accountability Act of 1996 and Privacy and Security Requirements*

In 1996, Congress enacted the Health Insurance Portability and Accountability Act of 1996, or HIPAA. HIPAA was designed to improve the portability and continuity of health insurance coverage, simplify the administration of health insurance, and protect the privacy and security of health-related information.

Privacy regulations promulgated under HIPAA regulate the use and disclosure of individually identifiable health information, whether communicated electronically, on paper, or orally. The regulations also provide patients with significant rights related to understanding and controlling how their health information is used or disclosed. Security regulations promulgated under HIPAA require that covered entities, including most health care providers, implement administrative, physical, and technical safeguards to protect the security of individually identifiable health information that is maintained or transmitted electronically. These privacy and security regulations require the implementation of compliance training and awareness programs for our health care service providers and selected other employees primarily associated with our employee medical plans. Further, covered entities and their business associates must provide notification to affected individuals without unreasonable delay but not to exceed 60 days of discovery of a breach of unsecured protected health information. Notification must also be made to the U.S. Department of Health and Human Services ("DHHS") and, in certain situations involving large breaches, to the media. In a final rule released in January 2013, DHHS modified the breach notification requirement by creating a presumption that all non-permitted uses or disclosures of unsecured protected health information are breaches unless the covered entity or business associate establishes that there is a low probability the information has been compromised.

Violations of the HIPAA privacy and security regulations could result in significant civil and criminal penalties, and the American Recovery and Reinvestment Act of 2009 ("ARRA") has strengthened the enforcement provisions of HIPAA. ARRA broadens the applicability of the criminal penalty provisions to employees of covered entities and requires DHHS to impose penalties for violations resulting from willful neglect. ARRA also increases the amount of the civil penalties, with penalties of up to $50,000 per violation for a maximum civil penalty of $1,500,000 in a calendar year for violations of the same requirement. Further, ARRA authorizes state attorneys general to bring civil actions for injunctions or damages in response to violations that threaten the privacy of state residents. In addition, under ARRA, DHHS is required to perform periodic HIPAA compliance audits of covered entities and their business associates. DHHS conducted compliance audits of 115 covered entities in 2012 and has announced its intent to conduct additional audits.

In addition, there are numerous legislative and regulatory initiatives at the federal and state levels addressing the privacy and security of patient health information and other identifying information. For example, federal and various state laws and regulations strictly regulate the disclosure of patient identifiable information related to substance abuse treatment. Further, various state laws and regulations require providers and other entities to notify affected individuals in the event of a data breach involving certain types of individually identifiable health or financial information, and these requirements may be more restrictive than the regulations issued under HIPAA and ARRA. These statutes vary and could impose additional penalties.

*Healthcare reform could have an impact on our business*

The Patient Protection and Affordable Care Act, as amended by the Health Care and Education Reconciliation Act of 2010 (collectively, the "Health Reform Law") were signed into law in the United States. Certain of the provisions that have increased our healthcare costs since 2010 include the removal of annual plan limits, the expansion of dependent child coverage up to age 26, and the mandate that health plans provide 100% coverage on expanded preventive care. Our healthcare costs may be more significantly affected in the future, depending upon regulatory guidance, elements of the law that are effective as of future dates, and our response to these changes. While much of the added cost from the Health Reform Law will occur in or after 2014 due to provisions being phased in over time, changes to our healthcare cost structure could have an impact on our business and operating costs.

*Acceptance of Privatization.* The prisoner population, excluding detention and jail populations, housed in privately managed facilities in the United States as of December 31, 2012 was approximately 137,000, an increase from 131,000 from the prior year. At December 31, 2012, 18.6% of federal inmates and 7.1% of state inmates were held in private facilities. Since December 31, 2000, the number of federal inmates held in private facilities has increased approximately 161%, while the number of state inmates held in private facilities has increased approximately 29%. Nineteen states had at least 5% of their prison population held in private facilities at December 31, 2012. Six states housed at least 25% of their prison population in private facilities as of December 31, 2012 – New Mexico (45%), Montana (39%), Idaho (34%), Alaska (31%), Hawaii (28%), and Oklahoma (26%).

*Governmental Budgeting Constraints.* We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. The use of facilities owned and managed by private operators allows governments to expand prison capacity without incurring large capital commitments or debt required to increase correctional capacity. Outsourcing correctional services to private operators also enables government agencies to avoid costly long-term pension obligations. We believe these advantages translate into significant cost savings for government agencies.

## Government Regulation

### Business Regulations

The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many governmental and regulatory authorities. Some of the regulations are unique to the corrections industry. Facility management contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Failure to comply with these regulations and contract requirements can result in material penalties or non-renewal or termination of facility management contracts.

In addition, private prison managers are subject to government legislation and regulation attempting to restrict the ability of private prison managers to house certain types of inmates. Legislation has been enacted in several states, and has previously been proposed in the United States Congress, containing such restrictions. Although we do not believe that existing legislation will have a material adverse effect on us, there can be no assurance that future legislation would not have such an effect.

### Environmental Matters

Under various federal, state, and local environmental laws, ordinances and regulations, a current or previous owner or operator of real property may be liable for the costs of removal or remediation of hazardous or toxic substances on, under, or in such property. Such laws often impose liability whether or not the owner or operator knew of, or was responsible for, the presence of such hazardous or toxic substances. As an owner of correctional and detention facilities, we have been subject to these laws, ordinances, and regulations as the result of our operation and management of correctional and detention facilities. Phase I environmental assessments have been obtained on substantially all of the properties we currently own. We are not aware of any environmental matters that are expected to materially affect our financial condition or results of operations; however, if such matters are detected in the future, the costs of complying with environmental laws may adversely affect our financial condition and results of operations.

Case 3:16-cv-02267   Document 62-9   Filed 05/12/17   Page 8 of 29 PageID #: 1035

## ITEM 1A.    RISK FACTORS.

As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable year beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations.

### Risks Related to Our Business and Industry

*Our results of operations are dependent on revenues generated by our jails, prisons, and detention facilities, which are subject to the following risks associated with the corrections and detention industry.*

*We are subject to fluctuations in occupancy levels, and a decrease in occupancy levels could cause a decrease in revenues and profitability.* While a substantial portion of our cost structure is fixed, a substantial portion of our revenue is generated under facility ownership and management contracts that specify per diem payments based upon daily occupancy. We are dependent upon the governmental agencies with which we have contracts to provide inmates for our managed facilities. We cannot control occupancy levels at our managed facilities. Under a per diem rate structure, a decrease in our occupancy rates could cause a decrease in revenue and profitability. Average compensated occupancy for our facilities in operation for 2013, 2012, and 2011 was 85%, 88%, and 90%, respectively. Occupancy rates may, however, decrease below these levels in the future. When combined with relatively fixed costs for operating each facility, a decrease in occupancy levels could have a material adverse effect on our profitability.

*We are dependent on government appropriations and our results of operations may be negatively affected by governmental budgetary challenges.* Our cash flow is subject to the receipt of sufficient funding of and timely payment by contracting governmental entities. If the appropriate governmental agency does not receive sufficient appropriations to cover its contractual obligations, it may terminate our contract or delay or reduce payment to us. Any delays in payment, or the termination of a contract, could have an adverse effect on our cash flow and financial condition. In addition, federal, state and local governments are constantly under pressure to control additional spending or reduce current levels of spending. Accordingly, we have been requested and may be requested in the future to reduce our existing per diem contract rates or forego prospective increases to those rates. Further, our customers could reduce inmate population levels in facilities we own or manage to contain their correctional costs. In addition, it may become more difficult to renew our existing contracts on favorable terms or otherwise.

*Competition for inmates may adversely affect the profitability of our business.* We compete with government entities and other private operators on the basis of bed availability, cost, quality, and range of services offered, experience in designing, constructing, and managing facilities and reputation of management and personnel. While there are barriers to entering the market for the ownership and management of correctional and detention facilities, these barriers may not be sufficient to limit additional competition. In addition, our government customers may assume the management of a facility that they own and we currently manage for them upon the termination of the corresponding management contract or, if such customers have capacity at their facilities, may take inmates currently housed in our facilities and transfer them to government-run facilities. Since we are paid on a per diem basis with no minimum guaranteed occupancy under most of our contracts, the loss of such inmates and resulting decrease in occupancy would cause a decrease in our revenues and profitability.

*Escapes, inmate disturbances, and public resistance to privatization of correctional and detention facilities could result in our inability to obtain new contracts or the loss of existing contracts.* The operation of correctional and detention facilities by private entities has not achieved complete acceptance by either

governments or the public. The movement toward privatization of correctional and detention facilities has also encountered resistance from certain groups, such as labor unions and others that believe that correctional and detention facilities should only be operated by governmental agencies.

Moreover, negative publicity about an escape, riot or other disturbance or perceived poor operational performance, contract compliance, or other conditions at a privately managed facility may result in adverse publicity to us and the private corrections industry in general. Any of these occurrences or continued trends may make it more difficult for us to renew or maintain existing contracts or to obtain new contracts, which could have a material adverse effect on our business.

*We are subject to terminations, non-renewals, or competitive re-bids of our government contracts.* We typically enter into facility contracts with governmental entities for terms of up to five years, with additional renewal periods at the option of the contracting governmental agency. Notwithstanding any contractual renewal option of a contracting governmental agency, 22 of our facility contracts with the customers listed under "Business – Facility Portfolio – Facilities and Facility Management Contracts" are currently scheduled to expire on or before December 31, 2014 but have renewal options (14), or are currently scheduled to expire on or before December 31, 2014 and have no renewal options (8). Although we generally expect these customers to exercise renewal options or negotiate new contracts with us, one or more of these contracts may not be renewed by the corresponding governmental agency. In addition, these and any other contracting agencies may determine not to exercise renewal options with respect to any of our contracts in the future. Our government partners can also re-bid contracts in a competitive procurement process upon termination or non-renewal of our contract. Competitive re-bids may result from the expiration of the term of a contract, including the initial term and any renewal periods, or the early termination of a contract. Competitive re-bids are often required by applicable federal or state procurement laws periodically in order to further competitive pricing and other terms for the government agency.

During the fourth quarter of 2013, the Florida Department of Management Services ("DMS") awarded to another operator contracts to manage three facilities owned by the state of Florida that we currently manage under contracts that expire January 31, 2014. Accordingly, we transferred operations of these facilities to the new operator upon expiration of the contracts.

The state of Idaho also announced in June 2013 that it was electing to not exercise option periods available upon expiration of the base contract on June 30, 2014 to manage the state-owned Idaho Correctional Center. During the third quarter of 2013, we decided not to submit a bid for the continued management of this facility and, therefore, expect to transition management to another operator upon expiration of the contract.

Based on information available at this filing, notwithstanding the contracts at facilities described above, we expect to renew all other contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

Governmental agencies typically may terminate a facility contract at any time without cause or use the possibility of termination to negotiate a lower per diem rate. In the event any of our contracts are terminated or are not renewed on favorable terms or otherwise, we may not be able to obtain additional replacement contracts. The non-renewal, termination, or competitive re-bid of any of our contracts with governmental agencies could materially adversely affect our financial condition, results of operations and liquidity, including our ability to secure new facility contracts from others.

*Our ability to secure new contracts to develop and manage correctional and detention facilities depends on many factors outside our control.* Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. This possible growth depends on a number of factors we cannot control, including crime rates and sentencing patterns in various jurisdictions, governmental budgetary constraints, and governmental and public acceptance of privatization. The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are

26

currently proscribed by criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them. Immigration reform laws are currently a focus for legislators and politicians at the federal, state, and local level. Legislation has also been proposed in numerous jurisdictions that could lower minimum sentences for some non-violent crimes and make more inmates eligible for early release based on good behavior. Also, sentencing alternatives under consideration could put some offenders on probation with electronic monitoring who would otherwise be incarcerated. Similarly, reductions in crime rates or resources dedicated to prevent and enforce crime could lead to reductions in arrests, convictions and sentences requiring incarceration at correctional facilities. Our policy prohibits us from engaging in lobbying or advocacy efforts that would influence enforcement efforts, parole standards, criminal laws, and sentencing policies.

Moreover, certain jurisdictions recently have required successful bidders to make a significant capital investment in connection with the financing of a particular project, a trend that will require us to have sufficient capital resources to compete effectively. We may compete for such projects with companies that have more financial resources than we have. Further, we may not be able to obtain the capital resources when needed. A prolonged downturn in the financial credit markets could make it more difficult to obtain capital resources at favorable rates of return or obtain capital resources at all.

*We may face community opposition to facility location, which may adversely affect our ability to obtain new contracts.* Our success in obtaining new awards and contracts sometimes depends, in part, upon our ability to locate land that can be leased or acquired, on economically favorable terms, by us or other entities working with us in conjunction with our proposal to construct and/or manage a facility. Some locations may be in or near populous areas and, therefore, may generate legal action or other forms of opposition from residents in areas surrounding a proposed site. When we select the intended project site, we attempt to conduct business in communities where local leaders and residents generally support the establishment of a privatized correctional or detention facility. Future efforts to find suitable host communities may not be successful. We may incur substantial costs in evaluating the feasibility of the development of a correctional or detention facility. As a result, we may report significant charges if we decide to abandon efforts to develop a correctional or detention facility on a particular site. In many cases, the site selection is made by the contracting governmental entity. In such cases, site selection may be made for reasons related to political and/or economic development interests and may lead to the selection of sites that have less favorable environments.

*We may incur significant start-up and operating costs on new contracts before receiving related revenues, which may impact our cash flows and not be recouped.* When we are awarded a contract to provide or manage a facility, we may incur significant start-up and operating expenses, including the cost of constructing the facility, purchasing equipment and staffing the facility, before we receive any payments under the contract. These expenditures could result in a significant reduction in our cash reserves and may make it more difficult for us to meet other cash obligations. In addition, a contract may be terminated prior to its scheduled expiration and as a result we may not recover these expenditures or realize any return on our investment.

*Failure to comply with unique and increased governmental regulation could result in material penalties or non-renewal or termination of our contracts to provide or manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors and the combination of regulations we face is unique and complex. Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations and contract requirements, and

failure to comply can result in material penalties, including financial penalties, non-renewal or termination of facility contracts, and suspension or debarment from contracting with certain government entities.

In addition, private prison managers are subject to government legislation and regulation attempting to restrict the ability of private prison managers to house certain types of inmates, such as inmates from other jurisdictions or inmates at medium or higher security levels. Legislation has been enacted in several states, and has previously been proposed in the United States Congress, containing such restrictions. Such legislation may have an adverse effect on us.

Our inmate transportation subsidiary, TransCor, is subject to regulations promulgated by the Departments of Transportation and Justice. TransCor must also comply with the Interstate Transportation of Dangerous Criminals Act of 2000, which covers operational aspects of transporting prisoners, including, but not limited to, background checks and drug testing of employees; employee training; employee hours; staff-to-inmate ratios; prisoner restraints; communication with local law enforcement; and standards to help ensure the safety of prisoners during transport. We are subject to changes in such regulations, which could result in an increase in the cost of our transportation operations.

On September 26, 2013, the Federal Communications Commission ("FCC"), which regulates interstate communications, released a Report and Order and Further Notice of Proposed Rulemaking on the subject of rate reform for interstate inmate calling services (the "ICS Order"). The ICS Order was effective on February 11, 2014, subject to a stay on certain portions as a result of a pending legal challenge to the ICS Order. The ICS Order has had a significant impact on the rates that may be charged for interstate inmate calling services, or ICS, which include per-minute charges, per-call charges, and ancillary charges and other fees charged in connection with such service.

The Order applies directly to ICS providers who offer their services pursuant to contracts with correctional facilities, including those that we manage. The ICS Order places limits on rates that ICS providers can charge. A portion of the Order that currently is subject to the stay noted above, and thus has not yet become effective, also eliminates payments to correctional facilities on interstate calling services that are unrelated to providing ICS. This provision could have a significant impact on commission payments received by correctional facilities, including our facilities. The ICS Order is not currently expected to result in a material impact on our financial statements, as a significant amount of commissions paid by our ICS providers are passed along to our customers or are reserved and used for the benefit of inmates in our care.

A number of legal challenges to the ICS Order are pending and additional future challenges are possible, any of which could alter or delay the FCC's implementation of the ICS Order. In addition, based on the ICS Order and/or the outcome of its challenges, various state commissions may consider changes to their intrastate rates. Moreover, the ICS Order seeks comment on additional measures for rate reform and the FCC has indicated that further reform of interstate and intrastate ICS rates is likely forthcoming. For these and other reasons, we cannot predict the ultimate impact of the ICS Order on our results of operations at this time.

Our failure to comply with, or changes to existing regulations or adoption of new regulations in, the areas discussed above could result in increases to our costs or reductions in revenue that could, independently or in the aggregate, have a material adverse effect on our results of operations.

*Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable performance requirements, laws, regulations and standards. The regulatory and contractual environment in which we operate is complex and many aspects of our operations remain subject to manual processes and oversight that make compliance monitoring difficult and resource intensive. For contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been

28

reimbursed. If a government audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. In February 2014, we reached an agreement to pay $1.0 million in compensation to the state of Idaho regarding contractual disputes related to staffing at the Idaho Correctional Center stemming in part from an audit by the Idaho Department of Corrections. In addition to the potential civil and criminal penalties and administrative sanctions noted above, any adverse determination with respect to contractual or regulatory violations could negatively impact our ability to bid in response to RFPs in one or more jurisdictions.

*We depend on a limited number of governmental customers for a significant portion of our revenues.* We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. The loss of, or a significant decrease in, business from the BOP, ICE, USMS, or various state agencies could seriously harm our financial condition and results of operations. The three primary federal governmental agencies with correctional and detention responsibilities, the BOP, ICE, and USMS, accounted for 44% of our total revenues for the fiscal year ended December 31, 2013 ($740.0 million). The USMS accounted for 19% of our total revenues for the fiscal year ended December 31, 2013 ($317.9 million), BOP accounted for 13% of our total revenues for the fiscal year ended December 31, 2013 ($211.9 million), and ICE accounted for 12% of our total revenues for the fiscal year ended December 31, 2013 ($210.2 million). Although the revenue generated from each of these agencies is derived from numerous management contracts, the loss of one or more of such contracts could have a material adverse impact in our financial condition and results of operations. We expect to continue to depend upon these federal agencies and a relatively small group of other governmental customers for a significant percentage of our revenues.

The CDCR accounted for 12% of our total revenues for the fiscal year ended December 31, 2013 ($204.9 million), including the revenue we generated at the California City facility under a lease, as further described hereafter. In July 2013, we extended our agreement with the CDCR to continue to house inmates at the four facilities we currently operate for them in Arizona, Oklahoma, and Mississippi. The extension, which runs through June 30, 2016, allowed CDCR to transition California inmates housed at our 1,596-bed Red Rock Correctional Center to our other facilities upon mutual agreement. Accordingly, as of December 31, 2013, all of the California inmates were removed from our Red Rock Correctional Center in order to make room for inmates under our new contract with the state of Arizona, which commenced January 1, 2014. While the transition resulted in the loss of some of the inmates housed at the Red Rock facility, the transition plan included retention and transfer of certain inmates to our other facilities.

In May 2011, in response to a lawsuit brought by inmates against the state of California, the U.S. Supreme Court upheld a lower court ruling issued by a three judge panel requiring California to reduce its inmate population to 137.5% of its then current capacity, or to 110,000 inmates. As of December 31, 2013, the adult inmate population held in state of California institutions totaled approximately 119,000 inmates, which did not include the California inmates held in our out-of-state facilities. In October 2013, the U.S. Supreme Court refused to hear California's appeal of the three judge panel's order stating that the high court did not have jurisdiction in the case. That decision leaves the most recent capacity order from the three judge panel in effect, which is described in more detail hereafter.

In an effort to meet the Federal court ruling, the fiscal year 2012 budget of the state of California called for a significant reallocation of responsibilities from state government to local jurisdictions, including housing certain lower level inmates that were the responsibility of the State. This realignment plan commenced on October 1, 2011 and has resulted in a reduction in state inmate populations of approximately 25,000 as of December 31, 2013.

During the third quarter of 2013, the California passed legislation providing $315 million in its fiscal year 2014 that provides funding for our base contract of approximately 9,000 beds, additional out-of-state capacity over our base contract, as well as to lease prison space in-state in order to meet the 137.5% of capacity cap. Concurrently, the State has asked the court to amend its order and provide an extension on the date of compliance in return for adding additional resources toward community-based inmate programs that reduce

recidivism. The State would pay for the additional programs by redirecting a portion of the monies allocated for additional out-of-state capacity described above. In response to the State's request, the three judge panel ordered the inmate plaintiffs to meet and confer on the State's proposal and extended the date of compliance to April 18, 2014. On February 10, 2014, a federal court extended to February 28, 2016 the date by which the state of California must comply with the maximum in-state population capacity rate of 137.5%, originally imposed by the federal court in 2009. As a result of the court's ruling, it is unlikely that the state of California will be seeking additional out-of-state capacity. Rather, we believe the state of California will be working to resolve the overcrowded conditions in-state through utilizing public and/or private in-state facilities and implementing good time credits and other measures to reduce prison populations over the long term. The return of the California inmates to the state of California would have a significant adverse impact on our financial position, results of operations, and cash flows.

In October 2013, we entered into a lease for our 2,304-bed California City Correctional Center with the CDCR to help meet the aforementioned capacity cap. The lease agreement includes a three-year base term that commenced December 1, 2013, with unlimited two-year renewal options upon mutual agreement. Annual rent during the three-year base term is fixed at $28.5 million. After the three-year base term, the rent will be increased annually by the lesser of CPI (Consumer Price Index) or 2%. We will be responsible for repairs and maintenance, property taxes and property insurance, while all other aspects and costs of facility operations will be the responsibility of the CDCR. We will also provide up to $10.0 million in tenant improvements at no additional cost to the CDCR. Upon mutual agreement, we will fund additional tenant improvements, which will be repaid by the CDCR in monthly installments over 15 years, beginning July 1, 2014.

*We depend upon our senior management and our ability to attract and retain sufficient qualified personnel.*

The success of our business depends in large part on the ability and experience of our senior management. The unexpected loss of any of these persons could materially adversely affect our business and operations.

In addition, the services we provide are labor-intensive. When we are awarded a facility management contract or open a new facility, we must hire operating management, correctional officers, and other personnel. The success of our business requires that we attract, develop, and retain these personnel. Our inability to hire sufficient qualified personnel on a timely basis or the loss of significant numbers of personnel at existing facilities could adversely affect our business and operations. Under many of our contracts, we are subject to financial penalties for insufficient staffing.

*Adverse developments in our relationship with our employees could adversely affect our business, financial condition or results of operations.*

As of December 31, 2013, we employed approximately 15,400 employees. Approximately 800 of our employees at four of our facilities, or approximately 5% of our workforce, are represented by labor unions. We have not experienced a strike or work stoppage at any of our facilities and in the opinion of management overall employee relations are good. New executive orders, administrative rules and changes in National Labor Relations could increase organizational activity at locations where employees are currently not represented by a labor organization. Increases in organizational activity or any future work stoppages could have a material adverse effect on our business, financial condition, or results of operations.

*We are subject to necessary insurance costs.*

Workers' compensation, auto liability, employee health, and general liability insurance represent significant costs to us. Because we are significantly self-insured for workers' compensation, auto liability, employee health, and general liability risks, the amount of our insurance expense is dependent on claims experience, our ability to control our claims experience, and in the case of workers' compensation and employee health, rising health care costs in general. Unanticipated additional insurance costs could adversely impact our results of operations and cash flows, and the failure to obtain or maintain any necessary insurance coverage could have a material adverse effect on us.

## *We may be adversely affected by inflation.*

Many of our facility contracts provide for fixed fees or fees that increase by only small amounts during their terms. If, due to inflation or other causes, our operating expenses, such as wages and salaries of our employees, insurance, medical, and food costs, increase at rates faster than increases, if any, in our fees, then our profitability would be adversely affected. See "Management's Discussion and Analysis of Financial Condition and Results of Operations – Inflation."

## *We are subject to legal proceedings associated with owning and managing correctional and detention facilities.*

Our ownership and management of correctional and detention facilities, and the provision of inmate transportation services by a subsidiary, expose us to potential third-party claims or litigation by prisoners or other persons relating to personal injury or other damages resulting from contact with a facility, its managers, personnel or other prisoners, including damages arising from a prisoner's escape from, or a disturbance or riot at, a facility we own or manage, or from the misconduct of our employees. To the extent the events serving as a basis for any potential claims are alleged or determined to constitute illegal or criminal activity, we could also be subject to criminal liability. Such liability could result in significant monetary fines and could affect our ability to bid on future contracts and retain our existing contracts. In addition, as an owner of real property, we may be subject to a variety of proceedings relating to personal injuries of persons at such facilities. The claims against our facilities may be significant and may not be covered by insurance. Even in cases covered by insurance, our deductible (or self-insured retention) may be significant.

## *We are subject to risks associated with ownership of real estate.*

Our ownership of correctional and detention facilities subjects us to risks typically associated with investments in real estate. Investments in real estate and, in particular, correctional and detention facilities have limited or no alternative use and thus, are relatively illiquid. Therefore, our ability to divest ourselves of one or more of our facilities promptly in response to changed conditions is limited. Investments in correctional and detention facilities, in particular, subject us to risks involving potential exposure to environmental liability and uninsured loss. Our operating costs may be affected by the obligation to pay for the cost of complying with existing environmental laws, ordinances and regulations, as well as the cost of complying with future legislation. In addition, although we maintain insurance for many types of losses, there are certain types of losses, such as losses from earthquakes and acts of terrorism, which may be either uninsurable or for which it may not be economically feasible to obtain insurance coverage, in light of the substantial costs associated with such insurance. As a result, we could lose both our capital invested in, and anticipated profits from, one or more of the facilities we own. Further, it is possible to experience losses that may exceed the limits of insurance coverage.

In addition, our focus on facility development and expansion poses additional risks, including cost overruns caused by various factors, many of which are beyond our control, such as weather, labor conditions, and material shortages, resulting in increased construction costs. Further, if we are unable to utilize this new bed capacity, our financial results could deteriorate.

## *Certain of our facilities are subject to options to purchase and reversions.*

Eleven of our facilities are subject to an option to purchase by certain governmental agencies. Such options are exercisable by the corresponding contracting governmental entity generally at any time during the term of the respective facility contract. Certain of these purchase options are based on the depreciated book value of the facility, which essentially results in the transfer of ownership of the facility to the governmental agency at the end of the life used for accounting purposes. See "Business – Facility Portfolio – Facilities and Facility Management Contracts." If any of these options are exercised, there exists the risk that we will be unable to invest the proceeds from the sale of the facility in one or more properties that yield as much cash flow as the property acquired by the government entity. In addition, in the event any of these options is exercised, there exists the risk that the contracting governmental agency will terminate the management contract associated with such facility. For the year ended December 31, 2013, the eleven facilities currently subject to these options generated $352.5 million in revenue (20.8% of total revenue) and incurred $226.2 million in operating expenses. Certain of the

31

options to purchase are exercisable at prices below fair market value. See "Business – Facility Portfolio – Facilities and Facility Management Contracts."

In addition, the ownership of two of our facilities (one of which is also subject to an option to purchase) will, upon the expiration of certain ground leases in 2015 and 2017, revert to the respective governmental agency contracting with us. See "Business – Facility Portfolio – Facilities and Facility Management Contracts." At the time of such reversion, there exists the risk that the contracting governmental agency will terminate the contract associated with such facility. For the year ended December 31, 2013, the facilities subject to reversion generated $70.6 million in revenue (4.2% of total revenue) and incurred $54.6 million in operating expenses.

*Risks related to facility construction and development activities may increase our costs related to such activities.* When we are engaged to perform construction and design services for a facility, we typically act as the primary contractor and subcontract with other companies who act as the general contractors. As primary contractor, we are subject to the various risks associated with construction (including, without limitation, shortages of labor and materials, work stoppages, labor disputes, and weather interference) which could cause construction delays. In addition, we are subject to the risk that the general contractor will be unable to complete construction at the budgeted costs or be unable to fund any excess construction costs, even though we require general contractors to post construction bonds and insurance. Under such contracts, we are ultimately liable for all late delivery penalties and cost overruns.

*We may be adversely affected by the rising cost and increased difficulty of obtaining adequate levels of surety credit on favorable terms.*

We are often required to post bid or performance bonds issued by a surety company as a condition to bidding on or being awarded a contract. Availability and pricing of these surety commitments are subject to general market and industry conditions, among other factors. Increases in surety costs could adversely affect our operating results if we are unable to effectively pass along such increases to our customers. We cannot assure you that we will have continued access to surety credit or that we will be able to secure bonds economically, without additional collateral, or at the levels required for any potential facility development or contract bids. If we are unable to obtain adequate levels of surety credit on favorable terms, we would have to rely upon letters of credit under our revolving credit facility, which could entail higher costs even if such borrowing capacity was available when desired at the time, and our ability to bid for or obtain new contracts could be impaired.

**Risks Related to Our Indebtedness**

*Our indebtedness could adversely affect our financial health and prevent us from fulfilling our obligations under our debt securities.*

As of December 31, 2013, we had total indebtedness of $1,205.0 million. Our indebtedness could have important consequences. For example, it could:

- make it more difficult for us to satisfy our obligations with respect to our indebtedness;
- increase our vulnerability to general adverse economic and industry conditions;
- require us to dedicate a substantial portion of our cash flow from operations to payments on our indebtedness, thereby reducing the availability of our cash flow to fund working capital, capital expenditures, dividends, and other general corporate purposes;
- limit our flexibility in planning for, or reacting to, changes in our business and the industry in which we operate;
- place us at a competitive disadvantage compared to our competitors that have less debt; and
- limit our ability to borrow additional funds or refinance existing indebtedness on favorable terms.

32

*Our revolving credit facility and other debt instruments have restrictive covenants that could affect our financial condition.*

The indentures related to our aggregate original principal amount of $325.0 million 4.125% senior notes due 2020 and $350.0 million 4.625% senior notes due 2023, referred to herein as our senior notes, and our revolving credit facility, contain financial and other restrictive covenants that limit our ability to engage in activities that may be in our long-term best interests. Our ability to borrow under our revolving credit facility is subject to compliance with certain financial covenants, including leverage and interest coverage ratios. Our revolving credit facility includes other restrictions that, among other things, limit our ability to incur indebtedness; grant liens; engage in mergers, consolidations and liquidations; make asset dispositions, restricted payments and investments; enter into transactions with affiliates; and amend, modify or prepay certain indebtedness. The indentures related to our senior notes contain limitations on our ability to effect mergers and change of control events, as well as other limitations, including limitations on the sale of assets and limitations on liens.

Our failure to comply with these covenants could result in an event of default that, if not cured or waived, could result in the acceleration of all or a substantial portion of our debts. We do not have sufficient working capital to satisfy our debt obligations in the event of an acceleration of all or a significant portion of our outstanding indebtedness.

*Servicing our indebtedness will require a significant amount of cash. Our ability to generate cash depends on many factors beyond our control.*

Our ability to make payments on our indebtedness, to refinance our indebtedness, and to fund planned capital expenditures will depend on our ability to generate cash in the future. This, to a certain extent, is subject to general economic, financial, competitive, legislative, regulatory, and other factors that are beyond our control.

The risk exists that our business will be unable to generate sufficient cash flow from operations or that future borrowings will not be available to us under our revolving credit facility in an amount sufficient to enable us to pay our indebtedness, including our existing senior notes, or to fund our other liquidity needs. We may need to refinance all or a portion of our indebtedness, including our senior notes, on or before maturity. We may not, however, be able to refinance any of our indebtedness, including our revolving credit facility and including our senior notes, on commercially reasonable terms or at all.

*We are required to repurchase all or a portion of our senior notes upon a change of control, and our revolving credit facility is subject to acceleration upon a change in control.*

Upon certain change of control events, as that term is defined in the indentures for our senior notes, including a change of control caused by an unsolicited third party, we are required to make an offer in cash to repurchase all or any part of each holder's notes at a repurchase price equal to 101% of the principal thereof, plus accrued interest. The source of funds for any such repurchase would be our available cash or cash generated from operations or other sources, including borrowings, sales of equity or funds provided by a new controlling person or entity. Sufficient funds may not be available to us, however, at the time of any change of control event to repurchase all or a portion of the tendered notes pursuant to this requirement. Our failure to offer to repurchase notes, or to repurchase notes tendered, following a change of control will result in a default under the respective indentures, which could lead to a cross-default under our revolving credit facility and under the terms of our other indebtedness. In addition, our revolving credit facility which is subject to acceleration upon the occurrence of a change in control (as described therein), may prohibit us from making any such required repurchases. Prior to repurchasing the notes upon a change of control event, we must either repay outstanding indebtedness under our revolving credit facility or obtain the consent of the lenders under our revolving credit facility. If we do not obtain the required consents or repay our outstanding indebtedness under our revolving credit facility, we would remain effectively prohibited from offering to purchase the notes.

### *Despite current indebtedness levels, we may still incur more debt.*

The terms of the indentures for our senior notes and our revolving credit facility restrict our ability to incur indebtedness; however, we may nevertheless incur additional indebtedness in the future and in the future, we may refinance all or a portion of our indebtedness, including our revolving credit facility, and may incur additional indebtedness as a result. As of December 31, 2013, we had $345.0 million of additional borrowing capacity available under our $900.0 million revolving credit facility. In addition, we may issue an indeterminate amount of debt securities from time to time when we determine that market conditions and the opportunity to utilize the proceeds from the issuance of such securities are favorable. If new debt is added to our and our subsidiaries' current debt levels, the related risks that we and they now face could intensify.

### *Our access to capital may be affected by general macroeconomic conditions.*

During the financial crisis in 2008 and 2009, several large financial institutions failed while others became dependent on the assistance of the federal government to continue to operate as going concerns. We can provide no assurance that the banks that have made commitments under our revolving credit facility will continue to operate as going concerns in the future. If any of the banks in the lending group were to fail, it is possible that the capacity under the revolving credit facility would be reduced. In the event that the availability under the revolving credit facility was reduced significantly, we could be required to obtain capital from alternate sources in order to continue with our business and capital strategies. Our options for addressing such capital constraints would include, but not be limited to (i) delaying certain capital expenditure projects, (ii) obtaining commitments from the remaining banks in the lending group or from new banks to fund increased amounts under the terms of the revolving credit facility, (iii) accessing the public capital markets, or (iv) reducing our dividend (but not less than amounts required to maintain our status as a REIT). Such alternatives could be on terms less favorable than under existing terms, which could have a material effect on our consolidated financial position, results of operations, or cash flows.

### *Rising interest rates would increase the cost of our variable rate debt.*

We have incurred and expect in the future to incur indebtedness that bears interest at variable rates. Accordingly, increases in interest rates would increase our interest costs, which could have a material adverse effect on us and our ability to make distributions to our stockholders and pay amounts due on our debt or cause us to be in default under certain debt instruments. In addition, an increase in market interest rates may lead holders of our common stock to demand a higher yield on their shares from distributions by us, which could adversely affect the market price for our common stock.

## Risks Related to our REIT Structure

### *If we fail to remain qualified as a REIT, we would be subject to corporate income taxes and would not be able to deduct distributions to stockholders when computing our taxable income.*

We currently operate in a manner that is intended to allow us to qualify as a REIT for federal income tax purposes commencing with our taxable year beginning January 1, 2013. However, we cannot assure you that we have qualified or will remain qualified as a REIT. Qualification as a REIT requires us to satisfy numerous requirements established under highly technical and complex sections of the Internal Revenue Code of 1986, as amended, (the "Code"), which may change from time to time and for which there are only limited judicial and administrative interpretations, and involves the determination of various factual matters and circumstances not entirely within our control. For example, in order to qualify as a REIT, the REIT must derive at least 95% of its gross income in any year from qualifying sources. In addition, a REIT is required to distribute annually to its stockholders at least 90% of the REIT taxable income (determined without regard to the dividends paid deduction and by excluding capital gains) and must satisfy specified asset tests on a quarterly basis.

If we fail to qualify as a REIT in any taxable year, we would be subject to federal income tax (including any applicable alternative minimum tax) on our taxable income computed in the usual manner for corporate taxpayers without deduction for distributions to our stockholders and we may need to borrow additional funds or issue securities to pay such additional tax liability. Any such corporate income tax liability could be

substantial and would reduce the amount of cash available for other purposes because, unless we are entitled to relief under certain statutory provisions, we would be taxable as a C-corporation, beginning in the year in which the failure occurs, and we would not be allowed to re-elect to be taxed as a REIT for the following four years.

**To maintain our REIT status, we may be forced to obtain capital during unfavorable market conditions, which could adversely affect our overall financial performance.**

In order to qualify as a REIT, we will be required each year to distribute to our stockholders at least 90% of our REIT taxable income (determined without regard to the dividends paid deduction and by excluding any net capital gain) and we will be subject to tax to the extent our net taxable income (including net capital gain) is not fully distributed. In addition, we will be subject to a 4% nondeductible excise tax on the amount, if any, by which distributions we pay in any calendar year are less than the sum of 85% of our ordinary income, 95% of our net capital gains, and 100% of our undistributed income from prior years. Accordingly, we may not be able to fund all future capital needs, including acquisition and development activities, from cash retained from operations and may require additional capital from third-party sources to make new investments. We may acquire additional capital through our issuance of securities senior to our common stock, including additional borrowings or other indebtedness or the issuance of additional securities. Issuance of such senior securities creates additional risks because leverage is a speculative technique that may adversely affect common stockholders. If the return on assets acquired with borrowed funds or other leverage proceeds does not exceed the cost of the leverage, the use of leverage could cause us to lose money.

Additionally, the issuance of senior securities involves offering expenses and other costs, including interest payments, which are borne indirectly by our common stockholders. Fluctuations in interest rates could increase interest payments on our senior securities, and could reduce cash available for distribution on common stock. Increased operating costs, including the financing cost associated with any leverage, may reduce our total return to common stockholders. Rating agency guidelines applicable to any senior securities may impose asset coverage requirements, dividend limitations, voting right requirements (in the case of the senior equity securities), and other restrictions. Further, the terms of any senior securities or other borrowings may impose additional requirements, restrictions and limitations that are more stringent than those required by a rating agency that rates outstanding senior securities that may have an adverse effect on us and may affect our ability to pay distributions to our stockholders. On the other hand, we may not be able to raise such additional capital in the future on favorable terms or at all. Unfavorable economic conditions could increase our funding costs, limit our access to the capital markets or result in a decision by lenders not to extend credit to us. We may issue debt securities, other instruments of indebtedness or preferred stock, and we may borrow money from banks or other financial institutions.

Further, in order to maintain our REIT status, we may need to borrow funds to meet the REIT distribution requirements even if the then-prevailing market conditions are not favorable for these borrowings. These borrowing needs could result from differences in timing between the actual receipt of cash and inclusion of income for federal income tax purposes, or the effect of non-deductible capital expenditures, the creation of reserves or required debt or amortization payments. Our ability to access debt and equity capital on favorable terms or at all is dependent upon a number of factors, including general market conditions, the market's perception of our growth potential, our current and potential future earnings and cash distributions and the market price of our securities. Issuance of debt or equity securities will expose us to typical risks associated with leverage, including increased risk of loss.

To the extent our ability to issue debt or other senior securities such as preferred stock is constrained, we may depend on issuance of additional shares of common stock to finance new investments. If we raise additional funds by issuing more shares of our common stock or senior securities convertible into, or exchangeable for, shares of our common stock, the percentage ownership of our stockholders at that time would decrease, and you may experience dilution.

*There are uncertainties relating to our estimate of the E&P Distribution.*

To qualify for taxation as a REIT effective for the year ended December 31, 2013, we were required to distribute to our stockholders on or before December 31, 2013, our undistributed accumulated earnings and profits attributable to taxable periods ending prior to January 1, 2013. On May 20, 2013, we distributed $675.0 million to shareholders of record as of April 19, 2013 in satisfaction of this requirement (the "E&P Distribution"). We believe that the total value of the E&P Distribution was sufficient to fully distribute our accumulated earnings and profits and that a portion of the E&P Distribution exceeded our accumulated earnings and profits. However, the amount of our accumulated earnings and profits is a complex factual and legal determination. We may have had less than complete information at the time we estimated our earnings and profits or may have interpreted the applicable law differently from the IRS. Substantial uncertainties exist relating to the computation of our undistributed accumulated earnings and profits, including the possibility that the IRS could, in auditing tax years through 2012, successfully assert that our taxable income should be increased, which could increase our pre-REIT accumulated earnings and profits. Thus, we could fail to satisfy the requirement that we distribute all of our pre-REIT accumulated earnings and profits by the close of our first taxable year as a REIT. Moreover, although there are procedures available to cure a failure to distribute all of our pre-REIT accumulated earnings and profits, we cannot now determine whether we would be able to take advantage of them or the economic impact to us of doing so.

*Performing services through our TRSs may increase our overall tax liability relative to other REITs or subject us to certain excise taxes.*

A TRS may hold assets and earn income, including income earned from the performance of correctional services, that would not be qualifying assets or income if held or earned directly by a REIT. We conduct a significant portion of our business activities through our TRSs. Our TRSs are subject to federal, foreign, state and local income tax on their taxable income, and their after-tax net income generally is available for distribution to us but is not required to be distributed to us. The TRS rules also impose a 100% excise tax on certain transactions between a TRS and its parent REIT that are not conducted on an arm's-length basis. In addition, the TRS rules limit the deductibility of interest paid or accrued by a TRS to its parent REIT to ensure that the TRS is subject to an appropriate level of corporate income taxation. We believe our arrangements with our TRSs are on arm's-length terms and intend to continue to operate in a manner that allows us to avoid incurring the 100% excise tax described above. There can be no assurance, however, that we will be able to avoid application of the 100% excise tax or the limitations on interest deductions discussed above.

*The value of the securities we own in our TRS is limited under the REIT asset tests.*

Under the Code, no more than 25% of the value of the gross assets of a REIT may be represented by securities of one or more TRSs. This limitation may affect our ability to increase the size of our TRSs' operations and assets, and there can be no assurance that we will be able to comply with the 25% limitation. If we are unable to comply with the 25% limitation, we would fail to qualify as a REIT. Furthermore, our significant use of TRSs may cause the market to value shares of our common stock differently than the stock of other REITs, which may not use TRSs as extensively. Although we intend to monitor the value of our investments in TRSs, there can be no assurance that we will be able to comply with the 25% limitation discussed above.

*We may be limited in our ability to fund distributions using cash generated through our TRSs.*

At least 75% of gross income for each taxable year as a REIT must be derived from passive real estate sources and no more than 25% of gross income may consist of dividends from our TRSs and other non-real estate income. This limitation on our ability to receive dividends from our TRSs may affect our ability to fund cash distributions to our stockholders using cash from our TRSs. Moreover, our TRSs are not required to distribute their net income to us, and any income of our TRSs that is not distributed to us will not be subject to the REIT income distribution requirement.

***REIT ownership limitations may restrict or prevent you from engaging in certain transfers of our common stock.***

In order to satisfy the requirements for REIT qualification, no more than 50% in value of all classes or series of our outstanding shares of stock may be owned, actually or constructively, by five or fewer individuals (as defined in the Code to include certain entities) at any time during the last half of each taxable year beginning with our 2014 taxable year. To assist us in satisfying this share ownership requirement, we amended our charter in May 2013 to impose ownership limits on each class and series of our shares of stock. Under applicable constructive ownership rules, any shares of stock owned by certain affiliated owners generally would be added together for purposes of the common stock ownership limits, and any shares of a given class or series of preferred stock owned by certain affiliated owners generally would be added together for purposes of the ownership limit on such class or series.

If anyone transfers shares of our common stock in a manner that would violate the ownership limits, or prevent us from qualifying as a REIT under the federal income tax laws, under the amended charter, those shares of common stock instead would be transferred to a trust for the benefit of a charitable beneficiary and will be either redeemed by us or sold to a person whose ownership of the shares will not violate the ownership limit. If this transfer to a trust fails to prevent such a violation or fails to permit our continued qualification as a REIT, then the initial intended transfer would be null and void from the outset. The intended transferee of those shares will be deemed never to have owned the shares. Anyone who acquires shares in violation of the ownership limit or the other restrictions on transfer bears the risk of suffering a financial loss when the shares of common stock are redeemed or sold if the market price of our shares of common stock falls between the date of purchase and the date of redemption or sale.

***Complying with REIT requirements may cause us to forego otherwise attractive opportunities or liquidate otherwise attractive investments.***

To qualify as a REIT for federal income tax purposes, we must continually satisfy tests concerning, among other things, the sources of our income, the nature and diversification of our assets, the amounts we distribute to our stockholders and the ownership of our common stock. If we fail to comply with one or more of the asset tests at the end of any calendar quarter, we must correct the failure within 30 days after the end of the calendar quarter or qualify for certain statutory relief provisions to avoid losing our REIT qualification and suffering adverse tax consequences. In order to meet these tests, we may be required to forego investments we might otherwise make or to liquidate otherwise attractive investments. Thus, compliance with the REIT requirements may hinder our performance and reduce amounts available for distribution to our stockholders.

***The tax imposed on REITs engaging in "prohibited transactions" may limit our ability to engage in transactions which would be treated as sales for federal income tax purposes.***

A REIT's net income from prohibited transactions is subject to a 100% penalty tax. In general, prohibited transactions are sales or other dispositions of property, other than foreclosure property, held primarily for sale to customers in the ordinary course of business. Although we do not intend to hold any properties that would be characterized as held for sale to customers in the ordinary course of our business, unless a sale or disposition qualifies under certain statutory safe harbors, such characterization is a factual determination and no guarantee can be given that the IRS would agree with our characterization of our properties or that we will always be able to make use of the available safe harbors.

***We have not established a minimum distribution payment level, and we may be unable to generate sufficient cash flows from our operations to make distributions to our stockholders at any time in the future.***

We are generally required to distribute to our stockholders at least 90% of our net taxable income (excluding net capital gains) each year to qualify as a REIT under the Code, which requirement we currently intend to satisfy. To the extent we satisfy the 90% distribution requirement but distribute less than 100% of our net taxable income (including net capital gains), we will be subject to federal corporate income tax on our undistributed net taxable income. We intend to distribute at least 100% of our net taxable income (excluding net capital gains). However, our ability to make distributions to our stockholders may be adversely affected by

the issues described in the risk factors set forth in this annual report. Subject to satisfying the requirements for REIT qualification, we intend over time to make regular quarterly distributions to our stockholders. Our Board of Directors has the sole discretion to determine the timing, form and amount of any distributions to our stockholders. Our Board of Directors makes determinations regarding distributions based upon, among other factors, our historical and projected results of operations, financial condition, cash flows and liquidity, satisfaction of the requirements for REIT qualification and other tax considerations, capital expenditure and other expense obligations, debt covenants, contractual prohibitions or other limitations and applicable law and such other matters as our Board of Directors may deem relevant from time to time. Among the factors that could impair our ability to make distributions to our stockholders are:

- our inability to realize attractive returns on our investments;
- unanticipated expenses that reduce our cash flow or non-cash earnings;
- decreases in the value of the underlying assets; and
- the fact that anticipated operating expense levels may not prove accurate, as actual results may vary from estimates.

As a result, it is possible that we will not be able to continue to make distributions to our stockholders or that the level of any distributions we do make to our stockholders will achieve a market yield or increase or even be maintained over time, any of which could materially and adversely affect the market price of our shares of common stock. Distributions could be dilutive to our financial results and may constitute a return of capital to our investors, which would have the effect of reducing each shareholder's basis in its shares of common stock. We also could use borrowed funds or proceeds from the sale of assets to fund distributions.

*Dividends payable by REITs, including us, generally do not qualify for the reduced tax rates available for some dividends.*

"Qualified dividends" payable to U.S. stockholders that are individuals, trusts and estates generally are subject to tax at preferential rates. Subject to limited exceptions, dividends payable by REITs are not eligible for these reduced rates and are taxable at ordinary income tax rates. The more favorable rates applicable to regular corporate qualified dividends could cause investors who are individuals, trusts and estates to perceive investments in REITs to be relatively less attractive than investments in the stocks of non-REIT corporations that pay dividends, which could adversely affect the value of the shares of REITs, including the shares of our common stock.

Distributions that we make to our stockholders are treated as dividends to the extent of our earnings and profits as determined for federal income tax purposes and are generally taxable to our stockholders as ordinary income. However, our dividends are eligible for the lower rate applicable to "qualified dividends" to the extent they are attributable to income that was previously subject to corporate income tax, such as the dividends we receive from our TRSs and our E&P Distribution. Also, a portion of our distributions may be designated by us as long-term capital gains to the extent that they are attributable to capital gain income recognized by us. Our distributions may constitute a return of capital to the extent that they exceed our earnings and profits as determined for federal income tax purposes. A return of capital generally is not taxable, but has the effect of reducing the basis of a shareholder's investment in our shares of common stock. Any such distributions that exceed a shareholder's tax basis in our shares of common stock generally will be taxable as capital gains.

*If you receive dividends in shares of our stock, you may be required to pay tax in excess of any cash you receive.*

We paid approximately 80% of the E&P Distribution in our common stock and may in the future distribute other taxable dividends that are payable in our stock. Taxable stockholders receiving such dividends will be required to include the full amount of the dividend as income to the extent of our current and accumulated earnings and profits for federal income tax purposes. As a result, a U.S. stockholder may be required to pay tax with respect to such dividends in excess of the cash received. If a U.S. stockholder sells the stock it receives as a dividend in order to pay this tax, the sales proceeds may be less than the amount included in income with

Case 3:16-cv-02267   Document 62-9   Filed 05/12/17   Page 22 of 29 PageID #: 1049

respect to the dividend, depending on the market price of our stock at the time of the sale. Furthermore, with respect to non-U.S. stockholders, we may be required to withhold U.S. tax with respect to such dividends, including in respect of all or a portion of such dividend that is payable in stock. In addition, if a significant number of our stockholders determine to sell shares of our common stock in order to pay taxes owed on dividends, such sales may have an adverse effect on the per share trading price of our common stock.

*We could have potential deferred and contingent tax liabilities from our REIT conversion that could limit, delay or impede future sales of our properties.*

Even though we qualify for taxation as a REIT, if we acquire any asset from a corporation which is or has been a C-Corporation in a transaction in which the basis of the asset in our hands is less than the fair market value of the asset (including as a result of the REIT conversion), in each case determined at the time we acquired the asset, and we subsequently recognize gain on the disposition of the asset during the ten-year period beginning on the date on which we acquired the asset, then we will be required to pay tax at the highest regular corporate tax rate on this gain to the extent of the excess of (a) the fair market value of the asset over (b) its adjusted basis in the asset, in each case determined as of the date on which we acquired the asset. These requirements could limit, delay or impede future sales of our properties. We currently do not expect to sell any asset if the sale would result in the imposition of a material tax liability. We cannot, however, assure you that we will not change our plans in this regard.

*Legislative or regulatory action affecting REITs could adversely affect us or our stockholders.*

In recent years, numerous legislative, judicial and administrative changes have been made to the federal income tax laws applicable to investments in REITs and similar entities. At any time, the federal income tax laws governing REITs or the administrative interpretations of those laws may be amended. Changes to the tax laws, regulations and administrative interpretations, which may have retroactive application, could adversely affect us and may impact our taxation or that of our stockholders. Accordingly, we cannot assure you that any such change will not significantly affect our ability to qualify for taxation as a REIT or the federal income tax consequences to us of such qualification.

**Other Risks Related to Our Securities**

*The market price of our equity securities may vary substantially, which may limit your ability to liquidate your investment.*

The trading prices of equity securities issued by REITs have historically been affected by changes in market interest rates. One of the factors that may influence the price of our common stock in public trading markets is the annual yield from distributions on our common stock as compared to yields on other financial instruments. An increase in market interest rates, or a decrease in our distributions to stockholders, may lead prospective purchasers of our shares to demand a higher annual yield, which could reduce the market price of our equity securities.

Other factors that could affect the market price of our equity securities include the following:

- actual or anticipated variations in our quarterly results of operations;
- changes in market valuations of companies in the corrections or detention industries;
- changes in expectations of future financial performance or changes in estimates of securities analysts;
- fluctuations in stock market prices and volumes;
- issuances of common shares or other securities in the future; and
- announcements by us or our competitors of acquisitions, investments or strategic actions.

*The number of shares of our common stock available for future sale could adversely affect the market price of our common stock.*

We cannot predict the effect, if any, of future sales of common stock, or the availability of common stock for future sale, on the market price of our common stock. Sales of substantial amounts of common stock (including stock issued under equity compensation plans), or the perception that these sales could occur, may adversely affect prevailing market prices for our common stock.

*Future offerings of debt or equity securities ranking senior to our common stock or incurrence of debt (including under our revolving credit facility) may adversely affect the market price of our common stock.*

If we decide to issue debt or equity securities in the future ranking senior to our common stock or otherwise incur indebtedness (including under our revolving credit facility), it is possible that these securities or indebtedness will be governed by an indenture or other instrument containing covenants restricting our operating flexibility and limiting our ability to make distributions to our stockholders. Additionally, any convertible or exchangeable securities that we issue in the future may have rights, preferences and privileges, including with respect to distributions, more favorable than those of our common stock and may result in dilution to owners of our common stock. Because our decision to issue debt or equity securities in any future offering or otherwise incur indebtedness will depend on market conditions and other factors beyond our control, we cannot predict or estimate the amount, timing or nature of our future offerings or financings, any of which could reduce the market price of our common stock and dilute the value of our common stock.

*Our issuance of preferred stock could adversely affect holders of our common stock and discourage a takeover.*

Our Board of Directors has the authority to issue up to 50.0 million shares of preferred stock without any action on the part of our stockholders. Our Board of Directors also has the authority, without stockholder approval, to set the terms of any new series of preferred stock that may be issued, including voting rights, dividend rights, liquidation rights and other preferences superior to our common stock. In the event that we issue shares of preferred stock in the future that have preferences superior to our common stock, the rights of the holders of our common stock or the market price of our common stock could be adversely affected. In addition, the ability of our Board of Directors to issue shares of preferred stock without any action on the part of our stockholders may impede a takeover of us and discourage or prevent a transaction favorable to our stockholders.

*Our charter and bylaws and Maryland law could make it difficult for a third party to acquire our company.*

The Maryland General Corporation Law and our charter and bylaws contain provisions that could delay, deter, or prevent a change in control of our company or our management. These provisions could also discourage proxy contests and make it more difficult for our stockholders to elect directors and take other corporate actions. These provisions:

- authorize us to issue "blank check" preferred stock, which is preferred stock that can be created and issued by our Board of Directors, without stockholder approval, with rights senior to those of common stock;

- provide that directors may be removed with or without cause only by the affirmative vote of at least a majority of the votes of shares entitled to vote thereon; and

- establish advance notice requirements for submitting nominations for election to the Board of Directors and for proposing matters that can be acted upon by stockholders at a meeting.

We are also subject to anti-takeover provisions under Maryland law, which could delay or prevent a change of control. Together, these provisions of our charter and bylaws and Maryland law may discourage transactions that otherwise could provide for the payment of a premium over prevailing market prices for our common

### Our Business

We are compensated for providing correctional bed space and operating and managing prisons and correctional facilities at an inmate per diem rate based upon actual or minimum guaranteed occupancy levels. The significant expansion of the prison population in the United States has led to overcrowding in the federal and state prison systems, providing us with opportunities for growth. Federal, state, and local governments are constantly under budgetary constraints putting pressure on governments to control correctional budgets, including per diem rates our customers pay to us as well as pressure on appropriations for building new prison capacity. Several of our state partners are projecting increases in tax revenues and improvements in their budgets. All of our state partners have balanced budget requirements, which may force them to further reduce their expenses if their tax revenues, which typically lag the overall economy, do not meet their expectations. Actions to control their expenses could include reductions in inmate populations through early release programs, alternative sentencing, or inmate transfers from facilities managed by private operators to facilities operated by government jurisdictions. Further, certain government partners have requested, and additional government partners could request, reductions in per diem rates or request that we forego prospective rate increases in the future as methods of addressing the budget shortfalls they may be experiencing. We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity.

Governments continue to experience many significant spending demands which have constrained correctional budgets limiting their ability to expand existing facilities or construct new facilities. We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system. Further, the use of facilities owned and managed by private operators allows governments to expand correctional capacity without incurring large capital commitments and allows them to avoid long-term pension obligations for their employees.

We also believe that having beds immediately available to our partners provides us with a distinct competitive advantage when bidding on new contracts. While we have been successful in winning contract awards to provide management services for facilities we do not own, and will continue to pursue such management contracts, we believe the most significant opportunities for growth are in providing our government partners with available beds within facilities we currently own or that we develop. We also believe that owning the facilities in which we provide management services enables us to more rapidly replace business lost compared with managed-only facilities, since we can offer the same beds to new and existing customers and, with customer consent, may have more flexibility in moving our existing inmate populations to facilities with available capacity. Our management contracts generally provide our customers with the right to terminate our management contracts at any time without cause.

We have staff throughout the organization actively engaged in marketing our available capacity to existing and prospective customers. Historically, we have been successful in substantially filling our inventory of available beds and the beds that we have constructed. Filling these available beds would provide substantial growth in revenues, cash flow, and earnings per share. However, we can provide no assurance that we will be able to fill our available beds.

Although the demand for prison beds in the short term has been and could continue to be affected by the severe budget challenges many of our customers currently face, these challenges put further pressure on our customers' ability to construct new prison beds of their own, which we believe could result in further reliance on the private sector for providing the capacity we believe our customers will need in the long term. We will continue to pursue build-to-suit opportunities like the 1,124-bed Jenkins Correctional Center we constructed and placed into service in 2012 for the state of Georgia, as well as the recently announced 2,552-bed facility in Trousdale County, Tennessee. In the long-term, we would like to see continued and meaningful utilization of

ability to control our claims. We have consistently accrued the estimated liability for employee health insurance claims based on our history of claims experience and the estimated time lag between the incident date and the date we pay the claims. We have accrued the estimated liability for workers' compensation claims based on an actuarial valuation of the outstanding liabilities, discounted to the net present value of the outstanding liabilities, using a combination of actuarial methods used to project ultimate losses, and our automobile insurance claims based on estimated development factors on claims incurred. The liability for employee health, workers' compensation, and automobile insurance includes estimates for both claims incurred and for claims incurred but not reported. These estimates could change in the future. It is possible that future cash flows and results of operations could be materially affected by changes in our assumptions, new developments, or by the effectiveness of our strategies.

*Legal reserves.* As of December 31, 2013 and 2012, we had $6.2 million and $8.6 million, respectively, in accrued liabilities related to certain legal proceedings in which we are involved. We have accrued our best estimate of the probable costs for the resolution of these claims based on a range of potential outcomes. In addition, we are subject to current and potential future legal proceedings for which little or no accrual has been reflected because our current assessment of the potential exposure is nominal. These estimates have been developed in consultation with our General Counsel's office and, as appropriate, outside counsel handling these matters, and are based upon an analysis of potential results, assuming a combination of litigation and settlement strategies. It is possible that future cash flows and results of operations could be materially affected by changes in our assumptions, new developments, or by the effectiveness of our strategies.

## RESULTS OF OPERATIONS

Our results of operations are impacted by the number of facilities we owned and managed, the number of facilities we managed but did not own, the number of facilities we leased to other operators, and the facilities we owned that were not in operation. The following table sets forth the changes in the number of facilities operated for the years ended December 31, 2013, 2012 and 2011.

Based on information available at this filing, notwithstanding the contracts at facilities described above, we believe we will renew all other contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

The operation of the facilities we own carries a higher degree of risk associated with a facility contract than the operation of the facilities we manage but do not own because we incur significant capital expenditures to construct or acquire facilities we own. Additionally, correctional and detention facilities have limited or no alternative use. Therefore, if a contract is terminated on a facility we own, we continue to incur certain operating expenses, such as real estate taxes, utilities, and insurance, which we would not incur if a management contract were terminated for a managed-only facility. As a result, revenue per compensated man-day is typically higher for facilities we own and manage than for managed-only facilities. Because we incur higher expenses, such as repairs and maintenance, real estate taxes, and insurance, on the facilities we own and manage, our cost structure for facilities we own and manage is also higher than the cost structure for the managed-only facilities. The following tables display the revenue and expenses per compensated man-day for the facilities placed into service that we own and manage and for the facilities we manage but do not own:

| | | For the Years Ended December 31, | | |
|---|---|---|---|---|
| | | 2013 | | 2012 |
| **Owned and Managed Facilities:** | | | | |
| Revenue per compensated man-day | $ | 68.19 | $ | 67.61 |
| Operating expenses per compensated man-day: | | | | |
| Fixed expense | | 35.02 | | 34.13 |
| Variable expense | | 10.66 | | 10.46 |
| Total | | 45.68 | | 44.59 |
| Operating income per compensated man-day | $ | 22.51 | $ | 23.02 |
| Operating margin | | 33.0% | | 34.0% |
| Average compensated occupancy | | 81.6% | | 85.1% |
| Average available beds | | 67,588 | | 67,340 |
| Average compensated population | | 55,123 | | 57,337 |
| **Managed Only Facilities:** | | | | |
| Revenue per compensated man-day | $ | 40.14 | $ | 39.69 |
| Operating expenses per compensated man-day: | | | | |
| Fixed expense | | 25.68 | | 25.72 |
| Variable expense | | 9.20 | | 9.21 |
| Total | | 34.88 | | 34.93 |
| Operating income per compensated man-day | $ | 5.26 | $ | 4.76 |
| Operating margin | | 13.1% | | 12.0% |
| Average compensated occupancy | | 96.6% | | 96.8% |
| Average available beds | | 21,306 | | 21,306 |
| Average compensated population | | 20,575 | | 20,624 |

Case 3:16-cv-02267   Document 62-9   Filed 05/12/17   Page 27 of 29 PageID #: 1054

our cash expenditure requirements for the next year utilizing these resources. None of our outstanding debt requires scheduled principal repayments and we have no debt maturities until December 2017.

Our cash flow is subject to the receipt of sufficient funding of and timely payment by contracting governmental entities. If the appropriate governmental agency does not receive sufficient appropriations to cover its contractual obligations, it may terminate our contract or delay or reduce payment to us. Delays in payment from our major customers or the termination of contracts from our major customers could have an adverse effect on our cash flow and financial condition. The temporary government shutdown during the fourth quarter of 2013 resulted in the delay of certain payments from our federal government partners, but did not have a material impact on our liquidity.

### Debt and refinancing transactions

During March 2013, we amended our $785.0 million revolving credit facility to, among other things, increase the commitment size from $785.0 million to $900.0 million, to extend the maturity by one-year to December 2017, and to provide flexibility to operate as a REIT. Interest on the $900.0 million revolving credit facility is based on either a base rate plus a varying margin ranging from 0.25% to 1.00% or a LIBOR plus a varying margin of 1.25% to 2.00% based on our leverage ratio.

Concurrent with the closing of the $900.0 million revolving credit facility on March 21, 2013, we announced our intention to offer up to an aggregate of $675.0 million in aggregate principal amount of new senior notes comprised of senior notes due 2020 and senior notes due 2023. Also on March 21, 2013, we announced a cash tender offer for any and all of our $465.0 million aggregate principal amount of 7.75% unsecured senior notes issued in June 2009. On April 4, 2013, we accepted $315.4 million principal amount of the 7.75% unsecured senior notes pursuant to the tender offer for holders who validly tendered their 7.75% unsecured senior notes by the early tender deadline.

Further, also on April 4, 2013, we completed the offering of $325.0 million aggregate principal amount of 4.125% senior notes due April 1, 2020 and $350.0 million aggregate principal amount of 4.625% senior notes due May 1, 2023, collectively referred to herein as the "New Notes". Following the expiration of the early tender deadline, we announced we would redeem on June 1, 2013 any and all remaining outstanding 7.75% unsecured senior notes at a price of 103.875% of par plus accrued interest pursuant to the indenture governing the 7.75% unsecured senior notes.

We incurred $36.5 million of expenses during the year ended December 31, 2013 associated with debt refinancing transactions consisting of the write-off of loan costs and the unamortized discount on the 7.75% unsecured senior notes, the tender fees and expenses associated with the tender offer and the redemption premium paid on the 7.75% unsecured senior notes.

We used a portion of the net proceeds from the offering of the New Notes to pay for the tender offer and redemption of the remaining 7.75% unsecured senior notes outstanding on June 1, 2013. We also used the net proceeds from the sale of the New Notes to fund the payment in cash of $135.0 million representing 20% of our required distribution of C-corporation accumulated earnings and profits in connection with our REIT conversion, to pay other REIT conversion costs, and for general corporate purposes.

As of December 31, 2013, we had $350.0 million principal amount of unsecured notes outstanding with a fixed stated interest rate of 4.625%, $325.0 million principal amount of unsecured notes outstanding with a fixed stated interest rate of 4.125%, and $530.0 million outstanding under our revolving credit facility, with a variable weighted average interest rate of 1.7%. At December 31, 2013, our total weighted average effective interest rate was 3.6% while our total weighted average maturity was 6.2 years. The 2013 refinancing lowered our total weighted average interest rate and extended our weighted average debt maturity. On March 21, 2013, Standard & Poor's Ratings Services raised our corporate credit rating to "BB+" from "BB" and also assigned a "BB+" rating to our New Notes. Additionally, on April 5, 2013, Standard & Poor's Ratings Services assigned a rating of "BBB" to our $900.0 million revolving credit facility. On February 7, 2012, Fitch Ratings assigned a rating of "BBB-" to our revolving credit facility and "BB+" ratings to our unsecured debt and corporate credit. On January 31, 2013, Fitch Ratings affirmed these ratings in connection with our intention to convert

## ITEM 9A.    CONTROLS AND PROCEDURES.

**Management's Evaluation of Disclosure Controls and Procedures**

An evaluation was performed under the supervision and with the participation of our senior management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of our disclosure controls and procedures, as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act as of the end of the period covered by this Annual Report. Based on that evaluation, our officers, including our Chief Executive Officer and Chief Financial Officer, concluded that as of the end of the period covered by this Annual Report our disclosure controls and procedures are effective to ensure that information required to be disclosed in the reports that we file or submit under the Exchange Act is recorded, processed, summarized and reported, within the time periods specified in the Commission's rules and forms and information required to be disclosed in the reports we file or submit under the Exchange Act is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, to allow timely decisions regarding required disclosure.

**Management's Report on Internal Control over Financial Reporting**

Management of Corrections Corporation of America (the "Company") is responsible for establishing and maintaining adequate internal control over financial reporting, as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. The Company's internal control over financial reporting is designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. The Company's internal control over financial reporting includes those policies and procedures that:

(i)     pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the Company;

(ii)    provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the Company are being made only in accordance with authorizations of management and directors of the Company; and

(iii)   provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the Company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

Management assessed the effectiveness of the Company's internal control over financial reporting as of December 31, 2013. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in Internal Control-Integrated Framework released in 1992. On May 14, 2013, COSO released an updated version of its Internal Control-Integrated Framework. The COSO Board has emphasized that the key concepts and principles embedded in the original Framework remains fundamentally sound for designing, implementing and maintaining systems of internal control and assessing their effectiveness. Therefore, COSO will continue to make the original Framework available through December 15, 2014, at which time the 1992 Framework will be considered suspended. During this transition period, COSO believes continued use of the 1992 Framework is acceptable. Based on management's assessment and the criteria in the 1992 Framework, management believes that, as of December 31, 2013, the Company's internal control over financial reporting was effective.

The Company's independent registered public accounting firm, Ernst & Young LLP, has issued an attestation report on the Company's internal control over financial reporting. That report begins on page 76.