# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. 3:16-cv-02267 |
| Plaintiff, ) ) | Honorable Aleta A. Trauger |
| ) | |
| vs. ) ) ) | PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED |
| CORRECTIONS CORPORATION OF AMERICA, et al., ) ) ) | CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE |
| Defendants. ) ) | FEDERAL SECURITIES LAWS |

1280913_1

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................... 1

II.    STATEMENT OF FACTS ........................................................................ 1

III.    ARGUMENT ............................................................................................ 6

    A.    False and Misleading Statements ................................................. 6

        1.    Defendants' Statements of Compliance with Applicable Standards Were Materially Misleading Given CCA's Chronic Understaffing and Failure to Provide Basic Healthcare or Safety to Inmates at Its BOP Facilities ................................................................. 6

        2.    Defendants' Misrepresentations About CCA's "Quality" Services and Cost Savings Were Materially Misleading for the Same Reasons ................................................................. 9

        3.    None of Defendants' Misrepresentations Is Protected by the Safe Harbor ................................................................. 12

    B.    The Complaint Adequately Alleges Liability for an Unlawful Scheme and Course of Conduct ................................................................. 13

    C.    The Complaint Pleads a Strong Inference of Scienter ................. 14

        1.    Defendants Received Reports that Contradicted Their Statements .......... 15

        2.    Defendants Resisted Transparency but Conceded the Materiality of Facility Deficiencies ................................................................. 17

    D.    The Complaint's Allegations Are More than Sufficient to Plausibly Plead Loss Causation in Compliance with Fed. R. Civ. P. 8(a)(2) ................. 18

IV.    CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ashland, Inc. v. Oppenheimer & Co.*,
    648 F.3d 461 (6th Cir. 2011) ................................................14

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007)...............................................................6, 7

*Burges v. BancorpSouth, Inc.*,
    2015 U.S. Dist. LEXIS 89822
    (M.D. Tenn. July 10, 2015)....................................7, 11, 14, 19

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
    399 F.3d 651 (6th Cir. 2005) ...........................................10, 15

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) ...............................................15

*Dura Pharms Inc. v. Broudo*,
    544 U.S. 336 (2005).................................................................18

*Frank v. Dana Corp.*,
    646 F.3d 954 (6th Cir. 2011) .................................................14

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
    2011 U.S. Dist. LEXIS 35661
    (M.D. Tenn. Mar. 31, 2011)..........................................11, 13, 16

*Helwig v. Vencor, Inc.*,
    251 F.3d 540 (6th Cir. 2001) ........................................ *passim*

*In re Am. Serv. Grp., Inc.*,
    2009 U.S. Dist. LEXIS 28237
    (M.D. Tenn. Mar. 31, 2009)..........................................11, 12, 19

*In re Cardinal Health, Inc. Sec. Litig.*,
    426 F. Supp. 2d 688 (S.D. Ohio 2006) ..................................10

*In re Compuware Sec. Litig.*,
    301 F. Supp. 2d 672 (E.D. Mich. 2004)................................13

*In re Comshare, Inc. Sec. Litig.*,
    183 F.3d 542 (6th Cir. 1999) .................................................14

*In re F & M Distribs. Sec. Litig.*,
    937 F. Supp. 647 (E.D. Mich. 1996)......................................12

1280913_1

Case 3:16-cv-02267   Document 67   Filed 06/26/17   Page 3 of 29 PageID #: 1133

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ...........................................................................10

*In re Omnicare, Inc. Sec. Litig.*,
   769 F.3d 455 (6th Cir. 2014) ...........................................................................7

*In re Priceline.com Inc.*,
   342 F. Supp. 2d 33 (D. Conn. 2004) ..............................................................11

*In re Prudential Sec. Ltd. P'ship Litig.*,
   930 F. Supp. 68 (S.D.N.Y. 1996) ...................................................................13

*James v. Gerber Prods. Co.*,
   587 F.2d 324 (6th Cir. 1978) ...........................................................................11

*Miller v. Champion Enters., Inc.*,
   346 F.3d 660 (6th Cir. 2003) ...........................................................................13

*Mulvaney v. The GEO Group, Inc.*,
   2017 WL 887193
   (S.D. Fla. Feb. 23, 2017)...................................................................8, 9, 16

*N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*,
   929 F. Supp. 2d 740 (M.D. Tenn. 2013)..........................................................20

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
   830 F.3d 376 (6th Cir. 2016) ...........................................................................18

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
   873 F. Supp. 2d 1070 (D. Minn. 2012)............................................................19

*PR Diamonds, Inc. v. Chandler*,
   364 F.3d 671 (6th Cir. 2004) ...........................................................................6

*Scritchfield v. Paolo*,
   274 F. Supp. 2d 163 (D.R.I. 2003)...................................................................10

*Sohol v. Yan*,
   2016 U.S. Dist. LEXIS 56049
   (N.D. Ohio Apr. 27, 2016)...............................................................................10

*Stone v. Life Partners Holdings, Inc.*,
   26 F. Supp. 3d 575, 596 (W.D. Tex. 2014)......................................................10

*Stoneridge Inv. Partners LLC v. Scientific-Atlanta Inc.*,
   552 U.S. 148 (2008)..........................................................................................13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ...........................................................................................6, 9, 14

*Willis v. Big Lots, Inc.*,
    2016 U.S. LEXIS 8028
    (S.D. Ohio Jan. 21, 2016) .........................................................................................10

*Winslow v. BancorpSouth, Inc.*,
    2011 U.S. Dist. LEXIS 45559
    (M.D. Tenn. Apr. 26, 2011) .....................................................................................18

## STATUTES, RULES AND REGULATIONS

15 U.S.C.
    §78u-5(c)(1)(A)(i) ....................................................................................................13

Federal Rules of Civil Procedure
    Rule 8(a) ....................................................................................................................18
    Rule 8(a)(2) ...............................................................................................................18

17 C.F.R.
    §240.10b-5 .................................................................................................................13
    §240.10b-5(a) ............................................................................................................13
    §240.10b-5(c) ............................................................................................................13

# I. INTRODUCTION

Throughout and before the Class Period, Defendants[1] repeatedly touted CCA as providing quality services that met applicable standards at lower costs than government-run facilities. These contentions formed the underpinning of CCA's entire business model. In truth, CCA paid lip service to government standards and routinely cut corners to save costs and increase its profits, leading to disastrous consequences, including the deaths of inmates and at least one correctional officer.

The Consolidated Complaint for Violation of the Federal Securities Laws (Dkt. No. 57) (the "Complaint")[2] pleads with particularity widespread deficiencies in CCA-operated Federal Bureau of Prisons ("BOP") facilities, which were known or recklessly disregarded by Defendants and which rendered Defendants' Class Period statements and omissions materially false and misleading. These allegations are based on numerous corroborating sources, including thousands of pages of BOP monitoring reports and Notices of Concern ("NOC"), the Office of the Inspector General's ("OIG") "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Review"), an August 18, 2016 memorandum by former Deputy Attorney General Sally Q. Yates (the "Yates Memorandum"), and first-hand accounts of a well-placed witness.

When Defendants' fraud was revealed to the market, CCA's stock price collapsed, losing as much as 53% of its value, and causing hundreds of millions of dollars or more in damages to investors who purchased CCA's stock while it was artificially inflated during the Class Period. This action seeks to recover for those losses caused by Defendants' unlawful misconduct.

# II. STATEMENT OF FACTS

Defendants do not seriously dispute the overwhelming evidence of CCA's deficient operations as revealed through government investigations and monitoring. For example, the

---

[1] "Defendants" collectively refers to CoreCivic, Inc. (f/k/a Corrections Corporation of America) ("CCA" or the "Company"), Damon T. Hininger ("Hininger"), David M. GarFinkle, Todd J. Mullenger ("Mullenger") and Harley G. Lappin ("Lappin").

[2] All "¶__" or "¶¶___" references are to the Complaint unless indicated otherwise.

1280913_1

evaluation and inspections division of the OIG examined the BOP's monitoring of its private contract prisons from FY 2011 through FY 2014. ¶39; Exhibit 1 at 46.[3] On August 11, 2016, the OIG found that in "recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer" and concluded that "*in most key areas*, *contract prisons* [specifically including CCA] *incurred more safety and security incidents per capita than comparable BOP institutions*," while not concluding that contract prisons offered any cost savings compared to BOP-run facilities. ¶¶38-39.

The OIG Review found CCA's BOP prisons had the: (i) *highest rates of inmate fights* (35% more than BOP institutions); (ii) *most inmate-on-inmate assaults* (64% more than BOP institutions); (iii) *most inmate-on-staff sexual assaults* (7.5 times more than BOP institutions); (iv) *most suicide attempts* and self-mutilations (37.5% more than BOP institutions); and (v) *most safety- and security-related inmate grievances* (over ten times more than other private prison operators). ¶39. Defendants ignore these findings, instead trying to downplay them by claiming there were fewer drug tests and sexual misconduct incidents among inmates at private prisons. Defendants' Memorandum of Points and Authorities in Support of Their Motion to Dismiss Plaintiff's Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws (Dkt. No. 61) ("MTD") at 6. This attempt to isolate two snippets of the Review ignores the OIG's conclusion – private prisons, and specifically CCA, had far more safety and security violations than BOP prisons. ¶¶38-39.

Defendants also fail to acknowledge that the Yates Memorandum concluded that private prisons "simply *do not provide the same level of correctional services*, programs, and resources; they *do not save substantially on costs*; and as noted in a recent report by the Department's Office of

---

[3]    All exhibit references are to the Declaration of Milton S. McGee, III in Support of Defendants' Motion to Dismiss (Dkt. No. 62).

1280913_1

Inspector General, they **do not maintain the same level of safety and security**." ¶¶13, 41. The Yates Memorandum is direct evidence of the falsity of Defendants' misrepresentations.[4]

The Complaint also details how reports of BOP's ongoing monitoring, showing egregious inadequacies of which Defendants were aware, contradicted Defendants' statements about CCA's purported high-quality, low-cost business strategy. For example, CCA deliberately understaffed its Adams BOP facility, resulting in a 12-hour riot on May 20, 2012, causing the death of one correctional officer and significant injuries to others. ¶¶43-44. According to the sworn affidavit of CCA correctional officer Deborah Temple, CCA knew about the understaffing and deliberately tried to cover it up: "My co-workers and I informed Prison officials on numerous occasions that there were not enough Prison employees to adequately control the prisoners." ¶45. The deliberateness of CCA's deception is evidenced by the fact that when the BOP audited the facility, "Prison officials would call in all possible Prison employees so it would appear as though the Prison was adequately staffed, even though it was not." *Id.* On the day of the riot, "[t]here were probably not more than 20 Prison employees at the facility" that housed nearly 2,000 inmates. ¶¶43, 46. The BOP's July 27, 2012 After-Action Report found that the riot was a result of staffing issues and ineffective intelligence operations by CCA. ¶48. Likewise, the FBI investigated and found the riot to be motivated by, *inter alia*, "substandard food [and] medical conditions" at the facility, and the BOP notified CCA of several related violations of its contract at the facility. ¶49.

Defendants had direct knowledge of CCA's substandard facilities and cut costs by not remediating the deficiencies of which they were aware. As to the Adams facility, CCA was warned repeatedly for breaching minimum staffing requirements even after the May 2012 riot, including

---

[4] The Jefferson B. Sessions III memorandum of February 21, 2017 does nothing to undermine the facts or conclusions set forth in the OIG Review or the Yates Memorandum regarding CCA's subpar services or the finding that private prisons do not provide cost savings. Ex. 3.

being alerted that the facility was understaffed for over two years.[5]  In May 2015, the OIG began an audit of CCA's compliance with that facility's contract, leading to a December 20, 2016 audit report observing: "Four years after the riot, we were deeply concerned to find that the facility was plagued by the same significant deficiencies in correctional and health services and Spanish-speaking staffing.  In 19 of the 38 months following the riot, we found [CCA] staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage."  ¶¶63-64.

CCA's widespread understaffing was not limited to Adams.  CCA was told in an April 25, 2012 report that its failure to staff a physician at its Cibola facility for the preceding year was unacceptable.  ¶71.  NOCs reveal CCA's policy and practice to deliberately understaff its BOP facilities.  For example, CCA was admonished for understaffing its Cibola facility for the entire year of 2013, at least eight months of 2014 and three months of 2015.[6]  Similarly, CCA was criticized for understaffing its Eden facility for four months in 2012, and again in 2014 and 2015.  ¶¶92-95.

In addition, CCA disregarded basic and essential services, such as healthcare, to increase perceived profitability.  NOCs and monitoring reports by the BOP reveal an egregious pattern of utter failures to provide healthcare to inmates, the majority of whom were incarcerated for immigration violations and non-violent drug offenses.  ¶¶43, 68, 87, 108.  For example:

- ***Adams facility*** – CCA was rebuked for over 50 health services deficiencies, including repeat deficiencies, some requiring "corrective action . . . to avoid additional deaths" and a "significant finding in Health Services."[7]  ¶¶61-62.

---

[5]  ¶53 (8/10/12 NOC – failed to maintain minimum staffing requirement 11 out of 16 months for the period of April 2011 through July 2012); ¶54 (11/14/12 NOC – failed to maintain minimum staffing requirements for August and September 2012); ¶55 (2/22/13 NOC – failed to maintain minimum staffing levels for October and December 2012); ¶57 (5/16/13 NOC – insufficient staffing levels for January through March 2013); ¶60 (6/9/14 NOC – deficiencies in staffing).

[6]  ¶74 (5/22/13 NOC – staffing levels inadequate for January to March 2013); *id*. (8/6/13 NOC – staffing levels inadequate April to June 2013); *id*. (10/3/13 NOC – staffing levels inadequate July to September 2013); *id*. (1/2/14 NOC – staffing levels inadequate October to December 2013); ¶75 (4/8/14 NOC – staffing levels inadequate January to March 2014); *id*. (7/7/14 NOC – staffing levels inadequate April to June 2014); *id*. (9/23/14 NOC – staffing levels inadequate July to August 2014); ¶80 (4/6/15 NOC – staffing levels inadequate January to March 2015).

[7]  ¶51 (5/31/11 report – twice repeated deficiency and five additional health services deficiencies); ¶52 (4/6/12 report – nine deficiencies, including management of an inmate's condition prior to

- 4 -

Showing CCA's deliberate conduct, the BOP's December 20, 2016 report of its contract audit not only noted that the problems that caused the riot had not been cured but went on to state that it had "*also found that, beginning in December 2012, [CCA] excluded from its required staffing reports the status of five critical health services positions* identified in the approved staffing plan."  ¶64.  This had a "negative effect on [CCA]'s ability to provide quality health care at the Adams County facility." *Id.*  "*[B]etween December 2012 and September 2015, the Adams County facility was staffed with only a single physician for 434 days* (43 percent of the time) and a single dentist for 689 days (69 percent of the time), resulting in inmate-to-provider ratios that were about double those specified in BOP program statements." *Id.*

- *Cibola facility* – CCA was criticized for over 75 health services deficiencies and inadequacies, including findings by the BOP that medical care was not adequate.[8] The unresolved health services deficiencies were so bad that on January 9, 2015, the BOP sent CCA a Cure Notice, saying the "failure of CCA in correcting the deficiencies, some of which have been noted deficient back to 2011 are cause for the Federal Bureau of Prisons to issue this Cure Notice," and, as a result, "*the Government is considering a termination for default of this contract*."  ¶79. Despite this warning, on June 2, 2015 the BOP found that "[m]edical management of an inmate's condition resulting in death was not in accordance with policy and standards of care" due to a failure to refer for mental health treatment an inmate who had previously been placed on suicide watch.  ¶81.

- *Eden facility* – CCA was admonished for over 30 health services deficiencies and inadequacies, including those related to "basic inmate healthcare."[9]  As with Cibola, *CCA failed to staff Eden with a physician.*  According to an August 2014 report, the OIG noted that "[d]uring our site visit to [Eden], we learned there was *no full-time physician, as required by its approved staffing plan*, for the 8-month period between

---

death); ¶56 (2/27/13 report – repeat deficiency and 19 other health services deficiencies); ¶59 (1/24/14 report – three repeat deficiencies and 11 other health services deficiencies); ¶61 (3/13/15 report – repeat health services deficiency and a "significant finding" regarding health services).

[8]  ¶70 (3/25/11 NOC – deficiency related to a death of an inmate who did not receive adequate medical care); ¶¶71-72 (4/25/12 report – noting institution without a physician for a year, two repeat deficiencies and 11 other health services deficiencies); ¶73 (5/2/13 report – one twice-repeated deficiency, one thrice-repeated deficiency and 14 other health services deficiencies); ¶¶76-77 (5/5/14 report – 13 repeat deficiencies, 15 other health services deficiencies and an adverse significant finding for patient care); ¶78 (11/21/14 NOC – a fourth repeated deficiency, a thrice-repeated deficiency, a twice-reported deficiency, two repeat deficiencies, and four other health services deficiencies); ¶81 (6/2/15 report – one repeat deficiency and eight other health services deficiencies).

[9]  ¶92 (8/23/12 NOC – failure to maintain the minimum 85% staffing requirement in Health Services from May to August 2012); ¶¶88-89 (August 2014 report – significant adverse finding for health services, 11 administration and patient care deficiencies, six repeat deficiencies); ¶93 (10/1/14 NOC – failure to maintain the minimum 85% staffing requirement in Health Services for August and September 2014); ¶94 (12/10/14 NOC – failure to maintain the minimum 85% staffing requirement in Health Services failure from August through November 2014); ¶95 (3/11/15 NOC – failure to maintain the minimum 85% staffing requirement in Health Services from August 2014 through February 2015); ¶90 (4/9/15 report – repeat health services deficiency not corrected resulting in death and eight new health services deficiencies).

December 2013 and August 2014," even though physicians "are critical for ensuring basic inmate healthcare." ¶88. CCA also was criticized for understaffing health services relative to its contract for many months in 2012, 2014 and 2015. ¶¶92-95. According to an American Civil Liberties Union ("ACLU") report, this facility also routinely failed to provide adequate medical care and gave inmates radioactive drinking water. ¶¶102, 106-107.

- ***McRae facility*** – CCA was informed of health services inadequacies. An August 8, 2011 letter from the ACLU admonished CCA for repeat violations of inmates' medical needs and violations of BOP standards. ¶¶110, 112.

As discussed below, CCA's understaffing and failure to provide adequate services at BOP facilities directly contradicted their statements to investors that the Company's services were of better quality and more cost effective than government-run prisons.

## III.   ARGUMENT

Even in securities actions subject to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), "courts must . . . accept all factual allegations in the complaint as true," and the plaintiff receives the benefit of all plausible inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 321-22 (2007); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680, 682 (6th Cir. 2004). The Complaint here pleads more than "enough factual matter (taken as true) to suggest that" the alleged conduct occurred. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). "Asking for plausible grounds . . . does not impose a probability requirement at the pleading stage." *Id.*

### A.   False and Misleading Statements

#### 1.   Defendants' Statements of Compliance with Applicable Standards Were Materially Misleading Given CCA's Chronic Understaffing and Failure to Provide Basic Healthcare or Safety to Inmates at Its BOP Facilities

As discussed above and in the Complaint, BOP monitoring reports and NOCs, as well as the OIG's Review and the Yates Memorandum, show that Defendants did not "operate [CCA's BOP] facilities in accordance with both company and facility-specific policies and procedures" or the "high standards" established by various "federal, state and local government guidelines" applicable

- 6 -

to private prisons, including the American Correctional Association ("ACA"). ¶¶135-139.[10]  Nor did CCA's BOP facilities "operate under these established standards," much less "exceed them."  *Id*.

Despite these findings, NOCs, and reports received before and during the Class Period, and Defendants' specific representations that they complied with applicable standards, Defendants contend that their statements should be disregarded as "generalized optimism."  MTD at 18-19.  The Sixth Circuit rejected a similar argument in *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014), where the company stated it was "in material compliance with laws and regulations" when it had audit results that a jury could find were material and, as a result, the Company "had a duty to disclose those results."  *Id.* at 480-81.  Judge Campbell rejected the same argument in *Burges v. BancorpSouth, Inc.*, 2015 U.S. Dist. LEXIS 89822 (M.D. Tenn. July 10, 2015): "Plaintiffs have pled facts, sufficient at this pleading stage of the litigation, which demonstrate that Defendants were not in compliance with federal . . . laws at the time these representations were made."  *Id.* at *13-*14. These cases are on all fours with the allegations here, and Defendants essentially concede that these statements are material by failing to cite a single case to the contrary.  MTD at 18-19.[11]

Rather than a "handful of cherry-picked violations at a small number of facilities" (MTD at 19), as Defendants suggest, the Complaint details specific and pervasive violations of federal standards at four of the five BOP facilities that CCA operated that are relevant to this action and explains that the BOP declined to renew its contract with the fifth.  ¶¶2, 42-114  The OIG Review specifically addresses CCA's deficiencies on prison safety issues addressed by ACA Standards, finding rampant violations in "most key areas."  Ex. 1 at 46-47; ¶¶12, 39.

---

[10]  Defendants made these representations in CCA's 2011 annual report filed on February 27, 2012 with the U.S. Securities and Exchange Commission, and repeated in all material respects in the Company's 2012, 2013, 2014 and 2015 annual reports.  ¶¶135-137.  Contrary to Defendants' suggestion (MTD at 19 n.9), the Complaint amply details how CCA violated applicable standards based on NOCs, the OIG Review and monitoring reports – both before and during the Class Period. *See* Complaint §VI.

[11]  Defendants rely on the dissent, not the holding of *Helwig*.  MTD at 19 (citing *Helwig*, 251 F.3d at 567-68).  Regardless, *Helwig* did not address the materiality of statements about compliance with standards or rules when facts are pled from which the court can infer falsity.

1280913_1

Contrary to Defendants' contentions, *Mulvaney v. The GEO Group, Inc.*, 2017 WL 887193 (S.D. Fla. Feb. 23, 2017), demonstrates the strength of the complaint. In *GEO*, the court held that "[i]nformation that GEO Group's services were inadequate, or that its relationship with BOP was fragile, if true, may have significantly altered the total mix of information available to the reasonable investor." *Id.* at *10. The complaint in *GEO*, however, "fail[ed] to plead specific facts showing that GEO Group's services were inadequate, or that its relationship with BOP was strained." *Id.* The complaint did not "provide sufficient facts to infer that conditions in GEO Group's prisons were inadequate or otherwise jeopardized GEO Group's relationship with the BOP." *Id.* And the complaint did "not offer any insight into whether these incidents [of poor medical care and security] rose to the level of contract violations," leaving it "possible that GEO Group was in compliance with contractual requirements at the times the statement was made." *Id.* at *9.

Here, by contrast, Plaintiff Amalgamated Bank, as Trustee For the LongView Collective Investment Fund ("Plaintiff") has alleged, in great detail, the many inadequacies and contractual violations in four of the five BOP prisons that CCA operated, throughout the Class Period, showing both that CCA's services were not likely to support a high renewal rate from BOP and that CCA was not in compliance with applicable standards. *See* ¶¶43-67 (describing "'several significant incidents of non-conformance'" with the terms and conditions of the facility contract and a "significant finding," the highest possible level of deficiency, regarding health services at Adams facility); ¶¶68-86 (describing breaches of BOP policy as to health services and staffing at Cibola facility, leading to a "Cure Notice" citing "numerous and repetitive items of critical non-conformance in the area of Health Services" and threatening to terminate the Cibola contract); ¶¶87-107 (describing "significant adverse finding in health services" as a result of "pervasive failures to ensure 'basic inmate healthcare' and 'a lack of appropriate intervention, treatment and programs to promote a healthy, safe and secure environment'" at Eden facility); ¶¶108-114 (detailing BOP-identified "repeated

- 8 -

deficiencies and contractual violations" at McRae). That is exactly the detail lacking in the *GEO* complaint and more than adequately demonstrates falsity. *Cf.* Ex. 5 (*GEO* complaint), ¶¶32-53 (referencing only OIG Review, an OIG audit of one facility, and public reports).

Accepting Plaintiff's allegations as true and viewing them in the light most favorable to Plaintiff, there are more than sufficient facts pled to infer that CCA was not in compliance with BOP policies and other applicable standards. *Tellabs*, 551 U.S. at 321-22.

### 2. Defendants' Misrepresentations About CCA's "Quality" Services and Cost Savings Were Materially Misleading for the Same Reasons

Throughout the Class Period, Defendants claimed in CCA's annual reports that the Company's "primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities." ¶¶119-120. Similarly, Defendants emphasized the quality of CCA's operations: "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, . . . the quality of our operations." ¶¶132-133. Defendants did not profess CCA's mere aim to provide quality services; they repeatedly claimed that it did provide "***service at equally high standards of quality and efficiency***" as government-run facilities and "maintain the ***highest operating standards at [the] least costs***," while concealing material adverse facts. ¶142.[12]

Defendants also claimed CCA's services came at a lower cost, stating: (i) CCA offered "a cost-effective alternative to our government partners by reducing their correctional services costs," ¶¶122, 124; (ii) "the outsourcing of prison management services to private [prison] operators . . . improv[es] correctional services" and "results in improvements to the quality and cost of corrections

---

[12] *See also* ¶¶126-127 (quality of services); ¶149 (CCA meets or exceeds ACA quality standards); ¶153("[o]ngoing operational cost savings without the loss of operational quality"); ¶159 (savings can be achieved by contracting with private sector without sacrificing quality); ¶166 ("we continue to . . . have high quality operations"); ¶168 ("we continue to do a good job on . . . quality").

services throughout [the government's] correctional system," ¶¶126-127; and (iii) "[o]ur competitive

cost structure offers prospective customers a compelling option for incarceration." ¶¶123-124; *see*

*also* ¶¶127, 129-130, 142, 147, 149, 153, 155, 157, 159-162, 166, 168.

Defendants assert these statements are inactionable puffery (MTD at 18), but "[f]ollowing the

devastating corporate scandals occurring in the past decade, most courts now consider statements of

corporate optimism with more hesitation" and should "proceed cautiously when examining

[d]efendants' assertions that their enthusiastic statements . . . were 'puffery' as opposed to reckless

or fraudulent misstatements." *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70

(S.D. Ohio 2006).[13]  The statements here are premised on observable facts tied to CCA's services,

unlike the statements generally proclaiming a commitment to quality that were at issue in *In re Ford*

*Motor Co. Sec. Litig.*, 381 F.3d 563, 570 (6th Cir. 2004).  *See City of Monroe Emps. Ret. Sys. v.*

*Bridgestone Corp.*, 399 F.3d 651, 671-72 (6th Cir. 2005)[14]; *see also Cardinal Health*, 426 F. Supp.

2d at 748-49 (distinguishing *Ford* where there were detailed facts that related to defendants'

statements); *Sohol v. Yan*, 2016 U.S. Dist. LEXIS 56049, at *27-*29 (N.D. Ohio Apr. 27, 2016)

(finding statements regarding the high quality of a company's product material).  The Complaint

overwhelmingly pleads that CCA's BOP prisons were not offering higher quality at a lower cost,

undermining the purported competitive advantage Defendants repeatedly misrepresented to

investors.  *See* Complaint §VI.  Statements, like these, that conceal known "issues that would call

into question the viability of [the issuer's] business model or the integrity of its . . . operations" are

actionable.  *Willis v. Big Lots, Inc.*, 2016 U.S. LEXIS 8028 (S.D. Ohio Jan. 21, 2016).[15]

---

[13]  Citations are omitted throughout unless indicated otherwise.

[14]  The Sixth Circuit in *Bridgestone*, in its analysis of materiality, relied on *Scritchfield v. Paolo*, 274 F. Supp. 2d 163 (D.R.I. 2003).  *Bridgestone*, 299 F. 3d 651 at 672.  The *Scritchfield* court emphasized that statements cannot be viewed in a vacuum and that allegations describing the quality of service were actionable where plaintiffs allege, as they do here, "specific and pervasive examples of sub-par . . . service."  274 F. Supp. 2d at 183-84.

[15]  *Accord Stone v. Life Partners Holdings, Inc.*, 26 F. Supp. 3d 575, 596 (W.D. Tex. 2014) (claim

"[A]n omission is actionable when disclosure of information is necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Burges*, 2015 U.S. Dist. LEXIS 89822, at *12; *Helwig*, 251 F.3d at 560-61 (same).[16] Defendants' statements of higher quality and cost savings were misleading because Defendants knew or recklessly disregarded at the time of their statements that CCA did not provide higher quality services at a lower cost. Rather, CCA's BOP facilities were plagued with understaffing and inadequate services resulting from CCA's cost cutting.[17] *See* Complaint §VI.

To dismiss Defendants' misrepresentations as immaterial, the Court would have to find as a matter of law that these misrepresentations "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Helwig*, 251 F.3d at 563. To the contrary, the allegations here are very similar to those upheld in *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2011 U.S. Dist. LEXIS 35661, at *124 (M.D. Tenn. Mar. 31, 2011), and *In re Am. Serv. Grp., Inc. ("ASG")*, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 31, 2009). CCA, like Psychiatric Solutions, "repeatedly made statements that the . . . care provided at [its] facilities is objectively better and of higher quality than care provided by [its] competitors." *Psychiatric Sols.*, 2011 U.S. Dist. LEXIS 35661, at *125. Yet, "governmental and media reports reflect [the Company's] failures to provide such level of services . . . and those reports adversely affected the value of [the Company's] stock." *Id.* at *125-*126. Similarly, CCA, like ASG,

---

that, "due to its unique business model, [a company] is more viable than those around it, when the company has knowledge that this same business model is an inherently unsustainable one for different reasons," is "materially false and misleading"); *In re Priceline.com Inc.*, 342 F. Supp. 2d 33, 53 (D. Conn. 2004).

[16] Defendants' reliance on *James v. Gerber Prods. Co.*, 587 F.2d 324 (6th Cir. 1978), for their claim that their cost-savings statements are puffery misses the mark. MTD at 18. At issue here are Defendants' comparative superiority claims, not earnings projections.

[17] Defendants claim that a cost comparison between BOP institutions and private prisons is impossible because the facilities have different inmate populations and say the OIG Review shows CCA's costs were slightly lower. MTD at 18. This claim misreads the OIG Review and ignores the Complaint's other allegations. Ex. 1 at 11-14. The Yates Memorandum specifically found no cost savings. ¶13. And the figures on which Defendants rely do not reflect CCA's practice of cutting costs by providing inadequate care. *See* Complaint §VI.

deliberately cut costs by engaging in a pattern and practice of reckless and inadequate health care services to prison inmates. *ASG*, 2009 U.S. Dist. LEXIS 28237, at *44-*52, *119-*123 (holding that "widespread practices" of inadequate medical services to inmates that "were critical to [the Company's] control of its costs and . . . profitability" were actionable non-disclosures). Neither the law nor the facts pled suggest these statements are non-actionable puffery.

### 3. None of Defendants' Misrepresentations Is Protected by the Safe Harbor

Defendants portray their statements as about future "contract renewals," yet, as explained above, Defendants' statements misled investors about the quality and relative cost of CCA's prisons. The statements Defendants claim are protected by the safe harbor, viewed in context, are statements of present or historical fact not protected by the PSLRA. *See, e.g.*, ¶¶123-124 ("we ***have been successful*** *and* ***"[o]ur competitive cost structure*** offers"); ¶¶129-130 ("we ***have been successful*** and "opportunities of our business ***remain very attractive***"); ¶¶132-133 ("our renewal rate on existing contracts ***remains high***" as a result of, among other things, "***the quality of our operations***"). The statements "were materially false and misleading because, as described herein, CCA did not offer a cost-effective alternative or competitive cost structure to its government partners or reduce correctional services costs" while providing quality care. ¶125.[18] Defendants oddly rely on *In re F & M Distribs. Sec. Litig.*, 937 F. Supp. 647, 656 (E.D. Mich. 1996), which supports denying the motion. Where, as here, defendants concealed an existing material fact, the allegations "cannot be considered as being tantamount to an allegation of false predictions or projections." *Id.*

Even if Defendants' statements could be construed as forward looking (which they are not), CCA's purported risk disclosures were not meaningful because they failed to disclose the nature of the true risks to the Company, including its widespread failure to provide high quality services at a

---

[18] *See also, e.g.*, ¶131 ("CCA did not provide efficiency or savings opportunities to its government partners); ¶134 ("the quality of CCA's operations was in fact subpar and thus did not contribute to renewals").

lower cost. The PSLRA safe harbor only applies where the alleged forward-looking statements are identified as such and are accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." 15 U.S.C. §78u-5(c)(1)(A)(i). "'[B]oilerplate warnings will not suffice . . . . The cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements.'" *Helwig*, 251 F.3d at 558-59 (ellipsis in original). Here, the cautionary language is inadequate. *Compare Miller v. Champion Enters., Inc.*, 346 F.3d 660 (6th Cir. 2003) (exact risk disclosed), *with In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685-86 (E.D. Mich. 2004) (quoting *In re Prudential Sec. Ltd. P'ship Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996)) (safe harbor provision provides "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away").

### B. The Complaint Adequately Alleges Liability for an Unlawful Scheme and Course of Conduct

Defendants do not contest Plaintiff's scheme liability claims, which provide an independent basis for upholding the Complaint. ¶213. For purposes of Rule 10b-5, "[t]he securities laws reach misleading conduct as well as misleading statements, so long as there is some mechanism by which that conduct misled investors." *Psychiatric Sols.*, 2011 U.S. Dist. LEXIS 35661, at \*124 (citing *Stoneridge Inv. Partners LLC v. Scientific-Atlanta Inc.*, 552 U.S. 148, 158-59 (2008)). Deceptive conduct is actionable pursuant to Rule 10b-5(a) and (c). 17 C.F.R. §240.10b-5.

The Complaint is replete with allegations of deceptive and manipulative conduct, including deliberate understaffing and failing to provide other costly services, such as health services, resulting in bodily injury and death. *See* Complaint §VI. As a result, investors were misled regarding CCA's business model, which depended on its ability to provide greater quality than government-run facilities at lower prices, while making a profit. ¶35. Unbeknownst to investors, this higher-quality,

lower-priced business strategy was a farce when it came to CCA's BOP facilities, which accounted for 11%-15% of the Company's revenue during the Class Period. ¶¶2, 34, 36. CCA's purported cost savings stemmed from deliberate staffing shortages and cutting basic health care services, and investors suffered when CCA's misconduct was revealed. *Id.* These allegations are sufficient.

### C.     The Complaint Pleads a Strong Inference of Scienter

To plead scienter, the Complaint must raise a "strong inference" that Defendants were reckless to the falsity of the alleged statements. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 549-50 (6th Cir. 1999). Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable [person] would have known of it.'" *Id.*; *see also Helwig*, 251 F.3d at 551. A complaint will survive "if a reasonable person would deem the inference of scienter cogent and *at least as* compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.*

Courts consider the totality of circumstances pled in the complaint. *Id.* at 321-22. Treating each paragraph of the Complaint as independent "risks losing the forest for the trees." *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011); *accord Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d 461, 469 (6th Cir. 2011) (explaining that Sixth Circuit has "eschewed *Helwig*'s checklist approach in favor of *Tellabs*'s and *Matrixx*'s entirely collective assessment" (citing *Frank*, 646 F.3d at 961)). For example, in *Burges* this Court "holistically" examined allegations that defendants were aware of the need to comply with regulations and that they "knew or should have known that they were not in compliance with these regulations and laws, particularly in light of the ongoing [government review of the company's compliance]," finding such allegations sufficient. 2015 U.S.

- 14 -

Dist. LEXIS 89822, at *17-*18. Viewed holistically, the allegations here more than support a strong inference of scienter.

### 1. Defendants Received Reports that Contradicted Their Statements

"'[D]ivergence between internal reports and external statements on the same subject'" can be a "key factor" supporting a finding of that scienter is adequately pled. *Bridgestone*, 399 F.3d at 688; *accord Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir. 2016).

The Complaint alleges the contents of the numerous NOCs, contract facility monitoring reports, and after-action reports sent to CCA by the BOP during the Class Period. *See* ¶¶43-114. This includes several reports blaming CCA's contract violations for the deaths of inmates and of a correctional officer and warning that failure to correct violations could cause more deaths. *E.g.*, ¶¶48, 61, 79, 81, 90-91. The Complaint also explains CCA's "extensive systems and controls in place to monitor the quality of the services provided by CCA's facilities," *see* ¶¶172-173, and describes how reports of audits of the BOP facilities (including the many damning reports described in §VI of the Complaint) were disseminated internally by e–mail and through two databases, and that ultimately all of the information about those audits "would go to senior executives at CCA headquarters, including defendants Hininger, Mullenger and Lappin." ¶¶174-179. Moreover, the OIG Review confirms that Defendants tracked the data that was used in the review. Ex. 1 at ii.

At the same time they were receiving these negative internal reports, Defendants repeatedly issued contradictory statements. Sometimes these positive statements were issued just days or weeks after receiving negative reports. *Compare* ¶¶48-49 (BOP after-action report and NOC, dated July 27, 2012 and September 19, 2012, respectively, identifying deficiencies and blaming CCA for riot leading to death of correctional officer), *with* ¶¶132-133 (statement repeated on August 9, 2012 and November 8, 2012 listing "the quality of our operations" as part of reason "our renewal rate on existing contracts remains high"); *compare* ¶79 (January 9, 2015 cure notice, threatening to

- 15 -

terminate contract, citing "numerous and repetitive items of critical non-conformance in the area of Health Services," including violations of policy that contributed to an inmate's death), *with* ¶¶132-137 (2014 annual report, filed with SEC on February 25, 2015, attributed "renewal rate on existing contracts remain[ing] high" to "the quality of our operations" and represented that "[w]e operate our facilities in accordance with both company and facility-specific policies and procedures").

These allegations demonstrate why *GEO Group*, 2017 WL 887193, is unavailing. The *GEO* complaint alleged that a "monthly report of the results of contract compliance audits" was distributed "to GEO Group's executives" but critically "did not provide any information as to the content of these reports." 2017 WL 887193, at *12. Similarly, there were "no allegations as to whether and when the Individual Defendants received notice of BOP audits, or the content of these audits during the relevant times." *Id.* With no allegations about what information was given to the individual defendants, the court could not conclude those individuals were aware of the alleged violations. The Complaint here, by contrast, provides that information in droves. *Compare* ¶¶43-114 & ¶¶172-179, *with* Ex. 5 (*GEO* complaint), ¶¶54-65 (describing GEO's internal reporting structure but providing no specifics about contents of information reported to senior executives). This information, which was wholly lacking in *GEO*, shows that the individual defendants knew (or were reckless in not knowing) of the many violations detailed in BOP reports throughout the Class Period.

The Court can infer that the individual defendants were aware of the reported violations, even if Plaintiff had not specifically alleged (as it has) that those reports were disseminated to those individuals, because these violations were central to CCA's entire business model. "'Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters,'" and especially where they are "'[f]acts critical to a business's core management.'" *Psychiatric Sols.*, 2011 U.S. Dist. LEXIS 35661, at *159 (alteration in original).

- 16 -

The many dire reports provided to the individual defendants about CCA's systematic violations demonstrate that Plaintiff has pled scienter.

### 2. Defendants Resisted Transparency but Conceded the Materiality of Facility Deficiencies

Deliberately crafting disclosures to make it difficult or impossible for shareholders to assess the completeness and accuracy of what they are being told also support a strong inference of scienter. *See Helwig*, 251 F.3d at 552 (listing "disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication" as a factor to consider in assessing scienter).

Twice, CCA resisted shareholder proposals seeking more information about facility conditions and compliance. First, a 2012 shareholder proposal requested biannual reports on prisoner sexual abuse. ¶¶144-145. CCA opposed the proposal on the basis that "the data could . . . be used to the Company's detriment." ¶184. That is, Defendants believed the data would significantly alter the total mix of information about CCA. *Id.* More recently, a shareholder proposal requested that CCA conduct and disclose the reports of biannual operational audits. ¶181. In arguing against disclosure, CCA admitted it was required (including throughout the Class Period) to disclose significant deficiencies at its facilities that were identified by the BOP, the OIG, or internal audits. *Id.* Yet, as alleged in the Complaint, CCA did not do so.

Defendants were similarly aware that CCA did not provide enough information to allow a direct comparison between CCA's costs and the BOP's costs as a result of similar concerns having been expressed in a December 2013 report by the U.S. Government Accountability Office. ¶187. Nonetheless, they did nothing to provide the necessary information. Rather, they touted misleading cost comparisons that excluded the cost of BOP oversight and did not account for differences in the inmate populations of CCA and BOP prisons. ¶188.

In short, Defendants knew that information about the operational failures at the Company's facilities, and data allowing more direct comparisons of the cost of CCA facilities with BOP facilities, would be material to shareholders and that it would be perceived negatively. They therefore concealed the information. That pattern further supports a strong inference of scienter.

### D. The Complaint's Allegations Are More than Sufficient to Plausibly Plead Loss Causation in Compliance with Fed. R. Civ. P. 8(a)(2)

The Complaint alleges that Defendants' false and misleading statements and scheme to defraud caused CCA's stock price to trade at inflated levels and that CCA's stock price declined by a staggering 53% when the relevant truth was revealed. ¶¶196-200. These allegations are more than sufficient to plausibly plead loss causation in accordance with Fed. R. Civ. P. 8(a).

"'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp*., 830 F.3d 376, 384 (6th Cir. 2016). Alleging loss causation "is 'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* (quoting *Dura Pharms Inc. v. Broudo*, 544 U.S. 336, 347 (2005)). To successfully plead loss causation, "it is sufficient that [Plaintiff's] allegations be plausible." *Id.* It is sufficient to allege "'that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *Id.* at 384-85; *Winslow v. BancorpSouth, Inc*., 2011 U.S. Dist. LEXIS 45559, at *27-*38 (M.D. Tenn. Apr. 26, 2011) (collecting cases).

The Complaint alleges the OIG Review and the Yates Memorandum were a "foreseeable materialization of the risk concealed by" Defendants' fraud. *See Fed. Home Loan Mortg.*, 830 F.3d at 385. Defendants hid that CCA's BOP facilities provided poor care and did not provide cost savings. ¶170. The OIG Review revealed private prisons, including CCA, "incurred more safety and security incidents per capita than comparable BOP institutions" and identifies several areas in

which CCA was the worst offender of all. ¶39. The Yates Memorandum found private prisons, and specifically CCA, "compare[d] poorly to our own Bureau facilities" and that the BOP should thus reduce its use of them. ¶¶13, 41. Far surpassing any plausibility requirements, the Complaint alleges these disclosures materialized the risk concealed by Defendants' fraud, causing CCA's stock price to drop over 53%. ¶¶196-199; *supra* §III.A.

*ASG*, 2009 U.S. Dist. LEXIS 28237, is directly on point. There, the Court rejected defendants' contentions that plaintiffs had not adequately pled loss causation, finding that articles published in *The New York Times* detailing "inmates' deaths and other injuries at PHS managed facilities" were sufficient to plead loss causation. *Id.* at *49; *see also Burges*, 2015 U.S. Dist. LEXIS 89822, at *20 ("The Court finds that Plaintiffs have adequately pled loss causation by showing that the stock price dropped when the information concerning the regulatory concerns and review was first disclosed."). Defendants' contention that Plaintiff's losses were caused by "industrywide reaction to the OIG Review and Yates Memorandum," MTD at 24, is factually inaccurate and legally insufficient to support dismissal. The fact that the stock price of GEO Group (purportedly CCA's "closest publicly traded competitor," *id.*), also dropped does not support an "industrywide reaction" argument because GEO Group's misconduct was also expressly detailed in the OIG Review. Ex. 1 at 15. The OIG Review did not even purport to address private prisons "industrywide"; it made findings about three private prison operators, including CCA, that contracted with the BOP. *Id.* at i. *Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1086 (D. Minn. 2012), is not binding on this Court and does not support a different result. In *Capella*, the purported corrective disclosures did not disclose the "aggressive and abusive recruiting and enrollment practices" that plaintiffs contended were omitted, and "[a]ll of the disclosures concerned the for-profit educational industry as a whole." *Id.* Here, by contrast, the OIG Review did disclose the poor safety and value of CCA operations that Plaintiff alleges were concealed. ¶¶38-40, 67, 88-89, 101.

- 19 -

Defendants' contention that CCA's stock price "rebounded, when the Yates Memorandum was rescinded," MTD at 24, is factually inaccurate. In fact, between February 21-23, 2007, when Attorney General Sessions purportedly rescinded the Yates Memorandum, CCA's stock price declined slightly from a close of $33.61 per share on February 21, 2017, to a close of $33.55 a share on February 23, 2017. In any case, "a bounce back of the stock's value after an initial drop does not preclude a Section 10(b) claim." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 788 (M.D. Tenn. 2013).

## IV. CONCLUSION

For the foregoing reasons, the Motion to Dismiss should be denied. If the motion is granted, Plaintiff respectfully requests leave to amend the complaint to address any deficiencies the Court finds.

DATED: June 26, 2017

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853


s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
& GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)

Local Counsel

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 26, 2017, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 26, 2017.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

Robbins Geller Rudman & Dowd LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Anna E. Berces**
  anna.berces@lw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,smcclenahan@barrettjohnston.com,tellis@barrettjohnston.com,nchanin@barrettjohnston.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,ptiffith@rgrdlaw.com,hdeshmukh@rgrdlaw.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com

Case 3:16-cv-02267   Document 67   Filed 06/26/17   Page 28 of 29 PageID #: 1158

**Manual Notice List**

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`