TAB 2

 Positive
As of: June 26, 2017 5:21 PM Z

# *Garden City Employees'. Ret. Sys. v. Psychiatric Solutions, Inc.*

United States District Court for the Middle District of Tennessee, Nashville Division

March 31, 2011, Decided; March 31, 2011, Filed

No. 3:09-00882

**Reporter**

2011 U.S. Dist. LEXIS 35661 *; 2011 WL 1335803

GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff, CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, Lead Plaintiff, v. PSYCHIATRIC SOLUTIONS, INC., JOEY A. JACOBS, BRENT TURNER, and JACK E. POLSON, Defendants.

**Subsequent History:** Motion denied by, Reconsideration denied by *In re Garden City Emples. Ret. Sys., 2011 U.S. Dist. LEXIS 91861 (M.D. Tenn., Aug. 13, 2011)*

**Prior History:** *Garden City Emples. Ret. Sys. v. Psychiatric Solutions, Inc., 2010 U.S. Dist. LEXIS 42915 (M.D. Tenn., Apr. 30, 2010)*

**Counsel:** [*1] For Garden City Employees' Retirement System, Plaintiff: Catherine J. Kowalewski, Darren J. Robbins, David C. Walton, LEAD ATTORNEYS, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Douglas S. Johnston, Jr., Timothy L. Miles, LEAD ATTORNEYS, George Edward Barrett, Barrett Johnston, LLC, Nashville, TN; Julie A. Kearns, LEAD ATTORNEY, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Michael J. Vanoverbeke, Thomas C. Michaud, LEAD ATTORNEYS, Vanoverbeke, Michaud & Timmony, P.C., Detroit, MI; Daniel J. Pfefferbaum, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Dennis J. Herman, Robbins Geller Rudman & Dowd LLP, San Francisco, CA.

For Central States, Southeast and Southwest Areas Pension Fund, Plaintiff: Dennis J. Herman, Robbins Geller Rudman & Dowd LLP, San Francisco, CA.

For Psychiatric Solutions, Inc., Joey A. Jacobs, Brent Turner, Jack E. Polson, Defendants: Jessica Perry Corley, Lisa R. Bugni, Todd Richard David, LEAD ATTORNEYS, PRO HAC VICE, Alston & Bird LLP, Atlanta, GA; Michael T. Harmon, W. Travis Parham, LEAD ATTORNEYS, Waller, Lansden, Dortch & Davis, LLP, Nashville, TN; Waverly David Crenshaw, Jr., LEAD ATTORNEY, Waller, Lansden, Dortch & [*2] Davis, Nashville, TN.

For Joe Middendorf, Movant: Jeffrey A. Berens, Robert J. Dyer, III, LEAD ATTORNEYS, Dyer & Berens LLP, Denver, CO; Wade Bonham Cowan, Nashville, TN.

For Policemen's Annuity and Benefit Fund of Chicago, Movant: Daniel E. Bacine, LEAD ATTORNEY, PRO HAC VICE, Barrack, Rodos & Bacine, Philadelphia, PA; Gregg S. Levin, LEAD ATTORNEY, PRO HAC VICE, Motley Rice LLC, Mount Pleasant, SC; James Gerard Stranch, III, James Gerard Stranch, IV, Jane Branstetter Stranch, LEAD ATTORNEYS, Branstetter, Stranch & Jennings, Nashville, TN; Samuel M. Ward, Stephen R. Basser, LEAD ATTORNEYS, PRO HAC VICE, Barrack, Rodos & Bacine, San Diego, CA.

For KBC Asset Management NV, Movant: James M. Hughes, William S. Norton, LEAD

ATTORNEYS, PRO HAC VICE, Motley Rice LLC, Mount Pleasant, SC; James Gerard Stranch, III, James Gerard Stranch, IV, LEAD ATTORNEYS, Branstetter, Stranch & Jennings, Nashville, TN; William H. Narwold, LEAD ATTORNEY, Motley Rice LLC, Hartford, CT.

For Central States, Southeast and Southwest Areas Pension Fund, Movant: Darren J. Robbins, Tor Gronborg, Tricia L. McCormick, LEAD ATTORNEYS, Robbins Geller Rudman & Dowd LLP, San Diego, CA; George Edward Barrett, Barrett Johnston, [*3] LLC, Nashville, TN.

For Psychiatric Solutions Institutional Investors Group, Movant: Daniel E. Bacine, LEAD ATTORNEY, PRO HAC VICE, Barrack, Rodos & Bacine, Philadelphia, PA; Gregg S. Levin, James M. Hughes, William S. Norton, LEAD ATTORNEYS, PRO HAC VICE, Motley Rice LLC, Mount Pleasant, SC; James Gerard Stranch, III, James Gerard Stranch, IV, Jane Branstetter Stranch, LEAD ATTORNEYS, Branstetter, Stranch & Jennings, Nashville, TN; Mark R. Rosen, LEAD ATTORNEY, Barrack, Rodos & Bacine, Philadelphia, PA; Samuel M. Ward, Stephen R. Basser, LEAD ATTORNEYS, PRO HAC VICE, Barrack, Rodos & Bacine, San Diego, CA; William H. Narwold, LEAD ATTORNEY, Motley Rice LLC, Hartford, CT; W. Travis Parham, Waller Lansden Dortch & Davis, LLP, Nashville, TN.

**Judges:** William J. Haynes, Jr., United States District Judge.

**Opinion by:** William J. Haynes, Jr.

# Opinion

## **MEMORANDUM**

 *Go to table1*

Plaintiffs, [*4] Garden City Employees' Retirement System ("Garden City") and Central States,

Southeast and Southwest Areas Pension Fund, filed this action under *Section 10(b)* and *20(a)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78a et seq.*, and *Rule 10b-5* promulgated thereunder, *17 C.F.R. § 240.10b-5*, on behalf of themselves and a class of shareholders against the Defendants: Psychiatric Solutions, Inc. ("PSI"), Joey A. Jacobs, Brent Turner, and Jack E. Polson. In earlier proceedings, the Court appointed Central States, Southeast and Southwest Areas Pension Fund ("Central States") as the Lead Plaintiff in this action. Central States then filed an amended complaint (Docket Entry No. 109). Plaintiffs assert jurisdiction under *15 U.S.C. § 78aa* of the Securities Exchange Act.

In sum, Plaintiffs allege that from February 21, 2008 through February 25, 2009 when Plaintiffs purchased or held PSI stock, these Defendants engaged in and/or materially assisted in a scheme and course of business to inflate artificially the value of PSI stock. Defendants allegedly did so by running the business in a manner which operated as a fraud or deceit upon investors and other members of the public. Plaintiffs specifically [*5] allege that the Defendants concealed PSI's increasing financial difficulties in increasing revenue and profits due to staffing PSI facilities at levels below those necessary for patient safety and PSI's stated quality of care at PSI facilities. Plaintiffs allege that the Defendants repeatedly minimized the significance of published reports of patient safety incidents at PSI institutions to hide PSI's actual financial problems and to prevent steep stock price declines until February 25, 2009, when PSI reported its fiscal year 2008 and fourth quarter 2008 financial results. Plaintiffs allege that the Defendants' fraud ultimately led to a collapse of PSI's stock price, damaging the Plaintiffs.

Before the Court is the Defendants' motion to dismiss (Docket Entry No. 110), contending, in essence, that the amended complaint fails to plead any actionable misrepresentation or omission and is legally insufficient to state the scienter necessary for Plaintiffs' securities claims. Defendants

specifically assert that: (1) any forward-looking statements are protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA"); (2) PSI's statements of past earnings are **[*6]** not actionable because they were not false; (3) Plaintiffs' amended complaint fails to allege that PSI's statements of substantial compliance with the law were false and PSI's disclosures were adequate as a matter of law; (4) Defendants' statements of "Highest Quality of Care" at PSI facilities are not actionable; and (5) Plaintiffs' allegations do not give rise to a strong inference of scienter.

In their response, Plaintiffs assert, in sum: (1) that their factual allegations are adequate to state actionable federal securities claims against each of the Defendants and to tie their alleged injuries to the Defendants' violations of federal securities laws; and (2) that Plaintiffs' factual allegations establish each Defendant's responsibility for these violations and state a cognizable injury due to such violations. Plaintiffs also argue that the Defendants concealed the true reasons for the apparent success of PSI's strategy of expanding through acquisition and deceived investors about PSI's financial strength and sustainability.

Based upon the amended complaint and the parties' submissions, the Court concludes that given the extent and scope of state enforcement agencies' findings and **[*7]** sanctions for inadequate services and patient care at PSI facilities, PSI's and the Individual Defendants' statements about the nature of PSI's services, practices and profitability are actionable. Plaintiffs' allegations give rise to a strong inference of scienter necessary for Plaintiffs' securities claims for Defendants' material misrepresentations and omissions. Thus, the Defendants' motion to dismiss should be denied.

## A. Analysis of the Amended Complaint

## 1. The Parties

According to Plaintiffs' amended complaint,[1] Plaintiffs, Garden City Employees' Retirement System ("Garden City") and Central States, Southeast and Southwest Areas Pension Fund are benefit funds that purchased PSI stock in providing pension services and benefits to more than 360,000 participants in those Plans. (Docket Entry No. 109, Amended Complaint at ¶¶ 19, 20). The proposed class in this action includes persons who purchased the publicly traded securities of PSI between February 21, 2008 through February 25, 2009. Id. at ¶ 1.

PSI is a publically traded company based in Franklin, Tennessee, and provides inpatient behavioral healthcare services at 95 hospitals and residential treatment facilities. Id. at ¶ 2. The majority of PSI's patients in these facilities are children and adolescents who have been placed under protective care after incidents of abuse or neglect by their former caregivers. Id. PSI's common stock is traded on the NASDAQ market under the ticker symbol "PSYS." Id. at ¶ 21. During the Class Period, there were more **[*9]** than 55 million shares of PSI common stock issued and outstanding. Id.

Defendant, Joey A. Jacobs, co-founded PSI in 1988, and has served as executive chairman of PSI's board of directors and as PSI's president and chief executive officer since April 1997. Id. at ¶ 22. As chief executive officer, Jacobs oversees and

---

[1] Plaintiffs' amended complaint, (Docket Entry No. 109), supersedes the original complaint. *Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986)*. Plaintiffs' amended complaint exceeds **[*8]** one hundred thirty-five pages. In addition, the parties submitted extensive memoranda and Defendants submitted supporting documents on the Defendants' motion to dismiss. (Docket Entry Nos. 111-1 through 111-7 and 123). As discussed *infra*, documents attached to or referred to in a complaint are to be considered on a motion to dismiss. For these claims, judicial analysis "necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept." *Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001)* (en banc), abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*.

directs PSI's day-to-day business. Id. During the Class Period, Jacobs signed PSI's Securities and Exchange Commission ("SEC") filings and Sarbanes-Oxley certifications. Id.

Since August 2002, Defendant Jack E. Polson has served as PSI's chief accounting officer. Id. at ¶ 23. Prior to that position, Polson served as PSI's controller beginning in June 1997. Id. As chief accounting officer, Polson participates in monthly executive review meetings with each of PSI's division's presidents. Id. During these meetings, Jacobs, Polson and other PSI executives discussed detailed financial reports for each PSI division and inpatient facility. Id. With Defendant Brent Turner and Jacobs, Polson sets PSI's facilities' budgets, including capital allocated to staffing. Id. During the Class Period, Polson signed SEC filings and Sarbanes-Oxley certifications. Id.

Since August 2005, Defendant [*10] Brent Turner has served as PSI's executive vice president for finance and administration. Id. at ¶ 24. In this position, Turner works with Jacobs and Polson to set PSI's facilities' budgets, including capital allocated to staffing. Id. Beginning in February 2003, Turner served as PSI's vice president, treasurer and had responsibility for investor relations. Id.

## 2. PSI's Business Practices

According to the amended complaint, in 1999 PSI decided to expand its services to inpatient hospitals and centers. Id. at ¶ 28. In 2002, PSI merged with the PMR Corporation and acquired five hospitals. Id. Between 2002 and 2007, PSI acquired more than 90 hospitals and centers averaging 17 such acquisitions per year. Id. at ¶¶ 28, 29, 41. PSI financed these acquisitions with $620 million in guaranteed notes, a line of credit and secured loans from lenders. Id. at ¶ 30. By the end of 2007, PSI's various debts exceeded $650 million with interest rates between 6.4% and 7.1% interest. Id. Plaintiffs allege that by May 2007, PSI had a maximum leverage ratio of 5.5x PSI's adjusted EBITDA (Earnings Before Interest Taxes Depreciation and

Amortization). Id. In December 2007, a Credit Suisse analyst cited PSI [*11] as "among the more successful health care service rollups in recent memory." Id. at ¶ 28.

Defendants allegedly stated that PSI could leverage its debt through 7% to 9% growth from existing facilities on an annual basis. Id. at ¶ 31. Between 2002 and 2008, PSI repeatedly told investors to expect and stated that PSI had delivered a growth in "same facility" revenues of 7% to 9% per year. Id. at ¶ 2. Plaintiffs alleged that to do so, Defendants essentially were purchasing earnings by using debt to buy facilities to increase PSI's annual revenue. Id. at ¶ 31. Investors raised questions about PSI's "rollup strategy" based upon acquisitions and the viability of this strategy. Id. In March 2008, after PSI's acquisition of five facilities in the first quarter of 2008, a Credit Suisse market analyst wrote that PSI "historically ... has overpaid for assets, in an attempt to drive the income statement, yet disregarding the balance sheet." Id.

PSI's 2007 10-K Report, issued on February 28, 2008, assured investors of PSI's continuing viability and explained PSI's plans to continue growth by acquisition of existing psychiatric hospitals and residential treatment centers:

### Our Growth Strategy

We have [*12] experienced significant growth in our operations as measured by the number of our facilities, admissions, patient days, revenue and net income. We intend to continue successfully growing our business and increasing our profitability **by improving the performance of our inpatient facilities and through strategic acquisitions**. The principal elements of our growth strategy are to:

- • Continue to Drive Same-Facility Growth — We increased our samefacility revenue by approximately 6.5% for the year ended December 31, 2007 compared to the year ended December 31, 2006. Samefacility revenue also increased by approximately

9.0%, 8.0%, and 9.0% for the years ended December 31, 2006, 2005, and 2004, respectively, compared to the immediately preceding years. Samefacility revenue refers to the comparison of the inpatient facilities we owned during a prior period with the comparable period in the subsequent period, adjusted for closures and combinations for comparability purposes. We intend to continue to increase our samefacility growth by increasing our admissions and patient days and obtaining annual reimbursement rate increases. We plan to accomplish these goals by:

• expanding bed capacity at our [*13] facilities to meet demand;

• expanding our services and developing new services to take advantage of increased demand in select markets where we operate;

• building and expanding relationships that enhance our presence in local and regional markets;

• developing formal marketing initiatives and expanding referral networks; and

• continuing to provide high quality service.

• Grow Through Strategic Acquisitions — Our industry is highly fragmented and we plan to selectively pursue the acquisition of additional inpatient behavioral health care facilities. There are approximately 500 freestanding acute and residential treatment facilities in the United States and the top two providers operate approximately one-third of these facilities. We believe there are a number of acquisition candidates available at attractive valuations, and we have a number of potential acquisitions that are in various stages of development and consideration. We believe our focus on inpatient behavioral health care provides us with a strategic advantage when assessing a potential acquisition. We employ a disciplined acquisition strategy that is based on defined criteria, including quality of service, return on invested [*14] capital and strategic benefits.

• Enhance Operating Efficiencies — **Our management team has extensive experience in the operation of multi-facility health care services companies. We intend to focus on improving our profitability by optimizing staffing ratios, controlling contract labor costs and reducing supply costs through group purchasing. We believe that our focus on efficient operations increases our profitability and will attract qualified behavioral health care professionals and patients.**

Id. at ¶ 32 (emphasis added).

PSI's 2007 10-K Report cited PSI's "[d]emonstrated ability to identify and integrate acquisitions" as a competitive strength, and its rigorous due diligence review, disciplined acquisition strategy, and comprehensive post-acquisition strategic plans to improve revenues and the quality of patient care:

We attribute part of our success in integrating acquired inpatient facilities to our rigorous due diligence review of these facilities prior to completing the acquisitions as well as our ability to retain key employees at the acquired facilities. We employ a disciplined acquisition strategy that is based on defined criteria including quality of service, return on invested [*15] capital and strategic benefits. **We also have a comprehensive post-acquisition strategic plan to facilitate the integration of acquired facilities that includes improving facility operations, retaining and recruiting psychiatrists and expanding the breadth of services offered by the facilities.**

Id. at ¶ 33 (emphasis added).

As to delivery of its services, PSI's 2007 10-K Report filed with the SEC stated that PSI's hospitals "provide the most intensive level of care, including 24-hour skilled nursing observation and care, **daily interventions and oversight by a psychiatrist and intensive, highly coordinated treatment by a physician-led team of mental health professionals**." Id. at ¶ 107 (emphasis added). This 2007 10-K Report also informed investors that PSI could manage this growth without sacrificing "our reputation for the quality of our services" or jeopardizing its "recruitment of first rate medical staff," both of which allowed PSI to "differentiate ourselves from our competition." Id. at ¶ 34. As to the quality of PSI's treatment facilities, the report cited the "[t]wenty-four hour observation and care" at its residential treatment centers and PSI's ability to "provide services to [*16] patients with multiple issues and specialized needs" that resulted in numerous out-of-state referrals of patients to PSI's facilities. Id.

This 2007 report assured investors that PSI was operating its facilities in compliance with regulatory requirements and operating standards:

### Regulation and Other Factors

### Licensure, Certification and Accreditation

Health care facilities are required to comply with extensive regulation at the federal, state and local levels. Under these laws and regulations, health care facilities must meet requirements for state licensure as well as additional qualifications to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, fire prevention, maintenance of adequate records, hospital use, rate-setting, and compliance with building codes and environmental protection laws. Facilities are subject to periodic inspection by governmental and other authorities to assure continued compliance with the various standards necessary for licensing and accreditation.

All of the inpatient facilities operated by us are properly licensed under [*17] applicable state laws. Most of the inpatient facilities operated by us are certified under Medicare and/or Medicaid programs and accredited by The Joint Commission, a functional prerequisite to participation in the Medicare and Medicaid programs. Should any of our inpatient facilities lose its accreditation by The Joint Commission, or otherwise lose its certification under the Medicare and/or Medicaid program, that inpatient facility may be unable to receive reimbursement from the Medicare and/or Medicaid programs. If a provider for who we provide contract management services is excluded from any federal health care program, no services furnished by that provider would be reimbursed by any federal health care program. If one of our facilities is excluded from a federal health care program, that facility would not be eligible for reimbursement by any federal health care program.

**We believe that the inpatient facilities we own and operate generally are in substantial compliance with current applicable federal, state, local and independent review body regulations and standards**. The requirements for licensure, certification and accreditation are subject to change and, in order to remain [*18] qualified, it may be necessary for us to affect changes in our inpatient facilities, equipment, personnel and services. Additionally, certain of the employed and contracted personnel working at our inpatient facilities are subject to state laws and regulations governing their particular area of professional practice. We assist our managed client hospitals in obtaining required approvals for new programs.

Id. at ¶ 107 (emphasis added).

The 2007 Report on Form 10-K further asserted that PSI had an extensive control system in effect to ensure the "identification and connection of any actual or perceived violations." Id. at ¶ 108. The 2007 Form 10-K Report further assured investors that PSI's operations were "continually assessed and monitored" to assure "the highest quality of care." Id. at ¶ 110.

> We strive to improve the operating results of new and existing inpatient behavioral health care operations by providing the highest quality service, expanding referral networks and marketing initiatives and meeting increased demand for behavioral health care services by expanding our services and developing new services. **We also attempt to improve operating results by optimizing staffing ratios, [*19] controlling contract labor costs and reducing supply costs through group purchasing**.
>
> * * *
>
> **The services provided at each inpatient facility are continually assessed and monitored through an ongoing quality improvement program**. The purpose of this program is to strive for the highest quality of care possible for individuals with behavioral health issues, and includes regular site visits to each inpatient facility in order to assess compliance with legal and regulatory standards, as well as adherence to our compliance program. Standardized performance measures based on a national outcomes measurement data base comparing our inpatient facilities' performance with national norms are also reported and reviewed and corrective steps are taken when necessary.

Id. at ¶¶ 109, 110 (emphasis added).

According to Plaintiffs, to meet PSI's financial expectations, Defendants, in fact, began cutting staffing levels at numerous PSI facilities to meet PSI's budget and staffing ratios. Id. at ¶¶ 35-37.

Plaintiffs allege such reductions caused insufficient staff to ensure patient safety and allegedly rendered compliance with applicable licensing and regulatory requirements extremely difficult. Id. Plaintiffs [*20] allege that PSI's corporate headquarters pressured its facilities' management for frequent cuts in staffing, id. at ¶¶ 38-39, that left fewer employees to monitor patients, and allowed the assaults, rapes or sexual molestations of unsupervised patients or suicidal acts by patients. Id. at ¶ 41. These incidents gave rise to regulatory violations that jeopardized PSI's facility's license and revenues. Id. at ¶¶ 40-41. According to Plaintiffs, PSI's focus on increasing patient-employee ratios jeopardized the safety of children, teenagers and other patients at its facilities, as reflected by the following allegations. Id.

## 3. State Enforcement Actions against PSI

In a February 27, 2006 letter, the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services informed PSI of its findings that PSI's 103-bed facility in Virginia, acquired by PSI in April 2003, was in violation of numerous state laws concerning patient care. Id. at ¶ 48. The Virginia agency found PSI had provided "overall inadequate medical care due to the understaffing of care and nursing staff to address the needs of the number of residents." Id. This letter notified PSI of Virginia's officials' intent [*21] to revoke the facility's license. Plaintiffs allege that PSI has made substantial efforts to conceal such violations, including by influencing regulators to withhold sanctions or penalties that could bring such incidents to light. Id. at ¶ 148.

Plaintiffs' amended complaint sets forth other state enforcement actions against PSI facilities in several states:

> After a five-year-old patient was sexually abused by a 12-year-old patient at the 88-bed Bryn Mar Hospital in North Carolina, acquired by PSI in June 2003, the North Carolina Department of Health and Human Services found in June 2007 that **PSI had failed to**

**protect patients after incidents of sexual abuse, lacked systems needed to identify the risks of sexual abuse, and — in 40% of the cases reviewed — failed to report sexual abuse promptly to authorities**. Records supplied to investigators further showed that, **PSI failed to provide sufficient monitoring of potential sexual abusers in 40% of the cases reviewed and failed to monitor patients with suicidal tendencies in 20% of the cases reviewed.**

In June 2007, the Texas Department of Health & Human Services concluded an investigation into a May 6, 2007 incident at [PSI's] Cypress Creek **[*22]** Hospital where a suicidal patient who was supposed to be monitored every 15 minutes had slit his wrist in the shower, passed out and remained unconscious for more than five hours while the shower flooded his room, then regained consciousness and walked to the nurses station where the self-inflicted injury was finally discovered. **Records from the 96-bed hospital — acquired by PSI in September 2001 — showed no rounds were performed during the entire time the patient was unconscious. Upon review of records of care provided to another 15 patients at the hospital, the agency found that PSI had provided none of them with a safe setting for treatment.**

On September 17, 2007, the Carolina Department of Health & Human Services made a finding of immediate jeopardy against PSI's 108-bed Holly Hill Hospital, acquired by PSI in December 2001. **The Department found numerous instances of providing drugs to the wrong patients and administering drugs without a doctor's order. Medication errors have frequently been linked to understaffing of nurses.**

California authorities have reported significant quality of care problems at the 72-bed Sierra Vista Hospital, acquired by PSI in July 2005, including medical **[*23]** errors and patient deaths. According to UIC, which "examined more than 500 pages of surveys at Sierra Vista," **"Surveys conducted by the California Department of Health underscored repeated issues about understaffing, patient safety, medication administration, poor supervision and staff training, and an array of serious quality of care violations."**

Id. at ¶ 56 (emphasis added). PSI's California facilities were cited for deficiencies of abuse and mistreatment of patients 29 times between January 2005 and June 2008, compared with just six citations for Universal Health Services, Inc. ("UHS"), a PSI competitor, in the same period. Id. at ¶ 58. The alleged primary reason for this state regulatory finding was understaffing at PSI facilities. Id. at ¶ 59.

On April 13, 2009, the Illinois Department of Children and Family Services issued the report of the department of psychiatry at the University of Illinois at Chicago ("UIC") and Illinois Department of Public Health ("IDPH") investigators that made a "consistent set of findings" of problems arising at PSI's Riveredge hospital. Id. at ¶¶ 11, 77. This report cited a "**pattern of quality care and patient safety problems**" at PSI facilities. Id. **[*24]** at ¶ 78 (emphasis in original). The Illinois report found repeated instances of inadequate documentation, "[q]uestionable or poor quality of individual therapeutic services," an "[u]nstructured, chaotic milieu" that was counterproductive to treatment, "[u]nit staff often poorly trained and supervised for their jobs," "[i]neffective monitoring creat[ing] serious risks for patient safety," and improper discharge and discharge planning of patients. Id. at ¶ 77. These conditions caused "sexual assaults; negligent supervision; physical harm to patients; a violent group outburst that required police intervention; and the death of a pregnant patient (not a DCFS ward), that has raised serious questions about the lack of reporting of the incident by Riveredge officials to Illinois authorities." Id.

**4. Media Reports on PSI's Practices**

On July 17, 2008, Chicago Tribune reported on numerous abuses at PSI's Riveredge Hospital:

> Illinois' largest psychiatric hospital left sexual predators unguarded despite allegations that at least 10 mentally disabled children were assaulted during the last three years. The youngest victim was an 8-year-old state ward admitted for evaluation after expressing suicidal [*25] thoughts. Administrators at west suburban Riveredge Hospital and government authorities failed to share basic information as the savage violence left some youth worse off than when they arrived, a Tribune investigation found. **After the newspaper asked about the series of assault reports, the state Department of Children and Family Services last week stopped admitting wards to Riveredge — a punishment imposed on just three other psychiatric hospitals since 2004, records show.** On Wednesday, agency officials announced that the Tribune's findings had prompted them to immediately impose changes, including new training for child-protection workers and better reporting of assault allegations.

Id. at ¶¶ 49-50 (emphasis added).

Plaintiffs' amended complaint summarizes the specific disclosures from this article that are set forth below for the time period from 2005 to 2007:

> After a 19-year old reported being raped by another patient in the Hospital in 2007, records reviewed by the Tribune showed that, despite having found evidence of the attack — drops of blood in the bathroom where the attack was alleged to have occurred — the hospital didn't send the victim to a local emergency room, didn't report [*26] the allegations to local police, and didn't assign an aide to maintain the required one-on-one observation on the attacker. The attacker struck the same victim again the next day, government records show.

The newspaper recounted a similar 2006 incident in which a 12-year-old patient was raped by his 15-year old roommate, who was being treated for sexual aggression. "I told Riveredge over and over again, 'Do not put anybody in the room with this boy,'" the attacker's mother told the newspaper. The newspaper recounted a police report of the attack which similarly quoted the boy's mother as telling police that "she informed them when [her son] was admitted that he needed his own room . . . so just as much blame should be on the hospital [as on her son, the attacker] for creating the environment for the incident to occur."

At 9:00 p.m. on December 31, 2006, local police responding to an anonymous 911 call from within the Hospital of a fight in progress were refused admittance by hospital employees. On New Year's Day, a woman reported her teenage son "had been battered in the melee." A hospital worker told the mother that a staff member had punched her boy in the eye, but no incident reports [*27] of the fight were available. Illinois Department of Public Health investigators were similarly stonewalled when they tried to look into the incident, reporting that "the hospital was unable to accurately identify the actual number of participants" in the melee.

Riveredge similarly failed to promptly notify DCFS of a July 5, 2008 fight in the adolescent boys unit. **Between 2005 and 2007, police and state surveyors investigated reports that eight young patients were injured in non-sexual assaults. Riveredge staff or contract employees were accused in four of those alleged attacks.** The attacks included a March 19, 2007 incident reported by a clinical social worker, in which two Riveredge workers had battered a 16-year-old bipolar patient who resisted getting a shot.

**When police tried to investigate the July 5**

**melee, the hospital's human resources department was "unable to provide the names and addresses of the offenders or witnesses." When police tried to investigate another fight at the hospital, on October 25, 2007, a hospital employee refused to turn a video of the incident over the police, telling officers she needed permission of PSI's risk management specialist before she could do** [*28] **so.**

**In at least four cases since 2006, the Tribune reported that government inspectors cited Riveredge for improperly sedating children with powerful psychotropic drugs.** In 2006, Riveredge administered forced medication to a bipolar 12-year-old three times without notifying a guardian actively involved in his care, an Illinois Human Rights Authority report stated.

Id. at ¶ 52 (emphasis added). In a follow-up article on February 26, 2009, the Chicago Tribune reported that sexual assaults by unsupervised patients continued at Riveredge weeks after the newspaper's original report. Id. at ¶ 55. According to Plaintiffs, Riveredge incidents were reflective of conditions at other PSI hospitals and residential treatment centers that PSI acquired years earlier because Defendants were struggling under increasingly tight budgets necessary to sustain PSI's apparently misleading and stated track record of providing 7% to 9% same facility revenue growth every year. Id. at ¶ 56.

After the Tribune's initial report, other media organizations investigated PSI's operations around the country, finding similar patterns of abuse and mistreatment of children and adolescents being treated at PSI hospitals and [*29] residential facilities. On November 22, 2008, the LA Times and ProPublica, an independent, non-profit public interest media, co-published their investigation about "a string of cases involving abuse and neglect at PSI facilities nationwide." Id. at ¶ 57. ProPublica found that "[s]ome of the PSI hospitals most under

fire from authorities are those the chain has owned longest. . . .**Since 2005, the 10 hospitals PSI has owned longest have compiled almost twice as many patient-care deficiencies as 10 similar hospitals owned by its closest competitor, Universal Health Services Inc.**" Id. at ¶ 58 (emphasis added).

On January 12, 2009, the Dallas Morning News published the results of its investigation of PSI facilities in Texas, recounting numerous incidents of violence, abuse, and injuries of patients at PSI's Laurel Ridge, The Oaks and San Marcos Treatment Centers in Texas.

**[Texas government inspection and investigation] records say, "the facility failed to provide adequate numbers of qualified personnel"** when a 13-year-old patient was injured while being restrained by a staff member. In another incident, a 14-year-old patient [was injured] in sexual activity with another patient. The investigator [*30] concluded that **"the facility failed to direct, monitor and evaluate the care of patients." Center management also neglected to monitor patients sufficiently,** an investigator found, when a 17-year-old patient with a "long history of violent and disruptive behavior" attacked another teenage patient. . . . [A] 13-year-old boy with Asperger's syndrome was ill for three days with acute respiratory problems and pancreatitis but did not see a doctor. . . . "The child . . . almost died," the investigator wrote. . . . **On numerous occasions, investigators found, center administrators were aware of serious problems but did not act properly.** In one case, a state finding said, "facility administration" knew of a sexual relationship between a staff member and a 16-year-old resident, but did not report it to licensing authorities. . . . In 2007, two suicide attempts by children were not reported to the state.

Id. at 64 (emphasis added).

PSI's San Marcos' facility received 52 citations after one inspection and in 2007, the Laurel Ridge facility received 92 citations after 36 inspections resulting in a state finding of "inadequate staffing." Id. at ¶¶ 65, 66. According to the Morning News report, PSI's **[*31]** facility staff "**made numerous requests of the administration to increase staffing levels.**" Id. at ¶ 65 (emphasis added). After calling in a Swat Team for one incident, a PSI clinical therapist is reported to have stated: "It is always felt like they were putting out fires instead of making things fire-retardant." Id. PSI operates 15 facilities in Texas and was fined $230,000 for violations by the state health department in 2007, nearly as much as all other Texas hospitals combined. Id. at ¶ 65. The Morning News article also described incidents reported by the Tribune and by ProPublica and the LA Times about other PSI facilities. Id. at ¶ 64.

According to a February 21, 2010 article in the Richmond Times-Dispatch, following a series of incidents in which PSI failed to report and actively attempted to conceal patients' suicide attempts and other patient incidents at PSI's The Pines facility. Id. at ¶ 148. In the spring of 2009, Virginia officials took steps to downgrade PSI's license to provisional status — the most serious sanction short of shutting down the facility, and one that was likely to result in lost admissions and negative publicity. Id. Citing e-mails and other documents obtained **[*32]** through a Freedom of Information Act request, the newspaper reported that the action was quashed by the state's Mental Health Commissioner, Dr. James S. Reinhardt, who subsequently left his post to become a PSI consultant. Id.

Plaintiffs allege that as reflected in the state enforcement actions and the Tribune, ProPublica, LA Times, Morning News, and Richmond Times-Dispatch articles and other sources, PSI employees repeatedly failed to report timely, completely or accurately, patient incidents at PSI's inpatient facilities and actively concealed such problems that should have been reported to state regulators. Id. at

¶ 181. Thus, Plaintiffs assert that PSI had continuing issues with regulatory compliance and abuse incidents in PSI facilities that were not disclosed to investors. Id. at ¶¶ 43-46.

**5. PSI's Responses to Published Reports**

As to awareness of media reports generally, Jacobs admitted that he and other PSI executives had advance notice of media investigations that were later published.

> [ANALYST:] Okay. And then can I just ask a question with regard to how you're educating your referral sources. You've obviously, some bad headlines which we would all like to see you avoid going **[*33]** forward, but in those markets where — that may have had some impact in your referral sources, perhaps, can you just talk to us about how your compliance team is educating referral sources with regard to your outcomes? If there's any different process there?
>
> [JACOBS:] **We know when someone's out there, doing a story, and we have — by the time the story is written, we kind of know where they're going to focus. Fortunately for us, they keep focusing on very old stories, very old incidents, so we do give state agencies joint commission, referral sources heads up ahead of time so they are not surprised or read it in the paper** and I think our operations team in conjunction with Kathy Bolmer and the Compliance and Quality Department do a good job of reaching out to those sources and providing more detail surrounding the events and that the subsequent appropriate agency has reviewed those incidents that are occurring.

Id. at ¶ 47 (emphasis added).

As an example, Plaintiffs allege that after a report about a series of assaults and allegations of sexual and physical abuse at PSI's Whisper Ridge residential treatment center in Charlottesville,

Virginia, Jacobs told investors during an April 27, 2006 **[*34]** investor call that the incident was "isolated" and that a new chief executive officer installed in February was "making great progress there." Id. at ¶ 48. According to Plaintiffs' amended complaint, the problems at Whisper Ridge were strikingly similar to and indicative of problems caused by understaffing at other PSI facilities, including Riveredge, that were disclosed during and after the Class Period. Id.

In its July 30, 2008 press release on its financial results for the second quarter 2008, PSI did not mention any problems at Riveredge or the Tribune's report. Id. at ¶ 119. This press release raised PSI's financial guidance for the year based on the purported strength of PSI's financial results. Id. at ¶ 119. Yet, on July 31, 2008, during the second quarter 2008 investor conference call, Jacobs first commented to investors about the Riveredge issues and the Tribune report. Id. Jacobs allegedly downplayed the Tribune report of two weeks earlier as involving historical incidents that did not reflect current operations at Riveredge or other PSI facilities. In his concluding remarks, Jacobs stated:

> [JACOBS:] Before closing my remarks, **I'll add that many of you are aware of a story [*35] that was published in a Chicago newspaper on July 17 about incidents that occurred in 2007 and 2006 at Riveredge Hospital. This is not the first story about incidents at one of our facilities, and it won't be the last.** So I'd like to share my perspective.
>
> First, **these types of unfortunate incidents do occur in this patient population. Minimizing and eliminating these types of incidents is one of PSI's top priorities. We take continuous improvement of quality, safety and risk management very seriously, and we have built a very effective infrastructure over the past several years**.
>
> As a matter of practice at all our facilities, **we thoroughly report incidents to relevant agencies as soon as possible and work directly with agencies to continuously improve safety and quality in a timely manner. The incidents referenced in the newspaper story were reported to the relevant agencies** and appropriate corrective actions were taken in 2006 and 2007.
>
> Second, it is also important to understand that we operate in a highly regulated industry with nearly continuous oversight. **Our facilities are surveyed multiple times each year on average and less than 1% of these surveys result in serious deficiencies, [*36] a testament to our diligent efforts to continuously improve risk management, safety and quality**.
>
> We are pleased with this track record in light of the fact that we are providing more than 2.7 million patient days of treatment annually. Just before the story was published, the Department of Children and Family Services placed an admissions hold on Riveredge. **Riveredge is currently in discussions with DCFS and expects to conclude those discussions soon. As a result, we don't expect a material adverse financial impact from the admissions hold**.

Id. at ¶ 124 (emphasis added).

Plaintiffs allege that when analysts pressed for more information about the Riveredge incidents during the 2008 conference call, Jacobs continued to discount their significance and repeatedly and falsely suggested that the Tribune's report was based on dated historical information. Id. at ¶ 125. In response to one analyst's question, Jacobs responded that "**We have taken action back in '06 and '07**. But once again, if they want to come in and take a relook at it, that is okay with us." Id. (emphasis in original). During that call, Jacobs reiterated to another investor, "**the stories in the Chicago [Tribune], those were 2006 [*37] and 2007 incidents, and the quality is better there; the management team is better there**, and will continue to get better." Id. (emphasis in original).

During this 2008 conference call, Jacobs specifically denied that PSI was violating regulatory requirements by failing to report the incidents as they occurred, as reported in the Tribune articles and later ProPublica, LA Times and other media reports:

**[W]e are in compliance with those states on reporting. We know when to report, how to report**. And also PSI captures incidents that you don't report, that **we are looking for minor incidents. We want to fix those so those don't become major incidents**. So for PSI, we capture much more than we actually have to report, but **we do diligently report anything that an agency needs to see**. . . .[W]e think **we have reported appropriately**, and the intent was absolutely to always report.

Id. at ¶ 126 (emphasis in original).

When asked to comment on the "negative story on the company" that PSI had "grown so fast that you've lost span control and the quality issues are systemic because of the growth," Jacobs attributed the problems to PSI's patients:

[JACOBS:] **Unfortunately, we take care of very difficult [*38] patients**. I want them all not to have incidents, but some incidents will occur, and we do our level best to go back and put the resources back to correct it. But as far as noise from the shorts or a negative newspaper article, as I mentioned earlier, we could have one today, or we could have one 30 days from now that somebody wants to write a story about us.

* * *

Now, from the risk management side, when you take these incidents and put them through the actual oral process and through our risk management, **we have great results there. So there is a disconnect between the sensationalism of an incident that might get put in the paper versus the actual reality**.

Id. at ¶ 127 (emphasis and asterisks in original). Plaintiffs allege that during this conference call, Defendants repeatedly assured investors that the government investigation of that facility, including the new admission hold imposed by the Illinois agency, did not and would not have any material impact on PSI's operations. Id. at ¶¶ 128, 152, 153.

On July 31, 2008, PSI filed its Form 8-K Report with the SEC stating that PSI "has received a subpoena from the Department of Justice requesting certain information regarding Riveredge [*39] Hospital, one of PSI's inpatient psychiatric facilities in Chicago, Illinois. PSI stated its intention to provide the requested information to the Department of Justice," but did not disclose when the subpoena had been received, nor did PSI attach a copy of the July 30, 2008 subpoena to its Form 8-K Report. Id. at ¶ 118.

Plaintiffs allege that based upon Jacobs' responses to the Tribune account of the Riveredge problems, numerous market analysts issued positive reports dismissing the events in the article as old news and isolated incidents that are not reflective of any systemic problems in PSI's operations. Id. at ¶ 128. Plaintiffs cite the following as representative examples of these analysts' assessments:

• "The market, however, narrowly focused on the DoJ investigation news, which we believe will prove to have little-to-no operational impact. Headline risk will likely always exist for this company given the nature of its patient population, and we believe the multiple well more than discounts this risk given the current growth prospects — LT EPS run-rate of 25+%. We would be buyers here." (JP Morgan, July 31, 2008).

• "The company believes it reported the events, which occurred in [*40] 2006 and 2007, appropriately to authorities and has taken multiple steps since to improve the quality at the facility. Admissions from the IL Department of Children and Family Services (DCFS) are still on hold. Management expects

the issue to be resolved in the near term and does not anticipate it having a material financial impact." (Avondale Partners, August 1, 2008).

• [I]n our discussions with the company, management highlighted the fact that the admission ban only affects those patients that would have been admitted by the DCFS, which is approximately 20% to 25% of total admissions. The company is having weekly discussions with DCFS, which are expected to conclude in the near future, and does not anticipate that the admission ban will have a material adverse financial impact. (Jefferies & Co., August 1, 2008).

Id. at ¶ 128.

Plaintiffs allege, however, that ongoing undisclosed and uncorrected regulatory violations occurred at other PSI institutions involving quality of patient care and safety and understaffing at PSI's other healthcare facilities. Plaintiffs cite:

• at Sierra Vista Hospital in California, which was then receiving the most serious patient deficiency citations at about [*41] eight times the statewide average among private psychiatric hospitals in California, as was **reported by the LA Times in November 2008**; and

• at Riveredge, where the continuing failure to adequately monitor and ensure patient safety at Riveredge had led to additional incidents of a sexual assault and sexual activity in the hospital's common area dayroom in August 2008, as was **reported by the UIC in March 2009**.

Id. at ¶ 132 (emphasis added).

After the ProPublica-LA Times November 2008 report, PSI responded that, "We do not believe that we have fewer nurses per bed." Id. at ¶ 62. In a letter, Jacobs downplayed the reported incidents that ProPublica had "focus[ed] on just a relatively

few incidents and paint[ed] an unfair picture" of PSI. Id. at ¶ 62. Plaintiffs allege that as with his earlier response to the Tribune investigation, Jacobs described ProPublica-LA Times's reported incidents as "unfortunate" occurrences and were not reflective of PSI's current operations and stated that any remedial measures "have long since been made." Id.

As [*42] to Jacobs's statements about PSI reporting obligations seriously and a timely correction of patient injuries or abuse at Riveredge, Plaintiffs allege that:

• As reflected in UIC's report on Riveredge, **follow up surveys conducted in September and October 2008 found that the cited conditions at the hospital remained uncorrected months after the foregoing statements were made, leading UIC and IDPH to conclude that "such data indicates that Riveredge officials are still failing — even in the fact of a critical IDPH finding as well as other forms of outside scrutiny — to ensure the hospital operates at minimally adequate standards of care"**;

• **Less than a week after the conference call, IDPH found that Riveredge had failed to notify the agency of the death of one of its patients in 2007** due to overmedication with Clozaril, as required by law; and

• UIC's Riveredge report includes a similar account of an affidavit and interview of a **Texas investigator looking into the case of the teenager who was passed out for five hours in a shower after a suicide attempt at PSI's Cypress Creek facility, who indicated that "hospital administrators appeared to minimize or hide the reporting of this incident [*43] to state officials."**

Id. at ¶ 133 (emphasis added).

Defendant Turner told investors at a December 5, 2008 conference call: "There's always going to be

incidents that occur inside a psych hospital that you would rather wish had not occurred. . . ." Id. at ¶ 151. When questioned further about the ProPublica article, Plaintiffs allege Turner deflected, stating, "I'm not here to talk about that." Id. at ¶ 63. Thereafter, Plaintiffs allege Defendants continued to deny that PSI's facilities were understaffed or its workers poorly trained, and dismissed the ProPublica/LA Times investigation as an unfounded and overly sensational account, as Defendants had earlier with the Tribune. Id. at ¶ 151.

On January 13, 2009 — one day after the Morning News expose of PSI's facilities in Texas, Turner and Jacobs participated in a JPMorgan investor conference on healthcare companies and assured investors of the safety of patients under PSI's care and the quality of its treatment. Id. at ¶ 154. Jacobs stated that he was "very pleased on our recent joint commission scores. Very, very pleased with what we are scoring on their surveys." Id. Jacobs told investors to expect data on PSI's core measure compliance [*44] that would support his claims about quality. Id.

After Jacobs' remarks, Plaintiffs allege Turner falsely assured investors of PSI's financial condition and the continuation of its prior growth trajectory. Id. at ¶ 155.

**...Our compliance program establishes mechanisms to aid in the identification and correction of any actual or perceived violations of any of our policies or procedures or any other applicable rules and regulations**. We have appointed a Chief Compliance Officer as well as compliance coordinators at each inpatient facility. The Chief Compliance Officer heads our Compliance Committee, which consists of senior management personnel and two members of our board of directors. Employee training is a key component of the compliance program. All employees receive training during orientation and annually thereafter.

* * *

In addition, **our management has spent, and may spend in the future, substantial time and effort on compliance measures**....

Id. at ¶ 108 (emphasis in original).

Following the end of the Class Period, PSI published data on its website regarding its compliance with the Joint Commission's core remedial measures. Id. at ¶ 74. Plaintiffs cite graphic statistical data revealing [*45] that at the outset of 2009, PSI's hospitals and treatment centers "were operating well below the Joint Commission performance standards on six of the seven criteria." Id. at ¶ 74. Plaintiffs allege that a trend line analysis shows that in 2008, PSI's core measures worsened. Id. at ¶ 75. On March 30, 2009, Illinois's 84-page report entitled "Review of Riveredge Hospital," strongly criticized PSI's patient treatment at Riveredge citing PSI's management's lack of accountability and failure to take responsibility and to correct systemic conditions that caused or permitted patient mistreatment. Id. On Friday, April 3, 2009, the date UIC's report was published, PSI's stock sustained a two-day drop the following week, when its shares closed at $13.65, a drop of 14%. Id. at ¶ 76.

## 6. Defendants' Statements on PSI's Finances

On February 28, 2008, PSI filed its Form 10-K Report for the period ending December 31, 2007 with the SEC. Id. at ¶ 83. This Report included PSI's financial statements for the fiscal year 2007 and the fourth quarter of 2007, including PSI's reported earnings per share, operating expenses, same facility results, revenue and patient data, and other financial metrics described [*46] below. Id. Plaintiffs allege that in its published guidance for 2008, Defendants artificially inflated its reported earnings per share for the fiscal year 2007 and the fourth quarter of 2007 by deliberately reducing of PSI's professional liability and malpractice reserves and manipulating PSI's operating expenses that added $0.05 to reported earnings. Id. at ¶ 84. PSI's

language on PSI's estimated reserves was as follows:

> The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial assumptions calculated by an independent third-party actuary.... This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations.

(Docket Entry No. 111-1 at p. 15). Jacobs and Polson signed this report with certifications under *§§ 302* and *906* of the Sarbanes-Oxley Act of 2002. Id. at ¶ 83.

In a February 20, 2008 press release entitled "Psychiatric Solutions Reports a 27% Increase in Fourth Quarter Earnings to $0.42 per Diluted Share," PSI and the Individual Defendants [*47] reported PSI's financial results for 2007 that were disseminated to the market via Business Wire, and thereafter by other news organizations, financial analysts, and websites. Id. at ¶ 79. Defendant Jacobs is quoted in this press release, and Defendant Turner is identified as the contact source for further information about the release's contents. Id. at ¶ 79. Plaintiffs' amended complaint set forth specific statements in this release as actionable:

> Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2007. For the quarter, revenue increased 44.1% to a record $403.4 million compared to the fourth quarter of 2006. **Income from continuing operations increased 27.3% to $0.42 per diluted share from the fourth quarter of 2006**.
>
> * * *
>
> Same-facility EBITDA margin expanded 200

basis points to 22.2% for the fourth quarter of 2007. Fourth quarter EBITDA margin for all facilities increased 70 basis points to 20.8%. Full year same-facility EBITDA margin increased 150 basis points to 21.5% and total facility EBITDA margin was 20.1%, an increase of 30 basis points compared to 2006.

"**PSI continued to produce outstanding profitable growth [*48] for the fourth quarter and full year 2007**," remarked Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "Demand for high quality inpatient psychiatric care continues to expand in this capacity constrained and very fragmented industry. **We are well positioned to achieve further significant profitable growth for 2008 and beyond through organic growth initiatives and acquisitions**.

"**We are targeting 7% to 9% same-facility revenue growth for 2008 once again. Work is already underway to add nearly 600 beds in existing and new facilities by the end of 2008, double our normal targeted pace of expansion, allowing us to treat patients that we do not have the capacity to treat today**.

"**We are highly confident that we will be able to acquire at least six inpatient facilities during 2008. The pipeline of potential acquisition opportunities remains strong, enhancing our ability to continue to build a platform for future growth**."

PSI is **increasing its 2008 earnings guidance range by $0.10 per diluted share to $1.93 to $1.97** to reflect the benefit of lower interest rates. As a result, growth in 2008 earnings per diluted share is expected to be 30% to 32% compared to 2007. In addition, [*49] PSI established its guidance for earnings from continuing operations for the first quarter of 2008 in a range of $0.42 to $0.43 per diluted share. The Company's guidance does not include the impact from any future acquisitions.

Id. at ¶ 80 (emphasis in original).

On February 21, 2008, PSI hosted a conference call to discuss PSI's 2007 financial results with institutional investors and analysts from twelve Wall Street firms. Id. at ¶ 81. Each of the Individual Defendants participated in this conference call that was recorded and thereafter made available on PSI's website. Written transcripts of the conference call were also published and disseminated by Thomson Reuters Streetevents and other sources. Id. Plaintiffs cited Defendant Jacobs's statements during this conference as actionable:

[JACOBS:] Thanks for being with us this morning to review a strong fourth quarter performance for PSI and another great year. The **continuing strength of the PSI business model is evident in the 27% growth in earnings per diluted share for the fourth quarter and 30% growth in earnings for the year**. These results were at the top end of our guidance for each period and after we revised our annual guidance **[*50]** upward on two occasions after first establishing it in October 2006. In this respect we are also pleased today to be increasing our guidance for 2008 and as a result of the recent decline in interest rates.

Our **earnings growth was driven by 44% increase in our revenue for the fourth quarter and 45% for the year, both of which establish new records for the company**. Consistent with our historical performance we produced this growth primarily through the addition of beds to our operations, the great majority of which resulted from acquisitions of inpatient facilities.

**We also benefited from solid growth in same facility revenues of 6.5% for the year. True to our business model, this growth generated additional operating leverage, which we complimented through ongoing initiatives to improve productivity and efficiency in each facility. As a result we produced a new record for same facility EBITDA margin of 200 basis points to 22.2% versus the fourth quarter of 2006. This performance was primarily accountable for the 49.1% growth in PSI's consolidated adjusted EBITDA for the quarter and its expansion as a percentage of revenue. We remain confident about our prospects to drive facility revenue [*51] growth for 2008 in our historic range of 7% to 9%**.

**We are enhancing our ability to drive same facility performance for 2008, as well as aggregate organic growth through the planned addition of nearly 600 beds in existing and new facilities during the year. In addition, PSI is well positioned to continue its long-term acquisition strategy by acquiring at least six inpatient facilities during 2008**. We have a strong top line of candidates, a favorable pricing environment and the financial resources to accomplish our goals.

In summary, let me repeat that what you have heard before is **we consider our strong prospects for long-term profitable growth. Our confidence in our future rests on our ability to continue implementing a proven business model and growth strategy in an industry whose growth dynamics remain very favorable for PSI. Simply put we are the clear leader in a highly fragmented capacity constrained growth industry**. While we never take execution for granted, especially in terms of providing the highest quality of care for our patients and their families, we expect the PSI team to continue leveraging our strong momentum for future growth.

Id. at ¶ 82 (emphasis added).

During the 2008 **[*52]** conference call, several Wall Street analysts questioned Jacobs for more information on PSI's same facility revenue growth of 5.3% for the fourth quarter 2007 and 6.5% for the full year and PSI's forecast estimates of 7% to 9% growth. Id. at ¶ 103. Jacobs responded that the

2007 shortfall was due to "bad luck," and was not indicative of problems with or maturation of PSI's acquisition strategy: "That 7% to 9% was well within our grasp, and we just had some bad luck." Id. at ¶ 103. Jacobs also stated: "But if you were just to take our bottom three facilities - not the bottom 10, just our bottom three facilities - and we focus on them and get them on the right track, we would have done well above 7% for last year. So quite frankly, **we can get above 7% in '08 just by doing what we did last year and just working on these three facilities.**" Id. (emphasis in original). Defendant Jacobs also cited the additional 600 beds to be acquired the next year as "**just . . . insurance**," because PSI's "**problems were limited to a small number of facilities that if we just fix, that 7% to 9% is there.**" Id. at ¶ 103 (emphasis in original).

In a February 2008 conference call with investors, Jacobs admitted **[*53]** the account had been underfunded throughout 2008, explaining that the reserve balance should have been increased every quarter during the Class Period, but admitted that the $0.05/share increase in expenses was "a build-up that probably should have been allocated one-fourth across all the quarters." Id. at ¶ 86. During the 2008 conference call, Jacobs admitted that "the actual claim costs per claim is going to go up. And has gone up over time." In response to an investor's question, "when it became known to you that you would have to take reserves?," Turner and Jacobs admitted that their awareness of the need to increase in reserve since at least December and that increased operating expenses should have been reflected in each of PSI's quarterly financial reports issued during the Class Period. Id. at ¶ 91.

On April 30, 2008, PSI issued a press release that was approved by each of the Individual Defendants, entitled "Psychiatric Solutions First Quarter Earnings Increase 39.4% to $0.46 per Diluted Share," through Business Wire and thereafter other news organizations, financial analysts, websites and other sources of information distributed this release. Id. at ¶ 112. Defendant Jacobs **[*54]** is

again quoted in this press release that identifies Defendant Turner as the contact source for further information. Id. at ¶ 112.

During a May 1, 2008 conference call with nine Wall Street firms on PSI's first quarter 2008 results with institutional investors and analysts, all Individual Defendants participated and the contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities. Id. at ¶ 114. At the outset of the call, Jacobs made the following statement:

> [JACOBS:] We appreciate your being with us this morning to discuss an **outstanding performance by PSI for the first quarter**. As you can see from our earnings release, we once again produced very strong results. **Given the acute focus on our same facility revenue growth metric, I am pleased to report that we delivered 7.7% same-facility revenue growth, solidly within the range we target on an annual basis**.
>
> I would also like to highlight very strong corporate wide growth. Total revenue increased 33%, consolidated adjusted EBITDA grew 43%, earnings from continuing operations increased 39%. And, **[*55]** once again, **we are raising our earnings guidance again for the year, and now expect to deliver earnings per share growth of 34% to 36% as compared to 2007**.
>
> Our strong growth reflects the addition of the new inpatient beds, primarily through acquisition. Since the end of the first quarter of 2007, we acquired 20 inpatient psychiatric facilities with approximately 2000 beds in two transactions. We completed the acquisition of Horizon Health in May 2007, and purchased the five facilities from United Medical Corporation in March of this year. We also purchased two EAP companies during the first quarter of 2008.

We also continued to expand our bed count through the addition of beds to new and existing facilities. **These beds will help us meet increasing demand for high-quality inpatient psychiatric care**, while serving patients whom we cannot admit today. In the first quarter, we added approximately 80 beds, and we expect to add another 250 beds in the second quarter, of which more than 100 have already opened. As we had previously discussed, we are on track to add nearly 600 beds this year, and we continue to believe we will have all of those beds operational by late this year or very early [*56] next year.

As I mentioned earlier, we were very pleased with the 7.7% growth in PSI same-facility revenue for the first quarter, consistent with our annual target of 7% to 9% growth for 2008. We produced this growth in spite of the negative effect of Easter shifting into the first quarter this year compared with the second quarter last year. The increase in same-facility revenue resulted from a 2.4% increase in patient days and a 5.1% increase in revenue per day.

Our same-facility growth also continued to drive increased operating leverage. Our same-facility EBITDA margin increased 180 basis points to 21.9% for the quarter. **Considering this was the first full quarter in which the nine facilities acquired from ABS were included in our same-facility base, this growth demonstrates our ongoing progress in operating those facilities more effectively**.

We also produced an increase of 80 basis points to 20.8% in EBITDA margin for all of our facilities. This improvement contributed significantly to the 120 basis point increase in our margin for consolidated adjusted EBITDA, which totaled $77 million for the quarter, up 43% from the first quarter of 2007.

Looking forward, **we intend to continue executing [*57] PSI's proven business model**. Our pipeline of potential acquisitions remains healthy in a favorable pricing environment. And we have the financial capacity to carry out our plans. Steady growth in the industry demand also provides a solid foundation for the growth in our existing facilities and supports our development of new beds.

**With an anticipated 7% to 9% expansion in same-facility revenue annually, we expect to continue increasing our EBITDA margins over time. We remain confident about our ability to continue to expand our same-facility EBITDA margin**.

In summary, **we are well-positioned for future significant growth**. We enjoy positive industry conditions, a successful strategy and a highly experienced management team. As in the first quarter, the key to leveraging this momentum is primarily a matter of execution. And let me assure you that we are very focused on getting the job done.

Id. at ¶ 115 (emphasis in original). A broadcast of the call remained available for at least 14 days thereafter on PSI's website.

On May 6, 2008, PSI issued its Form 10-Q Report on its financial results for the first quarter of 2008, citing PSI's ability to improve operations, reduce costs and to expand [*58] revenues at its facilities while providing high quality care to PSI's patients. Jacobs and Polson signed this Report and certified this report under the Sarbanes-Oxley Act. Id. at ¶ 116.

During a July 31, 2008, PSI conference call on PSI's second quarter 2008 results with institutional investors and analysts representing 12 Wall Street firms, Jacobs cited the improvement in PSI's existing facility revenues and margins from the additional beds at those facilities, but Plaintiffs allege Jacobs omitted that PSI facilities were understaffed and underfunded as revealed by problems at PSI facilities. Id. at ¶¶ 122, 123.

In a October 30, 2008 press release entitled

"Psychiatric Solutions Earnings Per Diluted Share Increases 37.8% on 8.7% Growth in Same-Facility Revenue," the Defendants describe PSI's third quarter 2008 financial results that included the following narrative statements:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the third quarter ended September 30, 2008. Revenue was $448.0 million for the quarter, an increase of 13.0% from $396.4 million for the third quarter of 2007. Income from continuing operations rose 39.1% to $28.6 million for the quarter [*59] from $20.6 million for the third quarter of 2007. Income from continuing operations per diluted share increased 37.8% to $0.51 for the third quarter of 2008 from $0.37 for the third quarter of 2007.

**Same-facility revenue increased 8.7%** for the third quarter of 2008 compared with the third quarter last year. This increase reflected same-facility growth in net revenue per patient day of 4.8% and growth in patient days of 3.7%. Same-facility EBITDA margin was 20.6% for the latest quarter, **up 60 basis points** from 20.0% for the third quarter of 2007, while the EBITDA margin for all facilities also **increased 60 basis points** to 20.5%. PSI produced a comparable-quarter increase of 18.1% in consolidated adjusted EBITDA to $80.6 million, which increased as a percentage of revenue to 18.0% from 17.2%. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on pages 6 and 7. "**PSI performed well** for the third quarter, with **strong same-facility revenue growth** driving expanded profit margins," said Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "The **addition of new beds throughout the year has contributed to the increasing rate of comparable-quarter** [*60] **growth in same-facility patient days for three consecutive quarters.**

"The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments. We plan to continue expanding our ability to serve this demand, both through the addition of new beds in our facilities and the ongoing execution of our proven acquisition strategy in a fragmented, capacity-constrained industry. **We are well positioned to fund our anticipated growth over the next year through substantial cash flow from operations**, our existing cash and the availability under our credit facility."

Based on the Company's results for the third quarter and first nine months of 2008 and its outlook for the remainder of the year, PSI today **affirmed its guidance** for earnings from continuing operations per diluted share for 2008 in a range of $2.02 to $2.03, reflecting growth of 36% compared with 2007. In addition, PSI also today **established its guidance for earnings per diluted share for 2009 in a range of $2.40 to $2.44, reflecting growth of 18% to 21%**.

Id. at ¶ 136.

During an October 31, 2008 conference call on PSI's third quarter 2008 results with institutional [*61] investors and analysts representing 16 Wall Street firms, the Individual Defendants participated, and Jacobs again touted the purported quality of PSI's operations and the improvement in existing facility revenues and margins:

[JACOBS:] **PSI continued to perform very well for the third quarter**. We produced growth of 8.7% in same-facility revenue for the third quarter. The third consecutive comparable quarter increase. This growth by 13% increase in revenue for the quarter, and also **margin improvement** that resulted in a 38% increase in earnings per diluted share.

As a result of this growth, **we are on track to achieve our earnings guidance for full year**

2008. **We are very pleased with our same-facility results**. Earlier this year we discussed our focus on expanding same-facility patient days. **For the third quarter patient days increased 3.7%, a rate which is now also increased over the third consecutive quarter. This improvement helped us produce our highest rate of same-facility revenue growth since the fourth quarter 2006**.

As expected, **the operating leverage created through this substantial growth resulted in higher profit margins. In addition we are continuing our initiatives to improve [*62] quality and efficiency in each facility**. As just one example, we are currently engaged in a process to standardize our automated dispensing machines for medication and to add these ADMs to facilities that don't currently have them. ADMs have already proven their ability to enhance the quality of care, increase efficiency by automating the distribution, tracking management and security of medications. **They contribute to our greater patient safety** and reduced pharmacy costs. This initiative is **representative of our continuous efforts to identify and implement best practices within our facilities or within the industry that are relevant to all of our facilities**.

**Through our combined focus on growth and increased efficiency, both same-facility EBITDA to a percent of revenue, and the EBITDA margin for all facilities increased 60 basis points over the third quarter last year. In addition, consolidated adjusted EBITDA grew 18% quarter-over-quarter to [$80.6] million for the third quarter. This growth represented an 80 basis point increase as a percentage of revenue to 18% versus 17.2% for the third quarter last year**.

In an industry with steady growth in demand, **a significant portion of samefacility [*63] growth reflects the addition of new beds to existing facilities**.

* * *

Riveredge Hospital in Chicago which as we've discussed in our conference call last quarter, had an admissions hold placed on it by the Illinois Department of Family Services in July. During the third quarter, our same-facility patient day growth was negatively impacted by approximately 70 basis point due to the lower census levels resulting from this DCF admissions hold. **This hold is still in place; however we expect it to be lifted in the current quarter. The financial impact of the admissions hold in complying with the DOJ investigation cost us approximately 2% to 3% earnings per share hit in the third quarter**.

To conclude my remarks today I'll repeat what you've often heard me say. Our confidence in the long-term growth potential of PSI remains very strong. We are the leader in a growing capacity constrained industry. **Our business model and growth strategy have been continuously refined and successfully proven** over the six years that we have implemented (inaudible) as a public company. **As a result, our scale, our resources, our management depth, and capability have all increased enhancing our ability to execute**.

With [*64] continued strong execution we expect to expand through both additional facility acquisition and through the development of bed for existing and new facilities. We also **expect to drive enhance profit margins** through growth in samefacility revenue at our target rate of 7% to 9% annually.

Id. at ¶¶ 137, 138 (emphasis in original).

During this call, as to the impact of the investigation and Illinois's hold on Riveredge admissions, Jacobs repeatedly told analysts that the

problem was largely behind PSI, but had caused a reduction of third quarter earnings by $0.02- $0.03 per share and would impact fourth quarter earnings by another $0.01-$0.03 per share. Jacobs told investors that "We have that coming back strong in '09" with legal expenses related to the investigation declining significantly in the fourth quarter. Id. at ¶ 139. Jacobs explained: "most if not all of those legal expenses are due to document production, and that's just a one-time event." Id. Jacobs said those expenses were included in the Company's fourth quarter guidance, "but it's a lot less than we had occur in the third quarter." Id. Jacobs also stated, "[W]e feel good about the quality of care at Riveredge, and it's been **[*65]** reevaluated by numerous people since the admissions hold." Id. at ¶ 140. Plaintiffs cite a colloquy with an analyst reveals the following:

> [ANALYST]: A few questions. First it sounds like your optimistic you're going to lift the admissions hold at Riveredge in the fourth quarter, and I know you've had some optimism that was going to be resolved sooner. What's your level of confidence around that Joey?
>
> [JACOBS]: **I think its 80%. I think it's 80%. I think it's 80%**, it may be January 1, be the date. But it could be next week.

Id. at ¶ 141. Jacobs described other PSI facilities with problems as continuing to perform well after implementing corrective measures. Id. at ¶ 142.

At a December 5, 2008 JP Morgan Small-Midcap Conference transcribed by Thomson Streetevents, Defendant Turner told investors:

> [TURNER:] PSI has always been a growth story. We have always been excited to talk about our growth but of late it is important to qualify and talk a little bit more about the quality. If you know what happens in a psych hospital, it's tragic. It is very important that these folks are treated and stabilized. We do a great job of treating patients inside of our psychiatric hospitals. But we are not

**[*66]** perfect. **There's always going to be incidences that occur inside a psych hospital that you would rather wish had not occurred. But those are very, very, very much the exception and not the general rule. But unfortunately when something like that happens, we tend to hear about it, read about it, have people talk about it and all of a sudden people think that is the norm. What we try to do here on this slide is just give you the perspective that it is absolutely not the norm**.

> * * *

> You can see we are surveyed by multiple regulatory agencies and **less than 1% of our surveys have historically resulted in any kind of a serious deficiency or sanction**. We have accreditation, licensing, certification and accreditation from joint commission, federal and state agencies that have unilateral — any time they want to come into our facility 24 hours day, they can come in unannounced and **we welcome that because we know what we are doing inside of those facilities**.

Id. at ¶ 151.

When asked about Riveredge at the December 5, 2008 conference, Turner responded:

> [TURNER:] The admissions hold at River Edge is really directly from the Department of Children and Family Services. They are the party that has the **[*67]** admission hold. We are still under the same — **there is no change since our last update on the earnings call there**. That is still in place.
>
> [AUDIENCE MEMBER]: Any sense for the timing on that?
>
> [TURNER:] Joey mentioned (inaudible) this quarter and I don't have anything updating from that.

Id. at ¶ 152.

Plaintiffs allege that PSI's February 25, 2009 release of its fourth quarter 2008 financial results revealed: (1) a 20% miss in earnings as the result of lost business and investigative costs at Riveredge and a reversal of the reduction in professional liability reserves that boosted earnings in February 2008, and (2) a reduction of PSI's 2009 earnings guidance by $0.14 per share at the midpoint of the range. Id. at ¶ 67. Plaintiffs allege that these facts reflect that PSI's acquisition business model was broken. Id.

During a February 26, 2009 conference call with investors, Jacobs told investors PSI was actively working behind the scenes to alert government officials and other referral sources of the upcoming articles allegedly in an effort to convince investors that the allegations were untrue or overblown so governmental entities would not stop sending patients to PSI facilities. Id. at [*68] ¶ 47. In this conference call with investors and analysts elicited angry criticism over PSI's delayed disclosure of the impact of regulatory problems, and Jacobs responded:

> [JACOBS:] As discussed in our press release, the fourth quarter earnings per diluted share were impacted by one of the Company's facilities in Chicago and increase in the Company reserves for general and professional liability coverage. The Chicago facility suffered a decline in operations of $0.03 relating to an admissions hold. And professional fees of $0.02 relating to an investigation. As a result of our annual actuarial review we determined that we needed to increase our self insured reserves for general and professional liability by $4.9 million or $0.05 per share.
>
> * * *
>
> Our revised 2009 earnings guidance of $2.24 to $2.32 represents earnings growth of 17% to 21% before the effect of any future acquisitions. We are lowering our guidance to reflect the financial impact of the following

three issues. The current economic environment and the continued admissions hold at our Chicago facility resulted in lowering our revenues goals for 2009. Same store revenue growth is expected to be mid single digits for the year [*69] 2009, and lower single digits for the first quarter. As we saw a softening in patient days that began in October.

> Number two, our guidance reflects the trending of general and professional liability expense that we experienced in 2008. And three, the impact of successfully amending our current revolving credit facility.

Id. at ¶ 68.

Jacobs described Riveredge alone as "probably costing us 50 to 70 basis points against the same store patient day comparison." Id. at ¶ 69. Jacobs informed investors of an administrative hold on new admissions until UIC completed its investigation and report of the incidents there, but stated that the State requirements to lift the hold had been accomplished. Id. One analyst stated: "What you're saying is that you've done everything the state has asked you to do and now you're just waiting for them to sort of make sure that you really have done those things with this outside survey and that's what's holding up the process?," to which Jacobs answered, "Correct." Id. Plaintiffs allege that UIC's final report disclosed that PSI's problems had **not** been corrected when Jacobs made that statement, however, citing PSI for a string of continuing violations at Riveredge [*70] and other facilities nationwide. Id. Moreover, Plaintiffs allege this administrative hold has never been lifted. Id.

During this conference call, Jacobs described a "general softening" in this market and since October that was a "general across the board" reduction in all but a few PSI facilities. Id. at ¶ 70. Plaintiffs allege that notwithstanding PSI facilities' problems in Illinois and California, Jacobs attributed blame for PSI's declining patients on Lehman Brothers: "It's just a general softening that

occurred in October and that was I guess when banks started to fail, maybe Lehman Brothers closed or whatever and we just — the uneasiness, the layoffs in the market just caused a softening in the census, starting in October, across the board." Id.

On October 30, 2008, during PSI's third quarter 2008 conference call, Jacobs told investors that PSI expected an increase due to the financial crisis because more people struggled to cope with stress arising from lost jobs, mortgages, and other financial problems: "The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments." Id. When pressed about **[*71]** this issue by an analyst, Jacobs responded:

> The surprise to us in the fourth quarter was October. For some reason, we occasionally have a month like that, where it's supposed to be a stronger quarter and for — I mean stronger month and for some reason the month just wants to be soft and at that time last year in September and October, there was a lot of bad news going out in the economy.

Id. at ¶ 71.

After ProPublica published reports of PSI's regulatory and patient care issues at Riveredge on February 26, 2009, PSI's stock dropped immediately by $9.79 per share to close at $17.50 on February 26, 2009, a 1-day decline of 35% on volume of more than 17 million shares, more than 19 times the average 3-month daily volume. This stock price was PSI's lowest in trading over four years. Id. at ¶¶ 72-73.

## 7. Scienter Allegations[2]

[2] Plaintiffs assert claims for securities fraud under the fraud on the market theory of reliance that are not challenged in Defendants' motion to dismiss. These allegations are that the market price of PSI securities, including common stock regularly traded on the NASDAQ market, was artificially inflated by the false and misleading statements, including PSI's misleading statements **[*72]** about the quality of care provided at its psychiatric hospitals

### a. Defendants' Alleged False or Misleading Statements

Plaintiffs' claims for Defendants' misrepresentations include statements from the 2007 reports, press releases and conference calls about the quality of PSI's operations, and the representations of productivity and efficiency at

and other facilities, its compliance with regulatory requirements and industry standards of care, the costs of providing its services and the operating margins and growth that could be achieved from its operations, the past, present and anticipated future success of its roll-up acquisition strategy, the risks to its business and operations, the adequacy of its reserves, the completeness and accuracy of its published financial results and guidance. Id. at ¶ 200. The Class Period inflation in PSI's stock price was eliminated when the financial conditions, business risks, and other information concealed by defendants' scheme was revealed to the market. Id. at ¶ 201. As to Plaintiffs' allegations of a fraud on the market, PSI's common stock was an efficient market because:

> (a) PSI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ market, a highly efficient and automated market;
>
> (b) During the Class Period, the average trading volume of the PSI common stock traded on the NASDAQ market was approximately 1.03 million shares per day;
>
> (c) As a regulated issuer, PSI filed periodic public reports **[*73]** with the SEC and Nasdaq;
>
> (d) PSI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services;
>
> (e) During the Class Period, PSI was followed by securities analysts employed by major brokerage firms including Lehman Brothers, Barclay Capital, William Blair, Merrill Lynch, JP Morgan, Deutsche Bank, Robert W. Baird & Co., Inc., Avondale Partners, Citigroup, Credit Suisse, Raymond James & Associates, Piper Jaffray, Banc of America, Stanford Group and others.

Id. at ¶ 202. Due to Defendants' series of partial disclosures, PSI's actual business conditions and risks were concealed from investors by Defendants' alleged scheme to defraud. This concealment was material to PSI's operations and inflicted price declines that reduced PSI's stock price when Defendants' misleading statements and omissions were publically disclosed. Id. at ¶ 205. **[*74]** Plaintiffs detail the purported inflation, corrective events, and drops in stock price in detail in the amended complaint. Id. at ¶ 206-212.

PSI facilities with "higher quality care" for patients, as materially misleading to investors. Id. at ¶ 106 Plaintiffs allege that these facts strongly infer that Defendants knew or recklessly disregarded that the statements in the 2007 Report on Form 10-K and other press releases would be, and were, misleading to and operated as a fraud upon investors, at least in the following material respects:

• Contrary to the claim that PSI "provide[d] higher quality care than [its] competitors" or the "highest quality service," including "24-hour skilled nursing observation" and "intensive, highly-coordinated treatment," PSI's facilities were staffed at levels far below those necessary to provide such services, and well below the levels of its competitors, such that its incidence [*75] of regulatory violations and patient safety and quality of care problems was much higher than that of its competitors, as alleged above and as reported by ProPublica, the LA Times and other media outlets;

• Contrary to the claim that PSI's facilities were in substantial compliance with applicable federal, state, local and independent review body regulations and requirements —

• PSI facilities were staffed below levels necessary to assure proper treatment of patients in a safe and secure therapeutic environment, or to monitor patients at risk for harming themselves and others, as described above;

• PSI consistently failed to promptly report or accurately document incidents of actual or potential harm to patients, and actively delayed or concealed reporting of a significant number of events, as described above;

• PSI was in violation of other regulatory requirements and standards pertaining to staffing levels and patient treatment, the condition of facilities, and medical record-keeping practices; and

• [*76] Serious patient care deficiencies were still occurring at PSI hospitals in California and would continue to occur through at least June 2008, as was reported by ProPublica in November 2008.

• The Company was not spending substantial time and resources on its compliance programs, nor was regulatory compliance a top priority for PSI —

• According to former PSI employees, the Company was serious about risk management only, as one employee put it, "until money was involved." A former CEO at two PSI hospitals echoed this sentiment, saying there was always a tension between training and budget — the Company wanted employees to be trained, s/he said, "but they didn't want to spend a month" doing it.

• Several PSI hospital executives, when shown organizational charts for the Company's compliance department or asked who filled the compliance or regulatory positions like those described above, said that they had never heard those job titles being used in the organization and had no idea who, if anyone, filled those compliance-related roles.

• The statements that PSI was successful in improving results by "optimizing [its] staffing ratios, controlling contract labor costs and reducing supply costs" [*77] was materially misleading because it omitted to disclose that the reductions in staffing and expense were below the level at which PSI could operate its facilities in a safe manner or provide adequate — much less high quality — treatment to patients; and

• The claim that services at each facility are "continually assessed and monitored" and "corrective steps are taken when necessary" was materially false and

misleading because, in reality, PSI took corrective actions only to avoid negative publicity, and only to the extent to create the appearance of action without making any meaningful changes in its practices or operations, as described in the UIC report on Riveredge and other sources detailed above.

Id. at ¶ 111.

In summary, Plaintiffs allege numerous statements in 2007 were deliberately or recklessly misleading to investors because PSI's problems were not limited to "a small number of facilities," nor were the published reports only "operational issues" or "bad luck," because PSI had problems at multiple Texas facilities and other PSI facilities in other states at the time of these statements. Id. at ¶ 105. Prior to and during the Class Period, Plaintiffs allege as false and misleading **[*78]** Defendants' assurances of their comprehensive monitoring systems to detect potential problems before their occurrence and their high-quality patient care in a safe and secure environment and in compliance with regulatory and licensing requirements. Id. at ¶ 43.

As to Defendants' statements about the condition of PSI's finances, Plaintiffs cite the following statements:

• Contrary to the contentions that PSI was providing "high quality" care and demonstrating "outstanding growth" while "improv[ing] productivity and efficiency" of acquired operations, many PSI hospitals and residential treatment centers were struggling under tight budgets that did not permit the facilities to be operated in compliance with regulatory requirements or in a manner that provided adequate — much less high quality — care to patients in a safe therapeutic environment;

• The Company was attempting to "double [its] normal targeted pace of expansion" not because

of the purportedly "strong" "pipeline of potential acquisition opportunities" or marketplace demand but because the Company needed to accelerate its acquisitions to cover up its inability to continue squeezing growth out of facilities it had previously acquired; **[*79]** and

• The Company could not achieve 7% to 9% same facility revenue growth without the planned addition of 600 beds by facility expansion or acquisition, such that the planned additions were not "just . . . insurance," as claimed by Jacobs.

Id. at ¶ 102.

Plaintiffs' allege as actionable the following statements about PSI's reported operating expenses, same facility results, revenue and patient data, in the first quarter of 2008:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the first quarter ended March 31, 2008. Revenue increased 33.3% to a record $429.7 million for the quarter from $322.4 million for the first quarter of 2007. Income from continuing operations rose 39.4% to $0.46 per diluted share from the comparable prior-year quarter.

**Same-facility revenue grew 7.7% for the first quarter of 2008, reflecting same-facility growth in net revenue per patient day of 5.1% and growth in patient days of 2.4%. Same-facility EBITDA margin expanded 180 basis points to 21.9% and EBITDA margin for all facilities increased 80 basis points to 20.8% for the first quarter of 2008 from the first quarter of 2007.** Consolidated adjusted EBITDA grew 42.5% to a record $76.8 million, **[*80]** or 17.9% of revenue, for the first quarter of 2008 from the first quarter of 2007. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on page 6.

**Joey Jacobs, Chairman, President and Chief Executive Officer of PSI, remarked, "PSI performed extremely well during the first quarter of 2008, enabling us to exceed earnings guidance for the quarter and to again raise our earnings guidance for the year. Our focus on execution enabled us to achieve our samefacility revenue and EBITDA targets and implement our plans for adding new beds**. With the March acquisition of five inpatient psychiatric facilities from United Medical Corporation, we also added more than 400 beds in a transaction expected to be accretive to our 2008 financial results.

**"Market dynamics in the inpatient behavioral health industry remain favorable, supporting our ability to continue implementing our proven business model. We remain confident of our prospects for driving further significant growth in our same-facility metrics**, while continuing to build our platform for future growth through the accretive acquisition of at least six inpatient facilities each year."

Based on its first quarter **[*81]** results and outlook for the remainder of the year, **PSI is increasing its guidance for earnings from continuing operations per diluted share for 2008 to a range of $2.00 to $2.03 from the previous range of $1.97 to $2.01. As a result, growth in 2008 earnings per diluted share is expected to be 34% to 36% compared to 2007**. The Company's guidance does not include the impact from any future acquisitions.

Id. at ¶ 113 (emphasis in original).

Given the regulatory violations and patient safety and care issues for incidents in 2007 and earlier, Plaintiffs allege PSI had increased exposure to professional liability claims at PSI's facilities. Id. at ¶ 85. Thus, Plaintiffs allege that Defendants lacked a reasonable basis to reduce PSI's reserve account at the outset of the Class Period and, in doing so, violated generally accepted accounting principles ("GAAP"). Id. Plaintiffs specifically cite Defendants' underreporting of PSI's actual operating expenses and malpractice reserves despite the prevalence of patient care and safety problems and likely increase of patient claims in 2008 as constituting misleading statements to investors at the outset of the Class Period. Id. at ¶¶ 85-95. Thus, Plaintiffs **[*82]** allege the Defendants' February 20, 2008 earnings release, Defendants' statements at the February 21, 2008 conference call, and in PSI's 2007 Form 10-K Report were deliberately or recklessly misleading to PSI investors. Plaintiffs allege that Jacobs' admission that PSI's reserves should have been increased in its prior quarterly financial statements demonstrates that PSI's Forms 10-K and 10-Q filed with the SEC during the Class Period violated GAAP. Id. at ¶ 92.

Plaintiffs allege these statements about PSI's 2008 performance to be false and in reckless disregard of PSI's actual operations and financial condition by failing to disclose and concealing from investors or recklessly ignoring material risks to PSI's financial viability. Plaintiffs cite the foregoing statements as recklessly and materially misleading:

- PSI's attribution of its strong growth, revenues and margins to PSI's "focus on execution" or its "successful strategy and [] highly experienced management team," was in fact due to PSI's understaffing and underfunding of psychiatric facilities below levels of compliance with regulatory licensing and accreditation standards and requirements;

- PSI's reported financial results **[*83]** did not reflect the true costs to operate its facilities consistent with all regulatory, licensing and accreditation standards and requirements;

- PSI's reported financial results continued to under-reserve for medical malpractice and other professional liability claims in violation of GAAP; and

• The financial guidance provided in the April 30 earnings release and discussed on the May 1 conference call lacked a reasonable basis because it failed to account for malpractice and professional liability expenses that had been incurred and were reasonably expected to continue to be incurred at levels above the amounts reserved for such expenses, and because the guidance was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment.

• Defendants' statement that PSI was "on track to achieve [its] earnings guidance for full year 2008" and PSI's guidance for 2009 lacked a reasonable basis because the published guidance failed to account for the actual and reasonably anticipated expenses and lost business arising from the Riveredge investigation or the administrative hold [*84] imposed by DCFS, continuing malpractice expense claims, or a decline in patient occupancy that began in October 2008. The guidance was also misleading and lacked a reasonable basis because it was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment. Id. at ¶ 145.

Id. at ¶ 117.

As to the material omissions about PSI's actual business practices, Plaintiffs allege:

• The statements omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate treatment or care to those patients, including

proper around the clock monitoring of patients with suicidal tendencies or who otherwise presented a risk of harm to themselves or other patients or staff. Id. at ¶ 102.

• By failing to disclose that annual revenue growth of 7% to 9% was predicated [*85] upon practice of cutting expenses and staffing below the levels necessary to prevent physical and sexual assaults on patients, that PSI's assertions of its "high quality" of treatment or care and safe environment for patients was misleading. Id. at ¶ 112;

• As of May 2008, serious patient care deficiencies were still occurring at PSI hospitals in California. Id.

• Turner knew or recklessly disregarded that his statements at the December 5, 2008 investor conference were misleading and contributed to a fraud upon investors, because Turner lacked a factual basis to state that PSI's operations of its facilities would be "viewed very favorably" once the core measure data was released, and lacked a basis for stating DCFS's hold at Riveredge would be lifted in the fourth quarter of 2008. Id. at ¶ 153.

Plaintiffs allege that Defendants' statements did not provide a truthful or accurate account of the Illinois' investigation of Riveredge that UIC's investigation had expanded to include facilities other than Riveredge and was therefore unlikely to be completed before the end of the year. Id. at ¶ 146. Thus, Plaintiffs allege Defendants lacked any factual basis to assert that the state hold at Riveredge [*86] would be lifted in the fourth quarter 2008, nor the 80% likelihood of such occurring. According to the minutes of the September 10, 2008 PSI Medical Executive Committee meeting, PSI had also been informed of the results of a federal agency survey of the facility that "the hospital was close to being placed in immediate jeopardy" based upon "a significant amount of concern for the hospital's reputation within the community and the quality of care

provided to patients." Id. Defendants also failed to disclose the continuing violations at its other facilities nor PSI efforts to dissuade state officials from imposing fines or sanctions at PSI's Pines facility. Id.

### b. Insider Trading

As to the Individual Defendants' motivation to inflate PSI's stock price throughout the Class Period, Plaintiffs cite insider trading in PSI stock. According to SEC Forms 4 filed by PSI insiders, the Individual Defendants and PSI board members' sales of PSI stock in large amounts and at critical times, as follows:

(a) **Polson**: On May 28 and 29, 2008, following defendants' false statements regarding PSI's 2008 earnings in the final quarter, Polson sold 50,000 shares of PSI stock at near Class Period highs of $37.02 **[*87]** and $37.21 per share, yielding $1.85 million in proceeds. Polson sold off 42% of his PSI stock without any pre-established plan or pattern. Polson has not sold a single share of PSI stock since the Class Period ended.

(b) **Turner**: On July 9 and September 19, 2008, just days before publication of the Tribune investigative report exposing patient mistreatment at Riveredge — which Defendants knew about before it was published ? Turner sold 95,800 shares at an average price of $40.03 per share, a price higher than any closing price of PSI stock during the Class Period. This sale represented 55% of Turner's holdings. Although Turner's September 2005 10b5-1 trading plan disclosed his stock sale, PSI's Insider Trading Policy and its Code of Conduct prohibited any sale of stock by an insider who possessed material, nonpublic information that is unavailable to investors. Turner sold 100% of his Class Period stock holdings on just two days runs contrary to the policy behind permitting trading plans under *Rule 10b5-1*.

(c) **Director and Insider Mark Clein**: On August 12 and November 4, 2008, just days after defendants' false statements regarding PSI's 2008 second and third quarter earnings, PSI Director **[*88]** Mark Clein sold 18,000 shares of PSI stock for $628,210 that represented more than 63% of his holdings, for which Clein did not publish an established plan. In the year preceding the Class Period, Clein sold only 10,000 shares for $360,000. Since the end of the Class Period, Clein has not sold a single share of PSI stock.

(d) **Director and Insider Christopher Grant**: On July 9, 2008, just days before the Tribune report on patient mistreatment at Riveredge, PSI Director Christopher Grant sold 100% of his 2,000 shares of Company stock for $80,000, but Grant had adopted a 10b5-1 trading plan in September 2005. Yet, PSI's Insider Trading Policy and its Code of Conduct prohibit any sale of stock by an insider when in possession of material, nonpublic information that is unavailable to investors. Grant sold 100% of his Class Period stock holdings on a single day runs contrary to *Rule 10b5-1*.

(e) **Director and Insider Edward Wissing**: On January 2, 2009, PSI Director Edward Wissing ("Wissing") sold 100% of his 7,000 shares of Company stock for $192,220 ahead of the Morning News report of problems in PSI's Texas facilities. Although these sales were purportedly made pursuant to a 10b5-1 trading **[*89]** plan adopted by Wissing in September 2005, both PSI's Insider Trading Policy and Code of Conduct prohibited any sale of stock by an insider when in possession of material, nonpublic information that is unavailable to investors. Furthermore, the fact that Insider Wissing sold 100% of his Class Period stock holdings on a single day runs contrary to the policy behind permitting trading plans under *Rule 10b5-1*, which was designed to establish a regular pattern of trade. Since the end of the Class Period, Wissing has not sold a single

share of PSI stock.

Id. at ¶ 198.

During the Class Period, Plaintiffs allege that the Individual Defendants' and insiders' sales of PSI stock were predominately between May 28, 2008 and September 19, 2008. According to the amended complaint, two of the three insiders' sales occurred between July 9, 2008 and September 19, 2008 — just over a two month period. Id. at ¶ 199.

### c. Executive Bonuses and Other Incentive Compensation

Following the March 10, 2010 announcement of the potential sale of PSI to third parties — which caused PSI's stock price to jump more than 20% to nearly $30 per share — the DOJ launched an investigation of PSI, particularly concerning the issuance [*90] of the compensation grants to its executives. Id. at ¶ 191. PSI failed to disclose this DOJ investigation into these grants until May 10, 2010, days before PSI's annual shareholder meeting where the compensation grants were to be approved. Id. Defendants also did not mention the DOJ investigation involving the grants in PSI's 14A Proxy Statement filed with the SEC on April 10, 2010 seeking approval of the grants. Id. On May 17, 2010, the day before the shareholder meeting, PSI announced a proposed merger with UHS for $33.75 per share, that Plaintiffs allege left shareholders with insufficient time to evaluate the grants, the DOJ investigation, the merger, or the interrelationship of the events. Id.

In addition to the $30 million acquisition expense and the compensation grants, on April 15, 2010, PSI's compensation committee approved an amendment to Jacobs's employment agreement, in the event of a "change in control" at PSI. Id. at ¶ 192. Under this modified employment agreement, if Jacobs left PSI voluntarily or involuntarily, other than by death or disability, within 12 months after a change in corporate control, Jacobs would receive a lump sum payment equal to the sum of: (i) Jacobs' [*91] earned but unpaid base salary through the

termination date; (ii) three times the sum of Jacobs' base salary plus an amount equal to the higher of (A) the highest annual amount of bonus compensation paid to or earned by Jacobs within the prior three fiscal years to the fiscal year of the change in control (B) 100% of the bonus compensation amount that would be payable to Jacobs, assuming that both PSI and Jacobs satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to Jacobs for the fiscal year in which the change in control occurs; and (iii) Jacobs' accrued but unused paid time off or sick pay and unreimbursed business expenses. Id. at ¶ 193. With the grants, Plaintiffs allege that Jacobs would receive millions of dollars, even if Jacobs voluntarily quit after a change in corporate control. Id. at ¶ 194.

Similarly, on April 15, 2010, PSI's compensation committee also approved compensation agreements for each of PSI's top executives that provide in relevant part:

> The compensation and benefits payable under the CIC Agreement include a lump sum payment equal to the [*92] sum of: (i) the earned but unpaid base pay due to the Covered Executive; (ii) two times (2x) the sum of the Covered Executive's base pay plus incentive pay in an amount equal to **the higher of (A) the highest annual amount of incentive pay paid to or earned by the Covered Executive with respect to any of the three fiscal years prior to the fiscal year in which the change in control occurs and (B) 100% of the incentive pay amount that would be payable to the Covered Executive**, assuming that both the Company and the Covered Executive satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to the Covered Executive for the fiscal year in which the change in control occurs; (iii) the

Covered Executive's accrued but unused paid time off or sick pay and unreimbursed business expenses; (iv) any other compensation or benefits payable to the Covered Executive in accordance with the terms of the Company's existing plans and programs; and (v) a pro-rata portion of the incentive pay amount that would be payable to the Covered Executive, assuming both the Company and the Covered [*93] Executive satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to the Covered Executive for the fiscal year in which the separation date occurs. **Additionally, the Covered Executive will be entitled to (a) full vesting of stock options and restricted stock or other equity-based awards that have not otherwise become vested,** (b) the provision of certain health and welfare benefits for 24 months following the termination and (c) reimbursement of up to $25,000 for outplacement counseling expenses and related benefits for 12 months following the termination.

Id. at ¶ 195 (emphasis in original). Thus, PSI's top executives would receive a lump sum payment of double their base salaries and equivalent to the compensation grants. In total, Plaintiffs allege the severance and equity payments to the Individual Defendants upon the merger would exceed $200 million, more than 10% of PSI's total market capitalization. Id. at ¶¶ 196-197.

Plaintiffs also allege the Individual Defendants were motivated to conceal the truth to avoid losing their jobs and their lucrative performance-based [*94] compensation. Id. at ¶ 184. During the Class Period, Plaintiffs alleged the Individual Defendants awarded themselves extraordinary stock-based compensation awards and were secretly negotiating a sale of PSI, knowing that the coming sale announcement would increase the value of PSI's stock price. Plaintiffs allege that the Individual

Defendants' continuing secret efforts to line their pockets at investors' expense provides additional strong evidence of their intent and motivation to defraud investors during the Class Period. Id. at ¶¶ 189-190.

**d. Whistleblower Actions**

In January of 2007, Leslie Smith ("Smith"), a former PSI master's level therapist for juvenile males at PSI's Gulf Coast Youth Academy ("GCYA") in 2006-2007, filed a complaint under Florida's whistleblower statute for retaliation after PSI terminated her from that facility. Smith alleged that she was fired after she reported sexual abuse by one youth on another, the excessive use of force on a youth by GCYA staff, refusing to execute reporting guidelines concerning abuse, reporting Medicaid fraud, and reporting the falsification of documents. Id. at ¶ 178. Smith additionally charged that GCYA's chief executive officer hired [*95] two employees who had been dishonorably discharged from the military for sexual harassment and misconduct. One of these employees was hired as Assistant Program Director. This individual was promoted to GCYA Program Director after Smith was terminated by GCYA. Additionally, employees, including senior staff members, at PSI's Intermountain Hospital in Boise, Idaho, were fired or suspended during 2006 for reporting to their superiors that the facility was understaffed and employees were unable to control the young patients in the residential treatment unit, leading to a riot in the main unit where the police had to be called to quell the violence. Id. Yet, Defendants' submissions reflect that Smith's whistleblower action was dismissed by a district court, and that dismissal was affirmed on appeal. (Docket Entry No. 111-7).

In another instance, a former interim executive at PSI's Manatee Palms facility, had filled similar roles at a number of other PSI facilities between 2005 and 2007. (Docket Entry No. 109, Amended Complaint at ¶ 179). Yet, this executive suddenly found s/he was out of work after s/he aired

concerns about the way the facility was staffed and the way patients were being [*96] treated there in early 2007. This person stated s/he felt like s/he had been "blackballed" by PSI, and when s/he later asked PSI if they had any more work assignments for him/her, s/he was told that "they won't use you anymore." Id. PSI did not act in response to his/her complaints at Manatee: "No one would listen to me," s/he said. Id.

In February 2008, Kimberly Gilyard, a former charge nurse for six years at PSI's Laurel Ridge Hospital in San Antonio, Texas, filed an action, in part under the Texas Health and Safety Code and the Texas Occupations Code, for retaliation. Id. at ¶ 180. Gilyard alleged that PSI terminated her in October 2006 for her report of abuse and neglect of patients, inadequate staffing that placed patient care at risk, and her exposure of cover-ups by management related to patient injury. Id. at ¶ 180.

### 8. Individual Defendants

As to the probative value of Plaintiffs' allegations about Jacobs's, Polson's and Turner's statements about PSI's business, Plaintiffs cite their high level positions, their participation in and awareness of PSI's actual operations and intimate knowledge of the cited false statements and omissions made by PSI that were disseminated to the investing [*97] public. Plaintiffs allege these Defendants had the power to influence and control and in fact influenced and controlled, directly or indirectly, the decision making of PSI, including the content and dissemination of the various false and misleading statements cited by Plaintiffs. These Defendants also participated in conference calls with investors and had unlimited access to copies of PSI's reports, press releases, public filings and other statements, and the ability to prevent the issuance of the false statements or cause the false and misleading statements to be corrected. Id. at ¶ 214.

These Defendants had authority over PSI's budget for its facilities that represented over 90% of PSI's total revenue during the Class Period. The Defendants' budget process set the maximum expenditure on staffing and staff-to-patient ratios for each PSI facility. Id. at ¶ 217. The Individual Defendants continuously tracked all patient incident reports on an immediate, monthly or quarterly basis, depending on the severity of the event, and through monthly risk management reports and monthly hospital operations reports from each PSI facility. Id. These reports were consolidated by division presidents [*98] and facility chief executive officers. Defendants also tracked key operating and financial statistics for each hospital, similarly compiled on a Division basis, through monthly operation review reports and monthly meetings on these reports. Id.

Generally, Plaintiffs allege that PSI executives, including Jacobs, Turner and Polson, were apprised of financial and incident metrics at each PSI facility through numerous reports and meetings that provided detailed information to the Individual Defendants. Id. at ¶ 177. Former employees of PSI confirmed that facility site visits were conducted on a monthly basis by Division-level officers, including chief executive officers or clinical services directors, who reported to PSI's most senior executives, and on an annual basis by PSI's Vice President of Environmental Safety and Compliance who reported to Executive Vice President of Quality and Compliance. Id. at ¶ 166.

According to Plaintiffs, the Individual Defendants' statements about PSI reserves during the conference calls, as well as Jacobs' and Polson's signatures on PSI's financial statements and their Sarbanes-Oxley certifications included with those statements, demonstrate that the Individual [*99] Defendants Jacobs and Polson were each directly aware of, responsible for, and involved in the decision to lower the reserve at the outset of the Class Period. Id. at ¶ 93. Plaintiffs allege that the impact of that action on PSI's reported earnings for fiscal year 2007 and fiscal year 2008 supports an inference that each of the Defendants was actually aware of the changes to the reserve account and the reasons therefore at the time the changes were implemented. Defendants' knowledge of and

involvement in addressing the numerous regulatory violations and incidents of negligent patient care described above, particularly including incidents that occurred during 2007 and 2008, further demonstrate that defendants knew or recklessly disregarded circumstances demonstrating that PSI's malpractice and other claims expenses would not decline in 2008 from the levels in 2007. Collectively, Plaintiffs allege that these facts and the other allegations herein give rise to a strong inference that defendants knew or recklessly disregarded that PSI's reported other operating expenses and the statements contained in PSI's SEC filings regarding the reasons for the reductions in those expenses would be, **[*100]** and were, materially misleading to investors. Id. Defendants' scienter is further demonstrated by past instances where PSI improved operating results and earnings per share by manipulating its other operating expenses. Id. at ¶¶ 94-95.

### a. Jacobs

Jacobs had direct authority over each of PSI's 11 Divisions, each of which was comprised of approximately ten facilities, a number specifically set by defendants as the appropriate quantity of facilities for efficient and effective oversight. Id. at ¶ 216. Jacobs was also the direct supervisor of Kathy Bolmer, PSI's executive vice president, quality and compliance, who exercised constant oversight over the regulatory compliance and risk management at each of PSI's inpatient psychiatric facilities.

In addition to his quoted statements supra, Defendant Jacobs certified PSI's 2007 Report on Form 10-K and each of its 2008 Form 10-Q Reports issued during the Class Period as required by the Sarbanes-Oxley Act of 2002. Id. at ¶ 182. Jacobs's certifications during the Class Period are cited as giving rise to the inference that Jacobs knew, or deliberately disregarded, information about changes in PSI's professional and general liability expenses, staffing **[*101]** ratios and expenses at PSI's facilities and these changes'

impact on PSI's reported margins and earnings, and patient treatment resulting in patient injuries or regulatory violations at PSI facilities. The latter are allegedly caused by PSI's failure to staff PSI's hospitals and residential treatment facilities to meet regulatory requirements and assure adequate treatment and patient care. Id. at ¶ 183. Jacobs's descriptions of PSI's compliance program during PSI's conference calls with analysts and investors were to quell investor concerns over the actual quality of PSI's operations after the negative Tribune report about Riveredge. Id. at ¶ 167.

During a conference call about PSI's first quarter 2009 earnings with analysts and investors on April 29, 2009, Jacobs admitted that PSI's needed to be more attentive to warning signs at its facilities, contradicting Defendants' Class Period statements that PSI was then focusing on minor and potential incidents and that such compliance was on Jacobs's "top of mind" and other PSI executives. Id. at ¶ 170.

Several former PSI employees who had direct contact with Jacobs during the budgeting process and in other contexts have described him as one **[*102]** of the most "hands-on" chief executive officers for whom they have ever worked. Jacobs was "unequivocally the most hands-on CEO" and "the most involved [I have worked with]," particularly when it came to financial issues, said one. "Some (CEO's) manage through delegation, less so Joey." Jacobs "was pretty informed, from what I could see" said another. "He was pretty close to everything . . . if you had something that surfaced, he'd pick up the phone and ask questions." Id. at ¶ 175. Several former employees recall getting weekly e-mails from Jacobs summarizing the Ten Worst hospitals in terms of patient capacity, comparing their performance to budgeted patient capacity targets. The e-mails were distributed to division presidents, hospital CEOs, and other executives. "There was peer pressure to make sure you weren't in the worst 10," said one e-mail recipient. I "didn't want to be on it," said another, who recalled that Jacobs displayed the

variance on "a big 38-inch screen" in his office. The census numbers were "driving decision-making," s/he said. Id. at ¶ 176.

Jacobs's extensive experience in healthcare is cited as giving rise to the inference of his understanding of the significance **[*103]** of the incidents of patient mistreatment or lack of supervision at Riveredge and other PSI facilities, or evinces his recklessness in failing to recognize the significant and material risks those incidents presented to PSI's operations and patients. Id. at ¶ 171. Prior to and during the Class Period, Defendants consistently explained PSI's increasing profitability was due in part to PSI's competitive strength in an "experienced management team." "Our senior management team has extensive experience in the health care industry. Joey A. Jacobs, our Chairman, President and Chief Executive Officer, has over 30 years of experience in various capacities in the health care industry." Id. at ¶ 172. "Our senior management operates as a cohesive, complementary group and has extensive operating knowledge of our industry and understanding of the regulatory environment in which we operate. Our senior managers employ conservative fiscal policies and have a successful track record in both operating our core business and integrating acquired assets." Id. at ¶ 173.

Plaintiffs assert that Jacobs had sufficient experience in this industry to recognize the significance of the incidents described above. Id. **[*104]** Yet Jacobs continued to assure investors in PSI's SEC filings, press releases and investor conferences.

### b. Polson

In addition to his quoted statements supra, Defendant Polson certified PSI's 2007 Report on Form 10-K and each of its 2008 Form 10-Q Reports issued during the Class Period as required by the Sarbanes-Oxley Act of 2002. Id. at ¶ 182. Polson's certifications during the Class Period are cited as giving rise to the inference that Polson knew, or deliberately disregarded, information about changes in PSI's professional and general liability expenses, staffing ratios and expenses at PSI's facilities and these changes' impact on PSI's reported margins and earnings, and patient treatment resulting in patient injuries or regulatory violations at PSI facilities. The latter are allegedly caused by PSI's failure to staff PSI's hospitals and residential treatment facilities to meet regulatory requirements and assure adequate treatment and patient care. Id. at ¶ 183. During the Class Period, Polson reported directly to Jacobs and supervised the operations of PSI departments.

At the end of the Class Period, PSI investors learned the extent to which the administrative hold had increased PSI's **[*105]** expenses and resulted in lost business that combined with steadily increasing malpractice expenses. The decline in PSI's financial performance caused an immediate 35% drop in the value of PSI's stock. Id. at ¶¶ 9, 67-73, 200-213.

## B. Conclusions of Law

### 1. *Rule 10(b)* and PLSRA Standards

Plaintiffs' claims seek recovery under *§ 10(b)* of the Securities Exchange Act of 1934 and *Rule 10b-5* promulgated thereunder. *Section 10(b)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78j*, prohibits the use "in connection with the purchase or sale of any security . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . .[.]" Pursuant to this section, the Securities Exchange Commission promulgated *Rule 10b-5*, that provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> * * *
>
> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading. . . .

*17 C.F.R. § 240.10b-5.*

The Supreme Court described the purpose of the 1934 Act as follows:

The [*106] 1934 Act was designed to protect investors against manipulation of stock prices. See S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the fundamental purpose' of the Act as implementing a philosophy of full disclosure."'

*Basic Inc. v. Levinson, 485 U.S. 224, 230, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* (quoting *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477-478, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977)* (quoting *SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963)))*.

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") that requires specificity in pleadings in private securities litigation before commencement of discovery:

(b) Requirements for securities fraud action. (1) Misleading statements and omissions. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*] in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; [*107] or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state

with particularity all facts on which that belief is formed.

(2) Required state of mind. In any private action arising under this title. . . [*15 U.S.C. §§ 78a et seq.*], the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind.

(3) Motion to dismiss, stay of discovery. (A) Dismissal for failure to meet pleading requirements. In any private action arising under this tile [*15 U.S.C. §§ 78a et seq.*], the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

* * *

(B) Stay of discovery. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*], all [*108] discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party the particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*15 U.S.C. §78u-4(b)(1)(A)*, *(b)*, *2* and *3(b)* (emphasis added).

The purpose of the PSLRA was to "protect investors, issuers and all who are associated with our capital markets from abusive securities litigation" as well as "to implement [] need[ed] procedural protections to discourage frivolous litigation." H.R. Conf. Rep. 104-369, 104th Cong. 1st Sess. 31, 31 (1995). Although Congress added the necessity of "strong inference," the Sixth Circuit later clarified that the PSLRA did not alter the recklessness standard for scienter in federal securities actions. *In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999)*. As to the elements of a Section 10(b) claim, the Sixth Circuit

recently restated the elements as follows: "To state a securities fraud claim under *Section 10(b)*, a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon **[*109]** which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" *Frank v. Dana Corp., 547 F.3d 564, 569 (6th Cir. 2008)* (quoting *In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999))*.

## 2. Standard of Review

For a Rule 12(b)(6) motion to dismiss, the Court must deny the motion if the complaint's factual allegations "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. "[T]he allegations of the complaint should be construed favorably to the pleader," *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* abrogated on other grounds *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*, and the Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. Dekalb County, Ga., 433 U.S. 25, 27 n.2, 97 S. Ct. 2490, 53 L. Ed. 2d 557 (1977)*. Yet, a legally sufficient complaint, "requires more than bare essentials of legal conclusions," *Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)*, and the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)*. Moreover, where, as here, fraud is alleged, **[*110]** *Fed. R. Civ. P. 9(b)* requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

In a securities action, the heightened pleading standards are to be evaluated as set forth by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*:

Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.

We establish the following prescriptions: **First**, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. **Second**, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is **[*111]** whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. **Third**, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

* * *

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? **To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e. of the "smoking-gun" genre, or even the "most plausible of competing**

inferences[.]" . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem [*112] the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

* * *

[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint. . . . [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

* * *

We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.

*551 U.S. at 321-29* (citations omitted) (emphasis in original and added in part).

The Sixth Circuit recently restated the Supreme Court's view on a Rule 12(b) motion in a securities action as follows:

Although the PSLRA left the [*113] term undefined, the Supreme Court has concluded that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter. *Tellabs, 127 S.Ct. at 2509*. In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." *Helwig v. Vencor, Inc., 251 F.3d 540, 547 (6th Cir. 2001)*.

In Tellabs, the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under *Section 10(b)*. First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, 127 S.Ct. at 2509*. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. (citation omitted). At the second stage, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether [*114] any individual allegation, scrutinized in isolation, meets that standard." Id. (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter rationally could be drawn." *Id. at 2510*. Rather, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." Id.

Finally, in determining whether the pleaded facts give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id. at 2509*. Because the strength of an inference "cannot be decided in a vacuum," the district court must conduct a "comparative inquiry" and assess the possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id. at 2509-10*.

In defining how this framework is to be

applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id. at 2510* (emphasis **[*115** added). Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward. See *id. at 2510 n. 5*; *ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008)* ("In other words, where there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff.").

*Dana Corp., 547 F.3d at 570-71.*

In addition to *Fed. R. Civ. P. 8* on the general rules of pleading, *Fed. R. Civ. P. 9(b)* applies here, given the nature of Plaintiffs' claims. In *Blount Financial Services v. Walter E. Heller & Co., 819 F.2d 151, 153 (6th Cir. 1987)*, the Sixth Circuit explained that "*Rule 9(b)* requiring 'averments of fraud . . . with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." (citation omitted). *Rule 9(b)* is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *American Town Ctr. v. Hall 83 Assocs., 912 F.2d 104, 109 (6th Cir. 1990).* **[*116]** The Sixth Circuit ruled that the provisions of *Fed. R. Civ. P. 8* and the requirement of *Rule 9(b)* are to be read in conjunction with each other. *Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988).*

Under Ameritrust, the plaintiff can satisfy *Rule 9(b)*'s requirements by pleading the circumstances of the fraud, not the evidence. *848 F.2d at 680 n.9*. Since Ameritrust, however, the Sixth Circuit reiterated the rule of this Circuit that *FRCP 9(b)*

requires that fraud be pleaded with particularity. To satisfy *FRCP 9(b)*, a plaintiff must "at a minimum **'allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied**.'" *American Town Center, 912 F.2d at 109* (quoting *Bender v. Southland Corporation, 749 F.2d 1205, 1216 (6th Cir. 1984))* (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient under *Rule 9(b)*.

> The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt **[*117]** to distinguish among them.

> This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'

*Benoay v. Decker, 517 F. Supp. 490, 493 (E.D. Mich. 1981)*, aff'd *735 F.2d 1363 (6th Cir. 1984)*[3] (quoting *McFarland v. Memorex Corp., 493 F. Supp. 631, 639 (N.D. Cal. 1980)* (quoting *Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518 (S.D.N.Y. 1977))* (other citations omitted).

In *City of Monroe Employees Ret. Sys. v. Bridgestone, 399 F.3d 651, 689-90 n. 32 (6th Cir. 2005)*, the Sixth Circuit noted a split in precedents, including a decision of a district court in this Circuit, on the "group pleading" exception to *Rule*

---

[3] The Supreme Court cited Benoay approvingly, albeit on other grounds. *Central Bank of Denver, N.A. v First Interstate Bank of Denver, N.A., 511 U.S. 164, 170, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994).*

9(b). This exception applies [*118] "in cases of corporate fraud when the false and misleading is conveyed in a prospectus, annual reports, press releases or other group published information [where] it is reasonable to presume that these are the collective actions of officers." Id. at 689-90 ns. 32 and 33 (citing inter alia, In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000). This principle could apply here as Plaintiffs cite PSI's 10-K reports and its press releases that commented on the financial performance of PSI. Bridgestone, however, did not adopt this exception and expressly declined to do so. 399 F.3d at 690. In any event, the Sixth Circuit followed Benoay on this specific pleading rule in United States ex rel. Bledsoe v. Community Health Systems, Inc., 342 F.3d 634, 643 (6th Cir. 2003). Despite the group pleading exception's relevance, this Court is bound by existing Sixth Circuit precedents in Bledsoe and Benoay that a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations.

In addition, in evaluating Plaintiffs' amended complaint under Fed. R. Civ. P. 10(c), any matters attached to the pleadings are considered part [*119] of the pleadings, such as Defendants' submissions. (Docket Entry Nos. 111-1 through 111-7). In Weiner v. Klais and Co., Inc., 108 F.3d 86, 88-89 (6th Cir. 1997), the Court reiterated the general rule that: "Matters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." (citations omitted). Yet, the Circuit Court recognized an exception in securities cases, but only for papers filed by a defendant and referred to in a plaintiff's complaint.[4]

The [district] court held . . .it would consider 'only those exhibits submitted by the defendant

which can properly be considered incorporated by reference into the complaint, and, thus, a part of the pleadings.'

**Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.** Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has held that **"[d]ocuments that a defendant attaches to a motion to dismiss are [*120] considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." We believe that this approach is appropriate.**

Id. at 89 (emphasis added and citations omitted) (quoting Venture Assocs. Corp v. Zenith Data Sys. Corp, 987 F.2d 429, 431 (6th Cir. 1993). See also Nieman v. NLO, Inc., 108 F.3d 1546, 1555 (6th Cir. 1997).

Thus, of the factual materials submitted by the Defendants, the Court will consider only those documents referred to in Plaintiffs' amended complaint. (Docket Entry Nos. 111-1 through 111-7, 123-1 and 123-2).

As pertinent here, a complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions, or public documents for its allegations of specific facts on [*121] a company's internal operations. Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000). Plaintiffs note that the naming of such sources is not required. Id. Hearsay is a sufficient basis on which to allege such facts in a complaint. In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 144 F.R.D. 613, 617 (E.D.N.Y. 1992). Newspaper accounts are also sufficient bases on which to plead, if not prove, facts giving rise to a claim for securities fraud. In re Am. Serv.

---

[4] This principle does not extend to extrinsic evidence Katt v. Titan Acquisitions, Ltd., 133 F. Supp. 2d 632, 637-38 (M.D. Tenn. 2000). The Court cannot presume the truth of the extrinsic information nor use such information in evaluating the pleadings. Bridgestone, 399 F.3d at 665; see also Logan v. Denny's, Inc., 259 F.3d 558, 581 n.5 (6th Cir. 2001) (court may not take judicial notice of disputed facts).

*Group, Inc., No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, 2009 WL 1348163, at \*62 (M.D. Tenn. Mar. 31, 2009)*. Accord *In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000)*; *In re Axis Capital Holdings, Ltd. Sec.Litig., 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006)*; *In re DaimlerChrysler AG Sec. Litig., 197 F. Supp. 2d 42, 80 (D. Del. 2002)*; *In re Air Disaster at Lockerbie, 144 F.R.D. 613, 617 (E.D.N.Y. 1992)*.

### 3. Analysis of Plaintiffs' Claims

#### a. The Materiality Element

Plaintiffs assert multiple theories of liability for their Section 10(b) and Rule 10(b)(5) claims: (1) Defendants' misrepresentations or misleading statements on PSI's costs, statement of reserves and profitability; (2) Defendants' scheme to omit material facts about [*122] PSI's actual practices in systematically understaffing its psychiatric hospitals to inflate artificially the value of PSI's stock; (3) Defendants' financial motive and opportunities to commit these securities violations; and (4) Defendants' fraud on the market by their concealment of PSI's actual practices.[5] Defendants' motion also challenges the insufficiency of Plaintiffs' allegations of scienter for the various aspects of PSI's statements and omissions regarding its financial and business practices as well as the Individual Defendants' related misrepresentations and omissions. To evaluate all of these contentions requires a review of Plaintiffs' specific factual allegations on each element of their securities claims under their theories of liability and the alleged role of each individual defendant in PSI's statements and conduct.

Yet, an element common to all of Plaintiffs' claims is the materiality of Defendants' alleged statements and omissions. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable [*123] investor as

having significantly altered the 'total mix' of information made available.'" *Basic Inc., 485 U.S. at 231-32*. The Court deems it noteworthy that the Supreme Court referred to information "such as earnings forecasts or projections" as "contingent or speculative information." *Id. at 232 n.9*. The Supreme Court, however, did not decide that issue. Id.

In Bridgestone, the Sixth Circuit noted that at the motion to dismiss stage, omissions should be considered material unless the omitted information was so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *399 F.3d at 681* (quotation omitted); see also *Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000)* (quoting *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985))*; *Arber v. Essex Wire Corp., 490 F.2d 414, 418 (6th Cir. 1974)* (The test for materiality is "whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question."). Unless written misrepresentations are material, such misrepresentations are not actionable. *Radol v. Thomas, 772 F.2d 244, 252 (6th Cir. 1985)*. [*124] The materiality requirement does not require that the defendant communicated the misrepresentation directly to the plaintiff. *In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998)*.

To be sure, allegations of internal corporate mismanagement "without any deception, misrepresentation, or nondisclosure" are not cognizable under the federal securities laws. *Santa Fe, 430 U.S. at 476, 479*. Yet, included as their misrepresentations and omissions are "manipulative" corporate practices that are actionable where those practices "artificially affect[] market activity ... No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Id. at 476, 477*.

---

[5] Defendants' motion to dismiss does not challenge this theory of liability.

The securities laws reach misleading conduct as well as misleading statements, so long as there is some mechanism by which that conduct misled investors. *Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 158-59, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008)*. See also *In re Am. Serv. Group, Inc., No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, 2009 WL 1348163 (M.D. Tenn. March 31, 2009)* (company's business practices of cutting medical services to inmates and defendants' failure to disclose those practices stated an actionable [*125] Rule 10b(5) claim); *In re UNUMProvident Corp. Sec. Litig., 396 F. Supp. 2d 858, 885-86 (E.D. Tenn. 2005)* ("Here, Glickenhaus has alleged Defendants conceived, instituted, and oversaw a claims handling strategy which was, at best, unethical and then both failed to credit this conduct as the cause of the company's success and knowingly failed to reflect the potential liabilities in the company's financial disclosures.... [E]ven assuming Defendants' alleged claims practices themselves constitute mere mismanagement, Glickenhaus has adequately alleged Defendants knowingly failed to account for the potential repercussions of those practices in its statements regarding the company's finances.").

On this element, in PSI's SEC reports and statements to investors and analysts, the Defendants repeatedly made statements that the psychiatric care provided at PSI facilities is objectively better and of higher quality than care provided by PSI's competitors. The Defendants' emphasis on these aspects of PSI's business reflects the importance of these factors to potential and actual investors. Yet, governmental and media reports reflect PSI's failures to provide such level of services to its patients [*126] at numerous PSI facilities across the country and those reports adversely affected the value of PSI's stock. Given Plaintiffs' specific allegations concerning the actual state of patient care in PSI facilities in several states and the alleged inability of PSI to monitor these failing standards of care through its core measurements, the Court concludes that Plaintiffs' cited misrepresentations or omissions about PSI's actual

services and business practices and their impact on PSI's financial condition, satisfy the materiality requirement under *Rule 10(b)* precedents.

For the remaining analyses, the Court addresses separately Plaintiffs' allegations of the Defendants' material misrepresentations and omissions about PSI's practices and acquisition strategy.

**b. The Safe Harbor Analysis**

The next issue is whether the Defendants' cited statements involve hard or soft fact. In their motion to dismiss, Defendants argue that the cited statements in Plaintiffs' amended complaint are soft facts protected by the Safe Harbor Provisions of the PSLRA. (Docket Entry No. 111, Defendants' Memorandum at pp. 2-3, citing ¶¶ 86, 96, 101, 102, and 111 of the Plaintiffs' Amended Complaint).

In their response to [*127] Defendants' motion to dismiss, Plaintiffs identify the Defendants' allegedly false statements in their amended complaint in the following paragraphs as presenting actionable hard facts: ¶¶ 3-7, 28-31, 33-34, 35, 53-54, 70, 85-95, 106-110, 119, 124-128, 130-133, 138-141, 146, and 152-153. Plaintiffs also cite the Defendants' false or misleading statements as reflecting their claims in their amended complaint:

> (1) PSI's Undisclosed Understaffing and Patient Care Problems (¶¶ 33-34, 45, 58, 61, 65, 70, 74-75, 106-111, 151, 154);
>
> (2) Defendants' Statements about PSI's Compliance and Omissions of Material Facts (¶¶ 13, 41, 48, 52, 56-57, 60-66, 132, 147);
>
> (3) Defendants' Misrepresentations and Omissions about Conditions at Riveredge (¶¶ 7, 53-55, 119, 124-128, 130-133, 138-141, 146, 152-153);
>
> (4) Defendants' Deliberate Accounting Manipulations and Omissions (¶¶ 4, 80, 82, 86, 101-104;

(Docket Entry No. 114, Plaintiffs' Memorandum at

pp. 9-21).

In reply, Defendants contend that many of Plaintiffs' citations of their challenged statements contain statements that are mixed with forward looking statements that are protected as a matter of law.

As to whether the cited statements underlying Plaintiffs' [*128] misrepresentation claims involve "soft" or "hard" information, under the PSLRA, safe harbor protection is available for a firm's statements that are "defendants' projections, statement of plans and objectives, and estimates of future economic performance." *15 U.S.C. § 78u-5(c)(1)*. The safe harbor statute provides that "in any private action . . . that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, [the defendant] **shall not be liable** with respect to any forward-looking statement . . . [that] is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *15 U.S.C. § 78u-5(c)(1)(A)(i)* (emphasis added).

According to the PSLRA's legislative history, the safe harbor provision was included because a "company's own assessment of its future potential [is] among the most valuable information shareholders and potential investors could have about a firm." See S. Rep. No. 104-98, at 15-16 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694-95. The safe harbor was intended to quell corporate management's [*129] "[f]ear that inaccurate projections [would] trigger the filing of a securities fraud lawsuit." Id., 1995 U.S.C.C.A.N. 679, at 695. Yet, Congress also provided that the safe harbor "shall not apply to a forward looking statement — that is made with respect to the business or operations of the issuer, if the issuer . . . makes the forward-looking statement in connection with a rollup transaction." *15 U.S.C. §78u-5(b)(1)(D)*. Here, Plaintiffs allege that PSI had a "rollup strategy" in PSI's acquisitions of new facilities to

increase profits and thereby offset the costs of its facilities with reduced numbers of patients. (Docket Entry No. 109, Amended Complaint at ¶ 31). In the Court's view, this "rollup strategy" is interrelated with Plaintiffs' allegations about PSI's other practices.

Moreover, under Sixth Circuit precedents, "for forward-looking statements that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in [the Reform Act] makes the state of mind irrelevant." *Miller v. Champion Enters., Inc., 346 F.3d 660, 672 (6th Cir. 2003)*. "In other words, if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary [*130] language, a defendant's statement is protected regardless of the actual state of mind." Id. Yet, this statutory protection is overcome "if the statement was material; if the defendant had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Helwig, 251 F.3d at 547-48 (6th Cir. 2001)* (the parties agree Helwig was abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007))*.

"As a matter of policy and precedent," false cautionary language cannot immunize defendants' misconduct. *Helwig, 251 F.3d at 560-61*. Accordingly, "[c]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Id. at 559*. Moreover, statements are not forward looking if the speaker has actual knowledge of their falsity and the statements lack meaningful cautionary language. *Miller, 346 F.3d at 672*. "[V]ague and insipid cautionary language is insufficient to afford the statements protection under PSLRA's safe harbor provision." *In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004)*. [*131] An example is *In re Humana, Inc. Sec. Litig., 3:08CV-00162-JHM, No. 2009 U.S. Dist. LEXIS 53535 (W.D. Ky. June 15, 2009)*, where the company's

statement was: "Our rigorous benefit expense trend analysis and forecasting includes regular interaction of many disciplines within our organization, this increases the reliability of our commercial pricing and profit planning" and held not to be forward-looking. *2009 U.S. Dist. LEXIS 53535, [WL] at *31*.

On the issue of whether Plaintiffs' allegations present hard or soft information, under Sixth Circuit precedents, "[h]ard information is typically historical information or other information that is objectively verifiable. Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable." *In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997)*; accord *Zaluski v. United American Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008)*. "The failure to disclose soft information is actionable only if it is virtually as certain as hard information." *Bridgestone, 399 F.3d at 669* (quotation omitted). As examples, the Sixth Circuit defines "generalized statements of optimism that are not capable of objective [*132] verification" as "puffing" statements. *In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004)*. In Ford the Sixth Circuit held that Ford's statements related to "quality" of its vehicles were not actionable as mere puffing. Id. As another example, in Bridgestone, the defendant's statement that its tires were "the best tires in the world" was held not to be actionable as a matter of law:

> These statements, both on their own terms and in context, lacked a standard against which a reasonable investor could expect them to be pegged; such statements describing a product in terms of "quality" or "best" or benefitting from "aggressive marketing" are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.

*399 F.3d at 670-71*.

Yet, "once [a company] chooses to speak on a subject, to do so fully and fairly: 'Our securities laws therefore, require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'" *Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 2010 U.S. Dist. LEXIS 128347, 2010 WL 5056184, at *13 (E.D. Mich. Dec. 6, 2010)* (quoting *Helwig, 251 F.3d at 561*).

To [*133] decide whether Plaintiffs' listed factual allegations from their amended complaint (Docket Entry No. 109) involve actionable hard facts, the Court addresses them in seriatim based upon Plaintiffs' categorization of their claims.

### i. PSI's Undisclosed Understaffing and Patient Care Problems

In paragraph 3, Plaintiffs summarize Defendants' business practices of understaffing its facilities causing harm to its patients; PSI staffs' failures to report timely patient safety issues; and Defendants' use of revenue from acquisitions to generate revenue and obscure the actual costs of PSI facilities. For the latter practice, paragraphs 28, 29 and 31 describe PSI's acquisition history and allege a market analysts' report stating these acquisitions represent an overpayment and "disregard[] the balance sheet." Paragraph 35 alleges that PSI's acquisitions were driven by its need for revenue from additional beds, but declining occupancy rates at PSI's older facilities rendered PSI's projected profits unachievable.

Paragraphs 33 and 34, has factual allegations concerning Defendants' statements of their "rigorous due diligence" in monitoring PSI's facilities and PSI's highly trained and coordinated staff. [*134] These allegations are hard facts because these allegations are capable of empirical verification by PSI's internal documents that reflect Defendants' monitoring and training as well as the qualifications of staff. Paragraph 45 refers to Defendants' core measures of PSI's performance that also are hard facts, as reflected in paragraph 74 alleging that PSI failed to meet accreditation standards in six of seven areas. Paragraph 58 cites a

published report comparing PSI's 10 oldest hospitals with PSI's competitors and finding "twice as many patient-care deficiencies" at PSI facilities, a hard fact. Similarly, the Court deems paragraph 61's citation to a published report that PSI has fewer private nurses than any other private psychiatric hospital in California to be a hard fact. Paragraph 65 cites Texas authorities imposing 52 violations against a PSI facility on a single visit and a published report of a PSI Texas staff member stating their "numerous request of administration to increase staffing levels". The Court concludes that all of these allegations involve hard facts.

The Court concludes that portions of paragraphs 106-111 also present hard facts, namely that PSI "provide[s] higher **[*135]** care than our competitors," "the most intensive level of care," "highly coordinated treatment," mechanisms to identify and counsel problems, "optimizing staff ratios," and "regular site visits." Those allegations are subject to empirical testing, as demonstrated by PSI's internal documents reflecting such efforts and as reflected by the state enforcement activities and PSI's core measures. In paragraphs 119, 124 and 125, Defendants' statements of the incident at Riveredge, as minor and historical, could be objectively measured. Similarly, paragraph 151 describes Defendant Turner's statements about the level of deficiencies at PSI hospitals, PSI's higher management's knowledge of PSI's facilities problems and PSI's core measures, all of which could be objectively verified by PSI's internal documents as well as state enforcement findings and PSI's core measures. Similarly, paragraph 154 references Defendant Jacobs's statements about PSI's joint commission scores involve hard facts, as reflected by Plaintiffs' publication of PSI's actual scores. The Court concludes that these allegations involve hard facts.

## ii. Defendants' Statements about Published Reports of PSI's Compliance and Omissions **[*136]** of Material Facts

Paragraphs 60 through 66 distill a media report on PSI's California facilities, citing "significant staff cuts" resulting in "insufficient time to devote to monitoring patients" and proportionally fewer registered nurses at PSI facilities compared to other private facilities. The report also cites PSI having 25% more profit than other such facilities; a PSI admissions officer's statements about PSI's "pattern of behavior driven totally by the almighty dollar" that is "not a client-centered approach; It's a money centered approach." The Texas enforcement decisions cited details of rapes, attacks and suicide attempts with the Texas fine of Plaintiffs in 2007 as "nearly as much as all other hospitals combined." Id. at ¶ 65. The Court concludes that these allegations present hard facts.

Paragraphs 125 through 128 describe Defendant Jacobs's statements about PSI's reporting capability and regulation compliance in response to the reports on Riveredge and PSI's California facilities. Paragraph 132 cites another 2008 incident at a PSI California facility with the most serious deficiencies that are cited as eight times the statewide average among private psychiatric hospitals **[*137]** in California. In Illinois, a 2008 media report described a state agency finding of "the continuing failure to adequately monitor and ensure patient safety" at a PSI facility in Illinois. Finally, paragraph 147 lists state agency findings in 2009 and published in 2009 about PSI facilities in Nevada, Pennsylvania and Illinois providing "deficient care," "inadequate treatment plans," "excessive rates of chemical restraints due to severe understaffing" and "continued deficient patient care, including the failure to properly develop treatment plans and documentation procedure." Given state agencies' ability to asses these core issues, the Court concludes that these factual allegations also present hard facts.

## iii. Defendants' Misrepresentations and Omissions about Conditions at Riveredge

Paragraph 7 describes the 2008 Illinois investigation of PSI's Riveredge facility that PSI acquired in 2002 and the State of Illinois's finding

of PSI's lack of monitoring of at least 10 mentally disabled children. The Illinois investigation also revealed PSI workers interfering in law enforcement investigations, and these actions resulted in a suspension of that facility's admissions. The Court concludes [*138] that these allegations present hard facts.

In paragraphs 53 through 55, Defendant Jacobs's and other PSI officials' statements discounting the Riveredge problems are quoted. Defendant Jacobs is quoted as telling investors "the company quickly corrected the deficiencies" in 2006 and 2007 and "unfortunate incidents" involving very difficult patients. Id. at ¶¶ 53, 54. In paragraph 55, Plaintiffs cite published reports in February 2009 of continuing problems at Riveredge despite new management in June 2008 as well as a 2007 patient death due to an overdose and a sexual assault against a 16 year old male patient. Paragraphs 138 through 142 describe Defendant Jacobs's statements in October 2008 about the Riveredge investigation as a "couple of unfortunate incidents" and that PSI's business model was "successfully proven" and "increased enhancing our ability to execute," id. at ¶ 138, 140, as well as Jacobs's statement that "whenever we found an issue that we need to address, we're addressing it." Id. at ¶ 142. In paragraphs 152-153, Defendant Turner makes similar misrepresentation in December 2008 of "no change since our last update on the earnings call" at Riveredge. The Court concludes [*139] that these allegations present hard facts.

In paragraphs 130 through 133, the above statements by PSI and Jacobs are alleged to be material misrepresentations of PSI's actual business practices. In paragraph 146, Plaintiffs describe the lack of any factual basis Jacobs's statements given that a federal agency informed PSI at a September 10, 2008 PSI board meeting that Riveredge "was close to being placed in immediate jeopardy" and represented a "significant amount of concern for [PSI's] reputation within the community" for patient care. In paragraphs 101 through 104, Plaintiffs assert that Defendants' February 2008

statements and press release recklessly ignored the actual quality of its operations and the level of PSI's actual patient care that represented the core of PSI's business and impacted PSI's attractiveness as an investment. The Court concludes that these allegations involve hard facts.

### iv. Defendants' Deliberate Accounting Manipulations and Omissions

For this category, in paragraph 4, Plaintiffs allege that at the outset of the Class Period, PSI's 2007 fourth quarter results were "20% below historical levels," but Defendants continued to assure investors of PSI's ability to [*140] maintain 7% to 9% annual returns. To do so, Plaintiffs allege in paragraph 86 that PSI manipulated its finances by lowering its reserves for medical liability claims by $3 million, the biggest component of a $5 million reduction in other operating expenses. Paragraph 82 sets forth PSI's 2008 press release and projected positive growth in earnings of 27% for the fourth quarter of 2008 and 30% for the year. Yet, Plaintiffs allege that in 2008, PSI's problems with patient care would actually reduce earnings and increase PSI's costs as reflected in the fourth quarter of 2008. Paragraph 56 states PSI tried to add $5 million to medical reserves and other expenses. Paragraph 4 also describes Defendants' statement of the acquisition of 600 beds by the end of 2008 to increase PSI's revenues that Plaintiffs allege that PSI lacked the financial capability to acquire. The Court concludes that these allegations present hard facts.

In paragraph 88, Plaintiffs allege that PSI's 2007 Report on Form 10-K falsely stated that the reserve account had been decreased due to "favorable developments in our professional and general liability experience." Id. Plaintiffs allege that given the state agency investigations [*141] about which Defendants had knowledge at the time PSI reduced its reserves, PSI was at greater risk of malpractice claims due to the widespread understaffing of its facilities. Id. at ¶¶ 85-86, 90, 93-94. PSI's malpractice claims expenses steadily increased

every quarter during the Class Period. Id. at ¶ 91. Defendant Jacobs has admitted that PSI should have increased the reserve account earlier in the Class Period. The Court concludes that these allegations involve hard facts.

As to Plaintiffs' allegations of PSI's statements about its "highest quality care," in paragraph 103, PSI asserts to investors that its 2007 performance was caused by "bad luck." In paragraphs 130-133, 138-141, 146 and 152-53, Plaintiffs alleged that Defendants' responses to the state agency's findings in Illinois and California as minor, rendered the statements on its second quarter results in 2008 about PSI's profitability misleading. These paragraphs present hard facts subject to objective verification given the scope and extent of State findings on PSI facilities, the core measures of PSI's performance for its accreditation, and the remedial costs for PSI's non-compliance.

The Court concludes, however, that **[*142]** Plaintiffs' allegations about the other Defendants' statements of their expectations and belief, standing alone, are not hard facts. For example, in paragraph 70, Defendant Jacobs's statements refer to his "guess" about PSI's financial conditions in one quarter and his "expected" measure in another quarter. Paragraphs with such language involve soft facts, but these allegations, when coupled with hard facts subject to empirical verification may become actionable. Yet, Defendants note that $3 million for the reserve expense is a 0.19% of PSI's total expenses for 2008 and this amount is immaterial as a matter of law. *Taubenfeld v. Hotels.com, 385 F. Supp. 2d 587, 593-94 (N.D. Tex. 2004)* (company not required to disclose $4 million dispute where potential liability was less than 1.5% of revenues and, therefore, immaterial). As a stand alone fact, the Court agrees.

## c. Scienter Analysis of Plaintiffs' Claims

The next issue is whether Plaintiffs' factual allegations in their amended complaint give rise to a strong inference of scienter. If Plaintiffs' amended complaint fails to satisfy the scienter requirement, the Court must dismiss the plaintiffs complaint. *15 U.S.C. § 78u-4(b)(3)*. Under **[*143]** Tellabs, after weighing the plausibilities, the Court must assess whether "[a] plaintiff alleging fraud in a § 10(b) action...[has pled] facts rendering an inference of scienter at least as likely as any plausible opposing inference." *551 U.S. at 311*. "[T]he Supreme Court has defined 'scienter' as a 'mental state embracing intent to deceive, manipulate or defraud.'" *In re Comshare, 183 F.3d at 548*. "Under current Sixth Circuit law, 'recklessness [also] satisfies the *§ 10(b)/Rule10b-5* scienter requirement.'" Id. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id. at 550*. To meet the scienter requirement, Plaintiffs' allegations must describe "multiple, obvious red flags." *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 687, 91 Fed. Appx. 418 (6th Cir. 2004)*; *In re Comshare, 183 F.3d at 553*. In considering this issue, the Court must consider the totality of circumstances pled in the complaint and "sift Plaintiffs' allegations individually and then aggregate the nuggets of inference they generate...." *PR Diamonds, 364 F.3d at 684*.

In **[*144]** evaluating the scienter issue, in *Ley v. Visteon Corp., 543 F.3d 801, 810 (6th Cir. 2008)*, the Sixth Circuit also noted the following factors to be considered explaining that:

[These] factors . . . . while not exhaustive, are probative of scienter in securities fraud cases:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

. . . . We find this list, while not [*145] exhaustive, at least helpful in guiding securities fraud pleading.

*543 F.3d at 810* (citation omitted).

As factual allegations for a strong inference of scienter here, Plaintiffs' claims and factual allegations, in summary, are: (a) divergence between internal reports and external statements relating to patient incidents and staffing ratios at PSI's inpatient facilities; (b) based upon the state agencies' detailed reports, Defendants' deliberately concealed illegal activity at its facilities as part of a scheme to defraud investors; (c) Defendants' misleading financial statements and (d) the Individual Defendants' financial motivations, insider trading at suspicious times. Plaintiffs also contend that collectively, these factual allegations give rise to a strong inference of scienter.

### i. Divergence Between Defendants' Public Reports and Government and Internal Reports

In their SEC filings, PSI described PSI facilities as providing higher quality of services than other firms in this market. PSI cited its highly

coordinated treatment with well trained staff who monitor even minor incidents for compliance with industry standards. Yet, during the Class Period, PSI's operations were significantly [*146] below industry standards of care on six of the seven "core measurements" established for psychiatric hospitals by the Joint Commission — standards which PSI itself helped to develop, actively tracked and told investors would provide an objective measurement of the quality of service it provided. (Docket Entry No. 109, Amended Complaint at ¶¶ 45, 74-75, 151, 154). Beginning in 2006,[6] inadequate monitoring has been blamed for numerous incidents where patients were raped, beaten or attempted suicide at PSI facilities around the country and was caused by inadequate staffing to provide 24-hour nursing supervision. Id. at ¶¶13, 41, 48, 52, 56-57, 60-61, 64-66, 147. Illinois cited PSI 22 times in 2007 alone for deficiencies that threatened the safety or legal rights of patients, as compared with 31 citations for the other 12 hospitals in the state subject to the same licensing requirements. Id. at ¶ 51. "Surveys conducted by the California Department of Health underscored repeated issues about understaffing, patient safety, medication administration, poor supervision and staff training, and an array of serious quality of care violations." Id. at ¶ 56.

### ii. Defendants' Concealment of Illegal Activity to Defraud Investors

In their multiple statements in response to media and governmental reports about PSI institutions in different states, the Defendants would characterize these reports as involving minor incidents and historical incidents that were not a reflection of how PSI actually conducts its business. Yet, throughout these reports, state officials characterize their findings on PSI's facilities as PSI having a lack of systems to identify sexual abusers and a lack of sufficient monitoring of abusers as in 40%

---

[6] Pre-class period facts can "confirm what [*147] a defendant should have known during the class period". *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001)*.

of the cases in North Carolina. The California agency found repeated issues of understaffing, inadequate patient care, poor supervision and training of PSI staff, and an "array of serious quality of care violations." See supra at 10. The Illinois findings were "a pattern of quality care and patient safety issues" at that PSI facility and the imposition of a bar to future admissions to the facility. In an April 2009 report, the Illinois authorities found:

> There is compelling data about the tendency of this [*148] organization's leadership to avoid taking direct responsibility for longstanding and reoccurring clinical/administrative failures — in effect, placing the onus for the chronic quality of care problems downward: first, onto the hospital staff "who do not perform their duties"; [and] second, onto mentally ill patients who "refuse to comply with the rules."

(Docket Entry No. 109, Amended Complaint at ¶ 11) (emphasis added).

These governmental findings are wholly inconsistent with PSI officials' repeated characterizations of these government investigations and media reports as minor and historical incidents, unrelated to the quality of PSI's actual business practices. Less than a week after Jacobs claimed that the incidents at Riveredge had been promptly reported, investigators uncovered yet another example of an incident at Riveredge that had gone unreported — the 2007 death of a pregnant patient who had collapsed and died at the hospital after being overmedicated with clozapine, a powerful antipsychotic drug. Id. at ¶¶ 55, 133. Moreover, despite the Defendants' assurances, these problems persisted at PSI facilities from 2006 through 2009.

According to Jacobs, PSI and its officers had prior [*149] knowledge of these investigations and published articles before their actual dissemination to the public and investors. Thus, Defendants' characterization in their cited statements of the reported events as minor would be inconsistent with PSI's internal information from governmental agencies about the extent and scope of the problems at PSI facility. This is particularly true of the Defendants' statements after September 10, 2008 about the Riveredge facility. The board minutes of the September 10th meeting of PSI's Medical Executive Committee reflect that PSI and its officers had been told that "the hospital was close to being placed in immediate jeopardy" as a result of a follow-up federal agency survey and that there was "a significant amount of concern for the hospital's reputation within the community and the quality of care provided to patients." Id. at ¶ 146. Yet, on an October 31, 2008 conference call, for example, Jacobs told investors that he "fe[lt] very good about the quality of care at Riveredge, and it's been reevaluated by numerous people since the admissions hold" was imposed. Id. at ¶ 140. Later, Illinois agencies concluded after a follow-up survey in September and [*150] October of 2008 that: "data indicates that Riveredge officials are still failing — even in the face of a critical IDPH finding as well as other forms of outside scrutiny — to ensure the hospital operates at minimally adequate standards of care." Id. at ¶¶ 133. These facts give rise to a strong inference of scienter in the Defendants' statements minimizing state findings.

Plaintiffs allege that PSI lacked any basis to believe that Illinois' ban on Riveredge would be lifted. In paragraph 119, Plaintiffs cite Defendants' statements during a July 31, 2008 conference call with investors stating that the report on Riveredge was based upon "historical incidents" unrelated to Riveredge's current operations as well as denying the state bar of new admissions did not have a material impact on PSI. Paragraphs 124 through 128 cite Defendant Jacobs's statements two weeks after the charges to the same effect. Defendants' characterization of Riveredge's incidents as historical are allegedly false, given the Illinois findings and the findings of other state regulatory agencies about PSI facilities from 2006 to 2009. On October 31, 2008, Jacobs told investors that he was

"80%" certain that the hold would [*151] be lifted before the end of the year. By then, however, additional follow up surveys in September and October 2008 had found that the conditions at Riveredge that had resulted in the administrative hold remained uncorrected, PSI had been warned the facility was in jeopardy of losing its license, and DCFS had widened its probe to encompass PSI's other facilities. Id. at ¶¶ 133, 141, 146. As a result, Jacobs had no reasonable basis to make his statements.

PSI disclosed during its February 26, 2009 investor conference call, "[d]uring 2008, [PSI] had approximately 700 regulatory surveys. Less than 1% of these surveys resulted in significant findings or deficiencies. Approximately 250 resulted in zero deficiencies." (Docket Entry No. 123-2). Yet, these statements, in the context of the nature of the other state agencies' findings, are not dispositive.

Unlike the statements generally proclaiming a commitment to quality at issue in *Ford* and *Bridgestone*, Defendants statements here are objectively-verifiable statements of hard facts about actual services delivered as well as the extent of actual staffing and monitoring. Defendants' statements that PSI's facilities are "in substantial compliance [*152] with current applicable, federal, state, local and independent review body regulations and standards" is significantly undermined by the nature and extent of state agencies' findings about PSI facilities across the country.

### iii. Defendants' Misleading Financial Statements

As to omissions, Plaintiffs cite the financial results, metrics and guidance Defendants provided to investors as failing to reflect the actual costs to operate PSI's facilities. To meet quarterly expectations for PSI's financial performance, Defendants regularly ordered staffing cuts at PSI's hospitals based solely on the facility's EPOB ratio, which was closely monitored by PSI's top executives. Id. at ¶¶ 36-41. As a result of these cuts, staffing at PSI's hospitals was significantly lower

than at hospitals run by its competitors, and its incidence of patient injuries, quality of care problems and regulatory violations was correspondingly higher. Id. at ¶¶ 58-59, 61. Former PSI workers have described repeated staffing cuts that left the facilities in which they worked with insufficient staff to monitor or protect patients. Id. at ¶¶ 60, 62, 65.

These undisclosed costs are PSI's costs to provide sufficient staffing to [*153] protect patients and provide high quality treatment in a safe therapeutic environment as PSI described to investors. These undisclosed costs include the actual and anticipated expenses, based upon state agencies' findings of negligent treatment and injuries at PSI's understaffed and underfunded facilities. Id. Plaintiffs argue that disclosure of these facts was necessary for investors to understand PSI's past financial results and future expectations of profitability. According to PSI, PSI's historic performance was premised on operating PSI facilities without sufficient staffing or funding to provide high quality care to patients in a safe therapeutic environment necessary to comply with applicable regulatory, licensing and accreditation standards as well as PSI's written statements about its services. By Defendants' omissions of these costs, Plaintiffs allege Defendants misled investors about the nature and strength of PSI's compliance and quality assurance programs as well as the extent of patient safety and care at PSI's facilities. Id. Given the state agencies' findings about PSI facilities, the Court concludes that these undisclosed allegations give rise to a strong inference [*154] of scienter.

To be sure, PSI specifically warned that PSI's estimated reserves could change and warned investors of the prospect of state and federal inquiries. As to estimated reserves, PSI stated:

> The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial

assumptions calculated by an independent third-party actuary. . . .This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations.

(Docket Entry No. 111, PSI's 2007 Form 10-K at p. 15).

Under the Sixth Circuit's holding in Miller, the only inquiry for the Court is whether the statements of earnings guidance are forward-looking statements accompanied by meaningful cautionary language. *346 F.3d at 672*. Defendants' state of mind when issuing the earnings guidance is irrelevant. Id. Statements of earnings guidance or estimates are "classically forward-looking" statements that are protected by the safe harbor when accompanied by meaningful cautionary language. *Id. at 677*.

To be sure, every **[*155]** case where there was an accounting error or auditing mistake by a publicly traded company does not satisfy the PSLRA pleading requirements for scienter. *Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)*. Yet, the "self-interested motivation of defendants in the form of saving their salaries" can support a strong inference of scienter. *Helwig, 251 F.3d at 552*. As this Court stated: "[s]tatements about medical reserves are forward looking statements and are protected by the [Reform Act]." *In re Am. Serv. Group, 2009 U.S. Dist. LEXIS 28237, 2009 WL 1348163, at *37*. Moreover, "the mere fact that a company increased its reserves for doubtful accounts in one period does not, by itself, call into question the accuracy of the earlier period reserves." Id. Yet, in *In re UNUMProvident Corp. Sec. Litig., 396 F. Supp. 2d 858, 887 (E.D. Tenn. 2005)*, a complaint alleging that defendants' misleading statements about claims and reserve practices attributing improved performance to factors other than reserve manipulation was held actionable.

As to the disclosure of governmental inquiries, in

Sofamor the defendant acknowledged its participation in the practices described in the FDA warning letter, as well as the **[*156]** potential significant impact of future FDA action. *123 F.3d at 397, 402*. Here, Defendants denied understaffing PSI's clinics or engaging in other practices which exposed patients to harm and claimed that the regulatory action at Riveredge was immaterial. As the Sixth Circuit has stated:

> If — as defendants contend — the protection for soft information remains intact even after a company speaks on an emerging issue, the speaker could choose which contingencies to expose and which to conceal. On any subject falling short of reasonable certainty, then, a company could offer a patchwork of honesty and omission. This proposition is untenable, however, both as a matter of policy and precedent.

*Helwig, 251 F.3d at 560-61*. In sum, PSI's warnings do not preclude Plaintiffs' claims about PSI misleading financial reports.

## iv. Individual Defendants' Financial Motivations and Insider Trading

On the scienter issue and the probative value of Plaintiffs' factual allegations about PSI, Jacobs, Turner and Polson, Plaintiffs cite Jacobs's and Polson's certifications under Sarbanes-Oxley, that PSI's internal controls systems are "designed . . . to provide reasonable assurance regarding reliability of financial **[*157]** reporting." (Docket Entry No. 109, Amended Complaint at ¶¶ 22-23, 93, 116, 129, 143 and 182).

Jacobs assured investors that he was directly and "personally involved" and responsible for PSI's quality and compliance. Id. at ¶¶ 163, 167, 169. Jacobs told investors that he personally supervised the hiring of new employees at PSI for compliance issues. Id. at ¶¶ 169. According to Jacobs, "it's top of mind for me." Id. Jacobs described PSI as tracking "multiple indicators" of quality and compliance in "real-time" for minor incidents and

"real-time incidents that might be occurring." Id. at ¶¶ 167, 169. Jacobs prominently displayed a 38-inch TV screen in his office that monitored PSI's "Ten Worst" hospitals. Jacobs sent weekly emails to hospital administrators, division presidents and other senior executives listing the ten worst hospitals to pressure these facilities to increase occupancy that would directly impact the adequacy of the staff for the increased patient load. Id. at ¶ 176.

The Sarbanes-Oxley certifications signed by Jacobs and Polson establishes their awareness of PSI's rising malpractice expenses and declining staffing levels and budgets as well as the increasing costs of the [*158] regulatory investigations at Riveredge. These events create the "red flags" that support a strong inference of scienter. *PR Diamonds, 364 F.3d at 688* (unusual pressures to make public statements reflecting positive performance support strong inference of scienter). The Individual Defendants' base salaries were increased for 2008 and 2009 based on PSI's position as "the top performing company in [its] peer group." (Docket Entry No. 109, Amended Complaint at ¶ 185(a)). Plaintiffs allege Defendants' cash bonuses were based on adjusted EBIDTA and EPS results that could not be met without cutting staff below reasonable levels. Id. at ¶¶ 35-42, 57-62, 185(b). According to the amended complaint, PSI established a bonus program with inordinate weight on hospital chief executive officers to increase revenues by adding beds and services despite insufficient facility budgets to staff the additional patients. Id. at ¶¶ 187-88.

As a matter of law, "high-level executives can be presumed to be aware of matters central to their business's operation, *PR Diamonds, 364 F.3d at 688*, but "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the company and alleged access [*159] to information." Id.; see also *In re Nat'l Century Fin. Enters., Inc. Inv. Litig., 580 F. Supp. 2d 630, 643 (S.D. Ohio 2008)* (complaint failed to allege scienter where there were no allegations defendant

knew or should have been aware of the red flags). Complaints "[m]erely stating that the Defendants had access to and receipt of internal financial reports without any proof of the adverse content of those reports is not a basis for a strong inference of scienter." See *Grillo v. Tempur-Pedic Int'l, Inc., 553 F. Supp. 2d 809, 819 (E.D. Ky. 2008)*.

Yet, "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.'" *Cardinal Health, 426 F. Supp. 2d at 724*. This is particularly appropriate for "[f]acts critical to a business's core management." *In re Ancor Commc'ns, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)*. A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter. *In re Envoy Corp. Sec. Litig., 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001)*.

Under [*160] *Bridgestone*, the Court must also consider Jacobs's and Polson's certifications in light of the other circumstances alleged by the Plaintiffs. To avoid undue repetition, based upon the Court's earlier discussion of the material facts and the Defendants' material misrepresentations and omissions about subjects that go to the core of PSI's business, the Court concludes that this strong inference of scienter as to PSI extends to the Individual Defendants.

As to the issue of insider trading, for this aspect of Plaintiffs' scienter allegations, Plaintiffs cite the following sales of PSI stock by Defendant Turner and members of PSI's board of directors in significant amounts and at times near to significant events in governmental actions and media reports about PSI institutions.

- Edward Wissing — one of two PSI Directors specifically tasked with monitoring compliance issues — sold 100% of the shares he owned for $192,000 on January 2, 2009, just days before the Dallas Morning News published its exposé

about conditions at PSI's facilities in Texas. (Docket Entry No. 109, Amended Complaint at ¶¶ 64, 167, 198(e)).

• Turner sold 15% of his holdings for more than $1 million. Id. Before the end of [*161] the Class Period, Turner would sell more than 70,000 additional shares, bringing his total Class Period proceeds to $3.8 million on the liquidation of 55% of his PSI stock. Id. at ¶ 198(b).

• Defendant Turner — made significant sales on July 9, 2008 and September 19, 2008, just eight days before the Chicago Tribune published its exposé about conditions at Riveredge. Id. at ¶¶ 7, 47, 198(b)(d).

• PSI Director Grant sold 100% of his holdings on July 9, 2008 for $80,000. Id.

• Director Mark Clein, liquidated nearly 64% of his holdings during the Class Period, receiving proceeds of $628,210. Id. at ¶ 198(c). Clein sold 57% of those shares (36% of his total holdings) for nearly $400,000 on November 4, 2008, just weeks before Pro Publica and the Los Angeles Times published the results of their investigation into PSI's misleading and injurious business practices. Id. at ¶¶ 47, 57-62, 198(c).

• In May 2008, over a period of just two days and shortly after defendants issued PSI's misleading first quarter 2008 financial results, Polson sold 42% of his holdings at near Class Period high prices and reaped over $1.85 million in proceeds. Id. at ¶ 198(a).

As to the amounts of stock sales, in *In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000)*, [*162] the district court deemed a company's defendant executives' sales of 40%, 27%, 11%, and 37% of their holdings to support a strong inference of scienter. To be sure, stock sales of non-defendants are "not ... probative of the defendants' scienter." *In re Century Bus.*

*Servs. Sec. Litig., No. 99-2200, 2002 U.S. Dist. LEXIS 26964, 2002 WL 32254513, at *7 n.18 (N.D. Ohio Jun. 27, 2002)*, and Defendants correctly note that courts have held that insider trading more than a year before the press release of alleged damaging news did not give rise to a strong inference of scienter, *In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-94 (9th Cir. 2002)*, and that a stock sale eleven months before announcement of charge to earnings was not suspicious, *In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724, 741 (W.D. Ky. 2004)*.

Yet, Polson and Turner are named Defendants and Turner's stock sales of over 55% of his PSI stock occurred shortly before the Chicago Tribune's 2008 publication about PSI's Riveredge facility. Polson's sale of 47% of his stock was just four months before the Tribune's report. These allegations give rise to a serious inference of scienter because of Jacobs's statement that key officers at PSI [*163] had prior knowledge of media reports before their publications. To be sure, prior to this sale, Turner filed his stock purchase plan, but that fact does not preclude the strong inference of scienter, given these other circumstances. See e.g. *Backe v. Novatel Wireless, Inc., 642 F. Supp. 2d 1169, 1184-85* (S.D. Cal. 2009) (despite 10b5-1 trading plans, "defendants unloading stock near in time to when the market would inevitably learn of the alleged [adverse disclosure] does support an inference that defendants timed their sales to benefit from stock prices before the information leaked to the market"). Assuming an ambiguity about the justifications for Turner's stock sales, Defendants' contentions on this issue cannot be resolved on a motion to dismiss. *Helwig, 251 F.3d at 558* (whether an "explanation" offered by defendants for making insider sales during the class period "is accurate is not an issue [the court] can decide on the pleadings").

As to the motive and opportunity aspect of scienter, financial pressures on corporate officers may provide the necessary motive for scienter. *PR Diamonds, 364 F.3d at 688*; *In re Cardinal Health*

*Sec. Litigs., 426 F. Supp. 2d 688, 726-27 (S.D. Ohio 2006)*. [*164] "[S]elf-interested motivation of defendants in the form of saving their salaries" can support scienter. *Bridgestone, 399 F.3d at 687*. "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide motive. *In re Telxon Corp. Sec. Litig., 133 F. Supp. 2d 1010, 1029 (N.D. Ohio 2000)*. In this Circuit, "an executive's desire to protect his position within a company or increase his compensation" does not "comprise a motive for fraud." *PR Diamonds, 364 F.3d at 690*, nor are allegations that Defendants would receive bonuses linked to company performance sufficient. *In re Kindred Healthcare, 299 F. Supp. 2d at 741*.

The Sixth Circuit has rejected allegations similar to those here. See *Sofamor, 123 F.3d 394*. In *Sofamor*, the defendants received a warning letter from the government, and plaintiff alleged that defendants should have disclosed the company was not in compliance with the law. *Id. at 402*. The Sixth Circuit held, however, that the company satisfied its disclosure obligations by disclosing (a) receipt of the government's warning letter and (b) specific risk warnings that the government might obtain an injunction against the company. Id.

Plaintiffs [*165] allege that numerous hospital executives have reported being under constant pressure from corporate headquarters to reduce staffing to meet financial targets. (Docket Entry No. 109, Amended Complaint at ¶¶ 39, 56). The amended complaint alleges that Defendants were motivated to conceal significant patient safety issues to avoid a reduction in capacity — and thus PSI earnings — because their executive compensation was directly tied to PSI's financial performance. Id. at ¶¶ 184-186. Plaintiffs also described detailed bonuses and favorable financial compensation packages for the Individual Defendants. Plaintiffs have set forth detailed findings of patient safety issues at PSI facilities for which understaffing is cited as a recurring cause.

Viewed individually or collectively, the Court concludes that the factual allegations for Plaintiffs' claims are sufficient to give rise to a strong inference of scienter.

## C. Conclusion

For the above stated reasons, the Court concludes that the Plaintiffs have alleged sufficient specific facts that collectively state actionable claims under *Section 10(b)* and *Rule 10b-5*. Accordingly, the Defendants' motion to dismiss should be denied.

An appropriate Order [*166] is filed herewith.

**ENTERED** this the 31st day of March, 2011.

/s/ William J. Haynes, Jr.

William J. Haynes, Jr.

United        States        District        Judge

**Table1** (*Return to related document text*)

      **A. ANALYSIS OF THE AMENDED COMPLAINT**

      1. THE PARTIES

      2. PSI's BUSINESS PRACTICES

      3. STATE ENFORCEMENT ACTIONS AGAINST PSI

      4. MEDIA REPORTS ON PSI's PRACTICES

      5. PSI's RESPONSES TO PUBLISHED REPORTS

      6. DEFENDANTS' STATEMENTS ON PSI's FINANCES

      7. SCIENTER ALLEGATIONS

      a. Defendants' Alleged False or Misleading Statements

      b. Insider Trading

      c. Executive Bonuses and Other Incentive Compensation

      d. Whistleblower Actions

      8. INDIVIDUAL DEFENDANTS


      **B. CONCLUSIONS OF LAW**


      1. *Rule 10(b)* AND PLSRA STANDARDS

      2. STANDARD OF REVIEW

      3. ANALYSIS OF PLAINTIFFS' CLAIMS

      a. The Materiality Element

      b. The Safe Harbor Analysis

      i. PSI's Undisclosed Understaffing and Patient Care Problems

      ii. Defendants' Statements about Published Reports of PSI's Compliance and Omissions of Material Facts

      iii. Defendants' Misrepresentations and Omissions about Conditions at Riveredge

      iv. Defendants' Deliberate Accounting Manipulations and Omissions

      c. Scienter Analysis of Plaintiffs' Claims

      i. Divergence Between Defendants' Public Reports and Government and Internal Reports

      ii. Defendants' Concealment of Illegal Activity to Defraud Investors

      iii. Defendants' Misleading Financial Statements

      iv. Individual Defendants' Financial Motivations and Insider Trading


      **C. CONCLUSION**

**Table1** (*Return to related document text*)

---

End of Document