# TAB 6

 Caution
As of: June 26, 2017 5:21 PM Z

# *Winslow v. BancorpSouth, Inc.*

United States District Court for the Middle District of Tennessee, Nashville Division

April 26, 2011, Decided; April 26, 2011, Filed

Case No. 3:10-00463

**Reporter**

2011 U.S. Dist. LEXIS 45559 *; Fed. Sec. L. Rep. (CCH) P96,304; 2011 WL 7090820

EDWARD B. WINSLOW, Plaintiff, v. BANCORPSOUTH, INC., et al., Defendants.

**Subsequent History:** Accepted by, Approved by, Motion denied by *Winslow v. BancorpSouth, Inc., 2012 U.S. Dist. LEXIS 7766 (M.D. Tenn., Jan. 24, 2012)*

**Counsel:** **[*1]** For Edward B. Winslow, Individually and on behalf of all others similarly situated, Plaintiff: Catherine J. Kowalewski, Darren J. Robbins, David C. Walton, LEAD ATTORNEYS, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Dennis J. Herman, LEAD ATTORNEY, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Jeffrey A. Berens, Robert J. Dyer, III, LEAD ATTORNEYS, Dyer & Berens LLP, Denver, CO; Christopher M. Wood, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Corey D. Holzer, Marshall Dees, Michael I. Fistel, Jr., PRO HAC VICE, Holzer, Holzer & Fistel, LLC, Atlanta, GA; Douglas S. Johnston, Jr., George Edward Barrett, Timothy L. Miles, Barrett, Johnston & Parsley, Nashville, TN.

For Bancorpsouth, Inc., Aubrey B. Patterson, Jr., James V. Kelley, William L. Prater, Defendants: Joseph A. Woodruff, LEAD ATTORNEY, Waller, Lansden, Dortch & Davis, Nashville, TN; Heather J. Hubbard, Tera Rica Murdock, Waller, Lansden, Dortch & Davis, LLP, Nashville, TN; James N. Bowen, Milton S. McGee, III, Steven Allen Riley, Riley, Warnock & Jacobson, Nashville, TN; Larry B. Childs, Waller, Lansden, Dortch & Davis, LLP,

Birmingham, AL.

For Gregg Cowsert, Defendant: Joseph A. Woodruff, Waller, **[*2]** Lansden, Dortch & Davis, Nashville, TN.

**Judges:** JOHN S. BRYANT, United States Magistrate Judge. The Honorable William J. Haynes, Jr., Judge.

**Opinion by:** JOHN S. BRYANT

# Opinion

## REPORT AND RECOMMENDATION

### To: The Honorable William J. Haynes, Jr.

The District Judge has referred this case to the undersigned for assorted purposes, including the formulation of a Report and Recommendation for the disposition of any Motion filed pursuant to *Rule 12 of the Federal Rules of Civil Procedure* (Docket No. 23). In accordance with that reference, the undersigned has considered Defendants' Motion to Dismiss and Memorandum of Law in Support thereof (Docket Nos. 41 & 44), Plaintiff's Response (Docket No. 48), and Defendants' Reply (Docket No. 50), along with the voluminous documents attached to those filings. For the following reasons, the undersigned recommends that the Motion to Dismiss be denied.

## I.INTRODUCTION

This is a putative class action against BancorpSouth Inc. ("BancorpSouth") and certain of its officers and/or directors for alleged violations of the Securities and Exchange Act of 1934 ("Exchange Act"). Plaintiff Edward B. Winslow filed suit, as lead Plaintiff, on behalf of himself and a proposed class of persons who purchased [*3] publicly traded securities of BancorpSouth from April 23, 2009, until February 25, 2010 (the "class period").

The upshot of Plaintiff's 109-page, 245-paragraph Consolidated Amended Complaint (Docket No. 36) is that Defendants, in the face of an ongoing economic recession, lured investors by claiming to have a strong loan portfolio that was more resistant to the rising credit delinquency and foreclosure rates plaguing other banking and financial institutions. BancorpSouth attributed its superior financial performance to several factors, including its conservative lending policies, the high credit quality of its loan portfolio, its community-based lending strategy, its strong internal controls, its detailed analysis of repayment risks, and its focus on the early identification of borrowers with potential repayment problems.

However, Plaintiff claims these things were vastly overstated by BancorpSouth, leading to significantly understated loan loss reserves which thereby increased a borrower's risks. Indeed, Plaintiff claims that no later than April 23, 2009 — the start of the proposed class period — BancorpSouth, just like other financial institutions in the recessionary market, was struggling [*4] to get its borrowers to make payments on their loans. Nevertheless, BancorpSouth ignored warnings that its existing controls over problem loans were inadequate, ignored conditions suggesting the declining credit of its borrowers, and repeatedly agreed to modify troubled loans to defer repayment obligations, rather than record a bad debt expense or increase loss reserves. Such acts and omissions purportedly were in violation of *Sections 10(b)*, *Rule10b-5*, and *20(a)* of the Exchange Act and accompanying regulations, and allegedly caused millions of dollars in losses to the putative class members.

With that general background, the Court turns to the specific allegations in Plaintiff's Consolidated Amended Complaint. In doing so, the Court recognizes that claims under the Exchange Act, and specifically *Section 10(b)*, are [*5] intensely fact driven and subject to heightened pleading standards. Therefore, the Court sets forth Plaintiff's factual allegations in some detail, tracking many of the specific allegations in the Consolidated Amended Complaint in order to preserve the import and substance of those allegations. Those facts will be expanded upon where necessary for purposes of the legal discussion.

## II. FACTUAL ALLEGATIONS

Plaintiff Winslow is a shareholder of BancorpSouth, having purchased 400 shares of stock at a cost of $8,838.96 on February 11, 2010. (Docket No. 36, Consolidated Amended Complaint ¶ 15 & attached certification). Defendant BancorpSouth Inc. is a financial holding company which, through its principal bank subsidiary, BancorpSouth Bank[1] conducts a general commercial banking, trust and insurance business through 318 offices located primarily in the southeastern United States. (Id. ¶ 16).

BancorpSouth focuses its financial services on individuals and small- to [*6] medium-size businesses. As of the start of the class period, BancorpSouth had total assets of approximately $13.2 billion and total deposits of approximately $10.7 billion. It regularly communicates with investors through periodic filings with the Securities & Exchange Commission ("SEC"), press releases, conference calls, and investor and analyst presentations.[2] (Id. ¶ 16).

---

[1] BancorpSouth Inc. and BancorpSouth Bank will generally be referred to collectively as "BancorpSouth." Where a distinction is necessary, the former will be referred to as "the company," and the latter will be referred to as "the bank."

[2] This information is also available to shareholders in the Investor's relations section of BancorpSouth's website:

In addition to BancorpSouth, Plaintiff names four individual Defendants. Aubrey B. Patterson, Jr. ("Patterson") is BancorpSouth's Chairman of the Board, Chief Executive Officer, and Chairman of the Board's Executive Committee. James V. Kelley ("Kelley") is President and Chief Operating Officer of BancorpSouth, who, aside from Patterson, is the only BancorpSouth executive on the Board of Directors. William L. Prater ("Prater") is Treasurer and Chief Financial Officer ("CFO") of the company and Executive Vice President, CFO and Cashier of the bank. Finally, Gregg Cowsert ("Cowsert") is Vice Chairman and Chief Lending Officer of the bank, as well as an Executive Vice President [*7] of the company, and is responsible for directing the commercial loan activities of the bank and approving commercial loans in excess of $2 million. (Id. ¶¶ 17-20).

The first three individual Defendants, Patterson, Kelley, and Prater are responsible for (1) reviewing and signing Forms 10-K filed with the SEC; (2) leading or participating in quarterly conference calls with shareholders; (3) leading or participating in presentations about the company at financial services conferences; and (4) reviewing and contributing to press releases issued by BancorpSouth. Patterson and Prater are also responsible for signing Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley") certifications attesting to the accuracy of the BancorpSouth's financial results and the adequacy of its internal controls. Cowsert, as chief lending officer, participates in the quarterly conference calls with shareholders, the presentations at financial services conferences, and is responsible for reviewing and/or contributing to press releases issued by BancorpSouth. (Id. ¶¶ 17-20).

Over 60% of BancorpSouth's revenues are derived from its loan portfolio, with three-fourths of that portfolio being comprised of real estate loans. (Id. [*8] ¶ 24). More germane to this case, BancorpSouth concentrates heavily on construction, acquisition and development ("CA&D") loans used to finance commercial and residential home developments.[3] Those CA&D loans include both loans and credit lines for the purpose of purchasing and developing land into commercial or residential subdivisions and represented 17% of the bank's loans at the outset of the class period. This percentage was almost double that of most competitors whose CA&D portfolios averaged 9% of the total loan portfolio. (Id. ¶¶ 26).

CA&D loans can be riskier than other, more conventional loans because contractors can run into unanticipated problems or economic difficulties during construction, a project may not be completed, or the project may not achieve the results the contractor anticipates, all of which can be exacerbated during economic downturns. To guard against such risks, the Federal Deposit Insurance Corporation ("FDIC") requires that lenders undertake any of a number of risk management measures in relation to CA&D loans, including [*9] maintaining strong capital levels based upon market conditions, analyzing the collectibility of such loans at least quarterly to ensure that the loan loss allowances cover estimated credit losses, creating a credit review and rating system which accurately reflects the borrower's condition, maintaining recent financial statements, evaluating the continued relevancy of appraisals, and insuring that the bank's loan workout department is adequately staffed by competent personnel to handle problem loans. (Id. ¶ 28).[4]

BancorpSouth extolled its supposed conservative

---

[3] Plaintiff claims that by virtue of this specialization, BancorpSouth has gained a reputation among developers as a "dirt bank."(Id. ¶ 25).

[4] According to Plaintiffs, BancorpSouth failed to follow the FDIC directives and was extremely aggressive in lending to developers, more so than most other lenders. Tactics included full value lending on some projects without any "downside protection" if the value of the project or the land on which it was built declined; failure to reappraise collateral; and having loan-funded interest reserves which paid the interest even if the project faltered, thereby making it appear that what was a troubled loan was actually current. (Id. ¶¶ 29-30).

lending practices, strong balance sheet, and high lending standards, making it attractive [*10] to investors who were recoiling from the economic downturn during 2008 and 2009. While BancorpSouth's credit losses had increased during this period, its stated reserves were higher and its net charge-off ("NCO") rate[5] was lower than the industry norm. BancorpSouth allegedly encouraged investors to rely on such figures as a reliable indicator of the strength of the company's loan portfolio, the quality of its borrowers, the conservativism of its lending practices, and its ability to identify and avoid problem loans. (Id. ¶¶33-34). While BancorpSouth acknowledged its greatest risk was in its CA&D loan portfolio, it assured investors it had taken steps to reduce the number and amount of those loans and was closely monitoring existing CA&D loans to identify and address problems at an early stage. (Id. ¶ 35).

Despite these assurances to investors, BancorpSouth was allegedly at an increasing of risk of loan defaults, particularly in relation to CA&D borrowers in certain particularly distressed areas. Indeed, by the third quarter of 2008, many CA&D borrowers were delinquent on their loans, and [*11] some sought loan workouts, deferrals, or filed for bankruptcy. To address these problems, BancorpSouth allegedly deferred the interest due and added it to the back end of the loan, routinely extended maturity dates and/or otherwise modified terms to accommodate borrowers, all of which were done to downplay a serious problem. Nevertheless, Plaintiff alleges that the problem was serious enough that, in late 2009, bank regulators required (and all Defendants well-knew) that some of the modified loans be converted into standard 15 or 20 year loans which actually ensured defaults because borrowers who could not even make interest payments would not be able to make interest and principal payments. (Id. ¶¶ 37-41, 158).

BancorpSouth issued its 3Q09[6] financial report on October 22, 2009, which was below estimates, due in part to an increase in loss reserves and an increase in charges for nonperforming assets. BancorpSouth insisted that the results were primarily the result of a large, but nonperforming, commercial real estate loan, and not due to the quality of loans awarded or increased risks from nonperforming loans. Patterson issued a press release[7] the following day seeking to assure investors [*12] that all was well, that BancorpSouth's focus was on "early identification and decisive resolution of any credit issues," and that this focus, and BancorpSouth's strict credit policies would keep problems to a minimum. Patterson voiced similar sentiments on October 23, 2009 during a conference call[8] with Wall Street analysts, telling them that BancorpSouth was "well capitalized and well positioned" with "consistently strong results in our performance," and that BancorpSouth's "conservative business model and [its] strong and experienced team" would enable it "to consistently outperform our industry peer group." He also stated there was some "mild improvements in the overall real-estate climate." (Id. ¶¶ 42-43, 152-158).

Four months later, on January 22, 2010, BancorpSouth filed a Form 8-K[9] reporting 4Q09/FY09 [*13] financial results. The day before, but after the market closed, BancorpSouth issued a press release which indicated "earnings of $0.23 per diluted share for fourth quarter 2009 and $1.25 for full year."[10] This was distributed to the market

---

[5] The NCO reflects the percentage of write-offs and delinquency reserves to the total loan portfolio.

[6] Quarterly reports are abbreviated by month and year. Thus "3Q09" refers to the third quarter of 2009. Yearly reports are prefaced simply by "FY" for fiscal year, and thus FY2009 refers to fiscal year 2009.

[7] Prater was listed as the contact person on the press release.

[8] The other three individual Defendants, Kelley, Prater, and Cowsert, participated in the conference call. (Id. ¶ 178(b)).

[9] In addition to filing annual reports (Form 10-K) and quarterly reports (Form 10-Q), public companies must report material events important to shareholders on Form 8-K.

[10] For ease of reference, the announcement of the increase and the corresponding Form 8-K will be referred to as the "4Q09/FY09 financial results."

via financial news wires. (Id. ¶ 70).

The 4Q09/FY09 financial results generally showed that loan reserves, non-performing assets, and net charge-off rates all appeared to better than the comparable figures for BancorpSouth's competitors, suggesting that BancorpSouth was continuing to manage and respond to credit issues as they arose during the continuing economic downturn. Still the results included an increase in credit reserves and charge-offs for non-performing loans, but those increases were downplayed by BancorpSouth as reflecting isolated and manageable problems, and the company again assured investors that it was aware of, and on top [*14] of, any potential problem loans. (Id. ¶¶ 45-48, 187).

Some financial observers were not overly impressed with the 4Q09/FY09 results. For example, Robinson Humphrey, a Sun Trust analyst, opined that BancorpSouth was recognizing the credit crunch later than most of its peers, was now feeling greater credit pressure than those competitors, and that BancorpSouth recognized its CA&D loans "have gotten worse recently for some of their more established clientele in larger markets." (Id. ¶ 48). Similarly, J.P. Morgan wrote that while BancorpSouth's "assets still best peers," "cracks were evident in the portfolio in 4Q, stemming from the construction and development portfolio." (Id. ¶ 187). Plaintiff claims the financial results and immediate concerns expressed by analysts, though far from revealing the whole truth about BancorpSouth's exposure to problem loans, was sufficiently alarming that BancorpSouth's common stock declined $1.32 per share on January 22, 2010, losing 5.4% of its value, and causing million of dollars in damages to the proposed class participants in this case. (Id. ¶¶ 48 & 187).

During a conference call with analysts on its 4Q09/FY09 financial results, BancorpSouth dismissed [*15] concerns that the financial results might reveal a weakening credit quality and greater exposure to the risks of defaults and delinquencies,

and assured investors it was well reserved for any credit losses that might arise from a continued economic downturn. Specifically, Patterson told investors that "BancorpSouth's overall performance for the fourth quarter and for all of 2009 was very consistent with the expectations inherent in our conservative long-term approach to the business." He also said: "we see that our credit quality continues to be strong and we are well reserved against potential losses. We expect industry data for the fourth quarter and for 2009 will again show that our loan portfolio is performing substantially better than our peer group." As for the increase in nonperforming loans during the fourth quarter, Patterson told investors that was "not unexpected in the context of [a] troubled real estate market," but assured investors that the Company "remain[s] focused on early identification and effective resolution of potential credit problems" and that its non-performing loans and net charge-off amounts "remain at very manageable levels." (Id. ¶ 49). Thereafter, analysts [*16] again opined that BancorpSouth was in a position to outperform peers based upon the company's "solid fundamentals, modest credit issues, and solid capital." (Id. ¶ 50).

Assurances about the propriety of BancorpSouth's lending practices were again provided at two separate analyst conferences held in early February 2010. (Id. ¶ 50). On February 2, 2010, Patterson, Prater, and Cowsert gave a presentation at the Morgan Stanley U.S. Financial Conference, during which Prater provided a detailed breakdown of the company's financial status based upon the 4Q09/FY09 financial results. (Id. ¶ 74(b)). At the second conference on February 10, 2010, Kelley and Prater made a presentation at the Sterne, Agee & Leach Financial Services Symposium, going through the 4Q09/FY09 financial results in detail. (Id. ¶ 74(c)). At both conferences, BancorpSouth basically repeated and reaffirmed the operating results for 4Q09 and FY10 as reported on January 21, 2010, and indicated the company was outperforming its peers. (Id. ¶¶ 51, 74(a) & (b)).

The 4Q09/FY09 financial results qualified the individual Defendants, collectively, to more than $1 million in bonus compensation and combined stock and stock option awards [*17] valued at more than $2.5 million.[11] Sixty-two other executives also received bonuses based upon those results. (Id. ¶¶ 8, 48).

As it turns out, the 4Q09/FY09 financial results that had been reported on January 21, 2010 were incorrect insofar as they revealed a profit of $0.23 per share in the fourth quarter and an annual profit of $1.25 per share. In actuality, BancorpSouth suffered a quarterly loss of $0.03 per share that reduced annual earnings to $0.99 per share. (Id. ¶ 57). The differences were attributed to BancorpSouth's failure to disclose tens of millions of dollars in nonperforming and risky loans. (Id. ¶ 53). Nevertheless, those who received bonuses based upon the 4Q09/ FY09 financial results were allowed to retain those bonuses. (Id. ¶ 48).

BancorpSouth recognition of possible problems with the 4Q09 and FY09 financial results surfaced on February [*18] 25, 2010. In a press release issued that day, the company told investors it would be unable to timely file its FY09 Report on Form 10-K because "management has determined, in consultation with BancorpSouth's independent registered public accounting firm and with the concurrence of the Audit Committee of the Board of Directors, that certain asset quality indicators, including the allowance for credit losses, and their impact on BancorpSouth's financial statements for the quarter ended December 31, 2009 should be further reviewed." (Id. ¶ 53, 71). BancorpSouth also admitted that it would need to reduce the quarterly and annual earnings announced on January 21, 2010 by booking adjustments to its credit reserves that would decrease its net income. (Id. ¶ 53).

Market analysts, including Macquarie Equities Research ("Macquarie") and J.P. Morgan were quick to express various concerns. Macquarie indicated that the delayed 10-K filing was "a negative" and would likely result in a restatement of 4Q09 earnings, a possible reduction in dividends, and a capital raise. (Id. ¶ 54). J.P. Morgan opined that, given BancorpSouth's high concentration in construction loans, BancorpSouth's construction portfolio [*19] was a logical target for review and it "would be cautious of the shares in light of yesterday's disclosures which are expected to result in a downward revision to income." (Id. ¶ 55).

With BancorpSouth's announcement that the Form 10K would be delayed, BancorpSouth's stock dropped $3.10 per share to close at $19.47 on February 26, 2010. This was a one-day decline of over 13% on a volume of over 6.8 million shares, and nearly ten times its average during the class period. (Id. ¶ 56).[12] It is this stock price drop which is at the core of this lawsuit.

On March 15, 2010, BancorpSouth filed its Form 10-K reporting its FY09 financial results. The report included a $27.6 million increase in the provision for credit losses, a $3.8 million increase in valuation allowances included as part of a $4.5 million increase in foreclosure expenses, and a $21.6 million reduction in net income.[13] This reduction in net income, as already noted, resulted in a quarterly loss of $0.03 per share that reduced fiscal year earnings to 0.99 per share, a 21% reduction. (Id. ¶ 57).

A press release issued the same day as the Form 10-K filing confirmed that the 4Q09/FY09 financial

---

[11] On January 27, 2010, the Executive Compensation and Stock Incentive Committee met and certified the bonuses to the individual Defendants. Historically, the Committee's decision to award bonuses was often based upon unaudited financial reports and was typically paid out prior to the company filing its Form 10-K. (Id. ¶¶ 213, 214).

[12] In contrast, the KBW Regional Banking Index showed a 0.4% increase for regional banks on February 26, 2010. (Id. ¶ 185).

[13] Additionally, [*20] the report indicated that non-performing loans and leases of $186.5 million represented 1.91% of net loans and leases at year end (as compared with the $145.1 million and 1.48% previously reported) and that the NCO ratio of charge-offs to average loans and leases had climbed to 1.27% in 4Q09 (as compared with the 1.01% previously reported).

results announced on January 21, 2010 had overstated BancorpSouth's net income and earnings per share ("EPS") because the provisions for credit losses and amount of nonperforming loans and leases were understated. The report itself also acknowledged internal control weaknesses led BancorpSouth to issue incorrect 4Q09/FY09 financial results. Specifically, the report stated:

> As a result of management's evaluation of the Company's internal control over financial reporting, management identified a material weakness in the Company's internal control over financial reporting related to the determination of the allowance for credit losses. The material weakness resulted from the aggregation of the following deficiencies:
>
> • Ineffective controls to timely recognize [*21] the impact of changes in credit quality on the grading of loans in the determination of the allowance for credit losses.
> • Personnel involved in loan modifications had insufficient knowledge to appropriately identify modifications to be communicated to accounting personnel for accounting and disclosure consideration.
> • Ineffective controls to ensure updated appraisals for loans are obtained.
>
> This material weakness resulted in a material error in the allowance for credit losses that was corrected prior to the issuance of the Company's financial statements. Additionally, as a result of the material weakness, management has concluded that the Company's internal control over financial reporting was not effective as of December 31, 2009.

(Id. ¶ 59 & Form 10-K at 54).

Though outside the date parameters of the class period, Plaintiff claims that, through the next several months, BancorpSouth disclosed further weaknesses in internal controls and increases in loan loss reserves. Plaintiff claims this is something which should not have been necessary since

BancorpSouth, with the release of its Form 10-K, claimed to have reviewed all of its outstanding reserves and was confident from that review that [*22] the reserves were adequate to cover any further losses from nonperforming loans.

Nevertheless, the increases in loan loss reserves caused additional losses to the members of the putative class that retained BancorpSouth shares through July 2010. Specifically, when BancorpSouth issued its 1Q10 financial results on April 22, 2010, it significantly missed analyst estimates (expected EPS — $0.20; reported — $0.10) due to higher than expected provisions for loan losses, causing the value of BancorpSouth's common stock to fall 4% on April 23, 2010 and close at $22.33 per share. This was followed by BancorpSouth's July 22, 2010 press release announcing its 2Q10 financial results which indicated that the provision for credit loss had increased to $62.4 million, its nonperforming loans and leases had increased by $66.6 million, and that its total nonperforming assets were approximately $370 million as of June 30, 2010, causing common shares to fall another 16% to $14 per share on July 23, 2010. (Id. ¶¶ 67-69).

Based upon the foregoing, Plaintiff's Consolidated Amended Complaint is in two counts. In Count I, he alleges that the Defendants violated *Section 10(b)* and *Rule 10b-5* of the Exchange Act. [*23] In Count II, he alleges violations of *Section 20(a)* of the Exchange Act in that Defendants and/or persons under their control allegedly violated *Section 10(b)* and *Rule 10b-5*.

### III.STANDARDS OF REVIEW

As a general rule, in considering a motion to dismiss under *Federal Rule of Civil Procedure 12(b)(6)*, a court must take "all well-pleaded material allegations of the pleadings" as true. *Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010)*. The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the

plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting *Ashcroft v. Iqbal, 129 S.Ct., 1937, 1949-50, 173 L. Ed. 2d 868 (2009)).* "'A legal conclusion couched as a factual allegation,'" however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." Id. (quoting *Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009)* and *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007)).* Further, in determining whether a complaint sets forth a plausible claim, a court may consider [*24] not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." *Ley v. Visteon Corp., 543 F.3d 801, 805 (6th Cir. 2008)* (citation omitted).

Where, as here, a complaint contains allegations of fraud under *Section 10(b)* of the Exchange Act, additional pleading requirements under *Rule 9(b) of the Federal Rules of Civil Procedure* and the Private Securities Litigation Reform Act of 1995 ("PSLRA") apply. The Sixth Circuit has summarized those requirements as follows:

> Because § 10(b) claims sound in fraud, the pleading strictures of *Federal Rule of Civil Procedure 9(b)* apply. . . . Thus, the complaint must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" . . .

> Bolstering this rule of specificity, the PSLRA imposes further pleading requirements. . . . First, the complaint must "specify each statement alleged to have been misleading" along with "the reason or reasons why the statement is misleading." . . . Second, plaintiffs [*25] must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."

*Indiana State Dist. Council of Laborers v. Omnicare, Inc., 583 F.3d 935, 942-43 (6th Cir. 2009)* (internal citations omitted).

# IV. APPLICATION OF LAW

As indicated, Plaintiff's claims are brought under Section 10(b), *15 U.S.C. § 78j, Rule 10b-5, 17 C.F.R. § 240.10b-5,* and Section 20(a), *15 U.S.C. § 78t(a),* of the Exchange Act. "*Section 10(b)* of the Exchange Act and *Rule 10b-5* promulgated thereunder prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security." *PR Diamonds v. Chandler, 364 F.3d 671, 681-82, 91 Fed. Appx. 418 (6th Cir. 2004)* (footnotes omitted). *Section 20(a),* in turn, "imposes control-person liability on '[e]very person who, directly or indirectly, controls any person liable' under the Act and accompanying rules, unless 'the controlling person acted in good faith and did not directly or indirectly' induce the illegal acts." *Konkol v. Diebold, Inc., 590 F.3d 390, 396 (6th Cir. 2009)* (quoting, *15 U.S.C. § 78t(a)*). Because *Section 20(a)* provides for secondary liability and "is contingent upon the investors' ability to [*26] establish an 'underlying' violation of *Section 10(b)* and *Rule 10b-5,*" id. (quoting, *PR Diamonds, 364 F.3d at 696*), the Court's focus necessarily is on *Section 10(b)* and *Rule 10b-5.*

While the text of *Section 10(b)* does not provide for a private cause of action, the Supreme Court "has found a right of action implied in the words of the statute and its implementing regulation." *Stoneridge Inv. Partners, LLC v. Scientific Atlanta, 552 U.S. 148, 157, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008).* In order to recover under *Section 10(b),* a plaintiff must plead and prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Id.*[14]

---

[14] "Liability under *Rule 10b—5* . . . does not extend beyond conduct

In this case, Defendants argue that the Consolidated Amended Complaint fails to state a claim under *Section 10(b)* for three primary reasons. First, Plaintiff cannot show causation because he alleges an impossibility, to wit, his stock **[*27]** lost approximately 14% of its value on February 25, 2010, based on a disclosure that was made to the market on March 15, 2010. Second, Plaintiff fails to allege that Defendants made any actionable misrepresentations of material fact that could have caused BancorpSouth's stock price to be artificially inflated during the Class Period. Third, even if Plaintiff had plead such a misrepresentation, he does not plead specific facts which would support a strong inference that Defendants acted with knowledge or recklessness. The corresponding legal arguments and sub-arguments will be considered roughly in the order presented by Defendants.

## A. Loss Causation and Economic Loss

### 1. Loss causation

A private cause of action under *Rule 10b-5* is "not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 344, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*. Therefore, "loss causation requires 'a causal connection between the material misrepresentation and the loss.'" *Brown v. Earthboard Sports USA, Inc., 481 F.3d 901, 920 (6th Cir. 2007)* (citation omitted). "It has been likened to proximate cause **[*28]** in tort law," id., in that a "misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Lentell v. Merrill Lynch & Co., Inc., 396 F.3d 161, 172 (2nd Cir. 2005)*. "Thus to establish loss causation, 'a plaintiff must allege ... that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered,' . . . i.e., that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id. at 173* (emphasis in original, internal citation omitted).

Here, Defendants argue that, as a matter of law, Plaintiff cannot show loss causation. This so, because the February 25, 2010 press release — causing the precipitous $3.10 per share and 13.7% overall drop in stock price the following day — was released some eighteen days before the actual March 15, 2010 Form 10-K filing. Defendants also argue the language of the press release cannot be said to have revealed the grounds for Plaintiff's fraud claims — inadequate internal controls and materially understated **[*29]** reserves — because it read, in relevant part, as follows:

> BancorpSouth, Inc. (NYSE: BXS) today announced its intention to file a Form 12b-25 notification of late filing with the Securities and Exchange Commission in connection with its Annual Report on Form 10-K for the year ended December 31, 2009, which is due March 1, 2010. The reason for the delay in filing the annual report is that management has determined, in consultation with BancorpSouth's independent registered public accounting firm and with the concurrence of the Audit Committee of the Board of Directors, that certain asset quality indicators, including the allowance for credit losses, and their impact on BancorpSouth's financial statements for the quarter ended December 31, 2009 should be further reviewed.
>
> * * *
>
> . . . Based on information currently available, management of BancorpSouth anticipates that the unaudited consolidated balance sheet and the consolidated income statement for the quarter and year ended December 31, 2009 will be adjusted prior to issuance of the Annual Report on Form 10-K. The adjustments are expected to decrease net income.

The impact of management's review on the

encompassed by § *10(b)*'s prohibition." *United States v. O'Hagan, 521 U.S. 642, 651, 117 S. Ct. 2199, 138 L. Ed. 2d 724 (1997)*.

Case 3:16-cv-02267    Document 68-6    Filed 06/26/17    Page 10 of 24 PageID #: 1343

previously reported financial condition [*30] and results of operations of BancorpSouth cannot be estimated or determined until BancorpSouth has completed its review of the Bank's loan portfolio and the auditors have completed their examination.

(Docket No. 42, App. Tab 10, Exh. 99-1). Lastly, Defendants argue that once the Form 10-K was filed on March 15, 2010, the price for BancorpSouth's shares actual went up over the next several weeks and thus any revelations in that filing were not the cause of a stock drop.

"[L]oss causation is fact-dependent." *Katyle v. Penn Nat. Gaming, Inc., 637 F.3d 462, 2011 U.S. App. LEXIS 4984, 2011 WL 857144 at *6 (4th Cir. Mar. 14, 2011)*. The Court's task at this juncture is not to decide whether Plaintiff can prove causation, only whether he has pled sufficient facts to support loss causation.

The actual requirements for pleading loss causation, unlike most elements of a Section 10(b) claim, are open to dispute. In *Dura Pharmaceuticals, 544 U.S. at 346*, the Supreme Court assumed for the sake of argument that a heightened pleading standard did not apply. Subsequently, the Sixth Circuit appears not to have addressed the matter directly. Looking elsewhere, some courts have specifically refused to decide the issue, see, *In re Gilead Sciences Securities Litigation, 536 F.3d 1049, 1056 (9th Cir. 2008)*, [*31] while others have suggested *Rule 8*'s short and plain statement standard applies. See, *In re Cardinal Health Inc. Securities Litigations, 426 F. Supp. 2d 688, 758 (S.D. Ohio 2006)*. Still others, recognizing the fact-driven nature of the issue, have indicated that "the specificity sufficient to plead loss causation will vary depending on the facts and circumstances of each case." See, *Katyle, 2011 U.S. App. LEXIS 4984, 2011 WL 857144 at *6*. The Fourth Circuit in Katyle, relying on the Second Circuit in Lentell, provided the following example:

"'[W]hen the plaintiff's loss coincides with a market wide phenomenon causing comparable losses to other investors, the prospect that the plaintiff's loss was caused by the fraud decreases, and a plaintiff's claim fails when it has not adequately pled facts which, if proven, would show that its loss was caused by the alleged misstatements [or omissions] as opposed to intervening events.

Id. (quoting, *Lentell, 396 F.3d at 174*).

Regardless of whether *Rule 8* or a sliding-scale standard applies, the Court concludes Plaintiff has sufficiently *pled* loss causation. In this regard, the Court is of the opinion that Defendants err by considering the February 25, 2010 press release in [*32] a vacuum, and by neglecting to consider the import of some of the language in that press release.

When the 4Q09/FY09 financial results were released in January 2010, some analysts opined that BancorpSouth was recognizing the credit crunch later than most of its peers, was feeling greater credit pressure, its CA&D loans with large established clients could be on shaky grounds, and "cracks" were evident in its portfolio. Still, in a conference call on the financial results, and at conferences for financial professionals the following month, upper management of BancorpSouth essentially assured investors that credit was strong, reserves were good, and that BancorpSouth's loan portfolio was better than any of its peers. It was with this recent history that BancorpSouth issued its press release. While BancorpSouth may not have specifically stated in its press release that there were problems with internal controls or the need to increase loan loss reserves, it did state the decision to delay filing the 10-K form was with the concurrence of its auditor and an independent accounting firm, review was necessary regarding the allowance for credit losses, and adjustments were expected which would [*33] decrease net income. This led to immediate and negative comments from financial analysts about BancorpSouth's substantial reliance (as compared to peers) on CA&D loans, and the opinion that a large reduction in income would be

an almost inevitable result. Indeed, when the Form 10-K was filed on March 15, 2010, it revealed substantial loan losses and vastly overstated earnings which were attributed to the lack or insufficiency of numerous internal controls.

True, BancorpSouth's stock may have plunged on February 25, 2010 for reasons other than those alleged by Plaintiff. After all, "a drop in a security's price may be a result of the correction of a previous misrepresentation," but "it may also have been caused by 'changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events.'" *In re DVI, Inc. Securities Litigation, 639 F.3d 623, 2011 U.S. App. LEXIS 6302, 2011 WL 1125926 at *4 (3rd Cir. 2011)*; (quoting, *Dura Pharmaceuticals, 544 U.S. at 343*). However, Defendants present no other reasons for the drop, and it is not encumbent upon Plaintiff at this point to disprove other possible reasons for the drop. See, e.g., *Caremark, Inc. v. Coram Healthcare Corp., 113 F.3d 645, 649 (7th Cir. 1997)* [*34] (loss causation requirement does not "place unrealistic burdens on the plaintiff at the initial pleading stage [and] does not require, for instance, that the plaintiff plead that all of its loss can be attributed to the false statement of the defendant"); *Malin v. XL Capital Ltd., 2005 U.S. Dist. LEXIS 27089, 2005 WL 2146089 at *4 n.5 (D. Conn. Sep. 1, 2005)* ("Defendants' argument is a competing theory of [loss] causation and raises factual questions not suitable for resolution on a motion to dismiss"). Besides, Plaintiff alleges that the KBW Regional Banking Index for February 26, 2010 showed an overall positive performance that day, and a plausible explanation for BancorpSouth's very different result was the February 25, 2010 press release.

Contrary to Defendants' assertion, it is not necessary for Plaintiff to plead that the corrective statement (in this case the February 25, 2010 press release) specifically details the exact basis of the fraud. "If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of it prior misstatements." *Alaska Elec. Pension Fund v. Flowserve Corp., 572 F.3d 221, 230 (5th Cir. 2009)*. Rather, "to establish [*35] loss causation th[e] disclosed information must reflect part of the 'relevant truth' — the truth obscured by the fraudulent statement." *Id.* Here, the disclosure, fairly read, revealed that "certain asset quality indicators, including the allowance for credit losses" needed to be reviewed and that said review was "expected to decrease net income," (Docket No. 42, App. Tab 10, Exh. 99-1), with a logical inference being that BancorpSouth had overstated its earnings in January 2010.[15]

The fact that there was no immediate stock drop and the price per share actually rose during the first few weeks following the Form 10K filing does not meant the revelations about insufficient reserves and controls were not of concern to investors. As Plaintiff observes, the ten-fold increase in trading volume of BancorpSouth stock and consequent stock drop immediately following the February 25, 2010 press release could be the investor's reaction to the significance of the announcement, and the neutral [*37] response to the actual Form 10K

---

[15] At this point, the Court notes that throughout their briefing, Defendants consistently refer to the 4Q09-FY09 financial results of January 21, 2010 as "unaudited" and/or "preliminary." This characterization does not automatically absolve them from financial liability for at least two reasons. First, the "unaudited" results appeared on the Form 8-K and "a Form 8-K [is] a Commission report used to report 'material events or corporate changes[.]'" *S.E.C. v. Gemstar-TV Guide Intern. Inc., 401 F.3d 1031, 1036* (quoting, *15 U.S.C. § 78m(a)(1)*). See, *SEC v. PCS EdventuresA.Com, Inc., 2011 U.S. Dist. LEXIS 8648, 2011 WL 337895 at *3 (D. Id. Jan. 27, 2011)*(plaintiff adequately alleged fraud based upon misrepresentations and omission in a press [*36] release and Form 8-K); *In re Thornburg Mortg. Inc. Secs. Litig., 695 F.Supp.2d 1165, 1214 (D.N.M. 2010)* (finding statement in Form 8-K materially misleading). Second, Defendants did not characterize their results as anything but factual, stating in the press release "BancorpSouth's net income for the fourth quarter of 2009 was $19.4 million, or $0.23 per diluted share, compared with $16.8 million, or $0.20 per diluted share, for the fourth quarter of 2008" and that "[n]et income for the year ended December 31, 2009 was $104.3 million, or $1.25 per diluted share, compared with $120.4 million, or $1.45 per diluted share, for 2008," among other things. (Docket No. 42, App. Tab 9, Ex. 99-1).

filing may be because investors considered it old news.

Moreover, Plaintiff alleges that in the months after the form 10K filing on March 15, 2010, there were at least two other significant stock drops — a 4% drop on April 23, 2010, and a 16% drop on June 23, 2010. Both drops followed the announcement of quarterly reports which showed significant losses and increases in nonperforming assets. Although a stock drop which occurs after the close of a class period may not show loss causation, *Masters v. GlaxoSmithKline, 271 Fed. Appx. 46, 51 (2nd Cir. 2008)*, this does not mean post-class period evidence of stock price changes is necessarily irrelevant. See, *Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1065 n.9 (9th Cir. 2008).*

In concluding that Plaintiff has adequately plead loss causation, the Court has considered the authorities relied on by Defendants and, in particular, their substantial reliance on the Sixth Circuit's unpublished decision in *D.E. & J. Limited Partnership v. Conaway, 133 Fed. Appx. 994 (6th Cir. 2005)*. Conaway dealt with K-Mart's bankruptcy, a subsequent stock drop, and a woefully inadequate complaint. Indeed, the Sixth [*38] Circuit wrote:

> [Plaintiff] has done nothing more than note that a stock price dropped after a bankruptcy announcement, never alleging that the market's acknowledgment of prior misrepresentations caused that drop. But the observation that a stock price dropped on a particular day, whether the result of a bankruptcy or not, is not the same as an allegation that a defendant's fraud caused the loss.

*Id. at 1000-01*. Here, Plaintiff does not merely note a stock drop followed the February 25, 2010 press release, but rather alleges that the market responded to that stock drop because previously made misrepresentations and omissions had improperly inflated BancorpSouth's shares. Whether Plaintiff can actually prove that connection is something to

be decided later, but he has sufficiently *pled* loss causation.

## 2. Economic Loss

Defendants argue that Plaintiff's Consolidated Amended Complaint must be dismissed because he does not plead a compensable injury. In this regard, Defendants note that Plaintiff fails to allege he sold any BancorpSouth shares post-disclosure, let alone that he sold them at a loss. Defendants insist this is fatal because on at least four separate occasions during the ninety-day [*39] period following the February 26, 2010 stock drop, BancorpSouth's shares exceeded the $22.10 per share Plaintiff paid.

Even leaving aside that Plaintiff purports to represent a class of investors who suffered economic losses, the Court need not tarry over Defendants' arguments. Dura Pharmaceuticals merely requires that a plaintiff provide a defendant "with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharmaceuticals, 544 U.S. at 347*. Here, Plaintiff alleges that he, like the other putative class members, was damaged by the price decline which followed the February 25, 2010 press release. See, *Lormand v. US Unwired, Inc., 565 F.3d 228, 258 (5th Cir. 2009)* (Dura requires that plaintiff allege "a facially plausible causal relationship between the fraud[] . . . and plaintiff's economic loss, including allegations of a material misrepresentation or omission followed by the leaking out of relevant or related truth about the fraud that caused . . . depreciation of the stock and plaintiff's economic loss").

In any event, in his response brief, Plaintiff affirmatively states he sold his shares at a loss on March 3, 2010 before the stock returned [*40] to the price at which he had purchased it, and Defendants take no issue with that representation in their reply. Even though Plaintiff did not make that allegation in his Consolidated Amended Complaint, Dura in conjunction with Twombly's plausibility standard only require that a complaint "allege enough facts to give rise to a reasonable hope or

expectation that discovery will reveal evidence of" loss causation and economic loss. Id. Plaintiff's allegation that he is a member of a class which lost millions as a result of the stock drop makes it plausible that he suffered an economic loss, and that plausibility is only strengthened by his subsequent representation that he did, in fact, personally lose money on March 3, 2010.

## B. Material Misrepresentation or Omission of Material Fact

Defendants argue that Plaintiff fails to adequately plead a material misrepresentation or omission and that, even if he did, those allegations fail for any of a number of reasons. Those reasons include that BancorpSouth repeatedly disclosed the size of its CA&D loans and the risks associated with such loans, any statements about loan loss reserves were not statements of material fact, BancorpSouth's statements **[*41]** about its loans were nonactionable subjective characterizations and/or general statements of optimism, and Plaintiff's other allegations of misrepresentation do not support a fraud claim under _Section 10b-5_.

_Section 10(b)_ of the Exchange Act makes it unlawful for any person to "use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of . . . such rules and regulations as the [Securities] Commission may prescribe[.]" _15 U.S.C. § 78j(b)_. _Rule 10b-5_, in turn, makes it unlawful for any person, directly or indirectly, "[t]o make any untrue statement or a material fact or to make the statements made, in the light of the circumstances under which they were made, not misleading . . . in connection with the sale of any security." _17 C.F.R. § 240.10b-5_.

In determining whether a representation is material, a court looks to whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" _Basic Inc. v._ _Levinson, 485 U.S. 224, 231-32, 108 S. Ct. 978, 99 L. Ed. 2d 194_. "Put another way, '[a] fact is **[*42]** to be considered material if there is a substantial likelihood that a reasonable person would consider it important in deciding whether to buy or sell shares [of stock].'" _Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., 595 F.3d 86, 92-3 (2nd Cir. 2010)_ (citation omitted).

## 1. Adequacy of Allegations Regarding Misstatements

Defendants first argue that Plaintiff fails to allege any single fact showing that any of the statements made by Defendants were false or misleading. This argument is underdeveloped, perhaps because it is akin to trying to prove a negative.

Regardless, the Sixth Circuit has indicated that that Plaintiff's "complaint must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" _Frank v. Dana Corp., 547 F.3d 564, 570 (6th Cir. 2008)_ (citation omitted). "At a minimum, Plaintiffs must allege the time, place and contents of the misrepresentations upon which they relied." Id.[16] Here, the Consolidated Complaint is replete with the identification of statements alleged to be false, and includes references to who **[*43]** made the statement, where the statement was made, and why the statement was allegedly fraudulent. (See, e.g., Consolidated Amended Complaint ¶¶ 70, 74, 85, 137-141, 146-147, 150-155 & 162-163).

Defendants also generally assert that Plaintiff fails to connect many of the alleged misstatements to any of the individual Defendants. They also argue that Plaintiff wholly fails to identify any purported misstatements by Kelley.

---

[16] Similarly, the PSLRA requires that when alleging a defendant made a material misrepresentation or omission, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." _15 U.S.C. § 78u-4(b)(1)_.

Defendants cite *United States ex rel. Bledsoe v. Community Health Sys. Inc., 342 F.3d 634 (6th Cir. 2003)* and *Benoay v. Decker, 517 F.Supp. 490 (E.D. Mich. 1981)* for the proposition that "[i]n the Sixth Circuit each individual defendant must have separate notice of the specific misstatements or omissions of which he is accused." (Docket No. 44 at 18). In <u>Bledsoe</u>, the Sixth Circuit quoted <u>Benoay</u>'s language that a complaint "'may not rely upon blanket references to the acts or omissions by all of the 'defendants,' **[*44]** for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'" *Bledsoe, 342 F.3d at 643* (quoting, *Benoay, 517 F.Supp. at 493*). The Sixth Circuit also observed that under *Rule 9(b)* a complaint "should provide fair notice to Defendants and enable them to 'prepare an informed pleading responsive to the specific allegations of fraud.'" <u>Id.</u> Dismissal of the complaint in <u>Bledsoe</u> was warranted since it failed to set forth dates, names of the individual defendants involved (save one), and collectively made allegations that "'defendants' engaged in certain practices without ever specifying the defendants to which it was referring." <u>Id.</u>

Plaintiffs' Consolidated Amended Complaint does not suffer the infirmities identified in *Bledsoe* because, as noted, he sets forth the "who, what, when, and where" of the false statement allegations against the specific individual Defendants. Thus, for example, he makes specific allegations of false (oral or written) statements against Patterson (<u>see,</u> <u>e.g.</u>, Consolidated Amended Complaint ¶¶ 34-36, 42-43, 84-87, 144-147, 196-197, 207); Prater (<u>see</u> <u>e.g.</u>, <u>id.</u>, **[*45]** ¶¶ 74(a)-(b), 161-163, 201, 207); Cowsert (<u>see e.g.</u>, <u>id.</u>, ¶¶ 88, 144 & 196); and Kelley (<u>see e.g.</u>, <u>id.</u>, ¶ 74(b), 85, 135, 178(b) - (c), 201). True, some of these paragraphs (and others not listed) contain allegations that a particular Defendant merely participated in a conference call or presentation, or approved a document in which false statements allegedly were made, and this is particularly so with respect to Kelley. However, "'a high ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements'" *Barrie v. Intervoice-Brite, Inc., 409 F.3d 653, 656 (5th Cir. 2005)*, nor is he automatically absolved from responsibility if he is not the one who actually authored a document containing a material misrepresentation. See, *Weiss v. S.E.C., 468 F.3d 849, 855, 373 U.S. App. D.C. 369 (D.C. Cir. 2006)* (collecting cases) (corporate officer can incur liability for misrepresentation even if he does not communicate it directly to investors if he reviews and approves of document containing the misrepresentation).

## 2. Sufficiency of Disclosures

Defendants next argue that Plaintiff's overarching claim that **[*46]** BancorpSouth failed to disclose material information about the nature of their CA&D loan portfolio, and the extent of the risks arising from those loans, is refuted by the numerous disclosure BancorpSouth made about its CA&D loans during the class period. In this regard, Defendants point out that each quarter, BancorpSouth provided the market with a detailed analysis of it entire loan and lease portfolio from which investors could readily determine how much of that portfolio consisted of CA&D loans, and that said disclosure included a detailed itemization of the sub-categories of loans which made up the CA&D portfolio. Those sub-categories also disclosed the amount of CA&D loans outstanding; 90-days past due but accruing; non-accruing; and non-performing. Additionally, BancorpSouth disclosed the risks surrounding such loans by including disclaimers, such as, BancorpSouth's "business may be adversely affected by conditions in the financial markets and economic conditions generally"; the market in which it operates had been "materially and adversely affected by significant declines in the values of nearly all asset classes and by a serious lack of liquidity"; and the ability of BancorpSouth's **[*47]** borrowers to "pay interest on and repay principal of outstanding loans and the value of collateral securing those loans, is

highly dependent upon the business environment in the markets where [it] operate[s] and in the United States as a whole." (Docket No. 44 at 20-21). Defendants argue that since these eventualities are what actually caused the rise in the loan reserves about which Plaintiff complains, BancorpSouth cannot be guilty of providing investors with a material misrepresentation or omission.

As already noted, determining materiality is a "fact-specific inquiry" that "depends on the significance the reasonable investor would place on the withheld or misrepresented information." *Basic Inc., 485 U.S. at 240*. Thus, "[t]he veracity of a statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Operating Local 649, 595 F.3d at 92*. "Some literally accurate statements can, 'through their context and manner of presentation, [become] devices which mislead investors.'" Id. (citation omitted).[17] That is essentially Plaintiff's contention in this case.

Plaintiff does not take issue with Defendants' position that CA&D loans can be risky, that setting loss reserves involves some judgment, and that such reserves can increase if the judgment turns out to be wrong. He accepts these things, but claims that the 10(b) violation arises because Defendants did not fully disclose the risk of Bancorp's CA&D portfolio, and did not calculate the reserves in the manner they claimed.

"[G]eneral cautionary language does not render omission of specific adverse historical facts immaterial," *S.E.C. v. Merchant Capital, LLC, 483 F.3d 747, 768 (11th Cir. 2007)*, and, moreover, "the disclaimer must be meaningful and tailored to the risks the business faces." Id. Here, Plaintiff alleges that the increase in loss reserves resulted from

---

[17] In an oft-quoted passage, Judge Milton Pollack explained [*48] that disclosures of risk provide "no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he know with near certainty that the Grand Canyon lies one foot away." *In re Prudential Sec. Inc. P'ships Litig., 930 F. Supp. 68, 72 (S.D.N.Y. 1996)*.

conditions which existed throughout the class period and that the risk warning provided by BankcorpSouth were meaningless because such [*49] warnings portended the future, but did not alert investors about the conditions that then existed. This can be a basis for a Section 10(b) claim. See, *In re Bear Sterns Companies, Inc. Securities & ERISA Litig., 763 F. Supp. 2d 423, 2011 U.S. Dist. LEXIS 6026, 2011 WL 223540 at *56 (S.D.N.Y. 2011, Jan. 19, 2011)* (falsity sufficiently plead where company provided "general boilerplate risk warning" that its "models might not accurately predict the future when it allegedly knew, but withheld from investors that its . . . models were fundamentally flawed" and "failed to include the accumulating evidence of market downturn and default risk").

Given Plaintiff's allegations, it is an open question as to whether BancorpSouth's risk warnings and disclaimers were sufficient. For example, Plaintiff contends some CA&D loans contained interest reserves which funded interest payments on the loans until the principal came due, but this information was not shared with investors until after the close of the class period. This may be significant in light of the fact that, according to Plaintiff, the FDIC recognizes that loans containing such interest reserves "'carry very high levels of risk because using interest reserves to fund interest payments [*50] can seriously mask the deteriorating credit quality of a borrower." (Consolidated Amended Complaint ¶ 130). Such allegations suggest that general market disclaimers and vanilla assertions about possibilities (e.g. " business may be adversely affected by conditions in the financial markets and economic conditions generally") may not have been sufficient for a reasonable investor to make an informed decision. See, *Southland Sec. Corp. v. INSpire Ins. Solutions, 365 F.3d 353, 372 (5th Cir. 2004)*.

Further, the risk warnings to which Defendants point were made at a time when BancorpSouth was allegedly downplaying the very risks it now claims the warnings were meant to address. That is, when

BancorpSouth issued general warnings about how its loans were dependent on all sorts of things that could happen in the market, it was also assuring investors the problems affecting the market generally were not affecting BancorpSouth, or so Plaintiff alleges. See, *Freudenberg v. E*Trade Financial Corp., 712 F.Supp.2d 171, 193 -194 (S.D.N.Y. 2010)* (Defendants' general statements that loan losses and securities impairments "'could be affected by market risks and were subject to change," do not insulate **[*51]** them from liability for their specific misstatements and omissions'"); *In re Credit Suisse-AOL Sec. Litig., 465 F.Supp.2d 34, 50 n. 17 (D.Mass.2006)* (fact that defendants continued to publish optimistic assessments of the company's financial position was "akin to a statement that the reader need not worry much about the generic risk disclosures that appeared from time to time").

### 3. Safe Harbor

Defendants argue that risk warnings aside, BancorpSouth's statements about its loan loss reserves were not statements of material fact and are protected by the PSLRA's safe harbor provision. Thus, Plaintiff's claims that BancorpSouth understated its loan loss reserves in 1Q09, 2Q09, 3Q09 and 4Q09 cannot support a claim under *Section 10(b)* and *Rule 10b-5* because those loan loss reserves were estimates and forward-looking statements under the PSLRA. The Court is unpersuaded by this argument.

The "safe-harbor 'excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance.'" *Omnicare, Inc., 583 F.3d at 943* (citation omitted). "This protection is overcome only 'if the statement was material; if defendants had actual knowledge that it was **[*52]** false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements.'" Id. (citation omitted). Even "[w]here a company does disclose that its statement is forward-looking, liability may still attach to the extent that the

company made the statement in a misleading manner" because "if a company chooses to disclose information about the future, 'its disclosure must be full and fair[.]'" *Zaluski v. United American Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008)* (citation omitted). "Therefore, once a company chooses to speak, it must 'provide complete and nonmisleading information with respect to subjects on which [it] undertakes to speak.'" Id. (quoting, *Rubin v. Schottenstein, Zox & Dunn, 143 F.3d 263, 268 (6th Cir.1998))*.

In this case, Defendants submit they are entitled to the safe harbor provision because "loss reserves are, [] no more than a best estimate about what will happen in the future, [and] do not provide historical information that is objectively verifiable." (Docket No. 44 at 23). They cite several cases for the proposition that "underestimating the size of loan loss reserves does not amount to securities fraud," **[*53]** and other cases for the proposition that "just because a reserve estimate does not prove to be adequate does not mean that the estimate itself was a false statement upon which a securities claim can be based." (Id., collecting cases).

"Statements about loss reserves and their adequacy are not per se forward-looking." *In re PMA Capital Corp. Securities Litigation, 2005 U.S. Dist. LEXIS 15696, 2005 WL 1806503 at *6 (E.D. Pa. Jul. 27, 2005)*. After all, a financial institution which "deliberately hides its financial status by failing to provide adequate loss reserves could significantly affect the behavior of a reasonable investor." Id. Further, while "[s]tatements regarding loan loss reserves necessarily include forward-looking projections about future defaults, 'statements regarding loss reserves are not projections [if] they are directed to the then-present state of the Company's financial condition.'" *In re SLM Corp. Sec. Litig., 740 F.Supp.2d 542, 556 (S.D.N.Y. 2010)* (citation omitted, collecting cases). Moreover, even where the safe harbor is triggered, it does not protect statements made with actual knowledge of falsity. See, *15 U.S.C. § 78u-5(c)(1)(B)*. Because the questions about whether a financial institution

[*54] intended to mislead investors regarding loan loss reserves and whether statements in relation thereto are false cannot be decided in the abstract, it is often "imprudent . . . to grant Defendants' Motion to Dismiss based on the safe harbor provision." *In re Netbank, Inc. Securities Litigation, 2009 U.S. Dist. LEXIS 69030, 2009 WL 2432359 at *8 (N.D. Ga. Jan. 29, 2009)*.

In this case, were Plaintiff's claims simply that BancorpSouth's underestimated its loan loss reserves and that this miscalculation resulted in loss, there might be merit to Defendants' argument. However, Plaintiff's allegations are broader — he claims the reserves were insufficient in light of the existing risks that had been identified (but ignored) in BancorpSouth's loan portfolio, an allegation which could be bolstered by the auditor's requirement that the FY09/4Q09 financial results be revised. At this juncture, the Court is not in a position to determine whether Defendants knowingly ignored risks of which they were aware regarding the adequacy of the loss reserves.

## 4. Subjective Characterizations and Statements of Opinion and/or Optimism

In the Consolidated Amended Complaint, Plaintiff refers to what Defendants identify as subjective characterizations [*55] and general statements of optimism regarding BancorpSouth's commitment to a strong loan portfolio, such as Patterson's statements about BancorpSouth's consistency in a difficult and volatile market being an indication of the effectiveness of it business plan, and his statements to the effect that BancorpSouth has strong control mechanisms geared towards protection against losses. Defendants also note that Plaintiff faults the individual Defendants for using terms such as "conservative," "strong," and "disciplined" in characterizing BancorpSouth's credit policies and controls.

Standing alone, subjective characterizations, opinions, and corporate optimism do not support a *Section 10(b)* fraud claim. "[F]ederal courts 'everywhere have demonstrated a willingness to

find immaterial as a matter of law certain kinds of rosy affirmation heard from corporate managers and numbingly familiar to the marketplace — loosely optimistic statements that are so vague, [and] so lacking in specificity, ... that no reasonable investor could find them important to the total mix of information available.'" *City of Monroe Employees Retirement Sys. v. Bridgestone Corp., 399 F.3d 651, 669 (6th Cir. 2005)*.

"Statements [*56] of corporate optimism . . . may be material, though, if the speaker knew at the time the statements were made that they were untrue or had no reasonable basis in fact." *Simmons Invest., Inc. v. Conversational Computing, Inc., 2011 U.S. Dist. LEXIS 15962, 2011 WL 673759 at *5 (D. Kan. Feb. 17, 2011)*. As the Supreme Court has observed, subjective characterizations or opinions "can be uttered with knowledge of truth or falsity just like more definitive statements," and "conclusory terms in a commercial context" may be "reasonably understood to rest on a factual basis that justifies them as accurate." *Virginia Bankshares, Inc. v. Sandberg, 501 U.S. 1083, 1093, 111 S. Ct. 2749, 115 L. Ed. 2d 929 (1991)*. Thus, statements that a proposed merger was a "high value" and its terms were "fair to shareholders" supported a misrepresentation claim, id., just as a "a statement by the executive committee of a law firm that no partner would be any 'worse off' solely because of an impending merger could be found to be a material misrepresentation." Id. (citing, *Day v. Avery, 548 F.2d 1018, 1025-27, 179 U.S. App. D.C. 63 (D.C. Cir. 1976))*. Likewise, a tire manufacturer's press release indicating that "we continually monitor the performance of all our tire lines, and the objective data clearly [*57] reinforces our belief that these are high-quality safe, tires" could support a securities claim when it turned out the tires were not so safe. *Bridgestone, 399 F.3d 672*.

Here, too, context matters. Patterson's statements about the effectiveness of BancorpSouth's business plan and control mechanism to stave off losses, and other Defendants' statements about BancorpSouth

being conservative and disciplined may be demonstrably false in light of Plaintiff's contention that BancorpSouth loss reserves ignored the declining credit quality of borrowers, failed to inform investors about facts which affected those reserves (such as using interest reserves to keep loans afloat), and failed to adopt control measures recommended by the FDIC in relation to CA&D loan.

### 5. GAAP Violations and the Sarbanes-Oxley Certifications

Defendants argue that Plaintiff's identification of BancorpSouth's alleged violations of generally accepted accounting principles ("GAAP") and his reference to the Sarbanes-Oxley certifications signed by Patterson and Prater cannot support a misrepresentation claim because each rests upon a faulty premise. The former is allegedly faulty because Plaintiff simply assumes the March 2010 [*58] increase in reserves was the result of prior estimates not being in conformity with GAAP, while the latter is allegedly faulty because Plaintiff not only assumes the former, but also overstates the certifications.

Plaintiff devotes a section of his Consolidated Amended Complaint to the allegation that BancorpSouth violated GAAP and SEC rules in filing its quarterly financial reports and related earning reports for 1Q09 through 3Q09 and, thereafter, "attempted to load all the errors into the Company's 4Q09 results[.]" (Consolidated Amended Complaint ¶ 91). These alleged misstatements during the first three quarters of 2009 included the failure to adequately and timely provide for credit losses; the overstatement of pretax income, net income, EPS, and assets; and the omission of required disclosures concerning the Company's operating results, management's analysis and discussion, and risk factors. (Id. ¶¶ 93(a) - (c)). Plaintiff then provides a chart which purports to show how BancorpSouth materially overstated its reported provision for credit losses, income before taxes, net income and EPS during

the class period. (Id. ¶ 95).

Defendants argue the chart upon which Plaintiff relies is "made [*59] up" because it divides by four the additional $27 million added to the loan loss reserves on March 15, 2010, and allocates equal sums across each quarter of 2009. Defendants contend that, in so doing, Plaintiff merely assumes the "loss reserves increased linearly throughout 2009," and, more importantly ignores the fact that BancorpSouth's independent auditor did not require it to restate or revise any of the loan estimates related to the first three quarters of 2009, opining instead that "the Company's 2009 financials were 'presented fairly' and 'in conformity with U.S. generally accepted accounting principles.'" (Docket No. 44 at 30) (citation omitted).

It is not clear that Plaintiff is merely assuming the prior reserves were not prepared in compliance with GAAP since, by revising the result, BancorpSouth has conceded problems with its accounting in relation to the reserves. Moreover, even if it can be said that Plaintiff errs by attributing loss reserves equally for the all quarters of 2009, the total amount alleged by Plaintiff to have been misstated would not change. In any event, the Court cannot at this point resolve the parties' different positions on this point, but must accept [*60] as true all of the factual allegations made by Plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007).*

As for the Sarbanes-Oxley certifications signed by Patterson and Prater, Defendants argue that the certifications did not guarantee BancorpSouth would detect all credit issues or that its estimates of future losses would not change. While that may be so, the Sarbanes-Oxley Act requires senior executives of public companies to "certify that they have 'evaluated the effectiveness of the issuer's internal controls'" and have "'presented in their report their conclusion about the effectiveness of their internal controls'." *Indiana Elec. Workers' Pension Fund v. Shaw Group, Inc., 537 F.3d 527,*

*545 (5th Cir. 2008)* (citing, *15 U.S.C. §§ 7241(a)* & *(a)(4)(A))*. Here, Plaintiff's claim is that Patterson and Prater attested to the adequacy of the internal controls, and those controls were, for all practical purposes, non-existent. As such, the Court cannot at this point say the Sarbanes-Oxley certifications are not material.

## C. Scienter Requirements Under the PSLRA

To state a securities fraud claim under *Section 10(b)*, a plaintiff must show that a misstatement or omission [*61] of a material fact was made with scienter. *Stoneridge, 552 U.S. at 157*. "Scienter is 'a mental state embracing the intent to deceive, manipulate, or defraud[.]'" *Louisiana School Employees' Retirement Sys. v. Ernst & Young, LLP, 622 F.3d 471, 478 (6th Cir. 2010)*. Under the heightened pleading standards required by the PSLRA a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *15 U.S.C. § 78u-4(b)(2)*.

In *Tellabs, 551 U.S. at 317-18*, the Supreme Court addressed the scienter requirement at great length, setting forth a "uniform pleading standard" and clarifying "to what extent[] a court must consider competing inferences in determining whether a securities fraud complaint gives rise to a 'strong inference' of scienter." In doing so, the Supreme Court "establish[ed] the following prescriptions": (1) "faced with a *Rule 12(b)(6)* motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true"; (2) "courts must consider the complaint in its entirety, as well as other sources [*62] courts ordinarily examine when ruling on *Rule 12(b)(6)* motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice"; and (3) "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." *Id. at 322-23*.

It is the third prescription which is central to Defendants' position that Plaintiff insufficiently pleads a "strong inference" of scienter. Although "strong inference" is undefined in the PSLRA, the Sixth Circuit has indicated that for there to be a strong inference, a plaintiff "must show that the defendant knew or recklessly disregarded the falsity of the statement at issue." *Konkol, 590 F.3d at 397*. Determining "'recklessness in securities fraud is an untidy, case-by-case-concept[.]" *PR Diamonds, 364 F.3d at 684*. Any of a number of nonexclusive factors can be probative of recklessness, including:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission [*63] and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Ley, 543 F.3d at 810*.

In this case, Defendants argue the Consolidated Amended Complaint suggests that Plaintiff seeks to show scienter based on three of the foregoing factors — the closeness in time of the statements to the disclosure, the disregard of the most current factual information, and the self-interested motivation of the individual Defendants. Defendants insist Plaintiff's factual allegations relating to these factors do not allow a strong inference of scienter.

2011 U.S. Dist. LEXIS 45559, *63

Determining whether a plaintiff has sufficiently [*64] pled scienter "necessarily involves a sifting of allegations in the complaint." *PR Diamonds, Inc., 364 F.3d at 684*. "Accordingly, [a court is to] sift Plaintiff's allegations individually and then aggregate the nuggets of inference they generate," in order to conclude whether a strong inference arises. Id. In this regard, the Supreme Court has instructed:

> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e., of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible" — it must be cogent and compelling, thus strong in light of other explanations.

*Tellabs, 551 U.S. at 323-324*.

Sifting through the allegations and [*65] then "aggregating the nuggets," the Court concludes that Plaintiff has sufficiently pled scienter by alleging facts which indicate that Defendants were at least reckless.[18] Those nuggets are as follows:

First, by Plaintiff's calculations, BancorpSouth's provision for credit losses was understated by 80%, and the CA&D loan charge-offs were understated by 40%. This required an increase in reserves and

wiped out the 4Q09 profits, resulting in BancorpSouth's first quarterly loss in almost two decades. If true, and while not conclusive, this supports scienter because "common sense and logic dictate that the greater the magnitude of a restatement or violation of GAAP, the more likely it is that such a restatement or violation was made consciously or recklessly." *P.R. Diamonds, 364 F.3d at 685*; see, *In re Proquest Sec. Litig., 527 F.Supp.2d 728, 741 (E.D. Mich. 2007)* [*66] (while accounting errors alone are insufficient, large errors can be an indication of scienter); *In re Cardinal, 426 F. Supp. 2d at 720* (collecting cases for the proposition that an inference of knowledge or recklessness may be drawn from accounting violations which are so great that they should have been obvious).

Second, the speed with which Defendants adjusted the reserves based upon the undisclosed problems with the CA&D loans supports scienter. See, *Konkol, 590 F.3d at 401* (citation omitted) ("closeness in time of an allegedly fraudulent statement . . . and the later disclosure of inconsistent information" is one factor supporting a finding of scienter). The 4Q09/FY09 financial results were posted on January 21, 2010, reaffirmed on February 2 and 10, 2010, admitted to be questionable in the February 25, 2010 press release, and restated on March 15, 2010. These dates alone are significant. However, those dates may turn out to be even more supportive of scienter because the audited financial results were to be reported by March 1, 2001, suggesting the possibility that the auditors would have talked with management before the February 25, 2010 press release and, in turn, potentially [*67] calling into question whether the Defendants were truthful when they spoke at the investor conferences on February 2 and 10, 2010.

Third, Defendants repeatedly assured investors they had their eyes on the CA&D loans and had an array of quality controls in place to monitor such loans, with Patterson even going so far as to suggest that "credit relationships of as little as $25,000" were

---

[18] In doing so, the Court notes that Defendants in their initial Memorandum correctly anticipated that Plaintiff would rely on three of the factors identified in Helwig (temporal proximity, disregard of information, and self-interest), but that, in response, Plaintiff has identified other factual allegations which support scienter.

evaluated at the executive level. (Consolidated Amended Complaint ¶ 36). Even though "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the company and alleged access to information," *PR Diamonds, 364 F.3d at 688*, "specific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter in light of improper accounting reports." *In re Daou Sys. Inc., 411 F.3d 1006, 1022 (9th Cir. 2005)*.

Fourth, Plaintiff alleges Defendants recklessly disregarded the problems which led to the understatement of reserves by repeatedly agreeing to modify the terms of loans, so as to prevent borrowers from becoming delinquent which would have necessitated an increase **[*68]** in loss reserves and resulted in a decrease in earning. This practice was allegedly endorsed by company executives and was so widespread that bank examiners informed BancorpSouth it had too many deferred interest loans on its books. Plaintiff claims the individual Defendants had to know about the situation and its impact on the reserves and profits because, for example, Cowsert regularly met with Patterson and Kelley to discuss problem loans, and Cowsert's office generated weekly past-due reports identifying problem loans. Although "generalized facts" alleging the Defendants had access to financial reports or may have attended meetings do not show a "strong inference" of scienter and "are properly discounted," *Konkol, 590 F.3d at 398-99*, the "divergence between internal reports and external statements on the same subject" can be probative of scienter, *Bridgestone, 399 F.3d at 683*, as can the existence of meetings concerning risks which are "inconsistent with the company's public statements downplaying or concealing that risk." *In re Citigroup Securities Litigation, 753 F. Supp. 2d 206, 2010 U.S. Dist. LEXIS 119274, 2010 WL 4484650 at *28 (S.D.N.Y. 2010)*.

Fifth, the individual Defendants collectively were awarded over a million dollars **[*69]** in year-end cash bonuses based upon admittedly incorrect FY09 financial results, and would not have received any bonuses based upon a true financial report. Nevertheless, the Defendants were not required to forfeit any of the bonuses, once it became clear they were not entitled to the bonuses. These bonuses were substantial in relation to the individual Defendants cash compensation: Patterson's salary was $783,500 and his bonus of $681,645 increased his earnings to more than $1.4 million; Cowsert's bonus of $180,000 was equivalent to 55% of his salary; Kelley's $326,250 bonus was 65% of his salary; and and Pater's $107,663 bonus was equivalent to 40% of his salary. While bonuses do not necessarily equate with motivation to commit fraud, "they can be catalysts to fraud and so serve as external markers to the required state of mind." *Helwig, 251 F3d 540, 550 (6th Cir. 2001)*. See, *Tellabs, 551 U.S. at 325* (pecuniary "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference").

As has been made clear, none of the foregoing factors, in isolation, is sufficient to support a strong inference of scienter. However, the Court's task **[*70]** is to look at the nuggets and then "aggregate the nuggets of inference they generate," to conclude whether they suggest a strong inference of scienter. *PR Diamonds, 364 F.3d at 684*. The Court finds they do, notwithstanding Defendants' arguments to the contrary.

To be sure, the nuggets upon which Plaintiff relies, viewed through a different prism, could produce an opposite result. In this regard, BancorpSouth offers diametrically different opinions on what Plaintiff's allegations actually suggest.

For example, Defendants assert that the timing between the 4Q09/FY09 financial results and the subsequent revelation that they were incorrect proves nothing and is based upon speculation. Defendants argue that corporate officers should be rewarded for diligently investigating and promptly disclosing errors or omissions, rather than having

their diligence be used to support a finding of recklessness. Moreover, they argue Plaintiff's "speculation fails to account for any other, more plausible possibilities, including that, precisely as they disclosed, Defendants acted promptly to inform the market of a potential problem in the fourth quarter preliminary results as soon as management and the Company's **[*71]** independent auditors — who were engaged in their audit of those results — became aware of it." (Docket No. 44 at 35).

Likewise, BancorpSouth paints a different picture regarding the bonuses that they received based upon the unaudited 4Q09/FY09 financial results, submitting it is ludicrous to think that the individual Defendants would engage in a year-long fraud to inflate the fourth quarter earnings and thereby obtain bonuses. After all, the "bonus compensation at issue is far from 'extraordinary'" (Docket No. 44 at 54) when one considers that Patterson owned approximately $22 million in stock and Kelley owned approximately $8 million in stock as of January 31, 2010. However, when the fourth quarter results were revised, Patterson's stock declined by approximately $2.9 million and Kelley's by approximately $1.1 million— losses which were in the neighborhood of four times more than the amount of the respective bonuses they received.

Similarly, Defendants argue Plaintiff cannot show recklessness based upon the fact that the individual Defendants may have had access to information, issued reports, and held meetings regarding problem loans. Such allegations fail to consider that the fixing **[*72]** of reserves involves "complicated estimates and aggregations based on a large amount of data and qualitative judgments." (Docket No. 44 at 40). Moreover, the complicated nature of the calculation for reserves losses is underscored in the quarterly reports which clearly state that "the Bank employs a systematic methodology for determining its allowance for credit losses that considers both qualitative and quantitative factors and requires that management make material estimates and assumptions that are particularly susceptible to significant change." (Id. at 43).

While the Court recognizes Defendants' arguments and finds they have provided cogent explanations for what Plaintiff's characterize as evidence of knowledge or recklessness, the Court cannot ignore the inferences which may be derived from Plaintiff's allegations. As the Supreme Court made clear in Tellabs, "a complaint will survive a motion to dismiss so long as 'a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Frank, 547 F.3d at 571* (quoting, *Tellabs, 551 U.S. at 324*). "Thus, where two equally compelling inferences can **[*73]** be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward." Id.

## D. Section 20(a) Claim

Finally, Defendants seek dismissal of Plaintiff's claim under *Section 20(a)* against BancorpSouth and the individual Defendants. The sole basis given is that Plaintiff cannot establish a *Section 10(b)* violation and *Section 20(a)* is a secondary, contingent claim. Since the Court concludes Plaintiff sets forth a viable claim against all of the Defendants under *Section 10(b)*, dismissal of the Section 20(a) claim is unwarranted.

## V. CONCLUSION

On the basis of the foregoing, the undersigned respectfully RECOMMENDS that Defendants' Motion to Dismiss (Docket No. 41) be DENIED.

Under *Rule 72(b) of the Federal Rules of Civil Procedure*, any party has fourteen (14) days from service of this Report and Recommendation in which to file any written objections to this Recommendation, with the District Court. Any party opposing said objections shall have fourteen (14) days from receipt of any objections filed in this Report in which to file any responses to said

objections. Failure to file specific objections within fourteen **[*74]** (14) days of receipt of this Report and Recommendation can constitute a waiver of further appeal of this Recommendation.

ENTERED this 26th day of April 2011.

/s/ John S. Bryant

JOHN S. BRYANT

United States Magistrate Judge

---