# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 3:16-cv-02267 |
| v. | ) ) | Judge Aleta A. Trauger |
| CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, and HARLEY G. LAPPIN | ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page(s)**

I.  INTRODUCTION .................................................................................................1

II. ARGUMENT .......................................................................................................4

    A.  Plaintiff Failed To Plead A "Strong Inference" Of Scienter....................................4

    B.  Plaintiff Failed To Plead Any Actionable False Or Misleading Statements ...........7

        1.  Plaintiff Cannot Establish Falsity Regarding Its Allegations About Quality Services ..................................................................................7

        2.  Plaintiff Cannot Establish Falsity Regarding Its Allegations About Contract Renewals ...................................................................................8

        3.  Plaintiff Cannot Establish Falsity Regarding Its Allegations About Costs Savings ..............................................................................11

        4.  Plaintiff Cannot Establish Falsity Regarding Its Allegations About Compliance With Applicable Standards....................................................12

    C.  Plaintiff Failed To Plead Loss Causation...............................................................13

III. CONCLUSION...................................................................................................15

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*In re Am. Serv. Grp., Inc.*,
2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 31, 2009) ....................................................8

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
752 F.3d 82 (1st Cir. 2014) .....................................................................................................14

*Burges v. BancorpSouth, Inc.*,
2015 U.S. Dist. LEXIS 89822 (M.D. Tenn. July 10, 2015) ....................................................13

*In re Cardinal Health Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ...............................................................................6, 11

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...............................................................................................7, 8

*D.E. & J. Ltd. P'ship v. Conaway*,
284 F. Supp. 2d 719 (E.D. Mich. 2003), aff'd, 133 F. App'x 994 (6th Cir.
2005) ........................................................................................................................................14

*Dura Pharmaceuticals, Inc. v. Broudo*,
544 U.S. 336 (2005)........................................................................................................3, 4, 13

*F & M Distribs. Sec. Litig.*,
937 F. Supp. 647 (E.D. Mich. 1996)........................................................................................11

*Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. Mar. 31, 2011) ....................................................8

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ...................................................................................................13

*James v. Gerber Prods. Co.*,
587 F.2d 324 (6th Cir. 1978) ...................................................................................................11

*KBC Asset Mgmt. N.V. v. Omnicare, Inc. (In re Omnicare, Inc. Sec. Litig.)*,
769 F.3d 455 (6th Cir. 2014) ...............................................................................................9, 13

*Louisiana Mun. Police Emps. Ret. Sys. v. KPMG, LLP*,
2012 WL 3903335 (N.D. Ohio Aug. 31, 2012)........................................................................12

*Mulvaney v. GEO Group, Inc.*,
2017 WL 887193 (S.D. Fla. Feb. 23, 2017) .............................................................................6

ii

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ...................................................................................6

*Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co.* (*In re Ford Motor*
    *Co. Sec. Litig.*),
    381 F.3d 563 (6th Cir. 2004) ...................................................................................7

*SEC v. Kelly*,
    817 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................12

*Sohol v. Yan*,
    2016 U.S. Dist. LEXIS 56049 (N.D. Ohio Apr. 27, 2016)......................................8

*Tellabs Inc. v. Makor Issues & Rights Ltd*,
    551 U.S. 308 (2007).........................................................................................1, 4, 6

## STATUTES

15 U.S.C. § 78u-4(b)...................................................................................................1

## OTHER AUTHORITIES

H.R. Conf. Rep. No. 104-369, at 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730......................10

iii

# I. INTRODUCTION

This is a federal securities fraud case.  Plaintiff (an institutional investor and routine plaintiff in shareholder cases) is not seeking retribution for civil rights violations or recovery for abuse to any inmate at any point in time.  Instead, Plaintiff is seeking to recover investment losses, based upon stock purchases it made on an informed basis, when its investment lost value (and then quickly rebounded) as a result of a short-lived but industry-wide shift in the use of private contractors to operate correctional facilities.  It is against this backdrop that the sufficiency of the allegations in the Complaint must be assessed.

Under established precedent, including an extensive body of Supreme Court jurisprudence, Plaintiff must plead—*with factual particularity*—certain elements of its cause of action.  These involve scienter (*i.e.*, intent to defraud or deliberate recklessness) and falsity (*i.e.*, that the statements were materially false or misleading when made, were not "corporate puffery," and not "forward-looking" statements protected by the safe-harbor provisions of the federal securities laws).  Plaintiff must also plead loss causation (*i.e.*, that the revelation of the "truth" of the alleged false class-period statements caused the damages Plaintiff seeks to recover).  These standards went into effect in 1995, following the PSLRA, which Congress enacted with the express purpose of eliminating frivolous shareholder "strike" suits, precisely like the one at issue here.  Plaintiff has failed as a matter of law to adequately plead these required elements.

On the critical element of scienter, the standard is not only exacting—it is unique to other pleading standards:  it requires the Court to consider competing inferences.  Here, the Complaint—as well as the Opposition—does not even attempt to overcome competing "cogent," non-fraudulent inferences that are far more "compelling" than any inference of fraud.  15 U.S.C. § 78u-4(b); *Tellabs Inc. v. Makor Issues & Rights Ltd*, 551 U.S. 308, 314 (2007).  Boiled down

1

to its essence, Plaintiff's argument hinged on a single sentence in a 75-page pleading about an undefined conversation with "FE1." Critically, and fatally, FE1 never claims to have spoken to any Defendant (and, for that matter, anyone for whom scienter can be imputed to CoreCivic ("CC" or the "Company")) at any point in time, much less during his or her undefined 10-year employment at CC. Tellingly, Plaintiff has now abandoned all reliance on FE1—indeed, there is no mention of FE1 in the Opposition. Again, Plaintiff does not and cannot allege what specific information was conveyed to any Defendant, at any point in time, much less why that information rendered Defendants' class period statements knowingly false or misleading when made. Instead, Plaintiff argues that "[t]he Court can infer that the individual defendants were aware of the reported violations, even if Plaintiff had not specifically alleged (as it has) that those reports were disseminated to those individuals . . . ." Opp. at 16. In other words, Plaintiff asks the Court to infer the very facts it was required to plead with particularity, while disregarding the far more "cogent" and "compelling" inferences of non-fraudulent intent, as set forth in the Motion. Mot. at 23-24. The Complaint should be dismissed on this basis alone.

Plaintiff's falsity arguments fare no better. Plaintiff challenges statements in CC's disclosures regarding the quality and performance of its facilities, forward-looking statements regarding the possible renewal of government contracts, statements about cost savings, and statements about the fact that the Company operated "in accordance with" applicable standards. Compl. ¶¶ 116-17. The Opposition falls far short of explaining how, under the exacting standards imposed by the PSLRA, any of these class period statements were materially false or misleading when made. Specifically, the statements regarding CC's "quality and performance," its "costs savings," and that its operations were "in accordance with" policy are inactionable "corporate puffery" that cannot be deemed false by a handful of infractions at four of CC's 80-

plus owned or operated facilities. The Opposition does not meaningfully engage this argument. Moreover, the statements regarding CC's contract renewals are expressly protected by the safe-harbor provisions under federal law, and in any event, constitute inactionable corporate optimism. Thus, the element of falsity, which Plaintiff was required to plead with factual particularity under established federal law, provides a separate and independent basis for dismissing this action.

Finally, Plaintiff's arguments regarding loss causation can be laid to rest in short order. Plaintiff must plead that the disclosure of the alleged fraud caused its investment losses, as opposed to "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 343 (2005). Plaintiff argues that the falsity of the alleged class-period misstatements was revealed when the Department of Justice's Office of the Inspector General issued the "OIG Review" that allegedly informed the market that CC's facilities were not high-quality, did not result in significant cost savings as compared to government prisons, and were uniformly compliant with BOP regulations. But CC's stock only dropped $0.17—less than one percent—when the OIG Review was publicly disclosed, and Plaintiff does not identify any facts (including any unusual trading volume) to suggest that this drop was unique from ordinary market activity. One week later, then-Deputy Attorney General Sally Yates issued a two-page memorandum announcing that the federal government intended to reduce its use of private prisons. That is when the market reacted. CC's stock price dropped $9.49, approximately 35%, as did its competitors (including GEO). *See infra* Section C. As noted in the Motion, that memorandum was rescinded shortly thereafter and CC's stock price rebounded. This chronological sequence

3

of events powerfully illustrates that this is not securities fraud, but instead, an industry wide reaction to a short-term shift in policy. As the Supreme Court has made clear, the securities laws exist to protect investors from "economic losses that misrepresentations actually cause," but "not to provide investors with broad insurance against market losses." *Dura*, 544 U.S. at 345.

For all of these reasons, as set forth in greater detail in CC's Motion to Dismiss, the Complaint should be dismissed in its entirety.

## II. ARGUMENT

### A. Plaintiff Failed To Plead A "Strong Inference" Of Scienter

Plaintiff acknowledges that it must plead *particularized* facts that create a "strong inference" of scienter, which "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs,* 551 U.S. at 314; Opp. at 14 (quoting *Tellabs*). CC explained, in detail, the controlling precedent and application of this standard in its Motion (Mot. at 11-12), and will not repeat it here. Instead, CC will make three observations, each of which is dispositive on the element of scienter, which Plaintiff was required to plead with factual particularity.

First, as noted above, Plaintiff's scienter claim hinged on one sentence in a 75-page Complaint regarding FE1. *See* Compl. ¶ 179 ("According to FE1, all of the information related to audits, both by the BOP and by CCA, that was entered into the systems would go to senior executives at CCA headquarters, including defendants Hininger, Mullenger and Lappin."). The Motion pointed out the glaring deficiency in this allegation: It is unclear when FE1 ever worked at CC, and there are no allegations—particularized or otherwise—that FE1 ever had a single conversation with any of the individual Defendants about the claims alleged in this case or, for

4

that matter, anything else. Mot. at 20. Plaintiff's Opposition does not mention—*not once*—FE1. In short, Plaintiff has abandoned the primary basis of its scienter allegations.[1]

Second, the arguments Plaintiff asserts in its Opposition illustrate its failure to plead scienter with factual particularity. *See* Opp. at 1 ("The Consolidated Complaint … pleads with particularity widespread deficiencies … which were known or recklessly disregarded by Defendants"); *id.* at 3 ("CCA knew about the understaffing and deliberately tried to cover it up[]"); *id.* ("Defendants had direct knowledge of CC's substandard facilities"); *id.* at 4 ("CCA was told in an April 25, 2012 report…"); and *id.* ("CCA[] [had a] policy and practice to deliberately understaff its BOP facilities."). But far from pleading (or even arguing) with factual particularity, these accusations beg the question Plaintiff was required to plead: Which Defendant knew what; when did he know it; and how does that demonstrate that any Defendant intentionally or with deliberate recklessness attempted to defraud CC's shareholders? These required facts are absent from the Complaint, and Plaintiff does not make any meaningful attempt to address this fatal flaw in the Opposition. Instead, as noted, the Complaint asks the Court to infer the particularized facts it has not pled. *See* Opp. at 16 ("The Court can infer that the individual defendants were aware of the reported violations, even if Plaintiff had not

---

[1] Plaintiff references its allegations regarding routine monitoring reports that the BOP issued to CC throughout the class period, Opp. at 15-16, but these allegations undercut Plaintiff's scienter claim. It is beyond dispute that these allegations relate to four of CC's 89 facilities and never caused the DOJ to refuse to renew a single one of CC's contracts. *See* Mot. at 7. Even if there were negative reports during the class period, there is nothing to suggest that Defendants acted with scienter when making the challenged statements, or that the negative reports affected their general beliefs about the quality of CC's facilities or the stability of its contractual relationship with BOP.

5

specifically alleged … that those reports were disseminated to those individuals[.]")  That sentence, standing alone, should end the scienter analysis.[2]

Third, under controlling Supreme Court jurisprudence, the complaint is required to plead a "strong inference" of scienter that "must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  *See* Mot. at 12, 23-24 (*citing Tellabs*, 551 U.S. at 314).  Here, Plaintiff does not address the merits of any of the arguments set forth in the Motion, which establish that the inference of nonfraudulent intent is far more "cogent" and "compelling."  Mot. at 23.  Defendants will not repeat those arguments here, but note only that Plaintiff has ignored all of them.[3]

---

[2] Recognizing the lack of particularized factual allegations in the Complaint, Plaintiff suggests that it has adequately pled scienter based upon "[t]he many dire reports provided to the individual defendants about CCA's systematic violations" which were "central to [CC's] entire business model."  Opp. at 16-17.  But again, Plaintiff does not explain whether or why negative information about four facilities supports a claim of fraud, considering that CC operated 85 other facilities during the class period.  There is no support for this theory in the Complaint, nor in the law.  *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004); *see also In re Cardinal Health Sec. Litig.*, 426 F. Supp. 2d 688, 724 (S.D. Ohio 2006) ("Fraudulent intent . . . cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.").

[3] Defendants respectfully request that this Court consider the *GEO* court's thorough analysis of nearly identical scienter allegations.  *Mulvaney v. GEO Group, Inc.*, 2017 WL 887193, at *12 (S.D. Fla. Feb. 23, 2017).  Plaintiff asserts that *GEO* is distinguishable because the complaint "did not provide any information as to the content of these reports," whereas here, Plaintiff claims to have "provide[d] that information in *droves*."  Opp. at 16 (quoting *Mulvaney*, 2017 WL 887193, at *12 (emphasis added)).  But in *GEO*, as in this case, Plaintiff pled only that "information about incidents at [the defendants'] prisons existed, not whether and when the Individual Defendants received [it], and the reasonable inferences they drew from it."  *Id.*  The *GEO* court properly dismissed that case.

6

**B.    Plaintiff Failed To Plead Any Actionable False Or Misleading Statements**

**1.    Plaintiff Cannot Establish Falsity Regarding Its Allegations About Quality Services**

As set forth in the Motion, the Sixth Circuit has held that reasonable investors do not view statements regarding quality as "significantly changing the general gist of available information." *See* Mot. at 14-15 (citing *Pub. Sch. Teachers Pension & Ret. Fund v. Ford Motor Co.* (*In re Ford Motor Co. Sec. Litig.*), 381 F.3d 563, 570 (6th Cir. 2004) (holding that statements such as "[a]t Ford quality comes first," "[w]e aim to be the quality leader," "Ford has its best quality ever," "Ford is a worldwide leader in automotive safety," and Ford "is going to lead in corporate social responsibility" are inactionable corporate optimism)).

In the Opposition, Plaintiff attempts to analogize Defendants' statements to a small handful of cases from the Sixth Circuit, but each is readily distinguishable. For example, Plaintiff cites *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671-72 (6th Cir. 2005) for the proposition that CC's statements were based on historical facts tied to CC's services, unlike statements generally proclaiming a commitment to quality that were at issue in *Ford*. As an initial matter, the *City of Monroe* court found that "*most* of the statements alleged by the [Plaintiff] were insufficiently specific to be actionable." *Id*. at 676 (emphasis added). In fact, the court determined that only one of the eight statements concerning "quality" was specific enough to be actionable because it alluded to "objective data."[4] *Id*. As noted, the court deemed all of the other statements too general to form a basis for securities fraud (*e.g*., we sell "the best tires in the world," our products demonstrate "global consistent quality," we "ensure reliable

_____

[4] The court found that a reasonable juror could conclude that Bridgestone's statement—"we continually monitor the performance of all our tire lines, and the objective data clearly reinforces our belief that these are high-quality, safe tires"—without any qualification, limitation, or other accompanying disclosure of other information, was a misrepresentation. *City of Monroe*, 399 F.3d at 672.

7

quality," sales in North America were due to "high regard among automakers for our strengths in product quality," and "we have built a premium-quality for…Firestone tires"). *Id.* at 670. The statements at issue here come nowhere close to being as particularized as the only one the court allowed to survive in *City of Monroe* and, in fact, are more vague than those the court dismissed as inactionable.[5]

### 2. Plaintiff Cannot Establish Falsity Regarding Its Allegations About Contract Renewals

Plaintiff fails to respond to the fact that CC's statements regarding the Company's contract renewals were not false or misleading in light of the disclosures Defendants simultaneously made to their shareholders. Indeed, each time CC issued disclosures about its contracts with government partners, it explicitly disclosed the risks involved with those contracts. For example, every time CC stated that the Company "had been successful in working with our government partners," it also disclosed that the Company's "growth is generally

---

[5] Plaintiff also attempts to analogize *Sohol v. Yan*, 2016 U.S. Dist. LEXIS 56049 (N.D. Ohio Apr. 27, 2016), *In re Am. Serv. Grp., Inc. ("ASG")*, 2009 U.S. Dist. LEXIS 28237 (M.D. Tenn. Mar. 31, 2009), and *Garden City Emps.' Ret. Sys. v. Psychiatric Solutions., Inc.*, 2011 U.S. Dist. LEXIS 35661 (M.D. Tenn. Mar. 31, 2011). These cases, too, are readily distinguishable. In *Sohol*, the court did not focus on the defendants' statements regarding quality, but instead focused on the fact that defendants touted their products as being "Energy-star compliant" when, in reality, the products were not "Energy-star" approved. In *ASG*, the court focused on the fact that ASG's expenses (including its reported cost margins) were misstated every quarter during the class period and that plaintiffs produced evidence that ASG had manipulated the costs and revenues of its subsidiaries—particularized support that does not exist here. Finally, in *Garden City*, the court's analysis centered on materiality and the application of the PSLRA's Safe Harbor provision, not on the merits of whether Plaintiff had sufficiently pled, with factual particularity, that the statements at issue were materially false or misleading at the time they were made. In any event, in the *Garden City* case, the court found that "governmental and media reports reflect [the Company's] failures to provide such level of services … and those reports adversely affected the value of [the Company's] stock." 2011 U.S. Dist. LEXIS 35661, at *125-126. Here, as explained in Section II.C., the OIG Review—which Plaintiff alleges reveals the "truth" regarding the quality of CC's facilities—had no demonstrable impact on CC's stock price.

dependent upon our ability to obtain new contracts to develop and manage correctional and detention facilities" and that "[t]his possible growth depends on a number of factors we cannot control, including . . . governmental and public acceptance of privatization." Dkt. No. 62.11, (2015 Form 10-K at 30-31). Given this context, none of the statements at issue here are materially false or misleading. Instead, they constitute corporate optimism that are not actionable as a matter of well-established law. *See* Mot. at 16-17.

Next, Plaintiff selectively quotes certain statements in its Opposition to obscure the fact that each contract renewal statement begins with the phrase "we *believe*." This is puffery. In any event, Plaintiff fails to plead facts showing that these Defendants' statements of optimism were objectively or subjectively false when made. *See KBC Asset Mgmt. N.V. v. Omnicare, Inc. (In re Omnicare, Inc. Sec. Litig.)*, 769 F.3d 455, 470 (6th Cir. 2014) ("Plaintiffs will need to allege particular facts demonstrating that defendants had actual knowledge that their statements concerning soft information [which the Court, and others, have defined as statements of subjective belief as opposed to objective or historical fact] were false or misleading at the time that they were made"). Instead, Plaintiff points to the fact that the Yates Memorandum—which was published *after* each of the alleged misstatements—called into question whether the federal government would continue to contract with private prisons. But the Yates Memorandum says nothing at all specific to CC, much less that CC's class-period statements about contract renewals were false when made.

Tellingly, Plaintiff responds to only one of Defendants' arguments regarding contract renewals, arguing that the statements are not covered by the PSLRA's Safe Harbor, which protects forward-looking statements because they are "statements of present or historical fact."

9

Opp. at 12.  Specifically, Plaintiff alleges that the following statements should not be protected under the Safe Harbor provision of the federal securities laws:

- "We believe **we have been successful** in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and **will continue to provide** unique solutions to their correctional needs."  Compl. ¶ 129.

- "We believe our renewal rate on existing contracts **remains high** as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."  *Id*. ¶ 132.

Plaintiff's argument fails for two basic, but fundamental, reasons.  First, the overwhelming majority of the statements Plaintiff places into this category of alleged misstatements are forward-looking.  Indeed, Plaintiff frames this category as statements disclosing that the Company's "renewal rate on contracts was and *would remain high*."  Compl. ¶ 3 (emphasis added).  As Congress made clear in protecting forward-looking statements under the Reform Act, "a company's own assessment of its *future potential* [is] among the most valuable information shareholders and potential investors could have about a firm." H.R. Conf. Rep. No. 104-369, at 43 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730, 742 (emphasis added).

Second, Plaintiff argues that even if the Safe Harbor applied, CC did not disclose cautionary language that revealed the "exact risks" at issue.  Opp. at 13.  But Plaintiff does not and cannot point to a single example from CC's cautionary language or risk disclosures that was insufficient in any manner, at any point in time.  This is because CC—repeatedly, and in detail— disclosed the exact "risks" Plaintiff claims manifested here.  For example, CC disclosed that renewal of government contracts was not a certainty, and the Company's failure to maintain the contracts could negatively impact revenue:  "We depend on a limited number of governmental customers for a significant portion of our revenues.  We currently derive, and expect to continue

to derive, a significant portion of our revenues from a limited number of governmental agencies. The loss of, or a significant decrease in, business from the BOP, ICE, USMS, or various state agencies could seriously harm our financial condition and results of operations." *See* Mot. at 16; *see also* Dkt. No. 62.10, (2014 Form 10-K) at 27. CC complied with all of its disclosure obligations regarding contract renewals, and nothing in the Opposition suggests otherwise.[6]

### 3. Plaintiff Cannot Establish Falsity Regarding Its Allegations About Costs Savings

Plaintiff ignores the fact that the OIG found that "the average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively," which fundamentally undercuts any argument that CC's contractual services cost more than those associated with BOP-run facilities (even assuming those metrics are comparable (*but see* Mot. at 18)). Dkt. No. 62.1, (OIG Review) at 12. In the Opposition, Plaintiff cites a Southern District of Ohio case that suggests that courts should "consider statements of corporate optimism with more hesitation" and to "proceed cautiously when examining [d]efendants' assertions that their enthusiastic statements…were 'puffery' as opposed to reckless or fraudulent misstatements." *In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 749 n.70 (S.D. Ohio 2006). This argument misses the mark entirely. Putting aside the fact that the numbers do not support Plaintiff's argument, the Sixth Circuit has made clear that "sales figures, projections, forecasts and the like only rise to the level of materiality when they can be calculated with substantial

---

[6] Plaintiff alleges that *F & M Distribs. Sec. Litig.*, 937 F. Supp. 647 (E.D. Mich. 1996), "supports denying the motion." Opp. at 12. Plaintiff is just wrong. The *F & M* court held that "economic projections are not actionable if they 'bespeak caution.'" *Id.* at 656. The "bespeaks caution" doctrine provides a mechanism by which a court can rule as a matter of law that defendants' forward-looking representations contained enough cautionary language or risk disclosures to protect the defendant against claims of securities fraud. Though the court clarified that the doctrine applies to claims alleging material misstatements (as opposed to claims regarding a failure to disclose material information), the distinction does not prevent the Court from applying the doctrine to the present case, and it certainly does not support denying the Motion. Indeed, Plaintiff pled both misstatements and omissions in the Complaint. *See* ¶¶ 3, 115-169, 213.

certainty." *James v. Gerber Prods. Co.*, 587 F.2d 324, 327 (6th Cir. 1978). The Opposition demonstrates that Plaintiff cannot establish, with factual particularity, the falsity of Defendants' class period statements about cost savings, by pointing to a handful of cherry-picked reports of "inadequate staffing," "poor health services," and "systemic failures[]" at four of the 80-plus facilities CC owned or operated during the class period. *See* Compl. at ¶ 37.[7]

### 4. Plaintiff Cannot Establish Falsity Regarding Its Allegations About Compliance With Applicable Standards

Plaintiff's arguments regarding CC's statements about the Company's compliance with "applicable standards" further highlight the weakness of the allegations in the Complaint. The Opposition fails to respond to the fact that CC's statements regarding compliance with "applicable standards" (*e.g.*, "We operate our facilities in accordance with both company and facility-specific policies and procedures") are far too general to be deemed false by the violations upon which Plaintiff relies (*e.g.*, that "inmates at Eden were exposed to drinking water with levels of radioactive contamination that exceeded the maximum allowable contaminant level, potentially increasing inmates' risks of cancer"). Compl. ¶ 9. Plaintiff's pleading failure is particularly noteworthy here, considering that Plaintiff alleges that "applicable standards" include not only company and facility-specific policies and procedures, but also the "high

---

[7] Plaintiff also asserts that Defendants "do not contest" a claim for scheme liability. Opp. at 13-14. This argument is frivolous. To be clear, every factual allegation in the Complaint is pled in an attempt to support the alleged falsity of CC's statements. But "[a] plaintiff must allege conduct beyond misstatements in order to allege Rule 10b–5(a) or Rule 10b–5(c) 'scheme liability.'" *Louisiana Mun. Police Emps. Ret. Sys. v. KPMG, LLP*, 2012 WL 3903335, at *3 (N.D. Ohio Aug. 31, 2012); *SEC v. Kelly*, 817 F. Supp. 2d 340, 343-44 (S.D.N.Y. 2011) (collecting cases, and explaining that "[s]cheme liability under subsections (a) and (c) of Rule 10b–5 hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement"). Therefore, courts "routinely reject[]" attempts "to bypass the elements necessary to impose 'misstatement' liability . . . by labeling the alleged misconduct a 'scheme' rather than a 'misstatement'" when "the primary purpose and effect of a purported scheme is to make a public misrepresentation or omission." *Id.* at 343. The same analysis is dispositive of any "scheme liability" theory here, even had it been alleged (and it was not).

standards" established by various "federal, state and local government guidelines" applicable to private prisons, including the American Correctional Association. Compl. ¶¶135-139. As a matter of prudent corporate governance, and indeed, common sense, it would have been irresponsible (if not impossible) for CC to credibly represent to investors that each of its 89 facilities complied with all applicable policies at all points during the entire class period.[8]

### C. Plaintiff Failed To Plead Loss Causation

As a matter of established Supreme Court precedent, Plaintiff must plead that the disclosure of the alleged fraud caused its damages, rather than "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Dura*, 544 U.S. at 343. Putting aside scienter and falsity for sake of argument (notwithstanding Plaintiff's failure to sufficiently plead either element), the "relevant truth" about CC's business was, according to Plaintiff, revealed on August 11, 2016, when the OIG Review was released. *See* Compl. ¶¶ 12, 38-41, 88-89, 109, 116-17, 187, 197.

Plaintiff does not and cannot identify any material stock drop until August 18, 2016—eight days after the release of the OIG Review, and just *hours* after the issuance of the Yates

---

[8] Plaintiff cites *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 480-81 and *Burges v. BancorpSouth, Inc.*, 2015 U.S. Dist. LEXIS 89822 (M.D. Tenn. July 10, 2015) as examples of securities cases where plaintiffs alleged misleading statements concerning compliance with applicable rules, policies, and standards. However, both involved statements that were far more specific and objective. *See, e.g., Omnicare*, 769 F.3d at 478 ("our billing practices materially comply with applicable state and federal requirements") and *Burges*, 2015 U.S. Dist. LEXIS 89822, at *10-11 ("[we] have complied in all material respects with and are not in material default or violation under any applicable law, statute, order, rule, regulation, policy and/or guideline of any Governmental Body relating to BancorpSouth or BancorpSouth Bank, including all Banking Laws"). In contrast, Plaintiff points only to the fact that CC stated that it was "highly motivated to comply with its contracts [and] meets its own standards of excellence." Compl. ¶ 142. CC's compliance statements, again, amount to nothing more than inactionable "puffery [that were] understood by reasonable investors as such." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 567-68 (6th Cir. 2001) (en banc), *overruled in part on other grounds by Tellabs*, 551 U.S. at 314.

13

Memorandum. *Id.* ¶ 198-99.[9] "[L]oss causation cannot be found if an intervening cause was responsible for the plaintiff's economic loss," *D.E. & J. Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 749 (E.D. Mich. 2003), aff'd, 133 F. App'x 994 (6th Cir. 2005), because in an efficient market, "courts will assume that the stock price reacts immediately, and any claim that an event moved the stock price when the event was not actually a new disclosure will necessarily fail." *See Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 89 (1st Cir. 2014). Plaintiff characterizes its loss causation theory as "a foreseeable materialization of the risk" of "conceal[ing]" the alleged operational deficiencies at certain CC facilities, Opp. at 18-19, but the market did not react when the "truth" of those alleged misstatements was revealed by the OIG Review. As a matter of public record, the market reacted in response to the announcement of a short-term policy shift (that did not even mention CC by name), *see* Mot. at 6-9, 24, and the stock prices of CC and its competitors thereafter recovered once the policy was rescinded. *See* Opp. at 20 (conceding that CC's stock price was $33.55 on February 23, 2017, which is 22% higher than it was on August 10, 2016, immediately prior to the issuance of the OIG Review, Compl. ¶ 199). That is why the impact on GEO's stock price is relevant, and the court's reasoning in *Mulvaney* (*see supra* n.3) is important: it illustrates the industry-wide impact of the Yates Memorandum, as opposed to a company-specific fraud Defendants perpetrated on CC's stockholders for no articulable reason.

---

[9] https://finance.yahoo.com/quote/CXW/history?period1=1470726000&period2=1471676400&interval=1d&filter=history&frequency=1d (confirming that CC's stock price dropped by $0.17, or less than 1%, with ordinary trading volume on August 11, 2016 (when the OIG Review was released) in stark contrast with August 18, 2016, when it dropped by $9.49, or 35%, with exceptionally heavy volume (when the Yates Memorandum was published)).

14

## III.     CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court dismiss

Plaintiff's Complaint in its entirety.

Respectfully submitted:

*/s/ Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler
Brian T. Glennon
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com

Anna E. Berces
Morgan E. Whitworth
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T:  (415) 391-0600
F:  (415) 395-8095
anna.berces@lw.com
morgan.whitworth@lw.com

*Attorneys for Defendants Corrections*
*Corporation of America, Damon T.*
*Hininger, David M. Garfinkle, Todd J.*
*Mullenger, and Harley G. Lappin*

15

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars, Suite 100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

16

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Dennis J. Herman
Willow E. Radcliffe
ROBBINS GELLER RUDMAN
 & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com

this 26th day of July, 2017.

 /s/ Steven A. Riley
Steven A. Riley