



Warning
As of: Jul 26, 2017

## WILLIAM E. BURGES, et al. v. BANCORPSOUTH, INC., et al.

### NO. 3-14-1564

### UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION

*2015 U.S. Dist. LEXIS 89822; Fed. Sec. L. Rep. (CCH) P98,572*

### July 10, 2015, Filed

**SUBSEQUENT HISTORY:** Motion denied by *Burges v. BancorpSouth, Inc., 2015 U.S. Dist. LEXIS 145635 (M.D. Tenn., Oct. 26, 2015)*
Motion granted by, Class certification granted by *Burges v. BancorpSouth, Inc., 2016 U.S. Dist. LEXIS 56802 (M.D. Tenn., Apr. 28, 2016)*
Class certification granted by *Burges v. Bancorpsouth, Inc., 2017 U.S. Dist. LEXIS 97953 (M.D. Tenn., June 26, 2017)*

**COUNSEL:** [*1] For William E. Burges, Rose M. Burges, Plaintiffs: Francis P. McConville, Jeremy A. Lieberman, LEAD ATTORNEYS, Pomerantz LLP (NY Office), New York, NY; Patrick V. Dahlstrom, LEAD ATTORNEY, Pomerantz LLP (Chicago), Chicago, IL; Paul Kent Bramlett, Robert P. Bramlett, LEAD ATTORNEYS, Bramlett Law Offices, Nashville, TN.

For BancorpSouth, Inc., James D. Rollins, III, William L. Prater, Defendants: Amy J. Eldridge, LEAD ATTORNEY, K&L Gates LLP (DC Office), Washington, DC; Jeffrey B. Maletta, LEAD ATTORNEY, PRO HAC VICE, K&L Gates LLP, Washington, DC; R. Bruce Allensworth, LEAD ATTORNEY; Gail Vaughn Ashworth, Thomas Anderton Wiseman, III, Wiseman Ashworth Law Group PLC, Nashville, TN.

For James V. Kelley, Defendant: Gail Vaughn Ashworth, Thomas Anderton Wiseman, III, Wiseman Ashworth Law Group PLC, Nashville, TN.

For City of Palm Beach Gardens Firefighters Pension Fund, Movant: Jack Reise, LEAD ATTORNEY, Robbins Geller Rudman & Dowd LLP (Boca Raton Office), Boca Raton, FL; Christopher M. Wood, Robbins Geller Rudman & Dowd LLP (Nashville Office), Nashville, TN; Jerry E. Martin, Timothy L. Miles, Barrett Johnston Martin & Garrison, LLC, Nashville, TN.

**JUDGES:** TODD J. CAMPBELL, UNITED STATES DISTRICT JUDGE. [*2]

**OPINION BY:** TODD J. CAMPBELL

**OPINION**

MEMORANDUM

Page 2

2015 U.S. Dist. LEXIS 89822, *2; Fed. Sec. L. Rep. (CCH) P98,572

Pending before the Court is Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws (Docket No. 52). For the reasons stated herein, Defendant's Motion is GRANTED in part and DENIED in part.

FACTS

This federal securities class action is brought on behalf of all persons who purchased or otherwise acquired the common stock of BancorpSouth, Inc. ("the Bank")[1] from January 8, 2014, through July 21, 2014. The Amended Complaint (Docket No. 39) seeks to recover damages caused by Defendants' alleged violations of the Securities Exchange Act and *Rule 10b-5* promulgated thereunder.

> 1    BancorpSouth, Inc. is a financial holding company which owns BancorpSouth Bank as a wholly-owned subsidiary.

Plaintiffs allege that Defendants made materially false and misleading statements and omissions regarding the Bank's compliance with federal laws and concerning the Bank's two pending acquisitions/mergers. Defendants contend that the Complaint should be dismissed because Plaintiffs have alleged no actionable misstatements, have failed to plead facts giving rise to a strong inference of scienter, and have failed adequately to allege loss causation.

At the [*3] heart of this dispute is the Bank's alleged non-compliance with federal banking laws and regulations concerning the Bank Secrecy Act ("BSA") and Anti-Money Laundering ("AML") laws. Plaintiffs allege that Defendants knew they were not in compliance (were, in fact, far out of compliance) and yet they affirmatively stated that they were in compliance with all banking laws and regulations, that they expected the two planned mergers to close in the second quarter of 2014, and that they expected to receive regulatory approval for those mergers.

MOTIONS TO DISMISS

For purposes of a motion to dismiss, the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).* To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

on its face. *Id.* A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations [*4] a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id. at 1950.* A legal conclusion couched as a factual allegation need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient. *Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010).*

Because *Section 10(b)* claims sound in fraud, the pleading strictures of *Fed. R. Civ. P. 9(b)* apply. Thus, the complaint must specify the statements (or omissions) that the plaintiffs contend were fraudulent, identify the speakers, state where and when the statements were made, and explain why the statements (or omissions) were fraudulent. *15 U.S.C. § 78u-4(b); Indiana State District Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc., 583 F.3d 935, 942-43 (6th Cir. 2009).*

ANALYSIS

Federal securities law makes it unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of federal law. *15 U.S.C. § 78j(2)(b).*

*Rule 10b-5*, promulgated by the Securities and Exchange Commission, specifies the prohibited acts as follows: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of a material fact or omitting to state a material fact necessary in order to make the [*5] statements made, in the light of the circumstances under which they were made, not misleading; and (3) engaging in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person. *17 C.F.R. § 240.10b-5.*

In order to state a claim for securities fraud, Plaintiffs must demonstrate (1) a material misrepresentation or omission by Defendants; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4)

Page 3

2015 U.S. Dist. LEXIS 89822, *5; Fed. Sec. L. Rep. (CCH) P98,572

reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *In re Omnicare, Inc. Securities Litigation, 769 F.3d 455, 469 (6th Cir. 2014)*.

Plaintiffs contend that Defendants made materially false and misleading statements concerning the Bank's compliance with legal and regulatory requirements and the timing of the anticipated mergers with Ouachita (a Louisiana bank) and Central Community (the parent company of First State Bank of Central Texas). More specifically, Plaintiffs allege that, beginning in January of 2014, Defendants assured investors that the Bank was in compliance with BSA and AML requirements when Defendants knew the Bank was not in compliance and was, after February 3, 2014, under review by the FDIC.[2] Plaintiffs also claim that Defendants failed [*6] to disclose the FDIC review and the effect it would have on the Bank's anticipated mergers. Plaintiffs assert false and misleading statements and omissions in the Bank's press releases, Form 8-Ks, conference calls, registration statements, Form 10-Ks and proxy statements from January through July of 2014.

> 2   The Amended Complaint alleges that because financial institutions are given advance notice of upcoming examinations, Defendants were aware of the impending FDIC review before the review began on February 3, 2014.

Material Misrepresentation or Omission

Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that the statement or omission concerned a material fact. *In re Omnicare, 769 F.3d at 470*. Materiality can be established by proof of a substantial likelihood that the disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. *Indiana, 583 F.3d at 943*.[3]

> 3   It does not appear that Defendants contend these alleged statements and omissions were not "material." In any event, whether [*7] or not a statement is "material" turns on a fact-intensive test and, therefore, the Court may not dismiss a complaint on the ground that the alleged statements or omissions were not material unless

they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance. *In re Sanofi Securities Litigation, 87 F. Supp. 3d 510, 2015 U.S. Dist. LEXIS 11209, 2015 WL 365702 at * 12 (S.D. N.Y. Jan. 28, 2015)*. These alleged statements and omissions do not fall in that category.

When an alleged misrepresentation concerns "hard information" - typically historical information or other factual information that is objectively verifiable - it is actionable if a plaintiff pleads facts showing that the statement concerned a material fact and that it was objectively false or misleading. *Omnicare, 769 F.3d at 470*. When an alleged misrepresentation concerns "soft information" - predictions and matters of opinion - a plaintiff must additionally plead facts showing that the statement was made with actual knowledge of its falsity. *Id.*

For the alleged misrepresentations in Plaintiffs' Complaint (Docket No. 39), Plaintiffs have alleged specific statements or omissions, the time and place of each communication or omission, and why they are allegedly false or misleading. For purposes of this Motion to Dismiss, [*8] these allegations are sufficiently particular under *Fed. R. Civ. P. 9(b)*.

Defendants argue, however, that the representations about the expected time-line for the mergers and the required regulatory approvals were not false or misleading because Defendants never suggested that the regulatory approvals were assured or that the time-line was guaranteed. Defendants claim their statements were forward-looking and included cautionary language such as use of the words "expect" and "anticipate." Defendants insist that they warned investors that the hoped-for regulatory approvals and mergers were not guaranteed.

Federal securities law includes a "safe harbor" which excuses liability for statements containing projections of revenues, income, earnings or other financial items; statements of the plans and objectives of management for future operations; and statements of future economic performance. *15 U.S.C. §78u-5(i)*; *Indiana, 583 F.3d at 943*.

Specifically, a person shall not be liable for any forward-looking statement (1) if the statement is identified as a forward-looking statement and is

Page 4

2015 U.S. Dist. LEXIS 89822, *8; Fed. Sec. L. Rep. (CCH) P98,572

accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement, [*9] or (2) if the forward-looking statement is immaterial, or (3) if the plaintiff fails to prove that the forward-looking statement was made by or with the approval of an executive officer of the business entity and was made or approved by such officer with actual knowledge by that officer that the statement was false or misleading. *15 U.S.C. § 78u-5(c)*.

The Court finds that certain of the allegedly misleading statements in this case are forward-looking statements. The statements in the press releases, registration statements, agreements, Form 10-Ks, proxy statements and/or oral representations which announced that the Bank expected the mergers to close in the second quarter of 2014 are forward-looking statements and are protected by the Safe Harbor provisions. Particularly because these statements are couched in cautionary terms such as "expect" or "anticipate," the statements are protected.

Moreover, both the January 8, 2014 and the January 22, 2014 press releases concerning the two mergers include two complete paragraphs headed "Forward-Looking Statements," which identify and specifically warn the readers not to place undue reliance on these statements and set forth a variety of factors which could change [*10] the anticipated results. Docket Nos. 57-2 and 57-4.

The statements which announced that the Bank expected to receive the appropriate regulatory approvals also reflect anticipated and expected actions, not guarantees, and they are forward-looking statements. For these reasons, the Court finds that the forward-looking statements concerning what Defendants anticipated and/or expected to happen concerning the two mergers are protected by the Safe Harbor and are not false or misleading.

Plaintiffs allege more than forward-looking statements about the timing of the regulatory approval and the mergers, however. Plaintiffs also allege that Defendants affirmatively represented that the Bank was in compliance with banking laws when they knew it was not. For example, Plaintiffs allege that, as part of the merger agreement with Ouachita, which was attached to the Bank's publicly-filed February 12, 2014 Registration Statement, and in similar documents with regard to the

Central Community merger, the Bank represented that:

> BancorpSouth and BancorpSouth Bank have complied in all material respects with and are not in material default or violation under any applicable law, statute, order, rule, regulation, [*11] policy and/or guideline of any Governmental Body relating to BancorpSouth or BancorpSouth Bank, including all Banking Laws.
>
> . . .
>
> Each of BancorpSouth and BancorpSouth Bank has timely and properly filed and maintained in all material respects all requisite Currency Transaction Reports and Suspicious Activity Reports and has systems customarily used by financial institutions of a similar size to BancorpSouth Bank that are designed to properly monitor transaction activity (including wire transfers).
>
> . . .
>
> BankcorpSouth has no Knowledge of any fact or circumstance relating to BancorpSouth or any of its Subsidiaries that would materially impede or delay receipt of any required regulatory approval of the Merger or the other transactions contemplated by this Agreement, including the Bank Merger, nor does BancorpSouth have any reason to believe that it will not be able to obtain all requisite regulatory and other approvals or consents which it is required to obtain in order to consummate the Merger and the Bank Merger.

Complaint, ¶ 127.

Plaintiffs allege that Defendants continued to falsely represent that the Bank was in compliance with all banking laws, had filed all relevant reports, and had [*12] no knowledge of any fact or circumstance which would impede or delay regulatory approvals when Defendants knew all along that the Bank was not in compliance and, in fact, after February 3, 2014, knew that the Bank was

Page 5

2015 U.S. Dist. LEXIS 89822, *12; Fed. Sec. L. Rep. (CCH) P98,572

the subject of a Target Review by the FDIC for BSA and/or AML compliance.

Defendants affirmatively stated that they were in compliance with all banking laws, had timely filed all the proper and required reports concerning currency transactions and suspicious activity, and had no knowledge of any fact or circumstance relating to BancorpSouth or any of its subsidiaries that would materially impede or delay receipt of any required regulatory approval of the proposed merger. These are affirmative statements about present or historical facts, not forward-looking statements, and Plaintiffs sufficiently allege that Defendants knew these statements were false and misleading, given the Bank's non-compliance and the existing FDIC review.

Although federal securities law does not create an affirmative duty to disclose any and all material information, an omission is actionable when disclosure of information is necessary to make the statements made, in light of the circumstances under [*13] which they were made, not misleading. *Sanofi, 2015 U.S. Dist. LEXIS 11209, 2015 WL 365702 at * 11; 17 C.F.R. § 240.10b-5(b)*. If a company chooses to volunteer information, its disclosure must be full and fair, and courts may conclude that the company was obliged to disclose additional material facts to the extent that the volunteered disclosure was misleading. *City of Monroe Employees Retirement System v. Bridgestone Corp., 399 F.3d 651, 670 (6th Cir. 2005)*. The securities laws require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak. *Id.* As stated in *Rule 10b-5*, it is unlawful for a person to omit to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading. *Id.*

Generally, companies have no duty to opine about the legality of their own actions. *Indiana, 583 F.3d at 945*. If the complaint adequately alleges that the defendants knew the statements were untruthful, however, liability can attach to a company's general assertion of legal compliance. *Id.* Here, unlike the plaintiffs in *Indiana*, Plaintiffs have set forth sufficient factual allegations to support their claim that Defendants knew these statements to be untrue when they were made. Plaintiffs have pled facts, sufficient at this pleading stage of the litigation, which demonstrate that Defendants [*14]

were not in compliance with federal banking laws at the time these representations were made.

For example, Plaintiffs allege that the BSA and AML regulations require, at a minimum, that the Bank have (1) a system of internal controls to ensure ongoing compliance; (2) independent testing of compliance; (3) a designated compliance officer; and (4) training for appropriate personnel. Plaintiffs contend that the Bank was not in compliance with any of these requirements. Plaintiffs also have alleged numerous facts showing that compliance with the BSA and AML laws was a key issue and well-known focus in the banking industry since at least 2012. In addition, Plaintiff asserts that the FDIC initiated a Target Review into the Bank's compliance program on February 3, 2014, before many of the alleged misrepresentations.

Because Defendants chose to speak on the issue of their compliance with banking laws and regulations, a reasonable juror could conclude that those statements, without some qualification or accompanying disclosure of their non-compliance and/or the pending FDIC review, were misrepresentations because they were, at a minimum, incomplete.

It may be the case that at the summary judgment [*15] stage of this dispute, Defendants can show otherwise; but at this stage in the lawsuit, construing the Complaint in the light most favorable to Plaintiffs, the Court finds that Defendants' representations concerning their compliance with banking laws could be deemed material misrepresentations. *See City of Monroe, 399 F.3d at 672*.

With the exception of the forward-looking statements concerning the timing of the mergers and regulatory approvals, Plaintiffs have sufficiently alleged material misrepresentations and/or omissions to survive the Motion to Dismiss.

Scienter

To show scienter, Plaintiffs must state with particularity facts giving rise to a strong inference that the Defendants acted with the required state of mind. *Frank v. Dana Corp., 646 F.3d 954, 958 (6th Cir. 2011)*. Scienter may take the form of knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness. *Id. at 959*.[4] "Recklessness" is defined as highly unreasonable conduct which is an extreme

Page 6

2015 U.S. Dist. LEXIS 89822, *15; Fed. Sec. L. Rep. (CCH) P98,572

departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable person would have known of it. Recklessness is not negligence, but more akin to conscious disregard. *Id.*

> 4   The Sixth Circuit has held that if the alleged misrepresentation is [*16] "soft" information, plaintiffs must plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate or defraud the public. *Omnicare, 769 F.3d at 473*. The alleged misrepresentations and omissions still at issue here, as explained above, deal with present and historical facts and are "hard" information.

The three-part test set forth by the Supreme Court for lower courts to apply in assessing the sufficiency of a plaintiff's scienter allegations is: (1) the court must accept all factual allegations in the complaint as true; (2) the court must consider the complaint in its entirety and decide whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard; and (3) assuming plaintiff's allegations create a powerful or cogent inference of scienter, the court must compare this inference with other competing possibilities, allowing the complaint to go forward only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged. *Omnicare, 769 F.3d at 473*.

Thus, accepting the allegations of the [*17] Complaint as true and viewing them collectively, the Court must decide whether the facts alleged give rise to a strong inference of scienter and, if so, whether that inference is at least as compelling as any opposing inference. To qualify as "strong," an inference of scienter must be more than merely plausible or reasonable; it must be cogent and at least as compelling as any opposing inference of non-fraudulent conduct. *Ashland, Inc. v. Oppenheimer & Co., Inc., 648 F.3d 461, 469 (6th Cir. 2011)*.

The facts alleged here include, as noted above, allegations that compliance with BSA and AML regulations was required, well-known and well-enforced during the time just before and the time of the alleged misrepresentations and/or omissions. Plaintiffs allege that Defendants knew or should have known that their

compliance was important and necessary. Plaintiffs also allege that Defendants knew or should have known that they were not in compliance with these regulations and laws, particularly in light of the ongoing FDIC Target Review of the Bank's BSA and AML compliance. Plaintiffs contend that Defendants' representations were, at best, reckless.

The Court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 326, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*. The [*18] Court finds that Plaintiffs' factual allegations, when considered together, give rise to a strong inference that Defendants acted with scienter with regard to their representations and omissions about compliance with the BSA and AML laws and regulations.

Plaintiffs have set forth factual allegations which, if true, show that Defendants knew or should have known or, at a minimum were reckless in ignoring the fact that, they were not in compliance with these banking laws. For example, Plaintiffs contend that Defendants knew that for the mergers to be approved, the Bank would have to be in compliance with applicable state and federal laws and regulations and that regulators would review the Bank's compliance therewith. Plaintiffs allege that Defendants knew (or at a minimum were reckless in not knowing) that the Bank was required to develop and maintain a BSA/AML compliance program which provided for the minimum "4 Pillars" of BSA compliance. Plaintiffs assert that Defendants were, at a minimum, reckless if they were unaware of these requirements and, especially in light of the FDIC Target Review, if they were unaware that they were not in compliance.

For these reasons, the Court finds [*19] that Plaintiffs have sufficiently pled scienter with regard to the Defendants' affirmative statements concerning compliance.

Loss Causation

Defendants contend that Plaintiffs have not sufficiently alleged loss causation. In any private action under the federal securities law, the plaintiff has the burden of proving that the act or omission of the defendant alleged to violate the securities law caused the loss for which the plaintiff seeks to recover damages. *15 U.S.C. § 78u-4(b)(4)*. Loss causation requires a causal connection between the material misrepresentation and

Page 7

2015 U.S. Dist. LEXIS 89822, *19; Fed. Sec. L. Rep. (CCH) P98,572

the loss. Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Indiana, 583 F.3d at 944.*

The Amended Complaint alleges that Defendants' false and misleading statements and omissions caused the Bank stock to trade at inflated prices and then, after July 21, 2014, when Defendants disclosed for the first time that bank regulators had "concerns" and additional time would be required to obtain regulatory approvals, the Bank's stock price dropped nearly 10% in two days.[5]

> 5  Plaintiffs also aver that during the same period when the Bank stock price [*20] fell nearly 10%, the stock of the Bank's selected industry peer group fell less than 1%.

Defendants argue that the market's reaction to the July 21, 2014 announcement was a reaction simply to the delay in the anticipated mergers, an occurrence about which the public had been warned numerous times. Defendants claim, therefore, that the drop in stock price was not a result of any alleged misrepresentations or omissions, but rather a result of a delay for regulators' concerns, of which the public had been warned all along. Defendants point out that on August 6, 2014, when Defendants disclosed for the first time that they were entering into a Consent Decree with the FDIC and that the merger applications would not be considered until the Consent Decree's terms were met, the Bank's stock price did not change materially.

The Court finds that Plaintiffs have adequately pled loss causation by showing that the stock price dropped when the information concerning the regulatory concerns and review was first disclosed. The Complaint sufficiently alleges that the information in the July 21, 2014 announcement was enough to affect the market and stock price in a negative way.

Section 20(a) Individual Liability

Because [*21] of the above-stated holdings, the Amended Complaint's Section 20(a) allegations with

regard to forward-looking statements (as identified herein) are dismissed and the Amended Complaint's Section 20(a) allegations with regard to the affirmative statements of compliance (as identified herein) are sufficient to survive this motion to dismiss.

CONCLUSION

For these reasons, Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws (Docket No. 52) is GRANTED in part and DENIED in part.

IT IS SO ORDERED.

/s/ Todd J. Campbell

TODD J. CAMPBELL

UNITED STATES DISTRICT JUDGE

ORDER

Pending before the Court is Defendants' Motion to Dismiss Lead Plaintiff's Complaint for Violations of the Federal Securities Laws (Docket No. 52). For the reasons stated in the accompanying Memorandum, Defendant's Motion is GRANTED in part and DENIED in part.

As explained in the Memorandum, Plaintiff's allegations concerning the timing and the expected regulatory approvals of the two mergers at issue, as to all Defendants, are DISMISSED as forward-looking statements.

This action is referred to the Magistrate Judge for further customized case management, including a target trial date.

IT IS SO ORDERED.

/s/ Todd [*22] J. Campbell

TODD J. CAMPBELL

UNITED STATES DISTRICT JUDGE





Positive
As of: Jul 26, 2017

**GARDEN CITY EMPLOYEES' RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff, CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, Lead Plaintiff, v. PSYCHIATRIC SOLUTIONS, INC., JOEY A. JACOBS, BRENT TURNER, and JACK E. POLSON, Defendants.**

**No. 3:09-00882**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF TENNESSEE, NASHVILLE DIVISION**

*2011 U.S. Dist. LEXIS 35661*

**March 31, 2011, Decided**
**March 31, 2011, Filed**

**SUBSEQUENT HISTORY:** Motion denied by, Reconsideration denied by *In re Garden City Emples. Ret. Sys., 2011 U.S. Dist. LEXIS 91861 (M.D. Tenn., Aug. 13, 2011)*

**PRIOR HISTORY:** *Garden City Emples. Ret. Sys. v. Psychiatric Solutions, Inc., 2010 U.S. Dist. LEXIS 42915 (M.D. Tenn., Apr. 30, 2010)*

**COUNSEL:** [*1] For Garden City Employees' Retirement System, Plaintiff: Catherine J. Kowalewski, Darren J. Robbins, David C. Walton, LEAD ATTORNEYS, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Douglas S. Johnston, Jr., Timothy L. Miles, LEAD ATTORNEYS, George Edward Barrett, Barrett Johnston, LLC, Nashville, TN; Julie A. Kearns, LEAD ATTORNEY, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Diego, CA; Michael J.

Vanoverbeke, Thomas C. Michaud, LEAD ATTORNEYS, Vanoverbeke, Michaud & Timmony, P.C., Detroit, MI; Daniel J. Pfefferbaum, PRO HAC VICE, Robbins Geller Rudman & Dowd LLP, San Francisco, CA; Dennis J. Herman, Robbins Geller Rudman & Dowd LLP, San Francisco, CA.

For Central States, Southeast and Southwest Areas Pension Fund, Plaintiff: Dennis J. Herman, Robbins Geller Rudman & Dowd LLP, San Francisco, CA.

For Psychiatric Solutions, Inc., Joey A. Jacobs, Brent Turner, Jack E. Polson, Defendants: Jessica Perry Corley, Lisa R. Bugni, Todd Richard David, LEAD ATTORNEYS, PRO HAC VICE, Alston & Bird LLP, Atlanta, GA; Michael T. Harmon, W. Travis Parham, LEAD ATTORNEYS, Waller, Lansden, Dortch & Davis, LLP, Nashville, TN; Waverly David Crenshaw, Jr., LEAD ATTORNEY, Waller, Lansden, Dortch & [*2]

Davis, Nashville, TN.

For Joe Middendorf, Movant: Jeffrey A. Berens, Robert J. Dyer, III, LEAD ATTORNEYS, Dyer & Berens LLP, Denver, CO; Wade Bonham Cowan, Nashville, TN.

For Policemen's Annuity and Benefit Fund of Chicago, Movant: Daniel E. Bacine, LEAD ATTORNEY, PRO HAC VICE, Barrack, Rodos & Bacine, Philadelphia, PA; Gregg S. Levin, LEAD ATTORNEY, PRO HAC VICE, Motley Rice LLC, Mount Pleasant, SC; James Gerard Stranch, III, James Gerard Stranch, IV, Jane Branstetter Stranch, LEAD ATTORNEYS, Branstetter, Stranch & Jennings, Nashville, TN; Samuel M. Ward, Stephen R. Basser, LEAD ATTORNEYS, PRO HAC VICE, Barrack, Rodos & Bacine, San Diego, CA.

For KBC Asset Management NV, Movant: James M. Hughes, William S. Norton, LEAD ATTORNEYS, PRO HAC VICE, Motley Rice LLC, Mount Pleasant, SC; James Gerard Stranch, III, James Gerard Stranch, IV, LEAD ATTORNEYS, Branstetter, Stranch & Jennings, Nashville, TN; William H. Narwold, LEAD ATTORNEY, Motley Rice LLC, Hartford, CT.

For Central States, Southeast and Southwest Areas Pension Fund, Movant: Darren J. Robbins, Tor Gronborg, Tricia L. McCormick, LEAD ATTORNEYS, Robbins Geller Rudman & Dowd LLP, San Diego, CA; George Edward Barrett, Barrett Johnston, [*3] LLC, Nashville, TN.

For Psychiatric Solutions Institutional Investors Group, Movant: Daniel E. Bacine, LEAD ATTORNEY, PRO HAC VICE, Barrack, Rodos & Bacine, Philadelphia, PA; Gregg S. Levin, James M. Hughes, William S. Norton, LEAD ATTORNEYS, PRO HAC VICE, Motley Rice LLC, Mount Pleasant, SC; James Gerard Stranch, III, James Gerard Stranch, IV, Jane Branstetter Stranch, LEAD ATTORNEYS, Branstetter, Stranch & Jennings, Nashville, TN; Mark R. Rosen, LEAD ATTORNEY, Barrack, Rodos & Bacine, Philadelphia, PA; Samuel M. Ward, Stephen R. Basser, LEAD ATTORNEYS, PRO HAC VICE, Barrack, Rodos & Bacine, San Diego, CA; William H. Narwold, LEAD ATTORNEY, Motley Rice LLC, Hartford, CT; W. Travis Parham, Waller Lansden Dortch & Davis, LLP, Nashville, TN.

**JUDGES:** William J. Haynes, Jr., United States District Judge.

**OPINION BY:** William J. Haynes, Jr.

**OPINION**

**MEMORANDUM**

| |
|---|
| **A. ANALYSIS OF THE AMENDED COMPLAINT** |
| 1. THE PARTIES |
| 2. PSI's BUSINESS PRACTICES |
| 3. STATE ENFORCEMENT ACTIONS AGAINST PSI |
| 4. MEDIA REPORTS ON PSI's PRACTICES |
| 5. PSI's RESPONSES TO PUBLISHED REPORTS |
| 6. DEFENDANTS' STATEMENTS ON PSI's FINANCES |
| 7. SCIENTER ALLEGATIONS |
| a. Defendants' Alleged False or Misleading Statements |
| b. Insider Trading |
| c. Executive Bonuses and Other Incentive Compensation |
| d. Whistleblower Actions |
| 8. INDIVIDUAL DEFENDANTS |
| **B. CONCLUSIONS OF LAW** |

| 1. RULE 10(B) AND PLSRA STANDARDS |
| 2. STANDARD OF REVIEW |
| 3. ANALYSIS OF PLAINTIFFS' CLAIMS |
| a. The Materiality Element |
| b. The Safe Harbor Analysis |
| i. PSI's Undisclosed Understaffing and Patient Care Problems |
| ii. Defendants' Statements about Published Reports of PSI's Compliance and Omissions of Material Facts |
| iii. Defendants' Misrepresentations and Omissions about Conditions at Riveredge |
| iv. Defendants' Deliberate Accounting Manipulations and Omissions |
| c. Scienter Analysis of Plaintiffs' Claims |
| i. Divergence Between Defendants' Public Reports and Government and Internal Reports |
| ii. Defendants' Concealment of Illegal Activity to Defraud Investors |
| iii. Defendants' Misleading Financial Statements |
| iv. Individual Defendants' Financial Motivations and Insider Trading |
| **C. CONCLUSION** |

Plaintiffs, [*4] Garden City Employees' Retirement System ("Garden City") and Central States, Southeast and Southwest Areas Pension Fund, filed this action under *Section 10(b)* and *20(a)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78a et seq.*, and *Rule 10b-5* promulgated thereunder, *17 C.F.R. § 240.10b-5*, on behalf of themselves and a class of shareholders against the Defendants: Psychiatric Solutions, Inc. ("PSI"), Joey A. Jacobs, Brent Turner, and Jack E. Polson. In earlier proceedings, the Court appointed Central States, Southeast and Southwest Areas Pension Fund ("Central States") as the Lead Plaintiff in this action. Central States then filed an amended complaint (Docket Entry No. 109). Plaintiffs assert jurisdiction under *15 U.S.C. § 78aa* of the Securities Exchange Act.

In sum, Plaintiffs allege that from February 21, 2008 through February 25, 2009 when Plaintiffs purchased or held PSI stock, these Defendants engaged in and/or materially assisted in a scheme and course of business to inflate artificially the value of PSI stock. Defendants allegedly did so by running the business in a manner which operated as a fraud or deceit upon investors and other members of the public. Plaintiffs specifically [*5] allege that the Defendants concealed PSI's increasing financial difficulties in increasing revenue and profits due to staffing PSI facilities at levels below those necessary for patient safety and PSI's stated quality of care at PSI facilities. Plaintiffs allege that the Defendants repeatedly minimized the significance of published reports of patient safety incidents at PSI institutions to hide PSI's actual financial problems and to prevent steep stock price declines until February 25, 2009, when PSI reported its fiscal year 2008 and fourth quarter 2008 financial results. Plaintiffs allege that the Defendants' fraud ultimately led to a collapse of PSI's stock price, damaging the Plaintiffs.

Before the Court is the Defendants' motion to dismiss (Docket Entry No. 110), contending, in essence, that the amended complaint fails to plead any actionable misrepresentation or omission and is legally insufficient to state the scienter necessary for Plaintiffs' securities claims. Defendants specifically assert that: (1) any forward-looking statements are protected by the safe harbor provisions of the Private Securities Litigation Reform Act ("PSLRA"); (2) PSI's statements of past

earnings are [*6] not actionable because they were not false; (3) Plaintiffs' amended complaint fails to allege that PSI's statements of substantial compliance with the law were false and PSI's disclosures were adequate as a matter of law; (4) Defendants' statements of "Highest Quality of Care" at PSI facilities are not actionable; and (5) Plaintiffs' allegations do not give rise to a strong inference of scienter.

In their response, Plaintiffs assert, in sum: (1) that their factual allegations are adequate to state actionable federal securities claims against each of the Defendants and to tie their alleged injuries to the Defendants' violations of federal securities laws; and (2) that Plaintiffs' factual allegations establish each Defendant's responsibility for these violations and state a cognizable injury due to such violations. Plaintiffs also argue that the Defendants concealed the true reasons for the apparent success of PSI's strategy of expanding through acquisition and deceived investors about PSI's financial strength and sustainability.

Based upon the amended complaint and the parties' submissions, the Court concludes that given the extent and scope of state enforcement agencies' findings and [*7] sanctions for inadequate services and patient care at PSI facilities, PSI's and the Individual Defendants' statements about the nature of PSI's services, practices and profitability are actionable. Plaintiffs' allegations give rise to a strong inference of scienter necessary for Plaintiffs' securities claims for Defendants' material misrepresentations and omissions. Thus, the Defendants' motion to dismiss should be denied.

## A. Analysis of the Amended Complaint

### 1. The Parties

According to Plaintiffs' amended complaint,[1] Plaintiffs, Garden City Employees' Retirement System ("Garden City") and Central States, Southeast and Southwest Areas Pension Fund are benefit funds that purchased PSI stock in providing pension services and benefits to more than 360,000 participants in those Plans. (Docket Entry No. 109, Amended Complaint at ¶¶ 19, 20). The proposed class in this action includes persons who purchased the publicly traded securities of PSI between February 21, 2008 through February 25, 2009. Id. at ¶ 1.

    1  Plaintiffs' amended complaint, (Docket Entry

No. 109), supersedes the original complaint. *Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986)*. Plaintiffs' amended complaint exceeds [*8] one hundred thirty-five pages. In addition, the parties submitted extensive memoranda and Defendants submitted supporting documents on the Defendants' motion to dismiss. (Docket Entry Nos. 111-1 through 111-7 and 123). As discussed infra, documents attached to or referred to in a complaint are to be considered on a motion to dismiss. For these claims, judicial analysis "necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept." *Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001)* (en banc), abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*.

PSI is a publically traded company based in Franklin, Tennessee, and provides inpatient behavioral healthcare services at 95 hospitals and residential treatment facilities. Id. at ¶ 2. The majority of PSI's patients in these facilities are children and adolescents who have been placed under protective care after incidents of abuse or neglect by their former caregivers. Id. PSI's common stock is traded on the NASDAQ market under the ticker symbol "PSYS." Id. at ¶ 21. During the Class Period, there were more [*9] than 55 million shares of PSI common stock issued and outstanding. Id.

Defendant, Joey A. Jacobs, co-founded PSI in 1988, and has served as executive chairman of PSI's board of directors and as PSI's president and chief executive officer since April 1997. Id. at ¶ 22. As chief executive officer, Jacobs oversees and directs PSI's day-to-day business. Id. During the Class Period, Jacobs signed PSI's Securities and Exchange Commission ("SEC") filings and Sarbanes-Oxley certifications. Id.

Since August 2002, Defendant Jack E. Polson has served as PSI's chief accounting officer. Id. at ¶ 23. Prior to that position, Polson served as PSI's controller beginning in June 1997. Id. As chief accounting officer, Polson participates in monthly executive review meetings with each of PSI's division's presidents. Id. During these meetings, Jacobs, Polson and other PSI executives discussed detailed financial reports for each PSI division and inpatient facility. Id. With Defendant Brent Turner

and Jacobs, Polson sets PSI's facilities' budgets, including capital allocated to staffing. Id. During the Class Period, Polson signed SEC filings and Sarbanes-Oxley certifications. Id.

Since August 2005, Defendant [*10] Brent Turner has served as PSI's executive vice president for finance and administration. Id. at ¶ 24. In this position, Turner works with Jacobs and Polson to set PSI's facilities' budgets, including capital allocated to staffing. Id. Beginning in February 2003, Turner served as PSI's vice president, treasurer and had responsibility for investor relations. Id.

### 2. PSI's Business Practices

According to the amended complaint, in 1999 PSI decided to expand its services to inpatient hospitals and centers. Id. at ¶ 28. In 2002, PSI merged with the PMR Corporation and acquired five hospitals. Id. Between 2002 and 2007, PSI acquired more than 90 hospitals and centers averaging 17 such acquisitions per year. Id. at ¶¶ 28, 29, 41. PSI financed these acquisitions with $620 million in guaranteed notes, a line of credit and secured loans from lenders. Id. at ¶ 30. By the end of 2007, PSI's various debts exceeded $650 million with interest rates between 6.4% and 7.1% interest. Id. Plaintiffs allege that by May 2007, PSI had a maximum leverage ratio of 5.5x PSI's adjusted EBITDA (Earnings Before Interest Taxes Depreciation and Amortization). Id. In December 2007, a Credit Suisse analyst cited PSI [*11] as "among the more successful health care service rollups in recent memory." Id. at ¶ 28.

Defendants allegedly stated that PSI could leverage its debt through 7% to 9% growth from existing facilities on an annual basis. Id. at ¶ 31. Between 2002 and 2008, PSI repeatedly told investors to expect and stated that PSI had delivered a growth in "same facility" revenues of 7% to 9% per year. Id. at ¶ 2. Plaintiffs alleged that to do so, Defendants essentially were purchasing earnings by using debt to buy facilities to increase PSI's annual revenue. Id. at ¶ 31. Investors raised questions about PSI's "rollup strategy" based upon acquisitions and the viability of this strategy. Id. In March 2008, after PSI's acquisition of five facilities in the first quarter of 2008, a Credit Suisse market analyst wrote that PSI "historically ... has overpaid for assets, in an attempt to drive the income statement, yet disregarding the balance sheet." Id.

PSI's 2007 10-K Report, issued on February 28, 2008, assured investors of PSI's continuing viability and explained PSI's plans to continue growth by acquisition of existing psychiatric hospitals and residential treatment centers:

**Our Growth Strategy** We have [*12] experienced significant growth in our operations as measured by the number of our facilities, admissions, patient days, revenue and net income. We intend to continue successfully growing our business and increasing our profitability **by improving the performance of our inpatient facilities and through strategic acquisitions**. The principal elements of our growth strategy are to:

o Continue to Drive Same-Facility Growth -- We increased our samefacility revenue by approximately 6.5% for the year ended December 31, 2007 compared to the year ended December 31, 2006. Samefacility revenue also increased by approximately 9.0%, 8.0%, and 9.0% for the years ended December 31, 2006, 2005, and 2004, respectively, compared to the immediately preceding years. Samefacility revenue refers to the comparison of the inpatient facilities we owned during a prior period with the comparable period in the subsequent period, adjusted for closures and combinations for comparability purposes. We intend to continue to increase our samefacility growth by increasing our admissions and patient days and obtaining annual reimbursement rate increases. We plan to

accomplish these goals by:

o expanding bed capacity at our [*13] facilities to meet demand;

o expanding our services and developing new services to take advantage of increased demand in select markets where we operate;

o building and expanding relationships that enhance our presence in local and regional markets;

o developing formal marketing initiatives and expanding referral networks; and

o continuing to provide high quality service.

o Grow Through Strategic Acquisitions -- Our industry is highly fragmented and we plan to selectively pursue the acquisition of additional inpatient behavioral health care facilities. There are approximately 500 freestanding acute and residential treatment facilities in the United States and the top two providers operate approximately one-third of these facilities. We believe there are a number of acquisition candidates available at attractive valuations, and we have a number of potential acquisitions that are in various stages of development and

consideration. We believe our focus on inpatient behavioral health care provides us with a strategic advantage when assessing a potential acquisition. We employ a disciplined acquisition strategy that is based on defined criteria, including quality of service, return on invested [*14] capital and strategic benefits.

o Enhance Operating Efficiencies -- **Our management team has extensive experience in the operation of multi-facility health care services companies. We intend to focus on improving our profitability by optimizing staffing ratios, controlling contract labor costs and reducing supply costs through group purchasing. We believe that our focus on efficient operations increases our profitability and will attract qualified behavioral health care professionals and patients.**

Id. at ¶ 32 (emphasis added).

PSI's 2007 10-K Report cited PSI's "[d]emonstrated ability to identify and integrate acquisitions" as a competitive strength, and its rigorous due diligence review, disciplined acquisition strategy, and comprehensive post-acquisition strategic plans to improve revenues and the quality of patient care:

We attribute part of our success in integrating acquired inpatient facilities to

our rigorous due diligence review of these facilities prior to completing the acquisitions as well as our ability to retain key employees at the acquired facilities. We employ a disciplined acquisition strategy that is based on defined criteria including quality of service, return on invested [*15] capital and strategic benefits. **We also have a comprehensive post-acquisition strategic plan to facilitate the integration of acquired facilities that includes improving facility operations, retaining and recruiting psychiatrists and expanding the breadth of services offered by the facilities.**

Id. at ¶ 33 (emphasis added).

As to delivery of its services, PSI's 2007 10-K Report filed with the SEC stated that PSI's hospitals "provide the most intensive level of care, including 24-hour skilled nursing observation and care, **daily interventions and oversight by a psychiatrist and intensive, highly coordinated treatment by a physician-led team of mental health professionals**." Id. at ¶ 107 (emphasis added). This 2007 10-K Report also informed investors that PSI could manage this growth without sacrificing "our reputation for the quality of our services" or jeopardizing its "recruitment of first rate medical staff," both of which allowed PSI to "differentiate ourselves from our competition." Id. at ¶ 34. As to the quality of PSI's treatment facilities, the report cited the "[t]wenty-four hour observation and care" at its residential treatment centers and PSI's ability to "provide services to [*16] patients with multiple issues and specialized needs" that resulted in numerous out-of-state referrals of patients to PSI's facilities. Id.

This 2007 report assured investors that PSI was operating its facilities in compliance with regulatory requirements and operating standards:

**Regulation and Other Factors**

**Licensure, Certification and Accreditation** Health care facilities are required to comply with extensive regulation at the federal, state and local levels. Under these laws and regulations, health care facilities must meet requirements for state licensure as well as additional qualifications to participate in government programs, including the Medicare and Medicaid programs. These requirements relate to the adequacy of medical care, equipment, personnel, operating policies and procedures, fire prevention, maintenance of adequate records, hospital use, rate-setting, and compliance with building codes and environmental protection laws. Facilities are subject to periodic inspection by governmental and other authorities to assure continued compliance with the various standards necessary for licensing and accreditation.

All of the inpatient facilities operated by us are properly licensed under [*17] applicable state laws. Most of the inpatient facilities operated by us are certified under Medicare and/or Medicaid programs and accredited by The Joint Commission, a functional prerequisite to participation in the Medicare and Medicaid programs. Should any of our inpatient facilities lose its accreditation by The Joint Commission, or otherwise lose its certification under the Medicare and/or Medicaid program, that inpatient facility may be unable to receive reimbursement from the Medicare and/or Medicaid programs. If a provider for who we provide contract management services is excluded from any federal health care program, no services furnished by that provider would be reimbursed by any federal health care program. If one of our facilities is excluded from a federal health care program, that facility would not be eligible for reimbursement by any federal health care program.

**We believe that the inpatient facilities we own and operate generally are in substantial compliance with current applicable federal, state, local and independent review body regulations and standards**. The requirements for licensure, certification and accreditation are subject to change

and, in order to remain [*18] qualified, it may be necessary for us to affect changes in our inpatient facilities, equipment, personnel and services. Additionally, certain of the employed and contracted personnel working at our inpatient facilities are subject to state laws and regulations governing their particular area of professional practice. We assist our managed client hospitals in obtaining required approvals for new programs.

Id. at ¶ 107 (emphasis added).

The 2007 Report on Form 10-K further asserted that PSI had an extensive control system in effect to ensure the "identification and connection of any actual or perceived violations." Id. at ¶ 108. The 2007 Form 10-K Report further assured investors that PSI's operations were "continually assessed and monitored" to assure "the highest quality of care." Id. at ¶ 110.

We strive to improve the operating results of new and existing inpatient behavioral health care operations by providing the highest quality service, expanding referral networks and marketing initiatives and meeting increased demand for behavioral health care services by expanding our services and developing new services. **We also attempt to improve operating results by optimizing staffing ratios,** [*19] **controlling contract labor costs and reducing supply costs through group purchasing**.

\* \* \*

**The services provided at each inpatient facility are continually assessed and monitored through an ongoing quality improvement program**. The purpose of this program is to strive for the highest quality of care possible for individuals with behavioral health issues, and includes regular site visits to each inpatient facility in order to assess compliance with legal and regulatory standards, as well as adherence to our compliance program. Standardized

performance measures based on a national outcomes measurement data base comparing our inpatient facilities' performance with national norms are also reported and reviewed and corrective steps are taken when necessary.

Id. at ¶¶ 109, 110 (emphasis added).

According to Plaintiffs, to meet PSI's financial expectations, Defendants, in fact, began cutting staffing levels at numerous PSI facilities to meet PSI's budget and staffing ratios. Id. at ¶¶ 35-37. Plaintiffs allege such reductions caused insufficient staff to ensure patient safety and allegedly rendered compliance with applicable licensing and regulatory requirements extremely difficult. Id. Plaintiffs [*20] allege that PSI's corporate headquarters pressured its facilities' management for frequent cuts in staffing, id. at ¶¶ 38-39, that left fewer employees to monitor patients, and allowed the assaults, rapes or sexual molestations of unsupervised patients or suicidal acts by patients. Id. at ¶ 41. These incidents gave rise to regulatory violations that jeopardized PSI's facility's license and revenues. Id. at ¶¶ 40-41. According to Plaintiffs, PSI's focus on increasing patient-employee ratios jeopardized the safety of children, teenagers and other patients at its facilities, as reflected by the following allegations. Id.

### 3. State Enforcement Actions against PSI

In a February 27, 2006 letter, the Virginia Department of Mental Health, Mental Retardation and Substance Abuse Services informed PSI of its findings that PSI's 103-bed facility in Virginia, acquired by PSI in April 2003, was in violation of numerous state laws concerning patient care. Id. at ¶ 48. The Virginia agency found PSI had provided "overall inadequate medical care due to the understaffing of care and nursing staff to address the needs of the number of residents." Id. This letter notified PSI of Virginia's officials' intent [*21] to revoke the facility's license. Plaintiffs allege that PSI has made substantial efforts to conceal such violations, including by influencing regulators to withhold sanctions or penalties that could bring such incidents to light. Id. at ¶ 148.

Plaintiffs' amended complaint sets forth other state enforcement actions against PSI facilities in several states:

After a five-year-old patient was sexually abused by a 12-year-old patient at the 88-bed Bryn Mar Hospital in North Carolina, acquired by PSI in June 2003, the North Carolina Department of Health and Human Services found in June 2007 that **PSI had failed to protect patients after incidents of sexual abuse, lacked systems needed to identify the risks of sexual abuse, and -- in 40% of the cases reviewed -- failed to report sexual abuse promptly to authorities.** Records supplied to investigators further showed that, **PSI failed to provide sufficient monitoring of potential sexual abusers in 40% of the cases reviewed and failed to monitor patients with suicidal tendencies in 20% of the cases reviewed.**

In June 2007, the Texas Department of Health & Human Services concluded an investigation into a May 6, 2007 incident at [PSI's] Cypress Creek [*22] Hospital where a suicidal patient who was supposed to be monitored every 15 minutes had slit his wrist in the shower, passed out and remained unconscious for more than five hours while the shower flooded his room, then regained consciousness and walked to the nurses station where the self-inflicted injury was finally discovered. **Records from the 96-bed hospital -- acquired by PSI in September 2001 -- showed no rounds were performed during the entire time the patient was unconscious. Upon review of records of care provided to another 15 patients at the hospital, the agency found that PSI had provided none of them with a safe setting for treatment.**

On September 17, 2007, the Carolina Department of Health & Human Services made a finding of immediate jeopardy against PSI's 108-bed Holly Hill Hospital, acquired by PSI in December 2001. **The Department found numerous instances of providing drugs to the wrong patients and administering drugs without a doctor's order. Medication**

**errors have frequently been linked to understaffing of nurses.**

California authorities have reported significant quality of care problems at the 72-bed Sierra Vista Hospital, acquired by PSI in July 2005, including medical [*23] errors and patient deaths. According to UIC, which "examined more than 500 pages of surveys at Sierra Vista," **"Surveys conducted by the California Department of Health underscored repeated issues about understaffing, patient safety, medication administration, poor supervision and staff training, and an array of serious quality of care violations."**

Id. at ¶ 56 (emphasis added). PSI's California facilities were cited for deficiencies of abuse and mistreatment of patients 29 times between January 2005 and June 2008, compared with just six citations for Universal Health Services, Inc. ("UHS"), a PSI competitor, in the same period. Id. at ¶ 58. The alleged primary reason for this state regulatory finding was understaffing at PSI facilities. Id. at ¶ 59.

On April 13, 2009, the Illinois Department of Children and Family Services issued the report of the department of psychiatry at the University of Illinois at Chicago ("UIC") and Illinois Department of Public Health ("IDPH") investigators that made a "consistent set of findings" of problems arising at PSI's Riveredge hospital. Id. at ¶¶ 11, 77. This report cited a "**pattern of quality care and patient safety problems**" at PSI facilities. Id. [*24] at ¶ 78 (emphasis in original). The Illinois report found repeated instances of inadequate documentation, "[q]uestionable or poor quality of individual therapeutic services," an "[u]nstructured, chaotic milieu" that was counterproductive to treatment, "[u]nit staff often poorly trained and supervised for their jobs," "[i]neffective monitoring creat[ing] serious risks for patient safety," and improper discharge and discharge planning of patients. Id. at ¶ 77. These conditions caused "sexual assaults; negligent supervision; physical harm to patients; a violent group outburst that required police intervention; and the death of a pregnant patient (not a DCFS ward), that has raised serious questions about the lack of reporting of the incident by Riveredge officials to

Illinois authorities." Id.

### 4. Media Reports on PSI's Practices

On July 17, 2008, Chicago Tribune reported on numerous abuses at PSI's Riveredge Hospital:

Illinois' largest psychiatric hospital left sexual predators unguarded despite allegations that at least 10 mentally disabled children were assaulted during the last three years. The youngest victim was an 8-year-old state ward admitted for evaluation after expressing suicidal [*25] thoughts. Administrators at west suburban Riveredge Hospital and government authorities failed to share basic information as the savage violence left some youth worse off than when they arrived, a Tribune investigation found. **After the newspaper asked about the series of assault reports, the state Department of Children and Family Services last week stopped admitting wards to Riveredge -- a punishment imposed on just three other psychiatric hospitals since 2004, records show.** On Wednesday, agency officials announced that the Tribune's findings had prompted them to immediately impose changes, including new training for child-protection workers and better reporting of assault allegations.

Id. at ¶¶ 49-50 (emphasis added).

Plaintiffs' amended complaint summarizes the specific disclosures from this article that are set forth below for the time period from 2005 to 2007:

After a 19-year old reported being raped by another patient in the Hospital in 2007, records reviewed by the Tribune showed that, despite having found evidence of the attack -- drops of blood in the bathroom where the attack was alleged to have occurred -- the hospital didn't send the victim to a local emergency room, didn't report [*26] the allegations to local police, and didn't assign an aide to maintain the required one-on-one observation on the attacker. The attacker

struck the same victim again the next day, government records show.

The newspaper recounted a similar 2006 incident in which a 12-year-old patient was raped by his 15-year old roommate, who was being treated for sexual aggression. "I told Riveredge over and over again, 'Do not put anybody in the room with this boy,'" the attacker's mother told the newspaper. The newspaper recounted a police report of the attack which similarly quoted the boy's mother as telling police that "she informed them when [her son] was admitted that he needed his own room . . . so just as much blame should be on the hospital [as on her son, the attacker] for creating the environment for the incident to occur."

At 9:00 p.m. on December 31, 2006, local police responding to an anonymous 911 call from within the Hospital of a fight in progress were refused admittance by hospital employees. On New Year's Day, a woman reported her teenage son "had been battered in the melee." A hospital worker told the mother that a staff member had punched her boy in the eye, but no incident reports [*27] of the fight were available. Illinois Department of Public Health investigators were similarly stonewalled when they tried to look into the incident, reporting that "the hospital was unable to accurately identify the actual number of participants" in the melee.

Riveredge similarly failed to promptly notify DCFS of a July 5, 2008 fight in the adolescent boys unit. **Between 2005 and 2007, police and state surveyors investigated reports that eight young patients were injured in non-sexual assaults. Riveredge staff or contract employees were accused in four of those alleged attacks.** The attacks included a March 19, 2007 incident reported by a clinical social worker, in which two Riveredge workers had battered a

16-year-old bipolar patient who resisted getting a shot.

> **When police tried to investigate the July 5 melee, the hospital's human resources department was "unable to provide the names and addresses of the offenders or witnesses." When police tried to investigate another fight at the hospital, on October 25, 2007, a hospital employee refused to turn a video of the incident over the police, telling officers she needed permission of PSI's risk management specialist before she could do** [*28] **so.**

> **In at least four cases since 2006, the Tribune reported that government inspectors cited Riveredge for improperly sedating children with powerful psychotropic drugs.** In 2006, Riveredge administered forced medication to a bipolar 12-year-old three times without notifying a guardian actively involved in his care, an Illinois Human Rights Authority report stated.

Id. at ¶ 52 (emphasis added). In a follow-up article on February 26, 2009, the Chicago Tribune reported that sexual assaults by unsupervised patients continued at Riveredge weeks after the newspaper's original report. Id. at ¶ 55. According to Plaintiffs, Riveredge incidents were reflective of conditions at other PSI hospitals and residential treatment centers that PSI acquired years earlier because Defendants were struggling under increasingly tight budgets necessary to sustain PSI's apparently misleading and stated track record of providing 7% to 9% same facility revenue growth every year. Id. at ¶ 56.

After the Tribune' s initial report, other media organizations investigated PSI's operations around the country, finding similar patterns of abuse and mistreatment of children and adolescents being treated at PSI hospitals and [*29] residential facilities. On November 22, 2008, the LA Times and ProPublica, an independent, non-profit public interest media, co-published their investigation about "a string of cases involving abuse and neglect at PSI facilities nationwide." Id. at ¶ 57. ProPublica found that "[s]ome of the PSI

hospitals most under fire from authorities are those the chain has owned longest. . . .**Since 2005, the 10 hospitals PSI has owned longest have compiled almost twice as many patient-care deficiencies as 10 similar hospitals owned by its closest competitor, Universal Health Services Inc.**" Id. at ¶ 58 (emphasis added).

On January 12, 2009, the Dallas Morning News published the results of its investigation of PSI facilities in Texas, recounting numerous incidents of violence, abuse, and injuries of patients at PSI's Laurel Ridge, The Oaks and San Marcos Treatment Centers in Texas.

> **[Texas government inspection and investigation] records say, "the facility failed to provide adequate numbers of qualified personnel"** when a 13-year-old patient was injured while being restrained by a staff member. In another incident, a 14-year-old patient [was injured] in sexual activity with another patient. The investigator [*30] concluded that **"the facility failed to direct, monitor and evaluate the care of patients." Center management also neglected to monitor patients sufficiently,** an investigator found, when a 17-year-old patient with a "long history of violent and disruptive behavior" attacked another teenage patient. . . . [A] 13-year-old boy with Asperger's syndrome was ill for three days with acute respiratory problems and pancreatitis but did not see a doctor. . . . "The child . . . almost died," the investigator wrote. . . . **On numerous occasions, investigators found, center administrators were aware of serious problems but did not act properly.** In one case, a state finding said, "facility administration" knew of a sexual relationship between a staff member and a 16-year-old resident, but did not report it to licensing authorities. . . . In 2007, two suicide attempts by children were not reported to the state.

Id. at 64 (emphasis added).

PSI's San Marcos' facility received 52 citations after one inspection and in 2007, the Laurel Ridge facility

received 92 citations after 36 inspections resulting in a state finding of "inadequate staffing." Id. at ¶¶ 65, 66. According to the Morning News report, PSI's [*31] facility staff "**made numerous requests of the administration to increase staffing levels.**" Id. at ¶ 65 (emphasis added). After calling in a Swat Team for one incident, a PSI clinical therapist is reported to have stated: "It is always felt like they were putting out fires instead of making things fire-retardant." Id. PSI operates 15 facilities in Texas and was fined $230,000 for violations by the state health department in 2007, nearly as much as all other Texas hospitals combined. Id. at ¶ 65. The Morning News article also described incidents reported by the Tribune and by ProPublica and the LA Times about other PSI facilities. Id. at ¶ 64.

According to a February 21, 2010 article in the Richmond Times-Dispatch, following a series of incidents in which PSI failed to report and actively attempted to conceal patients' suicide attempts and other patient incidents at PSI's The Pines facility. Id. at ¶ 148. In the spring of 2009, Virginia officials took steps to downgrade PSI's license to provisional status -- the most serious sanction short of shutting down the facility, and one that was likely to result in lost admissions and negative publicity. Id. Citing e-mails and other documents obtained [*32] through a Freedom of Information Act request, the newspaper reported that the action was quashed by the state's Mental Health Commissioner, Dr. James S. Reinhardt, who subsequently left his post to become a PSI consultant. Id.

Plaintiffs allege that as reflected in the state enforcement actions and the Tribune, ProPublica, LA Times, Morning News, and Richmond Times-Dispatch articles and other sources, PSI employees repeatedly failed to report timely, completely or accurately, patient incidents at PSI's inpatient facilities and actively concealed such problems that should have been reported to state regulators. Id. at ¶ 181. Thus, Plaintiffs assert that PSI had continuing issues with regulatory compliance and abuse incidents in PSI facilities that were not disclosed to investors. Id. at ¶¶ 43-46.

### 5. PSI's Responses to Published Reports

As to awareness of media reports generally, Jacobs admitted that he and other PSI executives had advance notice of media investigations that were later published.

[ANALYST:] Okay. And then can I just ask a question with regard to how you're educating your referral sources. You've obviously, some bad headlines which we would all like to see you avoid going [*33] forward, but in those markets where -- that may have had some impact in your referral sources, perhaps, can you just talk to us about how your compliance team is educating referral sources with regard to your outcomes? If there's any different process there?

[JACOBS:] **We know when someone's out there, doing a story, and we have -- by the time the story is written, we kind of know where they're going to focus. Fortunately for us, they keep focusing on very old stories, very old incidents, so we do give state agencies joint commission, referral sources heads up ahead of time so they are not surprised or read it in the paper** and I think our operations team in conjunction with Kathy Bolmer and the Compliance and Quality Department do a good job of reaching out to those sources and providing more detail surrounding the events and that the subsequent appropriate agency has reviewed those incidents that are occurring.

Id. at ¶ 47 (emphasis added).

As an example, Plaintiffs allege that after a report about a series of assaults and allegations of sexual and physical abuse at PSI's Whisper Ridge residential treatment center in Charlottesville, Virginia, Jacobs told investors during an April 27, 2006 [*34] investor call that the incident was "isolated" and that a new chief executive officer installed in February was "making great progress there." Id. at ¶ 48. According to Plaintiffs' amended complaint, the problems at Whisper Ridge were strikingly similar to and indicative of problems caused by understaffing at other PSI facilities, including Riveredge, that were disclosed during and after the Class Period. Id.

In its July 30, 2008 press release on its financial results for the second quarter 2008, PSI did not mention any problems at Riveredge or the Tribune's report. Id. at ¶ 119. This press release raised PSI's financial guidance for the year based on the purported strength of PSI's financial

results. Id. at ¶ 119. Yet, on July 31, 2008, during the second quarter 2008 investor conference call, Jacobs first commented to investors about the Riveredge issues and the Tribune report. Id. Jacobs allegedly downplayed the Tribune report of two weeks earlier as involving historical incidents that did not reflect current operations at Riveredge or other PSI facilities. In his concluding remarks, Jacobs stated:

> [JACOBS:] Before closing my remarks, **I'll add that many of you are aware of a story** [*35] **that was published in a Chicago newspaper on July 17 about incidents that occurred in 2007 and 2006 at Riveredge Hospital. This is not the first story about incidents at one of our facilities, and it won't be the last**. So I'd like to share my perspective.
>
> First, **these types of unfortunate incidents do occur in this patient population. Minimizing and eliminating these types of incidents is one of PSI's top priorities. We take continuous improvement of quality, safety and risk management very seriously, and we have built a very effective infrastructure over the past several years**.
>
> As a matter of practice at all our facilities, **we thoroughly report incidents to relevant agencies as soon as possible and work directly with agencies to continuously improve safety and quality in a timely manner. The incidents referenced in the newspaper story were reported to the relevant agencies** and appropriate corrective actions were taken in 2006 and 2007.
>
> Second, it is also important to understand that we operate in a highly regulated industry with nearly continuous oversight. **Our facilities are surveyed multiple times each year on average and less than 1% of these surveys result in serious deficiencies,** [*36] **a testament to our diligent efforts to continuously improve risk management, safety and quality**.

> We are pleased with this track record in light of the fact that we are providing more than 2.7 million patient days of treatment annually. Just before the story was published, the Department of Children and Family Services placed an admissions hold on Riveredge. **Riveredge is currently in discussions with DCFS and expects to conclude those discussions soon. As a result, we don't expect a material adverse financial impact from the admissions hold**.

Id. at ¶ 124 (emphasis added).

Plaintiffs allege that when analysts pressed for more information about the Riveredge incidents during the 2008 conference call, Jacobs continued to discount their significance and repeatedly and falsely suggested that the Tribune's report was based on dated historical information. Id. at ¶ 125. In response to one analyst's question, Jacobs responded that "**We have taken action back in '06 and '07**. But once again, if they want to come in and take a relook at it, that is okay with us." Id. (emphasis in original). During that call, Jacobs reiterated to another investor, "**the stories in the Chicago [Tribune], those were 2006** [*37] **and 2007 incidents, and the quality is better there; the management team is better there**, and will continue to get better." Id. (emphasis in original).

During this 2008 conference call, Jacobs specifically denied that PSI was violating regulatory requirements by failing to report the incidents as they occurred, as reported in the Tribune articles and later ProPublica, LA Times and other media reports:

> **[W]e are in compliance with those states on reporting. We know when to report, how to report**. And also PSI captures incidents that you don't report, that **we are looking for minor incidents. We want to fix those so those don't become major incidents**. So for PSI, we capture much more than we actually have to report, but **we do diligently report anything that an agency needs to see**. . . .[W]e think **we have reported appropriately**, and the intent was absolutely to always report.

Id. at ¶ 126 (emphasis in original).

When asked to comment on the "negative story on the company" that PSI had "grown so fast that you've lost span control and the quality issues are systemic because of the growth," Jacobs attributed the problems to PSI's patients:

> [JACOBS:] **Unfortunately, we take care of very difficult** [*38] **patients**. I want them all not to have incidents, but some incidents will occur, and we do our level best to go back and put the resources back to correct it. But as far as noise from the shorts or a negative newspaper article, as I mentioned earlier, we could have one today, or we could have one 30 days from now that somebody wants to write a story about us.
>
> * * *
>
> Now, from the risk management side, when you take these incidents and put them through the actual oral process and through our risk management, **we have great results there. So there is a disconnect between the sensationalism of an incident that might get put in the paper versus the actual reality**.

Id. at ¶ 127 (emphasis and asterisks in original). Plaintiffs allege that during this conference call, Defendants repeatedly assured investors that the government investigation of that facility, including the new admission hold imposed by the Illinois agency, did not and would not have any material impact on PSI's operations. Id. at ¶¶ 128, 152, 153.

On July 31, 2008, PSI filed its Form 8-K Report with the SEC stating that PSI "has received a subpoena from the Department of Justice requesting certain information regarding Riveredge [*39] Hospital, one of PSI's inpatient psychiatric facilities in Chicago, Illinois. PSI stated its intention to provide the requested information to the Department of Justice," but did not disclose when the subpoena had been received, nor did PSI attach a copy of the July 30, 2008 subpoena to its Form 8-K Report. Id. at ¶ 118.

Plaintiffs allege that based upon Jacobs' responses to the Tribune account of the Riveredge problems, numerous market analysts issued positive reports dismissing the events in the article as old news and isolated incidents that are not reflective of any systemic problems in PSI's operations. Id. at ¶ 128. Plaintiffs cite the following as representative examples of these analysts' assessments:

> o "The market, however, narrowly focused on the DoJ investigation news, which we believe will prove to have little-to-no operational impact. Headline risk will likely always exist for this company given the nature of its patient population, and we believe the multiple well more than discounts this risk given the current growth prospects -- LT EPS run-rate of 25+%. We would be buyers here." (JP Morgan, July 31, 2008).
>
> o "The company believes it reported the events, which occurred in [*40] 2006 and 2007, appropriately to authorities and has taken multiple steps since to improve the quality at the facility. Admissions from the IL Department of Children and Family Services (DCFS) are still on hold. Management expects the issue to be resolved in the near term and does not anticipate it having a material financial impact." (Avondale Partners, August 1, 2008).
>
> o [I]n our discussions with the company, management highlighted the fact that the admission ban only affects those patients that would have been admitted by the DCFS, which is approximately 20% to 25% of total admissions. The company is having weekly discussions with DCFS, which are expected to conclude in the near future, and does not anticipate that the admission ban will have a material adverse financial impact. (Jefferies & Co., August 1, 2008).

Id. at ¶ 128.

Plaintiffs allege, however, that ongoing undisclosed and uncorrected regulatory violations occurred at other

PSI institutions involving quality of patient care and safety and understaffing at PSI's other healthcare facilities. Plaintiffs cite:

> o at Sierra Vista Hospital in California, which was then receiving the most serious patient deficiency citations at about [*41] eight times the statewide average among private psychiatric hospitals in California, as was **reported by the LA Times in November 2008**; and

> o at Riveredge, where the continuing failure to adequately monitor and ensure patient safety at Riveredge had led to additional incidents of a sexual assault and sexual activity in the hospital's common area dayroom in August 2008, as was **reported by the UIC in March 2009**.

Id. at ¶ 132 (emphasis added).

After the ProPublica-LA Times November 2008 report, PSI responded that, "We do not believe that we have fewer nurses per bed." Id. at ¶ 62. In a letter, Jacobs downplayed the reported incidents that ProPublica had "focus[ed] on just a relatively few incidents and paint[ed] an unfair picture" of PSI. Id. at ¶ 62. Plaintiffs allege that as with his earlier response to the Tribune investigation, Jacobs described ProPublica-LA Times's reported incidents as "unfortunate" occurrences and were not reflective of PSI's current operations and stated that any remedial measures "have long since been made." Id.

As [*42] to Jacobs's statements about PSI reporting obligations seriously and a timely correction of patient injuries or abuse at Riveredge, Plaintiffs allege that:

> o As reflected in UIC's report on Riveredge, **follow up surveys conducted in September and October 2008 found that the cited conditions at the hospital remained uncorrected months after the foregoing statements were made, leading UIC and IDPH to conclude that "such data indicates that Riveredge officials are still failing -- even in the fact of a critical IDPH finding as well as other forms of outside scrutiny -- to ensure the hospital operates at minimally adequate standards of care"**;

> o **Less than a week after the conference call, IDPH found that Riveredge had failed to notify the agency of the death of one of its patients in 2007** due to overmedication with Clozaril, as required by law; and

> o UIC's Riveredge report includes a similar account of an affidavit and interview of a **Texas investigator looking into the case of the teenager who was passed out for five hours in a shower after a suicide attempt at PSI's Cypress Creek facility, who indicated that "hospital administrators appeared to minimize or hide the reporting of this incident** [*43] **to state officials."**

Id. at ¶ 133 (emphasis added).

Defendant Turner told investors at a December 5, 2008 conference call: "There's always going to be incidents that occur inside a psych hospital that you would rather wish had not occurred. . . ." Id. at ¶ 151. When questioned further about the ProPublica article, Plaintiffs allege Turner deflected, stating, "I'm not here to talk about that." Id. at ¶ 63. Thereafter, Plaintiffs allege Defendants continued to deny that PSI's facilities were understaffed or its workers poorly trained, and dismissed the ProPublica/LA Times investigation as an unfounded and overly sensational account, as Defendants had earlier with the Tribune. Id. at ¶ 151.

On January 13, 2009 -- one day after the Morning News expose of PSI's facilities in Texas, Turner and Jacobs participated in a JPMorgan investor conference on healthcare companies and assured investors of the safety of patients under PSI's care and the quality of its treatment. Id. at ¶ 154. Jacobs stated that he was "very pleased on our recent joint commission scores. Very, very pleased with what we are scoring on their surveys." Id. Jacobs told investors to expect data on PSI's core measure compliance [*44] that would support his claims about quality. Id.

After Jacobs' remarks, Plaintiffs allege Turner falsely assured investors of PSI's financial condition and the continuation of its prior growth trajectory. Id. at ¶ 155.

> **...Our compliance program establishes mechanisms to aid in the identification**

**and correction of any actual or perceived violations of any of our policies or procedures or any other applicable rules and regulations**. We have appointed a Chief Compliance Officer as well as compliance coordinators at each inpatient facility. The Chief Compliance Officer heads our Compliance Committee, which consists of senior management personnel and two members of our board of directors. Employee training is a key component of the compliance program. All employees receive training during orientation and annually thereafter.

* * *

    In addition, **our management has spent, and may spend in the future, substantial time and effort on compliance measures**....

Id. at ¶ 108 (emphasis in original).

    Following the end of the Class Period, PSI published data on its website regarding its compliance with the Joint Commission's core remedial measures. Id. at ¶ 74. Plaintiffs cite graphic statistical data revealing [*45] that at the outset of 2009, PSI's hospitals and treatment centers "were operating well below the Joint Commission performance standards on six of the seven criteria." Id. at ¶ 74. Plaintiffs allege that a trend line analysis shows that in 2008, PSI's core measures worsened. Id. at ¶ 75. On March 30, 2009, Illinois's 84-page report entitled "Review of Riveredge Hospital," strongly criticized PSI's patient treatment at Riveredge citing PSI's management's lack of accountability and failure to take responsibility and to correct systemic conditions that caused or permitted patient mistreatment. Id. On Friday, April 3, 2009, the date UIC's report was published, PSI's stock sustained a two-day drop the following week, when its shares closed at $13.65, a drop of 14%. Id. at ¶ 76.

**6. Defendants' Statements on PSI's Finances**

    On February 28, 2008, PSI filed its Form 10-K Report for the period ending December 31, 2007 with the SEC. Id. at ¶ 83. This Report included PSI's financial statements for the fiscal year 2007 and the fourth quarter

of 2007, including PSI's reported earnings per share, operating expenses, same facility results, revenue and patient data, and other financial metrics described [*46] below. Id. Plaintiffs allege that in its published guidance for 2008, Defendants artificially inflated its reported earnings per share for the fiscal year 2007 and the fourth quarter of 2007 by deliberately reducing of PSI's professional liability and malpractice reserves and manipulating PSI's operating expenses that added $0.05 to reported earnings. Id. at ¶ 84. PSI's language on PSI's estimated reserves was as follows:

    The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial assumptions calculated by an independent third-party actuary.... This estimated accrual for professional and general liabilities could be significantly affected should current and future occurrences differ from historical claim trends and expectations.

(Docket Entry No. 111-1 at p. 15). Jacobs and Polson signed this report with certifications under *§§ 302* and *906* of the Sarbanes-Oxley Act of 2002. Id. at ¶ 83.

    In a February 20, 2008 press release entitled "Psychiatric Solutions Reports a 27% Increase in Fourth Quarter Earnings to $0.42 per Diluted Share," PSI and the Individual Defendants [*47] reported PSI's financial results for 2007 that were disseminated to the market via Business Wire, and thereafter by other news organizations, financial analysts, and websites. Id. at ¶ 79. Defendant Jacobs is quoted in this press release, and Defendant Turner is identified as the contact source for further information about the release's contents. Id. at ¶ 79. Plaintiffs' amended complaint set forth specific statements in this release as actionable:

    Psychiatric Solutions, Inc. ("PSI") today announced financial results for the fourth quarter and year ended December 31, 2007. For the quarter, revenue increased 44.1% to a record $403.4 million compared to the fourth quarter of 2006. **Income from continuing operations increased 27.3% to $0.42 per diluted share from the fourth quarter of 2006**.

* * *

Same-facility EBITDA margin expanded 200 basis points to 22.2% for the fourth quarter of 2007. Fourth quarter EBITDA margin for all facilities increased 70 basis points to 20.8%. Full year same-facility EBITDA margin increased 150 basis points to 21.5% and total facility EBITDA margin was 20.1%, an increase of 30 basis points compared to 2006.

"**PSI continued to produce outstanding profitable growth** [*48] **for the fourth quarter and full year 2007**," remarked Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "Demand for high quality inpatient psychiatric care continues to expand in this capacity constrained and very fragmented industry. **We are well positioned to achieve further significant profitable growth for 2008 and beyond through organic growth initiatives and acquisitions**.

"**We are targeting 7% to 9% same-facility revenue growth for 2008 once again. Work is already underway to add nearly 600 beds in existing and new facilities by the end of 2008, double our normal targeted pace of expansion, allowing us to treat patients that we do not have the capacity to treat today**.

"**We are highly confident that we will be able to acquire at least six inpatient facilities during 2008. The pipeline of potential acquisition opportunities remains strong, enhancing our ability to continue to build a platform for future growth**."

PSI is **increasing its 2008 earnings guidance range by $0.10 per diluted share to $1.93 to $1.97** to reflect the benefit of lower interest rates. As a result, growth in 2008 earnings per diluted share is expected to be 30% to 32% compared to 2007. In addition, [*49] PSI established its guidance for earnings from continuing

operations for the first quarter of 2008 in a range of $0.42 to $0.43 per diluted share. The Company's guidance does not include the impact from any future acquisitions.

Id. at ¶ 80 (emphasis in original).

On February 21, 2008, PSI hosted a conference call to discuss PSI's 2007 financial results with institutional investors and analysts from twelve Wall Street firms. Id. at ¶ 81. Each of the Individual Defendants participated in this conference call that was recorded and thereafter made available on PSI's website. Written transcripts of the conference call were also published and disseminated by Thomson Reuters Streetevents and other sources. Id. Plaintiffs cited Defendant Jacobs's statements during this conference as actionable:

[JACOBS:] Thanks for being with us this morning to review a strong fourth quarter performance for PSI and another great year. The **continuing strength of the PSI business model is evident in the 27% growth in earnings per diluted share for the fourth quarter and 30% growth in earnings for the year**. These results were at the top end of our guidance for each period and after we revised our annual guidance [*50] upward on two occasions after first establishing it in October 2006. In this respect we are also pleased today to be increasing our guidance for 2008 and as a result of the recent decline in interest rates.

Our **earnings growth was driven by 44% increase in our revenue for the fourth quarter and 45% for the year, both of which establish new records for the company**. Consistent with our historical performance we produced this growth primarily through the addition of beds to our operations, the great majority of which resulted from acquisitions of inpatient facilities.

We also benefited from solid growth in same facility revenues of 6.5% for the year. True to our business model, this growth generated additional operating leverage, which we

**complimented through ongoing initiatives to improve productivity and efficiency in each facility. As a result we produced a new record for same facility EBITDA margin of 200 basis points to 22.2% versus the fourth quarter of 2006. This performance was primarily accountable for the 49.1% growth in PSI's consolidated adjusted EBITDA for the quarter and its expansion as a percentage of revenue. We remain confident about our prospects to drive facility revenue** [*51] **growth for 2008 in our historic range of 7% to 9%**.

**We are enhancing our ability to drive same facility performance for 2008, as well as aggregate organic growth through the planned addition of nearly 600 beds in existing and new facilities during the year. In addition, PSI is well positioned to continue its long-term acquisition strategy by acquiring at least six inpatient facilities during 2008.** We have a strong top line of candidates, a favorable pricing environment and the financial resources to accomplish our goals.

In summary, let me repeat that what you have heard before is **we consider our strong prospects for long-term profitable growth. Our confidence in our future rests on our ability to continue implementing a proven business model and growth strategy in an industry whose growth dynamics remain very favorable for PSI. Simply put we are the clear leader in a highly fragmented capacity constrained growth industry**. While we never take execution for granted, especially in terms of providing the highest quality of care for our patients and their families, we expect the PSI team to continue leveraging our strong momentum for future growth.

Id. at ¶ 82 (emphasis added).

During the 2008 [*52] conference call, several Wall

Street analysts questioned Jacobs for more information on PSI's same facility revenue growth of 5.3% for the fourth quarter 2007 and 6.5% for the full year and PSI's forecast estimates of 7% to 9% growth. Id. at ¶ 103. Jacobs responded that the 2007 shortfall was due to "bad luck," and was not indicative of problems with or maturation of PSI's acquisition strategy: "That 7% to 9% was well within our grasp, and we just had some bad luck." Id. at ¶ 103. Jacobs also stated: "But if you were just to take our bottom three facilities - not the bottom 10, just our bottom three facilities - and we focus on them and get them on the right track, we would have done well above 7% for last year. So quite frankly, **we can get above 7% in '08 just by doing what we did last year and just working on these three facilities.**" Id. (emphasis in original). Defendant Jacobs also cited the additional 600 beds to be acquired the next year as "**just . . . insurance,**" because PSI's "**problems were limited to a small number of facilities that if we just fix, that 7% to 9% is there.**" Id. at ¶ 103 (emphasis in original).

In a February 2008 conference call with investors, Jacobs admitted [*53] the account had been underfunded throughout 2008, explaining that the reserve balance should have been increased every quarter during the Class Period, but admitted that the $0.05/share increase in expenses was "a build-up that probably should have been allocated one-fourth across all the quarters." Id. at ¶ 86. During the 2008 conference call, Jacobs admitted that "the actual claim costs per claim is going to go up. And has gone up over time." In response to an investor's question, "when it became known to you that you would have to take reserves?," Turner and Jacobs admitted that their awareness of the need to increase in reserve since at least December and that increased operating expenses should have been reflected in each of PSI's quarterly financial reports issued during the Class Period. Id. at ¶ 91.

On April 30, 2008, PSI issued a press release that was approved by each of the Individual Defendants, entitled "Psychiatric Solutions First Quarter Earnings Increase 39.4% to $0.46 per Diluted Share," through Business Wire and thereafter other news organizations, financial analysts, websites and other sources of information distributed this release. Id. at ¶ 112. Defendant Jacobs [*54] is again quoted in this press release that identifies Defendant Turner as the contact source for further information. Id. at ¶ 112.

During a May 1, 2008 conference call with nine Wall Street firms on PSI's first quarter 2008 results with institutional investors and analysts, all Individual Defendants participated and the contents of the call were reported by news organizations, in analyst reports, and on Internet sites and, as a result, became widely available to investors and reflected in the market price for PSI securities. Id. at ¶ 114. At the outset of the call, Jacobs made the following statement:

[JACOBS:] We appreciate your being with us this morning to discuss an **outstanding performance by PSI for the first quarter**. As you can see from our earnings release, we once again produced very strong results. **Given the acute focus on our same facility revenue growth metric, I am pleased to report that we delivered 7.7% same-facility revenue growth, solidly within the range we target on an annual basis**.

I would also like to highlight very strong corporate wide growth. Total revenue increased 33%, consolidated adjusted EBITDA grew 43%, earnings from continuing operations increased 39%. And, [*55] once again, **we are raising our earnings guidance again for the year, and now expect to deliver earnings per share growth of 34% to 36% as compared to 2007**.

Our strong growth reflects the addition of the new inpatient beds, primarily through acquisition. Since the end of the first quarter of 2007, we acquired 20 inpatient psychiatric facilities with approximately 2000 beds in two transactions. We completed the acquisition of Horizon Health in May 2007, and purchased the five facilities from United Medical Corporation in March of this year. We also purchased two EAP companies during the first quarter of 2008.

We also continued to expand our bed count through the addition of beds to new and existing facilities. **These beds will help us meet increasing demand for high-quality inpatient psychiatric care**,

while serving patients whom we cannot admit today. In the first quarter, we added approximately 80 beds, and we expect to add another 250 beds in the second quarter, of which more than 100 have already opened. As we had previously discussed, we are on track to add nearly 600 beds this year, and we continue to believe we will have all of those beds operational by late this year or very early [*56] next year.

As I mentioned earlier, we were very pleased with the 7.7% growth in PSI same-facility revenue for the first quarter, consistent with our annual target of 7% to 9% growth for 2008. We produced this growth in spite of the negative effect of Easter shifting into the first quarter this year compared with the second quarter last year. The increase in same-facility revenue resulted from a 2.4% increase in patient days and a 5.1% increase in revenue per day.

Our same-facility growth also continued to drive increased operating leverage. Our same-facility EBITDA margin increased 180 basis points to 21.9% for the quarter. **Considering this was the first full quarter in which the nine facilities acquired from ABS were included in our same-facility base, this growth demonstrates our ongoing progress in operating those facilities more effectively**.

We also produced an increase of 80 basis points to 20.8% in EBITDA margin for all of our facilities. This improvement contributed significantly to the 120 basis point increase in our margin for consolidated adjusted EBITDA, which totaled $77 million for the quarter, up 43% from the first quarter of 2007.

Looking forward, **we intend to continue executing** [*57] **PSI's proven business model**. Our pipeline of potential acquisitions remains healthy in a favorable pricing environment. And we have the

financial capacity to carry out our plans. Steady growth in the industry demand also provides a solid foundation for the growth in our existing facilities and supports our development of new beds.

**With an anticipated 7% to 9% expansion in same-facility revenue annually, we expect to continue increasing our EBITDA margins over time. We remain confident about our ability to continue to expand our same-facility EBITDA margin**.

In summary, **we are well-positioned for future significant growth**. We enjoy positive industry conditions, a successful strategy and a highly experienced management team. As in the first quarter, the key to leveraging this momentum is primarily a matter of execution. And let me assure you that we are very focused on getting the job done.

Id. at ¶ 115 (emphasis in original). A broadcast of the call remained available for at least 14 days thereafter on PSI's website.

On May 6, 2008, PSI issued its Form 10-Q Report on its financial results for the first quarter of 2008, citing PSI's ability to improve operations, reduce costs and to expand [*58] revenues at its facilities while providing high quality care to PSI's patients. Jacobs and Polson signed this Report and certified this report under the Sarbanes-Oxley Act. Id. at ¶ 116.

During a July 31, 2008, PSI conference call on PSI's second quarter 2008 results with institutional investors and analysts representing 12 Wall Street firms, Jacobs cited the improvement in PSI's existing facility revenues and margins from the additional beds at those facilities, but Plaintiffs allege Jacobs omitted that PSI facilities were understaffed and underfunded as revealed by problems at PSI facilities. Id. at ¶¶ 122, 123.

In a October 30, 2008 press release entitled "Psychiatric Solutions Earnings Per Diluted Share Increases 37.8% on 8.7% Growth in Same-Facility Revenue," the Defendants describe PSI's third quarter 2008 financial results that included the following narrative statements:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the third quarter ended September 30, 2008. Revenue was $448.0 million for the quarter, an increase of 13.0% from $396.4 million for the third quarter of 2007. Income from continuing operations rose 39.1% to $28.6 million for the quarter [*59] from $20.6 million for the third quarter of 2007. Income from continuing operations per diluted share increased 37.8% to $0.51 for the third quarter of 2008 from $0.37 for the third quarter of 2007.

**Same-facility revenue increased 8.7%** for the third quarter of 2008 compared with the third quarter last year. This increase reflected same-facility growth in net revenue per patient day of 4.8% and growth in patient days of 3.7%. Same-facility EBITDA margin was 20.6% for the latest quarter, **up 60 basis points** from 20.0% for the third quarter of 2007, while the EBITDA margin for all facilities also **increased 60 basis points** to 20.5%. PSI produced a comparable-quarter increase of 18.1% in consolidated adjusted EBITDA to $80.6 million, which increased as a percentage of revenue to 18.0% from 17.2%. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on pages 6 and 7. "**PSI performed well** for the third quarter, with **strong same-facility revenue growth** driving expanded profit margins," said Joey Jacobs, Chairman, President and Chief Executive Officer of PSI. "The **addition of new beds throughout the year has contributed to the increasing rate of comparable-quarter** [*60] **growth in same-facility patient days for three consecutive quarters.**

"The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments. We plan to continue expanding our ability to serve

this demand, both through the addition of new beds in our facilities and the ongoing execution of our proven acquisition strategy in a fragmented, capacity-constrained industry. **We are well positioned to fund our anticipated growth over the next year through substantial cash flow from operations**, our existing cash and the availability under our credit facility."

Based on the Company's results for the third quarter and first nine months of 2008 and its outlook for the remainder of the year, PSI today **affirmed its guidance** for earnings from continuing operations per diluted share for 2008 in a range of $2.02 to $2.03, reflecting growth of 36% compared with 2007. In addition, PSI also today **established its guidance for earnings per diluted share for 2009 in a range of $2.40 to $2.44, reflecting growth of 18% to 21%**.

Id. at ¶ 136.

During an October 31, 2008 conference call on PSI's third quarter 2008 results with institutional [*61] investors and analysts representing 16 Wall Street firms, the Individual Defendants participated, and Jacobs again touted the purported quality of PSI's operations and the improvement in existing facility revenues and margins:

[JACOBS:] **PSI continued to perform very well for the third quarter**. We produced growth of 8.7% in same-facility revenue for the third quarter. The third consecutive comparable quarter increase. This growth by 13% increase in revenue for the quarter, and also **margin improvement** that resulted in a 38% increase in earnings per diluted share.

As a result of this growth, **we are on track to achieve our earnings guidance for full year 2008. We are very pleased with our same-facility results**. Earlier this year we discussed our focus on expanding same-facility patient days. **For the third quarter patient days increased 3.7%, a rate which is now also increased**

over the third consecutive quarter. This improvement helped us produce our highest rate of same-facility revenue growth since the fourth quarter 2006.

As expected, **the operating leverage created through this substantial growth resulted in higher profit margins. In addition we are continuing our initiatives to improve** [*62] **quality and efficiency in each facility**. As just one example, we are currently engaged in a process to standardize our automated dispensing machines for medication and to add these ADMs to facilities that don't currently have them. ADMs have already proven their ability to enhance the quality of care, increase efficiency by automating the distribution, tracking management and security of medications. **They contribute to our greater patient safety** and reduced pharmacy costs. This initiative is **representative of our continuous efforts to identify and implement best practices within our facilities or within the industry that are relevant to all of our facilities**.

**Through our combined focus on growth and increased efficiency, both same-facility EBITDA to a percent of revenue, and the EBITDA margin for all facilities increased 60 basis points over the third quarter last year. In addition, consolidated adjusted EBITDA grew 18% quarter-over-quarter to [$80.6] million for the third quarter. This growth represented an 80 basis point increase as a percentage of revenue to 18% versus 17.2% for the third quarter last year**.

In an industry with steady growth in demand, **a significant portion of samefacility** [*63] **growth reflects the addition of new beds to existing facilities**.

* * *

Riveredge Hospital in Chicago which as we've discussed in our conference call last quarter, had an admissions hold placed on it by the Illinois Department of Family Services in July. During the third quarter, our same-facility patient day growth was negatively impacted by approximately 70 basis point due to the lower census levels resulting from this DCF admissions hold. **This hold is still in place; however we expect it to be lifted in the current quarter. The financial impact of the admissions hold in complying with the DOJ investigation cost us approximately 2% to 3% earnings per share hit in the third quarter**.

To conclude my remarks today I'll repeat what you've often heard me say. Our confidence in the long-term growth potential of PSI remains very strong. We are the leader in a growing capacity constrained industry. **Our business model and growth strategy have been continuously refined and successfully proven** over the six years that we have implemented (inaudible) as a public company. **As a result, our scale, our resources, our management depth, and capability have all increased enhancing our ability to execute**.

With [*64] continued strong execution we expect to expand through both additional facility acquisition and through the development of bed for existing and new facilities. We also **expect to drive enhance profit margins** through growth in samefacility revenue at our target rate of 7% to 9% annually.

Id. at ¶¶ 137, 138 (emphasis in original).

During this call, as to the impact of the investigation and Illinois's hold on Riveredge admissions, Jacobs repeatedly told analysts that the problem was largely behind PSI, but had caused a reduction of third quarter earnings by $0.02- $0.03 per share and would impact fourth quarter earnings by another $0.01-$0.03 per share. Jacobs told investors that "We have that coming back

strong in '09" with legal expenses related to the investigation declining significantly in the fourth quarter. Id. at ¶ 139. Jacobs explained: "most if not all of those legal expenses are due to document production, and that's just a one-time event." Id. Jacobs said those expenses were included in the Company's fourth quarter guidance, "but it's a lot less than we had occur in the third quarter." Id. Jacobs also stated, "[W]e feel good about the quality of care at Riveredge, and it's been [*65] reevaluated by numerous people since the admissions hold." Id. at ¶ 140. Plaintiffs cite a colloquy with an analyst reveals the following:

[ANALYST]: A few questions. First it sounds like your optimistic you're going to lift the admissions hold at Riveredge in the fourth quarter, and I know you've had some optimism that was going to be resolved sooner. What's your level of confidence around that Joey?

[JACOBS]: **I think its 80%. I think it's 80%. I think it's 80%**, it may be January 1, be the date. But it could be next week.

Id. at ¶ 141. Jacobs described other PSI facilities with problems as continuing to perform well after implementing corrective measures. Id. at ¶ 142.

At a December 5, 2008 JP Morgan Small-Midcap Conference transcribed by Thomson Streetevents, Defendant Turner told investors:

[TURNER:] PSI has always been a growth story. We have always been excited to talk about our growth but of late it is important to qualify and talk a little bit more about the quality. If you know what happens in a psych hospital, it's tragic. It is very important that these folks are treated and stabilized. We do a great job of treating patients inside of our psychiatric hospitals. But we are not [*66] perfect. **There's always going to be incidences that occur inside a psych hospital that you would rather wish had not occurred. But those are very, very, very much the exception and not the general rule. But unfortunately when something like that happens, we tend to**

**hear about it, read about it, have people talk about it and all of a sudden people think that is the norm. What we try to do here on this slide is just give you the perspective that it is absolutely not the norm**.

\* \* \*

You can see we are surveyed by multiple regulatory agencies and **less than 1% of our surveys have historically resulted in any kind of a serious deficiency or sanction**. We have accreditation, licensing, certification and accreditation from joint commission, federal and state agencies that have unilateral -- any time they want to come into our facility 24 hours day, they can come in unannounced and **we welcome that because we know what we are doing inside of those facilities**.

Id. at ¶ 151.

When asked about Riveredge at the December 5, 2008 conference, Turner responded:

[TURNER:] The admissions hold at River Edge is really directly from the Department of Children and Family Services. They are the party that has the [*67] admission hold. We are still under the same -- **there is no change since our last update on the earnings call there**. That is still in place.

[AUDIENCE MEMBER]: Any sense for the timing on that?

[TURNER:] Joey mentioned (inaudible) this quarter and I don't have anything updating from that.

Id. at ¶ 152.

Plaintiffs allege that PSI's February 25, 2009 release of its fourth quarter 2008 financial results revealed: (1) a 20% miss in earnings as the result of lost business and investigative costs at Riveredge and a reversal of the

reduction in professional liability reserves that boosted earnings in February 2008, and (2) a reduction of PSI's 2009 earnings guidance by $0.14 per share at the midpoint of the range. Id. at ¶ 67. Plaintiffs allege that these facts reflect that PSI's acquisition business model was broken. Id.

During a February 26, 2009 conference call with investors, Jacobs told investors PSI was actively working behind the scenes to alert government officials and other referral sources of the upcoming articles allegedly in an effort to convince investors that the allegations were untrue or overblown so governmental entities would not stop sending patients to PSI facilities. Id. at [*68] ¶ 47. In this conference call with investors and analysts elicited angry criticism over PSI's delayed disclosure of the impact of regulatory problems, and Jacobs responded:

[JACOBS:] As discussed in our press release, the fourth quarter earnings per diluted share were impacted by one of the Company's facilities in Chicago and increase in the Company reserves for general and professional liability coverage. The Chicago facility suffered a decline in operations of $0.03 relating to an admissions hold. And professional fees of $0.02 relating to an investigation. As a result of our annual actuarial review we determined that we needed to increase our self insured reserves for general and professional liability by $4.9 million or $0.05 per share.

\* \* \*

Our revised 2009 earnings guidance of $2.24 to $2.32 represents earnings growth of 17% to 21% before the effect of any future acquisitions. We are lowering our guidance to reflect the financial impact of the following three issues. The current economic environment and the continued admissions hold at our Chicago facility resulted in lowering our revenues goals for 2009. Same store revenue growth is expected to be mid single digits for the year [*69] 2009, and lower single digits for the first quarter. As we saw a softening in patient days that began in October.

Number two, our guidance reflects the

trending of general and professional liability expense that we experienced in 2008. And three, the impact of successfully amending our current revolving credit facility.

Id. at ¶ 68.

Jacobs described Riveredge alone as "probably costing us 50 to 70 basis points against the same store patient day comparison." Id. at ¶ 69. Jacobs informed investors of an administrative hold on new admissions until UIC completed its investigation and report of the incidents there, but stated that the State requirements to lift the hold had been accomplished. Id. One analyst stated: "What you're saying is that you've done everything the state has asked you to do and now you're just waiting for them to sort of make sure that you really have done those things with this outside survey and that's what's holding up the process?," to which Jacobs answered, "Correct." Id. Plaintiffs allege that UIC's final report disclosed that PSI's problems had **not** been corrected when Jacobs made that statement, however, citing PSI for a string of continuing violations at Riveredge [*70] and other facilities nationwide. Id. Moreover, Plaintiffs allege this administrative hold has never been lifted. Id.

During this conference call, Jacobs described a "general softening" in this market and since October that was a "general across the board" reduction in all but a few PSI facilities. Id. at ¶ 70. Plaintiffs allege that notwithstanding PSI facilities' problems in Illinois and California, Jacobs attributed blame for PSI's declining patients on Lehman Brothers: "It's just a general softening that occurred in October and that was I guess when banks started to fail, maybe Lehman Brothers closed or whatever and we just -- the uneasiness, the layoffs in the market just caused a softening in the census, starting in October, across the board." Id.

On October 30, 2008, during PSI's third quarter 2008 conference call, Jacobs told investors that PSI expected an increase due to the financial crisis because more people struggled to cope with stress arising from lost jobs, mortgages, and other financial problems: "The market demand for our high quality inpatient psychiatric care remains strong and has historically intensified in difficult economic environments." Id. When pressed about [*71] this issue by an analyst, Jacobs responded:

The surprise to us in the fourth quarter was October. For some reason, we occasionally have a month like that, where it's supposed to be a stronger quarter and for -- I mean stronger month and for some reason the month just wants to be soft and at that time last year in September and October, there was a lot of bad news going out in the economy.

Id. at ¶ 71.

After ProPublica published reports of PSI's regulatory and patient care issues at Riveredge on February 26, 2009, PSI's stock dropped immediately by $9.79 per share to close at $17.50 on February 26, 2009, a 1-day decline of 35% on volume of more than 17 million shares, more than 19 times the average 3-month daily volume. This stock price was PSI's lowest in trading over four years. Id. at ¶¶ 72-73.

**7. Scienter Allegations**[2]

2    Plaintiffs assert claims for securities fraud under the fraud on the market theory of reliance that are not challenged in Defendants' motion to dismiss. These allegations are that the market price of PSI securities, including common stock regularly traded on the NASDAQ market, was artificially inflated by the false and misleading statements, including PSI's misleading statements [*72] about the quality of care provided at its psychiatric hospitals and other facilities, its compliance with regulatory requirements and industry standards of care, the costs of providing its services and the operating margins and growth that could be achieved from its operations, the past, present and anticipated future success of its roll-up acquisition strategy, the risks to its business and operations, the adequacy of its reserves, the completeness and accuracy of its published financial results and guidance. Id. at ¶ 200. The Class Period inflation in PSI's stock price was eliminated when the financial conditions, business risks, and other information concealed by defendants' scheme was revealed to the market. Id. at ¶ 201. As to Plaintiffs' allegations of a fraud on the market, PSI's common stock was an efficient market because:

(a) PSI's stock met the requirements for listing, and was listed and actively traded on the NASDAQ market, a highly efficient and automated market;

(b) During the Class Period, the average trading volume of the PSI common stock traded on the NASDAQ market was approximately 1.03 million shares per day;

(c) As a regulated issuer, PSI filed periodic public reports [*73] with the SEC and Nasdaq;

(d) PSI regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and through other wide-ranging public disclosures, such as through conference calls, communications with the financial press and other similar reporting services;

(e) During the Class Period, PSI was followed by securities analysts employed by major brokerage firms including Lehman Brothers, Barclay Capital, William Blair, Merrill Lynch, JP Morgan, Deutsche Bank, Robert W. Baird & Co., Inc., Avondale Partners, Citigroup, Credit Suisse, Raymond James & Associates, Piper Jaffray, Banc of America, Stanford Group and others.

Id. at ¶ 202. Due to Defendants' series of partial disclosures, PSI's actual business conditions and risks were concealed from investors by Defendants' alleged scheme to defraud. This concealment was material to PSI's

operations and inflicted price declines that reduced PSI's stock price when Defendants' misleading statements and omissions were publically disclosed. Id. at ¶ 205. [*74] Plaintiffs detail the purported inflation, corrective events, and drops in stock price in detail in the amended complaint. Id. at ¶ 206-212.

**a. Defendants' Alleged False or Misleading Statements**

Plaintiffs' claims for Defendants' misrepresentations include statements from the 2007 reports, press releases and conference calls about the quality of PSI's operations, and the representations of productivity and efficiency at PSI facilities with "higher quality care" for patients, as materially misleading to investors. Id. at ¶ 106 Plaintiffs allege that these facts strongly infer that Defendants knew or recklessly disregarded that the statements in the 2007 Report on Form 10-K and other press releases would be, and were, misleading to and operated as a fraud upon investors, at least in the following material respects:

o Contrary to the claim that PSI "provide[d] higher quality care than [its] competitors" or the "highest quality service," including "24-hour skilled nursing observation" and "intensive, highly-coordinated treatment," PSI's facilities were staffed at levels far below those necessary to provide such services, and well below the levels of its competitors, such that its incidence [*75] of regulatory violations and patient safety and quality of care problems was much higher than that of its competitors, as alleged above and as reported by ProPublica, the LA Times and other media outlets;

o Contrary to the claim that PSI's facilities were in substantial compliance with applicable federal, state, local and independent review body regulations and requirements --

o PSI facilities were staffed below levels necessary to assure proper treatment of patients in a safe and secure therapeutic environment, or to monitor

patients at risk for harming themselves and others, as described above;

o PSI consistently failed to promptly report or accurately document incidents of actual or potential harm to patients, and actively delayed or concealed reporting of a significant number of events, as described above;

o PSI was in violation of other regulatory requirements and standards pertaining to staffing levels and patient treatment, the condition of facilities, and medical record-keeping practices; and

o [*76] Serious patient care deficiencies were still occurring at PSI hospitals in California and would continue to occur through at least June 2008, as was reported by ProPublica in November 2008.

o The Company was not spending substantial time and resources on its compliance programs, nor was regulatory compliance a top priority for PSI --

o According to former PSI employees, the Company was serious about risk management only, as one employee put it, "until money was involved." A former CEO at two PSI hospitals echoed this sentiment, saying there was always a tension between training and budget -- the Company wanted employees to be trained, s/he said, "but they

didn't want to spend a month" doing it.

o Several PSI hospital executives, when shown organizational charts for the Company's compliance department or asked who filled the compliance or regulatory positions like those described above, said that they had never heard those job titles being used in the organization and had no idea who, if anyone, filled those compliance-related roles.

o The statements that PSI was successful in improving results by "optimizing [its] staffing ratios, controlling contract labor costs and reducing supply costs" [*77] was materially misleading because it omitted to disclose that the reductions in staffing and expense were below the level at which PSI could operate its facilities in a safe manner or provide adequate -- much less high quality -- treatment to patients; and

o The claim that services at each facility are "continually assessed and monitored" and "corrective steps are taken when necessary" was materially false and misleading because, in reality, PSI took corrective actions only to avoid negative publicity, and only to the extent to create the appearance of action without making any meaningful changes in its

practices or operations, as described in the UIC report on Riveredge and other sources detailed above.

Id. at ¶ 111.

In summary, Plaintiffs allege numerous statements in 2007 were deliberately or recklessly misleading to investors because PSI's problems were not limited to "a small number of facilities," nor were the published reports only "operational issues" or "bad luck," because PSI had problems at multiple Texas facilities and other PSI facilities in other states at the time of these statements. Id. at ¶ 105. Prior to and during the Class Period, Plaintiffs allege as false and misleading [*78] Defendants' assurances of their comprehensive monitoring systems to detect potential problems before their occurrence and their high-quality patient care in a safe and secure environment and in compliance with regulatory and licensing requirements. Id. at ¶ 43.

As to Defendants' statements about the condition of PSI's finances, Plaintiffs cite the following statements:

o Contrary to the contentions that PSI was providing "high quality" care and demonstrating "outstanding growth" while "improv[ing] productivity and efficiency" of acquired operations, many PSI hospitals and residential treatment centers were struggling under tight budgets that did not permit the facilities to be operated in compliance with regulatory requirements or in a manner that provided adequate -- much less high quality -- care to patients in a safe therapeutic environment;

o The Company was attempting to "double [its] normal targeted pace of expansion" not because of the purportedly "strong" "pipeline of potential acquisition opportunities" or marketplace demand but because the Company needed to accelerate its acquisitions to cover up its inability to continue squeezing growth out of facilities it had previously acquired; [*79] and

o The Company could not achieve 7%

to 9% same facility revenue growth without the planned addition of 600 beds by facility expansion or acquisition, such that the planned additions were not "just . . . insurance," as claimed by Jacobs.

Id. at ¶ 102.

Plaintiffs' allege as actionable the following statements about PSI's reported operating expenses, same facility results, revenue and patient data, in the first quarter of 2008:

Psychiatric Solutions, Inc. ("PSI") today announced financial results for the first quarter ended March 31, 2008. Revenue increased 33.3% to a record $429.7 million for the quarter from $322.4 million for the first quarter of 2007. Income from continuing operations rose 39.4% to $0.46 per diluted share from the comparable prior-year quarter.

**Same-facility revenue grew 7.7% for the first quarter of 2008, reflecting same-facility growth in net revenue per patient day of 5.1% and growth in patient days of 2.4%. Same-facility EBITDA margin expanded 180 basis points to 21.9% and EBITDA margin for all facilities increased 80 basis points to 20.8% for the first quarter of 2008 from the first quarter of 2007**. Consolidated adjusted EBITDA grew 42.5% to a record $76.8 million, [*80] or 17.9% of revenue, for the first quarter of 2008 from the first quarter of 2007. A reconciliation of all GAAP and non-GAAP financial results in this release can be found on page 6.

**Joey Jacobs, Chairman, President and Chief Executive Officer of PSI, remarked, "PSI performed extremely well during the first quarter of 2008, enabling us to exceed earnings guidance for the quarter and to again raise our earnings guidance for the year. Our focus on execution enabled us to achieve our samefacility revenue and EBITDA targets and implement our plans for**

**adding new beds**. With the March acquisition of five inpatient psychiatric facilities from United Medical Corporation, we also added more than 400 beds in a transaction expected to be accretive to our 2008 financial results.

**"Market dynamics in the inpatient behavioral health industry remain favorable, supporting our ability to continue implementing our proven business model. We remain confident of our prospects for driving further significant growth in our same-facility metrics**, while continuing to build our platform for future growth through the accretive acquisition of at least six inpatient facilities each year."

Based on its first quarter [*81] results and outlook for the remainder of the year, **PSI is increasing its guidance for earnings from continuing operations per diluted share for 2008 to a range of $2.00 to $2.03 from the previous range of $1.97 to $2.01. As a result, growth in 2008 earnings per diluted share is expected to be 34% to 36% compared to 2007**. The Company's guidance does not include the impact from any future acquisitions.

Id. at ¶ 113 (emphasis in original).

Given the regulatory violations and patient safety and care issues for incidents in 2007 and earlier, Plaintiffs allege PSI had increased exposure to professional liability claims at PSI's facilities. Id. at ¶ 85. Thus, Plaintiffs allege that Defendants lacked a reasonable basis to reduce PSI's reserve account at the outset of the Class Period and, in doing so, violated generally accepted accounting principles ("GAAP"). Id. Plaintiffs specifically cite Defendants' underreporting of PSI's actual operating expenses and malpractice reserves despite the prevalence of patient care and safety problems and likely increase of patient claims in 2008 as constituting misleading statements to investors at the outset of the Class Period. Id. at ¶¶ 85-95. Thus, Plaintiffs [*82] allege the Defendants' February 20, 2008 earnings release, Defendants' statements at the February 21, 2008

conference call, and in PSI's 2007 Form 10-K Report were deliberately or recklessly misleading to PSI investors. Plaintiffs allege that Jacobs' admission that PSI's reserves should have been increased in its prior quarterly financial statements demonstrates that PSI's Forms 10-K and 10-Q filed with the SEC during the Class Period violated GAAP. Id. at ¶ 92.

Plaintiffs allege these statements about PSI's 2008 performance to be false and in reckless disregard of PSI's actual operations and financial condition by failing to disclose and concealing from investors or recklessly ignoring material risks to PSI's financial viability. Plaintiffs cite the foregoing statements as recklessly and materially misleading:

    o PSI's attribution of its strong growth, revenues and margins to PSI's "focus on execution" or its "successful strategy and [] highly experienced management team," was in fact due to PSI's understaffing and underfunding of psychiatric facilities below levels of compliance with regulatory licensing and accreditation standards and requirements;

    o PSI's reported financial results [*83] did not reflect the true costs to operate its facilities consistent with all regulatory, licensing and accreditation standards and requirements;

    o PSI's reported financial results continued to under-reserve for medical malpractice and other professional liability claims in violation of GAAP; and

    o The financial guidance provided in the April 30 earnings release and discussed on the May 1 conference call lacked a reasonable basis because it failed to account for malpractice and professional liability expenses that had been incurred and were reasonably expected to continue to be incurred at levels above the amounts reserved for such expenses, and because the guidance was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment.

o Defendants' statement that PSI was "on track to achieve [its] earnings guidance for full year 2008" and PSI's guidance for 2009 lacked a reasonable basis because the published guidance failed to account for the actual and reasonably anticipated expenses and lost business arising from the Riveredge investigation or the administrative hold [*84] imposed by DCFS, continuing malpractice expense claims, or a decline in patient occupancy that began in October 2008. The guidance was also misleading and lacked a reasonable basis because it was predicated on operating PSI's facilities in a manner that failed to comply with regulatory requirements or to provide PSI's patients with adequate care in a safe therapeutic environment. Id. at ¶ 145.

Id. at ¶ 117.

As to the material omissions about PSI's actual business practices, Plaintiffs allege:

o The statements omitted to disclose that the Company's ability to produce combined annual revenue growth of 7% to 9% at the facilities it had owned for more than a year was predicated upon a longstanding pattern and practice of cutting expenses in a manner that required budgets and staffing to be reduced below the levels necessary to prevent physical and sexual assaults on patients, or to provide adequate treatment or care to those patients, including proper around the clock monitoring of patients with suicidal tendencies or who otherwise presented a risk of harm to themselves or other patients or staff. Id. at ¶ 102.

o By failing to disclose that annual revenue growth of 7% to 9% was predicated [*85] upon practice of cutting expenses and staffing below the levels necessary to prevent physical and sexual assaults on patients, that PSI's assertions of its "high quality" of treatment or care and safe environment for patients was

misleading. Id. at ¶ 112;

o As of May 2008, serious patient care deficiencies were still occurring at PSI hospitals in California. Id.

o Turner knew or recklessly disregarded that his statements at the December 5, 2008 investor conference were misleading and contributed to a fraud upon investors, because Turner lacked a factual basis to state that PSI's operations of its facilities would be "viewed very favorably" once the core measure data was released, and lacked a basis for stating DCFS's hold at Riveredge would be lifted in the fourth quarter of 2008. Id. at ¶ 153.

Plaintiffs allege that Defendants' statements did not provide a truthful or accurate account of the Illinois' investigation of Riveredge that UIC's investigation had expanded to include facilities other than Riveredge and was therefore unlikely to be completed before the end of the year. Id. at ¶ 146. Thus, Plaintiffs allege Defendants lacked any factual basis to assert that the state hold at Riveredge [*86] would be lifted in the fourth quarter 2008, nor the 80% likelihood of such occurring. According to the minutes of the September 10, 2008 PSI Medical Executive Committee meeting, PSI had also been informed of the results of a federal agency survey of the facility that "the hospital was close to being placed in immediate jeopardy" based upon "a significant amount of concern for the hospital's reputation within the community and the quality of care provided to patients." Id. Defendants also failed to disclose the continuing violations at its other facilities nor PSI efforts to dissuade state officials from imposing fines or sanctions at PSI's Pines facility. Id.

**b. Insider Trading**

As to the Individual Defendants' motivation to inflate PSI's stock price throughout the Class Period, Plaintiffs cite insider trading in PSI stock. According to SEC Forms 4 filed by PSI insiders, the Individual Defendants and PSI board members' sales of PSI stock in large amounts and at critical times, as follows:

(a) **Polson**: On May 28 and 29, 2008, following defendants' false statements regarding PSI's 2008 earnings in the final

quarter, Polson sold 50,000 shares of PSI stock at near Class Period highs of $37.02 [*87] and $37.21 per share, yielding $1.85 million in proceeds. Polson sold off 42% of his PSI stock without any pre-established plan or pattern. Polson has not sold a single share of PSI stock since the Class Period ended.

(b) **Turner**: On July 9 and September 19, 2008, just days before publication of the Tribune investigative report exposing patient mistreatment at Riveredge -- which Defendants knew about before it was published ? Turner sold 95,800 shares at an average price of $40.03 per share, a price higher than any closing price of PSI stock during the Class Period. This sale represented 55% of Turner's holdings. Although Turner's September 2005 10b5-1 trading plan disclosed his stock sale, PSI's Insider Trading Policy and its Code of Conduct prohibited any sale of stock by an insider who possessed material, nonpublic information that is unavailable to investors. Turner sold 100% of his Class Period stock holdings on just two days runs contrary to the policy behind permitting trading plans under *Rule 10b5-1*.

(c) **Director and Insider Mark Clein**: On August 12 and November 4, 2008, just days after defendants' false statements regarding PSI's 2008 second and third quarter earnings, PSI Director [*88] Mark Clein sold 18,000 shares of PSI stock for $628,210 that represented more than 63% of his holdings, for which Clein did not publish an established plan. In the year preceding the Class Period, Clein sold only 10,000 shares for $360,000. Since the end of the Class Period, Clein has not sold a single share of PSI stock.

(d) **Director and Insider Christopher Grant**: On July 9, 2008, just days before the Tribune report on patient mistreatment at Riveredge, PSI Director

Christopher Grant sold 100% of his 2,000 shares of Company stock for $80,000, but Grant had adopted a 10b5-1 trading plan in September 2005. Yet, PSI's Insider Trading Policy and its Code of Conduct prohibit any sale of stock by an insider when in possession of material, nonpublic information that is unavailable to investors. Grant sold 100% of his Class Period stock holdings on a single day runs contrary to *Rule 10b5-1*.

(e) **Director and Insider Edward Wissing**: On January 2, 2009, PSI Director Edward Wissing ("Wissing") sold 100% of his 7,000 shares of Company stock for $192,220 ahead of the Morning News report of problems in PSI's Texas facilities. Although these sales were purportedly made pursuant to a 10b5-1 trading [*89] plan adopted by Wissing in September 2005, both PSI's Insider Trading Policy and Code of Conduct prohibited any sale of stock by an insider when in possession of material, nonpublic information that is unavailable to investors. Furthermore, the fact that Insider Wissing sold 100% of his Class Period stock holdings on a single day runs contrary to the policy behind permitting trading plans under *Rule 10b5-1*, which was designed to establish a regular pattern of trade. Since the end of the Class Period, Wissing has not sold a single share of PSI stock.

Id. at ¶ 198.

During the Class Period, Plaintiffs allege that the Individual Defendants' and insiders' sales of PSI stock were predominately between May 28, 2008 and September 19, 2008. According to the amended complaint, two of the three insiders' sales occurred between July 9, 2008 and September 19, 2008 -- just over a two month period. Id. at ¶ 199.

**c. Executive Bonuses and Other Incentive Compensation**

Following the March 10, 2010 announcement of the

potential sale of PSI to third parties -- which caused PSI's stock price to jump more than 20% to nearly $30 per share -- the DOJ launched an investigation of PSI, particularly concerning the issuance [*90] of the compensation grants to its executives. Id. at ¶ 191. PSI failed to disclose this DOJ investigation into these grants until May 10, 2010, days before PSI's annual shareholder meeting where the compensation grants were to be approved. Id. Defendants also did not mention the DOJ investigation involving the grants in PSI's 14A Proxy Statement filed with the SEC on April 10, 2010 seeking approval of the grants. Id. On May 17, 2010, the day before the shareholder meeting, PSI announced a proposed merger with UHS for $33.75 per share, that Plaintiffs allege left shareholders with insufficient time to evaluate the grants, the DOJ investigation, the merger, or the interrelationship of the events. Id.

In addition to the $30 million acquisition expense and the compensation grants, on April 15, 2010, PSI's compensation committee approved an amendment to Jacobs's employment agreement, in the event of a "change in control" at PSI. Id. at ¶ 192. Under this modified employment agreement, if Jacobs left PSI voluntarily or involuntarily, other than by death or disability, within 12 months after a change in corporate control, Jacobs would receive a lump sum payment equal to the sum of: (i) Jacobs' [*91] earned but unpaid base salary through the termination date; (ii) three times the sum of Jacobs' base salary plus an amount equal to the higher of (A) the highest annual amount of bonus compensation paid to or earned by Jacobs within the prior three fiscal years to the fiscal year of the change in control (B) 100% of the bonus compensation amount that would be payable to Jacobs, assuming that both PSI and Jacobs satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to Jacobs for the fiscal year in which the change in control occurs; and (iii) Jacobs' accrued but unused paid time off or sick pay and unreimbursed business expenses. Id. at ¶ 193. With the grants, Plaintiffs allege that Jacobs would receive millions of dollars, even if Jacobs voluntarily quit after a change in corporate control. Id. at ¶ 194.

Similarly, on April 15, 2010, PSI's compensation committee also approved compensation agreements for each of PSI's top executives that provide in relevant part:

The compensation and benefits payable

under the CIC Agreement include a lump sum payment equal to the [*92] sum of: (i) the earned but unpaid base pay due to the Covered Executive; (ii) two times (2x) the sum of the Covered Executive's base pay plus incentive pay in an amount equal to **the higher of (A) the highest annual amount of incentive pay paid to or earned by the Covered Executive with respect to any of the three fiscal years prior to the fiscal year in which the change in control occurs and (B) 100% of the incentive pay amount that would be payable to the Covered Executive,** assuming that both the Company and the Covered Executive satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to the Covered Executive for the fiscal year in which the change in control occurs; (iii) the Covered Executive's accrued but unused paid time off or sick pay and unreimbursed business expenses; (iv) any other compensation or benefits payable to the Covered Executive in accordance with the terms of the Company's existing plans and programs; and (v) a pro-rata portion of the incentive pay amount that would be payable to the Covered Executive, assuming both the Company and the Covered [*93] Executive satisfy 100% (but not in excess of 100%) of the performance objectives specified in or pursuant to the applicable agreement, policy, plan, program or arrangement and communicated to the Covered Executive for the fiscal year in which the separation date occurs. **Additionally, the Covered Executive will be entitled to (a) full vesting of stock options and restricted stock or other equity-based awards that have not otherwise become vested,** (b) the provision of certain health and welfare benefits for 24 months following the termination and (c) reimbursement of up to $25,000 for outplacement counseling expenses and related benefits for 12

months following the termination.

Id. at ¶ 195 (emphasis in original). Thus, PSI's top executives would receive a lump sum payment of double their base salaries and equivalent to the compensation grants. In total, Plaintiffs allege the severance and equity payments to the Individual Defendants upon the merger would exceed $200 million, more than 10% of PSI's total market capitalization. Id. at ¶¶ 196-197.

Plaintiffs also allege the Individual Defendants were motivated to conceal the truth to avoid losing their jobs and their lucrative performance-based [*94] compensation. Id. at ¶ 184. During the Class Period, Plaintiffs alleged the Individual Defendants awarded themselves extraordinary stock-based compensation awards and were secretly negotiating a sale of PSI, knowing that the coming sale announcement would increase the value of PSI's stock price. Plaintiffs allege that the Individual Defendants' continuing secret efforts to line their pockets at investors' expense provides additional strong evidence of their intent and motivation to defraud investors during the Class Period. Id. at ¶¶ 189-190.

### d. Whistleblower Actions

In January of 2007, Leslie Smith ("Smith"), a former PSI master's level therapist for juvenile males at PSI's Gulf Coast Youth Academy ("GCYA") in 2006-2007, filed a complaint under Florida's whistleblower statute for retaliation after PSI terminated her from that facility. Smith alleged that she was fired after she reported sexual abuse by one youth on another, the excessive use of force on a youth by GCYA staff, refusing to execute reporting guidelines concerning abuse, reporting Medicaid fraud, and reporting the falsification of documents. Id. at ¶ 178. Smith additionally charged that GCYA's chief executive officer hired [*95] two employees who had been dishonorably discharged from the military for sexual harassment and misconduct. One of these employees was hired as Assistant Program Director. This individual was promoted to GCYA Program Director after Smith was terminated by GCYA. Additionally, employees, including senior staff members, at PSI's Intermountain Hospital in Boise, Idaho, were fired or suspended during 2006 for reporting to their superiors that the facility was understaffed and employees were unable to control the young patients in the residential treatment unit, leading to a riot in the main unit where the police had to be called to

quell the violence. Id. Yet, Defendants' submissions reflect that Smith's whistleblower action was dismissed by a district court, and that dismissal was affirmed on appeal. (Docket Entry No. 111-7).

In another instance, a former interim executive at PSI's Manatee Palms facility, had filled similar roles at a number of other PSI facilities between 2005 and 2007. (Docket Entry No. 109, Amended Complaint at ¶ 179). Yet, this executive suddenly found s/he was out of work after s/he aired concerns about the way the facility was staffed and the way patients were being [*96] treated there in early 2007. This person stated s/he felt like s/he had been "blackballed" by PSI, and when s/he later asked PSI if they had any more work assignments for him/her, s/he was told that "they won't use you anymore." Id. PSI did not act in response to his/her complaints at Manatee: "No one would listen to me," s/he said. Id.

In February 2008, Kimberly Gilyard, a former charge nurse for six years at PSI's Laurel Ridge Hospital in San Antonio, Texas, filed an action, in part under the Texas Health and Safety Code and the Texas Occupations Code, for retaliation. Id. at ¶ 180. Gilyard alleged that PSI terminated her in October 2006 for her report of abuse and neglect of patients, inadequate staffing that placed patient care at risk, and her exposure of cover-ups by management related to patient injury. Id. at ¶ 180.

### 8. Individual Defendants

As to the probative value of Plaintiffs' allegations about Jacobs's, Polson's and Turner's statements about PSI's business, Plaintiffs cite their high level positions, their participation in and awareness of PSI's actual operations and intimate knowledge of the cited false statements and omissions made by PSI that were disseminated to the investing [*97] public. Plaintiffs allege these Defendants had the power to influence and control and in fact influenced and controlled, directly or indirectly, the decision making of PSI, including the content and dissemination of the various false and misleading statements cited by Plaintiffs. These Defendants also participated in conference calls with investors and had unlimited access to copies of PSI's reports, press releases, public filings and other statements, and the ability to prevent the issuance of the false statements or cause the false and misleading statements to be corrected. Id. at ¶ 214.

These Defendants had authority over PSI's budget

for its facilities that represented over 90% of PSI's total revenue during the Class Period. The Defendants' budget process set the maximum expenditure on staffing and staff-to-patient ratios for each PSI facility. Id. at ¶ 217. The Individual Defendants continuously tracked all patient incident reports on an immediate, monthly or quarterly basis, depending on the severity of the event, and through monthly risk management reports and monthly hospital operations reports from each PSI facility. Id. These reports were consolidated by division presidents [*98] and facility chief executive officers. Defendants also tracked key operating and financial statistics for each hospital, similarly compiled on a Division basis, through monthly operation review reports and monthly meetings on these reports. Id.

Generally, Plaintiffs allege that PSI executives, including Jacobs, Turner and Polson, were apprised of financial and incident metrics at each PSI facility through numerous reports and meetings that provided detailed information to the Individual Defendants. Id. at ¶ 177. Former employees of PSI confirmed that facility site visits were conducted on a monthly basis by Division-level officers, including chief executive officers or clinical services directors, who reported to PSI's most senior executives, and on an annual basis by PSI's Vice President of Environmental Safety and Compliance who reported to Executive Vice President of Quality and Compliance. Id. at ¶ 166.

According to Plaintiffs, the Individual Defendants' statements about PSI reserves during the conference calls, as well as Jacobs' and Polson's signatures on PSI's financial statements and their Sarbanes-Oxley certifications included with those statements, demonstrate that the Individual [*99] Defendants Jacobs and Polson were each directly aware of, responsible for, and involved in the decision to lower the reserve at the outset of the Class Period. Id. at ¶ 93. Plaintiffs allege that the impact of that action on PSI's reported earnings for fiscal year 2007 and fiscal year 2008 supports an inference that each of the Defendants was actually aware of the changes to the reserve account and the reasons therefore at the time the changes were implemented. Defendants' knowledge of and involvement in addressing the numerous regulatory violations and incidents of negligent patient care described above, particularly including incidents that occurred during 2007 and 2008, further demonstrate that defendants knew or recklessly disregarded circumstances demonstrating that PSI's malpractice and other claims

expenses would not decline in 2008 from the levels in 2007. Collectively, Plaintiffs allege that these facts and the other allegations herein give rise to a strong inference that defendants knew or recklessly disregarded that PSI's reported other operating expenses and the statements contained in PSI's SEC filings regarding the reasons for the reductions in those expenses would be, [*100] and were, materially misleading to investors. Id. Defendants' scienter is further demonstrated by past instances where PSI improved operating results and earnings per share by manipulating its other operating expenses. Id. at ¶¶ 94-95.

a. Jacobs

Jacobs had direct authority over each of PSI's 11 Divisions, each of which was comprised of approximately ten facilities, a number specifically set by defendants as the appropriate quantity of facilities for efficient and effective oversight. Id. at ¶ 216. Jacobs was also the direct supervisor of Kathy Bolmer, PSI's executive vice president, quality and compliance, who exercised constant oversight over the regulatory compliance and risk management at each of PSI's inpatient psychiatric facilities.

In addition to his quoted statements supra, Defendant Jacobs certified PSI's 2007 Report on Form 10-K and each of its 2008 Form 10-Q Reports issued during the Class Period as required by the Sarbanes-Oxley Act of 2002. Id. at ¶ 182. Jacobs's certifications during the Class Period are cited as giving rise to the inference that Jacobs knew, or deliberately disregarded, information about changes in PSI's professional and general liability expenses, staffing [*101] ratios and expenses at PSI's facilities and these changes' impact on PSI's reported margins and earnings, and patient treatment resulting in patient injuries or regulatory violations at PSI facilities. The latter are allegedly caused by PSI's failure to staff PSI's hospitals and residential treatment facilities to meet regulatory requirements and assure adequate treatment and patient care. Id. at ¶ 183. Jacobs's descriptions of PSI's compliance program during PSI's conference calls with analysts and investors were to quell investor concerns over the actual quality of PSI's operations after the negative Tribune report about Riveredge. Id. at ¶ 167.

During a conference call about PSI's first quarter 2009 earnings with analysts and investors on April 29, 2009, Jacobs admitted that PSI's needed to be more attentive to warning signs at its facilities, contradicting Defendants' Class Period statements that PSI was then

focusing on minor and potential incidents and that such compliance was on Jacobs's "top of mind" and other PSI executives. Id. at ¶ 170.

Several former PSI employees who had direct contact with Jacobs during the budgeting process and in other contexts have described him as one [*102] of the most "hands-on" chief executive officers for whom they have ever worked. Jacobs was "unequivocally the most hands-on CEO" and "the most involved [I have worked with]," particularly when it came to financial issues, said one. "Some (CEO's) manage through delegation, less so Joey." Jacobs "was pretty informed, from what I could see" said another. "He was pretty close to everything . . . if you had something that surfaced, he'd pick up the phone and ask questions." Id. at ¶ 175. Several former employees recall getting weekly e-mails from Jacobs summarizing the Ten Worst hospitals in terms of patient capacity, comparing their performance to budgeted patient capacity targets. The e-mails were distributed to division presidents, hospital CEOs, and other executives. "There was peer pressure to make sure you weren't in the worst 10," said one e-mail recipient. I "didn't want to be on it," said another, who recalled that Jacobs displayed the variance on "a big 38-inch screen" in his office. The census numbers were "driving decision-making," s/he said. Id. at ¶ 176.

Jacobs's extensive experience in healthcare is cited as giving rise to the inference of his understanding of the significance [*103] of the incidents of patient mistreatment or lack of supervision at Riveredge and other PSI facilities, or evinces his recklessness in failing to recognize the significant and material risks those incidents presented to PSI's operations and patients. Id. at ¶ 171. Prior to and during the Class Period, Defendants consistently explained PSI's increasing profitability was due in part to PSI's competitive strength in an "experienced management team." "Our senior management team has extensive experience in the health care industry. Joey A. Jacobs, our Chairman, President and Chief Executive Officer, has over 30 years of experience in various capacities in the health care industry." Id. at ¶ 172. "Our senior management operates as a cohesive, complementary group and has extensive operating knowledge of our industry and understanding of the regulatory environment in which we operate. Our senior managers employ conservative fiscal policies and have a successful track record in both operating our core business and integrating acquired assets." Id. at ¶ 173.

Plaintiffs assert that Jacobs had sufficient experience in this industry to recognize the significance of the incidents described above. Id. [*104] Yet Jacobs continued to assure investors in PSI's SEC filings, press releases and investor conferences.

**b. Polson**

In addition to his quoted statements supra, Defendant Polson certified PSI's 2007 Report on Form 10-K and each of its 2008 Form 10-Q Reports issued during the Class Period as required by the Sarbanes-Oxley Act of 2002. Id. at ¶ 182. Polson's certifications during the Class Period are cited as giving rise to the inference that Polson knew, or deliberately disregarded, information about changes in PSI's professional and general liability expenses, staffing ratios and expenses at PSI's facilities and these changes' impact on PSI's reported margins and earnings, and patient treatment resulting in patient injuries or regulatory violations at PSI facilities. The latter are allegedly caused by PSI's failure to staff PSI's hospitals and residential treatment facilities to meet regulatory requirements and assure adequate treatment and patient care. Id. at ¶ 183. During the Class Period, Polson reported directly to Jacobs and supervised the operations of PSI departments.

At the end of the Class Period, PSI investors learned the extent to which the administrative hold had increased PSI's [*105] expenses and resulted in lost business that combined with steadily increasing malpractice expenses. The decline in PSI's financial performance caused an immediate 35% drop in the value of PSI's stock. Id. at ¶¶ 9, 67-73, 200-213.

**B. Conclusions of Law**

**1. *Rule 10(b)* and PLSRA Standards**

Plaintiffs' claims seek recovery under *§ 10(b)* of the Securities Exchange Act of 1934 and *Rule 10b-5* promulgated thereunder. *Section 10(b)* of the Securities Exchange Act of 1934, *15 U.S.C. § 78j*, prohibits the use "in connection with the purchase or sale of any security . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . .[.]" Pursuant to this section, the Securities Exchange Commission promulgated *Rule 10b-5*, that provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, . . .

* * *

To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading. . . .

*17 C.F.R. § 240.10b-5.*

The Supreme Court described the purpose of the 1934 Act as follows:

The [*106] 1934 Act was designed to protect investors against manipulation of stock prices. See S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the fundamental purpose' of the Act as implementing a philosophy of full disclosure.'"

*Basic Inc. v. Levinson, 485 U.S. 224, 230, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* (quoting *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477-478, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977)* (quoting *SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963)))*.

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") that requires specificity in pleadings in private securities litigation before commencement of discovery:

(b) Requirements for securities fraud action. (1) Misleading statements and omissions. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*] in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; [*107] or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind. In any private action arising under this title. . . [*15 U.S.C. §§ 78a et seq.*], the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a **strong inference** that the defendant acted with the required state of mind.

(3) Motion to dismiss, stay of discovery. (A) Dismissal for failure to meet pleading requirements. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*], the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

* * *

(B) Stay of discovery. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*], all [*108] discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party the particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*15 U.S.C. §78u-4(b)(1)(A), (b), 2* and *3(b)* (emphasis added).

The purpose of the PSLRA was to "protect investors, issuers and all who are associated with our capital markets from abusive securities litigation" as well as "to implement [] need[ed] procedural protections to

discourage frivolous litigation." H.R. Conf. Rep. 104-369, 104th Cong. 1st Sess. 31, 31 (1995). Although Congress added the necessity of "strong inference," the Sixth Circuit later clarified that the PSLRA did not alter the recklessness standard for scienter in federal securities actions. *In re Comshare, Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999)*. As to the elements of a Section 10(b) claim, the Sixth Circuit recently restated the elements as follows: "To state a securities fraud claim under *Section 10(b)*, a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon [*109] which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" *Frank v. Dana Corp., 547 F.3d 564, 569 (6th Cir. 2008)* (quoting *In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999))*.

## 2. Standard of Review

For a Rule 12(b)(6) motion to dismiss, the Court must deny the motion if the complaint's factual allegations "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 553-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*. "[T]he allegations of the complaint should be construed favorably to the pleader," *Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* abrogated on other grounds *Harlow v. Fitzgerald, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)*, and the Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. Dekalb County, Ga., 433 U.S. 25, 27 n.2, 97 S. Ct. 2490, 53 L. Ed. 2d 557 (1977)*. Yet, a legally sufficient complaint, "requires more than bare essentials of legal conclusions," *Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)*, and the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)*. Moreover, where, as here, fraud is alleged, [*110] *Fed. R. Civ. P. 9(b)* requires that in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.

In a securities action, the heightened pleading standards are to be evaluated as set forth by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007)*:

Our task is to prescribe a workable construction of the "strong inference"

standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.

We establish the following prescriptions: **First**, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. **Second**, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is [*111] whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. **Third**, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

\* \* \*

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? **To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e. of the "smoking-gun" genre, or even the**

**"most plausible of competing inferences[.]" . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations.** A complaint will survive, we hold, only if a reasonable person would deem [*112] the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

\* \* \*

[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint. . . . [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

\* \* \*

We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. **A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter at least as likely as any plausible opposing inference.**

*551 U.S. at 321-29* (citations omitted) (emphasis in original and added in part).

The Sixth Circuit recently restated the Supreme Court's view on a Rule 12(b) motion in a securities action as follows:

Although the PSLRA left the [*113] term undefined, the Supreme Court has concluded that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter. *Tellabs,*

*127 S.Ct. at 2509.* In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." *Helwig v. Vencor, Inc., 251 F.3d 540, 547 (6th Cir. 2001).*

In Tellabs, the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under *Section 10(b).* First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, 127 S.Ct. at 2509.* Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. (citation omitted). At the second stage, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether [*114] any individual allegation, scrutinized in isolation, meets that standard." Id. (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter rationally could be drawn." *Id. at 2510.* Rather, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." Id.

Finally, in determining whether the pleaded facts give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id. at 2509.* Because the strength of an inference "cannot be decided in a vacuum," the district court must conduct a "comparative inquiry" and assess the possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct,

as well as inferences favoring the plaintiff." *Id. at 2509-10*.

In defining how this framework is to be applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id. at 2510* (emphasis [*115] added). Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward. See *id. at 2510 n. 5*; *ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008)* ("In other words, where there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff.").

*Dana Corp., 547 F.3d at 570-71.*

In addition to *Fed. R. Civ. P. 8* on the general rules of pleading, *Fed. R. Civ. P. 9(b)* applies here, given the nature of Plaintiffs' claims. In *Blount Financial Services v. Walter E. Heller & Co., 819 F.2d 151, 153 (6th Cir. 1987)*, the Sixth Circuit explained that "*Rule 9(b)* requiring 'averments of fraud . . . with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." (citation omitted). *Rule 9(b)* is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *American Town Ctr. v. Hall 83 Assocs., 912 F.2d 104, 109 (6th Cir. 1990).* [*116] The Sixth Circuit ruled that the provisions of *Fed. R. Civ. P. 8* and the requirement of *Rule 9(b)* are to be read in conjunction with each other. *Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988).*

Under Ameritrust, the plaintiff can satisfy *Rule 9(b)*'s requirements by pleading the circumstances of the fraud, not the evidence. *848 F.2d at 680 n.9*. Since Ameritrust, however, the Sixth Circuit reiterated the rule of this Circuit that *FRCP 9(b)* requires that fraud be pleaded

with particularity. To satisfy *FRCP 9(b)*, a plaintiff must "at a minimum **allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied.**'" *American Town Center, 912 F.2d at 109* (quoting *Bender v. Southland Corporation, 749 F.2d 1205, 1216 (6th Cir. 1984)*) (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient under *Rule 9(b)*.

The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt [*117] to distinguish among them.

This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'

*Benoay v. Decker, 517 F. Supp. 490, 493 (E.D. Mich. 1981)*, aff'd *735 F.2d 1363 (6th Cir. 1984)*[3] (quoting *McFarland v. Memorex Corp., 493 F. Supp. 631, 639 (N.D. Cal. 1980)* (quoting *Jacobson v. Peat, Marwick, Mitchell & Co., 445 F. Supp. 518 (S.D.N.Y. 1977)*) (other citations omitted).

   3  The Supreme Court cited Benoay approvingly, albeit on other grounds. *Central Bank of Denver, N.A. v First Interstate Bank of Denver, N.A., 511 U.S. 164, 170, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994).*

In *City of Monroe Employees Ret. Sys. v. Bridgestone, 399 F.3d 651, 689-90 n. 32 (6th Cir. 2005)*, the Sixth Circuit noted a split in precedents, including a decision of a district court in this Circuit, on the "group pleading" exception to *Rule 9(b)*. This exception applies [*118] "in cases of corporate fraud when the false and

misleading is conveyed in a prospectus, annual reports, press releases or other group published information [where] it is reasonable to presume that these are the collective actions of officers." *Id. at 689-90* ns. 32 and 33 (citing inter alia, *In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000)*). This principle could apply here as Plaintiffs cite PSI's 10-K reports and its press releases that commented on the financial performance of PSI. Bridgestone, however, did not adopt this exception and expressly declined to do so. *399 F.3d at 690*. In any event, the Sixth Circuit followed Benoay on this specific pleading rule in *United States ex rel. Bledsoe v. Community Health Systems, Inc., 342 F.3d 634, 643 (6th Cir. 2003)*. Despite the group pleading exception's relevance, this Court is bound by existing Sixth Circuit precedents in *Bledsoe* and *Benoay* that a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations.

In addition, in evaluating Plaintiffs' amended complaint under *Fed. R. Civ. P. 10(c)*, any matters attached to the pleadings are considered part [*119] of the pleadings, such as Defendants' submissions. (Docket Entry Nos. 111-1 through 111-7). In *Weiner v. Klais and Co., Inc., 108 F.3d 86, 88-89 (6th Cir. 1997)*, the Court reiterated the general rule that: "Matters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." (citations omitted). Yet, the Circuit Court recognized an exception in securities cases, but only for papers filed by a defendant and referred to in a plaintiff's complaint.[4]

> The [district] court held . . .it would consider 'only those exhibits submitted by the defendant which can properly be considered incorporated by reference into the complaint, and, thus, a part of the pleadings.'
>
> **Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.** Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has

held that **"[d]ocuments that a defendant attaches to a motion to dismiss are** [*120] **considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." We believe that this approach is appropriate.**

*Id. at 89* (emphasis added and citations omitted) (quoting *Venture Assocs. Corp v. Zenith Data Sys. Corp, 987 F.2d 429, 431 (6th Cir. 1993)*. See also *Nieman v. NLO, Inc., 108 F.3d 1546, 1555 (6th Cir. 1997)*.

> 4   This principle does not extend to extrinsic evidence *Katt v. Titan Acquisitions, Ltd., 133 F. Supp. 2d 632, 637-38 (M.D. Tenn. 2000)*. The Court cannot presume the truth of the extrinsic information nor use such information in evaluating the pleadings. *Bridgestone, 399 F.3d at 665*; see also *Logan v. Denny's, Inc., 259 F.3d 558, 581 n.5 (6th Cir. 2001)* (court may not take judicial notice of disputed facts).

Thus, of the factual materials submitted by the Defendants, the Court will consider only those documents referred to in Plaintiffs' amended complaint. (Docket Entry Nos. 111-1 through 111-7, 123-1 and 123-2).

As pertinent here, a complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions, or public documents for its allegations of specific facts on [*121] a company's internal operations. *Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000)*. Plaintiffs note that the naming of such sources is not required. Id. Hearsay is a sufficient basis on which to allege such facts in a complaint. *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 144 F.R.D. 613, 617 (E.D.N.Y. 1992)*. Newspaper accounts are also sufficient bases on which to plead, if not prove, facts giving rise to a claim for securities fraud. *In re Am. Serv. Group, Inc., No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, 2009 WL 1348163, at *62 (M.D. Tenn. Mar. 31, 2009)*. Accord *In re McKesson HBOC, Inc. Sec. Litig., 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000)*; *In re Axis Capital Holdings, Ltd. Sec.Litig., 456 F. Supp. 2d 576, 589 (S.D.N.Y. 2006)*; *In re DaimlerChrysler AG Sec. Litig., 197 F. Supp. 2d 42, 80 (D. Del. 2002)*; *In re Air Disaster at Lockerbie, 144 F.R.D. 613, 617 (E.D.N.Y. 1992)*.

**3. Analysis of Plaintiffs' Claims**

**a. The Materiality Element**

Plaintiffs assert multiple theories of liability for their Section 10(b) and Rule 10(b)(5) claims: (1) Defendants' misrepresentations or misleading statements on PSI's costs, statement of reserves and profitability; (2) Defendants' scheme to omit material facts about [*122] PSI's actual practices in systematically understaffing its psychiatric hospitals to inflate artificially the value of PSI's stock; (3) Defendants' financial motive and opportunities to commit these securities violations; and (4) Defendants' fraud on the market by their concealment of PSI's actual practices.[5] Defendants' motion also challenges the insufficiency of Plaintiffs' allegations of scienter for the various aspects of PSI's statements and omissions regarding its financial and business practices as well as the Individual Defendants' related misrepresentations and omissions. To evaluate all of these contentions requires a review of Plaintiffs' specific factual allegations on each element of their securities claims under their theories of liability and the alleged role of each individual defendant in PSI's statements and conduct.

> 5    Defendants' motion to dismiss does not challenge this theory of liability.

Yet, an element common to all of Plaintiffs' claims is the materiality of Defendants' alleged statements and omissions. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable [*123] investor as having significantly altered the 'total mix' of information made available.'" *Basic Inc., 485 U.S. at 231-32*. The Court deems it noteworthy that the Supreme Court referred to information "such as earnings forecasts or projections" as "contingent or speculative information." *Id. at 232 n.9*. The Supreme Court, however, did not decide that issue. Id.

In Bridgestone, the Sixth Circuit noted that at the motion to dismiss stage, omissions should be considered material unless the omitted information was so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *399 F.3d at 681* (quotation omitted); see also *Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000)* (quoting *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985))*; *Arber v. Essex Wire Corp.,*

*490 F.2d 414, 418 (6th Cir. 1974)* (The test for materiality is "whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question."). Unless written misrepresentations are material, such misrepresentations are not actionable. *Radol v. Thomas, 772 F.2d 244, 252 (6th Cir. 1985)*. [*124] The materiality requirement does not require that the defendant communicated the misrepresentation directly to the plaintiff. *In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998)*.

To be sure, allegations of internal corporate mismanagement "without any deception, misrepresentation, or nondisclosure" are not cognizable under the federal securities laws. *Santa Fe, 430 U.S. at 476, 479*. Yet, included as their misrepresentations and omissions are "manipulative" corporate practices that are actionable where those practices "artificially affect[] market activity ... No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Id. at 476, 477*.

The securities laws reach misleading conduct as well as misleading statements, so long as there is some mechanism by which that conduct misled investors. *Stoneridge Inv. Partners LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 158-59, 128 S. Ct. 761, 169 L. Ed. 2d 627 (2008)*. See also *In re Am. Serv. Group, Inc., No. 3:06-0323, 2009 U.S. Dist. LEXIS 28237, 2009 WL 1348163 (M.D. Tenn. March 31, 2009)* (company's business practices of cutting medical services to inmates and defendants' failure to disclose those practices stated an actionable [*125] Rule 10b(5) claim); *In re UNUMProvident Corp. Sec. Litig., 396 F. Supp. 2d 858, 885-86 (E.D. Tenn. 2005)* ("Here, Glickenhaus has alleged Defendants conceived, instituted, and oversaw a claims handling strategy which was, at best, unethical and then both failed to credit this conduct as the cause of the company's success and knowingly failed to reflect the potential liabilities in the company's financial disclosures.... [E]ven assuming Defendants' alleged claims practices themselves constitute mere mismanagement, Glickenhaus has adequately alleged Defendants knowingly failed to account for the potential repercussions of those practices in its statements regarding the company's finances.").

On this element, in PSI's SEC reports and statements

to investors and analysts, the Defendants repeatedly made statements that the psychiatric care provided at PSI facilities is objectively better and of higher quality than care provided by PSI's competitors. The Defendants' emphasis on these aspects of PSI's business reflects the importance of these factors to potential and actual investors. Yet, governmental and media reports reflect PSI's failures to provide such level of services to its patients [*126] at numerous PSI facilities across the country and those reports adversely affected the value of PSI's stock. Given Plaintiffs' specific allegations concerning the actual state of patient care in PSI facilities in several states and the alleged inability of PSI to monitor these failing standards of care through its core measurements, the Court concludes that Plaintiffs' cited misrepresentations or omissions about PSI's actual services and business practices and their impact on PSI's financial condition, satisfy the materiality requirement under *Rule 10(b)* precedents.

For the remaining analyses, the Court addresses separately Plaintiffs' allegations of the Defendants' material misrepresentations and omissions about PSI's practices and acquisition strategy.

**b. The Safe Harbor Analysis**

The next issue is whether the Defendants' cited statements involve hard or soft fact. In their motion to dismiss, Defendants argue that the cited statements in Plaintiffs' amended complaint are soft facts protected by the Safe Harbor Provisions of the PSLRA. (Docket Entry No. 111, Defendants' Memorandum at pp. 2-3, citing ¶¶ 86, 96, 101, 102, and 111 of the Plaintiffs' Amended Complaint).

In their response to [*127] Defendants' motion to dismiss, Plaintiffs identify the Defendants' allegedly false statements in their amended complaint in the following paragraphs as presenting actionable hard facts: ¶¶ 3-7, 28-31, 33-34, 35, 53-54, 70, 85-95, 106-110, 119, 124-128, 130-133, 138-141, 146, and 152-153. Plaintiffs also cite the Defendants' false or misleading statements as reflecting their claims in their amended complaint:

(1) PSI's Undisclosed Understaffing and Patient Care Problems (¶¶ 33-34, 45, 58, 61, 65, 70, 74-75, 106-111, 151, 154);

(2) Defendants' Statements about PSI's Compliance and Omissions of Material Facts (¶¶ 13, 41, 48, 52, 56-57, 60-66, 132, 147);

(3) Defendants' Misrepresentations and Omissions about Conditions at Riveredge (¶¶ 7, 53-55, 119, 124-128, 130-133, 138-141, 146, 152-153);

(4) Defendants' Deliberate Accounting Manipulations and Omissions (¶¶ 4, 80, 82, 86, 101-104;

(Docket Entry No. 114, Plaintiffs' Memorandum at pp. 9-21).

In reply, Defendants contend that many of Plaintiffs' citations of their challenged statements contain statements that are mixed with forward looking statements that are protected as a matter of law.

As to whether the cited statements underlying Plaintiffs' [*128] misrepresentation claims involve "soft" or "hard" information, under the PSLRA, safe harbor protection is available for a firm's statements that are "defendants' projections, statement of plans and objectives, and estimates of future economic performance." *15 U.S.C. § 78u-5(c)(1)*. The safe harbor statute provides that "in any private action . . . that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, [the defendant] **shall not be liable** with respect to any forward-looking statement . . . [that] is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." *15 U.S.C. § 78u-5(c)(1)(A)(i)* (emphasis added).

According to the PSLRA's legislative history, the safe harbor provision was included because a "company's own assessment of its future potential [is] among the most valuable information shareholders and potential investors could have about a firm." See S. Rep. No. 104-98, at 15-16 (1995), reprinted in 1995 U.S.C.C.A.N. 679, 694-95. The safe harbor was intended to quell corporate management's [*129] "[f]ear that inaccurate projections [would] trigger the filing of a securities fraud lawsuit." Id., 1995 U.S.C.C.A.N. 679, at 695. Yet, Congress also provided that the safe harbor "shall not apply to a forward looking statement -- that is made with respect to the business or operations of the issuer, if the

issuer . . . makes the forward-looking statement in connection with a rollup transaction." *15 U.S.C. §78u-5(b)(1)(D)*. Here, Plaintiffs allege that PSI had a "rollup strategy" in PSI's acquisitions of new facilities to increase profits and thereby offset the costs of its facilities with reduced numbers of patients. (Docket Entry No. 109, Amended Complaint at ¶ 31). In the Court's view, this "rollup strategy" is interrelated with Plaintiffs' allegations about PSI's other practices.

Moreover, under Sixth Circuit precedents, "for forward-looking statements that are accompanied by meaningful cautionary language, the first prong of the safe harbor provided for in [the Reform Act] makes the state of mind irrelevant." *Miller v. Champion Enters., Inc., 346 F.3d 660, 672 (6th Cir. 2003)*. "In other words, if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary [*130] language, a defendant's statement is protected regardless of the actual state of mind." Id. Yet, this statutory protection is overcome "if the statement was material; if the defendant had actual knowledge that it was false or misleading; and if the statement was not identified as 'forward-looking' or lacked meaningful cautionary statements." *Helwig, 251 F.3d at 547-48 (6th Cir. 2001)* (the parties agree Helwig was abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S. Ct. 2499, 168 L. Ed. 2d 179 (2007))*.

"As a matter of policy and precedent," false cautionary language cannot immunize defendants' misconduct. *Helwig, 251 F.3d at 560-61*. Accordingly, "[c]autionary statements must be substantive and tailored to the specific future projections, estimates or opinions . . . which the plaintiffs challenge." *Id. at 559*. Moreover, statements are not forward looking if the speaker has actual knowledge of their falsity and the statements lack meaningful cautionary language. *Miller, 346 F.3d at 672*. "[V]ague and insipid cautionary language is insufficient to afford the statements protection under PSLRA's safe harbor provision." *In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004)*. [*131] An example is *In re Humana, Inc. Sec. Litig., 3:08CV-00162-JHM, No. 2009 U.S. Dist. LEXIS 53535 (W.D. Ky. June 15, 2009)*, where the company's statement was: "Our rigorous benefit expense trend analysis and forecasting includes regular interaction of many disciplines within our organization, this increases the reliability of our commercial pricing and profit planning" and held not to be forward-looking. *2009 U.S. Dist.*

*LEXIS 53535, [WL] at *31.*

On the issue of whether Plaintiffs' allegations present hard or soft information, under Sixth Circuit precedents, "[h]ard information is typically historical information or other information that is objectively verifiable. Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable." *In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997)*; accord *Zaluski v. United American Healthcare Corp., 527 F.3d 564, 572 (6th Cir. 2008)*. "The failure to disclose soft information is actionable only if it is virtually as certain as hard information." *Bridgestone, 399 F.3d at 669* (quotation omitted). As examples, the Sixth Circuit defines "generalized statements of optimism that are not capable of objective [*132] verification" as "puffing" statements. *In re Ford Motor Co. Sec. Litig., 381 F.3d 563, 570 (6th Cir. 2004)*. In Ford the Sixth Circuit held that Ford's statements related to "quality" of its vehicles were not actionable as mere puffing. Id. As another example, in Bridgestone, the defendant's statement that its tires were "the best tires in the world" was held not to be actionable as a matter of law:

> These statements, both on their own terms and in context, lacked a standard against which a reasonable investor could expect them to be pegged; such statements describing a product in terms of "quality" or "best" or benefitting from "aggressive marketing" are too squishy, too untethered to anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision.

*399 F.3d at 670-71.*

Yet, "once [a company] chooses to speak on a subject, to do so fully and fairly: 'Our securities laws therefore, require an actor to provide complete and non-misleading information with respect to the subjects on which he undertakes to speak.'" *Chamberlain v. Reddy Ice Holdings, Inc., 757 F. Supp. 2d 683, 2010 U.S. Dist. LEXIS 128347, 2010 WL 5056184, at *13 (E.D. Mich. Dec. 6, 2010)* (quoting *Helwig, 251 F.3d at 561*).

To [*133] decide whether Plaintiffs' listed factual allegations from their amended complaint (Docket Entry No. 109) involve actionable hard facts, the Court

addresses them in seriatim based upon Plaintiffs' categorization of their claims.

### i. PSI's Undisclosed Understaffing and Patient Care Problems

In paragraph 3, Plaintiffs summarize Defendants' business practices of understaffing its facilities causing harm to its patients; PSI staffs' failures to report timely patient safety issues; and Defendants' use of revenue from acquisitions to generate revenue and obscure the actual costs of PSI facilities. For the latter practice, paragraphs 28, 29 and 31 describe PSI's acquisition history and allege a market analysts' report stating these acquisitions represent an overpayment and "disregard[] the balance sheet." Paragraph 35 alleges that PSI's acquisitions were driven by its need for revenue from additional beds, but declining occupancy rates at PSI's older facilities rendered PSI's projected profits unachievable.

Paragraphs 33 and 34, has factual allegations concerning Defendants' statements of their "rigorous due diligence" in monitoring PSI's facilities and PSI's highly trained and coordinated staff. [*134] These allegations are hard facts because these allegations are capable of empirical verification by PSI's internal documents that reflect Defendants' monitoring and training as well as the qualifications of staff. Paragraph 45 refers to Defendants' core measures of PSI's performance that also are hard facts, as reflected in paragraph 74 alleging that PSI failed to meet accreditation standards in six of seven areas. Paragraph 58 cites a published report comparing PSI's 10 oldest hospitals with PSI's competitors and finding "twice as many patient-care deficiencies" at PSI facilities, a hard fact. Similarly, the Court deems paragraph 61's citation to a published report that PSI has fewer private nurses than any other private psychiatric hospital in California to be a hard fact. Paragraph 65 cites Texas authorities imposing 52 violations against a PSI facility on a single visit and a published report of a PSI Texas staff member stating their "numerous request of administration to increase staffing levels." The Court concludes that all of these allegations involve hard facts.

The Court concludes that portions of paragraphs 106-111 also present hard facts, namely that PSI "provide[s] higher [*135] care than our competitors," "the most intensive level of care," "highly coordinated treatment," mechanisms to identify and counsel problems, "optimizing staff ratios," and "regular site visits." Those allegations are subject to empirical testing, as demonstrated by PSI's internal documents reflecting such efforts and as reflected by the state enforcement activities and PSI's core measures. In paragraphs 119, 124 and 125, Defendants' statements of the incident at Riveredge, as minor and historical, could be objectively measured. Similarly, paragraph 151 describes Defendant Turner's statements about the level of deficiencies at PSI hospitals, PSI's higher management's knowledge of PSI's facilities problems and PSI's core measures, all of which could be objectively verified by PSI's internal documents as well as state enforcement findings and PSI's core measures. Similarly, paragraph 154 references Defendant Jacobs's statements about PSI's joint commission scores involve hard facts, as reflected by Plaintiffs' publication of PSI's actual scores. The Court concludes that these allegations involve hard facts.

### ii. Defendants' Statements about Published Reports of PSI's Compliance and Omissions [*136] of Material Facts

Paragraphs 60 through 66 distill a media report on PSI's California facilities, citing "significant staff cuts" resulting in "insufficient time to devote to monitoring patients" and proportionally fewer registered nurses at PSI facilities compared to other private facilities. The report also cites PSI having 25% more profit than other such facilities; a PSI admissions officer's statements about PSI's "pattern of behavior driven totally by the almighty dollar" that is "not a client-centered approach; It's a money centered approach." The Texas enforcement decisions cited details of rapes, attacks and suicide attempts with the Texas fine of Plaintiffs in 2007 as "nearly as much as all other hospitals combined." Id. at ¶ 65. The Court concludes that these allegations present hard facts.

Paragraphs 125 through 128 describe Defendant Jacobs's statements about PSI's reporting capability and regulation compliance in response to the reports on Riveredge and PSI's California facilities. Paragraph 132 cites another 2008 incident at a PSI California facility with the most serious deficiencies that are cited as eight times the statewide average among private psychiatric hospitals [*137] in California. In Illinois, a 2008 media report described a state agency finding of "the continuing failure to adequately monitor and ensure patient safety" at a PSI facility in Illinois. Finally, paragraph 147 lists state agency findings in 2009 and published in 2009 about PSI

facilities in Nevada, Pennsylvania and Illinois providing "deficient care," "inadequate treatment plans," "excessive rates of chemical restraints due to severe understaffing" and "continued deficient patient care, including the failure to properly develop treatment plans and documentation procedure." Given state agencies' ability to asses these core issues, the Court concludes that these factual allegations also present hard facts.

### iii. Defendants' Misrepresentations and Omissions about Conditions at Riveredge

Paragraph 7 describes the 2008 Illinois investigation of PSI's Riveredge facility that PSI acquired in 2002 and the State of Illinois's finding of PSI's lack of monitoring of at least 10 mentally disabled children. The Illinois investigation also revealed PSI workers interfering in law enforcement investigations, and these actions resulted in a suspension of that facility's admissions. The Court concludes [*138] that these allegations present hard facts.

In paragraphs 53 through 55, Defendant Jacobs's and other PSI officials' statements discounting the Riveredge problems are quoted. Defendant Jacobs is quoted as telling investors "the company quickly corrected the deficiencies" in 2006 and 2007 and "unfortunate incidents" involving very difficult patients. Id. at ¶¶ 53, 54. In paragraph 55, Plaintiffs cite published reports in February 2009 of continuing problems at Riveredge despite new management in June 2008 as well as a 2007 patient death due to an overdose and a sexual assault against a 16 year old male patient. Paragraphs 138 through 142 describe Defendant Jacobs's statements in October 2008 about the Riveredge investigation as a "couple of unfortunate incidents" and that PSI's business model was "successfully proven" and "increased enhancing our ability to execute," id. at ¶ 138, 140, as well as Jacobs's statement that "whenever we found an issue that we need to address, we're addressing it." Id. at ¶ 142. In paragraphs 152-153, Defendant Turner makes similar misrepresentation in December 2008 of "no change since our last update on the earnings call" at Riveredge. The Court concludes [*139] that these allegations present hard facts.

In paragraphs 130 through 133, the above statements by PSI and Jacobs are alleged to be material misrepresentations of PSI's actual business practices. In paragraph 146, Plaintiffs describe the lack of any factual basis Jacobs's statements given that a federal agency

informed PSI at a September 10, 2008 PSI board meeting that Riveredge "was close to being placed in immediate jeopardy" and represented a "significant amount of concern for [PSI's] reputation within the community" for patient care. In paragraphs 101 through 104, Plaintiffs assert that Defendants' February 2008 statements and press release recklessly ignored the actual quality of its operations and the level of PSI's actual patient care that represented the core of PSI's business and impacted PSI's attractiveness as an investment. The Court concludes that these allegations involve hard facts.

### iv. Defendants' Deliberate Accounting Manipulations and Omissions

For this category, in paragraph 4, Plaintiffs allege that at the outset of the Class Period, PSI's 2007 fourth quarter results were "20% below historical levels," but Defendants continued to assure investors of PSI's ability to [*140] maintain 7% to 9% annual returns. To do so, Plaintiffs allege in paragraph 86 that PSI manipulated its finances by lowering its reserves for medical liability claims by $3 million, the biggest component of a $5 million reduction in other operating expenses. Paragraph 82 sets forth PSI's 2008 press release and projected positive growth in earnings of 27% for the fourth quarter of 2008 and 30% for the year. Yet, Plaintiffs allege that in 2008, PSI's problems with patient care would actually reduce earnings and increase PSI's costs as reflected in the fourth quarter of 2008. Paragraph 56 states PSI tried to add $5 million to medical reserves and other expenses. Paragraph 4 also describes Defendants' statement of the acquisition of 600 beds by the end of 2008 to increase PSI's revenues that Plaintiffs allege that PSI lacked the financial capability to acquire. The Court concludes that these allegations present hard facts.

In paragraph 88, Plaintiffs allege that PSI's 2007 Report on Form 10-K falsely stated that the reserve account had been decreased due to "favorable developments in our professional and general liability experience." Id. Plaintiffs allege that given the state agency investigations [*141] about which Defendants had knowledge at the time PSI reduced its reserves, PSI was at greater risk of malpractice claims due to the widespread understaffing of its facilities. Id. at ¶¶ 85-86, 90, 93-94. PSI's malpractice claims expenses steadily increased every quarter during the Class Period. Id. at ¶ 91. Defendant Jacobs has admitted that PSI should have increased the reserve account earlier in the Class Period.

The Court concludes that these allegations involve hard facts.

As to Plaintiffs' allegations of PSI's statements about its "highest quality care," in paragraph 103, PSI asserts to investors that its 2007 performance was caused by "bad luck." In paragraphs 130-133, 138-141, 146 and 152-53, Plaintiffs alleged that Defendants' responses to the state agency's findings in Illinois and California as minor, rendered the statements on its second quarter results in 2008 about PSI's profitability misleading. These paragraphs present hard facts subject to objective verification given the scope and extent of State findings on PSI facilities, the core measures of PSI's performance for its accreditation, and the remedial costs for PSI's non-compliance.

The Court concludes, however, that [*142] Plaintiffs' allegations about the other Defendants' statements of their expectations and belief, standing alone, are not hard facts. For example, in paragraph 70, Defendant Jacobs's statements refer to his "guess" about PSI's financial conditions in one quarter and his "expected" measure in another quarter. Paragraphs with such language involve soft facts, but these allegations, when coupled with hard facts subject to empirical verification may become actionable. Yet, Defendants note that $3 million for the reserve expense is a 0.19% of PSI's total expenses for 2008 and this amount is immaterial as a matter of law. *Taubenfeld v. Hotels.com, 385 F. Supp. 2d 587, 593-94 (N.D. Tex. 2004)* (company not required to disclose $4 million dispute where potential liability was less than 1.5% of revenues and, therefore, immaterial). As a stand alone fact, the Court agrees.

**c. Scienter Analysis of Plaintiffs' Claims**

The next issue is whether Plaintiffs' factual allegations in their amended complaint give rise to a strong inference of scienter. If Plaintiffs' amended complaint fails to satisfy the scienter requirement, the Court must dismiss the plaintiffs complaint. *15 U.S.C. § 78u-4(b)(3)*. Under [*143] Tellabs, after weighing the plausibilities, the Court must assess whether "[a] plaintiff alleging fraud in a § 10(b) action...[has pled] facts rendering an inference of scienter at least as likely as any plausible opposing inference." *551 U.S. at 311*. "[T]he Supreme Court has defined 'scienter' as a 'mental state embracing intent to deceive, manipulate or defraud.'" *In re Comshare, 183 F.3d at 548*. "Under current Sixth

Circuit law, 'recklessness [also] satisfies the § 10(b)/Rule10b-5 scienter requirement.'" Id. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id. at 550*. To meet the scienter requirement, Plaintiffs' allegations must describe "multiple, obvious red flags." *PR Diamonds, Inc. v. Chandler, 364 F.3d 671, 687, 91 Fed. Appx. 418 (6th Cir. 2004)*; *In re Comshare, 183 F.3d at 553*. In considering this issue, the Court must consider the totality of circumstances pled in the complaint and "sift Plaintiffs' allegations individually and then aggregate the nuggets of inference they generate...." *PR Diamonds, 364 F.3d at 684*.

In [*144] evaluating the scienter issue, in *Ley v. Visteon Corp., 543 F.3d 801, 810 (6th Cir. 2008)*, the Sixth Circuit also noted the following factors to be considered explaining that:

[These] factors . . . . while not exhaustive, are probative of scienter in securities fraud cases:

(1) insider trading at a suspicious time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of

sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

. . . . We find this list, while not [*145] exhaustive, at least helpful in guiding securities fraud pleading.

*543 F.3d at 810* (citation omitted).

As factual allegations for a strong inference of scienter here, Plaintiffs' claims and factual allegations, in summary, are: (a) divergence between internal reports and external statements relating to patient incidents and staffing ratios at PSI's inpatient facilities; (b) based upon the state agencies' detailed reports, Defendants' deliberately concealed illegal activity at its facilities as part of a scheme to defraud investors; (c) Defendants' misleading financial statements and (d) the Individual Defendants' financial motivations, insider trading at suspicious times. Plaintiffs also contend that collectively, these factual allegations give rise to a strong inference of scienter.

### i. Divergence Between Defendants' Public Reports and Government and Internal Reports

In their SEC filings, PSI described PSI facilities as providing higher quality of services than other firms in this market. PSI cited its highly coordinated treatment with well trained staff who monitor even minor incidents for compliance with industry standards. Yet, during the Class Period, PSI's operations were significantly [*146] below industry standards of care on six of the seven "core measurements" established for psychiatric hospitals by the Joint Commission -- standards which PSI itself helped to develop, actively tracked and told investors would provide an objective measurement of the quality of service it provided. (Docket Entry No. 109, Amended Complaint at ¶¶ 45, 74-75, 151, 154). Beginning in 2006,[6] inadequate monitoring has been blamed for numerous incidents where patients were raped, beaten or attempted suicide at PSI facilities around the country and

was caused by inadequate staffing to provide 24-hour nursing supervision. Id. at ¶¶13, 41, 48, 52, 56-57, 60-61, 64-66, 147. Illinois cited PSI 22 times in 2007 alone for deficiencies that threatened the safety or legal rights of patients, as compared with 31 citations for the other 12 hospitals in the state subject to the same licensing requirements. Id. at ¶ 51. "Surveys conducted by the California Department of Health underscored repeated issues about understaffing, patient safety, medication administration, poor supervision and staff training, and an array of serious quality of care violations." Id. at ¶ 56.

6    Pre-class period facts can "confirm what [*147] a defendant should have known during the class period". *In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 72 (2d Cir. 2001).*

### ii. Defendants' Concealment of Illegal Activity to Defraud Investors

In their multiple statements in response to media and governmental reports about PSI institutions in different states, the Defendants would characterize these reports as involving minor incidents and historical incidents that were not a reflection of how PSI actually conducts its business. Yet, throughout these reports, state officials characterize their findings on PSI's facilities as PSI having a lack of systems to identify sexual abusers and a lack of sufficient monitoring of abusers as in 40% of the cases in North Carolina. The California agency found repeated issues of understaffing, inadequate patient care, poor supervision and training of PSI staff, and an "array of serious quality of care violations." See supra at 10. The Illinois findings were "a pattern of quality care and patient safety issues" at that PSI facility and the imposition of a bar to future admissions to the facility. In an April 2009 report, the Illinois authorities found:

> **There is compelling data about the tendency of this** [*148] **organization's leadership to avoid taking direct responsibility for longstanding and reoccurring clinical/administrative failures** -- in effect, placing the onus for the chronic quality of care problems downward: first, onto the hospital staff "who do not perform their duties"; [and] second, onto mentally ill patients who "refuse to comply with the rules."

(Docket Entry No. 109, Amended Complaint at ¶ 11)

(emphasis added).

These governmental findings are wholly inconsistent with PSI officials' repeated characterizations of these government investigations and media reports as minor and historical incidents, unrelated to the quality of PSI's actual business practices. Less than a week after Jacobs claimed that the incidents at Riveredge had been promptly reported, investigators uncovered yet another example of an incident at Riveredge that had gone unreported -- the 2007 death of a pregnant patient who had collapsed and died at the hospital after being overmedicated with clozapine, a powerful antipsychotic drug. Id. at ¶¶ 55, 133. Moreover, despite the Defendants' assurances, these problems persisted at PSI facilities from 2006 through 2009.

According to Jacobs, PSI and its officers had prior [*149] knowledge of these investigations and published articles before their actual dissemination to the public and investors. Thus, Defendants' characterization in their cited statements of the reported events as minor would be inconsistent with PSI's internal information from governmental agencies about the extent and scope of the problems at PSI facility. This is particularly true of the Defendants' statements after September 10, 2008 about the Riveredge facility. The board minutes of the September 10th meeting of PSI's Medical Executive Committee reflect that PSI and its officers had been told that "the hospital was close to being placed in immediate jeopardy" as a result of a follow-up federal agency survey and that there was "a significant amount of concern for the hospital's reputation within the community and the quality of care provided to patients." Id. at ¶ 146. Yet, on an October 31, 2008 conference call, for example, Jacobs told investors that he "fe[lt] very good about the quality of care at Riveredge, and it's been reevaluated by numerous people since the admissions hold" was imposed. Id. at ¶ 140. Later, Illinois agencies concluded after a follow-up survey in September and [*150] October of 2008 that: "data indicates that Riveredge officials are still failing -- even in the face of a critical IDPH finding as well as other forms of outside scrutiny -- to ensure the hospital operates at minimally adequate standards of care." Id. at ¶¶ 133. These facts give rise to a strong inference of scienter in the Defendants' statements minimizing state findings.

Plaintiffs allege that PSI lacked any basis to believe that Illinois' ban on Riveredge would be lifted. In paragraph 119, Plaintiffs cite Defendants' statements during a July 31, 2008 conference call with investors stating that the report on Riveredge was based upon "historical incidents" unrelated to Riveredge's current operations as well as denying the state bar of new admissions did not have a material impact on PSI. Paragraphs 124 through 128 cite Defendant Jacobs's statements two weeks after the charges to the same effect. Defendants' characterization of Riveredge's incidents as historical are allegedly false, given the Illinois findings and the findings of other state regulatory agencies about PSI facilities from 2006 to 2009. On October 31, 2008, Jacobs told investors that he was "80%" certain that the hold would [*151] be lifted before the end of the year. By then, however, additional follow up surveys in September and October 2008 had found that the conditions at Riveredge that had resulted in the administrative hold remained uncorrected, PSI had been warned the facility was in jeopardy of losing its license, and DCFS had widened its probe to encompass PSI's other facilities. Id. at ¶¶ 133, 141, 146. As a result, Jacobs had no reasonable basis to make his statements.

PSI disclosed during its February 26, 2009 investor conference call, "[d]uring 2008, [PSI] had approximately 700 regulatory surveys. Less than 1% of these surveys resulted in significant findings or deficiencies. Approximately 250 resulted in zero deficiencies." (Docket Entry No. 123-2). Yet, these statements, in the context of the nature of the other state agencies' findings, are not dispositive.

Unlike the statements generally proclaiming a commitment to quality at issue in *Ford* and *Bridgestone*, Defendants statements here are objectively-verifiable statements of hard facts about actual services delivered as well as the extent of actual staffing and monitoring. Defendants' statements that PSI's facilities are "in substantial compliance [*152] with current applicable, federal, state, local and independent review body regulations and standards" is significantly undermined by the nature and extent of state agencies' findings about PSI facilities across the country.

### iii. Defendants' Misleading Financial Statements

As to omissions, Plaintiffs cite the financial results, metrics and guidance Defendants provided to investors as failing to reflect the actual costs to operate PSI's facilities. To meet quarterly expectations for PSI's financial performance, Defendants regularly ordered

staffing cuts at PSI's hospitals based solely on the facility's EPOB ratio, which was closely monitored by PSI's top executives. Id. at ¶¶ 36-41. As a result of these cuts, staffing at PSI's hospitals was significantly lower than at hospitals run by its competitors, and its incidence of patient injuries, quality of care problems and regulatory violations was correspondingly higher. Id. at ¶¶ 58-59, 61. Former PSI workers have described repeated staffing cuts that left the facilities in which they worked with insufficient staff to monitor or protect patients. Id. at ¶¶ 60, 62, 65.

These undisclosed costs are PSI's costs to provide sufficient staffing to [*153] protect patients and provide high quality treatment in a safe therapeutic environment as PSI described to investors. These undisclosed costs include the actual and anticipated expenses, based upon state agencies' findings of negligent treatment and injuries at PSI's understaffed and underfunded facilities. Id. Plaintiffs argue that disclosure of these facts was necessary for investors to understand PSI's past financial results and future expectations of profitability. According to PSI, PSI's historic performance was premised on operating PSI facilities without sufficient staffing or funding to provide high quality care to patients in a safe therapeutic environment necessary to comply with applicable regulatory, licensing and accreditation standards as well as PSI's written statements about its services. By Defendants' omissions of these costs, Plaintiffs allege Defendants misled investors about the nature and strength of PSI's compliance and quality assurance programs as well as the extent of patient safety and care at PSI's facilities. Id. Given the state agencies' findings about PSI facilities, the Court concludes that these undisclosed allegations give rise to a strong inference [*154] of scienter.

To be sure, PSI specifically warned that PSI's estimated reserves could change and warned investors of the prospect of state and federal inquiries. As to estimated reserves, PSI stated:

> The self-insured reserves for professional and general liability risks are calculated based on historical claims, demographic factors, industry trends, severity factors and other actuarial assumptions calculated by an independent third-party actuary. . . .This estimated accrual for professional and general liabilities could be significantly affected

should current and future occurrences differ from historical claim trends and expectations.

(Docket Entry No. 111, PSI's 2007 Form 10-K at p. 15).

Under the Sixth Circuit's holding in Miller, the only inquiry for the Court is whether the statements of earnings guidance are forward-looking statements accompanied by meaningful cautionary language. *346 F.3d at 672*. Defendants' state of mind when issuing the earnings guidance is irrelevant. Id. Statements of earnings guidance or estimates are "classically forward-looking" statements that are protected by the safe harbor when accompanied by meaningful cautionary language. *Id. at 677*.

To be sure, every [*155] case where there was an accounting error or auditing mistake by a publicly traded company does not satisfy the PSLRA pleading requirements for scienter. *Garfield v. NDC Health Corp., 466 F.3d 1255, 1266 (11th Cir. 2006)*. Yet, the "self-interested motivation of defendants in the form of saving their salaries" can support a strong inference of scienter. *Helwig, 251 F.3d at 552*. As this Court stated: "[s]tatements about medical reserves are forward looking statements and are protected by the [Reform Act]." *In re Am. Serv. Group, 2009 U.S. Dist. LEXIS 28237, 2009 WL 1348163, at *37*. Moreover, "the mere fact that a company increased its reserves for doubtful accounts in one period does not, by itself, call into question the accuracy of the earlier period reserves." Id. Yet, in *In re UNUMProvident Corp. Sec. Litig., 396 F. Supp. 2d 858, 887 (E.D. Tenn. 2005)*, a complaint alleging that defendants' misleading statements about claims and reserve practices attributing improved performance to factors other than reserve manipulation was held actionable.

As to the disclosure of governmental inquiries, in Sofamor the defendant acknowledged its participation in the practices described in the FDA warning letter, as well as the [*156] potential significant impact of future FDA action. *123 F.3d at 397, 402*. Here, Defendants denied understaffing PSI's clinics or engaging in other practices which exposed patients to harm and claimed that the regulatory action at Riveredge was immaterial. As the Sixth Circuit has stated:

> If -- as defendants contend -- the

protection for soft information remains intact even after a company speaks on an emerging issue, the speaker could choose which contingencies to expose and which to conceal. On any subject falling short of reasonable certainty, then, a company could offer a patchwork of honesty and omission. This proposition is untenable, however, both as a matter of policy and precedent.

*Helwig, 251 F.3d at 560-61.* In sum, PSI's warnings do not preclude Plaintiffs' claims about PSI misleading financial reports.

### iv. Individual Defendants' Financial Motivations and Insider Trading

On the scienter issue and the probative value of Plaintiffs' factual allegations about PSI, Jacobs, Turner and Polson, Plaintiffs cite Jacobs's and Polson's certifications under Sarbanes-Oxley, that PSI's internal controls systems are "designed . . . to provide reasonable assurance regarding reliability of financial [*157] reporting." (Docket Entry No. 109, Amended Complaint at ¶¶ 22-23, 93, 116, 129, 143 and 182).

Jacobs assured investors that he was directly and "personally involved" and responsible for PSI's quality and compliance. Id. at ¶¶ 163, 167, 169. Jacobs told investors that he personally supervised the hiring of new employees at PSI for compliance issues. Id. at ¶¶ 169. According to Jacobs, "it's top of mind for me." Id. Jacobs described PSI as tracking "multiple indicators" of quality and compliance in "real-time" for minor incidents and "real-time incidents that might be occurring." Id. at ¶¶ 167, 169. Jacobs prominently displayed a 38-inch TV screen in his office that monitored PSI's "Ten Worst" hospitals. Jacobs sent weekly emails to hospital administrators, division presidents and other senior executives listing the ten worst hospitals to pressure these facilities to increase occupancy that would directly impact the adequacy of the staff for the increased patient load. Id. at ¶ 176.

The Sarbanes-Oxley certifications signed by Jacobs and Polson establishes their awareness of PSI's rising malpractice expenses and declining staffing levels and budgets as well as the increasing costs of the [*158] regulatory investigations at Riveredge. These events

create the "red flags" that support a strong inference of scienter. *PR Diamonds, 364 F.3d at 688* (unusual pressures to make public statements reflecting positive performance support strong inference of scienter). The Individual Defendants' base salaries were increased for 2008 and 2009 based on PSI's position as "the top performing company in [its] peer group." (Docket Entry No. 109, Amended Complaint at ¶ 185(a)). Plaintiffs allege Defendants' cash bonuses were based on adjusted EBIDTA and EPS results that could not be met without cutting staff below reasonable levels. Id. at ¶¶ 35-42, 57-62, 185(b). According to the amended complaint, PSI established a bonus program with inordinate weight on hospital chief executive officers to increase revenues by adding beds and services despite insufficient facility budgets to staff the additional patients. Id. at ¶¶ 187-88.

As a matter of law, "high-level executives can be presumed to be aware of matters central to their business's operation, *PR Diamonds, 364 F.3d at 688,* but "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the company and alleged access [*159] to information." Id.; see also *In re Nat'l Century Fin. Enters., Inc. Inv. Litig., 580 F. Supp. 2d 630, 643 (S.D. Ohio 2008)* (complaint failed to allege scienter where there were no allegations defendant knew or should have been aware of the red flags). Complaints "[m]erely stating that the Defendants had access to and receipt of internal financial reports without any proof of the adverse content of those reports is not a basis for a strong inference of scienter." See *Grillo v. Tempur-Pedic Int'l, Inc., 553 F. Supp. 2d 809, 819 (E.D. Ky. 2008).*

Yet, "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.'" *Cardinal Health, 426 F. Supp. 2d at 724.* This is particularly appropriate for "[f]acts critical to a business's core management." *In re Ancor Commc'ns, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998).* A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter. *In re Envoy Corp. Sec. Litig., 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001).*

Under [*160] *Bridgestone,* the Court must also consider Jacobs's and Polson's certifications in light of the other circumstances alleged by the Plaintiffs. To

avoid undue repetition, based upon the Court's earlier discussion of the material facts and the Defendants' material misrepresentations and omissions about subjects that go to the core of PSI's business, the Court concludes that this strong inference of scienter as to PSI extends to the Individual Defendants.

As to the issue of insider trading, for this aspect of Plaintiffs' scienter allegations, Plaintiffs cite the following sales of PSI stock by Defendant Turner and members of PSI's board of directors in significant amounts and at times near to significant events in governmental actions and media reports about PSI institutions.

 o Edward Wissing -- one of two PSI Directors specifically tasked with monitoring compliance issues -- sold 100% of the shares he owned for $192,000 on January 2, 2009, just days before the Dallas Morning News published its exposé about conditions at PSI's facilities in Texas. (Docket Entry No. 109, Amended Complaint at ¶¶ 64, 167, 198(e)).

 o Turner sold 15% of his holdings for more than $1 million. Id. Before the end of [*161] the Class Period, Turner would sell more than 70,000 additional shares, bringing his total Class Period proceeds to $3.8 million on the liquidation of 55% of his PSI stock. Id. at ¶ 198(b).

 o Defendant Turner -- made significant sales on July 9, 2008 and September 19, 2008, just eight days before the Chicago Tribune published its exposé about conditions at Riveredge. Id. at ¶¶ 7, 47, 198(b)(d).

 o PSI Director Grant sold 100% of his holdings on July 9, 2008 for $80,000. Id.

 o Director Mark Clein, liquidated nearly 64% of his holdings during the Class Period, receiving proceeds of $628,210. Id. at ¶ 198(c). Clein sold 57% of those shares (36% of his total holdings) for nearly $400,000 on November 4, 2008, just weeks before Pro Publica and the Los Angeles Times published the results of their investigation into PSI's misleading

and injurious business practices. Id. at ¶¶ 47, 57-62, 198(c).

 o In May 2008, over a period of just two days and shortly after defendants issued PSI's misleading first quarter 2008 financial results, Polson sold 42% of his holdings at near Class Period high prices and reaped over $1.85 million in proceeds. Id. at ¶ 198(a).

As to the amounts of stock sales, in *In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 542 (S.D. Ohio 2000)*, [*162] the district court deemed a company's defendant executives' sales of 40%, 27%, 11%, and 37% of their holdings to support a strong inference of scienter. To be sure, stock sales of non-defendants are "not ... probative of the defendants' scienter." *In re Century Bus. Servs. Sec. Litig., No. 99-2200, 2002 U.S. Dist. LEXIS 26964, 2002 WL 32254513, at *7 n.18 (N.D. Ohio Jun. 27, 2002)*, and Defendants correctly note that courts have held that insider trading more than a year before the press release of alleged damaging news did not give rise to a strong inference of scienter, *In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-94 (9th Cir. 2002)*, and that a stock sale eleven months before announcement of charge to earnings was not suspicious, *In re Kindred Healthcare, Inc. Sec. Litig., 299 F. Supp. 2d 724, 741 (W.D. Ky. 2004)*.

Yet, Polson and Turner are named Defendants and Turner's stock sales of over 55% of his PSI stock occurred shortly before the Chicago Tribune's 2008 publication about PSI's Riveredge facility. Polson's sale of 47% of his stock was just four months before the Tribune's report. These allegations give rise to a serious inference of scienter because of Jacobs's statement that key officers at PSI [*163] had prior knowledge of media reports before their publications. To be sure, prior to this sale, Turner filed his stock purchase plan, but that fact does not preclude the strong inference of scienter, given these other circumstances. See e.g. *Backe v. Novatel Wireless, Inc., 642 F. Supp. 2d 1169, 1184-85* (S.D. Cal. 2009) (despite 10b5-1 trading plans, "defendants unloading stock near in time to when the market would inevitably learn of the alleged [adverse disclosure] does support an inference that defendants timed their sales to benefit from stock prices before the information leaked to

Page 51

the market"). Assuming an ambiguity about the justifications for Turner's stock sales, Defendants' contentions on this issue cannot be resolved on a motion to dismiss. *Helwig, 251 F.3d at 558* (whether an "explanation" offered by defendants for making insider sales during the class period "is accurate is not an issue [the court] can decide on the pleadings").

As to the motive and opportunity aspect of scienter, financial pressures on corporate officers may provide the necessary motive for scienter. *PR Diamonds, 364 F.3d at 688*; *In re Cardinal Health Sec. Litigs., 426 F. Supp. 2d 688, 726-27 (S.D. Ohio 2006)*. [*164] "[S]elf-interested motivation of defendants in the form of saving their salaries" can support scienter. *Bridgestone, 399 F.3d at 687*. "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide motive. *In re Telxon Corp. Sec. Litig., 133 F. Supp. 2d 1010, 1029 (N.D. Ohio 2000)*. In this Circuit, "an executive's desire to protect his position within a company or increase his compensation" does not "comprise a motive for fraud." *PR Diamonds, 364 F.3d at 690*, nor are allegations that Defendants would receive bonuses linked to company performance sufficient. *In re Kindred Healthcare, 299 F. Supp. 2d at 741*.

The Sixth Circuit has rejected allegations similar to those here. See *Sofamor, 123 F.3d 394*. In Sofamor, the defendants received a warning letter from the government, and plaintiff alleged that defendants should have disclosed the company was not in compliance with the law. *Id. at 402*. The Sixth Circuit held, however, that the company satisfied its disclosure obligations by disclosing (a) receipt of the government's warning letter and (b) specific risk warnings that the government might obtain an injunction against the company. Id.

Plaintiffs [*165] allege that numerous hospital executives have reported being under constant pressure from corporate headquarters to reduce staffing to meet financial targets. (Docket Entry No. 109, Amended Complaint at ¶¶ 39, 56). The amended complaint alleges that Defendants were motivated to conceal significant patient safety issues to avoid a reduction in capacity -- and thus PSI earnings -- because their executive compensation was directly tied to PSI's financial performance. Id. at ¶¶ 184-186. Plaintiffs also described detailed bonuses and favorable financial compensation packages for the Individual Defendants. Plaintiffs have set forth detailed findings of patient safety issues at PSI facilities for which understaffing is cited as a recurring cause.

Viewed individually or collectively, the Court concludes that the factual allegations for Plaintiffs' claims are sufficient to give rise to a strong inference of scienter.

## C. Conclusion

For the above stated reasons, the Court concludes that the Plaintiffs have alleged sufficient specific facts that collectively state actionable claims under *Section 10(b)* and *Rule 10b-5*. Accordingly, the Defendants' motion to dismiss should be denied.

An appropriate Order [*166] is filed herewith.

**ENTERED** this the 31st day of March, 2011.

/s/ William J. Haynes, Jr.

William J. Haynes, Jr.

United States District Judge





Caution
As of: Jul 26, 2017

**In re AMERICA SERVICE GROUP, INC., et al.,**

**No. 3:06-0323**

**UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF
TENNESSEE, NASHVILLE DIVISION**

*2009 U.S. Dist. LEXIS 28237; Fed. Sec. L. Rep. (CCH) P95,203*

**March 30, 2009, Decided
March 31, 2009, Filed**

**PRIOR HISTORY:** *In re Am. Serv. Group, Inc., 2006
U.S. Dist. LEXIS 61779 (M.D. Tenn., Aug. 28, 2006)*

**COUNSEL:** [*1] For Plumbers and Pipefitters Local 51
Pension Fund, Individually and On Behalf of All Others
Similarly Situated, Plaintiff: Dennis J. Herman, Eli R.
Greenstein, LEAD ATTORNEYS, Coughlin, Stoia,
Geller, Rudman & Robbins, LLP, San Francisco, CA;
Douglas S. Johnston, Jr., George Edward Barrett,
Timothy L. Miles, LEAD ATTORNEYS, Barrett,
Johnston & Parsley, Nashville, TN; Ramzi Abadou,
LEAD ATTORNEY, Coughlin, Stoia, Geller, Rudman &
Robbins, LLP, San Diego, CA.

For Gail Beach, PLAINTIFF IN MEMBER CASE NO.
3:06cv341 - ADDED IN LEAD CASE FOR FILING
PURPOSES, Plaintiff: Alison K. Clark, Richard A.
Maniskas, LEAD ATTORNEYS, Schiffrin, Barroway,
Topas & Kessler, LLP, Radnor, PA; Eli R. Greenstein,
LEAD ATTORNEY, Coughlin, Stoia, Geller, Rudman &
Robbins, LLP, San Francisco, CA; Marc A. Topaz,
LEAD ATTORNEY, Schiffrin & Barroway, LLP,
Radnor, PA; Paul Kent Bramlett, LEAD ATTORNEY,

Bramlett Law Offices, Nashville, TN.

For David Waggoner, Individually and on behalf of all
others similarly situated (Plaintiff in member case
3:06-0443, added for filing purposes in lead case),
Plaintiff: Daniel S. Sommers, LEAD ATTORNEY,
Cohen, Milstein, Hausfeld & Toll, P.L.L.C., Washington,
DC; Eli R. Greenstein, [*2] LEAD ATTORNEY,
Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San
Francisco, CA; Jason M. Leviton, Steven J. Toll, LEAD
ATTORNEYS, Cohen, Milstein, Hausfeld & Toll,
P.L.L.C., Washington, DC; Paul Kent Bramlett, LEAD
ATTORNEY, Bramlett Law Offices, Nashville, TN.

For Jeffrey Schwartz, individually and on behalf of all
others similarly situated (Plaintiff in member case
3:06-0337, added for filing purposes in lead case),
Plaintiff: Eli R. Greenstein, LEAD ATTORNEY,
Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San
Francisco, CA; James Gerard Stranch, III, James Gerard
Stranch, IV, Joey Paul Leniski, Jr., LEAD
ATTORNEYS, Branstetter, Stranch & Jennings,
Nashville, TN; Mark C. Gardy, LEAD ATTORNEY,
Gardy & Notis, LLP, Englewood Cliffs, NJ; Nadeem

Page 2

2009 U.S. Dist. LEXIS 28237, *2; Fed. Sec. L. Rep. (CCH) P95,203

Faruqi, LEAD ATTORNEY, Faruqi & Faruqi, LLP, New York, NY.

For MARTA/ATU Local 732 Employees Retirement Plan, Plaintiff: Dennis J. Herman, Eli R. Greenstein, LEAD ATTORNEYS, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Francisco, CA; George Edward Barrett, LEAD ATTORNEY, Barrett, Johnston & Parsley, Nashville, TN.

For America Service Group, Inc., Michael Catalano, Michael W. Taylor, Defendants: B. Warren Pope, Benjamin Lee, Michael R. Smith, [*3] LEAD ATTORNEYS, King & Spalding LLC, Atlanta, GA; Robert Jackson Walker, LEAD ATTORNEY, Walker, Tipps & Malone, Nashville, TN; John C. Hayworth, Joseph F. Welborn, III, Walker, Tipps & Malone, Nashville, TN.

For Peoria Police Pension Fund, Defendant: Chet B. Waldman, LEAD ATTORNEY, Wolf, Popper LLP, New York, NY; Marcia Meredith Eason, LEAD ATTORNEY, Miller & Martin, Chattanooga, TN; Kevin C. Baltz, Miller & Martin PLLC, Nashville, TN.

For Grant J. Bryson, Enoch E. Hartman, III, Defendants: David Alexander Fardon, LEAD ATTORNEY, Harwell,

Howard, Hyne, Gabbert & Manner, Nashville, TN.

For Secure Pharmacy Plus, LLC, Defendant: B. Warren Pope, LEAD ATTORNEY, King & Spalding LLC, Atlanta, GA; John C. Hayworth, Walker, Tipps & Malone, Nashville, TN.

For Nathan Moseley, Intervenor Plaintiff: Eli R. Greenstein, LEAD ATTORNEY, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Francisco, CA; Paul Kent Bramlett, LEAD ATTORNEY, Bramlett Law Offices, Nashville, TN.

For WILLIAM GERKEN, GERKEN & MOSELEY, INTERVENING PLAINTIFFS, Interpleader: Paul Kent Bramlett, LEAD ATTORNEY, Bramlett Law Offices, Nashville, TN.

**JUDGES:** William J. Haynes, Jr., United States District Judge.

**OPINION BY:** William J. Haynes, Jr.

**OPINION**

**MEMORANDUM**

| A. Analysis of the Amended Complaint | |
|---|---|
| 1. ASG's Corporate History | |
| 2. ASG's Financial History | |
| 3. SPP's Accounting Practices | |
| 4. PHS's Medical Practices | |
| 5. Published Reports about ASG, SPP and PHS | |
| 6. ASG's Internal Investigation | |
| 7. GAAP Violations | |
| 8. Individual Defendants' Statements and Conduct | |
| B. Conclusions of Law | |
| 1. Standard of Review | |
| 2. Pleading Requirements under Rule 10(b) & PLSRA | |
| 3. Plaintiffs' Theories of Liability | |
| a. Defendants' Misrepresentations | |
| b. Defendants' Omissions | |
| c. Defendants' Practices in "Connection with" Sales of ASG stock | |

Page 3

2009 U.S. Dist. LEXIS 28237, *3; Fed. Sec. L. Rep. (CCH) P95,203

| d. Fraud on the Market |
| 4. Plaintiffs' Scienter Allegations |
| 5. Plaintiffs' Section 20(a) Claims |
| 6. The Dura Injury Requirement |
| C. Relief |

Plaintiffs, [*4] shareholders of America Service Group Inc. ("ASG"), filed this action under the federal securities laws, *15 U. S. C.§ 78aa*, on behalf of themselves and a class of shareholders against the Defendants: ASG; Michael Catalano, ASG's chief executive officer; Michael Taylor ASG's chief financial officer; Secure Pharmacy Plus, LLC ("SPP"), an ASG subsidiary; Enoch E. Hartman, III and Grant Bryson, who were at times relevant to this action, chief executive officers at SPP or ASG. Plaintiffs, owners of ASG stock, assert claims under *§§ 10(b)* and *20(a)* of the Securities Exchange Act of 1934, as well as *Rule 10b-5* of the Securities Exchange Commission's Regulations.

In sum, Plaintiffs allege that from September 2, 2003 through June 23, 2006 when they purchased or held ASG's stock, these Defendants engaged in and/or materially assisted in a scheme and course of business to inflate artificially the value of ASG stock by manipulating the costs and revenues of SPP and Prison Health Services ("PHS") ASG's subsidiaries, as reported in ASG's consolidated financial reports. These practices are alleged to have misled investors about ASG's and its subsidiaries' actual financial performance and condition. [*5] This unlawful scheme included false and misleading statements about ASG's ability to control its subsidiaries' costs and to earn profits on ASG's subsidiaries' government contracts to provide medications and medical services to inmates at federal and state prisons as well as at local jails. Plaintiffs also allege that ASG's statements of financial success were based upon revenue and earnings growth that were calculated in violation of Generally Accepted Accounting Principles ("GAAP"). Plaintiffs further allege that the Defendants engaged in a fraud on the market and that Defendants Catalano and Taylor engaged in unusual insider trading after these practices had artificially inflated ASG's stock value.

Before the Court is the Defendants' motion to dismiss [1] (Docket Entry No. 68) contending, in essence, that the Plaintiffs' amended complaint is legally insufficient to state the scienter necessary for their securities claims. Plaintiffs contend that Plaintiffs' amended complaint: (1) fails to tie the Defendants to any of the alleged fraudulent business practices and statements or loss of business or restatement of ASG's financial reports; (2) fails to allege scienter as to SPP's alleged [*6] "cookie jar" accounting practices; (3) fails to provide sufficient facts that PHS's medical care practices is a scheme that gives rise to a strong inference of scienter; (4) fails to allege sufficient facts that ASG, SPP and the individual Defendants are controlling persons of ASG, SPP or PHS; and (5) fails to plead any actionable loss due to the alleged fraudulent practices and statements. Finally, Defendants assert the statutory safe harbor defense for their forward-looking statements in ASG's published reports and their public statements.

> 1  The Defendants' motion does not challenge the Plaintiffs' claims under *§§13(b)(2)(A)* and *(B)* of the Exchange Act for the Defendants' failures to maintain accurate records concerning its inventories, costs and net income and to implement procedures reasonably designed to accomplish that purpose. (Docket Entry No. 60, Amended Complaint at PP 288 and 289).

In response, Plaintiffs assert, in essence, that their factual allegations are adequate to state actionable federal securities claims against each of the Defendants and to tie their alleged injuries to the Defendants' violations of federal securities law as well as to establish each Defendant's responsibility [*7] for these violations and to state a cognizable injury due to such violations.

**A. Analysis of the Amended Complaint**

**1. ASG' Corporate History**

Given the inordinate length of the Plaintiffs' amended complaint, [2] a summary of Plaintiffs allegations is that ASG, a publicly traded holding company, was created in1978 to provide medical care to inmates at

Page 4

2009 U.S. Dist. LEXIS 28237, *7; Fed. Sec. L. Rep. (CCH) P95,203

governmental facilities. (Docket Entry No. 60, Amended Complaint at P 25). ASG conducts that business through its wholly-owned subsidiaries, SPP and Prison Health Services, Inc., ("PHS"). Id. at PP 17-19). ASG utilized its subsidiaries to provide privately managed healthcare services and medications. SPP provides pharmaceuticals and medical supplies to state and federal prisons as well as local jails and PHS operates and staffs the health clinics at these institutions. Id. at PP 18 and 19. ASG describes itself as "the leading non-government provider of correctional healthcare and pharmacy services in the United States." Id. ASG's stock met the requirements for listing and active trading on the NASDAQ market, requiring ASG to file periodic public reports with the SEC and NASDAQ. Id. at P 295.

> 2 An amended complaint supercedes the original complaint. [*8] *Clark v. Tarrant County, 798 F.2d 736, 740-41 (5th Cir. 1986).* Plaintiffs' amended complaint with attachments is one hundred sixty-eight pages (Docket Entry No. 60, Amended Complaint) and is not the model of clarity. In addition, the parties submitted extensive memoranda and supporting documents on the Defendants' motion to dismiss. For these claims, judicial analysis "necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept." *Helwig v. Vencor, Inc., 251 F.3d 540, 551 (6th Cir. 2001)* (en banc), abrogated on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007).*

In the 1990s, in a competitive bidding process, ASG acquired fixed fee contracts whose profitability depended upon ASG's ability to estimate and control its future healthcare costs. Prior to and during the Class Period, from September 2, 2003 through June 23, 2006, ASG "assured investors that it could reliably predict such costs." Id. at P 26. ASG informed investors that inmates with severe and catastrophic illnesses could increase its costs, but ASG acquired excess insurance coverage [*9] to control its total operating costs. Id.

On September 2, 2000, ASG acquired Stadtlanders Corrections Division of Bergen Brunwing Corporation, SPP's predecessor, to increase ASG's control of its pharmacy and medical supply costs. Id. at P 27. The Defendant Hartman, then Stadtlanders's president and

chief executive officer, became SPP's president and chief executive officer and later ASG's executive vice president. Id. at P 28. In 2004, Hartman appointed Defendant Bryson as SPP's chief executive officer when Hartman became PHS's chief operating officer. Id.

At the time of ASG's acquisition of Stadtlander, ASG's costs for drugs and medical supplies represented 16% of ASG's operating costs. Id. at P 27. After the acquisition, SPP's annual revenues were approximately $ 80 million that led SPP to represent that it was the number one firm in the correctional pharmacy market. Id. at P 28. With this acquisition, Defendant Hartman consolidated the SPP's various local pharmacies into a central dispensing facility in Franklin, Tennessee, over protests from local governments and state pharmacy boards who questioned the legality of dispensing prescriptions from another state. Id. at P 29. Prior to [*10] this acquisition, a senior pharmacist at ASG allegedly warned Defendants Catalano and Hartman of problems with this consolidation of drug dispensation, but Catalano and Hartman ignored them. Id. at P 29.

According to Plaintiffs, PHS's hospital administrators prepared site budgets that were based on annual budgets and unidentified higher officials reviewed and forwarded these budgets to ASG's budget committee. Id. at P 312. These site budgets were allegedly "routinely cut," but with the submissions of monthly reports, a site administrator could submit a written justification for additional funds. Id.

The chief officers of ASG, PHS and SPP held regular meetings to discuss methods to reduce their operating costs. Id. at P 310. ASG conducted monthly meetings in Brentwood, Tennessee that Defendants Catalano and Hartman attended with site accounting managers to review performance at each contract site. Id. at P 311. ASG's regional directors participated in these monthly meetings by teleconference. Id. According to Plaintiffs, former ASG employees who regularly participated in these meetings, including those held during the Class Period, report that the details of a site's financial results [*11] were reviewed line item by line item, including facility ledgers and any operational issues. Id. Quarterly audit results were discussed at these meetings to ensure that each site remained within its budget. Id. During the meetings, Hartman and Catalano frequently referred to individual site reports that contained detailed information and financial ledgers

Page 5

2009 U.S. Dist. LEXIS 28237, *11; Fed. Sec. L. Rep. (CCH) P95,203

reflecting the costs of hospitalization, supplies and pharmaceuticals at each site. SPP held its weekly meetings at its Franklin headquarters over which either Hartman or Bryson presided. Id. at P 314. These meetings also reviewed "pharmaceuticals, contract information, client relations, order entry information ... financial results of operations ... outstanding bids, contract renewals and contracts ... at risk of being ... terminated." Id.

Plaintiffs allege that ASG and the individual Defendants manipulated SPP's and PHS's costs during the class period to lead investors to anticipate improved prospects for ASG's future profits. Id. at PP 34-44. As to the specifics of these manipulations, Plaintiffs allege that during the Class Period, the Defendants misled their investors by artificially reducing their subsidiaries' healthcare costs and inflating [*12] ASG's margins, earnings and prospects for continued financial success. Id. at PP 1, 111-219, 232-292. Plaintiffs allege that SPP employed "cookie jar" accounting in which earnings accrued until they were needed and expense recognition was delayed until expenses could be absorbed to meet expectations for ASG's performance. Id. at PP 5, 54, 73-78, 220-222, 227-228. According to Plaintiffs, to reduce their subsidiaries' costs, the Defendants also utilized fraudulent accounting and billing practices at SPP that violated SPP's contracts with its customers. In addition, PHS denied inmates access to covered and necessary medical services and expensive medications to reduce its costs in violation of PHS's government contracts. Id. at PP 45-72.

After published reports of these practices, ASG had to restate five years of its financial reports. In this restatement, ASG acknowledged that SPP had reduced its costs by failing to provide customers with contractually required discounts, rebates, and return credits. See e.g., PP 3-98, 104-105, 177-183, 220-231, 236-251. Plaintiffs allege that in ASG's restatement of its financial condition, ASG admitted SPP's accounting manipulations, but buried adverse [*13] information in ASG's financial statement's footnotes. Id. ASG also acknowledged that PHS reduced its costs by refusing to deliver higher priced medications to inmates; delaying or denying inmates' transfers for expensive off-site treatment facilities, and deliberately understaffing prison health clinics. Id. at PP 6 and 45-53. With the published reports and restatement of its financial condition, the value of ASG's stock allegedly plunged, giving rise to Plaintiffs' claims that

these Defendants' false statements, unlawful scheme and reckless conduct in their financial management of ASG and its subsidiaries caused Plaintiffs' losses.

With this summary, the Court presents Plaintiffs more specific allegations about ASG's financial history, the Defendants' alleged false statements, SPP's accounting practices, PHS's medical services practice, published reports about SPP's and PHS's business practices, Plaintiffs' GAAP claims and the conduct and statements of each Defendant alleged by Plaintiffs for their *Section 20(a)* claims.

**2. ASG's Financial History**

As relevant here, by 1997, ASG had 54,364 inmates under 32 government contracts. In June 2000, ASG received a three-year contract to provide [*14] healthcare for 19,500 inmates in Maryland that increased ASG's annual revenues by an estimated $ 48 million. Id. at P 30. Catalano, ASG's chairman, "told investors that ASG was preparing bids for new contracts that could generate up to $ 425 million in annual revenues starting in 2001." Id. On December 19, 2000, ASG announced a three-year contract of $ 100 million per year, to provide healthcare services at New York City's Rikers Island prison. Id. By the end of 2000, ASG was serving 176,563 prisoners under 130 contracts. Id.

After the first quarter [3] of 2001, ASG posted earnings with a 81% increase in revenue, and effectively met its costs estimates. Id. at P 32. Yet, ASG's expense ratio increased to 91.8%, compared to 90.1% in 2000. Id. ASG cited "lower margins and lower financial risks associated with [SPP's] pharmacy business, acquired in September 2000," and the start-up costs under the Rikers Island contract. Id. ASG told investors not to be alarmed, as its projected expense ratio would decrease over the next few quarters to prior level in 1999 of 89.9% and 90.1% in 2000. Id.

> 3 Plaintiffs focus on ASG's quarterly financial reports and statements. Plaintiffs contend that such focus [*15] is necessary to understand their theory of the Defendants' liability.

By the second quarter of 2001, ASG's medical expense ratio increased to 99.7% of its revenues and that increase was attributed to ASG's pharmacy costs and PHS's off-site utilization expenses. Id. at P 30. Plaintiffs allege ASG lost $ 3.39 per diluted share for the quarter.

Page 6

2009 U.S. Dist. LEXIS 28237, *15; Fed. Sec. L. Rep. (CCH) P95,203

Id. After the second quarter report, ASG's stock dropped 57.6% in value to $ 8.04 from $ 18.94 per share. Id. ASG also wrote-off special charges of $ 22 million, with $ 13 million in goodwill and $ 6 million in reserves for future losses. Id. ASG announced its loss of seven (7) prison contracts, representing $ 100 million, that cut its EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) in half to $ 4 million for each of the next two quarters. Id. Plaintiffs allege that ASG's 2001 second quarter results revealed that increases in expenses could significantly impact quarterly operating results. By September 17, 2001, ASG's costs increased such that ASG was unlikely to meet its projected $ 4 million EBITDA target for either the third or fourth quarters of 2001. Id. On October 25, 2001, ASG's stock price hit an all-time low of [*16] $ 1.53 per share (on a split adjusted basis). Id. at P 41. On November 14, 2001, ASG's third quarter results were EBITDA of $ 2.8 million and expense ratio of 95% of revenues. Id.

By the end of the 2001 fourth quarter, ASG had a $ 27.8 million loss, with an $ 18.3 million charge for additional reserves for expected future losses on five prison contracts. Id. at P 36. For that quarter, with expenses at 94.6% of revenues, ASG decided to renegotiate or terminate its contracts with cost-plus-fee arrangements, so as to increase its revenue by 88%. Id. ASG's EBITDA rose to $ 3.2 million (from $ 2.8 million in 2001), but total revenue fell to $ 134 million from $ 140 million in each of the two prior quarters. Id. Defendant Catalano cited $ 2 million in unreserved losses from five full-risk contracts. Id. at P 45. ASG repeated these results in its Form 10-K filed with the SEC on or about March 28, 2002 that Defendants Catalano and Taylor signed. Id. at P 113.

Defendant Catalano assured investors that the ASG would monitor its subsidiaries' costs and ASG would no longer enter into the unprofitable full-risk contracts because ASG's management was "intensely focused on addressing" its costs and [*17] had "developed a corrective course of action focused on a return to predictable financial results." Id. at PP 34 and 35. ASG announced Defendant Taylor as its new chief financial officer to replace Walker Choppin, ASG's former banker at Bank of America who had held his ASG position for more than a year. Id.

In its periodic reports to the SEC, ASG acknowledged that its gross margins were the primary

metric to evaluate its business performance, including SPP's performance. Id. at P 37. Plaintiffs allege that Arthur I. Henderson of Jefferies & Company, a market analyst cited ASG's medical expense ratio, *i.e.*, healthcare expenses as a percentage of revenue, as the critical factor in ASG's success and warned that "subtle changes in this ratio can have a significant impact on the company's profitability." Id.

As to ASG's revenue and cost recognition policy, ASG's March 28, 2002 SEC 10-K Report stated, in pertinent part:

> Revenue and Cost Recognition
>
> The Company's contracts with correctional institutions are principally fixed price contracts adjusted for census fluctuations. Revenues earned under contracts with correctional institutions are recognized in the period that services are rendered. **Cash [*18] received in advance for future services is recorded as deferred revenue and recognized as income when the service is performed.**
>
> Healthcare expenses include the compensation of physicians, nurses and other healthcare professionals including any related benefits and all other direct costs of providing the managed care. **The cost of healthcare services provided or contracted for are recognized in the period in which they are provided based in part on estimates, including an accrual for unbilled medical services rendered through the balance sheet dates.** The Company estimates this medical claims reserve using an actuarial analysis prepared by an independent actuary taking into account historical claims experience (including the average historical costs and billing lag time for such services) and other actuarial data.

Id. at P 113 (emphasis added).

On April 22, 2002, in public statements and its filings with the SEC, ASG reported for its results for the first quarter ending March 31, 2002: healthcare revenues of $ 137.9 million, healthcare expenses of $ 129.3

Page 7

2009 U.S. Dist. LEXIS 28237, *18; Fed. Sec. L. Rep. (CCH) P95,203

million, EBITDA of $ 4.5 million, net income of $ 2 million and earnings per share of $ 0.36 per basic and diluted share. Id. at P 114. [*19] Defendant Catalano allegedly commented, in pertinent part:

> "The initiatives we have implemented, coupled with an emphasis on strong fiscal discipline, are producing results. **Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear.**"

Id. (emphasis added).

On July 23, 2002, ASG's press release and Form 10-K filed with the SEC for the quarter ending June 30, 2002 revealed healthcare revenues of $ 138.5 million, healthcare expenses of $ 129.9 million, EBITDA of $ 5.1 million, net income of $ 5.3 million and earnings per share of $ 0.97 per basic share and $ 0.95 per diluted share. Id. at P 116. Defendant Catalano explained that: "**The Company's focus on improving its contract portfolio is producing solid results.** Our progress accelerated during the second quarter as more contracts came up for renewal." Id. (emphasis added). ASG's October 21, 2002 press release described a closed private placement financing of $ 4.56 million in gross proceeds. Id. at P 118.

By June 2003, ASG's stock price was $ 10 per share, and by September 2003 increased to $ 13 per share. On September 24, 2003, ASG's stock price [*20] closed above $ 14 per share for the first time in nearly three years. In its Form 10-K for fiscal year 2003, ASG cited $ 2.1 million or 0.4% in additional expenses of its healthcare revenues. Id. at P 203. ASG, however, noted its inability to retain qualified health care provides as a cause for losses of its contracts or its ability to gain contracts. Id. at P 203. In 2003, ASG had 800 doctors, 3,050 nurses and 300 independent contractors that included dentists, psychiatrists, psychologists and physicians. Id. at P 205.

ASG's 2003 fiscal year report in its Form 10-K reflects ASG's disclosures that any costs could be controlled and that excess insurance coverage had been secured for catastrophic illnesses.

When preparing bid proposals, the Company estimates the extent of its exposure to cost increases, severe individual cases and catastrophic events and attempts to compensate for its exposure in the pricing of its bids. **The Company's management has experience in evaluating these risks for bidding purposes and maintains an extensive database of historical experience. Nonetheless, increased or unexpected costs against which the Company is not protected could render a contract unprofitable.** [*21] In an effort to manage risk of catastrophic illness or injury of inmates under contracts that do not limit the Company's exposure to such risk, the Company maintains stop loss insurance from an unaffiliated insurer covering 100% of its exposure with respect to catastrophic illnesses or injuries for annual amounts in excess of $ 500,000 per inmate up to an annual per inmate cap of $ 2.0 million.

(Docket Entry No. 70-9, Appendix 4 at p. 9) (emphasis added).

In its Form 10-K for its 2003 fiscal year, ASG stated: "The Company evaluates segment performance based on each segment's gross margin without allocation of corporate selling, general and administrative expenses, interest expense or income tax provision benefit." Id. In addition, in its 2003 fiscal year report on Form 10-K, ASG represented:

Management establishes reserves for the estimated losses that will be incurred under these insurance policies using internal and external evaluations of the merits of the individual claims, analysis of claim history and the estimated reserves assigned by the Company's third-party administrator. . . . **The Company is not aware of any material unasserted claims and, based on its past experience, [*22] would not anticipate that potential future claims would have a material adverse effect on its consolidated financial position or results of**

Page 8

2009 U.S. Dist. LEXIS 28237, *22; Fed. Sec. L. Rep. (CCH) P95,203

**operations.** Any adjustments resulting from the review are reflected in current earnings.

(Docket Entry No. 60, Amended Complaint at P 211) (emphasis added). ASG repeated these statements in a Form 10-Q Report issued on May 10, 2004, August 9, 2004, November 9, 2004, March 14, 2005, May 10, 2005, and August 9, 2005. Id. at P 212.

During a February 24, 2004 telephone conference call with analysts on the results of ASG's fourth quarter of 2003 and its 2003 fiscal year, Defendant Taylor allegedly made the following statements about ASG's gross margins that Plaintiffs allege to be false.

Patrick Swindle - *Avondale Partners - Analyst*

Good morning, gentlemen. The gross margin from continuing operations was about 8.3% during the fourth quarter. The gross margin assuming the guidance for '04 is 6.9%, can you talk a little bit about what drove the gross margins during the fourth quarter, and the implications that has maybe for 2004?

Mike Taylor - *American Service Group, Inc. - CFO*

We gave full-year guidance for 2003 of 6.5% of total gross margin. We ended the [*23] year at 6.6% for the full year. So we did slightly better in the fourth quarter than we anticipated. The main drivers there, you know, we did get some benefit from a couple of new contracts that started later in the year, that operated a little better than we anticipated out of the box; but we do anticipate that over their complete term that they will operate at margins as we would have expected in the pricing of those contracts. So we got a little benefit there.

* * *

**[O]ur daily costs run about $ 1.6, $ 1.7 million on an average day.** So those are a couple of factors that I would put

into that as well, but overall, I mean, we're fairly pleased that we're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year.

Id. at PP 148, 149 (emphasis added).

Plaintiffs allege that these statements are false because ASG's "gross margins were inflated and eventually were restated." Id. at P 150. Further, Plaintiffs allege that during this call, Taylor and Catalano concealed the fact that their gross margin results were only achieved through fraudulent cost-cutting schemes implemented at PHS and SPP, including [*24] improper cost and revenue reporting at SPP and PHS's intentional disregard of proper medical care and staffing requirements. Id.

On July 2, 2004, ASG's press release announced a $ 6.8 million charge or loss on its contract with Maryland Department of Public Safety and Correctional Services. Id. at P 156. ASG also announced its financial projection for 2004 with increased anticipated revenues of $ 668 million from $ 658 million and net income to $ 24 million up from $ 22.5 million. Id. As cited in that release, ASG expected performance improvements in its contract portfolio and its pharmacy division during the second half of that year. In a July 27, 2004 conference call with securities analysts on ASG's 2004 financial results, Defendant Taylor allegedly made the following statements on ASG's gross margins in the second quarter of 2004.

Michael Lamb - Wealth Monitors - Analyst

You referenced the 7 percent gross margin expectation, Mike, for the second half. Can you tell us where that is going to [come] from? I assume you are referencing just for 43 and 4 combined; is that correct?

**Mike Taylor - America Service Group, Inc. - SVP and CFO**

**That is correct. I would anticipate something in the** [*25] **7.3 to 7.5 range for the Company in the second half of**

Page 9

2009 U.S. Dist. LEXIS 28237, *25; Fed. Sec. L. Rep. (CCH) P95,203

**the year. It is primarily coming from repricing of contracts.** This whole process that we have been on for the last 3 years at this point is over time to slowly increase margins of the Company back closer to where they were historically. So we do anticipate we will see that improved performance in the second half of this year. And that is really what has been contemplated all along. Maybe a little better than we thought initially as we started the year are our expectations for the second half at this point.

Id. at P 157 (emphasis added).

On October 25, 2004, ASG issued a press release on its financial results for the third quarter ending for September 30, 2004. In Plaintiffs' view, Catalano described ASG's cost increases as a "unique" event and stated that ASG's future looked bright:

We are disappointed in the additional reserve necessary to cover losses under our Maryland contract through its expiration on June 30, 2005. In the meantime, the Company will faithfully adhere to the terms of our contract and continue our commitment to provide quality healthcare to our patients. **We remain confident in the long-term prospects of the Company.** [*26] **The rest of our contract portfolio continues to produce expected financial results, cash balances are increasing and we are debt free as of the end of the quarter.** We are further encouraged by our selection by the State of Vermont as the provider to negotiate a contract for healthcare services with the Agency of Human Services, Department of Collections.

Id. at P 159 (emphasis added). In addition, ASG increased its "guidance" for 2004:

2004 Guidance

The Company is maintaining most aspects of its previous guidance for 2004 full-year results. . . .The Company is

maintaining its guidance for pre-tax income from continuing and discontinued operations of approximately $ 24.0 million in 2004, excluding the $ 5.2 million charge of the settlement of the Florida legal matter in the first quarter and the $ 12.8 million increase in the Company's loss contract reserve in the second and third quarters. Depreciation, amortization and interest expense is expected to be approximately $ 6.0 million in 2004, consistent with previous guidance. . . .[T]he Company is increasing its guidance for Total revenues from continuing and discontinued operations to $ 685.0 million for 2004, an increase of $ 17.0 million [*27] from previous guidance. . . .

Id. at P 160.

In an October 26, 2004 telephone conference call with securities analysts, the Defendant Catalano allegedly made the following statements about SPP:

Tyson Bauer - Wealth Monitors - Analyst

Okay. And one quick follow-up. On the pharmacy side, on previous calls we've talked about the opportunities of winning pharmacy business or increasing that part of the business, even in situations where you are not the provider, whether the state provides the service or even some of your competitors, in which you could actually, because of your efficiencies in the pharmacy, pick up that business. We have not heard a whole lot on that end as of recent times. Where does the pharmacy stand in operating as its own independent entity and growing going forward?

Michael Catalano - American Service Group - Chairman, President and CEO

Well, most recently, SPP was successful in being awarded the Kentucky statewide pharmacy contract for the DOC system up there. We have a current similar bid pending with the state of Oklahoma in which we expect a decision relatively

Page 10

2009 U.S. Dist. LEXIS 28237, *27; Fed. Sec. L. Rep. (CCH) P95,203

soon. So those opportunities do continue. They are selective opportunities in terms of bidding with or against [*28] competitors. We've looked at that on a couple of occasions. I think there's, understandably, some degree, or second look, or reticence on the part of competitors to bring SPP into a contract situation, but that's certainly happened before. **And quite frankly, SPP has been a significant part of generating the new business revenue growth on a year-to-date basis.** So we continue to see good opportunities there going forward, particularly with the emphasis just nationally on the continued escalation of pharmacy costs.

Id. at 161 (emphasis added).

In a February 7, 2005 press release, after ASG's fourth quarter financial results, ASG's shares were $ 0.07 higher than the market estimate of $ 0.36 per share, and ASG announced guidance of $ 170.4 million and $ 690.9 million respectively. Id. at P 164. ASG further explained that it had "significantly reduced the volatility of its contract portfolio over the last several years" and provided an increased 2004 projected on earnings per share from $ 1.42 to $ 1.53 per share. Id. ASG described its accomplishment of its costs control:

> The Company has significantly reduced the volatility of its contract portfolio over the last several years by a process [*29] of shifting its preferred contract structure from a full-risk model to a shared-risk model Shared-risk contracting model provide aggregate limits, or "caps," to the Company's exposure to hospitalization and other off-site medical expenses and benefit taxpayers by eliminating any risk premium or margin that would otherwise be associated with the probability of such costs exceeding mutually agreed upon thresholds and allowing taxpayers to share in any savings if such costs are less than those agreed upon."

> This ongoing process of adjusting the Company's contract portfolio has resulted

in 88% of the Company's healthcare contracts and all pharmacy contracts as of December 31, 2004, representing 74% of Total Revenues in the fourth quarter, **having structures that limit the Company's exposure to increases in hospitalization and other off-site medical expenses."**

Id. at P 164 (emphasis added).

In its first initial guidance for its 2005 fiscal year, ASG predicted earnings that Plaintiffs allege are significantly worse than any other time during the Class Period, including EDITDA of $ 10-$ 11 million with total revenues of $ 660 million. Id. at 92. This resulted in earnings of $ 0.39 per share. [*30] In 2004, ASG's EBITDA was $ 29.3 million with revenues of $ 690 million and earning per share of $ 0.82. On April 26, 2005, the ASG issued a press release announcing its financial results for the first quarter of 2005, the period ending March 31, 2005. Id. at P 167. In its release, Defendant Catalano asserted that "[t]he Company produced solid financial results in the first quarter that were consistent with our expectations." Id.

After a series of published reports in the *New York Times* in late February and early March, 2005 about PHS's business practices, discussed infra, ASG's stock price fell more that 16%. Id. at P 303. On April 27, 2005, Defendant Taylor held a conference call with securities analysts to discuss the details of the financial results for ASG's fourth quarter in 2005. Id. at P 168. During this conference, the securities analysts asked about the ASG's ability to maintain its gross margins and expenses and Taylor responded as follows:

> Anton Hie - Jefferies & Co. - Analyst

> Okay. How about the current quarter month-end here, do we think we will see the margins holding steady here, now that some of those utilization issues that caused the fourth-quarter spike are behind [*31] us?

> Mike Taylor - America Service Group - CFO

> Well, we are always subject to that volatility, and that is kind of the point on

Page 11

2009 U.S. Dist. LEXIS 28237, *31; Fed. Sec. L. Rep. (CCH) P95,203

those contracts. **Certainly at this point, Anton, things are tracking along with our expectations. That is why we've maintained the guidance that we have for the full year. So early into the second quarter, we don't see anything that changes that impression.**

Id. (emphasis added).

In a July 27, 2005, telephone conference call with securities analysts on ASG's financial results in the second quarter of 2005, specifically ASG's gross margins and EBITDA, Taylor allegedly responded to the following question in Catalano's presence:

Anton Hie - Jefferies & Co. - Analyst

A couple questions. Your EBITDA margin in the first half was around 4.5%; and based on the midpoint of your guidance, it looks like you are shooting for 5% for the full year, implying a significant improvement in the back half. I wonder if you could talk a little bit about, A, where you might see those improvements; whether that is being confirmed so far in the month of July; and how sustainable you think those levels might be going forward in light of the current competitive environment.

**Mike Taylor - America** [*32] **Service Group - CFO**

**Anton, we do expect the second half to see an increase in that EBITDA margin, as you pointed out, in our guidance. The 4.5% or so for the first half certainly was a solid start for the year. All along we had expected to see an improvement in that in the second half. That improvement primarily is going to be driven by the gross margin percentage improving in the second half. Once again that was in line with our initial expectations for what the year would hold. So it is really going to be a gross margin improvement in our expectations that gets us to that higher level of EBITDA margin.** In fact, we will

probably see the SG&A expense percentage creep up somewhat in the second half, because of the reduced revenues the Company has from making cuts in that area. But they probably won't offset the revenue drop. So I think the 2.5% that we saw in the first half there is going to go up for the second half. So it is a gross margin driven equation.

* * *

I think the last part of your question is whether that is sustainable or not. We have said over time that the Company's performance would certainly be more evidenced on the gross margin line, post the old Maryland contract, no [*33] matter which direction that rebid went. I think you are starting to see that in the continuing gross margin in the first half. And certainly we expect that to be enhanced even more in the second half.

Id. at P 171 (emphasis added).

In the second half of 2005, ASG's third quarter financial statements revealed its costs had risen to 99.7%, the highest level since 2001. Id. at P 89. SPP's net revenue dropped 18%. Id. at P 90. ASG missed its guidance on net income by 83.5%; EBITDA fell by 42.5% and earnings per share by 74.5%. Id. at 91. ASG cited "disappointing financial performance" in the second half of its 2005 fiscal year, with continuing costs from SPP accounting compliance costs and PHS's costs under government contracts for failing to provide outpatient care and staffing at inpatient clinics. Id. at P 93. ASG experienced an increase in medical malpractice claims against PHS. Id. at P 94. After *The New York Times'* articles, ASG increased its reserves for malpractice claims by $ 6.1 million. Id. ASG reported $ 4.4 million in net income for the 2005 fiscal year. Id.

In a March 16, 2006 telephone conference with analysts and investors, Defendants Catalano and Taylor cited continuing losses [*34] and lower gross margins as SPP, in the wake of SPP's accounting scandal and PHS's practices that Taylor described as "a major distraction to SPP's business," as well as lost business. Id. By the end of ASG's 2005 fiscal year, the number of inmates under ASG's contracts fell to 130,000 from 200,000 and the

Page 12

2009 U.S. Dist. LEXIS 28237, *34; Fed. Sec. L. Rep. (CCH) P95,203

facilities under contract fell to 260 from 300. Id. at P 103. ASG also had increased costs for off-site expenses and staffing of healthcare in Wyoming, Alabama and Vermont. Id. at P 94.

Upon news reports of ASG's internal investigation of SPP's and PHS's practices, ASG's stock dropped 29%. Id. at PP 304-305. On March 16, 2006, ASG revealed the results of that investigation that is discussed infra. Id. at P 305. Later, ASG had to restate five years of its financial statements. Id. In that restatement, ASG admitted that SPP's practices resulted in material weaknesses to ASG's previously issued financial statements. Id. at P 179. ASG's internal investigation revealed that ASG had overstated its income by at least $ 2.1 million and reduced its 2001 earnings by $ 347,000 with increased tax liability of $ 355,000. [4] SPP's customers were overcharged by at least $ 3.6 million. Id. ASG also [*35] cited its customers that were undercharged $ 5.9 million during the same time period, but deemed those undercharges uncollectible. Id. ASG reduced guidance for earnings for the end of the Class Period. Id. at PP 88-98, 224. SPP lost contracts to provide pharmaceuticals to inmates in Kentucky, Fulton County, Georgia, and Caddo County, Louisiana. Id. at P 110.

> 4    Docket Entry No. 69, Defendants' Memorandum at p. 11 citing the Defendants' restatement, but the Court cannot locate this statement at the cited reference.

In its 2005 Form 10-K, ASG admitted that "key members of SPP's senior management" had improperly established and used accrual and reserve accounts at SPP to manage earnings to meet expectations for performance. Id. at P 75. Plaintiffs refer to these practices as "cookie jar accounting." Plaintiffs allege that ASG's reference about the "key members" of management in its restatement was to Defendants Hartman and Bryson.

On May 10, 2006, ASG's released its first quarter 2006 results showing medical expenses (94.5% of revenues), SG&A expenses (3.5%), gross margin (5.5%) and a net loss of $ 989,000. Id. at P 95. In its Form 10-K and its 2005 Report on Form 10-Q and in its annual report [*36] filed with ASG's April 28, 2006 Proxy Statement, ASG cited its Audit Committee's 27 meetings during an internal investigation to receive and discuss reports and updates on the investigation and to provide direction and guidance for SPP and PHS. ASG expended $ 7.7 million for its internal investigation into these

matters. Id. at P 74. ASG's total healthcare expenses for the fourth quarter of 2005 were $ 142.1 million, or 94.9% of total revenues, as compared with $ 158.2 million, or 92.9% of total revenues, in the prior year quarter. ASG's total healthcare expenses for the year ended December 31, 2005 were $ 612.8 million, or 94.4% of total revenues, as compared with $ 644.0 million, or 93.3% of total revenues, in the prior year period. To assist in the understanding of ASG's restatement, the Court now reviews SPP's and PHS's alleged business practices.

### 3. SPP's Accounting Practices

As to the causes of ASG's financial losses, SPP's contracts defined the correct reference price to calculate the amounts charged for prescription drugs. Under these contracts, state and federal prisons are entitled to a pro rata share of a manufacturer's or distributor's price discounts and rebates provided [*37] to SPP. Id. at PP 185 and 222. In addition, prisons can return unused drugs for credits against their accounts with SPP. Id. SPP's computerized system ("CIPCS"), however, was designed to track only one purchase price for any drug. Id. at PP 59-63, 185-191. As a result, SPP could not track different prices from different vendors. Id. According to a former SPP manager, who allegedly reported directly to SPP's chief executive officers, Hartman and Bryson deliberately took advantage of CIPCS's shortcomings to manipulate the timing of price changes by inputting prices increases into the system before sending customer invoices and by delaying entry of falling prices until after invoices with the former higher prices had been issued. Id. at PP 55, 60.

Plaintiffs allege that CIPCS was widely known as incapable of tracking multiple prices for drugs purchased from different vendors so as to assure incorrect billings of its customers in accordance with the terms of their contracts. Id. at PP 159-61, 185-191. The obviousness of CIPCS's defective design is allegedly reflected in the single cost for each drug despite SPP's purchase of drugs from multiple vendors at constantly changing prices. Id. at PP 159, 185. [*38] Plaintiffs assert that CIPCS's obviousness in failing to credit SPP's customers for returned drugs is apparent because the CIPCS showed that SPP was selling more drugs at that price than it had purchased, clearly reflecting that drugs were being sold more than once without the price being lowered. Id. at PP 59-61, 185-191. ASG's replacement system, SPIN, was also unable to provide accurate pricing information, track inventory, verify shipments, or assure proper customer

Page 13

2009 U.S. Dist. LEXIS 28237, *38; Fed. Sec. L. Rep. (CCH) P95,203

billing. Id. at PP 187-191. Yet, the Defendants allegedly failed to alert investors to SPIN's problems and continued to certify falsely the adequacy of ASG's control system. Id. P 181.

A former SPP fulfillment manager allegedly recounted how SPP established an aggressive budget to earn $ 100,000 a month from reselling drugs that had been returned at a higher wholesale price above SPP's purchase price of those drugs, allegedly providing a further disincentive to assure customers receive proper credits. Id. at PP 55, 61. A former SPP executive allegedly states that customers were rarely credited for returned drugs, because to do so made it more difficult to meet the $ 100,000 revenue target. Id. at P 55.

SPP's "Procedural [*39] Manual" allegedly stated that returns would not be credited for drugs that were returned in a blister pack that had been partially used, even though SPP procedures also called for the remaining drugs to be manually removed from the blister pack and resold to other customers. Id. at P 55. [5] Plaintiffs allege SPP's policy of failing to credit customers for returned drugs was well known to Hartman and Bryson, and also to Catalano and Taylor. Id. A former SPP manager stated that during the due diligence preceding the SPP acquisition, Defendants Hartman, Bryson, Catalano and Taylor were aware of these practices and SPP's procedure manual. Credits for returned drugs were the exception, not the rule at SPP, and Hartman or Bryson personally approved credits, but only for customers who complained regularly. Id.

> 5   As a security measure, drugs provided to inmates were typically shipped in blister packs containing a 30-day supply of drugs, which SPP internally referred to as "bingo cards." When an inmate was released or transferred to another facility before the entire supply in their blister pack had been used, the partially used blister pack would be returned to SPP.

At a dinner with other executives [*40] in Boston in the fall of 2005, defendant Hartman and Northeast Region Group Vice President Geoff Persley openly discussed the reselling of returned drugs, which they referred to as "recycling," in a manner that implied to at least one of their dining companions that the practice was illegitimate. Id. at P 62. Excess profits were generated through such sales, which typically involved frequently prescribed drugs, such as insulin, or expensive

medications, such as antipsychotics and drugs used to treat HIV. Id.

Two former SPP pharmacists and other ex-employees, including a former vice president reported that SPP's billings were "always wrong" and that SPP frequently overcharged PHS, by billing for pharmaceuticals that were never ordered, or double-billing for prescriptions that were filled, or failing to credit PHS for returns. Id. at P 64. According to the former vice-president, SPP's billing was "closely watch[ed]" by the administrators. Id. In an October 24, 2005 article in the *Nashville Business Journal,* Catalano referred to Randy Beaman, SPP's controller and SPP's "corporate liaison to supplier and distributor" as raising the issues about SPP's practices during a "routine contact [*41] with the internal audit program." Id. at P 70.

Plaintiffs allege that at Bryson's direction, SPP also made illegal drug purchases. "[S]everal former SPP employees revealed that SPP was also illegally purchasing drugs from Canada in order to save money, and then overcharging customers for the costs of those drugs." Id. at P 65. Plaintiffs allege:

> Two high-level pharmacists working out of SPP's Franklin headquarters confided in co-workers that SPP was secretly importing drugs from Canada through a clandestine facility located in Maryland. Another pharmacist employed by SPP learned of the practices prior to 2004, and was told by the high-level pharmacists that the illegal importation was ongoing through at least the beginning of 2006. **The high-level pharmacists told this person that SPP would purchase the drugs from Canada at a reduced cost, then charge its customers the full U.S. average wholesale price for the drugs, which would often be triple the price SPP paid or more. The two high-level pharmacists confided in at least one other employee at the facility where they worked. The second employee was told in 2005 that the drugs were being illegally imported at Bryson's specific direction. [*42] The pharmacists who followed Bryson's directions described their fear of their liability for this**

Page 14

2009 U.S. Dist. LEXIS 28237, *42; Fed. Sec. L. Rep. (CCH) P95,203

**misconduct, including the potential loss of their licenses.** The two pharmacists involved in the illegal practices have since left ASG, according to one of the employees who had spoken with them about these practices.

Id. at P 65 (emphasis added).

These accounting and other practices at SPP allegedly continued for five years. Id. at P 67. Thus, Plaintiffs allege that during the class period, ASG's, SPP's and the individual Defendants' statements and reports to investors that SPP's expenses were under control, were false and/or misleading. Plaintiffs allege that the Defendants deliberately ignored or concealed SPP's improper accounting and other practices that had temporarily reduced ASG's costs by violating SPP's contracts with its customers. Id. at PP 42-82, 308-316.

In its restatement, ASG conceded ASG's controls over SPP "were not designed or operating effectively to reduce to remote the likelihood that material errors in healthcare revenues, health-care expenses, accounts receivable, inventories and accrued expenses would be prevented or detected in a timely manner" nor would ASG's contracts [*43] "reasonably assure the accurate and timely capture of SPP customer contract billing information and billing of SPP customers in accordance with contract terms." PP 80 and 179. ASG specifically cited that these missing controls "resulted in restatements of previously issued financial statements" for the past five years. Id. at P179. Thus, Plaintiffs allege that ASG's earlier financial statements were false or that the Defendants' were reckless in reporting such false information about SPP.

**4. PHS's Medical Practices**

As to PHS's role in these events, Plaintiffs allege that to reduce PHS's expenses, the Defendants focused on eliminating PHS's high costs of off-site hospitalization and expensive drug regimens. Id. at PP 45-53. Plaintiffs assert that former PHS employees reported that PHS management routinely cut budgets for utilization of hospitals off-site to reduce PHS's costs and to meet budgeted targets. Id. at P 312. With PHS's reduction of these expenses, ASG assured investors that ASG's medical expense margins, i.e., the ratio of healthcare expenses to revenues would be notably below the 99.7% level that ASG experienced in the second quarter of 2001.

Id. at PP 38-40. After a series [*44] of *New York Times* articles about PHS, ASG's medical malpractice expenses rose "much greater than reflected in [ASG's] SEC filings" and such increases are alleged to be the direct result of PHS's improper cost-cutting practices, specifically denying necessary healthcare and medications to inmates to reduce artificially expenses under PHS's government contracts. Id. at PP 218-219.

ASG also allegedly directed the "floating," of nurses, quick settlement of malpractice claims, and understaffing at institutions that resulted in contract penalties. Id. As specific examples of those PHS practices, Plaintiffs allege the following:

In September 2005, PHS paid $ 350,000 to settle a claim arising from the death of Ruth Hubbs, an inmate at the Leon County (Fla.) Jail from an overdose of Doxepin, an antidepressant. According to a lawsuit filed by Hubbs' Estate, the antidepressant had been administered over her objections pursuant to a PHS policy of rarely using a safer but more expensive medication, and despite signs that the inmate was chronically over medicated with Doxepin in the two weeks before her death. According to a former high ranking official with the Florida Department of Corrections, [*45] SPP typically used the cheapest drugs even if there was a better alternative that would ensure less hospitalization of inmates.

In 2004, following a death of a newborn infant delivered by an inmate at the Hillsborough County (Fla.) Jail, PHS conducted an internal audit of medical records at the facility. A former employee who participated in the audit said it was initiated because senior managers "knew" that PHS had been negligent for failing to attend to the infant after birth, including as the result of investigative reports which were sent to defendant Hartman and other senior official No medical records audit had previously been conducted at the jail, despite contractual requirements to do so, because PHS had not provided auditing staff to the prison.

Page 15

2009 U.S. Dist. LEXIS 28237, *45; Fed. Sec. L. Rep. (CCH) P95,203

In April 2005, a court-appointed monitor reported that **PHS' HIV treatment records at Alabama's Limestone Correctional Facility "reflect thousands of doses of medications ordered by physicians that have either not been given, or have been given without being documented. Interviews with patients, chart reviews and feedback from physicians support the concern that patients are not consistently given the medications that have been ordered** [*46] **for them for serious life-threatening conditions."** A follow-up report submitted in July 2005 found that PHS' record keeping had improved, but **there were still numerous concerns with HIV patients not receiving proper medication or medical treatment. In addition, the report found that the prison had only one doctor and one nurse to serve more than 2,000 inmates: "By all measures, this staffing is inadequate to meet the medical needs of this complex patient population."**

Similar complaints about understaffing of jail facilities were repeatedly raised in Bristol County, Massachusetts. **During 2005, the prison was understaffed by as many as 10 nurses below contractual requirements. Catalano was repeatedly told about the staffing shortages by jail representatives, including Peter Berthiaume and Henry Groby. In addition, at a meeting in the health service administrator's office at the jail in 2H05, a PHS vice president went over the understaffing problems with Catalano in detail. The vice president said: PHS' refusal to comply with the contractual staffing requirements stemmed from its refusal to pay nurses according to local rates for their services. The vice president learned from colleagues** [*47] **that this was a recurring issue throughout the company and similar problems had cropped up in other areas of the** **country, including Alabama and Wyoming.**

**The New York Times' expose also revealed another improper practice called "floating" which helped PHS avoid governmental fines imposed for understaffing prisons and inadequate care. The practice consisted of sending doctors or nurses with a backlog of patients at one prison to another where there were fewer inmates to treat, "simply to avoid fines."** Further, several former and current PHS employees, including three senior clinicians, reported that when there were too few doctors to "float," PHS employees would simply falsify prison records, signing in at one prison without seeing any patients as one former clinician stated, "[t]he practice is clearly fraudulent."

At the end of the Class Period, **ASG revealed that one of its clients had imposed $ 1.8 million in contractual penalties for failing to provide proper staffing levels at its facilities.** ASG withheld the identity of the client, but admitted that at least $ 600,000 of the penalties were valid charges under the contract.

Id. at P 51. The penalty provisions in its contracts were to [*48] incentivize PHS to maintain proper staffing.

To obscure these practices, ASG and PHS allegedly fired numerous PHS administrators and officers who reported and complained of mismanagement or prison understaffing, including an employee who reported directly to Catalano. Id. at P 52.

### 5. Published Reports about ASG, SPP and PHS

Plaintiffs allege that as early as January 2003, PHS's senior management were allegedly told of PHS's deliberate practice of delaying or denying prescription medications and medical treatment to inmates to increase PHS's profits and gross margins. Id. at P 140. In 2003, the Defendant Catalano was so informed. Id. A PHS medical director in Idaho filed a legal action against PHS alleging a corporate practice of providing insufficient health care.

Page 16

2009 U.S. Dist. LEXIS 28237, *48; Fed. Sec. L. Rep. (CCH) P95,203

Id. In 2005, ASG fired numerous employees who complained about such practices. Id. at PP 52, 53.

The significant event is *The New York Times* publication of a series of articles from February 27, 2005 through March 1, 2005 about PHS's business practices due to deaths of two New York inmates under PHS's care. Id. at P 45. ASG initially denied the first report. Id. at P 303. *The New York Times'* disclosed PHS's practice of cutting [*49] medical services to cut costs. Id.

> In the two deaths, and eight others across upstate New York, state investigators say they kept discovering the same failings: medical staffs trimmed to the bone, doctors under qualified or out of reach, nurses doing tasks beyond their training, prescription drugs withheld, patient records unread and employee misconduct unpunished.

Id. at P 46. A state investigation of those deaths found evidence that PHS was repeatedly cutting services to cut costs. Id.

The *New York Times* articles reported interviews of correctional officials in other states that reported inmates' deaths and other injuries at PHS managed facilities that were attributed to PHS's decision to lower costs so as to maximize profits. In summary, these articles reported:

> . In late 2000, government investigators looking into a string of inmate deaths in upstate New York noticed a pattern of inadequate healthcare under PHS' direction, including, "low-level employees [who] were doing work normally done by better-credentialed people" and nurses without proper qualifications or working on suspended licenses, "making medical decisions and pronouncing patients dead." **"Our sense was that what we were** [*50] **dealing with was not clinical problems but business practices," said James E. Lawrence, the New York State Commission of Correction's director of operations.**

> . **In 2001 in Broward County, Florida, three state court judges**

**ordered PHS to stop withholding expensive psychiatric drugs from inmates after they witnessed a parade of inmates showing up in court incoherent. "My impression was that it was money," Judge Susan Lebow told The New York Times. "The doctors were under corporate direction to not continue the medications."**

> . **Judge Lebow's concerns were eerily similar to those that had been raised in 2000 by five juvenile court judges in New York who had repeatedly taken PHS to task for failure to provide juvenile inmates with proper medication.** Brooklyn Family Court Judge Philip C. Segal held the company in contempt for failing to give HIV medication to a teenage inmate. Bronx Judge Harold J. Lynch ordered a teenage girl to be taken out of PHS' care when she tried to commit suicide after her psychiatric medication was inexplicably discontinued. **After another 14-year old girl suffering from bipolar disorder whose medication had been similarly discontinued appeared in Judge Paula J. Hepner's** [*51] **courtroom, the jurist told city lawyers that the incident "is not just a single case. It's many cases."**

> . And following one inmate's death **in 2001, the New York State Commissioner of Corrections denounced PHS as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."**

Id. at P 47 (emphasis added). In 2005, a Maryland grand jury allegedly found that PHS's management pressured PHS's staff to cut costs that caused PHS to restrict inmates medications, off-site hospitalization, or laboratory tests. Id. at P 50.

Plaintiffs allege that PHS's failures to provide necessary medications or treatment are attributable to ASG's corporate policies and practices implemented by the Defendants to reduce PHS's losses and thereby increase ASG's profits. Id. at P 53. Plaintiffs alleged ASG

Page 17

2009 U.S. Dist. LEXIS 28237, *51; Fed. Sec. L. Rep. (CCH) P95,203

failed to disclose to investors PHS's deliberate decisions to deny necessary medical care. ASG actually told investors that ASG was unaware of any conditions that would cause material cost increases under their contracts. Id. at PP 22. Plaintiffs allege PHS's and ASG's management, specifically Catalano, were aware of these practices, as were PHS's officers and employees. Id. at PP 52, 53 and 219. [*52] Plaintiffs allege that a former PHS vice president specifically warned the Defendant Catalano about problems with inadequate staffing and inaccurate billing. Id. at P 52.

**6. ASG's Internal Investigation**

On October 24, 2005, ASG announced the formation of an Audit Committee aided by outside counsel and independent accountants to conduct an internal investigation into improper accounting by SPP. Id. at P 67. This investigation included SPP's failures to credit customers for returned products or to credit required discounts and rebates so as to manage SPP's earnings. Id. The SEC was notified and commenced its investigation, as did the United States Attorney for the Middle District of Tennessee. Id. As stated earlier, ASG's Audit Committee met 27 times and its investigation costs totaled $ 7.7 million.

In its restatement, and ASG's Form 10-K Report for fiscal year 2005, ASG admitted SPP's practices and cited ASG's faulty and nonexistent internal controls at SPP, stating, in pertinent part:

. "SPP did not charge its customers (including PHS) in accordance with applicable contracts...SPP charged customers more than SPP's purchase invoice cost or the applicable third party reference price... SPP [*53] failed to properly credit certain customers with discounts, rebates or buy-in savings, and, in certain instances, failed to provide customers with contractually required credit for the return of pharmaceutical products."

. "The Audit Committee's investigation also found that key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely

match SPP's reported earnings to budgeted results."

. "As a result of the findings made during the investigation, the Audit Committee recommended significant strengthening to the Company's system of internal controls and compliance function. **In addition, management determined that material weaknesses existed in the Company's internal control structure,''** including a lack of required controls over SPP's revenues, expenses, accounts receivable, inventories and accrued expenses.

Id. at P 76 (emphasis added). This 10-K report also described "certain other issues, relating to accruals for rebates and inventory valuation, which resulted in changes to [ASG's] previously reported financial results." Id. at P 77. SPP's management was described as failing to follow corporate [*54] expenditure and disbursement policies and "a number of issues" on the faulty implementation of a new computer system at SPP in June 2005. Id. at P 74.

Plaintiffs allege that in its restatement, ASG admitted its lack of internal controls:

the lack of adequate "internal control" procedures necessary to reasonably detect material errors in revenues, expenses, accounts receivable, inventory, and accrued expenses, or to assure that SPP's customers were being charged in compliance with the terms of their contracts. Among the internal controls that were lacking during the Class Period were procedures necessary to ensure that contractual pricing terms were allowed when customers were billed, returns were properly credited to customer accounts, and **ASG[]'s finance department reviewed SPP's monthly accounting reconciliations to prevent improper use of accruals and reserves and other accounting gimmicks used to manage or inflate reported results. See ASG[]'s FY05 Report on Form 10-K, Item 9A. For example, as recounted by numerous**

Page 18

2009 U.S. Dist. LEXIS 28237, *54; Fed. Sec. L. Rep. (CCH) P95,203

**former employees of SPP, ASG[] and its management knew that the Company had recurrent problems with maintaining accuracy in financial reporting due to its use of computer [\*55] systems that were unable to properly manage sales and expense dates. CIPCS, SPP's system in place at the start of the Class Period, or earlier, repeatedly caused lost or delayed prescription orders, and was unable to track and apply contract-specific pricing terms. CIPCS' replacement, called SPIN, was plagued with similar problems from the time it was improperly launched in June 2005. See infra §VII.C.**

**In its FY05 Report on Form 10-K . . . ASG[] admitted that the Company's internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG[]'s consolidated financial statements] would be prevented or detected in a timely manner." In admitting that these internal controls did not exist, and that the controls that were in place during the Class Period were not properly designed or operating correctly, ASG[] tacitly acknowledged that the statements it had made during the Class Period about its purportedly effective system of internal controls, and the Sarbanes-Oxley certifications Catalano and Wright signed each quarter attesting to the adequacy of those controls, were false.**

**This admission, together with the nature and extent of [\*56] the accounting fraud, and the fact that it continued, purportedly undetected, for _five years,_ aptly demonstrates that ASG[], Catalano and Wright were all reckless in claiming, and certifying, that ASG[] had effectively designed and operated internal controls during the Class Period. Either Catalano or**

**Wright knew of the internal control problems during the Class Period, based on the repeated inspections they made of the control procedures at ASG[] and its subsidiaries, or they were deliberately reckless in signing those certifications by failing to make a reasonable inspection to assure that the internal controls were both adequately designed and properly operating, as claimed in the certifications.**

Id. at PP 79, 80 at 81 (emphasis added).

Plaintiffs allege that ASG issued "restated annual financial statements for FY03 and FY04, and "restated selected financial data" for FY01 and FY02 in its FY05 Report on its Form 10-K. ASG cited the cumulative impact of its practices as reducing ASG's income by $ 355,000. Id. at P 83. According to Plaintiffs, ASG buried an admission in its annual report for fiscal year 2005 that ASG's earlier quarterly and annual reports filed with the SEC during the [\*57] Class Period were misleading:

> The Company did not amend its previously filed Annual Reports on Forms 10-K or Quarterly Reports on Forms 10-Q for the restatement. **Accordingly, the financial statements and other information contained in such reports should no longer be relied upon.**

Id.

Plaintiffs alleged that the Defendants refused to amend ASG's prior reports that would reveal the full extent of ASG's quarterly manipulations and disclosed only the "cumulative" impact of these illegal practices to obscure the extent of ASG's false and misleading statements about its financial condition. Id. at P 84. Plaintiffs allege that a quarter-to-quarter analysis would have revealed ASG's holding back of earnings in improper reserves and accrual accounts until its results are better than forecasted, and ASG's use of those reserves to supplement earnings in quarters where results are worse than forecast. In a word, Plaintiffs allege ASG under-reported expenses in "bad" quarters when they were incurred and waited instead for a "good" quarter in which they could be reported without missing financial

Page 19

2009 U.S. Dist. LEXIS 28237, *57; Fed. Sec. L. Rep. (CCH) P95,203

targets. Id. at P 85.

Plaintiffs also allege that ASG included adjustments previously made to unreported [*58] results in the third quarter of 2005. The effect was to reduce the reported cumulative impact of its practices in its prior reports:

> **The Audit Committee's investigation also found that key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to its budgeted results.** The aggregate effect of the adjustments necessitated by the Audit Committee's findings related to this issue has been determined by the Company to be an increase in previously reported pre-tax income of approximately $ 355,000, in the aggregate, since January 1, 2001, **although it should be noted that different periods are affected by different amounts and that certain of the adjustments necessitated by the Audit Committee's findings related to the third quarter of 2005, which has not been previously reported.** The employees who the Company determined, based on the investigation, were responsible for these actions **were terminated or are no longer employed by the Company** or SPP.

Id. at P 87 (emphasis added).

According to Plaintiffs, ASG cited the Treadway Commission's Committee of Sponsoring Organizations [*59] ("COSO") standards for its internal controls. COSO requires direct involvement by management in establishing controls and continual monitoring and analysis of controls. Id. at PP 174 and 286. ASG's 2005 Report on Form 10-K, recognized that "[a] material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Id. at P 286. In addition, ASG admitted that its internal controls "were not designed or operating effectively to reduce the remote likelihood that

material errors [in ASG 's consolidated financial statements] would be prevented or detected in a timely manner." Id. at P 80. Plaintiffs also allege manipulations of SPP's accounting and that ASG's admissions were relegated to footnotes in ASG's restatement of its financial statements. Id. at PP 3-98, 104-105, 177-183, 220-231, 236-251.

Plaintiffs cite 58 months of ASG's and SPP's unchecked errors as evidence that Defendants Catalano and Taylor were at least reckless in signing certifications about ASG's internal controls for reporting its finances. [*60] Plaintiffs also allege that ASG's refusal to amend its prior reports avoided revelation of the full extent of its quarterly manipulations, as ASG elected to disclose only the alleged "cumulative" impact over this five-year period so as to hide ASG's manipulation of improper reserves, accruals and customer charges to meet its quarterly performance standards. Id. at PP 84, 85.

On December 7, 2005, ASG fired Defendant Bryson. Id. at P 71. On December 9, 2005, ASG fired Defendant Hartman. Id. "Other key SPP employees also resigned or were fired during or after the investigation, including Clinical Pharmacy Vice President Peter Mikhail, who left in October 2005 and Vice President of Client Services Joe Facchinei, who left in March 2006." Id. Two members of the Audit Committee, Richard M. Mastaler (a director since 1999) and Carol R. Goldsbery, resigned. Id. at P 72. Mastaler contended that Catalano should be fired. Id.

### 7. GAAP Violations

Plaintiffs next allege that the Defendants repeatedly violated GAAP standards in reporting ASG's financial condition despite that ASG's filings and financial statements that represented their compliance with GAAP standards. Id. at PP 232-266. Plaintiffs set [*61] forth a series of financial statements and cite GAAP rules and bulletins to reflect their contentions that ASG's restatement of its finances for 2000, 2001, 2003, 2004 and 2005 violated GAAP standards. Id. at P 234 through 237, 241, 243, and PP 248 and 292. Plaintiffs add that after the restatement, ASG failed to amend its Form 10-K reports that contained the same information that needed to be revised in other ASG documents. Id. at P 243.

ASG's report on its 2005 fiscal year 10-K reflects that ASG reclassified revenues as "discontinued operations." Id. at PP 246-247. Based upon GAAP

Page 20

2009 U.S. Dist. LEXIS 28237, *61; Fed. Sec. L. Rep. (CCH) P95,203

standards, Plaintiffs allege that these "reclassifications" are adjustments with tax consequences. Id. at P 246. Plaintiffs also allege ASG overstated its income for continuing operations by $ 18 million and understated its income from discontinued operations by $ 14 million. Id. at P 248.

## 8. Individual Defendants

The individual Defendants include current or former high-level executives of ASG and or SPP or PHS who during the Class Period, managed ASG, SPP and/or PHS. Id. at P 329. With their offices and responsibilities, each individual Defendant is alleged to have participated or was privy to the creation [*62] and development of SPP's and PHS's business practices as well as to the reporting of ASG's, SPP's and PHS's internal budgets, plans, projections and/or reports. The individual defendants Catalano and Taylor allegedly had significant personal interaction with Hartman and Bryson about SPP's and PHS's practices as well as personal knowledge about ASG's statements to the investing public about ASG's financial condition. Each individual defendant allegedly had access to the adverse undisclosed information about ASG's actual financial condition and performance and either knew or recklessly disregarded these practices' adverse effects in their representations about ASG's financial condition. Id. at PP 332 and 333. Plaintiffs allege, in sum:

> All defendants participated in making the statements complained of herein regarding ASG's financial results. ASG issued the statements. SPP provided the information regarding its own results. Defendants Hartman and Bryson were responsible for overseeing the preparation of SPP's financial statements.

Id. at P 132. See also PP 8, 22-23, 147, 194, 197, 311-315, 328-334.

Plaintiffs' specifically allege that the firing of ASG's former chief financial officer [*63] in 2001 placed Catalano, Taylor, Hartman and Bryson on notice that their jobs could be in jeopardy if they were unable to control ASG's costs. Id. P 35. As noted earlier, market analysts opined that "subtle changes in this ratio [of healthcare expenses to revenues like the 0.4% increase in 2002] can have a significant impact on the company's

profitability." Id. P 37.

According to Plaintiffs, the individual defendants were also motivated to engage in or to fail to correct these business practices so as to secure promotions, to enhance their compensation, to inflate the value of ASG's stock price, and to create higher cash value for sales of their stock options. Id. at PP 30-40, 92-98, 319-324. Plaintiffs also allege that ASG executives who are not named Defendants, sold more than 607,000 shares for more than $ 11.5 million during the class period. Id. at PP 320-322. "During the Class Period before the fraud was revealed, Burton C. Einspruch, director, sold 17,000 shares of ASG's stock (over 86% of his available shares) in November 2003 for proceeds of $ 341,697. Richard M. Mastaler, director, dumped 74,286 ASG shares (86% of his available shares) in November 2003 for $ 1.4 million in [*64] proceeds. Lawrence H. Pomeroy, Senior VP and Chief Development Officer, sold 50,092 shares of ASG's stock (over 97% of his available shares) for $ 1.2 million in proceeds. William C. Stapleton, director, unloaded 20,625 shares (100% of his available shares) in November 2003 for nearly $ 400,000 in proceeds. Finally, Richard D. Wright, Vice Chairman of Operations and director, sold 102,907 shares (90.62% of his available shares) for $ 2.144 million in insider proceeds." The Court addresses other specific allegations against each Defendant.

### a. ASG and SPP

To minimize undue repetition, ASG is the corporate parent of SPP and PHS. ASG filed consolidated financial statements in its corporate name as parent based upon SPP's and PHS's financial reports. See Docket Entry No. 70, Attachment thereto. As reflected by the firings of Bryson and Hartman, ASG controlled SPP and PHS. ASG issued the financial reports and press releases that included the contract performances of SPP and PHS. SPP's accounting practices provided the financial information that is the predicate for a substantial part of ASG's restatement. In an October 24, 2005 statement, ASG excluded SPP's sales to PHS from ASG's internal [*65] investigation. Plaintiffs cite ASG's explanation that those contracts were excluded as "the Company is financially responsible for the cost of pharmaceuticals". Id. at P 229.

### b. Catalano

Catalano attended the monthly operational meetings

Page 21

2009 U.S. Dist. LEXIS 28237, *65; Fed. Sec. L. Rep. (CCH) P95,203

with Hartman that included line-by-line review of SPP's and PHS's costs. Id. at PP 3, 11. Each quarter, Catalano specifically certified that he had personally "designed" or "caused" controls at ASG "including its consolidated subsidiaries" to be prepared and that Catalano found these controls to be both adequate and operating correctly. Id. at PP 176-178. Catalano, as ASG's chief executive officer, also signed ASG's SEC filings and financial statements that were relied upon by market analysts and investors. Id. at PP 20-21, 132.

In its April 22, 2002 press release, ASG reported its financial results for the first quarter of 2002, ending March 31, 2002, with healthcare expenses of $ 129.3 million, EBITDA of $ 4.5 million, net income of $ 2 million and earnings per share of $ 0.36 per basic and diluted share. In that press release, Defendant Catalano allegedly stated in pertinent part:

> "The initiatives we have implemented, coupled with an emphasis on strong [*66] fiscal discipline, are producing results. **Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear."**

Id. at P 114 (emphasis added).

In his sworn certifications under the Sarbanes-Oxley Act on the accuracy and reliability of ASG's financial statements and internal controls, Catalano certified that:

> 1. I have reviewed this quarterly report on Form 10-Q of America Service Group Inc.;

> 2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

> 3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly

present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

> 4. **The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined** [*67] **in Exchange Act *Rules 13a-15(e)* and *15d-15(e)* for the registrant and have:**

> a) **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,** to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

> b) **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report** our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

> c) **Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

> 5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors [*68] and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

Page 22

2009 U.S. Dist. LEXIS 28237, *68; Fed. Sec. L. Rep. (CCH) P95,203

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Id. at P 176 (emphasis added). Catalano signed additional such certifications in 2002, 2003, 2004 and 2005. Id. at PP 177, 178.

In his certifications of ASG's 10-K reports filed with SEC in 2003, 2004 and 2005, Catalano verified as follows:

**Disclosure controls and procedures are the Company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934, as amended, (the "Exchange Act") is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls [\*69] and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports that the Company files under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.**

**As of [the end of the period covered by this report], the Company evaluated under the supervision and with the participation of management, including the Chief Executive Officer and Chief**

Financial Officer, the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act *Rule 13a-14* and *Rule 13a-15*. Based upon that evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are effective in timely alerting them to material information that is required to be included in the Company's periodic SEC filings. There have been no significant changes in the Company's internal controls during [the period covered by this report] that have materially affected, or are reasonably likely to materially [\*70] affect, the Company's internal control financial reporting.**

Id. at P 178 (emphasis added). Given ASG's later admissions about the lack of effective internal controls at ASG and SSP, Plaintiffs allege that these certifications are materially false and misleading statements to investors about effective internal controls in ASG's financial operation. Id. at P 179. Plaintiffs allege that as investors, they relied upon these quarterly statements to provide assurances that ASG's financial and other information was accurate.

In addition, Plaintiffs allege that Catalano, who had never sold any of his ASG stock, liquidated more than 90% of his stock in October and November, 2003 after ASG told investors that ASG's expenses margins were under control and after ASG's stock price rose to $ 14.00 a share. Id. at P 319. During the Class Period, Catalano received $ 5.2 million from his stock sales. Id. at PP 320, 321.

### d. Taylor

Taylor, ASG' chief financial officer, oversaw ASG's financial operations. Id. at PP 20-21, 132. According to ASG's website, Taylor is responsible for "direct[ing] the Company's SEC reporting," "corporate accounting," "PHS site accounting," "operational analysis," "budgeting," [\*71] and "investor relations." Id. at P 21. As the primary spokesperson on ASG's financial condition, Taylor controlled and directed the flow of financial information concerning SPP. Id. at PP 148-149,

Page 23

2009 U.S. Dist. LEXIS 28237, *71; Fed. Sec. L. Rep. (CCH) P95,203

153-154. Taylor also signed the same certifications about ASG's financial condition as Catalano. Those certifications are quoted supra at pp. 36-38 Id. at PP 20-21, 132, 176-178.

According to Plaintiffs, during telephone calls with analysts and investors, Taylor made a series of false or misleading statements about SPP's and ASG's financial condition. Id. at PP 158, 162, 225-227. On February 24, 2004, after the announcement of ASG's fourth quarter results in 2003, Taylor allegedly made the following statements about ASG's gross margins:

> Patrick Swindle - Avandale Partners - Analyst
>
> Good morning, gentlemen. The gross margin from continuing operations was about 8.3% during the fourth quarter. The gross margin assuming the guidance for '04 is 6.9%, can you talk a little bit about what drove the gross margins during the fourth quarter, and the implications that has maybe for 2004?
>
> Mike Taylor - America Service Group Inc. - CFO
>
> We gave full-year guidance for 2003 of 6.5% of total gross margin. We ended [*72] the year at 6.6% for the full year. So we did slightly better in the fourth quarter than we anticipated **The main drivers there, you know, we did get some benefit from a couple of new contracts that started later in the year, that operated a little better than we anticipated out of the box;** but we do anticipate that over their complete term that they will operate at margins as we would have expected in the pricing of those contracts. So we got a little benefit there.

Id. at P 148 (emphasis added).

In the subsequent telephone call in response to an analysis questions, defendant Taylor stated about ASG's gross margins:

> Mike Taylor - America Service Group

Inc. - CFO

> [O]ur daily costs run about $ 1.6, $ 1.7 million on an average day. So those are a couple of factors that 1 would put into that as well, but overall, I mean, we're fairly pleased that we're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year.

Id. at P 149 (emphasis added). Plaintiffs allege these statements are false and misleading in light of SPP's and PHS's known practices that inflated ASG's gross margins as reflected by ASG's [*73] restatement. Plaintiffs also allege that Taylor concealed these misleading facts about SPP's and ASG's practices. Id. at P 150.

During a April 27, 2004 telephone conference call with securities analysts to Taylor described the increase in ASG's healthcare expenses and gross margins as follows:

> **Primarily as a result of the new business booked in the first quarter, we are increasing our 2004 guidance for total revenues to 658 million for the year as compared with our previous guidance of 650 million.** This guidance is based only on contracts in operation currently, and does not factor in any potential new business that may be realized later in the year. . . .

Id. at P 153 (emphasis added). In that same conference, Taylor referred to ASG's ability to cut its costs for its customers:

> **Yes, we do think that one of the things we're bringing to our clients this year, and I mentioned it I think on the year-end call, is that we think we're going to be able to mitigate to some degree for our clients their level of increase in cost of our services** and so that - we are seeing some of that based on our mix of cost and that would be our current hopes and anticipation.

Id. at P 154 (emphasis added).

Page 24

2009 U.S. Dist. LEXIS 28237, *73; Fed. Sec. L. Rep. (CCH) P95,203

Plaintiffs [*74] specifically identify as misrepresentations, Taylor's alleged statements about an "increase" in ASG's EBITDA margin in the second half of 2005 and that ASG was "comfortable" with its gross margins. Id. at PP 172 and 173. Plaintiffs allege these statements are factually misleading in their failure to disclose SPP's and PHS's actual practices that inflated ASG's actual margins and profit expectations. Id.

In its March 15, 2006 press release and on the March 16, 2006 telephone conference call with analysts and investors, Taylor attributed ASG's "disappointing" results for the second half of 2005 to the internal investigations of SPP's practices of overcharging customers, concealing manufacturer and distributor discounts and rebates from customers, and cited PHS's "unexpected adverse development in pending malpractice claims" in 2005. Id. at P 217. Taylor stated that ASG's professional liability expense of $ 6.1 million was higher than ASG's original expectations of $ 2.9 million.

Plaintiffs allege that Taylor concealed from investors the extent of ASG's exposure to malpractice claims. Those malpractice claims were greater than Taylor previously represented in ASG's SEC filings. Id. at P 218. [*75] Plaintiffs allege that after public disclosures in the *New York Times* articles about PHS's practices, and despite his personal knowledge of these practices, Taylor made statements attempting to deflect attention from ASG to PHS so as to avoid disclosure of ASG's manipulations of its reserves to meet forecasted results.

In October and November 2003, Taylor first sold more than 90% of his ASG stock. Id. at PP 319-20. These stock sales occurred after Taylor told investors that ASG's costs were under control. Id. Taylor received $ 842,897 from these stock sales. Id. at PP 320 and 321.

### e. Hartman

Hartman who is alleged to control ASG and SPP, was initially responsible for managing all of SPP's operations and approving SPP's financial practices. Id. at PP 22-23, 28, 55, 58, 62-63, 65, 311, 314. Hartman was SPP's President and chief executive officer and later ASG's executive vice- president. Id. at P 22. Plaintiffs allege that Hartman oversaw the preparation of SPP's financial statements that were bases for ASG's allegedly false consolidated financial statements filed with the SEC. Id. at P 132. According to alleged witnesses, former managers and employees at SPP, Hartman assumed direct

control [*76] to manipulate drug prices and sales to PHS and other SPP customers. Hartman allegedly decided whether to approve credits for returned drugs. Id. at P 155. As an ASG officer, Hartman attended the monthly operational meetings with Catalano that included line-by-line accounting of SPP's costs. Id. at PP 3, 11. Plaintiffs allege that ASG fired Hartman because ASG deemed Hartman responsible for instituting SPP's practices that caused ASG's restatement of its financial reports. Id. at P 147.

In 2004, Hartman was also PHS's chief operating officer and prepared PHS's financial statements for ASG. Id. at PP 22 and 132. Hartman also allegedly received reports of PHS's improper patient and medication practices during the period covered by ASG's restatement. Id. at P 158. Hartman attended the monthly operational meetings with Catalano that included line-by-line review of PHS's costs. Id. at PP 3, 11.

### f. Bryson

Plaintiffs allege that Bryson controlled ASG and SPP. Id. at P 352. In October 2004, Bryson, a certified accountant with over 17 years of experience with Price Waterhouse, began as SPP's president and chief executive officer. Id. at P 23. Bryson was allegedly Hartman's "right-hand man" and [*77] became SPP's chief executive officer when Hartman assumed that position at PHS. Id. at P 28. Hartman or Bryson directly approved credits for returned drugs. Id. at P 55. Bryson supervised quarterly inventories at SPP. Id. at P 56. Plaintiffs allege that a witness from SPP will testify that Bryson personally directed SPP's illegal importation of drugs from Canada. Id. at P 65. According to witnesses who oversaw contacts with SPP, Bryson personally handled complaints involving government contracts and conducted weekly SPP management meetings to address important problems. Id. at PP 190, 314.

On March 15, 2006, ASG told investors that the "key managers" responsible for SPP's practices were no longer with ASG. After the revelation of conduct in ASG's internal investigation, Bryson was fired. Id. at P 71. Plaintiffs assert the inference that Bryson was one of the "key members" of ASG's and SPP's management responsible for ASG's losses. Id. at P 222.

In closing of this review of the amended complaint, Plaintiffs allege that their factual allegations about the Defendants' false statements and wrongful conduct are

Page 25

2009 U.S. Dist. LEXIS 28237, *77; Fed. Sec. L. Rep. (CCH) P95,203

based, in part, upon information from former ASG, SPP and PHS executives and employees [*78] who possess firsthand knowledge of the circumstances about ASG, SPP and PHS, ASG's restatement of its financial condition and had direct contact with the individual Defendants. Id. at PP 24,55-72, 185-190, 311-315.

## B. Conclusions of Law

### 1. Standard of Review

For a Rule 12(b)(6) motion to dismiss, the Court must deny the motion if the complaint's factual allegations "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964-65, 167 L. Ed. 2d 929 (2007)*. "[T]he allegations of the complaint should be construed favorably to the pleader." *Scheuer v Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974)* and the Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. Dekalb County, Ga., 433 U.S. 25, 27 n.2, 97 S. Ct. 2490, 53 L. Ed. 2d 557 (1977)*. Yet, a legally sufficient complaint, "requires more than bare essentials of legal conclusions." *Columbia Natural Resources, Inc. v. Tatum, 58 F.3d 1101, 1109 (6th Cir. 1995)* and the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)*.

Moreover, where, as here, fraud is alleged, *Fed. R. Civ. P. 9(b)* requires that "in all averments [*79] of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In a securities action, the heightened pleading standards are to be evaluated as set forth by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights. Ltd., 551 U.S. 308, 127 S.Ct. 2499, 168 L. Ed. 2d 179 (2007)*:

> Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.
>
> We establish the following prescriptions: **First,** faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to

dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. **Second,** courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is whether **all** of the facts alleged, [*80] taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. **Third,** in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

\* \* \*

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e. of the "smoking-gun" genre, or even the "most plausible of competing inferences[.]" . . . [T]he inference of scienter must be more than merely "reasonable" or "permissible" - it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent [*81] and at least as compelling as any opposing inference one could draw from the facts alleged.

Page 26

2009 U.S. Dist. LEXIS 28237, *81; Fed. Sec. L. Rep. (CCH) P95,203

* * *

[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint. . . . [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

* * *

We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter **at least as likely as** any plausible opposing inference.

*127 S.Ct. at 2509-13* (citations omitted) (emphasis in original).

The Sixth Circuit recently restated the Supreme Court's view on a Rule 12(b) motion in a securities action as follows:

Although the PSLRA left the term undefined, the Supreme Court has concluded [*82] that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter. *Tellabs, 127 S.Ct. at 2509*. In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." *Helwig v. Vencor, Inc., 251 F.3d 540, 547 (6th Cir. 2001)*.

In Tellabs, the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under *Section 10(b)*. First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, 127 S.Ct. at 2509*. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Id. (citation omitted). At the second stage, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, [*83] meets that standard." Id. (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter rationally could be drawn." *Id. at 2510*. Rather, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." Id.

Finally, in determining whether the pleaded facts give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id. at 2509*. Because the strength of an inference "cannot be decided in a vacuum," the district court must conduct a "comparative inquiry" and assess the possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id. at 2509-10*.

In defining how this framework is to be applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id. at 2510* (emphasis added). Thus, where two equally

Page 27

2009 U.S. Dist. LEXIS 28237, *83; Fed. Sec. L. Rep. (CCH) P95,203

compelling inferences [*84] can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, Tellabs instructs that the complaint should be permitted to move forward. See *id. at 2510 n. 5*; *ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 59 (1st Cir. 2008)* ("In other words, where there are equally strong inferences for and against scienter, Tellabs now awards the draw to the plaintiff.").

*Frank v. Dana Corp., 547 F.3d 564, 570-71 (6th Cir. 2008).*

The Sixth Circuit ruled that the provisions of *Fed. R. Civ. P. 8* and the requirement of *Rule 9(b)* are to be read in conjunction with each other. *Michaels Bldg. Co. v. Ameritrust Co., N.A., 848 F.2d 674, 679 (6th Cir. 1988).* In *Blount Financial Services v. Walter E. Heller & Co., 819 F.2d 151, 153 (6th Cir. 1987),* the Court explained that "*Rule 9(b)* requiring 'averments of fraud . . . with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." (citation omitted). *Rule 9(b)* is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive [*85] pleading." *American Town Ctr. v. Hall 83 Assocs., 912 F.2d 104, 109 (6th Cir. 1990).*

Under Ameritrust, the plaintiff can satisfy *Rule 9(b)*'s requirements by pleading the circumstances of the fraud, not the evidence. *848 F.2d at 680 n.9.* Since Ameritrust, however, the Sixth Circuit reiterated the rule of this Circuit that *FRCP 9(b)* requires that fraud be pleaded with particularity. To satisfy *FRCP 9(b)*, a plaintiff must "at a minimum **'allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied.'**" *American Town Center, 912 F.2d at 109* (quoting *Bender v. Southland Corporation, 749 F.2d 1205, 1216 (6th Cir. 1948))* (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient under *Rule 9(b).*

The defendants now before the Court

comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt to distinguish among them.

This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is [*86] accused, especially in a case involving multiple defendants. 'The complaint, therefore, may not rely upon blanket references to acts or omissions by all of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'

*Benoay v. Decker, 517 F.Supp. 490, 493 (E.D. Mich. 1981),* aff'd *735 F.2d 1363 (6th Cir. 1984)* [6] (quoting *McFarland v. Memorex Corp., 493 F.Supp. 631, 639 (N.D. Cal. 1980),* (quoting *Jacobson v. Peat, Marwick, Mitchell & Co., 445 F.Supp. 518 (S.D.N.Y. 1977))).*

6  The Supreme Court cited Benoay approvingly albeit on other grounds. *Central Bank of Denver, N.A. v First Interstate Bank of Denver, N.A., 511 U.S. 164, 170, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994)*

More recently in *City of Monroe Employees Ret. Sys. v. Bridgestone, 399 F.3d 651, 689-90 n. 32 (6th Cir. 2005),* the Sixth Circuit noted a split in precedents, including a decision of a district court in this Circuit, on the "group pleading" exception to *Rule 9(b).* This exception applies "in cases of corporate fraud when the false and misleading is conveyed in a prospectus, annual reports, press releases or other group published information [*87] [where] it is reasonable to presume that these are the collective actions of officers." *Id. at 689-90 ns. 32 and 33* (citing *inter alia, In re SmarTalk Teleservices, Inc. Sec. Litig., 124 F. Supp. 2d 527, 545 (S.D. Ohio 2000).* This principle could apply here as Plaintiffs cite ASG's 10-K reports and its press releases that commented on the financial performance of ASG, SPP and PHS. Bridgestone, however, did not adopt this exception and expressly declined to do so. *399 F.3d at 690.* In any event, the Sixth Circuit followed Benoay on this specific pleading rule in *United States ex rel. Bledsoe*

Page 28

Page 28

2009 U.S. Dist. LEXIS 28237, *87; Fed. Sec. L. Rep. (CCH) P95,203

*v. Community Health Systems. Inc.,* 342 F.3d 634, 643 (6th Cir 2003). Despite the group pleading exception's relevance, this Court is bound by existing Sixth Circuit precedents in *Bledsoe* and *Benoay* that a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations.

In addition, in evaluating Plaintiffs' complaint under *Fed.R.Civ.P. 10(c)*, any matters attached to the pleadings are considered part of the pleadings. In *Weiner v. Klais and Co., Inc.,* 108 F.3d 86, 88 (6th Cir. 1997), the Court reiterated the general rule that: "Matters outside the pleadings [*88] are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." (citations omitted). Yet, the Court recognized an exception in securities cases, but only for papers filed by a defendant and referred to a plaintiff's complaint. [7]

> The [district] court held . . .it would consider 'only those exhibits submitted by the defendant which can properly be considered incorporated by reference into the complaint, and, thus, a part of the pleadings.'
>
> **Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.** Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has held that **"[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."** **We believe that this approach is appropriate.**

Id. at 89 (emphasis added and citations omitted) (quoting *Venture Assocs. Corp v. Zenith Data Sys. Corp,* 987 F.2d 429, 431 (6th Cir. 1993); [*89] See also *Nieman v. NLO, Inc.,* 108 F.3d 1546, 1555 (6th Cir. 1997).

[7]  This principle does not extend to extrinsic

evidence *Katt v. Titan Acquisitions, Ltd.,* 133 F. Supp. 2d 632, 637-38 (M.D. Tenn. 2000). The Court cannot presume the truth of the extrinsic information nor use such information in evaluating the pleadings. *Bridgestone,* 399 F.3d at 665; see also *Logan v. Denny's, Inc.,* 259 F.3d 558, 581 n.5 (6th Cir. 2001) (court may not take judicial notice of disputed facts).

Thus, of the factual materials submitted by the Defendants, (Docket Entry Nos. 70, 71 and 79) and the Plaintiffs (Docket Entry No. 74 and 75), the Court will consider only those documents referred to in Plaintiffs' Amended Complaint.

**2. *Rule 10(b)* & PLSRA Standards**

Plaintiffs' claims seek recovery under *§10(b)* of the Securities Exchange Act of 1934 and *Rule 10b-5* promulgated thereunder. Section 10(b) of the Securities Exchange Act of 1934, *15 U.S.C. § 78j,* prohibits the use "in connection with the purchase or sale of any security . . .[of] any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . .[.]" Pursuant to this section, the Securities [*90] Exchange Commission promulgated *Rule 10b-5,* that provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, . . .
>
> ***
>
> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading. . . .

*17 C.F.R. § 240.10b-5.*

The Supreme Court described the purpose of the 1934 Act as follows:

> The 1934 Act was designed to protect investors against manipulation of stock prices. See S. Rep. No. 792, 73d Cong., 2d Sess., 1-5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be

Page 29

2009 U.S. Dist. LEXIS 28237, *90; Fed. Sec. L. Rep. (CCH) P95,203

honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H. R. Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the fundamental purpose' of the Act as implementing a philosophy of full disclosure.'"

*Basic Inc. v. Levinson, 485 U.S. 224, 230, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)* (quoting *Santa Fe Industries. Inc. v. Green, 430 U.S. 462, 477-478, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977)* (quoting *SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963))).*

In [*91] 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") that requires specificity in pleadings in private securities litigation before commencement of discovery:

(b) Requirements for securities fraud action. (1) Misleading statements and omissions. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*] in which the plaintiff alleges that the defendant - -

(A) made an untrue statement of a material fact; or

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind. In any private action arising under this title. . . . [*15 U.S.C. §§ 78a et seq.*], the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a strong

inference that the defendant [*92] acted with the required state of mind.

(3) Motion to dismiss, stay of discovery. (A) Dismissal for failure to meet pleading requirements. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*], the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

* * *

(B) Stay of discovery. In any private action arising under this title [*15 U.S.C. §§ 78a et seq.*], all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party the particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

*15 U.S.C. §78u-4(b)(1)(A), (b), 2* and *3(b).*

The purpose of the PSLRA was to "protect investors, issuers and all who are associated with our capital markets from abusive securities litigation" as well as "to implement [] need[ed] procedural protections to discourage frivolous litigation." H.R. Conf. rep. 104-369, 104th Cong. 1st Sess. 31, 31 (1995). Although Congress added the necessity of "strong inference," the Sixth Circuit later clarified that the PSLRA did not alter the recklessness standard [*93] for scienter in federal securities actions. *In re Comshare Inc. Sec. Litig., 183 F.3d 542, 550 (6th Cir. 1999).* As to the elements of a Section 10(b) claim, the Sixth Circuit recently restated the elements as follows: "To state a securities fraud claim under *Section 10(b),* a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.'" *Dana Corp., 547 F.3d at 569-70* (quoting *In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999)).*

Plaintiffs assert multiple theories of liability for their *Section 10(b)* and Rule 10(b)(5) claims: (1) Defendants' misrepresentations or misleading statements on ASG's costs, statement of reserves and profitability; (2) the

Page 30

2009 U.S. Dist. LEXIS 28237, *93; Fed. Sec. L. Rep. (CCH) P95,203

Defendants engaged in manipulative scheme to omit material facts about the actual practices of SPP and PHS in breaching their contracts to reduce ASG's costs in connection with the sale of ASG's securities; (3) the Defendants' motive and opportunity for these securities violations; and (4) the Defendants' fraud on the market in their concealment [*94] of PHS's and SPP's actual practices.

The core of the Defendants' motion focuses on the insufficiency of Plaintiffs' allegations of scienter for the various aspects of ASG's omissions and its subsidiaries' alleged financial and business practices as well as the individual Defendants' related misrepresentations and omissions. Yet, in various parts of their supporting memoranda, the Defendants also challenge whether Plaintiffs adequately pled any material misrepresentations or pled any false or misleading statements or actionable business practices under the securities laws. To evaluate all of these contentions, requires a review of Plaintiffs' specific allegations on each element of their securities claims under their theories of liability and the alleged role of each individual defendant in ASG's, SPP's and PHS's statements and conduct impacting ASG's financial condition.

**Materiality**

An element common to all of Plaintiffs' claims is materiality. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.'" [*95] *Basic Inc., 485 U.S. at 231-32*. The Court deems it noteworthy that the Supreme Court referred to information "such as earnings forecasts or projections" as "contingent or speculative information." *Id. at 232 n.9*. The Supreme Court, however, did not decide that issue. Id.

In its opinion in Bridgestone, the Sixth Circuit noted that at the motion to dismiss stage, omissions should be considered material unless the omitted information was so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Bridgestone, 399 F.3d at 681* (quotation omitted); see also *Ganino v. Citizens Utilities Co., 228 F.3d 154, 162 (2d Cir. 2000)* (quoting *Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985)*); *Arber v. Essex Wire Corp., 490 F.2d 414, 418 (6th Cir. 1974)* (The test for materiality is "whether a reasonable man

would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question."). The materiality requirement does not require that the defendant communicated the misrepresentation directly to the plaintiff. *In re Kidder Peabody Sec. Litig., 10 F. Supp. 2d 398, 407 (S.D.N.Y. 1998)*. [*96] Unless written misrepresentations are material, such misrepresentations are not actionable. *Radol v. Thomas, 772 F.2d 244, 252 (6th Cir.1985)*.

On this element, in its periodic reports to the SEC, ASG acknowledged and a market analyst reported that ASG's gross margins were the primary metric to evaluate ASG's business performance, including SPP's performance. Id. at P 37. In its 2005 Report on Form 10-K, AGS stated that "[a] material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." Id. at P 286. Under the circumstances here, the Court concludes that misrepresentations or omissions about SPP's and/or PHS's business practices that create or cause adverse financial impact for ASG, affecting ASG's gross margin to a significant degree satisfy the materiality requirement under *Rule 10(b)* precedents.

For the remaining analysis, the Court addresses first Plaintiffs' allegations of the Defendants' material misrepresentations and omissions about ASG's financial condition and SPP's and PHS's practices that adversely [*97] impacted ASG's costs.

**a. Plaintiffs' Misrepresentation Claims**

As to these claims, Defendants argue that Plaintiffs's amended complaint does not identify a single false statement and also challenge the following allegations in the Plaintiffs' amended complaint as conclusory. (Docket Entry No. 69, Defendants' Memorandum at p 43 citing PP 7, 58, 75, 132, 142, and 330-33 of the Plaintiffs' Amended Complaint). Defendants also contend that the allegations in the following paragraphs of Plaintiffs' Amended Complaint are forward-looking statements that are protected by PSLRA's safe harbor provisions. Id. at pp. 44 and 46, listing PP 113-17, 119-26, 148-49, 151-54, 156-57, 159-161, 164, 168, 171, 210-13, 215, and 217.

In their response in opposition to the Defendants' motion to dismiss, Plaintiffs identify the Defendants' allegedly false statements in their amended complaint as

Page 31

2009 U.S. Dist. LEXIS 28237, *97; Fed. Sec. L. Rep. (CCH) P95,203

set forth in the following paragraphs PP 18, 22-23, 132, 147, 194, 197, 311-15, 328 and 334. Plaintiffs also cite the Defendants' false or misleading statements as reflecting the followings categories that are described in their amended complaint:

(1) ASG[]'s quarterly and annual financial statements, along with various [*98] statements made in press releases and on conference calls describing those results (PP 130-173, 232-324);

(2) Statements regarding the reliability of ASG[]'s financial statements and the system of internal controls in place at ASG[] and its subsidiaries, including the Sarbanes-Oxley Act of2002 ("Sarbanes-Oxley Act" or "SOX"), 15 U.S.C. PP 201, et seq.. certifications made by ASG[], Catalano and Taylor (PP 174-191, 285-292);

(3) Statements regarding ASG[]'s accounting policies and its purported compliance with those policies (PP 192-197);

(4) Statements regarding ASG[]'s compliance with the terms of its government contracts, and the laws and regulations governing the performance of its obligations under those contracts (PP 198-208); and

(5) Statements regarding ASG[]'s exposure to medical malpractice claims (PP 209-219).

(Docket Entry No. 73, Plaintiffs' Memorandum at pp. 5-6). Plaintiffs contend that the Defendants are tied to these statements in PP 22-23, 28, 55, 58, 62-63, 65, 311, and 314 of their amended complaint. Id. at p. 42.

In reply, the Defendants contend that many of Plaintiffs' citations of their challenged statements lack specificity as to which particular statement is false [*99] and most of these paragraphs contain statements that are mixed with forward looking statements that are protected as a matter of law.

As set forth below, several of the statements in the

paragraphs cited by the Plaintiffs for this section are general and conclusory in nature and refer to other unspecified statements in other unspecified paragraphs. As examples, paragraphs 22 and 23 are general descriptions of Hartman's and Bryson's position and duties. Paragraph 132 asserts that all of the defendants participated in the "making of the statements contained herein" and cites Hartman's and Bryson's responsibilities to oversee and prepare SPP's financial statements. Paragraph 147 refers to statements made during a telephone conference call. Paragraph 194 refers to statements about ASG's and SPP's accounting policies and Catalano's and Taylor's signatures on SEC filings as well as Hartman's and Bryson's responsibilities for SPP's compliance with ASG's accounting policies. Paragraph 197 refers generally to ASG's SEC filings signed by Catalano and Taylor and the responsibilities of Hartman and Bryson. Paragraphs 311 through 315 describe ASG's monthly meetings to discuss budgets and planning [*100] and the attendance of Catalano, Hartman and Taylor.

The Court fails to understand these conclusory references as stating specific misrepresentations or misleading statements. To be sure, some of these paragraphs refer to other statements in the amended complaint in unspecified paragraphs, but the Court is uncertain as to which specific statements Plaintiffs refer. Plaintiffs fail to analyze which part of these referenced statements contains hard information or protected soft information that could be converted into actionable statements. The Court cannot simply surmise the Plaintiffs' rationale on these issues. The Court therefore will address only the portions of the paragraphs in Plaintiffs' amended complaint that Plaintiffs cited to **and** which Plaintiffs supplied emphasis to portions of these paragraphs or quoted statements of a defendant.

### (1) ASG[]'s quarterly and annual financial statements, (PP130-173, 232-324)

Plaintiffs allege that due to ASG's restatement and the changes regarding five years of ASG's operation, the Defendants have admitted that during the Class Period, all of ASG's prior financial statements and SEC filings are false and misleading for every quarter for five years. [*101] In its restatement, ASG admitted that SPP had materially overstated its net income by at least $ 2.1 million, overcharged customers by at least $ 3.6 million and undercharged others from whom it could no longer

Page 32

2009 U.S. Dist. LEXIS 28237, *101; Fed. Sec. L. Rep. (CCH) P95,203

collect by at least $ 5.9 million. Plaintiffs also assert false and misleading statements, based upon conflicts between the Defendants' statements about SPP's and PHS's improved management to control costs and published reports about PHS's and SPP's actual practices. Id. at PP 174-191 and 285-292. Plaintiffs allege the actual impact of SPP's practices was greater than disclosed because ASG based these estimates on only 30% of SPP's sales and excluded SPP's sales to PHS. Id. at PP 222, 229. In addition, Plaintiff refer to ASG's statement about its "2004 Guidance" that appears to be from a SEC filing: "Pre-tax income from continuing and discontinued operation is expected to be approximately $ 22.8 million in 2004 . . . ." Id. P 152. In its 2003 Form 10-K report, ASG also represented that:

> Management establishes reserves for the estimated losses that will be incurred under these insurance policies using internal and external evaluations of the merits of the individual claims, analysis [*102] of claim history and the estimated reserves assigned by the Company's third-party administrator. . . . **The Company is not aware of any material unasserted claims and, based on its past experience, would not anticipate that potential future claims would have a material adverse effect on its consolidated financial position or results of operations.** Any adjustments resulting from the review are reflected in current earnings.

Id. at P 211 (emphasis added). ASG repeated these statements in its Form 10-Q Report issued on May 10, 2004, August 9, 2004, November 9, 2004, and March 14, 2005. Id. at P 212.

Plaintiffs also cite a chart of ASG's reported reserves for medical claims liability. Id. at P 213. After *The New York Times* articles and legal actions, ASG raised its reserves for malpractice claims to more than $ 6 million. Id. at P 94. Thus, Plaintiffs allege false representations in ASG's statements about its exposure to legal claims.

The controlling issue is whether these cited representations involve "soft" or "hard" information." *Bridgestone, 399 F.3d at 669*; accord *Zaluski v. United American Healthcare Corp., 527 F.3d 564 (6th Cir.*

*2008)*. "Hard information is typically historical information [*103] or other information that is objectively verifiable. Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable." *In re Sofamor Danek Group, Inc., 123 F.3d 394, 401 (6th Cir. 1997)*. "The failure to disclose soft information is actionable only if it is virtually as certain as hard information." *Bridgestone, 399 F.3d at 669* (quotation omitted). "Hard information is typically historical information or other factual information that is objectively verifiable. (internal quotations omitted). . . . 'Soft information,' on the other hand, includes 'predictions and matter of opinions.'" Id. (internal quotations omitted). Under the PSLRA, safe harbor protection is available for a firm's statements that are "defendants' projections, statement of plans and objectives, and estimates of future economic performance" *15 U.S.C. § 78u-5(c)(1)*, but this statutory protection can be overcome 'if the statement is material; if the defendant had actual knowledge that it was false or misleading; and if the statement was not identified as a forward-looking or lacked meaningful cautionary statements." *Helwig, 251 F.3d at 547-48*, abrogated [*104] on other grounds by *Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L. Ed. 2d 179 (2007)*.

Defendants cite paragraphs 113-17, 119-26, 148-49, 151-54, 156-57, 159-61, 164, 168, 171, 210-13, 215 and 217 of the Plaintiffs' Amended Complaint as reflecting projections of ASG's revenues, income, earnings per share, and other financial items such as medical claims liability reserves, that are covered by forward-looking statements safe harbor of the PSLRA. *15 U.S.C. 78u-5(i)(1)(A)*. As to the other PP 130 through 173 reciting figures and statements from ASG financial reports and SEC filings, upon review and with certain exceptions, the Court agrees that these statements are for the most part projections of future earnings and projected costs and are not actionable.

To the extent that some "hard facts" are included in these corporate statements, Plaintiffs contend that the extent of ASG's restatement and any future restatements cannot be decided on a motion to dismiss, citing *In re Envoy Corp Securities Litig. 133 F. Supp. 2d 647, 662 (M.D. Tenn. 2001)* ("the district court should decide the issue of materiality only if the alleged misrepresentations are so clearly and obviously [*105] unimportant that reasonable minds could not differ in their answers to the

Page 33

2009 U.S. Dist. LEXIS 28237, *105; Fed. Sec. L. Rep. (CCH) P95,203

question") (quoting *Semerenko v. Cendant Corp., 223 F.3d 165, (3d Cir. 2000)*). Yet, under subsequent Sixth Circuit precedent, the fact of restatement involving millions of dollars alone does not render the original statement of those finances to be actionable nor to meet the requisite scienter as a matter of law. *PR Diamonds, 364 F.3d at 686* (a corporate restatement that corrects millions of dollars in inaccuracies is not material). Consistent with PR Diamonds, the effect of ASG's restatement depends upon its "type and size" and must be evaluated in the totality of the circumstances in Plaintiffs' other allegations that are discussed at length infra. Id. In sum, under *PR Diamonds*, ASG's restatement alone does not provide an actionable claim for misrepresentations based solely on ASG's prior statements of its finances.

As to ASG's statements about its future exposure and its subsequent increase in reserves for PHS's medical claims, after *The New York Times'* articles, ASG increased its reserves for malpractice claims by $ 6.1 million. Id. at P 94. Statements about medical reserves are forward looking statements [*106] and are protected by the PSLRA. *In re Kindred Healthcare Inc. Securities Litig., 299 F. Supp. 2d 724, 738 (W.D. Ky. 2004)* ("The amount [a company] keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience . . . . Assertions about the adequacy of [defendant's] reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.") [8] .

> 8    In light of *Bridgestone*, this increase in reserves must be revisited in the analysis of Plaintiffs' omissions claims.

Defendants correctly note that ASG warned investors during the Class Period of risk factors that might cause actual malpractice expenses to exceed reserves. (Docket Entry No. 70, Appendix 4 at pp. 7-8; Appendix 2 at pp. 10-11). Such warnings render any projections inactionable as a matter of law. See *Miller v. Champion Enter., Inc., 346 F.3d 660, 678 (6th Cir. 2003)* (forward-looking statements accompanied by meaningful cautionary language are protected by PSLRA's safe harbor provisions). Moreover, [*107] "[t]he mere fact that [a company] increased its reserves for doubtful accounts in [one period] does not, by itself, call into

question the accuracy of the [earlier period reserves]." *In re Sprint Corp. Sec. Litig., 232 F. Supp. 2d 1193, 1227 (D. Kan. 2002)*. "[T]he failure to establish adequate reserves [] is generally not sufficient to establish securities fraud." *In re E.Spire Commc'ns, Inc. Sec. Litig., 127 F. Supp. 2d 734, 748 (D. Md. 2001)*.

The Court concludes that as a matter of law, Plaintiffs' claims based upon the Defendants' statements in PP 130-173 and 232-324 are not actionable.

## (2) ASG's Press Releases and Defendants' Catalano and Taylor's Published Statements

Plaintiffs apply the same rationale to the Defendants' other statements, namely that because of ASG's restatement of five years of its finances, any prior press statements about ASG's finances are false or misleading. Plaintiffs cited the following specific statements about ASG's financial condition in their first amended complaint as misrepresentations or misleading statements that occurred during conference calls and in press releases:

> . In a March 18, 2002 press release, Catalano told investors that ASG had "developed [*108] a corrective cause of action focused on a return to predictable financial results". (Docket Entry No. 60, Amended Complaint at P 34);

> . On that same date, Catalano stated that "debt levels had been significant reduced." Id. at P 112;

> . On April 22, 2004 Catalano alleged commented: "The initiatives we have implemented, coupled with an emphasis on strong fiscal discipline, are producing results. Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear." Id. at P 114

> . February 22, 2004 conference call during which Taylor told investors ASG's costs were "$ 1.6 to $ 1.7 million on an average day." Id. at P 149;

> . "[W]e're giving guidance that says

Page 34

2009 U.S. Dist. LEXIS 28237, *108; Fed. Sec. L. Rep. (CCH) P95,203

we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year." Id. P 149;

. "W]e are increasing our 2004 guidance for total revenues to 658 million for the year . . . ." Id. P 153;

. In the April 27, 2004 conference call, Defendant Taylor's stated ASG's purported ability to cut expenses for its clients:"Yes, we do think that one of the things we're bringing to our clients this year, and [*109] I mentioned it I think on the year-end call, is that we think we're going to be able to mitigate to some degree for our clients their level of increase in cost of our services and so that - we are seeing some of that based in our mix of costs and that would be our current hopes and anticipation." Id. at P 154

. In a July 27, 2004 conference call, Taylor stated, inter alia, "I would anticipate something in 7.3 to 7.5 [%] range for the Company in the second half of the year. It is coming primarily from repricing of contracts.... So we do anticipate we will see that improved performance in the second half of this year. And that is really what has been contemplated all along. Maybe a little better than we thought initially as we started the year are our expectations for the second half at this point" Id. P 157;

. In a press release, ASG reported: The Company is maintaining most aspects of its previous guidance for 2004 . . . ." Id. P 160;

. The October 26, 2004 conference call included Taylor's statement that "[Quite frankly, SPP has been a significant part of generating new business revenue growth on a year-to-date basis" Id. P 161

. In a February 7, 2005 press release, ASG stated: "The Company [*110] has significantly reduced the volatility of its

contract portfolio over the last several years . . . ." Id. P 164; and

. During a July 25, 2005 conference call, Taylor is quoted as stating "Anton, we do expect the second half to see an increase in that EBITDA margin, as you pointed out, in our guidance. The 4.5% [margin] or so for the first half certainly was a solid start for the year All along we had expected to see an improvement in that in the second half. That improvement primarily is going to be driven by the gross margin percentage improving in the second half. Once again that was in line with our initial expectations for what the year would hold." So it is really going to be a gross margin improvement in our expectations that gets us to that higher level of EBITDA margin. .... Certainly as we sit here in July, I mean, we are comfortable with these guidance figures for the full year. So there is nothing at this point that would change that view." Id. P 171.

Insofar as the February 24, 2004, April 27, 2004 and October 26, 2004 conference calls and the July 2, 2004 and October 25, 2004 press releases involve statements on ASG's stated guidance, Id. at PP 153, 154, 156, 157, 160, 161), [*111] the Court concludes that with exceptions noted below, these statements about guidance and other quoted projections and opinions about ASG's expectations of its future profits are not actionable as soft information.

The first exception is ASG's October 25, 2004 press release on ASG's financial results for the third quarter ending for September 30, 2004, when Catalano described ASG's cost increases:

We are disappointed in the additional reserve necessary to cover losses under our Maryland contract through its expiration on June 30, 2005. In the meantime, the **Company will faithfully adhere to the terms of our contract and continue our commitment to provide quality healthcare to our patients.** We

Page 35

2009 U.S. Dist. LEXIS 28237, *111; Fed. Sec. L. Rep. (CCH) P95,203

remain confident in the long-term prospects of the Company. The rest of our contract portfolio continues to produce expected financial results, cash balances are increasing and **we are debt free as of the end of the quarter.**

Id. at P 159. As discussed infra, this opinion about being in compliance with contracts is capable of verification by objective evidence of SPP's and PHS's practices.

Another exception is in its February 7, 2005, press release, wherein ASG stated:

This ongoing process of adjusting [*112] the Company's contract portfolio has resulted in 88% of the Company's healthcare contracts and all pharmacy contracts has of December 31, 2004, representing 74% of Total Revenues in the fourth quarter, **have structures that limit the Company's exposure to increases in hospitalization and other off-site medical expenses."**

Id. at P 164.

The third exception is the April 27, 2005 conference call with securities analysts when securities analysts asked about the ASG's ability to maintain its gross margins and expenses and Taylor responded as follows:

Anton Hie - Jefferies & Co. - Analyst

Okay. How about the current quarter month-end here, do we think we will see the margins holding steady here, now that some of those utilization issues that caused the fourth-quarter spike are behind us?

Mike Taylor - America Service Group - CFO

Well, we are always subject to that volatility, and that is kind of the point on those contracts. **Certainly at this point, Anton, things are tracking along with our expectations. That is why we've maintained the guidance that we have for the full year. So early into the**

**second quarter, we don't see anything that changes that impression.**

Id. (emphasis added).

Here, ASG's restatement [*113] reflects ASG's admission that its internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG's consolidated financial statements would be prevented or detected in a timely manner." Id. at P 80. Defendants contend that the cumulative effect or bottom line effect of all of these alleged wrongful practices is relatively small. Yet, the common theme that emerges from Plaintiffs' allegations is that the key to ASG's profitability is ASG's control of its subsidiaries' costs and the ratio of ASG's healthcare costs to its total revenue. Plaintiffs allege that a market analyst advised investors that ASG's medical expense ratio, *i.e.,* healthcare expenses as a percentage of revenue, is the critical factor in ASG's success and warned investors that "subtle changes in this ratio can have a significant impact on the company's profitability." Id. at P 37.

Under PR Diamonds, a company's "type and size" are important in evaluating financial errors and related statements. *PR Diamonds, 364 F.3d at 686.* From a management perspective, ASG, SPP and PHS are small companies with a few key managers that includes at least one interlocking officer, [*114] Hartman who served as SPP's chief executive officer, PHS's chief executive officer and ASG's executive vice-president. Although ASG has contracts nationwide, ASG's, SPP's and PHS's policies are set in Brentwood and Franklin, Tennessee. ASG and PHS operated out of the same building in Brentwood. (Docket Entry No. 60, Amended Complaint at PP 17 and 19). SPP's headquarters were just nine miles away in Franklin. Id. at P 18. Management of ASG and its subsidiaries frequently met with one another (including the individual defendants named here) to conduct detailed, line-by-line reviews of costs and operations at each facility. Id. at PP 310-316. SPP's accounting errors are based allegedly upon SPP's well-known defective computer program for pricing and SPP's manual. Governmental inquiries revealed that PHS's activities were a product of corporate management to reduce PHS's costs.

In these circumstances, with all favorable inferences to the Plaintiffs' factual allegations as required for this

Page 36

2009 U.S. Dist. LEXIS 28237, *114; Fed. Sec. L. Rep. (CCH) P95,203

type of motion, the Court concludes that a balancing of inferences results in a reasonable and strong inference for these statements of ASG, Catalano and Taylor about ASG's costs, and that these statements [*115] involve material facts and are actionable as securities claims.

**Statements and certification by ASG, Catalano and Taylor regarding the reliability of ASG's system of internal controls in place at ASG and its subsidiaries, including the Sarbanes-Oxley Act of 2002 (PP 174-191, 285-292)**

For their next category of false and misleading statements, Plaintiffs cite Catalano's and Taylor's Sarbanes-Oxley certifications during the Class Period falsely assuring investors that Catalano and Taylor had personally designed, checked, and monitored ASG's and its subsidiaries' systems of internal controls that would reasonably design to uncovered any accounting manipulations. As pertinent here, these certifications provided as follows:

**The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act *Rules 13a-15(e)* and *15d-15(e)* for the registrant and have:**

a) **Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,** to ensure that material information relating to the registrant, **including its consolidated subsidiaries,** is made known [*116] to us by others within those entities, particularly during the period in which this report is being prepared;

b) **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report** our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) **Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; . . . .**

Id. at P 176 (emphasis added). Catalano and Taylor signed such alleged false certifications in 2002, 2003, 2004 and 2005. Id. at PP 177, 178.

As to the Sarbanes-Oxley certifications, courts have declined to treat corporate officers' signature for such certifications, as a per se violation where accounting errors or mistakes are revealed by a subsequent audit. *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) ("We agree with the Eleventh Circuit that a Sarbanes-Oxley certification is only probative [*117] if the person signing the certification was severely reckless in certifying the accuracy of the financial statements") (citation omitted); see also *In re PhyCor Corp. Sec. Litig.*, No. 3:98-0834, 2000 U.S. Dist. LEXIS 2218 (M.D. Tenn. Feb. 17, 2000) (upholding §10(b)(5) claims where, at time defendants made false positive statements about PhyCor Corporation's financial condition at times when controls were known to be inadequate).

As to the Sarbanes-Oxley certifications, Catalano and Taylor certified that their personal responsibilities on these control measures included ASG's "consolidated subsidiaries." Id. at 60. Every quarter, Catalano and Taylor specifically certified that they had each personally reviewed the controls at ASG "including its consolidated subsidiaries" during the past 90 days, and found them to be both reasonably adequate. Id. at PP 176-178. Here, ASG Catalano, chief executive officer and Taylor, chief financial officer, specifically undertook responsibility for designing, maintaining, and certifying the adequacy of the internal controls at PHS that shares offices with ASG and SPP that is nine miles away. Id. at PP 18, 175-178. Catalano and Taylor were the signatories. Plaintiffs [*118] allege specific facts that these Defendants participated in fiscal meetings for SPP and PHS. As to SPP, the structural deficiency in SPP's computer system, Plaintiffs specifically allege a former SPP officer asserts that Catalano and Taylor knew of this computer's structural deficiencies that could not compute customer

Page 37

2009 U.S. Dist. LEXIS 28237, *118; Fed. Sec. L. Rep. (CCH) P95,203

rebates required by SPP's contracts. Upon these specific factual allegations, Plaintiffs' certification claims against Catalano and Taylor are actionable.

As to Defendants Hartman and Bryson, Plaintiffs' amended complaint "is devoid of a single specific factual allegation suggesting that either [of them] played any role in drafting, reviewing, or approving any of these certifications, that Plaintiffs contend were false or misleading." (Docket Entry No. 69, Defendants' Memorandum at p. 43). If the Plaintiffs' claims were limited to misrepresentations, the Court would agree that these Defendants should be dismissed. Yet, Plaintiffs also assert a theory of liability, discussed in more detail infra, that all of the Defendants engaged in a scheme or plan to inflate the value of ASG stock and under that theory, the defendants are alleged to be intimately involved. Hartman and [*119] Bryson prepared SPP's financial reports for ASG. Hartman and Bryson allegedly personally made the decisions whether to give credits for returned drugs were approved directly by Hartman or Bryson. Id. at P 55. Bryson supervised quarterly inventories at SPP. Id. at P 56. Plaintiffs allege, through direct witness testimony, that Bryson personally directed SPP's illegal importing of drugs from Canada. Id. at P 65.

With Plaintiffs' alternative theories of liability, the Court concludes that these statements are actionable as to Hartman and Bryson only as evidence that the Defendants engaged in a manipulative scheme in "connection with" ASG's sales of its securities.

### b. Plaintiffs' Omissions Claims

The flip side of Plaintiff's misrepresentation claims are Plaintiffs' omissions claims that the Defendants failed to disclose ASG's actual business practices and costs that were understated due to SPP's and PHS's practices that breached their contracts with governmental entities. Two related theories of liability are Plaintiffs' theories of "Fraud on the Market" and the Defendants' scheme or device in "connection with" the sales of ASG's securities theories that are also based omissions about SPP's [*120] and PHS's unlawful practices.

These omissions are alleged to be clear and material because the published news reports and legal actions disclosing SPP's and PHS's business practices caused ASG's restatement of its SEC filings and financial statements for five years. Plaintiffs allege that ASG's accurate cost data was omitted from ASG's press releases,

Catalano's and Taylor's statements to investors, and market analysts during conference calls. In addition, Plaintiffs contend that SPP's and PHS's breaches of their contracts evince widespread practices that the Defendants' knew about or were reckless in not knowing of these practices that were critical to ASG's control of its costs and to ASG's profitability.

In response, Defendants contend that the limited number of instances of PHS's alleged breaches of its contracts lack the required numerosity to find material omissions or to evince an actionable scheme to defraud investors. (Docket Entry No. 78, Defendants' Reply at pp. 2, 7).

As a threshold issue, to violate *Rule 10b-5* for omissions or nondisclosures, the defendant must have an affirmative duty to disclose the material fact because "[s]ilence without a duty to disclose, is not misleading [*121] under *Rule 10b-5*". *Basic Inc., 485 U.S. at 239 nns. 17, 18*. The materiality of the information does not create a duty to disclose. *Sofamor Danek, 123 F.3d at 402*. "Ordinarily, at least, a company is under no obligation to disclose the details of its merchandising practices" *Sofamor Danek, 123 F.3d at 400*. Yet, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to subjects on which it undertakes to speak." *Zaluski, 527 F.3d at 572* (quoting *Rubin v. Schottenstein, 143 F.3d 263, 268 (6th Cir. 1998)*. Moreover, where a company's corporate officers "elected to make statements such as the statement regarding. . . . 'objective data,' the company is required to qualify that representation with known information undermining (or seemingly undermining) the claim." *Bridgestone, 399 F.3d at 673*. The concealment of such data must be "known exclusively to the Defendants." *Id. at 676*.

Here, ASG had a duty to disclose material facts because ASG had to file SEC reports on its business. ASG, Catalano and Taylor also owed a duty to disclose material facts when they elected to make other statements in press releases and conference calls about ASG's healthcare [*122] revenues and costs. As ASG's restatement reflects, ASG's expenses were misstated every quarter during the five year period. ASG's reported cost margins - one of the most important metrics to investors - were unreliable during the entire Class Period. Id. at PP 97, 134-135, 225-228, 236-245. In its restatement, ASG admitted that SPP had overstated its

Page 38

2009 U.S. Dist. LEXIS 28237, *122; Fed. Sec. L. Rep. (CCH) P95,203

net income by at least $ 2.1 million, overcharged customers by at least $ 3.6 million, and undercharged others from whom it could no longer collect by at least $ 5.9 million. Id. at P 222. The cost of investigating and correcting these practices was $ 7.7 million that is twice ASG's net income for the entire 2005 fiscal year. Id. at P 74.

As to the materiality of these nondisclosures, the Defendants cite the cumulative effect of the challenged practices on ASG's earnings of $ 347,000 with increased tax liability of $ 355,000. As stated earlier, with the exclusion of SPP's transactions with PHS and the sampling of only 30% transactions, the figures stated by the Defendants may be understated. ASG's profitability depended on ASG's control of its subsidiaries' costs. ASG admitted that the ratio of ASG's healthcare costs to its total revenue [*123] was the critical metric for its business. Significantly, Plaintiffs allege that a market analyst advised investors that "subtle changes in this ratio can have a significant impact on the company's profitability." (Docket Entry No. 60, Amended Complaint at P 37). Moreover, ASG's restatement admittedly was based only on a small sample of transactions (only 30% of SPP"s Class Period revenues). ASG's restatement allegedly excluded analysis of affected inter company earnings to achieve better results or to understate its actual losses or the scope of SPP's misrepresentations of its finances. Id. at PP 63-64. ASG's restatement conceded that additional restatements could be required due to SPP's accounting manipulations. Id. PP 229-23. As a result, a reasonable and strong inference arises that ASG understated the true impact of SPP's accounting practices. There is not a competing inference to explain these omissions about ASG's business practices.

The Court concludes that the Defendants' cited omissions of SPP's and PHS's actual practices and their cost effects on ASG's financial condition involve material facts and are actionable.

### c. The "In Connection With" Theory

The next related theory is [*124] that SPP's and PHS's business practices were a scheme that influenced the investors' purchases of ASG's securities and ASG did not disclose those practices to investors. *Section 10(b)* and *Rule 10b-5 Section 10(b)* extend to prohibit material omissions where there is "the commission of a manipulative act in connection with the sales of securities." *Cent. Bank of Denver, N.A. v. First Interstate*

*Bank of Denver, N.A., 511 U.S. 164, 177, 114 S. Ct. 1439, 128 L. Ed. 2d 119 (1994).* In *SEC v. Zandford, 535 U.S. 813, 819, 825, 122 S. Ct. 1899, 153 L. Ed. 2d 1 (2002)*, an action under *§ 10(b)* and *Rule 10b-5*, the Court unanimously adopted the SEC's "broad reading of the phrase 'in connection with the purchase or sale of any security,'" and held that such "connection" occurs if the "fraudulent scheme" and a securities transaction "coincide." Earlier in *Affiliated Ute Citizens v. United States, 406 U.S. 128, 153, 92 S. Ct. 1456, 31 L. Ed. 2d 741 (1975)*, the Supreme Court deemed the "first and third subparagraphs [of *Rule 10b-5*]" to include a securities claim based upon "a 'course of business' or a 'device, scheme or artifice' that operated as a fraud [where] the defendants devised a **plan** and induced [stockholders] to dispose of their shares without disclosing to them material facts." [*125] (emphasis added).

To be sure, in *Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 477, 97 S. Ct. 1292, 51 L. Ed. 2d 480 (1977)*, the Supreme Court stated that *Section 10(b)* did not encompass "instances of corporate mismanagement." Rather, "*Section 10(b)*'s general protection of practices deemed by the SEC to be manipulative 'in this technical sense of artificially affecting market activity in order to mislead investors is fully consistent with the fundamental purpose of the 1934 Act to substitute a philosophy of full disclosure for the philosophy of caveat emptor. . . .'" *Id. at 476-77* (quoting *Affiliated Ute, 406 U.S. at 151* (quoting *SEC v. Capital Gains Research Bureau, 375 U.S. 180, 186, 84 S. Ct. 275, 11 L. Ed. 2d 237 (1963))).* "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Santa Fe Industries, 430 U.S. at 477.*

Zandford also cautioned that "our analysis does not transform every breach of duty into a federal securities violation." *535 U.S. at 825 n.4.* In *Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 128 S.Ct. 761, 766, 169 L. Ed. 2d 627 (2008)*, the Supreme Court applied the Zandford standard and rejected securities claims premised on alleged losses after purchasing common [*126] stock and "sought to impose liability on entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors' company to mislead its auditor and issue a misleading financial statement affecting the stock price. We conclude the implied right of action does not reach the customer/supplier companies because the investors

Page 39

2009 U.S. Dist. LEXIS 28237, *126; Fed. Sec. L. Rep. (CCH) P95,203

did not rely upon their statements or representations." Moreover, "the text of the 1934 Act does not in itself reach to those who aid and abet a § 10(b) violation." *Central Bank, 511 U.S. at 177.*

Under this theory, the challenged corporate practices should be "statistically significant", *In re Carter-Wallace, Inc. 220 F.3d 36, 41 (2d Cir. 1998)* or "widespread," as "anecdotal" occurrences do not evince an unlawful business scheme in connection with the sales of securities. *In re Spectrum Brands, Inc. Sec. Litig., 461 F. Supp. 2d 1297, 1310-11 (N.D. Ga. 2006).* Yet, in this Circuit, less frequent omissions, such as omissions of governmental scrutiny and legal actions over a company's practice of selling defective products, were held actionable in *Bridgestone, 399 F.3d at 670-80.*

This Court has found that "plaintiffs' allegations regarding [*127] Columbia's failure to disclose that it engaged in improper business practices" is an actionable omission under *Rule 10b-5. Morse v. McWhorter, 200 F. Supp. 2d 853, 861 (M.D. Tenn. 1998)* vacated on other grounds *290 F.3d 795 (6th Cir. 2000).* See also *In re Rent-Way Sec. Litig., 209 F.Supp.2d 493, 508-09, 516-18 (W.D. Pa. 2002)* (upholding claims based on concealment of defects in internal accounting systems and controls).

The core of Plaintiffs' "in connection with" claims are ASG's, SPP's and PHS's business practices that caused ASG's financial condition and ASG's officers' statements about ASG'S financial condition to be false and misleading. In summary, the individual practices are:

    1. SPP's computer practices that manipulated ASG's costs and revenues by delaying entry of falling prices rebates and discounts to customers so as to change higher price and to avoid credits to its customers.

    2. PHS's practice of denying patients off-site hospitalization and higher medications and shifting staff personnel to reduce ASG's violations of PHS's contracts.

    3. ASG's practice of terminating complaining employees and quick settlements of legal actions to avoid disclosures of PHS's practices as well [*128] as various government

investigations of PHS.

    4. ASG's lack of internal controls over SPP's and PHS's practices despite ASG's key executive officers' assurances to investors of such controls in public statements and ASG financial statements and certifications.

For these practices, Plaintiffs' allegations are based upon ASG's restatement and evidence from former officers and employees of ASG, SPP and PHS about these entities' practices.

On whether the defendants' practices nos. 1 and 2 were widespread, the Court deems probative the remarks of state and local governments about the results of their inquiries into PHS's practices.

    . **In late 2000,** government investigators looking into a string of inmate deaths in upstate **New York noticed a pattern of inadequate healthcare under PHS' direction, including, "low-level employees [who] were doing work normally done by better-credentialed people" and nurses without proper qualifications or working on suspended licenses, "making medical decisions and pronouncing patients dead." "Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the New York State Commission of Correction's director** [*129] **of operations.**

    . **In 2001 in Broward County, Florida, three state court judges ordered PHS to stop withholding expensive psychiatric drugs from inmates after they witnessed a parade of inmates showing in the court incoherent. "My impression was that it was money," Judge Susan Lebow told The New York Times. "The doctors were under corporate direction to not continue the medications."**

    . Judge Lebow's concerns were eerily similar to those that had been raised in

Page 40

2009 U.S. Dist. LEXIS 28237, *129; Fed. Sec. L. Rep. (CCH) P95,203

2000 by five juvenile court judges in New York who had repeatedly taken PHS to task for failure to provide juvenile inmates with proper medication. Brooklyn Family Court Judge Philip C. Segal held the company in contempt for failing to give HIV medication to a teenage inmate. Bronx Judge Harold J. Lynch ordered a teenage girl to be taken out of PHS' care when she tried to commit suicide after her psychiatric medication was inexplicably discontinued. After another 14-year old girl suffering from bipolar disorder whose medication had been similarly discontinued appeared in Judge Paula J. Hepner's courtroom, the jurist told city lawyers that **the incident "is not just a single case. It's many cases."**

. And following one inmate's death [*130] **in 2001, the New York State Commission of Corrections denounced PHS as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."**

Id. at P 144 (emphasis added).

As noted earlier, the market recognized that only small percentage increases in ASG' gross margin could adversely impact ASG's profitability. After the New York Times articles of February and March, 2005 about PHS's practices in the second half of 2005, ASG's third quarter financial statements revealed its costs had risen to 99.7%, the highest level since 2001. Id. at P 89. SPP's revenue dropped 18%. Id. at P 91. ASG missed its guidance on net income by 83.5%; EBITDA fell by 42.5% and earnings per share by 74.5%. Id.

As to practice 3, Plaintiffs identify several legal actions against the Defendants for PHS's practices and ASG's increase of $ 6.1 million for future medical malpractice claims. Plaintiffs cite other legal actions by employees who were terminated for complaining about PHS's practices. Id. at PP 52 and 53. SPP's accounting practices were structurally defective as SPP's highly restrictive computer program for prices consistently did not record credits for rebates and discounts for SPP's customers. [*131] Plaintiffs also allege that SPP resold drugs from partially used "blister packs" without

crediting customers for returns. Id. at PP 55, 56. Yet, these re-sales of returned drugs are not shown to violate SPP's individual customer agreements. Plaintiffs do not tie these resales to the accounting improprieties at SPP. Plaintiffs' allegation of Hartman's alleged reference to the sales as "recycling," id. P 62, fails to raise a strong inference of scienter. However, SPP's extensive purchases of drugs from Canada also evinces a pattern and practice of corporate misconduct. SPP's circumvention of federal regulations by smuggling low-cost prescription medications into the United States from Canada is another unlawful practice to control ASG's costs and to meet ASG's market expectations for performance.

For the reasons stated above, the Court deems Plaintiffs sufficiently allege that PHS's and SPP's practices are widespread and systemic, as reflected in the extent of ASG's restatement and revised losses. The Court concludes that Plaintiffs' allegations demonstrate that nondisclosures of these practices constituted material omissions about ASG's actual practices, costs and gross margins during [*132] the class period and are actionable.

### d. Fraud on the Market

The "Fraud on the Market" theory of liability under *Rule 10b-5* rests upon a presumption of reliance upon a showing of the Defendants' affirmative withholding of material facts affecting ASG's sale of securities. In Affiliated Ute, the Supreme Court considered securities fraud claims involving the sale of stocks by a corporation that was created under the Ute Partition Act, *25 U.S.C. §§ 677-677aa.* This corporation was organized to manage the Ute tribes' oil, gas and mineral asserts. In the sale of the corporations' stock, certain individuals who were selling stock, withheld from investors information that there was not a method to determine the stock's true value. The Supreme Court stated as to the reliance factor that:

> Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision. .

Page 41

2009 U.S. Dist. LEXIS 28237, *132; Fed. Sec. L. Rep. (CCH) P95,203

. [citations omitted]. This obligation to disclose and this withholding of a material fact establish [*133] the requisite element of causation in fact.

*406 U.S. at 152-53*. The rationale for presumption of reliance, in essence, is that it is impossible for the plaintiffs to show reliance upon facts there were not disclosed to them.

Subsequent decisions have clarified the Affiliated Ute presumption as limited to these circumstances in which there was an affirmative withholding of facts by a person under a duty to speak, i.e., where "the defendants . . . stand mute in the fact of a duty to disclose as did the defendants' in Affiliate Ute." *Kirkpatrick v. J.C. Bradford, 827 F.2d 718, 722 (11th Cir. 1987)*. In Kirkpatrick, the Affiliated Ute presumption was held not to apply were "the allegations contend that the defendants undertook . . . to disclose relevant information . . . alleged to contain certain misstatements of facts and fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading." *Id. at 722*.

Here, given ASG's press releases and Catalano's and Taylor's public statements, these Defendants owed a duty to not withhold material facts about ASG's, SPP's and PHS's business from investors. To avoid undue repetition, the Court adopts its earlier [*134] stated rationale on Plaintiffs' omission for Plaintiffs' "in connection with" theories, to conclude that Plaintiffs' complaints states an actionable "fraud on the market" claim for the above cited omissions.

### 4. Plaintiffs' Scienter Allegations

To be sure, the ultimate issue on this motion is whether Plaintiffs' factual allegations present a strong inference of scienter. If the complaint fails to satisfy the scienter requirement, the Court must dismiss the plaintiffs complaint upon a motion of the defendant. *15 U.S.C. § 78u-4(b)(3)*. "[T]he Supreme Court has defined 'scienter' as a 'mental state embracing intent to deceive, manipulate or defraud.'" *In re Comshare, 183 F.3d at 548*. "Under current Sixth Circuit law, 'recklessness [also] satisfies the § 10(b)/Rule10b-5 scienter requirement.'" Id. Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man

would have known of it." *Id. at 550*.

In Ley, the Sixth Circuit noted:

[These] factors . . . . while not exhaustive, are probative of scienter in securities fraud cases:

(1) insider trading at a suspicious [*135] time or in an unusual amount;

(2) divergence between internal reports and external statements on the same subject;

(3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

(4) evidence of bribery by a top company official;

(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

(6) disregard of the most current factual information before making statements;

(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

. . . . . We find this list, while not exhaustive, at least helpful in guiding securities fraud pleading.

*543 F.3d at 810* (citation omitted).

Page 42

2009 U.S. Dist. LEXIS 28237, *135; Fed. Sec. L. Rep. (CCH) P95,203

Of the actionable practices and conduct listed in *Ley*, the following are presented under Plaintiffs' factual allegations of scienter: "(1) insider trading at a suspicious time or in an unusual amount;" "(2) [*136] divergence between internal reports and external statements on the same subject;" "(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;" "(6) disregard of the most current factual information before making statements;" "(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;" and "(8) the self-interested motivation of defendants." Plaintiffs also assert that the Defendants' possessed the requisite motive and opportunity to intentionally commit these acts and to be reckless in their statements giving rise to Plaintiffs' claims.

**"[I]nsider trading at a suspicious time or in an unusual amount"**

Prior to October 2003, Plaintiffs allege that Catalano had never sold any of his ASG stock, but he liquidated more than 90% of his stock in October and November 2003, after ASG told investors that ASG's expense margins were under control and after ASG's stock price rose to $ 14.00 a share. Id. at PP 13, 19-32. Catalano received $ 5.2 million from his stock sales. Id. at PP 320, 321. In October and November 2003, Taylor first sold more [*137] than 90% of his ASG stock. Id. at PP 13, 19. These stock sales occurred after Taylor told investors that ASG's costs were under control. Id. Taylor received $ 842,897 from these stock sales. Id. at PP 320 and 321. Plaintiffs allege that SPP's and PHS's unlawful contract practices were implemented to inflate the value of ASG's stock so as to increase Catalano's and Taylor's profits on their sales of their stock options. Id. at PP 30-40, 92-98, 319-324. The Court deems the Plaintiffs' other allegations of insider trading to lack an adequate time to evaluate those trades for scienter purposes.

For the Catalano and Taylor trades, the Defendants cite the time disparity between these insider trades in 2003 to the disclosure of PHS's practices in February 27, 2005 as precluding any inference of scienter, citing *In re Vantive Corp. Sec. Litig., 283 F.3d 1079, 1093-94 (9th Cir. 2002)* (insider trading more than a year before the press release of alleged damaging news did not give rise to a strong inference of scienter); *In re Kindred Healthcare, 299 F. Supp. 2d at 741* (stock sale eleven

months before announcement of charge to earnings was not suspicious).

Yet, Plaintiffs allege that the timing [*138] of these trades was to maximize their profits before public disclosures of SPP's and PHS's improper practices. Plaintiffs' theory is that a reasonable and strong inference arises from the suspicious timing i.e. the date of the new cost control measures that ASG and these defendants enacted in April, 2002, supra at pp. 9-10, and the October and November 2003 insider trades of Catalano and Taylor. These insider trades occurred after improper cost control measures had been implemented to reduce ASG's costs and to inflate the value of ASG's stock. The cost controlling measures are the SPP's and PHS's deliberate practices that give rise to Plaintiffs' claims. These facts neutralize any favorable inference. In this context, the Court concludes that Plaintiffs present a reasonable and strong inference of insider trading as to Catalano and Taylor.

**"[D]ivergence between internal reports and external statements on the same subject"**

On the internal inconsistency, ASG cited the existence of its internal controls, but ASG's restatement found a lack of internal controls that caused SPP's revenues to be systematically inflated for SPP's failure to credit customers their share of rebates, discounts [*139] and return credits. An employee, a fulfillment manager who reported directly to Hartman and Bryson, allegedly relates that SPP deliberately took advantage of CIPCS's shortcomings to manipulate the timing of price changes - inputting rising prices into the system before customer invoices were sent, and delaying input of falling prices until after invoices issued at outdated higher prices had been generated. Id. at PP 55 and 60. CIPCS's inability to track more than one purchase price for any drug was allegedly well-known to the Defendants. E.g., PP 59-63, 185-191. The information contained in the C1PCS database also clearly reflected that customers were not receiving credits for returned drugs, despite the fact that SPP's warehouse was overloaded with returns and had no place to store them. Id. P 61. SPP's manual demonstrates how pervasive and routine these practices were at SPP. ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. Id. at PP 26, 309. PR Diamonds cited approvingly of precedent that found a strong inference arising where the company "touted the

Page 43

2009 U.S. Dist. LEXIS 28237, *139; Fed. Sec. L. Rep. (CCH) P95,203

individual Defendants' careful monitoring [*140] of the very areas in which Intrenet committed accounting violations." *364 F.3d at 688* (citation omitted). The Court reiterates its earlier conclusion that PHS's unlawful practices were widespread. The Court discerns an unfavorable inference from the Defendants' nondisclosure of SPP's and PHS's practices.

Thus, the Court concludes Plaintiffs' allegations create a strong inference of scienter to state a valid claim given the clear and significant inconsistencies between ASG's published statements of its internal costs control and ASG's management strong focus on those controls and the lack of such controls for SPP's and PHS's actual practices.

**"[E]xistence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit"**

According to Plaintiffs, a highly critical report of an investigation into the death of a Schenectady County inmate was due to PHS' refusal to provide medication needed to treat the inmate's Parkinson's disease. *The New York Times* quoted the Schenectady county attorney, Chris Gardner: "We were going to terminate them for cause, [b]ut they approached us and we mutually agreed to terminate the relationship." Id. at P 48. ASG also settled [*141] another action for a Florida inmate in September, 2005. Id. at P 51. As stated earlier, ASG set aside $ 6.1 million in reserves for future medical malpractice claims. Plaintiffs also refer to SPP and PHS employees who were terminated or forced to resign when they complained of SPP's and PHS's practices. Id. at PP 52, 53. The Court concludes that Plaintiffs' allegations about this practice are actionable given the deliberate nature of the practice.

**"[D]isclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication"**

Plaintiffs allege ASG's restatement disclosed only limited information about SPP's accounting impropriety by disclosing only the "net" or "cumulative" impact of the misconduct. ASG allegedly deliberately failed to provide complete restated quarterly financial statements that would have revealed the extent to which quarterly results had been manipulated by the Defendants' illegitimate accounting practices. Id. at PP 83-84, 229, 246-260.

Plaintiffs allege defendants did so in order to confuse investors about the impact of their fraud and to support their "net impact" argument in this action. [*142] In its restatement, ASG allegedly engaged in improperly "reclassifying" hundreds of millions of dollars in revenue during the Class Period. Id. PP 87, 246-260. These alleged acts allegedly destroyed the comparability of prior quarterly results, making it near impossible for all but the most sophisticated investors to unravel ASG's restatement and determine the extent to which investors had been misled. Id. at PP 87, 246-260

In the Sixth Circuit, misleading financial presentations that are intended to confuse rather than illuminate, can provide a strong inference of scienter. *Bridgestone, 399 F.3d at 684*. As to Defendants' suggestion that ASG's restatement treatment is legitimate given the approval of outside auditors, Plaintiffs note that these same auditors also approved ASG's prior financial statements for five years covered by ASG's restatement. In any event, this argument raises fact issues that cannot be resolved on a motion to dismiss. See e.g., *Aldridge v. A.T. Cross Corp., 284 F.3d 72, 83 (1st Cir. 2002)* (auditors' failure to require restatement does not conclusively prove that financial statements complied with GAAP).

In this Court's view, despite the cost of $ 7.7 million in [*143] ASG's internal investigation, ASG sampled only 30% of SPP's transactions and excluded SPP's sales to PHS. ASG conceded the prospect of future restatements and future customer claims for rebates and credits. Coupled with the alleged accounting errors, the Court concludes that these circumstances support a reasonable and strong inference that ASG's restatement is misleading as to the full extent of SPP's practices and their impact on ASG's financial condition.

**Plaintiffs' other Scienter Contentions**

To meet the scienter requirement, Plaintiffs' allegations must describe "multiple, obvious red flags." *PR Diamonds, 364 F.3d at 687*; *In re Comshare, 183 F.3d at 553*. In considering this issue, the Court must consider the totality of circumstances pled in the complaint and "sift Plaintiffs' allegations individually and then aggregate the nuggets of inference they generate...." *PR Diamonds, 364 F.3d at 684*.

**ASG's Restatement**

Page 44

2009 U.S. Dist. LEXIS 28237, *143; Fed. Sec. L. Rep. (CCH) P95,203

Again, the key to most of Plaintiffs' allegations and claims arise from the effect of ASG's restatement revealing differences from ASG's prior financial reports and the public statements of Defendants ASG, Catalano and Taylor. Yet, in the Sixth Circuit, "Plaintiffs' claim that [*144] a subsequent revelation of the falsehood of previous statement implies scienter lacks merit, since mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *In re Comshare, 183 F.3d at 553.* Moreover, a company's restatements of its finances involving millions of dollars has been rejected as evincing scienter. *PR Diamonds, 364 F.3d at 671.* As to Plaintiffs' contention that ASG's restatement covered five years, "although Plaintiffs speculate that it is likely that Defendant knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest on speculation and conclusory allegations." *In re Comshare, 183 F.3d at 553* (internal quotes omitted). Based upon *PR Diamond* and *In re Comshare*, the Court concludes that the restatement alone does not give rise to a strong inference of scienter.

**Sarbanes-Oxley Certifications**

Plaintiffs cite Catalano's and Taylor's certifications under Sarbanes-Oxley, that the Company's internal controls systems are "designed . . . to provide reasonable assurance regarding reliability of financial reporting." (Docket Entry No. 60, Amended Complaint [*145] at PP 176-78) (emphasis added). ASG cites its Form 10-Ks for both 2004 and 2005 disclosing that its internal controls were subject to "inherent limitations" and "may not prevent or detect misstatements." (Docket Entry No. 70, Appendix 2 at p. 30; Appendix 1 at p. 37). In Garfield, the Sixth Circuit stated "If we were to accept [Plaintiff's] proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." *466 F.3d at 1266.*

As stated earlier, under *Bridgestone*, the Court must also consider these certifications in light of the other circumstances alleged by the Plaintiffs. To be sure, a court "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls." *In re Comshare, 183 F.3d at 554.* Where "Plaintiffs have failed to plead facts that show that revenue recognition errors at [a subsidiary] should have been obvious to [the parent company] or that [the parent company] consciously disregarded 'red flags' that would have revealed [*146] the errors prior to their inclusion in public statements, . . . the Complaint fails to allege facts that give rise to a strong inference of scienter under *§10(b)* and *Rule 10b-5*" *Id. at 553, 554*; see also *Ley, 543 F.3d at 812.*

For the reasons stated earlier, the Court concludes that Plaintiffs allege specific facts about ASG's consolidated financial statements and SPP's and PHS's practices as to controlling ASG's costs. ASG is a small, close-knit corporate family where executive officers met and shared detailed information about SPP's and PHS's actual costs and practices or were informed about these practices by other corporate employees before their public disclosure. Based upon the collective circumstances of Catalano's and Taylor's certifications of their personal involvement in ASG's and its subsidiaries' internal cost controls, Catalano's statement of ASG's management's "intense focus" on ASG's subsidiaries' costs, ASG's meetings and extensive corporate knowledge of SPP's and PHS's practices, and the internal reports to Catalano by PHS's officers of PHS's unlawful practices, the Court concludes the Plaintiffs' allegations give rise to strong inferences of scienter. These factual [*147] allegations, collectively, establish the red flags to create a strong inference of the Defendants' scienter, whether intentional or reckless.

**ASG's GAAP Violations**

As to Plaintiffs' claims for the Defendants' alleged violations of GAAP standards in ASG's reporting of its financial condition, Plaintiffs contend that essence of "cookie jar" accounting is to "smooth" a company's earnings by under-reporting revenues in "fat" quarters so they can be held over and reported in "lean" quarters. (Docket Entry No. 60, Amended Complaint at PP 85-86).

ASG allegedly admitted that "key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to its budgeted results." Id. at PP 75-76, 87,145, 222, . This practice, commonly referred to as "cookie jar" accounting, allegedly demonstrates the Defendants' deliberate effort to manipulate improperly SPP's accounting to achieve desired results. *Id. at P 277.*

Page 45

2009 U.S. Dist. LEXIS 28237, *147; Fed. Sec. L. Rep. (CCH) P95,203

As to ASG's revenue and cost recognition policy, ASG's March 28, 2002 SEC 10-K Report stated, in pertinent part:

Revenue and Cost Recognition

The Company's contracts with correctional [*148] institutions are principally fixed price contracts adjusted for census fluctuations. Revenues earned under contracts with correctional institutions are recognized in the period that services are rendered. **Cash received in advance for future services is recorded as deferred revenue and recognized as income when the service is performed.** Healthcare expenses include the compensation of physicians, nurses and other healthcare professionals including any related benefits and all other direct costs of providing the managed care. **The cost of healthcare services provided or contracted for are recognized in the period in which they are provided based in part on estimates, including an accrual for unbilled medical services rendered through the balance sheet dates.** The Company estimates these medical claims reserve using an actuarial analysis prepared by an independent actuary taking into account historical claims experience (including the average historical costs and billing lag time for such services) and other actuarial data.

Id. at P 113.

In addition, Plaintiffs cite the lack of internal controls at SPP that caused SPP's clients not to receive credits due under their contracts. Plaintiffs allege [*149] that ASG admitted its lack of internal controls in its restatement:

[T]he lack of adequate "internal control procedures necessary to reasonably detect material errors in revenues, expenses, accounts receivable, inventory, and accrued expenses, or to assure that SPP's customers were being charged in

compliance with the terms of their contracts. Among the internal controls that were lacking during the Class Period were procedures necessary to ensure that contractual pricing terms were allowed when customers were billed, returns were properly credited to customer accounts, and ASG[]'s finance department reviewed SPP's monthly accounting reconciliations to prevent improper use of accruals and reserves and other accounting gimmicks used to manage or inflate reported results. See ASG[]'s FY05 Report on Form 10-K, Item 9A. **For example, as recounted by numerous former employees of SPP, ASG[] and its management knew that the Company had recurrent problems with maintaining accuracy in financial reporting due to its use of computer systems that were unable to properly manage sales and expense dates. CIPCS, SPP's system in place at the start of the Class Period, or earlier, repeatedly caused lost [*150] or delayed prescription orders, and was unable to track and apply contract-specific pricing terms. CIPCS' replacement, called SPIN, was plagued with similar problems from the time it was improperly launched in June 2005. See infra §VII.C.**

**In this 2005 Form 10-K ASG[] admitted that the Company's internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG[]'s consolidated financial statements] would be prevented or detected in a timely manner."**

Id. at PP 78 and 79 (emphasis added).

Plaintiffs set forth a series of financial statements and cite GAAP rules and bulletins to reflect their contentions that ASG's restatement of its finances for 2000, 2001, 2003, 2004 and 2005 violated GAAP standards. Id. at P 234-237, 241, 243, and PP 248, 278 and 292. Plaintiffs add that after the restatement, ASG

Page 46

2009 U.S. Dist. LEXIS 28237, *150; Fed. Sec. L. Rep. (CCH) P95,203

failed to amend its 14 Form 10-K reports that contained the same information that needed to be revised on other documents. Id. at P 243. ASG's report on its 2005 fiscal year 10-K, reflects that ASG reclassified revenues as "discontinued operations." Id. at PP 246-247.

Based on these GAAP violations, Plaintiffs allege that these "reclassifications" [*151] are adjustments with adverse tax consequences. Id. at P 246. Specifically, Plaintiffs challenge ASG's reclassification of contracts as improper under GAAP.

> ASG claimed that the "reclassification" of revenues was required by FASB Statement of Financial Accounting Standards ("SFAS") No. 144 to reflect revenues from contracts that had been cancelled or would not be renewed as resulting from discontinued operations. Because, however, ASG had *already* applied SFAS No. 144 at the time its financial statements were originally issued, no such change was required or permitted by SFAS No. 144. Nor did Accounting Principles Board ("APB") Opinion No. 20, which governs ASG's restatement, permit ASG to retroactively reclassify the revenues in its past financial statements, absent recognition that those revenues were false at the time they were originally reported.

Id. at P 250.

Plaintiffs contend that the Defendants' accounting errors were not minor because ASG's restatement here impacted five years of ASG's financial results, resulting in changes to virtually every line item and metric important to investors, including its revenues, expenses, cost margins, EBITDA (Earnings Before Interest, Taxes, Depreciation, [*152] and Amortization), inventory, accounts receivable, accrued expenses and reserves. Plaintiffs allege ASG overstated its income for continuing operations by $ 18 million and understated its income from discontinued operations by $ 14 million. Id. at P 248. For these collective practices, Plaintiffs allege that "[a]s a result of these accounting manipulations, ASG's reported revenues, healthcare expenses, SG&A expenses, gross margins, medical expense margins, total cost margins, EBITDA, net income, EPS, inventory, A/R,

and accrued expenses were materially false and misleading to investors. Id. at P 268

In this Circuit, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare, 183 F.3d at 553* (citations omitted). To give rise to an inference of scienter, accounting violations must be of a "type and scope" to be "obvious" or to show the "'magnitude' 'pervasiveness' and 'repetitiveness' of the company's violations of 'simpl[e] accounting principles' amounting to a night-and-day difference.'" *PR Diamonds, 364 F.3d at 684, 685* (quoting *In re MicroStrategy, Inc.Securities Litig., 115 F. Supp. 2d 620, 636, 637 (E.D. Va. 2000)*). For accounting [*153] errors to suffice, the Plaintiffs must also allege facts "that Defendants knew or could have known of the errors or that regular procedures should have alerted them to the errors sooner than they actually did." *In re Comshare, 183 F.3d at 553*. Yet, accounting errors can be "viewed in combination with other allegations." Id.

The accounting errors at SPP were structural in that SPP's computer system lacked the programming capability to calculate correctly and reflect the amounts owed to clients in rebates or discounts from SPP's sellers or from returned medications. As to the effect of SPP's customer billing errors and other accounting irregularities, ASG notes that SPP contributed less than 6% to its aggregate revenues during the alleged Class Period. (Docket Entry No. 60, Amended Complaint PP 5, 222, 225, 228). Yet, SPP was identified as a key source of ASG's future growth. Id. at P 161. ASG restated previously filed financial statements for the years ended December 31, 2001 through December 31, 2004 and for the first six months of 2005. ASG's restatement reduced prior reported net income for these periods by $ 2.1 million in the aggregate, as reflected in the Effects of Restatement [*154] schedule, and reduced previously reported retained earnings as of January 1, 2001 by $ 347,000. Plaintiffs also allege that Defendants made additional corrective disclosures on October 24, 2005 (announcement of internal investigation) and March 16, 2006 (announcement of results of investigation: restatement of earnings), which caused material drops, 28.1% and 28.8%, in ASG's stock price, respectively. Id. at PP 300, 304-305.

Plaintiffs allege that Catalano, Taylor, Hartman and Bryson closely monitored ASG's reported margins and medical expenses, particularly the pharmacy, staffing and

Page 47

2009 U.S. Dist. LEXIS 28237, *154; Fed. Sec. L. Rep. (CCH) P95,203

off-site utilization costs that caused ASG's 2001 losses and are the core of the underreported expenses during the Class Period. PP 328-333. Plaintiffs allege that through regular meetings and systematic reports detailing performance at each prison where ASG operates, ASG's key officials knew of the expense trends and other business practices at PHS and SPP. Id. at P 26, 308-316. ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. Id. at PP 26, 309.

Despite contentions that ASG maintained a control environment that [*155] complied with the Treadway COSO standard, one of the strictest and highest standards of internal control, ASG admitted to numerous, and basic structural deficiencies in its internal control systems during the Class Period, including the lack of procedures to assure that: (i) contract pricing rules are placed in SPP's accounting systems; (ii) changes to customer pricing rules be documented; and (iii) written policies to define pricing and return policies. Id. at PP 183, 287-289.

In combination with the Defendants' other alleged statements, nondisclosures and corporate practices, the Court concludes that Plaintiffs' allegations of systemic accounting violations add to the strong inference of the Defendants' scienter.

**Motive and Opportunity Allegations**

With the analyses of the various statements, nondisclosures and unlawful business practices, the Court now addresses Plaintiffs allegations of the Defendants' "motive and opportunity" that Plaintiffs assert also give rise to a "strong inference" of scienter. As to the motive, Plaintiffs cites the Defendants' reaction to negative business conditions in the second quarter of 2001, when SPP's drug and PHS's off-site utilization expenses caused [*156] ASG's healthcare margins to reach 99.7% of revenues, and reduced its stock value from $ 18.94 to $ 8.04 per share. (Docket Entry No. 60, Complaint at PP 4, 33-37). Plaintiffs' theory is that Defendants' concealed SPP's improper accounting actions that artificially reduced SPP's costs below contractually required levels to address ASG's 2001 results. Id. at PP 42-82, 308-316. Plaintiffs assert that these two key circumstances demonstrate the Defendants' motivation to falsify information to assure investors that ASG had remedied its past cost containment problems.

Financial pressures may provide the motive. *PR*

*Diamonds, 364 F.3d at 688*; *In re Cardinal Health, Inc. Sec. Litigs., 426 F. Supp. 2d 688, 726-27 (S.D. Ohio 2006)*. "[S]elf-interested motivation of defendants in the form of saving their salaries" can supports scienter. *Bridgestone, 399 F.3d at 687*. "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide motive. *Telxon, 133 F. Supp. 2d at 1029*. Plaintiffs' allegations are that the individual Defendants' motives were also to secure promotions and to enhance their compensation. In this Circuit "an executive's desire to protect his position [*157] within a company or increase his compensation" does not "comprise a motive for fraud." *PR Diamonds, 364 F.3d at 690*, nor are allegations that Defendants would receive bonuses linked to company performance sufficient. *In re Kindred Healthcare, 299 F.Supp.2d at 741*.

The Court concludes that collectively, Plaintiffs' factual allegations give rise to a strong inference of scienter from the Defendants' motive and opportunity to engage in these practices. With the results of 2001, ASG's gross margin had a 99.7% level of costs, SPP lost 18.5% in revenue, and ASG's chief financial officer was terminated. Plaintiffs assert that these circumstances demonstrate the Defendants' motivation to falsify information to assure investors that ASG had controlled its past cost containment problems and to remain a financially viable company in which to invest. Plaintiffs allege the Defendants' responses to these conditions were to institute **systemic** business practices at PHS that refused to provide contractually required medical services to inmates, understaffed its medical operations, prisons, and failed to credit the government for required rebates, discounts and product returns at SPP. [9] Id. at PP 5-6,42-72. [*158] These alleged practices had a direct positive effect on ASG's operating margins that investors utilize to analyze ASG's performance. Id. at PP 32-41, 88-91, 281-283. When these practices were instituted without effective or any meaningful internal controls, ASG experienced a reversal of ASG's earnings and a significant rise in the value of ASG's stock during the Class Period. Id. at PP 88-91. Without reasonably effective cost controls or accounting review, the factual information in ASG's reports on its financial condition were admittedly serious, inaccurate and misleading.

[9] Plaintiffs allege defendants' fraud began prior to the class period. Id. at PP 111-127.

To undermine the inference of scienter, ASG cites its

Page 48

2009 U.S. Dist. LEXIS 28237, *158; Fed. Sec. L. Rep. (CCH) P95,203

repurchase of some $ 3 million worth of shares of its own stock in furtherance of a $ 30 million stock repurchase program between the July 26, 2005 announcement of the program and suspension of the program in fall 2005 during the pendency of the Audit Committee investigation. To be sure, "[a] [*159] company's decision to reinvest its own stock undermines an inference of scienter because it presumably would make no sense to purchase that stock if defendants knew the prices to be inflated." *Morse, 200 F. Supp. 2d at 898* (internal quotation marks omitted). There are ambiguous inferences for these Defendants' purchases of ASG stock. Yet this repurchase decision occurred after publication of the New York Times articles in February and March, 2005 and in that context, this repurchase program does not gives rise to a favorable inference.

As to Plaintiffs' allegations about the firing of Hartman and Bryson, the adoption of sweeping internal Reforms, and the resignation of members of ASG's Audit Committee, some courts do describe these events as unusual. As one court recognized in similar circumstances:

> This was strong medicine. Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls. These circumstances, combined with the announcement of the impending restatement, establish a strong inference that the company itself believes that fraud led to materially misleading [*160] financials for the period in question. . . .

*In re Sipex Corp. Sec. Litig., 2005 U.S. Dist. LEXIS 30854, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005).*

In closing, Plaintiffs rely on former ASG executives for their allegations on the origin, nature and cause of ASG's and SPP's false accounting practices. With specific factual allegations, and Plaintiffs' anonymous sources are not altogether irrelevant to the scienter analysis. *Ley, 543 F.3d at 811.* A complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions, or public documents for its allegations of specific facts on a

company's internal operations. *Novak v. Kasaks, 216 F.3d 300, 313-14 (2d Cir. 2000).* Plaintiffs note that the naming of such sources is not required. Id. For example, statements of former vice presidents are permissible to describe the information they personally related to Catalano about problems at sites where they were personally responsible for overseeing operations. (Docket Entry No. 60, Amended Complaint at PP 51-52). Hearsay is a sufficient basis on which to allege such facts in a complaint. *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988, 144 F.R.D. 613, 617 (E.D.N.Y. 1992).*

In [*161] sum, the Court concludes that collectively, Plaintiffs' factual allegations are sufficiently specific to give rise to a strong inference of recklessness in the Defendants' actionable misrepresentations, omissions and unlawful business practices as set forth above.

## 5. Plaintiffs' Section 20(a) Claims

Section 20(a) of the Securities Exchange Act, *15 U.S.C. § 78t, Section 15 of the 1933* Act, and *Section 20(a)* of the 1934 Act impose legal responsibilities upon the "controlling person" in a publicly traded company for violations of the Securities Act by their agents, subject to certain defenses. *Section 15* of the 1933 Act provides as follows:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 771 of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts [*162] by reason of which the liability of the controlled person is alleged to exist.

*15 U.S.C. § 77o.* Similarly, *Section 20(a)* of the 1934 Act provides:

> a. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or

Page 49

2009 U.S. Dist. LEXIS 28237, *162; Fed. Sec. L. Rep. (CCH) P95,203

regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action

Under federal securities law, the controlling person must be an actual participant and in control of the specific activity at issue. *Sanders Confectionery Prods. v. Heller Fin., Inc., 973 F.2d 474, 486 (6th Cir. 1992)*. "[E]ssential elements" for a control person is of "power to control the specific transaction or activity upon which the primary violation is predicated" **and** "actual participation (i.e., exercise control) in the operations of the primary violator in general." (emphasis added). "Because 'controlling person' liability is derivative, however, a plaintiff may hold a defendant liable under this theory [*163] only if the defendant controlled an entity that violated the Securities Act." *D.E. & J. Limited P'ship v. Conaway, 133 Fed. Appx 994, 1001 (6th Cir. 2005)*. Accord *In re Prison Realty Secs. Litig., 117 F. Supp. 2d 681, 692 (M.D. Tenn. 2000)*; *Azzolini v. Corts Trust II for Provident Financial Trust I, 2005 U.S. Dist. LEXIS 31853, 2005 WL 2253971, at *13 (E.D. Tenn. Sept. 16, 2005)*. PSLRA's strong inference requirement does not apply on this claim. See *Florida State Bd. of Administration v. Green Tree Financial Corp., 270 F.3d 645, 660 (8th Cir. 2001)*. "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Nat'l Century Fin. Enters., Case No. 2:03-md-1565, 2006 U.S. Dist. LEXIS 16612, 2006 WL 469468, at *23 (S.D. Ohio Feb. 27, 2006)*.

In *In re Telxon Corp. Secs. Litig., 133 F. Supp. 2d 1010 (N.D. Ohio 2000)*, that court explained as to corporate officials:

> [T]itles and functions alone do not establish "controlling person" status. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed. Further, there must be some showing of actual participation in the activities which allegedly violated the securities [*164]

laws.

*Id. at 1032*. See also *Bomarko, Inc. v. Hemodynamics, Inc., 848 F. Supp. 1335, 1339 (W.D. Mich. 1993)*.

As applied here, Plaintiffs have sufficiently alleged that ASG controls SPP and PHS as the sole owner of PHS and SPP. SPP controlled its own financial statements, that were incorporated into ASG's consolidated financial statements, and to that extent SPP controlled SG. ASG had direct control over SPP as reflected in its firings of the individual defendants Hartman and Bryson. In these circumstances, control is presumed as to Defendants ASG and SPP. See *In re Advanced Lighting Techs., Inc., Case No. 1:99 CV 0836, 2000 U.S. Dist. LEXIS 20628, at *22-23 (N.D. Ohio June 6, 2000) (section 20(a)* sufficiently pled).

ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. Id. at PP 26, 309. PR Diamonds cited approvingly of precedent that found a strong inference arising where the company "touted the individual Defendants' careful monitoring of the very areas in which Intrenet committed accounting violations." *364 F.3d at 688* (citation omitted).

As to the individual Defendants' liability as controlling persons, [*165] "high-level executives can be presumed to be aware of matters central to their business's operation. *PR Diamonds, 364 F.3d at 688*. "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.'" *Cardinal Health, 426 F. Supp. 2d at 724*. This is particularly appropriate for "[f]acts critical to a business's core management." *In re Ancor Commc'ns, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998)*. A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter. *In re Envoy Corp. Sec. Litig., 133 F. Supp. 2d 647, 663-64 (M.D. Tenn. 2001)*. In Envoy, the Honorable Todd J. Campbell, Chief Judge held that plaintiffs' § 20(a) claims were sufficiently pled against the corporate defendant's top officers "because of their respective positions in the company, were each involved in the day-to-day management of [Defendant Company] . . .and . . . controlled and/or possessed the authority to control

Page 50

2009 U.S. Dist. LEXIS 28237, *165; Fed. Sec. L. Rep. (CCH) P95,203

the contents of [Defendant Company]'s [*166] reports, press releases and presentations to the public and, through that power, fraudulently misled the investing public." *Id. at 898.*

Plaintiffs' specific allegations are that Catalano, Taylor, Hartman and Bryson who were at the highest levels of ASG's, SPP's and PHS's management, initiated, concealed and maintained the above described practices. Catalano and Taylor were ASG's primary spokespersons to investors and analysts and personally directed the conference calls, public press releases and other disclosures on ASG's finances and the financial performance of ASG's subsidiaries. Taylor was ASG's chief financial officer who, according to ASG's website, was responsible for "direct[ing] the Company's SEC] reporting," "corporate accounting," "PHS site accounting," "operational analysis," "budgeting," and "investor relations." Id. at P 21. Plaintiffs allege specific practices, meetings, and procedures from persons with detailed contemporaneous knowledge of Catalano's and Taylor's personal involvement in these corporate cost control practices and decisions involving ASG, SPP and PHS. Id. at PP 26, 308-316.

In their Sarbanes-Oxley certifications, Defendants Catalano and Taylor stated their [*167] shared responsibility to ensure adequate controls at ASG. In these certifications, Catalano and Taylor certified that their personal responsibilities on these control measures included ASG's "consolidated subsidiaries." Id. at 60. Every quarter, Catalano and Taylor specifically certified that they had each personally reviewed the controls at ASG "including its consolidated subsidiaries" during the past 90 days, and found them to be both reasonably adequate. Id. at PP 176-178. Here, ASG Catalano, chief executive officer and Taylor, chief financial officer, specifically undertook responsibility for designing, maintaining, and certifying the adequacy of the internal controls at PHS that shares offices with ASG and SPP that is nine miles away. Id. at PP 18, 175-178. Under SEC rules, these responsibilities include:

> Disclosure controls and procedures [would] include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the

issuer's management, **including its principal executive and principal financial officers,** or persons performing similar [*168] functions, as appropriate to allow timely decisions regarding required disclosure.

SEC Rule 13a-15(e), *17 C.F.R. 240.13a-15(e)*; SEC Rule 15d-15(e), *17 C.F.R. 240.15d-15(e).* (emphasis added).

The Court concludes that Catalano and Taylor are controlling persons as to ASG, SPP and PHG. From a management perspective, ASG, SPP and PHS are small companies with at least one interlocking officer, Hartman, who was SPP's chief executive officer, PHS's chief executive officer and ASG's executive vice-president.

Plaintiffs' allegations are that with Catalano and Taylor, Hartman and Bryson closely monitored ASG's reported margins and medical expenses, particularly the pharmacy, staffing and off-site utilization costs, including for particular PHS sites. Hartman and Bryson were chief executive officers at SPP where accounting errors based upon SPP's defective computer program for pricing and SPP's manual were widespread. Governmental inquiries revealed that PHS's activities were a product of corporate management to reduce PHS's costs. ASG told investors on March 15, 2006 that the "key managers" responsible were no longer with ASG that can reasonably be inferred as meaning Hartman and Bryson, who [*169] were fired in December 2005. ASG's restatement described these practices as dated to the time ASG acquired SPP when Hartman and Bryson were in charge. E.g., PP 54, 240; see also PP 27-28.

In these collective circumstances, with all favorable inferences to the Plaintiffs, as required for this type of motion, Plaintiffs have properly alleged that Catalano and Taylor closely monitored ASG's reported margins and medical expenses, and Hartman and Bryson managed SPP's pharmacy costs and PHS's staffing and off-site utilization costs that caused ASG's 2001 losses. For these reasons, the Court concludes that Catalano, Taylor, Hartman and Bryson are controlling persons of ASG, PHS and/or SPP.

**6. Dura's Injury Requirement**

Defendants challenge Plaintiffs' contention that they are entitled to recover "losses" resulting from declines in

Page 51

2009 U.S. Dist. LEXIS 28237, *169; Fed. Sec. L. Rep. (CCH) P95,203

the price of ASG's shares following earnings announcements in October 2004 and February 2005, even though neither of these announcements revealed to the market any of the alleged fraudulent practices at PHS and SPP. (Docket Entry No. 60, Amended Complaint at PP 300-02). Defendants characterize these announcements as disappointing news of ASG's margins and earnings. [*170] Defendants contend that because these disclosures did not reveal the alleged fraud to the market, Plaintiffs have not suffered any actionable losses, citing *Initial Pub. Offering, 399 F. Supp. 2d 261, 266 (S.D.N.Y. 2003)* ("[A] failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect. . . . It does not disclose the scheme; therefore it cannot correct the artificial inflation caused by the scheme.") and *In re Compuware See. Litig., 386 F. Supp. 2d 913, 919 (E.D. Mich. 2005)* (allegations linking drops in stock price to disclosures of financial news that do not reveal fraud are insufficient to establish loss causation).

Yet, Plaintiffs also allege that despite the February 2005 announcement, the alleged fraudulent practices at PHS and SPP remained concealed from investors. Id. P 302. Plaintiffs allege that Defendants' false statements and earnings disclosures on specific dates caused the artificial increase in ASG's stock price and sets forth the amount of that inflation. Id. at P 298. Plaintiffs compare ASG's stock price with broader market indices and an industry peer group to allege that ASG's stock price increases were attributable to Defendants' [*171] false representations, rather than industry or market-wide factors. Id. at 298.

Plaintiffs' complaint also alleges that public disclosures of the Defendants' conduct at PHS also caused ASG's stock price to decline. Id. at PP 9, 88, 92-94, 223, 293-306. Plaintiffs cite negative earnings announcements after February 27, 2005, the date of the first New York Times article which plaintiffs allege began to reveal conditions concealed by defendants' fraud scheme and to cause ASG's stock price to drop by 8.3% and 9.7%, respectively. Id. at PP 300-302.

The Reform Act provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this [chapter] caused the loss for which the plaintiff seeks to recover damages." *15 U.S.C. § 78u-4(b)(4). Fed. R. Civ. P. 8(a)(2)* requires that Plaintiff plead "the relevant economic loss." Moreover, Plaintiffs' complaint must provide some basis for a causal

connection between plaintiffs' loss and defendants' misconduct. *Dura Pharms. v. Broudo, 544 U.S. 336, 347, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005)*. In Dura, the Supreme Court noted that the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff," [*172] *id. at 347*, but a plaintiff must allege "a causal connection between the material misrepresentation and the loss." *Id. at 342*. The securities plaintiff must allege that the misrepresentations or concealment "made its way into the market" or became "generally known" to the market and thereby caused a company's stock price to decline. See *Lenten v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir. 2005)* (plaintiffs must allege that the purported misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security").

The Court concludes that Plaintiffs' allegations are sufficient for such causation under *Fed. R. Civ. P. 8* and *Dura*, with the decline of ASG's stock after the *New York Times* article on PHG's practices. Moreover, with Plaintiffs' fraud on the market theory, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for ASG's publicly traded securities. See *D.E. & J. LL.P'ship v. Conaway, 133 Fed. Appx. 994, 999, 1001 (6th Cir. 2005)*. In Conaway, the plaintiff did not attempt to allege any "causal connection" between the stock price [*173] drops and defendants' earlier misstatements but instead sought to establish loss causation on allegations of price inflation alone. *Id. at 999-1000*. See also *Semerenko v. Cendant Corp., 223 F.3d 165, 186-87 (3d Cir. 2000)* ("So long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery.").

As to the Defendants' contention of alternate causes of Plaintiffs' losses, the Court agrees with the Seventh Circuit that "it is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct." *Caremark, Inc. v. Coram Healthcare Carp., 113 F.3d 645, 649 (7th Cir. 1997)*

As to the Defendants' reliance on *In re Compuware Sec. Litig., 386 F. Supp. 2d 913 (E.D. Mich. 2005)*, there it was "undisputed" that the lead plaintiffs sold all of their stock "well before" any corrective disclosure or stock

Page 52

2009 U.S. Dist. LEXIS 28237, *173; Fed. Sec. L. Rep. (CCH) P95,203

price decline. Here, Plaintiffs did not sell their stock prior to the partial corrective disclosures which revealed the fraud to the market and caused [*174] ASG's stock price to decline. Further, in In re Compuware, the plaintiffs did not "allege that a price decline immediately accompanied the . . . disclosure [of fraud], leaving th[at] court to speculate what portion of the loss, if any, should be attributed to the disclosure or whether the loss was caused by other factors." *Id. at 919*. Plaintiffs here have made numerous references in their Amended Complaint that reflect the timing of the loss causation, particularly with regards to the timing of the fraud, the dates on which it was slowly revealed to the market, and the accompanying effect on ASG's stock price. (Docket Entry No. 60, Amended Complaint at PP 4-7, 16, 41, 44, 293-306.

**C. Relief**

For the above stated reasons, the Court concludes that the Plaintiffs have alleged sufficient specific facts that collectively state actionable claims under *Section 10(b)* and *Rule 10b-5*. Accordingly, the Defendants' motion to dismiss should be denied.

An appropriate Order is filed herewith.

Entered this the 30th day of March, 2009

/s/ William J. Haynes

William J. Haynes, Jr.

United States District Judge

Louisiana Mun. Police Employees Retirement System v...., Not Reported in...

2012 WL 3903335, Fed. Sec. L. Rep. P 96,993

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by U.S. S.E.C. v. Geswein, N.D.Ohio, March 5, 2014

2012 WL 3903335

Only the Westlaw citation is currently available.

United States District Court,

N.D. Ohio,

Eastern Division.

LOUISIANA MUNICIPAL POLICE EMPLOYEES

RETIREMENT SYSTEM, Plaintiffs,

v.

KPMG, LLP, et al., Defendants.

No. 1:10cv01461.

|

Aug. 31, 2012.

**Attorneys and Law Firms**

Beth A. Kaswan, Scott & Scott, New York, NY, David R. Scott, Scott & Scott, Colchester, CT, Debra J. Wyman, Robbins Geller Rudman & Dowd, San Diego, CA, Geoffrey M. Johnson, Scott & Scott, Cleveland Heights, OH, for Plaintiffs.

David J. Tocco, Rajeev K. Adlakha, Vorys, Sater, Seymour & Pease, Adrienne F. Mueller, Geoffrey J. Ritts, John M. Newman, Jr., Kristin S.M. Morrison, Jones Day, Melissa L. Zujkowski, Michael N. Ungar, Ulmer & Berne, Daniel R. Warren, Erin R. Barker Brown, John D. Parker, Kathryn E. Schill, Terry M. Brennan, Baker & Hostetler, Fritz E. Berckmueller, Jeffrey J. Lauderdale, Virginia A. Davidson, Calfee, Halter & Griswold, Cleveland, OH, Phillip A. Brown, Robert N. Webner, Vorys, Sater, Seymour & Pease, Columbus, OH, Steven S. Scholes, William P. Schuman, Mcdermott, Will & Emery, Chicago, IL, Jonathan R. Barr, Baker & Hostetler, Washington, DC, John J. Carney, Baker & Hostetler, New York, NY, for Defendants.

*MEMORANDUM OF OPINION AND ORDER* [Regarding *ECF Nos. 65; 83, 87.*]

BENITA Y. PEARSON, District Judge.

**\*1** This action is before the Court upon the Motions for Reconsideration filed by Defendants Geswein and Krakora on October 13 and October 20, 2011. *ECF Nos.*

*83;* 87. The Court further notes Defendant Miller's Notice of Recent Authority (*ECF No. 65* ), also relevant to the instant action. The Court has reviewed the memorandums in support, memorandums in opposition (*ECF Nos. 66; 91*), and reply memorandum (*ECF Nos. 69;* 92). For the reasons set forth below, the Court grants Defendants' Motions for Reconsideration, and partially reverses its previous Order (*ECF No. 82* ) as it pertains to Defendant Miller.

## I. Background

This case is brought by Plaintiffs pursuant to Section 10(b) and Section 20(a) of the Securities and Exchange Act of 1934, and Rule 10b 5, *17 C.F.R. § 240.10(b) 5.* On September 30, 2011, the Court entered a memorandum of opinion and order that denied Defendants' motions to dismiss. *ECF No. 82.* Prior to the Court's Order, Defendant Miller filed a notice of recent authority, alerting the Court to the newly decided Supreme Court opinion *Janus Capital Group, Inc. v. First Derivative Traders, 564 U.S. , 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). ECF No. 65.* Plaintiffs responded (*ECF No. 66* ), and Miller replied (*ECF No. 69* ).

1    The Defendants motioning for dismissal were KPMG, Diebold, Miller, Geswein and Krakora. *ECF No. 82.*

After the Court issued its Order (*ECF No. 82* ), Defendants Geswein and Krakora filed motions for reconsideration based upon the *Janus* ruling. *ECF Nos. 83; 87.* Defendants Geswein, Krakora and Miller argue the *Janus* ruling changes the definition of who can "make" a statement for the purposes of Rule 10b 5 liability, and urge the Court to reconsider its Order denying dismissal. *ECF No. 83; 87.*

## II. Legal Standard

The authority to reconsider denial of a motion to dismiss before final judgment has been entered is well established. *E.g., Fed.R.Civ.Pro. 54(b); Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988)* ("[a] court has the power to revisit prior decisions of its own ... in any circumstance."). While a motion for reconsideration should not be used to re-litigate issues previously considered, courts traditionally

Louisiana Mun. Police Employees Retirement System v...., Not Reported in...

2012 WL 3903335, Fed. Sec. L. Rep. P 96,993

will find justification for reconsidering interlocutory orders when there is: 1) an intervening change of controlling law; 2) new evidence; or 3) a need to correct a clear error or prevent manifest injustice. *Rodriguez v. Tennessee Laborers Health & Welfare Fund,* 89 Fed. App'x. 949, 959 (6th Cir.2004) (unpublished disposition) (citing *Reich v. Hall Holding Company,* 990 F.Supp. 955, 965 (N.D.Ohio 1998)). Here, the change or clarification in the law provided by the Supreme Court's decision in *Janus* justifies revisiting the prior decision denying Defendants' motions to dismiss.

### III. Discussion

#### A. The *Janus* decision

On June 13, 2011, the United States Supreme Court issued a decision in *Janus Captial Group, Inc. v. First Derivative Traders,* 564 U.S. ___ , 131 S.Ct. 2296, 180 L.Ed.2d 166 (2011). In *Janus,* a shareholder attempted to bring a claim pursuant to Rule 10b 5 against Janus Capital Management LLC ("JCM") in relation to an allegedly fraudulent statement made by Janus Investment Fund ("JIF") in its prospectuses to investors. *Id. at 2299.* Janus Capital Group, Inc. ("JCG") was the parent company of JCM which, in turn, was the investment advisor and administrator for JIF. *Id.* The shareholder plaintiffs attempted to hold JCM liable based upon Rule 10b 5's prohibition against the making of any " 'untrue statement of a material fact'in connection with the purchase or sale of any security." *Id.,* (citing *17 CFR § 240.10b 5* ).

*\*2* The Court held that the complaint had been properly dismissed against JCM because JIF, not JCM, "made" the statements that the plaintiffs claimed were untrue and, therefore, JCM could not be liable for a violation of Rule 10b 5(b) despite the fact that the entities were related. *Janus,*131 S.Ct. at 2204 5. The Court's rationale turned upon an interpretation of the verb "to make," determining that "[o]ne makes a statement by stating it." *Id. at 2302.* The Court then announced that, pursuant to Rule 10b 5(b), "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and how to communicate it." *Id. at 2303.* The Court harmonized its decision in *Janus* with its prior decision in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), stating that private suits may not be brought against "entities that contribute

'substantial assistance' to the making of a statement but do not actually make it." *Janus,* 131 S.Ct. at 2302.

Defendants Miller, Geswein and Krakora moved the Court in the instant case to consider Plaintiffs' Rule 10b 5(b) claims against them in light of the recent *Janus* decision. *ECF Nos. 65; 83; 87.* [2] The Court does so, and states its findings below.

[2]      Prior to the Court's Order (*ECF No. 82* ), Defendant Miller filed a Notice of Recent Authority, as a supplement to her original Motion to Dismiss (*ECF No. 42* ), in which she asked the Court to dismiss Count I of the Amended Complaint against her based upon the *Janus* decision. *ECF No. 65 at 1.* Plaintiffs responded (*ECF No. 66* ) and Miller replied (*ECF No. 69* ). The Court notes the parties had opportunity to be heard on the matter, and thus treats Miller's Notice of Recent Authority as a Motion to Dismiss.

#### B. Defendant Miller

Defendant Miller argues that Plaintiffs merely allege she "participated" in the misstatements at issue, rather than "made" them, and, pursuant to *Janus,* Plaintiffs' 10b 5(b) claim against her should be dismissed. *ECF No. 65 at 1.* Plaintiffs argue Miller's reading of *Janus* is too restrictive and, in any event, the Amended Complaint sufficiently alleges Miller engaged in conduct that would sustain liability as per 10b 5(a) and (c). *ECF No. 66 at 3.*

##### 1. After *Janus,* Miller did not "make" statements for the purpose of Rule 10b–5(b)

The Supreme Court's decision in *Janus* warrants dismissal of Plaintiffs' 10b 5 claim against Miller. In *Janus,* the Supreme Court considered Rule 10b 5(b), which makes it "unlawful for any person, directly or indirectly .... [t]o make any untrue statement of a material fact ....in connection with the purchase or sale of any security." *17 C.F.R. § 240.10b 5(b).* The Court announced that "the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it ... [o]ne who prepares or publishes a statement on behalf of another is not its maker." *Janus, 131 S.Ct. at 2302.* As the Court further explained, "[t]his rule might best be exemplified by the relationship between a speechwriter and a speaker. Even when a speechwriter drafts a speech, the content is entirely within the control of the person who delivers it. And it

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.     2

Louisiana Mun. Police Employees Retirement System v...., Not Reported in...

2012 WL 3903335, Fed. Sec. L. Rep. P 96,993

is the speaker who takes credit or blame for what is ultimately said." *Id.*

Given the clear rule announced in *Janus,* Miller cannot be said to have "made" a statement as per Rule 10b 5(b). Miller, by Plaintiffs' admissions, "participated" in the making of untrue statements, and "caus[ed] the Company to include Diebold's false and misleading ... financial statements in public press releases and filings." *ECF No. 35 at 7, 93.* Plaintiffs specifically allege Miller: "made various accounting entries ... to Diebold's books"; "redrafted the Company's form sales contract"; "made off-setting journal entries" that were false; made "improper entries" that resulted in "improper capitalization of expenses," etc. *ECF No. 35 at 9, 11, 17.* All of these alleged acts resulted in Diebold's false or misleading statements. *ECF No. 35 at 7.* However, Miller did not publish the press releases or file the financial statements with the Securities and Exchange Commission (SEC): she prepared them. As per *Janus,* she is not considered the "maker," and cannot be held liable for the material included in the forms and press releases. *See Janus, 131 S.Ct. at 2302 3* (rejecting the Government's argument that " 'make' should be defined as 'create' " because it would create liability in a person "who provides the false or misleading information that another person then puts into the statement."); *see also Kerr v. Exobox Technologies Corp., 2012 WL 201872, at *11 (Jan.23, 2012)* (applying *Janus* to deny a claim against an individual who owned 88% to 100% of Exobox because he did not sign the statements, "even if he supplied Exobox with the false statements at issue.")

**\*3** Additionally, the *Janus* Court made clear it was maintaining the "narrow scope" of private rights of action, and, contrary to Plaintiffs' argument, did not limit its holding to secondary actors. *Janus, 131 S.Ct. at 2302 n. 6* (noting the need for distinction between primary and secondary liability and announcing, "[w]e draw a clean line between the two maker is the person or entity with ultimate authority over a statement and others are not."); *see also Hawaii Ironworkers Annuity Trust Fund v. Cole, et al., 2011 WL 3862206, at *3 (Sept. 7, 2011)* ("[*Janus* ] made clear that it intended its analysis to elucidate the contours of primary and secondary liability under Rule 10b 5(b)."). Thus, Plaintiffs' argument that *Janus* limited its holding to secondary actors is without merit.

**2. To the extent Plaintiffs allege Miller is liable based upon "scheme liability," the claim is unavailable to Plaintiffs**

Plaintiffs argue Miller's alleged conduct violated Rule 10b 5(a) and (c). [3] *ECF No. 66 at 1.* Miller argues any and all allegations of the Amended Complaint pertain to conduct that allegedly contributed only to fraudulent statements and, therefore, even prior to *Janus,* could only implicate Rule 10b 5(b). *ECF No. 69 at 4.*

[3]   Plaintiffs, in their Amended Complaint, generally alleged violations of all sections of 10b 5. *ECF No. 35 at 93.* In opposition to defendants' motions to dismiss, Plaintiffs do not address the issue of "scheme liability." *ECF No. 46.* Plaintiffs have revived their apparent allegations of scheme liability in response to Miller's Notice of Recent Authority and motion to dismiss, *ECF No. 65.*

**a. Rule 10b–5(a) and (c)**
The pertinent Rule 10b 5 sections make it unlawful "(a) to employ any device, scheme, or artifice to defraud"; "(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." *17 CFR § 240.10b 5(a), (c).* Rules 10b 5(a) or (c) prohibits "activities designed to affect the price of a security artificially by simulating market activity that does not reflect genuine investor demand." *Desai v. Deutsche Bank Securities, Ltd., 573 F.3d 931, 940 41 (9th Cir.2009).* A plaintiff must allege conduct beyond misstatements in order to allege Rule 10b 5(a) or Rule 10b 5(c) "scheme liability." *See, e .g., Benzon v. Morgan Stanley Distributors, Inc., 420 F.3d 598, 610 (6th Cir.2005)* ("[W]e agree with Plaintiffs that Rules 10b 5(a) and (c) encompass conduct beyond disclosure violations ... ); *Steed v. Warrior Capital, LLC, 2007 WL 1110757, *5 (W.D.Okla. April 11, 2007)* (granting motions to dismiss and noting "a statement that is, in essence, a misrepresentation (or omission) claim under subsection (b) may not be recast as a claim under subsection (a) or (c) so as to evade the pleading requirements which apply in misrepresentation cases.").

Generally, courts have found that subsections (a) or (c) are not a "back door into liability for those who help others make a false statement or omission in violation of subsection (b) of Rule 10b 5(b)." *In re Parmalat Sec.*

Louisiana Mun. Police Employees Retirement System v...., Not Reported in...

2012 WL 3903335, Fed. Sec. L. Rep. P 96,993

*Litig., 376 F.Supp.2d 472, 503 (S.D.N.Y.2005); see also In re Alstom SA, 406 F.Supp.2d 433, 476 (S.D.N.Y.2005)* ("a plaintiff cannot state a claim under Rule 10b 5(a) and (c) by pointing to fraudulent statements and claiming that the defendants were part of a scheme to make those statements, as this method of pleading would result in the circumvention of ... *Central Bank's* prohibition of aider and abettor liability.")

**b. *Stoneridge* and *Janus* decisions**

**\*4** In *Stoneridge Inv. Partners, LLC v. Scientific Atlanta, 552 U.S. 148 161 2, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008)*, the Supreme Court discussed scheme liability. In *Stoneridge,* plaintiffs brought a claim pursuant to the private right of action implied in Rule 10b 5 against "entities who ... agreed to arrangements that allowed the investors' company [Charter] to mislead its auditor and issue a misleading financial statement affecting the stock price." *Id. at 152 3.* Plaintiffs alleged the companies "knew of Charter's intention to use the transactions to inflate its revenues and knew the resulting financial statements issued by Charter would be relied upon by investors." *Id. at 155.* In this way, the plaintiffs argued, the companies "engaged in conduct with the purpose and effect of creating a false appearance of material fact to further a scheme to misrepresent Charter's revenue," and, without the companies' deceptive acts, Charter's financial statements would not have been misleading. *Id. at 160.*

The Court determined the companies were not liable for want of the necessary reliance. The Court noted plaintiffs were asking the Court to adopt a concept of reliance that indicated "investors rely not only upon the public statements relating to a security but also upon the transactions those statements reflect." *Id.* To do so, the Court reasoned, would mean the implied cause of action would reach the whole marketplace." *Id.* "It was Charter, not [the companies], that misled its auditor and filed fraudulent financial statements; nothing [the companies] did made it necessary or inevitable for Charter to record the transactions as it did." *Id. at 161.*

Plaintiffs in the instant case argue Miller is liable based upon scheme liability because "the public disclosure of the falsified financial results was both inevitable and required by the applicable disclosure regulations." *ECF No. 66 at 11.* Plaintiffs argue Miller falsified the financial results, and "these fraudulent numbers were then disclosed to the public pursuant to the reporting requirements Diebold

was bound to follow." *ECF No. 66 at 11.* Miller argues scheme liability requires more than misstatements, or there would be no difference between liability pursuant to 10b 5(b) on the one hand, and 10b 5(a) and (c) on the other. *ECF No. 69 at 5.*

The instant Court notes Plaintiffs do not sufficiently allege Miller engaged in conduct other than falsifying statements which were then included in Diebold's financial reports. The Court further notes Plaintiffs did not rely upon Miller's financial reports Plaintiffs relied upon Diebold's financial reports.[4] By Plaintiff s own admissions, Diebold, Geswein and Krakora published, filed and/or signed the financial reports and knew or should have known of the misstatements inherent in the reports. *ECF No. 35.* Plaintiffs cannot then reasonably ask the Court to find that Miller's conduct made it "inevitable" the allegedly fraudulent reports were filed. *See, e.g., Stoneridge, 552 U.S. at 161.*[5]

[4]     The *Stoneridge* Court noted, " r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the 10(b) private cause of action. It ensures that, for liability to arise, the 'requisite causal connection ... exists as a predicate for liability. *552 U.S. at 159* (citing *Basic Inc. v. Levinson, 485 U.S. 224, 243, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988)).*

[5]     In *Stoneridge,* the companies were third parties Charter did business with, whereas here, Miller was an employee of Diebold. The analysis does not change, however Plaintiffs allege Diebold, Geswein and Krakora knew or should have known about the false reports incorporated into the financial statements, and they would have simply deleted or modified them.

**\*5** Furthermore, after *Janus,* the Court cannot believe Supreme Court precedent intends to render a situation whereby a misstatement defendant is liable pursuant to Rule 10b 5(a) and (c) but is not liable pursuant to 10b 5(b), the subsection that deals specifically with misstatements. *See S.E.C. v. Kelly, 817 F.Supp.2d 340, 344 (S.D.N.Y.2011)* ("[w]here the SEC is attempting to impose primary liability under subsections (a) and (c) of Rule 10b 5 for a scheme based upon an alleged false statement, permitting primary scheme liability when the defendant did not 'make' the misstatement would render the rule announced in *Janus* meaningless."). The Court further notes that the Supreme Court has repeatedly held

that the scope of the implied private right of action in § 10(b) is very narrow, and that Congress, when faced with the recommendation to create an express right of action for aiders and abettors, declined to do so. *Stoneridge, 552 U.S. at 157 7; Central Bank, 511 U.S. at 177; Janus, 131 S.Ct. at 2303.* Heeding Supreme Court precedent, the instant Court declines to take an expansive view of a private right of action in the present case.

### C. Defendants Geswein and Krakora

Defendants Geswein and Krakora argue that, pursuant to *Janus,* Diebold was the entity with ultimate authority over the content in the filed documents and press releases; thus only Diebold can be the "maker" of the statements. *ECF Nos. 83 at 7; 87 at 7.* Plaintiffs argue Geswein and Krakora: 1) signed the SEC filings; 2) signed certificates required by SarbanesOxley attesting to the sufficiency of Diebold's internal financial controls and the material accuracy of the financial results released; and 3) in the case of Krakora, was quoted in at least one press release. *ECF No. 91 at 10.* Plaintiffs contend that based upon these acts Geswein and Krakora are considered to have made the statements even after *Janus.*[6]

[6] Plaintiffs, in opposition, expressly deny they are relying on Rule 10b 5(a) and (c) to maintain its claims against Geswein and Krakora. *ECF No. 91 at 11.*

Plaintiffs allege Geswein and Krakora, unlike Miller, were corporate officers who signed certain statements published by Diebold and thus can be considered to have made the statements. *E .g. ECF No. 35 at 30 31.* In *Janus,* the facts concerned only corporations, but the Court noted that the speaker is a "person or entity with ultimate authority over the statement ... [a]nd in the ordinary case, attribution within a statement or implicit from surrounding circumstances is strong evidence that a statement was made by-and only by-the party to whom it is attributed." *Janus, 131 S.Ct. at 2302.*

Subsequent courts have interpreted the attribution element of *Janus* to reach corporate officers who sign statements filed with the SEC and have been quoted in press releases. *See, e.g., In Re Merck & Co., Inc. Sec., Derivative & ERISA Litig., 2011 WL 3444199 at * 25 (Aug. 8, 2011)* (noting Janus cannot be read to limit liability when "Scolnick was at the time of each

attributed statement an officer of Merck. He signed SEC forms and was quoted in articles and reports in his capacity as Merck's Executive Vice President....He made the statements pursuant to his responsibility and authority to act as an agent of Merck."); *Local 703, I.B. of T. Grocery and Food Employees Welfare Fund v. Regions Financial Corp., 2011 U.S. Dist. LEXIS 93873, at * 15 (N.D.Ala. Aug. 23, 2011)* ("Nothing in Janus stands for the proposition that CEOs and CFOs can not be liable for false and misleading statements in their own company's financial statements, for which they signed."); *S.E.C. v. Das, 2011 WL 4375787, at *6 (D. Neb. Sept. 20, 2011)* (finding CFOs who signed the Forms 10 K and 10 Q were the "makers" of the statements.).[7]

[7] *See also City of Roseville Employees Ret. Sys. v. Energysolutions, Inc., 814 F.Supp.2d 395 (S.D.N.Y.2011)* (same); *In re Smith Barney Transfer Agent Litigation, 2012 WL 3339098, at *10 1 (S.D.N.Y. Aug. 15,* 2012) (same); *S.E.C. v. Brown, 2012 WL 2927712, at *5 (D.D.C.2012)* (same); *SEC v. Carter, 2011 WL 5980966, at *3 (N.D.Ill. Nov.28, 2011)* (same).

**\*6** Because Plaintiffs sufficiently allege Geswein and Krakora signed the allegedly false SEC filings and financial statements, Plaintiffs' Rule 10b 5(b) claim against Geswein and Krakora is still a viable claim, even after *Janus.* The Court reaffirms its previous denial of the motion to dismiss filed by Geswein and Krakora.

### IV. Conclusion

For the reasons stated above, the Court grants Defendants' motions for reconsideration. *ECF Nos. 83; 87.* Upon review, the Court modifies its previous order in part, *ECF No. 82,* and dismisses Count I, the Rule 10b 5(b) claim, against Defendant Miller. The Court leaves unmodified its earlier order denying the motions to dismiss filed by Defendants Geswein and Krakora.

IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 3903335, Fed. Sec. L. Rep. P 96,993

WESTLAW © 2017 Thomson Reuters. No claim to original U.S. Government Works.

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2017 Thomson Reuters. No claim to original U.S. Government Works.    6

2017 WL 887193
Only the Westlaw citation is currently available.
United States District Court,
S.D. Florida.

John J. MULVANEY, and Joseph William
Oldknow, Individually and On Behalf of
All Others Similarly Situated, Plaintiffs,

v.

The GEO GROUP, INC., George C.
Zoley, Brian R. Evans, John Hurley,
and David Donahue, Defendants.

CASE NO: 16–cv–81494–MIDDLEBROOKS
|
Signed 02/22/2017
|
Entered 02/23/2017

**Synopsis**
**Background:** Shareholders filed putative securities fraud
class action against corporation that operated private
prisons for the government, alleging that corporation
and its officers made materially misleading statements
in filings and earning calls, in violation of Securities
Exchange Act. Corporation and officers moved to
dismiss.

**Holdings:** The District Court, Donald M. Middlebrooks,
J., held that:

[1] statements about corporation's past revenue were not
misleading, as would require supplementation to avoid
claim for fraud;

[2] complaint failed to plead with particularity the
falsity of corporation's statement regarding its operative
procedures;

[3] complaint failed to plead with particularity the falsity
of corporation's statement regarding new private prison
contracts; and

[4] complaint failed to allege strong inference of scienter
to commit securities fraud.

Motion granted.

**Attorneys and Law Firms**

J. Alexander Hood, II, Jeremy A. Lieberman, Pomerantz,
LLP, New York, NY, Jayne Arnold Goldstein, Shepherd
Finkelman Miller & Shah LLP, James Paul Gitkin,
Salpeter Gitkin, LLP, Fort Lauderdale, FL, for Plaintiffs.

Brian Paul Miller, Ross Elliot Linzer, Samantha J.
Kavanaugh, Akerman LLP, Jorge David Guttman,
William King Hill, Gunster, Miami, FL, Jonathan
Brennan Butler, Akerman LLP, West Palm Beach, FL,
George S. LeMieux, Jennifer Nicole, Gunster Yoakley &
Stewart PA, Fort Lauderdale, FL, for Defendants.

## ORDER GRANTING MOTIONS TO DISMISS

DONALD M. MIDDLEBROOKS, UNITED STATES
DISTRICT JUDGE

**\*1** This cause comes before the Court on multiple
Motions to Dismiss the Amended Complaint. On January
13, 2017, Defendant The GEO Group, Inc. ("GEO
Group") filed its Motion to Dismiss (DE 65), as
did Defendants George C. Zoley, Brian R. Evans,
John Hurley, and David Donahue (the "Individual
Defendants") (DE 66). On January 27, 2017, Lead
Plaintiffs Brian A. Hellings and the Ann Hellings 2012
Trust ("Plaintiffs") filed a Response to the Motions to
Dismiss, (DE 69). On February 10, 2017, GEO Group
filed a Reply (DE 73), as did the Individual Defendants
(DE 74).

### I. BACKGROUND

**Parties.** According to the Amended Complaint, GEO
Group, a Florida corporation headquartered in
Boca Raton, Florida, provides government-outsourced
services, specializing in the management of correctional,
detention, and re-entry facilities in the United States,
Australia, South Africa, the United Kingdom, and
Canada. (Am. Compl. ¶¶ 3, 20). Defendant George
C. Zoley ("Zoley") served as GEO Group's Chairman
and Chief Executive Officer ("CEO") at all relevant
times in the Amended Complaint. (*Id.* ¶ 21). Defendant
Brian R. Evans ("Evans") was GEO Group's Chief
Financial Officer ("CFO") and Senior Vice President
("VP") at all relevant times. (*Id.* ¶ 22). Defendant John

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.
1

Hurley ("Hurley") served as Senior VP of Operations and President of GEO Corrections and Detentions at all relevant times until February 2016. (*Id.* ¶ 23). Defendant David Donahue ("Donahue") became President of GEO Corrections and Detentions in February 2016, and has since held that position. (*Id.* ¶ 24).

Plaintiffs acquired GEO Group securities between March 1, 2012 and August 17, 2016 (the "Class Period"). (*Id.* ¶ 1).

**GEO Group's BOP Contracts.** The Amended Complaint relates to GEO Group's contracts with the Federal Bureau of Prisons ("BOP"), an arm of the Department of Justice ("DOJ"), to run Criminal Alien Requirement ("CAR") prisons, which confine criminal alien adult males. (*Id.* ¶¶ 3, 26). The BOP contracts require GEO Group to comply with applicable laws and regulations and follow a number of BOP policies, which are defined in the contracts. (*Id.* ¶ 30).

**Conditions in Private Prisons.** According to the Amended Complaint, GEO Group's prisons were "plagued" by inadequate conditions, "often in direct disregard for BOP and other contractual policies and guidelines." (*Id.* ¶ 53).

On August 11, 2016, the DOJ Office of the Inspector General ("OIG") published a Review of the BOP's Monitoring of Contract Prisons from 2011 to 2014 (the "2016 OIG Report" or "Report"), which found that contractor prisons had more "safety and security incidents per capita than comparable BOP institutions," and "more frequent incidents per capita of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances." (*Id.* ¶ 127, 130). The 2016 OIG Report found that GEO Group's contract prisons had more incidents per capita than those of the BOP's other two private contractors "for contraband finds, several types of reports of incidents, lockdowns, guilty findings on inmate discipline charges, positive drug test results, and sexual misconduct." (*Id.* ¶ 130).

**\*2** The 2016 OIG Report noted specific problems in four of the prisons for which GEO Group provides services. Rivers Correctional Institution ("Rivers") and D. Ray James Correctional Institution ("D. Ray"), which GEO Group operates, were two of three contract prisons that "most often had more incidents per capita in the categories of data we analyzed." (*Id.* ¶ 130). The Report stated that

D. Ray accounted for 29 percent of the assaults on staff in all contract prisons from 2011 through 2014, and that a D. Ray employee told OIG that the prison "was having significant performance issues on its contract during this period and that the BOP had issued a cure notice in the fall of 2012," and 47 notices of concern in 2012. (*Id.* ¶ 130). The employee explained that a cure notice is issued to a contract prison that is not meeting the vital functions of its contract and indicates that the BOP is on the brink of ending the contract. (*Id.* ¶ 130). The Report also noted that "disturbances in several contract prisons have resulted in extensive property damage, bodily injury, and the death of a Correctional Officer," citing a December 2008 riot at the Reeves County Detention Center ("Reeves"), for which GEO Group provides managers, and a February 2011 assault at the Big Springs Correctional Center ("Big Springs"), which GEO Group operates. (*Id.* ¶¶ 33, 34, 128, 129). The Report stated that the first disturbance was affected by low staffing and the second disturbance was partially caused by inmate dissatisfaction with the staff's response to a medical emergency. (*Id.* ¶ 34).

The OIG Report also cited a 2015 audit of the Reeves facility (the "Reeves Audit"), which found that "the contractor" had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control, and that Reeves contained an isolation unit that lacked specific policies to ensure inmate rights. (*Id.* ¶ 34). The Audit found that Reeves' medical contractor, Correctional Healthcare Companies ("CHC"), had failed to meet contractual staffing obligations in the medical unit for at least 34 of the 37 months from 2010 to 2013. (*Id.* ¶ 52).

According to the Amended Complaint, BOP oversight "had little effect" on conditions. (*Id.* ¶ 42). Reports issued by BOP inspectors (the "BOP Reports") cited deficiencies in the healthcare at GEO's prisons for years. (*Id.* ¶ 42). Before the start of the Class Period, the head of BOP's Privatization Management Branch wrote in an email that BOP inspectors "have identified serious issues in health care specifically their infectious disease program." (*Id.* ¶ 42). At one point, the BOP considered not renewing its contract with Reeves County, noting 230 citations and $2 million in penalties for compliance failures at the Reeves facility, as well as a lack of healthcare that has "greatly impacted inmate health and well-being." (*Id.* ¶ 42). The

BOP Reports were not made public during the Class Period. (*Id.* ¶ 42).

1  The Amended Complaint does not identify whose infectious disease program the email was referring to.

Immigrant advocates also documented conditions in GEO Group's prisons. (*Id.* ¶ 35). An article written by Seth Freed Wessler for *The Nation* (the "Wessler Article") documented multiple accounts of prisoners at GEO Group's prisons receiving substandard medical care.[2] (*Id.* ¶¶ 36–37). A report drafted by the American Civil Liberties Union ("ACLU") in June 2014 (the "ACLU Report") documents conditions at Reeves and Big Springs. (*Id.* ¶ 44). The ACLU Report states that prisoners were punished for a protest in 2013, and documents instances of medical neglect, the use of isolation cells in contravention of BOP policy, and overcrowded conditions. (*Id.* ¶ 46). The ACLU Report also states that "BOP's own monitors have found numerous deficiencies that could let them out of contract expressing frustration in 2010 that GEO Group 'shows little signs of improvement' and 'is unable to successfully achieve their own plans of action to correct deficient areas.' " (*Id.* ¶ 46).

2  It is unclear when the Wessler Article was published. The Amended Complaint states that it was written earlier in 2016, and "updated following the DOJ's August 18, 2016 announcement. (*Id.* ¶ 36).

In addition, multiple inmates in GEO Group's facilities have filed lawsuits based on poor conditions. (*Id.* ¶ 18). The Amended Complaint cites at least two such lawsuits in 2014 and one in 2015. (*Id.* ¶ 18).

A number of confidential witnesses, who worked for GEO Group, commented on low staffing levels, disciplinary issues, security issues, and poor working conditions. (*Id.* ¶¶ 54, 58, 61, 64).

**\*3  Defendants' Awareness of Prison Conditions.** The Amended Complaint alleges that the Individual Defendants were aware of the inadequate conditions in GEO Group's prisons by virtue of their positions of power, BOP monitoring, GEO Group's internal reporting structure, and prisoner lawsuits. (*Id.* ¶¶ 3, 159). The Individual Defendants were motivated to omit this information in public statements in order to benefit from

the sale of GEO Group securities from their personal portfolios. (*Id.* ¶ 160).

Confidential witnesses explained the internal reporting structure. A warden at the Rivers facility from July 2009 to July 2012 stated that each GEO Group facility reported "information" to corporate headquarters daily, with "major events" reported within as little as three minutes. (*Id.* ¶ 55). The warden stated that when a "major event" occurred, "I would call my boss who would call [Defendant] John Hurley who would walk into [Defendant] Zoley's office and tell him." (*Id.* ¶ 55). The warden also stated that Zoley visited GEO Group's facilities a few times a year, at which times he received a 15 minute presentation on "what was going wrong and right." (*Id.* ¶ 56).

A director of contract compliance at GEO Group's headquarters from 2010 to 2012 stated that each facility had an employee who audited the facility for compliance with BOP contracts. (*Id.* ¶ 60). The director said that the audit employees sent their results to headquarters, where compliance directors compiled monthly reports based on the information they received, and distributed them to the GEO Group's executives. (*Id.* ¶ 60). The director also stated that problems at the facilities were brought to the attention of executives during monthly board meetings, attended by Zoley and Evans. (*Id.* ¶ 60).

A regional human resources specialist from March 2011 to May 2015 stated that each facility received a monthly visit from someone in legal or contract compliance at GEO Group's corporate office. The human resources specialist said that Zoley met with the wardens of each of GEO Group's facilities at an annual conference each year. (*Id.* ¶ 61).

Confidential witnesses also stated that GEO Group was aware that its BOP contracts were at risk. A correctional officer at Big Springs from May 2013 to February 2014 stated that there was talk that the DOJ would revoke private prison contracts before renewal, explaining that "safety, security and budget were all factors." (*Id.* ¶ 58). A proposal coordinator at headquarters from November 2013 to May 2015 said that Zoley's son-in-law told him that private prison companies could be "losing business soon." (*Id.* ¶ 62).

**Materially Misleading Statements.** The Amended Complaint alleges that throughout the Class Period, Defendants issued materially misleading statements in GEO Group's 10 K and 10 Q filings, and in earnings calls, touting their relationship with the BOP.[3] (*Id.* ¶ 4). Plaintiffs allege that having opted to speak about the BOP contracts, Defendants were duty bound to disclose that: (i) GEO Group's private facilities lacked adequate safety and security standards, and were less efficient than BOP facilities; (ii) GEO Group's private facilities often failed to adhere to the contractual obligations; (iii) a significant risk existed that the DOJ would recommend phasing out BOP's contracts with GEO; and (iv) consequently, a risk also existed that other governmental agencies would similarly choose to investigate GEO Group's private prisons, (*Id.* ¶ 4).

[3]    The Individual Defendants certified the accuracy of various SEC filings, pursuant to the Sarbanes Oxley Act of 2002, and also spoke during various earnings calls.

**\*4** The Amended Complaint alleges that multiple misleading statements were made about GEO Group's contracts and revenue. In 10 K filings and earnings calls, the Individual Defendants advised investors that: "We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies." (*Id.* ¶¶ 67, 77, 91, 103, 104, 116). Following these statements, GEO Group repeatedly mentioned that around 40% of its revenues came from BOP, Immigration and Customs Enforcement ("ICE"), and U.S. Marshals Service contracts, and that GEO Group had worked with various governments for approximately 25 years. (*Id.* ¶¶ 67, 68, 77, 91, 103, 104, 116, 117). In GEO Group's 10 Q filings, the Individual Defendants announced GEO Group's financial and operating results for each relevant quarter. (*Id.* ¶¶ 70 75, 81 82, 85, 87 88, 94 95, 97 98, 100 101, 107 108, 113 114. 121, 122 124).

GEO Group repeatedly announced new contracts with BOP and expected revenues from those contracts, as well as bid opportunities that GEO Group was pursuing. (*Id.* ¶¶ 102, 106, 112, 115, 119, 122). On an August 4, 2015 earnings call, Zoley stated: "As we look into the third quarter, we have several reasons to be optimistic," citing that GEO Group had several new BOP contracts, and had submitted proposals for other BOP contracts. (*Id.* ¶ 109). On a May 8, 2013 earnings call, Zoley stated: "[W]e

are currently participating in nonpublic procurements in California and Michigan and at the federal level, which are expected to have contract awards and may result in the reactivation of several of our idle facilities later this year." (*Id.* ¶ 80).

In 10 K filings and earnings calls, the Individual Defendants also listed GEO Group's various accreditations, and stated: "We operate each facility in accordance with our company-wide policies and procedures and with the standards and guidelines required under the relevant management contract." (*Id.* ¶¶ 68, 77, 91, 103, 104, 117).

The Amended Complaint alleges that GEO Group misleadingly projected optimism about future contracts based on the strength of its BOP relationships. In its 10 K filings, GEO Group stated: "We have developed long-term relationships with our federal, state and other governmental customers, which we believe enhance our ability to win new contracts and retain existing business." (*Id.* ¶¶ 68, 77, 91, 103, 104). On multiple earnings calls, Hurley and Zoley stated: "We have long-standing partnerships with the Federal Bureau of Prisons, the United States Marshals Service and the United States Immigration and Customs Enforcement or ICE. And we provide cost-effective solutions for them at a number of facilities across the country. We continue to see meaningful opportunity for us to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget." (*Id.* ¶ 76, 80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 112). On a February 17, 2016 earnings call, Zoley stated: "We are very pleased with our strong fourth quarter results and our outlook for 2016 which reflect the continued organic growth of our diversified business segments of GEO Corrections & Detention and GEO Care." (*Id.* ¶ 115). On an April 28, 2016 earnings call, Donahue stated: "We believe that our unique platform of correctional and rehabilitation services better positions GEO to capture future growth, which will enhance value for our shareholders and allow us to continue to grow our earnings, cash flows and dividend payments." (*Id.* at 119). On an August 2, 2016 earnings call, Donahue stated: "[W]e are optimistic that our projects will be reviewed favorably for continued use. We have a very good relationship with the Bureau of Prisons and our seven facilities with the 15,000 beds operational performances at the appropriate levels and exceeding our expectations and the client's expectations.

So we have no reason to believe that they the client will not view them appropriately on a going forward basis." (*Id.* ¶ 122).

**\*5  The Stock Drop.** The 2016 OIG Report, discussed above, was published on August 11, 2016. (*Id.* ¶ 126). GEO Group's written response to the Report, dated August 9, 2016 and signed by Zoley, was published as Appendix 9 to the Report. (*Id.* ¶ 131).

On August 18, 2016, the DOJ sent a memorandum ("DOJ Memo") to the Acting Director of the BOP asking him to "begin[ ] the process of reducing   and ultimately ending our use of privately operated prisons." (*Id.* ¶ 132). The DOJ Memo stated:

> Private prisons served an important role during a difficult period, but time has shown that they compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security.

(*Id.* ¶ 132). The same day that the DOJ issued its Memo, GEO Group's share price fell \$12.78, or 39.58%, to close at \$19.51. (*Id.* ¶ 133).

On August 29, 2016, the Department of Homeland Security ("DHS") released a statement that it had established a subcommittee to determine whether it should eliminate its use of private immigration detention facilities. (*Id.* ¶ 134). On December 1, 2016, the Homeland Security Advisory Council voted to shift away from using private contractors for its detention facilities. (*Id.* ¶ 137). Contracts with the ICE division of DHS account for 35% of GEO Group's total revenue from government contracts since 2008. (*Id.* ¶ 137).

## II. LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the legal sufficiency of a complaint. *See* Fed. R. Civ. P. 12(b) (6). In assessing the legal sufficiency of a complaint's allegations, the Court is bound to apply the pleading standard articulated in *Bell Atlantic Corp. v. Twombly* and *Ashcroft v. Iqbal. Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). That is, the complaint "must ... contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955). "Dismissal is therefore permitted when on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." *Glover v. Liggett Grp., Inc.*, 459 F.3d 1304, 1308 (11th Cir. 2006) (internal quotations omitted) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993)).

When reviewing a motion to dismiss, a court must construe plaintiff's complaint in the light most favorable to plaintiff and take the factual allegations stated therein as true. *See Erickson v. Pardus*, 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007); *Christopher v. Harbury*, 536 U.S. 403, 406, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002); *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1369 (11th Cir. 1997). However, pleadings that "are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937; *see also Sinaltrainal v. Coca  Cola Co.*, 578 F.3d 1252, 1260 (11th Cir. 2009) (stating that an unwarranted deduction of fact is not considered true for purpose of determining whether a claim is legally sufficient).

**\*6**  Generally, a plaintiff is not required to detail all of the facts upon which he bases his claim. Fed. R. Civ. P. 8(a)(2). Rather, Rule 8(a)(2) requires a short and plain statement of the claim that fairly notifies the defendant of both the claim and the supporting grounds. *Twombly*, 550 U.S. at 555  56, 127 S.Ct. 1955. However, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief," *Twombly*, 550 U.S. at 556 n.3, 127 S.Ct. 1955. Plaintiff's "obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555, 127 S.Ct. 1955 (citation omitted). "Factual allegations must be enough to raise [plaintiff's] right to relief above the speculative level, on the assumption that all of the allegations in the complaint are true." *Id.*

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   5

Private securities fraud claims are subject to a heightened pleading standard. "To survive a motion to dismiss, a claim brought under [§ 10(b) and] Rule 10b 5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading requirements found in Federal Rule of Civil Procedure 9(b); and (3) the additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *FindWhat Investor Grp. v. FindWhat.com,* 658 F.3d 1282, 1296 (11th Cir. 2011).

Under Rule 9(b), the complaint must "set[ ] forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.' " *Ziemba v. Cascade Int'l Inc.,* 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1371 (11t h Cir. 1997)). "A sufficient level of factual support for a 10b claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when, where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.,* 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotation marks and citations omitted).

"The PSLRA imposes additional heightened pleading requirements on Rule 10b 5 actions." *FindWhat,* 658 F.3d at 1296. "For Rule 10b 5 claims predicated on allegedly false or misleading statements or omissions, the PSLRA provides that 'the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.' " *Id.* (quoting 15 U.S.C. § 78u 4(b)(1)).

### III. DISCUSSION

**I. Count I—Section 10(b).**
Section 10(b) of the Exchange Act forbids (1) "the use or employ[ment] ... of any ... deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of Securities and Exchange

Commission rules and regulations." 15 U.S.C. § 78j(b). Rule 10b 5 prohibits, *inter alia,* the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made ... not misleading." 17 C.F.R. § 240.10b 5 (2004).

**[1]** "To state a claim for securities fraud under § 10(b) of the Exchange Act and Rule 10b 5 promulgated thereunder, a plaintiff must adequately allege: (1) a material misrepresentation or omission; (2) scienter a wrongful state of mind; (3) a connection between the misrepresentation and the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities market (fraud-on-the-market cases) as transaction causation; (5) economic loss; and (6) loss causation, i.e., a causal connection between the material misrepresentation and the loss." *Meyer v. Greene,* 710 F.3d 1189, 1194 (11th Cir. 2013) (citing *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 341 42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005)).

**\*7 (1) Material Misrepresentation or Omission.** Defendants move to dismiss Count I for failure to plead false or misleading statements with particularity. Plaintiffs contend that Defendants' statements about their contractual relationship with BOP were materially misleading because they omitted information that (i) GEO Group's contracted private facilities lacked adequate safety and security standards, and were less efficient than BOP facilities; (ii) GEO Group's private facilities often failed to adhere to contractual obligations; (iii) a significant risk existed that the DOJ would recommend phasing out BOP's contracts with GEO; and (iv) consequently, a risk also existed that other government agencies would choose to investigate GEO Group's private prisons.

There are three types of statements that Plaintiffs allege triggered a duty to disclose that GEO Group's inadequate prison conditions put its BOP contracts at risk:

> Statements that GEO Group relies on BOP, ICE, and U.S. Marshals Service contracts for a large percent of its revenue, as well as statements disclosing its BOP contracts, and the resulting revenue;
>
> GEO Group's statement about contract compliance, specifically, "We operate each facility in accordance with our company-wide policies and procedures and

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.   6

with the standards and guidelines required under the relevant management contract;" and

Statements touting the strength of GEO Group's relationship with BOP, and its optimism about leveraging that relationship for future growth.

**Statements about Current Contracts and Revenue.** [4]
Defendants argue that Plaintiffs have not pled any facts showing the statements detailing GEO Group's current revenue, its BOP contracts, and the share of its revenue attributable to the BOP, ICE, and U.S. Marshals Service contracts were false or misleading. Plaintiffs contend that Defendants' statements about GEO Group's BOP contracts, and the resulting revenue, misleadingly portray GEO Group as a company with a steady revenue source despite the significant risk that the DOJ would recommend phasing out these contracts due to inadequate conditions at GEO Group prisons.

[4]     The following statements are at issue in this section:
(1) "We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. (*Id.* ¶¶ 67, 77, 91, 103, 104, 116).
(2) GEO Group's statement that around 40% of its revenues came from BOP, ICE, and U.S. Marshals Service contracts, and that GEO Group had worked with various governments for approximately 25 years. (*Id.* ¶¶ 68, 77, 91, 103, 104, 116, 117).
(3) GEO Group's financial and operating results for each relevant quarter. (*Id.* ¶¶ 70 75, 81 82, 85, 87 88, 94 95, 97 98, 100 101, 107 108, 113 114.121, 122 124).
(4) GEO Group's announcement of new contracts with BOP and expected revenues from those contracts, as well as bid opportunities that GEO Group was pursuing. (*Id.* ¶ 102, 106, 112, 115, 119,122).

[2]  "Rule 10b 5 prohibits not only literally false statements, but also any omissions of material fact 'necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.' " *FindWhat Inv'r Grp.*, 658 F.3d at 1305 (citing 17 C.F.R. § 240.10b 5(b)). "By voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not

so incomplete as to mislead." *Id.* (internal citation and quotation omitted).

[3]   [4]   "A statement is misleading if in the light of the facts existing at the time of the statement[,] a reasonable investor, in the exercise of due care, would have been misled by it." *Id.* (internal citation and quotation omitted). "Thus, the appropriate primary inquiry is into the meaning of the statement to the reasonable investor and its relationship to truth." *Id.* (internal citation and quotation omitted). "Requiring that disclosures be complete and accurate does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise." *Id.* (internal citation and quotation omitted). "A corporation has a duty to neutralize only the natural and normal implication of its statements." *Id.* (internal citation and quotation omitted).

*8   [5]   In *FindWhat*, the corporate defendant ran a "pay-per-click" advertising service, for which revenue was determined, in part, by the price that advertisers bid for a click on their ads, which in turn increased when clicks were more likely to convert into a sale. *Id.* at 1291. For "pay-per-click" advertising services, click fraud, when a robot clicks on ads, generates short-term revenue, but can harm a company in the long term because it decreases the amount that advertisers are willing to bid for a click. *Id.* The plaintiffs alleged that the defendant's revenue disclosures were misleading because they portrayed the company as a growth company without revealing that such growth was based on illicit click-fraud operators. *Id.* at 1305. The Eleventh Circuit held that the defendant's general statement about revenue did not impose a duty to disclose the underlying quality of the defendant's click traffic, reasoning as follows:

No reasonable investor would believe that a conclusory, but apparently accurate, report of company-wide revenue growth naturally implied that all was well within every component of the company that could possibly affect revenue in the future. Otherwise, factual reporting of past earnings  disclosure of which the securities laws always encourage and frequently require     would become a treacherous endeavor indeed. Under the [p]laintiffs' preferred rule, company reports of revenue growth  no matter how factually accurate and no matter the level of generality  would be made at the company's peril, carrying a concomitant obligation to reveal a detailed picture of every aspect of the company's operations that could possibly bear on future

revenue. This is not the rule. "Factual recitations of past earnings, so long as they are accurate, do not create liability under Section 10(b)." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999); *see also Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 361 (1st Cir. 1994) ("[D]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy ...").

*Id.* at 1306.

[6] Here, Defendants' general statements about GEO Group's revenue, and the relationships and contracts generating that revenue, do not imply that all is well within every component of GEO Group's contractual relationships that could affect revenue in the future. Rather they are conclusory, but apparently accurate, statements of revenue. Because they do not convey a false impression about the underlying factors affecting Defendants' contractual relationships, they do not impose a duty to disclose the quality of conditions in Defendants' prisons, or the likely effect of such conditions on Defendants' contractual relationships. Accordingly, Defendants' omission of this information, as pled, was not misleading under the circumstances, and therefore neither were the statements themselves. *See* 17 C.F.R. § 240.10b 5(b).

**Statement about Contract Compliance.**[5] Defendants argue that Plaintiffs have not pled facts showing Defendants' statement that GEO Group operates its facilities in accordance with contract guidelines is false or misleading, arguing that this statement is not a guarantee or a representation, but rather a confirmation that GEO Group is subject to certain standards. Plaintiffs characterize this statement as a representation of current compliance with contractual standards, and contend that the 2016 OIG Report, Reeves Audit, Wessler Article, ACLU Report, and confidential witness statements document GEO Group's non-compliance.

[5] The following statement is at issue in this section: "We operate each facility in accordance with our company wide policies and procedures and with the standards and guidelines required under the relevant management contract. (*Id.* ¶¶ 68, 77, 91, 103, 104, 117).

The PSLRA requires Plaintiffs to state the reasons why a statement was false at the time that it was made. *See*

15 U.S.C. § 78u 4(b)(1); *see, e.g.*, *Bryant v. Avado Brands, Inc.*, 100 F.Supp.2d 1368, 1384 85 (M.D. Ga. 2000), *rev'd on other grounds by Bryant v. Dupree*, 252 F.3d 1161 (11th Cir. 2001) (holding allegations that company's sales were not meeting expectations in September 1996 did not show that company's sales were not meeting expectations in February 1996 when allegedly misleading statement was made). "A sufficient level of factual support for a 10b claim may be found where the circumstances of the fraud are pled in detail. This means the who, what, when where, and how: the first paragraph of any newspaper story." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006) (internal quotations and citations omitted).

*9 [7] The Wessler Article and confidential witness statements document incidents of poor medical care and security at GEO Group's facilities, but they do not offer any insight into whether these incidents rose to the level of contract violations. The ACLU Report states that GEO Group used isolation cells in contravention of BOP policy, but does not identify the relevant timeframe. The ACLU Report also states that BOP monitors expressed frustration in 2010 that GEO Group "is unable to successfully achieve their own plans of action to correct deficient areas," but that was before the Class Period began in March 2012.

The 2016 OIG Report, the Reeves Audit, and BOP Reports come closer to demonstrating instances of non-compliance, but also fail to show that GEO Group's statements about contract compliance were false when made. The 2016 OIG Report states that in the fall of 2012, the BOP issued GEO Group's D. Ray facility a cure notice, which is issued to a contract prison that is not meeting the vital functions of its contract, but Defendants made the statement about GEO Group's contract compliance in March 2012, March 2013, March 2014, February 2015, and February 2016, not in the fall of 2012. Thus, it is possible that GEO Group was in compliance with contractual requirements at the times the statement was made.

The Reeves Audit states that "the contractor" had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control, but does not specifically identify GEO Group, which was one of many subcontractors at Reeves, or the time frame of the contract violations. Although the Audit noted that Reeves' medical

contractor failed to meet contractual staffing obligations in the medical unit for at least 34 of the 37 months from 2010 to 2013, according to the Audit, the medical contractor was CHC, not GEO Group.

Finally, the Amended Complaint alleges that unidentified BOP Reports document deficiencies in healthcare at GEO Group's prisons "for years," but it does not identify the dates or the nature of these deficiencies. The Amended Complaint also alleges that BOP considered not renewing its contract with Reeves County, noting 230 citations and $2 million in penalties for compliance failures at the Reeves facility, but it does not identify the timeframe or whether GEO Group was the contractor responsible for the violations. The head of BOP's Privatization Management Branch wrote that BOP inspectors "have identified serious issues in health care," but this email was sent before the Class Period began. Accordingly, Plaintiffs have failed to plead specific facts that would lead to an inference that Defendants' statements about compliance were false when they were made.[6]

6    Because I find that Plaintiffs do not plead the falsity of Defendants' statement with particularity, I do not address Defendants' argument that this statement is not a representation that GEO Group is in compliance with contractual standards, but rather a confirmation that such standards apply.

**Statements about GEO Group's BOP Relationship and Future Growth.**[7] Defendants argue that the statements about GEO Group's relationship with BOP and future growth are non-actionable statements of corporate optimism, predictive opinions, or forward-looking statements protected by safe harbor. Plaintiffs contend that (i) the statements were misleading as to the facts forming the basis for GEO Group's optimism, specifically the strength of GEO Group's relationship with the BOP and the quality of its services, and (ii) any forward-looking statements are not entitled to safe harbor because the accompanying risk disclosures were not meaningful or because Defendants lacked a reasonable basis for believing the statements.

7    The following statements are at issue in the section:
(1) "We have developed long term relationships with our federal, state and other governmental customers, which we believe enhance our ability to win new contracts and retain existing business. (Id. ¶¶ 68, 77, 91, 103, 104).

(2) "We have long standing partnerships with the Federal Bureau of Prisons, the United States Marshals Service and the United States Immigration and Customs Enforcement or ICE. And we provide cost effective solutions for them at a number of facilities across the country. We continue to see meaningful opportunity for us to partner with all 3 of these federal agencies, notwithstanding the various issues with the federal budget. (Id. ¶¶ 76, 80, 83, 86, 89, 93, 96, 99, 102, 106, 109, 110 111).

(3) "We are very pleased with our strong fourth quarter results and our outlook for 2016 which reflect the continued organic growth of our diversified business segments of GEO Corrections & Detention and GEO Care. (Id. ¶ 115).

(4) "We believe that our unique platform of correctional and rehabilitation services better positions GEO to capture future growth, which will enhance value for our shareholders and allow us to continue to grow our earnings, cash flows and dividend payments. (Id. at 119).

(5) " [W]e are optimistic that our projects will be reviewed favorably for continued use. We have a very good relationship with the Bureau of Prisons and our seven facilities with the 15,000 beds operational performances at the appropriate levels and exceeding our expectations and the client's expectations. So we have no reason to believe that they the client will not view them appropriately on a going forward basis. (Id. ¶ 122).

**\*10** **[8]** "Statements regarding *future* performance are actionable only if they are worded as guarantees or are supported by specific statements of fact or if the speaker does not genuinely or reasonably believe them." *FindWhat,* 658 F.3d at 1304 (internal citation and quotation omitted). Defendants' statements contain a mix of generalized optimism, opinion, forward-looking projections, and statements of fact. The statements of fact tout the strength of GEO Group's current relationship with the BOP and the quality of GEO Group's services as significant factors in predicting the likelihood of BOP's continued use of GEO Group's prison services.

However, only material misrepresentations or omissions are actionable. 17 C.F.R. § 240.10b 5 ("It shall be unlawful for any person ... [t]o make any untrue statement of a material fact or to omit to state a material fact ....").

"[A] misstatement or omission is material if there is a 'substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available.' " *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245 (11th Cir. 2012) (citing *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)); *see also FindWhat*, 658 F.3d at 1298 99 (holding that, to avoid being misleading, statements of fact "triggered a duty to disclose [any] grave defects that existed within the [relationship and services] [ ] voluntarily touted"); *SEC v. Merchant Capital, LLC*, 483 F.3d 747, 770 71 (11th Cir. 2007) (holding that duty to disclose all material information relating to a particular subject arises by voluntarily "touting" the subject to investors). Information that GEO Group's services were inadequate, or that its relationship with BOP was fragile, if true, may have significantly altered the total mix of information available to the reasonable investor, and if so, would have been necessary for a reasonable investor to assess whether the quality of GEO Group's services and the strength of its relationship with BOP were likely to enhance GEO Group's ability to obtain additional contracts. *See Merchant Capital*, 483 F.3d at 771 (holding company's statement, touting consultant's expertise for generating returns without disclosing consultant's previous personal bankruptcy, was misleading).

[9] However, as a preliminary matter, the Amended Complaint fails to plead specific facts showing that GEO Group's services were inadequate, or that its relationship with BOP was strained. As discussed above, the Wessler Article, ACLU Report, and confidential witnesses address safety concerns at GEO Group's facilities, and provide anecdotal evidence that conditions in GEO Group prisons were worse than in BOP prisons, but do not provide sufficient facts to infer that conditions in GEO Group's prisons were inadequate or otherwise jeopardized GEO Group's relationship with the BOP. And although the 2016 OIG Report states that the BOP issued GEO Group's D. Ray facility a cure notice in the fall of 2012, there are no allegations that contract violations persisted or that the cure notice permanently impaired GEO Group's relationship with the BOP, Indeed, the Amended Complaint pleads facts suggesting the opposite may be true. According to the Amended Complaint, GEO Group's relationship with BOP continued for four more years after the 2012 cure notice, and it was not until the DOJ directed the BOP to phase out its contracts with GEO

Group that BOP took action.[8] Accordingly, Plaintiffs fail to plead specific facts showing that GEO Group's statements about the quality of its services or the strength of its relationship with BOP were misleading.[9]

8    The closest Plaintiffs come to pleading a material misrepresentation is the August 2, 2016 earnings call. This was seven days before Zoley's response letter to the 2016 OIG Report. However, the Amended Complaint does not allege when Zoley or GEO Group received the Report.

9    Having found that Plaintiffs have not sufficiently pled that Defendants' statements about GEO Group's services and BOP relationship were false or misleading, I need not determine the extent to which Defendants' statements are statements of corporate optimism, opinion, or entitled to safe harbor.

*11 In sum, Plaintiffs have not satisfied the particularity requirements under Rule 9(b) or PSLRA. The Amended Complaint, thus, fails to plead a material misrepresentation or omission.

[10]    [11]    [12] (2) Scienter. Under PSLRA, "the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind [i.e., scienter]." § 78u 4(b)(2). "In this Circuit, § 10(b) and Rule 10b 5 require a showing of either an intent to deceive, manipulate, or defraud, or severe recklessness." *Thompson v. RelationServe Media, Inc.*, 610 F.3d 628, 634 (11th Cir. 2010) (internal quotation marks and citations omitted), "Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Bryant*, 187 F.3d at 1287 n.18. Accordingly, "[a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

**[13]** **[14]** **[15]** This inquiry asks "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322 23, 127 S.Ct. 2499. In doing so, "courts must consider the complaint in its entirety," and "omissions and ambiguities count against inferring scienter." *Id.* at 322, 326, 127 S.Ct. 2499. To survive a motion to dismiss, the complaint must "allege facts supporting a strong inference of scienter for *each* defendant with respect to each" violation." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (emphasis added) (internal quotation marks and citations omitted).

Plaintiffs allege that Defendants either had knowledge of, or were severely reckless to, the danger of misleading investors by stating (1) GEO Group's revenue, (2) that GEO Group complied with contractual standards, and (3) that it had a strong relationship with BOP and provided quality services that would enable it to retain current contracts and obtain future contracts. To support an inference of scienter, Plaintiffs cite the Individual Defendants' motive to sell shares from their personal portfolios, their high-level positions at GEO Group, GEO Group's internal reporting structure, frequent BOP audits, prisoner lawsuits, prison disturbances, the Wessler Article, and the ACLU Report.

**[16]** **[17]** "[A]lthough motive and opportunity to commit fraud may under some circumstances contribute to an inference of severe recklessness," standing alone, they are insufficient to do so. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1285 (11th Cir. 1999). On their own, Plaintiffs' allegations that the Individual Defendants stood to benefit from the sale of securities at an inflated price do not support scienter, and Plaintiffs do not plead additional facts to show how Individual Defendants benefitted from the allegedly misleading statements. *See Abrams v. Baker Hughes, Inc.*, 292 F.3d 424, 434 (5th Cir. 2002) (finding allegations that defendants were motivated to commit fraud by the need to raise capital, the desire for enhanced incentive compensation, and the desire to sell stock at inflated prices were not enough to plead scienter); *see also Kalnit v. Eichler*, 264 F.3d 131, 140 (2d Cir. 2001) ("[A]n allegation that defendants were motivated by a desire to maintain or increase executive compensation is insufficient because such a desire can be imputed to all corporate officers,"). For example, Plaintiffs do not allege that Defendants sold securities during the Class Period,

or that such sales were dramatically out of line with prior trading practices. *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) (finding no motive to personally benefit when "[t]here is no claim here that false statements were made in an effort to sell off shares held by management").

**\*12** Similarly, merely holding a position of power does not lead to an inference of scienter without specific allegations of the Individual Defendants' role in the fraud. *See In re Spear & Jackson Sec. Litig.*, 399 F.Supp.2d 1350, 1360 61 (S.D. Fla. 2005) (Middlebrooks, J.). Plaintiffs' allegation that Zoley was a "hands on" CEO is nothing more than a conclusory label. *See, e.g., In re Republic Servs., Inc. Sec. Litig.*, 134 F.Supp.2d 1355, 1360 (S.D. Fla. 2001); *In re Royal Caribbean Cruises Ltd. Sec. Litig.*, No. 1:11-22855-CIV, 2013 WL 3295951, at \*19 (S.D. Fla. Apr. 19, 2013). The only allegation that comes anywhere close to showing the Individual Defendants had a role in the fraud was a confidential witness statement that corporate headquarters directed facilities to maintain staff vacancies to increase profits. However, this allegation does not provide that any of the Individual Defendants issued, or even knew about, this directive. Neither does low staffing necessarily mean that GEO Group would be unable to maintain adequate prison conditions.

Plaintiffs' allegations that GEO Group had an internal reporting structure, without particular allegations of what information the Individual Defendants actually received, do not support a strong inference of scienter. *See Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1265 (11th Cir. 2006) (concluding that general allegations about what was discussed at meeting involving senior executives was insufficiently particularized where the complaint "failed to allege what was said at the meeting, to whom it was said, or in what context"). Although Plaintiffs allege that "problems" were brought to the attention of Hurley, Zoley, and Evans, they do not allege the content of the information that the Individual Defendants received or the reasonable conclusions that they drew from this information. [0] Similarly, a compliance director, who stated that the compliance directors distributed a monthly report of the results of contract compliance audits to GEO Group's executives, did not provide any information as to the content of these reports. The absence of allegations detailing the reports' contents, when Plaintiffs had access to a director who compiled the reports, gives rise to the alternate inference that the

reports did not give the Individual Defendants notice of inadequate prison conditions that could jeopardize GEO Group's contracts, *See FindWhat*, 658 F.3d at 1303 (finding the omission of relevant allegations gave rise to an inference against scienter given that plaintiffs had access to numerous employee witnesses, who could have provided the information); *cf. Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1240 (11th Cir. 2008) ("[T]he weight to be afforded to allegations based on statements proffered by a confidential source depends on the particularity of the allegations made in each case.").

10  The Amended Complaint does not allege that Donahue received any information relevant to the allegedly misleading statements through the internal reporting structure.

Plaintiffs' other allegations address only whether information about incidents at GEO Group's prisons existed, not whether and when the Individual Defendants received this information, and the reasonable inferences they drew from it. There are no allegations as to whether and when the Individual Defendants received notice of BOP audits, or the content of these audits during the relevant times.    There are no allegations that the Individual Defendants were notified of prisoner lawsuits against GEO Group, or if they were, the import that they attributed to such lawsuits, given the frequency of prisoner litigation. Plaintiffs do not allege that the Individual Defendants read the Wessler Article or ACLU Report. Indeed, it appears that the Wessler Article was published after the Class Period. Finally, the prison disturbances in GEO Group prisons, cited by the 2016 OIG Report, all occurred before the Class Period.

11  As discussed above, the Amended Complaint alleges that BOP Reports document deficiencies in healthcare at GEO Group's prisons and compliance failures at Reeves, but it does not identify the dates or the nature of these deficiencies.

**\*13** The alternate inferences that can be drawn from the Amended Complaint are more compelling than the inference that Defendants touted GEO Group's relationship with BOP despite their awareness that inadequate conditions in GEO Group prisons created a significant risk of losing BOP contracts, GEO Group had provided services to the BOP for decades, which services the BOP frequently audited. In addition, GEO Group obtained several new contracts and contract renewals

with the BOP over the course of the Class Period. These facts support an alternate inference that the Individual Defendants reasonably believed GEO Group had a strong relationship with the BOP, and that there was not a significant risk that the DOJ would phase out BOP's use of contractors due to conditions in GEO Group's prisons. Although confidential witnesses stated that there was talk that the DOJ would revoke private prison contracts due to safety, security and budget factors and that Zoley's son-in-law said private prison companies could be "losing business soon," these allegations are too conclusory to support a strong inference of scienter. *See FindWhat*, 658 F.3d at 1303 (holding "Plaintiffs' allegation that it was 'commonly known' within the Company that Defendants relied on click fraud, [ ] is conclusory and plainly lacks sufficient particularity to create a strong inference of scienter").

In sum, Plaintiffs have failed to allege facts to support a strong inference that any Individual Defendant knowingly, or with severe recklessness, issued materially misleading statements about GEO Group's prison conditions and its relationship with the BOP. As to GEO Group, "[c]orporations have no state of mind of their own; rather, the scienter of their agents must be imputed to them." *See Thompson*, 610 F.3d at 635. Where, as here, a complaint fails to allege scienter as to a corporate officer, the complaint also fails to allege scienter of the corporation. *Id.* (concluding where complaint fails to sufficiently plead scienter as to any corporate directors or officers, complaint fails to plead scienter as to corporation). Accordingly, the Complaint fails to plead scienter as to GEO Group.

Because Plaintiffs have not pled a material misrepresentation or omission, or scienter, the Amended Complaint fails to state a claim under Section 10(b) and Rule 10b 5. [2]

12  Defendants also argue that Plaintiffs have not alleged loss causation because (1) GEO Group's filings disclosed that it would be adversely affected in the event its government clients decided to terminate or not renew its contracts, and (2) prior public reports of conditions in GEO Group's prisons, including the 2016 OIG Report, did not cause GEO Group's stock price to drop. However, I decline to address this argument in light of my finding that Plaintiffs have

WESTLAW  © 2017 Thomson Reuters. No claim to original U.S. Government Works.  12

failed to state a claim under § 10(b) by failing to allege a material misrepresentation and scienter.

**B. Count II—Section 20(a).**

 **[18]**  Section 20(a) of the Exchange Act creates liability for those who control others who commit an underlying violation of the federal securities laws. 15 U.S.C. § 78t(a). Because Plaintiffs fail to plead a primary violation of Section 10(b) of the Exchange Act, Plaintiffs do not plead a violation of Section 20(a). [3] *See Mizzaro*, 544 F.3d at 1237 ("Because a primary violation of the securities laws is an essential element of a § 20(a) derivative claim, we have held that a plaintiff adequately pleads a § 20(a) claim only if the primary violation is adequately pleaded.").

[13]    I decline to address the Individual Defendants' argument that Plaintiffs fail to allege how each Individual Defendant controlled GEO Group or was responsible for the alleged misleading statements.

## CONCLUSION

The Amended Complaint fails to allege a violation under the Exchange Act, and is, therefore, dismissed

without prejudice. Plaintiffs may file a Second Amended Complaint by March 30, 2017. [4]

[14]    Plaintiffs have not filed a motion for leave to amend the complaint but have indicated in response to the Motions to Dismiss a desire to amend the complaint.

**ORDERED AND ADJUDGED** that

(1)  Defendant The GEO Group, Inc.'s Motion to Dismiss (DE 65) is **GRANTED.**

(2) Defendants George C. Zoley, Brian R. Evans, John Hurley, and David Donahue's Motion to Dismiss (DE 66) is **GRANTED.**

(3) Plaintiffs may file a Second Amended Complaint by **March 30, 2017.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Florida, this 22 day of February, 2017.

**All Citations**

--- F.Supp.3d ----, 2017 WL 887193

---





Analysis
As of: Jul 26, 2017

**SANTOKH SOHOL, individually and on behalf of all people similarly situated, Plaintiffs vs. ELLIS YAN, et al., Defendants.**

**Case No. 1:15-cv-00393**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO, EASTERN DIVISION**

*2016 U.S. Dist. LEXIS 56049*; *Fed. Sec. L. Rep. (CCH) P99,080*

**April 27, 2016, Decided**
**April 27, 2016, Filed**

**PRIOR HISTORY:** *Sohol v. Yan, 2016 U.S. Dist. LEXIS 23208 (N.D. Ohio, Feb. 25, 2016)*

**CASE SUMMARY:**

**OVERVIEW:** HOLDINGS: [1]-The investor pled sufficient facts in the Second Amended Complaint to supports its claims under Section 11 and *12(a)(2) of the Securities Act, 15 U.S.C.S. §§ 77k(a), 77l(a)(2),* where the investor alleged the company made material misstatements when it made assertions about its commitment to quality control and the production of its products; [2]-The evidence supported the idea that the company was experiencing irregularities at the time of the IPO, which undermined the veracity of the statements being challenged in the Offering Materials; [3]-The claims against one individual were dismissed because the investor did not adequately plead scienter, but the claims against the other individual did and were allowed; [4]-The investor's adequately pleaded claims meant that its claims under *Section 15 of the Securities Act* and Section 20 of the Exchange Act were revived.

**OUTCOME:** Motion granted, judgment vacated.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Relief From Judgment > Motions to Alter & Amend*
*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*
[HN1] The purpose of a *Fed. R. Civ. P. 59(e)* motion is to allow the district court to correct its own errors, thus sparing the parties and appellate courts the burden of unnecessary appellate proceedings. Although *Rule 59* permits a party to move for reconsideration in certain circumstances, it does not allow a party to simply reargue its case. Under *Rule 59(e)*, a court may alter or amend its judgment: (1) to accommodate an intervening change in controlling law; (2) to consider newly discovered evidence; or (3) to prevent a clear error of law or a manifest injustice. In order to show clear error, a party must not only establish that errors were made, but that

Page 2

2016 U.S. Dist. LEXIS 56049, *; Fed. Sec. L. Rep. (CCH) P99,080

these errors were so egregious that an appellate court could not affirm the judgment.

**Civil Procedure > Judgments > Relief From Judgment > Excusable Neglect & Mistakes**
**Civil Procedure > Judgments > Relief From Judgment > Extraordinary Circumstances**
[HN2] *Fed. R. Civ. P. 60(b)(1)* and *(b)(6)* allow a court to grant relief from judgment for mistake, inadvertence, surprise, or excusable neglect or when any other reason justifies relief. If a movant relies on allegations of legal error to support its motion for relief from judgment, the motion should be premised on the category of mistake under *Rule 60(b)(1)*. *Rule 60(b)(6)* applies only in circumstances not addressed by the other provisions of the Rule and only in unusual and extreme situations where principles of equity mandate relief. Relief under *Rule 60(b)* is circumscribed by public policy favoring finality of judgments and termination of litigation. Moreover, a movant fails to demonstrate entitlement to relief under any subsection of 60(b) when he simply rephrases his prior allegations.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims**
[HN3] In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the nonmoving party. A court need not, however, credit bald assertions, legal conclusions, or unwarranted inferences.

**Civil Procedure > Pleading & Practice > Defenses, Demurrers & Objections > Failures to State Claims**
[HN4] To survive a motion to dismiss, a complaint must include enough facts to state a claim to relief that is plausible on its face, and not merely conceivable. The factual allegations must be sufficient to raise a right to relief above the speculative level. Although *Fed. R. Civ. P. 12(b)(6)* does not impose a probability requirement at the pleading stage, a plaintiff must present enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a cause of action. Simply reciting the elements of a cause of action does not suffice.

**Securities Law > Liability > Securities Act of 1933**

**Actions > Civil Liability > False Registration Statements > Elements of Proof**
[HN5] *Section 11 of the Securities Act* provides: In case any part of a registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may sue--(1) every person who signed the registration statement; (2) every person who was a director of or partner in the issuer at the time of the filing; and (5) every underwriter with respect to such security, *15 U.S.C.S. § 77k(a)*. *Section 12(a)(2)*, in turn, permits a plaintiff to sue "any person" who offers or sells a security by means of a prospectus which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading, *15 U.S.C.S. § 77l(a)(2)*.

**Securities Law > Liability > Securities Act of 1933**
**Actions > Civil Liability > False Registration Statements > Elements of Proof**
**Securities Law > Initial Public Offerings & the Securities Act of 1933 > Registration of Securities > Filing**
[HN6] Claims under *sections 11* and 12(a)(2) are *Securities Act* siblings with roughly parallel elements. So long as a plaintiff establishes one of the three bases for liability under these provisions--(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that is necessary to prevent existing disclosures from being misleading--then, in a Section 11 case, the general rule is that an issuer's liability is absolute. Unlike securities fraud claims pursuant to *section 10(b) of the Securities Exchange Act of 1934*, plaintiffs bringing claims under sections 11 and 12(a)(2) need not allege scienter, reliance, or loss causation.

**Securities Law > Liability > Securities Act of 1933**
**Actions > Civil Liability > False Registration Statements > Elements of Proof**
**Civil Procedure > Pleading & Practice > Pleadings > Complaints > Requirements**
[HN7] Because claims under Sections 11 & *12(a)(2) of*

Page 3

2016 U.S. Dist. LEXIS 56049, *; Fed. Sec. L. Rep. (CCH) P99,080

*the Securities Act* need not include allegations of fraud, this is an ordinary notice pleading case, subject only to the short and plain statement requirements of *Fed. R. Civ. P. 8(a)*.

**Securities Law > Liability > Securities Act of 1933 Actions > Civil Liability > False Registration Statements > Elements of Proof**

[HN8] A misrepresentation or omission is material if a reasonable investor would have considered it significant. Undisclosed information is considered material if there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having significantly altered the total mix of information available to that investor. A complaint may not properly be dismissed on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Elements of Proof**

[HN9] In order to state a claim under § 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

**Securities Law > Liability > Securities Exchange Act of 1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements**

[HN10] The *Private Securities Litigation Reform Act's (PSLRA)* exacting pleading requirements obligate a plaintiff to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud. If even one of the plaintiff's allegations satisfies the *PSLRA's* pleading standard, then the complaint must survive. A securities fraud claim may not be dismissed based on a court's disbelief of the facts alleged.

**Securities Law > Liability > Securities Exchange Act of**

**1934 Actions > Implied Private Rights of Action > Heightened Pleading Requirements**

[HN11] A plaintiff must adequately plead particular facts giving rise to a "strong inference" that this defendant acted with the state of mind required under the *Private Securities Litigation Reform Act*, *15 U.S.C.S. § 78u-4(b)(2)*. The inference may arise from allegations of a knowing and deliberate intent to manipulate, deceive, or defraud or recklessness, defined as highly unreasonable conduct which is an extreme departure from the standards of ordinary care and so obvious that any reasonable man would have known of it.

**COUNSEL:** [*1] For Santokh Sohal, On Behalf of All People Similarly Situated, Plaintiff: Laurence M. Rosen, LEAD ATTORNEY, Phillip C. Kim, Rosen Law Firm, New York, NY; Daniel R. Karon, Law Office of Daniel R. Karon, Cleveland, OH.

For Daniel V Leach, Jr., (Plaintiff in Member Case 1:15cv917), Plaintiff: Richard S. Wayne, Thomas P. Glass, Strauss & Troy, Cincinnati, OH.

For City of Warren Police & Fire Retirement System, Lead Plaintiff: Douglas S. Wilens, PRO HAC VICE, Robbins Geller Rudman & Dowd - Boca Raton, Boca Raton, FL; Jack Landskroner, Landskroner Grieco Merriman, Cleveland, OH; Jack Reise, Robbins Geller Rudman & Dowd - Boca Raton, Boca Raton, FL.

For Tim Williams, (Plaintiff in Member Case 1:15cv398), Plaintiff: Jack Landskroner, Landskroner Grieco Merriman, Cleveland, OH; Darren J. Robbins, David C. Walton, PRO HAC VICE, Robbins Geller Rudman & Dowd - San Diego, San Diego, CA; Douglas S. Wilens, Robert J. Robbins, Sabrina E. Tirabassi, PRO HAC VICE, Robbins Geller Rudman & Dowd - Boca Raton, Boca Raton, FL; Frank J. Johnson, Johnson & Weaver, San Diego, CA; Jack Reise, Robbins Geller Rudman & Dowd - Boca Raton, Boca Raton, FL; Thomas C. Michaud, PRO HAC VICE, Vanoverbeke Michaud & Timmony, [*2] Detroit, MI.

For Ellis Yan, (Defendant in Member Case 1:15cv398), Defendant: Charles F. Smith, Jr., Skadden Arps Slate Meagher & Flom - Chicago, Chicago, IL; Judy L. Woods, Benesch, Friedlander, Coplan & Aronoff - Indianapolis, Indianapolis, IN; Steven S. Kaufman, Kaufman & Company, Cleveland, OH.

For Brian Catlett, TCP International Holdings Ltd.,

Page 4

2016 U.S. Dist. LEXIS 56049, *2; Fed. Sec. L. Rep. (CCH) P99,080

Defendants: Charles F. Smith, Jr., LEAD ATTORNEY, Skadden Arps Slate Meagher & Flom - Chicago, Chicago, IL; Gail L. Ellis, Marcella L. Lape, LEAD ATTORNEYS, Skadden Arps Slate Meagher & Flom - Chicago, Chicago, IL; Daniel R. Warren, Baker & Hostetler - Cleveland, Cleveland, OH.

For Deutsch Bank Securities Inc., (Defendant in Member Case 1:15cv398), Piper Jaffray & Co., (Defendant in Member Case 1:15cv398), Canaccord Genuity Inc., (Defendant in Member Case 1:15cv398), Cowen and Company, LLC, (Defendant in Member Case 1:15cv398), Defendants: Fritz E. Berckmueller, LEAD ATTORNEY, Kirsty F. McNamara, Mitchell G. Blair, Calfee, Halter & Griswold - Cleveland, Cleveland, OH; Adam S. Hakki, Daniel C. Lewis, PRO HAC VICE, Shearman & Sterling, New York, NY; Charles F. Smith, Jr., Skadden Arps Slate Meagher & Flom - Chicago, Chicago, IL.

For Wang Jie Yi, [*3] Movant as Proposed Lead Plaintiff: James D. Wilson, Law Office of James D. Wilson, Cleveland, OH.

For Leonard Z May, (Movant in Member Case 1:15cv398), Movant: Richard S. Wayne, Thomas P. Glass, Strauss & Troy, Cincinnati, OH.

For Sohol & Scott, (Movant in Member Case 1:15cv917), Movant: Phillip C. Kim, Rosen Law Firm, New York, NY.

For Leonard Z May, (Movant in Member Case 1:15cv398), Movant: C. Dov Berger, LEAD ATTORNEY, Jeremy A. Lieberman, Pomerantz - New York, New York, NY; Patrick V. Dahlstrom, Pomerantz - Chicago, Chicago, IL; Richard S. Wayne, Thomas P. Glass, Strauss & Troy, Cincinnati, OH.

**JUDGES:** Dan Aaron Polster, United States District Judge.

**OPINION BY:** Dan Aaron Polster

**OPINION**

**OPINION AND ORDER**

Before the Court is Plaintiff's Motion to Reconsider and Set Aside, Alter, Amend, or Vacate Judgment pursuant to *Federal Rules 59(e)*, *60(b)(1)*, and/or *60(b)(6)*

(**Doc. #: 55**). Defendants have opposed the motion (Doc. #: 56), and Plaintiff has replied. (Doc. #: 57). Plaintiff argues, correctly, that the Court's previous order granting Defendants' motion to dismiss Plaintiff's Second Amended Complaint failed to address one of Plaintiff's claims, namely, that Defendants violated *Section 10(b)* and *Rule 10b-5 of the Exchange Act* when they made material misstatements [*4] or omissions in their post-IPO filings and statements. Plaintiff maintains that these claims are adequately pled and should be allowed to proceed.

Plaintiff also argues that dismissal of Plaintiff's Securities claims was erroneous because the Court overlooked a critical allegation in the Second Amended Complaint and failed to give Plaintiff the benefit of all reasonable inferences in relation to Defendants' pre- and post-IPO conduct.

After a careful reconsideration of the issues presented, the Court finds Plaintiff's arguments well-taken. Plaintiff's Motion is accordingly granted, the Court's Judgment is vacated, and Plaintiff's Second Amended Complaint is reinstated.

**I. Factual and Procedural Background**

In 1989, Defendant Ellis Yan ("Yan") and his brother began developing, manufacturing, and assembling lighting products, and, in 1993, TCP International Holdings, Ltd. ("TCP") was formed. (Doc. #: 45, P38). In 1996, TCP "introduced a groundbreaking energy efficient compact fluorescent lamp, the 'SpringLamp,' which revolutionized the residential lighting industry for the first time since Thomas Edison's invention of the light bulb." (*Id.*, P38).

On April 9, 2014, TCP was preparing to make an Initial [*5] Public Offering ("IPO"), and it filed a Draft Registration Statement on Form S-1 with the SEC. (*Id.*, P41). On June 25, 2014, after several amendments, the Registration Statement was deemed effective, and, on June 26, 2014, more than 27 million common shares were available on the New York Stock Exchange. (*Id.*, PP41-42). A Prospectus was filed with the SEC on June 27, 2104. (*Id.*, P43).

On February 26, 2015, TCP's now former General Counsel Laura Hauser sued TCP, one of its subsidiaries, and Defendant Yan in Cuyahoga Court of Common Pleas. (*Id.*, P48). That lawsuit, the allegations of which

are described in more detail below, revealed numerous instances of alleged misconduct on the part of Defendant Yan. (*Id.*, PP49-58). The market allegedly reacted swiftly to news of the *Hauser* lawsuit and, on February 27, 2015, TCP's share price dropped dramatically to 75% below the IPO price. (Doc. #: 45, P70).

In turn, on March 2 and March 5, 2015, TCP shareholders filed three related securities class actions in the United States District Courts for the Northern District of Ohio and the Southern District of New York.[1] The shareholder plaintiffs in all three cases asserted that Defendants made material false and misleading statements in the Registration [*6] Statement and Prospectus, in violation of the federal Securities laws. On May 29, 2015, the three cases were consolidated before this Court. (Doc. #: 35). The City of Warren Police & Fire Retirement System ("City of Warren") was appointed Lead Plaintiff ("Plaintiff"), and Plaintiff was directed to file a Consolidated Complaint. (*Id.*).

1 The first two cases, *Sohol v. Yan, et al.*, Case No. 1:15 CV 393 and *Williams v. Yan, et al.*, Case No. 1:15 CV 398 ("Williams case") were filed on March 2, 2015, in the U.S. District Court for the Northern District of Ohio. The third case, Leach v. TCP, et al., was filed in the U.S. District Court for the Southern District of New York on March 5, 2015.

*A. Plaintiff's Consolidated Amended Complaint*

On June 12, 2015, Plaintiff filed a Consolidated Amended Complaint ("CAC"). (Doc #: 36). The named Defendants included Corporate Defendant TCP and individual Defendants Ellis Yan (TCP's CEO) and Brian Catlett (TCP's CFO), who were signatories to the Company's Registration Statement. Plaintiff also sued four underwriter defendants,[2] who allegedly participated in the drafting and dissemination of the Registration Statement.

2 Underwriter Defendants included Deutsche Bank [*7] Securities Inc., Piper Jaffray & Co., Canaccord Genuity Inc., and Cowen and Company, LLC.

The CAC alleges that the Registration Statement and Prospectus ("Offering Materials") issued by TCP pursuant to its June 2014 IPO contained material misstatements or omissions in violation of *Section 11*, *Section 12(a)(2)*, and *Section 15* of the Securities Act. Specifically, the Offering Materials allegedly included false or misleading statements regarding Underwriters Laboratory ("UL") and Energy Star approval of TCP's products. (Doc. #: 36, PP 48-53). Additionally, Plaintiff alleged numerous instances in which Defendants falsely stated their commitment to quality control and the production of high quality lighting products.

To support the claim that these statements were false or misleading, the CAC highlights the alleged irregularities that were revealed in the *Hauser* lawsuit. (*Id.*, PP54-60). According to Plaintiff, at some point in 2014, Ms. Hauser learned that approximately 900,000 units of a LED lighting product had been improperly labeled with a UL certification. (*Id.*, PP54). It was further alleged that in August 2014, 40,000 LED lamps designated specifically for the Cinemark movie theaters were manufactured with the UL mark, pursuant to Yan's direct [*8] order, before the lamps actually received UL listing approval. (Doc. #: 36-2, P23). Ms. Hauser allegedly brought these irregularities to the attention of the Board, and, in December 2014, an investigation was initiated by the TCP's Audit Committee. (Doc. #: 36, PP54-56).

Following the investigation, the Audit Committee issued a memorandum stating that Defendant Yan had knowingly taken "unilateral action and disregard[ed] the need for factbased decision-making"; "limited visibility of financial information and accountability" causing TCP to bypass regulatory and supplier certification processes; and instructed employees to disregard quality assurance and control processes. (*Id.*, P58).

Additionally, the Audit Committee determined

> [t]hat each of the matters addressed in its memorandum reflects [Defendant Yan's] unwise, inappropriate and/or unlawful decision-making. The Audit Committee advised [Defendant E. Yan] of the need for a proper 'tone at the top' of the organization; developing and relying upon sound, supportable financial plans and planning functions; requiring internal controls that are effective and not disregarded or overridden; ensuring proper focus by the Company on compliance with legal and regulatory [*9] requirements;

Page 6

2016 U.S. Dist. LEXIS 56049, *9; Fed. Sec. L. Rep. (CCH) P99,080

maintaining the integrity of the Company's financial reporting; and in general making sure that there is a collaborative effort among each and every member of the executive management team to manage the Company's overall risk from multiple sources."

(*Id.*, P59). The Audit Committee concluded "that the manner in which [Defendant Yan] had been operating the Company must change 'promptly and substantially,'" and it set forth directives that

[n]o product destined for sale in the United States is to be manufactured or assembled by the Company or marketed with the UL logo unless and until [it] has been tested and received its UL listing certification, all in the normal course of business . . . . The same directive applies to the EnergyStar® program as well. . . . You have no authority to give, and are forbidden from giving, either directly or indirectly, any contrary instructions explicitly or implicitly

(*Id.*, P60).

On February 27, 2015, the company issued a press release announcing that the *Hauser* lawsuit had been filed against it. (*Id.*, P61). On March 2, 2015, the Company issued a second press release responding to the *Hauser* Action which also was filed with the SEC as an exhibit to the March 3, 2015 8-K, [*10] wherein it announced that it "takes these allegations seriously" and that "the one claim against TCP is without merit, and TCP intends to vigorously defend against it. (*Id.*, P62). On April 15, 2015, the Company announced that Defendant E. Yan would be stepping down as CEO on June 30, 2015. (*Id.*, P63).

### B. Defendants' First Motion to Dismiss

On July 20, 2015, Defendants filed a Motion to Dismiss for failure to state a claim upon which relief can be granted, arguing that the above allegations failed to support a plausible claim under the *Securities Act*. (Doc. #: 39). On September 30, 2015, this Court issued an Order granting Defendants' motion and holding that CAC failed to allege facts by which it could reasonably be inferred that statements made in the Registration

Statement and Prospectus were false or misleading at the time those statements were made. (Doc. #: 43). Specifically, the Court observed that

Here, the Complaint does not allege facts (sufficient to meet the *Iqbal/Twombly* pleading standard) that describe any wrongful acts prior to the IPO, the falseness of any statements when made, and any independent investigation which have been done in preparing the Complaint. While the Court must make plausible [*11] inferences in Plaintiff's favor, it is inadequate to simply describe events occurring after the IPO and ask the Court to infer that some of those things necessarily occurred prior to the IPO, without allegations of fact supporting such an inference. For example, Planitiff [sic] argues that "in August 2014, just two months after the IPO, the Company manufactured 40,000 LED lamps with a false UL certification pursuant to Yan's direct order." Opp. 11, Doc #: 40 (internal quotation marks omitted). This allegation may be consistent with ongoing corporate disregard for quality control, but, absent significant additional facts, forty thousand offending bulbs produced in August does lead to an inference of misbehavior and consequent misstatements occurring during or before June. In fact, given that TCP is alleged to produce more than one million CFL bulbs per day, Cons. Compl. P 36, these facts may support an inference of a misbehavior time-frame much shorter than two months.

(Doc. #: 43, p. 5). The Court granted Plaintiff leave to amend the complaint to cure the deficiency.

### C. Plaintiff's Second Amended Complaint

On October 28, 2015, Plaintiff filed the Second Amended Complaint,[3] which was similar [*12] to the first but included additional factual allegations to support its claims that the Offering Materials contained material misstatements and omissions under *Sections 11* & *12(a)(2)*. (Doc. #: 45). Plaintiff also alleged new causes of action under *Sections 10(b)* and *10b-5* of the Exchange

Page 7

2016 U.S. Dist. LEXIS 56049, *12; Fed. Sec. L. Rep. (CCH) P99,080

Act.

3    As the operative pleading, the Second Amended Complaint is hereinafter referred to as "the Complaint."

In order to cure the deficiencies related to claims under *Sections 11* & *12(a)(2)*, Plaintiff offered the following new factual allegations in the Complaint:

45. Specifically, the Company utilized "golden samples" for testing purposes. A "golden sample" is used in the lighting industry to refer to a sample product that has been built and tested to ensure that it will receive UL certification. It is supposed to be representative of the product that will later be mass produced once it is approved. It is improper to knowingly build a superior sample in order to receive UL listing if the mass produced product will be inferior. With Defendant Yan at the helm, however, TCPI used "golden samples" made with quality material (and presumably, more likely to meet industry standards and perform well when tested), but then used inferior materials when the products were [*13] mass produced.

* * *

47. The fact that TCPI was building products before the proper UL certifications had been received was a topic of various discussions within the Company; in fact, Defendant Yan directed team members on several occasions to begin building products prior to receipt of UL certifications. Meeting attendees would question the legality of Defendant Yan's directive. They would further comment that building products prior to the receipt of UL listings or appropriate certifications "should not be done." Notwithstanding, whether building products prior to receiving UL certifications was proper and/or legal was of no moment to Defendant Yan, who took the view that it could be done and should be done.

* * *

81. The statements in the Offering Materials were materially misleading because they failed to disclose that: (a) the Company was manufacturing "high quality" and "energy efficient" lighting fixtures and labeling those products with UL and Energy Star® approval when no such approvals had been received; (b) as would later be revealed, Defendant Yan was circumventing corporate policies that impacted the manufacturing and quality control processes of these products which undermined [*14] the Company's standards and practices, such as "[b]ypassing regulatory (UL, CE, EnergyStar [sic], etc.) and supplier certification processes," and "[o]verriding and/or disregarding Company policies on matters such as...product design and safety certification;" (c) as the Company would ultimately admit in its 2014 10-K, Defendant Yan's "actions were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures;" (d) Defendant Yan's improper "tone at the top" predated both the IPO and the Hauser Action, as was memorialized in the police report filed by Hauser following an acrimonious meeting with Defendant Yan regarding his misconduct, which details Defendant Yan's "explosive" temper; and (e) the material weaknesses in its internal controls Defendants

(Doc. #: 45, PP45, 47, 81). To further support the claim that Defendant Yan was routinely engaging in misconduct, Plaintiff provided evidence of an altercation that occurred between Defendant Yan and Ms. Hauser in the form of a police report that was filed with the Cleveland Heights Police Department. (Doc. #: 45-2). In the Report, Ms. Hauser described Defendant Yan's "explosive temper" and "anger [*15] and aggression" toward her. (*Id.*).

*D. Defendants' Motion to Dismiss the Second Amended Complaint*

Page 8

2016 U.S. Dist. LEXIS 56049, *15; Fed. Sec. L. Rep. (CCH) P99,080

On December 14, 2015, Defendants filed a motion to dismiss the Complaint (Doc. #48), which Plaintiff opposed. (Doc. #: 50). On February 25, 2016, the Court entered an order granting the motion and dismissing Plaintiff's Complaint with prejudice. (Doc. #: 53). The Court concluded that Plaintiff's new allegations failed to cure the deficiencies of the Consolidated Amended Complaint. Specifically, the Court rejected as irrelevant Plaintiff's allegations of Defendant Yan's misconduct, including his "verbally abusive and demeaning" attitude, his "improper tone at the top," and his "explosive temper" as described by the police report. (*Id.* at 7-8). The Court concluded that these particular allegations related to corporate mismanagement and as a consequence were inactionable under the securities laws. (*Id.*).

Additionally, the Court rejected Plaintiff's other new allegations because "Plaintiff add[ed] no wrongful acts that are alleged to have predated the IPO." "Absent such allegations," the Court stated, "there is no wrongdoing for the Defendants to have misrepresented or omitted in the June 2014 Registration Statement [*16] and Prospectus." (*Id.* at 9).

As for Plaintiff's new claims under *Section 10(b)* and *Rule 10b-5 of the Exchange Act*, the Court rejected Defendants' argument that the addition of the claims exceeded the Court's grant of leave to amend. Nonetheless, the Court ruled that the claims were insufficiently pled, observing that "Plaintiff does not allege material facts or events that occurred prior to the IPO, and therefore fails to establish a material misrepresentation or omission." (*Id.* at 12).

Plaintiff now moves the Court for reconsideration of its judgment.

## II. Federal *Rules 59(e)*, *60(b)(1)* and *60(b)(6)*

[HN1] "The purpose of [a] *Rule 59(e)* [motion] is to allow the district court to correct its own errors, [thus] sparing the parties and appellate courts the burden of unnecessary appellate proceedings." *Howard v. United States, 533 F.3d 472, 475 (6th Cir. 2008)* (internal quotation marks omitted) (citation omitted). Although *Rule 59* permits a party to move for reconsideration in certain circumstances, it does not allow a party to simply reargue its case. *Dorger v. Allstate Ins. Co., No. 2:08-56-DCR, 2009 U.S. Dist. LEXIS 61686, 2009 WL 2136268, at *1 (E.D. Ky. July 16, 2009)*. Under *Rule 59(e)*, a court may alter or amend its judgment: (1) to

accommodate an intervening change in controlling law; (2) to consider newly discovered evidence; or (3) to prevent a clear error of law or a manifest injustice. *GenCorp, Inc. v. Am. Int'l Underwriters, 178 F.3d 804, 834 (6th Cir. 1999)*. In order to show "clear error," [*17] a party must not only "establish that errors were made, but that these errors were so egregious that an appellate court could not affirm the judgment." *Dorger, 2009 U.S. Dist. LEXIS 61686, 2009 WL 2136268, at *1-2*.

[HN2] *Rules 60(b)(1)* and *(b)(6)* allow a court to grant relief from judgment for "mistake, inadvertence, surprise, or excusable neglect" or when "any other reason [] justifies relief." *Fed.R.Civ.P. 60(b)(1)*, *(b)(6)*. If a movant relies on allegations of legal error to support its motion for relief from judgment, the motion should be "premised on the category of mistake under *Rule 60(b)(1)*." *Taylor v. Postmaster Gen., U.S. Postal Serv., 88 F. App'x 917, 919 (6th Cir. 2004)*. *Rule 60(b)(6)* applies only in circumstances not addressed by the other provisions of the Rule and only in "unusual and extreme situations where principles of equity mandate relief." *In re Ferro Corp. Deriv. Litig., 511 F.3d 611, 623 (6th Cir. 2008)*. "[R]elief under *Rule 60(b)* is circumscribed by public policy favoring finality of judgments and termination of litigation." *Id.* Moreover, a movant fails to demonstrate entitlement to relief under any subsection of *60(b)* when he simply rephrases his prior allegations. *Johnson v. Unknown Dellatifa, 357 F.3d 539, 543 (6th Cir. 2004)*.

## III. *Federal Rule 12(b)(6)*

[HN3] In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the nonmoving party. *See Shoup v. Doyle, 974 F.Supp.2d 1058, 1071 (S.D. Ohio 2013)* (citing *Handy-Clay v. City of Memphis, Tenn., 695 F.3d 531, 538 (6th Cir. 2012)*. A court need not, however, credit bald assertions, legal conclusions, or [*18] unwarranted inferences. *Kavanagh v. Zwilling, 578 Fed.Appx. 24 (2d Cir. Sep. 17, 2014)* (citing *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-56, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*); *see also Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*.

[HN4] To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face," and not merely "conceivable." *Twombly, 550 U.S. at 570*. The factual allegations must

Page 9

2016 U.S. Dist. LEXIS 56049, *18; Fed. Sec. L. Rep. (CCH) P99,080

be sufficient "to raise a right to relief above the speculative level." *Id. at 555.* Although *Rule 12(b)(6)* does not impose a probability requirement at the pleading stage, a plaintiff must present enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary elements of a cause of action. *Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008)* (quotation marks omitted). Simply reciting the elements of a cause of action does not suffice. *Iqbal, 556 U.S. at 678.*

## IV. Law and Argument

### A. Plaintiff's Claims under *Sections 11* and *12 of the Securities Act*

[HN5] *Section 11 of the Securities Act* provides:

> In case any part of [a] registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may ... sue--(1) every person who signed the registration statement; (2) [*19] every person who was a director of ... or partner in the issuer at the time of the filing[;] ... [and] (5) every underwriter with respect to such security.

*15 U.S.C. § 77k(a). Section 12(a)(2),* in turn, permits a plaintiff to sue "[a]ny person" who "offers or sells a security ... by means of a prospectus ... which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." *15 U.S.C. § 77l(a)(2).*

[HN6] "Claims under *sections 11* and *12(a)(2)* are ... *Securities Act* siblings with roughly parallel elements." *In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 359 (2d Cir.2010).* "So long as a plaintiff establishes one of the three bases for liability under these provisions--(1) a material misrepresentation; (2) a material omission in contravention of an affirmative legal disclosure obligation; or (3) a material omission of information that

is necessary to prevent existing disclosures from being misleading--then, in a *Section 11* case, the general rule is that an issuer's liability ... is absolute." *Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 715-16 (2d Cir. 2011)* (citation and internal quotation marks omitted). "[U]nlike securities fraud claims pursuant to *section 10(b)* of the Securities Exchange Act of 1934, plaintiffs bringing claims under *sections 11* and *12(a)(2)* need not allege scienter, reliance, or loss causation." [*20] *Morgan Stanley Info. Fund, 592 F.3d at 359* (citation omitted).

[HN7] Because claims under *Sections 11* & *12(a)(2)* need not include allegations of fraud, "this is an ordinary notice pleading case, subject only to the 'short and plain statement' requirements of *Federal Rule of Civil Procedure 8(a).*" *Litwin, 634 F.3d at 715.*

In the present case, Plaintiff alleged that TCP made material misstatements when it made assertions about its commitment to quality control and the production of UL and Energy Star certified products. The pivotal issue on Defendants' motion to dismiss was whether Plaintiff had alleged facts by which it could be reasonably inferred that the alleged misstatements were untrue at the time of the IPO or that the alleged omissions related to facts known to Defendant at that same time. The Court previously answered these questions in the negative, because the facts that Plaintiff asserted to support the inference either (1) were deemed irrelevant (e.g. the allegation of an "improper tone at the top") or (2) were found to be related to the time period following the IPO (e.g. allegation that Defendant Yan authorized falsely labeling 40,000 bulbs in August 2014). Because the Court determined that no relevant pre-IPO instances of wrongdoing had been pled, it concluded that it could not reasonably infer [*21] that the Offering Materials contained any misstatement or that the Offering Materials omitted a material fact that could have been known to Defendants at the time of the IPO.

Having carefully reconsidered these issues in light of the parties' arguments on Plaintiff's *Rule 60* motion, the Court now reverses its previous judgment. First, Plaintiff correctly observes that the Court overlooked allegations related to TCP's 2014 10-K report. According to the Complaint, the 2014 10-K "covered the Company's entire fiscal year." (Doc. #: 45, ¶67). Accepting this allegation as true for present purposes, it is necessarily the case that the findings described in the Report existed at the time of,

Page 10

2016 U.S. Dist. LEXIS 56049, *21; Fed. Sec. L. Rep. (CCH) P99,080

and prior to, the IPO, which occurred on June 25, 2014. The findings in the 10-K included,

> that "due to a material weakness in our internal control over financial reporting . . . our disclosure controls and procedures were not effective."

> Our Chief Executive Officer's actions were inconsistent with setting an appropriate tone at the top by failing to adhere to the Company's established policies and procedures. Our Chief Executive Officer bypassed reporting lines established to enable the execution of authorities [*22] and responsibilities, which facilitate the flow of information to manage the activities of the Company and ensures that financial reporting matters could be adequately evaluated in a timely manner.

> Structural and management circumstances at the Company, generally centered on the Chief Executive Officer's ubiquitous and highly personalized approach to running the Company, need to be rectified.

> Despite a long history of designing and manufacturing quality products, the Company would benefit from improvements in its process for securing and documenting UL listings for its products.

(*Id.*, ¶¶65-66).

The findings reported in TCP's 10-K, being applicable to the year 2014, reasonably support the idea that the Company was experiencing irregularities at the time of the IPO, which undermine the veracity of the statements being challenged in the Offering Materials. For instance, the CEO's failure to adhere to policy and procedure, the need to rectify "structural and management" problems arising from the CEO's management style, and, in particular, the recognized need for improving the process for securing UL listings all reasonably support the claim that TCP was misrepresenting its commitment to quality [*23] control and the production of certified products. Additionally,

with respect to the claim that TCP omitted material facts from the Offering Materials, a disclosure of the issues identified in the 2014 10-K would have been necessary to prevent the disclosures that were made from being misleading.

The combination of TCP's 10-K admissions, which covered the 2014 calender year, and the numerous specific instances of alleged post-IPO misconduct on the part of Defendant Yan create a reasonable inference of material misconduct pre-IPO. Yan's post-IPO actions, which are entirely consistent with the alleged pre-IPO conduct, include Defendant Yan's alleged authorization of the manufacture of 40,000 falsely labeled light bulbs in August 2014, the mislabeling of 900,000 LED bulbs with a UL mark, and the company use of so-called Golden Samples for testing purposes. While all occurring post-IPO, these examples demonstrate a pattern of questionable behavior on the part of Defendant Yan. When viewing the constellation of allegations of misconduct, it can be reasonably inferred that this pattern is illustrative of the pre-IPO "structural and management" problems, the problems with securing UL certification, [*24] and the failure to adhere to policy and procedure, which the Company admitted to in the 2014 10-K report.

As it did previously, the Court again rejects as irrelevant a number of allegations relating to Defendant Yan's demeanor. In particular, the allegations relating to Defendant Yan's "improper tone at the top" and Ms. Hauser's concerns about Yan's business practices amount at most to mere corporate mismanagement and are inactionable under the securities laws. (See Doc. #: 53, p. 7).

The Court concludes that Plaintiff has pled sufficient facts to demonstrate the materiality of the alleged misstatements and omissions. [HN8] A misrepresentation or omission is material if a reasonable investor would have considered it significant. *Basic Inc. v. Levinson, 485 U.S. 224, 232, 108 S. Ct. 978, 99 L. Ed. 2d 194 (1988)*. Undisclosed information is considered material if "there is a substantial likelihood that the disclosure would have been viewed by the reasonable investor as having 'significantly altered the "total mix" of information' available to that investor." *See In re Westinghouse Sec. Litig., 90 F.3d 696, 714 (3d Cir.1996)* (quoting *TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S. Ct. 2126, 48 L. Ed. 2d 757 (1976))*. "[A] complaint may not properly be dismissed ... on the ground that the

Page 11

2016 U.S. Dist. LEXIS 56049, *24; Fed. Sec. L. Rep. (CCH) P99,080

alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable [*25] minds could not differ on the question of their unimportance." *Ganino v. Citizens Utils. Co., 228 F.3d 154, 162 (2d Cir.2000)*.

In this case, TCP indicated that its UL and Energy Star approvals and "commitment to quality assurance and control through every stage of the production" were critically important. (Doc. #: 45, ¶¶33, 76). At this procedural posture, the Court is persuaded that a reasonable investor in TCP would find these things important as well. As for the materiality of the alleged omissions, the Court is also persuaded. There is little question that the issues revealed in the 10-K were material, since the Audit Committee indicated that it found a "material weakness." Moreover, the "total mix" of information would have been significantly altered for the reasonable investor if it had been revealed that TCP was suffering from "structural and management" problems arising from the practices of the CEO; or that TCP needed to improve its process for securing UL certification; or that the CEO had demonstrated a failure to adhere to policy and procedure.

As it did in its previous Order issued September 30, 2015, the Court again rejects Defendants' puffery arguments. At the motion to dismiss stage, it is not necessary that all or even most alleged [*26] statements be more than mere puffery, and consequently the Court need not presently discuss which alleged statements may or may not be puffery.

In sum, the Court concludes that Plaintiff has pled sufficient facts in the Second Amended Complaint to support its claims under *Section 11* and *12(a)(2)* of the Securities Act.

## B. Plaintiff's *Exchange Act* Claims

The Complaint alleges that Defendants continued to make material misstatements and omissions in violation of *Section 10(b)* of the Exchange Act and *Rule 10b-5*, even after the Offering Materials were filed. As noted in Plaintiff's motion for reconsideration, the Court did not address these claims in its Opinion and Order dismissing the Second Amended Complaint. Therefore, the Court will do so now.

[HN9] In order to state a claim under *§10(b)* of the Exchange Act and *Rule 10b-5*, a plaintiff must allege:

"(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 37-38, 131 S. Ct. 1309, 179 L. Ed. 2d 398 (2011)*.

[HN10] The *PSLRA's* "[e]xacting pleading requirements" obligate a plaintiff to "state with particularity both the facts constituting the alleged violation, [*27] and the facts evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" *Tellabs, 551 U.S. at 313*. If even "one of [the plaintiff's] allegations [satisfies] the *PSLRA's* pleading standard," then the complaint must survive. *In re FirstEnergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 596 (N.D. Ohio 2004)*. A securities fraud claim may not be dismissed based on a court's disbelief of the facts alleged. *Bridgestone, 399 F.3d at 665*.

In this instance, Defendants did not dispute that the scienter element is satisfied as to Defendant Yan, and there was no dispute that third, fourth, and fifth elements are also satisfied. Thus, the only questions on this claim are, one, whether Plaintiff has adequately pled the first element - material misrepresentation or omission - and, two, whether Plaintiff has sufficiently alleged scienter as to Defendant Catlett.

### 1. Material Misrepresentation

As for the first element, the Complaint alleges that on August 7-8 and November 7, 2014, the TCP Defendants touted, in post-IPO SEC filings, press releases, and conference calls, the Company's high quality products ("high quality energy efficient lamps, fixtures and internet-based lighting control solutions") (Doc. #: 45, ¶¶115-117, 119); Energy Star-compliant products ("we have established the largest number of Energy [*28] Star compliant light products for LEDs and CFLs combined") (*Id.*, ¶¶116-17, 19); and effective, unchanged internal controls. (*Id.*, ¶¶118, 120).

The primary issue here, as with Plaintiff's Securities claims above, is whether the Complaint contains sufficient allegations by which it can be inferred that the above assertions were false or misleading at the time they were made. Upon review of the Complaint, the Court answers this question in the affirmative. These statements were misleading because they failed to disclose that TCP

Page 12

2016 U.S. Dist. LEXIS 56049, *28; Fed. Sec. L. Rep. (CCH) P99,080

was mislabeling products as Energy Star and UL-approved (*Id., ¶¶44-47*, 50-58, 121). At least one instance of mislabeling was alleged to have occurred prior to November 7, 2014. Therefore, this is a fact that would have been known to Defendant Yan and TCP at the time the statements were made on November 7.

It is reasonable to infer that prior to August 7, Yan was circumventing internal policies and procedures, which adversely impacted the Company's quality control and resulted in products being mislabeled as Energy Star and UL-approved (*Id., ¶¶44-47*, 50-58, 62-68, 121). These are material facts that a reasonable investor would have considered significant. Further [*29] Plaintiff has established that TCP's claim that it possessed "effective, unchanged internal controls" is materially false or misleading based on the Company's admission in the 2014 10-K that its internal controls suffered from a "material weakness."

### 2. The Scienter Element

As noted above, Defendants did not challenge the element of scienter with respect to Defendant Yan but do raise the issue with respect to Defendant Catlett. (Doc. #: 48-1, pp. 30-31). To prevail on its *Exchange Act* claims against Defendant Catlett,[HN11] Plaintiff must adequately plead particular facts giving rise to a "strong inference" that this defendant acted with the state of mind required under *PSLRA*. *15 U.S.C. § 78u-4(b)(2)*. The inference may arise from allegations of a "knowing and deliberate intent to manipulate, deceive, or defraud" or recklessness, defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care [and] so obvious that any reasonable man would have known of it." *Frank v. Dana Corp., 646 F.3d 954, 958-59 (6th Cir. 2011)*.

Plaintiff has failed to plead particular facts showing that Defendant Catlett acted with the requisite state of mind. The mere fact that Defendant Catlett was CFO is insufficient. *See In re Comshare Inc. Sec. Litig., 183 F.3d 542, 548 (6th Cir. 1999)* ("plaintiffs may plead scienter in [*30] *§ 10(b)* or *Rule 10b-5* cases by alleging facts giving rise to a strong inference of recklessness, but not by alleging facts merely establishing that a defendant had the motive and opportunity to commit securities fraud."). If anything, Plaintiff's allegation that Catlett expressed

objections to Yan's directive to label 40,000 LED lamps with a UL mark before actually receiving UL certification establishes that Catlett had no intent to defraud.

Because Plaintiff has not adequately pled scienter as to Defendant Catlett, the *Section 10(b)* and *Rule 10b-5* claims against him are dismissed.

On the other hand, these claims may proceed with respect to Defendant Yan. Additionally, because the Court is persuaded that Plaintiff has adequately pled material misstatements and omissions based on statements made in the Offering Materials, *see supra* pp. 12-16, Plaintiff's claims against Defendant Yan may proceed on that factual basis as well.

### C. Claims under *Section 15 of the Securities Act* and *Section 20(a) under the Exchange Act*

In its Opinion and Order dated February 2, 2016, the Court dismissed Plaintiff's claims for control person liability under *Section 15* of the Securities Act and *Section 20(a)* of the Exchange Act, on the ground that Plaintiff failed to plead underlying violations. As described above, [*31] the Court has determined on reconsideration that Plaintiff has adequately stated underlying claims pursuant to *Sections 11 & 12(a)* of the Securities Act and *Section 10(b)* and *Rule 10b-5* of the *Exchange Act*. As a consequence, Plaintiff's claims under *Section 15* of the Securities Act and *Section 20(a)* of the Exchange Act are revived.

### IV. Conclusion

For the reasons stated above, Plaintiff's motion to reconsider and vacate, set aside, alter or amend judgment (Doc. #: 55) is granted. The Court's judgment (Doc. #: 54) is vacated, and Plaintiff's Second Amended Complaint (Doc. #: 45) is reinstated, except with respect to Plaintiff's *Exchange Act* claims against Defendant Catlett.

**IT IS SO ORDERED**.

**Date: 4/27/2016**

**/s/ Dan Aaron Polster**

**United States District Judge**