UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

<table>
<tr><td>

NIKKI BOLLINGER GRAE, Individually<br>
and on Behalf of All Others Similarly<br>
Situated,<br>
<br>
Plaintiff,<br>
<br>
v.<br>
<br>
CORRECTIONS CORPORATION OF<br>
AMERICA, DAMON T. HININGER,<br>
DAVID M. GARFINKLE, TODD J.<br>
MULLENGER, and HARLEY G. LAPPIN,<br>
<br>
Defendants.

</td><td>

)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)<br>
)

</td><td>

<br>
<br>
<br>
<br>
<br>
<br>
Case No. 3:16-cv-2267<br>
Judge Aleta A. Trauger

</td></tr>
</table>

## MEMORANDUM

Pending before the court is a Motion to Dismiss (Docket No. 60) filed by CoreCivic (formerly Corrections Corporation of America), Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin ("Individual Defendants") (collectively, "CoreCivic"), to which Amalgamated Bank, as Trustee for the LongView Collective Investment Fund, ("Amalgamated") has filed a Response (Docket No. 67), and CoreCivic has filed a Reply (Docket No. 73). For the reasons stated herein, CoreCivic's motion will be denied.

## I. BACKGROUND & PROCEDURAL HISTORY[1]

CoreCivic is a publicly traded real estate investment trust ("REIT") that owns and operates correctional, detention, and residential reentry facilities. (Docket No. 57 ¶ 2.) Due to the nature of its business, CoreCivic relies on federal, state, and local governments as clients. (Id. ¶ 34.) In the period from February 27, 2012, through August 17, 2016 ("Class Period"),

---

[1] The facts are taken primarily from Amalgamated's Amended Complaint ("Complaint"). (Docket No. 57.) Except where otherwise noted, the facts are accepted as true for the purpose of deciding the merits of CoreCivic's Motion to Dismiss.

CoreCivic's federal clients, including the Federal Bureau of Prisons ("BOP") and Immigration and Customs Enforcement, accounted for between 43% and 51% of the company's annual revenue. (*Id.* ¶¶ 1, 34) In particular, CoreCivic's BOP contracts—which covered five facilities collectively housing approximately 8,000 inmates—were responsible for between 11% and 13%[2] of CoreCivic's annual revenue. (*Id.* ¶¶ 2, 34.) The BOP is a subdivision of the United States Department of Justice ("DOJ"). *See Mauldin v. United States*, No. 3:07-0496, 2008 WL 821523, at *3 (M.D. Tenn. Mar. 27, 2008).

Throughout the Class Period, Hininger was CoreCivic's chief executive officer, and Lappin was its chief corrections officer. Mullenger was its chief financial officer until his retirement from that position on May 1, 2014, after which that position was held by Garfinkle. Hininger, Mullenger, and Garfinkle respectively signed all or some of CoreCivic's Securities and Exchange Commission ("SEC") filings. (Docket No. 57 ¶¶ 22–25.) Although Lappin is not alleged to have signed the filings, he did participate, with Hininger and Mullenger, in presentations to investors. (*Id.* ¶ 149.)

Throughout the Class Period, Amalgamated purchased and held stock in CoreCivic. (Docket No. 40-2.) It has been appointed the lead plaintiff in this securities fraud litigation. (Docket No. 52.)

## A. CoreCivic's Relationship with the BOP

The crux of this case is whether CoreCivic and its executives misled investors about its history of quality, savings, and compliance at BOP facilities, causing those investors to suffer

---

[2] When discussing the Class Period as a whole, Amalgamated suggests that the BOP contracts' share of CoreCivic revenue went as high as 15% (Docket No. 57 ¶ 2), but the Complaint's enumeration of annual revenues reflects a 15% BOP share only for 2010, before the Class Period (*Id.* ¶ 34). Insofar as these numbers are inconsistent—which they might not be, if the Class Period's alleged 15% reflects a sub-period other than a particular year—the discrepancy would have no effect on the court's analysis, which would reach the same conclusion based on either figure.

losses when the truth about CoreCivic's operations came to light and the DOJ announced a decision to significantly curtail and eventually end the BOP's reliance on CoreCivic. In support of that theory, Amalgamated identifies a long-running series of deficiencies at CoreCivic's BOP facilities.

### 1. Adams County Correctional Center

The Adams County Correctional Center ("Adams") is a CoreCivic-owned, low-security prison in Natchez, Mississippi. In April 2009, CoreCivic announced a contract to house BOP prisoners in the facility. That contract was set to expire in July 2017, with a two-year renewal option. As of April 7, 2016, Adams housed 1,906 prisoners—mostly non-resident aliens convicted of non-violent federal offenses—with the median inmate spending 436 days at the facility. (*Id.* ¶ 43.) Although, as detailed below, CoreCivic's operation of Adams was troubled in many regards, the facility was most notable for a May 2012 riot that resulted in the death of a CoreCivic employee.

On May 20, 2012, Adams inmates "initiated a disturbance" intended to highlight the prisoners' concerns about conditions at the facility. (*Id.* ¶ 44.) That disturbance developed into a riot lasting more than twelve hours and resulting in the death of an Adams correctional officer, significant injuries to other staff and inmates, and more than one million dollars of property damage. (*Id.*)

Deborah Temple was a correctional officer at Adams at the time of the riot. In an affidavit dated July 17, 2014, Temple wrote:

> Prior to the Riot, the Prison was short staffed and there were not enough Prison employees to adequately control the prisoners. My co-workers and I informed Prison officials on numerous occasions that there were not enough Prison employees to adequately control the prisoners and that insufficient staffing created a dangerous work environment for the Prison employees.

> My co-workers and I were told not to worry about it and to "suck it up." In fact, I was told to "put my big girl panties on and get back to work." Prison officials ignored the fact that the Prison was short staffed and that the prison employees were in danger of physical harm due to the short staffing. Prison officials knew the Prison was short staffed. When the Bureau of Prisons would perform their audits at the Prison, Prison officials would call in all possible Prison employees so it would appear as though the Prison was adequately staffed, even though it was not.

(*Id.* ¶ 45.)

Temple's affidavit provides a first-person account of the riot and the events leading up to the killing of her colleague, Catlin Carithers. According to Temple, Adams "officials had been told by the prisoners that something big was going to happen that day," and "the prisoners had made a hit list that included on it the names of Prison guards," including Temple and, reportedly, Carithers. (*Id.* ¶¶ 46–47.) Temple's affidavit states that Adams was "short staffed" at the time—with "probably" twenty or fewer prison employees on site—and the warden made the decision not to place the facility on lockdown despite having received the warning. (*Id.* ¶ 46.) When the riot erupted, Temple was ordered by a superior to go to the roof of one of the prison buildings:

> I obtained the keys to the roof hatches and got on the roof of the building with my co-worker Smith. We observed about 1200 to 1500 prisoners gathered at the prison gates demanding to speak to the Warden. The prisoners at that time gave Prison officials a list of Prison employees who were on the hit list. My name was on the hit list as was the name of Catlin Carithers. Catlin joined us on the roof of the building.
>
> We had been on the roof for about 1 hour when my co-worker Smith left Catlin and I alone on the roof. Catlin had been called in from his day off. He started laying out all the gas canisters and began explaining to me . . . how to use them.

(*Id.*) As Temple and Carithers remained on the roof, the prisoners were able to seize a maintenance ladder that would allow them to ascend the building:

> I then heard an alert on the Prison radio that the prisoners had taken the ladder . . . , and that Catlin and I were then instructed to deploy the gas. That is when all hell broke loose. Carithers and I threw the gas into the crowd of prisoners as instructed, hoping they would [disperse]. Instead, the prisoners began

throwing the canisters of gas back onto the roof where we were located. They were also throwing at us garbage cans and rocks and anything else they could find. Catlin was a short distance away from me and I saw him trying to dodge food trays that were also being thrown at us. I then saw a head come over the side of the roof of the building that we were on. Two prisoners then appeared and confronted us. They asked for my keys and my radio. I could see that other prisoners were coming up the ladder onto the roof. Before I could respond about my keys and radio a prisoner began beating me with a metal pan and a food tray. I blacked out and I remember next seeing Catlin lying motionless on the roof near me. I called out to him but he never verbally responded.

(*Id.*)

After the riot was over, the BOP commissioned an "After-Action Report." The report, which was dated July 27, 2012, stated that the riot could be "directly attributed to actions taken by the [Adams] administration," in particular with regard to prison officials' failure to "grasp the severity and degree of the . . . inmates' intent to orchestrate a meeting"—a failure that the report attributed in part to Adams' lack of Spanish-speaking staff. (*Id.* ¶ 48.) A Federal Bureau of Investigations review concluded that the riot was at least in part attributable to inmates' having become disgruntled at the quality of the food, medical conditions, and treatment by staff at Adams. (*Id.* ¶ 49.)

Throughout the Class Period, the BOP sent CoreCivic a number of "Notices of Concern" related to its contractual compliance. On August 10, 2012, the BOP sent CoreCivic a Notice of Concern citing staffing shortages both before and after the riot:

The facility failed to maintain the [minimum staffing requirements] eleven months out of a total of sixteen months during the period of April 201[1] through July 2012. The referenced eleven months in which your facility failed to meet the minimum staffing requirements are as follow[s]: April 2011, May 2011, June 2011, July 2011, September 2011, October 2011, November 2011, April 2012, May 2012, June 2012 and July 2012.

(*Id.* ¶ 53.) Notices of Concern citing continued insufficient staffing levels were also sent on November 14, 2012, February 22, 2013, May 16, 2013, and June 9, 2014. (*Id.* ¶¶ 54–55, 57, 60.)

In addition to the Notices of Concern about staffing levels, the BOP sent a Notice of Concern on September 19, 2012, stating that "[r]eview of the [riot] by the Bureau of Prisons revealed several significant incidents of nonconformance" with the terms and conditions of the Adams contract. The Notice of Concern specifically cited CoreCivic's failure to conform to contractual requirements regarding gathering and disseminating "[i]ntelligence information related to security concerns" as well as terms about maintaining an "adequate level of emergency readiness." (*Id.* ¶ 49.)

The BOP also sent CoreCivic a number of reports related to BOP on-site monitoring at Adams. On March 31, 2011, the BOP sent CoreCivic a report citing a number of deficiencies related to medical care and testing, including one "repeat repeat deficiency," meaning a deficiency that had been repeated twice. (*Id.* ¶ 51.) On April 6, 2012, the BOP sent CoreCivic a monitoring report noting four deficiencies in correctional programs, one deficiency in correctional services, one in education and recreational services, two in food service, one in inmate services, and nine in health services, including a repeat deficiency. (*Id.* ¶ 52.) A February 27, 2013 report noted one deficiency in correctional programs, two in correctional services, two in education, four in safety, and twenty in health services. (*Id.* ¶ 56.) A January 24, 2014 report noted three repeat deficiencies and eleven other deficiencies related to health services, one deficiency in correctional programs, and one in safety and environmental health. (*Id.* ¶ 59.) A March 13, 2015 report included a "significant finding"—the highest level of deficiency finding possible in such a report—related to health services. (*Id.* ¶ 61 & n.5.) That report specifically criticized, among other things, CoreCivic's handling of five cases that had resulted in prisoner deaths for causes including respiratory distress and improperly treated diabetes. (*Id.* ¶ 61)

At certain times during the Class Period, the BOP made "Award Fee Determinations" regarding whether CoreCivic was entitled to "award fees" related to its performance. On May 23, 2013, the BOP sent a CoreCivic managing director an Award Fee Determination letter regarding Adams, stating:

> I have reviewed the recommendation of the Performance Evaluation Board based upon the performance monitoring information and the self-assessment submitted by Corrections Corporation of America (CCA). After a thorough review of this information, an award fee has not been authorized for the aforementioned performance period.
>
> Adams County Correctional Center received one repeat deficiency and twenty-one deficiencies during the February 2013 CFM Review. Additionally, six Notice of Concerns (NOC) were issued for contract noncompliance (failure to follow security procedures). Specifically, the NOC's were issued for CCA's failure to maintain staffing levels and failure to properly [redaction][3] in the Special Housing Unit (SHU). On May 20, 2012, Adams County experienced a large scale inmate disturbance resulting in substantial property loss, staff assaults and a staff fatality. Review of the incident by the Bureau of Prisons (BOP) revealed several instances of non-conformance. Correctional Services has had some issues with staff turnover, inmate accountability, and supervisors/correctional officers failing to properly follow policies and post orders within the SHU.
>
> Deficiencies have increased with the contractor's quality control component. Additionally, the contractor provided limited information in their self-assessment on program weaknesses despite the government's observations during this performance period.

(*Id.* ¶ 58.) A June 1, 2015 Award Fee Determination Letter stated:

> I have reviewed the recommendation of the Performance Evaluation Board (PEB) based upon the performance monitoring information and the self-assessment submitted by Corrections Corporation of America (CCA). After a thorough review of this information, it has been determined that the overall performance of the facility by the PEB is in the "Unsatisfactory" range for determining an award fee, and I concur with their assessment. Therefore, an award fee at this time is not warranted.
>
> Adams County Correctional Center received a significant finding in Health Services. The finding was for inadequate controls in the area of clinical care which included a repeat deficiency. There were thirteen other deficiencies in

---

[3] All redactions herein reflect redactions in the excerpts included in the Complaint.

various disciplines in addition to nine Notices of Concerns (NOCs), which several were repetitive. Two were for lack of [redaction] and two were for failing to restrain inmates in SHU before opening the cell door. Other various NOC's include: inadequate [redaction]; untimely processing of treaty transfers; not maintaining Health Services staffing levels; failing to address concerns over use of a spit guard/mask during a calculated use of force; and for staff with expired NACI clearances assessing Sentry.

Correctional Services continues to struggle with a high turnover rate for both correctional officers and supervisory correctional staff. The turnover rate and the high number of correctional staff with no prior corrections experience has been a challenge for the contractor.

Another major concern has been the lack of bilingual staff members. This continues to be a problematic issue considering the majority of the inmate population is comprised of Mexican nationals.

(*Id.* ¶ 62.)

Before the close of the Class Period in August 2016, the DOJ's Office of Inspector General ("OIG") initiated an audit of CoreCivic's compliance with the Adams contract. According to the OIG, "[d]uring this audit, we provided our staffing findings to both the BOP and [CoreCivic]," and CoreCivic expressed objections to the OIG's staffing-related findings "in May 2016," also before the close of the Class Period. The final report of the OIG's audit, however, was not released until December 2016, after the Class Period had ended. (*Id.* ¶¶ 63–64.) The audit found, among other things, that the low pay and limited options for advancement at Adams relative to BOP-managed facilities had resulted in less qualified staff and high turnover. (*Id.* ¶ 64.) It concluded that, although CoreCivic had been issued several Notices of Concern about staffing levels, those Notices of Concern had actually understated Adams' staffing shortfalls, because CoreCivic's original reports of staffing levels had been based on total head counts, not man-hours. (*Id.* ¶ 65.)

### *2. Cibola County Correctional Center*

Cibola County Correctional Center ("Cibola") is a facility in New Mexico that has been owned and operated by CoreCivic since 1994. CoreCivic operated Cibola as a BOP facility pursuant to a contract that had been set to expire on September 30, 2016. As of April 2015, Cibola housed 1,178 inmates, most of whom were non-resident aliens, and was classified as a low-security facility. According to 2015 figures, 51% of the inmates at Cibola had been convicted of illegal entry or reentry to the United States, and 41.5% had been convicted of drug offenses. The median sentence at Cibola was 18 months, and the median inmate spent 113 days at the facility. (*Id.* ¶ 68.)

Like Adams, Cibola was subject to a number of Notices of Concern before and throughout the Class Period. On March 25, 2011, for example, the BOP sent a Notice of Concern to CoreCivic focused on the facility's handling of an inmate with a cancer diagnosis who died while serving his sentence at Cibola. (*Id.* ¶ 70.) The BOP sent a Notice of Concern citing inadequate staffing levels on May 22, 2013 and sent further Notices of Concern based on inadequate staffing on August 6, 2013, October 3, 2013, January 2, 2014, April 8, 2014, July 7, 2014, September 23, 2014, and April 6, 2015. (*Id.* ¶¶ 74–75, 80.) A November 21, 2014 Notice of Concern noted a number of repeated deficiencies related to health services, including a "repeat repeat repeat repeat deficiency" regarding officials' failure to follow up with regard to inmates arriving at Cibola with positive tuberculosis skin tests. (*Id.* ¶ 78.)

The BOP's facility monitoring reports for Cibola also showed a number of deficiencies, in particular with regard to health services. On May 5, 2014, the BOP sent CoreCivic a monitoring report identifying "one significant finding, one repeat repeat repeat deficiency, two

repeat repeat deficiencies, and ten repeat deficiencies." The "significant finding" was related to health services, under the category "Administration and Patient Care." (*Id.* ¶ 76.)

Cibola's health services deficiencies eventually led the BOP to send CoreCivic headquarters a "Cure Notice" related to Cibola. The Cure Notice referenced "numerous and repetitive items of critical non-conformance in the area of Health Services, specifically[] Patient Care," and stated that, "unless the conditions are cured by April 21, 2015[,] the Government may terminate this contract." (*Id.* ¶ 79.) Although the BOP did not ultimately pursue early termination of the contract, its concerns apparently continued: a June 2, 2015 facility monitoring report noted one repeat deficiency in health services and a number of additional health services deficiencies. (*Id.* ¶ 81.)

On August 4, 2015, the BOP sent CoreCivic an Award Fee Determination letter regarding Cibola that stated:

> I have reviewed the recommendation of the Performance Evaluation Board based upon the performance monitoring information and the self-assessment submitted by Corrections Corporation of America (CCA). After a thorough review of this information, CCA received an overall rating of unsatisfactory. Therefore, an award fee will not be authorized for the aforementioned performance period.

(*Id.* ¶ 84.) On July 29, 2016, the BOP notified CoreCivic that it had elected not to renew its Cibola contract. (*Id.* ¶ 68.)

### *3. Eden Detention Center*

Eden Detention Center ("Eden") is a low-security prison located in Texas that has been owned and operated by CoreCivic since 1995. As of the end of the 2014 fiscal year, Eden housed an average of 1,458 inmates daily. As of June 27, 2015, 41% of the inmates at Eden were being held for illegal entry or reentry offenses, and 49% were being held for drug-related offenses. (*Id.* ¶ 87.)

The BOP's facility monitoring reports for Eden noted a number of recurring issues related to health services, just as they had with Adams and Cibola. An August 2014 report included eleven deficiencies related to health services, including six repeat deficiencies. That report also noted a significant adverse finding related to Eden's handling of individuals who had tested positive for latent tuberculosis infections—an issue that had also been noted at Cibola. (*Id.* ¶¶ 88–89.) An April 9, 2015 report based on follow-up monitoring concluded that the steps CoreCivic had taken in response to the significant adverse finding were "inadequate to prevent recurrence." (*Id.* ¶ 90.) That report detailed one case in which the Eden facility's allegedly inadequate treatment of a prisoner with a latent tuberculosis infection was linked to the prisoner's eventual death from hepatitis, which may have been attributable to the improper administration of the anti-tuberculosis drug INH and inadequate monitoring of the prisoner for potentially lethal side effects. (*Id.* ¶ 90.)

The BOP issued CoreCivic Notices of Concern, citing Eden's inadequate health services staffing, on August 23, 2012, October 1, 2014, December 10, 2014, and March 11, 2015. (*Id.* ¶¶ 92–95.) On May 29, 2012, the BOP issued a Notice of Concern regarding Eden staff's failure to file required incident reports, including failures to file incident reports for inmates who had been "actively involved in incidents of violence." (*Id.* ¶ 97.) On July 19, 2012, the BOP issued a Notice of Concern citing systemic failures by staff at Eden to comply with BOP rules regarding the use of force. (*Id.* ¶ 98.) On May 4, 2015, the BOP issued a Notice of Concern alleging that Eden personnel had attempted to hack into a BOP-related server and alter the security settings. (*Id.* ¶ 99.)

A report by the American Civil Liberties Union ("ACLU") identified a number of concerns related to alleged overcrowding at Eden, as well as alleged misuse of the facility's

Special Housing Unit ("SHU"), which was intended to be used for administrative segregation. Although BOP policies dictate that administrative segregation only be used in select situations related to maintaining safety, security, and order at the facility, Eden allegedly placed prisoners in SHU administrative segregation purely to alleviate overcrowding. At other times, Eden staff allegedly placed prisoners in administrative segregation purely for complaining or helping other prisoners file grievances. (*Id.* ¶¶ 101–04.) Eden allegedly operated at as much as 115% of its contracted capacity, leading to physical overcrowding and unsanitary conditions. (*Id.* ¶ 105.)

### *4. McRae Correctional Facility*

McRae Correctional Facility ("McRae") is a Georgia prison, owned and operated by CoreCivic since 2000. CoreCivic houses BOP prisoners at McRae pursuant to a contract set to expire in November 2018. As of June 27, 2015, McRae housed 2,066 inmates, 20% of whom were being held for illegal entry or reentry offenses and 61% of whom were being held for drug-related offenses. An OIG review, *see infra*, found that, of all BOP facilities in the relevant period, both private and government-managed, McRae had the highest rate of inmate suicide attempts and self-mutilations, the second highest rate of positive drug tests, and the third-highest rates of cell phones found and inmate grievances between fiscal year 2011 and fiscal year 2014. (*Id.* ¶¶ 108–09.)

On August 8, 2011, the ACLU sent a letter to the BOP, alleging a number of violations of BOP standards and constitutional protections at McRae. The ACLU alleged that staff at McRae—like those at Eden—had failed to comply with BOP procedures related to placing prisoners in the facility's SHU. The letter also alleged deficiencies in the health services available at McRae. (*Id.* ¶¶ 110–11.)

The BOP sent CoreCivic Notices of Concern regarding a failure to secure sensitive information in February 2011, May 2012, and June 2012, and a Notice of Concern for failing to properly secure and release inmates in the SHU in August 2013. (*Id.* ¶ 114.)

## B. CoreCivic's Internal Controls

At the same time that the BOP was lodging its complaints about CoreCivic's services, CoreCivic had its own set of internal controls and reviews that allowed it to monitor quality and compliance at its facilities. Central to that process was the company's Quality Assurance Division ("QAD"), which it discussed in several annual reports. (*Id.* ¶¶ 135–37.) According to CoreCivic's 2011 annual report, the QAD included, *inter alia*, "full time audit teams comprised of subject matter experts from all major disciplines within institutional operations," which performed "rigorous, on site annual evaluations of each [CoreCivic] facility . . . . with no advance notice." (*Id.* ¶ 135, 172.) The results of those audits were "used to discern areas of operational strength and areas in need of management attention." (*Id.* ¶ 172.) "The audit findings," the report claimed, "comprise[d] a major part of [CoreCivic's] continuous operational risk assessment and management process." (*Id.*) The QAD also "collect[ed] and analyze[d] performance metrics across multiple databases" and engaged in "rigorous reporting and analyses of comprehensive, comparative statistics across disciplines, divisions, business units and the Company as a whole." (*Id.*) The QAD would use those analyses to "provide[] timely, independently generated performance and trend data to senior management." (*Id.*)

Amalgamated identifies a pseudonymous former CoreCivic employee, "FE1," who worked as a quality assurance ("QA") manager for CoreCivic during some of the Class Period. (*Id.* ¶ 174.) According to FE1, CCA facilities were regularly audited by the BOP, and FE1 and other QA managers routinely communicated about the subject and results of the audits. (*Id.* ¶¶

13

175–76.) The results of BOP and internal QAD audits, as well as BOP Notices of Concern, were entered into two databases, one for deficiencies and one for specific incidents. According to FE1, reports were generated from the databases on a monthly basis. (*Id.* ¶¶ 176–78.) FE1 claims that the audit information entered into the databases would "go to senior executives . . . including defendants Hininger, Mullenger and Lappin." (*Id.* ¶ 179.) FE1 claims specifically that BOP policy required that CoreCivic senior executives receive the results of facility audits. (*Id.*)

## C. Allegedly Actionable Statements

As a publicly traded company, CoreCivic issued routine reports about its financial and business operations, and its executives frequently communicated with investors and prospective investors about the company. Because CoreCivic was reliant on government contracts, these communications regularly included discussions of why government entities, including the BOP, had chosen to work with CoreCivic in the past and why those government entities might be expected to continue or increase their patronage in the future—statements that, Amalgamated argues, were false or misleading in light of CoreCivic's actual history with the BOP.

### *1. General Claims of Quality & Savings*

Two themes that appeared throughout CoreCivic's communications were (1) CoreCivic's providing detention and incarceration services at a level of quality that its government clients would consider satisfactory and (2) its ability to offer cost savings while doing so. For example, several of CoreCivic's annual reports characterized the company's "primary business strategy" as "provid[ing] quality corrections services, offer[ing] a compelling value, and increas[ing] occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities." (Docket No. 57 ¶¶ 35, 120.)

Numerous CoreCivic annual and quarterly reports throughout the Class Period claimed, in identical or slightly modified form:

> We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services.

> We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system.

(*Id.* ¶ 126.) Other passages of the reports further emphasized CoreCivic's ability to offer "significant cost savings for government agencies." (*Id.* ¶ 127.)

In a February 14, 2013 conference call with investors and analysts, Hininger cited a report suggesting that certain states had understated the costs of their public prisons, claiming, "With all these costs factored in, which clearly has not been the case in the past, when cost comparisons are done between us and the public sector, our value proposition grows even further." (*Id.* ¶ 147.)

On October 2, 2013, CoreCivic held a "2013 Analyst Day," where its executives made presentations to investors and analysts interested in REITs. As part of its presentations, CoreCivic claimed that the use of its services generated "[a]nnual costs savings of 12% or more." The presentation claimed that CoreCivic's total cost per 1,000 beds was $55 to $65 million, with an average length of construction of one to three years, whereas government's total cost was $80 to $250 million, with an average length of construction of three to seven years. The presentation also claimed that the use of CoreCivic's services would "improve safety [and] inmate quality of life," which CoreCivic described as a "[c]ompelling value proposition [that] has driven privatized market penetration higher." (*Id.* ¶ 149.) CoreCivic, the presentation explained, offered

its "government partners" the opportunity to realize "[o]ngoing operational cost savings without the loss of operational quality." (*Id.* ¶ 153.)

On June 5, 2014, Hininger and Garfinkle led a presentation at a forum focused on REITs. In his prepared remarks, Hininger claimed that "we've . . . been able [to] provide great solutions for the government by providing cost savings and we have the unique dynamic in our industry where we can build facilities in locations that have a reasonable rational cost structure relative to construction, but also salary and wages." He concluded that "we are clearly well positioned to help correctional systems around the country to deal with this growth in overcrowding, but also have great reentry facilities to help them deal on the back end and provide appropriate programs to help with recidivism." (*Id.* ¶ 157.)

A November 2014 published CoreCivic investor presentation claimed that "[s]hort- and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality." (*Id.* ¶ 159.) Additional versions of that presentation made the same or similar claims throughout the Class Period. (*Id.*) Those presentations specifically touted "Operational Cost Savings" to the BOP, citing figures ranging from 9.2% to 18.1% for those savings, depending on the year. (*Id.* ¶ 160.) The presentations included a number of additional statements to the effect that CoreCivic-operated facilities provided "lower operational cost" relative to publicly owned and operated facilities and noting, in some instances, that they did so while also improving safety and security. (*Id.* ¶¶ 161–62.) The presentations further claimed that "Safety [and] Security" was CoreCivic's "**First** priority." (*Id.* ¶ 164.)

At certain points during the Class Period, CoreCivic provided statements to reporters who were preparing articles that included viewpoints critical of CoreCivic's claims. On March 5, 2012, the Lewiston Morning Tribune in Idaho ran an article under the headline, "Can private

prisons be run cheaper?: In Idaho, no one has actually done the math to find out." In that article, a CoreCivic spokesperson claimed: "As a business we are able to provide taxpayers an essential government service at equally high standards of quality and efficiency. . . . Competitive private-sector entities are motivated to move swiftly, evaluate and refine success each day, and maintain the highest operating standards at least cost." (*Id.* ¶ 142.) In May 2014, a CoreCivic spokesperson provided a comment for a story in the Chattanooga *Times Free Press*, citing an industry-backed study claiming that using privately operated prisons saves taxpayers 17% in corrections costs. The spokesperson claimed that opponents of privatization were "advocating for higher taxpayer costs and reduced flexibility for state leaders to manage their inmate populations in a safe, secure and humane way." (*Id.* ¶ 155.)

### *2. Claims About Compliance with Particular Standards*

In addition to CoreCivic's general claims of quality, it made a number of statements tying its services to particular policies and standards. For example, several annual reports included the following passage or slightly modified versions thereof:

> We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the [American Correctional Association ("ACA")], The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. . . . Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program.

(*Id.* ¶ 135.) Similarly, in a 2012 proxy statement defending its decision to oppose the adoption of more stringent policies about reporting to investors regarding its handling of sexual abuse

allegations, CoreCivic stated that it had "proactively adopted—and in some cases exceeded—many of the national PREA (Prison Rape Elimination Act) standards and best practices." (*Id.* ¶ 145.)

### *3. Claims About Client Relationships and Contract Renewals*

Because CoreCivic operated facilities pursuant to large, limited-term contracts, its volume of business was potentially susceptible to significant swings upward or downward as new contracts were obtained and/or old contracts were not renewed. At times, then, CoreCivic and its executives made statements directly addressing client relationships and contract renewals. For example, several annual and quarterly reports included the following claim:

> We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

(*Id.* ¶¶ 132–33.) CoreCivic also addressed the potential impact of declines in the overall federal prison population. In its November 2015 quarterly report, CoreCivic wrote:

> Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses.

(*Id.* ¶ 139.) CoreCivic repeated that claim in slightly modified form in annual or quarterly reports in February, May, and August 2016. (*Id.* ¶ 140.)

On March 30, 2016, Hininger wrote, in his annual letter to shareholders: "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we have experienced more than three decades of

continued growth and contract retention rates in excess of 90 percent." (*Id.* ¶ 35.) The letter boasted that CoreCivic's "strong record of operational excellence" had "earned [CoreCivic] the confidence of our government partners." (*Id.*)

At a June 8, 2016 investor forum, Hininger characterized CoreCivic's business model as resilient in the face of political changes in the federal executive branch due to the high level of quality CoreCivic provided:

> One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. **We have operationally made sure that we are providing high quality and standard and consistent services to our partners** and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama. **And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings . . . , then I think we'll be just fine.**

(*Id.* ¶ 168 (emphasis added).)

## D. OIG Review, Yates Memorandum, and Aftermath

At some point before the close of the Class Period, OIG allowed CoreCivic to review a pre-publication copy of a report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("OIG Review"). CoreCivic did not dispute any of the data contained therein, and the OIG Review was published on August 11, 2016. The OIG Review found that, "in most key areas, contract prisons [including, but not limited to, CoreCivic prisons] incurred more safety and security incidents per capita than comparable BOP institutions." (*Id.* ¶ 12.) The OIG Review noted that, in "recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer." (*Id.* ¶ 38.)

The OIG Review observed that CoreCivic facilities experienced substantially higher rates, relative to BOP institutions, of a number of unwelcome occurrences, such as inmate fights, inmate-on-inmate assaults, and suicide attempts and self-mutilations. (*Id.* ¶ 39.)

On August 18, 2016, Deputy Attorney General Sally Q. Yates issued a memorandum to the BOP entitled "Reducing our Use of Private Prisons" ("Yates Memorandum"). The Yates Memorandum stated that "[p]rivate prisons served an important role during a difficult period, but time has shown that they compare poorly to our own [BOP] facilities." (Docket No. 62-2 at 2.) Private facilities, Yates wrote, "simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in [the OIG Review], they do not maintain the same level of safety and security." (*Id.*) Yates concluded that "I am eager to enlist your help in beginning the process of reducing—and ultimately ending— our use of privately operated prisons." (*Id.* at 3.) Yates specifically directed that, "as each [private prison] contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population." (*Id.* at 3.) In the wake of the OIG Review and the Yates Memorandum, CoreCivic's stock price fell dramatically, dropping from a close of $27.56 per share on August 10, 2016 to an intraday low of $13.04 per share on August 18, 2016. (Docket No. 57 ¶ 14.)

The Yates Memorandum was eventually rescinded by a memorandum of Attorney General Jefferson B. Sessions III on February 21, 2017 ("Sessions Memorandum"). (Docket No. 62-3.) The Sessions Memorandum did not specifically dispute the details of the Yates Memorandum's analysis of private prison quality or savings, stating instead that the Yates Memorandum was rescinded because it had "changed long-standing policy and practice, and

impaired the Bureau's ability to meet the future needs of the federal correctional system." (*Id.* at 2.)

## E. Shareholder Suit Against CoreCivic

On August 23, 2016, Nikki Bollinger Grae filed a Class Action Complaint in this case. (Docket No. 1.) Notice of the suit was published in accordance with the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §78u-4(a)(3)(A)(i), and Amalgamated filed a timely motion to be appointed lead plaintiff, *see* 15 U.S.C. §78u-4(a)(3)(B)(i). (Docket No. 38.) Amalgamated claimed to have purchased or acquired almost 159,000 shares of CoreCivic stock and suffered over $1.2 million in losses as a result of the conduct covered by the suit. (Docket No. 39 at 5.) The court granted Amalgamated's motion, appointing it the lead plaintiff for the case. (Docket No. 52.) Amalgamated filed an Amended Complaint on March 13, 2017. (Docket No. 57.) The Amended Complaint pleads one claim for violation of Section 10(b) of the Securities and Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and one count for violation of Section 20(a) of the Act, 15 U.S.C. § 78t(a). (*Id.* ¶¶ 211–17.) On May 12, 2017, the defendants moved to dismiss the Amended Complaint in its entirety with prejudice. (Docket No. 60.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff" and "accept its allegations as true." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). Unless additional pleading requirements specific to the plaintiff's claims say otherwise, the Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice

of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Section 10(b) securities fraud claims such as Amalgamated's, however, must satisfy the heightened pleading requirements of Fed. R. Civ. P. 9(b). *Frank v. Dana Corp.*, 547 F.3d 564, 569–70 (6th Cir. 2008). Rule 9(b) states that, when pleading fraud, "a party must state with particularity the circumstances constituting fraud." The Sixth Circuit has explained that, while Rule 9(b) imposes a heightened standard, the underlying purpose of the rule is to serve the same ends as the general pleading requirements of Rule 8:

> [Rule 9(b)] should not be read to defeat the general policy of "simplicity and flexibility" in pleadings contemplated by the Federal Rules. Rather, Rule 9(b) exists predominantly for the same purpose as Rule 8: to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading. Rule 9(b), however, also reflects the rulemakers' additional understanding that, in cases involving fraud and mistake, a more specific form of notice is necessary to permit a defendant to draft a responsive pleading

*United States ex rel. SNAPP, Inc. v. Ford Motor Co.*, 532 F.3d 496, 504 (6th Cir. 2008) (citations and quotation marks omitted). "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.* "Where a complaint alleges 'a complex and far-reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *United States ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 510 (6th Cir. 2007)). "Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put [the opposing party] on notice as to the nature of the claim." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) (quoting *Michaels Bldg. Co. v. Ameritrust Co., N.A.*, 848 F.2d 674, 680 (6th Cir. 1988)).

In addition to the requirements of Rule 9(b), the PSLRA imposes particular heightened pleading requirements for certain elements of Amalgamated's claims, as discussed in more detail below. *See Frank*, 547 F.3d at 570.

## III. ANALYSIS

CoreCivic argues that Amalgamated's Complaint fails to state a Section 10(b) claim in three regards: (1) it has failed to plead, with particularity, any actionable misstatements or omissions of material facts; (2) it has failed to plead loss causation; and (3) it has failed to plead facts sufficient to support a strong inference of scienter, as required by the heightened pleading

standards imposed by Congress on securities fraud cases.[4] Amalgamated responds by arguing that it has pled, with particularity, numerous instances in which CoreCivic and its executives made misstatements and omitted material facts in order to give the false impression that CoreCivic's business model was founded on, and made sustainable by, an ability to provide governments with detention and incarceration services at a level of quality at least equivalent to those that the governments provided themselves, but at a lower cost. Amalgamated further responds that CoreCivic and its executives made these statements despite knowledge of the facts, as described in the Complaint, that CoreCivic provided inferior services and did not deliver on promised savings, and that its repeated failures with regard to BOP prisoners in particular had brought its ability to rely on continued federal business into doubt. These misstatements and omissions, Amalgamated argues, caused Amalgamated to suffer losses when the OIG Review and Yates Memorandum were published and revealed both the extent of CoreCivic's shortcomings under its BOP contracts and the poor state of its relationship with the DOJ.

## A. Actionable Statements

"Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder prohibit 'fraudulent, material misstatements or omissions in connection with the sale or purchase of a security.'" *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 478 (6th Cir. 2010) (quoting *Frank*, 547 F.3d at 569). "To state a securities fraud claim under Section 10(b), a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Ashland, Inc. v. Oppenheimer & Co.*, 648 F.3d

---

[4] Because Amalgamated's Section 10(b) claim fails, CoreCivic argues, its Section 20(a) claim must also fail as a matter of law. *See PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 697 (6th Cir. 2004).

461, 468 (6th Cir. 2011) (quoting *Frank*, 547 F.3d at 569). "Misrepresented or omitted facts are material only if a reasonable investor would have viewed the misrepresentation or omission as having significantly altered the total mix of information made available." *Id.* (quoting *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 400 (6th Cir. 1997)).

"General allegations of [falsity and materiality] are not enough" to satisfy Rule 9(b) and the PSLRA. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 470 (6th Cir. 2014). "The PSLRA mandates that," in order to survive a motion to dismiss, a plaintiff must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint [must] state with particularity all facts on which the belief is formed." *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting 15 U.S.C. § 78u-4(b)(1)). A finding of fraud under Section 10(b) cannot be premised on a statement that is "too vague to qualify as material," such as a claim that is so "soft" that it "escapes 'objective verification." *Ashland,* 648 F.3d at 468 (quoting *In re Ford*, 381 F.3d at 570).

"Silence, absent a duty to disclose, is not misleading under Rule 10b-5" and Section 10(b). *In re Ford*, 381 F.3d at 569 (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)). However, where a defendant initially had no obligation to disclose facts on a particular subject, but he chooses voluntarily to address the subject in relation to a securities transaction, he "assume[s] a duty to speak fully and truthfully on th[e] subject[]." *Id.* (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 561 (6th Cir. 2001)).

1. Falsity

Although CoreCivic's allegedly false statements are numerous, they are offered by Amalgamated in service of a single, central theory of liability: that CoreCivic and its executives

falsely touted its services as offering cost savings to governments while delivering an acceptable level of quality—defined, in some instances, in relation to compliance with particular standards—such that CoreCivic was an attractive option for continued and future government contracts. The reality, Amalgamated alleges, is that CoreCivic did not offer significant savings and frequently delivered substandard services, which had caused its relationship with at least one major client, the BOP, to fray considerably over the years leading up to the publication of the OIG Review and Yates Memorandum. Although CoreCivic does not appear to dispute that its relationship with the BOP was—at least briefly—brought into question by the Yates Memorandum, it does dispute both the falsity and the materiality of the statements that Amalgamated has cited.

CoreCivic first takes issue with Amalgamated's harsh characterization of the quality of CoreCivic's services. For example, CoreCivic claims that the various BOP Notices of Concern and negative review findings that Amalgamated has identified were "based upon a small handful of reports" and do not undermine CoreCivic's general claims to have provided quality services. (Docket No. 61 at 14.) Moreover, CoreCivic argues, contract prisons' allegedly worse statistics related to safety and security are not evidence of poor quality but rather reflect the fact that the BOP's government-operated prisons house a different population than its contract prisons, with different attendant risks and challenges.

Quality is, to some degree, in the eye of the beholder, and the question of what constitutes an adequate level of quality for clients in any particular field is difficult to resolve without evidence from knowledgeable experts. What Amalgamated has pled, however, is as much as any plaintiff could be expected to plead to establish an allegation of quality deficiencies at the complaint stage. Amalgamated has identified numerous instances where CoreCivic was

cited by the BOP for deficiencies in crucial service areas. It has identified statistics comparing private prisons, including CoreCivic, to the public prisons with which they compete. It has linked CoreCivic's alleged deficiencies to negative outcomes up to and including deaths. Finally, it has identified the harsh evaluations of CoreCivic and other private prison operators in the OIG Review and Yates Memorandum—evaluations that are doubly important because the authors were both (1) well-situated and knowledgeable participants in the field of incarceration and detention and (2) in a position to precipitate or direct the withdrawal of a substantial amount of CoreCivic's business. These allegations are more than sufficient to support Amalgamated's claim that CoreCivic's services were often at a level of quality below the expectations of at least the DOJ, if not its government clients generally.

CoreCivic argues next that its various claims of quality and savings were, at most, "corporate puffery and inactionable hyperbole." (Docket No. 61 at 14.) Taken in isolation, many of CoreCivic's general boasts—for example, that it provided "quality corrections services" and "compelling value" (Docket No. 57 ¶ 35)—do indeed seem too vague and insubstantial to meet the thresholds of either materiality or falsity.

In context, however, CoreCivic's claims of quality and, in particular, its claims that mixed the issues of quality, savings, and client relationships are not so easily dismissed as matters of opinion. The Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine if they convey more than just a generalized optimism. *See City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671–72 (6th Cir. 2005) (citing *Casella v. Webb*, 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance

upon such a representation."); *Scritchfield v. Paolo*, 274 F. Supp. 2d 163, 175–76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (i.e., by plucking the statements out of their context to determine whether the words, taken per se, are sufficiently 'vague' so as to constitute puffery")))). "[O]pinion or puffery . . . in particular contexts when it is both factual and material . . . may be actionable." *Id.* at 671–72 (quoting *Longman v. Food Lion, Inc.*, 197 F.3d 675, 683 (4th Cir. 1999)) (emphasis omitted).

A company's general boasts of quality are typically insufficient to establish liability under Section 10(b), because such statements usually "lack[] a standard against which a reasonable investor could expect them to be pegged." *Id.* at 671. CoreCivic, however, did peg its claims to something concrete: its relationships with specific, identifiable government clients, who themselves had express, documented expectations that they communicated to CoreCivic in their contracts, Notices of Concern, and other review findings. The connection between CoreCivic's claims of quality and its client relationships is implicit in many of the company's statements, but was perhaps most clearly drawn by Hininger's boast that CoreCivic's "strong record of operational excellence" had "earned [it] the confidence of [its] government partners." (Docket No. 57 ¶ 35.) The "government partners" to whom Hininger referred were not some nebulous class of hypothetical customers. As CoreCivic acknowledged in at least one annual report, CoreCivic "derives, and expects to continue to derive, a significant portion of [its] revenues from a limited number of governmental agencies." (Docket No. 61 at 16.) Hininger's statement, then, was a claim about the quality of CoreCivic's services in the eyes of a small group of specific, identifiable entities. Those identifiable clients' expectations, moreover, were

not ineffable or purely subjective, but rather tied to specific existing contracts and quality review practices.

Indeed, CoreCivic's own statements after the close of the Class Period have confirmed that it understands that its government clients have concrete, explicit expectations and that violation of those expectations can, if of a significant magnitude, give rise to a disclosure obligation. In a January 10, 2017 letter to the SEC, CoreCivic wrote:

> Each contract between the Company and its customer sets forth extensive and explicit performance requirements . . . . The Company's satisfactory performance of these contractual requirements is audited by the Company and the applicable customer. . . . [T]o the extent operational performance audits conducted by the Company's QA Division, its customer or any of the numerous independent oversight institutions that audit the Company's facilities reveal deficiencies of a magnitude to create a disclosure obligation under the federal securities laws or the NYSE listing rules, the Company would disclose those deficiencies by the designated means.

Letter from Scott D. Irwin, Executive Vice President, General Counsel & Secretary, CoreCivic, to the SEC 9–11 (Jan. 10, 2017), available at https://www.sec.gov/divisions/corpfin/cf-noaction/14a-8/2017/alexfriedmanncorecivic021317-14a8.pdf at 18.[5]

By the time Hininger made his March 30, 2016 claim that CoreCivic's "record of operational excellence" had "earned [it] the confidence of [its] government partners," CoreCivic had already received numerous Notices of Concern documenting chronic deficiencies related to, among other things, inadequate health services and understaffing in its BOP facilities. Those deficiencies had been linked to a deadly riot at Adams and the mishandling of the health needs of

---

[5] Amalgamated's Complaint identifies this letter and quotes a portion of the language cited by the court. (Docket No. 57 ¶¶ 180–82.) The court's inclusion of a lengthier excerpt taken from a copy available at the SEC's website is consistent with the principle that "public records and government documents available from reliable sources on the Internet" are generally appropriate for judicial notice. *U.S. ex rel. Dingle v. BioPort Corp.*, 270 F. Supp. 2d 968, 972 (W.D. Mich. 2003). Indeed, CoreCivic itself, through the declaration of its counsel, encouraged the court to rely upon the SEC's online records related to the company. (Docket No. 62 at 2 n.1.)

a number of prisoners, including prisoners who died in CoreCivic's care.[6] CoreCivic personnel had ample reason to believe that the BOP took these issues seriously, given that, among other things, the BOP had expressly threatened to terminate its Cibola contract early due to health services deficiencies the year before. Moreover, the BOP's long history of complaints to CoreCivic not only alerted CoreCivic to the specific deficiencies cited, but also gave CoreCivic numerous examples of the BOP's concrete expectations under its contracts. A reasonable juror could conclude that CoreCivic's statements, in context, were false or misleading because they ran directly counter to a wealth of available evidence establishing that its operations had pervasively failed to live up to the quality standards of the BOP.

2. Materiality

While the question of falsity requires the court to compare the facts on the ground to the substance of the defendants' statements, the materiality inquiry requires the court to place itself in the shoes of a reasonable investor deciding whether to buy, sell, or retain the company's stock. In so doing, the court must consider the effect of the relevant statements on a detached, probability-minded assessment of the company's future value.

In its Memorandum in Support of its Motion to Dismiss, CoreCivic expresses an understandable concern that the life-and-death stakes associated with incarceration might overshadow the dry economic fundamentals that determine the viability of a securities fraud

---

[6] CoreCivic urges the court to follow the lead of *Mulvaney v. GEO Grp., Inc.*, in which the Southern District of Florida concluded that, although the plaintiffs had identified a cure notice and several notices of concern related to one of the contractor's prisons and evidence of problems in others, they had not pled facts sufficient to show falsity of optimistic claims regarding its relationship with the BOP. 237 F. Supp. 3d 1308, 1322 (S.D. Fla. 2017). Based on the court's account of the facts pled in that case, it appears that the allegations of deficiencies for that contractor were not as extensive or detailed as those here. (*See also* Docket No. 62-5 (*Mulvaney* Complaint).) In any event, the court concludes, based on the specific facts alleged here regarding CoreCivic, that Amalgamated has pled facts sufficient to support a conclusion that CoreCivic's services repeatedly fell below the BOP's expectations and that these failures were sufficiently extensive and recurring that they cannot, as a matter of law, be dismissed as mere isolated incidents with no impact on an assessment of overall quality of services.

case. (Docket No. 61 at 1.) Viewed in the abstract, however, the materiality of CoreCivic's alleged misstatements is, if anything, clearer. Consider the following court-devised hypothetical:

> The government, as a matter of law, needs 100,000 units of commodity daily, but it only has the capacity to supply 90,000 units of its own power. Company A learns how to make the commodity itself, although its version costs the government about the same amount and is of a markedly lower quality. The government might buy from Company A as long as the government is suffering a shortage, but there is no reason to expect Company A's business to continue if the shortage ends. If Company B, however, can make units of the commodity that are as good or better than the government's version for less than the government pays to make the commodity itself, then Company B can expect to keep selling to the government, regardless of whether there is a shortage.

The Yates Memorandum concluded, unambiguously, that CoreCivic was something akin to Company A: that private prisons had "served an important role during a difficult period" but that, now that "the federal prison population ha[d] begun to decline," there was no reason to continue settling for an option that "do[es] do not provide the same level of correctional services, programs, and resources; . . . do[es] not save substantially on costs; and . . . do[es] not maintain the same level of safety and security." (Docket No. 62-2 at 2.) The problem, as alleged by Amalgamated, is that CoreCivic had been marketing its securities for the prior several years under the premise that it was not Company A, but Company B—offering quality alternatives and substantial savings that would make it an attractive option, even if the government did not have a dire need for extra beds.

CoreCivic's own communications made clear that its executives were well aware of this dichotomy and its implications for the value of CoreCivic's operations. On June 5, 2014, Hininger acknowledged that some of CoreCivic's success was due, in part, to the fact that it was "clearly well positioned to help correctional systems around the country to deal with this growth in overcrowding." (Docket No. 57 ¶ 157.) Several annual and quarterly reports attributed CoreCivic's high "renewal rate on existing contracts" to "a variety of reasons including" both

"the quality of [CoreCivic's] operations" and "the constrained supply of available beds within the U.S. correctional system." (*Id.* ¶¶ 132–33.) Yet CoreCivic knew and acknowledged that the excess in demand for federal beds might be coming to an end or at least decreasing, as several annual or quarterly reports, starting in November 2015, acknowledged the decline in the federal prison population. (*Id.* ¶¶ 139–40.) In the face of this potential waning overall demand from federal clients, CoreCivic and its executives emphasized claims supporting the proposition that CoreCivic was a "compelling" option to governments for reasons that were not contingent on insufficient capacity at government-operated prisons, namely the quality of its services and the savings it could offer. (*Id.* ¶¶ 35, 123.)

Any reasonable investor would understand that a company offering governments an inferior but necessary pressure release valve in the face of overcrowding would have a very different value than a company that had established itself as a justifiable, high-quality component in the governments' operations, regardless of short-term capacity concerns. *Cf. Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2016 WL 8199124, at *27 (S.D. Ohio Jan. 21, 2016) (noting the importance of a fact that "would call into question the viability of [the defendant's] business model"). If CoreCivic had lost the confidence of one or two small local governments, it could be argued that those minor aberrations did not rise to the level of materiality under Section 10(b). Failing to acknowledge and disclose the dire status of its relationship with a client as large and important as the BOP, however, is not "speak[ing] fully and truthfully on th[e] subject" of its client relationships and reputation for quality. *In re Ford*, 381 F.3d at 569 (quoting *Helwig*, 251 F.3d at 561).

While CoreCivic may dispute when and whether it knew how severely its relationship with the BOP had deteriorated, those are issues of scienter, *see infra*, not falsity or materiality.

*See In re Omnicare*, 769 F.3d at 471 (adopting approach that limits the "material-misrepresentation prong" to the "two objective inquiries" of falsity and materiality and "save[s] all subjective inquiries for the scienter analysis"). Indeed, temporarily setting aside the question of scienter makes the seemingly difficult issues of falsity and materiality in this case much clearer. The question becomes: If CoreCivic's executives had known, for a fact, that the DOJ had such a low assessment of CoreCivic's services that something like the Yates Memorandum was likely, would it have been fraudulent to claim that CoreCivic's history of quality services had earned it the confidence of its government partners? The answer to that question seems, to the court, to be "yes."

CoreCivic points out that all of its statements about the future were accompanied by appropriate cautionary language and that it had frequently disclosed that the nature of its business made it vulnerable to shifts in government policy. *See Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015) (discussing PSLRA safe harbor for qualified forward-looking statements). Those responses would be persuasive if CoreCivic were being sued for simply having failed to predict the Yates Memorandum. Amalgamated has made clear, however, that its claims are premised not on a failure to predict, but on CoreCivic's failure to give a full and truthful contemporaneous representation of the business fundamentals and client relationships on which an investor's own prediction could be based. CoreCivic's claims about its history of quality services in the eyes of its customers were discrete factual claims that are "easily separable from" its forward-looking predictions. *Miller v. Champion Enterps. Inc.*, 346 F.3d 660, 679 (6th Cir. 2003).

If investors had known about CoreCivic's many alleged shortfalls with respect to its clients' quality expectations, then each individual investor could have made an informed

decision either to bet on, or bet against, CoreCivic's ability to maintain its government contracts. *Cf. Mulvaney*, 237 F. Supp. 3d at 1322 (S.D. Fla. 2017) ("Information that [private prison contractor's] services were inadequate, or that its relationship with BOP was fragile, if true, may have significantly altered the total mix of information available to the reasonable investor, and if so, would have been necessary for a reasonable investor to assess whether the quality of [the company's] services and the strength of its relationship with BOP were likely to enhance [the company's] ability to obtain additional contracts.") By the same token, if CoreCivic and its executives had simply been silent about its reputation for quality among government clients, then investors would have known that any investments they made would need to account for the fact that they could only guess at the truth regarding that subject. CoreCivic and its executives, instead, chose to state affirmatively or suggest that its track record of high-quality services had resulted in its clients' confidence—an assertion that, it is now difficult to dispute, was shown to be incorrect, at least with regard to the DOJ.

The Sixth Circuit has stressed that a district court, in assessing the materiality of statements, should not "attribute to investors a child-like simplicity" or "an inability to grasp the probabilistic significance of [opinion statements]." *In re Omnicare*, 769 F.3d at 471–72. Indeed, any reasonable investor would know that statements by CoreCivic and its executives likely presented the version of the truth most favorable to the company. A reasonable investor, however, would also understand that CoreCivic had an obligation under the Exchange Act not to knowingly mischaracterize its relationship with key government clients. CoreCivic could have made any number of statements that conveyed an appropriate sense of corporate optimism without misleading investors. For example, in *In re Ford*, the Sixth Circuit found non-actionable the Ford Motor Company's statement that it "want[ed] to ensure that all [its] vehicles ha[d]

world-class quality" and were "defect-free." 381 F.3d at 571. CoreCivic could have stated that it strove to meet client expectations, that it wished to gain its clients' confidence, or that it sought to provide governments a compelling alternative to public prisons regardless of overcrowding. Instead, it chose to couch its statements in terms of its actual history of performance and its clients' historical and contemporaneous assessments thereof. In so doing, it assumed a duty to present those matters accurately.

CoreCivic's statements about its history of meeting clients' quality expectations are similar to the statements found by the Sixth Circuit to meet the pleading requirements for materiality in *In re Omnicare*. In that case, the defendant healthcare corporation's annual reports stated, "We believe that our billing practices materially comply with applicable state and federal requirements," and "[W]e believe that we are in compliance in all material respects with federal, state and local laws." 769 F.3d at 478. The Sixth Circuit noted that "one might be skeptical of whether a reasonable investor would put much stock in Omnicare's statements regarding legal compliance." *Id.* Moreover, the "vague language" that the defendant had used left it "a great amount of wiggle room." *Id.* Nevertheless, the court noted, "context matters when analyzing materiality." *Id.* (citing *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011); *City of Monroe,* 399 F.3d at 672). The court concluded that a reasonable jury, looking at the full context of the defendant's statements—including its "recent history of legal problems surrounding non-compliance"—could conclude that the statements were material. *Id.* Similarly, a reasonable jury could look at the history of controversy surrounding CoreCivic and the issue of prison privatization, as well as CoreCivic's admitted vulnerability to shifts in government policy, and conclude that CoreCivic's assurances of the quality of its services and its history of client satisfaction were material.

It may be that CoreCivic can show that the numerous Notices of Concern and adverse review findings it received were so commonplace in contract prison administration that its executives truly were in the dark about the peril facing their relationship with the BOP. It may also be that CoreCivic can show that its own internal quality control systems had not alerted CoreCivic executives to the extent of its quality problems and what those problems meant for its client relationships. Both of those issues, though, go to scienter, not falsity or materiality. For the purposes of showing falsity and materiality, it is sufficient that Amalgamated has pled that CoreCivic and its executives repeatedly claimed or suggested that the company's history of quality services had gained it the faith and esteem of its government partners, when, in fact, the perceived low quality of its services was leading one of its most important client relationships to the brink of collapse. The court will not dismiss Amalgamated's claims for having insufficiently pled falsity or materiality.

**B. Loss Causation**

A Section 10(b) plaintiff must plead facts showing a "causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005)). CoreCivic argues that Amalgamated's losses were caused purely by the release of the Yates Memorandum and the accompanying (short-lived) change in federal policy, not by CoreCivic's statements and omissions. The notion of causation in the securities fraud context, however, takes account of the fact that it is not usually the defendant's false statement or omission, in and of itself, that "cause[s] a security to drop in value, but rather, 'the underlying circumstance that [was] concealed or misstated'" *Id.* (quoting *Lentell*, 396 F.3d at 173). While it may be true that the Yates Memorandum would have

had some negative effect on the value of CoreCivic's stock no matter what, the scope of that loss was determined by the degree to which the market was able to evaluate the probability of such a shift and therefore price that risk into its valuation of CoreCivic. Amalgamated's Complaint amply alleges that CoreCivic gave a misleadingly incomplete picture of the issues that ultimately resulted in the DOJ's shift, and CoreCivic concedes that it was that shift that caused the loss in value of its stock. CoreCivic's argument, if accepted, would effectively immunize any company that concealed or misleadingly minimized a known risk from the damage done when that risk came to fruition. CoreCivic has identified no basis in statute, rule, or case law for such a result.

CoreCivic next points out that Amalgamated has not specifically alleged any losses that occurred between the release of the OIG Review and the Yates Memorandum. CoreCivic argues that, by Amalgamated's own version of events, the OIG Review unveiled many of the deficiencies that CoreCivic had previously concealed, meaning that the market onto which the Yates Memorandum was released was one that had already accounted for CoreCivic's shortfalls. Determining the degree to which that is true, however, would require an in-depth analysis of both the OIG Review and the market assumptions underlying CoreCivic's interpretation of events. Such fact- and expertise-intensive questions are unnecessary—and often impossible—to resolve at the pleading stage. The court will not dismiss Amalgamated's claims for having insufficiently pled loss causation.

## C. Scienter

"[T]he [PSLRA] imposes '[e]xacting . . . requirements for pleading scienter.'" *Ashland, Inc.*, 648 F.3d at 469 (quoting *Frank*, 547 F.3d at 570). The plaintiff must, "with respect to each act or omission alleged . . . , state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). "To qualify as

'strong' . . . , an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Ashland, Inc.*, 648 F.3d at 469 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007)). "'Strong inferences' . . . involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact." *City of Monroe*, 399 F.3d at 683 (quoting *Helwig*, 251 F.3d at 563).

"In examining scienter, [the court] must decide whether all of the facts alleged, *taken collectively*, meet the PSLRA's requirements." *Ashland, Inc.*, 648 F.3d at 469 (quoting *Tellabs, Inc.*, 551 U.S. at 322–23). "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Tellabs, Inc.*, 551 U.S. at 326. The court "must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?" *Id.* Before the court can answer in the affirmative, it "must compare [the inference of scienter] with other competing possibilities, allowing the complaint to go forward 'only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *In re Omnicare*, 769 F.3d at 473 (quoting *Tellabs, Inc.*, 551 U.S. at 324).

"In the securities-fraud context, scienter includes [1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (quoting *Ley v. Visteon Corp.*, 543 F.3d 801, 809 (6th Cir. 2008)). "Recklessness is defined as 'highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so

obvious that any reasonable man would have known of it.'"[7] *Frank*, 646 F.3d at 959 (quoting *PR Diamonds*, 364 F.3d at 681).

The Sixth Circuit has set forth a non-exhaustive list of nine factors relevant to determining scienter:

> (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

*Doshi*, 823 F.3d at 1039–40 (quoting *Helwig*, 251 F.3d at 552). Although some of those factors, such as allegations of bribery or insider trading, are not present here, others are, particularly a divergence between public and non-public assessments and a history of making statements without regard for recent contradictory facts.

In determining whether a defendant possessed scienter with regard to some hidden danger facing a company, the court looks, *inter alia*, at whether "the plaintiffs sufficiently explained *why or how* the defendants knew about" the danger. *Ashland, Inc.*, 648 F.3d at 470 (citing *In re Merrill Lynch Auction Rate Sec. Litig.*, No. 09-MD-2030, 2011 WL 1330847, at *2 (S.D.N.Y. March 30, 2011)). In this case, that means explaining why or how the Individual Defendants

---

[7] CoreCivic does not appear to dispute that recklessness would be sufficient to satisfy the "strong inference of scienter" requirement of the PSLRA with regard to CoreCivic's alleged misrepresentation of contemporaneous and past facts. (*See* Docket No. 61 at 11, 19.) The court notes, however, that the Sixth Circuit has suggested that, where an actionable statement involves a matter of opinion, the subjective nature of the statement "rais[es] the bar for alleging scienter" to a requirement of actual knowledge. *In re Omnicare*, 769 F.3d at 471. Because the court's analysis is focused on whether Amalgamated can support a strong inference of actual knowledge of facts contradicting CoreCivic's statements, the court need not definitively resolve whether recklessness would be sufficient in this case.

knew that CoreCivic's services were of sufficiently low quality, relative to client expectations, to endanger the company's relationship with the BOP and other government entities.

As Amalgamated points out, CoreCivic's own public statements about its quality assurance practices go a long way toward overcoming that hurdle. CoreCivic's 2011 Annual Report boasts of the company's "rigorous" and "comprehensive" monitoring of performance "across disciplines, divisions, business units and the Company as a whole." (Docket No. 57 ¶ 172.) The resulting QA information, CoreCivic stressed, was not merely siloed away in the QAD, but provided to and relied upon by "senior management" as a "major part of [CoreCivic's] continuous operational risk assessment and management process." (*Id.*) At the very least, CoreCivic's own statements establish that (1) the company engaged in ongoing monitoring and analysis of the quality of its services and (2) key CoreCivic decision makers were made aware of the results thereof. The information provided by FE1 completes the picture by confirming that (3) the ongoing QAD tracking included the results of BOP audits and Notices of Concern and (4) Hininger, Mullenger, and Lappin were among the senior executives who routinely received QAD information.[8] (*Id.* ¶¶ 176, 178–79.)

CoreCivic responds to Amalgamated's QA-related allegations by pointing to the Sixth Circuit's statement, in *PR Diamonds, Inc. v. Chandler*, that "fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information." 364 F.3d at 688. That holding, however, considered whether executives could be presumed to have knowledge of "accounting issues [that were] relatively arcane in nature and scope" and that did not "pertain[] to central, day-to-day operational matters." *Id.* While the Sixth

---

[8] CoreCivic makes much of the fact that FE1 has not claimed to have spoken directly to any of the Individual Defendants. Amalgamated, however, has explained the basis of FE1's claims: as a QA manager, he was ensconced in the company's QA processes and knowledgeable of the company's practices. (Docket No. 57 ¶¶ 174–76.)

Circuit did hold that an individual defendant could not be presumed to have knowledge of every fact to which he had access, the court also included the important corollary that "high-level executives *can* be presumed to be aware of matters central to their business's operation." *Id.* (citing *In re Complete Mgmt., Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 325-36 (S.D.N.Y. 2001)) (emphasis added). The overall health of CoreCivic's relationship with the BOP, which provided between 11% and 13% of the company's annual revenue, was central to CoreCivic's operations by any meaningful definition of the term. There is, moreover, nothing obscure or arcane about fundamental issues such as systemic understaffing or failing to provide adequate medical care.

If Amalgamated's allegations hinged on CoreCivic executives' actual knowledge of, for example, the contents of any one or two specific Notices of Concern, it would be fair to argue that the court cannot presume the executives' familiarity with such fine-grained details. What contradicts CoreCivic's statements, though, is not any one stray detail but the collective weight of dozens of deficiencies that were affirmatively brought to the company's attention. (*See, e.g.*, Docket No. 67 at 4–5 (noting over 50 health services deficiencies at Adams, over 75 health services deficiencies and inadequacies at Cibola, and over 30 health services deficiencies and inadequacies at Eden).) CoreCivic cannot, in one breath, claim that it placed a high priority on prisoner safety and then, in the next breath, plausibly suggest that perhaps its most important decision makers were simply unaware of the mountain of evidence made available to them on that very topic, particularly given that it pertained to such an important client.

The PSLRA does not require a plaintiff to definitively rule out non-fraudulent explanations of a defendant's behavior or even to establish, at the complaint stage, that the scales tip decidedly in favor of a finding of scienter. Rather, the court must simply consider all possible inferences and determine whether "the inference of scienter [is] at least as strong as any

opposing inference." *Tellabs, Inc.*, 551 U.S. at 326. It is certainly possible that CoreCivic executives did not understand just how badly the deficiencies at its BOP facilities had damaged or threatened to damage the company's relationship with the DOJ. *Cf. Miller*, 346 F.3d at 682 (finding no strong inference of scienter despite acknowledging that the "defendants made a choice that ultimately proved to be erroneous"). At least as likely, however, is the explanation offered by Amalgamated: that CoreCivic's executives were fully apprised of the company's history of falling short of BOP expectations and knowingly chose to conceal that history in the hope that the underlying risk of lost business would never come to fruition.

The PSLRA sets a high bar for a plaintiff attempting to plead scienter. Construing that high bar as an insurmountable one, however, would transform that Act into a *sub rosa* repeal of Section 10(b). CoreCivic has identified no evidence that Congress intended such a result. Amalgamated has pled a clear, cogent, and plausible account of how CoreCivic misled the market about its history of performance relative to BOP expectations. Amalgamated has further provided a concrete, plausible explanation of how and why its executives would have been aware of facts contradicting their public statements. Finally, the specific practical realities of CoreCivic's underlying business model strongly suggest that any reasonable and competent executive would have paid attention to the very issues that CoreCivic has identified, because meeting the expectations of the federal government was absolutely central to CoreCivic's continued success, or at least its success on anything close to the scale it had achieved by the time of the Class Period. While the inference that CoreCivic and its executives acted knowingly may not be inexorable, it is certainly at least as strong as any inference that they did not. That is enough to satisfy Rule 12(b)(6), Rule 9(b), and the PSLRA.

## IV. CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss (Docket No. 60) will be denied.

An appropriate order will enter.

ENTER this 18th day of December 2017.

ALETA A. TRAUGER
United States District Judge