UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiff, | |
| vs. | |
| CORRECTIONS CORPORATION OF AMERICA, et al., | |
| Defendants. | |

Civil Action No. 3:16-cv-02267

Honorable Aleta A. Trauger

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

I.      INTRODUCTION ..................................................................................................1

II.     FACTUAL BACKGROUND ..............................................................................3

        A.      The Parties ..............................................................................................3

        B.      Plaintiff's Allegations, the Alleged "Corrective Disclosures," and the
                Stock Price Reaction (or Lack Thereof) ................................................3

        C.      Plaintiff's Motion for Class Certification and the Expert Reports ..........4

                1.      The Feinstein "Market Efficiency" Report ................................4

                2.      The Allen "Price Impact" Analysis............................................5

III.    RULE 23 ESTABLISHES A DEMANDING STANDARD FOR CLASS
        CERTIFICATION ..............................................................................................7

IV.     INDIVIDUAL ISSUES CONCERNING EACH CLASS MEMBER'S
        RELIANCE WILL PREDOMINATE .................................................................8

        A.      The Court-Created Fraud-on-the-Market Presumption is Rebuttable ....8

                1.      Defendants Rebut the Presumption by Offering Evidence Showing
                        a Lack of Price Impact .............................................................9

                2.      Once Defendants Rebut the Presumption, Plaintiff Bears the
                        Burden of Proving that the Alleged Fraud Impacted the Market
                        Price .......................................................................................12

        B.      The Fraud-on-the-Market Presumption Does Not Apply Because None of
                the Alleged Misrepresentations Had a Stock Price Impact When Made ..............13

                1.      There Was No Statistically Significant Stock-Price Increase on
                        Twenty-Eight of the Thirty-Three Alleged Misrepresentation Dates........13

                2.      The Statistically Significant Price Increase on Four of the Five
                        Remaining Dates Preceded the Alleged Misrepresentations ....................13

                3.      The Price Increase on May 5, 2016 Was Solely Attributable to
                        Confounding News ..................................................................14

                4.      *None* of the Alleged Misrepresentations Introduced New
                        Information ............................................................................15

                5.      Plaintiff Cannot Avoid the Lack of Front-End Price Impact by
                        Arguing Price Maintenance ...................................................15

i

C.    There is No Indirect, or "Back-End," Price Impact Based on the Two
      Alleged Corrective Disclosures ..............................................................16

      1.    The OIG Review Did Not Affect CoreCivic's Stock Price .......................17

      2.    The Stock Drop Following Publication of the Yates Memorandum
            Does Not Demonstrate Price Impact of the Alleged
            Misrepresentations ......................................................................17

D.    Plaintiff Cannot Invoke the *Affiliated Ute* Presumption of Reliance....................19

V.    CONCLUSION...............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972).................................................................................................19

*In re Am. Serv. Grp., Inc.*,
    2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ....................................................20

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997)..................................................................................................7

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013)..............................................................................................8, 11

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
    597 F.3d 330 (5th Cir. 2010) .................................................................................10

*Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*,
    879 F.3d 474 (2d Cir. 2018)......................................................................11, 17, 19

*Baker v. SeaWorld Entm't*,
    2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) .......................................................16

*In re BancorpSouth, Inc.*,
    2017 WL 4125647 (6th Cir. Sept. 18, 2017) .........................................................20

*Basic, Inc. v. Levinson*,
    485 U.S. 224 (1988)....................................................................................... *passim*

*Burges v. Bancorpsouth, Inc.*,
    2017 WL 2772122 (M.D. Tenn. June 26, 2017).....................................................11

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .......................................................................4, 14

*Clayton v. Heartland Res., Inc.*,
    754 F. Supp. 2d 884 (W.D. Ky. 2010)...................................................................19

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013)....................................................................................................7

*Cooper v. Thoratec Corp.*,
    2018 WL 2117337 (N.D. Cal. May 8, 2018) .........................................................16

Case 3:16-cv-02267    Document 98    Filed 07/16/18    Page 4 of 29 PageID #: 2151

*In re Credit Suisse First Boston Corp.*,
250 F.R.D. 137 (S.D.N.Y. 2008) ........................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ........................................................10

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011).........................................................................8, 9

*Erica P. John Fund, Inc. v. Halliburton Co.*,
718 F.3d 423 (5th Cir. 2013) ...............................................................9

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017)........................................11

*Greenberg v. Crossroads Sys.*,
364 F.3d 657 (5th Cir. 2004) .............................................................11

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ............................................................. *passim*

*Hatamian v. Advanced Micro Devices, Inc.*,
2016 WL 1042502 (N.D. Cal. March 16, 2016) ....................................15

*Hayes v. MagnaChip Semiconductor Corp.*,
2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ......................................17

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ...............................................................9

*In re Intuitive Surgical Sec. Litig.*,
2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ......................................11

*Johnston v. HBO Film Mgmt., Inc.*,
265 F.3d 178 (3d Cir. 2001)...............................................................19

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2011) ..........................................................4

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) ........................................................10

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010).........................................................10, 17

*Rikos v. Procter & Gamble Co.*,
799 F.3d 497 (6th Cir. 2015) ...............................................................8

iv

*Schwab v. E*Trade Fin. Corp.*,
    285 F. Supp. 3d 745 (S.D.N.Y. 2018) .................................................................. 19

*Scottsdale Ins. Co. v. Flowers*,
    513 F.3d 546 (6th Cir. 2008) .............................................................................. 16

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
    552 U.S. 148 (2008) ........................................................................................... 12

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
    2017 WL 2062985 (S.D.N.Y. May 15, 2017) ....................................................... 9

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2017) ............................................................................... 16

*W. Va. Pipe Trades Health & Welfare Fund, Employees' Ret. Sys. v. Medtronic,
Inc.*,
    2018 WL 620383 (D. Minn. Jan. 30, 2018) ......................................................... 17

*Waggoner v. Barclays PLC*,
    875 F.3d 79 (2d Cir. 2017) ................................................................................. 12

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ....................................................................................... 7, 16

*Willis v. Big Lots, Inc.*,
    242 F. Supp. 3d 634 (S.D. Ohio 2017) ............................................................... 15

## RULES

Fed. R. Civ. P.
    23(a) ............................................................................................................... 4, 7
    23(b) ........................................................................................................... 1, 4, 7

Fed. R. Evid. 301 ................................................................................................... 12

## I. INTRODUCTION

Defendants oppose class certification on a narrow, yet dispositive, issue: lack of price impact, *i.e.*, the misrepresentations alleged by Plaintiff did not affect the price of CoreCivic stock. In order for its proposed class to be certified, Plaintiff must establish under Federal Rule of Civil Procedure Rule 23(b)(3) that common issues predominate over individual issues. Given that each putative class member's reliance on the alleged misstatements is an essential element of Plaintiff's claim, Plaintiff invokes the "fraud-on-the-market" presumption of reliance to meet its Rule 23(b)(3) burden. But that presumption is rebuttable: "any showing that severs the link" between the alleged misrepresentation and the market price defeats the presumption, and defendants must be afforded the opportunity to show this lack of "price impact" at the class certification stage. *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 134 S. Ct. 2398, 2415-17 (2014). Defendants have done so here.

Plaintiff claims that statements made by Defendants between February 27, 2012 and August 17, 2016, inclusive (the "Class Period") regarding CoreCivic's "quality," "cost effectiveness," and "compliance" with contracts and policies, were materially false and misleading. According to Plaintiff, these alleged misstatements artificially inflated the price of CoreCivic's stock. Plaintiff asserts that the truth was allegedly revealed first on August 11, 2016, when the U.S. Department of Justice's Office of Inspector General issued a report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Review"), which found that "in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." *See* Ex. 1 at Executive Summary.[1] Then, one

---

[1] "Ex.___" refers to Exhibits attached to the concurrently filed Declaration of Milton S. McGee, III in Support of Defendants' Opposition to Plaintiff's Motion for Class Certification, Appointment of Class Representative, and Appointment of Class Counsel.

week later, Deputy Attorney General Sally Yates issued a memorandum entitled, "Reducing our Use of Private Prisons" (the "Yates Memorandum"), which stated that private prisons "simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in [the OIG Review], they do not maintain the same level of safety and security." *See* Ex. 2 at 1.

As conclusively demonstrated by the Expert Report of Lucy P. Allen submitted in connection with this Opposition (Ex. 3), not one of the statements that Plaintiff claims were false or misleading caused the price of CoreCivic's stock to rise. Nor did the two alleged "corrective disclosures" cause the stock price to fall. There was no statistically significant stock price decline following the OIG Review, and not a single analyst issued a report about it. The Yates Memorandum—which did precipitate a significant stock drop—included no new information concerning the Company, and in fact, cited only the earlier OIG Review in support of its general observations concerning the relative quality and cost savings associated with private prisons. The analysts that cover the industry, and CoreCivic specifically, described the stock drop as attributable to a seismic political shift away from privatization that impacted the entire industry, and not any revelation about CoreCivic's quality, cost, or history of compliance.

In sum, the "efficient market" presumption of reliance is precisely that—a presumption, and not a substitute for establishing a nexus between alleged misstatements and movement in a company's stock price. Showing a lack of price impact—either at the time of the misrepresentation or correction—severs the link and rebuts the presumption. *See Halliburton II*, 134 S. Ct. at 2414 (holding that presumption is rebutted with evidence that "the asserted misrepresentation (*or* its correction) did not affect the market price of the defendant's stock") (emphasis added). Having demonstrated both – that the misrepresentations *and* their purported

corrections did not affect the market price of CoreCivic's stock – Defendants have soundly rebutted the presumption. Without this presumption of reliance, the law does not permit this class to be certified.

## II.    FACTUAL BACKGROUND

### A.    The Parties

Lead Plaintiff Amalgamated Bank is an investment manager that has served as lead plaintiff in multiple shareholder lawsuits. Defendant CoreCivic designs, builds, manages, and operates private prisons, jails, detention centers, and residential reentry centers on behalf of federal corrections agencies and individual states and counties across the United States. Compl. ¶¶ 2, 33-34. The Individual Defendants (Messrs. Hininger, Garfinkle, Mullenger and Lappin) are current and former executive officers of CoreCivic. Id. ¶ 10.

### B.    Plaintiff's Allegations, the Alleged "Corrective Disclosures," and the Stock Price Reaction (or Lack Thereof)

Plaintiff alleges that during the Class Period, Defendants misrepresented the quality, cost savings, and policy compliance at facilities CoreCivic operated pursuant to contracts with the BOP. Id. ¶¶ 3-4, 11; Motion for Class Cert. ("Mot.") at 2-3; Dkt. 76 at 2-3. Plaintiff claims that the nature and extent of these misstatements was revealed in two purported corrective disclosures. First, "[o]n August 11, 2016, the [OIG] issued [the Review] which found that 'in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." Mot. at 3 (citing Compl. ¶¶ 38-39).[2] One week later, "'[o]n August 18, 2016, [Ms. Yates] issued the [Yates Memorandum]', which stated that contract prisons operated lower-quality facilities without saving substantially on costs and that the BOP

_____

[2] The parties' experts agree that there was no significant stock price reaction following the OIG Review. Compare Allen Rpt. ¶ 5 with Feinstein Rpt. Ex. 4. (Dkt. 93-3).

3

should reduce the use of private prisons." Mot. at 3-4 (citing Compl. ¶¶ 41, 198). Following the Yates Memorandum, when the market learned for the first time that the DOJ would be reducing (and potentially ending) its use of private contractors to operate BOP facilities, CoreCivic's stock price fell considerably. *See* Dkt. 76 at 20. The analysts who cover the industry, and CoreCivic specifically, uniformly attributed the stock drop to a political shift away from privatization, and not related to CoreCivic's quality, cost or compliance during the Class Period. *See* Exs. 4-5.

### C.     Plaintiff's Motion for Class Certification and the Expert Reports

Plaintiff seeks class certification in accordance with Federal Rules of Civil Procedure 23(a) and 23(b)(3). *See generally* Mot. at 6-20. Plaintiff contends that Amalgamated Bank satisfies the four requirements of Rule 23(a) as well as Rule 23(b)(3), because "reliance can be presumed under the Supreme Court's *Basic* test because, *inter alia*, [CoreCivic's] securities traded in an efficient market[.]" *Id.* at 2. In support, Plaintiff offered a "Report on Market Efficiency" by Professor Steven P. Feinstein (the "Feinstein Report"). *See* Dkt. 93-3.

### 1.     The Feinstein "Market Efficiency" Report

In assessing market efficiency, Feinstein analyzed the five factors articulated in *Cammer v. Bloom*, 711 F. Supp. 1264, 1286-87 (D.N.J. 1989), and three additional considerations set forth in *Krogman v. Sterritt*, 202 F.R.D. 467, 474-78 (N.D. Tex. 2011). *See id.* ¶¶ 17, 42-44. In performing his statistical event study, Feinstein did not test the stock price reaction on the dates of the alleged misrepresentations or corrective disclosures. *See id.* ¶¶ 93, 94, 103, 106-108. Instead, Feinstein tested whether there was—"collectively"—a statistically significant stock price reaction on 19 earnings or guidance announcement dates during the Class Period. *Id.* Feinstein opined that earnings or guidance announcement dates would be more indicative of market efficiency because academic literature considers them to be high information flow dates.

*Id.* ¶¶ 103-05.  Feinstein concluded that CoreCivic "stock traded in an efficient market over the course of the Class Period."  *Id.* ¶¶ 19, 148.

Defendants do not dispute Feinstein's conclusion that CoreCivic's stock traded on an efficient market.  However, Feinstein's Report is more noteworthy for what it does not show than what it actually establishes.  Feinstein's event study did not assess whether CoreCivic's stock price reacted to the alleged misrepresentations, either directly (when they were made) or indirectly (when they were allegedly corrected).  *See id.* ¶¶ 103-05, 147.  In fact, with his report and all of its exhibits in front of him, Feinstein could not identify which of the earnings and forecast announcement dates (which he did test) coincided with alleged misrepresentation or corrective disclosures dates (which he did not).  *See* Ex. 6 (Feinstein Tr.) 89:13-22 (Q: "But you can't identify any of these 19 [dates tested] in Exhibit 7 [of Feinstein's Report] as including the alleged misrepresentation[s] or omissions that were addressed by company management, just as you sit here today?"  A: "That's correct.").

There is no dispute that Feinstein did not perform a "price impact analysis"—a study of whether the alleged misrepresentations affected the market price when made.  Ex. 6 (Feinstein Tr.) 115:7-18; Allen Rpt. ¶ 18.  But when asked how he hypothetically would conduct such an analysis, with some immaterial caveats, he endorsed the methodology that Allen (Defendants' expert) performed in this case.  Ex. 6 (Feinstein Tr.) at 114:6-134:12.

## 2.    The Allen "Price Impact" Analysis

Because market efficiency is not disputed, Allen first recreated Feinstein's event study but then tested the dates associated with the 33 alleged false or misleading statements and the two alleged corrective disclosures.  Allen Rpt. ¶¶ 23-25.  Allen concluded that none of the alleged misrepresentations affected CoreCivic's stock price.  *Id.* ¶¶ 3-6, 25.  Of the dates associated with 28 of the 33 alleged misrepresentations, there was no statistically significant

5

stock price movement (*i.e.*, M2-M4, M6-M9, M11-M16, M18-M29, M31-M33).  *See id.* ¶¶ 26-27 & p. 13.  On four of the remaining five dates, the stock price increase occurred *before* the alleged misrepresentations were made.  *Id.* ¶¶ 28-29 (and thus could not have been caused by the alleged misrepresentations).  Regarding the last of the alleged misrepresentations, analysts uniformly attributed the stock price increase to confounding information that had nothing to do with the alleged fraud.  *Id.* ¶¶ 30-31; 49-55.  Allen's conclusions are supported by the fact that the alleged misrepresentations on all five of the price-increase dates had previously been made, repeatedly, for years prior to the Class Period.  *See id.* ¶¶ 36, 40, 44, 48, 56.  In an "efficient market," the stock would not suddenly react to information the market had already learned.  *See also* Feinstein Rpt. (Dkt. 93-3) ¶ 30 ("An efficient market is one which rapidly reflects new information in price.").

Allen also evaluated the two alleged corrective disclosures.  At market close on August 11, 2016, the date of the OIG Review, there was no statistically significant change in CoreCivic's stock price.  Allen Rpt. ¶¶ 57-60.  One week later, following the revelation of a DOJ policy shift away from the use of private contract facilities, CoreCivic's stock price declined significantly.  Allen's analysis confirmed that which is apparent from the face of the disclosures: the Yates Memorandum did not reveal any new information about CoreCivic's quality, cost-effectiveness, or compliance that had not already been revealed one week earlier (and thus, under Plaintiff's efficient-market theory, already incorporated into CoreCivic's stock price).  Rather, the Yates Memorandum announced an unanticipated political shift away from the BOP's use of private corrections facilities.  *See* Allen Rpt. ¶¶ 67-95.  Allen confirmed that the analysts—who were noticeably (and uniformly) silent following the OIG Review—reacted quickly to the Yates

Memorandum, yet not one attributed the drop in CoreCivic's stock price to the revelation of new information about the services it provided to the BOP. *Id.* at 77-88.

## III. RULE 23 ESTABLISHES A DEMANDING STANDARD FOR CLASS CERTIFICATION

"The class action is 'an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.'" *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013). The exception is available only if a party "'affirmatively demonstrate[s] his compliance' with Rule 23." *Id.* (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). A party seeking class certification must "prove . . . *in fact*" that the four prerequisites of Federal Rule of Civil Procedure 23(a) are met: (1) numerosity, (2) commonality, (3) typicality, and (4) adequate representation. *Id.* (quoting *Wal-Mart*, 564 U.S. at 350); Fed. R. Civ. P. 23(a).

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Under Rule 23(b), the proposed class must fit within one of three specified class types. Plaintiff seeks certification under Rule 23(b)(3), which requires it to establish that (1) "questions of law or fact common to class members predominate over any questions affecting only individual members" (i.e., "predominance"); and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy" (i.e., "superiority"). Fed. R. Civ. P. 23(b)(3); *cf.* Mot. at 5-6.

Courts conduct a "rigorous analysis" to decide whether the requirements of Rule 23 are met, which unavoidably "will entail some overlap with the merits of the plaintiff's underlying claim" because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Wal-Mart* 564 U.S. at

351; *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 504 (6th Cir. 2015) (acknowledging that courts must engage in a "rigorous analysis").

## IV. INDIVIDUAL ISSUES CONCERNING EACH CLASS MEMBER'S RELIANCE WILL PREDOMINATE

### A. The Court-Created Fraud-on-the-Market Presumption is Rebuttable

To prevail on a 10b-5 claim, Plaintiff must prove, inter alia, "reliance upon the misrepresentation or omission." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 461 (2013). The Supreme Court has set forth a rebuttable presumption of class-wide reliance in Rule 10b-5 cases where plaintiffs trade on an impersonal market. The theory is that "the market price of shares traded on well-developed markets reflects all publicly available information," and "an investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price." *Basic, Inc. v. Levinson* 485 U.S. 224, 246-47 (1988). To invoke this "fraud-on-the-market" presumption, Plaintiff must establish: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton II*, 134 S. Ct. at 2408.

Critically, "*Basic* itself 'made clear that the presumption was just that'"—a presumption—that "'could be rebutted by appropriate evidence,'" including at the class certification stage. *Id*. at 2414 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 811 (2011)). Accordingly, "'[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'" *Id.* at 2415-16 (quoting *Basic*, 485 U.S. at 248). If a plaintiff cannot establish class-wide reliance via proof of a distorted

8

market price, individualized issues of reliance will predominate, and the class cannot be certified. *See id.* at 2416 ("[W]ithout the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not 'predominate' over individual ones, as required by Rule 23(b)(3)."). Therefore, "price impact" is "an essential precondition for any Rule 10b-5 class action." *Id.*

### 1. Defendants Rebut the Presumption by Offering Evidence Showing a Lack of Price Impact

A "defendant [may] rebut th[e] presumption in a number of ways, including by showing that the alleged misrepresentation did not actually affect the stock's price—that is, that the misrepresentation had no 'price impact.'" *Halliburton II*, 134 S. Ct. at 2405. Price impact refers to the price distortion at the time of the alleged misrepresentation, not at the time of a later corrective disclosure. *See id.* at 2414; *see also Halliburton I*, 563 U.S. at 814 (noting that the "price impact" inquiry asks "whether the alleged misrepresentations affected the market price in the first place") (emphasis added). Price impact can be shown in two ways: (1) directly "by an increase in price following a fraudulent public statement" (so called "front-end price impact"); or (2) indirectly by "a decrease in price following a revelation of the fraud" (called "back-end price impact"). *Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 434 (5th Cir. 2013), *vacated on other grounds by Halliburton II*, 134 S. Ct. 2398 (2014).

In the absence of a statistically significant stock-price increase, there can be no front-end price impact. The lack of front-end price impact is so important that the Eighth Circuit has held that direct "evidence of no 'front-end' price impact" *alone* rebuts the presumption and thus requires plaintiffs to prove price impact. *See IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (holding that plaintiffs' evidence of no front-end price impact rebutted the *Basic* presumption); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL

2062985, at *4 (S.D.N.Y. May 15, 2017) (noting that "defendant may rebut the presumption with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns ('front-end price impact')"); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) ("Defendants have successfully rebutted the . . . presumption" by demonstrating "that there is no date on which any alleged misrepresentation caused a statistically significant increase in the [stock] price."); *In re Credit Suisse First Boston Corp.*, 250 F.R.D. 137, 144-45 (S.D.N.Y. 2008) (decertifying class where "Defendants' reports had no impact on the price of the stock at the time they were issued").

Likewise, if a defendant shows evidence that there was no statistically significant price drop associated with a corrective disclosure, there is no back-end price impact, and the fraud-on-the-market presumption no longer applies. *See, e.g., Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-80 (N.D. Tex. 2015) (denying class certification for five corrective disclosures that did not cause a statistically significant price drop). Moreover, because a corrective disclosure is only *indirect* evidence of stock-price inflation at the time of the alleged misrepresentation, *Halliburton II*, 134 S. Ct. at 2414, a defendant can also rebut the presumption by showing that the supposed corrective disclosure was not corrective. A decrease in price following a corrective disclosure necessarily requires that the disclosure in fact be corrective—it must "reveal some then-undisclosed fact with regard to the specific misrepresentations in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010).

Thus, unless the price dropped "because of the correction to a prior misleading statement, . . . there would be no inference raised that the original, allegedly false statement caused an inflation in the price to begin with." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*, 597 F.3d 330, 336 (5th Cir. 2010), *vacated on other grounds, Halliburton I*, 563

U.S. 804 (2011) (emphasis modified).[3]  Showing a lack of correctiveness, therefore, "severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff," and "rebut[s] the presumption of reliance."  *Halliburton II*, 134 S. Ct. at 2415-16 (quoting *Basic*, 485 U.S. at 248); *see also Arkansas Teachers Ret. Sys. v. Goldman Sachs Grp., Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) (reversing class certification and directing district court to consider "evidence that the market learned the truth about" the alleged misstatements prior to the alleged corrective disclosures, "without any accompanying decline in the price of Goldman stock"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017) (analyst reports with new information disclosed after misstatements and before corrective disclosure "sever[]the link" between misstatements and stock price); *Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *7 (M.D. Tenn. June 26, 2017) ("The presumption can be rebutted by appropriate evidence, such as proof that news of the truth entered the market and dissipated the effects of the prior misstatements") (citing *Amgen*, 133 S. Ct. at 1193, 1204)); *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926 at *14-16 (N.D. Cal. Dec. 22, 2016) (finding no price impact where the defendant presented evidence showing the alleged corrective disclosure was not "corrective").

Finally, a defendant can rebut the presumption by demonstrating that a price increase following an alleged misrepresentation or a price drop following an alleged corrective disclosure was due to other, nonculpable news—so-called confounding information—rather than the alleged misrepresentation.  When "multiple items" of information are released on the same day, there are multiple potential sources of price movement—not just an alleged misrepresentation or correction thereof.  *See Greenberg v. Crossroads Sys.*, 364 F.3d 657, 665 (5th Cir. 2004).  If, by

---

[3] Plaintiff's expert agrees: "In order for a disclosure to display and make apparent inflation, given that the introduction of the inflation was obscured by other reasons . . . I believe that the disclosure would have to be corrective of the information."  *See* Ex. 6 (Feinstein Tr.) 145:3-9.

"[c]omparing the relative seriousness of all the information released" on a particular day, a defendant can show that the alleged misrepresentation or corrective disclosure did not "play[] a significant role" in the stock price's movement, *id.* at 667, then that showing "severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff" and thus "rebut[s] the presumption of reliance." *Halliburton II*, 134 S. Ct. at 2415-16 (quoting *Basic*, 485 U.S. at 248).[4]

### 2. Once Defendants Rebut the Presumption, Plaintiff Bears the Burden of Proving that the Alleged Fraud Impacted the Market Price

Federal Rule of Evidence 301 governs "presumptions in civil cases" "unless a federal statute or these rules provide otherwise." Fed. R. Evid. 301. In establishing the fraud-on-the-market presumption, the Supreme Court invoked Rule 301 in *Basic* as useful "for allocating the burdens of proof between parties." 485 U.S. at 245. Rule 301 provides in a clear way that the defendant has the burden of "producing evidence to rebut the presumption," but that the "burden of persuasion . . . remains on the party who had it originally." Fed. R. Evid. 301. Because the fraud-on-the-market presumption is a creature of the courts that has never been incorporated into any federal statute or any other Federal Rule of Evidence, Rule 301 applies to the presumption by its express terms. *See Basic*, 485 U.S. at 248 (holding that "*[a]ny showing* that severs the link" between the alleged misrepresentation and the stock price "will be sufficient to rebut the presumption of reliance") (emphasis added).[5]

---

[4] Feinstein did not consider confounding information as part of his market efficiency report. *See* Ex. 6 (Feinstein Tr.) 115:7-18.

[5] The Second Circuit has held that FRE 301 does not apply because it includes an exception for when "a federal statute . . . provides otherwise," thereby shifting the burden of persuasion to defendants. *Waggoner v. Barclays PLC*, 875 F.3d 79, 102-03 (2d Cir. 2017). But the *Waggoner* court's assertion that there is a "sufficient link" to the federal securities laws to trigger the exception ignores that a Section 10(b) private action *is a judicial creation* that is not part of the statute itself. *See Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157

12

### B. The Fraud-on-the-Market Presumption Does Not Apply Because None of the Alleged Misrepresentations Had a Stock Price Impact When Made

Defendants have met their burden of rebutting the *Basic* presumption because the evidence demonstrates that none of the alleged misrepresentations affected the price of CoreCivic stock at the time they were made. *See* Allen Rpt. ¶¶ 26-56. As noted, Plaintiff's expert did not evaluate or express an opinion on the price impact of any of the alleged misrepresentations, Ex. 6 (Feinstein Tr.) 115:7-18, but concurs generally with Allen's methodology for conducting a price impact analysis. *Id.* at 114:6-134:12.

### 1. There Was No Statistically Significant Stock-Price Increase on Twenty-Eight of the Thirty-Three Alleged Misrepresentation Dates

There was no statistically significant increase in CoreCivic's stock price on 28 of the 33 dates on which CoreCivic made the alleged misrepresentations.[6] Allen Rpt. ¶ 27. In other words, after controlling for market and industry movements, CoreCivic's stock price movement was within the range of normal expected daily variation in the stock price, and thus, cannot be distinguished from zero. *Id.*

### 2. The Statistically Significant Price Increase on Four of the Five Remaining Dates Preceded the Alleged Misrepresentations

On four of the five alleged misrepresentation dates that *did* have a statistically significant price increase, that increase occurred *before* the alleged misrepresentations were made. For example, CoreCivic filed its 2011 10-K at 2:31 p.m. on February 27, 2012 (the first day of the alleged Class Period), but by that time CoreCivic's stock price already had increased from a

---

(2008) ("Though the text of the Securities Exchange Act does not provide for a private cause of action for § 10(b) violations, the Court has found a right of action implied in the words of the statute and its implementing regulation."). The Sixth Circuit has not yet addressed the allocation of burdens at class certification. Regardless, and in any event, Defendants' evidence is sufficient to meet either burden at class certification—production or persuasion.

[6] Nor was there any negative confounding news on any of these dates that an alleged misrepresentation might have offset. *See* Allen Rpt. ¶ 28.

closing price of $20.86 on February 24 (the previous trading day) to $21.85. CoreCivic's stock price remained roughly stable after the filing of its Form 10-K, ranging from $21.78 to $21.88, and closing at $21.80. *See* Allen Rpt. ¶¶ 33-34. For the same reason, the increases in CoreCivic's stock price on the dates it filed its 2Q12, 2Q13, and 2Q14 10-Qs *cannot* be attributed to the misrepresentations alleged in this case: the price increase on each date occurred *before* the 10-Q was filed, and there was no additional statistically significant price increase thereafter. *See* Allen Rpt. ¶¶ 37-38, 41-42, 45-46.

### 3. The Price Increase on May 5, 2016 Was Solely Attributable to Confounding News

May 5, 2016 is the only purported misstatement date that cannot be explained purely by comparing the timing of the alleged misrepresentation with the timing of the stock price increase. *See* Allen Rpt. ¶ 50. Nonetheless, analyst reports and other market commentary support Allen's conclusion that none of the alleged misrepresentations that were made on dates that had a statistically significant price increase, including May 5, 2016, was the cause of the increase. *See, e.g.*, Allen Rpt. ¶¶ 51-55. For example, none of the five analyst reports that discussed CoreCivic's statements on May 5, 2016, even mentioned the alleged misrepresentations. *See* Exs. 7 - 11.[7] They focused instead on CoreCivic's announcement of results that beat market expectations and an announcement by the Oklahoma Department of Corrections that it had renewed the lease for CoreCivic's North Fork Correctional Facility. Allen Rpt. ¶¶ 51-55. In

---

[7] Reviewing analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for determining whether a piece of information had price impact. *See, e.g., Cammer*, 711 F. Supp. at 1286; *see also* Feinstein Rpt. ¶ 52 ("[S]ecurities analysts facilitate the flow of information and the digestion of information within the marketplace. These functions promote market efficiency.") (Dkt. 93-3); Ex. 6 (Feinstein Tr.) 29:24-30:15 (observing that it is "often the case" that analysts "can help the market direct attention to pieces of information that the analyst believes [are] very important and ought to be viewed.").

14

short, no analyst—not one—attributed the May 5, 2016 stock price increase to anything CoreCivic did or did not say regarding "quality," "cost" or "compliance."

### 4. *None* of the Alleged Misrepresentations Introduced New Information

Furthermore, none of the five alleged misrepresentation dates that had a statistically significant price increase featured misstatements that introduced any new, unique or original information. Indeed, many of the same alleged misstatements had been made for years prior to the five dates associated with statistically significant stock price increases. *Compare, e.g.*, Ex. 12 (excerpts of CoreCivic's 2011 10-K) *with* Exs. 13-23 (excerpts of CoreCivic's 2005, 2006, 2007, 2008, 2009, 2010, and 2015 10-Ks and its 3Q11, 1Q12, 1Q13, and 1Q14 10-Qs) (same); *see also* Allen Rpt. ¶¶ 36, 40, 44, 48, 56 (identifying identical or substantially similar statements made in earlier SEC filings). In an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction. Allen Rpt. ¶ 30.

### 5. Plaintiff Cannot Avoid the Lack of Front-End Price Impact by Arguing Price Maintenance

Plaintiff may argue that the misrepresentations merely maintained an already artificially high stock price rather than introduced new inflation. *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656-57 (S.D. Ohio 2017) (explaining that "the price maintenance theory" is "the theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price"). This "price maintenance theory" has no application in this case.

Where a price maintenance theory is adequately pled and supported by evidence, some courts have found that "[p]rice impact . . . can be quantified by [the] decline in price when the truth is revealed." *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *7 (N.D.

15

Cal. March 16, 2016). However, neither the Complaint in this case nor any briefing to date has advanced a price maintenance theory of stock inflation. Instead, Plaintiff consistently has alleged that "[t]he market price of CCA securities . . . was artificially inflated by the false and misleading statements and omissions complained of" in the Complaint, "including CCA's misleading and incomplete statements about the quality of its operations, its compliance with its contractual obligations and the costs associated with its operations, as well as the other matters complained of" therein. Compl. ¶ 191. Plaintiff does not allege any facts (much less provide supporting evidence) demonstrating that the stock price was inflated *prior* to the beginning of the Class Period and that the alleged misstatements at issue simply maintained that inflation.[8] *Cf. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2017) (price maintenance requires preexisting "inflation that is already extant in [defendants'] stock price").[9]

### C. There is No Indirect, or "Back-End," Price Impact Based on the Two Alleged Corrective Disclosures

In addition, Defendants have met their burden of rebutting the *Basic* presumption because there was no statistically significant price change following publication of the OIG Review, and

---

[8] Nor does Plaintiff allege any facts to suggest that CoreCivic's statements concealed a deterioration in its business that might have occurred at some point prior to or during the Class Period. According to Plaintiff, the quality and cost-effectiveness of CoreCivic's services was consistent throughout the Class Period. Plaintiff's allegations thus have nothing in common with a typical price maintenance case. *Cf. Cooper v. Thoratec Corp.*, 2018 WL 2117337, at *5 (N.D. Cal. May 8, 2018) (defendant downplayed harm of a competitor entering a market in which defendant was previously the sole manufacturer); *Baker v. SeaWorld Entm't*, 2017 WL 5885542, at *12 (S.D. Cal. Nov. 29, 2017) (defendants claimed SeaWorld attendance had not declined following the release of the *Blackfish* documentary).

[9] Plaintiff should not be permitted to assert a new theory in support of class certification for the first time in reply. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule."); *see also Scottsdale Ins. Co. v. Flowers*, 513 F.3d 546, 553 (6th Cir. 2008) (quoting *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002)) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs reply to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

16

the Yates Memorandum was not corrective.  *See* Allen Rpt. ¶¶ 57-95.[10]

## 1. The OIG Review Did Not Affect CoreCivic's Stock Price

There was no statistically significant reaction in CoreCivic's stock price following the release of the OIG Review on August 11, and no analyst covering CoreCivic issued a report during the week that followed.  *See* Allen Rpt. ¶¶ 58-60; Feinstein Rpt. (Dkt. 93-3) Ex. 1 at p. 56.  Therefore, there is no "back-end" price impact for the OIG Review.

## 2. The Stock Drop Following Publication of the Yates Memorandum Does Not Demonstrate Price Impact of the Alleged Misrepresentations

The Yates Memorandum was not "corrective" because it did not publish a "then-undisclosed fact" that Defendants purportedly misrepresented in the challenged statements.  *See In re Omnicom*, 597 F.3d at 511.[11]

As an initial matter, all of the alleged misstatements already had been "corrected" by the lengthy and detailed OIG Review.  *See* Allen Rpt. ¶¶ 73-75, 95.  Among other things, the OIG Review found that "in a majority of the categories [the OIG] examined, contract prisons incurred

_____

[10] Feinstein did not test whether there was a statistically significant stock price reaction on the dates of the OIG Review or the Yates Memorandum in his event study.  Feinstein Rpt. Ex. 7; Ex. 6 (Feinstein Tr.) 22:19-23; 115:7-18.

[11] It is appropriate for this Court to consider whether the Yates Memorandum contained "new" information that can be tied back to the misrepresentations in order to determine whether Defendants have rebutted the presumption of reliance.  *Halliburton II* makes clear that the presumption of reliance does not apply to "plaintiffs who purchased the securities at issue after 'the truth was revealed' because they 'could not be said to have acted in reliance on a fraud-tainted price.'"  *W. Va. Pipe Trades Health & Welfare Fund, Employees' Ret. Sys. v. Medtronic, Inc.*, 2018 WL 620383, at *11 (D. Minn. Jan. 30, 2018) (quoting *Halliburton II*, 134 S. Ct. at 2413-15).  This inquiry does not raise questions of materiality or loss causation, but rather questions appropriate at class certification about whether "continued reliance" on a misrepresentation is reasonable, *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016), and whether the stock price was tainted by the misrepresentation.  *See Goldman*, 879 F.3d at 485-86 (explaining that defendant is entitled to "show[] that an 'alleged misrepresentation did not, for whatever reason, actually affect the market price' of defendant's stock," and distinguishing the truth on the market defense based on a "theory . . . that the market was already aware of the truth regarding defendants' misrepresentations at the time the class members purchased their shares").

more safety and security incidents per capita than comparable BOP institutions." Ex. 1 at Executive Summary. The lack of market reaction to this disclosure—which goes to the heart of Plaintiff's allegations—coupled with the collective silence of analysts, speaks volumes.

Moreover, public reports and articles discussing the "quality" and "deficiencies" at the CoreCivic facilities discussed in the Complaint were published prior to and throughout the alleged Class Period with no statistically significant price reaction. *See* Allen Rpt. ¶¶ 59-65. The lack of any price reaction to the prior publication of this same information is consistent with Allen's conclusion that there was no stock price reaction to the corrective disclosures alleged in this case.

Finally, the analysts who covered CoreCivic recognized that the Yates Memorandum was the result of a political decision, not a reaction to previously concealed deficiencies in quality or cost-effectiveness.[12] For example:

- "[W]e believe the political environment is a large factor and driver behind the DOJ's memo." Ex. 4 (Canaccord Genuity, Aug. 23, 2016) at 3.

- "We believe the BOP itself is not going to be a fan of overcrowding its system to satisfy a political push to sever ties with private prisons. Overcrowding is the single metric that correlates best with incidents of violence, mortality and other disruptions often tabulated to compare quality of facilities." Ex. 5 (SunTrust, Sept. 1, 2016) at 4.

Notably, not a single analyst attributed the stock price decline that followed the Yates Memorandum to new information concerning CoreCivic's quality, cost, or compliance. The fact that CoreCivic's stock price rebounded almost immediately after the 2016 presidential election is further evidence that the market agreed with the analysts. Allen Rpt. ¶¶ 89-90.

---

[12] Notwithstanding the statements made in the OIG Review and the Yates Memorandum, analysts continued to believe that private facilities generally and CoreCivic specifically provided a high quality and cost-effective alternative. *See* Ex. 5 (Suntrust 9/1/16) at 7-8; Ex. 24 (Canaccord 1/13/17) at 8-9.

In sum, if Plaintiff were correct that the alleged misrepresentations regarding CoreCivic's quality, cost-effectiveness, and compliance inflated its stock price, and if Plaintiff were correct that disclosure of the "truth" caused the stock price to decline on August 18, 2016, then the stock price should have declined on August 11, 2016, when the market learned the "facts" about CoreCivic's quality and cost-effectiveness from the OIG Review. Based on Plaintiff's own theory of market efficiency, the price decline a week later was caused by something other than the "correction" of Defendants' alleged misrepresentations, such that Defendants' alleged misrepresentations "did not actually affect the stock's market price." *Goldman*, 879 F.3d at 486 (quoting *Halliburton II*, 134 S. Ct. at 2416). The OIG Review (and the lack of market reaction to it) severs any link between the alleged misrepresentations and the subsequent purported "correction"—the Yates Memorandum. *See Basic*, 485 U.S. at 248-49.

### D.       Plaintiff Cannot Invoke the *Affiliated Ute* Presumption of Reliance

As a fallback, Plaintiff asserts that it is entitled to a presumption of reliance based on the Supreme Court's decision regarding omissions in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Mot. at 17-18. As Plaintiff acknowledges, "[the] *Affiliated Ute* presumption applies to claims 'involving primarily a failure to disclose.'" Mot. at 17 (citing *Affiliated Ute*, 406 U.S. at 153). Where, as here, Plaintiff's claims "should be characterized primarily as misrepresentations, the Plaintiffs are not entitled to a presumption of reliance." *Clayton v. Heartland Res., Inc.*, 754 F. Supp. 2d 884, 895 (W.D. Ky. 2010); *see also Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001); *Schwab v. E*Trade Fin. Corp.*, 285 F. Supp. 3d 745, 755 (S.D.N.Y. 2018) ("If a plaintiff pleads affirmative misrepresentations on which the plaintiff relied, then the *Affiliated Ute* presumption does not apply even though the plaintiff alleges that the representations were false because they omitted the truth."). The overwhelming

19

majority of the challenged statements in this case are affirmative misstatements, not omissions.[13] To the extent Plaintiff attempts to claim that any of these are omissions, rather than misstatements, that avenue is foreclosed: the "*Affiliated Ute* presumption" does not apply where "'the allegations contend that the defendants undertook . . . to disclose relevant information . . . alleged to contain certain misstatements of facts and fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading.'" *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *48 (M.D. Tenn. Mar. 31, 2009). Plaintiff's *Affiliated Ute* argument has no place here, and has consistently been rejected in other misrepresentation cases. *See In re BancorpSouth, Inc.*, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) (recognizing that "*Affiliated Ute* ha[d] never been applied at the class-certification stage" until the decision under review).

## V.    CONCLUSION

For the reasons set forth above, Defendants respectfully request that Plaintiff's Motion for Class Certification be denied.

---

[13] *See, e.g.*, Compl. ¶ 123 (CoreCivic has a "competitive cost structure," which offers "customers a compelling option."); *id.* at ¶ 126 (outsourcing allows governments to "control[] costs and improve[] correctional services."); *id.* at ¶ 129 (CoreCivic successfully "help[s] [governments] manage their correctional costs"); *id.* at ¶ 132 ( "[w]e believe our [contract] renewal rate … remains high as a result of . . . reasons including . . . the quality of our operations."); *id.* at ¶ 135 ("[w]e operate our facilities in accordance with both company and facility specific policies and procedures."); *id.* at ¶ 139 (CoreCivic's belief that a reduction in BOP-wide prison populations would not impact CoreCivic's specific facilities); *id.* at ¶ 142 (CoreCivic provided services of an equally high standard of quality and efficiency as its government partners); *id.* at ¶ 145 (CoreCivic followed or exceeded Prison Rape Elimination Act standards); *id.* at ¶ 147 (CoreCivic provided "operational cost savings" to its state level partners); *id.* at ¶ 149 (CoreCivic provided cost savings to government partners, offered programs to reduce recidivism, and met or exceeded government quality standards); *id.* at ¶ 151 (CoreCivic provided quality services); *id.* at ¶ 153 (CoreCivic provided cost savings); *id.* at ¶ 155 (cost savings); *id.* at ¶ 157 (cost savings); *id.* at ¶¶ 159-162 (cost savings and safety of CoreCivic prisons).

DATED:  July 16, 2018                    Respectfully submitted:

　_/s/ Steven A. Riley_　　　　　
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler
Brian T. Glennon
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com

Morgan E. Whitworth
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T:  (415) 391-0600
F:  (415) 395-8095
morgan.whitworth@lw.com

*Attorneys for Defendants Corrections*
*Corporation of America, Damon T.*
*Hininger, David M. Garfinkle, Todd J.*
*Mullenger, and Harley G. Lappin*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

David J. Schindler
Brian T. Glennon
Anna E. Berces
Morgan E. Whitworth
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
david.schindler@lw.com
brian.glennon@lw.com
anna.berces@lw.com
morgan.whitworth@lw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars, Ste 100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN &
    DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN &
    DOWD LLP
Post Montgomery Center
One Montgomery Street, Ste 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

this 16th day of July, 2017.

          /s/ Steven A. Riley

23