2017 WL 5885542
United States District Court, S.D. California.

Lou BAKER, individually and on behalf of
all others similarly situated, et al., Plaintiffs,
v.
SEAWORLD ENTERTAINMENT,
INC., et al., Defendants.

Case No.: 14cv2129-MMA (AGS)
|
Signed 11/29/2017

**Attorneys and Law Firms**

Ethan Thomas Boyer, David J. Noonan, Noonan Lance
Boyer & Banach LLP, San Diego, CA, Gregory M.
Castaldo, Joshua E. D'Ancona, Joshua A. Materese,
Megan Koneski, Michael K. Yarnoff, Kessler Topaz
Meltzer & Check LLP, Radnor, PA, Laurence M. Rosen,
The Rosen Law Firm, P.A., Los Angeles, CA, Bradley
E. Beckworth, Cody L. Hill, Jeffrey J. Angelovich, Lloyd
Nolan Duck, III, Nix Patterson & Roach LLP, Austin,
TX, Eli R. Greenstein, Kessler Topaz Meltzer & Check,
LLP, San Francisco, CA, Susan Whatley, Nix Patterson
& Roach, LLP, Daingerfield, TX, for Plaintiffs.

Chet A. Kronenberg, Simpson Thacher and Bartlett LLP,
Richard H. Zelichov, Jason Yuegin Kelly, Katten Muchin
Rosenman LLP, Los Angeles, CA, Dean Michael McGee,
Janet Gochman, Jonathan Youngwood, Meredith Karp,
Simpson Thacher & Bartlett LLP, New York, NY,
Michael Joseph Diver, Michael J. Lohnes, Gil M.
Soffer, Katten Muchin Rosenman LLP, Chicago, IL, for
Defendants.

<u>REDACTED</u>

**ORDER GRANTING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

HON. MICHAEL M. ANELLO, United States District
Judge

**\*1** Lead Plaintiffs Arkansas Public Employees
Retirement System ("APERS") and Pensionskassen for
Børne-Og Ungdomspædagoger ("PBU") (collectively,
"Plaintiffs") bring this putative securities fraud class

action against Defendants SeaWorld Entertainment Inc.
("SeaWorld Entertainment"), The Blackstone Group
L.P., James Atchison, James M. Heaney, and Marc
Swanson (collectively, "Defendants") asserting claims
pursuant to Sections 10(b) and 20(a) of the Securities
Exchange Act of 1934 and Rule 10b-5 promulgated
thereunder. *See* Doc. No. 123 ("SAC"). Plaintiffs bring
this action on behalf of all individuals and entities
who purchased or acquired common stock of SeaWorld
Entertainment, Inc. ("SEAS Common Stock") during the
proposed class period of August 29, 2013 and August 12,
2014, inclusive.

Plaintiffs now move for class certification pursuant to
Federal Rule of Civil Procedure 23. *See* Doc. No. 213.
Defendants filed an opposition to Plaintiffs' motion,
to which Plaintiffs replied. *See* Doc. Nos. 215, 243.
Defendants also filed a sur-reply, to which Plaintiffs filed
a sur-sur-reply. *See* Doc. Nos. 246, 247. After entertaining
the oral arguments of counsel at the hearing on November
13, 2017, the Court took the motion under submission for
further review and consideration. For the reasons set forth
below, the Court affirms its tentative ruling and **GRANTS**
Plaintiffs' motion for class certification.

<u>BACKGROUND</u>

This case involves statements and omissions made by
Defendants in the wake of the 2013 documentary
*Blackfish*. *Blackfish* tells the story of Tilikum, a 12,000-
pound bull orca implicated in the deaths of three people,
and chronicles the cruelty of killer whale capture methods,
the dangers trainers face performing alongside killer
whales during SeaWorld Entertainment's popular shows,
and the physical and psychological strains killer whales
experience in captivity. Through interviews with former
trainers, spectators, employees of regulatory agencies,
and scientists, *Blackfish* makes the case that keeping
killer whales in captivity for human entertainment is
cruel, dangerous, and immoral. *Blackfish* premiered at the
Sundance Film Festival on January 19, 2013.

SeaWorld Entertainment is a theme park and
entertainment company best known for its parks with
shows featuring orca whales and its famous "Shamu"
mascot. SeaWorld Entertainment is headquartered in
Orlando, Florida, and owns and operates eleven theme
parks within the United States, including: three SeaWorld-

branded theme parks in Florida, Texas, and California; two Busch Gardens theme parks in Florida and Virginia; three water parks in Florida and Virginia; Discovery Cove, an attraction in Florida offering interactions with marine animals; and Sesame Place, a seasonal theme park in Pennsylvania. SeaWorld Entertainment's financial health is directly tied to its ability to attract and grow attendance at its parks.

SeaWorld Entertainment was a privately held company until it went public in April 2013 with an initial public offering of its common stock at a price of $27 per share. SAC ¶ 50.

**\*2** In July 2013, *Blackfish* was released in select theaters in the United States and Canada, and made available for viewing by Netflix customers in the United Kingdom. In September and October 2013, *Blackfish* premiered in a variety of different countries, and was broadcast on CNN in a highly promoted screening on October 24, 2013. *Blackfish* was released on DVD and Blu-ray in the United States in November 2013, and made available for streaming on iTunes and Netflix in December 2013. The BBC also aired the film in the United Kingdom in November 2013.

In December 2013, SeaWorld Entertainment finished a secondary public offering of common stock at a price of $30 per share. *Id.* ¶ 51. SeaWorld Entertainment completed another secondary public offering in April 2014 at a price of $30 per share of common stock. *Id.* ¶ 52.

During the class period, which extends from August 29, 2013 to August 12, 2014, overall attendance declined at the eleven SeaWorld Entertainment parks. Specifically, Defendants reported the following declines in attendance as compared to 2012: a 9% decline in attendance in the second quarter of 2013; a 3.6% decline in attendance in the third quarter of 2013; and a 1.4% decline in attendance in the fourth quarter of 2013. This resulted in a 4.1% decline in overall attendance for 2013. Defendants reported a 13% decline in attendance for the first quarter of 2014.

SeaWorld Entertainment attributed the declines in attendance to adverse weather conditions, school and holiday schedules, and a new pricing strategy. However, other major theme park groups located in the United States, including Disney and Universal, realized increases in attendance during 2013, even though they both

maintain parks in some of the same locations SeaWorld Entertainment does, and were therefore subject to some of the same adverse weather conditions. Disney and Universal parks were also subject to the same school and holiday schedules, and also increased prices at some of their parks in 2013.

Unlike Disney and Universal, SeaWorld Entertainment parks were subjected to significant negative publicity as a result of the *Blackfish* documentary. The negative publicity included statements by celebrities on Twitter urging millions of their followers to watch *Blackfish* and avoid "SeaWorld." An online poll on CNN on October 23, 2015 reported that 86% of the 3,000 respondents would not take their kids to "SeaWorld" in light of the allegations in *Blackfish. Id.* ¶ 141. Some schools also canceled their annual field trips to SeaWorld Entertainment parks. Later in 2013, a number of artists slated to perform at a series of summer concerts at the SeaWorld-branded park in Florida and Busch Gardens in Florida cancelled their performances after receiving online petitions urging them to do so. *Id.* ¶¶ 145-147. Most of the artists cited the controversy surrounding *Blackfish* as the reason for their withdrawal, and a variety of international news sources reported on the cancellations. In December 2013, SeaWorld Entertainment published an open letter featured in major newspapers and on social media in order to refute "misconceptions" regarding the artist cancellations. *Id.* ¶ 149.

In late 2013 and early 2014, activists initiated a series of online petitions urging sponsors to end their relationships with SeaWorld Entertainment. A variety of media outlets reported on the petitions, amplifying their impact. In July 2014, Southwest Airlines announced it would not renew its 26-year partnership with SeaWorld Entertainment. *Id.* ¶ 156. Other corporate sponsors also ended their relationships with SeaWorld Entertainment in late 2014 and early 2015.

**\*3** In March 2014, national media outlets reported that a California Assembly member had introduced legislation that would ban orca performances, breeding, and artificial insemination in California. *Id.* ¶ 159. The bill was colloquially referred to as "the *Blackfish* bill." Governor Brown signed the bill on September 13, 2016, officially banning orca breeding and captivity programs in California.

Case 3:16-cv-02267 Document 98-1 Filed 07/16/18 Page 2 of 149 PageID #: 2178

In August 2013, SeaWorld Entertainment Vice President of Communications Fred Jacobs stated "*Blackfish* has had no attendance impact," and that SeaWorld Entertainment "can attribute no attendance impact at all to the movie." *Id.* ¶ 208. In November 2013, SeaWorld Entertainment Chief Executive Officer James Atchison ("Defendant Atchison") stated "I scratch my head if there's any notable impact from this film at all, and I can't attribute one to it," and that "[i]ronically, our attendance has improved since the movie came out." *Id.* ¶ 217. In December 2013 Defendant Atchison also stated that "[a]s much data as we have and as much as we look, I can't connect anything really between the attention that the film has gotten and any effect on our business." *Id.* ¶ 219. In a fourth quarter earnings call in March 2014, Defendant Atchison reiterated that he had "seen no impact on the business," and that surveys conducted by SeaWorld Entertainment did not "reflect any shift in sentiment about intent to visit our parks." *Id.* ¶ 229. Lastly, in May 2014, SeaWorld reported a 13% decrease in attendance for the first quarter of 2014 and attributed the decline to the Spring Break holiday and adverse weather conditions. *Id.* ¶ 232.

On August 13, 2014, SeaWorld Entertainment made the following statement regarding the decline in attendance in the second quarter of 2014: "the Company believes attendance in the quarter was impacted by demand pressures related to recent media attention surrounding proposed legislation in the state of California." *Id.* ¶ 163. When asked why proposed legislation tabled in April 2014 would now have an effect on attendance at SeaWorld Entertainment parks in August 2014, Defendant Atchison responded that at the time, SeaWorld Entertainment was "still grappling with what impact there would be related to the news attention around the legislation." *Id.* ¶ 234. The same day, SeaWorld Entertainment's common stock price dropped nearly 33% ($9.25 per share). *Id.* ¶ 164.

SeaWorld Entertainment continued to receive negative publicity after the end of the class period. In November 2014, Defendant Atchison stated that negative attendance trends were the result of "a combination of factors, including negative media attention in California." *Id.* ¶ 185. Defendant Atchison also participated in a Bloomberg Business article entitled, "Saving SeaWorld," in which he acknowledged that SeaWorld Entertainment had struggled to find an effective approach in responding to widespread criticism and activism generated by *Blackfish.* Defendant Atchison resigned from his position as CEO of

SeaWorld Entertainment in December 2014. News outlets subsequently reported that *Blackfish* is "widely considered to be at least partly responsible for SeaWorld's attendance drop." *Id.* ¶ 191.

## PROCEDURAL HISTORY

Plaintiffs filed their previous Consolidated Amended Class Action Complaint ("CAC") on February 27, 2015. Doc. No. 42. The CAC named twenty-seven Defendants, including all of the banking institutions that underwrote SeaWorld Entertainment's public offerings. The CAC also included five counts, including three claims under Sections 11, 12, and 15 of the Securities Act of 1933, and two claims under Sections 10(b) and 20 of the Securities Exchange Act of 1934.

**\*4** The Court granted Defendants' motion to dismiss on March 31, 2016 and allowed Plaintiffs 60 days to amend. Doc. No. 102. Plaintiffs filed their Second Amended Consolidated Class Action Complaint on May 31, 2016. *See* SAC. Plaintiffs limited the defendants in the action to SeaWorld Entertainment, James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P. Plaintiffs also limited their causes of action to two counts for violations of Sections 10(b) and 20 of the Securities Exchange Act of 1934. *See id.* Plaintiffs seek the following relief on behalf of the class: (a) a declaration that this action is a proper class action, designating Plaintiffs as class representatives under Rule 23 and Plaintiffs' counsel as Class Counsel; (b) compensatory damages against Defendants jointly and severally, including interest; (c) reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and (d) awarding all equitable and other relief as the Court may deem just. *See id.*

On June 29, 2016, Defendants filed a motion to dismiss Plaintiffs' SAC for failure to state a claim under Rules 9(b) and 12(b)(6), as well as the Private Securities Litigation Reform Act of 1995 (15 U.S.C. § 78u-4). Doc. No. 128. The Court heard oral argument on the motion, and denied Defendants' motion to dismiss. Doc. No. 142. On May 19, 2017, Plaintiffs filed the instant motion.

## PLAINTIFFS' PROPOSED CLASS

Plaintiffs seek to represent a class of all persons and entities who purchased or otherwise acquired SEAS Common Stock between August 29, 2013 and August 12, 2014, and who were damaged thereby. SAC ¶ 1. Excluded from the class are: (i) Defendants, (ii) present or former executive officers of SeaWorld, members of SeaWorld's Board of Directors, and members of their immediate families, (iii) any of the foregoing persons' legal representatives, heirs, successors or assigns, and (iv) any entity in which Defendants have or had a controlling interest or any affiliate of SeaWorld. *Id.*

## LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs the certification of a class. Fed. R. Civ. P. 23. "Parties seeking class certification bear the burden of demonstrating that they have met each of the four requirements of Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b)." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 979-80 (9th Cir. 2011) (citing *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001)). Rule 23(a) requires a party seeking class certification to establish the following four elements:

> (1) that the class is so large that joinder of all members is impracticable (numerosity); (2) that there are one or more questions of law or fact common to the class (commonality); (3) that the named parties' claims are typical of the class (typicality); and (4) that the class representatives will fairly and adequately protect the interests of other members of the class (adequacy of representation).

*Id.* at 980 (citing Fed. R. Civ. P. 23(a)). The United States Supreme Court has made clear that "Rule 23 does not set forth a mere pleading standard." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Instead, "[a] party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Id.*

At the certification stage, district courts must "engage in a 'rigorous analysis' of each Rule 23(a) factor when determining whether plaintiffs seeking class certification have met the requirements of Rule 23." *Ellis*, 657 F.3d at 980. "In many cases, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim...." *Id.* (internal citation and quotation omitted). "[T]he merits of the class members' substantive claims are often highly relevant when determining whether to certify a class. More importantly, it is not correct to say a district court may consider the merits to the extent that they overlap with class certification issues; rather, a district court *must* consider the merits if they overlap with the Rule 23(a) requirements." *Id.* at 981 (emphasis in original).

**\*5** Once the prerequisites of Rule 23(a) are met, the Court must then determine whether the class action is maintainable under Rule 23(b). "Under Rule 23(b)(3), a class may be certified if the district court 'finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.' " *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 944 (9th Cir. 2009) (quoting Fed. R. Civ. P. 23(b)(3)); *see also Stockwell v. City & Cnty. of S.F.*, 749 F.3d 1107, 1111 (9th Cir. 2014). "The party seeking certification bears the burden of demonstrating that he has met the requirements of Rule 23(b)." *Vinole*, 571 F.3d at 944 n.9.

## DISCUSSION

### I. Defendants' Request for Judicial Notice
As an initial matter, Defendants request that the Court take judicial notice of several documents in connection with their opposition to Plaintiffs' motion for class certification (Exhibits 1-3, and 8-10 to the Declaration of Chet A. Kronenberg). *See* Doc. No. 198-21. Plaintiffs do not oppose this request.

Generally, a court must take judicial notice if a party requests it and supplies the court with the requisite information. Fed. R. Evid. 201(d). "A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 4

ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see Mack v. South Bay Beer Distributors,* 798 F.2d 1279, 1282 (9th Cir. 1986) (citing *Sears, Roebuck & Co. v. Metropolitan Engravers, Ltd.,* 245 F.2d 67, 70 (9th Cir. 1956)). While a court may take judicial notice of matters of public record, it may not take judicial notice of a fact that is subject to reasonable dispute. Fed. R. Evid. 201(b); *Lee v. City of Los Angeles,* 250 F.3d 668, 688-89 (9th Cir. 2001).

The Court previously took judicial notice of Exhibits 1, 3, 8 and 10, all of which were filed with the SEC, in connection with Defendants' motion to dismiss Plaintiffs' CAC. *See* Doc. No. 102 at 8-9. Exhibit 2 is an excerpt from SeaWorld's Prospectus, filed with the SEC on or about December 12, 2013. Exhibit 9 is a transcript of SeaWorld's Fourth Quarter 2013 Financial Results Conference Call, held on or about March 13, 2014. Because these documents are publicly-available and capable of accurate determination, the Court **GRANTS** Defendants' request for judicial notice. *See In re New Century,* 588 F. Supp. 2d 1206, 1219 (C.D. Cal. 2008) ("It is well-established that courts may take judicial notice of SEC filings."); *see also In re Washington Mut., Inc. Sec., Derivative & ERISA Litig.,* 259 F.R.D. 490, 495 (W.D. Wash. 2009) (taking judicial notice of conference call transcripts).

## II. Plaintiffs' Motion for Class Certification

Defendants oppose certification on several grounds. First, Defendants contend Plaintiffs do not satisfy Rule 23(a)'s adequacy and typicality requirements because: a) Plaintiffs' investment decisions were not typical; b) PBU may be subject to atypical standing defenses; and c) Plaintiffs have not instituted mechanisms to ensure coordination of their efforts in the litigation. *See* Doc. No. 215. Second, Defendants assert Plaintiffs cannot meet Rule 23(b)(3)'s predominance requirement because: a) Defendants rebut Plaintiffs' presumption of reliance; and b) Plaintiffs fail to proffer a damages model that is susceptible to proof on a class-wide basis. *See id.* The Court addresses each requirement of Rule 23(a) and Rule 23(b)(3) below.

### A. Rule 23(a)

#### 1. Numerosity

**\*6** Rule 23(a)(1) requires the proposed class to be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Here, Plaintiffs allege the class consists of "potentially thousands of investors in SEAS Common Stock, which was traded on the New York Stock Exchange." Doc. No. 213-1 at 8. Defendants do not dispute that Rule 23(a)(1)'s numerosity requirement is met in this case. Accordingly, the Court finds that the numerosity requirement is satisfied. *See Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.,* 311 F.R.D. 590, 602-03 (C.D. Cal. 2015) (" 'As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members[.]' ") (quoting *Slaven v. BP Am., Inc.,* 190 F.R.D. 649, 654 (C.D. Cal. 2000)).

#### 2. Commonality

Rule 23(a)(2) requires that there be a question of law or fact common to the class. *See* Fed. R. Civ. P. 23(a)(2). The common question "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes,* 564 U.S. at 350. Commonality therefore "requires plaintiffs to demonstrate that the class members have suffered the same injury, not merely violations of the same provision of law." *Parsons v. Ryan,* 754 F.3d 657, 674–75 (9th Cir. 2014) (citations and quotations omitted). Accordingly, "[w]here the circumstances of each particular class member vary but retain a common core of factual or legal issues with the rest of the class, commonality exists." *Id.* at 675 (quoting *Evon v. Law Offices of Sidney Mickell,* 688 F.3d 1015, 1029 (9th Cir. 2012)). As the Supreme Court has noted, "for purposes of Rule 23(a)(2) even a single common question will do." *Dukes,* 564 U.S. at 359 (internal quotation and alteration omitted).

Here, Plaintiffs argue several common questions of law and fact exist, including: (i) whether Defendants violated federal securities law; (ii) whether Defendants' statements during the class period misrepresented or omitted facts about the business and management of the company; (iii) whether those statements and/or omissions were material; (iv) whether Defendants acted with the requisite state of mind; (v) whether the market price of SEAS Common Stock was artificially inflated during the class period due to the alleged material misrepresentations and omissions; and (vi) whether Defendants' conduct resulted in damages to the class. *See* Doc. No. 213-1 at 9. Defendants do not

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 5

dispute that Rule 23(a)(2)'s commonality requirement is satisfied. As such, the Court finds this requirement is met. *See In re LDK Solar Sec. Litig.*, 255 F.R.D. 519, 530 (N.D. Cal. 2009) ("all class members are unified by an interest in proving the same common course of conduct regarding [the defendants'] allegedly fraudulent ... representations"); *Schaefer v. Overland Express Family of Funds*, 169 F.R.D. 124, 128 (S.D. Cal. 1996) (finding Rule 23(a)(2) was met in a securities fraud case when the legal claims arose from common misrepresentations).

### 3. Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[R]epresentative claims are 'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Parsons*, 754 F.3d at 685. The typicality requirement "assure[s] that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (quoting *Hanon*, 976 F.2d at 508).

**\*7** Plaintiffs argue that their claims are typical of all class members, as they purchased SEAS Common Stock during the class period for investment purposes. Defendants claim the typicality requirement is not met for two reasons.

First, Defendants contend [redacted text] "demonstrate[s] that Plaintiffs did not rely on the statements they themselves contend were false or misleading to the market." Doc. No. 215 at 9. [1]

[1]    Citations to this document refer to the pagination assigned by the CM/ECF system.

In response, Plaintiffs claim that "Westwood possessed and relied only on Sea World's market price and public information when deciding to trade SeaWorld shares." Doc. No. 243 at 5. [redacted text]

Here, [redacted text], the record reflects that Westwood based its trading decisions on information [redacted text];

*see Blackie v. Barrack*, 524 F.2d 891, 907 (9th Cir. 1975) (investors may "purchase because of a favorable price trend, price earnings ratio, or some other factor," but that decision is based on "the truth of the representations underlying the stock price"). "Most investors think they are a little smarter than average and see opportunities others have missed. Still, they all rely on publicly available data (with the exception, of course, of investors trading on insider information)." *In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 253 (N.D. Cal. 2013).

Defendants' reliance on *GAMCO Investors, Inc. v. Vivendi, S.A.* is misplaced. 927 F. Supp. 2d 88 (S.D.N.Y. 2013). In *GAMCO*, following class certification and a bench trial, the district court found that an investor who relied on "a private method of valuation" to purchase shares of the defendant company could not rely on the fraud-on-the-market theory. *Id.* at 102. In fact, the investor continued to purchase stock after the fraud had been fully disclosed; thus, the defendant had proven that "but for the alleged misrepresentations and omissions, Plaintiffs would have been *more* likely to invest in [the defendant company]." *Id.* (emphasis in original). Here, however, Westwood sold its SeaWorld shares shortly after learning of the alleged fraud. *See* Doc. No. 243-1 at 823; *see also In re Diamond Foods, Inc.*, 295 F.R.D. at 253 (distinguishing *GAMCO* where the plaintiffs' investment manager recommended selling shares based on concerns about alleged fraud).

Additionally, Defendants emphasize the fact that [redacted text]. According to Plaintiffs, there is "*no* evidence that Westwood knew during the class period that SeaWorld's public denials of *Blackfish*'s impact were false." Doc. No. 243 at 6 (emphasis in original). [redacted text]. *See In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *6 (N.D. Cal. Dec. 22, 2016) (noting that the "record here does not suggest Plaintiffs possessed material non-public information or otherwise operated under materially distinct factual circumstances from other class members."); *cf. Markewich v. Ersek*, 98 F.R.D. 9, 10-11 (S.D.N.Y. Aug. 23, 1982) (denying motion for class certification where the plaintiff purchased securities on the advice of a broker where evidence supported the contention that the broker had access to nonpublic information). Moreover, as previously mentioned, Westwood sold its Sea World shares shortly after the August 13, 2014 disclosure, further supporting a finding that Plaintiffs did not have access to nonpublic information.

As such, the Court finds that Plaintiffs are not subject to a unique defense [redacted text]. Such information was readily available to the other class members. *See In re Diamond Foods, Inc.*, 295 F.R.D. at 252-53 ("[t]hat an investment advisor thinks it is smarter than the rest of the market in evaluating truthful public data in the market should not be a license for manipulators to pump false information into the public domain to grossly inflate a stock price."); *Darquea v. Jarden Corp.*, 2008 WL 622811, at *4 (S.D.N.Y. Mar. 6, 2008) (noting that even where the lead plaintiffs' investment advisors testified that the alleged misrepresentations at issue were not crucial to their decision to recommend the purchase of the relevant stock, "there is no reason to believe that the defense will draw any extraordinary attention or divert the trial from the main issues").

Second, Defendants claim Plaintiff PBU may be subject to atypical standing defenses [redacted text]. [redacted text]. "PBU's atypical burden of establishing standing 'is likely to consume [PBU's] time' and 'rais[es] the potential for conflict with [its] duty to represent the class.' " *Id.* at 11 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 600 (N.D. Ill. 2009)). Defendants contend that they [redacted text]

Here, Defendants' argument is insufficient to defeat typicality. The record reveals [redacted text] Thus, Defendants have not shown PBU is atypical.

In sum, the Court concludes that Plaintiffs have satisfied the typicality requirement. Plaintiffs' claims are "typical of the claims" of the class, and there is insufficient evidence in the record to support a finding that Plaintiffs are subject to atypical defenses. Fed. R. Civ. P. 23(a)(3); *see also In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *6 ("Plaintiffs' claims are generally founded on the same alleged facts and legal theories as the claims of other Class members....") (internal quotation marks omitted).

### 4. Adequacy

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: '(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their

counsel prosecute the action vigorously on behalf of the class?' " *Ellis*, 657 F.3d at 985 (quoting *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)). This requirement satisfies due process for absent class members who are bound by entry of judgment. *Hanlon*, 150 F.3d at 1020.

**\*8** Here, Defendants do not raise any potential conflicts of interest, and the Court is unaware of any such conflicts in this case. Thus, the Court finds the first question of the adequacy test is met.

Regarding the second question, however, Defendants assert that Plaintiffs are not adequate class representatives because they have not shown that they are able to coordinate their efforts in the litigation. Doc. No. 215 at 11 (citing *Schriver v. Impac Mortg. Holdings, Inc.*, 2006 WL 6886020, at *8 (C.D. Cal. May 2, 2006)). [2] [redacted text]. [3] Defendants further contend Plaintiffs submitted a misleading declaration wherein PBU and APERS assert they "have discussed with each other mechanisms for joint decision-making, including the implementation of communication procedures to enable PBU and APERS to confer with or without counsel, via telephone and/or e-mail ...." Doc. No. 215-19 at 6. [4] Defendants claim the submission of a misleading declaration is "independently a sufficient reason to find [Plaintiffs] inadequate to represent the class." Doc. No. 215 at 12.

[2]   The district court in *Schriver* considered the adequacy of the plaintiffs at the appointment of the lead plaintiff stage. *See id.* Here, in contrast, the Court appointed PBU and APERS as lead plaintiffs nearly three years ago. *See* Doc. No. 25.

[3]   Citations to documents 215-7 and 215-8 refer to the pagination assigned by the CM/ECF system.

[4]   Citations to this document refer to the pagination assigned by the CM/ECF system.

In response, Plaintiffs assert [redacted text]. Moreover, Plaintiffs claim that Defendants misrepresent the record regarding mechanisms for joint decision making, [redacted text].

Here, the Court finds that Plaintiffs PBU and APERS are adequate class representatives that will prosecute the action vigorously on behalf of the class. *See Staton v.*

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works. 7

*Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). [redacted text]

Lastly, Plaintiffs assert that Lead Counsel Nix Patterson & Roach, LLP ("NPR") and Kessler Topaz Meltzer & Cheek, LLP ("Kessler Topaz"), are "highly experienced and amply qualified to serve as counsel for the proposed Class." Doc. No. 213-1 at 12. Defendants do not contest this point, and the Court finds no reason why NPR and Kessler Topaz are not qualified to represent the proposed class, or would not otherwise be adequate pursuant to Rule 23(g). As such, the Court appoints NPR and Kessler Topaz as Class Counsel.

In sum, the Court finds that Plaintiffs and Class Counsel have shown that they will "fairly and adequately protect the interests of the class," thereby satisfying the adequacy requirement. Fed. R. Civ. P. 23(a)(4).

## B. Rule 23(b)(3)

### 1. Predominance

"Under Rule 23(b)(3), the court must find that questions of law or fact common to class members predominate over any questions affecting only individual members." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017) (internal quotation marks omitted). "Rule 23(b) (3), however, does *not* require a plaintiff seeking class certification to prove that each elemen[t] of [her] claim [is] susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans and Trust Funds*, 568 U.S. 455, 469 (2013) (internal quotation marks omitted) (emphasis in original).

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) ("*Halliburton I*") (quoting Fed. R. Civ. P. 23(b)(3)). "To succeed on the merits, plaintiffs alleging securities fraud under [Section 10(b) of the Securities Exchange Act of 1934 and] Rule 10b-5 'must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase of sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.' " *Stockwell*, 749 F.3d at 1112 (quoting *Amgen*, 568 U.S. at 460-61). "Predominance is a test readily met in certain

cases alleging ... securities fraud...." *Amchem Prods, Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

**\*9** Here, Defendants argue individual issues predominate regarding the fourth and fifth elements of Plaintiffs' Section 10(b) claim—reliance and damages. *See* Doc. No. 215 at 12. Specifically, Defendants contend Plaintiffs: a) lack a viable class-wide theory of reliance, as "none of the alleged misrepresentations resulted in any price inflation of SeaWorld shares;" and b) fail to show damages can be measured on a class-wide basis. *Id.* at 13, 19. The Court addresses Defendants' arguments in turn.

### a. Reliance

#### i. Presumption of Reliance

Pursuant to the "fraud on the market" theory, plaintiffs in a securities class action may invoke a presumption of class-wide reliance by demonstrating that the common stock at issue traded in an efficient market. *Basic, Inc. v. Levinson*, 485 U.S. 224, 247 (1988). This is based on the hypothesis that "in an open and developed securities market, the price of a company's stock is determined by the available material information" and that "[m]isleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements[.]" *Id.* at 241-42.

In order to invoke *Basic*'s presumption of reliance, a plaintiff "must prove that: (1) the alleged misrepresentations were publicly known, (2) the stock traded in an efficient market, and (3) the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.' " *In re Diamond Foods, Inc.*, 295 F.R.D. at 247 (quoting *Basic*, 485 U.S. at 248 n.27).

Here, Plaintiffs contend that the prerequisites for invoking the fraud on the market presumption are "easily met." Doc. No. 213-1 at 15. Plaintiffs claim that the alleged false statements and omissions "occurred during conference calls and public interviews, and were reflected in SEC filings and news stories[.]" *Id.* Additionally, all class members "purchased SEAS Common Stock after the actionable statements/omissions were made and before disclosure of the relevant truth concealed by Defendants."

*Id.* Lastly, the market was efficient throughout the class period. *See id.*

Defendants do not dispute, and the Court agrees, that Plaintiffs have satisfied the prerequisites for invoking *Basic*'s presumption of reliance. The Court finds that the alleged misstatements were publicly made, and that the relevant transactions took place between the time the alleged misrepresentations were made and when the alleged truthful disclosures were made. The Court addresses market efficiency below.

The Ninth Circuit utilizes the five-factor test set forth in *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989), in determining market efficiency. *See Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999). The *Cammer* factors consider: (1) whether the stock trades at a high weekly volume; (2) whether securities analysts follow and report on the stock; (3) whether the stock has market makers and arbitrageurs; (4) whether the company is eligible to file SEC Registration Form S-3; and (5) whether there are "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." 711 F. Supp. at 1287.

Plaintiffs present an event study conducted by their expert, Mr. Coffman, who opines that the market for SEAS Common Stock was efficient through the class period. *See* Doc. No. 213-22 (hereinafter "Coffman Rpt."). "The event study method is an accepted method for the evaluation of materiality [and] damages to a class of stockholders in a defendant corporation." *In re Diamond Foods, Inc.*, 295 F.R.D. at 251.

**\*10** Here, the Court finds that Plaintiffs have met their burden in demonstrating that SeaWorld Common Stock traded in an efficient market. The average weekly trading volume was 4.9 million shares, equating to 5.41% of total outstanding shares. Coffman Rpt. ¶ 28; *see also Cammer*, 711 F. Supp. at 1293 ("Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption."). Moreover, "[t]here were at least 44 reports issued during the Class Period and ... 6 separate firms that issued reports on SeaWorld, including major firms such as Barclays, JP Morgan, and Wells Fargo." Coffman Rpt. ¶ 33. SEAS Common Stock traded

on the New York Stock Exchange during the class period, further supporting a finding of market efficiency. *Id.* ¶ 39. Regarding the fourth factor, SEAS was not S-3 eligible until April 2014, as SeaWorld had been public for approximately four months at the beginning of the class period. *Id.* ¶ 44. Mr. Coffman concluded, however, that he "found no evidence that SeaWorld was not [S-3] eligible starting in April 2014 ...." *Id.* Finally, regarding the last factor, the results of Mr. Coffman's event study reveal "a clear cause-and-effect relationship between new public information about SeaWorld and the market price of SEAS Common Stock." *Id.* ¶ 48. The event study took into account "market and industry factors," and "examined the price response of SEAS Common Stock to multiple earnings releases and guidance updates throughout the Class Period, including the corrective disclosure on August 13, 2014." Doc. No. 213-1 at 21; *see also* Coffman Rpt. ¶¶ 48-58. Specifically, Mr. Coffman found that "of the six regular quarterly earnings announcements and guidance updates SeaWorld issued during the Class Period, five resulted in statistically significant price movements above the 95% confidence level." Coffman Rpt. ¶ 57.

Accordingly, the Court finds that Plaintiffs have made a preliminary showing that they are entitled to *Basic*'s presumption of reliance in this case.

### ii. Rebutting the Presumption of Reliance

Defendants contend that they have rebutted the presumption of reliance by showing lack of price impact from the alleged fraud.

A defendant may introduce evidence at the class certification stage that the alleged misrepresentation did not affect stock price to rebut the *Basic* presumption. "*Basic* itself 'made clear that the presumption was just that, and could be rebutted by appropriate evidence,' including evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2414 (2014) ("*Halliburton II*") (citing *Halliburton I*, 563 U.S. at 811). "Any showing that severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff ... will be sufficient to rebut the presumption of reliance[.]" *Basic*, 485 U.S. at 248. If the presumption is successfully

Case 3:16-cv-02267 Document 98-1 Filed 07/16/18 Page 9 of 149 PageID #: 2185

rebutted, "a Rule 10b-5 suit cannot proceed as a class action" because individual questions will predominate over common questions of law and fact. *Halliburton II*, 134 S. Ct. at 2416.

Defendants present an event study conducted by their expert, Dr. Torous, who opines that Mr. Coffman never examined whether the alleged misrepresentations were associated with a statistically significant price impact. *See* Doc. No. 215-13 (hereinafter "Torous Rpt."). Specifically, Defendants argue that of the six dates Defendants are alleged to have made a material misrepresentation, there is no statistically significant evidence of price inflation. *See* Doc. No. 215 at 14-19; Torous Rpt. ¶ 14. Dr. Torous claims Mr. Coffman arbitrarily removed dates from consideration, resulting in a bias in favor of finding that SeaWorld's stock price reaction on an event day was statistically significant. Torous Rpt. ¶ 30. In his event study, Dr. Torous "included all market dates unrelated to any alleged misrepresentation or corrective disclosure identified in the SAC, and excluded all alleged misrepresentation dates and the alleged corrective disclosure date from the estimation," which he refers to as the "corrected Coffman study." *Id.* ¶ 31. "The corrected Coffman event study demonstrates a lack of price impact following all six alleged misrepresentations." *Id.* ¶ 33.

Further, Dr. Torous asserts that even Mr. Coffman's "flawed event study" confirms that SEAS Common Stock shares did not experience a statistically significant price increase in connection with any alleged misrepresentations, with the exception of March 13, 2014. *Id.* ¶ 35. Dr. Torous asserts that this result is inaccurate, and by using the corrected Coffman study, the March 13, 2014 date is no longer statistically significant. *Id.* Defendants argue that "[i]t is no surprise that Defendants' alleged misrepresentations had no price impact" because the "market had been saturated with speculation about the potential impact of *Blackfish* on SeaWorld." Doc. No. 215 at 18. "Dr. Torous conducted a detailed review of market analyst and media reports throughout the relevant class period, and determined that 'analysts and news media had reached their own conclusions about the potential effect of *Blackfish* on SeaWorld's business.' " *Id.* (citing Torous Rpt. ¶ 26).

**\*11** As an initial matter, to the extent Defendants seek to challenge the materiality of the alleged misrepresentations, such an argument is a premature

truth-on-the-market defense. *See Amgen*, 568 U.S. at 482 (noting that when "news of the [truth] credibly entered the market" is "a matter for trial" and "the potential immateriality of Amgen's alleged misrepresentations and omissions is no barrier to finding that common questions predominate.") (internal citations omitted); *Aranaz v. Catlyst Pharma. Partners Inc.*, 302 F.R.D. 657, 671 (S.D. Fla. 2014) ("a truth-on-the-market defense may not be used at the class certification stage to prove an absence of price impact so as to show a lack of predominance because it goes to materiality"). [redacted text]. Accordingly, Defendants' argument that the alleged misrepresentations did not alter the total mix of information is premature.

Regarding the alleged lack of price impact, Plaintiffs contend that " '[p]rice impact in securities fraud cases is not measured solely by price increase on the date of the misstatement; it can be quantified by decline in price when the truth is revealed.' " Doc. No. 243 at 8 (citing *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at \*7 (N.D. Cal. Mar. 16, 2016)). This is known as the price maintenance theory. Thus, Plaintiffs contend Defendants' focus on the price impact at the time of each alleged misrepresentation "ignor[es] price impact at the time of [the alleged August 13] corrective disclosure." *Id.* at 9 (citing *Hatamian*, 2016 WL 1042502, at \*7).

[redacted text] Mr. Coffman found a statistically significant price decline of SEAS Common Stock on the alleged disclosure date of August 13, 2014, wherein the stock price fell nearly 33%. Coffman Rpt. ¶ 22. The t-statistic reported in the Coffman Report was -22.35, indicating that there is greater than 99% confidence that this finding is not due to chance. *See id.*, Exh. 7. Dr. Torous does not dispute that the price decline on this day was statistically significant. *See* Torous Rpt. ¶¶ 40-46.

Defendants advance two arguments in opposition to Plaintiffs' price maintenance theory. First, Defendants assert that Plaintiffs' price maintenance theory is "contrary to binding Supreme Court precedent holding that a defendant can rebut the fraud-on-the-market presumption by showing *either* that the misrepresentation *or* its correction did not affect the stock price—not both as Plaintiffs contend." Doc No. 246 at 2 (emphasis in original). Defendants urge this Court to rely on the recent Eighth Circuit decision in *IBEW Local 98 Pension Fund v. Best Buy Co.*, wherein the Eighth Circuit determined a finding of no price impact was dispositive,

and that the defendants "rebutted the *Basic* presumption by submitting direct evidence (the opinions of both parties' experts) that severed any link between the alleged ... misrepresentations and the stock price at which plaintiffs purchased." 818 F.3d 775, 783 (8th Cir. 2016). However, *Best Buy* is distinguishable from the case at bar. There, the Eighth Circuit noted that the "allegedly 'inflated price' was established by [a] non-fraudulent" disclosure. 818 F.3d at 783. Here, in contrast, Plaintiffs contend that each of the allegedly false misstatements "propped up SeaWorld's stock price[.]" Doc. No. 247 at 4.

Further, the Second, Seventh, and Eleventh Circuits have all reached contrary conclusions, holding that "the lack of price movement on the dates of the alleged misrepresentations does not rebut the *Basic* presumption." *Waggoner v. Barclays PLC*, ─── F.3d ───, 2017 WL 5077355, at *19 (2d Cir. Nov. 6, 2017); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 259 (2d Cir. 2016) (noting that "securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."); *Glickenhaus & Co. v. Household Intern., Inc.*, 787 F.3d 408, 418 (7th Cir. 2015) (same); *FindWhat Investor Grp. v. FindWhat.com*, 658 F.3d 1282, 1316 (11th Cir. 2011) ("There is no reason to draw any legal distinction between fraudulent statements that wrongfully prolong the presence of inflation in a stock price and fraudulent statements that initially introduce that inflation.").

 **\*12** As such, the Court finds persuasive the reasoning of the Second, Seventh, and Eleventh Circuits, and agrees that Defendants cannot rebut the presumption of reliance by only arguing that the alleged misrepresentations did not affect the stock price. *See Barclays*, 2017 WL 5077355, at *19; *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *13 (S.D. Fla. Mar. 16, 2016) ("Measuring price change ... at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth, and thus maintain a stock's price."); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *6 (S.D.N.Y. Sept. 24, 2015) ("[T]hat the misstatements had no impact on the stock price when made is insignificant."). Because Defendants introduce no evidence of a lack of price impact associated with the August 13 disclosure, Defendants fail to rebut the presumption of reliance. [5]

5   In light of the Court's finding that Defendants fail to rebut the presumption of reliance, the Court declines to determine at this time whether there was a statistically significant price movement associated with the alleged misrepresentation on March 13, 2014. In any event, the Court declines to narrow the class period at this stage of the litigation. Defendants' argument that "under no circumstances could a class be certified before March 13, 2014" because "Plaintiffs still fail to submit any evidence that SeaWorld's stock price was inflated *before* March 13, 2014" is misplaced. Doc. No. 215 at 19 (emphasis in original). As discussed in detail above, the "lack of a statistically significant price increase does not necessarily equate to lack of price impact." *Hatamian*, 2016 WL 1042502, at *7.

Second, Defendants assert that even if this Court adopts Plaintiffs' price maintenance theory, "class certification should be denied because Plaintiffs' theory, by Plaintiffs' own admission, requires a corrective disclosure." Doc. No. 246 at 5 (internal quotation marks and citation omitted). Defendants argue that the August 13, 2014 statement "cannot be considered to be a corrective disclosure because it only addressed a decline in attendance in the second quarter of 2014—a quarter about which no alleged misrepresentations were made—and did not address statements concerning attendance in 2013 or the first quarter of 2014." *Id.*

Plaintiffs contend this argument is "not a challenge as to whether there was a statistically significant price reaction following the alleged corrective disclosure (all parties and experts agree there was not); rather, it is a class loss causation argument that is premature ... at this stage." Doc. No. 247 at 4. The Court agrees. "[I]nquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification." *Hatamian*, 2016 WL 1042502, at * 9 (citing *Halliburton I*, 563 U.S. at 813) (finding the circuit court erred in requiring the plaintiff "to show loss causation as a condition of obtaining class certification"); *see also Amgen*, 568 U.S. at 475 ("loss causation and the falsity or misleading nature of the defendant's alleged statements or omissions are common questions that need not be adjudicated before a class is certified."). Accordingly, Defendants' argument is premature at this time.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

*iii. Conclusion*

In sum, Defendants have not introduced evidence that "severs the link between the alleged misrepresentation and ... the price received (or paid) by [Plaintiffs.]" *Basic*, 485 U.S. at 248. Accordingly, the Court finds that Defendants fail to rebut the presumption of reliance.

b. Damages

Defendants, relying on *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), argue that Plaintiffs fail to proffer a class-wide method for computing damages. Thus, according to Defendants, individual damages assessments will predominate. *See* Doc. No. 215 at 19.

**\*13** The plaintiff "must show a class wide method for damages calculations as a part of the assessment of whether common questions predominate over individual questions." *Lambert*, 870 F.3d at 1182 (citing *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013)). The Ninth Circuit recently articulated that "uncertain damages calculations alone cannot defeat class certification because *Comcast* stood only for the proposition that 'plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability.' " *Id.* (citing *Leyva*, 716 F.3d at 513-14). Thus, "[u]ncertainty regarding class members' damages does not prevent certification of a class as long as a valid method has been proposed for calculating those damages." *Id.*

Plaintiffs contend that they will utilize the standard measures of damages in "virtually all Section 10(b)" cases—the "out-of-pocket" methodology. Doc. No. 213-1 at 21. Plaintiffs' expert, Mr. Coffman, opines that the "out-of-pocket" methodology can be applied using a common formula for the entire class. Coffman Rpt. ¶ 77. Specifically, "the standard methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the Class." *Id.* ¶ 78. "Damages for any individual class member could then be calculated formulaically" from the data. *Id.*

In opposition, Defendants again focus on the purported lack of a corrective disclosure in this case. Specifically, Defendants assert that "Mr. Coffman's deposition confirms that he made no effort to form a view as to whether the 'out-of-pocket' model could actually apply to the specific facts of this case." Doc. No. 215 at 20. Defendants argue Mr. Coffman omits factual analysis from his damages opinion because "he cannot identify any 'corrective disclosure' in this case." *Id.* Defendants further assert that the August 2014 statement cannot serve as a corrective disclosure in this case, as the August 2014 statement relates only to attendance declines in the *second quarter* of 2014—not attendance in 2013 or the first quarter of 2014. *See id.* at 21-22 (emphasis added). [6] Thus, Defendants conclude that given "the lack of corrective disclosure in this case, Mr. Coffman's proposed 'out-of-pocket' damages method collapses, leaving only a hypothetical damages model untethered to Plaintiffs' theory of liability." *Id.* at 23.

[6]    Defendants cite to the Court's March 31, 2016 order granting Defendants' first motion to dismiss, wherein the Court stated that "[e]ven if one infer[ed] that the statement was really a tacit reference to the so-called Blackfish effect as a whole, rather than just the California legislation, the statement only refers to attendance during the second quarter of 2014, not the entire Class Period." 2016 WL 2993481, at *11 (S.D. Cal. Mar. 31, 2016). However, the Court expressly declined to consider loss causation. *See id.* at *18 ("the Court declines to address [Defendants' loss causation argument] at this time as it appears that th[is] issue[ ] will be best considered after Plaintiffs have first pleaded a material misrepresentation or omission under the requisite pleading standards."). Further, the Court denied Defendants' motion to dismiss the SAC, finding Plaintiffs sufficiently allege loss causation. *See* Doc. No. 142.

**\*14** In response, Plaintiffs assert that "Defendants' argument [ ] that Plaintiffs cannot satisfy *Comcast* without proof of a corrective disclosure—i.e., loss causation," is misplaced. Doc. No. 243 at 13. In *Hatamian*, the district court noted that the defendants attacked the " 'fit' between an alleged corrective disclosure and a prior alleged fraudulent statement." 2016 WL 1042502, at *9. The district court stated, however, that "[t]his is nothing more than an attack on loss causation, or Plaintiffs' ability to 'show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss.' " *Id.* (emphasis in original)

(citing *Halliburton I*, 563 U.S. at 813). The Court agrees. [redacted text] Accordingly, Defendants' argument is premature at this time.

Defendants also rely upon the Fifth Circuit's decision in *Ludlow v. BP, P.L.C.*, based on the BP oil spill, wherein the circuit court found that the plaintiffs' proposed "materialization of the risk" theory of damages "hinges on a determination that each plaintiff would not have bought BP stock *at all* if not for the alleged misrepresentations —a determination not derivable as a common question, but rather one requiring individualized inquiry." 800 F.3d 674, 690 (5th Cir. 2015) (emphasis in original). Defendants argue Plaintiffs' SAC asserts a same theory of liability found incapable of class-wide damages in *Ludlow*. See Doc. No. 215 at 24 (citing SAC ¶ 253).

Notably, the Fifth Circuit in *Ludlow* considered two sub-classes: one involving plaintiffs who purchased stock before the oil spill (the pre-spill class), and another involving purchasers of the stock after the spill started (the post-spill class). 800 F.3d at 680. The pre-spill damage theory is based on a materialization of the risk theory, where "BP allegedly misstated the efficacy of its safety procedures, creating an impression that the risk of a catastrophic failure was lower than it actually was." *Id.* at 689. Thus, the plaintiffs claimed that when the risk was materialized (i.e., the spill occurred), and BP's stock price fell, the investors who were defrauded into taking on that heightened risk could recover the bulk of that fall as damages. *Id.* The Fifth Circuit affirmed the district court's determination that this theory of damages was not capable of class-wide determination. *Id.* at 690.

Here, however, Plaintiffs do not advance a materialization of the risk theory of damages. In fact, Plaintiffs clearly assert an "out-of-pocket" damages methodology. *See* Doc. No. 213 at 22 ("The standard formula for assessing damages for each Class Member is the artificial inflation per share at the time of purchase, less the artificial inflation at the time of sale," which is "applicable on a class-wide basis."). Thus, the case at bar is actually analogous to the post-spill class in *Ludlow*. As the Fifth Circuit noted, the plaintiffs' theory of damages in the post-spill class was that "because of BP's misstatements, the stock price was higher than it should have been. The damages model, in turn, relied on a theory that the 'inflation' in the stock price caused by the misstatements would be exposed by the fall in the price when certain 'corrective events' brought

the 'true' information to the market's attention." 800 F.3d at 680. The Fifth Circuit affirmed the district court's order certifying the post-spill class. As such, Defendants' reliance on *Ludlow* is misplaced.

On this record, the Court finds that Plaintiffs' proposed damages model is sufficiently linked to their theory of liability. Defendants' arguments to the contrary are unavailing. *See Blackie*, 524 F.2d at 905 ("The amount of damages is invariably an individual question and does not defeat class action treatment.... [W]e are confident that should the class prevail[,] the amount of price inflation during the period can be charted and the process of computing individual damages will be ... a mechanical task."). Accordingly, the Court finds that Plaintiffs have sufficiently shown damages are capable of measurement on a class-wide basis.

### c. Conclusion

**\*15** In sum, the Court concludes that Plaintiffs have sufficiently demonstrated that questions of law or fact common to class members predominate over any individual questions, thereby satisfying the predominance requirement of Rule 23(b)(3).

### *2. Superiority*

"In addition to establishing predominance of a common question, a class proponent must also demonstrate that the class action is superior to other methods of adjudicating the controversy." *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1123 (9th Cir. 2017) (citing Fed. R. Civ. P. 23(b)(3)).

Here, Plaintiffs assert the superiority requirement is satisfied because thousands of individual claims will unnecessarily burden the judiciary, Plaintiffs are unaware of any other action asserting similar claims to those asserted in this action, the geographic dispersion of class members makes it desirable to litigate in this forum, and there are no foreseeable management difficulties that would preclude this action from being maintained as a class action. *See* Doc. No. 213-1 at 24-25. Defendants do not dispute that the superiority requirement is met. Thus, the Court finds that the superiority requirement of Rule 23(b)(3) is satisfied. *See Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996) ("where classwide

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   13

litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation.")

### C. "In-Out" Traders

Finally, Defendants argue that any class must exclude "in-out" traders who sold SEAS common stock shares prior to August 13, 2014. *See* Doc. No. 215 at 25. Defendants claim that traders who sold their securities prior to the alleged corrective disclosure on August 13, 2014 will be unable to prove economic loss based on the alleged misrepresentations. *See id.* Plaintiffs contend that it is premature to exclude in-out traders at the class certification stage, as Defendants can move for summary judgment on this issue, if appropriate. *See* Doc. No. 243 at 15 n.31.

In-out traders are those who "purchased stock during the period of misrepresentation but sold it before any disclosure which either partially or completely corrected the misrepresentation." *Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1437 (9th Cir. 1987), *overruled on other grounds by Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1575 (9th Cir. 1990). "Proof of causation of economic loss is an element of a cause of action for securities fraud." *In re Juniper Networks Sec. Litig.*, 264 F.R.D. 584, 594 (N.D. Cal. 2009) (citing *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336 (2005)). "Thus, in order to determine whether in-and-out traders should remain part of the proposed class, it is necessary to demonstrate that they might be able to prove a loss, i.e., damages." *Id.* (quoting *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006)).

"District Courts in the Ninth Circuit have been in conflict with each other over whether in-and-out traders are appropriately included." *McGuire v. Dendreon Corp.*, 267 F.R.D. 690, 699 (W.D. Wash. 2010). Plaintiffs rely on *Buttonwood Tree Value Partners, LP v. Sweeney*, where the district court declined to exclude in-out traders because "it remains an open question as to whether the [first in time disclosure currently identified by the parties] was [indeed] the first corrective disclosure, or the first time damages occurred." 2013 WL 12125980, at *15 (C.D. Cal. Sept. 12, 2013) (internal citation omitted); *see also McGuire*, 267 F.R.D. at 699 (including in-out traders in the class at the class certification stage). Defendants rely on *In re Juniper Networks*, where the district court excluded in-out traders who sold their Juniper securities prior to the first date on which the plaintiffs allege that

partially curative disclosures were made to the public. 264 F.R.D. at 594; *see also In re UTStarcom, Inc. Sec. Litig.*, 2010 WL 1945737, at *11-12 (excluding in-out traders who sold their stock before the first alleged corrective disclosure).

**\*16** Here, unlike *Buttonwood*, where it was unclear whether the first corrective disclosure identified by the parties was the indeed the first corrective disclosure, the SAC alleges only one corrective disclosure—the August 13, 2014 statement. Thus, only those who held SEAS Common Stock through that date were allegedly harmed. All other persons or investors who may have bought or acquired SEAS Common Stock during the proposed class period, but sold prior to August 13, 2014, "would not have suffered any injury because they would have also sold the stock at an alleged artificially inflated price, and the level of artificial inflation present in the stock cannot change, absent any intervening corrective disclosures." Torous Rpt. ¶ 56.

Accordingly, the Court excludes in-out traders from the class (i.e., those who sold their SEAS Common Stock shares prior to August 13, 2014).

### CONCLUSION

Based on the foregoing, the Court **GRANTS** Plaintiffs' motion for class certification. The Court certifies Plaintiffs' class as follows:

> All persons and entities who purchased or otherwise acquired the publicly traded common stock of SeaWorld Entertainment, Inc. between August 29, 2013 and August 12, 2014, who did not sell such acquired securities before August 13, 2014, and were damaged. Excluded from the class are: (i) Defendants, (ii) present or former executive officers of SeaWorld, members of SeaWorld's Board of Directors, and members of their immediate families, (iii) any of the foregoing persons' legal representative, heirs, successors or assigns, and (iv) any entity in

which Defendants have or had a controlling interest or any affiliate of SeaWorld.

The Court appoints APERS and PBU as Class Representatives. Additionally, the Court appoints the law firms Nix Patterson & Roach, LLP and Kessler Topaz Meltzer & Cheek, LLP as Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 5885542, Fed. Sec. L. Rep. P 99,926

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    15

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re AVEO Pharmaceuticals, Inc. Securities Litigation, D.Mass., November 14, 2017

2017 WL 2772122

Only the Westlaw citation is currently available.

United States District Court,

M.D. Tennessee, Nashville Division.

William E. BURGES, et al., Plaintiffs

v.

BANCORPSOUTH, INC., et al., Defendants

NO. 3:14-cv-1564

|

Filed 06/26/2017

**Attorneys and Law Firms**

Francis P. McConville, Jeremy A. Lieberman, Pomerantz LLP, New York, NY, Patrick V. Dahlstrom, Pomerantz LLP, Chicago, IL, Paul Kent Bramlett, Robert P. Bramlett, Bramlett Law Offices, Nashville, TN, for Plaintiffs.

Amy J. Eldridge, Krista Consiglio, Jeffrey B. Maletta, Jeffrey B. Maletta, K&L Gates LLP, Washington, DC, Gail Vaughn Ashworth, Thomas Anderton Wiseman, III, Wiseman Ashworth Law Group PLC, Nashville, TN, Nicholas G. Terris, R. Bruce Allensworth, for Defendants.

## MEMORANDUM OPINION

WAVERLY D. CRENSHAW, JR., CHIEF UNITED STATES DISTRICT JUDGE

**\*1** Pending before the Court, for the second time, is a Motion to Certify the Class (Doc. No. 97), filed by Palm Beach Gardens Firefighters Pension Fund ("the Fund"). [1] On April 28, 2016, this Court entered an Order granting the Fund's Motion to Certify the Class (Doc. Nos. 157-58.) The Sixth Circuit Court of Appeals vacated that Order and remanded the case to this Court for further proceedings. (Doc. No. 178.)

---

[1]    The Court appointed Palm Beach Gardens Firefighters Pension Fund to be Lead Plaintiff in this action on October 22, 2014. (Doc. No. 31.) It found that the Fund, which possesses the largest financial

interest in the relief sought by the class, would fairly and adequately represent the interests of the class. 15 U.S.C. § 78u-4(a)(3)(B).

The parties have agreed, since that remand, that all discovery necessary to the determination of class certification is completed and no further briefing on class certification is necessary. (Doc. No. 197.) The Magistrate Judge has ordered a stay of merits discovery pending resolution of the class certification motion. (Id.)

## INTRODUCTION

In this federal securities fraud action, the Plaintiffs allege that Bancorpsouth, Inc. ("the Bank") and its Chief Executive Officer (James Rollins), its Chief Operating Officer and President (James Kelley), and its Chief Financial Officer (William Prater) (collectively, "Defendants") made materially false and misleading statements and omissions regarding the Bank's compliance with federal laws and that those statements and omissions violated the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. The Amended Complaint (Doc. No. 39) alleges that Defendants made false, misleading statements and omissions regarding (1) the Bank's compliance with critical anti-money laundering and Bank Secrecy Act regulations as well as the Bank's fair lending practices and (2) the closing of two pending mergers/acquisitions. Plaintiffs allege that Defendants knew the Bank was not in compliance with the anti-money laundering and Bank Secrecy Act regulations, and yet they affirmatively stated that (1) they were in compliance with all banking laws and regulations, (2) they expected the two planned mergers to close in the second quarter of 2014, and (3) they expected to receive regulatory approval for those mergers. [2] (Doc. No. 39, ¶¶ 108-155.)

[2]    On July 10, 2015, this Court dismissed the alleged misrepresentations that were "forward looking" statements concerning the timing and the expected regulatory approvals of the two mergers at issue. (Doc. Nos. 72-73.) Federal securities law includes a "safe harbor" which excuses liability for statements containing projections of revenues, income, earnings or other financial items; statements of plans and objectives of management for future operations; and statements of future economic performance. 15 U.S.C. § 78u-5. The Court dismissed the forward-

looking statements concerning what Defendants anticipated and/or expected to happen concerning the two mergers, finding they were protected by the Safe Harbor and were not false or misleading. (Doc. Nos. 72-73.)

**\*2** The Fund seeks to bring this action on behalf of all persons who purchased or otherwise acquired the common stock of the Bank from January 8, 2014, through July 21, 2014, and it asks the Court to certify a class of those persons pursuant to Fed. R. Civ. P. 23. Defendants maintain that the Fund has not met the requirements of Rule 23.

In vacating this Court's prior Order certifying a class, the Sixth Circuit stated that this Court (1) did not set forth the standard requiring it to "rigorously analyze" Plaintiffs' claims before certifying the action as a class action, (2) did not address the bulk of Rule 23's requirements in its Order, and (3) did not define the class it certified. (Doc. No. 178.) The Court will address those concerns and further expand on why it is appropriate to grant Plaintiffs' Motion.

The Court adopts its prior Order granting the Motion to Certify the Class (Doc. No. 158) that specifically defines the class as:

> All persons who purchased or otherwise acquired the publicly traded common stock of BancorpSouth, Inc. between February 12, 2014 and July 21, 2014, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

(Doc. No. 158 at 2.)

## CLASS CERTIFICATION

In order to certify a class, the Court must be satisfied that the Fund has met the requirements of both Rule 23(a)

and Rule 23(b) of the Federal Rules of Civil Procedure.[3] A class action will be certified only if, after rigorous analysis, the Court is satisfied that the prerequisites of Rule 23(a) have been met and also that the action falls within one of the categories under Rule 23(b). Castillo v. Envoy Corp., 206 F.R.D. 464, 467-68 (M.D. Tenn. 2002). The decision whether to certify a class is committed to the sound, broad discretion of the district judge and turns on the particular facts and circumstances of each individual case. In re Whirlpool Corp. Front-Loading Washers Product Liability Litigation, 722 F.3d 838, 850 (6th Cir. 2013); Ballan v. Upjohn Co., 159 F.R.D. 473, 479 (W.D. Mich. 1994). The party seeking class certification bears the burden of showing that the requirements for class certification are met. Bridging Communities Inc. v. Top Flite Financial Inc., 843 F.3d 1119, 1124 (6th Cir. 2016).

[3]     As the Sixth Circuit noted, in contesting certification, Defendants challenged only some of Plaintiffs' allegations. (Doc. No. 178 at 3.)

## RULE 23(a)

Rule 23(a) establishes four requirements for class certification: the class is so numerous that joinder of all members is impracticable; there are questions of law or fact common to the class; the claims or defenses of the representative party are typical of those of the class; and the representative party will fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a).

### Numerosity

Rule 23 (a)(1) requires that the proposed class be so numerous that joinder of all members is impracticable. While there is no strict numerical test, "substantial" numbers usually satisfy the numerosity requirement. In re Polyurethane Foam Antitrust Litigation, 314 F.R.D. 226, 237 (N.D. Ohio 2014) (citing Daffin v. Ford Motor Co., 458 F.3d 549, 552 (6th Cir. 2006)). Numerosity is generally assumed to have been met in class action suits involving nationally traded securities. In re Direct General Corp. Securities Litigation, 2006 WL 2265472 at * 2 (M.D. Tenn. Aug. 8, 2006); Ross v. Abercrombie & Fitch Co., 257 F.R.D. 435, 442 (S. D. Ohio 2009).

**\*3** The Fund has adequately shown that the Bank's common stock is nationally traded, with more than 200

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

large institutional investors, and that there are most likely thousands of class members. (Doc. No. 98 at 8.) The Court finds that the numerosity requirement has been met in this case and that Defendants do not suggest otherwise. (Doc. No. 115.)

Commonality

Rule 23's second requirement for class certification is that there are questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To demonstrate commonality, the Fund must show that class members have suffered the same injury. Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2555 (2011); Whirlpool, 722 F.3d at 851. Their claims must depend upon a common contention of such a nature that it is capable of class-wide resolution, which means that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Id.; Wal-Mart, 131 S.Ct. at 2551.

What matters to class certification is not the raising of common questions, but the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation. Wal-Mart, 131 S.Ct. at 2551. The mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible. In re American Medical Systems, Inc., 75 F.3d 1069, 1080 (6th Cir. 1996); see also Young v. Nationwide Ins. Co., 693 F.3d 532, 543 (6th Cir. 2012) (presence of questions peculiar to each individual member of the class was no bar when liability arose from a single course of conduct).

The Fund asserts that common questions in this case include: (1) whether Defendants' alleged statements and omissions were materially false or misleading; (2) whether federal law was violated by Defendants' alleged acts; and (3) to what extent class members have sustained damages.

Defendants contest commonality based on the lack of reliance. The Court will address reliance and the Fund's reliance upon the "fraud-on-the-market presumption" in the discussion concerning Rule 23(b)(3) and predominance. See Halliburton Co. v. Erica P. John Fund, Inc., 134 S.Ct. 2398, 2404 (2014) (elements of the presumption have everything to do with the issue of predominance under Rule 23(b)(3)). In summary, as it relates to commonality, application of the "fraud-on-the-market presumption" allows the Court to presume that

class members relied upon the alleged misstatements such that the question of liability is not an individualized issue.

The first two common questions posed by the Fund —whether the alleged misstatements and omissions are materially false or misleading and whether Defendants' alleged acts violated federal law—do arise from a single course of conduct by Defendants. The alleged misstatements and omissions were the same as relates to all potential class members. Determination of their truth or falsity will resolve an issue that is central to the validity of each of the claims in one stroke. In re Whirlpool, 722 F.3d at 852. If those misstatements and omissions violated federal law, they violated federal law as to all potential class members. Therefore, answering those questions will generate common, class-wide answers concerning liability. The Court finds that the commonality requirement is satisfied.

Typicality and Adequacy

**\*4** Rule 23(a)(3) requires the Fund to show that its claims are typical of the claims of the proposed class. A plaintiff's claim is typical if it arises from the same event, practice, or course of conduct that gives rise to the claims of other class members and if its claims are based on the same legal theory. American Medical Systems, 75 F.3d at 1082. The Fund's interests must be aligned with those of the putative class and, in pursuing its own claims, the Fund must also advance the interests of the class members. Id.

Rule 23(a)(4) requires the Court to find that the Fund will fairly and adequately protect the interests of the class. In order to satisfy the requirement of adequacy, the class representative must be part of the class and possess the same interest and suffer the same injury as the class members. Young, 693 F.3d at 543. In other words, the Fund must have common interests with unnamed members of the class and must be able to rigorously prosecute the interests of the class through qualified counsel.

The Fund has carried its burden of establishing that its claims are the same as those of the class. The Fund and the class both allege that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act and Rule10b-5 by making statements that misrepresented or omitted material facts. The claims of the Fund and the class involve the same security (BancorpSouth), the same alleged misstatements and omissions, the same legal

theories, and the same evidence. Whether those allegations are true or not will be the same for the Fund as for the proposed class members.

Defendants argue that because the Fund failed to file the mandatory Reform Act Certification with its Amended Complaint (Doc. No. 39), it does not meet the typicality and adequacy requirements of Rule 23(a). Federal law provides that each plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certificate with the complaint. 15 U.S.C. § 78u-4(a) (2)(A). The Fund filed a certification with its Motion for Appointment as Lead Plaintiff (Doc. No. 19-2) but not with its Amended Complaint.

A class representative need not file a new certification each time the complaint is amended. Thorpe v. Walter Investment Mgmt. Corp., 2016 WL 4006661 at * 10 (S.D. Fla. March 16, 2016); Atlas Air Worldwide Holdings, Inc. Sec. Litig., 324 F.Supp.2d 474, 500 (S.D. N.Y. 2004) ("[W]e think such a requirement would be a useless burden"). The Court finds nothing improper about the Fund's certification in this litigation and Defendants have shown no prejudice because of the certification. The certification submitted by the Fund with its earlier motion is sufficient.

Defendants next argue that the Fund cannot adequately represent the class because of its lack of meaningful involvement in and understanding of its "lawyer-driven" litigation. Defendants contend that the Fund did not become a Plaintiff in this case on its own, but rather, Plaintiffs' counsel brought the case to the Fund's attention pursuant to a portfolio monitoring agreement between counsel and the Fund. [2] Defendants point out that some courts have criticized such agreements as raising conflicts of interest.

[2]  Under such monitoring agreements, a law firm overlooks the specific fund and recommends to its administrators when the law firm believes a violation of the securities laws has occurred. Plumbers & Pipefitters Nat. Pension Fund v. Burns, 292 F.R.D. 515, 523 (N.D. Ohio 2013).

**\*5** For example, in Iron Workers Local No. 25 Pension Fund v. Credit-Based Asset Servicing and Securitization, LLC, 616 F.Supp 2d 461, 464 (S.D. N.Y. 2009), the court held that the pension fund was in no position adequately to monitor the conduct of the litigation based, in part, on

its monitoring agreement with counsel. In that monitoring agreement, the attorneys provided free monitoring of the pension fund's investments in exchange for the pension fund's agreement that, if the attorneys recommended bringing a securities class action, the pension fund would retain those same attorneys, on a contingency fee basis, to represent it in that action. Id. Defendants have not alleged such a provision in this case. [3]

[3]  The Chairman of the Fund and representative designated by the Fund to testify in deposition, Richard Rhodes, testified that the Fund could have considered other counsel. (Doc. No. 118-3 at 63.)

On the other hand, the Fund relies on cases in which the courts have recognized the importance of such monitoring agreements and held that they present no bar to class certification. See, e.g., Willis v. Big Lots, Inc., —— F. Supp. 3d ——, 2017 WL 1063479 at * 10 (S.D. Ohio March 17, 2017) (fact that plaintiff learned of case through monitoring agreement did not render plaintiff inadequate to serve as class representative); Plumbers & Pipefitters Nat. Pension Fund v. Burns, 292 F.R.D. 515, 523 (N.D. Ohio 2013) (citing United Food & Commercial Workers Union v. Chesapeake Energy Corp., 281 F.R.D. 641, 655 (W.D. Okla. 2012)).

In Plumbers, the court found that the fund was under no obligation to retain the law firm to pursue its claims identified through the monitoring agreement and, noting that other courts routinely reject attacks on the propriety of portfolio monitoring agreements, held that the monitoring agreement did not create a conflict or render the plaintiff inadequate to represent the class. Plumbers, 292 F.R.D. at 523. The court stated that at least one other court has held that such a monitoring agreement might actually favor adequacy of the counsel retained to monitor a fund because the firm's ongoing relationship with the fund would depend on its performance in the litigation. Id.

Similarly, in United Food, the court concluded that the monitoring agreement did not present a conflict of interest impacting the adequacy of the lead plaintiff's representation. United Food, 281 F.R.D. at 654-655. The court said that some courts have found that monitoring agreements actually illustrate a lead plaintiff's involvement in and awareness of the financial issues involved in the litigation. Id.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  4

The Court finds that the monitoring agreement between the Fund and counsel in this case, which does not require the Fund to hire specific counsel for this purpose, does not render the Fund inadequate to be the class representative in this case. The agreement does not create a conflict of interest, impair the Fund's exercise of independent judgment, and most of all, does not render the Fund substantially different from other members of the class.

Defendants also contend that the Fund has ceded control of this litigation to counsel. According to Defendants, this fact is shown because the Fund's representative, Mr. Rhodes, knew very little about the litigation. Both Defendants and the Fund cite excerpts from the testimony of Mr. Rhodes to support what he did and did not know about the litigation. [4] The Court has reviewed the deposition of Mr. Rhodes (Doc. No. 118-3) and finds the Fund representative's understanding of the litigation and commitment to it is adequate. It does not preclude the Fund from being Lead Plaintiff in this case.

[4] For example, Defendants point out that Mr. Rhodes testified that the Fund would be required to answer depositions, provide records and hire counsel. (Doc. 118-3 at 71.) But just before that, he also testified that the Fund's role was to act as a fiduciary of the class and to maximize the recovery for the class. (Id.)

**\*6** Mr. Rhodes explained the allegations underlying this litigation and the specific misrepresentations allegedly made—that in connection with buying two banks, BancorpSouth made statements that they were in compliance with all the rules and regulations of banking when they were not. (Doc. No. 118-3 at 67.) He also explained why the Fund was asked to serve as lead plaintiff —because it was the largest client and had the largest loss. (Id.) As noted above, Mr. Rhodes understood that the Fund's role was to act as a fiduciary of the class and to maximize the recovery for the class and that the Fund would be required to answer depositions, provide records and hire counsel. (Doc. 118-3 at 71.) This understanding of the basic facts underlying the claims, some general knowledge, and a willingness and ability to participate in discovery are sufficient to meet the adequacy requirement of Rule 23(a)(4). Plumbers, 292 F.R.D. at 520.

Defendants assert two additional arguments that the Fund is not typical or adequate in this case. First, Defendants argue that the Fund is represented by outside counsel, the Sugarman firm, which will be able to participate in a share of any class recovery without Court approval. Any attorneys' fee awards in this matter, however, will be determined by the Court, so they will not be without court approval.

In addition, the Sugarman firm is the Fund's regular outside counsel and represents the Fund, not the class. The Robbins Geller firm represents the class. The fact that both firms may eventually recover their fees out of the same settlement or judgment does not change their ethical or professional duties to their clients and to the proposed class. Plumbers, 292 F.R.D. at 523, n. 11. Furthermore, representation by the outside law firm will ensure that the Fund will fulfill its duty adequately to monitor class counsel. Id. at 523.

Second, Defendants claim that Plaintiffs' case depends in significant part on the testimony of a third party, David Michael Stamm, who was the Senior Vice-President Portfolio Manager of Dana Investment Advisors, the Fund's outside investment manager. Defendants contend that Mr. Stamm has a view of the facts that clashes with important allegations of the Amended Complaint. [5] If that is true, then Defendants will be able to challenge that testimony at trial, but it does not show that the Fund is not adequate or typical to represent the class. Defendants have not shown that statements of Mr. Stamm are binding on the Fund.

[5] Mr. Stamm testified that the corrective disclosures in this case did not correct any "misunderstanding" he had about BancorpSouth. (Doc. No. 116 at 122.) The Amended Complaint alleges that the corrective disclosures "shocked investors." (Doc. No. 39 at 34.)

For all these reasons, the Court finds that the Fund has shown sufficient typicality and adequacy and meets the requirements of Fed. R. Civ. P. 23(a).

### Rule 23(b)

As indicated above, if a plaintiff satisfies the requirements of Rule 23(a), then the Court looks to whether the proposed class action falls into any of the categories under Rule 23(b). Plaintiffs claim that their action satisfies the requirements of Rule 23(b)(3). Under that subsection, Plaintiffs must show that common questions of law or fact predominate over any questions affecting only individual members and that a class action is superior to other

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   5

available methods for fairly and efficiently adjudicating the controversy. Fed. R. Civ. P. 23(b)(3).

Plaintiffs assert that, as with their arguments concerning commonality, common questions of law and fact predominate in this case and the claims of all class members will be proved by the same evidence. To recover damages for securities violations, the Fund must prove (1) a material misleading statement or omission by Defendants, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation. Halliburton, 134 S.Ct. at 2407. Class members will be required to prove the same elements.

**\*7** Defendants argue that Plaintiffs cannot show that common issues of fact or law predominate over individual issues here because there are individual issues concerning reliance. In order to recover damages in a private securities action such as this one, Plaintiffs must prove that they relied on Defendants' misrepresentations. Halliburton, 134 S.Ct. at 2405. Defendants argue that Plaintiffs' reliance is a predominant, but not common, issue in this case because each Plaintiff's reliance or lack thereof is an individual issue. Plaintiffs contend that, with regard to the alleged misrepresentations, they can show reliance by means of the fraud-on-the-market presumption.

Fraud-On-The-Market Presumption

The Supreme Court has found that investors may satisfy the reliance requirement by invoking a presumption known as the "fraud-on-the-market" presumption." Halliburton, 134 S.Ct. at 2411-15; Basic Inc. v. Levinson, 108 S.Ct. 978, 989-90 (1988). Without the presumption of reliance, a Rule 10b-5 suit cannot proceed as a class action because each plaintiff would have to prove reliance individually, so common issues would never predominate over individual ones as required by Rule 23(b)(3). Halliburton at 2416.

The fraud-on-the-market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Basic, 108 S.Ct. at 989; Wilkof v. Caraco Pharmaceutical Laboratories, Ltd., 280 F.R.D. 332, 342 (E.D. Mich. 2012). Misleading statements will therefore defraud purchasers of stock even if the purchasers

do not directly rely on the misstatements because the market price of the stock was adversely affected by the misrepresentation. Id.

To demonstrate that the fraud-on-the-market presumption of reliance applies, a plaintiff must show that (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.[6] Halliburton, 134 S.Ct. at 2408. The theory is based on the premise that certain well-developed markets are efficient processors of public information. Amgen Inc. v. Conn. Retirement Plans and Trust Funds, 133 S.Ct. 1184, 1192 (2013). If a market is generally efficient in incorporating publicly available information into a security's market price, it is reasonable to presume that a particular public, material misrepresentation will be reflected in the security's price. Id.

6    Plaintiffs have in fact alleged that they and the proposed class members traded the stock between the time the misrepresentations were made and the time when the truth was revealed. (Doc. No. 39 at 60.) The Defendants do not dispute that allegation.

The presumption can be rebutted by appropriate evidence, such as proof that news of the truth entered the market and dissipated the effects of the prior misstatements. Amgen, 133 S.Ct. at1193 and 1204. Any showing that severs the link between the alleged misrepresentation and either the price received or paid by the plaintiff or his decision to trade at a fair market price will be sufficient to rebut the presumption. Halliburton,134 S.Ct. at 2408. For example, evidence that a plaintiff knew the company's statements were false but sold his shares nevertheless could rebut the presumption of reliance. Basic, 485 U.S. at 248.

a) Publicly Known

Defendants argue that Plaintiffs cannot show that the misrepresentations at issue were publicly known.[7] If the misrepresentation was not publicly known, then it could not have distorted the stock's market price. Halliburton, 134 S.Ct. at 2413. Defendants assert that showing the alleged misrepresentations are in the public domain falls short of proof that they are "publicly known" as required for the presumption to apply. Defendants contend that

the Fund must at least demonstrate that a critical mass of analysts, market makers or other market actors knew of the alleged misrepresentations and wrote about them or took some other action that would tend to affect the stock price. (Doc. No. 115 at 2.) Requiring Plaintiffs to show that certain people read and relied on the alleged misrepresentations, however, would circumvent the presumption by requiring Plaintiffs to show reliance.

[7]     A market may more readily process certain forms of widely disseminated and easily digestible information, such as public merger announcements, than information more difficult to acquire and understand, such as obscure technical data buried in a filing with the SEC. Amgen, 133 S.Ct. at 1197, n. 6. The information in the merger agreements here, however, was not obscure technical data or buried. It was information filed publicly with the SEC in which BancorpSouth represented that it was in compliance with all applicable laws, statutes, and regulations.

**\*8** The misrepresentations at issue herein were found in Registration Statements, Proxy Statements, and Merger Agreements, public documents that were filed with the Securities and Exchange Commission ("SEC"). For example, the Bank's February 28, 2014 Registration Statement included, as Annex A, an Agreement and Plan of Reorganization in which BancorpSouth allegedly misrepresented that it was in compliance with all applicable laws, statutes, and regulations. (Doc. No. 39 at ¶ 127.)

Other courts have summarily recognized that SEC filings are sufficiently public to be "publicly known." See, e.g., In re Neustar, Inc. Securities Litigation, 2015 WL 5674798 at \* 7 (E.D. Va. Sept. 23, 2015) and In re Red Hat, Inc. Securities Litigation, 261 F.R.D. 83, 91 (E.D. N.C. 2009). The Court agrees with these cases and finds that the merger agreements filed with the SEC in this case are sufficiently public to satisfy the Fund's obligation under the first element of the presumption for purposes of class certification.

b) Materiality

Even though materiality is an element for invoking the fraud-on-the-market presumption, the Supreme Court has held that it should be left to the merits stage of the litigation because it does not bear on the predominance

requirement of Rule 23(b)(3). Halliburton at 2416. In Amgen, the Court stated that proof of materiality is not a prerequisite to class certification, noting that materiality is a common question and the class will either prevail or fall in unison as to that issue. Amgen, 133 S.Ct. at 1191. [8] Thus, the Court need not address materiality on this motion. [9]

[8]     Similarly, the Supreme Court has held that loss causation need not be proved at the class certification stage. Amgen, 133 S.Ct. at 1200 (citing Halliburton, 131 S.Ct. at 2184).

[9]     Defendants acknowledge that the materiality showing need not be made prior to class certification. (Doc. No. 115 at 15.)

c) Efficient Market

As noted above, the fraud-on-the-market theory rests on the premise that certain well-developed markets are efficient processors of public information. Amgen, 133 S.Ct. at 1192. In such markets, the market price of shares will reflect all publicly available information. Id. Here, the Fund asserts that because the stock was widely traded on the New York Stock Exchange ("NYSE"), the market is efficient. Defendants contend that the Fund has not carried its burden to prove an efficient market, relying upon price impact arguments and challenging the findings of the Fund's expert as inadequate.

A district court may consider five factors [10] in determining whether a security was traded on an efficient market: (1) a large weekly trading volume; (2) the existence of a significant number of reports by securities analysts; (3) the existence of market makers and arbitrageurs in the security; (4) the eligibility of the company to file an S-3 Registration Statement; and (5) a history of immediate movement of the stock price caused by unexpected corporate events or financial releases. Freeman v. Laventhol & Horwath, 915 F.2d 193, 197-98 (6th Cir. 1990); Bovee v. Coopers & Lybrand, 216 F.R.D. 596, 605 (S.D. Ohio 2003). Defendants have not challenged or argued these factors but instead rely on their price impact arguments to try to rebut the Plaintiffs' assertion of an efficient market. (Doc. No. 115 at 16-24.)

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.     7

10    Rather than apply these factors as a checklist, they are to be used as analytic tools by the court to assist in its market efficiency determination. In re Accredo Health, Inc. Securities Litigation, 2006 WL 1716910 at * 10 (W.D.Tenn. April 10, 2006). Here, as in Accredo, the stock was traded in a national security market that is widely regarded as efficient.

**\*9** The Court finds that shares of the Bank's stock traded in an efficient market because they were traded on the NYSE. Certain markets, such as the NYSE, are well-suited for application of the fraud-on-the-market theory because "[a] well-developed and impersonal market, such as the New York or Pacific stock exchanges, will instantaneously incorporate all publicly available information about a given security into the market price of that security." Bovee, 216 F.R.D. at 606. Because the Bank's stock was traded on the NYSE during the class period (Doc. No. 39 at 9), the Court is satisfied that the Fund has established, for purposes of class certification, that the stock traded in an efficient market.

### d) Rebuttal—Price Impact

Defendants argue that they have rebutted Plaintiffs' allegations of an efficient market by showing that the alleged misrepresentations had no price impact. Plaintiffs are not required to present direct evidence to prove price impact in order to rely on the fraud-on-the-market presumption. Sterling Heights General Employees' Retirement Sys. v. Prudential Financial, Inc., 2015 WL 5097883 at * 12 (D. N.J. Aug. 31, 2015) (citing Halliburton, 134 S.Ct. at 2414). They can establish entitlement to the presumption through evidence of publicity and market efficiency, an indirect way of showing price impact. Sterling Heights at * 12; Halliburton, 134 S.Ct. at 2415.

Before Halliburton, courts around the country held that the presumption of reliance could be rebutted *at trial*. See, e.g., In re Accredo Health, Inc. at *11 (presumed reliance can be rebutted at trial); In re Polymedica, 432 F.3d at 17 (at the class certification stage, court will not address whether defendants can rebut the presumption of reliance). In Halliburton, however, the Court held that defendants must be afforded an opportunity before class certification to demonstrate that an alleged misrepresentation did not actually affect the market price of the stock.[11] Willis at * 15. Price

impact is the consideration of whether the alleged misrepresentations affected the market price. Id. at *16. The burden to prove lack of price impact by a preponderance of the evidence rests on the defendant in order to rebut the fraud-on-the-market presumption at this stage. Id. at 16; In re Goldman Sachs Group, Inc. Securities Litigation, 2015 WL 5613150 at * 4 and n. 3 (S.D. N.Y. Sept. 24, 2015).

11    Halliburton held that the defendants may seek to defeat the presumption at the class certification stage through direct as well as indirect price impact evidence. Halliburton, 134 S.Ct. at 2417.

Price impact is demonstrated by plaintiffs through either evidence that a stock's price rose in a statistically significant manner after a misrepresentation or evidence that the stock's price declined in a statistically significant manner after a corrective disclosure. Willis at 16. Defendants argue that the alleged misstatements in this case did not affect the stock price at the time those statements were made. They assert that this alone sufficiently demonstrates the absence of price impact. (Doc. No. 115 at 17.) To successfully rebut the fraud-on-the-market presumption, however, a defendant cannot simply show that a price did not rise after a misrepresentation. Willis at 16.

As explained in Halliburton, price impact (not *lack* of price impact) can be shown by the plaintiffs through evidence that the price was affected either at the time of the misrepresentation *or* at the time after a corrective disclosure. Willis at 16 (citing Halliburton at 2414). Analysis of the price impact usually focuses on stock price movement at the time the truth is disclosed. Goldman Sachs at * 6. "So the fact that there was no stock price increase when the statements were made does not suggest a lack of price impact." Id. In other words, in order to rebut the presumption for class certification purposes, Defendants must show that the misrepresentation did not in fact affect the stock price; but "affecting the stock price" can occur at the time the misrepresentation is made or at the time the corrective disclosure is given. Willis at * 15.

**\*10** The Fund contends that the price impact occurred at the time the corrective disclosure was made. The Amended Complaint alleges that when Defendants' "corrective disclosure" was made in July of 2014, the price of BancorpSouth stock tumbled more than 8% the first day and another 1.72% the second day. (Doc. No. 39 at ¶ 93.)

Defendants have not rebutted this change in the stock prices at the time of disclosure.

Defendants assert that any decline in stock price after the corrective disclosure likely reflects other factors besides the corrective disclosure. Whether Defendants are correct, however, involves merits issues as to causation. The case cited by Defendants, Dura Pharmaceuticals, Inc. v. Broudo, 125 S.Ct. 1627 (2005), dealt with a motion to dismiss, not a motion for class certification, and the Court was analyzing loss causation, not price impact. Loss causation is not price impact. Erica P. John Fund, Inc. v. Halliburton Co., 131 S.Ct. 2179, 2187 (2011). Price impact simply refers to the effect of a misrepresentation on a stock price. Id.

For all these reasons, the Court finds that Defendants have not rebutted the fraud-on-the-market presumption for purposes of this Motion, and Plaintiffs are entitled to rely on that presumption.

Affiliated Ute Presumption

Plaintiffs also contend that, with regard to the Defendants' failures to disclose (as opposed to misrepresentations), they are entitled to the "Affiliated Ute Presumption." In Affiliated Ute Citizens of Utah v. United States, 92 S.Ct. 1456 (1972), the Supreme Court held that in securities actions involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. Id. at 1473. "All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of a decision." Id. More recently, the Supreme Court stated that if there is an omission of a material fact by one with a duty to disclose, the investor to whom the duty was owed need not provide specific proof of reliance. Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 128 S.Ct. 761, 769 (2008).

Defendants argue that Plaintiffs have admitted this case does not involve omissions. The sentence from Plaintiffs' Memorandum in Support of Motion to Dismiss (Doc. No. 64 at 21) that Defendants quote, however, is not such an admission: "Nowhere does Plaintiff allege that Defendants had a stand-alone duty to disclose the existence of [an FDIC investigation]." In context, that sentence begins an explanation of how Defendants, having chosen to speak, had a duty—not an independent, stand-alone duty, but a duty brought about by their choosing

to speak—to disclose certain information. (Doc. No. 64 at 21.) Indeed, Plaintiffs allege situations where Defendants' failure to disclose certain information is what makes the alleged misrepresentations misleading or false.

Plaintiffs have alleged both omissions and misrepresentations. [12] (Doc. No. 39.) Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the Affiliated Ute presumption as to the element of reliance with regard to alleged omissions. Dodona I, LLC v. Goldman, Sachs & Co., 296 F.R.D. 261, 270 (S.D. N.Y. 2014). The Court finds that, for purposes of class certification, the Fund is entitled to the Affiliated Ute presumption as to its failure to disclose claims.

[12]   The Affiliated Ute Presumption applies to cases involving primarily a failure to disclose, which is not the same as *exclusively* a failure to disclose. Dodona I, 296 F.R.D. at 269.

Individualized Issues

**\*11** Finally, Defendants maintain that individual issues concerning reliance and damages remain. Under the fraud-on-the-market and Affiliated Ute presumptions, for purposes of class certification, reliance will be presumed. Similarly, Defendants' argument concerning damages as an individualized issue will be addressed at trial. As noted above, the presence of questions peculiar to each individual member of the class is no bar when liability arose from a single course of conduct. Young, 693 F.3d at 543. There is a "battle of the experts" with regard to damages, and it is unnecessary for the Court to rule on that battle at this time because this is a motion for class certification. If, after class certification, Plaintiffs cannot show that damages are capable of measurement on a class-wide basis, the Court may bifurcate the issues of liability and damages or Defendants may move to decertify the class.

CONCLUSION

For all these reasons, the Court finds that the Fund's Motion to Certify the Class (Doc. No. 97) should be **GRANTED**.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   9

An appropriate Order will enter.

**All Citations**

Slip Copy, 2017 WL 2772122

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 2117337
United States District Court, N.D. California.

Bradley COOPER, Individually and on Behalf of all
Others Similarly Situated; Todd Labak, Plaintiffs,
v.
THORATEC CORPORATION; Gerald F. Burbach;
Taylor C. Harris; and David Smith, Defendants.

No. 14-cv-0360 CW
|
Signed 05/08/2018

**Attorneys and Law Firms**

Jeremy A. Lieberman, Pomerantz LLP, New York,
NY, Louis C. Ludwig, Patrick V. Dahlstrom, Leigh
H. Smollar, Pomerantz LLP, Chicago, IL, Lesley F.
Portnoy, Lionel Z. Glancy, Robert Vincent Prongay,
Glancy Prongay & Murray LLP, Los Angeles, CA, for
Plaintiffs.

Colleen Carlton Smith, Amanda Marie Betsch, Latham
and Watkins LLP, San Diego, CA, Anna Elizabeth
Berces, Latham and Watkins LLP, San Francisco, CA,
Katherine Ann Rykken, Latham and Watkins LLP, Los
Angeles, CA, Matthew Rawlinson, Latham & Watkins
LLP, Menlo Park, CA, Patrick Edward Gibbs, Cooley
LLP, Palo Alto, CA, Susan E. Engel, Latham & Watkins
LLP, Washington, DC, for Defendants.

ORDER GRANTING MOTION
FOR CLASS CERTIFICATION

CLAUDIA WILKEN, United States District Judge

**\*1** Plaintiffs Bradley Cooper and Todd Labak are
investors in Thoratec Corporation, a medical device
company that manufactures the HeartMate II. They allege
that Thoratec and certain of its officers, Gerhard F.
Burbach, Taylor C. Harris, and David V. Smith, made
various misrepresentations in order to hide from its
investors and the public that the HeartMate II's rates of
thrombosis were increasing, which would have adversely
affected the stock price of Thoratec. They bring this suit
for damages on behalf of themselves and a putative class,
alleging violations of Sections 20(a) and 10(b) of the
Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule
10b-5 promulgated thereunder. Now before the Court is

Plaintiffs' Motion for Class Certification. For the reasons
stated below, the Court grants Plaintiffs' motion.

BACKGROUND

Thoratec is a medical device company that manufactures
and markets a Ventricular Assist System (VAS), the
HeartMate II. Second Amended Complaint (SAC) (Dkt.
No. 49) ¶¶ 34–35. During the relevant period between May
11, 2011 and August 6, 2014 (the Class Period), Thoratec's
common stock traded on the NASDAQ Global Market
under the ticker symbol "THOR." Id. ¶ 29. Individual
defendants Burbach, Harris, and Smith were directors or
officers of Thoratec during the Class Period. [1]

[1]     Specifically, Burbach was Thoratec's President and
        Chief Executive Officer during the Class Period,
        Harris was the Vice President and Chief Financial
        Officer beginning in October 11, 2012, and Smith
        was the Executive Vice President and Chief Financial
        Officer between December 2006 and July 2011. SAC
        ¶¶ 30–32.

On April 21, 2008, HeartMate II received approval from
the FDA for certain applications. SAC ¶ 41. The FDA
published a summary of safety and effectiveness data for
the HeartMate II, which demonstrated a two percent rate
of thrombosis for all patients as of September 14, 2007. Id.

Thoratec was the sole manufacturer of VAS until the
HeartWare VAS came on the European market in 2009,
and reported thrombosis rates as low as 3.1 percent.
SAC ¶¶ 48, 50. HeartWare earned FDA approval on
November 12, 2012. Id. ¶ 52. It represented a serious threat
to Thoratec's monopoly, especially because HeartWare
had been disclosing decreasing rates throughout the Class
Period. Id. ¶¶ 50–56. Defendants thus "knew that if they
did not maintain thrombosis rates at the clinical trial rate
of 2% that HeartWare would end up with the lion share
of the market." Id. ¶ 57.

By 2011, Thoratec became aware of problems with rising
thrombosis rates in patients receiving the HeartMate
II. See, e.g., SAC ¶¶ 8, 88, 92, 142, 145, 165. Despite
this, Defendants made various false and misleading
statements regarding the HeartMate II's thrombosis
rates. On May 11, 2011, for example, Smith spoke at
a health care conference and stated that HeartMate
II's rates of thrombosis were between 0.02 and 0.03,

the clinical trial rates, despite knowledge at that time that they had risen well above that level. Id. ¶¶ 90–92. The individual Defendants continued to make similar statements throughout the Class Period.

**\*2** On November 27, 2013, external studies and articles published, including a study by the New England Journal of Medicine (NEJM), concluded that the occurrence of thrombosis associated with the HeartMate II had significantly increased, causing Thoratec stock to drop by approximately six percent. Id. ¶¶ 128–29. Thoratec hid from its investors its own internal data confirming such reports and the related financial risk, and did not correct its prior disclosures. Id. ¶ 129. Thoratec did not disclose the extent of the impact that the reported increases had on HeartMate II's commercial viability until August 6, 2014, causing its stock to drop some twenty-five percent. Id. ¶¶ 166–68.

Plaintiffs Cooper and Labak are investors in Thoratec stock who purchased shares on July 15, 2013 and August 2, 2013, respectively. See Goldberg Decl. Ex. B (Movant Certification) (Dkt. No. 12-2); SAC ¶ 27. They move for certification of the following class:

> all persons or entities that purchased or otherwise acquired the common stock of Thoratec Corporation between May 11, 2011 and August 6, 2014, both dates inclusive. Excluded from the Class are any parties who are or have been Defendants in this litigation, the present and former officers and directors of Thoratec and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any current or former Defendant has or had a controlling interest.

Mot. at ii.

LEGAL STANDARD

Plaintiffs seeking to represent a class first must satisfy the threshold requirements of Rule 23(a). Rule 23(a) provides

that a case is appropriate for certification as a class action if:

> (1) the class is so numerous that joinder of all members is impracticable;

> (2) there are questions of law or fact common to the class;

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).

Plaintiffs must also meet the requirements of one of the subsections of Rule 23(b). In this motion, Plaintiffs seek certification pursuant to Rule 23(b)(3), which permits certification where common questions of law and fact "predominate over any questions affecting only individual members" and class resolution is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are intended "to cover cases 'in which a class action would achieve economies of time, effort, and expense ... without sacrificing procedural fairness or bringing about other undesirable results." Amchem Prods. v. Windsor, 521 U.S. 591, 615 (1997) (quoting Fed. R. Civ. P. 23(b)(3) adv. comm. notes to 1966 amendment).

Plaintiffs seeking class certification bear the burden of demonstrating that they satisfy each Rule 23 requirement at issue. Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 158–61 (1982); Doninger v. Pac. Nw. Bell, Inc., 564 F.2d 1304, 1308 (9th Cir. 1977). The court must conduct a "rigorous analysis," which may require it "to probe behind the pleadings before coming to rest on the certification question." Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350–51 (2011) (internal quotation marks omitted). "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." Id. at 2551. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 466 (2013). This determination is committed to the district court's discretion. Califano v. Yamasaki, 442 U.S. 682, 703 (1979).

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 2

DISCUSSION

I. Plaintiffs Meet Rule 23(a)'s Requirements, Including Adequacy

**\*3** Defendants do not dispute that Plaintiffs have satisfied Rule 23(a)'s requirements of numerosity, commonality, and typicality, and instead focus only on adequacy. They argue that Plaintiffs are not adequate class representatives because they purchased shares only prior to November 27, 2013, and thus have no incentive to pursue claims on behalf of post-November 27, 2013 investors. In order to establish adequacy under Rule 23(a)(4), named plaintiffs must show that they "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether named plaintiffs will adequately represent a class, courts must resolve two questions: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" Ellis v. Costco Wholesale Corp., 657 F.3d 970, 985 (9th Cir. 2011) (internal quotation marks omitted).

Defendants contend that investors who purchased stock after the November 27, 2013 publications could not have relied on the May 11, 2011 misrepresentation that thrombosis rates had not increased above the clinical trial rates of two to three percent. Because neither Labak nor Cooper purchased shares after November 27, 2013, they have no incentive to pursue vigorously the divergent claims of "post-publication" investors. As discussed further below, Defendants continued to make misrepresentations about thrombosis rates after the November 27, 2013 publications and undermined the studies' conclusions. Because class members who purchased both before and after may rely on the same theory of liability, there are no divergent claims, and Labak and Cooper are adequate class representatives.

Because Labak and Cooper are adequate class representatives and Defendants do not dispute the other factors, Plaintiffs have met Rule 23(a)'s requirements.

II. Plaintiffs Meet Rule 23(b)(3)'s Requirements, Including Predominance

Defendants most vigorously argue that Plaintiffs cannot show predominance for two reasons. First, they argue that Plaintiffs cannot rely on a presumption of reliance because they fail to show front-end price impact. Second, they argue that Plaintiffs have not demonstrated that damages are measurable on a class-wide basis. Neither of Defendants' arguments is successful.

A. Plaintiffs Sufficiently Allege Reliance Based on the Fraud-on-the-Market Theory

In order to bring a claim under Section 10(b), "the plaintiff must show individual reliance on a material misstatement." Hanon v. Dataproducts Corp., 976 F.2d 497, 506 (9th Cir. 1992). "The reliance element 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.' " Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2407 (2014) (quoting Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 568 U.S. 455, 488 (2013) ).

In Basic Inc. v. Levinson, 485 U.S. 224 (1988), the Supreme Court created a rebuttable presumption of reliance based on the "fraud-on-the-market" theory, which holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Id. at 246. This presumption recognizes that "the typical investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price—the belief that it reflects all public, material information." Halliburton, 134 S. Ct. at 2408 (internal quotation marks omitted). "As a result, whenever the investor buys or sells stock at the market price, his reliance on any public material misrepresentations ... may be presumed for purposes of a Rule 10b-5 action." Id. (internal quotation marks omitted).

In order to establish the Basic presumption, a plaintiff must demonstrate: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." Halliburton, 134 S. Ct. at 2408. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of

reliance." Basic, 485 U.S. at 248. For example, "evidence that the misrepresentation did not in fact affect the stock price" may be sufficient to rebut the presumption at the class certification stage. Halliburton, 134 S. Ct. at 2414. It is Defendants' burden to show lack of price impact. See id. at 2417; Hatamian v. Advanced Micro Devices, Inc., No. 14-cv-00226 YGR, 2016 WL 1042502, at *7 (N.D. Cal. Mar. 16, 2016).

### 1. Defendants' Argument of Lack of Price Impact With Respect to the May 11, 2011 Alleged Misrepresentation Fails

**\*4** Defendants argue that there was a lack of price impact, and thus Plaintiffs may not rely on the Basic presumption. In order to show price impact, Plaintiffs submit the expert report of Dr. Zachary Nye, who studied Thoratec common stock "to determine whether new material corporate events or financial releases promptly caused a measurable stock price reaction after accounting for contemporaneous market and industry effects." See Ludwig Decl. Ex. 1 (Nye Report) (Dkt. No. 99-1) at ¶¶ 51–55. His analysis concludes "(i) that a strong cause-and-effect relationship existed between the information disclosed on the events dates and resulting stock price movements; and (ii) that the direction of the Company-specific return on event dates is consistent with the information disclosed." Id. ¶ 54.

Defendants contend in opposition that Dr. Nye's analysis actually demonstrates that there was no statistically significant increase in Thoratec's stock price on May 11, 2011, the date that Smith made the first allegedly false and misleading statement. See Nye Report Ex. 11A at 1. Dr. Nye admitted as much at his deposition, and Defendants' expert, Dr. Allen Ferrell, conducted an analysis confirming the same. See Rawlinson Decl. Ex. 2 (Nye Dep. Tr.) (Dkt. No. 107-2) at 104:8–17; Rawlinson Decl. Ex. 1 (Farrell Report) (Dkt. No. 107-1) at ¶ 26. Defendants argue that this constitutes direct evidence that the alleged misrepresentation did not actually affect the stock's market price, and that Plaintiffs had not contended and cannot contend for the first time on reply that they are instead alleging a price maintenance theory.

Defendants' argument that Plaintiffs fail to allege a price maintenance theory is not well-taken. A fair reading of the SAC shows that Plaintiffs allege that Thoratec's claimed

misrepresentations led investors to believe that the HeartMate II was reporting thrombosis rates consistent with the clinical trials—e.g., that the product was maintaining the status quo. Had Thoratec admitted that thrombosis rates were actually higher, HeartMate II would not have been able to maintain its competitive position in relation to HeartWare, and Thoratec's stock price would not have remained afloat. Thus, that Smith's May 11, 2011 statement did not lead to any significant increase in stock price is entirely consistent with Plaintiffs' theory that this misrepresentation prolonged the artificial inflation of Thoratec's stock price. See, e.g., In re Vivendi, S.A. Sec. Litig., 838 F.3d 223, 259 (2d Cir. 2016) ("[W]e agree with the Seventh and Eleventh Circuits that securities-fraud defendants cannot avoid liability for an alleged misstatement merely because the misstatement is not associated with an uptick in inflation."); FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1310 (11th Cir. 2011) ("A corollary of the efficient market hypothesis is that disclosure of confirmatory information —or information already known by the market—will not cause a change in the stock price."); Schleicher v. Wendt, 618 F.3d 679, 683 (7th Cir. 2010) ("[W]hen an unduly optimistic statement stops a price from declining (by adding some good news to the mix): once the truth comes out, the price drops to where it would have been had the statement not been made."); see also Ludwig Decl. Ex. 1 (Farrell Dep. Tr.) (Dkt. No. 113-1) at 52:3–6 ("Q. Would one necessarily expect the price of the security to increase when a material false statement is reiterated to the market? A. No."), 53:13–20 ("Q. So, generally speaking, can price inflation exist during a class period when alleged misrepresentations do not coincide with significant price increases? A. It's possible."). [2] Defendants' proffered evidence of lack of price impact is irrelevant to Plaintiffs' theory, which is that the May 11, 2011 event would not have impacted Thoratec's stock price by raising it, but rather prolonged its inflation.

[2]   Because the plaintiff in In re Finisar Corp. Sec. Litig., No. 5:11-cv-01252-EJD, 2017 WL 6026244, at *8 (N.D. Cal. Dec. 5, 2017), was "not proceeding on a price maintenance theory," that case is inapposite.

**\*5** Defendants' argument that Plaintiffs do not show that the May 11, 2011 statement "maintained" the price at a level already inflated from some earlier misstatement has also been considered and rejected by various courts. See, e.g., Vivendi, 838 F.3d at 259 ("[T]heories of 'inflation maintenance' and 'inflation introduction' are not separate

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   4

legal categories.") (internal quotation marks and citation omitted); Glickenhaus & Co. v. Household Int'l, Inc., 787 F.3d 408, 418 (7th Cir. 2015) (same). This Court finds the reasoning in those cases persuasive and agrees that Plaintiffs here not need not allege separate theories of inflation introduction and inflation maintenance.

2. Defendants Do Not Show Lack of Price
Impact With Respect to Corrective Disclosures

Defendants next argue that the alleged corrective disclosures also fail to show price impact (1) because of the September 6, 2013 disclosure to the market and (2) because they were not "corrective" of the May 11, 2011 misrepresentation. Defendants do not dispute that on the dates of each of the corrective disclosures alleged in the SAC, Thoratec's stock price saw statistically significant declines, -6.81 percent on November 27, 2013, and -29.65 percent on August 6, 2014, according to their own expert. See Farrell Report at ¶¶ 34, 38; accord Nye Report Ex. 11A at 18, 23.

On September 6, 2013, the Interagency Registry for Mechanically Assisted Circulatory Support (INTERMACS) published its Initial Analyses indicating that since 2011, the thrombosis rate associated with the HeartMate II had increased beyond the pre-approval clinical trial rate of two to three percent. See Farrell Report Ex. C. There was no accompanying decline in the price of Thoratec stock. This Initial Analyses as submitted by Defendants, however, is a one-page web document that lists no authors and is not a published study. Indeed, Plaintiffs contend that it was merely web-published for physicians. The document also states, "Note the significant increase in events after May, 2011, but the magnitude of increase was relatively small." Id.

The Court agrees with Plaintiffs that this document is insufficient to establish that the market already knew of the increased thrombosis rates associated with the HeartMate II prior to the November 27, 2013 corrective disclosure. It is merely an initial analysis by INTERMACS, not a peer-reviewed, published study, undermining its authority on the topic. Moreover, the document itself notes that while its numbers show a "significant increase," the absolute "magnitude" of that increase was "relatively small," dampening the overall impact of the analysis. Farrell Report Ex. C. It is

not surprising that, even if this document had some viewership, it would not result in a meaningful impact on the stock price because of its lack of authority and cabined suggestion of increased rates of thrombosis. The INTERMACS analysis is insufficient to sever the link between the May 11, 2011 misrepresentation and the corrective disclosures.

Defendants' second theory is that neither the November 27, 2013 publications nor the August 6, 2014 announcement was "corrective" of the May 11, 2011 alleged misrepresentation because they did not disclose new information previously unknown to the market, nor did the information disclosed in the August 6, 2014 announcement match the specific alleged misrepresentation on May 11, 2011.

With respect to Defendants' argument that the November 27, 2013 publication did not disclose any new information, this argument fails for the same reasons that the September 6, 2013 "disclosure" argument fails. While Defendants point to analyst reports that suggest that increase in thrombosis rates was not unknown to the market prior to the November 27, 2013 publications, Defendants do not dispute that there were no peer-reviewed, published studies that confirmed these increases with scientific authority. The November publications for the first time offered evidence linking the HeartMate II to higher thrombosis rates, and the market responded accordingly.

*6 Plaintiffs also present a plausible theory, and sufficient evidence, that the August 6, 2014 announcement disclosed new information, even when considering the November 27, 2013 disclosures. Plaintiffs' SAC is rife with examples of the individual Defendants making misrepresentations about the thrombosis rates of increase, undermining the November 27, 2013 publications, misstating they had new clinical data exhibiting lower rates of increase when they did not, and omitting the impact of the increased rates on revenues. See, e.g., SAC ¶¶ 138, 140, 143, 146, 149, 151, 154, 156, 159, 162. These statements could have reasonably misled investors to doubt the November 27, 2013 publications and instead believe that Thoratec's rates of thrombosis were stable and no longer increasing, or even lower than suggested by the earlier publications.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.    5

Defendants' argument that the information disclosed in the August 6, 2014 announcement did not "match" the specific alleged misrepresentation on May 11, 2011, on the other hand, deserves more scrutiny. Plaintiffs allege that in the August 6, 2014 statement, Defendants disclosed missed earnings and revenues due to concern over high thrombosis rates, lowered 2014 guidance, and disclosed a label change. SAC ¶¶ 166–67. Burbach issued a statement on that date explaining that the November 27, 2013 publications "along with greater scrutiny of clinical outcomes overall continues to be the largest factor impacting our business on a worldwide basis" and growth in overall referrals was down. Id. at 166. Burbach explained, "While we expect that this would be a headwind during the first half of the year is [sic] now clearly the impact is persisting longer than expected. Id.

Defendants contend that these statements do not "match" earlier alleged misrepresentations because they do not reveal any fact known to Thoratec at the time of the May 11, 2011 statement, nor the earlier statements regarding 2014 guidance. Instead, these statements dealt only with the impact of the November 27, 2013 publications on the second half of 2014. Nor did the announced "label change" correct any earlier misstatement.

While this is Defendants' strongest argument, Defendants' statements in the period between November 27, 2013 and August 6, 2014 can reasonably be read to suggest that the impact of the November 2013 publications on implanting physicians (and therefore Thoratec's bottom line) would be minimal. Thus, Thoratec's August 2014 disclosure that the publications had in fact substantially impacted earnings and revenues corrected the earlier misleading statements, causing Thoratec's stock immediately to drop a significant amount. Plaintiffs also argue that Thoratec's purpose since May 11, 2011 was to hide the effect of the increased thrombosis rates on the company's financials, which did not come to light until August 6, 2014. While the Court is concerned about a sufficient link between the May 11, 2011 misrepresentations and the August 6, 2014 statement, Plaintiffs may proceed on their theory at this early stage. In the future, a subclass based on the misrepresentations made in 2013 and the August 2014 disclosure may be appropriate.

Because the Court concludes that Defendants continued to make material misrepresentations after the November 27, 2013 publications, and Plaintiffs may proceed on

their August 24, 2014 corrective disclosure theory as well, Defendants' alternative requests to end the Class Period on November 27, 2013 or to create subclasses are denied at this time without prejudice.

B. Damages

As part of the predominance inquiry, Plaintiffs must demonstrate that "damages are capable of measurement on a classwide basis." Comcast Corp. v. Behrend, 569 U.S. 27, 34 (2013). "Calculations need not be exact," id. at 35, nor is it necessary "to show that [the] method will work with certainty at this time," Khasin v. R.C. Bigelow, Inc., No. 12-cv-02204-WHO, 2016 WL 1213767, at *3 (N.D. Cal. Mar. 29, 2016). Furthermore, the Ninth Circuit has stated that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)." Leyva v. Medline Indus. Inc., 716 F.3d 510, 514 (9th Cir. 2013).

*7 Plaintiffs argue that damages can be calculated through an event study like that provided by their expert, Dr. Nye, which quantifies Thoratec's per share price decline upon disclosure of the fraud. Indeed, "[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." In re Diamond Foods, Inc. Sec. Litig., 295 F.R.D. 240, 251 (N.D. Cal. 2013) (citing In re Imperial Credit Indus., Inc. Sec. Litig., 252 F. Supp. 2d 1005, 1014 (C.D. Cal. 2003) ).

Defendants argue that this methodology is insufficient because it fails to take into consideration what Defendants characterize as competing sets of misrepresentations. For the same reasons that the Court rejected Defendants' arguments regarding the November 27, 2013 publication date, this argument too fails. The Court concludes that Plaintiffs have sufficiently shown, at this stage, that damages are capable of measurement on a classwide basis.

For these reasons, Plaintiffs have satisfied Rule 23(b)(3)'s requirements.

CONCLUSION

Because Plaintiffs have satisfied the requirements of Rules 23(a) and 23(b)(3), Plaintiffs' Motion for Class Certification is granted.

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  6

IT IS SO ORDERED.

**All Citations**

Slip Copy, 2018 WL 2117337, Fed. Sec. L. Rep. P 100,095

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    7

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by In re AVEO Pharmaceuticals, Inc. Securities Litigation, D.Mass., November 14, 2017

2016 WL 1042502
United States District Court,
N.D. California.

Babak Hatamian, et al., Plaintiffs,
v.
Advanced Micro Devices, Inc., et al., Defendants.

Case No.: 14-cv-00226 YGR
|
Signed 03/16/2016

**Attorneys and Law Firms**

Joy Ann Kruse, Katherine Collinge Lubin, Lieff Cabraser Heimann & Bernstein, LLP, Rosemarie Maliekel, Clarence Dyer & Cohen LLP, Nicole Catherine Lavallee, Berman DeValerio, Willem F. Jonckheer, Schubert Jonckheer & Kolbe LLP, San Francisco, CA, Sharon Maine Lee, Lieff Cabraser Heimann Bernstein, Jonathan Gardner, Alec T. Coquin, Carol C. Villegas, Paul J. Scarlato, Yah E. Demann, Labaton Sucharow LLP, New York, NY, William S. Norton, James Michael Hughes, Max Nikolaus Gruetzmacher, Meredith B. Miller, Motley Rice LLC, Mt. Pleasant, SC, William H. Narwold, Motley Rice LLC, Hartford, CT, Michael M. Goldberg, Goldberg Law PC, Marina Del Rey, CA, Avraham Noam Wagner, The Wagner Firm, Kara M. Wolke, Glancy Prongay & Murray LLP, Los Angeles, CA, for Plaintiffs.

Patrick Edward Gibbs, Cooley LLP, Palo Alto, CA, Jason C. Hegt, Latham & Watkins LLP, New York, NY, Kala Sherman-Presser, Melanie Marilyn Blunschi, Latham and Watkins LLP, San Francisco, CA, Matthew Rawlinson, Ming M. Zhu, Latham and Watkins LLP, Menlo Park, CA, for Defendants.

**ORDER GRANTING PLAINTIFFS'
MOTION FOR CLASS CERTIFICATION**

Re: Dkt. No. 143

YVONNE GONZALEZ ROGERS, UNITED STATES DISTRICT COURT JUDGE

**\*1** Lead plaintiffs Arkansas Teacher Retirement System and KBC Asset Management NV (collectively, "Plaintiffs") bring this putative securities fraud class action pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder. Specifically, Plaintiffs allege that defendants Advanced Micro Devices ("AMD") and several individuals (collectively, "Defendants") made over one hundred material misrepresentations and omissions concerning the launch of its "Llano" microprocessor. Plaintiffs further allege that Defendants' later disclosures of the ongoing problems with Llano caused AMD's stock price to drop.

Currently before the Court is Plaintiffs' motion for class certification pursuant to Federal Rule of Civil Procedure 23. (Dkt. No. 143, "Mtn.") Having carefully considered the papers submitted, the admissible evidence, oral argument held February 2, 2016, and for the reasons set forth below, the Court hereby **GRANTS** Plaintiffs' motion for class certification.

**I. FACTUAL BACKGROUND**

The facts at issue in this case are well-known to the parties and were summarized previously by the Court in its order on Defendants' motion to dismiss. (*See* Dkt. No. 110.) The Court recounts the factual allegations pertinent to the instant motion below:

AMD is a semiconductor company whose main products include microprocessors and other computer parts. (Dkt. No. 61, Corrected Class Action Complaint, "CCAC," ¶ 43.) In particular, AMD designs and sells microprocessors for use in computers and tablets. AMD sells its microprocessors to original equipment manufacturers ("OEM") and through authorized third-party distributor channel partners, commonly referred to as the "channel." (*Id.* ¶ 3; Dkt. No. 156, Exh. A.)

This case arises out of alleged misrepresentations and omissions of material fact that Defendants made concerning AMD's launch of its "Llano" microprocessor. Llano was a revolutionary product that combined a central processing unit ("CPU") and a graphics processing unit ("GPU") on a single chip. The Llano was set to launch, initially, in the fourth quarter of 2010. (CCAC ¶ 7.) The launch was delayed until the second quarter of 2011 because the foundry set to manufacture Llano for AMD, GlobalFoundries ("GF"), had difficulty transitioning to

Llano's new process technology. (*Id.*) Specifically, AMD announced that GF had been having problems producing sufficient quantities of Llano chips given lower than desired chip "yield." (*Id.*)

On April 4, 2011, the start of the proposed class period, Defendants announced that the Llano yield problems had been resolved and were in the past, and that Llano was set to launch on time in the second quarter. (*Id.* ¶ 8.) Thereafter, Defendants claimed that "ample product" was available for the launch, and that it was "well positioned" to take advantage of the high back-to-school selling cycle, thereby allegedly bolstering the market's expectations for Llano. (*Id.* ¶ 9.) In general, Plaintiffs claim Defendants made affirmative misrepresentations and omissions to conceal the facts that (i) yield problems still existed and had persisted since 2010, and (ii) AMD was significantly supply-constrained. (*Id.* ¶ 10.) Plaintiffs claim that despite the critical decision not to supply channel customers with Llanos, Defendants continually represented Llano devices were faring well in the market.

**\*2** Plaintiffs allege that in a series of disclosures, starting in September 2011, AMD began to inform the market of the Llano yield problem and its effects. On September 28, 2011, Defendants admitted that AMD would miss its revenue guidance by four to six percent due to "less than expected supply." (*Id.* ¶ 13.) Defendants nonetheless touted "strong" customer demand despite the fact that supply could not meet the demand due to the compromising yield problem. (*Id.*) Defendants continued to downplay the existence and effects of the yield problem during a subsequent earnings call with analysts in October of 2011, although they admitted there had been some issues with yield impacting revenues to that point, maintained AMD was working with its foundry partner, GF, to solve the yield problems, and continued to state they were expecting increasing shipments of the Llano. (*Id.* ¶¶ 14; 207-16.) Defendants made similar statements in the months that followed.

Defendants made additional public disclosures starting in mid-2012. In July 2012, AMD announced it would miss second quarter revenue guidance by 14% due to softer than anticipated channel sales in China and Europe and the impact of weaker than expected consumer buying in AMD's OEM business. (*Id.* ¶ 18.) Ten days later, on an earnings call, Defendants admitted that the "soft" channel sales were due to Llano supply chain problems, which was

"largely in AMD's control." (*Id.* ¶ 19.) AMD nonetheless maintained that Llano was a good product, and that it would sell well in the coming quarters. (*Id.* ¶ 20.)

Finally, in October 2012, AMD revealed it was writing down $100 million of Llano inventory because it was not salable. (*Id.* ¶ 22.) This would account for 8% of a 15% quarter over quarter decline in gross margin. (*Id.*) The stock price fell accordingly. In total, AMD's stock price dropped $6.17 (nearly 74%) during the class period. (*Id.* ¶ 24.) Plaintiffs attribute this decline to Defendants' allegedly false and misleading statements. (*Id.*)

In total, throughout the proposed class period, Plaintiffs claim that Defendants: (a) made 125 separate misrepresentations regarding the Llano processor launch on 20 dates; and (b) later corrected these misrepresentations via disclosures made on 5 dates. [1] (*See* CACC; Dkt. No. 144-2, "Coffman Report" ¶¶ 12-14; Dkt. No. 156-9, "Gompers Report" ¶¶ 21-27.)

[1]    On two dates – September 28, 2011 and July 19, 2012 – Defendants made statements that Plaintiffs construe as misrepresentations, as well as statements Plaintiffs construe as corrective disclosures. (Coffman Report ¶ 14; Gompers Report ¶ 26.)

## II. PLAINTIFFS' PROPOSED CLASS DEFINITION

Plaintiffs move to certify the following class as a damages class pursuant to Rule 23(b)(3):

> all persons and entities that, during the period from April 4, 2011 through October 18, 2012, inclusive (the "Class Period"), purchased or otherwise acquired shares of the publicly traded common stock of Advanced Micro Devices, Inc. ("AMD"), and were damaged thereby (the "Class"). Excluded from the Class are AMD and Rory P. Read ("Read"), Thomas J. Seifert ("Seifert"), Richard A. Bergman ("Bergman") and Dr. Lisa T. Su ("Su"), (collectively, the "Individual Defendants" and with AMD, the "Defendants"); members of the immediate families of the Individual

Defendants; AMD's subsidiaries and affiliates; any person who was an officer or director of AMD or any of AMD's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; AMD's employee retirement and benefit plan(s); and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

(*See* Mtn. at 2; Dkt. No. 143-1 at 2.)

### III. CLASS CERTIFICATION STANDARD

Rule 23, which governs class certification, contains two sets of distinct requirements Plaintiffs must meet before the Court may certify the proposed class. First, Plaintiffs must meet all of the requirements under Rule 23(a). Second, the class must meet one of the prongs of Rule 23(b).

**\*3** Under Rule 23(a), the Court may certify a class only where "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a). Courts refer to these four requirements as "numerosity, commonality, typicality and adequacy of representation." *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 588 (9th Cir. 2012).

Once Plaintiffs establish that the threshold requirements of Rule 23(a) are met, Plaintiffs must then show "through evidentiary proof" that a class is appropriate for certification under one of the provisions in Rule 23(b). *Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (2013). Here, Plaintiffs seek certification under Rule 23(b) (3). Rule 23(b)(3) requires Plaintiffs to establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). The shared legal or factual issues must be of sufficient importance to the case that the Court is convinced that the most efficient,

fair, and sensible method of adjudication is through a class action. CAL. PRAC. GUIDE FED. CIV. PRO. BEFORE TRIAL Ch. 10-C § 10:274 (citing *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). Therefore, the predominance inquiry focuses on "whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Hanlon. v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). Where questions common to class members represent significant issues that can be resolved in a single adjudication, "there is clear justification for handling the dispute on a representative rather than on an individual basis." *Id.* (internal quotation marks and citation omitted).

"[A] court's class-certification analysis must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.'" *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S.Ct. 1184, 1194 (2013) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2551 (2011)); *see also Mazza*, 666 F.3d at 588. The Court considers the merits to the extent they overlap with the Rule 23 requirements. *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 (9th Cir. 2011). The Court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole*." *Id.* (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.'" *Aburto v. Verizon Cal., Inc.*, 2012 WL 10381, at \*2 (C.D. Cal. Jan. 3, 2012) (quoting *Ellis*, 657 F.3d at 982). Ultimately, the Court exercises its discretion to determine whether a class should be certified. *Califano v. Yamasaki*, 442 U.S. 682, 703 (1979).

### IV. DISCUSSION

Defendants oppose class certification on two grounds, both of which concern predominance under Rule 23(b) (3). The Court addresses each element of Rule 23 in turn, albeit most are unopposed.

#### A. Rule 23(a) Requirements

Defendants do not contest, and the Court agrees, that Plaintiffs have met their burden with respect to

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements.

### 1. Numerosity

**\*4** The first requirement for class certification demands that the class be "so numerous that joinder of all members is impractical." Fed.R.Civ.P. 23(a)(1). While no specific minimum number of potential class members exists, a "proposed class of at least forty members presumptively satisfies the numerosity requirement." *Nguyen v. Radient Pharmaceuticals Corp.*, 287 F.R.D. 563, 569 (C.D.Cal. 2012) (citing *Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995)).

Here, Plaintiffs unquestionably meet the numerosity standard. Defendants admitted the putative class contains more than 1,000 members. (Dkt. No. 144-1, "Responses to RFAs," No. 3.) Additionally, AMD had approximately 700 million shares outstanding during the proposed class period. (*Id.*, No. 10; Coffman Report ¶ 66.) "The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year." *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 634 (C.D.Cal. 2009). And, the average daily trading volume for AMD common stock was over 19.6 million shares (Responses to RFAs, No. 9) further supporting an inference that numerosity is satisfied. *See Dean v. China Agritech*, 2012 WL 1835708, at \*4 (C.D.Cal. May 3, 2012). Plaintiffs satisfy this element.

### 2. Commonality

Rule 23(a)(2) requires that the party seeking certification show that "there are questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). To satisfy this requirement, a common question "must be of such a nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551. The existence of common questions itself will not satisfy the commonality requirement, and instead, "[w]hat matters to class certification... is... the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* (emphasis in original).

Under the commonality inquiry, "Plaintiffs need not show that every question in the case, or even a preponderance of questions, is capable of classwide resolution. So long as there is 'even a single common question,' a would-be class can satisfy the commonality requirement of Rule 23(a)(2)." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 544 (9th Cir. 2013) (quoting *Dukes*, 131 S.Ct. at 2556).

The Ninth Circuit recognizes that public disclosures alleged to contain material misrepresentations and omissions, like those at issue here, present common questions of law and fact: "Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable....and that the issue may profitably be tried in one suit." *Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir. 1975) (citing cases). Indeed, Plaintiffs point to a litany of questions common to the class, including whether Defendants: (1) violated the Securities Exchange Act of 1934; (2) misrepresented or omitted material facts; (3) knowingly or recklessly disregarded that their statements were false and misleading; and, if so, whether Defendants' (4) false statements artificially inflated the price of AMD's stock; and (5) disclosure of their misstatements caused economic damage to Plaintiffs. (Mtn. at 8.) Consequently, the Court finds commonality is met here.

### 3. Typicality

**\*5** To satisfy typicality, Plaintiffs must establish that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir.1992)). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* "[T]ypicality is a 'permissive' standard and 'the focus should be on the defendants' conduct and plaintiff's legal theory, not the injury caused to the plaintiff.'" *In re*

*First American Corp. ERISA Litig.*, 258 F.R.D. 610, 618 (C.D.Cal. 2009) (quoting *Simpson v. Fireman's Fund. Ins. Co.*, 231 F.R.D. 391, 396 (N.D.Cal. 2005)).

Plaintiffs contend that typicality is met here because Plaintiffs, like class members, were all similarly injured by Defendants' public misrepresentations and omissions. The Court agrees. Plaintiffs' claims are "reasonably co-extensive with those of absent class members" and Defendants have not raised any reason that typicality is not met here. *Hanlon*, 150 F.3d at 1020. Especially given the permissive nature of the typicality requirement, the Court finds that the interests of Plaintiffs are typical of the interests of the class. *See Wolin*, 617 F.3d at 1175.

### 4. Adequacy

The final hurdle to certification under Rule 23(a) requires Plaintiffs to demonstrate they will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a)(4). In this regard, the Court must consider "(1) [whether] the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) [if]the representative plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003). Here, Defendants do not raise any potential conflicts of interest, and the Court cannot discern any in this case. Defendants likewise do not doubt that Plaintiffs' counsel has and will continue to prosecute this action vigorously. Accordingly, the Court finds that Plaintiffs are adequate class representatives.

### B. Rule 23(b)(3) Requirements

### 1. Predominance

"Considering whether 'questions of law or fact common to class members predominate' begins, of course, with the elements of the underlying cause of action." *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011) ("*Halliburton I*") (quoting Fed.R.Civ.P. 23(b)(3)). Plaintiffs assert claims under Section 10(b) of the Securities Exchange Act of 1934 (the "Act") and Rule 10b-5 promulgated thereunder.[2] To establish liability on their Section 10(b) private actions, Plaintiffs must show:

(1) Defendants made a material misrepresentation or omission of fact; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) Plaintiffs' reliance on the misrepresentation or omission; (5) economic loss (damages); and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008); *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1061 (9th Cir. 2008).

2    Plaintiffs also assert claims against the individually named defendants for violations of Section 20(a) of the Act, which requires Plaintiffs to prove: (1) a primary violation of federal securities law; and (2) Defendants exercised power or control over the primary violator. *Howard v. Everex Systems, Inc.*, 228 F.3d 1057, 1065 (9th Cir. 2000). Defendants do not raise, and the Court cannot discern, any reason the Section 20(a) claims would raise any distinct issues of predominance outside of those discussed with respect to the underlying Section 10(b) claims. The Court therefore will not separately address the Section 20(a) claims against the individually named defendants.

*6 Here, Defendants urge that individual inquiry is necessary to prove the fourth and fifth elements of Plaintiffs' Section 10(b) claims, *i.e.* reliance and damages. Specifically, Defendants contend that individual issues will predominate because Plaintiffs: (a) are not entitled to invoke a presumption of reliance under the "fraud-on-market" theory to show reliance classwide; and (b) have not shown they can measure damages classwide. The court addresses Defendants' arguments in turn.

### a. Presumption of Reliance

First, Defendants contend that reliance is not a common fact issue across the class because Plaintiffs are not entitled to a presumption of reliance. Without a classwide presumption of reliance, Defendants correctly argue that individual issues of reliance would vary among all class members such that individual issues would predominate over common ones:

Rule 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members" would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation. But

WESTLAW    © 2016 Thomson Reuters. No claim to original U.S. Government Works.    5

the problem dissipates if the plaintiffs can establish the applicability of the so-called "fraud on the market" presumption, which says that all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements. To invoke this presumption, the plaintiffs seeking 23(b)(3) certification must prove that their shares were traded on an efficient market....

*Dukes*, 131 S.Ct. at 2552 n. 6.Thus, the Court must determine whether Plaintiffs are entitled to a presumption of reliance under a fraud-on-the-market theory. [3]

[3]  Plaintiffs also seek to invoke a presumption of reliance under *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Because the Court finds, *infra*, Plaintiffs can invoke a presumption of reliance under a fraud-on-the-market theory, the Court need not address whether they may also do so under *Affiliated Ute*. Plaintiffs' ability to prove reliance classwide under a fraud-on-the-market theory obviates any need for class members to prove reliance individually – the relevant concern at this juncture under Rule 23(b)(3).

Plaintiffs claim they meet the requirements for a rebuttable presumption of classwide reliance as set forth by the Supreme Court in *Basic, Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988). *See also Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.Ct. 2398, 2408 (2014) ("*Halliburton II*") (affirming the presumption of reliance as set forth in *Basic*). To invoke the presumption, Plaintiffs must show that: (1) the alleged misrepresentations were publicly known; (2) AMD's stock traded on an efficient market; and (3) the relevant transaction took place between the time the misrepresentations were made and when the truthful disclosures were made. *Halliburton I*, 131 S.Ct. at 2185. Here, Plaintiffs meet the *Basic*requirements, and Defendants do not contend otherwise. [4]

[4]  Defendants, in fact, concede the most commonly litigated issue: that AMD stock traded on an efficient market (second element). (Dkt. No. 155, "Oppo.," at 14:3.)

But the inquiry does not end there. As Defendants contend, the *Basic* presumption of reliance is rebuttable, not absolute. *Halliburton II*, 134 S.Ct. at 2415-16. Because the presumption's efficient market analysis is only an "indirect proxy for price impact," it must give way to direct "evidence showing that the alleged

misrepresentation did not actually affect the stock's market price...." *Id.* If Defendants show that the alleged misrepresentations did not in fact affect the stock's price, then the *Basic* presumption will not apply. *Id.* at 2416. Critically, the Supreme Court's recent *Halliburton II* decision held that Defendants are entitled to introduce evidence to rebut the presumption of reliance at the class certification stage to defeat Plaintiffs' efforts to certify a class. *Id.*

**\*7** To rebut the *Basic* presumption of reliance, Defendants must introduce evidence showing the alleged "misrepresentation[s] in fact did not lead to a distortion of price or that an individual plaintiff traded or would have traded despite his knowing the statement was false." *Basic*, 485 U.S. at 248. Defendants argue they can establish no actual price impact to rebut the presumption. In this context, Defendants bear the burden of proving no price impact. *See Halliburton II*, 134 S.Ct. at 2416-17; *see also In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *4 (S.D.N.Y. Sept. 24, 2015).

In support of their argument, Defendants present the report of their purported expert Paul Gompers, Ph.D., who in turn relies on the report of Plaintiffs' purported expert Professor Chad Coffman, CFA. (*See* Gompers Report; Coffman Report.) Specifically, Dr. Gompers opines that his analysis – using data generated by Professor Coffman – shows no statistically significant increase in the price of AMD's stock on a majority of the 20 dates Defendants allegedly made material misrepresentations. (Gompers Report ¶¶ 39-40, Ex. 6.) Defendants argue that because "there was no statistically significant movement in the price of AMD's stock on" a majority of the misstatement dates, "Plaintiffs have not met their burden of proving that reliance can be established on a class-wide basis as to the majority of the alleged false statements." (Oppo. at 14:18-20; *id.* at 15:2-4.)

Defendants' argument fails for two key reasons. First, Defendants misconstrue the burden to show no price impact and erroneously place it with Plaintiffs. The burden is on Defendants. [5] Second, Defendants essentially invite the Court to focus exclusively on price impact at the time of a misrepresentation, ignoring price impact at the time of a corrective disclosure. Price impact in securities fraud cases is not measured solely by price increase on the date of a misstatement; it

can be quantified by decline in price when the truth is revealed. *See Halliburton II*, 134 S.Ct. at 2414 (the *Basic* presumption of reliance may be rebutted by "evidence that the asserted misrepresentation (*or its correction*) did not affect the market price of the defendant's stock") (emphasis supplied). This is because lack of a statistically significant price increase does not necessarily equate to lack of price impact. As Professor Coffman explains, a misrepresentation may not cause a statistically significant change in price because misstatements are not made in a vacuum and other information can offset or confound the effects of a particular misrepresentation. (Dkt. No. 165-2, "Coffman Rebuttal Report," ¶¶ 20-21.) It is also possible that "a misstatement could serve to maintain the stock price at an artificially inflated level without also causing the price to increase further." *City of Livonia Emps.' Ret. Sys. v. Wyeth*, 284 F.R.D. 173, 182 (S.D.N.Y. 2012) (quoting *In re Bristol-Myers Squibb Sec. Litig.*, 2005 WL 2007004, at *17 (D.N.J. Aug. 17, 2005); *see In re Pfizer Inc. Sec. Litig.*, 936 F.Supp.2d 252, 264 (S.D.N.Y. 2013) ("a misstatement may cause inflation simply by maintaining existing market expectations, even if it does not actually cause the inflation in the stock price to increase on the day the statement is made"); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 282-83 (N.D.Ala. 2009) (rejecting defendants' attempt to rebut *Basic* presumption because "[e]ven without a demonstrated increase in share price directly related to the fraudulent statements, Plaintiffs can travel on the fraud-on-the-market theory by showing that the negative truthful information that caused the share price to drop was related to the prior false positive statements"). Thus, Defendants' evidence that there was no statistically significant price impact on certain misstatement dates cannot alone persuade where, as here, expert reports show statistically significant price impacts on each disclosure date. (Coffman Report ¶ 54; Gompers Report, Exh. 6; Coffman Rebuttal Report ¶ 17.)

[5]    At oral argument, Defendants proposed a burden shifting analysis under which plaintiffs should assume the burden after a defendant's showing of no statistically significant price impact. The Court need not reach this issue because there is a showing of a statistically price impact here: Defendants' own expert report reflects statistically significant price decreases on the disclosure dates.

**\*8** Accordingly, Defendants have not introduced evidence that "severs the link between the alleged misrepresentation and … the price received (or paid) by [Plaintiffs]," and their showing is therefore not "sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. The principal case relied on by Defendants, *In re Moody's Corp. Securities Litig.*, proves the point. 274 F.R.D. 480 (S.D.N.Y. 2011). In *Moody's*, the district court found that defendants' rebuttal evidence showed "no period within the proposed class period where the alleged misrepresentation caused a statistically significant increase in the price or where a corrective disclosure caused a statistically significant decline in the price." *Id.* at 493. By contrast, here, Defendants' own expert acknowledges that: (1) AMD's stock price experienced statistically significant price increases on four days on which Defendants are alleged to have made 43 misstatements and/or omissions, and (2) AMD's stock price experienced a statistically significant price decrease on every one of the five days Defendants are alleged to have made corrective disclosures. Thus, *Moody's* highlights how Defendants fail to establish no price impact to rebut the *Basic* presumption of reliance.

Because Defendants have not rebutted the presumption of reliance under *Basic*, reliance is a question of law or fact "common to all class members" and introduces no "questions affecting only individual members." Fed.R.Civ.P. 23(b)(3).

### b. Damages Model

Next, Defendants rely on *Comcast* to suggest that Plaintiffs must provide proof of a classwide damages methodology to demonstrate predominance under Rule 23(b)(3). *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013). Defendants seem to interpret *Comcast* to preclude class certification simply because Plaintiffs do not show that damages can be measured on a classwide basis. The Court agrees that *Comcast* supports the general notion that damages questions should be considered when weighing issues of predominance. However, Defendants construe *Comcast* too broadly. The Ninth Circuit reads *Comcast* to demand only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Levya v. Medline Industries, Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 133 S.Ct. at 1435); *accord Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015) ("the Court did not hold that proponents of class certification must

rely upon a classwide damages model to demonstrate predominance"); *In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (labeling Defendants' suggestion "a significant distortion of *Comcast*," which had already been rejected by several circuits, including the Ninth Circuit). Moreover, courts in this District have declined to adopt Defendants' suggested interpretation. *See, e.g., In re Diamond Foods, Inc., Sec. Litig.*, 295 F.R.D. 240, 251 (N.D.Cal. 2013) (declining to "decide whether, as defendant claims, *Comcast* requires that class certification be denied absent affirmative evidence that damages are susceptible of measurement across the entire class") (internal quotations omitted). The ultimate question, then, is not as Defendants suggest, but rather is whether "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." *Levya*, 716 F.3d at 514.

To satisfy this requirement, Plaintiffs submit they will use the standard measurement of damages in Section 10(b) securities cases – the "out-of-pocket" or "event study" method. (Coffman Report ¶ 77.) As Plaintiffs argue, "[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *Diamond Foods*, 295 F.R.D. at 251 (quoting *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F.Supp.2d 1005, 1014 (C.D.Cal. 2003)). This method first involves an event study that would measure the price reactions upon the alleged corrective disclosures. (Coffman Report ¶ 77.) Second, it "measures damages as the artificial inflation per share at the time of purchase less the artificial at the time of sale...." (*Id.*) Once the artificial inflation is established through the two-step methodology, "[d]amages for any individual class member could then be calculated formulaically" using objective data. (*Id.* ¶ 78.) Professor Coffman opines that this method shows damages may be calculated on a classwide basis utilizing standard methodology. (*Id.*)

**\*9** In opposition, Defendants principally rely on *In re BP P.L.C. Sec. Litig.* ("*BP I*") for the proposition that Plaintiffs' proposed methodology is too crude to account for the complex theories of liability at issue in this case. 2013 WL 6388408 (S.D.Tex. Dec. 6, 2013). In *BP I* the district court noted that "[s]imply invoking the event study methodology....[does] not assuage the Court that he class-wide damages methodology proposed will track Plaintiffs' theories of liability," as required

by *Comcast*. *Id*. at \*17. The district court's statement must be examined in light of the circumstances of that case. Notably, the district court there identified concerns with plaintiffs' proposed methodology in the context of plaintiffs' class claims. Namely, the district court found the proposed methodology did not take into account two differing theories of fraud liability plaintiffs were pursuing: pre-explosion and post-explosion. Upon a renewed motion for class certification, the district court found plaintiffs' proposed methodology was only appropriate to use with respect to the post-explosion subclass. *In re BP P.L.C. Sec. Litig.*, 2014 WL 2112823, at \*12 (S.D.Tex. May 20, 2014) ("*BP II*"). On the other hand, the pre-explosion theory of liability concerned the court because it was "non-traditional" and "antithetical to the 'fraud-on-the-market' theory." *Id.*, at \*4, \*12. Thus, the district court concluded that the plaintiffs' proposed damages model with respect to the pre-spill subclass would involve an examination of every class members' "subjective motivations" –injecting individualized issues that would predominate over issues common to the class. *Id.* at \*12.

Not so here. By contrast to the proposed classes in *BP I* and *BP II*, all of Plaintiffs' theories of liability rest upon a fraud-on-the-market theory of reliance. *See* Section IV.B.1.a, *supra*. Moreover, Plaintiffs propose the event study methodology for calculating damages – the very same methodology that the *BP* defendants argued was "the proper type of damages to be recovered by investors in securities fraud cases...." *BP II*, 2014 WL 2112823, at \*10. Defendants do not "identify any specific complications that would make such a calculation impossible or ill-advised in this case." *Diamond Foods*, 295 F.R.D. at 252. Rather, Defendants point to potential flaws in Plaintiffs' theories that are ultimately immaterial to class certification.

More specifically, Defendants argue that Plaintiffs' simplistic damages model is insufficient because it reflects a misalignment between certain misrepresentations and later corrective disclosures. In other words, Defendants attack the "fit" between an alleged corrective disclosure and a prior alleged fraudulent statement. This is nothing more than an attack on loss causation, or Plaintiffs' ability to "show that a misrepresentation that affected the integrity of the market price *also* caused a subsequent economic loss." *Halliburton I*, 131 S.Ct. at 2186 (emphasis in original). So too is Defendants' argument that

Professor Coffman's methodology would not be able to "disaggregate the price inflation" attributable to particular theories of liability. (Oppo. at 24:16-21.) As explained by Professor Coffman, this inquiry is appropriately understood as a loss causation analysis. (Coffman Rebuttal ¶ 56.) *See, e.g., In re SLM Corp. Sec. Litig.*, 2012 WL 209095, at *5 (S.D.N.Y. Jan. 24, 2012) ("evaluating potentially confounding information on the disclosure dates, and determining whether it was material, is tantamount to a loss causation analysis"). These sorts of inquiries into loss causation are properly addressed by a fact-finder on the merits; Plaintiffs need not show loss causation as a condition of class certification. *See Halliburton I*, 131 S.Ct. at 2186. Defendants' arguments are therefore misplaced.

Accordingly, Plaintiffs have shown not only that "damages could be feasibly and efficiently calculated once the common liability questions are adjudicated," but also that they are sufficiently capable of measurement on a classwide basis based on a common methodology.

\*\*\*

Because Plaintiffs are entitled to a presumption of reliance under *Basic* and they have adequately tied their damages model to their theories of recovery, the Court finds that Plaintiffs have demonstrated that "questions of law or fact [including reliance and damages] common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3).

## 2. Superiority

**\*10** The Court may certify a damages class under Rule 23(b)(3) only upon a finding that a class action is superior to individual suits. To make this determination, the Court considers the following four non-exhaustive factors: (1) the interests of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the members of the class; (3) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3)(A)– (D). "Where classwide

litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation." *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1235 (9th Cir. 1996).

Here, the Court finds that each factor weighs in favor of class certification. First, individual class members do not have a great interest in controlling the litigation because the individual damages are likely small enough to be economically prohibitive as individual claims. *See Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1190 (9th Cir. 2001), *am. on. den. reh*'g, 273 F.3d 1266 (9th Cir. 2001) ("Where damages suffered by each putative class member are not large, this factor weighs in favor of certifying a class action"). Second, Plaintiffs represent they are not aware of any litigation that concerns the allegations set forth in this case. Third, concentrating the litigation in this Court is adequately justified because AMD maintains its headquarters in this District. *Cf. Zinser*, 253 F.3d at 1191-92 (finding superiority not satisfied where plaintiffs provided no adequate justification to concentrate the litigation in the proposed forum). Finally, with respect to difficulties in managing a class action, this factor involves the same considerations as Rule 23(b)(3)'s predominance requirement. *See Id.* at 1192 (finding the fourth superiority factor weighed against certification because each class member would have to "litigate numerous and substantial separate issues to establish his or her right to recover individually"). For the reasons discussed in Section IV.B.1, *supra*, there are no substantial individual issues to be litigated in this case. *See Nguyen v. Radient Pharm. Corp.*, 287 F.R.D. 563, 575 (C.D.Cal. 2012) ("If united by a common core of facts, and a presumption of reliance on an efficient market, class actions are the superior way to litigate a case alleging violations of securities fraud").

Accordingly, the Court is satisfied that a class action is superior to individual adjudication of the class members' claims.

## V. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for class certification is **GRANTED**. The Court finds the following class appropriate for class treatment under Rule 23:

> all persons and entities that, during the period from April 4, 2011 through October 18, 2012,

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  9

inclusive (the "Class Period"), purchased or otherwise acquired shares of the publicly traded common stock of Advanced Micro Devices, Inc. ("AMD") (collectively, the "Class"). Excluded from the Class are AMD and Rory P. Read ("Read"), Thomas J. Seifert ("Seifert"), Richard A. Bergman ("Bergman") and Dr. Lisa T. Su ("Su"), (collectively, the "Individual Defendants" and with AMD, the "Defendants"); members of the immediate families of the Individual Defendants; AMD's subsidiaries and affiliates; any person who was an officer or director of AMD or any of AMD's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest;

AMD's employee retirement and benefit plan(s); and the legal representatives, heirs, successors and assigns of any such excluded person or entity.

**\*11** It is further **ORDERED** that lead plaintiffs Arkansas Teacher Retirement System and KBC Asset Management NV are appointed as representatives of the class and that the law firms of Labaton Sucharow LLP and Motley Rice LLC are appointed as class counsel.

This Order terminates Docket Number 143.

**IT IS SO ORDERED**.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 1042502, Fed. Sec. L. Rep. P 99,040

---

**End of Document**                     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   10

2016 WL 7406418
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

Richard Hayes, et al., Plaintiffs,
v.
MagnaChip Semiconductor Corp., et al., Defendants.

Case No. 14-cv-01160-JST
|
Signed 12/22/2016

**Attorneys and Law Firms**

Jeremy A. Lieberman, Marc Ian Gross, Michael J. Wernke, Pomerantz LLP, Phillip C. Kim, Jonathan Stern, The Rosen Law Firm, P.A., New York, NY, Lionel Z. Glancy, Lesley F. Portnoy, Robert Vincent Prongay, Glancy Prongay & Murray LLP, Laurence M. Rosen, The Rosen Law Firm, P.A., Los Angeles, CA, Joshua B. Silverman, Louis C. Ludwig, Patrick V. Dahlstrom, Pomerantz LLP, Chicago, IL, Sunny September Sarkis, Robbins Geller Rudman & Dowd LLP, San Francisco, CA, for Plaintiffs.

Daniel J. Kramer, Robert N. Kravitz, Jacqueline P. Rubin, Meredith A. Arfa, Paul Weiss Rifkind Wharton & Garrison LLP, Kimberly Perrotta Cole, Michael Sangyun Kim, Kobre & Kim LLP, Daniel J. Fetterman, Brian Choi, Trevor Joseph Welch, Kasowitz, Benson, Torres & Friedman LLP, Douglas Maynard, John C. Murphy, Michael Asaro, Stephen Michael Baldini, Sydney Spector, Akin Gump Strauss Hauer & Feld LLP, James E. Brandt, Jason C. Hegt, Latham & Watkins LLP, New York, NY, Alex Young K. Oh, Paul Weiss Rifkind Wharton & Garrison LLP, Washington, DC, John C. Tang, Kelsey Israel-Trummel, Jones Day, Evan N. Budaj, Michael Fang Peng, Kobre & Kim LLP, Jason Takenouchi, Kasowitz, Benson, Torres & Friedman LLP, Eric Ghiya Ruehe, Akin Gump Strauss Hauer & Feld LLP, San Francisco, CA, Matthew D. Stachel, Paul Weiss Rifkind Wharton & Garrison LLP, Wilmington, DE, Ali R. Rabbani, Andrew S. Jick, Neal Ross Marder, Peter Ian Altman, Akin Gump Strauss Hauer & Feld LLP, Los Angeles, CA, Matthew Rawlinson, Patrick Edward Gibbs, Latham & Watkins LLP, Menlo Park, CA, for Defendants.

## ORDER GRANTING CLASS CERTIFICATION

Re: ECF No. 231

JON S. TIGAR, United States District Judge

### I. BACKGROUND

**\*1** MagnaChip is a Delaware corporation with its principal place of business in Seoul, Korea, which "designs and manufactures semiconductor products for high-volume consumer applications." ECF No. 231 at 9; ECF No. 249 at 10. After MagnaChip emerged from bankruptcy in 2009, Avenue Capital became its majority shareholder, owning 70.3% of the company's shares. ECF No. 231 at 9. Avenue Capital appointed three of its employees to MagnaChip's board of directors. Id.

In March 2011, MagnaChip completed an IPO and its stock began trading on the New York Stock Exchange ("NYSE") at $14 per share. Id. For the eleven consecutive quarters that followed, MagnaChip "posted positive net income and beat analysts' consensus estimates of [earnings per share]," and as a result, MagnaChip's stock rose to a high of $23.57 per share. Id. But Plaintiffs allege that, [w]hile MagnaChip appeared to be healthy and successful, in reality the 'success' was a sham and resulted from Defendants[1] wide-ranging accounting fraud, which included fabricated sales, kickbacks, recognition of revenue for products that had not been manufactured, and channel stuffing." Id. at 10. On January 27, 2014, MagnaChip "delayed the release of Q4 and year-end 2013 results," and the company's stock price declined by 8%. Id. Throughout 2014, MagnaChip issued what Plaintiffs' describe as "partial disclosures related to the fraud" described above. Id. Most importantly, on March 11, 2014, Avenue Capital released a disclosure stating that corrections to its revenue recognition methodology "will require the restatement of its financial statements" and that MagnaChip's financial statements from 2011 to 2013 "should no longer be relied upon." Id. at 11. According to Plaintiffs, although "these partial disclosures did in fact result in a price decline, [it] was far more limited than would have been experienced had the Company told the complete truth" immediately. Id. Finally, on February 12, 2015, "MagnaChip issued restated financials for the fiscal years 2011, 2012, and the first three quarters of 2015." Id. Plaintiffs allege that the restatements demonstrate how MagnaChip had fraudulently inflated its revenue and

net profits. Id. Following this disclosure, MagnaChip's stock price fell 50%, and continued to decline throughout February 2015. Id.

[1]    In addition to Avenue Capital, Plaintiffs' original suit named MagnaChip and several of its officers. ECF No. 1. Plaintiffs have since settled with all Defendants but Avenue Capital. ECF No. 270.

During the 2011 IPO, at three registered secondary offerings, and at a Rule 144A private sale, Avenue Capital sold portions of its MagnaChip holdings. ECF No. 249 at 11. Plaintiffs allege that Avenue Capital obtained over $300 million in revenue by "dump[ing] 85% of its MagnaChip shares" on "unsuspecting investors." ECF No. 231 at 10. Because "Avenue Capital was the largest beneficiary of the fraud alleged in this action, and the control person of MagnaChip throughout the Class Period," Plaintiffs argue that its actions violated Sections 20A and 20(a) of the Exchange Act, 15 U.S.C. § 78t-1. Id. at 8. Plaintiffs now seek to certify the following class:

> **\*2**  all persons who purchased or otherwise acquired MagnaChip Semiconductor Corporation ("MagnaChip" or the "Company") common stock between February 1, 2012 and February 12, 2015 (the "Class Period"), inclusive. Excluded from the Class are any parties who are or have been Defendants in this litigation, the present and former officers and directors of MagnaChip and any subsidiary thereof, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which any current or former Defendant has or had a controlling interest.

Id. at 2. They also seek to appoint Keith Thomas and Herb Smith as class representatives, and Pomerantz, LLP and the Rosen Law Firm, LLC as class counsel. Id. Plaintiffs submitted a report by Zachary Nye ("Nye Report") in support of their motion, ECF No. 232-1, and Avenue Capital submitted a rebuttal report by Paul Gompers ("Gompers Report"), ECF No. 249-2.

## II. LEGAL STANDARD

Class certification under Rule 23 is a two-step process. First, a plaintiff must demonstrate that the numerosity, commonality, typicality, and adequacy requirements of Rule 23(a) are met: "One or more members of a class may sue or be sued as representative parties on behalf of all members only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "Class certification is proper only if the trial court has concluded, after a 'rigorous analysis,' that Rule 23(a) has been satisfied." Wang v. Chinese Daily News, Inc., 709 F.3d 829, 833 (9th Cir. 2013) (quoting Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 351, (2011)).

Second, a plaintiff must also establish that one of the bases for certification in Rule 23(b) is met. Here, Plaintiffs invoke Rule 23(b)(3), which requires that Plaintiffs show both "predominance" and "superiority": that the presence of "questions of law or fact common to class members predominate over any questions affecting only individual members, and ... [that] a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. Pro. 23(b)(3).

The party seeking class certification bears the burden of demonstrating by a preponderance of the evidence that all four requirements of Rules 23(a) and at least one of the three requirements under Rule 23(b) are met. See Dukes, 131 S. Ct. at 2551 ("A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."). In ruling on class certification, courts do not consider the merits of the plaintiffs' claims. Keilholtz v. Lennox Hearth Products Inc., 268 F.R.D. 330, 335 (N.D. Cal. 2010). Courts "must take the substantive allegations of the complaint as true" but "need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through class action." Id. (citations omitted). As a general matter, the Ninth Circuit has found Rule 23(b)(3) class actions to be "useful where a large number of purchasers or holders of securities claim to have been defrauded by a common course of dealing on the part of the defendants." Harris v. Palm Springs Alpine Estates, Inc., 329 F.2d 909, 913 (9th Cir. 1964).

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.                2

## III. DISCUSSION

### A. Rule 23(a) Requirements

#### 1. Numerosity

**\*3** The numerosity requirement is satisfied when a plaintiff shows that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs contend that "[d]uring the class period, the number of MagnaChip shares outstanding ranged from approximately 34.1 million to 37.1 million shares." ECF No. 231 at 12. "The Court certainly may infer that, when a corporation has millions of shares trading on a national exchange," the numerosity requirement is met. In re Cooper Companies Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D. Cal. 2009). Moreover, Avenue Capital does not contest numerosity. The Court concludes that Plaintiffs have satisfied their burden to show that the number of putative class members is sufficiently numerous that their joinder would be impracticable.

#### 2. Commonality

The commonality requirement is satisfied when a plaintiff shows that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality exists when plaintiffs' claims "depend upon a common contention" of "a nature that is capable of classwide resolution," such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." Wal-Mart Stores, Inc. v. Dukes, 131 S.Ct. 2541, 2545 (2011).

Thomas contends that this requirement is met, because questions of law or fact common to the putative class "include, among others: (i) whether MagnaChip's financial statements were materially false and misleading; (ii) whether the underlying misrepresentations and omissions were made with scienter; (iii) whether Avenue Capital controlled MagnaChip during the Class Period; (iv) whether Avenue Capital has a 'good faith' defense to liability under Section 20(a) of the Exchange Act; and (v) to what extent the members of the Class have sustained damages and the proper measure of damages." ECF No. 231 at 14.

The Court concludes that commonality exists because Plaintiffs claim that MagnaChip made the same alleged statements to the entire putative class, as members of the investing public. Thus, the information contained in the alleged statements is determinative of whether MagnaChip misrepresented material facts. Commonality also exists because whether Avenue Capital controlled MagnaChip is determinative of Avenue Capital's liability.

#### 3. Typicality

Typicality exists if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992) (citation and internal quotation marks omitted).

Plaintiffs argue that they satisfy the typicality requirement because their claims, like those of the other class members, "derive from the same legal theories and the same misrepresentations and omissions." ECF No. 231 at 14. Avenue Capital responds that Plaintiffs do not meet the typicality requirement because they "are subject to unique defenses that threaten to become the focus of the litigation." ECF No. 249 at 15.

First, Avenue Capital argues that both proposed class representatives are "subject to the defense that they did not rely on MagnaChip's alleged misstatements after March 11, 2014, when MagnaChip announced that nearly three years of its financial statements would be restated and 'should no longer be relied upon.' " Id. Given the Court's finding, discussed below in Part III.B.2., that the Class Period cannot extend beyond March 11, 2014, this argument is moot.

**\*4** Second, Avenue Capital claims that Smith is subject to two unique defenses: (a) that "MagnaChip's allegedly fraudulent statements were not a factor in his purchasing decisions" because he continued to purchase MagnaChip stock after March 2014, ECF No. 249 at 16, and (b) that Smith was an "in-and-out trader" who therefore "will not

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.    3

be able to show loss causation," id. at 17 n.6. The Court disregards the first unique defense for the same reasons stated above. The Court also rejects Avenue Capital's in-and-out trader argument. As Plaintiffs note, Smith retained several thousand shares of MagnaChip stock until after the final disclosure, which would make the in-and-out trader label inapposite. ECF No. 275 at 16. To the extent Avenue Capital claims otherwise, that is a factual dispute not appropriately resolved in this order.

Third, Avenue Capital claims that Thomas is subject to the "unique defense of non-reliance ... because he testified that his transactions in MagnaChip stock were based on technical stock information ... rather than MagnaChip's reported earnings or 'fundamentals.' " ECF No. 249 at 16 n.5. Although courts have disqualified "day-traders" from serving as lead plaintiffs in securities cases, Thomas's use of technical stock information did not rise to that level. Applestein v. Medivation, Inc., No. C 10-00998 MHP, 2010 WL 3749406, at *3 (N.D. Cal. Sept. 20, 2010) (finding atypical a proposed class representative who made as many as 44 trades in a single day). Indeed, Thomas testified that he "relied on the integrity of market prices to make his trading decisions" and that "he would not have purchased shares had he known of the alleged fraud." ECF No. 275 at 15. Under those circumstances, Thomas's use of technical stock information does disqualify him. See Hodges v. Immersion Corp., No. C-09-4073 MMC, 2009 U.S. Dist. LEXIS 122565, at *11, 2009 WL 5125917 (N.D. Cal. Dec. 21, 2009) (refusing to disqualify a day-trader where defendants offered no evidence that "his particular trading activities would subject him to a defense that he would have purchased his shares regardless of the alleged fraud").

The Court concludes that Thomas's and Smith's claims are typical of those of the putative class members.

### 4. Adequacy of Representation

A plaintiff may bring claims on behalf of a class only if she "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the named plaintiffs and their counsel prosecute the action vigorously on

behalf of the class?" Hanlon v. Chrysler Corp., 150 F.3d 1011, 1020 (9th Cir. 1998) (citations omitted).

Plaintiffs contend that they have "already demonstrated their adequacy by negotiating a favorable settlement from the settling Defendants, and vigorously pursuing remaining claims against Avenue Capital." ECF No. 231 at 14. They also claim to have "engaged qualified, experienced, and capable attorneys." Id. In response, Avenue Capital recycles the unique defense arguments it raised in its typicality analysis. ECF No. 249 at 14. The Court rejects those arguments for the reasons described above, and sees no evidence of any conflict of interest between the named representatives and the rest of the class. Accordingly, the Court finds that Thomas, Smith and their counsel will adequately protect the interests of the class.

### B. Rule 23(b)(3) Requirements

This provision requires the court to find that: (1) "the questions of law or fact common to the class members predominate over any questions affecting only individual members," and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

### 1. Predominance

**\*5** "The predominance analysis under Rule 23(b)(3) focuses on 'the relationship between the common and individual issues' in the case" and tests whether the proposed class is "'sufficiently cohesive to warrant adjudication by representation.' '" Wang v. Chinese Daily News, Inc., 737 F.3d 538, 545 (9th Cir. 2013) (quoting Hanlon, 150 F.3d at 1022). Here, there are two main areas of dispute relating to predominance: reliance and damages.

### a. Reliance

First, the parties dispute whether Plaintiffs may properly invoke the "rebuttable presumption of reliance" outlined by the Supreme Court in Basic Inc. v. Levinson, 485 U.S. 224 (1988), which obviates the need to make individualized showings of reliance. This presumption

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.    4

is based on "what is known as the 'fraud-on-the-market' theory, which holds that the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2408 (2014) ("Halliburton II"). "Under this theory, plaintiffs' reliance on misleading statements about a company's financial position can be presumed if: (1) the alleged misrepresentations or omissions were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded stock between when the misrepresentations or omissions were effectuated and when the truth was revealed." In re Montage Tech. Grp. Ltd. Secs. Litig., 2016 U.S. Dist. LEXIS 53734, at *20-21 (citing Halliburton II, 134 S. Ct. at 2407-2408). Only the question of market efficiency is disputed here.

The parties agree that a now-widely adopted district court decision, Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), outlines five relevant (but not exclusive) factors for determining market efficiency. ECF No. 231 at 17; ECF No. 249 at 20. For the reasons below, the Court agrees with Plaintiffs that the Cammer factors demonstrate that MagnaChip's stock traded on an efficient market, and therefore that individualized issues related to reliance will not predominate over class ones.

### Factor One: Weekly Trading Volume

The first Cammer factor is the "average weekly trading volume during the class period." 711 F. Supp. at 1286. "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption." Id. at 1292. According to Nye's Report, MagnaChip's average weekly share trading volume for the class period was 4.2% of shares outstanding. ECF No. 231 at 19. This is double the 2% that Cammer stated would justify a strong presumption of market efficiency. Avenue Capital responds MagnaChip's trading volume fell below 2% or 1% for multiple months during the class period, despite the 4.2% figure. ECF No. 249 at 21. But given that Cammer identified average trading volume as the relevant number, the Court does not find that response very persuasive. This factor favors a finding of market efficiency.

### Factor Two: Analyst Coverage

The second Cammer factor is whether a "significant number of securities analysts "followed and reported on a company's stock during the class period." 711 F. Supp. at 1286. According to the Nye Report, over 300 analysts reported on MagnaChip during the Class Period. ECF No. 231 at 20. Avenue Capital responds that Nye failed to "account for the significant decline in analyst coverage" toward the end of the Class Period, which it claims "fell by more than 50%." ECF No. 249 at 21. According to the Gompers Report, by the end of the class period, only seven analysts were covering MagnaChip's stock. Id. Avenue Capital argues that after this decline, the analyst coverage was no longer "significant," as Cammer requires. Id. But Avenue Capital cites no case that identifies a threshold number of analysts and the Court declines to create one here. [2] Moreover, the shortening of the Class Period, see below, reduces the force of Avenue Capital's argument. This factor, too, weighs in favor of market efficiency.

[2]   It bears noting that other courts have weighed this factor in favor of market efficiency when only four or six analysts published reports during the class period. See In re Nature's Sunshine Prod.'s Inc. Sec. Litig., 251 F.R.D. 656, 663 (D. Utah 2008).

### Factor Three: Market Makers and Arbitrageurs

**\*6** The third Cammer factor is the presence of "market makers" or "individuals [who] would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." 711 F. Supp. at 1286. Plaintiffs make two somewhat contradictory arguments about this factor. First, in their moving papers, Plaintiffs argue that the factor is irrelevant because MagnaChip's stock traded on the NYSE during the Class Period. ECF No. 231 at 22. They claim that the NYSE's status as an "auction market" means that MagnaChip has a "single designated market maker," rather than multiple market makers. Id. (citing Vinh Nguyen v. Radient Pharm. Corp., 287 F.R.D. 563, 573 (C.D. Cal. 2012)). Because the presence of a designated market maker suggests market efficiency, Plaintiffs say they need not otherwise show the presence of market makers. ECF No. 231 at 20. Avenue Capital responds that Plaintiffs single market maker argument fails "because

approximately 82% of MagnaChip's total trading volume during the Proposed Class Period occurred on venues other than the NYSE." To rebut this argument, Plaintiffs claim in their reply brief that Nye also found that a "significant number of market makers facilitated trading in MagnaChip shares," putting the number at over 170. ECF No. 275 at 20. In essence, Plaintiffs appear to argue that MagnaChip's designated market maker satisfies <u>Cammer</u> factor three, but even if it did not, that the 170 market makers facilitating trading do. The Court agrees that both the presence of a designated market maker and so many market makers in other trading venues weigh in favor of a finding of market efficiency.

### Factor Four: S-3 Eligibility

The fourth <u>Cammer</u> factor is the company's eligibility to file an S-3 Registration Statement in connection with public offerings. 711 F. Supp. at 1286. Plaintiffs claim that "MagnaChip was eligible and did file S-3 registration statements with the SEC during the Class Period." ECF No. 231 at 21. Avenue Capital faults Plaintiffs for failing to note that MagnaChip became "*ineligible* to file a Form S-3 beginning on January 27, 2014, when the Company announced it would delay the release of its fourth quarter and year-end 2012 financial results." ECF No. 249 at 23. Plaintiffs respond that where, as here, a company's "ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met," this factor still favors market efficiency. Cammer, 711 F. Supp. at 1286. Plaintiffs are correct that Avenue Capital does not challenge MagnaChip's ability to meet the minimum stock requirements to file S-3 Registration Statements. Therefore, the Court concludes that this factor weighs in favor of a finding of market efficiency.

### Factor Five: Cause and Effect Relationship

The fifth <u>Cammer</u> factor is the existence of "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." 711 F. Supp. at 1286. Plaintiffs claim that the Nye Report demonstrates this cause and effect relationship. ECF No. 231 at 21. Nye "examined nine dates on which MagnaChip released quarterly or annual financial results" along with the

"corrective disclosure dates examined in the complaints." Id. His analysis showed that "MagnaChip's stock price typically reacted more strongly on the event dates than on non-event dates during the Class Period." Id.

Gompers, Avenue Capital's expert, criticizes Nye's cause and effect study on several grounds. First, Gompers claims Nye should not have used "analyst reports published *after* each event to justify whether MagnaChip's stock price reacted efficiently." ECF No. 249 at 23. Nye does not effectively rebut this criticism, and neither did Plaintiffs' counsel at the hearing on this motion. Nonetheless, Avenue Capital cites no case rejecting Nye's approach, and the Court concludes that while Nye might better have relied on a different set of analyst reports, the criticism reduces the persuasive force of his study only slightly.

Second, Gompers attacks the Nye Report for analyzing "only 15 event days out of the 763 trading days during the Class Period." Id. at 24. Plaintiffs say 15 event days is sufficient. The parties do not identify, and the Court did not find, any cases on point from this district. Because Plaintiffs have identified several out-of-district cases where a similar or lesser number of event days sufficed, ECF No. 275 at 33, however, and their reasoning is persuasive. The Court rejects this particular challenge to Nye's cause and effect study.

**\*7** Third, Gompers claims Nye's regression model suffers from a number of deficiencies: it failed to "control for the statistically significant effect that market-wide factors in Korea had on MagnaChip's returns," it relies on a flawed industry index that "excludes several potentially relevant companies and includes companies of questionable comparability," and it produced "residual returns" that demonstrate either a deficient model or an inefficient market. Id. As to the first criticism, even assuming the failure to control for Korea-specific information is a legitimate criticism, Plaintiffs correctly note that this would affect the "weight rather than admissibility" of the study. See Rudebusch v. Hughes, 313 F.3d 506, 516 (9th Cir. 2002). As to the second, Plaintiffs explain that even incorporating Gompers's suggestions related to the industry indexes, Nye's results remained the same, making that objection irrelevant. ECF No. 275 at 23. And as to the third, Plaintiffs' expert rejects the contention that all statistically significant returns in large stocks are explainable by identifiable news events.

According to the Nye Report, "87% of MagnaChip's statistically significant dates were associated with news." Id. at 24. This figure, Plaintiffs claim, is similar to those found to satisfy Cammer in other cases. Id. (citing McIntire v. China MediaExpress Holdings, Inc., 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014); In re Alstom SA Sec. Litig., 253 F.R.D. 266, 280 (S.D.N.Y. 2008)). Avenue Capital's criticisms are not substantial enough to warrant this Court's rejection of Nye's cause and effect study. The fifth factor also suggests that MagnaChip's stock traded on an efficient market.

All five factors weigh in favor of a finding market efficiency. [3] In many ways, this case is similar to In re Diamond Foods, Inc., where the defendant "purportedly identif[ied] fundamental flaws in plaintiff's event study," but did not "not provide a study or other evidence concluding that the market for [the relevant] stock was not efficient during the class period." 295 F.R.D. 240, 250 (N.D. Cal. 2013). Responding to similar attacks on a cause and effect study in a different case, one court in this district noted that "[s]haky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.... Defendants' arguments contesting the validity of plaintiffs' expert's conclusions based on his market model may be presented at trial." In re Montage Tech. Grp. Ltd. Secs. Litig., 2016 U.S. Dist. LEXIS 53734, at *28. The same is true here. In addition, the fact that MagnaChip trades on the NSYE, though not dispositive of market efficiency, certainly helps to confirm that conclusion. ECF No. 231 at 19 (citing cases). In sum, the preponderance of the evidence supports a finding of class-wide reliance.

[3]    In addition to criticizing Nye's analysis of the Cammer factors, Avenue Capital offers the more general argument that the Nye Report fails to provide "an objective, unbiased standard for assessing market efficiency." ECF No. 249 at 20. Specifically, Avenue Capital claims Nye failed to test for one of three specific forms of market efficiency. Id. But Avenue Capital does not direct the Court to any case requiring this type of tiered analysis rather than the finding of "general efficiency" articulated by the Supreme Court in Halliburton II. 134 S. Ct. at 2414. Moreover, courts have acknowledged that "some subjectivity" is unavoidable in the context of event studies, which means the ultimate determination of market efficiency cannot be entirely objective. See In re Diamond Foods, 295 F.R.D. at 249. Here,

the fact that Nye faithfully followed the Cammer factors weakens any argument that his analysis was subjective and therefore unreliable.

### Rebuttal Evidence

Avenue Capital argues that even if Plaintiffs could demonstrate an efficient market and therefore invoke the presumption of reliance, that presumption is "rebutted as of March 11, 2014 because no investor could have reasonably relied after that date." ECF No. 249 at 31. Amgen Inc. v. Connecticut Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1193 (2013) (internal citations and alterations omitted) ( "The presumption, however, is just that, and can be rebutted by appropriate evidence."); see also, Basic, 485 U.S., at 248–249 ("[I]f petitioners could show that the 'market makers' were privy to the truth ..., and thus that the market price would not have been affected by their misrepresentations, the causal connection could be broken: the basis for finding that the fraud had been transmitted through market price would be gone."). Specifically, Avenue Capital points to the language in its March 2014 disclosures that its prior financial statements "should not be relied upon." ECF No. 249 at 32. Avenue Capital argues that reliance after that disclosure would have been unreasonable. ECF No. 249 at 32. Plaintiffs respond that the 2014 statement was "itself false and misleading" and therefore could not be "fully corrective." ECF No. 275 at 11. [4]

[4]    Plaintiffs allege that the March 2014 statement disclosed that the fraud was related to revenue recognition for one sales channel, but hid the fact that the "fraud wiped out the majority of MagnaChip's reported profits, was extremely widespread in scope and nature, and involved MagnaChip's management." ECF No. 275 at 11.

**\*8** Avenue Capital has the better argument here. A number of district courts have declined to extend the class period in a securities case beyond the date of disclosures like those made by MagnaChip here. For example, in In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ERISA Litig., 247 F.R.D. 32, 39–40 (D.D.C. 2008) ("Fannie"), the court ended the class period on the date that the "company explicitly warned investors to discount its prior financial statements and that it anticipated a restatement of around $9 billion as a result of a top-to-bottom review of its books." The court explained that "there was nothing equivocal about [the company's] disavowal of its financial

statements," and that the "announcement put investors on notice that Fannie Mae's financial future was, at best, uncertain." Id. Particularly given that the "market reacted immediately," the court decided that "investors who purchased Fannie Mae stock after [the disclosure] ... should not be able to claim a reasonable reliance on Fannie Mae's financial statements." Id. Importantly, the court was not persuaded by the plaintiffs' argument that this disclosure was only partial. Rather, it concluded that "while the subsequent disclosures in 2005 might have provided additional information as to the extent of the alleged fraud, investors were already proceeding with full knowledge that substantial errors and irregularities existed with the earlier financial statements." Id. This Court sees no way to distinguish this case from Fannie in light of the unequivocal nature of MagnaChip's March 2014 disclosure. And like in Fannie, the fact that MagnaChip's disclosure may have only revealed part of the fraud does not change the fact that the disclosure did warn investors against any reliance on the company's prior financial statements.

The same is true of In re Nature's Sunshine Prod.'s Inc. Sec. Litig., 251 F.R.D. 656, 666–67 (D. Utah 2008) ("Nature"). There, the defendant argued that the class period should end once "Nature filed an 8–K warning investors not to rely on any of its financials." Id. The district court rejected the plaintiffs argument that the "8–K was only a partial corrective disclosure and that further corrective disclosures were revealed after [that initial disclosure], which made Nature's stock price continue to fall." Instead, the court found as a matter of law that the 8–K served as "a curative disclosure ... render[ed] it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants alleged misrepresentations." Id.[5] This same reasoning requires the shortening of Plaintiffs' class period here. The question is not, as Plaintiffs' argue, whether the March 2014 disclosure was "fully corrective," ECF No. 275 at 11, but whether it made further reliance on MagnaChip's earlier financial reports unreasonable. The Court finds that it did.[6]

[5]     The Court does not dispute that "doubts regarding the reasonableness of the reliance should be resolved in favor of extending the class period," In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 143 (D.N.J. 1984), but nonetheless concludes that no doubt exists

where a company explicitly warns investors not to rely on past financial reports because they will be restated.

[6]     In re LDK Solar Sec. Litig., 255 F.R.D. 519, 527 (N.D. Cal. 2009), is distinguishable. There, unlike in this case, the defendant did not issue a report warning against reliance on prior financial statements. Rather, the court analyzed whether the class period should terminate on the date that the defendant "published a report disclosing [the comptroller's] departure from LDK and expressing generalized concerns about LDK's inventory accounting." Id. The court deemed this report a "partial disclosure" that did not "fully reveal[ ]" the fraud. Id. By contrast, courts have found a company's warning not to rely on prior financial statements to make future reliance on those statements unreasonable. See, e.g., Nature, 251 F.R.D. at 666–67. Those cases, not LDK, are persuasive here.

Contrary to Plaintiffs' position, Amgen does not counsel against resolving this question at the class certification stage. In Amgen, the defendant's "rebuttal evidence aimed to prove that the misrepresentations and omissions alleged in [the] complaint were immaterial" because, among other things, public documents already disclosed the subject of the misrepresentations at the time they were made." Amgen, 133 S. Ct. at 1203-04. The Court declined to consider the rebuttal evidence, explaining that while a "defendant could rebut the fraud-on-the-market presumption of reliance ... by demonstrating that news of the truth credibly entered the market and dissipated the effects of prior misstatements, [ ] proof of that sort is a matter for trial." Id. (internal quotations and alterations omitted) (citing Basic, 485 U.S. at 248–249). Here, however, nobody is arguing that the original misrepresentations were immaterial or that evidence of MagnaChip's misconduct had already entered the market when MagnaChip released its fraudulent financial reports between 2011 and early 2014. Instead, Avenue Capital has argued that a subsequent disclosure made continued reliance on those financial reports unreasonable. Therefore, Amgen does not control, and the fact that the district court cases cited by Avenue Capital preceded Amgen does not mean they are no longer good law.[7]

[7]     The same point can be made with regard to Plaintiff's reliance on Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 813 (2011) ("Halliburton I"), in which the Supreme Court held that plaintiffs in

a securities class action are not required "to show loss causation as a condition of obtaining class certification." Id. at 813. The Court imposes no such burden here as to any portion of the putative class period. It merely holds that, after March 11, 2014, reliance on Magnachip's prior disclosures was unreasonable as a matter of law.

**\*9** The Court concludes that the presumption of market efficiency is rebutted as of March 11, 2014, and ends the class period on that date.

### b. Damage Calculations

Second, the parties dispute whether individualized damages questions make this case unsuitable for class-wide resolution. Avenue Capital argues that Plaintiffs "must be able to show that 'their damages are capable of measurement on a class-wide basis' " to obtain certification, and that they have failed to make that showing. ECF No. 249 at 25 (citing Comcast Corp. v. Behrend, 133 S. Ct. 1426 (2013)). Avenue Capital criticizes Nye's use of a "price inflation" theory generally, and also identifies several problems with Nye's methodology. Id. at 26-31.

The reasoning in Hatamian v. Advanced Micro Devices, Inc., a similar securities class action case in this district, is instructive. No. 14-cv-00226 YGR, 2016 U.S. Dist. LEXIS 34150, at *26, 2016 WL 1042502 (N.D. Cal. Mar. 16, 2016). Hatamanian explained how the Ninth Circuit has applied Comcast to securities cases:

> The Ninth Circuit reads Comcast to demand only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." Leyva v. Medline Indus., 716 F.3d 510, 514 (9th Cir. 2013) (citing Comcast, 133 S.Ct. at 1435) ... The ultimate question, then, ... is whether "damages could feasibly and efficiently be calculated once the common liability questions are adjudicated." Leyva, 716 F.3d at 514.

Id. at *23-25. In other words, Comcast does not require certification proponents to rely on a class-wide damages model to demonstrate predominance. Id. Like in Hatamanian, Nye's event study, if reliable, should suffice to show how damages could be calculated. ECF No. 275 at 25; see In re Montage Tech. Grp. Ltd. Secs. Litig., 2016 U.S. Dist. LEXIS 53734, at *38 (explaining that in

"securities fraud matter[s] ..., courts have found that a price impact analysis such as an event study can serve as a method of calculating class-wide damages").

Avenue Capital attacks the methodology of Nye's event study on several grounds similar to those raised by the defendant in Hatamanian. The critiques fall into two main categories. First, Avenue Capital attacks the "fit" of Nye's damages methodology, arguing that the study fails to take into account price inflation over time, the impact of the 2014 corrective disclosures, and the impact of confounding news. ECF No. 249 at 26-29. Like the defendant in Hatamanian, Avenue Capital points to a Southern District of Texas case as an example of a court rejecting an event study under Comcast as insufficient tailored. In re BP p.l.c. Sec. Litig., No. 10-MD-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013). But as the Hatamanian court recognized, In re BP is distinguishable because in that case the problem was the event study's failure to "take into account two differing theories of fraud liability plaintiffs were pursuing." 2016 U.S. Dist. LEXIS 34150, at *26, 2016 WL 1042502. Plaintiffs have only one theory here. The flaws that Avenue Capital identifies in Nye's study, like in Hatamanian, are "are ultimately immaterial to class certification" because they relate to loss causation, an issue "properly addressed by a fact-finder on the merits." Id. [8]

---

[8]     Avenue Capital is correct that In re Diamond Foods held that calculating damages is only a mechanical task when there are no "specific complications that would make such a calculation impossible or ill-advised in this case." In re Diamond Foods, Inc., Sec. Litig., 295 F.R.D. at 252. But as discussed above, the complications identified by Avenue Capital do not rise to that level.

**\*10** Second, Avenue Capital argues that Nye's proposal for calculating Section 20A damages is inadequate. ECF No. 249 at 26. Nye's Report contains a one-sentence explanation of Section 20A damages: "The disgorgement remedy under §20A of the Exchange Act can be calculated in a similarly mechanical manner for all Class members who purchased MagnaChip shares contemporaneously with Avenue Capital's August 1, 2013 sale of MagnaChip stock." ECF No. 231-2 at 29. The Court agrees that this explanation is short, but sees no reason to require Plaintiffs to repeat their description of the event study used to calculate Section 20(a) damages if the study is the same for both types of claims. Nor does the Court

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   9

find material Plaintiffs' use of the term "disgorgement" when referring to the measure of Section 20A damages. Some courts have described the "measure of [Section 20A] damages as amount of disgorged profits," In re Petco Animal Supplies Inc. Sec. Litig., No. 05-CV-0823-H RBB, 2006 WL 6829623, at *10 (S.D. Cal. Aug. 1, 2006), and the Court will certainly keep in mind the language of the statute that Avenue Capital identifies, which sets a limit on total recovery. ECF No. 249 at 29. Finally, the Court acknowledges that "no class member should be allowed to recover more than the amount of its economic loss," meaning Section 20A and Section 20(a) damages should not be aggregated if that figure would exceed actual damages. Id. at 30 (citing The Ambassador Hotel Co. v. Wei-Chuan Inv., 189 F.3d 1017 (9th Cir. 1999)). But Plaintiffs are correct that this issue can be resolved on a class-wide basis and therefore should not prevent certification.

### 2. Superiority

The second Rule 23(b)(3) requirement is superiority. In determining superiority, courts must consider the four factors of Rule 23(b)(3): (1) the class members' interests in individually controlling a separate action; (2) the extent and nature of litigation concerning the controversy already begun by or against class members; (3) the desirability of concentrating the litigation in the particular forum; and (4) the manageability of a class action. Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 270–71 (N.D. Cal. 2011) (citing Zinser v. Accufix Research Inst., Inc.,

253 F.3d 1180, 1190 (9th Cir. 2001)). "Where classwide litigation of common issues will reduce litigation costs and promote greater efficiency, a class action may be superior to other methods of litigation," and is certainly superior "if no realistic alternative exists." Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234-35 (9th Cir. 1996).

Courts in this district have recognized the utility of the class action device in securities cases. In re UTStarcom, Inc. Sec. Litig., No. C 04-04908 JW, 2010 WL 1945737, at *10 (N.D. Cal. May 12, 2010); In re Juniper Networks, Inc. Sec. Litig., 264 F.R.D. 584 (N.D. Cal. 2009). Not only are all factors met here, ECF No. 231 at 23, but Avenue Capital also does not appear to contest superiority. The Court concludes that a class action is superior to other methods for resolving this controversy.

### CONCLUSION

The Court certifies the class, but imposes a March 11, 2014 end date for the Class Period. The Court appoints Keith Thomas and Herb Smith as class representatives, and Pomerantz, LLP and the Rosen Law Firm, P.A. as class counsel.

IT IS SO ORDERED.

### All Citations

Slip Copy, 2016 WL 7406418

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 10

2009 WL 1348163
United States District Court,
M.D. Tennessee,
Nashville Division.

In re AMERICA SERVICE GROUP, INC., et al.

No. 3:06–0323.
|
March 31, 2009.

**Attorneys and Law Firms**

Dennis J. Herman, Eli R. Greenstein, Coughlin, Stoia, Geller, Rudman & Robbins, LLP, San Francisco, CA, Douglas S. Johnston, Jr., George Edward Barrett, Timothy L. Miles, Barrett, Johnston & Parsley, Paul Kent Bramlett, Bramlett Law Offices, James Gerard Stranch, III, James Gerard Stranch, IV, Joey Paul Leniski, Jr., Branstetter, Stranch & Jennings, Nashville, TN, Ramzi Abadou, Samantha Smith, Coughlin, Stoia, Geller,

Rudman & Robbins, LLP, San Diego, CA, Marc A. Topaz, Schiffrin & Barroway, LLP, Radnor, PA, Daniel S. Sommers, Steven J. Toll, Cohen, Milstein, Sellers & Toll, PLLC, Washington, DC, Mark C. Gardy, Gardy & Notis, LLP, Englewood Cliffs, NJ, Nadeem Faruqi, Faruqi & Faruqi, LLP, New York, NY, for Plaintiffs.

B. Warren Pope, Benjamin Lee, Michael R. Smith, King & Spalding LLC, Atlanta, GA, Robert Jackson Walker, John C. Hayworth, Joseph F. Welborn, III, Walker, Tipps & Malone, Kevin C. Baltz, Miller & Martin PLLC, David Alexander Fardon, Harwell, Howard, Hyne, Gabbert & Manner, Nashville, TN, Chet B. Waldman, Wolf, Popper LLP, New York, NY, Marcia Meredith Eason, Miller & Martin, Chattanooga, TN, for America Service Group, Inc., et al.

*MEMORANDUM*

WILLIAM J. HAYNES, JR., District Judge.

| | | | |
|---|---|---|---|
| A. | | Analysis of the Amended Complaint | |
| | 1. | ASG's Corporate History .......... | ...................................... 2 |
| | 2. | ASG's Financial History .......... | ...................................... 6 |
| | 3 | SPP's Accounting Practices .......... | .................................... 20 |
| | 4. | PHS's Medical Practices .......... | .................................... 24 |
| | 5. | Published Reports about ASG, SPP and PHS .......... | .................................... 26 |
| | 6. | ASG's Internal Investigation .......... | .................................... 28 |
| | 7. | GAAP Violations .......... | .................................... 33 |
| | 8. | Individual Defendants' Statements and Conduct .......... | .................................... 34 |
| B. | Conclusions of Law | | |
| | 1. | Standard of Review .......... | ........ 44 |
| | 2. | Pleading Requirements under Rule 10(b) & PLSRA .......... | ........ 50 |
| | 3. | Plaintiffs' Theories of Liability .......... | ........ 52 |
| | | a. | ................................ Defendants' Misrepresentations    54 |
| | | b. | ................................Defendants' Omissions    67 |

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   1

c. Defendants' Practices in "Connection with" Sales of ASG stock ..... 70

d. ...................................................Fraud on the Market     75

4.   Plaintiffs' Scienter Allegations ..........                                  ........ 76

5.   Plaintiffs' Section 20(a) Claims ..........                                   ........ 92

6.   The *Dura* Injury Requirement ..........                                      ........ 96

**C.**                                          **Relief**

                                                                                  100

 **\*1** Plaintiffs, shareholders of America Service Group Inc. ("ASG"), filed this action under the federal securities laws, 15 U.S.C. § 78aa, on behalf of themselves and a class of shareholders against the Defendants: ASG; Michael Catalano, ASG's chief executive officer; Michael Taylor ASG's chief financial officer; Secure Pharmacy Plus, LLC ("SPP"), an ASG subsidiary; Enoch E. Hartman, III and Grant Bryson, who were at times relevant to this action, chief executive officers at SPP or ASG. Plaintiffs, owners of ASG stock, assert claims under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, as well as Rule 10(b)(5) of the Securities Exchange Commission's Regulations.

In sum, Plaintiffs allege that from September 2, 2003 through June 23, 2006 when they purchased or held ASG's stock, these Defendants engaged in and/or materially assisted in a scheme and course of business to inflate artificially the value of ASG stock by manipulating the costs and revenues of SPP and Prison Health Services ("PHS") ASG's subsidiaries, as reported in ASG's consolidated financial reports. These practices are alleged to have misled investors about ASG's and its subsidiaries' actual financial performance and condition. This unlawful scheme included false and misleading statements about ASG's ability to control its subsidiaries' costs and to earn profits on ASG's subsidiaries' government contracts to provide medications and medical services to inmates at federal and state prisons as well as at local jails. Plaintiffs also allege that ASG's statements of financial success were based upon revenue and earnings growth that were calculated in violation of Generally Accepted Accounting Principles ("GAAP"). Plaintiffs further allege that the Defendants engaged in a fraud on the market and that Defendants Catalano and Taylor engaged in unusual insider trading after these practices had artificially inflated ASG's stock value.

Before the Court is the Defendants' motion to dismiss [1] (Docket Entry No. 68) contending, in essence, that the Plaintiffs' amended complaint is legally insufficient to state the scienter necessary for their securities claims. Plaintiffs contend that Plaintiffs' amended complaint: (1) fails to tie the Defendants to any of the alleged fraudulent business practices and statements or loss of business or restatement of ASG's financial reports; (2) fails to allege scienter as to SPP's alleged "cookie jar" accounting practices; (3) fails to provide sufficient facts that PHS's medical care practices is a scheme that gives rise to a strong inference of scienter; (4) fails to allege sufficient facts that ASG, SPP and the individual Defendants are controlling persons of ASG, SPP or PHS; and (5) fails to plead any actionable loss due to the alleged fraudulent practices and statements. Finally, Defendants assert the statutory safe harbor defense for their forward-looking statements in ASG's published reports and their public statements.

[1]    The Defendants' motion does not challenge the Plaintiffs' claims under §§ 13(b)(2)(A) and (B) of the Exchange Act for the Defendants' failures to maintain accurate records concerning its inventories, costs and net income and to implement procedures reasonably designed to accomplish that purpose. (Docket Entry No. 60, Amended Complaint at ¶¶ 288 and 289).

 **\*2** In response, Plaintiffs assert, in essence, that their factual allegations are adequate to state actionable federal securities claims against each of the Defendants and to tie their alleged injuries to the Defendants' violations of federal securities law as well as to establish each Defendant's responsibility for these violations and to state a cognizable injury due to such violations.

### A. Analysis of the Amended Complaint

#### 1. ASG' Corporate History

Given the inordinate length of the Plaintiffs' amended complaint, [2] a summary of Plaintiffs allegations is that ASG, a publicly traded holding company, was created in 1978 to provide medical care to inmates at governmental facilities. (Docket Entry No. 60, Amended Complaint at ¶ 25). ASG conducts that business through its wholly-owned subsidiaries, SPP and Prison Health Services, Inc., ("PHS"). *Id.* at ¶¶ 17–19). ASG utilized its subsidiaries to provide privately managed healthcare services and medications. SPP provides pharmaceuticals and medical supplies to state and federal prisons as well as local jails and PHS operates and staffs the health clinics at these institutions. *Id.* at ¶¶ 18 and 19. ASG describes itself as "the leading non-government provider of correctional healthcare and pharmacy services in the United States." *Id.* ASG's stock met the requirements for listing and active trading on the NASDAQ market, requiring ASG to file periodic public reports with the SEC and NASDAQ. *Id.* at ¶ 295.

[2]  An amended complaint supercedes the original complaint. *Clark v. Tarrant County,* 798 F.2d 736, 740–41 (5th Cir.1986). Plaintiffs' amended complaint with attachments is one hundred sixty-eight pages (Docket Entry No. 60, Amended Complaint) and is not the model of clarity. In addition, the parties submitted extensive memoranda and supporting documents on the Defendants' motion to dismiss. For these claims, judicial analysis "necessarily involves a sifting of allegations in the complaint. As we have noted, recklessness in securities fraud is an untidy, case-by-case concept." *Helwig v. Vencor, Inc.,* 251 F.3d 540, 551 (6th Cir.2001) (*en banc* ), *abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007).

In the 1990s, in a competitive bidding process, ASG acquired fixed fee contracts whose profitability depended upon ASG's ability to estimate and control its future healthcare costs. Prior to and during the Class Period, from September 2, 2003 through June 23, 2006, ASG "assured investors that it could reliably predict such costs." *Id.* at ¶ 26. ASG informed investors that inmates with severe and catastrophic illnesses could increase its

costs, but ASG acquired excess insurance coverage to control its total operating costs. *Id.*

On September 2, 2000, ASG acquired Stadtlanders Corrections Division of Bergen Brunwing Corporation, SPP's predecessor, to increase ASG's control of its pharmacy and medical supply costs. *Id.* at ¶ 27. The Defendant Hartman, then Stadtlanders's president and chief executive officer, became SPP's president and chief executive officer and later ASG's executive vice president, *Id.* at ¶ 28, In 2004, Hartman appointed Defendant Bryson as SPP's chief executive officer when Hartman became PHS's chief operating officer. *Id.*

At the time of ASG's acquisition of Stadtlander, ASG's costs for drugs and medical supplies represented 16% of ASG's operating costs. *Id.* at at ¶ 27. After the acquisition, SPP's annual revenues were approximately $80 million that led SPP to represent that it was the number one firm in the correctional pharmacy market. *Id.* at ¶ 28. With this acquisition, Defendant Hartman consolidated the SPP's various local pharmacies into a central dispensing facility in Franklin, Tennessee, over protests from local governments and state pharmacy boards who questioned the legality of dispensing prescriptions from another state. *Id.* at ¶ 29. Prior to this acquisition, a senior pharmacist at ASG allegedly warned Defendants Catalano and Hartman of problems with this consolidation of drug dispensation, but Catalano and Hartman ignored them. *Id.* at ¶ 29.

**\*3** According to Plaintiffs, PHS's hospital administrators prepared site budgets that were based on annual budgets and unidentified higher officials reviewed and forwarded these budgets to ASG's budget committee. *Id.* at ¶ 312. These site budgets were allegedly "routinely cut," but with the submissions of monthly reports, a site administrator could submit a written justification for additional funds. *Id.*

The chief officers of ASG, PHS and SPP held regular meetings to discuss methods to reduce their operating costs, *Id.* at ¶ 310. ASG conducted monthly meetings in Brentwood, Tennessee that Defendants Catalano and Hartman attended with site accounting managers to review performance at each contract site. *Id.* at ¶ 311. ASG's regional directors participated in these monthly meetings by teleconference. Id According to Plaintiffs, former ASG employees who regularly participated in

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   3

these meetings, including those held during the Class Period, report that the details of a site's financial results were reviewed line item by line item, including facility ledgers and any operational issues. *Id.* Quarterly audit results were discussed at these meetings to ensure that each site remained within its budget. *Id.* During the meetings, Hartman and Catalano frequently referred to individual site reports that contained detailed information and financial ledgers reflecting the costs of hospitalization, supplies and pharmaceuticals at each site. SPP held its weekly meetings at its Franklin headquarters over which either Hartman or Bryson presided. *Id.* at ¶ 314. These meetings also reviewed "pharmaceuticals, contract information, client relations, order entry information ... financial results of operations ... outstanding bids, contract renewals and contracts ... at risk of being ... terminated." *Id.*

Plaintiffs allege that ASG and the individual Defendants manipulated SPP's and PHS's costs during the class period to lead investors to anticipate improved prospects for ASG's future profits. *Id.* at ¶¶ 34–44. As to the specifics of these manipulations, Plaintiffs allege that during the Class Period, the Defendants misled their investors by artificially reducing their subsidiaries' healthcare costs and inflating ASG's margins, earnings and prospects for continued financial success. *Id.* at ¶¶ 1, 111–219, 232–292. Plaintiffs allege that SPP employed "cookie jar" accounting in which earnings accrued until they were needed and expense recognition was delayed until expenses could be absorbed to meet expectations for ASG's performance. *Id.* at ¶¶ 5, 54, 73–78, 220–222, 227–228. According to Plaintiffs, to reduce their subsidiaries' costs, the Defendants also utilized fraudulent accounting and billing practices at SPP that violated SPP's contracts with its customers. In addition, PHS denied inmates access to covered and necessary medical services and expensive medications to reduce its costs in violation of PHS's government contracts. *Id.* at ¶¶ 45–72.

**\*4** After published reports of these practices, ASG had to restate five years of its financial reports. In this restatement, ASG acknowledged that SPP had reduced its costs by failing to provide customers with contractually required discounts, rebates, and return credits. See e.g., ¶¶ 3–98, 104–105, 177–183, 220–231, 236–251. Plaintiffs allege that in ASG's restatement of its financial condition, ASG admitted SPP's accounting manipulations, but buried adverse information in ASG's financial statement's

footnotes. *Id.* ASG also acknowledged that PHS reduced its costs by refusing to deliver higher priced medications to inmates; delaying or denying inmates' transfers for expensive off-site treatment facilities, and deliberately understaffing prison health clinics. *Id.* at ¶¶ 6 and 45–53. With the published reports and restatement of its financial condition, the value of ASG's stock allegedly plunged, giving rise to Plaintiffs' claims that these Defendants' false statements, unlawful scheme and reckless conduct in their financial management of ASG and its subsidiaries caused Plaintiffs' losses.

With this summary, the Court presents Plaintiffs more specific allegations about ASG's financial history, the Defendants' alleged false statements, SPP's accounting practices, PHS's medical services practice, published reports about SPP's and PHS's business practices, Plaintiffs' GAAP claims and the conduct and statements of each Defendant alleged by Plaintiffs for their Section 20(a) claims.

### 2. ASG's Financial History

As relevant here, by 1997, ASG had 54,364 inmates under 32 government contracts. In June 2000, ASG received a three-year contract to provide healthcare for 19,500 inmates in Maryland that increased ASG's annual revenues by an estimated $48 million. *Id.* at ¶ 30. Catalano, ASG's chairman, "told investors that ASG was preparing bids for new contracts that could generate up to $425 million in annual revenues starting in 2001." *Id.* On December 19, 2000, ASG announced a three-year contract of $100 million per year, to provide healthcare services at New York City's Rikers Island prison. *Id.* By the end of 2000, ASG was serving 176,563 prisoners under 130 contracts. *Id.*

After the first quarter [3] of 2001, ASG posted earnings with a 81% increase in revenue, and effectively met its costs estimates. *Id.* at ¶ 32. Yet, ASG's expense ratio increased to 91.8%, compared to 90.1% in 2000. *Id.* ASG cited "lower margins and lower financial risks associated with [SPP's] pharmacy business, acquired in September 2000," and the start-up costs under the Rikers Island contract. Id ASG told investors not to be alarmed, as its projected expense ratio would decrease over the next few quarters to prior level in 1999 of 89.9% and 90.1% in 2000. *Id.*

3    Plaintiffs focus on ASG's quarterly financial reports and statements. Plaintiffs contend that such focus is necessary to understand their theory of the Defendants' liability.

By the second quarter of 2001, ASG's medical expense ratio increased to 99.7% of its revenues and that increase was attributed to ASG's pharmacy costs and PHS's off-site utilization expenses. *Id.* at ¶ 30. Plaintiffs allege ASG lost $3.39 per diluted share for the quarter. *Id.* After the second quarter report, ASG's stock dropped 57.6% in value to $8.04 from $18.94 per share. *Id.* ASG also wrote-off special charges of $22 million, with $13 million in goodwill and $6 million in reserves for future losses. *Id.* ASG announced its loss of seven (7) prison contracts, representing $100 million, that cut its EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization) in half to $4 million for each of the next two quarters. *Id.* Plaintiffs allege that ASG's 2001 second quarter results revealed that increases in expenses could significantly impact quarterly operating results. By September 17, 2001, ASG's costs increased such that ASG was unlikely to meet its projected $4 million EBITDA target for either the third or fourth quarters of 2001. Id On October 25, 2001, ASG's stock price hit an all-time low of $1.53 per share (on a split adjusted basis). *Id.* at ¶ 41. On November 14, 2001, ASG's third quarter results were EBITDA of $2.8 million and expense ratio of 95% of revenues. *Id.*

 **\*5**  By the end of the 2001 fourth quarter, ASG had a $27.8 million loss, with an $18.3 million charge for additional reserves for expected future losses on five prison contracts. *Id.* at ¶ 36. For that quarter, with expenses at 94.6% of revenues, ASG decided to renegotiate or terminate its contracts with cost-plus-fee arrangements, so as to increase its revenue by 88%. *Id.* ASG's EBITDA rose to $3.2 million (from $2.8 million in 2001), but total revenue fell to $134 million from $140 million in each of the two prior quarters. *Id.* Defendant Catalano cited $2 million in unreserved losses from five full-risk contracts. *Id.* at ¶ 45. ASG repeated these results in its Form 10–K filed with the SEC on or about March 28, 2002 that Defendants Catalano and Taylor signed. *Id.* at ¶ 113.

Defendant Catalano assured investors that the ASG would monitor its subsidiaries' costs and ASG would no longer enter into the unprofitable full-risk contracts because ASG's management was "intensely focused on addressing" its costs and had "developed a corrective

course of action focused on a return to predictable financial results." *Id.* at ¶ 34 and 35. ASG announced Defendant Taylor as its new chief financial officer to replace Walker Choppin, ASG's former banker at Bank of America who had held his ASG position for more than a year. *Id.*

In its periodic reports to the SEC, ASG acknowledged that its gross margins were the primary metric to evaluate its business performance, including SPP's performance. *Id.* at ¶ 37. Plaintiffs allege that Arthur I. Henderson of Jefferies & Company, a market analyst cited ASG's medical expense ratio, *i.e.,* healthcare expenses as a percentage of revenue, as the critical factor in ASG's success and warned that "subtle changes in this ratio can have a significant impact on the company's profitability." *Id.*

As to ASG's revenue and cost recognition policy, ASG's March 28, 2002 SEC 10–K Report stated, in pertinent part:

Revenue and Cost Recognition

The Company's contracts with correctional institutions are principally fixed price contracts adjusted for census fluctuations. Revenues earned under contracts with correctional institutions are recognized in the period that services are rendered. **Cash received in advance for future services is recorded as deferred revenue and recognized as income when the service is performed.**

Healthcare expenses include the compensation of physicians, nurses and other healthcare professionals including any related benefits and all other direct costs of providing the managed care. **The cost of healthcare services provided or contracted for are recognized in the period in which they are provided based in part on estimates, including an accrual for unbilled medical services rendered through the balance sheet dates.** The Company estimates this medical claims reserve using an actuarial analysis prepared by an independent actuary taking into account historical claims experience (including the average historical costs and billing lag time for such services) and other actuarial data.

 **\*6** *Id.* at ¶ 113 (emphasis added).

On April 22, 2002, in public statements and its filings with the SEC, ASG reported for its results for the first quarter ending March 31, 2002: healthcare revenues of $137.9

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    5

million, healthcare expenses of $129.3 million, EBITDA of $4.5 million, net income of $2 million and earnings per share of $0.36 per basic and diluted share. *Id.* at ¶ 114. Defendant Catalano allegedly commented, in pertinent part:

> "The initiatives we have implemented, coupled with an emphasis on strong fiscal discipline, are producing results. **Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear."**

*Id.* (emphasis added).

On July 23, 2002, ASG's press release and Form 10–K filed with the SEC for the quarter ending June 30, 2002 revealed healthcare revenues of $138,5 million, healthcare expenses of $129.9 million, EBITDA of $5.1 million, net income of $5.3 million and earnings per share of $0.97 per basic share and $0.95 per diluted share. *Id.* at ¶ 116. Defendant Catalano explained that: **"The Company's focus on improving its contract portfolio is producing solid results.** Our progress accelerated during the second quarter as more contracts came up for renewal." *Id.* (emphasis added). ASG's October 21, 2002 press release described a closed private placement financing of $4.56 million in gross proceeds. *Id.* at ¶ 118.

By June 2003, ASG's stock price was $10 per share, and by September 2003 increased to $13 per share. On September 24, 2003, ASG's stock price closed above $14 per share for the first time in nearly three years. In its Form 10–K for fiscal year 2003, ASG cited $2.1 million or 0.4% in additional expenses of its healthcare revenues. *Id.* at ¶ 203. ASG, however, noted its inability to retain qualified health care provides as a cause for losses of its contracts or its ability to gain contracts. *Id.* at ¶ 203. In 2003, ASG had 800 doctors, 3,050 nurses and 300 independent contractors that included dentists, psychiatrists, psychologists and physicians. *Id.* at ¶ 205.

ASG's 2003 fiscal year report in its Form 10–K reflects ASG's disclosures that any costs could be controlled and that excess insurance coverage had been secured for catastrophic illnesses.

> When preparing bid proposals, the Company estimates the extent of its exposure to cost increases, severe individual cases and catastrophic events and attempts to compensate for its exposure in the pricing of its bids. **The Company's management has experience in evaluating these risks for bidding purposes and maintains an extensive database of historical experience. Nonetheless, increased or unexpected costs against which the Company is not protected could render a contract unprofitable.** In an effort to manage risk of catastrophic illness or injury of inmates under contracts that do not limit the Company's exposure to such risk, the Company maintains stop loss insurance from an unaffiliated insurer covering 100% of its exposure with respect to catastrophic illnesses or injuries for annual amounts in excess of $500,000 per inmate up to an annual per inmate cap of S2.0 million.

**\*7** (Docket Entry No. 70–9, Appendix 4 at p. 9) (emphasis added).

In its Form 10–K for its 2003 fiscal year, ASG stated: "The Company evaluates segment performance based on each segment's gross margin without allocation of corporate selling, general and administrative expenses, interest expense or income tax provision benefit." *Id.* In addition, in its 2003 fiscal year report on Form 10–K, ASG represented that:

> Management establishes reserves for the estimated losses that will be incurred under these insurance policies using internal and external evaluations of the merits of the individual claims, analysis of claim history and the estimated reserves assigned by the Company's third-party administrator.... **The Company is not aware of any material unasserted claims and, based on its past experience, would not anticipate that potential future claims would have a material adverse effect on its consolidated financial position or results of operations.**

Any adjustments resulting from the review are reflected in current earnings.

(Docket Entry No. 60, Amended Complaint at ¶ 211) (emphasis added). ASG repeated these statements in a Form 10–Q Report issued on May 10, 2004, August 9, 2004, November 9, 2004, March 14, 2005, May 10, 2005, and August 9, 2005. *Id.* at ¶ 212.

During a February 24, 2004 telephone conference call with analysts on the results of ASG's fourth quarter of 2003 and its 2003 fiscal year, Defendant Taylor allegedly made the following statements about ASG's gross margins that Plaintiffs allege to be false.

Patrick Swindle—*Avondale Partners–Analyst*

Good morning, gentlemen. The gross margin from continuing operations was about 8.3% during the fourth quarter. The gross margin assuming the guidance for #04 is 6.9%, can you talk a little bit about what drove the gross margins during the fourth quarter, and the implications that has maybe for 2004?

Mike Taylor—*American Service Group, Inc.—CFO*

We gave full-year guidance for 2003 of 6.5% of total gross margin. We ended the year at 6.6% for the full year. So we did slightly better in the fourth quarter than we anticipated. The main drivers there, you know, we did get some benefit from a couple of new contracts that started later in the year, that operated a little better than we anticipated out of the box; but we do anticipate that over their complete term that they will operate at margins as we would have expected in the pricing of those contracts. So we got a little benefit there.

* * *

**[O]ur daily costs run about $1.6, $1.7 million on an average day.** So those are a couple of factors that I would put into that as well, but overall, I mean, we're fairly pleased that we're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year.

*Id.* at ¶¶ 148, 149 (emphasis added).

Plaintiffs allege that these statements are false because ASG's "gross margins were inflated and eventually were restated." *Id.* at ¶ 150. Further, Plaintiffs allege that during this call, Taylor and Catalano concealed the fact that their gross margin results were only achieved through fraudulent cost-cutting schemes implemented at PHS and SPP, including improper cost and revenue reporting at SPP and PHS's intentional disregard of proper medical care and staffing requirements. *Id.*

*8 On July 2, 2004, ASG's press release announced a $6.8 million charge or loss on its contract with Maryland Department of Public Safety and Correctional Services. *Id.* at ¶ 156. ASG also announced its financial projection for 2004 with increased anticipated revenues of $668 million from $658 million and net income to $24 million up from $22.5 million. *Id.* As cited in that release, ASG expected performance improvements in its contract portfolio and its pharmacy division during the second half of that year. In a July 27, 2004 conference call with securities analysts on ASG's 2004 financial results, Defendant Taylor allegedly made the following statements on ASG's gross margins in the second quarter of 2004.

Michael Lamb—Wealth Monitors–Analyst

You referenced the 7 percent gross margin expectation, Mike, for the second half. Can you tell us where that is going to [come] from? I assume you are referencing just for 43 and 4 combined; is that correct?

**Mike Taylor—America Service Group, Inc.—SVP and CFO**

**That is correct. I would anticipate something in the 7.3 to 7.5 range for the Company in the second half of the year. It is primarily coming from repricing of contracts.** This whole process that we have been on for the last 3 years at this point is over time to slowly increase margins of the Company back closer to where they were historically. So we do anticipate we will see that improved performance in the second half of this year. And that is really what has been contemplated all along. Maybe a little better than we thought initially as we started the year are our expectations for the second half at this point.

*Id.* at ¶ 157 (emphasis added).

On October 25, 2004, ASG issued a press release on its financial results for the third quarter ending for September 30, 2004. In Plaintiffs' view, Catalano described ASG's cost increases as a "unique" event and stated that ASG's future looked bright:

> We are disappointed in the additional reserve necessary to cover losses under our Maryland contract through its expiration on June 30, 2005. In the meantime, the Company will faithfully adhere to the terms of our contract and continue our commitment to provide quality healthcare to our patients. **We remain confident in the long-term prospects of the Company. The rest of our contract portfolio continues to produce expected financial results, cash balances are increasing and we are debt free as of the end of the quarter.** We are further encouraged by our selection by the State of Vermont as the provider to negotiate a contract for healthcare services with the Agency of Human Services, Department of Collections.

*Id.* at ¶ 159 (emphasis added). In addition, ASG increased its "guidance" for 2004:

2004 Guidance

The Company is maintaining most aspects of its previous guidance for 2004 full-year results.... The Company is maintaining its guidance for pre-tax income from continuing and discontinued operations of approximately $24.0 million in 2004, excluding the $5.2 million charge of the settlement of the Florida legal matter in the first quarter and the $12.8 million increase in the Company's loss contract reserve in the second and third quarters. Depreciation, amortization and interest expense is expected to be approximately $6.0 million in 2004, consistent with previous guidance.... [T]he Company is increasing its guidance for Total revenues from continuing and discontinued operations to $685.0 million for 2004, an increase of $17.0 million from previous guidance....

**\*9** *Id.* at ¶ 160.

In an October 26, 2004 telephone conference call with securities analysts, the Defendant Catalano allegedly made the following statements about SPP:

Tyson Bauer—Wealth Monitors—Analyst

Okay. And one quick follow-up. On the pharmacy side, on previous calls we've talked about the opportunities of winning pharmacy business or increasing that part of the business, even in situations where you are not the provider, whether the state provides the service or even some of your competitors, in which you could actually, because of your efficiencies in the pharmacy, pick up that business. We have not heard a whole lot on that end as of recent times, Where does the pharmacy stand in operating as its own independent entity and growing going forward?

Michael Catalano—American Service Group—Chairman, President and CEO

Well, most recently, SPP was successful in being awarded the Kentucky statewide pharmacy contract for the DOC system up there. We have a current similar bid pending with the state of Oklahoma in which we expect a decision relatively soon. So those opportunities do continue. They are selective opportunities in terms of bidding with or against competitors. We've looked at that on a couple of occasions. I think there's, understandably, some degree, or second look, or reticence on the part of competitors to bring SPP into a contract situation, but that's certainly happened before. **And quite frankly, SPP has been a significant part of generating the new business revenue growth on a year-to-date basis,** So we continue to see good opportunities there going forward, particularly with the emphasis just nationally on the continued escalation of pharmacy costs.

*Id.* at 161 (emphasis added).

In a February 7, 2005 press release, after ASG's fourth quarter financial results, ASG's shares were $0.07 higher than the market estimate of $0.36 per share, and ASG announced guidance of $170.4 million and $690,9 million respectively. *Id.* at ¶ 164. ASG further explained that it had "significantly reduced the volatility of its contract portfolio over the last several years" and provided an increased 2004 projected on earnings per share from $1.42 to $1.53 per share. *Id.* ASG described its accomplishment of its costs control:

The Company has significantly reduced the volatility of its contract portfolio over the last several years by a process of shifting its preferred contract structure from a full-risk model to a shared-risk model Shared-risk contracting model provide aggregate limits, or "caps," to the Company's exposure to hospitalization and other off-site medical expenses and benefit taxpayers by eliminating any risk premium or margin that would otherwise be associated with the probability of such costs exceeding mutually agreed upon thresholds and allowing taxpayers to share in any savings if such costs are less than those agreed upon."

This ongoing process of adjusting the Company's contract portfolio has resulted in 88% of the Company's healthcare contracts and all pharmacy contracts as of December 31, 2004, representing 74% of Total Revenues in the fourth quarter, **having structures that limit the Company's exposure to increases in hospitalization and other off-site medical expenses."**

**\*10** *Id.* at ¶ 164 (emphasis added).

In its first initial guidance for its 2005 fiscal year, ASG predicted earnings that Plaintiffs allege are significantly worse than any other time during the Class Period, including EDITDA of $10–$11 million with total revenues of $660 million. *Id.* at 92. This resulted in earnings of $0.39 per share. In 2004, ASG's EBITDA was $29.3 million with revenues of $690 million and earning per share of $0.82. On April 26, 2005, the ASG issued a press release announcing its financial results for the first quarter of 2005, the period ending March 31, 2005. *Id.* at ¶ 167. In its release, Defendant Catalano asserted that "[t]he Company produced solid financial results in the first quarter that were consistent with our expectations." *Id.*

After a series of published reports in the *New York Times* in late February and early March, 2005 about PHS's business practices, discussed *infra*, ASG's stock price fell more that 16%. *Id.* at ¶ 303. On April 27, 2005, Defendant Taylor held a conference call with securities analysts to discuss the details of the financial results for ASG's fourth quarter in 2005. *Id.* at ¶ 168. During this conference, the securities analysts asked about the ASG's ability to maintain its gross margins and expenses and Taylor responded as follows:

Anton Hie—Jefferies & Co.—Analyst

Okay. How about the current quarter month-end here, do we think we will see the margins holding steady here, now that some of those utilization issues that caused the fourth-quarter spike are behind us?

Mike Taylor–America Service Group–CFO

Well, we are always subject to that volatility, and that is kind of the point on those contracts. **Certainly at this point, Anton, things are tracking along with our expectations. That is why we've maintained the guidance that we have for the full year. So early into the second quarter, we don't see anything that changes that impression.**

*Id.* (emphasis added).

In a July 27,2005, telephone conference call with securities analysts on ASG's financial results in the second quarter of 2005, specifically ASG's gross margins and EBITDA, Taylor allegedly responded to the following question in Catalano's presence:

Anton Hie—Jefferies & Co.—Analyst

A couple questions. Your EBITDA margin in the first half was around 4.5%; and based on the midpoint of your guidance, it looks like you are shooting for 5% for the full year, implying a significant improvement in the back half. I wonder if you could talk a little bit about, A, where you might see those improvements; whether that is being confirmed so far in the month of July; and how sustainable you think those levels might be going forward in light of the current competitive environment.

**Mike Taylor—America Service Group—CFO**

**Anton, we do expect the second half to see an increase in that EBITDA margin, as you pointed out, in our guidance. The 4.5% or so for the first half certainly was a solid start for the year. All along we had expected to see an improvement in that in the second half. That improvement primarily is going to be driven by the gross margin percentage improving in the second half. Once again that was in line with our initial expectations for what the year would hold. So it is really going to be a gross margin improvement in our expectations that gets us to that higher level of EBITDA margin. In fact, we will probably see the SG & A expense percentage creep up somewhat in the second half, because of the reduced**

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

revenues the Company has from making cuts in that area. But they probably won't offset the revenue drop. So I think the 2.5% that we saw in the first half there is going to go up for the second half. So it is a gross margin driven equation.

\* \* \*

**\*11** I think the last part of your question is whether that is sustainable or not. We have said over time that the Company's performance would certainly be more evidenced on the gross margin line, post the old Maryland contract, no matter which direction that rebid went. I think you are starting to see that in the continuing gross margin in the first half. And certainly we expect that to be enhanced even more in the second half.

*Id.* at ¶ 171 (emphasis added).

In the second half of 2005, ASG's third quarter financial statements revealed its costs had risen to 99.7%, the highest level since 2001. *Id.* at ¶ 89. SPP's net revenue dropped 18%. *Id.* at ¶ 90. ASG missed its guidance on net income by 83.5%; EBITDA fell by 42.5% and earnings per share by 74.5%. *Id.* at 91. ASG cited "disappointing financial performance" in the second half of its 2005 fiscal year, with continuing costs from SPP accounting compliance costs and PHS's costs under government contracts for failing to provide outpatient care and staffing at inpatient clinics. *Id.* at ¶ 93. ASG experienced an increase in medical malpractice claims against PHS. *Id.* at ¶ 94. After *The New York Times*' articles, ASG increased its reserves for malpractice claims by $6.1 million. *Id.* ASG reported $4.4 million in net income for the 2005 fiscal year. *Id.*

In a March 16, 2006 telephone conference with analysts and investors, Defendants Catalano and Taylor cited continuing losses and lower gross margins as SPP, in the wake of SPP's accounting scandal and PHS's practices that Taylor described as "a major distraction to SPP's business," as well as lost business. *Id.* By the end of ASG's 2005 fiscal year, the number of inmates under ASG's contracts fell to 130,000 from 200,000 and the facilities under contract fell to 260 from 300. *Id.* at ¶ 103. ASG also had increased costs for off-site expenses and staffing of healthcare in Wyoming, Alabama and Vermont. *Id.* at ¶ 94.

Upon news reports of ASG's internal investigation of SPP's and PHS's practices, ASG's stock dropped 29%. *Id.* at ¶¶ 304–305. On March 16, 2006, ASG revealed the results of that investigation that is discussed *infra. Id.* at ¶ 305. Later, ASG had to restate five years of its financial statements. In that restatement, ASG admitted that SPP's practices resulted in material weaknesses to ASG's previously issued financial statements. *Id.* at ¶ 179. ASG's internal investigation revealed that ASG had overstated its income by at least $2.1 million and reduced its 2001 earnings by $347,000 with increased tax liability of $355,000.[4] SPP's customers were overcharged by at least $3.6 million. *Id.* ASG also cited its customers that were undercharged $5.9 million during the same time period, but deemed those undercharges uncollectible. *Id.* ASG reduced guidance for earnings for the end of the Class Period. *Id.* at ¶¶ 88–98, 224. SPP lost contracts to provide pharmaceuticals to inmates in Kentucky, Fulton County, Georgia, and Caddo County, Louisiana. *Id.* at ¶ 110.

[4]     Docket Entry No. 69, Defendants' Memorandum at p. 11 citing the Defendants' restatement, but the Court cannot locate this statement at the cited reference.

**\*12** In its 2005 Form 10–K, ASG admitted that "key members of SPP's senior management" had improperly established and used accrual and reserve accounts at SPP to manage earnings to meet expectations for performance. *Id.* at ¶ 75. Plaintiffs refer to these practices as "cookie jar accounting." Plaintiffs allege that ASG's reference about the "key members" of management in its restatement was to Defendants Hartman and Bryson.

On May 10, 2006, ASG's released its first quarter 2006 results showing medical expenses (94.5% of revenues), SG & A expenses (3.5%), gross margin (5.5%) and a net loss of $989,000. *Id.* at ¶ 95. In its 2005 Form 10–K and its 2005 Report on Form 10–Q and in its annual report filed with ASG's April 28, 2006 Proxy Statement, ASG cited its Audit Committee's 27 meetings during an internal investigation to receive and discuss reports and updates on the investigation and to provide direction and guidance for SPP and PHS. ASG expended $7.7 million for its internal investigation into these matters. *Id.* at ¶ 74. ASG's total healthcare expenses for the fourth quarter of 2005 were $142.1 million, or 94.9% of total revenues, as compared with $158.2 million, or 92.9% of total revenues, in the prior year quarter. ASG's total healthcare expenses for the year ended December 31,

2005 were $612.8 million, or 94.4% of total revenues, as compared with $644.0 million, or 93.3% of total revenues, in the prior year period. To assist in the understanding of ASG's restatement, the Court now reviews SPP's and PHS's alleged business practices.

### 3. SPP's Accounting Practices

As to the causes of ASG's financial losses, SPP's contracts defined the correct reference price to calculate the amounts charged for prescription drugs. Under these contracts, state and federal prisons are entitled to a *pro rata* share of a manufacturer's or distributor's price discounts and rebates provided to SPP. *Id.* at ¶¶ 185 and 222. In addition, prisons can return unused drugs for credits against their accounts with SPP. *Id.* SPP's computerized system ("CIPCS"), however, was designed to track only one purchase price for any drug. *Id.* at ¶¶ 59–63, 185–191. As a result, SPP could not track different prices from different vendors. Id According to a former SPP manager, who allegedly reported directly to SPP's chief executive officers, Hartman and Bryson deliberately took advantage of CIPCS's shortcomings to manipulate the timing of price changes by inputting prices increases into the system before sending customer invoices and by delaying entry of falling prices until after invoices with the former higher prices had been issued. *Id.* at ¶¶ 55, 60.

Plaintiffs allege that CIPCS was widely known as incapable of tracking multiple prices for drugs purchased from different vendors so as to assure incorrect billings of its customers in accordance with the terms of their contracts. *Id.* at ¶¶ 159–61, 185–191. The obviousness of CIPCS's defective design is allegedly reflected in the single cost for each drug despite SPP's purchase of drugs from multiple vendors at constantly changing prices. *Id.* at ¶ 159, 185. Plaintiffs assert that CIPCS's obviousness in failing to credit SPP's customers for returned drugs is apparent because the CIPCS showed that SPP was selling more drugs at that price than it had purchased, clearly reflecting that drugs were being sold more than once without the price being lowered. *Id.* at ¶¶ 59–61, 185–191. ASG's replacement system, SPIN, was also unable to provide accurate pricing information, track inventory, verify shipments, or assure proper customer billing. *Id.* at ¶¶ 187–191. Yet, the Defendants allegedly failed to alert investors to SPIN's problems and continued to certify falsely the adequacy of ASG's control system. *Id.* ¶ 181.

**\*13** A former SPP fulfillment manager allegedly recounted how SPP established an aggressive budget to earn $100,000 a month from reselling drugs that had been returned at a higher wholesale price above SPP's purchase price of those drugs, allegedly providing a further disincentive to assure customers receive proper credits. *Id.* at ¶¶ 55, 61. A former SPP executive allegedly states that customers were rarely credited for returned drugs, because to do so made it more difficult to meet the $100,000 revenue target. *Id.* at ¶ 55.

SPP's "Procedural Manual" allegedly stated that returns would not be credited for drugs that were returned in a blister pack that had been partially used, even though SPP procedures also called for the remaining drugs to be manually removed from the blister pack and resold to other customers. *Id.* at ¶ 55. [5] Plaintiffs allege SPP's policy of failing to credit customers for returned drugs was well known to Hartman and Bryson, and also to Catalano and Taylor. *Id.* A former SPP manager stated that during the due diligence preceding the SPP acquisition, Defendants Hartman, Bryson, Catalano and Taylor were aware of these practices and SPP's procedure manual. Credits for returned drugs were the exception, not the rule at SPP, and Hartman or Bryson personally approved credits, but only for customers who complained regularly. *Id.*

[5]   As a security measure, drugs provided to inmates were typically shipped in blister packs containing a 30–day supply of drugs, which SPP internally referred to as "bingo cards." When an inmate was released or transferred to another facility before the entire supply in their blister pack had been used, the partially used blister pack would be returned to SPP.

At a dinner with other executives in Boston in the fall of 2005, defendant Hartman and Northeast Region Group Vice President Geoff Persley openly discussed the reselling of returned drugs, which they referred to as "recycling," in a manner that implied to at least one of their dining companions that the practice was illegitimate. *Id.* at ¶ 62. Excess profits were generated through such sales, which typically involved frequently prescribed drugs, such as insulin, or expensive medications, such as antipsychotics and drugs used to treat HIV. *Id.*

Two former SPP pharmacists and other ex-employees, including a former vice president reported that SPP's billings were "always wrong" and that SPP frequently

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   11

overcharged PHS, by billing for pharmaceuticals that were never ordered, or double-billing for prescriptions that were filled, or failing to credit PHS for returns. *Id.* at ¶ 64. According to the former vice-president, SPP's billing was "closely watch[ed]" by the administrators. *Id.* In an October 24, 2005 article in the *Nashville Business Journal,* Catalano referred to Randy Beaman, SPP's controller and SPP's "corporate liaison to supplier and distributor" as raising the issues about SPP's practices during a "routine contact with the internal audit program." *Id.* at ¶ 70.

Plaintiffs allege that at Bryson's direction, SPP also made illegal drug purchases. "[S]everal former SPP employees revealed that SPP was also illegally purchasing drugs from Canada in order to save money, and then overcharging customers for the costs of those drugs." *Id.* at ¶ 65. Plaintiffs allege:

> **\*14** Two high-level pharmacists working out of SPP's Franklin headquarters confided in co-workers that SPP was secretly importing drugs from Canada through a clandestine facility located in Maryland. Another pharmacist employed by SPP learned of the practices prior to 2004, and was told by the high-level pharmacists that the illegal importation was ongoing through at least the beginning of 2006. **The high-level pharmacists told this person that SPP would purchase the drugs from Canada at a reduced cost, then charge its customers the full U.S. average wholesale price for the drugs, which would often be triple the price SPP paid or more. The two high-level pharmacists confided in at least one other employee at the facility where they worked. The second employee was told in 2005 that the drugs were being illegally imported at Bryson's specific direction. The pharmacists who followed Bryson's directions described their fear of their liability for this misconduct, including the potential loss of their licenses.** The two pharmacists involved in the illegal practices have since left ASG,

according to one of the employees who had spoken with them about these practices.

*Id.* at ¶ 65 (emphasis added).

These accounting and other practices at SPP allegedly continued for five years. *Id.* at ¶ 67. Thus, Plaintiffs allege that during the class period, ASG's, SPP's and the individual Defendants' statements and reports to investors that SPP's expenses were under control, were false and/or misleading. Plaintiffs allege that the Defendants deliberately ignored or concealed SPP's improper accounting and other practices that had temporarily reduced ASG's costs by violating SPP's contracts with its customers. *Id.* at ¶¶ 42–82, 308–316.

In its restatement, ASG conceded ASG's controls over SPP "were not designed or operating effectively to reduce to remote the likelihood that material errors in healthcare revenues, health-care expenses, accounts receivable, inventories and accrued expenses would be prevented or detected in a timely manner" nor would ASG's contracts "reasonably assure the accurate and timely capture of SPP customer contract billing information and billing of SPP customers in accordance with contract terms." ¶¶ 80 and 179. ASG specifically cited that these missing controls "resulted in restatements of previously issued financial statements" for the past five years. *Id.* at ¶ 179. Thus, Plaintiffs allege that ASG's earlier financial statements were false or that the Defendants' were reckless in reporting such false information about SPP.

### 4. PHS's Medical Practices

As to PHS's role in these events, Plaintiffs allege that to reduce PHS's expenses, the Defendants focused on eliminating PHS's high costs of off-site hospitalization and expensive drug regimens. *Id.* at ¶¶ 45–53. Plaintiffs assert that former PHS employees reported that PHS management routinely cut budgets for utilization of hospitals off-site to reduce PHS's costs and to meet budgeted targets. *Id.* at ¶ 312. With PHS's reduction of these expenses, ASG assured investors that ASG's medical expense margins, i.e., the ratio of healthcare expenses to revenues would be notably below the 99.7% level that ASG experienced in the second quarter of 2001. *Id.*

Case 3:16-cv-02267   Document 98-1   Filed 07/16/18   Page 64 of 149 PageID #: 2240

at ¶¶ 38–40. After a series of *New York Times* articles about PHS, ASG's medical malpractice expenses rose "much greater than reflected in [ASG's] SEC filings" and such increases are alleged to be the direct result of PHS's improper cost-cutting practices, specifically denying necessary healthcare and medications to inmates to reduce artificially expenses under PHS's government contracts. *Id.* at ¶¶ 218–219.

 **\*15** ASG also allegedly directed the "floating," of nurses, quick settlement of malpractice claims, and under staffing at institutions that resulted in contract penalties. *Id.* As specific examples of those PHS practices, Plaintiffs allege the following:

> In September 2005, PHS paid $350,000 to settle a claim arising from the death of Ruth Hubbs, an inmate at the Leon County (Fla.) Jail from an overdose of Doxepin, an antidepressant. According to a lawsuit filed by Hubbs' Estate, the antidepressant had been administered over her objections pursuant to a PHS policy of rarely using a safer but more expensive medication, and despite signs that the inmate was chronically over medicated with Doxepin in the two weeks before her death. According to a former high ranking official with the Florida Department of Corrections, SPP typically used the cheapest drugs even if there was a better alternative that would ensure less hospitalization of inmates.

> In 2004, following a death of a newborn infant delivered by an inmate at the Hillsborough County (Fla.) Jail, PHS conducted an internal audit of medical records at the facility. A former employee who participated in the audit said it was initiated because senior managers "knew" that PHS had been negligent for failing to attend to the infant after birth, including as the result of investigative reports which were sent to defendant Hartman and other senior official No medical records audit had previously been conducted at the jail, despite contractual requirements to do so, because PHS had not provided auditing staff to the prison.

> In April 2005, a court-appointed monitor reported that **PHS' HIV treatment records at Alabama's Limestone Correctional Facility "reflect thousands of doses of medications ordered by physicians that have either not been given, or have been given without being documented. Interviews with patients, chart reviews and feedback from physicians support the concern that patients are not consistently given the medications that have been ordered for them for serious life-threatening conditions."** A follow-up report submitted in July 2005 found that PHS' record keeping had improved, but **there were still numerous concerns with HIV patients not receiving proper medication or medical treatment. In addition, the report found that the prison had only one doctor and one nurse to serve more than 2,000 inmates: "By all measures, this staffing is inadequate to meet the medical needs of this complex patient population."**

Similar complaints about understaffing of jail facilities were repeatedly raised in Bristol County, Massachusetts. **During 2005, the prison was understaffed by as many as 10 nurses below contractual requirements. Catalano was repeatedly told about the staffing shortages by jail representatives, including Peter Berthiaume and Henry Groby. In addition, at a meeting in the health service administrator's office at the jail in 2H05, a PHS vice president went over the understaffing problems with Catalano in detail. The vice president said: PHS' refusal to comply with the contractual staffing requirements stemmed from its refusal to pay nurses according to local rates for their services. The vice president learned from colleagues that this was a recurring issue throughout the company and similar problems had cropped up in other areas of the country, including Alabama and Wyoming.**

 **\*16 The New York Times' expose also revealed another improper practice called "floating" which helped PHS avoid governmental fines imposed for understaffing prisons and inadequate care. The practice consisted of sending doctors or nurses with a backlog of patients at one prison to another where there were fewer inmates to treat, "simply to avoid fines."** Further, several former and current PHS employees, including three senior clinicians, reported that when there were too few doctors to "float," PHS employees would simply falsify prison records, signing in at one prison without seeing any patients as one former clinician stated, "[t]he practice is clearly fraudulent."

At the end of the Class Period, **ASG revealed that one of its clients had imposed $1.8 million in contractual penalties for failing to provide proper staffing levels at its facilities.** ASG withheld the identity of the client, but admitted that at least $600,000 of the penalties were valid charges under the contract.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 13

*Id.* at ¶ 51. The penalty provisions in its contracts were to incentivize PHS to maintain proper staffing.

To obscure these practices, ASG and PHS allegedly fired numerous PHS administrators and officers who reported and complained of mismanagement or prison understaffing, including an employee who reported directly to Catalano. *Id.* at ¶ 52.

### 5. Published Reports about ASG, SPP and PHS

Plaintiffs allege that as early as January 2003, PHS's senior management were allegedly told of PHS's deliberate practice of delaying or denying prescription medications and medical treatment to inmates to increase PHS's profits and gross margins. *Id.* at ¶ 140. In 2003, the Defendant Catalano was so informed. *Id.* A PHS medical director in Idaho filed a legal action against PHS alleging a corporate practice of providing insufficient health care. *Id.* In 2005, ASG fired numerous employees who complained about such practices. *Id.* at ¶¶ 52, 53.

The significant event is *The New York Times* publication of a series of articles from February 27, 2005 through March 1, 2005 about PHS's business practices due to deaths of two New York inmates under PHS's care. *Id.* at ¶ 45. ASG initially denied the first report. *Id.* at ¶ 303, *The New York Times'* disclosed PHS's practice of cutting medical services to cut costs. *Id.*

> In the two deaths, and eight others across upstate New York, state investigators say they kept discovering the same failings: medical staffs trimmed to the bone, doctors under qualified or out of reach, nurses doing tasks beyond their training, prescription drugs withheld, patient records unread and employee misconduct unpunished.

*Id.* at ¶ 46. A state investigation of those deaths found evidence that PHS was repeatedly cutting services to cut costs. *Id.*

The *New York Times* articles reported interviews of correctional officials in other states that reported inmates'

deaths and other injuries at PHS managed facilities that were attributed to PHS's decision to lower costs so as to maximize profits. In summary, these articles reported:

**\*17** • In late 2000, government investigators looking into a string of inmate deaths in upstate New York noticed a pattern of inadequate healthcare under PHS' direction, including, "low-level employees [who] were doing work normally done by better-credentialed people" and nurses without proper qualifications or working on suspended licenses, "making medical decisions and pronouncing patients dead." **"Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the New York State Commission of Correction's director of operations.**

• **In 2001 in Broward County, Florida, three state court judges ordered PHS to stop withholding expensive psychiatric drugs from inmates after they witnessed a parade of inmates showing up in court incoherent. "My impression was that it was money," Judge Susan Lebow told The New York Times. "The doctors were under corporate direction to not continue the medications."**

• **Judge Lebow's concerns were eerily similar to those that had been raised in 2000 by five juvenile court judges in New York who had repeatedly taken PHS to task for failure to provide juvenile inmates with proper medication.** Brooklyn Family Court Judge Philip C. Segal held the company in contempt for failing to give HIV medication to a teenage inmate. Bronx Judge Harold J. Lynch ordered a teenage girl to be taken out of PHS' care when she tried to commit suicide after her psychiatric medication was inexplicably discontinued. **After another 14–year old girl suffering from bipolar disorder whose medication had been similarly discontinued appeared in Judge Paula J. Hepner's courtroom, the jurist told city lawyers that the incident "is not just a single case. It's many cases."**

• And following one inmate's death **in 2001, the New York State Commissioner of Corrections denounced PHS as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."**

*Id.* at ¶ 47 (emphasis added). In 2005, a Maryland grand jury allegedly found that PHS's management pressured PHS's staff to cut costs that caused PHS to restrict inmates

medications, off-site hospitalization, or laboratory tests. *Id.* at ¶ 50.

Plaintiffs allege that PHS's failures to provide necessary medications or treatment are attributable to ASG's corporate policies and practices implemented by the Defendants to reduce PHS's losses and thereby increase ASG's profits. *Id.* at ¶ 53. Plaintiffs alleged ASG failed to disclose to investors PHS's deliberate decisions to deny necessary medical care. ASG actually told investors that ASG was unaware of any conditions that would cause material cost increases under their contracts. *Id.* at ¶ 22. Plaintiffs allege PHS's and ASG's management, specifically Catalano, were aware of these practices, as were PHS's officers and employees. *Id.* at ¶¶ 52, 53 and 219. Plaintiffs allege that a former PHS vice president specifically warned the Defendant Catalano about problems with inadequate staffing and inaccurate billing. *Id.* at ¶ 52.

### 6. ASG's Internal Investigation

**\*18** On October 24, 2005, ASG announced the formation of an Audit Committee aided by outside counsel and independent accountants to conduct an internal investigation into improper accounting by SPP. *Id.* at ¶ 67. This investigation included SPP's failures to credit customers for returned products or to credit required discounts and rebates so as to manage SPP's earnings. *Id.* The SEC was notified and commenced its investigation, as did the United States Attorney for the Middle District of Tennessee. *Id.* As stated earlier, ASG's Audit Committee met 27 times and its investigation costs totaled $7.7 million.

In its restatement, and ASG's Form 10–K Report for fiscal year 2005, ASG admitted SPP's practices and cited ASG's faulty and nonexistent internal controls at SPP, stating, in pertinent part:

- "SPP did not charge its customers (including PHS) in accordance with applicable contracts ... SPP charged customers more than SPP's purchase invoice cost or the applicable third party reference price ... SPP failed to properly credit certain customers with discounts, rebates or buy-in savings, and, in certain instances, failed to provide customers

with contractually required credit for the return of pharmaceutical products."

- "The Audit Committee's investigation also found that key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to budgeted results."

- "As a result of the findings made during the investigation, the Audit Committee recommended significant strengthening to the Company's system of internal controls and compliance function. **In addition, management determined that material weaknesses existed in the Company's internal control structure," including a lack of required controls over SPP's revenues, expenses, accounts receivable, inventories and accrued expenses.**

*Id.* at ¶ 76 (emphasis added). This 10–K report also described "certain other issues, relating to accruals for rebates and inventory valuation, which resulted in changes to [ASG's] previously reported financial results." *Id.* at ¶ 77. SPP's management was described as failing to follow corporate expenditure and disbursement policies and "a number of issues" on the faulty implementation of a new computer system at SPP in June 2005. *Id.* at ¶ 74.

Plaintiffs allege that in its restatement, ASG admitted its lack of internal controls: the lack of adequate "internal control" procedures necessary to reasonably detect material errors in revenues, expenses, accounts receivable, inventory, and accrued expenses, or to assure that SPP's customers were being charged in compliance with the terms of their contracts. Among the internal controls that were lacking during the Class Period were procedures necessary to ensure that contractual pricing terms were allowed when customers were billed, returns were properly credited to customer accounts, and **ASG[ ]'s finance department reviewed SPP's monthly accounting reconciliations to prevent improper use of accruals and reserves and other accounting gimmicks used to manage or inflate reported results. *See* ASG[ ]'s FY05 Report on Form 10–K, Item 9A. For example, as recounted by numerous former employees of SPP, ASG[ ] and its management knew that the Company had recurrent problems with maintaining accuracy in financial reporting due to its use of computer systems that were unable to properly manage sales and**

expense dates. CIPCS, SPP's system in place at the start of the Class Period, or earlier, repeatedly caused lost or delayed prescription orders, and was unable to track and apply contract-specific pricing terms. CIPCS' replacement, called SPIN, was plagued with similar problems from the time it was improperly launched in June 2005. *See infra* § VII.C.

**\*19** In its FY05 Report on Form 10–K ... ASG[ ] admitted that the Company's internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG[ ]'s consolidated financial statements] would be prevented or detected in a timely manner." In admitting that these internal controls did not exist, and that the controls that were in place during the Class Period were not properly designed or operating correctly, ASG[ ] tacitly acknowledged that the statements it had made during the Class Period about its purportedly effective system of internal controls, and the Sarbanes–Oxley certifications Catalano and Wright signed each quarter attesting to the adequacy of those controls, were false.

This admission, together with the nature and extent of the accounting fraud, and the fact that it continued, purportedly undetected, for *five years,* aptly demonstrates that ASG[ ], Catalano and Wright were all reckless in claiming, and certifying, that ASG[ ] had effectively designed and operated internal controls during the Class Period. Either Catalano or Wright knew of the internal control problems during the Class Period, based on the repeated inspections they made of the control procedures at ASG[ ] and its subsidiaries, or they were deliberately reckless in signing those certifications by failing to make a reasonable inspection to assure that the internal controls were both adequately designed and properly operating, as claimed in the certifications.

*Id.* at ¶¶ 79, 80 at 81 (emphasis added).

Plaintiffs allege that ASG issued "restated annual financial statements for FY03 and FY04, and "restated selected financial data" for FY01 and FY02 in its FY05 Report on its Form 10–K. ASG cited the cumulative impact of its practices as reducing ASG's income by $355,000. *Id.* at ¶ 83. According to Plaintiffs, ASG buried an admission in its annual report for fiscal year 2005 that ASG's earlier quarterly and annual reports filed with the SEC during the Class Period were misleading:

The Company did not amend its previously filed Annual Reports on Forms 10–K or Quarterly Reports on Forms 10–Q for the restatement. **Accordingly, the financial statements and other information contained in such reports should no longer be relied upon.**

*Id.*

Plaintiffs alleged that the Defendants refused to amend ASG's prior reports that would reveal the full extent of ASG's quarterly manipulations and disclosed only the "cumulative" impact of these illegal practices to obscure the extent of ASG's false and misleading statements about its financial condition. *Id.* at ¶ 84. Plaintiffs allege that a quarter-to-quarter analysis would have revealed ASG's holding back of earnings in improper reserves and accrual accounts until its results are better than forecasted, and ASG's use of those reserves to supplement earnings in quarters where results are worse than forecast. In a word, Plaintiffs allege ASG under-reported expenses in "bad" quarters when they were incurred and waited instead for a "good" quarter in which they could be reported without missing financial targets. *Id.* at ¶ 85.

**\*20** Plaintiffs also allege that ASG included adjustments previously made to unreported results in the third quarter of 2005. The effect was to reduce the reported cumulative impact of its practices in its prior reports:

The Audit Committee's investigation also found that key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to its budgeted results. The aggregate effect of the adjustments necessitated by the Audit Committee's findings related to this issue has been determined by the Company to be an increase in previously reported pre-tax income of approximately $355,000, in the aggregate, since January 1, 2001, although it should be noted that different periods are affected by different amounts and that certain of the adjustments necessitated by the Audit Committee's findings related to the third quarter of 2005, which has not been previously reported. The employees who the Company determined, based on the investigation, were

responsible for these actions **were terminated or are no longer employed by the Company** or SPP.

*Id.* at ¶ 87 (emphasis added).

According to Plaintiffs, ASG cited the Treadway Commission's Committee of Sponsoring Organizations ("COSO") standards for its internal controls. COSO requires direct involvement by management in establishing controls and continual monitoring and analysis of controls. *Id.* at ¶¶ 174 and 286. ASG's 2005 Report on Form 10–K, recognized that "[a] material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." *Id.* at ¶ 286. In addition, ASG admitted that its internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG's consolidated financial statements] would be prevented or detected in a timely manner." *Id.* at ¶ 80. Plaintiffs also allege manipulations of SPP's accounting and that ASG's admissions were relegated to footnotes in ASG's restatement of its financial statements. *Id.* at ¶ 3–98, 104–105, 177–183, 220–231, 236–251.

Plaintiffs cite 58 months of ASG's and SPP's unchecked errors as evidence that Defendants Catalano and Taylor were at least reckless in signing certifications about ASG's internal controls for reporting its finances. Plaintiffs also allege that ASG's refusal to amend its prior reports avoided revelation of the full extent of its quarterly manipulations, as ASG elected to disclose only the alleged "cumulative" impact over this five-year period so as to hide ASG's manipulation of improper reserves, accruals and customer charges to meet its quarterly performance standards. *Id.* at ¶¶ 84, 85.

On December 7, 2005, ASG fired Defendant Bryson. *Id.* at ¶ 71. On December 9, 2005, ASG fired Defendant Hartman. *Id.* "Other key SPP employees also resigned or were fired during or after the investigation, including Clinical Pharmacy Vice President Peter Mikhail, who left in October 2005 and Vice President of Client Services Joe Facchinei, who left in March 2006." *Id.* Two members of the Audit Committee, Richard M. Mastaler (a director since 1999) and Carol R. Goldsbery, resigned. *Id.* at ¶ 72. Mastaler contended that Catalano should be fired. *Id.*

### 7. GAAP Violations

**\*21** Plaintiffs next allege that the Defendants repeatedly violated GAAP standards in reporting ASG's financial condition despite that ASG's filings and financial statements that represented their compliance with GAAP standards. *Id.* at ¶¶ 232–266. Plaintiffs set forth a series of financial statements and cite GAAP rules and bulletins to reflect their contentions that ASG's restatement of its finances for 2000, 2001, 2003, 2004 and 2005 violated GAAP standards. *Id.* at ¶ 234 through 237, 241, 243, and ¶¶ 248 and 292. Plaintiffs add that after the restatement, ASG failed to amend its Form 10–K reports that contained the same information that needed to be revised in other ASG documents. *Id.* at ¶ 243.

ASG's report on its 2005 fiscal year 10–K reflects that ASG reclassified revenues as "discontinued operations." *Id.* at ¶¶ 246–247. Based upon GAAP standards, Plaintiffs allege that these "reclassifications" are adjustments with tax consequences. *Id.* at ¶ 246. Plaintiffs also allege ASG overstated its income for continuing operations by $18 million and understated its income from discontinued operations by $14 million. *Id.* at ¶ 248.

### 8. Individual Defendants

The individual Defendants include current or former high-level executives of ASG and or SPP or PHS who during the Class Period, managed ASG, SPP and/or PHS. *Id.* at ¶ 329. With their offices and responsibilities, each individual Defendant is alleged to have participated or was privy to the creation and development of SPP's and PHS's business practices as well as to the reporting of ASG's, SPP's and PHS's internal budgets, plans, projections and/or reports. The individual defendants Catalano and Taylor allegedly had significant personal interaction with Hartman and Bryson about SPP's and PHS's practices as well as personal knowledge about ASG's statements to the investing public about ASG's financial condition. Each individual defendants allegedly had access to the adverse undisclosed information about ASG's actual financial condition and performance and either knew or recklessly disregarded these practices' adverse effects in their representations about ASG's financial condition. *Id.* at ¶¶ 332 and 333. Plaintiffs allege, in sum:

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    17

All defendants participated in making the statements complained of herein regarding ASG's financial results. ASG issued the statements. SPP provided the information regarding its own results. Defendants Hartman and Bryson were responsible for overseeing the preparation of SPP's financial statements.

*Id.* at ¶ 132. See also ¶¶ 8, 22–23, 147, 194, 197, 311–315, 328–334.

Plaintiffs' specifically allege that the firing of ASG's former chief financial officer in 2001 placed Catalano, Taylor, Hartman and Bryson on notice that their jobs could be in jeopardy if they were unable to control ASG's costs. *Id.* ¶ 35. As noted earlier, market analysts opined that "subtle changes in this ratio [of healthcare expenses to revenues like the 0.4% increase in 2002] can have a significant impact on the company's profitability." *Id.* ¶ 37.

**\*22** According to Plaintiffs, the individual defendants were also motivated to engage in or to fail to correct these business practices so as to secure promotions, to enhance their compensation, to inflate the value of ASG's stock price, and to create higher cash value for sales of their stock options. *Id.* at ¶¶ 30–40, 92–98, 319–324. Plaintiffs also allege that ASG executives who are not named Defendants, sold more than 607,000 shares for more than $11.5 million during the class period. *Id.* at ¶¶ 320–322. "During the Class Period before the fraud was revealed, Burton C. Einspruch, director, sold 17,000 shares of ASG's stock (over 86% of his available shares) in November 2003 for proceeds of $341,697. Richard M. Mastaler, director, dumped 74,286 ASG shares (86% of his available shares) in November 2003 for $1.4 million in proceeds. Lawrence H. Pomeroy, Senior VP and Chief Development Officer, sold 50,092 shares of ASG's stock (over 97% of his available shares) for $1.2 million in proceeds. William C. Stapleton, director, unloaded 20,625 shares (100% of his available shares) in November 2003 for nearly $400,000 in proceeds. Finally, Richard D. Wright, Vice Chairman of Operations and director, sold 102, 907 shares (90.62% of his available shares) for $2,144 million in insider proceeds." The Court addresses other specific allegations against each Defendant.

### a. ASG and SPP

To minimize undue repetition, ASG is the corporate parent of SPP and PHS. ASG filed consolidated financial statements in its corporate name as parent based upon SPP's and PHS's financial reports. See Docket Entry No. 70, Attachment thereto. As reflected by the firings of Bryson and Hartman, ASG controlled SPP and PHS. ASG issued the financial reports and press releases that included the contract performances of SPP and PHS. SPP's accounting practices provided the financial information that is the predicate for a substantial part of ASG's restatement. In an October 24, 2005 statement, ASG excluded SPP's sales to PHS from ASG's internal investigation. Plaintiffs cite ASG's explanation that those contracts were excluded as "the Company is financially responsible for the cost of pharmaceuticals". *Id.* at ¶ 229.

### b. Catalano

Catalano attended the monthly operational meetings with Hartman that included line-by line review of SPP's and PHS's costs. *Id.* at ¶¶ 3, 11. Each quarter, Catalano specifically certified that he had personally "designed" or "caused" controls at ASG "including its consolidated subsidiaries" to be prepared and that Catalano found these controls to be both adequate and operating correctly. *Id.* at ¶ ¶ 176–178. Catalano, as ASG's chief executive officer, also signed ASG's SEC filings and financial statements that were relied upon by market analysts and investors. *Id.* at ¶¶ 20–21. 132.

In its April 22, 2002 press release, ASG reported its financial results for the first quarter of 2002, ending March 31, 2002, with healthcare expenses of $129.3 million, EBITDA of $4.5 million, net income of $2 million and earnings per share of $0.36 per basic and diluted share. In that press release, Defendant Catalano allegedly stated in pertinent part:

> **\*23** "The initiatives we have implemented, coupled with an emphasis on strong fiscal discipline, are producing results. **Our improved performance in the first quarter reflects the actions we are taking. Our management team is intensely focused, and our mission remains clear."**

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    18

*Id.* at ¶ 114 (emphasis added).

In his sworn certifications under the Sarbanes–Oxley Act on the accuracy and reliability of ASG's financial statements and internal controls, Catalano certified that:

1. I have reviewed this quarterly report on Form 10–Q of America Service Group Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

**4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e) for the registrant and have:**

**a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,** to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) **Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report** our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) **Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and**

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

**\*24** *Id.* at ¶ 176 (emphasis added). Catalano signed additional such certifications in 2002, 2003, 2004 and 2005. *Id.* at ¶ 177, 178.

In his certifications of ASG's 10–K reports filed with SEC in 2003, 2004 and 2005, Catalano verified as follows:

**Disclosure controls and procedures are the Company's controls and other procedures that are designed to ensure that information required to be disclosed in the reports that the Company files or submits under the Securities Exchange Act of 1934, as amended, (the "Exchange Act") is recorded, processed, summarized and reported, within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include, without limitation, controls and procedures designed to ensure that information required to be disclosed in the reports that the Company files under the Exchange Act is accumulated and communicated to management, including the Chief Executive Officer and Chief Financial Officer, as appropriate, to allow timely decisions regarding required disclosure.**

As of [the end of the period covered by this report], the Company evaluated under the supervision and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, the effectiveness of the design and operation of the Company's disclosure controls and procedures, pursuant to Exchange Act Rule 13a–14 and Rule 13a–15. Based upon that evaluation, **the Chief Executive Officer and Chief Financial Officer concluded that**

the Company's disclosure controls and procedures are effective in timely alerting them to material information that is required to be included in the Company's periodic SEC filings. There have been no significant changes in the Company's internal controls during [the period covered by this report] that have materially affected, or are reasonably likely to materially affect, the Company's internal control financial reporting.

*Id.* at ¶ 178 (emphasis added). Given ASG's later admissions about the lack of effective internal controls at ASG and SSP, Plaintiffs allege that these certifications are materially false and misleading statements to investors about effective internal controls in ASG's financial operation. *Id.* at ¶ 179. Plaintiffs allege that as investors, they relied upon these quarterly statements to provide assurances that ASG's financial and other information was accurate.

In addition, Plaintiffs allege that Catalano, who had never sold any of his ASG stock, liquidated more than 90% of his stock in October and November, 2003 after ASG told investors that ASG's expenses margins were under control and after ASG's stock price rose to $14.00 a share. *Id.* at ¶ 319. During the Class Period, Catalano received $5.2 million from his stock sales. *Id.* at ¶¶ 320, 32*I*.

### d. Taylor

Taylor, ASG' chief financial officer, oversaw ASG's financial operations. *Id.* at ¶ ¶ 20–21, 132. According to ASG's website, Taylor is responsible for "direct[ing] the Company's SEC reporting," "corporate accounting," "PHS site accounting," "operational analysis," "budgeting," and "investor relations." *Id.* at ¶ 21, As the primary spokesperson on ASG's financial condition, Taylor controlled and directed the flow of financial information concerning SPP. *Id.* at ¶¶ 148–149, 153–154. Taylor also signed the same certifications about ASG's financial condition as Catalano. Those certifications are quoted *supra* at pp. 36–38 *Id.* at ¶¶ 20–21, 132, 176–178.

**\*25** According to Plaintiffs, during telephone calls with analysts and investors, Taylor made a series of false or misleading statements about SPP's and ASG's financial condition. *Id.* at ¶¶ 158, 162, 225–227. On February 24, 2004, after the announcement of ASG's fourth quarter

results in 2003, Taylor allegedly made the following statements about ASG's gross margins:

Patrick Swindle—Avandale Partners—Analyst

Good morning, gentlemen. The gross margin from continuing operations was about 8.3% during the fourth quarter. The gross margin assuming the guidance for #04 is 6.9%, can you talk a little bit about what drove the gross margins during the fourth quarter, and the implications that has maybe for 2004?

Mike Taylor—America Service Group Inc.—CFO

We gave full-year guidance for 2003 of 6.5% of total gross margin. We ended the year at 6.6% for the full year. So we did slightly better in the fourth quarter than we anticipated **The main drivers there, you know, we did get some benefit from a couple of new contracts that started later in the year, that operated a little better than we anticipated out of the box;** but we do anticipate that over their complete term that they will operate at margins as we would have expected in the pricing of those contracts. So we got a little benefit there.

*Id.* at ¶ 148 (emphasis added).

In the subsequent telephone call in response to an analysis questions, defendant Taylor stated about ASG's gross margins:

Mike Taylor—America Service Group Inc.—CFO

**[O]ur daily costs run about $1.6, $1.7 million on an average day.** So those are a couple of factors that 1 would put into that as well, but overall, I mean, we're fairly pleased that we're giving guidance that says we can take total gross margins as a company up another step from the 6.6% that we did for full year this year to 6.9% next year.

*Id.* at ¶ 149 (emphasis added). Plaintiffs allege these statements are false and misleading in light of SPP's and PHS's known practices that inflated ASG's gross margins as reflected by ASG's restatement. Plaintiffs also allege that Taylor concealed these misleading facts about SPP's and ASG's practices. *Id.* at ¶ 150.

During a April 27, 2004 telephone conference call with securities analysts to Taylor described the increase in ASG's healthcare expenses and gross margins as follows:

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  20

**Primarily as a result of the new business booked in the first quarter, we are increasing our 2004 guidance for total revenues to 658 million for the year as compared with our previous guidance of 650 million.** This guidance is based only on contracts in operation currently, and does not factor in any potential new business that may be realized later in the year....

*Id.* at ¶ 153 (emphasis added). In that same conference, Taylor referred to ASG's ability to cut its costs for its customers:

**Yes, we do think that one of the things we're bringing to our clients this year, and I mentioned it I think on the year-end call, is that we think we're going to be able to mitigate to some degree for our clients their level of increase in cost of our services** and so that—we are seeing some of that based on our mix of cost and that would be our current hopes and anticipation.

**\*26** *Id.* at ¶ 154 (emphasis added).

Plaintiffs specifically identify as misrepresentations, Taylor's alleged statements about an "increase" in ASG's EBITDA margin in the second half of 2005 and that ASG was "comfortable" with its gross margins. *Id.* at ¶¶ 172 and 173. Plaintiffs allege these statements are factually misleading in their failure to disclose SPP's and PHS's actual practices that inflated ASG's actual margins and profit expectations. *Id.*

In its March 15, 2006 press release and on the March 16, 2006 telephone conference call with analysts and investors, Taylor attributed ASG's "disappointing" results for the second half of 2005 to the internal investigations of SPP's practices of overcharging customers, concealing manufacturer and distributor discounts and rebates from customers, and cited PHS's "unexpected adverse development in pending malpractice claims" in 2005. *Id.* at ¶ 217. Taylor stated that ASG's professional liability expense of $6.1 million was higher than ASG's original expectations of $2.9 million.

Plaintiffs allege that Taylor concealed from investors the extent of ASG's exposure to malpractice claims. Those malpractice claims were greater than Taylor previously represented in ASG's SEC filings. *Id.* at ¶ 218. Plaintiffs allege that after public disclosures in the *New York Times* articles about PHS's practices, and despite his personal

knowledge of these practices, Taylor made statements attempting to deflect attention from ASG to PHS so as to avoid disclosure of ASG's manipulations of its reserves to meet forecasted results.

In October and November 2003, Taylor first sold more than 90% of his ASG stock. *Id.* at ¶¶ 319–20. These stock sales occurred after Taylor told investors that ASG's costs were under control. Id Taylor received $842,897 from these stock sales. *Id.* at ¶¶ 320 and 321.

### e. Hartman

Hartman who is alleged to control ASG and SPP, was initially responsible for managing all of SPP's operations and approving SPP's financial practices. *Id.* at ¶¶ 22–23, 28, 55, 58, 62–63, 65, 311, 314. Hartman was SPP's President and chief executive officer and later ASG's executive vicepresident. *Id.* at ¶ 22. Plaintiffs allege that Hartman oversaw the preparation of SPP's financial statements that were bases for ASG's allegedly false consolidated financial statements filed with the SEC. *Id.* at ¶ 132. According to alleged witnesses, former managers and employees at SPP, Hartman assumed direct control to manipulate drug prices and sales to PHS and other SPP customers. Hartman allegedly decided whether to approve credits for returned drugs. *Id.* at ¶ 155. As an ASG officer, Hartman attended the monthly operational meetings with Catalano that included line-by-line accounting of SPP's costs. *Id.* at ¶¶ 3, 11. Plaintiffs allege that ASG fired Hartman because ASG deemed Hartman responsible for instituting SPP's practices that caused ASG's restatement of its financial reports. *Id.* at ¶ 147.

**\*27** In 2004, Hartman was also PHS's chief operating officer and prepared PHS's financial statements for ASG. *Id.* at ¶¶ 22 and 132. Hartman also allegedly received reports of PHS's improper patient and medication practices during the period covered by ASG's restatement. *Id.* at ¶ 158. Hartman attended the monthly operational meetings with Catalano that included line-by line review of PHS's costs. *Id.* at ¶¶ 3, 11.

### f. Bryson

Plaintiffs allege that Bryson controlled ASG and SPP. *Id.* at ¶ 352. In October 2004, Bryson, a certified accountant

with over 17 years of experience with Price Waterhouse, began as SPP's president and chief executive officer. *Id.* at ¶ 23. Bryson was allegedly Hartman's "right-hand man" and became SPP's chief executive officer when Hartman assumed that position at PHS. *Id.* at ¶ 28. Hartman or Bryson directly approved credits for returned drugs. *Id.* at ¶ 55. Bryson supervised quarterly inventories at SPP. *Id.* at ¶ 56. Plaintiffs allege that a witness from SPP will testify that Bryson personally directed SPP's illegal importation of drugs from Canada. *Id.* at 165. According to witnesses who oversaw contacts with SPP, Bryson personally handled complaints involving government contracts and conducted weekly SPP management meetings to address important problems. *Id.* at ¶¶ 190, 314.

On March 15, 2006, ASG told investors that the "key managers" responsible for SPP's practices were no longer with ASG. After the revelation of conduct in ASG's internal investigation, Bryson was fired. *Id.* at ¶ 71. Plaintiffs assert the inference that Bryson was one of the "key members" of ASG's and SPP's management responsible for ASG's losses. *Id.* at ¶ 222.

In closing of this review of the amended complaint, Plaintiffs allege that their factual allegations about the Defendants' false statements and wrongful conduct are based, in part, upon information from former ASG, SPP and PHS executives and employees who possess firsthand knowledge of the circumstances about ASG, SPP and PHS, ASG's restatement of its financial condition and had direct contact with the individual Defendants. *Id.* at ¶¶ 24, 55–72, 185–190, 311–315.

### B. Conclusions of Law

### 1. Standard of Review

For a Rule 12(b)(6) motion to dismiss, the Court must deny the motion if the complaint's factual allegations "raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007). "[T]he allegations of the complaint should be construed favorably to the pleader." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and the Court must "treat all of the well-pleaded allegations of the complaint as true." *Miree v. Dekalb County, Ga.,* 433 U.S. 25, 27 n. 2, 97 S.Ct. 2490, 53 L.Ed.2d 557 (1977). Yet, a legally sufficient

complaint, "requires more than bare essentials of legal conclusions." *Columbia Natural Resources, Inc. v. Tatum,* 58 F.3d 1101, 1109 (6th Cir.1995) and the district court "need not accept as true legal conclusions or unwarranted factual inferences." *Morgan v. Church's Fried Chicken,* 829 F.2d 10, 12 (6th Cir.1987).

**\*28** Moreover, where, as here, fraud is alleged, Fed.R.Civ.P. 9(b) requires that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." In a securities action, the heightened pleading standards are to be evaluated as set forth by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007):

Our task is to prescribe a workable construction of the "strong inference" standard, a reading geared to the PSLRA's twin goals: to curb frivolous, lawyer-driven litigation, while preserving investors' ability to recover on meritorious claims.

We establish the following prescriptions: **First,** faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. **Second,** courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is whether **all** of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. **Third,** in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences.

\* \* \*

The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court

must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, i.e. of the "smoking-gun" genre, or even the "most plausible of competing inferences [.]" ... [T]he inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

\* \* \*

[A]llegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint.... [T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically. In sum, the reviewing court must ask: When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as any opposing inference?

\* \* \*

**\*29** We emphasize, as well, that under our construction of the "strong inference" standard, a plaintiff is not forced to plead more than she would be required to prove at trial. A plaintiff alleging fraud in a § 10(b) action, we hold today, must plead facts rendering an inference of scienter **at least as likely as** any plausible opposing inference.

*127 S.Ct. at 2509–13* (citations omitted) (emphasis in original).

The Sixth Circuit recently restated the Supreme Court's view on a Rule 12(b) motion in a securities action as follows:

Although the PSLRA left the term undefined, the Supreme Court has concluded that Congress adopted the "strong inference" standard in order to raise the bar for pleading scienter. *Tellabs,* 127 S.Ct. at 2509. In doing so, the PSLRA "implement[ed] procedural protections to discourage frivolous litigation." *Helwig v. Vencor, Inc.,* 251 F.3d 540, 547 (6th Cir.2001).

In *Tellabs,* the Supreme Court prescribed a specific three-step analysis that district courts are to follow in considering a motion to dismiss private securities claims arising under Section 10(b). First, "courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs,* 127 S.Ct. at 2509. Second, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* (citation omitted). At the second stage, the relevant question "is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* (emphasis in original). The PSLRA does not permit a plaintiff merely "to allege facts from which an inference of scienter rationally could be drawn." *Id.* at 2510. Rather, the inference of scienter "must be cogent and compelling, thus strong in light of other explanations." *Id.*

Finally, in determining whether the pleaded facts give rise to a strong inference of scienter, "the court must take into account plausible opposing inferences." *Id.* at 2509. Because the strength of an inference "cannot be decided in a vacuum," the district court must conduct a "comparative inquiry" and assess the possible competing inferences that could be drawn from the allegations, including "plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff," *Id.* at 2509–10.

In defining how this framework is to be applied, the Supreme Court expressly held that a complaint will survive a motion to dismiss so long as "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 2510 (emphasis added). Thus, where two equally compelling inferences can be drawn, one demonstrating scienter and the other supporting a nonculpable explanation, *Tellabs* instructs that the complaint should be permitted to move forward. *See id.* at 2510 n. 5; *ACA Fin. Guar. Corp. v. Advest, Inc.,* 512 F.3d 46, 59 (1st Cir.2008) ("In other words, where there are equally strong inferences

for and against scienter, *Tellabs* now awards the draw to the plaintiff.").

**\*30** *Frank v. Dana Corp.,* 547 F.3d 564, 570–71 (6th Cir.2008).

The Sixth Circuit ruled that the provisions of Fed.R.Civ.P. 8 and the requirement of Rule 9(b) are to be read in conjunction with each other. *Michaels Bldg. Co. v. Ameritrust Co., N.A.,* 848 F.2d 674, 679 (6th Cir.1988). In *Blount Financial Services v. Walter E. Heller & Co.,* 819 F.2d 151, 153 (6th Cir.1987), the Court explained that "Rule 9(b) requiring 'averments of fraud ... with particularity' is designed to allow the District Court to distinguish valid from invalid claims in just such cases as this one and to terminate needless litigation early in the proceedings." (citation omitted). Rule 9(b) is also intended "to provide a defendant fair notice of the substance of a plaintiff's claim in order that the defendant may prepare a responsive pleading." *American Town Or. v. Hall 83 Assocs.,* 912 F.2d 104, 109 (6th Cir.1990).

Under *Ameritrust,* the plaintiff can satisfy Rule 9(b)'s requirements by pleading the circumstances of the fraud, not the evidence. 848 F.2d at 680 n. 9. Since *Ameritrust,* however, the Sixth Circuit reiterated the rule of this Circuit that FRCP 9(b) requires that fraud be pleaded with particularity. To satisfy FRCP 9(b), a plaintiff must "at a minimum **'allege the time, place and contents of the misrepresentations upon which [the plaintiff] relied.' "** *American Town Center,* 912 F.2d at 109 (quoting *Bender v. Southland Corporation,* 749 F.2d 1205, 1216 (6th Cir.1948)) (emphasis added).

In addition, where the fraud claims involve multiple defendants, the alleged fraudulent conduct of each defendant must be set forth separately or otherwise the complaint is legally deficient under Rule 9(b).

The defendants now before the Court comprise a varied group of accounting firms and their employees; law firms and their employees; and bank employees. Yet the complaint makes no attempt to distinguish among them.

This is inadequate; each individual defendant must be appraised separately of the specific acts of which he is accused, especially in a case involving multiple defendants. The complaint, therefore, may not rely upon blanket references to acts or omissions by all

of the 'defendants,' for each defendant named in the complaint is entitled to be apprised of the circumstances surrounding the fraudulent conduct with which he individually stands charged.'

*Benoay v. Decker,* 517 F.Supp. 490, 493 (E.D.Mich.1981), *aff'd* 735 F.2d 1363 (6th Cir.1984) [6] (quoting *McFarland v. Memorex Corp.,* 493 F.Supp. 631, 639 (N.D.Cal.1980), (quoting *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518 (S.D.N.Y.1977))).

[6]     The Supreme Court cited *Benoay* approvingly albeit on other grounds. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 170, 114 S.Ct. 1439, 128 L.Ed.2d 119(1994)

More recently in *City of Monroe Employees Ret. Sys. v. Bridgestone,* 399 F.3d 651, 689–90 n. 32 (6th Cir.2005), the Sixth Circuit noted a split in precedents, including a decision of a district court in this Circuit, on the "group pleading" exception to Rule 9(b). This exception applies "in cases of corporate fraud when the false and misleading is conveyed in a prospectus, annual reports, press releases or other group published information [where] it is reasonable to presume that these are the collective actions of officers." *Id.* at 689–90 ns. 32 and 33 (citing *inter alia, In re SmarTalk Teleshares, Inc. Sec. Litig.,* 124 F.Supp.2d 527, 545 (S.D.Ohio 2000). This principle could apply here as Plaintiffs cite ASG's 10–K reports and its press releases that commented on the financial performance of ASG, SPP and PHS. *Bridgestone,* however, did not adopt this exception and expressly declined to do so. 399 F.3d at 690. In any event, the Sixth Circuit followed *Benoay* on this specific pleading rule in *United States ex rel. Bledsoe v. Community Health Systems, Inc.,* 342 F.3d 634, 643 (6th Cir.2003). Despite the group pleading exception's relevance, this Court is bound by existing Sixth Circuit precedents in *Bledsoe* and *Benoay* that a fraud claim requires specific allegations as to each defendant's alleged involvement in the securities violations.

**\*31** In addition, in evaluating Plaintiffs' complaint under Fed.R.Civ.P. 10(c), any matters attached to the pleadings are considered part of the pleadings. In *Weiner v. Klais and Co., Inc.,* 108 F.3d 86, 98 (6th Cir.1997), the Court reiterated the general rule that: "Matters outside the pleadings are not to be considered by a court in ruling on a 12(b)(6) motion to dismiss." (citations omitted). Yet, the Court recognized an exception in securities cases, but only

for papers filed by a defendant and referred to a plaintiff's complaint. [7]

[7]  This principle does not extend to extrinsic evidence *Katt v. Titan Acquisitions, Ltd.,* 133 F.Supp.2d 632, 637–38 (M.D.Tenn.2000). The Court cannot presume the truth of the extrinsic information nor use such information in evaluating the pleadings. *Bridgestone,* 399 F.3d at 665; *see also Logan v. Denny's, Inc.,* 259 F.3d 558, 581 n. 5 (6th Cir.2001) (court may not take judicial notice of disputed facts).

The [district] court held ... it would consider 'only those exhibits submitted by the defendant which can properly be considered incorporated by reference into the complaint, and, thus, a part of the pleadings.'

**Rule 10(c) is permissive, and a plaintiff is under no obligation to attach to his complaint documents upon which his action is based. However, a defendant may introduce certain pertinent documents if the plaintiff fails to do so.** Otherwise, a plaintiff with a legally deficient claim could survive a motion to dismiss simply by failing to attach a dispositive document upon which it relied. Hence, the Seventh Circuit has held that **"[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiffs complaint and are central to her claim." We believe that this approach is appropriate.**

*Id.* at 89 (emphasis added and citations omitted) (quoting *Venture Assocs. Corp v. Zenith Data Sys. Corp.,* 987 F.2d 429, 431 (6th Cir.1993); *See also Neiman v. NLO, Inc.,* 108 F.3d 1546, 1555 (6th Cir.1997).

Thus, of the factual materials submitted by the Defendants, (Docket Entry Nos. 70, 71 and 79) and the Plaintiffs (Docket Entry No. 74 and 75), the Court will consider only those documents referred to in Plaintiffs' Amended Complaint.

### 2. Rule 10(b) & PLSRA Standards

Plaintiffs' claims seek recovery under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder. Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, prohibits the use "in connection with the purchase or sale of any security ... [of] any manipulative or deceptive device or contrivance

in contravention of such rules and regulations as the Commission may prescribe ... [.]" Pursuant to this section, the Securities Exchange Commission promulgated Rule 10b–5, that provides in pertinent part:

> It shall be unlawful for any person, directly or indirectly, ...

> * * *

> To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading....
> 17 C.F.R. § 240.10b–5.

The Supreme Court described the purpose of the 1934 Act as follows:

> The 1934 Act was designed to protect investors against manipulation of stock prices. See S.Rep. No. 792, 73d Cong., 2d Sess,, 1–5 (1934). Underlying the adoption of extensive disclosure requirements was a legislative philosophy: "There cannot be honest markets without honest publicity. Manipulation and dishonest practices of the market place thrive upon mystery and secrecy." H.R.Rep. No. 1383, 73d Cong., 2d Sess., 11 (1934). This Court "repeatedly has described the fundamental purpose' of the Act as implementing a philosophy of full disclosure.' "

*32 *Basic Inc. v. Levinson,* 485 U.S. 224, 230, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 477–478, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977) (quoting *SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237(1963))).

In 1995, Congress enacted the Private Securities Litigation Reform Act ("PSLRA") that requires specificity in pleadings in private securities litigation before commencement of discovery:

> (b) Requirements for securities fraud action. (1) Misleading statements and omissions. In any private action arising under this title [15 U.S.C. §§ 78a *et seq.*] in which the plaintiff alleges that the defendant—

> (A) made an untrue statement of a material fact; or

WESTLAW  © 2018 Thomson Reuters. No claim to original U.S. Government Works.  25

(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading;

the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

(2) Required state of mind. In any private action arising under this title.... [15 U.S.C. §§ 78a *et seq.*], the complaint shall, with respect to each act or omission alleged to violate this title, state with particularity facts giving rise to a *strong inference* that the defendant acted with the required state of mind.

(3) Motion to dismiss, stay of discovery. (A) Dismissal for failure to meet pleading requirements. In any private action arising under this tile [15 U.S.C. §§ 78a *et seq.*]. the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs (1) and (2) are not met.

* * *

(B) Stay of discovery. In any private action arising under this title [15 U.S.C. §§ 78a *et seq.*]. all discovery and other proceedings shall be stayed during the pendency of any motion to dismiss, unless the court finds upon the motion of any party the particularized discovery is necessary to preserve evidence or to prevent undue prejudice to that party.

15 U.S.C. § 78u–4(b)(1)(A), (b), 2 and 3(b).

The purpose of the PSLRA was to "protect investors, issuers and all who are associated with our capital markets from abusive securities litigation" as well as "to implement [ ] need[ed] procedural protections to discourage frivolous litigation." H.R. Conf. rep. 104–369, 104th Cong. 1st Sess. 31,31 (1995). Although Congress added the necessity of "strong inference," the Sixth Circuit later clarified that the PSLRA did not alter the recklessness standard for scienter in federal securities actions. *In re Comshare, Inc. Sec. Litig.,* 183 F.3d 542, 550 (6th Cir.1999). As to the elements of a Section 10(b) claim, the Sixth Circuit recently restated the elements as follows: "To state a securities fraud claim under Section 10(b), a plaintiff 'must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury.' " *Dana Corp.,* 547 F.3d at 569–70 (quoting *In re Comshare Inc. Sec. Litig.,* 183 F.3d 542, 548 (6th Cir.1999)).

**\*33** Plaintiffs assert multiple theories of liability for their Section 10(b) and Rule 10(b)(5) claims: (1) Defendants' misrepresentations or misleading statements on ASG's costs, statement of reserves and profitability; (2) the Defendants engaged in manipulative scheme to omit material facts about the actual practices of SPP and PHS in breaching their contracts to reduce ASG's costs in connection with the sale of ASG's securities; (3) the Defendants' motive and opportunity for these securities violations; and (4) the Defendants' fraud on the market in their concealment of PHS's and SPP's actual practices.

The core of the Defendants' motion focuses on the insufficiency of Plaintiffs' allegations of scienter for the various aspects of ASG's omissions and its subsidiaries' alleged financial and business practices as well as the individual Defendants' related misrepresentations and omissions. Yet, in various parts of their supporting memoranda, the Defendants also challenge whether Plaintiffs adequately pled any material misrepresentations or pled any false or misleading statements or actionable business practices under the securities laws. To evaluate all of these contentions, requires a review of Plaintiffs' specific allegations on each element of their securities claims under their theories of liability and the alleged role of each individual defendant in ASG's, SPP's and PHS's statements and conduct impacting ASG's financial condition.

### Materiality

An element common to all of Plaintiffs' claims is materiality. "[T]o fulfill the materiality requirement 'there must be a substantial likelihood that the disclosure of the Dmitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Basic Inc.,* 485 U.S. at 231–32. The Court deems it noteworthy that the Supreme Court referred to information "such as earnings forecasts or projections" as "contingent or speculative

information." *Id.* at 232 n. 9. The Supreme Court, however, did not decide that issue. *Id.*

In its opinion in *Bridge stone,* the Sixth Circuit noted that at the motion to dismiss stage, omissions should be considered material unless the omitted information was so "obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Bridgestone,* 399 F.3d at 681 (quotation omitted); *see also Ganino v. Citizens Utilities Co.,* 228 F.3d 154, 162 (2d Cir.2000) (quoting *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985)); *Arber v. Essex Wire Corp.,* 490 F.2d 414, 418 (6th Cir.1974) (The test for materiality is "whether a reasonable man would have attached importance to the undisclosed facts in determining his choice of action in the particular transaction in question."). The materiality requirement does not require that the defendant communicated the misrepresentation directly to the plaintiff. *In re Kidder Peabody Sec. Litig.,* 10 F.Supp.2d 398,407 (S.D.N.Y.1998). Unless written misrepresentations are material, such misrepresentations are not actionable. *Radol v. Thomas,* 772 F.2d 244, 252 (6th Cir.1985).

**\*34** On this element, in its periodic reports to the SEC, ASG acknowledged and a market analyst reported that ASG's gross margins were the primary metric to evaluate ASG's business performance, including SPP's performance. *Id.* at ¶ 37. In its 2005 Report on Form 10–K, AGS stated that "[a] material weakness is a significant deficiency, or combination of significant deficiencies, that results in more than a remote likelihood that a material misstatement of the annual or interim financial statements will not be prevented or detected." *Id.* at ¶ 286. Under the circumstances here, the Court concludes that misrepresentations or omissions about SPP's and/or PHS's business practices that create or cause adverse financial impact for ASG, affecting ASG's gross margin to a significant degree satisfy the materiality requirement under Rule 10(b) precedents.

For the remaining analysis, the Court addresses first Plaintiffs' allegations of the Defendants' material misrepresentations and omissions about ASG's financial condition and SPP's and PHS's practices that adversely impacted ASG's costs.

### a. Plaintiffs' Misrepresentation Claims

As to these claims, Defendants argue that Plaintiffs's amended complaint does not identify a single false statement and also challenge the following allegations in the Plaintiffs' amended complaint as conclusory. (Docket Entry No. 69, Defendants' Memorandum at p. 43 citing ¶¶ 7, 58, 75, 132, 142, and 330–33 of the Plaintiffs' Amended Complaint). Defendants also contend that the allegations in the following paragraphs of Plaintiffs' Amended Complaint are forward-looking statements that are protected by PSLRA's safe harbor provisions. *Id.* at pp, 44 and 46, listing ff 113–17, 119–26, 148–49, 151–54, 156–57, 159–161, 164, 168, 171, 210–13, 215, and 217.

In their response in opposition to the Defendants' motion to dismiss, Plaintiffs identify the Defendants' allegedly false statements in their amended complaint as set forth in the following paragraphs ¶¶ 18, 22–23, 132, 147, 194, 197, 311–15, 328 and 334. Plaintiffs also cite the Defendants' false or misleading statements as reflecting the followings categories that are described in their amended complaint:

(1) ASG[ ]'s quarterly and annual financial statements, along with various statements made in press releases and on conference calls describing those results (¶¶ 130–173, 232–324);

(2) Statements regarding the reliability of ASG[ ]'s financial statements and the system of internal controls in place at ASG[ ] and its subsidiaries, including the Sarbanes–Oxley Act of 2002 ("Sarbanes–Oxley Act" or "SOX"), 15 U.S.C. ¶¶ 201, *et seq.*. certifications made by ASG[ ], Catalano and Taylor (¶¶ 174–191, 285–292);

(3) Statements regarding ASG[ ]'s accounting policies and its purported compliance with those policies (¶¶ 192–197);

(4) Statements regarding ASG[ ]'s compliance with the terms of its government contracts, and the laws and regulations governing the performance of its obligations under those contracts (¶¶ 198–208); and

**\*35** (5) Statements regarding ASG[ ]'s exposure to medical malpractice claims (¶¶ 209–219).

(Docket Entry No. 73, Plaintiffs' Memorandum at pp. 5–6). Plaintiffs contend that the Defendants are tied to these

statements in ¶¶ 22–23, 28, 55, 58, 62–63, 65, 311, and 314 of their amended complaint. *Id.* at p. 42.

In reply, the Defendants contend that many of Plaintiffs' citations of their challenged statements lack specificity as to which particular statement is false and most of these paragraphs contain statements that are mixed with forward looking statements that are protected as a matter of law.

As set forth below, several of the statements in the paragraphs cited by the Plaintiffs for this section are general and conclusory in nature and refer to other unspecified statements in other unspecified paragraphs. As examples, paragraphs 22 and 23 are general descriptions of Hartman's and Bryson's position and duties. Paragraph 132 asserts that all of the defendants participated in the "making of the statements contained herein" and cites Hartman's and Bryson's responsibilities to oversee and prepare SPP's financial statements. Paragraph 147 refers to statements made during a telephone conference call. Paragraph 194 refers to statements about ASG's and SPP's accounting policies and Catalano's and Taylor's signatures on SEC filings as well as Hartman's and Bryson's responsibilities for SPP's compliance with ASG's accounting policies. Paragraph 197 refers generally to ASG's SEC filings signed by Catalano and Taylor and the responsibilities of Hartman and Bryson. Paragraphs 311 through 315 describe ASG's monthly meetings to discuss budgets and planning and the attendance of Catalano, Hartman and Taylor.

The Court fails to understand these conclusory references as stating specific misrepresentations or misleading statements. To be sure, some of these paragraphs refer to other statements in the amended complaint in unspecified paragraphs, but the Court is uncertain as to which specific statements Plaintiffs refer. Plaintiffs fail to analyze which part of these referenced statements contains hard information or protected soft information that could be converted into actionable statements. The Court cannot simply surmise the Plaintiffs' rationale on these issues. The Court therefore will address only the portions of the paragraphs in Plaintiffs' amended complaint that Plaintiffs cited to **and** which Plaintiffs supplied emphasis to portions of these paragraphs or quoted statements of a defendant.

### (1) ASG[ ]'s quarterly and annual financial statements, (¶¶ 130–173, 232–324)

Plaintiffs allege that due to ASG's restatement and the changes regarding five years of ASG's operation, the Defendants have admitted that during the Class Period, all of ASG's prior financial statements and SEC filings are false and misleading for every quarter for five years. In its restatement, ASG admitted that SPP had materially overstated its net income by at least $2.1 million, overcharged customers by at least $3.6 million and undercharged others from whom it could no longer collect by at least $5.9 million. Plaintiffs also assert false and misleading statements, based upon conflicts between the Defendants' statements about SPP's and PHS's improved management to control costs and published reports about PHS's and SPP's actual practices. *Id.* at ¶¶ 174–191 and 285–292. Plaintiffs allege the actual impact of SPP's practices was greater than disclosed because ASG based these estimates on only 30% of SPP's sales and excluded SPP's sales to PHS. *Id.* at ¶¶ 222, 229. In addition, Plaintiff refer to ASG's statement about its "2004 Guidance" that appears to be from a SEC filing: "Pre-tax income from continuing and discontinued operation is expected to be approximately $22.8 million in 2004 ...." *Id.* ¶ 152. In its 2003 Form 10–K report, ASG also represented that:

> **\*36** Management establishes reserves for the estimated losses that will be incurred under these insurance policies using internal and external evaluations of the merits of the individual claims, analysis of claim history and the estimated reserves assigned by the Company's third-party administrator.... **The Company is not aware of any material unasserted claims and, based on its past experience, would not anticipate that potential future claims would have a material adverse effect on its consolidated financial position or results of operations.** Any adjustments resulting from the review are reflected in current earnings.

*Id.* at ¶ 211 (emphasis added). ASG repeated these statements in its Form 10–Q Report issued on May 10,

2004, August 9, 2004, November 9, 2004, and March 14, 2005. *Id.* at 1212.

Plaintiffs also cite a chart of ASG's reported reserves for medical claims liability. *Id.* at ¶ 213. After *The New York Times* articles and legal actions, ASG raised its reserves for malpractice claims to more than $6 million. *Id.* at ¶ 94. Thus, Plaintiffs allege false representations in ASG's statements about its exposure to legal claims.

The controlling issue is whether these cited representations involve "soft" or "hard" information." *Bridgestone,* 399 F.3d at 669;*accord Zaluski v. United American Healthcare Corp.,* 527 F.3d 564 (6th Cir.2008). "Hard information is typically historical information or other information that is objectively verifiable. Such information is to be contrasted with 'soft' information which includes predictions and matters of opinion and are not actionable."*In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 401 (6th Cir.1997). "The failure to disclose soft information is actionable only if it is virtually as certain as hard information." *Bridgestone,* 399 F.3d at 669 (quotation omitted). "Hard information is typically historical information or other factual information that is objectively verifiable. (internal quotations omitted).... 'Soft information,' on the other hand, includes 'predictions and matter of opinions.' " *Id.* (internal quotations omitted). Under the PSLRA, safe harbor protection is available for a firm's statements that are "defendants' projections, statement of plans and objectives, and estimates of future economic performance" 15 U.S.C. § 78u–5(c)(l), but this statutory protection can be overcome 'if the statement is material; if the defendant had actual knowledge that it was false or misleading; and if the statement was not identified as a forward-looking or lacked meaningful cautionary statements." *Helwig,* 251 F.3d at 547–48,*abrogated on other grounds by Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 127 S.Ct. 2499, 2510, 168 L.Ed.2d 179 (2007).

Defendants cite paragraphs 113–17, 119–26, 148–49, 151–54, 156–57, 159–61, 164, 168, 171, 210–13,215 and 217 of the Plaintiffs' Amended Complaint as reflecting projections of ASG's revenues, income, earnings per share, and other financial items such as medical claims liability reserves, that are covered by forward-looking statements safe harbor of the PSLRA. 15 U.S.C. 78u–5(i)(1)(A). As to the other ¶¶ 130 through 173 reciting figures and

statements from ASG financial reports and SEC filings, upon review and with certain exceptions, the Court agrees that these statements are for the most part projections of future earnings and projected costs and are not actionable.

**\*37** To the extent that some "hard facts" are included in these corporate statements, Plaintiffs contend that the extent of ASG's restatement and any future restatements cannot be decided on a motion to dismiss, citing *In re Envoy Corp. Securities Litig.,* 133 F.Supp.2d 647, 662 (M.D.Tenn.2001) ("the district court should decide the issue of materiality only if the alleged misrepresentations are so clearly and obviously unimportant that reasonable minds could not differ in their answers to the question") (quoting *Semerenko v. Cendant Corp.,* 223 F.3d 165, (3d Cir.2000)). Yet, under subsequent Sixth Circuit precedent, the fact of restatement involving millions of dollars alone does not render the original statement of those finances to be actionable nor to meet the requisite scienter as a matter of law. *PR Diamonds,* 364 F.3d at 686 (a corporate restatement that corrects millions of dollars in inaccuracies is not material). Consistent with *PR Diamonds,* the effect of ASG's restatement depends upon its "type and size" and must be evaluated in the totality of the circumstances in Plaintiffs' other allegations that are discussed at length *infra. Id.* In sum, under *PR Diamonds,* ASG's restatement alone does not provide an actionable claim for misrepresentations based solely on ASG's prior statements of its finances.

As to ASG's statements about its future exposure and its subsequent increase in reserves for PHS's medical claims, after *The New York Times'* articles, ASG increased its reserves for malpractice claims by $6.1 million. *Id.* at ¶ 94. Statements about medical reserves are forward looking statements and are protected by the PSLRA. *In re Kindred Healthcare Inc. Securities Litig.,* 299 F.Supp.2d 724, 738 (W.D.Ky.2004) ("The amount [a company] keeps in reserves to cover liability claims is necessarily a prediction about its future claims experience .... Assertions about the adequacy of [defendant's] reserves could only be verified when liability claims were actually filed, litigated to conclusion, or settled. It would seem rather beyond argument that such projections about the company's future economic health are forward-looking within the meaning of the PSLRA.") [8] .

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   29

8    In light of *Bridgestone,* this increase in reserves must
be revisited in the analysis of Plaintiffs' omissions
claims.

Defendants correctly note that ASG warned investors
during the Class Period of risk factors that might
cause actual malpractice expenses to exceed reserves.
(Docket Entry No. 70, Appendix 4 at pp. 7–8;
Appendix 2 at pp. 10–11). Such warnings render any
projections inactionable as a matter of law. *See Miller v.
Champion Enter., Inc.,* 346 F.3d 660, 678 (6th Cir.2003)
(forward-looking statements accompanied by meaningful
cautionary language are protected by PSLRA's safe
harbor provisions). Moreover, "[t]he mere fact that [a
company] increased its reserves for doubtful accounts in
[one period] does not, by itself, call into question the
accuracy of the [earlier period reserves]." *In re Sprint
Corp. Sec. Litig.,* 232 F.Supp.2d 1193, 1227 (D.Kan.2002).
"[T]he failure to establish adequate reserves [ ] is generally
not sufficient to establish securities fraud." *In re E.Spire
Commc'ns. Inc. Sec. Litig.,* 127 F.Supp.2d 734, 748
(D.Md.2001).

**\*38** The Court concludes that as a matter of law,
Plaintiffs' claims based upon the Defendants' statements
in ¶¶ 130–173 and 232–324 are not actionable.

### (2) ASG's Press Releases and Defendants' Catalano and Taylor's Published Statements

Plaintiffs apply the same rationale to the Defendants'
other statements, namely that because of ASG's
restatement of five years of its finances, any prior press
statements about ASG's finances are false or misleading.
Plaintiffs cited the following specific statements about
ASG's financial condition in their first amended complaint
as misrepresentations or misleading statements that
occurred during conference calls and in press releases:

- In a March 18, 2002 press release, Catalano told
  investors that ASG had "developed a corrective cause
  of action focused on a return to predictable financial
  results". (Docket Entry No. 60, Amended Complaint
  at ¶ 34);

- On that same date, Catalano stated that "debt levels
  had been significant reduced." *Id.* at ¶ 112;

- On April 22, 2004 Catalano alleged commented: "The
  initiatives we have implemented, coupled with an
  emphasis on strong fiscal discipline, are producing
  results. Our improved performance in the first
  quarter reflects the actions we are taking. Our
  management team is intensely focused, and our
  mission remains clear." *Id.* at ¶ 114

- February 22, 2004 conference call during which Taylor
  told investors ASG's costs were "$1.6 to $1.7 million
  on an average day." *Id.* at 1149;

- "{W}e're giving guidance that says we can take total
  gross margins as a company up another step from the
  6.6% that we did for full year this year to 6.9% next
  year." *Id.* ¶ 149;

- "W]e are increasing our 2004 guidance for total
  revenues to 658 million for the year ...." *Id.* ¶ 153;

- In the April 27, 2004 conference call, Defendant
  Taylor's stated ASG's purported ability to cut
  expenses for its clients: "Yes, we do think that one
  of the things we're bringing to our clients this year,
  and I mentioned it I think on the year-end call, is that
  we think we're going to be able to mitigate to some
  degree for our clients their level of increase in cost
  of our services and so that—we are seeing some of
  that based in our mix of costs and that would be our
  current hopes and anticipation."*Id.* at ¶ 154

- In a July 27, 2004 conference call, Taylor stated,
  inter alia, "I would anticipate something in 7.3 to
  7.5[%] range for the Company in the second half
  of the year. It is coming primarily from repricing
  of contracts.... So we do anticipate we will see that
  improved performance in the second half of this year.
  And that is really what has been contemplated all
  along. Maybe a little better than we thought initially
  as we started the year are our expectations for the
  second half at this point" *Id.* ¶ 157;

- In a press release, ASG reported: The Company is
  maintaining most aspects of its previous guidance for
  2004 ...." *Id.* ¶ 160;

**\*39** • The October 26, 2004 conference call included
Taylor's statement that "[Quite frankly, SPP has been
a significant part of generating new business revenue
growth on a year-to-date basis" *Id.* ¶ 161

- In a February 7, 2005 press release, ASG stated: "The Company has significantly reduced the volatility of its contract portfolio over the last several years ...." *Id.* ¶ 164; and

- During a July 25, 2005 conference call, Taylor is quoted as stating "Anton, we do expect the second half to see an increase in that EBITDA margin, as you pointed out, in our guidance. The 4.5% [margin] or so for the first half certainly was a solid start for the year All along we had expected to see an improvement in that in the second half. That improvement primarily is going to be driven by the gross margin percentage improving in the second half. Once again that was in line with our initial expectations for what the year would hold." So it is really going to be a gross margin improvement in our expectations that gets us to that higher level of EBITDA margin ..... Certainly as we sit here in July, I mean, we are comfortable with these guidance figures for the full year. So there is nothing at this point that would change that view." *Id.* ¶ 171.

Insofar as the February 24, 2004, April 27, 2004 and October 26, 2004 conference calls and the July 2, 2004 and October 25, 2004 press releases involve statements on ASG's stated guidance, *Id.* at ¶¶ 153, 154, 156, 157, 160, 161), the Court concludes that with exceptions noted below, these statements about guidance and other quoted projections and opinions about ASG's expectations of its future profits are not actionable as soft information.

The first exception is ASG's October 25, 2004 press release on ASG's financial results for the third quarter ending for September 30, 2004, when Catalano described ASG's cost increases:

> We are disappointed in the additional reserve necessary to cover losses under our Maryland contract through its expiration on June 30, 2005. In the meantime, the **Company will faithfully adhere to the terms of our contract and continue our commitment to provide quality healthcare to our patients.** We remain confident in the long-term prospects of the Company. The rest of our contract portfolio continues to produce expected financial results,

cash balances are increasing and **we are debt free as of the end of the quarter.**

*Id.* at ¶ 159. As discussed *infra,* this opinion about being in compliance with contracts is capable of verification by objective evidence of SPP's and PHS's practices.

Another exception is in its February 7, 2005, press release, wherein ASG stated:

> This ongoing process of adjusting the Company's contract portfolio has resulted in 88% of the Company's healthcare contracts and all pharmacy contracts has of December 31, 2004, representing 74% of Total Revenues in the fourth quarter, **have structures that limit the Company's exposure to increases in hospitalization and other off-site medical expenses."**

 **\*40** *Id.* at ¶ 164.

The third exception is the April 27, 2005 conference call with securities analysts when securities analysts asked about the ASG's ability to maintain its gross margins and expenses and Taylor responded as follows:

Anton Hie—Jefferies & Co.—Analyst

Okay. How about the current quarter month-end here, do we think we will see the margins holding steady here, now that some of those utilization issues that caused the fourth-quarter spike are behind us?

Mike Taylor—America Service Group—CFO

Well, we are always subject to that volatility, and that is kind of the point on those contracts. **Certainly at this point, Anton, things are tracking along with our expectations. That is why we've maintained the guidance that we have for the full year. So early into the second quarter, we don't see anything that changes that impression.**

*Id.* (emphasis added).

Here, ASG's restatement reflects ASG's admission that its internal controls "were not designed or operating

effectively to reduce to remote the likelihood that material errors [in ASG's consolidated financial statements would be prevented or detected in a timely manner." *Id.* at ¶ 80. Defendants contend that the cumulative effect or bottom line effect of all of these alleged wrongful practices is relatively small. Yet, the common theme that emerges from Plaintiffs' allegations is that the key to ASG's profitability is ASG's control of its subsidiaries' costs and the ratio of ASG's healthcare costs to its total revenue. Plaintiffs allege that a market analyst advised investors that ASG's medical expense ratio, *i.e.,* healthcare expenses as a percentage of revenue, is the critical factor in ASG's success and warned investors that "subtle changes in this ratio can have a significant impact on the company's profitability." *Id.* at ¶ 37.

Under *PR piamonds,* a company's "type and size" are important in evaluating financial errors and related statements. *PR Diamonds,* 364 F.3d at 686. From a management perspective, ASG, SPP and PHS are small companies with a few key managers that includes at least one interlocking officer, Hartman who served as SPP's chief executive officer, PHS's chief executive officer and ASG's executive vice-president. Although ASG has contracts nationwide, ASG's, SPP's and PHS's policies are set in Brentwood and Franklin, Tennessee. ASG and PHS operated out of the same building in Brentwood. (Docket Entry No. 60, Amended Complaint at ¶¶ 17 and 19). SPP's headquarters were just nine miles away in Franklin. *Id.* at ¶ 18. Management of ASG and its subsidiaries frequently met with one another (including the individual defendants named here) to conduct detailed, line-by-line reviews of costs and operations at each facility. *Id.* at ¶ 310–316, SPP's accounting errors are based allegedly upon SPP's well-known defective computer program for pricing and SPP's manual. Governmental inquiries revealed that PHS's activities were a product of corporate management to reduce PHS's costs.

**\*41** In these circumstances, with all favorable inferences to the Plaintiffs': factual allegations as required for this type of motion, the Court concludes that a balancing of inferences results in a reasonable and strong inference for these statements of ASG, Catalano and Taylor about ASG's costs, and that these statements involve material facts and are actionable as securities claims.

**Statements and certification by ASG, Catalano and Taylor regarding the reliability of ASG's system of internal controls in place at ASG and its subsidiaries,**

**including the Sarbanes–Oxley Act of 2002 (¶¶ 174–191, 285–292)**

For their next category of false and misleading statements, Plaintiffs cite Catalano's and Taylor's Sarbanes–Oxley certifications during the Class Period falsely assuring investors that Catalano and Taylor had personally designed, checked, and monitored ASG's and its subsidiaries' systems of internal controls that would reasonably design to uncovered any accounting manipulations. As pertinent here, these certifications provided as follows:

**The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e) for the registrant and have:**

**a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision,** to ensure that material information relating to the registrant, **including its consolidated subsidiaries,** is made known to us by others within those entities, particularly during the period in which this report is being prepared;

**b) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report** our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

c) **Disclosed in this report any changes in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; ....**

*Id.* at ¶ 176 (emphasis added). Catalano and Taylor signed such alleged false certifications in 2002, 2003, 2004 and 2005. *Id.* at ¶¶ 177, 178.

As to the Sarbanes–Oxley certifications, courts have declined to treat corporate officers' signature for such certifications, as a *per se* violation where accounting errors or mistakes are revealed by a subsequent audit. *Ley v. Visteon Corp.,* 543 F.3d 801, 812 (6th Cir.2008) ("We agree with the Eleventh Circuit that a Sarbanes–

Oxley certification is only probative if the person signing the certification was severely reckless in certifying the accuracy of the financial statements") (citation omitted); *see also In re PhyCor Corp. Sec. Litig.*, No. 3:98–0834, slip op. at 6 (M.D.Tenn. Feb. 17, 2000) (upholding § 10(b)(5) claims where, at time defendants made false positive statements about PhyCor Corporation's financial condition at times when controls were known to be inadequate).

**\*42** As to the Sarbanes–Oxley certifications, Catalano and Taylor certified that their personal responsibilities on these control measures included ASG's "consolidated subsidiaries." *Id.* at 60. Every finance, Catalano and Taylor specifically certified that they had each personally reviewed the controls at ASG "including its consolidated subsidiaries" during the past 90 days, and found them to be both reasonably adequate. *Id.* at ¶¶ 176–178. Here, ASG Catalano, chief executive officer and Taylor, chief financial officer, specifically undertook responsibility for designing, maintaining, and certifying the adequacy of the internal controls at PHS that shares offices with ASG and SPP that is nine miles away. *Id.* at ¶¶ 18, 175–178. Catalano and Taylor were the signatories. Plaintiffs allege specific facts that these Defendants participated in fiscal meetings for SPP and PHS. As to SPP, the structural deficiency in SPP's computer system, Plaintiffs specifically allege a former SPP officer asserts that Catalano and Taylor knew of this computer's structural deficiencies that could not compute customer rebates required by SPP's contracts. Upon these specific factual allegations, Plaintiffs' certification claims against Catalano and Taylor are actionable.

As to Defendants Hartman and Bryson, Plaintiffs' amended complaint "is devoid of a single specific factual allegation suggesting that either [of them] played any role in drafting, reviewing, or approving any of these certifications, that Plaintiffs contend were false or misleading." (Docket Entry No. 69, Defendants' Memorandum at p. 43). If the Plaintiffs' claims were limited to misrepresentations, the Court would agree that these Defendants should be dismissed. Yet, Plaintiffs also assert a theory of liability, discussed in more detail *infra*, that all of the Defendants engaged in a scheme or plan to inflate the value of ASG stock and under that theory, the defendants are alleged to be intimately involved. Hartman and Bryson prepared SPP's financial reports for ASG. Hartman and Bryson allegedly personally made

the decisions whether to give credits for returned drugs were approved directly by Hartman or Bryson. *Id.* at ¶ 55. Bryson supervised quarterly inventories at SPP. *Id.* at ¶ 56. Plaintiffs allege, through direct witness testimony, that Bryson personally directed SPP's illegal importing of drugs from Canada. *Id.* at ¶ 65.

With Plaintiffs' alternative theories of liability, the Court concludes that these statements are actionable as to Hartman and Bryson only as evidence that the Defendants engaged in a manipulative scheme in "connection with" ASG's sales of its securities.

### b. Plaintiffs' Omissions Claims

The flip side of Plaintiff's misrepresentation claims are Plaintiffs' omissions claims that the Defendants failed to disclose ASG's actual business practices and costs that were understated due to SPP's and PHS's practices that breached their contracts with governmental entities. Two related theories of liability are Plaintiffs' theories of "Fraud on the Market" and the Defendants' scheme or device in "connection with" the sales of ASG's securities theories that are also based omissions about SPP's and PHS's unlawful practices.

**\*43** These omissions are alleged to be clear and material because the published news reports and legal actions disclosing SPP's and PHS's business practices caused ASG's restatement of its SEC filings and financial statements for five years. Plaintiffs allege that ASG's accurate cost data was omitted from ASG's press releases, Catalano's and Taylor's statements to investors, and market analysts during conference calls. In addition, Plaintiffs contend that SPP's and PHS's breaches of their contracts evince widespread practices that the Defendants knew about or were reckless in not knowing of these practices that were critical to ASG's control of its costs and to ASG's profitability.

In response, Defendants contend that the limited number of instances of PHS's alleged breaches of its contracts lack the required numerosity to find material omissions or to evince an actionable scheme to defraud investors. (Docket Entry No. 78, Defendants' Reply at pp. 2, 7),

As a threshold issue, to violate Rule 10b–5 for omissions or nondisclosures, the defendant must have an affirmative

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works. 53

duty to disclose the material fact because "[s]ilence without a duty to disclose, is not misleading under Rule 10b–5". *Basic Inc.,* 485 U.S. at 239 nns. 17, 18. The materiality of the information does not create a duty to disclose. *Sofamor Danek,* 123 F.3d at 402. "Ordinarily, at least, a company is under no obligation to disclose the details of its merchandising practices" *Sofamor Danek,* 123 F.3d at 400. Yet, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to subjects on which it undertakes to speak." *Zaluski,* 527 F.3d at 572 (quoting *Rubin v. Schottenstein,* 143 F.3d 263, 268 (6th Cir.1998). Moreover, where a company's corporate officers "elected to make statements such as the statement regarding.... 'objective data,' the company is required to qualify that representation with known information undermining (or seemingly undermining) the claim." *Bridgestone,* 399 F.3d at 673. The concealment of such data must be "known exclusively to the Defendants." *Id.* at 676.

Here, ASG had a duty to disclose material facts because ASG had to file SEC reports on its business. ASG, Catalano and Taylor also owed a duty to disclose material facts when they elected to make other statements in press releases and conference calls about ASG's healthcare revenues and costs. As ASG's restatement reflects, ASG's expenses were misstated every quarter during the five year period. ASG's reported cost margins—one of the most important metrics to investors—were unreliable during the entire Class Period. *Id.* at ¶¶ 97, 134–135, 225–228, 236–245. In its restatement, ASG admitted that SPP had overstated its net income by at least $2.1 million, overcharged customers by at least $3.6 million, and undercharged others from whom it could no longer collect by at least $5.9 million. *Id.* at ¶ 222. The cost of investigating and correcting these practices was $7.7 million that is twice ASG's net income for the entire 2005 fiscal year. *Id.* at ¶ 74.

**\*44** As to the materiality of these nondisclosures, the Defendants cite the cumulative effect of the challenged practices on ASG's earnings of $347,000 with increased tax liability of $355,000. As stated earlier, with the exclusion of SPP's transactions with PHS and the sampling of only 30% transactions, the figures stated by the Defendants may be understated. ASG's profitability depended on ASG's control of its subsidiaries' costs. ASG admitted that the ratio of ASG's healthcare costs to its total revenue was the critical metric for its business. Significantly,

Plaintiffs allege that a market analyst advised investors that "subtle changes in this ratio can have a significant impact on the company's profitability." (Docket Entry No. 60, Amended Complaint at ¶ 37). Moreover, ASG's restatement admittedly was based only on a small sample of transactions (only 30% of SPP"s Class Period revenues). ASG's restatement allegedly excluded analysis of affected inter company earnings to achieve better results or to understate its actual losses or the scope of SPP's misrepresentations of its finances. *Id.* at ¶¶ 63–64. ASG's restatement conceded that additional restatements could be required due to SPP's accounting manipulations. *Id.* ¶¶ 229–23. As a result, a reasonable and strong inference arises that ASG understated the true impact of SPP's accounting practices. There is not a competing inference to explain these omissions about ASG's business practices.

The Court concludes that the Defendants' cited omissions of SPP's and PHS's actual practices and their cost effects on ASG's financial condition involve material facts and are actionable.

### c. The "In Connection With" Theory

The next related theory is that SPP's and PHS's business practices were a scheme that influenced the investors' purchases of ASG's securities and ASG did not disclose those practices to investors. Section 10(b) and Rule 10b–5 Section 10(b) extend to prohibit material omissions where there is "the commission of a manipulative act in connection with the sales of securities." *Cent. Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.,* 511 U.S. 164, 177, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). In *SEC v. Zandford,* 535 U.S. 813, 819, 825, 122 S.Ct. 1899, 153 L.Ed.2d 1 (2002), an action under § 10(b) and Rule 10b–5, the Court unanimously adopted the SEC's "broad reading of the phrase 'in connection with the purchase or sale of any security,' " and held that such "connection" occurs if the "fraudulent scheme" and a securities transaction "coincide." Earlier in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1975), the Supreme Court deemed the "first and third subparagraphs [of Rule 10b–5]" to include a securities claim based upon "a 'course of business' or a 'device, scheme or artifice' that operated as a fraud [where] the defendants devised a **plan** and induced [stockholders]

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   34

to disclosure of their shares without disclosing to them material facts." (emphasis added).

**\*45** To be sure, in *Sante Fe Industries, Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), the Supreme Court stated that Section 10(b) did not encompass "instances of corporate mismanagement." Rather, "Section 10(b)'s general protection of practices deemed by the SEC to be manipulative 'in this technical sense of artificially affecting market activity in order to mislead investors is fully consistent with the fundamental purpose of the 1934 Act to substitute a philosophy of full disclosure for the philosophy of caveat emptor....' " *Id.* at 476–77 (quoting *Affiliated Ute,* 406 U.S. at 151 (quoting *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963))). "No doubt Congress meant to prohibit the full range of ingenious devices that might be used to manipulate securities prices." *Sante Fe Industries,* 430 U.S. at 477.

*Zandford* also cautioned that "our analysis does not transform every breach of duty into a federal securities violation." 535 U.S. at 825 n4. In *Stoneridge Investment Partners. LLC v. Scientific–Atlanta, Inc.,* ——U.S. ——, ——, 128 S.Ct. 761, 766, 169 L.Ed.2d 627 (2008), the Supreme Court applied the *Zandford* standard and rejected securities claims premised on alleged losses after purchasing common stock and "sought to impose liability on entities who, acting both as customers and suppliers, agreed to arrangements that allowed the investors' company to mislead its auditor and issue a misleading financial statement affecting the stock price. We conclude the implied right of action does not reach the customer/supplier companies because the investors did not rely upon their statements or representations." Moreover, "the text of the 1934 Act does not in itself reach to those who aid and abet a § 10(b) violation." *Central Bank,* 511 U.S. at 177.

Under this theory, the challenged corporate practices should be "statistically significant", *In re Carter–Wallace, Inc.* 220 F.3d 38, 41 (2d Cir.1998) or "widespread," as "anecdotal" occurrences do not evince an unlawful business scheme in connection with the sales of securities. *In re Spectrum Brands, Inc. Sec. Litig.,* 461 F.Supp.2d 1297, 1310–11 (N.D.Ga.2006). Yet, in this Circuit, less frequent omissions, such as omissions of governmental scrutiny and legal actions over a company's practice

of selling defective products, were held actionable in *Bridgestone,* 399 F.3d at 670–80.

This Court has found that "plaintiffs' allegations regarding Columbia's failure to disclose that it engaged in improper business practices" is an actionable omission under Rule 10b–5. *Morse v. McWherter,* 200 F.Supp.2d 853, 861 (M.D.Tenn.1998)*vacated on other grounds*290 F.3d 795 (6th Cir.2000). *See also In re Rent–Way Sec. Litig.,* 209 F.Supp.2d 493, 508–09, 516–18 (W.D.Pa.2002) (upholding claims based on concealment of defects in internal accounting systems and controls).

The core of Plaintiffs' "in connection with" claims are ASG's, SPP's and PHS's business practices that caused ASG's financial condition and ASG's officers' statements about ASG'S financial condition to be false and misleading. In summary, the individual practices are:

**\*46** 1. SPP's computer practices that manipulated ASG's costs and revenues by delaying entry of falling prices rebates and discounts to customers so as to change higher price and to avoid credits to its customers.

2. PHS's practice of denying patients off-site hospitalization and higher medications and shifting staff personnel to reduce ASG's violations of PHS's contracts.

3. ASG's practice of terminating complaining employees and quick settlements of legal actions to avoid disclosures of PHS's practices as well as various government investigations of PHS.

4. ASG's lack of internal controls over SPP's and PHS's practices despite ASG's key executive officers' assurances to investors of such controls in public statements and ASG financial statements and certifications.

For these practices, Plaintiffs' allegations are based upon ASG's restatement and evidence from former officers and employees of ASG, SPP and PHS about these entities' practices.

On whether the defendants' practices nos. 1 and 2 were widespread, the Court deems probative the remarks of state and local governments about the results of their inquiries into PHS's practices.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   35

• **In late 2000,** government investigators looking into a string of inmate deaths in upstate **New York noticed a pattern of inadequate healthcare under PHS' direction, including, "low-level employees [who] were doing work normally done by better-credentialed people" and nurses without proper qualifications or working on suspended licenses, "making medical decisions and pronouncing patients dead." "Our sense was that what we were dealing with was not clinical problems but business practices," said James E. Lawrence, the New York State Commission of Correction's director of operations.**

• **In 2001 in Broward County, Florida, three state court judges ordered PHS to stop withholding expensive psychiatric drugs from inmates after they witnessed a parade of inmates showing in the court incoherent. "My impression was that it was money," Judge Susan Lebow told The New York Times. "The doctors were under corporate direction to not continue the medications."**

• Judge Lebow's concerns were eerily similar to those that had been raised in 2000 by five juvenile court judges in New York who had repeatedly taken PHS to task for failure to provide juvenile inmates with proper medication. Brooklyn Family Court Judge Philip C. Segal **held** the company in contempt for failing to give HIV medication to a teenage inmate. Bronx Judge Harold J. Lynch ordered a teenage girl to be taken out of PHS' care when she tried to commit suicide after her psychiatric medication was inexplicably discontinued. After another 14–year old girl suffering from bipolar disorder whose medication had been similarly discontinued appeared in Judge Paula J. Hepner's courtroom, the jurist told city lawyers that **the incident "is not just a single case. It's many cases."**

• And following one inmate's death **in 2001, the New York State Commission of Corrections denounced PHS as "reckless and unprincipled in its corporate pursuits, irrespective of patient care."**

**\*47** *Id.* at ¶ 144 (emphasis added).

As noted earlier, the market recognized that only small percentage increases in ASG' gross margin could adversely impact ASG's profitability. After the New York Times articles of February and March, 2005 about PHS's

practices in the second half of 2005, ASG's third quarter financial statements revealed its costs had risen to 99.7%, the highest level since 2001. *Id.* at ¶ 89. SPP's revenue dropped 18%. *Id.* at ¶ 91. ASG missed its guidance on net income by 83.5%; EBITDA fell by 42.5% and earnings per share by 74.5%. *Id.*

As to practice 3, Plaintiffs identify several legal actions against the Defendants for PHS's practices and ASG's increase of $6.1 million for future medical malpractice claims. Plaintiffs cite other legal actions by employees who were terminated for complaining about PHS's practices. *Id.* at ¶¶ 52 and 53. SPP's accounting practices were structurally defective as SPP's highly restrictive computer program for prices consistently did not record credits for rebates and discounts for SPP's customers. Plaintiffs also allege that SPP resold drugs from partially used "blister packs" without crediting customers for returns. *Id.* at ¶ 55, 56. Yet, these re-sales of returned drugs are not shown to violate SPP's individual customer agreements. Plaintiffs do not tie these resales to the accounting improprieties at SPP. Plaintiffs' allegation of Hartman's alleged reference to the sales as "recycling," *id.* ¶ 62, fails to raise a strong inference of scienter. However, SPP's extensive purchases of drugs from Canada also evinces a pattern and practice of corporate misconduct. SPP's circumvention of federal regulations by smuggling low-cost prescription medications into the United States from Canada is another unlawful practice to control ASG's costs and to meet ASG's market expectations for performance.

For the reasons stated above, the Court deems Plaintiffs sufficiently allege that PHS's and SPP's practices are widespread and systemic, as reflected in the extent of ASG's restatement and revised losses. The Court concludes that Plaintiffs' allegations demonstrate that nondisclosures of these practices constituted material omissions about ASG's actual practices, costs and gross margins during the class period and are actionable.

### d. Fraud on the Market

The "Fraud on the Market" theory of liability under Rule 10b–5 rests upon a presumption of reliance upon a showing of the Defendants' affirmative withholding of material facts affecting ASG's sale of securities. In *Affiliated Ute,* the Supreme Court considered securities

fraud claims involving the sale of stocks by a corporation that was created under the Ute Partition Act, 25 U.S.C. §§ 677–677aa. This corporation was organized to manage the Ute tribes' oil, gas and mineral asserts. In the sale of the corporations' stock, certain individuals who were selling stock, withheld from investors information that there was not a method to determine the stock's true value. The Supreme Court stated as to the reliance factor that:

> **\*48** Under the circumstances of this case, involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision ... [citations omitted]. This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact.

406 U.S. at 152–53. The rationale for presumption of reliance, in essence, is that it is impossible for the plaintiffs to show reliance upon facts there were not disclosed to them.

Subsequent decisions have clarified the *Affiliated Ute* presumption as limited to these circumstances in which there was an affirmative withholding of facts by a person under a duty to speak, i.e., where "the defendants ... stand mute in the fact of a duty to disclose as did the defendants' in *Affiliate Ute." Kirkpatrick v. J.C. Bradford,* 827 F.2d 718, 722 (11th Cir.1987). In *Kirkpatrick,* the *Affiliated Ute* presumption was held not to apply were "the allegations contend that the defendants undertook ... to disclose relevant information ... alleged to contain certain misstatements of facts and fail to contain other facts necessary to make the statements made, in light of the circumstances, not misleading." *Id.* at 722.

Here, given ASG's press releases and Catalano's and Taylor's public statements, these Defendants owed a duty to not withhold material facts about ASG's, SPP's and PHS's business from investors. To avoid undue repetition, the Court adopts its earlier stated rationale on Plaintiffs' omission for Plaintiffs' "in connection with" theories, to conclude that Plaintiffs' complaints states an actionable "fraud on the market" claim for the above cited omissions.

### 4. Plaintiffs' Scienter Allegations

To be sure, the ultimate issue on this motion is whether Plaintiffs' factual allegations present a strong inference of scienter. If the complaint fails to satisfy the scienter requirement, the Court must dismiss the plaintiffs complaint upon a motion of the defendant. 15 U.S.C. § 78u–4(b)(3). "[T]he Supreme Court has defined 'scienter' as a 'mental state embracing intent to deceive, manipulate or defraud.' " *In re Comshare,* 183 F.3d at 548. "Under current Sixth Circuit law, 'recklessness [also] satisfies the § 10(b)/Rule0b–5 scienter requirement.' " *Id.* Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 550.

In *Ley,* the Sixth Circuit noted:

> [These] factors .... while not exhaustive, are probative of scienter in securities fraud cases:

> (1) insider trading at a suspicious time or in an unusual amount;

> (2) divergence between internal reports and external statements on the same subject;

> **\*49** (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information;

> (4) evidence of bribery by a top company official;

> (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;

> (6) disregard of the most current factual information before making statements;

> (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;

(8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and

(9) the self-interested motivation of defendants in the form of saving their salaries or jobs.

..... We find this list, while not exhaustive, at least helpful in guiding securities fraud pleading.

543 F.3d at 810 (citation omitted).

Of the actionable practices and conduct listed in *Ley,* the following are presented under Plaintiffs' factual allegations of scienter: "(1) insider trading at a suspicious time or in an unusual amount;" "(2) divergence between internal reports and external statements on the same subject;" "(5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit;" "(6) disregard of the most current factual information before making statements;" "(7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication;" and "(8) the self-interested motivation of defendants." Plaintiffs also assert that the Defendants' possessed the requisite motive and opportunity to intentionally commit these acts and to be reckless in their statements giving rise to Plaintiffs' claims.

### "[I]nsider trading at a suspicious time or in an unusual amount"

Prior to October 2003, Plaintiffs allege that Catalano had never sold any of his ASG stock, but he liquidated more than 90% of his stock in October and November 2003, after ASG told investors that ASG's expense margins were under control and after ASG's stock price rose to $14.00 a share. *Id.* at ¶¶ 13, 19–32. Catalano received $5.2 million from his stock sales. *Id.* at ¶ ¶ 320, 321. In October and November 2003, Taylor first sold more than 90% of his ASG stock. *Id.* at ¶¶ 13, 19. These stock sales occurred after Taylor told investors that ASG's costs were under control. Id Taylor received $842,897 from these stock sales. *Id.* at ¶¶ 320 and 321. Plaintiffs allege that SPP's and PHS's unlawful contract practices were implemented to inflate the value of ASG's stock so as to increase Catalano's and Taylor's profits on their sales of their stock options. *Id.* at ¶¶ 30–40, 92–98, 319–324. The Court deems

the Plaintiffs' other allegations of insider trading to lack an adequate time to evaluate those trades for scienter purposes.

**\*50** For the Catalano and Taylor trades, the Defendants cite the time disparity between these insider trades in 2003 to the disclosure of PHS's practices in February 27, 2005 as precluding any inference of scienter, citing *In re Vantive Corp. Sec. Litig.,* 283 F.3d 1079, 1093–94 (9th Cir.2002) (insider trading more than a year before the press release of alleged damaging news did not give rise to a strong inference of scienter); *In re Kindred Healthcare,* 299 F.Supp.2d at 741 (stock sale eleven months before announcement of charge to earnings was not suspicious).

Yet, Plaintiffs allege that the timing of these trades was to maximize their profits before public disclosures of SPP's and PHS's improper practices. Plaintiffs' theory is that a reasonable and strong inference arises from the suspicious timing i.e. the date of the new cost control measures that ASG and these defendants enacted in April, 2002, supra at pp. 9–10, and the October and November 2003 insider trades of Catalano and Taylor. These insider trades occurred after improper cost control measures had been implemented to reduce ASG's costs and to inflate the value of ASG's stock. The cost controlling measures are the SPP's and PHS's deliberate practices that give rise to Plaintiffs' claims. These facts neutralize any favorable inference. In this context, the Court concludes that Plaintiffs present a reasonable and strong inference of insider trading as to Catalano and Taylor.

### "[D]ivergence between internal reports and external statements on the same subject"

On the internal inconsistency, ASG cited the existence of its internal controls, but ASG's restatement found a lack of internal controls that caused SPP's revenues to be systematically inflated for SPP's failure to credit customers their share of rebates, discounts and return credits. An employee, a fulfillment manager who reported directly to Hartman and Bryson, allegedly relates that SPP deliberately took advantage of CIPCS's shortcomings to manipulate the timing of price changes—inputting rising prices into the system before customer invoices were sent, and delaying input of falling prices until after invoices issued at outdated higher prices had been generated. *Id.* at ¶ ¶ 55 and 60. CIPCS's inability to

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   98

track more than one purchase price for any drug was allegedly well-known to the Defendants. *E.g.,* ¶¶ 59–63, 185–191. The information contained in the C1PCS database also clearly reflected that customers were not receiving credits for returned drugs, despite the fact that SPP's warehouse was overloaded with returns and had no place to store them. *Id.* ¶ 61. SPP's manual demonstrates how pervasive and routine these practices were at SPP. ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. *Id.* at ¶¶ 26, 309. *PR Diamonds* cited approvingly of precedent that found a strong inference arising where the company "touted the individual Defendants' careful monitoring of the very areas in which Intronet committed accounting violations." 364 F.3d at 688 (citation omitted). The Court reiterates its earlier conclusion that PHS's unlawful practices were widespread. The Court discerns an unfavorable inference from the Defendants' nondisclosure of SPP's and PHS's practices.

**\*51** Thus, the Court concludes Plaintiffs' allegations create a strong inference of scienter to state a valid claim given the clear and significant inconsistencies between ASG's published statements of its internal costs control and ASG's management strong focus on those controls and the lack of such controls for SPP's and PHS's actual practices.

### "[E]xistence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit"

According to Plaintiffs, a highly critical report of an investigation into the death of a Schenectady County inmate was due to PHS' refusal to provide medication needed to treat the inmate's Parkinson's disease. *The New York Times* quoted the Schenectady county attorney, Chris Gardner: "We were going to terminate them for cause, [b]ut they approached us and we mutually agreed to terminate the relationship." *Id.* at ¶ 48. ASG also settled another action for a Florida inmate in September, 2005. *Id.* at ¶ 51. As stated earlier, ASG set aside $6.1 million in reserves for future medical malpractice claims. Plaintiffs also refer to SPP and PHS employees who were terminated or forced to resign when they complained of SPP's and PHS's practices. *Id.* at ¶¶ 52, 53. The Court concludes that Plaintiffs' allegations about this practice are actionable given the deliberate nature of the practice.

### "[D]isclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication"

Plaintiffs allege ASG's restatement disclosed only limited information about SPP's accounting impropriety by disclosing only the "net" or "cumulative" impact of the misconduct. ASG allegedly deliberately failed to provide complete restated quarterly financial statements that would have revealed the extent to which quarterly results had been manipulated by the Defendants' illegitimate accounting practices. *Id.* at ¶¶ 83–84, 229, 246–260. Plaintiffs allege defendants did so in order to confuse investors about the impact of their fraud and to support their "net impact" argument in this action. In its restatement, ASG allegedly engaged in improperly "reclassifying" hundreds of millions of dollars in revenue during the Class Period. *Id.* ¶¶ 87, 246–260. These alleged acts allegedly destroyed the comparability of prior quarterly results, making it near impossible for all but the most sophisticated investors to unravel ASG's restatement and determine the extent to which investors had been misled. *Id.* at ¶¶ 87, 246–260

In the Sixth Circuit, misleading financial presentations that are intended to confuse rather than illuminate, can provide a strong inference of scienter. *See Bridgestone,* 399 F.3d at 684. As to Defendants' suggestion that ASG's restatement treatment is legitimate given the approval of outside auditors, Plaintiffs note that these same auditors also approved ASG's prior financial statements for five years covered by ASG's restatement. In any event, this argument raises fact issues that cannot be resolved on a motion to dismiss. *See e.g., Aldridge v. A.T. Cross Corp.,* 284 F.3d 72, 83 (1st Cir.2002) (auditors' failure to require restatement does not conclusively prove that financial statements complied with GAAP).

**\*52** In this Court's view, despite the cost of $7.7 million in ASG's internal investigation, ASG sampled only 30% of SPP's transactions and excluded SPP's sales to PHS. ASG conceded the prospect of future restatements and future customer claims for rebates and credits. Coupled with the alleged accounting errors, the Court concludes that these circumstances support a reasonable and strong inference that ASG's restatement is misleading as to the full extent

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   59

of SPP's practices and their impact on ASG's financial condition.

### Plaintiffs' other Scienter Contentions

To meet the scienter requirement, Plaintiffs' allegations must describe "multiple, obvious red flags." *PR Diamonds,* 364 F.3d at 687; *In re Comshare,* 183 F.3d at 553. In considering this issue, the Court must consider the totality of circumstances pled in the complaint and "sift Plaintiffs' allegations individually and then aggregate the nuggets of inference they generate ....." *PR Diamonds.* 364 F.3d at 684.

### ASG's Restatement

Again, the key to most of Plaintiffs' allegations and claims arise from the effect of ASG's restatement revealing differences from ASG's prior financial reports and the public statements of Defendants ASG, Catalano and Taylor. Yet, in the Sixth Circuit, "Plaintiffs' claim that a subsequent revelation of the falsehood of previous statement implies scienter lacks merit, since mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *In re Comshare,* 183 F.3d at 553. Moreover, a company's restatements of its finances involving millions of dollars has been rejected as evincing scienter. *PR Diamonds,* 364 F.3d at 671. As to Plaintiffs' contention that ASG's restatement covered five years, "although Plaintiffs speculate that it is likely that Defendant knew of the GAAP violations because they occurred over a long period of time, claims of securities fraud cannot rest on speculation and conclusory allegations." *In re Comshare,* 183 F.3d at 553 (internal quotes omitted). Based upon *PR Diamond* and *In re Comshare,* the Court concludes that the restatement alone does not give rise to a strong inference of scienter.

### Sarbanes–Oxley Certifications

Plaintiffs cite Catalano's and Taylor's certifications under Sarbanes–Oxley, that the Company's internal controls systems are "designed ... to provide reasonable assurance regarding reliability of financial reporting." (Docket Entry No. 60, Amended Complaint at ¶¶ 176–78)

(emphasis added). ASG cites its Form 10–Ks for both 2004 and 2005 disclosing that its internal controls were subject to "inherent limitations" and "may not prevent or detect misstatements." (Docket Entry No. 70, Appendix 2 at p. 30; Appendix 1 at p. 37). In *Garfield,* the Sixth Circuit stated "If we were to accept [Plaintiffs'] proffered interpretation of Sarbanes–Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." 466 F.3d at 1266.

**\*53** As stated earlier, under *Bridgestone,* the Court must also consider these certifications in light of the other circumstances alleged by the Plaintiffs. To be sure, a court "should not presume recklessness or intentional misconduct from a parent corporation's reliance on its subsidiary's internal controls." *In re Comshare,* 183 F.3d at 554. Where "Plaintiffs have failed to plead facts that show that revenue recognition errors at [a subsidiary] should have been obvious to [the parent company] or that [the parent company] consciously disregarded 'red flags' that would have revealed the errors prior to their inclusion in public statements, ... the Complaint fails to allege facts that give rise to a strong inference of scienter under § 10(b) and Rule 10b–5" *Id.* at 553, 554;*see also Ley,* 543 F.3d at 812.

For the reasons stated earlier, the Court concludes that Plaintiffs allege specific facts about ASG's consolidated financial statements and SPP's and PHS's practices as to controlling ASG's costs. ASG is a small, close-knit corporate family where executive officers met and shared detailed information about SPP's and PHS's actual costs and practices or were informed about these practices by other corporate employees before their public disclosure, Based upon the collective circumstances of Catalano's and Taylor's certifications of their personal involvement in ASG's and its subsidiaries' internal cost controls, Catalano's statement of ASG's management's "intense focus" on ASG's subsidiaries' costs, ASG's meetings and extensive corporate knowledge of SPP's and PHS's practices, and the internal reports to Catalano by PHS's officers of PHS's unlawful practices, the Court concludes the Plaintiffs' allegations give rise to strong inferences of scienter. These factual allegations, collectively, establish the red flags to create a strong inference of the Defendants' scienter, whether intentional or reckless.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    40

### ASG's GAAP Violations

As to Plaintiffs' claims for the Defendants' alleged violations of GAAP standards in ASG's reporting of its financial condition, Plaintiffs contend that essence of "cookie jar" accounting is to "smooth" a company's earnings by under-reporting revenues in "fat" quarters so they can be held over and reported in "lean" quarters. (Docket Entry No. 60, Amended Complaint at ¶¶ 85–86).

ASG allegedly admitted that "key members of SPP's senior management inappropriately established and used certain reserves during various periods over the last five years to more closely match SPP's reported earnings to its budgeted results." *Id.* at ¶¶ 75–76, 87, 145, 222,. This practice, commonly referred to as "cookie jar" accounting, allegedly demonstrates the Defendants' deliberate effort to manipulate improperly SPP's accounting to achieve desired results. *Id.* at ¶ 277.

As to ASG's revenue and cost recognition policy, ASG's March 28, 2002 SEC 10–K Report stated, in pertinent part:

> **\*54** Revenue and Cost Recognition

> The Company's contracts with correctional institutions are principally fixed price contracts adjusted for census fluctuations. Revenues earned under contracts with correctional institutions are recognized in the period that services are rendered. **Cash received in advance for future services is recorded as deferred revenue and recognized as income when the service is performed.** Healthcare expenses include the compensation of physicians, nurses and other healthcare professionals including any related benefits and all other direct costs of providing the managed care. **The cost of healthcare services provided or contracted for are recognized in the period in which they are provided based in part on estimates, including an accrual for unbilled medical services rendered through the balance sheet dates.** The Company estimates these medical claims reserve using an actuarial analysis prepared by an independent actuary taking into account historical claims experience (including the average historical costs and billing lag time for such services) and other actuarial data.

> *Id.* at ¶ 113.

In addition, Plaintiffs cite the lack of internal controls at SPP that caused SPP's clients not to receive credits due under their contracts. Plaintiffs allege that ASG admitted its lack of internal controls in its restatement:

> [T]he lack of adequate "internal control procedures necessary to reasonably detect material errors in revenues, expenses, accounts receivable, inventory, and accrued expenses, or to assure that SPP's customers were being charged in compliance with the terms of their contracts. Among the internal controls that were lacking during the Class Period were procedures necessary to ensure that contractual pricing terms were allowed when customers were billed, returns were properly credited to customer accounts, and ASG[ ]'s finance department reviewed SPP's monthly accounting reconciliations to prevent improper use of accruals and reserves and other accounting gimmicks used to manage or inflate reported results. *See* ASG[ ]'s FY05 Report on Form 10–K, Item 9A. **For example, as recounted by numerous former employees of SPP, ASG[ ] and its management knew that the Company had recurrent problems with maintaining accuracy in financial reporting due to its use of computer systems that were unable to properly manage sales and expense dates. CIPCS, SPP's system in place at the start of the Class Period, or earlier, repeatedly caused lost or delayed prescription orders, and was unable to track and apply contract-specific pricing terms. CIPCS' replacement, called SPIN, was plagued with similar problems from the time it was improperly launched in June 2005. *See infra* § VII.C.**

> **In this 2005 Form 10–K ASG[ ] admitted that the Company's internal controls "were not designed or operating effectively to reduce to remote the likelihood that material errors [in ASG[ ]'s consolidated financial statements] would be prevented or detected in a timely manner."**

> **\*55** *Id.* at ¶¶ 78 and 79 (emphasis added).

Plaintiffs set forth a series of financial statements and cite GAAP rules and bulletins to reflect their contentions that ASG's restatement of its finances for 2000, 2001, 2003, 2004 and 2005 violated GAAP standards. *Id.* at ¶¶ 234–237, 241, 243, and ¶¶ 248, 278 and 292. Plaintiffs add that after the restatement, ASG failed to amend its 14 Form 10–K reports that contained the same information that needed to be revised on other documents. *Id.* at ¶ 243.

ASG's report on its 2005 fiscal year 10–K, reflects that ASG reclassified revenues as "discontinued operations." *Id.* at ¶¶ 246–247.

Based on these GAAP violations, Plaintiffs allege that these "reclassifications" are adjustments with adverse tax consequences. *Id.* at ¶ 246. Specifically, Plaintiffs challenge ASG's reclassification of contracts as improper under GAAP.

> ASG claimed that the "reclassification" of revenues was required by FASB Statement of Financial Accounting Standards ("SFAS") No. 144 to reflect revenues from contracts that had been cancelled or would not be renewed as resulting from discontinued operations. Because, however, ASG had *already* applied SFAS No. 144 at the time its financial statements were originally issued, no such change was required or permitted by SFAS No. 144. Nor did Accounting Principles Board ("APB") Opinion No. 20, which governs ASG's restatement, permit ASG to retroactively reclassify the revenues in its past financial statements, absent recognition that those revenues were false at the time they were originally reported.

*Id.* at ¶ 250.

Plaintiffs contend that the Defendants' accounting errors were not minor because ASG's restatement here impacted five years of ASG's financial results, resulting in changes to virtually every line item and metric important to investors, including its revenues, expenses, cost margins, EBITDA (Earnings Before Interest, Taxes, Depreciation, and Amortization), inventory, accounts receivable, accrued expenses and reserves. Plaintiffs allege ASG overstated its income for continuing operations by $18 million and understated its income from discontinued operations by $14 million. *Id.* at ¶ 248. For these collective practices, Plaintiffs allege that "[a]s a result of these accounting manipulations, ASG's reported revenues, healthcare expenses, SG & A expenses, gross margins, medical expense margins, total cost margins, EBITDA,

net income, EPS, inventory, A/R, and accrued expenses were materially false and misleading to investors. *Id.* at ¶ 268

In this Circuit, "[t]he failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare,* 183 F.3d at 553 (citations omitted). To give rise to an inference of scienter, accounting violations must be of a "type and scope" to be "obvious" or to show the " 'magnitude' 'pervasiveness' and 'repetitiveness' of the company's violations of 'simpl[e] accounting principles' amounting to a night-and-day difference.' " *PR Diamonds,* 364 F.3d at 684, 685 (quoting *In re Micro Strategy, Inc. Securities Litig.,* 115 F.Supp.2d 620, 636, 637 (E.D.Va.2000). For accounting errors to suffice, the Plaintiffs must also allege facts "that Defendants knew or could have known of the errors or that regular procedures should have alerted them to the errors sooner than they actually did." *In re Comshare,* 183 F.3d at 553. Yet, accounting errors can be "viewed in combination with other allegations." *Id.*

**\*56** The accounting errors at SPP were structural in that SPP's computer system lacked the programming capability to calculate correctly and reflect the amounts owed to clients in rebates or discounts from SPP's sellers or from returned medications. As to the effect of SPP's customer billing errors and other accounting irregularities, ASG notes that SPP contributed less than 6% to its aggregate revenues during the alleged Class Period. (Docket Entry No. 60, Amended Complaint ¶¶ 5, 222, 225, 228). Yet, SPP was identified as a key source of ASG's future growth. *Id.* at ¶ 161. ASG restated previously filed financial statements for the years ended December 31, 2001 through December 31, 2004 and for the first six months of 2005. ASG's restatement reduced prior reported net income for these periods by $2.1 million in the aggregate, as reflected in the Effects of Restatement schedule, and reduced previously reported retained earnings as of January 1, 2001 by $347,000. Plaintiffs also allege that Defendants made additional corrective disclosures on October 24, 2005 (announcement of internal investigation) and March 16, 2006 (announcement of results of investigation: restatement of earnings), which caused material drops, 28.1% and 28.8%, in ASG's stock price, respectively. *Id.* at ¶¶ 300, 304–305.

Plaintiffs allege that Catalano, Taylor, Hartman and Bryson closely monitored ASG's reported margins and medical expenses, particularly the pharmacy, staffing and off-site utilization costs that caused ASG's 2001 losses and are the core of the underreported expenses during the Class Period. ¶¶ 328–333. Plaintiffs allege that through regular meetings and systematic reports detailing performance at each prison where ASG operates, ASG's key officials knew of the expense trends and other business practices at PHS and SPP. *Id.* at ¶ 26, 308–316. ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. *Id.* at ¶¶ 26, 309.

Despite contentions that ASG maintained a control environment that complied with the Tread way COSO standard, one of the strictest and highest standards of internal control, ASG admitted to numerous, and basic structural deficiencies in its internal control systems during the Class Period, including the lack of procedures to assure that: (i) contract pricing rules be placed in SPP's accounting systems; (ii) changes to customer pricing rules be documented; and (Hi) written policies to define pricing and return policies. *Id.* at ¶¶ 183, 287–289.

In combination with the Defendants' other alleged statements, nondisclosures and corporate practices, the Court concludes that Plaintiffs' allegations of systemic accounting violations add to the strong inference of the Defendants' scienter.

### Motive and Opportunity Allegations

With the analyses of the various statements, nondisclosures and unlawful business practices, the Court now addresses Plaintiffs allegations of the Defendants' "motive and opportunity" that Plaintiffs assert also give rise to a "strong inference" of scienter. As to the motive, Plaintiffs cites the Defendants' reaction to negative business conditions in the second quarter of 2001, when SPP's drug and PHS's off-site utilization expenses caused ASG's healthcare margins to reach 99.7% of revenues, and reduced its book value from $18.94 to $8.04 per share. (Docket Entry No. 60, Complaint at ¶¶ 4, 33–37). Plaintiffs' theory is that Defendants' concealed SPP's improper accounting actions that artificially reduced SPP's costs below contractually required levels to address ASG's 2001 results. *Id.* at ¶¶ 42–82, 308–316. Plaintiffs

assert that these two key circumstances demonstrate the Defendants' motivation to falsify information to assure investors that ASG had remedied its past cost containment problems.

**\*57** Financial pressures may provide the motive. *PR Diamonds,* 364 F.3d at 688; *In re Cardinal Health Sec. Litig., 426 F.Supp.2d 688, 726–27 (S.D.Ohio 2006).* "[S]elf-interested motivation of defendants in the form of saving their salaries" can supports scienter. *Bridgestone,* 399 F.3d at 687. "A very difficult position" and "unusual pressures to perform," coupled with other factors, can provide motive. *Telxon,* 133 F.Supp.2d at 1029. Plaintiffs' allegations are that the individual Defendants' motives were also to secure promotions and to enhance their compensation. In this Circuit "an executive's desire to protect his position within a company or increase his compensation" does not "comprise a motive for fraud." *PR Diamonds,* 364 F.3d at 690, nor are allegations that Defendants would receive bonuses linked to company performance sufficient. *In re Kindred Healthcare,* 299 F.Supp.2d at 741.

The Court concludes that collectively, Plaintiffs' factual allegations give rise to a strong inference of scienter from the Defendants' motive and opportunity to engage in these practices. With the results of 2001, ASG's gross margin had a 99.7 % level of costs, SPP lost 18.5% in revenue, and ASG's chief financial officer was terminated. Plaintiffs assert that these circumstances demonstrate the Defendants' motivation to falsify information to assure investors that ASG had controlled its past cost containment problems and to remain a financially viable company in which to invest. Plaintiffs allege the Defendants' responses to these conditions were to institute **systemic** business practices at PHS that refused to provide contractually required medical services to inmates, understaffed its medical operations, prisons, and failed to credit the government for required rebates, discounts and product returns at SPP. [9] *Id.* at ¶¶ 5–6,42–72. These alleged practices had a direct positive effect on ASG's operating margins that investors utilize to analyze ASG's performance. *Id.* at ¶¶ 32–41, 88–91, 281–283. When these practices were instituted without effective or any meaningful internal controls, ASG experienced a reversal of ASG's earnings and a significant rise in the value of ASG's stock during the Class Period. *Id.* at ¶¶ 88–91. Without reasonably effective cost controls or accounting review, the factual information in ASG's

reports on its financial condition were admittedly serious, inaccurate and misleading.

<sup>9</sup> Plaintiffs allege defendants' fraud began prior to the class period. *Id.* at ¶¶ 111–127.

To undermine the inference of scienter, ASG cites its repurchase of some $3 million worth of shares of its own stock in furtherance of a $30 million stock repurchase program between the July 26, 2005 announcement of the program and suspension of the program in fall 2005 during the pendency of the Audit Committee investigation. To be sure, "[a] company's decision to reinvest its own stock undermines an inference of scienter because it presumably would make no sense to purchase that stock if defendants knew the prices to be inflated." *Morse,* 200 F.Supp.2d at 898 (internal quotation marks omitted). There are ambiguous inferences for these Defendants' purchases of ASG stock. Yet this repurchase decision occurred after publication of the New York Times articles in February and March, 2005 and in that context, this repurchase program does not gives rise to a favorable inference,

**\*58** As to Plaintiffs' allegations about the firing of Hartman and Bryson, the adoption of sweeping internal Reforms, and the resignation of members of ASG's Audit Committee, some courts do describe these events as unusual. As one court recognized in similar circumstances:

> This was strong medicine. Such house-cleaning and reforms do not follow innocent mistakes. Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls. These circumstances, combined with the announcement of the impending restatement, establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question....

*In re Sipex Corp. Sec. Litig.,* 2005 WL 3096178, at \*1 (N.D.Cal. Nov.17, 2005).

In closing, Plaintiffs rely on former ASG executives for their allegations on the origin, nature and cause of ASG's and SPP's false accounting practices. With specific factual allegations, and Plaintiffs' anonymous sources are not altogether irrelevant to the scienter analysis. *Ley,* 543 F.3d at 811. A complaint may rely upon persons with personal knowledge of relevant events, including a defendant's public statements or admissions, or public documents for its allegations of specific facts on a company's internal operations. *Novak v. Kasaks,* 216 F.3d 300, 313–14 (2d Cir.2000). Plaintiffs note that the naming of such sources is not required. *Id.* For example, statements of former vice presidents are permissible to describe the information they personally related to Catalano about problems at sites where they were personally responsible for overseeing operations. (Docket Entry No. 60, Amended Complaint at ¶¶ 51–52). Hearsay is a sufficient basis on which to allege such facts in a complaint. *In re Air Disaster at Lockerbie Scotland on Dec. 21, 1988,* 144 F.R.D. 613, 617 (E.D.N.Y.1992).

In sum, the Court concludes that collectively, Plaintiffs' factual allegations are sufficiently specific to give rise to a strong inference of recklessness in the Defendants' actionable misrepresentations, omissions and unlawful business practices as set forth above.

### 5. Plaintiffs' Section 20(a) Claims

Section 20(a) of the Securities Exchange Act, 15 U.S.C. § 78t, Section 15 of the 1933 Act, and Section 20(a) of the 1934 Act impose legal responsibilities upon the "controlling person" in a publicly traded company for violations of the Securities Act by their agents, subject to certain defenses. Section 15 of the 1933 Act provides as follows:

> Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is

liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

**\*59** 15 U.S.C. § 77*o*. Similarly, Section 20(a) of the 1934 Act provides:

> a. Every person who, directly or indirectly, controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such control person is liable unless the controlling person acted in good faith and did not directly or indirectly induce the acts constituting the violation or cause of action

Under federal securities law, the controlling person must be an actual participant and in control of the specific activity at issue. *Sanders Confectionery Prods. v. Heller Fin., Inc.,* 973 F.2d 474, 486 (6th Cir.1992). "[E]ssential elements" for a control person is of "power to control the specific transaction or activity upon which the primary violation is predicated"**and** "actual participation (i.e., exercise control) in the operations of the primary violator in general." (emphasis added). "Because 'controlling person' liability is derivative, however, a plaintiff may hold a defendant liable under this theory only if the defendant controlled an entity that violated the Securities Act." *D.E. & J. Limited P'ship v. Conaway,* 133 Fed. Appx 994, 1001 (6th Cir.2005). Accord *In re Prison Realty Secs. Litig.,* 117 F.Supp.2d 681, 692 (M.D.Tenn.2000); *Azzolini v. Corts Trust II for Provident Financial Trust I,* 2005 WL 2253971, at \*13 (E.D.Tenn. Sept.16, 2005). PSLRA's strong inference requirement does not apply on this claim. *See Florida State Bd. of Administration v. Green Tree Financial Corp.,* 270 F.3d 645, 660 (8th Cir.2001). "Allegations of control are not averments of fraud and therefore need not be pleaded with particularity." *In re Nat'l Century Fin. Enters.,* Case No. 2:03–md–1565, 2006 WL 469468, at \*23 (S.D.Ohio Feb.27, 2006).

In *In re Telxon Corp. Sec. Litig.,* 133 F.Supp.2d 1010 (N.D.Ohio 2000), that court explained as to corporate officials:

> [T]itles and functions alone do not establish "controlling person" status. There must be some showing of actual participation in the corporation's operation or some influence before the consequences of control may be imposed. Further, there must be some showing of actual participation in the activities which allegedly violated the securities laws.

*Id.* at 1032. *See also Bomarko, Inc. v. Hemodynamics, Inc.,* 848 F.Supp. 1335, 1339 (W.D.Mich.1993).

As applied here, Plaintiffs have sufficiently alleged that ASG controls SPP and PHS as the sole owner of PHS and SPP. SPP controlled its own financial statements, that were incorporated into ASG's consolidated financial statements, and to that extent SPP controlled SG. ASG had direct control over SPP as reflected in its firings of the individual defendants Hartman and Bryson. In these circumstances, control is presumed as to Defendants ASG and SPP. *See In re Advanced Lighting Techs., Inc.,* Case No. 1:99 CV 0836, 2000 U.S. Dist. LEXIS 20628, at \*22–23 (N.D. Ohio June 6, 2000) (section 20(a) sufficiently pled).

**\*60** ASG publicly touted its customized computer systems that permit ASG executives to monitor revenue and expense continually across the country. *Id.* at ¶¶ 26, 309. *PR Diamonds* cited approvingly of precedent that found a strong inference arising where the company "touted the individual Defendants' careful monitoring of the very areas in which Intronet committed accounting violations." 364 F.3d at 688 (citation omitted).

As to the individual Defendants' liability as controlling persons, "high-level executives can be presumed to be aware of matters central to their business's operation. *PR Diamonds,* 364 F.3d at 688. "Courts may presume that high-level executives are aware of matters related to their business' operation where the misrepresentations as omissions pertain to 'central, day-to-day operational matters.' " *Cardinal Health,* 426 F.Supp.2d at 724. This is particularly appropriate for "[f]acts critical to a business's

core management." *In re Ancor Commc'ns., 22 F.Supp.2d 999, 1005 (D.Minn.1998).* A company's chief executive officer who regularly participates in meetings, signs SEC filings and participates in earnings announcements can be sufficiently involved so as to raise strong inference of scienter. *In re Envoy Corp. Sec. Litig., 133 F.Supp.2d 647, 663–64 (M.D.Tenn.2001).* In *Envoy,* the Honorable Todd J. Campbell, Chief Judge held that plaintiffs' § 20(a) claims were sufficiently pled against that corporate defendant's top officers "because of their respective positions in the company, were each involved in the day-to-day management of [Defendant Company] ... and ... controlled and/or possessed the authority to control the contents of [Defendant Company]'s reports, press releases and presentations to the public and, through that power, fraudulently misled the investing public." *Id.* at 762.

Plaintiffs' specific allegations are that Catalano, Taylor, Hartman and Bryson who were at the highest levels of ASG's, SPP's and PHS's management, initiated, concealed and maintained the above described practices. Catalano and Taylor were ASG's primary spokespersons to investors and analysts and personally directed the conference calls, public press releases and other disclosures on ASG's finances and the financial performance of ASG's subsidiaries. Taylor was ASG's chief financial officer who, according to ASG's website, was responsible for "direct[ing] the Company's SEC] reporting," "corporate accounting," "PHS site accounting," "operational analysis," "budgeting," and "investor relations." *Id.* at ¶ 21. Plaintiffs allege specific practices, meetings, and procedures from persons with detailed contemporaneous knowledge of Catalano's and Taylor's personal involvement in these corporate cost control practices and decisions involving ASG, SPP and PHS. *Id.* at ¶¶ 26, 308–316.

In their Sarbanes–Oxley certifications, Defendants Catalano and Taylor stated their shared responsibility to ensure adequate controls at ASG In these certifications, Catalano and Taylor certified that their personal responsibilities on these control measures included ASG's "consolidated subsidiaries." *Id.* at 60. Every quarter, Catalano and Taylor specifically certified that they had each personally reviewed the controls at ASG "including its consolidated subsidiaries" during the past 90 days, and found them to be both reasonably adequate. *Id.* at ¶¶ 176–178. Here, ASG Catalano, chief executive officer and Taylor, chief financial officer, specifically undertook

responsibility for designing, maintaining, and certifying the adequacy of the internal controls at PHS that shares offices with ASG and SPP that is nine miles away. *Id.* at ¶¶ 18, 175–178. Under SEC rules, these responsibilities include:

> **\*61** Disclosure controls and procedures [would] include, without limitation, controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, **including its principal executive and principal financial officers,** or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure.

SEC Rule 13a–15(e), 17 C.F.R. 5240.13a–15(e); SEC Rule 15d–15(e), 17 C.F.R. 5240.15d–15(e). (emphasis added).

The Court concludes that Catalano and Taylor are controlling persons as to ASG, SPP and PHG. From a management perspective, ASG, SPP and PHS are small companies with at least one interlocking officer, Hartman, who was SPP's chief executive officer, PHS's chief executive officer and ASG's executive vice-president.

Plaintiffs' allegations are that with Catalano and Taylor, Hartman and Bryson closely monitored ASG's reported margins and medical expenses, particularly the pharmacy, staffing and off-site utilization costs, including for particular PHS sites. Hartman and Bryson were chief executive officers at SPP where accounting errors based upon SPP's defective computer program for pricing and SPP's manual were widespread. Governmental inquiries revealed that PHS's activities were a product of corporate management to reduce PHS's costs. ASG told investors on March 15, 2006 that the "key managers" responsible were no longer with ASG that can reasonably be inferred as meaning Hartman and Bryson, who were fired in December 2005. ASG's restatement described these practices as dated to the time ASG acquired SPP when Hartman and Bryson were in charge. *E.g.,* ¶¶ 54, 240; *see also* ¶¶ 27–28.

In these collective circumstances, with all favorable inferences to the Plaintiffs, as required for this type of motion, Plaintiffs have properly alleged that Catalano and Taylor closely monitored ASG's reported margins and medical expenses, and Hartman and Bryson managed SPP's pharmacy costs and PHS's staffing and off-site utilization costs that caused ASG's 2001 losses. For these reasons, the Court concludes that Catalano, Taylor, Hartman and Bryson are controlling persons of ASG, PHS and/or SPP.

### 6. *Dura's* Injury Requirement

Defendants challenge Plaintiffs' contention that they are entitled to recover "losses" resulting from declines in the price of ASG's shares following earnings announcements in October 2004 and February 2005, even though neither of these announcements revealed to the market any of the alleged fraudulent practices at PHS and SPP. (Docket Entry No. 60, Amended Complaint at ¶¶ 300–02). Defendants characterize these announcements as disappointing news of ASG's margins and earnings. Defendants contend that because these disclosures did not reveal the alleged fraud to the market, Plaintiffs have not suffered any actionable losses, citing *Initial Pub. Offering,* 399 F.Supp.2d 261, 266 (S.D.N.Y.2003) ("[A] failure to meet earnings forecasts has a negative effect on stock prices, but not a corrective effect.... It does not disclose the scheme; therefore it cannot correct the artificial inflation caused by the scheme.") and *In re Compuware See. Litig.,* 386 F.Supp.2d 913, 919 (E.D.Mich.2005) (allegations linking drops in stock price to disclosures of financial news that do not reveal fraud are insufficient to establish loss causation).

**\*62** Yet, Plaintiffs also allege that despite the February 2005 announcement, the alleged fraudulent practices at PHS and SPP remained concealed from investors. *Id.* ¶ 302. Plaintiffs allege that Defendants' false statements and earnings disclosures on specific dates caused the artificial increase in ASG's stock price and sets forth the amount of that inflation. *Id.* at ¶ 298. Plaintiffs compare ASG's stock price with broader market indices and an industry peer group to allege that ASG's stock price increases were attributable to Defendants' false representations, rather than industry or market-wide factors. *Id.* at 298.

Plaintiffs' complaint also alleges that public disclosures of the Defendants' conduct at PHS also caused ASG's stock price to decline. *Id.* at ¶ 9, 88, 92–94, 223, 293–306. Plaintiffs cite negative earnings announcements after February 27, 2005, the date of the first New York Times article which plaintiffs allege began to reveal conditions concealed by defendants' fraud scheme and to cause ASG's stock price to drop by 8.3% and 9.7%, respectively. *Id.* at ¶¶ 300–302.

The Reform Act provides that "the plaintiff shall have the burden of proving that the act or omission of the defendant alleged to violate this [chapter] caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). Fed.R.Civ.P. 8(a)(2) requires that Plaintiff plead "the relevant economic loss." Moreover, Plaintiffs' complaint must provide some basis for a causal connection between plaintiffs' loss and defendants' misconduct. *Dura Pharms. v. Broudo,* 544 U.S. 336, 347, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). In *Dura,* the Supreme Court noted that the pleading requirements for loss causation "are not meant to impose a great burden upon a plaintiff," *id.* at 347, but a plaintiff must allege "a causal connection between the material misrepresentation and the loss." *Id.* at 342. The securities plaintiff must allege that the misrepresentations or concealment "made its way into the market" or became "generally known" to the market and thereby caused a company's stock price to decline. *See Lenten v. Merrill Lynch & Co.,* 396 F.3d 161, 173 (2d Cir.2005) (plaintiffs must allege that the purported misstatements or omissions "concealed something from the market that, when disclosed, negatively affected the value of the security").

The Court concludes that Plaintiffs' allegations are sufficient for such causation under Fed.R.Civ.P. 8 and *Dura,* with the decline of ASG's stock after the *New York Times* article on PHG's practices. Moreover, with Plaintiffs' fraud on the market theory, Plaintiffs and the Class have suffered damages in that, in reliance on the integrity of the market, Plaintiffs paid artificially inflated prices for ASG's publicly traded securities. *See D.E. & J. LL.P'ship v. Conaway,* 133 Fed. Appx. 994, 999, 1001 (6th Cir.2005). In *Conaway,* the plaintiff did not attempt to allege any "causal connection" between the stock price drops and defendants' earlier misstatements but instead sought to establish loss causation on allegations of price inflation alone. *Id.* at 999–1000. *See also Semerenko v. Cendant Corp.,* 223 F.3d 165, 186–87 (3d Cir.2000) ("So

long as the alleged misrepresentations were a substantial cause of the inflation in the price of a security and in its subsequent decline in value, other contributing forces will not bar recovery.").

**\*63** As to the Defendants' contention of alternate causes of Plaintiffs' losses, the Court agrees with the Seventh Circuit that "it is possible for more than one cause to affect the price of a security and, should the case survive to that point, a trier of fact can determine the damages attributable to the fraudulent conduct." *Caremark, Inc. v. Coram Healthcare Corp.,* 113 F.3d 645, 649 (7th Cir.1997)

As to the Defendants' reliance on *In re Compuware Sec. Litig.,* 386 F.Supp.2d 913 (E.D.Mich.2005), there it was "undisputed" that the lead plaintiffs sold all of their stock "well before" any corrective disclosure or stock price decline. Here, Plaintiffs did not sell their stock prior to the partial corrective disclosures which revealed the fraud to the market and caused ASG's stock price to decline. Further, in *In re Compuware,* the plaintiffs did not "allege that a price decline immediately accompanied the ... disclosure [of fraud], leaving th[at] court to speculate what portion of the loss, if any, should be attributed to the disclosure or whether the loss was caused by other

factors." *Id.* at 919. Plaintiffs here have made numerous references in their Amended Complaint that reflect the timing of the loss causation, particularly with regards to the timing of the fraud, the dates on which it was slowly revealed to the market, and the accompanying effect on ASG's stock price. (Docket Entry No. 60, Amended Complaint at ¶¶ 4–7, 16, 41, 44, 293–306.)

## C. Relief

For the above stated reasons, the Court concludes that the Plaintiffs have alleged sufficient specific facts that collectively state actionable claims under Section 10(b) and Rule 10b5. Accordingly, the Defendants' motion to dismiss should be denied.

An appropriate Order is filed herewith.

Entered this the *30th* day of March, 2009

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 1348163, Fed. Sec. L. Rep. P 95,203

---

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 4125647
Only the Westlaw citation is currently available.
United States Court of Appeals,
Sixth Circuit.

IN RE: BANCORPSOUTH, INC., et al., Petitioners.

No. 17–0508
|
FILED September 18, 2017

**Attorneys and Law Firms**

Robert Bruce Allensworth, Kirkpatrick & Lockhart Preston Ellis Gates, Boston, MA, Krista Consiglio, Amy J. Eldridge, Jeffrey B. Maletta, Nicholas George Terris, Kirkpatrick & Lockhart Preston Ellis Gates, Washington, DC, Thomas Anderton Wiseman, III, Wiseman Ashworth Law Group, Nashville, TN, for Petitioners.

Susan Katina Alexander, Andrew Love, Robbins Geller Rudman Dowd, San Francisco, CA, Pedro A. Herrera, Sugarman & Susskind, Coral Gables, FL, Christopher P. Lyons, Robbins, Salomon & Patt, Chicago, IL, Jerry E. Martin, Timothy L. Miles, Barrett Johnston Martin & Garrison, Nashville, TN, Maureen E. Mueller, Jack Reise, Sabrina Tirabassi, Robbins Geller Rudman & Dowd, Boca Raton, FL, Christopher M. Wood, Robbins Geller Rudman & Dowd, Nashville, TN, for City of Palm Beach Gardens Firefighters Pension Fund.

Before: SUHRHEINRICH, MOORE, and CLAY, Circuit Judges.

ORDER

**\*1** For the second time in this securities fraud litigation, Defendant BancorpSouth, Inc. and its chief officers (collectively "BancorpSouth") petition this court, pursuant to Federal Rule of Civil Procedure 23(f), for permission to appeal the district court's order certifying a class action. Plaintiffs allege violations of § 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b5, arising out of alleged misrepresentations and omissions in merger agreements and other documents filed with the Securities and Exchange Commission. Plaintiffs rely on the presumptions of reliance on material misrepresentations and omissions, articulated in Basic Inc. v. Levinson, 485

U.S. 224, 241 (1988), and Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972), to satisfy the predominance requirement of Federal Rule of Civil Procedure Rule 23(b)(3).

A court of appeals may permit an appeal from a district court order granting class action certification. Fed. R. Civ. P. 23(f). We have "broad discretion to grant or deny a Rule 23(f) petition, and any pertinent factor may be weighed in the exercise of [our] discretion." In re Delta Air Lines, 310 F.3d 953, 959 (6th Cir. 2002). And a "Rule 23(f) appeal is never to be routine." Id. The court may consider (1) the likelihood of success on the merits of the challenges to the class certification order; (2) whether the class certification decision would effectively terminate the litigation for either party (the "death-knell factor"); (3) whether the petition raises novel or unsettled questions of law relevant to both the instant case and class action litigation in general; and (4) the procedural posture of the case in the district court. Id. at 960. If the district court rigorously analyzed the correct factors, we review the certification order for an abuse of discretion. Id.

We first consider whether BancorpSouth has shown a likelihood of success on appeal. BancorpSouth argues that: (1) Plaintiffs did not establish the first element of the Basic presumption because the SEC filings, although publicly available, were not publicly known; (2) BancorpSouth met its burden to rebut the presumption, if it did pertain, under Federal Rule of Evidence 301; and (3) the district court misinterpreted and misapplied the presumption of reliance on material omissions. The Basic fraud-on-the-market presumption is based on the "premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.' " Halliburton Co. v. Erica P. John Fund, Inc., 134 S.Ct. 2398, 2410 (2014) (quoting Basic, 485 U.S. at 247 n.24). But, "[i]f the misrepresentation was not publicly known, then it could not have distorted the stock's market price." Id. at 2413. BancorpSouth urges us to distinguish between "publicly available" and "publicly known," but neither Basic nor Halliburton makes this distinction.

If the Basic presumption pertains, a defendant may rebut it with "evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock." Halliburton, 134 S.Ct. at 2414. BancorpSouth maintains that it rebutted the Basic

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 1

presumption because it demonstrated a lack of price impact at the time the alleged misrepresentations were made. But price impact may be demonstrated either at the time that the alleged misrepresentations were made, or at the time of their correction. *See id.* With respect to material omissions, *Affiliated Ute* held that "positive proof of reliance is not a prerequisite to recovery." 406 U.S. at 153. The district court reasoned that BancorpSouth's incomplete and allegedly misleading voluntary disclosures imputed upon them a duty to fully disclose material facts. "This obligation to disclose and this withholding of a material fact establish the requisite element of causation in fact." *Affiliated Ute*, 406 U.S. at 154. Although *Affiliated Ute* has never been applied at the class-certification stage, the district court did not abuse its broad discretion in doing so. Given our deferential standard of review, BancorpSouth has not shown a likelihood of success on the merits.

**\*2** The remaining factors also weigh against granting an appeal. BancorpSouth does not argue that class certification tolls the death knell of the litigation, nor does it "provide the court insight into potential expenses and liabilities." *In re Delta Air Lines*, 310 F.3d at 960. BancorpSouth correctly notes that the presence of novel or unsettled questions may support interlocutory review, especially "when the question is of relevance not only in the litigation before the court, but also in class litigation in general." *Id.* But, although BancorpSouth raises questions that are unsettled in class-securities fraud actions, the certification decision at issue does not turn on their answers. Moreover, given that the district court indicated that it might reconsider its certification following further discovery, this case's procedural posture does not compel immediate review.

The petition for permission to appeal the class certification order is **DENIED**.

**All Citations**

Not Reported in F.3d, 2017 WL 4125647

---

 © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   2

KeyCite Yellow Flag - Negative Treatment

Distinguished by Cooper v. Thoratec Corporation, N.D.Cal., May 8, 2018

2017 WL 6026244
United States District Court, N.D. California,
San Jose Division.

IN RE FINISAR CORPORATION
SECURITIES LITIGATION

Case No. 5:11-cv-01252-EJD
|
Signed 12/05/2017

ORDER DENYING MOTION
FOR CLASS CERTIFICATION

Re: Dkt. No. 131

EDWARD J. DAVILA, United States District Judge

**\*1** Lead Plaintiff, the Oklahoma Firefighters Pension & Retirement System ("Plaintiff"), brings this putative securities fraud class action against Defendants Finisar Corporation ("Finisar"), Eitan Gertel, and Jerry S. Rawls (collectively, "Defendants"), alleging that Defendants issued a single false or misleading statement on December 2, 2010, denying an inventory build-up of Finisar's key telecom products by the Company's customers. Presently before the Court is Plaintiff's motion for class certification. The Court finds it appropriate to take the motion under submission for decision without oral argument pursuant to Civil Local Rule 7-1(b). Having considered the parties' papers and for the reasons explained below, Plaintiff's motion for class certification is denied.

## I. BACKGROUND

Plaintiff brings this action on behalf of itself and a class of all persons and entities who purchased or otherwise acquired the common stock of Finisar between December 2, 2010 and March 8, 2011 (the "Class Period"). SAC ¶ 1. Finisar is a technology company that "develops and sells fiber optic subsystems and components that enable high-speed voice, video and data communications for telecommunications, networking, storage, wireless and cable television applications." Id. ¶ 2. Gertel served as Chief Executive Officer ("CEO") and a director of Finisar from August 2008 to September 2015. Id. ¶ 23. Plaintiff alleges that during the Class Period, Gertel made over $5.17 million by selling 201,913 shares of his Finisar stock at artificially inflated prices. Id. ¶¶ 23, 74-75. Rawls has served as Chairman of the Board of Finisar since 2006 and was appointed CEO in September 2015. Id. ¶ 24.

Prior to the Class Period, Finisar experienced six consecutive fiscal quarters of revenue growth, which Plaintiff alleges was driven primarily by sales of its wavelength selective switches ("WSS") and reconfigurable optical add/drop multiplexers ("ROADM") linecard telecom products. Id. ¶¶ 30-33. Plaintiff alleges that during this phase of growth but prior to the Class Period, analysts in the industry "suspected that this growth was driven by customers building-up inventory rather than purchasing Finisar products for immediate use in production." Id. ¶ 3. Plaintiff contends that Finisar did not affirm nor deny the inventory build-up suspicions during this time, and as a result, "Finisar's stock price remained relatively consistent over the course of the six-quarters of record-growth." Id. ¶ 36.

Plaintiff alleges that on December 2, 2010, Finisar's then-CEO, Gertel, "participated in the Credit Suisse Technology Conference call with analysts, media representatives, and investors." Id. ¶ 62. During this call, an analyst from Credit Suisse named William Stein allegedly highlighted that Finisar had "significantly outgrown [its] end markets for the last six quarters" and raised the fear that the company's growth "is going to revert." Id. Mr. Stein then asked, "Can you help us understand how it's possible for the company to not only sustain that [growth] but continue to grow faster than the end markets?" Id. In response, Gertel allegedly provided the following explanation:

**\*2** So if you look at the market, you see the fundamentals for growth are there. People need more higher bit rate products, more sophisticated products to address the cost reduction that the network needs and the demand continues.

As far as we know we haven't seen any inventory issues with our product with our customers. Our product —our business is 60/40, basically 40% is LAN/SAN business, 60% is telecom. On the LAN/SAN side, by far the majority of our sales is a vendor-managed

inventory. So we have visibility to what people have. There is no reason for them to have inventory because we own the inventory. So we're pretty safe with that.

And on the telecom side, look, there can be one or two guys who try to build their own inventory, but by far the majority of the customers expediting products and doesn't look to us, not visible to us at all, all these quarters if they are building any inventory.

Id.

The same day Gertel made this statement, Finisar's common stock increased $3.29 per share (or 16.64%), going from $19.77 per share on December 1, 2010, to close at $23.06 per share on December 2, 2010. Id. ¶¶ 13, 63. The following day, on December 3, 2010, the price per share increased another $0.95 (or 4.12%). Id. ¶ 63. Plaintiff alleges that Finisar's stock price continued to rise in this manner throughout the Class Period, reaching a Class Period high of $43.23 per share on February 14, 2011. Id. ¶¶ 63, ¶ 77.

But on March 8, 2011, Finisar issued a press release indicating that its fourth quarter revenues would be lower than projected due in part to "the previously undisclosed inventory build-up at some of the Company's telecom customers and a slowdown in business in China." Id. ¶ 78. The press release read, in relevant part:

> During the fourth quarter ending April 30, 2011, the Company will be impacted by the full three months of the annual price negotiations with telecom customers that typically take effect on January 1, the 10-day long shutdown at certain customers for Chinese New Year in February, the adjustment of inventory levels at some telecom customers, particularly for products which had previously been on allocation and long lead times, including WSS and ROADM line cards, and a slowdown in business in China overall. Primarily as a result of these factors, the Company indicated that it currently expects revenues for the fourth quarter to be in the range of $235 to $250 million.

Id. ¶ 53, 79. The press release was issued after the market closed on March 8, 2011. Id. Rawls also held a conference call the same day to discuss the expected results, and explained the inventory adjustment in this way:

> [M]any, many of the people that follow our company have speculated for several quarters about double ordering inventory builds on the part of our customers and we continually responded that we asked our customers and they say, "No. We're buying for production and we're not buying for inventory." Well we have clearly learned here in the last month or so from several of them that all of a sudden surprise, surprise they have some pretty good size inventories of wavelength selective switches. And the question is we don't really have great visibility into their inventory levels other than what they tell us and I, you know, they're not—we're not getting complete information I don't think.

**\*3** Id. ¶ 54

In reaction to the March 8 press release, Finisar's stock price dropped by $15.43 per share, falling from $40.04 per share on March 8, 2011 to close at $24.61 on March 9, 2011, "marking a one-day decline of nearly 39%." Id. ¶¶ 6, 68, 81. Plaintiff asserts that Finisar's stock price has never fully recovered from this decline. Id.

Plaintiff contends that Gertel's December 2nd statement misled investors as to the nature of Finisar's growth by denying that its revenue increase was the result of a short-term, unsustainable inventory build-up by customers rather than the result of increased demand for Finisar products. Plaintiff claims that the statement misrepresented Finisar's growth as being "in line with" and "not outpacing" the end-market growth, and incorrectly suggested that its "growth would not revert due to an inventory correction after an inventory build-up by customers." Id. ¶ 64.

Plaintiff alleges that both before and during the Class Period, Finisar would have "necessarily learned about customer inventory and demand during its annual demand and pricing negotiations with customers." Opp. at 5 (citing SAC ¶¶ 5, 45-50). According to Plaintiff, these negotiations occurred over the course of a three-month period that "concluded before the end of 2010," the results of which were implemented by January 1,

2011. SAC ¶¶ 7, 45, 53, 79. Plaintiff further alleges that an investigation conducted by Lead Counsel, with the assistance of a private investigative firm located in China, "affirm[ed] that inventory levels and the economic slowdown in China were discussed during negotiations with Finisar in 2010." Id. ¶ 46. Indeed, the SAC identifies confidential witnesses who, according to Plaintiff, were "personally involved in making purchases from Finisar" and confirmed that current volumes and the next year's projected demand volumes were discussed during annual negotiations at that time. Id. ¶¶ 49-51. From this Plaintiff concludes that Defendants either knew, or were reckless in not knowing, that an inventory build-up existed, and that Finisar's growth would decline in the upcoming quarters as customers became less concerned about supply constraints and needed to "burn-off existing excess inventory." Id.

Finally, Plaintiff contends that Defendants' knowledge of the inventory build-up is further supported by their behavior during the Class Period. Specifically, Plaintiff asserts that Defendants capitalized on the rapidly rising stock price by conducting a substantial stock offering that garnered over $118 million in gross proceeds. Id. ¶ 72. Additionally, Gertel himself "sold 201,913 shares of his personally held or controlled Finisar stock for gross proceeds of over $5.17 million," which Plaintiff claims was "substantially more than in any previous year." Id. ¶¶ 73-75

## II. STANDARDS

Rule 23 of the Federal Rules of Civil Procedure governs class certification. Parties seeking class certification bears the burden of affirmatively demonstrating that they have satisfied each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001). Rule 23(a) provides that a class may only be certified if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In other words, the class must satisfy

the requirements of numerosity, commonality, typicality, and adequacy to maintain a class action. Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012).

*4 In addition, a party seeking class certification must also "satisfy through evidentiary proof" at least one of the three requirements of Rule 23(b). Comcast Corp. v. Behrend, 569 U.S. 27, 33 (2013); Dukes, 564 U.S. at 350. Where a plaintiff seeks certification under Rule 23(b)(3)'s predominance approach, the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A trial court has broad discretion in making the decision to grant or deny a motion for class certification. Bateman v. American Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). In making this determination, the court's analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " Amgen Inc. v. Connecticut Retirement Plans and Trust Funds, 568 U.S. 455, 466 (2013) (quoting Dukes, 564 U.S. at 349); see also Mazza, 666 F.3d at 588. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen, 568 U.S. at 466; Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 (9th Cir. 2011). Thus, "[m]erits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 568 U.S. at 466. The court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole.*" Id. (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.' " Hatamian v. Advanced Micro Devices, Inc., No. 14-226 YGR, 2016 WL 1042502, at *3 (N.D. Cal. Mar. 16, 2016) (quoting Ellis, 657 F.3d at 982). Where a court concludes as a result of its analysis that the moving party has met its burden of proof, then the court may certify the class. Zinser, 253 F.3d at 1186.

## III. DISCUSSION

### A. Rule 23(a) Requirements

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

Plaintiff seeks certification of a class of all persons and entities who purchased or acquired the public traded common stock of Finisar during the period from December 2, 2010 through March 8, 2011, inclusive, and were damaged thereby. [1] With respect to the requirements for class certification set forth in Rule 23(a), Fed.R.Civ.P., Plaintiff first asserts that the numerosity requirement is satisfied because the Class consists of thousands of similarly situated investors who purchased Finisar common stock at artificially inflated prices during the Class Period. Second, Plaintiff contends that numerous legal and factual questions are common to all Class members. Third, Plaintiff asserts that its claims are typical of the proposed Class. Fourth, Plaintiff represents that it is a sophisticated institutional investor with a significant financial interest in the case and has been committed to overseeing and managing the litigation fairly and adequately to protect the interests of the Class. Defendants do not dispute Plaintiff's showing with respect to the four requirements set forth in Rule 23(a).

[1] Excluded from the Class are (i) Defendants Finisar, Gertel and Rawls, (ii) the officers and directors of Finisar at all relevant times, (iii) members of Defendants' immediate families and their legal representatives, heirs, successors, or assigns; and (iv) any entity in which Defendants have or had a controlling interest.

**\*5** After careful examination of the record, the Court finds that Plaintiff's proposed Class satisfies the numerosity, commonality, typicality, and adequacy requirements to maintain a class action under Rule 23(a).

### B. Rule 23(b) Requirements

Plaintiff also asserts that the action satisfies Rule 23(b)(3), Fed.R.Civ.P. According to Plaintiff, Defendants' alleged misstatements perpetuated a "fraud on the market," and therefore questions regarding whether misleading conduct occurred, whether that conduct occurred with the requisite scienter, and whether that conduct caused investors to suffer losses predominate over individual questions. Further, Plaintiff asserts that it is entitled to the presumption of class-wide reliance under the fraud-on-the-market doctrine. Finally, Plaintiff asserts that a class action is superior to a multitude of individual actions.

Defendants raise two arguments in opposition. First, Defendants contend that the proposed Class is overbroad

to the extent it includes persons who traded millions of shares on the morning of December 2nd before Gertel spoke during the Credit Suisse Technology Conference call at approximately 18:08:38 GMT (1:08:38 p.m. Eastern Time). Second, Defendants seek to rebut the presumption of reliance by showing that Gertel's alleged misrepresentations had no impact on Finisar stock price. Because the Court finds Defendants' second argument persuasive for the reasons set forth below, the Court finds it unnecessary to consider the first argument regarding the breadth of the proposed Class.

<u>Predominance Requirement</u>

Rule 23(b)(3) requires in pertinent part that "the questions of law or fact common to class members predominate over any questions affecting only individual members." Fed.R.Civ.P. 23(b)(3). Here, the parties dispute whether the element of reliance raises questions of law or fact common to the class. Plaintiff contends that class-wide issues predominate over individualized issues on the element of reliance because class members are entitled to a presumption of reliance based upon the fraud-on-the-market theory.

The fraud-on-the-market theory "facilitates class certification by recognizing a rebuttable presumption of class wide reliance on public, material misrepresentations when shares are traded in an efficient market." Amgen, 568 U.S. at 463. "Absent the fraud-on-the-market theory, the requirement that Rule 10b-5 plaintiffs establish reliance would ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class." Id. at 462-463. To invoke the presumption of reliance based upon the fraud-on-the-market theory, a plaintiff seeking class certification must show: (1) the alleged misrepresentations were publicly known; (2) they were material; (3) the stock traded in an efficient market; and (4) the plaintiff traded stock between the time the misrepresentations were made and when the truth was revealed. Halliburton Co. v. Erica P. John Fund, Inc., 134 S.Ct. 2398 (2014) (" Halliburton II") (citing Basic v. Levinson, 485 U.S. 224, 248, n.27 (1988)). The first three requirements "are directed at price impact—'whether the alleged misrepresentations affected the market price in the first place.' " Halliburton II, 134 S.Ct. at 2414. "In

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 4

the absence of price impact, <u>Basic</u>'s fraud-on-the-market theory and presumption of reliance collapse." <u>Id</u>.

**\*6** Here, Plaintiff has made a sufficient showing to invoke the fraud-on-the-market presumption of reliance. Plaintiff's expert, Michael L. Hartzmark, Ph.D. ("Hartzmark"), opines that the Finisar stock traded on an open, well-developed, and efficient market. Defendants do not dispute the sufficiency of Plaintiff's showing. Rather, Defendants seek to rebut the presumption of reliance based on evidence that Gertel's alleged misstatement had no impact on Finisar's stock price.

"Because the presumption's efficient market analysis is only an 'indirect proxy for price impact,' it must give way to direct 'evidence showing that the alleged misrepresentation did not actually affect the stock's market price....' " Hatamian, 2016 WL 1042502, at \*6 (N.D. Cal. March 16, 2016) (quoting Halliburton II, 134 S.Ct. at 2415-16). "If [d]efendants show that the alleged misrepresentation did not affect the stock's price, then the <u>Basic</u> presumption will not apply." Id. (citing Halliburton II, 134 S.Ct. at 2416); see also Basic Inc. v. Levinson, 485 U.S. at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."). Defendants bear the burden of production and the burden of persuasion on the issue of price impact. See Erica P. John Fund, Inc. v. Halliburton Co., 309 F.R.D. 251, 260 (N.D. Tex. 2015) ("Halliburton Tex."); see also Waggoner v. Barclays PLC, No. 16-1912, 2017 WL 5077355, at \*37 (2nd Cir. Nov. 6, 2017).

Defendants contend that Gertel's December 2nd statement did not cause the $3.29 increase in stock price from $19.77 at the close of trading on December 1st to $23.06 at the close of trading on December 2nd. Defendants' argument is supported by the event study conducted by their expert, Dr. Alexander Aganin ("Aganin"). Aganin's report shows that after the market closed on December 1st, Finisar issued a press release announcing its final unaudited results for its Second Quarter of Fiscal Year 2011 and its forecast for its Third Quarter of Fiscal Year 2011. Finisar management also held a conference call. According to Aganin, Finisar's stock price increased after the aftermarket dissemination of the unchallenged [2] December 1st statement to open on December 2nd at $21.12 per share, which was $1.35 above

the $19.77 closing price on December 1st. Thereafter, Finisar's stock price continued increasing during the morning trading hours to reach $22.81 per share before Gertel made any public statements on December 2nd.

[2] Neither the December 1st press release nor the conference call are alleged to contain false or misleading statements. Plaintiff's initial complaint, however, alleged that Finisar made false and misleading statements in the December 1st press release and conference call. Consolidated Complaint (filed Jan. 20, 2012).

In conducting his study, Aganin assumes that if Gertel's statements had an impact on Finisar's stock price as alleged by Plaintiff, "one would expect this impact to be discernible in Finisar's stock price by the time of 4:00 PM EST, market close on December 2, 2010 (approximately 3 trading hours after the statements were made)." Expert Report of Alexander Aganin, Ph.D., attached as Exhibit 1 to Decl. of David Priebe (Dkt. 136-2), p. 11. According to Aganin's calculation, Finisar's stock price increased 1.14% between the time Gertel made his public statements and the close of trading on December 2nd. During that same time frame, the SPDR S&P 500 ("SPY") increased 0.13% and the industry index [3] increased 1.07%. Aganin opines that Finisar's residual return was 0.65% and was not statistically significant.

[3] Aganin's industry index was an equal-weighted index of stock returns of four of Finisar's competitors: JDS Uniphase Corp., Oplink Communications, Inc., Oclaro, Inc. and Opnext, Inc.

**\*7** Aganin also evaluates whether there was any evidence of price impact by the end of the next trading day, December 3, 2010, when Finisar stock price closed at $24.01. Id. According to Aganin's calculation, Finisar's stock price increased 5.39% between the time Gertel made his public statements and the close of trading on December 3, 2010. During that same time frame, the SPY increased 0.38% and the industry index increased 5.84%. Aganin opines that Finisar's residual return was -0.25% and was not statistically significant. In summary, based upon the event study, Aganin opines that any increase in stock price after Gertel made his public statements, whether compared to the closing price on December 2nd or December 3rd, 2010, was not statistically significant when the price is adjusted for general market and industry trading.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   5

Plaintiff's expert, Hartzmark, does not provide any evidence about the stock price at the time Gertel made the challenged statements, and his event study does not segregate the effect of the December 1st information that was in the market on December 2nd before Gertel's statements from the effect, if any, of Gertel's statements. [4] Instead, Plaintiff argues that Aganin's study is flawed for various reasons. First, Plaintiff contends that Aganin failed to conduct a complete, affirmative price impact analysis, and therefore Aganin's conclusions are incorrect. As explained in Hartzmark's rebuttal report, to conduct an affirmative economic price impact analysis, an expert assumes that a misstatement represents new information entering the market, and then uses a statistical analysis "in combination with the analysis of news reports, analyst evaluations and firm specific financial information" to isolate the impact of the misstatements relative to other disclosures that are contemporaneously revealed." Rebuttal Report of Michael L. Hartzmark, Ph.D., attached as Exhibit B to the Supp. Decl. of Ian D. Berg (Dkt. 141). Hartzmark's rebuttal report tracks the continuing rise of Finisar's stock from December 2nd to March 8, 2011, the date Finisar allegedly issued a corrective statement, in combination with analyst reports issued on December 13 and 15, 2010, January 6, 2011, and February 4, 2011. Hartzmark reasons that after Gertel's statements on December 2nd, analysts and investors evaluated the prospects of Finisar through a more optimistic lens. According to Hartzmark, the increase in Finisar's stock price from December 2nd until the corrective disclosure on March 8, 2011 is consistent with his conclusion that there is a price impact.

[4]  In his rebuttal report, Hartzmark offers a new analysis in an attempt to show a statistically significant stock price change after Gertel's December 2nd statement. The Court rejects Hartzmark's analysis because he does not test for statistically significant stock price changes during the December 2nd trading day.

The Court rejects the notion that the analyst reports show a delayed price impact of the December 2nd statement. "An efficient market is said to digest or impound news into the stock price in a matter of minutes." _Halliburton Tex._, 309 F.R.D. at 269. The analyst reports relied upon by Hartzmark were issued weeks and months after Gertel's December 2nd statements and do not refer to Gertel's December 2nd statements. Furthermore,

Defendants cannot be held liable for any affect the analyst reports may have had on the price of Finisar stock in the absence of evidence that Defendants exercised control over the content of those analyst reports. See _Janus Capital Group, Inc. v. First Derivative Traders_, 564 U.S. 135, 144 (2011).

Second, Plaintiff contends that Aganin's report is flawed insofar as it fails to consider Finisar's stock price change following the allegedly corrective disclosure of March 8, 2011. According to Plaintiff, Finisar's stock price fell from $40.04 per share on March 8, 2011 to close at $24.61 on March 9, 2011. Plaintiff is correct that for purposes of price impact analysis, courts have focused on the corrective disclosure date in certain cases. See e.g. _Halliburton Tex._, 309 F.R.D. at 262 ("Measuring price change at the time of the corrective disclosure, rather than at the time of the corresponding misstatement, allows for the fact that many alleged misrepresentations conceal a truth."); _Hatamian v. Advanced Micro Devices, Inc._, 2016 WL 1042502, at *7 ("Price impact in a securities fraud case is not measured solely by price increase on the date of a misstatement; it can be quantified by decline in price when the truth is revealed."); _In re Intuitive Surgical Sec. Litig._, 2016 WL 7425926, *13 (N.D. Cal. Dec. 22, 2016) ("In conducting this analysis, the court will focus on changes in the stock price with respect to the corrective disclosure dates, as opposed to the misrepresentations alleged, because this method more accurately captures the impact, if any, of a material misrepresentation or omission."). Neither the Supreme Court nor the Ninth Circuit, however, has addressed the relative importance of the date of the alleged misstatement as compared to the date of the corrective statement in analyzing price impact and the issue is open to debate. The absence of controlling caselaw on this specific issue allows Defendants to make "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, [which] will be sufficient to rebut the presumption of reliance." _Basic Inc. v. Levinson_, 485 U.S. at 248. The Court accordingly finds no flaw in Aganin's analysis simply because it focuses on the date of the alleged misstatement rather than the date of the alleged corrective disclosure. Furthermore, Aganin's analysis focusing on the date of alleged misstatement is supported by a relatively recent decision by the Eighth Circuit. See _IBEW Local 98 Pension Fund v. Best Buy Co._, 818 F.3d 775 (8th Cir. 2016) (overwhelming evidence

of no "front-end" price impact at the time of the alleged misstatement rebutted the <u>Basic</u> presumption).

**\*8** Whether Aganin's showing is sufficient to sever the link between the alleged misrepresentation and the price received or paid by Plaintiff is a separate issue. Plaintiff contends that courts have inferred price impact from an alleged corrective disclosure even where, as in the present case, an alleged misstatement arguably has no price impact. See e.g. Hatamian, 2016 WL 1042502, *7. One stated rationale for focusing on the date of the corrective disclosure rather than the date of the alleged misstatement or omission is that "misstatements are not made in a vacuum and other information can offset or confound the effects of a particular misrepresentation." <u>Id</u>. There is, however, no evidence in the present case of any information in the market that may have offset or confounded the effects of Gertel's alleged misrepresentations. To the contrary, there is evidence that other information in the market before Gertel spoke, namely the December 1 press release and conference call, contributed to a price increase. Another stated rationale for focusing on the corrective disclosure date is that "a misstatement could serve to maintain the stock price at an artificially inflated level." <u>Id</u>. Plaintiff in this case is not proceeding on a price maintenance theory, however.

Notably, the <u>Hatamian</u> case is also factually distinguishable from the present case. In <u>Hatamian</u>, defendants' own expert acknowledged that defendant's stock price experienced statistically significant price increases on four days on which defendants had allegedly made 43 (of the 125) misstatements and/or omissions, and defendants' stock price experienced a statistically significant price decrease on every one of the five days defendants allegedly made corrective disclosures. In contrast, Aganin's analysis shows no statistically significant price increase following Gertel's December 2nd statements. Because the December 2nd statements had no price impact, it cannot be presumed that the March 8 disclosures revealed a latent price impact of Gertel's statements. Furthermore, after Gertel's statements and before the alleged corrective March 8th disclosure, several analyst reports were issued. These reports constitute new information that "severs the link" between Gertel's December 2nd statements and any increase in Finisar's stock.

Third, Plaintiff argues that Aganin's methodology contained three critical errors resulting in a flawed empirical analysis: (1) a flawed regression specification; (2) improper selection of two discrete points in time ("time frame") to evaluate price movement and statistical significance; and (3) an econometric error resulting from a biased "industry" index that lacks independence from Finisar's return and is influenced by Finisar-specific news. See Hartzmark Rebuttal Report, ¶¶ 10, 15-43. When these purported errors are corrected, Plaintiff contends that the evidence shows a price increase following Gertel's statements that was statistically significant.

With respect to the regression specification, Plaintiff contends that the Aganin Report is unreliable because Aganin erred in failing to use dummy variables to exclude seven dates when Finisar announced preliminary and actual earnings, an acquisition, and Finisar's secondary offering. Aganin clarifies in his Rebuttal Report that he ran his regression with and without dummy variables and the results did not change. Aganin Rebuttal Report, ¶ 50. Furthermore, Aganin reran his event study excluding the seven dates. The results confirm Aganin's opinion that Gertel's statements on December 2nd did not result in statistically significant increase of Finisar's stock price on December 2 or 3, 2010. Aganin Rebuttal Report, ¶¶ 56-57. The Court is persuaded by Aganin's rebuttal on these points.

Plaintiff's criticism of the time frame used in Aganin's analysis is also unpersuasive. "An efficient market is said to digest or impound news into the stock price in a matter of minutes." Halliburton Tex., 309 F.R.D. at 269. Further, the time frame selected by Aganin is supported by an academic study by James Patell and Mark Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," <u>Journal of Financial Economics</u> 13, no. 2 (June 1984).

**\*9** Finally, with respect to the industry indices, Aganin used two indices: the SPY and an index of four competitors of Finisar. Hartzmark does not object to the use of the SPY nor to the use of industry indices in general. According to Hartzmark, however, Aganin's index of four competitors was too narrow to fully account for industry-wide effects. Hartzmark contends that Aganin should have included a larger group of companies in the telecom industry, including customers and suppliers. Hartzmark opines that an appropriate index would be iShares U.S.

Telecommunication ETF. Hartzmark Rebuttal Report, ¶ 48, n.62.

In his rebuttal report, Aganin explains that Hartzmark's use of a broader index is methodologically unsound because good news for a major Finisar customer may be good news or bad news for Finisar and its peers. Aganin Rebuttal Report, ¶ 36. Aganin also states that an overbroad industry index fails to isolate the effect of issuer-specific information from information about the industry or market. Id., ¶¶ 36-37, 41-46. In any event, Aganin reran his event study using returns of both his index and the iShares U.S. Telecommunication ETF. The results show that none of the returns for the event windows ending on December 2, 2010 are statistically significant. Id., ¶ 38. Aganin concludes that the sensitivity analysis confirms that Gertel's challenged statements did not result in a statistically significant increase of Finisar's stock price on December 2 or 3, 2010. Id., ¶¶ 38-39. The Court finds Aganin's conclusion persuasive.

## IV. ORDER

Defendants have rebutted the <u>Basic</u> presumption of fraud-on-the-market reliance by demonstrating through a preponderance of evidence that Gertel's December 2nd statement had no price impact when made or thereafter. It follows that the predominance requirement for class certification has not been met. Accordingly, Plaintiff's motion for class certification is DENIED.

The hearing scheduled for December 7, 2017, is VACATED.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 6026244, Fed. Sec. L. Rep. P 99,929

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 7425926
Only the Westlaw citation is currently available.
United States District Court,
N.D. California,
San Jose Division.

In re Intuitive Surgical Securities Litigation.

Case No. 5:13-cv-01920-EJD
|
Signed 12/22/2016

**ORDER CERTIFYING PLAINTIFF CLASS**

EDWARD J. DAVILA, United States District Judge

 **\*1** Lead Plaintiff Employees' Retirement System of the State of Hawaii ("Hawaii ERS"), together with named Plaintiff Greater Pennsylvania Carpenters' Pension Fund ("Greater Penn") (collectively, "Plaintiffs"), bring this putative securities class action against Intuitive Surgical, Inc. ("Intuitive"), Lonnie M. Smith ("Smith"), Gary S. Guthart ("Guthart"), and Marshall L. Mohr ("Mohr") (collectively, "Defendants"), alleging violations of Sections 10(b), 20(a) and 20A of the Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. Pls' Second. Am. Class Action Compl. ("SACC"), Dkt. No. 184-9.[1] Plaintiffs bring this action individually and on behalf of all other persons and entities that purchased or acquired Intuitive's common stock during the proposed class period of February 6, 2012 and July 18, 2013, inclusive.

[1]    The court has determined that it is appropriate to Grant Plaintiffs' Motion for Leave to Amend the Complaint (Dkt. No. 185). A written Order to this effect is forthcoming. As a result, Plaintiff's Second Amended Class Action Complaint (Dkt. No. 184-9) is now the operative pleading in this action and the court will therefore rely on it accordingly for the purposes of this Order.

Presently before the court is Plaintiffs' Motion for Class Certification pursuant to Federal Rule of Civil Procedure 23 (Dkt. No. 123, "Mot."). After careful consideration of the parties' papers, the evidence submitted in this case, the argument of counsel presented at the hearing, and for the reasons explained below, the court hereby GRANTS

Plaintiffs' Motion for Class Certification in accordance with the findings and analysis set forth in this Order.

**I. BACKGROUND**

The factual and procedural background of this case is by now well-known and was discussed at length in this court's Order Granting in Part and Denying in Part Defendants' Motion to Dismiss ("Order on MTD"). See Dkt. No. 83. Accordingly, the court will briefly summarize the general background in this case, highlighting the facts and allegations most relevant to the issue of class certification.

Intuitive is a biomedical corporation that designs, manufactures, and sells da Vinci Surgical Systems ("da Vinci"), a robotic surgical system that uses computer technology to allow surgeons to remotely operate through a small tube inside the patient. SACC ¶¶ 30, 40-41. The da Vinci is Intuitive's sole product and source of revenue. Id. ¶¶ 30, 41. Because da Vinci is the only robotic surgical system in the United States approved by the Food and Drug Administration ("FDA") for soft tissue procedures, Intuitive enjoyed rapid growth, and by December 31, 2012, there were 2,585 da Vinci systems installed in 2,025 hospitals worldwide. Id. ¶¶ 39-40. Intuitive common stock is publicly traded on the NASDAQ under the ticker symbol "ISRG." Id. ¶ 30.

Hawaii ERS is a public pension plan governed by an eight-member board of trustees and made up of retirees, beneficiaries, inactive vested members, and active public employees working for the state and counties of Hawaii. Id. ¶ 26. Hawaii ERS purchased a total of 26,048 shares of Intuitive common stock during the class period, and sold a total of 12,268 shares. Id. Greater Penn is a "trustee-administered, multi-employer, defined benefit pension plan for carpenters in Pennsylvania." Id. ¶ 28. Greater Penn purchased a total of 2,893 shares, and sold 21 shares of Intuitive common stock during the class period. Id.

 **\*2** One of da Vinci's most commonly used tools is the "Hot Shears Monopolar Curved Scissors ("monopolar scissors"), which can cauterize tissue through the application of electricity via an electrode. Id. ¶ 43-44, 47. To ensure that the electricity is only channeled through that electrode, the metal parts of the scissors are covered with insulating rubber sleeves ("tip covers"). Id. ¶ 45. Plaintiffs allege that the tip covers were prone to tiny cracks or slits that prevented them from properly insulating the metal instruments, thus allowing electricity

to escape into the patient's body, damaging tissue and internal organs. Id. ¶¶ 45-48.

According to Plaintiffs, Intuitive became aware of this defect through medical device reports ("MDRs").[2] Plaintiffs allege that Intuitive received thousands of MDRs regarding da Vinci's safety issues, and systematically concealed and underreported the complaints to the FDA. See id. ¶¶ 85-111. Plaintiff alleges that, instead of reporting the MDRs to the FDA, Intuitive issued a "secret recall" where, beginning in October 2011, Intuitive sent letters modifying or correcting the instructions for proper use of the monopolar scissors in order to avoid damaging the tip covers. Id. at ¶¶ 60-64. Intuitive did not report or otherwise inform the FDA that it had sent these letters, which the FDA later determined to be a violation of 21 C.F.R. § 806.10. Id. ¶ 63. On July 16, 2013, Intuitive received a Warning Letter issued by the FDA, citing Intuitive's failure to adequately report the recalls and adverse events, which Intuitive publicly released on July 19, 2013. Id. ¶¶ 137-150.

[2]    Pursuant to FDA regulations, if an adverse event (death or serious injury) occurs at a hospital, and the hospital has information that reasonably suggests a medical device may have caused or contributed to that event, the hospital must report that information to the manufacturer through an MDR. See id. ¶¶ 81-85; see also 21 U.S.C. § 360i(b)(1)(B); 21 C.F.R. §§ 803.30, 803.50. And if the MDR suggests that the device may have contributed to a serious injury or death, then the manufacturer must report the MDR to the FDA. Id.; see also 21 C.F.R. § 803.50(a).

Plaintiffs filed this action alleging that Defendants made numerous materially false and misleading statements and omissions regarding the safety of the da Vinci system and Intuitive's compliance with FDA regulations. See Pls.' First Am. Compl., Dkt. No. 48. The alleged misrepresentations fell into roughly four categories: (1) statements regarding the general safety and efficacy of da Vinci surgery; (2) statements regarding Intuitive finances; (3) warning statements regarding the risks Intuitive may face from product-liability lawsuits, product defects, and product recalls; and (4) statements regarding the FDA regulations the company faces. See Order on MTD at 5-7, 11. The court dismissed Plaintiffs allegations as to the second, third, and fourth categories of statements. Id.

Plaintiffs contend that the "truth" about Defendants fraudulent misrepresentations and omissions was revealed in a series of five corrective disclosures: (1) a *Bloomberg* article published on February 28, 2013; (2) another *Bloomberg* article published on March 5, 2013; (3) Intuitive's first quarter financial results released on April 18, 2013; (4) a pre-announcement of Intuitive's second quarter financial results released on July 8, 2013, and (5) Intuitive's actual second quarter financial results plus the FDA's Warning Letter, released on July 18, 2013. Mot. at 4-5; SACC ¶¶ 216-220. Plaintiffs allege that each of these "corrective disclosures" cumulatively resulted in a dramatic decline the price of Intuitive common stock. Mot. at 5; SACC ¶ 180. Plaintiffs now seek to certify a class of investors who purchased Intuitive common stock between February 6, 2012 and July 18, 2013 and suffered damages as a result. Mot. at 2.

## II. LEGAL STANDARD

*3 Rule 23 of the Federal Rules of Civil Procedure governs class certification. A party seeking class certification bears the burden of affirmatively demonstrating that they have satisfied each of the four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b). Wal-Mart Stores, Inc. v. Dukes, 564 U.S. 338, 350 (2011); Zinser v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186 (9th Cir. 2001), opinion amended on denial of reh'g, 273 F.3d 1266 (9th Cir. 2001). Rule 23(a) provides that a class may only be certified if "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). In other words, the class must satisfy the requirements of numerosity, commonality, typicality, and adequacy to maintain a class action. Mazza v. Am. Honda Motor Co., Inc., 666 F.3d 581, 588 (9th Cir. 2012).

In addition, a party seeking class certification must also "satisfy through evidentiary proof" at least one of the three requirements of Rule 23(b). Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1432 (2013); Dukes, 564 U.S. at 350. Where a plaintiff seeks certification under Rule 23(b)(3)'s predominance approach, the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior

to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

A trial court has broad discretion in making the decision to grant or deny a motion for class certification. Bateman v. American Multi-Cinema, Inc., 623 F.3d 708, 712 (9th Cir. 2010). In making this determination, the court's analysis "must be 'rigorous' and may 'entail some overlap with the merits of the plaintiff's underlying claim.' " Amgen Inc. v. Conn. Ret. Plans and Trust Funds, 133 S. Ct. 1184, 1194 (2013) (quoting Dukes, 564 U.S. at 349); see also Mazza, 666 F.3d at 588. However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." Amgen, 133 S. Ct. at 1194–95; Ellis v. Costco Wholesale Corp., 657 F.3d 970, 983 (9th Cir. 2011). Thus, "[m]erits questions may be considered to the extent—but only to the extent— that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." Amgen, 133 S. Ct. at 1195. The court must resolve factual disputes as "necessary to determine whether there was a common pattern and practice that could affect the class *as a whole.*" Id. (emphasis in original). "When resolving such factual disputes in the context of a motion for class certification, district courts must consider 'the persuasiveness of the evidence presented.' " Hatamian v. Advanced Micro Devices, Inc., 2016 WL 1042502, at *3 (N.D. Cal. Mar. 16, 2016) (quoting Ellis, 657 F.3d at 982). Where a court concludes as a result of its analysis that the moving party has met its burden of proof, then the court may certify the class. Zinser, 253 F.3d at 1186.

## III. DISCUSSION

Plaintiffs move to certify a class consisting of "all persons or entities who purchased or acquired the publicly traded common stock of Intuitive Surgical, Inc. during the period from February 6, 2012 through July 18, 2013 inclusive, and who were damaged thereby." [3] SACC at 1 and ¶ 248. Plaintiffs contend that the proposed class complies with Rule 23(a) and 23(b)(3). Defendants oppose class certification on the grounds that Plaintiffs have failed to satisfy the requirements of Rule 23(a)(3), (a)(4) and (b)(3). See Defs.' Opp. to Mot. for Class Cert. ("Opp.") at 1-2, Dkt. No. 135.

[3]    Excluded from the Class are (i) all Defendants; (ii) members of the immediate families of individual defendants Guthart, Mohr, and Smith; (iii) any

subsidiaries and affiliates of Defendants; (iv) any person who is or was an officer or director of Intuitive or any of Intuitive's subsidiaries of affiliates; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) Intuitive's employee retirement and benefit plan(s); and (vii) the legal representatives, heirs, successors and assigns of any such excluded person or entity. ACC ¶ 256.

### A. Rule 23(a) Requirements

### i. Numerosity

**\*4** Under Rule 23(a)(1), the first requirement for class certification is that the proposed class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). While satisfaction of the numerosity requirement generally does not turn on an exact number, "where the number of class members exceeds forty, and particularly where class members number in excess of one hundred, the numerosity requirement will generally be found to be met." Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson, 102 F.R.D. 457, 461 (N.D. Cal. 1983); Noll v. eBay, Inc., 309 F.R.D. 593, 602 (N.D. Cal. 2015). "Additionally, it is not necessary to state the exact number of class members when the plaintiff's allegations 'plainly suffice' to meet the numerosity requirement." In re Cooper Cos. Inc. Sec. Litig., 254 F.R.D. 628, 634 (C.D. Cal. 2009). District courts have consistently found a proposed class to be sufficiently numerous in securities fraud cases where "several million shares of stock were purchased during the class period." Id. (quoting In re Unioil Sec. Litig., 107 F.R.D. 615, 618 (C.D. Cal. 1985)).

Here, Plaintiffs meet the requirements for numerosity. While the exact number of proposed class members is presently unknown, Plaintiffs submit evidence indicating that more than 1,000 persons and/or entities purchased or acquired Intuitive common stock between February 6, 2012 and July 18, 2013. See Mot. for Cert. at 7; Declaration of Jonathan Gardner ("Gardner Decl."), Ex. 1 (RFA Responses) at 5. The record further indicates that "Intuitive had between 39 million and 40 million shares outstanding throughout the Class Period. Gardner Decl. Ex. 1 at 22. Defendants do not challenge Plaintiffs' compliance with Rule 23(a)(1). See Opp. at 5 n. 2. Accordingly, the court finds that Plaintiffs have successfully met the requirements for numerosity.

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.

See Cooper, 254 F.R.D. at 634 (highlighting that the defendant had more than 36 million shares of stock outstanding during the class period and explaining that the court "certainly may infer that, when a corporation has millions of shares trading on a national exchange, more than 40 individuals purchased stock over the course of more than a year.").

### ii. Commonality

The second requirement under Rule 23(a), known as "commonality," requires that class members' claims contain "questions of law and fact common to the class." Fed. R. Civ. P. 23(a)(2); Staton v. Boeing Co., 327 F.3d 938, 953 (9th Cir. 2003). As the Ninth Circuit explained in Hanlon v. Chrysler Corp.,

> Rule 23(a)(2) has been construed permissively. All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class.

150 F.3d 1011, 1019 (9th Cir. 1998). In other words, a few factual variations among the class will generally not defeat commonality, so long as the class claims still arise from foundation of shared pertinent legal or factual issues. See Staton, 327 F.3d at 953. Such issues must be of sufficient importance "to convince a court that a class action is the most efficient way of determining the rights of the parties." Cooper, 254 F.R.D. at 634 (citing Martin v. Dahlberg, Inc., 156 F.R.D. 207, 214 (N.D. Cal. 1994) ("the core purposes of a class suit will generally be advanced if the common issues of law or fact are issues central to the case.")). In securities fraud cases, commonality is often satisfied as a result of the inherent nature of such cases. That is, courts have "easily" found commonality "where class members all bought or sold the same stock in reliance on the same disclosures made by the same parties." In re VeriSign, Inc. Sec. Litig., 2005 WL 7877645, at *5 (N.D. Cal. Jan. 13, 2005); see also Blackie v. Barrack, 524 F.2d 891, 902 (9th Cir. 1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a

common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions ...").

**\*5** Similarly to other securities fraud class actions, here, Plaintiffs contend that all class members were "harmed as a result of a common course of conduct arising from material misrepresentations and omissions Defendants made to the investing public." Mot. for Cert. at 9. Plaintiffs identify the common questions of law and fact as: (1) whether Defendants violated the Securities Exchange Act; (2) whether Defendants omitted and/or misrepresented material facts; (3) whether Defendants knowingly or recklessly disregarded that their statements and omissions were false and misleading; (4) whether the price of Intuitive's stock was artificially inflated as a result of Defendants' misrepresentations and/or omissions; and (5) whether and to what extent disclosure of the truth regarding Defendants' omissions and/or misrepresentations of material facts caused class members to suffer economic loss and damages. Id.

Such inquiries raise questions common to all purported class members. Moreover, Defendants do not dispute that Plaintiffs satisfy Rule 23(a)(2) here. See Opp. at 5 n. 2. Accordingly, the court finds that Plaintiffs have satisfied the commonality requirement.

### iii. Typicality

The third requirement under Rule 23(a), "typicality," provides that the claims or defenses of the class representatives must be "typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality must be assessed in light of the circumstances presented by each case. Blackie, 524 F.2d at 910. The purpose of the typicality requirement is to "assure that the interest of the named representative aligns with the interests of the class." Hanon v. Dataproducts Corp., 976 F.2d 497, 508 (9th Cir. 1992).

The Ninth Circuit instructs that the test for typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same conduct." Ellis, 657 F.3d at 984 (quoting Hanon, 976 F.2d at 508) see also Hanlon,

150 F.3d at 1020 (explaining that a representative's claims or defenses may be considered "typical" of the class where "they are reasonably co-extensive with those of absent class members; they need not be substantially identical."); accord Hevesi v. Citigroup, Inc., 366 F.3d 70, 82 (2d Cir. 2004) ("a class representative can establish the requisite typicality under Rule 23 if the defendants committed the same wrongful acts in the same manner against all members of the class." (internal quotations omitted)). However, "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation." In re Montage Technlgy Grp. Ltd. Sec. Litig., 2016 WL 1598666, at *4 (N.D. Cal. 2016) (citing Hanon, 976 F.2d at 508); In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 598 (C.D. Cal. 2009) (explaining that "typicality is defeated where 'there is a danger that absent class members will suffer [because] their representative is preoccupied with defenses unique to it.' ").

Here, Defendants contend that Plaintiffs—through their investment managers—were privy to different statements and information than other stockholders, and are therefore not typical of the proposed class. Opp. at 5-6. Specifically, Defendants assert that certain investment managers working on behalf of Plaintiffs regularly met with Intuitive executives, including "in person once a year at the investment managers' offices, and by phone once a quarter at Intuitive's headquarters following earnings calls." Id. Based on these interactions, Defendants challenge typicality on two related grounds. First, Defendants argue that the merits of Plaintiffs' claims are distinct from the claims of the proposed class because their investment advisors "heard and relied upon statements different than those alleged to have defrauded the market." Id. at 5. And second, because of these investment advisors' special relationship with Intuitive, Defendants contend Plaintiffs are subject to defenses that are unique from other class members. Id. at 5-6. Defendants particularly highlight instances where these advisors acknowledged, downplayed, or dismissed concerns regarding da Vinci's purported safety issues, and maintain that in light of this, "the litigation going forward will focus not on whether the class relied on the alleged misstatements and omissions, but rather on whether these particular Plaintiffs in fact relied on them." Id.

**\*6** Defendants' argument is insufficient to defeat typicality. The fact that certain of Plaintiffs' investment

managers met with Intuitive on occasion does not, without more, render Hawaii ERS or Greater Penn atypical of the proposed class. Importantly, there is no evidence that non-public information was shared during the in-person meetings or phone conversations referenced by Defendants. As the district court explained in Beach v. Healthways, Inc.,

> Mere communication with corporate insiders will not render a class representative atypical for class certification purposes absent the exchange of non-public information. Courts have consistently certified classes where there was no evidence that the named plaintiff received non-public information from a corporate officer. In general, the cases hold that if the plaintiff has received information from company insiders that confirms, reflects, repeats, or even digests publicly available market information, that plaintiff is an appropriate class representative.

2010 WL 1408791, at *4 (M.D. Tenn. Apr. 2, 2010) (citing In re DVI, Inc. Sec. Litig., 249 F.R.D. 196, 202-03 (E.D. Pa. 2008)) (internal citations omitted).

Moreover, where, as here, the plaintiffs advance a "fraud on the market" theory of liability, the question of whether investment managers specifically relied on Defendants' alleged misrepresentations is unlikely to significantly shift the focus of the case given that "an investor's reliance on any public material misrepresentations ... may be presumed for purposes of a Rule 10b-5 action." Basic Inc. v. Levinson, 485 U.S. 224, 247 (1988); see In re Diamond Foods, Inc., Sec. Litig., 295 F.R.D. 240, 252 (N.D. Cal. 2013) (explaining that while "[m]ost investors think they are a little smarter than average and see opportunities others have missed ... they all rely on publicly available data (with the exception, of course, of investors trading on insider information)."); see also Darquea v. Jarden Corp., 2008 WL 622811 (S.D.N.Y. 2008) (explaining that even where the lead plaintiffs' investment advisors testified that the alleged misstatements at issue were not crucial to their decision to recommend the stock purchase, "there is no reason to believe that the defense will draw any extraordinary attention or divert the trial from the

main issues"). Indeed, courts have "routinely rejected" the argument that different investment strategies among plaintiffs necessarily subject them to unique defenses such that they become atypical of the class. See Diamond Foods, 295 F.R.D. at 252 (quoting In re WorldCom Inc. Sec. Litig., 219 F.R.D. 267, 281-82 (S.D.N.Y. 2003)).

Thus, while special circumstances may be relevant to assessing typicality, the record here does not suggest Plaintiffs possessed material non-public information or otherwise operated under materially distinct factual circumstances from other class members. See Hanon, 976 F.2d at 508-09. To the contrary, Plaintiffs' claims are generally "founded on the same alleged facts and legal theories as the claims of other Class members— i.e., the alleged artificial inflation and consequent market correction of the price of Intuitive's stock caused by Defendants' fraudulent public statements and omissions —and the injury Plaintiffs suffered is alleged to be the same as the injury suffered by the proposed Class as a whole." Mot. at 10. Accordingly, the court finds that Plaintiffs are sufficiently typical of the proposed class.

### iv. Adequacy

**\*7** Finally, the fourth requirement under Rule 23(a), "adequacy," provides that class representatives must be capable of fairly and adequately protecting the interests of absent class members. Fed. R. Civ. P. 23(a)(4). The adequacy condition requires the court to evaluate issues on which the named plaintiffs and members of the proposed class might disagree. The two primary issues for the court to consider when evaluating the adequacy of representation are (1) whether the class representative(s) and counsel have any conflicts of interest with other class members; and (2) whether the named representative(s) and counsel will prosecute the action vigorously on behalf of the class. Staton, 327 F.3d at 954; Hanlon, 150 F.3d at 1020; see also In re Montage Technlogy, 2016 WL 1598666, at \*5. Plaintiffs contend that they are adequate class representatives because their "interests are not antagonistic to those of other Class members" and because they are represented by qualified, experienced counsel that is "fully capable of prosecuting this action vigorously on behalf of the Class." Mot. at 11-12.

Defendants challenge Plaintiffs' adequacy as representatives of the putative class on two grounds.

First, Defendants argue that there is a "real danger" that Plaintiffs will become preoccupied and distracted from representing the interests of other class members as a result of the unique defenses they may face, as discussed with respect to typicality. Opp. at 7-8. And second, Defendants contend that Plaintiffs lack sufficient knowledge of the case to serve as representatives, stating that Plaintiffs are "completely uninformed and unconcerned with both the prosecution of this litigation and its underlying allegations." Id. at 8-9.

With respect to the unique defenses issue, the court finds that there is no evidence to suggest that Plaintiffs or their counsel have conflicts of interest that would prevent them from adequately representing other class members. Defendants' identify two statements from certain of Plaintiffs' investment advisors in which the advisors expressed some skepticism or disagreement with respect to the allegations of fraud against Intuitive.[4] See Opp. at 8. However, based on the court's review of the record, these limited statements indicating possible differences of opinion between Plaintiffs and two of their investment advisors does not suggest that Plaintiffs have a conflict of interest with, or otherwise could not adequately represent the interests of, the unnamed class members.

[4]      First, Defendants point to the deposition testimony of Greater Penn's corporate representative, James Klein, wherein he agreed that Brown Advisory —an investment manager for Greater Penn— may have disagreed with Greater Penn's view of the fraud claims. Depo. of James Klein ("Klein Depo.") at 249:24-250:3, Dkt. No 139-10 Second, Defendants reference statements from Sands Capital —an investment manager for Hawaii ERS— downplaying the safety criticisms of the da Vinci. See Decl. of Philip Tassin ("Tassin Decl."), Ex. 39, Dkt. No. 134-20.

As to the argument that Plaintiffs' lacked adequate knowledge, the court finds Defendants' allegations to be overstated and without merit. "The threshold of knowledge required to qualify a class representative is low; a party must be familiar with the basic elements of her claim [ ] and will be deemed inadequate only if she is 'startlingly unfamiliar' with the case." Moeller v. Taco Bell Corp., 220 F.R.D. 604, 611 (N.D. Cal. 2004), amended on other grounds, 2012 WL 3070863 (N.D. Cal. 2012); see also Hodges v. Akeena Solar, Inc., 274 F.R.D. 259, 267 (N.D. Cal. 2011). To establish adequacy, class

WESTLAW  © 2016 Thomson Reuters. No claim to original U.S. Government Works.  6

representatives generally need only to be "familiar with the basis for the suit and their responsibilities as lead plaintiffs" such that they can uphold their obligations to other class members. In re Conseco Life Ins. Co. LifeTrend Ins. Sales & Mktg. Litig., 270 F.R.D. 521, 531 (N.D. Cal. 2010). However, while this is a "modest" requirement, class certification many nevertheless be denied "where the class representatives have so little knowledge of and involvement in the class action that they would be unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys." In re Monster Worldwide, Inc. Sec. Litig., 251 F.R.D. 132, 135 (S.D.N.Y. 2008).

**\*8** Defendants here argue that Greater Penn and Hawaii ERS demonstrated inadequate knowledge of the case to serve as class representatives and are "nothing more than the willing pawn[s] of counsel." Opp. at 8-11. In support of this position, Defendants highlight select answers from the deposition of Greater Penn's representative Jim Klein in an effort to show Mr. Klein's lack of knowledge or involvement as to certain aspects of the case. Id. at 10-11; see Depo. of James R. Klein ("Klein Depo.") at 126:2-127:3, 157:21-159:1, 259:2-4; 263:18-267:22, 269:12-20, Dkt. No. 139-10. Similarly with respect to Hawaii ERS, Defendants reference portions of the deposition testimony from Hawaii ERS witnesses Wesley Machida,[5] Vijoy Chatterry,[6] and Brian Aburano,[7] in which the witnesses were unable to answer certain questions about Hawaii ERS and/or the case. See id.

[5]   Mr. Machida was formerly employed as the Executive Director of Hawaii ERS and presently serves on its board of trustees. Depo. of Wesley Machida ("Machida Depo.") at 61:23-612:6; 70:13-16, Dkt. No 139-12. Mr. Machida now works as the State Director of Finance. Id. at 61:23-24.

[6]   Mr. Chatterry is the chief investment officer for Hawaii ERS. Depo. of Vijoy Chatterry ("Chatterry Depo.") at 9:22-10:1, Dkt. No 139-14.

[7]   Mr. Aburano is a deputy attorney general assigned to Hawaii ERS to advise and represent it, and serves as its corporate designee for purposes of this litigation. Depo. of Brian Aburano ("Aburano Depo.") at 50:3-16; 148:17-19, Dkt. No 139-8.

Defendants compare this testimony to Monster Worldwide, wherein the district court found the class

representative to be inadequate where the corporate designee for the plaintiff-entity did not know (1) the name of the stocks at issue; (2) the name of the defendants in the case; (3) whether plaintiff ever owned any of the stock at issue; (4) whether an amended complaint had been filed; (5) whether he had ever seen a complaint in the action; and (6) whether defendant had moved to dismiss. 251 F.R.D. at 135. Defendants then focus in on Mr. Machida and Mr. Chatterry's lack of knowledge as to such factors. See Opp. at 8-10; Machida Depo. at 116:15-19; 118:20-22, 120:22-124:24, 136:5-24, 145:19-146:13; Chatterry Depo. at 98:10-15, 111:18-112:5, 194:3-195:24, 198:25-199:24. However, these cherry-picked excerpts highlighted by Defendants are largely irrelevant, if not misleading, to the present inquiry. While it is true that Mr. Machida and Mr. Chatterry demonstrate arguably insufficient knowledge to serve as the class representative, neither individual was selected as Hawaii ERS' "corporate designee"—or 30(b)(6) witness—for the purposes of this action.[8] Rather, it is Mr. Aburano who Hawaii ERS identified as its corporate designee for the purposes of this litigation. See Aburano Depo. at 8:3-4, 10:19-21.

[8]   As Plaintiffs point out, during the class period, "Mr. Machida did not sit on the HIERS board or have a vote in board decisions and was not responsible for keeping up with the day to day of litigation. Mr. Machida was not designated as a 30(b)(6) witness and so there was no obligation that he be prepared to testify on behalf of [Hawaii ERS] as to all information reasonably available to the organization." Reply at 5. Similarly, "[w]hile Mr. Chatterry testified extensively as to the structure of the [Hawaii ERS] and its investment philosophy and policies, he was not knowledgeable about this litigation because he is not involved in its prosecution or supervision." Id.

In contrast to individual witnesses, corporate designees are responsible for the information related to the plaintiff-entity on a broader scale. "It is not expected that the designee have personal knowledge as to all relevant facts; however, the designee must become educated and gain the requested knowledge to the extent reasonably available." Louisiana Pac. Corp. v. Money Mkt. 1 Institutional Inv. Dealer, 285 F.R.D. 481, 486 (N.D. Cal. 2012) (recognizing that a Rule 30(b)(6) deposition represents the entity's knowledge and not that of the individual deponent). The witness should be capable of providing "complete, knowledgeable and binding answers on behalf of the corporation" about the topics noticed for deposition.

Marker v. Union Fidelity Life Ins., 125 F.R.D. 121, 126 (M.D.N.C. 1989). Thus, the entity has a duty to educate its designees about matters beyond his or her personal knowledge.

**\*9** In support of Mr. Aburano and Mr. Klein's adequacy as class representatives, Plaintiffs identify specific deposition testimony wherein both Mr. Aburano and Mr. Klein correctly provide information that the court in Monster Worldwide identified relevant to its determination of adequacy. See 251 F.R.D. at 135. The Monster factors and Plaintiffs' corresponding deposition excerpts are summarized as follows:

| | Factor | Hawaii ERS | Greater Penn |
|---|---|---|---|
| 1 | Whether designee knew the name of the stock at issue | "Intuitive stock." Ex. 1, Aburano Depo. 35:24. | Discussing Fund's purchases of "Intuitive stock." Ex. 2, Klein Depo. 147:22-24. |
| 2 | Whether designee knew the name of defendant(s) | "Gary Guthart … Marshall Mohr, Lonnie Smith." Aburano Depo. 183:3-5. | Marshall Mohr…I think he was CFO…Gary Guthart…I believe he was CEO…And Lonnie Smith · I think former CEO and board of directors." Klein Depo. 260:10-19. |
| 3 | Whether designee knew if plaintiff(s) ever owned the stock at issue | Correctly identified "ERS's transactions in Intuitive Surgical securities during the class period." Aburano Dep. 158:24-25. | Q: "Do you know which of the 15 equity managers held Intuitive Surgical shares in 2012 and 2013 for Greater Penn?" A: "Yes…Brown Advisory." Klein Depo. 124:4-11. |
| 4 | Whether designee knew if an amended complaint was filed | "I reviewed drafts of the amended complaint." Aburano Depo. 60:12-15. | Q: "Is there now some doubt in your mind that you [reviewed the amended complaint]?" A: "No." Klein Depo. 272:9-11. |
| 5 | Whether designee had ever seen a complaint in the action | | |
| 6 | Whether designee knew if defendant(s) had ever moved to dismiss | Q: "Did you read the motion to dismiss papers?" A: "I did at one point." Q: "Did you read the motion to dismiss order?" A: "I … read the order partially granting and partially denying the motion to dismiss." Q: "Did you read the motion for reconsideration of that order?" A: "I did read it." Aburano Depo. 201:7-16. | "I've looked at a lot of documents, court filings." Klein Depo. 264:21-22. "[The Order on Defendants' motion to dismiss] might be one of the documents I've read through." Klein Depo. 264:14-17. "I believe I've seen [defendants' motion for reconsideration]." Klein Depo. 274:17-21. |

Based on the foregoing, Mr. Aburano and Mr. Klein demonstrated a sufficient level of knowledge about this case to satisfy the court that they are capable of protecting the interests of the class in this litigation. Accordingly, the court concludes that Plaintiffs have met their burden to show that are adequate class representatives under Rule 23(a)(4).

**B. Rule 23(b)(3)—The Predominance Requirement**

Having satisfied the Rule 23(a) requirements, the court now turns to Rule 23(b). Where, as here, a plaintiff seeks certification under Rule 23(b)(3), the plaintiff must establish "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly

and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Plaintiffs contend the predominance requirement of Rule 23(b)(3) is satisfied here because Intuitive's alleged misconduct "affected all class members in the same manner," and therefore common question of law and fact prevail over questions affecting only individual class members. Mot. at 12; see Fed. R. Civ. P. 23(b)(3). Plaintiffs further contend the use of class action is superior in securities cases because it ensures "the just, speedy, and efficient determination of the class member's claims." [9] Mot. at 24.

[9]    Defendants do not challenge Plaintiffs' claim that superiority is satisfied in this case. See Opp. at 12-13.

**\*10** "Considering whether questions of law or fact common to class members predominate begins, of course, with the elements of the underlying cause of action." Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 809 (2011) ("Halliburton I"). Here, Plaintiffs bring claims pursuant to Section 10(b) of the Securities Exchange Act and Rule 10b-5 promulgated thereunder. [10] To establish liability and recover damages under Section 10(b) and 10b-5, Plaintiffs must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Amgen, 133 S. Ct. at 1191-92; Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1061 (9th Cir. 2008). However, the Supreme Court has ruled that loss causation and materiality need not be proven at the certification stage. See Halliburton I, 563 U.S. at 813 (it is not required to "show loss causation as a condition of obtaining class certification"); see also Amgen, 133 S. Ct. at 1197 (securities fraud plaintiffs need not prove materiality at the class certification stage, because "the question of materiality is common to the class, and [] a failure of proof on that issue would not result in questions affecting only individual members."). Defendants challenge Plaintiffs' ability to satisfy predominance as to reliance and damages. See Opp. at 12-13.

[10]    Plaintiffs also assert claims against the individually named defendants in this case for violations of sections 20(a) and 20A Securities Exchange Act of 1934 (15 U.S.C. § 78t, t-1). However, Defendants do not appear to advance any additional argument as to

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

predominance that is specific to these claims, nor does the court find that there is any reason to address them independently at this time.

### i. Presumption of Reliance

Courts have long recognized that without a classwide presumption of reliance in securities fraud cases, Rule 23(b) (3)'s predominance requirement "would often be an insuperable barrier to class certification, since each of the individual investors would have to prove reliance on the alleged misrepresentation." Dukes, 131 S.Ct. at 2552 n. 6; see also Halliburton, 563 U.S. at 810 (explaining that "requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would prevent such plaintiffs from proceeding with a class action, since individual issues would overwhelm the common ones.") (citing Basic, 485 U.S. at 242). Accordingly, the Supreme Court has identified two avenues through which plaintiffs may invoke a rebuttable presumption of reliance: the "fraud-on-the-market" presumption, as outlined in Basic Inc. v. Levinson, and the Affiliated Ute presumption, as set forth in Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-154 (1972). Plaintiffs contend they are entitled to a presumption of reliance under both theories. [11]

[11] Because the court finds that Plaintiffs are entitled to a presumption of reliance under Basic such that the class may be certified, it is unnecessary for the court to reach the question of whether Plaintiffs are similarly entitled to such a presumption under Affiliated Ute.

Basic's "fraud on the market" theory provides a rebuttable presumption that because "the market price of shares traded on well-developed markets reflects all publicly available information," including any misrepresentations, "all traders who purchase stock in an efficient market are presumed to have relied on the accuracy of a company's public statements." Basic, 485 U.S. at 246-7; Dukes, 131 S.Ct. at 2552 n. 6; see also Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2404 (2014) ("Halliburton II") (reaffirming Basic's presumption of reliance). To invoke this presumption at the class certification stage, plaintiff must show: (1) the alleged misrepresentations were publicly known, (2) Intuitive's stock traded in an efficient market, and (3) "the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed." Halliburton I,

131 S. Ct. at 2185 (quoting Basic, 485 U.S. at 248, n. 27). However, the presumption may be rebutted where a defendant offers evidence that "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." Basic, 485 U.S. at 248; see Halliburton II, 134 S. Ct. at 2415-16.

**\*11** Plaintiffs have made a preliminary showing that they are entitled to the fraud-on-the-market presumption here. [12] Defendants do not challenge Plaintiffs' initial satisfaction of the elements required to invoke the presumption, but rather contend that the presumption is rebutted because individual questions of knowledge predominate and because "the alleged misrepresentations and omissions had no impact on the stock price." Opp. at 17.

[12] Specifically, Plaintiffs allege that Intuitive "artificially inflated or maintained its stock price through *public* misrepresentations and omissions, that the stock is commonly traded on the NASDAQ, and that class members bought Intuitive common stock during the class period and suffered losses when the truth was disclosed." Mot. at 17. Plaintiffs also offer further analysis of market efficiency pursuant to the five factors set forth in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), as well as four of the additional factors used by some courts in the Ninth Circuit. See Mot. at 18-22; Binder v. Gillespie, 184 F.3d 1059, 1065 (9th Cir. 1999) (quoting Cammer, 711 F. Supp. at 1286-87).

### a. Individualized Questions of Knowledge

First, Defendants assert that individualized questions of knowledge will predominate over common questions because the allegedly "omitted" information at issue here was publicly available during the class period. Opp. at 13. That is, Defendants contend that "a substantial number of class members had actual knowledge of the allegedly omitted information, making reliance impossible to prove classwide." Opp. at 13. Specifically, Defendants identify four means through which they argue class members could have accessed the information Plaintiffs allege was fraudulently concealed: (1) the October 2011 Letters; (2) the Medical Device Reports; (3) the Product Liability Lawsuits; and (4) a January 2012 Patent Application. Defendants maintain that this theory is

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

distinct from a "truth-on-the-market" defense, which they acknowledge is improper to consider at the class certification stage. See Amgen, 133 S. Ct. at 1194-95. Defendants explain that a truth-on-the-market defense precludes any investor from recovering on the grounds that all investors necessarily knew of the allegedly omitted information, while Defendants here argue "only that some class members—not necessarily all class members—likely knew the truth and that consequently the court cannot presume that the whole class was ignorant of, and relied upon, the alleged omission." Opp. at 14, n. 6.

### 1. The October 2011 "Customer Letters" or "Secret Recall Letters"

In October 2011, Defendants sent over 2,000 letters to various purchasers of da Vinci—namely, hospitals —providing clarifications and additional instruction on how to use the da Vinci tip covers safely. See Opp. at 14; SACC ¶¶ 60-64. Plaintiffs characterize the Letters as "secret recalls," accusing Defendants of trying to indirectly correct for the safety issues without having to suffer the fallout of taking responsibility directly. See SACC ¶¶ 60-64. In any event, these letters arguably alluded to or implicated some of the safety concerns at issue in this lawsuit. As a result, Defendants argue that some members of the class were made aware of da Vinci's safety problems via the Letters, thus resulting in individualized questions of knowledge. Opp. at 14. However, the court agrees with Plaintiffs that there is a significant difference between sending an instructional letter to certain entities regarding a product, and publicly disclosing critical safety issues posed by the product. See Reply at 11.

### 2. The Medical Device Reports (MDRs)

 **\*12** Next, Defendants claim that MDRs are publicly available in the FDA's database, and thus the allegedly unreported or misclassified reports were actually uploaded and accessible to the public long before the March 2013 press release announcing the changes to Defendants' MDR reporting procedures. Accordingly, Defendants argue that "anyone in the proposed class could have known about the increase in MDRs." Opp. at 15.

Defendants' argument overlooks the substance of Plaintiffs' allegations on this particular issue. Plaintiffs assert that "thousands of MDRs were improperly kept secret by Defendants failing to report them at all, and even those that were filed [in the FDA's] database were misclassified as 'other' instead of 'serious injury,' thereby misleading the market as to da Vinci's safety. Reply at 11-12; SACC ¶¶ 7, 86, 96. Accordingly, the fact that some MDRs were publicly available is not inconsistent with Plaintiffs allegations that other MDRs were not, nor is it evidence that class members had knowledge of the information Plaintiffs actually allege was concealed.

### 3. The Products Liability Lawsuits

Defendants argue that the nature and number of product liability lawsuits against Intuitive was no secret, and therefore class members would have been aware of the safety issues Defendants purportedly concealed. However, this argument again excludes critical pieces of Plaintiffs' allegations regarding the extent of Defendants' omissions. Specifically, Plaintiffs accuse Defendants of having entered into "secret tolling agreements" with individuals who suffered injuries as a result of the da Vinci. SACC ¶¶ 6, 79-80; Reply at 12-13. Plaintiffs allege that Intuitive is currently engaged in litigation regarding insurance coverage for over a thousand claims made before and during the class period, where the insurers claim they had not been informed of the agreements, and had they been so informed, they would not have issued the policy. Id. Accordingly, the court agrees with Plaintiffs that these lawsuits, while public, are not an accurate or complete source of the relevant information pertaining to da Vinci's safety that Plaintiffs claim was omitted.

### 4. The Patent Application

Finally, Defendants claim that information regarding the defective tip cover was publically available and known to some class members because Defendants filed a patent application for a redesigned tip cover on January 12, 2012—before the proposed class period. This argument lacks merit. First, as Plaintiffs point out, patent updates are routine, and the mere fact that Defendants filed an application for a redesigned tip cover does not actually communicate relevant safety information regarding the product to the public. See Reply at 12. And second, it is

highly unlikely that a patent's technical language would be construed publicly as a "revelation" of the safety concerns at issue or a disclosure regarding the product's defective design. See id.

\* \* \*

In sum, while Defendants may be correct that certain individuals or entities had access to pieces of information Plaintiffs allege was fraudulently concealed, the court is not convinced that individual questions as to these highly specific and limited sources of information will predominate over the larger questions of reliance that remain common to the class. For this reason, and for the reasons explained above, Defendants fail to rebut the presumption of reliance.

### b. Price Impact

**\*13** Defendants' second argument seeks to rebut Plaintiffs' presumption of reliance on the grounds that the misrepresentations and corrective disclosures had no impact on Intuitive's stock price. Opp. at 17-18. In Halliburton II, the Court explained that price impact is at the core of Basic's fundamental premise that a misrepresentation or omission will be reflected by the market price at the time the statement is made. Halliburton II, 134 S. Ct. at 2416. For that reason, if a defendant can demonstrate that a misrepresentation or a corrective disclosure did not actually impact the price of the stock in an efficient market, the "basis for finding that the fraud had been transmitted through market price would be gone" and the suit should not proceed as a class action. Id.; Basic, 485 U.S. at 248. Accordingly, Halliburton II confirmed that a defendant may attempt to rebut the Basic presumption at the class certification stage with evidence showing a lack of price impact.

Based on the ruling from Halliburton II, on remand, the district court for the Northern District of Texas conducted an extensive assessment of the evidence of price impact submitted by both parties. See Erica P. John Fund, Inc. v. Halliburton Co., 309 F.R.D. 251, 263 (N.D. Tex. 2015) ("Halliburton Tex."). The evidence submitted by the respective parties primarily consisted of reports from competing experts, both of whom had "developed a market model and performed an event study to determine

whether there was statistically significant price movement on the dates of the alleged misrepresentations and corrective disclosures." Id. After a detailed evaluation of the merits of each expert's methodology and conclusions, the district court concluded that Halliburton's expert had demonstrated lack of price impact on all but one of the corrective disclosure dates. Id. at 270, 271 272, 274, 276, 280. The court therefore granted class certification, but only as to the single corrective disclosure date where Halliburton had failed to rebut price impact. See id. at 280.

As was presented to the district court in Halliburton Tex, the parties to the instant action have offered competing evidence from their respective experts on the issue of price impact. Thus, this court is now similarly tasked with evaluating whether Defendants have rebutted the presumption of reliance under a price impact theory as to each of the corrective disclosures here. In considering this evidence, the court evaluates not only the admissibility but also the persuasiveness of the expert reports. See Ellis, 657 F.3d at 982; In re Rail Freight Fuel Surcharge Antitrust Litig., 725 F.3d 244, 255 (D.C. Cir. 2013).

As a preliminary matter, the court finds that Defendants bear both the burden of production and the burden of persuasion on the issue of price impact. See Halliburton Tex., 209 F.R.D. at 260. That is, where Plaintiffs have satisfied the requirements entitling them to the initial presumption of reliance, in order to rebut this presumption Defendants must convince the court that their evidence is more probative of price impact than the evidence offered by Plaintiffs. See id. In conducting this analysis, the court will focus on changes in the stock price with respect to the corrective disclosure dates, as opposed to the misrepresentations alleged, because this method more accurately captures the impact, if any, of a material misrepresentation or omission. [13] While Defendants also challenge the seven dates Plaintiffs allege affirmative misrepresentations took place on the grounds that there was "no positive price impact," this argument is unpersuasive. See Opp. at 17. The lack of a statistically significant price increase following an alleged misrepresentation does not indicate lack of price impact. See Hatamian, 2016 WL 1042502, at \*7 ("Price impact in securities fraud cases is not measured solely by price increase on the date of a misstatement; it can be quantified by decline in price when the truth is revealed."); Halliburton II, 134, S. Ct. at 2414.

13      As explained by the district court on remand from Halliburton II,

> Fraud on the market securities litigation typically focuses on a price change at the time of a corrective disclosure. If a particular disclosure causes the stock price to decline at the time of disclosure, then the misrepresentation must have made the price higher than it would have otherwise been without the misrepresentation. Measuring price change at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth. Thus, the misrepresentation will not have changed the share price at the time it was made.

> Halliburton Tex., 309 F.R.D. at 262.

**\*14** With that, the court now turns to the five corrective disclosure dates alleged by Plaintiffs here: February 28, 2013; March 5, 2013; April 18-19, 2013; July 8, 2013; and July 18, 2013. "To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard, which means 'one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price.' " [14] Halliburton Tex., 309 F.R.D. at 262 (citing Merrit B. Fox, *Halliburton II: It All Depends on What Defendants Need to Show to Establish No Price Impact*, 70 Bus. Law 437, 442 n. 17 (2014–15)). Both parties have submitted expert reports as evidence in support of their arguments for and against price impact. Plaintiffs' expert, Professor Chad Coffman, concludes that statistically significant negative price changes occurred on each of the five corrective disclosure dates. Reply at 13-14, Dkt. No. 139-3; Expert Rebuttal Report of Chad Coffman, CFA ("Coffman Rebuttal") ¶ 6, Dkt. No 141-13. Conversely, Defendants' expert Dr. Kenneth M. Lehn concludes that there were no statistically significant price decreases on the first three dates (February 28, March 5, and April 19), and the statistically significant decreases on the last two dates (July 8 and July 18) are irrelevant and should not be considered by the court. Opp. at 18-19; Expert Report of Kenneth M. Lehn ("Lehn Report") ¶¶ 43-65, Dkt. No. 135-39. Each disclosure will be addressed briefly below.

14      An event study is a regression analysis that seeks to show how the market price of a company's stock

tends to respond to pertinent publicly reported events. Halliburton II, 134 S. Ct. at 2415.

### 1. February 28, 2013— Bloomberg's "Safety Probe" Article

On February 28, 2013, *Bloomberg News* reported that a U.S. regulator (later identified as the FDA in subsequent articles) had initiated a "safety probe" of the da Vinci surgical system. SACC ¶ 10, 113, 216; Lehn Report at ¶ 9; Coffman Rebuttal ¶¶ 31-32. The article was published approximately five minutes before the stock market closed. SACC ¶ 10, 113, 216. Within those five minutes, Intuitive's stock price dropped by approximately 11 percent, with the stock value declining from about $573 to about $510 per share. Id. at 10.

Because the article was released only five minutes before the market closed on February 28, 2013, Defendants' expert used a two-day window to conduct his event study, "consisting of both February 28, 2013 and March 1, 2013." Lehn Report ¶ 44. Lehn's event study did not find a statistically significant change in stock price. Id.

The court finds that it was inappropriate to use a two-day window to calculate price impact here. "An efficient market is said to digest or impound news into the stock price in a matter of minutes." Halliburton Tex., 309 F.R.D. at 269. Absent unusual circumstances, it is likely that the market would have therefore quickly incorporated the information contained in the *Bloomberg* article into Inuitive's stock price. See id.; Coffman Rebuttal ¶¶ 35-38. There is also no dispute that in the minutes following the release of the article, stock prices dropped by roughly 11 percent. Lehn reaches a different conclusion only when the event window is expanded to two full days. See Lehn Report ¶ 44. Moreover, as Coffman points out, "[e]ven if one accepts Dr. Lehn's position that the partial rebound on March 1, 2013 should be considered, a proper 'event window' to analyze this event should run from just before the release of the news at 3:55pm on February 28, 2013, through market close on the next trading day, March 1, 2013," rather than incorporating "almost a full day before the event occurs." Coffman Rebuttal ¶¶ 36-37. The court agrees with Coffman.

Based on the foregoing, the court finds that the substantial decline in Intuitive's stock price and Coffman's event

study establish price impact as to the February 28, 2013 disclosure, and Defendants have not met their burden to show otherwise. To the extent that Defendants advance an additional argument in a footnote that the information revealed by the disclosure was unrelated to any alleged misrepresentation, this argument is neither convincing nor adequately supported. See Opp. at 19 n.10. Accordingly, Plaintiffs are entitled to a presumption of reliance with respect to the February 28 corrective disclosure.

### 2. March 5, 2013—Bloomberg's "Robosurgery Death Reports" Article

**\*15** On March 5, 2013, another *Bloomberg* article entitled "Robosurgery Suits Detail Injuries as Death Reports Rise" was published, writing that "incident reports sent to U.S. regulators linked the da Vinci to at least 70 deaths since 2009." SACC ¶ 217. The parties disagree about exactly when the article was released, with Plaintiffs asserting that it was published in the early morning of March 5, 2013, while Defendants contend the news broke after the market closed that day. Compare Coffman Rebuttal ¶ 55, Dkt. No. 141-13, with Lehn Report ¶ 10, Dkt. No. 135-39. Based on Lehn's conclusion that the article was published after market close, he contends it is "appropriate to conduct an event study of Intuitive's stock price on March 6, 2013" as opposed to March 5. Lehn Report ¶¶ 52 n.90, 53.

While the record supports the contention that a version of the article was indeed released after the market closed, Plaintiffs offer compelling evidence to suggest that an earlier version of the article was released the morning of March 5, 2013. Plaintiffs cite an analyst's report released prior to the market open on March 5, 2013 that can be construed as referencing or alluding to the *Bloomberg* article and the information it reported. Coffman Rebuttal ¶ 58 n. 73 (citing "ISRG Volatility is Potential Boon to Buyers. The Chance of da Vinci Having Safety Issues is Remote," Janney Capital Markets, Mar. 5, 2013, Ex. 23, Dkt. No. 135-27). The analyst report stated: "ISRG shares could be under pressure this morning for the second straight day as business journal articles continue to harp on potential safety concerns on da Vinci." Id. Plaintiffs also submit a purported copy of the earlier version of the article as Appendix B to the Coffman Rebuttal (Dkt. No. 141-13 at 62-67). Defendants do not offer any such evidence on this issue.

Based on this record, the court finds that March 5, 2013 is the more appropriate date on which to perform the regression analysis. Because Lehn does not discuss his event study for the date of March 5 in his Report, Defendants fail to rebut price impact for this corrective disclosure.

### 3. April 18-April 19, 2013—First Quarter 2013 Financial Results

On April 18, 2013, Intuitive reported its first quarter financial results for 2013 after the market closed. SACC ¶ 218. Plaintiffs allege that "Intuitive reported procedure growth of 18%, below consensus expectations of 21%, and guided total 2013 procedure growth to the lower end of its range." Id. "Intuitive's common stock fell by $8.62, approximately 3%, from a closing price of $493.37 on April 18, 2013 to a closing price of $484.75 on April 19." Id. ¶ 218(c).

The court finds a lack of price impact in connection with the release of Intuitive's financial results between April 18th and April 19th 2013. First, neither Lehn nor Coffman found a statistically significant price impact at the 95% confidence level for this date. Coffman Rebuttal ¶ 6(iii)(a). Rather, Coffman's analysis resulted in a price impact at a 90% confidence level. Id.; Reply at 14. Although Plaintiffs argue that price impact at a 90% confidence level is a statistically significant, the district court in Halliburton Tex adopted 95% confidence level as the threshold requirement and this court finds no reason to deviate here. See 309 F.R.D. at 270.

Second, there is a lack of clarity regarding the source of information and the regression analysis conducted as to this disclosure. In addition to disclosing quarterly financial information, Plaintiffs also allege that Intuitive's Senior Vice President Marshall L. Mohr made a false or misleading statement on April 18, 2013. SACC ¶ 32. As Lehn points out, Coffman "does not provide a reliable methodology for distinguishing the effect of the alleged corrective disclosure from the effect of the alleged misrepresentation on April 18, 2013." Lehn Report ¶ 27(d). It is also not entirely clear from the parties' papers whether Coffman and Lehn used April 18th, April 19th, or a two-day window including both days

for their respective event studies regarding this disclosure. Compare Opp. at 19, Dkt. No. 135, with Reply at 14, Dkt. No. 139-3.

**\*16** Finally, even if the court accepted the 90% confidence level, the court is not convinced the quarterly financial results were a corrective disclosure at all. As discussed below in connection with the release of Intuitive's second quarter financial results, financial statements are not corrective of misrepresentations related to safety, and the court dismissed all other categories of affirmative misstatements Plaintiffs previously plead. See Order on MTD, 15-16, Dkt. No. 83. While Defendants only raise this argument in connection with July's financial disclosures, the court finds it equally applicable here. Accordingly, Plaintiffs' presumption of reliance for April 18-April 19, 2013 is rebutted.

### 4. July 8 Press Release & July 18 Second Quarter Financial Results

On July 8, 2013, Intuitive issued a press release "pre-announcing" its second quarter financial results, which Plaintiffs characterize as "dismal" and falling "well below expectations." SACC ¶¶ 130, 219. On July 18, 2013, after market-close, Intuitive then officially released its "2Q 2013" financial results, which were "consistent with its July 8, 2013 pre-announcement" prognosis. Id. ¶ 220. Both experts found statistically significant declines in Intuitive's stock price on July 8, 2013 and July 18, 2013. See Coffman Rebuttal ¶¶ 74-78, 84-95; Lehn Report ¶¶ 66-74.

While Defendants concede that there was a decline in stock price, they argue that the July financial statements should not be considered "corrective disclosures" because this kind of financial information is unrelated to allegations of da Vinci's safety problems. Plaintiffs argue that the July 8 press release and the July 18 financial report disclosed "new" information related to Intuitive's financial situation, which makes the statements corrective. SACC ¶¶ 130, 219. Plaintiffs are mistaken. As Defendants point out, the court dismissed allegations that were based on Intuitive's financial statements because such statements were "literally true," and therefore unlikely to "mislead a reasonable investor as to the future state of Intuitive's market success." Order on MTD at 15-16; Opp. at 19. Consequently, this action contains no alleged misrepresentations related to Intuitive's financial

condition that a remedial disclosure could correct. Based on the foregoing, Defendants have successfully rebutted the presumption as to the release of financial information on July 8, 2013 and July 18, 2013.

### 5. July 18, 2013—FDA Warning Letter

However, also on July 18, 2013, Intuitive publicly released a Warning Letter it had received two days earlier from the FDA. Id. ¶ 220. As discussed above, both experts found a statistically significant decline in Intuitive's stock price in connection with this disclosure. See Coffman Rebuttal ¶¶ 84-95; Lehn Report ¶¶ 66-74.

Intuitive was given the Warning Letter following an "onsite audit" conducted by the FDA to monitor issues it had previously identified in a Form 483. See SACC ¶ 220; Coffman Rebuttal ¶¶ 84-89. The Form 483 had been provided to Intuitive on June 25, 2013. Id. Defendants' argument that "the Warning Letter revealed nothing new to the market that was not disclosed previously in the Form 483" is unpersuasive. As Coffman explains, "Form 483 is used to document a problem that is still being investigated and not necessarily part of a company's permanent record, whereas a warning letter is an indication that the company reply to the Form 483 has been insufficient to explain or solve the issues in question." Coffman Rebuttal ¶ 87. According to Coffman, the FDA only issues a warning "after Form 483 is issued *and* the inspector completes the Establishment Inspection Report *and* an FDA official ... reviews the Form 483 and believes that a serious violation may exist." Id. As a result, issuance of a Warning Letter strongly suggests that it is the FDA's position that the corrective actions undertaken by the receiver have not been adequate. See Mulligan v. Impax Labs., Inc., 36 F. Supp. 3d 942, 948 (N.D. Cal. 2014).

**\*17** The existence and implications of the Warning Letter absolutely constitutes "new" information. Moreover, the information is also directly relevant to alleged misrepresentations regarding safety. Accordingly, the court concludes that there is compelling evidence of price impact in connection with the July 18, 2013 disclosure of the FDA Warning Letter. Based on this finding, the court also rejects Defendants' argument that if any class is certified, the class period must end no later than June 25, 2013. Opp. at 23. The class period shall extend through July 18, 2013, as proposed.

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works.

#### ii. Damages Methodology

In a final attempt to undermine Plaintiffs' satisfaction of the predominance requirement, Defendants, relying on Comcast, argue that Plaintiffs fail to present a classwide method for computing damages, and thus inquiries as to class members' individual damages assessments will predominate in contravention Rule 23(b)(3). Opp. at 21.

While the court agrees that Comcast supports the general notion that damages questions should be considered when weighing issues of predominance, Defendants' reading of Comcast is too broad. The Ninth Circuit has construed Comcast as requiring only that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." Levya v. Medline Industries, Inc., 716 F.3d 510, 514 (9th Cir. 2013) (citing Comcast, 133 S.Ct. at 1435); accord Roach v. T.L. Cannon Corp., 778 F.3d 401, 407 (2d Cir. 2015) ("the Court did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance"); In re Deepwater Horizon, 739 F.3d 790, 817 (5th Cir. 2014) (calling the defendants' suggestion that class certification should be denied based on a failure to show classwide damages "a significant distortion of Comcast" that had already been rejected by several circuits). Courts in this district have similarly declined to adopt such an overly broad interpretation of Comcast. See, e.g., Hatamian, 2016 WL 1042502, at *8; Diamond Foods, 295 F.R.D. at 251.

Plaintiffs state that they will use the "out-of-pocket" methodology, which is the standard approach used for calculating damages in Section 10(b) securities cases. Coffman Rebuttal ¶¶ 96-109. Coffman explains that the "out-of-pocket" method

> measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on

damages that also can be applied class wide

Id. ¶ 96. This method is widely considered "an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." Diamond Foods, 295 F.R.D. at 251; see id.

Based on ample legal precedent, as well as Coffman's report explaining the methodology Plaintiffs represent that they will use to calculate classwide damages, the court finds that Plaintiffs have identified a satisfactory methodology for calculating damages here. Plaintiffs demonstrate that damages are capable of being "feasibly and efficiently calculated" on a classwide basis "once the common liability questions are adjudicated." See Levya, 716 F.3d at 514; Hatamian, 2016 WL 1042502, at *9.

## IV. CONCLUSION

Based on the foregoing, the court finds, concludes, and orders as follows:

1. Plaintiffs' Motion for Class Certification is GRANTED.

2. Pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), this action is found to be appropriate for class certification. The class is defined as follows:

> **\*18** All persons or entities who purchased or acquired the publicly traded common stock of Intuitive Surgical, Inc. during the period from February 6, 2012 through July 18, 2013, inclusive, and who were damaged thereby. Excluded from the Class are (i) all Defendants; (ii) members of the immediate families of individual defendants Guthart, Mohr, and Smith; (iii) any subsidiaries and affiliates of Defendants; (iv) any person who is or was an officer or director of Intuitive or any of Intuitive's subsidiaries of affiliates; (v) Defendants' directors' and officers' liability insurance carriers, and any affiliates or subsidiaries thereof; (vi) Intuitive's employee

WESTLAW © 2016 Thomson Reuters. No claim to original U.S. Government Works. 15

retirement and benefit plan(s); and (vii) the legal representatives, heirs, successors and assigns of any such excluded person or entity. SACC ¶ 248.

3. Lead plaintiffs Employees' Retirement System of the State of Hawaii and Greater Pennsylvania Carpenters' Pension Fund are hereby appointed as Class Representatives.

4. The law firm of Labaton Sucharow LLP shall be appointed Class Counsel.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2016 WL 7425926

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2062985

United States District Court,
S.D. New York.

IN RE VIRTUS INVESTMENT PARTNERS,
INC. SECURITIES LITIGATION

15cv1249
|
Signed 05/15/2017

OPINION & ORDER

WILLIAM H. PAULEY III, U.S.D.J.

**\*1** Lead Plaintiff the Arkansas Teacher Retirement
System brings this securities class action on behalf of itself
and others who purchased the publicly traded securities of
Defendant Virtus Investment Partners ("Virtus Partners")
between January 25, 2013 and May 11, 2015. Lead
Plaintiff moves to certify a class. For the reasons that
follow, Lead Plaintiff's motion is granted.

BACKGROUND

The allegations of the Amended Complaint
("Complaint") are accepted as true for the purpose of this
motion for class certification.[1] In brief, Lead Plaintiff
alleges that, in 2009, Virtus Partners began marketing
a family of funds called "AlphaSector." (Compl. ¶¶ 4–
5.) In marketing materials, Defendants represented that
the outsized performance of the AlphaSector indices
had been achieved through live trading with real client
assets beginning in 2001. (Compl. ¶ 6.) But, in fact, the
AlphaSector indices did not come into existence until
2008. (Compl. ¶ 50.) Then, in a January 2013 conference
call, President and Chief Executive Officer George R.
Aylward stated that "[o]ur portfolio managers continued
to deliver strong relative investment performance, and
this performance has been a key driver of our high level
sales and net flows." (Compl. ¶ 165.) In his remarks,
Aylward neglected to state that at least a portion of
that performance was attributable to the misleading
statements in the AlphaSector indices.

[1]    Familiarity with this Court's Opinion & Order dated
July 1, 2016 is presumed. See In re Virtus Inv.

Partners, Inc. Sec. Litig., 195 F. Supp. 3d 528
(S.D.N.Y. 2016).

LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class
certification and "does not set forth a mere pleading
standard." Wal–Mart Stores, Inc. v. Dukes, 564 U.S. 338,
350 (2011). Rather, "[t]he party seeking class certification
must affirmatively demonstrate compliance with the Rule,
and a district court may only certify a class if it is satisfied,
after a rigorous analysis, that the requirements of Rule 23
are met." In re Am. Int'l Grp., Inc. Sec. Litig., 689 F.3d
229, 237–38 (2d Cir. 2012) (internal quotation marks and
alterations omitted).

The moving party must first satisfy Rule 23(a), which
"requires that a proposed class action (1) be sufficiently
numerous, (2) involve questions of law or fact common
to the class, (3) involve class plaintiffs whose claims are
typical of the class, and (4) involve a class representative
or representatives who adequately represent the interests
of the class." Myers v. Hertz Corp., 624 F.3d 537, 547
(2d Cir. 2010) (citing Fed. R. Civ. P. 23(a)). In addition,
"the proposed class must satisfy at least one of the three
requirements listed in Rule 23(b)." Wal-Mart, 131 S.Ct. at
2548. Plaintiffs here rely on Rule 23(b)(3), which "requires
the party seeking certification to show that 'questions of
law or fact common to class members predominate over
any questions affecting only individual members' and that
class treatment would be superior to individual litigation."
Myers, 624 F.3d at 547 (quoting Fed. R. Civ. P. 23(b)(3)).

**\*2** "Generally, claims alleging violations of Section[ ]
10(b) ... of the Exchange Act are especially amenable to
class certification," In re Smith Barney Transfer Agent
Litig., 290 F.R.D. 42, 45 (S.D.N.Y. 2013) (internal
quotation marks omitted). And, "[i]n light of the
importance of the class action device in securities fraud
suits, these factors are to be construed liberally." Gary
Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner
& Smith, Inc., 903 F.2d 176, 179 (2d Cir. 1990).

DISCUSSION

Lead Plaintiff moves to certify a class of investors
in Virtus Partners common stock harmed by Virtus's
misstatements. Specifically, the proposed class consists of:

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

all persons and entities that, during the period between January 25, 2013 and May 11, 2015, inclusive (the "Class Period"), who purchased or otherwise acquired shares of the publicly traded common stock of Virtus Investment Partners, Inc. and were damaged thereby (the "Class").

(Mem. In Support of Motion to Certify Class, ECF No. 80, at 3.)

Defendants oppose class certification and argue that (1) Lead Plaintiff fails to allege that common questions predominate because it does not allege class-wide reliance, (2) Lead Plaintiff's trading history makes it an unsuitable representative, and (3) in any event, if certification is granted the class period should be shortened.

### I. Rule 23(a) Requirements

#### a. Numerosity

Plaintiff must show that the proposed "class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). " 'Impracticable' simply means difficult or inconvenient, not impossible." In re Currency Conversion Fee Antitrust Litig., 230 F.R.D. 303, 307 (S.D.N.Y. 2004) (citing Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir. 1993)). In the Second Circuit, "numerosity is presumed at a level of 40 members." Consol. Rail Corp. v. Town of Hyde Park, 47 F.3d 473, 483 (2d Cir. 1995). Here, several hundred million shares of Virtus stock were traded on the NASDAQ during the class period, with daily trading volumes averaging approximately sixty-five thousand shares. (See Expert Report of Chad Coffman ("Coffman Rep."), ECF No. 81, Ex. D, ¶¶ 23–24.) Not only is the proposed class likely comprised of thousands of geographically dispersed parties, making joinder impractical, Defendants do not argue that the proposed class fails to satisfy this requirement. Accordingly, the proposed class satisfies the numerosity requirement.

#### b. Commonality

Rule 23(a)(2)'s commonality requirement is met when "plaintiffs' grievances share a common question of law

or of fact." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C., 504 F.3d 229, 245 (2d Cir. 2007). Courts in this Circuit find commonality satisfied where there are common issues relating to violations of federal securities laws, misrepresentations of material fact, scienter, and damages. See In re Flag Telecom Holdings, Ltd. Sec. Litig., 245 F.R.D. 147, 158 (S.D.N.Y. 2007), order aff'd in part, vacated in part, 574 F.3d 29 (2d Cir. 2009).

Here, the Complaint alleges that Defendants made misrepresentations and omissions about the performance history of Virtus Partner's AlphaSector funds. This raises common questions as to whether Defendants violated the Exchange Act, whether the prospectuses disseminated to the class misrepresented facts about the funds' performance history, whether Defendants acted knowingly or recklessly, and whether investors suffered damages as a result of the alleged misrepresentations. Indeed, Defendants do not contend that the proposed class lacks a common question of law or fact. Accordingly, the proposed class satisfies the commonality requirement.

#### c. Typicality and Adequacy: Unique Defenses Based on Trading History

**\*3** The typicality requirement overlaps with that of commonality. See Marisol A. v. Giuliani, 126 F.3d 372, 375 (2d Cir. 1997). "Typicality 'requires that the claims of the class representatives be typical of those of the class, and is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.' " Cent. States, 504 F.3d at 245 (quoting Robinson v. Metro–North Commuter R.R. Co., 267 F.3d 147, 155 (2d Cir. 2001)). However, typicality may fail where named plaintiffs will be forced to "expend considerable time on unique defenses—precisely the situation the case law does not condone." George v. China Auto. Sys., Inc., No. 11-CV-7533 (KBF), 2013 WL 3357170, at *6 (S.D.N.Y. July 3, 2013).

Defendants contend that Lead Plaintiff is neither typical of the class nor an adequate representative because its claims are subject to unique defenses based on its trading history. First, Defendants argue that Lead Plaintiff was an "in-and-out" trader. [2] Specifically, Defendants note that Lead Plaintiff engaged in significant in-and-

out trading during the class period and ultimately sold all of its Virtus shares prior to the end of the class period in May 2015, when the truth was purportedly fully revealed. (Declaration of Shannon McGovern ("McGovern Decl."), ECF No. 89, Ex. G.) But buying and selling shares throughout the class period is "not atypical in a class that contains ... numerous sophisticated investors." In re Petrobras Sec. Litig., 312 F.R.D. 354, 360 (S.D.N.Y. 2016). And even though Lead Plaintiff did not hold its shares through the entire class period, it held over thirty thousand shares through the first corrective disclosure, which subjects it to the same wrongful acts as the remainder of the class. See In re Petrobras Sec. Litig., 312 F.R.D. 354, 360 (S.D.N.Y. 2016). [3]

[2]    "In-and-out traders are those who both purchase and sell all of their shares prior to a corrective disclosure; if the purchaser sells shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." Sklar v. Amarin Corp. PLC, No. 13-CV-06663, 2014 WL 3748248, at *9 (D.N.J. July 29, 2014).

[3]    In Petrobras, the court noted that "variations are not relevant when the same alleged misconduct drives the claims.... The defendants allegedly committed the same wrongful acts in the same manner against all members of the class by participating in a bribery and kickback scheme and making false and misleading statements that impacted all members of the Exchange Act Class." 312 F.R.D. at 360.

Defendants also argue that Lead Plaintiff is atypical because it continued to purchase Virtus stock after the truth was revealed. In particular, Lead Plaintiff purchased additional shares of Virtus stock just weeks after news of the SEC's Wells Notice in September 2014. (McGovern Decl., Ex. G.) That Wells Notice caused the "biggest one-day drop" for Virtus stock in three years. (Declaration of John Browne ("Browne Decl."), ECF No. 95, Ex. D.) But even though Lead Plaintiff's final purchase of Virtus stock occurred just 16 days after news of F-Squared's Wells Notice, that purchase preceded the time in May 2015 when the truth was fully revealed to the market. (See Compl. ¶ 132.) In September 2014, the market was not alerted to how much the truth would affect Virtus Partners' stock price. Indeed, the analyst covering Virtus Partners reported that the errors were only in F-Squared materials, not those of Virtus Partners. (Browne Decl., ECF No. 95, Ex. E.) And, in any event, other courts have questioned the impact of post-disclosure purchases

on earlier reliance. See In re Petrobras, 312 F.R.D. at 360 (noting "the irrelevance of post-disclosure purchases to earlier reliance" in finding that such purchases "do not mean [defendant] will face atypical defenses"). Ultimately, the proposed class satisfies the typicality and adequacy requirements.

**II. Rule 23(b)(3) Requirements**

a. Predominance: Class-Wide Reliance

*4  "[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof." Brown v. Kelly, 609 F.3d 467, 483 (2d Cir. 2010). This inquiry "often turns on the element of reliance." Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I"), 563 U.S. 804, 810 (2011).

Plaintiffs contend that predominance is established through class-wide reliance under either a fraud-on-the-market theory, Basic Inc. v. Levinson, 485 U.S. 224 (1988), or presumed due to Defendants' non-disclosures, Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972).

i. Fraud-on-the Market Theory

To invoke the fraud-on-the-market presumption of reliance articulated in Basic, Lead Plaintiff must establish that the alleged misrepresentations were public, that the stock traded on an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. Halliburton I, 563 U.S. at 811. Here, the class qualifies for the Basic presumption of reliance. The alleged misstatements were contained in publicly filed prospectuses and public statements to investors. (See Compl. ¶¶ 132–54, 165–71, 177.) The class period is defined to end when the truth was revealed. And Virtus Partners' common stock traded on an efficient market. (See Coffman Rep., ¶¶ 6, 78.)

Conceding that Virtus Partners' stock traded on an efficient market, Defendants seek to rebut the

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

presumption of class-wide reliance. A defendant may rebut the presumption "through evidence that an alleged misrepresentation did not actually affect the market price of the stock." Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II"), 134 S. Ct. 2398, 2417 (2014); Basic, 485 U.S. at 248 ("Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."). "Defendants must demonstrate a lack of price impact by a preponderance of the evidence." In re Goldman Sachs Grp., Inc. Sec. Litig., No. 10-CV-3461 (PAC), 2015 WL 5613150, at *4 (S.D.N.Y. Sept. 24, 2015), leave to appeal granted, No. 15-3179 (2d Cir. Jan. 26, 2016).

Courts frequently consider "event study" data in determining price impact. "To prove that a stock was responding to a specific piece of information on a specific day under the generally accepted event study approach (1) the return must be abnormal; (2) the abnormal return must be significant; and (3) there must not be confounding news." In re Credit Suisse First Boston Corp. (Lantronix, Inc.) Analyst Sec. Litig., 250 F.R.D. 137, 143 (S.D.N.Y. 2008). A defendant may rebut the presumption with evidence that the alleged misstatements were not associated with abnormal, positive stock-price returns ("front-end price impact") or negative price stock-returns ("back-end impact").

Because the back-tested information was contained in registration statements that pre-date the class period, Lead Plaintiff advances a price-maintenance theory, focusing on back-end impact. Back-end price impact asks whether a decline in stock price when the truth is revealed demonstrates that the misstatements maintained an artificially high price.

**\*5** The Complaint alleges that the truth was revealed through multiple, partial disclosures: (1) in September 2014, when F-Squared received a Wells Notice from the SEC, (2) in November 2014, when Howard Present resigned from F-Squared, and (3) in May 2015, when Virtus Partners disclosed that the SEC was investigating Virtus Advisers regarding F-Squared's historic performance information. (Compl. ¶¶ 112–14, 116, 117–19, 132–34.) Defendants contend that these disclosures could not have impacted Virtus Partners' share price because the truth about back-testing was already

revealed. Specifically, Defendants point to three articles in December 2013 (*FundFire*, *Barron's,* and *Wall Street Journal* reported "the historic performance data relied upon backtested results") and one article in May 2014 (*Wall Street Journal* reported F-Squared "misrepresented that its strategy tracked real money"). [4] Defendants' expert concluded that there was no statistically significant abnormal negative return on the days these articles were published. (See Expert Report of Chad Coffman, ECF No. 89, Ex. I, ¶¶ 31–35.)

[4]     In Youngers v. Virtus Inv. Partners Inc., 195 F. Supp. 3d 499, 521 (S.D.N.Y. 2016), this Court held that such disclosures were sufficient to trigger an investor in the AlphaSector funds to investigate, thereby beginning the statute of limitations. That is separate from the issue of whether an investor in Virtus stock would have known the whole truth based on the same article.

But Defendants' argument is essentially a "truth-on-the-market defense," which is inappropriate on a motion for class certification. Rebutting " 'the [fraud-on-the-market] presumption of reliance' ... by demonstrating that 'news of the [truth] credibly entered the market and dissipated the effects of [prior] misstatements' ... is a matter for trial (and presumably also for a summary judgment motion ...)." Amgen Inc. v. Conn. Ret. Plans & Trust Funds, 133 S. Ct. 1184, 1204 (2013) (quoting Basic, 486 U.S. at 248–49); In re Goldman, 2015 WL 5613150, at *6 ("Defendants' demonstration of 34 separate dates ..., which allegedly revealed that Goldman had acted against clients' interest and on which there was no movement in Goldman's stock price, does not show a lack of price impact. This is because the argument is an inappropriate 'truth on the market' defense."). Thus, Defendants' argument lacks merit at this stage.

Defendants also assert that the drops in share price on the dates proffered by Lead Plaintiffs have alternative explanations. For instance, Howard Present's resignation creates uncertainty for investors, and the May 2015 10-Q contained negative financials for the company. (Choi Rpt., ECF No. 88, ¶ 41.) These drops, their argument continues, simply reflect market reaction to "new industry-specific or firm specific facts, conditions, or other events," as opposed to "truth behind the alleged misstatements." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 40 (2d Cir. 2009).

However, Defendants' theory is undermined by evidence that investors were still in the dark throughout the class period. First, it is not clear that the December 2013 and May 2014 articles revealed the truth to Virtus Partners investors. Those news articles focused on an SEC probe into F-Squared, not Virtus, regarding possible wrongdoing based on buy/sell signals generated by an unnamed wealth management firm. (See McGovern Decl., ECF No. 89, Ex. F.) That the truth was still not in the market is bolstered by a September 2014 article reporting on F-Squared's Well Notice, which is the first time a Virtus analyst reported on the issue. Even at that time, the known errors were attributed only to F-Squared, not Virtus. (Browne Decl., ECF No. 95, Ex. E.) News of the F-Squared's Wells Notice caused the "biggest one-day drop" for Virtus Partners stock in three years (Browne Decl., Ex. D), while the December 2013 and May 2014 reports did not have a statistically significant impact on the share price.

Moreover, internal emails acknowledged that the SEC investigation focused on "F-Squared marketing material, not Virtus marketing material." (Browne Decl., ECF No. 95, Ex. L.) And, continuing into 2015, Virtus appeared to communicate to investors that any back-testing was an oversight, not a misrepresentation. (See Browne Decl., Ex. O (email from Virtus investor explaining "[SEC] findings sound like this is pretty clearly misrepresentation, yet, throughout our discussions this has been positioned as a clerical error and more of an oversight.").)

**\*6** Accordingly, Defendants have failed to rebut the Basic presumption of reliance, and the proposed class satisfies the predominance requirement.

### ii. Affiliated Ute Presumption

Lead Plaintiff contends that it is also entitled to a presumption of class-wide reliance under Affiliated Ute because this action also involves material omissions. See City of Livonia Employees' Ret. Sys. v. Wyeth, 284 F.R.D. 173, 183 (S.D.N.Y. 2012) ("Even if Defendants had rebutted the presumption of reliance under Basic, Plaintiff would still be entitled to the presumption of reliance under Affiliated Ute."). In cases "involving primarily a failure to disclose, positive proof of reliance is not a prerequisite to recovery." Affiliated Ute, 406 U.S. at 153. Rather, all that needs to be shown is that the "facts withheld be material in the sense that a reasonable investor might have considered them important in making [his] decision." Affiliated Ute, 406 U.S. at 153–54.

However, the presumption does not apply when the omissions merely "exacerbate the misleading nature of the 'alleged conduct.' " Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc., 412 F.3d 103, 109 n. 5 (2d Cir. 2005); In re Smith Barney, 290 F.R.D. at 48. Indeed, "[i]f a misrepresentation claim could be reframed as an omission claim merely by alleging that a defendant 'did nothing to dispel' its own misrepresentation, then the limitation of the Affiliated Ute presumption to omissions alone would be meaningless indeed." In re Barclays Liquidity Cross & High Frequency Trading Litig., 126 F. Supp. 3d 342, 366 (S.D.N.Y. 2015); Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc., No. 05-CV-1898 (SAS), 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006) ("Where positive statements are central to the alleged fraud, thereby eliminating the evidentiary problems inherent in proving reliance on an omission, the Affiliated Ute presumption does not apply.").

Here, the Complaint alleges two sets of misleading statements. The first set relates to the AlphaSector indices and is characterized in the Complaint as "materially false and misleading affirmative statements," not omissions. (Compl., ¶ 153) Thus, these misstatements are not subject to a presumption of reliance under Affiliated Ute.

The second set of misleading statements relates to a January 2013 conference call in which Aylward claimed that "[o]ur portfolio managers continued to deliver strong relative investment performance, and this performance has been a key driver of our high level sales and net flows." (Compl. ¶ 165.) Describing this statement in its July 2016 Opinion and Order, this Court observed that "Virtus Partners cite[d] proper drivers of 'sales and net flows' but omit[ted] the misleading performance history. Such a statement is a half-truth...." See In re Virtus Inv. Partners, 195 F. Supp. 3d at 537 (emphasis added). Thus, unlike the statements relating to the AlphaSector indices, Aylward's omission in the January 2013 conference call is entitled to a presumption of reliance under Affiliated Ute.

### b. Superiority

"The superiority requirement asks courts to balance, in terms of fairness and efficiency, the advantages of a class action against those of alternative available methods of adjudication." In re Vivendi Universal, S.A., 242 F.R.D. 76, 91 (S.D.N.Y. 2007), aff'd sub nom. In re Vivendi, S.A. Sec. Litig., 838 F.3d 223 (2d Cir. 2016). Defendants do not dispute this requirement, and this Court finds that Lead Plaintiff carries its burden in this respect.

### III. Class Period

 *7 Defendants argue that the class period should be shortened to end in December 2013 or, at the latest, May 2014. "In the case of a securities fraud class action, courts are required to 'cut off the class period' on the date of a statement or event that 'cure[s][] the market.' " Carpenters Pension Trust Fund of St. Louis v. Barclays PLC, 310 F.R.D. 69, 97 (S.D.N.Y. 2015) (quoting In re Interpublic Sec. Litig., No. 02-CV-6527 (DLC), 2003 WL 22509414, at *5 (S.D.N.Y. Nov. 6, 2003)); see also Sirota v. Solitron Devices, Inc., 673 F.2d 566, 577 (2d Cir. 1982). Thus, the class period should end where an "announcement severed the link between the alleged misrepresentations and the stock price, even though additional information regarding the accounting irregularities came to light." In re Fed. Nat. Mortg. Ass'n Sec., Derivative & "ERISA" Litig., 247 F.R.D. 32, 39 (D.D.C. 2008).

However, "[w]hether a particular announcement ... actually cured a prior misrepresentation is ... a sensitive issue to rule on at this early stage of the proceedings, because it comes so close to assessing the ultimate merits in the case." In re Fed. Nat. Mortg. Ass'n, 247 F.R.D. at 39; see also In re Alstom SA Sec. Litig., 253 F.R.D. 266, 291 (S.D.N.Y. 2008) ("[G]iven the inherently factual nature of these types of disputes, courts repeatedly have refused to shorten a class period based on alleged inquiry notice."). Courts "often limit[ ] their analysis to a determination of whether there is 'a substantial question of fact as to whether the release cured the market or was itself misleading.' " In re Fed. Nat. Mortg. Ass'n, 247 F.R.D. at 39 (quoting Friedlander v. Barnes, 104 F.R.D. 417, 421

(S.D.N.Y. 1984)). If there is "no substantial doubt as to the curative effect" of the announcement, the class period may be shortened. Friedlander v. Barnes, 104 F.R.D. at 421.

Here, Defendants' argument is essentially the same as its "truth-on-the-market" theory, which the Supreme Court counsels is an issue for summary judgment or trial. Amgen, 133 S. Ct. at 1204. As previously discussed, Lead Plaintiff offered substantial evidence that the market was misled throughout the class period. Accordingly, Lead Plaintiff's proposed class period of January 25, 2013 and May 11, 2015 is appropriate.

### CONCLUSION

For the foregoing reasons, Lead Plaintiff's motion for class certification is granted. The class is defined as:

> all persons and entities that, during the period between January 25, 2013 and May 11, 2015, inclusive (the "Class Period"), who purchased or otherwise acquired shares of the publicly traded common stock of Virtus Investment Partners, Inc. and were damaged thereby.

This Court appoints Arkansas Teacher Retirement System as class representative and Labaton Sucharow LLP and Bernstein Litowitz Berger & Grossmann LLP as Class Counsel.

The Clerk of Court is directed to terminate the motion pending at ECF No. 79.

SO ORDERED.

### All Citations

Slip Copy, 2017 WL 2062985, Fed. Sec. L. Rep. P 99,720

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.   6

2018 WL 620383
United States District Court, D. Minnesota.

WEST VIRGINIA PIPE TRADES HEALTH
& WELFARE FUND, Employees' Retirement
System of the State of Hawaii, and Union
Asset Management AG, Plaintiffs,
v.
MEDTRONIC, INC., William A. Hawkins, Gary L.
Ellis, Richard E. Kuntz, Julie Bearcroft, Richard
W. Treharne, and Martin Yahiro, Defendants.

Civil No. 13–1686 (JRT/FLN)
|
Signed 01/30/2018

**Synopsis**

**Background:** Institutional investors filed putative class action against medical device corporation, and its officers and employees, alleging they engaged in a scheme to defraud investors by manipulating early clinical studies involving bone morphogenetic protein that induced development of new bone tissue, in violation of Securities Exchange Act. Investors moved for certification of class.

**Holdings:** The District Court, John R. Tunheim, Chief Judge, held that:

[1] claims of named plaintiffs were typical of those of class;

[2] investors were entitled to presumption of reliance, under *Affiliated Ute*, to satisfy predominance requirement for certification;

[3] class action was superior to other methods of resolving investors' claims; and

[4] corrective disclosure occurred when corporation's alleged scheme was published in article.

Motion granted.

West Headnotes (30)

**[1]** **Federal Civil Procedure**
👉 Discretion of court

District court is accorded broad discretion to decide whether class certification is appropriate. Fed. R. Civ. P. 23.

Cases that cite this headnote

**[2]** **Federal Civil Procedure**
👉 Evidence; pleadings and supplementary material

Court accepts substantive allegations in plaintiff's complaint as true when determining if a proposed class is acceptable for certification. Fed. R. Civ. P. 23.

Cases that cite this headnote

**[3]** **Federal Civil Procedure**
👉 Consideration of merits

In determining the propriety of a class action, the focus is on whether the class satisfies federal class action rule, not on whether the proposed action will prevail. Fed. R. Civ. P. 23.

Cases that cite this headnote

**[4]** **Federal Civil Procedure**
👉 In general; certification in general

Court evaluating motion to certify class action must undertake a rigorous analysis to assure that requirements of federal class action rule are met. Fed. R. Civ. P. 23.

Cases that cite this headnote

**[5]** **Federal Civil Procedure**
👉 Impracticability of joining all members of class; numerosity

The numerosity requirement for class action certification is generally satisfied in actions

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works.

involving nationally traded securities. Fed. R. Civ. P. 23(a)(1).

Cases that cite this headnote

**[6]** **Federal Civil Procedure**
👉 Common interest in subject matter, questions and relief;damages issues

While not every question of law and fact must be common to the entire class to meet commonality requirement for class action certification, plaintiffs must show that the course of action giving rise to their cause of action affects all putative class members, or that at least one of the elements of that cause of action is shared by all of the putative class members. Fed. R. Civ. P. 23(a)(2).

Cases that cite this headnote

**[7]** **Federal Civil Procedure**
👉 Stockholders, investors, and depositors

Commonality, as required for class action certification, is easily satisfied in securities fraud cases. Fed. R. Civ. P. 23(a)(2).

Cases that cite this headnote

**[8]** **Federal Civil Procedure**
👉 Representation of class;typicality; standing in general

Typicality, as required for class action certification, suggests that there are other members of the class who have the same or similar grievances as the representative plaintiff. Fed. R. Civ. P. 23(a)(3).

Cases that cite this headnote

**[9]** **Federal Civil Procedure**
👉 Representation of class;typicality; standing in general

Factual variations in individual claims will not normally preclude class certification for lack of typicality if the individual claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory. Fed. R. Civ. P. 23(a)(3).

Cases that cite this headnote

**[10]** **Federal Civil Procedure**
👉 Stockholders, investors, and depositors

Claims of named plaintiffs were typical of those of class, as required for certification of investors' putative securities fraud class action against medical device corporation, and its officers and employees, alleging they engaged in a scheme to defraud investors by manipulating early clinical studies involving bone morphogenetic protein that induced development of new bone tissue, since all investors purchased company's stock during class period and suffered damages as a result of the allegedly fraudulent scheme. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5; Fed. R. Civ. P. 23(a)(3).

Cases that cite this headnote

**[11]** **Federal Civil Procedure**
👉 Representation of class;typicality; standing in general

Court evaluating adequacy of representation, as required for certification of class action, considers (1) whether class representatives have common interests with members of the class, and (2) whether class representatives will vigorously prosecute interests of the class through qualified counsel. Fed. R. Civ. P. 23(a)(4).

Cases that cite this headnote

**[12]** **Federal Civil Procedure**
👉 Common interest in subject matter, questions and relief;damages issues

At the core of the predominance requirement for class action certification is the issue of whether defendant's liability to all plaintiffs may be established with common evidence; if the same evidence will suffice for each member to make a prima facie showing, then it becomes a common question. Fed. R. Civ. P. 23(b)(3).

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 2

Cases that cite this headnote

**[13] Federal Civil Procedure**
👉 Common interest in subject matter, questions and relief;damages issues

If a defendant's liability is common to the class, then common questions are held to predominate over individual questions, as required for class action certification. Fed. R. Civ. P. 23(b)(3).

Cases that cite this headnote

**[14] Federal Civil Procedure**
👉 Common interest in subject matter, questions and relief;damages issues

Common questions need only predominate; they need not be dispositive of the litigation to meet predominance requirement for class action certification. Fed. R. Civ. P. 23(b)(3).

Cases that cite this headnote

**[15] Securities Regulation**
👉 Reliance

The traditional and most direct way a plaintiff can demonstrate reliance on claim for securities fraud is by showing that he was aware of a company's statement and engaged in a relevant transaction, e.g., purchasing common stock, based on that specific misrepresentation. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

**[16] Securities Regulation**
👉 Nondisclosure

The *Affiliated Ute* presumption of reliance on claim for securities fraud, which asserts that in cases involving a failure to disclose, all that is necessary to show reliance is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of his decision, is appropriate in cases where the thrust of plaintiff's allegations is omissions and not affirmative representations. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

**[17] Federal Civil Procedure**
👉 Stockholders, investors, and depositors

Without the presumption of reliance, a securities fraud suit cannot proceed as a class action; each plaintiff would have to prove reliance individually, so common issues would not predominate over individual ones, as required for certification. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 23(b)(3); 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

**[18] Federal Civil Procedure**
👉 Stockholders, investors, and depositors

Thrust of investors' securities fraud suit against medical device corporation involved the company's omissions, rather than its affirmative representations, and thus, investors were entitled to presumption of reliance, under *Affiliated Ute*, on claims, as would satisfy predominance requirement on motion for class action certification; crux of investors' scheme liability claim was that company paid physicians to conceal adverse events and side effects associated with the use of its bone morphogenetic protein and to overstate the disadvantages of bone graft procedures in medical journals. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 23(b)(3); 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

**[19] Federal Civil Procedure**
👉 Common interest in subject matter, questions and relief;damages issues

Since damages traditionally require individual computation for each member in a class, to meet predominance requirement for class

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

action certification, plaintiff must show that damages are susceptible of measurement across the entire class. Fed. R. Civ. P. 23(b)(3).

Cases that cite this headnote

[20]    **Federal Civil Procedure**
         Common interest in subject matter, questions and relief;damages issues

Plaintiffs seeking to show damages are susceptible of measurement across the entire class, as required to meet predominance requirement for class action certification, may establish that it is possible to prove classwide common injury and to reliably compute classwide damages through an expert report proposing a method of calculation. Fed. R. Civ. P. 23(b)(3).

Cases that cite this headnote

[21]    **Federal Civil Procedure**
         Stockholders, investors, and depositors

Securities fraud cases easily satisfy superiority requirement for class action certification. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 23(b)(3); 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[22]    **Federal Civil Procedure**
         Stockholders, investors, and depositors

Class action was superior to other methods of resolving investors' securities fraud claims against medical device corporation, and its officers and employees, alleging they engaged in a scheme to defraud investors by manipulating early clinical studies involving bone morphogenetic protein that induced development of new bone tissue; class members had no interest in individually controlling prosecution of separate actions, and, due to the large number of possible class members, class action was necessary to avoid potentially crowding the docket with thousands of similar cases. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. §

78j(b); Fed. R. Civ. P. 23(b)(3); 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[23]    **Federal Civil Procedure**
         Stockholders, investors, and depositors

In a securities fraud class action, the class period ends when curative information is publicly announced or otherwise effectively disseminated to the market. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[24]    **Federal Civil Procedure**
         Stockholders, investors, and depositors
        **Securities Regulation**
         Causation;existence of injury

To end a class period in a securities fraud case, corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements will not affect the price. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[25]    **Securities Regulation**
         Reliance

Once a company's deception is publicly revealed for the first time by a corrective disclosure, a reasonable investor cannot be said to have relied on the company's misrepresentation or omission in deciding to invest, as required to support claim for securities fraud. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[26]    **Federal Civil Procedure**
         Stockholders, investors, and depositors

When court considers whether a disclosure is sufficient to terminate a class period, for purposes of securities fraud class action, it must determine if there is a substantial question of fact as to whether the release had cured the market. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[27]   **Securities Regulation**
   👉 Causation;existence of injury

Loss causation, on claim for securities fraud, requires plaintiff to show that defendant's misrepresentation or omission caused plaintiff subsequent loss. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[28]   **Federal Civil Procedure**
   👉 Stockholders, investors, and depositors

Court may determine the date of corrective disclosure at the class-certification stage for purposes of establishing the end of the class period in a securities fraud class action. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 23(b)(3); 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[29]   **Federal Civil Procedure**
   👉 Stockholders, investors, and depositors
   **Securities Regulation**
   👉 Nondisclosure

Date on which medical device corporation's allegedly fraudulent payments to the authors of journal articles were disclosed to the public for the first time, rather than later date information was re-published in analyst report, was the date of corrective disclosure, for purposes of defining class in investors' securities fraud class action against the corporation, since it was at this time that a reasonable investor would have known not

to rely on the assumption that the studies were conducted without significant financial incentives, as would influence his decision to purchase corporation's stock. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b); Fed. R. Civ. P. 23; 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

[30]   **Securities Regulation**
   👉 Causation;existence of injury

An analyst report can serve as a "corrective disclosure" for purposes of securities fraud claim. Securities Exchange Act of 1934, § 10(b), 15 U.S.C.A. § 78j(b), 17 C.F.R. § 240.10b–5.

Cases that cite this headnote

**Attorneys and Law Firms**

Christopher M. Wood and Shawn A. Williams, ROBBINS GELLER RUDMAN & DOWD LLP, 1 Montgomery Street, Suite 1800, San Francisco, CA 94104; Carolyn G. Anderson, ZIMMERMAN REED, PLLP, 1100 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402; William H. Narwold, MOTLEY RICE LLC, One Corporate Center, 20 Church Street, Seventeenth Floor, Hartford, CT 06103, for plaintiffs.

Steven M. Farina, WILLIAMS & CONNOLLY LLP, 725 Twelfth Street Northwest, Washington, DC 20005; Theresa M. Bevilacqua, DORSEY & WHITNEY LLP, 50 South Sixth Street, Suite 1500, Minneapolis, MN 55402, for defendants.

### ORDER CERTIFYING CLASS

JOHN R. TUNHEIM, Chief Judge

**\*1** Plaintiffs West Virginia Pipe Trades Health & Welfare Fund, Employees' Retirement System of the State of Hawaii, and Union Asset Management Holding AG (collectively, "Plaintiffs") bring this consolidated class action against Medtronic and several of its officers and employees (collectively, "Medtronic"), alleging that

Medtronic engaged in a scheme to defraud investors in violation of federal securities laws.

Plaintiffs have moved to certify class. The proposed class is defined as:

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Medtronic between September 8, 2010 and August 3, 2011 (the "Class Period"), and who were damaged by defendants' alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Class"). Excluded from the Class are defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

Medtronic opposes class certification and also argues that, if the Court grants Plaintiffs' motion to certify class, the end of the class period should be shortened from August 3, 2011, to June 28, 2011.

The Court will grant Plaintiffs' motion to certify class but will modify the class period to end on June 28, 2011.

## BACKGROUND

### I. INFUSE AND THIS ACTION

This case centers on Medtronic's INFUSE product. INFUSE is the "trade name of rhBMP–2," which is a bone morphogenetic protein ("BMP") that induces the body to develop new bone tissue. (Consolidated Class Action Compl. ("Compl.") ¶ 7, Nov. 4, 2013, Docket No. 28.) INFUSE is an alternative to replacement bone-tissue grafts and was the first BMP to reach the market. (*Id.*) The FDA approved INFUSE for what the plaintiffs allege is somewhat limited treatment purposes: certain treatment of degenerative disc disease, dental surgery, and certain shin fractures. (*Id.* ¶ 8.) INFUSE was never approved, however, "for any spinal fusion indication other than [the disc] surgeries." (*Id.*) INFUSE is a key part of Medtronic's

"spinal segment" of business, which generated more than $3.5 billion in revenue in 2008, 2009, and 2010. (*Id.* ¶ 20.) Relevant to this case, Medtronic also sought FDA approval for AMPLIFY, a second-generation BMP. (*Id.* ¶¶ 22, 24.)

The lead plaintiffs in this case are several institutional investors: West Virginia Pipe Trades Health & Welfare Fund, Union Asset Management Holding AG, and Employees' Retirement System of the State of Hawaii, all of which allege that they purchased Medtronic common stock during the Class Period and were damaged by the conduct alleged in the complaint. (*Id.* ¶¶ 43–45.) They bring this action against Medtronic and several of its officers and employees. (*Id.* ¶¶ 47–52.)

The only remaining allegation is that before and during the Class Period, Medtronic engaged in a scheme or course of conduct to manipulate the early clinical studies, which propelled INFUSE to success despite omitting many of INFUSE's adverse effects. (*Id.* ¶¶ 162–65.) Plaintiffs allege that early INFUSE clinical studies revealed safety risks that threatened Medtronic's goals for the product and, as a result, Medtronic "embarked on a scheme with physician investigators and authors to conceal the significant safety risks from the public and physician community." (*Id.* ¶¶ 15, 163.) They allege that Medtronic did so by "forg[ing] relationships, including financial relationships, with physician authors who published research articles in respected medical journals and knowingly concealed in those original articles, or omitted altogether, known facts regarding INFUSE's adverse side effects observed in clinical trials," and that these research articles "overstated apparent disadvantages of alternate bone graft procedures ... as opposed to treatment with INFUSE." (*Id.* ¶ 16.) Plaintiffs also allege that Medtronic and the consulting physicians "knew but failed to disclose that Medtronic had paid millions of dollars to the same physician authors and that during the drafting process[ ] Medtronic employees heavily edited the articles and specifically excised true facts learned during clinical trials about the efficacy and side effects of INFUSE, which would have alerted the public and physicians using INFUSE about its harmful side effects and lack of clinical benefit." (*Id.* ¶ 17.)

### II. POSSIBLE CORRECTIVE DISCLOSURES

**\*2** One critical dispute is which public disclosures made the market aware of Medtronic's alleged wrongdoing—

especially the alleged scheme to manipulate early clinical studies. The parties cite three possible dates for the corrective disclosure.

On June 28, 2011, *The Spine Journal* devoted an entire issue to critical studies of INFUSE, disclosing the financial conflicts of interest by the researchers who had published initial studies finding that the product was safe. (*Id.* ¶ 4.) *The Spine Journal* reported that for twelve of the studies, "the median-known financial association between the authors and Medtronic Inc. was found be approximately \$12,000,000–\$16,000,000 per study (range, \$560,000–\$23,500,000)." (*Id.* ¶ 30.) Moreover, *The Spine Journal* reported that the incidence of adverse events experienced in connection with INFUSE's use was between 10 and 50 times the rates published in industry-supported studies. (*Id.* ¶¶ 18, 30.) Medtronic argues that the June 28, 2011, issue of *The Spine Journal* constitutes the corrective disclosure.

On July 5, 2011, Wells Fargo and J.P. Morgan published analyst reports detailing the potential market effects of the disclosures in *The Spine Journal*. (Decl. of Shawn A. Williams ("Williams Decl.") ¶ 2, Ex. 7, Mar. 24, 2017, Docket No. 197; Decl. of Christopher M. Wood ("Wood Decl.") ¶ 2, Ex. 3, June 27, 2017, Docket No. 331.) The Wells Fargo report began, "We believe the InFuse papers published in The Spine Journal on June 28 will have broader implications for [Medtronic] and its spine business than the Street currently expects." (Williams Decl. ¶ 2, Ex. 7 at 283.) Wells Fargo predicted that "The Spine Journal papers will reduce InFuse sales by 30–50%" and would likely lead the FDA to "announce a formal review of InFuse." (*Id.*, Ex. 7 at 284.) Similarly, the J.P. Morgan report focused on the "scathing criticism of Medtronic's Infuse" contained in *The Spine Journal*. (Wood Decl. ¶ 2, Ex. 3 at 33.) J.P. Morgan reported that "in the wake of the June issue of *The Spine Journal*," surgeons reported that they were less likely to use INFUSE. (*Id.*, Ex. 3 at 35.) Both reports focused almost exclusively on the disclosures contained within *The Spine Journal*.

Finally, on August 3, 2011, Medtronic announced that it hired Yale for \$2.5 million and released the INFUSE data for Yale researchers to conduct a review. (Compl. ¶ 117.) Plaintiffs argue that the August 3, 2011, announcement about the decision to hire Yale constitutes the corrective disclosure.

## DISCUSSION

### I. STANDARD OF REVIEW

**[1] [2] [3] [4]** The district court is "accorded broad discretion to decide whether [class] certification is appropriate." *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski,* 678 F.3d 640, 645 (8th Cir. 2012) (quotation omitted). To certify a class, a plaintiff must show that the numerosity, commonality, typicality, and adequacy of representation requirements of Federal Rule of Civil Procedure 23(a) are met and that the class comports with one of the three types of classes identified in Rule 23(b). *Mathers v. Northshore Mining Co.,* 217 F.R.D. 474, 483 (D. Minn. 2003). The Court accepts the substantive allegations in the plaintiff's complaint as true when determining if the proposed class is acceptable. *Id.* In determining the propriety of a class action, the focus is on whether the class satisfies Rule 23 and not whether the proposed action will prevail. *Id.* The Court must undertake a "rigorous analysis" to assure that these requirements are met. *Gen. Tel. Co. v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

### II. CLASS CERTIFICATION

#### A. Rule 23(a)(1) Requirements

**\*3** To certify a class, a plaintiff must meet the four requirements in Rule 23(a). First, the class must be so numerous that joinder of all members is impracticable ("numerosity"). Fed. R. Civ. P. 23(a)(1). Second, there must be questions of law or fact common to the class ("commonality"). *Id.* at 23(a)(2). Third, the claims or defenses of the representative parties must be typical of the claims or defenses of the class ("typicality"). *Id.* at 23(a)(3). Fourth, the representative parties must fairly and adequately protect the interests of the class ("adequacy of representation"). *Id.* at 23(a)(4).

#### 1. Numerosity

**[5]** The Court must determine whether the proposed class "is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The numerosity requirement is generally satisfied in class actions involving nationally traded securities. *See City of Pontiac Gen.*

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

*Emps.' Ret. Sys. v. Wal–Mart Stores, Inc.*, No. 5:12–cv–5162, 2016 WL 5400373 at *4 (W.D. Ark. Sept. 20, 2016). Medtronic has stipulated that Plaintiffs' proposed class satisfies the numerosity requirement. (Wood Decl. ¶ 2, Ex. 1 at 2.) During the class period, an average of 6.5 million shares of Medtronic stock were traded daily and 1,187 major institutions owned Medtronic stock. (Williams Decl. ¶ 1, Ex. 1 ¶¶ 45, 53.) The Court will conclude that Plaintiffs' proposed class, therefore, satisfies the numerosity requirement.

### 2. Commonality

[6] [7] The Court must determine whether "there are questions of law or fact common to the class." *Fed. R. Civ. P. 23(a)(2)*. "While not every question of law and fact must be common to the entire class, Plaintiffs must show that the course of action giving rise to their cause of action affects all putative class members, or that at least one of the elements of that cause of action is shared by all of the putative class members." *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 328 (D. Minn. 2005). Commonality is easily satisfied in securities cases. *See id.* ("This case links a common legal theory—securities law violations—to a common group—purchasers of [the defendant's] shares.") Medtronic does not challenge whether Plaintiffs meet the commonality requirement. The Court will conclude that Plaintiffs' proposed class satisfies the commonality requirement.

### 3. Typicality

[8] [9] [10] The Court must determine whether "the claims or defenses of the representative parties are typical of the claims or defenses of the class." *Fed. R. Civ. P. 23(a)(3)*. Typicality suggests that "there are other members of the class who have the same or similar grievances as [the representative] plaintiff." *Chaffin v. Rheem Mfg. Co.*, 904 F.2d 1269, 1275 (8th Cir. 1990) (quotation omitted). "Factual variations in the individual claims will not normally preclude class certification if the claim arises from the same event or course of conduct as the class claims, and gives rise to the same legal or remedial theory." *Alpern v. UtiliCorp United, Inc.*, 84 F.3d 1525, 1540 (8th Cir. 1996). Medtronic challenges whether Plaintiffs meet the typicality requirement with respect to the length of the class period, which is discussed at length

in Part III. Plaintiffs, like all members of the proposed class, purchased Medtronic stock during the class period. According to Plaintiffs' allegations, all class members suffered damages as a result of Medtronic's fraudulent scheme. The Court will conclude that Plaintiff's claims are typical of the claims and defenses of the class.

### 4. Adequacy of Representation

[11] The Court must determine whether "the representative parties will fairly and adequately protect the interests of the class." *Fed. R. Civ. P. 23(a)(4)*. *Rule 23(a)(4)* involves two questions: (1) whether the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel. *Paxton v. Union Nat. Bank*, 688 F.2d 552, 562–63 (8th Cir. 1982).

**\*4** The Court finds that Plaintiffs have common interests with the members of the class and will vigorously prosecute the interests of the class. Plaintiffs are institutional shareholders that share the class's common interest in obtaining damages for Medtronic's alleged violations of securities laws. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 104 (S.D.N.Y. 2016). Plaintiffs have testified to their willingness to vigorously prosecute the interests of the class. (Williams Decl. ¶ 2, Exs. 2–4.) As discussed below, Plaintiffs' counsel is well-qualified to serve as class counsel in this case. Medtronic does not challenge whether Plaintiffs are adequate representatives in this case. The Court therefore will conclude that Plaintiffs will adequately and fairly protect the interests of the class.

Plaintiffs' counsel—lawyers from Robbins Geller Rudman & Dowd LLP and Motley Rice LLC—is well-qualified to serve as class counsel in this case. First, the filings in this case demonstrate that counsel has sufficiently investigated and identified potential claims in this case. *See Fed. R. Civ. P. 23(g)(1)(A)(i)*. Second, counsel has experience serving as class counsel in other disputes. (Williams Decl. ¶ 2, Exs. 5 & 6); *see also Fed. R. Civ. P. 23(g)(1)(A)(ii)*. Third, counsel has demonstrated in this case and others that they have significant knowledge of securities law. (Williams Decl. ¶ 2, Exs. 5 & 6); *see also Fed. R. Civ. P. 23(g)(1)(A)(iii)*. Finally, the Court is persuaded that counsel has sufficient resources to serve as

class counsel in this case. (Williams Decl. ¶ 2, Exs. 5 & 6); *see also* Fed. R. Civ. P. 23(g)(1)(A)(iv). The Court will therefore appoint Robbins Geller Rudman & Dowd LLP and Motley Rice LLC to serve as class counsel in this case.

### B. Rule 23(b)(3)

The Court must determine whether Plaintiffs' proposed class falls into one of the three categories of Rule 23(b). Fed. R. Civ. P. 23. Under Rule 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members **predominate** over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." *Id.* (emphasis added). A class action must also be superior to other methods of adjudication. *Id.*

[12] [13] [14] "At the core of Rule 23(b)(3)'s predominance requirement is the issue of whether the defendant's liability to all plaintiffs may be established with common evidence .... If the same evidence will suffice for each member to make a *prima facie* showing, then it becomes a common question." *Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 998 (8th Cir. 2016) (quotation omitted). If the defendant's liability is common to the class, then common questions are held to predominate over individual questions. *In re Select Comfort Corp. Sec. Litig.*, 202 F.R.D. 598, 610 (D. Minn. 2001). "Common questions need only predominate; they need not be dispositive of the litigation." *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 693 (D. Minn. 1995).

A Section 10(b) action involves six basic elements:

(1) A material misrepresentation or omission;

(2) Scienter;

(3) A connection with the purchase or sale of a security;

(4) Reliance;

(5) Economic loss; and

(6) Loss causation, i.e., a causal connection between the material misrepresentation and the loss.

*Dura Pharma., Inc. v. Broudo*, 544 U.S. 336, 341–42, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Elements (1)–(2) "relate[ ] solely to Defendant's conduct, and as such proof

for these issues will not vary among class members." *See In re Potash Antitrust Litig.*, 159 F.R.D. at 694. Potential class members must satisfy element (3) (i.e., that they purchased a Medtronic security during the class period) to join the class. But before deciding whether to grant the motion, the Court will address two issues that may require individual determinations for each class member: reliance and damages.

### 1. Reliance

**\*5** [15] In order to prevail in an action for securities fraud under Section 10(b), Plaintiffs must show reliance. *Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 715–16 (8th Cir. 1978). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Erica P. John Fund, Inc. v. Halliburton Co. (Halliburton I)*, 563 U.S. 804, 810, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011).

[16] [17] Positive proof of reliance is not necessary in every securities case. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153–54, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). The Supreme Court in *Affiliated Ute* held that, in cases involving a failure to disclose, "[a]ll that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* The *Affiliated Ute* presumption is appropriate in cases where the "thrust" of the plaintiffs' allegations is omissions and not affirmative representations. *Vervaecke*, 578 F.2d at 716–18. But the *Affiliated Ute* presumption is easier stated than applied because "every misstatement both advances false information and omits truthful information." *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000), *abrogated on different grounds by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, ––– U.S. ––––, 137 S.Ct. 2042, 198 L.Ed.2d 584 (2017). The Southern District of New York has described the *Affiliated Ute* presumption as a matter of practicality:

> The distinction between misstatements and omissions is often illusory.... In view of this semantic difficulty, what is important is to understand the rationale for a presumption of

causation in fact in cases like *Affiliated Ute*, in which no positive statements exist: reliance as a practical matter is impossible to prove. The *Affiliated Ute* doctrine, in other words, is a pragmatic one. When a defendant's fraud consists primarily of omissions, requiring a plaintiff to show a speculative set of facts, i.e., how he would have behaved if omitted material information had been disclosed, places an unrealistic evidentiary burden on the 10(b) plaintiff. Accordingly, reliance is presumed when it would be impossible to prove.

*In re Smith Barney Transfer Agent Litig.*, 290 F.R.D. 42, 47 (S.D.N.Y. 2013) (quotations, modifications, and citation omitted). "[W]ithout the presumption of reliance, a Rule 10b–5 suit cannot proceed as a class action: Each plaintiff would have to prove reliance individually, so common issues would not predominate over individual ones, as required by Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc. (Halliburton II)*, ––– U.S. ––––, 134 S.Ct. 2398, 2416, 189 L.Ed.2d 339 (2014) (quotation omitted).

The facts of this case suffer from the illusory distinction between affirmative representations and omissions. Plaintiffs' complaint describes various affirmative representations and omissions made by various actors in various contexts. The Court must decide whether the "thrust" of Plaintiffs' suit is affirmative representations or omissions. *See Vervaecke*, 578 F.2d at 716–18.

[18] Medtronic argues that Plaintiffs cannot benefit from the *Affiliated Ute* presumption because Plaintiffs' claims are based on the journal articles' statements downplaying risks associated with rhBMP–2 and overstating the disadvantages of bone-graft procedures. Certainly, statements in the journal articles about the efficacy and safety of rhBMP–2 are affirmative representations and not omissions. But the statements in the journal articles are not the focus of Plaintiffs' claims. "Notably, the [Plaintiffs] did not assert a false claim based on the clinical trials." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 845 F.3d 384, 393 n.3 (8th Cir. 2016). Rather, the crux of Plaintiffs' scheme liability claims is that Medtronic

**paid physicians** to conceal adverse events and side effects associated with the use of INFUSE and to overstate the disadvantages of bone graft procedures. (*See* Compl. ¶ 163); *see also W. Va. Pipe Trades Health & Welfare Fund.*, 845 F.3d at 393.

**\*6** In deciding whether Plaintiffs can benefit from the *Affiliated Ute* presumption for purposes of their scheme liability claims, the Court must determine whether Medtronic's failure to disclose that the authors were paid allegedly to induce their complicity in concealing adverse events related to INFUSE was an affirmative representation or an omission. Plaintiffs allege that over fourteen years Medtronic paid the authors of these studies $210 million to conceal the adverse side effects caused by INFUSE. (Compl. ¶ 87(c).) *The Spine Journal* issue devoted to INFUSE concluded that, with respect to twelve of the studies, "the median-known financial association between the authors and Medtronic Inc. was found to be approximately $12,000,000–$16,000,000 per study." (Compl. ¶ 30.) These payments were not disclosed to the investing public and, as the J.P. Morgan and Wells Fargo reports suggest, were considered important to a reasonable investor. *See Affiliated Ute*, 406 U.S. at 154, 92 S.Ct. 1456.

The Court finds *Fogarazzo v. Lehman Bros., Inc.*, instructive. 232 F.R.D. 176 (S.D.N.Y. 2005). The plaintiffs in *Fogarazzo* alleged that several large banks engaged in a fraudulent scheme to manipulate equity analyst reports on RSL Communications, Inc., in exchange for business, fees, and other profits. *Id.* at 178. In reality, "the Banks, knowing that RSL was actually in decline, inflated the price of RSL shares and then worked doubly hard to conceal or obfuscate the meaning of every fact that would have revealed that decline to the investing public." *Id.* In concluding that the *Affiliated Ute* presumption applies, the district court stated:

> Indeed, the theory behind the *Affiliated Ute* presumption—that, when material information is concealed, plaintiffs should only have to prove that a reasonable investor might have considered the omitted facts important in the making of her investment decision—is not undermined simply because a defendant makes misstatements at the same time it omits

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.

material information. In this case, plaintiffs allege that defendants **omitted their own *quid pro quo* arrangements in addition to deliberately misrepresenting their opinions**. If plaintiffs prove that a reasonable investor might have considered the omitted facts material in making an investment decision, then plaintiffs may employ the *Affiliated Ute* presumption to establish reliance on a common basis with respect to the alleged omissions.

*Id.* at 186 (quotations and citation omitted) (emphasis added). The *Fogarazzo* Court did not focus on the banks' misleading statements about RDL's success (or lack thereof). Rather, the Court focused on the quid pro quo arrangements between the authors of the reports (the banks) and the subject of those reports (RDL).

Analogously, Plaintiffs allege that Medtronic (like RDL) paid the authors of the journal articles (like the banks) millions to make false representations about the efficacy of rhBMP–2 and INFUSE. *See id.* at 178. Yes, the authors made false statements within their articles. But the relevant omission in this case is "[Medtronic's] own *quid pro quo* arrangements" with the authors of the journal articles. *See id.* The Court, therefore, finds that the thrust of the scheme liability claim is omissions, not affirmative statements. *See Affiliated Ute*, 406 U.S. at 154, 92 S.Ct. 1456.

Medtronic argues that the journal articles themselves disclose that the authors had received compensation and, therefore, there can be no omission. At least some of the articles disclose that "[i]n support of their research for or preparation of this work, one or more of the authors received, in any one year, outside funding or grants in **excess of $10,000** from Medtronic." (Decl. of Steven M. Farina ¶ 7, Ex. 5 at 99, May 8, 2017, Docket No. 273 (emphasis added).) There is nothing false about this disclosure; $210 million is unquestionably more than $10,000. But this disclosure does not even begin to capture the size or scope of the alleged omission in this case. According to Plaintiffs, the payments at issue were not merely "[i]n support of their research for or preparation of this work," (*id.*,) but to "conceal, or significantly downplay, known adverse

events." (Compl. ¶ 83.) Moreover, in the mind of the reasonable investor, payments totaling $210 million are something quite different than several payments "in excess of $10,000." The public's response to *The Spinal Journal*'s exposé demonstrates how insignificant the journal articles' disclosure was in assessing the validity of the studies. Following *The Spine Journal*'s disclosure that the authors were paid millions of dollars, J.P. Morgan found that "more than half (58%) of the surgeons thought that it diminished the value of the data to direct their treatment decisions, while 15% said that significant financial conflicts completely invalidated the studies' conclusions." (Wood Decl. ¶ 2, Ex. 3 at 34.) No evidence suggests that these concerns existed—at least to this degree—prior to *The Spine Journal* issue. The Court finds that the journal articles did not disclose Medtronic's $210 million payment to the authors.

**\*7** The Court will therefore conclude that Plaintiffs can benefit from the *Affiliated Ute* presumption.

### 2. Damages

**[19]** **[20]** Damages traditionally require individual computation for each member in the class and, therefore, Plaintiffs must show that "damages are susceptible of measurement across the entire class." *Comcast Corp. v. Behrend*, 569 U.S. 27, 35, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). "Calculations need not be exact, but at the class-certification state (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case ...." *Id.* (quotations and citation omitted). Plaintiffs may establish that "it is possible to prove classwide common injury and to reliably compute classwide damages" through an expert report proposing a method of calculation. *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 489 (D. Minn. 2015).

Professor Steven P. Feinstein has submitted a report suggesting that Plaintiffs are able to calculate damages on a classwide basis using an event study. (Williams Decl. ¶ 2, Ex. 1 ¶¶ 25–28.) According to the U.S. District Court for the Central District of California, "[t]he event study method is an accepted method for the evaluation of materiality damages to a class of stockholders in a defendant corporation." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F.Supp.2d 1005, 1014 (C.D. Cal. 2003) (quotations and citations omitted). Medtronic does not

challenge for purposes of class certification the use of an event study to calculate damages.

The Court will find that Plaintiffs have submitted sufficient evidence at this stage showing that they are able to use a common methodology to calculate damages for class members.

### 3. Superiority

Finally, the Court finds that a class action is superior to other available methods for fairly and efficiently adjudicating this controversy. Fed. R. Civ. P. 23(b)(3). To guide the inquiry, Rule 23(b)(3) sets forth four factors to consider: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Id.

 **[21]**   **[22]**  Securities cases easily satisfy Rule 23(b)(3)'s superiority requirement. In re NYSE Specialists Sec. Litig., 260 F.R.D. 55, 80 (S.D.N.Y. 2009). First, the Court has no reason to believe that the class members have any interest in individually controlling the prosecution of separate actions. Indeed, the cost and complexity of securities actions often prevent individual shareholders from bringing such claims. See id. Second, the Court is not aware of any other litigation begun by class members. Third, concentrating the litigation in this case is desirable to promote judicial efficiency by resolving the complaints of thousands of shareholders in one case. Finally, the Court does not believe that this case presents any likely difficulties that would make a class action inferior to individual adjudication. Rather, the Court finds that— due to the large number of possible class members—a class action is necessary to avoid potentially crowding the docket with thousands of similar cases. The Court therefore finds that a class action is superior to other available methods of adjudication. Fed. R. Civ. P. 23(b)(3).

 **\*8**  Having found that all of the requirements of Rule 23 are met, the Court will grant Plaintiffs' motion to certify class.

## III. CLASS PERIOD

Before granting the motion, the Court must consider one final issue: whether the end of the class period should be shortened from August 3, 2011, to June 28, 2011.

 **[23]**   **[24]**   **[25]**   **[26]**  In a securities class action, the class period ends "when curative information is publicly announced or otherwise effectively disseminated to the market." In re Ribozyme Pharmas., Inc. Sec. Litig., 205 F.R.D. 572, 579 (D. Colo. 2001). "Corrective disclosures must present facts to the market that are new, that is, publicly revealed for the first time, because, if investors already know the truth, false statements won't affect the price." Rand–Heard of N.Y., Inc. v. Dolan, 812 F.3d 1172, 1180 (8th Cir. 2016) (quotation omitted). Once the deception is publicly revealed for the first time by a corrective disclosure, a reasonable investor cannot be said to have relied on the company's misrepresentation or omission in deciding to invest. Halliburton II, 134 S.Ct. at 2413–14 ("[I]f the plaintiff did not buy or sell the stock after the misrepresentation was made but before the truth was revealed, then he could not be said to have acted in reliance on a fraud-tainted price."). When a court considers whether a disclosure is sufficient to terminate a class period, it must determine if there is a "substantial question of fact as to whether the release had cured the market." Friedlander v. Barnes, 104 F.R.D. 417, 421 (S.D.N.Y. 1984).

The ability to rebut an alleged corrective disclosure becomes particularly important in cases—like this one —where the parties dispute what event serves as the corrective disclosure. If the corrective disclosure occurred on August 3, 2011, then all investors who purchased Medtronic securities from September 8, 2010, to August 3, 2011, are included in the class. But if the corrective disclosure occurred on June 28, 2011, then only those investors who purchased Medtronic securities before June 28, 2011, are included in the class because investors who purchased securities after June 28, 2011, cannot establish the presumption of reliance. See Halliburton II, 134 S.Ct. at 2413–14.

### A. Stage of Litigation

Before the Court can decide on which date the corrective disclosure occurred, the Court must first decide whether the class-certification stage is the appropriate procedural

stage for the Court to rule on whether the disclosures at issue were corrective.

In a recent line of cases beginning with *Halliburton I* and ending with *Halliburton II*, the Supreme Court has considered to what extent plaintiffs in a securities case must prove the elements of reliance for purposes of class certification. *See Halliburton II*, 134 S.Ct. at 2405; *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013); *Halliburton I*, 563 U.S. at 806, 131 S.Ct. 2179. Since *Halliburton II*, district courts have reached differing conclusions about whether to decide that a particular event constitutes a corrective disclosure at the class-certification stage or, in the alternative, to wait until such issues are brought on a motion for summary judgment.[1]

[1] *Compare Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) (acknowledging that "a finding that a particular disclosure was not corrective as a matter of law would sever the link between the alleged misrepresentation and the price received," but concluding that this inquiry is barred by *Amgen* because the court "is unable to unravel such a finding from the materiality inquiry" (quotations omitted) ), *with Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST, 2016 WL 7406418, at *7–9 (N.D. Cal. Dec. 22, 2016) (concluding that *Amgen* did not bar the court from considering the date of corrective disclosure at class certification because "nobody is arguing that the original misrepresentations were immaterial or that evidence of MagnaChip's misconduct had already entered the market when MagnaChip released its fraudulent financial reports between 2011 and early 2014").

**\*9** Plaintiffs argue that *Halliburton I* bars the Court from considering the date of corrective disclosure at the class-certification stage. In *Halliburton I*, the Supreme Court considered whether a plaintiff must prove loss causation (that the defendant's deceptive conduct caused the plaintiff's claimed economic loss) at the class certification stage to invoke the *Basic* presumption of reliance—a cousin of the *Affiliated Ute* presumption.[2] *Halliburton I*, 563 U.S. at 807, 809–12, 131 S.Ct. 2179. The district court in *Halliburton I* required the plaintiffs to prove —in addition to the requisite elements of the *Basic* presumption[3]—that (1) the decline in Halliburton's stock was caused by the correction of a prior misleading

statement, and (2) the subsequent loss could not otherwise be explained by some additional factors revealed then to the market. *Id.* at 811–12, 131 S.Ct. 2179. The Supreme Court distinguished loss causation from reliance. *Id.* at 812, 131 S.Ct. 2179. Reliance is a form of "transaction causation" and concerns the "facts surrounding the investor's decision to engage in the transaction." *Id.* In contrast, "loss causation" requires "a plaintiff to show that a misrepresentation that affected the integrity of the market price also caused a subsequent economic loss." *Id.* Requiring a plaintiff to prove loss causation to benefit from a presumption of reliance contravenes the fundamental premise "that an investor **presumptively** relies on a misrepresentation **so long as it is reflected in the market price at the time of his transaction**." *Id.* at 813, 131 S.Ct. 2179 (emphasis added). The Supreme Court held that plaintiffs do not need to prove loss causation and thus remanded the case. *See id.* at 815, 131 S.Ct. 2179.

[2] All of the Supreme Court cases discussed here concern the *Basic* presumption and not the *Affiliated Ute* presumption. The Court concludes that there is no significant difference between the *Basic* presumption and the *Affiliated Ute* presumption for purposes of setting the class period—both require setting the end of the class period at the date of the corrective disclosure.

[3] Under the *Basic* presumption, plaintiffs must demonstrate that the alleged misrepresentations were publicly known, that the stock traded in an efficient market, and that the relevant transaction took place between the time the misrepresentations were made and the time the truth was revealed. *Id.* at 811, 131 S.Ct. 2179.

**[27]** Plaintiffs claim that consideration of the date of corrective disclosure would amount to consideration of loss causation in contravention of *Halliburton I*. Not so. Loss causation requires plaintiffs to show that defendant's misrepresentation or omission **caused** the plaintiffs subsequent loss. *Id.* at 812, 131 S.Ct. 2179. In contrast, the date of corrective disclosure concerns when this misrepresentation or omission was **publicly revealed**; it does not concern actual causation. A plaintiff cannot establish reliance after a corrective disclosure unveiled the fraud and, therefore, the fraud was no longer "reflected in the market price at the time of his transaction." *Halliburton I*, 563 U.S. at 813, 131 S.Ct. 2179. The Court can decide the date that the purported misrepresentation or omission was disclosed to the public without deciding

whether the underlying misrepresentation or omission ultimately caused a plaintiff's loss. *Halliburton I* is thus distinguishable from this case.

Several years later, the Supreme Court considered in *Amgen, Inc. v. Conn. Ret. Plans & Trust Funds* whether a plaintiff is required to prove at the class certification stage that the defendant's alleged misrepresentations materially affected the defendant's stock price. 568 U.S. 455, 133 S.Ct. 1184, 185 L.Ed.2d 308 (2013). The defendant argued that materiality is an essential element to establishing the *Basic* presumption applies and, therefore, plaintiffs are required to prove materiality before invoking the presumption at the class certification stage. *Id.* at 466, 133 S.Ct. 1184. The Supreme Court cautioned that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* According to the Supreme Court, "the pivotal inquiry is whether proof of materiality is needed to ensure that the questions of law or fact common to the class will 'predominate over any questions affecting only individual members' as the litigation progresses." *Id.* at 467, 133 S.Ct. 1184 (quoting Fed. R. Civ. P. 23(b)(3)). The Supreme Court concluded that materiality is an objective question that can be proved through evidence common to the class. *Id.* Moreover, "there is no risk whatever that a failure of proof on the common question of materiality will result in individual questions predominating" because "the failure of proof on the element of materiality **would end the case for one and for all**; no claim would remain in which individual reliance issues could potentially predominate." *Id.* at 467–68, 133 S.Ct. 1184 (emphasis added). The Supreme Court, therefore, concluded that a plaintiff is not required to prove the materiality of a defendant's alleged misrepresentations and omissions at the class-certification stage. *Id.* at 474, 133 S.Ct. 1184.

**\*10** Like *Halliburton I*, *Amgen* is distinguishable. In *Amgen*, the Supreme Court focused on the fact that the element of materiality was more relevant to the merits than class certification, and that a failure to satisfy the element of materiality would end the case for all class members. *Id.* at 468, 133 S.Ct. 1184. Unlike the issue of materiality, the corrective-disclosure issue in this case would not be dispositive of the claim for all proposed class members. For purposes of the class period, Medtronic does not argue that there has been **no** corrective disclosure; it simply disagrees with plaintiffs about **when** the corrective disclosure occurred. Regardless of whether

the Court ultimately concludes that June 28, 2011, or August 3, 2011, is the proper date of corrective disclosure, there will still be a class to bring a claim. At a minimum, investors who purchased Medtronic securities between September 8, 2010, and June 28, 2011, will be certified as a class and have the opportunity to pursue their claim against Medtronic.

If the Court refuses to consider the corrective-disclosure issue at this stage, however, individual questions that pertain to only a small subgroup of the class—investors who purchased Medtronic securities sometime between June 28, 2011, and August 3, 2011—will arise. An issue of reliance arises with respect to this subgroup because "an investor presumptively relies on a misrepresentation **so long as it was reflected in the market price at the time of his transaction.**" *Halliburton I*, 563 U.S. at 813, 131 S.Ct. 2179. If the corrective disclosure occurred on June 28, 2011, then Medtronic's alleged omission could not have been reflected in the market price at the time of the subgroup's transactions and, therefore, members of that subgroup cannot benefit from the presumption of reliance. See *Halliburton II*, 134 S.Ct. at 2413–14. Again, "without the presumption of reliance, a Rule 10b–5 suit cannot proceed as a class action." *Id.* at 2416.

Moreover, unlike materiality, the corrective disclosure is essential to defining the class itself because it marks the end date of the class period. *Ribozyme Pharms.*, 205 F.R.D. at 579. The Supreme Court in *Amgen* held that "[m]erits questions may be considered to the extent—but only to the extent—that they are **relevant to determining whether the Rule 23 prerequisites for class certification are satisfied.**" 568 U.S. at 466, 133 S.Ct. 1184 (emphasis added). An order certifying a class action "must define the class." Fed. R. Civ. P. 23(c)(1)(B). The class period is an important component of the class definition:

> If a plaintiff's allegations are sufficient to satisfy Rule 23 but insufficient to sustain the class period or class definition as pled, it is then appropriate for a court to limit the class period. Thus, where undisputed facts demonstrate that the allegations of the complaint can apply only to a particular period of time, the class period may be restricted to that time period.

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 14

*McLaughlin on Class Action* § 4:3 (14th ed. 2017). [4] Courts have long recognized that they "must evaluate some aspects of the merits of plaintiffs' proposed class period to determine the appropriate endpoints." *See In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 143 (D.N.J. 1984); *see also McLaughlin, supra*, § 4:3 (citing cases).

[4] For examples of cases granting a motion for class certification, but modifying the class period, see *Stevelman v. Alias Research, Inc.*, No. 5:91-CV-682 (EBB), 2000 WL 888385, at *8 (D. Conn. June 22, 2000) and *Klein v. A.G. Becker Paribas Inc.*, 109 F.R.D. 646, 653 (S.D.N.Y. 1986); *Markewich v. Adikes*, 76 F.R.D. 68, 75 (E.D.N.Y. 1977).

[28] Class certification in securities cases is no different. Courts have regularly examined the date of corrective disclosure at the class-certification stage in order to decide whether the class period should be modified. [5] *Amgen* and *Halliburton I* do not change courts' longtime practice of considering the date of corrective disclosure at the class-certification stage for purposes of determining the end of the class period.

[5] For examples, see *Hayes v. MagnaChip Semiconductor Corp.*, Case No. 14-cv-01160-JST, 2016 WL 7406418, at *7–9 (N.D. Cal. Dec. 22, 2016); *In re Fed. Nat. Mortg. Ass'n Sec., Derivative & ERISA Litig.*, 247 F.R.D. 32, 38–41 (D.D.C. 2008); *In re Nature's Sunshine Product's Inc. Sec. Litig.*, 251 F.R.D. 656, 666–67 (D. Utah 2008); and *Garfinkel v. Memory Metals, Inc.*, 695 F.Supp. 1397, 1405–06 (D. Conn. 1988).

**\*11** The Supreme Court's most recent decision in *Halliburton II* affirms the Court's conclusion that the Court may modify the class period during the class-certification stage. In *Halliburton II*, the Court considered whether defendants should be afforded an opportunity to rebut the *Basic* presumption at the class certification stage by showing a lack of price impact. 134 S.Ct. at 2405. The Supreme Court stated that plaintiffs must **prove**—not just allege—the Rule 23(b)(3) predominance requirement, including that they qualify to invoke the *Basic* presumption. *Id.* at 2412. But a plaintiff cannot benefit from the *Basic* presumption "if the plaintiff did not buy or sell the stock after the misrepresentation was made but before the truth was revealed" because "he could not be said to have acted in reliance on a fraud-tainted price." *Id.* at 2413–14. *Basic* "does not

require courts to ignore a defendant's direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price and, consequently, that the *Basic* presumption does not apply." *Id.* at 2416. Defendants can defeat the presumption with evidence that plaintiff "would have bought or sold the stock even had he been aware that the stock's price was tainted by fraud." *Id.* at 2408. The Supreme Court thus held that "to maintain the consistency of the presumption with the class certification requirements of Federal Rule of Civil Procedure 23, defendants must be afforded an opportunity before class certification to defeat the presumption through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Id.* at 2417.

*Halliburton II* reinforces that defendants should be afforded an opportunity to rebut the date of corrective disclosure at the class-certification stage. *Halliburton II* permits defendants to defeat the presumption of reliance at the class-certification stage with direct evidence, and shows that the presumption of reliance cannot apply to plaintiffs who purchased the securities at issue "the truth was revealed" because they "could not be said to have acted in reliance on a fraud-tainted price." *Id.* at 2413–15. The Court sees no reason why defendants would not similarly be able to rebut the presumption with respect to a discrete portion of the class by introducing evidence that this portion of the class purchased the securities after the date of the corrective disclosure.

Moreover, permitting rebuttal of the date of corrective disclosure at the class-certification stage is necessary for the efficient management of class actions. Once a court certifies a class, the parties must notify all class members who can be identified through reasonable effort. *See* Fed. R. Civ. P. 23(c)(2)(B). If the class period certified is broader than the law will ultimately support, the parties will be forced to notify more individuals than necessary. And, on some future dispositive motion, the Court will still be forced to decide whether the class should have been certified with respect to these individuals in the first place. Resolving this dispute in a timely fashion and minimizing the unnecessary expenditure of resources requires the Court to decide whether the class period should be modified as a matter of law. [6]

[6] The Court acknowledges that, in some cases, there may be a material dispute of fact about the date of the

corrective disclosure. If the Court were to conclude that a material dispute of fact existed regarding the date of the corrective disclosure, the Court may find it necessary to certify the longer class period while acknowledging that the class period may be limited upon further evidence. But nothing bars the Court from inquiring whether there is a material dispute of fact about the date of the corrective disclosure, and, when there is not, resolving the issue. To the extent that disputes regarding the date of corrective disclosure can be resolved at the class-certification stage, the Court should do so in order to properly "define the class." *See* Fed. R. Civ. P. 23(C)(1)(B).

**A. Corrective Disclosure in this Case**

The Court must now decide whether there is a material dispute of fact as to the date of corrective disclosure. The date of the corrective disclosure in this case is the date on which Medtronic's payments to the authors of the journal articles fully became public information for the first time. *See* Rand–Heart, 812 F.3d at 1180. The date of full correction "need not coincide with the stock price's absolute nadir." *In re Am. Italian Pasta Co. Sec. Litig.*, No. 05-0725-CV-W-ODS, 2007 WL 927745, at *4 (W.D. Mo. 2007). The parties propose three possible dates of corrective disclosure: June 28, 2011; July 5, 2011; and August 3, 2011.

**\*12** **[29]** The payments to physicians are the crux of Plaintiffs' scheme-liability claims and were disclosed to the public in *The Spine Journal* issue released on June 28, 2011. As a result, as of June 28, a reasonable investor would have known not to rely on the assumption that these studies were conducted without significant financial incentives. The Court therefore finds that June 28, 2011, is the date of the corrective disclosure.

**[30]** The two analysts' reports published on July 5, 2011, did not present any new facts to the market. Indeed, the Wells Fargo report was titled "Spine Journal Article Represents Tip of Iceberg—Downgrading Shares Downgrading to Market Platform" and relies almost entirely on the information disclosed in *The Spine Journal*. (Williams Decl. ¶ 2, Ex. 7.) The J.P. Morgan report was similarly based wholly on the disclosures in *The Spine Journal* article:

> Last Tuesday (6/28) *The Spine Journal* released a scathing criticism of Medtronic's Infuse. In an entire

issue dedicated to the subject, the editors asserted (1) systematic underreporting of adverse events in the clinical studies supporting Infuse's US approval, (2) faulty trial designs, and (3) **widespread financial conflicts of interest among the surgeons who participated in the studies and reported the results**.

(Wood Decl. ¶ 2, Ex. 3 at 33.) As the analyst reports themselves indicate, *The Spine Journal* was the first to report the significant payments Medtronic made to authors. [7] In other words, the July 5 reports "reiterated and reinforced" the June 28 disclosure, "but did not provide any new information to the market or investors." *See In re Am. Italian Pasta Co. Sec. Litig.*, 2007 WL 927745, at *4.

[7] The Court agrees with Plaintiffs that an analyst report can serve as a corrective disclosure. *See In re Enron Corp. Secs.*, 2005 WL 3504860, at *16, 2005 U.S. Dist. LEXIS 41240, at *59 (S.D. Tex. Dec. 22, 2005). But this is not a case in which an analyst report first revealed the information to the market. Here, the analyst reports merely reiterated *The Spine Journal*'s reporting and projected its potential impact on the market.

Nor does the Court consider Medtronic's August 3, 2011, announcement to be a corrective disclosure. On August 3, "Medtronic announced it would publicly release INFUSE data for Yale researchers to conduct a review." (Compl. ¶ 117.) Certainly, the decision to grant Yale researchers access to the data about the INFUSE studies was new information available to the public. *See* Rand–Heart, 812 F.3d at 1180. But the August 3 announcement merely represented efforts by Medtronic to show that, contrary to the assertions in *The Spine Journal*, INFUSE is in fact a safe product. (Compl. ¶¶ 117–18.) The August 3 effort did not reveal any new hidden information to the public; it only reveals Medtronic's prospective intent to salvage the viability of INFUSE. Rand–Heart, 812 F.3d at 1180. The parties focus on whether there was a significant decrease in stock price following this announcement, but the Court need not consider whether there was a decrease in stock price if no new information was revealed to the public. The entire scheme at issue—the decision to pay the authors substantial funds to conceal their findings—was fully revealed to the public by *The Spine Journal* on June 28,

WESTLAW © 2018 Thomson Reuters. No claim to original U.S. Government Works. 16

2011, and therefore the omission of the scheme could not have been "reflected in the market price at the time of [a] transaction" after that date. *Halliburton I*, 563 U.S. at 813, 131 S.Ct. 2179. Any investor who purchased Medtronic securities between June 28 and August 3 cannot have relied on the omission because they already knew the truth.

**\*13** The Court will therefore conclude that the class period ends on June 28, 2011.

## CONCLUSION

The Court finds that the proposed class meets the threshold requirements of Rule 23(a). Furthermore, the Court finds that common issues of law and fact predominate and that a class action is likely the superior way to adjudicate the claims. Accordingly, the Court certifies this action as a class action on behalf of the class defined below:

> All persons or entities who purchased or otherwise acquired the publicly traded common stock of Medtronic between September 8, 2010 and June 28, 2011 (the "Class Period"), and who were damaged by defendants' alleged violations of §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Class"). Excluded from the Class are defendants and their

families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

The Court hereby finds and concludes pursuant to Rule 23 that lead plaintiffs Employees' Retirement System of the State of Hawaii, Union Asset Management Holding AG, and West Virginia Pipe Trades Health & Welfare Fund are adequate class representatives and certifies these parties as representatives for the class. The Court further finds and concludes pursuant to Rule 23(g) that the law firms of Robbins Geller Rudman & Dowd LLP and Motely Rice LLC will fairly and adequately represent the interests of the class and appoints Robbins Geller and Motely Rice as lead class counsel for the class.

## ORDER

Based on the foregoing, and all files, records, and proceedings herein, **IT IS HEREBY ORDERED** that lead plaintiffs' Renewed Motion to Certify Class [Docket No. 194] is **GRANTED** as modified in the Conclusion of this Order.

### All Citations

--- F.R.D. ----, 2018 WL 620383, Fed. Sec. L. Rep. P 100,010

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2018 Thomson Reuters. No claim to original U.S. Government Works.