# Exhibit 1



# Office of the Inspector General
## U.S. Department of Justice

# Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons

Case 3:16-cv-02267   Document 95-1   Filed 07/16/18   Page 2 of 87 PageID #: 2934

# EXECUTIVE SUMMARY[*]

## Introduction

The Federal Bureau of Prisons (BOP), which is the component of the Department of Justice (Department) responsible for incarcerating all federal defendants sentenced to prison, was operating at 20 percent over its rated capacity as of December 2015. To help alleviate overcrowding and respond to congressional mandates, in 1997 the BOP had begun contracting with privately operated institutions (often referred to as "contract prisons"); at first on a smaller scale and later more extensively, to confine federal inmates who are primarily low security, criminal alien adult males with 90 months or less remaining to serve on their sentences. As of December 2015, contract prisons housed roughly 22,660 of these federal inmates, or about 12 percent of the BOP's total inmate population. These contract prisons were operated by three private corporations: Corrections Corporation of America; GEO Group, Inc.; and Management and Training Corporation.[1] The BOP's annual expenditures on contract prisons increased from approximately $562 million in fiscal year (FY) 2011 to $639 million in FY 2014. In recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer.

The Office of the Inspector General (OIG) initiated this review to examine how the BOP monitors these facilities. We also assessed whether contractor performance meets certain inmate safety and security requirements and analyzed how contract prisons and similar BOP institutions compare with regard to inmate safety and security data. We found that, in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions and that the BOP needs to improve how it monitors contract prisons in several areas. Throughout this report, we note several important corrective actions the BOP has taken, in response to findings and recommendations in our April 2015 audit of the Reeves County contract prison, to improve its monitoring of contract prisons, including in the areas of health and correctional services.[2]

The BOP's administration, monitoring, and oversight of contract prisons is conducted through three branches at BOP headquarters and on site. According to the BOP, at each contract prison, two BOP onsite monitors and a BOP Contracting Officer, in cooperation with other BOP subject matter experts, oversee each contractor's compliance with 29 vital functions within 8 operational areas, including correctional programs, correctional services, and health services. The BOP

---

[*] Redactions were made to the full version of this report for privacy reasons. The redactions are contained only in Appendix 9, the contractors' responses, and are of individuals' names or information that would enable an individual to be identified.

[1] In January 2007, the BOP awarded a contract to Reeves County, Texas, to operate the Reeves County Detention Center compounds R1 and R2 (RCDC I/II). Reeves County subcontracted operation of RCDC I/II to the GEO Group, Inc.

[2] See Department of Justice OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas*, Audit Report 15-15 (April 2015), iii.

i

monitors contractor performance through various methods and tools that include monitoring checklists, monitoring logs, written evaluations, performance meetings, and regular audits.

## Results in Brief

We found that in a majority of the categories we examined, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions. We analyzed data from the 14 contract prisons that were operational during the period of our review and from a select group of 14 BOP institutions with comparable inmate populations to evaluate how the contract prisons performed relative to the selected BOP institutions. Our analysis included data from FYs 2011 through 2014 in eight key categories: (1) contraband, (2) reports of incidents, (3) lockdowns, (4) inmate discipline, (5) telephone monitoring, (6) selected grievances, (7) urinalysis drug testing, and (8) sexual misconduct.[3] With the exception of fewer incidents of positive drug tests and sexual misconduct, the contract prisons had more incidents per capita than the BOP institutions in all of the other categories of data we examined. For example, the contract prisons confiscated eight times as many contraband cell phones annually on average as the BOP institutions. Contract prisons also had higher rates of assaults, both by inmates on other inmates and by inmates on staff. We note that we were unable to evaluate all of the factors that contributed to the underlying data, including the effect of inmate demographics and facility locations, as the BOP noted in response to a working draft of this report. However, consistent with our recommendation, we believe that the BOP needs to examine the reasons behind our findings more thoroughly and identify corrective actions, if necessary.

The three contract prisons we visited were all cited by the BOP for one or more safety and security deficiencies, including administrative infractions such as improper storage of use-of-force video footage, as well as more serious or systemic deficiencies such as failure to initiate discipline in over 50 percent of incidents reviewed by onsite monitors over a 6-month period. The contractors corrected the safety and security deficiencies that the BOP had identified. As a result, the BOP determined that each prison was sufficiently compliant with the safety and security aspects of its contract to continue with the contract during the period covered by our review. However, we concluded that the BOP still must improve its oversight of contract prisons to ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons.

Our site visits also revealed that two of the three contract prisons we visited were improperly housing new inmates in Special Housing Units (SHU), which are normally used for disciplinary or administrative segregation, until beds became available in general population housing. These new inmates had not engaged in

---

[3] We selected these categories of data to analyze as potential safety and security indicators because they provided information on areas addressed by American Correctional Association standards on security and control, inmate rules and discipline, and inmate rights, and because these data were tracked by both the contract prisons and the BOP institutions. See Appendix 1 for more information on our methodology, including our data analysis.

any of the behaviors cited in American Correctional Association standards and BOP policies that would justify being placed in such administrative or disciplinary segregation. When the OIG discovered this practice during the course of our fieldwork, we brought it to the attention of the BOP Director, who immediately directed that these inmates be removed from the SHUs and returned to the general population. The BOP Director also mandated that the contracts for all contract prisons be modified to prohibit SHU placement for inmates unless there is a policy-based reason to house them there. Since that time, the BOP informed us that the practice of housing new inmates in the SHU is no longer occurring in the contract prisons and that the BOP has not identified any further non-compliance to date regarding this issue.

Finally, we found that the BOP needs to improve the way it monitors contract prisons. We focused our analysis on the BOP's Large Secure Adult Contract Oversight Checklist (checklist) because, as described by BOP operating procedures, it is an important element of the BOP's Quality Assurance Plan, as well as a mechanism BOP onsite monitors use to document contract compliance on a daily basis. We believe onsite monitors are best positioned to provide the BOP's quickest and most direct responses to contract compliance issues as they arise. We found that the checklist does not address certain important BOP policy and contract requirements in the areas of health and correctional services. As a result, the BOP cannot as effectively ensure that contract prisons comply with contract requirements and BOP policies in these areas and that inmates in contract prisons receive appropriate health and correctional services.

For health services, the checklist does not include observation steps to verify that inmates receive certain basic medical services. For example, the observation steps do not include checks on whether inmates received initial examinations, immunizations, and tuberculosis tests, as BOP policy requires. We also found that monitoring of healthcare for contract compliance lacks coordination from BOP staff responsible for health services oversight.

For correctional services, the checklist does not include observation steps to ensure searches of certain areas of the prison, such as inmate housing units or recreation, work, and medical areas, or for validating actual Correctional Officer staffing levels and the daily Correctional Officer duty rosters.

## Recommendations

We make four recommendations to the BOP to improve the monitoring and oversight of its contract prisons, including enhancing its oversight checklist, which we believe should assist the BOP in ensuring that the significant number of inmates it houses in these facilities receive appropriate health and correctional services and that the contract prisons are safe and secure places to house federal inmates.[4]

---

[4] After incorporating the BOP's formal comments into this report, the OIG also provided a copy of the final report to each contractor. The OIG has reviewed the contractors' responses, which are attached as Appendix 9. The analysis in our report is based on information BOP has provided, and the OIG has determined that the contractors' responses do not affect our analysis or the conclusions reached in this report.

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................ 1

    Background ...................................................................................... 2

    Contract Prisons ............................................................................. 4

RESULTS OF THE REVIEW .................................................................... 13

    Contract Prisons Had More Safety and Security-related Incidents per Capita than BOP Institutions for Most of the Indicators We Analyzed ......... 14

    OIG Site Visits Revealed Safety and Security Concerns and Inappropriate Housing Assignments ...................................................... 27

    The BOP's Monitoring of Contract Prisons Needs Improvement ................. 31

CONCLUSION AND RECOMMENDATIONS ............................................... 44

    Conclusion ..................................................................................... 44

    Recommendations .......................................................................... 45

APPENDIX 1:    METHODOLOGY OF THE OIG REVIEW ...................................... 46

    Interviews ...................................................................................... 46

    Site Visits ...................................................................................... 46

    Data Analysis ................................................................................. 48

    Document Review ........................................................................... 50

APPENDIX 2:    CONTRACT PERFORMANCE REQUIREMENTS AND VITAL FUNCTIONS ........................................................................ 51

APPENDIX 3:    LARGE SECURE ADULT CONTRACT OVERSIGHT CHECKLIST OBSERVATION STEPS IN CORRECTIONAL AND HEALTH SERVICES ............................................................................. 53

APPENDIX 4:    THE OIG'S MEMORANDUM TO THE BOP ON THE HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS ............................. 55

APPENDIX 5:    THE BOP'S RESPONSE TO THE OIG'S MEMORANDUM ON THE HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS .......... 58

APPENDIX 6:    COMPARISON OF SECURITY INDICATORS AMONG CONTRACTORS ................................................................... 60

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 6 of 87 PageID #: 2338

APPENDIX 7:   COMPARISON OF SECURITY INDICATORS BETWEEN CONTRACT
              PRISONS AND BOP INSTITUTIONS ......................................... 64

APPENDIX 8:   THE BOP'S RESPONSE TO THE DRAFT REPORT ......................... 68

APPENDIX 9:   THE CONTRACTORS' RESPONSES TO THE DRAFT REPORT........... 70

APPENDIX 10:  OIG ANALYSIS OF THE BOP'S RESPONSE................................. 78

v

# INTRODUCTION

The mission of the Federal Bureau of Prisons (BOP) is to protect society by confining federal offenders in correctional facilities that are safe, humane, cost-efficient, and secure, and to provide reentry programming for the inmates to ensure their successful return to the community.  Since the early 1980s, there has been an unprecedented increase in the federal inmate population — from approximately 25,000 in fiscal year (FY) 1980 to nearly 219,000 in FY 2012.  According to a 2013 congressional report, since 1980 the federal inmate population has increased, on average, by 6,100 inmates each year.[5]  However, since FY 2013, when the BOP inmate population reached its peak of 219,298, the population has been declining — to 197,645 in December 2015, a decrease of 21,653 inmates (or approximately 10 percent) over that 2-year period.  In spite of this downward trend, the BOP currently operates at about 20 percent over its rated capacity, and costs spent on the federal prison system are predicted to continue to rise.[6]

To help alleviate overcrowding in BOP institutions and respond to congressional mandates, in 1997 the BOP began contracting with privately operated institutions (often referred to as "contract prisons"), at first on a smaller scale and later more extensively, to confine inmates who are primarily low security, criminal alien adult males.[7]  Many of the inmates incarcerated in these contract prisons are Mexican nationals with convictions for immigration offenses who have 90 months or less remaining to serve on their sentences.[8]  As of December 2015, contract prisons housed roughly 22,660 of these federal inmates, or approximately 12 percent of the BOP's total inmate population.  These prisons were operated by three private corporations:  Corrections Corporation of America (CCA); the GEO Group, Inc. (GEO); and Management and Training Corporation (MTC).

---

[5]  Nathan James, *The Federal Prison Population Buildup:  Options for Congress*, R42937 (Washington D.C.:  Congressional Research Service, January 22, 2013) (accessed July 28, 2016).

[6]  U.S. Department of Justice (DOJ), Fiscal Year 2016 Budget Summary (accessed July 28, 2016).

[7]  Two congressional actions precipitated the BOP's use of contract prisons to house low security inmates.  The *National Capital Revitalization Act of 1997* mandated that the BOP designate District of Columbia sentenced felons to correctional facilities operated or contracted for the BOP.  Congress also recommended that the BOP operate the Taft Correctional Institution as a private facility.  Since that time, the BOP has developed large scale contracts with the private sector to confine specialized populations.

[8]  The BOP refers to this as a Criminal Alien Requirement when soliciting for bids that require contract prisons to house this specific type of inmate population.  There are exceptions to the Criminal Alien Requirement for three facilities:  (1) the Rivers Correctional Institution also houses low security adult males from Washington, D.C.; (2) the Taft Satellite Camp houses minimum security adult males who are U.S. citizens; and (3) the now-closed Willacy County Correctional Center housed criminal alien adult males serving sentences of 3 months or less.

**Background**

In recent years, disturbances in several contract prisons have resulted in extensive property damage, bodily injury, and the death of a Correctional Officer. Examples include:

- In December 2008 and January 2009, the Reeves County Detention Center had a riot on its Compound III and Compounds I and II, respectively.[9] A 2015 Office of the Inspector General (OIG) audit of the Reeves Detention Center Compounds I and II cited a BOP After-Action Report from the 2009 riot: "While low staffing levels alone were not the direct cause of the disturbances, they directly affected Security and Health Services functions."[10]

- In February 2011, inmates at the Big Springs Correctional Center physically assaulted prison staff. The contractor reported that the inmates were dissatisfied with the staff's response to a medical emergency on the compound that resulted in the death of an inmate.

- In May 2012, a Correctional Officer was killed and 20 people were injured during a riot at the Adams County Correctional Center. The disturbance involved approximately 250 inmates who, according to contemporaneous media reports, were angry about low-quality food and medical care, as well as about Correctional Officers the inmates believed were disrespectful.

- In February 2015, at the Willacy County Correctional Center, inmates set fires and caused extensive damage to the prison. As a result of the damage to the prison and the BOP's determination that the contractor could no longer perform the required services, the BOP terminated its contract for this facility.

In April 2015, the OIG issued an audit of the Reeves County Detention Center Compounds I and II, which house over 2,400 federal inmates.[11] The OIG found that the contractor had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control. The audit identified almost $3 million in costs that were either unallowable or unsupported or funds that should be put to better use. Also, we found that from the start of the contract in January 2007 to March 2009, there were no minimum staffing requirements for the institution because the BOP had sought to reduce costs. After an inmate riot in 2009, the BOP established the minimum

---

[9] The Reeves County Detention Center is located in Reeves County, Texas, and has three compounds that house inmates for the BOP. Compounds I and II are one facility consisting of multiple housing units within a secure perimeter. Compound III is a separate facility.

[10] DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), iii.

[11] DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007.*

Correctional Officer staffing requirement in the contract. Nevertheless, the OIG's 2015 audit also found that the institution had significant issues meeting its minimum staffing requirement in health services. Additionally, the audit identified areas that needed improvement relating to internal quality control, such as fully documenting monitoring activities and tracking corrective action plans for significant deficiencies.

The OIG also found that contract prison officials at Reeves County had converted a general population housing unit into a "modified monitoring unit" that was being used to isolate and restrict movement of inmates whose behavior they believed was jeopardizing the safety of staff and other inmates. A review of the modified monitoring unit showed that there was a lack of specific policies and procedures to address inmate placement in and release from this unit, as well as its operation, and to ensure inmate due process and other rights were preserved.

In response to the aforementioned findings from the 2015 OIG audit report, the BOP took the following actions at the Reeves County facility: (1) reviewed its contract costs to identify and remedy those costs that were either unallowable or unsupported, (2) updated the BOP's oversight checklist for all the contract prisons and trained onsite monitors on how to use that tool to properly document monitoring activities, (3) issued guidance to the Reeves County contractor staff instructing them to create a corrective action plan for each significant deficiency identified during internal audits, and (4) developed new operational procedures for the modified monitoring unit at Reeves. Based on actions the BOP had taken, the OIG closed the recommendations made in its 2015 audit report.

The OIG initiated this review in order to examine how the BOP monitored its contract prisons during FY 2011 through FY 2014. In that context, we also assessed the contractors' compliance with the terms of the contract in selected areas of inmate safety and security. Finally, we analyzed data from the 14 contract prisons that were operational during the period of our review and a select group of 14 BOP institutions with comparable inmate populations to evaluate how the contract prisons performed relative to the selected BOP institutions in key areas. Our fieldwork, from April 2014 through February 2015, included interviews, data collection and analysis, and document review. We interviewed BOP officials, including Central Office administrators and staff responsible for oversight and management of contract prisons. We conducted site visits to three contract prisons: the Giles W. Dalby Correctional Facility and the Eden Detention Center in Texas and the Rivers Correctional Institution in North Carolina. During each site visit, we interviewed BOP onsite monitors, contract staff, and inmates. We also toured the sites, observed staff and inmate activities, attended staff meetings, and reviewed logs and records. Appendix 1 has a detailed description of the methodology of our review.

In this section, we discuss contract prisons that incarcerate federal inmates designated to the custody of the BOP. We then discuss the contract requirements, followed by the BOP's current structure and process for monitoring and oversight of the contract prisons.

3

**Contract Prisons**

At the time of our review, three private corporations, CCA, GEO, and MTC, operated 14 BOP contract prisons. Collectively, these contract prisons provided approximately 27,000 beds for federal inmates.[12] Figure 1 below shows the location and population of the BOP's contract prisons managed by each contractor as of December 2014.

---

[12] Our analysis includes data from the 14 contract prisons that were operational from FY 2011 through FY 2014. In March 2015, the BOP terminated its contract with the Willacy County Correctional Center in Texas following the February 2015 riot. The contract for the Northeast Ohio Correctional Center expired on May 31, 2015, with no option to renew. In December 2014, the BOP entered into a new contract with GEO to operate the Great Plains Correctional Facility in Oklahoma. Operations at this contract prison began in June 2015.

4

**Figure 1**

**Location and Population of BOP Contract Prisons**[13]



| Private Contract Prisons | |
|---|---|
| 1. Adams County, Mississippi | CCA |
| 2. Big Springs, Texas | GEO |
| 3. Cibola, New Mexico | CCA |
| 4. D. Ray James, Georgia | GEO |
| 5. Dalby, Texas | MTC |
| 6. Eden, Texas | CCA |
| 7. McRae, Georgia | CCA |
| 8. Moshannon Valley, Pennsylvania | GEO |
| 9. Northeast Ohio, Ohio | CCA |
| 10. Reeves Correction Institution, Texas | GEO |
| 11. Reeves Detention Center, Texas | GEO |
| 12. Rivers, North Carolina | GEO |
| 13. Taft, California | MTC |
| 14. Willacy, Texas | MTC |

**LEGEND**

● Private Prisons

Pop   Inmate Population

Source: BOP

---

[13] Figure 1 reflects the contract prisons and their population at the time of our fieldwork. In January 2007, the BOP awarded a contract to Reeves County, Texas, to operate the Reeves County Detention Center compounds R1 and R2 (RCDC I/II). Reeves County subcontracted operation of RCDC I/II to the GEO Group, Inc. Figure 1 reflects the combined population for these two facilities that are operated under two separate contracts.

*Contract Requirements*

The BOP's contracting process is governed by the Federal Acquisition Regulations (FAR) and the Justice Acquisition Regulations. The BOP's acquisition policy supplements the FAR and the Justice Acquisition Regulations and provides uniform acquisition procedures.[14] Contractors must comply with all applicable federal, state, and local laws and regulations, as well as all applicable executive orders, case laws, and court orders. In addition, contractors must follow a number of BOP policies and requirements as defined in their contracts.[15] One specific requirement applicable to all contract prisons is obtaining and maintaining accreditation from the American Correctional Association (ACA) and the Joint Commission on Accreditation of Healthcare Organizations.[16] Contractors also must meet 29 functions that the BOP has identified as vital to contract performance (see Appendix 2). The vital functions can range from creating an adequate security inspection system to providing nutritionally adequate meals and ensuring inmates have access to healthcare. The 29 vital functions fall under 8 operational areas, each of which is assigned a percentage that correlates with contractor performance:

1. Administration (10 percent),
2. Correctional Programs (10 percent),
3. Correctional Services (20 percent),
4. Food Service (15 percent),
5. Health Services (15 percent),
6. Human Resources (10 percent),
7. Inmate Services (15 percent), and
8. Safety and Environmental Health (5 percent).

A contract prison may receive a monetary deduction for less than satisfactory performance in any one of these areas.[17] The BOP determines the number of vital functions that were unsatisfactory under each operational area and then calculates a deduction amount based on the percentages assigned to each operational area. The BOP and the contractors have quality control mechanisms to ensure that these

---

[14] BOP Program Statement 4100.04, Bureau of Prisons Acquisition Policy (May 19, 2004).

[15] Such BOP polices include those on the use of force and inmate discipline. The contractors are permitted to develop their own policies in certain areas, such as the operation of Special Housing Units and healthcare, based on ACA and other standards. The contract contains administrative and program requirements, including all services, activities, deliverables, and the timelines for specified work throughout the life of the contract.

[16] The ACA is a private, nonprofit organization that administers a national accreditation program for all components of adult and juvenile corrections. The Joint Commission on Accreditation of Healthcare Organizations accredits and certifies healthcare organizations and programs in the United States. Joint Commission accreditation certifies that an organization meets certain healthcare performance standards.

[17] The BOP may also award a contractor an annual award fee based on exceptional performance. However, the award fees were removed from contract prison solicitations in June 2010. All contracts awarded after that date do not include an award fee. During the time of this review, 12 of the 14 contract prison contracts still contained the award fee provision.

vital functions are carried out in accordance with the contract. The contractors' quality control is known as the quality control program, and the BOP's is known as the Quality Assurance Plan (QAP). We describe each of these internal controls below.

<u>Quality Control and Quality Assurance</u>

BOP contracts place the responsibility for quality control on the contractor rather than on the BOP. Each contractor must maintain a quality control program with audit tools that incorporate, among other government requirements, the 29 vital functions in the 8 operational areas described above and detailed in Appendix 2. The audit tools define the contractor's work, which is evaluated during required internal inspections. The tools specify the documents to examine, sampling techniques, span of time for review, processes to observe, persons to interview, and desired outcomes. A Quality Assurance Specialist and a trained team of contract staff conduct audits monthly or every other month based on their prison's specific audit tools.[18] The contractor provides the audit results to its corporate headquarters and the BOP. Each contractor's corporate headquarters conducts an annual audit of its prisons and provides the results to the BOP. If the contractor identifies a deficiency, which generally is considered to be a deviation from the contract, a weakness in internal controls, or an instance of nonconformance with an ACA standard affecting the quality of service provided, the contract staff generates a corrective action plan to monitor and resolve areas of nonconformance.[19] Onsite monitors and contract staff oversee the implementation of corrective actions until deficiencies are resolved. When a deficiency is serious enough to affect the quality of service, the onsite monitors may suggest a nonrecurring deduction in the monthly contract payment. We discuss deficiencies and the role of BOP onsite monitors below.

The BOP's QAP is based on contract requirements as defined in the FAR.[20] The QAP includes oversight monitoring checklists, Contract Facility Monitoring (CFM) review guidelines, and the contractor's quality control plan. We discuss these aspects of the BOP's QAP below.

---

[18] The Quality Assurance Specialist manages the contract prison's internal audits, reviews the results of the audits, and assists prison staff with implementing a corrective action plan for any deficiencies as discussed below.

[19] A corrective action plan is the contract prison's written plan for correcting identified deficiencies and is submitted to the BOP within 30 days after receipt of the final CFM report or other notice of deficiency.

[20] The BOP's October 14, 2015, Privitizaton Management Branch Operation Procedures state: "The contract facility QAP, oversight monitoring checklists, and random samplings of the contractor's performance, as well as their quality control program, are examples of the Bureau's QAP efforts." The BOP's QAP also includes a formal annual audit of contractor performance by the Contract Facility Monitoring team, but this annual audit does not fulfill the same function of documenting day-to-day monitoring activities between audits. We discuss these BOP efforts in more detail below.

*Contract Monitoring and Oversight*

The BOP's administration, monitoring, and oversight of its 14 contract prisons is shared by three branches:  the Privatization Management Branch (PMB) of the Correctional Programs Division; the CFM Branch of the Program Review Division; and the Privatized Corrections Contracting Section within the Acquisitions Branch of the Administration Division.  These three branches work in different ways to ensure contract compliance and consistency in the monitoring and oversight of the contract prisons' operations.  The PMB is responsible for general oversight of the contract prisons, the CFM Branch provides subject matter expertise in the form of operational reviews, and the Privatized Corrections Contracting Section provides contractual oversight.  We discuss in more detail the role of each below.

<u>Privatization Management Branch</u>

In December 2001, the BOP created the PMB to monitor and oversee the operations of the BOP's contract prisons.  A Branch Administrator oversees two sections, Field Operations and Support and Development, each led by an Assistant Administrator.  The Assistant Administrator for Field Operations coordinates all field operations and manages field resources.  Within Field Operations, three regional Privatization Field Administrators (PFA), two onsite monitors at each contract prison, and five discipline-specific specialists at BOP headquarters provide operational support to the PMB field staff and contract prison staff.  The PMB field staffs (PFAs and onsite monitors) are responsible for oversight and liaison activities on their respective contracts to ensure contract compliance.  The Assistant Administrator of Support and Development leads a team of Program Specialists and Management Analysts who provide administrative support to the field staff.  The field staff uses a number of monitoring tools to directly oversee the contract prisons.  We discuss the PMB's field staff and monitoring tools below.

- **Privatization Field Administrators.**  PFAs provide contract management and oversight for three to five contract prisons, supervise the two onsite monitors at each prison, review all oversight work and documents, and ensure consistency among the contracts.

- **Onsite Monitors.**  Each contract prison has a Senior Secure Institution Manager (SSIM) and a Secure Oversight Monitor (SOM).  The SSIM, under the direction of a PFA, has primary responsibility for ensuring contract compliance onsite and provides administrative direction in accordance with the FAR.  The SSIM also ensures population levels are within the contract requirements, gathers information and formulates reports for the BOP's Central Office, and assists the SOM with onsite monitoring.  The SOM, under the direction of the SSIM, oversees the contract prisons' operations, mainly through daily observations and liaison with prison staff.

  The SSIM and SOM conduct routine inspections and daily reviews of the eight operational areas in all departments of their assigned contract prison.  The PMB operating procedures require the SSIM and the SOM to monitor the

contractor's performance through various methods and tools, including monitoring checklists, monitoring logs, written evaluations, and performance meetings.

o *Large Secure Adult Contract Oversight Checklist (checklist).* The checklist contains approximately 70 observation steps, relating to the 8 operational areas, which the onsite monitors must observe and document every month.[21] Onsite monitors at each contract prison document their observations on the checklist and rate each operational area as "compliant" or "non-compliant." The appropriate PFA receives the completed checklist by the 20th of the following month.

o *Monitoring and Notice of Concern (NOC) Logs.* Onsite monitors are required to keep a monitoring log and a NOC log.[22] The monitoring log helps the onsite monitors track and review the completion and results of internal and external audits required by the contract. A NOC is a memorandum the PMB staff submits to a contractor when the contractor is performing below a satisfactory level and the deficiency is more than minor or is a repetitive deviation from the contract requirements. Once a NOC is issued, the contractor must provide a written corrective action plan to the oversight staff, who ensure that the contractor implements and maintains its plan. BOP policy requires onsite monitors to use the NOC log to track NOCs until the deficiencies are resolved.

o *Written Evaluations.* The onsite monitors write evaluations of contract performance as required by the FAR, the Contracting Officer, or the PMB's internal procedures.[23] The FAR requires the BOP to use the Contractor Performance Assessment Reporting System to provide a record, both positive and negative, of a given contractor's performance during a specific period of time. In addition, the PMB's operating procedures require onsite monitors to issue the Oversight Facility Summary Report, a management-level assessment of the contractor's performance focused

---

[21] The checklist is generally standardized, but the oversight staff may vary its monitoring according to a contract's specific requirements. For example, Rivers Correctional Institution is required by contract to have a residential drug abuse treatment program because its population consists of approximately 50 percent U.S. citizens, primarily from the Washington, D.C., metropolitan area, many of whom have drug dependencies and who will return to the community when they complete their sentence.

[22] In response to recommendations in the OIG's report on the Reeves County contract prison, the BOP has incorporated the functions of the monitoring log and the NOC log into the checklist and added a step for documenting the contractor's follow-up efforts regarding identified deficiencies as the BOP no longer uses either log. See DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007.* Later in this report, we briefly discuss our findings on the BOP's use of the monitoring log during our review.

[23] The Contracting Officer ensures that the contractor adheres to the terms and conditions of the contract and has the authority to negotiate, award, cancel, and terminate contracts on behalf of the government.

primarily on quality of work and responsiveness to the BOP, annually and semiannually.

o *Performance Meetings.* The SSIM, SOM, and Contracting Officer have performance meetings with the contract prison management staff at least monthly. These meetings provide a management-level review and assessment of the contractor's quality of work and responsiveness, as well as a forum to discuss operational issues and oversight findings. Additionally, contract management staff from each operational area report on issues of significance within their respective departments.

In addition to the onsite monitors, the PMB has subject matter specialists for disciplinary hearings, intelligence, and health systems, who each provide operational assistance to the PMB field staff within their field of expertise. These specialists support the BOP's QAP, assist in monitoring contract compliance, and serve as Contracting Officer's Representatives.

Contract Facility Monitoring Branch

Within the BOP's Program Review Division, the CFM Branch consists of subject matter experts who use a comprehensive audit tool to conduct annual and ad hoc reviews of the contractor's performance in all of the vital functions, test the adequacy of internal controls, and assess risks in program and administrative areas. The CFM staff uses guidelines based on specific contract requirements, professional guidelines referenced in the contract, and applicable BOP policies. A CFM audit report can result in four levels of deficiency:

1. first-time deficiency,
2. repeat deficiency,
3. repeat repeat deficiency, and
4. significant finding.[24]

When the CFM team identifies repetitive or significant findings at a contract prison, the team may return for a follow-up assessment before the next annual audit. This follow-up may be a full or partial audit of the problematic department depending on the findings and/or level of deficiency previously identified. When a deficiency is serious enough to affect performance in the operational areas, the onsite monitors may suggest a deduction to the contractor's payment.

The CFM team includes a physician and a physician's assistant. In conjunction with CFM's annual review, the PMB's Health Systems Specialist (HSS) is tasked with the responsibility to assist in the oversight of contractor performance in

---

[24] Repeat deficiencies stem from failed internal controls that were developed to correct a noted deficiency. The BOP uses the term "repeat repeat deficiency" to describe a deficiency that is repeated twice or more. A "significant finding" generally consists of a series of related deficiencies that, taken together, constitute a failure of the program component. A significant finding can also be caused by a single event that results in a systemic program failure.

the area of health services.  The HSS conducts a thorough review of health services at each contract facility at least every 6 months, or more frequently if the HSS determines it is needed.

<u>Privatized Corrections Contracting Section</u>

The Privatized Corrections Contracting Section is responsible for contract procurement and administration, including cost agreements, and the assignment and supervision of Contracting Officers at each of the contract prisons.  The section also assists the PMB's oversight staff with contract interpretation and provides advice on contract requirements and NOC issuance.  If a CFM audit finds serious deficiencies, the onsite PMB monitor writes a deduction proposal to the Contracting Officer.  The Contracting Officer may consider other types of action, such as contract modification, in addition to deductions.  In cases of numerous "repeat repeat" or significant deficiencies that go uncorrected over time, the BOP may issue a "cure notice" to indicate to the contractor that the BOP may terminate the contract if the problem is not corrected.

<u>Expenditures on Contract Prisons</u>

From FY 2011 through FY 2014, the BOP's annual expenditures on contract prisons increased 13.7 percent, from approximately $562 million in FY 2011 to $639 million in FY 2014.  Since contracts with private prisons are fixed-price contracts, the payment amount does not change based on costs such as resources or time expended by the contractor.[25]  An accounting of costs for specific departments or operations is not provided to the BOP.  The contractors are responsible only for submitting an invoice to the BOP at the end of each month. The monthly invoice includes the monthly operating price that was negotiated prior to the start of the contract, which ensures the contractors receive a minimum payment from the BOP to staff the facilities and cover expenses as provided in the contract.

Because the BOP does not receive the breakdown of cost information under the fixed-price prison contracts, we were not able to analyze and compare costs incurred by function or department between the contract prisons and BOP institutions as part of this review.  Moreover, we were unable to compare the overall costs of incarceration between BOP institutions and contract prisons in part because of the different nature of the inmate populations and programs offered in those facilities.  The BOP does calculate the overall per capita annual and daily costs for housing its inmates in both BOP institutions and contract prisons. However, because of the factors discussed above, we do not draw, and caution

---

[25]  According to the FAR, this type of contract is preferred when contract costs and performance requirements are reasonably certain, the government wishes to motivate a contractor to enhance performance, and other incentives cannot be used because contractor performance cannot be measured objectively.  As stated in the FAR, fixed-price incentive contracts are to the government's advantage because the contractor has to "assume substantial cost responsibility and an appropriate share of the cost risk."

against drawing the conclusion from that data, which is summarized below, that contract prisons are necessarily lower cost than BOP intitutions on an overall basis. See Figures 2 and 3 for the BOP's annual costs per capita to house inmates in BOP low security institutions and contract prisons, respectively.

**Figure 2**

**Annual Per Capita Costs for BOP Institutions
FY 2011 — FY 2014**



Source: BOP

**Figure 3**

**Annual Per Capita Costs for Contract Prisons
FY 2011 — FY 2014**



Source: BOP

Based on this data from the BOP, for the 4 years of our review, the average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively.

In this regard, the BOP's inability to analyze and compare costs for major expenditures such as medical and food-related expenses between the contract prisons and its own institutions is significant. The *Government Performance and Results Act Modernization Act of 2010* (GPRA) mandates that federal agencies post on their public websites performance plans that include all programs in the agency's budget. One of the required objectives of the performance plans is to "establish a balanced set of performance indicators to be used in measuring or assessing progress toward each performance goal, including, as appropriate, customer service, efficiency, output, and outcome indicators." The GPRA defines the efficiency measure as "a ratio of a program activity's inputs (such as costs or hours worked by employees) to its outputs (amount of products or services delivered) or outcomes (the desired results of a program)." Without the ability to compare costs, however, the BOP is unable to evaluate whether the contractors' services are consistent with the value or quality of service the BOP should be receiving based on the amount of money that is being spent and, therefore, is unable to comply with this aspect of the GPRA.[26]

The U.S. Government Accountability Office (GAO) expressed similar concerns in a December 2013 report that assessed the extent to which opportunities exist to enhance the transparency of information in the BOP's budget justifications for congressional stakeholders and decision makers.[27] The GAO found that the BOP's budget justification for FY 2014 included $2.5 billion for Inmate Care and Programs such as medical services, food service, education and vocational training, psychology services, and religious services. However, the budget justification did not include a breakdown of proposed funding amounts for each of these categories. The BOP's budget justification for FY 2014 also included $1.1 billion for "Contract Confinement," and, consistent with our discussion above, that category did not specify how those costs were to be allocated. We agree with the GAO that such data would be useful in identifying trends and cost drivers that may affect future costs.[28]

---

[26]  The GPRA "directs OMB [Office of Management and Budget], each fiscal year, to determine whether each agency's programs or activities meet performance goals and objectives outlined in the agency performance plans and to submit a report on unmet goals to the agency head." See *GPRA Modernization Act of 2010,* 111th Cong., 2nd sess., S. 1116.

[27]  GAO, *Bureau of Prisons: Opportunities Exist to Enhance the Transparency of Annual Budget Justifications*, GAO-14-121 (December 6, 2013) (accessed July 28, 2016).

[28]  The GAO recommended that the Attorney General consult with congressional decision makers on providing additional BOP funding detail in future budget justifications and, in conjunction with the BOP, take action as appropriate. According to the GAO, the Department concurred with the GAO's recommendation and consulted with congressional Appropriations Committee staff to expand the level of detail in the two most recent budget requests, including an exhibit in the BOP's FY 2015 and FY 2016 budget submissions that provided additional details on BOP programs and activities. However, those submissions did not provide greater transparency or more cost information with regard to the BOP's expenditures on contract confinement.

# RESULTS OF THE REVIEW

**Contract Prisons Had More Safety and Security-related Incidents per Capita than BOP Institutions for Most of the Indicators We Analyzed**

One way to assess how effectively the BOP monitors its contract prisons is to compare the statistical profile for contract and BOP institutions on key inmate safety and security incidents. To evaluate how the contract prisons performed relative to the BOP's institutions, we analyzed data from the 14 contract prisons that were operational during the period of our review and 14 selected BOP institutions with similar population sizes, geographical locations, and security levels, comparing data in eight key areas that were relevant to American Correctional Association (ACA) standards and were tracked by both the contract prisons and the BOP institutions: (1) contraband, (2) reports of incidents, (3) lockdowns, (4) inmate discipline, (5) selected grievances, (6) telephone monitoring, (7) urinalysis drug testing, and (8) sexual misconduct.[29] With the exception of having fewer positive drug tests and sexual misconduct incidents, we found that the contract prisons had more incidents per capita than the BOP institutions in all of the other key areas.[30] We discuss the results of our analysis below. Unless otherwise stated, we calculated monthly and annual averages per 10,000 inmates. See Appendix 1 for more details regarding our methodology and Appendix 6 for the full results of our analysis.

*Contract Prisons Had More Frequent Incidents per Capita of Contraband Finds, Assaults, Uses of Force, Lockdowns, Guilty Findings on Inmate Discipline Charges, and Selected Categories of Grievances*

In three-quarters of the data categories we analyzed, the contract prisons had more safety- and security-related incidents per capita than the comparable BOP institutions. The contract prisons had more frequent incidents per capita for three of the four types of contraband we analyzed: cell phones, tobacco, and weapons. Also, we examined 10 types of reports of incidents and found that the contract prisons had higher rates of assaults and uses of force. In addition, the contract prisons had more lockdowns, more guilty findings on serious inmate discipline charges, and more grievances submitted by inmates in selected categories. Finally, although the contract prisons are not subject to a minimum requirement for

---

[29] In this review, we were not able to evaluate all of the factors that contributed to the underlying data. Where our interviews or document analyses provided explanations for the data findings, we note this. However, we also note a number of areas where we believe the BOP needs to examine the reasons behind our findings more thoroughly and identify corrective actions. The BOP indicated in response to a working draft of this report that a number of factors, including inmate demographics and facility location, may result in variance in the data reported in these categories. According to the BOP, as of January 2014 inmates incarcerated in private facilities were primarily non-U.S. citizens with 72.1 percent from Mexico, while the selected BOP institutions had an average of 11.8 percent non-U.S. citizens. See Appendix 1 for more information on our methodology, including our data analysis.

[30] However, overall, we found that inmates at the contract prisons filed fewer grievances in all categories (including those beyond our eight selected categories).

monitoring inmate phone calls, we found that they monitored a lower percentage. We discuss these findings in greater detail below.

In addition to the specific categories of findings discussed in this section, we looked at the overall frequency of incidents among the three private prison contractors. The extent to which one contractor's facilities performed better or worse than others on these indicators varied. Overall, the GEO Group's (GEO) contract prisons had more incidents per capita compared to those operated by the Corrections Corporation of America (CCA) and the Management and Training Corporation (MTC) for contraband finds, several types of reports of incidents, lockdowns, guilty findings on inmate discipline charges, positive drug test results, and sexual misconduct; that CCA contract prisons had the highest rates of inmate fights and inmate assaults on other inmates; and that MTC contract prisons had the highest rates of inmate grievances and monitored the lowest percentage of inmate telephone calls. Appendix 6 provides the full results of our analysis of the key indicators by contractor. Among the contract prisons, the Rivers Correctional Institution (GEO), D. Ray James Correctional Institution (GEO), and McRae Correctional Institution (CCA) most often had more incidents per capita in the categories of data we analyzed, though again the number of categories and extent of the differences varied. [31]

Contraband

We examined two sets of contraband data: (1) annual data on cell phone confiscations and (2) monthly data on confiscations of drugs, weapons, and tobacco. [32] These types of contraband are especially harmful, among other reasons because they can allow inmates to continue to operate criminal enterprises during incarceration, enable violence and support addictions, or serve as alternate forms of currency for inmates. We found that, on average, the contract prisons annually confiscated eight times as many cell phones per capita from FY 2011 through FY 2014. In terms of overall totals, contract prisons confiscated 4,849 cell phones compared to 400 confiscated in the BOP institutions. [33] Figure 4 below shows the per capita number of cell phones found at contract prisons and BOP institutions by year.

---

[31] For example, Rivers had the highest rates of contraband finds (excluding cell phones), inmate assaults on staff, uses of force, guilty findings on inmate discipline cases, inmate grievances, positive drug tests, inmate-on-inmate sexual misconduct, and the lowest phone monitoring rate. We found that D. Ray James had the highest rate of disruptive behavior incidents, as well as the second highest rate of inmate assaults on staff. McRae had the highest rate of inmate suicide attempts and self-mutilation, the second highest rate of positive drug tests, and the third highest rates of cell phones found and inmate grievances. The extent of the variation differed substantially among different indicators.

[32] The data on cell phones confiscated in the BOP institutions came from the BOP's annual Cell Phones Recovered reports, which are not broken out by month, so we analyzed annual rather than monthly data on cell phones confiscated in the contract prisons as well as other BOP institutions.

[33] These numbers include cell phones found on inmates as well as anywhere within contract prisons or BOP institutions. For the contract prisons, the contractors provided the count of cell phones.

**Figure 4**

**Per Capita Cell Phones Confiscated at
Contract Prisons versus BOP-managed Institutions
FY 2011 − FY 2014**



Source: OIG analysis of BOP and contractor data

The large volume of cell phones confiscated at the contract prisons compared to the BOP institutions during the period of our review was striking. Further, we found that two contract prisons (Big Springs and Adams County) accounted for 3,981 of the 4,849 (82 percent) cell phones confiscated at the 14 contract prisons.[34] Table 1 shows the total number of cell phones found at Big Springs, Adams Country, and the remaining 12 contract prisons, reflecting the substantial volume of cell phones that were confiscated.

**Table 1**

**Cell Phones Found at Big Springs, Adams County, and the
Remaining Contract Prisons, FY 2011 − FY 2014**

| Contract Prison | FY 2011 | FY 2012 | FY 2013 | FY 2014 | Total |
|---|---|---|---|---|---|
| Big Springs | 786 | 1,068 | 813 | 331 | **2,998** |
| Adams County | 8 | 24 | 390 | 561 | **983** |
| Remaining 12 Contract Prisons | 238 | 117 | 210 | 303 | **868** |
| **Totals** | **1,032** | **1,209** | **1,413** | **1,195** | **4,849** |

Source: OIG analysis of contractor data

According to contractor data, Big Springs accounted for 2,998 of 4,849 cell phones (62 percent) confiscated at the 14 contract prisons. While the number of cell phones confiscated at Big Springs peaked at 1,068 in FY 2012, confiscations decreased by 70 percent, to 331 in FY 2014. According to a Privatization Field Administrator (PFA), the high number of cell phones confiscated at Big Springs was

---

[34] As of September 2014, Big Springs' inmate population was 3,403, the largest of the contract prisons, and Adams County's was 2,304. Together, these two prisons accounted for 20 percent of the total combined population of the BOP's 14 contract prisons at that time.

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 23 of 87 PageID #: 2355

due to the prison's proximity to a public road and passersby being able to throw cell phones over its perimeter fence. The PFA stated that installing a tall net around the perimeter fence in the spring of 2013 helped reduce the number of cell phones entering the prison in that manner. The PFA stated that the prison also worked to improve relations with local law enforcement so that more cell phone incidents were fully prosecuted.

By contrast, the number of cell phones confiscated at Adams County increased from 8 in FY 2011 to 561 in FY 2014. In May 2012, there was a riot at the prison, and subsequently the contractor instituted heightened security measures, including new gates, increased security staff coverage, and greater controls over inmate movements. According to the prison's self-assessment, these measures resulted in an increase in contraband finds. However, even without the cell phones confiscated at Big Springs and Adams County, there were still more than twice as many cell phones confiscated at contract prisons than at BOP institutions during the period of our review. Staff confiscated 868 phones during this period in the remaining 12 contract prisons, compared to 400 confiscated in all 14 BOP institutions.

While the numbers may not have been large relative to the cell phone confiscations, we also found that the contract prisons had more frequent weapon and tobacco confiscations per capita than the BOP institutions but less frequent drug confiscations. Table 2 shows the average monthly finds per capita for these three types of contraband over the period of our review.

**Table 2**

**Average Monthly Finds Per Capita for Weapons, Tobacco, and Drugs at Contract Prisons and BOP Institutions FY 2011 – FY 2014**

|  | Weapons | Tobacco | Drugs | Combined |
|---|---|---|---|---|
| **Contract Prisons** | 3.2 | 2.5 | 1.8 | 7.6 |
| **BOP Institutions** | 1.8 | 1.9 | 3.0 | 6.6 |

Note: Due to rounding, the combined numbers are not an exact sum of the individual contraband categories. Averages are per 10,000 inmates.

Source: OIG analysis of BOP and contractor data

On average, the contract prisons had nearly twice as many weapons confiscated as BOP institutions (3.2 compared to 1.8) monthly. Also, the contract prisons had 2.5 tobacco finds monthly, on average, compared to 1.9 in the BOP institutions. Conversely, the BOP institutions had more drug finds than the contract prisons, with 3 monthly, on average, in the BOP institutions compared to 1.8 in contract prisons. Overall, we found that the contract prisons had 7.6 contraband finds in all 3 categories combined, more than the 6.6 finds in these 3 categories in the comparable BOP institutions.

We note that not all of the contract prisons found contraband in every category over the 4 years of our review. We did not compare contraband interdiction efforts between the contract prisons and BOP institutions as part of this

review.[35]  Therefore, we were unable to evaluate whether higher rates of contraband finds actually indicated more contraband present in either a contract prison or a BOP institution, a more aggressive or effective program for discovering and confiscating contraband, or some combination of those or other factors. However, where the disparity between contract prisons and BOP institutions is greatest, such as in cell phone recoveries, this may reflect at least to some extent a problem that should be examined and addressed by the BOP.

Reports of Incidents

We analyzed data on 10 types of incidents:  (1) assaults by inmates on inmates, (2) assaults by inmates on staff, (3) sexual assaults by inmates on staff, (4) inmate deaths, (5) inmate fights, (6) cell fires, (7) inmate suicide attempts and self-mutilation (combined), (8) inmate suicides, (9) disruptive behavior by inmates, and (10) staff uses of force on inmates.[36]  We found that the contract prisons had higher rates of inmate-on-inmate and inmate-on-staff assaults, as well as higher rates of staff uses of force.  We also found the contract prisons had comparatively equal rates of fights and suicide attempts and self-mutilation, and that the contract prisons had lower rates of disruptive behavior incidents.

As to the first two types of incidents, our analysis showed a higher rate of assaults in the contract prisons than in the BOP institutions, both by inmates against inmates and by inmates against staff.  Per capita, the contract prisons reported a 28 percent higher average of inmate-on-inmate assaults (3.3 assaults monthly, on average, compared to 2.5 on average in BOP institutions).[37]  An analysis of these assaults per capita by year indicated that both the contract prisons and the BOP institutions saw their numbers rise in FY 2012; but the rise was more dramatic in the contract prisons and remained high through FY 2014. Figure 5 below shows the per capita inmate-on-inmate assaults each year.

---

[35] The OIG is separately reviewed and reported on the BOP's contraband interdiction efforts. See DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts*, Evaluation and Inspections (E&I) Report 16-05 (June 2016).

[36] The first two categories of general assaults do not include sexual assaults by inmates on inmates or by staff on inmates, which we discuss separately under sexual misconduct, below.

[37] See Appendix 1 for the formula used to calculate the percentage differences presented throughout this section.

**Figure 5**

**Per Capita Inmate-on-Inmate Assaults in Contract Prisons and BOP Institutions FY 2011 − FY 2014**



Source: OIG analysis of BOP and contractor data

With regard to inmate-on-staff assaults, we found that the contract prisons reported well more than twice as many such incidents each month on average as compared to the BOP institutions: 4.2 assaults monthly, on average, in the contract prisons versus 1.6 in the BOP institutions. One contract prison, D. Ray James, accounted for 155 of 526 (29 percent) of the assaults on staff in all contract prisons from FY 2011 through 2014, including 114 assaults on staff in FY 2012 alone. A PFA told us that D. Ray James, operated by GEO in Folkston, Georgia, was having significant performance issues on its contract during this period and that the BOP had issued a cure notice in the fall of 2012.[38]

However, the PFA said the contractor had subsequently made personnel changes at the prison and its performance had noticeably improved. Our analysis found that the number of inmate-on-staff assaults at D. Ray James was reduced after FY 2012, with only one assault recorded in FY 2014. Figure 6 below shows the per capita numbers of assaults by inmates on staff each year.

---

[38] The PFA stated that a cure notice is issued to a contract prison that is not meeting the vital functions of its contract and indicates that the BOP is on the brink of ending the contract. Federal Acquisition Regulation 49.607 specifies that a cure notice is required when a contract is to be terminated for default before the delivery date. In FY 2012, D. Ray James received 47 notices of concern (NOC), more than double the highest number of NOCs that any other contract prison received in a 1-year period during the 4-year period of our review.

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 26 of 87 PageID #: 2358

**Figure 6**

**Per Capita Assaults by Inmates on Staff in Contract
Prisons Compared to BOP Institutions
FY 2011 – FY 2014**



Source: OIG analysis of BOP data

With regard to the other selected incidents, our analysis of BOP and contractor data also found that the contract prisons had 17 percent more use-of-force incidents; approximately the same rate of inmate fights, self-mutilations, and suicide attempts; and a 29 percent lower rate of disruptive behavior incidents. Appendix 6 shows the monthly averages and 4-year totals for each of these types of incidents.

Finally, we found few instances of inmate-on-staff sexual assaults, cell fires, and suicides in either the contract prisons or the BOP institutions. We excluded inmate deaths from the discussion above because they can occur for reasons unrelated to security, such as age-related illness, and the clinical adequacy of inmate medical care fell outside the scope of our review.[39] However, we did analyze comparative data on reports of incidents of inmate deaths to evaluate the existence of disparities in the inmate death rate between the contract prisons and BOP institutions. While we found that the contract prisons actually had a lower monthly per capita average of inmate deaths compared to BOP institutions — 0.4 inmate deaths compared to 1.2 in the BOP institutions — we still believe that any disparity in the inmate death rate bears closer examination to determine the causes for differing rates and any steps that might be taken to reduce such occurrences. See Appendix 6 for the results of our analysis for all 10 types of incident reports. Overall, we believe the BOP needs to examine the frequency of

---

[39] In 2008 and again in 2010, the OIG completed an audit of the BOP's efforts to manage inmate healthcare. See DOJ OIG, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care*, Audit Report 08-08 (February 2008), and *Follow-up Audit of the Federal Bureau of Prisons' Efforts to Manage Inmate Health Care*, Audit Report 10-30 (July 2010). See also DOJ OIG, *Review of the Impact of an Aging Inmate Population on the Federal Bureau of Prisons*, E&I Report 15-05 (May 2015), and *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*, E&I Report 16-02 (March 2016).

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 27 of 87 PageID #: 2359

these different types of incidents in its contract prisons and determine what corrective action may be required to address them.

As the BOP emphasized in response to a working draft of this report, no two BOP or private facilities are identical demographically. We acknowledge that inmates from different countries or who are incarcerated in various geographical regions may have different cultures, behaviors, and communication methods. The BOP stated that incidents in any prison are usually a result of a conflict of cultures, misinterpreting behaviors, or failing to communicate well. One difference within a prison housing a high percentage of non-U.S. citizens is the potential number of different languages and, within languages, different dialects. Without the BOP conducting an in-depth study into the influence of such demographic factors on prison incidents, it would not be possible to determine their impact.

<u>Lockdowns</u>

During a prison lockdown, inmates are restricted to their quarters and their movements and communication are also restricted, often in response to a disturbance or incident that threatens the secure and orderly running of the prison. According to the BOP:

> The purpose of a lockdown of a correctional facility is to ensure the security of the institution, maintain control of the inmate population, and ascertain the concerns of the inmate population. Lockdowns are often a precautionary measure used to maintain control during a period of inmate dissention. During each lockdown, oversight staff monitors the contractor's actions and progress to return the institution to normal operations as quickly as possible.

During the period of our review, contract prisons reported more lockdowns than the comparable BOP institutions. The contract prisons reported 30 partial lockdowns and 71 full lockdowns, while the BOP institutions reported no partial lockdowns and 11 full lockdowns, meaning that these security measures occurred more than 9 times as often at contract prisons.[40] Moreover, 12 of the 14 (86 percent) contract prisons reported full or partial lockdowns, while only 6 of the 14 (43 percent) BOP institutions reported lockdowns. Of the 12 contract prisons that reported a full or partial lockdown, Big Springs had the highest number, with 28 of the 101 partial and full lockdowns reported, or 28 percent of all contract prison lockdowns. Among the reasons cited in the data we obtained for lockdowns at Big Springs and other contract prisons were inmate demonstrations, fights, inmate assaults on staff, attempts to introduce significant contraband, conflicts between inmate gangs or racial groups, food strikes, inmates refusing to work, shakedowns, and local environmental or weather emergencies. In some cases, the contractors' descriptions of the circumstances surrounding lockdowns noted that inmates expressed concerns over specific issues, including medical care, commissary prices,

---

[40] A partial lockdown affects only some housing units in a prison; a full lockdown affects the entire prison.

inmate pay, movement restrictions, and television channels. While we could not review the basis for lockdowns in the context of this review, the greater number of such incidents at contract prisons suggests a need for the BOP to examine and address the issue.

Discipline

We analyzed inmate discipline data on charges such as murder, assault, sexual assault, possession of weapons or drugs, setting fires, fighting, and participating in riots or demonstrations. We found that the contract prisons had a higher number of guilty findings on these types of serious offense charges. The contract prisons had 77.9 guilty findings monthly on average (10,089 over 4 years), compared to 64.7 in the BOP institutions (7,439 over 4 years).[41] We believe that a higher incidence of substantiated misconduct may be an indication of greater inmate behavioral challenges in contract facilities, which merits further analysis and action by the BOP.

Grievances

Contract terms specify that the contract prisons must develop their own internal grievance policies and adhere to federal regulations setting forth procedures for inmates to receive formal review of issues of concern to them.[42] As part of our analysis, we selected eight categories of grievances we deemed particularly relevant to safety and security to analyze collectively and separately.[43] We selected grievances related to medical care and food because each was specifically identified among reasons that led to lockdowns at contract prisons, as detailed above. In addition to medical care and food, the grievance categories we selected as particularly relevant to this analysis were conditions of confinement, institutional operations, safety and security, sexual abuse or assault, Special Housing Units (SHU), and complaints against staff. We found that in these eight categories collectively, inmates at the contract prisons submitted 24 percent more grievances: 32.2 grievances per month, on average, compared to 25.3 for the BOP institutions.

Individually, not all of the eight grievance categories we selected had a larger number of grievances or showed notable differences.[44] However, our analysis did show that, per capita:

---

[41] Our analysis of the discipline data included sexual misconduct incidents that were also analyzed separately, as described below.

[42] 28 C.F.R. 542.

[43] Because the contract prisons sometimes used different descriptions for the same types of grievances and some descriptions were more detailed than necessary for the level of our analysis, we consolidated and standardized the grievance categories.

[44] Not all contract prisons had grievances in all of the categories. See Appendix 7 for a detailed comparison between contract prisons and BOP institutions for each of the eight grievance categories.

- Contract prison inmates submitted more than twice as many grievances regarding prison staff as inmates in the BOP institutions, averaging 12.9 monthly compared to 6.2 in the BOP institutions.

- There were more grievances regarding SHUs at the BOP institutions, with an average of 2.4 monthly compared to 0.2 monthly in the contract prisons.

- There were more food grievances at the contract prisons, on average 2.1 food grievances monthly compared to 1.2 in the BOP institutions.

- There was little difference in the number of medical grievances (14.3 at the contract prisons versus 14.1 at the BOP institutions on average monthly).

However, overall, we found that inmates at the contract prisons filed fewer grievances in all categories (including those beyond our eight selected categories). According to BOP data, inmates at the contract prisons filed, on average, 72.6 grievances per month compared to 121.5 grievances at the BOP institutions and a higher percentage of grievances were granted in the contract prisons. The overall rate of inmate grievances granted in the contract prisons over the 4 years of our review was 8.1 percent, while in the BOP institutions 5.2 percent were granted. Of the 8,756 total grievances filed by inmates at the contract prisons from FY 2011 through FY 2014, 1,800 (21 percent) were related to medical concerns, 1,538 (18 percent) were complaints about prison staff, and 1,186 (14 percent) were related to the inmate disciplinary process. Figure 7 below shows the most common categories of grievances in the contract prisons.

**Figure 7**

**Most Common Inmate Grievance Categories in the Contract Prisons, FY 2011 – FY 2014**



Note: Less common types of grievances included in the "Other" category (mauve) included transfers, classification, telephone and mail, institutional operations, conditions of confinement, and alleged violations of federal or state laws and regulations.

Source: OIG analysis of BOP and contractor data

By comparison, in the BOP institutions, of 14,098 total grievances filed by inmates, 3,451 (24 percent) were related to inmate discipline, hearings, and

appeals, followed by 1,609 grievances (11 percent) on medical concerns and 1,332 grievances (8 percent) on sentence computation issues. The remaining 47 percent of grievances at contract prisons and 57 percent of grievances at BOP institutions were related to categories including inmate classification, transfers, legal access, work assignments, residential reentry centers, and telephone and mail. Figure 8 below shows the most common categories of grievances in the BOP institutions.

**Figure 8**

**Most Common Inmate Grievances Categories in the BOP Institutions, FY 2011 – FY 2014**



- Discipline/Hearings/Appeals (24%)
- Medical/Dental (11%)
- Sentence Computation (9%)
- Classification (9%)
- Transfers (7%)
- Programs (6%)
- Staff Complaints (5%)
- Other (27%)

Note: Less common types of grievances included in the "Other" category (mauve) included residential reentry centers, telephone and mail, work assignments, SHUs, and legal access issues.

Source: OIG analysis of BOP and contractor data

Comparison of the distribution of grievances between the contract prisons and the BOP reveals that the concerns of inmates in the contract prisons are more focused on medical and dental issues (21 percent of the contract prison grievances as opposed to 11 percent of the BOP institution grievances). Similarly, the percentage related to staff complaints is much larger at the contract prisons than the BOP institutions (18 percent in the former compared to 5 percent in the latter). The higher focus on particular areas in contract prison grievances suggests that the BOP should examine those areas and develop plans to address any underlying issues.

<u>Monitoring of Inmate Phone Calls</u>

The BOP requires that BOP institutions monitor at least 5 percent of inmate phone calls.[45] Contracts do not require the contract prisons to monitor a specific percentage of inmate phone calls. However, a Privatization Management Branch (PMB) Intelligence Specialist told us that the BOP recommends that the contract

---

[45] Regional BOP Directors may set higher monitoring goals, ranging from 10 to 15 percent of calls monitored randomly for BOP institutions within their region. See DOJ OIG, *The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates*, E&I Report I-2006-009 (September 2006).

prisons monitor a minimum of 5 percent of inmate phone calls. The Intelligence Specialist stated that it is good correctional practice to monitor at least 5 percent of calls to gather intelligence. We found that all but two of the contract prisons met or exceeded the BOP's 5 percent phone call monitoring standard on average each month from FY 2010 through FY 2014. However, collectively, the contract prisons monitored fewer phone calls than the BOP institutions. Our analysis found that the BOP institutions monitored 21 percent of all inmate phone calls on average each month, compared to only 8 percent at the contract prisons.

We also found that the number of inmate phone calls that the contract prisons can monitor is limited by the unavailability of both bilingual staff and technological resources. With the exception of the Rivers Correctional Institution (Rivers), which houses approximately 50 percent of its inmates from the District of Columbia, most of the contract prison population consists of foreign national inmates, many of whom are Mexican nationals serving sentences for immigration violations.[46] At Rivers, staff told us that one full-time translator and another staff member monitored Spanish-language phone calls in addition to performing their other duties but were not able to monitor all phone calls that should have been monitored. We found similar circumstances at another contract prison we visited, where a single bilingual officer was responsible, among other duties, for monitoring all Spanish-language calls.

We were also told that the contract prisons do not have the same telephone technology that is available to BOP institutions to monitor inmate phone calls. A PMB Intelligence Specialist told us that with access to the BOP's TRUINTEL system, it was possible for staff to listen to inmates' phone calls in the BOP institutions through a desk telephone or through their desktop computers. Therefore, various staff in different departments throughout the institutions could monitor phone calls. However, staff at contract prisons do not have access to TRUINTEL or the intelligence it provides from other BOP institutions, nor are contract prison inmate phone calls recorded in TRUINTEL, all of which limits contract prisons' and the BOP's opportunities to gather intelligence.

Even though contract prisons are generally meeting the minimal monitoring standard, we believe that the lower monitoring rate at contract prisons and the personnel and technological hurdles faced there are issues that the BOP should consider and address.

*The Contract Prisons Had Fewer Incidents per Capita of Positive Drug Tests and Sexual Misconduct*

Another indicator of safety and security in a prison setting is the number of positive drug tests and sexual misconduct incidents per capita. Our analysis indicated that the contract prisons had fewer inmates who tested positive for drugs through urinalysis testing than the BOP institutions. We also found that the

---

[46] As of FY 2013, 96 percent of the BOP's inmate population in contract prisons consisted of foreign nationals.

contract prisons had lower rates of guilty findings on serious disciplinary charges of inmate-on-inmate sexual offenses. Additionally, the contract prisons had fewer allegations of sexual misconduct by staff against inmates. We discuss these findings in greater detail below.

<u>Urinalysis Drug Tests</u>

According to BOP policy and contract requirements, contract prisons and other BOP institutions must drug test 5 percent of inmates every month. We found that, per capita, the contract prisons had fewer positive urinalysis drug test results, on average monthly (2.1) than the BOP institutions (3.4), with a total over 4 years of 263 positive results in the contract prisons compared to 376 in the BOP institutions. However, the contract prisons also drug-tested a slightly lower percentage (7 percent) of inmates on average each month than the BOP institutions (8 percent). Despite the lower testing percentage, on average over the 4-year period of our review, all contract prisons drug tested over 5 percent of inmates per month, exceeding contract requirements.[47] Given the limitations of the BOP's data, which included only the number of inmates tested and the number of positive and negative results, we were not able to determine whether the lower per capita positive drug test results in contract prisons reflected less drug usage, an issue with the drug testing procedures being followed in those facilities, or some combination of these; but we believe that these are issues that merit closer examination and analysis by the BOP.

<u>Sexual Misconduct</u>

We analyzed two types of sexual misconduct data: (1) guilty findings on disciplinary charges of inmates committing sexual misconduct against other inmates and (2) allegations of staff sexual misconduct against inmates. In both categories, the data that we reviewed generally reflected that the contract prisons had fewer incidents per capita than the BOP institutions.

However, we found that some of the data on inmate-on-inmate sexual misconduct was recorded inconsistently, for both the contract prisons and the BOP institutions. BOP Intelligence Specialists produce monthly intelligence reports on the contract prisons with the number of reported sexual assault incidents, as well as a breakdown of categories of inmate-on-inmate sexual misconduct allegations. A PMB Intelligence Specialist told us these two types of data should be consistent with each other; however, we determined that the overall number of incidents and the number of incidents by category were frequently inconsistent. In addition, data on inmate discipline cases with sexual misconduct guilty findings indicated more inmate-on-inmate misconduct in contract prisons than was recorded in the monthly intelligence reports. Further, the BOP institutions reported no inmate-on-inmate sexual misconduct incidents, even though the data on inmate discipline in the BOP

---

[47]  The contract requires the contractor to adhere to BOP Program Statement 6060.8, Urine Surveillance and Narcotic Identification (March 8, 2001). The program statement stipulates that each institution should randomly drug test 5 percent of its total population each month.

institutions also showed guilty findings on sexual misconduct charges. The BOP's contract prisons are currently subject to *Prison Rape Elimination Act of 2012* (PREA) reporting requirements in their contracts, as are the BOP's noncontract institutions by statute.[48] However, since the rules for PREA took effect in August 2012, as part of this review we did not evaluate the contract prisons' compliance with PREA or how it may have affected the contract prisons' sexual misconduct incident reporting.

Given the limitations of the data on reports of incidents for inmate-on-inmate sexual misconduct, we focused our analysis on inmate discipline cases that resulted in guilty findings for charges of sexual misconduct.[49] Over the period of our study, we found that the contract prisons had approximately 9 percent less guilty findings on average annually in sexual misconduct cases than the BOP institutions. The contract prisons had 16.6 guilty findings annually, on average, as opposed to 18.1 in the BOP institutions. However, we also found that 50 of 156 (32 percent) of the contract prison inmate-on-inmate sexual misconduct guilty findings occurred at one contract prison, Rivers, between FY 2011 and 2014, and we believe that the disparity between different facilities on this issue warrants closer examination by the BOP.

Staff-on-inmate sexual misconduct is not tracked through reports of incidents, which apply only to inmate misconduct. Instead, allegations of staff misconduct against inmates must be reported to the BOP's Office of Internal Affairs (OIA). Our analysis of OIA data found that the contract prisons reported fewer misconduct allegations than the BOP institutions.[50] During our review period, the contract prisons reported 97 staff sexual misconduct allegations compared to 139 staff sexual misconduct allegations reported from the BOP institutions. Adjusting for population differences, the contract prisons averaged 9 allegations annually, compared to 15 on average in the BOP institutions. Of course, no level of sexual misconduct is acceptable, and we strongly encourage the BOP to continue to work to address this issue in both contract prisons and BOP institutions.

### OIG Site Visits Revealed Safety and Security Concerns and Inappropriate Housing Assignments

The BOP requires all of its contract prisons to provide a safe and secure setting for staff and inmates and to maintain ACA accreditation throughout the term of their contract. We found that while each contract prison we visited was cited for at least one safety or security deficiency during the period of our review, these

---

[48] PREA requires prisons to track allegations of sexual misconduct incidents. The OIG analyzed emerging issues with PREA implementation in *Progress Report on the Department of Justice's Implementation of the Prison Rape Elimination Act*, E&I Report 15-1 (October 2014).

[49] Specifically, we analyzed Codes 114 (Sexual Assault by Force), 205 (Engaging in Sexual Acts), 206 (Making Sexual Proposals or Threats to Another), and 229 (Sexual Assault without Force).

[50] Contract prisons and BOP institutions are required to report all allegations of staff sexual misconduct to the OIA. The OIA then notifies the OIG Investigations Division about the allegations, and the OIG decides which it should investigate and which should be referred back to the OIA for investigation or delegation to institutional staff to investigate.

issues were addressed by the contract prisons and each maintained ACA accreditation throughout the period covered by our review. However, during our fieldwork, we learned that two of the three facilities we visited housed newly received general population inmates in the SHU, inconsistent with ACA standards and BOP policy, and neither prison had been cited for a deficiency as a result.

*Safety and Security Deficiencies*

In addition to the concerns relating to inmate placement in the SHU detailed below, we discovered that some contract prisons experienced other safety and security issues during the period of our review. The three contract prisons we visited were each cited for one or more safety and security related deficiencies. A contract prison receives a deficiency when it violates a policy that affects the quality of service provided under the contract. These included administrative infractions, such as improper storage of use-of-force video footage, as well as other deficiencies that the BOP determined were more serious or systemic in nature, such as a failure to initiate discipline in over 50 percent of incidents reviewed by the onsite monitors over a 6-month period. However, the contractors corrected the safety and security deficiencies that the BOP identified. As a result, the BOP determined that each prison was sufficiently compliant with the safety and security aspects of its contract to continue with the contract during the period covered by our review.[51] Table 3 shows the safety and security indicators within the correctional services area and the number of deficiencies the BOP identified during our review period.[52]

**Table 3**

**Number of Deficiencies Received in Contract Prisons the OIG Visited, FY 2011 — FY 2014**

| Security Indicators | Dalby | Eden | Rivers |
|---|---|---|---|
| Use of Force | 1 | 1 | 0 |
| Reports of Incidents | 0 | 1 | 0 |
| Inmate Death Notifications | 0 | 0 | 0 |
| Inmate Urinalysis Testing | 1 | 0 | 0 |
| Inmate Disciplinary Hearings | 0 | 2 | 0 |
| Sexual Assaults | 0 | 1 | 0 |
| Inmate Grievances | 0 | 0 | 0 |
| Contraband | 1 | 1 | 1 |
| Lockdowns | 0 | 0 | 0 |
| Suicides | 2 | 0 | 0 |
| **TOTAL** | **5** | **6** | **1** |

Source: BOP data

During our review period, the 3 contract prisons we visited collectively received 12 deficiencies in the security indicators we analyzed. The Giles W. Dalby

---

[51] To maintain a contract, a contract prison must remain compliant with each operational area of the contract. See Contract Requirements in the Introduction for discussion of the operational areas.

[52] The three contract prisons were also cited for deficiencies in other areas not included in Table 3, such as administration, food service, and human resources.

Correctional Facility (Dalby) received five deficiencies in four areas: use of force, inmate urinalysis testing, contraband, and suicides (two). The Eden Detention Center (Eden) received six deficiencies in five areas: use of force, reports of incidents, inmate disciplinary hearings (two), sexual assaults, and contraband. Rivers received one deficiency for contraband. Of the three contract prisons, none was found deficient in the policy requirements pertaining to the areas of inmate death notifications, inmate grievances, or lockdowns.

We determined that for each of the safety and security related deficiencies that BOP onsite monitors identified during our study period, the contractor responded to the BOP and took corrective actions to ensure the prison was in compliance with policies and the contract. Depending on the severity of the security deficiency, corrective actions included providing training or retraining to the affected staff, increasing supervisory oversight, revising policy, and/or taking disciplinary action against staff. None of the three prisons lost its ACA accreditation because of these security related deficiencies.

*Two of the Three Contract Prisons We Visited Routinely Housed Newly Received General Population Inmates in the SHU*

At two of the three contract prisons we visited, we learned that all newly received inmates were housed in the SHU due to lack of available bed space in general population housing units, which is contrary to both ACA standards and BOP policies. Dalby placed new inmates directly into administrative segregation in the SHU for an average of 20 days pending available bed space in the general population. At the time of our visit, 73 inmates were housed in the SHU at Dalby. The Warden informed us that a majority of these were new inmates awaiting beds in the general population. Similarly, Eden housed new inmates in administrative segregation in the SHU for an average of 21 days before a bed became available in the general population. At the time of our visit to Eden, 71 of the 100 inmates in the SHU were waiting for beds in the general population.

The placement of general population inmates in the SHU due to lack of bed space is inconsistent with the ACA standard that states that an inmate may be placed in administrative segregation if the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or the security or orderly running of the institution.[53] Under ACA standards, an inmate can also be placed in the SHU for disciplinary segregation or detention only if a disciplinary committee or Disciplinary Hearing Officer has determined, after an impartial hearing, that the inmate is guilty of a serious rule violation. The placement of inmates in the SHU due to lack of bed space in the general population is also inconsistent with parallel BOP policies, which explicitly state that "when

---

[53] According to BOP policy, other appropriate reasons for placement in administrative segregation include being under investigation for an alleged rule violation or criminal act, pending investigation for a criminal trial, protective custody for the inmate, or pending transfer to another institution.

placed in the SHU, you [an inmate] are either in administrative detention status or disciplinary segregation status."[54]

Management at both Dalby and Eden acknowledged that the newly received inmates had not engaged in any conduct that warranted their placement in the SHU.  Yet, once placed in the SHU, these new inmates became subject to the same security measures as inmates placed in administrative segregation for specific security related reasons.  These measures included restricted and controlled movements; limited access to programs such as educational or vocational programs, as well as work details; and limited telephone calls.[55]

While using the SHU to house new inmates is inconsistent with both ACA standards and BOP policy, we found that neither contract prison had been cited for a deficiency for this practice.  According to contract prison management and BOP staff, contract prisons housed new inmates in the SHU because both the BOP and its contractors had interpreted language in their contracts as permitting SHU beds to be included in the general population bed count, rather than in a separate category.  Moreover, according to the contracts, "The contractor does not have a right of refusal and shall accept all designations from the BOP."  We were told that the BOP sent new inmates to Eden because there appeared to be beds available based on the inmate population data provided by the contractor, even though the beds were actually in a SHU, and Eden could not refuse to accept these new inmates under its contract.  Wardens at both Dalby and Eden told the OIG they believed that housing new inmates in the SHU was not good correctional practice.[56]

When the OIG learned about this practice, we brought it to the attention of the BOP Director (see Appendix 4 for the Inspector General's letter to the BOP Director).  In response, the BOP Director informed the Inspector General of the following:  (1) All new inmates awaiting general population bed space had been removed from the SHU and housed in the general population; (2) all movement into contract prisons was discontinued if the movement would result in SHU placement; (3) 5 of the 14 contracts were modified to address this issue (9 of the 14 contracts did not contain language that required modification prior to the Inspector General's letter); and (4) all 14 contracts prohibit SHU placement for inmates unless there is a policy-based reason to house them in administrative or disciplinary segregation.  The BOP Director further stated that the onsite monitors and Contracting Officers would ensure contract compliance, especially regarding placement of inmates in the SHU.  (See Appendix 5 for the BOP Director's response

---

[54] BOP Program Statement 5270.10, Special Housing Units (August 1, 2011).

[55] Inmates in administrative and disciplinary segregation may leave their cells only under handcuffed escort by Correctional Officers for 1 hour of exercise, 5 times per week, or for showers several times per week.  Also, inmates must have meals provided to them in their cells.  Finally, counselors and medical and other program staff are required to visit the SHU daily to meet with each inmate individually at their cell.  All of these activities are very time intensive for the staff.

[56] The Warden at Dalby informed us that the prison and the BOP had just signed a contract modification to expand the number of beds in the general population and reduce the previously required number of SHU beds, thereby creating sufficient beds in the general population for newly received inmates.

to the Inspector General addressing this issue.)  Since that time, the BOP informed the OIG that the practice of housing new inmates in the SHU is no longer occurring in the contract prisons and that there has been no further non-compliance identified to date by the BOP regarding this issue.

**The BOP's Monitoring of Contract Prisons Needs Improvement**

We found two principal areas of concern with the BOP's monitoring of contract prisons:  (1) a tool the BOP onsite monitors use to monitor day-to-day contract compliance, the Large Secure Adult Contract Oversight Checklist (checklist), does not address certain important BOP policy and contract requirements in the areas of health services and correctional services and (2) the monitoring of health services for contract compliance lacks coordination among BOP staff responsible for health services oversight.  As a result, the BOP's day-to-day monitoring may be less effective in ensuring that the inmate population it houses in contract prisons receives appropriate health and correctional services.  We discuss each of these issues in more detail below.

In April 2015, the OIG issued a report on the Reeves County contract prison that included findings and recommendations related to the BOP's monitoring of all contract prisons.[57]  In response to the OIG's recommendations, the BOP took many corrective actions, including in the areas of health and correctional services.  In addition, the BOP informed us of additional steps taken in response to concerns identified in this current review.  Below, we acknowledge the BOP's efforts to improve its monitoring of contract prisons and discuss additional steps the BOP should take to further ensure that these facilities are safe and secure places to house federal inmates.

*The Onsite Monitors' Checklist*

We found that the checklist, a monthly contract monitoring tool onsite monitors use to document their day-to-day efforts to ensure contract prisons comply with BOP policy and contract requirements, could be further improved.  We focused our analysis on the onsite monitors' checklist because, as described by the PMB operating procedures, it is an important element of the BOP's Quality Assurance Plan, as well as a mechanism used to document contract compliance on a daily basis.  We believe onsite monitors are best positioned to provide the BOP's quickest and most direct responses to contract compliance issues as they arise.  The checklist has observation steps, which are instructions on how to document contractor performance requirements.  However, we determined that observation steps for health services do not contain steps to verify that inmates receive a number of basic medical services.  Also, while the BOP made revisions to the checklist in response to the findings of the OIG's Reeves County audit as discussed below, the revised checklist does not include observation steps to assess some vital

---

[57] See DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas*, Audit Report 15-15 (April 2015), iii.

functions in the contracts related to correctional services, such as conducting adequate searches and gathering intelligence.[58] In addition, for some functions, the checklist still contains vague observation steps. Further, onsite monitors at the contract prisons we visited did not use the checklist or monitoring logs to track contractors' corrective actions. Finally, the BOP lacks a review process for the checklist to ensure that observation steps accurately verify contract compliance. As a result, the BOP may not be able to monitor as effectively whether contract prisons comply with BOP policies and contract requirements on a day-to-day basis.

<u>Observation Steps for Health Services Are Inadequate to Verify that Inmates Receive Basic Medical Services</u>

To support the monitoring of contract compliance in health services, the BOP developed seven observation steps in the checklist for onsite monitors to verify that a contract prison's health services comply with its contract. At the time of this review, we determined that none of the seven health services checklist observation steps, individually or when considered together, examined whether the contractors were providing basic medical care to the inmates. Rather, the observation steps were primarily administrative procedures such as checking that biohazard procedures followed contractor policy, ensuring staff interactions with inmates were confidential, recording the percentage of inmates in chronic care, and checking that deceased inmates were properly fingerprinted. As a result, the BOP onsite monitors were not verifying each month whether inmates in contract prisons were receiving basic medical care.

Onsite monitors and PFAs told us they did not have the medical expertise to provide additional monitoring in health services beyond the observation steps in the checklist. They stated that the onsite monitor's position was intended to be that of a generalist, rather than a subject matter expert with the clinical knowledge needed to evaluate the quality of medical care provided. However, in the PMB Health Systems Specialist's (HSS) opinion, even without medical expertise, the onsite monitors could perform additional health services oversight steps to help ensure the contractors provide basic medical care.[59] The HSS is responsible for providing medical oversight training programs for PMB staff, as well as coordinating oversight of the contractors' medical services with the BOP's Contract Facility Monitoring (CFM) Branch and the Health Services Division (HSD), conducting annual reviews and site visits of contract prison medical departments, and providing clinical guidance in a written site visit report to help the contractors correct medical deficiencies. In June 2014, at an annual training conference attended by all PMB staff, the HSS trained the onsite monitors and PFAs on how they could verify whether inmates received basic medical care, such as an initial medical examination within 14 days of arrival at the prison, and whether they received immunizations,

---

[58] Appendix 3 provides sample observation steps from the health services and correctional services sections of the checklist that the onsite monitors use.

[59] In response to a working draft report, the BOP told us that the HSS whom we interviewed during the course of our review has since retired. The BOP stated that the new HSS has extensive experience in the review, analysis, and monitoring of healthcare provided to inmates.

tuberculosis tests, and chronic care appointments, all as required by BOP policy. The HSS stated that these verifications involve checking entries and corresponding dates in SENTRY and do not require any medical expertise.[60]  However, the HSS told the OIG that there had been no discussion regarding whether the PMB could add these observation steps to the checklist, and he was not familiar with the checklist or its contents.

Following the OIG's 2015 report on the Reeves County contract prison, the BOP updated the checklist to include an observation step in the health services section that requires onsite monitors to run a chronic care roster in SENTRY to determine whether the contractor is current with follow-up care and appointments.[61]  While the BOP has updated the checklist to include chronic care, the health services section of the checklist still does not include other steps that could help ensure basic medical care, such as verifying that initial examinations and immunizations are provided.

During our site visit to one contract prison, we learned there was no full-time physician, as required by its approved staffing plan, for the 8-month period between December 2013 and August 2014.[62]  The dentist position was also vacant for approximately 6 weeks during this time.  We found that despite these vacancies, which we believe are critical for ensuring basic inmate healthcare, the onsite monitor's checklists showed that the prison was in compliance with all health services observation steps.  However, the BOP's annual CFM review at this prison in August 2014 resulted in a significant adverse finding in health services, with 11 deficiencies in administration and patient care, including 6 repeat deficiencies from the previous year.[63]  The CFM results stated:

> There were inadequate controls in the clinical care and staffing area of Health Services to ensure compliance with established procedures and practices.  These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment.  Many issues from previous [monitoring] have not

---

[60]  SENTRY is the BOP's primary mission support database.  It collects, maintains, and tracks critical inmate information, including location, medical history, behavior history, and release data. SENTRY does not currently track the dates of initial medical examinations and immunizations.

[61]  The BOP's updated observation step on chronic care was not in response to a specific recommendation made in the OIG's 2015 audit of the Reeves County contract prison.

[62]  The OIG also found medical understaffing in the 2015 audit of the Reeves County Detention Center.  DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007*, 22–26.  The report raised concerns that medical understaffing on the part of the contractor was financially incentivized because it cost the contractor less to pay penalty deductions for understaffing than to staff the prison adequately.

[63]  Five of the six repeat deficiencies cited were for failure to provide medical appointments and treatment required by contract and BOP policy, and a sixth deficiency was for not conducting dental appointments as policy required.

been corrected.  Medical needs and documentation were incomplete, including reports.[64]

Specific health services deficiencies cited in the CFM review included failing to provide prescribed antiviral therapy for inmates with hepatitis C, not following up with inmates with positive tuberculosis test results, missing preventive care evaluations and dental exams, and failing to provide some immunizations.  During the period in which these deficiencies occurred, the checklists indicated that the prison was in compliance with all seven of the health services observation steps.  However, none of the seven observation steps touched on the fundamental deficiencies cited by the CFM review.  We believe that PMB should establish additional observation steps in the monitoring checklist to ensure inmates are receiving basic healthcare as required by the contract and to enable earlier identification of deficient inmate health services.

In response to a working draft of this report, the BOP provided the OIG with a copy of a new Health Services report that is generated quarterly by the HSS to provide documentation of any issues reported to the HSS pertaining to medical services at contract prisons, which occurred during the reporting period, and information regarding unresolved issues during prior reporting periods.  According to the BOP, the purpose of the Health Services report is twofold.  First, the report provides objective data of various areas in medical services over a specified time frame.[65]  When sufficient data is collected, statistical analysis can detect significant trends and predict outcomes in contractor performance.[66]  Second, the report provides detailed information regarding how each issue originated, progressed, and resolved.[67]  Such information can be useful in retrospectively evaluating and potentially improving processes within health services.  The BOP stated that the Health Services report is submitted to the Assistant Administrator of Field Operations within 30 days following the end of the quarter.  The report is then distributed to all PMB Administrators.  Any issues warranting contractor attention are discussed by the PFA and onsite monitors for appropriate action.  Finally, the

---

[64]  BOP Program Review Division, *Contract Facility Monitoring Final Report, Eden Detention Center* (August 2014), 3.

[65]  The data sources for the quarterly reports include reports of BOP onsite staff (Senior Secure Institution Manager/Secure Oversight Monitor), contract staff, PFA reports, Office of Medical Designations, and HSS ad hoc reviews.

[66]  The new Health Services report covers Active tuberculosis, Administrative Remedy Responses, Administrative Issues, Catastrophic Cases, Contract Facility Monitoring, Critical Vacancies, Deaths, Hunger Strike, Infectious Disease – Not associated with tuberculosis, Involuntary Treatment, Joint Commission Accreditation, Other Concerns – Not Otherwise Specified, Patient Care, Policy Updates, Reduction in Sentence, Restraints, Sentinel Events/Root Cause Analysis, Subject Matter Expert On-Site Visits, Transfer Requests/Form 770, and Transfer – Treatment Complete – Form 413. The total number of events for each category is calculated and subtotaled for each facility during the reporting period.

[67]  The quarterly report provides a review of any CFM activity, as well as HSS follow-up visits, during the reporting period.  Onsite monitors use the HSS site visit report to supplement their CFM follow-up report.  The HSS site visit report provides medical-specific expertise to the CFM follow-up report.

BOP stated that a new tracking system was generated and the first HSS quarterly report was produced for the third quarter of 2015.

<u>The Checklist Does Not Include Observation Steps to Address Some Vital Functions Related to Correctional Services in the Contract</u>

While the BOP's annual CFM review provides a comprehensive annual audit of the contract prisons' compliance with BOP policy and contract requirements, onsite monitors use the checklist as a monitoring tool on a monthly basis to ensure contract prisons comply with BOP policy and contract requirements between annual audits.  However, the checklist does not include observation steps to address policy requirements related to some of the vital functions in each contract.  For example, one vital function in correctional services, which ensure the safety and security of the prison, states:  "An adequate security inspection system is provided to meet the needs of the institution."  We found that the only related observation step on the checklist does not adequately address this vital function.[68]  The observation step states:  "Include observation of staff routinely performing searches (use of metal detectors, pat searches at entrances/exits)."  However, the checklist does not include any observation step to verify the contractor is performing searches required by BOP and contractor policies in other areas of the prison, including inmate housing units and cells, recreation, work and program areas, medical areas, and visiting areas, or that there is a comprehensive inspection system in place that ensures the safety and security of the prison.[69]

Also, there is no observation step to monitor the inmate urinalysis drug testing program.  BOP policy requires that 5 percent of a prison's population be tested randomly each month.  Specified inmate groups receive additional testing.  For example, members of confirmed disruptive groups must be tested each month. Inmates who have been identified as suspects of prohibited acts, such as drug use, through intelligence gathering are supposed to be tested throughout an extended period of time, and inmates found to have committed prohibited drug-related acts are to be tested monthly for the subsequent 24 months.[70]  Without consistent monitoring to ensure the testing is accomplished, the BOP cannot ensure that contract prisons comply with BOP policy on an ongoing basis.  The annual CFM

---

[68]  In response to a working draft of this report, the BOP stated that the vital function of ensuring security inspection systems can encompass an enormous number of functions and that the language in the checklist reflects this appropriately.  The BOP also specified that there are two checklist steps to ensure security inspection systems are in place by the contractor.  Additionally, the BOP stated that contract prisons are accredited by the ACA, which further requires the contractor to have a security inspection system in place.

[69]  CCA Policy 09-05, Section 5(E) 1-2, for example, requires inmate cells to be searched randomly on a daily basis during each shift.  ACA Standard 4-4192 (2014 supplement) requires that: "Written policy, procedure, and practice provide for searches of facilities and inmates to control contraband and provide for its disposition.  These policies are made available to staff and inmates. The institution's search plans and procedures should include the following:  unannounced and irregularly timed searches of cells, inmates, and work areas; inspection of all vehicular traffic and supplies coming into the institution; etc."

[70]  BOP Program Statement 6060.08, Urine Surveillance and Narcotic Identification (November 24, 1999).

review does include monitoring of inmate urinalysis drug testing, as well as the security inspection system requirement discussed above, but we believe the BOP should consider adding observation steps on the monthly checklist to document compliance between CFM reviews.[71]

In addition, the checklist does not require onsite monitors to verify contract prisons' correctional services staffing levels. Correctional Officers ensure the safe and secure operation of the contract prisons. All contractors have a BOP-approved staffing plan and are required to meet certain staffing levels defined in each contract.[72] For correctional services, if contractors fall below a monthly average of 90 percent of the BOP-approved staffing plan, they are subject to deficiencies and financial deductions. However, there is no observation step to verify that the total number of Correctional Officers is consistent with the BOP-approved staffing plan. Given, for example, Correctional Officer leave, training, and part-time schedules, the actual staffing within contract prisons could fall below staffing levels as stated on monthly invoices. The PMB Administrator told us that this is an oversight activity that onsite staff could perform. We believe that adding an observation step to the checklist to periodically verify that the actual number of Correctional Officers is consistent with the BOP-approved staffing plan will ensure that staffing levels have not fallen below what is required to help ensure a safe and secure environment for staff and inmates.

In a response to a working draft of this report, the BOP stated that the PMB field staff reviews and certifies the monthly invoice and staffing reports that are submitted by the contractors. The invoice and certification memorandum are then reviewed for final certification by the PMB's Assistant Administrator, Support and Development, and routed for payment. The contractors' staffing reports indicate the number of required staff, the number of staff provided, and the percentage of staff provided based on the approved staffing plan. However, based on our review of a monthly invoice and staffing report provided by the BOP, we could not determine whether all staff on duty were actually Correctional Officers.[73] During

---

[71] In response to a working draft of this report, the BOP stated that intelligence gathering is a function obtained, tracked, and analyzed by PMB's two Intelligence Specialists. The PMB Intelligence Specialists remain in constant contact with the contractors' intelligence staff, who provide information related to disruptive groups, cell phone introduction, urinalysis testing, alcohol testing, phone monitoring, and use of force at all current contract locations. The information provided is compiled into a quarterly report that is shared with the PMB field staff. Additionally, the PMB Intelligence Specialists conduct monthly intelligence video conferences among PMB field staff to share intelligence.

[72] A staffing plan lists the number, type, and allocation of the contract prison's staff that is required to be maintained throughout the life of the contract. In addition, each contractor is required to maintain staffing level percentages in correctional services, health services, and all other departments. Appendix 1 provides more detail on staffing levels at each of the three prisons at the time of our review.

[73] Concerns regarding the verification of staffing levels were raised during our site visit to a contract prison. Some Corrections Counselors told us they were being asked to fill in as Correctional Officers in more than just temporary or relief roles, such as when Correctional Officers go to meals or to meetings. PMB onsite staff we interviewed at each contract prison we visited were not aware of such a practice, and we were unable to verify the Corrections Counselors' statements because PMB onsite monitors do not verify the approved staffing plan or the daily roster.

any 3-month period, if the contractor falls below the staffing requirement for 2 months, the PMB staff issues a deficiency.

### The Checklist Contains Vague Observation Steps

We found several vague or repetitive observation steps on the checklist that resulted in inconsistent and insufficiently documented monitoring activities or responses by onsite monitors.  For example, we found that the onsite monitors are supposed to determine whether trends exist in grievances and reports of incidents, but the steps do not describe how monitors are supposed to determine and analyze trends or over what timeframe the trends are to be analyzed.  We reviewed 48 months of the onsite monitors' documentation of the observation steps in these two areas and found that onsite monitors generally record "no identifiable trends" or "no trends," or do not address trends at all.  However, we performed trend analysis on reports of incidents and grievances the BOP collected to determine any significant differences in total numbers from FY 2011 through FY 2013 for the three contract prisons we visited.  At one contract prison, we found that reports of incidents had increased 192 percent from FY 2011 through FY 2013, yet monitors in the facility had not reported or analyzed the trend.  We believe that such limited responses from onsite monitors may be the result of unclear expectations for determining, analyzing, and documenting trends on a monthly oversight tool.  However, we found it troubling that the PMB's Assistant Administrator told us that he does not think it is necessary for the PMB to look at long-term trends.  While the BOP's primary responsibility is to monitor the contractor, identifying and analyzing trends is crucial to enabling the BOP to identify potential problem areas that could affect inmate safety and security, to enhance monitoring efforts in those specific areas, and to notify the contractor to promptly identify causes and solutions.

Another vague observation step states:  "The contractor is responsible for the movement of inmates within a 400-mile radius of the contract facility.  Observe actual process of inmate movement."  The observation step includes examples of inmate transportation; however, there is no guidance on what specifically should be observed and how often or how many times it should be observed.[74]

We also found that, due to such vague observation steps, onsite monitors varied in how they documented their observations and PFAs had inconsistent expectations regarding how onsite monitors were to complete the observation steps to ensure the contractor is performing in accordance with BOP standards.  We showed the three regional PFAs examples of onsite monitors' documentation regarding the inmate movement observation step and asked whether the documentation met their expectations.  Each PFA had a different understanding and expectation for what the observation step required and what they believed would be adequate documentation from the onsite monitors.  As a result, their

---

[74]  Following the OIG's 2015 Reeves County audit report, the BOP revised this observation step to include the words, "to ensure procedures are in accordance with contractual and policy requirements" (see Appendix 3 of the current report).  However, the BOP's revision still does not specify how often or how many times the movements should be observed.

assessment of the adequacy of the onsite monitor's responses varied, as did the rationale for those assessments, an example of which is shown in Table 4.

**Table 4**

**Onsite Monitor Response to an Observation Step and PFA Expectations from Onsite Monitors**

| Observation Step | Onsite Monitor Response | PFAs | | |
|---|---|---|---|---|
| | | PFA 1 | PFA 2 | PFA 3 |
| The contractor is responsible for the movement of inmates within a 400-mile radius of the contract facility. Observe actual process of inmate movement. Examples of inmate/ transportation include, but are not limited to, outside medical care, funeral and bedside trips, transfer or movement to/from other government facilities and airlift sites. | The contractor escorted nine inmates in medical trips during this observation period.<br><br>The contractor is responsible for movement inside a 400-mile radius. The contractor has been making regular weekly scheduled transfers. The contractor also receives Self Surrenders. | The response is inadequate. The onsite monitor should observe an actual inmate movement. | The response is inadequate. The PFA would expect to see if policies were followed, if there were any concerns, and any security considerations. | The response is adequate because the onsite monitor recorded what they observed. |

Sources: Large Secure Adult Contract Oversight Checklist and OIG interviews with PFAs

We also found observation steps that were repetitive. One observation step stated: "Review the results of internal/external audits conducted during this period. Determine if corrective action has been implemented as reported by contractor. This includes a sampling of corrective actions to the CFM, ACA, and corporate audits." Another observation step stated: "List all internal/external audits conducted this period." These two observation steps required onsite monitors to review the same audit documents. During the OIG audit of the Reeves County contract prison, auditors were told that having these duplicative observation steps was confusing to the monitors, with the result that the monitors did not fully complete the steps.[75]

In our 2015 audit report on the Reeves County contract prison, we recommmended that the BOP consider consolidating the two quality control observation steps in the checklist into a single observation step, as well as consider reviewing and updating guidance provided to PMB field staff to ensure the onsite monitors provided accurate and complete information in their monthly checklists. In response, the BOP combined the two repetitive observation steps into one observation step on the checklist and drafted guidance to PMB field staff to ensure that the checklist was accurate and complete. While the recommendation in the 2015 report did not ask the BOP to revise the whole checklist, the BOP chose to do

---

[75] DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007,* 30.

so. We believe that, although the BOP addressed the recommendation in the 2015 report by updating the checklist, it still should address some of the observation steps that are vague, such as how monitors are supposed to analyze trends and monitor inmate movement.

### The BOP Lacks a Regular, Substantive Review Process for the Oversight Checklist to Ensure that Observation Steps Verify Contract Compliance

Although the checklist is one of the tools the PMB onsite staff uses to monitor contractor compliance and performance, it is not substantively reviewed on a regular basis to ensure that it is the most effective and efficient tool possible. We found that the PMB does not ensure its observation steps represent the most important activities that onsite monitors should observe to ensure contract compliance. The PMB Administrator told us that the PMB reviews the operating procedures annually and that the checklist is an attachment to those operating procedures. However, the PFAs stated that revisions to the checklist usually occur only in response to a significant incident. For example, one PFA said that in 2012 the PMB added an observation step to the checklist to require the onsite monitors to review video recordings of SHUs in the aftermath of a suicide in one contract prison. We found that the checklist was last updated in 2012 in response to this and other incidents at contract prisons and has not been updated since then.[76] As a result of the lack of regular, substantive review of the oversight checklist, the BOP cannot be certain that the observation steps in its primary onsite monitoring tool effectively verify contractor compliance.

In response to the Reeves audit report, the BOP updated the checklist and provided additional guidance to PMB field staff to ensure the checklist is filled out accurately and completely. Additionally, in response to a working draft of this report, the BOP stated that the regional PFA reviews the checklist monthly to ensure the onsite monitors complete each observation step. When comments or concerns arise, the PFA annotates such by the affected step.[77] PFAs present and address appropriate information obtained from checklist during weekly PMB Administrator meetings. While the BOP's action is commendable, we believe that the BOP should review the checklist regularly and proactively, rather than reactively, such as in response to a significant incident, to determine whether the observation steps need updating.

---

[76] A PFA told us that the PFAs and BOP management planned to discuss whether the contractors' quality control programs and the BOP's Quality Assurance Plan are doing what they want, including whether the observation steps in the checklist and onsite monitor responses to the observation steps are appropriate. The PMB planned to hold this discussion in December 2014 but delayed the meeting so that it could consider the results of this review during that process.

[77] The BOP provided the OIG with a copy of an annotated checklist. According to the BOP, there is no policy or guidance regarding the reviewing and revising of the checklist. The updating of the checklist is done on an as-needed basis.

<u>Onsite Monitors at the Contract Prisons We Visited Did Not Use the
Monitoring Logs to Track Contractors' Corrective Actions</u>

When the BOP identifies deficiencies in contractor performance through CFM reviews or notices of concern (NOC), the contractor must submit a corrective action plan to the onsite monitors. The PMB operating procedures require onsite monitors to maintain monitoring logs to track and review the results of internal and external audits required by each contract. We found that onsite monitors in the three contract prisons we visited did not consistently use monitoring tools such as the monitoring logs to document whether the contractor had successfully corrected deficiencies identified by external audits.

Additionally, the onsite monitors received the results of the contractors' internal quality control audits but did not regularly document on the monitoring logs whether the contractors had corrected those deficiencies. One onsite monitor told us that he would take it as "gospel" if the contractor told him it had found and corrected deficiencies during its monthly internal audits.

Our 2015 report on the Reeves County contract prison found that onsite monitors were not using monitoring logs to document their monitoring and follow-up on the contractor's corrective actions. We recommended that the BOP take steps to ensure that PMB field staff at Reeves County document its follow-up efforts to ensure that the contractor's corrective actions are monitored and addressed in a timely manner. In response to the OIG's recommendations, the BOP has incorporated the functions of the monitoring log into the checklist to include an observation step for documenting follow-up efforts on corrective actions. We believe that the BOP's actions will help ensure the onsite staff tracks corrective actions consistently.

*Monitoring of Health Services for Contract Compliance Lacks Coordination among BOP Staff Responsible for Health Services Oversight*

One major area of concern with the BOP's monitoring of contract prison facilities is whether inmates are receiving adequate medical care. Four separate oversight activities regarding contract prison health services involve both medical and nonmedical specialists. These oversight activities are: (1) ongoing PMB onsite monitoring of contract compliance, including health services; (2) annual reviews by the PMB's HSS; (3) an annual CFM review, which includes a physician who evaluates the health services operations; and (4) contract physician mortality reviews of each contract prison inmate death when it occurs.[78] We found that communication between staff responsible for these oversight activities is limited, that they do not routinely share the results of the various reviews, and that no one person or office reviews the monitoring results. Additionally, while the onsite

---

[78] When an inmate dies in a contract prison, within 24 hours the contractor is required to conduct a mortality review and submit to the BOP a written report that includes a clinical synopsis of events leading up to the death. BOP policy then requires that a physician external to the BOP independently review the contractor's mortality review. The BOP's mortality reviews are the responsibility of the HSD.

monitors generally receive the results of the HSS and CFM reviews as well as the results of individual mortality reviews performed by the BOP's contract physician, we found that there are no procedures for them to require corrective action from the contractor when the BOP's contract physician identifies deficiencies during an individual mortality review. This resulted in deficiencies going uncorrected for extended periods. Accordingly, we determined that the BOP is unable to effectively identify problem areas among the contract prisons or contractors or to proactively take action before a problem becomes acute or systemic.

In order to ensure that inmates in contract facilities are getting appropriate healthcare, it is vital that health services information be shared among the PMB's onsite monitors, the Program Review Division's CFM physician, the PMB's HSS, and the BOP's contract physician in the HSD. The PMB's operating procedures state that "PMB staff is encouraged to maintain an open dialog with CFM staff and provide correspondence highlighting any problems or concerns." However, we identified instances in which health services information sharing was not occurring. For example:

- The HSS shares responsibility for coordination and oversight of the delivery of health services in contract prisons and, among other duties, is responsible for providing professional guidance to contract prison medical staff and developing procedures that describe how medical care of inmates is assessed, evaluated, and documented. However, we found that at the time of our review the HSS responsible for overseeing the delivery of health services in all of the contract prisons did not have input into the development of the health services observation steps in the checklist used by the onsite monitors; was unfamiliar with the checklist; and did not receive monthly copies of completed checklists from the onsite monitors.[79]

- The CFM physician and the BOP's contract physician both review the contractor's procedures and the circumstances surrounding inmate deaths at the contract prisons for the required mortality review. However, the CFM physician told the OIG that he is unsure whether the BOP's contract physician reviews all of his reports and he has never seen any of her reports.

Further regarding mortality reviews, we found that: (1) there are no procedures or guidance for the onsite monitors to require corrective action from the contractor when the BOP's contract physician identifies deficiencies and (2) the BOP's CFM physician, instead of the BOP's contract physician, was conducting the contract prisons' mortality reviews, which is inconsistent with the requirements in the contract. According to the contract, the BOP must have an external physician consultant to review all mortality records quarterly. The contract also states that, if

---

[79] In response to a working draft of this report, the BOP informed us that when the PMB revised the checklist following the OIG's 2015 report on the Reeves County contract prison, the HHS did provide input into the checklist revisions. The BOP further informed us that, "Any concerns identified by oversight staff regarding health services from the checklist steps are often discussed by field staff with the HSS and PFA to determine the level of non-compliance and what action(s) should be taken. All future revisions to the health services component on the checklist will include the HSS."

the external consultant (the BOP's contract physician) recommends improvement action, the contractor must address each recommendation and report any actions taken to the BOP Medical Director within 90 days of receiving the recommendations.  When mortality reviews identified deficiencies, the reviewing CFM physician did not provide the onsite monitors with guidance on what corrective actions they should require from the contractor.[80]  We found examples at both the Eden Detention Center and the Rivers Correctional Institution where the reviewing CFM physician had cited deficiencies, such as delayed or incomplete treatment, in the contractors' medical management or protocols surrounding an inmate death.  In one instance, when an inmate had trouble breathing, the contract prison medical staff told him to place a sick call, which would put him on a list of inmates waiting to be seen by medical personnel instead of being treated immediately.  However, after he died, the mortality reviews showing this deficiency gave the onsite monitors no guidance on what steps to take to require corrective action.  As a result, contractor deficiencies went uncorrected and corrective actions were delayed at both facilities.[81]  Delaying corrective action increases the likelihood that deficiencies identified in a mortality review could be repeated, thus putting other inmates at risk.[82]

We believe that the communication among the PMB, the Program Review Division, and the HSD needs to be improved, and that the roles of those responsible for ensuring health services are provided to federal inmates housed at contract prisons should be more clearly defined.  Without proper information sharing and coordination in the oversight of health services at the contract prisons, there is the risk to inmates from healthcare deficiencies that may not be identified or addressed in a timely fashion, as well as a significant potential for wasted resources such as time and costs in the BOP's duplication of efforts.  The latter may also result in the BOP paying for duplicate services or for services that are not actually provided.[83]

In response to a working draft of this report, the BOP stated that there is ongoing communication between those responsible for determining whether

---

[80]  By contrast, when the CFM physician finds deficiencies related to inmate deaths during the annual CFM review, the onsite monitors must require corrective action from the contractor.

[81]  An onsite monitor told us he had discussed the mortality review results with his supervisor, a PFA; but they decided not to issue a NOC because it was the reviewing physician's word against the contractor staff physician's and they did not have the medical expertise to judge between them.  Rather, they decided to wait until the next annual CFM review for a determination of whether to require corrective action from the contractor.

[82]  In response to a working draft of this report, the PMB Administrator told us that since April 2015 the CFM physician is no longer conducting the mortality reviews and that the contract physician is conducting all mortality reviews for both BOP institutions and contract prisons.  The contract physician now writes recommendations for deficiencies found during the mortality review, as required by the statement of work.  According to the BOP, the contract physician has conducted a total of six mortality reviews since April 2015.  Of the six reviews conducted, one contained a recommendation.

[83]  The Government Accountability Office (GAO) found that insufficient monitoring of corrective actions in BOP institutions leads to repeated deficiencies and significant findings that weaken the BOP's opportunity to maximize cost savings in correctional services.  GAO, *Bureau of Prisons: Information on Efforts and Potential Options to Save Costs*, GAO-14-821 (September 2014) (accessed July 28, 2016).

healthcare requirements are being met in the BOP's contract prisons. The PMB Assistant Administrator, Field Operations, supervises the HSS and ensures CFM follow-up visits and quarterly reports are completed in a timely manner. The Assistant Administrator also provides guidance regarding PMB policy and operations, as well as administrative support, including travel and equipment authorizations. In addition, the HSS communicates freely with the HSD regarding any matters involving medical services at contract prisons.[84] The HSS reviews the CFM reports and working papers generated by the CFM physician and CFM Health Services Examiner. The HSS uses the CFM reports and working papers to focus the scope of the CFM follow-up site visits. The CFM staff is available to clarify any items in the CFM reports; however, according to the BOP, the need for clarification has been minimal since the CFM reports have proven to be thorough and unambiguous.

---

[84] The BOP stated that the HSS has worked closely with several staff in the HSD, including the Medical Director, Assistant Director, Senior Deputy Assistant Director, National Health Services Administrator, Assistant National Health Services Administrator, Chief of Quality Management, National Infection Control Consultant, Chief Social Worker, Chief Psychiatrist, Chief of Medical Designations, Regional Medical Director, Regional Quality Managers, Regional Social Workers, and Regional Counsel.

# CONCLUSION AND RECOMMENDATIONS

**Conclusion**

The BOP's mission is to protect society by confining federal offenders in correctional facilities that are safe, humane, cost-efficient, and secure, and to provide reentry programming to ensure their successful return to the community. To carry out this mission, the BOP relies on contract prisons to house federal inmates and help alleviate overcrowding at its own institutions. To ensure these prisons house inmates in a safe and secure environment and that they comply with their contracts, the BOP has developed a multilayered approach to monitoring them.

In a majority of the categories we examined, we found that contract prisons incurred more safety and security incidents per capita than comparable BOP institutions and that the BOP could improve its contract monitoring efforts in several areas. Our analysis of data on safety and security indicators found that contract prisons had more incidents per capita than BOP institutions in three-quarters of the categories we examined. While the contract prisons had fewer positive inmate drug tests and sexual misconduct allegations than BOP institutions, they had more frequent incidents of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances. Neither we nor the BOP know the extent to which demographic factors play a role in these differences; but, in order to ensure that federal inmates are housed in safe and secure facilities, the BOP should evaluate why contract prisons had more safety and security incidents in these categories and identify possible approaches for corrective action.

The three contract prisons we visited were all cited for one or more safety and security deficiencies during the review period. Because the contractors corrected the deficiencies the BOP had found, the BOP determined that the prisons were sufficiently compliant with the safety and security aspects of their contracts to continue their contracts with them. However, the BOP still must improve its oversight to ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons. We also found that contract prisons we visited housed new inmates in Special Housing Units, inconsistent with American Correctional Association standards and BOP policy. The OIG brought this to the BOP's attention, and the BOP immediately took corrective actions to address it.

In addition to the current review, in April 2015, the OIG issued an audit report on the Reeves County contract prison that included findings and recommendations related to the BOP's monitoring of all contract prisons. Throughout this report, we note several corrective actions the BOP has taken to improve its monitoring of contract prisons in response to the OIG's 2015 audit report, including in the areas of health and correctional services. We also note several steps the BOP has taken in response to concerns identified in that report. Commendable as these steps are, we identified in this review additional areas in the

BOP's monitoring of its contract prisons that could be improved. First, as a monitoring tool to ensure compliance with BOP policy and contract requirements, onsite monitors use the Large Secure Adult Contract Oversight Checklist (checklist) of observation steps related to each operational area established in the contact. However, the checklist does not address certain important policy and contract requirements in the areas of health and correctional services. For health services, the checklist does not include observation steps to verify that inmates receive a number of basic medical services. Similarly, for correctional services, the checklist does not include observation steps to address policy requirements related to some of the contracts' vital functions, such as providing an adequate security inspection system. Deficiencies related to contract prisons' security inspection systems could jeopardize the safety and security of inmates and prison staff, and the BOP should address them promptly.

Finally, we found that the checklist contains vague observation steps, which may cause confusion and may result in onsite monitors not fully completing the observation steps. With more specific observation steps and clearer expectations for how onsite monitors should document their observations, the BOP could better ensure accurate and consistent monitoring of each contract prison. Moreover, the BOP should review the checklist regularly and proactively, rather than reactively, such as in response to a significant incident, to reflect the most important activities for contract compliance and determine whether the observation steps need updating.

## Recommendations

To ensure that the contract prisons are, and remain, a safe and secure place for housing federal inmates, we recommend that the BOP:

1.  Convene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions in a number of key indicators, and identify appropriate action, if necessary.

To improve monitoring and oversight of BOP contract prisons, we recommend that the BOP:

2.  Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.

3.  Ensure that correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.

4.  Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

# METHODOLOGY OF THE OIG REVIEW

In this review, the OIG examined the BOP's monitoring of its 14 private contract prisons from FY 2011 through FY 2014. We also examined how the contractors performed in selected areas related to inmate safety and security and how the contract prisons compared to similar BOP institutions on those indicators. Our fieldwork, from April 2014 through February 2015, included interviews, site visits to three contract prisons, data analysis, and document reviews. The following sections provide additional information about our methodology.

## Interviews

We interviewed 16 BOP officials and staff with roles in overseeing and monitoring contract prisons, as well as an external medical consultant. From the Correctional Programs Division's Privatization Management Branch (PMB), we interviewed the Administrator, an Assistant Administrator, two Intelligence Specialists, a Disciplinary Hearing Officer Specialist, a Health Services Specialist, and three Privatization Field Administrators. From the Program Review Division, we interviewed a Medical Officer. We also interviewed the Chief of the Quality Management Branch within the Health Services Division.

During our site visits, we interviewed five PMB onsite monitors and one Contracting Officer. The PMB briefed us on its role in managing and monitoring the contract prisons. We also interviewed 34 contract prison staff, including Wardens, Assistant Wardens, Chiefs of Security, intelligence staff, Special Housing Unit (SHU) staff, Disciplinary Hearing Officers, grievance coordinators, unit managers, counselors, case managers, compliance and quality assurance managers, and an interpreter. Finally, we interviewed 28 contract prison inmates, including 10 housed in SHUs at the time of our interviews.

## Site Visits

We visited three contract prisons, one from each private contractor: Giles W. Dalby Correctional Facility (Management and Training Corporation (MTC)), Eden Detention Center (Corrections Corporation of America (CCA)), and Rivers Correctional Institution (GEO Group (GEO)). We selected our site visits based on a comparison of data analysis results from the 14 contract prisons for FY 2011 through FY 2013 (FY 2014 data was not yet available at the time of the site selection analysis). We requested and received from the BOP data in eight categories we considered indicators of prison safety and security:

1. contraband,
2. reports of incidents,[85]

---

[85] In this category we analyzed assaults by inmates on inmates, assaults by inmates on staff, sexual assaults by inmates on staff, deaths, fights, cell fires, suicide attempts and self-mutilation (combined), suicides, disruptive behavior, and uses of force.

3. lockdowns,
4. inmate discipline,
5. telephone monitoring,
6. grievances,
7. urinalysis drug testing, and
8. notices of concern (NOC).

We selected these categories of data to analyze as potential safety and security indicators because they provided information on areas addressed by American Correctional Association (ACA) standards on security and control, inmate rules and discipline, and inmate rights. Additionally, these data were tracked by the contract prisons.

For each type of data, we calculated monthly or annual averages per capita, then ranked the 14 contract prisons from the highest to lowest averages. Each prison that fell in the highest three averages on a measure was assigned three, two, or one points, respectively, for that measure based on whether it had the first, second, or third highest average. Additionally, we weighted some data categories that we deemed to be of greater significance for security by adding an additional point to those already given by the rankings (that is, those categories received four, three, or two points, respectively).[86] We then ranked each contract prison based on how many points it received and selected the contract prisons that received the most points from each of the three contractors for our site visits.

During the site visits, we toured the contract prisons, including the SHUs; interviewed staff and inmates; attended staff meetings; reviewed log books; and observed the activities of staff and inmates. Below is a brief profile of each contract prison at the time of our site visits.

*Giles W. Dalby Correctional Facility (Dalby)*

MTC operated the Dalby Correctional Facility in Post, Texas. As of the end of FY 2014, the prison housed an average of 1,800 inmates daily. The average age of inmates at Dalby was 38, and its average sentence length was 59 months. The top three inmate offenses at Dalby were drug trafficking (47 percent), immigration (47 percent), and violence (3 percent). At the time of our review, the staff-to-inmate ratio was 1:6 and the Correctional Officer ratio was 1:11. Dalby's overall staffing was at 92 percent; its Correctional Officer staffing was at 91 percent; and its medical staffing was at 90 percent. Dalby provided specialized vocational classes such as electrical trade, building trade, and computer-assisted drafting. Dalby offered inmate programs that exceeded the minimum requirement of its contract.

---

[86] The weighted categories were contraband, selected types of incident reports, lockdowns, discipline, selected types of grievances, positive drug tests, and NOCs.

*Eden Detention Center (Eden)*

CCA operated the Eden Detention Center in Eden, Texas.  As of the end of FY 2014, the prison housed an average of 1,458 inmates daily.  The average age of inmates at Eden was 39, and its average sentence length was 67 months.  The top three inmate offenses at Eden were drug trafficking (48 percent), immigration (46 percent), and violence (3 percent).  At the time of our review, the staff-to-inmate ratio was 1:6 and the Correctional Officer ratio was 1:9.  Eden's overall staffing was at 89 percent; its Correctional Officer staffing was at 87 percent; and its medical staffing was at 78 percent.  Specialized inmate programs included eyeglass repair, crocheting, and computer classes.  Like Dalby, Eden offered inmate programs that exceeded the minimum requirement of its contract.

*Rivers Correctional Institution (Rivers)*

GEO operated the Rivers Correctional Institution in Winton, North Carolina.  As of the end of FY 2014, the prison housed an average of 1,414 inmates daily.  The average age of inmates at Rivers was 40, and its average sentence length was 86 months.  The top three inmate offenses at Rivers were drug trafficking (43 percent), immigration (18 percent), and violence (20 percent).  At the time of our review, the staff-to-inmate ratio was 1:4 and the Correctional Officer ratio was 1:9.  Rivers' overall staffing was at 96 percent; its Correctional Officer staffing was at 94 percent; and its medical staffing was at 92 percent.  Specialized inmate programs included commercial driver's license, building construction technology, and computer applications.  In addition, Rivers offered a work program whereby inmates repaired used wheelchairs to be sent to people in need around the world.  Since Rivers housed inmates to be released and returned to the Washington, D.C., area, it also had reentry and drug abuse programs.  Like Dalby and Eden, Rivers offered inmate programs that exceeded the minimum requirement of its contract.

## Data Analysis

We analyzed security-related data from the 14 contract prisons and a select group of 14 comparable BOP institutions to evaluate how the contract prisons performed relative to the selected BOP institutions.  The comparable BOP institutions housed male inmates with the same security level (low), similar population sizes, and similar geographical locations as the 14 contract prisons.[87] For our comparison, we used BOP institutions in the following locations:

- Allenwood (Pennsylvania),
- Bastrop (Texas),
- Beaumont (Texas),
- Big Spring (Texas),
- Butner (North Carolina),

---

[87] Most of the contract prison inmates were criminal aliens, and many were serving time for immigration offenses; most of the inmates in the BOP institutions were U.S. citizens.

- Elton (Ohio),
- Forrest City (Arkansas),
- La Tuna (Texas),
- Loretto (Pennsylvania),
- Oakdale (Louisiana),
- Seagoville (Texas),
- Terminal Island (California),
- Texarkana (Texas), and
- Yazoo City (Mississippi).

To conduct our analysis, we requested from the BOP eight categories of data from FY 2011 through FY 2014:

1. contraband,
2. reports of incidents,[88]
3. lockdowns,
4. inmate discipline,
5. telephone monitoring,
6. grievances,
7. urinalysis drug testing, and
8. sexual misconduct.

We selected these categories of data to analyze as potential safety and security indicators because they provided information on areas addressed by ACA standards on security and control, inmate rules and discipline, and inmate rights, and because these data were tracked by both the contract prisons and the BOP institutions.

For the contract prisons, a primary source of data for monthly inmate population snapshots, cell phone confiscations, reports of incidents, telephone monitoring, and urinalysis drug testing was the PMB Special Investigative Supervisor Monthly Tracking and Monitoring Report, which consolidated the monthly intelligence reports the individual contract prisons submitted to the PMB. The individual contract prisons provided data to the BOP on confiscations of contraband drugs, tobacco, and weapons; lockdowns; and grievances. The BOP provided information on BOP institutions and on inmate discipline in both BOP and contract prisons. Its sources included SENTRY, TRUINTEL (for confiscations of contraband drugs, tobacco, and weapons), and its annual Cell Phones Recovered reports (for confiscations of contraband cell phones). The BOP's Office of Internal Affairs provided data on allegations of sexual misconduct by staff against inmates for both the contract prisons and the BOP institutions.

Since the contract prisons and BOP institutions had a range of inmate population sizes that varied from month to month, we adjusted for these population

---

[88] The specific types of reports of incidents we analyzed in this category included assaults by inmates on inmates, assaults by inmates on staff, sexual assaults by inmates on staff, deaths, fights, cell fires, suicide attempts and self-mutilation (combined), suicides, disruptive behavior, and uses of force.

differences by calculating rates per capita where possible. As of September 2014, the combined inmate population of the 14 contract prisons was 27,987 and the combined population of the 14 BOP institutions was 22,562. In most cases we calculated the average annual rate per capita, or, where monthly data was available, the average monthly rate per capita. Since the per capita figures often ranged from .001 to .00001, except where otherwise noted in the body of the report, we give per capita rates per 10,000 inmates to present the numbers in an accessible format. In some cases we also provided total numbers unadjusted for population differences to give the reader additional perspective on the scope of the data we analyzed.

To perform the analysis, we calculated both summary and average monthly or annual per capita figures for each prison, the aggregate for both contract prisons and BOP institutions, and the same figures for all contract prisons by each of the three contractors. We also compared the data analysis results between individual contract prisons by examining how often each prison fell in the highest or lowest three on each indicator. To calculate the averages per capita, we used monthly and annual population snapshot data the BOP provided for each contract prison and BOP institution. To calculate percentage differences between various indicators for our comparisons between the contract prisons and BOP institutions, we used a standard formula to divide the difference between the two numbers by their average. That is, where the first value is $x$ and the second value is $y$, we used the formula $[(x-y)/([x+y]/2)]*100$. We present the results of the analysis in the color-coded Table 8 in Appendix 7. In Table 8, we designate as "roughly equal" those indicators where the average difference per 10,000 inmates times the number of months or years comprised less than 3 percent of the total number of occurrences over the 4-year period.

**Document Review**

We reviewed BOP and contractor documents, including the contracts established between the BOP and each contractor, program statements, policy documents, operating procedures, quality assurance plans, quality control plans, monthly intelligence reports, personnel position descriptions, performance work plans, contractor staffing plans, and Contractor Performance Assessment Reporting System reports. We also reviewed BOP onsite contract monitoring documents including monthly checklists, monthly performance meeting minutes, monthly logs, annual and semiannual performance reports, contractor self-assessments, Contract Facility Monitoring (CFM) reports, NOCs, letters of inquiry, and summaries of corrective actions in response to CFM deficiencies and NOCs. From the contract prisons, we reviewed sample reports of incidents, use-of-force after-action reports, contractor internal audit reports, inmate grievances, grievance logs and grievance summary reports, Disciplinary Hearing Officer reports, discipline logs, SHU reports, SHU logs, intelligence meeting minutes, and institutional intelligence reports. Finally, in the area of health services, we reviewed screenshots and tutorials from electronic recordkeeping systems, mortality reviews for contract prison inmate deaths, and CFM working papers.

# CONTRACT PERFORMANCE REQUIREMENTS AND VITAL FUNCTIONS

Table 5 lists each contract requirement and the vital functions essential to successful performance, summarizes the vital functions, and specifies the percentage of total contract value attributable to each contract requirement.

## Table 5

## Performance Requirements Summary

| CONTRACT REQUIREMENT: ADMINISTRATION (Quality Control) | 10% |
|---|---|
| Vital Function #1 | The contractor's Quality Control Program serves to identify deficiencies in the quality of services throughout the entire scope of the contract and implements corrective action before the level of performance becomes deficient. |

| CONTRACT REQUIREMENT: CORRECTIONAL PROGRAMS (Unit/Case Management, Grievance Procedures) | 10% |
|---|---|
| Vital Function #2 | Inmates are appropriately classified and managed commensurate with security and custody requirements to promote institution and public safety. |
| Vital Function #3 | Staff evaluates the needs of inmates and manages their program participation. |
| Vital Function #4 | Staff is accessible and communicates effectively with inmates to promote positive institutional adjustment. |
| Vital Function #5 | A program for inmate grievances exists, which provides for the expression and resolution of inmate problems. |

| CONTRACT REQUIREMENT: CORRECTIONAL SERVICES (Security/Control/Inmate Accountability/ Computer Security and Information Systems) | 20% |
|---|---|
| Vital Function #6 | A safe and secure environment is provided for staff and inmates through effective communication of operational concerns. This includes verbal and written instructions, post orders, institution supplements, information dissemination, training, and crisis prevention. |
| Vital Function #7 | Intelligence information related to security concerns is gathered for dissemination to appropriate contract and BOP staff. |
| Vital Function #8 | An adequate security inspection system is provided to meet the needs of the institution. |
| Vital Function #9 | An adequate level of emergency readiness is maintained to respond to institution emergencies. |
| Vital Function #10 | Appropriate operational and security requirements applicable to all computer and information systems are maintained. |

| CONTRACT REQUIREMENT: FOOD SERVICE | 15% |
|---|---|
| Vital Function #11 | Policy, procedures, and practices are in place for a safe, secure, and sanitary environment. |
| Vital Function #12 | Meals are nutritionally adequate, properly prepared, and attractively served. |
| Vital Function #13 | Policy, procedures, and essential resources are identified, developed, and managed to meet the operational needs of the Food Service Program. |

51

# Table 5 (Cont'd)

| CONTRACT REQUIREMENT: | HEALTH SERVICES | 15% |
|---|---|---|

| Vital Function #14 | Open access to healthcare is provided for all inmates in an environment that is safe and secure. |
|---|---|
| Vital Function #15 | Quality healthcare is provided utilizing qualified personnel and resources in accordance with applicable standards. |
| Vital Function #16 | Health information data is recorded accurately, legibly, in a timely manner and maintained in accordance with applicable BOP policy. |
| Vital Function #17 | All inmates are screened for mental health, substance abuse, and other behavioral problems and receive appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. |

| CONTRACT REQUIREMENT: | HUMAN RESOURCES | 10% |
|---|---|---|

| Vital Function #18 | Adequate staffing levels are maintained. |
|---|---|
| Vital Function #19 | Staff resources are properly administered and managed. |
| Vital Function #20 | All resources are managed to ensure training requirements and needs are provided. |

| CONTRACT REQUIREMENT: | INMATE SERVICES (Commissary/Laundry/Telephone/Trust Fund) | 15% |
|---|---|---|

| Vital Function #21 | Inmates are provided the privilege of an inmate telephone system and obtaining merchandise through the operation of a commissary. Effective security measures are in place to prevent misuse of the telephone system. |
|---|---|
| Vital Function #22 | Inmate funds and property are properly maintained and accounted for during incarceration. |
| Vital Function #23 | Clothing, linens, toiletries, and laundry services are provided to inmates. |

| **(Education and Recreation Programs)** | |
|---|---|
| Vital Function #24 | The needs of the inmate population are evaluated and General Educational Development, English as a Second Language, and recreational programs are provided. Programs are accessible for the inmate population, and program availability is communicated. |

| **(Mail/Receiving and Discharge/Records)** | |
|---|---|
| Vital Function #25 | The institution provides inmate mail services, which include timely processing and accountability of funds, special mail, and general correspondence. Special care is given to the detection of contraband and prohibited acts. |
| Vital Function #26 | Inmates are lawfully committed and processed in a safe and secure environment, with emphasis on the detection and elimination of contraband from their persons and property. |
| Vital Function #27 | The appropriate execution, processing, and verification of documents are performed to ensure the accurate and timely release of inmates. |

| **(Religious Services)** | |
|---|---|
| Vital Function #28 | Impartial religious leadership is provided through resources and programs to accommodate the free exercise of religion and diverse needs of inmates. |

| CONTRACT REQUIREMENT: | SAFETY AND ENVIRONMENTAL HEALTH/FACILITIES | 5% |
|---|---|---|

| Vital Function #29 | All facilities are safely operated and maintained in accordance with applicable laws, codes, and regulations. |
|---|---|

Source: BOP

# LARGE SECURE ADULT CONTRACT OVERSIGHT CHECKLIST OBSERVATION STEPS IN CORRECTIONAL AND HEALTH SERVICES

**Table 6**

**Observation Steps in Correctional Services and Health Services**

| No. | Sample Correctional Services Observation Steps |
|---|---|
| (1) | Observe to determine if the contractor is providing perimeter security in accordance with the contract. |
| (2) | Observe SHU [special housing unit] procedures during all three shifts and compare observations to contractor policy, practices, procedures, i.e., movement of inmate in appropriate restraints, property allowances, security practices, and visits by required staff. |
| (3) | The contractor is responsible for the movement of inmates within a 400-mile radius of the contract facility. Observe actual process of inmate movement to ensure procedures are in accordance with contractual and policy requirements. Examples of inmate/ transportation include, but are not limited to, outside medical care, funeral and bedside trips, transfer or movement to/from other government facilities, and airlift sites. |
| (4) | Observe vehicle sally port operations to determine if they are consistent with the contractor's policy and procedure manual. |
| (5) | Observe contractor's procedures for processing incoming packages and boxes to ensure they are in accordance with local policy. |
| No. | All Health Services Observation Steps |
| (1) | Observe access to health records and verify that access is controlled by the health authority. |
| (2) | In the event of an inmate death:<br><br>A. Did the contractor immediately notified BOP and submitted a written report within 24 hours,<br>B. Did the contractor obtained fingerprints of the deceased (right thumb or right index and dated & signed the fingerprint card and hand delivered the fingerprint card to the COR.<br>C. If death is due to violence, accident surrounded by unusual or questionable circumstances, or is sudden and the deceased has not been under immediate medical supervision did the contractor notify the coroner of the local jurisdiction to request review of the case, and if necessary, examination of the body.<br>D. Review contractor's records to determine if the deceased inmate's property was inventoried & forwarded to the designated family member, the nearest of kin, or the Consular Officer of the inmate's country of legal residence.<br><br>**Note: SSIM shall track the timely submission of the contractor's mortality review and follow up to ensure a response is received from Health Services Division.** |
| (3) | Review any allegations of sexual abuse/assault to ensure the procedures followed were in accordance with the BOP program statement. (Reported via 583, Sentry assignments keyed, follow ups conducted timely, etc) |

## Table 6 (Cont'd)

| No. | All Health Services Observation Steps (Cont'd) |
|---|---|
| (4) | Observe inmates housed in observation cells or cells in medical and determine if the:<br><br>A. Logs are maintained in accordance with contractor's policy?<br>B. Inmates are receiving services in a timely manner (i.e., food service, hospital rounds, etc.)?<br>C. Inmates on suicide watch are supervised in accordance with local procedures? |
| (5) | Observe Health Services staff interactions with inmates to determine if inmates are being afforded confidentiality, supervision in medical, etc. |
| (6) | Check bio-hazard procedures to ensure they are in accordance with contractor's policy. |
| (7) | Run a Chronic Care roster (SMDG eq N***/Column #4 SELD, #5 ARSD/Seq 4)  Determine if contractor is current with follow up care and appointments – any dates are past due. |

Note:  At the time of our review, the complete checklist contained nearly 70 observation steps in 8 categories, including the correctional services and health services steps listed here.  The BOP revised some of the observation steps in the checklist in response to the 2015 OIG audit on the Reeves County contract prison.  The red text above reflects some of the BOP's revisions.

Source:  BOP

# THE OIG'S MEMORANDUM TO THE BOP ON THE HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS



**U.S. Department of Justice**

Office of the Inspector General

July 28, 2014

MEMORANDUM FOR THE DEPUTY ATTORNEY GENERAL

          CHARLES E. SAMUELS, JR.
          DIRECTOR
          FEDERAL BUREAU OF PRISONS

FROM:           MICHAEL E. HOROWITZ
                 INSPECTOR GENERAL

SUBJECT:        Housing of New Inmates in BOP Contract Institutions'
                  Special Housing Units for Extended Periods

      In course of the ongoing review by the Office of the Inspector General (OIG) of the BOP's management of its private prison contracts, OIG staff recently visited two private contract facilities. During those visits, the OIG learned that both facilities were regularly housing newly received general population inmates in Special Housing Units due to space limitations in the general population. We further learned that these inmates are kept in Special Housing Units for extended periods of time until beds are available in the general population.

      On July 8, 2014, an OIG review team visited the Giles W. Dalby Correctional Facility (Dalby) in Post, Texas. We found that all new inmates are placed directly in Administrative Segregation in the Special Housing Unit for an average of 20 days, pending available bed space in the general population.

      On July 14, 2014, our review team visited the Eden Correctional Institution (Eden) in Eden, Texas, and learned from institution staff that the same practice was occurring there. As of July 16, 2014, 71 of 100 inmates in the Special Housing Unit were new inmates awaiting a bed in the general population. According to the Warden, new inmates at Eden spend an average of 25 days in the Special Housing Unit waiting for beds in the general population.

      Institution management and staff at both Dalby and Eden told us that these new inmates did not engage in any conduct that warranted their placement in the Special Housing Unit. Thus, even though these new inmates have not been determined to pose a threat to themselves, other inmates, or to

the security of the institution, they are subject to the same security measures as inmates who have been assigned to Administrative Segregation for specific, security-related reasons. These security measures include limiting telephone calls and all program services available in the general population due to the restrictive physical design and location of a segregation unit.

According to institution management and BOP staff, the private contract institutions are housing new inmates in the Special Housing Units because both the BOP and its contractors have interpreted language in their contracts as permitting Special Housing Unit beds to be counted as part of the general population bed count, rather than as a separate category. Moreover, Eden's Statement of Work within the contract states, "The contractor does not have a right of refusal and shall accept all designations from the BOP."[1] We have been told that the BOP sends new inmates to Eden because they appear to have available beds even though they are actually in a Special Housing Unit, and the contract institution cannot refuse to accept these new inmates.

While this practice may not be a violation of the BOP contract, Wardens at both Dalby and Eden told us that it is not good correctional practice. Moreover, the American Correctional Association (ACA), which must accredit contract institutions, states that special management units such as Special Housing Units are appropriate for "inmates who threaten the secure and orderly management of the institution."[2] The ACA does not recognize the use of Administrative Segregation to house new general population inmates due to a lack of bed space in the general population.[3]

We are providing this information to the Department and BOP leadership so that it can consider whether to undertake corrective action while our review is ongoing. Please advise us within 60 days of the date of this memorandum of any actions the Department has taken or intends to take regarding the issues discussed in this memorandum. If you have any questions or would like to

---

[1] Contract facilities operate according to a Statement of Work or a Performance Work Statement that outlines the requirements for operating under the contract.

[2] *Standards for Adult Correctional Institutions,* 4th edition, American Correctional Association (July 1, 2003), p. 69.

[3] ACA Standard 4-4249 states, "When segregation units exist, written policy and procedure govern their operation for the supervision of inmates under administrative segregation, protective custody, and disciplinary detention." The ACA describes segregation as encompassing "administrative segregation, protective custody, and disciplinary detention." It defines administrative segregation as a special unit where inmates are placed because their "continued presence in the general population poses a serious threat to life, liberty, self, staff, or other inmates, or to the security or orderly running of the institution."

2

discuss the information in the memorandum, please contact me at (202) 514-3435.

cc: Carla Wilson
Chief of Staff
Federal Bureau of Prisons

Sara M. Revell
Assistant Director
Program Review Division
Federal Bureau of Prisons

Paul Layer
Deputy Assistant Director
Program Review Division
Federal Bureau of Prisons

Joe Pecoraio
Deputy Administrator
External Auditing Branch, Program Review Division
Federal Bureau of Prisons

Richard P. Theis
Assistant Director, Audit Liaison Group
Internal Review and Evaluation Office
Justice Management Division

3

**THE BOP'S RESPONSE TO THE OIG'S MEMORANDUM ON THE HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS**



**U.S. Department of Justice**

Federal Bureau of Prisons

---

*Office of the Director*                    *Washington, D.C. 20534*

August 8, 2014

MEMORANDUM FOR MICHAEL E. HOROWITZ
                INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL

FROM:           Charles E. Samuels, Jr.
                Director
                Federal Bureau of Prisons

SUBJECT:        Response to the Office of Inspector General's
                (OIG) Request for Corrective Action Regarding
                Housing of New Inmates in BOP Contract
                Institutions' Special Housing Units for Extended
                Periods

I have received your memorandum dated July 28, 2014, regarding
Housing of New Inmates in BOP Contract Institutions' Special
Housing Units for Extended Periods. I take this matter very
seriously and am pleased to provide you with the following
information about the steps I have taken to assess and correct
the problems you have identified.

The facilities referenced in your letter, specifically,
Giles W. Dalby Correctional Facility and Eden Detention Center,
house many inmates serving short sentences and there are many
inmates transferring in and out daily. I have verified that new
commitments were often placed in the Special Housing Unit (SHU)
for a short period immediately upon arriving at the prison (the
stay in SHU generally did not exceed 25 days).

All inmates have been removed from SHU in the 14 private prisons
other than those who are subject to administrative detention or
disciplinary segregation. These inmates are now housed in a
general population environment. Moreover, we have stopped all
movement into the privates if such movement would have resulted
in placement in SHU. Nine of the 14 contracts were in

compliance prior to your letter and on August 1, 2014; the remaining five contracts were unilaterally modified to address this issue. Finally, all 14 contracts are now in compliance and prohibit SHU placement for inmates unless there is a need and a policy based reason to house them in administrative detention or disciplinary segregation.

A Senior Secure Institution Manager, a Secure Oversight Monitor, and a Contracting Officer are on-site at each private facility and will ensure contract compliance by conducting ad-hoc, systematic, and other reviews of on-site operations, especially regarding the placement of inmates in SHU.

I am confident these measures will address the concerns noted in your correspondence. If you require additional information, please contact me at (202) 307-3250.


cc:  James M. Cole
     Deputy Attorney General

# COMPARISON OF SECURITY INDICATORS AMONG CONTRACTORS

**Table 7**

**Comparison of Security Indicators among Contractors
FY 2011 – FY 2014**

| KEY | |
|---|---|
| **Red** | The Corrections Corporation of America's (CCA) contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Purple** | The GEO Group's (GEO) contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Blue** | The Management and Training Corporation's (MTC) contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |

| INDICATOR | | CONTRACTOR | | |
|---|---|---|---|---|
| | | **CCA** | **GEO** | **MTC** |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| *Contraband* | | | | |
| Cell Phones | Annual Average Confiscations per 10,000 Inmates | 314.6 | **462.1** | 31.3 |
| Drugs | Monthly Average Confiscations per 10,000 Inmates | 1.4 | **2.4** | 1.3 |
| Weapons | Monthly Average Confiscations per 10,000 Inmates | 2.3 | 3.2 | **5.0** |
| Tobacco | Monthly Average Confiscations per 10,000 Inmates | 0.8 | **4.8** | 0.7 |

## Table 7 (Cont'd)

| INDICATOR | | CONTRACTOR | | |
| --- | --- | --- | --- | --- |
| | | **CCA** | **GEO** | **MTC** |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| *Reports of Incidents* | | | | |
| Assaults by Inmates on Inmates | Monthly Average per 10,000 Inmates | **4.1** | 3.6 | 1.5 |
| Assaults by Inmates on Staff | Monthly Average per 10,000 Inmates | 3.7 | **6.0** | 1.3 |
| Sexual Assaults by Inmates on Staff | Monthly Average per 10,000 Inmates | **0.15** | 0.07 | 0.11 |
| Deaths | Monthly Average per 10,000 Inmates | 0.3 | 0.4 | **0.5** |
| Fights | Monthly Average per 10,000 Inmates | **5.4** | 3.7 | 1.7 |
| Setting a Fire | Monthly Average per 10,000 Inmates | 0.1 | **0.2** | 0.1 |
| Suicide Attempts and Self-mutilation | Monthly Average per 10,000 Inmates | **1.1** | 1.0 | 0.5 |
| Suicides | Monthly Average per 10,000 Inmates | 0.055 | 0.000 | **0.064** |
| Disruptive Behavior | Monthly Average per 10,000 Inmates | 1.0 | **3.1** | 0.5 |
| Uses of Force (Immediate and Calculated) | Monthly Average per 10,000 Inmates | 4.3 | **5.9** | 1.8 |
| *Lockdowns* | | | | |
| Full and Partial Lockdowns | Total per Prison | 7.6 | **9.5** | 2 |

## Table 7 (Cont'd)

| INDICATOR | | CONTRACTOR | | |
|---|---|---|---|---|
| | | CCA | GEO | MTC |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| *Discipline* | | | | |
| Guilty Findings on Serious (100- and 200-Level) Disciplinary Incident Report Charges | Monthly Average per 10,000 Inmates | 70.7 | **92.1** | 60.2 |
| *Telephone Monitoring* | | | | |
| Inmate Phone Calls Monitored | Monthly Average Percentage of Calls Monitored | 8.7% | 7.6% | **5.8%** |
| *Grievances* | | | | |
| All Grievances | Monthly Average Submitted per 10,000 Inmates | 48.6 | 74.4 | **111.5** |
| Grievances in Selected Safety and Security Categories | Monthly Average Submitted per 10,000 Inmates | 18.4 | 28.2 | **65.6** |
| Complaints about Staff | Monthly Average Submitted per 10,000 Inmates | 7.1 | 9.6 | **30.3** |
| Conditions of Confinement | Monthly Average Submitted per 10,000 Inmates | 0.2 | 1.8 | **3.2** |
| Food | Monthly Average Submitted per 10,000 Inmates | 1.0 | 1.9 | **4.5** |
| Institutional Operations | Monthly Average Submitted per 10,000 Inmates | 0.0 | 0.9 | **3.6** |
| Medical and Dental Grievances | Monthly Average Submitted per 10,000 Inmates | 9.6 | 13.9 | **23.5** |

Case 3:16-cv-02267   Document 99-1   Filed 07/16/18   Page 69 of 87 PageID #: 2401

## Table 7 (Cont'd)

| INDICATOR | | CONTRACTOR | | |
|---|---|---|---|---|
| | | **CCA** | **GEO** | **MTC** |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| *Grievances (Cont'd)* | | | | |
| Safety and Security | Monthly Average Submitted per 10,000 Inmates | **0.5** | 0.04 | 0.0 |
| Special Housing Unit | Monthly Average Submitted per 10,000 Inmates | 0.03 | 0.1 | **0.5** |
| *Urinalysis* | | | | |
| Percentage of Inmates Tested | Monthly Average Percentage Tested | 7.5 | 7.0 | **6.4** |
| Positive Drug Tests | Monthly Average per 10,000 Inmates | 2.0 | **2.3** | 1.6 |
| *Sexual Misconduct* | | | | |
| Allegations of Staff Sexual Misconduct against Inmates | Annual Average per 10,000 Inmates | 7.3 | **10.3** | 7.7 |
| Guilty Findings on Disciplinary Incident Charges of Inmate Sexual Misconduct against Inmates | Annual Average per 10,000 Inmates | 10.4 | **24.3** | 11.7 |

Source: OIG analysis of BOP and contractor data

# COMPARISON OF SECURITY INDICATORS BETWEEN CONTRACT PRISONS AND BOP INSTITUTIONS

**Table 8**

**Comparison of Security Indicators between
Contract Prisons and BOP Institutions
FY 2011 − FY 2014**

| KEY | |
|---|---|
| **Purple** | Contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Blue** | BOP institutions had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Green** | Contract prisons and BOP institutions were roughly equal on this indicator.  (See Appendix 1 for a further explanation of our criteria for determining this.) |

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| *Contraband* | | | |
| Cell Phones | *4-year Total* | *4,849* | *400* |
| | Annual Average Confiscations per 10,000 Inmates | **317.1** | 38.3 |
| Drugs | *4-year Total* | *220* | *330* |
| | Monthly Average Confiscations per 10,000 Inmates | 1.8 | **3.0** |
| Tobacco | *4-year Total* | *397* | *214* |
| | Monthly Average Confiscations per 10,000 Inmates | **2.5** | 1.9 |
| Weapons | *4-year Total* | *418* | *206* |
| | Monthly Average Confiscations per 10,000 Inmates | **3.2** | 1.8 |

## Table 8 (Cont'd)

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| *Reports of Incidents* | | | |
| Assaults by Inmates on Inmates | *4-year Total* | *423* | *289* |
| | Monthly Average per 10,000 Inmates | **3.3** | 2.5 |
| Assaults by Inmates on Staff | *4-year Total* | *526* | *184* |
| | Monthly Average per 10,000 Inmates | **4.2** | 1.6 |
| Sexual Assaults by Inmates on Staff | *4-year Total* | *13* | *2* |
| | Monthly Average per 10,000 Inmates | **0.1** | 0.02 |
| Deaths | *4-year Total* | *54* | *127* |
| | Monthly Average per 10,000 Inmates | 0.4 | **1.2** |
| Fights | *4-year Total* | *459* | *465* |
| | Monthly Average per 10,000 Inmates | **3.9** | **4.0** |
| Setting a Fire | *4-year Total* | *20* | *5* |
| | Monthly Average per 10,000 Inmates | **0.1** | 0.04 |
| Suicide Attempts and Self-Mutilation | *4-year Total* | *125* | *89* |
| | Monthly Average per 10,000 Inmates | **0.9** | **0.8** |
| Suicides | *4-year Total* | *4* | *4* |
| | Monthly Average per 10,000 Inmates | **0.03** | **0.03** |
| Disruptive Behavior | *4-year Total* | *256* | *274* |
| | Monthly Average per 10,000 Inmates | 1.8 | **2.4** |
| Uses of Force (Immediate and Calculated) | *4-year Total* | *548* | *455* |
| | Monthly Average per 10,000 Inmates | **4.5** | 3.8 |

## Table 8 (Cont'd)

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| **Lockdowns** | | | |
| Full and Partial Lockdowns | *4-year Total* | **101** | 11 |
| | Number of Facilities with Lockdowns | **12** | 6 |
| **Inmate Discipline** | | | |
| Guilty Findings on Serious (100- and 200-Level) Disciplinary Incident Report Charges | *4-year Total* | *10,089* | *7,439* |
| | Monthly Average per 10,000 Inmates | **77.9** | 64.7 |
| **Telephone Monitoring** | | | |
| Inmate Phone Calls Monitored | Monthly Average Percentage of Calls Monitored | **7.6%** | 21.1% |
| **Grievances** | | | |
| All Grievances | *4-year Total* | *8,756* | *14,098* |
| | Monthly Average Submitted per 10,000 Inmates | 72.6 | **121.5** |
| | Percent Granted | 8.1% | 5.2% |
| Grievances in Selected Safety and Security Categories | *4-year Total* | *3,969* | *2,883* |
| | Monthly Average Submitted per 10,000 Inmates | **32.2** | 25.3 |
| Complaints about Staff | *4-year Total* | *1,538* | *719* |
| | Monthly Average Submitted per 10,000 Inmates | **12.9** | 6.2 |
| Conditions of Confinement | *4-year Total* | *161* | *134* |
| | Monthly Average Submitted per 10,000 Inmates | **1.5** | 1.2 |
| Food | *4-year Total* | *247* | *133* |
| | Monthly Average Submitted per 10,000 Inmates | **2.1** | 1.2 |

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 73 of 87 PageID #: 2405

## Table 8 (Cont'd)

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| **Grievances (Cont'd)** | | | |
| Institutional Operations | 4-year Total | 171 | 20 |
| | Monthly Average Submitted per 10,000 Inmates | **1.1** | 0.2 |
| Medical and Dental | 4-year Total | 1,800 | 1,609 |
| | Monthly Average Submitted per 10,000 Inmates | **14.3** | **14.1** |
| Safety and Security (Contract Prisons Only) | 4-year Total | 25 | N/A |
| | Monthly Average Submitted per 10,000 Inmates | **0.2** | **N/A** |
| Sexual Abuse or Assault (BOP Institutions Only) | 4-year Total | N/A | 9 |
| | Monthly Average Submitted per 10,000 Inmates | **N/A** | **0.07** |
| Special Housing Unit | 4-year Total | 27 | 259 |
| | Monthly Average Submitted per 10,000 Inmates | 0.2 | **2.4** |
| **Urinalysis Drug Tests** | | | |
| Percentage of Inmates Tested | Monthly Average | **7.1** | 8.1 |
| Positive Drug Tests | 4-year Total | 263 | 376 |
| | Monthly Average per 10,000 Inmates | 2.1 | **3.4** |
| **Sexual Misconduct** | | | |
| Guilty Findings on Disciplinary Incident Charges of Inmate Sexual Misconduct against Inmates | 4-year Total | 156 | 175 |
| | Annual Average per 10,000 Inmates | 16.6 | **18.1** |
| Allegations of Staff Sexual Misconduct against Inmates | 4-year Total | 97 | 139 |
| | Annual Average per 10,000 Inmates | 8.7 | **14.5** |

Source: OIG analysis of BOP and contractor data

Case 3:16-cv-02267   Document 99-1   Filed 07/16/18   Page 74 of 87 PageID #: 2406

# THE BOP'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

**Federal Bureau of Prisons**

---

*Office of the Director*

*Washington, D.C. 20534*

July 25, 2016

MEMORANDUM FOR NINA S. PELLETIER
                ASSISTANT INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS DIVISION

                *Thomas R. Kane*

FROM:           Thomas R. Kane, Acting Director

SUBJECT:        Response to the Office of Inspector General's (OIG)
                DRAFT Report:  OIG Review of the Federal Bureau of
                Prisons' Monitoring of Contract Prisons, Assignment
                Number A-2014-003

The Bureau of Prisons (BOP) appreciates the opportunity to respond
to the open recommendations from the draft report entitled OIG Review
of the Federal Bureau of Prisons' Monitoring of Contract Prisons.
However, we continue to caution against drawing comparisons of
contract prisons to BOP operated facilities as the different nature
of the inmate populations and programs offered in each facility limit
such comparisons.  Despite this caution, the BOP agrees with the
recommendations as noted below.

**Recommendations**

**Recommendation** 1.  Convene a working group of BOP subject matter
experts to evaluate why contract prisons had more safety and security
incidents per capita than BOP institutions in a number of key
indicators, and identify appropriate action, if necessary.

**Response:** The BOP agrees with this recommendation. A core group of subject matter experts will be selected to evaluate the rate of safety and security incidents per capita within the private contract facilities compared to other BOP institutions, and to determine appropriate action, if necessary.

**Recommendation** 2. Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.

**Response:** The BOP agrees with this recommendation. Guidance will be drafted regarding procedures to ensure Health Systems Specialists verify medical services are provided to inmates on a more frequent basis than bi-annually.

**Recommendation** 3. Ensure correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.

**Response:** The BOP agrees with this recommendation. Guidance will be drafted regarding procedures to ensure periodic validation of actual correctional officer staffing levels based on the approved staffing plan, to determine whether the contractor is meeting the required staffing levels.

**Recommendation** 4. Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

**Response:** The BOP agrees with this recommendation. A work group, to include subject matter experts, will convene annually to ensure appropriate trend analysis and updates to the checklist.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

2

# THE CONTRACTORS' RESPONSES TO THE DRAFT REPORT



America's Leader in Partnership Correctic
Natasha K. Metcalf
Vice President, Partnership Development

August 8, 2016

█████████████
Deputy Assistant Inspector General
U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division
Washington, D.C.

Dear ████████:

CCA appreciates the opportunity to review and comment on the Office of the Inspector General, U.S. Department of Justice (OIG's) draft report resulting from a review of the Federal Bureau of Prisons (BOP) monitoring of contract prisons. We share the interests of the OIG and the BOP in ensuring contract prisons are operated safely and securely and in compliance with contract requirements. We are also committed to working in partnership with the BOP to address any recommendations in furtherance of these goals.

The comments we would like to provide are regarding the section of the report titled "Contract Prisons Had More Safety and Security-related Incidents per Capita than BOP Institutions for Most of the Indicators We Analyzed." We appreciate the OIG's candor that "we were unable to evaluate all of the factors that contributed to the underlying data, including the effect of inmate demographics and facility locations." We also recognize that the OIG therefore qualified its findings regarding safety and security related incidents; for example, the analysis of contraband seized is caveated with the acknowledgement that the OIG did not examine or compare the interdiction efforts of contract and BOP-operated prisons. We therefore support the OIG's recommendation that the BOP examine the data more thoroughly. CCA is committed to continual improvement in its facility operations, especially as it relates to inmate and staff safety and security, and will cooperate with any examination conducted by the BOP of the factors leading to the incidents in contract prisons.

We believe that demographic variables, particularly as they relate to housing a homogenous foreign national population, will have a significant impact on rates of inmate misconduct. Our experience has been that the criminal alien population housed in contract prisons has a higher rate of Security Threat Group (STG) members and associates (including border, Mexican and Central American gangs) and groups of inmates that strongly define their identity by geographical areas, such as the Mexican state they are from, than U.S. citizen populations of the comparable security level housed in most BOP facilities.

10 Burton Hills Boulevard, Nashville, Tennessee 37215, Phone: 615-263-3000, Fax: 615-263-3090, www.cca.com

There is also robust research literature, including research conducted on BOP populations,[1] indicating that STG-affiliated inmates are significantly more likely to be involved in violence and misconduct, even after controlling for individual characteristics of inmates that prior research has established are associated with violent predispositions. Additionally, these STG-affiliated inmates and geographic groups often have significant rivalries based on conflicts that originate outside of the prison system, leading to inter-group conflict and violence. Furthermore, there is much less intelligence and background information available to assist correctional managers in managing foreign national inmates than most systems would have on a U.S. citizen.

We look forward to further discussions with the BOP regarding the data and recommendations in the report and collaboration on any policy or operational changes.

Sincerely,

Natasha K. Metcalf

[1] Gaes, G.; Wallace, S.; Gilman, E., Klein-Saffran, J. & Suppa, S. (2002). The influence of prison gang affiliation on violence and other prison misconduct. *The Prison Journal, 82 (3)*, 359-385.

71

August 9, 2016



Corporate Headquarters
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

TEL: 561 999 5833
FAX: 561 999 7738
www.geogroup.com

███████████████
Deputy Assistant Inspector General
U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division
1425 New York Avenue, NW, Suite 6100
Washington, D.C. 20530

Re: The GEO Group's Comments to the
Formal Draft of Review of the Federal Bureau of Prisons' Monitoring of
Contract Prisons
Dated July 2016

Dear ██████████:

The GEO Group, Inc. (GEO) appreciates the opportunity to comment on the formal draft of the above referenced report. We have reviewed the draft and have the following for your consideration.

One of the 3 recommendations is that a working group of subject matter experts convene to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions and identify actions. A key ingredient of that review would likely be to evaluate the settings, populations, and reporting systems of the 14 contract and 14 BOP facilities. Any evaluation will require comparisons of the salient elements of all 28 facilities. Whereas the 14 contract prisons are discussed in detail in the report, the 14 BOP facilities are only listed once in the Methodology section. There are some references that, if enhanced, would add to the understanding of the reader and to the further fulfillment of the first recommended action item:

1. Discussion of the difference in population demographics.
   There are notable differences in the population housed at the contract facilities (criminal aliens) and the BOP facilities (U.S. citizens). That difference is briefly noted in two footnotes in the report and one in Appendix 1, but the impact of the difference is not discussed anywhere in the report. The 3 footnotes acknowledge that the Criminal Alien Requirement (CAR) applies to

72



all contract facilities, except parts of 2 current facilities (noted on page 1, footnote 6). The report states that the selected BOP facilities have "similar population and security levels." (page 15, first paragraph). Appendix 1 explains it a little differently by saying on page 53 under Data Analysis that the comparable BOP housed male inmates with the "same security level (low), similar population *sizes*, and similar geographical locations…" (emphasis added) For the following reasons, GEO believes that the differences in the population demographics are critical to the understanding of the collected data:

a. CAR facility populations are criminal aliens and not U.S. citizens. As a group, the CAR population is very homogeneous, with 72.1 % being from Mexico and the majority of the rest being from a few Central American countries. (Only 11.8 % of the BOP population is non-US. citizens.) As such, the contract facility population responds as one to any issue, real or perceived. The group leaders can control or direct a large majority of the population in a much larger fashion than in facilities with a mixed U.S. citizenry. Traditional populations do not follow recognized inmate leaders in a "one for all and all for one" mentality. This is a factor is analyzing the 8 categories as certain prohibited acts are higher in CAR facilities for this reason and the need for facility lockdowns is higher.

b. An additional effect of this CAR population on the data analysis is that the contraband numbers, particularly the cell phones, are greatly affected by housing the CAR population. The Texas GEO facilities (Reeves and Big Spring) are significantly affected due to the proximity to Mexico and the large numbers of Mexican National inmates in the facilities. This issue is not significant in the BOP facilities.

c. The CAR population comes with a high number of gang affiliations. That factor alone may result in increases in the level of violent incidents in the CAR facilities. See attached report "The Influence of Prison Gang Affiliation on Violence and Other Prison Misconduct" *The Prison Journal, 82 (3), 359-385. See attached.* This 2001 report, researched and authored by 3 BOP subject matter experts, specifically discusses the citizenship factor, distinguishing the citizens of Columbia and Mexico, in part because of the high drug trafficking aspects of those populations. Gang affiliated inmates were more likely to be involved in drug, property, accountability… (page 16) Membership in some of the gangs such as the Texas Syndicate and the Mexakanemi was associated with increases in almost all forms of misconduct.

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 80 of 87 PageID #: 2412



For the above reasons, GEO would request that the report include additional information on the differences in the population demographics and its effect on the data analysis.

2. Differences in Oversight and Reporting.
An additional factor that might be enhanced in the report would be a comparison of the amount and depth of existing oversight of the contract facilities with the oversight of the BOP facilities. Whereas the contract facilities operate using the BOP policies and systems to a large degree (SENTRY being one), the obligation of full and constant reporting and transparency is part of the good business relationship between GEO and the BOP. That relationship exists at the facility, regional and Washington, D.C. levels. The expectation is that GEO will report all incidents in a timely fashion and the contract facilities are evaluated on that thorough and prompt reporting in the CPARs and in the Contract Facility Monitoring. The ACA accreditation process at the contract facilities is more extensive than the same for the BOP facilities and possibly results again in additional reporting of incidents of all kinds. It seems that this difference in reporting was realized in the inconsistent numbers on the contract facility sexual misconduct as reported by the facilities and as reported in monthly intelligence reports.

In addition it should be noted that each contract facility has 2-4 on-site monitors who are not replicated at the BOP facilities. This is additional monitoring manpower dedicated to daily review of operations, daily reporting of incidents and daily tracking of compliance. There is no dedicated monitoring staff at the BOP facilities.

The current extensive review and oversight may have contributed to the higher contract facility numbers in several of the 8 categories.

GEO sincerely thanks the Office of Inspector General for this correspondence and would welcome the opportunity to add to this discussion at any time if there are questions about the above comments.

Sincerely,

Patricia McNair Persante
Executive Vice President, Contract Compliance

Page 3 of 4

74



cc:    George C. Zoley, Chairman and CEO
       J. David Donahue, SVP, U.S. Corrections
       Pablo Paez, VP, Corporate Relations
       ███████████ Dep. Asst. Inspector General, Dept. of Justice
       ███████████ Dept. of Justice

Attachment



## Management & Training Corporation

A Leader in Social Impact

Scott Marquardt
President

August 9, 2016

████████████

DEPUTY ASSISTANT INSPECTOR GENERAL
US DEPARTMENT OF JUSTICE

Dear ████████

Thank you for the opportunity to comment on the Formal Draft Review of the Federal Bureau of Prisons'
Monitoring of Contract Prisons, July 2016. MTC strongly disagrees with the conclusions and inferences of
this report. Any casual reader would come to the conclusion that contract prisons are not as safe as BOP
prisons. The conclusion is wrong and is not supported by the work done by the OIG.

The comparison of two sets of prisons is comparing apples and oranges. The contract prisons are holding
criminal aliens. The OIG reports that 90% of the inmates in the contract facilities are Mexicans. If the OIG
looked into the composition of the BOP prisons, it would find a much more balanced demographic mix.
The normal practice is to disperse groups as much as practical to weaken any STG groups operating in a
facility. Any difference in incident rates would be far more attributable to this factor than whether the
prison is a contract prison or BOP facility. (This point is made on page 22 but the limitation is lost in the
body of the report. If the OIG conducted some interviews of BOP and contract officials, this fact could be
easily substantiated.)

MTC has wardens that have worked in contract prisons after careers in the BOP. They report that
contractors bend over backwards to fully disclose any incident. BOP wardens have more discretion in
reporting. The OIG should go back and interview these wardens for themselves to test our assertion.

Each of the assertion in the report should be given to the BOP for further investigation. The
inflammatory conclusions that contract prisons are less safe is not supported by the facts and should be
re-written.

Specific concerns we have are:

Page i, paragraph 1; page 2, paragraph 1: Disturbances are mentioned from recent years in contract
facilities. No mention is made of disturbances in BOP facilities. The list of incidents on Page 2 in contract
facilities is very unfair without a similar list of major incidents at the 14 BOP facilities. Any reader is going
to come to an unjust conclusion without a balanced report.

Page 12 and 13. The contract facilities clearly operate at a lower cost. The OIG's information supports
this. Why does the OIG resist saying it? It's interesting to note the resistance of the OIG to report that

Case 3:16-cv-02267    Document 99-1    Filed 07/16/18    Page 83 of 87 PageID #: 2415

contract prisons operate at a lower cost, but relies on much less reliable support for the assertion that contract prisons are less safe.

Page 15, heading. The heading makes an assertion that relies on a comparison of apples and oranges. The phrasing of the headings and initial sentences should reflect the problem in making the comparison using facilities with very different populations.

Page 15, last paragraph. The BOP facilities should not be referred to as comparable institutions in the document. They house very different populations.

Page 16 and 24 to 26. The inference that grievances represent a prison with higher safety concerns is wrong. Grievances are an integral part of conflict resolution in a positive way. Lack of grievances can indicate an inmate's lack of trust of the prison's problem resolution process. The fact that inmates are widely using the system can show it's working and resolving concerns before they become incidents. The conclusion of the report is misguided.

Page 16, last paragraph. Confiscations of more cell phones, or more contraband, doesn't necessarily mean that there is more contraband coming into the facility. It can also mean that the prison has a more effective system of detecting and removing contraband. The conclusion again is misguided. At most, this data could be an indication that further study is warranted by the BOP. Our point is made at the bottom of Page 19 but only after the questionable assertion is fully developed. The limitation should be in the first sentence of this section.

Page 26, phone calls. The report says the requirement is different for BOP and contract facilities and further reports that all private contractors are meeting the "recommendation" of 5% monitoring. But the report presents this in a negative light on contract prisons.


Thank you again for the opportunity to provide a response to this report and we look forward to ongoing evaluation of performance.

Again, we appreciate the opportunity share our perspective.


Sincerely,

Scott Marquardt


Cc: ▇▇▇▇▇▇▇▇▇


77

## OIG ANALYSIS OF THE BOP'S RESPONSE

The OIG provided a draft of this report to the BOP and the three contractors. The BOP's response is included in Appendix 8 above. The contractors' responses are included in Appendix 9. Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:** Convene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions in a number of key indicators, and identify appropriate action, if necessary.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that a core group of subject matter experts will be selected to evaluate the rate of safety and security incidents per capita within the private contract facilities compared to other BOP institutions, and to determine appropriate action, if necessary.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide a list of the selected subject matter experts; a schedule of planned work group meetings; copies of meeting agenda for each work group meeting held by October 31, 2016; copies of BOP data or other information the subject matter experts considered to evaluate the rate of safety and security incidents per capita within the private contract facilities compared to other BOP institutions; and documentation of any appropriate action recommended, if necessary.

**Recommendation 2:** Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that it will draft guidance on procedures to ensure Health Systems Specialists verify that medical services are provided to inmates on a more frequent basis than biannually.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide copies of guidance on procedures to ensure Health Systems Specialists verify that medical services are provided to inmates on a more frequent basis.

**Recommendation 3:** Ensure that correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that it will draft guidance on procedures to ensure periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan to determine whether the contractor is meeting the required staffing levels.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide copies of guidance on procedures to ensure periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan to determine whether the contractor is meeting the required staffing levels.

**Recommendation 4:** Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that a work group, to include subject matter experts, will convene annually to ensure appropriate trend analysis and updates to the checklist.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide a list of the selected subject matter experts; a schedule of planned work group meetings; copies of meeting agenda for each work group meeting held by October 31, 2016; copies of BOP data or other information the subject matter experts considered to ensure appropriate trend analysis; and documentation of any recommended updates to the checklist, if necessary.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig