# EXHIBIT 3

NIKKI BOLLINGER GRAE, Individually and on
Behalf of All Others Similarly Situated,

                Plaintiff,

vs.

                Civil Action No. 3:16-cv-02267

CORRECTIONS CORPORATION OF AMERICA,
DAMON T. HININGER, DAVID M. GARFINKLE,
TODD J. MULLENGER, and HARLEY G. LAPPIN,

                Defendants.

# EXPERT REPORT

# OF

# LUCY P. ALLEN

# July 16, 2018

# TABLE OF CONTENTS

I.     Scope of Assignment ............................................................................................1

II.    Summary of Findings ...........................................................................................1

III.   Qualifications and Remuneration ........................................................................3

     A.   Qualifications ...............................................................................................3

     B.   Remuneration ..............................................................................................3

IV.   Materials Considered ..........................................................................................4

V.    Background ..........................................................................................................5

     A.   Company Background ..................................................................................5

     B.   Summary of Allegations ..............................................................................5

VI.   Methodology ........................................................................................................8

VII.   The alleged misrepresentations did not have price impact ................................12

     A.   There is no evidence that the alleged misrepresentations caused a statistically significant increase in CoreCivic's stock price..........................................12

     B.   CoreCivic's stock price did not react to the OIG Report, the first alleged corrective disclosure, which demonstrates that the alleged misrepresentations did not have price impact ..................................................................................32

     C.   Reports of riots and other safety and "quality"-related incidents that revealed information of the type that Plaintiff alleges is corrective of the alleged misrepresentations were released during the alleged Class Period to no stock price reaction................................................................................................35

     D.   The Yates Memo, the second alleged corrective disclosure, did not change the market's perception of the "quality" or cost-effectiveness of CoreCivic's facilities, which demonstrates that the alleged misrepresentations regarding "quality," "performance" and "cost savings" of CoreCivic's facilities did not have price impact..................................................................................43

         1.   Commentary by analysts covering CoreCivic shows that the market still considered CoreCivic's facilities to be a "quality" and cost-effective option for federal corrections after the Yates Memo ........................................43

         2.   Analyst commentary demonstrates that the Yates Memo was considered a shift in policy driven by politics that created uncertainty around CoreCivic's government contracts, and that this political shift negatively impacted CoreCivic's stock price at the end of the alleged Class Period ............................47

         3.   The recovery in CoreCivic's stock price after the end of the alleged Class Period is inconsistent with Plaintiff's allegations that the Yates Memo

revealed that CoreCivic's facilities were no longer a "quality" or cost-effective option for federal corrections ................................................................. 53

    4.    CoreCivic warned of the risk that changes in the political environment could negatively impact the Company's business both prior to and during the alleged Class Period, and commentary by analysts covering the Company shows that the market was aware of this risk ......................................................... 55

E.    The lack of change in the market's perception of CoreCivic's "quality" or cost-effectiveness from either the alleged misrepresentations or the alleged corrective disclosures affirmatively demonstrates that the alleged misrepresentations did not have price impact ........................................................................................................ 58

VIII.    Dr. Feinstein has not specified how his purported "common methodology" of calculating class-wide damages would apply given his conclusion that there was a "structural break" during the alleged Class Period ........................................................ 59

# I.    SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendants to analyze price impact of the allegedly false and misleading statements and/or omissions that Plaintiff claims inflated CoreCivic, Inc.'s ("CoreCivic" or "the Company") stock price between February 27, 2012 and August 17, 2016 (the alleged "Class Period").[1]

2.      In addition, I have been asked to review the claim by Dr. Steven P. Feinstein, Plaintiff's proposed expert, that class-wide damages can be calculated using a common damages methodology that is consistent with the event study methodology put forward by Dr. Feinstein.[2]

# II.    SUMMARY OF FINDINGS

3.      I find that the alleged misrepresentations and/or omissions did not have price impact. Plaintiff's theory is that the alleged misrepresentations regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities impacted CoreCivic's stock price and caused the price to be artificially inflated, and this inflation was "eliminated" by two alleged corrective disclosures – the OIG Report and the Yates Memo.

4.      I analyzed the price reactions following the alleged misrepresentations and found no evidence that the alleged misrepresentations caused a statistically significant increase in CoreCivic's stock price. There was no statistically significant increase in CoreCivic's stock price following 28 of the 33 alleged misrepresentations claimed in the Complaint. An analysis of the 5 alleged misrepresentation dates on which there was a statistically significant price reaction shows that the price reaction on these dates was *not* caused by the alleged misrepresentations. Rather, on these 5 dates, the increase in CoreCivic's stock price occurred either before the alleged misrepresentation was made and/or was in response to an announcement not claimed by Plaintiff as an alleged misrepresentation.

5.      I find that there was no market reaction to the OIG Report, the first alleged corrective disclosure, including no statistically significant price reaction and no analyst

---

[1]    Consolidated Complaint for Violation of the Federal Securities Laws ("Complaint"), ¶1.

[2]    Report of Steven P. Feinstein dated June 1, 2018 ("Feinstein Report"), ¶20.

commentary. The lack of any price reaction or analyst report following the release of the information that Plaintiff claims is corrective of the alleged misrepresentations affirmatively demonstrates that the alleged misrepresentations did not have price impact. In addition, I find that information regarding the "quality" and "performance" of CoreCivic's facilities of the type Plaintiff alleges is corrective of the alleged misrepresentations was also announced both prior to and during the alleged Class Period to no statistically significant price reaction. After a detailed review of analyst reports, I found no indication that these announcements changed analysts' perceptions of the "quality" or "performance" of CoreCivic's facilities, demonstrating that the alleged misrepresentations did not have price impact.

6.    I find that the Yates Memo, the second alleged corrective disclosure, did not change analysts' or the market's perception of the "quality" or cost-effectiveness of CoreCivic's facilities. Analyst reports on CoreCivic published after the Yates Memo explicitly stated that CoreCivic's facilities were cheaper than government-run prisons and provided similar "quality" of services. These analyst reports characterized the Yates Memo as a "political shift" in the government's use of private prisons that created uncertainty around the potential renewal of CoreCivic's contracts with the federal government, uncertainty that abated following the 2016 Presidential Election. The fact that analysts' and the market's perceptions of the "quality" and cost-effectiveness of CoreCivic's facilities did not change following the release of the OIG Report or the Yates Memo, and that, rather than reacting to the allegedly corrective information regarding the "quality" and cost-effectiveness of CoreCivic's facilities, CoreCivic's stock price was impacted by changes in the political environment demonstrates that the alleged misrepresentations did not have price impact.

7.    I find that Dr. Feinstein has not specified how his purported "common methodology" of calculating class-wide damages would apply given his conclusion that there was a "structural break" during the alleged Class Period. Dr. Feinstein found a "structural break" that separated the alleged Class Period into two intervals such that the stock price reacted statistically differently to market and industry forces in one interval versus the other, and concluded that two different models were needed to explain CoreCivic's stock price movements during the alleged Class Period. Dr. Feinstein has not provided, nor am I aware of, any "common methodology" that can be used to calculate class-wide damages in cases where there is such a "structural break." Dr. Feinstein provides no explanation of how an estimation of alleged

inflation and alleged damages measured when the alleged corrective disclosures occurred after the "structural break" could be applied to the period before the "structural break."

## III.  QUALIFICATIONS AND REMUNERATION

### A.  Qualifications

8.      I am a Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

9.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 20 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

### B.  Remuneration

10.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $900 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## IV.   MATERIALS CONSIDERED

11.     In preparing this report, I considered the following categories of materials (a complete list of materials considered is included as Appendix B):

a)  Complaint;

b)  Memorandum and Opinion, dated December 18, 2017;

c)  Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, dated June 1, 2018 ("Motion for Class Certification");

d)  Feinstein Report, including exhibits and materials relied upon;

e)  Deposition of Steven P. Feinstein, dated July 12, 2018 ("Feinstein Deposition");

f)  Analyst reports on CoreCivic and GEO Group, Inc. ("GEO") from Thomson Reuters and documents produced in discovery;

g)  CoreCivic's filings with the Securities and Exchange Commission ("SEC filings");

h)  CoreCivic press releases, conference call transcripts and news stories from Factiva, Bloomberg, L.P. and CoreCivic's website;

i)  Reviews and investigations of CoreCivic and other private prison facilities by U.S. government entities and other third-parties including news organizations and the American Civil Liberties Union ("ACLU");

j)  Price, trading volume and implied volatility data for CoreCivic and GEO from Bloomberg, L.P.;

k)  Price data for market and industry indices from Bloomberg, L.P.;

l)  Intraday price and volume data for CoreCivic from Tick Data, LLC;

m) Institutional holdings data for CoreCivic from FactSet Research Systems, Inc.;

n)  Total daily cost per capita data for privately-operated vs. government-operated Federal Bureau of Prisons ("BOP") facilities from the BOP website (https://www.bop.gov/foia/#tabs-1, last accessed July 14, 2018);

o) Expert reports of Dr. Feinstein in other matters;

p) Academic literature and textbooks on finance, securities, valuation and statistics; and

q) Legal decisions on class certification and market efficiency.

## V. BACKGROUND

### A. Company Background

12.     CoreCivic (formerly known as Corrections Corporation of America) owns and operates correctional and detention facilities in the United States.[3] CoreCivic contracts with federal, state and local correctional and detention authorities, including the BOP, the United States Marshals Service ("USMS") and the United States Immigration and Customs Enforcement ("ICE").[4] CoreCivic's contracts with the BOP accounted for between 11% and 13% of the Company's revenue during the alleged Class Period.[5] The Company began operating as a Real Estate Investment Trust ("REIT") on January 1, 2013.[6]

### B. Summary of Allegations

13.     Plaintiff alleges that CoreCivic's stock price was inflated during the alleged Class Period as a result of certain allegedly false and misleading statements and/or omissions regarding the Company's business operations and, specifically, regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities.[7] In particular, Plaintiff claims that CoreCivic allegedly misrepresented that:

---

[3]   CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5. The Company announced that it would change its name to CoreCivic on October 28, 2016. See, "Corrections Corporation of America Rebrands as CoreCivic," *Reuters Significant Developments*, October 28, 2016.

[4]   CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5.

[5]   CoreCivic FY2015 Form 10-K, filed February 27, 2013, p. 9, and CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 10. See, also, Feinstein Report, ¶23.

[6]   CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5. See, also, "Corrections Corp of America Completes Internal Reorganization," *Reuters Significant Developments*, January 2, 2013.

   According to CoreCivic, REIT status means that the Company is "generally not subject to federal income taxes" on its taxable income as long as it distributes at least 90% of its taxable income to its shareholders. See, CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5.

[7]   Complaint, ¶¶116-117.

- "the outsourcing of correctional services to [CoreCivic] resulted in improving correctional services for government agencies, including the BOP;"

- "[CoreCivic's] facilities were operated 'in accordance with' applicable policies, procedures and contractual requirements;"

- "[CoreCivic's] renewal rate on contracts was and would remain high because of the 'quality' of services it provided to government customers;" and

- "the outsourcing of correctional services to [CoreCivic] resulted in significant cost savings for government agencies, including the BOP."[8]

14.     Plaintiff claims CoreCivic made alleged misrepresentations that purportedly impacted and inflated the stock price on 33 separate dates. The alleged misrepresentations claimed in the Complaint are listed in Appendix C.

15.     Plaintiff claims that the alleged "truth" regarding the alleged misrepresentations was disclosed to the market on two "corrective disclosure" dates.[9] The Complaint describes the alleged corrective disclosures as follows:

- <u>August 11, 2016</u>: On August 11, 2016, the U.S. Department of Justice ("DOJ") Office of the Inspector General ("OIG") issued a report titled, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("OIG Report"). According to the Complaint, the OIG Report found that contract prisons "incurred more safety and security incidents per capita than comparable BOP institutions."[10]

- <u>August 18, 2016</u>: On August 18, 2016, Deputy Attorney General Sally Q. Yates issued a memorandum titled "Reducing our Use of Private Prisons" ("Yates Memo"). According to the Complaint, the Yates Memo stated that "contract

---

[8]   Complaint, ¶3. Note that although this is what the Complaint claims was allegedly misrepresented, it does not necessarily reflect the Company's actual statements. For example, according to the Complaint, CoreCivic allegedly stated that its renewal rate on contracts "would" remain high because of the quality of services provided by the Company. However, CoreCivic actually stated: "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons." See, for example, Complaint, ¶132, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, pp. 25, 49.

[9]   Complaint, ¶192.

[10]   Complaint, ¶39, citing OIG Report.

prisons operated lower-quality facilities without saving substantially on costs and that the BOP should reduce the use of private prisons."[11]

16.     According to Plaintiff, the alleged "truth" revealed by the alleged corrective disclosures was that:

- "[t]he outsourcing of correctional services to [CoreCivic] did not result in improving correctional services for government agencies, including the BOP" since "the correctional services offered by [CoreCivic] compared poorly to BOP facilities, did not provide the same level of correctional services, programs and resources, and did not maintain the same level of safety and security;"

- "[CoreCivic's] facilities were not operated 'in accordance with' applicable policies, procedures and contractual requirements;"

- "[t]he 'quality' of services that [CoreCivic] provided to its government customers, and in particular the BOP, was poor and was not supportive of the Company's renewal rate being and remaining high;"

- "[t]he outsourcing of correctional services to [CoreCivic] did not result in significant costs savings for government agencies, including the BOP."[12]

17.     The chart below shows CoreCivic's stock price, along with the alleged misrepresentation and the alleged corrective disclosure dates:

---

[11]  Complaint, ¶13.

[12]  Complaint, ¶170.



**Alleged Misrepresentations and Alleged Corrective Disclosures**

Alleged Class Period
February 27, 2012 through August 17, 2016

○ Alleged Misrepresentations (M)
● Alleged Corrective Disclosures

8/11/16
OIG Report

8/18/16
Yates Memo

**Sources:**
Data from Bloomberg, L.P. Alleged misrepresentations and alleged corrective disclosures from the Complaint.

## VI. METHODOLOGY

18.     An analysis of price impact is an analysis of whether the alleged misrepresentations affected the market price when made.[13] In general, the price impact of an alleged misrepresentation can be analyzed in at least two ways: (1) directly by analyzing the market reaction following an alleged misrepresentation, including analyzing the stock price movement and examining market and analyst commentary following the alleged misrepresentations, or (2) indirectly by analyzing the market reaction to a disclosure that is corrective of an alleged misrepresentation.[14]

---

[13]   See, for example, *Halliburton I*, 131 S. Ct. 2179, 2186 (2011). ("'[P]rice impact' – that is, whether the alleged misrepresentations affected the market price in the first place.")

[14]   See, for example, *Halliburton II*, 134 S. Ct. 2398 (2014).

19.     To analyze price impact of the alleged misrepresentations in this case, I examined publicly available information related to CoreCivic and Plaintiff's allegations. I reviewed Plaintiff's claims in the Complaint and other pleadings, and the Feinstein Report, and examined the alleged misrepresentations and the alleged corrective disclosures (including what information was allegedly false, when the alleged truth was purportedly revealed to the market and what information was alleged to be corrective). I analyzed publicly available information on CoreCivic, including analyst reports, SEC filings, and news stories from Bloomberg and Factiva.[15] I focused on what the market knew about the alleged misrepresentations, and on how the market reacted in terms of analyst and other market commentary and price reactions to the alleged misrepresentations.

20.     Analyst reports are periodic reports issued by professional financial analysts at brokerage firms who perform research and analysis on specific industries and companies. Analysts analyze companies by studying publicly available information, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries, using financial techniques such as a discounted cash flow models and valuation multiples. Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue,

---

Note that simply testing whether there were statistically significant price reactions on the dates of the alleged corrective disclosures may not be a reliable analysis of price impact of the alleged misrepresentations for a number of reasons, including the following:

a)  The alleged corrective disclosures may not actually be corrective of the alleged misrepresentations. (If the alleged corrective disclosures are not in fact corrective, they cannot help one determine the price impact of the alleged misrepresentations.);

b)  The alleged corrective disclosure dates may not properly correspond to when the alleged misrepresentations were first corrected in the market. (Since, in an efficient market, only new news should affect a security's price, the reaction to repeated news is not a reliable indicator of what the price impact of the news would be initially. If news that is not new affects the price, then that is an indication that the market is not efficient.);

c)  The price reaction on the alleged corrective disclosure dates may be the result of confounding factors or news unrelated to the alleged fraud; and

d)  Market conditions may have changed between the time that the alleged misrepresentations were made and the time of the alleged corrective disclosures.

[15]  Bloomberg is a commonly used provider of financial data and news, and Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

profits and earnings per share ("EPS")), and give recommendations to buy, hold or sell the stock. Analysts typically issue reports after new information about the company is released. These reports play an important role in disseminating information about a stock, and can be a valuable source of information on market knowledge and sentiment at the time.

21.　　The review of analyst reports is a standard and generally accepted methodology for determining what information is important to the market in valuing a stock, and thus, for determining whether a piece of information had price impact.[16] This position is echoed in the Feinstein Report, which states:

> Securities analysts disseminate and interpret information about the companies they cover. They conduct research and provide valuation opinions, helping market participants acquire relevant information and understand the implications of that information for valuation and investment decisions. Consequently, securities analysts facilitate the flow of information and the digestion of information within the marketplace. These functions promote market efficiency.[17]

22.　　There were 311 reports issued by 9 analysts covering CoreCivic during the alleged Class Period. In addition, there were 40 analyst reports on CoreCivic published between the end of the alleged Class Period and the end of February 2017.[18]

23.　　Plaintiff claims that the market for CoreCivic stock was efficient during the alleged Class Period, and thus, that CoreCivic's stock price "fully" and "rapidly" reflected available information.[19] For the purpose of this analysis of price impact, I have been asked to assume Plaintiff's claim of market efficiency, including adopting the event study methodology put forward by Dr. Feinstein.

24.　　An event study can be used to test whether the stock price reacts on the date of a particular announcement. An event study is a commonly accepted statistical analysis that

---

[16]　Courts often look to the number of analyst reports published on a company as an indication of market efficiency. See, for example, *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[17]　Feinstein Report, ¶52.

[18]　Based on available analyst reports from Thomson Reuters and documents produced in discovery.

Note that a number of analyst reports on CoreCivic also discuss GEO, a private prison REIT and competitor to CoreCivic. In addition, I considered analyst reports that focused on GEO specifically. There were 35 reports on GEO published in 2016.

[19]　Feinstein Report, ¶30, citing Bromberg, Alan and Lewis Lowenfels, *Securities Fraud and Commodities Fraud* (Thomson/West, 2nd ed., 2003), and Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25(2): 1970.

measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[20] Academics often use an event study to determine how stock prices respond to new information.[21] An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or industry indices.[22] Using the regression results and the returns of the indices, the predicted stock price movement and abnormal stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the event/period being tested. Then, the statistical significance of the abnormal stock price movement can be tested.

25.    In addition to adopting Dr. Feinstein's event study, I tested an alternative event study specification and found that the conclusions of the price impact analysis did not change. The S&P 500 Index, an index of 500 large companies listed on the New York Stock Exchange and the NASDAQ, was used to control for market movements, and the S&P Composite 1500 Real Estate Investment Trusts REITs Index ("S&P REITs Index"), an off-the-shelf index of publicly traded REITs, was used to control for industry movements.[23] A rolling control period of 252 trading days before each event tested, excluding the alleged misrepresentations and alleged corrective disclosures, was used to run the regressions.

---

[20]    See, for example, Alexander, Janet C., "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994, Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer* 38: 1982, and Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[21]    See, for example, MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Bowman, Robert G., "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, 10(4): 1983.

[22]    Regression analysis is used to estimate the relationship between two or more variables. See, for example, Hogg, Robert V. and Elliot A. Tanis, *Probability and Statistical Inference*, (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

[23]    Data obtained from Bloomberg, L.P. using the tickers "SPX Index" for the S&P 500 Index, and "S15REITS Index" for the S&P REITs Index. CoreCivic's return was removed from the return of the S&P 1500 REITS Index.

## VII. THE ALLEGED MISREPRESENTATIONS DID NOT HAVE PRICE IMPACT

### A. There is no evidence that the alleged misrepresentations caused a statistically significant increase in CoreCivic's stock price

26.     As part of the analysis of price impact, I analyzed whether the alleged misrepresentations caused a statistically significant increase in CoreCivic's stock price when made. Using both the Feinstein event study, as well as my alternative event study methodology described in Section VI above, I calculated the abnormal stock price movement (*i.e.*, the company-specific movement in CoreCivic's stock price after controlling for market and industry movements) following each alleged misrepresentation, and tested the abnormal movement to determine if it was statistically significant.

27.     Plaintiff alleges 33 dates on which CoreCivic made alleged misrepresentations that purportedly inflated its stock price. I find that there was no statistically significant increase in CoreCivic's stock price following 28 of the 33 alleged misrepresentations. In other words, CoreCivic's stock price reaction following 28 of the 33 alleged misrepresentations, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price and, thus, cannot be distinguished from zero. The results of the event study following the 33 alleged misrepresentations are below:

# Price Reactions Following the Alleged Misrepresentations

| Alleged Misrep. | Event Date | Reaction Date | Event | Stat. Sig. Price Increase? |
|---|---|---|---|---|
| M1 | 2/27/12 | 2/27/12 | 2011 10-K | Yes |
| M2 | 3/5/12 | 3/5/12 | Lewiston Morning Tribune article | No |
| M3 | 3/30/12 | 3/30/12 | 2012 Proxy Statement | No |
| M4 | 5/7/12 | 5/7/12 | 1Q12 10-Q | No |
| M5 | 8/9/12 | 8/9/12 | 2Q12 10-Q | Yes |
| M6 | 11/8/12 | 11/8/12 | 3Q12 10-Q | No |
| M7 | 2/14/13 | 2/14/13 | 4Q12 Earnings Call | No |
| M8 | 2/27/13 | 2/28/13 | 2012 10-K | No |
| M9 | 5/9/13 | 5/9/13 | 1Q13 10-Q | No |
| M10 | 8/8/13 | 8/8/13 | 2Q13 10-Q | Yes |
| M11 | 10/2/13 | 10/2/13 | 2013 Analyst Day | No |
| M12 | 11/7/13 | 11/7/13 | 3Q13 10-Q | No |
| M13 | 2/27/14 | 2/27/14 | 2013 10-K | No |
| M14 | 5/5/14 | 5/5/14 | Chattanooga Times Free Press Article | No |
| M15 | 5/8/14 | 5/8/14 | 1Q14 10-Q | No |
| M16 | 6/5/14 | 6/5/14 | NAREIT's Investor Forum | No |
| M17 | 8/7/14 | 8/7/14 | 2Q14 10-Q | Yes |
| M18 | 11/5/14 | 11/5/14 | 3Q14 10-Q | No |
| M19 | 11/7/14 | 11/7/14 | 3Q14 Investor Presentation | No |
| M20 | 2/24/15 | 2/24/15 | 4Q14 Investor Presentation | No |
| M21 | 2/25/15 | 2/25/15 | 2014 10-K | No |
| M22 | 5/7/15 | 5/7/15 | 1Q15 10-Q | No |
| M23 | 5/19/15 | 5/19/15 | 1Q15 Investor Presentation | No |
| M24 | 8/6/15 | 8/6/15 | 2Q15 10-Q | No |
| M25 | 8/21/15 | 8/21/15 | 2Q15 Investor Presentation | No |
| M26 | 11/5/15 | 11/5/15 | 3Q15 10-Q | No |
| M27 | 11/12/15 | 11/12/15 | 3Q15 Investor Presentation | No |
| M28 | 2/24/16 | 2/24/16 | 4Q15 Investor Presentation | No |
| M29 | 2/25/16 | 2/25/16 | 2015 10-K | No |
| M30 | 5/5/16 | 5/5/16 | 1Q16 Earnings Call, 1Q16 10-Q | Yes |
| M31 | 5/17/16 | 5/17/16 | 1Q16 Investor Presentation | No |
| M32 | 6/8/16 | 6/8/16 | NAREIT's Investor Forum | No |
| M33 | 8/4/16 | 8/4/16 | 2Q16 10-Q | No |

**Source:**
Events from the Complaint.

28.     For the 5 dates on which there was a statistically significant price increase (M1, M5, M10, M17, and M30), I reviewed the timing of the announcements, analyst commentary following the events, and compared the alleged misrepresentations to prior statements made by the Company to determine whether there was any evidence that the price increase was caused by the alleged misrepresentations.

29.     I find that the statistically significant price increase on each of the five alleged misrepresentation dates was *not* caused by the alleged misrepresentations. An analysis of the timing of each announcement shows that for four of the alleged misrepresentation dates (M1, M5, M10, and M17), the increase in CoreCivic's stock price had occurred *before* the alleged misrepresentation was made. In the case of M30, CoreCivic's stock price did not increase in response to the alleged misrepresentation, but instead, according to analysts, increased in response to an announcement not claimed by Plaintiff as an alleged misrepresentation.

30.     Further, on each of those 5 dates, the alleged misrepresentations in CoreCivic's SEC filings were either identical or substantially similar to statements made in earlier filings. In an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.[24]

31.     In addition to analyzing the 5 dates on which there was a statistically significant price increase, I analyzed market and analyst commentary following the 28 alleged misrepresentations after which there was *no* statistically significant price increase, including examining potential negative confounding news, to see if there was any evidence that any of these alleged misrepresentations caused a statistically significant price increase. Based on this analysis of each of the 28 alleged misrepresentation dates, I found no evidence that the alleged misrepresentations on these dates impacted CoreCivic's stock price.

32.     In sum, an analysis of the stock price reaction after the alleged misrepresentations yields no evidence that the alleged misrepresentations impacted CoreCivic's stock price. Details for the 5 dates on which there was a statistically significant price increase are discussed below.

---

[24]   See, for example, Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 8th ed., 2009), p. 345.

Courts have similarly noted that confirmatory news should not cause a statistically significant price reaction. See, for example, *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004). ("[C]onfirmatory information has already been digested by the market and will not cause a change in stock price.")

### *February 27, 2012 alleged misrepresentations (M1)*

33.　　Plaintiff claims that CoreCivic made a number of allegedly false and misleading statements in its Form 10-K for FY2011, filed at 2:31 p.m. on February 27, 2012 (the first day of the alleged Class Period).[25] There was a statistically significant increase in CoreCivic's stock price on February 27, 2012.[26]

34.　　I find that the statistically significant price increase on February 27, 2012 was *not* caused by the alleged misrepresentations in the 2011 10-K. I find that the increase in CoreCivic's stock price had occurred *before* the alleged misrepresentation was made. In particular, by the time the Form 10-K was filed at 2:31 p.m. on February 27, CoreCivic's stock price had already increased from a closing price of $20.86 on February 24 (the previous trading day) to $21.85. CoreCivic's stock price remained roughly stable after the filing of the Form 10-K, ranging from $21.78 to $21.88, and closing at $21.80.[27] The chart below shows CoreCivic's intraday stock price and trading volume around February 27, 2012:

---

[25]　Complaint, ¶¶119-141.

[26]　Based on the results of both the Feinstein event study and the alternative event study described in Section VI.

[27]　Based on intraday price data from Tick Data, LLC.



**Intraday Stock Price and Trading Volume Around February 27, 2012 Alleged Misrepresentation**

Notes and Sources:
Intraday price and volume from Tick Data, LLC. Note that to illustrate the timing of the events and price movements, the stock price axis (*i.e.*, vertical axis) has been truncated, which can have the effect of magnifying the price movements.

35.    Commentary by analysts covering CoreCivic indicates that the price increase on February 27, 2012 was caused by CoreCivic's announcement, before market hours, that it was initiating a dividend of $0.20 per share.[28] For example, the Macquarie analyst covering CoreCivic noted that the dividend announcement was "a good use of capital" and a "positive" for the stock price:

**Event**

**Initiation of a ~3.5% dividend yield should help support CXW** [CoreCivic]. On Monday before the market open, CXW announced their intention to initiate a quarterly dividend payment of US$0.20 per share beginning in June of 2012. […]

**Impact**

---

[28]    "CCA Announces Its Intention to Initiate a Quarterly Dividend of $0.20 per Share," *Marketwire via Comtex*, February 27, 2012. The precise time that the press release was published is not available. However, according to analysts covering CoreCivic, the press release was published before market hours. See, for example, *Macquarie*, February 27, 2012.

> **CXW's decision to declare a dividend is a good use of capital**. […]
>
> **Action and recommendation**
>
> **Today's dividend announcement is positive for the CXW stock**. [Macquarie, 2/27/12, emphasis original]

36.     Further, the alleged misrepresentations in CoreCivic's 2011 10-K were either identical or substantially similar to statements made in the Company's earlier SEC filings, as shown in the table below:

| **Alleged Misrepresentation** | **Previous Statement** |
|---|---|
| Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities.<br><br>    [Complaint, ¶120, citing 2011 10-K, filed 2/27/12] | Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities.<br><br>    [2010 10-K, filed 2/25/11] |
| We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds.<br><br>    [Complaint, ¶121, citing 2011 10-K, filed 2/27/12] | We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds.<br><br>    [2010 10-K, filed 2/25/11] |
| Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration.<br><br>    [Complaint, ¶123, citing 2011 10-K, filed 2/27/12] | Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration.<br><br>    [2010 10-K, filed 2/25/11] |

| Alleged Misrepresentation | Previous Statement |
|---|---|
| We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system.<br><br>[Complaint, ¶126, citing 2011 10-K, filed 2/27/12] | We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system.<br><br>[2010 10-K, filed 2/25/11] |
| We believe these advantages translate into significant cost savings for government agencies.<br><br>[Complaint, ¶127, citing 2011 10-K, filed 2/27/12] | We believe these advantages translate into significant cost savings for government agencies.<br><br>[2010 10-K, filed 2/25/11] |
| We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry.<br><br>[Complaint, ¶129, citing 2011 10-K, filed 2/27/12] | We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry.<br><br>[3Q11 10-Q, filed 11/4/11] |
| We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[Complaint, ¶132, citing 2011 10-K, filed 2/27/12] | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[3Q11 10-Q, filed 11/4/11] |

| Alleged Misrepresentation | Previous Statement |
|---|---|
| We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 58 of the facilities we operated as of December 31, 2011, and we intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process. Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program. | We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. Our facilities not only operate under these established standards (we have sought and received accreditation for 56 of the facilities we operated as of December 31, 2010) but are consistently challenged by management to exceed these standards. This challenge is presented, in large part, through an extensive, comprehensive Quality Assurance Program. We intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process. |
| [Complaint, ¶135, citing 2011 10-K, filed 2/27/12] | [2010 10-K, filed 2/25/11] |

| Alleged Misrepresentation | Previous Statement |
|---|---|
| Our Quality Assurance Division independently operates under the auspices of, and reports directly to, the Company's Office of General Counsel. […] The Quality Assurance Division oversees all efforts by our facilities to deliver high quality services and operations, with an absolute commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section.<br><br>[…] The Audit and Compliance Systems Section consists of two full time audit teams comprised of subject matter experts from all major disciplines within institutional operations, as well as management staff that oversee the process. […] In addition, our Quality Assurance Division contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities. Our teams of auditors are deployed several times a year as well (in advance of contractually mandated ACA accreditation audits) to help ensure that our facilities are operating at the highest possible levels.<br><br>[Complaint, ¶135, citing 2011 10-K, filed 2/27/12] | Our Quality Assurance Department independently operates under the auspices of, and reports directly to, the Company's Office of General Counsel. […] The second major section within the Quality Assurance Department is the Operational Audit Section. This section consists of two full time audit teams comprised of subject matter experts from all the major discipline areas within institutional operations. […] The audit findings also comprise a major part of our continuous operational risk assessment and management process. The Company has devoted significant resources to the Quality Assurance Department, enabling us to monitor compliance with contractual requirements, outside agency and accrediting organization standards. Quality Assurance closely monitors all efforts by our facilities to deliver the exceptional quality of services and operations expected.<br><br>[2010 10-K, filed 2/25/11] |

As noted above, the lack of any reaction in CoreCivic's stock price to the alleged misrepresentations in the Company's 2011 10-K is consistent with the fact that in an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.[29]

### *August 9, 2012 alleged misrepresentations (M5)*

37.     Plaintiff claims that CoreCivic made a number of allegedly false and misleading statements in its Form 10-Q for 2Q12, filed at 10:20 a.m. on August 9, 2012.[30] There was a statistically significant increase in CoreCivic's stock price on August 9, 2012.[31]

---

[29]   Note that a number of the statements in CoreCivic's SEC filings during the alleged Class Period that are claimed as alleged misrepresentations were first made by the Company over a decade before the start of the alleged Class Period, in some cases as early as 2001. See, for example, CoreCivic FY2000 Form 10-K, filed April 17, 2001.

[30]   Complaint, ¶¶119-141.

[31]   Based on the results of both the Feinstein event study and the alternative event study described in Section VI.

38. I find that the statistically significant price increase on August 9, 2012 was *not* caused by the alleged misrepresentations in the 2Q12 10-Q. I find that the increase in CoreCivic's stock price had occurred *before* the alleged misrepresentation was made. In particular, by the time the Form 10-Q was filed at 10:20 a.m. on August 9, CoreCivic's stock price had already increased from a closing price of $27.24 on August 8 to $28.72. CoreCivic's stock price remained roughly stable after the filing of the Form 10-Q, ranging from $28.37 to $28.96, and closing at $28.49.[32] The chart below shows CoreCivic's intraday stock price and trading volume around August 9, 2012:



**Intraday Stock Price and Trading Volume Around August 9, 2012 Alleged Misrepresentation**

Notes and Sources:
Intraday price and volume from Tick Data, LLC. Note that to illustrate the timing of the events and price movements, the stock price axis (*i.e.*, vertical axis) has been truncated, which can have the effect of magnifying the price movements.

39. Commentary by analysts covering CoreCivic indicates that the price increase on August 9, 2012 was caused by CoreCivic's 2Q12 earnings press release, published after market

---

[32] Based on intraday price data from Tick Data, LLC.

close on August 8.[33] In particular, analysts focused on CoreCivic's statements in the 2Q12 earnings release regarding the Company's potential REIT conversion. For example, the SunTrust analysts covering CoreCivic raised their 12-month price target for CoreCivic stock based on the perceived increase in the probability of a REIT conversion:

> The company indicated that: (1) strategically it is in favor of converting to a REIT; (2) a private letter ruling (PLR) has been requested of the IRS; and (3) its intention is to pursue a conversion effective January 1, 2013. We raise our price target to $36 on an increase in our estimate of the probability of a REIT conversion to 70% from 60%. We believe these new odds may be conservative. [SunTrust, 8/9/12]

40. Further, the alleged misrepresentations in CoreCivic's 2Q12 10-Q were either identical or substantially similar to statements made in the Company's earlier SEC filings, as shown in the table below:

| Alleged Misrepresentation | Previous Statement |
|---|---|
| We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry.<br><br>[Complaint, ¶¶129-130, citing 2Q12 10-Q, filed 8/9/12] | We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry.<br><br>[1Q12 10-Q, filed 5/7/12] |
| We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[Complaint, ¶132, citing 2Q12 10-Q, filed 8/9/12] | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[1Q12 10-Q, filed 5/7/12] |

---

[33] "CCA Announces 2012 Second Quarter Financial Results and Provides Update on Potential REIT Conversion," *Marketwire via Comtex*, August 8, 2012, 4:12 p.m.

As noted above, the lack of any reaction in CoreCivic's stock price to the alleged misrepresentations in the Company's 2Q12 10-Q is consistent with the fact that in an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.

### *August 8, 2013 alleged misrepresentations (M10)*

41.　　Plaintiff claims that CoreCivic made a number of allegedly false and misleading statements in its Form 10-Q for 2Q13, filed at 12:45 p.m. on August 8, 2013.[34] There was a statistically significant increase in CoreCivic's stock price on August 8, 2013.[35]

42.　　I find that the statistically significant price increase on August 8, 2013 was *not* caused by the alleged misrepresentations in the 2Q13 10-Q. I find that the increase in CoreCivic's stock price had occurred *before* the alleged misrepresentation was made. In particular, by the time the Form 10-Q was filed at 12:45 p.m. on August 8, CoreCivic's stock price had already increased from a closing price of $32.91 on August 7 to $33.90. CoreCivic's stock price remained roughly stable after the filing of the Form 10-Q, ranging from $33.72 to $34.08, and closing at $34.01.[36] The chart below shows CoreCivic's intraday stock price and trading volume around August 8, 2013:

---

[34]　Complaint, ¶¶119-141.

[35]　Based on the results of both the Feinstein event study and the alternative event study described in Section VI.

[36]　Based on intraday price data from Tick Data, LLC.



**Intraday Stock Price and Trading Volume Around August 8, 2013 Alleged Misrepresentation**

Notes and Sources:
Intraday price and volume from Tick Data, LLC. Note that to illustrate the timing of the events and price movements, the stock price axis (*i.e.*, vertical axis) has been truncated, which can have the effect of magnifying the price movements.

43.     Commentary by analysts covering CoreCivic indicates that the price increase on August 8, 2013 was caused by CoreCivic's 2Q13 financial results, announced after market close on August 7,[37] which were better than the market's expectations. For example, the Macquarie analyst covering CoreCivic stated that the Company's 2Q13 results were "strong" and would "benefit" the stock price:

> We expect the CXW [CoreCivic] stock to benefit THU 8/8 after reporting strong Q2 results + boosting its guidance—CXW offered a 2013 AFFO guidance range of US$2.58- US$2.66, up from prior US$2.53-US$2.65 + consensus of US$2.62[.] [Macquarie, 8/8/13]

44.     Further, the alleged misrepresentations in CoreCivic's 2Q13 10-Q were either identical or substantially similar to statements made in the Company's earlier SEC filings, as shown in the table below:

---

[37]   "CCA Announces 2013 Second Quarter Financial Results," *Marketwired*, August 7, 2013, 4:31 p.m.

| Alleged Misrepresentation | Previous Statement |
|---|---|
| We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity.<br><br>[Complaint, ¶¶129-130, citing 2Q13 10-Q, filed 8/8/13] | We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity.<br><br>[1Q13 10-Q, filed 5/9/13] |
| We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[Complaint, ¶¶132-133, citing 2Q13 10-Q, filed 8/8/13] | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[1Q13 10-Q, filed 5/9/13] |

As noted above, the lack of any reaction in CoreCivic's stock price to the alleged misrepresentations in the Company's 2Q13 10-Q is consistent with the fact that in an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.

### *August 7, 2014 alleged misrepresentations (M17)*

45.     Plaintiff claims that CoreCivic made a number of allegedly false and misleading statements in its Form 10-Q for 2Q14, filed at 12:25 p.m. on August 7, 2014.[38] There was a statistically significant increase in CoreCivic's stock price on August 7, 2014.[39]

46.     I find that the statistically significant price increase on August 7, 2014 was *not* caused by the alleged misrepresentations in the 2Q14 10-Q. I find that the increase in CoreCivic's stock price had occurred *before* the alleged misrepresentation was made. In

---

[38]   Complaint, ¶¶119-141.

[39]   Based on the results of both the Feinstein event study and the alternative event study described in Section VI.

particular, by the time the Form 10-Q was filed at 12:25 p.m. on August 7, CoreCivic's stock price had already increased from a closing price of $33.09 on August 6 to $34.25. CoreCivic's stock price remained roughly stable after the filing of the Form 10-Q, ranging from $34.15 to $34.52, and closing at $34.31.[40] The chart below shows CoreCivic's intraday stock price and trading volume around August 7, 2014:



47.     Commentary by analysts covering CoreCivic indicates that the price increase on August 7, 2014 was caused by CoreCivic's 2Q14 financial results, announced after market close on August 6,[41] which were better than the market's expectations. For example, the CRT Capital analyst covering CoreCivic stated that both revenue and adjusted funds from operations ("AFFO") in 2Q14 were "better than estimated:"

---

[40]   Based on intraday price data from Tick Data, LLC.

[41]   "CCA Announces 2014 Second Quarter Financial Results," *Marketwired*, August 6, 2014, 4:15 p.m.

Corrections Corporation reported a better than estimated quarter, beating us and the street in both revenue (beat by $3 - $4 million) and AFFO by $0.04 - $0.05 per share at $0.68 (roughly $0.02 of the beat was due to a lower tax rate). [...] We were encouraged by the recent finalization of a contract with Trousdale County and the state of Tennessee, paving the way for a 2015 opening. [CRT Capital, 8/7/14]

48.     Further, the alleged misrepresentations in CoreCivic's 2Q14 10-Q were either identical or substantially similar to statements made in the Company's earlier SEC filings, as shown in the table below:

| Alleged Misrepresentation | Previous Statement |
|---|---|
| We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency, savings, and inmate programming opportunities we can provide. Further, we expect our partners to continue to face challenges in developing new facilities and additional capacity which could result in future demand for the solutions that we provide.<br><br>[Complaint, ¶¶129-130, citing 2Q14 10-Q, filed 8/7/14] | We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency, savings, and inmate programming opportunities we can provide. Further, we expect our partners to continue to face challenges in developing new facilities and additional capacity which will result in future demand for the solutions that we provide.<br><br>[1Q14 10-Q, filed 5/8/14] |
| We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[Complaint, ¶¶132-133, citing 2Q14 10-Q, filed 8/7/14] | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[1Q14 10-Q, filed 5/8/14] |

As noted above, the lack of any reaction in CoreCivic's stock price to the alleged misrepresentations in the Company's 2Q14 10-Q is consistent with the fact that in an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.

### *May 5, 2016 alleged misrepresentations (M30)*

49.     Plaintiff claims that CoreCivic made allegedly false and misleading statements on two separate occasions on May 5, 2016 – in the Company's 1Q16 earnings conference call, held at 11:00 a.m., and in CoreCivic's Form 10-Q for 1Q16, filed at 12:30 p.m.[42] There was a statistically significant increase in CoreCivic's stock price on May 5, 2016.[43]

50.     In the case of the two May 5 alleged misrepresentation events, an analysis of the timing of does not help determine whether the alleged misrepresentations impacted CoreCivic's stock price. As shown in the chart below, CoreCivic's stock price had already begun to increase prior to the 11:00 a.m. conference call, and continued to increase throughout the trading day, including after the filing of the 1Q16 10-Q at 12:30 p.m.:

---

[42]   Complaint, ¶¶119-141,166-167.

[43]   Based on the results of both the Feinstein event study and the alternative event study described in Section VI.



**Intraday Stock Price and Trading Volume Around May 5, 2016 Alleged Misrepresentations**

Notes and Sources:
Intraday price and volume from Tick Data, LLC. Note that to illustrate the timing of the events and price movements, the stock price axis (*i.e.*, vertical axis) has been truncated, which can have the effect of magnifying the price movements.

51.    However, a review of the five analyst reports on CoreCivic published on May 5 and May 6 shows that the statistically significant price increase on May 5 was *not* caused by the alleged misrepresentations in the 1Q16 conference call or in the 1Q16 10-Q. Commentary by analysts covering CoreCivic indicates that the price increase on May 5, 2016 was caused by two pieces of news – (i) CoreCivic's 1Q16 financial results, announced after market close on May 4, which were better than the market's expectations, and (ii) an announcement by the Oklahoma Department of Corrections ("Oklahoma DOC") during market hours on May 5 that it had renewed the lease for CoreCivic's North Fork Correctional Facility ("North Fork"). For example, the Canaccord analysts covering CoreCivic stated that the Company's 1Q16 results were "robust across the board:"

> CXW's [CoreCivic's] 1Q print was robust across the board, as the company beat consensus FFO and raised full-year FFO expectations in excess of the guidance beat. Management continues to execute solidly, as operations beat internal expectations

while the company was active on the M&A front with the purchase of 600-beds of community corrections. [Canaccord Genuity, 5/5/16]

52.    The Macquarie analyst covering CoreCivic similarly noted that CoreCivic's 1Q16 financial results were better than expected:

We expect the CXW [CoreCivic] stock to build on recent momentum THU 5/5 after reporting a Q1 beat, Q2 guide in line with the Street + boosting 2016 AFFO guidance. [Macquarie, 5/4/16]

53.    On May 5, 2016, during market hours and at the same time that CoreCivic filed its 1Q16 10-Q, the Oklahoma DOC announced that it had renewed the lease for CoreCivic's North Fork facility located in the state.[44] The Wells Fargo analysts covering CoreCivic stated that the increase in CoreCivic's stock price on May 5 was due in part to the Oklahoma DOC's announcement:

In our view, much of the move in the stock price yesterday was due to details of the Oklahoma Board of Correction's meeting[.] [Wells Fargo, 5/6/16]

54.    Plaintiff claims that CoreCivic allegedly "misled investors regarding [CoreCivic's] 'high quality operations' and 'great value'" in the 1Q16 conference call.[45] In particular, the Complaint focuses on the following statements made during the conference call:

We have had tremendous success at the state and federal level with either at state-level governor's being a democrat or being a republican, or a president being a democrat or republican. We've been able to have really good operations, perform very, very well, and provide great value to our partners regardless of who's in the White House or who's in the Governor's residence in a respective state. And that's our focus, just to make sure that we continue to do a great job every day, have high quality operations, and then provide great value back to the taxpayers of that respective jurisdiction.[46]

55.    A review of the five analyst reports on CoreCivic published on May 5 and May 6 indicates that these alleged misstatements in the conference call did not impact CoreCivic's stock price. None of the analysts covering the Company stated that the alleged misrepresentations had provided them with a new understanding of CoreCivic's "quality" or "value," or that the alleged

---

[44] "Oklahoma DOC to Re-Open North Fork Correctional Facility, Reorganize Inmate Population," *Oklahoma Department of Corrections*, May 5, 2016. The Oklahoma DOC provided a link to this press release in a tweet published on May 5 at 12:30 p.m.

[45] Complaint, ¶166.

[46] Complaint, ¶166, citing CoreCivic 1Q16 earnings conference call, May 5, 2016.

misrepresentations had assured them that CoreCivic could be "successful regardless of the leaders in power."[47] In fact, the Canaccord analysts covering CoreCivic explicitly noted the "election-driven" uncertainty surrounding CoreCivic's operations and reiterated their "HOLD" rating on the stock due to this uncertainty:

> Furthermore, while we don't see these sentencing reform headwinds translating into any near-term cash flow disruption and we see more upside opportunity than downside risk to our 2016 estimates, we are reluctant to step in front of the aforementioned election-driven sentiment headwinds after the stock has already run so much. As such, we reiterate our HOLD rating, but raise our year-end price target $1 to $34 on the improvement in operations. [Canaccord Genuity, 5/5/16]

56.  Further, the alleged misrepresentations in the 10-Q were either identical or substantially similar to statements made in the Company's earlier SEC filings, as shown in the table below:

| Alleged Misrepresentation | Previous Statement |
| --- | --- |
| We believe the long-term growth opportunities of our business remain attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide.<br><br>[Complaint, ¶¶129-130, citing 1Q16 10-Q, filed 5/5/16] | We believe the long-term growth opportunities of our business remain attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide.<br><br>[2015 10-K, filed 2/25/16] |
| We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[Complaint, ¶¶132-133, citing 1Q16 10-Q, filed 5/5/16] | We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.<br><br>[2015 10-K, filed 2/25/16] |

---

[47]   Complaint, ¶166.

| Alleged Misrepresentation | Previous Statement |
|---|---|
| Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses.<br><br>[Complaint, ¶¶139-140, citing 1Q16 10-Q, filed 5/5/16] | Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses.<br><br>[2015 10-K, filed 2/25/16] |

As noted above, the lack of any reaction in CoreCivic's stock price to the alleged misrepresentations in the Company's 1Q16 10-Q is consistent with the fact that in an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant price reaction.

### B. CoreCivic's stock price did not react to the OIG Report, the first alleged corrective disclosure, which demonstrates that the alleged misrepresentations did not have price impact

57.     Plaintiff alleges that CoreCivic's stock price was inflated during the alleged Class Period as a result of alleged misrepresentations regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities.[48] Plaintiff claims that the release of the OIG Report on August 11, 2016, the first of the two alleged corrective disclosures, "partially corrected" CoreCivic's stock price by revealing the alleged truth regarding the "financial conditions, business risks and other information concealed" by the alleged fraud.[49] According to the Complaint, the OIG Report found that contract prisons "incurred more safety and security incidents per capita than comparable BOP institutions."[50] In other words, according to Plaintiff's theory, the alleged

---

[48]   Complaint, ¶¶116-117.

[49]   Complaint, ¶192.

[50]   Complaint, ¶39, citing OIG Report.

misrepresentations impacted CoreCivic's stock price and caused the price to be artificially inflated, and this inflation was "partially eliminated" by the disclosures in the OIG Report.[51]

58. To test Plaintiff's theory, I used the event study methodology described in Section VI above to measure whether there was a statistically significant stock price reaction following the release of the OIG Report. Contrary to Plaintiff's theory, there was no statistically significant reaction in CoreCivic's stock price on August 11, 2016 following the release of the OIG Report.[52] In other words, CoreCivic's stock price reaction on August 11, 2016, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, cannot be distinguished from zero.[53] The fact that the release of the very information that is purportedly corrective of the alleged misrepresentations did not cause any statistically significant reaction in CoreCivic's stock price affirmatively demonstrates that the alleged misrepresentations did not have price impact.[54] The table below shows the results of the Feinstein event study for August 11, 2016:

---

Note that the OIG Report did not focus solely on CoreCivic, but instead focused collectively on all three of the private prisons companies with whom the BOP contracts – CoreCivic, GEO and Management and Training Corporation.

[51] Complaint, ¶¶191-192.

[52] The DOJ provided a link to the OIG Report in a tweet published on August 11 at 6:06 a.m. The DOJ also published a press release on August 11 that mentioned CoreCivic by name and included a link to the OIG Report. See, "DOJ OIG Releases Report on the Federal Bureau of Prisons' Monitoring of Contract Prisons," *U.S. Department of Justice: Office of the Inspector General*, August 11, 2016.

[53] As a check, my team and I reviewed news on CoreCivic and the private prisons industry released on August 11, 2016. Based on this review, we found that there was no other news announced on August 11, 2016 that could have offset any negative reaction in CoreCivic's stock price on that date.

[54] In his reports in other matters, Dr. Feinstein has stated that examining the price reactions following the alleged corrective disclosures is useful to ascertain whether the market was efficient, "not only generally, but also with respect to the particular information at issue in the case." Thus, the lack of any statistically significant price reaction to the OIG Report shows either that the market for CoreCivic stock was not efficient with respect to Plaintiff's allegations or that the alleged misrepresentations did not have price impact. See, Report of Steven P. Feinstein in *Norfolk County Retirement System v. Community Health Systems, Inc. et al.*, filed May 7, 2018.

### Price Reaction Following OIG Report
According to Feinstein Event Study

| Date | CoreCivic Return | Market Index Return | Sector Index Return | REIT Index Return | CoreCivic Predicted Return | % Price Reaction | Statistically Significant?[1] |
|---|---|---|---|---|---|---|---|
| 8/11/16 | -0.62% | 0.48% | -0.30% | -1.00% | -0.74% | 0.12% | No |

Notes and Sources:

   Data from "FEIN_000006.XLSX." Based on methodology described in Feinstein Report, ¶¶110-119.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the sample period. "Yes" indicates that the price reaction is statistically significant at the 5% level.

The table below shows the results of the alternative event study (described in Section VI) for August 11, 2016:

### Price Reaction Following OIG Report
According to Alternative Event Study

| Date | CoreCivic Return | Market Index Return | REIT Index Return | CoreCivic Predicted Return | % Price Reaction | Statistically Significant?[1] |
|---|---|---|---|---|---|---|
| 8/11/16 | -0.62% | 0.47% | -1.03% | -0.83% | 0.21% | No |

Notes and Sources:

   Data from Bloomberg, L.P.

[1] Significance is based on the price reaction's t-statistic, calculated as the price reaction divided by the standard error of the regression over the sample period. "Yes" indicates that the price reaction is statistically significant at the 5% level.

     59.     Further evidence demonstrating no market reaction to the release of the OIG Report, and thus, no price impact of the alleged misrepresentations is the fact that there were no analyst reports on CoreCivic published between August 11, 2016 (the date of the OIG Report) and August 18, 2016 (the date of the Yates Memo). As discussed above, analysts typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The lack of analyst reports is consistent with the lack of a price reaction, demonstrating that neither the alleged misrepresentations nor

information purportedly correcting the alleged misrepresentations had any impact on analysts' valuations of CoreCivic's stock or analysts' perceptions of the "quality," "performance" or "cost savings" of CoreCivic's facilities.

60. In sum, Plaintiff claims that the alleged inflation in CoreCivic's stock price, caused by the alleged misrepresentations regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities, was "partially eliminated" by the OIG Report. However, an analysis of the price reaction and analyst commentary following the release of the OIG Report does not support Plaintiff's claim. The fact that the release of the very information that Plaintiff is claiming is corrective of the alleged misrepresentations did not cause any statistically significant reaction in CoreCivic's stock price, or change analysts' perceptions of the "quality," "performance" or "cost savings" of CoreCivic's facilities affirmatively demonstrates that the alleged misrepresentations did not have price impact.[55]

## C. Reports of riots and other safety and "quality"-related incidents that revealed information of the type that Plaintiff alleges is corrective of the alleged misrepresentations were released during the alleged Class Period to no stock price reaction

61. Plaintiff's theory is that the alleged misrepresentations impacted CoreCivic's stock price because they concealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities. Plaintiff claims the OIG Report revealed the alleged truth regarding the "quality" and cost-effectiveness of CoreCivic's facilities that was concealed by the alleged fraud. However, information regarding the "quality" and "performance" of CoreCivic's facilities of the type that Plaintiff alleges is corrective of the alleged misrepresentations, including reports of riots and other safety and "quality"-related incidents at CoreCivic's BOP facilities, was released on a number of occasions both prior to and during the alleged Class Period. As with the OIG Report, there was no statistically significant reaction in CoreCivic's stock price after any of these announcements, and no indication that these

---

[55] Note that even assuming Plaintiff is arguing that the alleged misrepresentations maintained the alleged inflation in CoreCivic's stock (and thus, that a price increase would not be expected at the time the alleged misrepresentations were made), the lack of any market reaction following the release of the OIG Report, which revealed information that Plaintiff claims is corrective of the alleged misrepresentations demonstrates that the alleged misrepresentations did not have price impact.

announcements changed analysts' perceptions of the "quality" or "performance" of CoreCivic's facilities, demonstrating that the alleged misrepresentations did not have price impact.

62. Plaintiff claims that, throughout the alleged Class Period, the alleged misrepresentations impacted CoreCivic's stock price because CoreCivic allegedly "knew information about the operational shortcomings at the Company's facilities," including purported "deficiencies" in the "quality" and "performance" of its BOP facilities, that, if revealed, would have been "perceived negatively" by the market.[56] The Complaint focuses on "quality" and "performance"-related "deficiencies" at four specific CoreCivic facilities.[57] These facilities are:

- Adams County Correctional Center ("Adams"), located in Natchez Mississippi.[58] According to the Complaint, "Adams was the scene of a riot in May 2012 that turned deadly when a [CoreCivic] correctional officer was killed."[59] The Complaint identifies "understaffing" as a "deficiency" at Adams that was concealed by the alleged fraud and that contributed to the May 2012 riot.[60]

- Cibola County Correctional Center ("Cibola"), located in Milan, New Mexico.[61] The Complaint identifies the failure "to provide adequate health services"[62] as a "deficiency" at Cibola that was concealed by the alleged fraud.

- Eden Detention Center ("Eden"), located in Eden, Texas.[63] As with Cibola, the Complaint identifies the failure "to provide adequate health services"[64] as a "deficiency" at Eden that was concealed by the alleged fraud.

---

[56] Complaint, ¶185.

[57] In addition to the four facilities discussed in the Complaint, CoreCivic also operated an additional BOP facility during the alleged Class Period – the Northeast Ohio Correctional Center. CoreCivic's contract with the BOP for this facility expired on May 31, 2015. See, for example, "Press Release: Federal Bureau of Prisons Elects Not to Renew Contract at the Northeast Ohio Correctional Center," *Dow Jones Institutional News*, December 29, 2014.

[58] Complaint, ¶43.

[59] Complaint, ¶44.

[60] Complaint, ¶4.

[61] Complaint, ¶68.

[62] Complaint, ¶6.

[63] Complaint, ¶87.

[64] Complaint, ¶6.

- McRae Correctional Facility ("McRae"), located in McRae, Georgia.[65] The Complaint identifies the use of "'capricious or retaliatory' disciplinary action"[66] and "indifference to inmates' medical needs"[67] as "deficiencies" at McRae that were concealed by the alleged fraud.

63. I reviewed publicly available information to see if information regarding "quality" and "performance"-related deficiencies at CoreCivic's facilities of the type Plaintiff alleges was concealed by the alleged fraud was released during the alleged Class Period, and tested whether there was any statistically significant reaction in CoreCivic's stock price following the release of this information. I found that a number of public reports and articles discussing the "quality" and "performance"-related "deficiencies" at the CoreCivic facilities listed above were published both prior to and during the alleged Class Period to no statistically significant price reaction.[68] In other words, the release of information on "quality" and "performance"-related "deficiencies" at CoreCivic's facilities that Plaintiff claims would have been "perceived negatively" by the market did not cause any statistically significant movement in CoreCivic's stock price. The lack of any price reaction to the release of this information is consistent with the lack of a price reaction to the allegedly corrective information regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities in the OIG Report, and demonstrates that the alleged misrepresentations did not have price impact. The reports on each of the four CoreCivic facilities that are the focus of the Complaint are summarized below:

- Adams: During the alleged Class Period, three reports alleging issues with understaffing and other "quality"-related "deficiencies" at Adams were publicly released. The first report, published on September 13, 2012, was an investigative report by *Justice Strategies* that examined the conditions for inmates at private prisons, including at Adams.[69] The *Justice Strategies* report stated that inmates at

---

[65] Complaint, ¶108.

[66] Complaint, ¶111.

[67] Complaint, ¶112.

[68] Note that these reports are not meant to be a representative view of the "quality" of CoreCivic facilities or private prisons in general, and I am not testing the accuracy of the information contained in these reports (including the OIG Report). Rather, my focus here is on negative reports with information similar to the information Plaintiff claims is corrective of the alleged misrepresentations.

[69] "Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary," *Justice Strategies*, September 13, 2012.

Adams had endured "beatings by guards," "discriminatory and humiliating treatment," "substandard food," "periods of excessive lockdown" and "lack of proper medical care" at the facility. There was no statistically significant price reaction following the publication of this report by *Justice Strategies*. The second report, dated July 27, 2012 and released publicly in June 2016, was an "After-Action Report" prepared by the BOP addressing the causes of the 2012 Adams riot.[70] This report concluded that the 2012 riot could be "directly attributed to actions taken by the administration leading up to the event," and recommended implementing "stronger staffing and training requirements" for correctional officers at Adams. It appears that the BOP's After-Action Report was publicly released on June 15, 2016.[71] There was no statistically significant price reaction following the release of the After-Action Report report. The third report was published on June 15, 2016 by Seth Freed Wessler, an investigative journalist at *The Nation*, and examined the BOP's use of private facilities, including of Adams.[72] This report by *The Nation* repeated the findings of the July 2012 After-Action Report, and quoted statements by the BOP's former chief of private prison contracting noting "inadequate medical care," "low staffing levels" and "food-service issues" at Adams. There was no statistically significant price reaction following the publication of this report by *The Nation*.

- Cibola: During the alleged Class Period, one report alleging issues with the healthcare services at Cibola was publicly released – the same June 2016 report by *The Nation* that discussed purported "deficiencies" at Adams.[73] The report by *The Nation* stated that Cibola "has accumulated more repeat deficiencies or significant findings in health services than any other private federal prison currently in operation." The report also noted that Cibola had received a "cure

---

[70] "After-Action Report: Disturbance at Adams Country Correctional Center, Natchez, Mississippi, May 20-May 21, 2012," *U.S. Department of Justice: Federal Bureau of Prisons*, July 27, 2012.

[71] "They Knew Something Was Going On," *The Nation*, June 15, 2016. ("In the wake of the Adams riot, the BOP conducted an investigation. Ten bureau officials, including Martz, spent days interviewing guards and reviewing documents. The report they produced in July 2012, marked "sensitive," hasn't been released until now.")

[72] "They Knew Something Was Going On," *The Nation*, June 15, 2016.

[73] "They Knew Something Was Going On," *The Nation*, June 15, 2016.

notice" in January 2015, which warned CoreCivic that Cibola "faced closure if the company didn't turn medical care around by April." As noted above, there was no statistically significant price reaction following the publication of this report.

- Eden: During the alleged Class Period, two reports alleging issues with the healthcare services at Eden were publicly released. The first report was published on June 9, 2014 by the ACLU, and documented the ACLU's investigation into five privately-operated BOP facilities located in Texas, including Eden, that were used by the BOP to house people convicted of immigration crimes.[74] The ACLU report stated that staff at Eden "routinely cuts corners on medical care and treatment," and highlighted issues such as delays in inmates receiving medical attention, denial of treatments and surgeries, and problems refilling prescriptions. The ACLU report also noted that staff at Eden took "extreme measures" to "stifle the dissent" of inmates, including isolating inmates in "special housing units." There was no statistically significant price reaction following the publication of this report. The second report, published on January 28, 2016 by investigative journalist Seth Freed Wessler at *The Nation*, examined incidents of prisoner deaths at privately-operated BOP facilities, including at Eden.[75] This report by *The Nation* stated that inmates at Eden "frequently suffer without the medical care that they need." As part of his research, Mr. Wessler claimed to have reviewed over 9,000 pages of medical records of inmates at private prisons, including at Eden, and claimed to have identified "dozens of deeply questionable deaths inside the facilities, including several cases in which care was flagged as inadequate by the contractors' own mortality reviews." There was no statistically significant price reaction following the publication of this report by *The Nation*.

- McRae: Prior to the alleged Class Period, one report alleging issues with healthcare services and use of disciplinary action at McRae was publicly released. On August 8, 2011, the ACLU released a letter, prepared by the ACLU and

---

[74] "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," *American Civil Liberties Union*, June 9, 2014

[75] "The 25 Men Whose Lives Ended Under Questionable Circumstances," *The Nation*, January 28, 2016.

addressed to the BOP, that set out reasons for why the BOP should not renew its contract for McRae.[76] An article accompanying the letter, dated August 18, 2011, stated that McRae "has a record of violations of constitutional and BOP standards regarding the medical treatment of prisoners" and "a record of abusive disciplinary practices that violate BOP standards."[77] There was no statistically significant price reaction following either the publication of the ACLU letter or the accompanying article.

64. Along with the public reports and articles on "quality" and "performance"-related "deficiencies" at CoreCivic's facilities listed above, I also found news stories on riots and disturbances at CoreCivic's facilities that occurred during the alleged Class Period. There was no statistically significant reaction in CoreCivic's stock price to news of riots at the Company's facilities, including the Adams riot, or to events in the aftermath of any riot, including public lawsuits alleging understaffing, safety and other "quality" and "performance"-related concerns at CoreCivic's facilities. The chart below shows CoreCivic's stock price along with events related to riots/disturbances at the Company's facilities and the reports discussed above that detailed information on "quality" and "performance"-related "deficiencies" at CoreCivic's facilities:

---

[76] "Re: Criminal Alien Requirement (CAR 12) Procurement Action," *American Civil Liberties Union*, August 8, 2011.

[77] "License to Abuse? Time for Bureau of Prisons to Sever Ties with CCA," *American Civil Liberties Union*, August 18, 2011.



**Reports of Riots and Other Safety and "Quality"-Related Incidents**

Alleged Class Period
February 27, 2012 through August 17, 2016

● Alleged Corrective Disclosures
◇ Other Events

**9/13/12**
Justice Strategies report on Adams. *No sig. reaction.*

**6/9/14**
ACLU report on Eden. *No sig. reaction.*

**1/28/16**
The Nation report on Eden. *No sig. reaction.*

**8/18/11**
ACLU article discussing letter on McRae. *No sig. reaction.*

**5/8/13**
Complaint filed for *Carithers v. CCA of Tennessee et al.* - alleges that inadequate staffing and treatment of the inmates created dangerous working conditions at Adams. *No sig. reaction.*

**8/12/14**
Inmates protest at Northeast Ohio Correctional Center. *No sig. reaction.*

**5/20/12**
Adams riot. *No sig. reaction.*

**8/8/12**
Complaint filed for *USA v. Lopez-Fuentes* - alleges that Adams riot was preceded by inmate complaints about food, medical conditions, and staff members. *No sig. reaction.*

**6/15/16**
The Nation report on Cibola and Adams and release of the BOP After-Action Report of the Adams riot. *No sig. reaction.*

**8/8/11**
ACLU letter on McRae. *No sig. reaction.*

Sources:
Data from Bloomberg, L.P.

65. I reviewed reports and commentary by analysts covering CoreCivic during the alleged Class Period to determine whether any of the safety and "quality"-related incidents and reports described above changed the market's perception about the "quality" of CoreCivic's facilities as Plaintiff claims. The results of my review are consistent with the lack of any price reaction to these events. None of the analysts covering CoreCivic made any comment that is consistent with Plaintiff's theory that the revelation of these types of "quality" and "performance"-related "deficiencies" were "perceived negatively" by the market in terms of value of the stock. Instead, in reports following riots at CoreCivic's facilities, analysts noted that riots are a risk that is "intrinsic" to the corrections industry, and even praised the response of CoreCivic staff to inmate disturbances. For example, following the Adams riot in May 2012, the SunTrust analysts covering CoreCivic stated:

> Last week, there was a riot in a CXW [CoreCivic] prison in MS. The company's response to the riot has been solid so far. Disturbances are a risk intrinsic to the

corrections industry, despite extensive efforts to mitigate such risks. In the end, we believe thorough, appropriate and timely responses are what will ultimately be judged by customers. [SunTrust, 5/30/12]

Similarly, following a riot in September 2015 at CoreCivic's Cimarron Correctional Facility in Oklahoma, the Canaccord analysts covering CoreCivic stated:

> **Officials defend use of private prisons (9/15)**. Despite the incident at CXW's [CoreCivic's] prison, Oklahoma state officials have publicly defended their choice and also praised the modernization of private prison facilities. […] The argument is that no corrections system, public or private, is immune to these types of disturbances. In fact, there have been 11 homicides at Oklahoma prisons from 2010 to 2014, with five at private facilities and six at state-run facilities. [Canaccord Genuity, 9/21/15, emphasis original]

Other analysts made general statements regarding the risk of riots and inmate disturbances at correctional facilities. For example:

> Next, we note that prison incidents are no stranger to both public and private operators, it's simply an issue of the environment prison life unfortunately propagates. [Canaccord, 10/5/15]

> The corrections space is subject to headline risk, including riots, deaths or escapes from facilities managed by CXW. [SunTrust, 1/31/17]

66.     In sum, Plaintiff claims that the alleged inflation in CoreCivic's stock price, caused by the alleged misrepresentations regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities, was "partially eliminated" by the OIG Report. However, information regarding the "quality" and "performance" of CoreCivic's facilities of the type Plaintiff alleges is corrective of the alleged misrepresentations was also announced both prior to and during the alleged Class Period. As with the OIG Report, there was no statistically significant reaction in CoreCivic's stock price after any of these announcements, and no indication that these announcements changed analysts' perceptions of the "quality" or "performance" of CoreCivic's facilities, demonstrating that the alleged misrepresentations did not have price impact.[78]

---

[78] Note that even assuming Plaintiff is arguing that the alleged misrepresentations maintained the alleged inflation in CoreCivic's stock (and thus, that a price increase would not be expected at the time the alleged misrepresentations were made), the lack of any market reaction following the release of the OIG Report and reports of riots and other "quality"-related incidents, which revealed information that Plaintiff claims is corrective of the alleged misrepresentations demonstrates that the alleged misrepresentations did not have price impact.

**D. The Yates Memo, the second alleged corrective disclosure, did not change the market's perception of the "quality" or cost-effectiveness of CoreCivic's facilities, which demonstrates that the alleged misrepresentations regarding "quality," "performance" and "cost savings" of CoreCivic's facilities did not have price impact**

67.    Plaintiff claims that the alleged misrepresentations regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities impacted CoreCivic's stock price and caused the stock price to be artificially inflated.[79] According to Plaintiff's theory, the inflation in CoreCivic's stock price was fully "eliminated" by the Yates Memo on August 18, 2016, the second alleged corrective disclosure date.[80]

68.    A review of publicly available information, including market and analyst commentary after the release of the Yates Memo, shows that the alleged misrepresentations did not have price impact. In particular, even though Plaintiff claims that the Yates Memo revealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities, commentary by analysts covering CoreCivic shows that analysts still considered CoreCivic's facilities to be a "quality" and cost-effective option for federal corrections *after* the Yates Memo. Analyst commentary shows that the Yates Memo was considered by the market to signal a shift in policy driven by politics, which created uncertainty around CoreCivic's government contracts. According to analysts, this political shift (as opposed to any new information regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities) was the cause of the decline in CoreCivic's stock price at the end of the alleged Class Period.

**1.    Commentary by analysts covering CoreCivic shows that the market still considered CoreCivic's facilities to be a "quality" and cost-effective option for federal corrections after the Yates Memo**

69.    Plaintiff claims the Yates Memo revealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities that was concealed by the alleged fraud. In particular, Plaintiff claims the Yates Memo revealed that "contract prisons operated lower-quality facilities without saving substantially on costs."[81] However, contrary to

---

[79]  Complaint, ¶191.

[80]  Complaint, ¶192.

[81]  Complaint, ¶13.

Plaintiff's theory, commentary by analysts covering CoreCivic shows that analysts' perceptions of the "quality" and cost-effectiveness of CoreCivic's facilities did not change following the release of the Yates Memo, and that analysts continued to believe that CoreCivic's facilities were a "quality" and cost-effective option for federal corrections.

70.     A review of analyst reports on CoreCivic published in the week following the Yates Memo shows that the Yates Memo did not change analysts' perceptions of the "quality," "performance" or "cost savings" of CoreCivic's facilities. While most of the analyst reports published in the week after the Yates Memo were relatively short (less than 10 pages long), the Canaccord analysts covering CoreCivic published a 24-page report on CoreCivic and GEO, a publicly-traded competitor, on August 23, 2016 discussing the implications of the Yates Memo. This report provided no indication that the Yates Memo changed the Canaccord analysts' perception of the "quality" or cost-effectiveness of CoreCivic's (or of GEO's) facilities.

71.     A review of analyst reports published in the months following the Yates Memo shows that analysts continued to believe that CoreCivic's facilities were a "quality" and cost-effective option for federal corrections despite the alleged revelations regarding "quality," "performance" and "cost savings" in the Yates Memo. For example, in a report published on September 1, 2016, the SunTrust analysts covering CoreCivic presented an analysis of the costs associated with private facilities compared to government-run prisons, concluding that private facilities "operate more efficiently across virtually every dimension of the project" compared to government-run prisons, and that the "efficiencies and cost savings" associated with private facilities are "often understated." In particular, the SunTrust analysts stated:

> **What would government customers pay to acquire private facilities?**
>
> There is a wide range of considerations in this evaluation. On the high end of the spectrum is replacement cost if a state government or federal agency chooses to replace existing for-profit capacity with newly constructed beds. **Our analysis of new and recently proposed construction by government entities suggests an average cost of $212,000 per bed. The BOP is championing the most expensive project in Lechter County in Kentucky that could cost $370,000 per bed. Our analysis of recently developed private facilities indicates an average cost per bed of $60,000.** Private operators are continually land banking real estate for future development, have shortened construction periods and **operate more efficiently across virtually every dimension of the project** with the notable exception of financing costs. They are unable to match the borrowing cost of customers [*i.e.*, federal and state government agencies].

**Operating Cost Comparison**

**Operating efficiencies are also tilted in favor of for-profit operators**. For example, the State of Ohio required a 7% reduction in operating expenses when it sold the Lake Erie facility to CXW [CoreCivic] several years ago under a long-term lease arrangement. **The efficiencies and cost savings associated with private operators is often understated in our experience** since customers rarely consider the costs of long-term liabilities such as pension and healthcare of unionized correctional employees. [SunTrust, 9/1/16, emphasis added]

72.     In the same September 1 report, the SunTrust analysts stated that the service levels in private facilities "generally mirror" those in government-run prisons:

**Service levels in for-profit facilities generally mirror those offered by state customers.** For example if a state increases the availability of GED course work and support, then a for-profit facility housing inmates from that state would correspondingly increase its services and per diems would rise. [SunTrust, 9/1/16, emphasis added]

These comments by the SunTrust analysts stating that private operators are more "efficient" than the government in providing correctional services, that the cost savings from private prisons are "often understated," and that the quality of the services in private facilities "generally mirror" the quality of services in government-run prisons is contrary to Plaintiff's theory that the Yates Memo (and the OIG Report) changed the market's perception about the "quality" and cost-effectiveness of CoreCivic's facilities.

73.     A review of analyst reports published after the 2016 Presidential Election similarly shows that analysts continued to believe that CoreCivic's facilities were a "quality" and cost-effective option for federal corrections despite the alleged revelations regarding "quality," "performance" and "cost savings" in the Yates Memo. For example, in a report published on January 13, 2017, around five months after the release of the OIG Report and the Yates Memo, the Canaccord analysts covering CoreCivic stated that "private prisons continue to be materially cheaper than their public counterparts:"

**Private prisons cheaper. Private prisons, as noted by BOP and some state budgets, continue to be materially cheaper than their public counterparts**. Furthermore, there are over 200,000 public prison beds that are over 75 years old, and in many cases facilities have become antiquated and inefficient. [Canaccord Genuity, 1/13/17, emphasis added]

The Canaccord analysts based their claim in part on the BOP's own budget, which the analysts stated showed that private facilities were between 17% to 22% cheaper than comparable government-run BOP institutions, and had become more cost-effective in recent years:

> The Federal Bureau of Prisons releases their budgets each year, and within the budget, they spell out per diems separately for privately-operated facilities vs. all other types of BOP facilities. We believe the private BOP facilities are most comparable to medium security prisons, and **by comparison, private facilities have averaged costs that are 17% cheaper over the past 7 years, and 22% cheaper during 2014 and 2015**. [Canaccord Genuity, 1/13/17, emphasis added]

Regarding the issue of cost savings, the Canaccord analysts focused in particular on the new Attorney General Jeff Sessions, noting that reducing the cost of providing correctional services would likely be his (and the new administration's) priority:

> Frugal. Sessions was raised on a Depression mentality when it comes to frugality, and his record of thriftiness extends to both his career and his personal life. We believe jurisdictions' consideration of costs are a critical factor in the decision to move forward with private solutions. We believe there is **plenty of support in this regard for private facilities screening cheaper at both the BOP and state level.** […] The Trump administration has been public about proprivatization, and we don't see any reason why this shouldn't carry over into the prison space, **especially in an environment where balancing the budget is as critical as ever**. [Canaccord Genuity, 1/13/17, emphasis added]

74.     In the same January 13 report, the Canaccord analysts addressed the findings regarding the "quality" and safety of CoreCivic's facilities in the OIG Report, stating that the OIG Report "seemed politically motivated" (discussed in more detail in the section below) and that the OIG Report provided no "overarching conclusions" regarding the safety of CoreCivic's facilities:

> Many critics argue that private management leads to unsafe conditions for both prisoners and guards at these facilities, citing the recent OIG report. **We note that the report seemed politically motivated**, as public prisons, as reported by Table 8 in Appendix 7 of the report notes that public BOP institutions have more deaths, more sexual misconduct, and more grievances, while private institutions have more contraband (arguably positive that they are finding it), more assaults by inmates, and more grievances filed. **We don't believe overarching conclusions of safety can be drawn from such survey results**. [Canaccord Genuity, 1/13/17, emphasis added]

These comments by the Canaccord analysts stating that private prisons are "materially cheaper than their public counterparts" and that the OIG Report did not provide any "overarching

46

conclusions" regarding the safety of private prisons is contrary to Plaintiff's theory that the Yates Memo (and the OIG Report) changed the market's perception about the "quality" and cost-effectiveness of CoreCivic's facilities.

75. In sum, Plaintiff claims that the Yates Memo revealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities that was concealed by the alleged fraud. However, contrary to Plaintiff's theory, commentary by analysts covering CoreCivic shows that analysts' perceptions of the "quality" and cost-effectiveness of CoreCivic's facilities did not change following the release of the Yates Memo. In particular, analyst reports published in the weeks after the Yates Memo and after the 2016 Presidential Election show that analysts continued to believe that CoreCivic's facilities were a "quality" and cost-effective option for federal corrections. The fact that analysts' perceptions of the "quality" and cost-effectiveness of CoreCivic's facilities did not change following the release of the Yates Memo, and that analysts continued to believe that CoreCivic's facilities were a "quality" and cost-effective option for federal corrections, demonstrates that the alleged misrepresentations did not have price impact.[82]

### 2. Analyst commentary demonstrates that the Yates Memo was considered a shift in policy driven by politics that created uncertainty around CoreCivic's government contracts, and that this political shift negatively impacted CoreCivic's stock price at the end of the alleged Class Period

76. Plaintiff claims the Yates Memo revealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities that was concealed by the alleged fraud. As shown above, contrary to Plaintiff's theory of price impact, analysts' perceptions of the "quality" and cost-effectiveness of CoreCivic's facilities did not change following the release of the Yates Memo. Instead, analyst commentary shows that the Yates Memo was considered a shift in policy driven by politics, which created uncertainty around CoreCivic's government contracts. According to analysts, this political shift (as opposed to any

---

[82] Note that even assuming Plaintiff is arguing that the alleged misrepresentations maintained the alleged inflation in CoreCivic's stock (and thus, that a price increase would not be expected at the time the alleged misrepresentations were made), the lack of any market reaction following the release of the OIG Report and reports of riots and other "quality"-related incidents, which revealed information that Plaintiff claims is corrective of the alleged misrepresentations demonstrates that the alleged misrepresentations did not have price impact, as does the fact that analysts perceptions of CoreCivic's quality and price did not change after either the OIG Report or the Yates Memo.

new information regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities) caused the decline in CoreCivic's stock price at the end of the alleged Class Period.

77.      Analysts covering CoreCivic stated after the end of the alleged Class Period that the "political environment" was "a large factor and driver" behind the decision in the Yates Memo to reduce the BOP's use of private prisons. For example, in a report on CoreCivic and GEO published on August 23, 2016, shortly after the release of the Yates Memo, the Canaccord analysts stated:

> **[W]e believe the political environment is a large factor and driver behind the DOJ's memo.** Given 4 – 5 years between now and some of these renewals, we believe the political landscape could be very different, limiting the impact on these contracts. [Canaccord Genuity, 8/23/16, emphasis added]

78.      Similarly, in a report published on September 1, 2016, the SunTrust analysts characterized the Yates Memo as a "political shift" and a "political push to sever ties with private prisons:"

> **CXW [CoreCivic], GEO - Lowering Estimates & PTs Amid Political Shift** […]
>
> We believe the BOP itself is not going to be a fan of overcrowding its system to satisfy a political push to sever ties with private prisons. Overcrowding is the single metric that correlates best with incidents of violence, mortality and other disruptions often tabulated to compare quality of facilities. [SunTrust, 9/1/16, emphasis original]

79.      Further evidence indicating that the Yates Memo signaled a political shift, as opposed to a finding that private prisons were of lower "quality" and more expensive than government-run prisons, is the fact that analysts covering CoreCivic believed that the likelihood of federal and state government agencies reducing their use of private prisons was dependent on the "political landscape" (*i.e.*, which political party was in power) when the Company's contracts came up for renewal:

> Given 4 – 5 years between now and some of these renewals, we believe the political landscape could be very different, limiting the impact on these contracts. [Canaccord Genuity, 8/23/16]
>
> Now all this business isn't going to disappear overnight. And like any discretionary policy decision in Washington, we suppose the landscape could change depending on who is calling the shots and other political factors. [Gordon Haskett, 8/19/16]
>
> Republican victory in the White House may alleviate investor concern about federal agencies severing ties with CXW [CoreCivic]. [SunTrust, 11/3/16]

Upside risk: Current election cycle results in a new administration in the White House and state governments that are supportive of increased utilization of private correctional facilities. [SunTrust, 10/17/16]

Additionally, we would note that the majority of these states are not left leaning states, making it even less likely that these states follow the DOJ's path [in reducing private prison use]. [Canaccord Genuity, 8/23/16]

80. Analyst commentary demonstrates that the political shift signaled in the Yates Memo created uncertainty around the potential renewal of the Company's contracts with the federal government (including the loss of contracts with agencies other than the BOP, such as ICE and USMS). For example, the Canaccord analysts covering CoreCivic noted that the magnitude of CoreCivic's stock price reaction following the Yates Memo implied that the market was pricing in not just the loss of CoreCivic's BOP contracts, but also the risk that the Company might lose other federal government contracts:

At current valuations, we believe the market is implying not only that the BoP contracts are lost immediately (assigning no value to them) but that the risk of contagion to the USMS, ICE and State contracts is a real near-term risk. We disagree on both accounts. [Canaccord Genuity, 8/23/16]

81. The increased uncertainty created by the political shift in the government's use of private prisons signaled in the Yates Memo is apparent from the change in CoreCivic's implied volatility at the end of the alleged Class Period. The implied volatility of a stock is a measure of the expected future volatility of the stock price and can be derived from the price of options traded on that stock.[83] In simple terms, options are contracts to buy or sell a stock in the future at a pre-determined price. The value of options is in large part determined by the expected volatility of the stock price. In general, higher volatility means higher option prices because the higher the volatility, the greater the likelihood that the option will be "in-the-money." An increase in implied volatility indicates that the market expects the stock price to become more variable in the near future.

82. CoreCivic's implied volatility more than trebled, from 20% to almost 90%, following the release of the Yates Memo and remained high until the 2016 Presidential Election. Following the 2016 Presidential Election, CoreCivic's implied volatility decreased sharply. The implied volatility of CoreCivic stock is shown in the chart below:

---

[83] See, for example, Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* McGraw-Hill: New York, NY, 7th ed., 2003), ch. 21.



**Implied Volatility of CoreCivic Stock**

Legend: ● Alleged Corrective Disclosures  ◇ Other Events

Alleged Class Period
Feb. 27, 2012 through Aug. 17, 2016

8/11/16
OIG Report

8/18/16
Yates Memo

9/26/16
"I'm glad that we're ending private
prisons in the federal system; I want to
see them ended in the state system." -
Hillary Clinton, 1st Presidential Debate

11/8/16
2016 Presidential
Election

2/8/17
Jeff Sessions
confirmed as
Attorney General

2/23/17
Jeff Sessions
rescinds the
Yates Memo

Sources:
Data from Bloomberg, L.P. Annotations from the Complaint and news stories from Factiva.

83. After the Yates Memo, analysts covering the Company increased the discount rate used in their valuation models for CoreCivic. This increase in discount rate is consistent with the increase in CoreCivic's implied volatility. Discount rates are commonly used in valuation analysis to account for the risks associated with earning future cash flows.[84] In general, the higher the risk and uncertainty associated with a company's business operations, the higher the discount rate, and the lower the value of the expected future cash flows. Prior to the alleged corrective disclosures, the Canaccord analysts covering CoreCivic valued the Company using a discount rate of 10%. The Canaccord analysts increased their discount rate from 10% to 11% following the Yates Memo, and subsequently decreased their discount rate back to 10% following the 2016 Presidential Election. This change in the discount rate used to value CoreCivic is consistent with the view that the Yates Memo signaled a shift in the political

---

[84]  See, for example, Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* McGraw-Hill: New York, NY, 7th ed., 2003), ch. 2.

environment and increased the risk around the potential renewal of CoreCivic's contracts with the federal government, while the 2016 Presidential Election decreased this risk/uncertainty. The table below shows the changes in the discount rate used by the Canaccord analysts in their valuation of CoreCivic after the alleged corrective disclosures.[85] Note that following the release of the OIG Report, the Canaccord analysts did not change their discount rate. This further supports the finding that changes in the political environment and associated risk to CoreCivic's business, rather than the alleged misrepresentations, impacted CoreCivic's stock price.

### Changes to Discount Rate in Valuation for CoreCivic After Selected Events
### Canaccord Genuity Analysts

| Event | | |
| --- | --- | --- |
| Description | Date | Change to Discount Rate |
| OIG Report | 8/11/16 | **No Change** |
| Yates Memo | 8/17/16 | **Raises** from 10% to 11% on 8/23/16 |
| 2016 Presidential Election | 11/8/16 | **Lowers** from 11% to 10% on 11/11/16 |
| Trump Policy Changes and Dividend Cut | 12/12/16 | **Lowers** from 10% to 9% on 12/12/16 |

**Sources:**
Data from discounted cash flow analysis in Canaccord Genuity analyst reports on CoreCivic.

84. Commentary in analyst reports on CoreCivic published after the 2016 Presidential Election shows that analysts believed the election of Donald Trump "materially" lowered the risk to the renewal of CoreCivic's government contracts. For example, in a report on CoreCivic and GEO published on November 11, 2016, the day after the election, the Canaccord analysts increased their 12-month price target for CoreCivic and GEO, citing "lower risk" to contract renewals post-election:

> **Raising GEO and CXW [CoreCivic] price targets on lower risk post-election**
>
> Following Donald Trump's presidential victory, we now see materially less risk to contract renewals and the overall private prison REIT business models. [...] [W]e believe it's possible that a new attorney general reverses the current plan to cancel BOP contracts upon renewal[.] [...] While risk to BOP business is now far less under

---

[85]  Note that the Canaccord analysts are the only analysts covering CoreCivic at the end of the alleged Class Period that provided detail on the discount rates used in their valuation of the Company.

51

a Trump presidency, we still include the contract losses in our estimates until there is further clarity. [Canaccord Genuity, 11/11/16, emphasis original]

85.     Other analyst reports on CoreCivic similarly noted that the results of the election had lowered the risk and uncertainty around the renewal of CoreCivic's contracts with the federal government:

> We expect CXW's [CoreCivic's] multiple to increase in the next twelve months to 14.0x given the less uncertainty [*sic*] and political threat to CXW's business and enhanced outlook for continuing business with ICE and the BOP. [SunTrust, 11/14/16]

> As we approach Trump's inauguration, we see low risk to contract renewals and the overall private prison business model, driving a compelling investment opportunity. [Canaccord Genuity, 1/13/17]

86.     A review of the statistical tests performed by Plaintiff's expert is helpful in illustrating the point that the Yates Memo did not change the market's perception of the "quality" or cost-effectiveness of CoreCivic's facilities. As part of his event study analysis, Dr. Feinstein tested to see if there was a "structural change" (or "structural break") in CoreCivic's stock price movements during the alleged Class Period.[86] In particular, Dr. Feinstein used a statistical test known as a "Chow test" to test whether there was a statistically significant change in the relationship between CoreCivic's stock price and the market and industry indices during the alleged Class Period. Dr. Feinstein found that the relationship between CoreCivic's stock price and the market and industry indices was statistically significantly different before and after CoreCivic announced its REIT conversion on February 7, 2013. Applying Dr. Feinstein's test to the period after the Yates Memo yields *two* "structural changes" in CoreCivic's stock price movements after the end of the alleged Class Period – after the release of the Yates Memo *and* after the 2016 Presidential Election. These findings are consistent with data and analyst commentary showing that the Yates Memo signaled a political shift in the government's use of private prisons that increased uncertainty around the potential renewal of CoreCivic's government contracts – uncertainty that abated following the 2016 Presidential Election.

87.     In sum, analysts covering CoreCivic attributed the price decline at the end of the alleged Class Period to uncertainty surrounding the potential renewal of CoreCivic's contracts with the federal government. This uncertainty abated following the 2016 Presidential Election,

---

[86]   Feinstein Report, ¶118.

and the Company's stock price recovered to its level prior to the Yates Memo, as the market believed the change in administration lowered the risk to CoreCivic's government contracts. This shows that rather than reacting to the allegedly corrective information regarding the "quality" and cost-effectiveness of CoreCivic's facilities, CoreCivic's stock price was impacted by changes in the political environment, and demonstrates that the alleged misrepresentations did not have price impact.

### 3. The recovery in CoreCivic's stock price after the end of the alleged Class Period is inconsistent with Plaintiff's allegations that the Yates Memo revealed that CoreCivic's facilities were no longer a "quality" or cost-effective option for federal corrections

88.     Plaintiff claims the Yates Memo revealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities that was concealed by the alleged fraud. However, the recovery in CoreCivic's stock price after the end of the alleged Class Period is inconsistent with Plaintiff's allegations that the Yates Memo revealed that CoreCivic's facilities were no longer a "quality" or cost-effective option for federal corrections, and instead supports the finding that changes in the political environment and associated risk to CoreCivic's business, rather than the alleged misrepresentations, impacted CoreCivic's stock price.

89.     The chart below shows CoreCivic's stock price along with the S&P 500 Index. As the chart shows, by the time Jeff Sessions was confirmed as the new Attorney General, CoreCivic's stock price had fully recovered to its level from prior to the release of the Yates Memo, even accounting for market movements during that period:



**S&P 500 Index Pegged to CoreCivic Stock Price on August 10, 2016**

Sources:
Data from Bloomberg, L.P. Annotations from the Complaint and news stories from Factiva.

90. Consistent with the recovery in CoreCivic's stock price, estimates of CoreCivic's future financial performance by analysts covering the Company also increased to, and in some cases surpassed, their levels prior to the release of the Yates Memo. For example, as shown in the chart below, by the time Jeff Sessions rescinded the Yates Memo, analysts covering CoreCivic had increased their 12-month price targets for CoreCivic's stock price to levels higher than they had been prior to the OIG Report and the Yates Memo:[87]

---

[87] Note that the Wells Fargo analysts covering CoreCivic lowered their price target for CorCivic stock on August 10, 2016, the day before the OIG Report, in response to CoreCivic's 2Q16 earnings announcement and "uncertainty" around the Company's renegotiation of its contract for the South Texas Family Residential Center, a non-BOP facility. See, *Wells Fargo*, August 10, 2016.



**4. CoreCivic warned of the risk that changes in the political environment could negatively impact the Company's business both prior to and during the alleged Class Period, and commentary by analysts covering the Company shows that the market was aware of this risk**

91. Both prior to and during the alleged Class Period, CoreCivic warned that changes in government policy affecting incarceration rates and public resistance to private prisons were risks that could impact the Company's business. For example, in its Form 10-K for FY2010, filed on February 25, 2011 (a year before the start of the alleged Class Period), CoreCivic warned that the privatization of prisons has "encountered resistance:"

> **Risks Related to Our Business and Industry**
>
> ***Our results of operations are dependent on revenues generated by our jails, prisons, and detention facilities, which are subject to the following risks associated with the corrections and detention industry.*** […]

*Escapes, inmate disturbances, and public resistance to privatization of correctional and detention facilities could result in our inability to obtain new contracts or the loss of existing contracts.* The operation of correctional and detention facilities by private entities has not achieved complete acceptance by either governments or the public. The movement toward privatization of correctional and detention facilities has also encountered resistance from certain groups, such as labor unions and others that believe that correctional and detention facilities should only be operated by governmental agencies.

Moreover, negative publicity about an escape, riot or other disturbance or perceived poor conditions at a privately managed facility may result in adverse publicity to us and the private corrections industry in general. Any of these occurrences or continued trends may make it more difficult for us to renew or maintain existing contracts or to obtain new contracts, which could have a material adverse effect on our business.[88]

CoreCivic's FY2010 10-K also warned that changes in government policies that lowered incarceration rates could impact the Company's ability to renew contracts for its facilities:

*Our ability to secure new contracts to develop and manage correctional and detention facilities depends on many factors outside our control.* Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. This possible growth depends on a number of factors we cannot control, including crime rates and sentencing patterns in various jurisdictions and acceptance of privatization. The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by our criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them. Legislation has been proposed in numerous jurisdictions that could lower minimum sentences for some non-violent crimes and make more inmates eligible for early release based on good behavior. Also, sentencing alternatives under consideration could put some offenders on probation with electronic monitoring who would otherwise be incarcerated. Similarly, reductions in crime rates could lead to reductions in arrests, convictions and sentences requiring incarceration at correctional facilities.[89]

CoreCivic repeated identical or substantially similar statements regarding the risks associated with its business operations in its 10-K for FY2011, filed on February 27, 2012 (the first day of the alleged Class Period),[90] and in its 10-Ks for FY2012-FY2015, filed during the alleged Class

---

[88]  CoreCivic FY2010 Form 10-K, filed February 25, 2011, pp. 21-22 (emphasis original).

[89]  CoreCivic FY2010 Form 10-K, filed February 25, 2011, p. 22 (emphasis original).

[90]  CoreCivic FY2011 Form 10-K, filed February 27, 2012, pp. 23-24.

Period on February 27, 2013,[91] February 27, 2014,[92] February 25, 2015,[93] and February 25, 2016,[94] respectively.

92.     A review of analyst reports on CoreCivic published both prior to and during the alleged Class Period shows that the market was aware of the risk that changes in government policy and public resistance to private prisons could negatively impact CoreCivic's business. For example, in a report published on February 10, 2011, over a year prior to the start of the alleged Class Period, the Avondale Partners analysts covering CoreCivic stated that CoreCivic's business was "susceptible to public policy changes:"

> **Policy Changes.** As a supplier of services to federal, state, and local governments, the private prison sector is susceptible to public policy changes that can influence demand for beds (e.g., war on drugs, immigration enforcement, etc.). [Avondale Partners, 2/10/11, emphasis original]

The Avondale Partners analysts covering CoreCivic made similar statements in reports on the Company published between February 10, 2011 and February 12, 2015

93.     Other analysts covering CoreCivic made similar statements regarding the risk that "social backlash" or "public policy changes" could impact CoreCivic's business. For example, the Wells Fargo analysts covering CoreCivic made the following statements in reports on the Company published between December 19, 2014 and November 30, 2017:

> Risks to our thesis include a large, unexpected decline in U.S. prison populations, unforeseen contract terminations, weaker than expected per diem increases and any increased social backlash related to the idea of profiting from imprisonment.

Similarly, the SunTrust analysts covering CoreCivic made the following statements in reports on the Company published between January 31, 2011 and March 16, 2018:

> Political pressure related to large social programs could affect operations or cause significant changes in the existing relationships with agencies and customers.

94.     In sum, as demonstrated above, the Yates Memo signaled a political shift in the government's use of private prisons, a risk that CoreCivic warned of in its SEC filings and that analysts were aware of prior to, during and after the alleged Class Period. The fact that the

---

[91]   CoreCivic FY2012 Form 10-K, filed February 27, 2013, pp. 26-29.

[92]   CoreCivic FY2013 Form 10-K, filed February 27, 2014, pp. 27-29.

[93]   CoreCivic FY2014 Form 10-K, filed February 25, 2015, pp. 26-28.

[94]   CoreCivic FY2015 Form 10-K, filed February 25, 2016, pp. 28-31.

alleged misrepresentations did not change analysts' perceptions of the risks to CoreCivic's business associated with changes in the political environment affecting the government's use of private prisons demonstrates that the alleged misrepresentations did not have price impact.

### E. The lack of change in the market's perception of CoreCivic's "quality" or cost-effectiveness from either the alleged misrepresentations or the alleged corrective disclosures affirmatively demonstrates that the alleged misrepresentations did not have price impact

95. Plaintiff's theory is that the alleged misrepresentations and/or omissions regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities impacted CoreCivic's stock price and caused the price to be artificially inflated, and this inflation was "eliminated" by the two alleged corrective disclosures – the OIG Report and the Yates Memo.[95] According to Plaintiff's theory and claim of market efficiency, if the alleged misrepresentations and/or omissions had price impact then the market and analysts covering the Company should have had a different view of the "quality," "performance" and "cost savings" of CoreCivic's facilities after the alleged corrective disclosures compared to when the alleged misrepresentations were made. However, there is no evidence of such a change in analysts' or the market's view. In particular:

- There was no market reaction following the OIG Report, including no statistically significant price reaction and no analyst commentary. In fact, no analyst covering CoreCivic even chose to issue a report following the release of the information that Plaintiff claims is corrective of the alleged misrepresentations.

- There was no statistically significant price reaction after any of the reports of riots and other safety and "quality"-related incidents at CoreCivic's facilities, reports that revealed information of the type that Plaintiff claims is corrective of the alleged misrepresentations, either prior to or during the alleged Class Period.

- Analyst reports on CoreCivic published in the weeks following the Yates Memo and after the 2016 Presidential Election explicitly stated that CoreCivic's facilities were cheaper than government-run prisons and provided similar "quality" of services, and these analyst reports characterized the Yates Memo as a "political

---

[95] Complaint, ¶¶191-192.

shift" in the government's use of private prisons driven by political
considerations.

- Analysts covering CoreCivic attributed the price decline at the end of the alleged
  Class Period to uncertainty surrounding the potential renewal of CoreCivic's
  contracts with the federal government. This uncertainty abated following the 2016
  Presidential Election, and the Company's stock price recovered to its level prior
  to the Yates Memo, as the market believed the change in administration lowered
  the risk to CoreCivic's government contracts.

The evidence presented above shows that analysts' and the market's perceptions of the "quality"
and cost-effectiveness of CoreCivic's facilities did not change following the release of the OIG
Report or the Yates Memo,[96] and that, rather than reacting to the allegedly corrective information
regarding the "quality" and cost-effectiveness of CoreCivic's facilities, CoreCivic's stock price
was impacted by changes in the political environment. This affirmatively demonstrates that the
alleged misrepresentations and/or omissions did not have price impact.

## VIII. DR. FEINSTEIN HAS NOT SPECIFIED HOW HIS PURPORTED "COMMON METHODOLOGY" OF CALCULATING CLASS-WIDE DAMAGES WOULD APPLY GIVEN HIS CONCLUSION THAT THERE WAS A "STRUCTURAL BREAK" DURING THE ALLEGED CLASS PERIOD

96.     The Feinstein Report purportedly describes a common methodology of
calculating class-wide alleged damages for proposed class members that purchased CoreCivic
stock during the alleged Class Period. According to the Feinstein Report, this methodology
involves constructing an "inflation ribbon," which Dr. Feinstein describes as follows:

> An inflation ribbon is a time series of the difference between a stock's actual price
> observed in the marketplace, and the estimated price that the stock would have traded

---

[96]  Note that even assuming Plaintiff is arguing that the alleged misrepresentations maintained the alleged inflation
in CoreCivic's stock (and thus, that a price increase would not be expected at the time the alleged
misrepresentations were made), the lack of any market reaction following the release of the OIG Report and
reports of riots and other "quality"-related incidents, which revealed information that Plaintiff claims is
corrective of the alleged misrepresentations demonstrates that the alleged misrepresentations did not have price
impact, as does the fact that analysts perceptions of CoreCivic's quality and price did not change after either the
OIG Report or the Yates Memo.

at each day had there been full disclosure from the outset of the Class Period. Construction of the inflation ribbon generally employs event study analysis, combined with widely used and generally accepted valuation tools and models. The inflation ribbon is often constructed by working chronologically backwards from the final corrective disclosure to the start of the Class Period, accounting for alleged fraud-related residual price declines as they occurred.[97]

97.    Thus, Dr. Feinstein's methodology involves using an event study to measure the price reaction to the alleged corrective disclosures, and using the price reaction as a measure of inflation earlier during the alleged Class Period (by constructing an "inflation ribbon") assuming that the stock price would have reacted in the same way to the revelation of the alleged fraud earlier in the alleged Class Period as it did after the alleged corrective disclosures.

98.    However, Dr. Feinstein has not explained how his methodology would apply given his conclusion in this case that there was a "structural break" during the alleged Class Period. As discussed above, Dr. Feinstein found that a "structural break" occurred during the alleged Class Period on February 7, 2013, the date that CoreCivic announced its REIT conversion. He found that the relationship between CoreCivic's stock price and the market and industry was statistically significantly different before the structural break compared to after. In other words, Dr. Feinstein found a "structural break" that separated the alleged Class Period into two intervals such that the stock price reacted statistically differently to market and industry forces in one interval versus the other, and concluded that two different models were needed to explain CoreCivic's stock price movements during the alleged Class Period.

99.    Dr. Feinstein has not provided any "common methodology" that can be used to calculate class-wide damages in cases where there is such a "structural break." Dr. Feinstein does not cite to, and I am not aware of, any "widely used and generally accepted valuation tools and models" that can be used to determine how some portion of the numerous pieces of information that affect a stock's price is affected by the "structural break." Given Dr. Feinstein's finding of a "structural break" in CoreCivic's stock price movements during the alleged Class Period and Dr. Feinstein's conclusion that CoreCivic's stock price reacted differently to market and industry events before the "structural break" versus after, Dr. Feinstein provides no explanation of how an estimation of alleged inflation and alleged damages measured when the alleged corrective

---

[97]    Feinstein Report, ¶153.

disclosures occurred after the "structural break" could be applied to the period before the "structural break."

Lucy P. Allen



**Lucy P. Allen**
Managing Director

NERA Economic Consulting
1166 Avenue of the Americas
New York, New York 10036
Tel: +1 212 345 5913  Fax: +1 212 345 4650
lucy.allen@nera.com
www.nera.com

# Appendix A

## MANAGING DIRECTOR

## Education

**YALE UNIVERSITY**
M.Phil., Economics, 1990
M.A., Economics, 1989
M.B.A., 1986

**STANFORD UNIVERSITY**
A.B., Human Biology, 1981

## Professional Experience

1994-Present **National Economic Research Associates, Inc.**
Managing Director. Responsible for economic analysis in the areas of securities, finance and environmental and tort economics.
Senior Vice President (2003-2016).
Vice President (1999-2003).
Senior Consultant (1994-1999).

1992-1993 **Council of Economic Advisers, Executive Office of the President**
Staff Economist. Provided economic analysis on regulatory and health care issues to Council Members and interagency groups. Shared responsibility for regulation and health care chapters of the *Economic Report of the President, 1993*. Working Group member of the President's National Health Care Reform Task Force.

1986-1988 **Ayers, Whitmore & Company (General Management Consultants)**
1983-1984 Senior Associate. Formulated marketing, organization, and overall business strategies including:
Plan to improve profitability of chemical process equipment manufacturer.
Merger analysis and integration plan of two equipment manufacturers.
Evaluation of Korean competition to a U.S. manufacturer.
Diagnostic survey for auto parts manufacturer on growth obstacles.
Marketing plan to increase international market share for major accounting firm.

| | |
|---|---|
| Summer 1985 | **WNET/Channel Thirteen, Strategic Planning Department**<br>Associate.  Assisted in development of company's first long-term strategic plan. Analyzed relationship between programming and viewer support. |
| 1981-1983 | **Arthur Andersen & Company**<br>Consultant.  Designed, programmed and installed management information systems.  Participated in redesign/conversion of New York State's accounting system.  Developed municipal bond fund management system, successfully marketed to brokers.  Participated in President's Private Sector Survey on Cost Control (Grace Commission).  Designed customized tracking and accounting system for shipping company. |

## Teaching

| | |
|---|---|
| 1989- 1992 | **Teaching Fellow, Yale University**<br>Honors Econometrics<br>Intermediate Microeconomics<br>Competitive Strategies<br>Probability and Game Theory<br>Marketing Strategy<br>Economic Analysis |

# Publications, Speeches and Conference Papers

"Snapshot of Recent Trends in Asbestos Litigation: 2018 Update," (co-author), NERA Report, 2018.

"Trends and the Economic Effect of Asbestos Bans and Decline in Asbestos Consumption and Production Worldwide," (co-author), *International Journal of Environmental Research and Public Health*, 15(3), 531, 2018.

"Snapshot of Recent Trends in Asbestos Litigation: 2017 Update," (co-author), NERA Report, 2017.

 "Asbestos: Economic Assessment of Bans and Declining Production and Consumption," World Health Organization, 2017.

"Snapshot of Recent Trends in Asbestos Litigation: 2016 Update," (co-author), NERA Report, 2016.

"Economic Dimension and Societal Costs and Benefits of Banning Asbestos," presented at the World Health Organization, Regional Office for Europe conference, Assessing the Economic Costs of the Health Impacts of Environmental and Occupational Factors: The Economic Dimension of Asbestos, Bonn, Germany, 2016.

"Snapshot of Recent Trends in Asbestos Litigation: 2015 Update," (co-author), NERA Report, 2015.

Participant in panel on "Expert Reports and Depositions" at PLI Expert Witness 2014, hosted by the Practising Law Institute, New York, New York, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2014 Update," (co-author), NERA Report, 2014.

"High Frequency Trading --A Primer in 1,800,000 Milliseconds" before the Litigation Group at Morrison Foerster, New York, New York, 2014.

"Snapshot of Recent Trends in Asbestos Litigation: 2013 Update," (co-author), NERA Report, 2013.

"Asbestos Payments per Resolved Claim Increased 75% in the Past Year – Is This Increase as Dramatic as it Sounds?  Snapshot of Recent Trends in Asbestos Litigation: 2012 Update," (co-author), NERA Report, 2012.

"Snapshot of Recent Trends in Asbestos Litigation: 2011 Update," (co-author), NERA White Paper, 2011.

Participant in panel at The Implications of Matrixx, hosted by NERA Economic Consulting, New York, New York, 2011.

"2011 & Beyond–Predicting Mass Tort Litigation: with a Focus on Pharmaceutical Torts" presented at Emerging Insurance Coverage and Allocation Issues, hosted by Perrin Conferences, New York, New York, 2011.

Presented recent trends in settlements, predicting settlement amounts, and the use of economic analysis at mediation in the "Settlement Trends & Tactics" panel at Securities Litigation & Enforcement: Current Developments & Strategies, hosted by the New York City Bar, New York, New York, 2010.

"Snapshot of Recent Trends in Asbestos Litigation: 2010 Update," (co-author), NERA White Paper, 2010.

"Settlement Trends and Tactics" presented at Securities Litigation During the Financial Crisis: Current Development & Strategies, hosted by the New York City Bar, New York, New York, 2009.

"GM and Chrysler Bankruptcies: Potential Impact on Other Asbestos Defendants" presented at Asbestos Litigation Conference: A Comprehensive National Overview and Outlook, hosted by Perrin Conferences, San Francisco, California, 2009.

"Snapshot of Recent Trends in Asbestos Litigation," (co-author), NERA White Paper, 2009.

"Emerging Economies and Product Recall -- Are the Claims Coming?" presented at The International Reinsurance Summit 2008, Hamilton, Bermuda, 2008.

"China Product Recalls: What's at Stake and What's Next," (co-author), NERA Working Paper, 2008.

"Recent Trends in Securities Litigation" presented at Strategies, Calculations & Insurance in Complex Business Litigation, hosted by the Directors Roundtable, New York, New York, 2008.

"The Current Landscape" presented at Mealey's Product Recall Liability Conference: Made in China and Beyond, Washington, DC, 2007.

"China Product Recalls: What's at Stake and What's Next" presented at China Product Recalls, sponsored by National Economic Research Associates, New York, New York, 2007.

"Damages and Loss Causation in Shareholder Class Actions after Dura" presented at Securities Litigation: Emerging Trends in Enforcement and Winning Litigation Strategies hosted by the International Quality & Productivity Center, New York, New York, 2006.

"Forecasting Product Liability by Understanding the Driving Forces," (co-author), The International Comparative Legal Guide to Product Liability, 2006.

"Recent Trends in Securities Class Action Litigation," presented at The Class Action Litigation Summit Program Class Action in the Securities Industry, Washington, D.C., 2003.

"Product Liability Claims Estimation – Four Steps, Four Myths" presented at Standard & Poor's Seminar, New York, New York, 2001.

"How Bad Can It Be? The Economics of Damages and Settlements in Shareholder Class Actions," Balancing Disclosure and Litigation Risks for Public Companies (Or Soon-To-Be Public Companies) Seminar, sponsored by Alston & Bird LLP and RR Donnelley Financial, Nashville, Tennessee, 2000.

"Securities Litigation Reform: Problems and Progress," Viewpoint, November 1999, Issue No. 2 (co-authored).

"Trends in Securities Litigation and the Impact of the PSLRA," Class Actions & Derivative Suits, American Bar Association Litigation Section, Vol. 9, No. 3, Summer 1999 (co-authored).

"Random Taxes, Random Claims," Regulation, Winter 1997, pp. 6-7 (co-authored).

"Adverse Selection in the Market for Used Construction Equipment," presented at the NBER Conference on Research in Income and Wealth, Federal Reserve Board, June 1992.

## Expert Reports, Depositions & Testimony (4 years)

Expert Report before the American Arbitration Association in *Arctic Glacier U.S.A, Inc. and Arctic Glacier U.S.A., Inc. Savings and Retirement Plan v. Principal Life Insurance Company*, 2018.

Rebuttal Report and Expert Report, in *Mahaska Bottling Company, Inc., et al. v. Pepsico, Inc. and Bottling Group, LLC*, US District Court Southern District of Iowa, 2018.

Declaration before the United States District Court District of New Jersey in *Association of New Jersey Rifle & Pistol Clubs, Inc., et al. v. Gurbir Grewal et al.*, 2018.

Deposition Testimony, Supplemental Expert Report and Expert Report before the Supreme Court of the State of New York in *Bernstein Liebhard, LLP v. Sentinel Insurance Company, Ltd.*, 2018.

Expert Report before the District Court for Douglas County, Nebraska in *Union Pacific Railroad Company v. L.B. Foster Company and CXT Incorporated, 2018.*

Deposition Testimony and Declarations before the United States District Court Southern District of New York in *Andrew Meyer v. Concordia International Corp., et al.*, 2018.

Expert Report before the United States District Court Eastern District of Texas in *Alan Hall and James DePalma v. Rent-A-Center, Inc., Robert D. Davis, and Guy J. Constant*, 2018.

Expert Report before the Clark County District Court of Nevada in *Round Square Company Limited v. Las Vegas Sands, Inc.*, 2018.

Deposition Testimony before the United States District Court Southern District of California in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2018.

Expert Report and Declaration before the United States District Court Southern District of California in *Virginia Duncan, et al. v. Xavier Becerra, et al.*, 2017.

Deposition Testimony and Expert Report before the United States District Court for the Western District of Texas, Austin Division in *City of Pontiac General Employees' Retirement System v. Dell, Inc., et al.*, 2017.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of Texas, Houston Division in *In re Willbros Group, Inc. Securities Litigation,* 2017.

Declaration before the United States District Court Eastern District of California in *William Wiese, et al. v. Xavier Becerra, et al.*, 2017.

Deposition Testimony and Expert Report before the United States District Court for the Southern District of Texas, Houston Division in *In re Cobalt International Energy Inc. Securities Litigation.,* 2017.

Testimony, Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *DEKA Investment GmbH, et al. v. Santander Consumer USA Holdings, Inc., et al*., 2017.

Deposition Testimony before the Superior Court of the State of North Carolina for Mecklenburg County in *Next Advisor, Inc. v. LendingTree, Inc.*, 2017

Deposition Testimony and Expert Report before the Supreme Court of the State of New York, County of New York in *Iroquois Master Fund Ltd., et al. v. Hyperdynamics Corporation*, 2016.

Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2016.

Expert Report before the United States District Court for the Northern District of Georgia, Atlanta Division, in *In re Suntrust Banks, Inc. ERISA Litigation,* 2016.

Deposition Testimony and Expert Report before the Superior Court of New Jersey, Union County, in *Syngenta Crop Protection, Inc. v. Insurance Company of North America et al.,* 2015.

Declaration before the United States District Court Northern District of Georgia, in *John Noble, et al. v. Premiere Global Services, Inc., et al.,* 2015.

Deposition Testimony and Expert Report before the United States District Court Central District of California, in *Amanda Sateriale, et al. v. RJ Reynolds Tobacco Co. et al*., 2015.

Rebuttal Report and Expert Report in the United States of America before the Securities and Exchange Commission in *Houston American Energy Corp., et al.*, 2014.

Testimony, Deposition Testimony and Expert Report before the United States District Court for the Northern District of Texas, Dallas Division in *The Archdiocese of Milwaukee Supporting Fund, Inc., et al. v. Halliburton Company, et al.*, 2014.

Deposition Testimony and Expert Report before the United States District Court for the Eastern District of Pennsylvania in *Power Restoration International, Inc. v. PepsiCo, Inc., Bottling Group, LLC, and Frito-Lay Trading Company (Europe), Gmbh*, 2014.

Deposition Testimony and Expert Reports before the United States District Court Southern District of New York in *In re Lower Manhattan Disaster Site Litigation*, 2014.

Deposition Testimony and Expert Report before the United States District Court Southern District of Florida in *Atul Kumar Sood, et al. v. Catalyst Pharmaceutical Partners Inc., et al.*, 2014.

Declaration before the Superior Court of Gwinnett County State of Georgia in *City of Riviera Beach General Employees Retirement System, et al. v. Aaron's Inc., et al., Norfolk County Retirement System, et al. v. Aaron's Inc., et al.*, 2014.

Deposition Testimony, Surrebuttal Report and Expert Report before the United States District Court Middle District of Tennessee Nashville Division in *Garden City Employees' Retirement System and Central States, Southeast and Southwest Areas Pension Fund, et al. v. Psychiatric Solutions, Inc., et al.*, 2014.

Declaration before the United States District Court Northern District of California San Jose Division in *Fyock, et al. v. The City of Sunnyvale, et al.*, 2014.

Deposition Testimony and Expert Report before the United States District Court for the District of Maryland (Northern Division) in *Kolbe, et al. v. O'Malley, et al.*, 2014.

Declaration before the United States District Court Northern District of California in *San Francisco Veteran Police Officers Association, et al. v. The City and County of San Francisco, et al.*, 2014.

# Appendix B – Materials Considered

**Case Documents, Filings and Court Decisions in This Matter**
1. Consolidated Complaint for Violation of the Federal Securities Laws, dated March 13, 2017
2. Memorandum Opinion of the Court on Defendants' Motion to Dismiss, dated December 18, 2017
3. Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, dated June 1, 2018
4. Expert Report of Steven P. Feinstein, dated June 1, 2018
5. Deposition of Steven P. Feinstein, July 12, 2018

**Documents produced by Dr. Feinstein**
1. FEIN001.dat
2. FEIN001.opt
3. FEIN_000001.TIF
4. FEIN_000002.TIF
5. FEIN_000003.TIF
6. FEIN_000004.TIF
7. FEIN_000005.TIF
8. FEIN_000006.TIF
9. FEIN_000007.TIF
10. FEIN_000008.TIF
11. FEIN_000009.TIF
12. FEIN_0000010.TIF
13. FEIN_000006.XLSX
14. FEIN_000001.txt
15. FEIN_000004.txt
16. FEIN_000006.txt
17. FEIN_000007.txt
18. FEIN_000009.txt

**Analyst Reports on CoreCivic**
1. 2011.01.05 - Avondale Partners
2. 2011.01.11 - Avondale Partners
3. 2011.01.26 - Avondale Partners
4. 2011.01.31 - SunTrust
5. 2011.02.04 - Avondale Partners
6. 2011.02.10 - Avondale Partners (1)
7. 2011.02.10 - Avondale Partners (2)
8. 2011.02.11 - Avondale Partners
9. 2011.02.11 - Macquarie
10. 2011.02.11 - SunTrust
11. 2011.02.17 - Avondale Partners
12. 2011.02.28 - Avondale Partners
13. 2011.03.08 - Avondale Partners
14. 2011.03.09 - Avondale Partners
15. 2011.03.17 - SunTrust
16. 2011.03.21 - Avondale Partners
17. 2011.03.30 - Avondale Partners
18. 2011.03.31 - Avondale Partners

19.  2011.04.01 - Avondale Partners
20.  2011.04.08 - Avondale Partners
21.  2011.04.15 - Avondale Partners
22.  2011.04.25 - Avondale Partners
23.  2011.05.03 - Avondale Partners
24.  2011.05.04 - Avondale Partners
25.  2011.05.05 - Avondale Partners
26.  2011.05.05 - SunTrust
27.  2011.05.06 - Macquarie
28.  2011.05.10 - SunTrust
29.  2011.05.23 - SunTrust
30.  2011.06.27 - Avondale Partners
31.  2011.06.28 - SunTrust
32.  2011.07.15 - Avondale Partners
33.  2011.07.26 - Avondale Partners
34.  2011.08.03 - Avondale Partners
35.  2011.08.04 - Avondale Partners (1)
36.  2011.08.04 - Avondale Partners (2)
37.  2011.08.04 - SunTrust
38.  2011.08.05 - Macquarie
39.  2011.08.08 - Avondale Partners
40.  2011.08.19 - Avondale Partners
41.  2011.08.25 - Avondale Partners
42.  2011.09.02 - Macquarie
43.  2011.09.06 - Avondale Partners
44.  2011.09.09 - Avondale Partners
45.  2011.10.12 - Avondale Partners
46.  2011.10.21 - SunTrust
47.  2011.11.02 - Avondale Partners
48.  2011.11.03 - Avondale Partners (1)
49.  2011.11.03 - Avondale Partners (2)
50.  2011.11.04 - Macquarie
51.  2011.11.04 - SunTrust
52.  2011.11.14 - Avondale Partners
53.  2011.11.15 - SunTrust
54.  2011.12.06 - Avondale Partners
55.  2011.12.23 - Avondale Partners
56.  2012.01.03 - Barclays
57.  2012.01.05 - Barclays
58.  2012.01.09 - Barclays
59.  2012.02.01 - Avondale Partners
60.  2012.02.08 - Avondale Partners
61.  2012.02.08 - Barclays
62.  2012.02.09 - Avondale Partners (1)
63.  2012.02.09 - Avondale Partners (2)
64.  2012.02.09 - Barclays
65.  2012.02.09 - SunTrust
66.  2012.02.10 - Avondale Partners (1)
67.  2012.02.10 - Avondale Partners (2)
68.  2012.02.10 - Macquarie
69.  2012.02.17 - Barclays

2

## Appendix B – Materials Considered

70. 2012.02.17 - SunTrust
71. 2012.02.21 - Barclays
72. 2012.02.27 - Barclays
73. 2012.02.27 - Macquarie
74. 2012.02.28 - Barclays
75. 2012.03.09 - Barclays
76. 2012.03.13 - Avondale Partners
77. 2012.03.14 - Avondale Partners
78. 2012.03.15 - Barclays
79. 2012.03.21 - SunTrust
80. 2012.03.29 - Avondale Partners
81. 2012.04.09 - Barclays
82. 2012.04.17 - Barclays (1)
83. 2012.04.17 - Barclays (2)
84. 2012.04.24 - SunTrust
85. 2012.04.27 - Barclays
86. 2012.05.01 - SunTrust
87. 2012.05.03 - Avondale Partners (1)
88. 2012.05.03 - Avondale Partners (2)
89. 2012.05.03 - SunTrust (1)
90. 2012.05.03 - SunTrust (2)
91. 2012.05.04 - Barclays
92. 2012.05.04 - Macquarie
93. 2012.05.18 - Avondale Partners
94. 2012.05.23 - Avondale Partners
95. 2012.05.30 - SunTrust
96. 2012.06.15 - Avondale Partners
97. 2012.06.19 - Avondale Partners
98. 2012.06.27 - Macquarie
99. 2012.06.29 - Barclays
100. 2012.07.02 - Avondale Partners
101. 2012.07.02 - Barclays
102. 2012.07.09 - SunTrust
103. 2012.07.16 - Barclays
104. 2012.07.16 - Macquarie
105. 2012.07.31 - Macquarie
106. 2012.08.02 - SunTrust
107. 2012.08.08 - Avondale Partners
108. 2012.08.09 - Avondale Partners (1)
109. 2012.08.09 - Avondale Partners (2)
110. 2012.08.09 - SunTrust (1)
111. 2012.08.09 - SunTrust (2)
112. 2012.08.10 - Macquarie
113. 2012.08.24 - Avondale Partners
114. 2012.08.27 - Avondale Partners
115. 2012.08.29 - SunTrust
116. 2012.09.04 - Barclays
117. 2012.09.04 - SunTrust
118. 2012.09.06 - Barclays
119. 2012.09.07 - Avondale Partners
120. 2012.09.10 - Avondale Partners

3

# Appendix B – Materials Considered

121. 2012.09.10 - Barclays
122. 2012.09.11 - Avondale Partners
123. 2012.10.04 - Avondale Partners
124. 2012.10.29 - Macquarie
125. 2012.11.06 - Macquarie (1)
126. 2012.11.06 - Macquarie (2)
127. 2012.11.07 - Avondale Partners
128. 2012.11.07 - Barclays
129. 2012.11.07 - SunTrust
130. 2012.11.08 - Avondale Partners (1)
131. 2012.11.08 - Avondale Partners (2)
132. 2012.11.08 - Barclays
133. 2012.11.08 - SunTrust
134. 2012.11.09 - Macquarie
135. 2012.11.29 - Macquarie
136. 2012.12.03 - SunTrust
137. 2012.12.07 - Barclays
138. 2012.12.07 - SunTrust (1)
139. 2012.12.07 - SunTrust (2)
140. 2012.12.12 - SunTrust
141. 2013.01.09 - Avondale Partners
142. 2013.01.18 - Macquarie
143. 2013.02.04 - Macquarie
144. 2013.02.07 - Avondale Partners
145. 2013.02.08 - Avondale Partners (1)
146. 2013.02.08 - Avondale Partners (2)
147. 2013.02.08 - Barclays
148. 2013.02.08 - Macquarie
149. 2013.02.08 - SunTrust
150. 2013.02.11 - Avondale Partners (1)
151. 2013.02.11 - Avondale Partners (2)
152. 2013.02.11 - Barclays
153. 2013.02.13 - Avondale Partners (1)
154. 2013.02.13 - Avondale Partners (2)
155. 2013.02.13 - Barclays
156. 2013.02.14 - Avondale Partners (1)
157. 2013.02.14 - Avondale Partners (2)
158. 2013.02.15 - Avondale Partners
159. 2013.02.15 - Barclays
160. 2013.02.15 - Macquarie (1)
161. 2013.02.15 - Macquarie (2)
162. 2013.02.15 - SunTrust
163. 2013.02.20 - Avondale Partners
164. 2013.03.15 - Barclays
165. 2013.03.19 - Avondale Partners
166. 2013.03.21 - Macquarie
167. 2013.04.08 - Macquarie
168. 2013.04.10 - Barclays
169. 2013.04.12 - Macquarie
170. 2013.04.17 - Barclays
171. 2013.04.23 - SunTrust

4

## Appendix B – Materials Considered

172. 2013.05.01 - Avondale Partners
173. 2013.05.02 - Avondale Partners
174. 2013.05.03 - Avondale Partners
175. 2013.05.06 - Avondale Partners
176. 2013.05.06 - Barclays
177. 2013.05.08 - Barclays
178. 2013.05.09 - Avondale Partners (1)
179. 2013.05.09 - Avondale Partners (2)
180. 2013.05.09 - Barclays
181. 2013.05.09 - SunTrust
182. 2013.05.10 - Avondale Partners
183. 2013.05.10 - Macquarie
184. 2013.05.13 - SunTrust
185. 2013.05.17 - Barclays
186. 2013.05.17 - SunTrust
187. 2013.05.21 - Macquarie
188. 2013.06.07 - Avondale Partners
189. 2013.06.07 - Barclays
190. 2013.06.17 - Macquarie
191. 2013.06.19 - Avondale Partners
192. 2013.06.20 - Barclays
193. 2013.06.26 - Avondale Partners
194. 2013.07.10 - Barclays (1)
195. 2013.07.10 - Barclays (2)
196. 2013.07.10 - Macquarie
197. 2013.07.12 - Macquarie
198. 2013.07.18 - SunTrust
199. 2013.08.05 - Avondale Partners
200. 2013.08.05 - Macquarie (1)
201. 2013.08.05 - Macquarie (2)
202. 2013.08.05 - SunTrust
203. 2013.08.08 - Barclays
204. 2013.08.08 - Macquarie
205. 2013.08.08 - SunTrust
206. 2013.08.19 - SunTrust
207. 2013.08.20 - Avondale Partners (1)
208. 2013.08.20 - Avondale Partners (2)
209. 2013.08.22 - Macquarie
210. 2013.08.23 - Barclays
211. 2013.08.28 - Macquarie
212. 2013.08.29 - Barclays
213. 2013.09.12 - Macquarie (1)
214. 2013.09.12 - Macquarie (2)
215. 2013.09.12 - SunTrust
216. 2013.09.23 - Macquarie
217. 2013.09.25 - SunTrust
218. 2013.09.30 - Macquarie
219. 2013.10.02 - Macquarie
220. 2013.10.03 - Barclays
221. 2013.10.07 - Avondale Partners
222. 2013.10.15 - Barclays

5

## Appendix B – Materials Considered

223. 2013.10.15 - Macquarie
224. 2013.10.16 - Macquarie
225. 2013.10.29 - Avondale Partners
226. 2013.11.04 - Barclays
227. 2013.11.06 - Avondale Partners
228. 2013.11.07 - Avondale Partners
229. 2013.11.07 - Barclays
230. 2013.11.07 - Macquarie
231. 2013.11.08 - SunTrust
232. 2013.11.22 - Avondale Partners (1)
233. 2013.11.22 - Avondale Partners (2)
234. 2013.12.12 - Barclays
235. 2013.12.12 - Macquarie
236. 2014.01.09 - Avondale Partners
237. 2014.01.14 - Avondale Partners
238. 2014.01.22 - Avondale Partners
239. 2014.01.23 - CRT Capital
240. 2014.01.27 - Avondale Partners
241. 2014.02.10 - Macquarie
242. 2014.02.12 - Avondale Partners
243. 2014.02.13 - Avondale Partners (1)
244. 2014.02.13 - Avondale Partners (2)
245. 2014.02.13 - Barclays
246. 2014.02.13 - Macquarie
247. 2014.02.13 - SunTrust
248. 2014.02.14 - Avondale Partners
249. 2014.02.14 - CRT Capital
250. 2014.02.20 - Macquarie
251. 2014.03.12 - Avondale Partners
252. 2014.03.31 - Barclays
253. 2014.04.01 - Avondale Partners
254. 2014.04.08 - SunTrust
255. 2014.04.10 - Macquarie
256. 2014.04.11 - Macquarie
257. 2014.04.28 - Avondale Partners
258. 2014.05.07 - Avondale Partners
259. 2014.05.08 - Avondale Partners
260. 2014.05.08 - Macquarie
261. 2014.05.08 - SunTrust
262. 2014.05.09 - CRT Capital
263. 2014.05.14 - Avondale Partners (1)
264. 2014.05.14 - Avondale Partners (2)
265. 2014.06.06 - SunTrust
266. 2014.06.30 - Avondale Partners
267. 2014.07.23 - Avondale Partners
268. 2014.08.07 - CRT Capital
269. 2014.08.07 - Macquarie
270. 2014.08.07 - SunTrust
271. 2014.08.19 - Macquarie
272. 2014.08.27 - Avondale Partners
273. 2014.09.11 - Macquarie

6

# Appendix B – Materials Considered

274. 2014.09.24 - Macquarie
275. 2014.09.24 - SunTrust
276. 2014.09.25 - CRT Capital
277. 2014.10.02 - CRT Capital
278. 2014.10.21 - Barclays
279. 2014.11.03 - Avondale Partners (1)
280. 2014.11.03 - Avondale Partners (2)
281. 2014.11.04 - Avondale Partners (1)
282. 2014.11.04 - Avondale Partners (2)
283. 2014.11.04 - CRT Capital
284. 2014.11.04 - Macquarie
285. 2014.11.04 - SunTrust
286. 2014.11.05 - Macquarie
287. 2014.11.19 - Macquarie (1)
288. 2014.11.19 - Macquarie (2)
289. 2014.12.01 - Macquarie
290. 2014.12.11 - Macquarie
291. 2014.12.19 - Wells Fargo
292. 2014.12.29 - Macquarie
293. 2014.12.30 - Avondale Partners
294. 2014.12.30 - CRT Capital
295. 2014.12.30 - Wells Fargo
296. 2015.02.10 - Avondale Partners
297. 2015.02.12 - Avondale Partners
298. 2015.02.12 - CRT Capital
299. 2015.02.12 - Macquarie
300. 2015.02.12 - SunTrust
301. 2015.02.12 - Wells Fargo
302. 2015.02.20 - Macquarie
303. 2015.02.20 - Wells Fargo
304. 2015.03.09 - Macquarie
305. 2015.03.17 - SunTrust
306. 2015.05.06 - Macquarie
307. 2015.05.06 - SunTrust
308. 2015.05.07 - CRT Capital
309. 2015.05.07 - Macquarie
310. 2015.05.07 - SunTrust
311. 2015.05.07 - Wells Fargo
312. 2015.05.12 - Wells Fargo
313. 2015.05.14 - Wells Fargo
314. 2015.05.15 - Macquarie
315. 2015.06.03 - Wells Fargo
316. 2015.06.04 - CRT Capital
317. 2015.06.19 - Macquarie
318. 2015.06.24 - Wells Fargo
319. 2015.07.13 - Canaccord Genuity
320. 2015.08.06 - Canaccord Genuity
321. 2015.08.06 - Macquarie
322. 2015.08.06 - Wells Fargo
323. 2015.08.07 - SunTrust
324. 2015.08.13 - Wells Fargo

## Appendix B – Materials Considered

325. 2015.08.24 - Wells Fargo
326. 2015.08.28 - SunTrust
327. 2015.08.31 - Macquarie
328. 2015.09.15 - Wells Fargo
329. 2015.09.21 - Canaccord Genuity (1)
330. 2015.09.21 - Canaccord Genuity (2)
331. 2015.09.22 - SunTrust
332. 2015.09.22 - Wells Fargo
333. 2015.09.23 - SunTrust
334. 2015.10.05 - Canaccord Genuity
335. 2015.10.13 - Macquarie
336. 2015.10.13 - Wells Fargo
337. 2015.10.18 - Canaccord Genuity
338. 2015.10.29 - SunTrust
339. 2015.10.29 - Wells Fargo
340. 2015.11.02 - Canaccord Genuity
341. 2015.11.05 - Macquarie
342. 2015.11.05 - Wells Fargo
343. 2015.11.06 - Canaccord Genuity
344. 2015.11.06 - SunTrust
345. 2015.11.13 - Wells Fargo
346. 2015.11.16 - Canaccord Genuity
347. 2015.11.19 - Wells Fargo
348. 2015.11.29 - Canaccord Genuity
349. 2015.12.13 - Canaccord Genuity
350. 2015.12.17 - SunTrust
351. 2015.12.17 - Wells Fargo
352. 2016.01.11 - Canaccord Genuity
353. 2016.01.11 - Canaccord Genuity (1)
354. 2016.01.11 - Canaccord Genuity (2)
355. 2016.01.25 - Canaccord Genuity
356. 2016.02.08 - Canaccord Genuity
357. 2016.02.11 - Canaccord Genuity
358. 2016.02.11 - Macquarie
359. 2016.02.11 - SunTrust
360. 2016.02.11 - Wells Fargo
361. 2016.02.12 - SunTrust
362. 2016.02.23 - Wells Fargo
363. 2016.02.25 - Wells Fargo
364. 2016.03.16 - Macquarie
365. 2016.03.21 - Canaccord Genuity
366. 2016.03.22 - Canaccord Genuity
367. 2016.04.11 - Macquarie
368. 2016.05.04 - Macquarie
369. 2016.05.05 - Canaccord Genuity
370. 2016.05.05 - SunTrust
371. 2016.05.05 - Wells Fargo
372. 2016.05.06 - Macquarie
373. 2016.05.06 - Wells Fargo
374. 2016.05.13 - Macquarie
375. 2016.05.20 - SunTrust

8

## Appendix B – Materials Considered

376. 2016.06.07 - Wells Fargo
377. 2016.06.10 - SunTrust
378. 2016.07.01 - SunTrust
379. 2016.08.04 - Canaccord Genuity
380. 2016.08.04 - SunTrust
381. 2016.08.04 - Wells Fargo
382. 2016.08.10 - Wells Fargo
383. 2016.08.19 - Gordon Haskett
384. 2016.08.19 - SunTrust
385. 2016.08.19 - Wells Fargo
386. 2016.08.23 - Canaccord Genuity
387. 2016.09.01 - SunTrust
388. 2016.09.01 - SunTrust (1)
389. 2016.09.01 - SunTrust (2)
390. 2016.09.27 - Canaccord Genuity
391. 2016.10.12 - SunTrust
392. 2016.10.17 - Canaccord Genuity
393. 2016.10.17 - SunTrust (1)
394. 2016.10.17 - SunTrust (2)
395. 2016.10.18 - SunTrust
396. 2016.10.20 - Canaccord Genuity
397. 2016.10.21 - Wells Fargo
398. 2016.10.31 - Canaccord Genuity
399. 2016.10.31 - SunTrust
400. 2016.11.03 - SunTrust
401. 2016.11.03 - Wells Fargo
402. 2016.11.09 - Canaccord Genuity
403. 2016.11.11 - Canaccord Genuity
404. 2016.11.11 - Wells Fargo
405. 2016.11.14 - SunTrust
406. 2016.12.08 - SunTrust (1)
407. 2016.12.08 - SunTrust (2)
408. 2016.12.12 - Canaccord Genuity (1)
409. 2016.12.12 - Canaccord Genuity (2)
410. 2016.12.13 - SunTrust
411. 2016.12.15 - SunTrust
412. 2016.12.30 - Wells Fargo
413. 2017.01.13 - Canaccord Genuity
414. 2017.01.19 - SunTrust
415. 2017.01.24 - SunTrust
416. 2017.01.31 - SunTrust (1)
417. 2017.01.31 - SunTrust (2)
418. 2017.02.08 - Canaccord Genuity
419. 2017.02.09 - Canaccord Genuity
420. 2017.02.09 - SunTrust
421. 2017.02.09 - Wells Fargo
422. 2017.02.21 - Wells Fargo
423. 2017.02.24 - Deutsche Bank
424. 2017.03.09 - SunTrust
425. 2017.03.13 - SunTrust
426. 2017.03.16 - SunTrust

9

## Appendix B – Materials Considered

427.  2017.04.11 - Deutsche Bank
428.  2017.04.12 - SunTrust
429.  2017.04.13 - Deutsche Bank
430.  2017.04.19 - Wells Fargo
431.  2017.05.03 - Canaccord Genuity
432.  2017.05.03 - Deutsche Bank
433.  2017.05.04 - Canaccord Genuity
434.  2017.05.04 - SunTrust (1)
435.  2017.05.04 - SunTrust (2)
436.  2017.05.04 - Wells Fargo
437.  2017.05.19 - Canaccord Genuity (1)
438.  2017.05.19 - Canaccord Genuity (2)
439.  2017.05.22 - SunTrust
440.  2017.05.23 - Deutsche Bank
441.  2017.06.07 - Wells Fargo
442.  2017.08.07 - Canaccord Genuity
443.  2017.08.07 - Deutsche Bank
444.  2017.08.07 - SunTrust
445.  2017.08.08 - Canaccord Genuity
446.  2017.08.08 - SunTrust
447.  2017.08.08 - Wells Fargo
448.  2017.08.15 - Wells Fargo
449.  2017.08.21 - Deutsche Bank
450.  2017.09.29 - SunTrust
451.  2017.11.08 - Deutsche Bank
452.  2017.11.09 - SunTrust
453.  2017.11.09 - Wells Fargo
454.  2017.11.15 - SunTrust
455.  2017.11.30 - Deutsche Bank (1)
456.  2017.11.30 - Deutsche Bank (2)
457.  2017.11.30 - Wells Fargo

**Analyst Reports on GEO**

1.   2016.02.17 - GEO - Canaccord Genuity
2.   2016.02.17 - GEO - Canaccord Genuity
3.   2016.02.17 - GEO - Macquarie
4.   2016.02.17 - GEO - SunTrust
5.   2016.02.17 - GEO - SunTrust
6.   2016.02.17 - GEO - Wells Fargo
7.   2016.02.25 - GEO - Wells Fargo
8.   2016.02.29 - GEO - Wells Fargo
9.   2016.03.04 - GEO - SunTrust
10.  2016.03.14 - GEO - Macquarie
11.  2016.04.12 - GEO - Macquarie
12.  2016.04.28 - GEO - Canaccord Genuity
13.  2016.04.28 - GEO - Canaccord Genuity
14.  2016.04.28 - GEO - Macquarie
15.  2016.04.28 - GEO - Wells Fargo
16.  2016.04.29 - GEO - SunTrust
17.  2016.05.06 - GEO - Dawson James

10

## Appendix B – Materials Considered

18. 2016.05.11 - GEO - Wells Fargo
19. 2016.06.08 - GEO - Wells Fargo
20. 2016.06.10 - GEO - SunTrust
21. 2016.08.02 - GEO - Canaccord Genuity
22. 2016.08.02 - GEO - Canaccord Genuity
23. 2016.08.02 - GEO - SunTrust
24. 2016.08.02 - GEO - Wells Fargo
25. 2016.08.10 - GEO - Canaccord Genuity
26. 2016.08.12 - GEO - Wells Fargo
27. 2016.09.30 - GEO - Canaccord Genuity
28. 2016.09.30 - GEO - SunTrust
29. 2016.11.03 - GEO - Canaccord Genuity
30. 2016.11.03 - GEO - Canaccord Genuity
31. 2016.11.03 - GEO - Wells Fargo
32. 2016.11.04 - GEO - SunTrust
33. 2016.11.21 - GEO - Wells Fargo
34. 2016.12.12 - GEO - Canaccord Genuity
35. 2016.12.30 - GEO - Wells Fargo

**CoreCivic SEC Filings from Lexis Nexis Securities Mosaic and SEC EDGAR**
(sec.gov/edgar.shtml)
1. 1999.03.30 - 10-K for period ending 1998.12.31
2. 2000.03.30 - 10-K for period ending 1999.12.31
3. 2000.05.15 - 10-Q for period ending 2000.03.31
4. 2000.08.14 - 10-Q for period ending 2000.06.30
5. 2000.11.14 - 10-Q for period ending 2000.09.30
6. 2001.04.17 - 10-K for period ending 2000.12.31
7. 2002.03.22 - 10-K for period ending 2001.12.31
8. 2003.03.28 - 10-K for period ending 2002.12.31
9. 2004.03.12 - 10-K for period ending 2003.12.31
10. 2005.03.07 - 10-K for period ending 2004.12.31
11. 2006.03.07 - 10-K for period ending 2005.12.31
12. 2007.02.27 - 10-K for period ending 2006.12.31
13. 2008.02.27 - 10-K for period ending 2007.12.31
14. 2009.02.25 - 10-K for period ending 2008.12.31
15. 2009.05.07 - 10-Q for period ending 2009.03.31
16. 2009.08.06 - 10-Q for period ending 2009.06.30
17. 2009.11.05 - 10-Q for period ending 2009.09.30
18. 2010.02.24 - 10-K for period ending 2009.12.31
19. 2010.05.06 - 10-Q for period ending 2010.03.31
20. 2010.08.05 - 10-Q for period ending 2010.06.30
21. 2010.11.05 - 10-Q for period ending 2010.09.30
22. 2011.02.25 - 10-K for period ending 2010.12.31
23. 2011.05.06 - 10-Q for period ending 2011.03.31
24. 2011.08.05 - 10-Q for period ending 2011.06.30
25. 2011.11.04 - 10-Q for period ending 2011.09.30
26. 2012.02.27 - 10-K for period ending 2011.12.31
27. 2012.03.30 - Proxy Statement for Stockholders Meeting to be Held on May 10, 2012
28. 2012.05.07 - 10-Q for period ending 2012.03.31
29. 2012.08.09 - 10-Q for period ending 2012.06.30

11

## Appendix B – Materials Considered

30. 2012.11.08 - 10-Q for period ending 2012.09.30
31. 2013.02.27 - 10-K for period ending 2012.12.31
32. 2013.05.09 - 10-Q for period ending 2013.03.31
33. 2013.08.08 - 10-Q for period ending 2013.06.30
34. 2013.11.07 - 10-Q for period ending 2013.09.30
35. 2014.02.27 - 10-K for period ending 2013.12.31
36. 2014.05.08 - 10-Q for period ending 2014.03.31
37. 2014.08.07 - 10-Q for period ending 2014.06.30
38. 2014.11.05 - 10-Q for period ending 2014.09.30
39. 2015.02.25 - 10-K for period ending 2014.12.31
40. 2015.05.07 - 10-Q for period ending 2015.03.31
41. 2015.08.06 - 10-Q for period ending 2015.06.30
42. 2015.11.05 - 10-Q for period ending 2015.09.30
43. 2016.02.25 - 10-K for period ending 2015.12.31
44. 2016.05.05 - 10-Q for period ending 2016.03.31
45. 2016.08.04 - 10-Q for period ending 2016.06.30
46. 2016.11.03 - 10-Q for period ending 2016.09.30
47. 2017.02.23 - 10-K for period ending 2016.12.31
48. 2017.05.04 - 10-Q for period ending 2017.03.31
49. 2017.08.08 - 10-Q for period ending 2017.06.30
50. 2017.11.08 - 10-Q for period ending 2017.09.30

**CoreCivic Press Releases from CoreCivic Website**
(ir.corecivic.com/news-releases)

1. 2011.01.19 - CCA Announces Earnings Release and Conference Call Date for Fourth Quarter 2010 Financial Results
2. 2011.02.09 - CCA Announces 2010 Fourth Quarter and Full-Year Financial Results
3. 2011.04.18 - CCA Announces Earnings Release and Conference Call Dates for First Quarter 2011 Financial Results
4. 2011.05.04 - CCA Announces 2011 First Quarter Financial Results
5. 2011.05.16 - CCA Announces $100 Million Increase in Share Repurchase Program
6. 2011.06.01 - CCA Announces Hiring of Harley G. Lappin as Chief Corrections Officer
7. 2011.07.06 - CCA Wins Re-Bid of Contract From the State of Hawaii
8. 2011.07.18 - CCA Announces Earnings Release and Conference Call Dates for Second Quarter 2011 Financial Results
9. 2011.08.03 - CCA Announces 2011 Second Quarter Financial Results
10. 2011.08.15 - CCA Announces $150 Million Expansion in Share Repurchase Program
11. 2011.08.23 - CCA Selected for the Continued Management of Two Contracts From the State of Texas
12. 2011.09.01 - CCA Awarded Contract to Purchase and Operate Lake Erie Correctional Institution in Ohio
13. 2011.10.24 - CCA Announces Earnings Release and Conference Call Dates for Third Quarter 2011 Financial Results
14. 2011.10.28 - CCA Awarded a New Federal Bureau of Prisons Contract for the Continued Management and Expansion of McRae Correctional Facility
15. 2011.11.02 - CCA Announces 2011 Third Quarter Financial Results
16. 2011.11.10 - CCA and the State of Mississippi Announce Closure of the Delta Correctional Facility

## Appendix B – Materials Considered

17. 2011.12.05 - Corrections Corporation of America Announces Tender Offer for up to $150 Million of Its 6.25% Senior Notes due 2013
18. 2011.12.09 - Corrections Corporation of America Elects Anne L. Mariucci to Its Board of Directors
19. 2011.12.19 - Corrections Corporation of America Announces Extension of Early Tender Deadline for Its Tender Offer
20. 2012.01.03 - CCA Announces Completion of Purchase and Commencement of Operations at Lake Erie Correctional
21. 2012.01.03 - CCA Awarded New Management Contract With Puerto Rico
22. 2012.01.09 - CCA Announces New $785 Million Senior Credit Facility and Calls for Redemption of $277,474,000 of Its 6
23. 2012.01.18 - CCA Announces 2011 Fourth Quarter and Full-Year Earnings Release and Conference Call Dates
24. 2012.02.08 - CCA Announces 2011 Fourth Quarter and Full-Year Financial Results
25. 2012.02.27 - CCA Announces Its Intention to Initiate a Quarterly Dividend of $0.20 per Share
26. 2012.04.13 - CCA Announces 2012 First Quarter Earnings Release and Conference Call Dates
27. 2012.04.30 - CCA Revises 2012 First Quarter Earnings Release Date
28. 2012.05.03 - CCA Announces 2012 First Quarter Financial Results
29. 2012.05.03 - CCA Assessing Feasibility of a REIT Conversion
30. 2012.05.11 - CCA Declares Quarterly Dividend
31. 2012.06.29 - CCA to Modify Contract With California Reducing Total Population
32. 2012.07.16 - CCA Awarded New Management Contract With Idaho and Expands Agreement With Oklahoma
33. 2012.07.25 - CCA Announces 2012 Second Quarter Earnings Release and Conference Call Dates
34. 2012.08.08 - CCA Announces 2012 Second Quarter Financial Results and Provides Update on Potential REIT Conversion
35. 2012.08.20 - CCA Declares Dividend for Third Quarter 2012
36. 2012.09.06 - CCA Awarded New Management Contract With Arizona
37. 2012.10.25 - CCA Announces 2012 Third Quarter Earnings Release and Conference Call Dates
38. 2012.11.06 - CCA Declares Dividend for Fourth Quarter 2012
39. 2012.11.07 - CCA Announces 2012 Third Quarter Financial Results and Provides Update on Potential REIT Conversion
40. 2013.01.02 - CCA Completes Internal Reorganization
41. 2013.02.07 - CCA Board of Directors Authorizes REIT Conversion
42. 2013.02.08 - CCA Announces 2012 Fourth Quarter Earnings Release and Conference Call Dates
43. 2013.02.13 - CCA Announces 2012 Fourth Quarter Financial Results
44. 2013.02.14 - CCA to Be Added to the MSCI US REIT Index (RMZ) as of the Close of February 28, 2013
45. 2013.02.22 - CCA Declares $0.53 Dividend for First Quarter 2013
46. 2013.02.25 - CCA Appoints Robert J. Dennis to Its Board of Directors
47. 2013.03.21 - CCA Announces Pricing of Senior Notes Offering
48. 2013.03.21 - CCA Announces Proposed Offering of Senior Notes
49. 2013.03.21 - CCA Announces Tender Offer for Any and All of Its 7.75% Senior Notes Due 2017
50. 2013.03.25 - CCA Amends Its Senior Secured Revolving Credit Facility With Increased Commitments and Extended

13

## Appendix B – Materials Considered

51. 2013.04.04 - CCA Announces Closing of $675 Million Senior Notes Offering
52. 2013.04.04 - CCA Announces Early Results of Tender Offer and Related Consent Solicitation
53. 2013.04.08 - CCA Board of Directors Authorizes Special Dividend of $675 Million
54. 2013.04.18 - CCA Announces Final Results of Tender Offer for 2017 Notes
55. 2013.04.22 - CCA Announces 2013 First Quarter Earnings Release and Conference Call Dates
56. 2013.05.08 - CCA Announces 2013 First Quarter Financial Results
57. 2013.05.16 - CCA Declares Regular Quarterly Dividend
58. 2013.05.16 - CCA to Issue 13.88 Million Shares in Connection With Special Dividend
59. 2013.06.12 - CCA to Cease Operations of Certain Facilities
60. 2013.06.14 - CCA Announces Addition to FTSE NAREIT Indices
61. 2013.06.26 - Kentucky Elects Not to Renew Contract at Marion Adjustment Center
62. 2013.07.10 - CCA Awarded Three-Year Contract Renewal With California
63. 2013.07.18 - CCA Announces 2013 Second Quarter Earnings Release and Conference Call Dates
64. 2013.08.05 - CCA Announces Acquisition of Correctional Alternatives, Inc.
65. 2013.08.07 - CCA Announces 2013 Second Quarter Financial Results
66. 2013.08.16 - CCA Declares Regular Quarterly Dividend
67. 2013.08.28 - CCA to Participate at the BMO Capital Markets Conference
68. 2013.10.15 - CCA to Lease California City Correctional Center to the California Department of Corrections and Rehabilitation
69. 2013.10.24 - CCA Announces 2013 Third Quarter Earnings Release and Conference Call Dates
70. 2013.11.06 - CCA Announces 2013 Third Quarter Financial Results
71. 2013.12.12 - CCA Declares Quarterly Dividend
72. 2014.01.15 - CCA Provides Tax Allocations of 2013 Dividend Distributions
73. 2014.01.28 - CCA Announces 2013 Fourth Quarter Earnings Release and Conference Call Dates
74. 2014.02.12 - CCA Announces 2013 Fourth Quarter Financial Results
75. 2014.02.20 - CCA Declares Quarterly Cash Dividend of $0.51 per Share
76. 2014.04.10 - CCA Announces David Garfinkle to Succeed Todd Mullenger as Chief Financial Officer
77. 2014.04.23 - CCA Announces 2014 First Quarter Earnings Release and Conference Call Dates
78. 2014.05.07 - CCA Announces 2014 First Quarter Financial Results
79. 2014.05.15 - CCA Declares Quarterly Cash Dividend of $0.51 per Share
80. 2014.07.07 - CCA Announces Completed Agreements for New Trousdale Facility
81. 2014.07.18 - CCA Announces 2014 Second Quarter Earnings Release and Conference Call Dates
82. 2014.08.06 - CCA Announces 2014 Second Quarter Financial Results
83. 2014.08.14 - CCA Appoints Mark A. Emkes to Its Board of Directors
84. 2014.08.14 - CCA Declares Quarterly Cash Dividend of $0.51 per Share
85. 2014.09.24 - CCA Expands Existing Intergovernmental Service Agreement to Manage the South Texas Family Residential
86. 2014.10.08 - CCA Announces 2014 Third Quarter Earnings Release and Conference Call Dates
87. 2014.11.03 - CCA Announces 2014 Third Quarter Financial Results
88. 2014.12.11 - CCA Declares Quarterly Cash Dividend of $0.51 per Share

## Appendix B – Materials Considered

89. 2014.12.29 - Federal Bureau of Prisons Elects Not to Renew Contract at the Northeast Ohio Correctional Center
90. 2015.01.16 - CCA Provides Tax Allocations of 2014 Dividend Distributions
91. 2015.01.26 - CCA Announces 2014 Fourth Quarter Earnings Release and Conference Call Dates
92. 2015.02.11 - CCA Reports Fourth Quarter and Full Year 2014 Financial Results
93. 2015.02.20 - CCA Announces 6% Increase in Quarterly Cash Dividend to $0.54 per Share
94. 2015.02.25 - CCA Board Chairman John Ferguson to Retire in 2016
95. 2015.04.16 - CCA Announces 2015 First Quarter Earnings Release and Conference Call Dates
96. 2015.05.06 - CCA Reports First Quarter 2015 Financial Results
97. 2015.05.14 - CCA Declares Quarterly Cash Dividend of $0.54 per Share
98. 2015.07.15 - CCA Announces 2015 Second Quarter Earnings Release and Conference Call Dates
99. 2015.07.23 - CCA Amends Its Senior Secured Revolving Credit Facility
100. 2015.08.05 - CCA Reports Second Quarter 2015 Financial Results
101. 2015.08.13 - CCA Declares Quarterly Cash Dividend of $0.54 per Share
102. 2015.08.31 - CCA Announces Acquisition of Four Residential Re-Entry Facilities
103. 2015.09.21 - CCA Announces Offering of Senior Unsecured Notes
104. 2015.09.21 - CCA Prices Offering of Senior Unsecured Notes
105. 2015.10.13 - CCA Awarded Three-Year Contract Renewal With California
106. 2015.10.14 - CCA Announces 2015 Third Quarter Earnings Release and Conference Call Dates
107. 2015.10.29 - CCA Announces Acquisition of Avalon Correctional Services, Inc.
108. 2015.11.04 - CCA Reports Third Quarter 2015 Financial Results
109. 2015.12.10 - CCA Declares Quarterly Cash Dividend of $0.54 Per Share
110. 2015.12.17 - CCA Awarded New Management Contract With Arizona
111. 2016.01.21 - CCA Announces 2015 Fourth Quarter Earnings Release and Conference Call Dates
112. 2016.02.10 - CCA Reports Fourth Quarter and Full Year 2015 Financial Results
113. 2016.02.19 - CCA Declares Quarterly Cash Dividend of $0.54 Per Share
114. 2016.02.22 - CCA Board of Directors Appoints Mark Emkes as Chairman
115. 2016.04.11 - CCA Acquires Correctional Management, Inc.
116. 2016.04.14 - CCA Announces 2016 First Quarter Earnings Release and Conference Call Dates
117. 2016.05.04 - CCA Reports First Quarter 2016 Financial Results
118. 2016.05.06 - CCA to Lease the North Fork Correctional Facility to the Oklahoma Department of Corrections
119. 2016.05.13 - CCA Declares Quarterly Cash Dividend of $0.54 Per Share
120. 2016.06.13 - CCA Appoints Scott Irwin to Succeed Steve Groom as General Counsel
121. 2016.06.13 - CCA Extends Lease of the California City Correctional Center with the California Department of Corrections
122. 2016.06.14 - CCA Announces Acquisition of Residential Reentry Facility in Long Beach, California
123. 2016.07.14 - CCA Announces 2016 Second Quarter Earnings Release and Conference Call Dates
124. 2016.07.18 - CCA Awarded Contract for Residential Reentry Services by the California Department of Corrections and
125. 2016.08.03 - CCA Reports Second Quarter 2016 Financial Results

# Appendix B – Materials Considered

126. 2016.08.11 - CCA Appoints Stacia A. Hylton to Its Board of Directors
127. 2016.08.11 - CCA Declares Quarterly Cash Dividend of $0.54 Per Share
128. 2016.08.19 - CCA Responds to the Department of Justice's Decision to Reduce Reliance on Privately Operated Prisons and
129. 2016.08.29 - CCA Provides Update on Customer Interactions in Response to DOJ Announcement
130. 2016.09.27 - CCA Announces Corporate Restructuring and Cost Reduction Plan
131. 2016.10.17 - Immigration and Customs Enforcement Amends and Extends Contract at the South Texas Family Residential
132. 2016.10.21 - CCA Announces 2016 Third Quarter Earnings Release and Conference Call Dates
133. 2016.10.28 - Corrections Corporation of America Rebrands as CoreCivic
134. 2016.10.31 - CCA Awarded New Management Contract at the Cibola County Corrections Center
135. 2016.11.02 - CCA Reports Third Quarter 2016 Financial Results
136. 2016.11.15 - CoreCivic Extends Contract for the McRae Correctional Facility
137. 2016.12.08 - CoreCivic Declares Quarterly Cash Dividend of $0.42 Per Share
138. 2016.12.14 - CoreCivic Awarded Management Contract at the Northeast Ohio Correctional Center
139. 2017.01.19 - CoreCivic Provides Tax Allocations of 2016 Dividend Distributions
140. 2017.01.30 - CoreCivic Announces 2016 Fourth Quarter Earnings Release and Conference Call Dates
141. 2017.02.08 - CoreCivic Reports Fourth Quarter and Full Year 2016 Financial Results
142. 2017.02.17 - CoreCivic Declares Quarterly Cash Dividend Of $0.42 Per Share
143. 2017.04.06 - CoreCivic Announces 2017 First Quarter Earnings Release and Conference Call Dates
144. 2017.04.11 - CoreCivic Expands Contract with the State of Ohio for Capacity at the Northeast Ohio Correctional Center
145. 2017.04.13 - CoreCivic Announces Contract Extension at the Houston Processing Center
146. 2017.05.03 - CoreCivic Reports First Quarter 2017 Financial Results
147. 2017.05.11 - CoreCivic Declares Quarterly Cash Dividend of $0.42 Per Share
148. 2017.07.19 - CoreCivic Announces 2017 Second Quarter Earnings Release and Conference Call Dates
149. 2017.08.07 - CoreCivic Reports Second Quarter 2017 Financial Results
150. 2017.08.10 - CoreCivic Declares Quarterly Cash Dividend of $0.42 Per Share
151. 2017.10.11 - CoreCivic Announces Offering Of Senior Unsecured Notes
152. 2017.10.11 - CoreCivic Prices Offering of Senior Unsecured Notes
153. 2017.10.17 - CoreCivic Announces 2017 Third Quarter Earnings Release and Conference Call Dates
154. 2017.10.30 - CoreCivic Announces Patrick Swindle to Succeed Harley Lappin as Chief Corrections Officer
155. 2017.10.31 - CoreCivic Launches Initiative to Advocate for Federal and State Policies Aimed at Reducing Recidivism
156. 2017.11.08 - CoreCivic Reports Third Quarter 2017 Financial Results

**CoreCivic Conference Call Transcripts from Factiva**
1. Q4 2011 Corrections Corp. of America Earnings Conference Call
2. Event Brief of CCA's Dividend Initiation
3. Q1 2012 Corrections Corp. of America Earnings Conference Call

16

# Appendix B – Materials Considered

4. Q2 2012 Corrections Corp. of America Earnings Conference Call
5. Q3 2012 Corrections Corp. of America Earnings Conference Call
6. Corrections Corp. of America Board of Directors Authorizes REIT Conversion Conference call
7. Q4 2012 Corrections Corp. of America Earnings Conference Call
8. Q1 2013 Corrections Corp. of America Earnings Conference Call
9. Q2 2013 Corrections Corp. of America Earnings Conference Call
10. Q3 2013 Corrections Corp. of America Earnings Conference Call
11. Q4 2013 Corrections Corp. of America Earnings Conference Call
12. Q1 2014 Corrections Corp. of America Earnings Conference Call
13. Corrections Corp. of America at REITWeek: NAREIT's Investor Forum (2014)
14. Q2 2014 Corrections Corporation of America Earnings Call
15. Q3 2014 Corrections Corporation of America Earnings Call
16. Q4 2014 Corrections Corporation of America Earnings Call
17. Q1 2015 Corrections Corporation of America Earnings Call
18. Q2 2015 Corrections Corporation of America Earnings Call
19. Q3 2015 Corrections Corporation of America Earnings Call
20. Q4 2015 Corrections Corp of America Earnings Call
21. Q1 2016 Corrections Corp of America Earnings Call
22. Corrections Corp of America at REITWeek: NAREIT's Investor Forum (2016)
23. Q2 2016 Corrections Corp of America Earnings Call
24. Corrections Corp of America Responds to the Department of Justice's Decision to Reduce Reliance on Privately Operated Prisons Conference Call
25. Corrections Corp of America Conference Call on ICE Renewal of STFRC Contract and Release of 2017 Financial Guidance
26. Q3 2016 Corrections Corp of America Earnings Call
27. Q4 2016 CoreCivic Inc Earnings Call
28. Q1 2017 CoreCivic Inc Earnings Call
29. CoreCivic Inc at REITWeek: NAREIT's Investor Forum (2017)
30. Q2 2017 CoreCivic Inc Earnings Call
31. Q3 2017 CoreCivic Inc Earnings Call

## CoreCivic Investor Presentations from CoreCivic Website
(ir.corecivic.com/events-and-presentations)
1. 2013.10.02 - 2013 Analyst Day Presentation
2. 2014.11.07 - Third Quarter 2014 Investor Presentation
3. 2015.02.24 - Fourth Quarter 2014 Investor Presentation
4. 2015.05.19 - First Quarter 2015 Investor Presentation
5. 2015.08.21 - Second Quarter 2015 Investor Presentation
6. 2015.11.12 - Third Quarter 2015 Investor Presentation
7. 2016.02.24 - Fourth Quarter 2015 Investor Presentation
8. 2016.11.10 - Third Quarter 2016 Investor Presentation
9. 2016.05.17 - First Quarter 2016 Investor Presentation
10. 2017.02.28 - Fourth Quarter 2016 Investor Presentation
11. 2017.05.16 - First Quarter 2017 Investor Presentation
12. 2017.11.15 - Third Quarter 2017 Investor Presentation
13. 2017.08.23 - Second Quarter 2017 Investor Presentation

## News Stories from Factiva
1. Factiva search with keywords related to CoreCivic and the private prisons industry from February 27, 2012 to March 1, 2017

17

## Appendix B – Materials Considered

**Reviews and Investigations of CoreCivic and Other Private Prison Facilities**

1. "Re: Criminal Alien Requirement (CAR 12) Procurement Action," *American Civil Liberties Union*, August 8, 2011
2. "License to Abuse? Time for Bureau of Prisons to Sever Ties with CCA," *American Civil Liberties Union*, August 18, 2011
3. "After-Action Report: Disturbance at Adams Country Correctional Center, Natchez, Mississippi, May 20-May 21, 2012," U.S. Department of Justice: Federal Bureau of Prisons, July 27, 2012
4. Complaint for *USA v. Lopez-Fuentes*, filed August 8, 2012
5. "Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary," *Justice Strategies*, September 13, 2012
6. Complaint for *Carithers v. CCA of Tennessee et al.*, filed May 8, 2013
7. "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," *American Civil Liberties Union*, June 9, 2014
8. "The 25 Men Whose Lives Ended Under Questionable Circumstances," *The Nation*, January 28, 2016
9. "Oklahoma DOC to Re-Open North Fork Correctional Facility, Reorganize Inmate Population," *Oklahoma Department of Corrections*, May 5, 2016
10. "They Knew Something Was Going On," *The Nation*, June 15, 2016
11. "DOJ OIG Releases Report on the Federal Bureau of Prisons' Monitoring of Contract Prisons," *U.S. Department of Justice: Office of the Inspector General*, August 11, 2016
12. "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," *The Office of the Inspector General, U.S. Department of Justice*, August 11, 2016
13. "Reducing our Use of Private Prisons," *Office of the Deputy Attorney General*, August 18, 2016
14. "Rescission of Memorandum on Use of Private Prisons," *Office of the Attorney General*, February 21, 2017

## Data

*Bloomberg, L.P.*

1. Price and volume data for CoreCivic stock
2. Implied volatility data for CoreCivic stock
3. Price and volume data for GEO Group stock
4. Price data for S&P 500 Index
5. Intraday price data for S&P 500 Index
6. Price data for S&P 1500 Real Estate Investment Trusts REITs Index
7. Historical constituents of S&P 1500 Real Estate Investment Trusts REITs Index
8. Intraday price data for S&P 1500 Real Estate Investment Trusts REITs Index
9. Intraday price data for FTSE NAREIT All Equity REITS Index
10. Intraday price data for S&P 400 Commercial Services & Supplies Industry Index

*FactSet Research Systems, Inc.*

1. Institutional holdings data for CoreCivic stock

*Tick Data*

1. Intraday price and volume data for CoreCivic stock

## Appendix B – Materials Considered

*Cost Data from Federal Bureau of Prisons*
(https://www.bop.gov/foia/#tabs-0)
1. Federal Prison System Per Capita Costs, FY 2011
2. Federal Prison System Per Capita Costs, FY 2012
3. Federal Prison System Per Capita Costs, FY 2013
4. Federal Prison System Per Capita Costs, FY 2014
5. Federal Prison System Per Capita Costs, FY 2015
6. Federal Prison System Per Capita Costs, FY 2016
7. Federal Prison System Per Capita Costs, FY 2017

**Expert Reports of Dr. Feinstein in Other Matters**
1. Expert Report of Steven P. Feinstein for *In Re: Petrobras Securities Litigation*, dated October 15, 2015
2. Expert Report of Steven P. Feinstein for *In Re Genworth Financial, Inc. Securities Litigation*, dated January 1, 2016
3. Expert Report of Steven P. Feinstein for *In Re Staar Surgical Company, Securities Litigation*, dated August 19, 2016
4. Expert Report of Steven P. Feinstein for *In Re American Realty Capital Properties, Inc. Litigation*, dated March 15, 2017
5. Expert Report of Steven P. Feinstein for *In Re: Eletrobras Securities Litigation*, dated June 30, 2017
6. Expert Report of Steven P. Feinstein for *Levin v. Resource Capital Crop., et al.*, dated September 15, 2017
7. Expert Report of Steven P. Feinstein for *Ohio Public Employees Retirement System v. Freddie Mac et al.*, dated October 16, 2017
8. Expert Report of Steven P. Feinstein for *Norfolk County Retirement System v. Community Health Systems, Inc., et al.*, dated May 7, 2018
9. Expert Report of Steven P. Feinstein for *Pearlstein v. Blackberry Limited et al.*, dated May 11, 2018

**Academic Literature and Textbooks on Finance, Securities, Valuation and Statistics**
1. Alexander, Janet C., "The Value of Bad News in Securities Class Actions," UCLA Law Review, 41: 1994
2. Bodie, Zvi, Alex Kane, and Alan J. Marcus, *Investments* (McGraw-Hill: New York, NY, 7th ed., 2003)
3. Bowman, Robert G., "Understanding and Conducting Event Studies," Journal of Business Finance & Accounting, 10(4): 1983
4. Brealey, Richard A., Stewart C. Myers and Franklin Allen, *Principles of Corporate Finance* (McGraw-Hill: New York, NY, 7th ed., 2003)
5. Bromberg, Alan and Lewis Lowenfels, Securities Fraud and Commodities Fraud (Thomson/West, 2nd ed., 2003)
6. Dunbar, Frederick C., and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," Litigation Services Handbook: The Role of the Financial Expert (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19
7. Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," The Journal of Finance 25(2): 1970
8. Fischel, Daniel R., "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," The Business Lawyer 38: 1982
9. Hogg, Robert V. and Elliot A. Tanis, Probability and Statistical Inference, (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997)

19

## Appendix B – Materials Considered

10. MacKinlay, A. Craig, "Event Studies in Economics and Finance," Journal of Economic Literature, 35: 1997

**Legal Decisions on Class Certification and Market Efficiency**
1. *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).
2. *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657 (5th Cir. 2004)
3. *Halliburton I*, 131 S. Ct. 2179, 2186 (2011)
4. *Halliburton II*, 134 S. Ct. 2398 (2014)

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| M1 | 2/27/12 | 2011 10-K | "Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities."[1] |
| | | | "We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[2] |
| | | | "Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration."[3] |
| | | | "We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system."[4] |
| | | | "We believe these advantages translate into significant cost savings for government agencies."[5] |
| | | | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry."[6] |
| | | | "We believe our renewal rate on existing contracts remains high as a |

---

[1]   Complaint, ¶120, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., p. 17.

[2]   Complaint, ¶122, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., p. 17.

[3]   Complaint, ¶123, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., p. 17.

[4]   Complaint, ¶126, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., p. 41.

[5]   Complaint, ¶127, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., p. 20.

[6]   Complaint, ¶129, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., pp. 40, 48.

1

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[7]<br><br>"We operate our facilities in accordance with both company and facility-specific policies and procedures. The policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government guidelines, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 58 of the facilities we operated as of December 31, 2011, and we intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process. Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program.<br><br>Our Quality Assurance Division independently operates under the auspices of, and reports directly to, the Company's Office of General Counsel. […] The Quality Assurance Division oversees all efforts by our facilities to deliver high quality services and operations, with an absolute commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section.<br><br>[…] The Audit and Compliance Systems Section consists of two full time audit teams comprised of subject matter experts from all major disciplines within institutional operations, as well as management staff that oversee the process. […] In addition, our Quality Assurance Division contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities. Our teams of auditors are deployed several times a year as well (in advance of contractually mandated ACA accreditation audits) to help ensure that our facilities are operating at the highest possible levels."[8] |
| M2 | 3/5/12 | *Lewiston Morning* | "[T]he company is highly motivated to comply with its contracts, meet its own standards of excellence and always 'do better than the |

---

[7]    Complaint, ¶132, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., pp. 25, 49.

[8]    Complaint, ¶135, citing CoreCivic FY2011 Form 10-K, filed February 27, 2012, 2:31 p.m., pp. 6-7.

2

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | *Tribune* article | competition. […] As a business, we are able to provide taxpayers an essential government service at equally high standards of quality and efficiency. […] Competitive private-sector entities are motivated to move swiftly, evaluate and refine success each day, and maintain the highest operating standards at least cost.'"[9] |
| M3 | 3/30/12 | 2012 Proxy Statement | "CCA takes a "zero tolerance" approach to prisoner sexual abuse. Since the creation of proposed national standards to eliminate prison sexual assaults, CCA has taken a leadership position on this important public policy issue. Even though the proposed standards have not yet been mandated and remain under consideration by the Department of Justice ("DOJ"), CCA has proactively adopted – and in some cases exceeded – many of the national PREA (Prison Rape Elimination Act) standards and best practices. |
| | | | Key features of CCA's sexual abuse prevention program include: -Regular oversight by our Board of Directors, including quarterly review of key program information; -Management oversight of the program through a PREA committee consisting of high level company officers and health care, legal, and corrections professionals; -Comprehensive sexual assault prevention and incident reporting policies and procedures; -24 hour access by inmates to toll free telephone numbers for reporting allegations of sexual harassment or abuse; -Training for inmates and employees, as well as other awareness efforts that emphasize our zero tolerance approach and encourage employees and inmates to report allegations of sexual assault or harassment, such as posters conspicuously placed throughout our facilities; -Review by the PREA committee of every allegation of sexual abuse at a CCA facility – from receipt of the incident report through investigation and enforcement of applicable policies, as well as referral to law enforcement where appropriate; and -Auditing of compliance with our standards and procedures by CCA's Quality Assurance team."[10] |
| M4 | 5/7/12 | 1Q12 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry."[11] |

---

[9]   Complaint, ¶142, citing "Can private prisons be run cheaper?" *Lewiston Morning Tribune*, March 5, 2012.

[10]   Complaint, ¶145, citing 2012 Proxy Statement, filed March 30, 2012, 3:49 p.m., p. 26.

[11]   Complaint, ¶¶129-130, citing CoreCivic 1Q12 Form 10-Q, filed May 7, 2012, 3:58 p.m., p. 27.

3

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[12] |
| M5 | 8/9/12 | 2Q12 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry."[13]<br><br>"We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[14] |
| M6 | 11/8/12 | 3Q12 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain customers consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in a return to the supply and demand imbalance that has benefited the private corrections industry."[15]<br><br>"We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[16] |
| M7 | 2/14/13 | 4Q12 Earnings | "We're observing a very much enhanced appreciation to the significant operational cost savings we can provide our partners at the state level. |

---

[12] Complaint, ¶132, citing CoreCivic 1Q12 Form 10-Q, filed May 7, 2012, 3:58 p.m., p. 29.

[13] Complaint, ¶¶129-130, citing CoreCivic 2Q12 Form 10-Q, filed August 9, 2012, 10:20 a.m., p. 29

[14] Complaint, ¶132, citing CoreCivic 2Q12 Form 10-Q, filed August 9, 2012, 10:20 a.m., p. 31

[15] Complaint, ¶¶129-130, citing CoreCivic 3Q12 Form 10-Q, filed November 8, 2012, 10:30 a.m., p. 30

[16] Complaint, ¶132, citing CoreCivic 3Q12 Form 10-Q, filed November 8, 2012, 10:30 a.m., p. 32

4

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | Conference Call | […] So I would say that states and other stakeholders are looking at more closely their actual cost of corrections."[17]<br><br>"With all these costs factored in, which clearly has not been [sic] the case in the past, when cost comparisons are done between us and the public sector, our value proposition grows even further."[18] |
| M8 | 2/27/13 | 2012 10-K | "Our primary business strategy is to provide prison bed capacity, quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities."[19]<br><br>"We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[20]<br><br>"Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration."[21]<br><br>"We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system."[22] |

---

[17] Complaint, ¶147, citing CoreCivic 4Q12 earnings conference call, February 14, 2013. The conference call was held at 11:00 a.m. See, "CCA Announces 2012 Fourth Quarter Earnings Release and Conference Call Dates," *Marketwire*, February 8, 2013.

[18] Complaint, ¶147, citing CoreCivic 4Q12 earnings conference call, February 14, 2013. The conference call was held at 11:00 a.m. See, "CCA Announces 2012 Fourth Quarter Earnings Release and Conference Call Dates," *Marketwire*, February 8, 2013.

[19] Complaint, ¶120, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., p. 19

[20] Complaint, ¶122, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., p. 19

[21] Complaint, ¶¶123-124, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., p. 19

[22] Complaint, ¶¶126-127, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., p. 52

5

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | "We believe these advantages translate into significant cost savings for government agencies."[23]<br><br>"We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity."[24]<br><br>"We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[25]<br><br>"Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 57 of the facilities we operated as of December 31, 2012, and our Lake Erie Correctional Institution, which we purchased from the state of Ohio in December 2011, received accreditation in January 2013. We intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process.<br><br>Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. Our facilities not only operate under these established standards, but they are consistently challenged by management to exceed them. This challenge is presented, in large part, through our extensive and comprehensive Quality Assurance Program.<br><br>Our Quality Assurance Division independently operates under the auspices of, and reports directly to, the Company's Office of General Counsel. […] The Quality Assurance Division provides governance for all efforts by our facilities to deliver high quality services and |

---

[23]   Complaint, ¶127, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., p. 23

[24]   Complaint, ¶¶129-130, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., pp. 52, 59

[25]   Complaint, ¶¶132-133, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., pp. 28, 61

6

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|--------------------------------------------|
| | | | operations, with an absolute commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section. <br><br> […] The Audit and Compliance Systems Section includes a team of full-time auditors, who provide subject matter expertise from all major disciplines within institutional operations. […] The Audit and Compliance Systems Section also includes a management team that coordinates the overall compliance effort across all facilities. […] Our Quality Assurance Division also contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities and to help ensure that our facilities are operating at the highest possible levels."[26] |
| M9 | 5/9/13 | 1Q13 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity."[27] <br><br> "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[28] |
| M10 | 8/8/13 | 2Q13 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity."[29] <br><br> "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional |

---

[26]   Complaint, ¶¶135-136, citing CoreCivic FY2012 Form 10-K, filed February 27, 2013, 5:07 p.m., pp. 8-9

[27]   Complaint, ¶¶129-130, citing CoreCivic 1Q13 Form 10-Q, filed May 9, 2013, 3:25 p.m., p. 34

[28]   Complaint, ¶¶132-133, citing CoreCivic 1Q13 Form 10-Q, filed May 9, 2013, 3:25 p.m., p. 35

[29]   Complaint, ¶¶129-130, citing CoreCivic 2Q13 Form 10-Q, filed August 8, 2013, 12:45 p.m., pp. 38-39

7

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | system, our ownership of the majority of the beds we operate, and the quality of our operations."[30] |
| M11 | 10/2/13 | 2013 Analyst Day | "CCA Provides to Government Partners and Taxpayers […] [a]nnual costs savings of 12% or more," which savings "can fund programs to reduce population growth and recidivism."[31] |
| | | | "The presentation claimed that CCA's total cost per 1,000 beds was $55 to $65 million, with an average length of construction of one to three years, whereas government's total cost was $80 to $250 million, with an average length of construction of three to seven years."[32] |
| | | | "CCA's services would 'improve safety & inmate quality of life'"[33] |
| | | | "Compelling value proposition has driven privatized market penetration higher."[34] |
| | | | "CCA achieves an '[o]ptimal balance between […] meeting or exceeding customer and [American Correctional Association] quality standards[,] minimizing construction cost per bed[,] minimizing operating and maintenance costs[,] maximizing desirability of beds (competitive per diem, location suitable for multiple customers, ability to house various security levels and multiple customers, 'just-in-time' availability)[, and] exceeding ROI hurdle rates.'"[35] |
| | | | "Quality, in the form of Operational Excellence, is a core value and essential guiding principle for CCA."[36] |
| | | | "Audits are typically conducted for each facility annually; more frequently if necessary."[37] |
| | | | "In addition to a comprehensive Quality Assurance Process conducted through our Legal department, it is worth noting that our governmental |

---

[30] Complaint, ¶¶132-133, citing CoreCivic 2Q13 Form 10-Q, filed August 8, 2013, 12:45 p.m., p. 40

[31] Complaint, ¶149, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 15. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[32] Complaint, ¶149, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 15. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[33] Complaint, ¶149, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 15. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[34] Complaint, ¶149, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 16. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[35] Complaint, ¶149, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 39. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[36] Complaint, ¶151, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 44. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[37] Complaint, ¶151, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 45. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

8

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | partners maintain on   site monitors at the facilities – in essence providing daily inspection of the facilities."[38] |
| | | | "When eligible, facilities are also audited by the American Correctional Association, an independent third party and considered the gold standard in the corrections industry."[39] |
| | | | CoreCivic provides a "solution" for "public prison […] overcrowd[ing]" and "[h]istorically low public sector prison development" because it has "[v]acant beds available at lower operational cost, avoids need for large capital investment by government," because "[u]sing CCA stems growth in unfunded pensions," and because "CCA provides cost savings of 12% or more."[40] |
| | | | "CCA is formally educating interested sellers[.] Sale of prisons benefits our [sic] government partners" by providing, among other things, "[o]ngoing operational cost savings without the loss of operational quality."[41] |
| M12 | 11/7/13 | 3Q13 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity."[42] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[43] |
| M13 | 2/27/14 | 2013 10-K | "Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase |

[38]   Complaint, ¶151, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 45. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[39]   Complaint, ¶151, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 45. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[40]   Complaint, ¶153, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 51. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[41]   Complaint, ¶153, citing CoreCivic 2013 Analyst Day Presentation, October 2, 2013, p. 52. The presentation was available online at 7:01 a.m. See, CoreCivic Form 8-K, filed October 2, 2013, 7:01 a.m.

[42]   Complaint, ¶¶129-130, citing CoreCivic 3Q13 Form 10-Q, filed November 7, 2013, 1:33 p.m., p. 41

[43]   Complaint, ¶¶132-133, citing CoreCivic 3Q13 Form 10-Q, filed November 7, 2013, 1:33 p.m., p. 42

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities."[44] |
| | | | "We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[45] |
| | | | "Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. Lately reductions in occupancy have resulted in higher costs per inmate. We are pursuing a number of initiatives intended to increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration."[46] |
| | | | "We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system."[47] |
| | | | "We believe these advantages translate into significant cost savings for government agencies."[48] |
| | | | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency and savings opportunities we can provide. Further, we expect insufficient bed development by our partners to result in future demand for additional bed capacity."[49] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional |

---

[44]    Complaint, ¶120, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., p. 18

[45]    Complaint, ¶122, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., p. 19

[46]    Complaint, ¶¶123-124, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., p. 19

[47]    Complaint, ¶¶126-127, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., p. 51

[48]    Complaint, ¶127, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., p. 23

[49]    Complaint, ¶¶129-130, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., pp. 9, 51

10

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | system, our ownership of the majority of the beds we operate, and the quality of our operations."[50] |
| | | | "Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 53 of the facilities we operated as of December 31, 2013, excluding owned facilities that were idle. We intend to apply for ACA accreditation for all of our eligible facilities that are not currently accredited where it is economically feasible to complete the 18-24 month accreditation process. |
| | | | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. |
| | | | Prison Rape Elimination Act ("PREA") regulations were published in June 2012 and became effective in August 2013. All confinement facilities covered under the PREA standards must be audited at least every three years to be considered compliant with the PREA standards, with one-third of each facility type operated by an agency, or private organization on behalf of an agency, audited each year. These include adult prisons and jails, juvenile facilities, lockups (housing detainees overnight), and community confinement facilities, whether operated by the Department of Justice or unit of a state, local, corporate, or nonprofit authority. |
| | | | Our facilities not only operate under these established standards, policies, and procedures, but they are consistently challenged by our management to exceed them. This challenge is presented, in large part, through our extensive Quality Assurance Program. Our Quality Assurance Division independently operates under the auspices of, and reports directly to, our Office of General Counsel. Our Quality Assurance Division provides governance for all efforts by our facilities to deliver high quality services and operations, with a commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section. |
| | | | […] The Audit and Compliance Systems Section includes a team of full-time auditors, who provide subject matter expertise from all major |

---

[50]    Complaint, ¶¶132-133, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., pp. 28, 61

11

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | disciplines within institutional operations. […] The Audit and Compliance Systems Section also includes a management team that coordinates the overall compliance effort across all facilities. […] Our Quality Assurance Division also contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities and to help ensure that our facilities are operating at the highest possible levels."[51] |
| M14 | 5/5/14 | Chattanooga *Times Free Press* Article | "For its part, CCA rejects the ACLU campaign and said the organization's 'logic is deeply flawed.' Citing Temple University economists, company spokesman Jonathan Burns said in a prepared statement that for-profit prisons save taxpayers 17 percent in corrections costs. 'Those are funds that can be used for additional rehabilitation programming and other public safety priorities, […] With this misguided effort, the ACLU is advocating for higher taxpayer costs and reduced flexibility for state leaders to manage their inmate populations in a safe, secure and humane way. […] All of our facilities comply with our federal, state and local government partners' reporting requirements.'"[52] |
| M15 | 5/8/14 | 1Q14 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency, savings, and inmate programming opportunities we can provide. Further, we expect our partners to continue to face challenges in developing new facilities and additional capacity which will result in future demand for the solutions that we provide."[53] <br><br> "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[54] |
| M16 | 6/5/14 | CoreCivic presentation at REITWeek: | "[W]e've also been able [sic] provide great solutions for the government by providing cost savings and we have the unique dynamic in our industry where we can build facilities in locations that have a reasonable |

---

[51] Complaint, ¶¶135-137, citing CoreCivic FY2013 Form 10-K, filed February 27, 2014, 3:29 p.m., pp. 7-8

[52] Complaint, ¶155, citing "Critics point finger at CCA : For-profit prison operator taken to task for campaign giving, operations," *Times Free Press*, May 5, 2014.

[53] Complaint, ¶¶129-130, citing CoreCivic 1Q14 Form 10-Q, filed May 8, 2014, 12:54 p.m., p. 34

[54] Complaint, ¶¶132-133, citing CoreCivic 1Q14 Form 10-Q, filed May 8, 2014, 12:54 p.m., p. 35

12

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | NAREIT's Investor Forum | rational cost structure relative to construction, but also salary and wages."[55]<br><br>"So we are clearly well positioned to help correctional systems around the country to deal with this growth in overcrowding, but also have great reentry facilities to help them deal on the back end and provide appropriate programs to help with recidivism."[56] |
| M17 | 8/7/14 | 2Q14 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency, savings, and inmate programming opportunities we can provide. Further, we expect our partners to continue to face challenges in developing new facilities and additional capacity which could result in future demand for the solutions that we provide."[57]<br><br>"We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[58] |
| M18 | 11/5/14 | 3Q14 10-Q | "We believe we have been successful in working with our government partners to help them manage their correctional costs while minimizing the financial impact to us, and will continue to provide unique solutions to their correctional needs. We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency, savings, and inmate programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions that we provide."[59]<br><br>"We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the |

---

[55] Complaint, ¶157, citing CoreCivic presentation at 2014 REITWeek: NAREIT's Investor Forum, June 5, 2014. CoreCivic presented at 9:30 a.m. Detailed schedule accessed at www.reit.com/nareit/events/reitweek/reitweek-2014/detailed-schedule on July 19, 2014 via the Internet Archive Wayback Machine.

[56] Complaint, ¶157, citing CoreCivic presentation at 2014 REITWeek: NAREIT's Investor Forum, June 5, 2014. CoreCivic presented at 9:30 a.m. Detailed schedule accessed at www.reit.com/nareit/events/reitweek/reitweek-2014/detailed-schedule on July 19, 2014 through the Internet Archive Wayback Machine.

[57] Complaint, ¶¶129-130, citing CoreCivic 2Q14 Form 10-Q, filed August 7, 2014, 12:25 p.m., p. 40

[58] Complaint, ¶¶132-133, citing CoreCivic 2Q14 Form 10-Q, filed August 7, 2014, 12:25 p.m., p. 41

[59] Complaint, ¶¶129-130, citing CoreCivic 3Q14 Form 10-Q, filed November 5, 2014, 11:14 a.m., p. 39

13

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[60] |
| M19 | 11/7/14 | 3Q14 Investor Presentation | "Prison Break –A New Approach to Public Cost and Safety, a recent Policy Report indicates short-and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality[.]"[61]<br><br>The presentation shows that "CCA Average Owned Per Diem" implies "18.1%" savings relative to the "operating" and "real estate cost[s]" of "BOP" facilities.[62]<br><br>"Competition Creates Additional Savings - adding competition has been found to lower [sic] costs and improve performance[.]"[63]<br><br>"CCA's SOLUTION[S]" include "Vacant beds available at lower operational cost, avoids need for large capital investment by government, […] short- and long-term savings to government partners" and that "[s]elling government prisons provides cash + cost savings."[64]<br><br>"Safety & Security is our First priority"[65]<br><br>CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[66] |
| M20 | 2/24/15 | 4Q14 Investor Presentation | "Prison Break –A New Approach to Public Cost and Safety, a recent Policy Report indicates short-and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality[.]"[67]<br><br>The presentation shows that "CCA Average Owned Per Diem" implies "17.0%" savings relative to the "Operating" and "Real Estate Cost[s]" of "BOP" facilities.[68]<br><br>"Competition Creates Additional Savings - Adding competition has been found to lower costs and improve performance[.]"[69] |

---

[60] Complaint, ¶¶132-133, citing CoreCivic 3Q14 Form 10-Q, filed November 5, 2014, 11:14 a.m., p. 40

[61] Complaint, ¶159, citing CoreCivic 3Q14 Investor Presentation, November 7, 2014, p. 10.

[62] Complaint, ¶160, citing CoreCivic 3Q14 Investor Presentation, November 7, 2014, p. 11.

[63] Complaint, ¶161, citing CoreCivic 3Q14 Investor Presentation, November 7, 2014, p. 11.

[64] Complaint, ¶162, citing CoreCivic 3Q14 Investor Presentation, November 7, 2014, p. 29.

[65] Complaint, ¶164, citing CoreCivic 3Q14 Investor Presentation, November 7, 2014, p. 36.

[66] Complaint, ¶164, citing CoreCivic 3Q14 Investor Presentation, November 7, 2014, p. 36.

[67] Complaint, ¶159, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 10.

[68] Complaint, ¶160, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 11.

14

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | "CCA provides short-and long-term savings[.]"[70] |
| | | | "Selling government prisons provides cash and cost saving for use in other public works[.]"[71] |
| | | | "Modern, state-of-the-art facilities that improve safety, security and cost efficiencies[.]"[72] |
| | | | "Safety & Security is our First priority"[73] |
| | | | CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[74] |
| M21 | 2/25/15 | 2014 10-K | "Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities."[75] |
| | | | "We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[76] |
| | | | "Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We are pursuing a number of initiatives intended to increase our occupancy and revenue. Our competitive cost structure offers prospective government partners a compelling solution to incarceration."[77] |
| | | | "We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their offenders introduces competition to their prison system, resulting in improvements |

---

[69]  Complaint, ¶161, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 11.

[70]  Complaint, ¶162, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 29.

[71]  Complaint, ¶162, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 29.

[72]  Complaint, ¶162, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 29.

[73]  Complaint, ¶164, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 36.

[74]  Complaint, ¶164, citing CoreCivic 4Q14 Investor Presentation, February 24, 2015, p. 36.

[75]  Complaint, ¶120, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., p. 18

[76]  Complaint, ¶122, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., p. 18

[77]  Complaint, ¶¶123-124, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., p. 19

15

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | to the quality and cost of corrections services throughout their correctional system."[78] |
| | | | "We believe these advantages translate into significant cost savings for government agencies."[79] |
| | | | "We believe the long-term growth opportunities of our business remain very attractive as certain states consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[80] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[81] |
| | | | "Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 47 of the eligible facilities we operated as of December 31, 2014. |
| | | | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. |
| | | | Prison Rape Elimination Act, or PREA, regulations were published in June 2012 and became effective in August 2013. All confinement facilities covered under the PREA standards must be audited at least every three years to be considered compliant with the PREA standards, with one-third of each facility type operated by an agency, or private organization on behalf of an agency, audited each year. These include adult prisons and jails, juvenile facilities, lockups (housing detainees overnight), and community confinement facilities, whether operated by the Department of Justice or unit of a state, local, corporate, or nonprofit |

---

[78]   Complaint, ¶¶126-127, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., p. 49

[79]   Complaint, ¶127, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., p. 22

[80]   Complaint, ¶¶129-130, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., p. 48,=.

[81]   Complaint, ¶¶132-133, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., pp. 27, 59.

16

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | authority. |
| | | | Our facilities not only operate under these established standards, policies, and procedures, but they are consistently challenged by our management to exceed them. This challenge is presented, in large part, through our extensive Quality Assurance Program. Our Quality Assurance Division, or QAD, independently operates under the auspices of, and reports directly to, our Office of General Counsel. We have devoted significant resources to meeting outside agency and accrediting organization standards and guidelines. Our QAD provides governance for all efforts by our facilities to deliver high quality services and operations, with a commitment to continuous quality improvement. |
| | | | [...] The QAD also employs a team of full-time auditors, who are subject matter experts from all major disciplines within institutional operations. [...] The QAD management team coordinates overall operational auditing and compliance efforts across all CCA facilities. [...] Our QAD also contracts with teams of seasoned, ACA certified correctional auditors to help ensure continuous compliance with ACA standards at accredited facilities and to help ensure that our facilities are operating at the highest possible levels. Similarly, the QAD coordinates the work of certified PREA auditors to help ensure that all facilities operate in compliance with these important regulations."[82] |
| M22 | 5/7/15 | 1Q15 10-Q | "We believe the long-term growth opportunities of our business remain very attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[83] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[84] |
| M23 | 5/19/15 | 1Q15 Investor Presentation | "Short-and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality[.]"[85] |
| | | | The presentation shows that "CCA Average Owned Per Diem" implies "15%" savings relative to the "Operating" and "Real Estate Cost[s]" of |

---

[82]  Complaint, ¶¶135-137, citing CoreCivic FY2014 Form 10-K, filed February 25, 2015, 12:17 p.m., pp. 7-8.

[83]  Complaint, ¶¶129-130, citing CoreCivic 1Q15 Form 10-Q, filed May 7, 2015, 1:31 p.m., pp. 32-33.

[84]  Complaint, ¶¶132-133, citing CoreCivic 1Q15 Form 10-Q, filed May 7, 2015, 1:31 p.m., p. 34.

[85]  Complaint, ¶159, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 10.

17

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | "BOP" facilities.[86] |
| | | | "Competition Creates Additional Savings - Adding competition has been found to lower costs and improve performance[.]"[87] |
| | | | "CCA provides short-and long-term savings[.]"[88] |
| | | | "Selling government prisons provides cash and cost saving for use in other public works[.]"[89] |
| | | | "Modern, state-of-the-art facilities that improve safety, security and cost efficiencies[.]"[90] |
| | | | "Safety & Security is our First priority"[91] |
| | | | CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[92] |
| M24 | 8/6/15 | 2Q15 10-Q | "We believe the long-term growth opportunities of our business remain very attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[93] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[94] |
| M25 | 8/21/15 | 2Q15 Investor Presentation | The presentation shows that "CCA Average Owned Per Diem" implies "9.2%" savings relative to the "operating" and "real estate cost[s]" of "BOP" facilities.[95] |
| | | | "Competition Creates Additional Savings - adding competition has been |

---

[86]  Complaint, ¶160, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 11.

[87]  Complaint, ¶161, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 11.

[88]  Complaint, ¶162, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 28.

[89]  Complaint, ¶162, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 28.

[90]  Complaint, ¶162, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 28.

[91]  Complaint, ¶164, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 33.

[92]  Complaint, ¶164, citing CoreCivic 1Q15 Investor Presentation, May 19, 2015, p. 33.

[93]  Complaint, ¶¶129-130, citing CoreCivic 2Q15 Form 10-Q, filed August 6, 2015, 12:23 p.m., pp. 36-37.

[94]  Complaint, ¶¶132-133, citing CoreCivic 2Q15 Form 10-Q, filed August 6, 2015, 12:23 p.m., p. 39.

[95]  Complaint, ¶160, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 11.

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | found to lower costs and improve performance[.]"[96] |
| | | | "CCA provides short-and long-term savings[.]"[97] |
| | | | "Selling government prisons provides cash and cost saving for use in other public works[.]"[98] |
| | | | "Modern, state-of-the-art facilities that improve safety, security and cost efficiencies[.]"[99] |
| | | | "Safety & Security is our First priority"[100] |
| | | | CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[101] |
| M26 | 11/5/15 | 3Q15 10-Q | "We believe the long-term growth opportunities of our business remain very attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[102] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[103] |
| | | | "Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses."[104] |

---

[96] Complaint, ¶161, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 11.

[97] Complaint, ¶162, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 26.

[98] Complaint, ¶162, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 26.

[99] Complaint, ¶162, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 26.

[100] Complaint, ¶164, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 31.

[101] Complaint, ¶164, citing CoreCivic 2Q15 Investor Presentation, August 21, 2015, p. 31.

[102] Complaint, ¶¶129-130, citing CoreCivic 3Q15 Form 10-Q, filed November 5, 2015, 12:52 p.m., p. 39.

[103] Complaint, ¶¶132-133, citing CoreCivic 3Q15 Form 10-Q, filed November 5, 2015, 12:52 p.m., pp. 41-42.

[104] Complaint, ¶139, citing CoreCivic 3Q15 Form 10-Q, filed November 5, 2015, 12:52 p.m., p. 38.

19

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---|---|---|---|
| M27 | 11/12/15 | 3Q15 Investor Presentation | The presentation shows that "CCA Average Owned Per Diem" implies "17.9%" savings relative to the "Operating" and "Real Estate Cost[s]" of "BOP" facilities.[105]<br><br>"Competition Creates Additional Savings - Adding competition has been found to lower costs and improve performance."[106]<br><br>"CCA provides short-and long-term savings[.]"[107]<br><br>"Selling government prisons provides cash and cost saving for use in other public works[.]"[108]<br><br>"Modern, state-of-the-art facilities that improve safety, security and cost efficiencies[.]"[109]<br><br>"Safety & Security is our First priority"[110]<br><br>CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[111] |
| M28 | 2/24/16 | 4Q15 Investor Presentation | The presentation shows that "CCA Average Per Diem" implies "17.3%" savings relative to the "Operating" and "Real Estate Cost[s]" of "BOP" facilities.[112]<br><br>"Competition Creates Additional Savings - Adding competition has been found to lower costs and improve performance[.]"[113]<br><br>"CCA provides short-and long-term savings[.]"[114]<br><br>"Selling government prisons provides cash and cost saving for use in other public works[.]"[115]<br><br>"Modern, state-of-the-art facilities that improve safety, security and generate cost efficiencies[.]"[116] |

---

[105]   Complaint, ¶160, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 12.

[106]   Complaint, ¶161, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 12.

[107]   Complaint, ¶162, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 27.

[108]   Complaint, ¶162, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 27.

[109]   Complaint, ¶162, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 27.

[110]   Complaint, ¶164, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 32.

[111]   Complaint, ¶164, citing CoreCivic 3Q15 Investor Presentation, November 12, 2015, p. 32.

[112]   Complaint, ¶160, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 12.

[113]   Complaint, ¶161, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 12.

[114]   Complaint, ¶162, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 28.

[115]   Complaint, ¶162, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 28.

[116]   Complaint, ¶162, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 28.

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | "Safety & Security is our First priority"[117] |
| | | | CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[118] |
| M29 | 2/25/16 | 2015 10-K | "Our primary business strategy is to provide prison bed capacity and quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities."[119] |
| | | | "We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[120] |
| | | | "Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We are pursuing a number of initiatives intended to increase our occupancy and revenue. Our competitive cost structure offers prospective government partners a compelling solution to incarceration."[121] |
| | | | "We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their offenders introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system."[122] |
| | | | "We believe the long-term growth opportunities of our business remain attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[123] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the |

---

[117]  Complaint, ¶164, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 33.

[118]  Complaint, ¶164, citing CoreCivic 4Q15 Investor Presentation, February 24, 2016, p. 33.

[119]  Complaint, ¶120, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., p. 21.

[120]  Complaint, ¶122, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., p. 21.

[121]  Complaint, ¶¶123-124, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., p. 22.

[122]  Complaint, ¶¶126-127, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., p. 54.

[123]  Complaint, ¶¶129-130, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., p. 54.

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[124] |
| | | | "Outside agency standards, such as those established by the ACA, provide us with the industry's most widely accepted operational guidelines. We have sought and received accreditation for 44 of the eligible facilities we operated as of December 31, 2015, excluding our community corrections facilities. |
| | | | Beyond the standards provided by the ACA, our facilities are operated in accordance with a variety of company and facility-specific policies and procedures, as well as various contractual requirements. These policies and procedures reflect the high standards generated by a number of sources, including the ACA, The Joint Commission, the National Commission on Correctional Healthcare, the Occupational Safety and Health Administration, federal, state, and local government codes and regulations, established correctional procedures, and company-wide policies and procedures that may exceed these guidelines. |
| | | | Prison Rape Elimination Act, or PREA, regulations were published in June 2012 and became effective in August 2013. All confinement facilities covered under the PREA standards must be audited at least every three years to be considered compliant with the PREA standards, with one-third of each facility type operated by an agency, or private organization on behalf of an agency, audited each year. These include adult prisons and jails, juvenile facilities, lockups (housing detainees overnight), and community confinement facilities, whether operated by the Department of Justice or unit of a state, local, corporate, or nonprofit authority. |
| | | | Our facilities operate under these established standards, policies, and procedures, and also are subject to audits by our Quality Assurance Division, or QAD, which works independent from Operations management under the auspices of, and reports directly to, our Office of General Counsel. We have devoted significant resources to meeting outside agency and accrediting organization standards and resources. |
| | | | The QAD employs a team of full-time auditors, who are subject matter experts from all major disciplines within institutional operations. […] The QAD management team coordinates overall operational auditing and compliance efforts across all CCA facilities. […] The QAD management team provides governance of the corporate plan of action process for issues identified through internal and external facility reviews. Our QAD also contracts with teams of ACA certified correctional auditors to evaluate compliance with ACA standards at accredited facilities. Similarly, the QAD coordinates the work of |

---

[124] Complaint, ¶¶132-133, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., pp. 30, 64.

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | certified PREA auditors to help ensure that all facilities operate in compliance with these important regulations."[125] |
| | | | "Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses."[126] |
| M30 | 5/5/16 | 1Q16 Earnings Conference Call, 1Q16 10-Q | "We have had tremendous success at the state and federal level with either at state-level governor's being a democrat or being a republican, or a president being a democrat or republican. We've been able to have really good operations, perform very, very well, and provide great value to our partners regardless of who's in the White House or who's in the Governor's residence in a respective state. And that's our focus, just to make sure that we continue to do a great job every day, have high quality operations, and then provide great value back to the taxpayers of that respective jurisdiction."[127] |
| | | | "We believe the long-term growth opportunities of our business remain attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[128] |
| | | | "We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[129] |
| | | | "Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the |

---

[125] Complaint, ¶¶135-137, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., pp. 7.

[126] Complaint, ¶¶139-140, citing CoreCivic FY2015 Form 10-K, filed February 25, 2016, 12:58 p.m., p. 10.

[127] Complaint, ¶166, citing CoreCivic 1Q16 earnings conference call, May 5, 2016. The conference call was held at 11:00 a.m. See, "CCA Announces 2016 First Quarter Earnings Release and Conference Call Dates," *Global Newswire*, April 14, 2016.

[128] Complaint, ¶¶129-130, citing CoreCivic 1Q16 Form 10-Q, filed May 5, 2016, 12:30 p.m., p. 35.

[129] Complaint, ¶¶132-133, citing CoreCivic 1Q16 Form 10-Q, filed May 5, 2016, 12:30 p.m., p. 37.

23

## Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses."[130] |
| M31 | 5/17/16 | 1Q16 Investor Presentation | The presentation shows that "CCA Average Per Diem" implies "14.4%" savings relative to the "Operating" and "Real Estate Cost[s]" of "BOP" facilities.[131]<br><br>"Competition Creates Additional Savings - Adding competition has been found to lower costs and improve performance[.]"[132]<br><br>"CCA provides short-and long-term savings[.]"[133]<br><br>"Selling government prisons provides cash and cost saving for use in other public works[.]"[134]<br><br>"Modern, state-of-the-art facilities that improve safety, security and generate cost efficiencies[.]"[135]<br><br>"Safety & Security is our First priority"[136]<br><br>CoreCivic "Perform[s] quality services for our government partners and the offenders entrusted in our care."[137] |
| M32 | 6/8/16 | CoreCivic Presentation at REITWeek: NAREIT's Investor Forum | "One thing I'd point to when people ask us what's a Clinton White House look like for you all, what's a Trump White House look like for you all and their respective administrations, and I can't speak in absolutes and make definitive statements. But I would say that being around 30 years and being in operation in many, many states, and also doing work with the federal government going back to the 1980s, where you had Clinton White House, you had a Bush White House, you had Obama White House, we've done very, very well. We have operationally made sure that we are providing high quality and standard and consistent services to our partners and being very flexible and innovative in the solutions. And with that, we've had some nice growth in our business under those three respective Presidents. We had a lot of |

---

[130] Complaint, ¶¶139-140, citing CoreCivic 1Q16 Form 10-Q, filed May 5, 2016, 12:30 p.m., p. 34.

[131] Complaint, ¶160, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 13.

[132] Complaint, ¶161, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 13.

[133] Complaint, ¶162, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 29.

[134] Complaint, ¶162, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 29.

[135] Complaint, ¶162, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 29.

[136] Complaint, ¶164, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 34.

[137] Complaint, ¶164, citing CoreCivic 1Q16 Investor Presentation, May 17, 2016, p. 34.

24

# Appendix C – Alleged Misrepresentations

| Misrep# | Date | Event | Alleged Misrepresentations from Complaint |
|---------|------|-------|-------------------------------------------|
| | | | growth under Clinton, we had a lot of growth under Bush, and we've had a lot of growth under President Obama. And so, with that, if we continue to do a good job on the quality, and with that, we can demonstrate savings both on capital voids, but also cost savings in our services, then I think we'll be just fine."[138] |
| M33 | 8/4/16 | 2Q16 10-Q | "We believe the long-term growth opportunities of our business remain attractive as governments consider efficiency, savings, and offender programming opportunities we can provide. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide."[139]<br><br>"We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations."[140]<br><br>"Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. Inmate populations in the BOP system declined in 2015 and are expected to decline further in 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses. However, we do not expect a significant impact on us because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses."[141] |

---

[138] Complaint, ¶168, citing CoreCivic presentation at 2016 REITWeek: NAREIT's Investor Forum, June 8, 2016. CoreCivic presented at 12:30 p.m. Detailed schedule accessed at https://www.reit.com/events/reitweek/reitweek-2016/detailed-schedule.

[139] Complaint, ¶¶129-130, citing CoreCivic 2Q16 Form 10-Q, filed August 4, 2016, 12:45 p.m., p. 41.

[140] Complaint, ¶¶132-133, citing CoreCivic 2Q16 Form 10-Q, filed August 4, 2016, 12:45 p.m., p. 44.

[141] Complaint, ¶¶139-140, citing CoreCivic 2Q16 Form 10-Q, filed August 4, 2016, 12:45 p.m., p. 40.