# Exhibit 6

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

```
1                UNITED STATES DISTRICT COURT

2                MIDDLE DISTRICT OF TENNESSEE

3    -------------------------x

4    NIKKI BOLLINGER GRAE,

5    Individually and on Behalf

6    of All Others Similarly        Civil Action

7    Situated,                      No. 3:16-cv-02267

8          Plaintiffs,

9     vs.

10   CORRECTIONS CORPORATION OF

11   AMERICA, ET AL.,

12         Defendants.

13   -------------------------x

14              VIDEOTAPED DEPOSITION OF

15              STEVEN P. FEINSTEIN, Ph.D.

16          Thursday, July 12, 2018 9:06 a.m.

17              Latham & Watkins LLP

18       200 Clarendon Street, Boston, MA 02116

19

20

21   Reported by:

22   Janet Sambataro, RMR, CRR, CLR

23   Job No.  10044537

24
```

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 2 of 37 PageID #: 2586

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1      Q.   And when did you conduct that search?

2      A.   I don't recall specifically.

3      Q.   Was it before you prepared your report?

4      A.   I think it was before and after.

5      Q.   And do you recall why you were looking

6 on Google for the Department of Justice -- strike

7 that.

8      Do you recall why you were running search

9 terms or searches or Google for the DOJ OIG

10 review?

11      A.   Yes.

12      Q.   And what was your reason for that?

13      A.   The report itself doesn't have a date

14 on it.  It has just a month, August 2016, so I

15 wanted to ascertain if there was a more precise

16 date as to when it first became available.

17      Q.   Under "News Articles and Press

18 Releases," you list Factiva news articles and you

19 list the number in parentheses, 2,578.

20      Do you see that?

21      A.   Yes.

22      Q.   Do you have all 2,578 of those articles

23 in your possession?

24      A.   Yes.

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 3 of 37 PageID #: 2587

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1      Q.    I see.

2      And it's your testimony that you didn't

3   include the Google searches that you ran on the

4   OIG review in the "Documents and Other

5   Information Considered" because you did not have

6   those articles in your physical possession?

7      A.    Well, it's one search.  And yes.

8      Q.    Is everything else listed in "Documents

9   and Other Information Considered" in your

10  possession?

11     A.    Yes.

12     Q.    Now, you said that one of the reasons

13  why you did not -- strike that.

14     One of the reasons that you ran that precise

15  search before and after you ran this report was

16  because it did not have a date on it; correct?

17     A.    The report.  That's right.

18     Q.    That's right.

19     And you would agree with me that the date of

20  the OIG report was not one of the 19 earnings and

21  guidance high information flow dates that you

22  used in your event study; correct?

23     A.    Exactly right.

24     MR. WOOD:  Objection.

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1    Q.   And can you describe for me why both

2   before and after the report it was important to

3   you to ascertain the date of the OIG review?

4          MR. WOOD:   Objection to form.

5    A.   Well, I'm not sure how important it

6   was, but at some point I considered other types

7   of tests that might -- that sometimes are run,

8   and that was one of the considerations, whether I

9   can date the events precisely.

10    Q.   Okay.  But that ended up not being one

11   of the 19 dates that was -- that your model was

12   designed to test, your market efficiency model;

13   correct?

14    A.   That's correct.

15    Q.   Anything else, other than the OIG

16   Google -- yeah, the OIG review Google search that

17   you can think of here that is not included on

18   your "Documents and Other Information

19   Considered"?

20    A.   No.

21    Q.   In preparing your market efficiency

22   report, in preparing for this deposition, was

23   there any information that you had requested or

24   that you attempted to obtain but for whatever

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 5 of 37 PageID #: 2589

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1    completely inundating the marketplace and

2    investors with so much information that it makes

3    it difficult to make informed decisions?

4        A.   Oh, well, I mean, they are one of the

5    avenues of information flow.  You know, there's

6    the media.  There's the news media, which may

7    inundate.

8        And then analyst is another avenue that's

9    essentially filtered somewhat, and information is

10   disseminated.  And they help the market

11   understand at least what the analyst believes is

12   the import of the information and the meaning of

13   the information.

14       Q.   And what is the significance about what

15   the analyst thinks is the import or the

16   significance of the information versus the

17   population at large?

18       A.   Well, I mean, the analysts have

19   different incentives and objectives than the news

20   media.  And so they usually provide updates to

21   their valuation models in response to pieces of

22   information and then the marketplace can see how

23   they've done that and why they've done that.

24       Q.   Do you think it would be fair to say

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 6 of 37 PageID #: 2590

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1    that analysts, considering their role in

2    following certain industries or sectors and the

3    models that they run, are helpful to the

4    investing public in terms of identifying what

5    information is particularly important with

6    respect to a company that they're following?

7         A.    Sometimes.   Generally, that's often the

8    case, that they can help the market direct

9    attention to pieces of information that the

10   analyst believes is very important and ought to

11   be viewed, but there's a literature on types of

12   information that analysts might overlook for

13   reasons related to their own incentives and the

14   relationship they wish to keep with management of

15   the company.

16        So, you know, how to read an analyst report

17   and how to follow analyst coverage and how to

18   benefit from analyst coverage is a skill in

19   itself.   And part of that skill is understanding

20   what the incentives and motivations of analysts

21   for directing attention to certain news or

22   directing or not directing attention to certain

23   news.   So they're useful, but there are

24   limitations to that function.

Grae vs. Corrections
Corporation of America, et al.

Steven Feinstein, Ph.D.

1    Q.   And that limitation, if I understood

2  you correctly, would stem from maybe their own

3  incentives or some other reason why they might be

4  motivated not to disseminate information on a

5  certain subject?

6           MR. WOOD:   Objection.   Form.

7      A.   That's right.   That's right.   So that's

8  why I included in this section buy-side analysts,

9  who are also important.   I mean, they have

10  different incentives.   And so the coverage by

11  buy-side analysts is also an indication of market

12  efficiency.

13      Sell-side analysts make money, in part, by

14  helping their companies maintain communications

15  and a good relationship with the companies they

16  cover, you know, so that they can get additional

17  investment banking business down the line.

18      I mean, there's quite a lot written on that

19  subject.   And so one has to keep in mind that

20  potential incentive when using analyst reports to

21  pay more attention or less attention to certain

22  pieces of information.

23      Q.   And I'm not trying to put words in your

24  mouth at all.   I just want to see if I understand

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 8 of 37 PageID #: 2592

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1   Q. You said "almost universally, if not

2 universally," a moment ago; correct?

3   A. That's right. That was my

4 recollection. I didn't -- it wasn't necessary --

5 you asked what was the basis for my choosing

6 earnings and guidance dates. That was a basis,

7 that my recollection from having read the news

8 that came out on these dates, not only does the

9 literature say these are high information flow

10 dates, not only is this a company that does

11 depend on -- for its valuation on cash flow and

12 earnings, but a third basis was that these dates

13 are dates on which allegations of

14 misrepresentations and omissions apply.

15   Q. So which ones?

16   A. I don't recall. I mean, it wasn't --

17 that is the basis for my choice, but it wasn't

18 necessary to specify which ones in any particular

19 location in this report.

20   Q. To be clear, I'm not -- I'm not

21 quibbling with your first two bases for choosing

22 the earnings and guidance announcement dates.

23 I'm focusing specifically on the third factor.

24   A. The third basis.

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1        Q.    The third basis.   Thank you.

2        A.    Right.

3        Q.    The third basis.   You testified that

4   these earnings and guidance announcements almost

5   universally, if not universally, corresponded

6   with the false and misleading allegations that

7   are at issue in this case.

8        A.    No.   I didn't say that.   I said the

9   alleged misrepresentations or omissions, that

10  they were in some way addressed on these dates --

11       Q.    But you --

12       A.    -- by company management.

13       Q.    But you can't identify any of these 19

14  in Exhibit 7 as including the alleged

15  misrepresentation or omissions that were

16  addressed by company management, just as you sit

17  here today?

18            MR. WOOD:   Objection to form.

19       A.    That's correct.   It wasn't necessary

20  for completing the market efficiency study to do

21  that.   So it's not in here.   But that was a basis

22  for choosing these dates.

23       Q.    Putting aside whether it was necessary

24  for your market efficiency analysis, still

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1  focusing on this third consideration, and that is

2  the overlap between the earnings and guidance

3  announcement events and the alleged false or

4  misleading statements that are at issue in this

5  case made by company management.

6      A.    I didn't say that.  I didn't say that

7  the Complaint cites to each of these events and

8  names those dates as a date on which there was an

9  actionable misrepresentation or omission.  I said

10  that my reading of these -- of the news that came

11  out on these dates indicated to me, and I think

12  would indicate to any reasonable analyst, that

13  what plaintiffs are alleging were the

14  misrepresentations and omissions was in some

15  manner addressed by the company on each of these

16  dates.

17      Q.    What is addressed in some manner?  Did

18  these -- did these 19 dates contain false and

19  misleading statements that are identified in the

20  Complaint?

21      A.    I didn't need to do that analysis.  But

22  I do understand from the Complaint that the --

23  what the allegations are, and the allegations

24  involve, among other things, that the company

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1    that, for this company especially, those were the

2    opportunities that the company chose to

3    communicate with the marketplace about a whole

4    host of things.  They tended to wait, in fact,

5    until the scheduled earnings and guidance dates

6    to update the market about events that had

7    happened over the course of the quarter.

8         So to the extent that there are alleged

9    misrepresentations and omissions, I believe that

10   testing earnings and guidance dates does tell you

11   something about efficiency, not just generally,

12   but with respect to the information at issue in

13   this case.

14        **Q.   But you didn't take each date on which**

15   **there's an alleged false or misleading statement**

16   **and determine whether or not the market's**

17   **reaction was statistically significant under your**

18   **event study; right?**

19        A.   Correct.  That was not the design of

20   the test.

21             THE WITNESS:  Could we take a short

22   break now?

23             MR. GLENNON:  Sure.

24             THE VIDEOGRAPHER:  The time is 11:45.

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1    We're off the record.

2                   (A recess was taken.)

3              THE VIDEOGRAPHER:   Okay.   We are back

4    on the record.   The time is 12:08.

5    BY MR. GLENNON:

6         Q.    Professor Feinstein, you would agree

7    with me that it's possible to construct an event

8    study that tests whether alleged

9    misrepresentations and/or corrective disclosures

10   had a price impact; right?

11              MR. WOOD:   Objection to form.

12        A.    Well, there are tests that are run for

13   that purpose.   Yes.

14        Q.    Yes.   So it is possible?

15        A.    Yes.

16        Q.    Let's say, hypothetically, that I

17   engage you on this case, and I asked you to do a

18   price impact analysis of the alleged

19   misrepresentations in this case.

20        A.    Okay.

21        Q.    Can you walk me through the methodology

22   you would employ to conduct that analysis,

23   please?

24              MR. WOOD:   Objection to form.

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 13 of 37 PageID #: 2597

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

```
 1        A.    I can, but it's really outside the
 2   scope of what I was asked to do so far in this
 3   case.
 4        Q.    I understand.  You did a market
 5   efficiency report.
 6        A.    Right.
 7        Q.    But you're an expert in econometrics.
 8   You've got years of testimony, experience.  And
 9   you've read as much material on this case as
10   anybody.  And I would be interested in your
11   expert views, hypothetically, if I were to ask
12   you to construct a price impact analysis.
13             MR. WOOD:  Objection to form.
14        A.    Okay.  I mean, it's not an opinion I
15   expressed in my report, and it's not something I
16   studied or prepared for in advance of this
17   deposition, but I could tell you my general
18   methodology.
19        Q.    That would be helpful.  Please.
20        A.    All right.  Well, I do -- you know,
21   it's something I -- I will take the notes or the
22   transcript transcription from this testimony and
23   I'll turn it into an article.  It's an article
24   I've been wanting to write for some time.
```

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 14 of 37 PageID #: 2598

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

```
 1        I do my price impact analyses very similar
 2   to how I do my loss causation analyses even
 3   though I understand that from a legal perspective
 4   loss causation and price impact are two distinct
 5   things.
 6        But what I do for each of those is I
 7   approach it, I think, with five prongs.  I have
 8   five prongs of analysis.  I first identify
 9   exactly what are the misrepresentations and
10   omissions.  And then test using fundamental
11   economic principles whether, according to the
12   literature, whether according to the principles
13   in the literature, they are valuation relevant.
14   So that's the first step.  I do a valuation -- a
15   theoretical test, economic theory.
16        And if they are, according to principles in
17   the literature, valuation relevant, that's
18   evidence in favor of price impact.
19        The second thing I do is I look at
20   statements made by the company about the alleged
21   misrepresentations and omissions.  Do they
22   emphasize the subject matter as being valuation
23   relevant or not?  That's the question I'm trying
24   to answer.
```

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 15 of 37 PageID #: 2599

1    If the company says this is an important

2  part of our business strategy, this is an

3  important part of what gives our company value,

4  that would be evidence in favor of price impact.

5    And if, on the other hand, they never

6  mention it or they mention the opposite, that

7  these things don't matter to us, that would be

8  evidence against price impact.

9    Then I look at -- I look at analyst coverage

10  to see if they address the issues that are

11  alleged to have been misrepresented and omitted,

12  to see if they consider it valuation relevant.

13  Because you've got the company's take on it, and

14  it's also informative to see if there's any

15  independent assessment of whether the subject

16  matter is valuation relevant.

17    So if it's something to do with

18  sustainability, for example, I would see if

19  there's mention of sustainability in their

20  analyst reports or in their valuation models.

21    And then, subsequently, I would see if, you

22  know, subsequent to corrective disclosures, if

23  there's been some change in their valuation.  And

24  that's informative.  So that's theory, company

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 16 of 37 PageID #: 2600

**Steven Feinstein, Ph.D.**

**Grae vs. Corrections**
**Corporation of America, et al.**

1    statements, analyst statements.  And then there's

2    some economic analysis that can be done, event

3    study analysis is used in loss causation and

4    damages and also price impact.  But, as I explain

5    in this report, I mean, it actually is described

6    in this report that I submitted for this case,

7    not finding statistically significant -- not

8    finding statistical significance does not prove

9    no price impact.  There may be price impact but

10   below the threshold for statistical significance.

11   So if there is statistical significance and you

12   can rule out confounding information, confounding

13   information in the same direction as the

14   information at issue, that would prove that the

15   disclosure or misstatement had an effect.  I

16   mean, the misstatement would be at the time it's

17   made and the disclosure would be at the time it's

18   corrected.

19        But if there's no significance, it doesn't

20   prove the opposite for reasons that are in the

21   report.  At the time the statement is made, it

22   may just be maintaining the market's view and,

23   therefore, it will maintain the market's

24   valuation and not move the stock price.

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 17 of 37 PageID #: 2601

**Grae vs. Corrections**
**Corporation of America, et al.**

Steven Feinstein, Ph.D.

1      When the misstatements and

2   misrepresentations are corrected, there might not

3   be a price movement because there could be

4   simultaneous countervailing news.  It could be

5   negative news about the company, coupled with

6   positive reassurances by the -- it could be

7   negative news about the company, coupled with

8   positive reassurances by the company could mute

9   the effect so that you don't have a statistically

10  significant reaction.  So you'd have to examine

11  that and perhaps do a disaggregation or

12  attribution analysis.

13      I did write about it here, about why events

14  might not be significant.

15      Q.   Yeah.  I can point to it.  If you want.

16  I understand your point, though.  We can talk

17  about that, but that wasn't really the gist of

18  what I was asking.

19      A.   But those are the things -- those are

20  the things I would look at for doing a price

21  impact analysis.

22      Q.   And let me just ask you just a couple

23  of follow-up questions, if I could, about the

24  event study that, in our hypothetical, on this

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 18 of 37 PageID #: 2602

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1    case, you would generate the empirical evidence

2    of price impact.

3        A.    Okay.

4        Q.    Walk me through in a little more detail

5    as to how you -- how you go about constructing

6    that event study.

7        MR. WOOD:    Objection to form.

8        A.    Well, it's essentially the same as the

9    event study that underlies the collective test in

10   this report.  One needs to run a regression

11   modeling the typical movement in the stock price

12   so that you can have a measure of the background

13   volatility.  It's the background volatility

14   against which the event movements are measured to

15   see if they stand out as being meaningful or not.

16   So you need to run a regression to assess typical

17   movements as a sort of as a benchmark.

18       But you also would run that regression so

19   that you can factor out noncompany-specific

20   effects, like an overall market effect or a

21   sector effect, or in this case, a REIT effect.

22       All right.  So you model the regression.

23   You test it.  You don't test it, you estimate it

24   on a sample of data that you believe is

1  comparable to the period of time as the event of

2  interest.

3      And as my report says, that could either be

4  before the event, after the event, or straddling

5  the event, is how other people have done it.  And

6  then you would use those -- you would use the

7  estimates from that regression to calculate

8  what's called an explained return for the event.

9  And that would be, according to econometric

10  principles, that would be what movement the event

11  most likely -- I'm sorry.  What the movement on

12  that event date would have been had there been no

13  company-specific information, just on the basis

14  of the market and the sector.

15      You subtract that from the actual return and

16  that's the -- that gives you what is called a

17  residual return.  And then you compare the

18  residual return to the standard error of the

19  regression, which is the measure of background

20  noise.  If it stands out as being highly unusual,

21  that proves that the company-specific news

22  impacted the stock price.  So that's the event

23  study.

24     Q.   And so what specific events would you

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 20 of 37 PageID #: 2604

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

```
 1   test if I were to engage you to do a price impact
 2   analysis and as part of that, you did this event
 3   study?  What would the events be that you would
 4   test?
 5            MR. WOOD:  Objection to form.
 6        A.   I would -- some people -- an event
 7   study is akin to a controlled experiment, where
 8   you can see the value of the stock before the
 9   information is introduced, a piece of information
10   is introduced, and also the value right after
11   that information is introduced.  The change
12   across that time frame is a measure of the value
13   of the information.  So if it's a significant
14   movement, that would be an indication of proof of
15   price impact.
16        So I would look at misrepresentation and
17   omission dates, although I wouldn't expect that
18   any or all of them would be significant, but --
19   and then I would look at corrective disclosure
20   events.  I would look at the analyst reports as
21   well to see if there's a protracted, if there's
22   some -- sometimes there's a protracted reaction
23   because the news is complicated and takes some
24   time to assess.  And if there's an indication
```

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

```
1    from that from the analyst reports I might
2    include more than a one-day window.  But if there
3    is an indication, I would include more than one
4    day of response but that's basically what you
5    look for.  When the information is -- when
6    misrepresentation -- when affirmative
7    misrepresentations are made and then when
8    misrepresentations are corrected or omissions are
9    corrected.  Or materialization of some event that
10   informs the marketplace, absent a mea culpa-type
11   admission, that informs the marketplace about
12   what was previously concealed.
13        Q.   You made a -- that's very helpful, but
14   you made a comment there, I'm not sure I quite
15   followed.
16        You were talking about if there was
17   information protracted or maybe it was that the
18   effect of the information was protracted, you
19   would look at analyst reports.  I can scroll back
20   this, but do you know what I'm talking about?
21        A.   Yeah.  I know.  I can help you.
22        Q.   Yeah.  Please.
23        A.   Sometimes the analyst reports will
24   indicate that the information was complex in a
```

1  way that required more than one day to evaluate.

2  When that's the case, I look at more than one day

3  for the reaction.

4      Q.   I see.  So if there's an event and

5  there is a delay between that event and, say, a

6  stock price movement, that may not be a counter

7  indicator of market efficiency.  It just could be

8  that it was complicated and it took sort of time

9  for the market to either digest or understand it?

10      A.   That is a -- in a hypothetical sense,

11  that's a possibility.

12      Q.   And if -- and to assess that, you would

13  look to the analyst reports to see if -- if

14  that's, in fact, what happened?

15      A.   No.  That's not what I said.  What I

16  said is let's say there's an event on the second

17  day of the month.  And let's say that event

18  occurs after the close on the second day of the

19  month.  Well, the appropriate day to test for an

20  immediate reaction would be the third.  Let's

21  say -- we're in July now, so let's say -- that's

22  not good, we're going to run right into the

23  Fourth of July holiday.

24      But let's say July 1st, okay.  Let's say

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 23 of 37 PageID #: 2607

1  July 1st, after the close.  Let's pretend that

2  all of these are, without looking at a calendar,

3  let's pretend they're all weekdays.

4      So after the close on July 1st there's an

5  announcement.  If you want to see what effect

6  that had on the stock price you would have to

7  look at the next trading day to see if there's an

8  immediate reaction.  So let's say there is or

9  isn't, it doesn't matter whether there is or

10 isn't.  That's what you're observing, is there a

11 reaction on July 2nd?  But if there's -- you know

12 if there's analyst reports on July 2nd and

13 there's also analyst reports about the same event

14 on July 3rd and maybe I've seen cases where

15 there's analyst reports on July 5th about the

16 same event, that tells you that it's not the

17 run-of-the-mill routine-type information that

18 could be digested immediately, but it takes human

19 beings sometimes more than 24 hours to fully

20 understand the valuation effect of a -- of a

21 disclosure.

22      And so I would -- if I see a string of

23 analyst reports spread out over days after the

24 event I might look at longer windows as well to

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 24 of 37 PageID #: 2608

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1    see if there was an effect.

2        Q.    Again, focusing on the allegations sort

3    of in this case, because you're familiar with the

4    market efficiency findings that you've made and

5    you're familiar with the market.

6        Can you give me just some approximation as

7    to how many days it might take for the market's

8    reaction to become apparent?

9            MR. WOOD:    Objection.    Objection to

10   form.

11       A.    No.    Not yet.    Because that's analysis

12   I would want to do carefully, with all of my

13   sources available to me, and with devoting the

14   appropriate amount of time to it.    I wouldn't do

15   it on the fly.

16       Q.    Okay.    So even with the amount of work

17   you've done, you're not comfortable approximating

18   the amount of time it would take for an event to

19   occur and the reaction of that event to become

20   apparent in this case?

21       A.    Correct.

22       Q.    Okay.    Anything else besides analyst

23   reports that you would look at to explain the

24   phenomenon you were just describing?

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1      A.    Of a protracted reaction?

2      Q.    Yes.

3      A.    There's a lot of things to look at.

4   The flow of news.  Sometimes it -- sometimes what

5   looks likes a protracted reaction to one

6   announcement is actually immediate reactions to a

7   string of related announcements.  So I would look

8   at that too, if that's the case.

9        You know, the other shoe dropping

10  proverbially, so to speak.  It's not really

11  necessary -- you know, it's almost philosophical,

12  is that one event or two events when there's a

13  disclosure and then a follow-on event that

14  follows that disclosure.  I would look at that

15  too.

16       There may be other considerations.  I just,

17  as I sit here now, not having done the loss

18  causation and damages report, that's what comes

19  to mind.

20       Q.    We were talking about a protracted

21  reaction a moment ago.  I want to talk again in

22  our hypothetical, in the hypotheticals I've

23  engaged you to do a price impact analysis on this

24  case.

Grae vs. Corrections
Corporation of America, et al.

Steven Feinstein, Ph.D.

```
 1        I understand, I think, the protracted
 2    reaction piece of it.  But what about intraday,
 3    let's say there's multiple news sources during
 4    the course of one business day --
 5        A.   Mm-hmm.
 6        Q.    -- is it possible to dissect and
 7    determine what the price is reacting to when you
 8    have multiple sources in a single day?
 9            MR. WOOD:  Objection to form.
10        A.    It's very difficult.  Intraday data is
11    notoriously difficult to deal with for a number
12    of reasons.  And so I usually find it less
13    reliable than end-of-day data analysis.
14        Q.    Mm-hmm.  Let me pose one hypothetical
15    to you.
16        Let's say at the close of day one, an
17    announcement is made.  Day two, stock price
18    increases.  Later in day two, another
19    announcement is made.  Is there a way to look at
20    that data and say, well, announcement two could
21    not have been responsible for the earlier stock
22    price, because it came out after the stock price
23    had already increased?  Is there a way to parse
24    the data to be able to determine that?
```

Case 3:16-cv-02267   Document 99-6   Filed 07/16/18   Page 27 of 37 PageID #: 2611

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1          MR. WOOD:   Objection to form.

2     A.    There may be, but it wouldn't be easy

3  or the standard analysis.   You'd be ignoring

4  market and sector effects.   The way you described

5  it, you'd be ignoring market and sector effects.

6  You wouldn't be taking into account what the

7  market did over that same period or what the

8  sector did over that same period.

9          You wouldn't be taking into account that

10  some traders may be working a trade over the

11  course of a day.   Maybe the information that came

12  out the night before is enough for them to move a

13  big position.   And because they want to trade

14  quickly, but without a lot of liquidated costs,

15  they would -- they call it "working the trade,"

16  they would spread the trade out over time and

17  they might not even complete their full reaction

18  and rebalancing their positions until the end of

19  the day or even the next day, depending on the

20  nature of the news.

21          And a third thing you'd be ignoring is that

22  the literature specifically says that sometimes

23  it takes the marketplace certainly more than 15

24  minutes, certainly more than a day for some kinds

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 28 of 37 PageID #: 2612

```
1    of information.  You wouldn't be taking all of
2    the reaction into account at any point in time,
3    if you didn't use end-of-day data.
4         Q.    Let's just follow on this hypothetical
5    that we're working on now, still on the intraday
6    data.
7         Is it possible to regress the market and
8    sector effects so that you can account for that
9    and look at only intraday company-specific
10   information?
11              MR. WOOD:   Objection to form.
12        A.    People have tried.  One of the problems
13   they run into is the non-synchroneity of the data
14   and the non-synchroneity of the trading.
15        For example, if you are, in fact, trying to
16   control for the market effect, the market
17   variable is an index and not all of the stocks
18   are trading continuously or at the exact same
19   time.  And the literature, econometric
20   literature, has articles on that problem.  The
21   problem of non-synchronous data.
22        Q.    Mm-hmm.
23        A.    You'd run into that problem too.  So
24   it's not easy.  People have tried, but it's not
```

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

```
 1   easy.
 2        Q.    Do you know -- in your opinion, has it
 3   ever been done successfully?
 4             MR. WOOD:   Objection to form.
 5        A.    As I sit here now, I can't cite a case
 6   where it has been or an article, but I don't have
 7   the entire literature memorized.   I know people
 8   have tried.   I know they've tried and I'm sure
 9   some of them think they've done it successfully.
10        Q.    All right.   Do you think it's at least
11   theoretically possible?
12             MR. WOOD:   Objection to form.
13        A.    In theory, almost anything is possible,
14   but the obstacles are pretty challenging.
15        Q.    Let me ask you one other question on
16   this because we were talking about the protracted
17   reaction.
18        If you were trying to explain, say, what it
19   was the market was reacting to, whether there's a
20   protracted reaction or you're really trying to
21   parse through a day where there's three or four
22   announcements, would the analyst reports provide
23   at least some context and some -- some context or
24   some understanding of what it was that was
```

**Steven Feinstein, Ph.D.**

**Grae vs. Corrections**
**Corporation of America, et al.**

1  causing the market to move?  Does that make

2  sense?

3      A.    Yeah.  I think I hear what you're

4  saying.

5          MR. WOOD:  Objection.  Objection to

6  form.

7      A.    I wouldn't ignore the analyst reports.

8  But depending on the facts and circumstances of

9  the problem in front of me, I wouldn't

10  necessarily put all of my faith in them either.

11     Q.    Right.

12     A.    Valuation principles is where I would

13  place more emphasis.  What information, according

14  to theory and principles, would cause the price

15  to move more, less, and maybe even

16  quantifiably -- by quantifiable amounts.

17     Q.    So aside from valuation principles and

18  analyst reports, if your job was to look at a day

19  where there was three or four news releases and

20  you were trying to distill down and determine

21  which caused a stock price impact, is there

22  anything else that you can think of, as you sit

23  here today, that you would look, that would help

24  you focus on what actually caused the price

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1    impact?

2            MR. WOOD:   Objection to form.

3       A.   As I sit here now, no.   But it's

4    because -- if I had ample amount of time to

5    address the problem, I might be able to think of

6    more tools to apply to the job.

7       Q.   **Have you ever performed a price**

8    **impact -- strike that.**

9       **Have you performed a price impact analysis**

10   **at the class certification stage?**

11      A.   I've been -- I have.   I've been asked

12   to.   I just don't recall specifics.   But I know I

13   have.

14      Q.   **And you did that for purposes of**

15   **determining market efficiency?**

16      A.   No.   What I recall is the discussions

17   I've had and the questions I've had, because it's

18   unusual.   So I recall being asked, and I

19   remember -- and I recall questioning --

20           MR. WOOD:   I caution you not to reveal

21   specific communications you have had with

22   counsel.

23      A.   Okay.   It's not this case.   I want to

24   be clear, it's not this case.   But I know I've

Steven Feinstein, Ph.D.

Grae vs. Corrections
Corporation of America, et al.

1   been asked at sometime in the past to essentially

2   address it preemptively, that they expected a

3   challenge of a sort and that I would -- you know,

4   so they thought it maybe would be prudent to

5   address it preemptively.

6       Q.   Have you ever filed an expert report

7   with a case with -- including a price impact

8   opinion?

9       A.   I believe I have.

10      Q.   Do you recall the name of that case or

11  cases?

12      A.   No.

13           MR. GLENNON:  This would actually be a

14  good time for us to break for lunch, if you guys

15  are good with that.

16           MR. WOOD:  Sure.

17           THE VIDEOGRAPHER:  The time is 12:32.

18  We're off the record.

19           (Lunch recess was taken.)

20           THE VIDEOGRAPHER:  Okay.  We're back on

21  the record.  The time is 1:21.

22  BY MR. GLENNON:

23      Q.   Good afternoon, Professor Feinstein.

24      The next series of questions, I want to go

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

1    back to the actual event study that you performed

2    in this case.  And we've marked that as

3    Defendant's Exhibit 11, if you have that in front

4    of you.

5        A.   Yes.

6        Q.   Good.

7        I want to talk about the construction and

8    the running of the event study itself.  Would you

9    agree that when downloading price data for use in

10   an event study that failing to make adjustments

11   for splits, spinoffs, or dividend payments could

12   distort the logarithmic price returns?

13            MR. WOOD:  Objection to form.

14       A.   Well, let's start with dividend

15   payments.  What sort of -- I'm not sure what you

16   mean by what sort of adjustment to make.  I mean,

17   some databases make a dividend adjustment, but

18   you don't need to do that if you have the actual

19   prices and take into account the dividend payment

20   as part of the return.

21       Q.   And when you say, "take into account

22   the dividend payment in the actual return," how

23   would you do that?

24       A.   Oh, well, if there's a dividend

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

```
1          A.    I didn't follow your question.

2          Q.    I'm saying that -- let's back up one.

3     Let's -- yeah.  Okay.  Let's assume there's

4     no confounding factors --

5          A.    Okay.

6          Q.    -- in the corrective disclosure.  I

7     was -- I was positing that in a scenario where

8     you have the -- a price maintenance theory, okay?

9     One way that you would show price impact is by

10    looking at the corrective disclosure?

11              MR. WOOD:  Objection to form.

12         A.    Sometimes looking at the corrective

13    disclosure will make apparent inflation that may

14    not have been apparent from examining only the

15    date when the inflation was introduced.

16         Q.    And in that sense, it would have to be

17    corrective?

18              MR. WOOD:  Objection to form.

19         A.    You mean corrective of the information,

20    the disclosure would have to be corrective of the

21    information or the disclosure would have to be

22    corrective of the inflation?

23         Q.    Well, let's take that one at a time.

24    Would it have to be corrective of the
```

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 35 of 37 PageID #: 2619

Steven Feinstein, Ph.D.

**Grae vs. Corrections
Corporation of America, et al.**

```
 1    information?

 2              MR. WOOD:   Objection.

 3        A.    Yes.   In order for a disclosure to

 4    display and make apparent inflation, given that

 5    the introduction of the inflation was obscured by

 6    other reasons, that I believe, as I sit here now,

 7    I can't think of an exception, but there may be

 8    one, but I believe that the disclosure would have

 9    to be corrective of the information.

10        Q.    But that -- would that disclosure

11    necessarily need to be corrective of the

12    inflation?

13              MR. WOOD:   Objection to form.

14        A.    I think if it weren't, it would be

15    difficult to observe the inflation on that date.

16    And there's a lot of reasons why it might be

17    corrective of the information but not corrective

18    of the inflation.

19        For example, if there's countervailing

20    positive news on the same day or denials and

21    explanations by the company.

22        Q.    So assuming there's no countervailing

23    information or denials, if there's no

24    statistically significant stock price change
```

Case 3:16-cv-02267    Document 99-6    Filed 07/16/18    Page 36 of 37 PageID #: 2620

1              C E R T I F I C A T E

2    COMMONWEALTH OF MASSACHUSETTS

3    SUFFOLK, SS.

4        I, Janet M. Sambataro, a Registered Merit

5    Reporter and a Notary Public within and for the

6    Commonwealth of Massachusetts do hereby certify:

7        THAT STEVEN P. FEINSTEIN, Ph.D., the witness

8    whose testimony is hereinbefore set forth, was duly

9    sworn by me and that such testimony is a true and

10   accurate record of my stenotype notes taken in the

11   foregoing matter, to the best of my knowledge, skill

12   and ability; that before completion of the

13   deposition review of the transcript was requested.

14       I further certify that I am not related to any

15   parties to this action by blood or marriage; and

16   that I am in no way interested in the outcome of

17   this matter.

18       IN WITNESS WHEREOF, I have hereunto set my hand

19   this 13th day of July, 2018.

20

21   _____

22                               JANET M. SAMBATARO
                                 Notary Public

     My Commission Expires:
23   July 16, 2021

24