# EXHIBIT A

2018 WL 3861840
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

OHIO PUBLIC EMPLOYEES
RETIREMENT SYSTEM, etc., Plaintiff,
v.
FEDERAL HOME LOAN MORTGAGE
CORPORATION, etc., et al., Defendants.

CASE NO. 4:08CV0160
|
08/14/2018

Benita Y. Pearson, United States District Judge

### MEMORANDUM OF OPINION AND ORDER
[Resolving ECF Nos. 372, 437, 440, and 444]

**\*1** Pending in this securities putative class action is Defendant Federal Home Loan Mortgage Corporation's ("Freddie Mac") Motion to Strike Reports and Exclude the Testimony of Dr. Steven P. Feinstein (ECF No. 444). For the reasons set forth in Section I and IV below, the motion is granted.

Also pending is Lead Plaintiff's Motion to Exclude the Expert Testimony of Dr. Mukesh Bajaj (ECF No. 437). For the reasons set forth in Section II below, the motion is denied.

In addition, pending is Lead Plaintiff's Motion to Exclude the Expert Testimony of Dr. Paul Gompers (ECF No. 440). For the reasons set forth in Section III below, the motion is denied.

Finally, pending is Lead Plaintiff's Renewed Motion for Class Certification and to Appoint Class Representative and Class Counsel (ECF No. 372). After conducting the "rigorous analysis" Fed. R. Civ. P. 23 requires, the Renewed Motion for Class Certification is denied for the reasons set forth in Sections I through IV below.

An oral hearing/argument was held on April 13, 2018, at which the Court heard the testimony of competing expert witnesses, Drs. Feinstein and Bajaj. *See* Transcript (ECF No. 468).

**I. Freddie Mac's Motion to Strike Reports and Exclude the Testimony of Dr. Steven P. Feinstein (ECF No. 444)**
Freddie Mac moves the Court to enter an order excluding any and all testimony from Lead Plaintiff's sole expert witness, Dr. Steven P. Feinstein (a financial economist), on the subject of market efficiency, and strike his reports on the subject as set forth in his reports filed with the Court at ECF Nos. 372-3 at PageID #: 18511-18604 and 406-1. Dr. Feinstein offers two opinions in support of OPERS' motion for class certification: (1) the market for Freddie Mac common stock was efficient during the period from August 1, 2006, through November 20, 2007 [1] ("Class Period"), ECF No. 372-3 at PageID #: 18551, ¶ 137, and (2) damages are measurable on a class-wide basis, ECF No. 372-3 at PageID #: 18554-58, ¶¶ 149-57. According to Freddie Mac, Dr. Feinstein's opinions on the subject of market efficiency are unreliable and, therefore, do not meet the threshold of admissibility for expert evidence set forth in Fed. R. Evid. 403 and 702.

[1] Freddie Mac announced a $2 billion loss on November 20, 2007, which was a 29% stock price decline.

The Federal Rules of Evidence, and specifically Rule 702, "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). Rule 702 governs the admissibility of expert testimony and codifies the Supreme Court's holdings in *Daubert* and *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137 (1999). Expert testimony is admissible only if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the expert has reliably applied the principles and methods to the facts of the case. Fed. R. Evid. 702. The proponent of the expert testimony has the burden of establishing by a preponderance of the evidence that the proposed testimony satisfies those standards. *See* Fed. R. Evid. 702 advisory committee's note (2000); *Daubert,* 509 U.S. at 592 n.10.

**\*2** While not a "definitive checklist or test," the following factors frequently bear on the analysis of whether an expert's testimony is the product of reliable principles and methods:

(1) whether a theory or technique...can be (and has been) tested; (2) whether the theory has been subjected to peer review and publication; (3) whether, with respect to a particular technique, there is a high known or potential rate of error and whether there are standards controlling the technique's operation; and

(4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

Johnson v. Manitowoc Boom Trucks, Inc., 484 F.3d 426, 429-30 (6th Cir. 2007) (elipses in original; internal quotation marks and citations omitted). In addition, the Sixth Circuit often analyzes another factor relating to the admissibility of expert testimony, the "Prepared-Solely-for-Litigation Factor." Id. at 434; see also Hayes v. MTD Prods., Inc., 518 F. Supp.2d 898, 900-01 (W.D. Ky. 2007). Under this factor, the Sixth Circuit "has recognized for some time that expert testimony prepared solely for purposes of litigation, as opposed to testimony flowing naturally from an expert's line of scientific research or technical work, should be viewed with some caution." Johnson, 484 F.3d at 434; see also Mike's Train House, Inc. v. Lionel, L.L.C., 472 F.3d 398, 408 (6th Cir. 2006) ("We have been suspicious of methodologies created for the purpose of litigation.").

To establish market efficiency, OPERS must sufficiently demonstrate that the release of unexpected material information promptly and consistently caused a corresponding change in the price of Freddie Mac common stock. Basic, Inc. v. Levinson, 485 U.S. 224, 248 n. 27 (1988); see also Plumbers & Pipefitters Nat. Pension Fund v. Burns, 967 F. Supp.2d 1143, 1147 (N.D. Ohio 2013) (Carr, J.) (citing In re PolyMedica Corp. Sec. Litig., 432 F.3d 1, 10 (1st Cir. 2005)). As Dr. Feinstein admitted during his deposition, "[f]or a market to be efficient, it needs to be incorporating available information all the time." Deposition of Dr. Feinstein (Vol. 1) (ECF No. 383-1) at PageID #: 18729, Pg. 97. See also Third Amended Complaint (ECF No. 166) at PageID #: 5688, ¶ 267 (defining an efficient market as one "promptly digest[ing] current information...at all relevant times"). If stock prices only "sometimes," or only "rarely," incorporate new information, then the markets for such stocks are not efficient. ECF No. 383-1 at PageID #: 18729, Pgs. 96-97.

A.

Freddie Mac argues that Dr. Feinstein's opinions are unreliable for four reasons. First, the opinions based on his single-date, last day of the putative Class Period event study [2] to assess market efficiency over a 330-day Class Period are unreliable. According to Freddie Mac, Dr. Feinstein's use of a single date for his event study finds no support in the law or logic, and is even rejected by the very authorities cited by Dr. Feinstein. Economists, including economists upon whom Dr. Feinstein relies, agree that using the last day of a class period is not a scientifically valid way to test for market efficiency because, among other reasons, securities plaintiffs intentionally select such dates for purposes of increasing potential damages. See Expert Report of Dr. Mukesh Bajaj (ECF No. 383-2) at PageID #: 18855-57, ¶¶ 58-63. As recognized by numerous courts, market efficiency across a lengthy class period cannot be assessed based upon a lone stock price reaction to news that concludes the class period. See Bell v. Ascendant Solutions, Inc., 422 F.3d 307, 316 (5th Cir. 2005) ("this single decline on the last day of the class period is plainly insufficient by itself to show market efficiency throughout the class period").

[2] Dr. Feinstein refers to the last day of the Class Period as an "allegation-related event." ECF No. 372-3 at PageID #: 18544.
Event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events." Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398, 2415 (2014) ("Halliburton II"); In re Countrywide Fin. Corp. Sec. Litig., 273 F.R.D. 586, 614 (C.D. Cal. 2009) ("An event study attempts to determine whether new information correlates with a price movement[.]"). In Halliburton II, the Supreme Court held that no specific degree of efficiency is required, and "general efficiency" suffices. 134 S. Ct. at 2414. The "generally efficient" standard is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'" Id. at 2410 (quoting Basic, 485 U.S. at 247 n. 24).

*3 While Dr. Feinstein's report appears to suggest that his event study proves the market for Freddie Mac common stock was efficient throughout the class-period, ECF No. 372-3 at PageID #: 18550-51, ¶ 136; PageID

#: 18551-52, ¶ 139; PageID #: 18554, ¶ 147, he conceded at his deposition that a single stock price reaction on November 20, 2007 could not possibly demonstrate that the stock traded in an efficient market fifteen months earlier in August 2006.

> Q. But from your perspective, the single-event event study was sufficient to prove that Freddie Mac's stock price was trading in an efficient market for the entire class period; is that fair to say?
>
> A. No, no, it's not fair to say.
>
> Q. Why not?
>
> A. It doesn't say for the entire class period in Paragraph 137. It says that it proved the market was efficient and it was efficient with respect to the information at issue in this case.

ECF No. 383-1 at PageID #: 18750, Pg. 178. Dr. Feinstein also admitted that his event study did not prove market efficiency for the duration of the Class Period.

> Q. The single-event event study is not enough on its own to prove market efficiency for the entirety of the class period; isn't that correct?
>
> A. If you mean by that eliminating consideration of the Cammer and Krogman factors, it depends on what standard of proof.
>
> For some purposes it might be. Maybe for the court, it would be. For me to stake my reputation on, it wouldn't be.
>
> By (sic) that's hypothetical, because in the real world, what I am staking my reputation on is I ran many additional tests: the Cammer test, the Krogman factor test and the collective test.

ECF No. 383-1 at PageID #: 18750, Pg. 179.

> Q. And accordingly, you think that it is appropriate, so long as an event study is constructed correctly, to prove market efficiency by using only a few, or in this case, one example; is that correct?
>
> A. Well, we talked about this earlier. No, that's not what I testified to.
>
> What I said was that these empirical results, in concert with the Cammer and Unger test results, proves to a high degree of statistical and professional certainty market efficiency.
>
> Proof, but to a lesser degree, is offered only by the test, but it is to a lesser degree. And that's -- and I'm not -- that's not my opinion in this case. I'm not drawing my conclusion on the basis of that test alone. I'm offering my opinion on the basis of that test in concert with the other evidence, the Cammer and Unger results.

ECF No. 383-1 at PageID #: 18798, Pg. 372. *See also* ECF No. 383-2 at PageID #: 18854-55, ¶¶ 55-57.

Ferrillo, et al., *The "Less Than" Efficient Capital Markets Hypothesis: Requiring More Proof From Plaintiffs in Fraud-On-The-Market Cases*, 78 St. John's L.Rev. 81 (2004) (Exhibit D3) is a law review article written by Paul A. Ferrillo, Frederick C. Dunbar, and David Tabak, three well-known securities econometric experts, whose combined initials are "FDT." The FDT Article is cited by Dr. Feinstein. *See* ECF No. 372-3 at PageID #: 18552, ¶ 141. FDT generally discuss the scientific prerequisites for any valid attempt at assessing market efficiency, and conclude: "Merely demonstrating a single or small number of cases where there is an apparent cause and effect relationship is not enough, since this measures only one point in time during the class period, and only the stock's response to one or a handful of disclosures." FDT Article at 128.

 *4 Dr. Feinstein admits that he has never used a single-date event study before.

> Q. Have you ever, in any other case, run an event study that tested only a single date?
>
> A. Well, like I said, Petrobras, it was zero. I don't recall. I think it's not likely, but I don't recall for sure.
>
> But if there's only one appropriate date to test, that's dictated by the history of the company, not by my choices.

ECF No. 383-1 at PageID #: 18724, Pgs. 75-76. According to Freddie Mac, no academic literature supports the view that market efficiency over an extended period of time may be established by testing only one date, and the existing literature supports the opposite conclusion. ECF No. 383-2 at PageID #: 18852-54, ¶¶ 50-54. Dr. Feinstein all but admitted that no literature, academic or otherwise, supports using an event study focused on a single date to

try to establish that the market for a particular security was efficient for the entirety of a 330-day Class Period.

> Q. Now, are you aware of any paper or brief in a case or a report where your same methodology was used? Event selection methodology.
>
> A. I can't say one way or the other. As I sit here right now, at the end of the day I can't name it for you, but I can't rule it out, either.

Deposition of Dr. Feinstein (Vol. 3) (ECF No. 444-5) at PageID #: 21120, Pg. 756-57. Courts also require the testing of many more dates throughout a class period to establish market efficiency. *See, e.g.*, *George v. China Auto. Sys., Inc.*, No. 11-cv-7533, 2013 WL 3357170, at *12 (S.D.N.Y. July 3, 2013) (market reaction on seven out of 16 days "is an insufficient foundation upon which to pronounce market efficiency") ; *In re Fed. Home Loan Mortg. Corp. (Freddie Mac) Sec. Litig.*, 281 F.R.D. 174, 180 (S.D.N.Y. 2012) ("*Freddie Mac Kreysar*") (16 of 57 news days insufficient to establish market efficiency because "plaintiff must show that the market price responds to most new, material news").

In David Tabak, "What Should We Expect When Testing for Price Response to News in Securities Litigation?", NERA Economic Consulting, Working Paper, August 2016, a paper from one of the co-authors of the FDT Article that Dr. Feinstein cited in his December 2016 Declaration (ECF No. 355-5 at PageID #: 16040, ¶ 22 n. 6) (Exhibit D4), Dr. Tabak explains that the "Proof-by-example" approach analyzing only a "handful" of days is fatally flawed. The reason is because an event study with too few "events" is incapable of distinguishing whether stock price movements are the probable result of news events or simply random variation. As Dr. Tabak notes, "[a] serious, and in fact, fatal, problem with this approach is that one would expect to see such results if stock-price movements were completely random and had no average correlation with news events." *See* ECF No. 383-2 at PageID #: 18854, ¶ 54. The article cites *In re PolyMedica Corp. Sec. Litig.*, 453 F. Supp.2d 260 (D. Mass. 2006), in which the court agreed with the defense expert, and found that the plaintiffs' expert's "mere listing of five days on which news was released and which exhibited large price fluctuations proves nothing." *Id.* at 270.

**B.**

**\*5** In addition to his single-date event study, Dr. Feinstein also conducted a z-test to analyze whether Freddie Mac's stock price was statistically more likely or equally likely to fluctuate on "news days" versus "non-news days." [3]

> Q. Well, in addition, as you testified earlier, you were unable to find a single other day among all the other 329 days that you thought were appropriate for testing; is that right?
>
> A. That were ideal candidates, right. That's the case.
>
> So that's also why it was restricted to a single event, but also why the collective event test was motivated.

ECF No. 383-1 at PageID #: 18797, Pg. 368. According to Dr. Feinstein, the z-test he conducted "collectively compares the differential incidence of significant stock price movements across two groups of dates, where one group comprises dates with high information flow and the second group is composed of dates with less information flow." ECF No. 355-5 at PageID #: 16040, ¶ 22.

[3] Dr. Feinstein's test for classifying a trading day in the class period as a "news day" simply asks whether an event relating to Freddie Mac appeared in both *The Wall Street Journal* and *The New York Times* newspaper articles. *See* Plaintiff's Slide 7. He devised this approach for the first time for this case. ECF No. 383-1 at PageID #: 18744, Pg. 157. In the two prior z-test reports he issued in other cases, Dr. Feinstein used dates of earnings and corporate announcements. *See, e.g.*, *In re Petrobras Sec. Litig.*, 312 F.R.D. 354 (S.D.N.Y. 2016) (earnings dates were used as news days), *aff'd in part vac'd in part*, 862 F.3d 250 (2d Cir. 2017); ECF No. 383-1 at PageID #: 18744-45, Pgs. 157-58.

Freddie Mac argues the opinions based on Dr. Feinstein's version of the FDT z-test [4] are unreliable. Dr. Feinstein's z-test identified a total of four dates with statistically significant price movements, out of a total of nine purported "news" dates tested (including November 20, 2007). ECF No. 372-3 at PageID #: 18552, ¶ 142. However, none of those dates was within the first five months of the Class Period. ECF No. 383-2 at PageID

#: 18875, ¶ 110; Freddie Mac's Demonstrative Ex. D-11; ECF No. 468 at PageID # 22526.

[4]  The FDT Article proposed using the z-test as a threshold test to assess market efficiency. A z-test, however, is not a peer-reviewed process that economists accept as a method to establish market efficiency. ECF No. 383-1 at PageID #: 18754, Pg. 194; ECF No. 468 at PageID #: 22417-18; 22527.

Dr. Feinstein's z-test demonstrates that Freddie Mac stock reacted to news in a statistically significant manner on four days, or 1.2% of the 330 trading days in the Class Period. It was based on an insufficiently small sample according to the authorities on which Dr. Feinstein relies. It also included November 20, 2007, which is a "corrective disclosure" date. However, the authors of the FDT Article included an express instruction that economists should exclude "corrective disclosure" dates from the "news day" population. FDT Article at 119 & n. 155.

One of the statistical manuals cited by Dr. Feinstein is *Applied Statistics for Public Policy* by Brian P. Macfie and Philip M. Nufrio, M.E. (Freddie Mac's Exhibit D5 and Demonstrative Ex. D-2 are excerpts). *See* ECF No. 355-5 at PageID #: 16040, ¶ 22 n. 4. The manual, at page 323, sets forth three sample size conditions that a z-test must meet to be considered reliable:

*Sample Size*

 *6 Similar to the single population proportion test covered in Chapter 12, when testing for differences between population proportions, we cannot test hypotheses involving proportions from small samples....

...The following three conditions must be met for both samples to assure the sample sizes are sufficiently large enough to conduct a hypothesis test for differences:
1. Both samples need to have at least 30 observations each.

2. Both ($n_1 * p_1$) and ($n_2 * p_2$) have to be greater than five.

3. Both [$n_1 * (1- p_1)$ ] and [$n_2 * (1- p_2)$ ] have to be greater than five. $n_1$ refers to the number of observations and $p_1$ refers to the proportion of the observations. n1 here is 9 and p1 here is 4 over 9. 9 * 4/9 4. Therefore, the z-test conducted by Dr. Feinstein fails the sample size condition one. It also fails conditions two and three. *See* ECF No. 468 at PageID #: 22423. Dr. Bajaj opines that Dr. Feinstein's z-test does not prove market efficiency. ECF No. 383-2 at PageID #: 18860-99, ¶¶ 72-154. In addition, the z-test conducted by Dr. Feinstein is unreliable due to numerous other fundamental design problems that infect it. *See* ECF No. 383-2 at PageID #: 18875-92.

Dr. Feinstein also ran three diagnostic tests, *i.e.*, Fisher's Exact, Bootstrap, and Binomial. He ran the diagnostic tests to verify that the z-test results were indeed accurate and reliable. *See* ECF No. 406-1 at PageID #: 19491, ¶ 80; ECF No. 468 at PageID #: 22392-93; 22423-24; Plaintiff's Slide 8. Dr. Bajaj discovered a structural break [5] in this market on February 27, 2007. *See* Freddie Mac's Demonstrative Exhibit D-3. He offers the opinion that if the three diagnostic tests conducted by Dr. Feinstein are adjusted to take into account a structural break in February 2007, the diagnostic tests yield statistically insignificant results. ECF No. 468 at PageID #: 22521-22; Freddie Mac's Demonstrative Exhibit D-8. Dr. Bajaj testified:

> And when you make those changes, several of the four dates that he said were statistically significant, in fact two of the four, are not statistically significant. The two that remain significant, one of the two is the last day of the class period.

ECF No. 468 at PageID #: 22523-24. The Court concludes that Dr. Feinstein's statistically insignificant diagnostic tests do not salvage his conclusions.

[5]  A "structural break" is a market disruption such that the average price volatility prior to the break is different from the average price volatility after the break. ECF No. 383-2 at PageID #: 18887, ¶ 135.

### C.

Third, Dr. Feinstein impermissibly offers legal opinions. It is undisputed that experts may opine on the facts, but not the law. *See, e.g.*, *Lassberg v. Barrett Daffin Frappier Turner & Engel, L.L.P.*, No. 4:13-cv-00577, 2014 WL 12659958, at *3-4 (E.D. Tex. Sept. 18, 2014) (excluding a "report [that] reads [ ] more like a lawyer's brief than an expert opinion"); *Employers Reinsurance Corp. v. Mid-Continent Cas. Co.*, 202 F. Supp.2d 1212, 1216-17 (D. Kan. 2002) (In rendering opinion testimony, expert may

not apply law to facts of case to form legal conclusions, but expert may refer to law in expressing his opinion.).

### D.

Finally, Freddie Mac argues other courts have deemed Dr. Feinstein opinions unreliable. *See Finkelstein v. Liberty Digital, Inc.*, No. 19598, 2005 WL 1074364, at *14-15 (Del. Ch. April 25, 2005) (rejecting Dr. Feinstein's valuation analysis of shares of a company that survived a merger as a wholly owned subsidiary and stating "[t]he problems with his [discounted cash flow] analysis are so pervasive and numerous that it is impossible to describe all of them").

*7 OPERS argues that Dr. Feinstein's opinion is not solely based on his event study, and also asserts that two cases support a single date event study. Dr. Feinstein used a single-date event study in *In re Am. Realty Capital Props. Inc. Sec. Litig.*, No. 1:15-mc-00040-AKH (S.D.N.Y. filed February 13, 2015). *See* ECF No. 369-13 at Page 38-39, ¶ 126 filed March 15, 2017 in No. 1:15-mc-00040). OPERS does not, however, cite any economic principle or economic authority that supports the proposition that an event study of a single date could possibly establish that a market is efficient over an extended period of time. The Court concludes Dr. Feinstein's opinions based on his single-date event study are based on insufficient facts. *See In re Groupon, Inc. Sec. Litig.*, No. 12 C 2450, 2015 WL 1043321, at *4 (N.D. Ill. March 5, 2015) (Dr. Feinstein admitted that his use of two dates over a seven-week class period was "on the low side"); *Bell*, 422 F.3d at 316 ("this single decline on the last day of the class period is plainly insufficient by itself to show market efficiency throughout the class period").

In August 2016, Dr. Greg Hallman, Lead Plaintiff's former expert, submitted a report (ECF No. 199-10) in the case at bar. He tested six earnings dates [6] for Freddie Mac and concluded that two of those dates yielded statistically significant results. One of those two dates was November 20, 2007, the last day of OPERS's chosen Class Period. In December 2012, Dr. Bajaj submitted an expert report (ECF No. 214) that criticized Dr. Hallman's work, and found that a market that reacts to news on two out of six days is not an efficient one. ECF No. 214 at PageID #: 7731, ¶ 43. He concluded that only one out of six dates November 20, 2007 was statistically significant. Dr. Feinstein reviewed both reports prior to selecting his single date for his event study.

> Q. So you knew before you constructed your single-event event study that both Dr. Hallman and Dr. Bajaj had concluded that November 20, 2007 was a date that, upon testing, yielded statistically significant price movement, correct?
>
> A. Well, I mean, the record is what it is. The history of the company is what it is. We can't -- it's not like a laboratory, a scientific laboratory, where we can change the facts and see what the -- if the results change.
>
> But yes, I did know, and because I did know, I was very careful to make sure that I could explain that the nature of the news that transpired that day was such so that under the objective selection criterion -- under the objective selective criteria, that date would be selected regardless of whether someone knew or did not know what the stock price reaction was that day.

ECF No. 383-1 at PageID #: 18728, Pgs. 91-92. According to Defendants, this is a classic example of "data snooping," which violates the axiom that research should not be "motivated by the successes and failures of past investigations." ECF No. 383-2 at PageID #: 18880, ¶ 118 and n. 140.

[6] Dates when information ("news") about the company was released to the market, such as the dates that companies publicly release financial results.

Freddie Mac cites two cases that excluded purported expert opinions offering event studies in securities cases when the expert selected events already knowing whether there was a significant price impact beforehand. *Brown v. China Integrated Energy Inc.*, No. CV 11-02559 BRO (PLAx), 2014 WL 12576643, at *8 (C.D. Cal. Aug. 4, 2014) (rejecting selection of events based upon price reaction); *Bell v. Ascendant Solutions, Inc.*, No. 3:01CV0166N, 2004 WL 1490009, at *3 & n.2 (N.D. Tex. July 1, 2004) (rejecting event study as unreliable where expert selected "six or seven 'information days,' " which included "dates that appear to be consciously chosen in order artificially to support his hypothesis of efficiency")), *aff'd and remanded*, 422 F.3d 307 (2005). Here, Dr. Feinstein was not only aware of the price impact on November 20, 2007 when Freddie Mac announced a $2 billion loss, he was actually aware of both Dr. Greg Hallman's and Dr. Bajaj's 2012 test results for that date. *See* ECF No. 468

at PageID #: 22406-407; Freddie Mac's Demonstrative Ex. D-10. Under this precedent, Dr. Feinstein's selection of November 20, 2007 as the sole date of his event study was entirely improper because you are supposed to hypothesize and then see your results. You are not supposed to know your results in advance. *Countrywide*, 273 F.R.D. at 618 (finding the events "should be selected using criteria that are as objective as possible," and the criteria "determined before looking at the result to be studied").

**II. Lead Plaintiff's Motion to Exclude the Expert Testimony of Dr. Mukesh Bajaj (ECF No. 437)**

 **\*8** OPERS moves the Court to enter an order excluding the report (ECF No. 383-2), opinions, and testimony of Mukesh Bajaj, the expert witness of Freddie Mac, as well as all evidence that is based upon, or directly or indirectly references, Dr. Bajaj's report, opinions, or testimony. According to OPERS, Dr. Bajaj's report, opinions, and testimony are irrelevant, unhelpful, confusing, and unfairly prejudicial and do not meet the threshold of admissibility for expert evidence set forth in Fed. R. Evid. 403 and 702, as interpreted by the U.S. Supreme Court in *Daubert*.[7]

[7] Lead Plaintiff did not file a motion to exclude the expert testimony of Dr. Bajaj in conjunction with its prior Motion for Class Certification (ECF No. 199).

**A.**

OPERS' principal argument is that Dr. Bajaj uses an economic standard for proof of market efficiency that is contrary to the applicable legal standard.[8] First, Dr. Bajaj's requirement of "semi-strong" market efficiency is contrary to the "general efficiency" required under *Halliburton II*. Second, Dr. Bajaj treats *Cammer* 5 as necessary and dispositive, contrary to the applicable legal standards. Third, Dr. Bajaj's opinion that market efficiency cannot be proven without an event study is contrary to applicable legal standards. Fourth, Dr. Bajaj's opinion regarding the necessity of an 80-90% stock price reaction is without basis and is misleading. Fifth, Dr. Bajaj's opinion regarding the necessity of a 95% confidence level for proof of market efficiency is at odds with the legal standard. Sixth, Dr. Bajaj's opinion rejects the legal standards set out in the *Cammer*/*Krogman* factors in favor of more stringent economic standards.

[8] Lead Plaintiff cites no case where a court excluded expert testimony on the grounds that the expert relied on an economic definition of "efficient market" that is inconsistent with the legal definition of an "efficient market."

**1.**

Dr. Bajaj's opinion that OPERS has failed to prove market efficiency is based on the premise that a semi-strong form of market efficiency is required. Sept. 26, 2017 Deposition of Dr. Bajaj (ECF No. 406-2) at PageID #: 19535, Pgs. 15-16; PageID #: 19537, Pg. 22. In *Freddie Mac Kreysar*, the court explicitly required proof of efficiency at the semi-strong level. 281 F.R.D. at 177. *See also Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 82 (S.D.N.Y. 2015) ("Despite *Halliburton II*, plaintiffs' expert employed the semi-strong definition of market efficiency when conducting his analysis.").

The Supreme Court held in *Basic* that "securities fraud plaintiffs can in certain circumstances satisfy the reliance element of a Rule 10b 5 action by invoking a rebuttable presumption of reliance, rather than proving direct reliance on a misrepresentation." *Halliburton II*, 134 S. Ct. at 2408 (citing *Basic*, 485 U.S. at 246). Economists identify three general forms of the efficient capital markets hypothesis:

> *First* is the weak form, which asserts simply that the current share price in an efficient market reflects all information about past share prices. If the weak form of the hypothesis accurately describes a market, it is impossible to predict future prices using only past prices. *Second*, the semi-strong form, which asserts that a share price in an efficient market reflects all public information concerning the security (including but not limited to past share prices). *Third*, the strong form, which asserts that all relevant information, public and private, is

reflected in the price of securities in an efficient market. The strong form has been widely discredited.

*\*9* *In re Initial Pub. Offering Sec. Litig.*, 260 F.R.D. 81, 97 n. 148 (S.D.N.Y. 2009) (emphasis in original). *See also Halliburton II*, 134 S. Ct. at 2420 n.4 (Thomas, J., dissenting) (citing Dunbar

& Heller, *Fraud on the Market Meets Behavioral Finance*, 31 Del. J. Corp. L. 455, 463-64

(2006)). In *Halliburton II*, the Supreme Court clarified that in recognizing the presumption of reliance, the *Basic* court did not adopt any particular theory of market efficiency. *See* 134 S. Ct. at 2410. Instead, the *Basic* presumption is based "on the fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.' " *Id.* (quoting *Basic*, 485 U.S. at 247 n. 24). "[I]n making the presumption rebuttable, *Basic* recognized that market efficiency is a matter of degree and accordingly made it a matter of proof." *Id.* "Debates about the precise *degree* to which stock prices accurately reflect public information are [ ] largely beside the point." *Id.* (emphasis in original).

"Courts have generally agreed that the relevant form of the efficient market hypothesis is semi-strong form efficiency." Allen Ferrell and Andrew Roper, *Price Impact, Materiality, and Halliburton II*, 93 Wash. U. L. Rev. 553, 557 n.13 (2015) (collecting cases). That is as true after *Halliburton II* as it was before. *See Brown v. China Integrated Energy Inc.*, No. CV 11-02559 BRO (PLAx), 2015 WL 12720322, at \*17 (C.D. Cal. Feb. 17, 2015) (applying *Basic* presumption based on evidence presented that the market "during the class period was semi-strong form efficient").

**2.**

Dr. Bajaj's opinion regarding market efficiency is also based on the premise that as a matter of financial economics *Cammer* 5 is both necessary and dispositive. ECF No. 406-2 at PageID #: 19568-69, Pgs. 149-50. According to OPERS, this opinion must be excluded because it is based upon an erroneous legal standard regarding *Cammer* 5.

The fifth *Cammer* factor considers whether Plaintiffs have submitted "empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer v. Bloom*, 711 F. Supp. 1264, 1287 (D.N.J. 1989).

**3.**

Dr. Bajaj opines that the only way to satisfy what he views as the necessary and dispositive *Cammer* 5, and therefore prove market efficiency, is through an event study. ECF No. 406-2 at PageID #: 19568, Pg. 149. According to Lead Plaintiff, while economists disagree on this issue, the courts do not for two reasons. First, *Cammer* 5 is not dispositive, but only one factor among many, and market efficiency can be shown without it. Second, courts increasingly recognize that there are other tests apart from event studies that satisfy *Cammer* 5. *See, e.g.*, *In re Petrobras Sec. Litig.*, 312 F.R.D. at 371 [9] (finding that z-test conducted by Dr. Feinstein, plaintiffs' expert, was well-established and sound statistical technique); *Första AP-Fonden v. St. Jude Med., Inc.*, 312 F.R.D. 511, 521-22 (D. Minn. 2015) (stating that to require an event study would "impose a burden on plaintiffs that the law does not mandate," and holding that news/non-news test can demonstrate *Cammer* 5). In addition to citing no case excluding expert testimony on the importance of event studies in proving market efficiency, Lead Plaintiff offers no authority actually suggesting that such exclusion would be permissible.

[9] This is the only case the Court is aware of in which class certification has been granted on direct and indirect evidence of market efficiency that included a z-test.

*\*10* Even OPERS' own expert, Dr. Feinstein, concedes that an event study is the "preeminent empirical test of market efficiency." ECF No. 355-5 at PageID #: 16038, ¶ 16. *See also* ECF No. 372-3 at PageID #: 18541, ¶ 103 (discussing how the event study methodology is "generally accepted and widely used in academic research"). Notably, courts in securities class actions regularly recognize event studies as the most powerful evidence on market efficiency. *See, e.g.*, *Plumbers & Pipefitters Nat. Pension Fund*, 967 F. Supp.2d at 1156

(admitting and discussing expert evidence on standards for event studies).

### 4.

In *Basic*, the Court held the standard of materiality set forth in [TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976)](#), is appropriate in [§ 10(b)](#) and [Rule 10b 5](#) context.

> The Court also explicitly has defined a standard of materiality under the securities laws, see [TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438 (1976)](#), concluding in the proxy-solicitation context that "[a]n omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." [Id., at 449](#). Acknowledging that certain information concerning corporate developments could well be of "dubious significance," [id., at 448](#), the Court was careful not to set too low a standard of materiality; it was concerned that a minimal standard might bring an overabundance of information within its reach, and lead management "simply to bury the shareholders in an avalanche of trivial information a result that is hardly conducive to informed decisionmaking." [Id., at 448-449](#). It further explained that to fulfill the materiality requirement "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." [Id., at 449](#). We now expressly adopt the *TSC Industries* standard of materiality for the [§ 10(b)](#) and [Rule 10b 5](#) context.

[485 U.S. at 231-32](#) (footnotes omitted).

Dr. Bajaj appears to opine that to demonstrate an efficient market one must show that news causes a statistically significant stock price reaction on 80 to 90% of news days. ECF No. [383-2 at PageID #: 18867, ¶ 93](#). He cites his own testimony in, [Freddie Mac Kreysar, 281 F.R.D. at 180](#) ("an economist may conclude that a market is efficient if it reacts to news 80 to 90% of the time"), to support his opinion. In David Tabak, "What Should We Expect When Testing for Price Response to News in Securities Litigation?", NERA Economic Consulting, Working Paper, August 2016, however, Dr. Tabak states "it is not clear if there is any case in which defendants have cited some empirical or even sound theoretical basis for an argument that there should be some minimum fraction of news days associated with statistically significant returns." OPERS argues to require a showing of an 80-90% statistically significant reaction on *all* news days would be to set a standard few if any stocks could meet, making establishment of market efficiency a practical impossibility.

During his deposition, Dr. Bajaj qualified this statement to say that stock prices should react in a statistically significant manner 80-90% of the time on "material" news days. ECF No. [406-2 at PageID #: 19544-45, Pgs. 53-57](#). He testified:

> ...Market efficiency is whether the market consistently reacts to material news dates.
>
> So if you were going to put a test of market efficiency in Z-test context, what you would do is take all material news dates and then see what fraction produce statistically significant impact, and then you can test it against the benchmark whether that is consistent....

**\*11** ECF No. [468 at PageID #: 22512-13](#). According to Lead Plaintiff, this opinion must be excluded because use of a *economic* definition different from that in *Basic*, when discussing "material" news days is based upon an erroneous legal standard.

### 5.

Dr. Bajaj next opines that to meet the standard of an economist, market efficiency must be shown to a level of significance of 95%. ECF No. [406-2 at PageID #: 19535-36, Pgs. 17-21](#). OPERS makes two arguments for excluding this opinion of Dr. Bajaj. First, market efficiency is a question of fact for the jury. [In re Initial Pub. Offering Sec. Litig., 544 F. Supp.2d 277, 297 (S.D.N.Y. 2008)](#); [Plumbers & Pipefitters Nat'l Pension Fund v. Burns, 292 F.R.D. 515, 526 (N.D. Ohio 2013)](#) (Carr, J.). Second, the applicable legal standard in a civil case is "preponderance of the evidence," not "statistically significant." A jury will have to decide the issue of market efficiency by a preponderance of the evidence. [Smilovits v. First Solar, Inc., 295 F.R.D. 423, 437 (D. Ariz. 2013)](#); [Carpenters, 310 F.R.D. at 94](#).

Statistical significance, however, is essential to give meaning to statistical evidence. As courts have recognized, absent statistical significance, correlation is meaningless. "Despite the problems with treating statistical significance as a magic criterion, it remains an important metric to distinguish between results supporting a true association and those resulting from mere chance." *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 793 (3rd Cir. 2017). *See also United States v. August*, 745 F.2d 400, 407 (6th Cir. 1984) ("[E]xpert testimony was highly probative and appropriate to assist the jury in interpreting the statistical significance of the distribution.").

### 6.

Dr. Bajaj disputes the *economic* relevance of the *Cammer/Krogman* factors apart from *Cammer* 5. In 2013, Dr. Bajaj opined that *Cammer* 1 "is not probative evidence, from an economic perspective." Jan. 11, 2013 Deposition of Dr. Bajaj (ECF No. 220-5) at PageID #: 8181-82, Pgs. 113-14. He has backtracked from that only slightly, out of necessity. In an October 2016 report supporting certification in *In re Allergan, Inc. Sec. Litig.*, No. 8:14-cv-02004-DOC-KES (C.D. Cal. filed Dec. 16, 2014), Dr. Bajaj opined that the *Cammer* factors, including factor 1, indicated an efficient market. *See Allergan Report* (ECF No. 406-3) at PageID #: 19622-26, ¶¶ 20-31. OPERS argues that following his opinion in *Allergan*, Dr. Bajaj could no longer take the position that these factors had "no" probative value. Dr. Bajaj attempts to square his *Allergan* opinion with his current opinion by claiming that while *Cammer* 5 is necessary and dispositive, some other factors may have "marginal relevance."

> Q. So if Cammer Factor 5 is addressed and found and found properly, the other Cammer-Krogman Factors would not be necessary to find market efficiency, in your view?

MR. FRANK: Objection.
A. They may have some marginal relevance in giving you comfort that market conditions are such that you can have -- that they would facilitate market efficiency and your Cammer Factor 5 study is reliable. And, in that sense,

they would be helpful; but by themselves, they are not sufficient.

*12 ECF No. 406-2 at PageID #: 19569, Pgs. 150-51.

Lead Plaintiff argues that Dr. Bajaj's opinion should be excluded because it rejects the relevance of the *Cammer/Krogman* factors. *Willis v. Big Lots, Inc.*, No. 2:12-CV-604, 2017 WL 1074048, at *4 (S.D. Ohio March 17, 2017) ("It may be that many financial economists... dispute the relevancy of the first four *Cammer* factors to a determination of market efficiency, but the *Cammer* factors nonetheless reflect the *legal* standard for market efficiency and have been considered by the Sixth Circuit in such determinations." (emphasis in original)); *In re Groupon, Inc. Sec. Litig.*, 2015 WL 1043321, at *11 ("Defendants rely on factors that are not legally relevant. This does not mean Defendants (or their expert, Paul Gompers) are incorrect in what they say it means Defendants (and their expert) often describe a different conception of an efficient market than is used by the law." (internal quotation marks and citations omitted)).

After considering Lead Plaintiff's critiques, the Court does not share similarly grave concerns about Dr. Bajaj's opinions. Expert testimony based on economic principles in a securities putative class action is routinely considered and accepted by the courts. *See e.g.*, *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 154 (N.D. Tex. 2014) (court relied on an un-refuted defense expert report demonstrating the need for individual inquiries into investor knowledge in finding Lead Plaintiff failed to demonstrate that questions of law or fact common to class members predominated over any questions affecting only individual members ). Moreover, such disputes with Dr. Bajaj's opinions go to the weight of his testimony, not its relevance. Finally, OPERS' arguments that the Court should not be persuaded by Dr. Bajaj's opinions are a reiteration of class certification arguments, not legitimate grounds to exclude expert testimony.

### B.

Next, Lead Plaintiff argues that Dr. Bajaj's price impact opinion is contrary to the applicable legal standard, and therefore his opinion regarding lack of price impact should be excluded.

**\*13** Defendants may be able to negate the presumption of reliance by coming forward with economic evidence of a lack of price impact through direct evidence. Halliburton II, 134 S. Ct. at 2415-16. The Court stated, "we see no reason to artificially limit the inquiry at the certification stage to indirect evidence of price impact. Defendants may seek to defeat the *Basic* presumption at that stage through direct as well as indirect price impact evidence." Id. at 2417. However, "it is incumbent upon the defendant to show the absence of price impact," and "in practice, the so-called 'rebuttable presumption' is largely irrebuttable." Id. at 2417, 2424 (Ginsburg, J., concurring, and Thomas, J., dissenting). "Because Defendants have the burden of showing an absence of price impact, they must show that price impact is *inconsistent* with the results of their analysis. Thus, that an absence of price impact is consistent with their analysis is insufficient." Aranaz v. Catalyst Pharmecutical Partners, Inc., 302 F.R.D. 657, 672 (S.D. Fla. 2014) (emphasis in original).

Dr. Bajaj testifies, from the perspective of financial economics, that there is no evidence that the alleged misrepresentations on 23 dates during the Class Period in the case at bar had any "price impact" on Freddie Mac stock. Dr. Bajaj concludes "[t]he economic evidence supports a finding that the alleged misrepresentations and omissions had no impact an Freddie Mac's common stock price. ECF No. 383-2 at PageID #: 18903-908, ¶¶ 162-71. Dr. Bajaj's testimony on price impact has two components. First, using a corrected version of Dr. Feinstein's market model regression, he analyzed whether there was statistically-significant movement in the price of Freddie Mac stock on any of the 23 dates of alleged inflationary misrepresentations ("front-end price movement") and found statistically insignificant stock price reactions or reactions that were statistically significant in the wrong direction on 22 of the 23 effective dates. Dr. Bajaj concludes that none of the 23 alleged misstatements caused any statistically significant change in Freddie Mac's stock price at the time they were made. *See, e.g.*, ECF No. 383-2 at PageID #: 18903 ¶ 163. Second, Dr. Bajaj analyzed the November 20, 2007 decline in Freddie Mac's stock price and found no ground upon which a financial economist could conclude that the 29% stock decrease on that date ("back-end price movement") was connected to OPERS' allegations in this case. ECF No. 383-2 at PageID #: 18906-908, ¶¶ 169-71.

Whether the "alleged misrepresentation did not actually affect the market price of the stock" is a question of fact, to be judged based on all the evidence. Halliburton II, 134 S. Ct. at 2417. The Court agrees with Freddie Mac that Dr. Bajaj's opinions grounded in well-established principles of statistics and financial economics are sound, relevant, and helpful in resolving two issues of fact central to the reliance element of Lead Plaintiff's § 10(b) claim, *i.e.*, OPERS' effort to invoke a rebuttable presumption of reliance and price impact. Expert testimony on back-end price impact is also admissible and directly relevant at the class certification stage. Ark. Teachers Ret. Sys. v. Goldman Sachs Grp., Inc., 879 F.3d 474, 486 (2d Cir. 2018). In any event, Lead Plaintiff's objections to Dr. Bajaj's testimony on price impact go entirely to its weight and provide no basis to question its admissibility. *See, e.g.*, In re Scrap Metal Antitrust Litig., 527 F.3d 517, 531-32 (6th Cir. 2008) (holding that challenge to usefulness of expert analysis was correctly directed towards "cross-examination and...criticism by [an opposing] expert," rather than by excluding the testimony altogether).

**III. Lead Plaintiff's Motion to Exclude the Expert Testimony of Dr. Paul Gompers (ECF No. 440)**

OPERS moves the Court to enter an order excluding the report (ECF No. 383-3), opinions, and testimony of Paul A. Gompers, the expert witness of Freddie Mac, as well as all evidence that is based upon, or directly or indirectly references, Dr. Gompers' report, opinions, or testimony. According to OPERS, Dr. Gompers' report, opinions, and testimony are irrelevant, unhelpful, confusing, and unfairly prejudicial and do not meet the threshold of admissibility for expert evidence set forth in Fed. R. Evid. 403 and 702, as interpreted by the Supreme Court in *Daubert*.[10]

---

[10] The parties agreed to offer no oral argument on this motion and submit it on the papers. ECF No. 468 at PageID #: 22624.

**\*14** In Comcast v. Behrend, 569 U.S. 27 (2013), the Supreme Court held that damages must be "capable of measurement on a classwide basis" and plaintiffs' must show that the methodology for calculating damages on a classwide basis is consistent with their theory of liability. Id. at 34.[11] OPERS argues that Dr. Gompers uses an improper legal standard regarding the requirements of *Comcast*. According to Lead Plaintiff, Dr. Gompers opines that *Comcast* "requires" a plaintiff expert to

provide details regarding how his damage analysis will address potential calculation issues. Dr. Gompers' opinion was rejected in *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447 WHA, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017), but not on *Daubert* grounds.[12] The Court in *Luna* held defendants' arguments "misperceive[ ] the holding of *Comcast*." *Id.* at *5. Dr. Gompers testified as follows in the case at bar:

> Q. When you give new opinions, you don't consider what courts have ruled with regard to your previous opinions?

[11] According to Lead Plaintiff, "*Comcast* has created a change in the law that will require a new expert opinion on class certification." Reply Memorandum (ECF No. 360) at PageID #: 17011.

[12] Dr. Gompers' *Comcast*-related opinions have been rejected in 11 cases 10 of them, including two within the Sixth Circuit, with certification of the class in each generally based upon *Comcast*-related plaintiff expert opinions similar to Dr. Feinstein's. *See* ECF No. 441 at PageID #: 20618. Freddie Mac does not dispute that Dr. Gompers' *Comcast*-related opinions have been rejected by every court that has considered them. Freddie Mac notes, however, that OPERS does not because it cannot cite a single decision where a court excluded Dr. Gompers' opinions on *Daubert* grounds or otherwise.

MR. GOLDFARB: Objection.
A. What a court rules will not affect whether or not my opinion is that -- it certainly wouldn't be a basis for me to alter my opinion. My opinions are based on my feeling. They are based on the standards in financial economics. They are not based on legal decisions.

Q. So you're not concerned whether your opinions are premised upon an incorrect legal standard?

MR. FRANK: Objection.
A. My opinions aren't based on any legal standard. They are based on standards in financial economics, based on whether or not, for example, in this case, does Dr. Feinstein demonstrate, using the tools of financial economics, the theory of liability of the case and the facts of the case that he can develop a damages model.

And that's a -- that's an opinion which is offered and grounded in my profession, not grounded in -- in the law. Deposition of Dr. Gompers (ECF No. 406-5) at PageID #: 19809, Pgs. 180-81. He admitted that his opinions are not based on "the legal reasons that a court might decide something." ECF No. 406-5 at PageID #: 19806, Pg. 166.

Expert testimony contrary to the applicable legal standard is inadmissible. *See, e.g.*, *In re Welding Fume Prod. Liab. Litig.*, No. 1:03CV17000, 2005 WL 1868046, at *7-8 (N.D. Ohio Aug. 8, 2005) (O'Malley, J.). OPERS, however, does not identify any erroneous legal standard on which Dr. Gompers' opinions are based, either by citation to or quotation from Dr. Gompers' report or deposition testimony. In his report, Dr. Gompers states: "I understand that Plaintiff is required to articulate a methodology for calculating damages class-wide and in a manner consistent with Plaintiff's theory of liability." ECF No. 383-3 at PageID #: 19223, ¶ 47. This is precisely the requirement the Supreme Court articulated in *Comcast*.

**IV. Lead Plaintiff's Renewed Motion for Class Certification and to Appoint Class Representative and Class Counsel (ECF No. 372)**

Pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), OPERS moves the Court for an order certifying this action as a class action and designating Lead Plaintiff as the representative of a plaintiff class (the "Class") defined as follows:

> ***15** All persons who purchased Freddie Mac common stock between August 1, 2006 and November 20, 2007, inclusive ("Class Period"). Excluded from the Class are: (i) Defendant Freddie Mac, its parents, subsidiaries, and any other entity owned or controlled by Freddie Mac; (ii) Individual Defendants Richard F. Syron, Patricia L. Cook, Anthony S. Piszel, and Eugene M. McQuade; (iii) all other executive officers and directors of Freddie Mac or any of its parents, subsidiaries, or any other entity owned or controlled by Freddie Mac; (iv) all

immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and step-relations of similar degree; and (v) all predecessors and successors in interest or assigns of any of the foregoing.

### A.

To prevail on its motion, OPERS must "affirmatively demonstrate" compliance with Rule 23. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). In putative securities class actions, where, as here, Lead Plaintiff seeks to proceed under the fraud-on-the-market theory, "[c]lass certification is only warranted if plaintiffs can establish by a preponderance of the evidence a class-wide presumption of reliance by virtue of the presence of an efficient market critical to the fraud-on-the-market theory." *George*, 2013 WL 3357170, at *7 (citing *Basic*, 485 U.S. at 241-42). Lead Plaintiff argues that the proposed class satisfies Fed. R. Civ. P. 23(a). Rule 23(a) provides:

PREREQUISITES. One or more members of a class may sue or be sued as representative parties on behalf of all members only if:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

### 1.

Next, Lead Plaintiff argues that this case satisfies the requirements of Fed. R. Civ. P. 23(b)(3). Rule 23(b)(3) permits certification only if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members." It provides:

(b) TYPES OF CLASS ACTIONS. A class action may be maintained if Rule 23(a) is satisfied and if:

* * *

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action. The Supreme Court has emphasized that it "may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160-161 (1982). "Rigorous analysis" may involve some overlap between the proof necessary for class certification and the proof required to establish the merits of the plaintiffs' underlying claims. *Wal-Mart*, 564 U.S. at 351; *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013).

To benefit from the fraud-on-the-market presumption, OPERS must at least show that Defendants made misrepresentations that impacted the price of a security that is actively traded on an efficient market, *i.e.*, that the market price for Freddie Mac stock rapidly reflected all public material information throughout the Class Period. *See Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197 (6th Cir. 1990). According to Defendants,[13] the Court should deny the motion for class certification pursuant to Rule 23(b)(3), as OPERS's newly proffered expert, Dr. Steven P. Feinstein, has failed to establish that Freddie Mac's common stock traded in an efficient market during the Class Period. *See, e.g., Freddie Mac Kreysar*, 281

F.R.D. at 181-82 (denying motion for class certification finding, after a *Daubert* hearing, that plaintiff's expert failed to demonstrate a cause-and-effect relationship between Freddie Mac's disclosures and stock price as required to prove market efficiency). [14] Defendants request that the Court deny class certification for failure to satisfy Rule 23(b)(3)'s predominance requirement because OPERS fails to demonstrate that the market for Freddie Mac common stock was, "in fact," efficient during the Class Period. *Wal-Mart*, 564 U.S. at 350.

[13] Defendants Richard F. Syron (ECF No. 382), Patricia L. Cook (ECF No. 384), Anthony S. Piszel (ECF No. 379), and Eugene M. McQuade (ECF No. 381) join in Freddie Mac's arguments (ECF No. 383).

[14] At the oral hearing/argument held on April 13, 2018, counsel for OPERS represented to the Court that Waggoner v. Barclays PLC, 875 F.3d 79 (2d Cir. 2017), overruled the *Freddie Mac Kreysar* decision. ECF No. 468 at PageID #: 22658-59. *Waggoner* held that where, unlike in the case at bar, all the structural *Cammer* factors have been overwhelmingly satisfied and there are no "specific circumstances" or a "flawed" event study that weigh in favor of scrutinizing *Cammer* 5 (an empirical showing of cause-and-effect), then it is not an abuse of discretion for the court to certify a class. 875 F.3d at 99 n. 29. In *Freddie Mac Kreysar*, like here, the court was faced with a flawed event study. 281 F.R.D. at 181-82.

a.

*16 A class-wide presumption of reliance through the fraud-on-the-market theory is a prerequisite for class certification in securities fraud cases. Erica P. John Fund, Inc. v. Halliburton Co., 563 U.S. 804, 810 (2011) ("*Halliburton I*"). To benefit from the fraud-on-the-market presumption, OPERS must at least show that Defendants made misrepresentations that impacted the price of a security that is actively traded on an efficient market, *i.e.*, that the market price for Freddie Mac stock rapidly reflected all public material information throughout the Class Period. *See* Freeman, 915 F.2d at 197. Here, Lead Plaintiff has not made that showing, and that failure is fatal to certification.

To assess whether the market for a particular stock is efficient, courts often analyze five factors first articulated in Cammer v. Bloom, 711 F. Supp. 1264 (D.N.J. 1989), commonly called the "*Cammer* factors." Under *Cammer*, the Court should consider: first, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has market makers and arbitrageurs; fourth, whether the company is eligible to file U.S. Securities and Exchange Commission ("SEC") registration form S-3, as opposed to form S-1 or S-2; and fifth, whether there are empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price. Id. at 1286-87. Krogman v. Sterritt, 202 F.R.D. 467 (N.D. Tex. 2001) stated three additional factors: (1) that "[m]arket capitalization...may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations," (2) "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade;" and, (3) "[i]n determining efficiency, courts also consider the percentage of shares held by the public, rather than insiders." Id. at 478. [15] A number of courts will also look at does the stock trade on a national exchange. *See, e.g.*, Huberman v. Tag It Pac. Inc., 314 Fed.Appx. 59, 63 (9th Cir. 2009).

[15] The parties agree that these factors are divided into two types: "structural" and "direct." Factors 1-4 and 6-8 are referred to as "structural" factors that facilitate or "indicate" market efficiency. Factor 5, the cause-and-effect factor, calls for direct, empirical tests of market efficiency. ECF No. 372-3 at PageID #: 18540, ¶ 99; ECF No. 383-2 at PageID #: 18840, ¶ 20.

In the case at bar, Defendants do not dispute the first three *Cammer* factors, they don't dispute any of the *Krogman* factors, and they do not dispute that Freddie Mac common stock traded on the New York Stock Exchange, which is a national exchange. *See* Plaintiff's Slide 4. Defendants note, however, that Dr. Feinstein admitted at deposition that Freddie Mac was not eligible to file Form S-3 during the Class Period, which is the fourth *Cammer* factor. ECF No. 383-1 at PageID #: 18730, Pg. 98-99. The only factor Defendants dispute is *Cammer* 5. In the *Freddie Mac Kreysar* case, the district court found that *Cammer* 5, the "cause and effect" factor, is the "most important" factor the "*sine qua non* of [market] efficiency." 281 F.R.D. at 178, 182 (citing Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc., 546 F.3d 196, 207 (2d Cir. 2008)). *See also* In re Xcelera.com Sec. Litig., 430 F.3d 503, 512

(1st Cir. 2005) ("the fifth [is] in many ways, the most important, *Cammer* factor"). The fifth factor maintains its prominence following *Halliburton II*. *See e.g.*, Brown, 2014 WL 12576643, at *6 ("The most important factor discussed in *Cammer* is the fifth one: whether there is 'a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.' ") (quoting Cammer, 711 F. Supp. at 1287); PolyMedica, 453 F. Supp.2d at 278 (holding plaintiff failed to demonstrate that the stock traded in an efficient market, despite finding that the first four *Cammer* factors favored finding of market efficiency).

**\*17** Dr. Feinstein appears to agree that the fifth factor is the most important factor. He notes that the court in *Halliburton II* found that the "cause and effect relationship" was "at the center of market efficiency," ECF No. 372-3 at PageID #: 18524, ¶ 39, and one of "the most convincing" ways to demonstrate market efficiency, ECF No. 372-3 at PageID #: 18540, ¶¶ 98-99 (quoting Cammer, 711 F. Supp. at 1291). Dr. Feinstein also testified in *In re Groupon, Inc. Sec. Litig.* that *Cammer* 5 is "the essence of market efficiency, whereas the first four are indicators of market efficiency." ECF No. 383-2 at PageID #: 18841 n. 23. Furthermore, when asked whether he would be willing to opine that a market was efficient if it merely satisfied the structural factors, Dr. Feinstein admitted that he had not, and would not, author a report concluding that a market was efficient without "some empirical demonstration" of efficiency. ECF No. 383-1 at PageID #: 18801, Pg. 384.

Lead Plaintiff argues against the importance of *Cammer* 5 in determining market efficiency. According to OPERS, *Halliburton II* essentially rejected In re PolyMedica Corp. Sec. Litig., 432 F.3d 1 (1st Cir. 2005), and relaxed the degree of proof necessary for establishing market efficiency. *See, e.g.*, Eric Alan Isaacson, The Roberts Court and Securities Class Actions: Reaffirming Basic Principles, 48 AKRON L. REV. 923, 966 (2015) (stating with respect to *PolyMedica* that "[s]uch holdings cannot survive *Halliburton II*, which clearly overrules the First Circuit's rigid definition of market efficiency).[16] Since *Halliburton II*, however, *PolyMedica* has been cited by various courts on the issue of market efficiency, not once disapprovingly. Moreover, *Plumbers & Pipefitters Nat. Pension Fund* is one of only two cases in the Sixth Circuit to cite *PolyMedica* regarding an efficient market, and it did so approvingly. 967 F. Supp.2d at 1155 ("The parties agree that the most important *Cammer* factor is the cause-and-effect relationship between new, unexpected information and bond prices.").

[16] The other cases that Lead Plaintiff cites do not state that *Halliburton II* changed the law, but merely observe that *Basic* does not mandate a specific method for proving market efficiency. *See* Strougo v. Barclays PLC, 312 F.R.D. 307, 315-17 (S.D.N.Y. 2016), *aff'd sub nom.* Waggoner v. Barclays PLC, 875 F.3d 79 (2d Cir. 2017); Carpenters, 310 F.R.D. at 78-80; Första AP-Fonden, 312 F.R.D. at 518.

According to OPERS, no court has held that *Cammer* 5 is dispositive, and many including one within the Sixth Circuit have held to the contrary. Carpenters, 310 F.R.D. at 83, 86, 94; Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp., 762 F.3d 1248, 1256 (11th Cir. 2014); Första AP-Fonden, 312 F.R.D. at 520 ("A plaintiff's shortfall on the fifth *Cammer* factor alone does not outweigh, as here, showings on many other relevant factors."); Plumbers & Pipefitters Nat. Pension Fund, 967 F. Supp.2d at 1161 (rejecting defendants' argument that "*Cammer* factors one through four are irrelevant to the issue of the market efficiency"); Smilovits, 295 F.R.D. at 437.

The structural *Cammer* factors are not enough, alone, to establish market efficiency. *See* Freddie Mac Kreysar, 281 F.R.D. at 182 (holding plaintiffs failed to show that market was efficient despite the fact that "the less important *Cammer*...factors support an inference of efficiency"); PolyMedica, 453 F. Supp.2d at 278 (holding plaintiff failed to demonstrate that the stock traded in an efficient market, despite finding that the first four *Cammer* factors favored finding of market efficiency). Dr. Feinstein's single-date event study, by his own admission, does not prove market efficiency. ECF No. 383-1 at PageID #: 18750, Pg. 178-79. His z-test also suffers from numerous fundamental design flaws (*e.g.*, sample size and limited events) that infect it. *See* ECF No. 383-2 at PageID #: 18872-92. Correcting just some of the flaws in the z-test leads to statistically insignificant results, undermining Dr. Feinstein's opinion. *See* ECF No. 383-2 at PageID #: 18892-93, ¶¶ 146-47. Upon weighing the evidence, as the Court must, the Court holds that OPERS has failed to establish market efficiency.

**b.**

*\*18* As stated above in Section II.B., the Supreme Court held that, where plaintiffs have sufficiently established market efficiency, defendants may rebut the presumption of reliance with evidence of a lack of price impact. *Halliburton II*, 134 S. Ct. at 2417. Applying *Halliburton II*, the Eighth Circuit held that a defendant had successfully rebutted the presumption at the class certification stage by showing that the alleged misstatements did not have any impact on the company's stock price at the time they were made. *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016); *see also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (denying class certification where fraud on the market presumption was rebutted by event studies showing no statistically significant link between changes in price of defendants' stock and any alleged misrepresentation).

Dr. Bajaj's report demonstrates that the alleged misstatements in the case at bar did not impact Freddie Mac's stock price, rebutting the presumption of reliance. ECF No. 383-2 at PageID #: 18903-908, ¶¶ 162-71. He conducted an analysis of the economic evidence surrounding the November 20, 2007 disclosures, and concluded that there was no evidence to suggest that the Company's disclosures were disclosures linked to the alleged misrepresentations and omissions in the Third Amended Complaint (ECF No. 166).

According to OPERS, the fact there may have been no price impact on the dates of the alleged misrepresentations is "insignificant." *Carpenters*, 310 F.R.D. at 86-87 ("[A] material misstatement can impact a stock's value either by improperly causing the value to increase or by improperly maintaining the existing stock price."); *Willis v. Big Lots, Inc.*, 242 F. Supp.3d 634, 658-59 (S.D. Ohio 2017) (recognizing price maintenance). [17] Lead Plaintiff cannot meaningfully argue that the misrepresentations artificially maintained the price of the stock until risks materialized, as that argument proves too much at the class certification stage, where OPERS has the burden of persuasion as an evidentiary matter. *In re Credit Suisse First Boston Corp. (Lantronix Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 145 (S.D.N.Y. 2008) ("price maintenance theory is patently deficient," because "Rule 23 determinations must be based on 'relevant facts' "). In *Best Buy*, the Eighth Circuit determined a finding of no price impact was dispositive, and that the defendants "rebutted the *Basic* presumption by submitting direct evidence (the opinions of both parties' experts) that severed any link between the alleged... misrepresentations and the stock price at which plaintiffs purchased." *Best Buy*, 818 F.3d at 783. A theory that statements maintained an inflated stock price is not evidence that can refute otherwise overwhelming evidence of no price impact.

[17] Lead Plaintiff also cites *In re Goldman Sachs Group, Inc. Sec. Litig.*, No. 10 Civ. 3461(PAC), 2015 WL 5613150, at \*6-7 (S.D.N.Y. Sept. 24, 2015) and *Burges v. Bancorpsouth, Inc.*, No. 3-14-1564, 2016 WL 1701956, at \*3 (M.D. Tenn. April 28, 2016). Reply Memorandum (ECF No. 405) at PageID #: 19448-49. However, *Goldman Sachs* was vacated by *Ark. Teachers Ret. Sys.*, 879 F.3d at 486 and the *Burges* opinion was vacated by *In re BancorpSouth, Inc.*, No. 16-0505, 2016 WL 5714755 (6th Cir. Sept. 6, 2016).

**B.**

OPERS claims that Defendants concealed certain risks that, when they materialized, caused the stock price to drop. Defendants argue that Lead Plaintiff has not demonstrated that it can calculate damages on a class-wide basis in a manner consistent with OPERS's theory of liability that plaintiffs purchased at an inflated price, as is required by *Comcast*, 569 U.S. at 34-36; *In re U.S. Foodservice v. Inc. Pricing Litig.*, 729 F.3d 108, 123 n. 8 (2d Cir. 2013) ("[C]ourts should examine the proposed damages methodology at the certification stage to ensure that it is consistent with the classwide theory of liability and capable of measurement on a classwide basis."). According to Defendants, individual issues will predominate over common issues in this matter, and class certification is inappropriate.

*\*19* In an attempt to satisfy the *Comcast* requirement, Dr. Feinstein describes in his report various techniques he believes he could use to calculate out-of-pocket damages based on inflation that can be applied on a classwide basis to determine damages under Rule 10b 5. *See* ECF No. 372-3 at PageID #: 18554-58, ¶¶ 149-57. He states there are unspecified "valuation tools" available to measure damages. ECF No. 372-3 at PageID #: 18555-56, ¶ 152; 18557, ¶ 155. He testified:

> Q. But to date, you haven't decided how you would calculate damages; is that fair to say?
>
> A. Well, I've assessed the facts enough to know that it's possible, that there's nothing so unusual about this case that it would be impossible to calculate the value of Freddie Mac's stock in the but-for world with perfect and correct --what plaintiffs consider correct disclosure.
>
> But the specifics of exactly which model I would use, I have not yet determined.
>
> I just know that I would have at my disposal all valuation models that other analysts have used to value Freddie Mac and other companies.
>
> But I -- but it's really important to note, I have more than they do. I mean, not only can I use all the models that other analysts valuing Freddie Mac used, I also have the event study and I also have the literature on reputational liquidity effects.

ECF No. 383-1 at PageID #: 18778-79. *See* Loritz v. Exide Technologies, No. 2:13-cv-02607-SVW-E, 2015 WL 6790247, at *22-23 (C.D. Cal. July 21, 2015) (finding that where a plaintiff's expert fails to articulate a damages model, offering only vague plans to calculate damages in the future, class certification should be denied). Dr. Feinstein's proposed damages approach is general and vague, and it fails to account for issues presented by OPERS's theories of damages.

In his report and at deposition, Dr. Gompers criticizes Dr. Feinstein's description, identifying various ways in which Dr. Feinstein failed to identify a common methodology for calculating damages consistent with OPERS's theory of liability in the case. ECF No. 383-3 at PageID #: 19223-46, ¶¶ 47-97; ECF No. 406-5. He testified:

> Q. Is it your opinion that it would be impossible to determine those out-of-pocket damages for a violation of rule 10b-5 in this case?
>
> MR. FRANK: Objection.
> A. So certainly Dr. Feinstein has not provided a model that -- that can calculate damages. He has not developed a method or proposed a method that could -- that could calculate damages on a class-wide basis.
>
> I haven't been asked to offer, but as I look at the particulars of this matter, the sort of facts of this matter, I'm unaware of a method that would allow one to calculate damages in this matter. I can't say, as I sit here, that it's impossible, but I don't see a way to do it.
>
> Q. And that would be true for each class member seeking those damages, correct?
>
> MR. FRANK: Objection.
> A. I don't see it being -- as I sit here, I don't -- I can't imagine or see a methodology that would allow one to -- calculate damages on a class-wide basis. I just don't -- I don't see a method that would be able to do that.

ECF No. 406-5 at PageID #: 19779, Pgs. 58-59. Dr. Gompers opines that Dr. Feinstein's proposed damages methodology would result in a windfall to plaintiffs' proposed class. ECF No. 383-3 at PageID #: 19245-46, ¶¶ 94-97.

When a class plaintiff presents a damages model that is vague, indefinite, and unspecific, or simply asserts (as did Dr. Feinstein) that there are unspecified "tools" available to measure damages, the model amounts to "no damages model at all," and the class cannot be certified. *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 552 (C.D. Cal. 2014) ("Although the methodologies he describes may very well be capable of calculating damages in this action, [plaintiffs' economic expert] has made no showing that this is the case."); *Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) (denying class certification in a securities case: "without assurance beyond [plaintiffs' proffered expert]'s say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis"). In *Sicav v. James Jun Wang*, No. 12 Civ. 6682(PAE), 2015 WL 268855 (S.D.N.Y. Jan. 21, 2015), the district court denied class certification on plaintiffs' insider sale theory under *Comcast* because plaintiff failed to adequately explain how damages would be proven, and specifically criticized the proffered analysis of Dr. Feinstein. *Id.* at *3-4, 5-6.

*20 OPERS fails to demonstrate that Freddie Mac's stock traded in an efficient market. *Halliburton II*, 134 S. Ct. at 2416 ("[M]arket efficiency...must be proved before class certification."). In addition, Lead Plaintiff has not adequately demonstrated that common issues of law and

fact will predominate over individual issues with respect to the reliance element of its Exchange Act claims. Finally, OPERS fails to establish that damages can be measured on a class-wide basis in a manner consistent with its theories of liability.

### C.

OPERS further moves the Court for an Order reaffirming Lead Plaintiff's selection of counsel by appointing Lead Counsel Markovits, Stock & DeMarco, LLC and Co-Lead Counsel Strauss Troy Co., LPA as Class Counsel pursuant to Fed. R. Civ. P. 23(g).

### V. Conclusion

Freddie Mac's Motion to Strike Reports and Exclude the Testimony of Dr. Steven P. Feinstein (ECF No. 444) is granted.

Lead Plaintiff's Motion to Exclude the Expert Testimony of Dr. Mukesh Bajaj (ECF No. 437) is denied. Lead Plaintiff's Motion to Exclude the Expert Testimony of Dr. Paul Gompers (ECF No. 440) is denied.

Lead Plaintiff's Renewed Motion for Class Certification (ECF No 372) is denied. As a result of this ruling, Lead Plaintiff's Motion to Appoint Class Representative and Class Counsel is denied as moot.

IT IS SO ORDERED.

August 14, 2018 /s/ *Benita Y. Pearson*

Date Benita Y. Pearson

United States District Judge

**All Citations**

Slip Copy, 2018 WL 3861840

---