# EXHIBIT D

# Grae vs. Corrections Corporation of America, et al.

## Videotaped Deposition of
## LUCY ALLEN
## October 10, 2018

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**Page 1**

```
1        UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF TENNESSEE
3  NIKKI BOLLINGER GRAE,        )
    Individually and on Behalf of   )
4  All Others Similarly Situated,  )
                                )
5     Plaintiffs,               )
                                )
6     -vs-              ) Civil Action No.
                        ) 3:16-cv-02267
7  CORRECTIONS CORPORATION OF    )
    AMERICA, et al.,            )
8                              )
       Defendants.             )
9                              )
10
11
12
13        VIDEOTAPED EXAMINATION of
14              LUCY ALLEN
15    _____
16              TAKEN ON
17       WEDNESDAY, OCTOBER 10, 2018
18
19
20
21
22
23  REPORTED BY:
     JESSICA WAACK,
24   RDR, CRR, CCRR, CCR, NYACR, NYRCR
25   JOB NO.:  10046971
```

**Page 2**

```
1
2
3
4
5        VIDEOTAPED EXAMINATION of
6  LUCY ALLEN, taken before JESSICA R. WAACK,
7  Registered Professional Reporter, Registered
8  Merit Reporter, Certified Realtime Reporter,
9  Registered Diplomate Reporter, California
10  Certified Realtime Reporter, Certified Court
11  Reporter in New Jersey, New York Association
12  Certified Reporter, New York Realtime Court
13  Reporter and Notary Public of the State of New
14  York, at Latham & Watkins, 885 Third Avenue,
15  New York, New York, on Wednesday,
16  October 10, 2018, commencing at 9:38 a.m. and
17  concluding at 4:46 p.m.
18
19
20
21
22
23
24
25
```

**Page 3**

```
1       A P P E A R A N C E S
2  ROBBINS GELLER RUDMAN & DOWD LLC
3     Attorneys for Plaintiffs and the Witness
4     414 Union Street, Suite 900
5     Nashville, Tennessee  37219
6     BY:  CHRISTOPHER WOOD, ESQ.
7     cwood@rgrdlaw.com
8        -and-
9  ROBBINS GELLER RUDMAN & DOWD LLC
10    Post-Montgomery Center
11    One Montgomery Street, Suite 1800
12    San Francisco, California  94104
13    BY:  WILLOW RADCLIFFE, ESQ.
14    wradcliffe@rgrdlaw.com
15
16  LATHAM & WATKINS LLC
17    Attorneys for CoreCivic and the
18    individual defendants and witness
19    355 South Grand Avenue
20    Los Angeles, California  90071-1560
21    BY:  BRIAN T. GLENNON, ESQ.
22    BY:  BRET M. GECKELER, ESQ.
23    brian.glennon@lw.com
24    bret.geckeler@lw.com
25
```

**Page 4**

```
1     A P P E A R A N C E S   C O N T ' D
2
3  RILEY WARNOCK & JACOBSON PLC
4     Attorneys for Defendants
5     1906 West End Avenue
6     Nashville, Tennessee  37203
7     BY:  TREY McGEE, ESQ.
8     tmcgee@rwjplc.com
9
10    A L S O   P R E S E N T
11
12  STEVEN FEINSTEIN, on behalf of Plaintiffs
13  DEREK ROSE, videographer
14
15         --o0o--
16
17
18
19
20
21
22
23
24
25
```

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

Page 5

1          INDEX TO EXAMINATION

2     WITNESS:  LUCY ALLEN

3   EXAMINATION                        PAGE

4    BY MR. WOOD                  10

5

6          -o0o-

7      INFORMATION REQUESTED

8

9          Page   Line

10          197    23

11

12

13   WITNESS INSTRUCTED NOT TO ANSWER

14

15          Page   Line

16          199    12

17

18

19

20

21

22

23

24

25

Page 6

1          INDEX TO EXHIBITS

2     WITNESS:  LUCY ALLEN

3    Wednesday, October 10, 2018

4    MARKED        DESCRIPTION        PAGE

5   Exhibit 1 Expert report of Lucy Allen   10

6   Exhibit 2 Report on market efficiency

7        by Dr. Feinstein         11

8   Exhibit 3 Memorandum           33

9   Exhibit 4 Thomson Reuters edited

10        transcript dated August 19,

11        2016             60

12   Exhibit 5 SunTrust article        81

13   Exhibit 6 Review of the Federal BOP's

14        monitoring of contract

15        prisons          107

16   Exhibit 7 Press release from CCA dated

17        August 11, 2016      119

18   Exhibit 8 Press release from CCA dated

19        August 11, 2016      129

20   Exhibit 9 Consolidated complaint for

21        violation of the federal

22        securities laws      137

23   Exhibit 10SunTrust article       157

24   Exhibit 11Canaccord article       172

25

Page 7

1          INDEX TO EXHIBITS

2     WITNESS:  LUCY ALLEN

3    Wednesday, October 10, 2018

4    MARKED        DESCRIPTION        PAGE

5   Exhibit 12 Article from Wells Fargo

6        dated February 9, 2017     181

7   Exhibit 13 Memo dated February 21, 2017

8        from the Office of the

9        Attorney General      186

10   Exhibit 14 Memo from the DOJ dated

11        August 18, 2016      186

12

13   ** All exhibits were attached to the

14        original transcript **

15

16

17

18

19

20

21

22

23

24

25

Page 8

```
 1              ******
 2         PROCEEDINGS
 3   October 10, 2018, 9:38 a.m.
 4         New York, New York
 5              ******
 6      THE VIDEOGRAPHER:  We are now on
 7   the record.  The date is October 10,
 8   2018, and the time is 9:39 a.m.
 9      This is the video deposition of
10   Lucy Allen being taken in the matter
11   of Nikki Bollinger Grae vs.
12   Corrections Corporation of America, et
13   al., pending in the United States
14   District Court, Middle District of
15   Tennessee, Civil Action
16   No. 3:16-cv-02267.
17      We are at 885 Third Avenue in
18   New York, New York.  My name is Derek
19   Rose of Aptus Court Reporting located
20   at 600 West Broadway, Suite 300 in
21   San Diego, California.
22      Will counsel please identify
23   yourselves and state whom you
24   represent.
25      MR. WOOD:  Christopher Wood,
```

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 9

1    Robbins Geller on behalf of Plaintiff
2    and the class.
3         MS. RADCLIFFE:  Willow Radcliffe
4    on behalf of the plaintiff, Robbins
5    Geller.
6         MR. GLENNON:  Brian Glennon,
7    Latham & Watkins for Defendants and
8    the witness.
9         MR. MCGEE:  Trae McGee of Riley,
10   Warnock & Jacobson on behalf of the
11   defendants and the witness.
12        MR. GECKELER:  Bret Geckeler,
13   Latham & Watkins, on behalf of the
14   defendants and the witness.
15        THE VIDEOGRAPHER:  The court
16   reporter today is Jessie Waack, and
17   she may now swear in the witness.
18                * * * * *
19        L U C Y   A L L E N
20        called as a witness herein,
21        having been first duly sworn on
22        oath, was examined and testified
23        as follows:
24   ///
25   ///

Page 10

1                EXAMINATION
2    BY MR. WOOD:
3         Q.   Good morning, Ms. Allen.
4         A.   Good morning.
5         Q.   Did you bring some documents
6    with you today?
7         A.   Yes, I did.
8         Q.   And what did you bring?
9         A.   I brought a copy of my report in
10   this matter as well as a copy of
11   Dr. Feinstein's report in this matter.
12        Q.   Okay.  Why don't we just put
13   exhibit numbers on those so you can put
14   those away so we're all using the same
15   document.
16            (Whereupon, Exhibit 1 is marked
17            for identification.)
18   BY MR. WOOD:
19        Q.   So I'm passing you what's been
20   marked as Exhibit 1.  If you want to take
21   a look at that and confirm that that's a
22   copy of the record that you issued in this
23   action?
24        A.   Yes, it looks like it is.  One
25   difference between this one and the one

Page 11

1    that I brought with me has color to it.
2    So this is in black and white.
3         Q.   Well, if there is an instance
4    that you want to look at the color, you
5    can do that.
6            Then let's introduce one more
7    exhibit.
8            (Whereupon, Exhibit 2 is marked
9            for identification.)
10   BY MR. WOOD:
11        Q.   I'm passing you what's been
12   marked as Exhibit 2.  Ms. Allen, that's a
13   copy of Professor Feinstein's report.
14   I'll just note that he -- or we served a
15   corrected version of Exhibit 4 a few days
16   after his deposition.
17            And so this version of his
18   report includes the corrected version of
19   Exhibit 4.
20            Turning to your report, Exhibit
21   No. 1, do you have -- do you have any
22   edits or changes that you want to make to
23   your report?
24        A.   There were, in reviewing the
25   list of analyst reports which were

Page 12

1    attached to the end of my report, I
2    believe there were a couple typos.
3         Q.   Okay.
4         A.   So I believe we turned over all
5    of the analyst reports, and I think what
6    we turned over is a correct listing.  But
7    some of them have similar names, and I
8    think there were a couple -- a couple
9    typos there, but I don't recall them as I
10   sit here.  That's it.
11        Q.   And that's in Appendix B?
12        A.   Yes, that's correct.
13        Q.   Any other edits or changes to
14   your report?
15        A.   No, I don't believe so.
16        Q.   Thank you.  And you had an
17   opportunity, I assume, to review your
18   report again in preparation for this
19   deposition; is that right?
20        A.   Yes.
21        Q.   Okay.  What does the term "price
22   impact" mean?
23            MR. GLENNON:  Objection.  Vague.
24   BY MR. WOOD:
25        Q.   I'll ask a better question.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1        When you use the term "price
2   impact" in your report, what do you mean
3   by that?
4        A.    So I believe I have defined that
5   in my report, and I kind of believe I have
6   a cite to a Halliburton decision.
7           But as I'm using it in my
8   report, it's -- I mean, the particular
9   question that I am asked to analyze in my
10  report is price impact of the alleged
11  misrepresentations and whether the alleged
12  misrepresentations impacted the stock
13  price when made.
14       Q.    Okay.
15       A.    But price impact, in general,
16  could refer to things other than alleged
17  misrepresentations.  It could refer to,
18  you know, whether any particular event,
19  for example, impacts the stock price.
20       Q.    Other than just a statement?
21       A.    So in the assignment, one of the
22  assignments that I have been asked to do
23  in this case is analyze price impact of
24  the alleged misrepresentations.  The term
25  "price impact" can refer to more than just

1   alleged misrepresentations.
2           So, for example, in the
3   Halliburton decision, the Court has used
4   the term "price impact" not only to refer
5   to alleged misrepresentations but refer to
6   other information or events that might
7   impact the stock price.
8        Q.    Have you reached any conclusions
9   in this matter that aren't reflected in
10  your report?
11       A.    My report is meant to summarize
12  my conclusions in this matter, and it does
13  so.  As I sit here, I don't think of other
14  conclusions that are not summarized within
15  my report.
16       Q.    You say -- so I think you're on
17  paragraph 18 -- well, I don't know where
18  you are.  But if you want to --
19       A.    I just randomly opened to a
20  page.
21       Q.    Yeah.  If you want to turn to
22  paragraph 18 of your report which is on
23  page 8.
24       A.    Sure.
25       Q.    You say that "Price impact of an

1   alleged misrepresentation can be analyzed
2   in at least two ways."
3           The second of the two ways that
4   you list here is "indirectly by analyzing
5   the market reaction to a disclosure that
6   is corrective of an alleged
7   misrepresentation."
8           Do you see that?
9        A.    Yes.
10       Q.    And what do you mean by that?
11  Can you just explain it for us, please?
12       A.    So what I am saying in this
13  particular sentence is that, in general,
14  there are at least two ways that one can
15  analyze an alleged misrepresentation, and
16  the second way that you have asked me
17  about is by focusing on the market
18  reaction to a disclosure that is allegedly
19  corrective of the alleged
20  misrepresentation.
21       Q.    How do you determine if a
22  disclosure is corrective of an alleged
23  misrepresentation?  What method do you
24  employ?
25       A.    Well, so this -- what I am

1   describing here as a method is analyzing
2   the market reaction to a disclosure.  Oh,
3   I'm sorry.  Can you just repeat that?  I
4   think I misheard that question.
5        Q.    Sure.  You say here one way of
6   analyzing price impact is by looking
7   indirectly at the market reaction to a
8   disclosure that's corrective of an alleged
9   misrepresentation.
10          And my question is:  How do you
11  determine -- what method do you use to
12  determine whether a disclosure is
13  corrective of an alleged
14  misrepresentation?
15       A.    I think there are a number of
16  ways one can analyze whether a disclosure
17  is corrective of an alleged
18  misrepresentation.
19          One of the things that I have
20  done in this matter is analyze the
21  corrective disclosures or analyze the
22  disclosure the plaintiffs have claimed are
23  corrective of the alleged
24  misrepresentation.
25       Q.    But what have you done, right?

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1   You can't -- you say you analyzed the
2   disclosures that Plaintiffs have claimed
3   are corrective.
4          But how do you determine if
5   something is corrective or not?  What is
6   the process that you use?
7       A.   So --
8          MR. GLENNON:  Objection.  Asked
9       and answered.
10         THE WITNESS:  So I think that
11      mischaracterizes what I just testified
12      to.
13         One of the things that I have
14      done in this matter is analyze the
15      disclosures that Plaintiffs claim are
16      allegedly corrective.
17         So in your question -- one
18      question is how do you determine
19      whether disclosures are corrective.
20      Another question -- another issue is
21      analyze the ones that Plaintiffs claim
22      are allegedly corrective.
23  BY MR. WOOD:
24      Q.   Have you made a determination
25  that the disclosures that Plaintiffs claim

1   are corrective in this case are not, in
2   fact, corrective?
3       A.   That's not particularly what I
4   have been asked to do, and that is not my
5   particular assignment in the course of the
6   work that I have been doing that may help
7   to answer those questions.
8          That's not particularly what my
9       assignment -- I've been focusing on price
10      impact; not whether -- not the question of
11      whether disclosures are or are not
12      corrective.
13         But I think some of the work
14      that I have done in this context may help
15      in answering that question.
16      Q.   Just to be clear, have you made
17  a conclusion -- well, let me start over.
18         Do you have an opinion as to
19  whether or not the disclosures alleged in
20  Plaintiffs' complaint are corrective?
21         MR. GLENNON:  Objection.  Asked
22      and answered.
23         THE WITNESS:  I haven't been
24      particularly asked to analyze that
25      question.  I think that some of the

1   analysis and conclusions that I have
2   in my report regarding price impact
3   may speak to that question or may
4   respond to that question, but that's
5   not a particular question that I have
6   been asked to look to.
7          So, for example, Plaintiffs'
8   claim in this case or part of their
9   claim in this case is that there were
10  alleged misrepresentations regarding
11  the quality and cost effectiveness of
12  the company's BOP-related facilities.
13         And there are disclosures,
14  public disclosures in the market of
15  the very types of information that
16  Plaintiffs claim were allegedly
17  misrepresented or not known by the
18  market.
19         And Plaintiffs have not claimed
20  those specific announcements regarding
21  those events as corrective
22  disclosures, and yet as -- as
23  Plaintiffs have alleged as their
24  allegations of the alleged
25  misrepresentations, they're claiming

1   that information itself is corrective,
2   and so those announcements of those
3   events by the logic of Plaintiffs'
4   allegations would be corrective
5   events.
6          And I have identified some of
7   those events and shown that a number
8   of those events, there's no price
9   reaction to those events.
10         So I think that's information in
11  my report that I think could speak to
12  the question of whether certain events
13  are corrective of the alleged
14  misrepresentations.  But that
15  particular question isn't something
16  that I have been asked or focused on.
17         But I think that one could use
18  the information that is in my report
19  and come to conclusions about that.
20  BY MR. WOOD:
21      Q.   Fair enough.  But you haven't
22  actually come to any conclusions about
23  that yet; is that right?
24         MR. GLENNON:  Objection.  Asked
25      and answered.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1       THE WITNESS: I think that there
2   is information in my report that could
3   speak to those conclusions. That's
4   not the particular assignment that
5   I've been asked.
6       And I think there may be overlap
7   and there could be information in my
8   report that could be used in that way
9   and would be consistent with that.
10      That's not -- my particular
11  assignment regarding the alleged
12  misrepresentations in this case was to
13  analyze price impact.
14  BY MR. WOOD:
15    Q.   Sure. So I understand that it
16  wasn't your assignment to make conclusions
17  about whether a disclosure was corrective.
18      And if you can't give me a yes
19  or no answer, then that's fine. But I
20  just want to be clear that you haven't
21  reached any conclusions about whether any
22  disclosures were corrective in this case?
23      MR. GLENNON: Objection. Vague.
24   And asked and answered.
25      THE WITNESS: I think that my

1   report and my analysis in my report
2   may speak to that. And there may be
3   answers in that.
4       That's not the particular
5   assignment that I would ask to -- to
6   do, but I think there may be those --
7   there may -- I think my report and my
8   analysis may address those questions
9   or could be used to address those
10   questions. That was not the
11   particular assignment that I was asked
12   to do.
13  BY MR. WOOD:
14    Q.   Okay. Well, I'm not going to
15  ask the same question six times. I think
16  I understand your answer.
17      Have you ever -- well, in this
18  case have you been asked to analyze loss
19  causation?
20    A.   I have not, no.
21    Q.   Have you ever been asked to
22  analyze loss causation in the context of a
23  securities class action?
24    A.   Yes, I have.
25    Q.   Do you have an understanding of

1   what the term "loss causation" means?
2     A.   In the context of a securities
3   class action, I do have some understanding
4   of loss causation.
5       And my understanding is that
6   it's an analysis of whether alleged
7   misrepresentation proximately or caused a
8   loss to Plaintiffs in a securities class
9   action.
10    Q.   Do you have an understanding
11  between the difference between loss
12  causation and price impact?
13      MR. GLENNON: Object to the
14   extent it calls for a legal opinion.
15      THE WITNESS: It's my
16   understanding that that is a legal
17   question. I have some understanding
18   of differences, yes.
19  BY MR. WOOD:
20    Q.   What is that understanding?
21      MR. GLENNON: Objection. Vague.
22   Same objection. Calls for a legal
23   conclusion.
24      THE WITNESS: It's my
25   understanding that the terms are legal

1   terms, and as they're being used, they
2   have legal meanings in a securities
3   class action.
4       And I'm not a lawyer, but as
5   I've just said, loss causation, as I
6   understand it, is an analysis of
7   whether alleged misrepresentations
8   caused or resulted in a loss to
9   alleged Plaintiffs -- or to
10   Plaintiffs, not alleged Plaintiffs --
11   to Plaintiffs in a matter, and price
12   impact -- in the analysis of price
13   impact.
14      In a securities class action --
15   or analysis of price impact in a
16   securities class action is whether the
17   alleged misrepresentations impacted
18   the price when made.
19      So those are just different
20   questions. One is whether the alleged
21   misrepresentations caused a loss to
22   Plaintiffs. The other is whether the
23   alleged misrepresentation or other
24   information impacted the stock price.
25   ///

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 25

1   BY MR. WOOD:
2      Q.    But one way to show whether or
3   not the misrepresentation impacted the
4   stock price according to paragraph 18 of
5   your report, right? is indirectly by
6   analyzing the market reaction to the
7   disclosure?
8          MR. GLENNON:  Objection.  The
9      report -- sorry.  The report speaks
10     for itself.
11  BY MR. WOOD:
12     Q.    How is that -- so my question
13  is:  How is -- the second way that you
14  discuss analyzing price impact in
15  paragraph 18, how is that different from
16  your understanding as an economist of loss
17  causation?
18     A.    I don't see that those are -- we
19  just described -- I just described or
20  testified to what my understanding of the
21  legal question of loss causation which is
22  whether the alleged misrepresentations
23  proximately caused a loss to Plaintiffs.
24         That's a different question than
25  whether a misrepresentation is affecting a

Page 26

1   stock price.  One is about a loss to
2   Plaintiffs, whether another is -- another
3   is about whether information affects a
4   stock price.  I think those are different
5   questions.
6      Q.    Okay.  If a case involves purely
7   omissions instead of misstatements, how do
8   you analyze price impact from an omission?
9          MR. GLENNON:  Objection.
10     Incomplete hypothetical.  Vague.  And
11     calls for a legal conclusion.
12         THE WITNESS:  I think there can
13     be different ways of analyzing price
14     impact.
15  BY MR. WOOD:
16     Q.    Okay.  Let me ask a better
17  question.
18     A.    Sure.
19     Q.    Have you ever analyzed whether
20  there is price impact in a case involving
21  omissions?
22         MR. GLENNON:  Objection.  Vague.
23         THE WITNESS:  I would think so.
24     But as I sit here, I don't have a
25     specific case in mind.

Page 27

1   BY MR. WOOD:
2      Q.    Can you tell me how you -- what
3   analysis you would undertake to analyze
4   price impact in a case involving
5   omissions?
6          MR. GLENNON:  Same objection.
7          THE WITNESS:  Well, I don't have
8      a specific case.  If you gave me a
9      specific case, I could describe to you
10     what I did.
11         Or if you give me a -- it would
12     be case specific.  I don't have an
13     example in mind.
14  BY MR. WOOD:
15     Q.    So you can't tell me how you
16  would analyze price impact in a case
17  involving omissions just generally?
18         MR. GLENNON:  Objection.
19     Mischaracterizes the testimony.
20         THE WITNESS:  Well, I would
21     describe -- I think the methodology
22     that I am overall describing in terms
23     of price impact in my report is a
24     methodology that I think can be
25     applied generally in a lot of

Page 28

1      different situations.
2          So I think as I've discussed the
3      general methodology here, I think that
4      can be applied in -- in a securities
5      class action in general.
6   BY MR. WOOD:
7      Q.    Including one involving
8   omissions?
9          MR. GLENNON:  Objection.  Vague.
10     And calls for a legal conclusion.
11         THE WITNESS:  Yes, I believe
12     that's correct.
13         I will say when you say a case
14     involving omissions, I'm not sure
15     precisely what you -- I'm not sure
16     what you mean by that, so it's my
17     understanding that there are -- yeah,
18     I guess I'm not sure what you mean by
19     "omissions" in that -- in that --
20  BY MR. WOOD:
21     Q.    Okay.
22     A.    -- case.
23     Q.    Sure.  Do you believe that in
24  order to show that a statement had price
25  impact, you have to show that the price

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 29
Page 30

1  moved when the statement was made?
2      A.    No.
3      Q.    So you can have a statement that
4  was made, you can have price impact, but
5  the stock price doesn't move at all; is
6  that fair?
7      A.    Yes, I believe that's possible.
8      Q.    If a statement does move a stock
9  price but by an amount that is not
10  statistically significant, does that
11  mean -- does that prove that the statement
12  didn't have price impact?
13     A.    So your question is if the
14  statement itself affects the stock price
15  but in a manner that is not
16  distinguishable from zero and is not
17  material?
18     Q.    Well, no, my question is -- I
19  used the word "statistic" -- so let me
20  back up.  Do you have an understanding
21  what the term "statistically significant"
22  means?
23     A.    I have an understanding what
24  statistically significant, in general,
25  means.  I think how exactly you're meaning

1  it in the context of what you're talking
2  about is -- makes a difference to the
3  question.
4      Q.    Sure.  That's fair.
5          So you use the term in your
6  report, right?
7      A.    I did use the term in my report.
8      Q.    And what did you mean by
9  "statistical significance" as you used it
10  in your report?
11     A.    I believe, as I have defined it
12  in my report, and I said statistically
13  significant -- so I am trying to think
14  where I have done that.
15          So I have some results of a
16  study analysis and given the -- the event
17  study in my report, I believe I'm using
18  both -- in various places in my report I'm
19  using the result of an event study that I
20  conducted as well as the results of an
21  event study that Dr. Feinstein conducted.
22          And I am in a number of
23  instances finding that the announcements
24  on a particular day, the price movement
25  according to the event study, either my

1  event study or Dr. Feinstein's event
2  study, the price impact is not
3  statistically significant at the 5 percent
4  level.
5      Q.    So if I use the term
6  "statistical significance" today, I'm
7  talking about it in the same way that
8  you're talking about it in your report; is
9  that fair?
10     A.    You're saying according to
11  Dr. Feinstein's event study, a price
12  movement is not statistically significant?
13  That's what I mean.  Is that what you mean
14  then?
15     Q.    Well, I'm just talking about the
16  term "statistical significance," period,
17  so if we want to say the 5 percent level.
18          But I want to make sure you
19  understand the term so we're on the same
20  page.  And I'm happy to use it in the same
21  manner as you understand it and use it in
22  your report; is that fair?
23     A.    Well, you said you're going to
24  use it the same way that I'm using it.
25  And so I just described that one of the

1  ways that I'm using it in my report is
2  saying that according to Dr. Feinstein's
3  event study, the price movement on the
4  date of the alleged misrepresentation, for
5  example, there was no statically
6  significant price movement according to
7  Dr. Feinstein's event study.
8      Q.    Great.  So if a statement moves
9  a stock price but in an amount that is not
10  statistically significant, does that prove
11  that the statement had no price impact?
12     A.    I think it's evidence that it
13  did not impact the stock price.  So what
14  Plaintiffs and their experts do as
15  described by the court in Halliburton II
16  is that they do -- to show market
17  efficiency, they do an event study and
18  show that there is price impact and that
19  the stock reacts to information by showing
20  that there's a statistically significant
21  reaction.
22          And if the converse is true,
23  that there is, for example, an alleged
24  misrepresentation and there is no
25  statistically significant reaction, then

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  that is evidence that there is no price
2  impact.  That is, as I understand, what
3  the -- how the Supreme Court described it.
4      Q.    If you turn to page 14 of your
5  report, you say that "Plaintiff claims
6  that CoreCivic made alleged
7  misrepresentations that purportedly
8  impacted and inflated the stock price on
9  33 separate dates.  Alleged
10  misrepresentations claimed in the
11  complaint are listed in Appendix C."
12          Do you see that?
13  A.    Yes.
14          (Whereupon, Exhibit 3 is marked
15          for identification.)
16  BY MR. WOOD:
17      Q.    I'm going to pass you what's
18  been marked as Exhibit 3.  This is a copy
19  of the Court's order in this case denying
20  Defendant's motion to dismiss.
21          And this is a document that you
22  list as a document that you considered in
23  drafting your report; is that correct?
24  A.    Correct.
25      Q.    And did you personally read the

1  Court's order?
2  A.    I did.
3      Q.    Why don't you turn to page 18 of
4  the Court's order.  Now, page 18 has a
5  section in bold in italics claims about
6  client relationships and contract
7  renewals.  That's a -- that's a subsection
8  you'll see of a section that the Court
9  starts on page 14 called allegedly
10  actionable statements.
11          Are you with me?
12  A.    Yes.
13      Q.    Okay.  So the bottom of page 18.
14  The Court is talking here, as the heading
15  shows, about claims about client
16  relationships and contract renewals.
17          Bottom of page 18, the Court
18  says, "On March 30, 2016, Hininger wrote
19  in his annual letter to shareholders every
20  day we remain focused on providing high
21  quality, safe and secure facilities that
22  meet the needs of our government partners.
23          "By consistently doing so, we've
24  experienced more than three decades of
25  continued growth and contract retention

1  rates in excess of 90 percent.
2  Paragraph 35.
3          "The letter boasted the
4  CoreCivic's strong record of operational
5  excellence had earned CoreCivic the
6  confidence of our government partners."
7          Do you see that?
8  A.    Yes.
9      Q.    That's one of the statements
10  that you analyzed in your report?
11  A.    The alleged misrepresentation --
12  the alleged misrepresentations are listed,
13  as you say, in Appendix C.  March 30,
14  2016.
15          I don't particularly see that as
16  a misrepresentation date in my alleged
17  misrepresentation, so.
18      Q.    So not one you looked at, huh?
19      MR. GLENNON:  Objection.
20  Mischaracterizes the testimony.
21          THE WITNESS:  No.  So the -- I
22  don't believe the statement on that
23  day is listed as an alleged
24  misrepresentation statement in the
25  complaint, so I tried to be very

1  careful and go through the complaint
2  and pick every date that were alleged
3  as misrepresentations.
4          And -- and there were, you know,
5  33 separate dates, and I have a chart
6  on page 8 of my report that lists each
7  of those 33 separate dates, and then I
8  have it as an appendix to my report.
9  I have the statements.
10          And as I recall the way the
11  complaint lists the alleged
12  misrepresentations was a bit -- the
13  complaint would say this -- this
14  statement, you know, was made and was
15  allegedly or -- misleading and it was
16  made on this date and they would quote
17  it, then they would say, A similar
18  statement was made on, and list a
19  whole bunch of other dates.
20          So that's sort of my
21  recollection of how -- it wasn't laid
22  out -- in my mind, it wasn't laid out
23  as -- it wasn't laid out by date,
24  which is the alleged misrepresentation
25  that is -- that the company made on

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1     each particular day.
2           It was sort of organized in a
3     way that required you to find each of
4     the dates.  So what I tried to do is
5     do it by date.
6           That's how I have laid out the
7     alleged misrepresentations in the
8     complaint in a slightly different --
9     but I -- if I don't have it as a date,
10    then the way I read the complaint, it
11    wasn't listed as a date of an alleged
12    misrepresentation.
13          My intention was to try to take
14    every single day that's an alleged
15    misrepresentation.  And as I sit here,
16    I don't -- I cannot recite each of the
17    dates.  All I can do is look back on
18    my report.
19          So I don't see that particular
20    date, I don't believe, as a date of an
21    alleged misrepresentation.
22    BY MR. WOOD:
23    Q.    Okay.  But you acknowledge that
24    the discussion that we just read on
25    page 18 and 19 in the Court's order is

1     under the section in the Court's order
2     labeled "Allegedly Actionable Statements,"
3     right?
4           MR. GLENNON:  Objection.
5     Document speaks for itself.
6           (Pause in testimony.)
7           THE WITNESS:  I'd agree that
8     there are pages under that.
9           But the sentences you read are
10    within a heading that's entitled -- it
11    goes on for pages, but under a heading
12    entitled "Allegedly Actionable
13    Statements."
14          I don't know that -- it's not a
15    list of allegedly actionable
16    statements.  It's paragraphs and
17    paragraphs and pages, and what you
18    have read is under that heading.  I
19    would agree with that, yes.
20    BY MR. WOOD:
21    Q.    Why didn't you include the
22    March 30, 2016, statement that's mentioned
23    by the Court on page 18 and 19 in your
24    report?
25          MR. GLENNON:  Objection.  Asked

1     and answered.
2           THE WITNESS:  I don't know if
3     those words are similar somewhere
4     else.  I think if you show me the
5     complaint, I can -- and where that is
6     in the complaint.
7           So I have tried to include and
8     -- every date that Plaintiffs allege
9     as a misrepresentation.  I don't, as
10    we sit here, see the particular date
11    that is referenced there.
12          So I would like to see where
13    that is referenced in the complaint.
14    I looked to the complaint.  My list of
15    the dates of the alleged
16    misrepresentations come from the
17    complaint.
18          And I have tried to be quite
19    careful with citing where did I get
20    that from and where is that from the
21    complaint.
22          And as I said, the complaint is
23    not organized in a way that says, Here
24    is every date, and here are the
25    alleged misstatements on every date.

1           So it took a little bit of work
2     to do this, and I -- as I sit here, I
3     don't -- I'm not -- I don't believe I
4     have left out the dates of an alleged
5     misrepresentation.
6     BY MR. WOOD:
7     Q.    Why did you read the Court's
8     order on the motion to dismiss?
9     A.    It was one of the materials I
10    considered.
11    Q.    Did it --
12    A.    I got the alleged
13    misrepresentations as I have analyzed them
14    from the complaint.
15    Q.    So you didn't look at the
16    Court's order to assist you in determining
17    what the alleged misrepresentations were?
18          MR. GLENNON:  Objection.
19    Mischaracterizes the testimony.
20          THE WITNESS:  Not to determine
21    what were the individual dates of each
22    alleged misrepresentation, no.
23          I went through the complaint and
24    tried to systematically go through the
25    complaint and pick every single date.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    And as I said, the complaint is
2  not organized in a way that makes that
3  particularly easy.  I don't think
4  the -- as I'm looking at this now, it
5  doesn't appear that the judge's
6  decision does not -- itself does not
7  appear to have a list of alleged -- it
8  doesn't list the statements and have
9  the dates.  It has pages and
10  paragraphs.
11    It also doesn't appear to have
12  an easy list of what are the alleged
13  misrepresentations and what dates did
14  those happen.
15  BY MR. WOOD:
16    Q.    Did reading the Court's order
17  impact your analysis at all?
18    MR. GLENNON:  Objection.  Vague.
19    THE WITNESS:  Not particularly.
20  I think that my assignment was to
21  analyze price impact as alleged based
22  on the misrepresentations as alleged
23  by Plaintiffs and assuming market
24  efficiency as concluded by Plaintiffs'
25  expert.

1    So I'm basing my analysis on
2  Plaintiffs' allegations as described
3  in their complaint and their analysis
4  of market efficiency as done by
5  their -- by their expert.
6    So I don't think this had a
7  particular effect on the analysis, no.
8  BY MR. WOOD:
9    Q.    Why don't you turn to page 25 of
10  the Court's order.
11    A.    Okay.
12    Q.    Bottom of page 24, there's a
13  section underlined that says "falsity."
14    Do you see that?
15    A.    Yes.
16    Q.    And the Court says, "Although
17  CoreCivic's alleged false statements are
18  numerous, they are offered by Amalgamated
19  in service of a single central theory of
20  liability that CoreCivic and its
21  executives falsely touted its services as
22  offering cost savings to governments while
23  delivering an acceptable level of quality
24  defined in some instances in relation to
25  compliance with particular standards such

1  that CoreCivic was an attractive option
2  for continued and future government
3  contracts."
4    Do you see that?
5    A.    I do.  I just -- I don't think
6  you quite read it right, but I think
7  you -- it's "allegedly false statements."
8    Q.    Okay.  Thank you.
9    And is that consistent with your
10  understanding of Plaintiffs' complaint?
11    MR. GLENNON:  Objection.  Vague.
12    THE WITNESS:  Oh, I don't know.
13  I don't have a particular opinion as I
14  sit here.  I focused on what the
15  complaint alleged.  Yeah, I don't
16  really have an answer to that as I sit
17  here.
18  BY MR. WOOD:
19    Q.    Okay.  You say in -- if you want
20  to turn back to your report in
21  paragraph 23, you say that you assumed --
22  well, let's just find your words so I'm
23  not paraphrasing here.
24    You state, "I have been asked to
25  assume Plaintiffs' claim of market

1  efficiency including adopting the event
2  study methodology put forward by
3  Dr. Feinstein."
4    Do you see that?
5    A.    Yes.
6    Q.    And so -- well, do you have an
7  opinion on whether or not the market for
8  CCA stock was efficient during the class
9  period?
10    A.    I was not asked to analyze that
11  question, and I have not analyzed that
12  question.
13    Q.    Okay.  So having not analyzed
14  it, you don't have an opinion on it; is
15  that fair?
16    A.    I don't have a finding about
17  that.  "Opinion" sounds like I could have,
18  you know, views or guesses.  I don't think
19  that's what you want.
20    Q.    No, no, no.
21    A.    You don't have a -- I have not
22  done an analysis of that, and I have no
23  conclusion about the market efficiency of
24  the stock.  I have been asked to assume
25  that.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    Q.    Okay.  Did you do any analysis
2 to determine whether or not the market for
3 CCA stock was sufficient during the class
4 period?
5        MR. GLENNON:  Objection.  Asked
6    and answered.
7        THE WITNESS:  I did not.
8 BY MR. WOOD:
9    Q.    Okay.  Dr. Feinstein found -- if
10 you turn to his reports, Exhibit 2, and if
11 you go to the Exhibit 4, which is near the
12 end of -- his Exhibit 4 to Exhibit 2 which
13 is near the end of the document, he has a
14 table of CCA stock prices, dividend and
15 returns.
16        And on the last page of that,
17 the last entry is for August 18, 2016, and
18 he shows a logarithmic return of negative
19 43.78 percent.
20        Do you see that?
21    A.    Yes.
22    Q.    So you don't have any reason to
23 dispute CCA's stock price -- this entry
24 here showing a return of negative
25 43.78 percent on August 18 is accurate,

1 right?
2        MR. GLENNON:  Objection.
3    Mischaracterizes the testimony.  Asked
4    and answered.
5        THE WITNESS:  I don't have any
6    particular reason to dispute that, no.
7 BY MR. WOOD:
8    Q.    Okay.  Do you believe that
9 the -- CCA stock price on August 18, 2016,
10 is statistically significant?
11        MR. GLENNON:  Objection.  Asked
12    and answered.
13        THE WITNESS:  Well, let me just
14    go back and say that I'm not sure what
15    a logarithmic return is with a percent
16    sign after that.
17        So typically if it's in
18    logarithms, you wouldn't have a
19    percent sign.  Percent has a
20    particular meaning, so I'm not -- I
21    think that's -- I'm not sure that's an
22    appropriate thing to do, so you would
23    either show a percent or you would
24    show it in logarithms.
25        But that's -- that's just a --

1    so I think that's a confusing way of
2    presenting a result.
3 BY MR. WOOD:
4    Q.    Okay.  Can you answer my
5 question, please?
6        Do you believe that CCA stock
7 price declined on August 18, 2016, do you
8 believe that decline is statistically
9 significant?
10        MR. GLENNON:  Objection.  Asked
11    and answered.
12        THE WITNESS:  According to
13    Dr. Feinstein's event study model, I
14    believe that the -- I believe that he
15    found that it was statistically
16    significant.
17 BY MR. WOOD:
18    Q.    Do you have any reason to
19 dispute his finding?
20        MR. GLENNON:  Objection.  Asked
21    and answered.
22        THE WITNESS:  Do I have reason
23    to dispute his event study model?  I
24    think there may be some issues with
25    his event study model.

1        I think the controlling -- if
2    one were to control for industry and
3    market movements, I think that the
4    return, the stock price return on that
5    date is statistically significant
6    controlling for industry and market
7    movements as I have done with the
8    event study model that I used.
9 BY MR. WOOD:
10    Q.    Do you have an opinion about
11 what caused CCA's stock price to decline
12 on August 18, 2016?
13        MR. GLENNON:  Objection.  Vague.
14    Calls for a legal conclusion.
15        THE WITNESS:  I think, as I say
16    in my report, one of the reasons the
17    stock price declines is increase in
18    uncertainty about the future.
19        That there was -- there was fear
20    of a policy shift from the government,
21    and there was uncertainty about the
22    future and what that might apply to in
23    terms in course of its business.
24 BY MR. WOOD:
25    Q.    Was there new information

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

1  released to the market on August 18, 2016?
2  MR. GLENNON: Objection. Vague.
3  THE WITNESS: Sure. There is
4  new information released to the market
5  on almost every day. And there was
6  surely new information released on
7  that day.
8  BY MR. WOOD:
9  Q. What was the new information
10  released to the market on August 18, 2016,
11  regarding CCA?
12  MR. GLENNON: Objection. Vague.
13  THE WITNESS: One piece of
14  information that was released that --
15  that as I describe in my report caused
16  uncertainty in the market was the
17  Yates memo, which Plaintiffs is
18  alleging is a corrective disclosure in
19  this matter.
20  BY MR. WOOD:
21  Q. Aside from the Yates memo, did
22  you find any other information -- any
23  other new information released to the
24  market regarding CCA on August 18, 2016?
25  MR. GLENNON: Objection.

1  Assumes facts. Mischaracterizes the
2  testimony.
3  THE WITNESS: I don't recall
4  specifically finding additional
5  information that -- that the analysts
6  or the -- the company were focusing on,
7  on that particular day.
8  BY MR. WOOD:
9  Q. Did you find any -- any new
10  information at all, aside from whatever it
11  was the analysts were focusing on?
12  MR. GLENNON: Objection. Vague.
13  Assumes factors.
14  THE WITNESS: I don't -- let me
15  look and see if I --
16  BY MR. WOOD:
17  Q. Sure.
18  A. -- if I say anything about that.
19  (Pause in testimony.)
20  THE WITNESS: I recall there was
21  a conference call that I believe the
22  company had. I just don't recall what
23  date that was on. That's what I was
24  looking for.
25  ///

1  BY MR. WOOD:
2  Q. I believe it's listed in your
3  appendix on the 19th under "conference
4  calls."
5  A. Thank you.
6  That's all I recall mentioning
7  in my report.
8  Q. Okay.
9  MR. WOOD: Why don't we take a
10  break.
11  THE VIDEOGRAPHER: The time is
12  10:35 a.m. We are going off the
13  record.
14  (Whereupon, a recess in the
15  proceedings was taken at
16  10:34 a.m.)
17  THE VIDEOGRAPHER: The time is
18  10:53 a.m. We are going back on the
19  record.
20  BY MR. WOOD:
21  Q. Could you turn to page 43 of
22  your report, please. In paragraph 68 in
23  your report in the middle, you say,
24  "Analyst commentary shows that the Yates
25  memo was considered by the market to

1  signal a shift in the policy driven by
2  politics which created uncertainty around
3  CoreCivic's government contracts."
4  Do you see that?
5  A. Yes, I do now.
6  Q. Is it your conclusion then that
7  the stock price drop in CCA stock on
8  August 18, 2016, was driven by politics?
9  MR. GLENNON: Objection.
10  Foundation.
11  THE WITNESS: I don't think
12  that's an accurate characterization of
13  the sentence that you just read. I
14  would agree with the sentence that's
15  in my report.
16  BY MR. WOOD:
17  Q. Okay. Well, what caused the
18  stock price to drop -- CCA stock price to
19  drop on August 18, 2016?
20  MR. GLENNON: Same objection.
21  THE WITNESS: My analysis in
22  this case is on price impact and
23  whether the alleged misrepresentations
24  impacted the price.
25  One of the things that I have

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1     done is to analyze the alleged
2     corrective disclosures, which is the
3     date that we were just discussing when
4     the Yates memo is released to the
5     market.
6          And one of the things that I say
7     here and that I have analyzed is that
8     the Yates memo didn't change the
9     market's perception about the quality
10    or cost effectiveness of CoreCivic's
11    facilities.
12         I also say in my report that --
13    that the -- that the analyst
14    considered -- the analyst following
15    the company considered the Yates memo
16    to signal a potential policy shift.
17    And there was concern and uncertainty
18    about that.
19    BY MR. WOOD:
20    Q.    Now, does that mean that the
21    stock price decline on that date was
22    caused by this potential policy shift that
23    you just testified about?
24    A.    It means that there was no price
25    reaction due to the alleged

1     misrepresentations in this matter that I
2     have found, that there's no price reaction
3     due to the market learning something
4     different about the quality or cost
5     effectiveness of CoreCivic's facilities.
6          But that's what I've been
7     analyzing, and I have found that there's
8     no indication and no evidence that there's
9     any reaction to the market learning
10    something new about the quality or cost
11    effectiveness of CoreCivic's facilities
12    which are issues related to the alleged
13    misrepresentations.
14    Q.    And in doing that analysis, you
15    looked at what analysts were saying on or
16    around that day, right?
17    A.    Right.  I looked at what they
18    were saying, and I looked to see
19    whether -- were they saying, Oh, now we
20    found out something new about the actual
21    quality or the cost effectiveness of
22    the -- of the company and its facilities.
23         And I found that they did not
24    say that, but that -- but, rather, I find
25    that they say that there is increased

1     uncertainty about the future.  They're not
2     learning something about the past.
3     They're not learning about the past
4     quality or cost effectiveness.
5          They're learning something about
6     potential future and potential policy
7     changes in the future and uncertainty
8     about the future.
9     Q.    Did you look to see what folks
10    in the news media were saying about the
11    Yates memo?
12    A.    I did look at news -- in
13    general, I looked at news stories about
14    CoreCivic throughout the alleged class
15    period.
16         And I believe I have turned over
17    what news information I have.  News
18    stories from Factiva, I think mostly was
19    where I obtained most of the news stories
20    which is a news aggregator.
21    Q.    Does it matter in your analysis
22    what analysts -- or how analysts
23    interpreted the Yates memo?
24         MR. GLENNON:  Objection.  Vague.
25         THE WITNESS:  I'm not sure how

1     to answer that.  What do you mean,
2     does it matter how they interpreted
3     it?
4     BY MR. WOOD:
5     Q.    Well, is it -- I believe, and
6     you can tell me if I'm wrong, I believe
7     your testimony was that according to the
8     analysts, there was no new news about
9     quality or cost related to CCA on
10    August 18; is that fair?
11         MR. GLENNON:  Objection.
12    Mischaracterizes the testimony.
13         THE WITNESS:  I think what I say
14    is that it didn't tell them anything
15    differently about the prior cost
16    effectiveness or quality of
17    CoreCivic's business.
18         It told them that there was --
19    they became more uncertain about the
20    future and considered that there was a
21    policy shift away from private
22    prisons.
23    BY MR. WOOD:
24    Q.    And what do you mean by a policy
25    shift?

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    A.    A change in the policy -- a
2  potential change of the policy of the
3  government and --
4    Q.    And what -- I'm sorry.
5    A.    Yeah.  Away from private
6  prisons.
7    Q.    So the government had -- was now
8  going to move away from using private
9  prisons?
10    A.    That was a potential fear.  So
11  what the Yates memo said is that in terms
12  of BOP contracts, that ones that were up
13  for renewal -- as contracts were up for
14  renewal, they would be -- would not renew
15  with private prisons as the contracts call
16  up for renewal.
17        The fear and what was discussed
18  by the analysts was that -- was that
19  the -- the signal of the policy shift in
20  general and that it might apply to more
21  than just the BOP contracts.
22    Q.    Do you know if CCA considered
23  this to be a policy shift?
24    A.    CoreCivic the company?
25    Q.    Yes.

1    A.    If you're referring to
2  internal -- I don't -- I've reviewed the
3  information that I have reviewed and that
4  I have listed in my materials considered.
5  I haven't reviewed any, you know, internal
6  documents.  Or all of the information that
7  I've reviewed is public information.
8    Q.    Sure.  So my question is --
9    A.    So if it's in -- for example,
10  there's a conference call as I mentioned
11  earlier, and the company responds to
12  questions from the analysts.
13        And as I recall, the questions
14  from the analysts are about, you know,
15  which contracts could this apply to?
16  Would this apply to other -- other parts
17  of your business?
18        And, you know, where might
19  this -- my recollection is that it was
20  being discussed as a -- as a policy shift.
21  I don't recall the company saying, you
22  know -- other than responding to those
23  questions and saying -- I don't recall
24  them saying one way or another what they
25  thought.

1    Q.    Is it relevant to your analysis
2  what the company -- whether the company
3  thought this was a policy shift or not?
4    A.    I guess what the company really
5  thought, I don't know.  I have reviewed
6  publicly available information.  I'm not
7  sure if there was nonpublic information
8  and there were opinions of the company
9  that weren't public.
10    Q.    Let me ask a better question.
11    A.    I -- I'm still answering that
12  question.
13    Q.    Sure.
14    A.    I -- I -- I suppose in some --
15  there could be some hypothetical situation
16  where something like that may be relevant.
17  I don't particularly see that situation as
18  I sit here.
19        What I have done is my analysis
20  is almost -- I think is -- has been
21  exclusively on publicly available
22  information and what is the public
23  understanding and whether the alleged
24  misrepresentation which are public
25  statements, whether they impacted the

1  stock price.
2    Q.    Is it relevant what the company
3  publicly said about what it thought about
4  the announcement?
5    A.    Yes, I think that can be
6  relevant.  And I have reviewed what the
7  company publicly said.
8    Q.    Okay.
9        (Whereupon, Exhibit 4 is marked
10        for identification.)
11  BY MR. WOOD:
12    Q.    I'm going to pass you what's
13  been marked as Exhibit 4.  We touched on
14  this for a second before the break.  I
15  believe this is the conference call that
16  you refer to on August 19 that the company
17  held to discuss the DOJ's memo.
18        And this is referenced in
19  your -- this part is a question, but this
20  is referenced in your Appendix B, I
21  believe, on -- if you look at page 89 on
22  the ECF numbering, ECF 89 of 117 is
23  probably the easiest way to find it.
24  Item 24, I believe on that page.
25    A.    Where do you see any -- I'm

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

Page 61

1  sorry.  Wrong document.  Yes.
2      Q.    You see it says Item 24, right?
3      A.    Yes.
4      Q.    So this is a document that you
5  considered in preparing your report; is
6  that correct?
7      A.    Correct.
8      Q.    Okay.  Did you read this
9  transcript?
10      A.    In part.  I don't recall if I
11  read the whole thing.
12      Q.    Okay.  Why don't you -- well,
13  I'm going to focus on some language, and,
14  you know, if you need to read more, you
15  certainly can.
16          On the top of page 4 of this
17  transcript --
18      A.    Where do I see the numbers?
19      Q.    They're very light on the bottom
20  of the pages.
21      A.    Okay.
22      Q.    The page begins with, "Again,
23  let me just say."
24      A.    Okay.  Got it.
25      Q.    You do want to read that first

1  paragraph that begins with, "Again, let me
2  just say," and let me know when you're
3  finished?
4      A.    Okay.
5          (Pause in testimony.)
6      THE WITNESS:  Okay.
7  BY MR. WOOD:
8      Q.    And you see that this -- the
9  individual speaking according to the
10  transcript is Mr. Hininger, who is the CEO
11  and one of the defendants, right?
12      A.    Correct.  He's the CEO.  I
13  believe he's one of the defendants.
14      Q.    I believe he is too.  So he says
15  at the end of this paragraph that you just
16  read, "So really not a change of practice
17  as we see it with this directive."
18          How did that statement impact
19  your view of the Yates memo in your
20  report?
21      MR. GLENNON:  Objection.
22  Foundation.
23          THE WITNESS:  So I believe what
24  he is saying.  If you look at the
25  prior paragraph, he says there was

1      some confusion in the media reports
2      that somehow this was a directive or
3      an executive order that was going to
4      prohibit us to operate facilities at
5      federal, state and local level, and
6      that is clearly not the case.
7          So I think what he is saying in
8      this next paragraph is -- is just
9      further to that; that it is not the
10      case that this is a directive or order
11      that is going to prohibit them and
12      that they're going to be able to
13      operate in the way that they have been
14      able to operate.
15  BY MR. WOOD:
16      Q.    That's how you read that
17  paragraph?
18      A.    Well, I think that's what --
19  let's see what the -- yeah, then the next
20  paragraph he says, "The other thing I
21  wanted to note is that we have had three
22  facilities that are going to go forward
23  for the foreseeable future."
24          So I think he is saying that
25  there is some fear based on media reports

1  that they are not going to continue with
2  their current contract, and I believe he
3  is saying that this is not going to
4  prohibit that.
5      Q.    Now, you didn't ask him what he
6  meant by this statement, right?
7      A.    I have not spoken to him, no.
8      Q.    Have you spoken to any CCA folks
9  about this case, anybody at the company?
10      A.    No, I don't believe so.
11      Q.    Okay.
12      A.    So after he's made the
13  statements, there are analysts, there are
14  questions from the analysts about the --
15      Q.    I haven't asked a question yet,
16  so I'm going --
17      MR. GLENNON:  She was still
18  answering the question.
19      THE WITNESS:  I was still
20  answering the question that I asked
21  you.
22  BY MR. WOOD:
23      Q.    No, that's not true.  I asked if
24  you had spoken to anybody at the company,
25  and you said no?

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    A.    Okay.  I felt like you asked
2  that question pretty quickly after I was
3  still looking through this to answer the
4  prior question.
5    Q.    Okay.  Well, I'm --
6    MR. GLENNON:  Did you complete
7  your answer on the prior question?
8    THE WITNESS:  So I think the
9    prior question was about do I -- did I
10    ask him or do I have an understanding
11    of what he was saying and did I ask
12    questions and what I -- I did not ask
13    questions, but I did review the
14    questions that were asked of him by
15    the analysts after he made those
16    statements.
17    So I think that was the
18    continuation of the prior question
19    that you asked me.
20  BY MR. WOOD:
21    Q.    I don't want to cut you off.
22  You should say whatever you want to say.
23    Do you want to talk about the
24  analyst's questions?
25    A.    No.  That was all I just wanted

1  to say.
2    Q.    Okay.  Great.
3    If you look at the next page,
4  it's page 5.  There's a paragraph near the
5  top that starts "The three facilities."
6    Do you see that?
7    A.    Yes.
8    Q.    And it talks about -- well, it
9  says, "The three facilities going forward
10  that we will be using to service the
11  Bureau of Prisons, again, Adams in
12  Mississippi, McRae in Georgia and Eden, if
13  we're successful on the rebid on CAR 16,
14  those facilities have gotten very, very
15  good reviews by the Bureau of Prisons over
16  the last couple of years."
17    Do you see that?
18    A.    Yes.
19    Q.    Do you know whether or not that
20  statement's true?
21    A.    It's not my understanding that
22  Plaintiffs in this case are alleging that
23  this is an alleged misrepresentation.
24    It's my understanding that
25  Plaintiffs' claim in this case is that at

1  this point, the alleged truth regarding
2  the alleged misrepresentation have come
3  out.
4    And I don't know whether -- so
5  it wouldn't -- I don't know whether that
6  statement is true or not.  The fact that
7  the CEO is making this statement after the
8  prices dropped and the alleged class
9  period has ended would appear to be
10  inconsistent with Plaintiffs' claim in
11  this matter.  But that's all I can say
12  about that.
13    Q.    Do you know what confounding
14  information is?
15    A.    I am familiar with the term
16  "confounding information" in the context
17  of a securities class action or sometimes
18  used to refer to information that is
19  announced at the same time as other
20  information and is not the particular
21  information that you are trying to
22  analyze.
23    Q.    Did you look in the course of
24  doing your analysis in this case at any
25  confounding information?

1    A.    So one of the things that I did
2  was I did an analysis using Plaintiffs'
3  claim of market efficiency and Plaintiffs'
4  event study analysis to see whether there
5  were positive price reactions to the
6  alleged -- at the time of the alleged
7  misstatements in this case.
8    And I also looked to see
9  whether -- at the same time those alleged
10  misstatements were made, was there any
11  evidence that there was confounding
12  negative news that that could be
13  responsible for a lack of a positive price
14  reaction after the alleged
15  misrepresentations.
16    So that's the one analysis that
17  I did that I think perhaps could be -- the
18  term "confounding" needs to be used --
19  applied to.
20    Q.    When you say that there is no
21  new information about quality or cost on
22  August the 18th, in your opinion, is it
23  relevant when a CEO tells only analysts on
24  a call on August 19 that the three
25  remaining BOP facilities have gotten very,

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1 very god reviews by the Bureau of Prisons?
2     MR. GLENNON: Objection. Vague.
3     THE WITNESS: Well, I think it
4 might be relevant in terms of
5 analyzing price impact in this case
6 to -- showing that Plaintiffs' claim
7 of -- it's sort of further evidence I
8 guess against price impact in this
9 case that -- Plaintiffs are claiming
10 that the -- the -- that the company
11 made alleged misstatements about the
12 quality and cost effectiveness of the
13 company and its facilities and then
14 claims that there is corrective
15 information about that.
16     To the extent that the same
17 alleged misrepresentations are made
18 after the corrective disclosure and
19 the company is continuing to say the
20 same things I think is only further
21 evidence against Plaintiffs' claim of
22 price impact.
23     So Plaintiffs' claim is the
24 stock prices inflated during the class
25 period, then the truth comes out and

1 the stock price drops.
2     To the extent that the company
3 is continuing to say the very -- the
4 very same things. And after the truth
5 is supposedly known and would seem to
6 be further evidence that these
7 statements are not moving the stock
8 price, they didn't move it up and they
9 didn't move it down.
10     But that isn't -- so I think
11 that perhaps I could have done an
12 additional analysis, which is that the
13 company continues to say the same
14 things and that that would be further
15 evidence of lack of price impact.
16     That wasn't particularly
17 something that I did in my report, but
18 it seems like maybe that is a good
19 idea, and perhaps something that I
20 could add.
21 BY MR. WOOD:
22    Q. Or it could just be that there's
23 more truth to come out, right?
24     MR. GLENNON: Objection. Lacks
25 foundation. Vague. Assumes facts.

1     THE WITNESS: Plaintiffs and
2 their counsel have an incentive to
3 find the biggest price drops and make
4 the biggest claim.
5     And to the extent that
6 they're -- that more truth has come
7 out later than presumably that would
8 be in Plaintiffs' claim.
9     So it doesn't make a whole lot
10 of sense to say the company's made
11 these misrepresentations. They lied
12 and inflated the stock price, and then
13 the truth came out and the stock price
14 dropped.
15     They continue to say the same
16 things. And nobody -- now that people
17 know the truth, how are they not
18 saying, Well, we now know this is not
19 true. Why are they not challenging
20 the CEO and saying, We've just learned
21 the truth. That's why the stock price
22 dropped.
23     So your story is the company
24 made misrepresentations which inflated
25 the price. The truth dropped -- the

1 truth came out, and the stock dropped.
2     If that's -- if -- it then
3 doesn't make sense to say the company
4 is continuing to say the false things
5 and nobody's -- and nobody's noticing.
6     I mean, the fact that nobody
7 notices or challenges the statements,
8 I think, is only further evidence that
9 there's no price impact from those
10 statements.
11     I don't see how it helps
12 Plaintiffs' claim or supports price
13 impact. But it isn't particularly
14 something that I focussed on in my
15 analysis of price impact.
16     I think it is further evidence
17 contrary to price impact, but it was
18 not the -- the focus of my analysis.
19 And it seems very counter to
20 Plaintiffs' allegations in this
21 matter.
22 BY MR. WOOD:
23    Q. Isn't it true that you've seen
24 many cases over the course of your career
25 where corrective disclosure happens, stock

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 73

1   price drops, and the company denies that
2   they've done anything wrong?
3       A.   I think that's different than
4   continuing to say the supposedly wrong
5   statements that were corrected, allegedly
6   corrected by a corrective disclosure.
7           So I think saying we didn't do
8   anything wrong is different from saying,
9   Let me make the exact same statements that
10  have been the cause of a -- you know,
11  alleged fraud.
12          So I don't -- no, I don't think
13  I've seen that situation before.
14      Q.   You've previous testified,
15  right? that you don't think that you have
16  to have, like, a mirror or mirror
17  corrective disclosure for something to be
18  corrective, right?
19          MR. GLENNON:  Objection.  Vague.
20          THE WITNESS:   I think I have
21      been asked a question that was -- I
22      think I may in testimony have been
23      asked a question that used some words
24      about mirror, and I've testified to
25      that.  But I don't feel you've -- I

Page 74

1       don't feel you've asked me an
2       understandable question.
3   BY MR. WOOD:
4       Q.   Okay.  So you testified in the
5   Blackberry case a few weeks ago, right?
6       A.   Yes.
7       Q.   And did you -- you testified
8   truthfully at your deposition in that
9   case, right?
10      A.   Yes.
11      Q.   Okay.  And so -- great.  I think
12  that will get us to where we need to go.
13          So when the CEO here says that
14  the three facilities -- the three BOP
15  facilities that are going forward have
16  very, very good reviews by the Bureau of
17  Prisons, do you know how an analyst would
18  go about testing those assertions?
19      A.   I don't know what you mean by --
20  for what purpose would an analyst be
21  testing those assertions?
22      Q.   If an analyst wanted to know is
23  this just a policy shift because, you
24  know, Hillary Clinton hates private
25  prisons or is it really a problem with the

Page 75

1   quality of these facilities?
2           If an analyst wanted to test
3   that, do you know if they could figure out
4   the statement that these facilities have
5   gotten very, very good reviews, how they
6   could figure that out?
7       A.   I'm not sure what the meaning of
8   "have gotten very, very good reviews."
9   It's not my understanding that Plaintiffs
10  in this case are alleging this is a
11  misrepresentation.
12          You're asking me this question
13  now insinuating or implying that this is a
14  potentially -- a potential
15  misrepresentation and that something
16  analysts should be questioning.
17          I don't recall them questioning
18  this, but this is not -- this is not -- I
19  have not focused on whether after the end
20  of the class period, the company made
21  alleged misrepresentations.
22          I have focused on the complaint
23  as alleged in this case and what are the
24  alleged misrepresentations and did those
25  alleged misrepresentations have price

Page 76

1   impact.
2           To the extent now you're asking
3   about whether the company made statements
4   after the end of the class period and
5   after, according to Plaintiffs, the
6   alleged truth has come out, that's not
7   something I particularly have looked at or
8   analyzed.
9           But my recollection is that none
10  of the analysts after this point mentioned
11  that the company made this statement, and
12  there are no questions about this
13  particular statement.
14          And this is not my -- I have no
15  recollection that the analyst focused on
16  this statement either in their question
17  and answer during the conference call or
18  in their reports afterward.
19          But as that is not an
20  allegation, an alleged misrepresentation
21  in this matter, that is not a statement
22  that I have focused on.
23          And I will just say back to one
24  of your prior questions which was why did
25  I not have one of the statements that you

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  had pointed out to me in the judge's
2  opinion as an alleged misrepresentation in
3  my report, the reason I -- I looked back
4  at the complaint at the break.
5          The reason I did not have that
6  as an alleged misrepresentation or
7  misstatement in my report is because it
8  was not listed as an alleged misstatement.
9          So the complaint has a section
10 called "Alleged Misstatements" in some --
11 I don't know, in SEC filings or something
12 and alleged misstatements with something
13 else.  And it was not in there.
14          It was in an earlier section
15 that was background.  So it was not listed
16 under what would -- was my understanding
17 based on a reading of the complaint or
18 from the table of contents would be where
19 you would put the alleged misstatements
20 and misrepresentations which would be
21 under the heading of Alleged Misstatements
22 or Misrepresentations.
23    Q.    Okay.  Let me try asking -- it
24 seems like you may be confused with my
25 question.  I'll try asking better

1  questions.
2          So this transcript, the
3  August 19 transcript is something that you
4  considered in writing your report, right?
5    A.    That's correct.
6    Q.    Now, this paragraph that starts,
7  "The three facilities" where Mr. Hininger
8  talks about "the three facilities getting
9  very, very good reviews," is that relevant
10 to your analysis at all?
11          MR. GLENNON:  Objection.  Vague.
12          THE WITNESS:  I think the fact
13 that there was a conference call and
14 the reaction to the conference call is
15 something that is relevant to my
16 analysis.  I reviewed the conference
17 call, the analyst reports after the
18 conference call.
19          I don't know if -- so one of the
20 things that I'm doing when I'm
21 analyzing price impact is the alleged
22 misrepresentations themselves, are
23 they impacting the stock price?
24          I don't have a particular
25 opinion whether this particular

1  statement, which is not alleged, is an
2  alleged misrepresentation -- how would
3  the world have been different if the
4  CEO had or had not made this
5  particular statement, which appears to
6  be a question you're asking me.  I
7  don't know.
8          So if they hadn't -- what this
9  is -- what actually happened, I have
10 read the analysts' reports after this.
11 There are comments from this.
12          I couldn't say what could have
13 or would have happened if that
14 particular statement had not been
15 made.
16 BY MR. WOOD:
17    Q.    Okay.  So if the CEO had said,
18 Hey, guys, you know what, these facilities
19 are terrible; I mean, they are really bad;
20 we are violating our contracts; inmates
21 are dying; they're committing suicide;
22 it's worse than you can ever imagine; do
23 you think that would make a
24 difference to the stock price?  Do you
25 think analysts would have had questions

1  about that?
2    A.    That's not something that I
3  particularly analyzed.  But I do think if
4  a CEO of a company makes a statement such
5  as you have made, I think that would be
6  certainly not a good PR statement for a
7  company to make.
8          And just phrased as you have,
9  that is something that I think would
10 certainly lead to negative perceptions of
11 the company and perhaps the capability of
12 a CEO to be a spokesman for the company.
13    Q.    So one of the analysts that
14 you've mentioned as -- in your section if
15 we go back to your report on page 47 and
16 48 --
17    A.    Okay.
18    Q.    -- one of the analysts that you
19 mentioned several times in your report
20 including in paragraph 79 -- 78, excuse
21 me -- is from SunTrust, right?
22    A.    Correct.
23    Q.    And you quote several SunTrust
24 reports in your report, right?
25    A.    I believe that's correct.  I'm

Case 3:16-cv-02267    Document 122-1    Filed 10/26/18    Page 22 of 86 PageID #: 3667
www.aptusCR.com
Pages 77..80

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  not sure, but that sounds possible.
2      Q.    You considered a lot of them
3  according to your appendix?
4      A.    Correct.  My recollection is
5  that SunTrust is an analyst that covered
6  the company throughout the class period.
7      Q.    Yeah.
8          (Whereupon, Exhibit 5 is marked
9          for identification.)
10  BY MR. WOOD:
11      Q.    So I'm going to pass you what's
12  been marked Exhibit 5, I hope.  Exhibit 5
13  is the report that you reference in
14  Exhibit 78; is that correct?
15      A.    Yes.
16      Q.    In -- you see the second bullet
17  point in this report.  It says, "We
18  believe that the private correction
19  industries 'raison d'etre'" -- my French
20  is not great -- "evolves around quality,
21  increased flexibility for government
22  customers and freeing up government
23  capital for schools, roads and hospitals
24  projects."
25          Do you see that?

1      A.    Yes.
2      Q.    And Mr. Sommer's French, right?
3  That is, like, "reason for being"?  Is
4  that your understanding of that phrase?
5      A.    Yes.
6      Q.    So he's saying that he believes
7  -- or "we," I guess, is SunTrust, believes
8  that the private correction industry's
9  reason for being revolves around quality
10  as well as these other things that he
11  mentions here, right?
12          MR. GLENNON:  Objection.
13      Document speaks for itself.
14          THE WITNESS:  What's your
15      question?
16  BY MR. WOOD:
17      Q.    Well, it's correct that he is
18  saying that SunTrust believes that the
19  private correction industry's reason for
20  being evolves around quality is the first
21  thing he mentioned, right?
22          MR. GLENNON:  Same objection.
23          THE WITNESS:  In what he's
24      saying here, quality is the first
25      thing that he mentions in a list of

1      other things including increasing
2      flexibility.
3  BY MR. WOOD:
4      Q.    Do you have an opinion about
5  whether or not the quality of CCA's
6  prisons was important to the SunTrust
7  analyst?
8          MR. GLENNON:  Objection.  Vague.
9          THE WITNESS:  I don't know what
10      you mean by that.
11  BY MR. WOOD:
12      Q.    Okay.  Well, you have -- you've
13  been retained to offer your expert opinion
14  on price impact at least, and I'm
15  wondering if you have an opinion about
16  SunTrust's view -- you talk a lot about
17  SunTrust in your report -- whether you
18  have an opinion about SunTrust's view of
19  the quality for CCA?
20          MR. GLENNON:  Same objection.
21          THE WITNESS:  Well, one of the
22      things that I have done in analyzing
23      price impact is to see whether there
24      is evidence that the alleged
25      misrepresentations regarding quality

1  and cost effectiveness impact the
2  stock price.
3          And the -- one of the things
4  that I -- so Plaintiffs claim that the
5  first corrective disclosure, the first
6  time the alleged truth regarding the
7  alleged misrepresentations comes to
8  the market is when the OIG report is
9  announced.
10          And according to Plaintiffs, it
11  is corrective of alleged quality
12  issues.  SunTrust as well as the other
13  analysts following the company do not
14  issue any reports at all.
15          So the type of quality issues
16  that Plaintiffs are alleging were
17  misrepresented, were not affecting the
18  valuation of the company if the OIG
19  report -- if what they're alleging was
20  wrong and was misrepresented is the
21  type of information that is corrected
22  in the OIG report, which is what
23  Plaintiffs are claiming, so that's
24  corrective information and that's the
25  sort of quality issues, then the

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    SunTrust analyst doesn't think that --
2    based on not issuing a report and
3    not changing their valuation after the
4    OIG report, that those issues as
5    alleged by Plaintiffs are not
6    affecting the value of the company.
7         Similarly, according to
8    Dr. Feinstein's event study analysis,
9    there's no price reaction by the
10   market when this alleged -- when this
11   corrective information -- this
12   information about the -- the quality
13   is released in the OIG report.
14        So to that extent, that's what
15   I've been analyzing. And that
16   information did not affect SunTrust's
17   value of the company -- or that's what
18   the -- the analyst -- the SunTrust
19   analyst's report -- the lack of
20   analysts' report after the OIG report
21   and the lack of price reaction after
22   the analyst report all indicate.
23   BY MR. WOOD:
24   Q.   Did you look -- well, did you
25   talk to anyone at SunTrust --

1         MR. GLENNON: Objection. Vague.
2         MR. WOOD: I'm sorry.
3    BY MR. WOOD:
4    Q.   -- about this matter?
5    A.   I did not.
6    Q.   So you didn't call up
7    Mr. Sommer, for example, and asked him
8    what he thought of CCA; is that right?
9    A.   I did not.
10   Q.   Did you do any analysis to
11   determine if SunTrust had any conflict or
12   bias with respect to CCA?
13   A.   They have a disclosure at the
14   end of analyst reports that has
15   information to that effect.
16        So sometimes they have a -- you
17   know, I don't recall specifically what was
18   in the -- what the SunTrust analyst said,
19   but I -- that is often something that
20   analysts disclose at the end of their
21   reports.
22   Q.   Well, it's on page 16 of 19,
23   right? the report of disclosures? And
24   they disclose that SunTrust has received
25   or is entitled to receive compensation

1    from investment banking services involving
2    CCA within the last 12 months, right?
3    A.   I don't actually see that. I'm
4    sorry. What did you just say?
5    Q.   Take a look at the second
6    sentence under "Required Disclosures."
7    "The following companies are clients of
8    SunTrust, Robinson Humphrey, Inc., and the
9    firm has received or is entitled to
10   receive compensation for investment
11   banking securities within the last 12 months: GO,
12   CoreCivic."
13   Q.   Do you see that?
14   A.   Yes.
15   Q.   Okay. So they got or were
16   entitled to investment banking
17   compensation.
18        The next one says, "The
19   following companies are clients of
20   SunTrust, Robertson Humphrey, Inc., and
21   the firm has received compensation for
22   non-investment banking securities-related
23   services within the last 12 months. GO
24   and CoreCivic," right? I read that

1    correctly?
2    A.   Yeah, I mean, it has their
3    ticker and things. But approximately
4    correctly.
5    Q.   Yeah. You recognize that CXW is
6    the ticker for CoreCivic?
7    A.   I do.
8    Q.   Okay. Great.
9         Then there's another one,
10   "Affiliate of SunTrust, Robinson Humphrey,
11   Inc., has received compensation for
12   non-securities services from the following
13   company within the last 12 months:
14   CXW/U.S."
15        Do you see that?
16   A.   Yes.
17   Q.   Do you know what affiliate
18   they're referring to there?
19   A.   No.
20   Q.   Do you know how much
21   compensation SunTrust received from
22   CoreCivic in the 12 months leading up to
23   this report?
24   A.   No, I don't believe so.
25   Q.   Do you know if they underwrote

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  any securities offerings for CoreCivic?
2      A.    Ever?  I don't know.
3      Q.    Do you --
4      A.    I don't recall.
5      Q.    Okay.
6      A.    I mean, I --
7      Q.    Do you know if they managed
8  CoreCivic's 401(k) program?
9      A.    I don't.
10     Q.    Is it relevant at all to you --
11         MR. GLENNON:  Objection.  Form.
12  BY MR. WOOD:
13     Q.    -- that the analyst that you're
14  relying on is getting paid by CoreCivic
15  for a lot of different services?
16         MR. GLENNON:  Objection.  Vague.
17  BY MR. WOOD:
18     Q.    You represent SunTrust as well,
19  haven't you?
20     A.    I'm still answering -- you're --
21  you're firing questions at me without
22  letting me answer the first question.
23     Q.    Sure.  No, go ahead and answer.
24     A.    Shall I ask it -- the last in,
25  first out?

1      Q.    No.  Let's do FIFO.
2         So is it relevant --
3      A.    I didn't really remember the
4  last one.
5      Q.    No, that's okay.  I'll repeat
6  it.
7         Is it relevant that the analyst
8  that you're relying on or the analyst's
9  firm is getting paid by CoreCivic for a
10  lot of different services?
11         MR. GLENNON:  Objection.  Vague.
12         THE WITNESS:  So I have -- I
13  have reviewed all the analysts'
14  reports, all of the analysts' coverage
15  that was available or I'm able to
16  find, which is -- which is my
17  practice.
18         I think there -- I think it's a
19  more objective and reliable analysis
20  to look at every single analyst
21  commentary and not try to do any sort
22  of subjective weight in terms of
23  considering one more or less than
24  others.
25         I -- testimony that I thought I

1  had heard Dr. Feinstein testify to --
2  and I think it is a standard practice
3  to take all analysts' information and
4  systematically review it.
5         I don't disagree with -- keeping
6  in mind that there can be -- there can
7  be other incentives, and I think it's
8  important it keep in mind, you know,
9  the purpose that analysts write
10  analyst reports.
11         And, you know, I think those are
12  all things that it's helpful to keep
13  in mind.  The analyst in my report
14  is -- I have systematically reviewed
15  all of the analysts and all of the
16  analysts that are covering the
17  company.
18         I have also looked at -- I mean,
19  for example, it's not only the absence
20  of analysts' report after the OIG
21  report.
22         It is also the absence of any
23  price reaction to the OIG report, the
24  very report and information that is
25  telling the market the corrective

1  information regarding the -- the
2  issues, the alleged
3  misrepresentations.
4         So it's not only that SunTrust
5  didn't issue a report.  It's that the
6  price didn't react and none of the
7  other analysts issued reports.
8  BY MR. WOOD:
9      Q.    Are you currently working for
10  SunTrust?
11     A.    No.
12     Q.    You represented them -- you
13  worked with them or for them in an ERISA
14  case, right?
15     A.    I was retained, yes, correct,
16  by -- I believe it was by SunTrust.
17     Q.    And is that retention ongoing?
18     A.    No.  I believe that's over.
19     Q.    Okay.  Is anybody else at NERA
20  working for SunTrust?
21     A.    I don't know.
22     Q.    Was -- in this case, was NERA
23  retained by Latham or -- well, let me ask
24  a better question.
25         Were you retained in this action

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1   or was NERA retained?
2        MR. GLENNON:  Objection to the
3   extent it calls for a legal
4   conclusion.
5        THE WITNESS:  I'm not sure of
6   the legal answer to that question.
7   BY MR. WOOD:
8   Q.    What does the retainer agreement
9   say?
10  A.    I don't recall.
11  Q.    Do I --
12  A.    I'm being retained as a -- an
13  expert.  NERA is being compensated for my
14  time.  I don't know legally who's being
15  retained.
16  Q.    But you don't know -- you don't
17  know if on the retainer agreement it says
18  Latham hereby retains NERA or Latham
19  hereby retains Lucy Allen?
20       MR. GLENNON:  Objection.
21  Foundation.
22       THE WITNESS:  I don't even know
23  if it says Latham.  So my
24  understanding is not that we're being
25  retained by the law firm but rather by

1    the defendant in the matter.
2   BY MR. WOOD:
3   Q.    Okay.  I appreciate that.
4        So your understanding is that
5   the law firms didn't retain you, it wasn't
6   any of the law firms, it was the
7   defendants?
8        MR. GLENNON:  Objection.
9   Mischaracterizes the testimony.
10       If you want to talk about this
11  offhand, we can discuss it.
12       MR. WOOD:  I'm just asking for
13  her understanding.
14       MR. GLENNON:  Then I think she's
15  testified to it.
16       THE WITNESS:  That's my
17  recollection.  But I don't -- I have
18  no legal opinion on that, and I don't
19  even have a good recollection of what
20  -- I believe we had a retainer
21  agreement.
22       I don't have a recollection of
23  what it said.  As best I can recall,
24  it wasn't Latham, but I don't know.  I
25  don't really know -- I don't know what

1    it actually says, and I don't know
2    what it legally means in terms of
3    whether it is -- who actually is being
4    retained; whether it's -- I know that
5    the compensation that NERA bills for
6    my time and the money goes to NERA.
7    It does not go to me.
8   BY MR. WOOD:
9   Q.    Did you sign the retainer
10  agreement?
11  A.    I don't recall.  I may have.
12  Q.    Okay.
13       MR. WOOD:  We need to change the
14  tape, so let's take a break.
15       THE VIDEOGRAPHER:  The time is
16  11:51 a.m.  We're going off the
17  record.
18       (Whereupon, a recess in the
19  proceedings was taken for lunch
20  at 11:51 a.m.)
21       THE VIDEOGRAPHER:  The time is
22  1 o'clock p.m.  This begins DVD No. 2.
23  We are going back on the record.
24  BY MR. WOOD:
25  Q.    Would you turn to page 32 of

1    your report, please.  In section B of your
2    report here, your conclusion is that the
3    CoreCivic's stock price did not react to
4    the OIG report; is that fair?
5   A.    That is one of the conclusions
6    that I have; that the stock price did not
7    react to the OIG report, correct.
8   Q.    Okay.  Do you know when the OIG
9    report was first released?
10  A.    I think I have a footnote to
11  that effect.  So I think -- the DOJ
12  provided a link in a Tweet that was early
13  in the morning, and I have I think the
14  time stamp for that.
15       But the report itself, I
16  believe, didn't have a specific, like,
17  time stamp on it.
18  Q.    Did you find any evidence that
19  the OIG report was available before
20  August 11?
21  A.    I don't believe so.  So in terms
22  of doing the event study, it's from market
23  close to market close.  So it's sort of
24  particularly important for the event study
25  is between the last market close.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 97

```
1            And certainly Plaintiffs in
2   their complaint, I believe, you know,
3   allege the corrective information came out
4   on this -- on August 11, so...
5       Q.    And you have -- do you have a
6   chart on page 34 after paragraph 58 which
7   shows -- well, can you tell me what those
8   two -- excuse me -- what those two charts
9   on page 34 show?
10      A.    Sure.  They're illustrating the
11  price reaction according to the Feinstein
12  event study as well as the price reaction
13  according to an alternative event study.
14      Q.    The alternative event study is
15  the one you put together, right?
16      A.    Correct.
17      Q.    And the conclusions of both of
18  those event studies that are set forth
19  here is that the price reaction on
20  August 11 was not statistically
21  significant, correct?
22      A.    Correct.
23      Q.    Now, does that mean that there
24  was no price impact on August 11?
25      A.    It's consistent with no price
```

Page 98

```
1   impact.  The price of OIG's stock
2   according to the event study of
3   Plaintiffs' expert as well as according to
4   the alternative event study that I have
5   done shows no significant reaction after
6   controlling for movement in the market and
7   industry and...
8       Q.    The fact that there was no
9   statistically significant price movement
10  doesn't prove by itself that there was no
11  price impact; is that correct?
12      A.    I have lots of other evidence
13  that there's no price impact, but it's
14  certainly consistent with no price impact.
15            And I -- when you perform a
16  test -- in a scientific analysis when you
17  perform a test, you need to think ahead of
18  time, When I perform the test, if I have
19  this result, what will that lead me to
20  conclude?  And if I have a different
21  result, what will that lead me to
22  conclude?
23            So the event study test of a
24  price reaction to an announcement is the
25  price is reacting if there's a
```

Page 99

```
1   statistically significant return, and
2   there's no evidence of a reaction based on
3   the event study if there's no
4   statistically significant return.
5            So and that's how Plaintiffs --
6   that's what Plaintiffs' expert and how
7   Dr. Feinstein in other cases when he has
8   analyzed whether there is market
9   efficiency and there's reaction to news,
10  what he does is he does an event study and
11  says, Is there reaction to news?
12            And if he finds a statistically
13  significant reaction, then he says that is
14  evidence of market efficiency.  And so in
15  this same vein this is evidence of no
16  price impact.
17            If this was all of the evidence,
18  could you conclude that?  I mean, if I
19  think if this was all the evidence I had
20  and there was no other evidence and
21  nothing else to look at, then I think you
22  would still come to the conclusion if this
23  is all I can analyze and this is all the
24  tests I can do, the evidence all points to
25  no price impact.
```

Page 100

```
1       Q.    So if there was no other
2   evidence that you had, the fact that there
3   was no statistically significant price
4   movement would lead you to conclude that
5   there was no price impact?
6       A.    So an event study is a test
7   of -- of price impact.  It's a test of
8   price reaction.  And if the event study
9   says there is no reaction, there's no
10  statistically significant reaction, then
11  the conclusion of the event study is that
12  there is no price impact.
13            You could have other evidence
14  that may show something else, but based on
15  that evidence, that is what the -- the
16  event study is a test of the -- does the
17  event impact the price, and the results of
18  the test are there is no statistically
19  significant reaction.
20      Q.    But that test by itself can't
21  show you that there's no price impact,
22  right?
23            MR. GLENNON:  Objection.  Asked
24      and answered.
25            THE WITNESS:  I'm not sure how
```

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    to answer that question.  If you do a
2    test, that is -- that is the
3    conclusion that comes from this test.
4         You could do -- you can look at
5    other pieces of information, but
6    the -- the question of is the stock
7    price reacting to this event, that is
8    what -- that is what the event
9    study -- that is the purpose of an
10   event study, and that is what the
11   event study that -- that Plaintiffs'
12   expert -- that's what an event study
13   does; it measures whether the stock is
14   reacting to a particular event.
15        And the results are that there
16   is no significant reaction, no
17   statistically significant reaction,
18   can't be statistically distinguished
19   from zero.
20   BY MR. WOOD:
21   Q.    But -- but so that could be, for
22   example, that a statement is maintaining
23   an artificially inflated price, right?
24   A.    The plaintiffs are claiming that
25   the company made alleged

1    misrepresentations about the quality or
2    cost effectiveness of CoreCivic's BOP
3    facilities.
4         And they're claiming that the
5    information that is correcting those --
6    information that is correcting those
7    allegedly false statements are in this OIG
8    report.
9         And this OIG report is being
10   released with this very information that
11   Plaintiffs say is important and is
12   inflating the stock price.
13        And there's no reaction by the
14   supposedly efficient market to this
15   information, which is evidence that this
16   information is not impacting the stock
17   price.
18        So, no, that is not consistent
19   with a -- I forgot how you worded it --
20   price maintenance, because the -- this is
21   the very information that Plaintiffs say
22   is correcting the allegedly false
23   statements.
24        And it's being released to the
25   market.  It is public in what Plaintiffs

1    claim is an efficient market, and there's
2    no reaction by the market using
3    Plaintiffs' and their expert's own test on
4    whether the market is reacting.
5    Q.    In Footnote 53, you say, "As a
6    check, my team and I reviewed news on
7    CoreCivic in the private prisons private
8    industry released on August 11, 2016.
9         "Based on this review, we found
10   that there was no other news announced on
11   August 11, 2016, that could have offset
12   any negative reaction in CoreCivic stock
13   price on that date."
14        Do you see that?
15   A.    Yes.
16   Q.    Now, why did you do that?
17   A.    Well, for a number of reasons.
18   So one is the information in the OIG
19   report could be impacting the stock price
20   in a negative way.  It could be causing a
21   negative reaction to the market.
22        And the event study wouldn't
23   pick that up because at the same time that
24   information is being announced, there
25   could be positive information that is

1    company specific and that isn't controlled
2    for by the market in the industry sector
3    analyses that Plaintiffs' expert has used
4    to control for movements in the market.
5         And that could be -- so it could
6    be possible that it's hiding the effect of
7    the OIG report and the stock market -- the
8    CoreCivic stock isn't reacting because
9    it's positively reacting to something else
10   and negatively reacting to the OIG report.
11   So that's something that I looked for.
12   Q.    So that would be -- in that
13   instance, the release of the OIG report,
14   if there was offsetting news, the release
15   of the OIG report could negatively impact
16   the stock price, but the return on that
17   day wouldn't be statistically significant
18   because there was offsetting news that
19   counteracted that effect; is that fair?
20        MR. GLENNON:  Objection.  Vague.
21        THE WITNESS:  I think that is --
22   that description of what I have looked
23   for and analyzed as a check, correct.
24   BY MR. WOOD:
25   Q.    And so just looking to see

Case 3:16-cv-02267     Document 122-1     Filed 10/26/18     Page 28 of 86 PageID #: 2611
www.aptusCR.com
Page 101..104

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1 whether there is a statistically
2 significant price decline on August 11
3 isn't enough to tell you whether or not
4 there's price impact from the OIG report,
5 because you need to know more, right?
6 Like, if any other statements came out on
7 that day?
8        MR. GLENNON:  Objection.  Asked
9    and answered.
10        THE WITNESS:  In general, when
11    analyzing the effect of an event on a
12    day, it's important to control for
13    other potential other effects on the
14    company stock price, yes, I would
15    agree with that.
16 BY MR. WOOD:
17    Q.    Okay.  So --
18    A.    But I wouldn't -- I don't know
19 if that's really -- really what you said,
20 so.  I'm not sure if your question -- I
21 don't necessarily want to agree with
22 however you characterized it.
23        I would agree with what I --
24 with my answer.  I'm not sure if it
25 parallels your question.

1    Q.    Okay.  Sure.
2        So, again, in Footnote 53, you
3 say you and your team reviewed news on
4 August 11.  And you say here that you
5 found no other news announced that could
6 offset the negative reaction.
7        Did you find any news at all on
8 August 11?
9        MR. GLENNON:  Objection.  Vague.
10        THE WITNESS:  Oh, sure.  There
11    is -- there is -- you know, as I think
12    I've testified to earlier, I think
13    every day there's some sort of news
14    announced.
15 BY MR. WOOD:
16    Q.    Let me ask a better question.
17        Did you see any CCA-specific
18 news on August 11?
19    A.    I don't have a particular
20 recollection of that, no.
21    Q.    Okay.
22    A.    I'm just -- I'm trying to --
23 unrelated to the OIG report?  Is that your
24 question or --
25    Q.    Just, yeah, CCA-specific,

1 please.
2    A.    But that doesn't -- that's not
3 related to the OIG report?
4    Q.    Sure.
5    A.    I do not recall.  I do recall
6 that there weren't analyst reports that
7 were issued.  I just don't recall what
8 the -- yeah, I don't recall.
9    Q.    Why don't we take a look at the
10 OIG report.
11        (Whereupon, Exhibit 6 is marked
12            for identification.)
13 BY MR. WOOD:
14    Q.    I'm passing you what's been
15 marked as Exhibit 6.  And you reviewed
16 Exhibit 6 in preparing your report; is
17 that right?
18    A.    That's correct.
19    Q.    Do you have an understanding
20 sitting here today of what the conclusion
21 of the OIG report was?
22    A.    Well, I think they have a -- you
23 know, what was important to them, I think,
24 is the -- I think the recommendation --
25 I'm not sure.

1        I don't know what you mean by
2 "conclusion."  I think they have a section
3 called "recommendations" is my
4 recollection going forward.
5    Q.    Sure.  On page 3, Roman
6 numeral III, the recommendations for the
7 BOP to improve the monitoring oversight.
8    A.    Page 3?
9    Q.    I'm sorry.  Roman III.
10    A.    Roman III.  Oh, like, little
11 Roman iii?
12    Q.    Yeah.
13    A.    Yes, yeah, I mean -- actually,
14 they do have a section called "Conclusion"
15 which is on page 44.
16    Q.    Okay.  Fair enough.
17        When you were reviewing the OIG
18 report and doing your work, did you
19 consider the letters which were appended
20 to the OIG report from CCA, GO and MTC
21 commenting on the report?
22    A.    I do recall the letters from
23 them.  I don't -- I do recall considering
24 the letters from them.  I didn't
25 particularly recall that they were

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    attached to the reports.
2        Q.    Okay.  If you look at page 76 of
3    the report, that's the letter from
4    Management and Training Corporation which
5    is a private prison company.
6            And they say in the first
7    paragraph "MTC strongly disagrees with the
8    conclusions, inferences of this report.
9    Any casual reader would come to the
10   conclusion that contract prisons are not
11   as safe as BOP prisons.  The conclusion is
12   wrong and not supported by the work done
13   by the OIG."
14           Do you see that?
15       A.    Yes.
16       Q.    Did you consider how MTC's
17   denials of what was in the OIG report
18   could offset the remainder of the report?
19           MR. GLENNON:  Objection.  Vague.
20           THE WITNESS:   I don't know that
21   I particularly considered the question
22       that you were asking.
23           What I was analyzing and what I
24       have done in this matter is analyze
25       Plaintiffs' allegations and whether

1    there is price impact from the alleged
2    misrepresentations.
3            And Plaintiffs' claim both in
4    their complaint as well as their
5    motion for class certification that
6    there were alleged misrepresentations
7    made during the alleged class period
8    and that the truth regarding those
9    alleged misrepresentations were
10   revealed by the OIG report.
11           And they also mentioned that
12   the -- that a number of reasons why
13   the alleged misrepresentations were
14   allegedly false when made were because
15   of other violations and issues and
16   other things that -- negative things
17   that were happening at the BOP
18   facilities.
19           And those events themselves that
20   Plaintiffs are alleging show the
21   falsity of the alleged
22   misrepresentations and were -- the
23   alleged truth were themselves publicly
24   announced during the alleged class
25   period to no reaction, which is

1        another part of my report that's
2        discussed that similarly indicates no
3        price impact from the alleged
4        misrepresentations.
5    BY MR. WOOD:
6        Q.    Are you -- well, you're familiar
7    with the Mother Jones publication,
8    correct?
9        A.    I am familiar with the Mother
10   Jones publication -- publications, in
11   general.
12       Q.    Well, sure.
13           Are you familiar with how CCA
14   viewed the Mother Jones publications?
15           MR. GLENNON:  Objection.  Vague.
16           THE WITNESS:  I don't know that
17       I'm familiar with that.  I'm not sure
18       what you mean by that.
19   BY MR. WOOD:
20       Q.    Okay.  Well, let me give you an
21   example.
22           You've relied on Mother Jones
23   data before in some of your work, right?
24           MR. GLENNON:  Objection.  Vague.
25           THE WITNESS:  I have relied on

1        data from Mother Jones.
2    BY MR. WOOD:
3        Q.    Do you know what the -- are you
4    familiar with The Nation, the publication
5    The Nation?
6        A.    I've heard of the publication
7    The Nation, yes.
8        Q.    I will represent to you that The
9    Nation has a liberal outlook on the world
10   versus a conservative outlook, in general,
11   I think is fair to say.
12           Would it make a difference to
13   you -- if The Nation came out and said,
14   You know, CCA runs poor quality
15   facilities, would it make a difference to
16   you that The Nation is saying that versus
17   what if the DOJ just, you know,
18   CoreCivic's customer came out and said,
19   CCA runs poor facilities?
20           Are those two things different
21   in your mind?  They're both publicly
22   available statements, but one comes from
23   The Nation versus coming from the DOJ?
24           MR. GLENNON:  Objection.  Vague.
25           THE WITNESS:  Hypothetical

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 113

1   question that I would like to see, you
2   know, have more specifics about.
3           To the extent that a publication
4   is reporting information that was not
5   previously available and is reporting
6   events or facts, I think that's a
7   potentially different situation than a
8   publication saying, In our opinion,
9   this is good or bad.
10          So Plaintiffs in this case have
11  made allegations that certain pieces
12  of information are corrective. And
13  those pieces of information, much of
14  what Plaintiffs talk to were pieces of
15  information that were actually made
16  public and during the alleged class
17  period to know price reaction.
18          They aren't statements that it
19  is the opinion of someone that it is
20  good or bad. They were -- but it --
21  sort of more generally, if -- one
22  publication has an opinion that
23  something is good versus another
24  company saying that their opinion is
25  that something is good or bad, I think

Page 114

1   those -- those can have different
2   meanings.
3   BY MR. WOOD:
4       Q.   Is it true that information can
5   be viewed more credibly by the market
6   depending on who the source is? Like,
7   front page of the Wall Street Journal
8   versus, you know, back page of a blog?
9       A.   Well, I think it's -- I think
10  the information can come from more or less
11  credible sources. One of the claims that
12  Plaintiffs are making in this case is that
13  when information is public, it is
14  impounded rapidly into the stock price.
15          And that information that is
16  public, there isn't a claim that it's only
17  slightly public or more public. It's that
18  all public information is rapidly
19  impounded into the stock price.
20      Q.   Let's turn to page 72 of the OIG
21  report. This is the letter from GO group.
22      A.   Okay.
23      Q.   Well, is this -- is the letter
24  from GO group something you considered
25  when you were looking at the OIG report?

Page 115

1           MR. GLENNON: Objection. Vague.
2           THE WITNESS: The letter from
3   the GO group is something that I
4   considered in preparing my report in
5   this matter.
6   BY MR. WOOD:
7       Q.   So -- sorry. Were you finished?
8       A.   Yes.
9       Q.   And you're welcome to read the
10  whole thing if you want.
11          So the GO group points out, for
12  example, some differences in population,
13  demographics. That's Point 1 between
14  privately run and publicly run BOP
15  facilities.
16          And then in Point 2 on page 74
17  it also points out that there are
18  differences -- or they claim there are
19  differences in oversight and reporting
20  between BOP and government run facilities?
21          Do you think that -- or did you
22  consider whether or not the GO group's
23  reaction to the report might have affected
24  how the market reacted to the OIG report?
25          MR. GLENNON: I'm just going to

Page 116

1   object on the fact that the document
2   speaks for itself.
3           THE WITNESS: So I have analyzed
4   Plaintiffs' claim and the alleged
5   misrepresentations, analyzed price
6   impact in this case.
7           Plaintiffs claim that the OIG
8   report came out, and this was an
9   alleged truth regarding the alleged
10  misrepresentations in this matter.
11          Plaintiffs claim that the stock
12  price dropped because of the
13  information in the OIG report. That's
14  what's in Plaintiffs' complaint and
15  that's what's in Plaintiffs' motion
16  for class certification.
17          I have analyzed that claim, and
18  I have found there is no price impact
19  from the alleged misrepresentations in
20  this case.
21          I haven't particularly tried to
22  separate the price impact of other
23  specific things. My assignment in
24  this case was to analyze the alleged
25  misrepresentations and analyze price

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 117

1    impact from the alleged
2    misrepresentations.
3         Plaintiffs' claim, as I've said,
4    is that the OIG report corrected
5    alleged misrepresentations.  And
6    Plaintiffs are claiming that the price
7    was reacting negatively as a result of
8    the OIG report.
9         And Plaintiffs' expert's event
10   study does not show that, but, in
11   fact, shows the opposite which is that
12   there is no market reaction to the OIG
13   report.
14   BY MR. WOOD:
15   Q.    Is it possible that CCA's stock
16   price would have declined further if the
17   letters from MTC, GO and CCA were not
18   appended to the back of the report?
19         MR. GLENNON:  Objection.  Vague.
20   Incomplete hypothetical.
21         THE WITNESS:  That is not a
22   particular question that I have
23   analyzed.  As I sit here, could I
24   think whether that would be the case?
25   I don't have any reason to think that

Page 118

1    that is the case as I sit here.  But
2    that is not a question that I have
3    particularly addressed.
4         The issues that are raised and
5    that you pointed out in the MTC letter
6    and in the CoreCivic letter are -- are
7    issues with -- the sort of data that
8    is in the OIG report that I think the
9    market would have been aware of anyway
10   and would have been -- in my opinion,
11   it's not something that I have
12   analyzed, but in my opinion, it's not
13   meaningful new information that the
14   market would care about what is in
15   those letters.
16   BY MR. WOOD:
17   Q.    Do you know if anyone at CCA had
18   any phone calls with any of the analysts
19   of SunTrust or Wells Fargo around the time
20   that the OIG report was issued?
21   A.    I don't know.  Well, I know
22   there is a conference call that is a
23   little bit after the OIG report that we
24   have been discussing, so that is a
25   conference call between the company and

Page 119

1    the analyst reports.
2         And that's -- so that's --
3    that's not that many days after the OIG
4    report, so I am aware of that.
5
6    Q.    Sure.  I meant the private phone
7    call.
8         Were you aware of any private
9    phone calls between any securities
10   analysts and anyone at CCA around the time
11   that the OIG report was issued?
12   A.    If the analysts in their
13   reports -- I don't have any recollection.
14   I mean, if I was aware, it would be
15   because the analyst may have mentioned
16   it -- they either mentioned it in a
17   conference call or they mentioned that
18   they had spoken to the company in their
19   analyst reports and had information from
20   the company.  I have no specific
21   recollection of that.
22         (Whereupon, Exhibit 7 is marked
23         for identification.)
24   BY MR. WOOD:
25   Q.    I'm going to pass you what's

Page 120

1    been marked as Exhibit 7.  Exhibit 7 is a
2    press release issued by CCA on August 11
3    declaring their quarterly dividend.
4         Do you see that?
5    A.    Yes.
6    Q.    Did you, in the course of your
7    report, analyze the effect that this
8    announcement had on the stock price return
9    on August 11?
10   A.    I looked for information that
11   was announced that -- this was one of my
12   stories that came up -- I think this would
13   be.  And I think this was expected.
14         I don't have a specific
15   recollection of this.  I do have a
16   specific recollection that Dr. Feinstein
17   had made a mistake in his report and
18   forgotten to include or exclude or did
19   something wrong with dividend returns.
20   That's my recollection about dividends.
21         And I do recall earlier on
22   during the class period that the company
23   announced that they were planning an
24   unexpected dividend.  And I think there
25   was a positive reaction from the market in

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  response to that.
2          I don't have a particular
3  recollection of this, but I don't think
4  this was an unexpected positive piece of
5  information to the market.
6          And one reason as I sit here now
7  that I can come to that conclusion is
8  because there aren't any analyst reports
9  that said, Oh, now there's this dividend
10  that we've been expecting, and this is
11  important positive information that is
12  causing me to revalue the company's stock.
13          Whereas I did see that with an
14  earlier announcement about a dividend.
15     Q.    Do you recall any analyst
16  reports near the end of the class period
17  expressing concern that the dividend might
18  be cut?
19     A.    Yes.  I think there was
20  uncertainty.  So one of the things that I
21  do recall and that we -- or that I've
22  testified to earlier is that after the
23  Yates memo was released, there was a large
24  increase and implied volatility of the
25  stock.  There's analysts saying there's

1  much more uncertainty about the future.
2          And this risk and uncertainty
3  about what might happen in the future, one
4  of the things I think that analysts were
5  questioning is whether there may be
6  less -- the company may be less likely to
7  have dividends.
8          So that was, I think, a
9  potential question about the -- about the
10  future that was questioned after the Yates
11  memo.
12     Q.    Aside -- I think you previously
13  testified there was no analyst reports
14  written about this August 11 dividend
15  announcement.
16          Aside from reviewing analyst
17  reports or the lack thereof, what did you
18  do to satisfy yourself that this August 11
19  announcement declaring the quarterly
20  dividend did not impact the stock price on
21  that day?
22     A.    So I don't have a specific
23  recollection of this, but I do have the
24  general recollection of reviewing all the
25  news that came out, reviewing information

1  about the company and looking to see what
2  was released about the company, what was
3  commented about the company and was there
4  anything that -- was there positive
5  information that could be counteracting a
6  potential negative price impact from the
7  correction of the alleged
8  misrepresentations.
9          And I -- I don't have -- I have
10  no recollection of there being anything
11  even sort of -- finding anything that I
12  thought was debatable, so I recall that
13  we -- my team and I did an entire review
14  and did not find anything.
15          So I just -- I don't have -- I
16  don't have any -- nothing even rose to the
17  level of could or could not -- do I need
18  to do more analysis to determine whether
19  this is important.  That's my
20  recollection, but...
21     Q.    Your recollection is that you
22  looked at this on its face.  You saw that
23  there were no analyst reports and
24  concluded that you didn't need to do
25  anything else?

1          MR. GLENNON:  Objection.
2  Mischaracterizes the testimony.
3          THE WITNESS:  That is absolutely
4  not what I just said.  I would go back
5  to my prior answer.  That's completely
6  not what I just said.
7  BY MR. WOOD:
8     Q.    Okay.  That's what it sounded
9  like to me, but we can -- but the
10  transcript will speak for itself.
11          Is it possible to do an event
12  study to determine whether or not
13  announcements of quarterly dividends
14  affect the stock price of a company?
15          MR. GLENNON:  Objection.  Vague.
16          THE WITNESS:  In general how
17  they affect companies overall or in a
18  specific case?  Or what is your
19  question?
20  BY MR. WOOD:
21     Q.    On a specific day, you can look
22  at a company and say they announce their
23  dividends on these four days every year so
24  they can look and see whether or not
25  there's evidence that those announcements

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  affect the stock price by doing an event
2  study?
3         MR. GLENNON:  Objection.  Vague.
4  BY MR. WOOD:
5     Q.   Is it possible?
6     A.   I'm not even sure what your
7  question really means, so.
8         So in the -- is the stock
9  price -- is the dividend announcement
10  having an unexpected effect, or is it --
11     Q.   A statistically significant
12  effect?
13         MR. GLENNON:  Objection.  Vague.
14         THE WITNESS:  Well, that depends
15  on what you're testing or what
16  you're -- so, I mean, there's a whole
17  body of literature about, you know,
18  whether a dividend should matter and
19  do they matter, and do they have
20  signalling issues?
21         And, you know, what is -- what
22  is the important -- you know, why do
23  companies have dividends?  When should
24  dividends make a difference?  Are
25  there sort of tax implications?

1         And, you know, there's lots of
2  literature about dividends and what is
3  the effect of dividends and what is
4  the potential effect of, you know,
5  what -- and so there have been lots of
6  event study -- much of the academic
7  literature may have used an event
8  study technique in terms of measuring
9  various things about dividends.
10         I don't think that -- the
11  question here and what the I have been
12  asked to analyze here is do the
13  alleged misrepresentations have price
14  impact?
15         And one of the things that I
16  have done is look at the very date
17  that Plaintiffs claim the truth and
18  information that -- the very
19  information that Plaintiffs claim was
20  misleading about the alleged
21  misrepresentation is announced in this
22  OIG study and Plaintiffs claim the
23  stock price dropped because of the OIG
24  study.
25         And I have found that there is

1  no price reaction on the date of the
2  OIG study.  And I have looked and I
3  have found -- after a detailed review,
4  I have found nothing that would
5  indicate that -- that there -- that I
6  wasn't seeing a reaction.  And that
7  Plaintiffs' expert event study wasn't
8  finding a reaction because there was
9  some counter-positive information that
10  was being released.
11         I have -- I don't have any
12  specific recollection of anything that
13  was announced on this date that I
14  thought was even debatable about
15  whether it itself could be
16  countervailing the supposed negative
17  impact from the OIG report.
18  BY MR. WOOD:
19     Q.   So even if analysts are
20  concerned that the dividend might be cut,
21  you think that the announcement of the
22  quarterly dividend on August 11 isn't even
23  debatable about whether it could be
24  offsetting news?
25         MR. GLENNON:  Objection.  Vague.

1  Mischaracterizes the testimony.
2         THE WITNESS:  You said "so."
3  That's not what I said.  I don't agree
4  with that statement, and that's not a
5  proper characterization of what I had
6  previously said.
7         After the Yates memo, after the
8  government had announced that there is
9  a policy shift and after the market
10  thinks that there is a shift in policy
11  and there's more uncertainty about the
12  future, the market is concerned that
13  the company may not get -- that the
14  government may be moving away from
15  private prisons altogether.
16         And there is concern in the
17  market about uncertainty about the
18  future of the company's business
19  including uncertainty that the company
20  will continue to have dividends at all
21  or at the same rate that they had been
22  having them previously.
23         I don't recall any indication
24  that anyone felt that this
25  announcement of a dividend was a

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  positive and unexpected piece of news
2  that caused a positive reaction in the
3  stock price.  I don't recall anything
4  consistent with that.
5  BY MR. WOOD:
6      Q.   Do you recall any concern
7  amongst analysts that the dividend might
8  be cut before the Yates memo came out?
9      A.   I don't have a particular
10  recollection of that.  There was
11  discussion about the dividends.  There's
12  no discussion that the OIG -- that the OIG
13  report itself was putting the dividend in
14  jeopardy.
15          (Whereupon, Exhibit 8 is marked
16          for identification.)
17  BY MR. WOOD:
18      Q.   I'm passing you what's been
19  marked as Exhibit 8.  This is a press
20  release from CCA on August 11, 2016,
21  announcing the decision of somebody to
22  their board of directors.
23          Did you analyze the extent to
24  which -- the extent to which Exhibit 8
25  impacted the CCA stock price on August 11,

1  if at all?
2      A.   I do recall seeing a news story
3  about the appointment, about this
4  appointment to the board of directors.  I
5  saw no indication that this was a --
6  considered by the market to have a
7  positive impact on CoreCivic stock price
8  on August 11.
9      Q.   And how did you reach that
10  conclusion that there was no indication
11  that the announcement was considered to
12  have a positive impact on CoreCivic's
13  stock price?
14      A.   I didn't see anyone saying that
15  this would have a positive impact on the
16  stock price.  I don't recall any other
17  announcements even referring -- news
18  stories referring to this.
19          I don't see any -- I don't
20  recall seeing anything that would lead me
21  to believe or anybody else to believe that
22  this was having a positive impact on the
23  stock price.
24          So I would have analyzed stock
25  price movements on many, many companies.

1  This is not the sort of announcement that
2  I have historically found to be --
3  meaningfully impact stock prices.
4          And I have not seen
5  Dr. Feinstein or other experts consider
6  these.  I think, as Dr. Feinstein would
7  say, is valuation relevant?  Or I don't
8  believe this was one of the pieces of
9  information that he found to be valuation
10  relevant with CoreCivic stock price.
11          So, in my experience, the sort
12  of announcement typically isn't relevant.
13  But in this case I found no evidence that
14  the -- that news stories or analysts or
15  others covering the company or the value
16  of the company attributed any importance
17  in terms of the -- positive importance in
18  terms of the stock price to this, but...
19      Q.   Did you consider the fact that
20  Ms. Hilton who is joining the board here
21  used to be a director of the U.S. Marshal
22  Service which is one of CoreCivic's
23  systems?
24      A.   I -- if it's in the article,
25  I --

1      Q.   Paragraph --
2      A.   -- may have seen that, but I did
3  not see -- I mean, typically people try to
4  appoint board members that have some
5  relevance or positive -- I'm not saying it
6  wasn't a positive thing to the company and
7  she wasn't a good addition to the board.
8          I didn't see any evidence that
9  it had a positive price reaction on the
10  stock that was countervailing the
11  potential negative price reaction from the
12  OIG report.
13          And to the extent that there
14  were these countervailing important
15  valuation pieces of information from two
16  very different unrelated news events, if
17  you want to call them that, you wouldn't
18  expect there to be no commentary from the
19  analyst.
20          You wouldn't expect the analyst
21  to say, Well, we have this one really,
22  really positive piece of information and
23  this one really, really negative piece of
24  information, and in my analysis, they
25  completely balance it out, so I'm just not

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  going to write a report at all.
2      So there's this really positive
3  thing that happened, there's a really
4  negative thing, and since they -- since
5  they've canceled each other out, I'm not
6  writing a report.
7      That's really not a reasonable
8  hypothesis.  So to the extent there's both
9  this very positive thing as well as this
10  very negative thing, you wouldn't -- you
11  would then expect it even be more likely
12  that there would be analyst commentary --
13  analysts who were covering the company and
14  are writing about what's important in
15  valuing the stock price.
16     Q.    Do you know if analysts wrote
17  reports on CCA every time there was a
18  statistically significant price movement
19  in the company's stock?
20     A.    I did not particularly look at
21  that question.  And that question is not a
22  meaningful question.
23        One of the things about
24  statistically significant -- so
25  statistically significant at the 5 percent

1  level means that 5 percent of the time you
2  expect an excess return this big even when
3  nothing is happening.
4      So even if analysts only wrote
5  about the times that were -- something
6  important was happening that was moving
7  the stock price, if you're testing things
8  at a 5 percent statistically significant
9  level, you would still expect 5 percent of
10  the time you would have movements that are
11  at that -- at that -- they're in the
12  extremes of the 5 percent and nothing
13  important has happened.
14      So I don't even think that the
15  question would really tell you anything,
16  but that is not -- so it wouldn't surprise
17  me, but that's not something I would have
18  looked at, because it wouldn't even be a
19  meaningful thing to look at.
20     Q.    Well, you didn't also look at
21  whether or not analysts wrote reports on
22  CCA 95 percent of the time that there was
23  a statistically significant price
24  movement, did you?
25        MR. GLENNON:  Objection.  Vague.

1  Mischaracterizes the testimony.
2      THE WITNESS:  I have reviewed
3  all of the analyst reports that were
4  issued during the class period.  And I
5  have reviewed Plaintiffs' experts
6  event study, which would say whether
7  each day movement in the class period
8  is statistically significant according
9  to his event study.
10      I have not tried to mix and
11  match and see when those things
12  happened.
13      MR. GLENNON:  Chris, we've been
14  going about an hour.  Can we take a
15  quick break?  It doesn't have to be
16  very long at all.
17      MR. WOOD:  Sure.
18      MR. GLENNON:  Thank you.
19      MR. WOOD:  That's fine.
20      THE VIDEOGRAPHER:  The time is
21  1:56 p.m.  We are going off the
22  record.
23      (Whereupon, a recess in the
24  proceedings was taken at
25  1:56 p.m.)

1      THE VIDEOGRAPHER:  The time is
2  2:20 p.m.  We are going back on the
3  record.
4  BY MR. WOOD:
5      Q.    We were talking before the break
6  about the August 11 dividend announcement
7  and the August 11 director announcement.
8      Would you agree that those two
9  stories are not negative news?
10      MR. GLENNON:  Objection.  Vague.
11      THE WITNESS:  I don't have any
12  reason to think that they're negative
13  news.
14  BY MR. WOOD:
15      Q.    Okay.
16      A.    I will note that looking at
17  them, both of them are issued after the
18  market closes on August 11, so they would
19  not be part of the price reaction on that
20  day.  They're information that's issued
21  after the market had already closed.
22      Q.    Okay.  You testified earlier
23  that Plaintiffs claimed the stock price
24  dropped because of the OIG study.
25      Do you recall that?

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    MR. GLENNON:  Objection.
2  Mischaracterizes the testimony.
3    THE WITNESS:  I think I said
4  something like that, yes.
5  BY MR. WOOD:
6    Q.    Okay.
7    MR. WOOD:  Ms. Court Reporter,
8  could you read back the sentence that
9  starts, "And Plaintiffs claim."
10    (The following answer was read
11    back:
12    "ANSWER:  And Plaintiffs claim
13    the stock price dropped because
14    of the OIG study.")
15  BY MR. WOOD:
16    Q.    Let me pass you the complaint.
17    (Whereupon, Exhibit 9 is marked
18    for identification.)
19  BY MR. WOOD:
20    Q.    This has been marked as
21  Exhibit 9.  And you reviewed the complaint
22  which has been marked Exhibit 9 in
23  preparing your report, right?
24    A.    I did review the complaint.  And
25  now that you're showing it to me, I can

1  now see the heading of the sections that I
2  have looked at for the alleged
3  misstatements, and they're under
4  Section 7.
5    "Defendant made numerous
6  fraudulent statements and omissions during
7  the class period," and there's A which is,
8  "misstatements and omissions in quarterly
9  and annual reports."
10    Then there's B, which is
11  "Misstatements and omissions" -- "and
12  omissions in conference calls, proxy
13  statements, investor presentations and
14  media articles."
15    So it was my understanding that
16  that section detailed all of the alleged
17  misstatements that -- that Plaintiffs
18  claim.
19    The one that you asked me about
20  earlier is, I believe, mentioned under
21  Roman numeral V which is called "The
22  Background."
23    Q.    "The Background of Defendants'
24  Fraudulent Statements and Course of
25  Conduct," right?

1    A.    "Background Two, Defendant
2  Fraudulent Statements and Course of
3  Conduct."
4    Q.    Fair enough.  Great.
5    So if you turn to page 63 of the
6  complaint.
7    A.    Okay.
8    Q.    There is a section here that
9  says, "Plaintiffs suffered damages when
10  CCA's stock price dropped as information
11  concealed by Defendant's fraud was
12  revealed to the market."
13    Do you see that?
14    A.    Yes.
15    Q.    And there was a paragraph that
16  talks about the August 11 release of the
17  OIG review, right?
18    Then there's a paragraph that
19  talks about the August 18 Yates memo which
20  cited the OIG report, right?
21    A.    Correct.
22    Q.    And then paragraph 199 says, "As
23  a result of these disclosures, CCA's
24  common stock declined from a close of
25  $27.56 per share on August 10, 2016, to an

1  intraday low of $13.05 per share on
2  August 18, 2016, a staggering decline of
3  53 percent."
4    Q.    Do you see that?
5    A.    Yes.
6    Q.    And nowhere in here does the
7  complaint allege that the stock price
8  decline on August 11 in and of itself was
9  statistically significant, right?
10    MR. GLENNON:  Objection.
11  Document speaks for itself.
12    THE WITNESS:  No.  The complaint
13  says, "As a result of these
14  disclosures, the stock price dropped a
15  staggering decline of 53 percent."
16  And the two disclosures that they're
17  talking about are the OIG report and
18  the Yates memo.
19    And they're starting with a
20  price from the day before the close,
21  which is exactly what I have been
22  using in the event study -- using the
23  event study that Plaintiffs' expert
24  had done, starts with the close of
25  27 -- I mean, I don't have a

Case 3:16-cv-02267    Document 122-1    Filed 10/26/18    Page 37 of 86 PageID #: 3767
Page 137..140
www.aptusCR.com

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    recollection that is the closing
2    price, but I would believe it.
3        So as I read this, this says
4    that as a result of these
5    disclosures -- and they've mentioned
6    two, the OIG report and the -- and the
7    Yates memo citing the OIG report.
8        So both of the corrective
9    disclosures, according to this
10       complaint, are the OIG report or
11       something citing the OIG report.
12       It says, As a result of this,
13       the stock price fell 53 percent.
14       That's how I would read the complaint.
15       That's how I read those sentences.
16   BY MR. WOOD:
17       Q.    Right.  So it's true that on
18   August 11 -- and you can look at
19   Feinstein's report if you want to look at
20   the stock price returns.  But it's true on
21   August 11 that the -- CCA's stock price
22   declined, right?
23       A.    On August 11?
24       Q.    Yes.
25       A.    I think as we talked about

1    before, Dr. Feinstein found that there was
2    some mistake related to dividends in his
3    report and in his returns.
4        Q.    Let me clear that up.  I don't
5    think that was a mistake in his report.  I
6    think it was a mistake in the way that
7    Exhibit 4 was printed out.
8        But what you have in front of
9    you is the corrected version of Exhibit 4.
10       A.    I actually have his original
11   report in front of me, which I brought
12   with me, which I don't think -- it's not
13   my understanding that it was the way it
14   was printed.
15       It was my understanding that he
16   actually had mistaken tables in his report
17   and made a mistake.  It wasn't a printing
18   mistake.
19       Q.    Okay.  Well, you're wrong about
20   that.  It was the way the spreadsheet was
21   printed out.
22       But you can look at the
23   exhibit that we marked in this case and
24   see the correct version of Exhibit 4, if
25   you want to take a look at that.

1        A.    Okay.  Actually, I think my
2    report has price reaction to OIG.
3        Q.    Well, we're going to look at
4    more than just August 11.  So I'm happy
5    for you to look wherever you want for --
6    paragraph 58 of your report.
7        A.    Okay.  Yeah, so according to --
8    return is negative .62 percent on
9    CoreCivic's stock price.
10       Q.    That's the same as what
11   Professor Feinstein has in his Exhibit 4,
12   correct?
13       A.    Well, he confusingly calls it a
14   logarithmic return, which I said before I
15   don't -- but, yes, he has negative
16   .62 percent.
17       Q.    Thank you.
18       So stock price declined on
19   August 11, right?  That's what that
20   reflects?  And it declined on August 12 as
21   well, right?  That's what it reflects,
22   what Exhibit 4 reflects?
23       A.    That's what Dr. Feinstein has in
24   his report under "logarithmic return."
25       Q.    Great.  And it declined on the

1    next trading day as well on the 15th,
2    right? according to Exhibit 4?
3        A.    According to the logarithmic
4    return under Dr. Feinstein's Exhibit 4, it
5    is negative.
6        Q.    And it declined on August 16 as
7    well, right?
8        A.    According to Dr. Feinstein's
9    logarithmic return in his corrected
10   Exhibit 4, yes.
11       Q.    And that's 11 straight days of
12   negative return; is that correct?
13       MR. GLENNON:  Objection.  The
14       document speaks for itself.
15       THE WITNESS:  I'm sorry.  You
16       only asked me about four days.
17   BY MR. WOOD:
18       Q.    Okay.  If you --
19       A.    Whether --
20       Q.    Let's go back up a little bit.
21       So if you go from August 2 to
22   August 16, right? you've got one, two,
23   three, four, five, six, seven, eight,
24   nine, ten -- 11 days of negative returns.
25   Is that -- according to Exhibit 4, right?

Case 3:16-cv-02267    Document 122-1    Filed 10/26/18    Page 38 of 86 PageID #: 2741
www.aptusCR.com
Page 141..144

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 145
Page 146

1    A.    Yes.  I count 11 negative
2  numbers in a row according to
3  Dr. Feinstein's corrected Exhibit 4 under
4  the column "Logarithmic Return."
5    Q.    Is it possible -- well, did you
6  look to see whether or not if you combine
7  stock price reaction on August 11 and
8  August 12, whether -- if you look at a
9  two-day window, whether that would be
10  statistically significant?
11          MR. GLENNON:  Objection.  Vague.
12          THE WITNESS:  I looked at
13    Dr. Feinstein's event study
14    methodology and the conclusions of his
15    event study.
16          I didn't -- and I did my
17    alternative event study.  I didn't
18    look for example of 11 different days,
19    which would not be consistent with
20    Plaintiffs' claim of an efficient
21    market.
22          And it wouldn't be consistent
23    with the event study analysis that
24    Dr. Feinstein has done, which
25    supposedly supports the Plaintiffs'

1  claim of an efficient market.
2  BY MR. WOOD:
3    Q.    Do you see that starting on
4  August the 3rd and going through -- well,
5  at least August 18, do you see that the
6  volume, the trading volume for CCA stock
7  appears to increase at least compared to
8  the couple weeks before that?
9    A.    It doesn't look like it's
10  increasing, so it -- I mean, it's -- it's
11  higher on the 4th than it was on the 3rd.
12  And then it goes down on the 5th compared
13  to the 4th.
14          Then it goes down, again, on the
15  8th.  Then it goes up again on the 9th.
16  Then it goes up again on the 10th.  Then
17  it goes down again on the 11th.  Then it
18  goes down again on the 12th.
19          So the volume on the 11th is
20  negative, smaller than it was the prior
21  day.
22    Q.    Sure.  But if you start, for
23  example, on August the 3rd and go through
24  the 18th, every day in that period has a
25  trading volume of over a million shares,

1  right?
2          And if you look back from
3  August 2 to July 15, there's only one day
4  that has over a million shares?
5          Do you see that?
6          MR. GLENNON:  Objection.
7    Document speaks for itself.
8          THE WITNESS:  Dr. Feinstein's
9    table in his corrected Exhibit 4
10    appears to show what you've -- appears
11    to say that.
12  BY MR. WOOD:
13    Q.    Did you do any analysis to help
14  understand why the trading volume of CCA
15  shares from October 3 to -- I'm sorry --
16  from August 3 to August 18 appears overall
17  to be elevated versus the trading volume
18  between April 2 and July 15?
19          MR. GLENNON:  Objection.  Vague
20    and lack of foundation.
21          THE WITNESS:  I think if you
22    look at page 8 to my report, you'll
23    see I have a picture of the volume.
24    And you'll see that sometimes earlier
25    during the class period there are

1  some, you know, quite high spikes in
2  the volume.
3          If you look at the period and
4  after the end of class period when as
5  I say there's much greater uncertainty
6  and implied volatility of the stock is
7  higher, the volume is higher, I don't
8  particularly see based on the picture
9  that I have that the volume near the
10  end of the class period before the
11  very -- before the end of the class
12  period is particularly high.
13  BY MR. WOOD:
14    Q.    Okay.  And I was just asking if
15  you did any analysis -- you may think it's
16  not particularly high, and that's fine.  I
17  appreciate that answer.
18          I'm just asking if you did any
19  analysis to try to understand why on
20  aggregate there's a higher trading volume
21  between August 3, 2016, and August 18
22  versus July 15 and August 2?
23          MR. GLENNON:  Same objections.
24          THE WITNESS:  That's not a
25    particular analysis that I did, no.

Case 3:16-cv-02267    Document 122-1    Filed 10/26/18    Page 39 of 86 PageID #: 2745
www.aptusCR.com
Page 145..148

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  BY MR. WOOD:
2      Q.   Okay.  Did you look to see what
3  caused the negative 6.39 from the stock
4  price decline on August 4?
5      A.    You are reading the 6.39 percent
6  from Dr. Feinstein's corrected Exhibit 4.
7  I don't know if that -- as I sit here, if
8  that number is correct or not.
9          I have looked, in general, at
10 what was affecting the stock price during
11 the alleged class period.
12         I've done the analysis that's
13 described in my report.  In the course of
14 my analysis of price impact, I have
15 reviewed all of the analyst reports that
16 were written about CoreCivic as well as
17 analyst reports that were written on one
18 of CoreCivic's competitors, the publicly
19 traded company GO.
20         I have read news stories.  I
21 have read conference calls transcripts and
22 I have looked at SEC filings and I have
23 reviewed a lot of information.
24         I have -- in the course of my
25 work, I'm analyzing price impact of the

1  alleged misrepresentation.  I have
2  reviewed a bunch of information about what
3  is affecting the stock price at various
4  points in time.
5          I have not particularly focused
6  on the date August 4, 2016, and I don't
7  have a specific recollection of what is
8  the actual stock price return on August 4,
9  2016.
10         But one of the things that I did
11 look at is how Plaintiffs' expert
12 Dr. Feinstein conducted his event study
13 which not only looked at the stock price
14 movements of CoreCivic but controlled --
15 did an event study controlling for the
16 movement in a market in sector and -- I
17 believe a REIT index.
18         So -- so all of those things are
19 things that I have looked at.  As I sit
20 here, I don't recall what happened to the
21 stock exactly on that date nor what
22 happened to the various indices on that
23 date.
24         You can look in -- and see what
25 Dr. Feinstein's report says is happening

1  to the various indices on that date.  And
2  it looks like the sector index is going
3  down as is the REIT index is going down on
4  that date.
5          And the -- you know, one of your
6  prior questions is, you know, you had
7  counted off 11 negative days on
8  Dr. Feinstein's corrected Exhibit 4.
9          There are a number of negative
10 days around that same time period
11 according to Dr. Feinstein with the sector
12 index as well as with the REIT index.
13     Q.   Okay.  Do you have any reason to
14 dispute that there was a statistically
15 significant price decline in CoreCivic
16 stock on August 4, 2016?
17     A.   Well, you know, I could do the
18 math and figure it out.  I could do the
19 math and try to figure this out according
20 to Dr. Feinstein's event study analysis.
21         August 4, 2016, according to --
22 so that is one of the dates that
23 Dr. Feinstein analyzed -- I believe in
24 his -- so Dr. Feinstein does an
25 analysis --

1      Q.   Well, you found there's no
2  statistically significant --
3          MR. GLENNON:  I don't know if
4  she's done answering the question.
5          THE WITNESS:  I think it was one
6  of the dates that Dr. Feinstein
7  selected.  So he did a -- what other
8  sometimes called a sort of news versus
9  no-news test.
10         He tested whether a group of
11 dates moved differently than another
12 group of dates, groups where there was
13 news groups versus where there wasn't
14 news, and I believe that was one of
15 his dates.
16 BY MR. WOOD:
17     Q.   It's in paragraph 27 of your
18 report.
19     A.   It's in paragraph 27 of my
20 report?
21     Q.    Yes.  And the table that
22 follows.
23         So you did an analysis --
24     A.    Oh, because it's a
25 misrepresentation day.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

Page 153

1    Q.    Right.
2    A.    So then, yes, I did analyze it
3 because it's a misrepresentation day.  I
4 think it's also one of his -- one of his
5 selected news dates.
6        So he compares his selected news
7 dates with other dates and found that, in
8 general, his selected news dates were
9 different than the non-news dates.
10    Q.    Right.  So you found on
11 August 4, 2016, that there was not a
12 statistically significant price increase,
13 right?
14    A.    That's right.  That's what my
15 table says, yes.
16    Q.    Right.  And you don't have any
17 reason to dispute that not only was there
18 not a statistically significant price
19 increase, but, in fact, there was a
20 negative 6.39 percent decrease on
21 August 4, 2016, right?
22    A.    Those aren't necessarily the
23 same thing.  So it could be a
24 statistically significant price increase
25 according to the event study, and there

Page 154

1 still could be a decrease.
2        So the event study is
3 controlling for movements in the market in
4 the industry, and the actual just flat
5 change in the stock price isn't
6 controlling for anything.
7    Q.    Okay.
8    A.    So I don't, as I sit here, have
9 a recollection of what the stock price
10 move was on that date.
11        I have Dr. Feinstein's corrected
12 Exhibit 4, which, you know, alleges --
13 which is supposed to show stock price
14 movements.
15        And then he also has what the
16 various market and industry and sector
17 REIT returns are for various days.  He
18 also has what his model shows -- what is
19 his model.
20        So he does not have the results
21 of the event study, but in -- in -- I
22 think his event study is -- his event
23 study model was replicable, and I was able
24 to replicate it.
25        But as I sit here, I don't

Page 155

1 recall the results.  But it is possible to
2 put in the numbers and calculate it.
3    Q.    I think you were in the middle
4 of doing that math and satisfying yourself
5 as to whether or not that stock price
6 decline was statistically significant.
7        Do you just want to finish doing
8 that?
9    A.    Oh, I wasn't even trying to do
10 that, no.  I was saying that it would be
11 doable.  Yeah, I would have to multiply a
12 bunch of different numbers.
13        So he has three different
14 indices.  Yeah, I don't -- I don't have
15 great confidence that I can do that as I
16 sit here in my head.
17    Q.    Okay.
18    A.    I would prefer to have the --
19 what we have done -- what I have done in
20 the office is we have his model replicated
21 on a spreadsheet, and we have put in what
22 he says are his -- are getting the same
23 results, but it would be hard to do that
24 in my head.
25    Q.    Take a look at page 139 of his

Page 156

1 report.  That's Exhibit 6-B.
2    A.    139?
3    Q.    Yes, please.
4    A.    Okay.
5    Q.    And you see that that indicates
6 on August 4 the t-statistic of negative
7 6.16?
8    A.    Yes.
9    Q.    And that was --
10    A.    So according to Dr. Feinstein,
11 he has found that it is statistically
12 significant -- or according to this table
13 it's a statistically significant negative
14 reaction.
15    Q.    And you reviewed this table in
16 preparing your report, right?
17    A.    I don't recall whether his
18 corrected -- I don't remember when his
19 recollections were made, whether that was
20 before or after my report was issued.
21    Q.    It was before.
22        Do you have any reason to
23 believe that his t-statistic here on
24 August 4 in Exhibit 6-B is wrong?
25    A.    Based on his event study model,

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1   I don't, no.
2        (Whereupon, Exhibit 10 is marked
3        for identification.)
4   BY MR. WOOD:
5        Q.   I'm passing you what's been
6   marked as Exhibit 10.  Exhibit 10 is an
7   analyst report from SunTrust.  Has a date
8   of August 4, 2016.  This is one of the
9   reports that you considered in your
10  report, right?
11       A.   Correct.
12       Q.   If you look at the third bullet
13  point in the bullet points, it says, "The
14  Federal Bureau of Prisons, BOP, decided
15  not to review -- not to renew the contract
16  with CXW on the 1129 bid Cibola County
17  Corrections Center in New Mexico in late
18  July."
19          It goes on.  You're welcome to
20  read the whole paragraph.
21          In the end it says, " The
22  closing of the Cibola facility will result
23  in a $0.01 cut from quarterly EPS which is
24  reflected in the company's guidance."
25          Do you see that?

1        A.   Yes.
2        Q.   Do you know why the BOP decided
3   not to renew the contract at Cibola with
4   CCA?
5        A.   Other than the publicly
6   information -- publicly available
7   information that I have reviewed and that
8   is listed in my materials considered, I
9   don't have any other understanding, and I
10  don't -- if there is information in there,
11  I don't have -- I don't, as I sit here,
12  have a specific recollection.
13       Q.   You reviewed a number of
14  articles about quality -- supposed quality
15  issues at CCA in your report and came to
16  the conclusion that there weren't
17  statistically significant price declines
18  when some of those media articles were
19  issued; is that fair?
20          MR. GLENNON:  Objection.  Vague.
21       Foundation.
22          THE WITNESS:  I would say that's
23       generally true.  So, for example, I'm
24       recalling that -- there's, for
25       example, a study done on -- there's an

1        ACLU report, I believe, and there's a
2        study done on the Adams facility.  And
3        there are other events -- other
4        information.
5           Much of that information is
6        information that was in the complaint
7        itself as showing that the -- claiming
8        to show that the alleged
9        misrepresentations, the statements the
10       company made were misrepresentations,
11       because the truth was there were -- I
12       mean, for example, there were issues
13       at Adams -- I think it was Adams where
14       somebody was killed.
15  BY MR. WOOD:
16       Q.   Uh-huh.
17       A.   And, you know, various...
18       Q.   This is -- Section 7-C of your
19  report, right?  I'm not trying to trip you
20  up with my words.
21       A.   Do you have a page for that?
22       Q.   It starts on page 35.
23       A.   Yes.
24       Q.   This is the section where you
25  talk about -- I guess it speaks for

1   itself, right?  Reports of riots and other
2   safety and quality-related incidents, no
3   stock price reaction.
4           So do you have an opinion as to
5   whether it would be relevant for the
6   market to know that BOP decided not to
7   renew its contract with Cibola, which was
8   announced on August 4, because of quality
9   issues at Cibola?
10          MR. GLENNON:  Objection.  Vague.
11          THE WITNESS:  I'm not sure what
12       you mean by "relevant."  Relevant to
13       whom?
14  BY MR. WOOD:
15       Q.   To the market.
16          MR. GLENNON:  Same objection.
17          THE WITNESS:  I'm not sure how
18       to answer that question.  I don't know
19       whether to ask for more information
20       about what you're talking about or
21       what you're hypothesizing.
22          What I have done is analyzed the
23       alleged misrepresentations in this
24       case and whether they have price
25       impact.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1        If your question is would
2    some -- could some hypothetical other
3    announcement be important to the
4    market, I -- you know, I don't know.
5    I mean, I suppose that's something I
6    could think about or try to analyze.
7        I've tried to analyze whether --
8    what is actually alleged in this case
9    had price impact.  That may or may not
10    help answer your hypothetical
11    question, but...
12 BY MR. WOOD:
13    Q.    Is it -- is it possible -- so it
14 says here that they're going to close
15 Cibola, which will result in a $0.01 cut
16 from quarterly EPS --
17    A.    I'm sorry.  Now you're back
18 on --
19    Q.    I'm sorry.  Yeah, back on the
20 August 4 SunTrust report.
21    A.    This one.  Sorry.  Okay.
22    Q.    So they say that Cibola's
23 facility's closing.  It will be a $0.01
24 cut from quarterly EPS as reflected in the
25 company's guidance, right?

1        Is it possible that -- that that
2    announcement with the $0.01 cut from
3    quarterly EPS could have price impact?
4        MR. GLENNON:  Objection.
5    Mischaracterizes the document and
6    vague.
7        THE WITNESS:  Oh, I don't know.
8    Now you're asking me whether a
9    specific piece of information that's
10    in this analyst's report, whether that
11    could reflect the stock price?
12 BY MR. WOOD:
13    Q.    A specific piece of information
14 that the analyst says will result in a
15 $0.01 cut from quarterly EPS, whether that
16 could create price impact.
17    A.    So is your question, did the
18 information that the closing of the Cibola
19 facility, did that negatively impact the
20 stock price?  Did it negatively impact the
21 stock price?
22        Or is your question did this --
23 regardless of the closing of the facility,
24 is a $0.01 cut from quarterly EPS -- did
25 that have price impact?

1        Or is your question that -- did
2    the fact that the SunTrust analyst said
3    this impact the stock price?
4    Q.    I think those are great
5 questions, by the way.  I don't think any
6 of them are my question.  But I think the
7 distinctions are very important.
8        My question was only whether it
9 would be possible that a $0.01 cut from
10    quarterly EPS as a result of a facility
11    closing could have price impact; not
12    whether it did, but if it could?
13    A.    I don't -- I mean, I suppose.
14 Most things are possible under some
15 scenarios.
16        So without thinking too much
17 about this, it's hard to imagine that it
18 would be impossible.  But I wouldn't
19 preclude that it's impossible.  I don't
20 know what the impact would be.
21        I don't have a -- as I sit here,
22 I haven't thought what the impact would
23 be.  But I certainly wouldn't say it would
24 be impossible that it could have impact.
25    Q.    It's certainly plausible, right?

1    that a company -- let's say a company
2    reduces its guidance going forward.
3        It's certainly plausible -- I'm
4 going to use the word "plausible" that a
5 cut in guidance could have price impact,
6 right?
7    A.    I think a cut in guidance, all
8 things equal, is generally a negative --
9 you know, considered a negative event.
10        It's decreasing guidance is --
11 you know, is generally not positive and is
12 generally negative.  And I do think that
13 most circumstance or many circumstances
14 the market cares about guidance, so.
15        So I would say that decreasing
16 guidance can have a negative effect.
17    Q.    Reducing future cash flows,
18 right? all else equal, is not going to be
19 a good thing?
20        MR. GLENNON:  Objection.  Vague.
21        THE WITNESS:  Yeah, in general,
22    cash is good, and a reduction in cash
23    is not good.  All else equal, I would
24    agree.
25 BY MR. WOOD:

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    Q.    Do you have an opinion as to
2  whether or not it matters why the Cibola
3  facility was closed, so, for example, if
4  it was closed just because they just
5  didn't need it anymore versus it was
6  closed because inmates were dying,
7  committing suicide and the BOP had
8  expressed their displeasure with that and
9  decided not to renew the contract?
10        MR. GLENNON:  Objection.  Vague.
11        THE WITNESS:  Is your question
12    does it matter to Plaintiffs' claim in
13    this case that Plaintiffs now want to
14    claim that instead of what they
15    actually claimed was the truth, that
16    now there's a different claim and
17    something else is -- it's not my
18    understanding that this is -- that
19    this is what Plaintiffs have claimed.
20        Are you saying does it matter to
21    this case?  I think it does matter, is
22    my legal understanding, that
23    Plaintiffs have a -- some duty to do,
24    you know, particularity and they have
25    to have a claim.

1        Can't just have a moving target,
2    but that's not a -- I'm not a lawyer,
3    and that seems like a legal opinion.
4  BY MR. WOOD:
5    Q.    Well, I'm -- I'm sorry.  I don't
6  want to interrupt.
7        I'm asking if you have an
8  opinion on whether the -- I can be more
9  general if you want, but this is a
10  specific one.
11        Do you have an opinion as to
12  whether it would matter to the market that
13  a CCA facility closes for innocuous
14  reasons versus a CCA facility closing
15  because of serious quality problems?
16        MR. GLENNON:  Objection.  Vague.
17    Incomplete hypothetical.
18        THE WITNESS:  I don't know.
19    You're asking me questions that are --
20    I think, sure, in some theoretical
21    thing I think it can make a difference
22    why things happen.  I wouldn't say
23    that it couldn't.
24        I don't know whether it would
25    make a difference in this instance.  I

1    don't -- I have focused my analysis on
2    the alleged misrepresentations in the
3    case.  This is not alleged as a
4    corrective disclosure.
5        This is alleged as a date when
6    the company has continued to make the
7    same allegedly false and misleading
8    statements that they have previously
9    made.
10  BY MR. WOOD:
11    Q.    Okay.  I'm going to go back to
12  your report, because I don't want to
13  mischaracterize what you said.
14        So in Section D-3 of your
15  report, it starts on page 53.
16    A.    Okay.  43, right?  Oh, D-3.
17    Q.    Yeah.  53, I think.
18    A.    Okay.
19    Q.    I'm trying to say these things
20  in ways that you will agree with them.
21        You note in section -- in this
22  section that CCA's stock price recovered
23  at some point to some degree following the
24  OIG report, right?
25        MR. GLENNON:  Object.  It

1    mischaracterizes the exhibit.
2        MR. WOOD:  No, it doesn't.
3        MR. GLENNON:  It doesn't say
4    OIG.
5        THE WITNESS:  I mean --
6        MR. WOOD:  It says "after the
7    class period."  All right.  Fair
8    enough.  The Yates memo.
9        THE WITNESS:  It falls after the
10    Yates memo, and it -- and it recovers
11    as the chart shows.  And it jumps up a
12    lot at the time of the presidential
13    election.
14  BY MR. WOOD:
15    Q.    And why did it jump up a lot at
16  the time of the presidential election?
17        MR. GLENNON:  Objection.  Vague.
18    Foundation.
19        THE WITNESS:  Well, one of the
20    things that analysts say after the
21    Yates memo is they say that they
22    believe that there's been a policy
23    shift and there is uncertainty and
24    fear that it may affect not only the
25    BOP contracts but other contracts.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1       And so there's -- I have a chart
2   too.  And after the presidential
3   election, there is a new
4   administration and there's a belief
5   that the -- the policy shift and the
6   move away from -- potential move away
7   from private prisons is not -- not as
8   likely.
9   BY MR. WOOD:
10      Q.    Take a look at paragraph 87 of
11  what you wrote.  I think that's what
12  you're talking about, but why don't you
13  read paragraph 87.
14      A.    Okay.
15          (Pause in testimony.)
16          THE WITNESS:  Okay.
17  BY MR. WOOD:
18      Q.    That's what you were explaining,
19  right?
20      A.    Yes.  I think that's imparted.
21  I think there's more in my report, but,
22  correct.
23      Q.    Yeah.  In the paragraphs before?
24      A.    Yeah.  I think there's some
25  other paragraphs, but, yes.  Thank you.

1       Q.    Sure.
2       Did you look to see what part of
3   the company's stock price recovery may
4   have been caused by people believing that
5   the government contracts were no longer at
6   risk as much versus what part of the
7   recovery was caused by people thinking
8   that a Trump administration was going to
9   use more private prisons probably through
10  locking up immigrants?
11          MR. GLENNON:  Objection.  Vague.
12      Foundation.
13          THE WITNESS:  I didn't
14      particularly try to parse the various
15      reasons.
16          I will note that one of the
17      claims that Plaintiffs make in this
18      case is that there are
19      misrepresentations regarding the cost
20      effectiveness of CoreCivic.
21          And what the analysts say after
22      the Trump administration and after
23      Jeff Sessions is -- put in is that
24      they feel that Jeff Sessions, in
25      particular I think, as well as the

1   Trump administration is -- you know,
2   believes in cutting costs and cost
3   consciousness.
4       So the -- that, I think, further
5   refutes the claim that the -- there is
6   price impact from learning that the
7   CoreCivic BOP prisons are actually
8   less cost effective than, you know,
9   alleged.
10  BY MR. WOOD:
11      Q.    Well, but, like, Trump and
12  Sessions also believe in detaining more
13  immigrants, right?  It's going to cost
14  more?
15          MR. GLENNON:  Objection.  Vague.
16      Lack of foundation.
17          THE WITNESS:  What the analysts
18      are saying is that the Sessions and
19      the administration cares about the
20      cost effectiveness and cheaper
21      alternatives.
22          So to the extent that
23      Plaintiffs' claim is that the Yates
24      memo revealed to the market somehow
25      that the CoreCivic prisons, BOP

1       prisons were not cheaper and -- but
2       the analysts are saying is we think
3       Jeff Sessions being in here is going
4       to be good news for CoreCivic, because
5       CoreCivic is cost effective
6       essentially.
7   BY MR. WOOD:
8       Q.    Well, let's look at some analyst
9   reports.
10          (Whereupon, Exhibit 11 is marked
11          for identification.)
12  BY MR. WOOD:
13      Q.    I'm passing you what's been
14  marked as Exhibit 11.  This is a Canaccord
15  record from December 12, 2016.  And this
16  is a report that you considered in writing
17  your report, right?
18      A.    I believe so, yes.
19      Q.    And before we get into the meat
20  of it --
21      A.    I can look and see if it's on my
22  December...
23      Yeah, so what I seem to have on
24  December 12 are two reports, two Canaccord
25  reports.  I don't -- so sometimes they

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  issue one report and then they issue,
2  however, another one that's somewhat
3  updated.
4          I don't -- I don't have a
5  specific recollection of this, and I
6  don't -- but it would appear based on my
7  materials considered that there were two
8  issued on this date by the same analyst.
9      Q.   Well, so this has got to be one
10 of the two, right?
11     A.   It would be -- hopefully.
12     Q.   Right?  I hope so too.
13         All right.  I'm sure you could
14 confirm with your folks at the office
15 whether this is actually one of the ones
16 you looked at, right?
17     A.   It should be.  In other words,
18 this should be a time period and this
19 should be one of the ones that we had,
20 that's correct.
21     Q.   Okay.  And before we look at the
22 first page, if you turn to -- there's
23 little page numbers at the bottom.  The
24 easiest ones to read says 274.
25     A.   Okay.

1      Q.   It's page 8 of the report.  And
2  this near the top has -- we looked at one
3  of these for SunTrust earlier, but it has
4  these required company disclosures as of
5  the date of publication.
6          And you see it says, "The
7  Canaccord or one or more of its affiliated
8  companies intends to seek or expect to
9  receive compensation for investment
10 banking services from CoreCivic, Inc. in
11 the next three months," right?
12     A.   Yes.
13     Q.   Okay.  Great.
14         So if you turn to page 1 -- and
15 you're -- you're welcome to read all of
16 this.  I don't want to prevent you from
17 doing that.
18         But my question is whether or
19 not this report reflects this analyst's
20 belief.  So in the middle of the first
21 paragraph, for example, he says, "Beyond
22 that, we believe there is upside from a
23 Trump administration on the external
24 growth front specifically with regard to
25 ICE contracts which result in substantive

1  earnings growth and warrant further
2  multiple expansion."
3          Do you see that?
4      A.   Yes.
5      Q.   And on the next page under the
6  investment summary on "What we like about
7  CXW," in the second bullet point it says,
8  "We believe a Trump administration will
9  encourage the further use of private
10 companies for the provision of traditional
11 corrections especially with ICE."
12         Do you see that?
13     A.   I'm sorry.  The second page?
14     Q.   The second bullet point under
15 "What we like about CXW."
16     A.   Yeah.
17     Q.   "We believe a Trump
18 administration will encourage the further
19 use of private companies for the provision
20 of traditional corrections especially with
21 ICE."
22         Do you see that?
23     A.   Yes.
24     Q.   So there's some -- at least this
25 analyst has some hope, right? that the

1  company is going to benefit from
2  additional contracts with ICE; is that
3  fair?
4          MR. GLENNON:  Objection.  Vague.
5      Foundation.
6          THE WITNESS:  Well, so when they
7      say, "Updating estimates and agency
8      thoughts under ICE, "they say, "We
9      don't assume any contract wins from
10     the recent ICE and" -- blah, blah,
11     blah.
12         So I don't know.  I think
13     they -- they're -- I would have to
14     read this all more carefully.  It
15     looks like the part that you sort of
16     skipped over is saying, you know,
17     We're upgrading because they've
18     eliminated the dividend cut overhang
19     that we had expected.
20         And then they're saying --
21     whatever -- bunch of other things.
22     And then they're saying, Beyond that,
23     we believe there's upside.
24         So it sounds like this upside
25     that they're talking about hasn't

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    actually gone into their valuation.
2    They're just saying, Other than what
3    we've already included in our
4    analysis, we think there's additional
5    upside.
6        But I would have to look at this
7    more carefully to see, you know, if it
8    went into their evaluation.  From the
9    first glance of the parts you showed
10    me, it looks like that's not -- not
11    why they've upgraded.
12        And that it's -- I don't know.
13    I do see that they say, "We don't
14    assume any contract wins" under the
15    ICE thing.
16  BY MR. WOOD:
17    Q.   And then there --
18    A.   But --
19    Q.   Sorry.  They also say under BOP,
20    right? that they "continue to forecast BOP
21    contract losses when the contracts are due
22    for renewal."
23        Do you see that?
24    A.   "We continue to forecast BOP
25    contract losses as the contracts are due

1    for renewal."
2        Yeah, and they're saying which
3    gives -- they're saying as capacity
4    remains less pressured for the BOP system
5    than in past years.
6        So I think they're saying that
7    given there is a capacity issue, we're
8    thinking that they may not -- there may be
9    contracts that are -- will not be renewed,
10    that the BOP won't need them.
11        Which is different than saying,
12    We think there might be a policy shift to
13    move away from private prisons and we're
14    afraid of that, which is what was the
15    discussion after the Yates memo.
16    Q.   You -- when you were doing your
17    work, you noted that Sessions had
18    rescinded the Yates memo, right? in
19    February 2017?
20    A.   Yeah.  I think that was the word
21    that I used.  I think that's right.
22    Q.   Did you analyze what the stock
23    price reaction was to the -- to the
24    rescinding the publication of the Sessions
25    memo?

1    A.   I don't know if there was --
2        MR. GLENNON:  Objection.  Vague.
3        THE WITNESS:  -- a -- I didn't
4    particularly do event studies on
5    dates -- other dates that are not
6    analyzed or mentioned in my report.
7        I think the expectation was with
8    a new administration that this policy
9    shift away from a -- a potential
10    policy shift away from private prisons
11    was not going to be something that the
12    new administration would be interested
13    in doing.
14        And there was, as I said, an
15    expectation that Sessions cared about
16    cost control and that would choose
17    options that were more -- relatively
18    more cost effective.
19        And the market thought that that
20    was good news for CoreCivic; that not
21    having a policy shift away from
22    private prisons, which they were
23    worried about, was good news.
24        And having a shift toward being
25    more caring about the relative cost,

1    the market appeared to an analyst's
2    feel that CoreCivic would benefit from
3    that.
4  BY MR. WOOD:
5    Q.   You said there was an
6    expectation that Sessions cared about cost
7    control.
8        Did you also read media saying
9    that there was an expectation that
10    Sessions likes to incarcerate immigrants?
11        MR. GLENNON:  Objection.  Vague.
12    Foundation.
13        THE WITNESS:  I would say there
14    was some general media reports that
15    the Trump administration -- that there
16    was an expectation that the Trump
17    administration may increase
18    incarcerations of immigrants.
19        MR. GLENNON:  Chris, we've been
20    going for an hour.  Can we take a
21    quick break?
22        MR. WOOD:  Sure.
23        MR. GLENNON:  Thank you.
24        THE VIDEOGRAPHER:  The time is
25    3:19 p.m.  This concludes DVD No. 3.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    We're going off the record.
2        (Whereupon, a recess in the
3        proceedings was taken at
4        3:19 p.m.)
5        THE VIDEOGRAPHER:  The time is
6    3:44 p.m.  This begins DVD No. 4.  We
7    are going back on the record.
8        (Whereupon, Exhibit 12 is marked
9        for identification.)
10   BY MR. WOOD:
11       Q.   I'm going to pass to you what's
12   been marked as Exhibit No. 12.
13       A.   Okay.
14       Q.   Exhibit No. 12 is a Wells Fargo
15   analyst report issued on -- well, it's
16   dated February 9, 2017.
17       Let me see if you mention it in
18   your -- I believe you do.  You have one
19   listed as Item 421 in your report.
20       A.   Okay.
21       Q.   Okay.  And if we first turn to
22   page 3, near the stop under the
23   certification you see that it's the two
24   bullet points.
25       First one says, "Wells Fargo

1    Securities, LLC or its affiliates intends
2    to seek or expects to receive compensation
3    for investment banking services in the
4    next three months from CoreCivic, Inc."
5        Do you see that?
6        A.   Yes.
7        Q.   And then it says, "Wells Fargo
8    Securities, LLC or its affiliates has a
9    significant financial interest in
10   CoreCivic, Inc."
11       Do you see that?
12       A.   Yes.
13       Q.   And do you know what the
14   significant financial interest that Wells
15   Fargo is talking about here is?
16       A.   I don't believe so, no.
17       Q.   Okay.  If we look at the first
18   page of the report --
19       A.   Okay.
20       Q.   -- under the summary, the very
21   end of the summary --
22       A.   Yeah.
23       Q.   -- Wells Fargo says, "Then said
24   in our view investors will continue to
25   focus on potential future ICE contract

1    wins related to President Trump's strict
2    border/immigration plans."
3        Do you see that?
4        A.   Yes.
5        Q.   So it's fair to say that
6    investors were looking at least at future
7    ICE contract wins as something that will
8    be good for CCA?
9        MR. GLENNON:  Objection.  Vague.
10       THE WITNESS:  Well, I think, in
11       general, if CoreCivic gets contract
12       wins, I think investors would think
13       that would be good.
14       But the particular statement you
15       said here starts with "that said" --
16   BY MR. WOOD:
17       Q.   Uh-huh.
18       A.   -- which as a -- whatever --
19   stylistic thing usually says that, you
20   know, this is somehow different than what
21   I've -- is coming before it.  So this is
22   the end of the summary.
23       So it seems to say that this
24   particular thing is somehow different than
25   their -- the main point of their summary,

1    or at least that is typically what the
2    phrase "that said" means.
3        Q.   Right.  And the sentence
4    before -- there's a sentence before that
5    says they're lowering the high end of
6    EBITDA because of California out-of-state
7    inmate reductions later in the year,
8    right?
9        A.   So it's not "they."  It's not
10   the analyst.  So I think the analyst is
11   saying the company is lowering of the
12   high-end EBITDA.  So I guess that's in
13   their guidance probably.
14       I'm sorry.  In the reductions
15   later in the week.  I mean, yeah -- sort
16   of reading the summary backwards and
17   trying to decide what it means isn't very
18   easy.
19       Do you want me to read it and
20   try to decide what it means or --
21       Q.   Sure.  You can read it forwards
22   if that's easier starting at the top.
23       A.   So they're saying that CoreCivic
24   reported funds from operations that were
25   well above their estimate consensus and

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1 the guidance on better-than-expected
2 EBITDA.
3     Q.    Right.  That's higher
4 Immigration and Customs Enforcement
5 populations, right?
6            MR. GLENNON:  Objection.
7 Foundation.  Vague.
8            THE WITNESS:  I'm not sure what
9 you just said.
10 BY MR. WOOD:
11    Q.    Well, right after you stopped
12 talking, the parenthetical there says,
13 "higher Immigration and Customs
14 Enforcement, ICE populations," right?
15    A.    Yes.
16    Q.    We can put this aside.
17    A.    So they're saying the majority
18 of the raises due to lower income tax
19 expense, outlook... (witness mumbles to
20 self while reading.)  Okay.
21    Q.    Do you -- well, I guess we can
22 look at it, but do you recall whether the
23 Sessions memo, whether the Sessions memo
24 said that Yates was wrong about private
25 prisons not providing the same level of

1 quality and service?
2     A.    I don't know that the Yates memo
3 said that private prisons didn't provide
4 the same level of quality and service.
5     Q.    Okay.  Let's not speculate.
6            (Whereupon, Exhibit 13 is marked
7            for identification.)
8            (Whereupon, Exhibit 14 is marked
9            for identification.)
10 BY MR. WOOD:
11    Q.    Okay.  I'm passing you what's
12 been marked Exhibits 13 and 14.
13    A.    Okay.
14            MR. GLENNON:  Just quickly,
15    Chris, which one is which?
16            MR. WOOD:  I was going to ask
17    the witness that, because I didn't
18    make a notation.
19            MR. GLENNON:  Okay.
20 BY MR. WOOD:
21    Q.    So which one is 13?  Is it
22 the --
23    A.    The Sessions is 13.
24    Q.    Okay.
25    A.    And Yates is 14.

1     Q.    Thank you very much.
2            Why don't you take a minute to
3 review both of them and then let me know
4 when you're fished.
5     A.    Okay.
6            (Pause in testimony.)
7            THE WITNESS:  Okay.
8 BY MR. WOOD:
9     Q.    And you reviewed both of these
10 in the course of putting your report
11 together, right?
12    A.    Yes.
13    Q.    Okay.  So the Yates memo in the
14 third paragraph says, "Private prisons
15 served an important role during a
16 difficult period, but time showed that
17 they compare poorly to our own bureau
18 facilities."
19            Do you see that?
20    A.    Yes.
21    Q.    "They simply do not provide the
22 same level of correctional services,
23 programs and resources.  They do not save
24 substantially on costs.  And as noted in a
25 recent report by the department's Office

1 of Inspector General, they do not maintain
2 the same level of safety and security."
3            Do you see that?
4     A.    Yes.
5     Q.    Do you know what the basis for
6 Deputy Attorney General Yates's statements
7 were that I just read aside from the one
8 that's self-explanatory about the OIG?
9     A.    Well, as she says, it's time has
10 shown.  So according to her own words, the
11 basis is that over time, this has become
12 apparent, according to her -- according --
13 it is information that has become known
14 over time.
15    Q.    Okay.  Now, if you look at the
16 Sessions memo on February 21, 2017, he
17 doesn't say that Yates is wrong about
18 private prisons having the same level of
19 safety, security or same level of
20 services, right?  He just said --
21    A.    He says that the memo changed a
22 longstanding policy and impaired the
23 bureau's ability to meet future needs.
24            So he wants to go back and not
25 change that longstanding policy is what

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1   I -- how I read that.
2       Q.   But he doesn't say that she was
3   wrong about her conclusions about the
4   comparative quality of private prisons,
5   right?
6           MR. GLENNON:  Objection.  Vague.
7           THE WITNESS:  No.  And I don't
8       know that he says she has conclusions.
9       She says time has shown -- I mean,
10      time has shown that they compare
11      poorly.
12          So, no, he doesn't say -- he
13      says it's a change in a policy, which
14      is consistent with what the analysts
15      said after the Yates memo came out.
16  BY MR. WOOD:
17      Q.   Well, when Yates says that "time
18  has shown they compare poorly to our own
19  bureau facilities," do you know to whom
20  that has been shown?
21      A.   I think she is saying we -- I
22  mean, as I read this, it seems to say, We
23  all can see this.
24          She's not saying, I now have
25  some new information that you don't have.

1   She's not saying, I discovered something,
2   and here's some data and let me tell you
3   something that I don't know.
4           This appears to be saying --
5   giving some history that they -- you know,
6   the prison population grew significantly.
7   And as the prison population grew
8   significantly, we started using private
9   prisons.
10          And now that the -- there is a
11  decline in the prison population, you
12  know, they served an important role, but
13  time -- time has shown that they compare
14  poorly and it's a -- we are going to make
15  a shift in our -- what we're going to do
16  in the future when contracts come up for
17  renewal, is what I recall the rest of it
18  saying.
19      Q.   The Yates memo -- I'm sorry.
20  The Sessions memo, as you pointed out,
21  says, "The memorandum changed longstanding
22  policy and practice and impaired the
23  bureau's ability to meet the future needs
24  of the federal correctional system."
25          Do you see that?

1       A.   Yes.
2       Q.   Do you think that part of those
3   future needs are the increased needs for
4   prison beds that Trump and Sessions were
5   effectuating?
6           MR. GLENNON:  Objection.  Vague.
7           THE WITNESS:  I don't know.  I
8       think what it's saying is -- is that
9       it was a change to longstanding
10      policy.  And it's saying that would
11      impair the future needs, and we're
12      going to reverse that policy.
13  BY MR. WOOD:
14      Q.   And, again, you didn't -- and
15  please correct me if I'm wrong, but you
16  didn't analyze the stock price reaction at
17  the time of the Sessions memo?
18          MR. GLENNON:  Objection.  Vague.
19          THE WITNESS:  I have -- I didn't
20      do an event study on the Sessions
21      memo.  I do show the stock price
22      movement through the end of the class
23      period and past the time of Sessions'
24      memo.
25  ///

1   BY MR. WOOD:
2       Q.   It's fair to say that there
3   wasn't a 43 percent increase in the stock
4   price after the Sessions memo, right?
5           MR. GLENNON:  Objection.
6       Foundation.
7           THE WITNESS:  Yes, there was not
8       a 43 percent increase in the -- after
9       the Sessions memo.
10  BY MR. WOOD:
11      Q.   And, in fact, the price of the
12  CCA stock has never returned to the class
13  period high, has it?
14          MR. GLENNON:  Objection.
15      Foundation.
16          THE WITNESS:  I don't know the
17      relevance of analyzing whether the
18      stock price returned to the class
19      period high.  I've been analyzing
20      price impact of the alleged
21      misrepresentation.
22          So whether it returns to a class
23      period high or not is not something
24      that would have been relevant to my
25      analysis.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    I suppose you could -- I have
2  the stock price through, I don't know,
3  the end of February 2017.  As a
4  picture in my report -- and I have
5  another picture which shows the stock
6  price, so.
7  BY MR. WOOD:
8    Q.   Which page are you looking at?
9    A.   Page 54 of my report.
10    Q.   And on page 54, right? that also
11  shows there was an increase in the stock
12  price after the presidential election, but
13  it had not increased back to the price it
14  was the day before the Yates memo, right?
15    A.   I think it does increase to what
16  it was before the Yates memo.  By the time
17  of the Sessions memo, it's higher than the
18  price that it was before the Yates memo.
19    Q.   Right.  But not -- not
20  immediately in mid-November of 2016,
21  right?
22    A.   Not immediately in mid-November?
23  Is that your question?
24    Q.   Yeah.
25    A.   Correct.  In mid-November of

1  2016, the price does not get higher than
2  it was before the Yates memo based on the
3  exhibit in my report.
4    Q.   How much has NERA been paid for
5  its work on this case?
6    A.   I don't know that as I sit here.
7    Q.   Do you have an estimate?
8    A.   I don't actually.  I just don't
9  know.
10    Q.   Well, would you say it's several
11  hundred thousand dollars?
12    A.   I honestly don't know.  It's
13  information that I could obtain, but as I
14  sit here, I just don't know that.
15    Q.   Do you know whether in the
16  retention agreement there was a provision
17  that said you can spend X amount of
18  dollars, but anything more than that, you
19  have to come back and ask us for more
20  money?
21    A.   I don't believe so, no.
22    Q.   Okay.  How much have you been
23  paid for your work on this case?
24    A.   I have not been personally paid
25  for my work on this case.  I am a salaried

1  employee of NERA.  NERA bills for my time.
2    Q.   Well, are you paid by NERA or by
3  Marsh & McLennan?
4    A.   I don't know the legal answer to
5  that.  I have money direct deposited into
6  an account, and I don't know who sends it.
7    Q.   Fair enough.  And how much do
8  they pay you?
9    MR. GLENNON:  I'm going to
10    object on this.  Are you talking just
11    generally?  She just -- do you want to
12    go off the record, or do you want to
13    do this on the record?
14    MR. WOOD:  No.  I'm just asking
15    how much she gets paid by NERA.
16    MR. GLENNON:  I don't know
17    that's relevant, and I don't know if
18    I'm going to allow her to answer this.
19    MR. WOOD:  Okay.  Well, you
20    can't instruct her not to answer for
21    relevance.  If you want to object to
22    relevance, you can certainly do that.
23    MR. GLENNON:  But I don't think
24    you're entitled to know what she's
25    paid generally especially when there's

1  other engagements and other things
2  going on.
3    I let you ask her how much she's
4  being paid on this.  But anything
5  beyond that, I would instruct her not
6  to answer.
7    I mean, I'm happy to meet and
8  confer.  We can talk about if there is
9  another way I can get you what you're
10  looking for.
11    But, generally speaking, I think
12  we're getting into some privacy areas
13  that I'm a little concerned about.
14    MR. WOOD:  We can mark this
15  portion of the transcript attorneys'
16  eyes only.  I think we're entitled to
17  know how much an expert is getting
18  paid for work on this case.
19    MR. GLENNON:  I don't disagree
20  with you on that piece, but that's not
21  what you asked.
22    MR. WOOD:  Okay.  I'm going to
23  ask my question.  If you want to
24  instruct her not to answer on
25  something that's not in the Federal

Case 3:16-cv-02267    Document 122-1    Filed 10/26/18    Page 51 of 86 PageID #: 2193..196
Page 193..196
www.aptusCR.com

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    Rules, I guess you can do whatever you
2    want.  I'm going to ask my question,
3    you can make your objection.
4         MR. GLENNON:  Can we take a
5    quick break and see if we can work
6    this out?
7         MR. WOOD:  Sure.
8         MR. GLENNON:  This seems like a
9    silly thing for us to get sideways on.
10   Let's see if we can work this out.
11        MR. WOOD:  Sure.  That's fine.
12        THE VIDEOGRAPHER:  The time is
13   4:03 p.m.  We are going off the
14   record.
15        (Whereupon, a recess in the
16        proceedings was taken at
17        4:03 p.m.)
18        THE VIDEOGRAPHER:  The time is
19   4:19 p.m.  We're going back on the
20   record.
21        MR. WOOD:  Okay.  So, Brian,
22   you're going to get us something on
23   how much NERA's been paid for the CCA
24   engagement?
25        MR. GLENNON:  Yeah, we'll give

1    you a statement of the compensation
2    that NERA has been paid for the
3    preparation of the study and the
4    testimony, which I think is consistent
5    with the Federal Rule of Civil
6    Procedure 26.
7    BY MR. WOOD:
8         Q.   Okay.  And, Ms. Allen, I
9    understand that you will refuse to answer
10   a question about your salary based on your
11   belief that it's proprietary information?
12        A.   So it's my understanding that
13   as -- that I am required to explain my
14   compensation as regards to the report.
15   The only compensation my agreement -- that
16   I am involved in with regard -- with
17   regard to this report is that NERA is
18   compensated for the time of myself and my
19   staff, my team.
20        And that my hours are $900 per
21   hour and the other staff is at their
22   regular rates, which I wouldn't be able to
23   recite as I sit hear.
24        And that I am a salary employee
25   of NERA, and I had a salary before I

1    started working on this project and have
2    that same -- and that was not -- that was
3    not dependent on this report.
4         Q.   Okay.  But I want to make sure
5    the record is clear.  So I'm going to ask
6    you what your salary is.  And if you're
7    not going to tell me, that's what the
8    record is.  So I want to make sure the
9    record is clear.
10        So what is your salary for this
11   year?
12        A.   Yeah.  That I am not going to
13   tell you.
14        MR. GLENNON:  I'm just going to
15   put on the record while we're making a
16   record, that I don't believe that's
17   called for under Federal Rule of Civil
18   Procedure 26.
19        MR. WOOD:  Okay.  But I can ask
20   anything I want, so that really
21   doesn't matter.  Okay.
22   BY MR. WOOD:
23        Q.   Do you have any stock or stock
24   options in Marsh & McLennan?
25        A.   I think I have stock in Marsh

1    McLennan.
2         Q.   And was that stock something
3    that you got through your employment
4    there?
5         A.   I think at some point I bought
6    stock with -- Marsh McLennan offered
7    the -- offered some deal in terms of
8    buying stock, so I...
9         Q.   Was it a deal to buy it at,
10   like, a below-market rate?
11        A.   Yeah.  I think that's
12   essentially what it was.  It was a while
13   ago.
14        Q.   You don't own any CoreCivic
15   stock, right?
16        A.   I don't believe so.
17        Q.   Okay.  And you know that Marsh
18   sells D&O policies, correct?
19        A.   I don't believe Marsh sells D&O
20   policies, no.  Marsh is a broker.  They're
21   not -- not selling insurance.  My
22   understanding is there are -- help to
23   broker deals, that they're not insurers or
24   selling insurance.
25        Q.   Okay.  They broker -- but they

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1  broker deals for D&O policies, right?
2      A.    I think they help clients buy
3  D&O insurance from other companies.  They
4  are not sellers of insurance.
5      Q.    And do you know if they were
6  involved in buying CCA's D&O policies?
7          MR. GLENNON:  Objection.  Vague.
8      Foundation.
9          THE WITNESS:  I don't know.
10 BY MR. WOOD:
11     Q.    Do you know if Marsh has any
12 contractual relationships with CCA with
13 regard to any insurance policies?
14         MR. GLENNON:  Same objections.
15         THE WITNESS:  I don't know.  To
16     the extent they do or don't is not
17     something that affected my report in
18     any way.
19 BY MR. WOOD:
20     Q.    Okay.  How many hours have you
21 personally spent on this case?
22     A.    I believe it's around 90 hours,
23 but that is something I can -- and
24 counting, I guess, as we're sitting here.
25     Q.    Right.  And do you know roughly

1  how many hours the other folks on your
2  team have spent?
3      A.    I don't know.  I'm sure I can
4  look for it.
5      Q.    I'm sure we'll find out.
6          Are you familiar with the term
7  "the leverage effect"?
8      A.    No.
9      Q.    Okay.
10     A.    I don't believe so.
11     Q.    I don't want to know specific
12 amounts, but is any component of your
13 compensation at NERA tied to NERA's
14 profits?
15         MR. GLENNON:  I'm going to
16     repeat my objection as beyond the
17     requirements of the Federal Rule of
18     Civil Procedure 26.
19         Do you want to consult offline?
20         THE WITNESS:  Not in the -- in a
21     specific -- I mean, all things equal,
22     if NERA, in general, is more
23     profitable, there is -- there's -- as
24     with most companies, the more
25     profitable a company, the more

1      potential there is that people could
2      possibly make more money.
3          And if a company is less
4      profitable, there is potential that
5      people could be making less money.  So
6      there is -- but there isn't a specific
7      formula.
8  BY MR. WOOD:
9      Q.    Is there, like, a bonus
10 potential at the end of the year, for
11 example?
12     A.    There are bonus potentials.
13     Q.    Do you have any equity interest
14 in NERA?
15     A.    No.
16     Q.    Okay.  Is there anyone that
17 assisted you with your report beyond the
18 folks that are listed in your report?
19     A.    I don't believe people are
20 listed in my report.
21     Q.    Well, then let me ask a better
22 question.  Who helped you with your
23 report?
24     A.    Jorge Baez, Augastya Shastri,
25 Jake Brekelbaum.  Those were the primary

1  members of -- that assisted me with my
2  report.  And I had a peer reviewer, Dave
3  Tabak.
4      Q.    Did you get any comments from
5  Mr. Tabak?
6      A.    Not that changed the
7  conclusions.  There may have been some
8  editing or other comments.  Nothing
9  substantive that I recall.
10     Q.    And do you recall any comments
11 that he made?
12     A.    I don't believe that I recall
13 him saying that he thought it was a very
14 good report.
15         MR. WOOD:  Let's go off the
16     record for a few minutes.  I just want
17     to see -- I don't think I have much
18     more to go.
19         THE VIDEOGRAPHER:  The time is
20     4:28 p.m.  We're going off the record.
21         (Whereupon, a recess in the
22         proceedings was taken at
23         4:27 p.m.)
24         THE VIDEOGRAPHER:  The time is
25     4:36 p.m.  We are going back on the

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    record.
2  BY MR. WOOD:
3     Q.    Are you familiar with any
4  literature which discusses the notion that
5  if there is a large stock price drop, that
6  will increase volatility in subsequent
7  periods?
8     A.    I don't recall seeing that
9  literature, no.
10     Q.    In doing your analysis, did you
11  assume that the statements alleged in the
12  complaint were false?
13     A.    I analyzed it assuming that they
14  were false and misleading statements,
15  correct.
16     Q.    Did you make any determination
17  as to whether they were false or you just
18  assumed it?
19     A.    I didn't analyze whether they
20  were or were not false, no.  That wasn't
21  part of my assignment in this case.
22        My assignment was assuming they
23  were false, did they have price impact.
24     Q.    Okay.  If you could turn to
25  page 37 of your report, please.

1     A.    Sure.  37?
2     Q.    Yes.  Please.
3     A.    Okay.
4     Q.    Under the Adams subsection you
5  have a discussion of a report by Justice
6  Strategies?
7     A.    Yep.
8     Q.    Do you know who Justice
9  Strategies are?
10     A.    I reviewed the report.  I don't
11  know that I have -- I don't recall having
12  heard of them before.
13     Q.    And sitting here today, do you
14  know anything about them?
15     A.    Not that I recall, no.  It was
16  possible that the report had a discussion
17  of who they were.  As I start here, I
18  don't have a recollection.
19     Q.    You also talk about some reports
20  in the nation, right? further on in that
21  paragraph?
22     A.    Yes.
23     Q.    And I believe you state here
24  that there were no statistically
25  significant price reaction to The Nation

1  reports that you mention in this
2  paragraph, right?
3     A.    I think I'm leaving to one --
4  I'm referring to one report by The Nations
5  as no statistically significant price
6  reaction.
7     Q.    Okay.
8     A.    Is there another one as well?
9     Q.    No, that's fine.
10        So you -- right.  You refer to
11  there being no statistically significant
12  price reaction following the June 15,
13  2016, Wessler report, right?
14     A.    Yes.
15     Q.    Now, if CCA had orchestrated a
16  campaign to discredit the author of that
17  publication, would that impact your view
18  of whether or not there was a
19  statistically significant price reaction
20  following the publication of the report?
21        MR. GLENNON:  Objection.  Vague.
22  Foundation.
23        THE WITNESS:  No, I don't think
24  that that would affect the statistical
25  significance of the event study.

1        So I'm saying taking the date
2  that the news is public and looking at
3  the event study price reaction after
4  controlling for the market and
5  industry, so I'm using both, I believe
6  using both Dr. Feinstein's event study
7  model as well as the alternative model
8  that I discuss in my report, I'm
9  finding that there is no statistically
10  significant price reaction following
11  that report.
12        So whether -- whatever you
13  hypothesize wouldn't make a difference
14  to the statistical analysis of the
15  event study.
16  BY MR. WOOD:
17     Q.    Well, let's say that CCA
18  believed that The Nation piece was a hit
19  piece funded by anti-privatization backers
20  and that they took efforts to try to
21  counter the piece and mute the reaction to
22  the piece by discrediting the author.
23        Let's say that's what the
24  documents that they produced to us
25  recently show.

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1          Would that be relevant to how
2   the stock price reacts on the day the
3   report was issued?
4          MR. GLENNON:  Objection.  Vague.
5          THE WITNESS:  I don't know if
6   that would be relevant to how the
7   stock price reacts.  The question was
8   whether that -- whether there was or
9   was not a statically -- according to
10  the event study model, there was no
11  statistically significant price
12  reaction.
13         I don't know if you're trying to
14  say if -- whatever happened, happened,
15  and there was no statistically
16  significant price reaction --
17  BY MR. WOOD:
18     Q.   Right.
19     A.   -- following The Nation.  So
20  whether you want to -- it wouldn't -- are
21  you saying would the price reaction have
22  been different had something else
23  happened?  That I don't know.
24     Q.   That's what I'm saying.
25     A.   I don't know.

1      Q.   Okay.
2      A.   This alternative world you're
3   hypothesizing I have not --
4      Q.   Well --
5      A.   I don't know what would happen
6   in an alternative world that you're
7   currently hypothesizing --
8      Q.   Okay.
9      A.   -- what would have happened.
10  But the statistically significant -- the
11  lack of statistically significant price
12  reaction is what I have found and what is
13  the result of Dr. Feinstein's event study
14  model.
15     Q.   But so if, for example, CCA had
16  given a heads-up to analysts or other
17  people, Hey, there is this report coming
18  out; it's going be very negative; it's not
19  true; we just want to make sure you're
20  aware of it so that when it comes out, you
21  know, you don't freak out; you know, that
22  could change how the market, how analysts
23  view that report, right?
24         MR. GLENNON:  Objection.  Vague.
25         THE WITNESS:  I don't know.  You

1          now seem to be hypothesizing things
2   that are not what they -- the
3   allegations or what I have been
4   analyzing.
5          If you're saying the company
6   made other statements or did other
7   things that are not what you are
8   alleging in the complaint, I have not
9   particularly analyzed things that --
10  hypothetical scenarios that were not
11  alleged in this case.
12         So what I have done is analyzed
13  the alleged misrepresentations as they
14  were put forward by Plaintiffs under
15  the success of market efficiency, as
16  put forward by Plaintiffs and their
17  experts and have used the event study
18  analysis of Plaintiffs' experts to
19  analyze price impact.
20         I have not analyzed other
21  alternative scenarios of potential
22  allegations that Plaintiffs have not
23  made in this case.
24  BY MR. WOOD:
25     Q.   Can media reports be useful to

1   understanding of market reaction?  So not
2   analyst reports, but media reports?
3      A.   I think media reports, for one,
4   can help to identify when information has
5   become public.
6          You know, so it's helpful to
7   look at media reports to see sometimes the
8   timing of, you know, when something either
9   went online or something happened.
10         So that's one useful source of
11  media reports in terms of -- I forgot what
12  your actual question was -- analyzing
13  price reactions I think, right?
14     Q.   Yeah.  I appreciate that answer.
15         And I guess my question is:  Can
16  media reports be useful in understanding
17  why a stock reacted in a certain way on a
18  specific day?
19     A.   Sure.  I think they -- they
20  could be useful.
21     Q.   Did you find any in this case
22  that were useful for you to understand
23  what caused the stock price drop on
24  August -- in this case?
25         MR. GLENNON:  Objection.  Vague.

Case 3:16-cv-02267     Document 122-1     Filed 10/26/18     Page 55 of 86 PageID #: 2209
Page 209..212
www.aptusCR.com

Lucy Allen

Grae vs. Corrections
Corporation of America, et al.

1    THE WITNESS:  I'm not
2  particularly analyzing what -- I'm not
3  doing a loss causation for analysis,
4  for example.  I'm analyzing the price
5  impact of the alleged
6  misrepresentations.
7    Did I find any news or media
8  stories helpful?  Probably.  I would
9  have to look through my report.  I
10  don't -- I would imagine there are
11  some -- I don't have a specific
12  recollection, but I reviewed the news
13  stories as I have detailed and listed
14  in my report.
15    And I -- I wouldn't be surprised
16  if I didn't find something that was
17  helpful in the news stories and
18  identifying at least what information
19  was known at various points in time.
20    MR. WOOD:  Pending any cross, I
21  don't have any further questions.
22    MR. GLENNON:  We don't have
23  anything either.
24    MR. WOOD:  Okay.
25    THE VIDEOGRAPHER:  The time is

1  4:47 p.m.  This concludes today's
2  deposition.  We are going off the
3  record.
4    (At 4:46 p.m., the proceedings
5  conclude.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1    REPORTER CERTIFICATE
2  I, the undersigned, do hereby certify:
3  That LUCY ALLEN was by me duly sworn in
4  the within-entitled cause; that said
5  deposition was taken at the time and place
6  herein named; and that the deposition is a
7  true record of the witness's testimony as
8  reported by me, a disinterested person, and
9  was thereafter transcribed.
10    I further certify that I am not
11  interested in the outcome of the said
12  action, nor connected with, nor related to
13  any of the parties in said action, nor to
14  their respective counsel.
15    IN WITNESS WHEREOF, I have hereunto set
16  my hand this 17th day of October, 2018.
17  Signature: __Requested__Waived_X_Not Requested
18
19
20
21    _____
22    JESSICA R. WAACK
    Registered Diplomate Reporter
    Certified Realtime Reporter
23  California Certified Realtime Reporter
    New York Realtime Court Reporter
24  New York Association Court Reporter
    Notary Public, State of New York
25    Licensed in New Jersey

1    DECLARATION UNDER PENALTY OF PERJURY
2  Case Name: Grae vs. Corrections
    Corporation of America, et al.
3  Date of Deposition: 10/10/2018
4  Job No.: 10046971
5
6    I, LUCY ALLEN, hereby certify
7  under penalty of perjury under the laws of the State of
8  _____ that the foregoing is true and correct.
9    Executed this _____ day of
10  _____, 2018, at _____.
11
12
13    _____
14    LUCY ALLEN
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20___,
21  by_____,  proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

Page 217

1  DEPOSITION ERRATA SHEET

2  Case Name: Grae vs. Corrections
   Corporation of America, et al.

3  Name of Witness: Lucy Allen
   Date of Deposition: 10/10/2018

4  Job No.: 10046971
   Reason Codes:  1. To clarify the record.

5          2. To conform to the facts.
           3. To correct transcription errors.

6  Page _____ Line _____ Reason _____

7  From _____ to _____

8  Page _____ Line _____ Reason _____

9  From _____ to _____

10 Page _____ Line _____ Reason _____

11 From _____ to _____

12 Page _____ Line _____ Reason _____

13 From _____ to _____

14 Page _____ Line _____ Reason _____

15 From _____ to _____

16 Page _____ Line _____ Reason _____

17 From _____ to _____

18 Page _____ Line _____ Reason _____

19 From _____ to _____

20 Page _____ Line _____ Reason _____

21 From _____ to _____

22 Page _____ Line _____ Reason _____

23 From _____ to _____

24 Page _____ Line _____ Reason _____

25 From _____ to _____

Page 218

1  DEPOSITION ERRATA SHEET

2  Page _____ Line _____ Reason _____

3  From _____ to _____

4  Page _____ Line _____ Reason _____

5  From _____ to _____

6  Page _____ Line _____ Reason _____

7  From _____ to _____

8  Page _____ Line _____ Reason _____

9  From _____ to _____

10 Page _____ Line _____ Reason _____

11 From _____ to _____

12 Page _____ Line _____ Reason _____

13 From _____ to _____

14 Page _____ Line _____ Reason _____

15 From _____ to _____

16 Page _____ Line _____ Reason _____

17 From _____ to _____

18 Page _____ Line _____ Reason _____

19 From _____ to _____

20 Page _____ Line _____ Reason _____

21 From _____ to _____

22 _____ Subject to the above changes, I certify that the
   transcript is true and correct

23 _____ No changes have been made. I certify that the
   transcript  is true and correct.

24

   _____

25          LUCY ALLEN

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**Exhibits**

**EX 001 - ALLEN, L**
6:5 10:16,20 11:20,
21

**EX 002 - ALLEN, L**
6:6 11:8,12 45:10,12

**EX 003 - ALLEN, L**
6:8 33:14,18

**EX 004 - ALLEN, L**
6:9 11:15,19 45:11,
12 60:9,13 142:7,9,
24 143:11,22 144:2,
4,10,25 145:3 147:9
149:6 151:8 154:12

**EX 005 - ALLEN, L**
6:12 81:8,12

**EX 006 - ALLEN, L**
6:13 107:11,15,16

**EX 007 - ALLEN, L**
6:16 119:22 120:1

**EX 008 - ALLEN, L**
6:18 129:15,19,24

**EX 009 - ALLEN, L**
6:20 137:17,21,22

**EX 010 - ALLEN, L**
157:2,6

**EX 011 - ALLEN, L**
172:10,14

**EX 012 - ALLEN, L**
7:5 181:8,12,14

**EX 013 - ALLEN, L**
7:7 186:6

**EX 014 - ALLEN, L**
7:10 186:8

**$**

**$0.01** 157:23 161:15,
23 162:2,15,24
163:9

**$13.05** 140:1

**$27.56** 139:25

**$900** 198:20

**1**

**1** 10:16,20 11:21
95:22 115:13 174:14

**10** 8:3,7 139:25
157:2,6

**10:34 a.m** 51:16

**10:35** 51:12

**10:53** 51:18

**10th** 146:16

**11** 96:20 97:4,20,24
103:8,11 105:2
106:4,8,18 120:2,9
122:14,18 127:22
129:20,25 130:8
136:6,7,18 139:16
140:8 141:18,21,23
143:4,19 144:11,24
145:1,7,18 151:7
172:10,14

**1129** 157:16

**117** 60:22

**11:51** 95:16

**11:51 a.m** 95:20

**11th** 146:17,19

**12** 87:2,12,24 88:13,
22 143:20 145:8
172:15,24 181:8,12,
14

**12th** 146:18

**13** 186:6,12,21,23

**139** 155:25 156:2

**14** 33:4 34:9 186:8,
12,25

**15** 147:3,18 148:22
207:12

**15th** 144:1

**16** 66:13 86:22 144:6,
22

**18** 14:17,22 25:4,15
34:3,4,13,17 37:25
38:23 45:17,25 46:9
47:7 48:12 49:1,10,
24 52:8,19 56:10
139:19 140:2 146:5
147:16 148:21

**18th** 68:22 146:24

**19** 37:25 38:23 60:16
68:24 78:3 86:22

**199** 139:22

**19th** 51:3

**1:56** 135:21

**1:56 p.m** 135:25

**2**

**2** 11:8,12 45:10,12
95:22 115:16 144:21
147:3,18 148:22

**2016** 34:18 35:14
38:22 45:17 46:9
47:7 48:12 49:1,10,
24 52:8,19 103:8,11
129:20 139:25 140:2
148:21 150:6,9
151:16,21 153:11,21
157:8 172:15 193:20
194:1 207:13

**2017** 178:19 181:16
188:16 193:3

**2018** 8:3,8

**21** 188:16

**23** 43:21

**24** 42:12 60:24 61:2

**25** 42:9

**26** 198:6 199:18
202:18

**27** 140:25 152:17,19

**274** 173:24

**2:20** 136:2

**3**

**3** 33:14,18 108:5,8
147:15,16 148:21
180:25 181:22

**30** 34:18 35:13 38:22

**300** 8:20

**32** 95:25

**33** 33:9 36:5,7

**34** 97:6,9

**35** 35:2 159:22

**37** 205:25 206:1

**3:16-cv-02267** 8:16

**3:19** 180:25

**3:19 p.m** 181:4

**3:44** 181:6

**3rd** 146:4,11,23

**4**

**4** 11:15,19 45:11,12
60:9,13 61:16 142:7,
9,24 143:11,22
144:2,4,10,25 145:3
147:9 149:4,6 150:6,
8 151:8,16,21
153:11,21 154:12
156:6,24 157:8
160:8 161:20 181:6

**401(k)** 89:8

**421** 181:19

**43** 51:21 167:16
192:3,8

**43.78** 45:19,25

**44** 108:15

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**47** 80:15

**48** 80:16

**4:03** 197:13

**4:03 p.m** 197:17

**4:19** 197:19

**4:27 p.m** 204:23

**4:28** 204:20

**4:36** 204:25

**4:46** 214:4

**4:47** 214:1

**4th** 146:11,13

---

**5**

**5** 31:3,17 66:4 81:8,
12 133:25 134:1,8,9,
12

**53** 103:5 106:2 140:3,
15 141:13 167:15,17

**54** 193:9,10

**58** 97:6 143:6

**5th** 146:12

---

**6**

**6** 107:11,15,16

**6-B** 156:1,24

**6.16** 156:7

**6.39** 149:3,5 153:20

**600** 8:20

**62** 143:8,16

**63** 139:5

**68** 51:22

---

**7**

**7** 119:22 120:1 138:4

**7-C** 159:18

**72** 114:20

**74** 115:16

**76** 109:2

**78** 80:20 81:14

**79** 80:20

---

**8**

**8** 14:23 36:6 129:15,
19,24 147:22 174:1

**87** 169:10,13

**885** 8:17

**89** 60:21,22

**8th** 146:15

---

**9**

**9** 137:17,21,22
181:16

**90** 35:1 201:22

**95** 134:22

**9:38** 8:3

**9:39** 8:8

**9th** 146:15

---

**A**

**a.m.** 8:3,8 51:12,18
95:16

**ability** 188:23 190:23

**able** 63:12,14 90:15
154:23 198:22

**absence** 91:19,22

**absolutely** 124:3

**academic** 126:6

**acceptable** 42:23

**account** 195:6

**accurate** 45:25 52:12

**acknowledge** 37:23

**ACLU** 159:1

**action** 8:15 10:23
22:23 23:3,9 24:3,
14,16 28:5 67:17
92:25

**actionable** 34:10
38:2,12,15

**actual** 54:20 150:8
154:4 212:12

**Adams** 66:11 159:2,
13 206:4

**add** 70:20

**addition** 132:7

**additional** 50:4 70:12
176:2 177:4

**address** 22:8,9

**addressed** 118:3

**administration** 169:4
170:8,22 171:1,19
174:23 175:8,18
179:8,12 180:15,17

**adopting** 44:1

**affect** 85:16 124:14,
17 125:1 168:24
207:24

**affiliate** 88:10,17

**affiliated** 174:7

**affiliates** 182:1,8

**afraid** 178:14

**afterward** 76:18

**agency** 176:7

**aggregate** 148:20

**aggregator** 55:20

**ago** 74:5 200:13

**agree** 38:7,19 52:14
105:15,21,23 128:3
136:8 164:24 167:20

**agreement** 93:8,17

**94**:21 95:10 194:16
198:15

**ahead** 89:23 98:17

**al** 8:13

**allegation** 76:20

**allegations** 19:24
20:4 42:2 72:20
109:25 113:11
211:3,22

**allege** 39:8 97:3
140:7

**alleged** 13:10,11,16,
24 14:1,5 15:1,6,15,
19,22 16:8,13,17,23
18:19 19:10,23,24
20:13 21:11 23:6
24:7,9,10,17,20,23
25:22 32:4,23 33:6,9
35:11,12,16,23 36:2,
11,24 37:7,11,14,21
39:15,25 40:4,12,17,
22 41:7,12,21,22
42:17 43:15 52:23
53:1,25 54:12 55:14
59:23 66:23 67:1,2,8
68:6,9,14 69:11,17
73:11 75:21,23,24,
25 76:6,20 77:2,6,8,
10,12,19,21 78:21
79:1,2 83:24 84:6,7,
11 85:5,10 92:2
101:25 110:1,6,7,9,
13,21,23,24 111:3
113:16 116:4,9,19,
24 117:1,5 123:7
126:13,20 138:2,16
149:11 150:1 159:8
160:23 161:8 167:2,
3,5 171:9 192:20
205:11 211:11,13
213:5

**allegedly** 15:18
17:16,22 19:16 34:9
36:15 38:2,12,15

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

43:7 73:5 102:7,22
110:14 167:7

**alleges** 154:12

**alleging** 49:18 66:22
75:10 84:16,19
110:20 211:8

**Allen** 8:10 10:3 11:12
93:19 198:8

**allow** 195:18

**alternative** 97:13,14
98:4 145:17 208:7
210:2,6 211:21

**alternatives** 171:21

**altogether** 128:15

**Amalgamated** 42:18

**America** 8:12

**amount** 29:9 32:9
194:17

**amounts** 202:12

**analyses** 104:3

**analysis** 19:1 22:1,8
23:6 24:6,12,15 27:3
30:16 41:17 42:1,3,7
44:22 45:1 52:21
54:14 55:21 59:1,19
67:24 68:2,4,16
70:12 72:15,18
78:10,16 85:8 86:10
90:19 98:16 123:18
132:24 145:23
147:13 148:15,19,25
149:12,14 151:20,25
152:23 167:1 177:4
192:25 205:10
208:14 211:18 213:3

**analyst** 11:25 12:5
51:24 53:13,14
74:17,20,22 75:2
76:15 78:17 81:5
83:7 85:1,18,22
86:14,18 89:13 90:7,
20 91:10,13 107:6

119:1,15,19 121:8,
15 122:13,16 123:23
132:19,20 133:12
135:3 149:15,17
157:7 162:14 163:2
172:8 173:8 175:25
181:15 184:10 212:2

**analyst's** 65:24 85:19
90:8 162:10 174:19
180:1

**analysts** 50:5,11
54:15 55:22 56:8
57:18 58:12,14
64:13,14 65:15
68:23 75:16 76:10
79:25 80:13,18
84:13 86:20 91:9,15,
16 92:7 118:18
119:10,12 121:25
122:4 127:19 129:7
131:14 133:13,16
134:4,21 168:20
170:21 171:17 172:2
189:14 210:16,22

**analysts'** 79:10 85:20
90:13,14 91:3,20

**analyze** 13:9,23
15:15 16:16,20,21
17:14,21 18:24
21:13 22:18,22 26:8
27:3,16 41:21 44:10
53:1 67:22 99:23
109:24 116:24,25
120:7 126:12 129:23
153:2 161:6,7
178:22 191:16
205:19 211:19

**analyzed** 15:1 17:1
26:19 35:10 40:13
44:11,13 53:7 76:8
80:3 99:8 104:23
116:3,5,17 117:23
118:12 130:24
151:23 160:22 179:6

205:13 211:9,12,20

**analyzing** 15:4 16:1,6
25:6,14 26:13 54:7
69:5 78:21 83:22
85:15 105:11 109:23
149:25 192:17,19
211:4 212:12 213:2,
4

**announce** 124:22

**announced** 67:19
84:9 103:10,24
106:5,14 110:24
120:11,23 126:21
127:13 128:8 160:8

**announcement** 60:4
98:24 120:8 121:14
122:15,19 125:9
127:21 128:25
130:11 131:1,12
136:6,7 161:3 162:2

**announcements**
19:20 20:2 30:23
124:13,25 130:17

**announcing** 129:21

**annual** 34:19 138:9

**answer** 18:7 21:19
22:16 43:16 47:4
56:1 65:3,7 76:17
89:22,23 93:6 101:1
105:24 124:5
137:10,12 148:17
160:18 161:10
195:4,18,20 196:6,
24 198:9 212:14

**answered** 17:9 18:22
20:25 21:24 39:1
45:6 46:4,12 47:11,
21 100:24 105:9

**answering** 18:15
59:11 64:18,20
89:20 152:4

**answers** 22:3

**anti-privatization**
208:19

**anybody** 64:9,24
92:19 130:21

**anymore** 165:5

**anyway** 118:9

**apparent** 188:12

**appear** 41:5,7,11 67:9
173:6

**appeared** 180:1

**appears** 79:5 146:7
147:10,16 190:4

**appended** 108:19
117:18

**appendix** 12:11 33:11
35:13 36:8 51:3
60:20 81:3

**applied** 27:25 28:4
68:19

**apply** 48:22 57:20
58:15,16

**appoint** 132:4

**appointment** 130:3,4

**appreciate** 94:3
148:17 212:14

**appropriate** 46:22

**approximately** 88:3

**April** 147:18

**Aptus** 8:19

**areas** 196:12

**article** 131:24

**articles** 138:14
158:14,18

**artificially** 101:23

**aside** 49:21 50:10
122:12,16 185:16
188:7

**asked** 13:9,22 15:16
17:8 18:4,21,24 19:6

**Lucy Allen**

**Grae vs. Corrections Corporation of America, et al.**

20:16,24 21:5,24 22:11,18,21 38:25 43:24 44:10,24 45:5 46:3,11 47:10,20 64:15,20,23 65:1,14, 19 73:21,23 74:1 86:7 100:23 105:8 126:12 138:19 144:16 196:21

**asking** 75:12 76:2 77:23,25 79:6 94:12 109:22 148:14,18 162:8 166:7,19 195:14

**assertions** 74:18,21

**assignment** 13:21 18:5,9 21:4,11,16 22:5,11 41:20 116:23 205:21,22

**assignments** 13:22

**assist** 40:16

**assisted** 203:17 204:1

**assume** 12:17 43:25 44:24 176:9 177:14 205:11

**assumed** 43:21 205:18

**Assumes** 50:1,13 70:25

**assuming** 41:23 205:13,22

**attached** 12:1 109:1

**Attorney** 188:6

**attorneys'** 196:15

**attractive** 43:1

**attributed** 131:16

**Augastya** 203:24

**August** 45:17,25 46:9 47:7 48:12 49:1,10, 24 52:8,19 56:10

60:16 68:22,24 78:3 96:20 97:4,20,24 103:8,11 105:2 106:4,8,18 120:2,9 122:14,18 127:22 129:20,25 130:8 136:6,7,18 139:16, 19,25 140:2,8 141:18,21,23 143:4, 19,20 144:6,21,22 145:7,8 146:4,5,23 147:3,16 148:21,22 149:4 150:6,8 151:16,21 153:11,21 156:6,24 157:8 160:8 161:20 212:24

**author** 207:16 208:22

**available** 59:6,21 90:15 96:19 112:22 113:5 158:6

**Avenue** 8:17

**aware** 118:9 119:4,8, 14 210:20

---

**B**

**back** 29:20 37:17 43:20 46:14 51:18 76:23 77:3 80:15 95:23 114:8 117:18 124:4 136:2 137:8, 11 144:20 147:2 161:17,19 167:11 181:7 188:24 193:13 194:19 197:19 204:25

**backers** 208:19

**background** 77:15 138:22,23 139:1

**backwards** 184:16

**bad** 79:19 113:9,20, 25

**Baez** 203:24

**balance** 132:25

**banking** 87:1,11,17, 23 174:10 182:3

**based** 41:21 63:25 77:17 85:2 99:2 100:14 103:9 148:8 156:25 173:6 194:2 198:10

**basing** 42:1

**basis** 188:5,11

**beds** 191:4

**begins** 61:22 62:1 95:22 181:6

**behalf** 9:1,4,10,13

**belief** 169:4 174:20 198:11

**believe** 12:2,4,15 13:4,5 28:11,23 29:7 30:11,17 35:22 37:20 40:3 46:8 47:6,8,14 50:21 51:2 55:16 56:5,6 60:15, 21,24 62:13,14,23 64:2,10 80:25 81:18 88:24 92:16,18 94:20 96:16,21 97:2 130:21 131:8 138:20 141:2 150:17 151:23 152:14 156:23 159:1 168:22 171:12 172:18 174:22 175:8,17 176:23 181:18 182:16 194:21 199:16 200:16,19 201:22 202:10 203:19 204:12 206:23 208:5

**believed** 208:18

**believes** 82:6,7,18 171:2

**believing** 170:4

**below-market** 200:10

**benefit** 176:1 180:2

**best** 94:23

**better** 12:25 26:16 59:10 77:25 92:24 106:16 203:21

**better-than-expected** 185:1

**beyond** 174:21 176:22 196:5 202:16 203:17

**bias** 86:12

**bid** 157:16

**big** 134:2

**biggest** 71:3,4

**bills** 95:5 195:1

**bit** 36:12 40:1 118:23 144:20

**black** 11:2

**Blackberry** 74:5

**blah** 176:10,11

**blog** 114:8

**board** 129:22 130:4 131:20 132:4,7

**boasted** 35:3

**body** 125:17

**bold** 34:5

**Bollinger** 8:11

**bonus** 203:9,12

**BOP** 57:12,21 68:25 74:14 102:2 108:7 109:11 110:17 115:14,20 157:14 158:2 160:6 165:7 168:25 171:7,25 177:19,20,24 178:4, 10

**BOP-RELATED** 19:12

**Lucy Allen**

**Grae vs. Corrections Corporation of America, et al.**

**border/immigration** 183:2

**bottom** 34:13,17 42:12 61:19 173:23

**bought** 200:5

**break** 51:10 60:14 77:4 95:14 135:15 136:5 180:21 197:5

**Brekelbaum** 203:25

**Bret** 9:12

**Brian** 9:6 197:21

**bring** 10:5,8

**Broadway** 8:20

**broker** 200:20,23,25 201:1

**brought** 10:9 11:1 142:11

**bullet** 81:16 157:12, 13 175:7,14 181:24

**bunch** 36:19 150:2 155:12 176:21

**bureau** 66:11,15 69:1 74:16 157:14 187:17 189:19

**bureau's** 188:23 190:23

**business** 48:23 56:17 58:17 128:18

**buy** 200:9 201:2

**buying** 200:8 201:6

---

**C**

**calculate** 155:2

**California** 8:21 184:6

**call** 50:21 57:15 58:10 60:15 68:24 76:17 78:13,14,17, 18 86:6 118:22,25 119:7,17 132:17

**called** 9:20 34:9 77:10 108:3,14 138:21 152:8 199:17

**calls** 23:14,22 26:11 28:10 48:14 51:4 93:3 118:18 119:9 138:12 143:13 149:21

**campaign** 207:16

**Canaccord** 172:14,24 174:7

**canceled** 133:5

**capability** 80:11

**capacity** 178:3,7

**capital** 81:23

**CAR** 66:13

**care** 118:14

**cared** 179:15 180:6

**career** 72:24

**careful** 36:1 39:19

**carefully** 176:14 177:7

**cares** 164:14 171:19

**caring** 179:25

**case** 13:23 18:1 19:8, 9 21:12,22 22:18 26:6,20,25 27:4,8,9, 12,16 28:13,22 33:19 52:22 63:6,10 64:9 66:22,25 67:24 68:7 69:5,9 74:5,9 75:10,23 92:14,22 113:10 114:12 116:6,20,24 117:24 118:1 124:18 131:13 142:23 160:24 161:8 165:13,21 167:3 170:18 194:5,23,25 196:18 201:21 205:21 211:11,23 212:21,24

**cases** 72:24 99:7

**cash** 164:17,22

**casual** 109:9

**causation** 22:19,22 23:1,4,12 24:5 25:17,21 213:3

**cause** 73:10

**caused** 23:7 24:8,21 25:23 48:11 49:15 52:17 53:22 129:2 149:3 170:4,7 212:23

**causing** 103:20 121:12

**CCA** 44:8 45:3,14 46:9 47:6 49:11,24 52:7,18 56:9 57:22 64:8 83:19 86:8,12 87:2 108:20 111:13 112:14,19 117:17 118:17 119:10 120:2 129:20,25 133:17 134:22 146:6 147:14 158:4,15 166:13,14 183:8 192:12 197:23 201:12 207:15 208:17 210:15

**CCA'S** 45:23 48:11 83:5 117:15 139:10, 23 141:21 167:22 201:6

**CCA-SPECIFIC** 106:17,25

**Center** 157:17

**central** 42:19

**CEO** 62:10,12 67:7 68:23 71:20 74:13 79:4,17 80:4,12

**certain** 20:12 113:11 212:17

**certainly** 61:15 80:6, 10 97:1 98:14

**163**:23,25 164:3 195:22

**certification** 110:5 116:16 181:23

**challenges** 72:7

**challenging** 71:19

**change** 53:8 57:1,2 62:16 95:13 154:5 188:25 189:13 191:9 210:22

**changed** 188:21 190:21 204:6

**changes** 11:22 12:13 55:7

**changing** 85:3

**characterization** 52:12 128:5

**characterized** 105:22

**chart** 36:5 97:6 168:11 169:1

**charts** 97:8

**cheaper** 171:20 172:1

**check** 103:6 104:23

**choose** 179:16

**Chris** 135:13 180:19 186:15

**Christopher** 8:25

**Cibola** 157:16,22 158:3 160:7,9 161:15 162:18 165:2

**Cibola's** 161:22

**circumstance** 164:13

**circumstances** 164:13

**cite** 13:6

**cited** 139:20

**citing** 39:19 141:7,11

**Civil** 8:15 198:5 199:17 202:18

**Lucy Allen**

**Grae vs. Corrections Corporation of America, et al.**

**claim** 17:15,21,25 19:8,9,16 43:25 66:25 67:10 68:3 69:6,21,23 71:4,8 72:12 84:4 103:1 110:3 114:16 115:18 116:4,7,11,17 117:3 126:17,19,22 137:9, 12 138:18 145:20 146:1 165:12,14,16, 25 171:5,23

**claimed** 16:22 17:2 19:19 33:10 136:23 165:15,19

**claiming** 19:25 69:9 84:23 101:24 102:4 117:6 159:7

**claims** 33:5 34:5,15 69:14 114:11 170:17

**class** 9:2 22:23 23:3, 8 24:3,14,16 28:5 44:8 45:3 55:14 67:8,17 69:24 75:20 76:4 81:6 110:5,7,24 113:16 116:16 120:22 121:16 135:4,7 138:7 147:25 148:4,10,11 149:11 168:7 191:22 192:12,18,22

**clear** 18:16 21:20 142:4 199:5,9

**clearly** 63:6

**client** 34:6,15

**clients** 87:7,20 201:2

**Clinton** 74:24

**close** 96:23,25 139:24 140:20,24 161:14

**closed** 136:21 165:3, 4,6

**closes** 136:18 166:13

**closing** 141:1 157:22 161:23 162:18,23 163:11 166:14

**color** 11:1,4

**column** 145:4

**combine** 145:6

**come** 20:19,22 39:16 67:2 70:23 71:6 76:6 99:22 109:9 114:10 121:7 190:16 194:19

**comes** 69:25 84:7 101:3 112:22 210:20

**coming** 112:23 183:21 210:17

**commentary** 51:24 90:21 132:18 133:12

**commented** 123:3

**commenting** 108:21

**comments** 79:11 204:4,8,10

**committing** 79:21 165:7

**common** 139:24

**companies** 87:7,20 124:17 125:23 130:25 174:8 175:10,19 201:3 202:24

**company** 36:25 50:6, 22 53:15 54:22 57:24 58:11,21 59:2, 4,8 60:2,7,16 64:9, 24 69:10,13,19 70:2, 13 71:23 72:3 73:1 75:20 76:3,11 80:4, 7,11,12 81:6 84:13, 18 85:6,17 88:13 91:17 101:25 104:1 105:14 109:5 113:24 118:25 119:18,20 120:22 122:6 123:1, 2,3 124:14,22

128:13,19 131:15,16 132:6 133:13 149:19 159:10 164:1 167:6 174:4 176:1 184:11 202:25 203:3 211:5

**company's** 19:12 71:10 121:12 128:18 133:19 157:24 161:25 170:3

**comparative** 189:4

**compare** 187:17 189:10,18 190:13

**compared** 146:7,12

**compares** 153:6

**compensated** 93:13 198:18

**compensation** 86:25 87:10,18,22 88:11, 21 95:5 174:9 182:2 198:1,14,15 202:13

**competitors** 149:18

**complaint** 18:20 33:11 35:25 36:1,11, 13 37:8,10 39:5,6, 13,14,17,21,22 40:14,23,25 41:1 42:3 43:10,15 75:22 77:4,9,17 97:2 110:4 116:14 137:16,21,24 139:6 140:7,12 141:10,14 159:6 205:12 211:8

**complete** 65:6

**completely** 124:5 132:25

**compliance** 42:25

**component** 202:12

**concealed** 139:11

**concern** 53:17 121:17 128:16 129:6

**concerned** 127:20

128:12 196:13

**conclude** 98:20,22 99:18 100:4 214:5

**concluded** 41:24 123:24

**concludes** 180:25 214:1

**conclusion** 18:17 23:23 26:11 28:10 44:23 48:14 52:6 93:4 96:2 99:22 100:11 101:3 107:20 108:2,14 109:10,11 121:7 130:10 158:16

**conclusions** 14:8,12, 14 19:1 20:19,22 21:3,16,21 96:5 97:17 109:8 145:14 189:3,8 204:7

**Conduct** 138:25 139:3

**conducted** 30:20,21 150:12

**confer** 196:8

**conference** 50:21 51:3 58:10 60:15 76:17 78:13,14,16, 18 118:22,25 119:17 138:12 149:21

**confidence** 35:6 155:15

**confirm** 10:21 173:14

**conflict** 86:11

**confounding** 67:13, 16,25 68:11,18

**confused** 77:24

**confusing** 47:1

**confusingly** 143:13

**confusion** 63:1

**consciousness** 171:3

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

consensus 184:25

conservative 112:10

consider 108:19
109:16 115:22
131:5,19

considered 33:22
40:10 51:25 53:14,
15 56:20 57:22 58:4
61:5 78:4 81:2
109:21 114:24 115:4
130:6,11 157:9
158:8 164:9 172:16
173:7

considering 90:23
108:23

consistent 21:9 43:9
97:25 98:14 102:18
129:4 145:19,22
189:14 198:4

consistently 34:23

consult 202:19

contents 77:18

context 18:14 22:22
23:2 30:1 67:16

continuation 65:18

continue 64:1 71:15
128:20 177:20,24
182:24

continued 34:25 43:2
167:6

continues 70:13

continuing 69:19
70:3 72:4 73:4

contract 34:6,16,25
64:2 109:10 157:15
158:3 160:7 165:9
176:9 177:14,21,25
182:25 183:7,11

contracts 43:3 52:3
57:12,13,15,21
58:15 79:20 168:25

170:5 174:25 176:2
177:21,25 178:9
190:16

contractual 201:12

contrary 72:17

control 48:2 104:4
105:12 179:16 180:7

controlled 104:1
150:14

controlling 48:1,6
98:6 150:15 154:3,6
208:4

converse 32:22

copy 10:9,10,22
11:13 33:18

Corecivic 33:6 35:5
42:20 43:1 55:14
57:24 87:13,25 88:6,
22 89:1,14 90:9
103:7,12 104:8
118:6 130:7 131:10
149:16 150:14
151:15 170:20
171:7,25 172:4,5
174:10 179:20 180:2
182:4,10 183:11
184:23 200:14

Corecivic's 35:4
42:17 52:3 53:10
54:5,11 56:17 89:8
96:3 102:2 112:18
130:12 131:22 143:9
149:18

Corporation 8:12
109:4

correct 12:6,12 28:12
33:23,24 61:6,7
62:12 78:5 80:22,25
81:4,14 82:17 92:15
96:7 97:16,21,22
98:11 104:23 107:18
111:8 139:21 142:24
143:12 144:12 149:8

157:11 169:22
173:20 191:15
193:25 200:18
205:15

corrected 11:15,18
73:5,6 84:21 117:4
142:9 144:9 145:3
147:9 149:6 151:8
154:11 156:18

correcting 102:5,6,22

correction 81:18
82:8,19 123:7

correctional 187:22
190:24

corrections 8:12
157:17 175:11,20

corrective 15:6,19,22
16:8,13,17,21,23
17:3,5,16,19,22
18:1,2,12,20 19:21
20:1,4,13 21:17,22
49:18 53:2 69:14,18
72:25 73:6,17,18
84:5,11,24 85:11
91:25 97:3 113:12
141:8 167:4

correctly 88:1,4

cost 19:11 42:22
53:10 54:4,10,21
55:4 56:9,15 68:21
69:12 84:1 102:2
170:19 171:2,8,13,
20 172:5 179:16,18,
25 180:6

costs 171:2 187:24

counsel 8:22 71:2

count 145:1

counted 151:7

counter 72:19 208:21

counter-positive
127:9

counteracted 104:19

counteracting 123:5

countervailing
127:16 132:10,14

counting 201:24

County 157:16

couple 12:2,8 66:16
146:8

course 18:5 48:23
67:23 72:24 120:6
138:24 139:2
149:13,24 187:10

court 8:14,19 9:15
14:3 32:15 33:3
34:8,14,17 38:23
42:16 137:7

Court's 33:19 34:1,4
37:25 38:1 40:7,16
41:16 42:10

coverage 90:14

covered 81:5

covering 91:16
131:15 133:13

create 162:16

created 52:2

credible 114:11

credibly 114:5

cross 213:20

current 64:2

currently 92:9 210:7

customer 112:18

customers 81:22

Customs 185:4,13

cut 65:21 121:18
127:20 129:8 157:23
161:15,24 162:2,15,
24 163:9 164:5,7
176:18

cutting 171:2

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**CXW** 88:5 157:16
175:7,15

**CXW/U.S.** 88:14

---

**D**

**D&o** 200:18,19 201:1,
3,6

**d'etre'** 81:19

**D-3** 167:14,16

**damages** 139:9

**data** 111:23 112:1
118:7 190:2

**date** 8:7 32:4 35:16
36:2,16,23 37:5,9,
11,20 39:8,10,24,25
40:25 48:5 50:23
53:3,21 103:13
126:16 127:1,13
150:6,21,23 151:1,4
154:10 157:7 167:5
173:8 174:5 208:1

**dated** 181:16

**dates** 33:9 36:5,7,19
37:4,17 39:15 40:4,
21 41:9,13 151:22
152:6,11,12,15
153:5,7,8,9 179:5

**Dave** 204:2

**day** 30:24 34:20
35:23 37:1,14 49:5,7
50:7 54:16 104:17
105:7,12 106:13
122:21 124:21 135:7
136:20 140:20 144:1
146:21,24 147:3
152:25 153:3 193:14
209:22 212:18

**days** 11:15 119:3
124:23 144:11,16,24
145:18 151:7,10
154:17

**deal** 200:7,9

**deals** 200:23 201:1

**debatable** 123:12
127:14,23

**decades** 34:24

**December** 172:15,22,
24

**decide** 184:17,20

**decided** 157:14 158:2
160:6 165:9

**decision** 13:6 14:3
41:6 129:21

**declaring** 120:3
122:19

**decline** 47:8 48:11
53:21 105:2 140:2,8,
15 149:4 151:15
155:6 190:11

**declined** 47:7 117:16
139:24 141:22
143:18,20,25 144:6

**declines** 48:17
158:17

**decrease** 153:20
154:1

**decreasing** 164:10,
15

**defendant** 94:1 138:5
139:1

**Defendant's** 33:20
139:11

**defendants** 9:7,11,14
62:11,13 94:7

**Defendants'** 138:23

**defined** 13:4 30:11
42:24

**degree** 167:23

**delivering** 42:23

**demographics**
115:13

**denials** 109:17

**denies** 73:1

**denying** 33:19

**department's** 187:25

**dependent** 199:3

**depending** 114:6

**depends** 125:14

**deposited** 195:5

**deposition** 8:9 11:16
12:19 74:8 214:2

**Deputy** 188:6

**Derek** 8:18

**describe** 27:9,21
49:15

**described** 25:19
31:25 32:15 33:3
42:2 149:13

**describing** 16:1
27:22

**description** 104:22

**detailed** 127:3 138:16
213:13

**detaining** 171:12

**determination** 17:24
205:16

**determine** 15:21
16:11,12 17:4,18
40:20 45:2 86:11
123:18 124:12

**determining** 40:16

**Diego** 8:21

**difference** 10:25
23:11 30:2 79:24
112:12,15 125:24
166:21,25 208:13

**differences** 23:18
115:12,18,19

**different** 24:19 25:15,
24 26:4,13 28:1 37:8
54:4 73:3,8 79:3

89:15 90:10 98:20
112:20 113:7 114:1
132:16 145:18 153:9
155:12,13 165:16
178:11 183:20,24
209:22

**differently** 56:15
152:11

**difficult** 187:16

**direct** 195:5

**directive** 62:17 63:2,
10

**director** 131:21 136:7

**directors** 129:22
130:4

**disagree** 91:5 196:19

**disagrees** 109:7

**disclose** 86:20,24

**disclosure** 15:5,18,
22 16:2,8,12,16,22
21:17 25:7 49:18
69:18 72:25 73:6,17
84:5 86:13 167:4

**disclosures** 16:21
17:2,15,19,25 18:11,
19 19:13,14,22
21:22 53:2 86:23
87:6 139:23 140:14,
16 141:5,9 174:4

**discovered** 190:1

**discredit** 207:16

**discrediting** 208:22

**discuss** 25:14 60:17
94:11 208:8

**discussed** 28:2 57:17
58:20 111:2

**discusses** 205:4

**discussing** 53:3
118:24

**discussion** 37:24
129:11,12 178:15

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

206:5,16

**dismiss** 33:20 40:8

**displeasure** 165:8

**dispute** 45:23 46:6
47:19,23 151:14
153:17

**distinctions** 163:7

**distinguishable**
29:16

**distinguished** 101:18

**District** 8:14

**dividend** 45:14 120:3,
19,24 121:9,14,17
122:14,20 125:9,18
127:20,22 128:25
129:7,13 136:6
176:18

**dividends** 120:20
122:7 124:13,23
125:23,24 126:2,3,9
128:20 129:11 142:2

**doable** 155:11

**document** 10:15
33:21,22 38:5 45:13
61:1,4 82:13 116:1
140:11 144:14 147:7
162:5

**documents** 10:5 58:6
208:24

**doing** 18:6 34:23
54:14 67:24 78:20
96:22 108:18 125:1
155:4,7 174:17
178:16 179:13
205:10 213:3

**DOJ** 96:11 112:17,23

**DOJ'S** 60:17

**dollars** 194:11,18

**Dr** 10:11 30:21 31:1,
11 32:2,7 44:3 45:9
47:13 85:8 91:1 99:7

120:16 131:5,6
142:1 143:23 144:4,
8 145:3,13,24 147:8
149:6 150:12,25
151:8,11,20,23,24
152:6 154:11 156:10
208:6 210:13

**drafting** 33:23

**driven** 52:1,8

**drop** 52:7,18,19
205:5 212:23

**dropped** 67:8 71:14,
22,25 72:1 116:12
126:23 136:24
137:13 139:10
140:14

**drops** 70:1 71:3 73:1

**due** 53:25 54:3
177:21,25 185:18

**duly** 9:21

**duty** 165:23

**DVD** 95:22 180:25
181:6

**dying** 79:21 165:6

---

## E

**earlier** 58:11 77:14
106:12 120:21
121:14,22 136:22
138:20 147:24 174:3

**early** 96:12

**earned** 35:5

**earnings** 175:1

**easier** 184:22

**easiest** 60:23 173:24

**easy** 41:3,12 184:18

**EBITDA** 184:6,12
185:2

**ECF** 60:22

**economist** 25:16

**Eden** 66:12

**editing** 204:8

**edits** 11:22 12:13

**effect** 42:7 86:15
96:11 104:6,19
105:11 120:7
125:10,12 126:3,4
164:16 202:7

**effective** 171:8 172:5
179:18

**effectiveness** 19:11
53:10 54:5,11,21
55:4 56:16 69:12
84:1 102:2 170:20
171:20

**effects** 105:13

**effectuating** 191:5

**efficiency** 32:17
41:24 42:4 44:1,23
68:3 99:9,14 211:15

**efficient** 44:8 102:14
103:1 145:20 146:1

**efforts** 208:20

**eight** 144:23

**either** 30:25 46:23
76:16 119:16 212:8
213:23

**election** 168:13,16
169:3 193:12

**elevated** 147:17

**eliminated** 176:18

**employ** 15:24

**employee** 195:1
198:24

**employment** 200:3

**encourage** 175:9,18

**ended** 67:9

**Enforcement** 185:4,
14

**engagement** 197:24

**engagements** 196:1

**entire** 123:13

**entitled** 38:10,12
86:25 87:9,17
195:24 196:16

**entry** 45:17,23

**EPS** 157:23 161:16,
24 162:3,15,24
163:10

**equal** 164:8,18,23
202:21

**equity** 203:13

**ERISA** 92:13

**especially** 175:11,20
195:25

**essentially** 172:6
200:12

**estimate** 184:25
194:7

**estimates** 176:7

**et** 8:12

**evaluation** 177:8

**event** 13:18 30:16,19,
21,25 31:1,11 32:3,
7,17 44:1 47:13,23,
25 48:8 68:4 85:8
96:22,24 97:12,13,
14,18 98:2,4,23
99:3,10 100:6,8,11,
16,17 101:7,8,10,11,
12,14 103:22 105:11
117:9 124:11 125:1
126:6,7 127:7 135:6,
9 140:22,23 145:13,
15,17,23 150:12,15
151:20 153:25
154:2,21,22 156:25
164:9 179:4 191:20
207:25 208:3,6,15
209:10 210:13
211:17

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**events** 14:6 19:21
20:3,5,7,8,9,12
110:19 113:6 132:16
159:3

**evidence** 32:12 33:1
54:8 68:11 69:7,21
70:6,15 72:8,16
83:24 96:18 98:12
99:2,14,15,17,19,20,
24 100:2,13,15
102:15 124:25
131:13 132:8

**evolves** 81:20 82:20

**exact** 73:9

**exactly** 29:25 140:21
150:21

**EXAMINATION** 10:1

**examined** 9:22

**example** 13:19 14:2
19:7 27:13 32:5,23
58:9 86:7 91:19
101:22 111:21
115:12 145:18
146:23 158:23,25
159:12 165:3 174:21
203:11 210:15 213:4

**excellence** 35:5

**excess** 35:1 134:2

**exclude** 120:18

**exclusively** 59:21

**excuse** 80:20 97:8

**executive** 63:3

**executives** 42:21

**exhibit** 10:13,16,20
11:7,8,12,15,19,20
33:14,18 45:10,11,
12 60:9,13 81:8,12,
14 107:11,15,16
119:22 120:1
129:15,19,24
137:17,21,22 142:7,
9,23,24 143:11,22

144:2,4,10,25 145:3
147:9 149:6 151:8
154:12 156:1,24
157:2,6 168:1
172:10,14 181:8,12,
14 186:6,8 194:3

**Exhibits** 186:12

**expansion** 175:2

**expect** 132:18,20
133:11 134:2,9
174:8

**expectation** 179:7,15
180:6,9,16

**expected** 120:13
176:19

**expecting** 121:10

**expects** 182:2

**expense** 185:19

**experience** 131:11

**experienced** 34:24

**expert** 41:25 42:5
83:13 93:13 98:3
99:6 101:12 104:3
127:7 140:23 150:11
196:17

**expert's** 103:3 117:9

**experts** 32:14 131:5
135:5 211:17,18

**explain** 15:11 198:13

**explaining** 169:18

**expressed** 165:8

**expressing** 121:17

**extent** 23:14 69:16
70:2 71:5 76:2 85:14
93:3 113:3 129:23,
24 132:13 133:8
171:22 201:16

**external** 174:23

**extremes** 134:12

**eyes** 196:16

**F**

**face** 123:22

**facilities** 19:12 34:21
53:11 54:5,11,22
63:4,22 66:5,9,14
68:25 69:13 74:14,
15 75:1,4 78:7,8
79:18 102:3 110:18
112:15,19 115:15,20
187:18 189:19

**facility** 157:22 159:2
162:19,23 163:10
165:3 166:13,14

**facility's** 161:23

**fact** 18:2 67:6 72:6
78:12 98:8 100:2
116:1 117:11 131:19
153:19 163:2 192:11

**Factiva** 55:18

**factors** 50:13

**facts** 50:1 70:25
113:6

**fair** 20:21 29:6 30:4
31:9,22 44:15 56:10
96:4 104:19 108:16
112:11 139:4 158:19
168:7 176:3 183:5
192:2 195:7

**falls** 168:9

**false** 42:17 43:7 72:4
102:7,22 110:14
167:7 205:12,14,17,
20,23

**falsely** 42:21

**falsity** 42:13 110:21

**familiar** 67:15 111:6,
9,13,17 112:4 202:6
205:3

**Fargo** 118:19 181:14,
25 182:7,15,23

**fear** 48:19 57:10,17
63:25 168:24

**February** 178:19
181:16 188:16 193:3

**federal** 63:5 157:14
190:24 196:25 198:5
199:17 202:17

**feel** 73:25 74:1
170:24 180:2

**Feinstein** 30:21 44:3
45:9 91:1 97:11 99:7
120:16 131:5,6
142:1 143:11,23
145:24 150:12
151:11,23,24 152:6
156:10

**Feinstein's** 10:11
11:13 31:1,11 32:2,7
47:13 85:8 141:19
144:4,8 145:3,13
147:8 149:6 150:25
151:8,20 154:11
208:6 210:13

**fell** 141:13

**felt** 65:1 128:24

**FIFO** 90:1

**figure** 75:3,6 151:18,
19

**filings** 77:11 149:22

**financial** 182:9,14

**find** 37:3 43:22 49:22
50:9 54:24 60:23
71:3 90:16 96:18
106:7 123:14 202:5
212:21 213:7,16

**finding** 30:23 44:16
47:19 50:4 123:11
127:8 208:9

**finds** 99:12

**fine** 21:19 135:19
148:16 197:11 207:9

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

finish 155:7

finished 62:3 115:7

firing 89:21

firm 87:9,22 90:9
93:25

firms 94:5,6

first 9:21 61:25 82:20,
24 84:5 89:22,25
96:9 109:6 173:22
174:20 177:9
181:21,25 182:17

fished 187:4

five 144:23

flat 154:4

flexibility 81:21 83:2

flows 164:17

focus 61:13 72:18
182:25

focused 20:16 34:20
43:14 75:19,22
76:15,22 150:5
167:1

focusing 15:17 18:9
50:6,11

focussed 72:14

folks 55:9 64:8
173:14 202:1 203:18

following 53:14 84:13
87:7,20 88:12
137:10 167:23
207:12,20 208:10
209:19

follows 9:23 152:22

footnote 96:10 103:5
106:2

forecast 177:20,24

foreseeable 63:23

forgot 102:19 212:11

forgotten 120:18

Form 89:11

formula 203:7

forth 97:18

forward 44:2 63:22
66:9 74:15 108:4
164:2 211:14,16

forwards 184:21

found 45:9 47:15
54:2,7,20,23 103:9
106:5 116:18 126:25
127:3,4 131:2,9,13
142:1 152:1 153:7,
10 156:11 210:12

foundation 52:10
62:22 70:25 93:21
147:20 158:21
168:18 170:12
171:16 176:5 180:12
185:7 192:6,15
201:8 207:22

four 124:23 144:16,
23

fraud 73:11 139:11

fraudulent 138:6,24
139:2

freak 210:21

freeing 81:22

French 81:19 82:2

front 114:7 142:8,11
174:24

funded 208:19

funds 184:24

further 63:9 69:7,20
70:6,14 72:8,16
117:16 171:4 175:1,
9,18 206:20 213:21

future 43:2 48:18,22
55:1,6,7,8 56:20
63:23 122:1,3,10
128:12,18 164:17
182:25 183:6 188:23

190:16,23 191:3,11

___

**G**

Geckeler 9:12

Geller 9:1,5

general 13:15 15:13
28:3,5 29:24 55:13
57:20 105:10 111:11
112:10 122:24
124:16 149:9 153:8
164:21 166:9 180:14
183:11 188:1,6
202:22

generally 27:17,25
113:21 158:23
164:8,11,12 195:11,
25 196:11

Georgia 66:12

getting 78:8 89:14
90:9 155:22 196:12,
17

give 21:18 27:11
111:20 197:25

given 30:16 178:7
210:16

gives 178:3

giving 190:5

glance 177:9

Glennon 9:6 12:23
17:8 18:21 20:24
21:23 23:13,21 25:8
26:9,22 27:6,18 28:9
35:19 38:4,25 40:18
41:18 43:11 45:5
46:2,11 47:10,20
48:13 49:2,12,25
50:12 52:9,20 55:24
56:11 62:21 64:17
65:6 69:2 70:24
73:19 78:11 82:12,
22 83:8,20 86:1

89:11,16 90:11 93:2,
20 94:8,14 100:23
104:20 105:8 106:9
109:19 111:15,24
112:24 115:1,25
117:19 124:1,15
125:3,13 127:25
134:25 135:13,18
136:10 137:1 140:10
144:13 145:11
147:6,19 148:23
152:3 158:20
160:10,16 162:4
164:20 165:10
166:16 167:25
168:3,17 170:11
171:15 176:4 179:2
180:11,19,23 183:9
185:6 186:14,19
189:6 191:6,18
192:5,14 195:9,16,
23 196:19 197:4,8,
25 199:14 201:7,14
202:15 207:21 209:4
210:24 212:25
213:22

go 36:1 40:24 45:11
46:14 63:22 74:12,
18 80:15 87:12,24
89:23 95:7 108:20
114:21,24 115:3,11,
22 117:17 124:4
144:20,21 146:23
149:19 167:11
188:24 195:12
204:15,18

god 69:1

goes 38:11 95:6
146:12,14,15,16,17,
18 157:19

going 22:14 31:23
33:17 51:12,18 57:8
60:12 61:13 63:3,11,
12,22 64:1,3,16 66:9

Index: finish–going

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

74:15 81:11 95:16,
23 108:4 115:25
119:25 133:1
135:14,21 136:2
143:3 146:4 151:2,3
161:14 164:2,4,18
167:11 170:8 171:13
172:3 176:1 179:11
180:20 181:1,7,11
186:16 190:14,15
191:12 195:9,18
196:2,22 197:2,13,
19,22 199:5,7,12,14
202:15 204:20,25
210:18 214:2

**good** 10:3,4 66:15
70:18 74:16 75:5,8
78:9 80:6 94:19
113:9,20,23,25
132:7 164:19,22,23
172:4 179:20,23
183:8,13 204:14

**gotten** 66:14 68:25
75:5,8

**government** 34:22
35:6 43:2 48:20 52:3
57:3,7 81:21,22
115:20 128:8,14
170:5

**governments** 42:22

**Grae** 8:11

**great** 32:8 66:2 74:11
81:20 88:8 139:4
143:25 155:15 163:4
174:13

**greater** 148:5

**grew** 190:6,7

**group** 114:21,24
115:3,11 152:10,12

**group's** 115:22

**groups** 152:12,13

**growth** 34:25 174:24

175:1

**guess** 28:18 59:4
69:8 82:7 159:25
184:12 185:21 197:1
201:24 212:15

**guesses** 44:18

**guidance** 157:24
161:25 164:2,5,7,10,
14,16 184:13 185:1

**guys** 79:18

---

**H**

**Halliburton** 13:6 14:3
32:15

**happen** 41:14 122:3
166:22 210:5

**happened** 79:9,13
133:3 134:13 135:12
150:20,22 209:14,23
210:9 212:9

**happening** 110:17
134:3,6 150:25

**happens** 72:25

**happy** 31:20 143:4
196:7

**hard** 155:23 163:17

**hates** 74:24

**head** 155:16,24

**heading** 34:14 38:10,
11,18 77:21 138:1

**heads-up** 210:16

**hear** 198:23

**heard** 91:1 112:6
206:12

**held** 60:17

**help** 18:6,14 147:13
161:10 200:22 201:2
212:4

**helped** 203:22

**helpful** 91:12 212:6
213:8,17

**helps** 72:11

**Hey** 79:18 210:17

**hiding** 104:6

**high** 34:20 148:1,12,
16 184:5 192:13,19,
23

**high-end** 184:12

**higher** 146:11 148:7,
20 185:3,13 193:17
194:1

**Hillary** 74:24

**Hilton** 131:20

**Hininger** 34:18 62:10
78:7

**historically** 131:2

**history** 190:5

**hit** 208:18

**honestly** 194:12

**hope** 81:12 173:12
175:25

**hopefully** 173:11

**hospitals** 81:23

**hour** 135:14 180:20
198:21

**hours** 198:20 201:20,
22 202:1

**huh** 35:18

**Humphrey** 87:8,21
88:10

**hundred** 194:11

**hypothesis** 133:8

**hypothesize** 208:13

**hypothesizing**
160:21 210:3,7
211:1

**hypothetical** 26:10
59:15 112:25 117:20

161:2,10 166:17
211:10

---

**I**

**ICE** 174:25 175:11,21
176:2,8,10 177:15
182:25 183:7 185:14

**idea** 70:19

**identification** 10:17
11:9 33:15 60:10
81:9 107:12 119:23
129:16 137:18 157:3
172:11 181:9 186:7,
9

**identified** 20:6

**identify** 8:22 212:4

**identifying** 213:18

**II** 32:15

**iii** 108:6,9,10,11

**illustrating** 97:10

**imagine** 79:22 163:17
213:10

**immediately** 193:20,
22

**immigrants** 170:10
171:13 180:10,18

**Immigration** 185:4,13

**impact** 12:22 13:2,10,
15,23,25 14:4,7,25
16:6 18:10 19:2
21:13 23:12 24:12,
13,15 25:14 26:8,14,
20 27:4,16,23 28:25
29:4,12 31:2 32:11,
13,18 33:2 41:17,21
52:22 62:18 69:5,8,
22 70:15 72:9,13,15,
17 76:1 78:21 83:14,
23 84:1 97:24 98:1,
11,13,14 99:16,25
100:5,7,12,17,21

**Index: good–impact**

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

104:15 105:4 110:1
111:3 116:6,18,22
117:1 122:20 123:6
126:14 127:17
130:7,12,15,22
131:3 149:14,25
160:25 161:9 162:3,
16,19,20,25 163:3,
11,20,22,24 164:5
171:6 192:20 205:23
207:17 211:19 213:5

**impacted** 13:12
24:17,24 25:3 33:8
52:24 59:25 129:25

**impacting** 78:23
102:16 103:19

**impacts** 13:19

**impair** 191:11

**impaired** 188:22
190:22

**imparted** 169:20

**implications** 125:25

**implied** 121:24 148:6

**implying** 75:13

**importance** 131:16,
17

**important** 83:6 91:8
96:24 102:11 105:12
107:23 121:11
123:19 125:22
132:14 133:14
134:6,13 161:3
163:7 187:15 190:12

**impossible** 163:18,
19,24

**impounded** 114:14,
19

**improve** 108:7

**incarcerate** 180:10

**incarcerations**
180:18

**incentive** 71:2

**incentives** 91:7

**incidents** 160:2

**include** 38:21 39:7
120:18

**included** 177:3

**includes** 11:18

**including** 28:7 44:1
80:20 83:1 128:19

**income** 185:18

**Incomplete** 26:10
117:20 166:17

**inconsistent** 67:10

**increase** 48:17
121:24 146:7
153:12,19,24 180:17
192:3,8 193:11,15
205:6

**increased** 54:25
81:21 191:3 193:13

**increasing** 83:1
146:10

**index** 150:17 151:2,3,
12

**indicate** 85:22 127:5

**indicates** 111:2 156:5

**indication** 54:8
128:23 130:5,10

**indices** 150:22 151:1
155:14

**indirectly** 15:4 16:7
25:5

**individual** 40:21 62:9

**industries** 81:19

**industry** 48:2,6 98:7
103:8 104:2 154:4,
16 208:5

**industry's** 82:8,19

**inferences** 109:8

**inflated** 33:8 69:24
71:12,24 101:23

**inflating** 102:12

**information** 14:6
19:15 20:1,10,18
21:2,7 24:24 26:3
32:19 48:25 49:4,6,
9,14,22,23 50:5,10
55:17 58:3,6,7 59:6,
7,22 67:14,16,18,20,
21,25 68:21 69:15
84:21,24 85:11,12,
16 86:15 91:3,24
92:1 97:3 101:5
102:5,6,10,15,16,21
103:18,24,25 113:4,
12,13,15 114:4,10,
13,15,18 116:13
118:13 119:19
120:10 121:5,11
122:25 123:5
126:18,19 127:9
131:9 132:15,22,24
136:20 139:10
149:23 150:2 158:6,
7,10 159:4,5,6
160:19 162:9,13,18
188:13 189:25
194:13 198:11 212:4
213:18

**inmate** 184:7

**inmates** 79:20 165:6

**innocuous** 166:13

**insinuating** 75:13

**Inspector** 188:1

**instance** 11:3 104:13
166:25

**instances** 30:23
42:24

**instruct** 195:20
196:5,24

**insurance** 200:21,24
201:3,4,13

**insurers** 200:23

**intends** 174:8 182:1

**intention** 37:13

**interest** 182:9,14
203:13

**interested** 179:12

**internal** 58:2,5

**interpreted** 55:23
56:2

**interrupt** 166:6

**intraday** 140:1

**introduce** 11:6

**investment** 87:1,10,
17 174:9 175:6
182:3

**investor** 138:13

**investors** 182:24
183:6,12

**involved** 198:16
201:6

**involves** 26:6

**involving** 26:20 27:4,
17 28:7,14 87:1,11

**issue** 17:20 84:14
92:5 173:1 178:7

**issued** 10:22 92:7
107:7 118:20 119:11
120:2 135:4 136:17,
20 156:20 158:19
173:8 181:15 209:3

**issues** 47:24 54:12
84:12,15,25 85:4
92:2 110:15 118:4,7
125:20 158:15
159:12 160:9

**issuing** 85:2

**italics** 34:5

**Item** 60:24 61:2
181:19

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

## J

**Jacobson** 9:10

**Jake** 203:25

**Jeff** 170:23,24 172:3

**jeopardy** 129:14

**Jessie** 9:16

**joining** 131:20

**Jones** 111:7,10,14,22
112:1

**Jorge** 203:24

**Journal** 114:7

**judge's** 41:5 77:1

**July** 147:3,18 148:22
157:18

**jump** 168:15

**jumps** 168:11

**June** 207:12

**Justice** 206:5,8

## K

**keep** 91:8,12

**keeping** 91:5

**killed** 159:14

**kind** 13:5

**know** 13:18 14:17
36:4,14 38:14 39:2
43:12 44:18 57:22
58:5,14,18,22 59:5
61:14 62:2 66:19
67:4,5,13 71:17,18
73:10 74:17,19,22,
24 75:3 77:11 78:19
79:7,18 83:9 86:17
88:17,20,25 89:2,7
91:8,11 92:21 93:14,
16,17,22 94:24,25
95:1,4 96:8 97:2

105:5,18 106:11
107:23 108:1 109:20
111:16 112:3,14,17
113:2,17 114:8
118:17,21 125:17,
21,22 126:1,4
133:16 148:1 149:7
151:5,6,17 152:3
154:12 158:2 159:17
160:6,18 161:4
162:7 163:20 164:9,
11 165:24 166:18,24
171:1,8 176:12,16
177:7,12 179:1
182:13 183:20 186:2
187:3 188:5 189:8,
19 190:3,5,12 191:7
192:16 193:2 194:6,
9,12,14,15 195:4,6,
16,17,24 196:17
200:17 201:5,9,11,
15,25 202:3,11
206:8,11,14 209:5,
13,23,25 210:5,21,
25 212:6,8

**known** 19:17 70:5
188:13 213:19

## L

**labeled** 38:2

**lack** 68:13 70:15
85:19,21 122:17
147:20 171:16
210:11

**Lacks** 70:24

**laid** 36:21,22,23 37:6

**language** 61:13

**large** 121:23 205:5

**late** 157:17

**Latham** 9:7,13 92:23
93:18,23 94:24

**law** 93:25 94:5,6

**lawyer** 24:4 166:2

**lead** 80:10 98:19,21
100:4 130:20

**leading** 88:22

**learned** 71:20

**learning** 54:3,9 55:2,
3,5 171:6

**leaving** 207:3

**left** 40:4

**legal** 23:14,16,22,25
24:2 25:21 26:11
28:10 48:14 93:3,6
94:18 165:22 166:3
195:4

**legally** 93:14 95:2

**let's** 11:6 43:22 63:19
90:1 95:14 114:20
144:20 164:1 172:8
186:5 197:10 204:15
208:17,23

**letter** 34:19 35:3
109:3 114:21,23
115:2 118:5,6

**letters** 108:19,22,24
117:17 118:15

**letting** 89:22

**level** 31:4,17 42:23
63:5 123:17 134:1,9
185:25 186:4 187:22
188:2,18,19

**leverage** 202:7

**liability** 42:20

**liberal** 112:9

**lied** 71:11

**light** 61:19

**likes** 180:10

**link** 96:12

**list** 11:25 15:4 33:22
36:18 38:15 39:14

41:7,8,12 82:25

**listed** 33:11 35:12,23
37:11 51:2 58:4
77:8,15 158:8
181:19 203:18,20
213:13

**listing** 12:6

**lists** 36:6,11

**literature** 125:17
126:2,7 205:4,9

**little** 40:1 108:10
118:23 144:20
173:23 196:13

**LLC** 182:1,8

**local** 63:5

**located** 8:19

**locking** 170:10

**logarithmic** 45:18
46:15 143:14,24
144:3,9 145:4

**logarithms** 46:18,24

**logic** 20:3

**long** 135:16

**longer** 170:5

**longstanding** 188:22,
25 190:21 191:9

**look** 10:21 11:4 19:6
37:17 40:15 50:15
55:9,12 60:21 62:24
66:3 67:23 85:24
87:5 90:20 99:21
101:4 107:9 109:2
124:21,24 126:16
133:20 134:19,20
141:18,19 142:22,25
143:3,5 145:6,8,18
146:9 147:2,22
148:3 149:2 150:11,
24 155:25 157:12
169:10 170:2 172:8,
21 173:21 177:6

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

182:17 185:22
188:15 202:4 212:7
213:9

**looked** 35:18 39:14
54:17,18 55:13
68:8 76:7 77:3 91:18
104:11,22 120:10
123:22 127:2 134:18
138:2 145:12 149:9,
22 150:13,19 173:16
174:2

**looking** 16:6 41:4
50:24 65:3 104:25
114:25 123:1 136:16
183:6 193:8 196:10
208:2

**looks** 10:24 151:2
176:15 177:10

**loss** 22:18,22 23:1,4,
8,11 24:5,8,21
25:16,21,23 26:1
213:3

**losses** 177:21,25

**lot** 27:25 71:9 81:2
83:16 89:15 90:10
149:23 168:12,15

**lots** 98:12 126:1,5

**low** 140:1

**lower** 185:18

**lowering** 184:5,11

**Lucy** 8:10 93:19

**lunch** 95:19

---

**M**

**main** 183:25

**maintain** 188:1

**maintaining** 101:22

**maintenance** 102:20

**majority** 185:17

**making** 67:7 114:12
199:15 203:5

**managed** 89:7

**Management** 109:4

**manner** 29:15 31:21

**March** 34:18 35:13
38:22

**mark** 196:14

**marked** 10:16,20
11:8,12 33:14,18
60:9,13 81:8,12
107:11,15 119:22
120:1 129:15,19
137:17,20,22 142:23
157:2,6 172:10,14
181:8,12 186:6,8,12

**market** 15:5,17 16:2,7
19:14,18 25:6 32:16
41:23 42:4 43:25
44:7,23 45:2 48:3,6
49:1,4,10,16,24
51:25 53:5 54:3,9
68:3 84:8 85:10
91:25 96:22,23,25
98:6 99:8,14 102:14,
25 103:1,2,4,21
104:2,4,7 114:5
115:24 117:12
118:9,14 120:25
121:5 128:9,12,17
130:6 136:18,21
139:12 145:21 146:1
150:16 154:3,16
160:6,15 161:4
164:14 166:12
171:24 179:19 180:1
208:4 210:22 211:15
212:1

**market's** 53:9

**Marsh** 195:3 199:24,
25 200:6,17,19,20
201:11

**Marshal** 131:21

**match** 135:11

**material** 29:17

**materials** 40:9 58:4
158:8 173:7

**math** 151:18,19 155:4

**matter** 8:10 10:10,11
14:9,12 16:20 17:14
24:11 49:19 54:1
55:21 56:2 67:11
72:21 76:21 86:4
94:1 109:24 115:5
116:10 125:18,19
165:12,20,21 166:12
199:21

**matters** 165:2

**Mcgee** 9:9

**Mclennan** 195:3
199:24 200:1,6

**Mcrae** 66:12

**mean** 12:22 13:2,8
15:10 28:16,18
29:11 30:8 31:13
53:20 56:1,24 72:6
74:19 79:19 83:10
88:2 89:6 91:18
97:23 99:18 108:1,
13 111:18 119:14
125:16 132:3 140:25
146:10 159:12
160:12 161:5 163:13
168:5 184:15 189:9,
22 196:7 202:21

**meaning** 29:25 46:20
75:7

**meaningful** 118:13
133:22 134:19

**meaningfully** 131:3

**meanings** 24:2 114:2

**means** 23:1 29:22,25
53:24 95:2 125:7
134:1 184:2,17,20

**meant** 14:11 64:6
119:6

**measures** 101:13

**measuring** 126:8

**meat** 172:19

**media** 55:10 63:1,25
138:14 158:18
180:8,14 211:25
212:2,3,7,11,16
213:7

**meet** 34:22 188:23
190:23 196:7

**members** 132:4
204:1

**memo** 49:17,21 51:25
53:4,8,15 55:11,23
57:11 60:17 62:19
121:23 122:11 128:7
129:8 139:19 140:18
141:7 168:8,10,21
171:24 178:15,18,25
185:23 186:2 187:13
188:16,21 189:15
190:19,20 191:17,
21,24 192:4,9
193:14,16,17,18
194:2

**memorandum** 190:21

**mention** 181:17
207:1

**mentioned** 38:22
58:10 76:10 80:14,
19 82:21 110:11
119:15,16,17 138:20
141:5 179:6

**mentioning** 51:6

**mentions** 82:11,25

**method** 15:23 16:1,
11

**methodology** 27:21,
24 28:3 44:2 145:14

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

Mexico 157:17

mid-november 193:20,22,25

middle 8:14 51:23 155:3 174:20

million 146:25 147:4

mind 26:25 27:13 36:22 91:6,8,13 112:21

minute 187:2

minutes 204:16

mirror 73:16,24

mischaracterize 167:13

mischaracterizes 17:11 27:19 35:20 40:19 46:3 50:1 56:12 94:9 124:2 128:1 135:1 137:2 162:5 168:1

misheard 16:4

misleading 36:15 126:20 167:7 205:14

misrepresentation 15:1,7,15,20,23 16:9,14,18,24 23:7 24:23 25:3,25 32:4, 24 35:11,16,17,24 36:24 37:12,15,21 39:9 40:5,22 59:24 66:23 67:2 75:11,15 76:20 77:2,6 79:2 126:21 150:1 152:25 153:3 192:21

misrepresentations 13:11,12,17,24 14:1, 5 19:10,25 20:14 21:12 24:7,17,21 25:22 33:7,10 35:12 36:3,12 37:7 39:16 40:13,17 41:13,22 52:23 54:1,13 68:15

69:17 71:11,24 75:21,24,25 77:20, 22 78:22 83:25 84:7 92:3 102:1 110:2,6, 9,13,22 111:4 116:5, 10,19,25 117:2,5 123:8 126:13 159:9, 10 160:23 167:2 170:19 211:13 213:6

misrepresented 19:17 84:17,20

Mississippi 66:12

misstatement 77:7,8

misstatements 26:7 39:25 68:7,10 69:11 77:10,12,19,21 138:3,8,11,17

mistake 120:17 142:2,5,6,17,18

mistaken 142:16

mix 135:10

model 47:13,23,25 48:8 154:18,19,23 155:20 156:25 208:7 209:10 210:14

money 95:6 194:20 195:5 203:2,5

monitoring 108:7

months 87:2,12,24 88:13,22 174:11 182:4

morning 10:3,4 96:13

Mother 111:7,9,14,22 112:1

motion 33:20 40:8 110:5 116:15

move 29:5,8 57:8 70:8,9 154:10 169:6 178:13

moved 29:1 152:11

movement 30:24

31:12 32:3,6 98:6,9 100:4 133:18 134:24 135:7 150:16 191:22

movements 48:3,7 104:4 130:25 134:10 150:14 154:3,14

moves 32:8

moving 70:7 128:14 134:6 166:1

MTC 108:20 109:7 117:17 118:5

MTC'S 109:16

multiple 175:2

multiply 155:11

mumbles 185:19

mute 208:21

─────────

**N**

name 8:18

names 12:7

nation 112:4,5,7,9,13, 16,23 206:20,25 208:18 209:19

Nations 207:4

near 45:11,13 66:4 121:16 148:9 174:2 181:22

necessarily 105:21 153:22

need 61:14 74:12 95:13 98:17 105:5 123:17,24 165:5 178:10

needs 34:22 68:18 188:23 190:23 191:3,11

negative 45:18,24 68:12 80:10 103:12, 20,21 106:6 110:16 123:6 127:16

132:11,23 133:4,10 136:9,12 143:8,15 144:5,12,24 145:1 146:20 149:3 151:7, 9 153:20 156:6,13 164:8,9,12,16 210:18

negatively 104:10,15 117:7 162:19,20

NERA 92:19,22 93:1, 13,18 95:5,6 194:4 195:1,2,15 198:2,17, 25 202:13,22 203:14

NERA'S 197:23 202:13

never 192:12

new 8:4,18 48:25 49:4,6,9,23 50:9 54:10,20 56:8 68:21 118:13 157:17 169:3 179:8,12 189:25

news 55:10,12,13,17, 19,20 56:8 68:12 99:9,11 103:6,10 104:14,18 106:3,5,7, 13,18 122:25 127:24 129:1 130:2,17 131:14 132:16 136:9,13 149:20 152:8,13,14 153:5,6, 8 172:4 179:20,23 208:2 213:7,12,17

Nikki 8:11

nine 144:24

no-news 152:9

nobody's 72:5

non-investment 87:23

non-news 153:9

non-securities 88:12

nonpublic 59:7

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

notation 186:18

note 11:14 63:21
136:16 167:21
170:16

noted 178:17 187:24

notices 72:7

noticing 72:5

notion 205:4

number 16:15 20:7
30:22 103:17 110:12
149:8 151:9 158:13

numbering 60:22

numbers 10:13 61:18
145:2 155:2,12
173:23

numeral 108:6
138:21

numerous 42:18
138:5

## O

o'clock 95:22

oath 9:22

object 23:13 116:1
167:25 195:10,21

objection 12:23 17:8
18:21 20:24 21:23
23:21,22 25:8 26:9,
22 27:6,18 28:9
35:19 38:4,25 40:18
41:18 43:11 45:5
46:2,11 47:10,20
48:13 49:2,12,25
50:12 52:9,20 55:24
56:11 62:21 69:2
70:24 73:19 78:11
82:12,22 83:8,20
86:1 89:11,16 90:11
93:2,20 94:8 100:23
104:20 105:8 106:9
109:19 111:15,24

112:24 115:1 117:19
124:1,15 125:3,13
127:25 134:25
136:10 137:1 140:10
144:13 145:11
147:6,19 158:20
160:10,16 162:4
164:20 165:10
166:16 168:17
170:11 171:15 176:4
179:2 180:11 183:9
185:6 189:6 191:6,
18 192:5,14 197:3
201:7 202:16 207:21
209:4 210:24 212:25

objections 148:23
201:14

objective 90:19

obtain 194:13

obtained 55:19

October 8:3,7 147:15

offer 83:13

offered 42:18 200:6,7

offering 42:22

offerings 89:1

offhand 94:11

office 155:20 173:14
187:25

offline 202:19

offset 103:11 106:6
109:18

offsetting 104:14,18
127:24

Oh 16:2 43:12 54:19
106:10 108:10 121:9
152:24 155:9 162:7
167:16

OIG 84:8,18,22 85:4,
13,20 91:20,23 96:4,
7,8,19 102:7,9
103:18 104:7,10,13,

15 105:4 106:23
107:3,10,21 108:17,
20 109:13,17 110:10
114:20,25 115:24
116:7,13 117:4,8,12
118:8,20,23 119:3,
11 126:22,23 127:2,
17 129:12 132:12
136:24 137:14
139:17,20 140:17
141:6,7,10,11 143:2
167:24 168:4 188:8

OIG'S 98:1

okay 10:12 12:3,21
13:14 22:14 26:6,16
28:21 34:13 37:23
42:11 43:8,19 44:13
45:1,9 46:8 47:4
51:8 52:17 60:8
61:8,12,21,24 62:4,6
64:11 65:1,5 66:2
74:4,11 77:23 79:17
80:17 83:12 87:16
88:8 89:5 90:5 92:19
94:3 95:12 96:8
105:17 106:1,21
108:16 109:2 111:20
114:22 124:8
136:15,22 137:6
139:7 142:19 143:1,
7 144:18 148:14
149:2 151:13 154:7
155:17 156:4 161:21
167:11,16,18
169:14,16 173:21,25
174:13 181:13,20,21
182:17,19 185:20
186:5,11,13,19,24
187:5,7,13 188:15
194:22 195:19
196:22 197:21 198:8
199:4,19,21 200:17,
25 201:20 202:9
203:16 205:24 206:3
207:7 210:1,8

213:24

omission 26:8

omissions 26:7,21
27:5,17 28:8,14,19
138:6,8,11,12

ones 17:21 57:12
173:15,19,24

ongoing 92:17

online 212:9

opened 14:19

operate 63:4,13,14

operational 35:4

operations 184:24

opinion 18:18 23:14
43:13 44:7,14,17
48:10 68:22 77:2
78:25 83:4,13,15,18
94:18 113:8,19,22,
24 118:10,12 160:4
165:1 166:3,8,11

opinions 59:8

opportunity 12:17

opposite 117:11

option 43:1

options 179:17
199:24

orchestrated 207:15

order 28:24 33:19
34:1,4 37:25 38:1
40:8,16 41:16 42:10
63:3,10

organized 37:2 39:23
41:2

original 142:10

out-of-state 184:6

outlook 112:9,10
185:19

overall 27:22 124:17
147:16

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**overhang** 176:18

**overlap** 21:6

**oversight** 108:7
115:19

---

**P**

**p.m.** 95:22 135:21
136:2 180:25 181:6
197:13,19 204:20,25
214:1,4

**page** 14:20,23 31:20
33:4 34:3,4,9,13,17
36:6 37:25 38:23
42:9,12 45:16 51:21
60:21,24 61:16,22
66:3,4 80:15 86:22
95:25 97:6,9 108:5,
8,15 109:2 114:7,8,
20 115:16 139:5
147:22 155:25
159:21,22 167:15
173:22,23 174:1,14
175:5,13 181:22
182:18 193:8,9,10
205:25

**pages** 38:8,11,17
41:9 61:20

**paid** 89:14 90:9
194:4,23,24 195:2,
15,25 196:4,18
197:23 198:2

**paragraph** 14:17,22
25:4,15 35:2 43:21
51:22 62:1,15,25
63:8,17,20 66:4 78:6
80:20 97:6 109:7
132:1 139:15,18,22
143:6 152:17,19
157:20 169:10,13
174:21 187:14
206:21 207:2

**paragraphs** 38:16,17

41:10 169:23,25

**parallels** 105:25

**paraphrasing** 43:23

**parenthetical** 185:12

**parse** 170:14

**part** 19:8 60:19 61:10
111:1 136:19 170:2,
6 176:15 191:2
205:21

**particular** 13:8,18
15:13 18:5 19:5
20:15 21:4,10 22:4,
11 30:24 37:1,19
39:10 42:7,25 43:13
46:6,20 50:7 67:20
76:13 78:24,25 79:5,
14 101:14 106:19
117:22 121:2 129:9
148:25 170:25
183:14,24

**particularity** 165:24

**particularly** 18:3,8,24
35:15 41:3,19 59:17
70:16 72:13 76:7
80:3 96:24 108:25
109:21 116:21 118:3
133:20 148:8,12,16
150:5 170:14 179:4
211:9 213:2

**partners** 34:22 35:6

**parts** 58:16 177:9

**pass** 33:17 60:12
81:11 119:25 137:16
181:11

**passing** 10:19 11:11
107:14 129:18 157:5
172:13 186:11

**pause** 38:6 50:19
62:5 169:15 187:6

**pay** 195:8

**peer** 204:2

**pending** 8:13 213:20

**people** 71:16 132:3
170:4,7 203:1,5,19
210:17

**percent** 31:3,17 35:1
45:19,25 46:15,19,
23 133:25 134:1,8,9,
12,22 140:3,15
141:13 143:8,16
149:5 153:20 192:3,
8

**perception** 53:9

**perceptions** 80:10

**perform** 98:15,17,18

**period** 31:16 44:9
45:4 55:15 67:9
69:25 75:20 76:4
81:6 110:7,25
113:17 120:22
121:16 135:4,7
138:7 146:24 147:25
148:3,4,10,12
149:11 151:10 168:7
173:18 187:16
191:23 192:13,19,23

**periods** 205:7

**personally** 33:25
194:24 201:21

**phone** 118:18 119:6,9

**phrase** 82:4 184:2

**phrased** 80:8

**pick** 36:2 40:25
103:23

**picture** 147:23 148:8
193:4,5

**piece** 49:13 121:4
129:1 132:22,23
162:9,13 196:20
208:18,19,21,22

**pieces** 101:5 113:11,
13,14 131:8 132:15

**places** 30:18

**plaintiff** 9:1,4 33:5

**plaintiffs** 16:22 17:2,
15,21,25 19:16,19,
23 23:8 24:9,10,11,
22 25:23 26:2 32:14
39:8 41:23 49:17
66:22 69:9 71:1 75:9
76:5 84:4,10,16,23
85:5 97:1 99:5
101:24 102:11,21,25
110:20 113:10,14
114:12 116:7,11
117:6 126:17,19,22
136:23 137:9,12
138:17 139:9
165:13,19,23 170:17
211:14,16,22

**Plaintiffs'** 18:20 19:7
20:3 41:24 42:2
43:10,25 66:25
67:10 68:2,3 69:6,
21,23 71:8 72:12,20
98:3 99:6 101:11
103:3 104:3 109:25
110:3 116:4,14,15
117:3,9 127:7 135:5
140:23 145:20,25
150:11 165:12
171:23 211:18

**planning** 120:23

**plans** 183:2

**plausible** 163:25
164:3,4

**please** 8:22 15:11
47:5 51:22 96:1
107:1 156:3 191:15
205:25 206:2

**point** 67:1 76:10
81:17 115:13,16
157:13 167:23
175:7,14 183:25
200:5

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**pointed** 77:1 118:5 190:20

**points** 99:24 115:11, 17 150:4 157:13 181:24 213:19

**policies** 200:18,20 201:1,6,13

**policy** 48:20 52:1 53:16,22 55:6 56:21, 24 57:1,2,19,23 58:20 59:3 74:23 128:9,10 168:22 169:5 178:12 179:8, 10,21 188:22,25 189:13 190:22 191:10,12

**politics** 52:2,8

**poor** 112:14,19

**poorly** 187:17 189:11,18 190:14

**population** 115:12 190:6,7,11

**populations** 185:5,14

**portion** 196:15

**positive** 68:5,13 103:25 120:25 121:4,11 123:4 129:1,2 130:7,12,15, 22 131:17 132:5,6,9, 22 133:2,9 164:11

**positively** 104:9

**possible** 29:7 81:1 104:6 117:15 124:11 125:5 145:5 155:1 161:13 162:1 163:9, 14 206:16

**possibly** 203:2

**potential** 53:16,22 55:6 57:2,10 75:14 105:13 122:9 123:6 126:4 132:11 169:6 179:9 182:25 203:1,

4,10 211:21

**potentially** 75:14 113:7

**potentials** 203:12

**PR** 80:6

**practice** 62:16 90:17 91:2 190:22

**precisely** 28:15

**preclude** 163:19

**prefer** 155:18

**preparation** 12:18 198:3

**preparing** 61:5 107:16 115:4 137:23 156:16

**presentations** 138:13

**presenting** 47:2

**President** 183:1

**presidential** 168:12, 16 169:2 193:12

**press** 120:2 129:19

**pressured** 178:4

**presumably** 71:7

**pretty** 65:2

**prevent** 174:16

**previous** 73:14

**previously** 113:5 122:12 128:6,22 167:8

**price** 12:21 13:1,10, 13,15,19,23,25 14:4, 7,25 16:6 18:9 19:2 20:8 21:13 23:12 24:11,12,15,18,24 25:4,14 26:1,4,8,13, 20 27:4,16,23 28:24, 25 29:4,5,9,12,14 30:24 31:2,11 32:3, 6,9,11,13,18 33:1,8 41:21 45:23 46:9

47:7 48:4,11,17 52:7,18,22,24 53:21, 24 54:2 60:1 68:5,13 69:5,8,22 70:1,8,15 71:3,12,13,21,25 72:9,12,15,17 73:1 75:25 78:21,23 79:24 83:14,23 84:2 85:9,21 91:23 92:6 96:3,6 97:11,12,19, 24,25 98:1,9,11,13, 14,24,25 99:16,25 100:3,5,7,8,12,17,21 101:7,23 102:12,17, 20 103:13,19 104:16 105:2,4,14 110:1 111:3 113:17 114:14,19 116:5,12, 18,22,25 117:6,16 120:8 122:20 123:6 124:14 125:1,9 126:13,23 127:1 129:3,25 130:7,13, 16,23,25 131:10,18 132:9,11 133:15,18 134:7,23 136:19,23 137:13 139:10 140:7,14,20 141:2, 13,20,21 143:2,9,18 145:7 149:4,10,14, 25 150:3,8,13 151:15 153:12,18,24 154:5,9,13 155:5 158:17 160:3,24 161:9 162:3,11,16, 20,21,25 163:3,11 164:5 167:22 170:3 171:6 178:23 191:16,21 192:4,11, 18,20 193:2,6,12,13, 18 194:1 205:5,23 206:25 207:5,12,19 208:3,10 209:2,7,11, 16,21 210:11 211:19 212:13,23 213:4

**prices** 45:14 67:8 69:24 131:3

**primary** 203:25

**printed** 142:7,14,21

**printing** 142:17

**prior** 56:15 62:25 65:4,7,9,18 76:24 124:5 146:20 151:6

**prison** 109:5 190:6,7, 11 191:4

**prisons** 56:22 57:6,9, 15 66:11,15 69:1 74:17,25 83:6 103:7 109:10,11 128:15 157:14 169:7 170:9 171:7,25 172:1 178:13 179:10,22 185:25 186:3 187:14 188:18 189:4 190:9

**privacy** 196:12

**private** 56:21 57:5,8, 15 74:24 81:18 82:8, 19 103:7 109:5 119:6,8 128:15 169:7 170:9 175:9, 19 178:13 179:10,22 185:24 186:3 187:14 188:18 189:4 190:8

**privately** 115:14

**probably** 60:23 170:9 184:13 213:8

**problem** 74:25

**problems** 166:15

**Procedure** 198:6 199:18 202:18

**proceedings** 8:2 51:15 95:19 135:24 181:3 197:16 204:22 214:4

**process** 17:6

**produced** 208:24

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**Professor** 11:13
143:11

**profitable** 202:23,25
203:4

**profits** 202:14

**program** 89:8

**programs** 187:23

**prohibit** 63:4,11 64:4

**project** 199:1

**projects** 81:24

**proper** 128:5

**proprietary** 198:11

**prove** 29:11 32:10
98:10

**provide** 186:3 187:21

**provided** 96:12

**providing** 34:20
185:25

**provision** 175:10,19
194:16

**proximately** 23:7
25:23

**proxy** 138:12

**public** 19:14 58:7
59:9,22,24 102:25
113:16 114:13,16,
17,18 208:2 212:5

**publication** 111:7,10
112:4,6 113:3,8,22
174:5 178:24
207:17,20

**publications** 111:10,
14

**publicly** 59:6,21 60:3,
7 110:23 112:21
115:14 149:18
158:5,6

**purely** 26:6

**purportedly** 33:7

**purpose** 74:20 91:9
101:9

**put** 10:12,13 44:2
77:19 97:15 155:2,
21 170:23 185:16
199:15 211:14,16

**putting** 129:13
187:10

**Q**

**quality** 19:11 34:21
42:23 53:9 54:4,10,
21 55:4 56:9,16
68:21 69:12 75:1
81:20 82:9,20,24
83:5,19,25 84:11,15,
25 85:12 102:1
112:14 158:14 160:8
166:15 186:1,4
189:4

**quality-related** 160:2

**quarterly** 120:3
122:19 124:13
127:22 138:8 157:23
161:16,24 162:3,15,
24 163:10

**question** 12:25 13:9
16:4,10 17:17,18,20
18:10,15,25 19:3,4,5
20:12,15 22:15
23:17 25:12,21,24
26:17 29:13,18 30:3
44:11,12 47:5 58:8
59:10,12 60:19
64:15,18,20 65:2,4,
7,9,18 73:21,23 74:2
75:12 76:16 77:25
79:6 82:15 89:22
92:24 93:6 101:1,6
105:20,25 106:16,24
109:21 113:1 117:22
118:2 122:9 124:19
125:7 126:11

133:21,22 134:15
152:4 160:18 161:1,
11 162:17,22 163:1,
6,8 165:11 174:18
193:23 196:23 197:2
198:10 203:22 209:7
212:12,15

**questioned** 122:10

**questioning** 75:16,17
122:5

**questions** 18:7 22:8,
10 24:20 26:5 58:12,
13,23 64:14 65:12,
13,14,24 76:12,24
78:1 79:25 89:21
151:6 163:5 166:19
213:21

**quick** 135:15 180:21
197:5

**quickly** 65:2 186:14

**quite** 39:18 43:6
148:1

**quote** 36:16 80:23

**R**

**Radcliffe** 9:3

**raised** 118:4

**raises** 185:18

**raison** 81:19

**randomly** 14:19

**rapidly** 114:14,18

**rate** 128:21 200:10

**rates** 35:1 198:22

**reach** 130:9

**reached** 14:8 21:21

**react** 92:6 96:3,7

**reacted** 115:24
212:17

**reacting** 98:25 101:7,

14 103:4 104:8,9,10
117:7

**reaction** 15:5,18
16:2,7 20:9 25:6
32:21,25 53:25 54:2,
9 68:14 78:14 85:9,
21 91:23 97:11,12,
19 98:5,24 99:2,9,
11,13 100:8,9,10,19
101:16,17 102:13
103:2,12,21 106:6
110:25 113:17
115:23 117:12
120:25 127:1,6,8
129:2 132:9,11
136:19 143:2 145:7
156:14 160:3 178:23
191:16 206:25
207:6,12,19 208:3,
10,21 209:12,16,21
210:12 212:1

**reactions** 68:5
212:13

**reacts** 32:19 209:2,7

**read** 33:25 37:10,24
38:9,18 40:7 43:6
52:13 61:8,11,14,25
62:16 63:16 79:10
87:25 115:9 137:8,
10 141:3,14,15
149:20,21 157:20
169:13 173:24
174:15 176:14 180:8
184:19,21 188:7
189:1,22

**reader** 109:9

**reading** 41:16 77:17
149:5 184:16 185:20

**really** 43:16 59:4
62:16 74:25 79:19
90:3 94:25 105:19
125:7 132:21,22,23
133:2,3,7 134:15
199:20

**Index: Professor–really**

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**reason** 45:22 46:6 47:18,22 77:3,5 82:3,9,19 117:25 121:6 136:12 151:13 153:17 156:22

**reasonable** 133:7

**reasons** 48:16 103:17 110:12 166:14 170:15

**rebid** 66:13

**recall** 12:9 36:10 50:3,20,22 51:6 58:13,21,23 61:10 75:17 86:17 89:4 93:10 94:23 95:11 107:5,7,8 108:22,23, 25 120:21 121:15,21 123:12 128:23 129:3,6 130:2,16,20 136:25 150:20 155:1 156:17 185:22 190:17 204:9,10,12 205:8 206:11,15

**recalling** 158:24

**receive** 86:25 87:10 174:9 182:2

**received** 86:24 87:9, 22 88:11,21

**recess** 51:14 95:18 135:23 181:2 197:15 204:21

**recite** 37:16 198:23

**recognize** 88:5

**recollection** 36:21 58:19 76:9,15 81:4 94:17,19,22 106:20 108:4 119:13,21 120:15,16,20 121:3 122:23,24 123:10, 20,21 127:12 129:10 141:9 150:7 154:9 158:12 173:5 206:18 213:12

**recollections** 156:19

**recommendation** 107:24

**recommendations** 108:3,6

**record** 8:7 10:22 35:4 51:13,19 95:17,23 135:22 136:3 172:15 181:1,7 195:12,13 197:14,20 199:5,8,9, 15,16 204:16,20 205:1 214:3

**recovered** 167:22

**recovers** 168:10

**recovery** 170:3,7

**reduces** 164:2

**Reducing** 164:17

**reduction** 164:22

**reductions** 184:7,14

**refer** 13:16,17,25 14:4,5 60:16 67:18 207:10

**reference** 81:13

**referenced** 39:11,13 60:18,20

**referring** 58:1 88:18 130:17,18 207:4

**reflect** 162:11

**reflected** 14:9 157:24 161:24

**reflects** 143:20,21,22 174:19

**refuse** 198:9

**refutes** 171:5

**regard** 174:24 198:16,17 201:13

**regarding** 19:2,10,20 21:11 49:11,24 67:1 83:25 84:6 92:1 110:8 116:9 170:19

**regardless** 162:23

**regards** 198:14

**regular** 198:22

**REIT** 150:17 151:3,12 154:17

**related** 54:12 56:9 107:3 142:2 183:1

**relation** 42:24

**relationships** 34:6,16 201:12

**relative** 179:25

**relatively** 179:17

**release** 104:13,14 120:2 129:20 139:16

**released** 49:1,4,6,10, 14,23 53:4 85:13 96:9 102:10,24 103:8 121:23 123:2 127:10

**relevance** 132:5 192:17 195:21,22

**relevant** 59:1,16 60:2, 6 68:23 69:4 78:9,15 89:10 90:2,7 131:7, 10,12 160:5,12 192:24 195:17 209:1,6

**reliable** 90:19

**relied** 111:22,25

**relying** 89:14 90:8

**remain** 34:20

**remainder** 109:18

**remaining** 68:25

**remains** 178:4

**remember** 90:3 156:18

**renew** 57:14 157:15 158:3 160:7 165:9

**renewal** 57:13,14,16 177:22 178:1 190:17

**renewals** 34:7,16

**renewed** 178:9

**repeat** 16:3 90:5 202:16

**replicable** 154:23

**replicate** 154:24

**replicated** 155:20

**report** 10:9,11 11:13, 18,20,23 12:1,14,18 13:2,5,8,10 14:10, 11,15,22 19:2 20:11, 18 21:2,8 22:1,7 25:5,9 27:23 30:6,7, 10,12,17,18 31:8,22 32:1 33:5,23 35:10 36:6,8 37:18 38:24 43:20 48:16 49:15 51:7,22,23 52:15 53:12 61:5 62:20 70:17 77:3,7 78:4 80:15,19,24 81:13, 17 83:17 84:8,19,22 85:2,4,13,19,20,22 86:23 88:23 91:13, 20,21,23,24 92:5 96:1,2,4,7,9,15,19 102:8,9 103:19 104:7,10,13,15 105:4 106:23 107:3, 10,16,21 108:18,20, 21 109:3,8,17,18 110:10 111:1 114:21,25 115:4,23, 24 116:8,13 117:4,8, 13,18 118:8,20,23 119:4,11 120:7,17 127:17 129:13 132:12 133:1,6 137:23 139:20 140:17 141:6,7,10, 11,19 142:3,5,11,16 143:2,6,24 147:22 149:13 150:25 152:18,20 156:1,16,

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

20 157:7,10 158:15
159:1,19 161:20
162:10 167:12,15,24
169:21 172:16,17
173:1 174:1,19
179:6 181:15,19
182:18 187:10,25
193:4,9 194:3
198:14,17 199:3
201:17 203:17,18,
20,23 204:2,14
205:25 206:5,10,16
207:4,13,20 208:8,
11 209:3 210:17,23
213:9,14

**reported** 184:24

**reporter** 9:16 137:7

**reporting** 8:19 113:4,
5 115:19

**reports** 11:25 12:5
45:10 63:1,25 76:18
78:17 79:10 80:24
84:14 86:14,21
90:14 91:10 92:7
107:6 109:1 119:1,
13,19 121:8,16
122:13,17 123:23
133:17 134:21 135:3
138:9 149:15,17
157:9 160:1 172:9,
24,25 180:14 206:19
207:1 211:25 212:2,
3,7,11,16

**represent** 8:24 89:18
112:8

**represented** 92:12

**required** 37:3 87:6
174:4 198:13

**requirements** 202:17

**rescinded** 178:18

**rescinding** 178:24

**resources** 187:23

**respect** 86:12

**respond** 19:4

**responding** 58:22

**responds** 58:11

**response** 121:1

**responsible** 68:13

**rest** 190:17

**result** 30:19 47:2
98:19,21 117:7
139:23 140:13
141:4,12 157:22
161:15 162:14
163:10 174:25
210:13

**resulted** 24:8

**results** 30:15,20
100:17 101:15
154:20 155:1,23

**retain** 94:5

**retained** 83:13 92:15,
23,25 93:1,12,15,25
95:4

**retainer** 93:8,17
94:20 95:9

**retains** 93:18,19

**retention** 34:25 92:17
194:16

**return** 45:18,24 46:15
48:4 99:1,4 104:16
120:8 134:2 143:8,
14,24 144:4,9,12
145:4 150:8

**returned** 192:12,18

**returns** 45:15 120:19
141:20 142:3 144:24
154:17 192:22

**revalue** 121:12

**revealed** 110:10
139:12 171:24

**reverse** 191:12

**review** 12:17 65:13
91:4 103:9 123:13
127:3 137:24 139:17
157:15 187:3

**reviewed** 58:2,3,5,7
59:5 60:6 78:16
90:13 91:14 103:6
106:3 107:15 135:2,
5 137:21 149:15,23
150:2 156:15 158:7,
13 187:9 206:10
213:12

**reviewer** 204:2

**reviewing** 11:24
108:17 122:16,24,25

**reviews** 66:15 69:1
74:16 75:5,8 78:9

**revolves** 82:9

**right** 12:19 16:25
20:23 25:5 30:6 38:3
43:6 46:1 54:16,17
61:2 62:11 64:6
70:23 73:15,18 74:5,
9 78:4 80:21,24
82:2,11,21 86:8,23
87:2,25 92:14 97:15
100:22 101:23 105:5
107:17 111:23
137:23 138:25
139:17,20 140:9
141:17,22 143:19,21
144:2,7,22,25 147:1
153:1,10,13,14,16,
21 156:16 157:10
159:19 160:1 161:25
163:25 164:6,18
167:16,24 168:7
169:19 171:13
172:17 173:10,12,
13,16 174:11 175:25
177:20 178:18,21
184:3,8 185:3,5,11,
14 187:11 188:20
189:5 192:4 193:10,

14,19,21 200:15
201:1,25 206:20
207:2,10,13 209:18
210:23 212:13

**Riley** 9:9

**riots** 160:1

**risk** 122:2 170:6

**roads** 81:23

**Robbins** 9:1,4

**Robertson** 87:21

**Robinson** 87:8 88:10

**role** 187:15 190:12

**Roman** 108:5,9,10,11
138:21

**rose** 8:19 123:16

**roughly** 201:25

**row** 145:2

**Rule** 198:5 199:17
202:17

**Rules** 197:1

**run** 115:14,20

**runs** 112:14,19

---

**S**

**safe** 34:21 109:11

**safety** 160:2 188:2,19

**salaried** 194:25

**salary** 198:10,24,25
199:6,10

**San** 8:21

**satisfy** 122:18

**satisfying** 155:4

**save** 187:23

**savings** 42:22

**saw** 123:22 130:5

**saying** 15:12 31:10
32:2 54:15,18,19

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

55:10 58:21,23,24
62:24 63:7,24 64:3
65:11 71:18,20 73:7,
8 82:6,18,24 112:16
113:8,24 121:25
130:14 132:5 155:10
165:20 171:18 172:2
176:16,20,22 177:2
178:2,3,6,11 180:8
184:11,23 185:17
189:21,24 190:1,4,
18 191:8,10 204:13
208:1 209:21,24
211:5

**says** 34:18 39:23
42:13,16 61:2 62:14,
25 63:20 66:9 74:1
81:17 87:19 93:17,
23 95:1 99:11,13
100:9 139:9,22
140:13 141:3,12
150:25 153:15
155:22 157:13,21
161:14 162:14 168:6
173:24 174:6,21
175:7 181:25 182:7,
23 183:19 184:5
185:12 187:14
188:9,21 189:8,9,13,
17 190:21

**scenarios** 163:15
211:10,21

**schools** 81:23

**scientific** 98:16

**SEC** 77:11 149:22

**second** 15:3,16 25:13
60:14 81:16 87:5
175:7,13,14

**section** 34:5,8 38:1
42:13 77:9,14 80:14
96:1 108:2,14 138:4,
16 139:8 159:18,24
167:14,21,22

**sections** 138:1

**sector** 104:2 150:16
151:2,11 154:16

**secure** 34:21

**securities** 22:23 23:2,
8 24:2,14,16 28:4
67:17 87:12 89:1
119:9 182:1,8

**securities-related**
87:23

**security** 188:2,19

**see** 15:8 25:18 33:12
34:8 35:7,15 37:19
39:10,12 42:14 43:4
44:4 45:20 50:15
52:4 54:18 55:9
59:17 60:25 61:2,18
62:8,17 63:19 66:6,
17 68:4,8 72:11
81:16,25 83:23 87:3,
14 88:15 103:14
104:25 106:17
109:14 113:1 120:4
121:13 123:1 124:24
130:14,19 132:3,8
135:11 138:1 139:13
140:4 142:24 145:6
146:3,5 147:5,23,24
148:8 149:2 150:24
156:5 157:25 170:2
172:21 174:6 175:3,
12,22 177:7,13,23
181:17,23 182:5,11
183:3 187:19 188:3
189:23 190:25
197:5,10 204:17
212:7

**seeing** 127:6 130:2,
20 205:8

**seek** 174:8 182:2

**seen** 72:23 73:13
131:4 132:2

**selected** 152:7 153:5,
6,8

**self** 185:20

**self-explanatory**
188:8

**sellers** 201:4

**selling** 200:21,24

**sells** 200:18,19

**sends** 195:6

**sense** 71:10 72:3

**sentence** 15:13
52:13,14 87:6 137:8
184:3,4

**sentences** 38:9
141:15

**separate** 33:9 36:5,7
116:22

**serious** 166:15

**served** 11:14 187:15
190:12

**service** 42:19 66:10
131:22 186:1,4

**services** 42:21 87:1,
11,24 88:12 89:15
90:10 174:10 182:3
187:22 188:20

**Sessions** 170:23,24
171:12,18 172:3
178:17,24 179:15
180:6,10 185:23
186:23 188:16
190:20 191:4,17,20
192:4,9 193:17

**Sessions'** 191:23

**set** 97:18

**seven** 144:23

**share** 139:25 140:1

**shareholders** 34:19

**shares** 146:25 147:4,
15

**Shastri** 203:24

**shift** 48:20 52:1
53:16,22 56:21,25
57:19,23 58:20 59:3
74:23 128:9,10
168:23 169:5 178:12
179:9,10,21,24
190:15

**show** 25:2 28:24,25
32:16,18 39:4 46:23,
24 97:9 100:14,21
110:20 117:10
147:10 154:13 159:8
191:21 208:25

**showed** 177:9 187:16

**showing** 32:19 45:24
69:6 137:25 159:7

**shown** 20:7 188:10
189:9,10,18,20
190:13

**shows** 34:15 45:18
51:24 97:7 98:5
117:11 154:18
168:11 193:5,11

**sideways** 197:9

**sign** 46:16,19 95:9

**signal** 52:1 53:16
57:19

**signalling** 125:20

**significance** 30:9
31:6,16 207:25

**significant** 29:10,21,
24 30:13 31:3,12
32:6,10,20,25 46:10
47:9,16 48:5 97:21
98:5,9 99:1,4,13
100:3,10,19 101:16,
17 104:17 105:2
125:11 133:18,24,25
134:8,23 135:8
140:9 145:10 151:15
152:2 153:12,18,24

**Lucy Allen**

**Grae vs. Corrections Corporation of America, et al.**

155:6 156:12,13 158:17 182:9,14 206:25 207:5,11,19 208:10 209:11,16 210:10,11

**significantly** 190:6,8

**silly** 197:9

**similar** 12:7 36:17 39:3

**similarly** 85:7 111:2

**simply** 187:21

**single** 37:14 40:25 42:19 90:20

**sit** 12:10 14:13 26:24 37:15 39:10 40:2 43:14,16 59:18 117:23 118:1 121:6 149:7 150:19 154:8, 25 155:16 158:11 163:21 194:6,14 198:23

**sitting** 107:20 201:24 206:13

**situation** 59:15,17 73:13 113:7

**situations** 28:1

**six** 22:15 144:23

**skipped** 176:16

**slightly** 37:8 114:17

**smaller** 146:20

**somebody** 129:21 159:14

**somewhat** 173:2

**Sommer** 86:7

**Sommer's** 82:2

**sorry** 16:3 25:9 57:4 61:1 86:2 87:4 108:9 115:7 144:15 147:15 161:17,19,21 166:5 175:13 177:19 184:14 190:19

**sort** 36:20 37:2 69:7 84:25 90:21 96:23 106:13 113:21 118:7 123:11 125:25 131:1,11 152:8 176:15 184:15

**sounded** 124:8

**sounds** 44:17 81:1 176:24

**source** 114:6 212:10

**sources** 114:11

**speak** 19:3 20:11 21:3 22:2 124:10

**speaking** 62:9 196:11

**speaks** 25:9 38:5 82:13 116:2 140:11 144:14 147:7 159:25

**specific** 19:20 26:25 27:8,9,12 96:16 104:1 116:23 119:20 120:14,16 122:22 124:18,21 127:12 150:7 158:12 162:9, 13 166:10 173:5 202:11,21 203:6 212:18 213:11

**specifically** 50:4 86:17 174:24

**specifics** 113:2

**speculate** 186:5

**spend** 194:17

**spent** 201:21 202:2

**spikes** 148:1

**spoken** 64:7,8,24 119:18

**spokesman** 80:12

**spreadsheet** 142:20 155:21

**staff** 198:19,21

**staggering** 140:2,15

**stamp** 96:14,17

**standard** 91:2

**standards** 42:25

**start** 18:17 146:22 206:17

**started** 190:8 199:1

**starting** 140:19 146:3 184:22

**starts** 34:9 66:5 78:6 137:9 140:24 159:22 167:15 183:15

**state** 8:23 43:24 63:5 206:23

**statement** 13:20 28:24 29:1,3,8,11,14 32:8,11 35:22,24 36:14,18 38:22 62:18 64:6 67:6,7 75:4 76:11,13,16,21 79:1,5,14 80:4,6 101:22 128:4 183:14 198:1

**statement's** 66:20

**statements** 34:10 35:9 36:9 38:2,13,16 41:8 42:17 43:7 59:25 64:13 65:16 70:7 72:7,10 73:5,9 76:3,25 102:7,23 105:6 112:22 113:18 138:6,13,24 139:2 159:9 167:8 188:6 205:11,14 211:6

**States** 8:13

**statically** 32:5 209:9

**statistic** 29:19

**statistical** 30:9 31:6, 16 207:24 208:14

**statistically** 29:10,21, 24 30:12 31:3,12 32:10,20,25 46:10 47:8,15 48:5 97:20

98:9 99:1,4,12 100:3,10,18 101:17, 18 104:17 105:1 125:11 133:18,24,25 134:8,23 135:8 140:9 145:10 151:14 152:2 153:12,18,24 155:6 156:11,13 158:17 206:24 207:5,11,19 208:9 209:11,15 210:10,11

**stock** 13:12,19 14:7 24:24 25:4 26:1,4 29:5,8,14 32:9,13,19 33:8 44:8,24 45:3, 14,23 46:9 47:6 48:4,11,17 52:7,18 53:21 60:1 69:24 70:1,7 71:12,13,21 72:1,25 78:23 79:24 84:2 96:3,6 98:1 101:6,13 102:12,16 103:12,19 104:7,8, 16 105:14 114:14,19 116:11 117:15 120:8 121:12,25 122:20 124:14 125:1,8 126:23 129:3,25 130:7,13,16,23,24 131:3,10,18 132:10 133:15,19 134:7 136:23 137:13 139:10,24 140:7,14 141:13,20,21 143:9, 18 145:7 146:6 148:6 149:3,10 150:3,8,13,21 151:16 154:5,9,13 155:5 160:3 162:11, 20,21 163:3 167:22 170:3 178:22 191:16,21 192:3,12, 18 193:2,5,11 199:23,25 200:2,6,8, 15 205:5 209:2,7

**Lucy Allen**

**Grae vs. Corrections Corporation of America, et al.**

212:17,23

**stop** 181:22

**stopped** 185:11

**stories** 55:13,18,19
120:12 130:18
131:14 136:9 149:20
213:8,13,17

**story** 71:23 130:2

**straight** 144:11

**Strategies** 206:6,9

**Street** 114:7

**strict** 183:1

**strong** 35:4

**strongly** 109:7

**studies** 97:18 179:4

**study** 30:16,17,19,21,
25 31:1,2,11 32:3,7,
17 44:2 47:13,23,25
48:8 68:4 85:8
96:22,24 97:12,13,
14 98:2,4,23 99:3,10
100:6,8,11,16 101:9,
10,11,12 103:22
117:10 124:12 125:2
126:6,8,22,24 127:2,
7 135:6,9 136:24
137:14 140:22,23
145:13,15,17,23
150:12,15 151:20
153:25 154:2,21,22,
23 156:25 158:25
159:2 191:20 198:3
207:25 208:3,6,15
209:10 210:13
211:17

**stylistic** 183:19

**subjective** 90:22

**subsection** 34:7
206:4

**subsequent** 205:6

**substantially** 187:24

**substantive** 174:25
204:9

**success** 211:15

**successful** 66:13

**suffered** 139:9

**sufficient** 45:3

**suicide** 79:21 165:7

**Suite** 8:20

**summarize** 14:11

**summarized** 14:14

**summary** 175:6
182:20,21 183:22,25
184:16

**Suntrust** 80:21,23
81:5 82:7,18 83:6,17
84:12 85:1,18,25
86:11,18,24 87:8,21
88:10,21 89:18 92:4,
10,16,20 118:19
157:7 161:20 163:2
174:3

**Suntrust's** 83:16,18
85:16

**supported** 109:12

**supports** 72:12
145:25

**suppose** 59:14 161:5
163:13 193:1

**supposed** 127:16
154:13 158:14

**supposedly** 70:5
73:4 102:14 145:25

**Supreme** 33:3

**sure** 14:24 16:5 21:15
26:18 28:14,15,18,
23 30:4 31:18 46:14,
21 49:3 50:17 55:25
58:8 59:7,13 75:7
81:1 89:23 93:5
97:10 100:25
105:20,24 106:1,10

107:4,25 108:5
111:12,17 119:6
125:6 135:17 146:22
160:11,17 166:20
170:1 173:13 180:22
184:21 185:8 197:7,
11 199:4,8 202:3,5
206:1 210:19 212:19

**surely** 49:6

**surprise** 134:16

**surprised** 213:15

**swear** 9:17

**sworn** 9:21

**system** 178:4 190:24

**systematically** 40:24
91:4,14

**systems** 131:23


**T**

**t-statistic** 156:6,23

**Tabak** 204:3,5

**table** 45:14 77:18
147:9 152:21 153:15
156:12,15

**tables** 142:16

**take** 10:20 37:13 51:9
87:5 91:3 95:14
107:9 135:14 142:25
155:25 169:10
180:20 187:2 197:4

**taken** 8:10 51:15
95:19 135:24 181:3
197:16 204:22

**talk** 65:23 83:16
85:25 94:10 113:14
159:25 196:8 206:19

**talked** 141:25

**talking** 30:1 31:7,8,15
34:14 136:5 140:17
160:20 169:12

176:25 182:15
185:12 195:10

**talks** 66:8 78:8
139:16,19

**tape** 95:14

**target** 166:1

**tax** 125:25 185:18

**team** 103:6 106:3
123:13 198:19 202:2

**technique** 126:8

**tell** 27:2,15 56:6,14
97:7 105:3 134:15
190:2 199:7,13

**telling** 91:25

**tells** 68:23

**ten** 144:24

**Tennessee** 8:15

**term** 12:21 13:1,24
14:4 23:1 29:21
30:5,7 31:5,16,19
67:15 68:18 202:6

**terms** 23:25 24:1
27:22 48:23 57:11
69:4 90:22 95:2
96:21 126:8 131:17,
18 200:7 212:11

**terrible** 79:19

**test** 75:2 98:16,17,18,
23 100:6,7,16,18,20
101:2,3 103:3 152:9

**tested** 152:10

**testified** 9:22 17:11
25:20 53:23 73:14,
24 74:4,7 94:15
106:12 121:22
122:13 136:22

**testify** 91:1

**testimony** 27:19
35:20 38:6 40:19
46:3 50:2,19 56:7,12
62:5 73:22 90:25

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

94:9 124:2 128:1
135:1 137:2 169:15
187:6 198:4

**testing** 74:18,21
125:15 134:7

**tests** 99:24

**Thank** 12:16 43:8
51:5 135:18 143:17
169:25 180:23 187:1

**theoretical** 166:20

**theory** 42:19

**thereof** 122:17

**thing** 46:22 61:11
63:20 82:21,25
115:10 132:6 133:3,
4,9,10 134:19
153:23 164:19
166:21 177:15
183:19,24 197:9

**things** 13:16 16:19
17:13 52:25 53:6
68:1 69:20 70:4,14
71:16 72:4 78:20
82:10 83:1,22 84:3
88:3 91:12 110:16
112:20 116:23
121:20 122:4 126:9,
15 133:23 134:7
135:11 150:10,18,19
163:14 164:8 166:22
167:19 168:20
176:21 196:1 202:21
211:1,7,9

**think** 12:5,8 14:13,16
16:4,15 17:10 18:13,
25 20:10,11,17 21:1,
6,25 22:6,7,15 26:4,
12,23 27:21,24 28:2,
3 29:25 30:13 32:12
39:4 41:3,20 42:6
43:5,6 44:18 46:21
47:1,24 48:1,3,15
52:11 55:18 56:13

59:20 60:5 63:7,18,
24 65:8,17 68:17
69:3,20 70:10 72:8,
16 73:3,7,12,15,20,
22 74:11 78:12
79:23,25 80:3,5,9
85:1 90:18 91:2,7,11
94:14 96:10,11,13
98:17 99:19,21
104:21 106:11,12
107:22,23,24 108:2
112:11 113:6,25
114:9 115:21
117:24,25 118:8
120:12,13,24 121:3,
19 122:4,8,12
126:10 127:21 131:6
134:14 136:12 137:3
141:25 142:5,6,12
143:1 147:21 148:15
152:5 153:4 154:22
155:3 159:13 161:6
163:4,5,6 164:7,12
165:21 166:20,21
167:17 169:11,20,
21,24 170:25 171:4
172:2 176:12 177:4
178:6,12,20,21
179:7 183:10,12
184:10 189:21
191:2,8 193:15
195:23 196:11,16
198:4 199:25 200:5,
11 201:2 204:17
207:3,23 212:3,13,
19

**thinking** 163:16
170:7 178:8

**thinks** 128:10

**third** 8:17 157:12
187:14

**thought** 58:25 59:3,5
60:3 86:8 90:25
123:12 127:14

163:22 179:19
204:13

**thoughts** 176:8

**thousand** 194:11

**three** 34:24 63:21
66:5,9 68:24 74:14
78:7,8 144:23
155:13 174:11 182:4

**ticker** 88:3,6

**tied** 202:13

**time** 8:8 51:11,17
67:19 68:6,9 84:6
93:14 95:6,15,21
96:14,17 98:18
103:23 118:19
119:10 133:17
134:1,10,22 135:20
136:1 150:4 151:10
168:12,16 173:18
180:24 181:5 187:16
188:9,11,14 189:9,
10,17 190:13
191:17,23 193:16
195:1 197:12,18
198:18 204:19,24
213:19,25

**times** 22:15 80:19
134:5

**timing** 212:8

**today** 9:16 10:6 31:6
107:20 206:13

**today's** 214:1

**told** 56:18

**top** 61:16 66:5 174:2
184:22

**touched** 60:13

**touted** 42:21

**traded** 149:19

**trading** 144:1 146:6,
25 147:14,17 148:20

**traditional** 175:10,20

**Trae** 9:9

**Training** 109:4

**transcript** 61:9,17
62:10 78:2,3 124:10
196:15

**transcripts** 149:21

**tried** 35:25 37:4 39:7,
18 40:24 116:21
135:10 161:7

**trip** 159:19

**true** 32:22 64:23
66:20 67:6 71:19
72:23 114:4 141:17,
20 158:23 210:19

**Trump** 170:8,22
171:1,11 174:23
175:8,17 180:15,16
191:4

**Trump's** 183:1

**truth** 67:1 69:25 70:4,
23 71:6,13,17,21,25
72:1 76:6 84:6
110:8,23 116:9
126:17 159:11
165:15

**truthfully** 74:8

**try** 37:13 77:23,25
90:21 132:3 148:19
151:19 161:6 170:14
184:20 208:20

**trying** 30:13 67:21
106:22 155:9 159:19
167:19 184:17
209:13

**turn** 14:21 33:4 34:3
42:9 43:20 45:10
51:21 95:25 114:20
139:5 173:22 174:14
181:21 205:24

**turned** 12:4,6 55:16

**Turning** 11:20

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

**Tweet** 96:12

**two** 15:2,3,14 97:8
  112:20 132:15 136:8
  139:1 140:16 141:6
  144:22 172:24
  173:7,10 181:23

**two-day** 145:9

**type** 84:15,21

**types** 19:15

**typically** 46:17
  131:12 132:3 184:1

**typos** 12:2,9

---

**U**

**U.S.** 131:21

**Uh-huh** 159:16
  183:17

**uncertain** 56:19

**uncertainty** 48:18,21
  49:16 52:2 53:17
  55:1,7 121:20 122:1,
  2 128:11,17,19
  148:5 168:23

**underlined** 42:13

**understand** 21:15
  22:16 24:6 31:19,21
  33:2 147:14 148:19
  198:9 212:22

**understandable** 74:2

**understanding** 22:25
  23:3,5,10,16,17,20,
  25 25:16,20 28:17
  29:20,23 43:10
  59:23 65:10 66:21,
  24 75:9 77:16 82:4
  93:24 94:4,13
  107:19 138:15
  142:13,15 158:9
  165:18,22 198:12
  200:22 212:1,16

**undertake** 27:3

**underwrote** 88:25

**unexpected** 120:24
  121:4 125:10 129:1

**United** 8:13

**unrelated** 106:23
  132:16

**updated** 173:3

**Updating** 176:7

**upgraded** 177:11

**upgrading** 176:17

**upside** 174:22
  176:23,24 177:5

**use** 13:1 16:11 17:6
  20:17 30:5,7 31:5,
  20,21,24 164:4
  170:9 175:9,19

**useful** 211:25 212:10,
  16,20,22

**usually** 183:19

---

**V**

**vague** 12:23 21:23
  23:21 26:10,22 28:9
  41:18 43:11 48:13
  49:2,12 50:12 55:24
  69:2 70:25 73:19
  78:11 83:8 86:1
  89:16 90:11 104:20
  106:9 109:19
  111:15,24 112:24
  115:1 117:19 124:15
  125:3,13 127:25
  134:25 136:10
  145:11 147:19
  158:20 160:10 162:6
  164:20 165:10
  166:16 168:17
  170:11 171:15 176:4
  179:2 180:11 183:9
  185:7 189:6 191:6,

18 201:7 207:21
  209:4 210:24 212:25

**valuation** 84:18 85:3
  131:7,9 132:15
  177:1

**value** 85:6,17 131:15

**valuing** 133:15

**various** 30:18 126:9
  150:3,22 151:1
  154:16,17 159:17
  170:14 213:19

**vein** 99:15

**version** 11:15,17,18
  142:9,24

**versus** 112:10,16,23
  113:23 114:8 147:17
  148:22 152:8,13
  165:5 166:14 170:6

**video** 8:9

**VIDEOGRAPHER** 8:6
  9:15 51:11,17 95:15,
  21 135:20 136:1
  180:24 181:5
  197:12,18 204:19,24
  213:25

**view** 62:19 83:16,18
  182:24 207:17
  210:23

**viewed** 111:14 114:5

**views** 44:18

**violating** 79:20

**violations** 110:15

**volatility** 121:24
  148:6 205:6

**volume** 146:6,19,25
  147:14,17,23 148:2,
  7,9,20

**vs** 8:11

---

**W**

**Waack** 9:16

**Wall** 114:7

**want** 10:20 11:4,22
  14:18,21 21:20
  31:17,18 43:19
  44:19 61:25 65:21,
  22,23 94:10 105:21
  115:10 132:17
  141:19 142:25 143:5
  155:7 165:13 166:6,
  9 167:12 174:16
  184:19 195:11,12,21
  196:23 197:2 199:4,
  8,20 202:11,19
  204:16 209:20
  210:19

**wanted** 63:21 65:25
  74:22 75:2

**wants** 188:24

**Warnock** 9:10

**warrant** 175:1

**wasn't** 21:16 36:21,
  22,23 37:11 70:16
  94:5,24 127:6,7
  132:6,7 142:17
  152:13 155:9 192:3
  205:20

**Watkins** 9:7,13

**way** 15:16 16:5 21:8
  25:2,13 31:7,24
  36:10 37:3,10 39:23
  41:2 47:1 58:24
  60:23 63:13 103:20
  142:6,13,20 163:5
  196:9 201:18 212:17

**ways** 15:2,3,14 16:16
  26:13 32:1 167:20

**we'll** 197:25 202:5

**we're** 10:14 31:19

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

66:13 93:24 95:16
143:3 176:17 178:7,
13 181:1 190:15
191:11 196:12,16
197:19 199:15
201:24 204:20

**we've** 34:23 71:20
121:10 135:13 177:3
180:19

**week** 184:15

**weeks** 74:5 146:8

**weight** 90:22

**welcome** 115:9
157:19 174:15

**Wells** 118:19 181:14,
25 182:7,14,23

**went** 40:23 177:8
212:9

**weren't** 59:9 107:6
158:16

**Wessler** 207:13

**West** 8:20

**white** 11:2

**Willow** 9:3

**window** 145:9

**wins** 176:9 177:14
183:1,7,12

**witness** 9:8,11,14,17,
20 17:10 18:23 21:1,
25 23:15,24 26:12,
23 27:7,20 28:11
35:21 38:7 39:2
40:20 41:19 43:12
45:7 46:5,13 47:12,
22 48:15 49:3,13
50:3,14,20 52:11,21
55:25 56:13 62:6,23
64:19 65:8 69:3 71:1
73:20 78:12 82:14,
23 83:9,21 90:12
93:5,22 94:16
100:25 104:21

105:10 106:10
109:20 111:16,25
112:25 115:2 116:3
117:21 124:3,16
125:14 128:2 135:2
136:11 137:3 140:12
144:15 145:12
147:8,21 148:24
152:5 158:22
160:11,17 162:7
164:21 165:11
166:18 168:5,9,19
169:16 170:13
171:17 176:6 179:3
180:13 183:10
185:8,19 186:17
187:7 189:7 191:7,
19 192:7,16 201:9,
15 202:20 207:23
209:5 210:25 213:1

**wondering** 83:15

**Wood** 8:25 10:2,18
11:10 12:24 17:23
20:20 21:14 22:13
23:19 25:1,11 26:15
27:1,14 28:6,20
33:16 37:22 38:20
40:6 41:15 42:8
43:18 45:8 46:7
47:3,17 48:9,24
49:8,20 50:8,16
51:1,9,20 52:16
53:19 56:4,23 60:11
62:7 63:15 64:22
65:20 70:21 72:22
74:3 79:16 81:10
82:16 83:3,11 85:23
86:2,3 89:12,17 92:8
93:7 94:2,12 95:8,
13,24 101:20 104:24
105:16 106:15
107:13 111:5,19
112:2 114:3 115:6
117:14 118:16
119:24 124:7,20

125:4 127:18 129:5,
17 135:17,19 136:4,
14 137:5,7,15,19
141:16 144:17 146:2
147:12 148:13 149:1
152:16 157:4 159:15
160:14 161:12
162:12 164:25 166:4
167:10 168:2,6,14
169:9,17 171:10
172:7,12 177:16
180:4,22 181:10
183:16 185:10
186:10,16,20 187:8
189:16 191:13
192:1,10 193:7
195:14,19 196:14,22
197:7,11,21 198:7
199:19,22 201:10,19
203:8 204:15 205:2
208:16 209:17
211:24 213:20,24

**word** 29:19 164:4
178:20

**worded** 102:19

**words** 39:3 43:22
73:23 159:20 173:17
188:10

**work** 18:6,13 40:1
108:18 109:12
111:23 149:25
178:17 194:5,23,25
196:18 197:5,10

**worked** 92:13

**working** 92:9,20
199:1

**world** 79:3 112:9
210:2,6

**worried** 179:23

**worse** 79:22

**wouldn't** 46:18 67:5
103:22 104:17
105:18 132:17,20

133:10 134:16,18
145:22 163:18,23
166:22 198:22
208:13 209:20
213:15

**write** 91:9 133:1

**writing** 78:4 133:6,14
172:16

**written** 122:14
149:16,17

**wrong** 56:6 61:1 73:2,
4,8 84:20 109:12
120:19 142:19
156:24 185:24
188:17 189:3 191:15

**wrote** 34:18 133:16
134:4,21 169:11

---

**Y**

**Yates** 49:17,21 51:24
53:4,8,15 55:11,23
57:11 62:19 121:23
122:10 128:7 129:8
139:19 140:18 141:7
168:8,10,21 171:23
178:15,18 185:24
186:2,25 187:13
188:17 189:15,17
190:19 193:14,16,18
194:2

**Yates's** 188:6

**yeah** 14:21 28:17
43:15 57:5 63:19
81:7 88:2,5 106:25
107:8 108:12,13
143:7 155:11,14
161:19 164:21
167:17 169:23,24
172:23 175:16
178:2,20 182:22
184:15 193:24
197:25 199:12

**Lucy Allen**

**Grae vs. Corrections
Corporation of America, et al.**

200:11 212:14

**year** 124:23 184:7
199:11 203:10

**years** 66:16 178:5

**Yep** 206:7

**York** 8:4,18

---

**Z**

---

**zero** 29:16 101:19