# EXHIBIT F

# THOMSON REUTERS STREETEVENTS
# EDITED TRANSCRIPT
CXW - Corrections Corp of America Responds to the Department of Justice's Decision to Reduce Reliance on Privately Operated Prisons Conference Call

EVENT DATE/TIME: AUGUST 19, 2016 / 4:00PM GMT

EXHIBIT NO. 4
Allen
10-10-18

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.



THOMSON REUTERS

## CORPORATE PARTICIPANTS

**Cameron Hopewell** *Corrections Corporation of America - Managing Director of IR*
**Damon Hininger** *Corrections Corporation of America - President & CEO*
**David Garfinkle** *Corrections Corporation of America - CFO*

## CONFERENCE CALL PARTICIPANTS

**Ryan Meliker** *Canaccord Genuity - Analyst*
**Tobey Sommer** *SunTrust Robinson Humphrey - Analyst*
**Kevin McClure** *Wells Fargo Securities - Analyst*

## PRESENTATION

**Operator**

Good morning, my name is Priscilla and I will be your conference operator. As a reminder, this call is being recorded. At this time, I'd like to welcome you to Corrections Corporation of America's investor update conference call.

(Operator Instructions)

Thank you. I would now like to turn the call over to Cameron Hopewell, CCA's Managing Director of Investor Relations. Mr. Hopewell, you may begin your conference.

---

**Cameron Hopewell** - *Corrections Corporation of America - Managing Director of IR*

Thanks, Priscilla. Good morning, ladies and gentlemen, and thank you for joining us. Participating on today's call are Damon Hininger, President and Chief Executive Officer; and David Garfinkle, Chief Financial Officer.

During today's call, our remarks and responses during the question-and-answer session will include forward-looking statements pursuant to the Safe Harbor provisions of the Private Securities and Litigation Reform Act. Our actual results or trends may differ materially as a result of a variety of factors, including those identified in today's press release and in our Securities and Exchange Commissions filings, including Forms 10-K, 10-Q and 8-K reports. You are also cautioned that any forward-looking statements reflect management's current views only and that the Company undertakes no obligation to revise or update such statements in the future.

With that, I'll now turn the call over to our President and CEO, Damon Hininger.

---

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Thank you so much, Cameron, and thank you so much to everybody on the phone today for calling in on such short notice. We greatly appreciate our employees, investors, business partners and supporters, and what we wanted to do today is share information as quickly as possible with the largest group as we could through this call.

Let me start the call with this reminder, which is we do business only with government and I want to provide a quick overview of who our partners are. This kind of helps frame the call that we're going to have for the next hour or so. So at the federal level, we do work with the Federal Bureau of Prisons, Immigration and Customs Enforcement and United States Marshals Service.

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

We also do business with about a dozen states throughout the country in various local jurisdictions. My call today is to talk about the Federal Bureau of Prisons, one of federal partners, and some of the actions that happened yesterday that is going to affect their use of the private sector going forward.

So let me start with some key facts of yesterday. About mid-morning, we got a call from the Bureau of Prisons indicating that they would like to have a call with us and also leadership with GEO and MTC to talk about their view of the private sector going forward and the utilization of companies like CCA, and they would like to do that call mid-morning about 10:20 Central time. We all participated in that call; again, it was leadership from both CCA, MTC, and GEO and there really was two parts to that call.

The first part of the call is that they wanted to alert us of a memo that was written by the Deputy Attorney General of the United States and the Department of Justice and addressed to the Interim Director of the Federal Bureau of Prisons and with that, highlight a couple of points in that memo and also note that they expected probably within the hour of that call, that media outlets were going to pick up the memo and report on that news. So I won't go into that in great detail, most likely you all have read those media reports and also seen a copy of the memo from the Deputy Attorney General.

The second part of the call that they had with us is they wanted to note, really, the three key changes in the CAR 16 solicitation that's currently pending with the Federal Bureau of Prisons. The three key changes were the following. First, they wanted to change the quantity that was advertised, which has been for quite some time, advertised at a bed quantity of 10,800 beds and they were going to reduce that advertisement to 3,600 beds.

Second, they were going to change the base period from a five-year base term on the contract to a two-year base, but the total contract term was still going to be a 10-year total term. And then finally, they were going to narrow the geographical requirements to make it where you could only perform within the State of Texas, and as you may know, the previous solicitation requirement allowed companies, like CCA, to propose facilities in several states in the Southwest.

I should also note that the 3,600 bed now advertised requirement did not affect the requirement that they had in the previous version, which indicated that a place of performance could [not] be a quantity larger than 1,800 beds. So say it a different way, they are advertising now 3,600 beds, at least indicates that they're looking at two locations of 1,800 beds each. Now I will tell you from the call, the message on the CAR 16 change in quantity was not a surprise to us because as we have noted in previous disclosures, and also most recently in my comments in our last earnings release call, the BOP has been very successful in reducing their system population by about 26,000 inmates over the last three years.

With that reduced pressure on their system, it was clear to us that their need for private sector beds was likely to be scaled back. And to be honest with you, that is part of our value proposition, where we provide customized solutions for our partners, as they need them and those solutions could be short-term or long-term. Now before I give some observations on our other federal partners and also our state partners, a couple more points on the Bureau of Prisons.

First, let me read directly from the memo from the Deputy Attorney General. On the second page of this memo, she indicates the following: quote -- for all of the these reasons, I'm eager to enlist your help in beginning the process of reducing and ultimate ending our use of privately operated prisons. As you know, all of the Bureau's existing contracts with private prison companies are term limited and subject to renewal or termination. I am directing that as each contract reaches the end of its term, the Bureau should consider either decline, to renew that contract, or substantially reduce its scope in a manner consistent with law and the overall decline in the Bureau's inmate population -- end quote.

Again, this is the memo from the Deputy Attorney General directed towards the Director of the Bureau of Prisons. Two pieces of that paragraph that I just read that I'd like to highlight. First, the comment saying use of private prisons versus eliminate private prisons. I want to clarify this and really clear up any communication or notes that were put in the article that came out after this announcement from the Attorney General's office.

There was some confusion in the media reports that somehow this was a directive or some type of executive order that was going to prohibit us to operate facilities at the federal, state and local level, and that clearly is not the case. This is more a direction to the Bureau of Prisons based on their needs at the time and increases or decreases of population to eliminate the use of privacy facilities, not to end the operation of private facilities.

3

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

Again, let me just say that this has been part of the Bureau's, really the way they operated and used contract beds over the last 15 years-plus. As populations have increased, or new capacities have come online their system, their advertised amounts and ultimate awarded contracts are based on the factors that currently affect their system at the time and that is also the case with our other federal partners and state partners. They make determinations based on their growth, overcrowding, new capacity bringing online, and that could impact up or down quantities awarded in contracts. So really, not a change of practice, as we see it with this directive.

The other thing I wanted to note is that we have had three facilities that are notable, I should say, that are going to go forward, serving with Bureau of Prisons for the foreseeable future and these are outlined in our supplemental but I did want to highlight them by name. The Eden Facility, which is the one in Texas, that contract currently is up for renewal on CAR 16 so we will know the outcome of that award by the end of this year. The other two I wanted to note is our Adams Facility, which is in Mississippi, and our McRae Facility, which is in Georgia, those two facilities are currently under contract and if all option periods is -- periods are exercised, one will expire in 2019 and the other in 2020, again, that's if all options are exercised.

And again, the contractor also serve -- we'll do an evaluation when those periods come up for expiration during the option period and it will evaluate the needs of the Bureau at that time to determine if they exercised those option periods. I also wanted to note that while nearly behalf of our revenue comes from our federal partners and the other half from our state partners, the BOP only makes up about $131 million of our revenues, or about 7% of our total revenue.

Now that compares to about $245 million we had in revenue in 2010, so our exposure has dramatically diminished over the last six years with the Bureau of Prisons. That's notable not only just because the [risk] exposure has gone down but it's also notable that during that period of time, where we've had that basically revenue cut in half, we've been very, very successful on utilizing that capacity for other partners that currently or could do business with CCA. The one I had highlighted is our California City Facility out in California, which is currently under lease with California.

That facility, for 10 years, was under a contract with the BOP. We were unsuccessful in a re-bid of that contract in 2010 and now we have got a really stable relationship with the State of California, where they operate it and we're providing the real estate to help them provide capacity in a system that's been severely overcrowded. It is notable that our revenues have gone down during that period of time and again, our risk profile has dramatically decreased, but it's also notable that we've been really, really effective on using our real estate and managing opportunities with new or existing partners.

Another point that I would like to make is that we clearly save money for taxpayers in the United States under our BOP contracts and this memo doesn't dispute that fact but that savings doesn't come at the risk of lower quality. One thing I would note about the Bureau of Prisons that they do very well, and they do many things very well, but one of which is they have on-site staff that are there, that they have offices within the facilities and they are monitoring our operations on a 24/7 basis. They have direct access to our warden and our staff and also, to the inmates and they expect our operation very rigorously in making sure we do not have any diminishing operations or have any issues with our quality.

But also I'd like -- if you would indulge me for a minute to talk about our team and our corrections professionals that we have within these facilities. I'm extremely proud of our team here in Nashville and also within our facilities and I have to tell you I have read some very unflattering things about our employees in the last 24 hours and I know that these assertions are unfair and untrue.

These women and men are proud Americans who put on the CCA uniform or provide services and programs with our facilities and they are from all walks of life and nearly one-fifth of them are former military or served in our Reserves. They do an outstanding job in operating our facilities. An example of the great work is our teachers, who just last year in 2015, within our BOP's facility, they helped 350 inmates achieve high school equivalency certificates.

I'd like to give you another example. Through our chaplaincy programs at our BOP's facilities, again in 2015, our chaplains led 229 programs and conducted over 2,500 counseling sessions with inmates. So the bottom line here is, that I'm really, really proud of our team and I'm honored to stand by them as they do the important work within our facilities.

Now let me also just talk about how the BOP sees our operations. As you know, our facilities are inspected by the BOP on an annual basis. They come in and do a very, very deep dive in our operations and again, I'd say they are one of the best in the business relative to inspecting our operations.

The three facilities going forward that we will be using to service the Bureau of Prisons, again, Adams in Mississippi, McRae in Georgia, and Eden, if we're successful on the re-bid on CAR 16, those facilities have gotten very, very good reviews by the Bureau of Prisons over the last couple of years. And have gotten the stamp of approval at the end, indicating at the time at the award, the people that audit our facilities would recommend these facilities get re-awarded, when contracts are up for renewal or looking to be extended.

Finally, I'd like to note that news accounts yesterday indicated that our facilities pay low wages, that our staff are poorly trained, and we have high turnover at our BOP facilities and I'd like to clear that up and provide you the facts. First, every employee at CCA that works at a BOP facility has to pass a comprehensive background check by the Bureau of Prisons, and the Bureau of Prisons can rescind that clearance at any time. So to be very clear, our employees that work for CCA under a BOP contract, they have to clear the background screening process by the Bureau of Prisons so they have final, final approval.

Second, I want to note the hours that we provide our staff in training, both in -- or pre-service, but on-the-job and that's about 204 hours a year. That's a higher standard than the American Correctional Association, they expect from public or private facilities. So we're training at a higher standard than the generally accepted practice within the industry.

And the Bureau of Prisons has to sign off on the curriculum and the content and length of our training so again, they have to sign off on exactly how long we train our staff and what content we provide them. Third, our wages at our BOP facilities are dictated by the Department of Labor. Within our facilities, we are paying starting salaries in the range of about $29,000 a year to $34,000 a year.

Again, that's base salary before benefits, which we think are very, very competitive in the markets where we operate, and again, those wages are set by the Department of Labor. Finally, turnover at our BOP facilities, in 2014, was approximately 23%, and in 2015, it was 24%, which I think compares very favorably to any other public or private facilities.

All right, so let me switch gears and just talk about what the memo didn't address and again, I know this was a big part of the confusion yesterday. This memo is clearly addressed to the Bureau of Prisons and I know there was confusion yesterday about this somehow going to impact also Immigration and Customs Enforcement and the United States Marshals Service, which is not the case.

As the day went on, and as those agencies were engaged by media, I think that confusion appeared to be cleared up, as they clearly stated that this does not impact their utilization of the private sector within the respective organizations. So let me take that one step further and just talk about the very unique missions that the Marshals Service and Immigration and Customs Enforcement have.

Let me talk first about the Marshals Service. The Marshals Service, for many investors, you've probably heard me describe is they are like the National Sheriff. They are the individuals responsible for individuals that are arrested by FBI or DEA and they have to maintain and control custody of these people once they are arrested as they have to go through the court process.

They have their very unique requirements. Very different than ICE is and very different than the Bureau of Prisons. To give you a real live example, to give you a better visual of how this works, yesterday in our facility in Northeast Ohio, actually in the city of Youngstown, we house 210 federal prisoners on behalf of the Marshals Service that were in custody in the Northern District of Ohio.

These prisoners have to be in the district. The have to be in close proximity to the federal courts in Cleveland because they are going through an active court case. They are either been arrested and indicted on a charge or maybe they are a witness in a case but they have to be in close proximity because they will frequently be going to the federal court for their case; they also have to be in close proximity to their legal staff that are representing them and they also have to be close to their family.

5

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

So to say it a different way, if there was capacity available in Florida, or in Texas, or in California, those prisoners couldn't be moved to that available capacity; they have to be in close, close proximity to the federal court as their case is being heard. Just to give you a sense of how fragmented that operation is, there is 94 US Marshals districts in the United States. What that means, in essence, there is at least 94 courts in the US that are hearing cases for federal prisoners.

Now let me talk about ICE. Very, very similar situation; very fragmented because the majority there, the individuals that they have to be responsible for have to be close to their operations. Now, a little different. ICE typically has a close working relationship with EOIR, which means it's the immigration courts, and those individuals or detainees have to be in close proximity to the courts, as their cases as being heard.

And with that, close to legal representation that are helping them with their cases. It's also notable that ICE does a lot of work just because they will have individuals that potentially, at the end of their case, may be deported and so ICE has a lot of staff that have to hear these cases, help them with their case at the end and then ultimately, put them on a path for deportation, if that ultimately is what their outcome brings them.

Again, like the Marshals Service, very fragmented. It really has to be -- house -- those individuals have to be housed in facilities in close proximity to either resources within ICE or with also the immigration courts. Now let me switch gears again and just talk a little bit about our state book of business, which, again, is about half of our business.

Every state that we do business with is very different relative to their needs and what their requirements are. They may be at capacity. They may be overcapacity. They may be seeing significant growth or they may have a lot of facilities that are at the end of their useful life and have to replace that infrastructure with new capacity.

Our critical high-quality solutions that have -- are very, very attractive have been reaffirmed here in the last 12 months. In the last 12 months, we have signed new agreements with our state partners in California, Arizona, Oklahoma, and Tennessee. So again, this action and this memo, which again was directed purely to the Bureau of Prisons, we don't see it having any affect with the work that we do with our state partners.

All right. Let me talk a little bit about also a couple of key things that I know are top of mind for our investors that I want to clear up, first of which is the dividend, and our dividend policy. So just last week, our current view of the business was affirmed with our dividend declaration. I also want to say very clearly, our policy remains the same which is payout at 80% of AFFO and dividends and as always, we will assess quarterly, with the Board, based on our view of the business for future declarations.

For the policy has not changed and again, our view of the business here in the short-term was reaffirmed with the declaration last week. Let me also say that this action yesterday has no impact on our covenants or our leverage policy and then finally, our guidance which we just released for the rest of the year, a couple weeks ago. Again, this action by the Bureau of Prisons does not affect our recently released guidance for the remainder of our fiscal year, which is calendar year 2016.

So to wrap up, let me just back up and say at a high level frame again our business strategy, which is focused on three specific areas and that is allowing us to grow and diversify the business. The first part is owning and operating correctional detention facilities and this is the model that has been the primary driver of growth over our 33-year history. Second, a relatively new offering and that is our real estate only solutions, where CCA provides mission-critical real estate assets leased by government organizations, and in a very, very short period of time, basically in less than 36 months, we have grown this platform to eight facilities and about 6,000 beds.

And then finally, expanding into our residential re-entry facility portfolio, through acquisitions, either owned and managed, or owned and leased to third-party operators, and increasing the occupancy at existing facilities. And in less than three years, CCA has gone from having zero facilities in our portfolio to now owning and controlling 25 facilities in six states, which represent about 5,000 beds. So these two last business growth drivers we have really ramped up and have had a lot of growth here in a short period of time.

That continues to manifest itself in new opportunities that we see both in the short-term and the long-term. So let me wrap up there and just say thank you for calling in. We're going to open for questions and happy to answer anything of note that we've gone through today or answer any questions also noted yesterday in some of these articles.

## QUESTIONS AND ANSWERS

**Operator**

(Operator Instructions)

We would take our first question from Ryan Meliker with Canaccord.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Hey everybody. Thanks for taking my questions. I had a couple for you. First, as we look at the BOP announcement and the three remaining facilities that you guys have within the BOP prison operations: McRae, Adams County and Eden. Eden, as you mentioned, was part of CAR 16. I think you highlighted that CAR 16 was going to be two 1,800 bed contracts, and if I recall correctly, it is now isolated to within the State of Texas as opposed to be -- outside the State of Texas. That eliminates you from contention for those contracts; is that correct?

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

No. So Eden is in the State of Texas --

**Ryan Meliker** - *Canaccord Genuity - Analyst*

But isn't Eden only 1422 beds?

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Yes, but it's a range. It can't be high -- it can't be larger than 1,800 beds.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Okay, so Eden is still within it; that's helpful.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

It's definitely a valid proposal and we think very competitive.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Okay, that's helpful.

Then the second question I had was you, when you reported our earnings last week, you -- not last week but earlier this month, you announced the end -- the termination of the New Mexico BOP contract. I'm wondering how much advanced notice they gave you for that? I forget if you mentioned anything there and have you heard anything with regards to the McRae Facility that's up for renewal in November?

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.


THOMSON REUTERS

7

Case 3:16-cv-02267    Document 122-3    Filed 10/26/18    Page 8 of 16 PageID #: 3403

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

So Cibola, we had -- we released as part of earnings, the actions there on that contract so nothing really more to report there on that one. As soon as we got the notice and I think it was within a day or two we did an earnings release and noted the Cibola action. And then McRae, so McRae is going to be up -- the option period is going to up later this year.

And so we expect probably within the next 30 days or so, we will start getting feedback from the Bureau. So the renewal that's near-term that's not CCA is, that you've probably heard earlier today, is the GEO Facility in Georgia, so that one is a little bit sooner and you heard what GEO said about that renewal so we're about 30 days behind them on that -- on McRae.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Okay, we'll just stay tuned for that. That's helpful as you guys do the BOP. Switching over to ICE, I'm curious, you guys have highlighted that you are in renegotiation on the South Texas Family Residential Center already. Do you think that the BOP action this week hurts your renegotiation strength? Does it mean you might come in at a lower price point? How -- and can you give us any update on how that renegotiation is going? If I recall correctly, it's a pretty substantial contract for you.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Yes, so two parts to that question. The first part is the action by the Bureau -- or the Department of Justice yesterday to the Bureau, we think has no impact on that contract relative to its value and purpose to ICE. So again, going back to that memo, it was directed only to the Bureau of Prisons and it wasn't giving any directive to ICE and Marshals Service and their utilization of the private sector.

The second part is there's really nothing new to report on the conversation we are having with ICE. That conversation has been ongoing since we had our earnings call a couple weeks ago and negotiations are continuing so nothing to report about that today.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Okay, that's helpful. David, maybe you can give just us an update. You mentioned that you feel pretty comfortable with in your debt covenants we've been getting especially after yesterday's move, a lot of questions surrounding debt covenants. Can you maybe walk us through, the major covenants and where the Company stands today?

**David Garfinkle** - *Corrections Corporation of America - CFO*

Sure. Our major covenants, our leverage covenants is at 5 times leverage. So at the end of the second quarter, we were at 3.5 times leverage. So if you just look at the cushion, if you will, between the 3.5 times and 5 times, we would have $125 million of EBITDA of cushion so that's really the only substantive covenants that we have.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Okay, that's helpful. Have you disclosed how much EBITDA you get from the STFRC?

**David Garfinkle** - *Corrections Corporation of America - CFO*

We have not. We disclosed the revenues on a quarterly basis, both -- well, usually in our 10 -- always in our 10-Qs and often in our press, earnings press release depending on what we're comparing for the comparable period.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

**Ryan Meliker** - *Canaccord Genuity - Analyst*

And based on the revenues, we would say that the EBITDA level is probably pretty close to where that $125 million was. So if you were to lose that, there might be some challenges which might give you more incentive to come in at pricing to make sure that you don't, right?

**David Garfinkle** - *Corrections Corporation of America - CFO*

Well, I guess I'd say that, that number does not contemplate any growth, so we've got a couple of contracts in place, like Krasdale and Red Rock, contributing to growth in 2017. So sitting here today, we're not concerned with that covenant at all.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Right, not at all. Okay, that's really helpful to hear. I think that makes a ton of sense. And then just last -- real last quick one here is, on the dividend, you mentioned 80% AFFO payout ratio is how the Company targets things. Given the renegotiation at a -- at the STFRC coupled with the BOP announcements, which may not have any more impact to you beyond the Cibalo which was announced last month, do you think there is risk to that dividend down the road or do you feel like that the embedded growth -- that you've got built into the Company is going to be off -- will offset any renegotiation that transpires at the STFRC and loss of contracts at -- with the BOP?

**David Garfinkle** - *Corrections Corporation of America - CFO*

So, I would say that the policy remains unchanged. We look at every quarter headwinds and tailwinds, which is normal with the business and then also what we've got in the pipeline is new growth over, say the next 12 to 24 months, and then make an evaluation that quarter. So the policy hasn't changed and we will continue to evaluate on a quarterly basis with the Board, and again, take into account the renegotiations or contract wins or losses and then with that, make a determination at that time.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

Okay, that's helpful. And then just one last quick one for you. Have you thought about share repurchases, given the free fall in the stock yesterday and individually, have you taken advantage of that?

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Well, I will tell you individually, I think that there is a lot of activity and a lot of interest on doing some individual purposes, so stay tuned on that front. But on the first part, that will be evaluated on share repurchase. One thing that's always a little challenge for the market, I know is that there are some public opportunities which we will talk about publicly. But there are some non-public opportunities that we know that we have, especially development, where we opt to deploy some capital, and so we just have to take that all into consideration. Our goal is for all of our shareholders to create long-lasting value is deploy that capital in long-term growth of the business and again, we've got some opportunities that are in the pipeline that are not public and know that will require us to deploy some capital. So your point is well-taken and that will be taken into account as we think about near-term and long-term opportunities.

**Ryan Meliker** - *Canaccord Genuity - Analyst*

All right. That's all for me. Thanks for taking the time to host the call today.

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS


Case 3:16-cv-02267    Document 122-3    Filed 10/26/18    Page 10 of 16 PageID #: 3405

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Absolutely. Thank you for your questions.

**Operator**

(Operator Instructions)

We would take the next question from Tobey Sommer from SunTrust.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Thank you.

Damon, I wanted to ask a question about contract terms and how we should think about them. In the case of the South Texas Facility, the contact term is longer than just the recent renegotiation that's taking place. How might that vary among your customer basis, so for a customer to maybe have a contract that isn't -- makes sense that you in 2018, 2019, 2020? Can they come to a provider and renegotiate or cancel that contract without a big financial liability? How should we think about that in broad strokes? Thanks.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Tobey, appreciate your question. I think there's a couple of answers there. Let me just first say that, I think, as a management team, I think we've done a very good job on interacting behavior with our partners and with that, we always try to have a long view, especially in good times and bad, that go back to the economic vibe with the recession, there were some real challenges with our partners. And they came to us and asked if we could renegotiate the contract to help them offset some deficits they had to incur within their system.

And we worked through that and again, had a really long-term view that we really want to make sure that we maintain a really strong partnership with those agencies. And I think we did really, really well in solidifying those relationships. That's a long way of saying that we are always open and flexible to have a two-way conversation with our partners.

If there is an opportunity where they're looking at maybe cost savings but they want to maybe expand the relationship or increase the quantity or do a new contract or do an expansion, we are willing to have that conversation. And again, I think we've been very, very successful and I think our partners know that we are flexible, we are innovative and we help them in good times and bad based on what maybe pressures they are feeling to meet their needs.

And again, I think our performance in the last six or seven years, as we've been able to deal with some of those ups and downs for the business but our earnings being durable show that we have been successful on that front.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Thank you.

You delineated, I think the -- in your prepared remarks between the BOP and United States Marshals and ICE on the fragmentation and geographic needs around the courts. Is the -- could the BOP theoretically, at least, absorb the inmates currently housed in private facilities and still operate underneath its prior high-water marks for occupancy, or would it bump up against those?



**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Yes, so a couple of answers there. Let me deal with the first part first. It would be very, very hard for the Bureau to absorb that population into their system. Right now, I think system-wide, the Marshals population is somewhere north of 50,000 federal prisoners. Again, and that's spread out between 94 districts and even some districts have multiple courthouses.

So again, going back to my example in Ohio where we're housing the 200-plus federal prisoners for the Northern district of Ohio, which is the courthouse out of Cleveland, it would be very hard for the Bureau to have capacity, I'm not sure even they have capacity in that district, where they can accommodate that need. Again, because the prisoner and the need there is so unique where they have got to be in close proximity to the courts so they can go to hearings and in some cases, they are going to hearings on a daily basis and also, have to interact with legal staff, it would be very hard for the Bureau to have capacity in those 94 districts to absorb all those prisoners.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Thank you. That's a great answer. I maybe poorly worded it; I intended to mean just the inmates that are currently housed for the BOP at private facilities?

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Just to make sure I'm following you there, Tobey, the BOP population, or the Marshall population?

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

The BOP. (multiple speakers) In other words, could the BOP kind of go to the -- its private company partners and say we'll just put those inmates inside our existing owned and operated network. That is the intent of my question, I apologize.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

So to make sure I'm following you here, I think that's what we're seeing half with CAR 16, that they have had their system population come down by about 26,000 inmates, so they do have some capacity within their systems, so I think that's why you're seeing with the CAR 16 action is a pulling back of some of the beds they got within the private sector, because they have had that reduction.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Okay, I will get back in the queue. Thank you.

**Operator**

(Operator Instructions)

We will go next to Kevin McClure with Wells Fargo.

**Kevin McClure** - *Wells Fargo Securities - Analyst*

Hi. Thanks for taking my question. I just wanted to drill down a little bit more into the expirations for the three active BOP facilities. I understand that they may elect to renew and stagger the expirations a bit, given an opportunity to reabsorb the population. But over time, as we think about

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

THOMSON REUTERS

Case 3:16-cv-02267   Document 122-3   Filed 10/26/18   Page 12 of 16 PageID #: 3407

what happens to those facilities as the BOP exits, would you prefer to sell those facilities or would you prefer to lease them, if possible? And would you prefer to do it with a federal partner or state partner?

Thanks.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Very good. I appreciate your question. So let me, Just as a reminder, just talk about the two key facilities. So again, Eden, we'll know the outcome on that probably by the end of the year on that contract renewal. The other two, the one in Georgia; that one has three two-year options that's remaining so if all are exercised, that will take us through 2022; and if our facility in Mississippi, which has one two-year option, that would take it out through 2019.

As it relates to your question about those facilities, if for whatever reason the Bureau did not renew those contracts, our preference would be to do like we did in Cal City. And I think that's a great, great example on how valuable our real estate is, that, in a very -- fairly short period of time, I know in that jurisdiction had high demand for capacity.

They were overcrowded. We worked out a lease agreement to where they operated and we'll provide the real estate and also maintaining it. And that strategy was reaffirmed this year, this summer where they just signed an extension with us for four years that takes us through 2020. So, as I think about, again, we're -- our risk is diminished here the Bureau of Prisons over the last six years.

But again, I'd say also, during that six years where we have diminished our risk over at the Bureau of Prisons, those assets as shown to be very, very viable, and we've been able to re-market them to other jurisdictions and it could be a turnkey solution where we do the service and provide the real estate, or it could be like Cal City, where we're just the landlord. So we're very open and flexible for all solutions that are most attractive to our partners.

**Kevin McClure** - *Wells Fargo Securities - Analyst*

Got it, okay, and just looking at it, there are medium security facilities. And looking at California, and I know my numbers maybe a little stale here, but as I understand it, they have a need at the higher level of security for beds so in other words, they are running at 150%-plus capacity in their medium and maximum security facilities.

Do you see an opportunity to expand your relationship with California over time and relieve some of that overcrowding at the higher end or --? I'm just trying to get a sense for potential growth opportunities with the state partners. Thanks.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

So the State of California, I would say we feel good about where we are at today, so I really can't predict or wouldn't want to speculate that that relationship is going to expand. I feel good about where we are today, though, relative to the size of their population out-of-state.

I think that's stabilized and I think we're seeing normalize with the budget passed by the governor during the summer months. And like I said in Cal City, that agreement was just signed -- or sent, I should say, here in early summer. So I feel good about where it's at today.

Could there be an opportunity down the road in California? Could be. They are forecasting some growth over the next couple of years. So we'll always be willing to provide a solution if they do need some more capacity within our system. Other state partners though, I noted just a little bit in my comments a couple weeks ago, with our earnings release, we have got a lot of activity.

Some of it public and some of it not public, with existing or our new partners and just like the agreement we signed earlier this summer with Oklahoma, with our largest at the time vacant facility, our North Fork Facility of 2,400 beds, and it wasn't just our vacant facility. That was a little

12

© 2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

**THOMSON REUTERS**

Case 3:16-cv-02267    Document 122-3    Filed 10/26/18    Page 13 of 16 PageID #: 3408

bit under the radar, but it turned out to be a great solution for us and a great solution for the State of Oklahoma, and they are ecstatic about the facility because they needed a newer modern facility that allowed them to close some older inadequate facilities within their system. So we've got a lot of meaningful activity going on the stateside, and again, I think if we've got capacity, either existing or future capacity, then I think we'll have good demand, as always.

**Kevin McClure** - *Wells Fargo Securities - Analyst*

Got it. Thanks for that. One final question for me about leverage. You stated it a 3 or 4 times leverage target and you prefer to operate within that band. Let's say you drift a little bit higher than 4 times leverage if there's some unfavorable resolution with ICE. How quickly do you think you could get that leverage back down and what route would you pursue?

Thanks.

**David Garfinkle** - *Corrections Corporation of America - CFO*

Yes, so it's David. It's a good question. I guess it depends on where our stock price is trading, so at today's price, we certainly wouldn't be interested in issuing equity to bring that leverage down. Probably the only thing I would add there is, we are going to continue to pursue acquisitions and that could result in an increase in leverage, given where the stock price is and where we would be unwilling to issue equity. But thus far, we really haven't had to forgo acquisition opportunities to this point because of our leverage policy.

Again, we have completed a number of acquisitions that we've previously discussed over the past six to 12 months and are 3.5 times leverage, so as we look forward, I think that's going to continue to be the strategy. We could go over that 4 times, if we find the right opportunities, and we wouldn't forgo them. We would still want to complete them, assuming we have accretive acquisitions so I don't know if it is a six to 12-month period to get that back below 4 times. It really all depends on where our stock price is and what opportunities we see going forward.

**Kevin McClure** - *Wells Fargo Securities - Analyst*

Thank you for your time.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

I'm going to try to answer Tobey's question, a follow-up question on that. Tobey, if I understand your question properly, if the BOP brought back all of the beds in the private sector and they all remained low security, the BOP would be at 179% of capacity in their low security facilities. I'm not sure if that answered it, but hopefully it did.

**Operator**

(Operator Instructions)

We will go now to a follow-up from Tobey Sommer with SunTrust.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Thank you. I'll table that other question and we can handle it off-line but I have two other ones. Do you expect sentencing reform at the federal level, kind of over the medium term, not near-term because I know we are about to enter our lame duck session in Congress?



**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Yes, I think that question, Tobey, is going to be hard to answer until we will just see what the world looks like next year. Who is voted in as President, and also what the Senate and the House looks like relative to control of Republicans or Democrats. So I think probably, at least be clear and then with that -- with the make-up of Congress and the administration then re-shuffling the deck on what the priorities are with everything going on in the world. So that's going to be a little hard to answer, probably until the Spring of next year.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Okay. What is your expectation for state inmate population trends, both nationally and among your state customers?

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

So it's a good question. So we have seen projections, and every state is a little different on how they do projections and how far they go out. So let me give that caveat. But I would say we're generally seeing about 1% annual growth on the state side. Again, some states are a little higher and some states are a little lower. But I'd say 1% annual growth is probably a good number for at least for the next couple of years.

**Tobey Sommer** - *SunTrust Robinson Humphrey - Analyst*

Perfect, thank you for your help.

**Operator**

This does conclude our Q&A session for today. I'd like to turn the call back to our presenters for any closing remarks.

**Damon Hininger** - *Corrections Corporation of America - President & CEO*

Well, very good. Let me say thank you, again, to our investors and other stakeholders and supporters for participating on this call on such short notice. Again, we tried our darnedest yesterday and early today to answer all questions. Just know that the management team is here to answer additional questions as we go into this day and into next week. But also just say to our investors, thank you so much for your support and your investments within CCA. And we will continue to report on our progress as we go through the course of this 2016 year. So thanks again for your call this morning.

**Operator**

This does conclude today's program. Thank you for your participation and you may disconnect at any time.

14

THOMSON REUTERS STREETEVENTS | www.streetevents.com | Contact Us



©2016 Thomson Reuters. All rights reserved. Republication or redistribution of Thomson Reuters content, including by framing or similar means, is prohibited without the prior written consent of Thomson Reuters. 'Thomson Reuters' and the Thomson Reuters logo are registered trademarks of Thomson Reuters and its affiliated companies.

Case 3:16-cv-02267    Document 122-3    Filed 10/26/18    Page 15 of 16 PageID #: 3410

**DISCLAIMER**

Thomson Reuters reserves the right to make changes to documents, content, or other information on this web site without obligation to notify any person of such changes.

In the conference calls upon which Event Transcripts are based, companies may make projections or other forward-looking statements regarding a variety of items. Such forward-looking statements are based upon current expectations and involve risks and uncertainties. Actual results may differ materially from those stated in any forward-looking statement based on a number of important factors and risks, which are more specifically identified in the companies' most recent SEC filings. Although the companies may indicate and believe that the assumptions underlying the forward-looking statements are reasonable, any of the assumptions could prove inaccurate or incorrect and, therefore, there can be no assurance that the results contemplated in the forward-looking statements will be realized.

THE INFORMATION CONTAINED IN EVENT TRANSCRIPTS IS A TEXTUAL REPRESENTATION OF THE APPLICABLE COMPANY'S CONFERENCE CALL AND WHILE EFFORTS ARE MADE TO PROVIDE AN ACCURATE TRANSCRIPTION, THERE MAY BE MATERIAL ERRORS, OMISSIONS, OR INACCURACIES IN THE REPORTING OF THE SUBSTANCE OF THE CONFERENCE CALLS. IN NO WAY DOES THOMSON REUTERS OR THE APPLICABLE COMPANY ASSUME ANY RESPONSIBILITY FOR ANY INVESTMENT OR OTHER DECISIONS MADE BASED UPON THE INFORMATION PROVIDED ON THIS WEB SITE OR IN ANY EVENT TRANSCRIPT. USERS ARE ADVISED TO REVIEW THE APPLICABLE COMPANY'S CONFERENCE CALL ITSELF AND THE APPLICABLE COMPANY'S SEC FILINGS BEFORE MAKING ANY INVESTMENT OR OTHER DECISIONS.

©2016, Thomson Reuters. All Rights Reserved.

