# EXHIBIT V

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

- - - - - - - - - - - - - - - - - - - - - x

THE ERICA P. JOHN FUND, INC., On Behalf of Itself and All Others Similarly Situated,

       Plaintiff,

                      Civil Action No.:
  -against-       3:02-CV-1152-M

HALLIBURTON COMPANY and DAVID J. LESAR,

       Defendants.

- - - - - - - - - - - - - - - - - - - - - x

      Videotaped oral deposition of LUCY ALLEN, taken pursuant to notice, was held at the law offices of BOIES SCHILLER & FLEXNER LLP, 575 Lexington Avenue, New York, New York, commencing September 22, 2014, 9:09 a.m., on the above date, before Leslie Fagin, a Court Reporter and Notary Public in the State of New York.

               - - -

     MAGNA LEGAL SERVICES
  1200 Avenue of the Americas
   New York, New York 10026
      (866) 624-6221

Page 2

```
 1
 2    APPEARANCES:
 3
 4    BOIES SCHILLER & FLEXNER LLP
          Attorneys for Plaintiff
 5            401 E. Las Olas Blvd., Suite 1200
              Ft. Lauderdale, Florida 33301
 6    BY:     CARL E. GOLDFARB, ESQUIRE
              DAVID NELSON, ESQUIRE
 7
              -and-
 8
      KAHN, SWICK & FOTI, LLC
 9        250 Park Avenue, Suite 2040
          New York, New York 10177
10    BY:     KIM E. MILLER, ESQUIRE
11
12
      BAKER, BOTTS, LLP
13        Attorneys for Defendant
              910 Louisiana Street
14            Houston, Texas 77002-4995
      BY:     DAVID STERLING, ESQUIRE
15
16
      ALSO PRESENT:
17
          CHAD COFFMAN, Global Economics Group
18
          JAMES CHRISTE, Videographer
19
20
21
22
23
24
25
```

Page 3

```
 1
 2        THE VIDEOGRAPHER:  We are now on
 3    the record and recording.
 4        This begins disk No. 1 in the
 5    deposition of Lucy Allen in the matter
 6    of the Erica P. Fund, Inc., et al.,
 7    versus Halliburton Company and David
 8    Lesar in U.S. District Court for the
 9    Northern District of Texas, Dallas
10    Division.
11        Today is September 22, 2014.  The
12    time is 9:09 a.m.
13        This deposition is being taken at
14    575 Lexington Avenue in New York at the
15    request of Carl Goldfarb.
16        The videographer is James Christe.
17    The court reporter is Leslie Fagin.
18        Will counsel state their appearance
19    and who they represent.
20        MR. GOLDFARB:  Carl Goldfarb from
21    Boies Schiller on behalf of the
22    plaintiff.
23        MR. NELSON:  David Nelson, Boies
24    Schiller on behalf of plaintiff.
25        MS. MILLER:  Kim Miller, Kahn Swick
```

Page 4

```
 1                L. Allen
 2    & Foti, also for plaintiff.
 3        MR. GOLDFARB:  Also with us is Chad
 4    Coffman from Global Economics Group.
 5        MR. STERLING:  David Sterling,
 6    Baker Botts, for the defendants.
 7    L U C Y   A L L E N,  called as a witness,
 8      having been duly sworn by a Notary
 9      Public, was examined and testified as
10      follows:
11    EXAMINATION BY
12    MR. GOLDFARB:
13        Q.  Good morning, Ms. Allen.
14        A.  Good morning.
15        Q.  About how many times have you been
16    deposed before?
17        A.  I don't know.  My report lists my
18    testimony in the last four years, I believe
19    so, and it's been more times than that, so
20    prior to four years, I've also been deposed.
21        Q.  I'm just going to go over some
22    ground rules, although I'm sure you are
23    familiar with them.
24            If I ask a question and your
25    counsel doesn't instruct you to not answer,
```

Page 5

```
 1                L. Allen
 2    you are required to answer if you understand
 3    the question.
 4            Do you realize that?
 5        A.  Yes.
 6        Q.  Is there anything that would keep
 7    you from testifying truthfully and accurately
 8    today, any medication you are on or anything
 9    like that?
10        A.  No.
11        Q.  If I ask a question and you don't
12    understand it, you can tell me that.
13            If you answer a question, I'm going
14    to assume you understand it, is that fair?
15        A.  Yes.
16        Q.  If you need to take a break for
17    some reason, if you let me know, I'm not
18    going to take a break instantly, but I will
19    try to take a break after a line of
20    questions, so please let me know if you need
21    to use the facilities or whatnot.
22        A.  Okay.
23        Q.  About how many expert reports have
24    you done in Federal securities cases, do you
25    know?
```

Page 274

1        L. Allen
2  at the 95 percent level, no matter what index
3  or how you control for peers or market.
4        Q.  That's over the two days, one day
5  is 90 percent, one day is 99 percent, over
6  the two days, it's 95 percent.  Was that not
7  what you found in this case?
8        A.  I don't know if that's what I
9  found.  This says, I think the movement would
10 be statistically significant.
11       Q.  I'm going to show you now what I am
12 marking as Exhibit 3, which is your expert
13 report in this case.
14       MR. STERLING:  "This case" being?
15       MR. GOLDFARB:  The same case we are
16    talking about, In Re: Lawrence.
17       Q.  I believe you did two expert
18 reports, this is the one in 2003 and it's
19 open to page 3.  If you could look at the
20 bottom paragraph on that page, please.
21       (Allen Exhibit 3, Expert Report of
22    Lucy P. Allen, In Re: Lawrence Group,
23    Inc. versus Barton, et al., marked for
24    identification.)
25       Q.  Here, it says, defendants say --

Page 275

1        L. Allen
2  would you read the paragraph at the very
3  bottom of the page?
4        MR. STERLING:  Which page?
5        MR. GOLDFARB:  Page 3.
6        Q.  Could you read in the record, The
7  defendants claim that the increase.
8        A.  Defendants claim that the increase
9  in the claim of MTI stock was not
10 attributable to the announcement of the ADL
11 demonstration.  The earliest story we find
12 reporting on the ADL demonstration is at 8:00
13 a.m. on October 21, 1997.  After controlling
14 for movement in an index of peer companies,
15 we find a statistically significant positive
16 reaction on October 21st at the 90 percent
17 significance level.  In addition, we find a
18 statistically significant market adjusted
19 stock return at the 99 percent level on
20 October 20th, the date preceding the
21 announcement.  See Exhibit 3.
22       Q.  That's enough.
23          If you look at this, can you
24 confirm that this is an expert report you
25 prepared in this case?

Page 276

1        L. Allen
2        A.  No, I cannot.
3        Q.  If you look at the front page of
4  it, that's available on West Law, it says,
5  Expert Report of Lucy P. Allen, In Re:
6  Lawrence Group, Inc. versus Barton, et al.?
7        A.  I see that.  This isn't the format
8  or the look of what a report of mine would
9  have, so if this is my report, it just
10 wouldn't have looked like this as I put it
11 together.
12       Q.  This is -- I will represent this is
13 the form it takes when you print it off West
14 Law.
15          Do you have any reason to think
16 this is not your report or an accurate copy
17 of your report given, even though the format
18 might look a little different?
19       A.  I don't know.  I would have to look
20 at it.  I'm just saying -- just from -- it's
21 just not the look of a report that I would
22 do.
23       Q.  Do you have any reason to think
24 what you read out loud is not what you wrote
25 in an expert report in this case at that

Page 277

1        L. Allen
2  time?
3        A.  I don't have a specific reason, no.
4        Q.  Do your colleagues at NERA
5  sometimes use two-day reports?
6        MR. STERLING:  You mean two-day
7     windows?
8        MR. GOLDFARB:  Thank you.
9        Q.  In doing event studies, do your
10 colleagues at NERA sometimes use two-day
11 windows?
12       A.  As a general approach, as I
13 generally described, and I believe that same
14 approach is followed by my colleagues and I
15 don't --
16       Q.  I'm going to show you what I have
17 marked as Exhibit 4, Allen Exhibit 4, which
18 is a study by David Tabak and Frederick
19 Dunbar, Materiality of Magnitude Event
20 Studies in the Courtroom.
21       (Allen Exhibit 4, study by David
22    Tabak and Frederick Dunbar, Materiality
23    of Magnitude Event Studies in the
24    Courtroom, marked for identification.)
25       Q.  I would like to ask you to -- do

Page 278

```
 1           L. Allen
 2   you see on page 7, under B, there is a few
 3   paragraphs under the event window and if you
 4   look at the top of page 8, you see it says,
 5   In securities fraud cases, many experts have
 6   adopted the convention of looking at one, two
 7   or five-day periods following an
 8   announcement.  The most recent academic
 9   announcements express support for the shorter
10   one or two-day window, although it recognizes
11   that, in practice, longer windows are often
12   used, is that correct?  Did I read that
13   correctly?
14        A.   Yes.
15        Q.   And is Mr. Tabak one of the people
16   who you said was -- I don't remember the
17   terminology, independent reviewer or outside
18   reviewer of your report in this case?
19        A.   That's correct.
20        Q.   And I believe he is also the person
21   you cited to when you were referencing a
22   decision to use one type of correction for
23   multiple event testing as opposed to another,
24   right?
25        A.   Correct.
```

Page 279

```
 1           L. Allen
 2        Q.   Now, you say that -- talking about
 3   the December 21st and 22nd days, you say, The
 4   allegation that the market did not react to a
 5   piece of news for almost two full trading
 6   days and then reacted to it is inconsistent
 7   with the conclusion that Halliburton stock
 8   traded in an efficient market, right?  Do you
 9   say that on page 59 of your report?
10        A.   Yes, I believe that's correct.
11        Q.   Now, if you look at page 44 of your
12   report, and you look at December 21st and
13   December 22nd on page 44, there is a chart?
14        A.   Yes.
15        Q.   The stock does go down somewhat on
16   December 21st, does it not, and then
17   experiences a larger drop later in the day on
18   December 22nd, the following day in the
19   afternoon?
20        A.   I'm sorry, what are you saying?
21   The stock does what?
22        Q.   Goes down some on December 21st and
23   goes down more in the afternoon of the 22nd?
24        A.   The movement on December 21st,
25   according to my event study, as well as
```

Page 280

```
 1           L. Allen
 2   plaintiff's expert, Ms. Nettesheim's, event
 3   study, there is no statistically significant
 4   price reaction on December 21st.
 5        Q.   I didn't ask you if there was a
 6   statistically significant price reaction.
 7             I asked whether this chart shows
 8   that the stock went down on December 21st and
 9   went down more on December 22nd?
10        A.   I don't know that that's what I
11   see.  The stock moves around a little bit on
12   December 21st.  I have done a statistical
13   test of whether the stock price is moving in
14   a statistically significant manner on
15   September 21st, as has plaintiff's expert,
16   Ms. Nettesheim, and neither of us has found
17   that the stock price is statistically
18   significant.
19             MR. GOLDFARB:  I would like to go
20        off the record.
21             THE VIDEOGRAPHER:  It's 6:09.  We
22        are off the record.
23             (Recess.)
24             THE VIDEOGRAPHER:  It's now 6:21
25        and we are back on the record.
```

Page 281

```
 1           L. Allen
 2        Q.   Ms. Nettesheim -- my apologies --
 3   Ms. Allen, in any other case, have you looked
 4   at regression for the year following the
 5   class period to draw any instances about what
 6   happened during the class period?
 7        A.   Yes, I believe so, but as I sit
 8   here, it wouldn't come to mind specifically.
 9        Q.   So you believe so, but you can't
10   name a case in which you have done that?
11        A.   That's right, I couldn't classify
12   cases in my mind by that particular aspect,
13   so I do believe I have done that, but I
14   can't, as I sit here, think when.
15        Q.   Can you describe anything about any
16   case in which you would have done that?
17        A.   I don't have a specific
18   recollection.  I mean, I can't think I -- I
19   would believe I would have done that, I don't
20   have any specific case, does not come to
21   mind.
22        Q.   I'm not asking you what you believe
23   you would have done.  I'm not asking you what
24   you have a specific recollection of.
25             I'm asking, as you sit here, can
```

Page 282

```
                L. Allen
 1
 2    you identify any case in which you have done
 3    that, even if you can't remember the name of
 4    the case?
 5       A.  I don't have a specific
 6    recollection.  My belief is that I would have
 7    done it, but I can't recall a specific
 8    instance, though.
 9       Q.  Have you ever, in any other case,
10    looked at the volatility of other companies
11    to make inferences about what effect did the
12    stock price of a different company?
13          MR. STERLING:  Do you mean applied
14       volatility?
15          MR. GOLDFARB:  Yes.  Thank you.
16       A.  I believe so.
17       Q.  Can you identify any case in which
18    you've done that?
19       A.  Not that I can specifically recall,
20    no.
21       Q.  Can you identify any textbook, case
22    or other authority that endorses the
23    methodology that you've used in this case in
24    drawing your conclusion that none of the
25    alleged corrective disclosures affected the
```

Page 283

```
                L. Allen
 1
 2    Halliburton stock price?
 3       A.  Sure.  I could point to academic
 4    authorities that use methods that I am
 5    describing or whose methodologies and
 6    findings are consistent with the approaches
 7    that I have taken here.
 8       Q.  Can you give me an example of an
 9    academic authority and tell me which of the
10    methodologies it is consistent with?
11       A.  Well, I mean, this is -- for
12    example, one of the things --
13       Q.  In the interest of time, I will
14    rephrase the question.
15          Can you think of any academic
16    authority that supports the use of a
17    regression after the class period to make
18    inferences about what happened during the
19    class period?
20       A.  This paper that you've talked
21    about, when you talk about academic
22    authorities and you are talking about a class
23    period, it would have to be an academic
24    authority that's talking about an event study
25    in a legal context, rather than in another
```

Page 284

```
                L. Allen
 1
 2    sort of finance or academic context because
 3    there would not be a class period, except in
 4    a legal context, sure, there have been
 5    articles talking about event studies that
 6    describe different periods, this may be one,
 7    this may make --
 8       Q.  That talk about using a post -- a
 9    period for a year after the event in question
10    to do a regression and then draw inferences
11    on what happened to the day or days prior to
12    that year?
13       A.  Yeah.  So, for example, sure.  For
14    one, I'm not sure that's what I've actually
15    done in this case.  I'm not sure why you are
16    asking that question, but, yes, I think there
17    are a number of articles that I have seen
18    that have discussed that -- the period over
19    which the regression is run can be a period
20    before a class period, can be a period during
21    the class period and sometimes be a period
22    after a class period.
23       Q.  Separate question.  In the
24    situation where you have a divergence between
25    the market reaction to a piece of news and a
```

Page 285

```
                L. Allen
 1
 2    stock analyst's reaction to a piece of news,
 3    how do you decide if the market is right or
 4    the analysts are right?
 5          MR. STERLING:  Objection.  Form.
 6       A.  I don't think that's a fully
 7    developed question or hypothetical, so I'm
 8    not sure how to answer that.
 9       Q.  There can be more, obviously,
10    specifics in the hypothetical, but if a stock
11    price, say, goes significantly down and the
12    analysts say that's an overreaction, how do
13    you decide if the analyst is right, that it's
14    an overreaction or the market is right?  What
15    kind of things would you look for?
16       A.  Regarding an overreaction?
17       Q.  An alleged overreaction.
18       A.  Well, there are a number of things.
19    One way to look at an overreaction is if
20    there is a later correction, so if the market
21    goes down a lot and then rebound, that, in
22    itself, would be generally consistent with an
23    overreaction.  That might be one piece of
24    evidence.
25          What some of the academic
```

Page 286

```
 1            L. Allen
 2   literature does in terms of -- so there is
 3   some academic literature on market efficient
 4   that looks at whether the market consistently
 5   overreacts and one of the things is that --
 6       Q.  Besides a rebound, what, if
 7   anything, else would you look at to determine
 8   whether or not the market is overreacting or
 9   the analysts are wrong?  If the analysts are
10   saying it's an overreaction, you could look
11   to see if the market rebounds.  What, if
12   anything, else would you look to?
13       A.  Well, we would have to think more
14   about what your question is.  What do you
15   mean, the analysts are wrong?  So I guess we
16   would have to say, what do you mean by an
17   overreaction?
18       Q.  An overreaction, the analysts are
19   saying that the stock price drop was not
20   justified, the market overreacted to some
21   news, I'm trying to get, in your view, how do
22   you decide who is right, the analyst or the
23   market?
24       A.  I don't think that's a question
25   that I'm particularly looking at here and I
```

Page 287

```
 1            L. Allen
 2   would have to understand what you mean by who
 3   is right.
 4            Oftentimes, it's important to know
 5   what the analysts, in general, are thinking.
 6   Is this different than what their
 7   expectations were and if they're saying that
 8   the market reacted differently than their
 9   expectations, that, in itself, can be
10   information that can be important, depending
11   on what your question, your study.
12       Q.  As you sit here, can you think if
13   there is anything else you would look at
14   besides a rebound that you would look at?
15       A.  To answer what question?  Your
16   question doesn't make sense to me.
17       Q.  To determine whether the market has
18   overreacted to a piece of news when the stock
19   price has gone down, besides seeing if there
20   is a rebound, can you think of, as you sit
21   here, anything else you would look at to
22   determine whether the market got it right or
23   the analyst got it right?
24       A.  Well, I don't know what you mean by
25   the market got it right or the analyst got it
```

Page 288

```
 1            L. Allen
 2   right, but one of the -- one type of
 3   information one can look at to see if a
 4   market is overreacting is whether analysts
 5   who were studying the stock think that the
 6   market overreacted.
 7            Another type of analysis one could
 8   do to analyze whether there is stock
 9   overreacted is to see when similar
10   information is announced, is there the same
11   reaction or is this reaction bigger or
12   different than what had other times happened
13   when the same information was announced.
14   There are other types of analyses where some
15   of which the analysts are doing in this case,
16   were to take the actual market reaction in
17   terms of a dollar amount and look at the
18   information that's being announced and
19   saying, how big an effect would this
20   information have to be from a valuation
21   standpoint in order to justify that kind of
22   market price reaction, so you can do some
23   sort of ground up valuation analysis of the
24   specific components of an announcement to see
25   if the market reaction makes sense from a
```

Page 289

```
 1            L. Allen
 2   valuation standpoint.
 3       Q.  Would you also look at the
 4   long-term reaction of the stock price?
 5            MR. STERLING:  That was the last
 6       question.
 7            MR. GOLDFARB:  That's fine.
 8       A.  I'm sorry?
 9       Q.  Would you also look at the
10   long-term reaction of the stock price?
11       A.  The long-term reaction of the stock
12   price, what do you mean by that?
13       Q.  What happens in the weeks and
14   months following the alleged overreaction?
15       A.  If you are just talking about one
16   company's stock price, I think perhaps you
17   can do that, yes.  I think that may be more
18   difficult if there is more information coming
19   out, so I think some of the academic articles
20   do that.  If you do a whole cross section of
21   companies, if you look at a whole bunch of
22   companies, it may be easier to look over a
23   longer time period because you can think that
24   individual things that might effect one
25   company might not -- might sort of come out
```

Page 290

```
 1           L. Allen
 2   in the wash when you are looking at a whole
 3   bunch of companies at one time.  I think
 4   looking over a longer time period for one
 5   individual company, it can be a little harder
 6   to make a determination or I'm not sure what
 7   you would do with that.  You would see the
 8   stock prices going up or down or whatever or
 9   mature over a longer time period, how much
10   easier it would be to come to some
11   conclusion, but that would be something you
12   could look at.
13         MR. GOLDFARB:  I think I'm out of
14     time.  No more questions.
15         THE VIDEOGRAPHER:  The time is 6:36
16     p.m.
17         (Time noted:  6:36 p.m.)
18
19
20
21
22
23
24
25
```

Page 291

```
 1
 2             - - -
 3           I N D E X
 4             - - -
 5
 6   LUCY ALLEN                    PAGE
 7     By Mr. Goldfarb                4
 8
 9             - - -
10          E X H I B I T S
11             - - -
12   ALLEN EXHIBIT                 PAGE
13   Exhibit 1  Report               40
14   Exhibit 2  Lucy Allen's deposition   271
15      testimony from September 2008
16      in the case In Re:  Lawrence
17      Group, Inc. versus Barton, et al.
18   Exhibit 3  Expert Report of Lucy P.   274
19      Allen, In Re:  Lawrence Group,
20      Inc. versus Barton, et al.
21   Exhibit 4  Study by David Tabak and   277
22      Frederick Dunbar, Materiality
23      Of Magnitude Event
24      Studies in the Courtroom
25
```

Page 292

```
 1
 2             - - -
 3      DEPOSITION SUPPORT INDEX
 4             - - -
 5   Direction to Witness Not to Answer
     Page Line   Page Line    Page Line
 6   None
 7             - - -
 8   Request for Production of Documents
     Page Line   Page Line    Page Line
 9   None
10             - - -
11   Stipulations
     Page Line   Page Line    Page Line
12   None
             - - -
13
     Questions Marked
14   Page Line  Page Line    Page Line
     None
15            - - -
16
17
18
19
20
21
22
23
24
25
```

Page 293

```
 1
 2            CERTIFICATE
 3
         I HEREBY CERTIFY that the witness,
 4   LUCY ALLEN, was duly sworn by me and that the
     deposition is a true record of the testimony
 5   given by the witness.
 6        _____
          Leslie Fagin,
 7        Registered Professional Reporter
          Dated:  September 22, 2014
 8
 9
10
         (The foregoing certification of
11   this transcript does not apply to any
12   reproduction of the same by any means, unless
13   under the direct control and/or supervision
14   of the certifying reporter.)
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 294
 1
 2          ACKNOWLEDGMENT OF DEPONENT
 3
            I,          , do hereby
 4   certify that I have read the foregoing pages,
     and that the same is a correct transcription
 5   of the answers given by me to the questions
     therein propounded, except for the
 6   corrections or changes in form or substance,
     if any, noted in the attached Errata Sheet.
 7
 8
 9   LUCY ALLEN             DATE
10
11   Subscribed and sworn
     to before me this
12       day of         , 2014.
13   My commission expires:
14
     Notary Public
15
16
17
18
19
20
21
22
23
24
25
```

```
                                    Page 295
 1
 2         ------
           E R R A T A
 3         ------
     PAGE  LINE  CHANGE
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```