UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:16-cv-02267 |
| Plaintiff, | ) ) | Honorable Aleta A. Trauger |
| vs. | ) ) | |
| CORRECTIONS CORPORATION OF AMERICA, et al., | ) ) ) | |
| Defendants. | ) ) | |
| | ) | |

**DEFENDANTS' SUR-REPLY IN OPPOSITION TO PLAINTIFF'S MOTION FOR
CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVE, AND
APPOINTMENT OF CLASS COUNSEL**

**TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     DEFENDANTS HAVE REBUTTED THE *BASIC* PRESUMPTION ..............................3

        A.      Plaintiff's New And Unsupported Price Maintenance Theory Does Not
                Overcome Defendants' Evidence Of No "Front-End" Price Impact ......................3

        B.      Plaintiff's New And Unsupported Theories Do Not Overcome
                Defendants' Evidence Of No "Back-End" Price Impact .........................................6

                1.      The OIG Review Did Not Impact The Stock Price ....................................7

                2.      The Stock Drop Following The Publication Of The Yates Memo
                        Could Not Have Been Linked To The Alleged Misrepresentations ...........9

                3.      The August 4, 2016 Stock Drop Is Not Evidence Of Price Impact ..........12

III.    THE *AFFILIATED UTE* PRESUMPTION IS INAPPLICABLE ....................................13

IV.     CONCLUSION....................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Affiliated Ute Citizens of Utah v. United States*,
406 U.S. 128 (1972)..............................................................................................14

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
126 F. Supp. 3d 342 (S.D.N.Y. 2015).....................................................................15

*Blackie v. Barrack*,
524 F.2d 891 (9th Cir. 1975) ..................................................................................15

*Burges v. Bancorpsouth, Inc.*,
2017 WL 2772122 (M.D. Tenn. June 26, 2017)..................................................7, 15

*In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*,
250 F.R.D. 137 (S.D.N.Y. 2008) ..............................................................................6

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)................................................................................................12

*Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*,
412 F.3d 103 (2d Cir. 2005)....................................................................................14

*Glickenhaus & Co. v. Household Int'l, Inc.*,
787 F.3d 408 (7th Cir. 2015) ....................................................................................6

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2015 WL 5613150 (S.D.N.Y. Sept. 24, 2015)........................................................11

*In re Goldman Sachs Grp., Inc. Sec. Litig.*,
2018 WL 3854757 (S.D.N.Y. Aug. 14, 2018) ..........................................................7

*Halliburton Co. v. Erica P. John Fund, Inc.*,
134 S. Ct. 2398 (2014) ................................................................................... *passim*

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) .................................................................................6, 7

*Johnston v. HBO Film Mgmt.*,
265 F.3d 178 (3d Cir. 2001)....................................................................................15

*Local 703 v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. 2015) ................................................................................6

*Marcus v. J.C. Penney Co., Inc.*,
    2017 WL 907996 (E.D. Tex. Mar. 8, 2017) ...................................................................9

*In re Montage Tech. Grp. Ltd. Sec. Litig.*,
    2016 WL 1598666 (N.D. Cal. Apr. 21, 2016) .........................................................15

*In re Moody's Corp. Sec. Litig.*,
    274 F.R.D. 480 (S.D.N.Y. 2011) .............................................................................7

*Ohio Pub. Emps. Ret. Sys. v. Federal Home Loan Mortg. Corp.*,
    2018 WL 3861840 (N.D. Ohio Aug. 14, 2018) ....................................................5, 7

*Pirnik v. Fiat Chrysler Autos., N.V.*,
    2018 WL 3130596 (S.D.N.Y. June 26, 2018) .........................................................4

*Silverman v. Motorola*,
    259 F.R.D. 163 (N.D. Ill. 2009) ..............................................................................6

*Simpson v. Specialty Retail Concepts*,
    823 F. Supp. 353 (M.D.N.C. 1993) ........................................................................14

*Skeway v. China Nat. Gas, Inc.*,
    304 F.R.D. 467 (D. Del. June 18, 2014) ................................................................15

*Swack v. Credit Suisse First Boston*,
    230 F.R.D. 250 (D. Mass. 2005) ..............................................................................6

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
    2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006) .........................................................14

*Thorpe v. Walter Inv. Mgmt. Comp.*,
    2016 WL 4006661 (S.D. Fla. Mar. 16, 2016) .......................................................11

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016).............................................................................6, 14

*Ways v. Miami Univ. of Ohio*,
    604 F. App'x 445 (6th Cir. 2015) ............................................................................9

*Willis v. Big Lots, Inc.*,
    Nos. 17-0303, 17-3871 (6th Cir. 2017).....................................................................7

## RULES

Fed. R. Civ. P.
    15(b)........................................................................................................................9
    23........................................................................................................................1, 6
    23(f)........................................................................................................................7

## I. INTRODUCTION

Defendants have conclusively demonstrated that Plaintiff's alleged misrepresentations did not impact the price of CoreCivic's stock. Defendants, therefore, have rebutted the *Basic* presumption of reliance and demonstrated that Plaintiff cannot satisfy the predominance requirement for certification of the class under Federal Rule of Civil Procedure 23(b)(3). In Reply, Plaintiff does not provide the Court with a shred of evidence sufficient to overcome Defendants' showing of no price impact. Instead, Plaintiff loaded the Reply, and the accompanying 104-paragraph "Rebuttal Report" by its expert, Steven Feinstein, with new theories that are rife with factual inaccuracies, analytical errors, and misstatements of applicable law in the hope that this Court will defer analyzing this potentially case-dispositive issue until the merits phase. But as a matter of controlling Supreme Court precedent, Defendants have the opportunity to rebut the *Basic* presumption at class certification. They have done so in this case.

Plaintiff and Feinstein do not challenge the evidence proffered by Defendants' expert, Lucy Allen, demonstrating that the alleged misrepresentations did not inflate CoreCivic's stock price at the time Defendants made the alleged false statements (*i.e.*, "front-end" price impact). Rather, Plaintiff now says (without any evidentiary support) that it does not matter because the purported misrepresentations maintained an already artificially inflated price. The glaring flaw with Plaintiff's newly-invoked "price maintenance" theory is that Plaintiff proffers absolutely no facts to support the theory, offering instead Feinstein's bald explanation of the price maintenance theory. But, as the Supreme Court teaches in *Haliburton II*, mere speculation that the alleged misrepresentations *could have* maintained an inflated stock price falls far short of overcoming Defendants' overwhelming evidence of no price impact.

Having failed to establish front-end price impact, Plaintiff again asks the Court to ignore

1

the plain language of *Halliburton II* and require Defendants to *also* show that the alleged misrepresentations did not have any price impact at the time of the corrective disclosures (*i.e.*, "back-end" price impact). That argument is wrong as a matter of law. Nonetheless, Defendants have made this showing: neither of the two alleged corrective disclosures demonstrates price impact. There was no statistically significant price drop following the release of the OIG Review, and Feinstein's new argument in Rebuttal—that the corrective information in that Review was "masked" by "confounding" information—is pure speculation. The OIG Review revealed the very issues that Plaintiff claims rendered the alleged class period statements false or misleading. Yet, CoreCivic's stock price did not decrease upon its release and not even one of the analysts covering the Company—the very same analysts whom Feinstein relies upon to justify his opinion that CoreCivic's stock traded in an efficient market—so much as commented on it. The Yates Memorandum, which led to a price decline, contained no "corrective" information about CoreCivic that was not already in the OIG Review. Faced with that insurmountable hurdle, Plaintiff advances yet another new theory, arguing that the OIG Review did not reveal that CoreCivic's BOP operations were in jeopardy. But there is no reasonable dispute that the OIG Review addressed CoreCivic's relative quality and cost savings in relation to its BOP-operated facilities, and the Company repeatedly warned that failure to comply with BOP contracts could result in non-renewals of those contracts.

Undeterred, Plaintiff next manufactures an entirely new corrective disclosure, arguing for the first time in Reply that a statistically significant decline in CoreCivic's stock price on August 4, 2016, purportedly in reaction to the news that the BOP had cancelled CoreCivic's contract to operate the Cibola facility, demonstrates price impact. Feinstein's analysis of this new alleged corrective disclosure is deeply flawed, and in fact demonstrates that there was no price impact

from this disclosure. The information regarding the Cibola non-renewal that Feinstein claims was announced on August 3, 2016 was actually announced to the market days earlier to no statistically significant price reaction. If CoreCivic's stock is indeed traded in an efficient market as Feinstein opines, the Cibola non-renewal was already impounded in the stock price on August 4.

Finally, Plaintiff seeks to avoid price impact altogether by arguing that it is entitled to proceed under the narrow *Affiliated Ute* presumption of reliance, intended only for cases involving pure omissions. That presumption simply does not apply if, as here, the alleged "omission" is the truth of the affirmative statement. Under Plaintiff's approach, nearly any misrepresentation could be reframed as an omission, and *Halliburton II* and its progeny would effectively be wiped off the books because the narrow *Affiliated Ute* presumption would swallow the reliance requirement. That is not, and cannot possibly be, the law.

## II. DEFENDANTS HAVE REBUTTED THE *BASIC* PRESUMPTION

### A. Plaintiff's New And Unsupported Price Maintenance Theory Does Not Overcome Defendants' Evidence Of No "Front-End" Price Impact

Plaintiff's expert, Feinstein, does not challenge Allen's conclusions that (1) there were no statistically significant price movements *after* 28 of the 33 alleged misrepresentations and (2) on the five misrepresentation dates where there was a statistically significant price reaction, that movement occurred *before* the alleged misrepresentation. Dkt. 122-2 ("Feinstein Rebut."), ¶¶ 30-43; Ex. 1 ("Allen Rebut."), ¶¶ 7, 10.[1] Instead, Feinstein theorizes that "[n]ot finding evidence of price impact is not at all the same thing as proving . . . no price impact." Feinstein Rebut., ¶ 31; *see also id.* Section A.4 ("Evidence of Absence Fallacy").[2] But the absence of price impact is,

---

[1] "Ex." refers to exhibits attached to the concurrently filed Declaration of Milton S. McGee, III.

[2] Feinstein also contends that Allen's analysis was incomplete because she did not address alleged misstatements made on March 30, 2016. Feinstein Rebut., ¶ 29. Those statements were not alleged in the section of the Complaint that identified the alleged misstatements at issue in this case in

3

itself, very powerful evidence of no price impact.[3]  Setting aside Feinstein's (unhelpful) analysis,

Allen found no evidence of price impact—*i.e.*, a lack of a statistically significant price movement

following any of the alleged misrepresentations.  Dkt. 99-3 ("Allen Rpt.") ¶¶ 3-4.

　　　　Conceding, as it must, that the alleged misrepresentations did not inflate CoreCivic's stock

price when made, Plaintiff advances for the first time on Reply the theory that the alleged

misrepresentations maintained an "already artificially inflated price."  Reply at 14.  Contrary to

Plaintiff's contention (*id.* at 15), this "price maintenance" theory was not pled in the Complaint.[4]

But even if the Court were to consider this new theory, there are no facts alleged or expert opinions

offered to support it.  Neither Plaintiff nor Feinstein even attempts to explain how or when

CoreCivic's stock price became artificially inflated prior to the Class Period, such that the alleged

misrepresentations maintained that inflation.  *See* Reply at 14-16; Allen Rebut., ¶¶ 16, 23-25.

Instead, Feinstein just describes the "maintenance principle" in the most generic terms; he does

not apply it to the facts of this case.  Feinstein Rebut., ¶¶ 34-36.  Nor does Plaintiff explain how a

price maintenance theory makes any economic sense here.  CoreCivic made essentially identical

---

chronological order. *See* CC Section VII. In any event, those statements also had no price impact.
Allen Rebut., ¶¶ 23-26.

[3] Plaintiff argues that Defendants have failed to meet their burden to show a "complete lack of
price impact." *See, e.g.*, Reply at 16. This articulation of Defendants' burden is inaccurate. As
Plaintiff acknowledges—and as the Supreme Court's *Halliburton II* decision makes clear—to
rebut the presumption of reliance, Defendants must only prove no price impact "by a
preponderance of the evidence." Reply at 1; *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S.
Ct. 2398, 2416 ("*Halliburton II*") (2014). Defendants have satisfied this burden.

[4] Indeed, Plaintiff's allegations contradict its current attempt to recast its theory as one of "price
maintenance." CC ¶ 191 (alleging that the price "***was artificially inflated by***" the alleged
misrepresentations) (emphasis added). Plaintiff's lone cited case does not hold that a plaintiff may
proceed on the price maintenance theory on reply for the first time to defeat a showing of no front-
end price impact, where the theory is not specifically alleged or pursued in support of class
certification. Reply at n. 24 (citing *Pirnik v. Fiat Chrysler Autos., N.V.*, 2018 WL 3130596, at *3
n.4 (S.D.N.Y. June 26, 2018)). Unlike Plaintiff, the *Pirnik* plaintiff "undeniably" alleged a price
maintenance theory in its class certification motion. *Id.*

representations regarding its "value proposition" for years, before and during the Class Period. *See* Allen Rpt. ¶ 36. Plaintiff's theory presumes that these statements concealed material deficiencies in the quality and cost of the Company's operations that, once revealed, drastically reduced CoreCivic's value proposition. Yet it is undisputed that CoreCivic continued to make the exact same statements regarding quality and cost **after** the Class Period, and CoreCivic's stock price soared to a 52-week high.[5] If Plaintiff were correct that CoreCivic's general statements of corporate optimism about its quality and cost-effectiveness impacted its stock price, then one would not expect its price to bounce back so dramatically in the changed political climate, despite no changes to the Company's public message. Allen Rebut. ¶¶ 17-22. Plaintiff's failure to explain this phenomenon further undermines its new price maintenance theory.

According to Plaintiff, to pursue a price maintenance theory, it need not proffer any evidence that the stock price was, in fact, artificially inflated prior to the Class Period. Reply at 8. If that were the law (it is not), any plaintiff could avoid the implications of a lack of front-end price impact by simply speculating that the price maintenance theory *could* apply. Such a result would (again) eviscerate the Supreme Court's holding in *Halliburton II*: "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton II*, 134 S. Ct. at 2417. Plaintiff's unbridled and unsupported speculation that the alleged misrepresentations "maintained an inflated stock price is not evidence that can refute" Defendants' "otherwise overwhelming evidence of no price impact." *Ohio Pub. Emps. Ret. Sys. v. Federal*

---

[5] *See, e.g.,* Ex. 2 (2016 SEC Form 10-K) at 32 (filed Feb. 23, 2017) ("We believe our renewal rate on existing contracts remains high for a variety of reasons including…the quality of our operations."); *id.* at 57 ("We believe…that partnering with private operators…result[s] in improvements to the quality and cost of corrections services").

*Home Loan Mortg. Corp.*, 2018 WL 3861840, at \*18 (N.D. Ohio Aug. 14, 2018) (absent actual evidence, "[p]laintiff cannot meaningfully argue that the misrepresentations artificially maintained the price of the stock until risks materialized, as that argument proves too much at the class certification stage, where [plaintiff] has the burden of persuasion as an evidentiary matter"); *see also IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (rejecting district court's reliance on speculation that "alleged misrepresentations ***could have*** . . . prolonged the inflation of the price, or slowed the rate of fall") (emphasis added); *In re Credit Suisse First Bos. Corp. (Lantronix, Inc.) Analyst Sec. Litig.*, 250 F.R.D. 137, 145 (S.D.N.Y. 2008) (holding that "price maintenance theory is patently deficient," because "Rule 23 determinations must be based on 'relevant *facts*'") (emphasis added).[6]

## B. Plaintiff's New And Unsupported Theories Do Not Overcome Defendants' Evidence Of No "Back-End" Price Impact

Plaintiff's argument that lack of front-end price impact is insufficient to rebut the *Basic* presumption of reliance ignores the plain language of *Halliburton II*. *Compare* Reply at 8; *with Halliburton II*, at 134 S. Ct. at 2415 (lack of price impact can be shown by "evidence that the asserted misrepresentation (***or*** its correction) did not affect the market price of the defendant's

---

[6] Plaintiff's cited case law does not change the outcome. *Vivendi* and *Glickenhaus* merely recognized the potential viability of a price maintenance theory where supported by expert testimony at trial. *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 253-260 (2d Cir. 2016) (rejecting argument that expert testimony was improperly admitted at trial because it was based on a price maintenance theory); *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 418 (7th Cir. 2015) (rejecting argument that expert testimony admitted at trial was legally insufficient to establish loss causation because it was based on a price maintenance theory). Plaintiff's other cases are pre-*Halliburton II* decisions that are inapplicable here. *Local 703 v. Regions Fin. Corp.*, 762 F.3d 1248, 1256 (11th Cir. 2015) (rejecting argument that plaintiff should be required "to offer evidence that the misrepresentations caused an immediate change in the stock price" to invoke *Basic*); *Silverman v. Motorola*, 259 F.R.D. 163, 174 (N.D. Ill. 2009) (rejecting argument that plaintiff must show price inflation, materiality, reliance and loss causation at class certification); *Swack v. Credit Suisse First Boston*, 230 F.R.D. 250, 272-273 (D. Mass. 2005) (finding "inflationary effect of alleged misstatements dissipated over time," based on expert testimony).

6

stock") (emphasis added); *see also Best Buy Co.*, 818 F.3d at 782-83 ("[E]vidence of no 'front-end' price impact" is sufficient to "rebut[] the *Basic* presumption" because it "sever[s] any link between the alleged [] misrepresentations and the stock price at which plaintiffs purchased."). But in any event, Defendants have also shown lack of "back-end" price impact.[7]

### 1. The OIG Review Did Not Impact The Stock Price

Unable to refute the fact that there was no statistically significant reaction in CoreCivic's stock price following the release of the OIG Review and that no analyst even issued a report during the week that followed (Opp. at 17), Plaintiff now advances a variety of new arguments, in an effort to overcome the clear implications of this lack of this evidence. Reply at 17-19, Feinstein Rebut., ¶¶ 13, 51-52.

*First*, Feinstein opines that the absence of a statistically significant stock drop does not prove no price impact. Reply at 17 (citing Feinstein Rebut., ¶¶ 51-52). To the contrary, the absence of a statistically significant price movement is (and must be) proof that there is no price impact. *Best Buy*, 818 F.3d at 782-83 (finding lack of price movement "overwhelming evidence" of no price impact); *Fed. Home Loan Mortg.*, 2018 WL 3861840 at *18 (same); *see also In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (denying class certification where

---

[7] The Sixth Circuit has not yet had an opportunity to opine on whether a lack of front-end price impact alone is sufficient to rebut the *Basic* presumption. It recently granted a petition under Federal Rule of Civil Procedure 23(f), in which the petitioners argued that the district court incorrectly required proof of both front-end and back-end price impact, but the case settled before the petition was heard. *Willis v. Big Lots, Inc.*, Nos. 17-0303, 17-3871 (6th Cir. 2017). District courts in the Sixth Circuit are split. *Compare Burges v. Bancorpsouth, Inc.*, 2017 WL 2772122, at *9 (M.D. Tenn. June 26, 2017) (requiring lack of front-end and back-end price impact) *with Ohio Pub. Employees Ret. Sys.*, 2018 WL 3861840, at *18 (holding that a defendant may rebut the presumption by showing lack of front-end price impact alone). Plaintiff's reliance on *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2018 WL 3854757, at *4 (S.D.N.Y. Aug. 14, 2018), to argue that Defendants must prove both lack of front-end and back-end price impact is misplaced. Reply at 2. Nowhere in that case does the court even consider that issue, much less resolve it. *Id.* at *22.

*Basic* presumption was rebutted by event studies showing no statistically significant link between changes in price of defendants' stock and any alleged misrepresentation). If Feinstein's position were correct, an event study could only be used as a one-way test of price impact—*i.e.* to prove that alleged misrepresentations caused the price to react, but not as evidence of a non-reaction. *Compare* Feinstein Rebut., ¶ 37 ("A statistically significant price reaction proves that information . . . caused a stock price to move.") *with id.* ¶ 51 ("Non-significance proves nothing"). This is unsupported by any economic principles and is contrary to *Halliburton II*. 134 S. Ct. at 2415 (ignoring direct evidence of no price impact "makes no sense, and can readily lead to bizarre results," like certification of a class "even though the [*Basic*] theory does not apply").

*Second*, Plaintiff claims for the first time on Reply that the market did not "immediately and fully" understand the implications of the OIG Report, because it was "masked" by denials from CoreCivic, and Feinstein even criticizes Allen for failing to credit this "confounding information." Reply at 17-18; Feinstein Rebut., ¶¶ 53-63; ¶ 67 (opining that Allen failed to consider this alternate explanation). But neither Plaintiff nor Feinstein offers any evidence showing that CoreCivic's letter attached to the OIG Review "boosted" CoreCivic's stock price. Feinstein Rebut. ¶¶ 53-67. As this Court has acknowledged, CoreCivic's one-page letter did not (contrary to Plaintiff's latest argument) "dispute" the findings of the OIG Review; rather, it suggested alternative causes for the high rate of security-related incidences and concurred with the recommendation that the BOP should examine the data more thoroughly. Dkt. 99-1 ("OIG Review") at 70; Allen Rebut., ¶ 14; *see also* Dkt. 76 at 19 ("CoreCivic did not dispute any of the data contained [in the OIG Review].").

Even if Feinstein were correct that CoreCivic's response letter was "confounding information," then, by definition, it would be valuation-relevant. But analysts did not cover either

the OIG Review or CoreCivic's response letter, which is even further evidence of no price impact. Allen Rpt. ¶ 59; Allen Rebut., ¶¶ 12, 13. Feinstein's new opinion that the nonexistence of analyst reports proves nothing (Feinstein Rebut., ¶ 68-69) is facially inconsistent with his market efficiency opinion, for which he relied heavily on analyst reports. Dkt No. 93-3 (Feinstein Rpt.) ¶¶ 44-47, 52-56; Dkt. 99-6 (Feinstein Depo. Tr.) 117:9-16 ("I look at analyst coverage to see if they address the issues that are alleged to have been misrepresented and omitted, to see if they consider it valuation relevant.").[8]

### 2. The Stock Drop Following The Publication Of The Yates Memo Could Not Have Been Linked To The Alleged Misrepresentations

As Defendants have shown, the OIG Review (and the lack of any market reaction to it) severs the link between the alleged misrepresentations and the subsequent purported "corrective information" in the Yates Memorandum. Opp. at 17-19. Plaintiff again attempts to amend its Complaint in its Reply, arguing that the lack of a statistically significant price movement following the OIG Review is irrelevant because "nothing in the OIG Review revealed that [CoreCivic]'s BOP operations were in jeopardy." Reply at 19. This results-driven attempt to recast a fundamental aspect of Plaintiff's case for purposes of class certification should be rejected. *See Ways v. Miami Univ. of Ohio*, 604 F. App'x 445, 448 (6th Cir. 2015) (although Rule 15(b) permits parties to ask to "constructively amend the complaint," "[i]t was not designed to allow parties to change theories in mid-stream").

On its face, the Complaint alleged that the OIG Review was a corrective disclosure. *See,*

---

[8] The absence of analyst reports renders *Marcus v. J.C. Penney Co., Inc.* inapplicable. Reply at 17. In *Marcus*, the court relied on the fact that "an analyst reported" on the "tempering" information released by the defendant in tandem with a ***prior***, potentially-corrective disclosure. *Marcus v. J.C. Penney Co., Inc.*, 2017 WL 907996, at *2 (E.D. Tex. Mar. 8, 2017). Unlike in *Marcus*, here, no analyst reported on the OIG Review (let alone CoreCivic's letter), and there is no other evidence to support Plaintiff's newly manufactured theory that CoreCivic's letter "tempered" the OIG Review. Reply at 17.

*e.g.,* Dkt. 57 ("CC") at 63 & ¶ 197 (OIG Review "[r]evealed to the [m]arket" information that corrected the alleged misstatements regarding quality and cost). There can be no rational dispute that the alleged disclosures in the OIG Review squarely addressed the Company's value proposition (specifically in relation to the BOP) and thereby fully revealed the purported "truth." Opp. at 17; CC ¶ 197. Plaintiff still has not identified what corrective information—bearing directly on the alleged misrepresentations—was revealed for the first time in the Yates Memorandum. That the OIG Review was *the sole source* the Yates Memorandum referenced in support of the DOJ's decision dramatically underscores that any "corrective" facts were in that Review. *See* Dkt. 99-2 (Yates Memo).

In its Reply, Plaintiff shifts away from a "corrective disclosure" theory to a "materialization of the risk" theory (Reply at 11), which the Court suggested may apply at the pleading stage for purposes of determining whether Plaintiff had pled loss causation. Dkt. 60 at 37 ("[E]ven if Defendants' 'political shift' argument was correct, the scope of [Plaintiff's] loss was determined by the degree to which the market was able to evaluate the probability of such a shift and therefore price that risk into its valuation of CoreCivic."). But the crux of that theory is that the risk which ultimately materializes must be concealed by the challenged statements. *Id.* There is no evidence that the risk of a political shift was concealed prior to the Yates Memorandum. After the OIG Review, investors had all of the information necessary to evaluate "the probability" that CoreCivic's contracts with the BOP were in jeopardy. *Id.* at 37. And even prior to that, CoreCivic continually disclosed the risk that the BOP could terminate its contracts, at its discretion.[9]

---

[9] *See, e.g.* Ex. 3 (2013 SEC Form 10-K) at 27-28 ("The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations…. failure to comply can result in material penalties, including financial penalties, non-renewal or termination of facility contracts, and suspension or debarment from contracting with certain government entities."); Ex. 4 (2014 SEC Form 10-K) at 27 ("The loss of, or a significant

Indeed, the analysts who covered CoreCivic recognized that the Yates Memorandum was the result of a political shift, not a reaction to previously concealed deficiencies in qualities or cost-effectiveness. Dkt. 98 ("Opp.") at 17-19; Allen Rpt. ¶¶ 67-94. Plaintiff argues that these analyst reports cannot be relied upon to show lack of price impact, because Allen has merely cherry-picked phrases from those reports and those analysts must be biased. Reply at 12. Neither criticism is valid.[10] Plaintiff's cited authority stands only for the proposition that experts cannot rely *solely* on market commentary to attribute price impact to something other than a corrective disclosure—it says nothing about whether analyst commentary can be considered in determining whether a disclosure was, in fact, corrective. *Cf. Thorpe v. Walter Inv. Mgmt. Comp.*, 2016 WL 4006661, at *14 (S.D. Fla. Mar. 16, 2016) ("That market commentary did not mention the corrective disclosure does not by itself [disprove] price impact."); *In re Goldman Sachs Grp., Inc. Sec. Litig.*, 2015 WL 5613150, at *7 (S.D.N.Y. Sept. 24, 2015) ("whether or not the market was focused to some degree on the impact [confounding factors] would have on the stock price does not mean that no decline in stock price is attributable to the revelation of misstatements"). At bottom, the only thing that changed between the OIG Review and the Yates Memorandum was a political decision—based on the information already available to investors.

In reply, Plaintiff depends heavily on the Court's ruling on the motion to dismiss, arguing that Defendants' lack of price impact evidence should be rejected as an "improper loss causation

---

decrease in, business from the BOP, ICE, USMS … could seriously harm our financial condition"); Ex. 5 (2015 SEC Form 10-K) at 30-31 ("Our growth is generally dependent upon our ability to obtain new contracts . . . . This possible growth depends on a number of factors we cannot control, including . . . governmental and public acceptance of privatization.").

[10] Feinstein's speculation regarding analyst "bias" is overblown, *see* Allen Rebut., ¶ 16 & n.20, particularly considering that Feinstein relies on these very same "biased" analysts when it supports his argument, *see* Feinstein Rebut. ¶¶ 46, 83 (quoting SunTrust, Canaccord, and Wells Fargo analyst reports).

argument[]" that the Court already has considered at the pleading stage and that should be considered at summary judgment. Reply at 13. Plaintiff's argument—that the use of expert testimony and other evidence (which was not available to Defendants at the pleading stage) to show lack of price impact is improper simply because it may also bear on loss causation (which Plaintiff also must ultimately prove)—is fundamentally wrong. Indeed, it ignores the very history of *Halliburton II*. In *Halliburton I*, the Court held that a plaintiff was not required to prove loss causation in order to certify a class. *Erica P. John Fund, Inc. v. Halliburton Co*., 563 U.S. 804, 809 (2011). But, in *Halliburton II*, the Supreme Court held that Halliburton could present the very same evidence it advanced previously (in support of arguments that there was no loss causation) to show lack of price impact. *Halliburton II*, 134 S. Ct. at 2415-16 (quoting *Basic*, 485 U.S. at 248) ("'Any showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff . . . will be sufficient to rebut the presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'").

### 3. The August 4, 2016 Stock Drop Is Not Evidence Of Price Impact

In is undisputed that Feinstein did not do a price impact analysis to support Plaintiff's motion for class certification. Feinstein Depo. Tr. 113:14-20 ("design of the test" was not to determine statistically significant price reaction); *id.* at 114:16-115:3 (price impact is "outside the scope of what [Feinstein] was asked to do"). Relying on Feinstein's Rebuttal, Plaintiff claims—for the first time in its Reply—that a statistically significant 6.4% decline in CoreCivic's stock price on August 4, 2016, after it "surfaced" during CoreCivic's August 3, 2016 second quarter earnings announcement that the BOP had cancelled CoreCivic's contract to operate the Cibola facility, also shows price impact. Reply at 5, 10; Feinstein Rebut. ¶¶ 83-84. This newly-minted "partial" corrective disclosure is not pled in the Complaint, and it has zero bearing on price impact.

Most fundamentally, Plaintiff is demonstrably wrong that the Cibola non-renewal was first

announced on August 3, 2016. In reality, this news was announced two days earlier, after market close on August 1, 2016, when KOAT Albuquerque (an ABC affiliate) published an article stating that the "Cibola County Sheriff . . . confirmed" the closure of the facility. Allen Rebut., ¶ 7. On August 2, another news article repeated the story and cited a letter from a CoreCivic spokeswoman confirming the closure. *Id.* ¶ 8. As Feinstein has acknowledged, in an efficient market, any impact of this news would have been incorporated into CoreCivic's stock price immediately (and long before August 4). *See* Feinstein Rpt. ¶ 30 ("An efficient market is one which rapidly reflects new information in price."). But there was no statistically significant price reaction on August 2 or 3. Allen Rebut., ¶ 10. The fact that CoreCivic announced the closure of one BOP facility with *no* impact on its stock price supports that there was no "back-end" impact.

In sum, in an efficient market, any decline in CoreCivic's stock price on August 4, 2016 cannot be evidence of price impact. To the contrary, the evidence shows that stock drop had nothing at all to do with CoreCivic's BOP facilities or the Cibola non-renewal. Analysts who issued reports after August 4 attributed the decline to the announcement of potential renegotiation of a separate contract for a separate ICE facility and the Company's biggest contract. Allen Rpt. at 54 n.87; Allen Rebut., ¶ 11. The only analyst who mentioned the Cibola non-renewal observed that this news was announced prior to August 4. Allen Rebut., ¶ 9.

## III. THE *AFFILIATED UTE* PRESUMPTION IS INAPPLICABLE

Unable to overcome Defendants' price impact arguments, Plaintiff claims for the first time on Reply that "the thrust of this case" is omissions and therefore, the Class is entitled to rely on the *Affiliated Ute* presumption of reliance. Reply at 6. Plaintiff's last ditch effort to reframe its case as one involving "omissions" must be rejected.[11]

---

[11] It is worth noting that Plaintiff's claim that this is an omissions case is fundamentally inconsistent with its other attempts to avoid the lack of price impact—*i.e.*, its price maintenance

Contrary to Plaintiff's characterization of its Complaint, each of the challenged statements is pled as an affirmative misstatement. *E.g.* CC ¶ 128 (alleging statements "were materially false and misleading because . . . CCA did not allow government to control correctional costs while improving correctional services and quality"); *see also id.* ¶¶ 121, 125, 128, 131, 134, 138, 141. The Court analyzed whether Plaintiff sufficiently pled affirmative misstatements when deciding Defendants' motion to dismiss. Dkt. 76 at 26 ("a reasonable juror could conclude that CoreCivic's statements, in context, were false or misleading"). Plaintiff cannot transform these statements into omissions, based on Defendants' alleged "fail[ure] to disclose" that these affirmative statements were untrue, in an obvious attempt to take advantage of the *Affiliated Ute* presumption.

The *Affiliated Ute* presumption is a narrow one, intended only for cases "involving primarily a failure to disclose," *i.e.*, "pure" omissions. *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 153-154, (1972). The presumption does not (and cannot) apply if the alleged "omission" is the truth of the affirmative statement. *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 356 & n.7 (M.D.N.C. 1993) ("Through word games, every plaintiff can style his or her complaint as a material misrepresentations or omissions case. . . . [but] there is a clear distinction between an allegation of material misrepresentation versus an omission."); *see also Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 109 n. 5 (2d Cir. 2005) (holding presumption does not apply where omissions merely "exacerbate the misleading nature of the 'alleged conduct'"); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, 2006

---

theory. As Plaintiff's cited case law makes clear, that theory applies where *affirmative misstatements* maintain inflation that already exists. *See Vivendi*, 838 F.3d at 257-58 (rejecting argument that silence—or an omission—could maintain equivalent inflation as an affirmative statement explaining "[i]t is far more coherent to conclude that such a misstatement does not simply maintain the inflation, but indeed 'prevents [the] preexisting inflation in a stock price from dissipating'").

14

Case 3:16-cv-02267   Document 134   Filed 11/21/18   Page 18 of 22 PageID #: 3547

WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006) ("Where positive statements are central to the alleged fraud, the *Affiliated Ute* presumption does not apply.").[12]

The crux of Plaintiff's claims is (and has always been) that Defendants falsely touted their services as offering cost savings to the BOP while delivering an equivalent level of quality. Dkt. 76 at 26. This claim cannot be transformed into an omission simply because Defendants did not disclose that the alleged misrepresentations were untrue. Under Plaintiff's approach, any misrepresentation could be reframed as an omission, and the *Affiliated Ute* presumption would "swallow the reliance requirement almost completely." *Johnston v. HBO Film Mgmt.*, 265 F.3d 178 (3d Cir. 2001); *see also In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 126 F. Supp. 3d 342, 366 (S.D.N.Y. 2015) ("If a misrepresentation claim could be reframed as an omission claim merely by alleging that a defendant 'did nothing to dispel' its own misrepresentation, then the limitation of the *Affiliated Ute* presumption to omissions alone would be meaningless indeed.").

## IV.    CONCLUSION

For the reasons set forth above, and in Defendants' Opposition (Dkt. 98), Defendants respectfully request that Plaintiff's Motion for Class Certification be denied.

---

[12] In Plaintiff's cited cases, *Affiliated Ute* was appropriately invoked where claims involved pure omissions. Reply at n. 11 (citing *Blackie v. Barrack*, 524 F.2d 891 (9th Cir. 1975) (applying *Affiliated Ute* where claims involved "primarily a failure to disclose")); *In re Montage Tech. Grp. Ltd. Sec. Litig.*, 2016 WL 1598666, at *7 (N.D. Cal. Apr. 21, 2016) (applying *Affiliated Ute* to properly pled omissions case); *Skeway v. China Nat. Gas, Inc.*, 304 F.R.D. 467, 475-76 (D. Del. June 18, 2014) (applying *Affiliated Ute* to alleged knowing omissions). And the *Burges* court found *Affiliated Ute* applied only to the alleged "failures to disclose (as opposed to misrepresentations)." *Compare Burges*, 2017 WL 2772122, at *10 ("Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the *Affiliated Ute* presumption as to the element of reliance **with regard to alleged omissions**") (emphasis added); *with* Reply at 6 (suggesting presumption applies any time "claims are based on a combination of omissions and misstatements").

DATED:  November 21, 2018

Respectfully submitted:

 /s/ Steven A. Riley

Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End. Ave.
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler
Brian T. Glennon
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com

Morgan E. Whitworth
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T:  (415) 391-0600
F:  (415) 395-8095
morgan.whitworth@lw.com

*Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*

<u>**CERTIFICATE OF SERVICE**</u>

      I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

David J. Schindler
Brian T. Glennon
Anna E. Berces
Morgan E. Whitworth
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
david.schindler@lw.com
brian.glennon@lw.com
anna.berces@lw.com
morgan.whitworth@lw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars, Suite
    100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER
RUDMAN & DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

this 21st day of November, 2018.

/s/ Steven A. Riley
Steven A. Riley