# EXHIBIT 1

NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, and HARLEY G. LAPPIN,

Defendants.

Civil Action No. 3:16-cv-02267

# SUPPLEMENTAL REPORT

# OF

# LUCY P. ALLEN

**November 21, 2018**

## I. SCOPE OF ASSIGNMENT

1. I have been asked by counsel for Defendants to review and respond to the Rebuttal Report of Steven P. Feinstein, dated October 26, 2018 ("Feinstein Rebuttal").

2. I have previously submitted a report on price impact in this matter, dated July 16, 2018 ("Allen Report").

## II. QUALIFICATIONS AND REMUNERATION

3. My qualifications and remuneration were set forth in my first report in this matter, the Allen Report.

## III. MATERIALS CONSIDERED

4. In preparing this report, I considered the materials previously considered in the Allen Report. I also considered the following additional materials:

a) Feinstein Rebuttal, including exhibits;

b) Reply in Further Support of Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, dated October 26, 2018 ("Plaintiff's Reply Brief"), including exhibits; and

c) Deposition of Lucy P. Allen, October 10, 2018 ("Allen Deposition").

## IV. THE OPINIONS IN THE FEINSTEIN REBUTTAL ARE EITHER MISLEADING, ILLOGICAL, OR ERRONEOUS, AND SERVE ONLY TO STRENGTHEN THE FINDINGS IN THE ALLEN REPORT

5. None of the opinions in the Feinstein Rebuttal rebut the findings in the Allen Report, and in fact, a number of Dr. Feinstein's analyses strengthen the findings in the Allen Report by providing further evidence demonstrating that the alleged misrepresentations did not have price impact.

### A. Dr. Feinstein's analysis of Plaintiff's new August 3, 2016 corrective disclosure regarding the non-renewal of the Cibola contract is erroneous because the allegedly corrective information was previously disclosed to no price reaction

6. The Feinstein Rebuttal includes a new corrective disclosure that is not alleged in Plaintiff's Complaint – CoreCivic's 2Q16 earnings announcement, after market close on August 3, 2016. According to Dr. Feinstein, as part of the 2Q16 earnings announcement, CoreCivic announced that the BOP had declined to renew the Company's contract for the Cibola County Correctional Facility ("Cibola").[1] Dr. Feinstein claims that the Cibola non-renewal announcement was "a partial revelation of prior misrepresentations and omissions,"[2] and that the price decline on August 4, 2016 "demonstrates price impact of allegation-related information."[3]

7. Dr. Feinstein's analysis of the new corrective disclosure is erroneous and actually supports the conclusion of no price impact. The information regarding the Cibola non-renewal that Dr. Feinstein claims was announced on August 3, 2016 was in fact announced to the market earlier and to no statistically significant price reaction. In particular, the news of the Cibola non-renewal was first announced in a news article published on August 1, after market close, by KOAT Albuquerque, an ABC-affiliated news station. The article stated:

> Cibola County Sheriff Tony Mace confirmed Monday that the cibola county correctional center [*sic*] in Milan near Grants, New Mexico, will be closing Oct. 1.

---

[1] Feinstein Rebuttal, ¶82.

[2] Feinstein Rebuttal, ¶85.

[3] Feinstein Rebuttal, p 28.

> The closure will affect an estimated 300 jobs. It is a privately run, low-level security facility and has been operated by the Corrections Corporation of America since 1998.[4]

8. The news regarding the Cibola non-renewal was repeated in another news story published the next day, August 2:

> Corrections Corporation of America will be closing its doors at midnight Oct. 1, displacing 254 workers at the Cibola County Correctional Center.
>
> Andrea Cooper, senior director for CCA human resources compliance, faxed a letter Monday afternoon to Grants Mayor Martin 'Modey' Hicks, informing him that the federal Bureau of Prisons had notified CCA of its decision not to exercise its option to renew its contract at the Cibola facility.[5]

9. The fact that the August 3 announcement regarding Cibola was not new to the market is apparent from the Wells Fargo analyst report on CoreCivic issued the following day, which explicitly stated that the news regarding the Cibola non-renewal had been previously announced:

> **Cibola County Corrections Center**. Announced earlier this week, the Bureau of Prisons (BOP) has decided not to renew its contract at CXW's Cibola County Corrections Center (1,129 beds) in New Mexico which expires on September 30th. [Wells Fargo, 8/4/16, emphasis original][6]

10. There was no statistically significant reaction in CoreCivic's stock price on August 2 following the announcement of the Cibola non-renewal according to Dr. Feinstein's event study as well as the alternative event study model.[7] If the market for CoreCivic stock were efficient, as Plaintiff and Dr. Feinstein claim, then the information regarding the Cibola non-renewal should have already been impounded into CoreCivic's stock price prior to the 2Q16 earnings announcement. Thus, in an efficient market the decline in CoreCivic's stock price on August 4, 2016 *cannot* be evidence of price impact of the alleged misrepresentations.

11. A review of analyst reports on the Company issued after the 2Q16 earnings announcement shows that all three analysts that issued reports attributed CoreCivic's stock price

---

[4] "Cibola County Correctional Center Closing," *KOAT Albuquerque*, August 1, 2016.

[5] "Milan Prison to Close; 254 Facing Layoffs," *The Gallup Independent*, August 2, 2016.

[6] This very quote is cited in ¶83 of the Feinstein Rebuttal.

[7] "ALLEN_017575.xlsx," "FEIN_000006.XLSX," and Report of Steven P. Feinstein dated June 1, 2018 ("Feinstein Market Efficiency Report"), ¶¶110-119 and Exhibit-6b.

3

decline on August 4, 2016 to the announcement that the Company's contract for the South Texas Family Residential Center ("STFRC"), an ICE facility and unrelated to the Company's BOP contracts, was going to be renegotiated. Statements by all three analysts are shown below:

- Wells Fargo: The Wells Fargo analyst covering CoreCivic stated that the "uncertainty" around the STFRC renegotiation was "likely to weigh heavily" on CoreCivic's share price and that they expected CoreCivic to "underperform" its peer group following the news of the STFRC renegotiation:

    **CXW: First Look--South TX Uncertainty Likely To Weigh On Shares**

    **Summary**. We expect shares of CXW to underperform the peer group average following its quarterly earnings release last night. While the company reported Q2 Funds-From-Operations (FFO)/sh ahead of consensus/our estimate/mgmt's previously provided guidance range and increased the midpoint of full-year FFO and EBITDA (adjusted) guidance ranges, new disclosure around potential modifications to the company's current Immigration & Customs Enforcement (ICE) contract at its South Texas Family Residential Center is likely to weigh heavily on shares given its large EBITDA contribution (undisclosed by the company, but 20% by our estimates) and uncertainty around the magnitude of any changes. As it relates to the facility, CXW states in its release that it "can provide no assurance that we will be awarded a new contract for family unit detention." [Wells Fargo, 8/4/16, emphasis original]

- Canaccord Genuity: The Canaccord analysts covering CoreCivic stated that investors were "focused" on the news of the STFRC renegotiation and stated that the "ambiguity" created by the news would "limit" any upside to CoreCivic's share price:

    **Lowering Target Price**

    **2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD**

    CXW's 2Q print was solid from an earnings perspective, but investors focused on the high probability of material EBITDA loss from renegotiation of the contract between ICE and the STFRC. As CXW has a 23% EBITDA exposure to this facility, we believe it will be difficult for investors to step in front of the outcome of this renegotiation, limiting near-term upside. [Canaccord Genuity, 8/4/16, emphasis original]

- SunTrust: The SunTrust analysts covering CoreCivic lowered their estimates of CoreCivic's future FFO (*i.e.*, funds from operations, a measure of a REIT's cash flow) and attributed their lowered estimates to the STFRC renegotiation:

4

> **Renegotiation With ICE Ongoing; Maintain Neutral**
>
> **What's Incremental To Our View**
>
> CXW is in the midst of renegotiating its contract with ICE regarding the South Texas Family Residential Center. ICE is seeking to lower the scale and cost of services currently provided at the facility. We maintain our Neutral rating and adjust our 2016E normalized FFO estimate to $2.66 from $2.63. [SunTrust, 8/4/16, emphasis original]

### B. Dr. Feinstein has no support for his claim that the response letter attached to the OIG Report "boosted" CoreCivic's stock price

12. Dr. Feinstein claims that the lack of any statistically significant price reaction following the OIG Report "proves nothing" because the "response letter" by CoreCivic attached to the OIG Report provided "positive countervailing" information that "boosted" the Company's stock price.[8,9] However, (i) Dr. Feinstein has no support for his claim, and (ii) the implied notion that the OIG Report had a negative significant impact while the response letter had a positive significant impact, and because of the balance no analyst mentioned either of these significant price impacts or issued any reports, is farfetched and defies logic.

13. As discussed in the Allen Report, there was no statistically significant reaction in CoreCivic's stock price and analysts covering CoreCivic did not issue any reports on the Company following the OIG Report.[10] Given the absence of any contemporaneous evidence

---

[8] Feinstein Rebuttal, ¶14, p. 22.

By asserting that the response letter prevented CoreCivic's stock price from declining, Plaintiff appears to now be claiming that the OIG Report is both an alleged misrepresentation and an alleged corrective disclosure. Plaintiff has not previously claimed the OIG Report as an alleged misrepresentation.

[9] Plaintiff's Reply Brief claims that CoreCivic announced two other pieces of confounding news on the same day as the OIG Report – (i) the appointment of a new member to CoreCivic's Board of Directors, and (ii) the announcement of a dividend of $0.54 per share. Plaintiff's Reply Brief, fn. 30.

Plaintiff's claims are incorrect. CoreCivic's press releases announcing the new board member and the dividend were issued after market close on August 11, 2016 (at 4:15 p.m. and 4:23 p.m. respectively), while the OIG Report was released before the market opened (at 6:06 a.m.). Thus, any reaction to the OIG Report and to the other two pieces of news would be expected to occur on different dates. (Exhibit U to Plaintiff's Reply Brief itself clearly shows that the news regarding the dividend was published after market close on August 11.)

[10] Allen Report, ¶¶57-60.

Dr. Feinstein claims that, even in the absence of confounding news, the lack of any price reaction following the OIG Report does not demonstrate that the alleged misrepresentations did not have price impact. Feinstein Rebuttal, ¶¶51-52.

5

showing that CoreCivic's response letter "boosted" the stock price, Dr. Feinstein attempts to support his claim by referring to the increase in CoreCivic's stock price on August 19, 2016, the day after the Yates Memo, when CoreCivic issued a press release and held a conference call.[11] However, the August 19 price increase, which occurred over a week after the OIG Report, only undermines Dr. Feinstein's argument of price impact from the OIG Report. Unlike the OIG Report, after which *no* analysts issued reports on CoreCivic, the Yates Memo prompted *all* analysts covering CoreCivic to issue reports. Further, unlike after the OIG Report, analysts commented both on the Yates Memo *and* on CoreCivic's response to the Yates Memo. For example, the Canaccord analyst covering CoreCivic stated:

> **What happened and the subsequent reaction**
> Prison REIT volatility was rampant over the past few trading sessions as the Department of Justice announced its plan to phase out private prison contracts at the BOP level. The memo noted that it would phase the contracts out as they came due for renewal. […]
>
> Friday [August 19]: On Friday morning after the DOJ's memo was fully digested by investors, GEO added to the volatility, by announcing the renewal of one of its September 2016 expiration BOP contracts, antithetical to the DOJ's memo, and then subsequently announced the rescinding of the contract (though ultimately, GEO obtained a written letter of intent to renew). Many investors started becoming more comfortable with the limited near- and medium-term reach of the memo, especially after the two conference calls eased a certain level of fears. As a result, GEO rebounded and moved up over 22% in the day following the DOJ's announcement, while CXW was up roughly 10% on the back of both management's discussion and GEO's renewal news. [Canaccord Genuity, 8/23/16, emphasis original]

14. Note that there was no new information included in CoreCivic's response letter that was not already publicly disclosed. For example, CoreCivic had previously disclosed that

---

Dr. Feinstein's claim is unfounded. Plaintiff alleges that but-for the alleged misrepresentations CoreCivic's stock price would have been different. Thus, when the alleged "truth" regarding the alleged misrepresentations was disclosed to the market in the OIG Report (with no other confounding information), one *would* expect CoreCivic's stock price to react. Dr. Feinstein's claim is analogous to setting up a scientific test to measure rainfall by placing a rain gauge in a specific orientation and location where rain is expected, but on finding that the gauge did not measure any rainfall, rather than concluding that it did not rain, you decide that the test doesn't tell you anything and you can't conclude anything based on the results.

Dr. Feinstein adopted a similar "heads I win, tails you lose" approach in his analysis of market efficiency – *i.e.*, he selected certain tests to perform, and stated that if the tests yielded results in his favor they supported his theory, but if the tests did not yield results in his favor, they would not constitute evidence contrary to his theory. See, for example, Feinstein Market Efficiency Report, ¶¶99-102.

[11] Feinstein Rebuttal, ¶¶65-67.

the inmate populations in their BOP facilities were primarily "criminal aliens."[12] In addition, the study that CoreCivic cited in its letter to support its claim that criminal alien populations housed in BOP facilities tend to have more violent incidents compared to U.S. citizen populations of a comparable security level was published more than a decade before the OIG Report.[13]

### C. Dr. Feinstein's claim that the lack of any analyst commentary following the OIG Report "proves nothing" is contrary to his claims of an efficient market and his analysis of the "value proposition" for CoreCivic's stock

15. Dr. Feinstein claims that the lack of any analyst reports issued following the OIG Report "proves nothing" because analysts should not "always be expected to release reports" following the release of important news about a company.[14] Dr. Feinstein's claim is unsupported and contrary to his claims of an efficient market and his analysis of the "value proposition" for CoreCivic's stock.

16. Dr. Feinstein provides no support for his claim that the lack of any analyst commentary following the OIG Report "proves nothing," particularly given his claim that information in the OIG Report was "valuation impactful news"[15] and revealed to the market that CoreCivic's "value proposition" (*i.e.*, ability to provide similar services compared to government-run prisons at lower cost[16]) was "not as sound" as previously represented.[17] In his report on market efficiency, Dr. Feinstein stated that analysts "facilitate" the "flow" and "digestion" of information in the market, and help market participants "acquire relevant information and understand the implications of that information for valuation and investment decisions."[18] In fact, Dr. Feinstein relied *entirely* on analyst reports to show that CoreCivic's "value proposition" was an "essential element" of the Company's business strategy and

---

[12] See, for example, CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 10.

[13] Gaes, Gerald G., et *al*., "The Influence of Prison Gang Affiliation on Violence and Other Prison Misconduct," *The Prison Journal* 82(3): 2002. Note that the authors of this study were BOP employees.

[14] Feinstein Rebuttal, ¶68, p. 23.

[15] Feinstein Rebuttal, ¶68.

[16] Feinstein Rebuttal. ¶25.

[17] Feinstein Rebuttal, ¶69.

[18] Feinstein Market Efficiency Report, ¶52.

7

valuation.[19] Dr. Feinstein's inability to cite *any* contemporaneous market evidence (in the form of a price reaction or market commentary), or provide any justification for why analysts did not issue reports after the OIG Report,[20] indicates either that the OIG Report was not "valuation impactful" or that CoreCivic stock did not trade in an efficient market.[21]

**D.  Dr. Feinstein has no valid response to the analysis in the Allen Report showing that the market characterized the Yates Memo as a "political shift" in the government's use of private prisons, a shift that was reversed following the 2016 Presidential Election**

17. Dr. Feinstein claims that the Allen Report "eschews" the facts in the Yates Memo and adopts a "fringe narrative" that the Yates Memo was merely a "political shift" that did not reveal any information about the "quality," "performance" or "cost-savings" of CoreCivic's BOP facilities.[22] However, Dr. Feinstein's criticisms of the Yates Memo analysis in the Allen Report are misleading and irrelevant, and Dr. Feinstein fails to provide *any* market evidence that is contrary to the findings in the Allen Report.

18. The analysis in the Allen Report entailed a systematic and replicable analysis of publicly available information, including market and analyst commentary after the release of the

---

[19] Feinstein Rebuttal, ¶¶44-47, 69.

[20] Plaintiff claims that analysts covering CoreCivic were "biased" and unwilling to discuss "problems" within the Company's business. Plaintiff's Reply Brief, p. 12.

Plaintiff's claim is at odds with Dr. Feinstein's conclusion that CoreCivic stock traded in an efficient market. In particular, Plaintiff appears to be suggesting that analysts covering CoreCivic only facilitated the flow of positive information on CoreCivic stock and suppressed negative information, and thus, that CoreCivic stock was only efficient with respect to positive information about the Company.

Note that Dr. Feinstein himself cited statements by the analysts that Plaintiff claims were "biased" (Canaccord Genuity, SunTrust and Wells Fargo). See, for example, Feinstein Rebuttal, ¶¶46, 83.

[21] Plaintiff claims that CoreCivic's stock price declined on almost every single day between the OIG Report and the Yates Memo and thus, rather than focusing on the price reaction on August 11 (the date of the OIG Report), one should consider a "multi-day return" – which supposedly both I and my colleagues at NERA have previously endorsed. Plaintiff's Reply Brief, fn. 30.

Plaintiff's claim is unscientific and misleading. Not only was there *no* statistically significant price decline according to Plaintiff's expert's own event study on *any* date between the OIG Report and the Yates Memo (and thus no basis to consider a "multi-day return"), but the evidence that Plaintiff cites in support (which is deposition testimony of mine in a prior case) omits the portion where I explicitly reject the proposition that Plaintiff is putting forward here.

[22] Feinstein Rebuttal, ¶76, p. 26.

8

Yates Memo, to show that the alleged misrepresentations did not have price impact. The Allen Report did not "adopt" any narrative and did not suggest, as Dr. Feinstein claims, that the Yates Memo was "akin to an Act of God."[23] As discussed in the Allen Report, *analyst commentary* shows that the Yates Memo was considered to be a "political shift" driven by politics, and, even though Plaintiff claims the Yates Memo revealed the alleged truth regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities, *analyst commentary* shows that CoreCivic's facilities were still considered to be a "quality" and cost-effective option for federal corrections after the Yates Memo.[24]

19. Further, while the Allen Report included a number of statements by analysts both immediately following the Yates Memo and later, after the 2016 Presidential Election, showing that analysts considered the Yates Memo to be a "political shift,"[25] Dr. Feinstein is unable to provide *any* quote from *any* analyst covering the Company that is consistent with Plaintiff's theory. The only evidence or analysis that Dr. Feinstein attempts to provide, citing the price decline following Plaintiff's new alleged corrective disclosure,[26] is, as discussed above, clearly erroneous and, rather than supporting Dr. Feinstein's argument, actually further supports the conclusion that the alleged misrepresentations did not have price impact.

20. In addition, Dr. Feinstein provides no valid response to the analysis in the Allen Report showing that analysts' valuations of CoreCivic stock (via their price targets and discount rates) as well as CoreCivic's implied volatility, which changed following the Yates Memo, returned to their pre-Yates Memo levels after the 2016 Presidential Election as the uncertainty surrounding the renewal of CoreCivic's contracts with the federal government abated.[27] The only arguments that Dr. Feinstein attempts – that the Allen Report did not consider changes in the implied volatility of the market,[28] and that there are "many reasons" why an analyst might increase the discount rate for a stock[29] – are either incorrect or irrelevant.

---

[23] Feinstein Rebuttal, ¶79.

[24] Allen Report, ¶68.

[25] Allen Report, ¶¶74, 77-79, 85.

[26] Feinstein Rebuttal, ¶¶81-86.

[27] Allen Report, ¶¶81-83, 90.

[28] Feinstein Rebuttal, ¶89.

[29] Feinstein Rebuttal, ¶92.

9

21. The analysis in the Allen Report did consider changes in the market's implied volatility. As shown below, the market's implied volatility was generally flat while CoreCivic's implied volatility more than trebled following the Yates Memo, and then sharply decreased following the 2016 Presidential Election:



22. Similarly, while Dr. Feinstein is correct that there are "many reasons" why an analyst might increase the discount rate, there is *no* indication that the Canaccord Genuity analysts increased their discount rate because they had learned any new information regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities. In fact, in the same report where the Canaccord analysts increased their discount rate for CoreCivic stock, the analysts stated:

> [W]e believe the political environment is a large factor and driver behind the DOJ's memo [*i.e.*, the Yates Memo]. Given 4 – 5 years between now and some of these

10

renewals, we believe the political landscape could be very different, limiting the impact on these contracts. [Canaccord Genuity, 8/23/16]

### E. Dr. Feinstein's claim that the analysis of price impact in the Allen Report is "incomplete" by not specifically addressing a March 30, 2016 alleged misstatement is incorrect and disingenuous

23. Dr. Feinstein claims that the analysis of price impact in the Allen Report is "incomplete" because it supposedly fails to analyze a March 30, 2016 alleged misstatement.[30] Dr. Feinstein's claim is incorrect and disingenuous.[31] The March 30, 2016 statement that Dr. Feinstein focuses on was not alleged as a misrepresentation in the relevant section of Complaint, and even if it had been, the analysis in the Allen Report is directly applicable and the conclusion of no price impact would not change.

24. In the Complaint, Plaintiff alleged that CoreCivic made misrepresentations regarding the "quality," "performance" and "cost-savings" of its facilities on 33 dates in the section titled "Defendants Made Numerous Fraudulent Statements and Omissions During the Class Period."[32] Plaintiff did not allege in this section that the March 30 statement was misleading. Rather, the March 30 statement that Plaintiff now claims as an alleged misrepresentation was listed in the "Background" section of the Complaint.

25. However, even assuming that March 30 was alleged as a misrepresentation, this would not affect the analysis in the Allen Report or the conclusion that the alleged misrepresentations did not have price impact. There was no new information in the March 30 statement that was not already included in Plaintiff's other alleged misrepresentations and not already analyzed in the Allen Report. For example, CoreCivic's March 30 statement that Plaintiff now claims as a misrepresentation stated that the Company was "focused on providing high-quality, safe and secure facilities that meet the needs of [CoreCivic's] government partners," and that, as a result, CoreCivic had "experienced more than three decades of continued

---

[30] Feinstein Rebuttal, ¶29.

[31] Note that Dr. Feinstein was at my deposition and heard me testify about why the March 30 statements were not included in the Allen Report. Allen Deposition, 76:23-77:22.

[32] The specific alleged misrepresentations claimed in the Complaint are listed in Appendix C of the Allen Report.

11

growth and contract retention rates in excess of 90 percent."[33] CoreCivic made a number of similar statements regarding the "quality" and "safety" of its facilities, as well as the Company's high contract renewal rate, on several occasions during the alleged Class Period – statements that the Complaint cites as alleged misrepresentations,[34] and that were already analyzed in the Allen Report and found to have had no price impact.[35]

26.   In sum, none of the opinions in the Feinstein Rebuttal causes me to revise my conclusion that the alleged misrepresentations did not have price impact, and in fact, a number of Dr. Feinstein's analyses strengthen the findings in the Allen Report by providing further evidence demonstrating that the alleged misrepresentations did not have price impact.

_____
Lucy P. Allen

---

[33] Complaint, ¶35.

[34] See, for example, Complaint, ¶¶120-121, 126-128, 132-134, 149-156, 162-165.

[35] As discussed in the Allen Report, in an efficient market, confirmatory or repeated news (*i.e.*, news that has already been publicly disclosed) should not impact the market or cause a statistically significant stock price reaction. See, for example, Allen Report, ¶30.