# EXHIBIT 2

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

---

# FORM 10-K

---

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2016**

**OR**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-16109**

---

# CORECIVIC, INC.
### (Exact name of registrant as specified in its charter)

---

| | |
|---|---|
| **MARYLAND** | **62-1763875** |
| **(State or other jurisdiction of incorporation or organization)** | **(I.R.S. Employer Identification No.)** |

**10 BURTON HILLS BLVD., NASHVILLE, TENNESSEE 37215**
**(Address and zip code of principal executive office)**

**REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (615) 263-3000**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value per share | New York Stock Exchange |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: NONE**

---

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15 (d) of the Act.   Yes ☐   No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.).   Yes ☐   No ☒

The aggregate market value of the shares of the registrant's Common Stock held by non-affiliates was approximately $4,092,088,786 as of June 30, 2016 based on the closing price of such shares on the New York Stock Exchange on that day. The number of shares of the registrant's Common Stock outstanding on February 16, 2017 was 117,666,948.

## DOCUMENTS INCORPORATED BY REFERENCE:

Portions of the registrant's definitive Proxy Statement for the 2017 Annual Meeting of Stockholders, currently scheduled to be held on May 11, 2017, are incorporated by reference into Part III of this Annual Report on Form 10-K.

## ITEM 1A.    RISK FACTORS.

As the owner and operator of correctional, detention, and residential reentry facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable years beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations.

### Risks Related to Our Business and Industry

***Our results of operations are dependent on revenues generated by our correctional, detention, and residential reentry facilities, which are subject to the following risks associated with the corrections and detention industry.***

*We are subject to fluctuations in occupancy levels, and a decrease in occupancy levels could cause a decrease in revenues and profitability.* While a substantial portion of our cost structure is fixed, a substantial portion of our revenue is generated under facility ownership and management contracts that specify per diem payments based upon daily occupancy. We are dependent upon the governmental agencies with which we have contracts to provide offenders for facilities we operate. We cannot control occupancy levels at the facilities we operate. Under a per diem rate structure, a decrease in our occupancy rates could cause a decrease in revenue and profitability. For the years 2016, 2015, and 2014, the average compensated occupancy of our facilities, based on rated capacity, was 79%, 83%, and 84%, respectively, for all of the facilities we operated, exclusive of facilities that are leased to third-party operators where our revenue is generally not based on daily occupancy. Occupancy rates may, however, decrease below these levels in the future. When combined with relatively fixed costs for operating each facility, a decrease in occupancy levels could have a material adverse effect on our profitability.

*We are dependent on government appropriations and our results of operations may be negatively affected by governmental budgetary challenges.* Our cash flow is subject to the receipt of sufficient funding of, and timely payment by, contracting governmental entities. If the appropriate governmental agency does not receive sufficient appropriations to cover its contractual obligations, it may terminate our contract or delay or reduce payment to us. Any delays in payment, or the termination of a contract, could have an adverse effect on our cash flow and financial condition. In addition, federal, state and local governments are constantly under pressure to control additional spending or reduce current levels of spending. In prior years, these pressures have been compounded by economic downturns. Accordingly, we have been requested and may be requested in the future to reduce our existing per diem contract rates or forego prospective increases to those rates. Further, our government partners could reduce offender population levels in facilities we own or manage to contain their correctional costs. In addition, it may become more difficult to renew our existing contracts on favorable terms or otherwise.

Our contract with the District of Columbia, or District, at the D.C. Correctional Treatment Facility is scheduled to expire in the first quarter of 2017. The District assumed operation of the facility in January 2017. We incurred facility net operating losses at the facility of $0.1 million and $0.7 million in 2016 and 2015, respectively, and generated facility net operating income of $1.0 million in 2014. Our investment in the direct financing lease with the District also expires in the first quarter of 2017. Upon expiration of the lease in 2017, ownership of the facility automatically reverts to the District.

During 2015, ICE solicited proposals for the rebid of our 1,000-bed Houston Processing Center. The contract is currently scheduled to expire in April 2017. We have submitted our response to ICE, but can provide no assurance that we will be awarded a new contract for this facility.

As previously discussed herein, on August 18, 2016, the DOJ directed that, as each contract with privately operated prisons reaches the end of its term, the BOP should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the BOP's inmate population. Currently, we have two owned and managed facilities that house BOP inmates with contracts that expire in the next twelve months. We can provide no assurance that we will be awarded new contracts for these two facilities or that the contracts will not be substantially reduced in scope. These two facilities have a total capacity of 3,654 beds and contributed $91.4 million in revenue during 2016. The total net carrying value of the two facilities was $144.5 million as of December 31, 2016. We have a third owned and managed facility housing BOP inmates under a contract that was renewed in November 2016 for two additional years through November 2018. This facility generated $40.5 million of revenue during 2016.

During the third quarter of 2016, the Texas Department of Criminal Justice, or TDCJ, solicited proposals for the rebid of four facilities we currently manage for the state of Texas. The current managed-only contracts for these four facilities are scheduled to expire in August 2017. The four facilities have a total capacity of 5,129 beds and generated $2.3 million in facility net operating income during 2016. We have submitted our response to the solicitation, but can provide no assurance that we will be awarded new managed-only contracts for these four facilities.

Based on information available at this filing, notwithstanding the contracts at facilities described above, we expect to renew all other material contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high for a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

Governmental agencies typically may terminate a facility contract at any time without cause or use the possibility of termination to negotiate a lower per diem rate. In the event any of our contracts are terminated or are not renewed on favorable terms or otherwise, we may not be able to obtain additional replacement contracts. The non-renewal, termination, or competitive re-bid of any of our contracts with governmental agencies could materially adversely affect our financial condition, results of operations and liquidity, including our ability to secure new facility contracts from others.

Table of Contents

## *Our Business*

We are compensated for providing bed capacity and correctional, detention, and residential reentry services at a per diem rate based upon actual or minimum guaranteed occupancy levels. Federal, state, and local governments are constantly under budgetary constraints putting pressure on governments to control correctional budgets, including per diem rates our customers pay to us as well as pressure on appropriations for building new prison capacity.

Despite our increase in federal revenues, inmate populations in federal facilities, particularly within the Federal Bureau of Prisons, or the BOP, system nationwide, have declined over the past two years. Inmate populations in the BOP system declined in 2015 and 2016 due, in part, to the retroactive application of changes to sentencing guidelines applicable to certain federal drug trafficking offenses. Increases in capacity within the federal system could result in a decline in BOP populations within our facilities, and could negatively impact the future demand for prison capacity. Further, in a memorandum to the BOP dated August 18, 2016, the Department of Justice, or DOJ, directed that, as each contract with privately operated prisons reaches the end of its term, the BOP should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the BOP's inmate population. However, in November 2016, we announced that the BOP exercised a two-year renewal option at our 1,978-bed, McRae Correctional Facility. The amended agreement commenced on December 1, 2016, and provides for housing up to 1,724 federal inmates with a fixed monthly payment for 1,633 beds, compared to our previous contract which contained a fixed payment for 1,780 beds.

On August 29, 2016, the Secretary of the Department of Homeland Security, or DHS, announced that he directed the Homeland Security Advisory Council, or HSAC, to establish a Subcommittee of the Council to review the U.S. Immigration and Customs Enforcement's, or ICE's, current policy and practices concerning the use of private immigration detention and evaluate whether this practice should be eliminated. A written report of the subcommittee's evaluation was provided by the HSAC to the Secretary of the DHS and the Director of ICE on November 30, 2016. According to the report, fiscal considerations, combined with the need for realistic capacity to handle sudden increases in detention, suggest that DHS's use of private for-profit detention will continue. The report indicated that, as of September 12, 2016, 10% of the ICE detainee population was housed in federally owned and directed facilities, while 65% was housed in facilities operated by private, for-profit contractors, and 25% was housed in facilities operated by county jails or other local or state government entities. Further, the report indicated that ICE should seek ongoing ways to reduce reliance on detention in county jails, which generally do not meet Performance-Based National Detention Standards, or PBNDS, promulgated by ICE.

We believe the utilization of private sector bed capacity and management services provides ICE with flexible and cost-effective solutions essential to their mission. We also believe the new contract we signed in October 2016 to provide detention space and services at our Cibola County Corrections Center to ICE for up to 1,116 detainees, and the new contract award we announced in December 2016 to provide detention capacity to ICE at our 2,016 bed Northeast Ohio Correctional Center, demonstrate examples of our ability to provide flexible solutions and fulfill emergent needs of ICE that would be very difficult to replicate in the public sector. We previously housed inmates from the BOP at the Cibola facility under a contract that expired in October 2016 and at the Northeast Ohio facility under a contract that expired in May 2015. Therefore, we believe these new contracts provide further examples of the marketability of our real estate assets across multiple government customers.

Table of Contents

We generated approximately 9% and 28% of our total revenue from the BOP and ICE during the year ended December 31, 2016, respectively.

Several of our state partners are projecting improvements in their budgets which has helped us secure recent per diem increases at certain facilities. Further, several of our existing state partners, as well as state partners with which we do not currently do business, are experiencing growth in inmate populations and overcrowded conditions. Although we can provide no assurance that we will enter into any new contracts, we believe we are well positioned to provide them with needed bed capacity, as well as the programming and reentry services they are seeking.

We believe the long-term growth opportunities of our business remain attractive as governments consider their emergent needs, as well as the efficiency, savings, and offender programming opportunities we can provide along with flexible solutions to match our partners' needs. Further, we expect our partners to continue to face challenges in maintaining old facilities, and developing new facilities and additional capacity which could result in future demand for the solutions we provide.

Governments continue to experience many significant spending demands which have constrained correctional budgets limiting their ability to expand existing facilities or construct new facilities. We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their offenders introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system. Further, the use of facilities owned and managed by private operators allows governments to expand correctional capacity without incurring large capital commitments and allows them to avoid long-term pension obligations for their employees.

We also believe that having beds immediately available to our partners provides us with a distinct competitive advantage when bidding on new contracts. While we have been successful in winning contract awards to provide management services for facilities we do not own, and will continue to pursue such management contracts selectively, we believe the most significant opportunities for growth are in providing our government partners with available beds within facilities we currently own or that we develop. We also believe that owning the facilities in which we provide management services enables us to more rapidly replace business lost compared with managed-only facilities, since we can offer the same beds to new and existing customers and, with customer consent, may have more flexibility in moving our existing inmate populations to facilities with available capacity. Our management contracts generally provide our customers with the right to terminate our management contracts at any time without cause.

We are actively engaged in marketing our available capacity to existing and prospective customers. Historically, we have been successful in substantially filling our inventory of available beds and the beds that we have constructed. Filling these available beds would provide substantial growth in revenues, cash flow, and earnings per share. However, we can provide no assurance that we will be able to fill our available beds.

The demand for capacity in the short-term has been affected by the budget challenges many of our government partners currently face. At the same time, these challenges impede our customers' ability to construct new prison beds of their own or update older facilities, which we believe could result in further need for private sector capacity solutions in the long-term.

57