# EXHIBIT 3

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

# FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2013

OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

Commission file number: 001-16109

# CORRECTIONS CORPORATION OF AMERICA
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **MARYLAND** | **62-1763875** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**10 BURTON HILLS BLVD., NASHVILLE, TENNESSEE 37215**
(Address and zip code of principal executive office)

REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (615) 263-3000

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value per share | New York Stock Exchange |

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: NONE

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.  Yes ☒  No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15 (d) of the Act.  Yes ☐  No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.  Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).  Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☐ |

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.). Yes ☐ No ☒

The aggregate market value of the shares of the registrant's Common Stock held by non-affiliates was approximately $3,868,995,909 as of June 30, 2013 based on the closing price of such shares on the New York Stock Exchange on that day. The number of shares of the registrant's Common Stock outstanding on February 18, 2014 was 115,954,124.

## DOCUMENTS INCORPORATED BY REFERENCE:

Portions of the registrant's definitive Proxy Statement for the 2014 Annual Meeting of Stockholders, currently scheduled to be held on May 15, 2014, are incorporated by reference into Part III of this Annual Report on Form 10-K.

**Table of Contents**

**Risks Related to Our Business and Industry**

*Our results of operations are dependent on revenues generated by our jails, prisons, and detention facilities, which are subject to the following risks associated with the corrections and detention industry.*

*We are subject to fluctuations in occupancy levels, and a decrease in occupancy levels could cause a decrease in revenues and profitability.* While a substantial portion of our cost structure is fixed, a substantial portion of our revenue is generated under facility ownership and management contracts that specify per diem payments based upon daily occupancy. We are dependent upon the governmental agencies with which we have contracts to provide inmates for our managed facilities. We cannot control occupancy levels at our managed facilities. Under a per diem rate structure, a decrease in our occupancy rates could cause a decrease in revenue and profitability. Average compensated occupancy for our facilities in operation for 2013, 2012, and 2011 was 85%, 88%, and 90%, respectively. Occupancy rates may, however, decrease below these levels in the future. When combined with relatively fixed costs for operating each facility, a decrease in occupancy levels could have a material adverse effect on our profitability.

*We are dependent on government appropriations and our results of operations may be negatively affected by governmental budgetary challenges.* Our cash flow is subject to the receipt of sufficient funding of and timely payment by contracting governmental entities. If the appropriate governmental agency does not receive sufficient appropriations to cover its contractual obligations, it may terminate our contract or delay or reduce payment to us. Any delays in payment, or the termination of a contract, could have an adverse effect on our cash flow and financial condition. In addition, federal, state and local governments are constantly under pressure to control additional spending or reduce current levels of spending. Accordingly, we have been requested and may be requested in the future to reduce our existing per diem contract rates or forego prospective increases to those rates. Further, our customers could reduce inmate population levels in facilities we own or manage to contain their correctional costs. In addition, it may become more difficult to renew our existing contracts on favorable terms or otherwise.

*Competition for inmates may adversely affect the profitability of our business.* We compete with government entities and other private operators on the basis of bed availability, cost, quality, and range of services offered, experience in designing, constructing, and managing facilities and reputation of management and personnel. While there are barriers to entering the market for the ownership and management of correctional and detention facilities, these barriers may not be sufficient to limit additional competition. In addition, our government customers may assume the management of a facility that they own and we currently manage for them upon the termination of the corresponding management contract or, if such customers have capacity at their facilities, may take inmates currently housed in our facilities and transfer them to government-run facilities. Since we are paid on a per diem basis with no minimum guaranteed occupancy under most of our contracts, the loss of such inmates and resulting decrease in occupancy would cause a decrease in our revenues and profitability.

*Escapes, inmate disturbances, and public resistance to privatization of correctional and detention facilities could result in our inability to obtain new contracts or the loss of existing contracts.* The operation of correctional and detention facilities by private entities has not achieved complete acceptance by either governments or the public. The movement toward privatization of correctional and detention facilities has also encountered resistance from certain groups, such as labor unions and others that believe that correctional and detention facilities should only be operated by governmental agencies.

27

**Table of Contents**

*Failure to comply with unique and increased governmental regulation could result in material penalties or non-renewal or termination of our contracts to provide or manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors and the combination of regulations we face is unique and complex. Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts. Federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations and contract requirements, and failure to comply can result in material penalties, including financial penalties, non-renewal or termination of facility contracts, and suspension or debarment from contracting with certain government entities.

In addition, private prison managers are subject to government legislation and regulation attempting to restrict the ability of private prison managers to house certain types of inmates, such as inmates from other jurisdictions or inmates at medium or higher security levels. Legislation has been enacted in several states, and has previously been proposed in the United States Congress, containing such restrictions. Such legislation may have an adverse effect on us.

Our inmate transportation subsidiary, TransCor, is subject to regulations promulgated by the Departments of Transportation and Justice. TransCor must also comply with the Interstate Transportation of Dangerous Criminals Act of 2000, which covers operational aspects of transporting prisoners, including, but not limited to, background checks and drug testing of employees; employee training; employee hours; staff-to-inmate ratios; prisoner restraints; communication with local law enforcement; and standards to help ensure the safety of prisoners during transport. We are subject to changes in such regulations, which could result in an increase in the cost of our transportation operations.

On September 26, 2013, the Federal Communications Commission ("FCC"), which regulates interstate communications, released a Report and Order and Further Notice of Proposed Rulemaking on the subject of rate reform for interstate inmate calling services (the "ICS Order"). The ICS Order was effective on February 11, 2014, subject to a stay on certain portions as a result of a pending legal challenge to the ICS Order. The ICS Order has had a significant impact on the rates that may be charged for interstate inmate calling services, or ICS, which include per-minute charges, per-call charges, and ancillary charges and other fees charged in connection with such service.

The Order applies directly to ICS providers who offer their services pursuant to contracts with correctional facilities, including those that we manage. The ICS Order places limits on rates that ICS providers can charge. A portion of the Order that currently is subject to the stay noted above, and thus has not yet become effective, also eliminates payments to correctional facilities on interstate calling services that are unrelated to providing ICS. This provision could have a significant impact on commission payments received by correctional facilities, including our facilities. The ICS Order is not currently expected to result in a material impact on our financial statements, as a significant amount of commissions paid by our ICS providers are passed along to our customers or are reserved and used for the benefit of inmates in our care.

30

A number of legal challenges to the ICS Order are pending and additional future challenges are possible, any of which could alter or delay the FCC's implementation of the ICS Order. In addition, based on the ICS Order and/or the outcome of its challenges, various state commissions may consider changes to their intrastate rates. Moreover, the ICS Order seeks comment on additional measures for rate reform and the FCC has indicated that further reform of interstate and intrastate ICS rates is likely forthcoming. For these and other reasons, we cannot predict the ultimate impact of the ICS Order on our results of operations at this time.

Our failure to comply with, or changes to existing regulations or adoption of new regulations in, the areas discussed above could result in increases to our costs or reductions in revenue that could, independently or in the aggregate, have a material adverse effect on our results of operations.

*Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable performance requirements, laws, regulations and standards. The regulatory and contractual environment in which we operate is complex and many aspects of our operations remain subject to manual processes and oversight that make compliance monitoring difficult and resource intensive. For contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been reimbursed. If a government audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. In February 2014, we reached an agreement to pay $1.0 million in compensation to the state of Idaho regarding contractual disputes related to staffing at the Idaho Correctional Center stemming in part from an audit by the Idaho Department of Corrections. In addition to the potential civil and criminal penalties and administrative sanctions noted above, any adverse determination with respect to contractual or regulatory violations could negatively impact our ability to bid in response to RFPs in one or more jurisdictions.

*We depend on a limited number of governmental customers for a significant portion of our revenues.* We currently derive, and expect to continue to derive, a significant portion of our revenues from a limited number of governmental agencies. The loss of, or a significant decrease in, business from the BOP, ICE, USMS, or various state agencies could seriously harm our financial condition and results of operations. The three primary federal governmental agencies with correctional and detention responsibilities, the BOP, ICE, and USMS, accounted for 44% of our total revenues for the fiscal year ended December 31, 2013 ($740.0 million). The USMS accounted for 19% of our total revenues for the fiscal year ended December 31, 2013 ($317.9 million), BOP accounted for 13% of our total revenues for the fiscal year ended December 31, 2013 ($211.9 million), and ICE accounted for 12% of our total revenues for the fiscal year ended December 31, 2013 ($210.2 million). Although the revenue generated from each of these agencies is derived from numerous management

Case 3:16-cv-02267    Document 135-3    Filed 11/21/18    Page 6 of 6 PageID #: 3583