# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, and HARLEY G. LAPPIN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:16-cv-2267<br>Judge Aleta A. Trauger |

## MEMORANDUM

Amalgamated Bank, as Trustee for the LongView Collective Investment Fund, ("Amalgamated") has filed a Motion to Certify Class (Docket No. 91), to which CoreCivic, Inc. ("CoreCivic") has filed a Response (Docket No. 98), and Amalgamated has filed a Reply (Docket No. 121), to which CoreCivic has filed a Surreply (Docket No. 134). For the reasons set out herein, Amalgamated's motion will be denied. CoreCivic's pending Motion for Evidentiary Hearing (Docket No. 136) will be denied as moot.

## I. BACKGROUND

CoreCivic is a publicly traded real estate investment trust that owns and operates private prisons and detention facilities. Amalgamated is the lead plaintiff in a putative class action against CoreCivic and four CoreCivic executives for securities fraud, based on the defendants' history of making allegedly false and/or misleading public statements about the quality of CoreCivic's services and its history of performance relative to the expectations of its federal clients, particularly the Federal Bureau of Prisons ("BOP").

The lengthy history of alleged deficiencies at CoreCivic's BOP facilities, and CoreCivic's notice of those deficiencies, is detailed in the court's December 18, 2017 Memorandum in support of its Order denying CoreCivic's Motion to Dismiss. (Docket No. 76 at 2–13.) Among the more prominent and frequently repeated deficiencies were CoreCivic's failures to provide necessary medical care and testing to inmates, despite its facilities' receiving numerous notices of deficiencies from the BOP informing the company of the BOP's expectations and concerns. (*See id.* at 6, 9, 11–12.) CoreCivic's facilities were also allegedly poorly and inadequately staffed, leading to problems with inmate safety and security. (*See id.* at 3–5, 8–9, 11.) In one instance, CoreCivic's allegedly inadequate staffing resulted in a failure to anticipate or appropriately respond to a violent riot at one of its BOP facilities, during which a CoreCivic correctional officer was killed. (*Id.* at 3–5.)

On August 11, 2016, the U.S. Department of Justice's Office of Inspector General ("OIG") published a report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" ("OIG Report"). (Docket No. 99-1.) The OIG Report found that, in almost all key areas, contract prisons had higher rates of undesirable incidents than BOP-run facilities. (*Id.* at 14.) The OIG Review noted that, in "recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer"—a reference to the aforementioned riot at a CoreCivic facility. (*Id.* at 2.) The OIG Review observed that CoreCivic facilities experienced substantially higher rates, relative to BOP institutions, of a number of unwelcome occurrences, such as inmate fights, inmate-on-inmate assaults, and suicide attempts/self-mutilations. (*Id.* 60–67.) The value of CoreCivic's stock does not appear to have immediately suffered from the release of the OIG Report in a statistically significant way. (See Docket No. 99-3 at 33.) Although the price of CoreCivic's stock did fluctuate at the time, CoreCivic has produced an economic analysis explaining that fluctuation in

terms of ordinary, overall market conditions and isolating any reaction to the OIG report to a small change of 0.12%, below the threshold of statistical significance. (*Id.* at 33–34.)

A week later, however, on August 18, 2016, Deputy Attorney General Sally Q. Yates issued a memorandum to the BOP entitled "Reducing our Use of Private Prisons" ("Yates Memorandum"). (Docket No. 99-2.) The Yates Memorandum stated that "[p]rivate prisons served an important role during a difficult period, but time has shown that they compare poorly to our own [BOP] facilities." (*Id.* at 2.) Private facilities, Yates wrote, "simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in [the OIG Report], they do not maintain the same level of safety and security." (*Id.*) Yates concluded that the BOP should "begin[] the process of reducing—and ultimately ending—our use of privately operated prisons." (*Id.* at 3.) Yates specifically directed that, "as each [private prison] contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population." (*Id.* at 3.) In the wake of the Yates Memorandum, CoreCivic's stock price dropped precipitously. (*See* Docket No. 122-2 at 25.)

The Yates Memorandum was eventually rescinded by a memorandum of Attorney General Jefferson B. Sessions III on February 21, 2017 ("Sessions Memorandum"). (Docket No. 62-3.) This putative class action, however, seeks to vindicate the shareholders whose shares' value was lost when the Yate Memorandum was first released. Amalgamated, which has been appointed lead plaintiff (Docket No. 52), has filed a Motion to Certify Class (Docket No. 91), seeking certification of a class defined as follows:

> All persons who purchased or otherwise acquired Corrections Corporation of America, Inc. ("CCA") [now "CoreCivic"] securities between February 27, 2012 and August 17, 2016, inclusive, and who were damaged thereby. Excluded from the Class are: (a) CCA, its parents, subsidiaries and any other entity owned or controlled by CCA; (b) Damon T. Hininger, Todd J. Mullenger, and Harley G.

Lappin; (c) all other executive officers and directors of CCA or any of its parents, subsidiaries or other entities owned or controlled by CCA; (d) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and steprelations of similar degree; and (e) all predecessors and successors in interest or assigns of any of the foregoing.

(Docket No. 92 at 1.) CoreCivic opposes the motion. (Docket No. 98.)

## II. LEGAL STANDARD

The principal purpose of class actions is to achieve efficiency and economy of litigation, both with respect to the parties and the courts. *Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 159 (1982). The Supreme Court has observed that, as an exception to the usual rule that litigation is conducted by and on behalf of individual named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). The Court directs that, before certifying a class, district courts must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 161. The Sixth Circuit has stated that district courts have broad discretion in deciding whether to certify a class, but that courts must exercise that discretion within the framework of Rule 23. *Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).

Although a court considering class certification should not inquire into the merits of the underlying claim, a class action may not be certified merely on the basis of its designation as such in the pleadings. *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974); *In re Am. Med. Sys.*, 75 F.3d at 1079. In evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings," as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Falcon*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079;

*Weathers v. Peters Realty Corp.*, 499 F.2d 1197, 1200 (6th Cir. 1974). Moreover, the party seeking class certification bears the burden of establishing that the requisites are met. *See Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976).

## III. ANALYSIS

### A. Class Action Requirements

A class action will be certified only if, after rigorous analysis, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and the action falls within one of the categories under Fed. R. Civ. P. 23(b). *Bridging Communities Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). A party seeking to maintain a class action must be prepared to show that Rule 23(a)'s numerosity, commonality, typicality and adequacy of representation requirements have been met. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). In addition, the party must satisfy, through evidentiary proof, at least one of Rule 23(b)'s provisions. *Id.* at 34. Amalgamated relies on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:
>
> > (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> >
> > (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> >
> > (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> >
> > (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). Although Amalgamated retains the initial burden of demonstrating compliance with the provisions of Rule 23(a) and Rule 23(b)(3), CoreCivic only specifically challenges its compliance in one respect: whether "questions of law or fact common to class members predominate over any questions affecting only individual members," in particular with regard to the issue of reliance. The court, accordingly, will first consider CoreCivic's objection and then, if necessary, move on to considering whether Amalgamated has carried its initial burden in all other respects.

**B. Rule 23(b)(3)—Reliance**

"Investors can recover damages in a private securities fraud action only if they prove that they relied on the defendant's misrepresentation in deciding to buy or sell a company's stock." *Halliburton Co. v. Erica P. John Fund, Inc.* ("*Halliburton II*"), 573 U.S. 258, 263 (2014). For example, in a conventional securities fraud case, an individual might show, via documentary or testimonial evidence, that he personally relied on a particular misrepresentation in making the decision to buy or sell at a specific price. *See Chelsea Assocs. v. Rapanos*, 527 F.2d 1266, 1271 (6th Cir. 1975) ("In the usual fraud case or case brought for misrepresentation in violation of Rule 10b-5, proof of reliance upon the misstated or false fact is required.") (citing *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 380 (2nd Cir. 1974), *cert. denied*, 421 U.S. 976 (1975)).

Although that approach may have been adequate for traditional, single-plaintiff securities fraud cases, proving individual reliance in such a manner for each member of a class that might number in the thousands would be impossibly complex. If reliance can be established categorically, however, then common issues of reliance can be resolved much more simply. The Supreme Court has recognized "two . . . circumstances" giving rise to a "rebuttable presumption of reliance," without the need for individual information about each plaintiff. *Stoneridge Inv.*

*Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 159 (2008). Amalgamated argues that it and its putative class members are entitled to both presumptions. CoreCivic responds that they are entitled to neither.

### 1. The *Basic* Presumption

 "[M]odern securities markets, literally involving millions of shares changing hands daily, differ from the face-to-face transactions contemplated by early fraud cases." *Basic Inc. v. Levinson*, 485 U.S. 224, 243–44 (1988). As the Supreme Court has explained:

> In face-to-face transactions, the inquiry into an investor's reliance upon information is into the subjective pricing of that information by that investor. With the presence of a market, the market is interposed between seller and buyer and, ideally, transmits information to the investor in the processed form of a market price. Thus the market is performing a substantial part of the valuation process performed by the investor in a face-to-face transaction. The market is acting as the unpaid agent of the investor, informing him that given all the information available to it, the value of the stock is worth the market price.

*Id.* at 244 (quoting *In re LTV Secs. Litig.*, 88 F.R.D. 134, 143 (N.D. Tex. 1980)). If, for example, an executive of a company makes a false statement affecting the market price of the company's stock, and a buyer purchases the stock at that market price, the buyer has, as a practical matter, relied on the executive's false statement in deciding what price to pay for his shares—even if the buyer was personally unaware of the statement. This theory—known as the "fraud-on-the-market" theory of reliance—acknowledges that a modern investor acting on an open and efficient securities exchange is relying on the market itself to be his eyes and ears with regard to publicly available information. *Id.*

The Supreme Court has held that, pursuant to the fraud-on-the-market theory, there is a rebuttable presumption of reliance with regard to material statements made about a company whose stock is traded on an "efficient market"—in other words, a market that, through plentiful and relatively unencumbered transaction opportunities, is able to assimilate all material public

information into a share's price. *Id.* at 253; *see Halliburton II*, 573 U.S. at 270–72 (discussing efficiency of capital markets). That fraud-on-the-market presumption of reliance is sometimes referred to as the "*Basic* presumption," after *Basic Inc. v. Levinson. See In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. Sept. 18, 2017) ("The *Basic* fraud-on-the-market presumption is based on the 'premise that market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices.'") (quoting *Halliburton II*, 573 U.S. at 272)).

"[T]o invoke the *Basic* presumption, a plaintiff must prove that: (1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277–78 (citing *Basic*, 485 U.S., at 248 n.27). Once a plaintiff makes an initial showing that it is entitled to the *Basic* presumption, however, "a defendant may rebut it with 'evidence that the asserted misrepresentation (or its correction) did not affect the market price of the defendant's stock.'" *BancorpSouth*, 2017 WL 4125647, at *1 (quoting *Halliburton II*, 573 U.S. at 279–80). The issue of whether a misstatement or correction actually affected a stock's price is referred to as "price impact." *Id.* "In the absence of price impact, *Basic*'s fraud-on-the-market theory and presumption of reliance collapse," because the "fundamental premise" of the fraud-on-the-market theory—that the alleged fraud was reflected in the price of the security—has been refuted. *Id.* at 278 (quoting *Erica P. John Fund, Inc. v. Halliburton Co.* ("*Halliburton I*"), 563 U.S. 804, 813 (2011)).

On its face, the *Basic* presumption goes to the merits of a claim, not the appropriateness of class certification. *See In re Whirlpool Corp. Front-Loading Washer Prod. Liab. Litig.*, 722 F.3d 838, 851 (6th Cir. 2013) ("[D]istrict courts . . . consider at the class certification stage only

those matters relevant to deciding if the prerequisites of Rule 23 are satisfied."). In practice, however, the *Basic* presumption is often relevant to a court's consideration of whether a putative class can satisfy Fed. R. Civ. P. 23(b)(3)'s requirement that questions of law or fact common to class members predominate. The fraud-on-the-market theory greatly simplifies the reliance inquiry in a securities fraud case by providing a factual and legal basis for reliance that can be applied easily to all investors. "[W]ithout the benefit of the *Basic* presumption," however, "investors would have to prove reliance on an individual basis, meaning that individual issues would predominate over common ones." *Halliburton II*, 573 U.S. at 265–66.

A plaintiff seeking to rely on the *Basic* presumption in support of class certification is not required to demonstrate that he will satisfy all of its prerequisites on the merits. Specifically, the Supreme Court has held that a party seeking class certification in a fraud-on-the-market case is not required to provide proof of materiality of the relevant statements in order to satisfy Rule 23. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013). The plaintiff must, however, establish, at least, "that the alleged misrepresentations were publicly known . . . , that the stock traded in an efficient market, and that the relevant transaction took place 'between the time the misrepresentations were made and the time the truth was revealed.'" *Halliburton I*, 563 U.S. at 811 (quoting *Basic*, 485 U.S. at 248 n.27). The Supreme Court has also held that, once an initial showing is made by the plaintiff, a defendant is entitled, at the class certification stage, to offer price impact evidence in order to rebut the *Basic* presumption. *Halliburton II*, 573 U.S. at 283–84.

Amalgamated has provided a lengthy Report on Market Efficiency by Professor Steven P. Feinstein, examining various historical events and conditions to establish that CoreCivic's stock traded on an efficient market during the relevant time period. (Docket No. 93-3.) In response, CoreCivic has conceded that its stock traded on an efficient market. (Docket No. 98 at

5.) CoreCivic also does not dispute that the relevant statements were public and that they occurred during the relevant time period. Accordingly, Amalgamated is entitled, as an initial matter, to a rebuttable presumption of reliance under *Basic*, and the burden of production shifts to CoreCivic to rebut that presumption. *See* Fed. R. Evid. 301 ("In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally.").

Instead, CoreCivic contends that it can defeat the *Basic* presumption with evidence showing a lack of price impact from the defendants' allegedly false or misleading statements. In particular, CoreCivic has produced its own lengthy Report, by economist Lucy P. Allen, evaluating the price impact, or lack thereof, of various events, including CoreCivic's alleged misrepresentation, the publication of the OIG Report, and the publication of the Yates Memorandum. (Docket No. 99-3.) With regard to CoreCivic's alleged misrepresentations, Allen found no evidence that any of the misrepresentations caused a statistically significant increase in the value of CoreCivic's stock. (*Id.* at 12–14.) This lack of price impact from the individual misstatements, CoreCivic argues, demonstrates that those statements were not affirmatively inflating the shares' market price.

As CoreCivic concedes, however, sometimes a false statement contributes to an inflated market price, not by causing an immediate, artificial increase in the stock's value, but by perpetuating an incorrect valuation or even mitigating a negative revaluation. For example, if a company has missed its revenue target by 30%, and its executives falsely claim it missed its target by 20%, the price of the company's stock may still go down—but that lower price would likely still reflect overvaluation due to fraud. Similarly, if a pharmaceutical company announces that it has discovered a drug that will effectively treat a major disease, then the company's value

will likely go up; if the company later comes to realize that its drug does not have the benefits it had claimed, but its executives continue to assert, falsely, that the drug is efficacious, the price may not go up again, since news of the drug has already been processed by the market. Nevertheless, the executives would still have engaged in fraud to preserve the earlier increase in value.

That latter example represents what is known as the "price maintenance" theory of price impact. *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656–57 (S.D. Ohio 2017) ("[T]he price maintenance theory [is] the theory that a misrepresentation can have a price impact not only by raising a stock's price but also by maintaining a stock's already artificially inflated price . . . ."). In a price maintenance case, price impact may be established, not via "evidence that a stock's price rose in a statistically significant manner after a misrepresentation," but with evidence that "it declined in a statistically significant manner after a corrective disclosure." *Id.* at 657. If the corrective disclosure clues the market in to the truth that the defendants had been falsely denying or concealing, and the value of the stock declines in response, it is evidence that the falsehood had, indeed, been improperly maintaining the higher price. *Id.*

CoreCivic suggests that, insofar as the company and its executives had fostered a false impression of the quality and value of its services, the OIG Report would have been a corrective disclosure—and that disclosure resulted in no price impact. According to Allen,

> there was no statistically significant reaction in CoreCivic's stock price on August 11, 2016 following the release of the OIG Report. In other words, CoreCivic's stock price reaction on August 11, 2016, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, cannot be distinguished from zero.

(Docket No. 99-3 at 33.) In contrast, Allen concedes that the Yates Memorandum triggered a precipitous reevaluation of CoreCivic by the market. Not only did the price of the stock drop, but analysts began treating CoreCivic's business as more precarious in their valuations of the

company. This perception, Allen notes, appears to have largely been dispelled by the results of the 2016 presidential election and the advent of a new administration perceived to be more favorable to contract prisons. (*Id.* at 47–51.)

Amalgamated argues that the decline in CoreCivic's value following the Yates Memorandum proves its case, because it was the Yates Memorandum, not the OIG Report, that finally revealed the truth sufficiently for the market to respond. As Amalgamated points out, sometimes a corrective disclosure—or the equivalent thereof—comes in the form of the real-world realization of the risk that a company's executives concealed or denied. For example, in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation*, 830 F.3d 376 (2016), the plaintiff alleged that the defendant had concealed the extent of its risk of foreseeable losses in the event of a substantial downturn in the housing market, particularly as related to subprime mortgages. *Id.* at 381–82. When those risks materialized (and the public became aware of the company's losses), the stock price fell—even though there had not yet been a corrective disclosure by the company admitting to its false statements. *Id.* at 388. The district court dismissed the plaintiff's securities fraud claim on the ground that, because there was no "corrective revelation," the plaintiff could not establish loss causation with regard to the allegedly concealed risk. *Ohio Pub. Employees Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, No. 4:08CV160, 2014 WL 5516374, at *10 (N.D. Ohio Oct. 31, 2014). The Sixth Circuit reversed, concluding that a plaintiff can rely on materialization of risk in the same manner as it would have relied on a corrective disclosure. *Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 385.

The "materialization of risk" theory of demonstrating loss causation flows from the common sense assumption that concealed risks are sometimes revealed by events, not admissions. For example, if a company makes a fortune selling what it claims to be unbreakable widgets, its value will go down if it admits that the widgets are, in fact, breakable—but its value

will also go down if it keeps silent but the widgets *just start breaking* and the public finds out about it. In either hypothetical, the value of the company has decreased because the public has learned the same truth. In either hypothetical, an unsuspecting shareholder would have been harmed by the same lie. To claim that only the hypothetical involving an admission represents an instance of loss causation by fraud would make little sense. The same reasoning applies in the price impact context. What matters is demonstrating a negative price impact from the public's learning the truth, not necessarily *how* the public learned the truth.

Of course, when the truth is revealed by a risk's coming to fruition, rather than merely by the disclosure of the risk itself, it may be difficult to separate the damage to a company's value done by the *revelation* from the damage done by the *event*. After all, even when the public is fully apprised of the possibility of some calamitous event, the value of an affected company should still be expected to go down if the event actually occurs, because, at that point, the relevant harm went from being a possibility to a certainty. Accordingly, when an event constitutes both a harm in and of itself and the revelation of a concealed truth, the value of the company may suffer from both. As long as some part of the price impact can be attributed to the revelation, however, it is corroborative of a fraud on the market.

The determination of whether the Yates Memorandum is an appropriate subject of price impact analysis is best separated into two questions: first, whether, as a categorical matter, the Memorandum could serve the purpose of corrective disclosure, assuming the alleged fraud continued until the Memorandum's release; and, second, if the intervening publication of the OIG Report rendered any revelation from the Memorandum superfluous. With regard to the first question, CoreCivic argues that Amalgamated cannot rely on price impact related to the Yates Memorandum because the Yates Memorandum did not reveal anything about the subjects of the defendants' alleged false statements, namely, the quality and value of CoreCivic's services.

CoreCivic argues that the Yates Memorandum instead merely revealed a "political decision" to move away from relying on private prisons. (Docket No. 98 at 18.) That argument, though, hinges on the mistaken assumption that the "politics" of the federal government's private prison use are somehow separable from issues such as whether CoreCivic's prisons were safe for inmates, whether inmates were receiving adequate medical care, whether BOP considered its money to be well spent, and whether CoreCivic was able to meet the BOP's basic quality expectations. Nothing in the record, however, supports this vision of politics as an external force unrelated to the BOP's quality concerns. Indeed, the Yates Memorandum's own account of the DOJ's decision placed those concerns front and center.

In her Report, Allen cites market analysts who characterized the BOP's proposed shift away from private prisons as "political," which CoreCivic suggests is evidence that the decision embodied by the Yates Memorandum was unrelated to quality or value of services. (Docket No. 99-3 at 47–48.) A decision's being, in some sense, "political," however, is not mutually exclusive with its being related to the quality concerns that Amalgamated has raised. To the contrary, the record suggests that, insofar as the Yates Memorandum can be said to reflect a political decision, that political decision was driven by precisely the deficiencies that Amalgamated has highlighted. When a company chooses, like CoreCivic has, to enter into a line of business that requires it to rely on government customers, then there is no neatly separating its client relationships from the underlying politics. Perhaps the Yates Memorandum did reflect a political decision—the political decision to not keep using such low-quality services.

CoreCivic, however, is correct that the presence of the OIG Report complicates the issue of price impact considerably. An event can only serve the role of a corrective disclosure if it "reveal[s] some [previously]-undisclosed fact with regard to the specific misrepresentations alleged." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (citing *In re*

*Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 40–41 (2d Cir. 2009)). There is no basis for treating the materialization of a risk as the equivalent of a corrective disclosure if the materialization occurred only *after* the truth had already been revealed. If the market learns the truth about an underlying risk to a company prior to the risk's materializing, then materialization has no concealed truth to reveal. The value of the company's shares still might go down—but that reduction in value would be due to the damage done by the materialized risk itself, not the market's having been in the dark about the risk's existence or severity.

Amalgamated argues that it is improper to consider whether the OIG Report prevented the Yates Memorandum from serving as a corrective disclosure, because "a 'truth on the market' defense cannot be used to rebut the presumption of reliance at the class-certification stage." *Washtenaw Cty. Employees' Ret. Sys. v. Walgreen Co.*, No. 15-CV-3187, 2018 WL 1535156, at *4 (N.D. Ill. Mar. 29, 2018) (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 256 F.R.D. 586, 595 (N.D. Ill. 2009); *In re Bridgepoint Educ., Inc. Sec. Litig.*, No. 12-cv-1737 JM (JLB), 2015 WL 224631, at *7 (S.D. Cal. Jan. 15, 2015); *In re Virtus Investment Partners, Inc. Sec. Litig.*, No. 15 CV 1249, 2017 WL 2062985, at *5 (S.D.N.Y. May 15, 2017)). CoreCivic's argument, though, is not being offered as a substantive defense on the merits. Rather, CoreCivic's argument regarding the OIG Report is merely an ancillary component of its price impact analysis, and the Supreme Court has held, definitively, that a price impact analysis can be used to rebut the *Basic* presumption at the Rule 23 stage. *Halliburton II*, 573 U.S. at 283–84. It is difficult to imagine how one could perform a price impact analysis in a price maintenance case *without* considering the threshold issue of whether the relevant event or disclosure was, in fact, corrective of the alleged fraud. Because CoreCivic's argument is a component of an issue that the Supreme Court has held that it has a right to raise at this juncture, the court's consideration of the issue is proper.

The OIG Report was voluminous and detailed, and, while its tone was measured, it does not appear to have pulled punches with regard to its discussion of the deficiencies of private prison contractors such as CoreCivic. (Docket No. 99-1.) In its conclusion, the OIG Report not only detailed the contractors' failings, but specifically raised the possibility that the BOP might take some action in response:

> In a majority of the categories we examined, we found that contract prisons incurred more safety and security incidents per capita than comparable BOP institutions . . . . Our analysis of data on safety and security indicators found that contract prisons had more incidents per capita than BOP institutions in three quarters of the categories we examined. While the contract prisons had fewer positive inmate drug tests and sexual misconduct allegations than BOP institutions, they had more frequent incidents of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances. . . . [I]n order to ensure that federal inmates are housed in safe and secure facilities, the BOP should evaluate why contract prisons had more safety and security incidents in these categories and identify possible approaches for corrective action.

(*Id.* at 44.) The Report discussed specific deficiencies at CoreCivic's Eden Detention Center, which was one of the facilities closely examined in the OIG's review. (*Id.* at 28–29.) It included detailed statistics about various undesirable events at CoreCivic facilities, such as inmate-on-inmate assaults, suicide attempts, grievances, and lockdowns. (*Id.* at 60–63.) The Report also made specific reference to private prisons' issues with inadequate staffing, one of the deficiencies central to CoreCivic's alleged quality control issues in this case. (*Id.* at 33 & n.62, 36, 45, 48). The Report, moreover, "caution[ed] against drawing the conclusion . . . that contract prisons are necessarily lower cost than BOP institutions on an overall basis." (*Id.* at 11.) In short, an investor who read the Report on the day of its publication, August 11, 2016, would have been well-apprised of the fact that there was evidence of significant quality issues with the BOP's contract prisons, including, specifically, CoreCivic's. CoreCivic's stock price, however, did not go down—with one obvious potential explanation being that investors simply were not surprised

by the information and did not consider the OIG Report to do anything other than confirm their prior assumptions about the quality of CoreCivic facilities.

Professor Feinstein authored a Rebuttal Report in which he attempts to dispute CoreCivic's premise that the lack of a stock-price reaction to the OIG Report precludes a price impact analysis based on the Yates Memorandum. (Docket No. 120-1.) Specifically, Professor Feinstein cites the existence of Appendix 9 of the OIG's Report, which included letters in response from the private prison contractors covered by the Report, including CoreCivic. (*Id.* at 17–18.) Professor Feinstein suggests that

> [t]he explanation for the non-significant price reaction on 11 August 2016 is not that there was no price impact from the disclosures in the OIG Report. The more reasonable explanation is that the price impact was offset by the positive countervailing impact of the response letters appended to the end of the OIG Report.

(*Id.* at 23.) Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations. Moreover, even if Professor Feinstein's theory did explain the lack of an immediate dip in price following the OIG Report, it would not solve the larger problem—that the OIG Report's release precluded the Yates Memorandum from serving as the equivalent of a corrective disclosure. Prior to the release of the Yates Memorandum, the truth, as alleged by Amalgamated, was this: 1) CoreCivic and other private prison operators had a history of major quality deficiencies, and the extent of the cost savings they offered was questionable. 2) There was ample reason for the DOJ to reconsider its relationship with private prison contractors, but CoreCivic defended its practices and hoped to continue doing business with the BOP. That is exactly the picture one receives when one reads the OIG Report, including Appendix 9. There was no concealed truth, then, left for the Yates Memorandum to disclose. All that the Memorandum revealed was the ensuing policy decision.

Finally, Amalgamated argues that, even if it cannot rely on the Yates Memorandum to demonstrate price impact, it can rely on a 6.4% decline in CoreCivic's stock on August 4, 2016, shortly after news came out that BOP was canceling its contract with CoreCivic regarding one significant facility, the Cibola County Correctional Center in New Mexico. The reasoning behind using that closure would, in essence, simply be a scaled-down version of relying on the Yates Memorandum; while ending the Cibola contract did not reveal the full extent of CoreCivic's quality deficiencies, it did, Amalgamated argues, amount to a partial realization of the allegedly concealed risk, and, therefore, can be treated as the equivalent of a corrective disclosure. Amalgamated, however, has not produced any evidence to suggest that the public would have understood the Cibola cancellation as revealing or partially revealing the truth about CoreCivic's operations. Absent some evidence of revelatory effect, the price downturn in the wake of the Cibola cancellation seems significantly more likely to represent merely the reaction to CoreCivic's loss of a large, important contract, not the reaction to some deeper truth being revealed.

In his Rebuttal Report, Professor Feinstein emphasizes that the difficulty of demonstrating price impact in this case is not necessarily evidence that none occurred. Undoubtedly, he is correct—"the absence of evidence is not the same as evidence of absence." *Gass v. Marriott Hotel Servs., Inc.*, 558 F.3d 419, 436 (6th Cir. 2009) (Boggs, J., dissenting). Nevertheless, the Supreme Court has left little doubt that the court must consider evidence of a lack of price impact as a basis for overcoming the *Basic* presumption at the class certification stage. *Halliburton II*, 573 U.S. at 283–84. While CoreCivic's evidence is not an ironclad demonstration, beyond a reasonable doubt, that CoreCivic's allegedly false or misleading statements and omissions had no price impact, the evidence is enough for CoreCivic to prevail with regard to whether the court can rely on the *Basic* presumption to simplify and universalize

the issue of reliance. Amalgamated, therefore, can only satisfy Rule 23(b)(3) if it identifies some other ground for bypassing the need to demonstrate reliance on an individual basis.

### 2. The *Affiliated Ute* Presumption

Amalgamated argues next that, even if it cannot establish that it is entitled to the *Basic* presumption, it can rely on a presumption of reliance pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972). Under *Affiliated Ute*, if the plaintiff's claim "involv[es] primarily a failure to disclose," then "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in the making of this decision." *Id.* at 153–54 (citations omitted). Amalgamated argues that its case is primarily about CoreCivic's failure to disclose the many deficiencies that led to the erosion of its relationship with the BOP and that, because the case is primarily about disclosure, *Affiliated Ute* applies.

Although *Basic* and *Affiliated Ute* present the "two . . . circumstances" giving rise to a "rebuttable presumption of reliance" in securities fraud cases, *Stoneridge*, 552 U.S. at 159, the rationales for the two presumptions differ substantially. The *Basic* presumption, as the court has discussed, is based on the application by courts of a particular economic principle—namely, the efficient market hypothesis—to the factual question of reliance in the context of modern securities markets. *See Halliburton II*, 573 U.S. at 270–72. The *Affiliated Ute* presumption, in contrast, is not based on some abstract theory of economics, but rather on the practical and conceptual challenges associated with establishing that a plaintiff relied on an omission. *See Vervaecke v. Chiles, Heider & Co.*, 578 F.2d 713, 717 (8th Cir. 1978) ("[R]eliance has little rational role in cases of nondisclosure, largely because of the difficulty of proving reliance on the negative.") (citation and internal quotation marks omitted); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 469 (S.D.N.Y. 2013) ("Because the . . . allegations

involve primarily a failure to disclose that presents a situation where reliance as a practical matter is impossible to prove, reliance may be presumed under the *Affiliated Ute* doctrine.") (citation and internal quotation marks omitted). After all, what does it mean to "rely" on one's *lack* of knowledge about something?

Before applying *Affiliated Ute*, however, a court must make the threshold determination of whether the plaintiff's case involves "primarily a failure to disclose" or whether, in the alternative, the case is primarily about the defendant's affirmative statements. 406 U.S. at 153. Unfortunately, the distinction between misleading statements and misleading nondisclosures is not always crystal clear, because, in the securities fraud context, it is often what one says that determines what one has an obligation to disclose. Under federal securities law, "[s]ilence, absent a duty to disclose, is not misleading." *In re Ford Motor Co. Sec. Litig., Class Action*, 381 F.3d 563, 569 (6th Cir. 2004) (quoting *Basic*, 485 U.S. at 239 n.17). That duty to disclose may come from an affirmative rule requiring a company to divulge certain information at a specific juncture—such as, for example, the rules requiring inclusion of particular information in SEC-mandated reports. *See Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 101 (2d Cir. 2015) (discussing 17 C.F.R. § 229.303(a)(3)(ii)). Federal securities law also recognizes, however, that a party may assume additional disclosure obligations by its statements or actions. In particular, when a company or executive chooses to make public statements on a topic material to a securities transaction, that party "assume[s] a duty to speak fully and truthfully on [the] subject[]" at hand. *In re Ford*, 381 F.3d at 569 (quoting *Helwig v. Vencor*, Inc., 251 F.3d 540, 561 (6th Cir. 2001)) (alteration in original). Once that duty arises, a party may commit fraud by remaining silent regarding a fact that it otherwise would have had no duty to reveal. In such a case, the misleading statement and the misleading omission are little more than the same lie seen

from different angles; the statement misled because of what was omitted, and the omission misled because of what was said.

There is, therefore, a tension between the test for determining whether a defendant had a disclosure obligation and the test for whether to apply *Affiliated Ute*. The disclosure case law looks at statements and omissions together, as complementary parts of a single truth or falsehood. After all, "every misrepresentation involves an omission of the true information," and a plaintiff may, "[t]hrough word games, . . . style his or her complaint as a material misrepresentations [case] *or* [an] omissions case" without any change in the substance. *Simpson v. Specialty Retail Concepts*, 823 F. Supp. 353, 356 n.7 (M.D.N.C. 1993) (emphasis added). *Affiliated Ute*, however, requires the court to pick one or the other—to decide whether a case is "primarily" about statements or about omissions—even if a case may, in a sense, be wholly about both.[1]

The only way out of this seeming conundrum, as far as the court can tell, is to construe the scope of *Affiliated Ute* narrowly, or, at least, narrowly enough to avoid creating an exception that swallows the rule. *See Johnston v. HBO Film Mgmt., Inc.*, 265 F.3d 178, 193 (3d Cir. 2001) ("This claim should not be transformed into an omission simply because the defendants failed to disclose that the allegedly misleading fact was untrue. Under an approach of that nature nearly

---

[1] One possible solution to this problem, as some courts have acknowledged, might be to apply the *Affiliated Ute* presumption only to the omissions in a case and afford no presumption to affirmative statements. *See Burges v. Bancorpsouth, Inc.*, No. 3:14-CV-1564, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (Crenshaw, C.J.) ("Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the *Affiliated Ute* presumption as to the element of reliance with regard to alleged omissions." (citing *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 270 (S.D.N.Y. 2014)), *leave to appeal denied sub nom. In re BancorpSouth, Inc.*, No. 17-0508, 2017 WL 4125647 (6th Cir. Sept. 18, 2017). Such an approach would be of no use here, for two reasons. First, the statements and omissions in this case are so closely related that it would make little sense conceptually, and perhaps even less sense practically, to separate them for reliance purposes. Second, an *Affiliated Ute* presumption for only a portion of Amalgamated's case would not solve its Rule 23(b)(3) problem, because it would not resolve the outstanding individual issues related to showing reliance for each plaintiff with regard to the numerous allegedly false or misleading statements made by the defendants.

any misrepresentation could become an omission, which . . . would allow the presumption to swallow the reliance requirement almost completely."); *Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) ("Any fraudulent scheme requires some degree of concealment, both of the truth and of the scheme itself. We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely."), *abrogated on other grounds*, *Cal. Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, 137 S. Ct. 2042, 2054 (2017); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 682 (S.D. Tex. 2006) ("*Ute* . . . does not require the burden of persuasion to shift in cases where the plaintiffs allege . . . that the defendant has . . . distorted the truth by making true, but misleading, incomplete statements."); *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05 CIV. 1898 (SAS), 2006 WL 2161887, at *5 (S.D.N.Y. Aug. 1, 2006) ("Where positive statements are central to the alleged fraud, thereby eliminating the evidentiary problems inherent in proving reliance on an omission, the *Affiliated Ute* presumption does not apply."); *Siemer v. Assocs. First Capital Corp.*, No. CV97-281TUCJMRJCC, 2001 WL 35948712, at *22 (D. Ariz. Mar. 30, 2001) (describing *Affiliated Ute* as providing a "narrow exception" to the ordinary need to prove reliance); *Kotlisky v. Omaha Investments, Inc.*, No. 90 C 3525, 1992 WL 237360, at *4 (N.D. Ill. Sept. 17, 1992) ("Th[e] very narrow rationale [for applying *Affiliated Ute*] does not extend to cover situations . . . where representations were actually made but were incomplete in some material fashion.").

A review of Amalgamated's claims confirms that, while this case is capable of being characterized in reference to omissions, the core of Amalgamated's allegations is, fundamentally, what CoreCivic said, not what it failed to say. Amalgamated's Complaint is replete with allegations of specific false or misleading statements. (Docket No. 57 ¶¶ 121, 125, 128, 131, 134,

22

138, 141.) This case, as pled and as it has been construed by the court and the parties prior to this juncture, is primarily about the false impression that CoreCivic, through its affirmative statements, gave to shareholders and potential shareholders about the quality and value of its services relative to BOP expectations. Admittedly, CoreCivic could have inoculated itself by disclosing more accurate information about the many deficiencies that the BOP found at CoreCivic facilities throughout their relationship. Some version of that premise, however, is true about every affirmative falsehood—every lie can be corrected by the truth. In such cases, however, it is still the initial misstatement that forms the primary basis for the fraud.

Considering Amalgamated's allegations in light of the rationale underlying *Affiliated Ute* confirms that this case does not present the kind of situation that *Affiliated Ute* was intended to address. Courts have justified *Affiliated Ute* based on the supposed difficulty of demonstrating reliance on a defendant's silence. CoreCivic, though, was not silent on the issues of the quality and value of its services, and the question of proving reliance on what it did convey is relatively straightforward. Indeed, the parties' dueling experts have demonstrated that the question of reliance, in this case, is fully amenable to empirical investigation.

The court admits that it has struggled to apply the Supreme Court's "primarily involving" test to the complex realities of real-world communication. A listener does not hear statements with one ear and omissions with the other; statements and omissions, together, form a speaker's message, whether it is a truthful or misleading one. Determining what a plaintiff's allegations "primarily" involve, therefore, is an inescapably artificial exercise, at least in a case like this one. Faced with such an uncertain and unsatisfying rubric, the court must simply try to construe the *Affiliated Ute* rule's scope in the manner most consistent with what the Supreme Court envisioned. A version of *Affiliated Ute* that reached this case would be so broad that it would threaten the viability of reliance as an element of securities fraud altogether. So broad an

23

exception would not be consistent with the limited purpose of the rule recognized by the Supreme Court. The court, accordingly, will not allow Amalgamated to rely on *Affiliated Ute* to establish that common issues of reliance predominate.

### 3. Conclusion

Because Amalgamated is unable to rely on either the *Basic* presumption or the *Affiliated Ute* presumption, any members of its putative class would have to establish reliance on an individual basis. As such, common issues of fact or law do not predominate over individual issues of fact or law, as required by Rule 23(b)(3). Because Amalgamated has not set forth any other basis for certification of the class under Rule 23(b), it is unnecessary to consider whether it has satisfied the requirements of Rule 23(a). Class certification would not be permitted, even if every requirement of Rule 23(a) were met.

The court stresses that this ruling is not, in any way, based on a determination that CoreCivic and its executives were forthright in their statements about the quality of their facilities. Nor should the court's ruling be read to rule out the possibility that members of the public, including shareholders, may have been misled by the defendants and harmed as a result. Rather, CoreCivic has merely shown that, based on the Supreme Court's current case law regarding reliance in securities fraud cases, the situation at issue here is one for which reliance must be shown individually, rather than collectively. Amalgamated, accordingly, has not demonstrated that it is entitled to proceed on behalf of the other investors, whose cases for reliance might be different from its own.

## IV. CONCLUSION

For the foregoing reasons, Amalgamated's Motion to Certify Class (Docket No. 91) will be denied. CoreCivic's Motion for Evidentiary Hearing (Docket No. 136) will be denied as moot.

An appropriate order will enter.

ENTER this 18th day of January 2019.

ALETA A. TRAUGER
United States District Judge