# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, ) ) | Civil Action No. 3:16-cv-02267 |
| )<br>Plaintiff, ) | Honorable Aleta A. Trauger |
| )<br>vs. ) ) | DEFENDANTS' OPPOSITION TO LEAD PLAINTIFF'S MOTION FOR RECONSIDERATION OF THE JANUARY |
| CORRECTIONS CORPORATION OF AMERICA, et al., ) ) ) | 18, 2019 ORDER DENYING CLASS CERTIFICATION |
| )<br>Defendants. ) | |
| _____ ) | |

# TABLE OF CONTENTS

I.      INTRODUCTION .................................................................................................1

II.     STANDARD OF REVIEW .................................................................................3

III.    ARGUMENT ........................................................................................................4

        A.      There Is No Legal Basis To Reconsider The Court's Denial of Class
                Certification ..............................................................................................5

                1.      The OIG Report Fully Revealed All "Concealed" Risks............................6

                2.      The OIG Report Revealed Everything In The Yates Memorandum
                        And More ..........................................................................................9

                3.      Internal Emails Have Nothing To Do With The Market's
                        Understanding Of, Or Reaction To, The OIG Report...............................10

        B.      There Is No Reason To Reconsider The Court's Finding That The Cibola
                Non-Renewal Did Not Demonstrate Price Impact.................................12

        C.      The Court's Application Of Law Was Correct .......................................14

        D.      Shortening The Class Period Does Not Cure The Fatal Flaws In Plaintiff's
                Analysis, And Only Creates More Problems.........................................17

IV.     CONCLUSION...................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Amgen v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013)..................................................................................................15

*Andren v. Alere, Inc.*,
  2018 U.S. Dist. LEXIS 69045 (S.D. Cal. April 24, 2018).......................................4

*Barnes v. United States*,
  68 Fed. Cl. 492 (2005) .............................................................................................4

*Basic v. Levinson*,
  485 U.S. 224 (1988)................................................................................................12

*Berti v. VideoLan Techs.*,
  1998 U.S. Dist. LEXIS 18066 (W.D. Ky. June 10, 1998)......................................13

*Block v. Meharry Med. Coll.*,
  2017 U.S. Dist. LEXIS 58289 (M.D. Tenn. Apr. 14, 2017)...................................12

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)..................................................................................................17

*Dorger v. Allstate Ins. Co.*,
  2009 WL 2136268 (E.D. Ky. July 16, 2009)............................................................4

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ...........................................................................11

*Erica P. John Fund, Inc. v Halliburton Co.*,
  563 U.S 804 (2011) (*Halliburton I*).......................................................................16

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) (*Halliburton II*)..................................................12, 15, 16

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
  818 F.3d 775 (8th Cir. 2016) ..................................................................................17

*Jaynes v. United States*,
  69 Fed. Cl. 450 (2006) .............................................................................................4

*Langan v. Johnson & Johnson Consumer Cos.*,
  897 F.3d 88 (2d Cir. 2018).......................................................................................18

*Miller v. Parker*,
  2018 U.S. Dist. LEXIS 197872 (M.D. Tenn. Nov. 20, 2018) ..................................6

*In re Omnicom Grp., Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010)..............................................................................5

*Rodriguez v. Tenn. Laborers Health & Welfare Fund*,
    89 Fed. Appx. 949 (6th Cir. 2004).................................................................4

*Whitlock v. FSL Mgmt.*,
    2013 U.S. Dist. LEXIS 148747 (W.D. Ky. Oct. 16, 2013) .............................4

## RULES

Fed. R. Civ. P. 23(d)(3).......................................................................................20

Fed. R. Evid. 301 ................................................................................................17

# I.    INTRODUCTION

After conducting the required "rigorous analysis" – including consideration of over 400 pages of briefing and expert reports – the Court concluded, in a thorough and well-reasoned 25-page order, that Defendants successfully rebutted the *Basic* presumption by demonstrating that none of the alleged misrepresentations impacted CoreCivic's stock price.  That decision – rooted in established Supreme Court precedent – was right.  Nothing in the Motion for Reconsideration changes the fact that none of the 33 alleged false statements caused a statistically significant stock price increase, and nothing in the Yates Memorandum revealed anything about CoreCivic's relative "quality" or "cost" that had not already been disclosed to the market (whether in the OIG Report or otherwise).  As a matter of law, the Motion should be denied.

Plaintiff contends that the OIG Report – one of two corrective disclosures alleged in the Complaint – does not show lack of price impact because it was not a "complete disclosure of the relevant truth."  Plaintiff argues it only assessed the safety of private facilities from 2011-2014, noted that the cited deficiencies were corrected, and was aimed at improving BOP oversight "on the assumption" that those contractual relationships would continue.  The cherry-picked statement in the OIG Report that Plaintiff now cites as support for the proposition that the deficiencies were remediated does not, in context, say that, and to ascribe such a meaning to it ignores the many other findings in the OIG Report, as detailed in the Court's Order.  Further, Plaintiff's suggestion that the OIG Report was based on an "assumption" of future contract renewals is wholly unsupported:  neither of the parties' experts and none of the fact witnesses provided opinions or testimony to support Plaintiff's baseless assertion.  Plaintiff does not and cannot cite any analyst commentary or other evidence for support of their speculation because there is none.

Plaintiff further contends that the OIG Report did not disclose that the alleged poor quality continued after the period under review, and that it did not disclose the non-renewal of CoreCivic's

contract for the Cibola facility. That argument ignores the fact that the OIG Report and the non-renewal of the Cibola contract were both disclosed before the Yates Memorandum, and there was no stock price reaction. Moreover, Plaintiff's argument (which could have been raised earlier in the case) ignores the chronology of Plaintiff's own allegations. The issues at Cibola, including the cure notice and the non-renewal of the contract, were publicly announced during the period between the completion of the OIG's investigation and the publication of the OIG Report. Again, as Lucy Allen's Report demonstrates, in each instance there was no stock price reaction. According to Plaintiff's own (evolving) legal theory—this was the "materialization of the concealed risk," *i.e.*, the fact that quality and cost issues would ultimately materialize and threaten CoreCivic's ongoing contractual relationship with the BOP. These publicly disclosed facts strongly support the Court's conclusion that "[t]here was no concealed truth … left for the Yates Memorandum to disclose." Order at 17.

Plaintiff's arguments concerning "contemporaneous emails and … internal documents" (all of which Plaintiff had earlier in the case) do not change the analysis. Most fundamentally, "contemporaneous emails" and "internal documents" offer nothing of relevance on the issue of price impact. As noted, concerns about non-renewal of the BOP facilities were public long before the OIG Report. The OIG Report detailed the underlying issues that gave rise to those concerns. The Yates Memorandum – which said nothing whatsoever about the non-renewal of the Cibola contract (or any CoreCivic "contemporaneous emails" or "internal documents") – cited only the OIG Report as support for its new directive. Simply stated, the Yates Memorandum did not reveal anything about CoreCivic's relative *quality* or *cost* that the public did not already know.

The Court did not misapply the law with respect to the parties' evidentiary burdens. Rather, the Court followed the guidance provided by the Supreme Court in *Halliburton II* (and its progeny) and concluded that Defendants rebutted the *Basic* presumption. Not only is the Court's reasoning

on this issue entirely consistent with Supreme Court jurisprudence, it is consistent with the plain language of the Federal Rules of Evidence. But even if Defendants bore the burden of persuasion in rebutting the presumption of reliance, that does not change the outcome. Defendants introduced overwhelming evidence demonstrating lack of price impact, and the arguments Plaintiff advances for the first time in the Motion are devoid of any expert opinion, analysis, or factual support.

Finally, tailoring the class period not only fails to cure the deficiencies in Plaintiff's class certification attempt, it creates more problems. The Court has held that Defendants demonstrated – through extensive expert testimony and analysis – that none of the purported misrepresentations impacted the price of CoreCivic stock. No amount of tailoring changes the fact that the alleged quality and cost issues about which Plaintiff complains were disclosed before the Yates Memorandum, with no stock price impact. Any decision to *sua sponte* tailor the class – after the parties submitted extensive legal briefing and expert analysis in which the parameters were never disputed – would be arbitrary, have *significant* ramifications, and unduly prejudice Defendants. Plaintiff has argued "price maintenance"—meaning that neither Plaintiff (nor its expert) has identified a specific false statement that initially (artificially) inflated the stock price such that it could or should commence a class period. Nor has either parties' expert performed an event study or other economic analyses of a modified class period to determine whether damages can be established on a class-wide basis, as required under the Federal Rules of Civil Procedure. In sum, Plaintiff defined the class period, vigorously defended it, and the Court got it right when it denied class certification.

## II.    STANDARD OF REVIEW

As a matter of established Sixth Circuit law, reconsideration is only justified "when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice." *Rodriguez v. Tenn. Laborers Health & Welfare Fund,*

89 Fed. Appx. 949, 959 (6th Cir. 2004); *Whitlock v. FSL Mgmt.*, 2013 U.S. Dist. LEXIS 148747, *5 (W.D. Ky. Oct. 16, 2013) (applying the traditional standard to motion for reconsideration brought under Rule 23(c)(1)(C)). To establish clear error, the movant "must not only establish that errors were made, but that these errors were so egregious that an appellate court could not affirm the judgment." *Dorger v. Allstate Ins. Co.*, 2009 WL 2136268, *2 (E.D. Ky. July 16, 2009). Importantly, "[m]otions for reconsideration are not intended to re-litigate issues previously considered by the Court or to present evidence that could have been raised earlier." *Whitlock*, 2013 U.S. Dist. LEXIS 148747 at *5. As set forth below, Plaintiff comes nowhere close to meeting these exacting standards.[1]

## III. ARGUMENT

The Order denying class certification carefully applied established legal precedent to indisputable market data. There has been no intervening change in controlling law. Plaintiff identified the class period, and both parties thereafter submitted extensive legal briefing and expert analysis on price impact (or lack thereof). Plaintiff's repackaged arguments and new speculation cannot change the fact that there was no price impact. Tailoring the class period is no answer. The alleged false and misleading statements were made years before (and years after) the alleged class period, and neither of the parties' experts has offered anything – no event study, regression analysis, or class-wide damages analysis – to support the maintenance of any class other than the

---

[1] Citing no Sixth Circuit authority, Plaintiff suggests that the aforementioned (controlling) standards do not apply; the two cases Plaintiff cites do not justify deviating from established precedent. *See* Mot. at 3. Neither involved a securities class action, and unlike this case, both involved movants who presented new authority (*see Jaynes v. United States*, 69 Fed. Cl. 450, 455-59 (2006) (discussing *Barnes v. United States*, 68 Fed. Cl. 492 (2005)), or "newly discovered facts not available at the time of class certification" (*Andren v. Alere, Inc.*, 2018 U.S. Dist. LEXIS 69045, *5-6 (S.D. Cal. April 24, 2018)). Even under those circumstances, which do not exist here, both courts denied reconsideration. *See Jaynes*, 69 Fed. Cl. at 462 (denying plaintiff's motion for reconsideration of court's order denying class certification); *Andren*, 2018 U.S. Dist. LEXIS 69045 at *15 (denying plaintiff's motion for reconsideration of court's order denying class certification).

one Plaintiff voluntarily alleged, and then vigorously defended, throughout the underlying class certification proceedings.

### A. There Is No Legal Basis To Reconsider The Court's Denial of Class Certification

As the Court correctly observed, "[a]n event can only serve the role of a corrective disclosure if it 'reveal[s] some [previously]-undisclosed fact with regard to the specific misrepresentations alleged,'" January 18, 2019 Order Denying Class Certification (Dkt. No. 143) ("Order") at 14 (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)), and "[t]here is no basis for treating the materialization of the risk as the equivalent of a corrective disclosure if the materialization occurred only after the truth had already been revealed." Order at 15.[2] From there, the Court analyzed whether the OIG Report prevented the Yates Memorandum from being "corrective," because the OIG Report disclosed the very risks purportedly concealed by the alleged misrepresentations regarding CoreCivic's relative "quality" and "cost-effectiveness." As the Court noted, the OIG Report discussed (among other things) specific deficiencies at CoreCivic's facilities, it made specific reference to issues concerning inadequate staffing (one of the core "quality" issues alleged in this case), specifically raised the prospect that the BOP might take corrective action, and cautioned against drawing any conclusion that contract prisons cost less. *See* Order at 16. The Court concluded that "the picture one receives when one reads the OIG Report" is that "[t]here was ample reason for the DOJ to reconsider its relationship with private prison contractors," and hence "[t]here was no concealed truth … left for the Yates Memorandum to disclose." *Id*. at 17.

Nothing in the Motion justifies reconsideration of that analysis, which, as noted, was supported by hundreds of pages of legal briefing and extensive expert testimony. Plaintiff does

---

[2] The Court's citation to *Omnicom* was not misplaced because it simply defined a corrective disclosure. *See* Plaintiff's Motion for Reconsideration (Dkt. No. 150) ("Mot.") at 17 n. 14.

not and cannot identify any "newly discovered" evidence, any evidence that was properly presented but the Court "overlooked," or any intervening change in law. Instead, Plaintiff improperly asserts (again) that the OIG Report was not fully corrective based upon arguments Plaintiff made (and lost), or new and inconsistent arguments that Plaintiff could have made earlier.[3] *See Miller v. Parker,* 2018 U.S. Dist. LEXIS 197872, *4 (M.D. Tenn. Nov. 20, 2018) (denying motion to reconsider brought under the guise of "new circumstances" because plaintiff's "motion to reconsider simply reargues issues that the Court already considered in ruling on the Plaintiff's original motion").

### 1. The OIG Report Fully Revealed All "Concealed" Risks

Plaintiff claims that the OIG Report "was not fully corrective of the alleged fraud" because it "only assessed the safety and security of private prisons between FY 2011-2014, noted that any violations described therein had been corrected, and was directed solely at improving BOP oversight of private prisons on the assumption that existing contractual relationships would continue." Mot. at 1. This argument fails at every level.

Putting aside the fact that this argument, like many others in the Motion, could have been raised earlier, it represents a fundamental shift of position from everything Plaintiff previously has argued, and its expert has opined upon. As the Court is aware, Plaintiff argued that "[t]he market did not immediately and fully understand the implications of the OIG Review's observations – masked as they were in denials by CCA[.]" Reply at 17. In fact, Feinstein opined that "[g]iven the total mix of information on that day, *i.e.*, the findings of the OIG Report and the response letters from the private prison operators disputing those findings, a non-statistically significant

---

[3] *Compare* Reply in Support of Class Certification at 17 (Dkt. No. 121) (the "Reply") (arguing that the lack of stock drop after the release of the OIG Report does not prove a lack of price impact) *with* Mot. at 4 (arguing that the OIG Report was not corrective and "[i]t was not until the Yates Memo was released that … investors learned of the risks those conditions presented to CCA's ability to continue operating private prisons under BOP contracts").

price reaction is consistent with market efficiency and price impact." Feinstein Rebuttal Report (Dkt. No. 120) ("Feinstein Rebut.") ¶ 54. In other words, just a few weeks ago, Plaintiff and its expert claimed the OIG Report was corrective, but offset by three letters submitted by private contractors. To that point, the Court opined "Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations." Order at 17. Now, Plaintiff has argued itself into a corner: either the OIG Report was corrective and offset by three letters buried in the appendix of an otherwise scathing review (*see* Reply at 17), or the OIG Report was of no concern to the Company because it was outdated, the issues were resolved, and the market's "assumption" was that CoreCivic's contracts would be renewed (*see* Mot. at 1-2). The Court already rejected Plaintiff's first argument, and there is zero support – not in the expert reports or analyst commentary (for which there is none) – for the second proposition.

Plaintiff's assertion that the OIG Report – one of two *corrective* disclosures alleged in this case – somehow reassured the market that the cited deficiencies had been remedied such that existing contracts would be renewed is baseless.[4] Mot. at 5 (citing Pl.'s Ex. A at ii). The OIG Report recommended that the BOP take numerous corrective and investigative actions—*i.e.,* remedial measures that would have been wholly unnecessary if, as Plaintiff suggests, the deficiencies already had been remedied. *See* OIG Report at 44 ("[I]n order to ensure that federal

---

[4] Plaintiff argues that the OIG Report did not reveal the full risks faced by CoreCivic because the scope of the OIG Report did not analyze inmate deaths, the clinical adequacy of medical care, or certain staffing deficiencies. Mot. at 5. This argument is legally irrelevant and factually wrong. Contrary to Plaintiff's representation, the OIG did review medical care and made recommendations to "ensure inmates receive basic medical care." OIG Report at 32-33 (finding "none of the seven health services checklist observation steps … examined whether the contractors were providing basic medical care to the inmates" and identifying severe deficiencies during a visit to one contract prison); *see also id.* at 45 (recommending the BOP "verify … that inmates receive basic medical services"). Further, as the Court noted, the OIG Report made repeated references to inadequate staffing. Order at 16 (citing OIG Report at 33, & n. 62, 36, 45, 48).

inmates are housed in safe and secure facilities, the BOP should evaluate why contract prisons had more safety and security incidents in these categories and **identify possible approaches for corrective action**.") (emphasis added); *see also* Order at 16 (noting the OIG Report "specifically raised the possibility that the BOP might take some action in response").[5]

The fact that the OIG Report's recommendations were directed at the BOP's oversight does not change the analysis. As the Court noted, it was "powerfully negative" and contained findings bearing directly on Plaintiff's allegations regarding CoreCivic's purported misstatements regarding quality and relative cost. Order at 17; *see e.g.* OIG Report at i (noting it "assessed whether contractor performance meets certain inmate safety and security requirements and analyzed how contract prisons and similar BOP institutions compare with regard to inmate safety and security data"). Again, there was no statistically significant stock price reaction to the OIG Report, and there was zero analyst commentary.

Plaintiff's argument that the market interpreted the OIG Report as conveying information that was stale, or that the cited deficiencies were remediated, is pulled from thin air. Nothing in the lengthy reports submitted by Plaintiff's expert, and nothing in his deposition testimony, supports such a theory. The alleged false or misleading statements in this case regarding CoreCivic's relative quality and cost were consistent (if not verbatim) throughout the four-year class period. As the Court recognized, the OIG Report directly addressed the issues underlying these representations. Order at 17 (finding the alleged "truth" was "exactly the picture one receives when one reads the OIG Report"). There is no reason to believe – in the absence of public data,

---

[5] The passage Plaintiff cites for support (that the facilities the OIG visited had "corrected the safety and security deficiencies that the BOP had identified") was limited to specific citations the BOP issued to three facilities (only one of which was a CoreCivic facility). *See* OIG Report at ii (noting the remaining need to "ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons"). As the Court noted, the OIG Report went on to conclude that "contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." Order at 16.

8

analyst reports or expert testimony – that an efficient market would interpret the OIG's findings as correcting only some portion of these alleged false or misleading statements. Indeed, that finding would not only disregard the Court's earlier ruling on class certification, it would flatly contradict Feinstein's definition of an efficient market. *See* Feinstein Report (Dkt. 93-3) ("Feinstein Rpt.") ¶¶ 30-36 ("economists do not generally disagree about whether market prices respond to new material information.") (emphasis in original); *see also* Order at 16 ("an investor who read the Report on the day of its publication, August 11, 2016, would have been well-apprised of the fact that there was evidence of significant quality issues with the BOP's contract prisons").

### 2. The OIG Report Revealed Everything In The Yates Memorandum And More

Plaintiff claims that the OIG Report was not fully corrective because it "did not disclose that the poor quality … continued to the present" or that the BOP cancelled CoreCivic's contract to operate the Cibola facility due to ongoing quality and performance problems. Mot. at 1. This argument misses the mark. As the Court correctly observed, the OIG Report revealed significant issues concerning CoreCivic's relative quality and costs – the very issues Plaintiff claims persisted throughout the class period (including the period between the end of the OIG's review and the publication of its Report). *See* Order at 16 (noting, among other things, that the OIG Report "discussed specific deficiencies at Eden," "detailed statistics about various undesirable events at CoreCivic facilities, such as inmate-on-inmate assaults, suicide attempts, grievances, and lockdowns" and "made specific reference to private prisons' issues with inadequate staffing").

As the Court is aware, the OIG Report was published one week before the Yates Memorandum. There is nothing in the Yates Memorandum that was not contained in even more detail in the OIG Report. Indeed, the Yates Memorandum cites only the OIG Report as support for the factual underpinnings of the policy shift away from the BOP's continued use of private correctional facilities. Plaintiff's (revisited) argument that the Yates Memorandum identified for

the first time new "factors besides the OIG Report as justifying the DOJ's decision to reduce or end reliance on private prisons" – *i.e.*, that "private prisons 'do not provide the same level of correctional services, programs, and resources'" – is demonstrably wrong. Mot. at 7. There is substantial public information, pre-dating the Yates Memorandum (much of which is cited in the Complaint), to refute Plaintiff's proposition. That explains why the market did not react to the OIG Report, why not a single analyst covered it, but why the investment community reacted to the later policy shift (and its potential investment implications) announced in the Yates Memorandum. Declaration of Milton S. McGee, III in Support of Defendants' Opposition to Plaintiff's Motion for Reconsideration ("McGee Decl."), Ex. 1 ("Warehoused and Forgotten," ACLU, 2014, cited by the Expert Report of Lucy Allen (Dkt. No. 99-3) ("Allen Rpt.") ¶ 63, n. 74); Ex. 2 ("Federal Officials Ignored Years of Internal Warnings About Deaths at Private Prisons," The Nation, 2016). Simply put, the Yates Memorandum did not offer anything to the investing public about CoreCivic's relative "quality" or "costs" that had not been revealed earlier to no price impact. *See* Order at 17 ("There was no concealed truth, then, left for the Yates Memorandum to disclose.").[6]

### 3. Internal Emails Have Nothing To Do With The Market's Understanding Of, Or Reaction To, The OIG Report

Finally, in a merits-based argument that adds nothing to the price impact analysis (*i.e.,* what the investing market knew and how it reacted to alleged misstatements and corrective disclosures), Plaintiff points to a handful of cherry-picked internal emails about ongoing operational challenges at certain CoreCivic facilities. *See* Mot. at 7-11. Plaintiff asserts that these

---

[6] Plaintiff's argument that the Yates Memorandum represented a materialization of the risk that CoreCivic's contract with Cibola would not be renewed is wholly unsupported. At the time the Yates Memorandum was issued, the (efficient) market already was aware that the contract had not been renewed. Allen Rpt. ¶¶ 62-65. In fact, the market did not react to *any* disclosure or event bearing on CoreCivic's representations of cost or quality—including reports of a riot at the Adams facility in 2012, the cure notice issued to Cibola in 2015, or articles generally impugning CoreCivic's operations in 2015. *See* Allen Rpt. ¶¶ 63-65.

emails "demonstrate[] that the OIG Report did not disclose [CoreCivic]'s ongoing problems or its fractured relationship with the BOP." Mot. at 7.[7]

Plaintiff's argument is irrelevant as a matter of law, and incorrect as a matter of fact. By definition, "internal" emails do not and cannot factor into the price impact analysis. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 261 (N.D. Tex. 2015) (noting that "publicity" is a prerequisite to a showing of price impact). There is no evidence these internal emails (most of which remain under seal) were ever made public, such that they ever could have price impact. Moreover, there is zero evidence that any of these emails were a factor in the short-lived policy shift reflected in the Yates Memorandum. Indeed, the Yates Memorandum – which again, cited the OIG Report as the sole basis for its observations about the relative quality and costs associated with private contractors – did not (and could not) cite a single one of the internal communications Plaintiff cites in the Motion. Regardless of how CoreCivic and its employees viewed the OIG Report, or other operational issues (including those discussed in the OIG Report), does not change the analysis: there was no statistically significant stock price increase following any of the alleged misrepresentations, and the Yates Memorandum did not disclose anything related to CoreCivic's relative "quality" or "cost" that was not revealed in the OIG Report (or other media outlets even earlier in Plaintiff's defined class period).

In the end, the critical question is whether the OIG Report disclosed information that allowed investors to evaluate the risk allegedly concealed by those alleged misrepresentations (such that the link between the misrepresentations and the stock price is severed). *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) (*Halliburton II*) ("Any showing that

_____

[7] Notably, every single one of these documents were produced well before Plaintiff's Reply and accompanying 66-page supplemental expert report was filed on October 26, 2018. *See* McGee Decl. ¶ 4; Exhibits to Declaration of Willow E. Radcliffe in Support of Plaintiff's Motion for Reconsideration (Dkt. No. 151) ("Pl.'s Ex.").

severs the link between the alleged misrepresentation and ... the price received (or paid) by the plaintiff ... will be sufficient to rebut the presumption of reliance" because "the basis for finding that the fraud had been transmitted through market price would be gone.") (quoting *Basic v. Levinson*, 485 U.S. 224, 248 (1988)). The Court found it did, and that ruling was right. Order at 16 ("[A]n investor who read the Report ... would have been well-apprised of the fact that there was evidence of significant quality issues with the BOP's contract prisons."). There was no error at all, much less "clear" error "apparent to the point of being indisputable" in the Court's decision that the alleged truth was "exactly the picture one received when one reads the OIG Report, including Appendix 9." Order at 17; *see also Block v. Meharry Med. Coll.*, 2017 U.S. Dist. LEXIS 58289, *2 (M.D. Tenn. Apr. 14, 2017) (denying motion for reconsideration and explaining that "manifest injustice is an error in the trial court that is direct, obvious, and observable").[8]

### B.    There Is No Reason To Reconsider The Court's Finding That The Cibola Non-Renewal Did Not Demonstrate Price Impact

Plaintiff's rehashed argument that the market's purported reaction to the BOP's non-renewal of CoreCivic's contract at Cibola fares no better than it did the first time. As an initial matter, it is worth noting that the August 4 stock drop to which Plaintiff cites was never alleged as a corrective disclosure. Consolidated Complaint (Dkt. No. 57) ¶ 130. To the contrary, Plaintiff alleged (and its expert opined) that the August 4 disclosure was false and misleading such that it maintained the artificial inflation in CoreCivic's stock price. *See* Feinstein Rebut. ¶ 26. In any event, Plaintiff is wrong as the Court has already held. Mot. at 12 ("[T]he price downturn in the

---

[8] Plaintiff's arguments about internal communications may have bearing on, if anything, the underlying merits of its claim—but, as Plaintiff concedes, it is not appropriate to resolve merits-based arguments at class certification. *Cf.* Mot. at 16. To that point, the Court correctly recognized that a decision on price impact is not a determination about the merits of the fraud claim, but rather whether Plaintiff is entitled to invoke the *Basic* presumption of reliance. Order at 24 ("This ruling, is not, in any way, based on a determination that CoreCivic and its executives were forthright in their statements about the quality of their facilities.").

wake of the Cibola cancellation seems significantly more likely to represent merely the reaction to CoreCivic's loss of a large, important contract, not the reaction to some deeper truth being revealed.").

It is beyond any dispute that CoreCivic's stock did not move in any statistically significant manner following the announcement of the Cibola non-renewal (which was publicly announced three days before the August 4 stock drop that Plaintiff claims shows price impact).[9] As the Court correctly held, on a voluminous and well-developed record, CoreCivic's stock price decline on August 4 "seems significantly more likely to represent merely the reaction to CoreCivic's loss of a large, important contract, not the reaction to some deeper truth being revealed." Order at 18.[10] Once again, Plaintiff offers nothing to "suggest that the public would have understood the Cibola cancellation as revealing or partially revealing the truth about CoreCivic's operations." Order at 18.[11] Rather than citing market data or analyst commentary (because there is none that supports

---

[9] Plaintiff's argues, without any factual or legal support, that a "tidbit in a local TV outlet" is not enough for public dissemination and cannot demonstrate lack of price impact. Mot. at 14 & n.13. First, this argument contradicts Plaintiff's own expert testimony on market efficiency. Feinstein Rpt. ¶ 30 ("An efficient market is one which rapidly reflects new information in price."). Second, the only case Plaintiff cites has nothing to do with price impact. *Berti v. VideoLan Techs.*, 1998 U.S. Dist. LEXIS 18066, at *21-22 (W.D. Ky. June 10, 1998) (denying motion to dismiss and refusing to shorten the class period, noting that whether a disclosure "was sufficient to counter the alleged misrepresentations … cannot be resolved on this motion"). But most importantly, Plaintiff's argument is factually incorrect. That "tidbit" was a report from the ABC affiliate located in Albuquerque, New Mexico – the state's largest city – and it was repeated in another published article on August 2, which cited a letter from a CoreCivic spokeswoman confirming the closure. *See* Supplemental Report of Lucy Allen (Dkt. No. 135-1) ("Allen Rebut.") ¶ 8. Moreover, the only analyst report that even mentioned the Cibola non-renewal observed that this news was announced prior to August 4. *Id.* at ¶ 9.

[10] Defendants' expert demonstrated that CoreCivic's price dropped on August 4 due to the potential renegotiation of a separate contract for a separate facility and the Company's biggest contract. Defendants' Sur-Reply in Opposition to Class Certification (Dkt. No. 124) at 13; Allen Rpt. at 54 n. 87; Allen Rebut. ¶ 11.

[11] Plaintiff's argument that the stock price did not react to the non-renewal until the disclosure of the impact to CoreCivic's earnings fails. There is no authority or any evidence to support Plaintiff's attempt to conflate an announced reduction in earnings with price impact of the alleged misrepresentations. The Court should reject this argument because there is no evidence of any "revelatory effect." Order at 18.

Plaintiff's argument), Plaintiff cites only internal (confidential) communications. At the same time, Plaintiff ignores the indisputable fact that the BOP simultaneously (and publicly) discontinued contracts with several other private correction services contractors. Pl.'s Ex. FF. When CoreCivic executives learned that the BOP would not renew its contract with Cibola, they naturally speculated about the possible reasons for the decision, but none of these internal discussions is relevant to price impact. *Id.*

C. **The Court's Application Of Law Was Correct**

Having failed to introduce any factual support or expert testimony warranting reconsideration of the Order, Plaintiff accuses the Court of misapplying the law by contravening Supreme Court precedent and purportedly misallocating the burden between the parties. Mot. at 15-19. But the Court carefully followed established precedent, and even under Plaintiff's flawed interpretation of the law, the result is the same because Defendants conclusively established no price impact.

Plaintiff attempts to revisit the question of whether the Court can assess the corrective nature of a disclosure as part of the price impact analysis, arguing that "[w]hether the relevant truth had previously entered the market, and whether the disclosures at issue are causally connected to the alleged fraud are questions of materiality and loss causation," and it was "manifest error" for the Court to decide these issues under the guise of "price impact." Mot. at 14-15. But the Court made no such decision. Instead, the Court correctly followed the Supreme Court's guidance in its seminal decision on the issue, *Halliburton II*, and it appropriately and explicitly limited its consideration of Defendants' evidence to the price impact analysis, and nothing more. Order at 15-18.

Plaintiff argues (again) that "the Supreme Court [has] rejected the notion that a defendant can assert a 'truth-on-the-market' defense to rebut the . . . presumption of reliance." *Compare*

Mot. at 15 (citing *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466-47 (2013)) *with* Reply at 17-18. But that argument, too, misses the mark. As this Court correctly observed, Defendants' price impact evidence was not offered as a defense on the merits of materiality (as *Amgen* prohibits). Order at 15. Rather, as the Court accurately explained, Defendants' argument regarding the OIG Report was "merely an ancillary component of its price impact analysis, and the Supreme Court has held, definitively, that a price impact analysis can be used to rebut the Basic presumption at the Rule 23 stage." *Id.*; *see also Halliburton II*, 134 S. Ct. at 2417. Indeed, Plaintiff's (mis)interpretation of *Amgen* would eviscerate the Supreme Court's subsequent holding in *Halliburton II* that "defendants must be afforded an opportunity before class certification to defeat the presumption [of reliance] through evidence that an alleged misrepresentation did not actually affect the market price of the stock." *Halliburton II*, 134 S. Ct. at 2417 (distinguishing *Amgen* and explaining that price impact differs from materiality in a "crucial respect," because the "common issue of materiality can be left to the merits stage without risking the certification of classes in which individual issues will end up overwhelming common ones," unlike the issue of price impact).

Plaintiff reaches further and argues that *Halliburton I* (*Halliburton II*'s predecessor) prohibited the Court's consideration of whether the Yates Memorandum was "corrective." *Compare* Mot. at 16; *with* Reply at 5 (arguing that whether there was a connection between the misrepresentations and price decline "is a common question of loss causation that the Supreme Court has repeatedly held ***cannot*** be answered at class certification") (citing *Erica P. John Fund, Inc. v Halliburton Co.*, 563 U.S 804, 807-08 (2011) ("*Halliburton I*"). But that is not what *Halliburton I* held, and it is not what this Court did here. In *Halliburton I*, the Supreme Court simply prohibited an analysis, at the class certification stage, of whether a "subsequent loss may have been caused by factors other than the revelation of a misrepresentation." *Halliburton I*, 563

15

U.S. at 813. To be clear, the fact that the same evidence might be relevant to the merits on the issue of loss causation does not mean the Court erred in considering it to determine lack of price impact. The Supreme Court unequivocally held in *Halliburton II* that indirect proof of price impact must be considered before certifying a class "even though such proof is also highly relevant at the merits stage." 134 S. Ct. at 2415 (noting that ignoring "direct evidence" of no price impact "makes no sense, and can readily lead to bizarre results," like certification of a class "even though the [*Basic*] theory does not apply"). CoreCivic's argument is (and always was) rooted in price impact. As a matter of Supreme Court jurisprudence, CoreCivic had the right to present it to the Court at this procedural posture, and the Court was correct in considering it. Order at 15.

Plaintiff's argument about the relative burdens between the parties is incorrect, unsupported, but ultimately irrelevant. *Compare* Mot. at 17-18 *with* Reply at 9. As a preliminary matter, in previously rejecting this argument, the Court correctly followed the plain language of Federal Rule of Evidence 301: "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption. But this rule does not shift the burden of persuasion, which remains on the party who had it originally." Order at 10. Rule 301 governs presumptions "unless a federal statute or these rules provide otherwise." Fed. R. Evid. 301. There is no statute or controlling law displacing this rule. *See* Defendants' Opposition to Class Certification (Dkt. No. 98) at 12 n.5. But even if the burden remained on Defendants, they more than satisfied it. Mot. at 19. There was no statistically significant stock price increase following any of the alleged false or misleading statements, and there was no stock price impact following the release of the OIG Report or the disclosure of the non-renewal of CoreCivic's contract. *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (finding lack of price movement "overwhelming evidence" of no price impact). As Defendants' expert opined, and as the Court has found, the Yates Memorandum was not corrective in light of the OIG Report.

*See* Allen Rebut. ¶¶ 6-14. These facts are an indisputable matter of public record, and they powerfully demonstrate that the Order was right, regardless of where the burden ultimately lies.

### D. Shortening The Class Period Does Not Cure The Fatal Flaws In Plaintiff's Analysis, And Only Creates More Problems

During a telephonic conference on February 12, 2019, the Court requested that Defendants address whether the Court had discretion to tailor the class period. As discussed below, the Court does have that discretion, but using it here, on this record, would be an abuse of that discretion. Indeed, no amount of tailoring (on the front or back of the class period), would overcome the established fact that none of the purported misstatements impacted CoreCivic's stock price. Moreover, modifying the class period *sua sponte* at this point – in the absence of any econometric analysis or expert testimony – would create even more problems.

The Court has discretion to tailor the class or even certify a partial class, but the parameters of that class must be grounded in evidence, and not just speculation. *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (Rule 23 "does not set forth a mere pleading standard" but requires "evidentiary proof"); *Langan v. Johnson & Johnson Consumer Cos.*, 897 F.3d 88, 97 (2d Cir. 2018) (granting 23(f) review and vacating certification, noting "district courts must do more than take the plaintiff's word"). Here, on a developed record, there is no evidence to support tailoring the class period which, again, Plaintiff defined in its pleadings and then vigorously defended during class certification proceedings.

Plaintiff may argue that it would be appropriate for the Court to certify a class of investors who purchased sometime between February 25, 2015 (the date on which the first alleged misstatement was made following the 2011-2014 time period under review by the OIG) and August 18, 2016. But that argument fails out of the gates. First, Plaintiff's theory on class certification (on which it heavily relied on to overcome the lack of front-end price impact) is one of "price maintenance." *See* Reply at 14. None of the alleged false or misleading statements – not

at the beginning of the existing class, and none at any later point – led to a statistically significant stock price increase. *See* Allen Rpt. ¶ 4. In any event, the alleged misrepresentations regarding the relative quality and cost of CoreCivic's services were consistent throughout the alleged Class Period (and were made both long before the class period began and long after the two alleged corrective disclosures). Even if investors interpreted the OIG Report as being only corrective of the statements made between some limited window of time – a point for which there is zero market, analytical, factual or expert support – there would have been some observable price impact, if as Plaintiff says, those misrepresentations maintained an artificially inflated stock price. Allen Rpt. ¶¶ 96-99. In a case in which Plaintiff argues price maintenance, like this case, it makes no sense to ignore the fact that the market price did not react to the alleged correction of statements made between one period of time, and then assume (again, without evidentiary support) that the market price was impacted by alleged misrepresentations about the exact same subjects during a different period.

These facts strongly support what the Court already observed: one explanation for why CoreCivic's stock price did not fall following the OIG Report was that investors were not surprised. Order at 17. The Court's observation is buttressed by the record evidence that the very events that Plaintiff claim illustrate a deteriorating relationship with the BOP were known to the public prior to the OIG Report and the Yates Memorandum. Mot. at 8-10 (identifying issues at Adams, Eden and Cibola, including persistent staffing issues at Adams and persistent deficiencies at Cibola resulting in a cure notice). The consistent theme that flows through all of these issues, and indeed throughout the alleged class period, is when issues concerning CoreCivic's relative level of "quality" or "cost-effectiveness" were disclosed, there was no stock price impact. There was no statistically significant price movement for disclosures following the disturbance at the Adams facility (which was prominently featured in the Complaint), alleged deficiencies at Eden,

the cure notice issued as a result of purported medical deficiencies at Cibola, and the non-renewal of the Cibola contract. Allen Rpt. at ¶ 63 ("I found that a number of public reports and articles discussing the 'quality' and 'performance'-related 'deficiencies' at the CoreCivic facilities" and outlining those reports); *id.* at ¶¶ 64-65 (finding no price impact from any of the safety or quality related incidents). These events not only demonstrate a lack of price impact, they powerfully establish that no amount of parsing of the class period will cure that lack of price impact.[12]

Finally, reframing the class period *sua sponte* – after both parties have exchanged expert reports, taken the depositions of the experts and submitted extensive briefing – raises a number of other practical and legal issues that only confounds the problem. Plaintiff has alleged this as a "price maintenance" case, meaning Defendants' alleged false or misleading statements maintained an artificial inflation in CoreCivic's stock price. There is no factual evidence, or expert analysis, to show at which point in time Defendants' statements (which, again, were made long before the class period began and continued to be made long after the alleged corrective disclosures) became false, such that the stock price became artificially inflated. Moreover, because Plaintiff never advanced an alternative class period, neither of the parties' experts has prepared an event study and regression analysis to assess class certification for a modified period. In addition, the is no factual or expert analysis to determine whether – as required by Federal Rule of Civil Procedure 23(d)(3) – damages could be provable on a class wide basis. This was not a focus of the briefing on class certification simply because of the strength of the evidence demonstrating lack of price

---

[12] There is no evidentiary support for any suggestion that there was some (undefined) additional "concealed risk" revealed by the Yates Memorandum. The numerous "new" exhibits (none of which is "newly discovered") have nothing to do with price impact. To be clear, Defendants have strong merits-based arguments in response to all of the evidence Plaintiff now cites – including arguments about falsity, materiality, scienter and loss causation. But this is neither the time nor the place for these arguments. The evidence shows, overwhelmingly, that the alleged false or misleading statements did not have price impact. Nothing in Plaintiff's merits-based arguments alters that conclusion.

impact. But the experts certainly differed on that issue, even with respect to the current class period.[13] There is no telling whether damages can be proven on a class-wide basis under some modified period. In sum, no amount of tailoring will address the lack of price impact, and in fact, modifying the class period only creates more problems.

## IV. CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion for Reconsideration.

---

[13] Ms. Allen raised significant concerns in her report about Plaintiff's current "common methodology" for calculating class-wide damages. Allen Rpt. ¶¶ 96-99.

DATED: February 15, 2019           Respectfully submitted:

/s/ Steven A. Riley
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Faraz Mohammadi (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
faraz.mohammadi@lw.com

Morgan E. Whitworth (admitted *pro hac vice)*
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600
F: (415) 395-8095
morgan.whitworth@lw.com

*Attorneys for Defendants Corrections Corporation*
*of America, Damon T. Hininger, David M.*
*Garfinkle, Todd J. Mullenger, and Harley G.*
*Lappin*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars
Suite 100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

this 15th day of February, 2019.

/s/ Steven A. Riley
Steven A. Riley

23