# EXHIBIT 1



# WAREHOUSED AND FORGOTTEN
**Immigrants Trapped in Our Shadow Private Prison System**

**June 2014**




**Warehoused and Forgotten**:
Immigrants Trapped in Our Shadow Private Prison System

June 2014



**American Civil Liberties Union**
125 Broad Street
New York, NY 10004
www.aclu.org



**American Civil Liberties Union of Texas**
P.O. Box 8306
Houston, TX 77288
www.aclutx.org

Cover photo © Gwoeii

# TABLE OF CONTENTS

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

METHODOLOGY AND ACKNOWLEDGMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
**From ICE to BOP** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
**Mass Incarceration and the Private Prison Industry** . . . . . . . . . . . . . . . . . . . . . . 17
**Operation Streamline and the Criminalization of Immigration** . . . . . . . . . . . . . . . 20

FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
**Prisoners are subject to shocking mistreatment and abusive conditions** . . . . . . . . 26
Prison staff use extreme isolation arbitrarily and abusively . . . . . . . . . . . . . . . . 28
BOP policies encourage overcrowding and enforced idleness . . . . . . . . . . . . . . 36
Delayed and inadequate medical care causes needless suffering . . . . . . . . . . . 42
Excluding non-citizen prisoners from family contact policies punishes them
and their U.S.-based families alike . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

**CAR prisons operate in the shadows** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52
BOP fails to subject CAR prisons to adequate oversight and accountability . . . . 52
Isolation from attorneys, legal services, and advocacy organizations impedes
external reform efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56
BOP assists private prison companies' efforts to block transparency . . . . . . . . 58

**Conclusion** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

FACILITY–SPECIFIC FINDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
**Reeves County Detention Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 63
Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

**Eden Detention Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74
Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

**Willacy County Correctional Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83
Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

**Big Spring Correctional Center** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92
Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

**Giles W. Dalby Correctional Facility** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97
Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98
Findings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

# EXECUTIVE SUMMARY

**T**oday, the United States has just 5% of the world's population but nearly 25% of the world's prisoners. But it has not always been this way. Thanks to the "War on Drugs," irrationally harsh sentencing regimes, and a refusal to consider evidence-based alternatives, the U.S. prison population grew by more than 700% between 1970 and 2009—far outpacing both population growth and crime rates.[1]

In the past decade, the growing criminalization of immigration has further contributed to this mass incarceration crisis. According to the nonpartisan Migration Policy Institute, U.S. Customs and Border Protection (CBP) now refers more cases for federal criminal prosecution than the FBI.[2] Nationwide, more than half of all federal criminal prosecutions initiated in fiscal year 2013 were for unlawfully crossing the border into the United States—an act that has traditionally been treated as a civil offense resulting in deportation, rather than as a criminal act resulting in incarceration in a federal prison.[3] This is dramatically changing who enters the federal prison system.[4] The tipping point came in 2009, when more people entered federal prison for immigration offenses than for violent, weapons, and property offenses combined—and the number has continued to rise each year since.[5]

The criminalization of immigration also enriches the private prison industry. Once prosecuted, non-citizen federal prisoners are mostly segregated into thirteen "Criminal Alien Requirement" (CAR) prisons. The CAR prisons are unusual in three respects: they are some of the only



**U.S. PRISON POPULATION GREW BY MORE THAN 700% BETWEEN 1970 AND 2009**

---

1   THE SENTENCING PROJECT, THE EXPANDING FEDERAL PRISON POPULATION (Mar. 2011), *available at* http://www.sentencingproject.org/doc/publications/inc_FederalPrisonFactsheet_March2011.pdf.

2   DORIS MEISSNER ET AL., MIGRATION POLICY INSTITUTE, IMMIGRATION ENFORCEMENT IN THE UNITED STATES: THE RISE OF A FORMIDABLE MACHINERY 94 (Jan. 2013), *available at* http://www.migrationpolicy.org/pubs/enforcementpillars.pdf.

3   *Prosecutions for 2013*, SYRACUSE UNIVERSITY: TRANSACTIONAL RECORDS ACCESS CLEARINGHOUSE (TRAC*FED*), http://tracfed.syr.edu/ (membership required) (last visited Dec. 18, 2013).

4   *More Hispanics Go to Federal Prison*, USA TODAY, June 4, 2011, http://usatoday30.usatoday.com/news/nation/2011-06-04-immigration-hispanic-offenders-federal-prison_n.htm (reporting that immigration-related convictions are responsible for 87% of the increase in the number of Latinos in federal prison over the past decade).

5   Bureau of Justice Statistics, Federal Justice Statistics Program, http://bjs.ojp.usdoj.gov/fjsrc/ (last visited Feb. 3, 2014). *See also* ALISTAIR GRAHAM ROBERTSON ET AL., GRASSROOTS LEADERSHIP, OPERATION STREAMLINE: COSTS AND CONSEQUENCES 2 (Sept. 2012), *available at* http://grassrootsleadership.org/sites/default/files/uploads/GRL_Sept2012_Report-final.pdf.

federal prisons operated by for-profit companies instead of being run as federal institutions by the Bureau of Prisons (BOP); they house exclusively non-citizens; and they are low-custody institutions with lesser security requirements than the medium and maximum-security institutions run directly by BOP.

> ❝ A guard said to me: 'When I see you, I see $80 a day.'"
>
> — Marc, a prisoner at GEO Group's Big Spring Correctional Center

Five of the nation's thirteen CAR prisons are located in Texas. This report documents the ACLU's multi-year investigation into these five institutions. Until now, the CAR prisons have not attracted the attention they deserve. Our investigation uncovered evidence that the men held in these private prisons are subjected to shocking abuse and mistreatment, and discriminated against by BOP policies that impede family contact and exclude them from rehabilitative programs:

- Private prison contracts negotiated by BOP and BOP's not-yet-awarded solicitations for new private prisons provide incentives that keep facilities overcrowded and place excessive numbers of prisoners in isolated confinement. One current solicitation and each of the Texas CAR contracts reviewed for this report require the prisons to use 10% of their bed space as isolation cells—nearly



■ Private prison company MTC originally operated the Willacy "tent city" prison as an immigration detention facility for Immigration and Customs Enforcement (ICE). In 2011, after numerous reports of abuses, ICE removed all of its detainees from Willacy. But barely a month later, MTC announced its new contract with BOP to run Willacy as a CAR prison.

## Criminal Alien Requirement Prisons in Texas



**Big Spring, Texas**
3,485 Prisoners

**Post, Texas**
1,896 Prisoners

**Pecos, Texas**
3,636 Prisoners

**Eden, Texas**
1,550 Prisoners

**Raymondville, Texas**
2,981 Prisoners

■ Five of the nation's thirteen CAR prisons are located in Texas and are home to nearly 14,000 immigrant prisoners. Until now, these privately run federal prisons have not attracted the attention they deserve.

double the rate of isolated confinement in BOP-managed institutions. Prisoners have reportedly been sent to isolation cells because they complained about food, complained about medical care, or helped others draft grievances and file lawsuits. As one prisoner put it, "anything you do or say" can get a person locked up in conditions of extreme isolation, spending 22 to 24 hours per day confined in a small cell where he must eat, sleep, use the toilet, and sometimes even shower.

- Private prison guards at Giles W. Dalby Correctional Facility reportedly call prisoners names like "wetback" and "Mexican nigger" and send them into isolation cells for failing to "speak English in America."

- Immigrant prisoners in CAR prisons have far more limited access to programming, drug treatment, and work opportunities than U.S. citizen prisoners in BOP-operated institutions, even though many have deep ties to the United States. Sergio, a 26-year-old Honduran who came to the United States with his parents when he was eight years old and thinks of New York City as home, told us that he feels he is treated like an animal, locked up and not given anything to do to pass the time. "They don't have a job for us. They don't have any education.

They just don't have any space for all of us. Sometimes it makes me go crazy. I just want to do something," he said.

- Medical understaffing and extreme cost-cutting measures reportedly limit prisoners' access to both emergency and routine medical care. Martin, a 36-year-old Cuban immigrant, told us he woke up in the middle of a severe asthma attack one night and did not have access to his inhaler. There was no doctor on staff that night, so he waited nearly an hour to see a nurse who did not know how to properly intubate him.

- Prisoners reported severely overcrowded and squalid living conditions. At Willacy County Correctional Center, most "dormitories" are Kevlar tents that each house about 200 men in bunk beds that are reportedly spaced only a few feet apart. Dante, a 38-year-old Mexican immigrant convicted of reentry, said the tents are dirty and crawling with insects and that the toilets often overflow and always smell foul. "Sometimes I feel suffocated and trapped," he said. "A lot of people get very upset and angry. Sometimes they become so frustrated that they even speak of burning down the tents. But what's the point? They'd build them back up."

Problems are not limited to the CAR prisons in Texas. In 2011, the ACLU alerted BOP staff to concerns about medical care, abusive disciplinary practices, and other issues at the McRae CAR prison in Georgia.[6] And in 2012, as many as 300 prisoners at another CAR prison run by the Corrections Corporation of America (CCA) in Natchez, Mississippi, started a violent protest over what they described as inadequate food, poor medical care, and mistreatment by guards. The uprising resulted in the death of one guard and the injury of nearly 20 other people.[7]

Yet these private prisons operate in the shadows, effectively free from public scrutiny. By statute, most of their records are exempt from the open records laws that apply to other federal prisons. Meanwhile, as detailed in this report, BOP fails to subject its private prison contractors to adequate oversight and accountability, and it fights to avoid public disclosure of basic information about these prisons.

> These private prisons operate in the shadows, effectively free from public scrutiny.

---

6   Letter from Azadeh Shahshahani, Director, National Security/Immigrants' Rights Project, ACLU of Georgia, to Richard A. Cohen, Chief, Capacity and Site Selection Branch, Federal Bureau of Prisons (Aug. 8, 2011) (on file with ACLU of Texas).

7   Holbrook Mohr, *Sheriff: Gang Started Prison Riot in Mississippi*, Associated Press, May 21, 2012, http://bigstory.ap.org/content/sheriff-gang-started-prison-riot-mississippi-0; Judith Greene & Alexis Mazon, Justice Strategies, Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary [Sept. 2012], *available at* http://www.justicestrategies.net/sites/default/files/publications/Privately%20 Operated%20Federal%20Prisons%20for%20Immigrants%209-13-12%20FNL.pdf.



■ Empty parking spots reserved for BOP monitors were a common sight at the CAR prisons we visited. Despite the private prison industry's record of abuse, neglect, and misconduct, BOP fails to subject the CAR prisons to adequate oversight and accountability.

In a recent speech to the American Bar Association, U.S. Attorney General Eric Holder emphasized that "we need to ensure that incarceration is used to punish, deter, and rehabilitate—not merely to warehouse and forget."[8] Yet as this report illustrates, we are doing exactly that to more than 25,000 non-citizen prisoners in for-profit CAR prisons. This practice cannot be justified on grounds of safety, fairness, or cost effectiveness.

To address the many problems with the use of CAR prisons, the ACLU calls on the U.S. government to take the following actions, described in detail in the "Recommendations" section:

**To the Bureau of Prisons, U.S. Department of Justice (DOJ):**

- Harmonize policies and procedures in BOP and private prisons;

- Stop using Special Housing Unit (SHU) quotas and private prison occupancy quotas, which incentivize unnecessary use of both isolated confinement and private prisons generally;

---

8    Eric Holder, U.S. Attorney General, U.S. Department of Justice, Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), *available at* http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 9 of 105 PageID #: 4264

- Ensure that private prisons are inspected regularly, with findings publicly posted, for compliance with all BOP policies and procedures;

- Strengthen oversight for existing private prisons;

- Strengthen accountability for existing private prisons;

- Reject contract bids from private companies with records of mismanagement, abuse, or substandard care;

- Improve communication opportunities at private prisons to support family and community ties;

- End discrimination against prisoners on the basis of citizenship;

- Ensure transparency of private prison operations;

- Stop spending taxpayer money to shield basic information about private prisons from public disclosure as "trade secrets"; and

- Stop expanding the use of private, for-profit contractors.

**To the Office of the Inspector General, U.S. Department of Justice:**

- Conduct a detailed investigation of the private prisons included in this report.

**To the U.S. Departments of Homeland Security (DHS) and Justice:**

- Return immigration enforcement to civil immigration authorities, through specified measures.

**To Congress:**

- Close the Freedom of Information Act (FOIA) loophole for private prisons and other contract detention facilities;

- Stop funding additional private low-security BOP beds;

- Request a report from the Government Accountability Office (GAO) on existing private prisons; and

- Pass legislation to address the problems created by the U.S. Supreme Court's decisions in *Minneci v. Pollard* and *Correctional Services Corp. v. Malesko*.

# RECOMMENDATIONS

## To the Bureau of Prisons, U.S. Department of Justice:

**Harmonize policies and procedures in BOP and private prisons.** Modify all contracts and solicitations to require that private prisons comply with all current and future BOP policies, procedures, program statements, and technical reference manuals, including but not limited to those regarding:

- Use of Special Housing Units (SHU), particularly subsequent to intake;

- Provision of adequate space, staffing, and services for each prisoner;

- Clear and uniform grievance procedures, including a meaningful opportunity for redress above the facility level;

- Access to legal resources, including confidential contact attorney visits in areas free from auditory supervision of prison officers or staff; and

- All aspects of medical and mental health care.

**Stop using SHU quotas and private prison occupancy quotas, which incentivize unnecessary use of both SHU and private prisons generally.** Remove SHU quotas (identified in contracts as "minimum capacity" for the SHU, and sometimes set at 10% of the total contracted prison beds) and occupancy quotas (identified in contracts as "minimum occupancy guarantees," and sometimes set at 90% of the total contracted prison beds) from all private prison contracts and solicitations.

**Ensure that private prisons are inspected regularly, with findings publicly posted, for compliance with all BOP policies and procedures.** Require regular training of all contract staff in BOP policies and procedures.[9]

**Strengthen oversight for existing private prisons.** Enhance the role of BOP's on-

---

9    This recommendation is not an endorsement of current BOP policies on certain issues, including isolated confinement and the grievance process, that are problematic and require reform. *See, e.g.,* U.S. Gov't Accountability Office, GAO-13-429, Bureau of Prisons: Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing (May 2013), *available at* http://www.gao.gov/products/GAO-13-429; *Oversight of the Bureau of Prisons & Cost-Effective Strategies for Reducing Recidivism: Hearing Before the S. Judiciary Comm.,* 113th Cong. (2013) (written statement of the ACLU), *available at* https://www.aclu.org/sites/default/files/assets/aclu_testimony_senate_bop_oversight_hearing-final.pdf; *Reassessing Solitary Confinement II: The Human Rights, Fiscal, and Public Safety Consequences: Hearing Before S. Judiciary Subcomm. on the Constitution, Civil Rights, and Human Rights,* 113th Cong. (2014) (written statement of the ACLU), *available at* https://www.aclu.org/sites/default/files/assets/aclu_testimony_for_solitary_ii_hearing-final.pdf. However, those reforms are beyond the scope of this report.

site personnel at private prisons and orient oversight toward humane and effective correctional management in addition to technical contract compliance. Require BOP staff to review all grievances and incident reports and to routinely inspect private prisons via unannounced visits. Continue conducting semi-annual audits. Incorporate interviews with prisoners and non-supervisory staff into inspections and audits. Collect data from private prisons comparable to what BOP collects for its own facilities regarding (1) facility characteristics, practices, and population and (2) safety, security, and other quality-of-service issues, to enable BOP to compare quality of service with BOP-run facilities.[10]

**Strengthen accountability for existing private prisons.** Issue meaningful financial penalties for substandard performance, and terminate contracts at facilities that have repeat deficiencies. Decline to exercise option periods or renew contracts at facilities that have demonstrated substandard performance.

**Reject contract bids from private companies with records of mismanagement, abuse, or substandard care.** To identify such records, conduct thorough independent investigations into the past performance of all potential contractors and significant subcontractors, including past performance of contracts with other federal, state, or local agencies.

**Improve communication opportunities at private prisons to support family and community ties.** Set telephone rates at levels that comply with recent FCC guidance[11] and are no higher than the standard per-minute flat rate used throughout the BOP system. Provide email access to all prisoners in private prisons through CORRLinks. Stop excluding non-citizens from BOP's general practice of placing prisoners within 500 miles of their homes and allow them to request transfer to prisons closer to their families upon satisfying the same good behavior requirements as other prisoners. Give respectful consideration to the placement recommendations of sentencing judges.

---

10   In 2007, GAO concluded that it was unable to conduct a methodologically sound cost comparison of BOP and private facilities in part because deficiencies in BOP data collection rendered GAO unable to conduct a quality-of-service comparison. GAO cited particular examples of useful data that BOP collected for its own facilities but not for private facilities (such as the number of prisoners attended to by health care professionals due to misconduct, staff turnover rates, and the experience level of the staff) and recommended that BOP develop a cost-effective way to collect such quality-of-service data from private facilities. However, according to GAO's report, BOP disagreed with this recommendation on the grounds that collecting such data could increase the costs of its private prison contracts. U.S. Gov't Accountability Office, GAO-08-6, Cost of Prisons: Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities (Oct. 2007), *available at* http://www.gao.gov/products/GAO-08-6.

11   *See* Rates for Interstate Inmate Calling Services, Report and Order and Further Notice of Proposed Rulemaking, WC Docket No. 12-375, FCC 13-113 (rel. Sept. 26, 2013). *See also* Federal Bureau of Prisons, Long Distance Phone Rates Reduced (Feb. 12, 2014), http://www.bop.gov/resources/news/20140212_reduced_phone_rate.jsp (last visited Feb. 28, 2014) (announcing reduced local, long distance, and international phone rates at BOP facilities in response to FCC guidance).

**End discrimination against prisoners on the basis of citizenship.** Provide non-citizens in both BOP-managed facilities and private prisons with opportunities for work, education, programming, and early release commensurate with those provided to other prisoners. Make custody decisions without regard to citizenship by rescinding the Deportable Alien Public Safety Factor (a BOP classification designation that makes non-citizens presumptively ineligible for minimum-security and community corrections placements[12]) and any similar policies of exclusion.

**Ensure transparency of private prison operations.** Develop policies that provide non-governmental organizations and the media access to facilities. These policies should be modeled after the directive issued by U.S. Immigration and Customs Enforcement (ICE), "Stakeholder Procedures for Requesting a Detention Facility Tour and/or Visitation," and ICE's Performance-Based National Detention Standard (2011) 7.2 "Interviews and Tours."[13] Publish online all policies in use at each private prison—including admission and orientation handbooks and facility supplements regarding visitation, legal activities, and communication. Make all inspection reports, deficiency notices, and audits publicly available.

**Stop spending taxpayer money to shield basic information about private prisons from public disclosure as "trade secrets."** When responding to requests for documents under the Freedom of Information Act (FOIA), do not withhold contracts, operating procedures, operating records, monitoring documents, or other similar documents related to private facilities under FOIA Exemption 4, the provision intended to protect trade secrets disclosed to government agencies. In the rare circumstances where an exception may be appropriate, the use of Exemption 4 should be supported by an individualized, detailed written justification approved at the time of initial withholding by the relevant Regional Director, the Chief of the BOP Acquisitions Branch, and appropriate staff in both the Central Office and relevant Regional Office of the BOP Office of General Counsel.

**Stop expanding the use of private, for-profit prison contractors.** Withdraw the existing, not-yet-awarded solicitations for new CAR prisons (CAR XIV and CAR XV). Stop soliciting new contract beds or facilities, and develop a long-term plan for phasing out the use of private prisons in concert with a reduction in the total federal prison population.

---

12 Federal Bureau of Prisons, Program Statement 5100.08, Inmate Security Designation and Custody Classification Ch. 5, at 9 (2006), *available at* http://www.bop.gov/policy/progstat/5100_008.pdf.

13 *See* Immigration and Customs Enforcement, Stakeholder Procedures for Requesting a Detention Facility Tour and/or Visitation, *available at* https://www.ice.gov/doclib/ero-outreach/pdf/access-directive-stakeholder.pdf; Immigration and Customs Enforcement, Performance-Based National Detention Standards, §§ 5.7, 7.2 (2011), *available at* http://www.ice.gov/detention-standards/2011/.

## To the Office of the Inspector General, U.S. Department of Justice:

**Conduct a detailed investigation of the private prisons included in this report.**
Investigate the five private prisons included in this report—Willacy, Reeves, Big Spring, Dalby, and Eden—with a focus on conditions of confinement, compliance with contracts and with BOP policy and procedures, and the effectiveness of BOP's oversight and accountability mechanisms.

## To the U.S. Departments of Homeland Security and Justice:

**Return immigration enforcement to civil immigration authorities through the following measures:**

- DOJ should direct U.S. Attorneys to de-prioritize 8 U.S.C. § 1325 (illegal entry) and 8 U.S.C. § 1326 (illegal reentry) prosecutions except in specific cases where such charges advance one of the Department's current prosecutorial interests: national security, violent crime, financial fraud, and protection of the most vulnerable members of society.

- In the case of violent crime, DOJ should direct prosecutors to pursue § 1325 or § 1326 charges only against individuals who have convictions for serious, violent felonies and whose sentences for those felonies were completed within the previous five years.

- Prosecutors should exercise discretion not to pursue a § 1326 charge when the nature of the prior removal order, prior entry conviction, or prior reentry conviction that justifies such a charge presented significant due process concerns.

- Prosecutors should exercise discretion not to pursue § 1325 and § 1326 charges against certain vulnerable categories of individuals (for example, victims of domestic violence and the elderly), or against individuals with significant U.S. ties (specifically, individuals with U.S. citizen minor children residing in the United States, veterans and members of the U.S. armed forces, and long-time lawful permanent residents).

- DOJ and DHS should end the practice of appointing Border Patrol attorneys or other DHS employees to act as Special Assistant U.S. Attorneys, or in any prosecutorial capacity, in § 1325 and § 1326 cases.

## To Congress:

**Close the FOIA loophole for private prisons and other detention facilities.** Enact legislation to ensure that records relating to private prisons and other detention facilities will be subject to FOIA to the same extent as records relating to federally operated prisons and detention facilities. Specifically, require the contracting agency to search for and produce not only records in the agency's possession, but also records in the possession of the entity that operates the prison or detention facility; require the entity to maintain records in a form that is readily reproducible and reasonably searchable by the agency; and require the agency to make withholding decisions based on its own independent judgment.

**Stop funding additional private low-security beds.** Decline to appropriate funds for new contract beds or facilities. Instead, direct funding toward Residential Reentry Centers and home confinement options, which could help divert low-security prisoners out of existing facilities, reducing BOP overcrowding and eliminating the need for additional beds.

**Request a GAO report on existing private prisons.** Request a report from GAO that 1) evaluates BOP's effectiveness at monitoring private facilities to ensure compliance with contracts and with BOP policy and procedures via meaningful oversight and accountability mechanisms, and 2) examines the extent to which privatization actually provides the flexibility that proponents claim, particularly with regard to responding to changing bedspace needs, rewarding good contractor performance, and punishing poor contractor performance.

**Pass legislation to address the problems created by the Supreme Court's decisions in *Minneci v. Pollard* and *Correctional Services Corp. v. Malesko.*** Together, the Supreme Court's 2001 decision in *Malesko* and its 2012 decision in *Minneci* effectively bar federal prisoners from bringing suit for violations of their constitutional rights inflicted in private prisons, leaving inconsistent and often inadequate state tort relief as the only resort.[14] As Justice John Paul Stevens wrote in dissent in *Malesko*, immunizing private prisons from constitutional liability incentivizes the "corporate managers of privately operated custodial institutions to adopt cost-saving policies that jeopardize the constitutional rights of the tens of thousands of inmates in their custody."[15] A legislative solution is needed to restore the right of federal prisoners to access the courts, by treating private prison employees and companies as agents of the government who can be sued for violating the constitutional rights of people in their prisons.

---

14   *See* Minneci v. Pollard, 132 S. Ct. 617 (2012); Corr. Servs. Corp. v. Malesko, 534 U.S. 61 (2001).
15   *Malesko*, 534 U.S. at 81 (Stevens, J., dissenting).

# METHODOLOGY AND ACKNOWLEDGMENTS

The American Civil Liberties Union of Texas's investigation of conditions at the Texas CAR prisons began in 2009, after a December 2008 uprising at the Reeves Detention Center Complex in Pecos, Texas, made national news. Starting in 2011, the ACLU of Texas staff began conducting interviews with individuals incarcerated in the three other CAR prisons that then existed in Texas: Big Spring Correctional Center, Eden Detention Center, and Giles W. Dalby Correctional Facility. In 2012, the scope of our investigation expanded to include Willacy County Correctional Center, after that former immigration detention facility reopened its doors as a BOP CAR prison.

Over this time period, ACLU of Texas staff—later joined by ACLU national staff—have conducted a total of twelve site visits to these CAR prisons and interviewed approximately 270 people incarcerated in these facilities. The most recent interviews occurred between November 2013 and January 2014 and covered Reeves, Big Spring, Eden, Dalby, and Willacy.

A significant number of the prisoners we spoke to expressed fears of retaliation. We have therefore used pseudonyms to protect the identity of the prisoners we interviewed in this report.

In addition to prisoners, we interviewed advocates, attorneys, journalists, consular officials, and family members of incarcerated individuals. We also reviewed medical records, case documents, and grievance forms relating to individual cases.

## A significant number of the prisoners we spoke to expressed fears of retaliation.

The ACLU of Texas submitted FOIA requests to BOP and Texas Public Information Act requests to Reeves County, Garza County, and the City of Eden, seeking information about the operation and oversight of these facilities. To date, we have not received a number of key documents we requested. BOP has produced no records whatsoever in response to these FOIA requests. Nonetheless, we have closely reviewed hundreds of pages of material, including facility policies, prisoner handbooks, and voluminous contracting documents. We have also reviewed policies, contracts, monitoring reports, and other documents obtained through the long-running FOIA litigation conducted by Oregon attorney Stephen Raher.

Given BOP's failure to respond to our FOIA requests, we do not have access to BOP

documents that would confirm or contradict the statements made to us by prisoners. In the case of deaths, prison disturbances, or staff uses of force involving large numbers of prisoners, we have tried to independently confirm prisoner allegations with news reports or other publicly available documents. Where we were unable to locate such independent confirmation, we have included such allegations only if they were reported by two or more prisoners.

**BOP has produced no records whatsoever in response to FOIA requests seeking information about the operation and oversight of these facilities.**

Over the past four years, a veritable army of ACLU of Texas and ACLU national staff participated in the research and writing of this report. Samantha Fredrickson, Carl Takei, and Rebecca Robertson authored major sections of the report, relying heavily on earlier work done by Lisa Graybill, Krystal Gomez, Adrienna Wong, and Kali Cohn. Christopher Clay, Abril Davila, Astrid Dominguez, Lisa Graybill, Krystal Gomez, Adriana Piñon, Carl Takei, and Adrienna Wong carried out much of the hard work of investigation, such as interviews and document review. Ruthie Epstein, Chris Rickerd, Jesselyn McCurdy, Carl Takei, and Georgeanne Usova developed the policy recommendations based on input from many individuals and relying on work previously done by Lisa Graybill and others. Numerous other ACLU staff also reviewed and made valuable contributions to the report. Additionally, we thank Bob Libal and Judy Greene for their helpful comments on the draft report.

A few words on terminology: Our Findings section uses the plural term "CAR prisons" to describe two or more of the CAR prisons we investigated for this report; however, such statements are not meant to imply that all five CAR prisons we investigated or all thirteen CAR prisons nationwide necessarily share the same attributes. Similarly, statements in this report that private prison companies, private prison operators, or the private prison industry made a certain claim, engaged in a certain practice, or exhibited a certain feature are not meant to imply that the same statement applies to all private prison companies or operators, or that all members of the private prison industry did the same.

# Introduction: From ICE to BOP

**J**ust off Highway 77, in Raymondville, Texas, nearly 3,000 non-citizen prisoners are locked behind layers of fencing and concertina wire and crammed into a complex dominated by ten 200-foot-long Kevlar tents. Three flags fly near the front gate: the Texas flag, the U.S. flag, and a flag emblazoned with the logo of Management and Training Corporation (MTC), the private prison company that runs the prison. This is Willacy County Correctional Center: a physical symbol of everything that is wrong with enriching the private prison industry and criminalizing immigration.

Willacy County Correctional Center began in 2006 as the Willacy County Processing Center, a detention facility for civil immigration detainees held by ICE. Nicknamed the "Tent City" or "Ritmo" (a portmanteau of "Gitmo" and "Raymondville"), Willacy soon earned a reputation as one of the most inhumane such facilities in the country.[16] A 2009 ACLU of Texas report described how detainees at Willacy were subjected to a host of civil rights abuses: overcrowded living quarters infested by vermin, unsanitary bathrooms, deprivation of natural light, and spoiled and inedible food.[17] A former Willacy nurse testified at a June 2009 Capitol Hill briefing about the "extreme temperatures, inadequate nutrition, medical staffing shortages, and long delays for critically needed health care" that persisted at Willacy.[18] She remarked, "The level of human suffering was just unbelievable."[19] A 2011 PBS *Frontline* documentary highlighted numerous stories of racial, physical, and sexual abuse of detainees at Willacy.[20]

In May 2011, ICE announced it was transferring its remaining 1,000 detainees out

---

[16]  Spencer S. Hsu & Sylvia Moreno, *Border Policy's Success Strains Resources*, Wash. Post, Feb. 2, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/02/01/AR2007020102238.html; Human Rights First, U.S. Detention of Asylum-Seekers: Seeking Protection, Finding Prison 78-79 (June 2009), *available at* http://www.humanrightsfirst.org/wp-content/uploads/pdf/090429-RP-hrf-asylum-detention-report.pdf.

[17]  ACLU of Texas, Missing the Mark: How National Security Strategies in Rio Grande Valley Border Communities Sacrifice Basic Human Rights and Fail to Make Texans Safe 17, 18, 21, 23 (Dec. 2009), *available at* http://www.aclutx.org/2009/12/10/missing-the-mark-how-national-security-strategies-in-rio-grande-valley-border-communities-sacrifice-basic-human-rights-and-fail-to-make-texans-safer/.

[18]  *US: Immigration Policy Harms Women, Families*, Human Rights Watch (June 24, 2009), http://www.hrw.org/news/2009/06/24/us-immigration-policy-harms-women-families; *see also* Florence Dethy, *Local Nurse Testifies About Detainee Abuse*, Toledo Blade, June 25, 2009, http://www.toledoblade.com/local/2009/06/25/Local-nurse-testifies-about-detainee-abuse.html.

[19]  Dethy, *supra* note 18.

[20]  *Frontline: Lost in Detention* (PBS broadcast Oct. 18, 2011), *transcript available at* http://www.pbs.org/wgbh/pages/frontline/race-multicultural/lost-in-detention/transcript-11/.

of Willacy.[21] But barely a month later, MTC triumphantly announced that Willacy's ICE contract would be replaced by a new, $532-million contract to house immigrant prisoners for a different agency: the Federal Bureau of Prisons.[22]

## National CAR Map



NE Ohio Correctional Center CI • • Moshannon Valley CI

Rivers Correctional Institution •

Cibola County Correctional Institution •

• Giles W. Dalby Correctional Facility

McRae Correctional Institute •
• D. Ray James Correctional Facility CI

Big Spring Correctional Center •
Reeves County Detention Center I/II/III •
• Eden Detention Center
• Adams County Correctional Center

• Willacy County Correctional Center

■ Today, more than 25,000 immigrant prisoners languish at thirteen private prisons in Georgia, Mississippi, New Mexico, North Carolina, Ohio, Pennsylvania, and Texas. GEO owns and operates six, CCA five, and MTC two.

Today, more than 25,000 immigrant prisoners languish at Willacy and twelve other private prisons in Texas, Georgia, New Mexico, Mississippi, North Carolina, Ohio, and Pennsylvania.[23] Known as "Criminal Alien Requirement" prisons, these for-profit prisons are reserved for low-security non-U.S. citizens in BOP custody. And because non-citizens are ostensibly "not expected to return to U.S. communities or BOP custody,"

---

21    Lynn Brezoski, *ICE Will Relocate Crowded Detention Center*, Houston Chron., June 9, 2011, *available at* http://www.chron.com/disp/story.mpl/metropolitan/7604060.html.
22    Press Release, Management & Training Corp., MTC Awarded Contract to House Federal Inmates: $532-million BOP Contract Will Replace the Current ICE Contract in Willacy County (June 7, 2011), *available at* http://www.mtctrains.com/public/uploads/1/2011/6/June%207,%202011%20News%20Release%20-%20MTC%20gets%20BOP%20contract.pdf.
23    *Population Statistics*, Federal Bureau of Prisons, http://www.bop.gov/about/statistics/population_statistics.jsp (last visited Jan. 3, 2014).

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 19 of 105 PageID #: 4274

the BOP does not require the private prison companies to provide these prisoners with the same vocational training, drug treatment, or other beneficial programs offered to U.S. citizen prisoners at BOP-run prisons.[24] Indeed, the BOP only requires these private prisons to comply with its policies in a few areas—including maintenance of files, classification, discipline procedures, sentence computation, health care, education, and commissary limits. For all other areas, the facilities can develop their own policies, leading to potentially harmful inconsistencies.[25] These second-class prisoners are thus trapped at the intersection of three disturbing trends: the national over-incarceration crisis, prison privatization, and the criminalization of immigration.

# Mass Incarceration and the Private Prison Industry

The United States has just 5% of the world's population but nearly 25% of the world's prisoners.[26] This glut of incarceration is an historical anomaly. Thanks to the "War on Drugs," irrationally harsh sentencing regimes, and a refusal to consider evidence-based alternatives, the U.S. prison population grew by more than 700% between 1970 and 2009—far outpacing both population growth and crime rates.[27]

Mass incarceration has fueled the growth of the modern private prison industry—a multi-billion-dollar enterprise that depends on and profits from our national addiction to incarceration. From 1990 to 2009, as mass incarceration accelerated, the private prison industry grew by more than 1600%.[28]

This growth has fueled rising fortunes in the private prison industry. The three corporations that operate CAR prisons nationwide—Corrections Corporation of America, the GEO Group (GEO), and MTC—reported nearly $4 billion in revenue in 2012.[29] According to the investment research firm Morningstar, the executive officers of CCA

24    U.S. Gov't Accountability Office, GAO-08-6, *supra* note 10, at 11.

25    Declaration of Randall G. Powers, BOP Privatization Management Branch ¶ 7, Patel v. Fed. Bureau of Prisons, No. 1:09-cv-00200 (D.D.C. Sept. 8, 2010) (No. 68-8). *See also infra* notes 197-99 and accompanying text.

26    Devlin Barrett, *Obama Administration Plans Overhaul to Cut Prison Population*, Wall St. J., Aug. 12, 2013, http://online.wsj.com/news/articles/SB10001424127887323446404579007043413137888.

27    The Sentencing Project, *supra* note 1.

28    ACLU, Banking on Bondage: Private Prisons and Mass Incarceration 12 (Nov. 2011), *available at* http://www.aclu.org/files/assets/bankingonbondage_20111102.pdf.

29    Corrections Corporation of America, 2012 Annual Report, *available at* http://thomson.mobular.net/thomson/7/3368/4799/; The GEO Group, 2012 Annual Report 1, 18 (2012), *available at* https://materials.proxyvote.com/Approved/36159R/20130314/AR_159415/; *At a Glance Corporate Facts*, Management and Training Corporation, http://www.mtctrains.com/public/uploads/1/2011/9/At-a-Glance_Corporate.pdf (last updated Dec. 6, 2013).

Case 3:16-cv-02267      Document 160-2      Filed 02/15/19      Page 20 of 105 PageID #: 4275

and GEO together received roughly $19 million in compensation in 2012.[30] The private prison industry also directs substantial sums toward lobbying efforts. According to a 2012 review of Federal Election Commission data, CCA, GEO, MTC, their political action committees, and their employees have spent more than $32 million on federal lobbying and campaign contributions since 2000.[31]

## Population of Criminal Alien Requirement Prisons

| Facility | Contractor | Location | Population as of Jan. 2, 2014 |
|---|---|---|---|
| Adams County Correctional Center | CCA | MS | 2,410 |
| Big Spring Correctional Center | GEO | TX | 3,485 |
| Cibola County Correctional Institution | CCA | NM | 1,189 |
| D. Ray James Correctional Facility CI | GEO | GA | 2,422 |
| Giles W. Dalby Correctional Facility | MTC | TX | 1,896 |
| Eden Detention Center | CCA | TX | 1,550 |
| McRae Correctional Institute | CCA | GA | 2,209 |
| * Moshannon Valley CI | GEO | PA | 1,796 |
| NE Ohio Correctional Center CI | CCA | OH | 1,505 |
| Reeves County Detention Center I/II | GEO | TX | 2,325 |
| Reeves County Detention Center III | GEO | TX | 1,311 |
| * Rivers Correctional Institution | GEO | NC | 1,408 |
| Willacy County Correctional Center | MTC | TX | 2,981 |
| TOTAL | | | 26,487 |

* Prison population is a mix of criminal aliens and prisoners from Washington, D.C.

Source: *Population Statistics*, Federal Bureau of Prisons, http://www.bop.gov/about/statistics/population_statistics.jsp (last visited Jan. 3, 2014).

The private prison industry has a vested interest in the continued expansion of mass incarceration. CCA's 2012 annual report to the Securities and Exchange Commission states:

---

30   *Corrections Corporation of America, Key Executive Compensation*, MORNINGSTAR, http://insiders.morningstar.com (under "search insiders by ticker," search for "CXW"); *The GEO Group, Inc., Key Executive Compensation*, MORNINGSTAR, http://insiders.morningstar.com (under "search insiders by ticker," search for "GEO") (last visited Jan. 7, 2014).
31   *Private Prisons Profit from Illegal Immigrants*, CBSNEWS.COM, Aug. 2, 2012, http://www.cbsnews.com/news/ap-private-prisons-profit-from-illegal-immigrants.

Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them.[32]

The current growth in federal private prisons began in 1999 when BOP issued its first request for proposals for a CAR contract to house up to 7,500 low-security, non-citizen prisoners (ultimately awarded to two CCA facilities in California and New Mexico).[33] Since that first CAR contract, BOP has steadily expanded its use of private prisons to confine non-citizens. Today, more than 25,000 "low-security criminal aliens" are incarcerated in thirteen private prisons under CAR contracts. Five of these CAR prisons are located in Texas, and they are home to roughly half of BOP's segregated non-citizen population.[34]

Proponents of private prisons argue that they save the government money, but the evidence from studies of other prison systems is mixed at best, and in 2007, GAO found that BOP did not gather enough data to determine whether it is cost-effective for BOP to use private prisons.[35] Moreover, BOP rejected GAO's recommendations to collect the data

**In 2007, BOP rejected GAO's recommendation to collect enough data to determine whether it is cost-effective for BOP to use private prisons.**

---

32   Corrections Corporation of America, 2012 Annual Report, *supra* note 29, at 28.
33   Judith Greene, *Bailing Out Private Jails*, Am. Prospect (Dec. 19, 2001), *available at* http://prospect.org/article/bailing-out-private-jails.
34   *Population Statistics*, *supra* note 23 (under "BOP facilities," select "Texas" and click "search"). The five Texas facilities house approximately 13,000 prisoners. As we understand it, BOP reserves these prisons primarily for non-citizens in part because many (though, puzzlingly, apparently not all) of the CAR prisons are hearing sites or release sites under the Institution Hearing Program (IHP), a cooperative effort by BOP, ICE, and the Executive Office for Immigration Review (EOIR) to facilitate deportation, exclusion, and removal proceedings for prisoners in BOP custody. *See* Bureau of Prisons, Program Statement 5111.04, Institution Hearing Program (July 3, 2006), *available at* http://www.bop.gov/policy/progstat/5111_004.pdf. Questions regarding whether the CAR prisons actually serve this apparent purpose, and whether this purpose justifies reserving prisons for non-citizens in the first place, are outside the scope of this report.
35   Studies in Hawaii, Arizona, Utah, and New Jersey have found that private prisons do not save the government money. And while some studies have found privatization to be cost-effective, at least one of those studies was questioned after the author was discovered to have accepted $3 million in consulting fees from private prison companies. *See* Banking on Bondage, *supra* note 28, at 19-20 and accompanying footnotes (discussing studies). Most recently, an industry-funded study became the subject of an ethics inquiry by Temple University officials. Matt Stroud, *Study Funded by Private Prison Dollars Praises Private Prisons; No Comment, Says Public University*, In These Times, Jan. 9, 2014, http://inthesetimes.com/prison-complex/entry/16079/temple_study_funded_by_private_prison_dollars_praises_private_prisons (last visited Feb. 25, 2014).

required to perform a methodologically sound analysis.[36] BOP officials flatly stated to GAO that "they have not considered, nor do they plan to consider alternatives besides contracting for low and minimum security facilities."[37] Indeed, BOP has repeatedly insisted that they are required to use private prisons for these low-custody prisoners—but BOP has never been able to identify for advocates requesting this information a statute or regulation to this effect.

In its fiscal year 2014 budget, BOP requested $691 million from Congress to pay private prison companies, including an increase of $26 million from fiscal year 2013 to house 1,000 additional prisoners.[38] And last year, BOP issued a new solicitation for nearly 4,000 additional CAR private-prison beds.[39] Although BOP's fiscal year 2015 budget does not request further increases in private prison spending for the coming year, the agency expressed its long-term commitment to using private prisons to house the "low security, short-term, sentenced criminal aliens" in its custody.[40]

# Operation Streamline and the Criminalization of Immigration

BOP's reliance on private prisons is unlikely to end any time soon. If current prosecution trends continue, it is likely that BOP will further increase its use of private prisons for immigrants.

Although BOP refers to the individuals it consigns to CAR prisons as "criminal aliens," many were convicted only of immigration offenses like unlawfully crossing the border.[41] Traditionally, federal authorities have handled such cases through the comprehensive enforcement scheme available under civil immigration laws. In recent years, however, federal policies that demand aggressive use of the criminal justice system for immigration enforcement have caused the number of criminal prosecutions for unlawful border crossing to skyrocket.

---

36   U.S. Gov't Accountability Office, GAO 08-6, *supra* note 10, at 18-19, 30.

37   *Id.* at 15.

38   U.S. Dep't of Justice, FY 2014 Performance Budget: Congressional Submission; Federal Prison System 86-87, *available at* http://www.justice.gov/jmd/2014justification/pdf/bop-se-justification.pdf; U.S. Dep't of Justice, FY 2014 Budget Request: Prisons and Detention 2, *available at* http://www.justice.gov/jmd/2014factsheets/prisons-detention.pdf.

39   *CAR XV Solicitation Number RFP-PCC-0022*, Fed Biz Opps, *available at* https://www.fbo.gov/index?s=opportunity&mode=form&id=3d3a58aefa1911d9fd8b8ea5d38801b6&tab=core&_cview=1 (last visited on Jan. 8, 2014).

40   U.S. Dep't of Justice, FY 2015 Performance Budget: Congressional Submission; Federal Prison System, Salaries and Expenses 55-56, *available at* http://www.justice.gov/jmd/2015justification/pdf/bop-se-justification.pdf.

41   Unlawful presence in the United States is not, by itself, a crime. However, entering the country without inspection is a federal misdemeanor punishable by up to six months in prison, and re-entering the country after being deported is a felony that can lead to two years of imprisonment for people with no prior criminal records, and up to 20 years for people with more significant criminal records. 8 U.S.C. §§ 1325-1326 (2011); 18 U.S.C. § 3559 (2011).

Chief among these programs is Operation Streamline, a "zero-tolerance" policy jointly instituted by the Department of Homeland Security and the Department of Justice in 2005 and now implemented in every Southwest border state except California.[42] Under Streamline, in addition to being processed for deportation, apprehended migrants are referred by DHS to DOJ for federal prosecution.[43] Since the program began, a rising tide of both misdemeanor and felony immigration prosecutions has strained the resources of federal courts, created serious due process problems, and—most relevant to this report—swelled the flow of immigrants into jails and federal prisons.[44]

### Prisoners entering federal prison, 1998–2011 (by offense)



Source: Bureau of Justice Statistics, Federal Justice Statistics Program, http://bjs.ojp.usdoj.gov/fjsrc/ (last visited Feb. 7, 2014)

---

42  *See* Tara Buentello et al., Grassroots Leadership, Operation Streamline: Drowning Justice and Draining Dollars along the Rio Grande 2 (July 2010), *available at* http://grassrootsleadership.org/sites/default/files/uploads/OperationStreamline.pdf; Joanna Lydgate, Assembly-Line Justice: A Review of Operation Streamline 1 (2010), *available at* http://www.law.berkeley.edu/files/Operation_Streamline_Policy_Brief.pdf.
43  Joanna Lydgate, *supra* note 42. *See generally Oversight Hearing on the Executive Office of U.S. Attorneys, H. Subcomm. on Commercial and Administrative Law,* 110th Cong. (2008) (*written statement of Heather Williams, First Ass't Fed. Public Defender, Dist. Ariz., Tuscon*), *available at* http://judiciary.house.gov/hearings/pdf/Williams080625.pdf; *Federal Criminal Enforcement and Staffing: How Do the Obama and Bush Administrations Compare?,* TRAC Reports (Feb. 2, 2011), http://trac.syr.edu/tracreports/crim/245/.
44  A recent ACLU issue brief explained that under Operation Streamline, misdemeanor illegal entry defendants face a myriad of due process problems, including little or no access to their attorneys and a trial that combines the initial appearance, plea, and sentencing into a mass hearing for 70 to 80 defendants at a time each day. The issue brief also described the impact of illegal entry and reentry prosecutions on the federal courts. ACLU, Immigration Reform Should Eliminate Operation Streamline, *available at* https://www.aclu.org/files/assets/operation_streamline_issue_brief.pdf (last visited Jan. 8, 2014).

Case 3:16-cv-02267   Document 160-2   Filed 02/15/19   Page 24 of 105 PageID #: 4279

**❝ Most people here came to provide for their family …. They treat us like we're Charles Manson or something."**

– Edgar, prisoner at Big Spring Correctional Center[45]



**23,700 PRISONERS IN BOP CUSTODY FOR IMMIGRATION OFFENSES**

Not everyone in the CAR prisons is incarcerated for an immigration offense; these prisons also contain substantial numbers of people serving time for drug-related offenses and a small number of people sentenced for other offenses.[46] However, criminal prosecutions of immigrants for crossing the border are dramatically changing who enters the federal prison system. The tipping point came in 2009 when, for the first time, more people entered federal prison for immigration offenses than for violent, weapons, and property offenses combined—and the number has continued to rise since then.[47] By 2012, BOP was holding 23,700 people convicted of immigration offenses in its custody on a daily basis—more than the total state prison populations of Massachusetts, Maine, New Hampshire, Rhode Island, and Vermont combined.[48]

In fiscal year 2013, 97,384 people were prosecuted for federal immigration offenses, an increase of 367% from 2003.[49] According to the nonpartisan Migration Policy Institute, U.S. Customs and Border Protection now refers more cases for federal criminal prosecution than the FBI.[50] Nationwide, more than half of all federal criminal prosecutions initiated in fiscal year 2013 were for illegal entry or reentry into the United

45    Interview with Edgar, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas).
46    According to 2010 statistics (the most recent available), 43% of non-citizens in federal custody were serving a sentence for an immigration offense, 47% were serving a sentence for a drug-related offense, and 10% were serving a sentence for another category of offense. Mark Motivans, BJS Statistician, *Immigration Offenders in the Federal Judicial System, 2010*, at 35 (July 2012, rev. Oct. 22, 2013), *available at* http://www.bjs.gov/content/pub/pdf/iofjs10.pdf. Anecdotally, all but a handful of the prisoners we interviewed for this report were serving sentences for immigration or drug-related offenses, with the majority being immigration offenses.
47    Bureau of Justice Statistics, Federal Justice Statistics Program, http://bjs.ojp.usdoj.gov/fjsrc/ (last visited Feb. 3, 2014). *See also* ALISTAIR GRAHAM ROBERTSON ET AL., *supra* note 5, at 2.
48    E. Ann Carson & Daniela Golinelli, BJS Statisticians, *Bureau of Justice Statistics, Prisoners in 2012: Trends in Admissions and Releases, 1991-2012*, at 39, 43 (Dec. 2013), *available at* http://www.bjs.gov/content/pub/pdf/p12tar9112.pdf.
49    *At nearly 100,000 Immigration Prosecutions Reach All Time High*, TRAC REPORTS (Nov. 25, 2013), http://trac.syr.edu/immigration/reports/336/.
50    DORIS MEISSNER ET AL., *supra* note 2, at 94.

States.[51] The vast majority of these prosecutions take place in the four Operation Streamline jurisdictions, where they dominate federal criminal dockets: in fiscal year 2013, illegal entry and reentry prosecutions accounted for 80% of all federal prosecutions in Arizona and New Mexico, 83% of all federal prosecutions in the Western District of Texas, and a whopping 88% of all federal prosecutions in the Southern District of Texas.[52] According to news reports, the increasing focus on immigration prosecutions has siphoned resources away from prosecution of other crimes, eroded morale among federal prosecutors near the border, and overloaded the federal court system.[53]

Judge Ruben Castillo, who has served on the U.S. Sentencing Commission since 1999, remarked on this trend: "There is a use of criminal justice resources that doesn't make sense."[54] "The expense of prosecuting illegal entry and reentry cases (rather than deportation) on aliens without any significant criminal history is simply mind-boggling," Judge Sam Sparks of the Western District of Texas wrote in a 2010 order.[55]

One constituency clearly stands to benefit. An executive of CCA stated in a 2009 investors meeting:

> Let me just make a brief comment on Operation Streamline…. Before this initiative was put in place, only a small percentage of [il]legal persons crossing the U.S.-Mexico border were prosecuted….We are now experiencing significant numbers to further be in place in custody as a result of Operation Streamline.[56]

He continued:

---

51   *Prosecutions for 2013*, Syracuse University: Transactional Records Access Clearinghouse (TRAC*fed*), http://tracfed.syr.edu/ (membership required) (last visited Dec. 18, 2013).

52   *Arizona Prosecutions for 2013*, Syracuse University: Transactional Records Access Clearinghouse (TRAC*fed*), http://tracfed.syr.edu/ (membership required) (last visited Dec. 18, 2013); *New Mexico Prosecutions for 2013*, Syracuse University: Transactional Records Access Clearinghouse (TRAC*fed*), http://tracfed.syr.edu/ (membership required) (last visited Dec. 18, 2013); *Texas West Prosecutions for 2013*, Syracuse University: Transactional Records Access Clearinghouse (TRAC*fed*), http://tracfed.syr.edu/ (membership required) (last visited Dec. 18, 2013); *Texas South Prosecutions for 2013*, Syracuse University: Transactional Records Access Clearinghouse (TRAC*fed*), http://tracfed.syr.edu/ (membership required) (last visited Dec. 18, 2013).

53   Joe Palazzolo, *Border Laws Put Judge on Map*, Wall St. J., May 31, 2013, *available at* http://online.wsj.com/news/articles/SB10001424127887323336104578499480108652610; Solomon Moore, *Push on Immigration Crimes Is Said to Shift Focus*, N.Y. Times, Jan. 11, 2009, *available at* http://www.nytimes.com/2009/01/12/us/12prosecute.html?pagewanted=all; Lillian Reid, *US Marshal Sees Threat in Mexican Mafia, Not Illegal Immigration*, Verde Indep., Oct. 10, 2012, *available at* http://verdenews.com/main.asp?SectionID=1&SubSectionID=1&ArticleID=50575. *See also* Solomon Moore, *Study Shows Sharp Rise in Latino Federal Convicts*, N.Y. Times, Feb. 18, 2009, *available at* http://www.nytimes.com/2009/02/19/us/19immig.html?_r=0; Joanna Lydgate, *supra* note 42.

54   Garance Burke, *Latinos Form New Majority of Those Sentenced to Federal Prison*, Huffington Post, Sept. 6, 2011, http://www.huffingtonpost.com/2011/09/09/hispanic-majority-prison_n_955823.html.

55   U.S. v. Ordones-Soto, No. 1:09-CR-00590-SS (W.D. Tex. Feb. 5, 2010), Steven Kreytak, *Federal Judge Questions Immigration Prosecutions*, Austin Am.-Statesman, Feb. 6, 2010, http://www.statesman.com/news/news/local/federal-judge-questions-immigration-prosecutions-1/nRkNB/.

56   *Corrections Corporation of America Q1 2009 Earnings Call Transcript*, Seeking Alpha (May 7, 2009), *available at* http://seekingalpha.com/article/136300-corrections-corporation-of-america-q1-2009-earnings-call-transcript.

We believe that the Federal Bureau of Prisons continues to see value in using the private sector to meet their capacity needs and will continue to provide a meaningful opportunity for the industry for the foreseeable future.[57]

The tragic and all-too-predictable consequences of criminalizing immigration and entrusting the lives of tens of thousands of immigrant prisoners to private prison companies—for-profit entities that must answer first to their shareholders—are detailed in the Findings section below.

# Who is imprisoned for illegal reentry?

**JAIME** moved to the United States with his parents when he was three years old, and he and his parents became legal permanent residents. Five years ago, Jaime was charged with a minor drug crime. His criminal attorney told him to accept a plea bargain because he had never been arrested before and would only receive probation. Unfortunately, after Jaime pleaded guilty, he was deported. He returned to his hometown in Texas to rejoin his wife and family, but he was arrested by a local police officer who identified him during a traffic stop. Jaime is now serving a three-year sentence for illegal reentry.[58]

**MIGUEL** moved to the United States 30 years ago to attend college in California. While studying, he fell in love with an American classmate. They married and had a son together. Miguel was subsequently deported, but he returned to the country to help raise his child. Years later, ICE raided Miguel's apartment and referred him to federal authorities for prosecution. He is serving a three-year sentence for illegal reentry.[59]

**LUIS** lives in Mexico, where he builds houses for a living. His wife and children are American citizens who live in Los Angeles. Between jobs, Luis traveled to the United States to visit with his family. While crossing the border, he was arrested by Border Patrol and then federally prosecuted. Luis is serving a three-year sentence for illegal reentry.[60] ■

---

57   *Id.*
58   Interview with Jaime, prisoner at Big Spring (May 20, 2011) (on file with ACLU of Texas).
59   Interview with Miguel, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas).
60   Interview with Luis, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas).

# FINDINGS

**M**uch of what happens behind the walls of CAR prisons goes unreported. But over the past four years, we have spoken to hundreds of immigrant prisoners who described what happens in this shadow prison system. There are tragic stories—of men dying after being denied potentially life-saving medical treatment. There are unimaginable stories—of men being locked in isolation cells for complaining about food or medical care, or for no reason at all. And there are stories of incredible loss—of men separated from their families, all but forgotten as they await deportation without access to counsel. As one prisoner put it, "Here I feel like I am in a hole without an exit. I don't have anything and I feel trapped."[61]

In our multi-year investigation, the ACLU of Texas and the National Prison Project found much evidence that the immigrants trapped in these private prisons are subjected to shocking abuse and mistreatment. Many have families and other deep ties in the United States but are separated from them by thousands of miles because of discriminatory BOP policies. Meanwhile, the for-profit prison companies operate in the shadows. BOP subjects CAR prisons to insufficient oversight and accountability, and it exempts CAR prisons from many of the policies and regulations intended to set baselines of safe and humane treatment in federal prisons. By both geography and policy, prisoners are isolated from attorneys and legal services. BOP even assists private prison companies in their efforts to block public scrutiny.

> BOP even assists private prison companies in their efforts to block public scrutiny.

The federal government has a responsibility to safeguard the health, safety, and basic human dignity of people in its custody—whether citizen or non-citizen and whether in government-run or private prisons. The government owes this obligation not only to the people inside its prisons, but also to the public at large, who rely on the criminal justice system to keep us safe, to operate fairly, and to be cost-effective. Yet our investigation revealed substantial evidence that the Bureau of Prisons and its for-profit contractors are failing us.

---

61    Interview with Esteban, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas).

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 28 of 105 PageID #: 4283

# Prisoners are subject to shocking mistreatment and abusive conditions

**❝[Our families] don't know that we suffer, that we're not treated with respect, or that we sometimes lack food or blankets. We don't tell our families. I just don't want my kids to see me like this."**

– Vicente, prisoner at Willacy County Correctional Center[62]

Although BOP-run facilities are far from perfect, prisoner disturbances are relatively rare. Yet we spoke with numerous prisoners who described conditions so bad in privately operated CAR prisons that people were driven to protests, hunger strikes, and even riots.

At Reeves County Detention Center in late 2008 and early 2009, after a prisoner died from inadequate medical care, prisoners organized uprisings that got so out of control they ended with prisoners setting fire to the facility.[63] Then, in the summer of 2013, prisoners started a petition to protest crowded conditions, bad food, and lack of medical care. When prison staff learned of the petition, they reportedly sought out the protest organizers, tear-gassed their dormitories, shot at them with rubber bullets, and then locked in isolation cells both the organizers and bystanders who objected to being tear-gassed.[64]

At Willacy in the summer of 2013, 30 prisoners were reportedly taken to the isolation unit for refusing to leave the recreation yard and return to their dormitories after prison officials ignored their complaints of toilets overflowing with raw sewage.[65] In

---

62   Interview with Vicente, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas).
63   Tom Barry, *A Death in Texas: Profits, Poverty, and Immigration Converge*, Boston Rev. (Nov./Dec. 2009), *reprinted with permission and available at* http://www.texastribune.org/2010/01/07/tom-barry-on-border-immigrant-detention-facilities/. *See also* Tom Barry, Border Wars (Massachusetts Institute of Technology 2011) (expanding on the reporting initially done in Barry's *Death in Texas* article).
64   Interview with Samuel, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Ruben, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Humberto, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas).
65   Interview with Darien, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Benicio, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Mauricio, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas); Interview with Dylan, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Alex, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Stephen, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas).

February 2014, a prisoner uprising at Willacy resulted in prisoner injuries and required the deployment of 30 Willacy County Sheriff patrol cars to the facility as a "defensive measure."[66]

At Big Spring in 2008, prisoners rose up over conditions and set fire to the Flightline Unit at the facility.[67] In 2010, prisoners at Eden rose up over conditions.[68]

According to the prisoners we interviewed, the changes prisoners seek with these protests—better medical care, more food, less use of extreme isolation as punishment, and cleaner living conditions—rarely come.

66    Fernando del Valle, *Inmate Injured in Raymondville Prison Riot*, Monitor (Feb. 14, 2014) http://m.themonitor.com/news/local/article_2a3fe3a8-95df-11e3-8f78-0017a43b2370.html?mode=jqm.

67    *Major Incident at Cornell's Big Spring Unit*, Texas Prison Bid'ness (Sept. 16, 2008), http://www.texasprisonbidness.org/major-incident-cornells-big-spring-unit; *Big Spring Riot Investigation Continues*, KWES NewsWest 9, http://www.newswest9.com/story/9014192/big-spring-riot-investigation-continues?clienttype=printable (last visited Jan. 28, 2014); Roma Vivas, *Big Spring Prisoner Riot and Fire Still Under Investigation*, KWES NewsWest 9, http://www.newswest9.com/story/9005071/big-spring-prisoner-riot-and-fire-still-under-investigation?nav=menu505_2&redirected=true (last visited Jan. 28, 2014).

68    Matthew Waller, *Eden Detention Center Locked Down After Riot*, San Angelo Standard Times, Apr. 12, 2010, http://www.gosanangelo.com/news/2010/apr/12/eden-detention-center-remains-in-lockdown-status/.

## Prison staff use extreme isolation arbitrarily and abusively

Extreme isolation is an extraordinarily cruel form of punishment that, if it is used at all, should be employed only as a last resort and for as brief a time as possible.[69] Yet at CAR facilities, prisoners told us that not only is isolation used to punish prisoners for minor infractions, but the isolation unit (typically referred to as segregation, the Special Housing Unit, or SHU) is regularly used for overflow when the general population dorms are full.[70] Additionally, prisoners are reportedly threatened with isolation, and sometimes put in SHU, for complaining about conditions, helping others to file grievances,[71] or just about anything.[72]

In the SHU, prisoners are confined for 22 to 24 hours per day in a small cell, either alone or with one or two cellmates.[73] In this report, we refer to this practice as "extreme isolation," because either scenario involves the complete deprivation of mental stimulation and meaningful human interaction beyond the confines of that tiny cell. Each CAR prison's SHU differs slightly, but most cells are small rooms with solid metal doors with a tray slot for passing food into the cell. Prisoners in the SHU must eat, sleep, use the toilet, and sometimes even shower without ever leaving the cell. While in the SHU, prisoners are not allowed to visit the library or participate in any programs.[74] They are rarely allowed to make outside phone calls.[75] When they are let out of the cell for

---

69    ABA Standards for Criminal Justice: Treatment of Prisoners (Washington: American Bar Association, 3d ed. 2011). Standard 23-3.8(c) states: "All prisoners placed in segregated housing should be provided with meaningful forms of mental, physical, and social stimulation." Standard 23-3.8(b) states: "Conditions of extreme isolation should not be allowed regardless of the reasons for a prisoner's separation from the general population." Standard 23-4.3(a) states: "[Disciplinary] sanctions should never include . . . conditions of extreme isolation . . . ." See also Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, Interim Rep. of the Special Rapporteur on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, U.N. Doc. A/66/268 (Aug. 5, 2011) (by Juan Mendez), available at http://solitaryconfinement.org/uploads/SpecRapTortureAug2011.pdf; European Committee for the Prevention of Torture and Inhuman or Degrading Treatment or Punishment, 21st General Report of the Council of Europe Committee for Prevention of Torture (COE-CPT) 44-50 (2011), available at http://www.cpt.coe.int/en/annual/rep-21.pdf.
70    See infra text accompanying notes 93-96.
71    Interview with Leonardo, prisoner at Eden (Jan. 7, 2014) (on file with ACLU of Texas); Interview with Agustin, prisoner at Eden (Jan. 7, 2014) (on file with ACLU of Texas); Interview with Richard, prisoner at Eden (Jan. 7, 2014) (on file with ACLU of Texas); Interview with Isaac, prisoner at Eden (Jan. 7, 2014) (on file with ACLU of Texas); Interview with Vladmir, prisoner at Eden (Jan. 8, 2014) (on file with ACLU of Texas); Interview with Kevin, prisoner at Eden (Jan. 8, 2014) (on file with ACLU of Texas).
72    Interview with Sergio, prisoner at Willacy (Nov. 12, 2013) (reporting that another prisoner was sent to SHU because he asked for new shoes) (on file with ACLU of Texas); Interview with Santiago, prisoner at Willacy (Nov. 12, 2013) (reporting that prisoners can be sent to SHU for doing their own laundry) (on file with ACLU of Texas); Interview with Costa, prisoner at Willacy (Nov. 12, 2013) (reporting that prisoners with mental health conditions are taken to SHU) (on file with ACLU of Texas); Interview with Sebastian, prisoner at Reeves (Nov. 19, 2013) (reporting that he was sent to SHU for complaining about the medical care) (on file with ACLU of Texas).
73    Interview with Dominic, prisoner at Big Spring (Nov. 20, 2013) (on file with ACLU of Texas); Interview with Henry, prisoner at Big Spring (Nov. 20, 2013) (on file with ACLU of Texas); Interview with Alfonso, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Patricio, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Sebastian, supra note 72; Interview with Bruno, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Tomas, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas); Interview with Agustin, supra note 71.
74    Interview with Richard, supra note 71; Interview with Henry, supra note 73; Interview with Patricio, supra note 73.
75    Interview with Dmitri, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Henry, supra note 73; Interview with Vicente, supra note 62; Interview with Alex, supra note 65.

"recreation," usually for no more than one hour a day, it is to a small outdoor cage that is typically eight to ten paces wide.[76]

Studies have shown that isolating prisoners in this manner can have serious effects on their mental health, including causing panic attacks, hallucinations, paranoia, obsessive or suicidal thoughts, and difficulty concentrating and remembering.[77] Isolating two or more strangers together in the same cell can cause mutual paranoia and hostility.[78] When prisoners reported to the ACLU that the SHU is noisy 24 hours a day with the sounds of other men pounding the walls and doors, screaming, shouting, and crying, they were describing the manifestations of deteriorating mental health.[79]

The American Bar Association's *Standards for the Treatment of Prisoners* calls for the complete abolition of extreme isolation and requires that all prisoners in segregated housing "be provided with meaningful forms of mental, physical, and social stimulation."

The American Bar Association's *Standards for the Treatment of Prisoners* calls for the complete abolition of extreme isolation and requires that all prisoners in segregated housing "be provided with meaningful forms of mental, physical, and social stimulation."[80] Moreover, the *Standards* require that segregated housing be used only for limited purposes and "for the briefest term and under the least restrictive conditions practicable and consistent with the rationale for placement and with the progress achieved by the prisoner."[81]

Although BOP policy lags behind the ABA *Standards*, it does prescribe limits on when prisoners can be placed in the SHU for administrative detention (when they pose a threat to themselves or other prisoners) or for disciplinary segregation (when they are

---

76 Interview with Dmitri, *supra* note 75; Interview with Dominic, *supra* note 73.
77 Stuart Grassian, *Psychiatric Effects of Solitary Confinement*, 22 Wash. U. J.L. & Pol'y 325, 335-36 (2006), *available at* http://law.wustl.edu/journal/22/p325grassian.pdf; R. Korn, *The Effects of Confinement in the High Security Unit at Lexington*, 15 Soc. Just. 8 (1988); Craig Haney, *Mental Health Issues in Long-Term Solitary and "Supermax" Confinement*, 49 Crime & Delinquency 124 (2003); Holly A. Miller & G. Young, *Prison Segregation: Administrative Detention Remedy or Mental Health Problem?*, 7 Criminal Behav. & Mental Health 85 (1997); Hans Toch, Mosaic of Despair: Human Breakdown in Prison (1992). *See also* Physicians for Human Rights, Buried Alive: Solitary Confinement in the U.S. Detention System (Apr. 2013), *available at* https://s3.amazonaws.com/PHR_Reports/Solitary-Confinement-April-2013-full.pdf.
78 Grassian, *supra* note 77, at 357 (citing a military study).
79 Interview with Alex, *supra* note 65; Interview with Dmitri, *supra* note 75.
80 ABA Standards for Criminal Justice: Treatment of Prisoners, *supra* note 69, at Standard 23-3.8(a)-(c).
81 *Id.* at Standard 23-2.6(a).

## All of the BOP contracts we reviewed encourage the private prison companies to place excessive numbers of prisoners in isolation.

punished for violating prison rules).[82] The CAR contracts we reviewed indicate that most BOP policies on detention and segregation are supposed to apply at these facilities.[83]

But our investigation uncovered evidence that the CAR prisons use extreme isolation in ways that are inconsistent with the ABA *Standards* and BOP policy. We heard numerous examples of staff sending prisoners to the SHU for arbitrary reasons that appear to lack any appropriate justification.[84] "Anything you do or say can get you into the SHU," a Reeves prisoner told us.[85]

Indeed, all of the BOP contracts we reviewed encourage the private prison companies to place excessive numbers of prisoners in isolation.[86] CCA's contract for Eden, MTC's contract for Dalby, and GEO Group's contracts for Reeves and Big Spring each require at least 10% of the "contract beds" to be SHU isolation cells—in effect, setting an arbitrary 10% quota for putting prisoners in extreme isolation whenever the prison is filled to capacity.[87] In fact, during the solicitation process for the CAR contract that was ultimately awarded to MTC for Willacy, BOP insisted on a 10% SHU quota even though a potential bidder asked if BOP would consider reducing the SHU requirement "[d]ue to the low security nature of the intended population."[88] Similar SHU quotas exist in BOP's not-

---

82  Federal Bureau of Prisons, Program Statement 5270.10, Special Housing Units (Aug. 1, 2011), *available at* http://www.bop.gov/policy/progstat/5270_010.pdf.

83  *Contract Between GEO Group and BOP for Management of Big Spring Correctional Center* [awarded Jan. 17, 2007] [hereinafter *Big Spring CAR 6 Contract*] 91; *Contract Between Management and Training Corporation and BOP for Management of Giles W. Dalby Correctional Facility* [awarded Jan. 17, 2007] [hereinafter *Dalby CAR 6 Contract*] 91; *Contract Between Corrections Corporation of America and BOP for Management of Eden Detention Center* [awarded Jan. 17, 2007] [hereinafter *Eden CAR 6 Contract*] 89; *Contract Between GEO Group and BOP for Management of Reeves County Detention Center I/II* [awarded May 24, 2006] [hereinafter *Reeves CAR 5 Contract*] 45; *Contract Between GEO Group and BOP for Management of Reeves County Detention Center III* [awarded Jan. 17, 2007] [hereinafter *Reeves CAR 6 Contract*] 92.

84  Interview with Freddie, prisoner at Dalby (May 19, 2011) [on file with ACLU of Texas]; Interview with Fernando, prisoner at Dalby (May 19, 2011) [on file with ACLU of Texas]; Interview with Pedro, prisoner at Dalby (May 19, 2011) [on file with ACLU of Texas]; Interview with Orlando, prisoner at Dalby (May 19, 2011) [on file with ACLU of Texas]; Interview with Fortunato, prisoner at Reeves (May 17, 2011) [on file with ACLU of Texas].

85  Interview with Gonzalo, prisoner at Reeves (Nov. 19, 2013) [on file with ACLU of Texas].

86  We reviewed the BOP contracts for four of the five CAR prisons in Texas. Although BOP did not respond to our request under FOIA for the Willacy contract, we were able to review the solicitation that led to the Willacy contract. That solicitation contains an identical 10% SHU quota. *Performance Work Statement, Short Term Sentence (STS) Solicitation Number RFP-PCC-0018*, Fed Biz Opps, *available at* https://www.fbo.gov/utils/view?id=96ffa1d7f4ca290034c31e8ec77e3a81 [last visited Mar. 14, 2014].

87  *Big Spring CAR 6 Contract*, *supra* note 83, at 55; *Eden CAR 6 Contract*, *supra* note 83, at 53; *Dalby CAR 6 Contract*, *supra* note 83, at 55; *Reeves CAR 5 Contract*, *supra* note 83, at 13; *Reeves CAR 6 Contract*, *supra* note 83, at 56.

88  *Performance Work Statement, Short Term Sentence (STS) Solicitation Number RFP-PCC-0018*, Fed Biz Opps, *available at* https://www.fbo.gov/utils/view?id=96ffa1d7f4ca290034c31e8ec77e3a81 [identifying 10% SHU quota] [last visited Mar. 14, 2014]; *STS Contractor Questions and Answers – Part 2, July 21, 2010, Short Term Sentence (STS) Solicitation Number RFP-PCC-0018*, Fed Biz Opps, *available at* https://www.fbo.gov/utils/view?id=743f5ba5ef74ba57e884a7fb4ec935a1 [denying request to reduce SHU requirement to 5% of contract beds] [last visited Mar. 14, 2014].

CAR CONTRACTS REQUIRE **10%** BED SPACE AS ISOLATION CELLS **2X** THE RATE OF BOP-RUN FACILITIES

yet-awarded CAR XIV and CAR XV solicitations. The 2012 CAR XIV solicitation contains the same 10% SHU quota as the existing contracts, while the 2013 CAR XV solicitation mandates that each prison build a SHU with at least 100 beds regardless of its overall size.[89]

This quota is nearly double the percentage of prisoners kept in isolated confinement in BOP-managed facilities, most of which house higher-security prisoners than the low-custody prisoners at the CAR prisons we visited.[90] And it is truly shocking compared to states that have made deliberate efforts to reduce their use of isolated confinement. For example, January 2014 statistics from the Colorado Department of Corrections indicate that fewer than 1% of the prisoners in that state's Security Level II facilities (the facilities most comparable to low-custody BOP prisons) and only 5.6% of prisoners in its Security Level III facilities (most comparable to medium-custody BOP prisons) are housed in isolation.[91] Similarly, news reports indicate that Maine housed only about 3% of its entire

---

89   *CAR XIV Solicitation Number RFP-PCC-0021*, Fed Biz Opps, *available at* https://www.fbo.
gov/?s=opportunity&mode=form&tab=core&id=ab1a2eef3ba781ba7ec769f352162995&_cview=0 (last visited
Feb. 26, 2014); *CAR XV Solicitation Number RFP-PCC-0022*, Fed Biz Opps, *available at* https://www.fbo.gov/
index?s=opportunity&mode=form&id=3d3a58aefa1911d9fd8b8ea5d38801b&tab=core&_cview=1 (last visited Feb. 26, 2014).
90   As of late 2013, 9,500 of the 175,174 prisoners in BOP-managed facilities, or 5.4%, were in restricted housing. *See Hearing on the Oversight of the Federal Bureau of Prisons, S. Comm. on the Judiciary*, 113th Cong. (2013) (testimony of Charles E. Samuels, Jr., Director, Bureau of Prisons), *available at* http://www.judiciary.senate.gov/pdf/11-6-13SamuelsTestimony.pdf (testifying that there are 9,500 prisoners in restricted housing in BOP facilities as of most recent data available); *Population Statistics*, *supra* note 23 (identifying total BOP-managed population as of December 2013 as 175,174 prisoners).
91   *See* Colo. Dep't of Corrections, Monthly Population and Capacity Report (Jan. 31, 2014), *available at* http://www.doc.state.co.us/sites/default/files/opa/MonthlyReport_2014_01.pdf (last visited Feb. 18, 2014). The percentage of prisoners in isolation was calculated for each security level by dividing the sum of "Punitive Beds" and "Ad. Seg. Beds" by the total "Facility Population."

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 34 of 105 PageID #: 4289

prison population (including maximum-custody prisoners) in isolated confinement in 2011.[92]

At Willacy, Dalby, and Eden, staff have reportedly been sending new arrivals to the SHU and then keeping them isolated there for days or weeks. Prisoners told us this practice has been routine at Willacy since April 2013 because there is no space available in the Kevlar tents used as general population dorms.[93] "Every day new people were brought into SHU because there weren't enough beds in the tents. People complained that they did not do anything and shouldn't be in SHU," a Willacy prisoner told us.[94] At Dalby, many prisoners we spoke to told us that they spent several weeks in the SHU when they first arrived.[95] At Eden, nearly everyone we interviewed in January 2014 reported that they were immediately locked in an isolation cell when they arrived, with some waiting for days and others waiting as long as two weeks before being assigned a bed in the general population dorms.[96] In addition to being pointlessly cruel, such extended periods of isolation upon intake appear inconsistent with BOP intake policies.[97] However, private prisons are not required to abide by those policies.[98]

At Reeves, before the construction of an infirmary, staff used the SHU to house both physically and mentally ill prisoners.[99] In August 2008, a man with known mental illness committed suicide in the SHU after being denied psychotropic medication.[100] In December of that same year, a man died in an isolation cell after not receiving treatment for epilepsy and suffering from a major seizure.[101]

---

92    *See* Lance Tapley, *Reform Comes to the Supermax*, PORTLAND PHOENIX, May 25, 2011, *available at* http://portland.thephoenix.com/news/121171-reform-comes-to-the-supermax/ (reporting Maine's population in solitary confinement as 60 prisoners); E. Ann Carson & William J. Sabol, BJS Statisticians, *Bureau of Justice Statistics, Prisoners in 2011*, at 31 (Dec. 2012), *available at* http://www.bjs.gov/content/pub/pdf/p11.pdf (reporting Maine's total custody population as 1,978 prisoners).

93    Interview with Vicente, *supra* note 62; Interview with Mario, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas); Interview with Hugh, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Dmitri, *supra* note 75.

94    Interview with Dmitri, *supra* note 75.

95    Interview with Patricio, *supra* note 73; Interview with Camilo, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Valentino, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Ambrosio, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Bautista, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Emmanuel, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas).

96    Interview with Agustin, *supra* note 71; Interview with Leonardo, *supra* note 71; Interview with Richard, *supra* note 71; Interview with Pablo, prisoner at Eden (Jan. 7, 2013) (on file with ACLU of Texas); Interview with Franco, prisoner at Eden (Jan. 7, 2013) (on file with ACLU of Texas); Interview with Bradley, prisoner at Eden (Jan. 7, 2013) (on file with ACLU of Texas); Interview with Jesse, prisoner at Eden (Jan. 7, 2013) (on file with ACLU of Texas); Interview with Simon, prisoner at Eden (Jan. 8, 2013) (on file with ACLU of Texas); Interview with Isaac, *supra* note 71; Interview with Marvin, prisoner at Eden (Jan. 8, 2013) (on file with ACLU of Texas); Interview with Gael, prisoner at Eden (Jan. 8, 2013) (on file with ACLU of Texas) interview with Elias, prisoner at Eden (Jan. 8, 2013) (on file with ACLU of Texas) interview with Vladimr, *supra* note 71; Interview with Kevin, *supra* note 71.

97    FEDERAL BUREAU OF PRISONS, PROGRAM STATEMENT 5290.15, INTAKE SCREENING (Mar. 30, 2009) *available at* http://www.bop.gov/policy/progstat/5290_015.pdf.

98    There is no mention of BOP Program Statement 5290.15 (Intake Screening) in the contract provisions pertaining to SHU. *See Big Spring CAR 6 Contract*, *supra* note 83, at 55; *Eden CAR 6 Contract*, *supra* note 83, at 53; *Dalby CAR 6 Contract*, *supra* note 83, at 55; *Reeves CAR 5 Contract*, *supra* note 83, at 13; *Reeves CAR 6 Contract*, *supra* note 83, at 56.

99    Complaint ¶ 93, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010).

100   *Id.* ¶ 226.

101   *Id.*

Prisoners at all of the facilities reported being sent to the SHU for inappropriate reasons. One man was reportedly sent to the SHU for six months after he complained about not receiving adequate medical care for a sprained ankle.[102] Another told us he was sent to the SHU after complaining about the food.[103] At Eden, we heard several reports of prisoners being sent to the SHU for helping others with lawsuits or grievances.[104]

**During the solicitation process for one CAR contract, BOP insisted that 10% of the bed space in each bid be reserved for isolation cells, even though one potential bidder requested it be reduced to 5%.**

We also heard instances of prisoners being sent to the SHU due to a pending investigation but not being let out after the investigation was or should have been concluded. Henry reported that he had been in isolation at Big Spring for nearly five months.[105] He was initially told he would be held in the SHU for three months while staff investigated whether he had illegally possessed a cell phone. But when we interviewed him, he was still in isolation and was unsure why.[106] Similarly, Dmitri reportedly was sent to the SHU at Willacy because he was under investigation for allegedly selling tobacco inside the prison. Although investigators dismissed the charges after six weeks, he was forced to spend an additional month in isolation while he waited for a bed to become available in the general population tents.[107]

Although extreme isolation is inherently inhumane and harmful, the conditions prisoners described in the SHU are especially abhorrent. At Big Spring, we heard about toilets in cells that stopped working, causing the smell of feces to permeate the SHU for days.[108] At Dalby, prisoners told us that they could go outside only if they filed a form asking for permission, and that staff did not even inform some prisoners that they could make such a request.[109] One prisoner told us he spent his first three months in isolation

---

102    Interview with Sebastian, *supra* note 72.
103    Interview with Dominic, *supra* note 73.
104    Interview with Leonardo, *supra* note 71; Interview with Agustin, *supra* note 71; Interview with Richard, *supra* note 71; Interview with Isaac, *supra* note 71; Interview with Vladmir, *supra* note 71; Interview with Kevin, *supra* note 71.
105    Interview with Henry, *supra* note 73.
106    *Id.*
107    Interview with Dmitri, *supra* note 75.
108    Interview with Dominic, *supra* note 73.
109    Interview with Alfonso, *supra* note 73; Interview with Valentino, *supra* note 95.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 36 of 105 PageID #: 4291

without ever seeing the outside because he was unaware he could ask for recreation.[110] At Big Spring and Reeves, three prisoners are reportedly crammed into small isolation cells that are meant for two, meaning that one of the prisoners is forced to sleep on the floor.[111] At Eden, we heard that prisoners in the SHU are offered showers at 1:00 a.m. and recreation at 5:00 a.m., causing many men to choose never to leave their cells.[112]

The psychological toll of confinement in such conditions is heavy. For many of the men, these claustrophobic conditions drive them to the verge of madness. "It was awful. The noise was bad. People could be heard screaming and kicking their doors all day," one prisoner told us.[113]

# What is it like in extreme isolation?

**DOMINIC** had been in isolation for four months when we interviewed him at Big Spring. He is serving a sentence for illegal entry and drug and weapon possession. Though he is originally from Mexico, his family lives in Los Angeles. This was not his first experience in isolation, he told us. He spent nine months in an isolation cell in the SHU when he was at Reeves, but the loneliness and squalid conditions had not gotten any easier.

His current stint in isolation at Big Spring started in July 2013 when he and other prisoners complained about the food while the facility was on lockdown. In response, Dominic explained, prison guards put him and others who had complained into the SHU. The riot squad pepper-sprayed him when they took him out of the general population unit, and the pepper spray was still burning his eyes and skin when he arrived in the SHU. Dominic says he waited three days before he was given the opportunity to wash off the pepper spray.

---

110    Interview with Alfonso, *supra* note 73.
111    Interview with Bruno, *supra* note 73; Interview with Dominic, *supra* note 73.
112    Interview with Richard, *supra* note 71.
113    Interview with Alex, *supra* note 65.

Dominic described living in the SHU: He spends about 23 hours every day in his cell. It is a small room with two bunk beds, though there are three men in Dominic's cell. There is a metal door with two parallel vertical windows above a tray slot for food. The cell has one toilet and a shower, though Dominic says the men do not always have running water and there is no privacy. Each day, the men are given one or two gallons of drinking water in large plastic containers to share. Their food arrives cold, sometimes only half cooked. Dominic reports that when it is time to go outside, the men are released into an outdoor cage that is about eight to ten paces wide. When Dominic needs a shave, a prison staff member does it, though Dominic told us he worries about blood-borne diseases because they often reuse the same razor on multiple men. Dominic reports that books are provided on a weekly basis and if a prisoner knows exactly what he needs from the law library, he can request it. There is no television.

## He spends about 23 hours every day in his cell.

The cell is cold, Dominic told us. One day he was standing on the top bunk, trying to cover the vent to warm the cell, when he fell and injured his wrist. There is an emergency button in the cell to call the guard. He pushed it but it took nearly ten minutes for a guard to respond. Medical staff arrived shortly after and injected him with a painkiller. He says he waited five more hours until he was finally taken to an emergency room. Dominic said the emergency room doctor recommended surgery, but because there was no anesthesiologist on shift he was told he would have to wait. He was sent back to his cell with his wrist wrapped and was told to take ibuprofen for the pain. Three months later, Dominic said he still had not heard anything about receiving surgery.

"They don't take us seriously," he said. "It's all money for them."[114] ■

---

114    Interview with Dominic, *supra* note 73.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 38 of 105 PageID #: 4293

# BOP policies encourage overcrowding and enforced idleness

**❝People don't have nothing to do here. Three thousand people in this facility and you can't move around."**

—Theodore, prisoner at Willacy[115]

Our investigation uncovered evidence suggesting that the private companies have financial incentives to overcrowd the CAR prisons. All of the contracts we reviewed contain occupancy quotas. The contracts stipulate that the facilities must remain at or above 90% capacity. The contracts further provide "Incremental Unit Price" payments for each additional prisoner above the 90% occupancy quota, up to 115% capacity.[116] By the terms of the contract, the companies actually make more money by admitting more prisoners from BOP than their facilities were designed to hold.[117]

The BOP defines "rated capacity" in federal facilities as the number of prisoners a facility is designed to house safely and securely, with adequate access to services, necessities for daily living, and programs.[118] A facility's rated capacity does not include additional beds in hallways, gyms, or other repurposed spaces.[119]

Our investigation indicates that all of the CAR prisons in Texas appear to be filled beyond their rated capacities.[120] Prisoners at each of the CAR prisons in Texas complained that the lack of space and privacy raises stress to the boiling point.

---

115    Interview with Theodore, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas).

116    *Big Spring CAR 6 Contract*, *supra* note 83, at 57-60 (providing that BOP pays GEO Group up to $82 million per year for 115% capacity); *Eden CAR 6 Contract*, *supra* note 83, at 53-58 (providing that BOP pays CCA up to $53 million per year for 115% capacity); *Dalby CAR 6 Contract*, *supra* note 83, at 57-60 (providing that BOP pays MTC up to $36 million per year for 115% capacity); *Reeves CAR 5 Contract*, *supra* note 83, at 6-10 (providing that BOP pays GEO Group up to $23 million per year for 115% capacity); *Reeves CAR 6 Contract*, *supra* note 83, at 55-61 (providing that BOP pays GEO Group up to $47 million per year for 115% capacity).

117    *See* contracts cited *supra* note 83. *See generally* Criminal: How Lockup Quotas and "Low Crime Taxes" Guarantee Profits for Private Prison Corporations, In the Public Interest (Sept. 2013), *available at* http://www.inthepublicinterest.org/sites/default/files/Criminal-Lockup%20Quota-Report.pdf (noting that occupancy quotas are unfortunately common in private prison contracts and incentivize mass incarceration).

118    U.S. Gov't Accountability Office, GAO-12-743, Bureau of Prisons: Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure 8 (Sept. 2012), *available at* http://www.gao.gov/assets/650/648123.pdf.

119    *Id.* at 8-9.

120    Prisoners at many facilities reported that hallways and recreation rooms were repurposed into dormitories. *See* interviews cited *infra* note 121. *See also Big Spring CAR 6 Contract*, *supra* note 83, at 57 (stating that 100% capacity is 3,051); *Eden CAR 6 Contract*, *supra* note 83, at 53 (stating that 100% capacity is 1,355); *Dalby CAR 6 Contract*, *supra* note 83, at 57 (stating that 100% capacity is 1,670); *Reeves CAR 5 Contract*, *supra* note 83, at 6 (stating that 100% capacity is 1,179); *Reeves CAR 6 Contract*, *supra* note 83, at 58 (stating that 100% capacity is 2,093); *Population Statistics*, *supra* note 23 (reporting the daily population as of Jan. 2, 2014, as follows: 1,550 at Eden CAR 6; 2,325 at Reeves CAR 6; 1,287 at Reeves CAR 5; 3,486 at Big Spring CAR 6; and 1,860 at Dalby CAR 6).

Many prisoners reported being housed in open-style dormitories with as many as 200 to 250 men in a single large room, and tightly packed bunks filling repurposed spaces such as hallways and former recreation rooms.[121] Prisoners complained that toilet and shower facilities are inadequate and smell foul from constant use.[122] Most of the recreation yards are too small to hold the hundreds of prisoners who must share them.[123]

**Our investigation indicates that all of the CAR prisons in Texas appear to be filled beyond their rated capacities.**

"They have a lot of people in here. Sometimes it smells. It's too many people. Some people even talk about burning down this place," a prisoner at Willacy told us. He added: "They just don't have enough space for all of us here. Sometimes it makes me go crazy."[124] At Willacy, 200 prisoners are packed into each of the 200-foot-long Kevlar tents.[125] They are reportedly housed so tightly that when they lie in their bunks, their feet can touch the bunk next to them.[126] Prisoners told us the overcrowding and lack of constructive activity drives many of them mad.[127] Fights frequently break out. One prisoner told us it was like "walking on minefields."[128]

At Reeves, some prisoners are housed in what they call the "chicken coops," which are converted recreation rooms that have been transformed into open dormitories with 42 bunk beds and three toilets.[129] The men cannot move freely around the packed facility because their movement to and from various rooms is restricted until the top of each hour.[130] At Eden, the hallways between cubicles have been repurposed into additional dormitory space, with beds lining the walls. Prisoners refer to this space as the "freeway" and report that there is no privacy and little space to move around.[131]

---

121    Interview with Sergio, *supra* note 72; Interview with Hugh, *supra* note 93; Interview with William, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas); Interview with Bruno, *supra* note 73.
122    Interview with Agustin, *supra* note 71; Interview with Pablo, *supra* note 96; Interview Franco, *supra* note 96; Interview with Andrew, prisoner at Reeves (Nov. 21, 2013) (on file with ACLU of Texas).
123    Interview with Andres, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas); Interview with Costa, *supra* note 72; Interview with Theodore, *supra* note 115; Interview with Vicente, *supra* note 62; Interview with Alex, *supra* note 65; Interview with Pedro, *supra* note 84.
124    Interview with Sergio, *supra* note 72.
125    Interview with Sergio, *supra* note 72; Interview with Hugh, *supra* note 93.
126    Interview with Theodore, *supra* note 115.
127    Interview with Hugh, *supra* note 93; Interview with Dante, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Dmitri, *supra* note 75.
128    Interview with Dmitri, *supra* note 75.
129    Interview with Sebastian, *supra* note 72; Interview with Andrew, *supra* note 122.
130    Interview with Sebastian, *supra* note 72.
131    Interview with Pablo, *supra* note 96.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 40 of 105 PageID #: 4295

To make matters worse, prisoners have very little to do to pass the time at most CAR prisons in Texas. Prisoners reported that the libraries are too small and lack adequate Spanish-language materials.[132] The yards, meant for recreation, are often bare dirt lots.[133]

Many prisoners told us that CAR prisons offer very few educational and rehabilitation opportunities.[134] "I had the idea: I have three years. I will do something so I have something to make of myself. . . . But there's nothing to do here," said Jaime, a prisoner at Big Spring.[135] A prisoner at Willacy said, "Life is sad here. This is no way to live."[136]

BOP offers prisoners in its government-operated prisons opportunities to participate in educational and rehabilitative programs. And with good reason: studies have shown that educational and other programming in prisons can have a dramatic impact on how a person leads his or her life once released from prison. For example, a recent meta-analysis by the RAND Corporation found that on average prisoners who participate in correctional education programs have a 43% lower chance of recidivating than other prisoners, and significantly higher chances of obtaining post-release employment.[137] Programming opportunities also have an impact on the safety of a facility. According to studies, prisons that provide educational opportunities have lower rates of violence.[138]

But privately run CAR facilities are not required to offer an equivalent range of programs under the rationale that such opportunities are unnecessary because immigrant prisoners will not remain in the United States.[139] This premise is simply incorrect. Prisoners may have valid asylum claims, the ability to assert derivative citizenship, or other legal rights to remain in the United States after being released. Moreover, many of the prisoners we spoke to have deep ties to the United States and plan on returning

---

132    Interview with Vicente, *supra* note 62; Interview with Dante, *supra* note 127; Interview with Alex *supra* note 65; Interview with Dylan, *supra* note 65; Interview with Maximo, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas); Interview with Jeremy, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas).
133    Interview with Lucas, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Andres, *supra* note 123; Interview with Liam, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Sebastian, *supra* note 72; Interview with Ruben, *supra* note 64.
134    Interview with Samuel, *supra* note 64; Interview with Adan, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas); Interview with Vicente, *supra* note 62; Interview with Santiago, *supra* note 72; Interview with Sergio, *supra* note 72.
135    Interview with Jaime, *supra* note 58.
136    Interview with Andres, *supra* note 123.
137    Lois Davis et al, Evaluating the Effectiveness of Correctional Education: A Meta Analysis of Programs that Provide Education to Incarcerated Adults, at xvi (RAND Corporation 2013), *available at* http://www.rand.org/content/dam/rand/pubs/research_reports/RR200/RR266/RAND_RR266.pdf.
138    Correctional Association of New York, Education from the Inside Out: The Multiple Benefits of College Programs in Prison 8 (Jan. 2009), *available at* http://www.correctionalassociation.org/wp-content/uploads/2012/05/Higher_Education_Full_Report_2009.pdf; *see generally* U.S. DOJ National Institute of Corrections, Programs and Activities: Tools for Managing Inmate Behavior (June 2010).
139    U.S. Gov't Accountability Office, GAO-08-6, *supra* note 10, at 11. *See also* Federal Bureau of Prisons, Program Statement 5100.08, *supra* note 12, ch. 5, at 9 (explaining that the deportable alien public safety factor is assigned to "[a] male or female inmate who is not a citizen of the United States" unless immigration authorities "have determined that deportation proceedings are unwarranted or there is a finding not to deport at the completion of deportation proceedings").

to their families after serving their time—even if that means returning via a dangerous illegal border crossing.[140] A recent report by the University of Arizona surveyed more than 1,000 immigrants who had been deported to Mexico. The study found that more than half had U.S. citizen family members and 42% intended to make the U.S. their permanent home.[141] Similarly, a recent report by Human Rights Watch concluded that many of the immigrants prosecuted for illegal entry or reentry have immediate family members who are U.S. citizens or permanent residents. Defense attorneys interviewed for that report estimated that 80% to 90% of their clients charged with illegal reentry had U.S. citizen family members.[142] These immigrants all have personal incentives to attempt reentry into the United States. "I'm gonna come right back," one prisoner told us. "My life is here. I know I'm going to come back."[143]

The Residential Drug Abuse Treatment Program provided in government-run BOP facilities offers prisoners an opportunity to reduce their sentences in exchange for participation.[144] However, non-citizen prisoners are presumptively ineligible for this program and the associated sentence reductions, so taxpayers foot the bill and the prisoners' families suffer the pain of longer confinements.[145]

Prisoners also report that private CAR facilities offer fewer opportunities for work. In federal facilities, prisoners can work for UNICOR, a government corporation established by Congress for the purpose of keeping prisoners constructively occupied while giving them job skills.[146] But prisoners report that compared to BOP facilities, the CAR prisons offer fewer jobs. Prisoners reportedly earn between 12 and 40 cents an hour for their work, money they spend on medical co-pays, additional food from the commissary, phone calls home, and court fees.[147] The pay is usually not enough to cover what they need, and there are far fewer jobs than there are prisoners.[148] One prisoner told us a

---

140    Interview with Jesse, *supra* note 96; Interview with Adan, *supra* note 134; Interview with Gonzalo, *supra* note 85. *See generally* Human Rights Watch, Turning Migrants into Criminals, The Harmful Impact of U.S. Border Prosecutions (May 2013), *available at* http://www.hrw.org/sites/default/files/reports/us0513_ForUpload_2.pdf; Damien Cave, *Crossing Over, and Over*, N.Y. Times, Oct. 2, 2011, http://www.nytimes.com/2011/10/03/world/americas/mexican-immigrants-repeatedly-brave-risks-to-resume-lives-in-united-states.html?_r=0.
141    Center for Latin American Studies, University of Arizona, In the Shadow of the Wall: Family Separation, Immigration Enforcement and Security; preliminary data from the Migrant Border Crossing Study 12 (2013), *available at* http://las.arizona.edu/sites/las.arizona.edu/files/UA_Immigration_Report2013web.pdf (last visited Jan. 30, 2014).
142    Human Rights Watch, *supra* note 140, at 50.
143    Interview with Jesse, *supra* note 96.
144    *Substance Abuse Treatment*, Federal Bureau of Prisons, http://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp (last visited Feb. 2, 2013); *see generally* Nora V. Demleitner, *Terms of Imprisonment: Treating the Non-citizen Offender Equally*, 21 Fed. Sent'g Rep. 174 (2009).
145    *See* 28 C.F.R. § 550.56 ("Inmates enrolled in a residential drug abuse treatment program shall be required to complete subsequent transitional services programming in a community-based program."); 28 C.F.R. § 550.58 (discussing eligibility for early release). *See also* ACLU, Public Comment on Proposed Amendments re: Cultural Assimilation, Collateral Consequences, and Recency 2-3 (75 Fed. Reg. 3525 (Jan. 21, 2010)), *available at* https://www.aclu.org/files/assets/United_States_Sentencing_Commission_Comments.pdf.
146    UNICOR, http://www.unicor.gov/about/overview/ (last visited Jan. 30, 2014).
147    Interview with Benjamin, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas); Interview with Camilo, *supra* note 95; Interview with Patricio, *supra* note 73.
148    Interview with Cristobal, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas); Interview with Cristofer, prisoner at Willacy (Nov. 13, 2013) (on file with ACLU of Texas).

guard said to him: "Jobs are not for you. You only have five months left. You're one of 1,500 in line."[149]

# Jesse's Story

Jesse made it his business to be a fully present and accountable parent. Raised by a single mother, he pampered his wife, Raquel, pushing her to take time for herself. Having grown up without a father, he doted on his three children. And when ICE sent a letter offering help with his legal status, he eagerly presented himself for the appointment.

It was a trap. ICE had scheduled the meeting to arrest him. When Jesse realized what had happened, he fainted.

Although he didn't know it until much later, Jesse's mother brought him from Mexico to Edinburg, Texas when he was four. As an adult, Jesse voluntarily left this country twice before because of this status. But this time, due to new prosecutorial policies, he was not deported. He was sentenced to 58 months in a federal facility in Eden, Texas.

A genial, affectionate man, Jesse keeps complaints to himself. His wife and children, all U.S. citizens, he said, have little idea of what prison is like. But for Jesse, even worse than what he sees around him is what he cannot see: his children's suffering.

"They miss him a lot. They want to see him. And I can't afford to take them," said his wife, 38-year-old Raquel. Four-year-old Julia, six-year-old Aiden, and seven-year-old Mia all idolize Jesse, she said.

**Brought to the U.S. when he was four, Jesse has three young children. "They miss him a lot.... And I can't afford to take them," says wife Raquel.**

"I don't even want to think about it, because it hurts so much," Raquel said,

---

149    Interview with Cristobal, *supra* note 148.

starting to weep. "We had a lot of gatherings: holidays, Thanksgiving, Easter, family barbecue. He was always wanting to be taking the kids everywhere. He was so devoted to the children, he was so caring, so overprotective. He always wanted to be with them."

Raquel is disabled with rheumatoid arthritis and struggles to make up for her husband's absence. But the whole family is reeling. "When I was sick, he would stay up with me," Raquel said. "He would get up in the middle of the night, feed the kids their bottles, change their diapers." Now, missing him, one of the girls has become aggressive. Their little boy, a star student, nevertheless has trouble concentrating and talks to himself aloud during the school day about his father. The other daughter cries and cries.

Most devastating of all, a predator recently made his way into the house. Last year, both little girls were molested by their grandmother's brother. Jesse, behind bars hundreds of miles away, couldn't protect them. Raquel pressed charges and got a conviction, but is now utterly alone. Her family had rallied to protect the child molester.

Although Jesse's work as a carpenter helped them financially, Raquel said it's his absence as a caregiver and protector that they can't overcome. Though she is desperate to stay focused on the future, she can't stop thinking about the way she encouraged her husband to go to ICE. "He always used his real identity, his Social Security card," Raquel said. "He never hid. That's why I figured everything was okay."* ■

* Interview with Jesse, *supra* note 96, interview with Raquel (on file with ACLU of Texas).

# Delayed and inadequate medical care causes needless suffering

The private companies that run BOP's immigrant prisons are responsible for providing medical services. According to the terms of their contracts with the federal government, private prison operators also absorb the costs of medical care.[150] This contractual scheme creates perverse incentives for private prison administrators to limit costs by reducing medical staff and withholding treatment in order to maximize profit. We heard numerous reports of prisoners being denied both urgent treatment and routine preventive care, with sometimes devastating results.[151]

Over the course of our investigation, the ACLU received numerous reports of medical understaffing and delayed care at CAR prisons, including some reports that a single doctor was responsible for overseeing health services for upwards of 2,000 prisoners.[152] Most recently, at least one document we obtained suggested that a Licensed Vocational Nurse (LVN) was making independent medical diagnoses at Willacy—an act beyond the proper scope of practice for an LVN.[153] Such out-of-scope practice puts patients at risk and suggests possible understaffing of Registered Nurses and mid-level practitioners.

> Some prisoners reported that a single doctor was responsible for overseeing health services for upwards of 2,000 prisoners.

Our investigation left us gravely concerned about the ability of some CAR prisons to provide timely care in urgent situations. One prisoner told us about a man who died after security staff failed to send medical staff into the unit for hours, despite the pleas of fellow prisoners who watched him slowly deteriorate.[154]

150   *Big Spring CAR 6 Contract*, *supra* note 83, at 94-98; *Eden CAR 6 Contract*, *supra* note 83, at 92-96; *Dalby CAR 6 Contract*, *supra* note 83, at 94-98; *Reeves CAR 5 Contract*, *supra* note 83, at 48-52; *Reeves CAR 6 Contract*, *supra* note 83, at 95-99.

151   *See, e.g.*, interview with Zavier, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas); Interview with Martin, prisoner at Dalby (May 19, 2011) (on file with ACLU of Texas); Interview with Gregory, prisoner at Reeves (Nov. 21, 2013) (on file with ACLU of Texas). *See also* Complaint, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010).

152   Interview with Aaron, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas); Interview with Jameel, prisoner at Big Spring (June 27, 2011) (on file with ACLU of Texas); Interview with Dennis, prisoner at Reeves (May 17, 2011); Interview with Johnny, prisoner at Reeves (May 17, 2011) (on file with ACLU of Texas); Interview with Daniel, prisoner at Reeves (May 17, 2011) (on file with ACLU of Texas); Interview with Arturo, prisoner at Big Spring (May 20, 2011) (on file with ACLU of Texas); Interview with Emilio, prisoner at Big Spring (May 20, 2011) (on file with ACLU of Texas). *See also infra* text accompanying notes 156-66.

153   *See* Inmate Request to Staff, filed by Esteban (Apr. 4, 2013) (grievance by prisoner alleged that "Dr. Aguilar" made an incorrect diagnosis; staff noted on the form that Aguilar is actually an LVN) (on file with ACLU of Texas). *See also* Texas Board of Nursing, Board Position Statements § 15.27 (July 2013), *available at* https://www.bon.texas.gov/practice/pdfs/position.pdf ("LVN scope of practice does not include acts of medical diagnosis or the prescription of therapeutic or corrective measures.").

154   *See infra* text accompanying note 256.

In another extreme example, Jesus Manuel Galindo died in 2008 after suffering a grand mal seizure while he was locked away in the SHU at Reeves for a month without proper medical treatment. As alleged in the lawsuit that the ACLU filed on behalf of Mr. Galindo's surviving family members, prison staff knew that Mr. Galindo was epileptic and placed him in isolation because Reeves did not have an infirmary at that time. "I get sick here by being locked up all by myself," Mr. Galindo wrote in a letter to his mother before he died. "They don't even know and I am all bruised up. . . . [T]he medical care in here is no good and I'm scared."[155] Mr. Galindo repeatedly asked the guards to give him his medicine and remove him from isolation. His pleas were ignored, and on the night of December 12, 2008, Mr. Galindo suffered a grand mal seizure and died unattended in his cell.[156]

Prisoners with chronic diseases such as diabetes and hepatitis complained their treatments were inconsistent.[157] Prescriptions could take weeks to fill, or they might not get filled at all.[158] We heard stories of prisoners waiting in the infirmary up to eight hours for scheduled appointments[159] and of medical staff taking weeks to respond to requests for medical assistance.[160] We heard about medical staff who reportedly responded to almost all medical complaints merely by dispensing ibuprofen.[161] One prisoner told us it took two weeks from the time he filled out a medical request to see a nurse.[162] Obtaining a referral for specialty off-site care was reportedly slow, difficult, and rare.[163] Many Spanish-speaking prisoners told us they could not communicate with medical staff because the staff only spoke English.[164]

Other prisoners reported they did not have access to preventive dental care and that staff responded to dental problems only by performing extractions.[165] Federal courts

---

155    Complaint, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010).
156    *Id.*
157    Interview with Esteban, *supra* note 61; Interview with Santiago, *supra* note 72; Interview with Diego, prisoner at Big Spring (May 18, 2011) [on file with ACLU of Texas); Interview with Leo, prisoner at Big Spring (May 18, 2011) [on file with ACLU of Texas); Interview with Daniel, *supra* note 152; Interview with Herman, prisoner at Reeves (May 17, 2011) [on file with ACLU of Texas); Interview with Bradley, *supra* note 96.
158    Interview with Loren, prisoner at Big Spring (May 18, 2011) [on file with ACLU of Texas); Interview with Aaron, *supra* note 152; Interview with Virgil, prisoner at Big Spring (May 18, 2011) [on file with ACLU of Texas); Interview with Lucien, prisoner at Big Spring (May 20, 2011) [on file with ACLU of Texas); Interview with Jonah, prisoner at Big Spring (May 18, 2011) [on file with ACLU of Texas); Interview with Nelson, prisoner at Eden (May 21, 2011) [on file with ACLU of Texas); Interview with Herman, *supra* note 157.
159    Interview with Aurelio, prisoner at Willacy (Nov. 12, 2013) [reporting waiting eight hours to see a doctor) [on file with ACLU of Texas); Interview with Cristobal, *supra* note 148 [reporting waiting five hours to see a doctor).
160    Interview with Agustin, *supra* note 71; Interview with Richard, *supra* note 71; Interview with Pablo, *supra* note 96; Interview with Bradley, *supra* note 96; Interview with Lucas, *supra* note 133.
161    Interview with Rico, prisoner at Reeves (Nov. 18, 2013) [on file with ACLU of Texas); Interview with Benjamin, *supra* note 147; Interview with Agustin, *supra* note 71.
162    Interview with Agustin, *supra* note 71.
163    Interview with Aaron, *supra* note 152; Interview with Leonardo, *supra* note 71.
164    Interview with Pablo, *supra* note 96; Interview with Valentino, *supra* note 95; Interview with Johnny, *supra* note 152; Interview with Jesse, *supra* note 96; Interview with Agustin, *supra* note 71; Interview with Samuel, *supra* note 64; Interview with Charlie, prisoner at Big Spring (Nov. 20, 2013) [on file with ACLU of Texas); Interview with Alfonso, *supra* note 73; Interview with Valentino, *supra* note 95; Interview with Camilo, *supra* note 95; Interview with Ambrosio, *supra* note 95.
165    Interview with Sergio, *supra* note 72; Interview with Hugh, *supra* note 93; Interview with Pablo, *supra* note 96; Interview with

have held that "extraction-only" dental policies of this kind can violate the Eighth Amendment's prohibition against cruel and unusual punishment.[166] Even BOP noted that the medical care provided in at least one of the CAR prisons was inadequate. When it came time to renew the agency's contract at Reeves, BOP officials identified numerous problems in monitoring reports and specifically noted: "Lack of healthcare has greatly impacted inmate health and well-being." The contract was nevertheless renewed.[167]

# Ian's Story

**LIKE ANYONE** who walks, climbs, or rides across Latin America to get here, Ian knew there were dangers to crossing over. One of the most obvious—arrest for re-entry—snared Ian almost at once, in 2013. But the sentence, 41 months for what until recently was a civil violation, was more than he might have imagined.

And it was in no way the worst threat to befall him.

## "I was practically dead."

In April 2013, Ian began feeling intense abdominal pain, and asked for a doctor. When the prison physician arrived, he diagnosed constipation and scribbled out a prescription for laxatives.

But the pain escalated, doubling Ian in two and making it impossible to get out of bed.

Four days later, when Ian was finally rushed to the hospital, his appendix had ruptured and his body was burning with a 101.7 degree fever.

"I was practically dead," Ian said.

And the ordeal wasn't over. Surgeons removed six inches of Ian's lower intestine and scoured the rest of his intestines to clear contaminants spread by the rupture. Ian then spent twelve days in a Lubbock, Texas hospital before being raced to Brownsville, Texas for twenty days of intensive antibiotic

---

166   *See* Dean v. Coughlin, 623 F. Supp. 392, 404 (S.D.N.Y. 1985) (holding that denying inmates access to dentist for treatment and diagnosis violates Eighth Amendment); Chance v. Armstrong, 143 F.3d 698, 703–04 (2d Cir. 1998) (holding that prisoner adequately alleged dentist violated Eighth Amendment by deciding, for financial reasons, to extract teeth that could have been saved); Heitman v. Gabriel, 524 F. Supp. 622, 627 (W.D. Mo. 1981) ("While it is by no means unprecedented for an old-fashioned prison regime to offer tooth extraction as the only dental care, no case has been found where such a limitation has been deemed judicially tolerable.") (citations and quotations omitted).

167   *See infra* notes 200–205 and accompanying text.

therapy. The extreme treatment saved his life. But Ian today is physically broken. His wounds haven't healed. He is in pain. He cannot stay seated or lift objects or eat anything but bland food.

And while he has filed a case in the federal court, there is no sign that his sentence might be altered. Ian now faces the possibility of deportation to Guatemala.

In Glenwood, Colorado, Ian's wife Charlotte has been left impoverished—and even more frightened about the future.

It's just the two of them there in Colorado, Charlotte explained in Spanish. She, too, came here from a village in Guatemala, to earn money for her family back home. Now, as a hotel maid, she regularly sends a portion of her earnings to her father and mother.

"It's hard, it's hard," Charlotte said. "I'm so sad. I don't speak English, and he helped me because he does speak English. When you go to work, fill out applications, go to a store—all these things, he helped me in everything. He was so good to me. He never raised a hand; never raised his voice."

Charlotte can't possibly visit her husband in Texas. It's too far and too expensive. But if she doesn't see him now, she may not see him again ever. If Ian is deported, then she'll have to stay here.

"What are we going to live on?" Charlotte asked rhetorically. "There isn't work in Guatemala. I have to stay here, to support him. People don't understand: he can't work in Guatemala."

Already, their small savings and dreams are gone. Last year Charlotte had to sell the house they had bought together. In addition to supporting her parents, she now sends what money she can to her husband. "I only send him a little, so he can buy little things to eat," she said.

But that small supplement is critical: though he must eat a special diet, the prison continues to give Ian highly spiced, jalapeño-laced meals, he said. A large part of Ian's sustenance, as a result, comes from what he can afford at the commissary with his wife's earnings.

"His stomach is open!" Charlotte said. "He has suffered a lot. If they hadn't mistreated him, nothing would have happened: they wouldn't have had to operate on his stomach. And then he stayed sick. He can't return to his country to work."* ■

* Interview with Ian, prisoner at Dalby, interview with Charlotte (on file with ACLU of Texas).

## Excluding non-citizen prisoners from family contact policies punishes them and their U.S.-based families alike

There is an overwhelming sense of despair at the CAR prisons we visited. Many of the men feel forgotten. They are far from family. They have little access to legal services. They feel like commodities exploited by the private prison companies that confine them. "You lose your memory in this place," one prisoner told us. "You keep counting days until you give up hope."[168]

Although it is ordinarily BOP policy to assign prisoners to a facility within 500 miles of their homes,[169] BOP denies non-citizens such consideration because the agency assumes that they will be deported after completing their sentences.[170] Instead, BOP transfers immigrant prisoners from all across the country to be housed in CAR prisons. Making matters worse, BOP specifically excludes these non-citizens from policies that permit prisoners to transfer to facilities closer to their families if they maintain good behavior.

# Families torn apart

**ADAN'S** ties to the United States are deep. He came to the U.S. with his family when he was a baby and has lived in Reno, Nevada, his entire life. His parents, siblings, and five young children still live there.

"I miss conversations with my mom and grandmother, the relationship with my dad, walks in the park, the small stuff," he told us. "Come in here and live our life for a month. You learn to cherish the little things."

Adan, 26 years old at the time we interviewed him, was sentenced to two years for drug and weapons charges. When his sentence at Willacy is finished he will be deported to Mexico, a country he does not even remember.

---

168   Interview with Alfonso, *supra* note 73.
169   *See* Federal Bureau of Prisons, *supra* note 12, ch. 5, at 3. *See also Housing D.C. Felons Far Away From Home: Effects on Crime, Recidivism and Reentry: Hearing Before the Subcomm. on Federal Workforce, Postal Serv. and the Dist. of Columbia of the H. Comm. on Gov't Reform and Oversight*, 111th Cong. 22 (2010) (statement of Harley G. Lappin, Director, Bureau of Prisons) [hereinafter *Housing D.C. Felons Hearing*], *available at* http://www.justice.gov/ola/testimony/111-2/05-05-10-lappin-housing-felons-away-from-home.pdf.
170   Federal Bureau of Prisons, *supra* note 12, ch. 5, at 9 (defining a "deportable alien" as an "inmate who is not a citizen of the United States," except if ICE or EOIR has determined that the person's deportation is unwarranted or has completed deportation proceedings with a decision not to deport).



**Adan's Family Home**
Reno, Nevada

**1,985 MILES**
**$350+ GAS**
**$500 LODGING**

**Willacy County Correctional Center**
Raymondville, Texas

"I have no family in Mexico that I know of," he said somberly.

Adan misses his family tremendously. BOP generally tries to place U.S. citizen prisoners within 500 miles of their homes, and those who end up further away can request a transfer as a reward for good behavior. But non-citizen prisoners like Adan receive no such consideration. Adan's family is nearly 2,000 miles away, in Reno. He talks to them as often as he can on the phone and anxiously awaits their letters, though it takes on average twelve days for mail to arrive. They have only been able to visit once. "My daughter did not recognize me," he said.[171]

The remoteness of the Texas CAR prisons imposes a heavy burden on families. It is extremely costly, often financially impossible for families to travel the long distances required to visit their loved ones. The ACLU spoke to many individuals imprisoned in Texas who identify New York, Florida, or California as their home states. Several told us they have not been able to see their families since BOP transferred them to CAR prisons.[172]

---

171    Interview with Adan, *supra* note 134.
172    Interview with Samuel, *supra* note 64; Interview with Andrew, *supra* note 122; Interview with Liam, *supra* note 133; Interview with Theodore, *supra* note 115.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 50 of 105 PageID #: 4305

Families traveling from out of state must drive long distances to visit, or find the money to buy airline tickets and rent a car. In either case, they have to pay for accommodations. There are few resources for families visiting these prisons, and facility-specific visiting restrictions make the process even more difficult.

Tara and her two sons were turned away at Eden after they drove nineteen hours to visit her husband, because her teenage son was wearing shorts—a violation of prison dress code. Because she could not find any open stores in the small town of Eden where she could purchase long pants for her son, Tara had to drive for hours more before she was able to provide her son with clothes that would allow him to see his father. [173]

When Luis tried to coordinate a long weekend for his wife and two young children to fly from California to Texas to visit him at Big Spring, prison staff denied him the visitation time, telling him that they did not have enough staff to supervise the visit.[174] Under BOP procedures, families traveling from out of state can be permitted additional visiting times, but Big Spring would not provide such accommodation for Luis's family.[175] It is hard, Luis told us, because his children want to spend time with him. But because his whole family lives in California, they cannot visit.[176]

Because the prisoners are often far from their families, they rely on telephone and mail to stay in touch. Yet even this limited contact is difficult to maintain. Telephone rates in BOP-operated prisons are set according to a standardized per-minute flat rate.[177] But at CAR prisons, each institution can charge what it wants.[178] At Big Spring, for example, a prisoner told us it costs up to three dollars for an eight-minute domestic phone call.[179] It costs one dollar per minute to Mexico.[180] Since the few prisoners who are able to secure jobs typically make around twelve cents an hour, many of them can afford to call home only rarely.

Other forms of communication are equally problematic. Although regulated email is allowed in BOP-operated prisons, email is completely prohibited in four of the five CAR

---

173   Interview with Tara, wife of Nelson, a prisoner at Eden (June 28, 2011) (on file with ACLU of Texas).
174   Interview with Luis, *supra* note 60.
175   *See* 28 C.F.R. § 540.42 (2012) ("Each Warden shall establish a visiting schedule for the institution. At a minimum, the Warden shall establish visiting hours at the institution on Saturdays, Sundays, and holidays. *The restriction of visiting to these days may be a hardship for some families and arrangements for other suitable hours shall be made to the extent practicable.*") (emphasis added); 28 C.F.R. § 540.43 (2012) ("The Warden may limit the length or frequency of visits only to avoid chronic overcrowding. . . . Exceptions may be made to any local guideline when indicated by *special circumstances, such as distance the visitor must travel.*") (emphasis added).
176   Interview with Luis, *supra* note 60.
177   U.S. Gov't Accountability Office, GAO-11-893, Bureau of Prisons: Improved Evaluations and Increased Coordination Could Improve Cell Phone Detection 8 (Sept. 2011), *available at* http://www.gao.gov/assets/330/322805.pdf.
178   *Big Spring CAR 6 Contract*, *supra* note 83, at 100-01; *Eden CAR 6 Contract*, *supra* note 83, at 98-99; *Dalby CAR 6 Contract*, *supra* note 83, at 100-01; *Reeves CAR 5 Contract*, *supra* note 83, at 54-55; *Reeves CAR 6 Contract*, *supra* note 83, at 101-02.
179   Interview with Nathaniel, prisoner at Big Spring (Nov. 20, 2013) (on file with ACLU of Texas).
180   *Id.*

facilities we visited.[181] Mailed letters take a long time to arrive and are subject to review and censorship by the guards. One Willacy prisoner told us that when he tried to write a letter to his aunt describing the conditions in the prison, it was returned to him with a note saying that it would not be sent because he was not allowed to complain about the prison in his letters.[182]

Many of the prisoners we spoke to were worried about their children, most of whom are U.S. citizens, growing up without them. Liam was incarcerated when his son was just two months old and worries that his son is forgetting him. "It's been a year since I've seen him and he doesn't want to talk when I call," he told us.[183] Gonzalo told us about missing his four children (ages six, ten, fifteen, and seventeen years old) who are growing up in Los Angeles without him. He is serving a 63-month sentence for reentry because he returned to see his children after the last time he was deported.[184] He has lived in the United States since he was five years old, considers Mexico a "whole different world" that is unfamiliar to him, and wants to get back to his children. "Can someone judge you for trying to come back to what you know? I'd rather try to do something for my kids here than drag them to Mexico," he said.[185] We heard story after story like Gonzalo's and Liam's: men who miss their children deeply; men who are serving time for trying to come back and see their kids; men who are locked up so far away it is nearly impossible for their families to visit.

**Tara and her two sons were turned away at Eden after they drove nineteen hours to visit her husband, because her teenage son was wearing shorts—a violation of prison dress code.**

The prisoners are not the only ones affected. Studies show that children of prisoners experience symptoms similar to post-traumatic stress disorder and suffer from depression, anxiety, and withdrawal.[186] These symptoms can manifest as aggression, loss of self-esteem, poor performance in school, and disobedience.[187] Studies have also

181  *Stay in Touch*, Federal Bureau of Prisons, http://www.bop.gov/inmates/communications.jsp#email (last visited Feb. 2, 2013). The lone exception is Big Spring, which allows email through the standard BOP system.
182  Interview with Adan, *supra* note 134.
183  Interview with Liam, *supra* note 133.
184  Interview with Gonzalo, *supra* note 85.
185  *Id.*
186  Creasie Finney Hairston, Focus on Children with Incarcerated Parents: An Overview of the Research Literature, 18-20 (Oct. 2007), *available at* http://www.aecf.org/~/media/Pubs/Topics/Special%20Interest%20Areas/Incarceration%20and%20Reentry/FocusonChildrenwithIncarceratedParentsAnOverv/HAIRSTON.pdf (last visited Jan. 30, 2014).
187  *Id.*

found "evidence that maintaining contact with one's incarcerated parent improves a child's emotional response to the incarceration."[188] Warehousing immigrant prisoners in remote facilities rips apart families and ensures that their children will grow up without regular contact with their fathers.

# Leah's Story

**LEAH AND HER HUSBAND ADALID** lived together with their three sons in Boston for twelve years.[189] Although Leah is an American citizen, they were unable to secure legal status for Adalid, and he was deported and later arrested while crossing the border in an attempt to rejoin his family.[190]



**2,055 MILES**
**$370+ GAS**
**$500 LODGING**

**Leah's Family Home**
Boston, Massachusetts

**Eden Detention Center**
Eden, Texas

After Adalid was convicted of illegal reentry, he was sent to serve a two-year sentence in Eden, Texas, more than 2,000 miles away from his wife and

---

188    Annie E. Casey Foundation, Children of Incarcerated Parents Fact Sheet 1, *available at* www.fcnetwork.org/AECFChildren%20of%20 Incarcerated%20Parents%20Factsheet.pdf.
189    Kevin Cullen, *Wife Fights to Save Husband From Deportation*, WBZ.com, Apr. 2, 2009, http://raidreport.blogspot.com/2009/04/wife-fights-to-save-husband-from.html.
190    Andrea Grimes, *When Operation Streamline Deters: One Immigrant's Story*, Dallas Observer, Oct. 21, 2010, http://www.dallasobserver.com/2010-10-21/news/when-operation-streamline-deters-one-immigrants-story/full/.

children in Boston.[191] Phone calls are prohibitively expensive, and the boys rely primarily on letters to stay in touch with their father.[192]

Leah described the effect that this long-distance separation has had on her children. The couple's oldest child attempted suicide, and the six-year-old boy has developed a habit of hiding his mother's shoes, hoping that will prevent her from leaving like his father did.[193]

She reflected: "I am especially dismayed at the way our own 'American Citizen' children are being mistreated by their own government by having one or both of their parents taken away. It is a suffering that no child should ever have to endure."[194] ■

# Andrew's story

Andrew has deep ties to the United States. His son Ray is a U.S. citizen serving in the Coast Guard. His fiancée Maria lives in Atlanta. He has nieces and nephews in New York. But Andrew is in Reeves County Detention Center, in West Texas far away from everyone he knows and loves.

"It's real hard, day in and day out, with the family situation. Being so far from them," he said. "Especially for a guy like me. I've been in here for so long."

Andrew has been in prison for 22 years on drug charges. He is originally from Jamaica but calls the United States his home. He has served time in several state and federal prisons, finally being transferred to Reeves in April 2013 because he is not a U.S. citizen.

> "It's real hard, day in and day out, with the family situation. Being so far from them."

---

191   *Id.*
192   Interview with Adalid, prisoner at Eden (May 21, 2009) (on file with ACLU of Texas).
193   Grimes, *supra* note 190.
194   Email from Leah to ACLU of Texas (July 18, 2011) (on file with ACLU of Texas).

Andrew was incarcerated for nearly all of Ray's childhood and had not seen his son for many years. But Andrew rekindled the relationship when he was in an Atlanta prison in 2008 and his son was attending college in the same city. "I cried," Andrew said of the first time Ray was able to visit him after their nineteen-year separation. "Tears come out my eyes." Ray visited him frequently. Sometimes, Andrew remembered, he would arrive unexpectedly and say to Andrew: "I just wanted to see you, I was driving down the street."

But since Andrew has been at Reeves, there have been no visits from Ray. His fiancée Maria tries to visit, but since it costs her around $900 per visit she is not able to come often.

Andrew's sentence is up in 2016. Until then, he thinks it unfair that he is so far away from his family just because he is a non-citizen. He questioned the system that has again ripped apart his family: "Why you got to play with life over money?"[195]  ■

# CAR prisons operate in the shadows

The truth about what happens behind the walls of these private prisons often stays hidden. BOP subjects CAR prisons to insufficient oversight and accountability and exempts CAR prisons from many of the policies, rules, and regulations intended to set baselines of safe and humane treatment in federal prisons. Meanwhile, external oversight and accountability is frustrated by the isolation of prisoners from attorneys and legal services. BOP even assists private prison companies in efforts to block BOP's own records from public disclosure. BOP's shadow system of private prisons remains largely exempt from public scrutiny—and the public interest suffers along with the prisoners inside.

## BOP fails to subject CAR prisons to adequate oversight and accountability

BOP does not impose sufficient oversight and accountability at CAR prisons, leaving

---

195    Interview with Andrew, *supra* note 122.

the private prison companies in a position of dangerous impunity. Although BOP does evaluate conditions in its own federal prisons, it does not collect the data from private prisons that would permit the agency to conduct a direct quality-of-service comparison with its own facilities. BOP's stated reason? "[C]ollecting additional facility characteristic and quality-of-service data could add cost to contracts."[196]

BOP has issued hundreds of "program statements" that regulate the operations of its prisons.[197] These program statements provide a consistent standard for prison operation on issues relating to prisoner care, staffing, and facility administration. CAR prisons, however, are governed by the terms of their contracts, which specify which program statements apply to them. Each of the CAR contracts we reviewed requires the facility to abide by only about 40 program statements, leaving out important BOP policies relating to prisoner grievances, staff hiring and training (including the number of staff required), rated capacity, telephone rates, recreational and educational programming, and attorney visits.[198]

Notably, the contracts require compliance with several program statements related to medical care, but are silent on the issue of medical co-pays, leaving each private CAR prison free to develop its own co-pay policy. The contracts also require compliance with the program statements related to prisoner discipline and use of the SHU, but are silent on how private CAR prisons can use SHU upon intake. It is perhaps unsurprising, then, that the ACLU received complaints about both of these issues.[199]

BOP does conduct monitoring visits of the CAR facilities to determine compliance with its contracts and issues reports that identify areas of non-compliance. However, the information that BOP collects through its contract monitoring process rarely, if ever, leads to contract cancellations, even in egregious circumstances. Documents obtained through a multi-year FOIA lawsuit filed by *pro bono* attorney Stephen Raher provide an alarming window into this process: over a period of years, monitoring reports found serious problems at Reeves, including improper treatment of HIV patients, untimely medical examinations, failure to maintain the safety of the SHU, and unsanitary kitchen

---

196    U.S. Gov't Accountability Office, GAO-08-6, *supra* note 10, at 5 (reporting assertions made to GAO by BOP).
197    Policy and Forms, Federal Bureau of Prisons, http://www.bop.gov/resources/policy_and_forms.jsp (last visited Feb. 20, 2014).
198    *Big Spring CAR 6 Contract*, *supra* note 83; *Eden CAR 6 Contract*, *supra* note 83; *Dalby CAR 6 Contract*, *supra* note 83; *Reeves CAR 5 Contract*, *supra* note 83; *Reeves CAR 6 Contract*, *supra* note 83.
199    *See supra* notes 93-97 and accompanying text (complaints from prisoners that they were put in SHU upon arrival); *infra* note 470 and accompanying text.

conditions.[200] In late 2010, when BOP was considering whether to exercise its option to renew the Reeves contract, a BOP official compiled a list of "pros and cons."[201]

BOP's "pros" for renewing centered on the idea that continuing the contract would require less acquisition work and disruption for the agency, as well as a feeling that Reeves' physical plant and per-prisoner prices were satisfactory.[202] But the fifteen

> ## The information that BOP collects through its contract monitoring processes rarely, if ever, leads to contract cancellations.

"cons" included such items as "Contractor did not fulfil [sic] contract terms from [2006] award until Oct. 2010"; "Contractor is unable to successfully achieve their own plans of action to correct deficient areas"; "Lack of healthcare has greatly impacted inmate health and wellbeing"; and "Contractor shows little sign of improvement."[203] The "cons" list also cited the 14 repeat deficiencies, 161 deficiencies, and 57 notices of concern that BOP had found during the contract and the occurrence of a "major disturbance" (*i.e.*, an uprising) that had been in part precipitated by staffing and medical care issues.[204]

Despite these serious problems, BOP chose to renew its contract with GEO Group. In a subsequent email to Justice Management Division officials (a branch of the Department of Justice that oversees organization, management, and administration issues), BOP officials explained that the agency had chosen to exercise all of its current contract options with private prisons because not doing so would cost BOP additional time and money and would cause BOP to lose its "credibility as a solid customer" with the private

---

200   BOP Contract Facility Monitoring Report for Reeves County Detention Center I & II (Jan. 27-30, 2009) (obtained through FOIA and on file with ACLU of Texas); BOP Response and Closure Report of Reeves County Detention Center I & II (Feb. 11, 2008) (obtained through FOIA and on file with ACLU of Texas); BOP Contract Facility Monitoring Report for Reeves County Detention Center I & II (July 13-14, 2010) (obtained through Freedom of Information Act and on file with ACLU of Texas); BOP Contract Facility Monitoring Report for Reeves County Detention Center I & II (Dec. 7-9, 2010) (obtained through FOIA and on file with ACLU of Texas); BOP Contract Facility Monitoring Report for Reeves County Detention Center I & II (Jan. 26-29, 2010) (obtained through FOIA and on file with ACLU of Texas); BOP Response and Closure Report of Reeves County Detention Center III (Feb. 12, 2008) (obtained through FOIA and on file with ACLU of Texas).
201   Email from Matthew D. Nace, Chief, Federal Bureau of Prisons Acquisition Branch, to Darlene Ely, Procurement Executive, Federal Bureau of Prisons (Dec. 17, 2010) (obtained through FOIA and on file with ACLU of Texas).
202   *Id*. Specifically, the email identified as "pros" the following: "No solicitation needed for new services"; "No additional burden on BOP inmate pipeline"; "No additional bedspace needed"; "Renovated facility"; and "Reasonable per diem."
203   *Id*.
204   *Id*.

prison companies.[205] Without a realistic threat of contract cancellation, there is little incentive for the private prison companies to comply with BOP standards.

In addition to failing to cancel contracts in response to underperformance, BOP policies turn a blind eye to prisoner grievances from these private prisons. As Lucien, a prisoner at Big Spring, put it: "Washington—[they] don't want to be a part of this."[206]

For BOP-run facilities, BOP oversees operations through regional offices that work closely with facility-level staff. In turn, the central office of the BOP oversees the regional offices. Through a uniform administrative remedy system, a prisoner in a BOP facility can appeal a grievance denied at the facility level to the regional and central offices.[207]

In contrast, CAR prisons apparently lack uniform policies governing how prisoners must submit grievances, and we heard from prisoners that some staff refuse to accept grievance forms in Spanish or that the prisoners are questioned as to why they want a grievance form.[208] Moreover, if a prisoner is dissatisfied with how the warden of a CAR prison responds to his grievance, he usually has no recourse; the prisoner cannot appeal to BOP's regional or central offices, and he may bring his concern to the attention of BOP (through its Privatization Management Branch in Washington) only if it falls within a narrow range of issues relating to designation, classification, or sentence computation, or issues involving federal BOP staff or the taking of prisoner property.[209] For example, the Dalby Admission & Orientation Booklet specifically states that "medical issues involving the day-to-day operations of the medical department" are not appealable, so prisoners have no remedy beyond the four walls of the prison for appealing any complaints about the medical care they receive.[210] Such policies of willful blindness leave private prison employees, not government officials, as the final arbiters of most prisoner grievances involving abuse, misconduct, and neglect.

205    Email from Carol J. Durkee, Chief, Budget Execution Branch-Federal Prison System, U.S. Dep't of Justice, to Rachel Johnson, Justice Management Division, U.S. Dep't of Justice (Mar. 17, 2011) (obtained through FOIA and on file with ACLU of Texas).
206    Interview with Lucien, *supra* note 158.
207    Federal Bureau of Prisons, Program Statement 1330.18, Administrative Remedy Program 1, 7 (Jan. 6, 2014), *available at* http://www.bop.gov/policy/progstat/1330_018.pdf.
208    Interview with Carl, prisoner at Reeves (Nov. 19, 2013) (stating that guards always ask why prisoners want grievance forms) (on file with ACLU of Texas); Interview with Henry, *supra* note 73 (stating that grievance forms in Spanish are ignored). *See also* GEO Group, Reeves County Detention Center Handbook [hereinafter *Reeves Handbook*] 22 (2011) (requiring all grievance forms to be submitted in English).
209    Corrections Corporation of America, Giles W. Dalby Correctional Facility Admission & Orientation Booklet [hereinafter *Dalby Booklet*] 8 (2011); Corrections Corporation of America, Eden Detention Center Inmate Handbook [hereinafter *Eden Handbook*] 45- 47 (2009); Cornell Companies, Big Spring Correctional Center Inmate Handbook 6-7 (2010); *Reeves Handbook*, *supra* note 208, at 20-22.
210    *Dalby Booklet*, *supra* note 209.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 58 of 105 PageID #: 4313

## Isolation from attorneys, legal services, and advocacy organizations impedes external reform efforts

Geographic isolation, unnecessary barriers to access by attorneys and advocacy organizations, and legal barriers to accountability combine to make the CAR prisons we examined unusually resistant to external pressure for reform.

> The barriers to access at these BOP contract facilities contrast starkly with the policies that Immigration and Customs Enforcement maintains at its contract detention facilities.

Even without active interference from prison administrators, the immigrants in Texas CAR prisons face major barriers to accessing legal assistance. Few have ongoing relationships with criminal defense or immigration attorneys, and those prosecuted in fast-track legal proceedings often never got the chance to develop such a relationship in the first place.[211] For those who are lucky enough to be represented by a lawyer, the remote location of the Texas facilities makes it difficult for attorneys to visit their clients.

The paucity of legal resources in the communities where the prisons are located exacerbates this legal isolation. The ACLU was able to identify few *pro bono* attorneys based near the five private prisons we visited. Indeed, the areas where these prisons are located suffer from a lack of private counsel for immigration cases, civil cases, or criminal appeals.[212] If such resources existed, attorneys who represent prisoners on their immigration or criminal cases might step in to advocate for their rights. But without access to any attorneys, it is nearly impossible for a prisoner to challenge inadequate medical care, abuse of solitary confinement, or staff harassment.

Even if a prisoner is lucky enough to have an attorney, two decisions from the U.S. Supreme Court create significant deterrents for a lawyer who is considering filing a case challenging constitutional violations in one of BOP's private prisons. The first is *Correctional Services Corp. v. Malesko*, a 2001 case holding that a private prison company is not liable for violations of constitutional rights, on the theory that allowing such a suit

---

211    *See supra* text accompanying notes 41-57.
212    The State Bar of Texas website lists no immigration attorneys near any of the five prisons and only five criminal attorneys near Big Spring and four criminal attorneys near Willacy. No criminal attorneys were located near any other prisons. *See* Find a Lawyer, STATE BAR OF TEXAS, http://www.texasbar.com/AM/Template.cfm?Section=Find_A_Lawyer&Template=/CustomSource/MemberDirectory/Search_Form_Client_Main.cfm (last visited Mar. 4, 2014).

would not advance the "core purpose of deterring individual officers from engaging in unconstitutional wrongdoing."[213] The second is *Minneci v. Pollard*, a 2012 case holding that an individual private prison officer is not liable for violations of constitutional rights, on the theory that there was no need for a constitutional cause of action because state tort law offered sufficient remedies.[214] Although the two cases have been harshly criticized,[215] they will remain in force unless reversed or legislatively overturned.

Perhaps emboldened by this combination of physical isolation and legal impunity, some CAR prison administrators took surprising steps to interfere with the ACLU's efforts to speak with prisoners who had asked to meet with us. Big Spring canceled a scheduled visit on short notice, after the legal team had already traveled to the town where the facility is located. When pressed for a justification, the assistant to the warden explained that he was displeased with the tone of our correspondence—he claimed we had "demanded" access rather than "requesting" it.[216] Our lawyers were permitted to visit only after mollifying him. At Eden, the warden denied our request for attorney visitation with a curt letter demanding we explain why our meetings with prisoners "might be appropriate" and asserting: "The BOP Program Statements [regarding attorney visitation] which you have now cited do not apply at this facility."[217] It took nearly two months of letters to the warden, including a three-page letter we copied to the Director of BOP and other BOP officials, to arrange confidential interviews with the numerous men who had requested to meet with us at Eden.[218]

The barriers to access at these BOP contract facilities contrast starkly with the policies that Immigration and Customs Enforcement maintains at its contract detention facilities—including facilities operated by the same private prison companies that run BOP's CAR prisons. ICE policy not only allows confidential attorney visits, but also permits nongovernmental organizations to interview detainees and tour detention

---

213   Corr. Servs. Corp. v. Malesko, 534 U.S. 61, 74 (2001). As Justice John Paul Stevens wrote in a prescient dissent, "a tragic consequence of [this] decision is the clear incentive it gives to corporate managers of privately operated custodial institutions to adopt cost-saving policies that jeopardize the constitutional rights of the tens of thousands of inmates in their custody." *Id.* at 81 (Stevens, J., dissenting).

214   Minneci v. Pollard, 132 S. Ct. 617, 625-26 (2012).

215   *See, e.g.*, Maurica Sthanki, *Deconstructing Detention: Structural Impunity and the Need for an Intervention*, 65 Rutgers L. Rev. 447 (2013); Allison L. Waks, Note, *Federal Incarceration By Contract in a Post-*Minneci *World: Legislation to Equalize the Constitutional Rights of Prisoners*, 46 U. Mich. J. L. Reform 1065 (2013); Geoffrey Segal, *Supreme Court Rules on Private Prison Liability, Inmates at Private and Government-run Prisons Should Have Same Rights*, Reason Foundation (Jan. 7, 2002), http://reason.org/news/show/supreme-court-rules-on-private (last visited Feb. 7, 2014).

216   Telephone conversation between Michael Harding, Executive Assistant to the Warden, Big Spring Correctional Center, and Rebecca L. Robertson, Legal & Policy Director, ACLU of Texas (Nov. 19, 2013).

217   Letter from Keith E. Hall, Warden, Eden Detention Center, to Rebecca L. Robertson, Legal & Policy Director, ACLU of Texas (Nov. 1, 2013) (on file with ACLU of Texas).

218   Letter from Rebecca L. Robertson, Legal & Policy Director, ACLU of Texas, to Keith E. Hall, Warden, Eden Detention Center (Nov. 26, 2013) (on file with ACLU of Texas).

facilities.[219] While ICE's own record of problems shows that more liberal access policies do not guarantee acceptable conditions of confinement, they do make it harder for private prison employees to hide abuse in the shadows by impeding the access of attorneys and nongovernmental organizations. We see no reason why BOP cannot require its private prison contractors to adhere to the same access policies that ICE requires of its contractors.

## BOP assists private prison companies' efforts to block transparency

Federal agencies are required to disclose their records to the public under the Freedom of Information Act.[220] Similarly, Texas state and municipal agencies are required to make their records public under the Texas Public Information Act.[221] And although courts in Texas and some other states have found public records laws to cover private prisons,[222] the federal FOIA has not been found to apply to records in the possession of the corporations that run the CAR prisons. As journalist and policy analyst Tom Barry stated in a congressional briefing: "Requests for the most basic information about the functioning of these prisons and detention centers routinely lead nowhere."[223]

This keeps much of what happens in CAR prisons hidden from the public. And the private prison industry has fought to ensure that does not change. According to one review of lobbying reports, CCA has spent about $7 million since 2007 successfully lobbying against legislation that would have subjected its prisons to the same federal open records obligations as BOP-operated prisons.[224]

It is even difficult to obtain information about private prisons from BOP itself.

---

219    *See* Immigration and Customs Enforcement, Stakeholder Procedures for Requesting a Detention Facility Tour and/or Visitation, *supra* note 13; Immigration and Customs Enforcement, Performance-Based National Detention Standards, *supra* note 13, §§ 5.7, 7.2.
220    5 U.S.C. § 552 (2011).
221    *See generally* Tex. Gov't Code Ann. § 552 (West 2011).
222    *See* Prison Legal News v. Corr. Corp. of Am., No. D-1-GN-13-001445 (Dist. Ct., 353rd Judicial Dist., Travis Cty, Tex. Mar. 19, 2014) (finding CCA is a "governmental body" under the Texas Public Information Act and therefore subject to the Act's obligations to disclose public information); Friedman v. Corrections Corp. of Am., No. M2012-00212-COA-R3-CV (Tenn. Ct. App. Feb. 28, 2013) (ordering CCA to produce records under Tennessee public records laws); Prison Legal News v. Corrections Corp. of Am., No. 332-5-13 (Vt. Sup. Ct. Jan. 10, 2014) (ordering CCA to produce records under Vermont public records laws).
223    Tom Barry, Policy Briefing: The Shadow Prison Industry and Its Government Enablers 3 (2010), *available at* http://www.ciponline.org/images/uploads/publications/Barry_The_Shadow_Prison_Industry_01-10.pdf.
224    Grassroots Leadership, The Dirty Thirty: Nothing to Celebrate About 30 Years of Corrections Corporation of America 26 (2013), *available at* http://grassrootsleadership.org/sites/default/files/uploads/GRL_Dirty_Thirty_formatted_for_web.pdf.

It is even difficult to obtain information about private prisons from BOP itself. The ACLU filed FOIA requests with BOP in April 2011 and again in February 2013 to obtain information about its CAR contracts—but as of the date of this report, BOP has not released any documents to us.[225] Additionally, BOP fought vigorously to shield its own records from the public in *pro bono* attorney Stephen Raher's multi-year FOIA litigation regarding BOP's Reeves contracting documents.

In Raher's litigation, BOP argued that the amounts it paid to GEO Group under the Reeves contract should be withheld because they purportedly fell within FOIA Exemption 4, the "trade secrets" exemption to FOIA.[226] In a curious logical inversion, BOP officials also argued that some documents could not be made public under FOIA because they had already been publicly released in the past.[227] It is disturbing that the objections BOP advanced seem to have originated with the private prison companies rather than resulting from BOP's independent judgment. In rejecting the "trade secret" withholdings, the court noted: "For whatever reason, BOP apparently relied on . . . CCA and GEO Group . . . to supply reasons for withholding information under Exemption 4 and never thoughtfully re-examined its position in response to the evidence and arguments made by Raher."[228]

Raher said of the litigation: "The Bureau of Prisons invited this lawsuit by refusing to release any meaningful information that would shed light on its secretive immigrant prisons. Over time, the BOP conceded that it did not have a legal basis for withholding much of the information, yet obtaining these documents still required hundreds of hours of my time and tens of thousands of dollars. Most citizens cannot realistically spend resources like this to vindicate their FOIA rights, thus showing that transparency in the federal government is too often illusory."[229]

Raher's experience is hardly unique. In 2000, for example, criminal justice policy analyst Judith Greene submitted a FOIA request to BOP seeking information about how CCA, which had recently obtained a BOP contract in California, could acquire the legal power to operate a private prison on behalf of BOP, including the power to use deadly force, in California—a state that had not enacted legislation conferring such authority on

---

225    Letter from Lisa Graybill, Legal Director, ACLU of Texas, to Office of General Counsel, Federal Bureau of Prisons (Apr. 2011) (requesting contracts under FOIA); Letter from Wilson J. Moorer, Senior Paralegal Specialist, Federal Bureau of Prisons, to Lisa Graybill, Legal Director, ACLU of Texas (Feb. 1, 2013) (stating that the BOP does not have a record of the original request); Letter from Adriana Piñon, Senior Staff Attorney, ACLU of Texas, to Office of General Counsel, Federal Bureau of Prisons (Feb. 11, 2013) (resubmitting original FOIA request). As of the date of this report, the ACLU of Texas has not received a response to this last letter.
226    Raher v. Fed. Bureau of Prisons, No. 09-CV-536-ST, 2013 WL 26205 at *2 (D. Or. Jan. 2, 2013).
227    Email from Stephen Raher, FOIA Litigant, to Samantha Fredrickson, Contract Attorney, ACLU of Texas (Jan. 3, 2014).
228    *Raher*, 2013 WL 26205 at *3.
229    Email from Stephen Raher, *supra* note 227.

private corporations. After several months, BOP notified Greene that it had withheld the information she sought because the company deemed it a trade secret.[230]

The private prison companies also fight the release of government-held information under state public records laws. When the ACLU requested policy statements relating to the use of segregated housing units and medical care at the Reeves County Detention Center through a Texas Public Information Act request, Reeves County and its corporate subcontractors—GEO Group and Physicians Network Association, a for-profit company contracted to provide medical service—argued that those documents should be exempt from state open records requirements because they are "trade secrets." When the Texas Attorney General found that their arguments had no merit under Texas law, Reeves County sued in state court to contest the Attorney General's ruling and to prevent the release of those policies.[231]

This secrecy needs to end. As long as the CAR prisons are providing services that the government would otherwise provide itself, they should be subject to the same open records laws as BOP's own prisons—and BOP should stop wasting taxpayer money by litigating to withhold basic information about private prisons as "trade secrets."

# Conclusion

Overall, our multi-year investigation revealed that while the CAR prisons enrich the private prison industry, they impose serious costs in health and human dignity. Prisoner after prisoner described how BOP's decisions to incentivize overcrowding and abuse of extreme isolation, turn a blind eye to inadequate medical care and other forms of neglect, and deny rehabilitative programming have created dangerous, squalid, and tense conditions in these private prisons. And despite multiple protests and uprisings, little seems to change.

Prisoners reportedly sleep in hallways and repurposed recreation rooms, their bunk beds often only a few feet apart. Isolation units are reportedly kept so full that some people must sleep on the floor of a small cell they share with two strangers for 23 hours

---

230    Judith A. Greene, Congressional Briefing: Expanding Freedom of Information Act Accountability to All Federal Prisons and Detention Facilities (2010), *available at* http://www.privateci.org/private_pics/JG%20Briefing%20Statement%201-25-10.doc.
231    *See* Tex. Att'y Gen. OR2011-01613 (noting that Reeves County, GEO, and PNA submitted objections to open records requests and rejecting argument that documents constituted trade secrets), *available at* https://www.oag.state.tx.us/opinions/openrecords/50abbott/orl/2011/htm/or201101613.htm; Petition, Reeves County v. Greg Abbott, No. D-1-GN-11-000434 (Dist. Ct., 353rd Judicial Dist., Travis Cty., Tex. Feb. 11, 2011) (challenging attorney general's conclusions) (on file with ACLU of Texas).

per day. BOP encourages this abuse through a combination of arbitrary SHU quotas and contractual incentives for overcrowding each prison as a whole.

Putting profit before people seems to touch every facet of life at CAR prisons. From alarming lapses in chronic care to terrifying denials of emergency care, we received many reports that medical care—if it was delivered at all—was delivered slowly, cheaply, and poorly. Little money appears to be put into education and rehabilitative programs, both of which are proven to create safer environments in prisons and help prisoners reenter society.

Meanwhile, life in CAR prisons remains in the shadows. Prisoners are warehoused in facilities located in remote and barren parts of Texas, far from their families who live all over the United States and often cannot afford the long journey to visit. Few have relationships with attorneys who can advocate for them. And since these private prisons often evade the reach of state and federal open records laws, much of what happens behind these walls has gone unseen and unheard by the public until this report.

## Reeves County Detention Center
**Pecos, Texas**



■ The "residents" of Reeves County Detention Center make up almost half of the population of Pecos, Texas.

Aprisoner protest during the summer of 2013 at the GEO Group-operated Reeves County Detention Center reportedly ended with guards tear-gassing dormitories, shooting rubber bullets, locking down the entire facility, and punishing prisoners by putting them in extreme isolation. The improvements the prisoners had hoped to achieve—better medical care, more food, and less crowded living conditions—never came.[232]

This incident was hardly the first time prisoners protested the conditions at Reeves. Since Reeves became a CAR facility in 2006, prisoners at the institution have organized several strikes and uprisings to demand better medical care and conditions. Most

---

[232]  *See infra* text accompanying notes 271-74.

notably, riots broke out in late 2008, after prisoner Jesus Manuel Galindo died in solitary confinement, and a few months later in early 2009.[233]

The 3,700 prisoners at Reeves have reason to be angry. Several prisoners have died in recent years.[234] And even though BOP's own monitors have found numerous deficiencies that could let them out of the contract—expressing frustration in 2010 that GEO Group "shows little signs of improvement" and "is unable to successfully achieve their own plans of action to correct deficient areas"—BOP continues to renew its contracts with the company.[235] Throughout our investigation, prisoners reported that they are often denied necessary medical treatment, frequently put in isolation cells, and are forced to live in cramped, overcrowded conditions. Reeves illustrates what happens when BOP refuses to impose serious consequences for repeated unsatisfactory performance: this private prison is run by a company that knows it can operate with impunity.



■ Despite prisoner protests, two major uprisings, and negative reports from BOP's own monitors, BOP continues to renew its contracts with the company that runs Reeves.

Photo: Smokey Briggs, Pecos Enterprise

## Background

Reeves County Detention Center is a massive detention complex in Pecos, Texas, nearly 100 miles from Midland, in the desolate expanse of the Permian Basin. GEO Group at one point described Reeves, which has two prison facilities and a capacity to house 3,700

233    Barry, *supra* note 63.
234    Complaint, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010) (citing four deaths prior to Jesus Manuel Galindo's death).
235    Email from Matthew D. Nace, *supra* note 201. *See also supra* text accompanying notes 197-205.

prisoners, as "the largest detention/correctional facility under private management in the world."[236] Its "residents" make up almost half of the population of Pecos, Texas.[237]

According to news reports, the original sections of the Reeves complex (Reeves I/II) were built by Reeves County during the height of the "War on Drugs" in the 1980s with hopes that incarceration would bring revenue to the depressed county.[238] In 2001, the county built an additional section (Reeves III) on the assumption that more prison contracts would eventually come their way, financing the expansion by using the existing structure as collateral on a loan.[239] But instead of improving the county economy, the Reeves expansion drained it. Between 2003 and 2004, nearly 1,000 beds at Reeves remained empty—creating a risk that the County would default on its bonds.[240]

County Judge Jimmy Galindo, who had pushed for the prison to open, reacted by retaining the lobbying firm Public-Private Strategies and Randy DeLay, the brother of then House Majority Leader Tom DeLay, to help pursue a federal prison contract. Judge Galindo also signed a new contract with GEO Group to both operate the prison and identify new sources of prisoners.[241] These efforts to make the prison profitable apparently succeeded in March 2006, when Reeves County entered into a contract with BOP and GEO Group to make Reeves III a CAR prison to house 1,200 immigrant prisoners. A year later, BOP and Reeves County contracted again with GEO Group to make Reeves I/II a CAR prison as well, housing 2,300 prisoners.


# Findings

## Necessary and life-saving medical treatments are frequently denied

In December 2008, Jesus Manuel Galindo (no relation to Judge Jimmy Galindo) died of a seizure, alone in an isolation cell at Reeves. A long-time epileptic, Galindo had been locked in the SHU for a month after being hospitalized for a grand mal seizure.

236    Press Release, GEO Group, Inc., The GEO Group, Inc. Announces Contract Award for the Housing of Criminal Aliens at the 3,556-bed Reeves County Detention Center Under CAR 5 (June 1, 2006) *available at* http://phx.corporate-ir.net/phoenix.zhtml?c=91331&p=irol-newsArticle&ID=862768.

237    The population of Pecos City was 8,780 as of the 2010 census. *Community Facts, Pecos City, Texas*, U.S. Census Bureau American Fact Finder, http://factfinder2.census.gov (in the "Community Facts" box, enter "Pecos City, Texas") (last visited Jan. 14, 2014).

238    Barry, *supra* note 63; Sasha Abramsky, *Incarceration, Inc.: Private Prisons Thrive on Cheap Labor and the Hunger of Job-starved Towns*, Nation, July 19, 2004, http://www.thenation.com/article/incarceration-inc.

239    *Reeves County Makes Payment on Prison*, TexNews.com, Sept. 3, 2003 http://www.texnews.com/1998/2003/texas/texas_Reeves_Co93.html; Abramsky, *supra* note 238.

240    *See, e.g.*, *Fitch Dwngrs $89MM Reeves County, TX COPS to BB; Watch Neg*, Business Wire, Sept. 3, 2003, http://www.businesswire.com/news/home/20030903005850/en/Fitch-Dwngrs-89MM-Reeves-County-TX-COPs#.UtWD-tJDtyl.

241    Barry, *supra* note 63; Abramsky, *supra* note 238.





Photo courtesy of the Galindo family

■ Jesus Galindo with his son. The day before he died, Jesus mailed a letter to his mother. "I get sick here by being locked up all by myself," he wrote. "[T]he medical care in here is no good and I'm scared." He asked her to "write to me every day, ok?" but by the next morning, he was dead.

As alleged in the wrongful death suit filed by the ACLU of Texas and his family, while he was in solitary Galindo suffered two more seizures before the one that killed him and repeatedly asked medical and prison staff to adjust his medication and remove him from solitary so he would not be alone when he seized.[242]

The day before he died, Jesus mailed a letter to his mother. "I get sick here by being locked up all by myself," he wrote. "[T]he medical care in here is no good and I'm scared."[243] He asked her to "write to me every day, ok?" but by the next morning, he was dead.

After his fellow prisoners learned that Jesus had died, they rioted and set fire to a recreation center at the prison.[244] A month later, amidst fears of another death, the prisoners rioted again, this time taking two officials hostage and causing $20 million in damage by setting a fire. GEO staff called in numerous law enforcement agencies—

---

242  Complaint, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010).
243  Letter from Jesus Manuel Galindo, prisoner at Reeves, to Graciela Galindo, his mother (Dec. 11, 2008) (on file with ACLU of Texas); *see also* Barry, *supra* note 63.
244  Barry, *supra* note 63.

including county deputies, city police, Border Patrol agents, state police, and GEO's own security guards.[245]

In 2010, the ACLU of Texas, along with El Paso co-counsel Mike Torres and Leon Schydlower, filed a wrongful death suit on Jesus's behalf against BOP officials, Reeves County, GEO Group, and the prison's medical services contractor.[246] After years of litigation, the suit was settled in January 2013.[247] Unfortunately, the prisoners we visited at Reeves continue to describe numerous problems with medical care.

Daniel, a diabetic who served a two-year sentence at Reeves III, told us that it took him ten months to see a doctor.[248] According to Daniel, medical staff lowered his insulin intake, changed his prescriptions, and modified his schedule for receiving medication without ever consulting him.[249] They also denied him prescription eye drops to help with his loss of eyesight, a common complication of uncontrolled diabetes.[250] When Daniel told staff that he was going to complain to BOP about the inadequate treatment he was receiving for his diabetes, they laughed at him and told him to go ahead, because BOP would not care and complaining would not make a difference.[251]

Herman, a prisoner at Reeves I/II who also has diabetes, informed us that prisoners must line up to receive their insulin at the same time as meals, so that diabetic individuals are forced to choose between eating and receiving their insulin.[252] Herman reported he has received extremely variable dosages of diabetes medication, has waited months for his medication to be refilled, and as a result, has experienced high blood-sugar levels.[253] Herman also reported that medical staff do not clean the glucose meter device they use to draw blood, so he is worried about being exposed to other prisoners' blood when a staff member pricks his finger to check his blood sugar.[254] He wrote, "I am genuinely concerned over...the looming danger of dying of medical negligence like the six other prisoners who dies [sic] before the rioting."[255]

Gregory reported that he watched a fellow prisoner die after being ignored by Reeves correctional staff. He described to us how the prisoner started vomiting in the middle of the night, and how a group of prisoners told the guard who passed through the dorm

245    Id.
246    Complaint, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010).
247    Judgment, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Jan. 2, 2013).
248    Interview with Daniel, *supra* note 152.
249    Id.
250    Id.
251    Id.
252    Interview with Herman, *supra* note 157.
253    Id.
254    Id.
255    Id.

at 2:00 a.m. that he needed a doctor. When the guard returned at 5:00 a.m., after they noticed the man had stopped moving, they again insisted that he needed a doctor. However, Gregory reports medical staff did not arrive until 7:00 a.m., when the man looked pale and Gregory could no longer see him breathing. They took the man to the clinic, where he was pronounced dead three hours later.[256]

We received troubling reports about the spread of contagious diseases. When BOP conducted a monitoring visit at Reeves I/II in July 2010, it issued a deficiency finding that prisoners were not being screened for tuberculosis within the proper time frame.[257] Subsequently, a Reeves III prisoner reported to us that medical staff attempted to dissuade a fellow prisoner with tuberculosis from receiving treatment.[258]

We received numerous reports of medical understaffing. Prisoners at Reeves III report that there is only one physician's assistant, and until recently only one doctor to serve the entire prison population.[259] Medical examinations last only a few minutes and prisoners report that they are usually just given ibuprofen, no matter their ailment, and sent on their way.[260] Understaffing in the chronic care clinic and in the pharmacy reportedly lead to dangerous delays in the provision of medical treatment. One prisoner who has experienced heart infarctions reported that he recently went ten days without the heart medication he is required to take on a daily basis.[261] Another prisoner reported that he had to take antibiotics for an infected molar but was never provided his medication reliably enough to finish a course of treatment.[262] When we interviewed him, he was waiting to see a doctor to attend to his infection for the fourth time.[263] Yet another prisoner told us that though he had seen a doctor seven times for a chronic bleeding hemorrhoid, he had consistently been denied surgery to fix the problem.[264] Overall, prisoners report it takes weeks to see a doctor once they submit a request for medical care.[265]

---

256   Interview with Gregory, *supra* note 151. The Mexican consulate in Presidio, Texas, confirmed that Federico Santa Cruz-Gonzalez, a Mexican citizen, died on February 3, 2013, in Reeves County Detention Center from a heart attack at the age of 58. Interview with official at the Consulado de Carrera de Mexico en Presidio (Mar. 10, 2014).
257   BOP Contract Facility Monitoring Report for Reeves County Detention Center I & II (July 13-14, 2010), *supra* note 200.
258   Interview with Daniel, *supra* note 152.
259   Interview with Dennis, *supra* note 152; Interview with Johnny, *supra* note 152; Interview with Daniel, *supra* note 152.
260   Interview with Rico, *supra* note 161; Interview with Benjamin, *supra* note 147.
261   Interview with Herman, *supra* note 157.
262   Interview with Johnny, *supra* note 152.
263   *Id*.
264   Interview with Abdul, prisoner at Reeves (Nov. 19, 2013) (on file with ACLU of Texas).
265   Interview with Benjamin, *supra* note 147; Interview with Lucas, *supra* note 133.

**❝They will not bring a doctor if you are sick. They don't want to spend the money, but these are human beings and they deserve medical services.❞**

—Graciela Arrendondo, mother of a former Reeves prisoner[266]

According to prisoner reports and the prison handbook distributed by staff, Reeves requires prisoners to submit all medical requests in English.[267] To the extent this represents a widespread policy or practice, it obstructs access to medical services for the substantial percentage of Reeves's population with limited English proficiency.

Finally, prisoners reported that they were told by GEO staff that prisoners "would not receive medical care because BOP did not want to pay for them to receive medical care."[268] One prisoner said both guards and medical staff had the same attitude, which was "you're illegals and you're going to be deported, so why do we need to take care of you?"[269]

## Facility staff use segregated housing abusively

After being hit with tear gas, shot at with rubber bullets, and thrown on the ground and cuffed, Samuel and more than 100 of his fellow prisoners were reportedly forced to spend two days in isolation cells in the SHU.[270] Even the prisoners who were not in the few dorms that were gassed were reportedly punished with lockdown and bad food for about a month.[271]

According to prisoner accounts, this mass lockup in the SHU, which took place in the summer of 2013, was retribution against prisoners who started a petition to protest the conditions at Reeves. When guards got wind of the planned protest, they went to the dorms to pull out the protest organizers.[272] Samuel was not involved in the planning, but when the organizers refused to go with the guards, the guards tear-gassed the entire dorm.[273]

---

266   Forrest Wilder, *The Pecos Insurrection*, Tex. Observer, Oct. 8, 2009, *available at* https://www.texasobserver.org/cover-story/the-pecos-insurrection.
267   Interview with Johnny, *supra* note 152; Interview with Cesar, *supra* note 164. *See also Reeves Handbook*, *supra* note 208, at 22.
268   Interview with Oscar, prisoner at Reeves (May 17, 2011); Interview with Daniel, *supra* note 152.
269   Interview with Johnny, *supra* note 152.
270   Interview with Samuel, *supra* note 64; Interview with Ruben, *supra* note 64; Interview with Humberto, *supra* note 64.
271   Interview with Ruben, *supra* note 64; Interview with Carl, *supra* note 208.
272   Interview with Samuel, *supra* note 64.
273   *Id.*

"Once everyone was lying down [after the tear-gassing], they cuffed us and took us out and put water on us. I started speaking up, not talking of resistance, but I was saying it's not fair to punish all," Samuel told the ACLU.[274] Samuel and the others were taken to SHU where they were locked up four to a cell—even though the cells were designed to hold no more than two people at a time—and forced to sleep on the ground with no pillows or blankets.[275] Though there were showers in the cells, the prisoners were denied soap for two days.[276] Samuel reported that his skin burned the whole time.[277]

Samuel is a 38-year-old Jamaican immigrant with legal documentation serving an eight-year sentence on a drug-related charge.[278] Most of his family lives in Miami, including his father, sister, and three children.[279] Because they are more than 1,700 miles away, he has not seen them since he was transferred to Reeves in July 2013.[280] After Samuel was released from the SHU, he had to wait a week to call his mother to let her know he was okay.[281]

> "I was asleep and woke up to two gas bombs on me."
>
> —Samuel, a prisoner at Reeves

Samuel's experience in the SHU is apparently common. Multiple prisoners reported that staff at Reeves grossly overuse isolated confinement.[282] Indeed, the contracts between GEO Group and BOP for Reeves apparently incentivize this by requiring that 10% of the facility's contract bed space be in the SHU. In a prison the size of Reeves, this requirement means more than 300 people may be placed in isolation cells on any given day.[283] This rate is nearly double the percentage of prisoners kept in isolated confinement in BOP-managed facilities—most of which house higher-security prisoners than the low-custody prisoners at the CAR prisons we visited.[284] Prisoners report the SHU is full, with men often housed three to a cell,[285] meaning that two sleep in bunks and the third sleeps on the floor.

One prisoner reported being kept in isolation for months without either a disciplinary

---

274   *Id.*
275   *Id.* Interview with Humberto, *supra* note 64; Interview with Rico, *supra* note 161 (reporting that four people were in each SHU cell, but unaware whether they were given blankets).
276   Interview with Samuel, *supra* note 64.
277   *Id.*
278   *Id.*
279   *Id.*
280   *Id.*
281   *Id.*
282   Interview with Gonzalo, *supra* note 85 (stating that "anything" can get you sent to SHU); Interview with Andrew, *supra* note 122 (stating that prisoners with mental health issues are sent to SHU); Interview with Sebastian, *supra* note 72 (stating that he was placed in SHU for complaining about inadequate medical care and now constantly fears he will be placed in SHU for anything).
283   *Reeves CAR 5 Contract, supra* note 83, at 45; *Reeves CAR 6 Contract, supra* note 83, at 92.
284   See *supra* note 90 and accompanying text.
285   Interview with Bruno, *supra* note 73.

Case 3:16-cv-02267    Document 160-2    Filed 02/15/19    Page 72 of 105 PageID #: 4327

hearing or periodic status review hearings (which BOP regulations require within the first seven days in isolation and then every 30 days of continuous isolation, regardless of whether the isolation is for disciplinary or administrative reasons).[286] One prisoner we spoke to told us that "anything" could get him sent to SHU.[287] One prisoner said he complained about a painful ankle and instead of receiving medical treatment, he was sent to the SHU for six months.[288] We received additional reports that sick and mentally ill prisoners are placed in SHU without access to treatment and medication.[289]

Other sources echo the reports we received from prisoners about the abusive use of isolated confinement at Reeves. According to court papers in one lawsuit, in August 2008, Reyes Garcia Rangel committed suicide at Reeves after prison officials first denied him the psychotropic medication he needed for his bipolar disorder, and then isolated him in the SHU without adequate observation or monitoring. Rangel's family filed a wrongful death suit against Reeves County, the GEO Group, and the Reeves medical contractor, alleging that Reeves administrators maintained a policy of placing prisoners who continually sought medical attention and/or filed grievances in the SHU in order to quash their efforts to obtain medical care.[290]

According to news reports, in late January 2009, prisoners at Reeves rioted when guards moved 25-year-old Ramon Garcia to the SHU after he told medical staff that he felt dizzy and ill. "All we wanted was for them to give him medical care, and because they didn't, things got out of control and people started fires in several offices," an anonymous prisoner told a reporter.[291] A friend of Garcia's family told reporters that Reeves staff put him into solitary confinement after he complained that he could no longer walk down the hall without holding on to the wall.[292]

Despite the deaths of Jesus Manuel Galindo and Reyes Garcia Rangel, and despite two consecutive prisoner uprisings resulting in part from practices regarding the SHU, little appears to have changed in the use of solitary confinement at Reeves. As one prisoner at Reeves reported: "Nine months ago, a prisoner arrived who refused to eat food for a month, and their solution was to put him in the SHU. He's still there."[293] Another prisoner described the situation succinctly: "Anything you say or do can get you sent to SHU."[294]

---

286    Interview with Fortunato, *supra* note 84. *See also* Federal Bureau of Prisons, Program Statement 5270.10, *supra* note 82.
287    Interview with Gonzalo, *supra* note 85.
288    Interview with Sebastian, *supra* note 72.
289    Interview with Andrew, *supra* note 122. *See also* Complaint, Galindo v. Reeves County, No. 3:12-cv-00063-DB-NJG (W.D. Tex. Dec. 7, 2010).
290    *See* Petition, Favila v. Reeves County, No. 10-07-19702-CVR (Dist. Ct., 143d Judicial Dist., Reeves Cty., Tex. filed July 30, 2010).
291    Barry, supra note 63
292    Wilder, supra note 266.
293    Interview with Daniel, *supra* note 152.
294    Interview with Gonzalo, *supra* note 85.

# Samuel's Story

When 38 year-old Samuel got arrested for distributing marijuana, he understood he would pay the price. Born in Jamaica but raised in Florida, he knew that for a green card holder like himself, conviction might result in deportation.

But Samuel could never guess at the conditions in the privately run federal prison system where he landed—or its policies of discrimination against immigrants.

Determined to move to a low-security prison, Samuel stayed on excellent behavior. But when he finally arrived last year at the lower-security Reeves unit, it was more restrictive than the previous prisons.

*Penned like a farm animal, with only ten minutes to move about every hour. "You're just immigrants," says a guard.*

Samuel is penned like a farm animal, with only ten minutes to move about every hour and harassed by guards like the one who said bluntly: "You're just immigrants. They can do whatever they want."

About three months after he arrived, Samuel says, fellow prisoners started a strike. After the strike's leaders refused to leave their bunks, 14 guards arrived, hurling gas bombs and firing rubber bullets into the dorm. Guards threw Samuel and the other men to ground, cuffing them as they went.

Samuel complained openly that this collective punishment was unfair. His reward for speaking out? Guards marched Samuel and the others to cells in the SHU. Packed four men to a cell, they were denied basic necessities like soap and toilet paper for two days, their skin and eyes seared from the gas.

Miles away in Ft. Lauderdale, Samuel's mother and three teen-aged children know almost nothing of his experiences. They can't afford to see him. But his incarceration still haunts them daily.

"I have to take care of his kids," says Violet, Samuel's mother. "I work from 8:00 in the morning to 8:30 at night. I have to work with a brace on my foot—I can barely walk. And next week I have to get a CT scan because I'm having some very bad headaches and the doctor doesn't like what he's seeing." But she keeps her health problems to herself. She doesn't want Samuel to worry.

The children's mother, Violet says, works two jobs to keep them out of need. But all three children live with open emotional wounds. Before incarceration, Samuel lived with the children and doted on them, Violet says.[*] ∎

[*] Interview with Samuel, *supra* note 64, interview with Violet (on file with ACLU of Texas).

## Movement is restricted and dormitories are overcrowded

Though Reeves is a low-security facility, prisoners report that their movements are severely restricted and that they are frequently body-searched. Prisoners report that for 50 minutes out of every hour they must stay in the same room. They can only move around the unit—to the recreation room, to the yard, to the library—during the ten minutes at the top of every hour. If they happen to miss the announcement that movement is allowed, they have to wait another hour. Guards conduct pat-down searches on prisoners when they move from room to room.[295] "Inside the unit we're locked down. [We] can't move around. They are constantly segregating us," said Samuel. As another prisoner put it: "This is supposed to be a low-custody prison, but it's run like a maximum-custody prison."[296]

Disturbingly, GEO Group's contracts with BOP for Reeves incentivize overcrowding by setting a minimum occupancy quota of 90% capacity and then providing additional per-prisoner payments for up to 115% capacity.[297] The result is predictable. In their dormitories, prisoners report crowded conditions with no privacy. In each living unit there is a mix of regular dormitories that hold 48 bunks and recreation rooms that have been converted into dormitories.[298] Prisoners call the latter "chicken coops."[299] The 42 bunk beds in these "chicken coops" are close together,[300] and some of them are near

---

295   Interview with Andrew, *supra* note 122; Interview with Ruben, *supra* note 64.
296   Interview with Andrew, *supra* note 122.
297   *Reeves CAR 5 Contract*, *supra* note 83, at 6, 13; *Reeves CAR 6 Contract*, *supra* note 83, at 56.
298   Interview with Andrew, *supra* note 122; Interview with Ruben, *supra* note 64.
299   Interview with Gregory, *supra* note 151; Interview with Gonzalo, *supra* note 85.
300   Interview with Ruben, *supra* note 64; Interview with Sebastian, *supra* note 72.

the bathroom area.[301] One prisoner told us that it smells of feces all the time.[302] As one prisoner described it, "In the chicken coops, conditions are so bad a person couldn't survive there for more than a year."[303]

Outside of the dormitories, prisoners report that conditions were not much better. There is a big yard and a small yard, and prisoners report bad conditions in both. The small yard is a dusty lot reportedly meant for 40 people but frequently used for 400 prisoners at a time. Prisoners also report that the Port-A-Potties in the yard have not been replaced in more than four years and the dirty contents have "splashed up" on them.[304]

# Eden Detention Center
## Eden, Texas



■  CCA's contract with BOP, like all the others we reviewed, incentivizes overcrowding. The 1,550 prisoners kept at Eden Detention Center are reportedly packed so tightly that their beds spill out into the hallways.

Despite its name, the Eden Detention Center is no paradise. Paint peels from the walls. The rooms are dark and dreary. And the 1,550 prisoners kept there are

---

301   Interview with Andrew, *supra* note 122; Interview with Sebastian, *supra* note 72.
302   Interview with Andrew, *supra* note 122.
303   Interview with Daniel, *supra* note 152.
304   Interview with Andrew, *supra* note 122.

reportedly packed so tightly that their beds spill out into the hallways. One prisoner told us that CCA, the private prison company that operates Eden, should stand for the "Concentration Camp of America."[305]

Throughout our investigation, we uncovered evidence of severe overcrowding and abuse of isolated confinement, both incentivized by the contract BOP negotiated with CCA. We also heard stories of squalid living conditions, contaminated water, and scabies outbreaks from used clothing. Compounding these problems, prisoners reported that CCA frequently punishes them for banding together to file grievances and lawsuits.

## Background

Eden is located in sparsely populated Concho County, Texas, about 90 miles south of Abilene. The 1,550 prisoners at Eden constitute roughly half of the town's population. The facility was originally built to house 950 prisoners and has been run by CCA since the early 1990s. Its current CAR contract began in 2007.

The problems the ACLU uncovered throughout our investigation are unfortunately not new to Eden. The prison has a history of uprisings. In 1996, when Eden was operating under an earlier contract with BOP, violence broke out after about 400 prisoners organized a sit-in in the yard to protest conditions.[306] According to news reports, CCA guards used pepper spray and shot prisoners with shotgun pellets in an attempt to force prisoners to comply with orders to return to their bunks.[307] Fourteen prisoners were hurt during the incident, two of whom were hospitalized.[308] Three guards also required medical attention—one for a broken jaw and two for heat exhaustion.[309] In 2010, another uprising took place at Eden after prisoners once again organized to protest conditions.[310] Guards responded with tear gas.[311] One prisoner told the ACLU that afterward, a CCA guard approached him and said: "Did you see me? I was the one with my foot on your head."[312]

---

305    Interview with Agustin, *supra* note 71.

306    *4 Inmates, 1 Guard Hurt During Texas Prison Riot*, Orlando Sentinel, Aug. 23, 1996, http://articles.orlandosentinel.com/1996-08-23/news/9608221093_1_prison-guard-four-inmates-san-angelo; *Eden Ships Out Suspected Prison Rioters*, Pecos Enterprise, Aug. 23, 1996, http://www.pecos.net/news/archives/082396p.htm.

307    *Eden Ships Out Suspected Prison Rioters*, *supra* note 306.

308    *Id.*

309    *Id.*

310    Matthew Waller, *supra* note 68; Interview with David, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas); Interview with Ezra, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas).

311    Matthew Waller, *supra* note 68; Interview with David, *supra* note 310.

312    Interview with Ezra, *supra* note 310.

## Findings

## Interference with legal activities and stifling of dissent

Our investigation found evidence that CCA staff at the Eden Detention Center take extreme measures to stifle the dissent of prisoners.

We received numerous reports that prisoners who complain or help others file grievances or lawsuits are punished, in some cases by being sent to isolation units. Leonardo, a Cuban immigrant who has been in Eden since 2008, says he often helped his fellow prisoners file grievances or lawsuits.[313] But last year, when he helped another prisoner file a motion to reduce his sentence, he was sent to an isolation unit for eight days for "investigation."[314] Though no charges were ultimately filed against him, he says the message was clear: while Leonardo was in the SHU, a guard threatened to "lock his ass up" again if he resumed helping others with legal paperwork.[315] Later, when Leonardo was returned to the SHU for unrelated charges (guards found an MP3 player near his bunk—an item that is sold in BOP prison commissaries[316] but prohibited at Eden), guards confiscated his legal material and law books.[317]

Several other prisoners reported incidents of prisoners being punished for trying to help others.[318] For example, Pablo told us he spent three days in solitary confinement after he tried to help a new prisoner get oriented to Eden. "When an inmate tries to help out another inmate, they are a threat to the institution and are thrown in the SHU," he said.[319] Spanish-speaking prisoners told us that grievance forms are only in English and they cannot ask bilingual prisoners to help them because they know those prisoners will be punished.[320]

CCA staff also interfere with prisoners' access to counsel. The ACLU heard numerous reports from prisoners who faced resistance from prison administrators when trying to arrange for unmonitored attorney visits.[321] Prisoners also reported problems trying

---

313   Interview with Leonardo, *supra* note 71.
314   *Id*.
315   *Id*.
316   *See* Joshua Hunt, *The iPod of Prison*, NEW YORKER, Jan. 16, 2014, http://www.newyorker.com/online/blogs/elements/2014/01/the-ipod-of-prison-sony-radio.html (reporting that according to a BOP spokesperson, more than half of federal prisoners have bought MP3 players as part of a new program making them available from BOP commissaries) (last visited Feb. 9, 2014).
317   *Id*.
318   Interview with Agustin, *supra* note 71; Interview with Richard, *supra* note 71; Interview with Isaac *supra* note 71; Interview with Vladmir, *supra* note 71; Interview with Kevin, *supra* note 71.
319   Interview with Pablo, *supra* note 96.
320   Interview with Marvin, *supra* note 96; Interview with Elias, *supra* note 96.
321   Interview with David, *supra* 310 (reporting that he had to get a letter from the U.S. Attorney General's office in order to have an unmonitored, non-visitation day attorney visit); Interview with Ezra, *supra* note 310; Interview with William, *supra* note 121.

to arrange unmonitored legal calls. One prisoner reported that CCA staff refused to add his attorney's phone number to his telephone list without giving him a reason.[322] Another told us that, until he complained to BOP, CCA staff did not allow him to have unmonitored legal calls.[323] The ACLU received reports that staff at Eden open legal mail in violation of BOP policy, even when that mail is appropriately marked as privileged and confidential attorney-client communication.[324] Prisoners reported that staff members open their mail outside their presence and read privileged communications, ostensibly to "scan for legal content."[325]

These stories were corroborated by our own experience; the ACLU faced significant barriers when we tried to meet with prisoners who had contacted us.

When we visited in 2011, the warden informed us that the prison would not accommodate our request for legal visitation outside social visiting hours, nor would prison officials provide us with the opportunity to meet with prisoners in a separate visiting area, outside of auditory supervision by correctional staff.[326] Instead, ACLU attorneys were forced to conduct meetings in a crowded visiting room where it was impossible to establish a reasonable level of confidentiality. One prisoner told us that he could not confer with our staff about his legal issues because of the proximity of other prisoners, visitors, and CCA staff in the visitation room.[327]

When we attempted to schedule a return visit for October 2013, the warden at Eden initially denied our request for attorney visitation.[328] After we responded with citations to the relevant BOP attorney visitation policies, he demanded we explain why our meetings with prisoners "might be appropriate" and asserted that these policies "do not apply at this facility."[329] It took nearly two months of letters to this CCA warden and to BOP officials to arrange confidential interviews.[330] As this dispute was going on, a CCA official reportedly opened and read two incoming letters to prisoners from the ACLU containing confidential communications about our planned visit to Eden.[331] And as the ACLU's visit

322   Interview with Ezra, *supra* note 310.
323   Interview with Richard, *supra* note 71.
324   Interview with Tomas, *supra* note 73; Interview with David, *supra* note 310.
325   Interview with David, *supra* note 310.
326   Letter from Keith E. Hall, Warden, Eden Detention Center, to Krystal M. Gomez, Policy Counsel, ACLU of Texas (May 9, 2011) (on file with ACLU of Texas); Letter from Keith E. Hall, Warden, Eden Detention Center, to Krystal M. Gomez, Policy Counsel, ACLU of Texas (May 16, 2011) (on file with ACLU of Texas).
327   Interview with David, *supra* note 310.
328   Letter from Keith E. Hall, Warden, Eden Detention Center, to Rebecca L. Robertson, Legal & Policy Director, ACLU of Texas (Oct. 21, 2013) (on file with ACLU of Texas).
329   Letter from Keith E. Hall, Warden, Eden Detention Center, to Rebecca L. Robertson, Legal & Policy Director, ACLU of Texas (Nov. 25, 2013) (on file with ACLU of Texas).
330   Letter from Rebecca L. Robertson, *supra* note 218.
331   Grievance filed by Richard (Nov. 4, 2013) (on file with ACLU of Texas); Informal Resolution filed by Richard (Oct. 21, 2013) (on file with ACLU of Texas).

neared, Eden staff reportedly started asking prisoners on our visitation list questions about what they were planning on reporting to us.[332] By the time the visit occurred in January 2014, two of the men who had sought our assistance declined to speak with us.

Disturbingly, the warden who denied us space for confidential interviews in 2011 and stonewalled our 2013 visit was subsequently promoted by CCA to a managing director position where he will oversee, among other things, all five of CCA's BOP contract facilities.[333]

## BOP's contract rewards CCA for abuse of extreme isolation

Our investigation found that BOP's contract with CCA creates perverse incentives that encourage abuse, as it requires that 10% of Eden's "contract beds" be used for isolated confinement. In effect, the contract sets an arbitrary quota for the use of isolated confinement—one that is far higher than the rate of isolation in BOP-run facilities.

It should be no surprise, then, that prisoners told us that Eden's SHU is always full. Nearly every prisoner we interviewed in January 2014 reported that he had been forced to spend from several days to up to a month in extreme isolation when he first arrived at the facility.[334] One prisoner told us that they can be sent to the SHU for almost anything and that guards frequently threaten to put them in the SHU.[335] As described above, prisoners described being sent to SHU for helping others with grievances and legal claims.[336] Prisoners also report that three or four prisoners are often crammed into a SHU cell designed to hold no more than two people.[337]

Conditions in isolation are abysmal. Each cell is a small room with a metal door containing a tray slot for food; opposite the door is a small tinted window that provides no view to the outside.[338] There is a toilet in the cell, though one prisoner reported that they sometimes are without toilet paper.[339] Prisoners report they are locked in their SHU cells for at least

---

332    Interview with Richard, *supra* note 71; Interview with Bradley, *supra* note 96.
333    Press Release, Corrections Corporation of America, Keith Hall Named Managing Director, Facility Operations (Jan. 24, 2014), *available at* http://cca.com/insidecca/keith-hall-named-managing-director-facility-operations#.
334    Interviews with Agustin, *supra* note 71; Interview with Leonardo, *supra* note 71; Interview with Richard, *supra* note 71; Interview with Pablo, *supra* note 96; Interview with Franco, *supra* note 96; Interview with Bradley, *supra* note 96; Interview with Jesse, *supra* note 96; Interview with Simon, *supra* note 96; Interview with Isaac, *supra* note 71; Interview with Marvin, *supra* note 96; Interview with Gael, *supra* note 96; Interview with Elias, *supra* note 96; Interview with Vladmir, *supra* note 71; Interview with Kevin, *supra* note 71. *See also Eden Handbook, supra* note 209, at 34 ("An inmate may be placed in Administrative Detention when the inmate … is a new commitment pending classification . . . .").
335    Interview with Pablo, *supra* note 96.
336    Interview with David, *supra* note 310; Interview with Leonardo, *supra* note 71; *see also supra* text accompanying notes 313-320.
337    Interview with Ezra, *supra* note 310; Interview with Tomas, *supra* note 73 (reporting that prisoners in the SHU are sometimes required to sleep on the floor).
338    Interview with Agustin, *supra* note 71.
339    Interview with Jesse, *supra* note 96 (reporting that he considered using his bedsheet to clean himself after using the toilet).

23 hours a day, and the only daily opportunity to exit the cell is for one hour of outdoor "recreation" offered at 5:00 a.m. Showers are offered only every few days, and one prisoner told us that because they are offered at 1:00 a.m., many men skip them.[340]

## BOP incentivizes overcrowding

The Eden contract, like all the others we reviewed, contains an occupancy quota stipulating that the facility must remain at least at 90% capacity, with extra per-prisoner payments up to 115% capacity. This gives CCA a perverse incentive to admit as many prisoners as BOP is willing to send, leaving the facility overcrowded.[341]

Prisoners at Eden report that they are packed into crowded dormitories with insufficient ventilation, personal space, or bathroom facilities. Roughly 1,550 prisoners are crammed into Eden—almost exactly 115% of the prison's originally contracted capacity.[342] Prisoners described how this feat is accomplished: CCA utilizes every nook and cranny for bed space. In the open dormitories, 96 bunks are crammed together with very little space between.[343] In other dormitories, cubicles initially designed for four beds now hold six beds. And in hallways between those cubicles that were never intended to be housing areas, CCA has lined the walls with additional beds. Prisoners call this area the "freeway." The facility is so crowded that prisoners "can reach out and touch the bunk next to you," one prisoner told us.[344] There is very little personal privacy in any of the dorms.[345]

The overcrowding, in turn, reportedly leads to squalid living conditions. Prisoners in multiple dormitories reported to us that the toilets are very close to the sleeping areas and the smell of urine and feces often permeates the rooms.[346] Dirty water leaks out from below the toilets when they are flushed.[347] Showerheads and toilets break frequently and are left unrepaired.[348] Many showers have no hot water.[349]

One prisoner, William, described the living conditions this way: "I sleep in a hallway

---

340    Interview with Richard, *supra* note 71.
341    *Eden CAR 6 Contract*, *supra* note 83, at 53. *See generally* Criminal: How Lockup Quotas and "Low Crime Taxes" Guarantee Profits for Private Prison Corporations, *supra* note 117.
342    *Eden CAR 6 Contract*, *supra* note 83, at 53.
343    Interview with Richard, *supra* note 71.
344    *Id.*
345    Interview with Ryan, prisoner at Eden (May 21, 2011) [on file with ACLU of Texas]; Interview with William, *supra* note 121.
346    Interview with Agustin, *supra* note 71; Interview with Franco, *supra* note 96; Interview with Jesse, *supra* note 96.
347    Interview with Richard, *supra* note 71; Interview with Pablo, *supra* note 96.
348    Interview with Ryan, *supra* note 345; Interview with William, *supra* note 121.
349    Interview with Pablo, *supra* note 96.

with about 80 inmates."[350] He added: "I sleep right next to the bathroom so it's like I'm sleeping in the toilet. I feel like my head is in the toilet." [351]

Several other prisoners reported problems with ventilation and sanitation in the housing units at Eden. The units often leak when it rains.[352] We heard reports of mice and cockroaches.[353] One prisoner told us he recently found a scorpion in his bed.[354]

In an extreme example of cost-saving tactics, prisoners reported that instead of issuing new clothing to incoming prisoners, CCA issues them used underwear and uniforms. This contributes to the overall feeling that the facility is not sanitary, and some prisoners believe it has contributed to the scabies outbreaks that have occurred in the prison.[355]

## Prisoners exposed to contaminated water

❝I was sentenced to serve my time, not develop a life-threatening disease that can be prevented by prison officials who have no regard for human life."

—Tomas, a prisoner at the Eden Detention Center[356]

In 2011, the Texas Commission on Environmental Quality found that Eden's drinking water contained unacceptable levels of radioactive contamination that exceeded the maximum contaminant level allowed by the U.S. Environmental Protection Agency.[357] A notice issued by the Commission and distributed by the City of Eden stated that people who drink water with a high level of radioactive radium "may have an increased risk of getting cancer."[358]

---

350   Interview with William, *supra* note 121.
351   *Id.*
352   Interview with Ryan, *supra* note 345; Interview with Leonardo, *supra* note 71; Interview with Isaac, *supra* note 71.
353   Interview with Ryan, *supra* note 345; Interview with Leonardo, *supra* note 71.
354   Interview with Ryan, *supra* note 345.
355   Interview with Richard, *supra* note 71; Interview with Pablo, *supra* note 96.
356   Interview with Tomas, *supra* note 73.
357   *See* Kiah Collier, *City Says It Learned from Brady's Problems with Hickory Water's Radium*, SAN ANGELO STANDARD TIMES, May 19, 2011, *available at* http://www.gosanangelo.com/news/2011/may/19/city-says-it-learned-from-bradys-problems-with/.
358   CITY OF EDEN, NOTICE OF DRINKING WATER COMBINED RADIUM 226 & RADIUM 228 VIOLATION (Sept. 20, 2012), *available at* http://www.edentexas.com/storage/afm_uploads/1209-B.pdf; CITY OF EDEN, NOTICE OF DRINKING WATER GROSS ALPHA PARTICLE VIOLATION (Sept. 20, 2012), *available at* http://www.edentexas.com/storage/afm_uploads/1209.pdf.

Case 3:16-cv-02267   Document 160-2   Filed 02/15/19   Page 82 of 105 PageID #: 4337

Until recently, signs posted around the facility warned prisoners not to drink the water.[359] However, the only alternative was for prisoners to buy bottled water through the prison commissary. At 80 cents per bottle, the cost was prohibitive for many of the men.[360] One prisoner told us that he requested that the prison reduce the price of bottled water to make it affordable, but his request was denied.[361] He reported that drinking the irradiated water made him feel like he was dying slowly.[362] Another prisoner reported that he has to drink a very large quantity of water every day due to a medical condition.[363] He expressed to Eden staff his concerns about drinking so much of the contaminated water, especially given his vulnerable health, but was told that they would not provide him an alternative source of water.[364]

In 2013, the city received a grant from the Texas Water Development Board to remove the radionuclides from the water.[365] When we visited Eden again in early 2014, the signs had been taken down, and many prisoners had begun to drink Eden's water again. However, they continue to be suspicious of the water, with many noting an odd taste[366] and some reporting that showering in it gives them an itchy rash.[367] Anyone who is worried about the water quality can, of course, buy bottled water from CCA's prison commissary— giving the company one more opportunity to squeeze additional profit from its prisoners.

## Failure to provide adequate medical care

According to prisoners we interviewed, CCA routinely cuts corners on medical care and treatment. The ACLU spoke with numerous prisoners who reported not receiving necessary treatment or medicine. Prisoners reported that it takes at least a week to see medical staff.[368] Dental care is reportedly limited to tooth extractions.[369] Many ailments are treated only with ibuprofen.[370] And because the medical staff responsible for triaging requests for medical assistance only speak English, Spanish-speaking prisoners have difficulty accessing medical care.[371]

---

359    Interview with Richard, *supra* note 71; Interview with Simon, *supra* note 96.
360    Interview with Marvin, *supra* note 96.
361    Interview with Paul, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas).
362    *Id.*
363    Interview with Nelson, *supra* note 158.
364    *Id.*
365    *Water Success Story: City of Eden*, Texas Water Development Board (Jan. 2013), http://www.twdb.texas.gov/newsmedia/featured/ projects/eden/index.asp.
366    Interview with Agustin, *supra* note 71; Interview with Pablo, *supra* note 96; Interview with Franco, *supra* note 96; Interview with Bradley, *supra* note 96; Interview with Marvin, *supra* note 96; Interview with Elias *supra* note 96; Interview with Mohammed, prisoner at Eden (Jan. 8, 2014) (on file with ACLU of Texas); Interview with Kevin, *supra* note 71.
367    Interview with Leonardo, *supra* note 71; Interview with Elias, *supra* note 96.
368    Interview with Agustin, *supra* note 71; Interview with Pablo, *supra* note 96; Interview with Richard, *supra* note 71.
369    Interview with Jesse, *supra* note 96; Interview with Simon, *supra* note 96.
370    Interview with Agustin, *supra* note 71.
371    Interview with Pablo, *supra* note 96.

Prisoners reported trouble refilling prescriptions. Nelson, a prisoner with stage-three kidney disease, told us that he goes up to five days at a time without his kidney medications before they are refilled.[372] Another prisoner who takes prescription medications for severe depression informed us that he has been forced to go four to five days without his medication at Eden.[373] Yet another prisoner reported that he had waited 25 days for his ulcer medication to be refilled.[374]

Prisoners with chronic conditions told us they fear for their health. A diabetic prisoner reported that one of the Eden guards forces diabetics to eat last, long after they have taken their pre-meal insulin injection, and he worries this could be dangerous.[375] Additionally, one night when there was insufficient staff, Eden unexpectedly shut down its medical unit, making it impossible for diabetics to obtain time-sensitive insulin shots.[376]

Prisoners with hernias reported that they were frequently denied treatment or surgeries.[377] In May 2011, we spoke to Manuel, a prisoner at Eden who had been authorized for surgery on a strangled and irreducible hernia since February but had not yet been scheduled for an appointment.[378] Manuel reported that he had been denied treatment for months even though he filed repeated grievances notifying the administration that he was unable to stand or urinate without suffering debilitating pain.[379] One prisoner reported that medical staff at Eden told him he would have to wait until he was deported to receive medical attention.[380]

Ernesto has been unable to walk properly and has relied on crutches since he fell and hurt his leg at Eden in July 2010.[381] Because of the way he was forced to walk on his legs following his injury, both his knees are now seriously damaged.[382] Shortly after he fell, a doctor at Eden told Ernesto that he needed an MRI on his knee.[383] However, health service administrators at Eden canceled Ernesto's MRI.[384] Instead, Ernesto was

372    Interview with Nelson, *supra* note 158.
373    Interview with David, *supra* note 310.
374    Interview with Ernesto, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas).
375    Interview with Bradley, *supra* note 96. *See also Insulin Routines*, AMERICAN DIABETES ASSOCIATION, http://www.diabetes.org/living-with-diabetes/treatment-and-care/medication/insulin/insulin-routines.html (stating that regular insulin works best when taken 30 minutes prior to a meal) (last visited Mar. 5, 2014).
376    Interview with Bradley, *supra* note 96.
377    Interview with Marvin, *supra* note 96; Interview with Gael, *supra* note 96; Interview with Mohammed, *supra* note 366; Interview with Vladmir, *supra* note 71.
378    Interview with Manuel, prisoner at Eden (May 21, 2011) (on file with ACLU of Texas).
379    *Id.*
380    Interview with Ezra, *supra* note 310.
381    Interview with Ernesto, *supra* note 374.
382    *Id.*
383    *Id.*
384    *Id.*

prescribed a "lifestyle change," which had no effect except to strip him of his work and recreation privileges.[385]

# Willacy County Correctional Center
## Raymondville, Texas



<span style="color:blue">■ The corporate slogan of MTC, the private prison company that operates the Kevlar tent city of the Willacy County Correctional Center, is "BIONIC: Believe it or not I care."</span>

In a bleak, remote area of the Rio Grande Valley near the Mexico border, approximately 3,000 men languish in the Kevlar tent city of the Willacy County Correctional Center, operated by the private prison company MTC.[386] Just past the metal detectors in the lobby, a large sign greets visitors with MTC's corporate slogan: "BIONIC: Believe it or not I care." But few of the prisoners here believe it. "I think that's got to be one of the most enormous lies there's ever been. The officers here treat us with such little respect," said one prisoner.[387] "That's just not true. Here they just think you're not serious, and they ignore you. They just laugh at you," said another.[388] The men spend their days in squalid and cramped living quarters, without jobs or educational programming to occupy them, far removed from family support and legal resources.

---

385  *Id.*
386  *See Population Statistics, supra* note 23.
387  Interview with Stephen, *supra* note 65.
388  Interview with Alex, *supra* note 65.

The ACLU conducted dozens of interviews with prisoners at the Willacy County Correctional Center in 2012 and 2013. What we found was overwhelming despair. The men we interviewed felt warehoused and forgotten.

## Background

Willacy County Correctional Institution (nicknamed "Tent City" or "Ritmo," and originally named Willacy County Processing Center) earned a terrible reputation from 2006 to 2011, when MTC operated it as an immigration detention facility under a contract with ICE.[389] In May 2011, ICE announced it was transferring its detainees out of Willacy.[390] But MTC quickly obtained a new contract to hold prisoners for BOP—the same contract that keeps Tent City operating today.[391]

❝I don't think they care about us. If they did, things would be different. They don't have enough activities for us. We take things out of the trash cans to entertain ourselves."

— Dante, 38 years old, serving a thirteen-month sentence for reentry

Under the original ICE contract, Willacy County received a per diem payment for each detainee, but county officials expressed disappointment that, because the facility was never at capacity, revenue was always low.[392] By that measure, the county ought to be happy with what we learned at Willacy: prisoners described a facility that is not only foul, cramped, and depressing, but also overcrowded.

## Findings

### Overcrowding and lack of programming

The prisoners at Willacy described how they live: crammed into crowded and squalid

---

389   Spencer S. Hsu & Sylvia Moreno, *supra* note 16; Human Rights First, *supra* note 16.
390   Lynn Brezoski, *supra* note 21.
391   Press Release, Management & Training Corp., *supra* note 22.
392   *New Prisoners Begin Arriving in Tent City*, Monitor, Oct. 10, 2011, http://www.themonitor.com/news/local/article_c958cc6d-e46e-56ab-926d-b8a747f6db32.html.

Kevlar tents and given nothing to do to pass the time. Their frustration and despair is palpable.

"It's like walking through minefields. You never know when someone is going to explode, because everyone is frustrated," said one prisoner.[393] "Sometimes you can feel the unrest and people start fighting, and they go to SHU. There isn't enough space for everybody. We're too crowded," another prisoner told us.[394]

Based on our interviews, the cramped and unclean living conditions combined with the lack of educational, therapeutic, and rehabilitative programming create an environment unsafe for prisoners and staff. Many prisoners told us that the overcrowded conditions and lack of programming made them frustrated and uneasy.[395] One man told us that fellow prisoners had threatened to burn the tents but rationalized, "What's the point? They'd build them back up."[396] Prisoners are bored, listless, and frustrated by the conditions, and the atmosphere, they say, is tense and could escalate at any time.

Prisoners reported that 200 of them are packed into each Kevlar tent, with only about three feet of space between each bed. Each prisoner gets very little personal space. There is no privacy between beds, nor in the five bathrooms where toilets and showers are in the open with no partitions. There are eight televisions throughout the tent. Prisoners report that it gets very loud in the tents. "They treat us like animals," one prisoner told us.[397]

Predictably, the overcrowding leads to conditions the prisoners described as squalid, although many men told us that they do their best to keep their own living spaces clean with the two ounces of cleaning solution provided per tent.[398] They told us about insects and spiders that crawl in through holes in the Kevlar and bite them. They reported that their clothes are washed without detergent and mixed in the same laundry loads as mops and other cleaning equipment.[399] One prisoner said if they try to do their own laundry, they can get punished for hanging clothes to dry in the dormitory.[400] Many of the prisoners told us that the toilets are constantly overflowing, leaving a terrible smell in the tents.[401] It got so bad one night in July 2013 that, when Willacy staff did not fix the

393    Interview with Dmitri, *supra* note 75.
394    Interview with Hugh, *supra* note 93.
395    Interview with Sergio, *supra* note 72; Interview with Hugh, *supra* note 93; Interview with Dante, *supra* note 127.
396    Interview with Dante, *supra* note 127.
397    Interview with Sergio, *supra* note 72.
398    Interview with Alonzo, prisoner at Willacy (Nov. 12, 2013) (on file with ACLU of Texas).
399    Interview with Adan, *supra* note 134; Interview with Santiago, *supra* note 72.
400    Interview with Santiago, *supra* note 72.
401    Interview with Stephen, *supra* note 65; Interview with Cristobal, *supra* note 148; Interview with Benicio, *supra* note 65; Interview with Cristofer, *supra* note 148; Interview with Dario, prisoner at Willacy (Nov.13, 2013) (on file with ACLU of Texas).

overflowing toilets that were leaking sewage water throughout one tent, the prisoners held a strike out in the yard.[402] "It was so unpleasant that a bunch of us mutinied. The inmates in [three dorms] stayed outside in the yard in protest, until the toilets were fixed," said Mauricio.[403] Maintenance repaired the toilets later that evening, but the leaders of the strike were reportedly taken to extreme isolation as punishment.[404]

Other prisoners reported that overflowing toilets are a common occurrence. "The bathrooms are always a problem," one man told us. "They get clogged all the time, and they have to clean the septic tank. But sometimes they overflow and it's very dirty. They don't even have ventilators inside to help with the foul smell. Everything smells bad."[405] Another prisoner said, "They have a problem here with overflowing sewage water, and it smells all the time. I even fear for my respiratory health."[406]

In 2012, prisoners reported to us that the water was shut off for two days when the tap water started to look yellowish green.[407] Some prisoners protested, and as many as 80 of them were taken to isolation.[408] After two days, prison staff gave the prisoners bottled water and portable toilets.[409]

To make matters worse, Willacy's prisoners spend most of their time in the foul, cramped tents with little to divert them. Of the five CAR prisons in Texas, Willacy appears to offer the least amount of programming. Many prisoners reported that they were not aware of any educational classes.[410] A few mentioned middle-school level or GED classes but reported that the classes could be completed in a short time because they were very basic.[411] A few prisoners mentioned guitar classes (with guitars donated by a local church)[412] and hobby crafts (though they report access is limited by the requirement that prisoners purchase their own supplies).[413]

Dante is spending thirteen months in Willacy after being convicted of reentry. Since there are no organized activities or classes to occupy the men productively, he and other prisoners scavenge materials from the trash to make figurines and art. "Sometimes

---

402    *Id.*; Interview with Mauricio, *supra* note 65; Interview with Dylan, *supra* note 65; Interview with Alex, *supra* note 65.
403    Interview with Mauricio, *supra* note 65.
404    *Id.*
405    Interview with Dante, *supra* note 127.
406    Interview with Stephen, *supra* note 65.
407    Interview with Geoff, prisoner at Willacy (Nov. 13, 2012) (on file with ACLU of Texas); Interview with Marco, prisoner at Willacy (Nov. 14, 2012) (on file with ACLU of Texas); Interview with Michael, prisoner at Willacy (Nov. 14, 2012) (on file with ACLU of Texas).
408    Interview with Marco, *supra* note 407; Interview with Michael, *supra* note 407.
409    Interview with Marco, *supra* note 407; Interview with Michael, *supra* note 407.
410    Interview with Vicente, *supra* note 62; Interview with Mario, *supra* note 93; Interview with Sergio, *supra* note 72; Interview with Dmitri, *supra* note 75.
411    Interview with Adan, *supra* note134; Interview with Santiago, *supra* note 72.
412    Interview with Vicente, *supra* note 62; Interview with Aurelio, *supra* note 159; Interview with Santiago, *supra* note 72.
413    Interview with Theodore, *supra* note 115; Interview with Cristobal, *supra* note 148; Interview with Benicio, *supra* note 65.

I feel suffocated and trapped," Dante told us during his interview.[414] Another prisoner told us: "Here I feel like I am in a hole without an exit. I don't have anything and I feel trapped."[415]

In addition to the lack of formalized programming, interviews revealed that Willacy provides little opportunity for recreation. Willacy does have a library, but prisoners told us that it was too small and did not have many Spanish-language books.[416] "The library's supposed to be freedom because that is where you free your mind. But there's nothing in the library," one prisoner said.[417] Many of the prisoners we spoke to also complained that the recreation yards are too small.[418] There is one small yard for every 400 prisoners, not nearly enough room to get the exercise many of the men crave.[419] Most of the prisoners are not able to work because there are not enough jobs.[420] The ones who can work typically make between eleven and seventeen cents per hour.[421]

Sergio, a 26-year-old Honduran man who came to the United States with his parents when he was eight years old and thinks of New York City as home, yearns to work. He told us that he feels he is treated like an animal, locked up and not given anything to do to pass the time. "They don't have a job for us. They don't have any education. They just don't have any space for all of us. Sometimes it makes me go crazy. I just want to do something," he said.[422]

Another prisoner said that although he misses his family, he does not want them to know about the abhorrent conditions he is forced to live in. "This place is hard on us, on everyone, and hard on our families, too. Sometimes we don't tell anything about it to our families. They don't know that we suffer, that we're not treated with respect, or that we sometimes lack food or blankets. We don't tell our families. I just don't want my kids to see me like this," Vicente said.[423]

---

414    Interview with Dante, *supra* note 127.
415    Interview with Esteban, *supra* note 61.
416    Interview with Vicente, *supra* note 62; Interview with Dylan, *supra* note 65; Interview with Alex, *supra* note 65; Interview with Dante, *supra* note 127.
417    Interview with Theodore, *supra* note 115.
418    Interview with Costa, *supra* note 72; Interview with Vicente, *supra* note 62; Interview with Sergio, *supra* note 72.
419    Interview with Costa, *supra* note 72; Interview with Vicente, *supra* note 62; Interview with Sergio, *supra* note 72.
420    Interview with Cristobal, *supra* note 148; Interview with Cristofer, *supra* note 148; Interview with Sergio, *supra* note 72.
421    Interview with Adan, *supra* note 134.
422    Interview with Sergio, *supra* note 72.
423    Interview with Vicente, *supra* note 62.

# Arbitrary and abusive use of extreme isolation

Willacy has a total prisoner population of just under 3,000 people.[424] Yet according to the men we interviewed who had recently been in the SHU, approximately 300 people are held in extreme isolation in the SHU at any given time.[425]

Prisoners who have been confined in the SHU report that the extreme isolation drives men to the verge of psychosis. "In the SHU, the noise was bad. People could be heard screaming and kicking their doors all day," Alex told us.[426] Some prisoners reportedly attempted suicide or self-mutilation.[427] They describe the cells as small, with three metal walls and a metal door. Showers take place outside of the cells and are only available on Mondays, Wednesdays, and Fridays. When prisoners are taken out of their cells for their daily hour of recreation, they stand in a small outdoor cage with fencing on the sides and the top. [428]

In the SHU, contact with the outside world is severely limited. "I was kept there for about 24 hours each day. I asked to use the telephone, and they said no," Alex told us.[429] Dmitri was accustomed to telephoning his parents in Phoenix twice a day, but in the SHU, "I only got one phone call a month and couldn't contact my family to let them know what was happening. They worried because I [normally] speak to them twice a day, and then I couldn't speak to them for a while. My family was worried about me and my dad had to call the prison to ask where I was," he said.[430]

Numerous prisoners told us that since April 2013, new arrivals have automatically been held in the SHU for extended periods, apparently because there is no room in the tents.[431] "There are 300 [people] in SHU and it is always full," said Dmitri of his time in SHU. "Every day new people were brought into SHU because there weren't enough beds in the tents. People complained that they did not do anything and should not be in SHU."

It is not just new arrivals who are affected by the misuse of SHU cells as overflow bed space. Dmitri told us he was sent to the SHU for allegedly selling tobacco in the prison. A month and a half later, the charges were dismissed—but he was forced to spend another

---

424    *Population Statistics*, *supra* note 23.
425    Interview with Dmitri, *supra* note 75; Interview with Andres, *supra* note 123.
426    Interview with Alex, *supra* note 65.
427    Interview with Dmitri, *supra* note 75.
428    *Id.*
429    Interview with Alex, *supra* note 65.
430    Interview with Dmitri, *supra* note 75.
431    Interview with Vicente, *supra* note 62; Interview with Mario, *supra* note 93; Interview with Hugh, *supra* note 93; Interview with Dmitri, *supra* note 75.

Case 3:16-cv-02267      Document 160-2      Filed 02/15/19      Page 90 of 105 PageID #: 4345

month in the SHU while he waited for a bed to become available in the tents.[432] Prisoners reported that guards put people in the SHU for minor infractions or even for requesting new shoes or extra food.[433]

## Inadequate medical treatment

The daily sense of desolation and abandonment felt by prisoners is compounded by Willacy's apparent inattention to their medical needs. As with the other facilities we examined for this report, our interviews with prisoners at Willacy revealed a widespread sense that corners are cut and basic medical concerns are often ignored or inadequately addressed by staff.

Zavier, age 52, reports that after arriving at Willacy, he developed an open varicose ulcer on his right ankle that is swollen and discolored.[434] His only treatment came from a nurse who cleaned it with water and wrapped it in gauze.[435] "I don't get enough medical attention and that affects me emotionally. If I complain, they deny me everything. Once after complaining, the prison major yelled at me, 'Don't forget that you're a prisoner here! And that the medicines you get here are given to you for free!'" Zavier said.[436]

When Zavier was detained at the Eden CAR prison, his remaining teeth were removed because of an infection.[437] Since his arrival at Willacy, the medical staff has refused to give him dentures.[438] With neither teeth nor dentures, he has great difficulty eating the meals that are served to him. Several other prisoners told us that Willacy cuts corners on medical treatment by refusing to provide any preventive dental care or teeth cleaning.[439] And when a prisoner has a toothache stemming from a possible cavity or infection, the only treatment Willacy will provide is extraction.[440]

Other prisoners reported similar concerns about basic medical diagnosis and treatment—that when they see medical staff to diagnose various ailments, they are merely given Tylenol or ibuprofen and dismissed without having their problems fully identified or resolved. For example, Esteban went to "sick call" to receive treatment for a

_____

432   Interview with Dmitri, *supra* note 75.
433   Interview with Sergio, *supra* note 72.
434   Interview with Zavier, *supra* note 151.
435   *Id.*
436   *Id.*
437   *Id.*
438   *Id.*
439   Interview with Sergio, *supra* note 72; Interview with Hugh, *supra* note 93; Interview with Marco, *supra* note 407; Interview with Geoff, *supra* note 407.
440   Interview with Sergio, *supra* note 72; Interview with Hugh, *supra* note 93; Interview with Marco, *supra* note 407; Interview with Geoff, *supra* note 407.

cough. But according to a grievance he later filed, a medical staff member (identified in the response to his grievance as being a licensed vocational nurse, who is not qualified to make independent diagnoses) turned him away by yelling at him, "There's nothing wrong with you!" It was not until he returned for an appointment with another provider that Esteban was appropriately diagnosed and treated.[441]

Another prisoner, Santiago, was diagnosed with hepatitis C at Eden but was never informed of the diagnosis. After a few visits to the doctor in Willacy he eventually learned of the diagnosis. But at the time of our interview, he still had not received any treatment or explanation about how to care for himself.[442]

# Santiago's Story

Forty-five year old Santiago is a sturdy, slow-talking Texan. What's happened to him the past three years shows how differently the justice system treats people who are born, as Santiago was, just over the border. And it reveals the chaos this treatment wreaks on family members like his mother and children—all U.S. citizens.

"We broke the law and we know it," Santiago says of the prisoners at the Willacy County Correctional Center. "But it doesn't mean we're not human."

Soft-spoken and bespectacled, Santiago is eloquent in both English and Spanish. He spends hours helping fellow prisoners with documents. But Santiago only learned Spanish as an adult, when he was deported to Mexico because of drug charges.

Three years after landing in a country where he had never lived, Santiago headed back across the border to Presidio, Texas. He returned to the house he shared with his mother and two children, and to his work driving trucks.

In 2012 Santiago was arrested again: for re-entry. Ever since, Santiago has been swept through the network of private prisons subcontracted to the federal government.

---

441    Attempt at Informal Resolution filed by Esteban (Apr. 8, 2013) (on file with ACLU of Texas).
442    Interview with Santiago, *supra* note 72.

His time at Willacy has been nightmarish. Four months after arriving, Santiago became so weak and confused that fellow inmates had to help him stumble out of his cell to eat. To see a doctor, he squeezed into a cell with 25 other ailing inmates and waited eight hours. Staffers denied his pleas for blood work. Weeks later, a visiting doctor told him why he was sick.

**Santiago's mother, 800 miles away, cannot afford to visit. Santiago, who holds a U.S. visa, has gone untreated for Hepatitis C after almost two years in Eden.**

"The doctor said, 'Didn't you know you have Hepatitis C?'" Santiago says. Almost two years later, Santiago has received no treatment at all.

Some 800 miles away, in McCaney, Texas, Santiago's mother Beatrice shoulders different burdens. For years, she raised Santiago's son and daughter, as her son supported them. On the weekend, when Santiago returned from trucking runs, they gathered for his mother's enchiladas, noodle soups, and cookies. Now the 65-year old former waitress, dependent on Social Security, skimps on food, bills, and medicine.

"I'm by myself," Beatrice says. "I don't have money now. I have skipped my Prozac for up to two weeks. That's always the first one that I skip. If I don't have the Prozac, it's not a happy day for me. It's a go-to-sleep day."

Yet the worst part, she says, is the distance. Because Santiago is imprisoned seven hours away, neither she nor his children can afford to see him.

"I just want him close to home," Beatrice says. His twice-weekly phone calls, she says, bring her badly needed emotional support. But she is too far away to know how he is really doing. Beatrice has no idea about her son's life-threatening disease.

"Health?" she muses. "His health seems good. Or maybe he doesn't want to tell me anything about it." From 800 miles away, there's no way for her to be sure.[*] ◼

* Interview with Santiago, *supra* note 72, interview with Beatrice (on file with ACLU of Texas).

# Big Spring Correctional Center
## Big Spring, Texas



■ Held in rural west Texas, prisoners at Big Spring Correctional Center report that there is only one doctor for the entire population of 3,500 prisoners and that the doctor is infrequently present at any particular unit of the facility.

The 3,500 prisoners at Big Spring Correctional Center are housed in four separate detention facilities, sprawling across more than 40 acres of a decommissioned Air Force base about 100 miles south of Lubbock.

Prisoners reported that sick or injured men are frequently ignored. Some limp around general population in constant pain. Others languish in isolation without their medicine. Prisoners in need of care for chronic illnesses go days or weeks without treatment.

Prisoners also reported that the medical unit is severely understaffed and that they often have difficulty obtaining medication, treatment, and specialist care. For the unfortunate prisoners sent to the SHU at Big Spring, the conditions are abysmal and medical care is even worse.

## Background

Big Spring became a CAR facility in January 2007 under a contract with private prison operator Cornell Companies. In 2010, Cornell was acquired by GEO Group. Under Cornell and then GEO Group's management, Big Spring has repeatedly been in the news for disturbing incidents, although the details have largely been shrouded from public view.

In 2008, prisoners at Big Spring's Flightline Unit rose up over their discontent with the facility's conditions.[443] The disturbance caused multiple fires, requiring local law enforcement and firefighters to rush to the scene.[444] Then, in November 2010, when a GEO Group guard shot a prisoner in the arm (the shooting was reportedly accidental), news about the incident was scarce.[445] Following each of these incidents, the private prison operators refused to provide details to the public and to the surrounding community, telling the press that they could not release information "due to company policy."[446] It is unclear whether BOP or any other DOJ components ever formally investigated these incidents.

## Findings

### Inadequate medical care

Luis told us his story: his knee was injured after he was pushed off a ledge by a Border Patrol agent in San Diego.[447] He was arrested for illegal reentry during that encounter and spent a year in three different prisons before being transferred to Big Spring in 2010.[448] His wife, a U.S. citizen, waits for him back home in California. When he arrived at Big Spring he was in a wheelchair and had not received any medical treatment for his injured knee.[449] Even though medical staff wrote in Luis's medical records that his knee has an "obvious deformity," the records show they have denied him treatment other than

---

443    *Major Incident at Cornell's Big Spring Unit*, *supra* note 67; *Big Spring Riot Investigation Continues*, *supra* note 67; Roma Vivas, *supra* note 67. *See also* interview with Lucien, prisoner at Big Spring (May 20, 2011) (on file with ACLU of Texas).

444    *Major Incident at Cornell's Big Spring Unit*, *supra* note 67; *Big Spring Riot Investigation Continues*, *supra* note 67; Roma Vivas, *supra* note 67.

445    *Big Spring Inmate Shot in Accidental Shooting*, KWES NewsWest9, Nov. 10, 2010, http://www.newswest9.com/story/13473330/big-spring-inmate-shot-in-accidental-shooting?redirected=true.

446    Bob Libal, *Shooting at GEO's Big Spring FBOP Facility*, Texas Prison Bid'ness (Nov. 10, 2010), http://www.texasprisonbidness.org/shooting-geos-big-spring-fbop-facility (quoting *GEO Group Controversy*, CBS 7 News).

447    Interview with Luis, *supra* note 60.

448    *Id*.

449    *Id*.



■ Like other contracts we reviewed, the Big Spring contract contains a SHU quota provision requiring the prison to use at least 10% of its contract beds for isolation.

painkillers.[450] When the ACLU met with Luis in 2011 he was on crutches, struggling, and in visible discomfort.

Luis is in constant pain and worries that, if his condition is allowed to irreparably deteriorate, he will not be able to work to support his family after he is released.[451] He said to us, "I just want to be a normal person."[452]

The ACLU received many such reports of inadequate medical care at Big Spring, much of it apparently stemming from understaffing. Prisoners report that there is only one doctor for the entire population of 3,500 prisoners and that the doctor is infrequently present at any particular unit of the facility.[453] Health care services are primarily provided by nurses, who are reportedly overworked and under-resourced.[454] It may take weeks or even months to see a physician's assistant or doctor after initial evaluation by a nurse.[455] "Sick-call" lines to access medical services are long, and prisoners report that they are sometimes forced to choose between eating a meal and receiving medical attention—a practice that is especially hazardous for prisoners with conditions such as diabetes, for which scheduling medication and food intake is necessary to prevent emergencies.[456] Several prisoners at Big Spring commented that they felt medical staff are sincerely trying to help but are simply unable to because they are overstretched.[457]

450    Intake Medical Records of Luis (May 14, 2010) (noting obvious deformity) (on file with ACLU of Texas); Inmate Request to a Staff Member filed by Luis (June 22, 2010) (complaining about knee pain and requesting follow-up care, denied on July 7, 2010) (on file with ACLU of Texas); Inmate Request to a Staff Member filed by Luis (July 12, 2010) (requesting orthopedic shoes, denied on July 16, 2010) (on file with ACLU of Texas); Inmate Request to a Staff Member filed by Luis (Aug. 13, 2010) (requesting outside specialty care, denied on Aug. 19, 2010) (on file with ACLU of Texas).

451    Interview with Luis, *supra* note 60.

452    *Id.*

453    Interview with Arturo, *supra* note 152; Interview with Aaron, *supra* note 152.

454    For example, one prisoner reported that there is only one nurse on duty at night for all four units of Big Spring and that she does not know CPR. Interview with Emilio, *supra* note 152. Several prisoners expressed concern that there is either one nurse, or no medical provider on duty at all at night in the complex. *See* Interview with Miguel, *supra* note 59; Interview with Virgil, *supra* note 158; Interview with Jameel, *supra* note 152; Interview with Aaron, *supra* note 152; Interview with Jaime, *supra* note 58.

455    Interview with Miguel, *supra* note 59; Interview with Virgil, *supra* note 158; Interview with Jeremiah, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas).

456    Interview with Jeremiah, *supra* note 455; Interview with Luis, *supra* note 60.

457    Interview with Miguel, *supra* note 59; Interview with Jaime, *supra* note 58.

Prisoners report problems receiving routine care for chronic diseases. For example, Diego has diabetes and needs his blood sugar regularly tested.[458] Although his blood sugar was tested daily when he was housed in a BOP facility, he told us he has rarely been tested since his transfer to Big Spring.[459] When he asked about this situation, medical staff told Diego that they do not have the testing equipment.[460] Similarly, Leo has a thyroid condition that BOP doctors told him requires testing every month.[461] Since his transfer to Big Spring, he estimates he has been tested at most every three months.[462]

Prisoners also described difficulty obtaining prescribed medications reliably. One prisoner reported that he was unable to finish a course of antibiotics because doses were provided to him only erratically.[463] Other prisoners informed us that they had gone weeks without their cholesterol and high blood-pressure pills before their prescriptions were refilled.[464] And one prisoner who takes medication for anxiety and depression reported that his prescriptions have been altered and discontinued for two months without explanation, causing him to suffer insomnia and anxiety.[465]

Miguel is serving a 37-month sentence at Big Spring for illegal reentry.[466] He suffers from diabetes and high cholesterol, which he controlled with medication prior to his incarceration.[467] When he arrived at Big Spring, medical staff reportedly discontinued these medications and told Miguel that he would not receive pills for his diabetes and high cholesterol until three months prior to his release date.[468] Until then, he was informed, he would receive only Tylenol.[469] Miguel has submitted five or six written requests to see a doctor, which cost him two dollars per submission, even when he did not received an appointment.[470] Since the BOP program statement pertaining to medical co-pays does not apply at Big Spring, there is no regulation prohibiting GEO staff from charging for each request for a medical appointment, even if no appointment is actually provided.[471]

We received reports that even medical treatments approved by medical staff are unreasonably delayed. One prisoner reported that although medical staff determined he needed surgery for his hernia, it took four months before he finally received the

---

458    Interview with Diego, *supra* note 157.
459    *Id.*
460    *Id.*
461    Interview with Leo, *supra* note 157.
462    *Id.*
463    Interview with Loren, *supra* note 158.
464    Interview with Aaron, *supra* note 152; Interview with Virgil, *supra* note 158; Interview with Lucien, *supra* note 158.
465    Interview with Jonah, *supra* note 158.
466    Interview with Miguel, *supra* note 59.
467    *Id.*
468    *Id.*
469    *Id.*
470    *Id.*
471    *Big Spring CAR 6 Contract*, *supra* note 83.

procedure.[472] The doctor who saw him reportedly commented, "I have never seen a hernia like that in ten years."[473] Another prisoner reported that he has waited over a year for treatment for a neurological condition, even though a doctor noted months ago that he needed a medical intervention "as soon as possible" to prevent partial paralysis.[474]

## Arbitrary and abusive use of extreme isolation

Prisoners in the SHU at Big Spring reportedly live in conditions of overcrowding and extreme isolation. Three men are locked in a cell with only two beds, forcing one of the men to sleep on the floor. For 23 hours a day, they are shut in behind a steel door with two tiny windows and a tray slot for food. Once a day, for about an hour, they are released outside into a cage that is eight to ten paces wide. This is their only recreation. They can call their family once a month for fifteen minutes at a time.[475]

Each cell has a toilet and some have showers, but nothing is private. One prisoner told us that sometimes there is no running water in the unit for days at a time; when this happens, he and his cellmates cover the toilet with a towel to stifle the smell and defecate in plastic bags.[476] Even when the toilets are working, if a female guard enters the unit, the men are not allowed to use the toilet or they can reportedly be written up for indecent exposure.[477]

Prisoners reported that guards frequently abuse their authority by using the SHU to punish minor or nonexistent infractions. Several prisoners told us they were sent to the SHU in retaliation for filing or threatening to file lawsuits.[478] One prisoner was sent to the SHU for a week after going to the soda machine when he was not supposed to.[479] Isolation for "investigatory" purposes can stretch to interminable lengths: one prisoner was sent to the SHU for 89 days while staff investigated whether he had a cell phone. He did not.[480]

Like the other contracts we reviewed, the Big Spring contract contains a SHU quota provision requiring the prison to use at least 10% of its contract beds for isolation.[481] This may explain why we heard Kafkaesque stories like Henry's. Henry does not know why

---

472  Interview with Raja, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas).
473  *Id.*
474  Interview with Jameel, *supra* note 152.
475  Interview with Henry, *supra* note 73.
476  Interview with Dominic, *supra* note 73.
477  *Id.*
478  Interview with Hugo, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas); Interview with Emilio, *supra* note 152.
479  Interview with Marc, prisoner at Big Spring (May 18, 2011) (on file with ACLU of Texas).
480  Interview with Raja, *supra* note 472.
481  *Big Spring CAR 6 Contract, supra* note 83, at 55.

he was sent to the SHU.[482] But when the ACLU interviewed him, he had been in extreme isolation for five months.[483] He is given a review hearing every month but he has never been told why the guards keep him in isolation.[484] He told us he is held in a squalid cell with "dirty and smelly" sheets and blankets.[485] He is fed rice, beans, and meat three times a day on dirty plates.[486] The food portions are so inadequate that he has reportedly lost significant weight.[487]

As in general population, prisoners held in isolation report they are frequently denied medical treatment. Henry described how he began bleeding rectally about ten days after he was placed in isolation but was forced to wait over a month before seeing a doctor who diagnosed him with hemorrhoids and prescribed ointment and medication.[488] It helped at first but when the bleeding recurred and Henry requested another medical visit, he was ignored.[489]

Dominic, a Mexican immigrant who has family in Los Angeles, also reported problems with medical and mental health care provided in the SHU. Dominic had been in isolation for five months when we interviewed him and was reportedly sent there for complaining about the food during a lockdown.[490] Dominic broke his arm after a couple months in the SHU.[491] He described what happened: he was standing on a bunk trying to cover the ceiling vent to warm up the temperature in the frigid cell when he fell.[492] He was taken to the hospital and though he says a doctor recommended surgery, he was sent back to his cell with only a wrist wrap and ibuprofen.[493] He has not received any other care.[494]

Dominic expressed concern that there is no way for a prisoner in the SHU to speak confidentially with mental health staff about suicidal ideation.[495] Dominic told us that if a prisoner in the SHU needs mental health care or feels suicidal, his options are either to tell a counselor by speaking through the tray slot in the door of his cell (with the other prisoners listening) or write a note to a guard who will submit it to the medical staff.[496]

"They don't take us seriously," he said. "It's all money for them."[497]

---

482  Interview with Henry, *supra* note 73.
483  *Id.*
484  *Id.*
485  *Id.*
486  *Id.*
487  *Id.*
488  *Id.*
489  *Id.*
490  Interview with Dominic, *supra* note 73.
491  *Id.*
492  *Id.*
493  *Id.*
494  *Id.*
495  *Id.*
496  *Id.*
497  *Id.*

# Giles W. Dalby Correctional Facility
## Post, Texas



■ Though the vast majority of prisoners at Dalby are Spanish speaking, there are few Spanish-speaking staff members. And MTC guards reportedly send prisoners to SHU for speaking Spanish.

Emmanuel is blind and incarcerated at Dalby Correctional Facility. For this, he must endure a special humiliation: when he stands in the cafeteria line, a guard holding a barcode reader (intended for scanning prison IDs) often aims the barcode reader into Emmanuel's eyes and laughs at the man who cannot see.[498]

Other prisoners reported that such indignities are common at Dalby. Prisoners told the ACLU that Dalby staff exhibit a lack of professionalism and worse. Guards call them names like "Mexican nigger" and "wetback."[499] Staff appear unprepared to respond to life-threatening emergencies.[500] And though the vast majority of prisoners at Dalby are Spanish speaking, there are few Spanish-speaking staff members, making it difficult for many prisoners to communicate their needs and concerns.[501]

---

498   Interview with Emmanuel, *supra* note 95.
499   Interview with Victor, prisoner at Dalby (May 19, 2011) (on file with ACLU of Texas); Interview with Martin, *supra* note 151; Interview with Bernard, prisoner at Dalby (May 19, 2011) (on file with ACLU of Texas); Interview with Orlando, *supra* note 84; Interview with Eric, prisoner at Dalby (May, 29, 2011) (on file with ACLU of Texas).
500   Interview with Ian, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Martin, *supra* note 151.
501   Interview with Noah, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas); Interview with Valentino, *supra* note 95.

Case 3:16-cv-02267     Document 160-2     Filed 02/15/19     Page 100 of 105 PageID #: 4355

As one man told us: "I learn not to complain anymore. I just go along."[502]

## Background

Like many of the prisons in rural west Texas, the Giles W. Dalby Correctional Facility in Garza County was built to bring revenue to an isolated area.[503] Its namesake, County Judge Giles Dalby, proposed the prison to stem economic decline in the depressed county. It was built in 1999 and, during the next decade, the population of Post, Texas, shot up from 1,600 to more than 6,000, much of that attributed to the men incarcerated there.[504]

Operated by MTC, Dalby won a CAR contract in 2006. Today, Dalby houses roughly 1,900 non-citizen prisoners.

## Findings

### Staff harass and abuse prisoners

We received repeated reports of abusive behavior by staff against prisoners, including racist and derogatory comments, abusive use of disciplinary sanctions and isolation, sexual harassment, and threats of physical violence. We heard from two disabled prisoners who said they feel like they bear the brunt of this abuse. Emmanuel not only is made fun of in the cafeteria line, but he is also taunted by the guards in the recreation yard.[505] And since the guards do not provide him any help getting around the facility, he is forced to rely on assistance from other prisoners.[506] But he is lucky compared to a prisoner who could not walk; that man was reportedly placed in an isolation cell for telling a guard that he was unable to climb the stairs to his housing unit.[507]

Prisoners reported that MTC guards call them names like "wetback" and "Mexican nigger" and use profanities against them.[508] A Spanish-speaking prisoner told the ACLU

---

502   Interview with Alfonso, *supra* note 73.
503   Katie Hepburn, *Garza Judge Dalby Receives Trailblazer Award in State Senate*, Lubbock Avalanche-J., Aug. 13, 2004, http://lubbockonline.com/stories/081304/sta_081304084.shtml.
504   Adam D. Young, *Garza County Growth Could Be Mixed Blessing*, Lubbock Avalanche-J., Mar. 7, 2011, http://m.lubbockonline.com/local-news/2011-03-06/garza-county-growth-could-be-mixed-blessing.
505   Interview with Emmanuel, *supra* note 95.
506   *Id.*
507   Interview with Freddie, *supra* note 84.
508   Interview with Victor, *supra* note 499; Interview with Martin, *supra* note 151; Interview with Bernard, *supra* note 499; Interview with Orlando, *supra* note 84; Interview with Eric, *supra* note 499.

that guards harass him and others by saying: "Where do you think you live? You live in America."[509] They reportedly send prisoners to the SHU "for not speaking English in America."[510] Both gay and straight prisoners reported that Dalby staff use homophobic insults against them and taunt them for being gay.[511] One prisoner told us that staff reportedly target openly gay prisoners with sexually provocative comments and issue them false disciplinary tickets for "engaging in sexual acts."[512]

The ACLU received numerous reports that prisoners with limited English proficiency are punished for not following orders given in English that they do not fully understand.[513] Other prisoners reported that they could not communicate with guards at all. One man told us that so few guards speak Spanish that when guards need to speak to a Spanish-speaking prisoner, they have to call over another prisoner to translate.[514]

Prisoners told us that MTC staff make arbitrary threats of physical violence and disciplinary sanctions.[515] In one case, a correctional officer reportedly challenged a prisoner: "Let's go outside and fight."[516] Those who complain about such threats do so at their peril: correctional staff reportedly tell prisoners who try to raise concerns with prison administrators or to report abuse that they will be put in the SHU if they attempt further action.[517]

The ACLU was unable to obtain specific information related to training and staffing in CAR prisons through open records requests.[518] However, a review of the Dalby contract suggests that little training is provided and virtually none is required.[519] All the contracts we reviewed stipulate that BOP will provide specialized training on a one-time basis on a limited number of topics pertaining to records administration and correctional programs.[520] The only required training is 24 hours on "disciplinary hearings." Other trainings are offered but must be paid for by the contractor. This contractual scheme provides little incentive for private companies to spend money on training. And it is foolish to expect private prison companies to provide adequate training in the absence of contractual requirements: a 2004 study found that the private sector requires less

---

509   Interview with Martin, *supra* note 151.
510   *Id.*
511   Interview with Manolo, prisoner at Dalby (May 19, 2011) (on file with ACLU of Texas); Interview with Guillermo (May 19, 2011) (on file with ACLU of Texas); Interview with Eduardo, prisoner at Dalby (May 19, 2011) (on file with ACLU of Texas).
512   Interview with Manolo, *supra* note 511.
513   Interview with Guillermo, *supra* note 511; Interview with Victor, *supra* note 499.
514   Interview with Christian, prisoner at Dalby (Dec. 3, 2013) (on file with ACLU of Texas).
515   Interview with Fernando, *supra* note 84; Interview with Guillermo, *supra* note 511.
516   Interview with Guillermo, *supra* note 511.
517   Interview with Fernando, *supra* note 84.
518   *See supra* text accompanying notes 224-31.
519   *Dalby CAR 6 Contract*, *supra* note 83, at 79-80.
520   *Big Spring CAR 6 Contract*, *supra* note 83, at 79-80; *Dalby CAR 6 Contract*, *supra* note 83, at 79-80; *Eden CAR 6 Contract*, *supra* note 83, at 77-78; *Reeves CAR 5 Contract*, *supra* note 83, at 32-33; *Reeves CAR 6 Contract*, *supra* note 83, at 80-81.

training of its guards than correctional officers in public prisons; that private prisons have a lower staff-to-prisoner ratio; that the private sector pays its guards less; and that the private sector experiences staff turnover rates approaching three times that of the public sector.[521]

## Failure to provide timely medical intervention

Martin, a 36-year-old Cuban immigrant serving a fifteen-month sentence for marijuana possession, suffers from severe asthma. He told the ACLU that he almost died one night when he stopped breathing during a severe attack and an unprepared nurse did not know how to intubate him.

Martin told us he woke up in the midst of a serious attack. Usually, he would use his rescue inhaler to help him breathe, but he could not do so on this day because a guard had taken it from his cell.[522] He and his cellmate called through the intercom, asking guards to open the cell door because he was having an asthma attack.[523] MTC staff took 25 minutes to arrive and open his door, during which time Martin's cellmate had to hit him on the back repeatedly so that he could breathe.[524] When they finally arrived, Martin asked for permission to go to the doctor.[525] It took fifteen or twenty minutes more for MTC staff to escort him to the medical department.[526] When they finally arrived, there was no doctor at the medical department.[527] At this point, Martin could not breathe at all.[528] The nurse on call attempted to intubate Martin, but she did not know how to perform the procedure.[529]

When we spoke to Martin, he had been placed in an isolation unit while awaiting transfer to another facility. The cold temperature in his cell was provoking asthma attacks, but he reported that he was not receiving medical attention.[530] When he informed a nurse that he was having asthma attacks in the SHU, she responded that she could not help him and that he would have to wait until a doctor arrived on site later that week.[531] Martin is afraid for his life. "Asthma is one of those things where you can't wait," Martin explained

---

521    Curtis R. Blakely & Vic W. Bumphus, *Private and Public Sector Prisons, a Comparison of Select Characteristics*, 68 Fed. Probation no. 1, *available at* http://www.uscourts.gov/uscourts/FederalCourts/PPS/Fedprob/2004-06/prisons.html (last visited Feb. 2, 2014).
522    Interview with Martin, *supra* note 151.
523    *Id.*
524    *Id.*
525    *Id.*
526    *Id.*
527    *Id.*
528    *Id.*
529    *Id.*
530    *Id.*
531    *Id.*

to us.[532] "You could get respiratory arrest. Here, if something happened to me right now, tonight, I would die."[533]

Martin's was not the only story we heard of emergency medical treatment being denied. According to one complaint we received, an epileptic prisoner went unattended during a seizure because a guard—not a medical professional—decided that he was faking it.[534] Several prisoners told the ACLU that they were disturbed by the slow medical response at Dalby in a different incident, when a prisoner collapsed from a heart attack in the yard.[535] It reportedly took 15 to 20 minutes for medical personnel to reach him after he collapsed. It took even more time for prison staff to evacuate all the prisoners from the yard and move him onto an ambulance for transport to a hospital. He later died. One prisoner who was present during the incident remarked, "We were watching him die right there."[536]

---

532    *Id.*
533    *Id.*
534    Interview with Guillermo, *supra* note 511.
535    Interview with Pedro, *supra* note 84; Interview with Fernando, *supra* note 84.
536    Interview with Pedro, *supra* note 84.

