# EXHIBIT H

Videotaped Deposition of

# David Garfinkle

July 31, 2020

Volume I

Grae

vs.

Corrections Corporation of America, et al.

**Confidential**



1            IN THE UNITED STATES DISTRICT COURT
           FOR THE MIDDLE DISTRICT OF TENNESSEE
2
              Civil Action No. 3:16-CV-02267
3

4    NIKKI BOLLINGER GRAE, Individually and on
     Behalf of All Others Similarly Situated,
5
                        Plaintiff,
6    vs.

7    CORRECTIONS CORPORATION OF AMERICA, et al.,

8                        Defendants.
     _____/
9

10

11                  *** CONFIDENTIAL ***

12

13            VIDEOTAPED/ZOOM DEPOSITION OF

14                    DAVID GARFINKLE

15                        Volume I

16

17

18

19
                     Friday, July 31, 2020
20                   9:38 a.m. - 6:27 p.m.

21
                     Franklin, Tennessee
22

23
     Stenographically Reported By:
24   Debra Duran-Bornstein, CCR, RPR, LCR
     Aptus Court Reporting
25   Job No. 10071104

www.aptusCR.com

1

2

3

4        The video-recorded deposition via Zoom of

5    DAVID GARFINKLE was taken by Counsel for the

6    Plaintiff for all purposes under the Federal

7    Rules of Civil Procedure.

8        It is agreed that DEBRA DURAN-BORNSTEIN,

9    LCR, RPR, and CCR for the State of Tennessee,

10    may swear the witness, and that the reading and

11    signing of the completed deposition by the

12    witness are not waived.

13

14

15

16

17

18

19

20

21

22

23

24

25

www.aptusCR.com

1   The following proceedings began at 9:38 a.m.:

2               THE VIDEOGRAPHER:  We are now on the

3   record.  Today's date is July 31, 2020, and the time

4   is 9:38 a.m.

5               This is the video deposition of David M.

6   Garfinkle, being taken in the Matter of Nikki

7   Bollinger Grae versus Corrections Corporation of

8   America, et al.

9               We are taking this deposition via Zoom,

10  and my name is Spencer Beneveniste of Aptus Court

11  Reporting.

12              Will counsel please identify yourselves

13  and state who you represent.

14              MS. RADCLIFFE:  Willow Radcliffe, of

15  Robbins Geller, for the Plaintiff and the Class.

16              MR. WOOD:  Christopher Wood, Robbins

17  Geller, on behalf of Plaintiff and the Class.

18              MR. LYONS:  Christopher Lyons, from

19  Robbins Geller, on behalf of the Plaintiff and the

20  Class.

21              MR. BLACK:  Kenneth Black, Robbins

22  Geller, on behalf of the Plaintiff and the Class.

23              MR. GLENNON:  Brian Glennon, Latham &

24  Watkins, on behalf of Defendants and, of course, the

25  witness.

Case 3:16-cv-02267    Document 286-8    Filed 08/21/20    Page 5 of 26 PageID #: 9478

 1              MR. McGEE:  Trey McGee, Riley, Warnock &

 2      Jacobson, on behalf of the witness and the

 3      Defendants.

 4              And I believe my partner, Steve Riley,

 5      with Riley Warnock & Jacobson, is also on.

 6              MR. RILEY:  Correct.  Thank you.

 7              MR. WHITWORTH:  And Morgan Whitworth, of

 8      Latham & Watkins, on behalf of the Defendants and the

 9      witness.

10              THE VIDEOGRAPHER:  The court reporter

11      today is Debra Duran, and she may now swear in or

12      affirm the Deponent.

13              THE STENOGRAPHER:  Please raise your

14      right hand.

15              Do you swear that the testimony you are

16      about to give in this case will be the truth, the

17      whole truth, and nothing but the truth?

18              THE WITNESS:  Yes, I do.

19      Thereupon:

20                      DAVID GARFINKLE

21      having been first duly sworn remotely was examined

22      and testified as follows:

23                      DIRECT EXAMINATION

24        BY MS. RADCLIFFE:

25      **Q.      Good morning, Mr. Garfinkle.**

www.aptusCR.com

 1          (Thereupon, marked as Plaintiff

 2      Exhibit 523.)

 3      BY MS. RADCLIFFE:

 4  Q.      Mr. Garfinkle, do you see that you received an

 5  email from Mr. Hininger on January 22nd, 2015?

 6  A.      I do.

 7  Q.      Okay.  Do you have any reason to believe

 8  what's been marked as Exhibit 523 is not a true and

 9  correct copy of the email you received from

10  Mr. Hininger?

11  A.      No.

12  Q.      Okay.  In the email below in the email chain,

13  the one that's 7:59 a.m., there's an email that

14  appears that Mr. Hininger wrote, and it discusses, in

15  the third paragraph, that -- a request for a

16  debriefing.

17          Do you see that?

18  A.      I do.

19  Q.      Okay.  And he indicates that we received it on

20  January 6th.

21          Is this the debriefing that -- that you

22  indicated earlier that you likely attended?

23  A.      Yes.

24              MR. GLENNON:  Object to form.

25              THE WITNESS:  I'm sorry.

Case 3:16-cv-02267   Document 286-8   Filed 08/21/20   Page 7 of 26 PageID #: 9480

www.AptusCR.com

1           THE VIDEOGRAPHER:  We're back on the

2      record.  The time is 5:43 p.m.

3               MS. RADCLIFFE:  Okay.  We're going to go

4      ahead and mark the next exhibit, Tab 9, as Exhibit

5      531.

6               (Thereupon, marked as Plaintiff

7          Exhibit 531.)

8       BY MS. RADCLIFFE:

9      Q.      Mr. Garfinkle, do you recognize this document?

10     A.      I do.

11     Q.      Do you recognize it as your objections and

12     responses to Plaintiff's first set of interrogatories?

13     A.      Yes.

14     Q.      Okay.  Do you recall when you saw Plaintiff's

15     first set of interrogatories?

16     A.      This document is dated April 28.  It was

17     not -- you know, probably a week or two -- well, no

18     more than a month before that.  It would have been

19     within weeks.

20     Q.      And when you first -- when you had reviewed

21     Plaintiff's first set of interrogatories, did you have

22     subsequent discussions with anyone regarding the

23     responses?

24     A.      You mean other than my attorneys?

25     Q.      Well, including your attorneys.  I don't want

1   to know the substance of it.

2   A.      We discussed it.  I had questions.  We -- they

3   had responses, and we made some changes.

4   Q.      Okay.  Did you -- were you the primary drafter

5   of this document?

6               MR. GLENNON:  Objection, form.

7   A.      No, it was presented to me, and I provided

8   answers.

9     BY MS. RADCLIFFE:

10  Q.      Do you recall what you edited?

11  A.      Not particularly, no.  Probably, you know, a

12  few sentences in a few sections, but I don't remember

13  specifics.  If you don't want me to read the whole

14  document, I'm not going to be able to recall.

15  Q.      Okay.  So when you received the document, it

16  was primarily already filled out by another

17  individual?

18              MR. GLENNON:  Objection, vague.  Form.

19  A.      Yes, I think that's fair to say.

20    BY MS. RADCLIFFE:

21  Q.      Okay.  And --

22  A.      I mean, I'm not an attorney, I don't know how

23  to draft this, so it had to be drafted by somebody

24  else.

25  Q.      Okay.  Did you -- for example, let's just go

Case 3:16-cv-02267    Document 286-8    Filed 08/21/20    Page 9 of 26 PageID #: 9482
www.aptusCR.com

```
 1    to page 3.

 2           And the interrogatory is:  "Identify all

 3    documents and communications that you relied upon at

 4    the time of any direct or indirect representation by

 5    you or CCA to investors during the class period that

 6    CCA provided quality corrections services, high

 7    standards of quality, high quality operations, or high

 8    quality safe and secure facilities."

 9           And set forth below are some objections and --

10    and responses.

11           The second paragraph has the response, and

12    after a series of objections, in the third sentence it

13    says, "In allegedly making the statements,

14    Mr. Garfinkle relied upon, amongst other things, his

15    decades of experience in public accounting, corporate

16    finance, real estate investment trusts, and the

17    private prisons corrections industry."

18           Did you have experience in the private prisons

19    corrections industry prior --

20                 MR. GLENNON:  That's not exactly what --

21     what that says.

22                 MS. RADCLIFFE:  Did I misstate the

23     document?

24                 MR. GLENNON:  Yes.

25                 MS. RADCLIFFE:  Okay.
```

www.aptusCR.com

 1       BY MS. RADCLIFFE:

 2    Q.        So I'll ask it another way.

 3              Mr. Garfinkle, it says you relied upon some

 4    things listed here in the sentence, okay?  One of them

 5    is that you relied upon regular communications with

 6    CoreCivic accounting, I assume the accounting

 7    department or division.

 8              Who did you have regular communications with

 9    in CoreCivic's accounting department?

10    A.        Who specifically?  I mean --

11    Q.        Who you relied upon with respect to

12    representations regarding the high quality of

13    operations that CCA provided?

14    A.        Let me read the -- I was making these

15    statements, which statements we're referring to -- so

16    I guess this is saying -- so I'm relying on regular

17    communications with accounting financial operations,

18    quality assurance policies and procedures.

19              These are the different departments that I

20    would have been relying on or consulting with in

21    making the statements that are identified in the

22    Interrogatory Number 1.

23    Q.        And I'm asking you which individuals in the

24    accounting department would you have relied on when

25    making statements regarding the high standards of

www.aptusCR.com

1    quality?

2    A.      Brian Hammonds is the vice president of

3    finance, Susie Simmons is the managing director of

4    finance.

5         Are you asking me specifically in accounting

6    or any of these departments?

7    **Q.      Well, let's start with accounting.**

8    A.      Yes.  So it probably would have Brian.  It

9    could have been Cameron Hopewell, who is our managing

10   director of -- of investor relations.  He -- he

11   studies the industry, he has to stay up to date on --

12   on the industry in -- in carrying out his

13   responsibilities.

14   **Q.      And --**

15   A.      Numerous people.

16   **Q.      Okay.  And so, for example, in the -- with**

17   **respect to regular communications with quality**

18   **assurance, who in quality assurance?**

19   A.      That would primarily have been Don Murray.

20   **Q.      And do you recall any specific conversations**

21   **you had with -- or communications with Don Murray that**

22   **you would have received that you would have relied on**

23   **regarding statements as to the high standards of**

24   **quality of services that CCA provided?**

25   A.      Yes.

1          MS. WHITE:  Objection, compound.

2     A.       Yes.  So, particularly, you know, when we

3     prepared the 10Qs or 10Ks, as I mentioned earlier, he

4     is the primary draftsperson for the part of the 10K

5     under the description of the business that talks about

6     the quality assurance department and the procedures

7     that they perform.  It would have included

8     conversations in the officers meetings on Mondays.  It

9     would have included conversations in the quality

10    assurance quarterly meetings that we have.  So it's

11    numerous conversations.

12      BY MS. RADCLIFFE:

13    **Q.       And do any specific communications come to**

14    **mind with any specific individual that would have**

15    **given you comfort with respect to the representations**

16    **in the various public filings by CCA regarding CCA's**

17    **high standards of quality?**

18    A.       No, not -- I don't recall specific

19    conversations asking this particular question.  It's

20    the body of knowledge of the communication exchanges

21    that we have through the course of our relationships

22    with -- with -- that I have with the -- with the

23    various departments, including Don Murray, if you're

24    talking about Don.

25    **Q.       So there's no specific communications that you**

www.aptusCR.com

1    can point to or recall, for example, the emails, any

2    reports, any, maybe, oral conversations?

3                    MR. GLENNON:  Object to form.

4    A.    No.  I wouldn't have gone to Don and said,

5    Don, you know, I'm being asked about the high quality

6    of safe and secure facilities, can you give me some

7    feedback?  I mean, that's -- it's not limited to a

8    point in time, it's over a long period of time.

9    BY MS. RADCLIFFE:

10   Q.    Okay.  And generally, what would Mr. Murray,

11   do you recall, would have conveyed to you that you

12   would have relied on for those representations?

13                    MR. GLENNON:  Objection, vague.

14   A.    The unannounced -- the structure of their

15   department, unannounced quality assurance audits that

16   they perform is unique.  Not every public sector

17   correctional system performs unannounced audits of

18   their facilities.

19        You know, things like that.  The programs that

20   we offer, the audit results that they -- that they

21   report on and produce.

22   BY MS. RADCLIFFE:

23   Q.    And then with respect to policies and

24   procedures, what are you referring to there with

25   respect to what you --

www.aptusCR.com

1    A.      We have -- we have an exhaustive set of

2    policies and procedures.  The policies and procedures

3    department is led by a few people -- or I shouldn't

4    say "led by," it includes a few people that are

5    responsible for updating, maintaining, changing all of

6    our policies and procedures, and they are voluminous.

7         If you can imagine, it's very government like.

8    Governments are all about policies and procedures, so

9    I think our background and the way we approach the

10   policies and procedures department is all about

11   establishing procedures so that we can follow

12   contracts and just perform a high quality level

13   operation, and that's why I included them in this --

14   in this listing.

15   **Q.      So would it mean every policy and procedure at**

16   **CCA that you would have relied on for these**

17   **representations regarding high quality operations?**

18              MR. GLENNON:  Form.

19   A.      No.  Again, this policies and procedures is

20   referring to a department, so I'm not referring to

21   individual policies and procedures because I don't

22   read -- again, it's a stack of policies, hundreds, if

23   not thousands, of pages long.  So I can't tell you

24   I've read every policy and procedure, but I do rely on

25   the folks who have that expertise in that area for

1    drafting and keeping policies and procedures updated,

2    so that we can perform at a high level.

3            Our -- our industry is very rigid and

4    structured, and follows policies and procedures.  So,

5    you know, when you get people like that who have the

6    experience in prior responsibilities leading that

7    department, it gives me confidence that I'm -- the

8    confidence to rely on them in making this type of a

9    statement as well.

10     BY MS. RADCLIFFE:

11   Q.      And who in policies and procedures would you

12   have relied on?

13   A.      Amy Gardner, Linda Vandever.  They're the two

14   primary contacts.

15   Q.      And do you recall any specific communications

16   you would have relied on, for example, when you signed

17   the 2014 Form 10K that contained those

18   representations from the policies and procedures

19   department or any of these departments?

20             MR. GLENNON:  Object to form and

21    compound.

22   A.      No.  And perhaps if I was expected to ask each

23   of these departments that I'm relying on -- if I was

24   expected to go to them and say can I -- you know,

25   explain to me why we have high quality safe and secure

www.aptusCR.com

 1    facilities, I didn't do that.

 2            So if -- if the representation is that I went

 3    out and asked people, and relied on them and their

 4    responses, that's not what I did.

 5            What I was saying is, you know, my decades of

 6    experience in working with these people is really what

 7    the intent of this is saying.  My decades of

 8    experience in public accounting, corporate finance,

 9    real estate investment trusts, regular communications

10    with those departments.  So it's regular

11    communications, it's not a specific communication that

12    I went and asked them, Tell me why we operate high

13    quality, safe and secure facilities.

14      BY MS. RADCLIFFE:

15    Q.    Can you identify even the topics of the

16    regular types of communications you would have had

17    that you would have relied on?

18                MR. GLENNON:  Object to form.

19    A.      Regular topics?

20      BY MS. RADCLIFFE:

21    Q.    I mean, can you categorize even the

22    communications that you would have had, for example,

23    with in-house and outside counsel that you would have

24    relied on in making these representations?

25                MR. GLENNON:  I'm going to instruct the

www.aptusCR.com

 1     witness not to answer to the extent it's going to

 2     reveal privileged communication.  And the form of the

 3     question.

 4      BY MS. RADCLIFFE:

 5     **Q.        You can answer.**

 6     A.      So I can answer?

 7     **Q.        As long as you don't tell me anything that is**

 8     **privileged.**

 9     A.      I'm not sure I can -- I could point to

10     anything specific.  Maybe you need to repeat the

11     question for me.

12     **Q.        I'll ask you.  For example, did you rely on**

13     **in-house and outside counsel with respect to your**

14     **representations in CCA's public filing of 10Ks and Qs**

15     **that you signed regarding the high standards of CCA's**

16     **operations?**

17                    MR. GLENNON:  Same objection.

18                    But you can answer, Mr. Garfinkle.

19     A.      Well, you know, when it comes to outside

20     counsel, outside counsel does not have the expertise

21     that our company has.  You know, I think -- so, you

22     know, I wouldn't have relied on outside counsel in

23     assessing, you know, specific high quality statements

24     to secure facilities.

25                    MR. GLENNON:  Hold on, Willow.  Please

www.aptusCR.com

1       let him answer.

2    A.      We consult with outside counsel, and they

3    review our public documents.  So, you know, we take

4    their feedback.  They're part of our disclosure

5    process.

6      BY MS. RADCLIFFE:

7    Q.      So the interrogatory asked for those

8    communications and documents you relied on in making

9    these representations regarding high standards of

10   quality.

11          So I guess my question is:  Which in-house and

12   outside counsel did you rely on?

13              MR. GLENNON:  I'm going to object.  I

14    think you overly paraphrased the interrogatory.

15              THE WITNESS:  Do I answer?

16     BY MS. RADCLIFFE:

17   Q.      Go ahead and answer.

18              MR. GLENNON:  If you understand the

19    question.

20   A.      Maybe you better repeat it.

21     BY MS. RADCLIFFE:

22   Q.      Sure.

23          Mr. Garfinkle, the interrogatory asks you to

24   "Identify all documents and communications that you

25   relied upon at the time of representations made by you

www.aptusCR.com

 1    or CCA to investors during the class period that CCA

 2    provided quality corrections services, high standards

 3    of quality, high quality operations, high quality safe

 4    and secure facilities, or high quality services to the

 5    BOP."

 6              In response, it indicates that you relied

 7    upon, among other things, and there's a list of

 8    things, and that includes in-house and outside

 9    counsel.

10              MR. GLENNON:  Willow, I'm sorry, I'm not

11     trying to get in your way here.  Are we talking

12     Interrogatory 3 still?

13              MS. RADCLIFFE:  One.

14              MR. GLENNON:  Okay.  Got you.

15    A.      Yeah.  And, again, it's not -- I wouldn't say

16    it's a specific document or communication.  If you're

17    asking me specific with respect --

18    **Q.      I'm just asking you which counsel you would**

19    **have relied upon.**

20    A.      Okay.  So in-house counsel during this period

21    could have been Steve Groom, it could have been Cole

22    Carter.  No, it probably -- it probably was Steve

23    Groom.  I believe Cole Carter replaced Steve Groom

24    after the period you're talking about.

25              Outside counsel would have been numerous

www.aptusCR.com

1    attorneys at -- Latham & Watkins was our outside

2    corporate securities counsel for some period of time.

3    Bass, Berry & Sims, I think, was also part of our

4    outside corporate securities counsel for other periods

5    of times during the period.

6    Q.      And you've also indicated that company's

7    external auditors.

8            Who at the external auditors would you have

9    relied on?

10   A.      So we had Ernst & Young as our auditors during

11   the whole class period.  They've had numerous

12   partners, they've had numerous senior managers and

13   staff, but, again, they review all of our public

14   documents and provide feedback and -- and ask

15   questions about the types of disclosures that we

16   included in those documents.

17   Q.      And are there any communications that you

18   recall, let's just say specifically from in-house or

19   outside counsel, that you relied upon in -- when the

20   statements -- or representations identified in

21   Interrogatory Number 1 were made?

22               MR. GLENNON:  Object to form.

23   A.      No, nothing specific.

24     BY MS. RADCLIFFE:

25   Q.      And you also indicate here, "Feedback from

www.aptusCR.com

1    CoreCivic employees who directly or indirectly

2    reported to you."

3         Which ones?

4    A.    Yes.  So, again, I -- I think that would be

5    some of the folks in the accounting department, so

6    that it may be a little duplicative.  People reporting

7    directly to me are, you know, the vice president of

8    treasury, John Pfeiffer, our CIO, who installs the

9    systems at all of our facilities responsible for the

10   whole enterprise, resource management, all the

11   software, all the -- and gets involved in all the

12   processes that we have in all of our facilities.

13        So he's very knowledgable about how we perform

14   and how we operate our correctional facilities, and

15   has to be in order to set up those -- those tools for

16   us.  So, people like that.

17   Q.    Okay.  If you could turn to Page 9.

18        Interrogatory Number 7, it says, "Describe in

19   detail all reasons for the loss of the Cibola County

20   Correctional Center contract with the BOP in or around

21   2016, including any information conveyed by the BOP

22   and any debriefing or otherwise as to the reasons for

23   the loss."

24        And go ahead and read your response to

25   yourself.

Case 3:16-cv-02267   Document 286-8   Filed 08/21/20   Page 22 of 26 PageID #: 9495

www.aptusCR.com

```
1    A.     Right.

2    Q.     Did you attend the debriefing with respect to

3    this Cibola County Correctional Center contract?

4              MR. GLENNON:  Object to form.

5    A.     No.

6      BY MS. RADCLIFFE:

7    Q.     Did anyone, to your knowledge, attend a

8    debriefing regarding the Cibola County Correctional

9    Center contract loss?

10             MR. GLENNON:  Objection.

11   A.     I don't know if we had a debriefing on the

12   Cibola contract.

13     BY MS. RADCLIFFE:

14   Q.     At no time did you become aware of any reasons

15   given by the BOP as to the BOP's decision not to

16   extend the Cibola contract?

17             MR. GLENNON:  Objection.

18     BY MS. RADCLIFFE:

19   Q.     I'm sorry?

20   A.     That's correct.

21   Q.     Okay.  If you wanted to find out that

22   information, who would you ask?

23   A.     Well, I'm not sure we know the reasons for the

24   nonrenewal of the Cibola contract.  It was in 2016,

25   and we would be speculating if -- if we -- you know,
```

www.aptusCR.com

 1   because we didn't get any information from the Bureau

 2   of Prisons, to my knowledge, about why that contract

 3   was not renewed.

 4   Q.      Let me just ask it a slightly different way.

 5           If you wanted to find out if there's a

 6   debriefing, who would you --

 7   A.      Oh, all right.  For that contract, it probably

 8   would have been Bart VerHulst.

 9   Q.      Prior to responding to these interrogatories,

10   did you ask Mr. VerHulst if there was any debriefing

11   with respect to the Cibola contract?

12   A.      I did not ask him, no.

13   Q.      Okay.  You can go ahead and turn to the next

14   tab, Tab 10, which we'll mark as Exhibit 532.

15           (Thereupon, marked as Plaintiff

16       Exhibit 532.)

17   A.      Okay.

18     BY MR. GLENNON:

19   Q.      Mr. Garfinkle, have you seen this document

20   before?

21   A.      I don't believe so.

22   Q.      Okay.  Do you understand the title to be

23   "Defendants' Objections and Responses to Plaintiff's

24   Second Set of Interrogatories"?

25   A.      If I understand it correctly, it's

www.aptusCR.com

1     corporate's -- the corporation's response to the

2     interrogatories.

3     Q.      Okay.  Do you recall at all seeing Plaintiff's

4     second set of interrogatories in this action?

5                 MR. GLENNON:  Object to form.

6     A.      No, I don't think I was presented with them.

7       BY MS. RADCLIFFE:

8     Q.      Okay.  Just so we're clear for the record,

9     we're going to introduce Tab 104.

10            Sorry, you have to change binders.  You get a

11     workout.

12    A.      I know, right?

13                MR. GLENNON:  And we'll mark that as

14      Exhibit 533.

15            (Thereupon, marked as Plaintiff

16       Exhibit 533.)

17      BY MS. RADCLIFFE:

18    Q.      And I'm just going to give you a chance to

19    look at that.

20            Mr. Garfinkle, I'm just going to ask you if

21    you've seen this document before?

22    A.      I don't believe so.

23    Q.      Okay.  You can go ahead and put that aside.

24                MS. RADCLIFFE:  Can we go off the record,

25     please?

Case 3:16-cv-02267    Document 286-8    Filed 08/21/20    Page 25 of 26 PageID #: 9498
www.aptusCR.com

```
 1                    REPORTER CERTIFICATE

 2     STATE OF TENNESSEE

 3     COUNTY OF WILLIAMSON

 4              I, the undersigned, a Licensed Court Reporter

 5     of the State of Tennessee, do hereby certify:

 6              That the foregoing proceedings were taken

 7     before me at the time and place herein set forth; that

 8     any witnesses in the foregoing proceedings, prior to

 9     testifying, were duly sworn; that a record of the

10     proceedings was made by me using machine shorthand,

11     which was thereafter transcribed under my direction;

12     that the foregoing transcript is a true record of the

13     testimony given.

14              Further, that if the foregoing pertains to

15     the original transcript of a deposition in a federal

16     case, before completion of the proceedings, review of

17     the transcript [ X ] was [  ] was not requested.

18              I further certify that I am neither

19     financially interested in the action nor a relative or

20     employee of any attorney or party to this action.

21              IN WITNESS WHEREOF, I have this date

22     subscribed my name.

23     Dated: August 3, 2020

24     _____
       Debra Duran-Bornstein
25     RPR, CCR, LCR No. 808
```

www.aptusCR.com