# EXHIBIT I

Videotaped Deposition of

# Todd J. Mullenger

March 13, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential**



```
 1         IN THE UNITED STATES DISTRICT COURT
         FOR THE MIDDLE DISTRICT OF TENNESSEE
 2

 3

 4   NIKKI BOLLINGER GRAE, Individually
     and Behalf of All Others Similarly
 5   Situated,

 6                     Plaintiff,
     vs.                                  CASE NO.
 7                                        3:16-CV-02267
     CORRECTIONS CORPORATION OF
 8   AMERICA, et al.,

 9                     Defendants.

10

11

12                   CONFIDENTIAL

13      VIDEO DEPOSITION OF TODD J. MULLENGER

14             Nashville, Tennessee

15               March 13, 2020

16

17

18

19

20

21

22   Reported by:

23   Elisabeth A. Miller Lorenz

24   RMR, CRR, LCR No. 66

25   Job No.:  10066906
```

```
 1           IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF TENNESSEE
 2

 3

 4   NIKKI BOLLINGER GRAE, Individually
     and Behalf of All Others Similarly
 5   Situated,

 6                        Plaintiff,
     vs.                                     CASE NO.
 7                                           3:16-CV-02267
     CORRECTIONS CORPORATION OF
 8   AMERICA, et al.,

 9                        Defendants.

10

11

12

13

14

15

16

17        Video deposition of TODD J. MULLENGER was

18   taken on behalf of Plaintiff, at Riley, Warnock &

19   Jacobson, 1906 West End Avenue, Nashville,

20   Tennessee, beginning at 9:35 a.m., and ending at

21   3:03 p.m., on Friday, March 13, 2020, before

22   Elisabeth A. Miller Lorenz, RMR, CRR, and LCR No.

23   66.

24

25
```

```
 1                 P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  Good morning.  We're
 3  now on the record.  Today's date is March 13th,
 4  2020, and the time is approximately 9:35 a.m.
 5              This is the video deposition of
 6  Todd Mullenger being taken in the matter of Grae
 7  versus CCA; on behalf of the plaintiff; pending in
 8  the United States District Court for the Middle
 9  District of Tennessee; Case No. 3:16-CV-02267.  We
10  are here at Riley Warnock at 1906 West End Avenue in
11  Nashville, Tennessee.
12              My name is David Drumel of Aptus Court
13  Reporting.  The court reporter is Elisabeth Lorenz.
14              Counsel, please identify yourselves for
15  the record at this time.
16              MR. LYONS:  Christopher Lyons, Robbins
17  Geller Rudman & Dowd, on behalf of the plaintiff and
18  the class.
19              MR. WOOD:  Christopher Wood on behalf
20  of the plaintiffs and the class.
21              MR. WHITWORTH:  Morgan Whitworth of
22  Latham & Watkins on behalf of defendants and the
23  witness.
24              MR. McGEE:  Trey McGee, Riley,
25  Warnock & Jacobson, on behalf of the -- the
```

1  defendants.
2       THE VIDEOGRAPHER:  Thank you.
3       Will the court reporter please swear in
4  the witness.
5                    * * *
6                TODD MULLENGER
7  was called as a witness, and after having been first
8  duly sworn, testified as follows:
9                E X A M I N A T I O N
10 BY MR. LYONS:
11 Q    Good morning, Mr. Mullenger.
12 A    Good morning.
13 Q    Have you ever had your deposition taken
14 before?
15 A    Yes, once many years ago.
16 Q    Do you remember what case that was in
17 connection with?
18 A    I do not.
19 Q    Do you remember generally what type of case
20 it was?
21 A    I do not.
22 Q    Were you -- were you a party in whatever
23 litigation?
24 A    I don't believe so.
25 Q    Did it have to do with a work matter or a

Page 7

```
 1  defendants.
 2              THE VIDEOGRAPHER:  Thank you.
 3              Will the court reporter please swear in
 4  the witness.
 5                         * * *
 6                       TODD MULLENGER
 7  was called as a witness, and after having been first
 8  duly sworn, testified as follows:
 9                    E X A M I N A T I O N
10  BY MR. LYONS:
11  Q       Good morning, Mr. Mullenger.
12  A       Good morning.
13  Q       Have you ever had your deposition taken
14  before?
15  A       Yes, once many years ago.
16  Q       Do you remember what case that was in
17  connection with?
18  A       I do not.
19  Q       Do you remember generally what type of case
20  it was?
21  A       I do not.
22  Q       Were you -- were you a party in whatever
23  litigation?
24  A       I don't believe so.
25  Q       Did it have to do with a work matter or a
```

1    bottom line.
2    A      Uh-huh. Uh-huh, yes.
3    Q      Do you see that?
4    A      Yes.
5    Q      What is that page there -- or what are those
6    couple pages?
7    A      You said 31.2?
8    Q      I think so.
9    A      This is the certification of the CFO.
10    Q      And did you sign this certification?
11    A      Yes.
12    Q      And you know what a -- what a Sarbanes-Oxley
13    certification is, right?
14    A      Yes.
15    Q      And so you're certifying -- I guess just
16    looking at Paragraph 2 there, you're certifying that
17    based on your knowledge, this annual report does not
18    contain any untrue statement of a material fact or
19    omit to state a material fact necessary to make the
20    statement made in light of the circumstances under
21    which such statements were made not misleading with
22    respect to the period covered by this annual report;
23    is that right?
24    A      Yes.
25    Q      And so what did you do to satisfy yourself

1  that that statement there was correct with respect
2  to this 10-K?
3  A      I would review the filing in detail before
4  it got filed with the SEC and met with members of my
5  staff.  We also had a stand -- standing disclosure
6  committee meeting process with members of various
7  departments throughout the org- -- organization who
8  might be in possession of material -- nonpublic
9  information that needed to be disclosed.
10         And we would hold periodic meetings to
11 discuss any information that we might have and
12 review that information with internal and outside
13 counsel to determine whether or not we needed to
14 disclose it.
15 Q      So you said you would review it in -- in
16 detail.
17         Would you read the whole filing?
18 A      Yes.
19 Q      Cover to cover?
20 A      With the exception of some of the more
21 mundane, such as statements such as table of
22 contents or something like that.
23 Q      Any other sections that come to mind that
24 you would not view?
25 A      No.

1  Q    Were there any particular parts that you
2  focused on more than others when you reviewed the
3  10-K?
4  A    No.
5  Q    And you said you would -- in addition to
6  reviewing the 10-K, you would meet with your staff.
7       Who would be involved in that process?
8  A    That would be Dave Garfinkle,
9  Patrick Swindle primarily.
10 Q    Primarily them?  Anybody else in -- in those
11 meetings?
12 A    Not that I recall.  Dave might have some
13 members of his team there.
14 Q    And what would happen in those meetings --
15 those -- were these in-person meetings with -- with
16 your staff?
17 A    Could be telephone calls; could be in-person
18 meetings.
19 Q    And what would happen in those meetings?
20 A    Oftentimes if I had questions, we'd review
21 the wording.  That's generally --
22 Q    Who was primarily responsible for drafting
23 the 10-K?
24 A    That would have been Dave Garfinkle.
25 Q    So he would draft it, and then he would send

1  it to you, and you would review it, and then you
2  would meet with him to talk through questions you
3  had about it; is that right?
4  A      Yes.
5  Q      And then you mentioned disclosure --
6  standing disclosure committee?
7  A      (Nonverbal response.)
8  Q      Actually, first, can you tell me just, would
9  that be -- was that, like, a regularly scheduled
10 meeting with your staff where you knew it would
11 always be on a certain day after the end of a
12 quarter, or how did that work?
13 A      It's -- it was every quarter.  We didn't
14 have a standing time because the timing of the
15 filing might change.
16 Q      Would it generally just be a one-time
17 meeting, or would there be multiple meetings?
18 A      It could be multiple meetings.
19 Q      Is that the sort of meeting where minutes
20 were kept or anything like that?
21 A      I believe minutes were kept by outside
22 counsel.
23 Q      So counsel would be in these meetings as
24 well?
25 A      Yes.

1  Q     Who was the outside counsel who would be at
2  these meetings?
3  A     Bass, Berry & Sims.
4  Q     Was inside counsel in those meetings too?
5  A     Well, Bass, Berry & Sims, and then it
6  transitioned I believe to Latham & Watkins and
7  inside -- yes, inside counsel was party as well.
8  Q     And then in connection with those meetings,
9  how would you go about deciding what types of facts
10 would be included in filings, what would be excluded
11 from filings?
12 A     In conversation with inside and outside
13 counsel.
14        MR. WHITWORTH:  And I'll just caution
15 you not to reveal the contents of any of those
16 conversations that relate to legal matters.
17        THE WITNESS:  Thank you.
18 BY MR. LYONS:
19 Q     And then you -- you mentioned -- okay.  So
20 the standing disclosure committee, you said various
21 departments were there.
22        Who was -- who was involved in the
23 disclosure committee meetings?
24 A     I couldn't tell you every -- there was 15 to
25 20 people, as I recall.

```
 1  Q      Were you always -- at least during your time
 2  as the CFO, were you always a part of those
 3  meetings?
 4  A      Yes.
 5  Q      Was the CEO always a part of those meetings?
 6  A      Yeah.
 7  Q      And would those -- the disclosure committee
 8  meetings, would that be a one-time meeting for each
 9  filing, or would that -- could that be multiple
10  times as well?
11              MR. WHITWORTH:  Object to form.
12              THE WITNESS:  That could be multiple
13  times as well.
14  BY MR. LYONS:
15  Q      What would decide if you would meet multiple
16  times versus just once as a committee?
17  A      If someone had -- if -- some questions,
18  follow-up on information that was presented seeking
19  additional clarification or additional information.
20  Q      And were these in-person meetings?
21  A      Yes.
22  Q      Where would they be held?
23  A      A conference room at the corporate offices.
24  Q      And so it would -- I guess who -- who led
25  the meetings?
```

```
 1  A       I believe it was --
 2              (Cellular phone interruption.)
 3              THE WITNESS:  I'm sorry, I'm sorry, so
 4  sorry, my apologies.
 5              I believe it was our general counsel.
 6  BY MR. LYONS:
 7  Q       And would he -- would he go around the room
 8  to various departments to get information?
 9  A       Yes.  Everyone -- he went around the room to
10  every individual in the meeting.
11  Q       And -- and what would -- would he ask
12  each -- everyone in the meeting questions or...
13  A       It was typically, as I recall, a reminder to
14  everyone of the types of information we were looking
15  for, and then he'd go around to every individual and
16  ask them if they were aware of any information that
17  met those guidelines he provided.
18  Q       So any information that met those
19  guidelines, so it was not in the filings; is that
20  right?
21              MR. WHITWORTH:  Object to the form.
22              THE WITNESS:  Yeah.  So as I recall,
23  everyone was provided a copy of the 10-K in advance,
24  asked to read it, and then were asked if there was
25  any information that wasn't included or any new
```

1  information that had come to light since the draft
2  of that document.
3  BY MR. LYONS:
4  Q       So in connection, for example, with the 2011
5  10-K, is there anything else you would have reviewed
6  other than the Draft 10-K itself?
7  A       In -- in preparation of the 10-K?
8  Q       Yes.
9  A       Internal financial statements, forecast that
10 was prepared.  Those come to mind.
11 Q       And what -- what was the forecast that you
12 would look at in connection with the 10-K
13 preparation meetings?
14 A       Well, I guess actually I'd use the forecast
15 more for the earnings call in our earnings release
16 where we gave guidance is where I'd primarily use
17 that document.
18 Q       So you'd look at -- you'd look at -- you'd
19 have an internal forecast that you looked at that
20 then you used to decide what guidance you would
21 issue when you would --
22 A       Yes.
23 Q       -- issued your earnings release and had an
24 earnings call; is that right?
25 A       Yes.

```
 1  Q       And so would that -- were your disclosure
 2  committee meetings normally before the earnings
 3  release went out?
 4  A       I don't recall.
 5  Q       Is there anything else that comes to mind
 6  that -- sources of information that you would review
 7  before -- or in connection with the preparation of a
 8  10-K?
 9  A       Not that I recall.
10  Q       And so it sounds like every department would
11  provide information in connection with the
12  disclosure committee meetings; is that right?
13  A       They would have the opportunity to provide
14  information.
15  Q       Was there anything else that you did to get
16  information from -- from other departments outside
17  of the disclosure committee for inclusion in the
18  10-K?
19              MR. WHITWORTH:  Object to form.
20              THE WITNESS:  It could come from
21  conversations I or my staff had with other
22  departments.
23  BY MR. LYONS:
24  Q       So just sort of an on -- ongoing basis
25  conversations?
```

```
 1              I, the undersigned, a Licensed Court
 2   Reporter of the State of Tennessee, do hereby
 3   certify:
 4              That the foregoing proceedings were
 5   taken before me at the time and place herein set
 6   forth; that any witnesses in the foregoing
 7   proceedings, prior to testifying, were duly sworn;
 8   that a record of the proceedings was made by me
 9   using machine shorthand, which was thereafter
10   transcribed under my direction; that the foregoing
11   transcript is a true record of the testimony given.
12              Further, that if the foregoing pertains
13   to the original transcript of a deposition in a
14   federal case, before completion of the proceedings,
15   review of the transcript was requested.
16              I further certify I am neither
17   financially interested in the action nor a relative
18   or employee of any attorney or party to this action.
19              IN WITNESS WHEREOF, I have this date
20   subscribed my name.
21   Dated: March 25, 2020
22
23              _____
24              Elisabeth A. Miller Lorenz
25              RMR, CRR, LCR No. 66
```