# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,<br><br>       Plaintiff,<br><br> vs.<br><br>CORRECTIONS CORPORATION OF AMERICA, et al.,<br><br>       Defendants. | Civil Action No. 3:16-cv-02267<br><br>Honorable Aleta A. Trauger<br><br>Magistrate Judge Jeffrey S. Frensley<br><br><br>DEMAND FOR JURY TRIAL |

## MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE DEFENDANTS FROM RELYING ON AN ADVICE OF COUNSEL DEFENSE

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................................1

II.   BACKGROUND ...................................................................................................4

    A.    The Role Of Counsel In CoreCivic's Operations ......................................4

    B.    The Role Of Counsel In CoreCivic's Disclosure Process ........................6

    C.    Correcting The Meet And Confer Record ............................................12

III.  ARGUMENT........................................................................................................13

    A.    Plaintiffs Fail To Cite The Key Securities Class Action Authority......................13

    B.    There Is No Legal Support For The Relief Plaintiffs Seek.................................14

    C.    Evidence And Testimony About CoreCivic's Partnership Development Or Quality Assurance Division Does Not Implicate Advice Of Counsel..................15

    D.    Defendants Should Be Permitted To Describe The Process By Which The Challenged Statements Were Prepared Without Disclosing Legal Advice ..........16

    E.    Defendants Should Be Permitted To Explain The Reasons For The Individual Defendants' Stock Transactions Without Reference To Counsel .......19

    F.    There Is No Basis To "Preclude" Defendants' Good Faith Defense ....................19

IV.  CONCLUSION.....................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Baker v. SeaWorld Entm't, Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ............................................................... 13, 17

*In re Broadcom Corp. Sec. Litig.*,
2005 WL 1403516 (C.D. Cal. Feb. 10, 2005) ........................................................ 13

*CFIP Master Fund, Ltd. v. Citibank, N.A.*,
738 F. Supp. 2d 450 (S.D.N.Y. 2010) ................................................................... 13

*City of Pontiac Gen. Employees' Ret. Sys. v. Holley*,
2018 WL 4183243 (W.D. Ark. Mar. 29, 2018) ....................................................... 13

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) .............................................................................. 16

*In re Grand Jury Proceedings October 12, 1995*,
78 F.3d 251 (6th Cir. 1996) .................................................................................. 18

*Henry v. Quicken Loans, Inc.*,
263 F.R.D. 458 (E.D. Mich. 2008) ........................................................................ 20

*K&S Associates, Inc. v. American Association of Physicists in Medicine*,
2011 WL 12873137 (M.D. Tenn. Dec. 14, 2011) .................................................. 14

*Medpace, Inc. v. Biothera, Inc.*,
2013 WL 5937040 (S.D. Ohio Nov. 4, 2013) ........................................................ 17

*New Jersey v. Sprint Corp.*,
258 F.R.D. 421 (D. Kan. 2009) ............................................................................. 13

*Owner-Operator Independent Driver Association, Inc. v. USIS Commercial Services, Inc.*,
2006 WL 8454224 (D. Colo. July 28, 2006) ......................................................... 14

*Ross v. City of Memphis*,
423 F.3d 596 (6th Cir. 2005) ................................................................................ 14

*Smilovits v. First Solar, Inc.*,
2019 WL 6698199 (D. Ariz. Dec. 9, 2019) .............................................. 13, 16, 19

*United States v. Bilzerian*,
926 F.2d 1285 (2d Cir. 1991) ............................................................................... 13

*In re VisionAmerica, Inc. Sec. Litig.*,
2002 WL 31870559 (W.D. Tenn. Dec. 18, 2002) ...........................................17, 18

*Whitworth v. Consolidated Biscuit Company*,
2007 WL 9736117 (E.D. Ky. Feb. 2, 2007) ...........................................................15

*Williams v. Sprint/United Mgmt. Co.*,
464 F. Supp. 2d 1100 (D. Kan. 2006) ....................................................................18

*Xuedan Wang v. Hearst Corp.*,
2012 WL 6621717 (S.D.N.Y. Dec. 19, 2012) ........................................................20

## STATUTES

15 U.S.C. § 78t.............................................................................................................3, 20

- iii -

## I.    INTRODUCTION

Plaintiffs' "Motion to Preclude Defendants from Relying on an Advice of Counsel Defense" (the "Motion") suggests, misleadingly, that Defendants intend to rely on such a defense. ***Defendants do not***.  Defendants have not advanced, and will not advance, advice of counsel as a defense to any of the allegations in the Consolidated Complaint (ECF No. 57), or request that the Court instruct the jury on this defense.  Advice of counsel is typically advanced as a defense to the element of scienter.  Here, Defendants intend to argue, as they have throughout this case, that the statements at issue were not only true, but honestly held statements of opinion based on Defendants' (and other CoreCivic employees') decades of collective experience in the corrections industry.  What Plaintiffs seek is an order precluding Defendants from describing the *process* through which the challenged statements were made (which, unsurprisingly, involved counsel as recommended by the U.S. Securities and Exchange Commission) in order to leave the jury with an inaccurate impression.  That is not warranted, and it is not fair.

Plaintiffs' proposal is entirely at odds with the well-developed body of case law in federal securities class actions addressing this exact issue.  Consistent with that precedent, Defendants should be permitted at trial to "present evidence or testimony that Counsel reviewed corporate disclosures and attended meetings where corporate disclosures were discussed" when "describing the process by which Defendants formulated their corporate disclosures," without revealing attorney advice or arguing that they relied on such advice.  Ex. B at 1.[1]  Defendants made this exact proposal to Plaintiffs, but, unwilling to accept the lines that have been drawn by every Court that has considered this dispute, Plaintiffs rejected that approach.  Instead, Plaintiffs moved for unprecedented limitations on Defendants' ability to present their case at trial.  In support of this

---

[1] Citations to "Ex." reference exhibits to the Declaration of Morgan E. Whitworth ("Whitworth Decl.").

1

request, Plaintiffs distort the evidence regarding ordinary business processes that *involve* counsel as a "reliance on advice" of counsel defense and accuse Defendants of withholding *en masse* privileged documents and testimony regarding those business processes (when, in fact, Defendants withheld a tiny fraction of business documents that specifically reflected, solicited, or provided legal advice). Based on this distorted record, Plaintiffs seek to preclude Defendants from presenting *any* evidence or testimony that falls into three categories.

*First*, Plaintiffs seek an order precluding Defendants from introducing any evidence or testimony that they "received," "considered," or "relied" on four sources when making the challenged disclosures in this case: (i) CCA's General Counsel's Office ("OGC") (including non-attorneys who, according to Plaintiffs, fall under the purview of the OGC); (ii) CCA's Disclosure Committee; (iii) CCA's Audit, Risk, or "Other" Committees or "Departments"; and (iv) external counsel. This request is overbroad and factually unfounded:

- CCA's OGC: Plaintiffs' request is not limited to an order precluding Defendants from asserting that they relied on the advice of the OGC. Rather, Plaintiffs want an order that would bar Defendants from presenting evidence that they relied on CoreCivic's Partnership Development and Quality Assurance ("QA") teams. These teams are almost entirely comprised of non-lawyers carrying out non-legal functions, which Plaintiffs concede. Defendants can present evidence and testimony regarding their reliance on these operational teams without implicating legal advice.

- CCA's Disclosure Committee: Throughout the Class Period, approximately 20–25 people were members of the Disclosure Committee. Only 2 or 3 of those individuals at any given time were attorneys. Defendants have produced many non-privileged documents and permitted testimony regarding the Disclosure Committee's operations. Defendants have not asserted that they relied on any legal advice provided to the Disclosure Committee and will not do so at trial.

- CCA's Audit, Risk, or "Other" Committees or "Departments": CoreCivic's Audit and Risk Committees are part of its Board of Directors. No attorneys sit on these committees. The Audit Committee reviews the Company's annual and quarterly SEC filings before they are submitted. From time to time, these committees also review privileged documents or receive privileged briefings. Defendants have not asserted that they relied on any legal advice provided to those committees and will not do so at trial.

- <u>External Counsel</u>: External counsel played some role in reviewing certain of CoreCivic's public disclosures. However, Defendants have not asserted that they relied on the advice of external counsel when making *any* of the challenged statements and will not do so at trial.

*Second*, Plaintiffs seek to prevent Defendants from asserting or offering evidence or testimony regarding "the reasons for [the Individual Defendants'] stock transactions"— regardless of whether the evidence or testimony has any connection with legal advice. Br. at 23; ECF No. 265-1 at ¶ 7. Plaintiffs do not cite a *single* case supporting this request or testimony indicating that the Individual Defendants relied on advice of counsel in making trading decisions. Rather, Plaintiffs cite to entries on Defendants' privilege log that generically refer to "stock ownership" or trading windows. The Individual Defendants can testify to whether or not they sold stock without mentioning counsel at all. This unreasonably broad request should be rejected out of hand.

*Third*, Plaintiffs request that the Court "preclude any assertion of the good faith defense to the extent such purported good faith relates to the advice of counsel." Br. at 25. Again, Defendants have no intention of advancing a good faith defense on the advice of counsel. Rather, as noted in Defendants' Answer, good faith is a statutory defense available to alleged control persons like the Individual Defendants. *See* ECF No. 81 at p. 31 (citing 15 U.S.C. § 78t). There are several (non-legal) sources of Defendants' good faith, including most notably the Disclosure Committee and the various non-legal inputs to that committee—CoreCivic's internal and external auditors and the Operations, QA, Partnership Development, Finance, and Human Resources teams. Defendants should be permitted to introduce this evidence at trial. Indeed, if they cannot, the jury might make the opposite, inaccurate inference (that they did not consult any of these resources), which would not only be prejudicial, it would be untrue.

Defendants respectfully request that this Court deny Plaintiffs' Motion, and enter an Order in the form attached hereto.

- 3 -

## II. BACKGROUND

### A. The Role Of Counsel In CoreCivic's Operations

The central alleged "fraud" in Plaintiffs' case is that Defendants omitted from their public statements (which referred to the Company's government partners, generally) that CoreCivic's BOP contracts were in danger of non-renewal, as a result of alleged shortcomings in quality at just three of the Company's sixty-plus facilities. The Individual Defendants, including the former director of the BOP, have decades of subject matter expertise on the operational topics covered by the challenged statements. With this context, Plaintiffs' argument that Defendants "injected counsel throughout CCA's ordinary business affairs," Br. at 4, and into the two operational groups Plaintiffs mention in their Motion (Partnership Development and Quality Assurance), is not just wrong, it defies common sense. Plaintiffs' portrayal of CoreCivic's business affairs is also not supported by the record. CoreCivic has produced more than 420,000 documents in this litigation from 65 custodians. Whitworth Decl. ¶ 6. A mere 8,750 (*i.e.*, 2% of the total volume of responsive documents) have been withheld or redacted for privilege. *Id.* If there were any truth to Plaintiffs' claim that counsel was so intertwined in business decisions, the percentage of privileged documents responsive to Plaintiffs' requests would have been far greater. In reality, while these two groups might have formally "reported to" the OGC (Br. at 15), they were comprised primarily of non-attorneys who served in non-legal functions and had limited interactions with counsel.

Partnership Development. CoreCivic's Partnership Development team did not operate as "agents" of the OGC, and Plaintiffs are wrong that it consists of two persons (Natasha Metcalf and Carol Olson). *See* Br. at 15–16, n. 10. CoreCivic's Partnership Development team is led by Tony Grande, the Company's Chief Development Officer (not an attorney), and includes Vice Presidents Bart VerHulst and Natasha Metcalf and Managing Director Jeb Beasley, among others. Ex. C at CORECIVIC_0005370. Mr. VerHulst and Mr. Beasley are not attorneys. They are responsible

- 4 -

for maintaining relationships with federal agencies, including the "Federal Bureau of Prisons, Immigration and Customs Enforcement, [and] the United States Marshal Service." Ex. D, Dep. Tr. of Bart VerHulst at 23:8–21, 26:10–20. Ms. Metcalf functioned in a non-legal role during the Class Period, managing the company's contracts with all of its partners—federal, state, and local. Ex. E, Dep. Tr. of Natasha Metcalf ("Metcalf Tr.") at 13:16–19, 16:14–17:10. Defendants produced more than 17,369 emails for which Ms. Metcalf is listed in the "to," "from," or "cc" fields, withholding or redacting only 891 for privilege.[2] Whitworth Decl. ¶ 10. Defendants produced another 10,243 emails on which Messrs. Grande, VerHulst, and Beasley are listed in the "to," "from," or "cc" fields but Ms. Metcalf is not. *Id.* ¶ 11.

Quality Assurance. Likewise, Plaintiffs have no foundation whatsoever to assert that CCA's Quality Assurance ("QA") Division operated as "agents" of the OGC. Br. at 16. The QA Division "ensur[es] that [CoreCivic's] facilities meet outside agency and accrediting organization standards and guidelines" by "employ[ing] a team of full-time auditors, who are subject matter experts from all major disciplines within institutional operations." Ex. F at 9. The QA Division also coordinates with external auditors and "provides governance of the corporate corrective action plan process for any items of nonconformance identified through internal and external facility reviews." *Id.* Of the approximately 57 statements Plaintiffs challenged in the Complaint, at least nine refer to the QA Division. Compl., ECF No. 57 at ¶¶ 133–38.

Despite the critical role that the QA Division plays at CoreCivic and the fact that it is the subject of some of the challenged statements, Plaintiffs have almost completely (and conveniently)

---

[2] Ms. Metcalf is an attorney by training, and has served in legal roles during portions of her career at CoreCivic. ECF No. 225 at ¶¶ 5–12. Nevertheless, Defendants' operative privilege log contains only 28 documents for which Ms. Metcalf is the only attorney involved in the communication, and each of these includes at least one other attorney or law firm as the counsel responsible for creating the privilege.

ignored it.  Don Murray (the head of the QA Division, a member of the Disclosure Committee, and a long-term BOP veteran) was listed in Defendants' Initial Disclosures in February 2018. Whitworth Decl. ¶ 13.  CoreCivic produced 10,231 emails on which Mr. Murray is listed in the "to," "from," or "cc" fields, withholding or redacting only 297 for privilege.  *Id.*  He is a member of CoreCivic's Disclosure Committee, which reviewed the very SEC filings that Plaintiffs challenge.  Yet, Plaintiffs decided not to take his deposition.  Similarly, CoreCivic produced another 2,414 unique emails for which Mr. Murray's deputy, Ward Cullum, is listed in the "to," "from," or "cc" fields, withholding or redacting only 79 for privilege.  *Id.* ¶ 14.  Plaintiffs did not depose Mr. Cullum, either.  Finally, Plaintiffs did not serve a single Interrogatory or RFA focused on the QA Division.  Plaintiffs cite at least 60 documents from Defendants' privilege log; not one relates to the QA Division.[3]  In sum, Plaintiffs did not attempt to determine whether the QA Division played a legal function whatsoever (it did not).

**B.    The Role Of Counsel In CoreCivic's Disclosure Process**

All of CoreCivic's SEC filings during the Class Period were the subject of a diligent review process by the Disclosure Committee.  CoreCivic's head of Investor Relations described the Disclosure Committee as "a collection of—of leadership at the company from all various groups, so HR, government relations, finance, real estate, operations, health services, all—all those folks that—that lead those various areas."  Ex. G, Dep. Tr. of Cameron Hopewell at 22:16–24. CoreCivic created agendas and kept minutes for Disclosure Committee meetings.  During these meetings, each member of the Disclosure Committee was asked, "[a]ccording to your specific area

---

[3] Plaintiffs identify two emails, REV02314046 and REV02314055, authored by Don Murray, but the subject lines of these emails confirm that they were sent in the context of Mr. Murray's service on the Disclosure Committee.  *See* Br. at 17 ("REV02314046 and REV02314055, for example, are each an e-mail with subject 'FW: Revisions to Earlier Draft and Proposed Revisions for 10-K Narrative' (and each with attachment).").

- 6 -

of responsibility and / or expertise within the Company, are there any material items omitted in the document which you believe should be included or, alternatively, to your knowledge, are the descriptions of material items in the document complete and accurate?" *See e.g.*, Ex. H at CORECIVIC_0390282.[4]

A review of the deposition testimony conclusively establishes that the Disclosure Committee considered the input of a wide range of individuals, and that to the extent the General Counsel or other lawyers got involved, they played primarily an organizational, rather than decision-making role. Mr. Hininger listed more than a dozen non-lawyer members (and only one lawyer, the General Counsel) of the committee on whom he relied when making the challenged statements:

> Q: [D]id you discuss with others the possibility of including the fact that part of the reason for the nonrenewal was performance based—
>
> [Objection.]
>
> Q: —correct?
>
> [Objection.]

---

[4] Copies of these agendas and minutes from Disclosure Committee meetings have been produced in response to Plaintiff's document requests, and the agenda for the Committee's Q3 2013 meeting and minutes from the Committee's Q2 meeting was used by Plaintiffs during the deposition of Todd Mullenger (but not with any of the other Individual Defendants). *See* Ex. H at CORECIVIC_0390282–85; *see also, e.g.*, Ex. I.

In their Motion, Plaintiffs identify, for the first time, 12 entries on Defendants' privilege log that appear to relate to certain Disclosure Committee agendas, minutes and materials. *See* Br. at 18. Plaintiffs did not identify such entries during the parties' months-long meet and confer process over Defendants' privilege log, in the extensive briefing regarding Defendants' privilege log, or during the parties' meet and confers over a stipulation regarding advice of counsel. And as Defendants' production of minutes and agendas for numerous Disclosure Committee meetings shows, the withholding of similar non-privileged minutes and agendas, if any, was inadvertent. *See generally* Ex. I. Defendants will review all of the Disclosure Committee documents listed in the Privilege Log, and will make a supplemental production if needed.

- 7 -

A: [I]t was a collective discussion, so it was our disclosure committee which is probably a couple dozen people.  It was our external auditors, it was our board of directors, and it was our audit committee. . . .

*     *     *

Q:  I asked [about] whichever members of the [disclosure] committee on which you relied on making these statements.

A:  Understood.  So it would be, again, those individuals I just recalled.  Others on the committee would be the other members of the executive team, so Tony Grande, Lucibeth Mayberry, previously Kim White, Patrick Swindle, previously Harley Lappin, David Churchill, and—virtually all of our officers are on the committee.  I say virtually.  Most all of them are.  So that would be Natasha Metcalf, Bill Dalius, Steve Conry, Jason Medlin, Brad Regens, Bart Verhulst, Brian Ferrell, John Paul Wooden, Brian Hammonds, Erik Rasmussen, Steve Owen, Don Murray.  I believe that's it, sir.  I think that's—I may have missed one or two there, but I think that's pretty close to the full membership of the committee.

Ex. J, Dep. Tr. of Damon Hininger, Vol. I at 252:15–253:2; Ex. K, Dep. Tr. of Damon Hininger,

Vol. II ("Hininger Tr. Vol. II") at 365:17–366:11.

Mr. Garfinkle described the "extensive review process" in which members of the committee would "flip page by page," but emphasized that the Company's CEO and CFO had final authority regarding the issuance of the SEC filings.

Q:  [W]hen you say you would submit [the 10Ks and 10Qs] to various parties for review, who would that include?

A:  It would include our outside independent accountants; it would include our disclosure committee, which is probably 20 to 25 people . . . who represent various departments within the company and subsidiaries.  So a lot of people, an extensive review process.

*     *     *

A:  Then in the disclosure committee meeting . . . we, you know, page turn the document; we'll flip page by page, we highlight certain new or sensitive areas that were not necessarily in the previous document. . . .  So we—after the page turn, we—we go around the room, generally speaking, and ask if everybody has had adequate time to review the document.  They would offer comments to make sure—we would ask—we've got a checklist of things that—to make sure that if there was anything not in the document that needed disclosure, we'd have discussions around those things.  We would discuss issues of materiality and things like that.

- 8 -

Q:  And during the time you were the controller, who had final authority regarding the issuance of those Qs and Ks?

[Objection.]

A:  The chief financial officer and the CEO.

Ex. L, Dep. Tr. of Dave Garfinkle ("Garfinkle Tr.") at 15:17–16:2, 17:16–18:20.  Mr. Garfinkle confirmed that the Disclosure Committee process remained the same after he became CFO in 2014.  *Id.* at 19:3–13.

Mr. Mullenger also described the Disclosure Committee's process as one in which the General Counsel merely collected information from the various departments and subject-matter experts, including on the central challenged statements in this case.  When Mr. Mullenger was asked about the process and who participated, he responded as follows:

A:  Everyone—he went around the room to every individual in the meeting . . . .  It was typically, as I recall, a reminder to everyone of the types of information we were looking for, and then he'd go around to every individual and ask them if they were aware of any information that met those guidelines he provided.

\*      \*      \*

Q:  And so it sounds like every department would provide information in connection with the disclosure committee meetings; is that right?

A:  They would have the opportunity to provide information.

\*      \*      \*

Q:  [W]hat did you do to—to analyze whether it was right to continue to expect to derive a significant portion of revenues from those agencies?

[Objection.]

A:  Conversations with the subject matter experts.

Q:  Who were those subject matter experts?

A:  It would be members in our contracting partnership development organization as well as our operations organization.

- 9 -

Ex. M, Dep. Tr. of Todd Mullenger ("Mullenger Tr.") at 52:9–52:17, 54:10–14, 62:1–12. Mr. Mullenger also described the various non-lawyers who provided input on specific challenged statements. *See id.* at 57:16–59:6, 59:7–63:7, 63:9–64:11, 67:25–69:12, 69:13–70:18.

While Plaintiffs emphasize the portions of the Individual Defendants' deposition testimony describing the role of counsel in CoreCivic's Disclosure Committee, in some cases those answers were given in response to questions specifically asking about counsel's role on the committee. In other words, Plaintiffs are selectively quoting testimony in an effort to obtain the overbroad relief they seek here. The full exchange with Mr. Garfinkle is set forth below:

Mr. Garfinkle:

Q: [W]ho leads the disclosure committee meetings?

A: The vice president of finance, Brian Hammonds . . . . There's also a government section led by our internal general counsel who has prepared the checklist that we review at every disclosure committee meeting. . . .

Q: And do you rely on that checklist in assessing . . . . whether or not you should sign off on the filing of a Form 10K?

[Objection.]

A: I rely on many things in signing the certifications. The checklist is just one component of the review process.

Q: And is it one component of the review process you rely on?

[Objection.]

A: It is, but . . . it's not the only thing we rely on . . . .

Q: So just to rephrase the question, the checklist is one component of the review process, not the only component, but one component, is that fair to say?

[Objection.]

A: That's correct.
Q: Okay.

- 10 -

A: Yes.

Q: And it's one component that you rely on, this checklist?

[Objection.]

A: Yes.

\* \* \*

Q: Did you or anyone at CCA, to your knowledge, rely on those discussions with Latham in determining whether or not to disclose specifics about the cure notice?

[Objection.]

A: So I can't disclose what was discussed with the attorneys. I'm not sure I can answer the question.

\* \* \*

Q: [D]id you rely on in-house and outside counsel with respect to your representations in CCA's public filing of 10Ks and Qs that you signed regarding the high standards of CCA's operations?

[Objection.]

A: Well, you know, when it comes to outside counsel, outside counsel does not have the expertise that our company has. . . . [I] wouldn't have relied on outside counsel in assessing, you know, specific high quality statements to secure facilities.

Ex. L, Garfinkle Tr. at 78:17–80:10, 282:16–283:1, 303:12–303:24.

Mr. Hininger:

Q: Was the disclosure committee primarily run by the lawyers with the general counsel's office?

A: No, [I] was more of referring to the fact that the general counsel's office typically would chair the meeting and ensure it's being run in accordance with its governing documents, so that—that was more of what I was referring to.

Ex. K, Hininger Tr. Vol. II at 366:19–368:15.

The Individual Defendants' testimony proves that while legal counsel participated in the

Disclosure Committee process, non-lawyer officers decided what to disclose based on the input of

more than a dozen subject matter experts.

- 11 -

**C.      Correcting The Meet And Confer Record**

Plaintiffs' description of the meet and confer process that preceded this Motion is incomplete.  Plaintiffs raised this issue in a May 26, 2020 letter requesting that  "Defendants make a full disclosure of all documents and communications evidencing, created, sent or received pursuant to a reliance on counsel defense or excuse," on the basis that Defendants purportedly had waived privilege with respect to these documents.  Decl. of Christopher M. Wood, ECF. No. 267 ("Wood Decl."), Ex. 10 at 1.  Defendants responded on June 1, 2020, explaining that "Defendants have not invoked, and do not intend to invoke, a reliance on counsel defense."  *Id.* Ex. 11 at 1.  Defendants reiterated this position during the June 2, 2020 hearing.  Whitworth Decl. ¶ 2.

Rather than memorialize that Defendants would not be offering an advice of counsel defense, Plaintiffs again overreached and circulated a stipulation that would have prevented Defendants from introducing any evidence or testimony "regarding CCA's Disclosure Committee," "CCA's Risk Committee," the Individual Defendants' "reasons for selling CCA stock," and any evidence or testimony "where the evidence or witness testimony was based on, considered, or relied on the advice of any individual or committee that received, considered, or relied on the advice of Counsel" or that any witness "received, considered, or relied on any processes or procedures that included Counsel," among other limitations.  *See* Ex. A at 2.

Defendants met and conferred with Plaintiffs in good faith, reiterating their willingness to resolve this issue through a stipulation, but explained that the draft Plaintiffs circulated went far beyond what was needed to foreclose an advice of counsel defense.  Whitworth Decl. ¶ 4. Defendants sent a revised stipulation providing that "Defendants will not advance advice of Counsel as a defense to any of the allegations in the Consolidated Complaint (ECF No. 57), or request that the Court instruct the jury on the advice of Counsel defense" but reserving the right to "present evidence or testimony that Counsel reviewed corporate disclosures and attended meetings

- 12 -

where corporate disclosures were discussed" when "describing the process by which Defendants formulated their corporate disclosures." *See* Ex. B at 1. Plaintiffs then filed this motion.

## III.    ARGUMENT

### A.    Plaintiffs Fail To Cite The Key Securities Class Action Authority

Courts across the country have considered nearly identical motions to restrict evidence and testimony in securities class actions—some of which were filed by Plaintiffs' counsel in this case. Not one of these courts ordered the sweeping relief Plaintiffs seek here. *See, e.g.*, *Smilovits v. First Solar, Inc.*, 2019 WL 6698199, at *1–2 (D. Ariz. Dec. 9, 2019); *Baker v. SeaWorld Entm't, Inc.*, 423 F. Supp. 3d 878, 924 (S.D. Cal. 2019); *City of Pontiac Gen. Employees' Ret. Sys. v. Holley*, 2018 WL 4183243, at *3–4 (W.D. Ark. Mar. 29, 2018); *New Jersey v. Sprint Corp.*, 258 F.R.D. 421, 428–33 (D. Kan. 2009); *see also CFIP Master Fund, Ltd. v. Citibank, N.A.*, 738 F. Supp. 2d 450, 474 n.27 (S.D.N.Y. 2010).

The unanimous conclusion of these cases is that defendants are permitted to introduce evidence of "the nature of the inquiry that [counsel] undertook," which is relevant to the element of scienter, but not "the substance of the legal advice that was eventually provided." *CFIP*, 738 F. Supp. 2d at 474 n.27. As one court put it in denying a motion in limine brought by Plaintiffs' counsel in another matter, "Defendants may present evidence that counsel reviewed corporate disclosures and stock-sale plans or attended meetings, but may not present evidence that counsel approved the disclosures or plans or that Defendants relied on what the lawyers said about the disclosures or plans." *Smilovits*, 2019 WL 6698199, at *2.

Plaintiffs' Motion ignores this well-developed body of case law. Instead, Plaintiffs cite two securities cases, one 15 years old and the other approaching 30. *See In re Broadcom Corp. Sec. Litig.*, 2005 WL 1403516, at *2 (C.D. Cal. Feb. 10, 2005); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991). Neither case ordered the overreaching relief Plaintiffs seek and

- 13 -

neither is factually analogous. To the contrary, both involve overt reliance on a lawyer's blessing or approval of the disclosures or transactions at issue. In *Broadcom*, the Court found privilege was waived where the defendants represented at summary judgment that "they relied on their excellent attorney to do a good job examining all the documents to tell them if anything was wrong, and their lawyers never said anything was wrong, with the unmistakable inference defendants felt assured the lawyers thought everything was legal." *Broadcom*, 2005 WL 1403516, at *2. Even then, the Court refused to exclude all evidence of attorney communications, instead opting to re-open discovery on a very limited basis. *Id.* at *3. Similarly, in *Bilzerian*, the defendant argued *at trial* that his transactions were structured to "legally . . . avoid disclosure," but then asserted the attorney-client privilege to avoid any cross-examination on the subject. *Bilzerian*, 926 F.2d at 1291. The trial court ruled that cross-examination was necessary because defendant had put "[h]is conversations with counsel regarding the legality of his schemes" directly in dispute. *Id.* at 1292. As stated (repeatedly), Defendants are not seeking to proffer similar evidence here.

## B. There Is No Legal Support For The Relief Plaintiffs Seek

Plaintiffs' non-securities cases also do not support the relief they seek; rather, these cases involve situations where the substance or content of attorney-client communications were affirmatively put at issue. For example, *Ross v. City of Memphis* involved a defendant who affirmatively relied on conversations with counsel to "argue[ ] that his reliance on their advice render[ed] his behavior reasonable, thus entitling him to a defense of qualified immunity." 423 F.3d 596, 598–99 (6th Cir. 2005). Similarly, the Court in *K&S Associates, Inc. v. American Association of Physicists in Medicine* precluded the defendant from relying on a *legal opinion memorandum* after he refused to produce it during discovery. 2011 WL 12873137, at *1 (M.D. Tenn. Dec. 14, 2011). And, in *Owner-Operator Independent Driver Association, Inc. v. USIS Commercial Services, Inc.*, the Court rejected the sweeping remedy Plaintiffs seek here, refusing

- 14 -

to preclude all evidence implicating knowledge obtained from defendant's attorneys. 2006 WL 8454224, at *2 (D. Colo. July 28, 2006) (precluding only evidence "reflect[ing] the advice the defendant received from its counsel").

Other courts in this Circuit have refused to find even an implicit advice of counsel defense under circumstances similar to what Plaintiffs describe in their Motion. Indeed, in *Whitworth v. Consolidated Biscuit Company*, the Court denied plaintiff's motion to compel discovery of privileged communications, rejecting plaintiff's argument that defendants "impliedly" waived the attorney-client privilege "by the litigation positions taken, or anticipated to be taken." 2007 WL 9736117, at *1 (E.D. Ky. Feb. 2, 2007). In doing so, the Court reasoned that "Defendants have the right to defend on the culpability elements, and contesting good faith and willfulness does not, in and of itself, waive the privilege." *Id.* at *7–8.

### C. Evidence And Testimony About CoreCivic's Partnership Development Or Quality Assurance Division Does Not Implicate Advice Of Counsel

Defendants should be allowed to testify that they relied on CoreCivic's Partnership Development team and QA Division without implicating advice of counsel at all. Defendants produced thousands of non-privileged documents regarding CoreCivic's Partnership Development team and QA Division. As discussed above, Natasha Metcalf, a Vice President in the Partnership Development team, was deposed in this action, and the role of counsel came up only once in the context of this case, in connection with CoreCivic's response to the Cibola Cure Notice. *See* Ex. E, Metcalf Tr. at 49:2–4, 52:9–25, 55:21–25, 63:19–64:4. Ms. Metcalf testified that "[t]here were a number of people" involved in responding to the Cibola Cure Notice, including "counsel" and "subject matter experts" from "the medical department, operations, the HR department" in addition to "partnership development" and "a consultant." *Id.* at 49:2–4, 52:9–25. As Ms. Metcalf testified, outside counsel's role in responding to the Cibola Cure Notice was limited to "reviewing

- 15 -

information, talking to employees regarding the deficiencies, and drafting the response." *Id.* at 63:19–23. Ms. Metcalf did not testify that the Company relied on the advice of counsel in determining whether to disclose the Cibola Cure Notice, and Defendants have never indicated that they intend to rely on advice of counsel to defend this decision at trial (and to be clear, they do not). Notably, advice of counsel did not come up at all during the depositions of Messrs. Grande, VerHulst, or Beasley. Plaintiffs' argument that the QA Division played some legal role is based solely on the fact that this Division was "managed" by the OGC. Br. at 15. As noted, Plaintiffs chose not depose the head of the QA Division, Don Murray, or his deputy, Mr. Cullum.

The Partnership Development team and QA Division are operational groups that play a key role in Defendants' business, and they support many of the challenged statements. That they were "housed" under or "reported to" the OGC as an organizational matter, Br. at 15–16, is irrelevant to the question of whether Defendants have put any legal advice relating to either of these groups affirmatively at issue. They have not; there is nothing to "preclude."

### D. Defendants Should Be Permitted To Describe The Process By Which The Challenged Statements Were Prepared Without Disclosing Legal Advice

Defendants should be allowed to testify about the purpose, processes, and membership of the Disclosure Committee (without revealing in any way the substance of, or reliance on, legal advice) in order to rebut any allegation that Defendants made the challenged statements recklessly or without regard for their truth. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (describing standards for pleading recklessness in the scienter context); *see also Smilovits*, 2019 WL 6698199 at *2 (holding that "Defendants may present evidence that counsel reviewed corporate disclosures and stock-sale plans or attended meetings" but not that "counsel approved the disclosures or plans or that Defendants relied on what the lawyers said about the disclosures or plans"). Defendants should also be permitted to describe the roles of the Audit Committee, the

- 16 -

Risk Committee, external counsel, and whatever unspecified "other committees or departments" Plaintiffs intend to preclude, Br. at 19–20, with respect to the disclosure process, without presenting evidence or testimony of any privileged communications or legal advice.

Again, Plaintiffs' argument that counsel's involvement in this disclosure processes warrants preclusion of those processes has been rejected repeatedly. For example, in *Baker v. SeaWorld Entertainment, Inc.*, the "Defendants identif[ied] SeaWorld's processes, including the Disclosure Committee Process, as evidence that the Company ensured the integrity of its SEC filings and disclosures" and "describe[d] those processes in detail, referencing the involvement and approval of inside and outside lawyers in the processes." 423 F. Supp. 3d at 924. The "Plaintiffs claim[ed] that Defendants' attempt to rely on this evidence [was] directly contrary to numerous representations made by defense counsel . . . that Defendants would not rely on the involvement of inside and outside counsel to support the individual defendants' state of mind," but the Court rejected Plaintiffs' arguments because "Defendants do not disclose any advice 'SeaWorld legal' may have provided or state that SeaWorld's disclosures are accurate or that there is no scienter because of the advice from counsel." *Id.*; *see also supra* Section III.A.

The same reasoning applies with equal force here. Defendants' acknowledgment that attorneys participated in meetings and reviewed the challenged statements at issue is not an affirmative use of privileged communications to defend themselves, and thus does not constitute a waiver of privilege (or warrant evidence preclusion). *See Medpace, Inc. v. Biothera, Inc.*, 2013 WL 5937040, at *3–4 (S.D. Ohio Nov. 4, 2013) ("Only affirmative reliance on the advice of counsel as an aspect of a claim or defense waives the privilege. . . . [A] party must affirmatively use privileged communications to defend itself or attack its opponent in the action before the implicit waiver rule is applicable." (internal quotations and citations omitted)); *In re*

*VisionAmerica, Inc. Sec. Litig.*, No. 02-MC-033 D/V, 2002 WL 31870559, at *4 (W.D. Tenn. Dec. 18, 2002) ("The Sixth Circuit also made clear . . . . a mere acknowledgment that an attorney has looked into a particular question which does not divulge the subject matter of the attorney's whole line of inquiry does not waive attorney-client privilege.") (citing *In re Grand Jury Proceedings October 12, 1995*, 78 F.3d 251, 254 (6th Cir. 1996)).[5]

Finally, the notion that exercising sound corporate governance through a robust Disclosure Committee precludes Defendants from mentioning the existence of that Committee and its processes flies in the face of SEC guidance and investors' expectations. To ensure compliance with the Sarbanes-Oxley Act of 2002, the SEC "expect[s] each issuer to develop a process [for evaluating disclosures] that is consistent with its business and internal management and supervisory practices," and specifically recommends that issuers "create a committee with responsibility for considering the materiality of information and determining disclosure obligations on a timely basis." Certification of Disclosure in Companies' Quarterly & Annual Reports, SEC Release No. 8124 (Aug. 28, 2002). The SEC goes on to recommend that "the committee could include," *inter alia*, "*the general counsel or other senior legal official* with responsibility for disclosure matters who reports to the general counsel" and "*such other officers or employees, including individuals associated with the issuer's business units*, as the issuer deems appropriate." *Id.* at n.60 (emphases added). Defendants followed this SEC guidance.

---

[5] The only reason Plaintiffs are able to quote deposition testimony regarding attorney involvement in the disclosure process is because *they elicited it*. *See* Ex. L, Garfinkle Tr. at 78:17–80:10, 282:16–283:1, 303:12–303:24; Ex. M, Mullenger Tr. at 91:14–95:9. This does not count as an "affirmative use" of privilege or an invocation of advice of counsel defense. *See Williams v. Sprint/United Mgmt. Co.*, 464 F. Supp. 2d 1100, 1114–16 (D. Kan. 2006) (rejecting privilege waiver where "the testimony concerning reliance on counsel was elicited by plaintiffs' counsel in response to pointed questions from plaintiffs' counsel"); *Sprint Corp.*, 258 F.R.D. at 432 (same).

- 18 -

### E. Defendants Should Be Permitted To Explain The Reasons For The Individual Defendants' Stock Transactions Without Reference To Counsel

Plaintiffs seek to prohibit Defendants from asserting or offering evidence or testimony regarding "the reasons for [the Individual Defendants'] stock transactions"—regardless of whether the evidence or testimony has any connection with legal counsel. Br. at 22–23; ECF No. 265-1 at ¶ 7. The evidence on this issue is clear and irrefutable: none of the Individual Defendants sold any of their CoreCivic stock at the supposedly "inflated" stock price and thus never personally profited from any alleged "fraud." Plaintiffs do not like this fact, but they cannot cite a *single* case supporting their request to exclude this evidence. In fact, the courts that have considered this issue not only allow evidence regarding stock trading as a matter of course, they even permit defendants to describe the role of *counsel* in reviewing those transactions. *See, e.g.*, *Smilovits*, 2019 WL 6698199, at *2 (holding that "[d]efendants may present evidence that counsel reviewed corporate disclosures and stock-sale plans"). Nor have Plaintiffs identified any document or testimony suggesting that the Individual Defendants based trading decisions on advice of counsel. Their lone support for this request is that Defendants included documents on their privilege log that generically refer to "stock ownership" or trading windows. Br. at 23. That is plainly insufficient.[6]

### F. There Is No Basis To "Preclude" Defendants' Good Faith Defense

Finally, Plaintiffs request that the Court "preclude any assertion of the good faith defense to the extent such purported good faith relates to the advice of counsel." Br. at 25. Again, Plaintiffs

---

[6] CoreCivic is required to disclose publicly the details of the Individual Defendants' stock purchases and sales, and there is no evidence and no allegation that CoreCivic failed to do so. Plaintiffs thus do not "lack[] any basis to determine whether Hininger, or others, made sales for tax or other purposes." *Id.* If the Individual Defendants had sold stock for tax or any other purpose, there would be a publicly available SEC form reflecting those sales. None exist. And if Plaintiffs believed (without basis) that CoreCivic failed to comply with its reporting obligations, Plaintiffs simply could have asked the Individual Defendants during their depositions whether CoreCivic's public forms regarding their trading history were incomplete (or for that matter, whether their decisions to abstain from trading was based on any advice of counsel). Plaintiffs did not ask.

- 19 -

attack a strawman. Defendants have not, and have no intention of, basing their good faith defense on the advice of counsel. Br. at 24–25. Good faith is a statutory defense available to alleged control persons like the Individual Defendants, and Defendants need not rely on advice of counsel to assert the defense. *See* ECF No. 81 at p. 32 (citing 15 U.S.C. § 78t). There are several non-legal sources of Defendants' good faith, including most notably the Disclosure Committee and the various non-legal inputs to the committee. Indeed, Plaintiffs concede that Defendants identified the Disclosure Committee process described above as one fact "that would support a good faith defense." Br. at 24. The two cases Plaintiffs cite are inapposite to an Exchange Act case like this one—they are Fair Labor Standards Act cases dealing with specific elements of that statute, and they arose in the context of a motion to compel production of documents and a motion for summary judgment. Br. at 24–25 (citing *Xuedan Wang v. Hearst Corp.*, 2012 WL 6621717, at *2 (S.D.N.Y. Dec. 19, 2012) and *Henry v. Quicken Loans, Inc.*, 263 F.R.D. 458, 470 (E.D. Mich. 2008)). At a minimum, the Individual Defendants should be permitted to assert the good faith defense for statements made by CoreCivic, for which the only basis for their liability would be Section 20(a).[7]

## IV.     CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion and enter the Proposed Order attached hereto.

---

[7] It is also unclear what the procedural basis is for Plaintiffs' request to "preclude" Defendants' good faith defense. It *sounds* like a motion for summary judgment ("Defendants have not substantiated this defense with any facts or other information," Br. at 24), but that would be premature. The Court set deadlines for summary judgment motions and motions in limine in the Case Management Order to prevent the parties from engaging in this sort of piecemeal attack on each other's pleadings. *See* ECF No. 258 at 2 (setting November 13, 2020 as the summary judgment filing date and April 16, 2021 as the deadline for filing motions in limine).

- 20 -

DATED:  August 24, 2020                    Respectfully submitted:

 /s/ Steven A. Riley
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Ave., Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Morgan E. Whitworth (admitted pro hac vice)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600
F: (415) 395-8095
morgan.whitworth@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T:  (202) 637-2335
F:  (415) 637-2201
sarah.tomkowiak@lw.com
*Attorneys for Defendants Corrections Corporation*
*of America, Damon T. Hininger, David M.*
*Garfinkle, Todd J. Mullenger, and Harley G.*
*Lappin*

- 21 -

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars
Suite 100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

- 22 -

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
  & DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

this 24th day of August, 2020.

  /s/ Steven A. Riley
Steven A. Riley