# EXHIBIT E

Grae vs. Corrections
Corporation of America, et al.

Videotaped Deposition of
NATASHA METCALF
December 19, 2019
***CONFIDENTIAL***



```
 1                UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF TENNESSEE
 2   _____

 3   NIKKI BOLLINGER GRAE,
     Individually and on Behalf of
 4   All Others Similarly Situated,

 5              Plaintiff,

 6
     vs.                          Civil Action No. 3:16-CV-02267
 7

 8   CORRECTIONS CORPORATION OF AMERICA,
     et al.,
 9
                Defendants.
10   _____

11

12

13
                         CONFIDENTIAL
14
                         Videotape Deposition of:
15
                         NATASHA METCALF
16
                         Taken on behalf of the Plaintiff
17                       December 19, 2019

18

19

20

21

22

23   Reported by:

24   JEANNIE CHAFFIN, LCR

25   Job No. 10064035
```

Page 1
www.aptusCR.com
Case 3:16-cv-02267   Document 290-5   Filed 08/24/20   Page 3 of 15 PageID #: 9657

1                S T I P U L A T I O N S

2

3      The videotape deposition of NATASHA METCALF was taken by

4  counsel for the Plaintiff, at the offices of Robbins, Geller,

5  Rudman & Dowd, 414 Union Street, Suite 900, Nashville, Tennessee,

6  on December 19, 2019, for all purposes under the Federal Rules of

7  Civil Procedure.

8       All formalities as to caption, notice, statement of

9  appearance, et cetera, are waived.  All objections, except as to

10  the form of the questions, are reserved to the hearing, and that

11  said deposition may be read and used in evidence in said cause of

12  action in any trial thereon or any proceeding herein.

13       It is agreed that JEANNIE CHAFFIN, LCR, Notary Public and

14  Court Reporter for the State of Tennessee, may swear the witness,

15  and that the reading and signing of the completed deposition by

16  the witness was not waived.

17

18

19

20

21

22

23

24

25

1     \*    \*    \*

2

3     THE VIDEOGRAPHER: We are now on the

4 record. Today's date is December 19th, 2019, and the

5 time is 9:30 a.m. This is the video deposition of

6 Natasha Metcalf in the matter of Nikki Bollinger

7 Grae, et al. versus Corrections Corporation of

8 America, et al. pending in the US District Court,

9 Middle District of Tennessee, Case Number

10 3:16-CV-02267.

11     We are at Robbins Geller in Nashville,

12 Tennessee. My name is Jim Weter of Aptus Court

13 Reporting. The court reporter today is Jeannie

14 Chaffin, also of Aptus Court Reporting.

15     Counsel, would you please identify

16 yourselves for the record and state whom you

17 represent.

18     MR. WOOD: Christopher Wood, Robbins,

19 Geller, Rudman & Dowd, on behalf of the Plaintiff in

20 the class.

21     MS. TOMKOWIAK: Sarah -- excuse me.

22 Sarah Tomkowiak, Latham & Watkins, on behalf of the

23 witness and the Defendants.

24     MS. GRANT: Meryn Grant, also of Latham &

25 Watkins, on behalf of the witness and the Defendants.

Page 6
www.aptusCR.com
Case 3:16-cv-02267    Document 290-5    Filed 08/24/20    Page 5 of 15 PageID #: 9659

1        MR. McGEE:  Trey McGee, Riley, Warnock &
2   Jacobson, on behalf of the witness and the
3   Defendants.
4        THE VIDEOGRAPHER:  Would the court
5   reporter please swear in the witness.
6
7                    *   *   *
8             NATASHA METCALF,
9   was called as a witness and having first been duly
10  sworn, testified as follows:
11
12                    EXAMINATION
13  QUESTIONS BY MR. WOOD:
14  **Q.    Good morning, Ms. Metcalf.**
15  A.    Good morning.
16  **Q.    Thanks for being here.**
17  **         Have you had your deposition taken**
18  **before?**
19  A.    Yes.
20  **Q.    How many times have you had your deposition**
21  **taken before?**
22  A.    I believe just once.
23  **Q.    Okay.  And what was that related to?**
24  A.    It was a lawsuit involving CCA.  I don't
25  remember the details of it.

Page 7
www.aptusCR.com
Case 3:16-cv-02267   Document 290-5   Filed 08/24/20   Page 6 of 15 PageID #: 9660

1  relations are essentially the same.
2  Q.     Okay.  So I'm going to pass you what's been
3  previously marked Exhibit Number 99, which are some
4  org charts.  If you take a look at the -- I think
5  it's the third page, it says partnership development.
6  Do you see that?
7  A.     Yes.
8  Q.     And you see at the bottom, this has a last
9  update date of November 2015?
10 A.     Yes.
11 Q.     Okay.  And do you see it has you here as VP
12 of partnership development?
13 A.     Yes.
14 Q.     And that was accurate as of November 2015?
15 A.     Yes.
16 Q.     And so what was -- what were your
17 responsibilities as VP of partnership development in
18 November 2015?
19 A.     I was responsible for managing the contracts.
20 Q.     Okay.
21 A.     That was the primary responsibility.
22 Q.     And you reported to Mr. Grande?
23 A.     Yes.
24 Q.     Mr. Ferrell was also VP of partnership
25 development, right?

1   reporting relationship with Mr. Beasley?
2   A.   Mr. Beasley?
3   Q.   Uh-huh, Jeff Beasley.
4   A.   No reporting relationship.
5   Q.   What were kind of the nature of your
6   interactions with him?
7   A.   I would interact with him if we had a
8   contract modification, make him aware of it.  If we
9   needed to respond to the partner, make him aware
10  generally of how we would respond.  If there were
11  pricing issues, again, keeping him aware so that he
12  would know if we were requesting an adjustment or
13  things of that nature.
14  Q.   So most of what we're going to talk about
15  today kind of deals with, like, 2012 to 2016.  Can --
16  how -- can you describe in general just how you kind
17  of spent most of your time at CoreCivic during that
18  time period?
19  A.   Generally, that time period would have been
20  involved in negotiating contracts, negotiating and
21  managing contract amendments, modifications.  Again,
22  any activity under the contracts requiring approvals,
23  whether it was staffing patterns or other types of
24  activity.  That really was the primary activity.
25  Q.   And that would be new and existing contracts?

Page 16
www.aptusCR.com
Case 3:16-cv-02267   Document 290-5   Filed 08/24/20   Page 8 of 15 PageID #: 9662

1   A.   Yes.
2   Q.   And so -- and that would include for partners
3   such as the BOP, right?
4   A.   Yes.
5   Q.   The US Marshals?
6   A.   Yes.
7   Q.   State governments?
8   A.   Yes.
9   Q.   Local governments?
10  A.   Yes.
11  Q.   Okay. And was anyone else -- was there
12  anyone else responsible for any subset of those
13  customers, kind of other than you?
14  A.   Yes, the persons who worked for me. So
15  the --
16  Q.   Okay.
17  A.   -- person in the senior director position or
18  it was actually director at one point, became a
19  senior director position. So that person and then
20  also there was someone in the legal department.
21  Q.   And so who were those people?
22  A.   I don't remember, again, the specific
23  timeframe. But Ashley Odubeko. And prior to Ashley
24  being in that position, it was Carol Olson.
25  Q.   Uh-huh.

Page 17
www.aptusCR.com
Case 3:16-cv-02267   Document 290-5   Filed 08/24/20   Page 9 of 15 PageID #: 9663

1  the cure notice?

2  A.     There were a number of people.  We had

3  counsel involved, subject matters experts.  There

4  were quite a few people involved in the response.

5  Q.     So it was a more significant undertaking than

6  a -- than a notice of concern; is that right?

7              MS. TOMKOWIAK:  Objection.

8              THE WITNESS:  I don't know that I would

9  say more significant.  There were more people

10 involved.

11 BY MR. WOOD:

12 Q.     Okay.  It got -- was it fair to say it got

13 more attention than a typical notice of concern?

14             MS. TOMKOWIAK:  Objection.

15             THE WITNESS:  It was -- more people were

16 involved.

17             MR. WOOD:  Okay.  Why don't we go off the

18 record and take a quick break.

19             THE VIDEOGRAPHER:  Off record at 10:31

20 a.m.

21             (Short break.)

22             THE VIDEOGRAPHER:  Back on the record at

23 10:43 a.m.

24             (WHEREUPON, a document was marked as

25 Exhibit 144.)

1  MS. TOMKOWIAK: Objection.
2  BY MR. WOOD:
3  Q.     Okay. And did you review the cure notice
4  when you received it?
5  A.     Yes.
6  Q.     And you testified previously that you were
7  involved in responding to the cure notice, too?
8  A.     Yes.
9  Q.     And you testified that there were a number of
10 people, as well as you, involved in responding to the
11 cure notice, right?
12 A.     Correct.
13 Q.     And do you remember specifically who those
14 people were?
15 A.     As best I can remember, again, we had outside
16 counsel that would have been involved.
17 Q.     And -- and which -- which outside counsel
18 specifically?
19 A.     From Wiley Rein.
20 Q.     Okay. And -- okay. Go ahead.
21 A.     In addition to subject matter experts from
22 the medical department, operations, the HR
23 department. I believe we had a consultant who may
24 have been involved in reviewing, partnership
25 development.

```
 1  correctional experience.
 2  Q.      At the BOP?
 3  A.      Yes.
 4  Q.      Okay.  Do you know if he's still a consultant
 5  for CoreCivic?
 6  A.      I do not.
 7  Q.      Okay.  And how often do you interact with
 8  him?
 9               MS. TOMKOWIAK:  Objection.
10               THE WITNESS:  I don't recall
11  specifically.  Not a lot, that I remember.
12  BY MR. WOOD:
13  Q.      Okay.  And so lots of folks involved in -- in
14  the response.
15               What was your role in responding to the
16  cure notice?
17  A.      Similar to other responses, working on
18  facilitating a response.
19  Q.      And what does that -- and what does that
20  mean?
21  A.      Again, sharing it with the folks who could
22  provide input on a response.  Working on drafting
23  perhaps or gathering information needed for the
24  response.  Reviewing the response.  Working with
25  outside counsel to, you know, get information that
```

1  A.      (Reviews documents.)
2          It is an e-mail exchange regarding
3  documents that were forwarded to our counsel.
4  Q.      I don't want to know any discussions that you
5  had with your counsel.  But just in general, are you
6  able to kind of describe how you would utilize --
7  now, let me step back a minute.
8          This is still in relation to the Cibola
9  cure notice, right?
10 A.      I believe so.
11 Q.      And again, I don't -- I don't want to know
12 any specific communications with counsel, but how
13 would CoreCivic use counsel in responding to a cure
14 notice?
15         MS. TOMKOWIAK:  So again, without
16 revealing the substance of any actual communications,
17 your process in general of using outside counsel.
18         THE WITNESS:  Right.
19         To my knowledge, this is the only cure
20 notice that we received.  And so in this instance,
21 they would have been involved in reviewing
22 information, talking to employees regarding the
23 deficiencies, and drafting the response.
24 BY MR. WOOD:
25 Q.      Okay.  And did they draft the -- the -- the

Page 63

```
 1   response?
 2   A.      I believe I may have drafted an initial
 3   response, but the final response, they did most of
 4   the drafting of that.
 5   Q.      Okay.
 6   A.      The bulk of the response -- drafting on that
 7   one.
 8   Q.      Okay.
 9           (WHEREUPON, a document was marked as
10   Exhibit 146.)
11   BY MR. WOOD:
12   Q.      I'm passing you what's been marked Exhibit
13   146.  And when you've had a chance to review it, what
14   is Exhibit 146?
15   A.      It is an e-mail exchange regarding a
16   deduction for the Eden facility.
17   Q.      So -- and this deduction -- or this letter
18   was sent by D. Simmons of the Bureau of Prisons to
19   the warden, Ms. Bedard, and to you and some other
20   folks, right?
21   A.      Yes.
22           Bedard.
23   Q.      Bedard, I'm sorry.
24           And then you forwarded it on to some of
25   your colleagues, right?
```

```
 1                C E R T I F I C A T E

 2   STATE OF TENNESSEE

 3   COUNTY OF SUMNER

 4           I, JEANNIE CHAFFIN, Licensed Court Reporter,

 5   with offices in Portland, Tennessee, hereby certify

 6   that I reported the foregoing videotape deposition of

 7   NATASHA METCALF by machine shorthand to the best of

 8   my skills and abilities, and thereafter the same was

 9   reduced to typewritten form by me.

10           I further certify that I am not related to

11   any of the parties named herein, nor their counsel,

12   and have no interest, financial or otherwise, in the
     outcome of the proceedings.
13           Further, that if the foregoing pertains to
     the original transcript of a deposition in a federal
14   case, before completion of the proceedings, review of
     the transcript [ X ] was [  ] was not requested.
15           I further certify that in order for this
     document to be considered a true and correct copy, it
16   must bear my original signature and that any
     unauthorized reproduction in whole or in part and/or
17   transfer of this document is not authorized, will not
     be considered authentic, and will be in violation of
18   Tennessee Code Annotated 39-14-104, Theft of
     Services.
19   Dated: Janauary 7, 2020

20

21   _____
     JEANNIE CHAFFIN, LCR
22   Elite Reporting Services
     Associate Court Reporter and
23   Notary Public State of Tennessee

24      My Notary Commission Expires:  6/22/2021
        LCR #169 - Expires:  6/30/2020
25
```