# EXHIBIT L

Videotaped Deposition of

# David Garfinkle

July 31, 2020

Volume I

Grae

vs.

Corrections Corporation of America, et al.

**Confidential**



```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE MIDDLE DISTRICT OF TENNESSEE
 2
                  Civil Action No. 3:16-CV-02267
 3

 4    NIKKI BOLLINGER GRAE, Individually and on
      Behalf of All Others Similarly Situated,
 5
                         Plaintiff,
 6    vs.

 7    CORRECTIONS CORPORATION OF AMERICA, et al.,

 8                       Defendants.
      _____/
 9

10

11                     *** CONFIDENTIAL ***

12

13              VIDEOTAPED/ZOOM DEPOSITION OF

14                       DAVID GARFINKLE

15
                             Volume I
16

17

18

19
                      Friday, July 31, 2020
20                    9:38 a.m. - 6:27 p.m.

21
                        Franklin, Tennessee
22

23
      Stenographically Reported By:
24    Debra Duran-Bornstein, CCR, RPR, LCR
      Aptus Court Reporting
25    Job No. 10071104
```

4    The video-recorded deposition via Zoom of
5    DAVID GARFINKLE was taken by Counsel for the
6    Plaintiff for all purposes under the Federal
7    Rules of Civil Procedure.
8        It is agreed that DEBRA DURAN-BORNSTEIN,
9    LCR, RPR, and CCR for the State of Tennessee,
10   may swear the witness, and that the reading and
11   signing of the completed deposition by the
12   witness are not waived.

1  The following proceedings began at 9:38 a.m.:

2              THE VIDEOGRAPHER:  We are now on the

3  record.  Today's date is July 31, 2020, and the time

4  is 9:38 a.m.

5              This is the video deposition of David M.

6  Garfinkle, being taken in the Matter of Nikki

7  Bollinger Grae versus Corrections Corporation of

8  America, et al.

9              We are taking this deposition via Zoom,

10  and my name is Spencer Beneveniste of Aptus Court

11  Reporting.

12              Will counsel please identify yourselves

13  and state who you represent.

14              MS. RADCLIFFE:  Willow Radcliffe, of

15  Robbins Geller, for the Plaintiff and the Class.

16              MR. WOOD:  Christopher Wood, Robbins

17  Geller, on behalf of Plaintiff and the Class.

18              MR. LYONS:  Christopher Lyons, from

19  Robbins Geller, on behalf of the Plaintiff and the

20  Class.

21              MR. BLACK:  Kenneth Black, Robbins

22  Geller, on behalf of the Plaintiff and the Class.

23              MR. GLENNON:  Brian Glennon, Latham &

24  Watkins, on behalf of Defendants and, of course, the

25  witness.

Page 8
www.aptusCR.com
Case 3:16-cv-02267    Document 290-12    Filed 08/24/20    Page 5 of 18 PageID #: 9732

1        MR. McGEE:  Trey McGee, Riley, Warnock &

2   Jacobson, on behalf of the witness and the

3   Defendants.

4        And I believe my partner, Steve Riley,

5   with Riley Warnock & Jacobson, is also on.

6        MR. RILEY:  Correct.  Thank you.

7        MR. WHITWORTH:  And Morgan Whitworth, of

8   Latham & Watkins, on behalf of the Defendants and the

9   witness.

10        THE VIDEOGRAPHER:  The court reporter

11   today is Debra Duran, and she may now swear in or

12   affirm the Deponent.

13        THE STENOGRAPHER:  Please raise your

14   right hand.

15        Do you swear that the testimony you are

16   about to give in this case will be the truth, the

17   whole truth, and nothing but the truth?

18        THE WITNESS:  Yes, I do.

19   Thereupon:

20                    DAVID GARFINKLE

21   having been first duly sworn remotely was examined

22   and testified as follows:

23                   DIRECT EXAMINATION

24     BY MS. RADCLIFFE:

25   **Q.    Good morning, Mr. Garfinkle.**

1  Q.     Okay.  And he was the CFO at the time?
2  A.     That's right.
3  Q.     Okay.  You indicated that you prepared the
4  company's public filings, the 10Qs and 10Ks.
5         Were you the -- the initial drafter of those
6  documents during that time?
7  A.     Yes.  I think that's a fair description.
8         Obviously, the 10Ks are a much larger
9  document, so we involved many subject matter experts
10 in the initial drafting of the document.  10Qs are
11 much shorter, so I -- I typically, as controller,
12 would meet with certain representatives, including the
13 chief financial officer, to talk about what we want to
14 disclose, developments during the quarter that need to
15 be disclosed, and then draft it, we'd submit it out to
16 various parties for review.
17 Q.     Okay.  And when you say you would submit it to
18 various parties for review, who would that include?
19 A.     It would include our outside independent
20 accountants; it would include our disclosure
21 committee; it would include our outside attorneys; it
22 would include all the members of the disclosure
23 committee, which is probably 20 to 25 people of -- of
24 who represent various departments within the company
25 and subsidiaries.

Page 15
Case 3:16-cv-02267   Document 290-12   Filed 08/24/20   Page 7 of 18 PageID #: 9734
www.aptusCR.com

1     So, a lot of people, an extensive review
2  process.
3  Q.    Okay.  So the -- the types of individuals that
4  you just listed would receive copies of the initial
5  drafts of the 10Qs and 10Ks; is that fair to say?
6  A.    Yes.
7          MR. GLENNON:  Objection, foundation and
8   vague.
9    BY MS. RADCLIFFE:
10 Q.    Okay.  When -- would you explain the next step
11 in the process after various committees?  For example,
12 the disclosure committee members, as well as the
13 accountants and outside attorneys, once they got the
14 drafts of the 10Qs and 10Ks, how, then, would a formal
15 document come to fruition?
16         MR. GLENNON:  Objection.
17 A.    Back then, most of it was -- you know, the
18 various reviewers would, like I say, come in various
19 forms.  The -- the disclosure committee typically
20 would call and -- are you talking about the time when
21 I was the controller?
22   BY MS. RADCLIFFE:
23 Q.    Correct.
24 A.    Yes.  So when I was the controller, many of
25 the members of the disclosure committee, particularly

1  if they knew they weren't going to be able to attend
2  the -- the meeting -- and we have 20, 25 people, so
3  it's difficult to line up everybody to attend those
4  couple of hours that we reviewed the document -- they
5  would provide me with comment, either via telephone,
6  they would mark up copies, send it to me.
7       The same for the accountants, they typically
8  would mark up copies and ask questions, point to
9  certain disclosure items and, you know, make sure we
10 were accurate on them.  They would -- the accountants
11 would tick and tie the numbers, so if they found a
12 number that was an error, they would circle it or
13 provide some kind of communication to me that they --
14 they didn't necessarily agree with the number, so we
15 had to double-check the number.
16      Then in the disclosure committee meeting,
17 again, a lot of times I will have had conversations
18 with various members, if they provide me with comment,
19 but in that meeting -- and it's much like it is today,
20 we, you know, page turn the document; we'll flip page
21 by page, we highlight certain new or sensitive areas
22 that were not necessarily in the previous document.  A
23 lot of our public filings, as with any public company,
24 a lot of disclosures are repetitive from quarter to
25 quarter so we typically highlight those changes from

1  quarter to quarter, so that we can get a good set of
2  eyes on them and make sure everybody is comfortable
3  with what we're disclosing.
4        So we -- after the page turn, we -- we go
5  around the room, generally speaking, and ask if
6  everybody has had adequate time to review the
7  document.  They would offer comments to make sure --
8  we would ask -- we've got a checklist of things
9  that -- to make sure that if there was anything not in
10  the document that needed disclosure, we'd have
11  discussions around those things.  We would discuss
12  issues of materiality and things like that.
13  **Q.     And during the time you were the controller,**
14  **who had final authority regarding the issuance of**
15  **those Qs and Ks?**
16  A.     That would be the --
17            MR. GLENNON:  Object to form.
18            THE WITNESS:  I'm sorry.
19            MR. GLENNON:  Go ahead.
20  A.     The chief financial officer and the CEO.
21    BY MS. RADCLIFFE:
22  **Q.     And was there ever an instance where the chief**
23  **financial officer and the CEO did not agree on a final**
24  **filing for the SEC?**
25            MR. GLENNON:  Same objection.

Page 18
Case 3:16-cv-02267    Document 290-12    Filed 08/24/20    Page 10 of 18 PageID #: 9737
www.aptusCR.com

```
 1   A.      No.
 2      BY MS. RADCLIFFE:
 3   Q.      And after you became -- well, let's just say
 4   after 2014, you became the CFO of CCA; is that
 5   correct?
 6   A.      Yes.
 7   Q.      And that was in approximately May of 2014?
 8   A.      Exactly.  May of 2014.
 9   Q.      Okay.  Did the process change in terms of
10   finalizing the 10Qs and the 10Ks for filing with the
11   SEC?
12   A.      My responsibility obviously changed, but the
13   process didn't change.
14   Q.      And how did your responsibilities change?
15   A.      Well, I converted from a person who was, more
16   or less, the primary draftsperson to somebody who
17   would review the drafts.
18           Again, I would be involved in the
19   conversations.  So we have a managing director of
20   finance who primarily drafts it today, so I guess that
21   part I guess may have changed a little bit.  So I meet
22   with the current controller, with the Managing
23   Director of Finance currently, and we kind of go over
24   what -- what we think needs to be disclosed in the
25   current quarter.
```

1  activities.

2  Q.     And in your experience as CFO, have you ever

3  hesitated to sign a Form 10K?

4         MR. GLENNON:  Object to form.

5  A.     No.  I mean, it's a very exhaustive process,

6  and we described the disclosure committee process,

7  which is the -- kind of the -- near the end of the

8  process, and that's the formal meeting that we have to

9  discuss the disclosures, so -- just to correct the

10 record or elaborate on the record there.

11        You know, my everyday business activities are

12 informative as to what we need to disclose for the

13 quarter, but it is that disclosure committee meeting

14 at the end where we kind of rehash and conclude that

15 we've captured everything for the quarter.

16   BY MS. RADCLIFFE:

17 Q.     And who leads the disclosure committee

18 meetings?

19 A.     The vice president of finance, Brian Hammonds,

20 normally leads the discussion of the review of the

21 10Q.  There's also a government section led by our

22 internal general counsel who has prepared the

23 checklist that we review at every disclosure committee

24 meeting.

25        But I would say the meeting is more or less

1   led by the vice president of finance who is reviewing
2   the documents.
3   Q.      And do you rely on that checklist in
4   assessing --
5               MR. GLENNON:  Form.
6     BY MS. RADCLIFFE:
7   Q.      -- whether or not you should sign off on the
8   filing of a Form 10K?
9               MR. GLENNON:  Objection, form.
10   Foundation.
11  A.      I rely on many things in signing the
12  certifications.  The checklist is just one component
13  of the review process.
14    BY MS. RADCLIFFE:
15  Q.      And is it one component of the review process
16  that you rely on?
17              MR. GLENNON:  Same objections.
18  A.      It is, but I wouldn't say it's -- you know,
19  it's -- if we didn't go through that checklist -- it's
20  not the only thing that we rely on, I guess, is what
21  I'm saying.
22    BY MS. RADCLIFFE:
23  Q.      So just to rephrase the question, the
24  checklist is one component of the review process, not
25  the only component, but one component; is that fair to

Page 79
Case 3:16-cv-02267   Document 290-12   Filed 08/24/20   Page 13 of 18 PageID #: 9740
www.aptusCR.com

1  say?
2         MR. GLENNON:  Object to form.
3  A.    That's correct.
4    BY MS. RADCLIFFE:
5  Q.    Okay.
6  A.    Yes.
7  Q.    And it's one component that you rely on, this
8  checklist?
9         MR. GLENNON:  Object to form.
10 A.    Yes.
11   BY MS. RADCLIFFE:
12 Q.    Go ahead and pull up Tab 5, please.
13 A.    Okay.
14        MS. RADCLIFFE:  Tab 5, we will mark as
15  Exhibit 503.
16        (Thereupon, marked as Plaintiff
17     Exhibit 503.)
18   BY MS. RADCLIFFE:
19 Q.    Do you recognize this document Mr. Garfinkle?
20        MR. GLENNON:  Willow, can you give us two
21  minutes?  We're having -- there's a little bit of a
22  delay.
23        Okay, we got it.  Thank you.
24 A.    I do.
25

Page 80

1  between publicly disclosing something and closing the
2  window.  So just because we may have information that
3  is not public does not create a disclosure obligation.
4  We have nonpublic information routinely within our
5  business, but that doesn't mean we're required to
6  disclose that information.
7    BY MS. RADCLIFFE:
8  Q.     And here, in this sentence, it's referring to
9  "After discussions with Latham, we concluded that the
10 disclosure of the specifics about the cure notice
11 weren't required."
12         So the sentence is referring to the
13 disclosures --
14 A.     Right.
15 Q.     -- correct?
16         And my question is:  Did you or anyone at CCA,
17 to your knowledge, rely on those discussions with
18 Latham in determining whether or not to disclose the
19 specifics about the cure notice?
20             MR. GLENNON:  Objection to form.
21             And also advise the witness not to
22  disclose anything that's protected by the
23  attorney-client privilege.
24 A.     So I can't disclose what was discussed with
25 the attorneys.  I'm not sure I can answer the

1    question.
2      BY MS. RADCLIFFE:
3    Q.    So my question --
4            MR. GLENNON: Willow, let's -- let's take
5    a quick break. We don't need much time.
6            MS. RADCLIFFE: Let me just ask him a
7    follow-up question, and then you can have your break,
8    okay?
9            MR. GLENNON: Sure.
10           I'm not going let him wander too much on
11   this particular issue until we can talk on the
12   privilege point.
13     BY MS. RADCLIFFE:
14   Q.    The next sentence says, "We did, however, add
15   disclosures in our risk factors about the potential
16   for contract terminations resulting from contract
17   compliance."
18   A.    Yes, I see that.
19   Q.    Okay. Now, if you can go back to what was
20   tabbed -- it's -- I believe it's Exhibit 3.
21   A.    Three? That's the exhibit. Do you know what
22   tab number?
23   Q.    Tab 3. Sorry.
24           Tab 3. It's previously marked as
25   Hininger 364.

Page 283
Case 3:16-cv-02267   Document 290-12   Filed 08/24/20   Page 16 of 18 PageID #: 9743
www.aptusCR.com

```
 1   witness not to answer to the extent it's going to
 2   reveal privileged communication.  And the form of the
 3   question.
 4    BY MS. RADCLIFFE:
 5   Q.       You can answer.
 6   A.       So I can answer?
 7   Q.       As long as you don't tell me anything that is
 8   privileged.
 9   A.       I'm not sure I can -- I could point to
10   anything specific.  Maybe you need to repeat the
11   question for me.
12   Q.       I'll ask you.  For example, did you rely on
13   in-house and outside counsel with respect to your
14   representations in CCA's public filing of 10Ks and Qs
15   that you signed regarding the high standards of CCA's
16   operations?
17              MR. GLENNON:  Same objection.
18              But you can answer, Mr. Garfinkle.
19   A.       Well, you know, when it comes to outside
20   counsel, outside counsel does not have the expertise
21   that our company has.  You know, I think -- so, you
22   know, I wouldn't have relied on outside counsel in
23   assessing, you know, specific high quality statements
24   to secure facilities.
25              MR. GLENNON:  Hold on, Willow.  Please
```

Page 303
Case 3:16-cv-02267   Document 290-12   Filed 08/24/20   Page 17 of 18 PageID #: 9744
www.aptusCR.com

```
 1                    REPORTER CERTIFICATE

 2    STATE OF TENNESSEE

 3    COUNTY OF WILLIAMSON

 4              I, the undersigned, a Licensed Court Reporter

 5    of the State of Tennessee, do hereby certify:

 6              That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were duly sworn; that a record of the

10    proceedings was made by me using machine shorthand,

11    which was thereafter transcribed under my direction;

12    that the foregoing transcript is a true record of the

13    testimony given.

14              Further, that if the foregoing pertains to

15    the original transcript of a deposition in a federal

16    case, before completion of the proceedings, review of

17    the transcript [ X ] was [  ] was not requested.

18              I further certify that I am neither

19    financially interested in the action nor a relative or

20    employee of any attorney or party to this action.

21              IN WITNESS WHEREOF, I have this date

22    subscribed my name.

23    Dated: August 3, 2020

24                         _____

                           Debra Duran-Bornstein
25                         RPR, CCR, LCR No. 808
```