# EXHIBIT M

Videotaped Deposition of

# Todd J. Mullenger

March 13, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential**



Todd J. Mullenger

Confidential

Grae vs.
Corrections Corporation of America, et al.

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually
     and Behalf of All Others Similarly

5    Situated,

6                         Plaintiff,

     vs.                                    CASE NO.

7                                           3:16-CV-02267

     CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                         Defendants.

10

11

12                     CONFIDENTIAL

13         VIDEO DEPOSITION OF TODD J. MULLENGER

14                 Nashville, Tennessee

15                  March 13, 2020

16

17

18

19

20

21

22   Reported by:

23   Elisabeth A. Miller Lorenz

24   RMR, CRR, LCR No. 66

25   Job No.:  10066906

Todd J. Mullenger

Confidential

Grae vs.
Corrections Corporation of America, et al.

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE MIDDLE DISTRICT OF TENNESSEE
 2

 3

 4   NIKKI BOLLINGER GRAE, Individually
     and Behalf of All Others Similarly
 5   Situated,

 6                        Plaintiff,
     vs.                                  CASE NO.
 7                                        3:16-CV-02267
     CORRECTIONS CORPORATION OF
 8   AMERICA, et al.,

 9                        Defendants.

10

11

12

13

14

15

16

17          Video deposition of TODD J. MULLENGER was

18   taken on behalf of Plaintiff, at Riley, Warnock &

19   Jacobson, 1906 West End Avenue, Nashville,

20   Tennessee, beginning at 9:35 a.m., and ending at

21   3:03 p.m., on Friday, March 13, 2020, before

22   Elisabeth A. Miller Lorenz, RMR, CRR, and LCR No.

23   66.

24

25
```

www.aptusCR.com

Todd J. Mullenger

Confidential

Grae vs.
Corrections Corporation of America, et al.

1          P R O C E E D I N G S

2          THE VIDEOGRAPHER:  Good morning.  We're

3   now on the record.  Today's date is March 13th,

4   2020, and the time is approximately 9:35 a.m.

5          This is the video deposition of

6   Todd Mullenger being taken in the matter of Grae

7   versus CCA; on behalf of the plaintiff; pending in

8   the United States District Court for the Middle

9   District of Tennessee; Case No. 3:16-CV-02267.  We

10  are here at Riley Warnock at 1906 West End Avenue in

11  Nashville, Tennessee.

12         My name is David Drumel of Aptus Court

13  Reporting.  The court reporter is Elisabeth Lorenz.

14         Counsel, please identify yourselves for

15  the record at this time.

16         MR. LYONS:  Christopher Lyons, Robbins

17  Geller Rudman & Dowd, on behalf of the plaintiff and

18  the class.

19         MR. WOOD:  Christopher Wood on behalf

20  of the plaintiffs and the class.

21         MR. WHITWORTH:  Morgan Whitworth of

22  Latham & Watkins on behalf of defendants and the

23  witness.

24         MR. McGEE:  Trey McGee, Riley,

25  Warnock & Jacobson, on behalf of the -- the

 1  defendants.

 2              THE VIDEOGRAPHER:  Thank you.

 3              Will the court reporter please swear in

 4  the witness.

 5                          *  *  *

 6                      TODD MULLENGER

 7  was called as a witness, and after having been first

 8  duly sworn, testified as follows:

 9                  E X A M I N A T I O N

10  BY MR. LYONS:

11  Q       Good morning, Mr. Mullenger.

12  A       Good morning.

13  Q       Have you ever had your deposition taken

14  before?

15  A       Yes, once many years ago.

16  Q       Do you remember what case that was in

17  connection with?

18  A       I do not.

19  Q       Do you remember generally what type of case

20  it was?

21  A       I do not.

22  Q       Were you -- were you a party in whatever

23  litigation?

24  A       I don't believe so.

25  Q       Did it have to do with a work matter or a

Case 3:16-cv-02267   Document 290-13   Filed 08/24/20   Page 6 of 27 PageID #: 9751
www.aptusCR.com

```
 1   A       I believe it was --

 2           (Cellular phone interruption.)

 3           THE WITNESS:  I'm sorry, I'm sorry, so

 4   sorry, my apologies.

 5           I believe it was our general counsel.

 6   BY MR. LYONS:

 7   Q       And would he -- would he go around the room

 8   to various departments to get information?

 9   A       Yes.  Everyone -- he went around the room to

10   every individual in the meeting.

11   Q       And -- and what would -- would he ask

12   each -- everyone in the meeting questions or...

13   A       It was typically, as I recall, a reminder to

14   everyone of the types of information we were looking

15   for, and then he'd go around to every individual and

16   ask them if they were aware of any information that

17   met those guidelines he provided.

18   Q       So any information that met those

19   guidelines, so it was not in the filings; is that

20   right?

21           MR. WHITWORTH:  Object to the form.

22           THE WITNESS:  Yeah.  So as I recall,

23   everyone was provided a copy of the 10-K in advance,

24   asked to read it, and then were asked if there was

25   any information that wasn't included or any new
```

www.aptusCR.com

1  information that had come to light since the draft

2  of that document.

3  BY MR. LYONS:

4  Q      **So in connection, for example, with the 2011**

5  **10-K, is there anything else you would have reviewed**

6  **other than the Draft 10-K itself?**

7  A      In -- in preparation of the 10-K?

8  Q      **Yes.**

9  A      Internal financial statements, forecast that

10  was prepared.  Those come to mind.

11  Q      **And what -- what was the forecast that you**

12  **would look at in connection with the 10-K**

13  **preparation meetings?**

14  A      Well, I guess actually I'd use the forecast

15  more for the earnings call in our earnings release

16  where we gave guidance is where I'd primarily use

17  that document.

18  Q      **So you'd look at -- you'd look at -- you'd**

19  **have an internal forecast that you looked at that**

20  **then you used to decide what guidance you would**

21  **issue when you would --**

22  A      Yes.

23  Q      **-- issued your earnings release and had an**

24  **earnings call; is that right?**

25  A      Yes.

www.aptusCR.com

1  Q        And so would that -- were your disclosure

2  committee meetings normally before the earnings

3  release went out?

4  A        I don't recall.

5  Q        Is there anything else that comes to mind

6  that -- sources of information that you would review

7  before -- or in connection with the preparation of a

8  10-K?

9  A        Not that I recall.

10 Q        And so it sounds like every department would

11 provide information in connection with the

12 disclosure committee meetings; is that right?

13 A        They would have the opportunity to provide

14 information.

15 Q        Was there anything else that you did to get

16 information from -- from other departments outside

17 of the disclosure committee for inclusion in the

18 10-K?

19           MR. WHITWORTH:  Object to form.

20           THE WITNESS:  It could come from

21 conversations I or my staff had with other

22 departments.

23 BY MR. LYONS:

24 Q        So just sort of an on -- ongoing basis

25 conversations?

www.aptusCR.com

1  periodic meetings.

2          Are there -- were there other periodic

3  meetings that I'm missing other than meetings with

4  your staff and meetings with the disclosure

5  committee?

6  A      Focused around the disclosure committee?

7  Q      Focused around the review and preparation of

8  a 10-K.

9  A      Meetings?  Scheduled meetings?  No, not that

10  I recall.

11  Q      Anything else that you would do, other than

12  your participation in those meetings and the review

13  of the things we talked about to get information for

14  inclusion in the 10-K?

15  A      Not that I recall.

16  Q      So if you were to turn to Page 17 in the

17  exhibit in front of you, heading Business Strategy.

18  A      Uh-huh.

19  Q      Who would be responsible for this section?

20          MR. WHITWORTH:  Object to form.

21          THE WITNESS:  This would have been

22  prepared -- drafted by Dave and his team based on

23  input from members of management.

24  BY MR. LYONS:

25  Q      Did you have input on it?

1  A      Based on my review, I would have had input,

2  yes.

3  **Q      Based on your review, do you mean at the**

4  **time you would have reviewed it and had input on it?**

5  A      I would have had the opportunity to propose

6  changes or modifications.

7  **Q      You referred to input from members of**

8  **management.**

9       **Who -- who all are you including in that?**

10  A      Anyone who -- who read the document.

11  **Q      So, for example --**

12  A      Would have -- would have the opportunity.

13  Would have the opportunity.

14  **Q      So, for example, looking at the first**

15  **sentence under the heading there, it says, Our**

16  **primary business strategy is to provide quality**

17  **corrections services, offer a compelling value, and**

18  **increase occupancy and revenue while maintaining our**

19  **position as the leading owner, operator, and manager**

20  **of privatized correctional and detention facilities.**

21       **So what would you do to confirm that that**

22  **statement was true?**

23  A      Well, that was our stated strategy as a

24  company.

25  **Q      So who had input on -- on that statement of**

www.aptusCR.com

Todd J. Mullenger

**Confidential**

Grae vs.
Corrections Corporation of America, et al.

1  strategy?

2  A      CEO would be the primary.  CEO, myself.  And

3  it was kind of our mission statement.

4  Q      Would you -- would you periodically review

5  that to make sure it was still accurate?

6  A      Yes.

7  Q      Turning to Page 28 in the document.

8  A      Yes.

9  Q      Do you see where it says, We depend on a

10  limited number of governmental customers for a

11  significant portion of our revenues, near --

12  A      Yes.

13  Q      -- the top of the page.

14         And it says, second sentence, The loss of or

15  significant decrease in business from the BOP, ICE,

16  USMS, or various state agencies could seriously harm

17  our financial condition and results of operations.

18         Did you talk to specific people about these

19  customers in connection with the preparation of the

20  10-K?

21              MR. WHITWORTH:  Object to form.

22              THE WITNESS:  Sir, what -- what

23  statement are you --

24  BY MR. LYONS:

25  Q      So -- well, there's a list here of a limited

1  number of government customers, which includes the

2  BOP, ICE, USMS, and various state agencies.

3  Was -- did you speak to people who had

4  specific responsibilities for those customers in

5  connection with the preparation of the 10-K?

6  A    Yes.

7  Q    When and how?

8  A    As a normal course of business.

9  Q    Would they have a role on the -- in the

10 disclosure committee meetings?

11 A    Yes, there would be members there.

12 And if I could kind of amend my earlier

13 statement, on that first page you were referring to,

14 was that 17?

15 Q    Yeah, 17.

16 A    That -- that was really the -- that was the

17 primary responsibility of senior management, not

18 anyone on the disclosure committee, anyone who read

19 the 10-K.  That was really the primary

20 responsibility of senior management, CEO, CFO, CCO.

21 Q    Understood.

22 Is the same true for -- for this discussion

23 on Page 28, or would that be a broader group of

24 people who would have responsibility?

25 MR. WHITWORTH:  Object to form.

```
 1  BY MR. LYONS:

 2  Q       And feel free to look at the whole paragraph

 3  at least.

 4  A       So that -- is that that first full paragraph

 5  on the page?

 6  Q       Yes.

 7              MR. WHITWORTH:  Are you asking him

 8  about the whole paragraph or just the statement that

 9  you had him read?

10  BY MR. LYONS:

11  Q       Start -- starting with the -- with the

12  sentence -- with the statement that we read, but I

13  didn't know if reading the rest of the paragraph

14  would help with context on who was involved in -- in

15  this -- in preparation of this statement.

16  A       Yeah, that would have been primarily senior

17  management.  I mean, everyone was generally aware of

18  the impact to the BOP, ICE, and marshals on our

19  business and our revenues.

20  Q       And so then when you're -- well, first, I

21  guess, did you -- you agreed, I assume, that the

22  company derived and expected to continue to derive a

23  significant portion of its revenues from a limited

24  number of agencies?

25  A       Yes.
```

Case 3:16-cv-02267   Document 290-13   Filed 08/24/20   Page 14 of 27 PageID #: 9759

www.aptusCR.com

1  Q       And so what did you do to -- to analyze

2  whether it was right to continue to expect to derive

3  a significant portion of revenues from those

4  agencies?

5              MR. WHITWORTH:  Object to form.

6              THE WITNESS:  Conversations with the

7  subject matter experts.

8  BY MR. LYONS:

9  Q       Who were those subject matter experts?

10 A       It would be members in our contracting

11 partnership development organization as well as our

12 operations organization.

13 Q       And so for the BOP, do you remember who

14 those individuals would be?

15 A       On the partnership development, Tony Grande,

16 Bart VerHulst come to mind.  On -- on operations,

17 Rick Seiter, who was CCO -- I forget when he

18 transitioned out, and -- and Harley Lappin.

19 Q       Harley Lappin was CCO after Mr. --

20 A       Yes.

21 Q       -- Seiter?

22 A       Yes.

23 Q       And so you -- I guess you said that -- we

24 just talked about a list of people -- the subject

25 matter experts who had input on the discussion of

www.aptusCR.com

1  these customers.

2          Just to confirm, was that -- was that input

3  in the disclosure committee meetings?

4                  MR. WHITWORTH:  Object to form.

5                  THE WITNESS:  That could be in the

6  disclosure committee meetings; it could be outside

7  of the disclosure committee meetings.

8  BY MR. LYONS:

9  Q      Looking at the next page, Paragraph --

10  Page 29, the paragraph in the middle beginning, In

11  addition, the services we provide?

12  A      Uh-huh.

13  Q      About halfway down, it says, Our inability

14  to hire sufficient qualified personnel on a timely

15  basis or the loss of significant numbers of

16  personnel at existing facilities could adversely

17  accept our business -- affect our business and

18  operations.

19          Under many of our management contracts, we

20  are subject to financial penalties for insufficient

21  staffing.

22          Who would you talk to about this portion of

23  the document?

24  A      Subject matter experts, so members in human

25  resources and the operations department.

www.aptusCR.com
Case 3:16-cv-02267    Document 290-13    Filed 08/24/20    Page 16 of 27 PageID #: 9761

1   Q       And the operations department, would those

2   be the same people you just spoke about or who would

3   those be?

4   A       That could be Harley Lappin and members of

5   his staff -- members of his staff.

6   Q       And then who would the human resources

7   subject matter experts be?

8   A       That would be the director of HR and one or

9   more of his or her assistants.

10  Q       Who was the director of HR at the time?

11  A       Brian Collins, I believe at this time.

12  Q       And so the -- the last sentence there refers

13  to financial penalties for insufficient staffing.

14          What determined whether and how specific

15  financial penalties for insufficient staffing would

16  be disclosed?

17              MR. WHITWORTH:  Object to the form.

18              THE WITNESS:  Where would it be

19  disclosed, in the -- in the 10-K?

20  BY MR. LYONS:

21  Q       Yes.

22  A       Discussions with internal and external

23  counsel.

24  Q       Were there other ways that those penalties

25  would be disclosed --

**www.aptusCR.com**

1   Q      Or I guess not be on that line, the absence

2   of it would be --

3   A      Yes.

4   Q      If you wanted to go back and figure out

5   which of those places that these things -- financial

6   penalties showed up on the income statement, how

7   would you do that?

8   A      I'm sorry, in the 10-K?

9   Q      Yes, yeah -- well, or, I mean, even just

10   looking -- say -- if you put yourself back in

11   your -- your time that you had access to whatever

12   you wanted access to, where would you look or who

13   would you talk to to figure out where the penalties

14   show up on the income statement?

15   A      I'm sorry, on this income statement?

16   Q      Yes.

17   A      Who would I talk to to find out --

18   Q      Who would --

19   A      Dave Garfinkle.

20   Q      If you could turn to Page 49 in the

21   document.

22   A      49?

23   Q      Yes.

24   A      Yes.

25   Q      I see there's a section there that begins --

Case 3:16-cv-02267    Document 290-13    Filed 08/24/20    Page 18 of 27 PageID #: 9763

www.aptusCR.com

Todd J. Mullenger

Confidential Grae vs.
Corrections Corporation of America, et al.

1   or there's a heading there, Facility Management

2   Contracts.

3        Do you see that?

4   A     Yes.

5   Q     Who would be responsible for this section?

6   A     Dave would draft it.

7   Q     And then who else would have input on it?

8   A     Members of the disclosure committee and

9   partnership development.

10   Q     Anybody else in particular that comes to

11   mind as having input on it?

12   A     No.

13   Q     And partnership development, which

14   individuals would that be?

15        MR. WHITWORTH:  Object to form.

16   BY MR. LYONS:

17   Q     Or individual?

18   A     I don't recall who in two -- 2011 it would

19   have been.

20   Q     And do you know who would provide

21   information to Mr. Garfinkle as he was drafting this

22   section?  You know, for example, specific updates on

23   individual customers in that section, where would

24   that information come from?

25        MR. WHITWORTH:  Objection to form,

Case 3:16-cv-02267   Document 290-13   Filed 08/24/20   Page 19 of 27 PageID #: 9764

Todd J. Mullenger

**Confidential**

Grae vs.
Corrections Corporation of America, et al.

 1  calls for speculation.

 2          THE WITNESS:  That would have come from

 3  the partnership development area.  Again, I don't

 4  recall who -- who in 2011 would have had that

 5  responsibility.

 6  BY MR. LYONS:

 7  **Q      But they would have provided information to**

 8  **Mr. Garfinkle as he was drafting it, and then they**

 9  **would have also reviewed the draft after it was**

10  **written and -- and in connection with the disclosure**

11  **committee meetings; is that right?**

12  A      That's correct.

13  **Q      Looking at, I think it's -- yeah, the last**

14  **sentence on that page, it says, We believe our**

15  **renewal rate on existing contracts remains high as a**

16  **result of a variety of reasons, including but not**

17  **limited to the constrained supply of available beds**

18  **within the U.S. correctional system, our ownership**

19  **of the majority of the beds we operate, and the**

20  **quality of our operations.**

21      **How were you defining renewal rate in that**

22  **sentence?**

23          MR. WHITWORTH:  Object to form.

24          THE WITNESS:  As I recall, there was a

25  calculation we made based on the number of contracts

1  that renewed each year off the base.

2  BY MR. LYONS:

3  Q        If a -- if a contract expires and there's a

4  rebid process, is it -- would you include that in

5  your calculation of the renewal rate?

6  A        I believe so, yes.

7  Q        And presumably there would also be -- for

8  example, if the contract hasn't expired but there

9  may be an option period, if the ex- -- if the

10 customer exercises the option, would that be

11 included as a renewal?

12 A        I don't recall.

13 Q        Who was responsible for -- for analyzing the

14 renewal --

15          MR. WHITWORTH:  Object to form.

16          THE WITNESS:  I believe that was -- it

17 would have been Dave or Patrick, Dave Garfinkle or

18 Patrick Swindle.

19 BY MR. LYONS:

20 Q        Do you recall a time in 2012 that CCA was

21 expanding its -- some cost containment efforts?

22          MR. WHITWORTH:  Object to form.

23          THE WITNESS:  Can you be a little bit

24 more specific?

25

www.aptusCR.com

1   A        Yes.

2                   MR. LYONS:  I suspect we've been going

3   about an hour, and I'm getting ready for another

4   document.  So if you would like to take a break, we

5   can do that.

6                   MR. WHITWORTH:  Thank you.

7                   THE WITNESS:  Thank you.

8                   THE VIDEOGRAPHER:  Off the record at

9   11:51.

10                  (Luncheon recess observed.)

11                  THE VIDEOGRAPHER:  Returning to the

12  record, the time is 12:35 p.m.

13  BY MR. LYONS:

14  **Q        So, Mr. Mullenger, just a couple more**

15  **questions going back to the disclosure committee**

16  **process we were talking about before.**

17  **          I believe you said inside and outside**

18  **counsel were -- were involved in those meetings; is**

19  **that right?**

20  A        Yes.

21  **Q        What was their role?**

22  A        That --

23                  MR. WHITWORTH:  Objection to the form.

24                  THE WITNESS:  I believe -- I believe it

25  was inside counsel who acted as the -- headed --

Case 3:16-cv-02267   Document 290-13   Filed 08/24/20   Page 22 of 27 PageID #: 9767
www.aptusCR.com

1  headed the meeting, and then both would provide

2  input based on the topics that came up for

3  discussion.

4  BY MR. LYONS:

5  Q       And you mentioned both Bass Berry and

6  Latham & Watkins at different sometimes; is that

7  right?

8  A       Well, Bass, Berry & Sims was our outside

9  counsel, and then it transitioned, I forget when, to

10 Latham & Watkins.

11 Q       Yeah, that was going to be my question --

12 A       Yes.

13 Q       -- if you remembered when.

14 A       No.

15 Q       Not off the top of your head?

16 A       No.

17 Q       So what were the issues where inside and

18 outside counsel would provide input?

19              MR. WHITWORTH:  I caution you not to

20 reveal the content of the input, any legal advice

21 that they gave you.

22              THE WITNESS:  Really any -- any issues

23 that were brought up around whether or not we should

24 be disclosing it.

25

www.aptusCR.com
Case 3:16-cv-02267   Document 290-13   Filed 08/24/20   Page 23 of 27 PageID #: 9768

Todd J. Mullenger

**Confidential**

Grae vs.
Corrections Corporation of America, et al.

1  BY MR. LYONS:

2  **Q       What did they tell you with respect to**

3  **whether -- how to determine whether facts should be**

4  **disclosed?**

5              MR. WHITWORTH:  Objection.  Hold on.

6              That -- you're asking what legal advice

7  told them about what to disclose -- what legal

8  counsel told them?

9              MR. LYONS:  Yes.

10              MR. WHITWORTH:  So don't answer that.

11  It's a -- that's a privileged conversation.

12  BY MR. LYONS:

13  **Q       Are you going to follow your counsel's**

14  **instruction on that objection?**

15  A       Yes.

16  **Q       How did you determine whether facts should**

17  **be disclosed?**

18  A       In consultation with our legal counsel.

19  **Q       So -- so you relied on your counsel to -- to**

20  **make a decision about whether facts were material;**

21  **is that right?**

22              MR. WHITWORTH:  Object to the form.

23              THE WITNESS:  Yes.

24              MR. LYONS:  But, Mr. Whitworth, you're

25  not letting him testify as to what -- what they were

1  told in terms of how to make that determination?

2           MR. WHITWORTH:  So your question is,

3  what did they tell you with respect to whether --

4  how to determine whether facts should be disclosed.

5           I'm not -- that's not the clearest

6  question, but my understanding is you're asking what

7  legal advice Bass Berry and Latham & Watkins gave

8  the disclosure committee.

9           And, no, he can't testify about what

10 legal advice they gave him.  You know, he -- he can

11 testify about what -- what considerations the

12 disclosure committee had, who participated, who --

13 you know, what the topics were of the filings.

14           But I don't think he should testify

15 about legal advice from outside counsel or in-house

16 counsel.

17           And if you can ask a clearer question,

18 maybe it's something -- he can give you some answers

19 for that but not as for it is now.

20           MR. LYONS:  We'll get to some more

21 specifics too.

22 BY MR. LYONS:

23 Q       **So can you tell what -- what the**

24 **considerations were that the disclosure committee**

25 **had when they decide -- were deciding whether a fact**

www.AptusCR.com

1 was material and should be disclosed?

2 A      Well, we rely on the advice of counsel in

3 terms of whether we should disclose it for FD

4 purposes.

5 Q      What do you mean by FD purposes?

6 A      Fair disclosure, is it required by the SEC.

7 Fair disclosure requirement.

8 Q      Anything other than the advice of counsel?

9 A      Not that I recall.

10 Q      As a financial professional, did you have

11 any perspective on what types of facts would be

12 material to investors?

13              MR. WHITWORTH:  Object to form.

14              THE WITNESS:  Again, relied heavily on

15 inside and outside counsel on an areas there --

16 their area of expertise.

17              MR. LYONS:  I'm going to mark this as

18 Exhibit 397.

19              (Marked Exhibit No. 397.)

20 BY MR. LYONS:

21 Q      And hand that to you.

22      Do you recognize this document,

23 Mr. Mullenger?

24 A      I do not.

25 Q      Who is Mr. Craddock -- Scott Craddock?

 1              I, the undersigned, a Licensed Court

 2    Reporter of the State of Tennessee, do hereby

 3    certify:

 4              That the foregoing proceedings were

 5    taken before me at the time and place herein set

 6    forth; that any witnesses in the foregoing

 7    proceedings, prior to testifying, were duly sworn;

 8    that a record of the proceedings was made by me

 9    using machine shorthand, which was thereafter

10    transcribed under my direction; that the foregoing

11    transcript is a true record of the testimony given.

12              Further, that if the foregoing pertains

13    to the original transcript of a deposition in a

14    federal case, before completion of the proceedings,

15    review of the transcript was requested.

16              I further certify I am neither

17    financially interested in the action nor a relative

18    or employee of any attorney or party to this action.

19              IN WITNESS WHEREOF, I have this date

20    subscribed my name.

21    Dated: March 25, 2020

22

23    _____

24    Elisabeth A. Miller Lorenz

25    RMR, CRR, LCR No. 66

www.aptusCR.com