# EXHIBIT B

# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. 3:16-cv-02267 |
| Plaintiff, ) ) | Honorable Aleta A. Trauger |
| vs. ) ) ) | PLAINTIFF'S SECOND SET OF REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANTS |
| CORRECTIONS CORPORATION OF AMERICA, et al., ) ) ) | |
| Defendants. ) ) | |

PROPOUNDING PARTY:    Amalgamated Bank, as Trustee for the LongView Collective Investment Fund

RESPONDING PARTIES:    Defendants CoreCivic, Inc., f/k/a Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger and Harley G. Lappin

SET NUMBER:    Two

## I. DEFINITIONS

Unless stated otherwise, the terms set forth below are defined as follows:

1. "ACA" means the American Correctional Association and any of its predecessors, successors, parents, subsidiaries, divisions, committees or affiliates, and their respective present and former officers, directors, executives, board of governors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing, including, but not limited to, the American Correctional Association Commission on Accreditation.

2. "Adams County Audit" means the Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi, published by the OIG on December 20, 2016.

3. "BOP" means the Federal Bureau of Prisons and any of its predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

4. "BOP Prisons" means the prisons or other facilities operated by CoreCivic under contract for the BOP, including Adams County Correctional Center, Cibola County Correctional Center, Eden Detention Center, McRae Correctional Facility and Northeast Ohio Correctional Center.

5. "CoreCivic" or "Company" refers to CoreCivic, Inc., f/k/a Corrections Corporation of America, and any of its predecessors, successors, parents, subsidiaries, divisions, operational units, facilities or affiliates, and their respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

- 1 -

6. "Communication(s)" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise) and includes original and all non-identical copies of all documents, as defined herein, sent by you or received by you from any person, as well as any documents reflecting or recording the content of any oral communications in any form (including, without limitation, inter- and intra-office memoranda, e-mail and other communications). "Communication(s)" also includes, without limitation, all inquiries, discussions, conversations, correspondence, negotiations, agreements, understandings, meetings, notices, requests, responses, demands or complaints, or press, publicity or trade releases.

7. "Concerning" means constituting, evidencing, reflecting, incorporating, effecting, including or otherwise pertaining or relating, either directly or indirectly, or being in any way logically or factually connected with the subject matter of the inquiry or request. Requests for "documents concerning" any subject matter include documents concerning communication regarding that subject matter.

8. "Defendants" refers to CoreCivic and the Individual Defendants (defined below), collectively.

9. "Document(s)" is intended to be interpreted in the broadest possible sense under Rule 34 of the Federal Rules of Civil Procedure and Rule 1001 of the Federal Rules of Evidence and includes, without limitation, all electronic data, databases and all communications or information that are stored or retrievable or recorded in any manner and also includes, without limitation, any writings (as "writing" is defined in Rule 1001 of the Federal Rules of Evidence) or other record of information or images, including, without limitation, prints, handwritings, photographs, videotapes, films and recordings (as "recording" is defined in Rule 1001 of the Federal Rules of Evidence). "Document(s)" also includes, without limitation, drafts or non-identical copies of any document.

10.     "DOJ" means the U.S. Department of Justice and any of its predecessors, successors, parents, subsidiaries, divisions or affiliates, including the Federal Bureau of Investigation, and their respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

11.     "Electronically stored information" or "ESI" refers to all documents stored electronically, including e-mails, voicemails, instant messages, text messages, documents, spreadsheets, databases, file fragments, metadata, digital images and digital diagrams.

12.     "Employee" refers to any person who at any time acted or purported to act on your behalf or under your supervision, direction or control, including, without limitation, past and current directors, officers, principals, partners, executives, analysts, investment bankers, consultants, advisors, representatives, attorneys, agents, trustees, independent contractors, assigns, businesses or similar persons or entities.

13.     "Government entity" refers to any agency, committee, commission, panel, regulatory body or law enforcement agency of the United States or any state or local government and any predecessors, successors, parents, subsidiaries, divisions or affiliates, and respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

14.     "Individual Defendants" means Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger and Harley G. Lappin, and their agents, attorneys, accountants, assistants, employees, partners or other persons occupying similar positions or performing similar functions, and all other persons acting or purporting to act on their behalf.

15.     "Joint Commission" refers to the Joint Commission on Accreditation of Healthcare Organizations and any of its predecessors, successors, parents, subsidiaries, divisions or affiliates,

1439154_1

and their respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

16. "Meeting" refers to the contemporaneous presence of any natural persons (including by telephone) for any purpose, whether or not such presence was by chance or prearranged, and whether or not the meeting was formal or informal or occurred in connection with some other activity.

17. "National Commission" means the National Commission on Correctional Healthcare and any of its predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

18. "OIG" means the Office of the Inspector General of the U.S. Department of Justice and any of its predecessors, successors, parents, subsidiaries, divisions or affiliates, and their respective present and former officers, directors, agents, attorneys, accountants, employees, partners or other persons acting or purporting to act on behalf of the foregoing.

19. "Person" means any natural person or any business, legal or government entity or association.

20. "Requirements" includes any requirement, contract term, standard, policy, guidance or expectation set by the BOP, ACA, Joint Commission, National Commission, any government entry or any other person or entity, whether generally applicable or facility specific.

21. "Review" means the report entitled "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," issued by the OIG on August 11, 2016.

22. "SEC" means the U.S. Securities and Exchange Commission.

1439154_1

23. "Special Litigation Committee" refers to the Special Litigation Committee of CoreCivic's Board of Directors identified in CoreCivic's filings with the U.S. Securities and Exchange Commission, including in its proxy statement filed March 29, 2018.

24. "Yates Memorandum" means the memorandum titled "Reducing our Use of Private Prisons," issued by Deputy Attorney General Sally Q. Yates on August 18, 2016.

25. "You" or "your" refers to CoreCivic and the Individual Defendants.

26. "All" shall be construed as "any," and "any" shall be construed as "all."

27. "And" shall include "or," and "or" shall include "and," such that each document request calls for the production of the greatest number of documents.

## II.    INSTRUCTIONS

1. All documents shall be produced as they are maintained in the ordinary course of business and shall be produced in their original folders, binders, covers or containers, or facsimile thereof, *i.e.*, documents maintained electronically shall be produced in the manner in which such documents are stored and retrieved.

2. In responding to these requests, you shall produce all responsive documents (including those stored electronically) that are in your possession, custody or control, or in the possession, custody or control of your predecessors, successors, parents, subsidiaries, divisions or affiliates, or any of your respective directors, officers, managing agents, agents, employees, attorneys, accountants or other representatives. A document shall be deemed to be within your control if you have the right to secure the document or a copy of the document from another person having possession or custody of the document.

3. Pursuant to the Federal Rules of Civil Procedure, you are to produce for inspection and copying by Plaintiff *original* documents, including those stored electronically, as they are kept in the usual course of business. If the original is not in your custody, then a copy thereof, and all

- 5 -

non-identical copies that differ from the original or from the other copies produced for any reason, including, without limitation, the making of notes thereon.

4.      If production of documents is withheld on the ground of privilege, as to each such withheld document state the following information:

(a)      which privilege is claimed;

(b)      who is asserting the privilege;

(c)      a precise statement of the facts upon which said claim of privilege is based; and

(d)      the following information describing each purportedly privileged document:

(i)      a brief description sufficient to identify its nature, *i.e.*, agreement, letter, memorandum, type, etc.;

(ii)      a brief description sufficient to identify its subject matter and the purpose of the document;

(iii)      the date it was prepared;

(iv)      the date it bears;

(v)      the date it was sent;

(vi)      the date it was received;

(vii)      the identity of the person preparing it;

(viii)      the identity of the person sending it;

(ix)      the identity of each person to whom it was sent or was to have been sent, including all addresses and all recipients of copies;

(x)      a statement as to whom each identified person represented or purported to represent at all relevant times;

(xi)      all persons to whom its contents have been disclosed; and

(xii)    a precise description of the place where each copy of that document is kept, including the title or description of the file in which said document may be found and the location of such file.

5.      If a portion of any document responsive to these requests is withheld under claim of privilege pursuant to Instruction No. 4, any non-privileged portion of such document must be produced with the portion claimed to be privileged redacted.

6.      If you contend that responding to these requests would impact a privilege claim by a third party, in addition to complying with Instruction No. 4 above, Defendants shall promptly inform such third party of these requests so that it will have notice and the opportunity to intervene and protect any interests, arguments or concerns it may have.

7.      You are to produce each document requested herein in its entirety, without deletion or excision (except as qualified by Instruction Nos. 4-6 above), regardless of whether you consider the entire document to be relevant or responsive to the requests.

8.      Whenever a document is not produced in full or is produced in redacted form, so indicate on the document and state with particularity the reason or reasons it is not being produced in full, and describe to the best of your knowledge, information and belief, and with as much particularity as possible, those portions of the document that are not being produced.

9.      If a document responsive to these requests was at any time in your possession, custody or control but is no longer available for production, as to each such document state the following information:

(i)     whether the document is missing or lost;

(ii)    whether it has been destroyed;

(iii)   whether the document has been transferred or delivered to another person and, if so, at whose request;

- 7 -

(iv)    whether the document has been otherwise disposed of; and

(v)    a precise statement of the circumstances surrounding the disposition of the document and the date of its disposition.

10.    With respect to any category of documents, the production of which you contend is in some way "burdensome" or "oppressive," please state the specific reasons for that objection.

## III.    FORM OF PRODUCTION – HARD COPY

Hardcopy documents should be scanned as single-page, Group IV, 300 DPI TIFF images with an .opt image cross-reference file and a delimited database load file (*i.e.*, .dat).  The database load file should contain the following fields: "BEGNO," "ENDNO," "BEGATTACH," "ENDATTACH," "PAGES" and "CUSTODIAN."  The documents should be logically unitized (*i.e.*, distinct documents should not be merged into a single record, and a single document should not be split into multiple records) and should be produced in the order in which they are kept in the usual course of business.  If an original document contains color necessary to understand the meaning or content of the document, the document should be produced as single-page, 300 DPI, color JPG images.  Multi-page Optical Character Recognition ("OCR") text for each document should also be provided.  The OCR software should maximize text quality over process speed.  Settings such as "auto-skewing" and "auto-rotation" should be turned on during the OCR process.

## IV.    FORM OF PRODUCTION – ELECTRONICALLY STORED INFORMATION

1.    Electronically stored information should be produced as single-page, Group IV, 300 DPI TIFF images with the exception of source code, audio, video and spreadsheet-type files, including, without limitation, Microsoft Excel, CSV – which should be produced in native format.  All ESI should be produced with a delimited, database load file that contains the metadata fields listed in Table 1, attached hereto.  An .opt image cross-reference file should also be provided for all TIFF images.

- 8 -

2. TIFF images should show any and all text and images which would be visible to the reader using the native software that created the document.  For example, TIFF images of e-mail messages should include the BCC line.  PowerPoint documents should be processed with hidden slides and all speaker notes unhidden, and should be processed to show both the slide and the speaker's notes on the TIFF image.  If an original document contains color, the document should be produced as single-page, 300 DPI, color JPG images.

3. If a document is produced in native format, a single-page Bates-numbered TIFF image slip-sheet containing the confidential designation and text stating the document has been produced in native format should also be provided.  If documents requested in native format require redactions, the parties should meet and confer regarding how to implement redactions while ensuring that proper formatting and usability are maintained.  Each native file should be named according to the Bates number it has been assigned, and should be linked directly to its corresponding record in the load file using the NATIVELINK field.  To the extent that either party believes that native files should be produced for a specific document or class of documents not required to be produced in native format pursuant to this paragraph or to the extent records do not easily conform to native or TIFF format (*i.e.*, structured data), the parties should meet and confer in good faith.

4. Removal of duplicate documents should only be done on exact duplicate documents (based on MD5 or SHA-1 hash values, at the family level).  Attachments should not be eliminated as duplicates for purposes of production, unless the parent e-mail and all attachments are also duplicates.  An e-mail that includes content in the BCC or other blind copy field should not be treated as a duplicate of an e-mail that does not include content in those fields, even if all remaining content in the e-mail is identical.  Removal of near-duplicate documents is not acceptable.  De-duplication should be done across the entire collection (*i.e.*, global level) and the CUSTODIAN field should list each Custodian, separated by a semicolon, who was a source of that document.  To

accommodate for rolling productions, for ESI that is removed as duplicate from earlier productions, the producing party should provide an overlay file no later than three days after the date of each rolling production that includes the duplicate custodian names.

5.      Prior to use, the parties should meet and confer to disclose and discuss any proposed use of technologies to reduce the number of documents to be reviewed or produced (*i.e.*, file type culling, near de-duplication, e-mail thread suppression or technology-assisted review).  Use of these technologies to reduce the reviewable collection or production, other than as described within this document, requires the consent of the receiving party.

## V.      RELEVANT TIME PERIOD

All requests herein refer to the time period from January 1, 2011 through March 1, 2017, unless otherwise specifically indicated, and shall include all documents and information that relate to such period, even though prepared or published outside of the Relevant Time Period.

## VI.      DOCUMENTS REQUESTED

REQUEST NO. 15:

All communications with or reports issued by financial analysts regarding CoreCivic including, but not limited to, those with Kevin McVeigh of Macquarie Research and/or Deutsche Bank, Tobey Summer of SunTrust Robinson Humphrey, Robert LaQuaglia of Wells Fargo Securities, LLC, Kevin Campbell at Avondale Partners and Ryan Meliker of Canaccord Genuity.

REQUEST NO. 16:

All communications with actual or potential investors, or their representatives, other than those filed publicly with the SEC, concerning the quality or costs of CoreCivic's services, CoreCivic's compliance with BOP contracts, or compliance with laws and regulations.

REQUEST NO. 17:

All communications concerning, or regarding the reasons for, the movement of CoreCivic's stock price on February 21, 2012, February 27, 2012, April 5, 2012, April 24, 2012, May 3, 2012,

May 8, 2012, June 26, 2012, August 9, 2012, December 3, 2012, December 7, 2012, January 18, 2013, February 8, 2013, March 1, 2013, April 18, 2013, June 6, 2013, August 20, 2013, August 22, 2013, December 16, 2013, February 10, 2014, February 14, 2014, August 7, 2014, January 5, 2015, May 7, 2015, September 18, 2015, November 2, 2015, November 11, 2015, November 12, 2015, November 20, 2015, December 4, 2015, December 11, 2015, December 18, 2015, January 4, 2016, January 19, 2016, February 12, 2016, February 16, 2016, May 5, 2016, July 1, 2016, July 7, 2016, August 3, 2016, August 4, 2016, August 18, 2016, and August 19, 2016.

REQUEST NO. 18:

All documents concerning communications to or from CoreCivic's officers, investor relations employees, public relations employees, executives or management at CoreCivic's headquarters concerning the Review, the Yates Memorandum, the Adams County Audit, or Sally Yates.

REQUEST NO. 19:

All documents relied on to support or concerning representations in CoreCivic's annual reports filed with the SEC on Forms 10-K filed on February 27, 2012, February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016 to the effect that: (i) CoreCivic offers a cost-effective alternative to the BOP; (ii) by contracting with CoreCivic BOP reduces correctional services costs; (iii) that private prison operators, including CoreCivic, lower operating costs per inmate as occupancy rates increase; (iv) CoreCivic's competitive cost structure offers prospective customers a compelling option for incarceration; (v) the outsourcing of prison management services to private operators, including CoreCivic, allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services; and (vi) the BOP's partnership with private operators, including CoreCivic, results in improvements to the quality and cost of corrections services throughout their correctional system and significant cost savings for government agencies.

- 11 -

REQUEST NO. 20:

All documents relied on to support or concerning representations in CoreCivic's quarterly reports filed with the SEC on Forms 10-Q on May 7, 2012, August 9, 2012, November 8, 2012, May 9, 2013, August 8, 2013, November 7, 2013, May 8, 2014, August 7, 2014, November 5, 2014, May 7, 2015, August 6, 2015, November 5, 2015, May 5, 2016 and August 4, 2016, and CoreCivic's annual reports filed with the SEC on Forms 10-K on February 27, 2012, February 27, 2013, February 27, 2014, February 25, 2015 and February 25, 2016 to the effect that: (i) CoreCivic had been successful in working with its government partners, including the BOP, to help them manage their correctional costs while minimizing the financial impact to CoreCivic; (ii) CoreCivic provides efficiency and savings opportunities to its customers; and (iii) CoreCivic's renewal rate on existing contracts remained high because of the quality of its operations.

REQUEST NO. 21:

All documents concerning the actual or anticipated impact on CoreCivic of the decline in inmate populations in the BOP Prisons.

REQUEST NO. 22:

All documents relied on to support or concerning representations attributed to a CoreCivic spokesman printed in a March 5, 2012 Lewiston Morning Tribune article to the effect that: (i) CoreCivic was able to provide taxpayers a service at equally high standards of quality and efficiency than the government; and (ii) CoreCivic maintained the highest operating standards at the least cost.

REQUEST NO. 23:

All documents relied on to support or concerning representations in CoreCivic's definitive proxy filed with the SEC on March 30, 2012 to the effect that CoreCivic had met or exceeded the Prison Rape Elimination Act's standards and practices.

REQUEST NO. 24:

All documents relied on to support or concerning the representations made during a February 14, 2013 CoreCivic conference call to the effect that the value proposition of CoreCivic was strengthened by cost comparisons done between CoreCivic and the public sector.

REQUEST NO. 25:

All documents relied on to support or concerning representations made during an October 2, 2013 CoreCivic meeting with analysts and other investors to the effect that: (i) the use of CoreCivic's services generated cost savings, including an annual cost savings of 12% or more; (ii) CoreCivic's total cost per 1,000 beds was $55 to $65 million, with an average length of construction of one to three years, whereas government's total cost was $80 to $250 million, with an average length of construction of three to seven years; (iii) CoreCivic's services improve the safety and inmate quality of life; (iv) CoreCivic meets or exceeds ACA quality standards while minimizing operating and maintenance costs and exceeding "ROI hurdle rates"; and (v) provides ongoing operational costs savings without the loss of operational quality.

REQUEST NO. 26:

All documents relied on to support or concerning representations made by CoreCivic spokesman Jonathan Burns as printed in a May 5, 2014 Chattanooga Times Free Press article titled "Critics point finger at CCA: For-profit prison operator taken to task for campaign giving, operations" to the effect that all of CoreCivic's facilities "comply with our federal, state and local government partners' reporting requirements."

REQUEST NO. 27:

All documents relied on to support or concerning representations made in a November 7, 2014 CoreCivic Third Quarter 2014 Investor Presentation and in subsequent investor presentations published on February 24, 2015, May 19, 2015, August 21, 2015, November 12, 2015, February 24, 2016 and May 17, 2016, to the effect that: (i) savings by governments can be achieved by

- 13 -

contracting with the private sector, including CoreCivic, without sacrificing quality; and (ii) the operational cost savings relative to the operating and real estate costs of BOP Prisons could be quantified.

REQUEST NO. 28:

All documents relied on to support or concerning representations made during a May 5, 2016 CoreCivic conference call to the effect that CoreCivic has high quality operations and provides great value back to taxpayers.

REQUEST NO. 29:

All documents relied on to support or concerning representations made on behalf of CoreCivic in a June 8, 2016 presentation at REITWeek: NAREIT's Investor Forum to the effect that CoreCivic: (i) provides high quality and consistent services to their partner; (ii) continues to do a good job on the quality; and (iii) use of its services offers cost savings to its partners.

REQUEST NO. 30:

Monthly or other periodic reports or analysis concerning to deficiencies and incidents at the BOP Prisons, including, but not limited to, any reports or analysis provided to the Individual Defendants and members of CoreCivic's Quality Assurance Division.

REQUEST NO. 31:

Documents sufficient to explain the Corrective Action Plan (CAP) process, the individuals involved in the process and their responsibilities.

REQUEST NO. 32:

Any reports, draft reports or other documents, along with any attachments or exhibits, reflecting the analysis of compliance levels related to contract compliance or the interpretation of contractual obligations done by or at the direction of any of the Individual Defendants or members of CoreCivic's Quality Assurance Division.

REQUEST NO. 33:

Documents concerning the methodology and factors used by CoreCivic to calculate cost savings of BOP's contracts with CoreCivic to operate BOP Prisons, including, but not limited to, any discussion of modifications of the methodology or factors used, or the impact of using a different methodology or factors.

REQUEST NO. 34:

Documents identifying: (i) CoreCivic's annual quality and cost targets for each of its major operational areas; (ii) the persons responsible for setting those targets; (iii) the parameters or criteria used to set those targets; and (iv) whether those targets were met, exceeded or missed, and the reasons why.

REQUEST NO. 35:

Documents concerning any analysis or modeling of the return on investment of any cost-cutting measure, budgeting or increase in expenditures concerning any services CoreCivic provides to the BOP or its inmates including, but not limited to, the reduction in staffing, training, transportation, medical or dental care, security or otherwise.

REQUEST NO. 36:

All appointment books, diaries, flight logs or calendars of the Individual Defendants or those kept on their behalf containing information related to their employment at CoreCivic, CoreCivic's services or the private prison industry.

REQUEST NO. 37:

All telephone bills or other documents reflecting the date, existence or duration of any communication between any of the Individual Defendants and any representative of the BOP, OIG or DOJ concerning CoreCivic or the private prison industry.

REQUEST NO. 38:

All performance reviews of the Wardens and Quality Assurance Managers at the BOP Prisons.

REQUEST NO. 39:

All documents concerning monies, items of monetary value or compensation paid by CoreCivic to the Individual Defendants, or documents concerning discussions concerning such matters.

REQUEST NO. 40:

All documents and communications concerning any trades or requests to trade CoreCivic securities by any of the Individual Defendants, officers or members of CoreCivic's Board of Directors and any insider trading policy.

REQUEST NO. 41:

All documents concerning performance reviews or evaluations of the Individual Defendants' performance as an officer or representative of CoreCivic.

REQUEST NO. 42:

All documents concerning the reasons for the departure from CoreCivic and replacement of: (i) Harley G. Lappin; (ii) Todd J. Mullenger; (iii) any Warden of any BOP Prison; (iv) any VP, Facility Operations; (v) any of CoreCivic's Board of Directors; and (vi) any CoreCivic officer.

REQUEST NO. 43:

All documents concerning any research studies or articles, whether published or not, relating to the private prison industry's or CoreCivic's cost savings or the quality of services, including, but not limited to: (i) communications with professors, researchers (such as fellows or graduate students) or others in academia; (ii) communications with other private prison operators, public relations firms, or lobbyists; (iii) communications with journalists or members of the media; (iv) drafts; and (v) amounts paid or discussed.

- 16 -

REQUEST NO. 44:

All documents concerning the Special Litigation Committee of the Board of Directors of CoreCivic, including, but not limited to, any: (i) communications to or from; (ii) documents provided to; (iii) notes or memoranda; and (iv) reports and supporting documents.

REQUEST NO. 45:

Documents sufficient to show all expenditures made by CoreCivic, whether individually or collectively as part of the private prison industry, concerning efforts to lobby any government entity concerning the quality or cost of private prison services, the benefits of the use of private prison companies, reasons any government entity should use private prison services, or other issues concerning any government entity's policies, laws or regulations relevant to the private prison industry.

REQUEST NO. 46:

All documents or communications concerning the shareholder proposal submitted for inclusion in CoreCivic's proxy statement concerning CoreCivic's 2017 annual meeting of shareholders, including communications concerning CoreCivic's request for permission to exclude such proposal from CoreCivic's proxy statement.

REQUEST NO. 47:

To the extent not already produced, all communications concerning the accreditation or reaccreditation of any actual or proposed CoreCivic BOP Prison or with the Joint Commission, including those communications in or through the Joint Commission Connect or similar portal, and survey reports.

REQUEST NO. 48:

To the extent not already produced, all documents identified in Defendants' Initial Disclosures Pursuant to Rule 26(a)(1)(A) in this action dated February 23, 2018 that Defendants assert therein that they may use to support their defense.

REQUEST NO. 49:

All declarations, testimony or other statements made under oath by anyone on behalf of CoreCivic regarding the quality or cost of CoreCivic's services, or its performance within connection with BOP contracts.

DATED: June 1, 2018

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
KENNETH J. BLACK

_WILLOW E. RADCLIFFE_

WILLOW E. RADCLIFFE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

- 18 -

# TABLE 1: METADATA FIELDS[1]

| Field Name | Example / Format | Description |
|---|---|---|
| BEGNO | ABC0000001  (Unique ID) | The Document ID number associated with the first page of a document. |
| ENDNO | ABC0000003  (Unique ID) | The Document ID number associated with the last page of a document. |
| BEGATTACH | ABC0000001  (Unique ID Parent-Child Relationships) | The Document ID number associated with the first page of the parent document. |
| ENDATTACH | ABC0000008  (Unique ID Parent-Child Relationships) | The Document associated with the last page of the last attachment. |
| VOLUME | VOL001 | The name of CD, DVD or Hard Drive. |
| RECORDTYPE | Options: eMail, Attachment, Scanned Doc, eFile | The record type of a document. |
| SENTDATE | MM/DD/YYYY | The date the e-mail or calendar entry was sent. |
| SENTTIME | HH:MM | The time the e-mail or calendar entry was sent. |
| RECEIVEDDATE | MM/DD/YYYY | The date the document was received. |
| RECEIVEDTIME | HH:MM | The time the document was received. |
| CREATEDATE | MM/DD/YYYY | The date the document was created. |
| CREATETIME | HH:MM | The time the document was created. |
| LASTMODDATE | MM/DD/YYYY | The date the document was last modified. |
| LASTMODTIME | HH:MM | The time the document was last modified. |
| MEETING START DATE | MM/DD/YYYY | Start date of calendar entry |
| MEETING START TIME | HH:MM | Start time of calendar entry |
| MEETING END DATE | MM/DD/YYYY | End date of calendar entry |
| MEETING END TIME | HH:MM | End time of calendar entry |
| FILEPATH | i.e. ./Jsmith/PC/Users/Jsmith/Desktop | The file path from the location in which the document was stored in the usual course of business.  This field should be populated for both e-mail and e-files. |
| FILEPATH-DUP | i.e.  //Jsmith.pst/Inbox<br>/Network Share/Accounting/…<br>/TJohnsonPC/Users/TJohnson/My Documents/… | The file paths from the locations in which the duplicate documents were stored in the usual course of business.  This field should be populated for both e-mail and e-files and separated by semicolons. |
| AUTHOR | jsmith | The author of a document from extracted metadata. |
| LASTEDITEDBY | jsmith | The name of the last person to edit the document from extracted metadata. |
| FROM | Joe Smith <jsmith@email.com> | The display name and e-mail address of the author of an e-mail/calendar item.  An e-mail address should always be provided. |
| TO | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail address of the recipient(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a recipient existed. |
| CC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail of the copyee(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a copyee existed. |
| BCC | Joe Smith <jsmith@email.com>: tjones@email.com | The display name and e-mail of the blind copyee(s) of an e-mail/calendar item.  An e-mail address should always be provided for every e-mail if a blind copyee existed. |
| SUBJECT | | The subject line of the e-mail/calendar item. |
| MESSAGE TYPE | Appointment, Contact, Task, Distribution List, Message, etc. | An indication of the email system message type. |
| IMPORTANCE | Normal, Low, High | E-mail Importance Flag |
| TITLE | | The extracted document title of a document. |
| CUSTODIAN-ALL | Smith, Joe: Doe, Jane | All of the custodians of a document from which the document originated, separated by semicolons. |
| SOURCE | Computer, Mobile Phone, Email, Network Share, Database Name, etc. | The source from which the document was collected. |
| ATTACH COUNT | Numeric | The number of attachments to a document. |
| FILEEXT | XLS | The file extension of a document. |
| FILENAME | Document Name.xls | The file name of a document. |
| FILESIZE | Numeric | The file size of a document (including embedded attachments). |
| HASH | | The MD5 or SHA-1 Hash value or "de-duplication key" assigned to a document.  The same hash method (MD5 or SHA-1) should be used throughout production. |
| CONVERSATION INDEX | | ID used to tie together e-mail threads. |
| REDACTED | YES or Blank | If a document contains a redaction, this field will display 'YES'. |
| TIMEZONE PROCESSED | PST, CST, EST, etc | The time zone the document was processed in. NOTE: This should be the time zone where the documents were located at time of collection. |
| NATIVELINK | D:\NATIVES\ABC000001.xls | The full path to a native copy of a document. |
| FULLTEXT | D:\TEXT\ABC000001.txt | The path to the full extracted text of the document.  There should be a folder on the deliverable, containing a separate text file per document.  These text files should be named with their corresponding bates numbers.  Note: E-mails should include header information: author, recipient, cc, bcc, date, subject, etc.  If the attachment or e-file does not extract any text, then OCR for the document should be provided. |

[1]For ESI other than email and e-docs that do not conform to the metadata listed here, such as text messages, Instant Bloomberg, iMessage, Google Chat, Yammer, Slack, etc., the parties will meet and confer to determine appropriate metadata fields to be produced.