# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and ) Civil Action No. 3:16-cv-02267
on Behalf of All Others Similarly Situated, )
                                              ) Honorable Aleta A. Trauger
                     Plaintiff, )
                                              ) Magistrate Judge Jeffrey S. Frensley
        vs. )
                                              )
CORRECTIONS CORPORATION OF )
AMERICA, et al., )
                                              )
                    Defendants. )
                                              )

## <u>DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE TESTIMONY OF DONNA MELLENDICK</u>

# TABLE OF CONTENTS

**Page**

I.  BACKGROUND AND SUMMARY OF OPINIONS ........................................................1

II.  LEGAL STANDARD.....................................................................................................5

III.  ARGUMENT ..................................................................................................................7

    A.  Ms. Mellendick's Quality Opinion Is Contrary To Industry Standards And, For The Most Part, Simply Regurgitates Facts ........................................................7

        1.  Ms. Mellendick Invented Her Own Performance Standard........................8

        2.  Ms. Mellendick Serves As A Mere Mouthpiece.......................................13

    B.  Ms. Mellendick Is Unqualified To Offer Her Contract Opinion, Which Is Also Unreliable ..............................................................................................14

    C.  Ms. Mellendick's Cost Opinion Is Based On No Analysis And Improperly Instructs The Trier Of Fact On The Ultimate Issue ................................................17

IV.  CONCLUSION.............................................................................................................19

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Apple, Inc. v. Samsung Elecs. Co.*,
2014 WL 794328 (N.D. Cal. Feb. 25, 2014) ........................................................................6

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) .................................................................................14, 15, 19

*Brainard v. Am. Skandia Life Assur. Corp.*,
432 F.3d 655 (6th Cir. 2005) ...........................................................................................6, 18

*Braun v. Wal-Mart, Inc.*,
2006 Minn. Dist. LEXIS 78 (Mar. 29, 2006).....................................................................11

*Burgett v. Troy-Bilt LLC*,
579 F. App'x 372 (6th Cir. 2014) ......................................................................................14

*Coffey v. Dowley Mfg., Inc.*,
187 F. Supp. 2d 958 (M.D. Tenn. 2002).............................................................................2

*Coffey v. Dowling Mfg., Inc.*,
89 F. App'x 927 (6th Cir. 2003) ..................................................................................12, 17

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ..............................................................................................8

*Daubert v. Merrell Dow Pharmaceuticals*,
509 U.S. 579 (1993)...............................................................................................2, 6, 11

*In re Fosamax Prod. Liab. Litig.*,
645 F. Supp. 2d 164 (S.D.N.Y. 2009)................................................................................13

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)............................................................................................................6

*Johnson v. Manitowoc Boom Trucks, Inc.*,
484 F.3d 426 (6th Cir. 2007) ..............................................................................................6

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999)...................................................................................................5, 6, 7

*Lee v. Metro. Gov't of Nashville & Davidson Cty.*,
No. 3:06-cv-0108 (M.D. Tenn. 2009)..................................................................................6

*Madej v. Maiden*,
  951 F.3d 364 (6th Cir. 2020), *cert. denied*, 2020 WL 6037415 (U.S. Oct. 13,
  2020) ......................................................................................................................6, 17

*Mohney v. USA Hockey, Inc.*,
  138 F. App'x 804 (6th Cir. 2005) .........................................................................11

*Pride v. BIC Corp.*,
  218 F.3d 566 (6th Cir. 2000) ...................................................................5, 7, 11, 12

*TBL Collectibles, Inc. v. Owners Ins. Co.*,
  285 F. Supp. 3d 1170 (D. Colo. 2018).....................................................................8

*Thomas v. City of Chattanooga*,
  398 F.3d 426 (6th Cir. 2005) ...................................................................................7

*Trs. of Bos. Univ. v. Everlight Elecs. Co.*,
  141 F. Supp. 3d 147 (D. Mass. 2015) ....................................................................13

*United States v. An Easement & Right-of-Way Over 3.74 Acres of Land, More or
  Less, in Montgomery Cty., Tenn.*,
  415 F. Supp. 3d 812 (M.D. Tenn. 2019)..................................................................5

*United States v. Brownlee*,
  744 F.3d 479 (7th Cir. 2014) .................................................................................13

*United States v. Deuman*,
  892 F. Supp. 2d 881 (W.D. Mich. 2012) .................................................................6

*Woods v. Lecureux*,
  110 F.3d 1215 (6th Cir. 1997) ...........................................................................7, 19

*In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig.*,
  816 F. Supp. 2d 442 (W.D. Ky. 2011)...................................................................15

## RULES

Fed. R. Evid. 403 .........................................................................................................6

Fed. R. Evid. 702 .........................................................................................................6

Fed. R. Evid. 702(a).................................................................................................6, 17

CoreCivic, Inc. ("CoreCivic"), Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin (the "Individual Defendants," and together with CoreCivic, the "Defendants") respectfully move to exclude the proposed testimony of Plaintiff's industry expert witness, Donna Mellendick, as set forth in her August 7, 2020 expert report ("Report" or "Mellendick Rpt."),[1] *see* Ex. 1,[2] and state in support as follows:

## I.     BACKGROUND AND SUMMARY OF OPINIONS

As relevant here, Plaintiff has alleged that certain statements made by Defendants regarding CoreCivic's quality, cost-effectiveness, and relationships with its government partners were false and misleading, because Defendants knew but failed to disclose indications that the quality and savings of CoreCivic's services, and the strength of its relationship with the Federal Bureau of Prisons ("BOP"), were below the levels represented to investors. *See* Ex. 2, Plaintiff's Interrogatory Response No. 13. Among other issues, the trier of fact will need to decide whether these statements were false or misleading when made, in light of the information contemporaneously known to Defendants. Purportedly to assist the trier of fact in resolving these issues, Plaintiff proffers expert testimony from a retired BOP administrator, Donna Mellendick.

Ms. Mellendick spent more than 30 years working at the BOP and retired as the Administrator for the Privatization Management Branch in August 2015. She is no stranger to CoreCivic. While at the BOP, she and her team frequently interacted with CoreCivic (including certain Individual Defendants). Ms. Mellendick also worked side-by-side with, and even reported directly to, individuals who worked at the BOP and later came to work at CoreCivic during the Class Period. As such, Ms. Mellendick was directly involved in, or had knowledge of, several of

---

[1] Ms. Mellendick had the opportunity to, but did not, provide a Rebuttal to the Report of Defendants' industry expert, D. Scott Dodrill.

[2] All "Ex." citations refer to the Declaration of Eric C. Pettis, filed concurrently with this motion.

the facts and documents upon which she bases her expert opinions regarding CoreCivic's performance. Indeed, Ms. Mellendick's name appears more than 12,000 times in documents produced in this case discussing some of the topics on which she now provides expert opinions. Plaintiff is *not* offering Ms. Mellendick as a percipient witness, however. *She is being offered to provide expert testimony.* Specifically, Ms. Mellendick was asked to opine on three questions:

1) [T]he quality of CCA's performance of its contracts with the BOP;

2) [W]hether (and if so when) its past performance ever reached a point as to render CCA unlikely to win any competitively bid BOP contract (and therefore unlikely to receive any additional BOP business beyond the option years of existing contracts); and

3) [W]hether the services CCA provided to the BOP were sufficiently comparable to the services BOP provided at its own facilities as to be able to make an apples-to-apples cost comparison such that anyone could have accurately claimed that contracting with CCA did and/or would save the BOP money.

Mellendick Rpt. at 3. In response to these questions, Ms. Mellendick offers the following opinions:

1) [I]t is my opinion the quality of CCA's performance in the majority of their BOP private prison contracts, for the timeframe of this case, was largely deficient, particularly with respect to their obligation to provide quality healthcare and a safe and secure environment to the inmate population. ["Quality Opinion"].

2) The CAR XV awards in late 2014, concretely determined the BOP would not grant CCA a new contract based on their poor past performance. However, in my opinion, the BOP would have been reluctant to award a new contract to them, for this same reason, as far back as April 2013. ["Contract Opinion"].

3) Given the vast differences among the services CCA offered the BOP and the services the BOP provides in its own institutions, it is my opinion it is impossible to make an apples-to-apples cost comparison. ["Cost Opinion"].

*Id.* at 22, 23, 26.

Defendants do not contend that Ms. Mellendick does not have expertise in the correctional services industry. But her credentials do not excuse her failure to rely on and articulate a reliable methodology, as Federal Rule of Evidence 702, *Daubert v. Merrell Dow Pharmaceuticals*, 509

U.S. 579 (1993), and its progeny require. *See, e.g.*, *Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 975-76 (M.D. Tenn. 2002) (excluding testimony that was based on "'guesstimations' and speculations" rather than on "reliable principles and methods," even though his "pedigree [was] impressive"). Each of Ms. Mellendick's opinions is inadmissible.

*First*, Ms. Mellendick's Quality Opinion is based upon a performance standard she invented that is inconsistent with the quality standards used in her field, including by the BOP. To arrive at her Quality Opinion, Ms. Mellendick reviewed documents selected for her by counsel (based on unknown criteria)[3] and then applied her "professional experience." That is not itself improper, but Ms. Mellendick fails to explain how she reliably applied that experience to the documents that she reviewed to reach her conclusion. It is difficult to see how she could have, because her Quality Opinion is utterly inconsistent with the documents that she reviewed and the actions taken by the BOP in conformity with the standards actually used by the BOP. The documents evaluated by Ms. Mellendick reflect the standards *actually used* in Ms. Mellendick's industry (*i.e.*, the corrections industry) to evaluate contractors' performance. Inexplicably, to arrive at her Quality Opinion, Ms. Mellendick invented a different standard, that is used only by her. Ms. Mellendick conceded that the standard "largely deficient" is not used in the corrections industry and was conceived by herself for this litigation, without reference to any quantitative or qualitative benchmark used by the BOP. This renders her Quality Opinion unreliable and

_____

[3] Ms. Mellendick testified that the documents that she reviewed in forming her opinion were selected for her by Plaintiff's counsel and that she did not know the process by which counsel selected the documents. *See* Ex. 3, Mellendick Dep. 16:13-25 ("Q: How did you get these materials? A: They were mailed to me by the law firm of Robbins Geller Rudman & Dowd. Q: Who selected them? A: I believe – well, what I received from them and if there were any documents that I thought were missing, I worked through Robbins Geller, Dowd and Rudman (sic) to request them. So everything came from the law firm. Q: With respect to the initial batch of documents you received, do you have an understanding of how the law firm selected those? A: I do not.").

irrelevant. *See* Motion to Dismiss Order, ECF No. 76 ("MTD Order") at 30 (explaining alleged misstatements may be rendered false if Plaintiff proves that CoreCivic's operations "pervasively failed to live up to the quality standards of the BOP"). Moreover, the majority of Ms. Mellendick's "opinion" is nothing more than a regurgitation of cherry-picked evidence Plaintiff hopes to present under the guise of expert authority. The bulk of her Report is devoted to summarizing, in chronological order, documents that were selected by counsel for Ms. Mellendick to review. Mere "mouthpiece" testimony such as this is routinely excluded, and it should be here as well.

*Second,* Ms. Mellendick is unqualified to offer her Contract Opinion because she has no professional experience making contracting decisions. Ms. Mellendick's Contract Opinion is also unreliable, because it too is not reached by reference to any industry standards or benchmarks. At her deposition, Ms. Mellendick struggled to define what "reluctant" even meant and was not certain of why she chose April 2013 as the date that the BOP would have been "reluctant" to award CoreCivic a new contract. She also clarified that her opinion—that it was "concretely determined" in late 2014 that CoreCivic would not receive a new contract from the BOP—was based solely on the fact that CoreCivic lost the CAR XV bid in December 2014, and was not an opinion on the likelihood that CoreCivic would or would not win a new contract with the BOP at any point *subsequent to* December 2014. No expert testimony is required to explain the simple fact that CoreCivic lost the CAR XV bid or to repeat the out-of-court statements made by the BOP (and never shared with CoreCivic) regarding why they chose CoreCivic's competitor, GEO, for this bid.

*Third,* Ms. Mellendick's Cost Opinion is based on no analysis whatsoever. Ms. Mellendick lists various programs that the BOP provides at a variety of its facilities and then asserts that the type of facility operated by CoreCivic (low-security, criminal alien population) does not require

complex programming (ignoring that CoreCivic frequently provided such programs anyway). She does not state how much these programs cost or what percentage of the overall services (or costs) these programs comprise. She just states that these programs constitute "vast differences" in the services that CoreCivic offered the BOP and the services the BOP provides to itself, and concludes that given these "vast differences," it is "impossible to make an apples-to-apples" cost comparison between CoreCivic and the BOP. But Ms. Mellendick herself only compared programs (not costs), *i.e.*, apples-to-oranges, by comparing programs provided by the BOP at all of its facilities (regardless of security level) to programs provided by CoreCivic to the BOP at its low-level security, criminal alien facilities. Ms. Mellendick has no basis to say that a true "apples-to-apples" cost comparison cannot be done. Then, without doing any work to arrive at that conclusion, she goes a step further and improperly seeks to usurp the jury's role on an ultimate issue, stating that "it would not be accurate to claim that contracting with CCA did and/or would save the BOP money." Ex. 1, Mellendick Rpt. at 26. This is a question for the trier of fact, not Ms. Mellendick.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The proponent of the expert's testimony, here Plaintiff, has the burden of proving that the testimony is admissible by a preponderance of the evidence. *See Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

As a gatekeeper, this Court is "charged with 'discretion in determining whether . . . [Plaintiff's] proposed expert's testimony is admissible,'" based on whether it is both relevant and reliable. *United States v. An Easement & Right-of-Way Over 3.74 Acres of Land, More or Less, in Montgomery Cty., Tenn.*, 415 F. Supp. 3d 812, 817 (M.D. Tenn. 2019) (Trauger, J.) (quoting *Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 429 (6th Cir. 2007)). With respect to relevance, the Court must determine whether the evidence "will help the trier of fact to understand or determine a fact in issue." *See Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting Fed. R. Evid. 702(a)), *cert. denied*, 2020 WL 6037415 (U.S. Oct. 13, 2020). In doing so, the Court "should also be mindful of other applicable rules," *Daubert*, 509 U.S. at 595, including Federal Rule of Evidence 403, because "expert testimony may 'carry special weight with the jury,'" resulting in unfair prejudice. *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 794328, at *9 (N.D. Cal. Feb. 25, 2014) (internal citations and quotations omitted); *United States v. Deuman*, 892 F. Supp. 2d 881, 885 (W.D. Mich. 2012) ("[F]erreting out unreliable testimony is significant because jurors are likely to give special weight to expert testimony."); Memorandum at 10-17, *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, No. 3:06-cv-0108 (M.D. Tenn. 2009) (Trauger, J.), ECF No. 550 (granting motion in limine to exclude expert testimony based on Rules 403 and 702).

With respect to reliability, the Court's task is to assess "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592-93. The Supreme Court has emphasized that expert testimony should be excluded if "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). It is "well within" a district court's discretion to exclude expert testimony

when there is an "absence of meaningful analysis or reasoning[.]" *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005).

In *Daubert*, the Supreme Court identified non-exclusive factors that may be helpful to the court in assessing expert testimony, but those factors are not a "definitive checklist." *Kumho Tire*, 526 U.S. at 150. In particular where, as here, "the proffered expert testimony is outside of the scientific realm, the court's fundamental objective is to generally evaluate, based on whatever factors are important in the particular case, the relevancy and reliability of the testimony, and not necessarily to explore [*Daubert*] factors that might not be relevant to a particular case, such as whether the expert's methods are subject to empirical testing." Memorandum at 3-4, *Lee*, No. 3:06-cv-0108 (citing *Kumho Tire*, 526 U.S. at 151). The Court is to ensure that the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152. Moreover, "[w]hen expert testimony is primarily based on the experience that the proffered expert has gained through personal endeavors, the expert 'must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts.'" Memorandum at 4, *Lee*, No. 3:06-cv-0108 (citing *Thomas v. City of Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005)). The paramount consideration for this Court remains whether the proffered testimony will assist the trier of fact in understanding and disposing of issues relevant to the case, *Pride*, 218 F.3d at 578, without telling "the jury what result to reach." *Woods v. Lecureux*, 110 F.3d 1215, 1221 (6th Cir. 1997).

## III.     ARGUMENT

### A.     Ms. Mellendick's Quality Opinion Is Contrary To Industry Standards And, For The Most Part, Simply Regurgitates Facts

In answering the first question posed to her, Ms. Mellendick offers her opinion that "the quality of CCA's performance in the majority of their BOP private prison contracts, for the

timeframe of this case, was largely deficient, particularly with respect to their obligation to provide quality healthcare and a safe and secure environment to the inmate population." Ex. 1, Mellendick Rpt. at 22. This Quality Opinion does nothing more than parrot out-of-court statements and then render a conclusion based upon an invented standard that cannot be squared with the quality benchmarks actually used in the corrections industry, including by the BOP. It is thus unreliable and irrelevant.

### 1. Ms. Mellendick Invented Her Own Performance Standard

Ms. Mellendick's Quality Opinion is based on a "review and analysis of the evidence in this case," Ex. 1, Mellendick Rpt. at 5, 22, to which she then applies her "professional experience." *Id.* at 3, 5, 24. As the advisory committee notes to Rule 702 explain:

> If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply "taking the expert's word for it."

Fed. R. Evid. 702 (advisory committee's note to 2000 amendment) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1319 (9th Cir. 1995)). Ms. Mellendick does none of this. She does not explain how she reliably applied her professional experience evaluating contractors' performance or any quality standards used in the industry to the facts that she reviewed. Mindful that many of the traditional *Daubert* factors do not apply to non-scientific experts like Ms. Mellendick, even industry experts must apply "industry standards to the facts." *See TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1190 (D. Colo. 2018) (excluding expert opinion that made "factual 'observations' based on the evidence and cites authorities ostensibly reflecting insurance industry standards" but did "not clearly apply those standards to the facts"). Ms. Mellendick utterly fails to do so.

The bulk of the Report is comprised of "chronologies" summarizing the BOP's

assessments of CoreCivic's performance at each of its five BOP facilities. Ms. Mellendick spends fourteen pages summarizing these "performance-related events" during the Class Period. Ex. 1, Mellendick Rpt. at 7-21. According to Ms. Mellendick, these chronologies both provide background and support for her opinions:

> Q: I'm trying to understand how this -- this chronology fits into your opinions. Is this support for your opinions? Is this just background that's helpful to a reader to know before they get to your opinions? How does this chronology fit into your opinions?
> A: Well, I think both of what you just said. I think it helps show each facility's issues with performance. And then later on in my report I summarize them as a whole as far as CCA's performance as a company amongst all of their facilities.

Ex. 3, Mellendick Dep. 94:15-95:1. But, as Ms. Mellendick admits, the chronologies themselves were not based on any methodology beyond a review of documents:

> Q: What methodology did you use to develop these chronologies?
> A: I reviewed all the relevant documents[4] involving the performance of these contract facilities during the relevant time frame.
> Q: Did you do anything besides review documents?
> A: Not that I'm aware of.

*Id.* at 93:11-18.

In Ms. Mellendick's role as Privatization Branch Administrator, she was "responsible for the oversight and management of all of the Bureau of Prisons' contract facilities." *Id.* at 24:5-10. In that role and earlier roles in her career, she was responsible for directing and/or making quality assessments of the BOP's own facilities, based upon defined performance standards. *See, e.g., id.* at 46:14-22 (testifying that she assisted in auditing BOP-operated facilities). Inexplicably, Ms. Mellendick did not rely on those standards. Instead, she came up with her own. As Ms. Mellendick explained, the phrase "largely deficient" is not a term of art or performance standard used in the

---

[4] Meaning, the ones that Plaintiff's counsel decided were "relevant."

corrections industry or by the BOP, but rather, was created by Ms. Mellendick for the purpose of this case:

> Q: Okay. Is there any definition of largely deficient that you're relying upon there?
> A: No.
> Q: So it's just a standard that you created?
> A: Well, deficient is something that is used in the Bureau of Prisons. You know, it's used throughout my career with the program review division. You know, we have a -- when we identified areas of nonconformance, when we reviewed the facilities, they were called deficiencies. So I thought the phrase largely deficient was appropriate to summarize their performance.
> Q: Okay. But that's not a -- a term that the BOP has used itself?
> A: They use deficient.
> Q: Right. But -- but largely deficient I think you just testified is the phrase that you thought was appropriate to summarize their performance?
> A: Correct.

*Id.* at 121:13-122:9. That this phrase was invented by Ms. Mellendick is not in-and-of-itself troublesome; what is troublesome is that Ms. Mellendick is unable to tie "largely deficient" to any qualitative or quantitative benchmark. It is undisputed that CoreCivic received notices from the BOP of certain deficiencies in its services during the Class Period. But Ms. Mellendick is not able to say whether it is the nature or number (or both, or some combination) of those deficiencies that rendered CoreCivic's overall performance "largely" deficient. *See, e.g.*, *id.* at 120:3-25 (testifying that "largely deficient" means "numerous and serious and repetitive deficiencies" but is not tied to a "threshold number of deficiencies"). So the question remains, "largely deficient" based on what?

One might assume that Ms. Mellendick meant to assess the quality of CoreCivic's performance based on its contractual requirements. But if so, her invented "largely deficient" standard is inconsistent with the quality standards actually used by the BOP, as reflected in the very documents that Ms. Mellendick reviewed. Ms. Mellendick agrees that "satisfactory" (a term actually used within the BOP) "performance mean[s] meeting the contractual requirements." *See*

*id.* at 85:3-6. But, according to Ms. Mellendick, out of CoreCivic's five BOP facilities, two "performed *well above* satisfactory levels," s*ee* Ex. 1, Mellendick Rpt. at 18 (McRae and Northeast Ohio), one "achieved *no higher than* satisfactory levels" and "*below*-satisfactory levels" for the last three years, *see id.* at 15 (Cibola), one "achieved *only overall* satisfactory or *below*-satisfactory levels," *see id*. at 11 (Adams), and one "achieved *above*-satisfactory performance levels for 2012 through early 2014" but "*dropped* significantly in 2014," *id.* at 18 (Eden). Based on Ms. Mellendick's own summaries, "largely deficient" *cannot* mean "below satisfactory," because three out of five facilities (McRae, Northeast Ohio, and Eden) never achieved "below satisfactory" levels. In fact, this data is utterly inconsistent with her conclusion that CoreCivic's performance was "largely deficient," whatever that means. Nothing in *Daubert* or the Federal Rules of Evidence requires this Court to admit an expert opinion, like this, that is connected to the facts and data only by the *ipse dixit* of the expert. *See Mohney v. USA Hockey, Inc.*, 138 F. App'x 804, 809 (6th Cir. 2005); *Braun v. Wal-Mart, Inc.*, 2006 Minn. Dist. LEXIS 78, at *3 (Mar. 29, 2006) (excluding opinion that concluded based on "raw numbers" without any "benchmark" by which "to see if those raw numbers correlate to reality").

This analytical gap between the facts and Ms. Mellendick's opinions is further widened by her use of the word "majority." When asked at her deposition to clarify what "majority" meant, Ms. Mellendick stated "I meant three of the five facilities were not performing." *See* Ex. 3, Mellendick Dep. 118:3-6 (referring to Adams, Cibola, and Eden). But she then walked back on that as well, testifying that even for these "three" facilities, it is not her opinion that CoreCivic's performance was "largely deficient" throughout the Class Period. *See id.* at 118:11-15 ("Q: Is it your opinion that their performance was largely deficient for the entire relevant time frame of the case? A: For the entire period, not all three of them, no."). Instead, her opinion is that for one of

the three facilities (Eden), its performance only dropped "significantly" (whatever that means) sometime in 2014. Yet, she still counts Eden in concluding that CoreCivic's performance at a "majority" of its facilities was "largely deficient" for the entire Class Period. This simply does not pass muster under *Daubert*.

Expert testimony is only relevant if it "fits" with "the disputed factual issues in the case." *See Pride*, 218 F.3d at 578 (citing *Daubert*, 509 U.S. at 592). As this Court has made clear since it ruled on Defendants' Motion to Dismiss, "quality is in the eye of the beholder" and the veracity of the statements at issue can only be assessed by comparison to "the quality standards *of the BOP*." *See* MTD Order at 26, 30 (emphasis added). Ms. Mellendick's testimony would not assist the trier of fact in determining that issue, because her opinion does not compare the quality of CoreCivic's performance to the quality standards of the BOP. She evaluates CoreCivic's performance under her own personal (seemingly higher) standards. For example, during her deposition, Ms. Mellendick testified that she believed there were several times during the Class Period that the BOP could have terminated the Adams contract. Ex. 3, Mellendick Dep. 100:2-11, 100:24-101:19. The BOP never terminated the contract, so they must have rejected her point of view or had a different one, based on the same facts and data available to Ms. Mellendick then (and now). But, whether CoreCivic provided quality services *in the eye of Ms. Mellendick* is irrelevant. Indeed, if Ms. Mellendick harbored different views from her colleagues at the BOP during the Class Period, allowing her to express those views now in the guise of purported expert testimony is wholly inappropriate. Her Quality Opinion is both unreliable and irrelevant and should be excluded. *See Pride*, 218 F.3d at 578.[5]

---

[5] Ms. Mellendick further admitted that she made no effort to compare the quality of CoreCivic's services to the quality of services provided by the BOP, *see* Ex. 3, Mellendick Dep. 78:14-18 ("Q: Did you make any effort to compare the quality of the services provided by CoreCivic relative to the quality of services provided by the BOP? A: I did not."), purportedly because an "apples-to-

## 2. Ms. Mellendick Serves As A Mere Mouthpiece

Experts are regularly excluded for merely providing a "mouthpiece" for evidence that can be provided by a percipient witness. *See United States v. Brownlee*, 744 F.3d 479, 482 (7th Cir. 2014) ("An expert who parrots an out-of-court statement is not giving expert testimony; he is a ventriloquist's dummy."); *see also Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 141 F. Supp. 3d 147, 149 (D. Mass. 2015) (same). Indeed, Ms. Mellendick herself is a percipient witness to many of the events at issue here. *See* Ex. 3, Mellendick Dep. 95:2-14 ("Q: You personally participated in several of the events that are described in here; is that right? … A: That is right."). Plaintiff is permitted to call Ms. Mellendick as a percipient witness at trial and ask her about events for which she has personal knowledge if it so chooses (or even to testify as to whether CoreCivic lived up to her own standards, as a matter of personal opinion). But as explained above, the vast majority of Ms. Mellendick's Quality Opinion is nothing more than a chronological summarization of documents. *See* Ex. 1, Mellendick Rpt. at 7-21 ("CCA's Performance"); Ex. 3, Mellendick Dep. 94:8-10 ("Q: Okay. So you reviewed documents and you summarized them here; is that right? A: Yes.").

This problem is compounded by the fact that Ms. Mellendick is not even summarizing the full universe of documents evaluating CoreCivic's performance, but only the subset of those documents that was chosen for her by Plaintiff's counsel. To the extent that Ms. Mellendick is

---

apples comparison" could not be done. *See id.* at 78:21-23. To the extent the statements at issue spoke of quality relative to the quality of services provided by the BOP, Ms. Mellendick's Quality Opinion is even more irrelevant. Ms. Mellendick is also wrong that such a comparison cannot be done. The Office of Inspector General's "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" contained a comparative analysis. Defendants' industry expert, D. Scott Dodrill, conducted a comparative analysis. It is not that a comparison *could not be done*, Ms. Mellendick just chose not to conduct one. *See Coffey v. Dowling Mfg., Inc.*, 89 F. App'x 927, 932 (6th Cir. 2003) (finding that expert analysis was properly excluded given his failure to conduct physical tests that another expert was "easily" able to conduct).

permitted to testify, she should not be allowed to merely regurgitate the evidence that Plaintiff wants to present to the jury under the guise of expert authority. *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) ("In detailing the factual basis for [plaintiff expert's] opinions, [the expert's] report presents a narrative of select regulatory events through the summary or selective quotation from internal Merck documents, regulatory filings, and the deposition testimony of Merck employees. The Court agrees with Merck that, to the extent such evidence is admissible, it should be presented to the jury directly. . . . She will not be permitted to merely read, selectively quote from, or 'regurgitate' the evidence.").

## B. Ms. Mellendick Is Unqualified To Offer Her Contract Opinion, Which Is Also Unreliable

Ms. Mellendick's Contract Opinion is that "[t]he CAR XV awards in late 2014, concretely determined the BOP would not grant CCA a new contract based on their poor past performance. However, in my opinion, the BOP would have been reluctant to award a new contract to them, for this same reason, as far back as April 2013." Ex. 1, Mellendick Rpt. at 23. And like her other opinions, she purports to base her Contract Opinion upon the documents she reviewed and her professional experience. Under Rule 702, an expert must be qualified by "knowledge, skill, experience, training, or education." *See* Fed. R. Evid. 702; *see also Burgett v. Troy-Bilt LLC*, 579 F. App'x 372, 376 (6th Cir. 2014) (same). Ms. Mellendick's qualifications must not be considered in "the abstract"; rather, this Court must consider "whether those qualifications provide a foundation for [Ms. Mellendick] to answer a specific question." *Burgett*, 579 F. App'x at 376 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). In *Berry*, the Sixth Circuit explained the important distinction between scientific and non-scientific expert testimony in evaluating an expert's qualifications:

> The distinction between scientific and non-scientific expert testimony is a critical one. By way of illustration, if one wanted to explain to a jury how a bumblebee is

able to fly, an aeronautical engineer might be a helpful witness. . . . Conceivably, even if he had never seen a bumblebee, he still would be qualified to testify, as long as he was familiar with its component parts. On the other hand, if one wanted to prove that bumblebees always take off into the wind, a beekeeper with no scientific training at all would be an acceptable expert witness if a proper foundation were laid for his conclusions. The foundation would not relate to his formal training, but to his firsthand observations. In other words, the beekeeper does not know any more about flight principles than the jurors, but he has seen a lot more bumblebees than they have.

*Berry*, 25 F.3d at 1350. Extrapolating from *Berry*, Ms. Mellendick is only qualified to provide a helpful non-scientific opinion if she has "firsthand observations" in the area in which she is opining (competitive contract awards). She does not.

Ms. Mellendick played no role in making contract decisions. *See* Ex. 3, Mellendick Dep. 49:6-9 ("Q: At any time during your career at the BOP did you have a role in selecting who won competitive procurements? A: I did not"). Indeed, during the Class Period, Ms. Mellendick was in the Privatization Management Branch ("PMB"), which was separate from Privatized Corrections Contracting ("PCC"), the BOP division tasked with making contracting decisions. *See* Ex. 1, Mellendick Rpt. at 1. Ms. Mellendick was never a member of the Source Selection Authority or the Technical Source Selection Evaluation Board, the two BOP committees tasked with evaluating contractor proposals. *See* Ex. 3, Mellendick Dep. 49:10-15. Ms. Mellendick therefore is not qualified to render an opinion on whether and when CoreCivic's performance reached a point as to render it unlikely to win a competitively bid contract from the BOP. She has seen no more "bumblebees" than the jury. *See Berry*, 25 F.3d at 1351; *see also In re Yamaha Motor Corp. Rhino ATV Prods. Liab. Litig.*, 816 F. Supp. 2d 442, 450 (W.D. Ky. 2011) (excluding testimony from an expert on off-road vehicle handling and operation that opined on warning labels, but allowing testimony on the occupant protection system).

Ms. Mellendick's opinion that the CAR XV awards in "late 2014" "concretely determined the BOP would not issue CoreCivic a new contract based on their poor past performance," and

that the BOP would have been "reluctant" to award CoreCivic a new contract by April 2013 for this "same reason," is also unreliable and unhelpful. As with Ms. Mellendick's Quality Opinion, the key terminology upon which her Contract Opinion rests is not commonly used in the corrections industry, but was made up by Ms. Mellendick, who then had trouble defining it. *See* Ex. 3, Mellendick Dep. 135:19-21 ("Q: Can you quantify reluctance? Does that mean it's more likely than not? A. No, I can't."); *id.* at 138:14-22 (when asked if reluctant means the same as unlikely, Mellendick states "I believe they have similar meanings, yes"); *id.* at 139:5-8 ("I don't know that you can quantify the term unlikely. Unlikely to me just is doubtful, unlikely. I don't know that you can quantify that."). At one point, Ms. Mellendick suggested that she used "reluctant" and not another word like "unlikely" merely because there was no "contract to be awarded" in April 2013, *id.* at 141:19-142:3, and struggled to even recall why she chose April 2013.[6] At her deposition, Ms. Mellendick also clarified that her opinion that it was "concretely determined" in late 2014 that CoreCivic would not receive a new contract from the BOP was based solely on the fact that CoreCivic lost the CAR XV bid in December 2014, and was not an opinion on the likelihood that CoreCivic would or would not win a new contract with the BOP at any point *subsequent to* December 2014:

---

[6] Ms. Mellendick eventually agreed with Defense counsel's suggestion that this date was "probably" based on the April 23-25 Contract Facility Monitoring at Cibola. *See* Ex. 3, Mellendick Dep. 130:10-24 ("Q: What is the threshold by which you determined the BOP would have been reluctant to award CCA a contract as far back as April 2013? A: Well, I looked at where the facilities were with the -- the varying performance documentation and how they were performing as far as the types and number and repetitive nature, serious nature of the deficiencies at -- at their facilities. And around that time frame is where, I believe, in my opinion, that had the BOP be looking -- been looking to award a -- a new contract, that the BOP could have been reluctant to award to CCA just based on performance to that time frame."); *id* at 131:14-132:4 ("Q: So was there any particular event in April 2013 at -- that is the catalyst for the BOP becoming reluctant to award CCA a new contract? A: That was probably the time frame of one of the CFMs that was -- that had some serious deficiencies. Q: Okay. So, for example, the Cibola annual CFM was conducted April 23rd to 25th? A: 2013? Q: 2013, correct. A: So that might have been around like -- among other things, that might have been -- yeah. Q: Okay. A: That was probably one of the main factors.").

Q:  Well, if that's the case, if I asked you how likely it was for the BOP to -- for the BOP to award CCA a new contract at any point during the period of December 2014 to August 2016, is it your testimony that you would have to look at the performance documentation at that particular point in time in order to be able to render an opinion on that?

A:  I would have to rereview my notes to offer an opinion on that.

Q:  Okay.  So your opinion might change based on the specific date and time that you were asked to opine on?

A:  It -- it -- it may.

*See id.* at 149:16-150:10 (objections omitted).  This is not surprising given her lack of professional experience in making contract determinations, which necessarily limits her to just parroting what she reviewed.  But no expert testimony is required to explain the simple fact that CoreCivic lost the CAR XV bid or to repeat the out-of-court statements made by the BOP (and never shared with CoreCivic) regarding why.  This, again, is unhelpful to the trier of fact.  *See Madej*, 951 F.3d at 370 (quoting Fed. R. Evid. 702(a)).

### C.  Ms. Mellendick's Cost Opinion Is Based On No Analysis And Improperly Instructs The Trier Of Fact On The Ultimate Issue

Ms. Mellendick's third opinion is wholly improper and must be excluded.  Ms. Mellendick opines that:

> Given the vast differences among the services CCA offered the BOP and the services the BOP provided in its own institutions, it is my opinion it is impossible to make an apples-to-apples cost comparison… Therefore, it would not be accurate to claim that contracting with CCA did and/or would save the BOP money.

Ex. 1, Mellendick Rpt. at 26.  Ms. Mellendick's opinion that it is "impossible" to make an apples-to-apples comparison is based on her mere say-so.  She did not attempt to make any such comparison, *see* Ex. 3, Mellendick Dep. 167:17-19 ("Q:  Did you attempt to make any cost comparisons yourself?  A: I did not."), nor did she even review the cost comparison conducted by CoreCivic,[7] so she has absolutely no basis to state whether it is impossible to do, or not.  This is

---

[7] CoreCivic's internally conducted cost analysis, *see* Ex. 4, CORECIVIC_1327566, is not listed in Exhibit 1, "Documents and Other Information Considered," to Ms. Mellendick's Report.

not entirely unsurprising, given that Ms. Mellendick does not have any expertise in government cost accounting.[8] But, Rule 702 and *Daubert* require Ms. Mellendick to base all of her opinions on reliable principles and methods, rather than faulty un-tested theories about what is possible. Her Cost Opinion must be set aside because she conducts no analysis whatsoever. *See Brainard*, 432 F.3d at 664 (it is "well within" a district court's discretion to exclude expert testimony where there is an "absence of meaningful analysis or reasoning").

Ms. Mellendick's Cost Opinion is also unhelpful to the trier of fact in resolving any relevant issue. Her Report does not mention or quantify a single cost of corrections services provided by anyone, let alone the BOP or CoreCivic. The word "cost" appears only three times before the final paragraph of Ms. Mellendick's report, and two of those three occasions are just summaries of her third opinion. Ex. 1, Mellendick Rpt. at 3, 20, 21. Her "opinion" ostensibly starts on page 25 (of 26) of her Report, but page 25 is devoted solely to a "[c]omparison of services CCA provided to the BOP versus services the BOP provided at its own facilities." The first half of that page lists various types of BOP facilities (*e.g.*, Metropolitan Detention Centers, Medical Centers, Administrative Max facilities) and then summaries in one paragraph the "vast array of programs" provided by the BOP across "all of these security levels and types of facilities." *Id.* at 25. Ms. Mellendick then observes that because CoreCivic's BOP facilities are low-security and house criminal aliens, CoreCivic was not contractually obligated to provide "much" or "complex" programming. *Id.* For one thing, CoreCivic in fact provides many of the programs summarized in the Report, which Ms. Mellendick ignored or did not bother to find out. But even setting that aside, Ms. Mellendick says nothing about what these extra programs cost to provide, standing

[8] Defendants' expert Justin Marlowe, an expert in government cost accounting, provided a comprehensive comparison of the costs of BOP and CoreCivic's services. *See Coffey*, 89 F. App'x at 932 (finding that expert analysis was properly excluded given his failure to conduct physical tests that another expert was "easily" able to conduct).

alone or relative to the entire host of corrections services that the BOP and CoreCivic provide. Ms. Mellendick just throws up her hands and says it is impossible to make an "apples-to-apples" cost comparison. But Ms. Mellendick is using apples and oranges to reach this conclusion. She is comparing programs provided by the BOP at *all* types of facilities to programs provided by CoreCivic to *one* type of facility (low-level security, criminal alien population) ("CAR"). The trier of fact will be asked to decide whether CoreCivic saved the government money—*i.e.*, whether the BOP could have provided the *same services* that CoreCivic was providing for less. *See* MTD Order at 31. The real question therefore is: if the BOP operated a CAR, would it cost more, less or the same than it would cost if CoreCivic operated a CAR? Ms. Mellendick does not provide any analysis (of services, much less costs) that would be useful to a jury in reaching an answer.

Finally, Ms. Mellendick's Cost Opinion must also be excluded because she improperly "tell[s] the jury what result to reach." *See Woods*, 110 F.3d at 1221 (when an expert tells the jury what result to reach it "runs the risk of interfering with a district court's jury instructions, [and] hardly can be viewed as being helpful to the jury"). Ms. Mellendick states that "it would not be accurate to claim that contracting with CCA did and/or would save the BOP money." Ex. 1, Mellendick Rpt. at 26. It is not up to an expert, however, to make this determination in place of the jury. An expert witness can only "stat[e] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue," but cannot opine on an ultimate issue. *Berry*, 25 F.3d at 1353. Here, one of the ultimate issues is whether "the BOP saved money by contracting with CCA." *See* MTD Order at 31. Ms. Mellendick boldly tells the jury how it should decide this ultimate issue, which is improper.

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court exclude the expert opinions of Donna Mellendick.

DATED: November 20, 2020

Respectfully submitted:

 /s/ Sarah A. Tomkowiak
Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Morgan E. Whitworth (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600
F: (415) 395-8095
morgan.whitworth@lw.com

Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

*Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System and via electronic mail:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

21

this 20th day of November, 2020.

/s/ *Sarah A. Tomkowiak*
Sarah A. Tomkowiak