# EXHIBIT 3

1                   UNITED STATES DISTRICT COURT

2                   MIDDLE DISTRICT OF TENNESSEE

3

4       NIKKI BOLLINGER GRAE, Individually
        and on Behalf of All Others
        Similarly Situated,

5

                      Plaintiff,              Civil Action No.

6

        vs.                                   3:16-cv-02267

7

        CORRECTIONS CORPORATION OF

8       AMERICA, ET AL.,

9                     Defendants.

10      _____

11

12          CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

13

14          VIDEOTAPED DEPOSITION OF DONNA MELLENDICK

15

16       Conducted virtually via remote videoconference

17                      October 27, 2020

18

19

20

21

22

23       Reported by:
         Misty Klapper, RMR, CRR
24       Job No.: 10073773

25

www.aptusCR.com

```
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF TENNESSEE

 3

       NIKKI BOLLINGER GRAE, Individually
 4     and on Behalf of All Others
       Similarly Situated,
 5
                  Plaintiff,              Civil Action No.
 6
       vs.                                3:16-cv-02267
 7
       CORRECTIONS CORPORATION OF
 8     AMERICA, ET AL.,

 9                Defendants.

10     _____

11

12

13

14

15

16

17        Videotaped deposition of DONNA MELLENDICK, taken on

18     behalf of Defendants, via Zoom remote videoconference,

19     beginning at 10:10 a.m. CST on Tuesday, October 27, 2020,

20     before Misty Klapper, RMR, CRR.

21

22

23

24

25
```

```
 1       APPEARANCES:

 2        (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)

 3       ON BEHALF OF PLAINTIFF:

 4               CHRISTOPHER HAMP LYONS, ESQUIRE
                 ROBBINS GELLER RUDMAN & DOWD LLP
 5               414 Union Street, Suite 900
                 Nashville, Tennessee 37219
 6               (615) 244-2203
                 E-mail:  clyons@rgrdlaw.com
 7
                            AND
 8
                 JASON A. FORGE, ESQUIRE
 9               ROBBINS GELLER RUDMAN & DOWD LLP
                 655 West Broadway, Suite 1900
10               San Diego, California 92101
                 (619) 231-1058
11               E-mail: jforge@rgrdlaw.com

12       ON BEHALF OF DEFENDANTS:

13
                 SARAH TOMKOWIAK, ESQUIRE
14               LATHAM & WATKINS, LLP
                 555 Eleventh Street, N.W., Suite 1000
15               Washington, D.C. 20004-1304
                 (202) 637-2335
16               E-mail: sarah.tomkowiak@lw.com

17                          AND

18
                 ERIC CHARLES PETTIS, ESQUIRE
19               LATHAM & WATKINS, LLP
                 355 South Grand Avenue, Suite 100
20               Los Angeles, California 90071
                 (213) 485-1234
21               E-mail: eric.pettis@lw.com

22

23       ALSO PRESENT:  DeSHAWN WHITE, VIDEO OPERATOR

24               D. SCOTT DODRILL

25
```

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 4 of 177 PageID #: 10321

www.aptusCR.com

```
 1                  C O N T E N T S

 2       WITNESS:              EXAMINATION BY:          PAGE:

 3       Donna Mellendick     Ms. Tomkowiak              6

 4

 5

 6

 7                  E X H I B I T S

 8       MELLENDICK EXHIBITS:

 9       NO.:         DESCRIPTION:                      PAGE:

10       Exhibit 585 Expert Report of Donna Mellendick

11                   of D1 Corrections Counseling, LLC

12                   dated 8-7-20                         8

13       Exhibit 586 Notice of Deposition of Donna

14                   Mellendick dated 10-16-20           26

15       Exhibit 587 Expert retention letter, Forge to

16                   Mellendick dated 3-10-20            31

17       Exhibit 588 LinkedIn profile page for Donna

18                   Mellendick                          40

19

20       Note:  Exhibits marked and attached to original.

21

22

23

24

25
```

www.aptusCR.com

1                P R O C E E D I N G S

2            VIDEO OPERATOR:  Okay.  The time on

3       the record is 10:10 a.m. Central Time.

4       Today's date is October 27, 2020.

5            My name is DeShawn White of Aptus

6       Court Reporting.  The court reporter today

7       is Misty Klapper of Aptus Court Reporting,

8       located at 600 West Broadway, Suite 300,

9       San Diego, California, 92101.

10           This begins the video-recorded

11      deposition of Donna Mellendick, testifying

12      in the matter of Nikki Bollinger Grae versus

13      Corrections Corporation of America, et al.,

14      pending in the United States District Court,

15      Middle District of Tennessee, case number

16      3:16-cv-02267, taken by Zoom video remote

17      conferencing, physical recording in

18      Culpeper, Virginia.

19           The video and audio recordings will

20      take place at all times during this

21      deposition unless all counsel agree to go

22      off the record.  The beginning and end of

23      each video recording will be announced.

24      Counsel appearances will be on a

25      stenographic record.

1               The court reporter may now swear in

2          or affirm the deponent.

3               MS. REPORTER:  One moment.

4

5    Whereupon:

6               DONNA MELLENDICK,

7    was called for examination, and, after being duly

8    sworn, was examined and testified as follows:

9               MS. REPORTER:  Thank you.

10               You may proceed.

11        EXAMINATION BY COUNSEL FOR DEFENDANTS

12               BY MS. TOMKOWIAK:

13        Q.    Good morning, Ms. Mellendick.

14        A.    Good morning.

15        Q.    We -- we spoke before we went on the

16    record, but I don't think I introduced myself.

17    So my name is Sarah Tomkowiak and I represent the

18    defendants in this matter.

19               Have you been deposed before?

20        A.    I have not.

21        Q.    Okay.  Well, this deposition is being

22    taken over Zoom, so it's even more important

23    than -- and when we're in person usually to try

24    not to talk over each other.

25               Your counsel might also object to my

1      questions.  And so if you could let him finish

2      his objection before you give your answer just so

3      we have a clear record, I would appreciate that.

4           A.     Okay.

5                MR. FORGE:  Sarah, I apologize for

6           interrupting, but did everybody state

7           their appearances on the record?

8                MS. TOMKOWIAK:  I'm sorry --

9                MS. REPORTER:  They're on the

10          stenographic record.

11               MS. TOMKOWIAK:  Right.

12               MR. FORGE:  Okay.  I've -- I've --

13          I've never done that before.  I think in

14          every deposition we've done so far

15          everybody has actually stated their

16          appearances.  But if you're okay with

17          that, that's fine.

18               MS. TOMKOWIAK:  I'm okay with that

19          as long as they're on the transcript.

20               BY MS. TOMKOWIAK:

21          Q.     Okay.  If I ask a question that you

22      don't understand, please let me know and I'll try

23      to clarify.  Okay?  And if you need a break for

24      any reason, just let me know and I'm -- I'm happy

25      to do that.  I'll try to take a break every hour,

www.aptusCR.com

1      90 minutes or so, both for us and for the court

2      reporter.

3                   Do you understand that you are under

4      oath today as if you were giving testimony in

5      court?

6           A.     Yes.

7           Q.     Is there anything that would impact

8      your ability to answer questions today?

9           A.     No, ma'am.

10          Q.     I might refer to CCA today as CCA or

11     CoreCivic.  Do you understand that I'm talking

12     about the same company?

13          A.     I do.

14          Q.     So we are sending the court reporter

15     your report to mark as Exhibit 585.

16                      (Thereupon, Mellendick Exhibit

17                   Number 585 was marked for

18                   identification.)

19               MS. TOMKOWIAK:  And that is tab 1.

20               THE WITNESS:  Okay.

21               BY MS. TOMKOWIAK:

22          Q.     I understand that you have a copy of

23     the report that you've submitted in this case in

24     front of you; is that correct?

25          A.     Right.  It is correct.

1          Q.      Okay.

2                  MS. TOMKOWIAK:  And for the

3          videographer, we do not need to display

4          this on the screen.  This is the one

5          document that we'll be referring to from

6          time to time today and -- and we can -- we

7          all have a copy of it.

8                  BY MS. TOMKOWIAK:

9          Q.      So the front page of your report says

10    Expert Report of Donna Mellendick of

11    D1 Corrections Consulting, LLC, August 7, 2020.

12              Do you see that?

13         A.      I do.

14         Q.      What is D1 Corrections Consulting,

15    LLC?

16         A.      It is an LLC that I established

17    earlier this year.

18         Q.      When did you establish it?

19         A.      In March of this year.

20         Q.      When did you first begin working as a

21    consultant?

22         A.      I believe I signed the agreement -- I

23    can pull it up.  I don't have the exact in front

24    of me, but I believe it was late March or early

25    April.

www.aptusCR.com

1          Q.     I see.  You're -- you're referring to

2     this matter; is that correct?

3          A.     Correct.  Yes.

4          Q.     Okay.  Well, let me ask the question

5     this way:

6               In between the time that you retired

7     from the BOP in August 2015 to March 2020 what

8     did you do in between that time period?

9          A.     In between that time period I have

10    done some consulting with various research

11    companies periodically.

12         Q.     Okay.  So you were doing consulting,

13    but it wasn't until March of this year that you

14    established your own D1 Corrections Consulting

15    Company?

16         A.     That's correct.

17         Q.     When, approximately, after you

18    retired did you begin doing consulting work?

19         A.     It was a little after a year, August

20    of -- late August of 2016, I believe.

21         Q.     Why did you start doing consulting at

22    that time?

23         A.     I was presented with some

24    opportunities from some different companies based

25    on my expertise and what I did with the Bureau of

www.aptusCR.com

1      Prisons.

2            Q.      Were any of those private companies?

3            A.      No, ma'am.

4            Q.      What types of companies generally

5      speaking?  You don't need to tell me the names of

6      them.

7            A.      It was research companies.  They were

8      just looking for information regarding some of

9      the work I did while I was employed with the

10     Bureau of Prisons just to get a feel for what was

11     involved with the -- like a better understanding

12     of -- of the particular discipline or the

13     industry, things of those natures, but I never

14     talked with any private corrections company.

15           Q.      Do you understand what those research

16     companies were doing with your work?

17           A.      Yes.

18           Q.      And what -- what were they doing with

19     your work?

20           A.      They were using it to gain

21     information to better help them determine how

22     they were going to invest.  That's my

23     understanding of it.

24           Q.      Do you have any employees?

25           A.      I do not.

www.aptusCR.com

1          Q.      What type of work product did you

2     produce for those research companies, generally

3     speaking?

4          A.      It was just over-the-phone

5     consulting.

6          Q.      All right.  So nothing in writing?

7          A.      No, ma'am.

8          Q.      Did any of those clients ever ask you

9     to opine on the quality of performance of their

10    contracts?

11         A.      No.

12         Q.      You can turn to page 26 of your

13    report.

14         A.      Okay.  Okay, I'm there.

15         Q.      Is that your signature?

16         A.      Yes.

17         Q.      Approximately when did you sign this

18    report?

19         A.      August 7th.

20         Q.      You signed it the -- the day it's

21    dated?

22         A.      Yes.

23         Q.      Since that time have the opinions

24    that you've expressed in this report changed at

25    all?

www.aptusCR.com

```
1                  A.      They have not.

2                  Q.      Do you have any additional opinions

3          that you intend to offer at trial, beyond those

4          that are stated in this report?

5                  A.      I do not.

6                  Q.      Are there any errors in this report

7          that you would like to correct?

8                  A.      Not that I'm aware of.

9                  Q.      Just -- just to be clear, does your

10         report contain all of the opinions that you

11         intend to offer at trial in this case?

12                 A.      I'm -- I am assuming it does.  Again,

13         I've -- this is my first deposition.  If we go to

14         trial, I -- if there's new information that is

15         presented, I don't know that that might affect an

16         opinion that -- you know, an additional opinion

17         that I may have.

18                 Q.      Okay.  Well, then, let me ask it this

19         way:

20                         Based on everything that's been made

21         available to you as of October 27th 2020, does

22         your report contain all of the opinions that you

23         intend to offer at trial in this case as of

24         today?

25                 A.      Yes.
```

www.aptusCR.com

```
 1                  Q.       If you can turn to Exhibit 1 of your
 2         report.
 3                  A.       Um-hmm.
 4                  Q.       This is a list of documents and other
 5         information considered.
 6                           Does this list every document that
 7         you -- every document or other piece of
 8         information that you considered in forming the
 9         opinions in your report?
10                  A.       It is all of the documents that were
11         numbered with the Bates numbers.
12                           MR. FORGE:  I'm just going to
13               interject an objection.  It's compound.
14                           Could you just -- I'm not getting the
15               realtime.  Could you repeat the question,
16               Sarah, please?
17                           MS. TOMKOWIAK:  Sure.
18                           BY MS. TOMKOWIAK:
19                  Q.       The title of the exhibit is Documents
20         and Other Information Considered.  And so my
21         question is, is this a list of all documents and
22         other information considered by you,
23         Ms. Mellendick, in forming the opinions in your
24         report?
25                           MR. FORGE:  Yeah, I'm going to
```

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 15 of 177 PageID #:
10332

1            object.  That's compound for documents and

2            information.  They're two different

3            things.

4                 MS. TOMKOWIAK:  Just the title of

5            the document.

6                 BY MS. TOMKOWIAK:

7       **Q.     But in any event, is this an**

8  **accurate -- a full and accurate list of**

9  **everything that you considered?**

10            A.     The documents that are listed in

11  Exhibit 1 and then, in addition, what I

12  referenced in my report, if I referenced any like

13  media articles that I looked at, just doing some

14  Google research.  But everything else is listed

15  in Exhibit 1.

16       **Q.     Okay.  So everything that's listed in**

17  **Exhibit 1 or otherwise referenced in your**

18  **report --**

19            A.     Yes, ma'am.

20       **Q.     -- is the world of documents that you**

21  **considered?**

22            A.     Yes, ma'am.

23       **Q.     And other information?**

24            A.     As listed in my report.

25       **Q.     Did you review every single document**

www.aptusCR.com

**Donna Mellendick**
Confidential Pursuant to Protective Order    Grae vs.
Corrections Corporation of America, et al.

1      listed in Exhibit 1 personally?

2              A.      Yes, I did.

3              Q.      Approximately how many hours would

4      you say you spent reviewing these documents?

5              A.      Just reviewing the documents or my

6      total time working on this report or --

7              Q.      Just reviewing the documents.

8              A.      Just reviewing the documents,

9      probably at least hundred plus.

10             Q.      Is there any information that you

11     requested but did not receive?

12             A.      Not that I can think of.

13             Q.      How did you get these materials?

14             A.      They were mailed to me by the law

15     firm of Robbins Geller Rudman & Dowd.

16             Q.      Who selected them?

17             A.      I believe -- well, what I received

18     from them and if there were any documents that I

19     thought were missing, I worked through Robbins

20     Geller, Dowd and Rudman (sic) to request them.

21     So everything came from the law firm.

22             Q.      With respect to the initial batch of

23     documents you received, do you have an

24     understanding of how the law firm selected those?

25             A.      I do not.

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 17 of 177 PageID #: 10334

1      Q.      You did not do any personal searching

2      through any document databases or -- or anything

3      like that?

4      A.      No, I did not.

5      Q.      Did you look at any deposition

6      transcripts?

7      A.      Yes, I have.

8      Q.      Are those listed in Exhibit 1?

9      A.      No, they're not.

10     Q.      Do you know why not?

11     A.      They weren't used to formulate my

12     report most likely why not.

13     Q.      Okay.  So are you saying you looked

14     at deposition transcripts, but you did not

15     consider them in forming your opinions?

16     A.      I did not.

17     Q.      What deposition transcripts did you

18     look at?

19     A.      I have reviewed the deposition of

20     Mr. Lappin, Mr. Hininger, Mr. Dalius, Mr. Martz,

21     Mr. Kelly, Mr. Bland.

22             I believe that's it.  And then I did

23     sit in on audio with Mr. Dodrill's deposition as

24     well.

25     Q.      But again, you didn't consider any of

www.aptusCR.com

1          that testimony in forming the opinions that are

2          set forth in your report?

3               A.     No, ma'am.

4               Q.     If you can look at page 3, footnote 1

5          of your report.

6               A.     Okay.

7               Q.     Footnote 1 says, Though I have

8          received and reviewed hundreds of documents, I do

9          not believe I have received all relevant

10         documents.

11              What do you mean by that?

12              A.     Well, as I go on to say in the next

13         sentence, For example, some documents refer to

14         events such as a follow-up review, but I had not

15         seen the actual report of the events.

16              Q.     Okay.  Is there anything else

17         specifically that you're referring to when you

18         say you do not believe that you have received all

19         relevant documents?

20              A.     No, there's not.

21              Q.     With respect to the documents that

22         refer to events such as follow-up reviews, did

23         you ask to see those follow-up reviews?

24              A.     I did work with the law firm to

25         acquire what they could get.  And some of them

www.aptusCR.com

```
 1        were -- although we may not have the actual
 2        follow-up review, the information from the
 3        follow-up review was summarized in other
 4        documents.
 5             Q.    So in some instances you actually did
 6        have access to the follow-up information in a
 7        different form; is that what you're saying?
 8             A.    Yes.
 9             Q.    Do you believe that your opinions are
10        incomplete in any way, absent reviewing the
11        information that you refer to in footnote 1?
12             A.    I do not.
13             Q.    Setting aside the time that you
14        worked at the BOP, in connection with preparing
15        this report, did you visit any of the facilities
16        that you reference in your report?
17             A.    I have not.
18             Q.    Did you interview anybody from CCA?
19             A.    I have not.
20             Q.    Did you interview anybody from the
21        BOP?
22             A.    I have not.
23             Q.    If you go to page 5 of your report,
24        please --
25             A.    Okay.
```

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 20 of 177 PageID #: 10337

www.aptusCR.com

1          Q.       -- in the paragraph right above the

2      title Background, it says, This report is based

3      on my training, experience and the information I

4      have reviewed to date.

5                  What training are you referring to?

6          A.       The training that I received

7      throughout my career with the Bureau of Prisons,

8      in particular probably the last 17 years of my

9      career, where I worked and was involved with the

10     bureau's privatization initiative.

11                 I don't have a list of training in

12     front of me to spout off to you, but -- I'm not

13     sure what else, so --

14         Q.       I -- I appreciate that.  And I --

15     just to clarify, then, is there any training

16     besides training that you received in your career

17     at the BOP that you're including here?

18         A.       No, nothing outside when I -- other

19     than when I was employed with the Bureau of

20     Prisons.  I did take various training classes

21     throughout my career in each role that I served.

22         Q.       What are you referring to by

23     experience?

24         A.       So experience.  Do you want me to

25     talk about my entire career with the Bureau of

www.aptusCR.com

1    Prisons or do you want me to focus on my

2    experience working with the bureau's

3    privatization initiative?

4         **Q.    I just want to know about the**

5    **experience that your report is based on, so**

6    **however broad or narrow that is.**

7         A.    Okay.  Well, I've got almost 31 years

8    in with the Bureau of Prisons before I retired in

9    August of 2015.  And my first involvement with

10   the bureau's privatization initiative dated back

11   to -- it was the late '90s when the Bureau of

12   Prisons' executive staff approved to formulate a

13   workgroup to examine how to better evaluate our

14   private prison providers -- the services that

15   they provide for us and how we were to monitor

16   them and -- excuse me -- oversee those

17   facilities.

18              Back at that time the Bureau of

19   Prisons had the supervision of those private

20   contract prisons that fell under the respective

21   regional office.  And the Bureau of Prisons

22   was -- the executive staff was realizing that

23   there was probably a better and more consistent

24   way to oversee these facilities and wanted to

25   bring the responsibility for it under our -- our

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 22 of 177 PageID #:
10339

1    headquarters, if you will, or our central office.

2    So I was part of that workgroup to formulate that

3    plan that was approved by the executive staff in

4    late of -- December of 2000.  And with that plan

5    it approved the -- as I elaborate in my report,

6    it approved the privatization initiative, but

7    encompassed like a three-prong approach.

8              It -- it started the privatization

9    management branch, which was in the correctional

10   programs division in central office.  And that

11   branch was responsible for the management and

12   oversight of all of the bureau's private prison

13   contracts.

14             It established the privatization --

15   privatized corrections contracting section in the

16   administration division.  And that section was

17   responsible for all the contractual obligations

18   and management of those contract prisons.

19             And then it also established a

20   contract facility monitoring section in the

21   program review division.

22             So you had three different divisions

23   now responsible for the oversight of these

24   private prison contracts.

25             And with that, I was a section chief

www.aptusCR.com

1    in the program review division and I was named as

2    the first CFM, or contract facility monitoring.

3    Section chief.  In that role I worked closely

4    with the other two divisions.  We staffed our

5    branches respectively.

6              In the program review division as the

7    CFM section chief we brought on subject matter

8    experts to be -- not only were they subject

9    matter experts in their field of expertise, for

10   example, whether it be health services or

11   education or food service, they also became

12   experts in these contracts that we held with

13   these providers.  So that team was solely devoted

14   to monitoring all of our private prisons.

15             So that was my first experience with

16   that.  I held that position for several years.

17   My duties and responsibilities increased into

18   other positions within the program review

19   division.  I became a deputy administrator in

20   that division and I held that position until

21   2010.

22             In that role I oversaw various

23   sections of program review branch, to include the

24   CFM section.  So I also -- I had other sections

25   under my responsibility, for example, the

www.aptusCR.com

1           correctional services program review section.

2           And I had, like, health services section.  And I

3           always maintained the contract facility

4           monitoring section under my supervision.

5                     And in 2010, August of 2010, I became

6           the privatization branch administrator in the

7           correctional programs division.  And in that role

8           I was then responsible for the oversight and

9           management of all of the Bureau of Prisons'

10          contract facilities.  And I held that position

11          for five years until I retired in August of 2015.

12          Q.      Any other experience that your report

13     is based on?

14          A.      Not that I could think of.

15          Q.      Are you aware that you had an

16     opportunity to provide a rebuttal report in this

17     case?

18          A.      I believe the attorney I'm working

19     with mentioned that was a possibility, but it was

20     not requested of me.

21          Q.      Okay.  So that was not your decision?

22          A.      Correct.

23          Q.      Did you read the report submitted by

24     Mr. Dodrill in this case?

25          A.      Which report?

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 25 of 177 PageID #:
10342

www.aptusCR.com

1          Q.     Did you read the opening report?

2          A.     His first expert report, yes, I did.

3     Um-hmm.

4          Q.     Did you read his second report?

5          A.     The rebuttal report?

6          Q.     Yes.

7          A.     Yes, I did.

8          Q.     How many times prior today -- how

9     many times prior to today have you provided

10    expert testimony under oath?

11         A.     I cannot recall a time.

12         Q.     Has any court ever qualified you as

13    an expert?

14         A.     No.

15         Q.     I believe you said that you were

16    retained in this matter around March 2020; is

17    that correct?

18         A.     Yes.

19         Q.     Who reached out to you?

20         A.     Mr. Forge.

21         Q.     And without getting into the -- the

22    specifics of those conversations, generally

23    speaking, what were you asked to do?

24         A.     I was asked to review a lot of

25    documents regarding the -- core -- CoreCivic or

www.aptusCR.com

```
 1        CCA's performance during the relevant period of
 2        2012 through 2016 and to form an opinion based on
 3        the review of those documents.
 4             Q.    Do you recall when you began to draft
 5        your report?
 6             A.    I believe it was in June of this
 7        year.
 8                   MS. TOMKOWIAK:  If we could put
 9             tab 20 in the chat box and mark that as
10             Exhibit 586.
11                        (Thereupon, Mellendick Exhibit
12                   Number 586 was marked for
13                   identification.)
14                   BY MS. TOMKOWIAK:
15             Q.    By the way, Ms. Mellendick, did you
16        form your LLC for purposes of this engagement?
17             A.    No, ma'am.
18             Q.    Okay.  That was something you decided
19        to do independent of this matter?
20             A.    Yes.
21             Q.    All right.  So we have Exhibit 586 on
22        the screen, which is the notice of your
23        deposition.
24                   Are you familiar with this document?
25             A.    Is it just the first page that's on
```

www.aptusCR.com

```
1        here?
2            Q.    No.  If -- if you could scroll
3        through and it -- and it is in the -- the chat
4        box, although I know that's difficult for -- for
5        you to download at the same time as you're
6        looking at it.  But we'll scroll -- scroll
7        through here so you can see the full document.
8                MR. FORGE:  Well, actually, she
9            should have control over the document,
10           Sarah, if you want to ask her about it.
11           It shouldn't be -- if you want to put a
12           document in front of her, you should let
13           her download it.
14               VIDEO OPERATOR:  Ms. Donna, would
15           you like control of --
16               THE WITNESS:  Yes.  Yes, I would,
17           please.
18               MS. TOMKOWIAK:  Yeah, that's fine.
19           I -- what I -- I -- I agree.  That's fine.
20               MR. FORGE:  No, what I mean is she
21           should have independent control over it.
22           It shouldn't be scrolling on everybody's
23           screen depending on what she's doing.  She
24           should be allowed to have the document in
25           front of her like any other document and
```

www.aptusCR.com

1        look at it on her screen, not necessarily

2        being broadcast to everybody.

3           MS. TOMKOWIAK:  That's fine too.

4        Some -- some witnesses have just said that

5        they don't prefer that or have a -- you

6        know, varying technical capabilities.

7           BY MS. TOMKOWIAK:

8        **Q.    But Ms. Mellendick, if -- if that's**

9     **what you would prefer, to download it separately**

10    **and look at it on your screen, that's totally**

11    **fine.**

12        A.    Okay.  Well, I have control of it

13    now.  As I'm moving it, is -- is that what it's

14    doing for everybody else too?

15        **Q.    Yes.**

16        A.    Okay.  Then, yeah, if we could send

17    that to me, that would be --

18        **Q.    Okay.  Great.**

19          **So it should be in the chat box.**

20        A.    Okay.  And then do I just X out of

21    this?

22           MS. TOMKOWIAK:  So I think that if

23        the videographer can take back control --

24           THE WITNESS:  Okay.

25           MS. TOMKOWIAK:  -- and just go --

```
 1              scroll up to the first page.
 2                    BY MS. TOMKOWIAK:
 3              Q.    And then, Ms. Mellendick, I think you
 4         just need to click on that link and it should pop
 5         up in a separate tab on your browser.
 6              A.    In the chat box?  Is that where I'm
 7         going?
 8              Q.    Um-hmm (affirmative).
 9              A.    Okay.
10                    VIDEO OPERATOR:  So should I take
11              down this exhibit?
12                    MS. TOMKOWIAK:  No, you can leave
13              it up.  I'm going to ask questions about
14              it, but --
15                    VIDEO OPERATOR:  Okay.  No problem.
16                    THE WITNESS:  Okay.
17                    Okay.  I have it in front of me.
18                    BY MS. TOMKOWIAK:
19              Q.    Okay.  And just as a reminder, my
20         question was are you familiar with this document.
21              A.    Yes, I am.
22              Q.    When was the first time you saw it?
23              A.    I believe that was last week.
24              Q.    Do you recall who sent it to you?
25              A.    Mr. Forge shared it with me.
```

1          Q.     Okay.  And if -- if you could please

2     scroll to page 9, which is Schedule A.  Well, I

3     guess it's not a schedule.  It's just page 9.

4                And Ms. Mellendick, do you understand

5     that this document is the notice of your

6     deposition in this case?

7          A.     Yes, I do.

8          Q.     And -- and on page 9, Documents to be

9     Produced, did you review this portion of the

10     document when you first received it from

11     Mr. Forge last week?

12          A.     Yes.

13          Q.     What did you do to search for

14     documents responsive to these requests?

15          A.     I discussed it with Mr. Forge and we

16     had determined that we had our -- you know,

17     listed everything in my report.

18          Q.     Did you provide Mr. Forge with any

19     documents?

20          A.     Any additional documents, no, I did

21     not.

22          Q.     Okay.

23                MS. TOMKOWIAK:  If you could take

24          that document down and put tab 22 in the

25          chat box.  And we'll mark that as

```
 1                    Exhibit 587.
 2                         (Thereupon, Mellendick Exhibit
 3                    Number 587 was marked for
 4                    identification.)
 5                    THE WITNESS:  Okay.  I'm looking to
 6               see how to get out of this right now.
 7                    BY MS. TOMKOWIAK:
 8          Q.    Okay.  You can either --
 9          A.    I clicked an X and that didn't work.
10          Q.    That usually works for me, to hit the
11     X, or if you can just open the next one that's in
12     the chat box, that might just replace it.
13          A.    Okay.
14          Q.    Okay.
15          A.    Is it the same -- looks like it's the
16     same document.
17                    VIDEO OPERATOR:  Yeah, there's a
18               second link after the first link.  My
19               apologies.  That should be tab 22.
20                    BY MS. TOMKOWIAK:
21          Q.    Ms. Mellendick, do you have that open
22     separately on your own screen as well?
23          A.    Not yet.
24                    Okay.  I believe I'm in it now.
25          Q.    Do you recognize Exhibit 587?
```

www.aptusCR.com

1          A.      Yes, I do.

2          Q.      Okay.  And -- and what is it?

3          A.      It's the agreement to work on this

4     case that I have with Robbins Geller

5     Rudman & Dowd.

6          Q.      All right.  Did you -- did you draft

7     this engagement letter or was it provided to you?

8          A.      It was provided to me.

9          Q.      If you look at number 1, Nature of

10    Engagement --

11         A.      Um-hmm (affirmative).

12         Q.      -- the second sentence says, It is

13    expressly understood and acknowledged that your

14    retention, brackets, and compensation, is not

15    contingent upon any specific opinions that you

16    may ultimately form or render in this case or on

17    the outcome of this case, and that you are being

18    retained as an independent expert who will render

19    independent opinions.

20              Do you know why the phrase and

21    compensation is in brackets?

22         A.      I do not.

23         Q.      Is it your understanding that your

24    compensation is not contingent upon any specific

25    opinions that you may offer in this case?

www.aptusCR.com

1          A.      I'm sorry, repeat that question.

2          Q.      Is it your understanding that your

3     compensation is not contingent upon any specific

4     opinions that you may ultimately render in this

5     case?

6          A.      Yes, that is my understanding.

7          Q.      In connection with this engagement

8     letter, it -- it indicates that you will provide

9     counsel with invoices.

10              Have you, in fact, provided counsel

11     with those invoices?

12          A.      Yes, I have.

13          Q.      And you do that on a monthly basis?

14          A.      Yes, I do, on a monthly basis.

15          Q.      I think you said you have no

16     employees, but are -- are you the only person who

17     has billed time to this matter?

18          A.      Yes.

19          Q.      And do you know why those invoices

20     were not provided to us in connection with our

21     request prior to your deposition?

22          A.      I do not.

23          Q.      You didn't make that decision one way

24     or the other?

25          A.      I did not.

www.aptusCR.com

1          Q.      If you look at section 9, which is on

2     page 4 --

3          A.      Um-hmm (affirmative).  Yes, ma'am.

4          Q.      -- it says, Your billing rate is

5     $600 an hour for all services, except for

6     nonworking travel time; is that correct?

7          A.      That is correct.

8          Q.      And that remains true today?

9          A.      It is.

10         Q.      And again, as set forth here, it says

11    the invoices shall detail time billed by name,

12    date worked, time worked and work description.

13              Is -- is that, in fact, the format

14    that your invoices follow?

15         A.      It is.

16         Q.      It also says in that same paragraph

17    that you commit to dedicating a minimum of

18    100 hours to this matter.

19              Have you done that already?

20         A.      I have.

21         Q.      Do you know approximately how much

22    time total you've spent on this matter?

23         A.      To date, probably about 250 hours.

24         Q.      And you estimated earlier that you

25    thought you had spent over 100 hours reviewing

www.aptusCR.com

1      documents; is that fair?

2           A.     I believe it's about that figure.

3      I'd have to go back through my invoices to

4      determine an exact number for you, but yes.

5           Q.     And so does that mean you've spent

6      approximately 150 hours preparing your report and

7      preparing for today's deposition?

8           A.     That's very possible.  Again, I don't

9      have the exact numbers in front of me.  I'd have

10     to pull out invoices to provide that to you.

11          Q.     Yeah, understood.  And -- and -- and

12     neither do we, but just -- I just wanted to

13     understand the rough breakdown of that

14     approximately 250 hours.

15          A.     Yes.  It was putting -- it was

16     reviewing all documents and using those documents

17     to form my opinion and writing my report.

18               MS. TOMKOWIAK:  You can take that

19          document down.

20               BY MS. TOMKOWIAK:

21          Q.     Did you personally write your report?

22          A.     I did.

23          Q.     Every word?

24          A.     Every word.

25          Q.     Did anybody else review or revise

www.aptusCR.com

1     your report?

2          A.    I mean, it was reviewed by the law

3     firm which I'm dealing with, but there were no

4     revisions that I did not make myself.

5          Q.    Okay.  Do you know who Scott

6     Dalrymple is?

7               MS. REPORTER:  Sorry?

8               BY MS. TOMKOWIAK:

9          Q.    Do you know who Scott Dalrymple -- I

10    might be butchering his name --

11    D-A-L-R-Y-M-P-L-E.

12         A.    I do not.

13         Q.    Okay.  So you don't understand that

14    Mr. Dalrymple is another expert that the

15    plaintiff's law firm has retained in this case?

16         A.    I'm not aware of that.

17         Q.    Okay.  Mr. Dalrymple submitted a

18    report in this case that refers to conversations

19    that he had with you.

20               Do you not recall those

21    conversations?

22         A.    Not by -- not with anyone by that

23    name.

24         Q.    Okay.  Did you have -- do you recall

25    any conversations that you had with any other

www.aptusCR.com

1          expert retained by the same law firm in this case

2          that retained you?

3               A.     I do not.

4               Q.     Other than counsel, have you spoken

5          with any other third party regarding the opinions

6          in your report?

7               A.     I have not.

8               Q.     Have you spoken with any third party

9          regarding the opinions in any other expert's

10         report?

11              A.     I'm sorry.  Repeat the question

12         again.

13              Q.     Yeah.

14                     Other than counsel, have you spoken

15         with any third party about any other experts'

16         opinions in this matter?

17              A.     I have not.

18              Q.     What did you do to prepare for

19         today's deposition?

20              A.     Re-refreshed myself with my report

21         and Mr. Dodrill's reports.

22              Q.     Did you meet with counsel?

23              A.     I did speak with Mr. Forge, yes.

24              Q.     How many times did you speak with

25         Mr. Forge?

www.aptusCR.com

1           A.      Once.

2           Q.      Was anybody else on the phone?

3           A.      No.

4           Q.      Was it just a phone call?

5           A.      Yes.

6           Q.      Do you recall approximately how long

7      it lasted?

8           A.      I think it was maybe a little over an

9      hour.

10          Q.      Other than your report and the two

11     reports submitted by Mr. Dodrill, did you review

12     any other documents in preparation for today's

13     deposition?

14          A.      Not that I can think of.

15          Q.      What is your understanding of the

16     plaintiff's claims in this matter?

17          A.      I understand that there are investors

18     that were upset with CCA for not disclosing their

19     performance during the time period specified in

20     this case, from February of 2012 through August

21     of 2016.

22          Q.      Is that understanding based on any

23     information besides information that you've

24     received from counsel?

25          A.      No, it's not.

**Page 38**
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 39 of 177 PageID #:
10356
www.aptusCR.com

1          Q.      Have you read the complaint in this

2     matter?

3          A.      It's been a while.  I believe I have,

4     but it's been a while.

5          Q.      Do you understand that plaintiff is

6     accusing CCA of committing fraud?

7          A.      I do.

8          Q.      Do you know which individuals are

9     being sued in this matter?

10         A.      As it's listed on the case

11    Corrections Corporation of America, and I believe

12    there is a couple of other names from the company

13    listed on there too.  I believe Harley Lappin.

14    I'm not sure.  Mr. Hininger may be listed on

15    there as well.

16         Q.      What is your understanding, if any,

17    of what issues the jury in this case will be

18    asked to decide at trial?

19         A.      I would expect they'd be asked to

20    determine if, in fact, CCA was not forthcoming

21    with their investors about their performance on

22    these BOP contracts.

23         Q.      Do you own any CCA stock?

24         A.      I do not.

25         Q.      All right.

Page 39
www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 40 of 177 PageID #:
10357

1             MS. TOMKOWIAK:  If we can put in

2        the chat box Tab 3.  And as -- as long as

3        everybody can access it, I don't think we

4        need to put it up on the screen.  Unless

5        there's any objections, we can, but I

6        think we can all just look at it

7        ourselves.

8             It's Exhibit 588.

9               (Thereupon, Mellendick Exhibit

10       Number 588 was marked for

11       identification.)

12       BY MS. TOMKOWIAK:

13      Q.    **Let me know when you have that pulled**

14  **up.**

15      A.    I have it pulled up.

16      Q.    **Exhibit 588 is a copy of your**

17  **LinkedIn profile.  And I don't know if you've had**

18  **a chance to scroll through here.**

19        **Does this generally look to be your**

20  **LinkedIn profile?**

21      A.    It does.

22      Q.    **Do you recall the last time you**

23  **updated this?**

24      A.    It's been a few years, I believe.

25      Q.    **To the best of your knowledge, is**

www.aptusCR.com

1          this an accurate list of the various positions

2          that you held within the Bureau of Prisons?

3               A.     It does.  Is there more information

4          under regional inmate systems specialist?

5                    No.  I see it now.  No.  Okay.

6                    Yes, this is an accurate description

7          of what I have in LinkedIn.

8               Q.     And am -- am I correct in

9          interpreting this to show that the last time that

10         you worked on the ground in a corrections

11         facility was 1998?

12                    MR. FORGE:  I'm going to object as

13              vague as what it means to work on the

14              ground in a corrections facility.

15                    THE WITNESS:  Yeah.  Could you

16              clarify that question?

17                    BY MS. TOMKOWIAK:

18              Q.     Well, you can work in a corrections

19         facility day to day, actually in the facility

20         most of the time, or you can be in an office

21         somewhere else.

22                    So is it fair to say that in 1998

23         that was the last time that your full-time job

24         was on the ground working in a corrections

25         facility?

www.aptusCR.com

```
 1              A.      Yes.
 2              Q.      Now, for the last five years of your
 3         career, it says here that you were the
 4         administrator of the privatization management
 5         branch; is that right?
 6              A.      Yes.
 7              Q.      Does this accurately summarize your
 8         responsibilities?
 9              A.      Yes.
10              Q.      And in fact, you were promoted to
11         that position by Mr. Dodrill; is that correct?
12              A.      That is correct.
13              Q.      And so at that time he was your
14         superior?
15              A.      He was the assistant director for the
16         division in which I worked.  He was not my direct
17         supervisor.
18              Q.      Okay.  But he occupied a position
19         above yours?
20              A.      Yes, he did.
21              Q.      And do you understand that your
22         promotion was approved by the director of the BOP
23         at the time?
24              A.      I do.
25              Q.      And that was Harley Lappin at the
```

www.aptusCR.com

1          time; is that right?

2              A.      At the time it was, yes.

3              Q.      And you understand, I believe you

4          testified earlier, that Mr. Lappin is named as an

5          individual defendant in this case?

6              A.      Yes.

7              Q.      So fair to say during your time at

8          the BOP you worked with both Mr. Dodrill and

9          Mr. Lappin?

10             A.      I worked for them.

11                     MR. FORGE:  Objection, vague.

12                     BY MS. TOMKOWIAK:

13             Q.      Who did you directly report to as

14         administrator?

15             A.      For most -- well, it depends on

16         the -- the time frame.  When I came into the

17         branch in 2010 it was Kathryn Tracy.  She was the

18         deputy assistant director for the correctional

19         programs division.

20             Q.      And who did Ms. Tracy report to?

21             A.      Ms. Tracy reported to Mr. Dodrill.

22             Q.      And who did Mr. Dodrill report to?

23             A.      He reported to the director,

24         Mr. Lappin.

25             Q.      At some point did your direct

www.aptusCR.com

1          supervisor change?

2                    A.     It did.

3                    Q.     So after Ms. Tracy, who became your

4          direct supervisor?

5                    A.     That would have been Angela Dunbar.

6                    Q.     And do you recall who Ms. Dunbar

7          reported to?

8                    A.     There was a different assistant

9          director at the time.  She reported to Frank

10         Strada, who was the assistant director for

11         correctional programs division.

12                   Q.     As administrator of the privatization

13         management branch, what was your salary?

14                   A.     When I retired, it was about 155,000

15         per year.

16                   Q.     So that was an annual salary?  It

17         wasn't based on -- on the hour?

18                   A.     It was an annual salary.

19                   Q.     So I want to focus these next

20         questions specifically on your -- specifically

21         during the period of time in which you were the

22         administrator of the privatization management

23         branch.  Or can I just say PMB?  Is that okay?

24                   A.     Yes.  Yeah, that's fine.

25                   Q.     Okay.  So during that five-year

1          period, that -- that's -- that's what I'm

2          interested in, in -- in asking the -- the next

3          set of questions.

4                    So in that role, how often did you

5          visit private -- privately operated facilities?

6          A.     Quite often.  If -- are you looking

7          for, like, so many per month or per year?

8          Q.     Depending on the frequency, was it

9          every month?

10          A.     I -- I think it is safe to say I went

11          out at least once a month.  Some months may have

12          been none.  Other months may have been two, three

13          times.

14          Q.     Okay.  And so how often would you say

15          you visited privately operated facilities then on

16          an annual basis?

17          A.     I'd say I got out there at least

18          10 to 12 times.

19          Q.     How often did you visit BOP-operated

20          facilities?

21          A.     During what period of time?

22          Q.     Same period of time.  During those

23          five years that you were administrator of the

24          PMB.

25          A.     I don't recall that I did in my role

www.aptusCR.com

1     as PMB administrator.

2          Q.     And in your role as PMB

3     administrator, did you have any role in auditing

4     privately operated facilities?

5          A.     As the PMB administrator I did not

6     have a direct role in auditing those facilities.

7          Q.     Did you have an indirect or

8     supervisory role?

9          A.     Yes.

10         Q.     In your role as PMB administrator,

11    did you have any direct or indirect role in

12    auditing BOP-operated facilities?

13         A.     Not in my role as PMB administrator.

14         Q.     And in any of your prior roles did

15    you have a role in auditing BOP-operated

16    facilities?

17         A.     I did.

18         Q.     Which role would that be?

19         A.     That would be in my role dating back

20    to when I was an assistant inmate systems manager

21    up until the time I went into my position as PMB

22    administrator.

23         Q.     Okay.  So are you saying from

24    March 1995 to August 2010?

25         A.     I'm saying from, like, '92, where I

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 47 of 177 PageID #:
10364
www.aptusCR.com

1    was an assistant inmate systems manager at

2    Manchester.

3         Q.     Through August 2010?

4         A.     Yes.

5         Q.     And what exactly was your role in

6    auditing BOP-operated facilities?

7         A.     Well, it would depend on what

8    position I was in.  Do you want me to touch on

9    each one?

10        Q.     Yes.

11        A.     Okay.  Well, when I was an assistant

12   department head, the assistant inmate systems

13   manager position and the inmate systems manager

14   position at Beckley, I was tacked, if you will,

15   by the program review division to be a member of

16   a program review team to evaluate the inmate

17   systems management department at another BOP

18   facility.

19             When program review would put

20   together a team to conduct an audit at one of its

21   BOP facilities, the program review division, that

22   particular section, had subject matter experts,

23   but they relied on a team that they would put

24   together using subject matter experts throughout

25   the Bureau of Prisons.

www.aptusCR.com

1          So I was tasked on numerous occasions

2     in both my roles as assistant inmate systems

3     manager and inmate systems manager to assist them

4     in auditing inmate systems management departments

5     at other BOP facilities.

6          In my role within the program review

7     division, my first -- my first position in that

8     role when I was -- when I started there in 1998,

9     I was the section chief for the inmate systems

10     management, program review branch section.

11          So in that role I was then a

12     supervisory examiner, if you will, for that

13     section and responsible for all of the inmate

14     systems management department program review

15     audits throughout the Bureau of Prisons.  So I

16     individually participated in some of those

17     reviews and, again, oversaw that section.

18          In my role as deputy administrator

19     while in the program review division, I would go

20     out with our various program review teams in --

21     in various disciplines and oversee the program

22     reviews that were being conducted.

23          Q.    With respect to BOP-operated

24     facilities?

25          A.    Yes.

www.aptusCR.com

```
1              Q.      And then when you became

2        administrator of the PMB, your roles shifted

3        solely to focusing on privately operated

4        facilities; is that right?

5              A.      That is correct.

6              Q.      At any time during your career at the

7        BOP did you have a role in selecting who won

8        competitive procurements?

9              A.      I did not.

10             Q.      Were you ever a member of the source

11       selection authority?

12             A.      I was not.

13             Q.      Were you ever a member of the

14       technical source selection evaluation board?

15             A.      I was not.

16             Q.      Focusing on your role as PMB

17       administrator, did you have any role in

18       negotiating contracts with private prison

19       operators?

20             A.      I'm not sure I understand the

21       question.  What do you mean by negotiating

22       contracts?

23             Q.      Sure.

24                     Did you have a role in negotiating

25       a -- the -- the terms of the contracts between
```

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 50 of 177 PageID #:
10367

1       the BOP and a private operator?

2              A.     I don't know if that's the correct

3       term.  We didn't negotiate with private

4       providers.  You know, we put out a solicitation

5       for a facility, you know, so many beds, but we

6       didn't negotiate.

7              Q.     Okay.  I understand, then, why you're

8       struggling with the question.

9                     So what -- what role, if any, did you

10      have with respect to the actual contract between

11      the BOP and a -- a private operator?

12             A.     Well, in my role as administrator for

13      the privatization management branch, we -- the --

14      the executive staff of the Bureau of Prisons

15      would advise us whether or not we wanted to seek

16      additional contract bids.

17                    So, for example, each year with our

18      budget request, were we looking based on

19      population demands of the Bureau of Prisons, were

20      we looking to increase our number of private

21      beds.  And if that -- that was the case, then my

22      branch was responsible for putting together a

23      solicitation in connection with the privatization

24      corrections contracting section in the admin

25      division, so putting together the solicitation,

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 51 of 177 PageID #:
10368

1     the statement of work and outlining that.

2                    The privatization corrections

3     contracting section -- is it okay to call them

4     PCC for the purposes of this deposition?

5            Q.     Yes.

6            A.     Okay.  So we would work with PCC.

7     PCC would be the ones that were responsible for

8     putting that out there on -- I believe it was

9     like FedBizOpps.  And then once the offerors came

10    back in, one of my assistant administrators was

11    responsible for her and her staff was responsible

12    for putting together the technical source

13    selection team of subject matter experts to

14    review all of the solicitations.

15           Q.     Did you have any role in drafting the

16    contracts themselves?

17           A.     If we made amendments to the

18    statement of work, if we felt the need for a

19    contract modification, yes, I was involved in

20    reviewing those.

21           Q.     Did you have any role in determining

22    whether the BOP exercised options on its existing

23    contracts with private operators?

24           A.     The PCC section and the admin

25    division was responsible -- ultimately

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 52 of 177 PageID #:
10369

1    responsible for that decision.  We did consult at

2    times when those option years were coming up.  So

3    we were consulted.

4         Q.    Okay.  So the -- the PMB and yourself

5    personally was consulted, but the PCC was

6    ultimately responsible for determining whether or

7    not to exercise an option?

8         A.    Yes.

9         Q.    What was your role in approving new

10   staff hires at privately operated facilities?

11        A.    What staff?  Are you talking about

12   contract staff or BOP staff?

13        Q.    Both, focusing first on contract

14   staff.

15        A.    Okay.  So in other words, if CCA

16   wanted to hire a correctional officer, what is my

17   role?  Is that basically the question?

18        Q.    Correct.

19        A.    I had -- my staff oversaw that.  I

20   was not involved unless the contractor was

21   seeking a waiver.

22        Q.    What about if it was a -- a more

23   senior position, like a -- a warden of a

24   facility?  Would you have become more personally

25   involved in that?

www.aptusCR.com

1          A.      Yes.

2          Q.      Is there a certain level at which

3      your approval was required?

4          A.      Actually, at that level it would go

5      through me and then I -- I would also run that

6      through my direct supervisor, the deputy

7      assistant director and possibly in turn up to the

8      assistant director for the division.

9          Q.      And by that level, do you mean at the

10     warden level?

11         A.      Yes.

12         Q.      What about assistant wardens?  Would

13     that be the same process?

14         A.      I don't recall.  I'm sorry, it's been

15     a while.

16         Q.      That's okay.  To the best of your

17     recollection, though, is -- is that something

18     that you would have at least approved, an

19     assistant warden position?

20         A.      I believe so, but again, my memory is

21     a little vague on that.

22         Q.      Is it your understanding, though,

23     that under the contracts that the BOP had with

24     private operators, the -- the BOP was required to

25     approve those types of hiring decisions; is that

www.aptusCR.com

1    right?

2         A.    Yes.

3         Q.    You retired from the BOP in August

4    2015, correct?

5         A.    Correct.

6         Q.    And after you retired, you did not

7    receive any reports from BOP staff regarding CCA

8    facilities; is that right?

9         A.    That's correct.

10        Q.    And after you retired, you didn't

11   tour any CCA facility?

12        A.    No.

13        Q.    After you retired, you didn't speak

14   to anybody working at the BOP or CCA about

15   deficiencies in CCA's facilities?

16        A.    No.

17        Q.    After you retired, you didn't speak

18   to anyone working at the BOP about the likelihood

19   that the BOP would award CCA new business?

20        A.    I'm sorry, can you repeat that,

21   please?

22        Q.    Sure.

23              After you retired, you didn't speak

24   to anybody working at the BOP about the

25   likelihood that the BOP would award CCA a new

1        contract; is that right?

2             A.     I never spoke with anyone at the BOP

3        about any contract issues once I retired.

4             Q.     Okay.  So to that end, you're not

5        aware of the extent to which the BOP might have

6        implemented different contractual terms or

7        oversight procedures involving privately operated

8        facilities after you retired?

9             A.     That's correct.

10            Q.     And for any of the events that are

11       cited in your report that took place after you

12       retired in August 2015, you don't have any

13       firsthand knowledge of those events, right?

14            A.     Not after I retired, no.

15            Q.     You didn't work at or do any

16       consulting for the BOP at any point between

17       August 2015 and August 2016?

18            A.     I did not.

19            Q.     Is it fair to say that your opinion

20       regarding the quality of CCA's performance during

21       the full relevant time period, which you define

22       as February 2012 to August 2016, that's based

23       upon what you learned and knew during your time

24       at the BOP; is that right?

25                   MR. FORGE:  Objection, vague.

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 56 of 177 PageID #:
10373

```
 1                      THE WITNESS:  Could you repeat the
 2           question, please?
 3                      BY MS. TOMKOWIAK:
 4           Q.     Sure.
 5                      You -- you -- your opinion regarding
 6      the quality of CCA's performance, that relates to
 7      a time period roughly February 2012 to August
 8      2016, right?
 9           A.     Yes.
10           Q.     And you testified earlier that your
11      opinion is based in part on your experience at
12      the BOP, correct?
13           A.     Yes.
14                      MR. FORGE:  I'm sorry, I -- did
15           you -- I don't have the realtime.  Did you
16           say based in part?
17                      MS. TOMKOWIAK:  Yes.
18                      MR. FORGE:  Okay.
19                      BY MS. TOMKOWIAK:
20           Q.     So sorry.  I need an answer from you
21      too.
22                      So what I said was and you testified
23      earlier that your opinion is based in part on
24      your experience at the BOP, correct?
25           A.     Correct.
```

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 57 of 177 PageID #:
10374

1          Q.      And that's referring to your

2      experience during the time you were at the BOP

3      30-plus years through August 2015, correct?

4          A.      You -- but you were talking about

5      what I put in my report?

6          Q.      Well, I'm talking about the

7      experience that you drew upon in forming your

8      opinions as they relate to the 2012-2016 time

9      period.  The experience that you're drawing upon

10     is your experience at -- during the time that you

11     were at the BOP; is that right?

12         A.      That is right.

13         Q.      Okay.  I just have a couple other

14     questions on this LinkedIn profile and then we

15     can put it away.

16              I see under Interests that you follow

17     the GEO Group and MTC and CoreCivic.

18              Why do you do that?

19              MR. FORGE:  I'm going to object as

20         vague as to time.

21              THE WITNESS:  It's been a while.

22         Probably just kind of -- just to see

23         what's -- what they're up to, I guess.

24              It was my -- was my career for quite

25         a while, so --

www.aptusCR.com

1                BY MS. TOMKOWIAK:

2         Q.     All right. And I see that you also

3    follow the ACA, the American Correctional

4    Association.

5              What's that?

6         A.     American Correctional Association?

7         Q.     Um-hmm (affirmative).

8         A.     It's -- how do I describe it?

9              Mr. Dodrill talks about it in his

10    report, but it's a organization that is comprised

11    of correctional professionals that go out and

12    audit correctional facilities and provide a

13    certification that they're meeting all the

14    standards that the ACA has developed.

15         Q.     Why do you or did you at one point

16    follow them?

17         A.     I -- throughout my career I've dealt

18    with ACA in my position in the program review

19    division, worked closely with ACA accreditations,

20    et cetera. And -- and I know some -- or did know

21    some folks that are, you know, associated with

22    them, so --

23         Q.     Okay. And all BOP-operated

24    facilities are required to maintain ACA

25    accreditation; is that right?

1          A.      That is correct.

2          Q.      And same thing is true for all

3     privately operated facilities?

4          A.      Correct.

5          Q.      Okay.  We are done with that exhibit,

6     so you can close that out if you want.

7                  During the time that you worked as

8     PMB administrator, the BOP was under contract

9     with CCA for the housing of federal inmates in

10    five correctional facilities; is that right?

11         A.      That is right.

12         Q.      And those are the facilities that you

13    discuss in your report.  They're Adams, Cibola,

14    Eden, McRae and Northeast Ohio?

15         A.      Yes.

16         Q.      In your role as PMB administrator,

17    you interacted with CCA and its employees, right?

18         A.      I did.

19         Q.      How frequently would you say those

20    interactions were?

21         A.      Mainly my staff were the ones that

22    interacted with CCA employees on a regular basis,

23    whether it be daily, weekly.  I would say my

24    interactions were probably maybe -- maybe

25    monthly.  I kind of think it depended on what was

www.aptusCR.com

1       going on at the time.

2           Q.     And what were the nature of those

3       interactions with CCA?

4           A.     My staff's or mine?

5           Q.     Yours.

6           A.     Typically it would be working

7       together to schedule partnering meetings and if

8       there were -- we had a -- let's step back a

9       minute.

10              So the Bureau of Prisons partnered

11      with our private providers.  We wanted to work

12      together.  We wanted our private partners to be

13      successful in providing these inmates with

14      confinement beds.  And the partnering process

15      involved staff at all levels in -- in my branch,

16      in the PCC section, in the CFM section to be able

17      to interact with one another.

18              So usually I didn't interact with

19      anyone at CCA unless it was something that

20      couldn't be resolved at a lower level or it was

21      just a higher level, whether we were looking to

22      try to organize our next partnering meeting, you

23      know, the logistics and -- and the agenda,

24      et cetera.

25          Q.     Okay.  And when it did rise to the

1      level of your involvement, who are the people at

2      CCA on your same level that you would interact

3      with?

4           A.     I'm trying to remember their titles.

5      They -- they were usually like a vice president

6      or senior vice president.

7           Q.     Do you recall anybody's name?

8           A.     Yes, Jeb Beasley and Ron Thompson,

9      Mike Nalley, I think Bart VerHulst.

10          Q.     What about Keith Hall?

11          A.     Yes, Keith Hall.

12          Q.     Bill Dalius?

13          A.     Bill Dalius was still employed with

14     the Bureau of Prisons when I was the PMB

15     administrator.  He was the assistant director for

16     the administration division.

17          Q.     I'm sorry, I didn't catch that.  The

18     what division?

19          A.     Bill Dalius was the assistant

20     director for the administration division of the

21     Bureau of Prisons.

22          Q.     Was that a -- how did that position

23     compare to yours?  Was that at the same level as

24     administrator?

25          A.     No, he would have been Mr. Dodrill's

www.aptusCR.com

1        counterpart.  So Mr. Dodrill was the assistant

2        director for correctional programs and he was the

3        assistant director for the administration

4        division.

5                Q.      What about Kim White?  Did you

6        interact with her at CCA?

7                A.      Not during her time at CCA, I did

8        not.

9                Q.      During her time at the BOP?

10               A.      Yes.

11               Q.      How so?

12               A.      We worked together for many years on

13       a initiative that the Bureau of Prisons had.  It

14       was called the Forward Thinking Initiative.  And

15       Ms. White was one of the chairpersons for that

16       initiative and I was the facilitator of that

17       initiative.

18               Q.      Okay.  What about Don Murray?  Did

19       you interact with him at CCA?

20               A.      I knew he was working for CCA.  I

21       don't think I directly interacted with him, no.

22               Q.      You mentioned Mr. Lappin earlier.

23       Did you have any interactions with him at CCA?

24               A.      Other than we did have -- every year

25       the Bureau of Prisons -- the director of the

1       Bureau of Prisons would meet with the heads of

2       the private prison companies.  And Mr. Lappin,

3       once he retired from the Bureau of Prisons and

4       went to work for CCA, sometimes he did attend

5       those meetings.  And in my role at PMB

6       administrator, I sat in on those meetings during

7       the ACA conferences.

8              Q.     Okay.  It sounds like --

9              A.     I'm sorry.

10             Q.     I'm sorry.  Did you finish your

11      answer?

12             A.     Yeah, I'm finished.

13             Q.     And other than those conferences, did

14      you have any interaction with him in his capacity

15      at CCA?

16             A.     No, I don't recall.  I don't recall I

17      did.

18             Q.     What about Mr. Hininger?  You

19      referenced earlier that you believed he was a

20      defendant in this case.

21                    Did you have any interactions with

22      him while he was at CCA?

23             A.     I'm sorry.  Who -- who again?

24             Q.     Sure.

25                    Damon Hininger, did you have -- while

www.aptusCR.com

1     you were at the BOP, did you interact with --

2     with him while he was at CCA?

3     A.     On occasion I did, yes.

4     Q.     How frequently would you say?

5     A.     It was not frequent.

6     Q.     What about Todd Mullenger? Do you

7     know who that is?

8     A.     I don't.

9     Q.     What about David Garfinkle? Do you

10     know him?

11     A.     I don't know that I've met him. I --

12     I know I've seen the name in CCA, but was not

13     somebody I'd interact with regularly.

14     Q.     And, again, you said that Mr. Lappin

15     also worked at the BOP while you were there?

16     A.     Yes.

17     Q.     How often did you -- did you interact

18     with him at the BOP?

19     A.     Not often. I'm not recalling a time

20     where I had like a one-on-one interaction with

21     him.

22     Q.     What was your opinion of Mr. Lappin

23     at the BOP?

24     A.     I highly respected him.

25     Q.     What was your opinion of Mr. Dodrill?

www.aptusCR.com

1          A.     The same.  I highly respected him.

2          Q.     Now, you said that your staff also

3     had interactions with CCA; is that right?

4          A.     Yes.

5          Q.     And what was -- if you -- to the

6     extent of your knowledge, what were the nature of

7     those interactions?

8          A.     Well, in my branch I had -- I had

9     staff in my branch that worked on-site at each of

10    the private contract facilities.  So I typically

11    had at least two staff in my branch.  And they

12    interacted with the provider.  Whether it be CCA

13    or another company, they interacted with those

14    staff daily.  So --

15         Q.     You're referring to the -- make sure

16    I get my acronyms right, but SSIM and SOM; is

17    that right?

18         A.     That is correct.

19         Q.     Okay.  And those were the -- the

20    on-site monitors that the BOP had in place at the

21    privately operated facilities?

22         A.     Yes.

23         Q.     Did the -- do you know, did the BOP

24    have any similar type of on-site monitoring at

25    its own facilities?

www.aptusCR.com

1          A.          The only instance I could recall that

2     is if -- I think the BOP had at least a couple

3     facilities in which they might have contracted

4     services.  So they may have had someone

5     responsible for monitoring the contract.

6          Q.          Okay.  But as a general matter,

7     the -- the BOP facilities did not have the same

8     type of 24/7 on-site monitors as the privately

9     operated facilities did?

10          A.          They did not.  And it -- and it

11     wasn't 24/7.  I mean, my staff worked a -- an

12     eight-hour day.  So it wasn't 24/7, yeah.

13          Q.          8/7?

14          A.          Yeah.

15          Q.          Got it.

16               And -- and we -- we talked a little

17     bit about the auditing process earlier.  And

18     privately operated facilities were audited on an

19     annual basis; is that right?

20          A.          Initially when we first started back

21     in early 2000s, it was -- CFM did a -- an audit

22     every six months.  And that eventually changed to

23     an annual audit.

24          Q.          And is it fair to say that with

25     respect to BOP-operated facilities, they're not

1        always audited on an annual basis, depending upon

2        the rankings that they receive?

3               A.      Are you referring to program reviews

4        that were conducted of a discipline in a BOP

5        facility?

6               Q.      Yes.

7               A.      Yes.  So they -- it would -- it was

8        cyclic.  It would depend on -- on their last

9        rating, whether the next program review would be

10       a year out, two years out or three years.

11              Q.      And turning -- turning back to CCA in

12       your role as PMB administrator, is it accurate to

13       say that you oversaw the issuances of notices of

14       concern, for example, to CCA?

15              A.      They were brought to my attention.

16              Q.      And what does that mean?

17              A.      I was -- I was, like, in the loop.

18       You know, my staff would inform me of what was

19       going on.  I didn't approve all of them, but I

20       was aware of them.

21              Q.      What about with respect to

22       deductions?  What was your role in determining

23       whether a deduction was warranted or not?

24              A.      My staff, again, just kept me

25       informed, depending on the circumstances.

www.aptusCR.com

1        Q.      Okay.  So you were aware of them, but

2    would not have been personally involved in

3    issuing them; is that right?

4        A.      That is right.

5        Q.      Okay.  Did you have any ability to

6    change the amount of the deduction or was that

7    not something that was in -- within your control

8    or responsibility?

9        A.      No, it was not within my

10   responsibility.  That fell under the

11   administration division.

12       Q.      Okay.  And -- and what about with

13   respect to award fees?  What was your role with

14   respect to award fees?

15       A.      I was the chairperson for the award

16   fee panel.

17       Q.      Okay.  So does that mean that you

18   were personally involved in determining whether

19   and to what extent CCA would receive award fees?

20       A.      I was -- yes.  I was -- we met

21   probably quarterly to look at the facilities that

22   were coming due for their annual award fee and we

23   would meet as a committee and review various

24   documents that reflected the facility's

25   performance and we came to a consensus as to what

www.aptusCR.com

1      our recommendation would be for -- if the

2      facility were to get an award fee and we would

3      recommend a percentage or a percentage range.

4              And that recommendation would go to

5      the award fee determination official.  FDO, I

6      believe, is the acronym for them.

7          Q.    Who was that person or persons during

8      your time as PMB administrator?

9          A.    There was two.  So there was Matthew

10     Nace when he was the procurement executive.  And

11     then after that, I think when they hired -- the

12     acquisitions branch chief position, if I recall,

13     was vacant for a while.  So when they filled that

14     position, then it was Catherine Scott.

15         Q.    What about with respect -- respect to

16     CPARS?  Do you know what I'm talking about when I

17     refer to CPARS?

18         A.    I do.

19         Q.    Okay.  What was your role with

20     respect to CPARS?

21         A.    I did not have a role.

22         Q.    Okay.  But the SSIM and the SOM did

23     have a role in -- in drafting the CPARS; is that

24     right?

25         A.    My understanding is that the

Page 69
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 70 of 177 PageID #:
10387
www.aptusCR.com

1    contracting officer drafted it in consulting with

2    the SSIM and the SOM on site.

3              Q.    What's that understanding based on?

4              A.    They would just, I think, make sure

5    that all of the relevant information, any

6    performance documentation, evaluations that --

7    they would make sure the contracting officer had

8    that information so that they could complete that

9    report.

10             Q.    Okay.  And the -- the contracting

11   officer is somebody employed by the BOP, correct?

12             A.    Correct.

13             Q.    Okay.  And then you didn't have any

14   personal role in reviewing CPARS?

15             A.    I did not.

16             Q.    Who would?

17             A.    I would believe the contracting

18   officer reported to the PCC section chief, and

19   that would have been Doug Martz.

20                   Can I ask if we're going to take a

21   break sometime soon?

22             Q.    We are.  I have about -- like three

23   to five more questions on this and then we'll

24   move on to something else.

25                   Is that okay to just close that out

Page 70
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 71 of 177 PageID #:
10388
www.aptusCR.com

```
 1          real quick?

 2               A.     Yep.

 3               Q.     Okay.  During the relevant period,

 4          how would -- and again, understanding that's

 5          February 2012 to approximately August 2016, how

 6          would you describe the BOP's relationship with

 7          CCA?

 8               A.     I'm not sure --

 9                      MR. FORGE:  Objection, vague.

10                      THE WITNESS:  Yeah.  I think it's

11          vague too.  I'm not sure I understand

12          the -- the question.

13                      BY MS. TOMKOWIAK:

14               Q.     Sure.

15                      Well, do you agree that the BOP had a

16          relationship with CCA as a -- a private

17          institution that it partnered with to operate

18          correctional facilities?

19               A.     Yes, I agree.

20               Q.     Okay.  And how would you, the person

21          who worked at the BOP and who personally

22          interacted with CCA at times and who staffed it

23          as well, how would you describe the nature of

24          that relationship during the relevant time

25          period?
```

www.aptusCR.com

```
 1                    MR. FORGE:  Same objections, vague.

 2                    THE WITNESS:  We had a professional

 3            working relationship.

 4                    BY MS. TOMKOWIAK:

 5            Q.     Would you say that the nature of that

 6       relationship stayed the same throughout those --

 7       the entire four-year period?

 8                    MR. FORGE:  Objection, vague as to

 9            nature of the relationship.  Do you mean

10            as -- as contractor and contractee?

11                    MS. TOMKOWIAK:  Jason, you guys

12            have been pretty adamant about objecting

13            to form, so I would appreciate the same

14            courtesy.  You can -- you know, I

15            understand your objection and that it's

16            vague.

17                    MR. FORGE:  So you're saying if I

18            object to form, you're allowing me to

19            preserve all preservable objections; is

20            that right?

21                    MS. TOMKOWIAK:  With the

22            understanding that that's mutual, yes.

23                    MR. FORGE:  Yeah.  I mean, you guys

24            haven't been doing it, but I'm -- I'm

25            happy to do it.
```

www.aptusCR.com

1              So if I object to form, that

2          preserves all objections that I could have

3          raised, right?

4                  MS. TOMKOWIAK:  I agree.  I agree.

5                  MR. FORGE:  Okay.  Then I object as

6          to form.

7                  MS. TOMKOWIAK:  Okay.

8                  BY MS. TOMKOWIAK:

9          Q.     Okay.  So my question was would you

10     say that the nature of the relationship stayed

11     the same throughout the entire four-year period?

12                 MR. FORGE:  Object to form.

13                 THE WITNESS:  It was always a

14         professional relationship.

15                 BY MS. TOMKOWIAK:

16         Q.     During your time as PMB

17     administrator, would you say that that

18     relationship improved over time?

19                 MR. FORGE:  Object to form.

20                 THE WITNESS:  I'm not sure how to

21         answer that.  Again, we had a professional

22         working relationship.

23                 BY MS. TOMKOWIAK:

24         Q.     Okay.  Well, would you say over the

25     four-year period that that relationship

Page 73

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 74 of 177 PageID #:
10391

1          deteriorated at any point in time?

2                    MR. FORGE:  Object to form.

3                    THE WITNESS:  I believe it was a

4          professional working relationship

5          throughout my tenure in my position.

6                    BY MS. TOMKOWIAK:

7          Q.     And the events that you describe at

8          length in your report -- you go through, you

9          know, a chronology of events with respect to each

10         of the five facilities -- is it your opinion

11         that -- that none of those events had any impact

12         on the nature of the BOP's relationship with CCA

13         at any point over that four-year period?

14                    MR. FORGE:  Object to form.

15                    THE WITNESS:  Again, I guess I'm

16         not understanding the question.  When I

17         think of relationship, we had a, you know,

18         contractor -- you know, professional

19         working relationship with CCA.

20                    BY MS. TOMKOWIAK:

21         Q.     What -- what about with respect to

22         the -- the BOP's, you know, view of CCA as a

23         contractor?  I mean, did that stay the same over

24         the -- the four-year period?

25                    If -- if relationship is the word

www.aptusCR.com

1          that you're struggling with, what about the BOP's

2          perspective or their view of CCA as a contractor?

3          Did that stay the same?

4                    MR. FORGE:  Object to form.

5                    THE WITNESS:  I could say how we

6               thought of their performance over time

7               changed.

8                    BY MS. TOMKOWIAK:

9          Q.    How did -- how did the -- what the

10         BOP thought of CCA's performance change over

11         time?

12         A.    Frustration, disappointment in not

13         correcting the repetitive deficiencies.

14         Q.    So would you say that that

15         frustration and disappointment occurred over some

16         period of time in that four-year period?

17         A.    I -- during the period in which they

18         were having serious and repetitive deficiencies

19         identified at their facilities and not

20         maintaining minimum staff requirements, once we

21         got into that and it was just continuous, then,

22         again, just continued disappointment, frustration

23         with CCA not being able to correct these issues.

24         Q.    Okay.  And that -- and that

25         disappointment and frustration, would you say

www.aptusCR.com

1        that increased every time the BOP perceived that

2        CCA could not correct these issues?

3             A.    I don't know that you could say it

4        increased.

5             Q.    Okay.  You can't -- can't say one way

6        or the other?

7             A.    It continued.

8             Q.    Did it decrease?

9             A.    I'm thinking of where they were as I

10       retired.  I'm not sure.  I don't recall.

11            Q.    Okay.  Well, we can -- we can talk

12       about that more later.  Just three more questions

13       and then let's take a break.

14                  Are you aware that the defendants in

15       this case have produced over 420,000 documents

16       from CoreCivic's files?

17            A.    No, I was not aware of the total

18       number.

19            Q.    Okay.  Are you aware that the BOP has

20       produced nearly 190,000 documents from its files?

21            A.    I was not aware of the total number,

22       no.

23            Q.    Would it surprise you to learn that

24       your name appears on over 12,000 of those

25       documents?

www.aptusCR.com

1          A.     No, it would not.

2                 MS. TOMKOWIAK:  All right.  Let's

3          go ahead and go off the record.

4                 MR. FORGE:  That's fine.

5                 Can I -- Misty, can I ask, is there

6          realtime today?

7                 VIDEO OPERATOR:  It is 11:46 a.m.

8          and we are now off the record.

9                 (Thereupon, a brief recess was

10                  taken.)

11                VIDEO OPERATOR:  Okay.  The time is

12         12:06 p.m. and we are now on the record.

13                BY MS. TOMKOWIAK:

14         **Q.    Ms. Mellendick, can you turn back to**

15         **your report?**

16         A.     Um-hmm (affirmative).

17         **Q.    Okay.  And if you look at page 3,**

18         **paragraph one at the very top of that page.**

19         A.     Okay.

20         **Q.    Is that a fair summary of what you**

21         **were asked to opine on in this case?**

22         A.     It is.

23         **Q.    Is it fair to say that you are not**

24         **offering any opinions on CCA's performance of its**

25         **contracts with the U.S. Marshals?**

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 78 of 177 PageID #:
10395

1          A.      Correct.

2          Q.      Is it fair to say that you're not

3    offering any opinions on CCA's performance of its

4    contracts with ICE?

5          A.      Correct.

6          Q.      Fair to say that you're not offering

7    any opinions on CCA's performance of its

8    contracts with any other business partner besides

9    the BOP?

10          A.      My opinions are only based on the

11    contracts that are listed in this report: Adams,

12    Cibola, Eden, McRae and Northeast Ohio during the

13    relevant time frame.

14          Q.      Did you make any effort to compare

15    the quality of the services provided by CoreCivic

16    relative to the quality of services provided by

17    the BOP?

18          A.      I did not.

19          Q.      You don't intend to offer any opinion

20    on that at trial, correct?

21          A.      I believe I stated in my report that

22    it is not an apples-to-apples comparison.

23    They're very different.

24          Q.      To that end, you did not conduct any

25    analysis of the number or nature of deficiencies

1     documented at any BOP-operated facility during

2     the relevant time period?

3          A.    I did not, because it would not have

4     been a true comparison.

5               (Remote transmission interference)

6               MS. REPORTER:  Sorry?  I'm sorry.

7               THE WITNESS:  I didn't hear it

8     either.

9               BY MS. TOMKOWIAK:

10         Q.    That's not something you looked at,

11    right?

12         A.    What -- what was -- I'm sorry.  You

13    cut out and I didn't hear you, so --

14         Q.    I said but -- but just to be clear,

15    that's not something that you looked at?

16         A.    I'm not sure -- what was it --

17         Q.    I think you answered it before and

18    I -- I just wanted to be clear.

19               You said you did not conduct any

20    analysis of the number or nature of deficiencies

21    documented at any BOP-operated facility during

22    the relevant time period, right?

23         A.    Correct.

24               MR. FORGE:  Hold on.

25

www.aptusCR.com

```
 1                    BY MS. TOMKOWIAK:

 2          Q.      Did you consider any publicly

 3      available sources regarding the BOP's efforts to

 4      staff its own facilities?

 5          A.      I did not.

 6          Q.      Okay.  Didn't consider the United

 7      States Government Accountability Office report

 8      from September 2012?

 9          A.      I did not.

10          Q.      Didn't consider the OIG's 2016 report

11      titled Review of the Federal Bureau of Prisons'

12      Medical Staffing Challenges?

13          A.      I did not.

14          Q.      Didn't review any congressional

15      testimony by the former director of the BOP,

16      Charles Samuels, in 2015?

17          A.      I did not.

18          Q.      You're familiar with the OIG's audit

19      of the Federal Bureau of Prisons' Monitoring of

20      Contract Prisons that was published in August

21      2016, right?

22          A.      I am.

23          Q.      And -- and you cited that in your

24      report as one of the documents that you

25      considered?
```

www.aptusCR.com

```
1              A.    I did.
2              Q.    Did you do any analysis of that data
3       to compare CCA's performance to that of the
4       BOP's?
5              A.    I'm not sure what you mean.
6              Q.    Did you utilize any of the
7       comparative data in the OIG's 2016 report in
8       forming your opinions?
9              A.    I believe I may have cited in -- you
10      know, in support of my opinion I may have quoted
11      a line or two.  I'd have to go back through
12      and -- and review for sure.
13             Q.    Okay.  Is it fair to say, though,
14      that you were focused on the data in that report
15      as it related to CCA's performance?
16                   MR. FORGE:  Object as to form.
17                   THE WITNESS:  Yeah.  Can you ask
18          that -- the question again?  I'm not sure
19          I understood it.
20                   BY MS. TOMKOWIAK:
21             Q.    Sure.
22                   You said that you -- you might have
23      quoted a line or two in your report; is that
24      right?
25                   A.    Right.
```

www.aptusCR.com

1        Q.     And -- and do you recall if that

2    related to the OIG's analysis of CCA's

3    performance at its facilities as opposed to the

4    BOP's?

5        A.     Yes, it would have been regarding

6    CCA's performance if I did cite anything in my

7    report.

8        Q.     Okay.  If you can turn to page 5.

9             If you look at the first paragraph on

10    page 5 after the line that's numbered 29, so the

11    paragraph starting, Based on my review and

12    analysis of the evidence in this case, it is my

13    opinion, that paragraph.

14             Do you see that?

15        A.     I do.

16        Q.     All right.  Is this a fair summary of

17    the opinions that you intend to offer in this

18    case?

19        A.     It is.

20        Q.     Is it a complete summary of the

21    opinions that you intend to offer in this case

22    based on what you know now?

23             MR. FORGE:  Object as to form.

24             THE WITNESS:  Yeah, I'm not sure --

25             I mean, this is a -- a summary of my

www.aptusCR.com

1          opinion and, you know, I have a lot of --

2          numerous pages after that that support my

3          opinion.

4                    BY MS. TOMKOWIAK:

5          Q.     Okay.  Understood.

6                    So this is -- in your -- this is a

7          fair summary of the opinions that you intend to

8          offer at trial and they are supported by the rest

9          of the information in your report; is that right?

10         A.     Yes.

11         Q.     All right.  I want to talk a little

12         bit about some of the statements in the

13         background section of your report.

14         A.     Okay.

15         Q.     So in the first instance where you're

16         discussing performance-based contracts, you talk

17         about the award fee incentives that were

18         available to private operators.

19                    Do you see that?

20         A.     Yes.

21         Q.     And it says in the second paragraph

22         under Background, first sentence, To motivate

23         exceptional performance, the majority of the

24         contracts during this period offered an award fee

25         incentive allowing for an award fee of up to

www.aptusCR.com

1    5 percent of the paid annual invoice for contract

2    performance exceeding a satisfactory level.

3              Do you see that?

4         A.    I do.

5         Q.    What did you mean by exceptional?

6         A.    It -- what I meant by was that award

7    fee clause in those contracts was there to be a

8    motivator.  The bureau wanted more than

9    satisfactory performance from any of its

10   providers.

11        Q.    What's your basis for saying that,

12   that the bureau wanted more than satisfactory

13   performance?

14        A.    That's why the award fee clause was

15   put in those contracts.  We had that available to

16   us and that's what its intent is.

17        Q.    Okay.  And in order to receive an

18   award fee, as you say here, a contractor's

19   performance had to exceed a satisfactory level;

20   is that right?

21        A.    Yes.

22        Q.    And -- and what do you mean by

23   satisfactory?

24        A.    There were definitions with the award

25   fees that would constitute what was acceptable,

www.aptusCR.com

1    what was not acceptable, what was exceeds, what

2    was superior.

3         Q.    Would you agree with me that

4    satisfactory performance meant meeting the

5    contractual requirements?

6         A.    Yes, I would agree with that.

7         Q.    So an award fee was available for

8    performance that exceeded those contractual

9    requirements?

10        A.    Yes.

11        Q.    So then is it fair to say that a

12   contractor could be performing at a satisfactory

13   level and not receive an award fee?

14        A.    Yes.

15        Q.    You suggest here in this paragraph

16   that the McRae contract did not have this award

17   fee incentive; is that right?

18        A.    It didn't have it on its most recent

19   contract that began in late 2012.  It had it, the

20   award fee incentive, in the previous contract

21   that ended in -- I believe it was November of

22   2012.

23        Q.    Okay.  And are you aware that McRae,

24   in fact, received an award fee in March 2013 for

25   its performance in that period ending

www.aptusCR.com

1      November 30, 2012?

2           A.     Yes.

3           Q.     Did you consider that document in

4      forming the opinions in your report?

5           A.     I'd have to go back and look.  If you

6      want me to, I can.

7           Q.     Well, I've -- I've looked and I

8      didn't see it listed in Exhibit 1 of your report.

9      But I guess rather than try to waste your time

10     trying to figure out if it's in there or not,

11     if -- if it's -- if I'm right and it's not in

12     there, does that mean you did not consider it?

13          A.     Say that again.

14          Q.     If it's -- if -- if the McRae award

15     fee is -- is not listed in Exhibit 1 of your

16     report, does that mean that you did not consider

17     it or do you believe that that's a -- just a

18     mistake and it should be listed there?

19               MR. FORGE:  Objection as to form.

20               THE WITNESS:  I'm not sure.  I'd

21          have to go back and -- and search.

22               BY MS. TOMKOWIAK:

23          Q.     Okay.  So you don't know whether or

24     not you considered that document in forming the

25     opinions in your report?

www.aptusCR.com

```
 1              A.      Not off the top of my head without
 2         checking my notes, no.
 3              Q.      If you go to paragraph -- the first
 4         paragraph of page 7.
 5              A.      Okay.
 6              Q.      And paragraph number 8 there is
 7         talking about Contractor Performance Assessment
 8         Reporting System or CPARS.  That's what we -- we
 9         spoke about those briefly earlier.
10                      Do you recall that?
11              A.      I do.
12              Q.      All right.  And it says it's the
13         Federal Government-wide system used to capture
14         contractor report cards.
15                      What do you mean by that?
16              A.      That's what I understand it to be.
17         Any agency, any federal government agency that
18         has contracts, they use that system to rate the
19         contractor for a period of time on those areas
20         that I specify in that -- in that paragraph.
21              Q.      Okay.  Well, would you agree with me
22         that the CPARS is the official source of a
23         contractor's past performance?
24              A.      I will say it is one source for the
25         Bureau of Prisons in which they documented
```

Page 87
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 88 of 177 PageID #: 10405
www.aptusCR.com

1      performance of a contractor's performance for a

2      given time frame.

3          Q.    If -- if -- if the -- the FAR

4      describes it as the official source, you would

5      disagree with that?

6              MS. REPORTER:  I'm sorry?

7              MR. FORGE:  You're cutting out a

8          little bit when you turn away from the

9          mic.

10             MS. TOMKOWIAK:  I'm sorry.  I was

11         just looking at notes.  I apologize.

12             BY MS. TOMKOWIAK:

13         Q.    So if the -- if the federal

14     regulations describe that as the official source

15     for past performance information, you would

16     disagree with that?

17         A.    I --

18             MR. FORGE:  Object as to form.

19             THE WITNESS:  I'm not an expert on

20         the FAR, but if it says that, I'm not one

21         to disagree with it.

22             BY MS. TOMKOWIAK:

23         Q.    Okay.  And are you familiar with the

24     various categories within each CPAR in which a

25     contractor is rated?

www.aptusCR.com

1          A.     Like I have listed in my report,

2     quality of service, business relations,

3     et cetera?

4          Q.     Correct.

5          A.     Yes, I'm familiar with those

6     categories.

7          Q.     And -- and you reviewed CPARS for CCA

8     throughout the relevant time period in connection

9     with this matter; is that right?

10          A.     I did.

11          Q.     Okay.  In how many categories for all

12     of the CPARS that you reviewed did CoreCivic

13     receive a below satisfactory rating?

14          A.     I'd have to go back and check my

15     notes, but I would believe marginal would

16     constitute below satisfactory.  So I'd have to --

17     I'd have to go back through and count them.

18          Q.     And so you'd -- you'd have to go back

19     through your notes to know how many times CCA

20     received a rating of marginal in any of those

21     categories?

22          A.     Yes.

23          Q.     And if I told you that was 10 out of

24     119 times that they were rated in those

25     categories, you just don't know one way or the

1          other if that's correct?

2               A.     I don't.

3               Q.     In every CPAR there's a section

4          labeled Recommendation; is that right?

5               A.     I believe so, yes.

6               Q.     Okay.  And in that section the -- the

7          contracting officer, who I believe you testified

8          earlier was responsible for drafting the CPAR, is

9          required to say given whether -- given what the

10         contracting officer knows today about the

11         contractor's ability to perform the contract,

12         that they would or would not recommend the

13         contractor for similar requirements in the

14         future.

15                     Are you aware of that language?

16              A.     Yes.  I believe there's like a check

17         box.  They have a choice of one or two of those

18         statements.

19              Q.     Did you review that section of the

20         CPAR in -- in forming the opinions in your

21         report?

22              A.     Yes.

23              Q.     I didn't see that section mentioned.

24         Was that intentional?  Did you intentionally

25         exclude that from your report?

1          A.      I didn't feel it was necessary for my

2     report.

3          Q.      Why not?

4          A.      Because I didn't.  That is a -- a

5     check box that the contracting officer has to

6     check.  So whether a contracting officer says

7     they would or would not -- I believe typically if

8     a contractor would -- would choose would not

9     recommend them, then that would mean that the

10    government would be looking toward terminating

11    that contract.

12         Q.      So are you aware that in all of the

13    CPARS throughout the relevant time period no

14    contracting officer checked the box that they

15    would not recommend CCA for a similar contract?

16         A.      I am aware.

17         Q.      You are aware, okay.

18                 But you just did not think that that

19    was, I think in your words, necessary to include

20    in your report?

21         A.      I did not.

22         Q.      If you look at the third paragraph on

23    page 7, it says, As this report will outline, CCA

24    often failed to provide satisfactory performance

25    at three of their five contracts, Adams, Cibola

www.aptusCR.com

1          and Eden, with the BOP, particularly in the areas

2          of health services and correctional services.

3                        What does often mean?

4               A.     It means more often than they did

5          provide satisfactory performance during that time

6          frame.

7               Q.     Okay.  So often means more than

8          50 percent?

9               A.     Possibly.

10              Q.     Okay.  Well, I'm just trying to

11         understand because you said that you wrote every

12         word of your report.  And so in choosing the word

13         often, what -- what did you mean to convey there?

14              A.     There was a lot of performance issues

15         that were not at a satisfactory level.

16              Q.     But you can't quantify that, other

17         than to say it means more often than they did

18         provide satisfactory performance during that time

19         frame?

20              A.     Yes.

21              Q.     And with respect to satisfactory

22         performance, we -- we talked earlier that

23         satisfactory means performing the contractual

24         requirements.

25              A.     Yes.

www.aptusCR.com

1          Q.      Okay.  So -- so you're saying here

2      that CCA often failed to perform at a level

3      consistent with the contractual requirements?

4          A.      Yes.

5          Q.      Okay.  Now, starting at Section V,

6      you have a chronology of performance and events

7      with respect to each of the five facilities that

8      CCA contracted with the BOP for in this time

9      frame; is that right?

10          A.      Yes.

11          Q.      What methodology did you use to

12      develop these chronologies?

13          A.      I reviewed all the relevant documents

14      involving the performance of these contract

15      facilities during the relevant time frame.

16          Q.      Did you do anything besides review

17      documents?

18          A.      Not that I'm aware of.

19          Q.      What part of your training that you

20      described earlier did you apply to develop the

21      chronology?

22          A.      Well, as I mentioned, I spent

23      12 years in the bureau's program review division,

24      which was our own internal auditing division for

25      the agency.  So I have over 12 years of

**Page 93**
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 94 of 177 PageID #:
10411
www.aptusCR.com

1          experience with auditing in a correctional

2          environment.

3              Q.      And how did you use that auditing

4          experience to develop these chronologies?

5              A.      Basic review of all of the documents

6          and putting all the information together and it

7          painted the picture.

8              Q.      Okay.  So you reviewed documents and

9          you summarized them here; is that right?

10             A.      Yes.

11             Q.      What is the relevancy of this

12         chronology to your opinions?

13             A.      I'm not sure I understand the

14         question.

15             Q.      I'm trying to understand how this --

16         this chronology fits into your opinions.

17                     Is this support for your opinions?

18         Is this just background that's helpful to a

19         reader to know before they get to your opinions?

20         How does this chronology fit into your opinions?

21             A.      Well, I think both of what you just

22         said.  I think it helps show each facility's

23         issues with performance.  And then later on in my

24         report I summarize them as a whole as far as

25         CCA's performance as a company amongst all of

```
 1           their facilities.
 2               Q.       You personally participated in
 3      several of the events that are described in here;
 4      is that right?
 5               A.       Such as?
 6               Q.       Such as the CFMs that I believe you
 7      said that you would have been kept in the loop on
 8      or there's a discussion of the disturbance at
 9      Adams.   There's a discussion of award fees.   So
10      those are just a few examples of some of the
11      events that you would have had some personal
12      firsthand knowledge of during your time at the
13      BOP; is that right?
14               A.       That is right.
15               Q.       Okay.   And, again, that's not an
16      exhaustive list, but there -- there are others in
17      here as well, right?
18                       Is that right?
19      A.       Yes, I believe so.
20               Q.       Do you plan to testify at trial that
21      these events happened?
22                       MR. FORGE:   Object as to form.
23                       THE WITNESS:   I assume so, if
24          it's -- if I'm questioned about it.
25
```

www.aptusCR.com

1          BY MS. TOMKOWIAK:

2              Q.    Okay.  And is that true with respect

3          to only the events that you would have had some

4          firsthand involvement with or is that true with

5          respect to all of the events that are summarized

6          in the documents that you reviewed?

7                      MR. FORGE:  Object as to form.

8                      THE WITNESS:  I'm not sure I can

9              answer that question.  I think it would

10             depend on what I'm asked of.

11                     BY MS. TOMKOWIAK:

12             Q.    Okay.  So if it's -- if it's -- if

13         you are asked about a specific event to which you

14         have firsthand contemporaneous knowledge, then

15         you believe that -- that you could testify that

16         that event actually happened at trial?

17             A.    Yes, I --

18                     MR. FORGE:  Object as to form.

19                     BY MS. TOMKOWIAK:

20             Q.    I'm sorry, what was your answer?

21             A.    Yes, I believe so.

22             Q.    Okay.  If we look at the -- the first

23         chronology with respect to the Adams facility, if

24         you look at the first paragraph, you say in the

25         very last sentence about halfway through that It

1          is important to note less-than-acceptable

2          performances at this facility.

3                    What did you mean by less than

4          acceptable?

5          A.    Just what it means, less than

6          acceptable.  It was not acceptable to the Bureau

7          of Prisons.

8          Q.    Well, does acceptable -- is

9          acceptable the same as satisfactory?

10         A.    In my mind, it is.

11         Q.    Okay.  Yeah, and that's all I'm

12         asking for.

13                   So you would use acceptable and

14         satisfactory interchangeably?

15         A.    Yes.

16         Q.    Okay.  If you turn to bottom of page

17         9, the top of page 10 --

18         A.    Okay.

19         Q.    -- you're referring here to award

20         fees for Adams and you say that From the

21         beginning of this contract in 2009 through

22         March 2017, no award fees were awarded for five

23         of those eight years.

24                   And then In the other three years,

25         CCA only achieved a slightly above satisfactory

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 98 of 177 PageID #:
10415

1   award fee rating and minimal award fee amounts.

2              Do you know which three years you're

3   referring to there?

4         A.    I can glance at my notes and tell

5   you.

6         Q.    Okay.

7         A.    They received award fees for the

8   rating period April of 2011 through March of

9   2012; April of 2013 to March of 2014; and April

10  of 2015 to March of 2016.

11        Q.    And when you -- when you're looking

12  at your notes, I'm sorry, what are you referring

13  to?  What notes do you have?

14        A.    The documents and just a chronology

15  of everything kind of compiled.

16        Q.    Okay.  So -- so that's something

17  separate than your report?

18        A.    Yes.

19        Q.    Did you review the award fee letters

20  for those three years?

21        A.    Yes.

22        Q.    Okay.  Do you know why they're not

23  listed on Exhibit 1 of your report?

24        A.    No, I do not.

25        Q.    And I see in paragraph 10 where

Page 98
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 99 of 177 PageID #:
10416
www.aptusCR.com

1      you're talking about BOP award fee determination

2      letters and then you refer to Bates numbers cited

3      in this paragraph.  I don't see any Bates numbers

4      cited in that paragraph.

5                   So is that just a -- a typo or did

6      you mean to cite something there?

7      A.      That -- that is -- we were putting

8      Bates numbers in there just so -- as I was

9      checking my -- like fact-checking my report and

10      later went in to take them out because it was

11      very convoluted being in paragraph format.  So

12      that was something that was overlooked in coming

13      out of the final report.

14      Q.      Okay.  And you said we were putting

15      Bates numbers in there.

16                   Who are you referring to?

17      A.      I was referring to myself.

18      Q.      Okay.

19      A.      Me.  I was.

20      Q.      And then the very last sentence on

21      page 10 -- the very last two sentences say that

22      The Adams County Correctional Center contract

23      expired on July 31, 2019.  The contract completed

24      its full 10-year lifespan.

25                   Do you see that?

www.aptusCR.com

```
 1              A.      I do.
 2              Q.      The BOP never terminated its contract
 3         with CCA for the Adams facility?
 4              A.      It did not.
 5              Q.      Do you agree with me that it could
 6         have?
 7                      MR. FORGE:  Object as to form.
 8                      THE WITNESS:  I believe there were
 9              periods of time throughout the life of
10              that contract that the bureau could have
11              considered termination.
12                      BY MS. TOMKOWIAK:
13              Q.      Well, BOP can terminate a contract
14         with a private operator at any time, right, for
15         any reason?
16                      MR. FORGE:  Object as to form.
17                      THE WITNESS:  Correct.
18                      BY MS. TOMKOWIAK:
19              Q.      You discuss in here a disturbance
20         that took place at the Adams facility in 2012.
21         That took place during the time that you were the
22         PMB administrator; is that right?
23              A.      That is correct.
24              Q.      Did you think that CCA's contract
25         should be terminated after that disturbance?
```

www.aptusCR.com

1      A.      Not necessarily as a result of just

2          that disturbance.

3          Q.      Okay.  Well, did you think that CCA's

4      contract should be terminated as a result of that

5      disturbance plus other factors?

6          A.      There were times when I recall

7          discussing with my counterparts our feelings

8          about moving forward with this particular

9          contract.

10          Q.      What times specifically, do you

11      recall?

12          A.      I believe it was when we were looking

13          at exercising their option year, which I think

14          was 2013.

15          Q.      Okay.  So you recall discussing that,

16      but a decision was made not to terminate the

17      contract, right?

18          A.      The decision was made to exercise the

19          option year.

20          Q.      If you look at the next page -- and

21          this is under your heading Performance Synopsis

22          of the Adams County Correctional Center Contract.

23          A.      I see that.

24          Q.      Okay.  And so you say in the second

25          paragraph, CCA's performance on the Adams County

www.aptusCR.com

1        Correctional Center contract for the time frame

2        of this case achieved only overall satisfactory

3        or below satisfactory levels, contrary to the

4        BOP's expectations.

5                  Do you see that?

6        A.      I do.

7        Q.      So is it your opinion that the -- the

8        BOP expected its contractors to perform at a

9        higher-than-satisfactory level?

10        A.      Yes.

11        Q.      Is that stated in the contract?

12        A.      That's why the award fee provision

13        was put in the contracts, to motivate the

14        contractors to give us more than just acceptable

15        performance.

16        Q.      To motivate, but the -- the -- the

17        requirements of the contract mandated

18        satisfactory performance as we discussed, right?

19        A.      Correct.

20        Q.      Was this expectation of higher than

21        satisfactory performance communicated to CCA in

22        some way other than the award fee incentives that

23        were in the contract?

24        A.      Yes.

25                  MR. FORGE:  Object as to form.

www.aptusCR.com

 1                    BY MS. TOMKOWIAK:

 2          **Q.    What was your answer?**

 3          A.    Yes.

 4          **Q.    How so?**

 5          A.    Like I talked about, we had routine

 6     partnering meetings with our providers.

 7          **Q.    And what was said during those**

 8     **meetings to communicate that the BOP expected**

 9     **higher than satisfactory performance?**

10          A.    What we communicated was our

11     dissatisfaction of continued performance

12     failures, particularly when it came to health

13     services and minimum staffing levels and them

14     continually not to meet those requirements.

15          **Q.    Okay.  So you communicated -- you**

16     **communicated your disappointment that CCA had not**

17     **achieved satisfactory performance; is that right?**

18          A.    We communicated our disappointment

19     that they continued to have serious and

20     repetitive deficiencies that they were not

21     correcting.  They were not maintaining minimum

22     staffing requirements.

23          **Q.    And all of those issues were issues**

24     **that meant their performance had fallen below**

25     **satisfactory in your opinion?**

Case 3:16-cv-02267    Document 336-5   www.aptusCR.com Filed 11/20/20   Page 104 of 177 PageID #:
10421

1       A.      Yes.  When issues are repetitive in

2       nature and they are not correcting them, one of

3       the vital functions that holds 10 percent of the

4       contract value is the contractor's quality

5       control plan.  They are supposed to have a

6       quality control plan in place to prevent the

7       serious and repetitive issues from becoming

8       problematic.

9       **Q.      Okay.  Understood, but I -- I wanted**

10      **to focus, then, on was anything said at those**

11      **partnering meetings to communicate the BOP's**

12      **expectation that they -- that CCA needed to**

13      **perform at a higher than satisfactory level?**

14      A.      We communicated the fact that we

15      expected them to correct the deficiencies.

16      That's what we communicated.

17      **Q.      Okay.  You said that you reviewed**

18      **the -- the rebuttal report submitted by**

19      **Mr. Dodrill in this case.**

20      A.      Yes, I did.

21      **Q.      Okay.  And in that report, which we**

22      **can absolutely look at if -- if you want to, I**

23      **was just going to quote a very small portion of**

24      **it where Mr. Dodrill says that while he was at**

25      **the BOP, the BOP director stressed that he**

1          expected nothing more than satisfactory

2          performance from BOP facilities.

3                    Do you disagree with that statement?

4          A.     Which director is he referring to?

5          Q.     **The BOP director in place during his**

6     **tenure at the BOP, regardless of who was in that**

7     **position.**

8               MR. FORGE:  Objection.

9               THE WITNESS:  That would have been

10          Harley Lappin, who is now -- now on the

11          board of directors for CCA?

12               BY MS. TOMKOWIAK:

13          Q.     **Yes.  At one point, yes.**

14          A.     That is not something that I ever

15     heard Mr. Lappin say -- say directly.  The

16     program review process, you know, involved

17     several different ratings and acceptable was like

18     the medium level of rating and I know that all

19     BOP wardens strive to have their departments do

20     better than acceptable.

21          Q.     **Okay.  With respect to the BOP**

22     **wardens; is that right?**

23          A.     Oh, I'm sorry.  Was that a question?

24          Q.     **I just wanted to see if I understood**

25     **it.**

www.aptusCR.com

1          A.      Yes, with respect to the BOP.

2          Q.      Okay.  Why wouldn't the BOP just

3      change its contracts to include higher standards

4      if that was the case?

5                  MR. FORGE:  Object as to form.

6                  THE WITNESS:  I'm not sure I

7          understand your question.

8                  BY MS. TOMKOWIAK:

9          Q.      Well, as I understand your opinion,

10      the BOP expected higher than satisfactory

11      performance from its contractors.  And if that's

12      the case, why wouldn't they just change the

13      contract to include higher standards?

14                  MR. FORGE:  Object as to form.

15                  THE WITNESS:  I'm still not -- I'm

16          still not sure I totally understand what

17          you're asking of me and how to respond to

18          that.

19                  BY MS. TOMKOWIAK:

20          Q.      What don't you understand?

21          A.      Say it -- repeat the question again.

22          Q.      Sure.

23                  As I understand your opinion, the BOP

24      expected higher than satisfactory performance

25      from its contractors.  And if that's the case,

1    why wouldn't they just change the contract to

2    include higher standards?

3                    MR. FORGE:  Object as to form.

4                    THE WITNESS:  I don't know that

5            there is a way to change the standards in

6            the contract.  I'm not -- well, yeah, I'm

7            having -- having a hard time

8            understanding.

9                    BY MS. TOMKOWIAK:

10        Q.    So you're -- I didn't mean to

11    interrupt, but are you saying you're having a

12    hard time with my question because you don't know

13    if that's possible?

14        A.    I don't know that I -- I can answer

15    it.  I don't -- I don't understand it.

16        Q.    And is that because you don't have an

17    understanding of how the contracts could be

18    modified or amended?

19                    MR. FORGE:  Object as to form.

20                    THE WITNESS:  Contracts have basic

21            requirements outlined, become ACA

22            accredited, follow this bureau policy, do

23            this, do that.

24                    Nowhere in the contract does it

25            really tell you in all of those areas what's

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 108 of 177 PageID #: 10425
www.aptusCR.com

1          acceptable and what's not acceptable.  I

2          guess that's what I'm trying to convey.

3                   BY MS. TOMKOWIAK:

4          **Q.     Okay.  I understand.**

5                   **So you're saying that somewhere else**

6     **defines what it means to be satisfactory or**

7     **acceptable and what it means to exceed or -- or**

8     **fall below those standards, satisfactory and**

9     **acceptable?**

10         A.     I -- I believe so --

11                 MR. FORGE:  Object as to form.

12                 THE WITNESS:  -- yeah.

13                 The -- the contractor needs to abide

14         by what's outlined in the contract and then

15         they're -- they're evaluated.  And part of

16         that evaluation -- yeah, probably one of the

17         major ones was the CFM process where you had

18         experts to come in and evaluate are they

19         meeting what they say they're going to do in

20         their contract and their policies.

21                 And their findings will help to

22         convey how well they're doing in those

23         areas.  And then that contributes to whether

24         or not they're performing satisfactory,

25         above satisfactory, below satisfactory.

www.aptusCR.com

1        BY MS. TOMKOWIAK:

2            Q.      Okay.  And if the -- the BOP set the

3        definitions for what it -- what it meant to be

4        satisfactory or below satisfactory or above

5        satisfactory, right?

6            A.      In what format?

7            Q.      In -- in any format, in any audit

8        where the BOP was conducting an audit or rating

9        CCA and determining how to rate their

10       performance, that was based on definitions that

11       the --

12           A.      No.

13           Q.      -- BOP came up with.

14                   It wasn't -- CCA didn't define what

15       it meant to be satisfactory, the BOP did, right?

16                   MR. FORGE:  Object as to form.

17                   THE WITNESS:  No, there were no

18           ratings assigned other than -- CFM team

19           did not assign a rating.  My -- the

20           on-site staff that worked at each facility

21           never provided a rating based on what they

22           saw on a daily basis.

23                   BY MS. TOMKOWIAK:

24           Q.      Okay.  Well, then, when you're

25       talking in your opinions about CCA's performance

www.aptusCR.com

1    achieving only a satisfactory level or below

2    satisfactory and sometimes contrary to the BOP's

3    expectations, what expectations are you referring

4    to?

5         A.    I was referring to where ratings were

6    assigned, whether it be the award fee and

7    probably CPARS.

8         Q.    Okay.  Other than those two types of

9    documents, anything else?

10        A.    Not that I recall that assigned a

11   rating.

12        Q.    Okay.  If you look at the last

13   sentence of that second paragraph, the very last

14   clause says that more than 1.5 million in

15   deductions were imposed at -- at Adams for

16   inadequately performed services.

17             Do you see that?

18        A.    I do.

19        Q.    Did you do any analysis to determine

20   or understand what those deductions represented

21   in terms of the overall value of the contract?

22        A.    I did not.

23        Q.    And you don't intend to offer any

24   opinions on that at trial, right?

25        A.    I do not.

1       Q.     Does the BOP impose any financial

2    deductions against its own facilities?

3       A.     Against its own Bureau of Prisons

4    facilities?

5       Q.     Um-hmm (affirmative).

6       A.     Not that I'm aware of.

7       Q.     Did you compare the deductions

8    received by CCA during the relevant time period

9    to the deductions received by any other private

10   prison operator during that same time frame?

11      A.     I did not.

12      Q.     Okay.  We want to look at the Cibola

13   chronology next.

14            At the bottom of page 11, the very

15   last paragraph, you discuss an inmate

16   demonstration that Cibola experienced in

17   March 2013.

18            Do you see that?

19      A.     I do.

20      Q.     And the last sentence starting on

21   page 11 says, I recall it was a BOP oversight

22   staff member, the SSIM, who was responsible for

23   bringing this demonstration to a peaceful end.

24            And then the -- the sentence goes

25   on -- and I'm happy to read the rest of it, but

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 112 of 177 PageID #:
10429

www.aptusCR.com

1      my -- my question is, is that based on anything

2      but your recollection?

3          A.    It's based on my recollection.

4          Q.    Okay.  So there's no report from this

5      incident that you reviewed?

6          A.    No, as I went on to further share in

7      that paragraph that CCA was very unwilling to

8      share any information about that disturbance.

9          Q.    Okay.  So -- and, again, that -- that

10     also is based on your recollection of this event

11     from March 2013; is that right?

12         A.    It is.

13         Q.    So then is it fair to say that where

14     indicated in this chronology, certain of the

15     events are based on your review of documents, but

16     others are based on your recollection?

17         A.    Well, as I said, in my experience, so

18     that falls under my experience.

19         Q.    Okay.  Your recollection is part of

20     your experience?

21         A.    Yes.

22         Q.    Was there any instances in which your

23     recollection was inconsistent with the document

24     that you reviewed?

25         A.    Not that I recall.

www.aptusCR.com

1          Q.      And if presented with a -- a document

2      like that at trial, do you intend to testify

3      based on your recollection or what's in the

4      document?

5                  MR. FORGE:  Objection as to form.

6                  THE WITNESS:  I would have to take

7          the document into consideration obviously.

8                  BY MS. TOMKOWIAK:

9          Q.      Do you recall whether this

10     particular -- particular SSIM spoke Spanish?

11         A.      Yes, he did.

12         Q.      And then you say that the BOP was

13     extremely frustrated with CCA.

14                 Who at the BOP was extremely

15     frustrated?

16         A.      The administration within PMB and

17     PCC.  Both branches were frustrated.

18         Q.      Okay.  Does that include yourself?

19         A.      It does.

20         Q.      Okay.  You go on in this chronology

21     to -- to talk about the fact that in July 2016

22     the BOP decided not to exercise the second option

23     period of its contract with CCA for Cibola; is

24     that right?

25         A.      Yes.  What page are you on?  Let me

**www.aptusCR.com**

1        catch up to you.

2              Q.     It is at the top of --

3              A.     I see.  Page 15?

4              Q.     Yeah.  And that was after you had

5        retired from the BOP, correct?

6              A.     Correct.

7              Q.     So in this case, you don't have any

8        firsthand knowledge of the reasons why the BOP

9        decided not to continue with that contract?

10             A.     No, other than what is stated in

11       their written document.

12             Q.     Okay.  So other than what you read in

13       the document you cite here, which is the contract

14       determination not to exercise option, performance

15       period two?

16             A.     Yes.

17             Q.     On the last paragraph of that

18       performance synopsis of the Cibola County

19       Correctional Center contract --

20             A.     Okay.

21             Q.     -- you say, As a result of CCA's

22       inability to perform in the area of health

23       services, the BOP determined it was not in the

24       government's best interest to continue this

25       contract.

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 115 of 177 PageID #:
10432
www.aptusCR.com

1               Is it your opinion that CCA's

2          inability to perform in the area of health

3          services was the only reason the BOP determined

4          not to continue that contract?

5               A.    It was, I believe -- it was one of

6          the reasons.  They also cited market value.  So

7          they cited price.  But I believe that was, in my

8          opinion, the main focus of them deciding not to

9          renew the option years for Cibola.

10              Q.    So you agree that there were other

11         factors, but in -- including price, but in your

12         opinion, the main focus was the performance in

13         the area of health services?  That's your

14         opinion?

15              A.    That is my opinion.

16              Q.    And -- and, again, that is based on

17         the document listed here on page 15, the contract

18         determination not to exercise option performance

19         period two?

20              A.    It's based on that document and then

21         all the other supporting document that documents

22         the problems in their performance.

23              Q.    The documents that are listed here in

24         this chronology?

25              A.    Yes.

1          Q.      You also say that -- in that last

2     paragraph that Declining to exercise option years

3     of a private prison contract based on poor

4     performance is an extremely rare occurrence in

5     the BOP.

6                   What is your basis for saying that?

7          A.      Based on my experience in working

8     within PMB and prior to that, my experience in

9     PRD with my access to the information that CFM

10    was under my supervision.

11         Q.      Did you -- you had mentioned earlier,

12    I believe when we were discussing the

13    solicitation process, that trends in prison

14    population growth can -- can impact the decision

15    at least in terms of whether or not to solicit --

16    solicit bids for additional beds.

17                 Did you consider trends in population

18    growth at all in forming your opinion that this

19    was an extremely rare occurrence in July 2016?

20         A.      I considered it, yes.

21         Q.      And what impact, if any, did that

22    have on your opinion?

23         A.      It did not have an impact.  At the

24    time, the Bureau of Prisons was starting to see a

25    decline in the prison population.  However,

www.aptusCR.com

1       Bureau of Prisons was still reawarding contracts

2       and going out for more bids.  And they also had

3       other facilities that were due for renewal of

4       option years within that same period -- that same

5       year and those facilities were continued.

6            Q.    Which facilities were those?

7            A.    I believe McRae would have been due

8       for their option year renewal because if they

9       began in 2012, their four-year base would have

10      been coming due the end of 2016.

11           Q.    Okay.  If you can turn to page 22 of

12      your report.

13           A.    Okay.

14           Q.    Okay.  And so at the top of the page

15      it says, Based on my review and analysis of the

16      evidence in this case, it is my opinion the

17      quality of CCA's performance in the majority of

18      their BOP private prison contracts for the time

19      frame of this case was largely deficient,

20      particularly with respect to their obligation to

21      provide quality healthcare and a safe and secure

22      environment to the inmate population.

23                You -- you wrote that, correct?

24           A.    I did.

25           Q.    And that's the opinion that -- one of

www.aptusCR.com
Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 118 of 177 PageID #: 10435

1     the opinions you intend to offer in this case?

2     A.     It is.

3     Q.     What -- what do you mean by the

4     majority?

5     A.     I meant that three of the five CCA

6     facilities were not performing.

7     Q.     Okay. And is it your opinion that

8     those three facilities -- and are you referring

9     to Adams, Cibola and Eden?

10     A.     I am.

11     Q.     Is it your opinion that their

12     performance was largely deficient for the entire

13     relevant time frame of the case?

14     A.     For the entire period, not all three

15     of them, no.

16     Q.     Okay.

17     A.     But --

18     (Crosstalk)

19     Q.     And --

20     A.     -- a large portion of the relevant

21     time frame.

22     Q.     And just -- just help me understand

23     that.

24     So for which -- which one of those

25     facilities would you say their performance was

www.aptusCR.com

```
 1        not largely deficient for the entire relevant
 2        time frame?
 3                    MR. FORGE:  Object as to --
 4                    THE WITNESS:  I would --
 5                    MR. FORGE:  -- form.
 6                    THE WITNESS:  I would say Eden.
 7             Eden started to show a decline a little
 8             bit later on into the relevant time
 9             period.
10                    BY MS. TOMKOWIAK:
11             Q.    Okay.  And -- and we can -- we can
12        look at your report.
13                    On -- on page 18 I think you actually
14        say that Eden had achieved above satisfactory
15        performance levels for 2012 through early 2014.
16        That's on page 18.
17                    Do you agree with that?
18             A.    Yes.
19             Q.    And so with respect to the other two
20        facilities, McRae and Northeast Ohio, you found
21        CCA's performance to be well above satisfactory;
22        is that right?
23             A.    That is correct.
24             Q.    And, in fact, the -- the BOP still
25        has a contract with CCA with respect to the McRae
```

www.aptusCR.com

1    facility today; is that right?

2         A.    Yes.

3         Q.    **Going back to your opinion, what does**

4    **largely deficient mean?**

5         A.    Among those three facilities, they

6    had numerous and serious and repetitive

7    deficiencies.

8         Q.    **And when you say numerous, is there a**

9    **specific quantitative benchmark that you're**

10   **referring to?**

11        A.    Just looking at their specific

12   reports in any given area, depending on which

13   report it was, you know, across that time frame.

14   But, no, I didn't have a minimal number in mind,

15   if that's what you're asking.

16        Q.    **Yeah.  So there's no threshold number**

17   **of deficiencies that you would say is required**

18   **before a performance becomes largely deficient?**

19        A.    Can you ask that one more time?

20        Q.    **Sure.**

21              **There's no threshold number of**

22   **deficiencies, in your opinion, required before a**

23   **contractor's performance becomes largely**

24   **deficient?**

25        A.    No --

www.aptusCR.com

 1                    MR. FORGE:  Object as to form.

 2                    THE WITNESS:  No, there's not.  You

 3            know, these facilities had some -- or just

 4            a deficiency alone that would -- warranted

 5            a significant finding.

 6                    One of the deficiencies across the

 7            board was mismanagement of -- of medical

 8            care that contributed to inmate deaths.  So

 9            that alone is alarming and largely

10            deficient, in my mind.  So, no, there's no

11            threshold.

12                    BY MS. TOMKOWIAK:

13            **Q.    Okay.  Is there any definition of**

14     **largely deficient that you're relying upon there?**

15            A.    No.

16            **Q.    So it's just a standard that you**

17     **created?**

18            A.    Well, deficient is something that is

19     used in the Bureau of Prisons.  You know, it's

20     used throughout my career with the program review

21     division.  You know, we have a -- when we

22     identified areas of nonconformance, when we

23     reviewed the facilities, they were called

24     deficiencies.  So I thought the phrase largely

25     deficient was appropriate to summarize their

www.aptusCR.com

1    performance.

2         Q.    Okay.  But that's not a -- a term

3    that the BOP has used itself?

4         A.    They use deficient.

5         Q.    Right.  But -- but largely deficient

6    I think you just testified is the phrase that you

7    thought was appropriate to summarize their

8    performance?

9         A.    Correct.

10        Q.    Largely deficient compared to what?

11        A.    I'm not sure what -- I understand

12   what you're asking.  Compared to?

13        Q.    Well, that -- that is what I'm

14   asking.  So if their performance was largely

15   deficient --

16        A.    Um-hmm (affirmative).  Compared to

17   meeting contract requirements.

18        Q.    Okay.  You -- you testified earlier

19   that you've been involved in audits of both BOP

20   facilities and private facilities.

21               Is it fair to say that even a

22   high-performing facility can have multiple

23   deficiencies?

24        A.    Yes.

25        Q.    You also at the -- the last sentence

www.aptusCR.com

1       talks about with respect to their obligation to

2       provide quality healthcare and a safe and secure

3       environment.

4               Would you agree that this is one of

5       the most difficult areas of correctional

6       services?

7           A.      Which --

8               MR. FORGE:  Object as to form.

9               THE WITNESS:  Where are you reading

10          from?

11              BY MS. TOMKOWIAK:

12          Q.      Sure.

13              You say largely deficient,

14      particularly with respect to their obligation to

15      provide quality healthcare and a safe and secure

16      environment to the inmate population.

17              Would you agree that -- that this is

18      one of the most difficult areas of correctional

19      services?

20              MR. FORGE:  Object as to form.

21              THE WITNESS:  I believe all areas

22          of a -- a correctional setting are -- are

23          very important to the safe and secure

24          running of a -- of a correctional

25          facility.

www.aptusCR.com

```
1                     BY MS. TOMKOWIAK:
2          Q.     Okay.  But setting aside whether
3     they're important, would you agree that some
4     aspects of providing correctional services are
5     more challenging to do than others?
6          A.     Correctional services is the -- the
7     most important and the most basic requirement in
8     running a correctional institution.
9          Q.     Okay.  And are all aspects of that
10    equal or are some -- so take -- take recruiting
11    and retaining qualified medical personnel.
12                 Isn't it fair to say that all
13    correctional facilities, including those operated
14    by the BOP, struggle with that?
15                 MR. FORGE:  Object as to form.
16                 THE WITNESS:  I'm not familiar with
17           the BOP and their recruitment efforts.
18           I'm not disagreeing that the Bureau of
19           Prisons did not have their fair share of
20           issues with recruit -- recruitment and
21           retention.
22                 BY MS. TOMKOWIAK:
23         Q.     Okay.  If you look at the top of
24    page 23, paragraph two --
25         A.     Okay.
```

www.aptusCR.com

1      Q.      -- and I'm sorry, it's actually the

2      very last sentence of the first paragraph.

3      A.      Okay.

4      Q.      And it says that -- and -- and feel

5      free to read the -- the paragraph if -- if you

6      need to for context.

7              The last sentence says that -- refers

8      to a -- a meeting between the BOP and CCA

9      executives to, in your words, make clear that

10     CCA's performance was unacceptable and could not

11     continue in this manner.

12             Do you see that?

13     A.      Yes.

14     Q.      What meeting are you referring to

15     there?

16     A.      I'm not referring to any one

17     particular meeting.  We stress that throughout

18     the time period.  We stress that during our

19     partnering meetings that we would have.  We --

20     our on-site staff stressed it with the wardens at

21     those facilities.  Our internal -- middle

22     management staff within PMB stressed that to

23     their counterparts amongst CCA.

24             There were times I recall CCA kind of

25     popping in on us in D.C. shortly after some of

www.aptusCR.com

1      these CFMs identified very serious problems and

2      asking to meet with us.  We would typically

3      accommodate them if our schedule permitted.

4              These were very high levels of CCA.

5      I recall, you know, Mr. Hininger coming on

6      occasion, Mr. Nalley, Mr. Hall and stressing

7      their disappointment themselves and assuring us

8      of how they were going to fix it.

9              That's what that sentence references.

10         Q.      Okay.  Did you attend any of those

11     meetings?

12         A.      I did.

13         Q.      And how was it -- how was it made

14     clear to CCA executives that their performance

15     was unacceptable?

16         A.      We told them that their performance

17     was unacceptable.

18         Q.      Okay.  Do you have any notes of those

19     meetings or any documents reflecting what was

20     said at the time?

21         A.      I do not.  I believe there are some

22     references to it in some of the internal CCA

23     E-mails that are part of the documents in this

24     case.

25         Q.      Okay.

1          MS. TOMKOWIAK:  Okay.  If we could

2     go off the record.

3               THE WITNESS:  Is this a break or --

4               VIDEO OPERATOR:  Okay.  The time is

5     1:14 p.m. and we are now off of the

6     record.

7               (Thereupon, a discussion was had off

8                the record.)

9               (Thereupon, at 1:14 p.m. CST, a lunch

10                recess was taken.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

www.aptusCR.com

```
 1                        AFTERNOON SESSION      (2:03 p.m. CST)

 2                        VIDEO OPERATOR:  Okay.  The time is

 3              2:03 p.m. and we are back on the record.

 4                        BY MS. TOMKOWIAK:

 5              Q.      Okay.  Ms. Mellendick, during the

 6        break you told me that you wanted to clarify

 7        something.  What did you want to clarify?

 8              A.      Yes.  Before we broke some of the

 9        questions that you had where we were talking

10        about the Adams County award fees, where there

11        were three instances over eight years where they

12        did receive award fees.  And you had mentioned

13        that they weren't listed in my appendix as a

14        document that I referenced.  And that surprised

15        me, so I went back to check that during the break

16        and they are listed in my list of documents in my

17        report.

18                        And if you want --

19              Q.      Where --

20                        (Crosstalk)

21                        BY MS. TOMKOWIAK:

22              Q.      Where are they listed?  Do you want

23        to just give me the -- the Bates numbers or --

24              A.      Yeah, I can give it to you.  Let me

25        know when you're ready.
```

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 129 of 177 PageID #:
10446

www.aptusCR.com

1      Q.     I'm ready.

2      A.     Okay.  The first one is

3  CORECIVIC_0044374.

4      Q.     Okay.

5      A.     Next one is CORECIVIC_0990186.  And

6  the last one is CORECIVIC_1337426.

7      Q.     Okay.  All right.  I appreciate that

8  clarification.

9      A.     Sure.

10     Q.     And did you -- did you check that out

11  yourself or was that in consultation with your

12  counsel during the break?

13     A.     I checked that out myself.

14     Q.     All right.  If we can go to page 23

15  of your report.

16         Do you still have that in front of

17  you?

18     A.     I do.

19     Q.     So at -- around the bottom of the

20  page, number 2, before the break we were

21  discussing what I'll call your first opinion.

22  Is -- is it fair to call this paragraph 2 your

23  second opinion?

24     A.     That's fair.

25     Q.     Okay.  And so in this opinion you --

www.aptusCR.com

1        you say that the CAR XV awards in late 2014

2        concretely determined the BOP would not grant CCA

3        a new contract based on their poor past

4        performance.  However, in my opinion, the BOP

5        would have been reluctant to award a new contract

6        to them for this same reason as far back as

7        April 2013.  And then you elaborate on that.

8               Do you see that?

9        A.     I do.

10       Q.     What is the threshold by which you

11       determined the BOP would have been reluctant to

12       award CCA a contract as far back as April 2013?

13              A.     Well, I looked at where the

14       facilities were with the -- the varying

15       performance documentation and how they were

16       performing as far as the types and number and

17       repetitive nature, serious nature of the

18       deficiencies at -- at their facilities.

19                     And around that time frame is where,

20       I believe, in my opinion, that had the BOP be

21       looking -- been looking to award a -- a new

22       contract, that the BOP could have been reluctant

23       to award to CCA just based on performance to that

24       time frame.

25       Q.     So I want to break that down a bit.

www.aptusCR.com
Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 131 of 177 PageID #: 10448

1          So when you talk about the

2     performance documentation, are you referring to

3     the CFMs?

4          A.     Yes.

5          Q.     **Anything besides the CFMs?**

6          A.     Probably I would have looked at

7     CPARS.  I would have looked at their number of

8     NOCs that were identified by oversight staff

9     on-site.  I would have looked at deductions

10    possibly.  Probably looked at oversight facility

11    reports, any documentation and award fee letters.

12              Those would be examples of what I

13    looked at.

14          Q.     **So was there any particular event in**

15    **April 2013 at -- that is the catalyst for the BOP**

16    **becoming reluctant to award CCA a new contract?**

17          A.     That was probably the time frame of

18    one of the CFMs that was -- that had some serious

19    deficiencies.

20          Q.     **Okay.  So, for example, the Cibola**

21    **annual CFM was conducted April 23rd to 25th?**

22          A.     2013?

23          Q.     **2013, correct.**

24          A.     So that might have been around

25    like -- among other things, that might have

www.aptusCR.com

1      been -- yeah.

2          Q.     Okay.

3          A.     That was probably one of the main

4      factors.

5          Q.     Probably one of the main factors.

6      But are you saying that -- I guess I'm trying to

7      understand what you mean by April 2013.

8                 Is it April 1st?  Is it April 23rd?

9      Is it April 30th?  Is it any -- just at some

10      point during the month of April?

11         A.     Just around that time frame, around

12      that month, around that time of year, based on

13      all the documentation I looked at to date where

14      their -- their issues were.

15         Q.     Okay.  So in March 2013, in your

16      opinion, the BOP would not yet have been

17      reluctant to award a new contract to CCA?

18         A.     If I said April, I'm sure there's

19      information, documentation that occurred in

20      April, possibly the CFM at Cibola that we just

21      talked about, that probably would have led me to

22      believe that April was more of an appropriate

23      month in -- of that year to indicate that the BOP

24      may have been reluctant to award.

25         Q.     Okay.  And -- and so just to be

www.aptusCR.com

1     clear, the -- the -- the point of us having this

2     deposition today is for me to fully understand

3     what you're going to testify to at trial so that

4     there aren't any surprises and I understand the

5     scope of your opinions.

6               And so I just want to be clear.  You

7     said if I said April.  You did say April.  You

8     said April 2013.  And I -- I want to understand

9     why you chose that.  And it sounds like you're

10    saying you -- you listed a number of different

11    performance documentation.

12              Is there -- is there anything else?

13         A.    Other than the documents and -- that

14    I reviewed that I --

15         Q.    Okay.

16         A.    -- just mentioned.

17         Q.    All right.  And so with respect to

18    March 2013, in your opinion, would the BOP have

19    been reluctant to grant CCA a new contract?

20         A.    I don't know.

21         Q.    You don't know one way or the other?

22         A.    In my report, in my opinion, I say

23    April of 2013.

24         Q.    Right.  So in your opinion, the

25    earliest point in time that the BOP would have

www.aptusCR.com

1    been reluctant to award a new contract to CCA is

2    April 2013?

3                    MR. FORGE:  Object to form.

4                    THE WITNESS:  Yeah.  I'm sorry.

5        Can you repeat that question?

6                    BY MS. TOMKOWIAK:

7        Q.      Sure.

8                So in your opinion, the earliest

9    point in time that the BOP would have been

10   reluctant to award a new contract to CCA is April

11   2013?

12                   MR. FORGE:  Object to form.

13                   THE WITNESS:  In my opinion, yes.

14                   BY MS. TOMKOWIAK:

15       Q.      And within the month of April, you

16   don't have an opinion as to a specific date upon

17   which the BOP became reluctant to award CCA a new

18   contract?

19       A.      I would say that I was probably

20   referring to after the results of the Cibola CFM.

21   So at what point in time in April 2013 that

22   occurred.

23       Q.      And that occurred -- we just looked

24   at it -- that occurred -- if you look on page 22,

25   it says Cibola's annual CFM was conducted

www.aptusCR.com

1       April 23rd to 25th 2013.

2               A.      Correct.

3               Q.      Okay.  So you believe, as you sit

4       here today, that -- that you were -- let me put

5       it this way -- as you sit here today, that after

6       April 25th, that time, upon which the BOP would

7       have been reluctant award a new contract to CCA?

8               A.      Yes.

9               Q.      What do you mean by reluctant?

10              A.      I believe -- obviously, you know, we

11      can't predict what, you know, contract award may

12      have been on the table and who the offerors were,

13      but I believe that based on performance at

14      several of the CCA facilities that the BOP would

15      have considered that in reviewing past

16      performance of that company and, based on what

17      information they had to date, would have been

18      reluctant to award to CCA.

19              Q.      Can you quantify that reluctance?

20      Does that mean it's more likely than not?

21              A.      No, I can't.

22              Q.      Okay.  So you don't -- you don't

23      have -- there's no quantification to that?

24      It's -- it's just -- let me just ask that:

25                      So you -- just to be clear, you --

1       you -- you can't quantify what that reluctance

2       means, correct?

3                  MR. FORGE:  Object to form.

4                  THE WITNESS:  Correct.

5                  BY MS. TOMKOWIAK:

6          Q.     If you -- if you look on -- if you go

7       back to page 3 --

8          A.     Okay.

9          Q.     -- and at the top where it talks

10      about what you were asked to opine on in this

11      case, the second clause says, whether, and if so,

12      when its -- meaning CCA's -- past performance

13      ever reached a point as to render CCA unlikely to

14      win any competitively bid BOP contract, and

15      therefore unlikely to receive any additional BOP

16      business beyond the option years of existing

17      contracts.

18                 Do you see that?

19         A.     I do.

20         Q.     So in your opinion, as of April 25,

21      2013, had CCA's past performance reached the

22      point so as to render it unlikely to win any

23      competitive bid BOP contract?

24         A.     In my opinion, yes.

25         Q.     And, in your opinion, as of April 25,

1      2013, had CCA's past performance reached a point

2      as to render CCA unlikely to receive any

3      additional BOP business beyond the option years

4      of existing contracts?

5              A.    Can you repeat that question, please?

6              Q.    Sure.

7                    In your opinion, as of April 25,

8      2013, had CCA's past performance reached a point

9      as to render CCA unlikely to receive any

10     additional BOP business beyond the existing

11     years -- beyond -- excuse me -- the option years

12     of existing contracts?

13             A.    Well, those are two separate things.

14     You have a new award and then you have option

15     years.

16             Q.    Okay.  Yeah, and I guess -- I

17     understand.  And I'm just using the language from

18     paragraph three, where it -- it -- it says what

19     you were asked to opine on.  And I'm just trying

20     to understand as of April 25, 2013, is that a

21     point in time, in your opinion, where CCA was

22     unlikely to receive any additional business

23     beyond the option years of its existing

24     contracts?

25             A.    In my opinion, as of April 25th of

www.aptusCR.com

1    2013, I think it would have been unlikely for CCA

2    to be awarded a new BOP contract.

3              Q.      Okay.

4              A.      Yeah.

5              Q.      And so on page 22 where you said that

6    they would be -- would have been reluctant, does

7    that mean you're using reluctant interchangeably

8    with it would have been unlikely?

9              A.      I'm sorry, you cut out toward the end

10   there.  The audio cut out.

11             Q.      So on page 22 where -- can you hear

12   me now?

13             A.      Now I can, yes.

14             Q.      Sorry about that.  That's why I came

15   into my office today, but apparently that did not

16   work.

17                     So on page 23 -- sorry -- when we

18   talked about your second opinion and you said

19   that the BOP would have been reluctant to award

20   CCA a new contract, does reluctant mean unlikely?

21             A.      I believe they have similar meanings,

22   yes.

23             Q.      And -- and you are using -- as you

24   use them in your report, they have similar

25   meanings?

1          A.          Correct.

2          Q.          In your opinion, does unlikely mean

3     less than 50 percent?  More than 50 percent?  Can

4     you quantify the term unlikely?

5          A.          I don't know that you can quantify

6     the term unlikely.  Unlikely to me just is

7     doubtful, unlikely.  I don't know that you can

8     quantify that.

9          Q.          Was this reluctance or unlikeliness

10    communicated to CCA in April 2013?

11               MR. FORGE:  Object as to form.

12               THE WITNESS:  Not that I recall.

13               BY MS. TOMKOWIAK:

14          Q.          Okay.  So to your knowledge, no one

15    at the BOP communicated to COC -- I'm sorry --

16    CCA after April 25, 2013 that they were unlikely

17    to win a new contract?

18          A.          To my knowledge.

19          Q.          Now, you -- you say here -- we're

20    back on page 23 -- by this point in time, CCA had

21    demonstrated their inability to perform essential

22    services of the contracts, and then you include,

23    providing an effective quality control program

24    and maintaining minimum staffing requirements.

25               Are there other essential services

1      that support your opinion?

2            A.      Can you -- I'm sorry, what paragraph

3      are we on?

4            Q.      Page 23 --

5            A.      Okay.  I see it.

6            Q.      -- paragraph --

7            A.      I see it, the paragraph that you're

8      on.  I'm sorry.  I see it now.

9                    Let me take a second to read it.

10                   Okay.  Okay.  And, I'm sorry, can you

11     repeat your question based on that sentence?

12           Q.      Sure.

13                   I just -- you -- you say inability to

14     perform essential services and then you include

15     two services here, providing an -- an effective

16     quality control program and maintaining minimum

17     staffing requirements.

18                   What other essential services of the

19     contracts do you believe CCA had demonstrated

20     their inability to perform as of April 2013?

21           A.      It was based on the areas in which

22     the deficiencies were identified in their recent

23     CFM report and any NOCs they may have had, I

24     believe most of which fell in health services, at

25     least as far as the CFM deficiencies.

www.aptusCR.com

```
 1          Q.      When you're referring to the
 2     contracts, are you referring to all five of the
 3     contracts or are you referring to Cibola, Adams
 4     and Eden?
 5          A.      At that point in time I'm referring
 6     to the performance at Adams and at Cibola.
 7          Q.      Are you aware that after April 2013,
 8     the BOP renewed the Adams contract?
 9          A.      Yes, I am.
10          Q.      Are you aware that after April 2013,
11     the BOP renewed the Cibola contract?
12          A.      Yes, I am.
13          Q.      Are you aware that after April 2013,
14     the BOP renewed the Eden contract?
15          A.      Yes, I am.  Well, when you say renew,
16     they exercised their option years.
17          Q.      That's what I mean, yep.
18          A.      Just to clarify.
19          Q.      And then when you say the BOP would
20     have been reluctant, is there a difference
21     between have been and actually was?
22          A.      Well, I believe the term I used -- I
23     used would have because there wasn't a current,
24     you know, contract to be awarded.
25          Q.      Okay.  So you're using that term
```

1       because there -- there wasn't a competitively bid

2       contract for CCA to bid on as of that time?

3              A.      Correct.

4              Q.      Between April 2013 and late 2014, how

5       would you describe CCA's performance?

6                      MR. FORGE:  Object as to form.

7                      THE WITNESS:  It -- that's a --

8              well, that's a broad question.  Are you

9              asking it specific to any particular

10             facility?

11                     BY MS. TOMKOWIAK:

12             Q.      Overall with respect to the five

13      facilities, did it improve?  Did it get worse?

14             A.      And the period of time again was

15      April --

16             Q.      April --

17             A.      -- April of 2013 through late 2014?

18             Q.      Yes.

19             A.      No.  In my opinion, it had not

20      improved.  It declined.

21             Q.      It declined.

22                     Was there a particular point in

23      between April 2013 and late 2014 that it

24      declined?

25             A.      It progressed.  With each CFM that

1          was occurring amongst the Adams facility, the

2          Cibola facility and the Eden facility, they were

3          all seeing very serious repetitive deficiencies

4          in very critical areas, health, failing to

5          maintain staffing for numerous months, close to a

6          year at some point in some of these facilities.

7          And most all of the deficiencies were repetitive.

8                    When we -- when the Bureau of Prisons

9          and when CFM would go out and do an -- a

10         monitoring and they'd identify a deficiency and

11         they'd come back a year or six months later and

12         that deficiency still -- still exists, then it's

13         called a repeat deficiency.  And when they come

14         out the next time it's a repeat, repeat

15         deficiency.

16                    We were getting to the point where we

17         were seeing over the course of that time frame

18         CoreCivic -- their facilities were being

19         identified with, you know, repeat, repeat

20         deficiencies, repeat, repeat, repeat

21         deficiencies, significant findings that involved

22         repetitive deficiencies with probably the most

23         alarming deficiency in the fact that they were

24         not handling -- they weren't managing the medical

25         care appropriately, which contributed to inmate

www.aptusCR.com

```
 1        deaths.  So we were seeing that deficiency
 2        repeated amongst their facilities.  So --
 3              Q.    Okay.  And you say on page 23 that
 4        The CAR XV awards in late 2014 concretely
 5        determined that -- or I'm sorry -- concretely
 6        determined the BOP would not grant CCA a new
 7        contract based on their poor past performance.
 8                  So the CAR XV poor selection decision
 9        was signed by the BOP on December 29, 2014.
10        Is -- is that the -- the date by which the -- it
11        was concretely determined that the BOP would not
12        award CCA a new contract?
13              A.    Yes, in my opinion.
14              Q.    Okay.  So when you say late 2014 by
15        referring to the CAR XV awards, you mean by
16        December 29, 2014; is that right?
17              A.    I don't disagree with that statement.
18        Yeah, that's fine.
19              Q.    Okay.  What do you mean by concretely
20        determined?
21              A.    Well, it was spelled out in the
22        ██████████████████████████████████████████████
   ████████████████████████████████████████████████████
   █████████████████████████████████████████████████
   █████████████████████████████████████████████████
```

```
 1    ████████████████████████████████████████

      ████████████████████████████████████████

      █████████████████████████

 4             That award -- I mean, it was -- CCA

 5    lost a very well-running facility, their

 6    Northeast Ohio facility.  They actually bid that

 7    ██████████████████████████████████████████

      █████████████████████████████████████████

 9    another provider.  So in my mind, that spoke

10    volumes.

11         Q.     And you weren't involved in that

12    decision, correct?

13         A.     I was not.

14         Q.     And so -- and your opinion is based

15    on your review of the source selection document?

16         A.     Based on the -- my review of the

17    source selection document and just my experience

18    in general in the position I was in.

19         Q.     And so by concretely determined,

20    are -- you're saying that the BOP did not grant

21    CCA the CAR XV award on that date; is that right?

22         A.     Correct.

23         Q.     So I just want to be clear.  You're

24    not speaking as you were in April 2013 about

25    hypothetical contracts that CCA may or may not
```

1     get in the future, you were just referring to the

2     CAR XV award; is that right?

3              MR. FORGE:  Object --

4              THE WITNESS:  I was --

5              MR. FORGE:  -- as to form.

6              THE WITNESS:  I was referring to

7        the CAR XV award.

8              BY MS. TOMKOWIAK:

9        Q.    As of December 29, 2014, do you have

10    any opinion regarding how likely or not it would

11    have been for the BOP to award a different new

12    contract to CCA?

13             MR. FORGE:  Object as to form.

14             THE WITNESS:  Yeah, I'm not -- I'm

15       not sure I understood that question.

16       Could you repeat it?

17             BY MS. TOMKOWIAK:

18       Q.    Sure.

19             Do you have an opinion as to any

20    point after December 29, 2014 as to how likely or

21    not the BOP was to award CCA a new contract?

22             MR. FORGE:  Object as to form.

23             THE WITNESS:  I would think it

24       would depend on what period of time, but

25       what I think does speak volumes is the

**Page 146**
Case 3:16-cv-02267    Document 336-5    Filed 11/20/20   Page 147 of 177 PageID #: 10464
www.aptusCR.com

1              fact that the bureau has awarded since

2              that time another 15 -- more than 15,000

3              bids and CCA has not won a competitively

4              bidded contract with the Bureau of Prisons

5              in nine years.  I believe 2011 was the

6              last time they won one.

7                   BY MS. TOMKOWIAK:

8         **Q.    Are you speaking just with respect to**

9    **low security correctional facilities or are --**

10   **you're -- you're speaking about all type of**

11   **facilities?**

12        A.    I'm speaking in regards to these CAR

13   facilities.

14        **Q.    Okay.  Well, what I'm -- I guess what**

15   **I'm trying to understand is let's look at the**

16   **relevant time period.**

17              **From December 29, 2014 to August**

18   **2016, do you have any opinion during that time**

19   **frame how likely or not it was for the BOP to**

20   **award CCA with a new contract?**

21              MR. FORGE:  Object as to form.

22              THE WITNESS:  I believe it would

23         have been unlikely for the BOP to award to

24         CCA during that time frame.

25

www.aptusCR.com

1          BY MS. TOMKOWIAK:

2          Q.     So in your opinion, at -- at no point

3     after the CAR XV awards was it possible for CCA

4     to turn their performance around?

5                    MR. FORGE:  Object as to form.

6                    THE WITNESS:  No, I'm not saying

7          that.

8                    BY MS. TOMKOWIAK:

9          Q.     Okay.  Well, in your opinion, could

10    CCA have turned things around at some point after

11    the CAR XV awards?

12                   MR. FORGE:  Object as to form.

13                   THE WITNESS:  We hoped that CCA

14         would have turned things around at any

15         time.

16                   BY MS. TOMKOWIAK:

17         Q.     You mention in your report the -- the

18    cure notice that was issued to the -- to Cibola

19    in 2015.

20                   Do you recall that?

21         A.     I do.

22         Q.     And you're aware that CCA

23    successfully responded to that cure notice and

24    that it was lifted a -- a few months later?

25                   Is that a fair summary?

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 149 of 177 PageID #:
10466
www.aptusCR.com

1           MR. FORGE:  Object as to form.

2           THE WITNESS:  I recall that it was

3       lifted because they corrected the majority

4       of the issues that were outlined in the

5       cure notice.

6           BY MS. TOMKOWIAK:

7       **Q.    And at that point in time, was it --**

8   **was the BOP more or less likely to award CCA a**

9   **new contract?**

10          MR. FORGE:  Object as to form.

11          THE WITNESS:  I would have to

12      reanalyze all of the performance

13      information amongst their facilities to

14      provide an opinion on that.

15          BY MS. TOMKOWIAK:

16      **Q.    Well, if that's the case, if I asked**

17  **you how likely it was for the BOP to -- for the**

18  **BOP to award CCA a new contract at any point**

19  **during the period of December 2014 to August**

20  **2016, is it your testimony that you would have to**

21  **look at the performance documentation at that**

22  **particular point in time in order to be able to**

23  **render an opinion on that?**

24          MR. FORGE:  Object as to form.

25          THE WITNESS:  I would have to

**Page 149**
Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 150 of 177 PageID #:
10467
www.aptusCR.com

1          rereview my notes to offer an opinion on

2          that.

3                    BY MS. TOMKOWIAK:

4          Q.     Okay.  So your opinion might change

5     based on the specific date and time that you were

6     asked to opine on?

7                    MR. FORGE:  Object --

8                    THE WITNESS:  It --

9                    MR. FORGE:  -- as to form.

10                    THE WITNESS:  -- it -- it may.  But

11          what stands out in my mind is that there

12          were subsequent competitively bid

13          contracts and CCA did not receive any of

14          them.

15                    BY MS. TOMKOWIAK:

16          Q.     To your knowledge, did anybody at the

17     BOP tell CCA after December 2014 that it was

18     unlikely that they would win any new contract

19     with the BOP?

20          A.     Not to my knowledge.

21          Q.     You mentioned that you -- this

22     opinion is based on the source selection

23     decision -- or I should say at least in part on

24     the source selection decision; is that right?

25          A.     Can you refresh my -- refresh me on

www.aptusCR.com

```
 1          which opinion you -- you're referencing or

 2          what --

 3               Q.      Your second -- your second opinion

 4          relating to the CAR XV award.

 5               A.      It is based on the source selection

 6          decision.  It is based on my review of all of the

 7          documents for this relevant time period.  It's

 8          based on my recollection of their performance in

 9          my capacity as PMB administrator.

10               Q.      And -- and you're aware, based on

11          your review of all those materials and your

12          experience, that past performance was not the

13          only non-price consideration in CAR XV?

14          ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████

██████████████████████████████████████

25               Q.      Did you consider that in forming your
```

```
 1    opinion?

 2         A.    I relied on -- mainly for that

 3    opinion was the main reason that the source

 4    selection official said that CCA did not receive

 5    ████████████████████████████████████████

      ████████████████████████████████████████████████

 7    that is where the weight was, in my opinion.

 8         Q.    In your opinion, was the ranking of

 9    CCA's past performance as poor consistent with

10    the ratings that it had received in the CPARS

11    during the time period being evaluated?

12         A.    I don't know that you can compare the

13    two.

14         Q.    Well -- and we can -- we can look at

15    it if you'd like, but just in the interest of

16    time, I mean, the source selection document

17    itself goes through all of the ratings in the --

18    the CPARS.  You saw the categories in the CPARS.

19    So I'm just interested if you know -- sitting

20    here today if you recall -- you said you reviewed

21    the CPARS, correct?

22         A.    Um-hmm (affirmative).  That's

23    correct.

24         Q.    And you -- okay.  And you've reviewed

25    the source selection document?
```

1          A.      Yes.

2          Q.      And do you have an opinion one way or

3      the other if the rating of CCA's past performance

4      as poor by -- in the source selection document

5      was consistent with the ratings it had received

6      in the CPARS for the relevant facilities during

7      that same time period?

8                  MR. FORGE:  Object as to form.

9                  THE WITNESS:  That's where I think

10              it's difficult to answer your question,

11              because I don't believe in CPARS that poor

12              was one of the ratings.  It was --

13              they're -- the terms are -- are different,

14              so that's where I'm struggling with

15              answering that question.

16                  BY MS. TOMKOWIAK:

17          Q.      I -- I see.  So because the ratings

18      there use the terminology like below satisfactory

19      or -- or marginal and that's -- that's why you're

20      saying you don't think you can compare the two?

21          A.      Yes.

22          Q.      Are you aware that the BOP awarded

23      CCA a new contract in September 2020 to operate a

24      new residential reentry center in Oklahoma?

25          A.      I am not.

www.aptusCR.com

1        Q.      Does that change your opinion that

2     the -- the BOP would not grant CCA a new contract

3     after December 2014?

4        A.      My opinion was based on they would

5     not be likely to award a new contract for a

6     private prison.  That's what my opinion was based

7     on.  It wasn't anything outside of a prison

8     environment-type contract.

9        Q.      So in your report when you talk about

10    a new contract or additional business, you're

11    referring to a private prison and nothing else?

12       A.      Yes.

13       Q.      Could you turn to page 25 of your

14    report.

15       A.      Okay.

16       Q.      I'm going to -- is it fair if I refer

17    to -- pages 25 and 26, does this describe your

18    third opinion?

19       A.      Yes.

20       Q.      If you look at the paragraph -- the

21    second to last paragraph, which says that -- in

22    the first sentence it says, The CCA facility

23    contracts required them to house inmates who were

24    male, low security, parentheses, inmates with

25    little to no current or history of serious

www.aptusCR.com

1      violence or detainers, criminal aliens, and then

2      parentheses, non-U.S. citizens who will be

3      reported (sic) back to their countries of birth

4      upon their release, comma, serving less than

5      90 months of their sentence.

6               Do you see that?

7          A.    I do.

8          Q.    Okay.  And then in the next paragraph

9      you go on to describe that population.  And are

10     you referring back to the -- the population that

11     you described in what I just read?

12         A.    The next sentence starting with BOP

13     designators?

14         Q.    No, I -- I apologize.

15               So if you look at the last paragraph

16     on that page --

17         A.    Okay.

18         Q.    -- and the first sentence starts with

19     In summary, this population requires a low level

20     of correctional management, basic health

21     services, new or complex programming and is

22     viewed by the BOP as an easy-to-manage

23     population.

24               So my question is by this population,

25     are you -- does that mean the -- the male, low

www.aptusCR.com

1          security criminal aliens serving less than

2          90 months of their sentence?

3                    MR. FORGE:  Object as to form.

4                    THE WITNESS:  It takes into

5              consideration that sentence and then it

6              takes into consideration the rest of that

7              paragraph.

8                    BY MS. TOMKOWIAK:

9          Q.     Okay.  So by this population -- I'm

10     just trying to understand what -- what this

11     population is referring to.  Is it referring to

12     everything in the preceding paragraph?

13         A.     Yes.

14         Q.     Do you -- do you agree that the level

15     of programming is set by contract?

16                    MR. FORGE:  Object as to form.

17                    THE WITNESS:  The contract spells

18              out any programs that we required the

19              contractors provide to the inmate

20              population at those facilities.  It did

21              not say they couldn't have more.  It

22              provided the bare minimum.

23                    BY MS. TOMKOWIAK:

24         Q.     Are you aware that CCA actually

25     offered educational programming in excess of

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 157 of 177 PageID #:
10474

www.aptusCR.com

1    those bare minimum requirements at several of its

2    facilities?

3              A.    I am -- I am aware of it.

4              Q.    And is -- do you agree that

5    programming is a small percentage of the overall

6    correctional services that CCA provided?

7                        MR. FORGE:  Object as to form.

8                        THE WITNESS:  I don't know how to

9              quantify that.  It's a portion of it.  I'm

10             not comfortable saying it's a small

11             portion, but it's a portion of what they

12             provide.

13                      BY MS. TOMKOWIAK:

14             Q.    How would you describe it, if not

15    small?

16             A.    It's a relevant portion of services

17    that they need to provide, as outlined in the

18    contract.

19             Q.    What evidence do -- do you have to

20    support your opinion that the BOP viewed this as

21    a easy-to-manage population?

22             A.    My comment on there was in a broader

23    sense, basically outlining the fact that what we

24    required the contractors provide to the inmates

25    that we placed in these facilities was to a much

www.aptusCR.com

1      lesser extent than what a BOP facility -- you

2      know, what a BOP low security facility would

3      provide to its inmate population.

4              Q.      Okay.  So are you saying that easy to

5      manage means fewer contractual requirements?

6                      MR. FORGE:  Object as to form.

7                      THE WITNESS:  I guess I'm not sure

8          how to answer that.  Can you give me an

9          example?

10                     BY MS. TOMKOWIAK:

11             Q.      Well, I -- I just want to understand.

12     You say that the BOP viewed this as an

13     easy-to-manage population.  What is -- what is

14     that view based on?  I mean, what -- what does

15     easy to manage mean?

16             A.      Well, as I reference in the paragraph

17     above, where I'm talking about they don't need to

18     provide any programs for sex offenders; they

19     don't need -- they don't have to deal with

20     serious physical or mental health issues with the

21     inmates that were placed in the -- those

22     facilities; inmates that presented serious

23     correctional management issues; required drug

24     treatment or any other court-imposed programs.

25     So I'm referring to those particular types.

www.aptusCR.com

1    Q.    Okay.  So are the -- are the types

2    that you just laid out, in your opinion, are

3    those the inmates who are more difficult to

4    manage?

5    A.    They require -- they require

6    different things in a correctional setting.  They

7    require different programs.  They possibly

8    require more staffing.  They require more

9    security.  There's a lot of variables involved in

10    that.

11    Q.    But the -- in -- but in -- in your

12    opinion, the inmate population in contrast that

13    CCA's facilities housed were easier to manage

14    than -- than those inmates?

15    A.    In my opinion, the inmate -- inmate

16    population that we placed in these private

17    facilities did not require as much programming,

18    as much security, all of those things that a BOP

19    low security facility would face with the inmate

20    population that they had.

21    Q.    Is that opinion based on any

22    research?

23    A.    It is not.

24    Q.    Is that opinion based on any academic

25    articles?

Case 3:16-cv-02267    Document 336-5    www.aptusCR.com    Filed 11/20/20    Page 160 of 177 PageID #:
10477

```
 1              A.      No.
 2              Q.      Do you agree that the population of
 3      inmates at CCA's facilities have a higher rate of
 4      security threat group members?
 5                      MR. FORGE:  Object as to form.
 6                      THE WITNESS:  As compared to?
 7                      BY MS. TOMKOWIAK:
 8              Q.      As compared to inmates at
 9      BOP-operated facilities.
10              A.      Do they have a higher number?
11                      MR. FORGE:  Object as to form.
12                      THE WITNESS:  I don't know, unless
13      I were to see documentation, but doesn't
14      stand out to me.
15                      BY MS. TOMKOWIAK:
16              Q.      Okay.  Do you agree that the inmate
17      population at CCA facilities is more homogenous
18      than the population at BOP-operated facilities?
19                      MR. FORGE:  Object as to form.
20                      THE WITNESS:  Not necessarily.
21                      BY MS. TOMKOWIAK:
22              Q.      Why not?
23              A.      So homogenous meaning similar.  The
24      fact -- if you want to look at that, the
25      population in a -- in one of the private
```

www.aptusCR.com

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20    Page 161 of 177 PageID #:
10478

```
 1        facilities was mostly like as we just talked

 2        about, foreign-born citizens that were going to

 3        be deported, then I would say yes; but you have

 4        similar BOP facilities with populations that are

 5        very similar in nature.

 6                You know, they're -- they're there

 7        for the same type of programs or the same type of

 8        security level and things of that nature.

 9        Q.    Do you agree that the inmates at

10        BOP-operated facilities are typically more

11        diverse than predominantly U.S.-born?

12                MR. FORGE:  Object as to form.

13                THE WITNESS:  Yes, I would agree.

14                BY MS. TOMKOWIAK:

15        Q.    Do you agree that criminal alien

16        populations impose certain language and cultural

17        barriers?

18                MR. FORGE:  Object as to form.

19                THE WITNESS:  Well, I -- can you

20            clarify that?

21                BY MS. TOMKOWIAK:

22        Q.    Sure.

23                Do you think that -- do you agree

24        with me that criminal alien populations impose

25        language and cultural barriers?
```

www.aptusCR.com

1          MR. FORGE:  Object as to form.

2          THE WITNESS:  They -- well, they do

3       create a -- a -- a need for obviously the

4       staffing at that facility to be able to

5       better communicate with that inmate

6       population.  So just like in a BOP

7       facility, depending on where it's located,

8       if it had a lot of -- a large

9       Spanish-speaking population, then you

10       would probably see more Spanish-speaking

11       staff.

12          So whether it's a barrier or an issue

13       that just needs to be accommodated.  I'm not

14       sure I would call it a barrier, but it's --

15       it's something to take into consideration.

16          If you're going to manage a certain

17       type of population, you want to take that

18       into consideration with how you staff that

19       facility.

20          BY MS. TOMKOWIAK:

21       Q.    **Has anybody besides you at the BOP**

22    **ever stated that they consider the criminal alien**

23    **population to be easy to manage?**

24          MR. FORGE:  Objection as to form.

25          THE WITNESS:  I don't know.

www.aptusCR.com

1              BY MS. TOMKOWIAK:

2          **Q.       To your knowledge, has anyone at the**

3      **BOP ever stated that they consider the criminal**

4      **alien population to be easy to manage?**

5                      MR. FORGE:  Object as to form.

6                      THE WITNESS:  I thought I just

7          answered that question.

8                      BY MS. TOMKOWIAK:

9          **Q.       Well, my first question did not add**

10     **the qualifier to your knowledge and so I wanted**

11     **to understand if that's why you were saying you**

12     **didn't know.**

13         A.      To my knowledge, has anyone actually

14     made that statement?  No.  But to my knowledge,

15     the reason that the Bureau of Prisons decided to

16     place this specialized population into these

17     private prisons is because they weren't

18     comfortable in putting in the hands of a

19     contractor any higher security-type population

20     and thought that this would be, from what I

21     recall, based on my experience, one of the easier

22     type populations to manage.

23         **Q.       That was the intent, from what you**

24     **can recall and in your experience?**

25         A.      Yes.

www.aptusCR.com

1          Q.      Are you aware that every major

2     private prison operator under a BOP criminal

3     alien contract has had a major disturbance within

4     this population?

5                    MR. FORGE:  Object as to form.

6                    THE WITNESS:  I know there has been

7          different disturbances amongst different

8          providers.  I don't know that you could

9          say it was every provider that the bureau

10         has contracted with for this type of

11         contract.

12                    BY MS. TOMKOWIAK:

13         Q.      Are you familiar with the disturbance

14     in 2015 at Willacy County in Texas?

15         A.      Yes, I am.

16         Q.      And -- and that's operated by MTC; is

17     that right?

18         A.      It was, yes.

19         Q.      Are you familiar with the disturbance

20     in Big Springs, Texas in 2008?

21         A.      That one I am not familiar with.

22     That was prior to my role as PMB administrator.

23     I don't recall that one.

24         Q.      What about the disturbance at Reeves

25     County, Texas in 2009?  Are you familiar with

1    that?

2          A.     I am familiar with that.

3          Q.     **And -- and that particular facility**

4    **is operated by the GEO Group; is that right?**

5          A.     It is on contract with Reeves County.

6    It is subcontracted to the GEO Group to manage

7    the -- that facility.  At least it was at the

8    time.

9                One thing I do recall about those

10   disturbances, at least the ones that I can

11   recall, is that there were perceptions from the

12   inmate population that they were not receiving

13   adequate medical care.

14         Q.     **If you could turn to page 26.**

15         A.     Okay.

16         Q.     **If you look at the last paragraph, it**

17   **says that Given the vast differences among the**

18   **services CCA offered the BOP and the services the**

19   **BOP provides in its own institutions, it is my**

20   **opinion it is impossible to make an**

21   **apples-to-apples cost comparison.**

22                **Do you see that?**

23         A.     I do.

24         Q.     **And what are the vast differences**

25   **among the services offered?**

www.aptusCR.com

1          A.     Well, as I articulate in the previous

2     page, some of the things that we just talked

3     about, and then qualifications of staff that I

4     refer to in the paragraph prior to that.  There

5     were just -- there were just vast differences.

6               In a BOP institution, you know, BOP

7     offered many different programs.  Security

8     levels, industries, work environments and

9     staffing qualifications were at a higher level

10    than what CCA required.

11               The contract requires certain things,

12    but not everything that the bureau offers and

13    provides.  So taking into consideration all of

14    those things, there's -- in my mind, there's no

15    way to make a comparison, an apples-to-apples

16    comparison.

17         Q.    **With respect to the quality of staff,**

18    **you agree that the staffing requirements are set**

19    **out in the contract, right?**

20         A.    They are.

21               MR. FORGE:  Object as to form.

22               BY MS. TOMKOWIAK:

23         Q.    **Okay.**

24         A.    The minimum core requirements, yes.

25         Q.    **I'm sorry, what?**

Case 3:16-cv-02267    Document 336-5    Filed 11/20/20   Page 167 of 177 PageID #: 10484
www.aptusCR.com

```
 1              A.     The minimum requirements, yes.

 2              Q.     Right.  So the -- the -- for CCA to

 3      be in compliance with the contract, the contract

 4      sets out the minimum requirements for the

 5      qualifications and -- of the staff and the

 6      staffing levels, correct?

 7              A.     Correct.

 8              Q.     I believe we -- you -- we talked

 9      earlier about the fact that you or staff under

10      your direction were required to approve staffing

11      decisions made by CCA, right?

12              A.     Yes.

13              Q.     What is an apples-to-apples

14      comparison?

15              A.     You're comparing the same exact

16      thing.

17              Q.     Did you attempt to make any cost

18      comparisons yourself?

19              A.     I did not.

20              Q.     So you don't have an opinion one way

21      or the other if CCA provided cost savings to the

22      BOP?

23                     MR. FORGE:  Object as to form.

24                     THE WITNESS:  I can't offer an

25              opinion without -- can you repeat the
```

 1          question, please?

 2                    BY MS. TOMKOWIAK:

 3          **Q.     So you don't have an opinion one way**

 4     **or the other if CCA provided cost savings to the**

 5     **BOP?**

 6                    MR. FORGE:  Object as to form.

 7                    THE WITNESS:  Again, what CCA

 8          offered or any other provider offered the

 9          BOP versus what the BOP provided in its

10          own institutions, there's no way to

11          compare that there was any cost savings.

12          I don't know how else to answer that

13          question.

14                    BY MS. TOMKOWIAK:

15          **Q.     Well, again, the -- the point here is**

16     **to understand and make sure I know all of the**

17     **opinions that you have formed in this case.  And**

18     **so based on what you just told me, it's my**

19     **understanding that you do not have an opinion**

20     **regarding whether CCA provided cost savings to**

21     **the BOP or not; is that right?**

22                    MR. FORGE:  Object as to form.

23                    THE WITNESS:  Well, as I stated,

24          the way I say it in my opinion, I guess

25          I'll just stick with that, that it would

1          not be accurate to claim -- to say that

2          contracting with CCA did or would save the

3          BOP money.

4              BY MS. TOMKOWIAK:

5          Q.     Did CCA ever say that it provided

6      cost savings to the BOP based on an

7      apples-to-apples comparison?

8              MR. FORGE:  Object as to form.

9              THE WITNESS:  I am not sure.  I was

10         asked to provide my opinion on that.

11             BY MS. TOMKOWIAK:

12         Q.     On -- on what?  On whether it would

13     be accurate to claim that CCA did or would save

14     the BOP money?

15         A.     I was asked whether the services CCA

16     provided to the BOP were sufficiently comparable

17     to the services BOP provided at its own

18     facilities as to be able to make an

19     apples-to-apples cost comparison such that anyone

20     could have accurately claimed that contracting

21     with CCA did and/or would save the BOP money.

22         Q.     You were not asked to opine on

23     whether or not CCA in fact provided cost savings

24     to the BOP?

25         A.     No.

Case 3:16-cv-02267   Document 336-5   Filed 11/20/20   Page 170 of 177 PageID #: 10487

www.aptusCR.com

1    Q.      You don't have an opinion on that?

2    A.      I was not --

3            MR. FORGE:  Object as to form.

4            THE WITNESS:  -- asked to provide

5        an opinion on that.

6            BY MS. TOMKOWIAK:

7    **Q.      We talked a little bit about ACA**

8    **accreditation earlier and the ACA -- I -- I**

9    **believe you testified to this, but I want to make**

10   **sure:**

11          **The ACA accredits all correctional**

12   **facilities, whether operated by a private**

13   **operator or the BOP; is that right?**

14   A.      Amongst -- yeah.  For the Bureau of

15   Prisons we sought ACA accreditation for all of

16   our BOP facilities and it was part of the

17   contract that our private providers acquire ACA

18   accreditation.

19   **Q.      And the ACA accreditation standards**

20   **are the same for the BOP facilities and the**

21   **privately operated facilities, correct?**

22          MR. FORGE:  Object as to form.

23          THE WITNESS:  I believe so.  There

24       was a different set of standards depending

25       on -- I think for our BOP facilities there

1          were detention standards.  So depending on

2          the mission of the BOP facility, there

3          could have been different standards

4          utilized.

5                    BY MS. TOMKOWIAK:

6          **Q.     Are you aware during the relevant**

7     **time period that all of CCA's facilities were**

8     **accredited by the ACA?**

9          A.     Yes.

10         **Q.     In fact, many of their facilities**

11    **consistently scored 100 percent on those audits?**

12         A.     Correct.

13                   MR. FORGE:  Object as to form.

14                   BY MS. TOMKOWIAK:

15         **Q.     We talked a little bit about the**

16    **oversight of BOP-operated facilities versus**

17    **privately operated facilities.  And I believe,**

18    **but correct me if I'm wrong, that you testified**

19    **that some functions at BOP-operated facilities**

20    **are contracted out.**

21              **Is that accurate?**

22         A.     I -- I recollect that the bureau --

23    yeah.  I think there may have been a couple

24    institutions where they may have contracted some

25    services, but I don't recall specifics, no.

www.aptusCR.com

```
 1              Q.      You don't recall specifically what
 2         services you believe were contracted out?
 3              A.      I don't.  It might have been a
 4         commissary.  I just recall that there was like a
 5         contracting person on-site or in a regional
 6         office and that was their responsibility for
 7         whatever institution may have had a contract
 8         within that region, to just ensure that the
 9         contractor was providing the services for what it
10         was contracted for.
11              Q.      We also talked a little bit about
12         third -- about monitors that were on-site at
13         BOP-operated facilities.
14                      Do you recall that?
15              A.      I do.
16              Q.      Just to clarify, those are not
17         third-party monitors, right?
18              A.      I don't -- those --
19              Q.      Let me ask it a different way.
20                      Those -- those monitors were employed
21         by the BOP; is that right?
22              A.      They were.  They're BOP staff.
23                      MS. TOMKOWIAK:  Could we go off the
24         record?
25                      MR. FORGE:  Sure.
```

www.aptusCR.com

```
 1                    VIDEO OPERATOR:  Yes.  The time is
 2          3:06 p.m. and we are now off the record.
 3                    (Thereupon, a brief recess was
 4                     taken.)
 5                    VIDEO OPERATOR:  Okay.  The time is
 6          3:23 p.m. and we are back on the record.
 7                    BY MS. TOMKOWIAK:
 8          Q.     So Ms. Mellendick, I just have a few
 9     very brief questions.
10                    First, when we were speaking about
11     the -- the populations of inmates at BOP
12     facilities and CCA facilities --
13          A.     Um-hmm (affirmative).
14          Q.     -- and you didn't mean to suggest
15     that the BOP contracts out all of the low
16     security inmate population, correct?
17          A.     No, I did not say that.
18          Q.     Okay.  And -- and, in fact, the BOP
19     itself continues to operate -- in -- in both the
20     relevant time period and today continues to
21     operate several low security facilities itself,
22     right?
23          A.     Yes.  The BOP has numerous low
24     security facilities.
25          Q.     Including facilities that have
```

www.aptusCR.com

1      criminal alien populations?

2           A.    There -- there could be inmates in

3      BOP low security facilities that have some

4      criminal aliens housed there, correct.

5           Q.    The BOP's low security prisons have

6      the same security requirements as CCA's low

7      security facilities; is that right?

8                 MR. FORGE:  Object as to form.

9                 THE WITNESS:  Far as I'm aware.

10                BY MS. TOMKOWIAK:

11          Q.    Who succeeded you in your role as PMB

12     administrator?

13          A.    Her name is Pamela Jones.

14          Q.    Did you work with Ms. Jones during

15     your time at the BOP?

16          A.    I did.

17          Q.    What's your opinion of Ms. Jones?

18                MR. FORGE:  Object as to form.

19                THE WITNESS:  She was one of the

20           privatization field administrators in my

21           branch and I was always respectful of her

22           and had no problems with the work that she

23           did and I was pleased to see her take on

24           my position once I retired.

25                MS. TOMKOWIAK:  I have no further

```
 1              questions.

 2                   MR. FORGE:  Okay.  I have no

 3              questions.

 4                   THE WITNESS:  Okay.

 5                   VIDEO OPERATOR:  All right.

 6                   MS. TOMKOWIAK:  All right,

 7         Ms. Mellendick, thank you for your time.

 8                   VIDEO OPERATOR:  No more questions?

 9         Let me go ahead and do my little read-on.

10                   This concludes today's deposition of

11         Donna Mellendick.  The time is 3:25 p.m. and

12         the date is October 27, 2020.

13                   We are now off of the record.

14                   (Thereupon, signature having not been

15                    waived, at 3:25 p.m. CST the

16                    deposition concluded.)

17

18

19

20

21

22

23

24

25
```

www.aptusCR.com

1                    CERTIFICATE OF NOTARY

2              I, MISTY KLAPPER, the officer before

3         whom the foregoing deposition was taken, do

4         hereby certify that the witness whose

5         testimony appears in the foregoing

6         deposition was duly sworn by me; that the

7         testimony of said witness was taken by me in

8         shorthand and thereafter reduced to

9         typewriting by me; that said deposition is a

10        true record of the testimony given by said

11        witness; that I am neither counsel for,

12        related to, nor employed by any of the

13        parties to the action in which this

14        deposition was taken; and, further, that I

15        am not a relative or employee of any

16        attorney or counsel employed by the parties

17        hereto, nor financially or otherwise

18        interested in the outcome of this action.

19              Further, that if the foregoing pertains to

20        the original transcript of a deposition in a federal

21   case, before completion of the proceedings, review

22   of the transcript [ X ] was [  ] was not requested.

23        Dated: November 3, 2020

24                         _____
                           Misty Klapper, RMR, CRR
                           and Notary Public

25