# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, ) ) ) | Civil Action No. 3:16-cv-02267 |
| Plaintiff, ) ) | Honorable Aleta A. Trauger |
| vs. ) ) | Magistrate Judge Jeffrey S. Frensley |
| CORRECTIONS CORPORATION OF AMERICA, et al., ) ) ) | |
| Defendants. ) ) ) | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO EXCLUDE TESTIMONY OF SCOTT DALRYMPLE

## REDACTED VERSION FILED PUBLICLY

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    LEGAL STANDARD.........................................................................................4

III.   ARGUMENT .....................................................................................................5

      A.      Mr. Dalrymple's Flawed Inflation Calculations ....................................5

      B.      Mr. Dalrymple's Inflation Estimates For The Yates Memo Are Unreliable And Lack Sound Methodology ...................................................................6

            1.      Mr. Dalrymple's Flawed Calculation of Inflation at the Time of the Yates Memo ...................................................................................6

            2.      The Overwhelming Amount of "Inflation" Mr. Dalrymple Calculates Has No Connection To CoreCivic's BOP Contracts ................7

      C.      Mr. Dalrymple's Inflation Calculation For The Cibola Non-Renewal Is Conclusory "Junk Science"...................................................................9

      D.      Mr. Dalrymple's Damages Model Is Flawed In Other Respects ...........................12

            1.      Mr. Dalrymple Cannot Calculate Inflation Without First Analyzing The Corrective Disclosures Or Challenged Statements............................12

            2.      Mr. Dalrymple's Damages Model Relies On A Notion Of "Risk" That Is Incompatible With The Allegations In This Case ........................13

            3.      Mr. Dalrymple Ignores Other Causes Of CoreCivic's Stock Drop ..........15

      E.      To The Extent He Seeks To Offer Them, Mr. Dalrymple's Loss Causation "Opinions" Are Unreliable, Conclusory Assertions With No Analysis ...............17

            1.      Mr. Dalrymple's Loss Causation "Opinions" Simply Parrot Plaintiff's Allegations Without Evidence Or Analysis.............................17

            2.      Mr. Dalrymple Did No Work To Support A Loss Causation Opinion Or Show A Connection Between The Alleged "Fraud" And Disclosures ........................................................................20

IV.   CONCLUSION.................................................................................................24

# **TABLE OF AUTHORITIES**

**Page(s)**

## **CASES**

*360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*,
2016 WL 6075566 (W.D. Tex. Apr. 22, 2016)........................................................9

*Apple, Inc. v. Samsung Elecs. Co.*,
2014 WL 794328 (N.D. Cal. Feb. 25, 2014) ...........................................................4

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co.*,
597 F.3d 330 (5th Cir. 2010), *vacated and remanded sub nom. Erica P. John
Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011)...........................................20

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
2010 WL 6397500 (S.D. Fla. Aug. 18, 2010).........................................................20

*Barber v. United Airlines, Inc.*,
17 F. App'x 433 (7th Cir. 2001) ............................................................................12

*In re BP p.l.c. Securities Litigation*,
2016 WL 3090779 (S.D. Tex. May 31, 2016) ........................................................15

*Brainard v. Am. Skandia Life Assur. Corp.*,
432 F.3d 655 (6th Cir. 2005) ..................................................................................5

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom. Bricklayers & Trowel
Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st
Cir. 2014) ....................................................................................................11, 16, 20

*Coffey v. Dowley Mfg., Inc.*,
187 F. Supp. 2d 958 (M.D. Tenn. 2002), *aff'd*, 89 F. App'x 927 (6th Cir.
2003) .......................................................................................................................8, 17

*Daubert v. Merrell Dow Pharm., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ...............................................................................5, 24

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993)...............................................................................................1, 4

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)................................................................................................20

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Penn. Sept. 3, 2010) .......................................................23

*Ed Peters Jewelry Co. v. C & J Jewelry Co.*,
    124 F.3d 252 (1st Cir. 1997) ................................................................12

*Fail-Safe, L.L.C. v. A.O. Smith Corp.*,
    744 F. Supp. 2d 870 (E.D. Wis. 2010) ..........................................22, 24

*Gen. Elec. Co. v. Joiner*,
    522 U.S. 136 (1997) ....................................................................5, 13

*Henricksen v. ConocoPhillips Co.*,
    605 F. Supp. 2d 1142 (E.D. Wash. 2009) ............................................5

*In re Imperial Credit Indus., Inc. Sec. Litig.*,
    252 F. Supp. 2d 1005 (C.D. Cal. 2003), *aff'd sub nom. Mortensen v. Snavely*,
    145 F. App'x 218 (9th Cir. 2005) ......................................................11

*Johnson v. Manitowoc Boom Trucks, Inc.*,
    484 F.3d 426 (6th Cir. 2007) .............................................................4

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) ........................................................................4

*Lentell v. Merrill Lynch & Co.*,
    396 F.3d 161 (2d Cir. 2005) ............................................................20

*Madej v. Maiden*,
    951 F.3d 364 (6th Cir. 2020), *cert. denied*, 2020 WL 6037415 (U.S. Oct. 13,
    2020) .............................................................................................4

*Mulvaney v. GEO Grp., Inc.*,
    237 F. Supp. 3d 1308 (S.D. Fla. 2017) .............................................16

*In re Nuveen Funds/City of Alameda Sec. Litig.*,
    2011 WL 1842819 (N.D. Cal. May 16, 2011) ........................13, 16, 20

*Oglesby v. Gen. Motors Corp.*,
    190 F.3d 244 (4th Cir. 1999) ...........................................................24

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ...........................................................20

*Pride v. BIC Corp.*,
    218 F.3d 566 (6th Cir. 2000) ........................................................4, 12

*In re REMEC, Inc. Sec. Litig.*,
    702 F. Supp. 2d 1202 (S.D. Cal. 2010) .........................................10, 23

*In re Rezulin Prods. Liab. Litig.*,
    369 F. Supp. 2d 398 (S.D.N.Y. 2005).........................................................................22

*Royal Park Investments SA/NV v. Deutsche Bank National Trust Co.*,
    2017 WL 1331288 (S.D.N.Y. 2017)...........................................................................24

*Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*,
    2018 WL 1750595 (S.D.N.Y. Apr. 11, 2018)..............................................................24

*State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*,
    980 F. Supp. 2d 1031 (N.D. Ind. 2013) .....................................................................24

*Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*,
    2001 WL 1602976 (S.D.N.Y. Dec. 14, 2001) ..........................................................9, 22

*United States v. An Easement & Right-of-Way Over 3.74 Acres of Land, More or
    Less, in Montgomery Cty., Tenn.*,
    415 F. Supp. 3d 812 (M.D. Tenn. 2019)......................................................................4

*In re Williams Sec. Litig.-WCG Subclass*,
    558 F.3d 1130 (10th Cir. 2009) .................................................................................15

*In re Xcelera.com Sec. Litig.*,
    2008 WL 7084626 (D. Mass. Apr. 25, 2008) .............................................................23

*Zenith Elecs. Corp. v. WH-TV Broad. Corp.*,
    395 F.3d 416 (7th Cir. 2005) .....................................................................................13

## RULES

Fed. R. Evid. 403 ...............................................................................................................4

Fed. R. Evid. 702 ...............................................................................................................4

# I.     INTRODUCTION

Plaintiff hired Scott Dalrymple ostensibly to "quantify the effect of [P]laintiff's allegations," *i.e.*, to render an opinion on potential damages should Plaintiff manage to prove all of the elements of liability for securities fraud at trial. But Mr. Dalrymple's work falls far short of meeting the basic requirements of relevance and reliability demanded by the Supreme Court, and there is too great an analytical gap between his opinions and the facts of this case. *See generally Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). His opinions are inherently unreliable and unhelpful to the trier of fact for multiple reasons, and, therefore, he should not be permitted to testify about them at trial.

Although the theory has shifted, Plaintiff now claims that CoreCivic's "fraud" was revealed through two corrective events: the non-renewal of CoreCivic's Cibola facility contract with the Bureau of Prisons ("BOP") and the announcement of a policy shift away from *all* private prison operators in a Memorandum issued by then-Deputy Attorney General Sally Yates (the "Yates Memo"). Mr. Dalrymple claims to have calculated the amount of "inflation" in CoreCivic's stock price that was attributable to Plaintiff's claims of fraud, but his deeply flawed methodology results in potential damages that are untethered to the facts and allegations at issue.

First, Mr. Dalrymple's opinion of inflation "revealed" by the Yates Memo bears no connection to Plaintiff's allegations and is grossly disproportionate to the size of the Company's BOP business. He concedes that CoreCivic's BOP contracts represented a relatively small portion of its overall business when the Yates Memo was issued—roughly seven percent. Yet Mr. Dalrymple claims that the fraud-related inflation revealed by the Yates Memo amounts to $6.62 per share, or more than **three times** his estimate of the value of CoreCivic's entire BOP business. Mr. Dalrymple concedes, as he must, that some portion of the inflation is unrelated to the BOP business. He also concedes that he *could have* calculated that amount, but that he did not. Not

surprisingly, Mr. Dalrymple provides no support or analysis for the novel concept of claiming inflation and damages arising from business that has nothing to do with the claims in this case. Mr. Dalrymple's estimate of inflation is unreliable and misleading, and, if presented to a jury, would unfairly prejudice Defendants.

Second, in finding that the Cibola non-renewal "revealed" fraud-created inflation, Mr. Dalrymple ignores his own (and this Court's) reliance on the efficient market theory—without which this case would never have been certified as a class action. It is undisputed that there was no statistically significant stock price decline associated with the Cibola non-renewal, which means that the market did not react to the news. Undeterred, Mr. Dalrymple simply invents a new way to attribute some inflation to the announcement. His methodology for doing so is completely different from what he used to estimate inflation revealed by the Yates Memo, has no economic basis, and is routinely rejected by courts.

Mr. Dalrymple's damages model is fundamentally flawed in other respects, too. He fails to consider whether any portion of the post-Yates Memo stock drop was attributable to factors unrelated to the claimed fraud. For example, CoreCivic's closest competitor (which Mr. Dalrymple assumes did <u>not</u> commit fraud) suffered a nearly identical stock price decline following the Yates Memo, and both companies' stock prices rebounded after the 2016 presidential election, but Mr. Dalrymple incredibly claims that those facts are irrelevant to his analysis. This makes no sense. Mr. Dalrymple also mixes and matches financial data with his own assumptions in a manner designed to do one thing: maximize potential damages for Plaintiff. Mr. Dalrymple cannot recall ever submitting a report or testifying in a case involving claims under the Securities Exchange Act

of 1934, Ex. 1,[1] Dalrymple Dep. 18:14–19:13, 225:25–226:8, but his inexperience does not excuse his fundamental errors.

Mr. Dalrymple's written reports also contain no analysis of loss causation. Rather, they set forth conclusory assertions that *assume* the truth of Plaintiff's loss causation theory: that CoreCivic's operational performance caused its relationship with the BOP to deteriorate to such a degree that there was a "risk that [CoreCivic's] BOP business would be lost." Ex. 2, Rebuttal Rpt. of Scott Dalrymple ("Dalrymple Rebuttal") ¶ 13; *see also* Ex. 3, Pl.'s Suppl. Resps. to Defs.' Interrogs. ("Suppl. Resps.") at 5–10. Nonetheless, at his deposition, Mr. Dalrymple vacillated, initially saying he is offering an opinion on loss causation, then later testifying that he is not. *Compare* Ex. 1, Dalrymple Dep. 35:14–16 *with id.* at 81:6–15, 173:11–174:5, 195:20–196:8. To the extent Mr. Dalrymple seeks to offer a loss causation opinion at trial, that opinion should be excluded. He performed no meaningful analysis and reviewed little evidence to confirm or test Plaintiff's loss causation theory. He did not form an opinion as to whether the two purported "materializations of risks" claimed by Plaintiff actually revealed the risk allegedly concealed by Defendants. He did not rely on *any* of the hundreds of thousands of documents produced by CoreCivic and the BOP. He did not review a single transcript from any fact witness deposition. He failed to consider CoreCivic's risk disclosures or other information disclosed during the Class Period relevant to the supposedly concealed risk. While he did review numerous securities analyst reports, he admitted he did not assess whether any of them supported Plaintiff's loss causation theory—perhaps because not one securities analyst suggested CoreCivic's relationship with the BOP was the catalyst of, or even had anything to do with, the Yates Memo. Mr. Dalrymple's

---

[1] All "Ex." citations refer to the Declaration of Morgan E. Whitworth, filed concurrently with this motion.

"methodology" is to assume Plaintiff's loss causation theory is true, perform no meaningful analysis to test it, and ignore all evidence to the contrary. He should not be allowed to stamp Plaintiff's loss causation theory with the imprimatur of "expertise" at trial after doing nothing more than parroting unproven allegations.

For all of these reasons, Defendants respectfully request that the Court exclude Mr. Dalrymple's reports and preclude him from testifying at trial.

## II.     LEGAL STANDARD

Expert testimony is permitted only where: "(a) [testimony] will help the trier of fact . . . ; (b) the testimony is based upon sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702; *see also Daubert*, 509 U.S. at 591. The proponent of the expert's testimony has the burden of proving that the testimony is admissible by a preponderance of the evidence. *See Pride v. BIC Corp*., 218 F.3d 566, 578 (6th Cir. 2000); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

"As 'gatekeepers,' the district courts are charged with 'discretion in determining whether . . . a proposed expert's testimony is admissible,'" based on whether it is both relevant and reliable. *United States v. An Easement & Right-of-Way Over 3.74 Acres of Land, More or Less, in Montgomery Cty., Tenn*., 415 F. Supp. 3d 812, 817 (M.D. Tenn. 2019) (Trauger, J.) (quoting *Johnson v. Manitowoc Boom Trucks, Inc*., 484 F.3d 426, 429 (6th Cir. 2007)). With respect to relevance, the Court must determine whether the evidence "will help the trier of fact to understand or determine a fact in issue." *See Madej v. Maiden*, 951 F.3d 364, 370 (6th Cir. 2020) (quoting Fed. R. Evid. 702(a)), *cert. denied*, 2020 WL 6037415 (U.S. Oct. 13, 2020). In doing so, the court "should also be mindful of other applicable rules," *Daubert*, 509 U.S. at 595, including Federal Rule of Evidence 403, because "expert testimony may 'carry special weight with the jury'"

resulting in unfair prejudice.  *Apple, Inc. v. Samsung Elecs. Co.*, 2014 WL 794328, at *9 (N.D. Cal. Feb. 25, 2014).

In assessing reliability, a court should consider "whether the theory or technique employed by the expert is generally accepted in the scientific community . . . [and] whether it can be and has been tested."  *See Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995).  The Supreme Court has emphasized that a "court [need not] admit [an expert] opinion . . . that is connected to [the underlying] data 'only by the *ipse dixit* of the expert,'" and that expert testimony should be excluded if "there is simply too great an analytical gap between the data and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  In other words, an "expert's bald assurance of validity is not enough.  Rather, the party presenting the expert must show that the expert's findings are based on sound science, and this will require some objective, independent validation of the expert's methodology."  *Henricksen v. ConocoPhillips Co.*, 605 F. Supp. 2d 1142, 1154 (E.D. Wash. 2009).  As such, it is "well within" a district court's discretion to exclude expert testimony when there is an "absence of meaningful analysis or reasoning."  *Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 664 (6th Cir. 2005).

## III.    ARGUMENT

### A.    Mr. Dalrymple's Flawed Inflation Calculations

Mr. Dalrymple purports to calculate per-share damages as the difference between CoreCivic's actual stock price and what the price would have been absent the alleged fraud.  Ex. 4, Expert Rpt. of Scott Dalrymple ("Dalrymple Rpt.") ¶¶ 11–12, 98–99.  He claims a total of $6.94 in inflation per share of CoreCivic stock as a result of the purported fraud.  *Id.* ¶ 89.  His $6.94 is the sum of two components:  (a) $6.62 that Mr. Dalrymple claims represents inflation at the time of the Yates Memo, and (b) $0.32 that Mr. Dalrymple claims represents additional inflation at the time of the Cibola non-renewal.  *Id.*  Mr. Dalrymple used one methodology to calculate the Yates

Memo inflation and a different one to calculate the Cibola non-renewal inflation. Both methodologies are fundamentally flawed, internally inconsistent, and reach unreliable results.

**B.  Mr. Dalrymple's Inflation Estimates For The Yates Memo Are Unreliable And Lack Sound Methodology**

      **1.  Mr. Dalrymple's Flawed Calculation of Inflation at the Time of the Yates Memo**

Mr. Dalrymple claims that $6.62 of CoreCivic's stock price decrease following the Yates Memo is attributable to the alleged fraud—in his words, it "quantif[ies]" the "extent of risk" that CoreCivic concealed if "the trier-of-fact determines that information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud."[2] Ex. 4, Dalrymple Rpt. ¶¶ 1–2, 12, 79, 90–91, 98. Mr. Dalrymple claims to measure the $6.62 in inflation at the time of the Yates Memo attributable to this alleged fraud as follows:

- First, he uses an event study to "estimate[] the share price impact of the [alleged] corrective disclosures," which Mr. Dalrymple calculates as **$8.06** for the Yates Memo. *Id.* ¶¶ 78, 80.

- To account for the possibility "that the share price would have declined" in response to the Yates Memo even absent any fraud, Mr. Dalrymple calculates a "counterfactual value" of CoreCivic's three remaining BOP contracts at the time of the Yates Memo (*i.e.*, the value of those contracts but-for Defendants' alleged fraud) of **$1.44**. *See id.* ¶¶ 82–84. To obtain this figure, he takes CoreCivic's estimate that the three remaining BOP contracts made up 7% of the Company's revenue, and then calculates what the dollar price decline would have been if the stock had only declined by 7% but still ended up at the same price (*i.e.*, at a closing price of $19.08) after the Yates Memo. *Id.* His counterfactual value assumes "that the BOP contracts contributed no value to [CoreCivic's] share price after the corrective disclosures." *Id.* ¶¶ 83–84.

- Finally, by subtracting the counterfactual value from the share price decline associated with the Yates Memo, Mr. Dalrymple claims to have estimated the inflation revealed by the Yates Memo that is attributable to the alleged fraud, *i.e.*, the value of the allegedly concealed risk: **$6.62**. *See id.* ¶¶ 80–89.

---

[2] Mr. Dalrymple recognizes that the amount of "inflation" baked into CoreCivic's stock price (if any) is equal to the value of the allegedly concealed "risk" of CoreCivic losing its BOP contracts. Ex. 4, Dalrymple Rpt. ¶ 79.

### 2. The Overwhelming Amount of "Inflation" Mr. Dalrymple Calculates Has No Connection To CoreCivic's BOP Contracts

As described above, Mr. Dalrymple's "counterfactual value" of $1.44 representing CoreCivic's BOP business at the time of the Yates Memo assumes that the market "placed little to no value on [CoreCivic's] BOP contracts" after the Yates Memo. *See id.* ¶ 84. This necessarily means that most, if not all, of the remaining $6.62 of inflation Mr. Dalrymple claims is ***unrelated*** to the BOP contracts at issue in the case.[3] Mr. Dalrymple concedes, as he must, that some portion of the $6.62 is related to CoreCivic's non-BOP contracts, *see* Ex. 1, Dalrymple Dep. 150:8–152:2, 157:19–158:3, 158:16–22, and does not dispute that he could have calculated this amount, *see id.* at 133:22–137:21, 152:5–8. Yet, Mr. Dalrymple chose not to do so, because it would only highlight the fact that the overwhelming amount of his inflation is not related to the BOP at all. *See* Ex. 6, Allen Rebuttal ¶ 33. Indeed, under Mr. Dalrymple's damages construct, Plaintiff claims damages for all of CoreCivic's non-BOP contracts—those with state and local governments, Immigration and Customs Enforcement, and the United State Marshals Service. Of course, those contracts have nothing to do with the BOP and none of Plaintiff's allegations relates to them. They were not the subject of discovery, and there is not a shred of evidence in this case about them. Mr. Dalrymple did not review those contracts. Nor did he analyze CoreCivic's non-BOP businesses or value them. He did nothing to support a claim of damages for those businesses. But Mr. Dalrymple claims inflation related to them nonetheless.

Mr. Dalrymple's response is that much of this "inflation"—perhaps all of it—represents the market's perception of an increase in risk to the *rest* of CoreCivic's business. *See, e.g.*, Ex. 1,

---

[3] As Defendants' expert, Ms. Allen, explains, 93% pertains to CoreCivic's non-BOP contracts based on Mr. Dalrymple's assumption that the amount of inflation from BOP versus non-BOP contracts is proportional to how much these contracts made up of CoreCivic's revenue and profits. Ex. 6, Rebuttal Rpt. of Lucy Allen ("Allen Rebuttal") ¶ 33.

Dalrymple Dep. 192:3–195:19. But Mr. Dalrymple does not explain *why* disclosing a risk to the BOP business would have increased the risk to the Company's other lines of business, and he certainly offers no analysis for why that risk is over *three times* the value of the entire BOP business. *Id.* Mr. Dalrymple devoted pages of his report, including the 12-page Appendix D, to his analysis of the value of CoreCivic's BOP business. The sum total of his analysis of the value of the remainder of CoreCivic's business—from which he derives the overwhelming amount of his inflation—is his bald speculation that "the corrective disclosure would have resulted in an increase in the perceived risk of CCA's other profit streams due to the BOP's decision and CCA's failure to disclose the extent of this risk prior to the Yates Memorandum." Ex. 4, Dalrymple Rpt. ¶ 70. Guesswork like this is junk science, not expert testimony. *See Coffey v. Dowley Mfg., Inc.*, 187 F. Supp. 2d 958, 975–76 (M.D. Tenn. 2002) (excluding testimony that was based on "'guesstimations' and speculations" rather than on "reliable principles and methods"), *aff'd*, 89 F. App'x 927 (6th Cir. 2003).

All of the available evidence contradicts Mr. Dalrymple's assumption that the purported fraud related to CoreCivic's BOP relationship was the catalyst of the Yates Memo, and that is what caused investors to discount CoreCivic's other businesses. Not one securities analyst that covered CoreCivic (or its competitor GEO) has ever made such a suggestion. *See infra* Section III.E.2 And it does not square at all with what actually happened at CoreCivic's non-BOP business lines. Even when CoreCivic was losing BOP business, it was *gaining* business from other customers— ICE, the US Marshals, etc.—sometimes at the very same facilities the BOP was vacating. Statement of Undisputed Material Facts iso Defs.' Mot. for Summ. J., filed contemporaneously herewith ¶¶ 110, 132.

Given all of that, it is not surprising that Mr. Dalrymple could provide absolutely no

analysis or evidence to support his baseless assumption that investors would have imputed a significant increase in risk for CoreCivic's non-BOP lines of business. Mr. Dalrymple's repeated reliance on assumptions contrary to the evidence, including market commentary, renders his conclusions unreliable and inadmissible. *See Supply & Bldg. Co. v. Estee Lauder Int'l, Inc.*, 2001 WL 1602976, at *5 (S.D.N.Y. Dec. 14, 2001) (rejecting expert opinions "contradicted by other data available to [the expert]"); *360 Mortg. Grp., LLC v. Homebridge Fin. Servs., Inc.*, 2016 WL 6075566, at *4 (W.D. Tex. Apr. 22, 2016) (excluding experts because their "application of th[eir] methodology is unreliable, both because of the facts they chose to include as well as those they chose to ignore"). Moreover, Defendants would be unfairly prejudiced if Mr. Dalrymple is allowed to testify about a speculative inflation amount that is wholly unrelated to the facts and circumstances at issue in this lawsuit.

### C. Mr. Dalrymple's Inflation Calculation For The Cibola Non-Renewal Is Conclusory "Junk Science"

Plaintiff also claims that the BOP's decision not to renew CoreCivic's Cibola facility was the materialization of a risk stemming from the allegedly deficient quality of CoreCivic's operations.[4] Mr. Dalrymple's claim of inflation arising from the Cibola non-renewal flies in the face of the results of his own event study, his opinion that CoreCivic stock traded in an efficient market, and the efficient market theory upon which the Court certified the class.

In his report, Mr. Dalrymple admits that the news of the Cibola non-renewal was "first published" on August 1, 2016 after the market closed, meaning any associated stock price reaction would be expected to occur on August 2, 2016. *See* Ex. 4, Dalrymple Rpt. ¶ 53. However, Mr.

---

[4] As noted below, Mr. Dalrymple has expressed no opinion and performed no analysis as to whether that theory is correct. Yet, Mr. Dalrymple still purports to offer an estimate of the inflation in CoreCivic's stock price as if he had in fact tested (and substantiated) such a theory. *See* Ex. 4, Dalrymple Rpt. ¶¶ 80–97.

Dalrymple's event study, which tests the price reaction on August 2 and 3, 2016, found no statistically significant price reaction associated with the Cibola non-renewal on either of those two days. *See id.* ¶¶ 53, 60. Mr. Dalrymple reiterated this conclusion during his deposition. Ex. 1, Dalrymple Dep. 91:24–92:24 ("On August 2nd and 3rd, there was not a statistically significant share price decline" even though "[t]he information that was known about the loss of the contract at that time was reflected in its share price on those days."). Mr. Dalrymple's testimony is consistent with his understanding that shares trading "in a semi-strong form efficient market . . . quickly incorporate new, value-relevant public information about the issuer" into the share price. Ex. 4, Dalrymple Rpt. App. C, ¶ 4. That finding should have been the end of Plaintiff's claim for damages for the Cibola non-renewal. But Plaintiff's theory demands that Mr. Dalrymple assume that the Cibola non-renewal was a partial materialization of allegedly concealed risks, so he had no choice but to ignore the results of his own event study and conjure a new way to find stock price inflation. *See* Ex. 4, Dalrymple Rpt. ¶¶ 67–69. To do so, Mr. Dalrymple multiplied $0.04 (the per share reduction in annual funds from operations ("FFO") from the loss of the Cibola contract) by 11.5 (the FFO multiple that CoreCivic's stock was trading at around the time of the alleged corrective disclosure).[5] *Id.*

Mr. Dalrymple's attempt to claim damages from the Cibola non-renewal fails because damages are not recoverable for securities fraud where the company's stock price did not react after the alleged corrective disclosure or materialization of the risk. *See In re REMEC, Inc. Sec. Litig.*, 702 F. Supp. 2d 1202, 1266 (S.D. Cal. 2010) ("[T]he decline in stock price caused by the revelation of th[e] truth must be statistically significant," to show "a causal connection between

---

[5] As he did for the Yates Memo inflation, Mr. Dalrymple reduces his Cibola non-renewal inflation estimate by his estimate of the BOP contracts' counterfactual value. *See supra* at III.B.1.

the material misrepresentation and the loss." (citation omitted)). Not surprisingly, Mr. Dalrymple cannot cite any supporting authority for his methodology of ignoring his own event study. *See* Ex. 4, Dalrymple Rpt. ¶¶ 67–69.[6] His methodology also does not reconcile with the efficient market hypothesis that the Court relied upon to certify the class. Dkts. 143, 165. This is grounds for exclusion, because a damages opinion is "unreliable" if it "ignores the efficient market principle." *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 189–90 (D. Mass. 2012) ("Plaintiffs may not at the same time presume an efficient market to prove reliance and an inefficient market to prove loss causation. They may not have their cake and eat it too."), *aff'd sub nom. Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82 (1st Cir. 2014).

Mr. Dalrymple admits that "[t]he extent to which the Cibola Contract Loss was reflected in CCA's share price reaction is ***not directly observable*** due to: 1) the ***lack of a significant price reaction to the initial news*** about the Cibola Contract Loss on August 1, 2016 . . . and 2) the ***substantial confounding information*** disclosed in conjunction with additional news about the Cibola Contract Loss on August 4, 2016." Ex. 4, Dalrymple Rpt. ¶ 67 (emphases added). Those factors are exactly why courts demand event studies from damages experts in securities class actions—otherwise, the expert is unable "to distinguish between the fraud-related and non-fraud related influences of the stock's price behavior." *In re Imperial Credit Indus., Inc. Sec. Litig.*, 252 F. Supp. 2d 1005, 1015 (C.D. Cal. 2003) (excluding damages expert's opinion as unreliable and collecting similar cases), *aff'd sub nom. Mortensen v. Snavely*, 145 F. App'x 218 (9th Cir. 2005). Mr. Dalrymple's unsupported and inconsistent methodology for measuring inflation from the

---

[6] Nor does Mr. Dalrymple replicate this same approach with the Yates Memo, most likely because doing so would have slashed Plaintiff's damages claim by at least 34%. *See* Ex. 4, Dalrymple Rpt. ¶¶ 88–89; Ex. 6, Allen Rebuttal ¶ 59.

Cibola non-renewal warrants exclusion of his opinions as irrelevant, unreliable, and arbitrary. *See Pride*, 218 F.3d at 578 ("The failure of [a party's] experts to test . . . [and] to validate their hypotheses by reference to generally accepted scientific principles as applied to the facts . . . renders their testimony . . . unreliable and therefore inadmissible . . . ."). Mr. Dalrymple is not allowed to pick and choose methodologies based on what maximizes Plaintiff's damages. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 260 (1st Cir. 1997) (affirming exclusion of valuation expert whose methodology "was internally inconsistent and unreliable" and created a "moving target"); *see also Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001) ("[I]n formulating his opinion [the expert] cherry-picked the facts he considered . . .[;] such a selective use of facts fails to satisfy the scientific method and *Daubert*, and it thus fails to 'assist the trier of fact.'" (citation omitted)).

### D. Mr. Dalrymple's Damages Model Is Flawed In Other Respects

#### 1. Mr. Dalrymple Cannot Calculate Inflation Without First Analyzing The Corrective Disclosures Or Challenged Statements

Mr. Dalrymple states that "to estimate inflation based on a company's share price reaction, certain conditions must hold. Importantly, the corrective disclosure must contain information relevant to the alleged contraventions, such that the disclosure of the relevant information may be used to infer how market participants adjusted expectations in response to the news." Ex. 4, Dalrymple Rpt. ¶ 37. But Mr. Dalrymple did not perform any analysis or form any opinions as to whether the Yates Memo or the Cibola non-renewal announcement actually "contain[ed] information relevant to" the challenged statements." *Id.* ¶¶ 37, 49–51. He simply assumed, at the direction of counsel, that they did. He similarly did not evaluate whether the Department of Justice's review of the BOP's monitoring of private prisons (the "OIG Review") was a corrective disclosure or revealed information relevant to the alleged fraud, despite the fact that Plaintiff

claimed in the Consolidated Complaint that it is a corrective disclosure, and Plaintiff's first expert, Dr. Steven Feinstein, agreed.[7] Consolidated Complaint, Dkt. 57 ¶¶ 191, 196–200; Rebuttal Report of Steven Feinstein, Dkt. 120-1 ¶¶ 14, 27. Mr. Dalrymple takes Plaintiff's allegations as gospel when they suit him but ignores others when they do not support his results-driven positions.[8]

Mr. Dalrymple's inflation calculations are a classic example of an opinion that is "connected to [the underlying] data only by the *ipse dixit* of the expert," and it must be excluded as a result. *Gen. Elec.*, 522 U.S. at 146; *see also Zenith Elecs. Corp. v. WH-TV Broad. Corp.*, 395 F.3d 416, 419–20 (7th Cir. 2005) (excluding expert testimony because "[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process" (citation omitted)). This is even more important in securities fraud cases because a damages calculation is meaningless without evidence of loss causation. *See In re Nuveen Funds/City of Alameda Sec. Litig.*, 2011 WL 1842819, at *4–8 (N.D. Cal. May 16, 2011) (excluding causation *and* damages opinions of expert who assumed "that plaintiffs' losses were caused by defendants' fraud" without "perform[ing] any investigation or analysis to support his conclusion).

## 2. Mr. Dalrymple's Damages Model Relies On A Notion Of "Risk" That Is Incompatible With The Allegations In This Case

Another problem with Mr. Dalrymple's damages model is that he assumes, rather than demonstrates, that the value of the allegedly concealed risk is exactly $6.94 per share (the sum of his estimates for fraud-related inflation revealed by the Yates Memo and the Cibola non-renewal) as soon as CoreCivic entered the so-called "zone of risk" and at all times that CoreCivic remained

---

[7] Mr. Dalrymple testified that he reviewed Dr. Feinstein's expert report but did not form any conclusions about Dr. Feinstein's opinions. Ex. 1, Dalrymple Dep. 16:9–17:16.

[8] Incredibly, Mr. Dalrymple claimed at his deposition that he did not remember "how plaintiffs characterize [the OIG Review] in their complaint." *Id.* at 50:8–14.

in the "zone of risk." Ex. 4, Dalrymple Rpt. ¶ 91.[9]  Mr. Dalrymple does not evaluate or opine on whether the market had already assumed some risk that CoreCivic might lose its BOP contracts (and discounted the stock to reflect that possibility) prior to CoreCivic's entering the "zone of risk."  Nor does Mr. Dalrymple assess when CoreCivic entered this "zone of risk."  Once again Mr. Dalrymple relies upon assumption rather than analysis by simply assuming that the zone of risk is an all-or-nothing, binary condition such that inflation in the stock price was either $6.94 or $0.  Ex. 1, Dalrymple Dep. 177:7–178:5[10]; *see also id.* at 181:19–182:1 ("Inflation either applies on that date, if that is the finding, or it does not, if that is not the finding.  It does not progress through some sort of scale . . . .  It is either found to be the case or it not found to be the case.").

The second problem is that Mr. Dalrymple's model cannot account for how inflation might change if CoreCivic is found to have entered and exited the zone of risk at different points during the class period.  Mr. Dalrymple acknowledged as much during his deposition:  "I suppose if the finder of fact found that it exited the zone of risk for some intermediate period during the class period, then inflation would not apply on those dates when it was outside the zone of the risk." *Id.* at 182:25–183:23.  But Mr. Dalrymple's inflation construct does not account for such fluctuations. Plaintiff's industry expert, Donna Mellendick, acknowledges that the allegedly concealed risk Plaintiff complains of here could fluctuate over time. *See* Ex. 8, Mellendick Dep. 146:9–150:14.[11]

---

[9] "My share price inflation estimates are based on a finding that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud [which he assumes without analysis], such that the extent of share price inflation remains constant from the time that the trier-of-fact makes such a finding until inflation is eliminated through the Cibola Contract Loss and the yates Memorandum." Ex. 4, Dalrymple Rpt. ¶ 91.

[10] For example, when asked to assume, as a hypothetical, that CoreCivic entered the zone of risk on February 9, 2013, Mr. Dalrymple said inflation on that day would be $6.94 per share, but "there would be no inflation on February 8, 2013." Ex. 1, Dalrymple Dep. 177:7–178:5.

[11] Mr. Dalrymple claims to have spoken with Ms. Mellendick in connection with preparing his report, *see* Ex. 4, Dalrymple Rpt. ¶ 8; Ex. 1, Dalrymple Dep. 186:9–187:16, but apparently did not discuss this point.  Ms. Mellendick claims to have never spoken with Mr. Dalrymple.  *See* Ex. 8,

So, if the jury finds Ms. Mellendick's testimony that the risk fluctuated over time during the Class Period credible, the jury would have no way to apply Mr. Dalrymple's inflation model. His construct is profoundly unhelpful to the jury.

Mr. Dalrymple's conception of risk is not how investors treat risk in real life, and it does not square with Plaintiff's theory of the case. It is irrational to assume that an investor would discount CoreCivic's stock price by the same amount ($6.94 per share) regardless of what the actual risk of losing the BOP contract is, so long as CoreCivic was in the "zone of risk" of losing them. But that is exactly what Mr. Dalrymple assumes, with no analysis or methodology. *In re BP p.l.c. Securities Litigation* rejected a similar all-or-nothing approach to inflation under a materialization theory. *See* 2016 WL 3090779, at *33 (S.D. Tex. May 31, 2016). In that case, the plaintiffs' expert's damages model did not account for the reality that investors may perceive "the probability of the risk materializing" as less than 100%. *See id.* For this reason, the Court called the expert's model "flawed" and rejected the plaintiffs' damages claims. *Id.* The result should be the same here.

### 3. Mr. Dalrymple Ignores Other Causes Of CoreCivic's Stock Drop

Mr. Dalrymple states that "[w]hen a corrective disclosure also contains information unrelated to the allegations, known as *confounding information*, it is necessary to remove the effects of this confounding information in order to isolate the share price reaction to information pertaining to the alleged contraventions." Ex. 4, Dalrymple Rpt. ¶ 37. That is because Plaintiff can only recover for losses that are attributable to Defendants' alleged fraud. *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1135 (10th Cir. 2009) (excluding expert who "fail[ed] to

---

Mellendick Dep. 36:5–36:23 ("Q: Mr. Dalrymple submitted a report in this case that refers to conversations that he had with you. Do you not recall those conversations? A: Not by—not with anyone by that name.").

differentiate between losses rooted in causes cognizable under loss causation doctrine" and "losses attributable to industry-specific stresses"); *In re Nuveen Funds*, 2011 WL 1842819, at *7. But Mr. Dalrymple failed to follow his own methodology because he did not assess whether there were other contributing factors to the post-Yates Memo stock drop besides its supposed revelation of CoreCivic's poor relationship with the BOP. This makes his inflation estimate unreliable.[12]

First, Mr. Dalrymple ignores contradictory evidence about the Yates Memo's impact on CoreCivic's primary competitor, GEO. He argues that GEO did not suffer the same deterioration of its relationship with the BOP, Ex. 2, Dalrymple Rebuttal ¶¶ 30–36, yet he does not even attempt to explain why GEO's stock price declined *more* than CoreCivic's the day the Yates Memo was released. *See* Ex. 4, Dalrymple Rpt. 15 n.72 ("Including or excluding GEO from these indices does not significantly affect the results of my analysis."). Mr. Dalrymple claimed that his event study "control[led] for the industry," but he could not have controlled for the private corrections industry because he does not know if it is "technically defined as an industry." Ex. 1, Dalrymple Dep. 201:15–202:9. And he could only dissemble when asked why GEO's comparable stock drop does not suggest that something besides market recognition of CoreCivic's purportedly impaired BOP relationship cased both companies' stock prices to drop following the Yates Memo. *Id.* at 204:11–208:2. This is willful blindness. If it were true that CoreCivic committed fraud and GEO committed no fraud, one would not expect GEO's stock price to react almost identically to a supposed revelation that only *CoreCivic* committed fraud.[13]

---

[12] It is not enough that Mr. Dalrymple performed an event study. "An event study that fails to disaggregate the effects of confounding factors must be excluded because it misleadingly suggests to the jury that a sophisticated statistical analysis proves the impact of defendants' alleged fraud on a stock's price when, in fact, the movement could very well have been caused by other information released to the market on the same date." *Bricklayers*, 853 F. Supp. 2d at 190.

[13] After the Yates Memorandum, GEO investors filed a similar suit, which the court dismissed on the pleadings. *Mulvaney v. GEO Grp., Inc.*, 237 F. Supp. 3d 1308, 1326 (S.D. Fla. 2017).

16

Similarly, Mr. Dalrymple ignores the rebound in CoreCivic's stock price after the 2016 presidential election. Mr. Dalrymple speculates that this rebound could have been driven by investors' expectations of "new future business from ICE and other customers." Ex. 2, Dalrymple Rebuttal ¶ 28. But Mr. Dalrymple does not explain why that improvement is not relevant when he freely admits that the stock price decrease for which Plaintiff is claiming damages resulted from investors' diminished expectations for future business from ICE and other customers. Ex. 1, Dalrymple Dep. 192:3–195:19. Mr. Dalrymple also blindly speculates that CoreCivic's stock price might have rebounded because its "economic circumstances may have changed," but offers no analysis and cites no evidence. Ex. 2, Dalrymple Rebuttal ¶ 27. This is exactly the sort of unscientific "'guesstimations' and speculations" courts exclude. *Coffey*, 187 F. Supp. 2d at 976.

### E. To The Extent He Seeks To Offer Them, Mr. Dalrymple's Loss Causation "Opinions" Are Unreliable, Conclusory Assertions With No Analysis

#### 1. Mr. Dalrymple's Loss Causation "Opinions" Simply Parrot Plaintiff's Allegations Without Evidence Or Analysis

In his reports, Mr. Dalrymple rests on Plaintiff's *allegations* of loss causation by repeatedly employing phrases like "I understand plaintiff alleges." *See, e.g.*, Ex. 4, Dalrymple Rpt. ¶ 10 ("I understand plaintiff alleges that the following corrective disclosures were in the zone of the risk concealed by Defendants' fraud"); *id.* ¶ 50 ("I understand plaintiff alleges, *inter alia*, that information contained in the Yates Memorandum and the Cibola Contract Loss . . . were corrective disclosures that revealed to the market relevant information")[14]; *id.* ¶ 70 ("I understand plaintiff

---

[14] As Mr. Dalrymple notes, Plaintiff now claims two corrective disclosures: the Cibola non-renewal and the Yates Memo. This is a significant departure from Plaintiff's allegations in the Consolidated Complaint and its position at class certification, where Plaintiff and its former expert claimed that the release of the OIG Review in August 2016 was a corrective disclosure but the Cibola non-renewal was not. Not surprisingly, given Plaintiff's position and its expert's opinion, the OIG Review was the focus of briefing on class certification and the Court's ruling certifying the class. Indeed, the heart of the Court's reasoning to certify the Class was its observation that

alleges the Yates Memorandum revealed to the market the extent to which the BOP relationship had deteriorated."); Ex. 2, Dalrymple Rebuttal ¶ 17 ("The Yates Memorandum allegedly revealed to the market the link between CCA's quality issues and its ability to retain the BOP business."); *see also* Ex. 4, Darlymple Rpt. ¶¶ 2, 3, 17–21, 66.

Yet, at his deposition, Mr. Dalrymple equivocated. First, he stated that he *was* rendering an opinion on loss causation. *See* Ex. 1, Dalrymple Dep. 35:14–16 ("Q: So are you rendering an opinion with respect to loss causation? A: Yes."). Then later, and consistent with his report, Mr. Dalrymple repeatedly testified that he did "not form an opinion" on loss causation because that question is reserved for the factfinder, and because Plaintiff did not "ask" him to form such an opinion. *Id*. at 81:6–15 ("I did not form an opinion as to whether certain releases were within the zone of risk of what was concealed."); *id.* at 195:20–196:8 ("Well, I think I state very clearly **what I assume** the plaintiff will prove, or more specifically what the finder of fact will find, which is that the information revealed through the corrective disclosures was within the zone of risk concealed through defendants' alleged fraud."); *id*. at 173:11–174:5 ("But as I testified earlier, I had not reached some sort of finding of fact as to whether the information revealed through the Yates memo was corrective or not. . . . I haven't been asked to form an opinion as to that finding of fact."); *id.* at 200:25–201:5 ("Q: Is it your opinion that CoreCivic's stock decline, upon release of the Yates memorandum, was the result of fraud by the [D]efendants? . . . . A: That sounds like you're asking me about a finding of fact or law, **I'm not sure**.").

Mr. Dalrymple's confusion tracks Plaintiff's responses to CoreCivic's loss causation

---

the OIG Review did not "bridge the gap between CoreCivic's representations and the truth" due to "limitations on [the OIG Review's] date range, subject matter, and methodology." Dkt. 165 at 32–33. Yet, Mr. Dalrymple did not even analyze the OIG Review, much less its date range, subject matter, or methodology, because now, having survived class certification, Plaintiff apparently thinks the OIG Review is irrelevant. Ex. 4, Dalrymple Rpt. ¶ 51.

interrogatories. Plaintiff initially objected that these interrogatories "prematurely seek information subject to expert testimony and reports that will be produced at a later stage of this litigation." Dkt. 312 at 31–33. Defendants moved to compel further responses to these interrogatories in part because Mr. Dalrymple's report obviously did not provide the promised information. *See* Dkt. 282 at 6–7. Judge Frensley agreed: "While Amalgamated seemed certain that its expert report(s) would provide the additional information that CoreCivic requires, it seems that such is not the case." Dkt. 312 at 34. Finally, in its supplemental interrogatory responses, Plaintiff cited Mr. Dalrymple's reports alongside pleadings and court orders in its objections to CoreCivic's interrogatories, but only mentioned his reports once in an actual response—for the uncontroversial proposition that the Yates Memo revealed "new" information. Ex. 3, Suppl. Resp. No. 27.

It is clear that Mr. Dalrymple *assumes* loss causation, and every other element of liability, and only attempts to estimate damages—a fact Mr. Dalrymple also acknowledged at his deposition.[15] Nonetheless, given Mr. Dalrymple's equivocation at his deposition, Defendants request that the Court not permit Mr. Dalrymple to flip flop again at trial and attempt to offer an opinion on loss causation.

---

[15]Specifically, Mr. Dalrymple testified:

> A: It's my opinion that the Yates memo revealed—sorry, that the—that if the Yates memo is found to have—sorry. The risk that materialized through the Yates memo, *if that is found to have been within the zone of the risk concealed*, then I have computed *what the inflation is* related to that, *but I have not—I have not determined whether the Yates memorandum and the information concealed were within the zone of risk*. . . . I have not been asked to make that determination. I have assumed that the plaintiffs, you know, will—you know, for the purposes of my analysis, will show liability."

Ex. 1, Dalrymple Dep. 174:14–175:8 (emphases added); *see also id.* at 80:2–81:23 (acknowledging a similar assumption with respect to the Cibola non-renewal announcement).

### 2. Mr. Dalrymple Did No Work To Support A Loss Causation Opinion Or Show A Connection Between The Alleged "Fraud" And Disclosures

While loss causation is ultimately up to the trier of fact, that does not absolve Plaintiff of its duty to put forth sufficient evidence of loss causation, which, among other things, requires that "the stock market . . . reacted to the subsequent disclosure of the misconduct and not to a 'tangle of [other] factors'" that can affect a stock's price. *Bricklayers*, 752 F.3d at 86 (alteration in original) (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 343 (2005)).[16] Mr. Dalrymple is not qualified to opine on loss causation here because he offered no discernable analysis that would allow him to do so reliably. He did not review any evidence or do any analysis to connect the risks supposedly concealed by Defendants' alleged fraud with the purported materialization of those risks.[17] Consequently, "[i]t would be just as scientific to submit to the jurors evidence of defendants' alleged fraud and [the] stock fluctuations and let them speculate whether the former caused the latter." *Id.* at 95 (citation omitted).

First, Mr. Dalrymple failed to consider the evidence. He mentions more than 200 documents in Appendix B of his report, but he admitted during his deposition that he did not rely on *any* of them because "[t]hey just weren't necessary to the analysis [he] was doing," *i.e.*,

---

[16] *See also Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co*., 597 F.3d 330, 344 (5th Cir. 2010) (plaintiff could not plead loss causation where expert "failed to provide the necessary linkage between the change in stock price and the allegedly culpable information"), *vacated and remanded sub nom. Erica P. John Fund, Inc. v. Halliburton Co*., 131 S. Ct. 2179 (2011); *In re Nuveen*, 2011 WL 1842819, at *4-8 (excluding testimony of expert who assumed that the inflated value of notes was caused by the defendant's alleged fraud); *In re BankAtlantic Bancorp, Inc. Sec. Litig*., 2010 WL 6397500, at *14 (S.D. Fla. Aug. 18, 2010) (excluding in part plaintiffs' loss causation expert where the disclosure in question was supposedly a "materialization of . . . previously undisclosed risk," but the expert did "not explain how or why this is so").

[17] Establishing loss causation under a "materialization of the risk" theory requires Plaintiff to prove that "the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384–85 (6th Cir. 2016) (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172–75 (2d Cir. 2005)).

estimating damages.[18]  Ex. 1, Dalrymple Dep. 31:8–32:13.  Nor does Mr. Dalrymple cite or rely

on any fact witness depositions.  Ex. 4, Dalrymple Rpt. App. B.  Mr. Dalrymple also failed to

consider any of the evidence produced by the BOP.  This is not surprising, because none of this

evidence supports Plaintiff's theory of loss causation.  Not one of the three current or former BOP

employees Plaintiff deposed testified that the Yates Memo was linked to risks regarding the quality

or cost-effectiveness of Defendants' BOP facilities.[19]  The Yates Memo does not mention

CoreCivic by name.  *See generally* Ex. 13.  And an email between BOP personnel exchanged

shortly after the release of the Yates Memo states that ███████████████████████████████

█████████████████████████████████████████████████████████████████████

███████████████████████ Ex. 14.  As a result, Mr. Dalrymple never saw—much

less considered—evidence inconsistent with the assumptions underlying Plaintiff's "loss

causation" theory.  This renders any of Mr. Dalrymple's potential loss causation opinions

unreliable and requires that they be excluded.

Second, while Mr. Dalrymple reviewed numerous securities analyst reports, he failed to

assess whether any of them actually support Plaintiff's causation theory.  In fact, market

commentary following the Yates Memo disproves the theory that it revealed any information that

was concealed by Defendants' alleged misrepresentations.  *See* Ex. 5, Expert Rpt. of Lucy Allen

("Allen Rpt.") ¶¶ 53–58.  None of the analyst reports published in the wake of the Yates Memo

implied that CoreCivic had misled investors with respect to the risk of losing its BOP contracts.

---

[18] Nor could they be.  All but one of these documents is some variation of a facility occupancy
report providing an update on BOP inmate population statistics, and has no apparent bearing on
Defendants' alleged fraud, or the losses purportedly caused by that fraud.  *See, e.g.*, Ex. 9; Ex. 10;
Ex. 11.

[19] In fact, Plaintiff's counsel never even asked about the Yates Memo during any of the BOP
witnesses' depositions.  And, when *Defendants'* counsel asked about the Yates Memo during one
of the BOP witness's depositions, that witness testified that he was not aware of it before it came
out.  *See* Ex. 12, Kelly Dep. 100:17–101:7.

21

Instead, analysts attributed the Yates Memo to a political shift in the BOP's use of private prisons. *See, e.g.*, Ex. 15 at 4 ("We believe the BOP itself is not going to be a fan of overcrowding its system to satisfy a ***political push*** to sever ties with private prisons." (emphasis added)); Ex. 16 at 1 ("For-profit prisons have been facing headline pressure throughout 2016 due to ***legislative efforts*** to enact criminal justice reform ***and comments from the campaign trail***. Our sense is that [the OIG Review] provided the ***political cover*** necessary for this memo. " (emphases added)); *see also* Ex. 5, Allen Rpt. ¶¶ 59–61. Mr. Dalrymple's "blindness to contrary evidence . . . 'fails to satisfy the scientific method and *Daubert.*'" *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887–89 (E.D. Wis. 2010) (citation omitted); *see also In re Rezulin Prods. Liab. Litig.*, 369 F. Supp. 2d 398, 425 (S.D.N.Y. 2005) ("[A]ny theory that fails to explain information that otherwise would tend to cast doubt on that theory is inherently suspect."); *Supply & Bldg.*, 2001 WL 1602976, at *5.

Third, information relevant to the supposedly concealed risks was repeatedly disclosed throughout the class period prior to the alleged corrective disclosures, but Mr. Dalrymple did not consider any of it.

- CoreCivic disclosed in SEC filings that "[e]scapes, inmate disturbances, and public resistance to privatization of correctional and detention facilities could result in [the] inability to obtain new contracts or the loss of existing contracts"; that it "may not always successfully comply with [its partners'] regulations" and contract requirements; and that this "failure . . . can result in . . . non-renewal, or termination of facility contracts." *E.g.*, Ex. 17 at 27, 30. Mr. Dalrymple acknowledged that he did not consider whether these risk disclosures informed the market of the allegedly concealed risks. *See* Ex. 1, Dalrymple Dep. 120:20–126:9.

- The OIG Review, published a week before the Yates Memo, also informed the market that contract prisons had higher rates of undesirable incidents than BOP-run facilities. Ex. 7 at ii, 14. Mr. Dalrymple admitted that this public report "identified quality issues," Ex. 1, Dalrymple Dep. 79:14–19, and his report acknowledges that the OIG Review contained disclosures "related to certain information allegedly concealed in this matter." Ex. 4, Dalrymple Rpt. ¶ 51. Yet Mr. Dalrymple only "analyzed what plaintiffs contend about the OIG Review and what the Court upheld about those allegations" without "form[ing] an opinion as to whether certain

releases were within the zone of risk of what was concealed." Ex. 1, Dalrymple Dep. 81:6–15.

- Other public sources published before the Yates Memo disclosed additional relevant information regarding the allegedly concealed risks. *See, e.g.*, Ex. 18 at -737, -743–44, (reporting that CoreCivic had received a "Cure Notice" from the BOP regarding medical services at Cibola, noting that Cibola "has accumulated more repeat deficiencies or significant findings in health services than any other private federal prison currently in operation," and highlighting negative audit findings regarding the Adams facility). Mr. Dalrymple ignored these as well. *See* Ex. 4 Dalrymple Rpt. App. B; Ex. 2 Dalrymple Rebuttal App. B.

If this type of information did not reveal the risk Plaintiff claims Defendants fraudulently concealed, then how could the challenged statements be materially misleading? Mr. Dalrymple does not know, because he did not look. Had he looked, Mr. Dalrymple would have discovered that the risks allegedly concealed had been previously disclosed on numerous occasions prior to their alleged materializations. *See* Ex. 5, Allen Rpt. ¶¶ 38–45; Ex. 6, Allen Rebuttal ¶¶ 43–44. Mr. Dalrymple's opinions on loss causation—to the extent he claims he has any—are simply too unreliable to be offered as evidence. *See In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *23 (E.D. Penn. Sept. 3, 2010) (excluding expert because "no reasonable jury could find that these disclosures revealed to the market new information about the falsity of [the] alleged misstatements"); *In re REMEC*, 702 F. Supp. 2d at 1273–75 (excluding expert who made the "key flaw" of "fail[ing] to separate the loss caused by the disclosure of corrective information . . . from loss caused by the disclosure of other company-specific information"); *In re Xcelera.com Sec. Litig.*, 2008 WL 7084626, at *1 (D. Mass. Apr. 25, 2008) (excluding expert testimony about a corrective disclosure because "his theory d[id] not match the facts").

Mr. Dalrymple's failure to perform any analysis, let alone empirical or scientific analysis, means that any opinion he might render on loss causation would consist entirely of assumptions

provided by Plaintiff's counsel.[20]  Whether an expert's opinion is developed independent of, or for purposes of, the litigation is a factor when determining its reliability.  *See Daubert*, 43 F.3d at 1317; *Oglesby v. Gen. Motors Corp.*, 190 F.3d 244, 250 (4th Cir. 1999) (excluding testimony from a "qualified" expert who relied upon "unsupported suppositions"); *Fail-Safe*, 744 F. Supp. 2d at 887–89 (excluding expert because he "in no way scrutinize[d] [a party]'s assumptions"); *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1048 (N.D. Ind. 2013) ("[A]n expert's proffered opinion that merely parrots information provided to her by a party is generally excluded.").  The jury does not need an "expert" to repeat Plaintiff's opening statement, and the Court should not permit Plaintiff's theories to be imbued with a false cloak of expertise.  To the extent Mr. Dalrymple has an opinion on loss causation, Defendants request that the Court exclude it.

## IV.  CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court exclude the report and testimony of Scott Dalrymple from this matter.

---

[20] This is not the first time Mr. Dalrymple has assumed what he should have analyzed, accepted flawed causation-related assumptions, and failed to propose a reliable damages model.   For example, in *Royal Park Investments SA/NV v. Deutsche Bank National Trust Co.*—another case in which Mr. Dalrymple was retained by Plaintiff's counsel—the court criticized his opinion on ascertainability because he "neither attempted nor [had] been asked to attempt" to "grapple substantively with the challenge, identified by [defendant]" inherent in the plaintiff's theory.  2017 WL 1331288, at *8 (S.D.N.Y. 2017) (denying class certification).  In a subsequent order denying class certification a second time, the court reiterated its criticism of Mr. Dalrymple—this time with respect to his damages analysis—for "assum[ing] that the information required to create the 'but for' world against which he could compare the actual world in order to measure damages . . . may be reliably calculated and provided to him."  *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2018 WL 1750595, at *8 (S.D.N.Y. Apr. 11, 2018).

DATED:  November 20, 2020                 Respectfully submitted:

 /s/ *Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Morgan E. Whitworth (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600
F: (415) 395-8095
morgan.whitworth@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

*Attorneys for Defendants Corrections Corporation*
*of America, Damon T. Hininger, David M.*
*Garfinkle, Todd J. Mullenger, and Harley G.*
*Lappin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

this 20th day of November, 2020.

/s/ *Steven A. Riley*
Steven A. Riley