# EXHIBIT 1

Videotaped Deposition of

**W. Scott Dalrymple, CFA**

October 22, 2020

Grae

vs.

Corrections Corporation of America, et al.



www.aptusCR.com / 866.999.8310

```
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF TENNESSEE

 3                       - - -

 4  NIKKI BOLLLINGER GRAE,            )
    Individually and on Behalf of     )
 5  All Others Similarly Situated,    )
                                      )
 6                     Plaintiff,     )    Case No.
                                      )
 7       vs.                          )   3:16-cv-02267
                                      )
 8  CORRECTIONS CORPORATION OF        )
    AMERICA, et al.                   )
 9                                    )
                       Defendants.    )
10  _____ )

11

12

13

14              THURSDAY, OCTOBER 22, 2020

15              VIDEOTAPED DEPOSITION OF

16               W. SCOTT DALRYMPLE, CFA

17              VIA REMOTE VIDEOCONFERENCE

18

19

20

21

22

23  Stenographically Reported by:
    Victoria L. Valine, CSR, RMR, CRR, RSA
24  California CSR License No. 3036

25  Job No. 10073772
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1                    REMOTE APPEARANCES:

 2

 3   FOR PLAINTIFF:

 4           ROBBINS GELLER RUDMAN & DOWD LLP
             Attorneys at Law
 5           BY:  Christopher M. Wood, Esq.
             414 Union Street, Suite 900
 6           Nashville, Tennessee  37219
             800.449.4900   FAX:  615.252.3798
 7           cwood@rgrdlaw.com

 8   FOR DEFENDANTS:

 9           RILEY WARNOCK & JACOBSON, PLC
             Attorneys at Law
10           BY:  Milton S. McGee III, Esq.
             1906 West End Avenue
11           Nashville, Tennessee 37203
             615.320.3700   FAX:  615.320.3737
12           tmcgee@rwjplc.com

13           LATHAM & WATKINS LLP
             Attorneys at Law
14           BY:  Morgan E. Whitworth, Esq.
             505 Montgomery Street, Suite 2000
15           San Francisco, California  94111
             415.391.0600   FAX:  415.395.8095
16           morgan.whitworth@lw.com

17           LATHAM & WATKINS LLP
             Attorneys at Law
18           BY:  Caitlin Campbell, Esq.
             355 South Grand Avenue, Suite 100
19           Los Angeles, California 90071-1560
             213.891.7786
20           Caitlin.campbell@lw.com

21

22   Also Present: Lucy Allen

23   Videographer:  David Campbell

24

25      (All parties appeared remotely via videoconference.)
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  deponent, and that there is no objection to that at this

2  time, nor will there be an objection to it at a future

3  date.

4        Please indicate your agreement by stating your

5  name and agreement on the record, after which, I will

6  swear in the witness.

7        MR. MCGEE:  Tray McGee on behalf of the

8  defendant.  We agree.

9        MR. WOOD:  Chris Wood.  We also agree.

10        CERTIFIED STENOGRAPHER:  Will you raise your

11  right hand, please, sir.

12        Do you solemnly swear that the testimony you

13  are about to give will be the truth, the whole truth,

14  and nothing but the truth, so help you God?

15        THE WITNESS:  I do.

16        CERTIFIED STENOGRAPHER:  Thank you very much.

17        Counsel, you may proceed.

18                         EXAMINATION

19  BY MR. MCGEE:

20     **Q.   Mr. Dalrymple, my name is Trey McGee.  I am an**

21  **attorney in Nashville, and I represent the defendants in**

22  **this matter.**

23        **Good morning.**

24     A.   Good morning.

25     **Q.   Have you given a Zoom deposition before?**

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  exactly we're doing, between say two and five people.

2      Q.    So apart from yourself, somewhere between two

3  and five people contributed to the work that underlies

4  your opinions?

5      A.    It might be if you look at the invoices, it

6  might be -- there might be more than five just because

7  at certain stages certain people were doing certain

8  things.  It would be fewer than 10 in total who helped

9  me on this report.

10     Q.    Okay.  Do you know roughly how much your firm

11 has been paid so far for this engagement?

12     A.    It would only be a very rough estimate.

13 Again, I have not added that up.

14     Q.    What would your rough estimate be?

15     A.    It would be -- a very rough estimate would be

16 500,000, but that is -- that has a very wide range

17 around it.  I would have to just go look at the

18 invoices.

19     Q.    Okay.  Are you offering any opinions in this

20 matter that are not contained within these reports?

21     A.    Well, since I issued these reports, I have

22 reviewed Ms. Allen's rebuttal report and her expert

23 testimony, and I have some opinions on that.

24     Q.    Any of those opinions, in particular, come to

25 mind?

1      A.   I would really just need to take a look at her

2  report.   They're similar and consistent with what's

3  written in my reports.

4      Q.   Okay.   So you haven't -- you might have some

5  new opinions, but -- but they haven't changed the

6  opinions that you wrote in your original report and your

7  rebuttal report?

8      A.   That's accurate.

9      Q.   Okay.   Are you aware that the plaintiffs -- or

10  plaintiff's counsel in this case previously retained

11  Steven Feinstein who issued an opinion?

12      A.   I am aware of that, yes.

13      Q.   Did you review Professor Feinstein's reports?

14      A.   I did review his reports.

15      Q.   If you'll turn to your initial report, which

16  is Exhibit 562, page 13.

17      A.   All right.

18      Q.   If you look down at footnote 65, you -- do you

19  see footnote 65?

20      A.   I do.

21      Q.   I'm just going to read the first sentence of

22  footnote 65.   It says, "I considered, but did not rely

23  on the expert reports of Professor Steven B. Feinstein

24  Ph.D., CFA, the plaintiff's expert on market

25  efficiency."

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      Why did you consider, but not rely upon

2  Professor Feinstein's report?

3      A.   When I became involved in the case, it was a

4  report that was in the records, so I reviewed the report

5  to see what it said, but I did not rely on it as a basis

6  for my opinions.

7      Q.   Okay.  Did you come to the conclusion that any

8  of Professor Feinstein's opinions in those reports were

9  wrong?

10     A.   No.  I did not -- I did not form opinions --

11  detailed opinions about Mr. Feinstein's opinions, but in

12  general, I do not recall having any disagreements with

13  them.

14     Q.   Did you speak with him in connection with your

15  work in this matter?

16     A.   No.

17     Q.   Let's turn to your CV, which is Appendix A of

18  your report.

19          First off, I see that you're a Longhorn.

20     A.   I am.  I -- I sometimes -- it's a -- it was a

21  hard choice, you know, every fall, I have to explain to

22  my children why I have to watch the Longhorns every

23  Saturday on television.

24     Q.   Well, I'm a Longhorn as well, so I suffer

25  similarly.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1        A.    Yeah.   It's -- it's been a tough few years.
 2        Q.    Let's -- let's look at -- at page 2 of your
 3   CV.   This is the testimony and publications section?
 4        A.    Yes.
 5        Q.    And this list includes all of your testimony
 6   over the past four years, correct?
 7        A.    Yes.
 8        Q.    Let's start with the -- the hearing
 9   testimony -- the trial and hearing testimony, which is
10   on page 3 of your CV.
11              Did the plaintiffs -- I see seven cases listed
12   there; is that correct?
13        A.    Let me count.   Yes.   I count seven as well.
14        Q.    Okay.   Did the plaintiffs in any of those
15   seven cases assert claims under the Securities and
16   Exchange Act of 1934?
17        A.    I do not believe so, but I do not recall
18   specifically.
19        Q.    And you understand that the plaintiffs in this
20   case are asserting claims under the Securities and
21   Exchange Act of 1934, correct?
22        A.    I have a general understanding of the claims
23   that are being asserted.
24        Q.    Good deal.
25              Flipping back a page to the deposition
```

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

 1   testimony, there's a lengthy list of deposition

 2   testimony here.  I won't try to count them, but do you

 3   recall if the plaintiffs in any of the cases listed

 4   under your deposition testimony asserted claims under

 5   the Securities and Exchange Act of 1934?

 6        A.   I don't have a specific recollection.

 7        Q.   Okay.  Do you have -- before today, have you,

 8   to your knowledge, testified in a case in which claims

 9   were asserted under the Securities and Exchange Act of

10   1934?

11        A.   Again, I don't have a specific recollection

12   of -- of the claims in each of these cases.  I don't

13   recall.

14        Q.   Fair enough.

15             In approximately -- so let's look back over

16   kind of a four-year timeframe from now.

17             Do you have any sense of how many expert

18   reports in litigation matters you've submitted?

19        A.   Sorry.  Over the last four years?

20        Q.   Yes.

21        A.   I have not gone back and counted.  I mean, I

22   could provide a --

23        Q.   Just an estimate.

24        A.   Individual expert reports -- let's see.

25        Q.   If it helps --

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      A.    I would imagine -- no.  Go ahead.

2      Q.    Go ahead.  Go ahead.

3      A.    I would imagine it's more than 25, probably

4  less than 50.

5      Q.    Okay.  Just -- I'm not trying to hide the

6  ball, I'm just trying to understand roughly how many

7  matters you've submitted records that didn't involve

8  testimony, so that they aren't listed here on your CV.

9      A.    Quite a few.

10      Q.    Okay.  And you performed an event study in

11  this case, correct?

12      A.    Yes.

13      Q.    And prior to this case, how many reports have

14  you issued that contained event studies?  Again,

15  roughly.

16      A.    Expert reports, probably -- I would guess

17  about five.

18      Q.    And --

19      A.    But I would just have to go back and look.  I

20  don't know.

21      Q.    That's fine.  But you estimate roughly five?

22      A.    Five reports, that's probably.

23      Q.    And were any of those in connection with

24  securities class action lawsuits like this one?

25      A.    Yes.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  efficiency discussion, so I'm quite familiar with those

2  cases.   The -- I would have personally reviewed just the

3  ones that I was perhaps less familiar with.

4      **Q.   So can you give me an example of one that you**

5  **would have reviewed that you were less familiar with**

6  **from the list?**

7      A.   So the Ohio Public Employees Retirement

8  System, which is number 10 --

9      Q.   Mmmm-hmmm.

10     A.   -- I believe that's a Sixth Circuit case

11  which -- which I was less familiar with.

12     **Q.   And so how did it come to be that -- that you**

13  **reviewed it?**

14     A.   When I was forming my view of the allegations,

15  I wanted to ensure that I had the appropriate

16  understanding of the, you know, legal basis of the

17  plaintiff's theory, and that was one of the cases that

18  plaintiffs pointed to in support of their theory of

19  liability.

20     **Q.   So you didn't independently locate that case?**

21  **It was provided -- it was pointed to you?**

22     A.   I believe -- well, I came to know about that

23  case through this case.  Whether I saw it in something

24  the plaintiffs had filed, or whether counsel identified

25  it to me first, I don't -- I'm not sure.

www.aptusCR.com

1    Q.   Okay.  How did these cases inform your

2  opinions about this matter?

3    A.   Well, I believe that each of these cases is

4  referenced in the relevant section in my report.  So

5  it -- it just depends each -- the cases support various

6  aspects of my report.  I would just have to go through

7  the report.

8    Q.   Okay.  All right.  Let's turn to page 12 of

9  Appendix B.

10    A.   All right.

11    Q.   And there are several tables that cover, at

12  least onto the third page, that list a number of Bates

13  stamps.  Are you familiar -- do you understand what I

14  mean by Bates stamps?

15    A.   I do.

16    Q.   And so these are individual documents that

17  were produced in the litigation; is that your

18  understanding?

19    A.   Yes.  I don't -- sorry.  I don't know if they

20  were individual documents, but yeah, these are -- I

21  don't recall if they're files or actual pages.  I would

22  just have to look.

23    Q.   Okay.  But they are documents -- they

24  represent documents produced in the lawsuit?

25    A.   Yes.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
1      Q.   Did you review these?

2      A.   I did.

3      Q.   And how did you decide that these -- of the

4  documents produced in the lawsuit that this group is

5  what you needed to review in order to render your

6  opinion?

7      A.   Well, ultimately, these -- these documents are

8  not anything that I needed to rely on for my analysis,

9  so I reviewed them, but ultimately did not utilize them

10  in preparing my opinions.

11      Q.   Why not?

12      A.   They just weren't necessary to the analysis I

13  was doing.

14      Q.   And you came to that conclusion after

15  reviewing all of them?

16      A.   Yes.

17      Q.   Did you ask to review any other documents that

18  were produced by parties in the case?

19      A.   Not that I recall.

20      Q.   Okay.  Let's turn to page 1 of -- of your

21  initial report, Exhibit 562, please.

22      A.   All right.

23      Q.   Are you there?

24      A.   I am.

25      Q.   Okay.  Paragraph 1 you state, "I have been
```

Grae vs.

W. Scott Dalrymple, CFA                Corrections Corporation of America, et al.

1   retained by Robbins, Geller, Rudman & Dowd in the

2   above-styled case to analyze and quantify the effect of

3   plaintiff's allegations that the defendants engaged in a

4   scheme to defraud investors and made materially false

5   and misleading statements and omissions regarding CCA's

6   business and operations that led to artificially

7   inflated share prices between February 27, 2012, and

8   August 17, 2016."  Correct?

9        A.   I believe you read that correctly.

10       Q.   And that was the scope of your engagement in

11   this matter, correct?

12       A.   Well, the section goes on for the next couple

13   of -- it goes through paragraph 3, but that is generally

14   the scope, yes.

15       Q.   And so are you rendering an opinion in this

16   matter as to whether the defendants were actually

17   engaged in a scheme to defraud investors?

18       A.   Yeah.  I'm sorry.  Let me just clarify.

19            That was the -- that was the scope at the time

20   I issued my report.  So the scope obviously does not

21   include the rebuttal opinions that I issued.

22       Q.   Okay.  Understood.

23       A.   Do you remind repeating that last question?

24       Q.   Sure.  Sure.  I'd be happy to.

25            Are you rendering an opinion in this matter as

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 15 of 95 PageID #: 10799

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  to whether the defendants were actually engaged in a

2  scheme to defraud investors?

3      A.   You're asking if I'm rendering an opinion?

4      Q.   Right.

5      A.   If defendants were -- did you say actively?

6      Q.   Actually.

7      A.   Actually.  Okay.  No.  I'm not rendering an

8  opinion about that.

9      Q.   Okay.  Are you rendering an opinion as to

10  whether the defendants made materially false and

11  misleading statements?

12      A.   I'm not -- I'm not rendering an opinion about

13  that.

14      Q.   Are you rendering an opinion in this matter as

15  to whether the defendants made materially false and

16  misleading omissions?

17          MR. WOOD:  Objection to form.

18          THE WITNESS:  I am not rendering an opinion

19  about that.

20  BY MR. MCGEE:

21      Q.   Are you rendering an opinion as to whether the

22  alleged materially false and misleading statements or

23  omissions led to artificially inflated share prices

24  during the class period?

25      A.   Would you mind repeating that?  I -- I just

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    want to make sure I answer it accurately.

2        Q.    Sure.    Sure.

3           Are you rendering an opinion in this matter as

4    to whether the alleged materially false and misleading

5    statements and/or omissions led to artificially inflated

6    share prices during the class period?

7       A.    So my -- my opinion is -- is not whether

8    the -- whether there were or were not misstatements, it

9    just -- you know, as I say here, to the extent that that

10    is found, it is my opinion that if the prior effect

11    determines that those -- that those misstatements and

12    omissions occurred, then that led to artificially

13    inflated share prices.

14       Q.    So are you -- are you rendering an opinion

15    with respect to loss causation?

16       A.    Yes.

17           MR. WOOD:   Scott, I don't think your answer

18    came through.

19           MR. MCGEE:   I'm sorry.   I'll ask the question

20    again.

21    BY MR. MCGEE:

22       Q.    So are you rendering an opinion as to loss

23    causation?

24       A.    Yes.

25       Q.    And what is your opinion as to loss causation?

www.aptusCR.com

Grae vs.

W. Scott Dalrymple, CFA                    Corrections Corporation of America, et al.

1      A.    I -- yeah, I summarize it pretty well in

2   section 4, yeah, paragraph 11, "I have measured the loss

3   caused by the materialization of the allegedly concealed

4   risks," and then I go on to explain what my opinions are

5   with regard to share price inflation.

6      **Q.    I understand.  And we'll spend a fair amount**

7   **of time on the inflation, but what I'm trying to get to**

8   **is what your opinion is on the loss cause.**

9      A.    Yeah.  Again, I'm not sure how to answer it

10  any -- any better than what I've written here in my

11  summary of opinions.

12     **Q.    Okay.  We'll circle back around to that.**

13          **What were you asked to assume with respect to**

14  **the misrepresentations that plaintiffs have alleged?**

15          MR. WOOD:  Objection to form.

16          THE WITNESS:  Well, I -- I don't believe I was

17  asked to assume anything, other than just like with any

18  damages or share price inflation case, there is an

19  assumption that -- that plaintiffs prove their

20  allegations.

21          MR. MCGEE:  Right.

22  BY MR. MCGEE:

23     **Q.    So -- but you're assuming for purposes of**

24  **rendering your opinion here, that the misrepresentations**

25  **are true?**

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  BY MR. MCGEE:

2      Q.   Can you explain it to me sitting here now,

3  why -- why you do not believe it's a corrective

4  disclosure?

5      A.   Well, as I -- and I'll just, you know, flip

6  back to what I wrote in paragraph 51 of my affirmative

7  report, I say, "the information contained in the OIG

8  review related to certain information allegedly

9  concealed in this matter.  It is my understanding that

10  plaintiffs contend that this information did not reveal

11  the truth about the concealed risk.  In addition, I

12  understand that the Court has found that due to

13  limitations on its date range, subject matter, and

14  methodology, the OIG review failed to bridge the gap

15  between CoreCivic's representations and the truth."

16          Accordingly, I do not consider the OIG review

17  as a corrective disclosure.

18      Q.   Okay.  Let's break that down then.

19          So the first sentence you say, it's your

20  understanding that plaintiff contends this information

21  did not reveal the truth about the concealed risk.

22          So -- so is the reason that you believe the

23  OIG report is not corrective is because that's your

24  understanding of what plaintiff alleges?

25          MR. WOOD:  Objection to form.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      THE WITNESS:  Well, that's -- obviously part

2  of my reason is going to be my understanding of the

3  plaintiff's allegations.

4  BY MR. MCGEE:

5      Q.   And what's the other part of your reason?

6      A.   Well, it's what I've written in the rest of

7  this paragraph.

8      Q.   Do you understand that the plaintiff's

9  complaint alleges that the OIG report was a corrective

10  disclosure, right?

11          MR. WOOD:  Objection to form.

12          THE WITNESS:  You know, I don't have a

13  specific recollection of how plaintiffs characterize

14  that in their complaint.

15  BY MR. MCGEE:

16      Q.   Did you read the complaint?

17      A.   I did.

18      Q.   Did you take a look at it?

19      A.   I'm sorry, what --

20      Q.   Do you recall if plaintiffs alleged that it

21  was a corrective disclosure?

22      A.   Yeah.  I just don't recall off the top of my

23  head precisely how plaintiffs wrote that in their

24  complaint.

25          MR. MCGEE:  Okay.  So David, could you pull up

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

 1  tab 15, please.

 2          THE WITNESS:  I think it's loaded.

 3  BY MR. MCGEE:

 4      Q.   Okay.  You've got it up?

 5      A.   Yes.

 6      Q.   Okay.  If you would turn to page 63 of the

 7  complaint, please.

 8      A.   Sorry.  It's still loading on my end.

 9      Q.   Yep.  That's fine.

10          And while that's loading, let me ask you

11  another question.

12          You read Lucy Allen's expert reports, correct?

13      A.   I have read Lucy Allen's export reports, yes.

14      Q.   And Ms. Allen discusses it at some length in

15  her report, the fact that plaintiffs allege that the OIG

16  report was, indeed, a corrective disclosure, correct?

17          MR. WOOD:  Objection to form.

18          THE WITNESS:  Yeah.  I'm sorry.  I was -- I

19  was multitasking a bit.  Would you mind just repeating

20  that?

21          MR. MCGEE:  Sure.

22  BY MR. MCGEE:

23      Q.   Ms. Allen discusses at some length in her

24  report the fact that plaintiffs allege that the OIG

25  report was a corrective disclosure?

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      A.    Well, that's not what I mean by that.

2            Cibola was linked to the cost and quality

3  issues that are part of the plaintiff's allegations, and

4  plaintiffs allege that the loss of that contract was

5  related to those same cost and quality issues.  When the

6  Cibola contract was lost, that reduced the value of the

7  allegedly concealed information.

8      Q.    But you're not answering my question.

9            We just spent a long time talking about the

10 OIG report and how it contained many, many different

11 statements, or allegations, or findings about cost and

12 quality issues at CoreCivic facilities.  And you

13 testified, as you wrote in paragraph 14 of your

14 rebuttal, that in order for it to be a corrective

15 disclosure, it had to link those cost and quality issues

16 to the loss of a contract, correct?

17           MR. WOOD:  Objection to form.

18           THE WITNESS:  I don't think that's precisely

19 what I said.

20           What I was referring to in paragraph 14 is

21 Ms. Allen's analysis where she attempts to test the

22 share price reaction corresponding to previous releases

23 from news reports and other public information about

24 quality and cost savings.

25           / / / / /

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1   BY MR. MCGEE:
 2        Q.   But that's precisely what the OIG report is,
 3   Mr. Dalrymple, it's public information that alleged
 4   quality and cost savings issues.  We just looked at it,
 5   right?
 6             MR. WOOD:  Objection to form.
 7             THE WITNESS:  Are you asking me if we just
 8   looked at the OIG report?
 9   BY MR. MCGEE:
10        Q.   Yeah.
11        A.   We just looked at the OIG report.
12        Q.   Yes.
13        A.   We did.
14        Q.   And -- and the OIG report is public
15   information that allege quality and cost savings issues,
16   correct?
17        A.   The OIG report is public, and it identified
18   quality issues.  I -- well -- and I don't recall
19   specifically what, if anything, it said about costs.
20        Q.   Okay.  Let's focus on quality.
21        A.   As I go back to paragraph 14, my point in
22   paragraph 14 is the identification of that type of
23   information without a link to the problems with CCA's
24   BOP relationship are not relevant in assessing
25   plaintiff's claims.  That's what I'm saying in
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1   paragraph 14.
 2        Q.   Right.
 3             You say there has to be a linkage.  So what is
 4   the linkage between quality and contracts that the
 5   Cibola corrective disclosure revealed?
 6             MR. WOOD:  Objection to form.
 7             THE WITNESS:  Well -- sorry.  So -- yeah, like
 8   I say in my report -- just bear with me.
 9             Yeah.  So in paragraph 66 of my report I
10   discuss this, that it was "a partial corrective
11   disclosure to the extent it reduced the value of the BOP
12   relationship that plaintiff alleges caused CCA's stock
13   to be inflated."
14   BY MR. MCGEE:
15        Q.   Right.  Well, I --
16             THE VIDEOGRAPHER:  Excuse me.  Sir, can you
17   scoot to your left, you're sliding out of frame.
18             THE WITNESS:  Is that better?
19             THE VIDEOGRAPHER:  Yes.  Thank you.
20   BY MR. MCGEE:
21        Q.   I understand that you write in paragraph 66
22   that that's what the plaintiff alleges, but you have --
23   you've -- you've told me today, and you say in your
24   report that Cibola is a corrective disclosure -- or at
25   least a partial corrective disclosure, and you've told
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    me that the OIG report is not a corrective disclosure,

2    correct?

3         A.   For purposes of my analysis, I look at Cibola

4    as a corrective disclosure, and I do not look at the OIG

5    review as a corrective disclosure.

6         Q.   So I'll ask the question again.  Is it your

7    opinion -- let me ask it this way.

8              Did you analyze whether the OIG report was a

9    corrective disclosure?

10             MR. WOOD:  Objection to form.

11             THE WITNESS:  I analyzed what plaintiffs

12   contend about the OIG report and what the Court upheld

13   about those allegations.  I did not form an opinion as

14   to whether certain releases were within the zone of risk

15   of what was concealed.

16   BY MR. MCGEE:

17        Q.   Did you --

18        A.   So I --

19        Q.   I'm sorry.  Go ahead.

20        A.   Yeah.  I mean, that's all -- that's all I can

21   tell you.  I think you're asking me if I, you know, made

22   some finding of fact about the OIG review, which I did

23   not.

24        Q.   I'm asking you your opinion.

25             Is it in your opinion -- did you analyze the

www.aptusCR.com

1  OIG report and formulate an opinion that it was not a

2  corrective disclosure?

3          MR. WOOD:  Objection to form.

4          THE WITNESS:  I analyzed the OIG report, I

5  analyzed plaintiff's allegations and what the Court

6  upheld, and I determined -- and I also looked at the

7  share price reaction, and I determined that it was not

8  necessary to consider the OIG review a corrective

9  disclosure for the purposes of my analysis.

10  BY MR. MCGEE:

11      Q.  Did you analyze the Cibola nonrenewal

12  announcement and formulate an opinion that it was a

13  corrective disclosure?

14          MR. WOOD:  Objection to form.

15          THE WITNESS:  Again, I analyzed the Cibola

16  nonrenewal in conjunction with the plaintiff's claims

17  and what the Court had upheld about those claims, and I

18  determined that it was necessary to analyze Cibola as a

19  corrective disclosure for the purposes of my analysis.

20  BY MR. MCGEE:

21      Q.  There was no statistically significant share

22  price movement on the release of the Cibola nonrenewal

23  announcement, was there?

24          MR. WOOD:  Objection.  Form.

25          THE WITNESS:  Well, that's not entirely

Case 3:16-cv-02267    Document 340-1    Filed 11/20/20    Page 26 of 95 PageID #: 10810
www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1 context as to that hypothetical.

2     Q.  Well, I'm just looking at your Appendix C, and

3 you say that "new information that is relevant to the

4 value of the company --" let's see. Whoops, I just lost

5 it.

6       "Since information has the potential to change

7 expectations about a company, and therefore the value of

8 its shares, on average one would expect days on which

9 new information was released to be associated with a

10 relatively higher frequency of statistically significant

11 abnormal returns in an efficient market in which shares

12 react quickly to new information."

13       Right?

14     A.  That sounds --

15       CERTIFIED STENOGRAPHER: I'm sorry, counsel,

16 what was your objection?

17       MR. WOOD: Well, Trey, which paragraph are you

18 at? Sorry.

19       MR. MCGEE: I'm sorry. I'm on paragraph 28 of

20 Appendix C.

21       MR. WOOD: Okay. Thank you.

22       THE WITNESS: I'm sorry. Let me flip over to

23 that. Okay. Yes. I see that.

24 BY MR. MCGEE:

25     Q.  Okay. And so if -- if information -- if new

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1 information was released that was not associated with --

2 I'm sorry.  I'm sorry.  I misread that.  Let me step

3 back.

4          Let's look at paragraph 53 of your report.

5     A.   Okay.

6     Q.   Paragraph 53 you state in the first sentence,

7 "it appears that news of the Cibola contract loss was

8 first published in a news article after market close on

9 August 1, 2016, by a local Albuquerque news station,

10 followed by another news story on August 2, 2016, in the

11 "Gallup Independent," a local newspaper in Gallup New

12 Mexico, correct?

13    A.   I think you read that correctly.

14    Q.   Well, those are your findings.

15    A.   Well, yeah, that's -- that was the information

16 I was able to find about that.

17    Q.   Okay.  And so, "although CCA's shares

18 experienced negative abnormal returns on both days,

19 neither of these daily price declines was statistically

20 significant at the 5 percent level," correct?

21    A.   That is what I wrote.

22    Q.   Well, is what you wrote accurate?

23    A.   Yes.

24    Q.   Okay.  So it's your opinion that after the

25 release on two consecutive days of news articles about

www.aptusCR.com

1    the Cibola contract nonrenewal, that there was no

2    statistically significant price declines in CoreCivic

3    stock, right?

4        A.   That -- that's correct.

5             On August 2nd and 3rd, there was not a

6    statistically significant share price decline.

7        Q.   And -- and it's further your opinion that

8    CoreCivic stock price was sufficient during the class

9    period, and that means that all publicly available

10   information was quickly and fully reflected in

11   CoreCivic's stock price, correct?

12       A.   I mean, that's -- that's generally accurate

13   without parsing the technical words around it.

14       Q.   So that's accurate -- that's an accurate

15   statement, correct?

16       A.   Yes.  It's my opinion that CCA traded in a

17   semi-strong form efficient market where -- where new

18   information was fully reflected in its share price.

19       Q.   So the loss of the -- or the nonrenewal of the

20   Cibola contract was fully reflected in the share price

21   of CoreCivic on August 2nd and 3rd, correct?

22       A.   The information that was known about the loss

23   of the contract at that time was reflected in its share

24   price on those days.

25       Q.   And you reviewed -- we went through it

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  earlier, you reviewed over 350 analyst reports, correct?

2      A.   I think that's right.

3      Q.   How many analyst reports -- how many of those

4  analyst reports you reviewed confirmed your view that

5  the Cibola nonrenewal revealed a deteriorating

6  relationship between the BOP and CoreCivic?

7      A.   Sorry.  Just to break that down a bit.

8           Are you asking me how many analyst reports --

9  sorry.  I'm not entirely sure what you're asking.  I

10 think what you're asking is how many analysts stated

11 that there was a deteriorating relationship between the

12 BOP and CCA after the Cibola contract loss; is that the

13 question?

14     Q.   Sure.

15     A.   I don't recall -- I don't recall analysts

16 commenting on the relationship after the Cibola contract

17 loss.  I'd have to look, but I don't recall any.

18     Q.   It's true, isn't it, Mr. Dalrymple, that no

19 analyst suggested that the Cibola nonrenewal was related

20 to cost or quality issues at CoreCivic, isn't it?

21          MR. WOOD:  Objection to form.

22          THE WITNESS:  Yeah.  I just don't recall

23 without going back through the analyst reports and

24 verifying that.

25          / / / / /

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1              MR. WOOD:  Objection to form.
 2              THE WITNESS:  Well, I mean, to the extent they
 3   inform the plaintiff's allegations, they do.
 4              So, for instance, if there is an allegation of
 5   a misstatement at the beginning of the period and
 6   without that statement the period would begin later,
 7   then that factors in.
 8              But my analysis does not disaggregate
 9   inflation based on each of those alleged misstatements.
10   BY MR. MCGEE:
11        Q.   Okay.  So your analysis does not disaggregate
12   or take into account each individual statement and apply
13   an inflation to each statement?
14              MR. WOOD:  Objection to form.
15              THE WITNESS:  Well, it's what I just said.
16              It accounts for the individual misstatements
17   to the extent that those individual misstatements form
18   the basis of plaintiff's allegations.
19              I did not disaggregate my inflation
20   calculation based on each of those individual
21   misstatements -- or alleged misstatements.
22              MR. MCGEE:  I'm just rereading your answer
23   there.
24   BY MR. MCGEE:
25        Q.   How can you tell if the Yates memo in the
```

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  Cibola nonrenewal revealed the risk that was allegedly

2  concealed without looking at the statements that

3  allegedly concealed that risk?

4     A.  Well, I did not say I did not look at those

5  statements.  I said I looked at those statements and I

6  formed a general understanding of the plaintiff's

7  allegations.

8     Q.  Okay.  Let's look at tab 12.  Were you able to

9  download that?

10     A.  I was.  It appears that I do have the

11  correct -- I do have the 2015 10-K in tab 12 of the

12  binder, if it's okay for me to look at that.

13     Q.  Yeah.  I think it's got perhaps some writing

14  on it, so I prefer to use the one.

15     A.  Yeah.  Okay.

16     MR. MCGEE:  Let's introduce this document.  I

17  believe we're at 566.

18     (Deposition Exhibit 566 marked.)

19  BY MR. MCGEE:

20     Q.  And Mr. Dalrymple, you started to tell me, but

21  for the record, could you tell me what this document is?

22     A.  Yeah.  Sorry.  Just hang on one second.

23     Yes.  This appears to be CoreCivic's 10-K for

24  the fiscal year ending December 31, 2015.

25     Q.  And did you review this document in connection

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    with formulating your opinions in this matter?

2         A.    Yes.

3         Q.    If you would turn with me to page 32 of the

4    10-K.

5              MR. WOOD:  Trey, which 32 are you -- the one

6    in the middle or on the right?

7              MR. MCGEE:  Good point, Chris.  The one in the

8    middle.

9              MR. WOOD:  Okay.

10             MR. MCGEE:  It would be 33 on the bottom

11   right.

12             MR. WOOD:  Okay.

13   BY MR. MCGEE:

14        Q.    Are you there Mr. Dalrymple?

15        A.    I almost am.  I'm sorry.

16        Q.    No.  That's fine.  I know it's not nearly as

17   easy to scroll through on a screen as it is in paper.

18        A.    I passed it up.  So sorry that was 32 in the

19   middle and 33 on the right?

20        Q.    Yeah.  33 of 161 which is, I think, page 32 of

21   it.

22        A.    Yep.  I have it now.

23        Q.    And these are what are commonly known as risk

24   factors.

25             Are you familiar with risk factors generally?

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 33 of 95 PageID #: 10817

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1        A.    Sorry.  Did you say "risk factors"?
 2        Q.    Yes.  Are you generally familiar with risk
 3   factors?
 4        A.    I'm generally familiar with them.
 5        Q.    Yeah.  And so if you look on page 32 there, do
 6   you see the paragraph beginning "failure to comply"?
 7        A.    Yes.
 8        Q.    So the first sentence there says, "failure to
 9   comply with facility contracts or with unique and
10   increased governmental regulation could result in
11   material penalties, or non-renewal, or termination of
12   non-compliant contracts or our other contracts to
13   provide or manage correctional and detention
14   facilities."
15              Do you see that?
16        A.    I do.
17        Q.    And then if you kind of scroll down to the
18   bottom, probably three lines from the bottom of that
19   paragraph there's a sentence that says, "we may not
20   always successfully comply with these regulations and
21   contract requirements, and failure to comply can result
22   in material penalties, including financial penalties,
23   non-renewal, or termination of non-compliant contracts."
24              Do you see that?
25        A.    I do.
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    Q.    Did you review these statements in connection

2  with formulating your opinion?

3    A.    I would have reviewed these and other

4  statements in the 10-K.

5    Q.    Do you agree with me that this statement

6  expresses a potential risk that CoreCivic might be found

7  to be not in compliance with certain contracts?

8    A.    Well, it says what it says.  I don't have any

9  reason to interpret it in any way other than what's

10  written on the page.

11    Q.    Would this have informed the market of these

12  risks?

13        MR. WOOD:  Objection to form.

14        THE WITNESS:  Well, this would have informed

15  the market of what it says on the page.

16  BY MR. MCGEE:

17    Q.    And so in an efficient market, such as you

18  found, this type of information would be reflected in

19  the stock price of the company?

20        MR. WOOD:  Objection to form.

21        THE WITNESS:  In an efficient market this, and

22  the other information in the 10-K, would be reflected in

23  the share price as it's written here.

24  BY MR. MCGEE:

25    Q.    So we talked a bit before -- about the -- when

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    we were discussing corrective disclosures, about the

2    linkage, I think is the word you used, with respect to

3    the quality issues at CoreCivic's BOP facilities and the

4    linkage of the fact that the contracts might be in

5    jeopardy as a result of those quality issues.

6             Do you remember that?

7        A.    Generally.

8        Q.    Would the -- would this statement in the 10-K

9    link public -- publicly known quality issues at

10   CoreCivic BOP facilities with the risk that those BOP

11   contracts would be in jeopardy?

12            MR. WOOD:  Objection to form.

13            THE WITNESS:  Well, I think what you're asking

14   me is part of what's at issue in the case, which is

15   whether these disclosures were adequate.

16   BY MR. MCGEE:

17       Q.    No.  No.  I'm -- I'm simply asking you that

18   if -- if there was -- let's use the Adams riot, for

19   instance, public disclosure of that event which is a

20   quality issue at the Adams facility, and we have a

21   disclosure here that says that these types of issues

22   could cause us to lose contracts, is that enough to link

23   the quality issues with the risk of loss of the

24   contract?

25            MR. WOOD:  Objection to form.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    THE WITNESS:  Yeah.  I think you're asking me

2  to make some sort of finding that again strikes me as

3  what -- part of what's at issue in the case.

4  BY MR. MCGEE:

5    Q.   I'm asking you your opinion.

6    A.   Well --

7    Q.   Is it -- I'm sorry.  I interrupted you.

8    A.   Well, I think, as I testified earlier, I have

9  not formed opinions as to whether these disclosures, or

10  any disclosures, were adequate.  That's not what I was

11  asked to do.

12    Q.   Yeah.  And I'm not asking you as to whether

13  these were -- were adequate.  I'm asking you about

14  linking the different types of information.

15    A.   Well, I realize you're not using the word

16  "adequate" --

17    MR. WOOD:  I'm sorry.  I don't think that's a

18  proper question or a question at all.

19  BY MR. MCGEE:

20    Q.   So is it your opinion that publicly disclosed

21  quality information, such as the Adams riot, and

22  disclosures such as this, and others in the 10-K, are

23  not enough for the market to understand that there could

24  be potential contractual ramifications for issues --

25  quality issues like the Adams riot?

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1              MR. WOOD:  Objection.
 2              THE WITNESS:  Yeah.  I just go back to it
 3   sounds like you're asking me to tell you whether I have
 4   a finding as to whether these disclosures, in
 5   conjunction with the previous events, were adequate,
 6   sufficient, whatever, to inform the market of the risk.
 7              And like I said, I have not analyzed the
 8   adequacy of these disclosures.  I was not asked to do
 9   that.
10              MR. MCGEE:  Okay.  Chris, do you want to take
11   a lunch break?
12              MR. WOOD:  Yeah.  I would like to do that.
13              MR. MCGEE:  It's almost 1:00 central.  How
14   long do you guys need?
15              We can go off the record.
16              THE VIDEOGRAPHER:  Going off the record at
17   12:54.
18              (The lunch recess was taken at 12:54 p.m.)
19                         --o0o--
20              (The proceedings resumed after the lunch break
21   at 1:50 p.m.)
22              THE VIDEOGRAPHER:  We are back on the record
23   at 1:50.
24   BY MR. MCGEE:
25        Q.   Good afternoon, Mr. Dalrymple.
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1        A.    Good afternoon.

 2        Q.    Would you turn to page 24 of your first

 3   report, please.

 4              Let me know when you get there.

 5        A.    I'm there.

 6        Q.    Okay.  This section of your report is your

 7   description of the inflation at the time of the

 8   corrected disclosures, correct?

 9        A.    Yes.

10        Q.    Specifically paragraphs 80 through 89?

11        A.    Yes.

12        Q.    If you would look at paragraph -- excuse me,

13   at table 5 on page 26.

14              Are you with me?

15        A.    Yes.

16        Q.    There you state that the impact of the

17   corrective -- excuse me, the impact of the Cibola

18   contract loss was 46 cents, correct?

19        A.    Yes.

20        Q.    And your opinion as to the impact of the Yates

21   memo, is $8.06, correct?

22        A.    Yes.  To clarify when you say "impact," that

23   is the impact before adjusting for the counter-factual

24   value of the BOP contracts.

25        Q.    Understood.  I'm just reading across the
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      A.   Yes.  I mean, the $19.08 in the preceding

2  sentence, which is after the Yates memorandum.

3      Q.   Right.  After the Yates memorandum.

4           So you say, "assuming this post-announcement

5  price placed little to no value on the BOP contracts,

6  one may infer what the value of the share price would

7  have been based on CCA's statement that the BOP

8  contracts represented approximately 7 percent of its

9  annual revenue and earnings."

10          Correct?

11     A.   I believe you read that correctly, yes.

12     Q.   And then you run through a calculation and

13 reach the conclusion that the BOP -- in your view, at

14 least, that the BOP contract's counter-factual value

15 would have been approximately $1.44 based on the

16 market's assessment of CCA's risk after the Yates

17 memorandum, correct?

18     A.   What I'm saying here is that that is one data

19 point that is implied by what CCA said after the Yates

20 memorandum.

21     Q.   What are other data points?

22     A.   Well, I discuss those in paragraphs 85 to 87

23 and in Appendix D.

24     Q.   Okay.  So let's focus on the $1.44 now.

25          Turn back to table 5, page 26.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      A.   All right.

2      Q.   In the middle column you -- as we just

3  discussed you list $8.06 as the impact of the corrective

4  disclosures.  And then you subtract the $1.44 we just

5  talked about, correct?

6      A.   That's correct.  For the Yates memorandum.

7      Q.   Yeah.  For the Yates memorandum.  That leaves

8  a total of $6.62, correct?

9      A.   Yes.

10      Q.   What does that $6.62 represent?

11      A.   That represents the loss attributable to the

12  materialization of risk through the Yates memorandum.

13      Q.   How much of the $6.62 of inflation is related

14  to the BOP?

15           MR. WOOD:  Objection to form.

16           THE WITNESS:  I did not disaggregate it here.

17  BY MR. MCGEE:

18      Q.   Did you disaggregate it anywhere?

19      A.   No.  I mean, I reviewed what Ms. Allen wrote

20  after I issued this report, but no, I did not

21  disaggregate it.

22      Q.   How much of the $6.62 of inflation you claim

23  at the time of the Yates memo is related to CoreCivic's

24  U.S. Marshals Service business?

25           MR. WOOD:  Objection to form.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1          THE WITNESS:  I did not disaggregate it by

2    business line or customer.

3    BY MR. MCGEE:

4         Q.   **Did you analyze the company's U.S. Marshals**

5    **Service contracts?**

6         A.   To the extent they were provided in CCA's

7    filings, I -- I was aware of them.  I did not perform

8    any specific analysis to try to disaggregate the $6.62

9    across those various contracts.

10         Q.   **What about ICE?**

11              **ICE is Immigration and Customs Enforcement.**

12              **How much of the company's ICE contracts are**

13    **represented in the $6.62 of inflation you claim?**

14              MR. WOOD:  Objection to form.

15              THE WITNESS:  Yeah.  Again, I did not

16    disaggregate the $6.62 by customer.

17    BY MR. MCGEE:

18         Q.   **How about state contracts, the State of**

19    **Tennessee, for instance, how much of the company's State**

20    **of Tennessee business is reflected in the $6.62 of**

21    **inflation you claim?**

22              MR. WOOD:  Objection to form.

23              THE WITNESS:  Again, it's the same answer.  I

24    did not disaggregate the $6.62 by customer.

25              / / / / /

www.aptusCR.com

1   BY MR. MCGEE:

**2      Q.   What does the $6.62 represent with respect to**

**3   inflation?**

4            MR. WOOD:  Objection to form.

5            THE WITNESS:  Well, if you -- if you look at

6   table 6, which is right after paragraph 94, you can see

7   $6.62 is the component of inflation related to the Yates

8   memorandum between February 8, 2013 and August 17, 2016.

9   BY MR. MCGEE:

**10     Q.   Did you -- you mentioned a chart in**

**11  Ms. Allen's report earlier with respect to this**

**12  calculation.**

**13           Do you disagree with Ms. Allen's chart?**

14     A.   Are you referring to her rebuttal report?

**15     Q.   Yes.**

16     A.   Could I -- could I flip to that?  Is it in

17  this binder?  I just want to make sure we're talking

18  about the same chart.

**19     Q.   Sure.  And that's tab -- for David, that's**

**20  tab 4.**

21           THE VIDEOGRAPHER:  I'm sorry.  You said tab 4?

22           MR. MCGEE:  Yes.  It was tab 4.

23           It was previously introduced, but I don't have

24  the exhibit number but we can reintroduce it as

25  Exhibit 567.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1          THE VIDEOGRAPHER:  Okay.

2          (Deposition Exhibit 567 marked.)

3    BY MR. MCGEE:

4          Q.    **That's on page 17, Mr. Dalrymple.**

5          A.    Okay.  I just wanted to make sure we were

6    talking about the same charts.  And your question was

7    whether I -- whether I agree or disagree with this

8    chart?

9          Q.    **Yes.  Is -- is the chart accurate?**

10         A.    I'm sorry.  I missed the last part.  Is the

11   what?

12         Q.    **Is the chart in Ms. Allen's report correct?**

13   **The chart on page 17.**

14         A.    Oh.  No.  It's not correct.

15         Q.    **What's wrong with it?**

16         A.    It improperly suggests that $6.16 of the $6.62

17   inflation figure is attributable to the non-BOP

18   business.

19         Q.    **Well, what is it attributable to?**

20         A.    Well, it's not proper to break it out in the

21   way Ms. Allen has.  The -- she seems to be multiplying

22   $6.62 by 7 percent, and I don't follow that logic.  But

23   regardless, that's just not an appropriate way to look

24   at -- to look at that.  So the $6.16 is just not a

25   meaningful number.

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 44 of 95 PageID #: 10828

www.aptusCR.com

1    Q.   Your inflation number is not meaningful?

2    A.   No.  That's not what I said.

3         I said her split of inflation between $6.16

4 for non-BOP, and 46 cents for BOP, that's not

5 meaningful.  That's not a meaningful split.  It's not

6 logical.

7    Q.   Okay.  So let me ask you this.  I'll turn back

8 to your report.  And while we do that, can you tell me

9 why it's not logical?

10   A.   Well, because there's no reason that you would

11 multiply the $6.62 inflation by 7 cents.  And if you

12 look in my report, you know, for instance in Appendix D,

13 you can see why that is.  You can see that, you know,

14 at -- given the contribution of the BOP businesses to

15 FFO at the margin and CCA's multiple at the time, the

16 BOP would account for much higher proportion of that

17 $6.62.

18   Q.   And what proportion would it account for?

19   A.   Well, like I said, I haven't -- I have not

20 done the math explicitly, but certainly a great deal

21 more than 7 percent.

22   Q.   So you say in paragraph 84 that your $1.44

23 counter-factual number assumes that little to no value

24 is placed on the BOP contracts, correct?

25   A.   The $1.44 figure -- I'm sorry.  Let me flip

1   back to that -- is based on the $19.08 figure which --
2   which appears to have little -- have placed little to no
3   value on the BOP contracts.
4        Q.   Right.
5             So if the $19.08 figure places little to no
6   value on the BOP contracts, as you've said, how much of
7   the $6.62 inflation relates to the BOP contracts?
8             It has to be either zero or a de minimis
9   amount, correct?
10             MR. WOOD:  Objection to form.
11             THE WITNESS:  Yeah.  That's not correct.
12  BY MR. MCGEE:
13        Q.   Why?
14        A.   Well, I think I'm going to have to ask you to
15  explain your logic a little bit more to explain what's
16  wrong with it.  I just don't follow the logic there.
17        Q.   Okay.  We'll try again.
18             Then maybe I can have you explain it to me.
19  You said -- testified earlier and your report says that
20  on August 19, 2016, CCA stock closed at $19.08, correct?
21        A.   Yes.
22        Q.   And you said, "assuming that this price --"
23  the $19.08 -- "placed little to no value on the BOP
24  contracts --" that you could calculate a counter-factual
25  value, correct?

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    Q.   Is it your opinion that was a result of CCA's

2  failure to disclose the extent of the risk prior to the

3  Yates memorandum?

4            MR. WOOD:  Objection to form.

5            THE WITNESS:  Well, I think you're asking me a

6  finding of fact.  That's -- that sounds like it's the

7  issue that's before the trier of fact.

8  BY MR. MCGEE:

9    Q.   I'm just reading what you wrote.

10           You said that you were not surprised that the

11  corrective disclosure would have resulted in an

12  increased risk -- increase in perceived risk of CCA's

13  other profit streams due to the BOP's decision and CCA's

14  failure to disclose the extent of this risk prior to the

15  Yates memorandum?

16    A.   Yeah.  I'm wondering if perhaps I should have

17  said alleged failure, but I think the point there is

18  that when there is a large revision to expectations and

19  the market learns a significant piece of information,

20  such as what it learned here, that a major customer is

21  at risk, it is unsurprising that there is an increase in

22  perceived risk across the rest of the company's

23  business.

24    Q.   But you're attributing inflation as a result

25  of the fraud, correct?

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1          MR. WOOD:  Objection to form.

2          THE WITNESS:  I'm not sure I understand your

3   question.

4   BY MR. MCGEE:

5      Q.   Well, you say back here -- flip to

6   paragraph 90.

7      A.   All right.

8      Q.   You say, "if the trier of fact finds that

9   defendants' alleged fraud fell within the zone of risk

10  revealed through the corrective disclosures, then the

11  inflation estimate set forth in table 5 would have been

12  present in CCA's shares beginning at the time the trier

13  of fact determines that the information revealed by the

14  corrective disclosures was within the zone of risk,"

15  correct?

16     A.   That -- that's what I wrote, yes.

17     Q.   All right.  Have you concluded -- have you

18  assumed that the BOP -- that CoreCivic's relationship

19  with the U.S. Marshals Service, ICE, and its state

20  customers was deteriorating?

21          MR. WOOD:  Objection to form.

22          THE WITNESS:  Have I assumed it that --

23  that --

24  BY MR. MCGEE:

25     Q.   In connection with your analysis.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    A.   No.  I have not made any assumptions about the
2  state of CCA's relationship with those customers.
3    Q.   Yet your inflation -- your $6.62 of inflation
4  includes inflation for those customers, correct?
5         MR. WOOD:  Objection to form.
6         THE WITNESS:  Well, like I said, it extends
7  beyond simply CCA's business, because there was an
8  increase in the perceived risk of CCA's entire earnings
9  stream, not just its BOP business.
10 BY MR. MCGEE:
11   Q.   And so that additional perceived risk you
12 calculate as inflation that results from the failure to
13 disclose the extent of the risk prior to the Yates
14 memorandum, correct?
15   A.   I think your question is how I -- are you --
16 are you asking me how I calculate the risk?
17        Did you ask me how I calculate the risk?
18   Q.   No.  You calculated $6.62 at the time of the
19 Yates memorandum of inflation.
20        As we talked about that $6.62 has some amount
21 of inflation as a result of the ICE business, some
22 amount as a result of the U.S. Marshals Service
23 business, some amount as a result of the state business,
24 correct?
25        MR. WOOD:  Objection to form.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

 1             THE WITNESS:  Some portion of the $6.62 is
 2   attributable to the non-BOP customers.
 3             MR. MCGEE:  Correct.
 4   BY MR. MCGEE:
 5        Q.   And you didn't calculate how much is
 6   attributable to each customer?
 7        A.   I did not calculate how much of the $6.62 is
 8   attributable to each individual customer.
 9        Q.   Correct.  Yet you're attributing all of that
10   inflation to CCA's failure to disclose the extent of the
11   risk -- the BOP risk, and the BOP's decision, as you
12   say, prior to the Yates memorandum, correct?
13        A.   Well, it is a single risk, and that risk is
14   materialized through the Yates memorandum.  And the
15   Yates memorandum was related directly to the BOP.
16             The materialization of the risk and the Yates
17   memorandum caused an increase in perceived risk across
18   the rest of CCA's business as well.  So it's all the
19   same risk that materialized.
20        Q.   And it all materialized because of BOP -- the
21   BOP declining relationship or deteriorating relationship
22   with CoreCivic?
23        A.   Again, it sounds like you're asking me a
24   finding of fact.
25        Q.   No.  You have said in your report that if a --

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 50 of 95 PageID #: 10834

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  a finder of fact can use the table at table 6 to

2  determine amount of inflation, correct?

3      A.   Sorry.  Are you reading from paragraph 98, I

4  guess?

5      Q.   Yes.

6      A.   Yes.  Paragraph 98 says that the finder of

7  fact -- "to the extent the finder of fact determines

8  that the information revealed by the corrective

9  disclosures was within the zone of risk concealed by

10  defendants' alleged fraud, then the share price

11  inflation figures corresponding to purchase dates in

12  table 6 would apply to any member of the class,"

13  et cetera.

14      Q.   Right.

15           And so the alleged fraud here is -- relates to

16  the BOP's relationship with CoreCivic, correct?

17      A.   Like I said, I feel like I've stated my

18  understanding of the allegations pretty clearly in my

19  report.

20           I don't --

21      Q.   Well, the allegations are contained in the

22  complaint, and the complaint -- the allegations in the

23  complaint are directed at the BOP's relationship with

24  CoreCivic, correct?

25           We've already established that there are no

www.aptusCR.com

Grae vs.

W. Scott Dalrymple, CFA                    Corrections Corporation of America, et al.

1    least a significant amount of the BOP business is worth

2    $1.44, correct?

3            MR. WOOD:  Objection to form.

4            THE WITNESS:  So, again, to go back to the

5    $1.44, the $1.44 is what I've assumed the

6    counter-factual value of the three BOP contracts would

7    have been before the Yates memorandum, and that was one

8    of three data points that I selected, the highest one,

9    which rendered my inflation calculations conservative.

10   BY MR. MCGEE:

11       Q.   Okay.  So backing up.

12            It's fair to say that the $6.62 inflation you

13   calculated contains some amount of non-BOP related

14   inflation, correct?

15           MR. WOOD:  Objection to form.

16           THE WITNESS:  I mean, I think your -- what you

17   say is that some portion of that loss relates to the

18   expectation that the BOP business is going to be lost,

19   and some other portion reflects the additional risk that

20   non-BOP business will be lost.

21   BY MR. MCGEE:

22       Q.   And you're attributing that additional risk

23   that non-BOP business will be lost to the alleged fraud

24   that plaintiffs put in the complaint, correct?

25           MR. WOOD:  Objection to form.

www.aptusCR.com

 1              THE WITNESS:  Again, I'm just measuring what

 2    the share price did when the risk materialized

 3    accounting for the counter-factual value of the BOP

 4    contracts.

 5    BY MR. MCGEE:

 6        **Q.   So your -- so when you say "inflation," that's**

 7    **just what it is, inflation, it may be wholly unrelated**

 8    **to the allegations in the complaint?**

 9              MR. WOOD:  Objection to form.

10              THE WITNESS:  That's -- no.  That's

11    inaccurate.

12              Like I said, I explain how the share price

13    declines, that I measure in table 5, relate to inflation

14    in table 6.  That that inflation is -- is derived

15    directly from those -- from the share price declines in

16    table 5.

17              MR. MCGEE:  Right.

18    BY MR. MCGEE:

19        **Q.   But let's look at table 6.  There's your $6.62**

20    **in the far column.**

21              **Do you see it in the third column?**

22        **A.   I do.**

23        **Q.   And so some amount, that you didn't calculate,**

24    **is related to the company's ICE business, correct?**

25              **MR. WOOD:  Objection to form.**

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1            THE WITNESS:  Yeah.  As I testified earlier,
 2   the $6.62 would be -- would represent inflation related
 3   to the BOP and the non-BOP business.
 4   BY MR. MCGEE:
 5       Q.   And so the non-BOP inflation -- that's what
 6   I'm focused on -- that inflation, in your opinion, must
 7   be as a result of the allegations in the complaint
 8   related to the BOP business?
 9            MR. WOOD:  Objection to form.
10            THE WITNESS:  Like I said, my understanding of
11   the allegations is that the risk that materialized and
12   was alleged in the complaint, was a single risk.  The
13   impact of the materialization of that risk affected
14   expectations for both the BOP and non-BOP business.
15   BY MR. MCGEE:
16       Q.   How much did the BOP business represent of
17   CCA's stock price prior to the Yates memorandum?
18            MR. WOOD:  Objection to form.
19            THE WITNESS:  Well, we talked about this
20   earlier, and -- and I pointed you to Appendix D.  I have
21   not calculated a precise estimate of what proportion of
22   CCA's share price the BOP business represented.
23   BY MR. MCGEE:
24       Q.   What did you analyze to measure that risk?
25            MR. WOOD:  Objection to form.
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1            THE WITNESS:  What risk?
 2  BY MR. MCGEE:
 3      Q.   The risk that you say materialized.
 4      A.   When you say "measure the risk," that
 5  analysis -- that is essentially subsumed within my
 6  analysis.  I do not, in my report, parameterize risk as
 7  a parameter.  So I guess I just don't understand what
 8  your question is getting at.
 9      Q.   I think we talked about this earlier, but I
10  want to make sure.  Which analyst concluded that the
11  CoreCivic stock price drop following the Yates
12  memorandum was -- resulted from the disclosure of the
13  BOP's deteriorating relationship?
14            MR. WOOD:  Objection to form.
15            THE WITNESS:  Sorry.  You're asking me which
16  analyst said that?
17            I don't -- I don't recall an analyst saying
18  that.
19  BY MR. MCGEE:
20      Q.   Well, what forms your basis to say that the
21  impact of the Yates memo extended beyond the value of
22  the BOP contracts?
23      A.   Yeah.  I think I said it pretty clearly in the
24  report.  I don't know --
25      Q.   I'm not asking you to re-read the report.  I'm
```

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 55 of 95 PageID #: 10839

www.aptusCR.com

Grae vs.

W. Scott Dalrymple, CFA                    Corrections Corporation of America, et al.

 1  B, I have a D.  Did you say D or E?

 2       Q.   D as in David.

 3       A.   D.  Okay.  Yes.  This appears to be it.

 4       Q.   If the Yates memo had, in fact, revealed to

 5  the market the deteriorating relationship between the

 6  Bureau of Prisons and CoreCivic, would you have expected

 7  that these analysts from SunTrust Robinson Humphrey and

 8  Compass Point would have noted that fact in these

 9  analyst reports?

10            MR. WOOD:  Objection to form.

11            THE WITNESS:  I don't know.  I don't know what

12  they would have -- what they would have noted.  It would

13  just -- it would just depend on, you know, what that

14  hypothetical Yates memorandum looked like.

15  BY MR. MCGEE:

16       Q.   I don't mean the hypothetical Yates

17  memorandum, I mean the actual Yates memorandum.

18       A.   But I think you just said -- or you posited a

19  Yates memorandum that had called out the deteriorating

20  relationship between the BOP and CCA.

21       Q.   Well, that's plaintiff's position, correct?

22  That the Yates memo is a corrective disclosure that

23  revealed to the market the deteriorating relationship

24  between CoreCivic and the Bureau of Prisons?

25            MR. WOOD:  Objection to form.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    THE WITNESS:  Yeah.  I mean, my understanding
2    of plaintiff's allegations is as set out in the report.
3    I guess I just don't understand how this relates to your
4    question.
5    BY MR. MCGEE:
6        Q.  Well, it's your opinion that the Yates
7    memorandum is a corrective disclosure, correct?
8        A.   Well, as I discuss in my report, the Yates
9    memorandum, based on the plaintiff's allegations, is a
10   corrective disclosure.
11       Q.   So you haven't independently determined
12   whether it's a corrective disclosure or not?
13           MR. WOOD:  Objection to form.
14           THE WITNESS:  Based on what the plaintiff
15   alleges, I have determined that the Yates memorandum
16   conveyed the information that caused the market to
17   revise its expectations.
18           You know, and I tested it as a corrective
19   disclosure.  I incorporated it into my analysis based
20   upon that.
21           But as I testified earlier, I had not reached
22   some sort of finding of fact as to whether the
23   information revealed through the Yates memo was
24   corrective or not.  That -- that's a finding of fact
25   that I understand is before the trier of fact.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1  BY MR. MCGEE:
 2      Q.   I'm not asking about a find -- I'm asking your
 3  opinion.
 4      A.   Well, I haven't been asked to form an opinion
 5  as to that finding of fact.
 6      Q.   Is it your opinion that the Yates memo was a
 7  corrective disclosure?
 8          MR. WOOD:  Objection to form.
 9          THE WITNESS:  What I have concluded here is --
10  you know, all I can do is go back to what I've written
11  in the summary of my opinions and I can tell you what my
12  opinions are.
13  BY MR. MCGEE:
14      Q.   I'm just -- it's a yes or no question.
15          I'm asking you, is it your opinion that the
16  Yates memo is a corrective disclosure?
17          MR. WOOD:  Objection to form.
18          THE WITNESS:  It's my opinion that the Yates
19  memo revealed -- sorry, that the -- that if the Yates
20  memo is found to have -- sorry.
21          The risk that materialized through the Yates
22  memo, if that is found to have been within the zone of
23  the risk concealed, then I have computed what the
24  inflation is related to that, but I have not -- I have
25  not determined whether the Yates memorandum and the
```

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    information concealed were within the zone of risk.

2              And in order for me to tell you -- to answer

3    your question, it sounds like I would have to make that

4    determination, and I have not been asked to make that

5    determination.

6              I have assumed that the plaintiffs, you know,

7    will -- you know, for the purposes of my analysis, will

8    show liability.

9    BY MR. MCGEE:

10        Q.   Is it your opinion that the information

11   revealed in the Yates memorandum was new information to

12   the market?

13        A.   Yes.  The information revealed through the

14   Yates memorandum was new information to the market.

15        Q.   Let's turn back to table 6.  This is your

16   table, and paragraph 94, page 27 of your complaint.

17        A.   All right.

18        Q.   Are you with me?

19        A.   Table 6, yes.

20        Q.   You say in paragraph 95, "the above inflation

21   estimates are based on an approach known as the constant

22   dollar method --" I'm sorry.  Excuse me.  Let's go down

23   to 97.

24              You say, "in my opinion the above inflation

25   estimates represent reasonable and conservative

1    estimates of the impact of the allegedly concealed risk

2    during the class period."

3              That's your opinion, correct?

4        A.   Yes.  I'm sorry.  You're on 97?

5        Q.   Yep.  I misspoke earlier.  I apologize.  I

6    meant to direct you to 97.

7        A.   Okay.  I just read what I wrote.  I think you

8    said it.

9        Q.   And so it's your opinion that the inflation

10   estimates in table 6 represent reasonable and

11   conservative estimates of the impact of the allegedly

12   concealed risk during the class period?

13       A.   Yes.

14       Q.   So table 6, let's look at the -- as I

15   understand it, the table has three columns, and the

16   difference -- or the reason that the first two columns

17   exist is because you had to reflect the company's

18   conversion to a REIT, correct?

19       A.   The -- that's the first column reflects -- is

20   reflective of that shift, and then the second column is

21   reflective of inflation including the Cibola contract

22   loss, and then the third column is -- is inflation once

23   the partial corrective disclosure of the Cibola contract

24   loss has been made.

25       Q.   Let's look at the middle column.  The middle

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 60 of 95 PageID #: 10844
www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  column is -- covers February 8, 2013, to August 1, 2016,

2  right?

3      A.    Correct.

4      Q.    Total inflation of $6.94.  Do you agree with

5  that?

6      A.    Yes.

7      Q.    Okay.  Let me give you a hypothetical to make

8  sure -- I want to make sure I understand how this chart

9  works.  So let's say on February 9th of 2013 -- so one

10 day into this class period -- let's say the finder of

11 fact -- the trier of fact determines that the

12 information revealed about a corrective disclosure was

13 within the zone of risk concealed by defendants' alleged

14 fraud and that began on February 9, 2013.

15          Are you with me?

16     A.    I am.

17     Q.    Is it your opinion then that the inflation on

18 February 9, 2013, would be $6.94?

19     A.    Based on that finding, yes.

20     Q.    And under that hypothetical, what would the

21 inflation have been on February 8, 2013?

22          MR. WOOD:  Objection to form.

23          THE WITNESS:  I'm sorry.  Did you say

24 February 8th is before the finder of fact determines

25 that the risk concealed was within the zone of risk that

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

 1  materialized; is that right?

 2  BY MR. MCGEE:

 3       Q.    Correct.

 4       A.    Then -- then there would be no inflation on

 5  February 8, 2013.

 6       Q.    So in my hypothetical there would be no

 7  inflation on February 8th, 2013, but on

 8  February 9th, 2013, there would be $6.94 of inflation,

 9  correct?

10       A.    If that is what the finder of fact determines.

11       Q.    Well, the finder -- let's -- let's go back to

12  the finder of fact.

13            If the finder of fact determines that the

14  information revealed by the corrective disclosure is

15  within the zone of risk, then you say that the inflation

16  figures on table 6 would apply, correct?

17       A.    I believe that's generally what I say in

18  paragraph 98.  I say it a little differently there, but

19  I -- I think that's accurate.

20       Q.    So your compute -- so you have computed

21  inflation here as if the relationship between CoreCivic

22  and the BOP was irretrievably broken in one day, and on

23  that day, February 9, it was certain that the BOP would

24  no longer renew or award CoreCivic new contracts; is

25  that correct?

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1                  MR. WOOD:  Objection to form.
 2                  THE WITNESS:  No.
 3   BY MR. MCGEE:
 4        Q.   Why not?
 5        A.   Well, for multiple reasons.  It was -- you
 6   said a couple of things in that question that weren't
 7   correct.
 8        Q.   What were they?
 9                  MR. WOOD:  Objection to form.
10                  THE WITNESS:  Well, I think you said that the
11   relationship was irretrievably broken in one day, and
12   I'm not sure how that comes into play in your
13   hypothetical, but I don't -- I don't see why a finder of
14   fact would need to find that the relationship was broken
15   in a single day.
16                  And then -- well, I think -- if you want to
17   read the question back to me, we could break it down
18   that way.
19   BY MR. MCGEE:
20        Q.   Well, let's do it this way.
21                  If -- in your rebuttal report you say that
22   "CoreCivic concealed quality-related incidents during
23   the class period that caused its relationship with the
24   BOP to deteriorate."
25                  And that's consistent with what the plaintiffs
```

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    have alleged.

2              Do you agree with that?

3         A.   Could you -- would you mind pointing me to

4    where you are in my rebuttal report, just so I can

5    follow along?

6         Q.   Sure.  Paragraph 13.

7         A.   I think you were reading from probably the

8    second to last sentence in there, in 13, but I think

9    I'm -- I understand what you were saying.

10        Q.   Right.

11             It says, "plaintiff argues that CoreCivic

12   concealed that these incidents had caused its

13   relationship with the BOP to deteriorate causing it to

14   lose contracts and putting its business at risk."

15             And so my question is simply, if a

16   relationship deteriorates over time, how is it that the

17   inflation on day one is the same as it is on the day

18   before the Cibola announcement or the Yates memo?

19        A.   Well, again it is -- the inflation applies

20   when it is determined that the -- the information

21   concealed is within the zone of the risk that

22   materialized.  And that determination can be as of the

23   day.  That day might be after the relationship had

24   already deteriorated.  It could be somewhere in the

25   middle.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1        It's not necessarily the first instance when

2  the relationship started to deteriorate.  Again, that's

3  up to the finder of fact.

4      Q.    Right.

5        But this is your model and opinion of

6  **inflation, and so if the finder of fact finds that the**

7  **information revealed by the corrective disclosure was**

8  **within the zone of risk concealed by defendants by fraud**

9  **on February 9th, in my hypothetical, you go, under**

10 **your -- under your analysis, from zero dollars of**

11 **inflation to the maximum dollars of inflation on day**

12 **one, and it stays at the maximum dollar of inflation for**

13 **over three years, correct?**

14     A.    Well, you say "maximum dollars of inflation"

15 as if there's some sort of scale there, and there's not.

16 The finder of fact either determines that the

17 information concealed as of that date was within the

18 zone of risk, or they do not.

19     Q.    **But you don't give the finder of fact --**

20     A.    But they -- I'm sorry.

21     Q.    **Sorry.  Go ahead.**

22     A.    But inflation either applies on that date, if

23 that is the finding, or it does not, if that is not the

24 finding.  It does not progress through some sort of

25 scale up to a maximum as you stated.  It is either found

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  to be the case or it is not found to be the case.

2      Q.   How would your damage model change if the

3  trier of fact found that CoreCivic was within the zone

4  of risk for certain periods of time and then left the

5  zone of risk for other periods of time?

6           MR. WOOD:  Objection to form.

7           THE WITNESS:  So in other words, the finding

8  would be that CoreCivic was within the zone of risk for

9  some portion of the class period, and then was outside

10 the zone of risk for some other portion of the class

11 period?

12 BY MR. MCGEE:

13     Q.   Sure.

14     A.   And was then back in the zone of risk for the

15 rest of the class period?

16          I'm having -- I'm just -- I'm having trouble

17 thinking about a realistic finding where that could be

18 the case.

19     Q.   I'm just asking how your damage model would

20 change.

21          MR. WOOD:  Objection to form.

22          THE WITNESS:  Can you give me an example of --

23          MR. MCGEE:  Okay.  Sure.  Sure.

24 BY MR. MCGEE:

25     Q.   Let's use my hypothetical.  February 8, zero

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  dollars of inflation.  February 9th, the finder of fact

2  finds that CoreCivic entered the zone of risk.

3            Let's say that six months later CoreCivic

4  announces it's renewing the BOP contract, and the finder

5  of fact finds that while the relationship had

6  deteriorated, CoreCivic turns it around and is no longer

7  in the zone of risk.  And then subsequently CoreCivic

8  has some more quality issues, and CoreCivic goes back

9  into the zone of risk.

10            How would your model -- how would your model

11  contemplate inflation in that scenario?

12            MR. WOOD:  Objection to form.

13            THE WITNESS:  Well, I don't think it would be

14  any different, but it's -- it really just says on the

15  dates on which the finder of fact determines that

16  CoreCivic was within the zone of risk, then the

17  inflation in table 6 would apply.

18            I -- it's difficult to imagine CoreCivic going

19  in and out of the zone of risk, but I suppose if the

20  finder of fact found that it exited the zone of risk for

21  some intermediate period during the class period, then

22  inflation would not apply on those dates when it was

23  outside the zone of risk.

24  BY MR. MCGEE:

25      Q.   Would losing BOP contracts during the class

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    period suggest that CoreCivic was within the zone of

2    risk?

3              MR. WOOD:  Objection to form.

4              THE WITNESS:  That sounds like it's a finding

5    of fact.

6    BY MR. MCGEE:

7         Q.   Well, I'm just asking your opinion.

8              MR. WOOD:  Objection to form.

9              THE WITNESS:  I wasn't asked to form opinions

10   on what is and is not within the zone of risk.

11   BY MR. MCGEE:

12        Q.   Let's turn to tab 6, please.

13        A.   All right.

14             MR. MCGEE:  Let's label this Exhibit 570.

15             (Deposition Exhibit 570 marked.)

16   BY MR. MCGEE:

17        Q.   Mr. Dalrymple, can you tell me what this

18   document is?

19        A.   Well, it appears to be plaintiff amalgamated

20   bank's responses and objections to defendant

21   CoreCivic Inc.'s first set of interrogatories to

22   plaintiff.

23        Q.   Have you seen this document before?

24        A.   I don't recall whether I have or not.

25        Q.   Look back -- it's lengthy.  Look back to

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 68 of 95 PageID #: 10852

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  page 145.

2      A.   I don't think it's that lengthy.  Mine stops

3  at page 12.

4      Q.   Are you on tab 6?

5      A.   Yes.

6      Q.   Okay.  Let me see what David put up.

7          Mr. Dalrymple, could I get you -- I hate to do

8  this, it is a lengthy document, but could I get you to

9  click on the link that's -- I take that back.

10      A.   I just did and it looks like the same document

11  appeared when I clicked on the link.

12      Q.   Yeah.  Okay.  Let's use that document then.

13      A.   Okay.  Sorry.  The document that I have in my

14  binder?

15      Q.   Yeah.

16      A.   Okay.

17          MR. WOOD:  Trey, sorry, which document are we

18  supposed to be looking at?

19          MR. MCGEE:  Well, I guess I gave the wrong

20  tab, but Chris, it's Plaintiff's Supplemental Objections

21  and Responses to CoreCivic's Second Set of

22  Interrogatories.

23          MR. WOOD:  Okay.  I don't have that.  Do you

24  want me to pull it up?

25          MR. MCGEE:  Yeah, if you don't mind.  David

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 69 of 95 PageID #: 10853

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

```
 1   put the link, I think in the --
 2          MR. WOOD:  No, but the link that he -- the
 3   link that he put up on tab 6 is our -- is our
 4   2008 responses to your first set of interrogatories.
 5          MR. MCGEE:  Oh.  That's what -- okay.  Hang
 6   on.  I'll come back.  I'll come back to these.  Let's
 7   hold that for a moment.
 8   BY MR. MCGEE:
 9       Q.   Mr. Dalrymple, can you turn to page 8 of your
10   report -- excuse me, paragraph 8.  I misspoke.
11       A.   All right.
12       Q.   You say there in the last sentence that you
13   had discussions with Donna Mellendick.
14            Who is Ms. Mellendick?
15       A.   I understand she is -- and I don't know or
16   recall her title, but I understand she is another expert
17   retained on behalf of the plaintiffs.
18       Q.   How many discussions did you have with her?
19       A.   One.
20       Q.   How long was that discussion?
21       A.   I don't recall, probably half an hour, maybe a
22   bit longer.  Maybe -- probably roughly half an hour to
23   45 minutes, but I'm really not sure.  I just -- I don't
24   recall specifically.
25       Q.   Who requested the discussion?
```

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1      MR. WOOD:  Objection to form.

2      THE WITNESS:  I don't know.  My recollection

3  is it was a discussion that -- that counsel set up to

4  kind of help me understand what the allegations were,

5  and -- and I don't recall specifically how long I had

6  the discussion with her versus, you know, counsel being

7  on the phone before or after that call.  I just -- I

8  don't recall it very well.

9  BY MR. MCGEE:

10      Q.  What topics did you discuss with

11  Ms. Mellendick?

12      A.  We generally talked about the analysis that

13  she was doing about the BOP contracts and the extent to

14  which, you know, CCA might have expected to renew those

15  contracts, but I really have a pretty vague recollection

16  of it.

17      Q.  Is any part of your opinion based on what

18  Ms. Mellendick told you during your conversation?

19      A.  No.

20      Q.  So you're not relying upon anything

21  Ms. Mellendick told you with respect to your opinions?

22      A.  No.

23      Q.  And so I assume that Ms. Mellendick did not

24  provide any facts or data that you considered in forming

25  your opinion?

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1        A.    No.

2        Q.    Did you provide any facts or data to

3    Ms. Mellendick?

4        A.    Not that I'm aware of.

5        Q.    Did any of your opinions change as a result of

6    speaking to Ms. Mellendick?

7        A.    No.

8        Q.    Is your damage estimate with respect to -- or

9    your inflation estimate with respect to the Cibola

10   nonrenewal predicated on the assumption that the

11   Cibola's FFO contribution is gone forever?

12             MR. WOOD:  Objection to form.

13             THE WITNESS:  When you say "gone forever," do

14   you mean after the contract was lost?

15             What do you mean by "forever"?

16   BY MR. MCGEE:

17       Q.    Well, the contract was lost, correct?

18       A.    Yes.

19       Q.    And -- and you calculated inflation as a

20   result of that, correct?

21       A.    Yes.

22       Q.    And so, as part of your calculation, did you

23   assume that Cibola had no value?

24             MR. WOOD:  Objection to form.

25             THE WITNESS:  Well, so you've just asked two

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  not relevant because the Cibola contract is incremental

2  to CCA's business.

3  BY MR. MCGEE:

4      **Q.   Does the $6.62 inflation number, that we've**

5  **been talking about, include some inflation for the**

6  **Cibola nonrenewal?**

7      A.   Sorry.  The $6.62?

8      **Q.   Yes.**

9      A.   No.  That -- that does not include inflation

10  for the Cibola nonrenewable.

11      **Q.   So that inflation is built into the 32 cents?**

12      A.   I'm sorry.  When you say "that inflation --"

13      **Q.   The inflation for the Cibola contract loss of**

14  **32 cents.**

15      A.   Yes.  The inflation associated with the Cibola

16  contract loss is 32 cents.

17      **Q.   Why didn't you use the same FFO-based**

18  **methodology that you used to estimate the value of the**

19  **Cibola nonrenewal to estimate the value of the**

20  **announcement that CoreCivic's other three remaining BOP**

21  **contracts were unlikely to be renewed?**

22      A.   Well, it's -- you know, for the reasons we

23  discussed earlier, after the Yates memorandum, the

24  reduction in CCA's share price reflected, not only the

25  expected loss of the BOP business, but it also reflected

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    the higher risk associated with the remainder of CCA's

2    business.

3        Q.   I'm not sure that that answered my question.

4             Why didn't you use the same FFO-based

5    methodology for the three remaining contracts that you

6    used for Cibola?

7             MR. WOOD:  Objection to form.

8             THE WITNESS:  Well, if I had used the same

9    FFO-based methodology I had used for Cibola, that would

10   have ignored the loss arising from the increased risk

11   associated with CCA's non-BOP business.

12   BY MR. MCGEE:

13       Q.   Why?

14       A.   Well, because the FFO contribution method is

15   necessarily based only on the FFO contribution of each

16   individual facility.  And -- excuse me.

17            And so making that calculation is not going to

18   reflect the additional increase in perceived risk that

19   was reflected in the share price associated with CCA's

20   non-BOP business.

21       Q.   Why will using the FFO methodology not reflect

22   the additional increase in perceived risk that was

23   reflected in the share price associated with CCA's

24   non-BOP business?

25            MR. WOOD:  Objection to form.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1           THE WITNESS:  Well, I think I just answered

2    that, but it's the same answer.

3           Looking at the FFO contribution is going to

4    arrive at a value that is related only to those three

5    BOP contracts, and it cannot -- or it would not capture

6    the effects of the increase in risk across CCA's

7    business.

8    BY MR. MCGEE:

9       Q.   Why couldn't you have looked at the FFO for

10   the non-BOP contracts?

11          MR. WOOD:  Objection to form.

12          THE WITNESS:  Well, the non-BOP contracts,

13   unlike the BOP contracts, what we saw with the non-BOP

14   business is there was not a discrete set of contracts

15   that were expected to be lost, but rather there was an

16   increase in perceived risk across the rest of CCA's

17   business as it related to all of its expected earnings.

18   So there was no need to break that down by each

19   contract.

20   BY MR. MCGEE:

21      Q.   You expected -- so you didn't expect the

22   non-BOP contracts to be lost?

23          MR. WOOD:  Objection to form.

24          THE WITNESS:  Are you asking me if I expected

25   the non-BOP contracts to be lost?

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  BY MR. MCGEE:

2      Q.   I'm just reading your answer.

3           You said -- let me scroll back up.  You said,

4  "well, the non-BOP contracts, unlike the BOP contracts,

5  what we saw with the non-BOP business is there was not a

6  discrete set of contracts that were expected to be

7  lost."

8           So what's your basis for that statement?

9      A.   Well, if you look at the share price reaction,

10  and the analyst reports, and their revisions to their

11  expectations after the Yates memorandum, you can see

12  that there is a set of earnings which is quantifiable,

13  which analysts and I have quantified in terms of FFO,

14  which was expected to be lost or significantly reduced.

15           So it is possible to take that earnings stream

16  and translate that into a value.  However, the remaining

17  portion of CCA's earnings was -- also faced increased

18  risk after the Yates memorandum.  And that was reflected

19  in a lower, for instance, FFO multiple across the

20  company.

21           There is not a need, nor would it be

22  appropriate, to attempt to disaggregate that by customer

23  or across contracts, and that's what I testified to

24  earlier.

25      Q.   Why wouldn't it be appropriate?

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1       A.   Because we're able to observe directly what

2   the impact was, the materialization of risk on CCA's

3   share price.

4       Q.   How?

5       A.   Well, as I explained in my report, we start

6   with an event study, and that event study measures an

7   abnormal return that corresponded to the Yates

8   memorandum.

9            And having measured that abnormal return, we

10  can then subtract the counter-factual value of the BOP

11  contracts, which, as I discussed earlier, I estimated

12  conservatively to be $1.44.

13           And the difference between $8.06, which we

14  observed directly from the share price, and the

15  counter-factual value of the BOP contracts, which I

16  conservatively estimate to be $1.44, is $6.62.

17           The entirety of that $6.62 is related to the

18  materialization of the risk that plaintiffs allege was

19  concealed.

20       Q.   And just to be clear, you're assuming that the

21  plaintiff would prove that the market's perception of

22  the increased risk for the non-BOP contracts is linked

23  to the alleged fraud regarding the BOP contracts --

24           MR. WOOD:  Objection to form.

25           / / / / /

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

BY MR. MCGEE:

Q.   -- right?

A.   Well, I think I state very clearly what I assume the plaintiff will prove, or more specifically what the finder of fact will find, which is that the information revealed through the corrective disclosures was within the zone of risk concealed through defendants' alleged fraud.

Q.   But -- but in order to -- for your total inflation to apply, you have to assume, correct, that the plaintiff will prove that the market's perception of the increased risk of the non-BOP contracts is linked to the alleged fraud regarding BOP contracts, correct?

MR. WOOD:  Objection to form.

THE WITNESS:  I don't have to assume anything. I -- again, my inflation figures are based on the finder of fact determining that -- what I just read.

It -- it does not -- it's not predicated on the finder of fact doing that in some specific way or making some sort of specific finding.

BY MR. MCGEE:

Q.   Well, if there's no finding of fraud with respect to the BOP contracts, can there still be inflation for non-BOP contracts that can be awarded in this case?

1          MR. WOOD:  Objection to form.

2          THE WITNESS:  So I'm having a little trouble

3    understanding your question.

4          Are you -- so you're saying there's no finding

5    of fraud with respect to the BOP contracts -- I'm just

6    not sure what the finding of fraud would be.  But that

7    might be a legal question.  I'm not sure I know how to

8    answer that.

9    BY MR. MCGEE:

10        Q.   Well, let me ask you this:  You say that the

11   inflation with respect to the Yates memorandum is $6.62,

12   and as we've talked about, you did not disaggregate that

13   so it includes inflation for ICE, and Marshals, and

14   state contracts, and perhaps even a few BOP contracts,

15   right?

16         MR. WOOD:  Objection to form.

17         THE WITNESS:  As I testified earlier, I did

18   not disaggregate the $6.62.

19   BY MR. MCGEE:

20        Q.   And if the finder of fact determines that the

21   allegations in the complaint, which all relate to the

22   BOP business, have no merit, right, then there can be no

23   finding that the inflation in your $6.62 that's related

24   to the non-BOP contracts could be awarded in this case,

25   right?

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  BY MR. MCGEE:

2      Q.   Yes.

3      A.   -- the alleged misrepresentations to the

4  Yates -- okay.

5           Ultimately, the link between the alleged

6  misrepresentations and the Yates memorandum is up to the

7  finder of fact.

8      Q.   Is GEO Group a peer company of CoreCivic?

9      A.   Yes.  GEO is a peer company of CoreCivic.

10     Q.   Did you do anything in your damage analysis to

11  take out the reaction to the Yates memo that also

12  affected the GEO Group?

13     A.   No.  That would not be appropriate.

14     Q.   Why not?

15     A.   Well, because the GEO Group was a -- I

16  addressed this pretty specifically in my rebuttal

17  report.

18          But the GEO Group was also affected by the

19  Yates memorandum in its own idiosyncratic ways.

20     Q.   Was it --

21     A.   But I address it specifically in section 3D of

22  my rebuttal report.

23     Q.   Was the GEO Group -- was the GEO Group's

24  relationship with the BOP deteriorating the same as

25  CoreCivic's?

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1              MR. WOOD:  Objection to form.

2              THE WITNESS:  I don't know the answer to that.

3    BY MR. MCGEE:

4        Q.   Why did the GEO Group's stock price decline

5    roughly 35 percent upon the release of the Yates

6    memorandum?

7              MR. WOOD:  Objection to form.

8              THE WITNESS:  Again, I haven't formed opinions

9    on the GEO Group, but presumably because there was an

10   expectation that the GEO Group would lose future

11   business from the BOP.

12   BY MR. MCGEE:

13       Q.   Do you think it's a coincidence that the GEO

14   Group's stock price dropped significantly upon the

15   release of the Yates memorandum?

16             MR. WOOD:  Objection to form.

17             THE WITNESS:  I don't think that's a

18   coincidence.

19   BY MR. MCGEE:

20       Q.   It's not a coincidence?

21       A.   That the GEO Group declines in response to the

22   Yates memorandum?

23       Q.   Correct.

24       A.   I don't think that's a coincidence.

25       Q.   Is it your opinion that CoreCivic's stock

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    decline, upon release of the Yates memorandum, was the

2    result of fraud by the defendants?

3              MR. WOOD:  Objection to form.

4              THE WITNESS:  That sounds like you're asking

5    me about a finding of fact or law, I'm not sure.

6    BY MR. MCGEE:

7        Q.   In -- you performed -- we talked about this

8    earlier.  You performed other event studies before,

9    correct?

10       A.   Yes.

11       Q.   Have you, in those other event studies, ever

12   controlled for peer company reactions?

13       A.   It would -- in some of them, yes.  It would

14   just depend on what I'm trying to look at.

15       Q.   Isn't it standard methodology of an event

16   study to control for the movement of industry peers?

17       A.   It's pretty standard to control for the

18   movement of the industry -- the industry, as typically

19   measured by an index.

20            I would not say it's typical to control for

21   the movements of an individual peer company.  I think it

22   just depends on what you're trying to measure.

23       Q.   Well, so here we have a unique situation.

24            We have, as -- as you and I discussed earlier

25   this morning, you have an industry, private corrections,

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

 1   that has two publicly traded -- two publicly traded

 2   companies, correct?

 3            MR. WOOD:  Objection to form.

 4            THE WITNESS:  Yeah.  I mean, to define that as

 5   an industry -- I don't know if that's technically

 6   defined as an industry.  They're both REITs, and both

 7   government services companies, but my understanding is

 8   that GEO and CoreCivic are the only two publicly traded

 9   private prison operators.

10   BY MR. MCGEE:

11        Q.   And so don't you think that it would be

12   appropriate to control for the industry here?

13            MR. WOOD:  Objection to form.

14            THE WITNESS:  But my event study does control

15   for the industry.

16   BY MR. MCGEE:

17        Q.   It doesn't control for GEO.

18        A.   Well, that would not be appropriate.

19        Q.   But GEO is the only other company in the

20   industry --

21            MR. WOOD:  Objection to form.

22   BY MR. MCGEE:

23        Q.   -- right?

24        A.   No.  GEO is the only other publicly traded

25   private prison operator.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    Q.   Well, isn't the private prison industry what

2  we're talking about here?

3    A.   When you say "industry," what we typically

4  talk about is a sector of companies that one would

5  expect to respond to macroeconomic changes, or large,

6  sort of, variables, broad market, and industry-specific

7  share price movements.

8          It would not be appropriate, in this case, to

9  define the industry as simply GEO and CoreCivic.  It

10  would -- it would subject the event study and the

11  measurement to any idiosyncratic movements --

12  company-specific movements that were specific to GEO --

13  that were specific to GEO as -- that would essentially

14  build in those company-specific GEO movements into the

15  abnormal returns that one measures for CoreCivic.  And

16  no, that would not be appropriate.

17    Q.   What companies make up the publicly -- the

18  publicly traded prison industry?

19          MR. WOOD:  Objection to form.

20          THE WITNESS:  Well, like I testified earlier,

21  the only two publicly traded private prison operators

22  that I'm aware of are GEO and CoreCivic.

23  BY MR. MCGEE:

24    Q.   And yet, you don't think it is appropriate to

25  control for the GEO Group, the only other publicly

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  traded private prison operator, in your event study?

2          MR. WOOD:  Objection to form.

3          THE WITNESS:  Well, bear in mind that the GEO

4  Group is part of the industry index that I use in my

5  event study.

6          But no, I do not think it is appropriate for

7  the purposes of this exercise to include the GEO Group

8  as an independent progressor benchmark when measuring

9  the abnormal returns.

10  BY MR. MCGEE:

11     Q.  Why doesn't GEO's comparable stock drop

12  suggest that something other than market recognition of

13  CoreCivic's purportedly impaired relationship drove both

14  companies stock drops following the Yates memorandum?

15          MR. WOOD:  Objection to form.

16          THE WITNESS:  Sorry.  That -- that was --

17  that's kind of a hard question to answer because of -- I

18  think there were two negatives in there.

19          Would you mind rephrasing it?

20          MR. MCGEE:  Sure.

21  BY MR. MCGEE:

22     Q.  Doesn't GEO's comparable stock drop, following

23  the Yates memorandum, suggest that something other than

24  the market's recognition of CCA's purportedly

25  deteriorating relationship with the BOP drove GEO and

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  CoreCivic's stock drops?

2        MR. WOOD:  Objection to form.

3        THE WITNESS:  I hate to ask you to take

4  another crack at it, but I'm just having trouble

5  following the sentence because it starts with "does it

6  not."

7        Is there any way you could rephrase it to be a

8  bit more direct?

9        MR. MCGEE:  Sure.

10 BY MR. MCGEE:

11     Q.   GEO Group had a comparable stock drop to

12 CoreCivic, following the Yates memorandum, correct?

13       MR. WOOD:  Objection.

14       THE WITNESS:  GEO Group declined significantly

15 after the Yates memorandum.  I don't remember precisely

16 what it was, but it was significant.

17 BY MR. MCGEE:

18     Q.   So doesn't the fact that both GEO and

19 CoreCivic declined substantially, following the Yates

20 memorandum, suggest to you that something other than

21 CoreCivic's purportedly deteriorating relationship with

22 the BOP drove the stock -- CoreCivic's stock price drop?

23     A.   No.  I think the answer to that is no, it does

24 not suggest -- anyway, GEO's share price decline does

25 not suggest that it was something other than CCA's

Case 3:16-cv-02267    Document 340-1    Filed 11/20/20    Page 86 of 95 PageID #: 10870

www.aptusCR.com

Grae vs.

W. Scott Dalrymple, CFA                          Corrections Corporation of America, et al.

1  deteriorating relationship with the BOP.

2      Q.   So it's a coincidence that the revelation of

3  the fraud at CoreCivic also resulted in GEO Group's

4  stock price dropping substantially?

5          MR. WOOD:  Objection to form.

6          THE WITNESS:  No.  I don't think it's a

7  coincidence.  That's not what I meant to imply.

8          I was having a bit of trouble following your

9  last question.

10 BY MR. MCGEE:

11     Q.   Why did you ignore in your report the fact

12 that the BOP renewed Adams and McRae following the Yates

13 memorandum release?

14         MR. WOOD:  Objection to form.

15         THE WITNESS:  I wouldn't say I ignored it,

16 I -- it just was not relevant to my analysis.

17 BY MR. MCGEE:

18     Q.   Why not?

19     A.   Well, I don't remember the details related

20 to -- to each of those, and I know that Ms. Allen has,

21 in her report, suggested it is necessary to look at the

22 myriad of post-class period events that happened, but

23 for the purposes of measuring the loss caused by the

24 materialization of the risk revealed through the Yates

25 memorandum, it's just simply not relevant to that

Case 3:16-cv-02267   Document 340-1   Filed 11/20/20   Page 87 of 95 PageID #: 10871

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  analysis.

2        And more generally, it's not appropriate to

3  continue to look at events that happened after the class

4  period as a -- as a benchmark or as part of that

5  analysis because they happened for -- what Ms. Allen's

6  report doesn't do is it does not -- it does not explain

7  or attempt to reconcile those renewals back to the

8  allegations.

9        Q.   Well, the allegation is that the deteriorating

10  relationship between the company and the BOP would

11  result in the loss of contracts, correct?

12        MR. WOOD:  Objection to form.

13        THE WITNESS:  Well, the allegations are what

14  I've -- you know, my understanding is what I've written

15  in my report.

16  BY MR. MCGEE:

17        Q.   And so it's irrelevant to you that -- the fact

18  that the BOP indeed continued to renew contracts; is

19  that -- do I understand you correctly?

20        MR. WOOD:  Objection.

21        THE WITNESS:  It's not relevant to consider

22  that.  Those contracts were renewed under subsequent

23  economic conditions for whatever reasons they were

24  renewed.

25        But what matters is how market participants

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  revised their expectations at the time the risk

2  materialized.

3          MR. MCGEE:  All right.  Let's take a brief

4  break if that works for you guys.

5          MR. WOOD:  Sure.

6          THE WITNESS:  Sure.

7          THE VIDEOGRAPHER:  Okay.  Going off the record

8  at 4:36.

9          (Off the record at 4:36 p.m.  Back on the

10  record at 4:57 p.m.)

11                    --oOo--

12          THE VIDEOGRAPHER:  Back on the record at 4:57.

13          MR. MCGEE:  Okay.  Thank you.

14  BY MR. MCGEE:

15      Q.   Mr. Dalrymple, I think that we've just put

16  another document in the chat there.

17          Were you able to open up that document?

18      A.   I think so.

19          The document that I have is plaintiff's

20  objections and responses to defendant CoreCivic, Inc.'s

21  second set of interrogatories to plaintiff?

22      Q.   Yes.  And it's a lengthy document --

23      A.   Yes.

24      Q.   -- several hundred some odd pages.

25      A.   Yes.

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1        MR. MCGEE:  Let's enter that as Exhibit 571.

2        (Deposition Exhibit 571 marked.)

3  BY MR. MCGEE:

4        Q.   So as you said, Mr. Dalrymple, this is

5  plaintiff's objections and responses to defendant

6  CoreCivic's second set of interrogatories to plaintiffs.

7             Have you seen this document before?

8        A.   I don't recall.

9        Q.   If you turn back to page 145.

10       A.   Okay.

11       Q.   Interrogatory number 17.  State each

12  disclosure that you contend reveal the truth regarding

13  one or more of the challenge statements listed in your

14  response to interrogatory number 12.

15            Do you see that?

16       A.   Yes.

17       Q.   Does this refresh your recollection of whether

18  you've seen this document before?

19       A.   I'm not sure that it does.

20       Q.   Do you recall if you were asked to provide any

21  input to these responses?

22            MR. WOOD:  Objection to form.  I think you can

23  answer that yes or no.

24            THE WITNESS:  I don't recall.

25            / / / / /

www.aptusCR.com

1  consulting, and I am not -- I'm not certain if I can

2  disclose those.

3         The cases in Australia post -- one -- one --

4  two of them are over.  They were two separate cases

5  against a company called Downer EDI, and I don't -- I

6  don't recall who the plaintiff was on those cases.

7         I am not sure if -- if I should disclose one

8  case in which I've issued a report, but have not yet

9  testified.  It's also Australian.

10        There are several other Australian cases where

11 I have issued mediation statements or analyses which

12 are -- if I just recall off the top of my head, GPT

13 Group, there was one called Aristocrat Leisure, another

14 called Australian Leap Board, there was another one that

15 I think was a REIT, but I don't recall the name.

16        And then with regard to U.S. cases, I've been

17 involved in a number of those in a consulting role,

18 although I cannot -- given that I was not disclosed, I'm

19 not sure I am at liberty to say which ones they are.

20 There have been a large number of those.

21        In addition to securities class actions, event

22 studies are often used in support of analyses like

23 fairness opinions.  And, you know, our firm has issued a

24 number of fairness opinions, and I've been involved in

25 some of those in performing event studies.

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1    In addition to those, I've also assessed
2    artificiality outside the securities fraud context with
3    respect to, say, for instance antitrust claims, and I
4    believe we used some event studies there.
5        Q.   And I may have asked you this before, but how
6    many event studies have you performed in a securities
7    case in which claims are brought pursuant to the
8    Securities and Exchange Act of 1934?
9        A.   In cases in which I was involved in a
10   consulting capacity, it would be a -- numerous.  I
11   believe the number you asked me for earlier was -- I
12   think you asked me for -- for the number of event
13   studies on which I've issued reports, and I said maybe
14   it was roughly five.
15           And when I say that, I mean when I have issued
16   the reports.  And that's -- it's probably more than five
17   reports, and it's at least three cases from what I can
18   recall.
19       Q.   That involved claims under the Securities and
20   Exchange Act of 1934?
21       A.   Oh, no.  I'm sorry.  No.  That are securities
22   class actions.
23       Q.   No.  I understand.
24       A.   Sorry about that.
25       Q.   But specifically I'm looking for the number of

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1 event studies you have done in connection with cases

2 that involve claims under the Securities and Exchange

3 Act of 1934.

4          A.   Yeah.   In a consulting capacity a large

5 number, but I have not -- I don't recall that I have

6 issued a report under the Securities and Exchange Act of

7 1934, but I would just have to go back and look at my

8 previous cases.

9          Q.   In a consulting role, you said "a large

10 number."  Can you put any parameters around that?

11          A.   Well, the trouble I'm having is I don't -- I

12 don't know which of those cases were actually under this

13 act.  And so when I think about it, you know, many of

14 those were securities class actions pursuant to

15 Rule 10b-5.

16          Q.   Okay.

17          A.   And maybe that's it.  I'm not sure if you're

18 trying to put a finer point on it or not.

19          Q.   How many -- how many event studies have you

20 performed in 10b-5 cases?

21          A.   It -- 25, maybe.  Some of those are class

22 actions, some are not.  Probably -- probably more.

23               When I say "25," I'm probably talking about

24 cases.  You know obviously when you perform -- when

25 you're in a case, you're often performing multiple event

www.aptusCR.com

W. Scott Dalrymple, CFA

Grae vs.
Corrections Corporation of America, et al.

1  studies.

2          So if you add up the total number of event

3  studies I've actually performed or analyzed in 10b-5

4  cases, it's -- maybe it's a very large number.  I

5  don't -- I don't know what that is.

6      **Q.   And in that consulting role, are you**

7  **supporting other experts?**

8      A.   Sometimes I was, sometimes I was assisting

9  with mediation.

10          MR. MCGEE:  All right.  Let me break and get

11  my notes in order if we can.  Thank you.

12          MR. WOOD:  Sure.

13          THE VIDEOGRAPHER:  Okay.  Going off the record

14  at 5:33.

15          (Off the record at 5:33 p.m.  Back on the

16  record at 5:54 p.m.)

17                      --o0o--

18          THE VIDEOGRAPHER:  Back on the record at 5:54.

19          MR. MCGEE:  We have nothing further.

20          Thank you for your time, Mr. Dalrymple.

21          THE WITNESS:  Thank you.

22          MR. WOOD:  I've got nothing.  But we would

23  like to read and sign.

24          THE VIDEOGRAPHER:  If that is everything, we

25  are going off the record on October 22, 2020, at

1       STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION

2                           - - -

3            I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,

4   RSA, certify:  That the foregoing proceedings were

5   remotely taken before me via videoconference at the time

6   herein set forth; at which time the witness was duly

7   sworn; that a record of the proceedings was made by me

8   using machine shorthand which was thereafter transcribed

9   under my direction; and that the transcript is a true

10  record of the testimony so given.

11           Further, that if the foregoing pertains to the

12  original transcript of a deposition in a federal case,

13  before completion of the proceedings, review of

14  transcript was requested.

15           The dismantling, unsealing, or unbinding of

16  the original transcript will render the Stenographer's

17  Certificate null and void.

18           I further certify that I am not financially

19  interested in the action, and I am not a relative or

20  employee of any attorney of the parties, nor of any of

21  the parties.

22           Dated this 29th day of October, 2020.

23

24  _____
             Victoria L. Valine, CSR License #3036

25