# EXHIBIT 4


EXHIBIT 562
Witness: Dalrymple
Date: 10-22-2020
Stenographer: Victoria L. Valine, CSR No. 3036

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

|  |  |  |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | § § § § § | Civil Action No. 3:16-cv-02267 |
| | § | Honorable Aleta A. Trauger |
| Plaintiff, | § § § | |
| vs. | § § | |
| CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, AND HARLEY G. LAPPIN, | § § § § § § | |
| Defendants. | § § | |

---

## EXPERT REPORT OF
## W. SCOTT DALRYMPLE, CFA
## AUGUST 7, 2020

---

## CONFIDENTIAL
## AUGUST 7, 2020



**TABLE OF CONTENTS**

<u>**Page**</u>

I.      Scope of the Engagement ................................................................................................ 1

II.     Credentials and Compensation ....................................................................................... 2

III.    Information Considered .................................................................................................... 2

IV.     Summary of Opinions ...................................................................................................... 3

V.      Background ...................................................................................................................... 4

      A.      The Class .............................................................................................................. 4

      B.      CCA ...................................................................................................................... 4

      C.      Allegations ........................................................................................................... 5

      D.      Overview of Disclosures ...................................................................................... 6

VI.     Analysis of Corrective Disclosures ............................................................................... 12

      A.      Event Study ........................................................................................................ 13

      B.      Corrective Disclosures ....................................................................................... 15

      C.      Calculation of abnormal returns ........................................................................ 16

            1)      Cibola Contract Loss ............................................................................. 16

            2)      Yates Memorandum ............................................................................... 16

      D.      Analysis of the corrective disclosures ............................................................... 18

            1)      Cibola Contract Loss ............................................................................. 18

            2)      Yates Memorandum ............................................................................... 20

VII.    Share Price Inflation ..................................................................................................... 23

      A.      Inflation at the time of the corrective disclosures .............................................. 24

      B.      Inflation during the Class Period ....................................................................... 26

VIII.   Per Share Damages ....................................................................................................... 28

IX.     Further Work .................................................................................................................. 29





| | | |
|---|---|---|
| 7250 Dallas Parkway | 1000 Louisiana Street | 205 East 42nd Street |
| Suite 200 | Suite 6925 | Floor 20 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10017 |
| 972.377.0300 | 713.457.3125 | 212.364.1926 |

Re: Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated vs. Corrections Corporation of America ("CCA"),[1] Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin ("Defendants")

## I.    Scope of the Engagement

1.    I have been retained by Robbins Geller Rudman & Dowd LLP in the above-styled case to analyze and quantify the effect of plaintiff's allegations that the Defendants engaged in a scheme to defraud investors and made materially false and misleading statements and omissions regarding CCA's business and operations that led to artificially inflated share prices between February 27, 2012 and August 17, 2016 (the "Class Period").

2.    Generally, I understand plaintiff alleges that Defendants concealed the extent of risk related to CCA's business and operations, including by falsely stating that:

    a.    the outsourcing of correctional services to CCA resulted in improving correctional services for government agencies, including the Federal Bureau of Prisons ("BOP");

    b.    CCA's facilities were operated "in accordance with" applicable policies, procedures and contractual requirements;

    c.    CCA's renewal rate on contracts was and would remain high because of the "quality" of services it provided to government customers; and

    d.    the outsourcing of correctional services to CCA resulted in significant costs savings for government agencies, including the BOP.[2]

3.    These and other alleged misrepresentations and omissions, according to plaintiff, resulted in artificially inflated share prices during the Class Period.

---

[1]    Defendant Corrections Corporation of America, commonly abbreviated "CCA," trades on the New York Stock Exchange under the ticker symbol "CXW." (*See* "The CCA Story: Our Company History," available at http://www.correctionscorp.com/our-history.) In October 2016, Corrections Corporation of America announced that it was rebranding its corporate enterprise as "CoreCivic." (*See* press release, "Corrections Corporation of America Rebrands as CoreCivic," October 28, 2016). For the purposes of this report, unless otherwise noted, CCA, CXW, Corrections Corporation of America and CoreCivic are used interchangeably.

[2]    Consolidated Complaint for Violation of the Federal Securities Laws dated March 13, 2017 ("Consolidated Complaint"), ¶ 3.



## II. Credentials and Compensation

4. I, W. Scott Dalrymple, am a Partner at BVA Group LLC ("BVA Group"). I am an economist and a CFA charter holder with extensive experience in economic, financial and statistical analyses. During my career, I have worked on issues relating to the analysis of economic damages involving securities litigation, business valuation, structured finance, financial derivatives, antitrust, intellectual property and breach of contract. I have advised clients in the U.S., Europe and Australia on a range of matters, including valuation and securities analysis, market structure, capital restructurings, financial and economic modelling and quantitative methods.

5. I have been retained as a consulting and testifying expert in a wide range of matters involving financial markets and securities, including equities, fixed income, structured products, and derivatives. I have been involved in shareholder class action matters in the US and Australia on issues related to share price inflation, market efficiency and shareholder damages. I have provided expertise on numerous litigation matters involving financial, economic, statistical, and valuation analysis.

6. I hold a Master of Science in economics with a concentration in Industrial Organization from the London School of Economics and Political Science and a Bachelor of Business Administration in the Business Honors Program and Finance from the University of Texas at Austin. I have written about and presented on various economic and financial topics, including financial markets and securities analysis. My full curriculum vitae, including testimony history and publications, is attached as **Appendix A**.

7. BVA Group is being compensated at the rate of $675 per hour for my work in this matter. As part of performing my analysis, I utilized a team of BVA Group personnel who worked under my direction and supervision. BVA Group is being compensated for time incurred by other professionals who have supported my analysis in this matter at rates of $250 to $600 per hour. Neither BVA Group's nor my compensation depends on opinions provided herein or on the outcome of this litigation.

## III. Information Considered

8. I have prepared this report to state my expert opinions; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data I considered in reaching my opinions; and to make other appropriate disclosures.[3] The work that I conducted in this matter has been informed by my education, knowledge, and experience in economics and finance. The information in this report is based upon discovery to date and the information that is currently available. A listing of the materials I have considered in my work for this matter as of the date of this report is contained in **Appendix B**, as well as the citations presented in this report.[4] In addition, I have had discussions with Donna Mellendick.

---

[3] Use of the first person "I" in my report refers either to me or to those working under my direct supervision.

[4] In addition to documents referenced in this report and attached appendices, I relied on my education, background, skills, and experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified herein.



9. I may review, evaluate, and analyze additional data, facts, or information as they become available. I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me. Therefore, the analyses and opinions described herein may be subject to change based upon additional information that becomes available or other developments that occur.

## IV. Summary of Opinions

10. I understand plaintiff alleges that the following corrective disclosures were in the zone of the risk concealed by Defendants' fraud:

    a. CCA's announcement on August 4, 2016 that its BOP contract for the Cibola County Corrections Center would not be renewed (the "Cibola Contract Loss");

    b. The memorandum released by Deputy Attorney General Sally Yates on August 18, 2016 titled "Reducing our Use of Private Prisons" (the "Yates Memorandum").

11. I have measured the loss caused by the materialization of the allegedly concealed risks by reference to the share price reactions corresponding to the corrective disclosures, adjusting for the impact of factors other than the revelation of allegedly concealed risks. Based on this analysis, I have estimated share price inflation over the Class Period, as summarized in the following table:

**Table 1. Per Share Inflation: February 27, 2012 to August 17, 2016**

| February 27, 2012 to February 7, 2013 | February 8, 2013 to August 1, 2016 | August 2, 2016 to August 17, 2016 |
|:---:|:---:|:---:|
| $4.51 | $6.94 | $6.62 |

12. The above share price inflation figures would apply as of the date that the trier-of-fact determines that information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud. Subject to these findings of fact and statutory limitations as set forth herein, one may compute damages for any member of the class of investors who acquired CCA stock during the Class Period (the "Class") based on share price inflation corresponding to the above purchase dates for shares sold or held on or after August 2, 2016.[5]

---

[5] I understand that the Class includes "[a]ll persons who purchased or otherwise acquired Corrections Corporation of America, Inc. ("CCA") [now "CoreCivic"] securities between February 27, 2012 and August 17, 2016, inclusive, and who were damaged thereby. Excluded from the Class are: (a) CCA, its parents, subsidiaries and any other entity owned or controlled by CCA; (b) Damon T. Hininger, Todd J. Mullenger, and Harley G. Lappin; (c) all other executive officers and directors of CCA or any of its parents, subsidiaries or other entities owned or controlled by CCA; (d) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and steprelations of similar degree; and (e) all predecessors and successors in interest or assigns of any of the foregoing. *See* Memorandum dated March 26, 2019, pp. 12 and 36; Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel dated June 1, 2018, p. 1.



## V.    Background

### A.    The Class

13.    I understand that the Class in this matter are persons who acquired CCA securities between February 27, 2012 and August 17, 2016, inclusive.[6]  I understand that this class has been granted class certification.[7]

### B.    CCA

14.    CCA is an owner of private correctional, detention and residential reentry facilities and one of the largest private prison operators in the United States.[8]  CCA was founded in 1983 as a company with the capability to "design, finance, build, operate and manage correctional facilities of many types in direct partnership with government agencies."[9]  During the Class Period, CCA owned between 45 and 49 correctional and detention facilities, managed between 11 and 22 additional correctional and detention facilities owned by government institutions, and housed an average compensated population of between 66 and 81 thousand people.[10]

15.    On February 7, 2013 after close of trading, CCA announced it reorganized from a corporation to a real estate investment trust ("REIT") for federal income tax purposes effective January 1, 2013.[11]  As a REIT, CCA was generally not subject to federal income tax on its taxable income and gains that it distributed to its shareholders, and was generally required to distribute annually to its shareholders at least 90% of its REIT taxable income.[12]

16.    During the Class Period, CCA's clients consisted of U.S. governmental agencies at the federal, state and local levels.[13]  Federal customers, primarily the BOP, United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE") constituted 43 to 52 percent of total CCA revenue

---

[6]    Consolidated Complaint, ¶ 1.

[7]    Memorandum dated March 26, 2019, p. 36.

[8]    Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 5.

[9]    CoreCivic website, "The CCA Story: Our Company History," available at http://www.correctionscorp.com/our-history.

[10]    As of December 31, 2011, CCA owned 46 correctional and detention facilities, operated 20 additional government owned correctional and detention facilities, and housed an average compensated population of 81,016.  As of December 31, 2016, CCA owned 49 correctional and detention facilities, operated 11 additional government owned correctional and detention facilities, and housed an average compensated population of 66,112.  *See* Corrections Corporation of America Form 10-K for period ending December 31, 2011, pp. 5 and 47; CoreCivic, Inc. 10-K for period ending December 31, 2016, pp. 5 and 64.

[11]    CCA press release, "CCA Board of Directors Authorizes REIT Conversion," February 7, 2013; Barclays Capital, "CXW Receives Its PLR," 11am Call," February 8, 2013; Macquarie Capital (USA), "Positive PLR to 'Unlock' Value in CXW," February 8, 2013; SunTrust Robinson Humphrey, "Favorable Ruling and Details on REIT Conversion," February 8, 2013

[12]    Corrections Corporation of America Form 10-K for period ending December 31, 2015, pp. 5-6.

[13]    *See, e.g.,* Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 9.



during the Class Period, and BOP revenues constituted 9 to 13 percent of total CCA revenues, as set forth in the following table:[14]

**Table 2. BOP Revenues as a Fraction of Total CCA Revenues[15]**

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| BOP Revenues % | 12% | 12% | 13% | 13% | 11% | 9% |
| Federal Revenues % | 43% | 43% | 44% | 44% | 51% | 52% |

## C.   Allegations

17.   Plaintiff generally alleges that CCA materially misrepresented that its correctional services offered sufficient quality and cost savings that would result in government entities continuing to renew its contracts.[16] The Court described plaintiff's claims as "a single, central theory of liability: that CoreCivic and its executives falsely touted its services as offering cost savings to governments while delivering an acceptable level of quality—defined, in some instances, in relation to compliance with particular standards—such that CoreCivic was an attractive option for continued and future government contracts."[17]

18.   I understand that plaintiff alleges that CCA engaged in a scheme to mislead investors with claims that their services "were of a high quality, specifically, in the eyes of their government clients."[18] CCA allegedly conveyed that its "cost-effective" offerings "provide quality corrections services" and "offer a compelling value."[19] For example, Damon Hininger, CCA's President and CEO, wrote in CCA's March 2016 Annual Letter to its shareholders that "[w]e take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners."[20]

19.   Plaintiff alleges that these statements concealed the reality that CCA's relationship with the BOP had deteriorated, putting their BOP contracts in jeopardy.[21] The Consolidated Complaint includes numerous examples of CCA deficiencies and BOP complaints regarding those deficiencies, particularly

---

[14]  Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. 7; Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 9; Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 6; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 5; CoreCivic, Inc. Form 10-K for period ending December 31, 2016, pp. 6 and 10.

[15]  Corporation of America Form 10-K for period ending December 31, 2012, p. 9; Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 9; Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 6; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 5; CoreCivic Form 10-K for period ending December 31, 2016, pp. 6 and 10.

[16]  Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, p. 3.

[17]  Memorandum dated December 18, 2017, pp. 25-26.

[18]  Memorandum dated March 26, 2019, p. 4.

[19]  Consolidated Complaint, ¶¶ 120-125.

[20]  2015 CCA Annual Report, p. 10.

[21]  Memorandum dated March 26, 2019, p. 6-7.



with regard to significant deficiencies in the staffing levels and medical care in BOP facilities.[22]  According to the Court:

> Plaintiff "has identified numerous instances where CoreCivic was cited by the BOP for deficiencies in crucial service areas.  It has identified statistics comparing private prisons, including CoreCivic, to the public prisons with which they compete.  It has linked CoreCivic's alleged deficiencies to negative outcomes up to and including deaths.  Finally, It has identified the harsh evaluations of CoreCivic and other private prison operators in the OIG Review and Yates Memorandum—evaluations that are doubly important because the authors were both (1) well-situated and knowledgeable in the field of incarceration and detention and (2) in a position to precipitate or direct the withdrawal of a substantial amount of CoreCivic's business.[23]

20.    For example, I understand CCA's BOP contract at Cibola County Corrections Center was the subject of repeated Notices of Concern regarding the quality of its services and CCA's failure to provide adequate remedies.[24]  I also understand that the BOP sent CCA numerous Notices of Concern detailing deficiencies at CCA's  Cibola County Correctional Center throughout the Class Period, including a "Cure Notice" in January 2015 noting "numerous and repetitive items of critical non-conformance in the area of Health Services, specifically, Patient Care...."[25]  According to the Court, CCA's internal "correspondence during the Class period echoes…concerns about the BOP's assessment of CoreCivic's services and the possibility of lost contracts as a result."[26]  I understand, however, that CCA did not disclose this information to investors.

21.    According to plaintiff, the share price of CCA stock was artificially inflated as a result of Defendants' alleged fraud, which led the markets to believe that CCA's governmental customers, including the BOP, were sufficiently satisfied with the cost savings and level of quality of CCA's correctional services that they would continue to be CCA customers, thereby concealing the extent of the risk associated with such contracts.[27]

## D.    Overview of Disclosures

22.    From an economic perspective, CCA's ability to operate within applicable policies and contractual requirements while delivering high quality services and cost savings to its customers was key to its value proposition.  During the Class Period, CCA repeatedly claimed that it operated its correctional services in compliance with the policies and procedures of its governmental customers.

---

[22]    Consolidated Complaint, ¶¶ 43-114; Memorandum dated December 18, 2017, pp. 5-12.
[23]    Memorandum dated December 18, 2017, pp. 26-27.
[24]    Consolidated Complaint, ¶¶ 68-86; Memorandum dated March 26, 2019, pp. 6-7.
[25]    Consolidated Complaint, ¶¶ 68-86; Memorandum dated March 26, 2019, pp. 6-7.
[26]    Memorandum dated March 26, 2019, p. 8.
[27]    Consolidated Complaint, ¶ 31; Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, p. 3.



     a.    "The [Quality Assurance Division] management team coordinates overall operational auditing and compliance efforts across all CoreCivic facilities.… Our QAD also contracts with teams of ACA certified correctional auditors to evaluate compliance with ACA standards at accredited facilities."[28]

     b.    "The Audit and Compliance Systems Section includes a team of full-time auditors, who provide subject matter expertise from all major disciplines within institutional operations. Annually, and with no advance notice, these auditors conduct rigorous, on site evaluations of each facility we operate. The audit teams use highly specialized, discipline-specific audit tools, containing over 1,400 audited items across twelve major operational areas, in this detailed, comprehensive process. The results of these on-site evaluations are used to discern areas of operational strength and areas in need of management attention. The audit findings also comprise a major part of our continuous operational risk assessment and management process. Audit teams are also available to work with facilities on specific areas of need, such as meeting requirements of new partner contracts or providing detailed training of new departmental managers."[29]

     c.    "[G]overnment partners hold CCA accountable through strong oversight by utilizing a combination of formalized facility and operational standards, on-site contract monitors and detailed audit procedures to ensure strict contract compliance and to evaluate the quality of CCA's operations."[30]

    23.    In addition, CCA emphasized its focus on maintaining safe, high-quality correctional services. For instance:

     a.    "The Quality Assurance Division provides governance for all efforts by our facilities to deliver high quality services and operations, with an absolute commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section."[31]

     b.    "We focus relentlessly on continuous improvement on our operations, from running even safer and more secure facilities to offering evidence-based reentry progress proven to help prepare inmates for success when they return to our communities. Ensuring our operations are performed with integrity and deliver high-quality services while creating meaningful value allows us to achieve this high level of contract retention."[32]

---

[28] Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 8. *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 8.

[29] Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 8.

[30] Corrections Corporation of America Annual Letter to shareholders for year ending December 31, 2015, p. 10.

[31] Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. 8.

[32] Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014, p. 5.



     c.    "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners.... "[w]e take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners."[33]

24.    CCA consistently claimed that its privatized services offered substantial cost savings to its governmental customers in comparison with publicly-operated correctional facilities.

     a.    "We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[34]

     b.    "Now this is because of what I've been trying to highlight for several years, which is that State DOC budgets typically do not fully embed the cost of pensions, healthcare cost and capital outlays as it relates to the corrections departments. With all these factors, all these costs factored in which clearly has not been the case in the past, when cost comparisons are done between us and the public sector, our value proposition grows even further."[35]

     c.    "We collaborate with our government partners to provide flexible, timely and cost-effective solutions to address their unique needs."[36]

25.    Analysts' commentary on the quality and cost savings of CCA's services were, likewise, generally positive. Analysts echoed CCA's claims, in some cases citing the same study and evidence that CCA promoted.

     a.    "There is growing evidence that customers achieve cost savings. The VERA Institute for Justice's recent report found fully loaded taxpayer costs were 14% higher than DOC budgets when including hidden costs shouldered by other departments (e.g. unfunded benefits, legal, and maintenance)."[37]

     b.    "A projected annual demand for beds is being met with below-average supply... This coupled with the access to capital, time efficiencies, and cost savings (particularly in light of cash-strapped budgets) offered by the private operators makes companies like GEO and CXW good investments for the long-term-oriented investor, in our opinion."[38]

---

[33]   Corrections Corporation of America Annual Letter to shareholders for year ending December 31, 2015, p. 10.

[34]   Corrections Corporation of America Annual Letter to shareholders for year ending December 31, 2015, p. 10. *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 18; Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 19; Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. 19.

[35]   Corrections Corporation of America, Q2 2016 Earnings Call, February 14, 2013, p. 8.

[36]   Corrections Corporation of America, Q2 2016 Earnings Call, August 04, 2016, p. 4.

[37]   SunTrust Robinson, "Corrections Future Is Solid Despite FL Decision," February 17, 2012.

[38]   Barclays Capital, "Awaiting PLRs but Returning as REITs," January 8, 2013.



     c.     "There are many older and inefficient prisons that need to be replaced (over 215,000 pubic prison beds are located in facilities over 75 years old). These older facilities are much more expensive to maintain and manage than more modern facilities…Replacing older public prisons saves money on operating costs and improves safety…Going forward we anticipate strong growth in private prisons over publicly constructed and managed prisons for the following reasons…It is more cost effective to privatize the management of prisons, with savings primarily resulting from labor efficiencies and lower pension expenses."[39]

     d.     "[O]n top of the capital deployment benefit there is also the potential for operating cost savings. Studies on this topic are more mixed, but we generally believe that the private industry operates more efficiently than government entities. While there are exceptions to that blanket statement, we believe it applies to the prison industry for the most part. CXW provides a schedule of three agencies in particular, where such savings are in excess of 15% relative to government-run properties."[40]

     e.     "[W]ith ever-dwindling budgets, we believe the commitment of building an entirely new project (which could take many months, if not years), as well as the capital devoted to such an endeavor, is very burdensome to a jurisdiction. With CXW's quality in operations and simply writing a monthly lease payment, it's far easier to flip a switch to turn the lights back on in order to alieve [*sic*] the capacity issues."[41]

26.     In addition, CCA pointed to historical customer retention rates as an important driver of stable and predictable cash flow. For instance, according to CCA:

> …a majority of our contracts have terms between one and five years, and we have historically experienced customer retention of approximately 90%, which contributes to our relatively predictable and stable revenue base. This stream of revenue combined with our low maintenance capital expenditure requirement translates into steady predictable cash flow.[42]

27.     The retention of customer relationships and contracts were key drivers of CCA's revenue and earnings during the Class Period. As CCA claimed:

     a.     "We have an above-average dividend payout ratio and also a historical customer retention rate in excess of 90%."[43]

---

[39]   CRT Capital, "Initiating Coverage of CXW; Expect Earnings Revisions, "FV," \$35 PT," January 23, 2014.

[40]   Cannacord Genuity, "Positive on Prison REITs: We're dancin' to the Jailhouse Rock," July 13, 2015.

[41]   Cannacord Genuity, "Behind the Bars: Bi-Weekly Prison Update 10-5-15,", October 5, 2015.

[42]   Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 17. *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 17; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 20; CoreCivic, Inc. Form 10-K for period ending December 31, 2016, p. 23.

[43]   Corrections Corporation of America, Q2 2013 Earnings Call, Aug 08, 2013, p. 8.



b.    "Historical customer retention rate is in excess of 90%, which we expect to maintain based on our renewal activity this year."[44]

c.    "And for many years, CCA has enjoyed strong customer retention rates in excess of 90%, and each spring late summer we renew many of our contracts with our state partners."[45]

d.    "…over the last 6, 7 years, again with changes in leadership both at state and federal level, we've had renewal rates on our contracts north of 90%."[46]

28.    Analysts covering CCA echoed management's comments, referring to the company's high retention rates:

a.    "CXW has been successful in retaining its customers over history, with retention rates averaging about 91% since 2009. The company has had slightly more success with its owned & managed contracts, which have averaged 92%, versus its managed only contracts, which have averaged 87%."[47]

b.    "Government RFPs for contracts in the private prison sector tend to be very sticky and long-term in nature, with average terms of 3-5 years excluding renewal options. Furthermore, both GEO and CXW have historically operated with a strong renewal rate over the past few years, in excess of 90% for both companies annually."[48]

c.    "[W]e note that CXW still boasts a high, ~85%+ retention rate."[49]

29.    Based on my review, neither CCA nor analysts distinguished the risk to the BOP relationship stemming from CCA's performance issues.  Similarly, I have seen no evidence to suggest that market participants understood the extent of the risks that the company faced as a result of its deteriorating relationship with the BOP.

30.    On August 3, 2016, after the close of trading and as part of its second quarterly announcement of earnings and financial guidance, CCA announced that the BOP contract for Cibola was not being renewed.[50]  Following the announcement of the Cibola Contract Loss and other news in its earnings release, CCA's closing share price dropped from $31.03 on August 3, 2016 to $29.11 on August 4, 2016.[51]

---

44    Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014, p. 9.
45    Corrections Corporation of America, Q2 2014 Earnings Call, Aug 07, 2014, p. 5.
46    Corrections Corporation of America, Q1 2016 Earnings Call, May 05, 2016, p. 14.
47    Wells Fargo, "CXW: Initiating Coverage With A Market Perform Rating," December 19, 2014.
48    Cannacord Genuity, "Positive on Prison REITs: We're dancin' to the Jailhouse Rock," July 13, 2015, p. 23.
49    Macquarie Capital (USA), "Federal Contract Escapes CXW," December 29, 2014.
50    Press release, "CCA Reports Second Quarter 2016 Financial Results," August 3, 2016.
51    Bloomberg, LP.



Case 3:16-cv-02267    Document 340-4    Filed 11/20/20    Page 13 of 92 PageID #: 10923

31.     On August 11, 2016, the OIG published "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Review").[52]  According to plaintiff, the OIG Review reported that between 2011 through 2014, private prisons incurred more safety and security incidents per capita than comparable BOP institutions without offering significant cost savings.[53]  CCA's closing share price fell from $27.56 on August 10, 2016 to $27.39 on August 11, 2016.[54]

32.     On August 18, 2016, Deputy Attorney General Sally Yates released a memorandum titled "Reducing our Use of Private Prisons" from the Office of the Deputy Attorney General to the Acting Director of the Federal Bureau of Prisons.  The Yates Memorandum stated that "[p]rivate prisons served an important role during a difficult period" when the federal inmate population was increasing.[55]  However, the federal prison population was beginning to decline.  According to the Yates Memorandum,

> …time has shown that [private prisons] compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security.[56]

33.     Consequentially, the Yates Memorandum stated that "as each contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population."[57]  The Yates Memorandum noted "that the Bureau is already taking steps in this direction," referring to the Cibola Contract Loss in which "the Bureau declined to renew a contract for approximately 1,200 beds."[58]  It also stated that, "concurrent with the release of this memo, the Bureau is amending an existing contract solicitation to reduce an upcoming contract award from a maximum of 10,800 beds to a maximum of 3,600."[59]

34.     The price of CCA shares dropped substantially immediately after the Yates Memorandum was released, from a closing price of $27.22 on August 17, 2016 to a closing price of $17.57 on August 18, 2016.[60]

---

[52]  Office of the Inspector General, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," August 11, 2016.
[53]  Consolidated Complaint, ¶ 12, 38-42.
[54]  Bloomberg, LP.
[55]  Yates Memorandum.
[56]  Yates Memorandum.
[57]  Yates Memorandum.
[58]  Yates Memorandum.
[59]  Yates Memorandum.
[60]  Bloomberg, LP.



## VI. Analysis of Corrective Disclosures

35.    As a general proposition, modern finance theory holds that, in an efficient market, the market price of a share is the present value of the market's expectations of future economic benefits available to shareholders, discounted at the opportunity cost of capital, which reflects the risk associated with those benefits.[61]    All else equal, the market price of a share will be reduced when the amount of expected future cash flows is reduced and/or the riskiness associated with expected future cash flows is increased.

36.    When a firm conceals or misleads the market about the expected amount and/or extent of the risk of future cash flows, this may inflate its share price to a price that is higher than it would otherwise have been had the firm not concealed the relevant information.   In the event that the market receives new information that partially or completely reveals the true expectations and/or risk, the new market equilibrium (as reflected in the share price) reflects investors' new consensus about expected future economic benefits and risk.

37.    In order to estimate inflation based on a company's share price reaction, certain conditions must hold.   Importantly, the corrective disclosure must contain information relevant to the alleged contraventions, such that the disclosure of the relevant information may be used to infer how market participants adjusted expectations in response to the news.   When a corrective disclosure also contains information unrelated to the allegations, known as *confounding information*, it is necessary to remove the effects of this confounding information in order to isolate the share price reaction to information pertaining to the alleged contraventions.

38.    I understand that courts have considered evidence that a security traded in a market characterized by the semi-strong form of the efficient market hypothesis ("<u>EMH</u>") —under which all publicly available information is incorporated into the price of an actively traded asset—as evidence that it is appropriate to invoke the "fraud on the market" presumption with respect to that security in the context of securities litigation.[62]   The consequence of the semi-strong form of the EMH is that share prices adjust quickly to reflect the discounted value of expected future cash flows, and that investors' expectations as to future cash flows reflect the appropriate, risk-adjusted discount rate.[63]   This ensures that the share price

---

[61]   The value of an asset or security is generally driven by the discounted value of future cash flows it is expected to generate. Discounted cash flows refers to cash flows that have been adjusted to their present value on the basis that a dollar received today is worth more than a dollar received in the future, taking into account the time value of money as well as the risk that future cash flows may not materialize.  *See, e.g.* Pratt, Shannon, P., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th ed., McGraw Hill (2008), p. 175.

[62]   *Basic*, 485 U.S. at 245-46; Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, pp. 22.

[63]   According to an *amici curiae* brief of testifying economists submitted to the Supreme Court, "economists do *not* generally disagree about whether market prices respond to new material information. In particular, there is little doubt that the stock price will increase reasonably promptly after favorable news about a company is released and decline after unfavorable news." Brief of Financial Economists as Amici Curiae in Support of Respondent, *Halliburton Co. and David Lesar v. Erica P. John Fund, Inc., FKA Archdiocese of Milwaukee Supporting Fund, Inc.*, February 5, 2014, pp. 8-9 (emphasis in original).



after the corrective disclosure reflects investors' revised expectations and, therefore, that the share price reaction is indicative of the corrective disclosure's effect on the company's value.[64]

39.    I have concluded that CCA traded in a market that was semi-strong form efficient during the Class Period.[65]  My discussion and analysis of market efficiency is found in **Appendix C** of this report.

## A.    Event Study

40.    Having established that CCA traded in a market that was semi-strong form efficient during the Class Period, one may then look to the share price decline following the revelation of allegedly withheld information to assess the impact of those disclosures when they were made.

41.    In order to examine the extent to which CCA's share price responded to information disclosed through the corrective disclosures at issue in this matter, I apply a widely accepted technique known as an event study.[66]  Event studies examine share price returns corresponding to a particular *event window*, during which the event in question occurred.  An event study may be used to isolate the impact of an announcement corresponding to a particular event from other factors that would have affected the share price at that time, such as macroeconomic news affecting broad market indices.

42.    A widely used application of the event study is known as the market model.[67]  The market model is based on regression analysis, which provides a statistical framework for examining the nature and form of the relationship between two or more variables.  In this case, a market model may be used to explain or predict changes in the dependent variable, in this case CCA's share price returns, as a function of changes in the values of the independent variables, such as returns to the overall U.S. stock market and an industry sector index.

---

[64]    While market participants have different perceptions and expectations regarding the characteristics of assets, which determine their willingness to pay for a security, the confluence of these differences determines a market equilibrium value.  *See* Campbell, John, Andrew W. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets*. Princeton, New Jersey: Princeton University Press (1997), pp. 20-25.  *See also* Fama, Eugene, "Random Walks in Stock Market Prices," *Financial Analysts Journal*, January-February (1995), pp.3-4.

[65]    I considered, but did not rely on, the expert reports of Professor Steven P. Feinstein, Ph.D., CFA, the plaintiff's expert on market efficiency.  Professor Feinstein also concluded that CCA's stock traded in an efficient market during the Class Period.  I note that that "CoreCivic has conceded that its stock traded on an efficient market" (see Memorandum dated January 18, 2019, p. 9), and that the Court arrived at the same conclusion.  *See* Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA dated June 1, 2018, ¶¶ 17-19; Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA dated October 26, 2018, ¶ 1; Memorandum dated March 26, 2019, p. 35 ("Because Amalgamated has established that CoreCivic stock traded on an efficient market and the defendants' statements were public and made during the Class Period…").

[66]    Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, Chapter 4.  See also *Halliburton II*, 573 U.S. at 280-81.

[67]    Campbell, John, Andrew W. Lo and A. Craig MacKinlay. *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press (1997), Chapters 4-6.  *See also*, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature, Vol. 35. No. 1, Mar. 1997*.



43.     The market model works by predicting what the share price return would have been based on movements in market indices on a particular day.[68] By subtracting predicted returns from the actual returns, one can estimate the change in the company's share price that is not explained by wider market phenomena, which is known as the *abnormal return*. Thus, the abnormal return is the difference between the return predicted by the market model and the actual return associated with the event at issue.

44.     In cases where the abnormal return is statistically significant, it may be reasonable to conclude that it was caused by the event in question, provided the news became available to the market at the time of (or just prior to) the abnormal movement.[69] If no confounding information was released at the same time, the abnormal return may be used as an estimate of the corrective disclosure's effect on the value of a company's shares; otherwise, it is necessary to disaggregate the effect of the corrective disclosure from the portion of the abnormal return attributable to the confounding information.

45.     The market model can control for broad market movements as well as industry-specific information that is not specific to the company.  In addition, market models may also include indicator variables to control for other events, such as earnings announcements, that one would expect to affect share price returns on days outside the event window.[70]

46.     The market model I apply uses the S&P 500 Total Return Index to control for broad market movements along with two different indexes:[71]

    a.     Between February 27, 2012 through February 7, 2013, prior to CCA's announcement that it was converting to a REIT, I use the S&P Midcap 400 Commercial Services & Supplies Index (the "S&P 400 Index") to control for industry specific performance.

    b.     Between February 8, 2013 and August 17, 2016, I use the FTSE Nareit All Equity REITs Index (the "REIT Index") adjusted to exclude the returns of CCA to control for REIT sector performance in addition to the S&P400 Index.

---

[68]  Share price returns are computed as the percentage movements in the security price.  For the purposes of estimating the market model, share price returns are typically expressed as logarithmic returns, or log returns.  Specifically, a log return is the natural logarithm of the ratio of two daily closing security prices: $\ln(P_t/P_{t-1})$, where '$\ln$' is the natural logarithm, '$P_t$' refers to the security price on day $t$ and '$P_{t-1}$' refers to the security price one trading day prior to day $t$.

[69]  Statistical significance represents the likelihood that a result or observed relationship between two variables is unlikely under a specific hypothesis.  Hypothesis testing is traditionally employed to determine if a result is statistically significant or not.  This provides a "p-value" representing the probability of observing data as extreme as that which was measured if the null hypothesis is indeed true.  A statistically significant result at the one percent significance level is one in which there is a less than one percent probability of observing this data if the null hypothesis were true.  Such p-values are also often described in terms of confidence levels by subtracting the p-value from 100 percent, as done above.  *See*, for instance, Wooldridge, Jeffrey M., *Introductory Econometrics*, 6th ed., Boston, MA: Cengage Learning (2016), p. 119.

[70]  Indicator variables take a value of one on the relevant day and zero on all other days.

[71]  Details of this model are set forth in **Appendix C**.



47.    In addition to the market and industry indices, I include indicator variables for each day on which CCA released earnings results, which measure CCA's returns on those days when one may expect statistically significant abnormal returns.[72]

48.    I estimate the market model over the one year period preceding the corrective disclosures.[73] Results of my analysis are presented in **Exhibit 1** and **Exhibit 2**.

## B.    Corrective Disclosures

49.    According to plaintiff's allegations, "[i]t was not until the Yates Memorandum announced that CoreCivic contracts would be terminated and stated that BOP was 'already taking steps in this direction,' that CoreCivic's deficient services were specifically linked to the loss of business—and to Defendants' misrepresentations that its relationship with governmental entities would remain strong because of the quality of its services."[74]  In its memorandum certifying the Class in this case, the Court wrote that the plaintiff "argued that price impact was established by the decline in price following the release of the Yates Memorandum, via a 'materialization of risk' theory."[75]

50.    I understand plaintiff alleges, *inter alia*, that information contained in the Yates Memorandum and the Cibola Contract Loss (which was referenced in the Yates Memorandum) were corrective disclosures that revealed to the market relevant information that had been previously withheld.[76]  Through these announcements, plaintiff alleges that market participants learned of CCA's true business condition and the extent of the risks concealed from investors.  As a result, according to plaintiff, CCA's share price was artificially inflated, and declined as a result of these announcements.[77]

51.    While the information contained in the OIG Review also related to certain information allegedly concealed in this matter, it is my understanding that plaintiff contends that this information did not reveal the truth about the concealed risks.[78]  In addition, I understand that the Court has found that, "due to limitations on its date range, subject matter, and methodology," the OIG Review failed to "bridge the gap

---

[72]  The market and industry indices include returns for Geo Group, Inc. ("GEO"), a publicly-traded prison operator whose share price also was impacted by the Yates Memorandum.  Including or excluding GEO from these indices does not significantly affect the results of my analysis.

[73]  The market model in this matter may be estimated over different time periods (*estimation windows*) within the Relevant Period and using alternative specifications.  Using alternative estimation windows and specifications, however, does not materially affect the resulting abnormal returns.

[74]  Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, p. 17 (internal citations omitted).

[75]  Memorandum dated March 26, 2019, p. 25.

[76]  Consolidated Complaint, ¶¶ 192, 196-199.

[77]  Consolidated Complaint, ¶¶ 196-199.

[78]  Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, pp. 4-5, 16-18.



between CoreCivic's representations and the truth."[79]  Accordingly, I do not consider the OIG Review as a corrective disclosure.

### C.    Calculation of abnormal returns

#### 1)  Cibola Contract Loss

52.    CCA announced the Cibola Contract Loss in conjunction with its second quarter 2016 earnings results after the market had closed on August 3, 2016, such that the market's reaction to this announcement was reflected in CCA's share price on August 4, 2016.  On that day, CCA's price fell from $31.03 to $29.11, a decline of 6.2 percent.  The abnormal return was negative 5.9 percent and was statistically significant at the 1 percent level, as set forth in **Exhibit 1**.[80]

53.    It appears that news of the Cibola Contract Loss was first published in a news article after market close on August 1, 2016 by a local Albuquerque news station, followed by another news story on August 2, 2016 in the *Gallup Independent*, a local newspaper in Gallup, New Mexico.[81]  CCA's share price fell from $32.54 on August 1, 2016 to $31.86 on August 2, 2016 and again to $31.03 on August 3, 2016 (declines of 2.1 percent and 2.6 percent, respectively).  Although CCA's shares experienced negative abnormal returns on both days, neither of these daily price declines was statistically significant (at the five percent level).[82]

#### 2)  Yates Memorandum

54.    On August 18, 2016, the Yates Memorandum was released.  The Yates Memorandum stated that "time has shown that [private prisons] compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security."[83]  The Yates Memorandum further directed the BOP to "either decline to renew [BOP] contract[s] or substantially reduce [their] scope in a manner consistent with law and the overall decline of the Bureau's inmate population."[84]

---

[79]  Memorandum dated March 26, 2019, pp. 32-33.
[80]  Statistical significance is the likelihood that a result or observed relationship between two variables is unlikely under a specific hypothesis.  Hypothesis testing is traditionally employed to determine if a result is statistically significant or not.  This provides a "p-value" representing the probability of observing data as extreme as that which was measured if the null hypothesis is indeed true.  A statistically significant result at the 1 percent significance level is one in which there is a less than 1 percent probability of observing this result if the null hypothesis were true.  See, *e.g.*, Wooldridge, Jeffrey M., Introductory Econometrics, 6th ed., Boston, MA: Cengage Learning, 2016, p. 119.
[81]  "Cibola County Correctional Center Closing," *KOAT Albuquerque*, August 1, 2016; "Milan Prison to Close; 254 Facing Layoffs," *The Gallup Independent*, August 2, 2016.
[82]  **Exhibit 1**.
[83]  Yates Memorandum.
[84]  Yates Memorandum.



55.     Following the Yates Memorandum, CCA's share price declined from $27.22 to close at $17.57 on August 18, 2016, a decline of $9.65 (35.5 percent).[85]  The share price reaction following the Yates Memorandum on August 18, 2016 was significant and negative.  As set forth in **Exhibit 2**, CCA's abnormal return on this day was negative 35.5 percent.  This abnormal return was significant at the 1 percent level.

56.     Before the markets opened on August 19, 2016, CCA issued a press release announcing a conference call later that day to respond to the Yates Memorandum, stating that "we are disappointed with the BOP's decision to reduce its utilization of privately operated facilities to meet their capacity needs, and believe our value proposition remains strong."[86]  The press release also stated that its BOP contracts "represent approximately $131.2 million in annual revenues, or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio average."[87]

57.     On the conference call, Damon Hininger generally conveyed that the Yates Memorandum did not impact its contracts with the Marshals Service, ICE, and state governments, and told listeners that "we clearly save money for taxpayers in the United States under our BOP contracts, and this memo doesn't dispute that fact, but that savings doesn't come at the risk of lower quality."[88]  He also stressed that they were not surprised by the reduction in BOP procurement of private prison facilities in the face of the BOP's success in reducing their system population.[89]

58.     In addition to this conference call, analysts also released commentary discussing the impact of the Yates Memorandum, such that the share price reaction on this day would have reflected the market's further reaction to this news (as no additional information about CCA appears to have been released).

59.     On August 19, 2016, CCA's stock increased by $1.51 (8.59 percent), to close at $19.08.[90]  As set forth in **Exhibit 2**, the abnormal return on August 19, 2016 was positive 9.1 percent and was significant at the 1 percent level.[91]

---

[85]  Bloomberg, LP.
[86]  CCA press release, "CCA Responds to the Department of Justice's Decision to Reduce Reliance on Privately Operated Prisons and Announces Investor and Analyst Conference Call," August 19, 2016.
[87]  CCA press release, "CCA Responds to the Department of Justice's Decision to Reduce Reliance on Privately Operated Prisons and Announces Investor and Analyst Conference Call," August 19, 2016.
[88]  CoreCivic, Inc. Special Call, August 19, 2016, pp. 6-7.
[89]  CoreCivic, Inc. Special Call, August 19, 2016, pp. 5, 12 ("I think that's what we're seeing happen with CAR XVI, that they have their system population come down by 26,000 in May, so they do have the capacity within their system.  So I think that's why you're seeing, with the CAR XVI action, is a pulling back of some of the beds they've got within the private sector because they have had that reduction.")  I understand plaintiff contends that the information provided through this call was misleading.
[90]  Bloomberg, LP.
[91]  See **Exhibit 2**.



### D. Analysis of the corrective disclosures

#### 1) Cibola Contract Loss

60.     As previously discussed, I understand that news of the Cibola Contract Loss was first published in a news article after market close on August 1, 2016 by the local press in New Mexico. While the local news articles indicated that the BOP had elected not to renew the Cibola contract, there appears to have been no analyst reaction to the news until after CCA provided further information in its press release after the close of daily trading on August 3, 2016, nor were the abnormal returns on August 2, 2016 and August 3, 2013 statistically significant (at the five percent level).

61.     On August 3, 2016, after the close of daily trading and as part of its second quarterly announcement of earnings and financial guidance, CCA announced that the BOP contract for Cibola contract was not being renewed.[92] On the next day, August 4, 2016, CCA's President, CEO and Director Damon T. Hininger told analysts:

> …I would like to provide a brief update on other recent business developments. Last week, we received word from the BOP that they intend not to renew our contract at the 1,129-bed Cibola County Corrections Center which is set to expire on September 30, 2016. Of course, we are disappointed with the Bureau's decision not to renew, but the federal inmate population has declined by nearly 25,000 in the last 3 years, resulting in reduced overcrowding in BOP operated facilities. Today, the BOP is operating at approximately 117% of their rate of capacity, down from a roughly 140% 3 years ago. We are committed to work with the BOP through the transition of Cibola and continue to operate 3 additional correctional facilities on behalf of the BOP.[93]

62.     Executive VP and CFO David Garfinkle added that guidance was being reduced by $0.01 for the fourth quarter for the non-renewal of Cibola.[94] Other news in that earnings announcement were mixed. CCA reported funds from operations ("<u>FFO</u>") per share for the quarter above consensus, raised its FFO guidance, but slightly lowered its adjusted FFO ("<u>AFFO</u>") guidance for 2016.[95] CCA also discussed the renegotiation of its ICE contract at the South Texas Family Residential Center ("<u>STFRC</u>"), which analysts understood accounted for approximately 15 to 23% of its earnings.[96]

63.     CCA's earnings results were met with generally negative reactions by analysts, who expressed concern over the Cibola Contract Loss and STFRC renegotiation. Analysts expected a rate cut for the

---

[92]     Press release, "CCA Reports Second Quarter 2016 Financial Results," August 3, 2016.

[93]     CoreCivic, Inc. FQ2 2016 Earnings Call Transcript, August 4, 2016, p. 7.

[94]     CoreCivic, Inc. FQ2 2016 Earnings Call Transcript, August 4, 2016, p. 8.

[95]     CoreCivic, Inc. FQ2 2016 Earnings Call Transcript, August 4, 2016, pp. 8-9; Wells Fargo, "CXW: First Look--South TX Uncertainty Likely To Weigh On Shares," August 4, 2016. CCA announced second-quarter AFFO of $0.65 per share, ahead of May's previous guidance of $0.61 to $0.63 per share. CCA also raised 2016 FFO guidance from $2.64 to $2.68 (up from $2.60 to $2.66) and slightly lowered 2016 full-year AFFO/share guidance to $2.53 - $2.57 (from $2.53 - $2.59).

[96]     Cannacord Genuity, "Takeaways from meetings with management: cash flow risk lower than perceived," March 21, 2016; Cannacord Genuity, "2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD," August 4, 2016; SunTrust Robinson, "Renegotiation With ICE Ongoing; Maintain Neutral," August 4, 2016; Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To Limit Upside," August 10, 2016.



STFRC contract, which had been negotiated at a high per diem and accounted for a disproportionate share of CCA profits.[97] With respect to the Cibola Contract Loss, analysts considered the loss of approximately $0.04 FFO per year into their valuations along with other revisions that CCA made to its guidance.[98]

64. While the renegotiation of the STFRC facility was the main headline, the Cibola Contract Loss also attracted analysts' attention:

    a.    "Closing of the Cibola facility will result in $0.01 cut from quarterly EPS, which is reflected in the company's guidance."[99]

    b.    "The decision comes after the BOP has reduced populations by 25k over the past three years, and the outsized 140% of BOP design capacity of three years ago has dipped to a more reasonable 117% of design capacity."[100]

    c.    "Notably, our updated 2017 estimate assumes a full-year negative impact related to the announced non-renewal of a Bureau of Prisons (BOP) contract at the company's Cibola County Corrections Center."[101]

65. CCA's share price fell by approximately 6.2 percent between August 3 and August 4, 2016 with an abnormal return of approximately 5.9 percent.[102]

66. The Cibola Contract Loss, which was referenced in the Yates Memorandum two weeks later as a step in the direction of reducing reliance on private prisons, was a partial corrective disclosure to the extent it reduced the value of the BOP relationship that plaintiff alleges caused CCA's stock to be inflated.[103] The announcement of the Cibola Contract Loss, however, did not reveal the extent to which the BOP relationship had deteriorated nor did it link the loss of the contract to CCA's poor performance.

67. The extent to which the Cibola Contract Loss was reflected in CCA's share price reaction is not directly observable due to: 1) the lack of a significant price reaction to the initial news about the Cibola Contract Loss on August 1, 2016 (consistent with the facility's relatively small contribution to FFO); and 2) the substantial confounding information disclosed in conjunction with additional news about the Cibola Contract Loss on August 4, 2016 (i.e. risk to the STFRC and other earnings news). Therefore, in order to estimate the extent to which CCA's share price was inflated as a result of the concealed risks associated with the Cibola Contract Loss, I look to the extent to which earnings from this facility had driven previous

---

97  Cannacord Genuity, "2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD," August 4, 2016; Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To Limit Upside," August 10, 2016.

98  SunTrust Robinson, "Renegotiation With ICE Ongoing; Remain Neutral," August 4, 2016; Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To Limit Upside," August 10, 2016.

99  SunTrust Robinson, "Renegotiation With ICE Ongoing; Remain Neutral," August 4, 2016

100  Cannacord Genuity, "2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD," August 4, 2016.

101  Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To Limit Upside," August 10, 2016.

102  **Exhibit 1**.

103  Yates Memorandum.



expectations. Analysts covering CCA generally looked to the company's FFO, a widely used measure of performance for REITs, which CCA also reported in its public filings and on its earnings calls.[104]

68. Although market participants would not have known the precise amount of the Cibola contract's contribution to CCA's FFO until August 4, 2016, it was previously known that this contract accounted for well less than five percent of CCA's business. Before the corrective disclosure, Canaccord Genuity had estimated in 2015 that the Cibola contract contributed $0.08 in annual FFO/share.[105] When the Cibola Contract Loss was announced, however, CCA stated that the loss reduced quarterly FFO by $0.01 per share and expected annual FFO by $0.04 per share.[106] For the purpose of this analysis, $0.04 per share is a reasonable estimate of the reduction in FFO expectations associated with the Cibola Contract Loss.

69. At the time of the Cibola Contract Loss, CCA was trading at a multiple of approximately 11.5x FFO.[107] I have seen no evidence to suggest that risk and growth expectations associated with CCA's BOP business was significantly higher or lower than the company's overall business, which suggests that one may apply CCA's overall multiple to estimate the value associated with the Cibola contract. Applying this multiple to the $0.04 per share reduction in FFO associated with the Cibola facility implies that the total value of the Cibola Contract Loss was approximately $0.46 per share, which falls well within the aggregate share price decline that corresponded to the partial corrective disclosure.[108]

### 2) Yates Memorandum

70. In contrast to the partial corrective disclosure associated with the Cibola Contract Loss, I understand plaintiff alleges the Yates Memorandum revealed to the market the extent to which the BOP relationship had deteriorated. Namely, the Yates Memorandum resulted in changes to the market's perception of CCA's value proposition, reductions in expectations related to CCA's existing BOP business and CCA's ability to secure future business, along with increased concerns over wider implications for CCA's other federal and state contracts. That the impact of the Yates Memorandum extended beyond the value of the BOP contracts is unsurprising, since the corrective disclosure would have resulted in an increase in the perceived risk of CCA's other profit streams due to the BOP's decision and CCA's failure to disclose the extent of this risk prior to the Yates Memorandum.[109]

---

[104]  *See, for instance,* Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 85; Corrections Corporation of America Form 10-Q for period ending June 30, 2016, pp. 55-56; . Second Quarter 2016 Earnings Call, August 4, 2016, p. 8; and SunTrust Robinson, "Renegotiation With ICE Ongoing; Maintain Neutral," August, 4 2016, p. 3.

[105]  Cannacord Genuity, "Behind the Bars: Bi-Weekly Prison Update 10-5-15," October 5, 2015, at Figure 3.

[106]  CoreCivic, Inc. Second Quarter 2016 Earnings Call dated August 4, 2016, pp. 11 and 14.

[107]  **Exhibit 5.** At the time of the corrective disclosures, CCA's business was characterized by relatively stable cash flow expectations and dividend payments. In such an environment, it is typical to view the value of a company through the lens of an earnings multiple, as analysts often did for CCA.

[108]  **Exhibit 2.** I note that the above estimate would understate the share price impact associated with the Cibola Contract Loss to the extent that the loss of this facility also contributed to an increase in CCA's perceived risk (and therefore a lower multiple) for the rest of its operations.

[109]  *See, for instance,* Karpoff, Jonathan, Lee, D. Scott, and Martin, Gerald S., "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis* 43(3) Sept. 2008, 581-612, p. 581;



71.   Analysts responded to the Yates Memorandum by reducing their price targets by approximately 20 to 40 percent:

### Table 3. Analysts' Revisions to Price Targets [110]

| Analyst | Prior Update | Revision Date | PT Prior | PT New | PT Change | PT Pct. Change |
|---------|--------------|---------------|----------|--------|-----------|----------------|
| Canaccord | 8/4/2016 | 8/23/2016 | $30 | $21 | ($9) | (30%) |
| Suntrust | 8/4/2016 | 9/1/2016 | $34 | $20 | ($14) | (41%) |
| Wells Fargo | 8/10/2016 | 8/19/2016 | $26-$28 | $17-$22 | ($6)-($9) | (21%)-(35%) |

72.   Analysts' price target reductions were driven by both lower expected earnings and higher expected risk, as reflected by significantly lower FFO expectations and corresponding multiples:

### Table 4. Analyst Revisions to Estimated 2017 FFO [111]

| Analyst | Prior Update | Revision Date | FFO Prior | FFO New | FFO Change | FFO Multiple Prior | FFO Multiple New | FFO Multiple Change |
|---------|--------------|---------------|-----------|---------|------------|--------------------|------------------|---------------------|
| Canaccord | 8/4/2016 | 8/23/2016 | $2.26 | $1.82 | ($0.44) | 13.27x | 11.54x | (1.73x) |
| Suntrust | 8/4/2016 | 9/1/2016 | $2.64 | $1.97 | ($0.67) | 12.88x | 10.15x | (2.73x) |
| Wells Fargo | 8/10/2016 | 8/19/2016 | $2.49 | $2.39 | ($0.10) | 10.84x | 8.16x | (2.68x) |

73.   Analysts acknowledged that CCA's sharp share price decline reflected a reduction in expected future earnings and an increase in the risk associated with those earnings, with commentary that reflected the perspective that CCA's BOP business faced significant increased risk.

a.   Wells Fargo wrote, "We expect shares of both CXW and GEO to remain weak until more clarity around specific outcomes and timing around contract losses surface."[112]

b.   Canaccord Genuity wrote, "[w]e maintain concerns surrounding BoP contract cancellation headlines, a likely CXW dividend cut, and risk of a CXW covenant breach that could all weigh on both GEO and CXW shares in the near-term. As such, while we believe most of these concerns are priced in, we believe they could limit upside to both stocks."[113]

---

[110]   Analysts' revisions to AFFO were consistent with their changes to FFO.

[111]   Analysts' revisions to AFFO were consistent with their changes to FFO; Wells Fargo based on the midpoint of its range.

[112]   Wells Fargo, "DOJ Creates Uncertainty Around Private Corrections," August 19, 2016.

[113]   Cannacord Genuity, "Private prisons aren't going anywhere, but risks could continue to weigh on stocks," August 23, 2016.



c.     SunTrust Robinson wrote, "[w]e believe that BOP business is at-risk over five years, ICE and US Marshals business is substantially more secure and we see higher likelihood of declines in CA inmate populations resulting from Prop 57."[114]

d.     Compass Point wrote, "[t]his policy shift is clearly a negative for the publicly-traded for-profit prison companies but it is far from a death sentence."[115]

74.     Commentary surrounding the Yates Memorandum also tended to reflect CCA's position that the Yates Memorandum could be limited to BOP contracts and expressed some skepticism that the BOP business would not be renewed.

a.     Wells Fargo Securities: "In our view, the recent Department of Justice (DOJ) announcement pertains only to Bureau of Prisons (BOP) contracts, more specifically those up for renewal/rebid as part of Criminal Alien Requirement (CAR) XVI, and does not pertain to US Marshals or Immigration & Customs Enforcement (ICE). We believe angst around a larger government pullback from private prison business will likely persist, particularly in light of news that ICE is reworking its contract with CXW at its South Texas Family Residential Center well ahead of scheduled expiration."[116]

b.     Canaccord Genuity: "At current valuations, we believe the market is implying not only that the BoP contracts are lost immediately (assigning no value to them) but that the risk of contagion to the USMS, ICE and State contracts is a real near-term risk. We disagree on both accounts."[117]

c.     SunTrust Robinson: "CXW emphasized the DoJ's directive to the BOP was to reduce and eliminate the use of private facilities over time, not to end existing contracts...U.S. Marshals Service (USMS) and ICE contracts will not be impacted by the DoJ's directive, in our view, as USMS and ICE cannot overcrowd existing non-private facilities and have special constraints that must be met unlike the BOP."[118]

d.     Compass Point: "Our sense is that infrastructure limitation, political dynamics, and budgetary constraints will shield state-level contracts. Furthermore, the cash flow being generated by existing contracts appears safe as the memo directs review at the end of term. Finally, the language in this memo signals that termination is not the only option as the BOP appears to have sufficient latitude to renew expiring contracts so long as the scope is 'substantially reduce[d].'"[119]

---

[114] SunTrust Robinson, "CXW, GEO – Lowering Estimates & PTs Amid Political Shift," September 1, 2016.

[115] Compass Point, "Quick Thoughts on DOJ's For-Profit Prison Memo", August 18, 2016.

[116] Wells Fargo Securities, "DOJ Creates Uncertainty Around Private Corrections, "August 19, 2016.

[117] Cannacord Genuity, "Private prisons aren't going anywhere, but risks could continue to weigh on stocks," August 23, 2016.

[118] SunTrust Robinson, "Conference Call Takeaways," August 19, 2016.

[119] Compass Point, "Flash Note: Quick Thoughts on DOJ's For-Profit Prison Memo," August 18, 2016.



75.     Despite any skepticism that analysts expressed about the market's reaction to the Yates Memorandum, their reassessment of the extent of CCA's business risks and expected performance was ultimately reflected in significantly reduced price targets.[120]

76.     The extent of the risk to CCA's business revealed by the Yates Memorandum was reflected in CCA's share price decline immediately after the announcement.[121]  As set forth in **Exhibit 3**, CCA's share price declined by an additional 25.6 percent from its closing price on August 19 until November 8, 2016, exceeding its August 19 close price only once (on August 20) during that period.

77.     I have examined the period surrounding the Yates Memorandum and found there is no other information or news other than the Yates Memorandum and related responses that would explain CCA's share price reaction.  The evidence indicates that the entirety of the share price decline on August 18, 2016 as well as the increase on August 19, 2018 was driven by the Yates Memorandum and reactions to this announcement.  It is my understanding that plaintiff contends that the information disclosed by CCA on August 19, 2016 was misleading.  Nevertheless, it is possible that market participants continued to react to the disclosure of the Yates Memorandum on August 19, 2016, such that the cumulative impact of this disclosure may not have been reflected until the end of trading on that day.

78.     The abnormal return as measured by my event study may be used to estimate the reduction in value per share associated with the Yates Memorandum corrective disclosure.  To ensure the abnormal return captures the cumulative reaction attributable to the Yates Memorandum, I have computed a two-day abnormal return based on CCA's share price reaction on August 18-19, 2016.  To the extent this share price reaction reflected information disclosed on CCA's conference call that was misleading, this would represent a conservative estimate of the market's reaction to the revelation of concealed risk alleged by plaintiff (*i.e.* it would understate the impact of corrective information contained in the Yates Memorandum).  For the Yates Memorandum, the abnormal dollar return over the two-day event window is equal to $8.06, as set forth in **Exhibit 2**.

## VII.  Share Price Inflation

79.     According to plaintiff's allegations, CCA should have disclosed the risk to its BOP business caused by its inadequate performance and the deteriorations of its relationship with the BOP.  Had such a disclosure been made, CCA's share price would have declined to reflect the extent of this risk.

---

[120] **Table 3**.
[121] *See, e.g.,* Cannacord Genuity, "Raising GEO and CXW price targets on lower risk post-election," November 11, 2016; SunTrust Robinson, "Increasing PT to $26 On Outlook For Rising Estimates," November 14, 2016; Cannacord Genuity, "Upgrading CXW to BUY following dividend cut, lowered risk, and external growth opportunity," December 12, 2016.



## A.    Inflation at the time of the corrective disclosures

80.    To measure the extent to which CCA's share price was inflated at the time of the corrective disclosures, I begin with my estimates of the share price impacts of the corrective disclosures related to the allegations:

    a.    The impact of the Cibola Contract Loss of $0.46 is limited to the direct effect of the Cibola contract, which reflects my understanding that the full information was released over multiple days and announced along with confounding information about the STFRC renegotiation and other news unrelated to the allegations.

    b.    The abnormal return of $8.06 on August 18-19, 2016 relates entirely to the information contained in the Yates Memorandum and its consequent effects, all of which relates to the allegations.

81.    Before the corrective disclosures, market participants' expectations reflected a relatively low probability of CCA losing its BOP business.  After the corrective disclosures, market participants' expectations changed to reflect a significantly higher likelihood that CCA would lose the BOP contracts, in addition to the perception that the rest of CCA's business faced higher risks.

82.    It is possible that the share price would have declined in response to the Cibola Contract Loss and Yates Memorandum, even in the counterfactual in which CCA had disclosed the extent of the allegedly concealed risks.[122]  In this counterfactual, market participants still would have reassessed the value of CCA's BOP contracts (which would have been lower since CCA would have disclosed the extent of the risks), such that the Cibola Contract Loss and Yates Memorandum still would have changed the (relatively high) likelihood of losing these contracts to an even higher likelihood (or near certainty).  In other words, in the counterfactual, the realization of the disclosed risks could have had a (smaller) negative effect on the price of CCA's shares than the impact of these announcements attributable to the corrective disclosures.

83.    Conceptually, the portion of the abnormal returns explained by the increased likelihood of CCA losing its BOP contracts may be estimated as the difference between the counterfactual values of those contracts before and after the corrective disclosures.  As an upper bound, one may assess the counterfactual value of these contracts before the corrective disclosures, assuming that the BOP contracts contributed no value to CCA's share price after the corrective disclosures.

84.    One indicator of CCA's counterfactual value is its share price after it reflected the information disclosed through the Yates Memorandum along with what CCA purported to be the BOP's contribution to its earnings.  On August 19, 2016, CCA's stock closed at $19.08.  Assuming this post-announcement price placed little to no value on the BOP contracts, one may infer what the value of the share price would have

---

[122]    This is consistent with the Supreme Court's decision in *Dura*, which requires losses to shareholders to have been caused by the alleged contraventions.  *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627 (2005).



been based on CCA's statement that the BOP contracts represented approximately seven percent of its annual revenue and earnings.[123] All else equal, this suggests that CCA's shares would have been worth $20.52 ($19.08 / (1 – 0.07)) in a scenario under which it was expected to retain the BOP contracts. This indicates that the BOP contracts' counterfactual value would have been approximately $1.44 ($20.52 – $19.08) based on the market's assessment of CCA's risk after the Yates Memorandum.

85. One may expand this approach to estimate the counterfactual value of the Cibola contract by applying that contract's proportional contribution of earnings. As I explain in **Appendix D**, the Adams, McRae, and Eden contracts accounted for approximately $0.40 of CCA's FFO. Comparing Cibola's FFO contribution of $0.04 to the FFO contribution of $0.40 for the other three facilities suggests that Cibola would account for approximately $0.14 (10% times $1.44) based on CCA's share price after the Yates Memorandum.

86. Estimating the value of the BOP contracts under this approach, however, would tend to overstate the value of these contracts in the counterfactual, in which CCA would have distinguished its BOP relationship as subject to greater risk than the rest of its business. In order to account for this, I have examined how earnings from CCA's BOP contracts would have interacted with the information that I understand plaintiff contends would have been known in the counterfactual. As set forth in **Appendix D**, I have estimated the counterfactual value of CCA's BOP contracts based on:

    a. the BOP contracts' residual FFO contribution through the contract terms assuming plaintiff's contention that CCA could not have reasonably expected to retain its BOP contracts after they terminated;

    b. the counterfactual multiple of FFO that would have been associated with the BOP contracts assuming plaintiff's contention that CCA should have disclosed that it was unlikely to renew its BOP contracts or win any competitive bids.

87. As set forth in **Appendix D**, my analysis of the BOP contracts' counterfactual values suggests that these values would have ranged from $1.08 to $1.12 for Adams, McRae, and Eden, and from $0.11 to $0.13 for Cibola. These estimates, however, are conservative to the extent they reflect certain observed valuation parameters (*e.g.*, perceived risk) rather than valuation parameters that would have existed in the counterfactual since, in the counterfactual, CCA would have distinguished these BOP contracts as subject to greater risk than the rest of its business. In addition, as previously discussed, these estimates represent upper bound estimates of the counterfactual share price declines that would have corresponded to the corrective disclosures since they are based on the estimate of the BOP contracts' total (rather than the change in) counterfactual value.

---

[123] According to CCA, the BOP contracts "represent approximately $131.2 million in annual revenues, or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio average." CCA Form 8-K dated August 19, 2016. This suggests that the BOP contracts' contributions to CCA's profits were proportional to their revenue contribution.



88. For the purpose of this analysis, a conservative estimate of the value of the BOP contracts at the time of the Yates Memorandum suggests that the portion of the share price reaction explained by the loss of these contracts (had the extent of their allegedly concealed risks been known) would not have exceeded:

   a. $0.14 associated with the expected loss of the Cibola contract, which would have been realized as a result of the Cibola Contract Loss;

   b. $1.44 associated with the expected loss of the Adams, McRae, and Eden contracts, which would have been realized as a result of the Yates Memorandum.

89. Subtracting the above values from the total impacts related to the Cibola Contract Loss and the Yates Memorandum represents a conservative measure of inflation arising from the allegations at the time of the corrective disclosures, as set forth in the following table.

**Table 5.  Inflation at the time of the corrective disclosures**

|  | Cibola Contract Loss | Yates Memorandum | Total |
|---|---|---|---|
| Impact of the Corrective Disclosures | $0.46 | $8.06 | $8.52 |
| Less: Counterfactual Value of BOP Contracts | (0.14) | (1.44) | (1.58) |
| **Total** | **$0.32** | **$6.62** | **$6.94** |

## B.    Inflation during the Class Period

90. If the trier-of-fact finds that Defendants' alleged fraud fell within the zone of risk revealed through the corrective disclosures, the inflation estimates set forth in **Table 5** would have been present in CCA's shares beginning at the time that the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk.  As previously discussed, the inflation arising from the Cibola Contract Loss would have been present through August 1, 2016 while the inflation arising from the non-disclosures revealed through the Yates Memorandum would have persisted through August 17, 2016.

91. My share price inflation estimates are based on a finding that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud, such that the extent of share price inflation remains constant from the time that the trier-of-fact makes such a finding until inflation is eliminated through the Cibola Contract Loss and the Yates Memorandum.  The impact of any concealed risks on CCA's share price, however, would have been different before the company announced its conversion to a REIT on February 7, 2013.

92. From an economic perspective, the primary difference between a corporation and a REIT is the obligation of the company to pay corporate income tax.  A corporation's earnings are generally subject



to corporate income tax whereas those of a REIT are generally exempt; according to CCA's 2013 10-K, "CCA will be entitled to a deduction for dividends paid, resulting in a substantial reduction in the amount of federal income tax expense it recognizes."[124]  Thus, any reduction in value measured for CCA as a corporation (before converting to a REIT) would have been attenuated by offsetting corporate tax obligations on expected future earnings and, therefore, value.

93.  In the three years prior to the conversion (2010, 2011, and 2012), CCA's effective tax rate was approximately 36.8 percent;[125] following its conversion to a REIT, its average income tax rate fell to approximately 3.6% for the full years of 2014, 2015, and 2016.[126]  During the portion of the Class Period before CCA converted to a REIT, the prevailing marginal corporate tax rate was 35 percent.[127]  Thus, any reduction in value arising from the concealed risks would have been partially offset by the marginal corporate tax rate.[128]  Accordingly, I reduce my estimates of share price inflation by 35 percent before February 8, 2013.

94.  The following table summarizes share price inflation during the Class Period, including this adjustment.

### Table 6.  Inflation: February 27, 2012 to August 17, 2016

|  | February 27, 2012 to February 7, 2013 | February 8, 2013 to August 1, 2016 | August 2, 2016 to August 17, 2016 |
|---|---|---|---|
| Cibola Contract Loss | $0.21 | $0.32 | $ - |
| Yates Memorandum | $4.30 | $6.62 | $6.62 |
| Total inflation | $4.51 | $6.94 | $6.62 |

95.  The above inflation estimates are based on an approach known as the constant dollar method, in which the dollar value of inflation is held constant during the Class Period, adjusted to reflect the difference in the impact of the allegedly concealed risk before/after the Cibola Contract Loss and CCA's

---

[124]  Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. F-28.

[125]  Based on income total tax expense of $279.4 million and pretax income of $758.6 million from 2010 through 2012.  Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. F-4.

[126]  Based on income total tax expense of $23.6 million and pretax income of $652.1 million from 2014 through 2016.  CoreCivic, Inc. 10-K for period ending December 31, 2016, p. F-4.

[127]  IRS Publication 542 (Rev. March 2012), p.17 based on the marginal tax rate for taxable income over $18.3 million (CCA's pre-tax income exceed this level in each year of the Class Period).

[128]  Prior to CCA's REIT conversion, CCA paid "qualified dividends" that "generally are subject to tax at preferable rates.  Subject to limited exceptions, dividends payable by REITs are not eligible for those reduced rates and are taxable at ordinary income tax rates… [Post-conversion dividends] are generally taxable to our stockholders as ordinary income. However, our dividends are eligible for the lower rate applicable to 'qualified dividends' to the extent they are attributable to income that was previously subject to corporate income tax."  Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 43.  Adjusting share price inflation by the marginal corporate tax rate is therefore conservative (would tend to understate inflation) to the extent that the net impact of tax savings to shareholders associated with the REIT conversion was lower.



conversion to a REIT. The constant dollar method is a widely accepted approach to estimating share price inflation and is consistent with the legal framework for measuring damages.[129]

96.     In the generally declining share price environment at issue in this case, in which CCA's stock generally traded higher during the Class Period than at the time of the corrective disclosures, a constant dollar approach results in inflation as a proportion of share price being generally lower during the Class Period than at the time of the corrective disclosures.[130] I also note that CCA's implied multiple relative to expected FFO during the Class Period was rarely below its value at the time of the corrective disclosures, which suggests that the above estimates are conservative, since the impact of the concealed risk would only have increased in a higher multiple environment.[131] Similarly, the above estimates do not consider the declining value of the BOP business; in earlier periods, the contribution of the BOP business to CCA's share price was higher, which suggests that the value of the concealed risk also would have been higher.[132]

97.     In my opinion, the above inflation estimates represent reasonable and conservative estimates of the impact of the allegedly concealed risks during the Class Period.

## VIII. Per Share Damages

98.     To the extent the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud, then the share price inflation figures corresponding to the purchase dates set forth in **Table 6** would apply to any member of the Class who bought CCA stock during the Class Period and sold or held shares on or after August 2, 2016. I note that the above estimates are additive and separable, such that the impacts of each corrective disclosure may be considered jointly or individually at any time during the Class Period.

99.     I understand that an individual plaintiff's recoverable damages are based on the difference between: (a) share price inflation associated with shares purchased at the time they were purchased; and (b) share price inflation associated with shares sold at the time they were sold after one or more corrective disclosures. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") a "plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis

---

[129]  The constant dollar approach also is consistent with *Dura*, which requires that inflation not exceed losses caused by the revelation of the alleged wrongdoing.

[130]  See **Exhibit 4**.

[131]  See **Exhibit 5**. Said differently, the value of the concealed risk would have been higher to the extent the market placed a higher value on CCA's earnings.

[132]  For instance, until December 30, 2014, CCA's share price would have reflected expected earnings associated with the Northeast Ohio Correctional Center. See, Wells Fargo, "CXW: Loses Federal Bureau Of Prisons Contract At Its Northeast Ohio Correctional Center," December 30, 2014.



for the action is disseminated to the market."[133]  Additionally, "if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period," then "damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."[134]

100.   As set forth in **Exhibit 3,** I have computed CCA's mean trading price between August 19, 2016 and each of the following days during the 90-day period through November 16, 2016 based on CCA's closing price on each day.  Based on the inflation figures in **Table 6** and the mean share prices set forth in **Exhibit 3**, one may compute damages for any class member based on their relevant transactions within the Class Period.

## IX.   Further Work

101.  My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available to me.

W. Scott Dalrymple, CFA

---

[133] 15 U.S.C. § 78u-4 (2011).
[134] 15 U.S.C. § 78u-4 (2011).






## SCOTT DALRYMPLE, CFA

**Appendix A**

PARTNER

| | |
|---|---|
| Direct | +1.214.619.4960 |
| Mobile | +1.214.842.0078 |
| Email | sdalrymple@bvagroup.com |

Scott Dalrymple is an economist specializing in quantitative valuation, econometrics, statistics, securities analysis, antitrust, financial markets, and intellectual property.

Mr. Dalrymple has led numerous consulting, commercial litigation, and restructuring engagements on behalf of multinational companies, investors, financial institutions, and government agencies in the U.S., Europe, and Australia. He has testified in federal and state court and has advised clients in areas including:

- Application of economic, statistical, and quantitative methods used in business interruption matters, securities analysis, financial forecasting, valuation, and antitrust analyses;

- Construction of event studies, market efficiency tests, and other financial econometric models to assess share price artificiality associated with alleged misrepresentations and non-disclosures;

- Quantification of multibillion-dollar claims related to the securitization of residential mortgage-backed assets;

- Estimation of price artificiality arising from alleged manipulations in crude oil futures and options markets through monopolization of cash forward contracts;

- Valuation of residual interests in mortgage-backed securitizations based on loan-level econometric models and simulations;

- Analysis of reasonable royalty and lost profits damages arising from patent infringement claims;

- Development of economic and financial forecast models for purposes of capital restructurings, evaluating investment opportunities, and managing working capital; and

- Design of sampling procedures and statistical inferences drawn from samples used in fraud investigations, product evaluations, accounting reviews, and class certification analyses.

Mr. Dalrymple holds a Master of Science in Economics with a concentration in Industrial Organization from the London School of Economics and Political Science and a Bachelor of Business Administration in Finance and Business Honors from the University of Texas at Austin. He has presented chapters of the American Bar Association, the Licensing Executives Society, and other organizations on topics including patent infringement damages, quantitative analysis, and macroeconomic trends. Mr. Dalrymple also contributed to the AICPA Practice Aid on Intellectual Property Infringement Damages and has been published in Law360. He is a member of the CFA Society of Dallas–Fort Worth.

Prior to joining BVA, Mr. Dalrymple was with AlixPartners and was an economist in the London office of a global economics consulting firm. Mr. Dalrymple began his career at PricewaterhouseCoopers and also worked in corporate finance and transaction advisory roles for a publicly-traded technology company.

**bvagroup**®

Valuation.
Disputes.
Advisory.

| | | |
|---|---|---|
| 7250 Dallas Parkway | 1000 Louisiana Street | 340 Madison Avenue |
| Suite 200 | Suite 6925 | 19th Floor |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10173 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

## TESTIMONY AND PUBLICATIONS

**DEPOSITION:**

*Leaf Trading Cards, LLC v. The Upper Deck Company*
Civil Action No. 3:17-CV-03200-N
United States District Court, Northern District of Texas, Dallas Division

*Samsung Electronics America, Inc., v. Yang Kun "Michael" Chung, Thomas Porcarello, Yoon-Chul "Alex" Jang, Jin-Young Song, All Pro Distributing, Inc.*
Civil Action No. 3:15-CV-04108-D
United States District Court, Northern District of Texas, Dallas Division

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. The Bank of New York Mellon, as Trustee*
Cause No. 14-CV-6502
United States District Court, Southern District of New York

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. HSBC Bank USA, National Association, as Trustee*
Cause No. 14-CV-08175
United States District Court, Southern District of New York

*Avaya Inc., v. Interactive Intelligence, Inc.*
Cause No. 01-16-0004-7193
AAA Commercial Arbitration

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Wells Fargo Bank, N.A., as Trustee*
Cause No. 14-CV-9764
United States District Court, Southern District of New York

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. U.S. Bank National Association, as Trustee*
Cause No. 14-CV-2590
United States District Court, Southern District of New York

*Galt Strategies, LLC v. Critter Control, Inc., Kevin Clark, ABCN Services Corp., Animal Intrusion Prevention Systems Holding Co., LLC, Jezek, Inc. d/b/a Critter Control St. Louis, Critter Control of Reno, LLC, CRICO, Inc., Salmick, Inc. d/b/a Critter Control Greater Hudson Valley, and MOAN, LLC*
Cause No. DC-15-05281
162nd Judicial District Court, Dallas County, Texas

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

# SCOTT DALRYMPLE, CFA

**PARTNER**

Appendix A

---

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Deutsche Bank National Trust Company, as Trustee*
Cause No. 14-CV-4394
United States District Court, Southern District of New York

*Maxus Healthcare Partners, LLC ("Maxus"), v. Texas RHH, LLC d/b/a Renew Home Health ("Texas RHH"), Misty Chaney-Brady, BP Chaney, Zera, Inc., Curtis James Brady, Furtek & Associates, L.L.C. and Richard E. Furtek*
Cause No. 017-275219-14
17th Judicial District Court, Tarrant County, Texas

*GTG Holdings, Inc. v. Amvensys Capital Group, LLC, ACG Telecom, LLC, and Z. Edward Lateef*
Case No. 3:13-cv-03107-M
United States District Court, Northern District of Texas, Dallas Division

*In The Matter of the Marriage of Jessica L. Jones and David E. Jones and in the Interest of David E. Jones, Jr., Jackson H. Jones and William A. Jones, Children*
Case No. D-1-FM-13-001139
250th Judicial District Court, Travis County, Texas

**TRIAL AND HEARING:**

*Shirley Jones, Individually and on Behalf of Her IRAs, et al., v. WFG Investments, Inc., WFG Advisors, LP, Wilson H. Williams, and David W. Williams*
Case No. 16-03743
Financial Industry Regulatory Authority

*Smith Walker v. E\*Trade Securities LLC and E\*Trade Clearing LLC*
Case No. 16-03022
Financial Industry Regulatory Authority

*Avaya Inc., v. Interactive Intelligence, Inc.*
Cause No. 01-16-0004-7193
AAA Commercial Arbitration

*Maxus Healthcare Partners, LLC ("Maxus"), v. Texas RHH, LLC d/b/a Renew Home Health ("Texas RHH"), Misty Chaney-Brady, BP Chaney, Zera, Inc., Curtis James Brady, Furtek & Associates, L.L.C. and Richard E. Furtek*
Cause No. 017-275219-14
17th Judicial District Court, Tarrant County, Texas

*Galt Strategies, LLC v. Critter Control, Inc., Kevin Clark, ABCN Services Corp., Animal Intrusion Prevention Systems Holding Co., LLC, Jezek, Inc. d/b/a Critter Control St. Louis, Critter Control of Reno, LLC, CRICO, Inc., Salmick, Inc. d/b/a Critter Control Greater Hudson Valley, and MOAN, LLC*
Cause No. DC-15-05281
162nd Judicial District Court, Dallas County, Texas

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

# SCOTT DALRYMPLE, CFA

PARTNER

---

*Edward Kennard Andrew and Mark L. Hepworth v. Southwest Securities, Inc.*
Case No. 14-02566
Financial Industry Regulatory Authority

*In the Matter of the Marriage of Jessica L. Jones and David E. Jones and in the Interest of David E. Jones, Jr., Jackson H. Jones and William A. Jones, Children*
Case No. D-1-FM-13-001139
250th Judicial District Court, Travis County, Texas

## PRESENTATIONS AND PUBLICATIONS:

Co-Author (with Joseph R. Mason and Jody Bland), "Collateralized Loan Obligations: Overview and Challenges," *BVA Group*, May 14, 2020.

Co-Author (with Robert Manz and Emily Chiu), "COVID-19 Business Interruption Claims: Causation May be Key," *BVA Group*, April 24, 2020.

Co-Author (with Joseph R. Mason and Jeffrey D. Balcombe), "Financial Supervision and Regulation in the US: Dodd-Frank Reform," *European Parliament*, December 2018.

Contributing Author, Hitchner, James R., *Financial Valuation: Applications and Models*, Fourth Edition, April 2017.

*Series N and Super Priority Preferred: The Unintended Consequences of Increasing Complexity in Today's Capital Markets*, Houston Bar Association Securities Litigation and Arbitration Section, April 11, 2017.

Co-Author, "Don't Shoot the Methodology: Use and (Mostly) Misuse of the Nash Bargaining Solution," *Law360*, March 2014.

*Economic Factors That Influence Royalties: Application of Game Theory*, LES Seattle Chapter Presentation, November 14, 2013.

*Bargaining Power in Licensing Negotiations*, LES San Diego Chapter Presentation, March 12, 2013.

*Bargaining Theory in Reasonable Royalty Calculations,* ABA Webinar, December 14, 2012.

Contributing Author, "Calculating Intellectual Property Infringement Damages," AICPA Practice Aid 06-1, 2012.

## AFFILIATIONS:

The Economic Club of Washington D.C., panelist judge for the Philip M. Dearborn and Vernon E. Jordan fellowships for graduate students pursuing doctoral degrees in the fields of economics, finance, and business, 2014 to present.

CFA Institute and CFA Society of Dallas–Fort Worth.

---

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

PARTNER

## PARTIAL LIST OF CASES

Mr. Dalrymple has been involved with the following types of cases in a consulting and/or testifying capacity:

### VALUATION AND SECURITIES ANALYSIS

- Provided expert and rebuttal opinions on share price inflation and aggregate damages on behalf of a former Australian electronics retail chain.

- Provided expert testimony on damages and losses on behalf of a broker/dealer arising from a series of private placement investments and offerings.

- Quantified the impact of trustees' alleged failures to repurchase loans on behalf of a residential mortgage backed securitization (RMBS) investor.

- Developed a class-wide damage model arising from suitability claims against an investment bank.

- Provided expert testimony in support of class certification on behalf of residential mortgage backed securitization (RMBS) holders.

- Analyzed market efficiency in support of fairness and solvency opinions related to shares of publicly traded companies in the energy sector.

- Prepared event studies and damages analyses based on various share matching (LIFO, FIFO, offsets) and account consolidation conventions on behalf of security holders evaluating class action opt outs.

- Analyzed trading activity and valuations of restricted and unrestricted shares associated with an alleged pump-and-dump scheme following a reverse merger.

- Provided expert opinions and rebuttal of opposing expert analysis regarding share price inflation damages on behalf of an Australian industrial conglomerate involved in a shareholder class action lawsuit.

- Served as a testifying expert in an arbitration matter involving the liquidation of margin positions.

- Provided economic and statistical analysis of loan collateral characteristics, performance, and alleged misrepresentations associated with residential and commercial mortgage-backed securities on behalf of multinational financial institutions and investors.

- Developed econometric models to establish relationships between crude oil futures and options prices and numerous industrial, financial, and macroeconomic variables in a securities class action lawsuit.

- Provided expert testimony on the valuation of a healthcare services company.

- Served as a consulting expert for government agencies in negotiations of multibillion-dollar settlements involving the origination, sale, and securitization of residential mortgages.

- Negotiated the value of residual interests in Canadian mortgage-backed securities on behalf of the bankrupt sponsor based on econometric models and Monte Carlo simulations used to predict future cash flows from individual mortgages.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

- Provided expert opinions the solvency of a debtor subsidiary in the telecom industry facing fraudulent transfer allegations.

- Analyzed the economic merits of civil penalties assessed by the U.S. SEC related to the sale of restricted stock.

- Assessed the appropriateness of certain private equity investments related to the investment policy statement of a family limited partnership.

- Evaluated the economic merits of breach of fiduciary duty claims related to options trading strategies in a jointly-held investment account.

- Quantified share price inflation damages on behalf of an Australian contracting and development company involved in a shareholder class action lawsuit.

- Evaluated share price inflation allegations against an Australian real estate investment trust and quantified damages based on multiple share purchase matching approaches and detailed trading data in a shareholder class action lawsuit.

- Analyzed plaintiff and defendant shareholder damages models related to claims against an Australian commodities company in a shareholder class action lawsuit.

- Investigated quantitative methods used to value the structured credit portfolios of a global investment and insurance company.

- Advised a major U.S. bank on the write-down of its structured finance portfolio.

- Quantified share price inflation and corresponding damages based on allegations against an Australian gaming corporation in a shareholder class action lawsuit.

- Analyzed the effects of management representations on a U.S. technology firm's share price in a shareholder class action lawsuit.

- Examined the impact of accounting scandal revelations on the share price of a U.S. media firm in a shareholder class action lawsuit.

- Constructed a Monte Carlo simulation to estimate the value of performance-based incentives in the UK media industry.

**ANTITRUST AND REGULATION**

- Provided expert testimony on relevant market definitions, market power, and vertical restraints of competition on behalf of a manufacturer in a case involving allegations of market foreclosure.

- Quantified damages on behalf of a plaintiff class alleging overcharges on purchases of accessory items.

- Provided expert opinions in support of class certification in a case involving alleged overcharges of building materials.

- Quantified the impact of price artificiality associated with alleged market manipulations in crude oil futures and options markets.

- Assessed the impact of monopolization claims on prices in the European automobile parts market.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



**bva**group®

Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

## PARTNER

- Evaluated monopolization claims in the market for remanufactured printer cartridges.

- Analyzed the price impact of alleged false advertising claims in the market for fruit juices.

- Assisted a European competition authority in a review of its financial services sector based on event studies used to estimate the effect of firm entry on lending rates.

- Examined the impact of competition policies on the personal banking sector in a national European market based on quantitative analysis of current account activity associated with major banks.

- Analyzed the impact of a UK pharmaceutical firm's alleged predatory pricing behavior on sales of its primary competitor.

- Quantified the impact of regulatory and commercial changes on a portfolio of media and gambling rights in the UK.

- Developed an industrial analysis framework used to evaluate competitive drivers across several manufacturing sectors for purposes of valuing a European manufacturing firm.

**INTELLECTUAL PROPERTY**

- Provided testimony rebutting an opposing expert's lost profits calculations arising from claims of intellectual property infringement, trade secret misappropriations, tortious interference and other allegations.

- Led the analysis of reasonable royalty damages on behalf of more than 150 defendants alleged to infringe a single patent covering widely-used website features related to geographic location services.

- Provided expert testimony regarding the economics of contractual royalty calculations on behalf of a U.S. communications company.

- Served as a testifying expert on behalf of a consulting firm seeking damages arising from alleged misappropriations of trade secrets.

- Assessed the merits of trade secret misappropriation claims against a global energy services company.

- Evaluated reasonable royalty claims associated with alleged U.S. patent infringements related to numerous technologies, including:

  o Telephony and cellular network;

  o Network architecture;

  o Hardware and software technology;

  o Digital media;

  o Remote access technologies;

  o Power converter architectures;

  o E-commerce;

  o Garments and apparel;

  o Automotive parts;

  o Food processing;

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

- o Methods for check payment processing;

- o Geographic location services; and

- o Oil and gas exploration.

- Advised patent holders on strategic opportunities and licensing strategy for purposes of monetizing patent portfolios in the network technology and electronic storage industries.

- Computed lost profits, unjust enrichment, and reasonable royalty damages arising from theft of trade secrets claims brought by a specialized provider of electronic components against former employees.

- Assessed damages associated with contingency fee agreements between a law firm and former client arising from the settlement of a patent litigation lawsuit.

- Analyzed lost profits damages arising from patent infringement claims covering a wide range of network, software, and industrial applications.

- Composed a series of intellectual property valuations submitted to European tax authorities on behalf of a global steel manufacturer.

- Assessed the economic merits of an injunction claims against a major provider of rail track inspection services.

- Evaluated price erosion claims on behalf of defendants accused of patent infringement in industrial applications.

- Assessed damages arising from trade secret claims involving tens of millions of transactions in the freight industry.

- Evaluated damages arising from trademark infringement claims against companies in the financial services, technology, and automotive industries.

**COMMERCIAL LITIGATION AND INVESTIGATIONS**

- Designed sampling procedures and advised on statistical inferences drawn from samples used in numerous fraud investigations, accounting reviews, and class certification analyses.

- Provided expert opinions based on statistical and econometric models used to evaluate employee allegations of discrimination under U.S. Title VII.

- Led the sampling, investigation, and extrapolation of results from transaction data retrieved from various accounting systems for purposes of identifying unreported IT costs in a breach of contract dispute involving a major U.S. hospital network.

- Provided expert opinions on lost wages associated with an alleged wrongful termination of a public services officer.

- Assessed damages associated with contingency fee agreements between a law firm and former client arising from the settlement of a patent litigation lawsuit.

- Constructed a series of econometric and financial models used to evaluate breach of contract claims in the freight and shipping industry based on the analysis of tens of millions of individual shipping records.

- Quantified the effects of a U.S. publicity scandal on Japanese sales of celebrity-sponsored products based on a quantitative analysis of sales data, controlling for numerous macroeconomic factors.

- Analyzed the forgone acquisition value of a UK retailer due to an alleged breach of fiduciary duty.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

PARTNER

## TURNAROUND AND RESTRUCTURING

- Assisted a regional hospital in preparing for Chapter 11 proceedings.

- Implemented a weekly cash projection process and advised on working capital strategies that enabled a U.S. manufacturer to operate within its asset-based facility.

- Managed the implementation of financial models and weekly cash management processes on behalf of a U.S. metals distributor.

- Developed a series of integrated financial models that enabled a public U.S. technology firm to evaluate restructuring opportunities and secure long-term and short-term funding.

- Implemented a short-term cash management tool and monthly strategic model for a private equity portfolio company

- Developed cash forecast and liquidation models on behalf of creditors of a U.S. metal fabricator.

- Assisted a U.S. hospital operator in developing financial plans used to secure additional funding.

- Estimated the impact of an audit firm's alleged misrepresentations on the unsecured claims against a U.S. company's bankrupt estate.

- Quantified the value of life insurance and executive benefit claims against a U.S. bankruptcy estate based on various actuarial assumptions.

- Advised on the reliability of a U.S. distributor's financial model and business plan based on a series of financial and statistical tests.

- Negotiated the settlement of numerous claims on behalf of a U.S. bankruptcy estate.

- Managed bankruptcy proceedings on behalf of a regional U.S. electronics chain.

## BUSINESS ADVISORY AND CORPORATE FINANCE

- Designed econometric models to measure revenue impacts of product placements for a global consumer product company.

- Advised a U.S. freight company on the design and implementation of financial and economic forecasting tools.

- Designed sampling procedures to optimize new sporting goods product tests given limited access to college-level athletes.

- Identified demand drivers for an equipment manufacturer based on econometric analyses of distribution channels and inventory levels.

- Developed a comprehensive IT framework that enabled a U.S. manufacturer to project short-term borrowing requirements in a consolidated database/ERP system.

- Designed weekly cash management and monthly financial reporting tools for multiple private equity portfolio companies in the marketing and broadcast industries.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

PARTNER

- Managed numerous projects for a public U.S. technology firm, including: product pricing and bundling analysis, development of operational metrics, and the redesign of the commission structure.

- Designed and implemented automation tools used in numerous business planning and reporting applications for clients in the retail, shipping, and manufacturing sectors.

- Advised a commercial real estate client on the sale of a major U.S. shopping mall.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
Appendix B - Information Considered

**Court Documents:**

(1) Consolidated Complaint For Violation Of The Federal Securities Laws, dated 3/13/17

(2) Defendants' Memorandum Of Points And Authorities In Support Of Their Motion To Dismiss Plaintiff's Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated 5/12/17

(3) Declaration Of Milton S. McGee, III In Support Of Defendants' Motion To Dismiss, with Exhibits, dated 5/12/17

(4) Plaintiff's Opposition To Defendants' Motion To Dismiss Plaintiff's Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated 6/26/17

(5) Defendants' Reply Memorandum In Further Support Of Their Motion To Dismiss Plaintiff's Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated 7/26/17

(6) Memorandum, dated 12/18/17

(7) Answer To Consolidated Complaint For Violation Of The Federal Securities Laws, dated 2/2/18

(8) Revised Stipulation and Protective Order, dated 2/12/18

(9) Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, dated 6/1/18

(10) Memorandum Of Law In Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, dated 6/1/18

(11) Declaration Of Christopher M. Wood In Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, dated 6/1/18

(12) Defendants' Memorandum In Opposition To Plaintiff's Motion For Class Certification, Appointment Of Class Representative, and Appointment Of Class Counsel, dated 7/16/18

(13) Declaration Of Milton S. McGee, III In Support Of Defendants' Opposition To Plaintiff's Motion For Class Certification, Appointment Of Class Representative, And Appointment Of Class Counsel, dated 7/16/18

(14) Reply In Further Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, dated 10/26/18

(15) Declaration Of Christopher M. Wood In Support Of Reply In Further Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, with Exhibits, dated 10/26/18

(16) Memorandum, dated 1/18/19

(17) Petition For Permission To Appeal Pursuant To Federal Rule Of Civil Procedure 23(f), dated 2/1/19

(18) Memorandum Of Law In Support Of Lead Plaintiff's Motion For Reconsideration Of The January 18, 2019 Order Denying Class Certification, dated 2/1/19

(19) Declaration Of Willow E. Radcliffe In Support Of Memorandum Of Law In Support Of Lead Plaintiff's Motion For Reconsideration Of The January 18, 2019 Order Denying Class Certification, with Exhibits, dated 2/1/19

(20) Defendants' Opposition To Lead Plaintiff's Motion For Reconsideration Of The January 18, 2019 Order Denying Class Certification, dated 2/15/19

(21) Petitioner's Voluntary Dismissal With Prejudice Pursuant To Fed. R. App. P. 42(B), dated 3/28/19

(22) Memorandum, dated 3/26/19

(23) Order, dated 3/29/19

(24) Petition For Permission To Appeal Class Certification Order Pursuant To Federal Rule Of Civil Procedure 23(F), dated 4/9/19

(25) Plaintiff-Respondent's Opposition To Petition For Permission To Appeal Class Certification Order Pursuant To Federal Rule Of Civil Procedure 23(F), dated 4/19/19

(26) Order, dated 8/23/19

(27) Order Setting Case for Trial, dated 9/3/19

(28) Revised Case Management Order, dated 3/20/20

**Expert Reports:**

(1) Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA dated 6/1/18

(2) Expert Report of Lucy Allen, dated 7/16/18

(3) Rebuttal Report of  Professor Steven P. Feinstein, Ph.D., CFA dated 10/26/18

(4) Supplemental Report of Lucy Allen, dated 11/21/18

**Deposition Transcripts:**

(1) Deposition of Steven Feinstein, dated 7/12/18

(2) Deposition of Lucy Allen, dated 10/10/18

**Analyst Reports:**

(1) 2011-02-09 Barclays 4Q'10 First Look-Strong Beat & Good FY'11 Guidance; 11am Conf Call.pdf

(2) 2011-02-10 Barclays 4Q'10 Post Call-Q Helped by USMS Delays; Pipeline Growing; Awaiting Budgets; 2-EW.pdf

(3) 2011-02-11 Macquarie CCA Solid Q4A-Q1E.pdf

(4) 2011-02-11 SunTrust CCA 4Q10 Results; Adjusting Estimate  and Reiterate Buy.pdf

(5) 2011-03-02 Barclays GEO's Continuum of Care, including Electronic Monitoring.pdf

(6) 2011-03-15 Barclays GEO UK Border Contract for First Scottish Facility.pdf

bvagroup

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**

(7) 2011-03-16 Barclays GEO 3 UK Region Transport Contracts.pdf

(8) 2011-03-17 Barclays BOP Awards 1K-Bed Low Security Contract to CEC.pdf

(9) 2011-03-18 ISEC's 2011 Electronic Monitoring Outlook.pdf

(10) 2011-03-21 Barclays GEO Misses Out on UK Managed-Only Contracts (on Price).pdf

(11) 2011-03-24 Barclays GEO Returned from Prison (Tour).pdf

(12) 2011-04-01 Barclays All Eyes on Florida.pdf

(13) 2011-04-07 Barclays FL Budgets Head to Conference Committee.pdf

(14) 2011-05-04 Barclays CCA 1Q'11 First Look Another $0.04 Beat Due to Better than Expected USMS Levels.pdf

(15) 2011-05-04 SunTrust CIS with Operating Metrics.pdf

(16) 2011-05-05 Barclays CCA Conf Call Highlights Strengthening US Bed Pipeline & FL.pdf

(17) 2011-05-05 SunTrust CCA 1Q Results; EPS beat and Upside Guidance, Adjusting Estimates.pdf

(18) 2011-05-06 Macquarie CCA Improving Pipeline Bodes Well for CXW.pdf

(19) 2011-05-23 SunTrust Opportunities for Growth; Reiterate Buy.pdf

(20) 2011-06-22 Disclosure Insight CCA DI Report.pdf

(21) 2011-06-28 SunTrust CCA Takeaways From Investor Meetings; CA Risk Overblown.pdf

(22) 2011-08-04 Avondale CXW=US CXW - $650 million in Awards Expected in 3-4 Months.pdf

(23) 2011-08-04 Avondale CXW=US Morning Meeting Summary.pdf

(24) 2011-08-04 SunTrust CCA 2Q11 Results; Reiterate Buy on Abundance of Opportunities.pdf

(25) 2011-08-05 Macquarie CCA Defensive Model Bodes Well for CXW.pdf

(26) 2011-08-16 Barclays CCA Buying Back Shares at Current Levels.pdf

(27) 2011-08-19 Barclays CXW.N U.S. Business & Information Services_ A Quick Gauge of ..., CXW Worth the Extra Look.pdf

(28) 2011-09-02 Barclays CCA Increasing Estimates for OH Win.pdf

(29) 2011-09-02 Macquarie CCA Ohio Win Should be Accretive in 2012.pdf

(30) 2011-10-21 SunTrust Consulting and Government Services; Updating Estimates.pdf

(31) 2011-10-31 Barclays CCA BoP Re-Bid Win; AZ & FL Awards Update.pdf

(32) 2011-11-02 Macquarie CCA Well Positioned for Expanding Pipeline.pdf

(33) 2011-11-03 Barclays CXW Corrections Corp. of America_ 3Q11 Post-Call_ Awaiting ...rom Strengthening Pipeline.pdf

(34) 2011-11-04 Macquarie CCA Well Positioned for Expanding Pipeline.pdf

(35) 2011-11-04 SunTrust CCA 3Q Results; Thesis Intact and Reiterate Buy.pdf

(36) 2011-12-13 Barclays CXW.N Private Prisons_ Upgrade CXW_ Prefer the Potential for ...end and Continued Buybacks.pdf

(37) 2011-12-31 Corrections Corporation of America.pdf

(38) 2012-01-03 Barclays CCA New 480-bed Award from Puerto Rico.pdf

(39) 2012-01-05 Barclays CCA CA Budget Proposal ('12-'13) Out-of-State Pop Left Unchanged.pdf

(40) 2012-01-09 Barclays CCA Refi Accretive; A Step Closer to a Dividend.pdf

(41) 2012-02-08 Barclays CCA Solid 4Q'11 balanced by in-line 2012 guide despite small KY loss & Q1 moving parts.pdf

(42) 2012-02-09 Barclays CCA more than secure in '12-'13.pdf

(43) 2012-02-09 SunTrust CCA Raising 2012 EPS and Reiterate Buy on Steady Pipeline.pdf

(44) 2012-02-10 Avondale CXW=US CXW - Limited Re-Bid Risk, Solid Pipeline.pdf

(45) 2012-02-10 Avondale CXW=US CXW, GEO - Corrections News & Notes.pdf

(46) 2012-02-10 Macquarie CCA Existing Pipeline Keeps Us Positive.pdf

(47) 2012-02-17 Barclays CCA $250M 'Corrections Investment Initiative' as a new avenue for growth.pdf

(48) 2012-02-17 SunTrust Corrections Future is Solid Despite FL Decision.pdf

(49) 2012-02-27 Barclays CCA Initiates Dividend at ~3.4% Yield; 1-OW.pdf

(50) 2012-02-27 Macquarie CCA New ~3.5% Dividend Yield is a Positive.pdf

(51) 2012-02-28 Barclays CCA Initiated dividend does not limit growth.pdf

(52) 2012-03-09 Macquarie CCA HQ Visit and Prison Tour.pdf

(53) 2012-03-15 Barclays CCA REIT value exists, but is now the right time.pdf

(54) 2012-03-21 SunTrust CCA Moving to Neutral.pdf

(55) 2012-04-09 Barclays CCA Structure key to addressing REIT challenges.pdf

(56) 2012-04-17 Barclays Laying out considerations for a potential REIT conversion at CXW.pdf

(57) 2012-04-24 SunTrust CCA Long-Term Plan for CA to Bring Out-of-State Inmates Home.pdf

(58) 2012-04-27 Barclays Factoring the not so golden state of affairs in CA into CXW's REIT-urns.pdf

(59) 2012-05-01 SunTrust Corrections-Recent KS Escape May Impact CA.pdf

(60) 2012-05-03 SunTrust CXW Management Evaluating REIT Conversion; First Look at 1Q12.pdf

(61) 2012-05-04 Barclays CCA Opportunity to accumulate if you believe in REIT.pdf

(62) 2012-05-04 Macquarie CCA REIT-erate Outperform on CXW + REIT + GEO.pdf

(63) 2012-05-23 AVONDALE CXW, GEO - Corrections News & Notes 0027977.pdf

(64) 2012-05-30 SunTrust CCA Upgrading to Buy; REIT Conversion Presents Upside.pdf

bvagroup

**CONFIDENTIAL**

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v.**
**Corrections Corporation of America, et al.**
Appendix B - Information Considered

(65) 2012-06-29 Barclays CXW's CA contract modification expected; Remains a buy on potential REIT conversion.pdf
(66) 2012-07-02 Barclays CCA ID Out-of-State Contract Forthcoming.pdf
(67) 2012-07-09 SunTrust CCA Moving to Top Pick on REIT Potential.pdf
(68) 2012-07-16 Barclays CCA ID and OK contracts to help offset CA loss.pdf
(69) 2012-07-16 Macquarie CCA Likely REIT + Solid Fundamentals = OP.pdf
(70) 2012-07-31 Macquarie Prefer CXW Ahead of Q2 Results.pdf
(71) 2012-08-02 SunTrust CXW-GEO Preview; REIT Conversion Update Expected.pdf
(72) 2012-08-09 SunTrust CCA Raising Price Target on PLR Request.pdf
(73) 2012-08-10 Macquarie CCA Fundamentals + REIT Potential = OP.pdf
(74) 2012-08-27 Avondale CXW.N CXW, GEO - Valuation Framework for REIT Analysis.pdf
(75) 2012-08-29 SunTrust CCA Opportunities Forthcoming; Reiterate Buy.pdf
(76) 2012-09-04 Barclays AZ awards 1,000-beds to CXW; positive but widely expected.pdf
(77) 2012-09-04 SunTrust CCA Shift in State Demand with AZ Contract Win.pdf
(78) 2012-09-06 Barclays More details on CXW's 1,000-bed AZ win.pdf
(79) 2012-09-10 Barclays CCA Raise PT to $38 as judges say no to CA's request for cap rate increase.pdf
(80) 2012-11-06 Macquarie GEO REIT Commentary Bodes Well for CXW.pdf
(81) 2012-11-07 Barclays CCA Provides details, sounds confident on REIT.pdf
(82) 2012-11-07 SunTrust CCA First Look at 3Q; Incremental REIT Conversion Detail.pdf
(83) 2012-11-08 Avondale CXW=US CXW - TRS Timing Relief.pdf
(84) 2012-11-08 Barclays CCA Conversion to REIT possible even if IRS responds after January 2013; Raise PT.pdf
(85) 2012-11-08 SunTrust CCA Raising Target Price on Increased Likelihood of Conversion.pdf
(86) 2012-11-09 Macquarie CCA Potential REIT to Drive CXW Higher.pdf
(87) 2012-12-03 SunTrust CXW-GEO 2013 REIT Conversions Appear Likely.pdf
(88) 2012-12-07 SunTrust GEO-CXW Post GEO Conference Call; Raising Price Target.pdf
(89) 2012-12-12 SunTrust CCA Reiterating Top Pick on Near-Term Catalysts.pdf
(90) 2013-01-08 Barclays Private Prisons_ Awaiting PLRs but Returning as REITs.21265175.pdf
(91) 2013-02-08 Barclays CXW Receives its PLR; 11am Call.pdf
(92) 2013-02-08 Macquarie CCA Positive PLR to Unlock Value in CXW.pdf
(93) 2013-02-08 SunTrust CCA Favorable Ruling and Details on REIT Conversion.pdf
(94) 2013-02-11 Barclays PLR arrival creates captivating opportunity; What happened at CXW.pdf
(95) 2013-02-13 Avondale CXW.N CXW, GEO - 4Q12 Proprietary Population Checks.pdf
(96) 2013-02-13 Avondale CXW=US CXW - 4Q12 First Look.pdf
(97) 2013-02-13 Barclays CCA No surprises as CXW confirms guide ahead of call; GEO added to RMZ.pdf
(98) 2013-02-15 Barclays CCA Clears the air on CA; Talks immigration reform; and RMZ inclusion a good sign.pdf
(99) 2013-02-15 Macquarie CXW is Unexpected, Early Add to MSCI.pdf
(100) 2013-02-15 Macquarie CCA Q4 + REIT Indices to Drive CXW Higher.pdf
(101) 2013-02-15 SunTrust CCA 4Q12 Results; Reiterate Buy.pdf
(102) 2013-03-15 Barclays CCA Positive feedback from first road trip in almost a year; Maintain OW.pdf
(103) 2013-03-21 Macquarie CCA Refinancing Sets Path for Special Divvy.pdf
(104) 2013-04-08 Macquarie E+P Divy Makes Indices Inclusion Likely.pdf
(105) 2013-04-10 Macquarie Upgrade GEO to OW and recommend with CXW; Raise both PTs to $45.pdf
(106) 2013-04-12 Macquarie CCA CA Ruling Bodes Well for CXW + GEO.pdf
(107) 2013-04-17 Barclays CCA Trading ex-dividend today; Reit $45 PT.pdf
(108) 2013-04-23 SunTrust Reiterate Buy on CXW and GEO; Raising Target on GEO.pdf
(109) 2013-05-01 Avondale CXW=US CXW - CA Proposal Due Tomorrow.pdf
(110) 2013-05-06 Barclays Political maneuvers continue as revised CA plan submitted under protest.pdf
(111) 2013-05-08 Barclays CCA Solid numbers despite a little noise from TX; 11am call tomorrow.pdf
(112) 2013-05-09 Avondale CXW=US CXW - Raising Price Target after 1Q13 Beat.pdf
(113) 2013-05-09 Barclays CCA On track despite some puts and takes.pdf
(114) 2013-05-09 SunTrust CCA Positive FFO Guidance; Reiterate Buy & Raising Price Target.pdf
(115) 2013-05-10 Macquarie CCA REIT Unlocking Shareholder Value.pdf
(116) 2013-05-17 Barclays CCA Expect June inclusion in FTSE NAREIT Equity Index.pdf
(117) 2013-05-17 SunTrust Healing State Budgets Foreshadow Better Pricing.pdf
(118) 2013-05-21 Macquarie CCA Positioned to Capture a Higher Multiple.pdf
(119) 2013-06-07 Barclays Credit Bureaus benefit if revolving credit grows; Macro updates & more.pdf
(120) 2013-06-17 Macquarie CCA 6-21 FTSE Add to Drive Multiple Higher.pdf
(121) 2013-06-20 Barclays Three-judge panel orders CA to take all steps necessary to reach 137.5%; Positive for GEO & CXW.pdf
(122) 2013-07-10 Barclays Three-year CA renewal a positive with potential upside to FY13 guidance.pdf

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

(123) 2013-07-10 Macquarie CCA CA Renewal is First Phase of Rerating.pdf
(124) 2013-07-12 Macquarie Use IRM + CXW to Play Cycle + Payouts.pdf
(125) 2013-08-05 Macquarie CCA $36m Deal is Smart + Sensible for CXW.pdf
(126) 2013-08-05 SunTrust Court Ruling Should Translate into Sales for Prisons.pdf
(127) 2013-08-08 Macquarie CCA Buy CXW Prior to California Gold Rush.pdf
(128) 2013-08-08 SunTrust CCA Growth Drivers Begin to Assemble; Reiterate Buy.pdf
(129) 2013-08-20 Avondale CXW=US CXW - Material Upside Possible from CA in Near Term.pdf
(130) 2013-08-22 Macquarie CCA Use MSCI rumblings to Buy CXW.pdf
(131) 2013-08-23 Barclays CCA MSCI proposal creates volatility, but presents buying opp (for GEO too).pdf
(132) 2013-08-28 Macquarie CCA CA is Golden for CXW + GEO.pdf
(133) 2013-08-29 Barclays 8,000+ bed opportunity from CA; Reiterate OW on CXW & GEO.pdf
(134) 2013-09-12 Macquarie CCA California Optionality to Drive CXW Higher.pdf
(135) 2013-09-12 SunTrust CCA Positive News in CA for Private Prison Companies.pdf
(136) 2013-09-13 Macquarie CCA CA Plan to Drive CXW+GEO multiples higher.pdf
(137) 2013-09-25 SunTrust CCA Court Ruling Prolongs CA Process.pdf
(138) 2013-09-30 Macquarie Like CXW Given 10-2 A-day + CA Potential.pdf
(139) 2013-10-02 Macquarie CCA A Tale of Two Growth Stories.pdf
(140) 2013-10-03 SunTrust CCA Investor Day provides Private Prison 101 to build REIT traction.pdf
(141) 2013-10-15 Barclays CCA CA news more than offsets 4Q noise.pdf
(142) 2013-10-15 Macquarie CCA CA Win Should be First of Many.pdf
(143) 2013-10-16 Macquarie CCA No MSCI to Drive CXW + GEO 3-5%.pdf
(144) 2013-11-04 Barclays Meet CXW & GEO at Barclays' Select Growth Conf (11-18-20) post 3Q earnings results.pdf
(145) 2013-11-07 Barclays Growth investments hurt quarter but long-term opportunity remains solid.pdf
(146) 2013-11-07 Macquarie CCA CA Opportunities Overshadow Guidance.pdf
(147) 2013-11-07 SunTrust CCA Quick Look at CXW 3Q13 Results.pdf
(148) 2013-11-08 SunTrust CCA Reiterate Buy Post 3Q Results.pdf
(149) 2013-11-22 Avondale CXW=US CXW - Downgrading Due to Lack of Catalysts, Fair Valuation.pdf
(150) 2013-12-12 Barclays Takeaways from investor meetings.pdf
(151) 2013-12-12 Macquarie CCA CA Delay Eases Stress on CXW + GEO.pdf
(152) 2014-01-23 CRT Research CXW=US CRT_ CXW - Expect Earnings Revisions _FV,_ $35 PT.pdf
(153) 2014-01-29 Barclays Americas Morning Research Summary.23173672.pdf
(154) 2014-02-10 Macquarie CCA Extension Doesn't Ease Structural Issue.pdf
(155) 2014-02-13 Avondale CXW=US CXW - Some Near Term Catalysts.pdf
(156) 2014-02-13 Barclays CCA There is life after CA (albeit it's slow).pdf
(157) 2014-02-13 Macquarie CCA CA Verdict Allows CXW to Unlock FCF.pdf
(158) 2014-02-13 SunTrust CCA Conference Call Takeaways.pdf
(159) 2014-02-14 CRT Research CXW=US CRT_ CXW - See Potential Upcoming Catalysts; Upgrading to _Buy_.pdf
(160) 2014-02-20 Macquarie CCA 1st of Several Divy Boosts Good 4 CXW.pdf
(161) 2014-03-31 Barclays CCA Feedback from HQ visit & prison tour.pdf
(162) 2014-04-08 SunTrust CCA Post-Investor Marketing Thoughts.pdf
(163) 2014-04-10 Macquarie CCA New CFO to Build on Current Legacy.pdf
(164) 2014-04-11 Macquarie CCA Fed Changes no Impact to CXW + GEO.pdf
(165) 2014-05-07 Avondale CXW - 1Q14 First Look.pdf
(166) 2014-05-08 AvondalePartners Morning Meeting Summary.pdf
(167) 2014-05-08 Macquarie CCA Revenue Levers Signify Durable Model.pdf
(168) 2014-05-08 SunTrust CCA Takeaways from CXW 1Q14 Call; Tone of State Partners Improving.pdf
(169) 2014-05-14 AvondalePartners CCA CXW Maintain Market Perform Following 1Q14.pdf
(170) 2014-06-05 SunTrust CXW-GEO Update Post-NAREIT.pdf
(171) 2014-06-06 SunTrust CXW-GEO Update Post-NAREIT.pdf
(172) 2014-07-23 AvondalePartners CXW, GEO 2Q14 Proprietary Pop Checks.pdf
(173) 2014-08-07 CRT Research CXW=US CRT_ CXW - Solid Q - Raising PT to $37, Maintain Our _Buy_.pdf
(174) 2014-08-07 Macquarie CCA Q2 Beat + Raise = Improving Fundamentals.pdf
(175) 2014-08-07 SunTrust CCA Reiterate Buy on Opportunities; 2Q14 Earnings Call Takeaways.pdf
(176) 2014-08-08 Barclays A look at IHS & Gartner's (IT) M&A Strategies, and CXW-GEO earnings.pdf
(177) 2014-08-19 Macquarie GEO + CXW are situated to Help Border.pdf
(178) 2014-08-27 AvondalePartners CCA CXW Catalysts Remain Limited.pdf
(179) 2014-09-08 Macquarie CCA Meetings Reinforce Value Proposition.pdf
(180) 2014-09-11 Macquarie CCA Meetings Reinforce Value Proposition.pdf

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

(181) 2014-09-23 Macquarie CCA Family Housing Win is One Step Around the Border Crisis.pdf
(182) 2014-09-24 SunTrust CCA Incremental ICE Opportunity Announced.pdf
(183) 2014-10-02 CRT Research CXW=US CRT_ CXW - Met w_ Mgmt, '16 Looks Strong; _Buy,_ PT to $40.pdf
(184) 2014-10-21 Barclays CCA Discontinuing Coverage.pdf
(185) 2014-11-03 AvondalePartners Morning Meeting Summary.pdf
(186) 2014-11-04 Avondale CXW=US CXW Maintaining Market Perform and Raising PT to $38.pdf
(187) 2014-11-04 AvondalePartners CCA CXW 3Q14 First Look-Revenue In-Line and AFFO-share Beat.pdf
(188) 2014-11-04 Macquarie CCA Q3 Beat Bodes Well for 2015 Divvy Boost.pdf
(189) 2014-11-04 SunTrust CCA 3Q14 Results; Reiterate Buy.pdf
(190) 2014-11-19 Macquarie A Rise in State Populations Positive for CXW + GEO.pdf
(191) 2014-12-01 Macquarie Adelanto, CA is Good for GEO + CXW.pdf
(192) 2014-12-02 Directors Deals CCA.pdf
(193) 2014-12-11 Macquarie CCA Divvy Upside Leaves Room for Growth.pdf
(194) 2014-12-19 Wells Fargo CCA CXW Initiating Coverage with a Market Perform Rating.pdf
(195) 2014-12-29 Macquarie CCA Federal Contract Escapes CXW.pdf
(196) 2014-12-30 Wells Fargo CXW Loses Federal Bureau of Prisons Contract at Its Northeast Ohio Correctional Center.pdf
(197) 2015-02-12 AvondalePartners CCA CXW Maintaining Market Perform after 4Q14.pdf
(198) 2015-02-12 CRT Research CCA 4Q14 Solid, Growth on Track; Reiterate Buy, up PT to $43.pdf
(199) 2015-02-12 SunTrust Reiterate Buy on Strong Opportunity Set; 4Q14 Results.pdf
(200) 2015-02-12 Wells Fargo CXW First Look Q4 Beat Expected 2015 AFFO-Sh In Line.pdf
(201) 2015-02-15 AvondalePartners CXW Maintaining Market Perform after 4Q14.pdf
(202) 2015-02-15 Macquarie CCA Q4A + 2015 = Smooth REIT Transition.pdf
(203) 2015-02-20 Macquarie CCA Dividend Boost to 5.3% Yield = OP.pdf
(204) 2015-02-20 Wells Fargo CXW Updating Estimates & Valuation Range after Q4 Earnings.pdf
(205) 2015-03-17 SunTrust CCA Thoughts from the Road.pdf
(206) 2015-05-06 Macquarie CCA Declining CA Populations to Clip CXW.pdf
(207) 2015-05-06 SunTrust CA Risk Reappears; First Look at 1Q.pdf
(208) 2015-05-07 CRT Research CCA 1Q Strong, Outlook Uncertain w-CA; Buy, $40 PT.pdf
(209) 2015-05-07 Macquarie CCA CA Uncertainty Compresses CXW Multiple.pdf
(210) 2015-05-07 SunTrust CCA Lowering Estimates on Soft Demand From CA; Post Call Thoughts.pdf
(211) 2015-05-07 Wells Fargo CXW First Look--Lowers '15 Guide on Decreased CA Demand.pdf
(212) 2015-05-12 Wells Fargo CXW Reducing Ests & Valuation on Lower CA Inmate Populations.pdf
(213) 2015-05-14 Wells Fargo CXW CA to Reduce Out-of-State Prison Bed Use by 2,700 in 2015-Addl 1,300 by June 2016.pdf
(214) 2015-05-15 Macquarie CCA CA budget trim not as bad as feared.pdf
(215) 2015-06-03 Wells Fargo CXW Highlights from West Coast Investor Meetings.pdf
(216) 2015-06-04 CRT Research CCA Takeaways from Recent Meetings; Buy, $40 PT.pdf
(217) 2015-06-19 Macquarie CCA D-g to Neutral = Relative Value Elsewhere.pdf
(218) 2015-06-24 Wells Fargo CXW Columbia University Endowment Fund Divests Shares.pdf
(219) 2015-07-13 Canaccord Positive on Prison REITs-We're dancin' to the Jailhouse Rock.pdf
(220) 2015-08-06 Canaccord 2Q review Strong quarter but uncertainty in CA looms; reiterate HOLD.pdf
(221) 2015-08-06 Macquarie CCA CA + ICE concerns offset strong Q2.pdf
(222) 2015-08-06 Wells Fargo CXW First Look--Q2 Beat, but Weaker H2 on CA Inmate Reductions.pdf
(223) 2015-08-07 SunTrust CCA Reiterate Buy Post 2Q call.pdf
(224) 2015-08-13 Wells Fargo CXW Adjusting Estimates & Valuation Range After Q2 Earnings.pdf
(225) 2015-08-24 Wells Fargo Prison REITs Judge Rules on Immigration Facilities--Limits Length of Stay to 72 hrs.pdf
(226) 2015-08-27 Wright Investors CCA Company Profile.pdf
(227) 2015-08-28 SunTrust CXW Model Update.pdf
(228) 2015-08-31 Macquarie CCA US$13.5m deal helps diversify model.pdf
(229) 2015-09-00 GlobalData CXW Financial and Strategic SWOT Analysis Review.pdf
(230) 2015-09-01 ValuEngine CXW Rating and Forecast Report.pdf
(231) 2015-09-15 Wells Fargo CXW Slightly More Positive After Recent Investor Meetings.pdf
(232) 2015-09-18 Canaccord Financial Market Performance.pdf
(233) 2015-09-21 Canaccord Behind the Bars-Bi-Weekly Prison Update 9-18-15 (2).pdf
(234) 2015-09-22 SunTrust CXW Update After HQ Visit; Lowering PT.pdf
(235) 2015-09-22 Wells Fargo CXW Lowering Estimates After $250MM Unsecured Notes Offering.pdf
(236) 2015-09-23 SunTrust Morning Meeting Highlights.pdf
(237) 2015-10-05 Canaccord Behind the Bars-Bi-Weekly Prison Update 10-5-15.pdf
(238) 2015-10-13 Macquarie CXW CA Renewal to help set a floor in CXW.pdf

Appendix B, Page 2 of 7

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

(239) 2015-10-13 Wells Fargo CXW Signs Three-Year Contract Renewal With State of CA.pdf
(240) 2015-10-18 Canaccord Behind the Bars-Bi-Weekly Prison Update 10-19-15.pdf
(241) 2015-10-21 buysellsignals CXW sinks 15.2% in trailing year.pdf
(242) 2015-10-29 SunTrust CXW Diversification into Re-Entry Continues.pdf
(243) 2015-10-29 Wells Fargo CXW Announces Acquisition of Avalon Correctional Services for $157.5MM.pdf
(244) 2015-10-30 Wright Investors CCA Company Profile.pdf
(245) 2015-11-02 Canaccord Behind the Bars-Bi-Weekly Prison Update 11-2-15.pdf
(246) 2015-11-02 Compass Point Morning Research Summary.pdf
(247) 2015-11-04 ValuEngine CXW Rating and Forecast Report.pdf
(248) 2015-11-05 Macquarie CXW Still working thru CA headwinds.pdf
(249) 2015-11-05 Wells Fargo CXW First Look-Q3 Beat, But Full-Year FFO-adj EBITDA Lowered.pdf
(250) 2015-11-06 Canaccord CXW 3Q review-Diversification attractive but scale requires time; reiterate HOLD.pdf
(251) 2015-11-06 SunTrust CXW Positioning for Organic Growth; Reiterate Buy.pdf
(252) 2015-11-11 Sadif CCA Will Corrections Corp of America Deliver Top-Shelf Performance.pdf
(253) 2015-11-13 Wells Fargo CXW Adjusting Estimates & Valuation Range Post Q3 Earnings.pdf
(254) 2015-11-16 Canaccord Behind the Bars-Bi-Weekly Prison Update 11-16-15.pdf
(255) 2015-11-19 Wells Fargo CXW Highlights from NAREIT.pdf
(256) 2015-11-20 Validea CXW Guru Stock Report.pdf
(257) 2015-11-29 Canaccord Behind the Bars-Bi-Weekly Prison Update 11-30-15.pdf
(258) 2015-12-00 GlobalData CXW Financial and Strategic SWOT Analysis Review.pdf
(259) 2015-12-03 Wright Investors CCA Company Profile.pdf
(260) 2015-12-13 Canaccord Behind the Bars-Bi-Weekly Prison Update 12-14-15.pdf
(261) 2015-12-17 SunTrust CXW New Contract Award in AZ, as Expected.pdf
(262) 2015-12-17 Wells Fargo CXW Wins Contract Award from AZ Dept of Corrections as Expected.pdf
(263) 2015-12-29 Compass Point Morning Research Summary.pdf
(264) 2015-12-31 buysellsignals CXW Corrections Corp of America tumbles 27.1% in FY 2015.pdf
(265) 2016-01-05 Wright Investors CCA Company Profile.pdf
(266) 2016-01-11 Canaccord Behind the Bars-Bi-Weekly Prison Update 1-11-16.pdf
(267) 2016-01-25 Canaccord Behind the Bars-Bi-Weekly Prison Update 1-25-16.pdf
(268) 2016-02-08 Canaccord Behind the Bars-Bi-Weekly Prison Update 2-8-16.pdf
(269) 2016-02-10 Sadif CXW Stock upgraded to average from risky.pdf
(270) 2016-02-10 ValuEngine CXW Rating and Forecast Report.pdf
(271) 2016-02-11 Canaccord 4Q review-solid results, but guidance that missed consensus; reiterate HOLD, $30 target.pdf
(272) 2016-02-11 Macquarie CCA ~8% dividend yield we see on lockdown.pdf
(273) 2016-02-11 SunTrust CXW First Look at Mixed 4Q15 Results.pdf
(274) 2016-02-11 Wells Fargo CXW First Look-Q4 Beat on Tax--2016 FFO Guide Below Consensus.pdf
(275) 2016-02-12 Sadif CCA Is Corrections Corp of America a Good Long-Term Investment.pdf
(276) 2016-02-12 SunTrust CXW Lowering PT; Continuing to Diversify, Reiterate Buy.pdf
(277) 2016-02-23 Wells Fargo CXW Adjusting 2016 FFO and Establishing 2017 Estimate after Q4.pdf
(278) 2016-02-25 Wells Fargo CXW Highlights from Wells Fargo Real Estate Conference.pdf
(279) 2016-02-26 Validea CXW Guru Stock Report.pdf
(280) 2016-03-00 GlobalData CXW Financial and Strategic SWOT Analysis Review.pdf
(281) 2016-03-09 Wright Investors CCA Company Profile.pdf
(282) 2016-03-16 buysellsignals CXW Corrections Corp of America climbs 19% in 2016, beating 94% of the market.pdf
(283) 2016-03-21 Canaccord CXW Takeaways from meetings with management-cash flow risk lower than perceived.pdf
(284) 2016-03-29 Directors Deals CCA.pdf
(285) 2016-04-09 Wright Investors CCA Company Profile.pdf
(286) 2016-04-11 Macquarie CXW US$35m deal to help CXW multiple.pdf
(287) 2016-04-21 buysellsignals CXW Corrections Corp of America climbs 15% in 2016, outperforming 82% of the market.pdf
(288) 2016-05-04 Macquarie CXW Q1 + Q2E supports higher multiple.pdf
(289) 2016-05-04 ValuEngine CXW Rating and Forecast Report.pdf
(290) 2016-05-05 Canaccord CXW 1Q review-strong print as occupancy gains, diversification drive value; reiterate HOLD.pdf
(291) 2016-05-05 SunTrust CXW Stead Performance in 1Q; Future Real Estate Transactions Promising.pdf
(292) 2016-05-05 Wells Fargo CXW First Look-Increases '16 FFO--Narrows Adj EBITDA Outlook.pdf
(293) 2016-05-06 Macquarie CXW New contract adds runway to H216 EPS.pdf
(294) 2016-05-06 Wells Fargo CXW_ Oklahoma Dept Of Corrections Leases Company's North Fork Facility.29322678.pdf
(295) 2016-05-06 Wells Fargo Equity Flash Notes.29323726.pdf
(296) 2016-05-11 Wells Fargo CXW Adjusting Estimates After Q1 Earnings and North Fork Lease.pdf

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**

Appendix B - Information Considered

(297) 2016-05-11 Wells Fargo CXW Updating Estimates After Q1 Earnings.pdf
(298) 2016-05-13 Macquarie CXW Unchanged 0.54 1-4ly divvy is durable.pdf
(299) 2016-05-13 Sadif CXW Stock downgraded to below average from average.pdf
(300) 2016-05-20 SunTrust CXW Real Estate Solutions in Focus; Increasing Estimates.pdf
(301) 2016-06-00 GlobalData CXW Financial Strategic SWOT Analysis Review.pdf
(302) 2016-06-03 Validea CXW Guru Stock Report.pdf
(303) 2016-06-07 Wells Fargo CXW Takeaways from NAREIT Conference.pdf
(304) 2016-06-10 SunTrust CXW Thoughts from NAREIT.pdf
(305) 2016-06-20 Wright Investors CCA Company Profile.pdf
(306) 2016-07-01 SunTrust CXW Downgrading to Neutral on CA Risk.pdf
(307) 2016-07-05 Compass Point Takeaways from the Draft Democratic Party Platform.pdf
(308) 2016-07-06 Compass Point Morning Research Summary.pdf
(309) 2016-07-27 Wright Investors CCA Company Profile.pdf
(310) 2016-08-00 GlobalData CXW Financial and Strategic SWOT Analysis Review.pdf
(311) 2016-08-03 buysellsignals CXW Corrections Corp of America sinks 12.0%.pdf
(312) 2016-08-03 ValuEngine CXW Rating and Forecast Report.pdf
(313) 2016-08-04 Canaccord CXW 2Q review-STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD.pdf
(314) 2016-08-04 SunTrust CXW Renegotiation with ICE Ongoing; Maintain Neutral.pdf
(315) 2016-08-04 Wells Fargo CXW First Look-South TX Uncertainty Likely to Weigh on Shares.pdf
(316) 2016-08-10 Sadif CXW Stock downgraded to risky from below average.pdf
(317) 2016-08-10 Wells Fargo CXW Uncertainty Around South TX Facility Likely to Limit Upside.pdf
(318) 2016-08-12 Sadif CXW Is Corrections Corp of America a Good Long-Term Investment.pdf
(319) 2016-08-18 Compass Point Quick Thoughts on DOJ's For-Profit Prison Memo.pdf
(320) 2016-08-19 Compass Point Morning Research Summary.pdf
(321) 2016-08-19 SunTrust CXW Conference Call Takeaways.pdf
(322) 2016-08-19 Wells Fargo DOJ Creates Uncertainty Around Private Corrections.pdf
(323) 2016-08-22 Directors Deals CCA.pdf
(324) 2016-08-23 Canaccord CXW Private prisons aren't going anywhere, but risks could ...continue to weigh on stocks.pdf
(325) 2016-09-01 SunTrust CXW=US CXW, GEO - Lowering Estimates & PTs Amid Political Shift.pdf
(326) 2016-09-10 theScreener CCA An unfavourable environment weighs on CCA which sees a downgrade to slightly negative.pdf
(327) 2016-09-27 Canaccord CXW Corporate restructuring step in right direction, but challenges remain.pdf
(328) 2016-10-12 SunTrust CXW Upgrading to Buy With $20 PT.pdf
(329) 2016-10-16 Compass Point Morning Research Summary.pdf
(330) 2016-10-17 Canaccord CXW amends STFRC; provides 2017 guidance.pdf
(331) 2016-10-17 SunTrust CXW ICE Extends Contract for South Texas Family Residential Center.pdf
(332) 2016-10-18 SunTrust CXW Brighter Outlook Embedded in 2017 Guidance.pdf
(333) 2016-10-20 Canaccord CXW Risks remain, but valuation offers upside; reiterate HOLD.pdf
(334) 2016-10-21 Wells Fargo CXW Adjusting Ests & Valuation Range After Business Update.pdf
(335) 2016-10-25 Compass Point Client Meeting Takeaways-Trump-Clinton Trades, Higher Ed, Lame Duck, Taxes.pdf
(336) 2016-10-31 Canaccord CXW awarded ICE Contract at Cibola-Positive read-through to ICE review & alternative use of BOP contracts.pdf
(337) 2016-10-31 SunTrust CXW Unexpected ICE Contract Announced.pdf
(338) 2016-11-03 SunTrust CXW Demand from ICE Remains Persistent-Reiterate Buy.pdf
(339) 2016-11-03 Wells Fargo CXW First Look-Q3 Beat--Boosts '17 Guide for Cibola Contract.pdf
(340) 2016-11-11 Canaccord CXW=US Raising GEO and CXW price targets on lower risk post-election.pdf
(341) 2016-11-11 Wells Fargo CXW Adjusting Ests-Range After Q3 Earnings--New Cibola contract.pdf
(342) 2016-11-14 SunTrust CXW Increasing PT to $26 on Outlook for Rising Estimates.pdf
(343) 2016-12-08 SunTrust CXW Reduced Dividend at High-End of Range.pdf
(344) 2016-12-12 Canaccord CXW Upgrading CXW to BUY following dividend cut, lowered risk, and external growth opportunity.pdf
(345) 2016-12-15 SunTrust CXW Sales Momentum Building; Raising Estimates and PT.pdf
(346) 2016-12-30 Wells Fargo CXW Updating Ests & Valuation Range After Recent Contract Award.pdf
(347) 2017-01-13 SunTrust CXW=US 2017 private prison outlook and primer_ an attractive i...ive investment opportunity.pdf
(348) 2017-02-08 Canaccord CXW Initial take-strong 4Q16 beat tempered by conservative guidance.pdf
(349) 2017-02-09 Canaccord CXW 4Q review-solid risk-reward profile remains despite recent run; reiterate BUY.pdf
(350) 2017-02-09 SunTrust CXW Utilizing Idle Beds to Fuel Rising Estimates; Increasing PT.pdf
(351) 2017-02-09 Wells Fargo CXW First Look-Q4 Beat--Narrows '17 Adj EBITDA Outlook.pdf
(352) 2017-02-21 Wells Fargo CXW Initiating 2018 Est & Updating Val Range Post Q4 Earnings.pdf
(353) 2017-03-09 SunTrust CXW Rising Estimates & Occupancy Expected; Reiterate Buy.pdf
(354) 2017-04-11 Deutsche Bank CXW Ohio is a great state for CXW.pdf

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

(355) 2017-04-19 Wells Fargo CXW Increasing Ests & Val Range for Expanded Ohio Contract.pdf
(356) 2017-05-03 Canaccord CXW Initial take-Solid 1Q beat mostly carried through to guidance despite loss of Eden contract.pdf
(357) 2017-05-03 Deutsche Bank CXW Q1A + 17E = Buy CXW.pdf
(358) 2017-05-04 Canaccord CXW 1Q review-portfolio de-risked further, more upside than downside from here; reiterate BUY.pdf
(359) 2017-05-04 SunTrust CXW Idle Facilities Await New Contracts-First Look at 1Q17.pdf
(360) 2017-05-04 Wells Fargo CXW First Look-Q1 Beat; Guide Reflects Weaker Federal Outlook.pdf
(361) 2017-05-17 Directors Deals CXW.pdf
(362) 2017-05-19 Canaccord CXW Takeaways from meetings with management-buy the dip.pdf
(363) 2017-06-07 Wells Fargo CXW Takeaways from NAREIT Conference.pdf
(364) 2017-08-07 Canaccord CXW Initial take-amidst low expectations, 2Q beat on margins partly carried through to FY guidance.pdf
(365) 2017-08-07 Deutsche Bank CXW Beat + raise ease fundamental concern.pdf
(366) 2017-08-07 SunTrust CXW Focus on ICE Rebound-First Look at 2! Results.pdf
(367) 2017-08-08 SunTrust CXW Improving ICE-USMS Trends & New Diversification Goal; Buy.pdf
(368) 2017-08-08 Wells Fargo CXW First Look-Q2 Beat; Weaker ICE Populations Limit Full Yr Impact.pdf
(369) 2017-08-09 Canaccord CXW 2Q review-paid to wait for the catalysts to unfold; reiterate BUY.pdf
(370) 2017-08-15 Wells Fargo CXW Updating Estimates & Price Target After Q2 Earnings.pdf
(371) 2017-08-21 Deutsche Bank CXW REITerate our Buy on CXW.pdf
(372) 2017-09-29 SunTrust CXW State Population and News Update.pdf
(373) 2017-11-01 theScreener increased risk weighs on Corecivic Inco., penalising its rating down to slightly negative.pdf
(374) 2017-11-08 Deutsche Bank CXW Focus on budgets into 2018.pdf
(375) 2017-11-09 SunTrust CXW New Contracts & New Acquisitions-Reiterate Buy.pdf
(376) 2017-11-09 Wells Fargo CXW First Look-Q3 Beat; Full-Year Adj EBITDA-FFO Midpoints Increased.pdf
(377) 2017-11-30 Deutsche Bank CXW Use 7.2% yield to bridge capacity build.pdf
(378) 2017-11-30 Wells Fargo CXW Updating Estimates & Price Target Post Q3 Earnings-NAREIT.pdf
(379) 2018-01-22 Deutsche Bank CXW Deal boosts business remix strategy.pdf
(380) 2018-01-24 Deutsche Bank CXW KS win underscores biz shift.pdf
(381) 2018-01-31 SunTrust Business & Government Services -Best Ideas for 2018, Estimate & PT Adjustments.pdf
(382) 2018-02-14 Deutsche Bank CXW Q4A beat + 2018 guide to pace CXW.pdf
(383) 2018-02-15 Suntrust CXW Bigger New Business Pipeline-Buy.pdf
(384) 2018-02-15 Wells Fargo CXW Q4 Beat; '18 Guidance Above Our Estimate-Consensus.pdf
(385) 2018-02-27 Wells Fargo CXW Updating Estimates & Price Target After Q4 Earnings.pdf
(386) 2018-03-01 Wells Fargo CXW Highlights from Wells Fargo's 21st Annual Real Estate Conference.pdf
(387) 2018-03-10 theScreener An increasingly favourable environment allows CORECIVIC INCO to improve to medium.pdf
(388) 2018-03-16 SunTrust CXW Increased Occupancy Potential Under-Appreciated.pdf

**CCA SEC Filings (2011-2016):**

(1) Corrections Corporation of America Form 10-K, for the fiscal year ended December 31, 2011
(2) Corrections Corporation of America Form 10-K, for the fiscal year ended December 31, 2012
(3) Corrections Corporation of America Form 10-K, for the fiscal year ended December 31, 2013
(4) Corrections Corporation of America Form 10-K, for the fiscal year ended December 31, 2014
(5) Corrections Corporation of America Form 10-K, for the fiscal year ended December 31, 2015
(6) Corrections Corporation of America Form 10-K, for the fiscal year ended December 31, 2016
(7) Corrections Corporation of America Form 10-Q, for the quarterly period ended March 31, 2011
(8) Corrections Corporation of America Form 10-Q, for the quarterly period ended June 30, 2011
(9) Corrections Corporation of America Form 10-Q, for the quarterly period ended September 30, 2011
(10) Corrections Corporation of America Form 10-Q, for the quarterly period ended March 31, 2012
(11) Corrections Corporation of America Form 10-Q, for the quarterly period ended June 30, 2012
(12) Corrections Corporation of America Form 10-Q, for the quarterly period ended September 30, 2012
(13) Corrections Corporation of America Form 10-Q, for the quarterly period ended March 31, 2013
(14) Corrections Corporation of America Form 10-Q, for the quarterly period ended June 30, 2013
(15) Corrections Corporation of America Form 10-Q, for the quarterly period ended September 30, 2013
(16) Corrections Corporation of America Form 10-Q, for the quarterly period ended March 31, 2014
(17) Corrections Corporation of America Form 10-Q, for the quarterly period ended June 30, 2014
(18) Corrections Corporation of America Form 10-Q, for the quarterly period ended September 30, 2014
(19) Corrections Corporation of America Form 10-Q, for the quarterly period ended March 31, 2015
(20) Corrections Corporation of America Form 10-Q, for the quarterly period ended June 30, 2015
(21) Corrections Corporation of America Form 10-Q, for the quarterly period ended September 30, 2015
(22) Corrections Corporation of America Form 10-Q, for the quarterly period ended March 31, 2016

Appendix B - Page 20 of 24
bvagroup

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

(23) Corrections Corporation of America Form 10-Q, for the quarterly period ended June 30, 2016
(24) Corrections Corporation of America Form 10-Q, for the quarterly period ended September 30, 2016
(25) Corrections Corporation of America Form S-3 dated May 15, 2015
(26) Corrections Corporation of America Form 8-K, dated August 19, 2016

**CCA Press Releases:**
(1) CCA press release, "CCA Announces Its Intention to Initiate a Quarterly Dividend of $0.20 per Share," February 27, 2012
(2) CCA press release, "CCA Announces 2012 First Quarter Financial Results," May 3, 2012
(3) CCA press release, "CCA Announces 2012 Second Quarter Financial Results Provides Update on REIT Conversion," August 8, 2012
(4) CCA press release, "CCA Announces 2012 Third Quarter Financial Results Provides Update on REIT Conversion," November 7, 2012
(5) CCA press release, "CCA Board of Directors Authorizes REIT Conversion," February 7, 2013
(6) CCA press release, "CCA Announces 2012 Fourth Quarter Earnings Release and Conference Call Dates," February 8, 2013
(7) CCA press release, "CCA Announces 2012 Fourth Quarter Financial Results," February 13, 2013
(8) CCA press release, "CCA Announces 2013 First Quarter Financial Results," May 8, 2013
(9) CCA press release, "CCA Announces 2013 Second Quarter Financial Results," August 7, 2013
(10) CCA press release, "CCA Announces 2013 Third Quarter Financial Results," November 6, 2013
(11) CCA press release, "CCA Announces 2013 Fourth Quarter Financial Results," February 12, 2014
(12) CCA press release, "CCA Announces 2014 First Quarter Financial Results," May 7, 2014
(13) CCA press release, "CCA Announces 2014 Second Quarter Financial Results," August 6, 2014
(14) CCA press release, "CCA Announces 2014 Third Quarter Financial Results," November 3, 2014
(15) CCA press release, "CCA Reports Fourth Quarter and Full Year 2014 Financial Results," February 11, 2015
(16) CCA press release, "CCA Reports First Quarter 2015 Financial Results," May 6, 2015
(17) CCA press release, "CCA Reports Second Quarter 2015 Financial Results," August 5, 2015
(18) CCA press release, "CCA Reports Third Quarter 2015 Financial Results," November 4, 2015
(19) CCA press release, "CCA Reports Fourth Quarter and Full Year 2015 Financial Results," February 11, 2016
(20) CCA press release, "CCA Reports First Quarter 2016 Financial Results," May 4, 2016
(21) CCA press release, "CCA Reports Second Quarter 2016 Financial Results," August 3, 2016
(22) CCA press release, "CCA Responds to the Department of Justice's Decision to Reduce Reliance on Privately Operated Prisons and Announces Investor and Analyst Conference Call," August 19, 2016
(23) CCA press release, "Corrections Corporation of America Rebrands as CoreCivic," October 28, 2016

**Earnings Call Transcripts:**
(1) Corrections Corporation of America, Q1 2012 Earnings Call, May 03, 2012
(2) Corrections Corporation of America, Q2 2012 Earnings Call, Aug 09, 2012
(3) Corrections Corporation of America, Q3 2012 Earnings Call, Nov 08, 2012
(4) Corrections Corporation of America, Q4 2012 Earnings Call, Feb 14, 2013
(5) Corrections Corporation of America, Q1 2013 Earnings Call, May 09, 2013
(6) Corrections Corporation of America, Q2 2013 Earnings Call, Aug 08, 2013
(7) Corrections Corporation of America, Q3 2013 Earnings Call, Nov 07, 2013
(8) Corrections Corporation of America, Q4 2013 Earnings Call, Feb 13, 2014
(9) Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014
(10) Corrections Corporation of America, Q2 2014 Earnings Call, Aug 07, 2014
(11) Corrections Corporation of America, Q3 2014 Earnings Call, Nov 04, 2014
(12) Corrections Corporation of America, Q4 2014 Earnings Call, Feb 12, 2015
(13) Corrections Corporation of America, Q1 2015 Earnings Call, May 07, 2015
(14) Corrections Corporation of America, Q2 2015 Earnings Call, Aug 06, 2015
(15) Corrections Corporation of America, Q3 2015 Earnings Call, Nov 05, 2015
(16) Corrections Corporation of America, Q4 2015 Earnings Call, Feb 11, 2016
(17) Corrections Corporation of America, Q4 2016 Earnings Call, Feb 09, 2017
(18) Corrections Corporation of America - Special Call, Aug 19, 2016
(19) Corrections Corporation of America, Q1 2016 Earnings Call, May 05, 2016
(20) Corrections Corporation of America, Q2 2016 Earnings Call, Aug 04, 2016
(21) CoreCivic, Inc., Q3 2016 Earnings Call, Nov 03, 2016

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

**Court Cases:**

(1) *Basic Inc. v. Levinson* , 485 U.S. 224 (1988)
(2) *Cammer v. Bloom* , 711 F. Supp. 1264 (D.N.J. 1989)
(3) *Krogman v. Sterritt* , 202 F.R.D. 467 (N.D. Tex. 2001)
(4) *Cheney v. Cyberguard Corp.* , 213 F.R.D. 484 (S.D. Fla. 2003)
(5) *Dura Pharmaceuticals, Inc. v. Broudo* , 544 U.S. 336, 125 S.Ct. 1627 (2005)
(5) *Unger v. Amedisys Inc* ., 401 F.3d 316 (5th Cir. 2005)
(6) *In re DVI Inc. Sec. Litig.* , 249 F.R.D. 196 (E.D. Pa. 2008)
(7) *Schleicher v. Wendt* , 618 F.3d 679 (7th Cir. 2010)
(8) *Halliburton Co. v. Erica P. John Fund, Inc* ., 273 U.S. 258 (2014)
(9) *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC* , 310 F.R.D. 69 (S.D.N.Y. 2015)
(10) *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corporation* , 830 F.3d 376 (6th Cir. 2016)
(11) *Todd v. STAAR Surgical Co.* , 2017 WL 821662 (C.D. Cal. Jan. 5, 2017)
(12) *In re Banc of Cal. Sec. Litig.* , 326 F.R.D. 640 (C.D. Cal. 2018)
(13) *In the Matter of Gary S. Bell* , SEC Release No. 65941, December 13, 2011
(14) *Monroe County Employees' Retirement System v. Southern Co.,* 332 F.R.D. 370 (N.D. Ga. 2019)

**Other Sources:**

(1) Bloomberg, LP
(2) S&P Capital IQ
(3) Thompson Reuters
(4) https://www.sec.gov/
(5) http://ir.corecivic.com/
(6) http://www.correctionscorp.com/our-history
(7) Office of the Inspector General, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," August 11, 2016
(8) Memorandum released by Deputy Attorney General Sally Yates, "Reducing our Use of Private Prisons," August 18, 2016
(9) Brief of Financial Economists as Amici Curiae in Support of Respondents, *Halliburton Co. v. Erica P. John Fund, Inc.* , 2014 WL 526436 (U.S. Feb 5, 2014)
(10) Brief of Testifying Economists as Amici Curiae in Support of Respondent dated February 5, 2014, *Halliburton Co. v. Erica P. John Fund, Inc.* , 134 S. Ct. 2398 (2014)
(11) Aharony, Joseph and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35(1), 1980
(12) Barber, Brad M.; Griffin, Paul A.; & Lev, Baruch, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *Journal of Corporate Law,* Winter 1994
(13) Beaver, William H., "The Information Content of Annual Earnings Announcements," *Journal of Accounting Research* 6, Empirical Research in Accounting: Selected Studies, 1968
(14) May, Robert G., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research* 9 (1971), Empirical Research in Accounting: Selected Studies, 1971,
(15) Chow, Gregory C. "Tests of Equality Between Sets of Coefficients in Two Linear Regressions," *Econometrica* 28, no. 3 (1960): 591-605. Accessed July 30, 2020. doi:10.2307/1910133.
(16) Dickey, David, and Fuller, Wayne, "Distribution of the Estimators for Autoregressive Time Series with a Unit Root," *Journal of the American Statistical Association* , Vol. 74, Issue 366, June 1979
(17) Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* 25(2), Papers and Proceedings of the Twenty-Eighth Annual Meeting of the American Finance Association New York, N.Y., December, 28-30, 1969 (May 1970), pp. 383-417.
(18) Fama, Eugene, "Random Walks in Stock Market Prices", *Financial Analysts Journal* , January-February (1995)
(19) Karpoff, Jonathan M., et al., "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantative Analysis* , Vol. 43, No. 3, Sept. 2008
(20) MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* , Vol. 35. No. 1, Mar. 1997
(21) Campbell, John, et al., *The Econometrics of Financial Markets* , Princeton, New Jersey: Princeton University Press, 1997
(22) Pindyck, Robert S. and Rubinfeld, Daniel L., *Econometric Models and Economic Forecasts* , 4th ed., The McGraw-Hill Companies, Inc., 1998
(23) Pratt, S. P.; Niculita, A. V., *Valuing a Business: The analysis and appraisal of closely held companies* .,New York: McGraw-Hill Education, 2008
(24) Wooldridge, Jeffrey M., *Introductory Econometrics* , 6th ed., Boston, MA: Cengage Learning, 2016
(25) "Cibola County Correctional Center Closing," *KOAT Albuquerque* , August 1, 2016.
(26) "Milan Prison to Close; 254 Facing Layoffs," *The Gallup Independent* , August 2, 2016.

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

(27) "Augmented Dickey-Fuller unit root test," *Stata Time Series Reference Manual Release 15,* 2017

(28) McGrath, Charles, "80% of equity market cap held by institutions," *Pensions & Investments* , 4/25/17

(29) Gunzberg, J. & Edwards, T., "Why is the S&P 500® Relevant Globally?" *S&P Global,* https://www.spglobal.com/en/research-insights/articles/Why-is-the-SP-500-Relevant-Globally, June 20, 2018

(30) CFA Institute, *CFA Program Curriculum Level I Volume 5: Equity and Fixed Income* , 2019

(31) Press Release, Intercontinental Exchange, "NYSE's Record-Breaking January Across IPOs and ETFs Opens 2018," dated 2/1/18, available at https://ir.theice.com/press/press-releases/all-categories/2018/02-01-2018-204845310

(32) S&P Capital IQ; CCA Press release, "CCA to Be Added to the MSCI US REIT Index (RMZ) as of the Close of February 28, 2013

(33) S&P 400 (^MID) > Key Developments for the period from 1/1/2008 to 11/2012

(34) CNN Business, "S&P Global," at https://money.cnn.com/quote/shareholders/shareholders.html?symb=SPGI&subView=institutional

(35) "CoreCivic Investor FAQs at http://ir.corecivic.com/investor-faqs

(36) Factsheets about S&P Dow Jones Indices available at https://us.spindices.com/idsenhancedfactsheet/file.pdf?calcFrequency=M&force _download=true&hostIdentifier=48190c8c-42c4-46af-8d1a-0cd5db894797&indexId=410

(37) Factsheets about S&P Dow Jones Indices available at https://us.spindices.com/idsenhancedfactsheet/file.pdf?calcFrequency=M&force_download=true&hostIdentifier=48190c8c-42c4-46af-8d1a-

(38) 0cd5db894797&indexId=340

(39) SEC, "Fast Answers: Market Maker," https://www.sec.gov/fast-answers/answersmktmakerhtm.html

(40) Intercontinental Exchange, Designated Market Maker, https://www.nyse.com/market-model

(41) "S&P Index," *Bloomberg* , https://www.bloomberg.com/quote/SPX:IND

(42) S&P Global, "GICS- Global Industry Classification Standard"

(43) FTSE webpage at https://research.ftserussell.com/Analytics/FactSheets/temp/a15e957e-90a2-4087-8634-a4f41399d0f2.pdf

(44) Intercontinental Exchange, NYSE Regulation Threshold Securities, *available at* https://www.nyse.com/ regulation/threshold-securities

(45) Nasdaq Trader, Nasdaq Threshold List, available at https://www.nasdaqtrader.com/trader, aspx?id=RegSHOThreshold

(46) SEC, Fails-to-Deliver Data, available at https://www.sec.gov/data/foiadocsfailsdatahtm

(47) SEC, Threshold Securities, available at https://www.sec.gov/answers/threshold.htm

(48) SEC Rule 203(c)(6)

(49) 15 U.S.C. § 78u-4 (2011)

(50) IRS Publication 542 (Rev. March 2012)

(51) Form S-3 Registration Statement Under the Securities Act of 1933, at 2-3, *available at* https://www.sec.gov/files/forms-3.pdf

(52) Federal Reserve H.15 report, August 17, 2016

bvagroup

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

Bates Ranges*:

| Bates Begin | Bates End | Bates Begin | Bates End |
|---|---|---|---|
| CORECIVIC_0001995 | CORECIVIC_0001999 | CORECIVIC_1208218 | CORECIVIC_1208223 |
| CORECIVIC_0039499 | CORECIVIC_0039502 | CORECIVIC_1208225 | CORECIVIC_1208230 |
| CORECIVIC_0039525 | CORECIVIC_0039529 | CORECIVIC_1208388 | CORECIVIC_1208389 |
| CORECIVIC_0093325 | CORECIVIC_0093331 | CORECIVIC_1208929 | CORECIVIC_1208929 |
| CORECIVIC_0107597 | CORECIVIC_0107599 | CORECIVIC_1211830 | CORECIVIC_1211832 |
| CORECIVIC_0211655 | CORECIVIC_0211669 | CORECIVIC_1218335 | CORECIVIC_1218338 |
| CORECIVIC_0211802 | CORECIVIC_0211808 | CORECIVIC_1218437 | CORECIVIC_1218440 |
| CORECIVIC_0211816 | CORECIVIC_0211816 | CORECIVIC_1218449 | CORECIVIC_1218452 |
| CORECIVIC_0801724 | CORECIVIC_0801729 | CORECIVIC_1218464 | CORECIVIC_1218467 |
| CORECIVIC_0991390 | CORECIVIC_0991394 | CORECIVIC_1218490 | CORECIVIC_1218493 |
| CORECIVIC_0991614 | CORECIVIC_0991614 | CORECIVIC_1218497 | CORECIVIC_1218499 |
| CORECIVIC_0993108 | CORECIVIC_0993108 | CORECIVIC_1218507 | CORECIVIC_1218513 |
| CORECIVIC_0993190 | CORECIVIC_0993190 | CORECIVIC_1218519 | CORECIVIC_1218522 |
| CORECIVIC_1009419 | CORECIVIC_1009423 | CORECIVIC_1218526 | CORECIVIC_1218531 |
| CORECIVIC_1009677 | CORECIVIC_1009680 | CORECIVIC_1218536 | CORECIVIC_1218539 |
| CORECIVIC_1009699 | CORECIVIC_1009703 | CORECIVIC_1218543 | CORECIVIC_1218548 |
| CORECIVIC_1009720 | CORECIVIC_1009728 | CORECIVIC_1218554 | CORECIVIC_1218559 |
| CORECIVIC_1009745 | CORECIVIC_1009749 | CORECIVIC_1218564 | CORECIVIC_1218567 |
| CORECIVIC_1009832 | CORECIVIC_1009836 | CORECIVIC_1218571 | CORECIVIC_1218579 |
| CORECIVIC_1009861 | CORECIVIC_1009865 | CORECIVIC_1218584 | CORECIVIC_1218587 |
| CORECIVIC_1108407 | CORECIVIC_1108407 | CORECIVIC_1218591 | CORECIVIC_1218596 |
| CORECIVIC_1108434 | CORECIVIC_1108434 | CORECIVIC_1218606 | CORECIVIC_1218608 |
| CORECIVIC_1108438 | CORECIVIC_1108438 | CORECIVIC_1218613 | CORECIVIC_1218616 |
| CORECIVIC_1108450 | CORECIVIC_1108450 | CORECIVIC_1218632 | CORECIVIC_1218649 |
| CORECIVIC_1108671 | CORECIVIC_1108677 | CORECIVIC_1218654 | CORECIVIC_1218657 |
| CORECIVIC_1108681 | CORECIVIC_1108681 | CORECIVIC_1218661 | CORECIVIC_1218665 |
| CORECIVIC_1108685 | CORECIVIC_1108685 | CORECIVIC_1218670 | CORECIVIC_1218673 |
| CORECIVIC_1108689 | CORECIVIC_1108690 | CORECIVIC_1218682 | CORECIVIC_1218685 |
| CORECIVIC_1108706 | CORECIVIC_1108706 | CORECIVIC_1218689 | CORECIVIC_1218694 |
| CORECIVIC_1108710 | CORECIVIC_1108710 | CORECIVIC_1218699 | CORECIVIC_1218702 |
| CORECIVIC_1108714 | CORECIVIC_1108714 | CORECIVIC_1218706 | CORECIVIC_1218710 |
| CORECIVIC_1108760 | CORECIVIC_1108760 | CORECIVIC_1218715 | CORECIVIC_1218718 |
| CORECIVIC_1108764 | CORECIVIC_1108764 | CORECIVIC_1218722 | CORECIVIC_1218724 |
| CORECIVIC_1108768 | CORECIVIC_1108768 | CORECIVIC_1218729 | CORECIVIC_1218732 |
| CORECIVIC_1108793 | CORECIVIC_1108793 | CORECIVIC_1219136 | CORECIVIC_1219138 |
| CORECIVIC_1108797 | CORECIVIC_1108797 | CORECIVIC_1219290 | CORECIVIC_1219293 |
| CORECIVIC_1108815 | CORECIVIC_1108815 | CORECIVIC_1219381 | CORECIVIC_1219384 |
| CORECIVIC_1108819 | CORECIVIC_1108819 | CORECIVIC_1219428 | CORECIVIC_1219428 |
| CORECIVIC_1108823 | CORECIVIC_1108855 | CORECIVIC_1219792 | CORECIVIC_1219795 |
| CORECIVIC_1108859 | CORECIVIC_1108886 | CORECIVIC_1219886 | CORECIVIC_1219886 |
| CORECIVIC_1108863 | CORECIVIC_1108863 | CORECIVIC_1219966 | CORECIVIC_1219968 |
| CORECIVIC_1108867 | CORECIVIC_1108867 | CORECIVIC_1220408 | CORECIVIC_1220411 |
| CORECIVIC_1108871 | CORECIVIC_1108882 | CORECIVIC_1220443 | CORECIVIC_1220446 |
| CORECIVIC_1108942 | CORECIVIC_1108942 | CORECIVIC_1220479 | CORECIVIC_1220482 |
| CORECIVIC_1108955 | CORECIVIC_1108955 | CORECIVIC_1220559 | CORECIVIC_1220562 |
| CORECIVIC_1108959 | CORECIVIC_1108959 | CORECIVIC_1220589 | CORECIVIC_1220592 |
| CORECIVIC_1108963 | CORECIVIC_1108963 | CORECIVIC_1220643 | CORECIVIC_1220646 |
| CORECIVIC_1108967 | CORECIVIC_1108973 | CORECIVIC_1220747 | CORECIVIC_1220750 |
| CORECIVIC_1108979 | CORECIVIC_1108979 | CORECIVIC_1237075 | CORECIVIC_1237077 |
| CORECIVIC_1149973 | CORECIVIC_1149983 | CORECIVIC_1238025 | CORECIVIC_1238028 |
| CORECIVIC_1150026 | CORECIVIC_1150034 | CORECIVIC_1241246 | CORECIVIC_1241249 |
| CORECIVIC_1150263 | CORECIVIC_1150268 | CORECIVIC_1247468 | CORECIVIC_1247471 |
| CORECIVIC_1150484 | CORECIVIC_1150496 | CORECIVIC_1248283 | CORECIVIC_1248285 |

bvagroup

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v.**
**Corrections Corporation of America, et al.**
Appendix B - Information Considered

| | | | |
|---|---|---|---|
| CORECIVIC_1150506 | CORECIVIC_1150515 | CORECIVIC_1248473 | CORECIVIC_1248479 |
| CORECIVIC_1150520 | CORECIVIC_1150520 | CORECIVIC_1248631 | CORECIVIC_1248634 |
| CORECIVIC_1150561 | CORECIVIC_1150564 | CORECIVIC_1308255 | CORECIVIC_1308262 |
| CORECIVIC_1150621 | CORECIVIC_1150624 | CORECIVIC_1313181 | CORECIVIC_1313183 |
| CORECIVIC_1150661 | CORECIVIC_1150661 | CORECIVIC_1313543 | CORECIVIC_1313546 |
| CORECIVIC_1150718 | CORECIVIC_1150718 | CORECIVIC_1313643 | CORECIVIC_1313646 |
| CORECIVIC_1150778 | CORECIVIC_1150778 | CORECIVIC_1313715 | CORECIVIC_1313715 |
| CORECIVIC_1150801 | CORECIVIC_1150801 | CORECIVIC_1313719 | CORECIVIC_1313723 |
| CORECIVIC_1150870 | CORECIVIC_1150873 | CORECIVIC_1317791 | CORECIVIC_1317793 |
| CORECIVIC_1150924 | CORECIVIC_1150927 | CORECIVIC_1317798 | CORECIVIC_1317801 |
| CORECIVIC_1150934 | CORECIVIC_1150935 | CORECIVIC_1318198 | CORECIVIC_1318206 |
| CORECIVIC_1150946 | CORECIVIC_1150948 | CORECIVIC_1318211 | CORECIVIC_1318213 |
| CORECIVIC_1150951 | CORECIVIC_1150954 | CORECIVIC_1318218 | CORECIVIC_1318221 |
| CORECIVIC_1150981 | CORECIVIC_1150984 | CORECIVIC_1318229 | CORECIVIC_1318232 |
| CORECIVIC_1151005 | CORECIVIC_1151006 | CORECIVIC_1318236 | CORECIVIC_1318242 |
| CORECIVIC_1151012 | CORECIVIC_1151013 | CORECIVIC_1318246 | CORECIVIC_1318248 |
| CORECIVIC_1151017 | CORECIVIC_1151020 | CORECIVIC_1318253 | CORECIVIC_1318256 |
| CORECIVIC_1151054 | CORECIVIC_1151055 | CORECIVIC_1318260 | CORECIVIC_1318271 |
| CORECIVIC_1151075 | CORECIVIC_1151077 | CORECIVIC_1318286 | CORECIVIC_1318289 |
| CORECIVIC_1151089 | CORECIVIC_1151090 | CORECIVIC_1318294 | CORECIVIC_1318296 |
| CORECIVIC_1151109 | CORECIVIC_1151112 | CORECIVIC_1318303 | CORECIVIC_1318306 |
| CORECIVIC_1151116 | CORECIVIC_1151118 | CORECIVIC_1318311 | CORECIVIC_1318318 |
| CORECIVIC_1151123 | CORECIVIC_1151124 | CORECIVIC_1318322 | CORECIVIC_1318329 |
| CORECIVIC_1151184 | CORECIVIC_1151185 | CORECIVIC_1318335 | CORECIVIC_1318338 |
| CORECIVIC_1151189 | CORECIVIC_1151192 | CORECIVIC_1318346 | CORECIVIC_1318355 |
| CORECIVIC_1151196 | CORECIVIC_1151197 | CORECIVIC_1318376 | CORECIVIC_1318380 |
| CORECIVIC_1151216 | CORECIVIC_1151219 | CORECIVIC_1318386 | CORECIVIC_1318389 |
| CORECIVIC_1151227 | CORECIVIC_1151230 | CORECIVIC_1318399 | CORECIVIC_1318404 |
| CORECIVIC_1151232 | CORECIVIC_1151233 | CORECIVIC_1318406 | CORECIVIC_1318410 |
| CORECIVIC_1151237 | CORECIVIC_1151240 | CORECIVIC_1318418 | CORECIVIC_1318421 |
| CORECIVIC_1151244 | CORECIVIC_1151245 | CORECIVIC_1318431 | CORECIVIC_1318434 |
| CORECIVIC_1151274 | CORECIVIC_1151276 | CORECIVIC_1318446 | CORECIVIC_1318449 |
| CORECIVIC_1151298 | CORECIVIC_1151301 | CORECIVIC_1318462 | CORECIVIC_1318465 |
| CORECIVIC_1151306 | CORECIVIC_1151308 | CORECIVIC_1324021 | CORECIVIC_1324021 |
| CORECIVIC_1151315 | CORECIVIC_1151315 | CORECIVIC_1336887 | CORECIVIC_1336892 |
| CORECIVIC_1151318 | CORECIVIC_1151319 | CORECIVIC_2176406 | CORECIVIC_2176406 |
| CORECIVIC_1151320 | CORECIVIC_1151321 | CORECIVIC_2179531 | CORECIVIC_2179544 |
| CORECIVIC_1151373 | CORECIVIC_1151376 | CORECIVIC_2186893 | CORECIVIC_2186902 |
| CORECIVIC_1151380 | CORECIVIC_1151381 | CORECIVIC_2186909 | CORECIVIC_2186912 |
| CORECIVIC_1151390 | CORECIVIC_1151391 | CORECIVIC_2186917 | CORECIVIC_2186920 |
| CORECIVIC_1151395 | CORECIVIC_1151398 | CORECIVIC_2206573 | CORECIVIC_2206579 |
| CORECIVIC_1151402 | CORECIVIC_1151403 | CORECIVIC_2206583 | CORECIVIC_2206585 |
| CORECIVIC_1151406 | CORECIVIC_1151407 | CORECIVIC_2206589 | CORECIVIC_2206591 |
| CORECIVIC_1151412 | CORECIVIC_1151415 | CORECIVIC_2206595 | CORECIVIC_2206604 |
| CORECIVIC_1151422 | CORECIVIC_1151425 | CORECIVIC_2207877 | CORECIVIC_2207881 |
| CORECIVIC_1151429 | CORECIVIC_1151432 | CORECIVIC_2207887 | CORECIVIC_2207892 |
| CORECIVIC_1151474 | CORECIVIC_1151480 | CORECIVIC_2207898 | CORECIVIC_2207901 |
| CORECIVIC_1151544 | CORECIVIC_1151547 | CORECIVIC_2207938 | CORECIVIC_2207939 |
| CORECIVIC_1151647 | CORECIVIC_1151650 | CORECIVIC_2207951 | CORECIVIC_2207955 |
| CORECIVIC_1189348 | CORECIVIC_1189351 | HHQ_0000481 | HHQ_0000486 |
| CORECIVIC_1190571 | CORECIVIC_1190573 | HHQ_0001240 | HHQ_0001244 |
| CORECIVIC_1190700 | CORECIVIC_1190703 | HHQ_0001466 | HHQ_0001472 |
| CORECIVIC_1202414 | CORECIVIC_1202415 | HHQ_0001643 | HHQ_0001650 |
| CORECIVIC_1207436 | CORECIVIC_1207436 | HHQ_0001730 | HHQ_0001736 |
| CORECIVIC_1207777 | CORECIVIC_1207780 | HHQ_0001975 | HHQ_0001976 |
| CORECIVIC_1207873 | CORECIVIC_1207873 | HHQ_0002331 | HHQ_0002334 |
| CORECIVIC_1208015 | CORECIVIC_1208018 | HHQ_0002435 | HHQ_0002438 |
| CORECIVIC_1208075 | CORECIVIC_1208077 | HHQ_0003737 | HHQ_0003740 |

bvagroup

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v. Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

| CORECIVIC_1208203 | CORECIVIC_1208203 |
|---|---|
|  |  |

| HHQ_0003755 | HHQ_0003759 |
|---|---|
|  |  |

*Bates range may include certain documents labeled as deposition exhibits.

## Appendix C

### I.    Assessment of Market Efficiency for CCA Stock

1.    It is my understanding that, in order to invoke the "fraud on the market" presumption of reliance, the courts have required (among other things) that the plaintiff establish that the security was traded on an efficient market during the relevant period.[1]

2.    It is widely accepted that prices of shares traded on major exchanges such as the New York Stock Exchange ("NYSE") respond to new value-relevant information; that is, such markets are informationally efficient with respect to publicly available information.  As prominent academics have noted, "economists generally agree that material information—whether truthful or fraudulent—will generally affect the price of a stock and that the effect will be in a predictable direction."[2]

3.    According to the efficient market hypothesis ("EMH"), in an efficient market, the price of an investment fully reflects all available information in the market.  The economic literature identifies three forms of the EMH:

a.    The weak form suggests that all information contained in past prices is incorporated in the current price of an actively traded asset;

b.    The semi-strong form of the efficient market hypothesis states that all publicly available information is quickly and fully reflected in the price of a traded asset.

c.    The strong form of market efficiency suggests that all public and private information is incorporated in the current price of a traded asset.[3]

4.    A finding that shares trade in a semi-strong-form efficient market indicates that the prices of those shares quickly incorporate new, value-relevant public information about the issuer.[4]  Consistent with this principle, I understand that courts have considered evidence that a security traded in a market characterized by the semi-strong form of the EMH as evidence that it is appropriate to invoke the "fraud on the market" presumption with respect to that security in the context of securities litigation.[5]

---

[1]    *Basic Inc. v. Levinson*, 485 U.S. 224, 245-46 (1988) ("*Basic*"); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*").

[2]    Brief of Financial Economists as Amici Curiae in Support of Respondents, *Halliburton II*, 2014 WL 526436, at *13-14 (U.S. Feb 5, 2014).

[3]    Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *The Journal of Finance* (May, 1970) 25(2) Papers and Proceedings of the Twenty-Eighth Annual Meeting of the American Finance Association New York, N.Y. December, 28-30, 1969, pp. 383-417.  Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, at p. 22.

[4]    For the purposes of this discussion, general references to market efficiency refer to the semi-strong form unless otherwise noted.

[5]    *Basic*, 485 U.S. at 245-46; Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, at p. 22.



**Appendix C**

5.      Practitioners and courts have found that shares of large companies traded on major exchanges generally trade in semi-strong form efficient markets.[6]  Throughout the Class Period, CCA traded on the NYSE, which in 2018 traded more U.S. equity volume than any other exchange.[7]  CCA stock was included in the S&P MidCap 400 Index for the entire Class Period, and was added to the MCSI US REIT Index (which represented approximately 85% of the US REIT universe) as of the market close on February 28, 2013.[8]  Inclusion in such indices is based on a firm's shares meeting certain criteria with regard to market capitalization, public float, liquidity, and "reasonable" prices, similar to those typically used to evaluate whether a stock trades in semi-strong form efficient markets.[9]

6.      I understand that courts regularly consider the five factors set forth in *Cammer v. Bloom* (the "Cammer Factors") in assessing market efficiency.[10]  These five factors are:

      a.   average weekly trading volume relative to outstanding shares;

      b.   number of analysts following the stock;

      c.   market maker and arbitrage activity;

      d.   ability to issue new securities through an S-3 registration statement; and

      e.   empirical facts showing a cause-and-effect relation between unexpected corporate events or financial releases and stock price movement.

7.      In addition to the factors outlined in *Cammer*, I understand that courts have considered additional factors relevant in demonstrating the efficiency of a market, including:

      a.   market capitalization and float;[11]

      b.   bid-ask spread;[12]

---

[6]   *See*, *e.g.*, *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017) (quoting *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990)) ("[I]t appears that securities traded in national secondary markets such as the New York Stock Exchange ... are well suited for application of the fraud-on-the-market theory. The high level of trading activity ensures that information from many sources is disseminated into the marketplace and consequently is reflected in the market price. This is the premise upon which the fraud on the market theory rests."); *id.* (quoting *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 208 (E.D. Pa. 2008)) ("While Defendants are correct that trading on a national exchange is not a *per se* indicator of market efficiency, ... the fact that DVI common stock was traded on the NYSE strongly favors a finding of market efficiency."); *see also* Brief of Testifying Economists as *Amici Curiae* in Support of Respondent, *Halliburton II*, 2014 WL 507164, at *7-8 (U.S. Feb. 5, 2014).

[7]   Press Release, Intercontinental Exchange, "NYSE's Record-Breaking January Across IPOs and ETFs Opens 2018" (Feb. 1, 2018), available at https://ir.theice.com/press/press-releases/all-categories/2018/02-01-2018-204845310.

[8]   S&P 400 (^MID) > Key Developments for the period from 1/1/2008 to 11/2012; "CoreCivic Investor FAQs" at http://ir.corecivic.com/investor-faqs; S&P Capital IQ; CCA Press release, "CCA to Be Added to the MSCI US REIT Index (RMZ) as of the Close of February 28, 2013," February 14, 2013.

[9]   Factsheets about S&P Dow Jones Indices available at https://us.spindices.com/idsenhancedfactsheet/file.pdf?calcFrequency=M&force _download=true&hostIdentifier=48190c8c-42c4-46af-8d1a-0cd5db894797&indexId=410; https://us.spindices.com/idsenhancedfactsheet/file.pdf?calcFrequency=M&force_download=true&hostIdentifier=48190c8c-42c4-46af-8d1a-0cd5db894797&indexId=340 (last visited July 27, 2020).

[10]  *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

[11]  *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005).

[12]  *Krogman v. Sterritt*, 202 F.R.D. 467, 477-78 (N.D. Tex. 2001); *Unger v. Amedisys Inc.*, 401 F.3d 316, 323 (5th Cir. 2005).



    c.   presence of autocorrelation in stock price returns;[13] and

    d.   constraints on short selling.[14]

8.     Each of these factors is considered below.

## A.   *Cammer* Factors

### 1)   *Cammer* Factor 1: Average Weekly Trading Volume

9.     In *Cammer*, the court observed that an actively traded security is indicative of market efficiency "because it implies significant investor interest in the company," which "in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information."[15]  The court identified weekly turnover (average weekly trading volume relative to the shares outstanding) as a relevant indicator of active trading, concluding that "[t]urnover measured by average weekly trading of two percent or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; one percent would justify a substantial presumption."[16]

10.    **Chart C-1** shows weekly turnover in CCA stock throughout the Class Period:

---

[13]   *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196 (E.D. Pa. 2008).

[14]   *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 n.77 (S.D.N.Y. 2015).

[15]   *Cammer*, 711 F. Supp. at 1286.

[16]   *Cammer*, 711 F. Supp. at 1286 (citing Bromberg, Alan R. & Lowenfels, Lewis D., 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg").





**Appendix C**

**Chart C-1.   CCA Weekly Stock Turnover**[17]



11.    Weekly turnover (expressed in terms of shares outstanding) averaged 4.1 percent per week (on average, 4,629,489 shares traded out of 114,811,443 shares outstanding) throughout the Class Period and exceeded the 2 percent threshold for a strong presumption of efficiency in 86 percent of weeks of the Class Period.  At no point during the Class Period did turnover fall below the 1 percent threshold required for a substantial presumption of efficiency.[18]   This supports an inference of an efficient market for CCA common stock.

### 2)    *Cammer* Factor 2: Analyst Coverage

12.    *Cammer* held that a "significant" number of securities analysts following a stock "would imply, for example, [relevant financial reports] were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors."[19]

---

[17]    Weekly trading volume and total shares outstanding for CXW as reported by Bloomberg, L.P. ("Bloomberg").
[18]    *Cammer*, 711 F. Supp. at 1286 (citing Bromberg).
[19]    *Cammer*, 711 F. Supp. at 1286.



Appendix C - Page 4 of 17

**Appendix C**

13.     Securities analysts from major financial institutions who follow CCA made buy and sell recommendations about CCA to their investors on a regular basis.  I am aware of analysts from at least 8 major financial institutions that provided detailed coverage of CCA for at least some portion of the Class Period.[20]

14.     Bloomberg reports the number of such analyst recommendations on a weekly basis. Bloomberg reports buy/sell recommendations on CCA stock by at least three analysts in each week of the Class Period, with an average of five analysts per week covering CCA during the Class Period.[21]  Coverage by one or two analysts has been found to strengthen the presumption of efficiency for a publicly traded stock.[22]

15.     I have been provided with over 250 individual analyst reports discussing CCA during the Class Period.[23]  These reports include detailed analyses of CCA's business and operations from securities analysts at major financial institutions such as Wells Fargo Securities, LLC, Deutsche Bank, and Barclays Capital.[24]  In addition to supporting analysts' buy/sell recommendations and price targets for CCA, these reports reflected analysts' commentary (both quantitative and qualitative) on new, value-relevant information.

16.     The analyst coverage of CCA during the Class Period demonstrates that newly available, value-relevant financial information was actively monitored and scrutinized by a network of investment professionals who quickly digested new information and disseminated their reactions to CCA investors. Such coverage supports the proposition that CCA's shares traded in an efficient market throughout the Class Period.

**3)     *Cammer* Factor 3: Existence of Market Makers/Institutional Investors and Arbitrageurs**

17.     The court in *Cammer* found that "[t]he existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level."[25]

18.     The U.S. Securities and Exchange Commission ("SEC") defines a market maker as "a firm that stands ready to buy and sell a particular stock on a regular and continuous basis at a publicly quoted price."[26]  Market makers hold shares of securities to fill buy or sell orders on demand, thereby offering investors liquidity.  The presence of market makers ensures that buyers and sellers of a stock have a ready

---

[20]     See **Appendix B**.
[21]     Bloomberg.
[22]     Barber, Brad M.; Griffin, Paul A.; and Lev, Baruch, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," *The Journal of Corporation Law*, 1994, pp. 302 and 310-311.
[23]     I identify 219 individual analyst reports related to CCA during the Class Period in **Appendix B**.
[24]     *See* **Appendix B**.  Analyst reports were accessed through Thompson Reuters.
[25]     *Cammer*, 711 F. Supp. at 1286-87.
[26]     SEC, "Fast Answers: Market Maker," https://www.sec.gov/fast-answers/answersmktmakerhtm.html (last visited July 27, 2020).



counterparty available for the "completion of the market mechanism" as new value-relevant information becomes available.[27]

19.     CCA was listed on the NYSE throughout the Class Period.  The NYSE assigns a Designated Market Maker ("DMM") to each security that trades on it, facilitating fair and orderly trading.[28]  The structure of the NYSE, including its DMM system, in combination with the requirements for being listed on the NYSE, supports the general presumption that a stock traded on the NYSE trades in an efficient market.[29]

20.     Through a review of the analyst reports covering CCA, I identified four financial institutions that disclose they made a market in CCA common stock during the Class Period.[30]  The presence of the NYSE DMM in addition to multiple large institutional market makers ensures that buyers and sellers are able to routinely exchange shares at market-clearing prices, which ensures prices are reflective of information known by market participants.

21.     *Cammer* also points to the presence of arbitrageurs, who "react swiftly to company news and reported financial results," as another indication of market efficiency.[31]  Arbitrageurs maintain market efficiency by identifying opportunities to buy/sell securities that are under/over-priced.  This ensures prevailing prices reflect available value-relevant information.

22.     One way to measure the extent to which a security is owned by the type of well-informed investors that typically act as arbitrageurs is to examine the percentage of shares owned by institutional investors such as mutual funds or money managers.  Institutional investors are presumed to be well-informed about the securities they hold and able to interpret and act upon new information.[32]  Such investors have the capital, information, and resources required to take advantage of even relatively small arbitrage opportunities, ensuring that share prices reflect value-relevant information.

---

[27]  *Cammer*, 711 F. Supp. at 1286-87; Fast Answers: Market Maker, https://www.sec.gov/fast-answers/answersmktmakerhtm.html (last visited July 27, 2020).

[28]  According to the NYSE:

> The cornerstone of the NYSE market model is the Designated Market Maker (DMM).  DMMs have obligations to maintain fair and orderly markets for their assigned securities.  They operate both manually and electronically to facilitate price discovery during market opens, closes and during periods of trading imbalances or instability.  This high-touch approach is crucial for offering the best prices, dampening volatility, adding liquidity and enhancing value. DMMs apply their market experience and judgment of dynamic trading conditions, macroeconomic news and industry-specific intelligence, to inform their decisions.  A valuable resource for our listed-company community, DMMs offer insights, while making capital commitments, maintaining market integrity, and supporting price discovery.

Intercontinental Exchange, Designated Market Maker, https://www.nyse.com/market-model (last visited July 27, 2020).

[29]  *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 649 (C.D. Cal. 2018) ("oversight of a DMM favors market efficiency")**.**

[30]  *See, for example,* Wells Fargo, "CXW: Initiating Coverage with a Market Perform Rating," December 19, 2014, at p. 14; Barclays Capital, "Investor Day provides 'Private Prison 101' to build REIT traction," October 3, 2013, at p. 9; CRT Capital, "Initiating Coverage of CXW; Expect Earnings Revisions, "FV," $35 PT," January 23, 2014, at p. 26; Avondale Partners, LLC, "CXW - Raising Price Target after 1Q13 Beat" May 9, 2015 at p. 5.

[31]  *Cammer*, 711 F. Supp. at 1286-87.

[32]  Barber, Brad M.; Griffin, Paul A.; & Lev, Baruch, "The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency," Winter 1994, *Journal of Corporate Law*, at p. 292.



<u>**Appendix C**</u>

23.     During the Class Period, institutional investors owned at least 76 percent of CCA's publicly-available common stock.[33]   This is broadly consistent with the level of institutional ownership of stocks included in major indices such as the S&P 500.[34]   CCA stock is, therefore, predominantly held by sophisticated, well-informed investors who are in a position to consider and react to new, value-relevant information.   The level of institutional ownership of CCA stock, coupled with the participation of multiple market makers, suggests that CCA traded in an efficient market.

### 4)     *Cammer* Factor 4: Eligibility to File an S-3 Registration Statement

24.     The SEC allows "more seasoned" companies to file a Form S-3 to register securities.[35]   The court in *Cammer* found "the existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient" as "it is the largest and most well-known companies which register equity securities on Form S-3."[36]

25.     The Form S-3 provides for an expedited registration of public securities by a company that already has registered a class of securities under the Securities Act and which has been in compliance with the reporting requirements under the Securities Act without defaulting on debts during the previous year.[37] A company is eligible to register an equity offering with an expedited Form S-3 when its common equity held by non-affiliates (its "public float") is at worth least $75 million.[38]   According to *Cammer*, "[t]he 'public float' aspect of the Form S-3 requirements ensures that enough investors have in fact read the previously filed [prospectus]. . . . It is this aspect of the Form S-3 requirements that calls into play the efficient market hypothesis."[39]

26.     Throughout the Class Period, I understand CCA traded on the NYSE and met the principal requirements to file a Form S-3: it had sufficient public float, had not defaulted on debt, and was in compliance with Securities Act disclosure obligations; in addition, CCA did file a Form S-3 during to the Class Period.[40]   CCA's eligibility to file a Form S-3 during the Class Period is further evidence that its shares traded in an efficient market.

---

[33]   Calculated as the number of shares owned by institutional investors expressed as a percentage of shares outstanding as reported by Bloomberg.

[34]   *See, e.g.,* McGrath, Charles, "80% of equity market cap held by institutions," *Pensions & Investments,* April 25, 2017; CNN Business, "S&P Global," at https://money.cnn.com/quote/shareholders/shareholders.html?symb=SPGI&subView=institutional (last visited August 5, 2020).

[35]   *Cammer*, 711 F. Supp. at 1284.

[36]   *Cammer*, 711 F. Supp. at 1285, 1271 n.5.  *See also, Krogman*, 202 F.R.D. at 476 (finding that the SEC permits the filing of a Form S-3 "only on the premise that the stock is already traded on an open and efficient market, such that further disclosure is unnecessary")**.**

[37]   Form S-3 Registration Statement Under the Securities Act of 1933, at 2-3, *available at* https://www.sec.gov/files/forms-3.pdf (last visited July 27, 2020).

[38]   Alternatively, companies that do not have a public float of at least $75 million can file an S-3 if they meet all other S-3 requirements, are not a shell company, have their stock listed and registered on a national securities exchange, and limit their offerings to no more than 1/3 of the market value of stock held by non-affiliates.  *See id.* at 3, 5.

[39]   *Cammer*, 711 F. Supp. at 1285 & n. 33.

[40]   CCA filed an S-3 in May 2015 (*see* CCA Form S-3 dated May 15, 2015).



<u>**Appendix C**</u>

**5)** ***Cammer*** **Factor 5: Empirical Evidence of Cause-and-Effect Relationship Between Events and Stock Price Movements**

27.     The fifth *Cammer* factor relates to a cause-and-effect relationship between events and stock price movements.  As the court explained:

> [I]t would be helpful to a plaintiff seeking to allege an efficient market to allege empirical facts showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price.  This, after all, is the essence of an efficient market and the foundation for the fraud on the market theory.[41]

28.     The fifth *Cammer* factor implies that on days when new information that is relevant to the value of a company whose stock trades in an efficient market becomes available, price movements (both positive and negative) tend to be larger than price movements on days without such information.[42]  Since information has the potential to change expectations about a company and, therefore, the value of its shares, on average one would expect days on which new information was released to be associated with a relatively higher frequency of statistically significant abnormal returns in an efficient market in which shares react quickly to new information.

**a)     Release Days**

29.     In order to analyze the fifth *Cammer* factor with regard to CCA, I first identify a subset of days on which CCA released value-relevant information through press releases ("<u>Release Days</u>").  The Release Days are therefore days on which one would expect value-relevant information to have become available to the market.  I compare the frequency of statistically significant abnormal returns on Release Days (the treatment group) to that of other days in the Class Period (the control group) to test whether Release Days tended to be accompanied by significant changes in CCA's share price.

30.     After reviewing CCA's press releases during the Class Period, I consider days on which CCA issued a press release or guidance relating to quarterly or annual financial results to be a clear and unambiguous set of days that one would expect, *ex ante,* to be value-relevant.[43]  Academic articles and

---

[41]  *Cammer*, 711 F. Supp. at 1287.

[42]  An abnormal price movement on all days when information is released is not necessary for a finding of market efficiency because certain releases may have been small relative to the size of the firm or expected (*e.g.*, financial releases where CCA met expectations).

[43]  Limiting my Release Days to earnings release days and the announcement of CCA's REIT conversion does not mean that there are no other days within the Class Period on which new, value-relevant information was released.  By its very nature, the selection of a limited number of Release Days when news was released, if anything, biases my results toward a finding of no cause-and-effect relationship (as my Release Days exclude all but one non-earnings-release day on which value-relevant information may have become available, thereby decreasing the likelihood of observing a difference in the frequency of statistically significant abnormal returns across Release days and others).  By only considering earnings releases and CCA's REIT conversion announcement, therefore, I ensure that the manner in which I identified Release Days is consistent with the principles of economic hypothesis testing and was performed using a replicable process.



### Appendix C

treatises explain theoretically and demonstrate empirically that information disclosed in conjunction with earnings announcements can cause investors to significantly reevaluate the worth of a particular security.[44]

31.    I identified 19 Release Days during the Class Period, which includes earnings release days and the announcement of CCA's REIT conversion.  The earnings information included in each Release Day originated from CCA and was released to the public market via press release at the beginning of the business day.[45]

### b)    Event Study

32.    In order to examine the extent to which CCA's share price responded to information disclosed on Release Days, I apply a widely accepted technique known as an event study.[46]  Event studies examine share price returns corresponding to a particular *event window*, during which the event in question occurred. An event study may be used to isolate the impact of an announcement corresponding to a particular event from other factors that would have affected the share price at that time, such as macroeconomic news affecting broad market indices.

33.    A widely used application of the event study is known as the market model.[47]  The market model is based on regression analysis, which provides a statistical framework for examining the nature and form of the relationship between two or more variables.  In this case, a market model may be used to explain or predict changes in the dependent variable, in this case CCA's share price returns, as a function of changes in the values of the independent variables, such as returns to the overall U.S. stock market and a REIT sector index.

34.    The market model works by predicting what the share price return would have been based on movements in market indices on a particular day.[48]  By subtracting predicted returns from the actual returns, we can estimate the change in the company's share price that is not explained by wider market phenomena, which is known as the *abnormal return*.  Thus, the abnormal return is the difference between the return predicted by the market model and the actual return associated with the event at issue.

---

[44]    *See, e.g.*, Beaver, William H., "The Information Content of Annual Earnings Announcements," *Journal of Accounting Research* 6 (1968), *Empirical Research in Accounting: Selected Studies, 1968*, pp. 67-92; May, Robert G., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Journal of Accounting Research* 9 (1971), *Empirical Research in Accounting: Selected Studies, 1971*, pp. 119-163; Aharony, Joseph and Swary, Itzhak, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance* 35(1) (1980), pp. 1-12.

[45]    The one exception is the CCA press release "CCA Board of Directors Authorizes REIT Conversion," issued on February 7, 2013 after the close of business.

[46]    Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, Chapter 4.  See also *Halliburton II*, 573 U.S. at 280-81.

[47]    Campbell, John, Andrew W. Lo and A. Craig MacKinlay. *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press (1997), Chapters 4-6.  *See also,* A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature, Vol. 35. No. 1, Mar. 1997*.

[48]    Share price returns are computed as the percentage movements in the security price.  For the purposes of estimating the market model, share price returns are typically expressed as logarithmic returns, or log returns.  Specifically, a log return is the natural logarithm of the ratio of two daily closing security prices: $\ln(P_t/P_{t-1})$, where '$\ln$' is the natural logarithm, '$P_t$' refers to the security price on day $t$ and '$P_{t-1}$' refers to the security price one trading day prior to day $t$.



**Appendix C**

35.     In cases where the abnormal return is statistically significant, it may be reasonable to conclude that it was caused by the event in question, provided the news became available to the market at the time of (or just prior to) the abnormal movement.[49]

36.     The market model can control for broad market movements as well as industry-specific information that is not specific to the company.  In addition, market models may also include indicator variables to control for other events, such as earnings announcements, that one would expect to affect share price returns on days outside the event window.[50]

37.     In this case, CCA announced that it was converting to a REIT after the market had closed on February 7, 2013.[51]  I tested for changes in the regression model and found that a structural change in the model occurred on February 8, 2013.  A widely used statistical test known as a Chow Test indicates that there was a structural break in the regression model between the periods from February 27, 2012 through February 7, 2013 ("Interval 1") and February 8, 2013 through August 17, 2016 ("Interval 2").[52]  The Chow Test was statistically significant at the 5% significance level, indicating that there were structural changes in the regression relationship before and after the formal announcement of the REIT conversion.

38.     I apply a market model to estimate CCA abnormal returns for the Class Period using the following independent variables:

a.     An independent variable representing the daily log return of the S&P 500 Total Return Index (the "Market Index") adjusted to exclude the returns of CCA, calculated as the natural logarithm of the ratio of its consecutive daily closing prices, or $\ln(P(MRKT)_t/P(MRKT)_{t-1})$.[53]

b.     Independent variables representing the daily log return of a relevant index.

i.     During Interval 1, I rely on the S&P Midcap 400 Commercial Services & Supplies Index (the "S&P 400 Index").[54]

---

[49]     Statistical significance represents the likelihood that a result or observed relationship between two variables is unlikely under a specific hypothesis.  Hypothesis testing is traditionally employed to determine if a result is statistically significant or not.  This provides a "p-value" representing the probability of observing data as extreme as that which was measured if the null hypothesis is indeed true.  A statistically significant result at the one percent significance level is one in which there is a less than one percent probability of observing this data if the null hypothesis were true.  Such p-values are also often described in terms of confidence levels by subtracting the p-value from 100 percent.  *See*, for instance, Wooldridge, Jeffrey M., *Introductory Econometrics*, 6th ed., Boston, MA: Cengage Learning (2016), p. 119.

[50]     Indicator variables take a value of one on the relevant day and zero on all other days.

[51]     Barclays Capital, "CXW Receives Its PLR; 11am Call," February 8, 2013; Macquarie Capital (USA), "Positive PLR to 'Unlock' Value in CXW," February 8, 2013; SunTrust Robinson Humphrey, "Favorable Ruling and Details on REIT Conversion," February 8, 2013.

[52]     Chow, Gregory C. "Tests of Equality Between Sets of Coefficients in Two Linear Regressions." *Econometrica* 28, no. 3 (1960): 591-605. Accessed July 30, 2020. doi:10.2307/1910133.

[53]     The S&P 500 index is a widely-used proxy for large-cap equity movements and currently represents approximately 80 percent of the total available U.S. equity market by market capitalization.  Gunzberg, J. & Edwards, T., "Why is the S&P 500® Relevant Globally?"  *S&P Global,*  https://www.spglobal.com/en/research-insights/articles/Why-is-the-SP-500-Relevant-Globally  (last visited July 27, 2020).  *See also* "S&P Index," *Bloomberg*, https://www.bloomberg.com/quote/SPX:IND (last visited July 27, 2020).

[54]     The S&P Midcap 400 Commercial Services & Supplies Index is a capitalization-weighted index which includes the sub-industries of Commercial Printing, Environmental & Facilities Services, Office Services and Supplies, Diversified Support Services, and Security and Alarm Services (*see* S&P Global, "GICS- Global Industry Classification Standard"). https://www.spglobal.com/spdji/en/documents/education/education-sector-primer-series-industrials.pdf.



### Appendix C

ii. During Interval 2, I rely on the FTSE Nareit All Equity REITs (FNER) Index (the "REIT Index") adjusted to exclude the returns of CCA along with the S&P 400 Index.[55]

c. Indicator, or dummy, variables that have a value of one on Release Days and zero on all other days.

39.    I use the market model to predict CCA's expected share price return on each day of the Class Period using a set number of prior days' returns, or *estimation windows*.[56]  In order to confirm that my results are not sensitive to changes in the estimation window, I predict each trading day's return using a rolling estimation window based on the preceding twelve months (252 trading days) of daily returns.

40.    I then compare the frequency of statistically significant abnormal returns on the Release Days to abnormal returns on all other trading days during the Class Period.

### c)    Analysis of Abnormal Returns

41.    The market model ensures that the abnormal return on any Release Day is indicative of a stock's reaction to new information, after controlling for returns that may be predicted from broader market movements.  When statistically significant abnormal returns systematically follow the release of new information, one can infer that the value-relevant information is causing returns.[57]

42.    When an event related to firm value (such as an information release) takes place on a specific day and the return following that event is significantly different from the prediction, it can be inferred that the stock price responded to the event or release of information on that day.  If a day's return following such an event is statistically significant (as typically measured at the 5 percent level), then this implies that there is less than a 5 percent chance one would observe such an abnormal return under the null hypothesis that the market model fully explains CCA's returns.

43.    I evaluate evidence of a cause-and-effect relationship between the release of value-relevant information and stock price movements by testing a hypothesis that the frequency of statistically significant abnormal returns differs between Release Days and other trading days. If CCA trades in an efficient market, I expect a higher frequency of statistically significant abnormal returns on days in which news is released

---

Prior to the REIT conversion, CCA identified the S&P Midcap 400 Commercial Services & Supplies Index as representative of its sector.  See Corrections Corporation of America, 2012 Annual Report on Form 10-K for the fiscal year ended December 31, 2012, at p. 48; and Corrections Corporation of America, 2013 Annual Report on Form 10-K for the fiscal year ended December 31, 2013, at p. 44.

[55]    The FTSE Nareit All Equity REITs index contains all tax-qualified REITs with more than 50 percent of total assets in qualifying real estate assets other than mortgages secured by real property that also meet minimum size and liquidity criteria.  *See*, FTSE webpage at https://research.ftserussell.com/Analytics/FactSheets/temp/a15e957e-90a2-4087-8634-a4f41399d0f2.pdf

[56]    Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, at p. 152.

[57]    The absence of a statistically significant abnormal return does not necessarily imply that a company's stock did not react to a particular set of information since, for instance, significant positive and negative news released at the same time can have offsetting effects, resulting in an abnormal return that is not statistically significant.



## Appendix C

to the market relative to other trading days. I do not expect statistically significant returns to occur on all Release Days, since not all information released to the market is necessarily material or differs from expectations (*e.g.*, market prices may already reflect the information if the event it was previously expected).

44.     The set of Release Days that I identify in the Class Period provide sufficient statistical power from which to draw reliable inferences as to the responsiveness of CCA stock to new, value-relevant information. I find a significantly higher frequency of statistically significant abnormal returns on Release Days compared to other days. Within the Class Period, 9 of the 19 Release Days identified (47 percent), have abnormal returns that are significant at the 5 percent level. In contrast, for the remaining 1,108 days in the Class Period, only 72 days (6 percent) have abnormal returns that are significant at the 5 percent level. These results are summarized in the following table.

**Table C-1.   Abnormal Returns During the Class Period**

**Release Days**

| | Significance Level |
| --- | --- |
| | 5% |
| **Total days** | 19 |
| **Significant Abnormal Return Days** | 9 |
| *Percent of total days* | 47% |

**Other days**

| | Significance Level |
| --- | --- |
| | 5% |
| Days | 1,108 |
| **Significant Abnormal Return Days** | 72 |
| *Percent of total days* | 6% |

45.     My results are consistent with the hypothesis that there is a cause-and-effect relationship between information revealed on Release Days and CCA's stock price movements. From a statistical perspective, the proportion of Release Days with statistically significant abnormal returns (47%) is higher than the proportion of statistically significant abnormal returns on all other trading days (6%) at the 5 percent significance level.[58] Such results directly support a conclusion that CCA's share price responded to new information throughout the Class Period, and therefore, CCA's shares traded in an efficient market.

---

[58]     This result holds across alternative estimation windows of three months and six months as well as across abnormal return significance levels of one percent and ten percent. The results indicate that large abnormal returns are much more common on Release Days (when financial results were announced) than on non-Release Days, as would be expected in an efficient market. Chi-squared and Fisher's exact tests confirm the statistical significance of the difference in the frequency of occurrences. Under both tests, the null hypothesis is that Release Days are *not* more likely than non-Release Days to have abnormally large price returns.



<p align="center">Appendix C</p>

#### d) Conclusion

46.     My analysis of CCA's abnormal returns during the Class Period demonstrates that CCA's shares responded quickly and systematically to new information about the company, which directly supports a conclusion that CCA's common stock traded in an efficient market during the Class Period in a manner that can be considered as having arisen from a cause and effect relationship.

### B.     Additional Indicators of Market Efficiency

47.     In addition to those factors identified in *Cammer*, I understand courts have considered other factors when assessing market efficiency.

#### 1)     Market Capitalization and Public Float

48.     The size of a stock's market capitalization and public float have been found to be indicators of market efficiency, as larger companies are more likely to be traded and a larger public float may represent greater trading opportunities for sophisticated investors.[59]

49.     On every day throughout the Class Period, CCA's market capitalization exceeded $2.4 billion with no less than 97.9 million shares outstanding on every trading day.[60] CCA was included in the S&P Midcap 400 index which represents a widely used proxy for mid-cap U.S. equities.[61]

50.     CCA's public float as a percent of total shares outstanding remained above 97.6 percent throughout the Class Period.[62] As discussed in relation to *Cammer* factor 4, CCA had sufficient public float to file a Form S-3 throughout the Class Period.

51.     CCA's large market capitalization and public float throughout the Class Period further supports the evidence that CCA traded in an efficient market for CCA stock during the Class Period.

---

[59]     *Krogman*, 202 F.R.D. at 477-78; *Unger v. Amedisys Inc.*, 401 F.3d at 323; *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 502 (S.D. Fla. 2003).
[60]     CCA historical market capitalization and shares outstanding as reported by Bloomberg. Market capitalization represents the market value of a company's issued and outstanding stock. CFA Institute, *CFA Program Curriculum Level I Volume 5: Equity and Fixed Income 2019*, Wiley, at p. 44.
[61]     S&P 400 (^MID) > Key Developments for the period from 1/1/2008 to 11/2012; "CoreCivic Investor FAQs at http://ir.corecivic.com/investor-faqs; S&P Capital IQ; CCA Press release, "CCA to Be Added to the MSCI US REIT Index (RMZ) as of the Close of February 28, 2013," February 14, 2013.
[62]     Free float percentage calculated from Bloomberg data. Free float percentage defined as the number of shares of public float (*i.e.*, shares that are readily and freely tradable) expressed as a percentage of shares outstanding. CFA Institute, *CFA Program Curriculum Level I Volume 5: Equity and Fixed Income 2019*, Wiley, at 165.



<u>Appendix C</u>

**2)    Bid-Ask Spread**

52.    The bid-ask spread for a security is the difference between the price that a buyer is willing to pay and the price that a seller is willing to accept.[63]  Stocks trading at high volumes with multiple market makers tend to have many ready buyers and sellers, such that bid-ask spreads are smaller than those of more thinly traded stocks, which tend to have fewer market participants and larger bid-ask spreads.

53.    Certain courts have established threshold values for bid-ask spreads that are deemed to weigh in favor of market efficiency.  For instance, the court in *Cheney* found that a bid-ask spread of 2.44 percent weighed in favor of market efficiency.[64]

54.    Bloomberg reports that the average bid-ask spread for CCA stock for each trading day during the Class Period averaged 0.045 percent.[65]  CCA's narrow bid-ask spread is consistent with evidence that its shares traded in an efficient market.

**3)    Statistical Properties of Stock Returns (Autocorrelation)**

55.    Econometric techniques can be used to evaluate market efficiency by assessing whether lagged price returns are predictors of future price returns (*i.e.*, whether price returns are autocorrelated).  If share price returns systematically predict returns on the next day, then investors could, in theory, profitably trade on past market data, implying that the market for that stock is not efficient.[66]

56.    I test for autocorrelation in CCA returns by examining the relationship between each day's share price return and the return on the previous day using regression analysis.  I find no statistically significant relationship, indicating that price returns cannot be predicted from previous days' returns.  This is consistent with a stock that traded in an efficient market. [67]

57.    When news released into the market affects the stock price unpredictably over time and in a non-systematic manner—that is, when returns respond quickly to new information—the price series is said to have what is known as a "unit root."[68]  The presence of a unit root suggests that historical information does not have a persistent effect on returns.[69]  The Augmented Dickey-Fuller test evaluates the presence

---

[63]   CFA Institute, *CFA Program Curriculum Level I Volume 5: Equity and Fixed Income 2019*, Wiley, at 44.
[64]   *Cheney*, 213 F.R.D. at 501.
[65]   CCA bid-ask spread percent as reported by Bloomberg.
[66]   *See, e.g.*, Campbell, John Y.; Lo, Andrew W.; MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton University Press, 1997, at p. 22.
[67]   In regression analysis, the null hypothesis being tested is that the coefficient on the independent variables is zero.  In this case, the coefficient on the independent variable is insignificant, indicating the data are consistent with the null hypothesis (that the coefficient is zero and that the prior day's return has no impact on the current day's return).  Pindyck, Robert S. and Rubinfeld, Daniel L., *Econometric Models and Economic Forecasts*, 4th ed., The McGraw-Hill Companies, Inc., 1998, at p. 43.
[68]   *Stata Time Series Reference Manual Release 15* (2017), "Augmented Dickey-Fuller unit root test," at p. 157.
[69]   See, for instance, Campbell, John Y.; Lo, Andrew W.; MacKinlay, A. Craig, *The Econometrics of Financial Markets,* Princeton University Press, 1997, at p. 30.



**Appendix C**

of a "unit root" in a time-series.[70]  Performing the Augmented Dickey-Fuller on CCA's stock price during the Class Period indicates that CCA's price series has a unit root, which is consistent with the evidence that CCA's stock traded in an efficient market.[71]

### 4)    Lack of Constraints on Short Selling

58.    I understand that the presence of short sellers is another factor that courts have considered as evidence of market efficiency.[72]  Short sellers increase trading volumes and enhance the ability of a market to adjust for new information (*e.g.* as a check on share prices).

59.    Constraints on short sellers, all else equal, would reduce market participation and potentially affect market efficiency.  To assess whether short-selling constraints exist, regulatory agencies rely on certain factors, including "fails-to-deliver" in a short transaction.  The SEC requires self-regulating organizations (like the NYSE) to maintain lists of "threshold securities" that may have heightened risk of short sale constraints.[73]  A threshold security is one that meets the following criteria:

   a.    There is an aggregate fail to deliver position at a registered clearing agency for five consecutive settlement days;[74]

   b.    There are aggregate fails to deliver at a registered clearing agency of 10,000 shares or more per security;[75] and

   c.    The level of fails is equal to at least one-half of one percent of the issuer's total shares outstanding.[76]

60.    The SEC tracks the total fails-to-deliver shares for each security.  While some level of delivery failures is common, the SEC tracks securities with delivery failures exceeding one-half of one percent for more than five consecutive settlement dates.[77]  As shown in the chart below, CCA was below the threshold established by the SEC on all trading days during the Class Period.

---

[70]   Dickey, David, and Fuller, Wayne, "Distribution of the Estimators for Autoregressive Time Series with a Unit Root," *Journal of the American Statistical Association*, Vol. 74, Issue 366 (June 1979), at 427-431.

[71]   The Augmented Dickey Fuller test evaluates the presence of a unit root in a time-series.  The null hypothesis being tested is that a unit root exists.  In this case, the test suggests the presence of a unit root in CCA's stock price *series* and rejects the premise a unit root exists in CCA's stock price *returns*.

[72]   *See, e.g., Schleicher v. Wendt*, 618 F.3d 679, 685 (7th Cir. 2010); *Barclays*, 310 F.R.D. at 81 n.77.

[73]   *See, e.g.*, Intercontinental Exchange, NYSE Regulation Threshold Securities, *available at* https://www.nyse.com/regulation/threshold-securities (last visited July 27, 2020); Nasdaq Trader, Nasdaq Threshold List, available at https://www.nasdaqtrader.com/trader.aspx?id=RegSHOThreshold (last visited July 27, 2020).

[74]   In the context of short selling, fails-to-deliver shares "represent the aggregate net balance of shares that failed to be delivered as of a particular settlement date."  SEC, Fails-to-Deliver Data, *available at* https://www.sec.gov/data/foiadocsfailsdatahtm (last visited July 27, 2020); SEC, Threshold Securities, available at https://www.sec.gov/answers/threshold.htm (last visited July 27, 2020).

[75]   SEC, Threshold Securities, available at https://www.sec.gov/answers/threshold.htm (last visited July 27, 2020).

[76]   SEC Rule 203(c)(6).

[77]   SEC Rule 203(c)(6).



**Chart C-2.   CCA Failed-to-Deliver Shares** [78]



61.    The SEC also notes that securities designated as "threshold securities" tend to have higher fees.[79]   High fees can also limit short selling by consuming profits and deterring investors who might otherwise engage in short transactions. CCA was not on the threshold list during the Class Period and, therefore, was less likely to have high shorting fees during the Class Period.

62.    With few delivery failures and the lack of a threshold security designation, there is no evidence of short sale constraints for CCA common stock during the Class Period.  This further supports the inference that CCA traded in an efficient market.

---

[78]    SEC, Fails-to-Deliver Data, *available at* https://www.sec.gov/data/foiadocsfailsdatahtm (last visited July 27, 2020); shares outstanding as reported by Bloomberg.

[79]    *In the Matter of Gary S. Bell*, SEC Release No. 65941, December 13, 2011 (noting that "threshold securities are hard-to-borrow and therefore command large fees in the stock loan market").



### Appendix C

C.    **Conclusion**

63.    I understand courts have not established a single test to determine whether a security trades in an efficient market; rather, a finding of market efficiency is based on multiple factors.[80]  **Table 2** summarizes my findings for each of the above factors.

**Table C-2.    Summary of Market Efficiency Findings**

| Factor | Results During Class Period | Supports EMH |
|---|---|---|
| ***Cammer* Factors** | | |
| Stock trading volume | 4.1 percent average weekly turnover during Class Period | Yes |
| Number of analysts following stock | ~ 5 analysts covering in any week, 11 total throughout Class Period | Yes |
| Market makers and institutional investors | At least five market makers and numerous institutional holders | Yes |
| Eligibility to file an S-3 registration statement | Yes, eligible, and actually did file an S-3 during the Class Period | Yes |
| Cause-and-effect relationship between events and stock price movements | Statistically significant differences between Release Days and non-Release Days | Yes |
| **Other Factors** | | |
| Market capitalization | > $2.4 billion | Yes |
| Bid-ask spread | Average spread of 0.045 percent | Yes |
| Stock's float | > 97.6% of shares publicly floated | Yes |
| Statistical properties | No indication of autocorrelation in returns; unit root illustrates no persistence of historical information in returns | Yes |
| Constraints on short selling | No evidence of constraints | Yes |

64.    Shares that trade in an efficient market do not necessarily have to meet each of the above criteria.  Shares of CCA common stock, however, met each of these criteria throughout the Class Period.  In my opinion, CCA stock traded in an efficient market, which is supported by my analysis of the *Cammer* and other factors.

---

80    *Cammer*, 711 F. Supp. at 1287.



## Appendix D

### I.    BOP Contracts' Contribution to FFO Per Share

1.    To estimate the value of the BOP contracts that would have been removed from CCA's share price if CCA had disclosed the allegedly concealed risks about its BOP relationship, I start by examining the earnings contribution of its BOP facilities.  It is this expected earnings stream that would have been a basis for the value of these contracts in the counterfactual.

2.    For the purpose of this analysis, I refer primarily to expected FFO, as this is a measure of earnings that is closely related to cash and one on which CCA and covering analysts consistently focused around the time of the corrective disclosures.  I begin with the evidence provided by CCA in regard to earnings from these facilities at the times of the corrective disclosures:

    a.    With respect to the Cibola facility, CCA disclosed at the time of the Cibola Contract Loss that its FFO contribution per share was approximately $0.04 per year.[1]

    b.    With respect to the remaining BOP facilities at the time of the Yates Memorandum (Adams, McRae, and Eden), CCA did not disclose FFO contribution associated with these facilities. The morning after the Yates Memorandum, however, CCA disclosed that "[t]hese contracts represent approximately $131.2 million in annual revenues, or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio average."[2]  Applying CCA's estimate of seven percent to CCA's consensus FFO of $2.55 before the Yates Memorandum suggests that these remaining facilities would have contributed about $0.18 per share per year to FFO.

3.    A review of analyst reports suggests that analysts generally attributed a higher FFO contribution to the Adams, McRae, and Eden facilities.  This is consistent with the notion that analysts would have assessed marginal, rather than average, earnings contributions from CCA's BOP facilities.  As CCA explained in its public filings:

> The operation of the facilities we own carries a higher degree of risk associated with a facility contract than the operation of the facilities we manage but do not own because we incur significant capital expenditures to construct or acquire facilities we own. Additionally, correctional and detention facilities have limited or no alternative use. Therefore, if a contract is terminated on a facility we own, we continue to incur certain operating expenses, such as real estate taxes, utilities, and insurance.[3]

---

[1]    CoreCivic, Inc. Second Quarter 2016 Earnings Call dated August 4, 2016 at pp. 11 and 14.  The transcript describes the reduction as both 4 cents in FFO and 4 cents in EBITDA.

[2]    CCA Form 8-K dated August 19, 2016.

[3]    CCA 2015 Form 10-K.



<u>**Appendix D**</u>

4.      Accordingly, I have examined analyst reports and changes in expected FFO at the time of the Yates Memorandum for the analysts covering CCA.

**A.      Canaccord Genuity**

5.      The October 5, 2015 Canaccord analyst report directly estimated annualized FFO per share contribution of each facility.[4]  The estimates are presented in the table below:

**Table D-1.     Canaccord Genuity FFO Estimates for Adams, McRae, and Eden (Oct-15)**

| Facility | Location | Contract Renewal Date | Est. Annualized FFO/sh. Contribution | Pct. Est. Annualized FFO/sh. Contribution |
|---|---|---|---|---|
| Adams County Correctional | Natchez, MS | July 2017 | $0.16 | 40.0% |
| McRae Correctional Facility | McRae, GA | November 2016 | $0.14 | 35.0% |
| Eden Detention Center | Eden, TX | April 2017 | $0.10 | 25.0% |
| **Total** | | | **$0.40** | |

6.      I note that the FFO contributions in the above table are proportional to each facility's design capacity (in terms of bed count), with Adams, McRae, and Eden accounting for 2,232, 1,978, and 1,422 beds, respectively.[5]

7.      Following the Yates Memorandum, on August 23, 2016, Canaccord updated its normalized FFO forecast for 2017 to assume that the three BOP prison contracts would not be renewed upon expiration.[6]  The following table summarizes changes in Canaccord's estimates.

---

[4]   Cannacord Genuity, "Behind the Bars: Bi-Weekly Prison Update 10-5-15," October 5, 2015, at Figure 3.
[5]   Cannacord Genuity, "Behind the Bars: Bi-Weekly Prison Update 10-5-15," October 5, 2015, at Figure 3.
[6]   Cannacord Genuity, " Private Prisons Aren't Going Anywhere, but Risks Could Continue to Weigh on Stocks," August 23, 2016, p. 8.  The impact of the renegotiation of the South Texas Family Residential Facility contract and closure of the Cibola facility are previously addressed in Canaccord's August 4, 2016 update (Cannacord Genuity, "2Q Review: STFRC Renegotiation Ambiguity Limits Near-term Upside; Reiterate HOLD," August 4, 2016, pp. 4-5), such that this revision reflects updated expectations following the Yates Memorandum.



<u>Appendix D</u>

Table D-2. **Canaccord Genuity Post Yates Memorandum Revisions**

|  | 2017E<br>As of 8/4/2016 | 2017E<br>As of 8/23/2016 | Change in<br>Estimate |
|---|---|---|---|
| Year-End Owned Bed Count | 68,952 | 63,320 | (5,632) |
| Adjusted EBITDA | $382.0M | $330.2M | ($51.8M) |
| FFO | $266.7M | $215.0M | ($51.7M) |
| FFO per Share | $2.26 | $1.82 | ($0.44) |

8. Using the forecasted full year 2017 data, the implied annual FFO impact of the loss of CCA's remaining three BOP contracts is approximately $0.44 per share. The full year forecast, however, includes contribution attributable to the Eden and Adams facilities through the end of their contracts in April 2017 and July 2017, respectively. Annualizing the forecast revision from Q3-Q4 2017E implies that these facilities accounted for approximately $0.52 of FFO.[7]

Table D-3. **Canaccord Genuity Post Yates Memorandum FFO Revisions (Annualized)**

|  | 3Q-4Q 2017E<br>As of 8/4/2016 | 3Q-4Q 2017E<br>As of 8/23/2016 | Change in<br>Estimate | Annualized<br>Change[8] |
|---|---|---|---|---|
| FFO per Share | $1.16 | $0.90 | ($0.26) | ($0.52) |

9. Together, estimates from Canaccord analyst reports imply a range of annualized FFO per share contributions of $0.40 to $0.52 for the McRae, Eden, and Adams facilities.

**B. SunTrust**

10. SunTrust issued an analyst report dated September 1, 2016. In this report, SunTrust updated its 2017 financial estimates for CCA from a previous report dated August 4, 2016.[9] A summary of the changes are presented in the table below:

---

[7] Cannacord Genuity, "2Q Review: STFRC Renegotiation Ambiguity Limits Near-term Upside; Reiterate HOLD," August 4, 2016, at p. 8 and Cannacord Genuity, " Private Prisons Aren't Going Anywhere, but Risks Could Continue to Weigh on Stocks," August 23, 2016, at p. 19. This approach would not account for seasonal or other assumptions Canaccord made when forecasting on a quarterly basis.

[8] Change in Estimate annualized based on 365 day year.

[9] SunTrust Robinson, "Renegotiation With ICE Ongoing; Remain Neutral," August 4, 2016, at p. 3 and SunTrust Robinson, "CXW, GEO - Lowering Estimates & PTs Amid Political Shift," September 1, 2016, at p.13. While SunTrust issued a report for CCA on August 19, 2016, it did not include updated financial projections.



### Appendix D

### Table D-4.    SunTrust Post Yates Memorandum Revisions

| | 2017E As of 8/4/2016 | 2017E As of 9/1/2016 | Change in Estimate |
|---|---|---|---|
| Total Revenue | $1,851.2M | $1,611.7M | ($239.5M) |
| Operating Income | $292.5M | $212.4M | ($80.2M) |
| EBITDA | $464.7M | $384.8M | ($79.9M) |
| Normalized FFO Per Share | $2.64 | $1.97 | ($0.67) |
| Adjusted FFO Per Share | $2.56 | $1.89 | ($0.67) |

11.     SunTrust noted that it maintains its neutral rating due to: "(1) risk to the dividend (currently $2.16 annually or 110% of our $1.97 FFO estimate in '17); (2) our expectation for the lucrative South Texas family detention contract with ICE to be renegotiated and cut EBITDA by 10%; and (3) Prop 57 to change sentencing and parole in CA and put 5% or more of EBITDA at risk in 2017."[10]

12.     In addition, estimated BOP revenue was assumed to decline by approximately $50 million in 2017 as part of the update, making up 20.9% of the estimated $239 million reduction in revenue.[11] Allocating the total estimated change in FFO per share of $0.67 to the BOP business segment using this 20.9% yields an estimated decline of $0.14 FFO per share attributable the approximately $50 million BOP revenue reduction.[12]

13.     Given that the $50 million estimated decline in 2017 BOP revenue is only a portion of the total BOP revenue, the total per share contribution to FFO of the BOP business may be estimated by extrapolating the reduction in revenue to the full business line. Using total annual BOP revenue associated with the three facilities of approximately $131.2 million, a $50 million reduction is roughly 38.1% of total revenue. [13] Put differently, SunTrust estimated a decline in BOP revenue of approximately 38.1% after the release of the Yates Memo.  Such a reduction is commensurate with a $0.14 per share annual FFO reduction.  Extrapolating the $0.14 per share contribution based on a full reduction of $131.2 million in BOP revenue would yield a corresponding annual FFO per share reduction of $0.37 associated with the full revenue of the three BOP facilities.[14]

---

[10]  SunTrust Robinson, "CXW, GEO - Lowering Estimates & PTs Amid Political Shift," September 1, 2016, p.1.

[11]  SunTrust Robinson, "CXW, GEO - Lowering Estimates & PTs Amid Political Shift," September 1, 2016, pp.2 and 5.

[12]  $0.67 X 20.9% = $0.14.  According to CCA on August 19, 2016, "[t]hese contracts represent approximately $131.2 million in annual revenues, or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio average" (CCA Form 8-K dated August 19, 2016).

[13]  CCA Form 8-K dated August 19, 2016.

[14]  $0.14 / 38.1% = $0.37



## Appendix D

### C. Wells Fargo

14. In a Wells Fargo analyst report dated August 19, 2016, the potential impact of the DOJ announcement on BOP performance is discussed. Namely, the update provides revised estimates assuming a loss of the Eden Detention Center at time of renewal and bidding of the CAR XVI contracts.

15. Using the quarterly data provided in the earlier August 10, 2016 and the August 19, 2016 update, the impact of the loss of the Eden contract can be quantified as beginning in the second quarter of 2017:[15]

**Table D-5. Wells Fargo Post Yates Memorandum Revisions**

| | 2Q-4Q 2017E As of 8/10/2016 | 2Q-4Q 2017E As of 8/19/2016 | Change in Estimate |
|---|---|---|---|
| Total Revenue | $1,353.5M | $1,322.5M | ($31.0M) |
| NOI | $409.7M | $399.4M | ($10.3M) |
| EBITDA | $329.2M | $320.7M | ($8.5M) |
| FFO | $220.6M | $212.5M | ($8.1M) |
| FFO per Share | $1.877 | $1.808 | ($0.069) |

16. Annualized, the total reduction in revenue and FFO per share attributable to the Eden facility are calculated as approximately $41.1 million and $0.092, respectively.[16] The Eden facility therefore represented approximately 31.3% of total BOP revenues on a base of $131.2 million.[17] As such, the implied FFO/AFFO per share contribution of the three total BOP facilities is $0.29.[18] Alternatively, assuming the Eden facility comprised approximately 25 percent of FFO for the three facilities, based on bed count, this would imply total FFO associated with the three facilities of approximately $0.37.[19]

### D. Summary

17. The following table summarizes the FFO per share contribution calculated for the McRae, Eden, and Adams BOP facilities based on analyst reports:

---

15 Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To Limit Upside," August 10, 2016, at p.2 and Wells Fargo Securities, "DOJ Creates Uncertainty Around Private Corrections, "August 19, 2016, p.2.

16 Quarters 2 through 4 of 2017 represent 275 days of a 365 day year.

17 CCA Form 8-K dated August 19, 2016.

18 $0.092 / 31.3% = $0.29.3.

19 $0.092 / 25.0% = $0.36.7.

<u>Appendix D</u>

**Table D-6.    Analysts' Implied FFO Estimates for Adams, McRae, and Eden**

|  | Canaccord | SunTrust | Wells Fargo |
|---|---|---|---|
| FFO per Share Attributable to BOP | $0.40 - $0.52 | $0.37 | $0.29 - $0.37 |

18.    Based on my review of analyst reports and changes in analysts' expectations, Canaccord Genuity's October 2015 report that Adams, McRae, and Eden contributed $0.40 to CCA's FFO is a reasonable estimate of these facilities' FFO contribution at the time of the Yates Memorandum.

**II.    BOP Contracts' Contribution to CCA's Counterfactual Value**

19.    While earnings associated with the BOP contracts would have been the same in the counterfactual, the value of these earnings would have been substantially different, since CCA would have disclosed significant risks associated with its BOP relationship.  As a result, the value of earnings from the BOP contracts, as reflected in CCA's share price, would have been significantly lower in the counterfactual in which these risks had been known.

20.    To estimate the value of CCA's BOP contracts in the counterfactual, I have assessed the value of the BOP contracts based on the following counterfactual inputs, which I understand plaintiff expects to demonstrate:

  a.    the BOP contracts' residual FFO contribution through the contract terms consistent with plaintiff's contention that CCA could not have reasonably expected to retain its BOP relationship after the end of the contracts;

  b.    the counterfactual multiple of FFO that would have been associated with the BOP contracts consistent with plaintiff's contention that CCA should have disclosed that it was unlikely to renew its BOP contracts or win any competitive bids.

**A.    Remaining value of the BOP contracts**

21.    In the counterfactual, it is my understanding that plaintiff contends that CCA could not have reasonably expected to retain its BOP contracts at the end of their terms and would have met its obligation to disclose this information to its shareholders.  Market participants, therefore, would not have expected CCA to retain its BOP contracts as they approached renewal or expiration.

## Appendix D

22.     Before the corrective disclosures in August 2016, all four of the BOP contracts were up for renewal within one year.[20] If the market expected that none of these contracts would be renewed, then the value of these contracts reflected in the share price would be less than their expected annual contributions to FFO, which as previously discussed was approximately $0.44 ($0.40 for Adams, McRae, and Eden plus $0.04 for Cibola), as each contract would be expected to expire within the year.

23.     It is possible that market participants would have expected some portion of the BOP earnings stream to be renewed, based on the BOP having renewed certain contracts during the Class Period.  I understand, however, that CCA's likelihood of winning a contract through a competitive bidding process (as opposed to the BOP exercising an option to renew) for any of its BOP facilities was even lower than its likelihood of having a contract renewed.  At the time of the corrective disclosures, CCA had not won a competitive BOP bid since 2011 and had lost its bid for the Northeast Ohio facility.[21]  Therefore, at most, a reasonable assumption is that market participants would only have placed a value on the FFO expected through the end of each of the BOP contracts, as set forth in the following table.

**Table D-7.     CCA BOP Contracts' Remaining FFO and Value as of August 2016**[22]

|  | Exp. | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | Total |
|---|---|---|---|---|---|---|---|---|---|
| McRae | Nov-22 | $0.05 | $0.14 | $0.14 | $0.14 | $0.14 | $0.14 | $0.12 | $0.88 |
| Adams | Jul-19 | 0.06 | 0.16 | 0.16 | 0.08 | 0.00 | 0.00 | 0.00 | 0.46 |
| Eden | Apr-17 | 0.04 | 0.02 | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | 0.06 |
| Cibola | Sep-20 | 0.01 | 0.04 | 0.04 | 0.04 | 0.03 | 0.00 | 0.00 | 0.16 |
| **Total** |  | $0.16 | $0.36 | $0.34 | $0.26 | $0.17 | $0.14 | $0.12 | $1.56 |
| **Discounted Value**[23] |  | $0.16 | $0.33 | $0.29 | $0.20 | $0.11 | $0.09 | $0.07 | **$1.25** |
| *Cibola* |  | $0.01 | $0.04 | $0.03 | $0.03 | $0.02 | $- | $- | **$0.13** |
| *Adams/McRae/Eden* |  | $0.15 | $0.30 | $0.25 | $0.17 | $0.10 | $0.09 | $0.07 | **$1.12** |
| **Discount Rate**[24] |  | 10.4% |  |  |  |  |  |  |  |
| **Growth Rate** |  | 1.0% |  |  |  |  |  |  |  |

---

[20]  Cibola County Corrections Center in September 2016, McRae Correctional Facility in November 2016, Eden Detention Center in April 2017, and Adams County Corrections Center in July 2017.  Corrections Corporation of America Form 10-K for period ending December 31, 2015, pp. 14-17.

[21]  Corrections Corporation of America Form 10-K for period ending December 31, 2011 through 2016.

[22]  Details of these calculations are provided in my reliance materials.

[23]  Discounted Value assessed using a mid-period convention.

[24]  As set forth in my reliance materials, other earnings capitalization assumptions (discount and growth rates) consistent with CCA's FFO multiple do not materially affect these results.



**Appendix D**

24.     The value of remaining term of the BOP contracts at the time of the corrective disclosures would tend to overstate their counterfactual value.  Not only does this analysis assume that the BOP was expected to exercise all renewal options, but the discount rate applied to FFO reflects CCA's actual discount rate before the Yates Memorandum.  In the counterfactual, the discount rate applied to expected BOP cash flows would be higher to account for CCA's higher risk profile as well as the additional risk associated with its BOP contracts.

**B.     Counterfactual FFO multiple**

25.     In addition to measuring the actual value of the BOP contracts, one may also look to valuation principles to estimate the counterfactual valuation multiple that would be applied to earnings from the BOP contracts.   From an economic perspective, CCA's purported customer retention rate was directly linked to its value.  As CCA explained in its public filings:

> …a majority of our contracts have terms between one and five years, and we have historically experienced customer retention of approximately 90%, which contributes to our relatively predictable and stable revenue base. This stream of revenue combined with our low maintenance capital expenditure requirement translates into steady predictable cash flow.[25]

26.     CCA also referred to purported retention rates in excess of 90 percent on its earnings calls.[26] Analysts covering CCA echoed management's comments, referring to the company's high retention rates.[27] Based on my review, neither CCA nor analysts distinguished the risk to the BOP relationship stemming from CCA's performance issues from the general risks associated with CCA's overall business.  Similarly, I have seen no evidence to suggest that market participants understood that the likelihood of renewing earnings from the BOP was lower than what CCA reported for the rest of its business.

27.     In the counterfactual world, however, market participants would have held a different view of expected retention rates associated with CCA's BOP contracts.   Contrary to CCA's representations regarding its retention rates, I understand that CCA should have known that the likelihood of renewing its BOP contracts was low.   As such, I understand that plaintiff contends CCA should have disclosed to investors that it was unlikely to renew its BOP contracts or win any competitive bids.  From an economic

---

[25]   Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 17.  *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 17; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 20; CoreCivic, Inc. Form 10-K for period ending December 31, 2016, p. 23.

[26]   *See, for instance,* Corrections Corporation of America, Q2 2013 Earnings Call, Aug 08, 2013, p. 8; Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014, p. 9; Corrections Corporation of America, Q2 2014 Earnings Call, Aug 07, 2014, p. 5; Corrections Corporation of America, Q1 2016 Earnings Call, May 05, 2016, p. 14.

[27]   *See, for instance,* Wells Fargo, "CXW: Initiating Coverage With A Market Perform Rating," December 19, 2014; Cannacord Genuity, "Positive on Prison REITs: We're dancin' to the Jailhouse Rock," July 13, 2015, at p. 23; Macquarie Capital (USA), "Federal Contract Escapes CXW," December 29, 2014.



**Appendix D**

perspective, this suggests that CCA's expected retention rate with respect to its BOP contracts would have been less than 50 percent.

28.     By examining CCA's valuation multiple, one can infer the valuation parameters associated with its BOP contracts.  Using this information, it is possible to derive what CCA's counterfactual multiple would have been if the company had disclosed counterfactual, rather than purported, retention rates for these contracts.

### 1)     CCA's actual valuation parameters

29.     Before the corrective disclosures, CCA's business was characterized by relatively stable cash flow expectations and dividend payments.[28]  When a company has positive earnings, it is typical to apply a multiple to expected earnings, as analysts often did for CCA, in order to arrive at a value.[29]  Embedded in such a multiple are the parameters that affect a stock's price, which, in instances where earnings are relatively stable, can reasonably be reflected in the widely-used Gordon growth model:

$$P/E = \frac{(1 + g)}{(r - g)}$$

*Where:*
$\quad P$ = Value
$\quad E$ = Expected earnings/cash in the current period
$\quad r$ = Cost of capital
$\quad g$ = Expected growth rate

30.     For earnings streams with expectations of customer or contract attrition, the above formula may be expanded to reflect the likelihood of losing customers or contracts from which earnings are generated (a form of negative growth), as well as adding new customers or contracts to replace those that are lost (a form of positive growth), in addition to growth associated with overall price levels.

$$P/E = \frac{(1 + g) * (1 - a + n)}{(r - ((1 + g) * (1 - a + n) - 1))}$$

*Where:*
$\quad P/E$ = Earnings multiple
$\quad r$ = Cost of capital
$\quad g$ = Expected growth rate
$\quad a$ = Expected attrition rate = $(1 - c) * p$

*Where:*
$\quad c$ = Retention rate for earnings subject to renewal
$\quad p$ = Proportion of earnings subject to renewal in each period

---

[28]   Analysts routinely applied multiples in order to estimate CCA's value during the Class Period, typically to CCA's FFO.

[29]   Pratt, S. P.; Niculita, A. V. (2008). Chapter 10. In *Valuing a Business: The analysis and appraisal of closely held companies*. New York: McGraw-Hill Education.



## Appendix D

$n$ = Expected replacement rate

31.    Note that when the rate of replacement offsets the rate of attrition, such that $n = a$, then the above formula reduces to the Gordon growth model.

32.    In the case of CCA, the above parameters are directly observable and may be used to understand how they affected the value of CCA's BOP relationship during the Class Period.

$P/E$ :    As set forth in **Exhibit 5**, CCA's actual multiple of its consensus FFO was approximately 10.7x prior to the Yates Memorandum. This multiple implies a combination of $r$ and $g$ based on the above Gordon growth model specification. While I estimate values for these parameters for the purpose of completeness, the results of this analysis are not sensitive to the combination of $r$ and $g$ used to derive the multiple.

$g$ :    As a mature steady-state company, CCA's steady-state expected growth rate would have been less than 3 percent, which is consistent with analysts' views and long-term inflation expectations.[30] For the purpose of this analysis, I assumed a growth rate of 1 percent.

$r$ :    The above FFO multiple and growth rate imply a cost of equity of approximately 10.4 percent, which is generally consistent with analysts' expectations.[31]

$a$ :    Attrition is the product of the likelihood that an earnings stream will not be renewed and the likelihood that the earnings stream is up for renewal in a given period, or $(1 - c) * p$.

$c$ :    CCA repeatedly stated that its retention rate exceeded 90%, referring to historical performance.[32] It is therefore reasonable that market participants would have expected a retention rate of at least 90% for CCA's BOP business.

$p$ :    At the time of the corrective disclosures, CCA's BOP contracts were up for renewal or rebid every two years. This suggests that market participants would have viewed 50 percent of CCA's BOP revenue as subject to renewal each year.[33]

---

[30]    *See, for example*, estimated terminal growth rates of 1.0 percent, 3.0 percent, and 2.0 percent in Cannacord Genuity, "2Q Review: STFRC Renegotiation Ambiguity Limits Near-term Upside; Reiterate HOLD," August 4, 2016, at p.5, Cannacord Genuity, "1Q Review: Strong Print as Occupancy Gains, Diversification Drive Value; Reiterate HOLD," May 5, 2016 at p.2, and Cannacord Genuity, " Takeaways from Meetings with Management: Cash Flow Risk Lower than Perceived" March 21, 2016 at p.4, respectively. *See also*, 1.9 percent market yield on U.S. Treasury securities at 20-year constant maturity, as reported in the Federal Reserve's H.15 report on August 17, 2016 (https://www.federalreserve.gov/datadownload/Choose.aspx?rel=H15).

[31]    *See, for example*, Cannacord Genuity, "2Q Review: STFRC Renegotiation Ambiguity Limits Near-term Upside; Reiterate HOLD," August 4, 2016, at p. 5 and Cannacord Genuity, "1Q Review: Strong Print as Occupancy Gains, Diversification Drive Value; Reiterate HOLD," May 5, 2016 at p.6.

[32]    Corrections Corporation of America, Q2 2013 Earnings Call, Aug 08, 2013, p. 8; Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014, p. 9; Corrections Corporation of America, Q2 2014 Earnings Call, Aug 07, 2014, p. 5; Corrections Corporation of America, Q1 2016 Earnings Call, May 05, 2016, p. 14.

[33]    CCA 2015 Form 10-K.



$n$ : Although analysts sometimes incorporated earnings from specific contract wins/losses into earnings projections, they generally assumed that earnings remained stable.[34] Thus, by applying a growth assumption greater than zero to CCA's current earnings, market participants assumed that CCA would to be able to replace the 10 percent (or less) of contracts that it failed to renew.[35]

33. These parameters are reflected in the following equation, which reflect CCA's multiple just prior to the corrective disclosures.[36]

$$10.7x = \frac{(1 + 1.0\%) * (1 - 5.0\% + 5.0\%)}{(10.4\% - ((1 + 1.0\%) * (1 - 5.0\% + 5.0\%) - 1))}$$

*Where:*
$$r = 10.4\%$$
$$g = 1.0\%$$
$$a = (1 - c) * p = (1 - 90.0\%) * 50.0\% = 5.0\%$$
$$n = a = 5.0\%$$

34. The above specification reflects the value of a steady-state, low-growth business, such as CCA's BOP relationship. This value assumes a high earnings retention rate of 90%, with earnings losses of about 5% per year offset by replacements at the same rate.

### 2) Counterfactual valuation of CCA's BOP business

35. In the counterfactual, I understand that CCA would have been unable to contend that its likelihood of retaining its BOP contract was more that 50%. Replacing retention rate in the above equation with 50%, holding all other parameters the same, yields:[37]

$$2.7x = \frac{(1 + 1.0\%) * (1 - 25.0\% + 5.0\%)}{(10.4\% - ((1 + 1.0\%) * (1 - 25.0\% + 5.0\%) - 1))}$$

*Where:*
$$r = 10.4\%$$
$$g = 1.0\%$$
$$a = (1 - c) * p = (1 - 50.0\%) * 50.0\% = 25.0\%$$
$$n = 5.0\%$$

36. The above specification would tend to overstate the valuation multiple associated with CCA's BOP contracts to the extent it holds CCA's percentage replacement rate constant when, in the counterfactual, market participants would not have expected replacement of the BOP contracts.

---

[34] **Exhibit 4**.
[35] Consistent with an assumed retention rate of at least 90 percent.
[36] As set forth in my reliance materials, these parameters can also be applied using an expanded discounted cash flow model, since it is equivalent to applying the Gordon growth model in this context.
[37] As set forth in my reliance materials, these parameters can also be applied using an expanded discounted cash flow model, since it is equivalent to applying the Gordon growth model in this context.



<u>**Appendix D**</u>

37.    Applying the multiple of 2.7x as derived in the equation above to FFO associated with the BOP contracts suggests that the counterfactual values for the BOP contracts reflected in CCA's counterfactual share price would have been approximately:

      a.   $1.08 for Adams, McRae, and Eden (2.7 times $0.40)

      b.   $0.11 for Cibola (2.7 times $0.04).



**Exhibit 1**
**Nikki Bollinger Grae, et al. v. Corrections Corporation Of America, et al.**
**Summary of Abnormal Share Price Returns - Cibola Closure**

|  | Event Windows (1) | | |
| --- | --- | --- | --- |
|  | August 02, 2016 | August 03, 2016 | August 04, 2016 |
| **Parameter Estimates:** | | | |
| S&P 500 Total Return Index | (0.121) | (0.121) | (0.121) |
| FTSE NAREIT Equity REITS Index | 0.853*** | 0.853*** | 0.853*** |
| S&P Midcap 400 Commercial Services & Supplies Index | 0.295** | 0.295** | 0.295** |
| Constant (Intercept) | (0.001) | (0.001) | (0.001) |
| **Benchmark Log Returns:** | | | |
| S&P 500 Total Return Index | (0.64%) | 0.34% | 0.05% |
| FTSE NAREIT Equity REITS Index | (1.55%) | (0.58%) | (0.26%) |
| S&P Midcap 400 Commercial Services & Supplies Index | (0.62%) | (0.79%) | (0.18%) |
| **Abnormal Return Calculation:** | | | |
| Predicted Log Return for CCA | (1.51%) | (0.85%) | (0.36%) |
| Actual Log Return for CCA | (2.11%) | (2.64%) | (6.39%) |
| Abnormal Log Return for CCA | (0.61%) | (1.79%) | (6.03%)*** |
| Predicted Nominal Return for CCA | (1.49%) | (0.85%) | (0.35%) |
| Actual Nominal Return for CCA | (2.09%) | (2.61%) | (6.19%) |
| Abnormal Nominal Return for CCA | (0.60%) | (1.77%) | (5.85%) |
| CCA Previous Day Closing Price ($USD) | $32.54 | $31.86 | $31.03 |
| **Per Share Abnormal Return** | **($0.20)** | **($0.57)** | **($1.82)** |

**Sources and notes:**
Share prices, adjusted share prices, and index data provided by Bloomberg, L.P.
Asterisks next to abnormal returns represent significance levels based on a two-tailed test: * p<0.10, ** p<0.05, *** p<0.01.
(1) Estimation Window of July 31, 2015 to August 1, 2016.



**Exhibit 2**
**Nikki Bollinger Grae, et al. v. Corrections Corporation Of America, et al.**
**Summary of Abnormal Share Price Returns - Yates Memo**

| | Event Window (1) | | |
| --- | --- | --- | --- |
| | August 18, 2016 | August 19, 2016 | Total |
| **Parameter Estimates:** | | | |
| S&P 500 Total Return Index | (0.142) | (0.142) | |
| FTSE NAREIT Equity REITS Index | 0.860*** | 0.860*** | |
| S&P Midcap 400 Commercial Services & Supplies Index | 0.313*** | 0.313*** | |
| Constant (Intercept) | (0.001) | (0.001) | |
| **Benchmark Log Returns:** | | | |
| S&P 500 Total Return Index | 0.22% | (0.13%) | |
| FTSE NAREIT Equity REITS Index | (0.22%) | (0.66%) | |
| S&P Midcap 400 Commercial Services & Supplies Index | 1.01% | 0.47% | |
| **Abnormal Return Calculation:** | | | |
| Predicted Log Return for CCA | 0.03% | (0.47%) | |
| Actual Log Return for CCA | (43.78%) | 8.24% | |
| Abnormal Log Return for CCA | (43.80%)*** | (8.72%)*** | (35.09%) |
| Predicted Nominal Return for CCA | 0.03% | (0.47%) | |
| Actual Nominal Return for CCA | (35.45%) | 8.59% | |
| Abnormal Nominal Return for CCA | (35.47%) | 9.11% | (29.59%) |
| CCA Previous Day Closing Price ($USD) | | | $27.22 |
| **Per Share Abnormal Return** | | | ($8.06) |

**Sources and notes:**
Share prices, adjusted share prices, and index data provided by Bloomberg, L.P.
Asterisks next to abnormal returns represent significance levels based on a two-tailed test: * p<0.10, ** p<0.05, *** p<0.01.
(1) Estimation Window of August 18, 2015 to August 17, 2016.



**Exhibit 3**
**Nikki Bollinger Grae, et al. v. Corrections Corporation Of America, et al.**
**CCA Share Price Over the 90-day Period Following Corrective Disclosures**

| Calendar Day | Date | Price (Unadjusted) | $ Δ Price (Daily) | % Δ Price (Daily) | $ Δ Price (Cumulative) | % Δ Price (Cumulative) | Cumulative Average Price |
|---|---|---|---|---|---|---|---|
| 1 | 8/19/2016 | $ 19.08 | $ - | 0.0% | $ - | 0.0% | $ 19.08 |
| 4 | 8/22/2016 | $ 19.36 | $ 0.28 | 1.5% | $ 0.28 | 1.5% | $ 19.22 |
| 5 | 8/23/2016 | $ 18.40 | $ (0.96) | (5.0%) | $ (0.68) | (3.6%) | $ 18.95 |
| 6 | 8/24/2016 | $ 18.00 | $ (0.40) | (2.2%) | $ (1.08) | (5.7%) | $ 18.71 |
| 7 | 8/25/2016 | $ 18.14 | $ 0.14 | 0.8% | $ (0.94) | (4.9%) | $ 18.60 |
| 8 | 8/26/2016 | $ 17.51 | $ (0.63) | (3.5%) | $ (1.57) | (8.2%) | $ 18.42 |
| 11 | 8/29/2016 | $ 16.79 | $ (0.72) | (4.1%) | $ (2.29) | (12.0%) | $ 18.18 |
| 12 | 8/30/2016 | $ 16.02 | $ (0.77) | (4.6%) | $ (3.06) | (16.0%) | $ 17.91 |
| 13 | 8/31/2016 | $ 15.93 | $ (0.09) | (0.6%) | $ (3.15) | (16.5%) | $ 17.69 |
| 14 | 9/1/2016 | $ 15.64 | $ (0.29) | (1.8%) | $ (3.44) | (18.0%) | $ 17.49 |
| 15 | 9/2/2016 | $ 16.05 | $ 0.41 | 2.6% | $ (3.03) | (15.9%) | $ 17.36 |
| 19 | 9/6/2016 | $ 16.05 | $ - | 0.0% | $ (3.03) | (15.9%) | $ 17.25 |
| 20 | 9/7/2016 | $ 16.01 | $ (0.04) | (0.2%) | $ (3.07) | (16.1%) | $ 17.15 |
| 21 | 9/8/2016 | $ 16.07 | $ 0.06 | 0.4% | $ (3.01) | (15.8%) | $ 17.08 |
| 22 | 9/9/2016 | $ 15.49 | $ (0.58) | (3.6%) | $ (3.59) | (18.8%) | $ 16.97 |
| 25 | 9/12/2016 | $ 15.53 | $ 0.04 | 0.3% | $ (3.55) | (18.6%) | $ 16.88 |
| 26 | 9/13/2016 | $ 15.36 | $ (0.17) | (1.1%) | $ (3.72) | (19.5%) | $ 16.79 |
| 27 | 9/14/2016 | $ 16.02 | $ 0.66 | 4.3% | $ (3.06) | (16.0%) | $ 16.75 |
| 28 | 9/15/2016 | $ 16.20 | $ 0.18 | 1.1% | $ (2.88) | (15.1%) | $ 16.72 |
| 29 | 9/16/2016 | $ 16.12 | $ (0.08) | (0.5%) | $ (2.96) | (15.5%) | $ 16.69 |
| 32 | 9/19/2016 | $ 16.60 | $ 0.48 | 3.0% | $ (2.48) | (13.0%) | $ 16.68 |
| 33 | 9/20/2016 | $ 15.80 | $ (0.80) | (4.8%) | $ (3.28) | (17.2%) | $ 16.64 |
| 34 | 9/21/2016 | $ 15.70 | $ (0.10) | (0.6%) | $ (3.38) | (17.7%) | $ 16.60 |
| 35 | 9/22/2016 | $ 16.34 | $ 0.64 | 4.1% | $ (2.74) | (14.4%) | $ 16.59 |
| 36 | 9/23/2016 | $ 15.90 | $ (0.44) | (2.7%) | $ (3.18) | (16.7%) | $ 16.56 |
| 39 | 9/26/2016 | $ 15.96 | $ 0.06 | 0.4% | $ (3.12) | (16.4%) | $ 16.54 |
| 40 | 9/27/2016 | $ 14.78 | $ (1.18) | (7.4%) | $ (4.30) | (22.5%) | $ 16.48 |
| 41 | 9/28/2016 | $ 14.60 | $ (0.18) | (1.2%) | $ (4.48) | (23.5%) | $ 16.41 |
| 42 | 9/29/2016 | $ 13.82 | $ (0.78) | (5.3%) | $ (5.26) | (27.6%) | $ 16.32 |
| 43 | 9/30/2016 | $ 13.87 | $ 0.05 | 0.4% | $ (5.21) | (27.3%) | $ 16.24 |
| 46 | 10/3/2016 | $ 14.08 | $ 0.21 | 1.5% | $ (5.00) | (26.2%) | $ 16.17 |
| 47 | 10/4/2016 | $ 14.00 | $ (0.08) | (0.6%) | $ (5.08) | (26.6%) | $ 16.10 |
| 48 | 10/5/2016 | $ 13.76 | $ (0.24) | (1.7%) | $ (5.32) | (27.9%) | $ 16.03 |
| 49 | 10/6/2016 | $ 13.67 | $ (0.09) | (0.7%) | $ (5.41) | (28.4%) | $ 15.96 |
| 50 | 10/7/2016 | $ 13.45 | $ (0.22) | (1.6%) | $ (5.63) | (29.5%) | $ 15.89 |
| 53 | 10/10/2016 | $ 13.45 | $ - | 0.0% | $ (5.63) | (29.5%) | $ 15.82 |
| 54 | 10/11/2016 | $ 13.40 | $ (0.05) | (0.4%) | $ (5.68) | (29.8%) | $ 15.76 |
| 55 | 10/12/2016 | $ 14.36 | $ 0.96 | 7.2% | $ (4.72) | (24.7%) | $ 15.72 |
| 56 | 10/13/2016 | $ 14.23 | $ (0.13) | (0.9%) | $ (4.85) | (25.4%) | $ 15.68 |
| 57 | 10/14/2016 | $ 14.22 | $ (0.01) | (0.1%) | $ (4.86) | (25.5%) | $ 15.64 |
| 60 | 10/17/2016 | $ 14.35 | $ 0.13 | 0.9% | $ (4.73) | (24.8%) | $ 15.61 |
| 61 | 10/18/2016 | $ 14.55 | $ 0.20 | 1.4% | $ (4.53) | (23.7%) | $ 15.59 |

bvagroup®

**Exhibit 3**
**Nikki Bollinger Grae, et al. v. Corrections Corporation Of America, et al.**
**CCA Share Price Over the 90-day Period Following Corrective Disclosures**

| Calendar Day | Date | Price (Unadjusted) | $ Δ Price (Daily) | % Δ Price (Daily) | $ Δ Price (Cumulative) | % Δ Price (Cumulative) | Cumulative Average Price |
|---|---|---|---|---|---|---|---|
| 62 | 10/19/2016 | $ 14.06 | $ (0.49) | (3.4%) | $ (5.02) | (26.3%) | $ 15.55 |
| 63 | 10/20/2016 | $ 13.70 | $ (0.36) | (2.6%) | $ (5.38) | (28.2%) | $ 15.51 |
| 64 | 10/21/2016 | $ 13.99 | $ 0.29 | 2.1% | $ (5.09) | (26.7%) | $ 15.48 |
| 67 | 10/24/2016 | $ 13.72 | $ (0.27) | (1.9%) | $ (5.36) | (28.1%) | $ 15.44 |
| 68 | 10/25/2016 | $ 13.76 | $ 0.04 | 0.3% | $ (5.32) | (27.9%) | $ 15.40 |
| 69 | 10/26/2016 | $ 13.63 | $ (0.13) | (0.9%) | $ (5.45) | (28.6%) | $ 15.37 |
| 70 | 10/27/2016 | $ 13.35 | $ (0.28) | (2.1%) | $ (5.73) | (30.0%) | $ 15.32 |
| 71 | 10/28/2016 | $ 13.18 | $ (0.17) | (1.3%) | $ (5.90) | (30.9%) | $ 15.28 |
| 74 | 10/31/2016 | $ 14.45 | $ 1.27 | 9.6% | $ (4.63) | (24.3%) | $ 15.26 |
| 75 | 11/1/2016 | $ 14.06 | $ (0.39) | (2.7%) | $ (5.02) | (26.3%) | $ 15.24 |
| 76 | 11/2/2016 | $ 13.88 | $ (0.18) | (1.3%) | $ (5.20) | (27.3%) | $ 15.22 |
| 77 | 11/3/2016 | $ 14.15 | $ 0.27 | 1.9% | $ (4.93) | (25.8%) | $ 15.20 |
| 78 | 11/4/2016 | $ 14.56 | $ 0.41 | 2.9% | $ (4.52) | (23.7%) | $ 15.18 |
| 81 | 11/7/2016 | $ 14.36 | $ (0.20) | (1.4%) | $ (4.72) | (24.7%) | $ 15.17 |
| 82 | 11/8/2016 | $ 14.19 | $ (0.17) | (1.2%) | $ (4.89) | (25.6%) | $ 15.15 |
| 83 | 11/9/2016 | $ 20.31 | $ 6.12 | 43.1% | $ 1.23 | 6.4% | $ 15.24 |
| 84 | 11/10/2016 | $ 19.81 | $ (0.50) | (2.5%) | $ 0.73 | 3.8% | $ 15.32 |
| 85 | 11/11/2016 | $ 19.44 | $ (0.37) | (1.9%) | $ 0.36 | 1.9% | $ 15.39 |
| 88 | 11/14/2016 | $ 20.80 | $ 1.36 | 7.0% | $ 1.72 | 9.0% | $ 15.48 |
| 89 | 11/15/2016 | $ 20.42 | $ (0.38) | (1.8%) | $ 1.34 | 7.0% | $ 15.56 |
| 90 | 11/16/2016 | $ 20.65 | $ 0.23 | 1.1% | $ 1.57 | 8.2% | $ 15.64 |

**Sources and notes:**
CCA share prices provided by Bloomberg, L.P.



**Exhibit 4**
**Nikki Bollinger Grae, et al. v. Corrections Corporation Of America, et al.**
CCA Consensus FTM FFO per Share



$ Price per Share

— Analyst Consensus FFO/Share    — Analyst Consensus FFO/Share (CapIQ)    — Price

**Sources and notes:**
CCA share prices provided by Bloomberg, L.P.
Consensus FTM FFO per Share calculated using analyst estimate data from analyst reports listed in Appendix B.

Exhibits - Page 5 of 6

**Exhibit 5**
**Nikki Bollinger Grae, et al. v. Corrections Corporation Of America, et al.**
CCA Consensus FTM FFO Multiple



Exhibits - Page 6 of 6

**Sources and notes:**
Consensus FTM FFO Multiple calculated using analyst estimate data from analyst reports listed in Appendix B.

