# EXHIBIT 6

NIKKI BOLLINGER GRAE, Individually and on
Behalf of All Others Similarly Situated,

       Plaintiffs,

vs.

CORRECTIONS CORPORATION OF AMERICA,
DAMON T. HININGER, DAVID M. GARFINKLE,
TODD J. MULLENGER, and HARLEY G. LAPPIN,

       Defendants.

Civil Action No. 3:16-cv-02267



Exhibit
543-Allen
10-14-20
MK

# REBUTTAL REPORT

## OF

# LUCY P. ALLEN

## September 18, 2020

# TABLE OF CONTENTS

I. Scope of Assignment ...................................................................................1

II. Qualifications and Remuneration .................................................................1

III. Materials Considered ...................................................................................1

IV. Summary of the Dalrymple Report...............................................................2

V. The Dalrymple Report fails to show or even analyze loss causation and damages from the alleged fraud.........................................................................................7

    A. Mr. Dalrymple does not analyze whether the alleged corrective disclosures revealed the alleged truth about the quality and costs of CoreCivic's facilities or actually corrected the alleged misrepresentations.........................................................7

    B. The alleged corrective disclosures are not consistent with the materialization of fraud-related cost and quality issues at CoreCivic, but instead are consistent with the materialization of a known risk about a shift in policy driven by politics...............8

    C. The same analysts that Mr. Dalrymple cites to show that quality and costs were "key" to CoreCivic's "value proposition" did not change their opinions about CoreCivic's quality and costs after the alleged corrective disclosures.......................11

    D. Mr. Dalrymple's claim that Plaintiffs' alleged damages were caused by a deterioration in CoreCivic's relationship with the BOP is belied by the fact that over 90% of his alleged inflation is due to non-BOP contracts ....................................16

    E. Mr. Dalrymple ignores market evidence demonstrating that the information allegedly concealed by CoreCivic was revealed to the market prior to the alleged corrective disclosures ...........................................................................................18

        1. Mr. Dalrymple performs no analysis of the market reaction to the OIG Report ...18

        2. Mr. Dalrymple ignores the analysis of Plaintiffs' previous expert Dr. Feinstein, who argued that the OIG Report was an alleged corrective disclosure and negatively impacted CoreCivic's stock price ...............................21

        3. Mr. Dalrymple ignores the lack of market reaction to disclosures of quality-related issues at CoreCivic's facilities that Plaintiffs allege were concealed by the alleged fraud.........................................................................................21

    F. Mr. Dalrymple's analysis, along with not being linked to the alleged fraud, suffers from additional substantive deficiencies....................................................................22

        1. Mr. Dalrymple's analysis fails to account for the fact that the Cibola facility was contracted by another government agency soon after the non-renewal of the BOP contract ..........................................................................................22

        2. Mr. Dalrymple's analysis fails to account for the facts that the Yates Memo was rescinded, CoreCivic's stock price recovered, and CoreCivic's facilities

continued to be contracted by government agencies, including the BOP, after the Class Period....................................................................................................23

3. Mr. Dalrymple's analysis does not account for the fact that controlling for peer movements (GEO) yields no reaction in CoreCivic's stock price following the Yates Memo.........................................................................................26

4. Correcting Mr. Dalrymple's analysis to use consistent data substantially reduces his estimates of alleged inflation ...........................................................26

# I.    SCOPE OF ASSIGNMENT

1.      I have been asked by counsel for Defendants to review and comment on the Expert Report of W. Scott Dalrymple, dated August 7, 2020 ("Dalrymple Report").

2.      I have previously submitted a report on loss causation in this matter, dated August 7, 2010 ("Allen Loss Causation Report"). Nothing in the Dalrymple Report causes me to change any of the findings in the Allen Loss Causation Report, including my finding that there is no loss causation and no damages from the alleged fraud, but it does provide additional evidence in support of my analysis.

3.      I have also submitted two reports on price impact in this matter, dated July 16, 2018 ("Allen Price Impact Report") and November 21, 2018 ("Allen Price Impact Supplemental").

# II.    QUALIFICATIONS AND REMUNERATION

4.      My qualifications and remuneration were set forth in the Allen Loss Causation Report.

# III.    MATERIALS CONSIDERED

5.      In preparing this report, I considered the materials previously considered in the Allen Loss Causation report. I also considered the following additional materials:

a)  Expert Report of W. Scott Dalrymple, dated August 7, 2020 ("Dalrymple Report"), including exhibits, appendices and materials relied upon;

b)  Expert Report of Donna Mellendick, dated August 7, 2020 ("Mellendick Report"), including materials relied upon;

c)  Plaintiff's Objections and Responses to Defendant CoreCivic, Inc's First Set of Requests for Admission to Plaintiff, dated May 1, 2020; and

d)  Plaintiff's Objections and Responses to Defendant CoreCivic, Inc's Second Set of Interrogatories to Plaintiff, dated May 1, 2020.

1

## IV. SUMMARY OF THE DALRYMPLE REPORT

6. Mr. Dalrymple was asked to "analyze and quantify" the inflation in CoreCivic's stock price during the Class Period as a result of Defendants' alleged misrepresentations and omissions.[1] Mr. Dalrymple's analysis and findings can be summarized as follows:

a) Mr. Dalrymple states that the alleged misrepresentations related to the quality and cost effectiveness of CoreCivic's facilities,[2] and that these issues were "key" to the market's valuation of CoreCivic's stock;[3]

b) Without analysis, Mr. Dalrymple adopts Plaintiffs' claim that the truth about the alleged misrepresentations was revealed on two corrective disclosure dates – the August 3, 2016 Cibola non-renewal announcement and the August 18, 2016 Yates Memo.[4] Mr. Dalrymple analyzes and measures the price reaction for just these two dates, ignoring all other relevant events, including the OIG Report;[5] and

c) Mr. Dalrymple attempts to adjust his estimates of the price reactions to exclude the impact of factors other than the revelation of the alleged fraud, ostensibly leaving

---

[1] Dalrymple Report, ¶1 ("I have been retained by Robbins Geller Rudman & Dowd LLP in the above-styled case to analyze and quantify the effect of plaintiff's allegations that the Defendants engaged in a scheme to defraud investors and made materially false and misleading statements and omissions regarding CCA's business and operations that led to artificially inflated share prices between February 27, 2012 and August 17, 2016 (the 'Class Period').").

[2] Dalrymple Report, ¶18 ("I understand that plaintiff alleges that CCA engaged in a scheme to mislead investors with claims that their services 'were of a high quality, specifically, in the eyes of their government clients.' CCA allegedly conveyed that its "cost-effective" offerings "provide quality corrections services" and 'offer a compelling value.'")

[3] Dalrymple Report, ¶¶22-28 ("From an economic perspective, CCA's ability to operate within applicable policies and contractual requirements while delivering high quality services and cost savings to its customers was key to its value proposition. During the Class Period, CCA repeatedly claimed that it operated its correctional services in compliance with the policies and procedures of its governmental customers. [...] Analysts covering CCA echoed management's comments, referring to the company's high retention rates[.]").

[4] Dalrymple Report, ¶50 ("I understand plaintiff alleges, inter alia, that information contained in the Yates Memorandum and the Cibola Contract Loss (which was referenced in the Yates Memorandum) were corrective disclosures that revealed to the market relevant information that had been previously withheld.")

Note that although Mr. Dalrymple states that the Cibola alleged corrective disclosure occurred on August 4, 2016, the announcement that Plaintiffs cite was actually made on August 3, after market hours. See, "CCA Reports Second Quarter 2016 Financial Results, Increases Full Year 2016 Financial Guidance," *Globe Newswire*, August 3, 2016, 4:15 p.m.

[5] Dalrymple Report, ¶51 ("While the information contained in the OIG Review also related to certain information allegedly concealed in this matter, it is my understanding that plaintiff contends that this information did not reveal the truth about the concealed risks.").

2

only the portion due to the allegedly concealed cost and quality issues at CoreCivic's facilities. Mr. Dalrymple states that this remaining price drop represents the inflation and damages caused by the alleged misrepresentations.[6]

7.    Mr. Dalrymple concludes that the total inflation in CoreCivic's stock price due to the alleged misrepresentations is $6.94 per share, with $6.62 due to the Yates Memo and $0.32 due to the Cibola non-renewal.[7] Details of Mr. Dalrymple's calculations are as follows.

8.    First, Mr. Dalrymple uses an event study to measure the price reaction following the August 3, 2016 Cibola non-renewal announcement and the August 18, 2016 Yates Memo.

9.    For the August 3 newly alleged corrective disclosure, Mr. Dalrymple finds, consistent with the Allen Loss Causation Report, that the information regarding the Cibola non-renewal that Plaintiffs claim was announced on August 3, 2016 was in fact announced to the market earlier – in a news article published on August 1, after market close, and repeated in another news article published the next day, August 2.[8] In addition, Mr. Dalrymple finds, also consistent with the Allen Loss Causation Report, that there was no statistically significant decline in CoreCivic's stock price following the earlier news of the Cibola non-renewal.[9]

10.    Given the lack of a statistically significant price reaction, Mr. Dalrymple relies on Company statements and analyst valuations to conclude that the loss of the Cibola contract had a negative $0.46 effect on CoreCivic's stock price. Mr. Dalrymple obtains this figure by

---

[6] Dalrymple Report, ¶11 ("I have measured the loss caused by the materialization of the allegedly concealed risks by reference to the share price reactions corresponding to the corrective disclosures, adjusting for the impact of factors other than the revelation of allegedly concealed risks.").

[7] Dalrymple Report, Table 5. Note that Mr. Dalrymple does not analyze when this amount of inflation first entered CoreCivic's stock price or whether it changed over time.

[8] Dalrymple Report, ¶53 ("It appears that news of the Cibola Contract Loss was first published in a news article after market close on August 1, 2016 by a local Albuquerque news station, followed by another news story on August 2, 2016 in the Gallup Independent, a local newspaper in Gallup, New Mexico."). See, also, Allen Loss Causation Report, ¶¶78-79.

[9] Dalrymple Report, ¶53. See, also, Allen Loss Causation Report, ¶81.

Mr. Dalrymple used the S&P 500 Total Return Index to control for market movements, and the S&P Midcap 400 Commercial Services & Supplies Index and FTSE NAREIT All Equity REITs Index (excluding CoreCivic) to control for industry movements. Mr. Dalrymple used a rolling control period of 252 trading days (approximately one year) prior to each day tested, and excluded from his control periods CoreCivic's earnings and guidance announcements during the Class Period. See, Dalrymple Report, ¶¶46-48. See, also, Dalrymple Report, Appendix C, ¶¶29-31, 38-39.

multiplying $0.04 (the per share reduction in FY16 funds from operation ("FFO")[10] from the loss of the Cibola contract[11]) by 11.5 (the FFO multiple that CoreCivic's stock was trading at around the time of the alleged corrective disclosure[12]). Note, however, that according to Mr. Dalrymple's event study, CoreCivic's stock price reaction was less than $0.46 on August 2, 2016 following the earlier news of the Cibola non-renewal.[13]

11.     For the August 18 alleged corrective disclosure, Mr. Dalrymple finds that there was a statistically significant decline in CoreCivic's stock price on August 18, 2016, after the release of the Yates Memo, followed by a statistically significant stock price increase the next day, August 19.[14] According to the Dalrymple Report, "[t]he evidence indicates that the entirety of the share price decline on August 18, 2016 as well as the increase on August 19, 201[6] was driven by the Yates Memorandum and reactions to this announcement."[15] Mr. Dalrymple concludes that the Yates Memo overall had a negative $8.06 effect on CoreCivic's stock price over the two-day period August 18-19.[16]

12.     Second, Mr. Dalrymple attempts to adjust his price reactions to exclude the impact of factors other than the revelation of the alleged fraud. According to Mr. Dalrymple, even if CoreCivic had disclosed the extent of the allegedly concealed risks, the "near certainty" of the BOP contract losses would not have been fully anticipated at the beginning of the Class

---

[10]  FFO is a measure of a real estate investment trust's cash flow and operating performance. CoreCivic began operating as a real estate investment trust ("REIT") on January 1, 2013. See, "Corrections Corp of America Completes Internal Reorganization," *Reuters Significant Developments*, January 2, 2013 and CoreCivic FY2015 Form 10-K, filed February 25, 2016, pp. 5, 85.

[11]  Dalrymple Repot, ¶68 ("When the Cibola Contract Loss was announced, however, CCA stated that the loss reduced quarterly FFO by $0.01 per share and expected annual FFO by $0.04 per share. For the purpose of this analysis, $0.04 per share is a reasonable estimate of the reduction in FFO expectations associated with the Cibola Contract Loss."). See, also, CoreCivic 2Q16 earnings conference call, August 4, 2016 ("Q. For your Cibola County contract that was lost, in guidance are you guys assuming that FFO contribution there is kind of loss on September 30 or do you have some kind of other – what's the ramp down of that? […] A. It's about $0.04 impact. So, our $0.01 per share in the fourth quarter is pretty representative for our full year.").

[12]  Mr. Dalrymple uses a multiple of CoreCivic's stock price to analysts' next 12 months FFO estimates. See, Dalrymple Report, ¶69 and Exhibit 5.

[13]  In particular, according to Mr. Dalrymple's event study, CoreCivic's stock price decline, after controlling for market and industry movements, was just $0.20 on August 2, 2016 – less than half the $0.46 stock price effect he calculates for the loss of the Cibola contract. See, Dalrymple Report, Exhibit 1.

[14]  Dalrymple Report, ¶¶55, 59.

[15]  Dalrymple Report, ¶77.

[16]  Dalrymple Report, ¶78.

Period, and the announcements on the alleged corrective disclosure dates would still have caused the stock price to decline.[17] Thus, Mr. Dalrymple calculates inflation by subtracting the "counterfactual value" of CoreCivic's BOP contracts (*i.e.*, the value but-for the alleged misrepresentations) from the price drops following the alleged corrective disclosures.

13.     According to Mr. Dalrymple, this "counterfactual value" represents the additional amount that CoreCivic's stock price declined due to the BOP contracts relative to the non-BOP contracts. For the Yates Memo, the counterfactual value is $1.44. To obtain this figure, Mr. Dalrymple takes CoreCivic's estimate that the three remaining BOP contracts at the time of the Yates Memo (Adams, Eden and McRae) made up 7% of the Company's revenue,[18] and then calculates what the dollar price decline would have been if the stock had only declined by 7% and ended up at the same level (*i.e.*, at a closing price of $19.08) after the Yates Memo.[19]

14.     For the Cibola non-renewal, the counterfactual value is $0.14. To obtain this figure, Mr. Dalrymple first calculates (using analyst estimates) that the Cibola contract was worth 10% in FFO relative to the other three BOP contracts (Adams, Eden and McRae),[20] and then multiplies this 10% by the $1.44 counterfactual value for the Yates Memo.[21]

15.     The figure below illustrates Mr. Dalrymple's calculation of alleged inflation and damages from the two alleged corrective disclosures:

---

[17]  Dalrymple Report, ¶82 ("It is possible that the share price would have declined in response to the Cibola Contract Loss and Yates Memorandum, even in the counterfactual in which CCA had disclosed the extent of the allegedly concealed risks. In this counterfactual, market participants still would have reassessed the value of CCA's BOP contracts (which would have been lower since CCA would have disclosed the extent of the risks), such that the Cibola Contract Loss and Yates Memorandum still would have changed the (relatively high) likelihood of losing these contracts to an even higher likelihood (or near certainty). In other words, in the counterfactual, the realization of the disclosed risks could have had a (smaller) negative effect on the price of CCA's shares than the impact of these announcements attributable to the corrective disclosures.").

[18]  Dalrymple Report, ¶84, citing CoreCivic Form 8-K, filed August 19, 2016 ("At this time the contracts at the three facilities CCA operates on behalf of the BOP remain unchanged, and the BOP will determine whether to extend these contracts at the end of their respective contract terms. These contracts represent approximately $131.2 million in annual revenues, or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio average.").

[19]  CoreCivic's closing price was $19.08 on August 19, 2016, after the Yates Memo. In the Dalrymple Report's counterfactual, the stock price prior to the Yates Memo would have been $20.52 ($19.08 ÷ [100% − 7%]). $20.52 minus $19.08 equals $1.44.

[20]  Calculated by dividing the $0.04 per share reduction in FY16 FFO by the $0.40 in FFO per share for the three BOP contracts estimated by Canaccord Genuity analysts in their October 5, 2015 report. See, Dalrymple Report, ¶85.

[21]  10% × $1.44 equals $0.14.

### *Dalrymple Alleged Inflation Calculation*



16.     As discussed in the sections below, there are a number of issues with Mr. Dalrymple's analysis and calculations. Most importantly, Mr. Dalrymple does not analyze whether the alleged corrective disclosures revealed the alleged truth about the quality and costs of CoreCivic's facilities and/or actually corrected the alleged misrepresentations – the failure of which renders his calculations meaningless. In addition, Mr. Dalrymple ignores the allegations in the Complaint, the analysis of Plaintiffs' previous expert, Dr. Feinstein, as well as market evidence demonstrating that the information allegedly concealed by CoreCivic was revealed to the market prior to the alleged corrective disclosures (including by the OIG Report).

17.     Furthermore, even if Mr. Dalrymple's analysis were linked to the alleged misrepresentations (which it is not), there are additional substantive deficiencies in his calculations of alleged inflation. Mr. Dalrymple's calculations fail to account for several factors, including, for example, peer movements and the rescission of the Yates Memo, and his calculations are based on inputs that are inconsistent with each other. Correcting Mr. Dalrymple's calculations to account for these factors and to use consistent data substantially reduces and/or eliminates any alleged damages arising from his analysis.

## V. THE DALRYMPLE REPORT FAILS TO SHOW OR EVEN ANALYZE LOSS CAUSATION AND DAMAGES FROM THE ALLEGED FRAUD

### A. Mr. Dalrymple does not analyze whether the alleged corrective disclosures revealed the alleged truth about the quality and costs of CoreCivic's facilities or actually corrected the alleged misrepresentations

18.     Mr. Dalrymple does not analyze whether the alleged corrective disclosures revealed the alleged truth about the quality and costs of CoreCivic's facilities and/or actually corrected the alleged misrepresentations. In fact, Mr. Dalrymple does not even meaningfully address the specific alleged misrepresentations. Instead, Mr. Dalrymple's analysis is limited to examining whether there were stock price drops following the two alleged corrective disclosure dates provided to him by Plaintiffs (which were not the original set of disclosures claimed in the Complaint).[22] This is a fundamental flaw in Mr. Dalrymple's analysis, since he provides no analysis showing that the specific alleged misrepresentations and omissions *caused* the price drops and Plaintiffs' losses on these dates. Further, as discussed below, Mr. Dalrymple ignores market evidence demonstrating that the information allegedly concealed by CoreCivic was revealed to the market prior to his chosen alleged corrective disclosures (including by the OIG Report).[23] Mr. Dalrymple's calculations, as presented, are meaningless in the absence of any

---

[22]    Dalrymple Report, ¶¶1, 10-11. Mr. Dalrymple measures the price reaction following two corrective disclosures – the Yates Memo and the Cibola non-renewal announcement – but ends up not even using the price drop on the date that Plaintiffs claim the Cibola news came out. Instead, Mr. Dalrymple agrees with my analysis showing that the Cibola news was released earlier and to no statistically significant price reaction. See, Dalrymple Report, ¶53 and Allen Loss Causation Report, ¶¶78-81.

As discussed in the Allen Loss Causation Report, the price decline on the date Plaintiffs claim as the Cibola alleged corrective disclosure was not due to the Cibola announcement or the correction of the alleged misrepresentations, but rather was due to information unrelated to the alleged fraud. In particular, the price decline on August 4, 2016, following the alleged corrective disclosure, was due to news of the renegotiation of CoreCivic's South Texas Family Residential Center ("STFRC") contract – an ICE contract that was around twice as large as all of CoreCivic's BOP contracts combined and over ten times larger in profits than the BOP Cibola contract. See, for example, Allen Loss Causation Report, ¶¶23, 82-83.

[23]    Note that although Mr. Dalrymple states that "the corrective disclosure must contain information relevant to the alleged contraventions," he does not lay out any methodology or provide any analysis to make that determination in this case, and he does not explain why he chose to ignore other events, such as the OIG Report, that by his own admission "also related to certain information allegedly concealed in this matter." See, Dalrymple Report, ¶¶37, 51.

economic evidence of loss causation or analysis linking the alleged corrective disclosures to the alleged misrepresentations.[24]

19. In contrast, in the Allen Loss Causation Report, I affirmatively analyzed loss causation and damages from the alleged fraud. I analyzed both Plaintiffs' original claims in the Complaint and their new theory in the Motion for Reconsideration. I analyzed what information was allegedly false, when the alleged truth was purportedly revealed to the market and what information was alleged to be corrective. I examined whether there is evidence that the alleged misrepresentations inflated CoreCivic's stock price (*i.e.*, caused CoreCivic's stock price to be higher than it would have been absent the alleged misstatements), and whether there is evidence that the alleged misrepresentations caused CoreCivic's stock price to decline when corrected and investors to suffer losses. I analyzed whether there was any indication of a market reaction after the alleged corrective disclosures and/or when information corrective of the alleged misrepresentations was disclosed that could be attributed to the alleged misrepresentations, given Plaintiffs' claim of market efficiency. I found that there was no loss causation and no damages from the alleged fraud.

### B. The alleged corrective disclosures are not consistent with the materialization of fraud-related cost and quality issues at CoreCivic, but instead are consistent with the materialization of a known risk about a shift in policy driven by politics

20. Plaintiffs allege that misrepresentations about the quality and cost effectiveness of CoreCivic's facilities inflated the Company's stock price, and that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about the alleged misrepresentations was revealed to the market.[25] Rather than analyze Plaintiffs' claim of loss causation, Mr. Dalrymple assumes without analysis that the August 3 Cibola non-renewal and the August 18

---

[24] While Mr. Dalrymple states that his calculations would apply if the "trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud," neither Plaintiffs, Mr. Dalrymple, nor Plaintiffs' economic expert at class certification (Dr. Feinstein) have thus far provided any analysis or economic evidence of loss causation to aid that determination. See, Dalrymple Report, ¶98.

The lack of any economic analysis of loss causation or correctiveness is inconsistent with Plaintiffs' statement in their recent interrogatory responses that these issues would be addressed by "expert testimony and reports that will be produced at a later stage of this litigation." See, Plaintiff's Objections and Responses to Defendant CoreCivic, Inc's Second Set of Interrogatories to Plaintiff, dated May 1, 2020, pp. 145-147.

[25] Complaint, ¶¶116-117.

Yates Memo were "materialization[s] of the allegedly concealed risks."[26] However, the two alleged corrective disclosures that Mr. Dalrymple examines are not consistent with the materialization of fraud-related cost and quality issues at CoreCivic's facilities, but instead consistent with the materialization of a known risk about a shift in policy driven by politics.

21.     As shown in the Allen Loss Causation Report, there is no indication that the Yates Memo changed or "corrected" analysts' opinions of the quality or cost effectiveness of CoreCivic's facilities. Instead, analyst commentary demonstrates that the Yates Memo was considered by the market to signal a shift in policy driven by politics, and that this political shift (as opposed to any new information regarding the quality, performance and cost savings of CoreCivic's facilities) was the cause of the market reaction to the Yates Memo.[27] In fact, an analysis of reports by the same analysts cited by Mr. Dalrymple shows that these analysts considered the Yates Memo to signal a shift in policy driven by politics.[28] For example, the Canaccord Genuity analysts covering CoreCivic stated shortly after the Yates Memo that the "political environment" was a driver behind the decision in the Yates Memo to reduce the BOP's use of private prisons.

> **[W]e believe the political environment is a large factor and driver behind the DOJ's memo**. Given 4 – 5 years between now and some of these renewals, we believe the political landscape could be very different, limiting the impact on these contracts. [Canaccord Genuity, 8/23/16, emphasis added]

22.     Similarly, in a report published on September 1, 2016, around two weeks after the Yates Memo, the SunTrust analysts characterized the Yates Memo as a "political shift" and a "political push to sever ties with private prisons":

> **CXW [CoreCivic], GEO - Lowering Estimates & PTs Amid Political Shift** […]
>
> We believe the BOP itself is not going to be a fan of overcrowding its system to satisfy a political push to sever ties with private prisons. Overcrowding is the single metric that correlates best with incidents of violence, mortality and other disruptions often tabulated to compare quality of facilities. [SunTrust, 9/1/16, emphasis original]

---

26  Dalrymple Report, ¶¶11, 50.

27  Allen Loss Causation Report, ¶¶52-61.

28  Mr. Dalrymple cites the Canaccord Genuity and SunTrust analysts several times in his report, including for example in ¶¶25 and 73-74, and in Appendix D.

23.     Mr. Dalrymple also cites a report by Compass Point – an analyst whose reports I
did not have access to at the time of my previous report – issued right after the Yates Memo on
August 18. A review of the Compass Point report provides additional evidence showing that the
Yates Memo was considered to signal a shift in policy driven by politics. For example, the
Compass Point analysts stated that whether or not the recommendations in the Yates Memo
would be implemented depended on "political dynamics" and which presidential candidate
and/or political party was in power:

> How Would the Presidential Candidates Handle This? While we admittedly have
> little insight into how a Trump DOJ would handle for-profit prisons, **our sense is that
> a reversal of this policy would be likely**. We are far more confident that a Clinton
> DOJ would support this memo. […] What is Our Take? This policy shift is clearly a
> negative for the publicly-traded for-profit prison companies but it is far from a death
> sentence. **Our sense is that infrastructure limitation, political dynamics, and
> budgetary constraints will shield state-level contracts.** [Compass Point, 8/18/16,
> emphasis added]

24.     Further, the Compass Point analysts did not point to any new information about
CoreCivic's costs or quality in the Yates Memo – and in fact cited the OIG Report (one of
Plaintiffs' original corrective disclosures and a date that Mr. Dalrymple ignored) as providing the
necessary "political cover" for the Yates Memo:

> Our sense is that the August 9 report from the DOJ's Inspector General [the OIG
> Report] finding that contract prisons underperformed in a number of different
> categories provided the political cover necessary for this memo. [Compass Point,
> 8/18/16]

25.     Moreover, the fact that GEO's stock price dropped as much or more than
CoreCivic's stock price on the release of the Yates Memo is further evidence contrary to
Plaintiffs' and Mr. Dalrymple's claim that the Yates Memo disclosed CoreCivic-specific cost
and quality issues. Instead, the sharp decline in GEO's stock price following the Yates Memo, as
shown in the Allen Loss Causation Report,[29] supports the finding that changes in the political
environment and associated risk to CoreCivic's business, and *not* the alleged misrepresentations
about CoreCivic's operations, caused the market reaction to the Yates Memo.

26.     Thus, Mr. Dalrymple has failed to show that the alleged corrective disclosures are
materialization of CoreCivic-specific fraud-related cost and quality issues, while (i) the analyst

---

[29]   Allen Loss Causation Report, ¶¶75-76.

commentary discussed above, (ii) the decline in GEO's stock price, and (iii) the fact that neither Plaintiffs nor their experts have cited a single statement by any analyst indicating that the Yates Memo changed analysts' perceptions of the quality or cost-effectiveness of CoreCivic's facilities is consistent with the alleged corrective disclosures representing materializations of a known risk about a shift in policy driven by politics.

27.     Note that, as shown in the Allen Loss Causation Report, CoreCivic warned both prior to and during the Class Period that political opposition to privatized corrections and changes in government policy affecting incarceration rates were risks that could impact the Company's business.[30] In fact, the Company warned during the Class Period that declines in the federal prison population (primarily due to changes in sentencing guidelines for drug offenses) and reductions in overcrowding in BOP-operated facilities could negatively impact the Company's business.[31] The Yates Memo explicitly cited the decline in the federal prison population over prior years in part due to "the retroactive application of revised drug sentencing guidelines" as a key reason for directing the BOP to end its use of private prisons.[32]

**C.     The same analysts that Mr. Dalrymple cites to show that quality and costs were "key" to CoreCivic's "value proposition" did not change their opinions about CoreCivic's quality and costs after the alleged corrective disclosures**

28.     Mr. Dalrymple cites several analyst reports issued during the Class Period to support his claim that "high quality services and cost savings" were "key" to CoreCivic's "value proposition" and important to the market's valuation of CoreCivic's stock.[33] According to Mr. Dalrymple, analyst commentary on the quality and cost savings of CoreCivic's facilities was

---

[30]   Allen Loss Causation Report, ¶¶62-64.

[31]   Allen Loss Causation Report, ¶65.

[32]   Yates Memo, p. 1 ("Since then, for the first time in decades, the federal prison population has begun to decline, from nearly 220,000 inmates in 2013 to fewer than 195,000 inmates today. In part, this is due to several significant efforts to recalibrate federal sentencing policy, including the retroactive application of revised drug sentencing guidelines, new charging policies for low-level, non-violent drug offenders, and the Administration's ongoing clemency initiative."). See, also, Allen Loss Causation Report, ¶66.

[33]   Dalrymple Report, ¶22.

"generally positive" and that analysts "echoed" CoreCivic's statements, "in some cases citing the same study and evidence that [CoreCivic] promoted."[34]

29.     However, the same analysts that Mr. Dalrymple cites to show that quality and costs were "key" to CoreCivic's "value proposition" demonstrate that there is no loss causation and damages from the alleged fraud because these analysts did not change their opinions about CoreCivic's quality and costs after the alleged corrective disclosures.  If, as Mr. Dalrymple claims, the alleged corrective disclosures revealed new, negative information about CoreCivic's quality and costs that was contrary to the Company's prior representations, one would expect analysts to indicate a change in their opinions about the quality and cost effectiveness of CoreCivic's facilities. Thus, the fact that these analysts *did not* change their opinions about the quality or costs, and instead attributed the price decline following the Yates Memo to a policy shift driven by politics, is strong evidence that the alleged corrective disclosures were not corrective of the alleged misrepresentations, and thus, that there is no loss causation and no damages from the alleged fraud.

30.     As shown in the table below, the SunTrust and Canaccord Genuity analysts made statements after the alleged corrective disclosures about CoreCivic's quality and costs that were similar to the quotes during the Class Period cited by Mr. Dalrymple.[35]

---

[34]  Dalrymple Report, ¶25.

Note that Mr. Dalrymple also references CoreCivic's "historical customer retention rates" as being important to analysts, yet there is no allegation that the retention rates CoreCivic reported to the market were false or misleading. See, Dalrymple Report, ¶¶26-28.

[35]  Mr. Dalrymple also includes quotes from the Barclays and CRT analysts. Both analysts terminated coverage of CoreCivic before the end of the Class Period. See, Dalrymple Report, ¶25.

Note that all emphasis in the table is added.

| Analyst | Quote From Dalrymple Report | Similar Quote After Class Period |
|---------|------------------------------|-----------------------------------|
| SunTrust | **There is growing evidence that customers achieve cost savings.** The VERA Institute for Justice's recent report found fully loaded taxpayer costs were 14% higher than DOC budgets when including hidden costs shouldered by other departments (e.g. unfunded benefits, legal, and maintenance).<br><br>[SunTrust, 2/17/12; cited in Dalrymple Report, ¶25a] | Our analysis of new and recently proposed construction by government entities suggests an average cost of $212,000 per bed. The BOP is championing the most expensive project in Lechter County in Kentucky that could cost $370,000 per bed. Our analysis of recently developed private facilities indicates an average cost per bed of $60,000. **Private operators** are continually land banking real estate for future development, have shortened construction periods and **operate more efficiently across virtually every dimension of the project** with the notable exception of financing costs. They are unable to match the borrowing cost of customers.<br><br>[SunTrust, 9/1/16]<br><br>**Operating efficiencies are also tilted in favor of for-profit operators**. For example, the State of Ohio required a 7% reduction in operating expenses when it sold the Lake Erie facility to CXW several years ago under a long-term lease arrangement. The efficiencies and cost savings associated with private operators is often understated in our experience since customers rarely consider the costs of long-term liabilities such as pension and healthcare of unionized correctional employees.<br><br>[SunTrust, 9/1/16]<br><br>There are numerous states watching this process to see how they can finance replacement beds and >200K public prison beds that are over 75 years old. **Governments are wildly inefficient prison builders yielding an average per bed cost of $212K vs. $60K for CXW and GEO**. PA is a specific recent example where the state is two years late on completing a 4,000 bed facility. See our note on 9/1/16 for a contrast between government and private metrics.<br><br>[SunTrust, 5/22/17] |

| Analyst | Quote From Dalrymple Report | Similar Quote After Class Period |
|---|---|---|
| Canaccord Genuity | [O]n top of the capital deployment benefit there is also the potential for operating cost savings. Studies on this topic are more mixed, but **we generally believe that the private industry operates more efficiently than government entities.** While there are exceptions to that blanket statement, we believe it applies to the prison industry for the most part. **CXW provides a schedule of three agencies in particular, where such savings are in excess of 15% relative to government-run properties.**<br><br>[Canaccord Genuity, 7/13/15; cited in Dalrymple Report, ¶25d] | Private prisons cheaper. **Private prisons, as noted by BOP and some state budgets, continue to be materially cheaper than their public counterparts.** Furthermore, there are over 200,000 public prison beds that are over 75 years old, and in many cases facilities have become antiquated and inefficient.<br><br>[Canaccord Genuity, 1/13/17]<br><br>The Federal Bureau of Prisons releases their budgets each year, and within the budget, they spell out per diems separately for privately-operated facilities vs. all other types of BOP facilities. **We believe the private BOP facilities are most comparable to medium security prisons, and by comparison, private facilities have averaged costs that are 17% cheaper over the past 7 years, and 22% cheaper during 2014 and 2015.**<br><br>[Canaccord Genuity, 1/13/17]<br><br>Management offered investors a variety of stats on the trip, which included [...]  **At the federal level, it costs CXW roughly $60 to operate, while the government operates at about $80.**<br><br>[Canaccord Genuity, 5/19/17] |

| Analyst | Quote From Dalrymple Report | Similar Quote After Class Period |
|---|---|---|
| Canaccord Genuity | [W]ith ever-dwindling budgets, we believe the commitment of building an entirely new project (which could take many months, if not years), as well as the capital devoted to such an endeavor, is very burdensome to a jurisdiction. **With CXW's quality in operations and simply writing a monthly lease payment, it's far easier to flip a switch to turn the lights back on in order to alieve [sic] the capacity issues.**<br><br>[Canaccord Genuity, 10/5/15; cited in Dalrymple Report, ¶25e] | Many critics argue that private management leads to unsafe conditions for both prisoners and guards at these facilities, citing the recent OIG report. **We note that the report seemed politically motivated, as public prisons, as reported by Table 8 in Appendix 7 of the report notes that public BOP institutions have more deaths, more sexual misconduct, and more grievances, while private institutions have more contraband (arguably positive that they are finding it), more assaults by inmates, and more grievances filed. We don't believe overarching conclusions of safety can be drawn from such survey results.**<br><br>[Canaccord Genuity, 1/13/17]<br><br>[B]oth GEO and CXW are subject to accreditation by the ACA at many of their facilities, with GEO achieving a year-end 2015 score of 99.8% for all accreditation eligible facilities, while **CXW has achieved 100% accreditation at 92% of the eligible facilities.**<br><br>[Canaccord Genuity, 1/13/17] |

31.     As discussed in the Allen Report and noted above, neither Plaintiffs nor their experts, Dr. Feinstein and Mr. Dalrymple, have cited a single statement by any analyst indicating that the Yates Memo changed analysts' perceptions of the quality or cost-effectiveness of CoreCivic's facilities, or that following the Yates Memo analysts no longer considered CoreCivic's facilities to be a quality or cost-effective option for federal corrections.[36]

---

[36]   Allen Loss Causation Report, ¶¶50, 52.

**D. Mr. Dalrymple's claim that Plaintiffs' alleged damages were caused by a deterioration in CoreCivic's relationship with the BOP is belied by the fact that over 90% of his alleged inflation is due to non-BOP contracts**

32.     According to Mr. Dalrymple, Plaintiffs claim that the alleged misrepresentations "concealed the reality that [CoreCivic's] relationship with the BOP had deteriorated,"[37] and that Plaintiffs' losses and damages were caused when the deterioration of this relationship was disclosed by the Yates Memo.[38] However, Mr. Dalrymple's claim that Plaintiffs' alleged damages were caused by a deterioration in CoreCivic's relationship with the BOP appears unsupported and illogical for a number of reasons, including the following.

33.     First, Mr. Dalrymple's claim is belied by the fact that over 90% of his alleged inflation is due to *non-BOP* contracts. In particular, as shown in the chart below, according to Mr. Dalrymple's methodology and calculations, just 7% of his $6.62 in alleged inflation from the Yates Memo (or $0.46) is due to CoreCivic's BOP contracts, while 93% (or $6.16) is due to non-BOP contracts.[39] Attributing the vast majority of alleged damages to non-BOP contracts is inconsistent with Mr. Dalrymple's claim that the allegations are about CoreCivic's BOP relationship.

---

[37]  Dalrymple Report, ¶19.

[38]  Dalrymple Report, ¶70 ("In contrast to the partial corrective disclosure associated with the Cibola Contract Loss, I understand plaintiff alleges the Yates Memorandum revealed to the market the extent to which the BOP relationship had deteriorated.").

[39]  Mr. Dalrymple calculates his alleged inflation such that the amount from BOP compared to non-BOP contracts is proportional to how much these contracts made up of CoreCivic's revenue and profits. Mr. Dalrymple's analysis assumes that 7% of CoreCivic's revenue came from its BOP contracts, and thus 93% from non-BOP. See, Dalrymple Report, ¶84.

Note that an additional error/inconsistency in Mr. Dalrymple's analysis is the fact that he attributes $0.46 in inflation to CoreCivic's three remaining BOP contracts at the time of the Yates Memo (Adams, Eden and McRae), and $0.32 in inflation to Cibola, despite stating that the Cibola contract was worth 10% in FFO relative to the three other BOP contracts. See, Dalrymple Report, ¶85.



**Dalrymple Breakdown of Yates Memo Price Reaction**

Alleged Inflation = $6.62

Total Price Reaction = $8.06

Non-Fraud Related = $1.44

BOP = $0.46

Non-BOP = **$6.16**

BOP = **7%** of alleged inflation

Non-BOP = **93%** of alleged inflation

34.     Second, Mr. Dalrymple does not identify any statement by CoreCivic that purportedly concealed a deterioration in CoreCivic's relationship either with the BOP or with any other government agency, and he performs no analysis of how these alleged misstatements were corrected by the Yates Memo.

35.     Third, Mr. Dalrymple does not identify a single statement by any analyst after the Yates Memo indicating that analysts were misled about CoreCivic's relationship with any government agency (including the BOP). In fact, Mr. Dalrymple himself points out that, following the Yates Memo, analysts "expressed some skepticism that the BOP business would not be renewed."[40] As discussed below, this skepticism was ultimately borne out, as the Yates Memo was later rescinded and the BOP *did* renew contracts that Mr. Dalrymple claims

[40] Dalrymple Report, ¶ 74.

Case 3:16-cv-02267     Document 340-6     Filed 11/20/20     Page 21 of 31 PageID #: 11128

CoreCivic was "near certain[]" to lose given the allegedly concealed cost and quality issues at CoreCivic's facilities that he assumes were disclosed by the Yates Memo.[41]

36.     Fourth, the fact that GEO's stock price dropped as much or more than CoreCivic's stock price on the release of the Yates Memo is further evidence contrary to Plaintiffs' and Mr. Dalrymple's claim that the price decline following the Yates Memo was due to the deterioration in *CoreCivic's* relationship with the BOP.[42]

37.     Thus, Mr. Dalrymple's analysis appears inconsistent with, and actually undermines, his claim that Plaintiffs' alleged damages were caused by a deterioration in CoreCivic's BOP relationship, and further supports my finding that there is no loss causation and no damages from the alleged fraud.

**E.     Mr. Dalrymple ignores market evidence demonstrating that the information allegedly concealed by CoreCivic was revealed to the market prior to the alleged corrective disclosures**

**1.     Mr. Dalrymple performs no analysis of the market reaction to the OIG Report**

38.     Mr. Dalrymple makes no attempt to match the alleged misrepresentations to the disclosures in the OIG Report, and performs no analysis of the market reaction to the OIG Report. In fact, while Mr. Dalrymple acknowledges that the OIG Report contained disclosures "also related to certain information allegedly concealed in this matter," he states, without performing any analysis, that since Plaintiffs contend the OIG Report "did not reveal the truth about the concealed risks" he did not consider the OIG Report to be a corrective disclosure.[43]

39.     However, Mr. Dalrymple's claim is directly undermined both by Plaintiffs' Complaint and by the disclosures in the OIG Report. In particular, Plaintiffs in the Complaint explicitly stated that the OIG Report *did* reveal the "alleged truth" regarding CoreCivic's business operations that was concealed by the alleged fraud,[44] and, as shown in the Allen Loss

---

[41]   Dalrymple Report, ¶82.

[42]   Allen Loss Causation Report, ¶¶75-76.

[43]   Dalrymple Report, ¶51.

[44]   Complaint, ¶¶12-14.

Causation Report, it is clear that the disclosures in the OIG Report *do* match the information that Plaintiffs allege was concealed by CoreCivic.[45]

40. Furthermore, to the extent that Plaintiffs are now claiming that the OIG Report could not alert investors to the "relevant truth" concealed by the alleged fraud, in part because the OIG Report was supposedly based on "old data,"[46] the lack of coherence and logic behind Plaintiffs' new theory is already laid out and addressed in the Allen Loss Causation Report.[47] While the Court was open to Plaintiffs' new claims in the Motion for Reconsideration and to examining the OIG Report's disclosures from an alternative perspective (given the importance of the Report to the survival of Plaintiffs' case), neither Dr. Feinstein nor Mr. Dalrymple has provided any analysis to support Plaintiffs' "old data" theory. Plaintiffs' shifting claims regarding the OIG Report, as well as any analysis of their theories provided by their economic experts Dr. Feinstein and Mr. Dalrymple, are shown in the table below:

---

[45] Allen Loss Causation Report, Exhibit 1.

In contrast, as shown in the Allen Loss Causation Report, the disclosures in the Yates Memo do not match the allegedly concealed information. As with the OIG Report, Mr. Dalrymple made no attempt to match the alleged misrepresentations to the disclosures in the Yates Memo. See, Allen Loss Causation Report, ¶¶46-51.

[46] Plaintiffs' Motion for Reconsideration, pp. 2, 5, 7.

[47] Allen Loss Causation Report, ¶¶30-37.

19

|  | **Plaintiffs' Allegation** | **Analyzed by Plaintiffs' Experts?** | |
| --- | --- | --- | --- |
|  |  | **Feinstein** | **Dalrymple** |
| Original Claim | "The partial disclosures on which plaintiff's damage theory is based include stock price declines accompanying and resulting from: (a) **the Review by the OIG of the BOP's Monitoring of Contract Prisons [OIG Report]**; and (b) the Yates Memorandum[.]"[48] | **YES**<br><br>"negative impact on [CoreCivic's] stock price of the OIG Report's partially corrective disclosures [...] was offset by the positive countervailing impact of the response letters appended to the end of the OIG Report."[49] | **NO**<br><br>"While the information contained in the OIG Review also related to certain information allegedly concealed in this matter, it is my understanding that plaintiff contends that this information did not reveal the truth about the concealed risks."[50] |
| New Claim | "The OIG Review's **focus on old data**, together with its underlying assumption that current conditions were improved and contracts would continue, cogently explains the lack of a statistically significant price reaction to its publication."[51] | **NO** | **NO** |

41.     In sum, as demonstrated in the Allen Loss Causation Report, the OIG Report was claimed by Plaintiffs in their Complaint as the first corrective disclosure of the "truth" about the alleged misrepresentations and, according to Plaintiffs' own event study test, the OIG Report did not cause any statistically significant decline in CoreCivic's stock price. The lack of any market reaction following the OIG Report is straightforward proof that there is no loss causation and no damages from the alleged misrepresentations, and there is nothing in the Dalrymple Report that is in any way contrary to this finding.

---

[48]   Complaint, ¶192 (emphasis added).

[49]   Feinstein Price Impact Rebuttal, ¶¶64, 67. Note that the Court did not accept Dr. Feinstein's theory. See, Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019, p. 17 ("Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations.").

[50]   Dalrymple Report, ¶51.

[51]   Plaintiffs' Motion for Reconsideration, p. 2 (emphasis added).

### 2. Mr. Dalrymple ignores the analysis of Plaintiffs' previous expert Dr. Feinstein, who argued that the OIG Report was an alleged corrective disclosure and negatively impacted CoreCivic's stock price

42. Not only does Mr. Dalrymple ignore the allegations in the Complaint and the contents of the OIG Report, but he also ignores the analysis of Plaintiffs' economic expert at class certification, Dr. Feinstein. As discussed in the Allen Loss Causation Report, Dr. Feinstein reviewed the OIG Report and never stated that the OIG Report was not corrective of the alleged misrepresentations or that the data in the Report was too old to be meaningful to the market. In fact, Dr. Feinstein insisted that the revelations in the OIG Report *did* negatively impact CoreCivic's stock price, and attributed the lack of a price reaction to "countervailing" news (*i.e.*, the short letters by CoreCivic and other private prison operators attached to the OIG Report) rather than to any issue with the data in the OIG Report.[52]

### 3. Mr. Dalrymple ignores the lack of market reaction to disclosures of quality-related issues at CoreCivic's facilities that Plaintiffs allege were concealed by the alleged fraud

43. Mr. Dalrymple ignores the lack of market reaction to disclosures of quality-related issues at CoreCivic's facilities that Plaintiffs allege were concealed by the alleged fraud — including those that both he and Plaintiffs' other expert Ms. Mellendick identify. In particular, Mr. Dalrymple, in discussing alleged quality issues at CoreCivic's facilities, states that the Cibola facility "was the subject of repeated Notices of Concern regarding the quality of its services," and notes that CoreCivic had received a "Cure Notice" from the BOP related to medical care at Cibola.[53] Similarly, Plaintiffs other expert Ms. Mellendick cites a number of riots and other disturbances at CoreCivic's facilities, including the Adams Riot, to support her opinion that CoreCivic's performance "in the majority of their BOP private prison contracts" was "largely deficient."[54]

---

[52] Allen Loss Causation Report, ¶32, citing Feinstein Price Impact Rebuttal, ¶¶14, 62, 67. Note that the Court did not accept Dr. Feinstein's theory. See, Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019, p. 17 ("Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations.").

[53] Dalrymple Report, ¶20.

[54] Mellendick Report, p. 22.

44.     However, as shown in the Allen Loss Causation Report, the very information regarding "operational shortcomings" at CoreCivic's BOP facilities, including purported "quality"-related "deficiencies,"[55] that Plaintiffs allege were concealed by the alleged fraud, and that Mr. Dalrymple and Ms. Mellendick identify, were released on a number of occasions both prior to and during the Class Period to *no* statistically significant price reaction. In particular, as shown in the Allen Loss Causation Report, CoreCivic's stock price did not decline following, for example, (i) news of riots at CoreCivic's facilities (including the Adams Riot), (ii) the release of investigative reports by government agencies and third-party organizations into conditions at CoreCivic's facilities, and (iii) news that CoreCivic had received a "Cure Notice" from the BOP related to medical care at Cibola – disclosures that according to the Complaint were "consistent" with the alleged corrective disclosures,[56] and indicative of "quality"-related "deficiencies" at CoreCivic's facilities.[57] The fact that CoreCivic's stock price did not decline following the release of the particular negative information that Plaintiffs allege was concealed by the alleged fraud directly undermines Plaintiffs' claim of loss causation and damages.

## F.  Mr. Dalrymple's analysis, along with not being linked to the alleged fraud, suffers from additional substantive deficiencies

### 1.  Mr. Dalrymple's analysis fails to account for the fact that the Cibola facility was contracted by another government agency soon after the non-renewal of the BOP contract

45.     Mr. Dalrymple's analysis does not account for the fact that CoreCivic could and did repurpose the Cibola facility for another government agency after the non-renewal of the BOP contract. Instead, Mr. Dalrymple's calculations assume a permanent loss of all future revenue and earnings from the Cibola facility.

46.     However, the Cibola facility was repurposed less than a month after the BOP contract expired. In particular, while CoreCivic's contract with the BOP for Cibola expired on September 30, 2016, the Company's new contract for the facility with ICE began on October 27,

---

[55]  Complaint, ¶¶3,185.

[56]  Complaint, ¶42.

[57]  Allen Loss Causation Report, ¶¶38-45.

2016, just 27 days later.[58] Accounting for the fact that the Cibola facility was contracted by ICE almost immediately after the non-renewal of the BOP contract essentially eliminates Mr. Dalrymple's damages from the Cibola alleged corrective disclosure.

47.     Note that the fact that the Cibola facility was contracted by ICE so soon after the expiration of the BOP contract and the Yates Memo is inconsistent with Plaintiffs' and Mr. Dalrymple's claims that the Yates Memo was a materialization of allegedly concealed cost and quality issues and that CoreCivic's government customers were not "sufficiently satisfied with the cost savings and level of quality" of CoreCivic's correctional services.[59]

### 2.     Mr. Dalrymple's analysis fails to account for the facts that the Yates Memo was rescinded, CoreCivic's stock price recovered, and CoreCivic's facilities continued to be contracted by government agencies, including the BOP, after the Class Period

48.     Mr. Dalrymple's analysis entirely ignores events after the Class Period that critically undermine his damages calculations and assumption of loss causation. In particular, Mr. Dalrymple's analysis does not account for the fact that the Yates Memo was rescinded, CoreCivic's stock price recovered, and that CoreCivic's facilities continued to be contracted by government agencies, including the BOP, after the Class Period.

49.     First, Mr. Dalrymple claims that the Yates Memo disclosed the "near certainty" that CoreCivic would lose its remaining BOP contracts,[60] and thus, his calculations assume a permanent loss of all future revenue and earnings from these facilities. However, Mr. Dalrymple does not account for the fact that of the three prisons CoreCivic was operating under BOP contracts at the time of the Yates Memo, two facilities – Adams and McRae – *were renewed* by the BOP when the contracts expired after the end of the Class Period despite the directive in the

---

[58]  "CCA Awarded New Management Contract at the Cibola County Corrections Center," *Globe Newswire*, October 31, 2016 ("The new contract at the Cibola County Corrections Center commenced on October 27, 2016, and contains an initial term of 5 years, with renewal options upon mutual agreement.").

[59]  Dalrymple Report, ¶21 ("According to plaintiff, the share price of CCA stock was artificially inflated as a result of Defendants' alleged fraud, which led the markets to believe that CCA's governmental customers, including the BOP, were sufficiently satisfied with the cost savings and level of quality of CCA's correctional services that they would continue to be CCA customers, thereby concealing the extent of the risk associated with such contracts.").

[60]  Dalrymple Report, ¶82.

Yates Memo.[61] The third, Eden, was not renewed by the BOP, but this facility was later repurposed, like Cibola, and contracted jointly by USMS and ICE.[62] Thus, by assuming a permanent loss of all future earnings from these three facilities, as he does for Cibola, Mr. Dalrymple is including losses and damages for events that did not materialize (thus overstating his damages).

50.    Second, as discussed above, the vast majority of Mr. Dalrymple's alleged damages from the Yates Memo (93%) are due to the risk that CoreCivic would lose its non-BOP contracts. However, Mr. Dalrymple does not account for the fact that numerous government agencies continued to contract with CoreCivic after the Class Period, and that the Company did not suffer the contract losses that the market feared.

51.    Third, Mr. Dalrymple does not account for the market reaction following the 2016 Presidential Election – including the recovery in CoreCivic's stock price,[63] as well as commentary demonstrating that analysts continued to believe CoreCivic's facilities were a quality and cost-effective option for federal corrections.[64] For example, in a report published on January 13, 2017, just after Donald Trump's inauguration and around five months after the Yates Memo, the Canaccord analysts covering CoreCivic stated that "private prisons continue to be materially cheaper than their public counterparts":

> **Private prisons cheaper. Private prisons, as noted by BOP and some state budgets, continue to be materially cheaper than their public counterparts**. Furthermore, there are over 200,000 public prison beds that are over 75 years old, and in many cases facilities have become antiquated and inefficient. [Canaccord Genuity, 1/13/17, emphasis added]

---

[61]  "CoreCivic Extends Contract for the McRae Correctional Facility," *GlobeNewswire*, November 15, 2016, and CoreCivic FY2017 Form 10-K, filed February 22, 2018, p. 10 ("[I]n July 2017, the BOP exercised a two-year renewal option at our 2,232-bed Adams County Correctional Center").

[62]  "CoreCivic Enters into New Management Contract to Activate the Eden Detention Center," *Globe Newswire*, May 23, 2019.

[63]  Allen Loss Causation Report, ¶¶69-74. See, also, *Canaccord Genuity* analyst report, dated November 11, 2016 ("Raising GEO and CXW [CoreCivic] price targets on lower risk post-election […] Following Donald Trump's presidential victory, we now see materially less risk to contract renewals and the overall private prison REIT business models.").

[64]  Allen Loss Causation Report, ¶¶54-58.

The Canaccord analysts focused in particular on the new Attorney General Jeff Sessions, noting that a "frugal" administration, focused on reducing the cost of providing correctional services, would actually help rather than hurt CoreCivic's business:

> **Frugal**. Sessions was raised on a Depression mentality when it comes to frugality, and his record of thriftiness extends to both his career and his personal life. We believe jurisdictions' **consideration of costs are a critical factor** in the decision to move forward with private solutions. We believe there is **plenty of support in this regard for private facilities screening cheaper at both the BOP and state level.** [...] The Trump administration has been public about pro-privatization, and we don't see any reason why this shouldn't carry over into the prison space, **especially in an environment where balancing the budget is as critical as ever**. [Canaccord Genuity, 1/13/17, emphasis added]

52.     Thus, as with the potential loss of the BOP contracts, Mr. Dalrymple is including losses and damages for events/risks that the market feared (in this case, the loss of non-BOP contracts), but that did not actually materialize (and that CoreCivic is not alleged to have misrepresented). Accounting for the fact that the feared risks to CoreCivic's contracts did not materialize, and that these risks dissipated and the Company's stock price recovered following the 2016 Presidential Election, essentially eliminates Mr. Dalrymple's damages from the Yates Memo.

53.     If Mr. Dalrymple's theory were correct, and the vast majority of the stock price reaction following the Yates Memo was caused by the market's realization that CoreCivic's *non-BOP* contracts were at risk due to revelations about cost and quality at the Company's *BOP* facilities, then one would not expect the stock price to recover fully merely because of Donald Trump's victory and the expected rescission of the Yates Memo. Similarly, one would not expect analysts to continue to state that CoreCivic's facilities (both BOP and non-BOP) were a quality and cost-effective option for federal corrections, or that the nomination of a "frugal" Attorney General would help the Company's business. Thus, the fact that CoreCivic's stock price recovered and that government agencies, including the BOP, renewed and/or continued to contract with CoreCivic after the end of the Class Period is inconsistent with Plaintiffs' and Mr. Dalrymple's claims that the Yates Memo was a materialization of allegedly concealed cost and

quality issues and that CoreCivic's government customers were not "sufficiently satisfied with the cost savings and level of quality" of CoreCivic's correctional services.[65]

### 3. Mr. Dalrymple's analysis does not account for the fact that controlling for peer movements (GEO) yields no reaction in CoreCivic's stock price following the Yates Memo

54.     As discussed in the Allen Loss Causation Report, GEO's stock price dropped as much or more than CoreCivic's stock price on the release of the Yates Memo. Thus, controlling for the movement in GEO's stock yields no reaction in CoreCivic's stock price following the Yates Memo.[66] Accounting for the decline in GEO's stock price eliminates Mr. Dalrymple's damages from the Yates Memo.

### 4. Correcting Mr. Dalrymple's analysis to use consistent data substantially reduces his estimates of alleged inflation

55.     Mr. Dalrymple calculates inflation by subtracting the "counterfactual value" of CoreCivic's BOP contracts (*i.e.*, the value but-for the alleged misrepresentations) from the price drops following the alleged corrective disclosures. As part of his counterfactual value calculation, Mr. Dalrymple uses estimates of how much CoreCivic's three remaining BOP facilities at the time of the Yates Memo (Adams, Eden and McRae) contributed to the Company's FFO.

56.     However, the FFO figure for the three BOP facilities that Mr. Dalrymple uses in his calculation of the counterfactual value for the Cibola alleged corrective disclosure is *more than double* the value he uses for the same three facilities in calculating the counterfactual value for the Yates Memo. This inconsistency has the effect of understating the counterfactual value, and thus substantially overstating his alleged inflation.

57.     In particular, in calculating the counterfactual value for Cibola, Mr. Dalrymple uses the $0.40 in FFO per share for the three BOP contracts estimated by Canaccord Genuity analysts in a report issued in October 2015.[67] However, when calculating the counterfactual

---

[65]  Dalrymple Report, ¶21.

[66]  Allen Loss Causation Report, ¶¶75-76.

[67]  Dalrymple Report, ¶85 ("One may expand this approach to estimate the counterfactual value of the Cibola contract by applying that contract's proportional contribution of earnings. As I explain in Appendix D, the

value for the Yates Memo, Mr. Dalrymple uses an FFO contribution for the same three facilities of just $0.18 per share.[68]

58.    Not only is Mr. Dalrymple's FFO figure for the Yates Memo substantially lower than the value he uses for Cibola, it is also inconsistent with the estimates in analyst reports issued right after the Yates Memo. In particular, Mr. Dalrymple's $0.18 per share figure is substantially lower than the Wells Fargo analysts' estimate of $0.29-$0.37,[69] the SunTrust analysts' estimate of $0.37,[70] and the Canaccord Genuity analysts' estimate of $0.52.[71]

59.    If Mr. Dalrymple had assumed that the remaining BOP facilities were worth $0.40 FFO per share (consistent with his Cibola calculation) instead of $0.18, his total alleged inflation would have been $4.62 per share instead of $6.94 – a reduction of 34%.

_____

Lucy P. Allen

---

Adams, McRae, and Eden contracts accounted for approximately $0.40 of CCA's FFO.") and Appendix D, Table D-1.

Mr. Dalrymple does not explain why he chose to base his damages on analyst estimates from almost a year prior to the Cibola alleged corrective disclosure, despite also analyzing estimates from contemporaneous analyst reports issued around the end of the Class Period. See, Dalrymple Report, Appendix D, Table D-6.

[68]    Dalrymple Report, Appendix D, ¶2 ("With respect to the remaining BOP facilities at the time of the Yates Memorandum (Adams, McRae, and Eden), CCA did not disclose FFO contribution associated with these facilities. […] Applying CCA's estimate of seven percent to CCA's consensus FFO of $2.55 before the Yates Memorandum suggests that these remaining facilities would have contributed about $0.18 per share per year to FFO.").

[69]    *Wells Fargo* analyst reports, dated August 10, 2016 and August 19, 2016. See, also, Dalrymple Report, Appendix D, ¶16 and Table D-6.

[70]    *SunTrust* analyst reports, dated August 4, 2016 and September 1, 2016. See, also, Dalrymple Report, Appendix D, ¶13 and Table D-6.

[71]    *Canaccord Genuity* analyst reports, dated August 4, 2016 and August 23, 2016. See, also, Dalrymple Report, Appendix D, ¶8 and Table D-6.