# EXHIBIT 17

Exhibit 490
Ferguson, J.
7/29/20
@ptus

10-K 1 d452767d10k.htm FORM 10-K

**Table of Contents**

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### WASHINGTON, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2012**

### OR

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 001-16109**

# CORRECTIONS CORPORATION OF AMERICA
**(Exact name of registrant as specified in its charter)**

| MARYLAND | 62-1763875 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**10 BURTON HILLS BLVD., NASHVILLE, TENNESSEE 37215**
**(Address and zip code of principal executive office)**

**REGISTRANT'S TELEPHONE NUMBER, INCLUDING AREA CODE: (615) 263-3000**

**SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT:**

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Stock, $.01 par value per share | New York Stock Exchange |

**SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT:**
**NONE**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☒    No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15 (d) of the Act.   Yes ☐    No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒    No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one):

Large accelerated filer ☒                                                                                                  Accelerated filer                    ☐

Non-accelerated filer    ☐   (Do not check if a smaller reporting company)                             Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act.).    Yes ☐    No ☒

The aggregate market value of the shares of the registrant's Common Stock held by non-affiliates was approximately $2,887,621,888 as of June 30, 2012 based on the closing price of such shares on the New York Stock Exchange on that day. The number of shares of the registrant's Common Stock outstanding on February 19, 2013 was 100,249,241.

**DOCUMENTS INCORPORATED BY REFERENCE:**

Portions of the registrant's definitive Proxy Statement for the 2013 Annual Meeting of Stockholders, currently scheduled to be held on May 16, 2013, are incorporated by reference into Part III of this Annual Report on Form 10-K.

Table of Contents

CORRECTIONS CORPORATION OF AMERICA
FORM 10-K
For the fiscal year ended December 31, 2012

TABLE OF CONTENTS

| Item No. | | Page |
|---|---|---|
| | **PART I** | |
| 1. | Business | |
| | Overview | 5 |
| | Operations | 7 |
| | Business Development | 9 |
| | Facility Portfolio | 11 |
| | Competitive Strengths | 17 |
| | Business Strategy | 19 |
| | Capital Strategy | 20 |
| | The Corrections and Detention Industry | 22 |
| | Government Regulation | 23 |
| | Insurance | 25 |
| | Employees | 25 |
| | Competition | 26 |
| 1A. | Risk Factors | 26 |
| 1B. | Unresolved Staff Comments | 46 |
| 2. | Properties | 46 |
| 3. | Legal Proceedings | 46 |
| 4. | Mine Safety Disclosures | 46 |
| | **PART II** | |
| 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 47 |
| | Market Price of and Distributions on Capital Stock | 47 |
| | Dividend Policy | 47 |
| | Issuer Purchases of Equity Securities | 48 |
| 6. | Selected Financial Data | 48 |
| 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 50 |
| | Overview | 50 |
| | Critical Accounting Policies | 53 |
| | Results of Operations | 57 |
| | Liquidity and Capital Resources | 73 |
| | Inflation | 79 |
| | Seasonality and Quarterly Results | 79 |
| 7A. | Quantitative and Qualitative Disclosures about Market Risk | 80 |
| 8. | Financial Statements and Supplementary Data | 80 |
| 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 80 |
| 9A. | Controls and Procedures | 80 |
| 9B. | Other Information | 84 |
| | **PART III** | |
| 10. | Directors, Executive Officers and Corporate Governance | 85 |
| 11. | Executive Compensation | 85 |
| 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 86 |
| 13. | Certain Relationships and Related Transactions and Director Independence | 86 |
| 14. | Principal Accounting Fees and Services | 86 |
| | **PART IV** | |
| 15. | Exhibits and Financial Statement Schedules | 87 |
| | **SIGNATURES** | |

Table of Contents

We have not experienced a strike or work stoppage at any of our facilities. Approximately 785 employees at four of our facilities are represented by labor unions. In the opinion of management, overall employee relations are good.

**Competition**

The correctional and detention facilities we own, operate, or manage, as well as those facilities we own but are managed by other operators, are subject to competition for inmates from other private prison managers. We compete primarily on the basis of bed availability, cost, the quality and range of services offered, our experience in the operation and management of correctional and detention facilities, and our reputation. We compete with government agencies that are responsible for correctional facilities and a number of privatized correctional service companies, including, but not limited to, The GEO Group, Inc. and Management and Training Corporation. We also compete in some markets with small local companies that may have a better knowledge of the local conditions and may be better able to gain political and public acceptance. Other potential competitors may in the future enter into businesses competitive with us without a substantial capital investment or prior experience. We may also compete in the future for new development projects with companies that have more financial resources than we have. Competition by other companies may adversely affect the number of inmates at our facilities, which could have a material adverse effect on the operating revenue of our facilities. In addition, revenue derived from our facilities will be affected by a number of factors, including the demand for inmate beds, general economic conditions, and the age of the general population.

**ITEM 1A. RISK FACTORS.**

As the owner and operator of correctional and detention facilities, we are subject to certain risks and uncertainties associated with, among other things, the corrections and detention industry and pending or threatened litigation in which we are involved. In addition, we are also currently subject to risks associated with our indebtedness as well as our qualification as a REIT for federal income tax purposes effective for our taxable year beginning January 1, 2013. The risks and uncertainties set forth below could cause our actual results to differ materially from those indicated in the forward-looking statements contained herein and elsewhere. The risks described below are not the only risks we face. Additional risks and uncertainties not currently known to us or those we currently deem to be immaterial may also materially and adversely affect our business operations. Any of the following risks could materially adversely affect our business, financial condition, or results of operations.

**Risks Related to Our Business and Industry**

***Our results of operations are dependent on revenues generated by our jails, prisons, and detention facilities, which are subject to the following risks associated with the corrections and detention industry.***

*We are subject to fluctuations in occupancy levels, and a decrease in occupancy levels could cause a decrease in revenues and profitability.* While a substantial portion of our cost structure is fixed, a substantial portion of our revenue is generated under facility ownership and management contracts that specify per diem payments based upon daily occupancy. We are dependent upon the governmental agencies with which we have contracts to provide inmates for our managed facilities. We cannot control occupancy levels at our managed facilities. Under a per diem rate structure, a decrease in our occupancy rates could cause a decrease in revenue and profitability. Average compensated occupancy for our facilities in

Case 3:16-cv-02267  Document 340-17  Filed 11/20/20  Page 5 of 9 PageID #: 11302

https://www.sec.gov/Archives/edgar/data/1070985/000119312513080296/d452767d10k.htm  8/19/2016

[Table of Contents](#)

operation for 2012, 2011, and 2010 was 88.2%, 89.9%, and 90.3%, respectively. Occupancy rates may, however, decrease below these levels in the future. When combined with relatively fixed costs for operating each facility, a decrease in occupancy levels could have a material adverse effect on our profitability.

*We are dependent on government appropriations and our results of operations may be negatively affected by governmental budgetary challenges.* Our cash flow is subject to the receipt of sufficient funding of and timely payment by contracting governmental entities. If the appropriate governmental agency does not receive sufficient appropriations to cover its contractual obligations, it may terminate our contract or delay or reduce payment to us. Any delays in payment, or the termination of a contract, could have an adverse effect on our cash flow and financial condition. In addition, federal, state and local governments are constantly under pressure to control additional spending or reduce current levels of spending. These pressures have been compounded by the current economic downturn. Accordingly, we have been requested and may be requested in the future to reduce our existing per diem contract rates or forego prospective increases to those rates. Further, our customers could reduce inmate population levels in facilities we own or manage to contain their correctional costs. In addition, it may become more difficult to renew our existing contracts on favorable terms or otherwise.

*Competition for inmates may adversely affect the profitability of our business.* We compete with government entities and other private operators on the basis of bed availability, cost, quality, and range of services offered, experience in managing facilities and reputation of management and personnel. While there are barriers to entering the market for the ownership and management of correctional and detention facilities, these barriers may not be sufficient to limit additional competition. In addition, our government customers may assume the management of a facility that they own and we currently manage for them upon the termination of the corresponding management contract or, if such customers have capacity at their facilities, may take inmates currently housed in our facilities and transfer them to government-run facilities. Since we are paid on a per diem basis with no minimum guaranteed occupancy under most of our contracts, the loss of such inmates and resulting decrease in occupancy would cause a decrease in our revenues and profitability.

*Escapes, inmate disturbances, and public resistance to privatization of correctional and detention facilities could result in our inability to obtain new contracts or the loss of existing contracts.* The operation of correctional and detention facilities by private entities has not achieved complete acceptance by either governments or the public. The movement toward privatization of correctional and detention facilities has also encountered resistance from certain groups, such as labor unions and others that believe that correctional and detention facilities should only be operated by governmental agencies.

Moreover, negative publicity about an escape, riot or other disturbance or perceived poor conditions at a privately managed facility may result in adverse publicity to us and the private corrections industry in general. Any of these occurrences or continued trends may make it more difficult for us to renew or maintain existing contracts or to obtain new contracts, which could have a material adverse effect on our business.

*We are subject to terminations, non-renewals, or competitive re-bids of our government contracts.* We typically enter into facility contracts with governmental entities for terms of up to five years, with additional renewal periods at the option of the contracting governmental agency. Notwithstanding any contractual renewal option of a contracting governmental agency, 38 of our facility contracts with the customers listed under "Business – Facility Portfolio – Facilities and Facility Management Contracts" are currently scheduled to

Case 3:16-cv-02267   Document 340-17   Filed 11/20/20   Page 6 of 9 PageID #: 11303

https://www.sec.gov/Archives/edgar/data/1070985/000119312513080296/d452767d10k.htm   8/19/2016

Table of Contents

expire on or before December 31, 2013 but have renewal options (33), or are currently scheduled to expire on or before December 31, 2013 and have no renewal options (5). Although we generally expect these customers to exercise renewal options or negotiate new contracts with us, one or more of these contracts may not be renewed by the corresponding governmental agency. In addition, these and any other contracting agencies may determine not to exercise renewal options with respect to any of our contracts in the future. Our government partners can also re-bid contracts in a competitive procurement process upon termination or non-renewal of our contract. Competitive re-bids may result from the expiration of the term of a contract, including the initial term and any renewal periods, or the early termination of a contract. Competitive re-bids are often required by applicable federal or state procurement laws periodically in order to further competitive pricing and other terms for the government agency.

The Florida Department of Management Services has issued a competitive procurement for three facilities owned by the state of Florida that we currently manage under contracts that expire in the third quarter of 2013. We can provide no assurance that we will be successful in maintaining the contracts to manage these facilities. We do not believe the loss of any of these contracts would have a material impact on our results of operations.

Based on information available at this filing, notwithstanding the competitive procurement for three of the facilities we manage in Florida, we believe we will renew all other contracts that have expired or are scheduled to expire within the next twelve months. We believe our renewal rate on existing contracts remains high as a result of a variety of reasons including, but not limited to, the constrained supply of available beds within the U.S. correctional system, our ownership of the majority of the beds we operate, and the quality of our operations.

Governmental agencies typically may terminate a facility contract at any time without cause or use the possibility of termination to negotiate a lower per diem rate. In the event any of our contracts are terminated or are not renewed on favorable terms or otherwise, we may not be able to obtain additional replacement contracts. The non-renewal, termination, or competitive re-bid of any of our contracts with governmental agencies could materially adversely affect our financial condition, results of operations and liquidity, including our ability to secure new facility contracts from others.

*Our ability to secure new contracts to develop and manage correctional and detention facilities depends on many factors outside our control.* Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. This possible growth depends on a number of factors we cannot control, including crime rates and sentencing patterns in various jurisdictions, governmental budgetary constraints, and governmental and public acceptance of privatization. The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by criminal laws. For instance, any changes with respect to drugs and controlled substances or illegal immigration could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them. Immigration reform laws are currently a focus for legislators and politicians at the federal, state, and local level. Legislation has also been proposed in numerous jurisdictions that could lower minimum sentences for some non-violent crimes and make more inmates eligible for early release based on good behavior. Also, sentencing alternatives under consideration could put some offenders on probation with electronic monitoring who would otherwise be incarcerated. Similarly, reductions in crime rates or resources dedicated to prevent and enforce crime could

Table of Contents

lead to reductions in arrests, convictions and sentences requiring incarceration at correctional facilities. Our policy prohibits us from engaging in lobbying or advocacy efforts that would influence enforcement efforts, parole standards, criminal laws, and sentencing policies.

Moreover, certain jurisdictions recently have required successful bidders to make a significant capital investment in connection with the financing of a particular project, a trend that will require us to have sufficient capital resources to compete effectively. We may compete for such projects with companies that have more financial resources than we have. Further, we may not be able to obtain the capital resources when needed. A prolonged downturn in the financial credit markets could make it more difficult to obtain capital resources at favorable rates of return or obtain capital resources at all.

*We may face community opposition to facility location, which may adversely affect our ability to obtain new contracts.* Our success in obtaining new awards and contracts sometimes depends, in part, upon our ability to locate land that can be leased or acquired, on economically favorable terms, by us or other entities working with us in conjunction with our proposal to construct and/or manage a facility. Some locations may be in or near populous areas and, therefore, may generate legal action or other forms of opposition from residents in areas surrounding a proposed site. When we select the intended project site, we attempt to conduct business in communities where local leaders and residents generally support the establishment of a privatized correctional or detention facility. Future efforts to find suitable host communities may not be successful. We may incur substantial costs in evaluating the feasibility of the development of a correctional or detention facility. As a result, we may report significant charges if we decide to abandon efforts to develop a correctional or detention facility on a particular site. In many cases, the site selection is made by the contracting governmental entity. In such cases, site selection may be made for reasons related to political and/or economic development interests and may lead to the selection of sites that have less favorable environments.

*We may incur significant start-up and operating costs on new contracts before receiving related revenues, which may impact our cash flows and not be recouped.* When we are awarded a contract to provide or manage a facility, we may incur significant start-up and operating expenses, including the cost of constructing the facility, purchasing equipment and staffing the facility, before we receive any payments under the contract. These expenditures could result in a significant reduction in our cash reserves and may make it more difficult for us to meet other cash obligations. In addition, a contract may be terminated prior to its scheduled expiration and as a result we may not recover these expenditures or realize any return on our investment.

*Failure to comply with unique and increased governmental regulation could result in material penalties or non-renewal or termination of our contracts to provide or manage correctional and detention facilities.* The industry in which we operate is subject to extensive federal, state, and local regulations, including educational, health care, and safety regulations, which are administered by many regulatory authorities. Some of the regulations are unique to the corrections industry, some are unique to government contractors and the combination of regulations we face is unique. Facility contracts typically include reporting requirements, supervision, and on-site monitoring by representatives of the contracting governmental agencies. Corrections officers are customarily required to meet certain training standards and, in some instances, facility personnel are required to be licensed and subject to background investigation. Certain jurisdictions also require us to award subcontracts on a competitive basis or to subcontract with certain types of businesses, such as small businesses and businesses owned by members of minority groups. Our facilities are also subject to operational and financial audits by the governmental agencies with which we have contracts.

29

[Table of Contents](#)

New federal regulations also require federal government contractors like us to self-report evidence of certain forms of misconduct. We may not always successfully comply with these regulations, and failure to comply can result in material penalties, including financial penalties, non-renewal or termination of facility contracts, and suspension or debarment from contracting with certain government entities.

In addition, private prison managers are subject to government legislation and regulation attempting to restrict the ability of private prison managers to house certain types of inmates, such as inmates from other jurisdictions or inmates at medium or higher security levels. Legislation has been enacted in several states, and has previously been proposed in the United States Congress, containing such restrictions. Such legislation may have an adverse effect on us.

Our inmate transportation subsidiary, TransCor, is subject to regulations promulgated by the Departments of Transportation and Justice. TransCor must also comply with the Interstate Transportation of Dangerous Criminals Act of 2000, which covers operational aspects of transporting prisoners, including, but not limited to, background checks and drug testing of employees; employee training; employee hours; staff-to-inmate ratios; prisoner restraints; communication with local law enforcement; and standards to help ensure the safety of prisoners during transport. We are subject to changes in such regulations, which could result in an increase in the cost of our transportation operations.

The Federal Communications Commission, or the FCC, has published for comment a notice of proposed rulemaking that seeks comments on the interstate inmate calling industry, including whether and how calling rates could be capped, how providers can be justly compensated and whether commissions to correction and detention facilities (public and private) should be limited. The FCC has traditionally deferred from rulemaking in this area; however, there is the risk that the FCC could act to limit or prohibit commissions to public and private prison managers like us.

Our failure to comply with, or changes to existing regulations or adoption of new regulations in, the areas discussed above could result in increases to our costs or reductions in revenue that could, independently or in the aggregate, have a material adverse effect on our results of operations.

*Government agencies may investigate and audit our contracts and, if any improprieties are found, we may be required to refund revenues we have received, to forego anticipated revenues, and we may be subject to penalties and sanctions, including prohibitions on our bidding in response to RFPs.* Certain of the governmental agencies with which we contract have the authority to audit and investigate our contracts with them. As part of that process, government agencies may review our performance of the contract, our pricing practices, our cost structure and our compliance with applicable laws, regulations and standards. For contracts that actually or effectively provide for certain reimbursement of expenses, if an agency determines that we have improperly allocated costs to a specific contract, we may not be reimbursed for those costs, and we could be required to refund the amount of any such costs that have been reimbursed. If a government audit asserts improper or illegal activities by us, we may be subject to civil and criminal penalties and administrative sanctions, including termination of contracts, forfeitures of profits, suspension of payments, fines and suspension or disqualification from doing business with certain government entities. Any adverse determination could adversely impact our ability to bid in response to RFPs in one or more jurisdictions.

Case 3:16-cv-02267    Document 340-17    Filed 11/20/20    Page 9 of 9 PageID #: 11306

https://www.sec.gov/Archives/edgar/data/1070985/000119312513080296/d452767d10k.htm    8/19/2016