# EXHIBIT 5

Videotaped Deposition of

# Lucy P. Allen

October 14, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential Pursuant to Protective Order**



Page 37

1 dismiss.
2 A. I do recall that. And I do -- I have
3 that now as one of the alleged
4 misrepresentations.
5 As I recall, it was not in the
6 section of the complaint that lists the
7 categories and types of misrepresentations. It
8 was somewhere else in the complaint.
9 So if you looked at the -- no, I
10 don't have the complaint in front of me. And
11 this was a while ago. But as I recall, the
12 headings and the categories of the complaint made
13 clear that the alleged misrepresentations were in
14 one section and the one that you told me that I
15 had omitted was somewhere else.
16 So it was not contained within what
17 would -- would organizationally and normally been
18 the section that you listed all the alleged
19 misrepresentations.
20 And if you look at Appendix C to my
21 report, I think you'll see that I have listed all
22 the alleged misrepresentations and I've given
23 them all numbers and they all cite to a similar
24 area of the complaint, except for M30, which
25 cites to paragraph 35.

Page 38

1 Q. Right. But paragraph -- you -- you
2 agree, though, that paragraph 35 is not included
3 in Exhibit 1, right?
4 MR. WHITWORTH: Object to the form.
5 BY MR. WOOD:
6 Q. Let me -- let me ask a -- a -- a more
7 specific question, hopefully to avoid that
8 objection.
9 You -- you agree that the -- the --
10 literally the -- the characters paragraph symbol
11 and 35 do not appear in Exhibit 1, right?
12 MR. WHITWORTH: Same objection.
13 THE WITNESS: I believe that is
14 correct.
15 BY MR. WOOD:
16 Q. And so --
17 A. And, again, I mean, just -- you
18 have -- plaintiffs have written a complaint where
19 all of the alleged misrepresentations are under a
20 category that -- a heading that has that. And
21 the -- the one that you are asking about and that
22 you asked me about previously was not listed
23 there.
24 So it's a -- it's a -- I -- I have --
25 I have considered that alleged misrepresentation

Page 39

1 and I have analyzed it in this report.
2 It is not -- and you did bring this
3 question up at my last deposition.
4 Q. Yeah, I -- I disagree that you've
5 analyzed it in the report. I don't think that's
6 true.
7 But I'm going to introduce your
8 supplemental report from 2018 -- and this is
9 tab 1 -- as Exhibit 536.
10 MR. WOOD: If we could pull that
11 up.
12 (Thereupon, Allen Exhibit
13 Number 536 was marked for
14 identification.)
15 THE WITNESS: November 2018, I have
16 that.
17 BY MR. WOOD:
18 Q. Yeah, November 21, 2018. Your --
19 yeah, if you've got a hard copy --
20 A. Okay. Yep.
21 Q. I can't imagine --
22 A. Yeah.
23 Q. -- we're going to have a dispute
24 about your report -- the -- the --
25 A. Okay.

Page 40

1 Q. Yeah.
2 But they have put it in the -- in the
3 chat here if you want to just pull up what's in
4 the chat box and confirm that Exhibit 536 is your
5 November 21, 2018 report.
6 A. Okay. Yeah, I guess it takes awhile
7 to open these chats.
8 Q. Yeah.
9 A. Yeah, that looks right.
10 Q. And if you turn to paragraph 23 on
11 page 11 of your prior report --
12 A. I'm sorry. Look at where?
13 Q. It's -- well, it's starting on
14 paragraph 23 on page 11 of your report.
15 A. This earlier report, okay.
16 Q. Right, the -- Exhibit 536, the
17 November 21, 2018 report.
18 Are you on page 11?
19 A. Yes.
20 Q. And you see on page 11 and going into
21 page 12, this report mentions -- well, it's the
22 same thing we were just talking about, right,
23 where on paragraph 24 you say that this March 30,
24 2016 statement is -- is not in the section with
25 the other false statements, right?

Page 93

1  A.  Yes.
2  Q.  And the Yates memo was new news,
3  right?
4      MR. WHITWORTH:  Object to the form.
5      THE WITNESS:  I'm not sure exactly
6  what you mean by that, but when the --
7  when the Yates memo came out and it was
8  public on this date, it was news to the
9  market, yeah.
10      BY MR. WOOD:
11  Q.  And the -- well, the -- the
12  announcement that the BOP was going to reduce and
13  eliminate the use of private prisons, that was
14  new news, right?  That hadn't been previously
15  announced?
16  A.  I don't know if it says they're going
17  to eliminate.  It says reducing our use of
18  private prisons.  I'm not sure it says they will
19  eliminate it, but --
20  Q.  All right.  Well, let's -- if you
21  look at page -- the top of page 2 of the Yates
22  memo, it says, For all these reasons, I'm eager
23  to enlist your help in beginning the process of
24  reducing and ultimately ending our use of
25  privately operated prisons.

Page 94

1  Do you see that?
2  A.  Yeah.
3  Q.  And that -- that was new news, right?
4  That hadn't been said by the DOJ before, right?
5  A.  Which part of the sentence?
6  Q.  Whole -- whole -- the whole --
7  A.  That sentence or --
8  Q.  The whole sentence.
9  A.  I mean, no.  This says, I am eager to
10  enlist your help in beginning the process of
11  reducing, but -- yes, I think that's new.
12  Q.  Okay.  On page 1, the last paragraph,
13  it says, Private prisons served an important role
14  during a difficult period, but time has shown
15  that they compare poorly to our own Bureau
16  facilities.
17      And then it -- the first clause after
18  that says, They simply do not provide the same
19  level of correctional services, programs and
20  resources.
21      Do you see that?
22  A.  Yes.
23  Q.  Now, had -- had the DOJ said that
24  before?
25  A.  That they don't provide the same

Page 95

1  level of correctional services, programs and
2  resources?
3  Q.  Yep.
4  A.  That -- that information was known.
5  They -- they don't provide the same.  They're not
6  even -- they're not asked to provide the same.
7  So that's -- that's -- that's just known
8  information.  I don't think the -- I think the --
9  they're contracting for different services.
10  Q.  So you say that was known information
11  based on the contracts for the private prisons?
12      MR. WHITWORTH:  Object to the form.
13      THE WITNESS:  I say that it was
14  known that the private prisons had
15  different services and programs and
16  resources than other prisons.
17      BY MR. WOOD:
18  Q.  And -- and, again -- and how -- how
19  was that known?
20  A.  I think that was known for many
21  reasons.  I think they -- well, I'm quite sure
22  that's something I address in my report.  They
23  just have different services that they're
24  providing.  They're different types of prisons
25  with different populations providing different

Page 96

1  services.
2  Q.  Where -- where is that in your
3  report?
4  A.  Well, I don't -- I'm pretty sure it's
5  in my earlier report as well.  I -- I don't think
6  that any of your experts have disputed that they
7  provide different services.  But I'm not finding
8  where I say that in my report.
9  Q.  Okay.  Would you turn to page 29 of
10  your report?
11  A.  Sure.  Oh, I'm right there.
12  Q.  Okay.  You say in paragraph 49 that
13  the plain language of the Yates memo indicates
14  that it did not rely on any newer or more current
15  data than the OIG report.
16      Do you see that?
17  A.  Yes.
18  Q.  How -- so my question to you is what
19  did the Yates memo rely on in reaching its
20  conclusions in paragraph 3 that we just looked
21  at?
22  A.  I -- so when I'm saying the plain
23  language, I'm saying you read the language and
24  see what they say -- what the memo references and
25  relies upon.

Page 153

1    recovered more than CCA through February 2017,
2    right?
3         A.    February 2017.  Well -- so if you
4    take out -- so between -- well, I don't have a
5    chart where you can see the two of them together,
6    right?
7              So GEO had some good news about a --
8    a contract and it was sort of mixed news the
9    second day and then in the -- the following,
10   like, month it's the -- I want to say like
11   D. James Ray (ph.) or D. Ray James (ph.) or --
12   anyway, that's the facility.
13             Yeah.  So part of the reason GEO
14   outperformed CoreCivic during some of this time
15   period is good news about this D.J. Rames (ph.)
16   or -- I'm not sure if that's the exact name.  I
17   think those are the three -- three parts of the
18   name.
19        Q.    And that's -- that was -- that's
20   company-specific news unrelated to the BOP,
21   right?
22        A.    Well, it's company-specific news.  It
23   may actually be a BOP.  I'm not sure if it is a
24   BOP contract.
25        Q.    All right.  Let -- let's -- let --

Page 154

1         A.    But it's a GEO facility, not a
2    CoreCivic facility.
3         Q.    Right.  Let's turn to your rebuttal
4    report.  And I don't -- I don't think we've
5    introduced this yet, but it's tab 3 in my binder
6    and I guess we should introduce it as
7    Exhibit 543.
8              (Thereupon, Allen Exhibit
9              Number 543 was marked for
10             identification.)
11             BY MR. WOOD:
12        Q.    All right.  And, Ms. Allen, do you
13   recognize Exhibit 543 to be your rebuttal report?
14        A.    Yes.
15        Q.    Okay.  On page 9 of your report at
16   the top you say that the two alleged corrective
17   disclosures --
18             MS. REPORTER:  I'm sorry, sir?
19             BY MR. WOOD:
20        Q.    On the top of page 9 you say that
21   the -- the two alleged corrective disclosures --
22   and we're talking about Cibola and the Yates
23   memo.  You say they're consistent with the
24   materialization of a known risk about a shift in
25   policy driven by politics.

Page 155

1    Do you see that?
2         A.    Yes.
3         Q.    And you wrote that statement, so you
4    agree with it, right?
5         A.    Yes.  So you're reading part of the
6    sentence, so -- but I say -- yes, I agree with
7    my --
8         Q.    You agree with your report?
9         A.    I agree with my report.
10        Q.    Okay.  And -- and so when you say it
11   was the material -- the materialization of a
12   known risk, what support do you have for your
13   opinion that these were known risks?
14        A.    I say it's consistent.  I say,
15   However, the two alleged corrective disclosures
16   that Mr. Dalrymple examines are not consistent
17   with the materialization of fraud-related cost
18   and quality issues at CoreCivic's facilities, but
19   instead are consistent with the materialization
20   of a known risk about a shift in policy driven by
21   politics.
22        Q.    Yep.  So when you say they're
23   consistent with the materialization of a known
24   risk, what is the known risk that you're
25   referring to?

Page 156

1         A.    That there's a -- so that -- that
2    there could be a shift in policy away from
3    wanting to use private prisons and that was
4    something that the company had warned about in
5    its SEC filings, as we discussed earlier.
6              And the -- the -- the -- the Yates
7    memo, which the market interpreted and perceived
8    to be a shift in policy driven by politics,
9    the -- the -- the market did not consider that
10   CoreCivic's cost or quality had changed.  The
11   market did not understand that CoreCivic had a
12   different relationship to BOP than its
13   competitors did, for example, but instead the
14   market believed that this was a negative shift
15   away from private prisons that was similarly
16   affecting all private prison companies.
17        Q.    You're -- you're saying it's -- okay.
18   I understand what you're saying.  That's fine.
19             I want to give you a hypothetical.
20   Let's assume that there was only one statement at
21   issue in this case and it was made one week
22   before the Yates memo.
23             Are you with me so far?
24        A.    Okay.
25        Q.    And that statement is from the CEO,

Case 3:16-cv-02267    Document 346-5    Filed 11/20/20    Page 5 of 6 PageID #: 11659
www.aptusCR.com
Pages 153..156

Confidential Pursuant to Protective Order

Lucy P. Allen | Grae vs. Corrections Corporation of America, et al.

Page 157

let's say, that -- the statement is that the DOJ will never announce that the BOP is going to reduce and ultimately eliminate the use of private prisons. Okay? That's -- that's the statement.

You'd agree that the Yates memo was corrective of that statement, right?

MR. WHITWORTH: Object to the form of the hypothetical.

THE WITNESS: I think that's the case, yes. I mean -- I mean, I -- I suppose if the -- nobody believed the -- yeah. I -- I think that's -- that would be corrective, yes.

BY MR. WOOD:

Q. Okay. And so -- and one more hypothetical. Let's assume, again, the CEO -- a week before the Yates memo and the CEO says no political shift will ever result in an announcement from the DOJ that the BOP is going to reduce and ultimately eliminate the use of private prisons.

You agree that the Yates memo would be corrective of that statement as well, right?

MR. WHITWORTH: Objection to the

Page 158

form of the hypothetical.

THE WITNESS: I believe so, yes.

MR. WHITWORTH: Sorry.

BY MR. WOOD:

Q. Great.

If we turn to --

MR. WOOD: Give me a second to make sure I've got the right -- that we all have the right exhibit in front of us -- tab 9 -- well, tab 9 is the court's order denying class certification, which I don't think we've marked. So I think we probably should as Exhibit 544.

(Thereupon, Allen Exhibit Number 544 was marked for identification.)

BY MR. WOOD:

Q. Do you have that in front of you, Ms. Allen?

A. Yes.

Q. All right. And I'd like -- I'd ask you to turn to page 14 of the court's opinion. I'd ask you to read the paragraph to yourself. It starts In her report and -- and let me know when you're finished.

Page 159

A. Okay.

Q. Is there anything in that paragraph that you just read from the court's order that -- that you disagree with?

A. Well, it says, To the contrary, the record suggests that, insofar as the Yates memo it can be said to reflect that political decision was driven by precisely the deficiencies.

I don't know if that is what -- I'm not sure what the record to date that the judge is referring to as of this point. I don't know -- so I don't know. I don't think the record now is -- is consistent with that, but -- and that's not what the market has understood the Yates memo to represent.

So I don't believe the court has -- at the time that this decision -- I mean, this is the decision that -- that basically accepted defendants' view and -- and denied class certification. So I don't -- you know, so I don't know how far -- I don't -- I don't know what record the court has reviewed to do that.

So it -- it may be true, given the record that the court was reviewing, that that is what it suggests.

Page 160

And I think -- yeah. And I don't -- I don't necessarily disagree with other parts of it, but I think it is based on a limited -- a limited record.

BY MR. WOOD:

Q. And you -- you -- you haven't reviewed the -- the full record in this case, right?

A. I'm not sure what that means, to review the full record. So I think what the court reviews is different than what I would review. I'm not aware of any court that would review all the analyst reports and, you know, all the things that -- that I have reviewed or that your experts may have reviewed.

So I don't even really know what it -- what -- I'm not even sure what the record means. But I am sure that I have not reviewed everything.

Q. Right. But you --

A. I am also sure that the -- I'm also sure that the court has not reviewed everything that I have reviewed and -- and it -- you know, this was -- this is a decision that denied class certification and sided with CoreCivic.