# EXHIBIT 4

Videotaped Deposition of

# Lucy P. Allen

October 14, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential Pursuant to Protective Order**



Page 9

1 have opinions that you can share about his
2 rebuttal report that don't require you to go line
3 by line through the report?
4     MR. WHITWORTH: Object to the form.
5     THE WITNESS: I'm not sure what you
6 mean by that, in general do I have
7 opinions that I can -- I mean, I don't --
8 can I think of things off the top of my
9 head that may not be comprehensive?
10 Perhaps.
11     BY MR. WOOD:
12   Q.  Sure. Let's -- let's do that.
13   A.  I have a copy of his report here.
14 Shall I look at that? That might help me to --
15   Q.  No, I'm just interested in -- in --
16 in -- in whether you have opinions about his
17 report that you can share without going line by
18 line through it, because I don't want to do that
19 right now.
20   A.  Yeah, and I didn't mean that I would
21 necessarily go line by line. I think at least
22 looking at his report would -- would help me, if
23 I could look at his -- the headings.
24     Glancing at his report may be helpful
25 to structure my comments.

Page 10

1   Q.  Okay. Well, that's an exhibit that
2 we're going to look at later, so I'm -- I'm happy
3 to -- to do that later in the deposition.
4     How much --
5     MS. REPORTER: Counsel, can we go
6 off the record?
7     MR. WOOD: Sure.
8     VIDEO OPERATOR: Okay. The time is
9 10:07 a.m. and we're off the record.
10     (Thereupon, a discussion was had off
11     the record.)
12     VIDEO OPERATOR: The time is
13 10:09 a.m. and we're on the record.
14     MR. WHITWORTH: Just for the
15 record, defense objected to the previous
16 question by Mr. Wood.
17     BY MR. WOOD:
18   Q.  Ms. Allen, how -- how much time did
19 you personally spend on the reports in this case
20 that you issued this year?
21   A.  I would estimate between the reports,
22 as well as some time for preparation for today,
23 about 100 hours.
24   Q.  And there were folks that helped you
25 write your report, right?

Page 11

1   A.  I had a team and in your office
2 helped me in the preparation of my reports,
3 correct.
4   Q.  And -- and they helped write some of
5 it too, right?
6   A.  I don't know if I would say they
7 helped write it. They helped in the drafting
8 process. The -- the content of the report and
9 the opinions and findings are my own. I had a
10 team that assisted me.
11   Q.  Okay. And can you tell us the names
12 of the folks that were on that team, please?
13   A.  Yeah. So the primary people
14 assisting me in preparing the reports -- and I am
15 assuming you're talking about there are two
16 reports that I have done in this loss causation
17 and damages phase.
18     Are those the reports you're
19 referring to? I think you previously deposed me
20 on prior reports.
21   Q.  Right, just the -- the 2020 reports,
22 for lack of a better term.
23   A.  Okay. Jorge Baez, Agastya Shastri,
24 Jake Brekelbaum, Andrei Boiko were the primary
25 members assisting me in -- in this work.

Page 12

1   Q.  Any folks that you can recall who
2 assisted you that were not the primary folks?
3   A.  Yeah. So I had a -- I had a peer
4 review of my report which was done by a colleague
5 at NERA that did not work on the report, Dave
6 Tabak.
7     I don't recall others, but I
8 wouldn't -- there may have been others that had
9 helped with certain parts or checking, but not
10 specifically that I recall.
11   Q.  Okay. Do you -- do you have a copy
12 of your August 7th -- so we have a binder that we
13 sent to you, which I believe will get delivered
14 in the next 40 minutes, which has copies of some
15 documents. So hopefully that will help in a
16 little bit, but I -- I'm going to introduce your
17 report as an exhibit.
18     MR. WOOD: This is tab 2 in the
19 documents that we sent to Aptus. And I
20 think we're starting Exhibit 534. So
21 if -- if Aptus wants to share that.
22     BY MR. WOOD:
23   Q.  But I was going to say, Ms. Allen, if
24 you have a copy of your -- a hard copy of your --
25 your August 7th expert report in front of you,

Case 3:16-cv-02267   Document 350-4   Filed 11/20/20   Page 3 of 10 PageID #: 11923
Page 9..12
www.aptusCR.com

Page 37

1  dismiss.
2      A.   I do recall that.  And I do -- I have
3  that now as one of the alleged
4  misrepresentations.
5          As I recall, it was not in the
6  section of the complaint that lists the
7  categories and types of misrepresentations.  It
8  was somewhere else in the complaint.
9          So if you looked at the -- no, I
10 don't have the complaint in front of me.  And
11 this was a while ago.  But as I recall, the
12 headings and the categories of the complaint made
13 clear that the alleged misrepresentations were in
14 one section and the one that you told me that I
15 had omitted was somewhere else.
16         So it was not contained within what
17 would -- would organizationally and normally been
18 the section that you listed all the alleged
19 misrepresentations.
20         And if you look at Appendix C to my
21 report, I think you'll see that I have listed all
22 the alleged misrepresentations and I've given
23 them all numbers and they all cite to a similar
24 area of the complaint, except for M30, which
25 cites to paragraph 35.

Page 38

1      Q.   Right.  But paragraph -- you -- you
2  agree, though, that paragraph 35 is not included
3  in Exhibit 1, right?
4          MR. WHITWORTH:  Object to the form.
5          BY MR. WOOD:
6      Q.   Let me -- let me ask a -- a -- a more
7  specific question, hopefully to avoid that
8  objection.
9          You -- you agree that the -- the --
10 literally the -- the characters paragraph symbol
11 and 35 do not appear in Exhibit 1, right?
12         MR. WHITWORTH:  Same objection.
13         THE WITNESS:  I believe that is
14   correct.
15         BY MR. WOOD:
16     Q.   And so --
17     A.   And, again, I mean, just -- you
18 have -- plaintiffs have written a complaint where
19 all of the alleged misrepresentations are under a
20 category that -- a heading that has that.  And
21 the -- the one that you are asking about and that
22 you asked me about previously was not listed
23 there.
24         So it's a -- it's a -- I -- I have --
25 I have considered that alleged misrepresentation

Page 39

1  and I have analyzed it in this report.
2          It is not -- and you did bring this
3  question up at my last deposition.
4      Q.   Yeah, I -- I disagree that you've
5  analyzed it in the report.  I don't think that's
6  true.
7          But I'm going to introduce your
8  supplemental report from 2018 -- and this is
9  tab 1 -- as Exhibit 536.
10         MR. WOOD:  If we could pull that
11   up.
12         (Thereupon, Allen Exhibit
13   Number 536 was marked for
14   identification.)
15         THE WITNESS:  November 2018, I have
16   that.
17         BY MR. WOOD:
18     Q.   Yeah, November 21, 2018.  Your --
19 yeah, if you've got a hard copy --
20     A.   Okay.  Yep.
21     Q.   I can't imagine --
22     A.   Yeah.
23     Q.   -- we're going to have a dispute
24 about your report -- the -- the --
25     A.   Okay.

Page 40

1      Q.   Yeah.
2          But they have put it in the -- in the
3  chat here if you want to just pull up what's in
4  the chat box and confirm that Exhibit 536 is your
5  November 21, 2018 report.
6      A.   Okay.  Yeah, I guess it takes awhile
7  to open these chats.
8      Q.   Yeah.
9      A.   Yeah, that looks right.
10     Q.   And if you turn to paragraph 23 on
11 page 11 of your prior report --
12     A.   I'm sorry.  Look at where?
13     Q.   It's -- well, it's starting on
14 paragraph 23 on page 11 of your report.
15     A.   This earlier report, okay.
16     Q.   Right, the -- Exhibit 536, the
17 November 21, 2018 report.
18         Are you on page 11?
19     A.   Yes.
20     Q.   And you see on page 11 and going into
21 page 12, this report mentions -- well, it's the
22 same thing we were just talking about, right,
23 where on paragraph 24 you say that this March 30,
24 2016 statement is -- is not in the section with
25 the other false statements, right?

Page 49

1  So it's not to say that I haven't
2  analyzed it, but the way you wrote your
3  complaint, you have a large section labeled
4  alleged misstatements and omissions. It goes
5  chronologically through all the various
6  statements and it claims what is -- what -- there
7  are -- I think it's something like four
8  categories of -- of types of issues that you say
9  are wrong with each of these statements.
10      And you did not put that statement in
11 that whole section of your complaint. So I
12 just -- you know, organizationally I didn't know
13 what to do with it. You didn't -- you didn't put
14 it in your section. You didn't have a -- a
15 description of why it was false and misleading.
16     Q.  Okay. So even though the court
17 relies on paragraph 35 in denying the defendants'
18 motion to dismiss, even though I accused you of
19 ignoring paragraph 35 in your class cert report
20 and you subsequently addressed it in your
21 previous supplemental report, it's still not in
22 Exhibit 1, right?
23     MR. WHITWORTH: Object to the form.
24     THE WITNESS: I have explained to
25 you it is -- it is analyzed in my report.

Page 50

1  It is mentioned as an alleged
2  misrepresentation in my report.
3      It does not fit into category 1
4  because of the way that you wrote your
5  complaint. You have a section that's called
6  something like alleged misstatements and
7  omissions. It goes on and on for pages.
8  And for each alleged misstatement in your
9  complaint, you say why you claim that
10 alleged statement is false or misleading.
11     What -- what Exhibit 1 does is take
12 each of the reasons that you say that the
13 alleged misstatements are false and
14 misleading and rather than doing it as -- in
15 the order that you have done it, which is by
16 misstatement, it takes each category of --
17 of misstatement and puts them by category.
18     You did not categorize the -- the
19 sentence or sentences in paragraph 35 and
20 say why they were allegedly false or
21 misleading, so it does not fit into
22 Exhibit 1. Exhibit 1 is putting your claims
23 of why statements are allegedly false and
24 misleading into a -- a table.
25     So I feel the -- I have analyzed your

Page 51

1  claims. I have reviewed the judge's
2  decision. And your -- your question about
3  my table 1 is really a question about why
4  did you write the -- if this was such an
5  important alleged misstatement, why is it
6  not under your section of misstatements and
7  why did you not say in the complaint a
8  category and -- or set of categories of what
9  made this particular statement false or
10 misleading.
11     So that's what Exhibit 1 is doing.
12 It's just reorganizing what you have alleged
13 in the complaint.
14     BY MR. WOOD:
15     Q.  Is there anywhere in your August
16 report, anywhere, that you cite to paragraph 35,
17 other than in M30 or whichever one it is of the
18 alleged misrepresentations?
19     MR. WHITWORTH: Object to the form.
20 You're -- you're still just talking about
21 the numbered paragraph 35?
22     MR. WOOD: Yep.
23     MR. WHITWORTH: Okay.
24     THE WITNESS: So I see it cited
25 twice, for example, on page 24 of

Page 52

1  Appendix C.
2      BY MR. WOOD:
3      Q.  Right.
4      A.  I don't believe so. I don't see
5  other of the alleged misrepresentations being
6  cited multiple times either, though, so --
7      Q.  Isn't it true, Ms. Allen, that you
8  intentionally ignored the statement in
9  paragraph 35 in your class cert report and in
10 this report because if you had actually analyzed
11 it, it would have undermined your conclusions?
12     MR. WHITWORTH: Object to the form.
13     THE WITNESS: Absolutely not true.
14     BY MR. WOOD:
15     Q.  Can you point me to anywhere in your
16 August 2020 report where you analyze the
17 statements in paragraph 35?
18     MR. WHITWORTH: Object to the form.
19 You still don't want to show her the
20 statements in paragraph 35?
21     MR. WOOD: No, that's fine.
22     Let's introduce the complaint. So
23 it's tab 11. And tab 11's going to be
24 Exhibit 538.
25

Page 61

1  Q. And -- but you agree that the last
2  time I deposed you in this case I criticized you
3  for not analyzing paragraph 35 in your class
4  certification report, right?
5      MR. WHITWORTH: Object to the form.
6      THE WITNESS: You criticized me for
7  not listing it as an alleged
8  misrepresentation. I don't believe I said
9  I didn't analyze it. I have listed it and
10  analyzed it in my reports on damages and
11  loss causation.
12      BY MR. WOOD:
13  Q. Well, in your initial report you were
14  looking at the alleged misstatements and you were
15  looking at whether or not there was any price
16  impact attributable to the alleged misstatements
17  in your class cert report, right?
18      MR. WHITWORTH: Object to the form.
19      THE WITNESS: I was analyzing price
20  impact from the alleged misstatements in
21  my first report, that's correct.
22      BY MR. WOOD:
23  Q. And -- but you didn't analyze price
24  impact in paragraph 35, which is why -- in your
25  opening report, which I criticized you for, and

Page 62

1  that's why you did it in your supplemental report
2  that we just looked at for the class cert, right?
3  A. So I'm not sure I'm going to agree
4  with your characterization of that. I think I
5  did analyze it. I think I didn't list it as an
6  alleged misrepresentation because, again, it was
7  not under the -- the section called Defendants
8  made numerous fraudulent statements and omissions
9  during the class period.
10  Q. All right. We'll --
11  A. And it was under the background
12  section.
13  Q. We will let the reports --
14  A. And -- and so what I say in my
15  supplemental report is there was no new
16  information in the March 30th statement that was
17  not already included in plaintiffs' other alleged
18  misrepresentations and not already analyzed in
19  the Allen report.
20  Q. All right. We'll let the reports
21  speak for themselves.
22      Do you have an opinion on market
23  efficiency in this case?
24  A. I have not been asked to -- I guess
25  the question is -- is whether -- I have some

Page 63

1  findings about whether plaintiffs' experts'
2  claims are consistent with their claim of market
3  efficiency. I have not been asked to analyze,
4  nor have I, whether CoreCivic stock was efficient
5  during the class period.
6  Q. Okay. And so just to be clear,
7  because you haven't been asked to analyze whether
8  CoreCivic's stock was efficient during the class
9  period, you don't have an opinion on whether
10  CoreCivic's stock was efficient during the class
11  period, right?
12  A. I don't have a finding on whether it
13  was a -- yeah, I think that's correct.
14  Q. Okay. And in Mr. Dalrymple's opening
15  report in this case, his August 2020 report, he
16  has a -- a -- a section in one of his appendices
17  on market efficiency.
18      Do you remember that?
19  A. I have his report.
20  Q. Let's -- well, let -- if you're going
21  to look at something, let's -- let's introduce it
22  into evidence, because I don't want to just look
23  at random documents --
24  A. Okay.
25  Q. -- separately.

Page 64

1      MR. WOOD: So why don't we
2  introduce tab 4, which is going to be
3  Exhibit 538 (sic).
4      VIDEO OPERATOR: Are you sure it's
5  not going to be 539?
6      MR. WOOD: No, I am not sure about
7  that.
8      VIDEO OPERATOR: I think it's 539.
9      MR. WOOD: All right. That's good.
10  Let's do 539.
11      (Thereupon, Allen Exhibit
12  Number 539 was marked for
13  identification.)
14      BY MR. WOOD:
15  Q. Ms. Allen, if you want to take a look
16  at 539 and confirm that that's Mr. Dalrymple's
17  August 7, 2020 report.
18  A. Yes.
19  Q. All right. And if you'd go to
20  Mr. Dalrymple's Appendix C, which starts on
21  page 57 of the PDF, and --
22  A. So E like Edward or --
23  Q. C like Chris.
24  A. Okay.
25      Yes.

Page 93

1  A. Yes.
2  Q. And the Yates memo was new news,
3  right?
4      MR. WHITWORTH: Object to the form.
5      THE WITNESS: I'm not sure exactly
6  what you mean by that, but when the --
7  when the Yates memo came out and it was
8  public on this date, it was news to the
9  market, yeah.
10     BY MR. WOOD:
11 Q. And the -- well, the -- the
12 announcement that the BOP was going to reduce and
13 eliminate the use of private prisons, that was
14 new news, right? That hadn't been previously
15 announced?
16 A. I don't know if it says they're going
17 to eliminate. It says reducing our use of
18 private prisons. I'm not sure it says they will
19 eliminate it, but --
20 Q. All right. Well, let's -- if you
21 look at page -- the top of page 2 of the Yates
22 memo, it says, For all these reasons, I'm eager
23 to enlist your help in beginning the process of
24 reducing and ultimately ending our use of
25 privately operated prisons.

Page 94

1      Do you see that?
2  A. Yeah.
3  Q. And that -- that was new news, right?
4  That hadn't been said by the DOJ before, right?
5  A. Which part of the sentence?
6  Q. Whole -- whole -- the whole --
7  A. That sentence or --
8  Q. The whole sentence.
9  A. I mean, no. This says, I am eager to
10 enlist your help in beginning the process of
11 reducing, but -- yes, I think that's new.
12 Q. Okay. On page 1, the last paragraph,
13 it says, Private prisons served an important role
14 during a difficult period, but time has shown
15 that they compare poorly to our own Bureau
16 facilities.
17     And then it -- the first clause after
18 that says, They simply do not provide the same
19 level of correctional services, programs and
20 resources.
21     Do you see that?
22 A. Yes.
23 Q. Now, had -- had the DOJ said that
24 before?
25 A. That they don't provide the same

Page 95

1  level of correctional services, programs and
2  resources?
3  Q. Yep.
4  A. That -- that information was known.
5  They -- they don't provide the same. They're not
6  even -- they're not asked to provide the same.
7  So that's -- that's -- that's just known
8  information. I don't think the -- I think the --
9  they're contracting for different services.
10 Q. So you say that was known information
11 based on the contracts for the private prisons?
12     MR. WHITWORTH: Object to the form.
13     THE WITNESS: I say that it was
14 known that the private prisons had
15 different services and programs and
16 resources than other prisons.
17     BY MR. WOOD:
18 Q. And -- and, again -- and how -- how
19 was that known?
20 A. I think that was known for many
21 reasons. I think they -- well, I'm quite sure
22 that's something I address in my report. They
23 just have different services that they're
24 providing. They're different types of prisons
25 with different populations providing different

Page 96

1  services.
2  Q. Where -- where is that in your
3  report?
4  A. Well, I don't -- I'm pretty sure it's
5  in my earlier report as well. I -- I don't think
6  that any of your experts have disputed that they
7  provide different services. But I'm not finding
8  where I say that in my report.
9  Q. Okay. Would you turn to page 29 of
10 your report?
11 A. Sure. Oh, I'm right there.
12 Q. Okay. You say in paragraph 49 that
13 the plain language of the Yates memo indicates
14 that it did not rely on any newer or more current
15 data than the OIG report.
16     Do you see that?
17 A. Yes.
18 Q. How -- so my question to you is what
19 did the Yates memo rely on in reaching its
20 conclusions in paragraph 3 that we just looked
21 at?
22 A. I -- so when I'm saying the plain
23 language, I'm saying you read the language and
24 see what they say -- what the memo references and
25 relies upon.

Page 113

1 CoreCivic.
2 So I have seen the information that
3 plaintiffs and their experts have put forward --
4 Q. I'm just --
5 A. -- and the -- the -- the information
6 is not -- I haven't seen information that's
7 consistent with the claims. So I can't say that
8 I -- I do know definitively what happened, but I
9 can say that I have reviewed all the materials
10 that plaintiffs and their economic experts have
11 put forward supporting plaintiffs' claim and --
12 and I don't see that supporting that claim.
13 So I have -- I -- so I have some
14 information on that to the extent that you think
15 the information that you've put forward supports
16 it.
17 Q. Have you reviewed plaintiffs' summary
18 judgment papers?
19 A. When would those have been filed?
20 Q. Well, we --
21 A. If they're in my materials
22 considered, then --
23 Q. No, we -- we haven't filed them.
24 And -- and so you don't know what evidence
25 plaintiffs have to support the notion that the

Page 114

1 Yates memo was actually driven by cost and
2 quality, right?
3 MR. WHITWORTH: I'll object to the
4 form.
5 Actually, withdrawn.
6 THE WITNESS: Oh. I -- I -- I
7 don't know what's in a motion that you
8 have not yet filed.
9 BY MR. WOOD:
10 Q. I -- I agree with that. That's
11 something we can agree on. Let me ask maybe a
12 simpler question:
13 You were not asked by the defendants
14 to reach an opinion on what cause -- on what
15 caused the policy shift that is articulated in
16 the Yates memo; is that fair?
17 A. I believe that's correct. I was, at
18 least for this report that we're talking about
19 now, asked to -- yes, that's correct.
20 Q. Have you -- okay. I think we
21 established a few minutes ago that you concluded
22 that the market believed the Yates memo to signal
23 a shift in policy driven by politics, right?
24 That's what you say in your report?
25 A. Yes.

Page 115

1 Q. How did the market go about reaching
2 an understanding as to whether the Yates memo was
3 driven by politics or driven by quality and cost
4 issues?
5 MR. WHITWORTH: Object to the form.
6 THE WITNESS: The market reacts,
7 particularly in an efficient market, which
8 is what plaintiffs have claimed, to the
9 public information that is out there,
10 including, you know, the reading of the
11 Sally Yates memo, and the market can have
12 its own plain English understanding of
13 what words mean.
14 And after that same reading of that
15 memo, the -- my plain English understanding
16 of those words is consistent with analyst
17 commentary and other market commentary.
18 How the market reacts to information
19 is -- they're -- you know, the -- the
20 market -- efficient market, there's --
21 there's lots of forces that to the extent
22 money can be made by figuring something out
23 and figuring out what's driving, you know,
24 where the market will go, there's a lot of
25 incentive to try to uncover information.

Page 116

1 So finding out how companies are
2 really doing and what really might happen is
3 something that the -- that's one of the
4 reasons the market is efficient, is people
5 trying to make money off of trading the
6 stock. And to the extent that they can, you
7 know, find out what's really going on or
8 figure out, you know, where things -- what
9 will happen in the future to stock prices,
10 then, you know, you can -- you can get rich
11 like that.
12 So that's what -- market forces make
13 this -- make public information and the
14 expectation of you know, discounted value of
15 future cash flows incorporated into the
16 stock price. And that's what -- that's
17 where the whole fraud on the market theory
18 and the market efficiency, you know, comes
19 into play, is that these forces make the
20 market react to public information very
21 quickly.
22 BY MR. WOOD:
23 Q. One -- one possible, you know, data
24 point that a securities analyst might rely on in
25 figuring out, you know, what was driving this

Page 117

1  policy shift would be statements by CoreCivic
2  itself, right?
3      A.   Possibly.  I mean, I think this --
4  first of all, this memo is not directed at
5  CoreCivic.  It's at other -- it affects all of
6  the private prisons and it's expected to affect
7  all of the private prisons.
8      Q.   You --
9      A.   You know, I'm not sure why -- I --
10 I'm not sure why specifically the market or
11 analysts would think that CoreCivic would have
12 specific insight into this, but sure.  I don't
13 know, you know.
14     Q.   And you -- you agree, right, that
15 the -- the only facility that is specifically
16 referred to in the Yates memo is a CoreCivic
17 facility, right?
18         MR. WHITWORTH:  Object to the form.
19         THE WITNESS:  Oh.  You mean they
20     mention a CoreCivic facility by name?
21     Well, they don't mention -- I mean,
22     they're talking about reducing our use of
23     private prisons.  I don't think that
24     anyone thought this was specifically
25     directed at CoreCivic.

Page 118

1          BY MR. WOOD:
2      Q.   Well, if you look at page 2 of the
3  Yates memo in -- in the second paragraph, you see
4  it says, I am aware that the Bureau is already
5  taking steps in this direction.
6          Do you see that?
7      A.   Yes.
8      Q.   And then it says, Three weeks ago,
9  the Bureau declined to renew a contract for
10 approximately 1200 beds.
11         Do you see that?
12     A.   Yes.
13         VIDEO OPERATOR:  Okay.  I'm sorry
14     to interrupt right now, but Lucy, you're
15     going to have to angle your camera away
16     from that window because it's making you
17     go dark.
18         Thank you.
19         THE WITNESS:  Oh, sorry.  I don't
20     know what's going on.
21         VIDEO OPERATOR:  It's good now.
22         THE WITNESS:  Is that better?
23         VIDEO OPERATOR:  Yes.
24         THE WITNESS:  Sorry about that.
25

Page 119

1          BY MR. WOOD:
2      Q.   Okay.  And so you -- you see in the
3  second sentence it says, Three weeks ago, the
4  Bureau declined to renew a contract for
5  approximately 1200 beds.
6          Do you see that?
7      A.   Yes.
8      Q.   And you understand that that's
9  referring to a specific core -- CoreCivic
10 facility, right?
11     A.   Yes, I believe that's a Cibola --
12     Q.   Right.  Okay.
13     A.   -- facility.
14     Q.   I want to ask you about a specific
15 case, which is a broader --
16         MS. REPORTER:  I'm sorry?  Please
17     repeat that.
18         MR. WOOD:  Sure.
19         Let's turn to tab 13 in the binder.
20 And if we could mark that as Exhibit 541.
21         (Thereupon, Allen Exhibit
22     Number 541 was marked for
23     identification.)
24         BY MR. WOOD:
25     Q.   And tab 13 is -- is a case from the

Page 120

1  Sixth Circuit, which is obviously the Court of
2  Appeals --
3      A.   Can I just -- can I just interrupt
4  you for a second?
5      Q.   Yes.
6      A.   I'm just -- so they mention the -- I
7  guess with Cibola and then they talk about
8  amending an existing contract, which I think is a
9  GEO contract.
10     Q.   Well, if that's your testimony,
11 that's fine.
12         So Exhibit 541 -- it's tab 13 in
13 the -- the binder --
14     A.   Okay.
15         MR. WOOD:  Let me make sure this is
16     coming up.
17         MR. WHITWORTH:  At least when I
18     click on the link it's just the Yates
19     memo.
20         MR. WOOD:  Yeah.
21         Carrie, I think you need to fix that.
22         VIDEO OPERATOR:  Yes.  One second.
23 I'm sorry.  Those copy links aren't
24 wanting to go right.
25         MR. WOOD:  That's okay.

Page 129

1 language reading, let's say, of footnote 5, it's
2 saying that a materialization of the risk theory
3 is where the truth doesn't need to be expressly
4 disclosed, but the risk that was concealed is
5 disclosed instead, which leads to a stock drop,
6 right?
7        MR. WHITWORTH: Object to that
8 mischaracterization of the court order.
9        THE WITNESS: So I think what it
10 says is you might not have known that
11 there was a defect, but, instead, you see
12 the failures that are caused by the
13 defect.
14        BY MR. WOOD:
15    Q.    And that that is the equivalent of a
16 corrective disclosure, right?
17    A.    I don't think it says that, no. Oh,
18 it does. The materialization -- well, it -- it
19 doesn't particularly say that that is that. It
20 does -- it does say that even without an express
21 acknowledgment, the materialization would serve
22 as the equivalent of a corrective disclosure.
23    Q.    And that -- that makes sense to you
24 from an economics perspective, right?
25    A.    What?

Page 130

1    Q.    The notion that the market could
2 react not just to an express admission that
3 something previously was false, but that the
4 market might learn that something was false
5 through something like a product defect.
6    A.    No, the product defect is what was
7 concealed. So it's the failure that the market
8 sees.
9    Q.    Right. And so -- for example, let's
10 say a company says our cars never blow up, right,
11 and then the market -- just everyone is running
12 around and these cars are blowing up, right? The
13 market might see that and be like gee, their
14 statement that their cars never blow up appears
15 to be false because these cars are blowing up
16 everywhere, right?
17        MR. WHITWORTH: Object to the form.
18        THE WITNESS: Well, that seems like
19 a -- a directly corrective statement. So
20 the company says they don't blow up and
21 then they do blow up. So that is actually
22 correcting the false statement.
23        BY MR. WOOD:
24    Q.    Right.
25    A.    I don't think that's analogous to

Page 131

1 this, but --
2    Q.    Okay. But even if the company
3 doesn't admit that their cars blow up, the very
4 fact that they are blowing up is corrective,
5 right?
6    A.    Yes, I -- I agree with that. I don't
7 think that -- that -- that does not work well
8 with your CoreCivic example, but okay.
9    Q.    Yeah, we'll have to agree to disagree
10 on that, but I -- I appreciate your answer.
11 So --
12    A.    So in the CoreCivic answer, here
13 you're finding that the product fails. In the
14 CoreCivic, what your second economic expert said
15 is that the fact that analysts cited CoreCivic's
16 cost and quality as evidence that that was
17 important to the value proposition. And those --
18 the -- the market continued to think that
19 CoreCivic's cost and quality was good after the
20 end of the class period.
21        So none of your experts have found
22 any change in the analysts' view of the company's
23 cost and quality. So to the extent that the --
24 the -- the misrepresentations were
25 misrepresenting the cost and quality or hiding

Page 132

1 performance features, operating performance of
2 the company, that is not something the market
3 ever learned.
4        Whereas, in this example that the
5 judge decided the -- the market is actually
6 learning of product failures. The product is
7 actually not working and they have a -- a worse
8 view of the product.
9        Here, the market does not have a
10 worse view of CoreCivic's product and there's no
11 evidence that the market has a worse view of
12 CoreCivic's product.
13    Q.    The market did, however, after the
14 Yates memo reevaluate and adjust its expectations
15 with respect to future revenues from BOP
16 contracts, right?
17    A.    As -- as -- as it did with its --
18 the -- the same thing happened to its peer that
19 was not allegedly misrepresenting their cost and
20 quality. So to the extent you take out what's
21 going on with the industry, you -- you see
22 exactly the same effect with -- its peer company
23 is also. And what the market is finding is not
24 that there's a bad relationship with BOP or that
25 there's worse cost and quality. They're thinking

Case 3:16-cv-02267    Document 350-4    Filed 11/20/20    Page 10 of 10 PageID #: 11939
Pages 129..132
www.aptusCR.com