# UNITED STATES DISTRICT COURT

## MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and )    Civil Action No. 3:16-cv-02267
on Behalf of All Others Similarly Situated, )
                             )    Honorable Aleta A. Trauger
              Plaintiff, )
                             )    Magistrate Judge Jeffrey S. Frensley
      vs. )
                             )
CORRECTIONS CORPORATION OF )
AMERICA, et al., )
                             )
             Defendants. )
                             )

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

## REDACTED VERSION FILED PUBLICLY

# TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................4

      A.    CoreCivic's Business ...................................................................................4

      B.    CoreCivic's BOP Facilities.........................................................................4

      C.    Plaintiff's Omissions Claim ........................................................................5

            1.    The Adams Disturbance .....................................................................6

            2.    NEOCC Re-Bid ..................................................................................6

            3.    Cibola Cure Notice ............................................................................7

      D.    The Alleged Corrective Disclosures ...........................................................8

III.  ARGUMENT .......................................................................................................10

      A.    Plaintiff Cannot Establish That Defendants Made Any False Or
            Misleading Statements With Scienter .......................................................11

            1.    Defendants' Statements Regarding Quality And Cost Savings
                  Were Not Materially Misleading ......................................................12

            2.    Defendants' Statements Regarding The Company's Quality
                  Assurance Audits And Procedures Were Not False Or Misleading .........16

            3.    Defendants' Statements Regarding CoreCivic's Client
                  Relationships And Contract Renewals Were Not Materially
                  Misleading...........................................................................................17

            4.    Plaintiff Cannot Establish Scienter ..................................................19

      B.    Plaintiff Cannot Prove Loss Causation ....................................................20

            1.    Plaintiff's Evolving Theory of Loss Causation ................................22

            2.    The Yates Memo Was Not The Materialization Of A Risk That
                  Was Concealed By The Challenged Statements................................23

            3.    The Cibola Non-Renewal Was Not The Materialization Of A Risk
                  That Was Concealed By The Challenged Statements.......................30

IV.   CONCLUSION....................................................................................................30

i

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ................................................................................................... 11

*Aschinger v. Columbus Showcase Co.*,
    934 F.2d 1402 (6th Cir. 1991) ................................................................................... 10

*Bondali v. Yum! Brands, Inc.*,
    620 F. App'x. 483 (6th Cir. 2015) ............................................................................. 11

*In re BP p.l.c. Sec. Litig.*,
    2016 WL 3090779 (S.D. Tex. May 31, 2016) ................................................. 21-22, 29

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*,
    752 F.3d 82 (1st Cir. 2014) ....................................................................................... 30

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ................................................................................... 18

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) .............................................................................................. 10-11

*In re Champion Enters., Inc., Sec. Litig.*,
    144 F. Supp. 2d 848 (E.D. Mich. 2001), *aff'd sub nom. Miller v. Champion*
    *Enters. Inc.*, 346 F.3d 660 (6th Cir. 2003) .............................................................. 25

*Demoss v. Kretz*,
    2009 WL 47142 (M.D. Tenn. Jan. 7, 2009) ............................................................. 11

*Doshi v. Gen. Cable Corp.*,
    823 F.3d 1032 (6th Cir. 2016) ................................................................................... 19

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................. 20, 28

*In re DVI, Inc. Sec. Litig.*,
    2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) ............................................................. 30

*Ernst & Ernst v. Hochfelder*,
    425 U.S. 185 (1976) ................................................................................................... 19

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ........................................................................................19

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ........................................................................................19

*Janus Capital Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) .....................................................................................................12

*Lentell v. Merrill Lynch & Co.*,
396 F.3d 161 (2d Cir. 2005) .....................................................................................20, 21

*Longman v. Food Lion, Inc.*,
197 F.3d 675 (4th Cir. 1999) ........................................................................................18

*In re Lululemon Sec. Litig.*,
14 F. Supp. 3d 553 (S.D.N.Y. 2014), *aff'd*, 604 F. App'x 62 (2d Cir. 2015) .........................14

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) .......................................................................................................13

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ....................................................................................25

*In re Moody's Corp. Sec. Litig.*,
2013 WL 4516788 (S.D.N.Y. Aug. 23, 2013) .............................................................21, 24

*Mulvaney v. GEO Grp., Inc.*,
2017 WL 887193 (S.D. Fla. Feb. 23, 2017) ....................................................................29

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
877 F.3d 687 (6th Cir. 2017) .....................................................................................24, 30

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda*,
730 F.3d 1111 (9th Cir. 2013) ...............................................................................21, 24, 28

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ...............................................................................20, 21, 26

*Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*,
873 F. Supp. 2d 1070 (D. Minn. 2012) ...........................................................................24

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015) .............................................................................................13, 15, 16

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010) .................................................................................20, 24, 26

iii

*Ong v. Chipotle Mexican Grill, Inc.*,
    294 F. Supp. 3d 199 (S.D.N.Y. 2018)....................................................................17

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ...............................................................................24

*In re OSG Sec. Litig.*,
    2015 WL 3466094 (S.D.N.Y. May 29, 2015) .......................................................22

*Schuster v. Symmetricon, Inc.*,
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) .....................................................19

*Shanahan v. Vallat*,
    2008 WL 4525452 (S.D.N.Y. Oct. 3, 2008).........................................................22

*Silver v. H&R Block, Inc.*,
    105 F.3d 394 (8th Cir. 1997) ...............................................................................13

*In re TransDigm Grp., Inc. Sec. Litig.*,
    440 F. Supp. 3d 740 (N.D. Ohio 2020).................................................................24

*Wielgos v. Commonwealth Edison Co.*,
    892 F.2d 509 (7th Cir. 1989) ...............................................................................26

*In re Williams Sec. Litig.*,
    558 F.3d 1130 (10th Cir. 2009) ......................................................................22, 28

Case 3:16-cv-02267   Document 352-1   Filed 11/20/20   Page 5 of 38 PageID #: 11845

## I.    INTRODUCTION

CoreCivic operates prisons.  Sometimes bad things happen in prisons no matter whether the government, or a private company like CoreCivic, operates them.  But the most dangerous and least humane prison is not a government prison or a private prison—it is an overcrowded prison. For most of the Class Period, populations in prisons operated by the Federal Bureau of Prisons ("BOP") exceeded 120% of capacity.  Regardless of one's political views, this much is clear: private prisons fill an essential need during challenging periods.  And the public companies who operate private prisons, like CoreCivic, provide value to the government and their shareholders. Plaintiff itself chose to invest in CoreCivic, and invested even more in CoreCivic, despite filing this lawsuit accusing CoreCivic of misleading its investors.

Throughout the Class Period, CoreCivic operated between 64-85 contracts to operate facilities, with multiple government partners.  This case concerns only five facilities that CoreCivic operated pursuant to contracts with the BOP.  The manner in which CoreCivic operated the five facilities at issue was dictated by the terms of its contracts with the BOP, and CoreCivic's performance was monitored and evaluated by its own Quality Assurance division, the BOP, and other third parties—more frequently and thoroughly than the BOP's own prisons.  CoreCivic and the BOP were partners, working together to ensure that the facilities operated by CoreCivic were both safe and secure.  Indeed, the BOP maintained personnel on-site at every facility operated by CoreCivic.  Both partners recognized that the prison industry—whether publicly or privately operated—faces systemic challenges, including securing, and maintaining, adequate staffing levels for myriad geographies and specialties.  In particular, CoreCivic faced challenges at two facilities located in rural areas of Mississippi and New Mexico with providing healthcare services and attracting and retaining healthcare professionals to fill certain positions with the necessary (BOP-

mandated) credentials. Despite these challenges, which CoreCivic met, the BOP renewed each of CoreCivic's contracts for the five facilities at least once, and in some instances twice, during the Class Period. This is reflected by CoreCivic's renewal rate on its contracts with *all* government partners, which averaged over 91% during the Class Period.

The crux of Plaintiff's current theory is that Defendants' statements regarding CoreCivic's overall quality, cost-effectiveness, compliance, and relationships with its government partners over a five-year period were false and misleading because Defendants knew (but concealed) a risk that the Company's relationship with the BOP had "severely . . . deteriorated" or was on "the brink of collapse" such that it had no future prospects for obtaining BOP business. *See* Mot. to Dismiss Opinion (Dkt. 76). Plaintiff alleges that this concealed risk "materialized" in August 2016, when the Department of Justice announced that it would no longer rely on *any* private prisons, causing CoreCivic's (and its competitor's) stock price to drop until Donald Trump was elected, the policy was rescinded, and their stock prices fully recovered. But, after years of discovery, this theory of fraud has not borne out.

First, Plaintiff has not adduced any evidence that the 130-plus statements at issue were false or misleading. The facts regarding performance issues in healthcare services and staffing identified by the BOP at three of CoreCivic's BOP facilities are not in dispute. On those facts, Plaintiff survived dismissal at the pleading stage. But at summary judgment, Plaintiff cannot ignore the context of those discrete performance issues. Throughout the Class Period, CoreCivic indisputably received multiple positive indications from all of its government partners, including the BOP, regarding its performance. The BOP renewed CoreCivic's contracts, gave it discretionary award fees for above-satisfactory performance, and consistently informed CoreCivic that it would award contracts to it again. There is no evidence that these performance issues were

unique to CoreCivic's facilities, or that CoreCivic's facilities performed worse than any BOP facilities (or any other facilities).

Second, Plaintiff cannot overcome the higher hurdle of establishing that Defendants knew, or obviously should have known, that any of its statements were misleading. There is no evidence that the BOP ever informed CoreCivic that it was unlikely to be awarded contracts in the future, or that Defendants knew their performance issues were of sufficient magnitude to endanger the *very existence* of CoreCivic's relationship with the BOP. Defendants' statements were made based on honestly held beliefs and all of the information contemporaneously known to Defendants.

Third, Plaintiff's loss causation theory fails as a matter of law. The risk Plaintiff claims CoreCivic concealed—that the loss of its BOP business was inevitable—materialized most significantly in a Memorandum issued by Deputy Attorney General Sally Yates (the "Yates Memo") in August 2016. But Plaintiff cannot point to any evidence suggesting that the Yates Memo—which never mentioned CoreCivic, but directed the BOP to reduce its reliance on *all* private prison contractors—was caused by, or in any way linked to, CoreCivic's relationship with the BOP. Not one of the CoreCivic or BOP deponents suggested as much, nor did either of Plaintiff's "experts" (including a former BOP employee). Neither did the DOJ or any analyst or market observer—even after this lawsuit was filed. In reality, the risk that materialized in the Yates Memo was a *different* risk than the one Defendants allegedly concealed—it was a known political risk, and that fact was demonstrated by the rebound in CoreCivic's (and its competitor, The GEO Group Inc.'s ("GEO")) stock prices following the 2016 presidential election.

Because Plaintiff cannot prove the essential falsity, scienter, and loss causation elements of its claim, Defendants respectfully request this Court grant summary judgment in their favor.

3

## II. STATEMENT OF FACTS

### A. CoreCivic's Business

CoreCivic owns, operates, and manages correctional facilities under contracts with federal, state, and local correctional authorities, including the BOP. UF 1-2, 15. During the five-year Class Period, CoreCivic had between 64 and 85 contracts to operate or manage correctional and detention facilities and its renewal rate for its contracts with its government partners averaged over 91%. UF 3.

### B. CoreCivic's BOP Facilities

Within these 64-85 contracts, CoreCivic had contracts to operate five correctional facilities for the BOP: Adams County Correctional Center ("Adams"), Cibola County Correctional Center ("Cibola"), Eden Detention Center ("Eden"), McRae Correctional Facility ("McRae"), and the Northeast Ohio Correctional Center ("NEOCC") (collectively, the "BOP Facilities"). UF 15. CoreCivic's BOP contracts accounted for 9 to 13.7% of the Company's revenue throughout the Class Period. UF 16. CoreCivic's BOP contracts were "fixed-price type" contracts to operate low security facilities. UF 18-19. CoreCivic was entitled to award fees for performance above the acceptable, *i.e.*, "satisfactory" level, and could face deductions for failing to meet certain contractual terms. UF 21, 24. Each contract had a base period and a series of options where the BOP could extend the contract. UF 26, 29, 33, 36, 39. The BOP exercised all but one of CoreCivic's contract options during the Class Period. UF 25-40.

CoreCivic's BOP facilities were audited by CoreCivic, the American Correctional Association ("ACA"), the Joint Commission on Accreditation of Healthcare Organizations ("JC"), and the BOP. UF 41. CoreCivic conducted routine internal audits of all its facilities. UF 42. These audits tracked each facility's performance on more than 1,400 guidelines. UF 43-44. The BOP required that each of the BOP Facilities maintain ACA accreditation, and used the ACA to

4

monitor and accredit many of its own facilities. UF 45-46. Throughout the Class Period, CoreCivic's facilities maintained accreditations from both the ACA and the JC. UF 47-51.

The BOP monitored and reviewed performance at each of CoreCivic's BOP Facilities as well. UF 52-53, 60. The BOP conducted formal reviews through its Contract Facility Monitoring ("CFM") program, to determine whether CoreCivic was in compliance with contract requirements, policies, and accepted practices. UF 53-55. If any problem or weakness was identified on the day of the review, the facility would receive a deficiency. UF 56-59. Additionally, the BOP employed two on-site monitors at every facility who provided the BOP with information about facility operations. UF 63. If the on-site monitors identified any issue they wanted CoreCivic (or any contract facility) to remedy, the BOP issued a Notice of Concern ("NOC"). UF 64, 66.

A BOP official is also responsible for preparing Contract Performance Assessment Reports ("CPARS")—an official measure of the contractor's overall performance over the past year. UF 68-69. As part of the CPAR, the contracting officer is asked whether, based on the information they know about CoreCivic's operations at the time, they would recommend CoreCivic for similar contracts in the future. UF 69. In ***every*** CPAR for CoreCivic's BOP facilities during the Class Period, ██████████████████████████████████████████████████████████████████ UF 74-76, 97-100, 124-128, 133-135, 136-38.

### C.     Plaintiff's Omissions Claim

Plaintiff has taken 24 fact witness depositions and received over 420,000 documents from CoreCivic and the BOP. Declaration of Meryn C. N. Grant ("Grant Decl.") ¶ 2.[1] Plaintiff has focused on NOCs and deficiencies that CoreCivic received in the regular course of business, and

---

[1] Exhibits labeled numerically correspond to the concurrently filed Grant Declaration. Exhibits labeled alphabetically correspond to the exhibits in the concurrently filed Declaration of Patrick Swindle.

events at three of its facilities. Ex. 156 (Pl.'s Rog. Resp.) at No. 13.

**1.** The Adams Disturbance

On May 20, 2012, there was a disturbance at the Adams facility. UF 77. Over the span of eight hours, CoreCivic lost, and then regained, control of this facility. UF 78-79; Ex. 74. Tragically, an Adams staff member was killed. UF 80. During the disturbance, the BOP's on-site monitor was present and working with CoreCivic to regain control. UF 81-83.

This disturbance was widely-reported and publicly disclosed. UF 86-91. Multiple analysts noted that these types of incidents are "a risk intrinsic to the corrections industry," and that no prison, private or public, is immune to this risk. Ex. G, I, J. There was no statistically significant decline in the price of CoreCivic's share price in the days following the Adams disturbance. UF 188.

After the disturbance, the BOP created an internal After-Action Report documenting the incident, which was not shared with CoreCivic, but contained recommendations for CoreCivic and the BOP alike. Thereafter, the BOP continued to provide Adams with feedback about its performance. In a CPAR issued in November 2012, the BOP officer commented that from August 2011 through July 2012, Adams ███████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 49. The BOP could have cancelled or declined the option to extend the contract; instead, the BOP exercised its option to extend the Adams contract on July 31, 2013. UF 27.

**2.** NEOCC Re-Bid

On March 25, 2013, as CoreCivic's contract to operate NEOCC was set to expire, the BOP issued a competitive rebid. UF 101-102. As part of this process, CoreCivic and its competitors placed bids for contracts to house BOP inmates. UF 106. The contract was awarded to CoreCivic's competitor, GEO. UF 109. The BOP did not provide CoreCivic with any official

6

reason for its decision.  UF 110; Ex. 86.  Internal documents from the BOP ██████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████  UF

111; Ex. 85.  These documents were not shared with CoreCivic.  UF 112.[2]  However, CoreCivic

employees generally understood that the Company's unsuccessful bid was due to a variety of

factors including price, performance, and a unique issue at NEOCC where the facility

simultaneously housed BOP and non-BOP inmates, to which the BOP was opposed.  Ex. 2,

Garfinkle Tr. 231:1-238:25; Ex. 100, Verhulst Tr. 69:14-70:3; Ex. 90, Hininger (7/30/2020) Tr.

372:22-373:5; 378:21-379:8; 395:16-21; Ex. 96, Lappin (7/28/2020) Tr. 243:4-18.

Following the BOP's decision on the re-bid, CoreCivic continued to house detainees for

the US Marshal's Service at NEOCC and subsequently entered into a contract to house

Immigration and Customs Enforcement ("ICE") detainees there, too.  UF 115.

**3.**   Cibola Cure Notice

On January 9, 2015, Cibola received a Cure Notice—*i.e.*, a notice that the government may

terminate its contract, unless certain deficiencies were cured by April 21, 2015.  UF 116; Ex. 92.

This Cure Notice followed several repeat deficiencies, stemming in large part from CoreCivic's

challenges with staffing a full-time doctor.  UF 116-117.  In the Cure Notice, the BOP listed seven

areas of deficient performance including inmates not receiving proper follow-up treatments,

improper health appraisals, and inaccurate medical records.  Ex. 92.  The delivery of health

services to inmates is a challenge faced by public and private prison operators alike.  UF 118-120.

To enhance Cibola's health services, CoreCivic provided signing bonuses for healthcare

---

[2] This document was designated as confidential source selection information which was not to be accessed by the Parties in this action.  ECF No. 177 ¶ 4 (Source Selection Information may be disclosed or made available only to attorneys employed by Outside Counsel. . . . Neither Plaintiffs nor Defendants . . . may obtain access to any Source Selection Information.").

professionals, requested temporary staff from its other facilities, and hired (at its own expense) a third-party healthcare vendor. UF 121. On April 27, 2015, the BOP's Procurement Executive congratulated CoreCivic on its "excellent progress" at Cibola, stating that he "was pleased to see the significant improvement" in health services. UF 122. The Cure Notice was lifted on May 18, 2015. UF 123.

On June 15, 2016, a report alleging issues with the healthcare services at Cibola was published in *The Nation*. UF 129. This report stated that Cibola "has accumulated more repeat deficiencies or significant findings in health services than any other private federal prison currently in operation" and that CoreCivic had received a Cure Notice from the BOP. Ex. 76. According to the article, a "Cure Notice" can "set a countdown . . . for the BOP to shut a facility down." *Id*. CoreCivic's stock price increased in the days following the publication of the report by *The Nation*. UF 190. On July 29, 2014, the BOP notified CoreCivic that it would not be exercising its option to renew the Cibola Contract. UF 31. On August 1 and 2, 2016, the non-renewal of the Cibola contract was reported in multiple news articles. UF 130. Later, on August 4, 2016, at the same time that CoreCivic reported its second quarter earnings, CoreCivic disclosed that the BOP had declined to exercise its option for Cibola and that its contract for the South Texas Family Residential Center ("STFRC"), an ICE facility, was going to be renegotiated. UF 131. CoreCivic's stock price dropped $1.92 (or 6.2%) after this announcement. UF 193. Following the BOP's decision not to execute the option at Cibola, CoreCivic entered into a contract with ICE to house detainees at Cibola. UF 132.

### D. The Alleged Corrective Disclosures

The Consolidated Complaint alleged two dates on which "[t]he business conditions and risks concealed from investors . . . reached the market": August 11, 2016, when "the OIG released the Review" (the "OIG Review"), and August 18, 2016 when, "citing the OIG report, the Yates

Memorandum" was released. Dkt. 57 ¶¶ 196-200. At class certification, Plaintiff abandoned its original theory that the OIG Review was a corrective disclosure and replaced it with a claim based on CoreCivic's August 3, 2016 announcement that the BOP had declined to renew its contract with the Cibola facility. Dkt. 150, at 2, 12; *see also* Dkt. 121 at 5, 10-11.

The OIG Review was published by the DOJ on August 11, 2016, and covered by multiple national news outlets. UF 139; Ex. 78 ¶ 28. The OIG Review provided information to the market about the quality and cost-effectiveness of the private prison sector generally and CoreCivic:

- "We found that, in a majority of the categories we examined, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." Ex. 61.

- "In recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer." Ex. 61.

- "We found that the contract prisons had higher rates of inmate-on-inmate and inmate-on-staff assaults, as well as higher rates of staff uses of force." Ex. 61.

- "With the exception of fewer incidents of positive drug tests and sexual misconduct, the contract prisons had more incidents per capita than the BOP institutions in all of the other categories of data we examined. For example, the contract prisons confiscated eight times as many contraband cell phones annually on average as the BOP institutions. Contract prisons also had higher rates of assaults, both by inmates on other inmates and by inmates on staff." Ex. 61.

There was no statistically significant change in CoreCivic's stock price following the publication of the OIG Review. UF 194.

The Yates Memo was a two-page memorandum dated August 18, 2016, from Sally Yates to the Acting Director of the BOP. UF 140. The Yates Memo stated that private prisons "do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security." Ex. 123. The Yates Memo does not mention CoreCivic (or any private prison operator) and the only source it cited in support of its conclusions was the OIG Report. Ex. 123. The Yates Memo also included a paragraph

describing a decline in the federal prison population from "nearly 220,000 inmates in 2013 to fewer than 195,000 inmates today" and information about "rehabilitative services that the Bureau provides" but private prisons do not. *Id.* The Memo then states that "[f]or all these reasons," Yates was "directing that, as each [private prison] contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population." *Id.* Just five days after the Yates Memo, Pamela Jones, the Administrator of the BOP's Privatization Management Branch, emailed

█████████████████████████████████████████████████████
█
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████
█████████████████████████████████████████████████████

The day the Yates Memo was released, CoreCivic's stock priced decreased by 35.5%, while the stock price of GEO, CoreCivic's only publicly traded competitor, decreased by 39.6%. UF 195-196. On November 8, 2016, Donald Trump won the 2016 Presidential Election. UF 142. CoreCivic's stock price increased by 43% the next day. UF 143. By January 13, 2017, CoreCivic's stock price exceeded its pre-Yates Memo price. UF 144. On February 21, 2017, Attorney General Jeff Sessions rescinded the Yates Memo, stating that it "changed long-standing policy and practice, and impaired the Bureau's ability to meet the future needs of the federal correctional system." UF 145-46.

## III. ARGUMENT

To prevail under Section 10(b), Plaintiff must establish a materially false or misleading statement, made with scienter, that caused its alleged losses. *See Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1409 (6th Cir. 1991). Plaintiff has no evidence sufficient to establish any one of these elements. Summary judgment thus should be granted in favor of Defendants. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A.    **Plaintiff Cannot Establish That Defendants Made Any False Or Misleading Statements With Scienter**

Plaintiff challenges over 130 statements made by Defendants over a nearly five-year Class Period.   *See* Appx. A.[3]   This Court must undertake a "statement-by-statement analysis" to determine whether Plaintiff can establish that each statement was either objectively false or conveyed a misleading impression "when read in light of all the information then available to the market."   *Bondali v. Yum! Brands, Inc.*, 620 F. App'x. 483, 491-92 (6th Cir. 2015).   If Plaintiff's evidence "is 'merely colorable,' or 'not significantly probative,' or not enough to lead a fair-minded jury to find for" Plaintiff, summary judgment in Defendants' favor should be granted. *Demoss v. Kretz*, 2009 WL 47142, at *4 (M.D. Tenn. Jan. 7, 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-52 (1986)).

As this Court observed, the "crux of this case" is whether CoreCivic "misled investors about its history of quality, savings, and compliance at BOP facilities."   Dkt. 76 at 2.   Plaintiff challenges three "categories" of statements regarding CoreCivic:  (1) quality and cost savings; (2) compliance with standards; and (3) client relationships and contract renewals.   Ex. 156 (Pl.'s Rog. Resp.) at No. 13.[4]   Plaintiff does not contend that Defendants said anything that was literally false. Rather, Plaintiff claims that "each statement omitted information that would have enabled investors to understand that at least as to one important government client, the [BOP], there were many indications that the quality and savings of CoreCivic's services, its compliance, and the

---

[3] There are at least 40 unique statements, as several Challenged Statements were repeated year-over-year in CoreCivic's SEC filings.  Challenged statements will be referred to by "Stmt" and the designated number in Appendix A.

[4] Defendants utilize these same categories for organizational purposes here, however, Plaintiff cannot avoid its burden of proving each statement is false by simply lumping them together.  The categories do not accurately describe the statements actually made by CoreCivic, each of which is set forth in Appendix A, Column F.

strength of its relationship were below the levels Defendants had represented." *Id.* Accepting all inferences in Plaintiff's favor at the pleading stage, the Court previously held that Plaintiff adequately alleged that CoreCivic failed to live up to the BOP's quality standards, "directly counter" to Defendants' statements. Dkt. 76 at 29-30.

After sixteen months of discovery, however, Plaintiff has adduced no facts supporting its allegation that during the Class Period, the purported low quality of CoreCivic's services was "leading one of its most important client relationships to the brink of collapse," Dkt. 76 at 36, much less that any Defendant actually knew or was reckless in not knowing "how severely its relationship with the BOP had deteriorated." *Id.* at 32. Rather, Plaintiff relies on its own expert to bridge this gap.[5] But, even that expert admitted that any purported performance issues did not endanger its relationship before December 2014. Mot. to Exclude Mellendick at 4, 16. At a minimum, the Court should grant summary judgment as to all statements made before that date. *See* Appx. A, Column G; *see also supra* n. 7, 9.[6]

> **1.** <u>Defendants' Statements Regarding Quality And Cost Savings Were Not Materially Misleading</u>
>
>> a. *Defendants' Statements Regarding Overall Quality Were Not Rendered Misleading By Omitting Discrete Deficiencies*

Plaintiff claims that CoreCivic's general statements that it provided "quality" corrections

---

[5] Plaintiff offers unreliable "mouthpiece" expert testimony to opine that CoreCivic's performance was "largely deficient" for a "majority" of its facilities during the Class Period. *See* Mot. to Exclude Mellendick, filed concurrently herewith. That opinion is untethered to any standards used by the BOP, or any comparison to the quality of services offered by the BOP. When summarizing the actual performance metrics used by the BOP, even Plaintiff's expert agrees that four out of five of CoreCivic's facilities never fell below satisfactory levels. *Id.* at 11.

[6] Because Individual Defendants Lappin and Mullenger are not alleged to have made any statements after that date (*see id.* Column H), the Court should also grant summary judgment as to the Section 10(b) claims made against them. Compl., Count I; *see also Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011) ("[T]he maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

services to **all** of its government partners misled investors absent disclosure of specific deficiencies identified at Adams, Cibola, and (after 2014) Eden. *See, e.g.*, Stmts. 1, 16, 50, 52, 96.[7] This claim cannot be reconciled with Defendants' disclosure obligations, which require consideration of **all** operational information known to CoreCivic. CoreCivic's claims of "quality" applied to all of its government partners, not just for the BOP facilities. *See* Stmts. 1-5, 16-20, 44-45, 47-50, 52, 55, 96-104. During the Class Period, CoreCivic had up to 85 contracts with government partners, UF 3; its renewal rate for all government contracts averaged 91% (and actually increased by 2016). UF 5-11. CoreCivic's BOP contracts were a small portion of its total revenue—between 9 and 13.7% during the Class Period. UF 5. With respect to those contracts, it is undisputed that CoreCivic's performance at two of its BOP facilities—McRae and NEOCC—was above satisfactory, throughout the Class Period. UF 197. Viewed in this context, Plaintiff's argument that it was necessary for a reasonable investor to know about deficiencies at three BOP facilities out of 85 total contracts in order to understand Defendants' otherwise true claims of quality fails as a matter of law. The omitted "facts" regarding Adams, Cibola, and Eden simply do not "conflict with what a reasonable investor would take from" these general statements of overall quality. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 189 (2015); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 45 (2011); *Silver v. H&R Block, Inc.*, 105 F.3d 394, 396 (8th Cir. 1997).

Plaintiff's approach of isolating discrete operational metrics while ignoring others would mislead investors about what actually matters to CoreCivic's consolidated performance. Defendants never said their performance was perfect, and it would be unreasonable for investors

---

[7] Only four statements (Stmts 40-43) mention the BOP. Those statements warn that BOP inmate populations were generally declining, which was true. UF 151; Ex. 130 at 4.

to read their general statements of quality as guarantees of zero-deficiency facilities—which do not exist. *In re Lululemon Sec. Litig*., 14 F. Supp. 3d 553, 577–78 (S.D.N.Y. 2014), (it is unreasonable to read "statements on the company's website regarding product quality as guarantees of no product defects") *aff'd*, 604 F. App'x 62 (2d Cir. 2015).

Further, certain of Defendants' "quality" statements were framed as comparisons between the quality of services provided by CoreCivic to the quality of services provided by the government itself. *See e.g.*, Stmt 44 ("equally high standards of quality and efficiency" as government services); *see also* Stmts. 16-20, 47. Plaintiff has adduced no factual evidence or expert testimony from which a jury can conclude that the quality of CoreCivic's services was not, in fact, comparable to that of its government partners, including the BOP. *See, e.g.*, Ex. 58 Mellendick Tr. 78:14-18.[8] Nor does the record substantiate Plaintiff's claim that CoreCivic "failed to live up to the quality standards of the BOP," Dkt. 76 at 30, but misled investors to believe otherwise. To the contrary, the "satisfactory" ratings CoreCivic facilities received throughout the Class Period mean that its performance met "contractual requirements." UF 73.[9] There is no evidence that the NOCs or deficiencies (which Plaintiff relies on to try to establish a material omission) affected the overall quality of CoreCivic's services. That CoreCivic earned millions in award fees from the BOP throughout the Class Period for above-satisfactory performance confirms as much. UF 21-23.

---

[8] To the contrary, the record demonstrates that it is not uncommon for any facility to receive deficiencies when audits or reviews are conducted. Ex. 96, Lappin Tr. 97:24-98:18; *id.* at 99:16-20; Ex. 97, Dalius Tr. 81:17-18; Ex. 45, Swindle 30(b)(6) Tr. 47:10-16.

[9] Similarly, although Plaintiff has focused in discovery on the fact that not all CoreCivic facilities received award fees every year, this is insufficient to establish that CoreCivic did not live up to the BOP's quality standards. Award fees are only for "optimal" or above-satisfactory performance—*i.e.*, performance that goes above and beyond the expectations of the BOP. UF 21. Thus, failure to obtain award fees does not mean that CoreCivic did not provide services at the level expected by the BOP.

b.  *Plaintiff Cannot Establish That Defendants Did Not Believe Their Opinions Regarding Quality*

Many of Defendants' statements regarding the quality of CoreCivic's services were opinions, for which the burden is even higher. *See, e.g.*, Stmts 16-20. "Quality is, to some degree, in the eye of the beholder." Dkt. 76 at 26. Plaintiff cannot establish, as it must, that any of these opinions were not genuinely held when made, or that Defendants omitted "particular (and material) facts going to the basis for the [speaker's] opinion." *Omnicare*, 575 U.S. at 189-90, 194. There is no evidence that Defendants did not genuinely believe in the quality of their corrections services and value proposition as a whole. As the Supreme Court explained in *Omnicare*, the mere existence of "some fact cutting the other way,"—such as the discrete deficiencies on which Plaintiff's claim is based—is not enough to establish the falsity of an opinion because "[a] reasonable investor does not expect that every fact known to a[] [speaker] supports its opinion." *Id.* at 190; *see also* Dkt. 76 at 34 ("A reasonable investor would know that statements . . . likely presented the version of the truth most favorable to the Company."). And, Plaintiff's omissions theory is insufficient to render opinion statements misleading under *Omnicare*: the purportedly omitted facts are not "facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have." 575 U.S. at 194.

c.  *Plaintiff Cannot Establish That Defendants' Cost Statements Were False Or Misleading*

Plaintiff next challenges statements regarding the cost of services CoreCivic (or private prisons generally) provided to its government partners. Stmts 6-15, 21-39, 46, 51, 53-54, 56-95. Plaintiff alleged these statements were false because CoreCivic "did not provide any cost savings to its government partners." Compl. ¶¶ 148, 150, 153, 156, 158, 163; *see also* ¶ 125 (CoreCivic "did not offer a cost-effective alternative or competitive cost structure"). Plaintiff abandoned these statements in discovery, and has not adduced any actual evidence that they are false.

First, CoreCivic's statements in investor presentations regarding cost savings that privatization provided to the government (*see* Stmts 46, 53, 56-69, 78-84) provided citations to (and were supported by) publicly available data. UF 157-79, 184. Investors had all the information necessary to evaluate these statements in context and Plaintiff has adduced no evidence suggesting investors were misled. Second, CoreCivic's statements that it provided "cost-effective alternatives," "a competitive cost structure" or helped "manage correctional costs" (Stmts 6-13, 21-39) were narrow, qualitative opinion statements, supported by both external research and internal CoreCivic analyses. UF 184; *see also* Ex. 134, Marlowe Rpt. ¶¶ 9, 51-57, 60-61. No evidence would allow a reasonable juror to conclude these statements were subjectively false, or that they omitted "material facts about [CoreCivic's] inquiry into or knowledge" of costs that were necessary to render these statements not misleading. *Omnicare*, 575 U.S. at 186-89. Third, certain statements were not specific to CoreCivic at all, but rather addressed the cost savings and efficiencies that result from the government's use of private prisons generally. *See, e.g.,* Stmts 54, 70-77, 85-95. These statements reflect the reality that contracting with private prisons avoids the need for a large capital investment to construct facilities and pension costs for government employees, and that funds saved can be used for other public services. UF 156. They are indisputably true.

      **2.**    <u>Defendants' Statements Regarding The Company's Quality Assurance Audits And Procedures Were Not False Or Misleading</u>

Next, Plaintiff challenges statements made in SEC Filings and a 2013 Analyst Day presentation describing the Company's Quality Assurance ("QA") Division and the process by which it monitors compliance at the Company's facilities. *See, e.g.*, Stmts. 105-114. But, Plaintiff has failed to develop any evidence that render these general statements about CoreCivic's business false—*i.e.*, that CoreCivic did not have an "independent quality assurance division," did not

"contract[] with . . . ACA certified correctional auditors," was not committed to "continuous quality improvement," or otherwise did not conduct the audits or have quality assurance processes outlined in its public statements. Stmts. 105-109; *see also id.* 111-114. There is similarly no dispute that CoreCivic had a robust QA program that conducted audits for each of its facilities at least annually, and that those audits identified areas of improvement. UF 42-44. To the extent that CoreCivic's QA program failed to detect or prevent each of the deficiencies identified by the BOP, those facts "do not conflict with Defendants' statements regarding the [quality assurance] programs and procedures . . . but merely quibble with [the] execution of those programs." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232-33 (S.D.N.Y. 2018).[10]

### 3. Defendants' Statements Regarding CoreCivic's Client Relationships And Contract Renewals Were Not Materially Misleading

Finally, Plaintiff alleges that CoreCivic's statements regarding its relationships with its government partners and high contract renewal rates gave investors a misleading impression that the Company's history of quality services had gained it the confidence of its government partners, when in fact its future relationship with the BOP was in peril. *See, e.g.*, Stmts. 115-134. Plaintiff's allegation focuses solely on CoreCivic's representations that the quality of its operations contributed to its existing contract renewal rate and implication that future government demand for its services, including from the BOP, would remain high. The record supports, rather than refutes, those representations. CoreCivic's renewal rates were high across all government partners—averaging 91%—and the BOP exercised all but one of its options during the Class Period. UF 5-11, UF 25-40. As for the BOP, throughout the Class Period, it regularly and consistently informed CoreCivic in CPARs ████████████████████████ UF 75-76,

---

[10] And, the record is devoid of factual support for Plaintiff's challenge to statements regarding CoreCivic's adoption of "the national PREA (Prison Rape Elimination Act) standards and best practices." *See* Stmt 110.

97-100, 124-128, 133-135, 136-38.

Plaintiff cites just two facts that relate to contract renewals, both of which occurred over half way through the Class Period. First, Plaintiff points to CoreCivic's unsuccessful re-bid of its NEOCC facility in December 2014. There is no dispute that CoreCivic lost a competitive bid to GEO. But not a single witness—even Plaintiff's own expert[11]—testified that CoreCivic should have known, based on losing the NEOCC bid that it would not receive *any* future contracts from the BOP. *Cf.* Mellendick Tr. 150:16-20. Second, Plaintiff points to the BOP's January 2015 Cure Notice to Cibola—*i.e.*, the only time during which the BOP notified CoreCivic that it might actually terminate a contract. Even that notice gave CoreCivic three months to cure the problem, which CoreCivic did, and was praised by the BOP for its efforts to do so. UF 122. No facts establish that CoreCivic's relationship with the BOP was sufficiently in jeopardy to render its accurate claims of high renewal rates based, in part, on quality, misleading.

Nor is there any evidence that these (or any) omitted performance issues were material to investors. To the contrary, the fact that news articles disclosed the Cure Notice (and even later the non-renewal of the Cibola contract) to investors, and the market did not react, confirms the immateriality of these events. *Longman v. Food Lion, Inc.*, 197 F.3d 675, 684 (4th Cir. 1999) (affirming grant of summary judgment to defendant where information was available to the market from third-parties that rendered the at-issue disclosures immaterial).[12]

---

[11] Here too, Plaintiff's expert is insufficient to manufacture a dispute. Ms. Mellendick has no experience in awarding contracts, made up her own criteria to opine that CoreCivic was unlikely to receive contracts as of December 2014, and even then could not provide an opinion on the likelihood that CoreCivic would or would not win a new contract with the BOP at any point *subsequent to* December 2014. *See* Mot. to Exclude Mellendick at 4, 16.

[12] That there was no significant price reaction to the disclosure of the OIG Review confirms the immateriality of any allegedly omitted information that CoreCivic's facilities did not perform *better than* BOP operated prisons. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

Even if Plaintiff could somehow establish a factual dispute as to whether there was a material omission, it would only apply to statements made *after* those events—after December 29, 2014.

### 4.    Plaintiff Cannot Establish Scienter

Plaintiff also cannot establish as a matter of law that Defendants acted with scienter—the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 & n.12 (1976). Proving scienter requires evidence of actual knowledge or recklessness, *i.e.*, "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." Dkt. 76 at 38-39 (citing *Frank v. Dana Corp.*, 646 F.3d 954, 959 (6th Cir. 2011)). The alleged danger facing CoreCivic must have been "so obvious that any reasonable man would have known of it." *Id.* Here, Plaintiff offers only conjecture that Defendants knowingly misled investors, while ignoring the fact that they had no motive to do so.[13]

Plaintiff has not adduced any evidence regarding CoreCivic's relationship with other government entities. With respect to CoreCivic's relationship with the BOP, Plaintiff's scienter theory relies on the same allegedly omitted performance issues as it does for falsity. But the undisputed facts—supported by expert testimony and testimony from the BOP itself—establish that deficiencies were not unique to CoreCivic, and occurred at other prisons, including those operated by the BOP. UF 62, 118-120. Those deficiencies rose to a contract-threatening level exactly once, as set forth in the Cibola January 2015 Cure Notice, and they were promptly and successfully cured by CoreCivic. UF 116, 121-123. And, as discussed above, the Individual Defendants were continually told by the BOP that ████████████████████████████████████

---

[13] There is no allegations or evidence of any motive to commit fraud. This underscores Plaintiff's inability to establish scienter. *See Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000); *see also Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1042 (6th Cir. 2016); *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001).

19

███████████████ UF 75-77, 97-100, 124-128, 133-135, 136-38.

Far from anticipating that "something like the Yates Memorandum was likely," Dkt. 76 at 33, CoreCivic's witnesses (including former high ranking BOP officials) testified that they expected that CoreCivic's contracts with the BOP would continue to be renewed throughout the Class Period. *See, e.g.*, Ex. 62, White Expert Tr. 62:17-64:8; 75:7-76:13; 95:4-96:3; Ex. 97, Dalius Expert Tr. 106:14-107:25; Ex. 96, Lappin Tr. 215:11-217:3; Ex. 2, Garfinkle Tr. 28:5-31:24-55:21-58:9. And in fact, the BOP exercised all but one of its options on CoreCivic's contracts during the Class Period. There is no evidence that the BOP ever informed CoreCivic that its performance issues at Adams, Cibola, and Eden rendered it unlikely to be awarded contracts in the future, and no evidence that Defendants recklessly disregarded issues of significant magnitude to endanger the *very existence* of their relationship with the BOP. Lacking such evidence, Plaintiff cannot establish scienter.

### B.     Plaintiff Cannot Prove Loss Causation

Plaintiff also bears the burden to prove loss causation—"a causal connection between the material misrepresentation and the loss"—because private securities actions are "available, not to provide investors with broad insurance against market losses, but to protect them against those economic losses that misrepresentations actually cause." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342, 345-46 (2005). The Sixth Circuit recognizes two methods of establishing loss causation: the "corrective disclosure theory" and "the alternative theory of materialization of the risk." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384-85 (6th Cir. 2016) (citing *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010)). Under the materialization theory that Plaintiff has now chosen, Ex. 160 (Pl.'s Supp. Rog. Resp.) at Nos. 17-21, 27-28, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a

disappointed investor." *Ohio Pub. Emps.*, 830 F.3d at 384 (quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)). Plaintiff must prove three elements to sustain its new theory: (i) the loss was caused by the materialization of a "***concealed***" risk; (ii) the loss was a "***foreseeable***" consequence of the alleged fraud; and (iii) Plaintiff "would have been spared all or an ascertainable portion of [their] loss ***absent the fraud***." *Ohio Pub. Emps.*, 830 F.3d at 384 (emphasis added); *Lentell*, 396 F.3d at 172-75.

Plaintiff's current theory is that the Yates Memo and the non-renewal of the Cibola contract were "materialization[s] of risks about which [D]efendants had misled investors." Ex. 160 at Nos. 17-21, 27-28. Assuming that Plaintiff would prove loss causation, Plaintiff's damages expert testified that he "understands" the theory as follows: CoreCivic represented that its "correctional services offered sufficient quality and cost savings that would result in government entities continuing to renew its contracts," but "these statements concealed the reality that [CoreCivic's] relationship with the BOP had deteriorated, putting their BOP contracts in jeopardy," because of deficiencies in quality and cost effectiveness at the BOP facilities. Ex. 79 (Dalrymple Rpt. ¶¶ 17, 19); Dkt. 150 at 4-6, 18. Plaintiff then asserts that the Yates Memo revealed that deteriorating relationship, which would imply that the Yates Memo was linked in some way to the BOP's relationship with CoreCivic. But there is no evidence to support that conjecture.

Courts routinely grant summary judgment where the plaintiff relies on a materialization theory but fails to put forth firm-specific evidence "demonstrat[ing] a causal connection between the alleged misrepresented risks . . . and the economic loss [plaintiff] suffered." *See, e.g.*, *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1121-23 (9th Cir. 2013); *In re Moody's Corp. Sec. Litig.*, 2013 WL 4516788, at *10-12 (S.D.N.Y. Aug. 23, 2013). Even if it is "true that disclosures may be indirectly corrective, Plaintiff[ ] still must provide evidence that

*the market understood the link between the indirect disclosure and the earlier misrepresentation*." *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *25-27 (S.D. Tex. May 31, 2016) (emphasis added) (granting summary judgment on Plaintiff's claim that concealed risks regarding BP's ability to contain an oil spill materialized in a dividend cut when the "evidence indicates that the market viewed the dividend cut as a response to increasing political pressure" stemming from the oil spill).[14]

### 1. Plaintiff's Evolving Theory of Loss Causation

Plaintiff's theory of loss causation has transformed during this litigation. The Complaint pled that the OIG Review and the Yates Memo were two "disclosures" that "partially corrected the market price of CoreCivic's securities." Dkt. 57 ¶¶ 192, 196-200. At the class certification phase, Plaintiff acknowledged that the OIG Review "did not result in a statistically significant price reaction," but still believed that it provided corrective information. Dkt. 120 at 17. At the same time, Plaintiff *added* a corrective disclosure that was not pled in the Complaint—the announcement that CoreCivic's BOP contract for the Cibola facility would not be renewed. *Id.* at 16. Plaintiff largely refused to answer Defendants' interrogatories on loss causation.[15] After Judge Frensley ordered Plaintiff to supplement its responses, Dkt. 312 at 33-34, Plaintiff admitted that it has abandoned its claim that the OIG Review was a corrective disclosure, but refused to explain

---

[14] These courts are joined by numerous others granting summary judgment on materialization theories of loss causation. *See, e.g.*, *In re OSG Sec. Litig.*, 2015 WL 3466094, at *4 (S.D.N.Y. May 29, 2015); *Shanahan v. Vallat*, 2008 WL 4525452, at *5 (S.D.N.Y. Oct. 3, 2008); *In re Williams Sec. Litig.*, 558 F.3d 1130, 1142-43 (10th Cir. 2009).

[15] Plaintiff refused to answer interrogatories asking it to "[s]tate each disclosure that [it] contend[s] revealed the relevant truth regarding one or more of the Challenged Statements," describe "how the alleged disclosure[s] revealed the relevant truth about the Challenged Statement(s)," or support its "contention that CoreCivic's stock price dropped on August 18, 2016, as a result of investors learning that CoreCivic did not provide quality corrections services or cost savings to its government partners, and not because of some other reason." Ex. 160 at Nos. 17-18, 28-29. Plaintiff's purported basis for its refusal was that the interrogatories called for premature expert testimony. But Plaintiff has not presented any expert testimony addressing loss causation.

its causation theory beyond arguing that the Yates Memo and Cibola non-renewal represented "a materialization of risks about which defendants had misled investors." Ex. 160 at Nos. 18, 20. Plaintiff cites no evidence for its theory that the Yates Memo was a materialization of a risk (besides the text of the Memo itself) and no evidence for the Cibola non-renewal apart from a list of documents that Plaintiff copied from its falsity allegations. *Id.*

    **2.**    <u>The Yates Memo Was Not The Materialization Of A Risk That Was Concealed By The Challenged Statements</u>

         a.    *The Yates Memo Did Not Reveal New Information About CoreCivic's Risk Of Losing Contracts Due To Its Quality Or Costs*

Defendants had no visibility into the political landscape within the DOJ that gave rise to the Yates Memo's decision to move away from private prisons, and Plaintiff does not allege otherwise. Those political considerations continue to occupy the public discourse, but CoreCivic had, and has, no nonpublic information that would have allowed investors to weigh the risk that the Yates Memo would issue on August 18, 2016. There is no evidence that the Yates Memo, and the political decision that underlay it, derived from particular issues of quality and cost at CoreCivic facilities.[16] Nor is there evidence that the BOP had any involvement in formulating the policy shift announced in the Yates Memo or that Ms. Yates was even aware of any BOP findings regarding CoreCivic beyond what was publicly disclosed in the OIG Review.

Indeed, the Yates Memo does not mention CoreCivic; rather it speaks in general terms about "private prisons." Ex. 123 (Yates Memo). It offers only two sentences regarding the quality and cost effectiveness of private prisons, and includes a paragraph describing a decline in the

---

[16] Defendants' economic expert, Lucy Allen, evaluated an enormous amount of public commentary related to the issuance of the Yates Memo, including securities analyst reports and new articles. All of those sources support Defendants' position that the Yates Memo was a politically motivated policy shift; none of those sources even hint that it resulted from CoreCivic's operations or relationship with the BOP. *See* Ex. 78 (Allen Rpt. ¶¶ 69-73, exhibit 1, Appx. B).

federal prison population and information about "rehabilitative services that the Bureau provides" but private prisons do not. *Id.* The Memo then states that "[f]or ***all*** these reasons . . . the Bureau should either decline to renew [private] contract[s] or substantially reduce [their] scope in a manner consistent with law and the overall decline of the Bureau's inmate population." *Id.* (emphasis added). The Yates Memo says nothing specific about the quality of any of CoreCivic's (or any other company's) operations, nothing about CoreCivic's (or any company's) cost effectiveness (other than noting that they save on costs, just not "substantially"), and nothing about the tenor of the relationship between the BOP and CoreCivic (or any company). The text of the Yates Memo provides no evidence that CoreCivic's quality, cost, or allegedly deteriorating relationship with the BOP was a substantial factor in causing the DOJ's policy shift. Thus, Plaintiff has failed to provide any evidence linking the Yates Memo with the risks allegedly concealed. *See Nuveen*, 730 F.3d at 1121-23; *In re Moody's*, 2013 WL 4516788 at *10-12; *see also Okla. Firefighters Pension & Ret. Sys. v. Capella Educ. Co.*, 873 F. Supp. 2d 1070, 1084-86 (D. Minn. 2012).

> b.  *The Information Defendants Allegedly Concealed Was Repeatedly Disclosed During The Class Period To No Price Impact*

As this Court previously recognized, "[a]n event can only serve the role of a corrective disclosure if it 'reveal[s] some [previously]-undisclosed fact with regard to the specific misrepresentations alleged.'" Dkt. 143 at 14-15 (quoting *Omnicom*, 597 F.3d at 511). "[O]therwise the market will have processed and reacted to that information already." *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 877 F.3d 687, 695 (6th Cir. 2017); *In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 771-72 (N.D. Ohio 2020). It is not enough to show "that the market reacted to the purported 'impact' of the alleged fraud[.]" *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 392 (9th Cir. 2010). Here, the information Plaintiff claims was revealed by the Cibola non-renewal and the Yates Memo was disclosed to investors on a number of occasions,

all without any effect on CoreCivic's stock price.

- **Risk Disclosures In SEC Filings.** CoreCivic disclosed that "[e]scapes, inmate disturbances, and public resistance to privatization of correctional and detention facilities could result in [the] inability to obtain new contracts or the loss of existing contracts"; that it "may not always successfully comply with regulations" and contract requirements; and that this "failure . . . can result in . . . non-renewal, or termination of facility contracts." UF 150 (citing Exs. A-E). CoreCivic also warned about the risk of declines in the federal prison population. *Id*. Finally, CoreCivic disclosed that "[t]he loss of, or a significant decrease in, business from the BOP . . . could seriously harm [its] financial condition and results of operations." *Id*. These disclosures gave the market a clear picture of the risks that would accompany negative news about CoreCivic's operations—such as the information revealed *prior to* the Yates Memo. *See* Ex. 78, Allen Rpt. ¶¶ 62-68.[17]

- **The Adams Disturbance.** The Adams disturbance was the subject of extensive news coverage at the time it occurred and later, when information from the BOP After-Action Report that was critical of CoreCivic was released in an article in *The Nation*. Ex. 78, Allen Rpt. ¶¶ 38-42.

- **The Cibola Cure Notice And Other Negative Reports.** The Cibola cure notice and subsequent contract loss, and various negative news reports about staffing and healthcare at all of CoreCivic's BOP facilities, were made public during the Class Period. *See* Ex. 78, Allen Rpt. ¶¶ 43-45.

- **The OIG Review.** Plaintiff claimed in the Complaint that the OIG Review revealed the very quality and cost-effectiveness deficiencies Plaintiff claims were concealed by the Challenged Statements. Compl. ¶¶ 38-41, 88-89, 109, 116, 187, 192, 197-98. There can be no reasonable dispute that the OIG Review provided the most comprehensive information on the performance of private contractors generally and in comparison to the BOP. *See supra* Section II.D. The OIG Review provided contradictory information for each category of misstatements in the Complaint. Ex. 78, Allen Rpt. ¶¶ 27-37; *id.* Ex. 1. And while the Yates Memo cites the OIG Review for its conclusion that private prisons generally do not compare favorably with BOP facilities, "the fact that *the sources used in the [alleged disclosure] were already public is fatal* to the [plaintiff]s' claim of loss causation" because "a corrective disclosure obviously must disclose new information." *Meyer v. Greene*, 710 F.3d 1189, 1198 (11th Cir. 2013) (emphasis added) (quotation marks omitted).

Plaintiff's response to the overwhelming amount of information disclosed about

---

[17] Even if the warned-of risks "are not the actual risks that materialized," Defendants "need only warn of risks of similar significance to those that materialize" because they are "not obligated to foretell the future." *In re Champion Enters., Inc., Sec. Litig.*, 144 F. Supp. 2d 848, 862 (E.D. Mich. 2001), *aff'd sub nom. Miller v. Champion Enters. Inc.*, 346 F.3d 660 (6th Cir. 2003).

CoreCivic's operations during the Class Period is that the allegations are not about quality issues "in the abstract," but how these issues affected the Company's "ability to renew BOP contracts." Ex. 157 (Dalrymple Rebuttal. Rpt. ¶ 13). But none of the analysts who followed the Company changed their opinions of its quality or cost savings after the alleged disclosures. Ex. 158 (Allen Rebuttal Rpt. ¶¶ 28-31). If it were true that disclosures of riots and other quality-related issues during the Class Period could not change the market's perception of the risk of losing contracts for quality-related issues, the market would not have been misled by "false" statements regarding quality that are not specifically linked to contract renewal. Plaintiff cannot have it both ways—its experts agree that quality and costs are key to CoreCivic's "value proposition" and the stock price. Ex. 79 (Dalrymple Rpt. ¶ 22). Under Plaintiff's own theory, disclosures of poor quality should have increased the perceived risks to CoreCivic's contracts and negatively impacted the stock price. They did not.

      c.    *The Yates Memo's Policy Shift Was Not A Foreseeable Result Of The Risks Allegedly Concealed By The Challenged Statements*

The Yates Memo's policy shift also was not corrective because it was not a foreseeable consequence of the allegedly deteriorating relationship between CoreCivic and the BOP. Recovery under the materialization of risk doctrine is limited to *foreseeable* losses. *Ohio Pub. Emps.*, 830 F.3d at 384-85. As the Second Circuit explained in *Omnicom*, "[f]irms are not required by the securities laws to speculate about **distant**, **ambiguous**, and perhaps **idiosyncratic** reactions . . . . for events later alleged to be frauds, the facts of which were known to the investing public at the time but did not affect share price." 597 F.3d at 514 (emphasis added). The Seventh Circuit noted the deeper problem of requiring companies to predict unprecedented actions by regulators:

> [I]ssuers need not estimate the chance that a federal agency will change its rules or tighten up on enforcement. Securities laws require issuers to disclose ***firm-specific*** information; investors and analysts combine that information with knowledge about the competition, regulatory conditions, and the economy as a whole to

produce a value for stock.

*Wielgos v. Commonwealth Edison Co.*, 892 F.2d 509, 515 (7th Cir. 1989).

First, CoreCivic could not have predicted a decision where the DOJ or BOP decided not to renew *any* of its contracts (or any contracts with private prison operators) all at once. CoreCivic had received almost exclusively good news from the BOP on the subject of contract renewals prior to the Cibola non-renewal—three weeks before the end of the class period. In every single CPAR for every single CoreCivic facility, ████████████████████████████████████ ███████████████████████████████ UF 74-76, 97-100, 124-128, 133-135, 136-38.. The only time CoreCivic unsuccessfully bid for a new contract (for its NEOCC facility), the BOP awarded the contract to another private prison operator, GEO. UF 109. The BOP's selection of a *different* private contractor over CoreCivic does not provide any basis for Defendants to foresee the policy change announced by the Yates Memo.

Second, every CoreCivic employee who testified about the Yates Memo in this case stated that it was a surprise to the company, that it was politically motivated, or both. *See, e.g.*, Ex. 132, Dalius Tr. 128:24-129: 5; *see also* Ex. 98 Swindle Tr. 36:3-7, 210:8-22; Ex. 159 Hopewell Tr. 93:24-94:2; Ex. 62, White 10/30/2020 Tr. 57:7-58:3.

Third, Plaintiff has not identified any evidence to show that (i) anyone from the BOP knew about the policy shift announced in the Yates Memo in advance; (ii) anyone from the BOP warned CoreCivic that the policy shift was even a possibility; or (iii) anyone from the BOP supported the policy shift. To the contrary, the only evidence of the BOP's opinion of the Yates Memo is the email from a senior BOP official ████████████████████████████████ ██████████████████████████████████ UF 141 (emphasis added). It is impossible for Plaintiff to show how CoreCivic should have anticipated the Yates Memo policy shift when there is no evidence that the BOP did.

Thus, while CoreCivic foresaw (and specifically warned) that the BOP might not renew individual contracts because of quality and cost shortcomings, there is no evidence that CoreCivic knew that the DOJ would direct the BOP to end its relationship with *all* private prisons.

          d.     *Plaintiff's Loss Would Have Been The Same Absent The Alleged Fraud*

Even if Plaintiff could show that CoreCivic's allegedly deficient quality and costs were a substantial cause of the policy shift announced in the Yates Memo, Plaintiff still must demonstrate that the losses for which it is seeking to recover are attributable to the "earlier misrepresentation[s]" and not "changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events" resulting from the alleged materialization of the risk. *Dura Pharm.*, 544 U.S. at 343. At summary judgment, "evidence that certain misrepresented risks are responsible for a loss must reasonably distinguish the impact of those risks from other economic factors." *Nuveen*, 730 F.3d at 1122-23; *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1132 (10th Cir. 2009) (affirming summary judgment).[18] Plaintiff has not even attempted to perform this critical analysis, and the evidence shows that investors believed that the Yates Memo policy shift was driven by politics. As such, there is no evidence that the revelation of CoreCivic's alleged "fraud" caused investors' losses.

First, analysts unanimously attributed CoreCivic's stock drop to the Yates Memo's revelation of additional political risks. Both parties' economic experts reviewed hundreds of analyst reports, including dozens issued in the wake of the Yates Memo, and there is no indication that analysts believed that the Yates Memo was in fact driven by the DOJ's dissatisfaction with

---

[18] Plaintiff's expert agrees: "When a corrective disclosure also contains information unrelated to the allegations, known as *confounding information*, it is necessary to remove the effects of this confounding information in order to isolate the share price reaction to information pertaining to the alleged contraventions." Ex. 79 (Dalrymple Rpt. ¶ 37).

the quality or cost savings provided by private prisons. *See* Ex. 78 (Allen Rpt. ¶¶ 59-61); Ex. 158 (Allen Rebuttal Rpt. ¶¶ 20-26). Instead, analyst commentary shows that the market understood the Yates Memo to signal a politically driven policy shift. *Id.* (*e.g.*, quoting analysts stating that the OIG Review's "finding that contract prisons underperformed in a number of different categories provided the political cover necessary for" the Yates Memo). Not one analyst attributed the Yates Memo to CoreCivic's operations. Ex. 78 ¶ 50. Thus, even if there were evidence that the Yates Memo's policy shift was motivated by CoreCivic's quality or cost savings (and there is not), that is not what investors believed, and not the cause of CoreCivic's stock price decline.[19]

Second, Plaintiff cannot explain why the Yates Memo had the same effect on the stock price of CoreCivic's only publicly traded competitor, GEO, whose stock price dropped even more than CoreCivic's on the release of the Yates Memo. Ex. 78 ¶¶ 75-76. The sharp decline in GEO's stock price following the Yates Memo demonstrates that investors were recalibrating their political risk assessment for the industry, not reacting to the revelation of alleged misrepresentations by CoreCivic. Plaintiff makes no allegations of similar "fraud" at GEO.[20]

Third, Plaintiff cannot explain why CoreCivic's stock price completely rebounded after the 2016 election. Ex. 78 ¶¶ 69-74. There would be no logical explanation for the stock price recovery if investors actually believed that CoreCivic's allegedly deficient quality and cost savings caused the Yates Memo's policy shift.

---

[19] Courts recognize that events are not corrective just because they are associated with the subject matter of the alleged misstatements and accompanied by a stock drop. *E.g., In re BP*, 2016 WL 3090779 at *27 (granting summary judgment where "[p]laintiffs' own evidence indicates that the market viewed the dividend cut as a response to increasing political pressure"). As in the *BP* case, CoreCivic's investors were reacting to what they perceived to be a political shift—not to any revelations (real or pre-textual) about CoreCivic's quality and cost savings.

[20] After the Yates Memo, investors in GEO filed a similar suit, which the court dismissed on the pleadings. *Mulvaney v. GEO Grp., Inc.*, 2017 WL 887193 (S.D. Fla. Feb. 23, 2017).

**3.** The Cibola Non-Renewal Was Not The Materialization Of A Risk That Was Concealed By The Challenged Statements

Plaintiff claims that "CoreCivic's August 3, 2016 announcement that its BOP contract for the Cibola County Correctional Center would not be renewed" was the other "materialization[] of risks about which Defendants had misled investors." Ex. 160 at No. 17. But even Plaintiff's expert concedes that information regarding the Cibola non-renewal was in fact disclosed in separate news stories on August 1 and 2, and that CoreCivic's stock price did not react at all. Ex. 78 (Allen Rpt. ¶¶ 77-81); Ex. 79 (Dalrymple Rpt. ¶ 53). It was only after Defendants announced quarterly earnings for the entire Company on August 3, 2016, and new information regarding the Company's much higher revenue-generating South Texas facility, that CoreCivic's stock price decreased in a statistically significant amount. *Id.* This defeats loss causation for the stock price decrease on August 3, 2016. *Norfolk*, 877 F.3d at 695-96; *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse Sec. (USA) LLC*, 752 F.3d 82, 95-97 (1st Cir. 2014) (affirming summary judgment). And Plaintiff has put forth no evidence to suggest that analysts perceived the stock drop following the August 3 announcement to be related to Cibola at all. Ex. 78 ¶¶ 77-81.

Plaintiff must also present "evidence indicating that the market in fact recognized" the "relationship" between the disclosure and the alleged misrepresentations. *In re DVI, Inc. Sec. Litig.*, 2010 WL 3522090, at *24 (E.D. Pa. Sept. 3, 2010). Plaintiff has not presented evidence that quality or cost deficiencies were the reason for the Cibola non-renewal. The BOP never told CoreCivic why it was not renewing the Cibola contract, instead stating only that its decision was "a result of market research, which included cost and other factors." Ex. 35.

**IV. CONCLUSION**

For the foregoing reasons, Defendants respectfully ask the Court to grant summary judgment in their favor on all claims.

DATED: November 20, 2020           Respectfully submitted:

 /s/ *Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Morgan E. Whitworth (admitted pro hac vice)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600
F: (415) 395-8095
morgan.whitworth@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

*Attorneys for Defendants Corrections Corporation*
*of America, Damon T. Hininger, David M.*
*Garfinkle, Todd J. Mullenger, and Harley G.*
*Lappin*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

this 20th day of November, 2020.

/s/ *Steven A. Riley*
Steven A. Riley