# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> CORRECTIONS CORPORATION OF AMERICA, et al., ) <br><br> Defendants. ) | Civil Action No. 3:16-cv-02267 <br><br> Honorable Aleta A. Trauger <br><br> Magistrate Judge Jeffrey S. Frensley |

## <u>DEFENDANTS' STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMRAY JUDGMENT</u>

## REDACTED VERSION FILED PUBLICLY

## STATEMENT OF UNDISPUTED MATERIAL FACTS

### I. CORECIVIC'S BUSINESS

1. CoreCivic, Inc. ("CoreCivic" f/k/a Corrections Corporation of America or CCA) specializes in owning, operating and managing prisons and other correctional facilities. Ex. A, CoreCivic, Annual Report (Form 10-K) (Feb. 27, 2014) ("2013 Form 10-K") at 5[1]; Consolidated Compl. ("Compl.") ¶ 33.

   **Response:**


2. CoreCivic's customers are federal, state and local correctional and detention authorities. Ex. B, CoreCivic, Annual Report (Feb. 27, 2013) ("2012 Form 10-K") at 7; Ex. 1, CORECIVIC_0122295 at -308–313[2]; Compl. ¶ 34.

   **Response:**


3. During the Class Period, CoreCivic owned, controlled or managed between 64 and 85 contracts with federal, state and local correctional, detention, and residential reentry facilities. Ex. B, 2012 Form 10-K at 5 (67 facilities); Ex. A, 2013 Form 10-K at 5 (66 facilities); Ex. C, CoreCivic, Annual Report (Feb. 25, 2015) ("2014 Form 10-K") at 5 (64 facilities); Ex. D, CoreCivic, Annual Report (Feb. 25, 2016) ("2015 Form 10-K") at 5 (77 facilities); Ex. E, CoreCivic, Annual Report (Feb. 23, 2017) ("2016 Form 10-K") at 5 (85 facilities); Ex. F, CoreCivic, Quarterly Report (Nov. 3, 2016) ("3Q 2016 Form 10-Q") at 6 (85 facilities).

---

[1] Exhibits labeled alphabetically correspond to the exhibits in the concurrently filed Declaration of Patrick Swindle.

[2] Exhibits labeled numerically correspond to the concurrently filed Declaration of Meryn C. N. Grant.

**Response:**


4.      From 2014 to 2016, CoreCivic reported a year-over-year revenue increase in its Form 10-Ks.  Ex. C, 2014 Form 10-K at F-4 (revenue for 2014 was $1,646,867,000); Ex. D, 2015 Form 10-K at F-4 (revenue for 2015 was $1,793,087,000); Ex. E, 2016 Form 10-K at F-4 (revenue for 2016 was $1,849,785,000).

**Response:**


5.      During the Class Period, CoreCivic's contract retention rate across all government partners averaged over 91%.  Ex. 1, CORECIVIC_0122295 at -308; Ex. 2, Dep. Tr. of David Garfinkle ("Garfinkle Tr.") 57:9–58:9; Ex. 3, Dep. Tr. of Tony Grande 185:7–185:24.

**Response:**


6.      The Company's contract retention rate for 2011 was 100%.  Ex. 1, CORECIVIC_0122295 at -308.

**Response:**


7.      The Company's contract retention rate for 2012 was 93.1%.  Ex. 1, CORECIVIC_0122295 at -308.

**Response:**


8.      The Company's contract retention rate for 2013 was 87.8%.  Ex. 1, CORECIVIC_0122295 at -308.

**Response:**

9.      The Company's contract retention rate for 2014 was 89.7%.    Ex. 1, CORECIVIC_0122295 at -308.

**Response:**

10.      The Company's contract retention rate for 2015 was 92.3%.    Ex. 1, CORECIVIC_0122295 at -308.

**Response:**

11.      The Company's contract retention rate for 2016 was 93.5%.    Ex. 1, CORECIVIC_0122295 at -308.

**Response:**

## II.      PLAINTIFF

12.      Lead Plaintiff is Amalgamated Bank, as Trustee for the LongView Collective Investment Fund ("Amalgamated Bank").  Lead Plaintiff began purchasing CoreCivic securities as early as March 29, 2012 and continued to purchase securities throughout the Class Period. Certification of Named Pl., Dkt. No. 40-2, at 3–6.

**Response:**

13.      Lead Plaintiff purchased CoreCivic securities after the end of the Class Period.  Ex. 4, Pl.'s Resp. RFA No. 37.

**Response:**

14. This lawsuit was initially filed on August 23, 2016. Compl.

**Response:**


III. **CORECIVIC'S BOP CONTRACTS**

A. **Background**

15. During the Class Period, CoreCivic had contracts to operate five correctional facilities housing BOP inmates: Adams County Correctional Center ("Adams"), Cibola County Correctional Center ("Cibola"), Eden Detention Center ("Eden"), McRae Correctional Facility ("McRae"), and the Northeast Ohio Correctional Center ("NEOCC") (collectively, the "BOP Facilities"). Compl. ¶¶ 42 n.2, 43, 68, 87, 108.

**Response:**


16. During the Class Period, the revenue derived from contracts with the BOP made up between 9% and 13.7% of the Company's total revenue. Ex. B, 2012 Form 10-K at 9; Ex. A, 2013 Form 10-K at 9; Ex. C, 2014 Form 10-K at 9; Ex. D, 2015 Form 10-K at 10; Ex. E, 2016 Form 10-K at 10; *see also* Ex. 5, CORECIVIC_1356105 at 16; Ex. 6, CORECIVIC_1377899 at 12; Ex. 7, CORECIVIC_1325572 at -585; Ex. 8, CORECIVIC_1209387 at -387; Ex. 9, CORECIVIC_0394417 at -430; Ex. 10, CORECIVIC_1211835 at -848; Ex. 11, CORECIVIC_0395027 at -040; Ex. 12, CORECIVIC_0121824 at -837; Ex. 1, CORECIVIC_0122295 at -308.

**Response:**

17.     Throughout the Class Period, CoreCivic earned an average of 12% of its total revenue from the BOP.  Ex. B, 2012 Form 10-K at 9 (12%); Ex. A, 2013 Form 10-K at 9 (13%); Ex. C, 2014 Form 10-K at 10 (13%); Ex. D, 2015 Form 10-K at 10 (11%); Ex. E, 2016 Form 10-K at 10 (9%); Ex. 1, CORECIVIC_0122295 at -308 (9% in 2016).

**Response:**

18.     CoreCivic's BOP contracts were to operate low security facilities, which housed primarily criminal aliens (*i.e.*, non-U.S. citizens).  Ex. 13, CORECIVIC_0000001 at -012 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -703 (Cibola); Ex. 15, CORECIVIC_0001329 at -389 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -097 (McRae); Ex. 17, CORECIVIC_0003791 at -801 (NEOCC).

**Response:**

19.     Adams, Cibola, Eden, McRae and NEOCC were fixed-price type contracts that included award-fee incentives.  *See, e.g.*, Ex. 13, CORECIVIC_0000001 at -005 (Beach Dep. Ex. 277) (Adams); *see also* Ex. 14, CORECIVIC_0000692 at -696 (Cibola); Ex. 15, CORECIVIC_0001329 at -381 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 (McRae) at -158, -198; Ex. 17, CORECIVIC_0003791 at -852, -854 (NEOCC).

**Response:**

20. Each contract has a Statement of Work that sets forth the contract performance requirements for the management and operation of a contract correctional institution. Each Statement of Work listed 18 Performance Objectives. Ex. 13, CORECIVIC_0000001 at -012, -019–061 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -703, -710–755 (Cibola); Ex. 15, CORECIVIC_0001329 at -389, -395–428 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -097, -104–148 (McRae); Ex. 17, CORECIVIC_0003791 at -801, -808–844 (NEOCC).

**Response:**


21. CoreCivic's contracts with the BOP provided the opportunity to earn Award Fees. Award Fees are discretionary and may be awarded to contractors for optimal performance, or performance above the acceptable level. Ex. 18, Dep. Tr. of Douglas Martz ("Martz Tr.") 170:20–171:3; Ex. 13, CORECIVIC_0000001 at -005 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -696 (Cibola); Ex. 15, CORECIVIC_0001329 at -381 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -198–201 (McRae); *see also* Ex. 17, CORECIVIC_0003791 at -875–877 (NEOCC); Ex. 19, Expert Rpt. of D. Scott Dodrill ("Dodrill Rpt.") ¶ 83 (Dodrill Dep. Ex. 545).

**Response:**


22. Of the 18 instances where a CoreCivic Facility was eligible for an Award Fee during the Class Period, the BOP awarded CoreCivic an award fee 10 times, as reflected in Exhibits 20-29. Ex. 20, CORECIVIC_0065110 at -111 ($292,449.88, or 10% of maximum award fee) (Martz Dep. Ex. 430); Ex. 21, CORECIVIC_0096381 at -382 ($156,063.60, or 8% of maximum

award fee); Ex. 22, CORECIVIC_1337569 at -570 ($277,723.25, or 10% of maximum award fee); Ex. 23, CORECIVIC_1084667 at -667 ($157,525.10, or 15% of maximum award fee); Ex. 24, CORECIVIC_0990221 at -221 ($324,801.88, or 20% of maximum award fee); Ex. 25, CORECIVIC_0025298 at -298 ($1,401,516.79, or 85% of maximum award fee); Ex. 26, CORECIVIC_1086611 at -611 ($1,296,311.44, or 59% of maximum award fee); Ex. 27, CORECIVIC_0990234 at -234 ($728,228.67, or 35% of maximum award fee); Ex. 28, CORECIVIC_0047207 at -208 ($1,553,388.09, or 82% of maximum award fee); Ex. 29, CORECIVIC_0184605 at -606 ($1,765,255.56, or 90% of maximum award fee); *see also* Ex. 19, Dodrill Rpt. ¶ 84 (Dodrill Dep. Ex. 545).

**Response:**


23.    Four of those times the award fee was greater than 50% of the maximum allowable award fee, and 3 of those times it was greater than 80%.  Ex. 25, CORECIVIC_0025298 at -298 ($1,401,516.79, or 85% of maximum award fee); Ex. 26, CORECIVIC_1086611 at -611 ($1,296,311.44, or 59% of maximum award fee); Ex. 28, CORECIVIC_0047207 at -208 ($1, 553,388.09, or 82% of maximum award fee); Ex. 29, CORECIVIC_0184605 at -606 ($1,765,255.56, or 90% of maximum award fee); *see also* Ex. 19, Dodrill Rpt. ¶ 84 (Dodrill Dep. Ex. 545).

**Response:**


24.    Pursuant to the terms of its contracts, CoreCivic could also face deductions for failing to meet certain contractual terms, including failure to maintain a quality control program and failing to meet the required staffing levels.  Ex. 13, CORECIVIC_0000001 at -051, -065, -

071, -106 (Beach Dep. Ex. 277) (Adams); Ex. 14, CORECIVIC_0000692 at -710, -759, -767, -801 (Cibola); Ex. 15, CORECIVIC_0001329 at -399, -453–454 (Swindle 30(b)(6) Dep. Ex. 39) (Eden); Ex. 16, CORECIVIC_0003082 at -110, -190 (McRae); Ex. 17, CORECIVIC_0003791 at -813, -866–867 (NEOCC).

**Response:**

B. **Adams Facility**

25.    CoreCivic's Adams County Correctional Center is located in Natchez, Mississippi. Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶ 43; Ex. 31, Expert Rpt. of Donna Mellendick ("Mellendick Rpt.") at 7 (Mellendick Dep. Ex. 585).

**Response:**

26.    The BOP awarded Adams the DJB1PC010 contract (the "Adams Contract") resulting from Request for Proposals (RFP)-PCC-0012 (Criminal Alien Requirement 8) on April 1, 2009.  This contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP.  Ex. 13, CORECIVIC_0000001 at -001, -134 (Beach Dep. Ex. 277).

**Response:**

27.    The Bureau of Prisons ("BOP") exercised Option Period 1 for the Adams Contract on July 31, 2013.  The BOP exercised Option Period 2 for the Adams Contract on July 17, 2015. Ex. 32, CORECIVIC_0000403 at -403–404; Ex. 33, CORECIVIC_0000473 at -473–474.

**Response:**

**C.**      **Cibola County Correctional Facility**

28.      CoreCivic's Cibola County Correctional Facility is located in Milan, New Mexico. Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶ 68; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

     **Response:**

29.      The BOP awarded Cibola the DJB1PC011 contract (the "Cibola Contract") resulting from Requests for Proposals (RFP)-PCC-0014 (Criminal Alien Requirement 10) on January 12, 2010. The Cibola Contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP. Ex. 14, CORECIVIC_0000692 at -692, -696.

     **Response:**

30.      On October 1, 2014, the BOP exercised Option Period 1 for the Cibola Contract. Ex. 34, CORECIVIC_0001082 at -083.

     **Response:**

31.      On July 29, 2016, the BOP notified CoreCivic that it would not be exercising Option Period 2 for the Cibola Contract. Ex. 35, CORECIVIC_0031085 at -085.

     **Response:**

## D. Eden

32.    CoreCivic's Eden Detention Center ("Eden") is located in Eden, Texas.  Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶ 87; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

**Response:**


33.    The BOP awarded Eden the DJBPCC005 contract (the "Eden Contract") resulting from Request for Proposals (RFP)-PCC-0010 (Criminal Alien Requirement VI) on January 17, 2007.  This contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP.  Ex. 15, CORECIVIC_0001329 at -329, -381 (Swindle 30(b)(6) Dep. Ex. 39).

**Response:**


34.    The BOP exercised Option Period 1 for the Eden Contract on April 26, 2011.  The BOP exercised Option Period 2 for the Eden Contract on April 30, 2013.  The BOP exercised Option Period 3 for the Eden Contract, which began on May 1, 2015.  Ex. 36, CORECIVIC_0001925 at -925; Ex. 37, CORECIVIC_0002185 at -185; Ex. 38, CORECIVIC_0002228 at -228.

**Response:**


## E. McRae Correctional Facility

35.    CoreCivic's McRae Correctional Facility ("McRae") is located in McRae, Georgia. Ex. 30, CORECIVIC_1341482 at -484; Compl. ¶ 108; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

**Response:**


36.     The BOP awarded McRae the DJB1PC016 contract (the "McRae Contract") resulting from Request for Proposals (RFP)-PCC-0017 (Criminal Alien Requirement 12) on October 27, 2011.  This contract was to house BOP inmates for a four-year base period, with up to three two-year option periods that could be exercised by the BOP.  Ex. 16, CORECIVIC_0003082 at -082, -155.

**Response:**


37.     The BOP exercised Option Period 1 for the McRae Contract, which began on December 1, 2016.  The BOP exercised Option Period 2 for the McRae Contract on November 26, 2018.  Ex. 39, CORECIVIC_0092519 at -519; Ex. 40, BOP_0049552 at -552.

**Response:**


**F.     Northeast Ohio Correctional Center**

38.     CoreCivic's Northeast Ohio Correctional Center ("NEOCC") is located in Youngstown, Ohio.   Ex. 30, CORECIVIC_1341482 at -484; Ex. 31, Mellendick Rpt. at 7 (Mellendick Dep. Ex. 585).

**Response:**


39.     The BOP awarded NEOCC the DJB1PC002 contract (the "NEOCC Contract") resulting from Request for Proposals (RFP)-PCC-0008 (Criminal Alien Requirement 4) on December 23, 2004.  This contract was to house BOP inmates for a four year base period, with up

to three two-year option periods that could be exercised by the BOP. Ex. 17, CORECIVIC_0003791 at -791, -793–794.

Response:

40.     The BOP exercised Option Period 1 for the NEOCC contract on June 1, 2009.  The BOP exercised Option Period 2 for the NEOCC contract on May 31, 2011.  The BOP exercised Option Period 3 for the NEOCC Contract on May 29, 2013.  Ex. 41, CORECIVIC_0004197 at -197–198; Ex. 42, CORECIVIC_0004317 at -317; Ex. 43, CORECIVIC_0004481 at -481–482.

Response:

IV.     FACILITY AUDITS AND FEEDBACK

41.     CoreCivic's BOP facilities were audited by the BOP, CoreCivic, the American Correctional Association ("ACA") and the Joint Commission on Accreditation of Healthcare Organizations ("Joint Commission").  Ex. 44, Dep. Tr. of Keith Hall 103:6–104:10; Ex. 45, 30(b)(6) Dep. Tr. of Patrick Swindle ("Swindle 30(b)(6) Tr.") 182:22–183:21; Declaration of Patrick Swindle ("Swindle Decl.") ¶¶ 3, 5.

Response:

B.      CoreCivic's Internal Audits

42.     CoreCivic conducted annual internal audits of its facilities.  *See, e.g.*, Ex. 46, CORECIVIC_1009202 at -202–209; *see also* Ex. 47, U.S. Dep't of Just. Off. of the Inspector Gen., *Audit of the United States Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Det. Ctr. Leavenworth, Kansas* at 19 (Apr. 2017) (Murray Dep. Ex. 583); Swindle Decl. ¶ 5.

13

**Response:**

43.     The audits for CoreCivic's BOP facilities tracked each facility's performance on over 1,400 guidelines. Ex. 48, Dep. Tr. of Michael Nalley 75:8-14; Ex. 49, CORECIVIC_0684697 at -698 (Martz Dep. Ex. 431); Ex. 50, BOP_0077775 at -778 (Bland Dep. Ex. 442); Ex. 51, CORECIVIC_0990432 at -432 (Garfinkle Dep. Ex. 529).

**Response:**

44.     CoreCivic's internal audit tool evaluated more performance indicators than the BOP's audit tool. Ex. 50, BOP_0077775 at -778 (Bland Dep. Ex. 442) ("███████████ ██████████████████████████████████████████████████████████"); Ex. 52, CORECIVIC_0054224 at -225 (listing 184 total indicators in BOP Contract Facility Monitoring Tool); Ex. 53, CORECIVIC_0054354 at -354 (same); Ex. 54, CORECIVIC_0056715 at -715 (same); Ex. 51, CORECIVIC_0990432 at -436 (Dep. Ex. 529) ("That significant difference in the tools sets was corrected earlier this year with the BOP's approval (received April 8, 2014—See Attachment A) to incorporate the full CFM audit tool into CCA's internal audit tools."); *see also* Ex. 45, Swindle 30(b)(6) Tr. 176:2–177:6; Ex. 56, Dep. Tr. of Emilee Beach ("Beach Tr.") 279:7–12.

**Response:**

C.      **Third-Party Audits**

45.     Each of CoreCivic's BOP facilities was required by its contract to obtain and maintain ACA accreditation. Ex. 57, Dep. Tr. of Paul Kelly ("Kelly Tr.") 78:15–79:11; *id.* at 120:5–14; Ex. 58, Dep. Tr. of Donna Mellendick ("Mellendick Tr.") 58:23–59:1; *see also* Ex. 13,

CORECIVIC_0000001 at -019 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -710 (Cibola); Ex. 15, CORECIVIC_0001329 at -395 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -104 (McRae); Ex. 17, CORECIVIC_0003791 at -808 (NEOCC).

>    **Response:**

46.     All BOP facilities were required to maintain ACA accreditation.  Ex. 57, Kelly Tr. 120:5–14; Ex. 58, Mellendick Tr. 58:23–59:1.

>    **Response:**

47.     The ACA audited and accredited CoreCivic's BOP facilities every three years. CoreCivic's BOP facilities maintained accreditation throughout the Class Period and were accredited on the following dates during the Class Period:

- Adams – February 3, 2014; August 8, 2016;

- Cibola – January 29, 2011; February 2, 2014;

- Eden – January 23, 2012; February 9, 2015;

- McRae – April 9, 2012; August 2, 2014;

- NEOCC – August 10, 2013; August 7, 2016.

Swindle Decl. ¶ 4; Ex. 45, Swindle 30(b)(6) Tr. 183:16–21.

>    **Response:**

48.     To be accredited by the ACA, a facility must comply with all mandatory ACA standards and at least 90 percent of all non-mandatory standards.  *See* Ex. 59, CORECIVIC_0338317 at -335; Ex. 60, CORECIVIC_0343063 at -081.

**Response:**


49.     CoreCivic's BOP facilities maintained ACA accreditation throughout the Class Period.  Swindle Decl. ¶ 4; *see also* Ex. B, 2012 Form 10-K at 8; Ex. A, 2013 Form 10-K at 7; Ex. C, 2014 Form 10-K at 6; Ex. D, 2015 Form 10-K at 6; Ex. E, 2016 Form 10-K at 8–9.

**Response:**


50.     The Joint Commission is a national accreditation process designed to assess healthcare performance.  Ex. 57, Kelly Tr. 83:7–13.

**Response:**


51.     Each of CoreCivic's BOP facilities were audited by and maintained accreditation by the Joint Commission during the Class Period.  Ex. 57, Kelly Tr. 83:7–84:6; Ex. 45, Swindle 30(b)(6) Tr. 187:3–189:18.

**Response:**


**D.     BOP Audits And Monitoring**

52.     The BOP's Program Review Division conducts at least annual reviews to monitor its contract facilities.  Ex. 61, U.S. Dep't of Just. Off. of the Inspector Gen., *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* at 10 (Aug. 2016) ("August 2016 OIG Review") at 10 (VerHulst Dep. Ex. 118).

**Response:**

16

53.     During the Class Period, CoreCivic's BOP facilities were subject to a Program Review to inspect their performance, test the adequacy of their internal quality controls and assess risks for all programs and administrative areas of contract performance.   Ex. 13, CORECIVIC_0000001 at -106 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -801 (Cibola); Ex. 15, CORECIVIC_0001329 at -453 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -190 (McRae); Ex. 17, CORECIVIC_0003791 at -866 (NEOCC); *see also* Ex. 31, Mellendick Rpt. at 1–2 (Mellendick Dep. Ex. 585).

**Response:**


54.     The review guidelines for the Program Review is based on the Contractor's Quality Control Program (ACP), the Statement of Work (SOW), professional guidelines reference by the SOW, applicable BOP policy and any other appropriate measures within the contract's scope of work.   Ex. 13, CORECIVIC_0000001 at -106 (Adams) (Beach Dep. Ex. 277); Ex. 14, CORECIVIC_0000692 at -801 (Cibola); Ex. 15, CORECIVIC_0001329 at -453 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -190 (McRae); Ex. 17, CORECIVIC_0003791 at -866 (NEOCC).

**Response:**


55.     The Contract Facility Monitoring ("CFM") Section of the BOP provides subject matter expertise in the form of routine monitoring of contract prisons.  Ex. 61, August 2016 OIG Review at 10; Ex. 19, Dodrill Rpt. ¶ 61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 1 (Mellendick Dep. Ex. 585).

**Response:**

56.     At the conclusion of each review, a CFM Report is written to document any findings identified during the review.  Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118); Ex. 62, Dep. Tr. of Kim White ("White Oct. 30, 2020 Tr.") 15:20–16:2; Ex. 19, Dodrill Rpt. ¶ 61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 1 (Mellendick Dep. Ex. 585).

**Response:**

57.     A CFM Report makes findings of deficiencies, repeat deficiencies, repeat repeat deficiencies, and significant findings.  Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118); *see also* Ex. 19, Dodrill Rpt. ¶ 61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 5–6 (Mellendick Dep. Ex. 585).

**Response:**

58.     A deficiency is defined by the BOP as "[p]roblems or weaknesses noted by the reviewer which are in need of correction.  In its broadest sense, a deficiency includes any condition needing improvement.  A deficiency can include:  noncompliance from policy/regulation; lack of adequate internal controls; poor or unprofessional practice; inefficient practice; ineffective results; poor quality, etc."  Ex. 63, U.S. Dep't of Just. Fed. Bureau of Prisons Program Statement 1210.23 at Attachment A; *see also* Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118).

**Response:**

59.     Repeat deficiencies indicate a deficiency in the same category as a deficiency from a prior audit that is present on the day the audit is conducted.  Ex. 62, White Tr. Oct. 30, 2020

107:2–9; *id.* at 107:21–109:3; *see also* Ex. 64, Dep. Tr. of Don Murray ("Murray Tr.") 194:10–197:11; Ex. 65, Dep. Tr. of D. Scott Dodrill ("Dodrill Tr.") 164:1–13.

Response:

60. During the Class Period, CoreCivic's BOP Facilities were reviewed at least annually by the BOP's CFM Branch and received CFM Reports. Ex. 66, Defs.' Resps. to Interrog. No. 25; *see also* Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118).

Response:

61. During the Class Period, all privately operated prisons under BOP contract were reviewed annually by the BOP's CFM Branch. Ex. 61, August 2016 OIG Review at 10 (VerHulst Dep. Ex. 118); Ex. 19, Dodrill Rpt. ¶ 61 (Dodrill Dep. Ex. 545); Ex. 31, Mellendick Rpt. at 1 (Mellendick Dep. Ex. 585); Ex. 58, Mellendick Tr. 66:15–23.

Response:

62. During the Class Period, ██████████████████████████████████████ ████████████████████████████████████ Ex. 67, BOP_0116379 at -382.

Response:

63. All privately operated facilities under contract with the BOP have two full-time employees from the BOP's Privatization Monitoring Branch ("PMB") monitoring the facility. Ex. 57, Kelly Tr. 59:12–19; Ex. 61, August 2016 OIG Review at 8 (VerHulst Dep. Ex. 118); *see also* Ex. 13, CORECIVIC_0000001 at -042 (Adams) (Beach Dep. Ex. 277); Ex. 14,

CORECIVIC_0000692 at -735 (Cibola); Ex. 15, CORECIVIC_0001329 at -414 (Eden) (Swindle 30(b)(6) Dep. Ex. 39); Ex. 16, CORECIVIC_0003082 at -128 (McRae); Ex. 17, CORECIVIC_0003791 at -830 (NEOCC).

**Response:**


64.     These on-site monitors provide oversight and real-time information about how the facility is operating.  Ex. 57, Kelly Tr. 59:16–60:9; Ex. 61, August 2016 OIG Review at 8–9 (VerHulst Dep. Ex. 118); *see also* Ex. 31, Mellendick Rpt. at 1, 6 (Mellendick Dep. Ex. 585); Ex. 19, Dodrill Rpt. ¶¶ 57–59 (Dodrill Dep. Ex. 545).

**Response:**


65.     The BOP does not have full-time on-site monitors from the PMB at its own facilities.  Ex. 57, Kelly Tr. 60:14–18; *see also* Ex. 19, Dodrill Rpt. ¶ 80 (Dodrill Dep. Ex. 545).

**Response:**


66.     A Notice of Concern ("NOC") is issued to the contractor by the on-site monitor when the contractor is performing below a satisfactory level and the deficiency is more than minor or is a repetitive deviation from the contract requirement.  Ex. 61, August 2016 OIG Review at 9; *see also* Ex. 19, Dodrill Rpt. ¶ 62.

**Response:**


67.     CoreCivic received NOCs during the Class Period.  Ex. 66, Defs.' Resp. Interrog. No. 23 (identifying NOCs and closure letters).

**Response:**


68.     Contractor Performance Assessment Reports ("CPARS") measure the quality of the contractor's past performance and is the official source of past performance information. Ex. 68, FAR § 42.1501(b); Ex. 18, Martz Tr. 162:21–163:4.

**Response:**


69.     Each CPAR contains a section where the contracting officer recommends whether the contractor should have been awarded the contract given the contractor's ability to execute what was promised in its proposal or whether the contractor should be recommended for similar contract requirements in the future.    Ex. 57, Kelly Tr. 84:22–85:2; *see also e.g.*, Ex. 49, CORECIVIC_0684697.

**Response:**


70.     Before making a recommendation in the CPAR, the contracting officer documents the CFM Reports and NOCs received by the facility.  *See, e.g.*, Ex. 49, CORECIVIC_0684697 at -697.

**Response:**


71.     The Federal Acquisition Regulations ("FAR") defines a CPAR evaluation score of "Exceptional" to mean "Performance meets contractual requirements and exceeds many to the Government's benefit."  Ex. 69, FAR § 42.1503, Table 42-1(a).

**Response:**

72.     The FAR defines a CPAR evaluation score of "Very Good" to mean "Performance meets contractual requirements and exceeds some to the Government's benefit."  Ex. 69, FAR § 42.1503, Table 42-1(b).

**Response:**


73.     The FAR defines a CPAR evaluation score of "Satisfactory" to mean "Performance meets contractual requirements."  Ex. 69, FAR § 42.1503, Table 42-1(c); *see also* Ex. 57, Kelly Tr. 87:14–22 ("████████████████████████████████████████████

████████████████████████████████████")

**Response:**


## V.     CORECIVIC FACILITIES' MONITORING AND COMPLIANCE

### A.     Adams

74.     During the Class Period, the BOP issued five Contractor Performance Assessment Reports ("CPARs") regarding Adams.   Ex. 49, CORECIVIC_0684697; Ex. 70, CORECIVIC_0606109; Ex. 71, CORECIVIC_1974933; Ex. 72, CORECIVIC_1337633; Ex. 73, CORECIVIC_0728682.

**Response:**


75.     Adams' CPARs issued for the performance periods of August 1, 2011, through July 31, 2012; and August 1, 2012, through July 31, 2013, stated, ████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████ Ex. 49, CORECIVIC_0684697 at -698; Ex. 70,

CORECIVIC_0606109 at -110.

     **Response:**

76.    Adams' CPARs issued for the performance periods of August 1, 2013, through July

31, 2014; August 1, 2014, through July 31, 2015; and August 1, 2015, through July 31, 2016,

stated, ████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████ Ex. 71, CORECIVIC_1974933 at -935; Ex. 72,

CORECIVIC_1337633 at -367; Ex. 73, CORECIVIC_0728682 at -689.

     **Response:**

77.    █████████████████████████████████ as reflected in Ex.

74, BOP_0293137.

     **Response:**

78.    ████████████████████████████████████████████

Ex. 74, BOP_0293137 at 5.

     **Response:**

79.    ████████████████████████████████████████████

████████ Ex. 74, BOP_0293137 at 8.

     **Response:**

80.     During the disturbance, an Adams facility staff member was killed.   Ex. 74, BOP_0293137 at 1.

        **Response:**


81.     ███████████████████████████████████████████████████████

████████     Ex. 57, Kelly Tr. 18:24–20:15; *id.* at 23:19–23:23.

        **Response:**


82.     The senior security information manager is one of the BOP's two on-site monitors. Ex. 57, Kelly Tr. 59:12–19; Ex. 61, August 2016 OIG Review at 8.

        **Response:**


83.     ███████████████████████████████████████████████████████

██████████████     Ex. 57, Kelly Tr. 28:15–21.

        **Response:**


84.     Following the disturbance, the BOP created an After-Action Report reflected in Exhibit 74, BOP_0293137.

        **Response:**

85. The After-Action Report ████████████████████████████████████████ ████████████████████████████████████████████████████████ Ex. 74, BOP_0293137 at 17.

**Response:**

86. On May 30, 2012, the SunTrust analysts issued an analyst report reflected in Exhibit G. That report stated, "Last week, there was a riot in a CXW [CoreCivic] prison in MS." Ex. G, SunTrust Robinson Humphrey, *Corrections Corporation of America Upgrading to Buy; REIT Conversion Presents Upside* at 2 (May 30, 2012).

**Response:**

87. On September 13, 2012, Justice Strategies published an article that discussed the May 20, 2012 disturbance at Adams. Ex. 75, Greene, Judith, and Alexis Mazon. "Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary." *Justice Strategies*, Sept. 13, 2012.

**Response:**

88. CoreCivic disclosed the May 2012 disturbance at its Adams facility in its Form 10-Q for the quarter ended June 30, 2012. Ex. H, CoreCivic, Quarterly Report (Form 10-Q) (Aug. 9, 2012) ("2Q 2012 Form 10-Q") at 30 ("we also experienced negative claims in workers compensation during the first six months of 2012, including adverse claims resulting from an inmate disturbance at our Adams County Correctional Center during the second quarter of 2012.").

**Response:**

89.    On October 5, 2015, Cannacord Genuity issued an analyst report reflected in Ex. I. The analyst wrote that "prison incidents are no stranger to both public and private operators, it's simply an issue of the environment prison life unfortunately propagates."  Ex. I, Cannacord Genuity, *Behind the Bars:  Bi-Weekly Prison Update 10-5-15* at 4 (Oct. 5, 2015).

    **Response:**


90.    On January 31, 2017, SunTrust issued an analyst report reflected in Ex. J.  That analyst report stated, "[t]he corrections space is subject to headline risk , including riots, deaths or escapes from facilities managed by CXW [CoreCivic]."  Ex. J, SunTrust Robinson Humphrey, *Human Capital & Government Services – Best Ideas for 2017* at 2 (Jan. 31, 2017).

    **Response:**


91.    On June 15, 2016, an article published in *The Nation* described certain findings of the BOP's After Action Report on the Adams Disturbance.  Ex. 76, CORECIVIC_0029731 at -740.

    **Response:**


92.    In 2008 there was a disturbance at Federal Correctional Institution, Three Rivers, a BOP-operated correctional facility.  Ex. 77, Blumenthal, Ralph. "Gang Fights in Prison Injure 22 and Kill One." *The New York Times*, March 29, 2008, available at https://www nytimes.com/2008/03/29/us/29prison.html; Ex. 19, Dodrill Rpt. ¶ 98; Ex. 65, Dodrill Tr. 114:15–18.

**Response:**

93.     There have been disturbances at facilities operated by other private contractors other than CoreCivic housing criminal alien populations, including facilities operated by Cornell Corrections in Big Spring, Texas; The Geo Group in Reeves Country, Texas; Management and Training Corporation in Willacy County, Texas.  Ex. 61, August 2016 OIG Review at 2; Ex. 19, Dodrill Rpt. ¶ 97; Ex. 65, Dodrill Tr. 106:6–12.

**Response:**

94.     Following the disturbance at Management and Training Corporation's Willacy County facility, the BOP terminated the contract with that facility.  Ex. 61, August 2016 OIG Review at 2; Ex. 19, Dodrill Rpt. ¶ 101.

**Response:**

95.     News of riots at CoreCivic's facilities during the Class Period did not cause a decline in the Company's stock price.  Ex. 78, Expert Rpt. of Lucy Allen ("Allen Rpt.") ¶¶ 38–41; *see generally* Ex. 79, Dalrymple Rpt. (no discussion of Adams disturbance effect on price).

**Response:**

**B.     NEOCC**

96.     NEOCC housed inmates from both the BOP and the United States Marshal Service ("USMS").  Ex. 45, Swindle 30(b)(6) Tr. 50:9–52:2 ("Northeast Ohio is separation of the compound.  So at Northeast Ohio, we have Marshal service and the BOP.").

**Response:**

97.     During the Class Period, the BOP issued four Contractor Performance Assessment Reports ("CPARs") regarding NEOCC.     Ex.  80,  CORECIVIC_0046207;  Ex.  81, CORECIVIC_0095065; Ex. 82, CORECIVIC_1337756; Ex. 83, CORECIVIC_0578404.

**Response:**


98.     NEOCC's CPAR issued for the performance period of June 1, 2011, through May 31, 2012, stated █████████████████████████████████████████████

████████████████████████████████████████████████████████ Ex. 80, CORECIVIC_0046207 at -208.

**Response:**


99.     NEOCC's CPAR issued for the performance period of June 1, 2012, through May 31, 2013, stated █████████████████████████████████████████████

████████████████████████████████████████████████████████ Ex. 81, CORECIVIC_0095065 at -066.

**Response:**


100.     NEOCC's CPARs issued for the performance periods of June 1, 2013, through May 31, 2014; and June 1, 2014 through May 31, 2015, stated ███████████████████

█████████████████████████████████████████████████████████████

████████████████████████████████████████████ Ex. 82, CORECIVIC_1337756 at -757; Ex. 83, CORECIVIC_0578404 at -407.

**Response:**


101.    The third and final option period for the NEOCC contract ended on May 31, 2015. Ex. 43, CORECIVIC_0004481 at -481–482.

**Response:**


102.    On March 25, 2013, the BOP issued a Pre-Solicitation Notice pursuant to Criminal Alien Requirement XV ("CAR 15"), soliciting Requests for Proposal.    Ex. 84, CORECIVIC_1340862.

**Response:**


103.    CAR 15 had two requirements—Requirement A and Requirement B—for the management and operation of a contractor-operated correctional facility.    Ex. 84, CORECIVIC_1340862 at -862–863.

**Response:**


104.    CAR 15 Requirement A solicited proposals from facilities in Ohio, Michigan, Pennsylvania, Delaware, New Jersey, or New York to house approximately 1,565 to 2,000 low security, adult male inmates that are primarily criminal aliens.  Ex. 84, CORECIVIC_1340862 at -862–863.

**Response:**

105.     Requirement B solicited proposals to house approximately 1,565 to 2,000 low security, adult male inmates that are primarily criminal aliens.  Requirement B did not have a geographic restriction.  Ex. 84, CORECIVIC_1340862 at -863.

**Response:**


106.     ████████████████████████████████████████████████
████████████████████████████████ Ex. 85, BOP_0334043 at -044.

**Response:**


107.     CoreCivic submitted a bid for NEOCC pursuant to Requirement A.  Ex. 85, BOP_0334043 at -044.

**Response:**


108.     CoreCivic's NEOCC bid proposed to continue to share services between BOP inmates and other DOJ inmates from the USMS—*i.e.*, NEOCC would house two inmate populations.  Ex. 85, BOP_0334043 at -051, -054, -059, -063, -074; Ex. 45, Swindle 30(b)(6) Tr. 50:9–52:12.

**Response:**


109.     GEO was awarded the contracts pursuant to Requirements A and B of CAR 15. Ex. 85, BOP_0334043 at -099; Ex. 87, CORECIVIC_1198504 at -504–505.

**Response:**

110.    On December 29, 2014, the BOP sent CoreCivic a Notice to Unsuccessful Offeror related to CAR 15, reflected in Exhibit 86.  In the Notice to Unsuccessful Offeror, the BOP stated that CoreCivic's "prices were assessed against the evaluation results of the Non-Price areas, [and] it was determined that the proposal submitted by GEO was the best value to the Government."  Ex. 86, CORECIVIC_0759554 at -554, -556.

**Response:**


111.    The BOP created an internal document entitled "Source Selection Decision RFP-PCC-0022 Criminal Alien Requirement XV" (the "Source Selection Decision"), reflected in Exhibit 85, which includes the reasons for the BOP's decision regarding the CAR 15 Award.  Ex. 85, BOP_0334043.

**Response:**


112.    The Source Selection Decision was labeled Source Selection Information, and therefore was not shared with CoreCivic.  Ex. 85, BOP_0334043; Ex. 88, Dep. Tr. of Robert Bland ("Bland Tr.") at 201:2–202:3; Ex. 89, FAR § 3.104-4(a).

**Response:**


113.    On January 6, 2015, employees from CoreCivic attended a telephone call with BOP officials to debrief on the BOP's decision to award CAR 15 to GEO.  Ex. 90, July 30, 2020 Dep. Tr. of Damon Hininger 371:15–21; Ex. 91, CORECIVIC_0036536 at -537.

**Response:**

114.    After the NEOCC rebid, no one at the BOP told CoreCivic that CoreCivic was unlikely to win new contracts with the BOP.  Ex. 58, Mellendick Tr. 150:16–20.

**Response:**


115.    In December 2016, CoreCivic announced a new contract award from Immigration and Customs Enforcement to house up to 2,016 inmates at its NEOCC facility.  Ex. E, 2016 Form 10-K at 11.

**Response:**

**C.    Cibola**

116.    On January 9, 2015, Cibola received a Cure Notice reflected in Ex. 92.  The Cure Notice listed seven items of non-conformance in health services and stated that "unless the conditions are cured by April 21, 2015 the Government may terminate this contract."  Ex. 92, CORECIVIC_0038055 at -055.

**Response:**


117.    Prior to the Cure Notice, Cibola did not have a full-time physician on staff.  Ex. 93, CORECIVIC_0098789 at -789 (Cibola response to Notice of Concern re staffing); Ex. 92, CORECIVIC_0038055; Ex. 94, Dep. Tr. of John Baxter ("Baxter Tr.") 141:19–25; *id.* at 241:12–242:12; *see also* Ex. 95, Nov. 15, 2019 Dep. Tr. of Kim White ("White Nov. 15, 2019 Tr.") 120:13–121:4.

**Response:**


118.    Operational challenges in staffing and the provision of medical services were not unique to Cibola or CoreCivic.  Ex. 64, Murray Tr. 95:15–98:11; *id.* at 103:12–104:10; Ex. 2,

Garfinkle Tr. 41:25–42:24; Ex. 96, July 8, 2020 Dep. Tr. of Harley Lappin ("Lappin July 28, 2020 Tr.") 97:19–98:21; *id.* at 140:8–24; Ex. 62, White Oct. 30, 2020 Tr. 28:8–23; *see also id.* at 78:11–79:21.

> **Response:**

119.    BOP-operated facilities have received deficiencies and repeat deficiencies when audited.  Ex. 64, Murray Tr. 179:12–23; *see also* Ex. 97,  Oct. 28, 2020 Dep. Tr. of William Dalius ("Dalius Oct. 28, 2020 Tr.") 81:10–18; Ex. 45, Swindle 30(b)(6) Tr. 43:17–49:15; Ex. 96, Lappin July 28, 2020 Tr. 97:19–98:21.

> **Response:**

120.    BOP-operated facilities faced difficulties in staffing and health services as well.  Ex. 99, "The Federal Bureau of Prison's Efforts to Manage Inmate Health Care," Office of the Inspector General, Audit Division, Audit Report 08-08, February 2008 at xiv–xv; Ex. 94, Baxter Tr. 141:1–18; Ex. 100, Dep. Tr. of Bart VerHulst 101:9–17; Ex. 101, BOP_0080016 at -016 (Mellendick email) ██████████████████████████████████████████████ ███████████████████████████████████.").

> **Response:**

121.    To improve Cibola's health services, CoreCivic provided signing bonuses for healthcare professionals, requested to temporarily staff Cibola with healthcare professionals from its other BOP facilities, and hired (at its own expense) a third party healthcare vendor.  Ex. 93, CORECIVIC_0098789 at -790 (Cibola response to Notice of Concern); Ex. 102, CORECIVIC_2209170 at -170; Ex. 103, CORECIVIC_1317716; Ex. 94, Baxter Tr. 177:1-178:8.

**Response:**

122. On April 27, 2015, Matt Nace, the Procurement Executive for the BOP, sent an email to the Warden of the Cibola facility reflected in Exhibit 104. Mr. Nace stated that there was "excellent progress made by [Cibola]," and "[i]t goes without saying that these results didn't occur without significant contributions from Cibola staff and the support of Headquarters. I was pleased to see the significant improvement in Heath Services." Mr. Nace congratulated Cibola's Warden and "all Cibola staff for a job well done!" Ex. 104, CORECIVIC_0058268 at -268.

**Response:**

123. On May 18, 2015, the BOP lifted the Cure Notice, and informed CoreCivic that "the failures by [CoreCivic] indicated in the cure notice, are no longer endangering the performance of the contract." Ex. 105, CORECIVIC_0038054.

**Response:**

124. During the Class Period, the BOP issued five CPARs regarding Cibola reflected in Exs. 106-110. Ex. 106, CORECIVIC_0674188; Ex. 107, CORECIVIC_1337444; Ex. 108, CORECIVIC_0473652; Ex. 109, CORECIVIC_0722785; Ex. 110, CORECIVIC_1337493.

**Response:**

125. Cibola's CPAR issued for the performance period of October 1, 2011 through September 30, 2012, stated, ████████████████████████████████████

█████████████████████████████████████████████████████████████

███████ Ex. 106, CORECIVIC_0674188 at -189.

**Response:**


126.    Cibola's CPAR issued for the performance period of October 1, 2012 through

September 30, 2013, stated,█████████████████████████████████████

█████████████████████████████████████████████████████████████

███████ Ex. 107, CORECIVIC_1337444 at -445.

**Response:**


127.    Cibola's CPAR issued for the performance period of October 1, 2013 through

September 30, 2014, stated,█████████████████████████████████

█████████████████████████████████████████████████████████████

████████████████████████ Ex. 108, CORECIVIC_0473652 at -655.

**Response:**


128.    Cibola's CPARs issued for the performance periods of October 1, 2014 through

September 30, 2015; and October 1, 2015 through October 30, 2016, stated, ███████████

█████████████████████████████████████████████████████████████

█████████████████████████████████████████████████ Ex.

109, CORECIVIC_0722785 at -789; Ex. 110, CORECIVIC_1337493 at -497.

**Response:**

129.    On June 15, 2016, an article published in *The Nation* reported that Cibola had received the Cure Notice and provided information about medical deficiencies at the facility.  Ex. 76, CORECIVIC_0029731 at -744.

    **Response:**


130.    News articles published on August 1 and 2, 2016, reported that the BOP had decided not to renew the Cibola contract.   Ex. 111, *Cibola County Correctional Center closing*, KOAT Albuquerque, (Aug. 1, 2016); Ex. 112, Kathy Helms, *Milan Prison to Close; 254 Facing Layoffs*, The Gallup Independent (Aug. 2, 2016); *see also* Ex. 79, Dalrymple Rpt. ¶ 53; Ex. 78, Allen Rpt. ¶¶ 78–79

    **Response:**


131.    On August 4, 2016, CoreCivic's Form 10-Q for the second quarter of 2016, reflected in Exhibit K, also stated that the BOP was not renewing the Cibola contract and that ICE was renegotiating the South Texas Residential Center contract.   Ex. K, CoreCivic, Quarterly Report (Form 10-Q) (Aug. 4, 2016) ("2Q 2016 Form 10-Q") at 43–44.

    **Response:**


132.    In October 2016, CoreCivic entered into a contract with ICE to house up to 1,116 inmates at the Cibola facility.  Ex. E, 2016 Form 10-K at 11.

    **Response:**

**D.      Eden**

133.    During the Class Period, the BOP issued five Contractor Performance Assessment Reports ("CPARs") regarding Eden.    Ex.  113,  CORECIVIC_0606193;  Ex.  114, CORECIVIC_0669245; Ex. 115, CORECIVIC_1337591; Ex. 72, CORECIVIC_1337633; Ex. 116, CORECIVIC_1337660.

**Response:**


134.    The CPARs issued for Eden for the performance periods of May 1, 2012 through April 30, 2013; and May 1, 2013 through April 30, 2014, stated ███████████████████

████████████████████████████████████████████████████████

████████████████████████    Ex. 113, CORECIVIC_0606193 at -193; Ex. 114, CORECIVIC_0669245 at -245–246.

**Response:**


135.    The CPARs issued for Eden for the performance periods of May 1, 2014 through April 30, 2015; May 1, 2015 through April 30, 2016; and May 1, 2016 through April 30, 2017, stated ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████    Ex.  115,  CORECIVIC_1337591  at  -593;  Ex.  72, CORECIVIC_1337633 at -635; Ex. 116, CORECIVIC_1337660 at -663.

**Response:**

**E.**     **McRae**

136.    During the Class Period, the BOP issued five Contractor Performance Assessment Reports ("CPARs") regarding McRae.    Ex. 117, CORECIVIC_0660735; Ex. 118, CORECIVIC_0606206; Ex. 119, CORECIVIC_0720859; Ex. 120, CORECIVIC_0722041; Ex. 121, CORECIVIC_1337713.

**Response:**

137.    McRae's CPARs issued for the performance periods of December 1, 2011, through November 30, 2012; and December 1, 2012, through November 30, 2013, stated, ███████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████  Ex. 117, CORECIVIC_0660735 at -736; Ex. 118, CORECIVIC_0606206 at -207.

**Response:**

138.    McRae's CPARs issued for the performance periods of December 1, 2013, through November 30, 2014; December 1, 2014, through November 30, 2015; and December 1, 2015, through November 30, 2016, stated, ██████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████  Ex. 119, CORECIVIC_0720859 at -860; Ex. 120, CORECIVIC_0722041 at -043; Ex. 121, CORECIVIC_1337713 at -715.

**Response:**

## VI. THE OIG REVIEW

139. On August 11, 2016, the Department of Justice publicly released a report titled, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Review"), reflected in Exhibit 122. The OIG Review documented findings that, among other things, (i) in a majority of categories, contract prisons incur more safety and security incidents per capita than comparable BOP institutions; (ii) past disturbances in contract prisons had caused property damage, injury, and the death of one Correctional Officer; and (iii) contract prisons had higher rates of assaults and staff uses of force than comparable BOP institutions. Ex. 122, U.S. Dep't of Justice Off. of the Inspector Gen., *DOJ OIG Releases Report on the Federal Bureau of Prisons' Monitoring of Contract Prisons* (Aug. 11, 2016); Ex. 61, August 2016 OIG Review at i–ii; Ex. 78, Allen Rpt. ¶ 28, exhibit 1 at 5; Compl. ¶¶ 12, 38–39.

> Response:

## VII. THE YATES MEMO

140. On August 18, 2016, the Department of Justice released a two-page memorandum from Deputy Attorney General Sally Yates addressed to the Acting Director of the BOP (the "Yates Memo"), reflected in Exhibit 123. Ex. 123, CORECIVIC_2207912 ("Yates Memo") at -913–914; Compl. ¶ 13.

> Response:

141. On August 23, 2016, Pamela Jones, an Administrator for the BOP's Privatization Management Branch, sent an email to Angela Dunbar, the BOP's Assistant Director for the Correctional Programs Division, reflected in Exhibit 124 ███████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████ Ex. 124, BOP_0148858 at -858, -860.

**Response:**

142.     On November 8, 2016, Donald Trump won the 2016 Presidential Election.  Ex. 125, "Donald J. Trump 45th President of the United States," The White House, whitehouse.gov/people/donald-j-trump/ (last visited Nov. 13, 2020).

**Response:**

143.     On November 9, 2016, CoreCivic's stock price increased 43%.  Ex. 126, CXW Historical Data, Yahoo Finance, https://finance.yahoo.com/quote/CXW/history?period1=1330214400&period2=1488412800&interval=1d&filter=history&frequency=1d&includeAdjustedClose=true (closing price on November 8, 2016 was $14.19; closing price on November 9, 2016 was $20.31); Ex. 4, Pl.'s Resp. to RFA No. 31 (admitting, in response to RFA 31, that CoreCivic's closing stock price on November 9, 2016, was 43% higher than its closing stock price on November 8, 2016).

**Response:**

144.     On January 13, 2017, CoreCivic's closing stock price was $27.22.  Ex. 126, CXW Historical Data, Yahoo Finance.

**Response:**

145.    On February 9, 2017, Jeff Session was sworn in as Attorney General.  Ex. 78, Allen Rpt.  ¶  70;  Ex.  127,  "Attorney  General:    Jeff  Sessions,"  U.S.  Dep't  of  Justice, justice.gov/ag/bio/attorney-general-jeff-sessions (last visited Nov. 13, 2020).

        **Response:**

146.    On February 21, 2017, Attorney General Sessions rescinded the Yates Memo, stating that "[t]he memorandum changed long-standing policy and practice, and impaired the Bureau's ability to meet the future needs of the federal correctional system."  Ex. 128, Attorney General Jeff Sessions, Rescission of Memorandum on Use of Private Prisons (Feb. 21, 2017) (Allen Dep. Ex. 13) ("I hereby rescind the memorandum dated August 18, 2016, sent to you by former Deputy Attorney General Sally Q. Yates, entitled 'Reducing Our Use of Private Prisons.'"); Compl., at 67, n.14; *see also* Ex. 4, Pl.'s Resp. to RFA No. 29.

        **Response:**

147.    On February 21, 2017, CoreCivic's stock price rose as high as $34.10.  Ex. 126, CXW Historical Data, Yahoo Finance; *see also* Ex. 78, Allen Rpt. ¶¶ 69–70.

        **Response:**

148.    Before the Yates Memo was released, on August 17, 2016, CoreCivic's stock price was $27.22.  Ex. 126, CXW Historical Data, Yahoo Finance; Ex. 78, Allen Rpt. ¶ 75.

        **Response:**

149.     On February 23, 2017, CoreCivic's stock price reached a high of $34.69.  Ex. 126, CXW Historical Data, Yahoo Finance; Ex. 78, Allen Rpt. ¶¶ 69–70.

        **Response:**


## VIII.  RELEVANT RISK DISCLOSURES REGARDING CORECIVIC'S BUSINESS

### A.     Risk Disclosures

150.     CoreCivic's SEC filings during the Class Period, reflected in Exhibits A–E, included risk disclosures regarding (i) the potential effects of its operational performance and compliance with regulations on its ability to obtain, renew, and retain contracts; (ii) the possibility that inmate disturbances may occur, and the potential effects on its ability to obtain, renew, and retain contracts; and (iii) the potential effects of losing BOP business on its financial performance. Ex. B, 2012 Form 10-K at 26–31; Ex. A, 2013 Form 10-K at 26–31; Ex. C, 2014 Form 10-K at 25–31; Ex. D, 2015 Form 10-K at 28–34; Ex. E, 2016 Form 10-K at 30–36.

        **Response:**


151.     Starting in November 2015, CoreCivic's SEC filings disclosed that BOP prison populations had declined, and were expected to continue declining.  Ex. L, CoreCivic, Quarterly Report (Form 10-Q) (Nov. 5, 2015) ("3Q 2015 Form 10-Q") at 38; Ex. D, 2015 Form 10-K at 10; Ex. M, CoreCivic, Quarterly Report (Form 10-Q) (May 5, 2016) ("1Q 2016 Form 10-Q") at 34; Ex. K, 2Q 2016 Form 10-Q at 40.

        **Response:**

42

### B. BOP Populations

152. During the Class Period, the BOP reported to Congress that "federal prisons [were] significantly overcrowded." Ex. 130, U.S. Dep't. of Justice, *FY 2016 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities* at 2; *see also id.* at 5 (listing the percent overcrowd[ing] of BOP population as 38% (2012), 36% (2013) 30% (2014), 24% (2015), 15% (2016)).

Response:


153. In 2016, the BOP had a population of 192,170 and was 16% overcrowded. Ex. 131, *FY 2020 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities*, U.S. Dept. of Justice at 4; *see also* Ex. 132, Feb. 26, 2020 Dep. Tr. of William Dalius ("Dalius Feb. 26, 2020 Tr.") at 98:21–25 (acknowledging there was "generally a downward trend from July 2013 to August 2016 with respect to the BOP population.").

Response:


154. As one consequence of the overcrowding, the BOP contracted during the Class Period with private companies to house federal inmates. Ex. 19, Dodrill Rpt. ¶¶ 22–23, Figure 1 (showing the growth of the inmate population over time); Ex. 133, Dep. Tr. of Todd Mullenger 142:16–143:5; *see also* Ex. 123, Yates Memo, CORECIVIC_2207912 at -913.

Response:


155. Literature on the use of private prisons shows that there are three principal bases for the cost savings generated by private correctional facilities: construction related costs, personnel costs, and private sector competition. Ex. 134, Expert Rpt. of Justin Marlowe

("Marlowe Rpt.") ¶¶ 27–29 (citing numerous sources); *see also* Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5–138:23.

      **Response:**

156.    If the BOP contracts with a private prison operator to house inmates that it does not have room for in its own facilities, it can avoid the capital expenditure and construction costs of building a new prison. It can also avoid the cost of pensions for employees. Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5–138:23; Ex. 134, Marlowe Rpt. ¶¶ 27–28; *see also, e.g.*, Ex. 135, U.S. Gov't Accountability Office, *Prison Construction: Clear Communication of the Accuracy of Cost Estimates and Project Changes is Needed*, GAO-08-634 (May 2008), MARLOWE_0005967 at -973.

      **Response:**

## IX.    CORECIVIC'S PUBLIC DISCLOSURES REGARDING COST COMPARISONS

157.    BOP published per capita daily cost across all security classifications after each full fiscal year in the Class Period—*i.e.*, 2012–2015. Ex. 134, Marlowe Rpt. ¶ 33; Ex. 136, MARLOWE_0004824 at -826–829.

      **Response:**

158.    On October 2, 2013, CoreCivic held a "2013 Analyst Day," in which certain executives made a presentations to investors and analysts reflected in Ex. 137. Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013).

      **Response:**

159.    The 2013 Analyst Day presentation contained a slide entitled "The Value CCA Provides to Government Partners and Taxpayers."  That slide contained a bullet which stated: "[A]nnual cost savings of 12% or more substantiated by Temple University Study."  Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013) at 15.

        **Response:**

160.    The 2013 Analyst Day presentation cited a footnote in support of the above statement.  The footnote stated: "Temple University's Center for Competitive Government in April 2013:  Contracted Prisons Cut Costs without Sacrificing Quality" ("Temple University Study"). The footnote also stated: "This study received funding by members of the private corrections industry."  Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013) at 15 n. 1.

        **Response:**

161.    The 2013 Analyst Day presentation stated for a second time later in the presentation: "CCA provides cost savings of 12% or more," and cited the Temple University Study in the footnote in support of the statement.  Ex. 137, CoreCivic, *2013 Analyst Day: Durable Earnings and Significant Growth Potential* (Oct. 2, 2013) at 51, 51 n. 1.

        **Response:**

162.    The Temple University Study cited in the 2013 Analyst Day presentation slides 15 and 51 was a publicly available working paper dated April 2013.  Ex. 138, Simon Hakim and

Erwin A. Blackstone, Cost Analysis *of Public and Contractor [O]perated Prisons* (Temple Univ. Ctr. For Competitive Gov., Working Paper Apr. 29, 2013) MARLOWE_0008000 (Marlowe Dep. Ex. 550); Ex. 139, Dep. Tr. of Justin Marlowe 107:10–16 (authenticating 2013 working paper).

> **Response:**

163.     The Temple University Study working paper disclosed that it had "received funding by members of the private corrections industry." Ex. 138, Simon Hakim and Erwin A. Blackstone, Cost Analysis *of Public and Contractor [O]perated Prisons* (Temple Univ. Ctr. For Competitive Gov., Working Paper Apr. 29, 2013) MARLOWE_0008000 at -004 (Marlowe Dep. Ex. 550) ("The study received funding by members of the private corrections industry.").

> **Response:**

164.     The Temple University Study was eventually published in 2014, as reflected in Exhibit 140.  Ex. 140, Simon Hakim and Erwin A. Blackstone, Prison Break*: A New Approach to Public Cost and Safety*, Independent Policy Report (Jun. 2014), MARLOWE_0007885 (Marlowe Dep. Ex. 549).

> **Response:**

165.     The Temple University Study published in 2014 disclosed that "[t]he authors of the study were partially funded by members of private corrections industry.  No other funding was provided." Ex. 140, Simon Hakim and Erwin A. Blackstone, Prison Break*: A New Approach to Public Cost and Safety*, Independent Policy Report (Jun. 2014), MARLOWE_0007885 at -887 (Marlowe Dep. Ex. 549).

**Response:**

166.    During the Class Period, there was publicly available information regarding CoreCivic's funding of certain studies, including the Temple University Study. *See, e.g.*, Ex. 141, Prison Legal News, Research Study *Finding Benefits from Prison Privatization Funded by Private Prison Companies* (Jun. 15, 2013), https://www.prisonlegalnews.org/news/2013/jun/15/research-study-finding-benefits-from-prison-privatization-funded-by-private-prison-companies/; Ex. 138, Simon Hakim and Erwin A. Blackstone, Cost Analysis *of Public and Contractor [O]perated Prisons* (Temple Univ. Ctr. For Competitive Gov., Working Paper Apr. 29, 2013) MARLOWE_0008000 (Marlowe Dep. Ex. 550); Ex. 140, Simon Hakim and Erwin A. Blackstone, Prison Break*: A New Approach to Public Cost and Safety*, Independent Policy Report (Jun. 2014), MARLOWE_0007885 (Marlowe Dep. Ex. 549); Ex. 142, Louie Brogdon, *Critics point [fi]nger at CCA: For-pro[fi]t prison operator taken to task for campaign giving, operations*, Local Regional News, (May 5, 2014)  MARLOWE_0006999.

**Response:**

167.    For every quarter between the third quarter of 2014 and first quarter of 2016, CoreCivic published an investor presentation ("Investor Presentations") reflected in Exhibits 143-149.  Ex. 143, CoreCivic, CoreCivic Third Quarter 2014 Investor Presentation (Nov. 2014), CORECIVIC_0116477; Ex. 144, CoreCivic, CoreCivic Fourth Quarter 2014 Investor Presentation (Feb. 2015), CORECIVIC_0118664; Ex. 145, CoreCivic, CoreCivic First Quarter 2015 Investor Presentation (May 2015), CORECIVIC_0437869; Ex. 146, CoreCivic, CoreCivic Second Quarter 2015 Investor Presentation (Aug. 2015), CORECIVIC_0119192; Ex. 147, CoreCivic, CoreCivic

Third Quarter 2015 Investor Presentation (Nov. 2015), CORECIVIC_1202106; Ex. 148, CoreCivic, CoreCivic Fourth Quarter 2015 Investor Presentation (Feb. 2015), CORECIVIC_0119881; Ex. 149, CoreCivic, CoreCivic First Quarter 2016 Investor Presentation (May 2016), CORECIVIC_0401036.

       **Response:**

168.     The Third Quarter 2014 Investor Presentation and Fourth Quarter 2014 Investor Presentation contained the following statement: "*Prison Break – A New Approach to Public Cost and Safety*, a recent Policy Report indicates short-and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality." These statements referenced the following footnote: "A Policy Report issued by the Independent Institute in June 2014. This study received funding by members of the private corrections industry." Ex. 143, CORECIVIC_0116477 at 486; Ex. 144, CORECIVIC_0118664 at -673.

       **Response:**

169.     The Investor Presentations for first quarter 2015 through the first quarter of 2016 contained the statement: "Short-and long-term savings can be achieved by governments contracting with the private sector without sacrificing quality," which referenced a footnote stating: "A Policy Report issued by the Independent Institute in June 2014. This study received funding by members of the private corrections industry." Ex. 145, CORECIVIC_0437869 at -878; Ex. 146, CORECIVIC_0119192 at -201; Ex. 147, CORECIVIC_1202106 at -116; Ex. 148, CORECIVIC_0119881 at -891; Ex. 149, CORECIVIC_0401036 at -047.

       **Response:**

170.    The Third Quarter 2014 Investor Presentation contained a chart entitled "Operational Cost Savings," which compared "Operating Cost Per Day in Government Facilit[ies]" reported by the BOP, California and Colorado with "CCA Average Owned Per Diem" and calculated a "Percent Savings." Ex. 143, CORECIVIC_0116477 at -487; Ex. 134, Marlowe Rpt. ¶ 33, Exhibit 2.1 (regarding the source of the BOP data); Ex. 132, Dalius Feb. 26, 2020 Tr. 65:15–68:14 (regarding the BOP data).

**Response:**


171.    The Third Quarter 2014 Investor Presentation Operational Cost Savings Chart contained per day (or "per diem") operating costs reported by the BOP for the fiscal year ended 2013 ($73.00), an estimate for "real estate cost per day" ($12.00) and combined those two numbers to calculate a "Total Government-Run Cost Per Day" for the BOP of $85.00. It then compared that to CCA's Averaged Owned Per Diem for the quarter ended September 30, 2014 ($69.65), to reach a Percent Savings of 18.1%. Ex. 143, CORECIVIC_0116477 at -487; Ex. 136, MARLOWE_0004824 at -828; Ex. 45, Swindle 30(b)(6) Tr. 285:23–289:12 (explaining per diem comparison).

**Response:**


172.    Investor Presentations for the fourth quarter 2014 through the first quarter of 2016 also contained a chart entitled "Operational Cost Savings." Those charts used the same methodology for calculating a "Percent Savings" as the Operational Cost Savings' charts in the Third Quarter 2014 Investor Presentation. Ex. 144, CORECIVIC_0118664 at -674; Ex. 145,

CORECIVIC_0437869 at -879; Ex. 146, CORECIVIC_0119192 at -202; Ex. 147, CORECIVIC_1202106 at -117; Ex. 148, CORECIVIC_0119881 at -892; Ex. 149, CORECIVIC_0401036 at -048.

**Response:**


173.     Using the methodology outlined in UF 171, CoreCivic's Investor Day Presentations reported the following "Percent Savings" as compared to BOP facilities:

4Q 2014: 17%;

1Q 2015: 15%;

2Q 2015: 9.2%;

3Q 2015: 17.9%;

4Q 2015: 17.3%;

1Q 2016: 14.4%;

Ex. 144, CORECIVIC_0118664 at -674; Ex. 145, CORECIVIC_0437869 at -879; Ex. 146, CORECIVIC_0119192 at -202; Ex. 147, CORECIVIC_1202106 at -117; Ex. 148, CORECIVIC_0119881 at -892; Ex. 149, CORECIVIC_0401036 at -048.

**Response:**


174.     CoreCivic's "Average Owned Per Diem" or "Average Per Diem" figures used in each Operational Cost Savings Chart in the Investor Presentations were consistent with the average per diem revenue figures presented in its SEC filings—i.e. the average per diem rates for all of CoreCivic's facilities it runs for government partners.  Ex. 134, Marlowe Rpt. ¶ 34; *compare* Ex. 143, CORECIVIC_0116477 at -487 *with* Ex. N, CoreCivic, Quarterly Report (Form 10-Q) (Nov.

5, 2014) ("3Q 2014 Form 10-Q") at 41 (revenue per compensated man-day $69.65); *compare* Ex. 144, CORECIVIC_0118664 at -674 *with* Ex. C, 2014 Form 10-K at 59 ($70.55); *compare* Ex. 145, CORECIVIC_0437869 at -879 *with* Ex. O, CoreCivic, Quarterly Report (Form 10-Q) (May 7, 2015) ("1Q 2015 Form 10-Q") at 31 ($70.16); *compare* Ex. 146, CORECIVIC_0119192 at -202 *with* Ex. P, 2Q 2015 Form 10-Q at 40 ($79.91); *compare* Ex. 147, CORECIVIC_1202106 at -117 *with* Ex. L, 3Q 2015 Form 10-Q at 36 ($72.22); *compare* Ex. 148, CORECIVIC_0119881 at -892 *with* Ex. D, 2015 Form 10-K at 60 ($72.76); *compare* Ex. 149, CORECIVIC_0401036 at -048 *with* Ex. M, 1Q 2016 Form 10-Q, at 33 ($75.30).

**Response:**


175.    The figures labelled "Operating Cost Per Day in Government Facility" were consistent with the most recent BOP published per diem costs for all BOP facilities.  Specifically:

3Q 2014:  $73  (from BOP FY 2013);

4Q 2014: $73  (from BOP FY 2013);

1Q 2015: $76  (from BOP FY 2014);

2Q 2015: $76  (from BOP FY 2014);

3Q 2015: $76  (from BOP FY 2014);

4Q 2015: $76  (from BOP FY 2014);

1Q 2016: $76  (from BOP FY 2014).

*Compare* Ex. 143, CORECIVIC_0116477 at -487 *with* Ex. 136, MARLOWE_00004824 at -828; *compare* Ex. 144, CORECIVIC_0118664 at -674 *with* Ex. 136, MARLOWE_00004824 at -828; *compare* Ex. 145, CORECIVIC_0437869 at -879 *with* Ex. 136, MARLOWE_00004824 at -827; *compare* Ex. 146, CORECIVIC_0119192  at -202 *with* Ex. 136, MARLOWE_00004824 at -827;

*compare* Ex. 147, CORECIVIC_1202106 at -117 *with* Ex. 136, MARLOWE_00004824 at -827;

*compare* Ex. 148, CORECIVIC_0119881 at -892 *with* Ex. 136, MARLOWE_00004824 at -827;

*compare* Ex. 149, CORECIVIC_0401036 at -048 *with* Ex. 136, MARLOWE_00004824 at -827.

> **Response:**

176.    The BOP per diem figures published by the BOP and used in CoreCivic's Investor Presentations do not include all costs related to BOP facilities.  Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5–138:23; Ex. 150, CORECIVIC_1327565 at -573; *see also* Ex. 134, Marlowe Rpt. ¶¶ 35, 39.

> **Response:**

177.    The per diem figures published by the BOP and used in CoreCivic's Investor Presentations do not include costs to construct BOP facilities, capital expenditures over $10,000, administrative overhead costs, costs of funding pensions for BOP employees and monitoring costs. Ex. 136, MARLOWE_0004824 at 826–829 (Federal Prison System, Per Capita Costs, FY 2012–2015); Ex. 97, Dalius Oct. 28, 2020 Tr. 137:5–138:23; Ex. 98, Feb. 21, 2020 Dep. Tr. of Patrick Swindle ("Swindle Feb. 20, 2020 Tr.") 73:3–74:1; *see also* Ex. 134, Marlowe Rpt. ¶ 35; Ex. 150, CORECIVIC_1327565 at -573; Ex. 151, Douglas C. McDonald and Kenneth Carlson, Contracting *for Imprisonment in the Federal Prison System: Cost and Performance of the Privately-Operated Taft Correctional Institution*," Abt Associates, Inc. (Oct. 1, 2005), MARLOWE_0007431 at -493.

> **Response:**

178.    The "Average Owned Per Diem" or "CCA Average Per Diem" costs used to calculate operational savings in the Investor Presentations were lower than the per diem revenue

CoreCivic earned during the Class Period for its BOP facilities only. Ex. 134, Marlowe Rpt. at ¶ 38 ("[T]he per diem revenue used as a basis for CoreCivic's 'average owned per diem' in the cost comparisons was higher than the per diem revenue CoreCivic received on average for its BOP-contracted facilities"); *id.* exhibit 5; *id.* exhibit 6.

      **Response:**

179.    The real estate adjustment cost per day ($12) used in the Operational Cost Savings chart in each Investor Presentation from Third Quarter 2014 to Fourth Quarter 2015 was lower than the average per diem construction cost reported by the BOP for the period of 2011-2015. Ex. 134, Marlowe Rpt. ¶ 36, exhibit 4 (the average per diem construction cost to the BOP per facility was $17.50 for 2011–2015)).

      **Response:**

180.    During the Class Period, each of CoreCivic's BOP-contract facilities reported lower per diem revenues than the BOP's per diem cost for BOP-operated low security facilities. Ex. 134, Marlowe Rpt. at ¶ 37, exhibit 5 (comparing daily operating costs per capita of CoreCivic BOP-contracted facilities and BOP low security facilities); Ex. 4, Pl.'s Resp. to RFA Nos. 45–49; *see also* Ex. 97, Dalius Oct. 28, 2020 Tr. at 137:5–138:23.

      **Response:**

181.    For its BOP facilities, CoreCivic was contractually entitled to a guaranteed fixed payment (the Monthly Operating Price or "MOP") up to 90% occupancy for that facility, and in addition a fixed per diem payment (the Fixed Incremental Unit Price or "FIUP") for each inmate

housed above 90% occupancy. Ex. 13, CORECIVIC_0000001 at -008 (Adams); Ex. 16, (CORECIVIC_0003082) at -084–085(McRae); Ex. 15, (CORECIVIC_0001329) at -1384 (Eden); Ex. 14, CORECIVIC_0000692 at -699 (Cibola); Ex. 17, CORECIVIC_0003791 at -3798 (NEOCC).

> **Response:**

182.    Under the terms of its contracts with CoreCivic, the cost to the BOP does not increase based on the number of staff hired by CoreCivic to work at a particular facility. Ex. 13, CORECIVIC_0000001 at -008 (Adams); Ex. 16, (CORECIVIC_0003082) at -084–085(McRae); Ex. 15, (CORECIVIC_0001329) at -1384 (Eden); Ex. 14, CORECIVIC_0000692 at -699 (Cibola); Ex. 17, CORECIVIC_0003791 at -3798 (NEOCC); Ex. 61, August 2016 OIG Review at 11; *see also* Ex. 97, Dalius Oct. 28, 2020 Tr. 139:22–25.

> **Response:**

183.    CoreCivic would receive vacancy fines in revenue for failing to meet the minimum staffing requirements in its contracts with the BOP. *See e.g.,* Ex. 152, CORECIVIC_0094237; *see also* Ex. 153, CORECIVIC_0094238 (same); Ex. 154, CORECIVIC_0094239 (same); Ex. 18, Martz Tr. 45:7–47:22.

> **Response:**

184.    In 2011, CoreCivic conducted an internal analysis to compare the private sector's cost of services versus the Bureau of Prisons reflected in Exhibit 143. Ex. 150, CORECIVIC_1327565 (presentation of analysis); Ex. 98, Swindle Feb. 20, 2020 Tr. 65:21–66:6

(authenticating), 69:1–25, 73:1–74:13, 93:10–99:4; *see also* Ex. 45, Swindle 30(b)(6) Tr. 95:19–97:3.

    **Response:**


185.    Neither the OIG Review, nor the Yates Memorandum contained a direct comparison of overall costs between BOP facilities and any private contractor.  Ex. 61, August 2016 OIG Review; Ex. 123, Yates Memo, CORECIVIC_2207912 at -913.

    **Response:**


186.    The OIG Review contained a comparison of Annual Per Capita Costs for BOP Institutions and Annual Per Capita Costs for Contract Prisons for fiscal years 2011-2014.  That comparison showed that Annual Per Capita Costs were consistently lower for contract prisons.  It reported that "the average annual costs in the BOP institutions and the contract prisons per capita were \$24,426 and \$22,488, respectively."  Ex. 61, August 2016 OIG Review at 12, Figures 2–3.

    **Response:**


## X.    STOCK PRICE MOVEMENTS

187.    Securities analysts released periodic reports referencing CoreCivic during the Class Period, as reflected in Exhibits 155 and Q–Y, regarding CoreCivic's business, financial performance, expectations for and risks to future performance; CoreCivic's competitors; and significant events that affected CoreCivic's business. *See, e.g.*, Ex. 155, Wells Fargo, *CXW: First Look—South TX Uncertainty Likely to Weigh On Shares* (Aug. 4, 2016), CORECIVIC_0688135; Ex. Q, Canaccord Genuity, *2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD* at 1(Aug. 4, 2016) ; Ex. R, SunTrust Robinson Humphrey, *Renegotiation with*

*ICE Ongoing; Maintain Neutral*, at 1 (Aug. 4. 2016); Ex. S, Sadif, *Is Corrections Corp of America a Good Long-Term Investment?* (Aug. 12, 2016); Ex. T, Compass Point Research & Trading LLC, *Quick Thoughts on DOJ's For-Profit Prison Memo*, at 1 (Aug. 18, 2016); Ex. U, Canaccord Genuity, *Private prisons aren't going anywhere, but risks could continue to weigh on stocks* at 1–5 (Aug. 23, 2016); Ex. V, SunTrust Robinson Humphrey, *CXW, GEO – Lowering estimates & PTs Amid Political Shift* at 7–8 (Sept. 1, 2016); Ex. W, SunTrust Robinson Humphrey, *Increasing PT To $26 On Outlook For Increasing Estimates*, at 1 (Nov. 14, 2016); Ex. X, Cannacord Genuity, *Raising GEO and CXW price targets on lower risk post election* at 1–2 (Nov. 11, 2016); Ex. Y, *Cannacord Genuity, 2017 private prison outlook and primer: an attractive investment opportunity* at 1, 9 (Jan. 13, 2017).

        **Response:**


188.    There was no statistically significant decline in CoreCivic's stock price on May 21-25, 2012.  Ex. 126, CXW Historical Data, Yahoo Finance, (closing price on May 18, 2012 was $26.01; closing price on May 21, 2012 was $26.28; closing price on May 22, 2012 was $26.14; closing price on May 23, 2012 was $26.34; closing price on May 24, 2012 was $26.26; closing price on May 25, 2012 was $26.08); Ex. 78, Allen Rpt. ¶¶ 38-39; Feinstein Rpt. Exhibit 4, Dkt. 93-3.

        **Response:**


189.    There was no statistically significant decline in CoreCivic's stock price on June 15, 2016.  Ex. 126, CXW Historical Data, Yahoo Finance, (closing price on June 14, 2016 was $33.62;

closing price on June 15, 2016 was $33.65); *see also* Feinstein Rpt. exhibit. 4, Dkt. 93-3 at 109; Ex. 78, Allen Rpt. ¶¶ 43–44.

**Response:**


190.    CoreCivic's stock price increased over the previous day's closing stock price every day between June 15 and June 21, 2016. Ex. 4, Pl.'s Resp. to RFA No. 9; Ex. 126, CXW Historical Data, Yahoo Finance (closing price on June 15, 2016 was $33.65; closing price on June 16, 2016 was $33.84; closing price on June 17, 2016 was $33.90; closing price on June 20, 2016 was $34.16; closing price on June 21, 2016 was $34.37).

**Response:**


191.    There was no statistically significant reaction in CoreCivic's stock price on August 2, 2016. Ex. 126, CXW Historical Data, Yahoo Finance, (closing price on August 1, 2016 was $32.54; closing price on August 2, 2016 was $31.86); *see also* Ex. 78, Allen Rpt. ¶¶ 23, 81; Ex. 79, Dalrymple Rpt. ¶ 53.

**Response:**


192.    There was no statistically significant reaction in CoreCivic's stock price on August 3, 2016. Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 2, 2016 was $31.86; closing price on August 3, 2016 was $31.03); *see also* Ex. 79, Dalrymple Rpt. ¶ 53.

**Response:**

193.     CoreCivic's stock price dropped 6.2% on August 4, 2016.  Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 3, 2016 was $31.03; closing price on August 4, 2016 was $29.11); *see also* Ex. 79, Dalrymple Rpt. ¶ 52.

**Response:**


194.     There was no statistically significant reaction in CoreCivic's stock price on August 11, 2016.  Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 10, 2016 was $27.56; closing price on August 11, 2016 was $27.39); Ex. 78, Allen Rpt. ¶ 28; Feinstein Rebuttal Rpt. ¶ 27, Dkt. 120-1.

**Response:**


195.     On August 18, 2016, CoreCivic's stock priced decreased by 35.5%.  Ex. 126, CXW Historical Data, Yahoo Finance (closing price on August 17, 2016 was $27.22; closing price on August 18, 2016 was $17.57); Ex. 78, Allen Rpt. ¶ 75; Ex. 79, Dalrymple Rpt. ¶ 55.

**Response:**


196.     On August 18, 2016, GEO's stock price decreased by 39.6%.  Ex. 4, Pl.'s Resp. to RFA No. 26; Ex. 78, Allen Rpt. ¶ 75.

**Response:**


197.     CoreCivic's performance at McRae and NEOCC was above satisfactory, throughout the Class Period.  Ex. 58, Mellendick Tr. 119:19-23 (Q:  And so with respect to the other two facilities, McRae and Northeast Ohio, you found CCA's performance to be well above

satisfactory; is that right?  A:  That is correct.); *see also* Ex. 117, CORECIVIC_0660735; Ex.

118, CORECIVIC_0606206; Ex. 119, CORECIVIC_0720859; Ex. 120, CORECIVIC_0722041;

Ex. 121, CORECIVIC_1337713; Ex. 80, CORECIVIC_0046207; Ex. 81,

CORECIVIC_0095065; Ex. 82, CORECIVIC_1337756; Ex. 83, CORECIVIC_0578404.

      **Response:**


DATED:  November 20, 2020          Respectfully submitted:

           /s/ *Steven A. Riley*
          Steven A. Riley (TN #6258)
          Milton S. McGee, III (TN #024150)
          RILEY WARNOCK & JACOBSON, PLC
          1906 West End Avenue
          Nashville, TN 37203
          T: (615) 320-3700
          F: (615) 320-3737
          sriley@rwjplc.com
          tmcgee@rwjplc.com

          David J. Schindler (admitted *pro hac vice*)
          Brian T. Glennon (admitted *pro hac vice*)
          Meryn C. N. Grant (admitted *pro hac vice*)
          LATHAM & WATKINS LLP
          355 South Grand Avenue, Suite 100
          Los Angeles, CA 90071
          T: (213) 485-1234
          F: (213) 891-8763
          david.schindler@lw.com
          brian.glennon@lw.com
          meryn.grant@lw.com

          Morgan E. Whitworth (admitted *pro hac vice*)
          LATHAM & WATKINS LLP
          505 Montgomery Street, Suite 2000
          San Francisco, CA 94111
          T: (415) 391-0600
          F: (415) 395-8095
          morgan.whitworth@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

*Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway,  Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.

Christopher T. Cain

HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike,  Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

this 20th day of November, 2020.

 /s/ *Steven A. Riley*
Steven A. Riley