EXHIBIT 8
[Filed Under Seal]

Videotaped Deposition of

# Kim White

October 30, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential Pursuant to Protective Order**

Confidential Pursuant to Protective Order

Kim White — Grae vs. Corrections Corporation of America, et al.

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF TENNESSEE
 3
 4    NIKKI BOLLINGER GRAE, Individually
      and on Behalf of All Others
 5    Similarly Situated,
 6              Plaintiff,        Civil Action No.
 7    vs.                         3:16-cv-02267
 8    CORRECTIONS CORPORATION OF
      AMERICA, ET AL.,
 9
                Defendants.
10
      _____
11
12         CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13
14         VIDEOTAPED DEPOSITION OF KIM WHITE
15
16      Conducted virtually via remote videoconference
17                     October 30, 2020
18
19
20
21
22
23    Reported by:
      Misty Klapper, RMR, CRR
24    Job No.: 10073533
25
```

**Page 2**

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF TENNESSEE
 3
 4    NIKKI BOLLINGER GRAE, Individually
      and on Behalf of All Others
 5    Similarly Situated,
 6              Plaintiff,        Civil Action No.
 7    vs.                         3:16-cv-02267
 8    CORRECTIONS CORPORATION OF
      AMERICA, ET AL.,
 9
                Defendants.
10
      _____
11
12
13
14
15
16
17    Videotaped deposition of KIM WHITE, taken on behalf of
18    Plaintiff, via Zoom remote videoconference, beginning at
19    9:04 a.m. CST on Friday, October 30, 2020, before Misty
20    Klapper, RMR, CRR.
21
22
23
24
25
```

**Page 3**

```
 1    APPEARANCES:
 2    (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
 3    ON BEHALF OF PLAINTIFF:
 4         CHRISTOPHER M. WOOD, ESQUIRE
           ROBBINS GELLER RUDMAN & DOWD LLP
 5         414 Union Street, Suite 900
           Nashville, Tennessee 37219
 6         (615) 244-2203
           E-mail: cwood@rgrdlaw.com
 7                 clyons@rgrdlaw.com
 8
      ON BEHALF OF DEFENDANTS:
 9
           SARAH TOMKOWIAK, ESQUIRE
10         LATHAM & WATKINS, LLP
           555 Eleventh Street, N.W., Suite 1000
11         Washington, D.C. 20004-1304
           (202) 637-2335
12         E-mail: sarah.tomkowiak@lw.com
13              AND
14         MERYN C.N. GRANT, ESQUIRE
           LATHAM & WATKINS, LLP
15         355 South Grand Avenue, Suite 100
           Los Angeles, California 90071
16         (213) 485-1234
           E-mail: meryn.grant@lw.com
17
18
19    ALSO PRESENT:  DAVID CAMPBELL, VIDEO OPERATOR
20
21
22
23
24
25
```

**Page 4**

```
 1                  C O N T E N T S
 2    WITNESS:          EXAMINATION BY:         PAGE:
 3    Kim White         Mr. Wood                  6
 4
 5
 6
 7                     E X H I B I T S
 8    WHITE EXHIBITS:
 9    NO.:     DESCRIPTION:                      PAGE:
10    Exhibit 591 Defendants' Disclosures Pursuant to
11         Federal Rule of Civil Procedure
12         26(a)(2)(C)                            27
13
14    Note:  Exhibit marked and attached to original.
15
16    EXHIBITS REFERRED TO:                      PAGE:
17    White Exhibit 139                           88
18
19
20
21
22
23
24
25
```

Page 5

PROCEEDINGS

VIDEO OPERATOR: The time on the record is 9:04 a.m. Central Time.

Today's date is October 30, 2020. My name is David Campbell of Aptus Court Reporting. The court reporter today is Misty Klapper of Aptus Court Reporting, located at 600 West Broadway, Suite 300, San Diego, California, 92101.

This begins the video-recorded deposition of Kim White, testifying in the matter of Nikki Bollinger Grae versus Corrections Corporation of America, et al. This is pending in the United States District Court, Middle District of Tennessee, Case Number 3:16-cv-02267.

This is a remote Zoom video deposition. The audio and -- video and audio recordings will take place at all times during this deposition, unless all counsel agree to go off the record. The beginning and end of each video recording will be announced. All attorneys' appearances will be noted on the stenographic record.

Page 6

With that, will the court reporter please swear in the witness and we can proceed.

MS. REPORTER: One moment.

Whereupon:

KIM WHITE,

was called for examination, and, after being duly sworn, was examined and testified as follows:

MS. REPORTER: Thank you very much. You may proceed.

EXAMINATION BY COUNSEL FOR PLAINTIFF

BY MR. WOOD:

Q. Good morning, Ms. White.

A. Good morning.

Q. When -- at -- at your last deposition you testified that you were still working for CoreCivic.

Is that still the case today?

A. Yes, it is.

Q. And I believe you previously testified that you were doing project-based work. Is that -- is that accurate?

A. That is still accurate, yes.

Q. And what types of projects have you done for CoreCivic this year?

Page 7

A. So this year I've done two. One is mentoring and coaching a director at one of our residential reentry centers. The second is working on a refresh of the company's diversity, equity and inclusion strategy.

Q. And how are you compensated for that work?

A. I'm still salaried, based on the employment agreement I discussed during our first deposition.

Q. And what's your current salary?

A. It's 175K per year.

Q. Is there an end date for that agreement?

A. No, it's at the pleasure of the chief executive officer.

Q. Okay. Have you ever testified as an expert witness?

A. No, I've never been invited to do that before.

Q. You've never been designated as an expert before?

A. No, not for any testimony or court case.

Q. Have you ever held yourself out to be

Page 8

an expert in a particular topic?

A. Not for official purposes through any kind of litigation, no.

Q. What about aside from litigation?

A. I would consider myself, and have said so to people in my circle, that I'm an expert in correctional management.

Q. And what do you mean by correctional management?

A. I mean the leadership, oversight and guidance of facilities, regional offices and the industry as it relates to all of my professional experience.

Q. You were the assistant director of human resources management at the BOP before coming to CCA, right?

A. That is correct.

Q. And during the time that you were with the BOP, you didn't have any interaction with anyone at CCA on a professional basis, right?

A. That is true, yes.

Q. And you didn't have any interaction with anyone at the -- the GEO Group on a professional basis either, right?

Case 3:16-cv-02267    Document 356-8    Filed 11/20/20    Page 4 of 18 PageID #: 12992
www.aptusCR.com
Page 5..8

Page 9

1   A.   No, I did not.
2   Q.   Do you have -- so before -- before
3   coming to CCA, did you have any understanding as
4   to the -- the quality of the services that CCA
5   offered?
6   A.   Through my executive experience with
7   the Bureau of Prisons, we talked about the
8   private sector as it related to the services it
9   provided to the Bureau of Prisons.  So I was
10  familiar with the good things that were being
11  done, the challenges that they faced and
12  certainly what benefit we were getting from the
13  services provided.
14  Q.   And would you consider -- did you
15  believe that you had expertise as to private
16  prisons before the time that you went to work at
17  CCA?
18  A.   I believe that I had professional
19  experience and understanding of private prisons,
20  primarily because they're in the same industry as
21  I was at the time.  We discussed performance
22  quite a bit and we also talked about the
23  comparative benefits between us doing the role
24  and the private sector doing the role.
25  Q.   And who did you have those

Page 10

1   discussions with?
2   A.   Other members of the executive staff
3   at the Bureau of Prisons.  We discussed it with
4   other state and local representatives when they
5   were contemplating using those kind of services.
6   And certainly I talked about it at Adult
7   Correction Association conferences.
8        So it was within the industry circle
9   that I performed in.
10  Q.   And who specifically did you have
11  those discussions with?
12  A.   Again, members of the executive team
13  at the time, which would have included people
14  like Harley Lappin, Bill Dalius, Mike Nalley,
15  Sara Revell, VaNessa Adams, a number of people on
16  the executive team, and other members outside of
17  the Bureau of Prisons.  I don't recall their
18  names, but it was from other state entities, as
19  well as other professionals within the circle of
20  the Adult Corrections Association.
21  Q.   You didn't have any personal
22  interaction, though, with anyone at CCA prior to
23  the time that you went to work there, aside from
24  any social relationships that you may have had,
25  right?

Page 11

1   A.   I'm not sure I understood the
2   question.
3        So let me say I had interactions with
4   people who used to work for the Bureau of Prisons
5   before who were still -- I would consider friends
6   that went to work for CoreCivic, CCA, GEO, MTC
7   and other private sector businesses.  But that
8   was all social, based on my relationships with
9   them previously.
10  Q.   Right.  While you were at the -- the
11  BOP, you didn't have any responsibility for
12  awarding contracts to private prisons, right?
13  A.   No, that was not in my capacity and
14  area of -- area of responsibility.  No, it was
15  not.
16  Q.   And you weren't responsible for
17  evaluating private prisons, right?
18  A.   Well, it depends on what you mean by
19  evaluating.  If it was for the purposes of
20  contract awards, the answer is no.
21       If it was for the purposes of
22  efficacy and impact and suitability for services
23  provided, the answer would be yes.
24  Q.   Okay.  What -- what -- how were you
25  responsible for overseeing the efficacy, impact

Page 12

1   and suitability of services provided by private
2   prisons?
3   A.   As a member of the executive team, we
4   discussed at our meetings institution operations,
5   performance, quality assurance, a number of
6   things, especially if there were incidents that
7   occurred at those locations.
8        So I would talk to a number of my
9   colleagues and we would discuss how the
10  facilities were doing.  We would talk about sort
11  of comparisons on what we viewed as being
12  acceptable versus what we were seeing.  And a lot
13  of times we would also talk about does it still
14  make sense to have this as a part of our
15  portfolio or should we take the business back.
16       So that was a fairly frequent
17  conversation.
18  Q.   And who did you have those
19  conversations with?
20  A.   With other executive staff members,
21  some of which I mentioned.  Others I've not
22  named, but those members of the executive team
23  during my tenure.
24  Q.   Well, who specifically do you recall
25  having those conversations with?

Confidential Pursuant to Protective Order

Kim White

Grae vs. Corrections Corporation of America, et al.

Page 17

1 private prison while you were at the BOP?
2  A.  No, I did not.
3  Q.  You were not responsible for deciding
4 whether to renew a contract with a private
5 prison, right?
6  A.  No, that was not my responsibility.
7  Q.  And you weren't responsible for
8 deciding whether to rebid a contract either,
9 right?
10  A.  Not directly, but if that was a point
11 of discussion before the executive team, as a
12 member of that team I would be involved in those
13 discussions.
14  Q.  But you weren't responsible for the
15 decision, right?
16  A.  I was not directly responsible for
17 the decision, no.
18  Q.  And you weren't responsible for
19 deciding whether to terminate the contract with a
20 private prison?
21  A.  Again, I might be a -- a part of a
22 conversation about it, but ultimately I was not
23 responsible for that final decision.
24  Q.  Once you left the BOP and joined CCA,
25 what information did you have at that point about

Page 18

1 how BOP facilities were continuing to perform
2 after you left the Bureau of Prisons?
3  A.  Well, I had my experiences, my direct
4 involvement with and my knowledge of the outcomes
5 of those that obviously I took with me into my
6 new role.
7       But everything from -- other than
8 that would have been in conversations with my
9 colleagues who still work for the Bureau of
10 Prisons.  And that -- that would have been pretty
11 much it in respect to BOP operations at that
12 point.
13       Other than that, I continued to keep
14 track of the industry, which included my beloved
15 BOP, and I would read articles about what was
16 happening.  There was very little the BOP did
17 that didn't hit the pages of many newspapers.
18       We would talk collectively when we
19 got together during ACA conferences.  And I had
20 the same level of knowledge about what was going
21 on with the BOP as anybody who would leave their
22 organization, but still stay within the industry.
23  Q.  So after you left BOP -- after you
24 left the BOP and joined CCA in 2012 --
25  A.  Yes.

Page 19

1  Q.  -- you believe you still had the
2 ability to evaluate how BOP facilities were
3 operating, despite the fact that you no longer
4 worked at the BOP?
5  A.  I believe so.  And the time frame in
6 which that separation occurred was 30 days.  And
7 so there was no loss of contact or memory to that
8 point.  And even after that, as I said, I stayed
9 very in tuned (sic) with the organization I spent
10 most of my adult life in.  And also within the
11 industry, we talked about trends, key indicators,
12 any kind of major event or circumstance.
13       So I -- I would say I stayed still
14 very much in touch with what was going on in the
15 agency that I loved.
16  Q.  Well, you had a cooling-off period
17 after you left the BOP, right, when you joined
18 CCA.
19       Remember that?
20  A.  Yes, I did.
21  Q.  And you weren't supposed to be
22 interacting with folks at the BOP during that
23 cooling-off period, right?
24  A.  That is true, but that had some
25 stipulations that did not include social

Page 20

1 interactions or general conversations.
2  Q.  So -- okay.  So you would just talk
3 about -- okay.
4       So in your social interactions you
5 talked about the performance of the BOP?
6  A.  In some circumstances I certainly
7 did.  I would ask how things were doing, if they
8 were -- if my friends were frustrated with
9 something that was happening, they would vent.
10 So, yeah, I still stayed in touch with kind of
11 what was happening.
12       The stipulations for the cooling-off
13 period really was about having official meetings,
14 conducting work, making any decisions along the
15 lines of our CoreCivic or CCA business and the
16 Bureau of Prisons.  But that did not preclude me
17 from having conversations about how people were
18 doing, how things were going, those kinds of
19 things.
20  Q.  You didn't have conversations with
21 folks at the BOP in your professional capacity as
22 a CCA employee?
23  A.  Not to -- not in an official capacity
24 and certainly not to conduct business during that
25 year cooling-off period.  That is correct.

Page 21

1  Q. Or what about after the year
2  cooling-off period?
3  A. After the year sometimes we would
4  talk about -- for instance, I would reach back
5  out to the gentleman who replaced me to talk
6  about some of the HR challenges he was facing,
7  what he was doing about it. So we exchanged
8  common themes, some corrective actions, some
9  recommendations for improvement.
10      So we would talk about those kind of
11 things and obviously the business side of it
12 would come up as well. So those are the kinds of
13 conversations I would say I spent the most time
14 in.
15  Q. While you were at CCA, you weren't
16 responsible for hiring doctors, right?
17  A. No, I was not.
18  Q. And you weren't responsible for
19 evaluating the performance of doctors, right?
20  A. No, that is correct.
21  Q. And you weren't responsible for
22 hiring psychiatrists, right?
23  A. No, I was not.
24  Q. And you weren't responsible for
25 evaluating the performance of psychiatrists,

Page 22

1  right?
2  A. No, I was not.
3  Q. You weren't responsible for hiring or
4  evaluating dentists at CCA, right?
5  A. That is correct.
6  Q. And you weren't responsible for
7  hiring or evaluating nurse practitioners; is that
8  right?
9  A. That is correct.
10 Q. And you weren't responsible for
11 hiring or evaluating outsourced medical care
12 either, right?
13 A. That is -- that is correct as well.
14 Q. And you're not -- you're not a
15 medical expert, right?
16 A. No, I'm not.
17 Q. And you're not a doctor, right?
18 A. No, I'm not a doctor.
19 Q. And you're not in a position to
20 provide expert testimony about the quality of
21 CCA's medical care, right?
22 A. I think I can provide expertise on
23 the quality of care standards that we evaluate,
24 what we expect as leaders. I -- I can attest to
25 that.

Page 23

1  Q. And what do you mean by quality of
2  care standards?
3  A. So I know that when inmates or
4  detainees or residents come to our facilities,
5  there is a certain time frame in which an intake
6  screening should be done.
7       I know when physicals are supposed to
8  be accomplished.
9       I know how quickly physicians and
10 nurses are supposed to respond to chronic care
11 clinics.
12      I also know about what time dentists
13 are supposed to see patients in respect to
14 periodic dental care.
15      So those are the kinds of things that
16 I am aware of as an executive leader and somebody
17 who was a warden at a facility who had oversight
18 for these areas.
19      So while I'm not a physician and I'm
20 not a dentist, I do know the standards by which
21 they are governed and -- and responsible for
22 ensuring that I -- when I was a warden, at least,
23 that I tracked and monitored those standards to
24 make sure the quality of care was being
25 delivered.

Page 24

1  Q. Those standards are standards that
2  will be written in the contract for a specific
3  facility?
4  A. Some of the standards would be
5  written into the contract. Many of them are
6  written into our policies or are under external
7  regulating bodies that we still need to be aware
8  of. So there are a variety of sources of
9  standards within and beyond the contract.
10 Q. Well, is it your testimony that --
11 that -- that if those -- that those standards are
12 synonymous with quality of care; in other words,
13 as long as those standards are being met that
14 quality of care is being delivered?
15 A. I think the standards are an
16 indication of quality care, but not the beginning
17 and end of quality care.
18 Q. Right. And so you -- you could
19 testify as to whether the standards are met,
20 right, but you're not in a position to testify
21 about whether quality of care was actually
22 provided to the specific facility?
23 A. I believe that based on the key
24 indicators within the standards, what the
25 contract requires and just sound correctional

Page 25

1 management, that I can attest to overall quality
2 of care.
3     Q.    Well, if the BOP concluded that CCA's
4 actions contributed to the deaths of inmates, you
5 wouldn't be able to render an informed opinion
6 one way or another about whether that was
7 correct, right?
8     A.    From a medical standpoint, no, I
9 would not.
10     Q.    Right. Because you're not a medical
11 expert?
12     A.    I'm not a physician, that is correct.
13     Q.    Well, you're not a medical expert,
14 right?
15     A.    I am not a medical expert, but I do
16 have expertise in the management of medical
17 departments, as health service administrators do,
18 as wardens do. That's the -- that's the
19 experience and expertise that I can offer.
20     Q.    But you agree that managing a medical
21 department and providing quality medical care to
22 a specific human being are two different things,
23 right?
24     A.    I -- I believe they're hand in hand.
25     Q.    Okay. Did you have responsibility

Page 26

1 for staffing patterns while you were at the BOP?
2     A.    I -- when I was in human resources, I
3 had responsibility for what the BOP called
4 staffing guidelines. And those were
5 collaboratively created for each department and
6 encapsulated in the human resource manual. So
7 that -- for the three years I was in HR -- was my
8 responsibility.
9     Q.    Did you have responsibility for
10 developing staffing patterns at private prisons
11 while you were at the BOP?
12     A.    I did not.
13     Q.    Why don't we turn to --
14     MR. WOOD: Can we put tab 4 in
15 the -- the chat, please.
16     BY MR. WOOD:
17     Q.    And Ms. White, hopefully this will
18 work. We don't have a ton of documents to go
19 through today, but I'd like to see if you can
20 pull up that document and you can let me know
21 once you've had an opportunity to -- to do that.
22     A.    Yeah, the defendants' disclosure?
23     Q.    Yes.
24     A.    Okay. I can see it.
25     Q.    Great. And I'm going to make sure I

Page 27

1 know what exhibit number I'm supposed to mark
2 this as. Let's see --
3     MS. REPORTER: 591.
4     MR. WOOD: Thank you.
5     All right. We're going to mark this
6 as 591.
7     (Thereupon, White Exhibit
8     Number 591 was marked for
9     identification.)
10     BY MR. WOOD:
11     Q.    And Ms. White, have you seen this
12 document before?
13     A.    Yes, I saw this yesterday.
14     Q.    Okay. Do you recall if you had seen
15 it before yesterday?
16     A.    I don't believe so, no.
17     Q.    Okay. You see on page 7 there's a
18 section entitled Kim White.
19     A.    Yes, I see that.
20     Q.    Okay. And on -- and it goes onto
21 page 8, right?
22     A.    Yes, it does.
23     Q.    Okay. So under Summary of Facts and
24 Opinions on page 8, the -- the first line reads,
25 Ms. White may testify that CoreCivic's

Page 28

1 operational performance was similar to and
2 compared favorably with the BOP's operational
3 performance in the areas of correctional facility
4 management, oversight, staffing, security and
5 related policies and procedures.
6     Do you see that?
7     A.    I do.
8     Q.    Now, do you have an opinion as to
9 whether or not CoreCivic's operational
10 performance was similar to and compared favorably
11 with the BOP's operational performance in the
12 areas of correctional facility management,
13 oversight, staffing, security and related
14 policies and procedures?
15     A.    I believe I do.
16     Q.    And what is your opinion?
17     A.    My opinion is CoreCivic and the
18 Bureau of Prisons, as well as other partners that
19 we worked with, have similar -- similar
20 attributes, similar challenges, similar outcomes
21 when it relates to oversight, staffing, security
22 and all of the related policies and procedures
23 that are listed here sort of generally.
24     Q.    What about when it comes to specific
25 facilities?

Page 29

1  A. I would say that's across the board,
2  not specific to just the BOP, but to the U.S.
3  Marshals, to immigration facilities, to all of
4  the state partners we have. And even as we
5  developed beyond 2016 when we branched into
6  halfway houses, I believe that within the
7  industry we function very similarly.
8  Q. But you're not making a comparison as
9  to a specific facility in terms of saying all
10  facilities run by CoreCivic are all similar in
11  these areas to all BOP facilities?
12  A. Oh, I can say generally overall that
13  statement is absolutely true based on my
14  experience and expertise.
15  Q. That all facilities run by CoreCivic
16  are all similar to all facilities run by the BOP?
17  A. Overall I absolutely agree with that
18  statement.
19  Q. So the security, for example, at a
20  low security facility run by CoreCivic is going
21  to be the same as security at a high security
22  facility run by the BOP?
23  A. No. I believe that a low security
24  facility run by CoreCivic would be the same as a
25  low security facility operated by the BOP.

Page 30

1  Q. And which -- which low security
2  facilities were operated by the BOP?
3  A. Oh, goodness, there were quite a few.
4  I would have to look at a list, but there were
5  well over 27 low security facilities in the BOP
6  that were comparable to our low security
7  facilities within CoreCivic.
8  Q. Were there facilities at the BOP
9  that -- that housed criminal aliens starting in
10  2012?
11  A. Yes.
12  Q. And which ones?
13  A. Not -- not exclusively, but certainly
14  there were facilities that did have criminal
15  aliens in them. They were not -- from what I
16  recall, they were not similar in status because
17  most of them had already been adjudicated and
18  they were serving time. And then once they
19  finished that time, they would be transferred to
20  a detention center.
21  So they were just at a different
22  juncture in their tenure when they were with the
23  Bureau of Prisons.
24  Q. But there weren't facilities at the
25  BOP, at least starting in 2012, that housed

Page 31

1  exclusively or almost exclusively criminal
2  aliens, right?
3  A. Yes, that is correct.
4  Q. So --
5  A. Would you like me to stay here or go
6  back to picture?
7  Q. I'm sorry?
8  A. Would you like me to stay here or go
9  back to the picture?
10  Q. Oh, you mean the exhibit?
11  A. Yeah. I was going to say would you
12  like me -- like to see my lovely face again or
13  would you like me to stay with the exhibit?
14  Q. Well, I can see everyone on my
15  screen.
16  A. Oh, okay. All right.
17  Q. So let -- in -- in terms of the
18  operational performance of BOP -- of the BOP and
19  whether it was similar to CoreCivic, what facts
20  and data did you rely on in forming the opinion
21  that BOP's operational performance was similar to
22  CoreCivic's?
23  A. That was specifically based on my
24  experience as -- as a warden at facilities that
25  were similar, as a regional director with

Page 32

1  oversight of over 30 facilities at various levels
2  that were similar. And that experience I took
3  with me into CoreCivic. That's not something
4  that you do a data dump on. So those kinds of
5  industry-specific expectations and operations are
6  similar and they typically don't change over
7  time.
8  So that's why I can say confidently
9  that a low security facility with the Bureau of
10  Prisons, with the state of Texas, with CoreCivic
11  are the same, because the industry standards are
12  the same for those kind of facilities.
13  Q. Were there any principles or methods
14  that you relied on in forming your opinion about
15  the similarity of CoreCivic and BOP facilities?
16  A. Beyond staying abreast of what the
17  industry standards were, looking at audit data
18  across the industry, especially when we had a
19  chance to do that at ACA conferences and other
20  industry-based conventions at that point, I would
21  look at any kind of report that was publicly
22  available because I would want to know how we
23  were doing versus the industry. And the only way
24  to do that is to make those kinds of comparisons.
25  But specifically recalling the types

Page 33

1  of reports that I looked at might be a little
2  difficult today.  That was many years ago.  But
3  those are the kinds of things I would do to stay
4  abreast of the industry.
5      Q.    Well, when you say audit data across
6  the industry, what specifically are -- are you
7  referring to?
8      A.    So each agency within the industry of
9  corrections does audits.  Each agency, not only
10 nationally but internationally, uses ACA as its
11 accreditation standard.
12           And so that data is publicly
13 available.  You can see accreditation scores.  In
14 some cases the -- the state facilities and other
15 entities make their audit data public available.
16 And certainly within our partner group we knew
17 what audit outcomes and findings were in
18 existence because much of that data is shared so
19 that we can have lessons learned, we can identify
20 key themes and trends and then we can also look
21 for red flags when those kinds of circumstances
22 happen within our facilities too.
23           So that's what I mean by audit
24 findings.
25      Q.    Anything aside from ACA data?

Page 34

1      A.    And various audit findings.  That was
2  really about what was available to me at the
3  time.
4      Q.    I'm sorry, is -- is the various audit
5  findings separate from ACA data?
6      A.    Yes, it is.
7      Q.    Okay.  And -- and -- and what do you
8  mean by various audit findings?
9      A.    So as I mentioned, a lot of our
10 partners do their own audits.  They also, as we
11 did, celebrate when the ACA audits were very
12 favorable, as many of them were for us.
13           So it's that kind of publicly
14 available data that we would use, that I
15 personally would use, to make those kind of
16 comparisons, if you will, on how we were doing,
17 how our partners were doing and how that
18 wonderful agency I worked for, the BOP, was
19 doing.
20      Q.    I'm sorry, I'm just still not clear
21 specifically which audit data you're referring to
22 aside from ACA audits.
23           Is it internal audits conducted by
24 the Bureau of Prisons?
25      A.    Not those.  Those are not readily

Page 35

1  available publicly.  But, for instance, the state
2  of Tennessee, they make their audit data public.
3  Has nothing to do with ACA.  It's their own
4  internal audit process.  Georgia does the same
5  thing.  Texas does at some locations, not at
6  others.  So it's publicly available, but it's
7  usually released by the partner or other state
8  and local entities.
9            And just as a correctional
10 practitioner, it's good to look at what other
11 people are doing to determine, again, whether or
12 not there are vulnerabilities and weaknesses in
13 your own operations or if there are some best
14 practices that you can learn from that other
15 organizations have discovered.
16      Q.    So in terms of comparing CoreCivic's
17 performance to the BOP, you wouldn't be looking
18 at the BOP's internal audits because those
19 weren't publicly available, right?
20      A.    That is correct.
21      Q.    You would look at the ACA audits
22 conducted of CCA's BOP facilities; is that right?
23      A.    Oh, absolutely.  Yes.
24      Q.    And are you aware of instances where
25 CCA was accused of falsifying information to the

Page 36

1  ACA?
2      A.    I don't have any recollection or
3  memory of that ever occurring.
4      Q.    And would that be something that
5  would be of concern to you?
6            MS. TOMKOWIAK:  Objection.
7            THE WITNESS:  I -- anytime there is
8  evidence or accusations of falsification,
9  I would obviously be concerned.  I know
10 our organization would fully investigate.
11 And, if substantiated, there would be
12 swift and appropriate action taken.
13           BY MR. WOOD:
14     Q.    Because if CCA was falsifying
15 information to the ACA, then that audit report
16 wouldn't be reliable, right?
17           MS. TOMKOWIAK:  Objection.
18           THE WITNESS:  I would say whatever
19 the falsification was associated with
20 would be suspect, not, perhaps, the entire
21 report, but certainly the areas that were
22 proven to be falsified.
23           BY MR. WOOD:
24     Q.    The ACA didn't audit BOP facilities,
25 right?

Page 37

1  A.  Oh, they did.
2  Q.  And did you review the ACA audits for
3  BOP facilities between 2012 and 2016?
4  A.  I don't believe I had any audits
5  through ACA that I had access to.  Obviously, we
6  knew which facilities were being audited and
7  awarded because that happens -- the award process
8  at least happens at ACA conferences.
9  Q.  The awards to BOP facilities?
10  A.  The ACA reaccreditation or
11  accreditation absolutely would be awarded at
12  those conferences just as they would be for
13  CoreCivic, other states, countries, anybody who
14  had accreditation for their facilities.
15  Q.  So you knew which facilities were
16  being audited, but you didn't have access to the
17  audits for BOP facilities?
18  A.  No, not generally.  Unless they were
19  provided by a friend or associate, there would
20  really be no way for me to know.  And through
21  those four years, I didn't have access, nor did I
22  ask for those reports from any of my former
23  colleagues.
24  Q.  Why would a friend be providing you
25  with an internal audit from a BOP facility?

Page 38

1  A.  Not an internal audit.  The ACA audit
2  is a little bit different, but there have been
3  occasions, not for me, but for others, where
4  their friends have provided those kind of
5  reports.  It's usually just to brag.  It's not
6  necessarily to unveil dirty laundry, but it's to
7  showcase when a facility does really good.
8  Q.  And do you know if there are any
9  confidentiality rules that apply to those --
10  those ACA audits?
11  A.  I don't know.  I could certainly look
12  that up, but I really don't know.
13  Q.  So you don't know if any friends that
14  were providing you with ACA audit materials were
15  violating any confidentiality obligations?
16      MS. TOMKOWIAK:  Objection,
17    mischaracterizes her testimony.
18      THE WITNESS:  I did not get any
19    reports that way.  But, as I said, if they
20    were to be garnered through any process,
21    it would usually be through former
22    colleagues.
23      MS. REPORTER:  One moment.
24    Thank you.
25

Page 39

1  BY MR. WOOD:
2  Q.  If we turn back to the exhibit, the
3  last clause in that first sentence under Summary
4  of Facts and Opinions says related policies and
5  procedures.  And do you know what that refers to?
6  A.  I believe it would refer to those
7  policies and procedures that are identical,
8  irrespective of the agency.
9  Q.  And what do you mean by that?
10  A.  So if there is a policy that the
11  Bureau of Prisons required us to follow, that
12  policy would be identical.  The procedures
13  between the Bureau of Prisons and CoreCivic are
14  very, very similar because in the industry there
15  are standards of -- there are standard procedures
16  and practices that you have to adhere to just to
17  make sure you have safe and secure facilities.
18      When it comes to medical, there are
19  requirements that the Bureau of Prisons must
20  follow in order to meet community standards.
21  Those are the same community standards that
22  CoreCivic or CCA are responsible for.  And in
23  many cases, those policies and procedures are the
24  same, irrespective of the company or organization
25  you're talking about, because it's standard to

Page 40

1  the industry.
2      So that's -- that's what I mean.
3  Q.  Are there any specific policies and
4  procedures that -- that you can think of?
5  A.  Well, there was one.  I don't know if
6  it's still in effect, but during this time it was
7  the duty officer policy that the Bureau of
8  Prisons had -- has is very similar to what
9  CoreCivic utilized.  Escort procedures that the
10  Bureau of Prisons follows, very, very similar for
11  CoreCivic.  Food safety that Bureau of Prisons
12  has, very, very similar for CoreCivic.
13      The same thing with HR-related
14  practices, very similar between the organizations
15  because there's really not a whole lot new under
16  the sun when it comes to that.  And the nuances
17  are different based on sort of the origination of
18  the policy, not necessarily because the
19  differences in organization.
20      So policies can be related, but not
21  identical.  And so in the practice of
22  corrections, there are a number of related
23  policies across the industry that would look
24  almost identical if you were to lay them side by
25  side.

Page 41

1  Q. In terms of staffing, there are
2  differences in how CCA's BOP facilities were
3  staffed versus BOP facilities, right?
4  A. In the types of positions a little
5  difference in the numbers. That was more
6  indicative of the facility footprint, less about
7  the BOP versus CoreCivic.
8      So it's really hard to compare
9  because you have to look at a variety of things,
10 other than just the numbers.
11 Q. It -- it -- it's the case, right,
12 that BOP correctional officers were paid more
13 than CCA correctional officers, right?
14 A. That is correct. In some
15 circumstances they were more closely aligned in
16 certain parts of the country, further apart in
17 other parts of the country.
18 Q. Well, as a general matter, right, the
19 CCA correctional officers were paid less, right?
20 A. Generally CCA pay for correctional
21 officers was closer to state-run operations
22 versus the BOP.
23 Q. Have you ever done any analysis to
24 determine whether the lower pay of CCA
25 correctional officers at BOP facilities versus

Page 42

1  the BOP impacted the way that those facilities
2  performed?
3  A. We periodically do labor force
4  analyses to look at a number of things. Pay
5  happens to be one of them. But what we look at
6  beyond comparing one agency to another is what's
7  happening in the labor market; what does the
8  Bureau of Labor Statistics provide in respect to
9  kind of across the United States -- United States
10 comparison; what is the minimum wage for that
11 location; how does it compare to other
12 organizations or companies within that area. And
13 then retention rate is evaluated -- what do you
14 call it -- applicant flow is looked at.
15     So there are a number of things that
16 we look at beyond just the pay-for-pay
17 comparison.
18 Q. Right. My -- my question was whether
19 you ever analyzed whether the differential in pay
20 between CCA and the BOP impacted the quality of
21 the services provided at a facility.
22 A. I don't know that we did that kind of
23 very specific target analysis, but I do know that
24 we looked at a variety of different variables
25 when it came to pay and retention and our ability

Page 43

1  to attract people to work in those positions.
2  Q. Did CCA have a higher turnover in
3  terms of facility employees than the BOP?
4  A. It really depended on the location.
5  There are certain locations in the Bureau of
6  Prisons that had exceedingly high turnover.
7  Those tended to be in the more urban areas. And
8  there were facilities in CoreCivic that had
9  nearly zero turnover in areas primarily because,
10 again, the job market, sometimes leadership. But
11 more often than not, if there was a labor force
12 or a labor market that was challenging, it would
13 be challenging for the partner as well as it
14 would be for us.
15 Q. Well, CCA had challenges in -- in --
16 in retaining employees at some of its BOP
17 facilities, right?
18 A. We had challenges in retaining
19 employees at the BOP in the state of Georgia,
20 Tennessee, Colorado and Oklahoma. Those were the
21 kind of six markets where we were struggling.
22 And a lot of it had to do with the -- the market
23 of those locations.
24 Q. And, I'm sorry, when you say the BOP
25 and the states of Georgia, Tennessee, Colorado

Page 44

1  and Oklahoma, those are separate areas, right?
2  A. Those are state partners where
3  CoreCivic is responsible for the facility and the
4  offenders.
5  Q. In addition to challenges retaining
6  employees at BOP facilities, right?
7  A. Correct. That -- that is in addition
8  to.
9  Q. Okay. And what analysis did you do,
10 if any, to determine whether the challenges that
11 CCA had in retaining employees at its BOP
12 facilities impacted the performance of those
13 facilities?
14 A. Well, we would look at quality
15 assurance reports. We would look at the number
16 of grievances that might be filed. We would look
17 at inmate grievances, because many times when you
18 have turnover and other issues, that tends to
19 impact operational exhaustion.
20     We would look at the -- the number of
21 injuries that might have been occurring at that
22 facility. And those are just a few of the items
23 that we would look at. We'd also look at
24 turnover. We would look at the number of
25 candidates we were hiring, when they were leaving

Case 3:16-cv-02267    Document 356-8    Filed 11/20/20    Page 12 of 18 PageID #: 13001
Pages 41..44
www.aptusCR.com

Page 81

 1  difficulty retaining people, which indicates to
 2  me that the issue is less about pay and it's more
 3  about the employee value proposition, the total
 4  employee value proposition, and pay is one of
 5  those issues.
 6      Q.   And how did you reach that
 7  conclusion?
 8      A.   Well, I didn't reach that conclusion
 9  independently.  There have been studies, not only
10  by adult -- ACA, but within the realm of human
11  resources in the industry conferences that I go
12  to, where they talk about -- they, meaning the
13  experts, talk about what attracts people to jobs,
14  what allows them to stay and what draws them
15  away.
16           So we did our own research.  We
17  utilized -- I can't remember the company we used.
18  David Churchill would be able to remind me of
19  that.  But we actually used an external company
20  for ourselves to determine what the key factors
21  were with keeping people and losing people.
22           And I know from talking to my
23  predecessor -- I'm -- I'm sorry, my successor
24  that they had done their own research within
25  human resources to determine what the key drivers

Page 82

 1  were with turnover within the Bureau of Prisons,
 2  as well as what worked to attract people in the
 3  BOP.
 4           Some of that research was done during
 5  my tenure.  It was concluded after I left.
 6      Q.   And do you know what that research
 7  showed?
 8      A.   That engagement is a huge factor when
 9  it comes to keeping people once they've been
10  hired.  And that pay is a key factor, but pay is
11  not a surprise to people when they join
12  companies.  They know what the pay is when they
13  sign the agreement.
14           So it's not something that
15  necessarily detracts people from staying at work.
16  It's how they're treated.  It's whether or not
17  they feel their work is valuable.  It's whether
18  or not it aligns with their lifestyle.
19           If it's flexible, it might be better
20  for them.  If it's not, then that's going to be a
21  distraction.  Also, what the labor force is doing
22  generally has a big influence.
23           But engagement, actually, was a far
24  bigger indicator or predictor of whether or not
25  people stayed with the company over pay.

Page 83

 1      Q.   So you received a copy of the
 2  conclusions of the research from the BOP that was
 3  finished after you left?
 4      A.   I did not receive a report, but I had
 5  a conversation with Dan Joslin, my successor,
 6  about it, and he shared those key themes with me,
 7  which were not inconsistent with what we had
 8  found and what industry leaders in HR had been
 9  reporting on for those years and continuing into
10  today.
11      Q.   So you don't actually know what that
12  report says beyond the conversation that you had
13  with your successor?
14      A.   Did I lay my eyes on the report?  No.
15           Do I trust what information I was
16  provided?  I absolutely do.
17      Q.   Which wardens did you talk to at the
18  BOP who told you that the BOP was having problems
19  with staffing between 2014 and 2016?
20      A.   Oh, goodness.  I don't remember the
21  individuals by name, but they were at a variety
22  of locations.  And typically, those conversations
23  were during the conferences, the Adult Correction
24  Association conferences.  Those are kind of like
25  almost reunions, where people from various former

Page 84

 1  backgrounds and locations talk about those
 2  things.
 3           But I don't remember specifically the
 4  names of the individuals I talked to.  That was
 5  many, many years ago now.
 6      Q.   You -- you can't remember the names
 7  of a single individual who told you that the BOP
 8  was struggling with staffing in -- between 2014
 9  and 2016?
10      A.   I can recall Sara Revell.  Sara was a
11  regional director, but she had been appointed
12  from a warden position.  Dan Joslin I already
13  mentioned.  Oh, goodness, let me think.
14           There were a couple in Florida.
15  There were -- Mike Nalley is a good example.  He
16  wasn't a warden at the time, but he was in
17  contact with many in his area.
18           And like I said, when I go to the
19  conferences, I'm not jotting down the names of
20  everybody that I meet and talk to, but there are
21  usually 20-plus, 30 wardens at that conference
22  twice a year and we always talk and catch up.
23  And this was a pervasive challenge for them,
24  as -- as it was for us.
25           So that's -- that's where I draw my

Case 3:16-cv-02267    Document 356-8    Filed 11/20/20    Page 13 of 18 PageID #: 13903
Pages 81..84
www.aptusCR.com

Page 85

1  conclusions from.
2  Q.  So Ms. Revel told you that the BOP
3  was having a pervasive problem with staffing
4  between 2014 and 2016?
5  A.  Certainly in medical --
6  MS. TOMKOWIAK:  Objection.
7  THE WITNESS:  Oh, sorry.
8  MS. TOMKOWIAK:  That's okay.  Go
9  ahead.
10  THE WITNESS:  Okay.
11  Certainly at certain locations.
12  Definitely in medical.  But, yes, she was
13  experiencing it within her own region.
14  BY MR. WOOD:
15  Q.  And Mr. Joslin told you the same
16  thing, right?
17  A.  Yes.  Mr. Joslin was the head of HR
18  and he was responsible for coming up with some
19  key strategies to help combat some of those
20  challenges.
21  Q.  Aside from conversations with these
22  individuals, what other insight did you have into
23  the BOP's struggles with staffing between 2014
24  and 2016?
25  A.  Well, there were a number of

Page 86

1  articles.  And within those articles within the
2  industry universe, there were congressmen and
3  women who were asking questions about staffing.
4  I know there was an OIG investigation that I
5  actually read about medical staffing for the
6  Bureau of Prisons that wasn't very complimentary.
7  And there were other articles and
8  reports that I've read from other partners who
9  were also struggling with it from the U.S.
10  Marshals, to immigration and customs enforcement.
11  The state of Tennessee was struggling.  The state
12  of Georgia it got so bad they had to lock down
13  facilities because they didn't have enough staff
14  to operate the locations.  Same thing in
15  Oklahoma.
16  So there were a number of reports
17  circulating, a number of articles about this, as
18  there were in other industries because everybody
19  was struggling with the same challenge.
20  Q.  Can you recall any specific articles
21  on -- or reports that you relied on in forming
22  your conclusion?
23  A.  The Office of Inspector General
24  report I mentioned about medical services in the
25  Bureau of Prisons is one in particular.  That's

Page 87

1  on their public website.
2  There were a number of articles that
3  I read specifically relative to locations in
4  Texas, for instance.  Oh, my goodness.  The
5  Carswell facility, which is a federal medical
6  center, there were local articles about staffing
7  shortages.
8  The same in Louisiana.  The same in
9  New York, primarily because of the two detention
10  centers there.  There was a lot of coverage about
11  those facilities.
12  Q.  I was just asking if you could recall
13  any specific articles or reports that you relied
14  on in forming that opinion.
15  A.  Well, I mentioned the OIG report.  I
16  think that's specific.
17  The article, specifically who wrote
18  it, what the title was and what city, I don't
19  recall that.
20  Q.  I want to ask you about a document
21  that we looked at last time.
22  MR. WOOD:  It's -- it's tab
23  number 3, if we want to put that in the
24  chat.
25  It was previously marked as

Page 88

1  Exhibit 139.
2  (Thereupon, White Exhibit
3  Number 139, previously marked for
4  identification, was referred to.)
5  BY MR. WOOD:
6  Q.  If you want to pull that up,
7  Ms. White, and let me know when you've had an
8  opportunity to -- to do that.
9  A.  Yes, I see it.
10  Q.  If you want to just review
11  Exhibit 139 and let me know when you're finished.
12  A.  Okay.  I'm ready.
13  Q.  So your -- your E-mail in the bottom
14  half of the page, you're -- you ask Mr. Vanyur,
15  who -- I guess he must have been working at CCA
16  in September 2016, right?
17  A.  He was a consultant working with CCA
18  at that point.
19  Q.  Was -- and was he your former boss at
20  the BOP?
21  A.  No, he was a former colleague.
22  Q.  Okay.  He was in HR, right?
23  A.  He was the head of HR.  That is where
24  he ended his career with the Bureau of Prisons.
25  Q.  Okay.  While you were there, he

Case 3:16-cv-02267   Document 356-8   Filed 11/20/20   Page 14 of 18 PageID #: 13903
Page 85..88
www.aptusCR.com

Page 97

1  partners we have.
2      Q.    I -- I'm just trying to understand
3  what -- what your opinion is.
4          So is your opinion that CoreCivic
5  offers quality and cost effective operations
6  to -- to every one of its partners?
7      A.    Absolutely.
8      Q.    And -- and -- and -- and same opinion
9  specifically with respect to the BOP?
10     A.    Yes, I would agree with that
11 statement.
12     Q.    And that's based on your experience
13 at the BOP and your experience at CoreCivic?
14     A.    And also, when it comes to other
15 partners, specifically to my experience with
16 CoreCivic, absolutely.
17     Q.    Right.  Because with other partners,
18 you hadn't worked for them, right?  So you
19 wouldn't have experience with -- haven't worked
20 for them.  You wouldn't have direct experience as
21 an employee, for example, with the state of
22 California, right?
23     A.    That is correct.  While I was with --
24 within the Bureau of Prisons, I had very limited
25 contact with anybody outside of the Bureau of

Page 98

1  Prisons.
2          CoreCivic has obviously opened up
3  that opportunity more as a partner, not as a
4  direct employee of those jurisdictions though.
5      Q.    You testified previously that your
6  understanding was that the BOP didn't renew the
7  Adams and Eden facilities, in part, because of
8  the -- the costs that CCA had proposed; is that
9  fair?
10     A.    That is fair, yes.
11     Q.    So is it -- is it fair to say that
12 CCA was not able to offer a cost effective
13 proposal to the BOP to continue operating the
14 Eden and Adams facilities?
15     A.    Certainly with the Adams facility,
16 given what I've previously testified to, what the
17 BOP wanted and what CoreCivic believed it could
18 deliver when it came to the number of services
19 for the number of inmates proposed, I think the
20 BOP did not like our cost option.
21         With Eden, I think they had some
22 competitors who were offering a lower price.  So
23 I think that's what happens in business, the
24 competition sometimes beats you out when it comes
25 to the cost proposals that you put forward.

Page 99

1      Q.    Okay.  So does -- does the fact that
2  CCA was unable to renew the Adams and Eden
3  contract -- contracts, at least partly based on
4  cost, change your opinion about CCA's ability to
5  offer cost effective services to the BOP?
6      A.    It does not.
7      Q.    And why not?
8      A.    I still believe that we offered the
9  best services at the most cost effective price
10 point, especially compared to what BOP costs were
11 at that point.  I simply believe that somebody
12 was willing to do it for lower than what we were
13 and still ensure quality services.
14     Q.    You've never worked for the GEO
15 Group, right?
16     A.    No, I have not.
17     Q.    And have you had the opportunity to
18 compare the services that the GEO Group provides
19 to the BOP versus the services that CCA provides
20 to the BOP?
21     A.    Not in an official research-based
22 orientation, no, I have not.
23     Q.    And you understand that the GEO Group
24 currently has a lot more contracts to operate
25 correctional facilities with the BOP than CCA

Page 100

1  does, right?
2      A.    I will have to assume that that's
3  true.  I haven't been keeping up with their
4  contract renewals.  But given, I believe, we only
5  have one facility still in our book of business,
6  I would assume what you said is accurate.
7      Q.    Okay.  During your -- and I -- I
8  assume that you -- well, I -- I assume that
9  you've read the transcript of your last
10 deposition because you submitted an errata.  So
11 you -- I -- you -- you must have read that
12 transcript, right?
13     A.    Oh, I did.
14     Q.    And did you read it in preparing for
15 your deposition today?
16     A.    I did go back over it a couple of
17 weeks ago just to refresh my memory about the
18 substance of our conversation, yes.
19     Q.    And what else did you do to -- to
20 prepare for your deposition today?
21     A.    I spent time with the attorneys that
22 are on the line yesterday for a few hours, just
23 to talk about aspects of this case again.
24     Q.    Anything else that you did, aside
25 from spending a few hours with your attorneys

Case 3:16-cv-02267    Document 356-8    Filed 11/20/20    Page 15 of 18 PageID #: 12993
Pages 97..100
www.aptusCR.com

Confidential Pursuant to Protective Order

Kim White

Grae vs. Corrections Corporation of America, et al.

Page 101

1  yesterday?
2     A.    No.
3     Q.    Did you review any documents aside
4  from the transcript of your prior deposition?
5     A.    I reviewed the subpoena.  I reviewed
6  the -- it's a declaration or disclosures.
7     Q.    The ones that we've been looking at?
8     A.    Yes.  That -- that is the other
9  document I reviewed yesterday.
10    Q.    Okay.  And any other documents?
11    A.    No, that's it.
12    Q.    Okay.  So at -- at your last
13 deposition, we talked about the BOP or the OIG
14 doing things potentially for political reasons.
15 That was at the end of your testimony.
16          Do you remember -- do you remember
17 that?
18    A.    I do.
19    Q.    And -- and is it -- it's fair to say
20 that you don't know whether any actions were
21 taken by the BOP -- I mean -- I'm sorry -- by the
22 OIG with respect to CCA for political reasons,
23 right?
24    A.    No, I do not.  I believe I stated a
25 personal opinion and qualified it as such.

Page 102

1     Q.    Right.  That's right.
2           You -- you did testify, though,
3  that -- that sometimes policy decisions can
4  happen for political reasons.  I think an example
5  you gave was the Prison Rape Elimination Act.
6           Do you remember that?
7     A.    I do.
8     Q.    And I think you said that that was
9  clearly political, right?
10    A.    From my opinion and listening to
11 others talk about how it evolved, it definitely
12 came by way of activists, but I think my
13 testimony also indicated that it improved our
14 operations for the better.
15    Q.    Right.  And so -- and by political,
16 I -- you meant it was -- it was -- that was a
17 policy that was proposed by politicians, right?
18    A.    That was a policy absolutely that was
19 proposed by politicians.
20    Q.    And that -- that wasn't the policy
21 that was proposed by one specific political
22 party, right?
23    A.    I don't recall.  I -- I can't
24 remember the officials who were responsible for
25 it.  But there are occasions, at least in my

Page 103

1  experience, where a particular person associated
2  with a particular political party has rendered
3  some issues and which resulted in policy changes.
4     Q.    Well, do you recall that the --
5  the -- the Prison Rape Elimination Act had
6  bipartisan congressional sponsors?
7     A.    I don't recall.  Yeah, I don't
8  remember that one, who the parties were involved
9  specifically on that one.
10    Q.    Do -- do you remember the -- that the
11 Prison Rape Elimination Act passed by unanimous
12 consent in both the House and the Senate in 2003?
13    A.    No, I don't, but I -- I'm assuming
14 you have the record.  So if that's the case, then
15 I would have to agree with that.
16    Q.    Well, I -- I did look it up.  I --
17 yeah.
18          And so the -- and -- and -- and you
19 agree that trying to reduce rape in prisons is --
20 is obviously an important thing, right?
21    A.    I -- I wholeheartedly, unequivocally,
22 without a doubt agree that that's a good thing
23 for prisons.  Absolutely.
24    Q.    And -- and, in fact, you testified
25 previously that the Prison Rape Elimination Act

Page 104

1  improved the -- improved your performance, right?
2     A.    I think it improved the industry's
3  performance without a doubt.
4     Q.    And so -- and so that's -- that's an
5  example of something being political, but, at the
6  same time trying to address an important issue
7  and -- and improving performance in the industry,
8  right?
9     A.    Oh, I -- I agree with that.
10    Q.    Okay.  I just wanted to make sure I
11 was clear on your testimony.
12          If we go back to Exhibit 591, going
13 back to your summary of facts and opinions --
14    A.    Okay.  Hold on.
15          Okay.  I'm there.
16    Q.    -- the -- the second sentence says,
17 Ms. White may also testify -- and I'm -- I'm on
18 the summary of facts and opinions again on
19 page 8.
20    A.    Okay.
21    Q.    The second sentence says, Ms. White
22 may also testify about CoreCivic's compliance
23 with contractual requirements, company standards
24 and third-party standards in the area -- areas of
25 correctional facility management, oversight,

Page 109

1 where we did not meet the contractual staffing
2 requirements on the day or the time that those
3 snapshots were taken.
4     Q.    Well, do you -- do you have an
5 understanding as to whether the deficiencies were
6 related to, you know, one specific day every
7 month or every three months or whether they were
8 more longstanding deficiencies?
9     A.    Some were certainly more challenging
10 than others, but I will tell you that we did meet
11 staffing requirements during those time frames as
12 well. And there were times where we didn't meet
13 it, either because of turnover, because of other
14 challenges when it came to ensuring we had those
15 staff on board at the time the snapshots were
16 taken.
17     Q.    And those were challenges that --
18 that you were directly involved in trying to
19 overcome, right?
20     A.    Along with the operations team, I was
21 directly involved, as well as those working for
22 me.
23     Q.    And the challenges in staffing that
24 you had at the BOP facilities were at -- at the
25 top of your list in terms of dealing with

Page 110

1 staffing challenges more broadly at the company,
2 right?
3     A.    They were among many states that
4 experienced the same challenges, five of which
5 I've mentioned earlier in my testimony today.
6     Q.    So is it -- I mean, is it fair to say
7 that they were at the top of the list or they
8 were just one of many challenges you were dealing
9 with?
10     A.    They were one of many locations that
11 were at the top of the list, including those
12 other five states I mentioned.
13     Q.    None of that changes your opinion,
14 though, about CCA's compliance with its
15 contractual requirements to the BOP with respect
16 to staffing?
17     A.    It does not change my opinion, nor
18 the history.
19     Q.    Do you know what the BOP's opinion
20 was regarding CCA's compliance with its staffing
21 requirements?
22     A.    I know the BOP was as concerned as we
23 were that when they took the snapshots in time,
24 we did not meet the contractual requirements.
25 But I also believe that the Bureau of Prisons

Page 111

1 recognized that we were taking definitive and
2 appropriate action to try to ameliorate those
3 challenges that existed at their locations.
4     Q.    How do you know that the BOP was as
5 concerned as CoreCivic was regarding the failure
6 to meet the contractual requirements?
7     A.    I believe that was reflected in the
8 notices of concern. It was certainly reflected
9 in conversations that Jeb Beasley and others had
10 with members of the Bureau of Prisons, whose
11 responsibility it was to -- to monitor that.
12     And I also know that in those notices
13 of concerns they would raise the staffing as a --
14 as the notice of concern.
15     Q.    Do you recall instances in which the
16 BOP expressed frustration that CoreCivic had
17 repeatedly promised to fix staffing deficiencies
18 and yet repeatedly failed to do so?
19     A.    I know that the Bureau of Prisons
20 understood the challenge because they were facing
21 it themselves at certain locations. And while
22 they recognized the efforts that we were exerting
23 to rectify the problem, I think they got as tired
24 as we did having to talk about it.
25     But frustration at us, no.

Page 112

1 Understanding what we were facing, absolutely.
2 But holding us accountable, that's a part of
3 their responsibility.
4     Q.    And -- and what is that understanding
5 based off?
6     A.    That understanding, as I mentioned,
7 is based on what the industry as a whole was
8 experiencing; what they experienced individually;
9 and what they knew to be true, based on what we
10 were telling them in our responses back to them
11 were the circumstances that we were facing at
12 those locations.
13     Q.    And is your understanding based on
14 any discussions that you personally had with
15 anyone at the BOP regarding staffing
16 deficiencies?
17     A.    I don't know that I had direct
18 conversations with anyone about our staffing
19 challenges, but if I did, it would have been, as
20 I said earlier today, as the industry struggle
21 with staffing in an effort to share best
22 practices and also some of the industry
23 challenges that existed in certain locations.
24     Q.    But you can't recall any specific
25 conversations that you had with anyone at the BOP

Case 3:16-cv-02267   Document 356-8   Filed 11/20/20   Page 17 of 18 PageID #: 12905
Pages 109..112
www.aptusCR.com

Page 113

```
 1   regarding staffing challenges?
 2       A.   Beyond what I've discussed today, did
 3   I talk with somebody about the challenges we were
 4   having at Eden, Cibola or Adams or any other
 5   place, I did not have specific conversations
 6   relative to those locations.
 7       Q.   Well, and just to be clear, I know
 8   you said beyond what I've discussed today, but
 9   I -- I -- I'm asking specifically if you had any
10   specific conversations that you recall with
11   anyone at the Bureau of Prisons while you were at
12   CoreCivic specifically about CoreCivic's staffing
13   challenges.
14       A.   As I mentioned earlier, I talked to
15   Dan Joslin about it because he was -- he and I
16   talked about the challenges in medical with
17   correctional officers that the BOP was facing,
18   that we were facing.
19            I talked to Sara Revell about it.  I
20   mentioned earlier I talked to some wardens who
21   were struggling at their local place of
22   operations.
23            I just recalled one of the ladies I
24   talked to was at Aliceville, which is a female
25   facility in Alabama.  Her first name is Pat.  Her
```

Page 114

```
 1   last name is escaping me right now.  But she was
 2   having challenges trying to get women to work at
 3   that facility since it was an all-female
 4   facility.
 5            So there were conversations, as I
 6   testified to earlier, that we had specific to
 7   staffing challenges.
 8       Q.   But those were staffing challenges in
 9   general that the -- the BOP or those specific
10   wardens were facing, or at least some of them.
11   And I just want to be clear, did -- did you have
12   conversations with anyone at the BOP specifically
13   about the BOP's concern, or lack thereof, with
14   respect to CoreCivic's staffing deficiencies?
15       A.   No, I did not.
16       Q.   Okay.  If you'd turn to page 7 of
17   Exhibit 591.
18       A.   Okay.
19       Q.   There's a -- under Kim White there's
20   a section that kind of has a bit of your kind of
21   biography and it goes onto the top of page 8.
22            Would -- would you just read that
23   and -- and -- and confirm whether that's -- all
24   of that is accurate?
25       A.   Do you want me to start at Ms. White
```

Page 115

```
 1   holds a bachelor's degree?
 2       Q.   Yes, please.  And you can just read
 3   it to yourself and just confirm whether or not
 4   this -- the paragraph is accurate.
 5       A.   I mentioned to the attorneys
 6   yesterday that I started as the head of HR in
 7   November of 2013 as the senior vice president of
 8   HR and then was in place promoted to the EVP of
 9   HR in 2015.  So I was in HR from November 2013
10   through May of 2019.
11            That's the only little distinction I
12   see that I'd like to bring to your attention.
13       Q.   Okay.  So in that respect, it's just
14   slightly incomplete; is that right?
15       A.   Well, it's mentioned as you go
16   further into the paragraph, so it's more out of
17   sequence than it is incomplete.
18       Q.   Okay.  I guess it also doesn't
19   mention that you're currently employed by
20   CoreCivic either, right?
21       A.   Let me see.
22            No, it does not reflect my special
23   advisor role.
24       Q.   Okay.  And is that -- that's the
25   official title of your current role, special
```

Page 116

```
 1   advisor?
 2       A.   Special advisor to the CEO.  That is
 3   the current title.
 4       Q.   Do you -- do you know if there are
 5   other special advisors to the CEO aside from you?
 6       A.   Yes, one of -- one of the
 7   individuals -- and I can't believe I've forgot
 8   his name -- is one of the founders of the
 9   company.  Oh, goodness.  This is embarrassing.
10       Q.   Is it a Beasley?
11       A.   No.  He -- he is Jeb Beasley's
12   father.  It's the other gentleman who had been
13   with the Alabama Department of Corrections.
14       Q.   Is it Krantz?
15       A.   No.  No, no, no.  Krantz left.
16       Q.   Hutto?
17       A.   Don Hutto.  Thank you for that.  And
18   please don't tell him I forgot his last name.
19       Q.   We'll mark this part.
20       A.   But, yes, Don Hutto is a special
21   advisor.
22       Q.   Any other --
23       A.   There have -- there have been others,
24   but -- I don't know what title Mike Nalley has,
25   but Mike, I believe, does part-time work for the
```

Case 3:16-cv-02267   Document 356-8   Filed 11/20/20   Page 18 of 18 PageID #: 12906
Pages 113..116
www.aptusCR.com