# EXHIBIT 2
# [Filed Under Seal]

Videotaped Deposition of

# Justin Marlowe, Ph.D.

October 16, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential Pursuant to Protective Order**



www.aptusCR.com / 866.999.8310

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.

Grae vs.
Corrections Corporation of America, et al.

## Page 1

```
1                  UNITED STATES DISTRICT COURT
2                   MIDDLE DISTRICT OF TENNESSEE
3
4       NIKKI BOLLINGER GRAE, Individually
        and on Behalf of All Others
5       Similarly Situated,
6             Plaintiff,           Civil Action No.
7       vs.                        3:16-cv-02267
8       CORRECTIONS CORPORATION OF
        AMERICA, ET AL.,
9
              Defendants.
10
        _____
11
12      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13
14      VIDEOTAPED DEPOSITION OF JUSTIN MARLOWE, Ph.D.
15
16      Conducted virtually via remote videoconference
17                  October 16, 2020
18
19
20
21
22
23      Reported by:
        Misty Klapper, RMR, CRR
24      Job No.: 10073529
25
```

## Page 2

```
1                  UNITED STATES DISTRICT COURT
2                   MIDDLE DISTRICT OF TENNESSEE
3
4       NIKKI BOLLINGER GRAE, Individually
        and on Behalf of All Others
5       Similarly Situated,
6             Plaintiff,           Civil Action No.
7       vs.                        3:16-cv-02267
8       CORRECTIONS CORPORATION OF
        AMERICA, ET AL.,
9
              Defendants.
10
        _____
11
12
13
14
15
16
17      Videotaped deposition of JUSTIN MARLOWE, Ph.D., taken
18      on behalf of Plaintiff, via Zoom remote videoconference,
19      beginning at 8:35 a.m. PST on Friday, October 16, 2020,
20      before Misty Klapper, RMR, CRR.
21
22
23
24
25
```

## Page 3

```
1       APPEARANCES:
2       (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3       ON BEHALF OF PLAINTIFF:
4             WILLOW E. RADCLIFFE, ESQUIRE
              KENNETH J. BLACK, ESQUIRE
5       ROBBINS GELLER RUDMAN & DOWD LLP
        Post Montgomery Center
6       One Montgomery Street, Suite 1800
        San Francisco, California 94104
7       (415) 288-4545
        E-mail: willowr@rgrdlaw.com
8               kennyb@rgrdlaw.com
9
        ON BEHALF OF DEFENDANTS:
10
              SARAH TOMKOWIAK, ESQUIRE
11      LATHAM & WATKINS, LLP
        555 Eleventh Street, N.W., Suite 1000
12      Washington, D.C. 20004-1304
        (202) 637-2335
13      E-mail: sarah.tomkowiak@lw.com
14                 AND
15            MERYN C.N. GRANT, ESQUIRE
        LATHAM & WATKINS, LLP
16      355 South Grand Avenue, Suite 100
        Los Angeles, California 90071
17      (213) 485-1234
        E-mail: meryn.grant@lw.com
18
19
        ALSO PRESENT:  DeSHAWN WHITE, VIDEO OPERATOR
20
21
22
23
24
25
```

## Page 4

```
1                   C O N T E N T S
2       WITNESS:            EXAMINATION BY:        PAGE:
3       Justin Marlowe, Ph.D.   Ms. Radcliffe          9
4                           Ms. Grant              307
5
6
7                   E X H I B I T S
8       MARLOWE EXHIBITS
9       NO.:      DESCRIPTION:                    PAGE:
10      Exhibit 548 Expert report of Dr. Justin
11            Marlowe, Ph.D., CGFM dated 8-7-20       24
12      Exhibit 549 June 2014 Hakim and Blackstone
13            report, Prison Break, A New Approach
14            to Public Cost and Safety, Bates
15            Nos. MARLOWE_0007885 through
16            MARLOWE_0007960                        101
17      Exhibit 550 4-29-13 Hakim and Blackstone Working
18            Paper, Cost Analysis of Public and
19            Contractor Operated Prisons, Bates
20            Nos. MARLOWE_0008000 through
21            MARLOWE_0008042                        106
22      Exhibit 551 E-mail, Lilley to Grande dated
23            9-27-11, Subject: Background
24            Documents, Bates No. CORECIVIC_0102355 107
25
```

Page 5

```
1              E X H I B I T S  (CONTINUED)
2    MARLOWE EXHIBITS (CONTINUED)
3    NO.:       DESCRIPTION:                  PAGE:
4    Exhibit 552 E-mail, Lilley to Hakim, Blackstone
5               and Buck dated 10-25-11, Subject:
6               Proposal on Private vs. Public
7               Prisons with attachments, Bates
8               Nos. BLACKSTONE0000080 through
9               BLACKSTONE0000357              109
10   Exhibit 553 E-mail string dated 5-23-12 and
11              5-29-12, Subject: Proposal for CCA,
12              Bates Nos. BLACKSTONE0003557 through
13              BLACKSTONE0003559             130
14   Exhibit 554 E-mail string dated 5-23-12,
15              5-30-12, 6-11-12, 6-13-12 and 6-19-12,
16              Subject: Proposal for CCA, Bates
17              Nos. BLACKSTONE0003581 through
18              BLACKSTONE0003583             132
19   Exhibit 555 E-mail, Lilley to Hakim and
20              Blackstone dated 10-29-13, Subject:
21              Reviewed Study Document with
22              attachment Prison Book_10.29.13.docx,
23              Bates Nos. CORECIVIC_0955178 through
24              CORECIVIC_0955260             135
25
```

Page 6

```
1              E X H I B I T S  (CONTINUED)
2    MARLOWE EXHIBITS (CONTINUED)
3    NO.:       DESCRIPTION:                  PAGE:
4    Exhibit 556 Private Corrections Institute
5               Press Release dated 5-22-13, Bates
6               Nos. BLACKSTONE0017862 through
7               BLACKSTONE0017863             149
8    Exhibit 557 Plaintiff's Objections and Responses
9               to Defendant CoreCivic, Inc.'s
10              Second Set of Interrogatories to
11              Plaintiff dated 6-8-20         201
12   Exhibit 558 CCA First Quarter 2015 Investor
13              Presentation, May 2015, Bates
14              Nos. MARLOWE_0006503 through
15              MARLOWE_0006554               210
16   Exhibit 559 October 2007 US GAO Report to
17              Subcommittees, Cost of Prisons,
18              Bureau of Prisons Needs Better Data
19              to Assess Alternatives for Acquiring
20              Low and Minimum Security Facilities,
21              Bates Nos. MARLOWE_0005923 through
22              MARLOWE_0005961               260
23
24
25
```

Page 7

```
1              E X H I B I T S  (CONTINUED)
2    MARLOWE EXHIBITS (CONTINUED)
3    NO.:       DESCRIPTION:                  PAGE:
4    Exhibit 560 10-7-05 BOP Evaluation of the Taft
5               Demonstration Project: Performance
6               of a Private-Sector Prison and
7               the BOP                        270
8    Exhibit 561 SEC Form 10-K for Corrections
9               Corporation of America dated
10              2-27-12, Bates Nos. MARLOWE_0008043
11              through MARLOWE_0008178         303
12
13   Note:  Exhibits marked and attached to original.
14
15   EXHIBITS REFERRED TO:                     PAGE:
16   Allen Exhibit 3                            183
17
```

Page 8

```
1              P R O C E E D I N G S
2        VIDEO OPERATOR:  The time on the
3    record now is 8:35 a.m. Pacific Time.
4    Today's date is October 16, 2020.
5        My name is DeShawn White of Aptus
6    Court Reporting.  The court reporter today
7    is Misty Klapper of Aptus Court Reporting,
8    located at 600 West Broadway, Suite 300,
9    San Diego, California, 92101.
10       This begins the video-recorded
11   deposition of Justin Marlowe, testifying in
12   the matter of Nikki Bollinger Grae versus
13   Corrections Corporation of America, et al.,
14   pending in the United States Court, Middle
15   District of Tennessee, Case Number
16   3:16-cv-02267, taken by Zoom video remote
17   conferencing, physical recording in
18   Culpeper, Virginia.
19       The video and audio recordings will
20   take place at all times during this
21   deposition unless all counsel agree to go
22   off of the record.  The beginning and end of
23   each video recording will be announced.  All
24   appearances will be on a stenographic
25   record.
```

Page 9

1          The court reporter may now swear
2     and/or affirm the deponent.
3          MS. REPORTER:  One moment.
4     Whereupon:
5          JUSTIN MARLOWE, PH.D.,
6     was called for examination, and, after being duly
7     sworn, was examined and testified as follows:
8          MS. REPORTER:  Thank you.
9     You may proceed.
10          EXAMINATION BY COUNSEL FOR PLAINTIFF
11          BY MS. RADCLIFFE:
12     Q.    Good morning, Mr. Marlowe.  Could you
13     please spell your name for the record?
14     A.    Sure.
15          Justin, J-U-S-T-I-N, Marlowe,
16     M-A-R-L-O-W-E.
17     Q.    And where do you currently reside?
18     A.    Chicago, Illinois.
19     Q.    And have you been deposed before?
20     A.    Yes.
21     Q.    How many times?
22     A.    Twice, once as an expert and once in
23     a nonprofessional matter.
24     Q.    And what did the nonprofessional
25     matter relate to?

Page 10

1     A.    It was a -- a traffic accident that I
2     was involved in many years ago now.  And there
3     was litigation surrounding that accident and so I
4     was deposed as a -- as someone who had been
5     involved in that.
6     Q.    And in addition to that deposition,
7     you indicated that you had been deposed as an
8     expert once; is that correct?
9     A.    That's correct.
10     Q.    Okay.  How long ago was that?
11     A.    That was, as I recall, the summer of
12     2017.  I'd say July of 2017.
13     Q.    Okay.  It's been a little bit of
14     time, so we're going to go over some ground
15     rules.
16          If you don't understand any of my
17     questions, please let me know or ask me to
18     clarify.
19          Do you understand --
20     A.    I do.
21     Q.    -- that -- okay.
22          Is there any reason today why you
23     couldn't give your best testimony?
24     A.    No.
25     Q.    As the court reporter indicated,

Page 11

1     we're going to try not to talk over the top of
2     each other and answers to questions need to be
3     audible.
4          Do you understand?
5     A.    I do.
6     Q.    Okay.  If you need a break, just let
7     me know.  We're all virtual here, but we still
8     may need breaks at some time, so if you do, just
9     let me know and we'll finish the line of
10     questioning we're on and go ahead and break.
11          In addition, your counsel may object
12     to certain questions, but unless you're
13     instructed not to answer, I'm entitled to your
14     best recollection in terms of a response.
15          Do you understand?
16     A.    I do.
17     Q.    Okay.  Do you understand that if I
18     refer to CCA or Corrections Corp. or CoreCivic
19     that it is all related to the company now known
20     as CoreCivic?
21     A.    Yes, I understand that.
22     Q.    Okay.  And do you understand that if
23     I refer to the BOP, I'm referring to the Federal
24     Bureau of Prisons?
25     A.    I do.

Page 12

1     Q.    Thank you.
2          What do you feel is your expertise
3     that you brought to this case?
4     A.    My expertise generally is in public
5     finance.  That is the study of how communities
6     determine what government will do and how
7     government will be paid for.
8          Within the broad field of public
9     finance, I have a couple specialty areas.  One of
10     them is what we might call government financial
11     management.  And that's how governments manage
12     the resources that they have collected.  That
13     includes lots of different kind of niche fields
14     within government financial management, including
15     what I would call government cost accounting or
16     cost accounting for government services.
17          And cost accounting for government
18     services is the main expertise that I brought to
19     this matter, although I drew upon all of my
20     expertise in public finance in drawing my
21     opinions.
22     Q.    And you're not an economist; is that
23     correct?
24     A.    I'm not formally trained as an
25     economist, although I've -- that -- that is to

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 13

1  say I don't hold a Ph.D. in economics, but I have
2  taken a variety of courses in different types of
3  economics throughout all of my formal education
4  and I use various methodologies and theories and
5  concepts from many branches of economics in both
6  my academic work, as well as my expert witness
7  work.
8      Q.    Going back to your prior deposition
9  testimony, what was the nature of that testimony
10  in the expert matter?
11     A.    So that matter was the Snohomish
12  matter.  That's S-N-O-H-O-M-I-S-H.  And in that
13  matter the -- there was a Native American tribe,
14  the Tulalips, T-U-L-A-L-I-P-S, who were suing
15  Snohomish County, Washington, a county just north
16  of Greater Seattle, and also the State of
17  Washington.
18         And the issue was that the tribe did
19  not feel that it should be required to collect
20  sales taxes on a commercial development on their
21  reservation land.  And so they sued the state and
22  the county for an injunction against having to
23  collect those sales taxes.
24         I was hired by the county, by
25  Snohomish County, to do an evaluation of the cost

Page 14

1  and the value of the services that Snohomish
2  County provided at that commercial development.
3  And the question was whether the sales taxes that
4  were collected by the Tulalip tribe were adequate
5  or equal to the value of the services that
6  Snohomish County was providing in exchange for
7  the collection of those revenues.
8      Q.    And can you explain to me when you
9  used the term -- terms cost and value of services
10  what the differences are?
11     MS. GRANT:  Object to form.
12     THE WITNESS:  In that particular
13  matter, it meant a -- a couple things.
14         So the -- the cost of the services
15  that Snohomish County was providing was just
16  that.  It was trying to determine where
17  Snohomish County had incurred expenses in
18  delivering a variety of services, public
19  safety, public health, infrastructure.  And
20  the idea was to simply be able to say here's
21  how much Snohomish County spends every year
22  in public services that are directly
23  supporting that commercial development that
24  the Tulalip tribe had developed.
25         The valuation question in that

Page 15

1  specific case -- and valuation can mean
2  different things in different contexts when
3  we're talking about government services.
4  But in that particular case, the value
5  question for the county and for the state
6  government as well, but specifically for the
7  county, was whether the value of the
8  services that they were providing was
9  greater than the tax revenues that the
10  Tulalip tribe was collecting on that
11  reservation.
12         So there was a question of the
13  expenses incurred to deliver those services,
14  and then the related, but separate, question
15  of those services relative to the revenues
16  that were collected.  And that was the
17  valuation question.
18     BY MS. RADCLIFFE:
19     Q.    And what was your opinion regarding
20  the valuation?
21     A.    In that specific matter, my
22  conclusion was that the value of the services
23  that Snohomish County delivered was considerably
24  greater than the value of the -- of the revenues
25  or the amount of the revenues that were being

Page 16

1  collected by the tribe at that particular
2  commercial development.  Costs of the services
3  that Snohomish County provided were orders of
4  magnitude greater than the amount of the revenues
5  that were collected.
6      Q.    And in reaching your opinion in -- in
7  that matter, you had access to Snohomish County's
8  data regarding it -- it -- its expenses that it
9  had actually incurred; is that correct?
10     A.    That's correct.  I had access to a --
11  a variety of financial information about
12  Snohomish County, its budgets, its comprehensive
13  annual financial reports, its budget variance
14  reports, variety of information.
15     Q.    And in that matter, you were not
16  making any comparisons, cost comparisons,
17  regarding the services of a governmental agency
18  versus a public entity -- private entity?
19     MS. GRANT:  Object to form.
20     THE WITNESS:  I'm not quite sure
21  what you mean when you say a -- a
22  government agency versus a -- a public
23  agency.
24     BY MS. RADCLIFFE:
25     Q.    I apologize.  I'll restate the

Page 17

1  question.
2          And in that matter, you were not
3  making any cost comparisons regarding the
4  services of a governmental agency versus a
5  private entity?
6          MS. GRANT: Object to the form.
7          THE WITNESS: There were a variety
8  of cost comparisons that were made in that
9  matter. And as I -- as I sit here today,
10  without going back and looking at the --
11  at the specific substance of the report, I
12  may have, in doing that analysis, had to
13  consider some of the contracts that
14  Snohomish County had made for -- for
15  delivering services across the entire
16  county, as well as specifically at that
17  commercial development.
18          And so there were, I'm sure, a
19  variety of -- of private providers that were
20  providing services on behalf of the county.
21  How much comparing I did of the county's
22  service -- the county's cost of delivering
23  services to a private partner's service
24  delivery costs, again, I -- I -- I might
25  very well have done that, but I'd have to go

Page 18

1  back and -- and look specifically at what I
2  did.
3          BY MS. RADCLIFFE:
4      Q.   So as you sit here today, you don't
5  recall one way or another?
6      A.   When you say one way or another --
7      Q.   As you sit here today, you don't
8  recall one way or another whether you did, in
9  fact -- did comparisons, for example, between the
10  county's cost of delivering services versus the
11  cost of private partners that it -- it had used
12  to deliver services?
13          MS. GRANT: Object to the form.
14          THE WITNESS: Well, again, I -- the
15  very narrow statement that you made, yes.
16  As I sit here today -- I'm not saying I
17  didn't do those comparisons, I'm just
18  saying as I sit here today, I can't recall
19  specifically which comparisons were made.
20          BY MS. RADCLIFFE:
21      Q.   Okay. And in your experience, have
22  you done such types of comparisons in the past?
23          MS. GRANT: Object to the form.
24          THE WITNESS: Okay. By types of
25  comparisons, you mean the cost of

Page 19

1  government services versus the cost of a
2  private provider of similar services?
3          BY MS. RADCLIFFE:
4      Q.   Yes.
5      A.   Yes, I've done those comparisons
6  often.
7      Q.   And were those primarily comparisons
8  of the private provider with state and local
9  agencies?
10          MS. GRANT: Object to the form.
11          THE WITNESS: I've done comparisons
12  of cost of government services to a
13  private provision of services across all
14  levels of government, state, local,
15  federal, and the degree of specific
16  comparisons that I have made has depended
17  on the particular service and the -- the
18  particular government that we're talking
19  about.
20          But -- and I'm not sure I would
21  characterize my work as -- as mostly focused
22  on state and local governments.
23          BY MS. RADCLIFFE:
24      Q.   And what kind of methodologies have
25  you employed in ascertaining cost comparisons in

Page 20

1  the past between public sector and private
2  sector?
3          MS. GRANT: Object to the form.
4          THE WITNESS: That's a -- that's a
5  broad question. I -- I think the best
6  answer I can give is that there's a
7  variety of methodologies that are employed
8  when we think about the cost of government
9  services. There's a -- a body of
10  professional knowledge and best practices
11  that people like myself, experts in cost
12  accounting for government services, tend
13  to go to as the -- as the best available
14  theories, frameworks, concepts and
15  practices.
16          So the way I would answer that is to
17  say that in all the work I've done, it's
18  grounded in the best available information
19  about government cost accounting. The
20  specific methodologies can vary a lot,
21  depending on the specific service and the
22  specific unit of government that you're
23  talking about.
24          BY MS. RADCLIFFE:
25      Q.   So it fair to say there's not one

Page 21

1    uniform methodology, but that it would depend on
2    the circumstances which methodology you had used
3    in the past?
4         MS. GRANT:  Object to the form.
5         THE WITNESS:  If -- as I said, I
6    think we need to be specific when we're
7    talking about methodologies.  So for
8    certain kinds of cost concepts, there are
9    very well-accepted methodologies for other
10    kinds of cost comparisons.  There may be
11    less agreement on specific methodologies.
12    And for other kinds of cost comparisons
13    there might be lots of different ways that
14    it's done.  And the key is to simply be
15    transparent in what an analyst is assuming
16    or is not assuming.
17         So I don't know that I would
18    characterize it as broadly as there's no
19    accepted methodology.  In my report I talk
20    specifically around certain cost concepts
21    and characterize the extent of agreement
22    about which methodologies are more accepted
23    or -- or less accepted.
24         But, again, methodology really
25    depends on exactly what kind of cost concept

Page 22

1    or term we're talking about.
2         BY MS. RADCLIFFE:
3         Q.    And you mentioned something regarding
4    transparency.
5              What did you mean by that?
6         A.    Simply that a -- as a general rule
7    with -- with cost accounting and for -- for
8    government services specifically, it's important
9    to understand what the analyst assumed.  It's
10    important to understand what kind of methodology
11    they use, which information they relied upon in
12    drawing their conclusions.
13         So transparency there simply means
14    understanding what the analyst did and,
15    therefore, being able to try to re-create what
16    the analyst did, if possible.
17         Q.    What did you do to prepare for your
18    deposition today?
19         A.    I reviewed my report.  I looked at a
20    few of the source documents that I had cited in
21    the report just to refresh my memory.  I had some
22    conversations with staff from Cornerstone and had
23    a -- a -- a conversation with some of the staff
24    from Latham.
25         Q.    Approximately how long did you spend

Page 23

1    in conversation with folks from Cornerstone?
2         A.    During what time frame?
3         Q.    In preparation for your deposition.
4         A.    I'd say a total of eight hours.
5         Q.    And how long did you spend in
6    conversation with folks at Latham in preparation
7    for your deposition?
8         A.    It was approximately five hours.
9         Q.    Do you have a copy of your expert
10    report?
11         A.    I do.
12         Q.    Okay.
13              MS. RADCLIFFE:  Can you pull up tab
14    1, please.
15         We're going to mark for the record --
16    and I apologize, I don't know the next
17    exhibit number -- the deposition -- I mean
18    the expert report of Dr. Justin Marlowe.
19         BY MS. RADCLIFFE:
20         Q.    Do you recognize the document before
21    you as your report, Mr. Marlowe?
22         A.    Yes.
23         Q.    Okay.
24              MS. RADCLIFFE:  Can you go ahead
25    and -- and turn to Appendix C?

Page 24

1         VIDEO OPERATOR:  Apologies.
2    What -- what page?
3         MS. RADCLIFFE:  Appendix C, which
4    is going to be after the end of the
5    report.  So the report ends on page 33.
6         MS. REPORTER:  Can we get an
7    exhibit number for this?
8         MS. RADCLIFFE:  Yeah, hold on.
9    548.
10         MS. REPORTER:  Thank you.
11         (Thereupon, Marlowe Exhibit
12    Number 548 was marked for
13    identification.)
14         BY MS. RADCLIFFE:
15         Q.    And I know it's harder for folks
16    online, but have you located Appendix C?
17              What do you understand Appendix C to
18    be?
19         MS. REPORTER:  I'm sorry.  Was
20    there an answer to the last question?
21         Mr. Marlowe, can you hear me?
22         THE WITNESS:  I can.
23         The previous question was do I have
24    Appendix C in front of me?  If -- if that
25    was the question, yes.

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1      MS. REPORTER:  Thank you.

2      BY MS. RADCLIFFE:

3      Q.    And I'll repeat the question

4  because -- the question was do you recognize what

5  before you to be a copy of your expert report in

6  this matter?

7      A.    Yes.

8      Q.    And what does Appendix C purport to

9  be, Mr. Marlowe?

10      MS. GRANT:  Object to the form.

11      THE WITNESS:  I'm not -- what it is

12  is a list of the documents that I relied

13  upon in forming my opinion.

14      BY MS. RADCLIFFE:

15      Q.    And are all -- are these all the

16  documents you considered in rendering your

17  opinion?

18      MS. GRANT:  Object to the form.

19      THE WITNESS:  I relied on a -- a

20  lot of different information.  There -- I

21  think what's on this list is the documents

22  that were most influential in forming my

23  opinion, but I -- I would imagine there

24  were documents that I had considered or

25  that I was aware of before beginning the

1  work that aren't listed here.

2      BY MS. RADCLIFFE:

3      Q.    Do you recall what any of those

4  documents might be?

5      A.    Well, generally academic literature

6  that looks at cost of contracting for government

7  services generally.  As an expert in cost

8  accounting for government services, I'm aware of

9  a -- broad literature that looks at lots of

10  different kinds of government services, so

11  certainly my expertise incorporates knowledge of

12  that literature.

13      Some of it appears here, but some of

14  it simply was not as relevant or was included

15  in -- in other work that is cited here.

16      That would -- that would be an

17  example of documents that I had considered either

18  before or refreshed my memory as -- once I

19  started work on this that don't appear here.

20      Q.    Any particular academic literature?

21      A.    Well, there's a broad academic

22  literature on lots of different areas of cost

23  accounting for government services generally, as

24  well as academic literature on private provision

25  of government services.

1      In a lot of my academic research I

2  focused on how governments go about procuring

3  financing, how they access the capital markets

4  for capital investments, particularly

5  infrastructure.  And so some of the same concepts

6  around cost, cost efficiency, cost effectiveness,

7  are relevant in that literature.  There's broad

8  literature that I'm aware of that looks at the

9  cost of contracting for social services,

10  particularly at the state level.

11      There's broad literature on how the

12  federal government goes about contracting for a

13  variety of services and -- and goods, especially

14  in a military context.

15      Those are all literatures that, as an

16  expert in cost accounting for governmental

17  services, I was aware of and certainly informed

18  my thinking throughout this report, but

19  especially informed my thinking early on, as I

20  was just getting familiar with the facts in the

21  case and the nature of -- of some of the

22  questions in the case.

23      Q.    But is it fair to say that you didn't

24  rely on that information in preparing your report

25  or you would have included it in Appendix C?

1      A.    I think it's fair to say that, yes,

2  the -- the sources that I relied upon the most

3  are included here.  It's difficult as an expert

4  in this area to separate things that you knew as

5  you started the work, given, you know, my

6  extensive background in this area, from the

7  literature that informed my understanding of --

8  of my expertise in this area.

9      But as far as specific documents that

10  informed the particular opinions that I rendered

11  here, Appendix C includes those that were most

12  central.

13      Q.    And in addition to broad literature,

14  were there any CoreCivic documents that you

15  considered in connection with forming your

16  opinions in this action that you did not include

17  in Appendix C?

18      A.    No.  Anything from CoreCivic that I

19  relied upon is listed here.

20      Q.    What about any deposition testimony

21  taken in this case or other cases that you

22  considered in connection with forming your

23  opinions in this action that you considered?

24  Would that all be included in Appendix C?

25      MS. GRANT:  Object to the form.

1      THE WITNESS: Any deposition
2   testimony that I relied upon is included
3   in Appendix C.
4      BY MS. RADCLIFFE:
5      Q.   Okay. When were you first hired to
6   be a witness for CCA in this case?
7      A.   I was first contacted in the summer
8   of 2018. I can't recall the -- the exact date
9   offhand, but was -- was contacted at that time
10  and then formally retained in, I believe it was,
11  early October 2018.
12     Q.   And who contacted you?
13     A.   Initially the contact was with staff
14  from Cornerstone.
15     Q.   Who at Cornerstone?
16     A.   Katie Galley, G-A-L-L-E-Y.
17     Q.   Have you worked with Cornerstone in
18  the past?
19     A.   I have.
20     Q.   How many times?
21     A.   So I have worked with Cornerstone, as
22  I recall, on three different -- no, I'm sorry, I
23  take that back -- on -- I'd worked with
24  Cornerstone on one matter where I had been
25  retained. And I had spoken with Cornerstone on,

1   I want to say, two or three separate occasions
2   after that about potential engagements.
3      Q.   What was the nature of the matter
4   that you were retained?
5      A.   That is the -- the Libor matter that
6   I included in my list of testimony.
7      Q.   And did you prepare an expert report
8   in the Libor matter?
9      A.   I -- I -- I prepared a variety of
10  reports and analysis for that as part of that
11  engagement. The -- the nature of that engagement
12  was that there was -- there -- it wasn't a -- a
13  complaint at that point. It was -- it was work
14  that was being done prior to a -- a formal
15  complaint being written.
16     And so a lot of the analysis that I
17  did was similar to what may have appeared in an
18  expert report, but there was no formal expert
19  report in that particular matter.
20     Q.   Do you know if there were any formal
21  expert reports in that particular matter that
22  were not prepared by you?
23     A.   Not to my knowledge. Again, the --
24  the nature of that -- of that matter was -- was
25  analysis in advance of -- of a formal complaint

1   being written. So there -- there might very well
2   have been other experts that were doing analysis,
3   but to my opinion -- to my knowledge, there were
4   no other formal reports made or certainly no
5   other formal report that I reviewed as part of my
6   work in that matter.
7      Q.   And approximately how many hours did
8   you work on the Libor matter?
9      A.   You know, as I sit here today, my
10  best recollection is that it would have been
11  somewhere in the neighborhood of 30 to --
12     (Remote transmission interference)
13     THE WITNESS: You know, the
14  specifics I'd have to think --
15     MS. REPORTER: I'm sorry. Did
16  anybody else get cut off?
17     MS. RADCLIFFE: No, ma'am.
18     MS. REPORTER: Okay. I did. And
19  if you look at your realtime, you can see
20  where it occurred.
21     BY MS. RADCLIFFE:
22     Q.   You can correct me if I'm wrong,
23  Mr. Marlowe, but I believe your testimony was
24  that it would have been somewhere in the
25  neighborhood of between 30 and 40 hours; is that

1   correct?
2      A.   For the Libor matter?
3      Q.   Yes.
4      A.   Yeah, that's right.
5      Q.   And then my next question was what
6   was the nature of the two other matters that you
7   spoke with Cornerstone regarding that you were
8   not retained?
9      A.   As I recall, they -- both of them
10  were similar to the Libor matter, in that there
11  was some analysis required around the dynamics of
12  pricing in the municipal securities market.
13     Q.   To whom do you submit your bills in
14  this case?
15     A.   In this case I submit my bills to
16  staff at CoreCivic.
17     Q.   And you understand CoreCivic to be a
18  defendant in this action, correct?
19     A.   Correct.
20     Q.   Do you have any understanding
21  throughout your time working on this case that
22  CCA would continue to pay you for working on the
23  case, even if your opinions were not favorable to
24  their side?
25     A.   That's -- right, that's been the

1    understanding and I -- I say that in my report,
2    that my -- my compensation is not related to the
3    substance of my opinion.
4        Q.    And how many hours have you billed
5    for this case?
6        A.    I believe it was 27.
7        Q.    And that would be the -- for the
8    period of time from approximately October of 2018
9    to just recently, say beginning of October 2020?
10       A.    Right.  I think that's -- I think
11   that's fair.
12       Q.    When did you spend the bulk of your
13   hours that you billed, what time frame?
14       A.    It would have been -- well, it's --
15   you know, I think it was pretty evenly
16   distributed throughout the engagement.  There
17   were, as I recall, a -- a few more hours as I was
18   going through the process of finalizing the
19   report back in -- I believe that was in August.
20       But otherwise, the work was -- was
21   pretty steady throughout the engagement.
22       Q.    So it's approximately 24 months.  So
23   you spent approximately an hour a month working
24   on the case?
25       MS. GRANT:  Form.

1        THE WITNESS:  Not necessarily.
2    By -- but by steady what I mean was when I
3    was working on the actual report, it was
4    roughly the same amount of time.  There
5    were long gaps where there was no work
6    being done on the report because, as I
7    understood it, you know, there were --
8    there were, you know, motions and -- and
9    other -- other things happening on the
10   legal side.
11       I'm simply saying that when I -- when
12   I was working on it, particularly when I was
13   working toward a deadline, the number of
14   hours were relatively evenly spaced during
15   that time.
16       BY MS. RADCLIFFE:
17       Q.    And when would you say that you began
18   to put, you know, pen to paper and start drafting
19   the report?
20       A.    Well, it was definitely a -- an
21   iterative process.  To the best of my
22   recollection, I started actually putting thoughts
23   on paper in probably early 2019.
24       Q.    And did you write the entirety of
25   your report?

1        MS. GRANT:  Object to the form.
2        THE WITNESS:  Staff at Cornerstone
3    assisted with the drafting of parts of the
4    report, but all of the content of the
5    report is mine and I directed anyone else
6    who might have assisted with the drafting
7    of the report.
8        BY MS. RADCLIFFE:
9        Q.    Which parts of the report did
10   Cornerstone draft initially?
11       A.    Well, I don't know that it's fair to
12   characterize Cornerstone as having drafted
13   anything initially.  As I said, it was an -- an
14   iterative process.  There were sections where I
15   had put down some ideas and then solicited
16   feedback.  There -- there were sections where I
17   would direct Cornerstone to help me to work
18   through particular information or particular
19   documents that I knew would be especially
20   relevant.
21       There were sections where -- on some
22   of the quantitative analysis where staff at
23   Cornerstone would -- you know, would develop, at
24   my direction, the -- some of the initial model,
25   come to me with -- with their thoughts on what

1    those quantitative analyses were looking like,
2    particularly around the cost savings.  And -- and
3    then we would iterate on how we wanted to write
4    up those findings.
5        So again, it was an iterative process
6    throughout and it's -- you know, as I sit here
7    today, it's -- it's difficult to be able to go
8    into a lot of detail about particular sections of
9    the report, just because, again, it was a -- it
10   was an iterative and collaborative process
11   throughout.
12       Q.    Mr. Marlowe, this is a 33-page report
13   with multiple exhibits, correct?
14       A.    That's correct.
15       Q.    Okay.  And if you turn to the table
16   of contents, for example, the -- the section on
17   Evaluation of CoreCivic's General Cost Savings
18   Statements, Section VII.
19       A.    Yep, I see that.
20       Q.    How much input do you think that
21   Cornerstone gave on that section?
22       MS. GRANT:  Object to the form.
23       THE WITNESS:  I'm not sure what you
24   mean by -- by how much.  This -- again,
25   throughout the report it was an iterative

Page 37

1    process and --
2        BY MS. RADCLIFFE:
3        Q.    So, for example, for that section,
4    would you have drafted the language in that
5    section initially or would have you received an
6    initial draft from Cornerstone and then provided
7    input?
8        MS. GRANT:  Object to the form.
9        THE WITNESS:  Well, as I recall,
10   for -- for that particular section, this
11   was one where I had a lot of my own
12   understanding and -- and knowledge of some
13   of these textbook definitions for
14   particular cost concepts.
15       And so again, as I -- as I sit here
16   today, my best recollection of that
17   particular section was that after having
18   reviewed the -- the statements in question
19   that CoreCivic had made, you know, I -- I
20   undertook my own analysis of how those cost
21   concepts were being used and how those cost
22   concepts were compared to the way that
23   people like myself, governmental cost
24   accounting experts, tend to think about
25   those terms.

Page 38

1        And so on this one in particular,
2    again, a lot of -- a lot of both the
3    initial, as well as the input throughout,
4    was me directing Cornerstone on, you know,
5    my thoughts on how to go about thinking
6    about which cost concepts were most relevant
7    and -- and how to write it up in a way that
8    made clear what my -- what my opinion was.
9        BY MS. RADCLIFFE:
10       Q.    And what about Section V, Empirical
11   Research on Cost Effectiveness of -- of Private
12   Correctional Facilities?  Would it be fair to say
13   that you wrote the initial draft of that section
14   before circulating it for input to Cornerstone?
15       MS. GRANT:  Object to the form.
16       THE WITNESS:  Well, again, I'm
17   not -- I'm not sure I would characterize
18   any of this as Cornerstone preparing an
19   initial draft.
20       For that particular section, as I had
21   mentioned before, I had some of my own ideas
22   on which literatures were most relevant,
23   given my expertise in this area, and was
24   certainly familiar with some of the
25   literature that I ultimately cited in the

Page 39

1    report about questions about the cost
2    effectiveness of private correctional
3    facilities.
4        And from there, I also then directed
5    Cornerstone to -- to help me to identify
6    other literature that they had either come
7    across or were aware of or could find that
8    might be relevant and to be able to come
9    back to me with some summaries of -- of what
10   else was out there that may ultimately
11   relevant in forming my opinions.
12       BY MS. RADCLIFFE:
13       Q.    Mr. Marlowe, do you have any
14   professional experience in budgeting for a -- a
15   federal public entity?
16       MS. GRANT:  Object to the form.
17       THE WITNESS:  So my professional
18   experience certainly has -- has put me
19   in -- in contact with and, in some cases,
20   in the practice of federal government
21   financial management, I've worked -- I've
22   done a variety of analysis over the years
23   for -- you know, as an example, I'm a
24   member of the National Academy of Public
25   Administration, which is a -- an

Page 40

1    association that -- that's created by
2    Congress, chartered by Congress, to
3    provide input to Congress on a variety of
4    policy and management issues, including
5    and especially federal fiscal policy and
6    federal financial management issues.
7        In fact, just earlier this week I was
8    involved in a -- in a panel discussion about
9    federal government's current fiscal policy
10   and fiscal outlook.
11       So in the course of that work, I'm
12   always in contact with practitioners of
13   federal financial management.  I also hold
14   the certified government financial manager
15   credentials, the CGFM, which is a credential
16   that recognizes specialized expertise in
17   government financial management broadly, but
18   there's a strong emphasis on federal
19   government financial management and the
20   practice of federal government financial
21   management as a part of that credential.
22       So, yes, so my work I've -- I've been
23   involved in the practice of federal
24   government financial management in lots of
25   different ways.

Case 3:16-cv-02267   Document 359-2   Filed 11/20/20   Page 12 of 125 PageID #: Page 37..40
3009
www.JSCR.com

Page 41

1    BY MS. RADCLIFFE:
2    Q.    Have you been hired by a federal
3    public entity in the capacity of -- let me strike
4    that.
5    Have you been hired by a federal
6    public entity with respect to assisting it in its
7    budgeting?
8    MS. GRANT:  Object to the form.
9    THE WITNESS:  If the -- if -- if
10    the specific question is have I ever
11    worked on a federal government's budget,
12    particularly the preparation of a federal
13    government's -- a federal government
14    agency's budget, the answer is -- is no.
15    I've not worked specifically on the
16    preparation or in the process of preparing
17    a federal government's budget -- a federal
18    government agency's budget.
19    But as I said, a lot of the work that
20    I do is related to planning, forecasting,
21    cost analysis, infrastructure investment
22    practices, a variety of areas that are
23    relevant and inform the practice of federal
24    government budgeting.
25

Page 42

1    BY MS. RADCLIFFE:
2    Q.    And have you ever worked in the
3    preparation of a correctional facility's budget?
4    MS. GRANT:  Object to the form.
5    THE WITNESS:  In my work with state
6    governments, and I've worked on state
7    government budgeting in several states,
8    the preparation of the state government
9    budget involves as part of it the
10    preparation and analysis of correctional
11    facilities' budgets.
12    BY MS. RADCLIFFE:
13    Q.    And which states?
14    A.    I was on the faculty at the
15    University of Kansas for approximately five
16    years, and at that time was both a -- a formal
17    and informal advisor to the government -- to the
18    governor's budget office.
19    I also was at the University of
20    Washington for 11 years until recently.  And
21    while I was there, I was a member of the
22    Governor's Council of Economic Advisors, which
23    helps to create the revenue forecasts that drive
24    the ultimate state government budget process.
25    Was also a member of the -- of an

Page 43

1    entity in Washington State called the Citizens
2    Commission for Performance Measurement of Tax
3    Preferences, which is an entity that evaluates
4    tax deductions, tax exemptions, other kinds of
5    what we call tax preferences, anything that --
6    that reduces the amount of -- of tax that a
7    business or an individual will pay.
8    And the recommendations that we made
9    as part of that -- of that body again directly
10    informed the preparation of Washington State's
11    budget.
12    Q.    So as I understand your testimony --
13    and none of these were you formally hired by any
14    of these states to perform budgeting analysis for
15    them with respect to correctional facilities?
16    MS. GRANT:  Object to the form.
17    THE WITNESS:  Again, I'm not -- I'm
18    not sure that that's a fair
19    characterization of -- of what I'm saying.
20    I'm saying I've worked for state
21    governments in a variety of analytical
22    capacities, all of which have informed
23    their -- their budget processes.
24    As a member of, for example, the
25    Governor's Council of Economic Advisors,

Page 44

1    you're not hired.  You're appointed by the
2    governor as a leading expert in your field.
3    And so that's a -- that's an
4    appointment that's confirmed by the
5    governor's office to serve in an advisory
6    role.  And that's an important, you know,
7    component of -- of a lot of the work that
8    I've done as an expert in this field.
9    BY MS. RADCLIFFE:
10    Q.    And is it fair to say that you have
11    never worked for the Federal Bureau of Prisons?
12    A.    That's fair to say.  I've never --
13    I've never been employed by the Federal Bureau of
14    Prisons.
15    Q.    Do you have any professional
16    experience in budgeting for a private prison
17    operator?
18    MS. GRANT:  Object to the form.
19    THE WITNESS:  If by that you mean
20    have I ever prepared the budget for a
21    private prison operator, no, I've -- I've
22    not done that.
23    As I mentioned, in the -- in the
24    course of -- of doing budget analysis and
25    advisory work for both state governments and

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 13 of 125 PageID #: Page 41..44
13003
www.CR.com

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1    the federal government, you know, certainly
2    the way that state governments and the
3    federal government write contracts with
4    private prison providers, you know, my work
5    would have informed that.
6         But I've never -- I've never actually
7    prepared the budget or participated in the
8    preparation of the budget for a private
9    prison provider.
10        BY MS. RADCLIFFE:
11        Q.    Have you ever had any professional
12   relationship with any private prison operator?
13        A.    Can you be more specific about
14   professional relationship?
15        Q.    For example, have you ever provided
16   an advisory consultant role with respect to any
17   private prison operator?
18        A.    Well, I mean, outside of the context
19   of this engagement, no.
20        Q.    And have you ever been hired by a
21   private prison operator to perform work on their
22   behalf?
23        A.    Again, outside the context of -- of
24   this engagement, no.
25        Q.    And prior to this engagement, had you

1    ever met anyone affiliated with Corrections
2    Corp.?
3         A.    Not that I can recall, no.
4         Q.    And do you understand GEO to be a
5    competitor of Corrections Corp.?
6         A.    I -- I do, yes.
7         Q.    And prior to this engagement, had you
8    ever met anyone affiliated with GEO?
9         A.    Not that I can recall.
10        Q.    Have you ever performed any written
11   analysis with respect to benefits that a private
12   prison operator might provide a governmental
13   agency?
14        MS. GRANT:  Object to the form.
15        THE WITNESS:  I don't recall
16   anything in my -- in my academic writing
17   that speaks specifically to the question
18   of the benefits of private prisons.
19        Again, in my academic work I've
20   looked at a -- at the -- the costs and the
21   benefits of a variety of different service
22   delivery arrangements across all levels of
23   government.  But to my knowledge, no, I have
24   not commented specifically on the benefits
25   of private prisons.

1         BY MS. RADCLIFFE:
2         Q.    Have you ever commented on whether or
3    not private prisons save governmental agencies
4    costs?
5         MS. GRANT:  Object to the form.
6         THE WITNESS:  We want to be clear
7    on what we mean by -- by costs.  So with
8    that in mind, again, I -- I think my
9    previous answer applies there as well.
10        To -- to my recollection, I had not prior
11   to this engagement made any comment on --
12   on prison privatization generally.
13        BY MS. RADCLIFFE:
14        Q.    Okay.  Prior to being hired in this
15   case to be a witness, you didn't have any
16   personal experience regarding the cost to the BOP
17   of contracting with CCA to operate any particular
18   facility; is that accurate?
19        MS. GRANT:  Object to the form.
20        THE WITNESS:  What -- what do you
21   mean by -- by personal experience?
22        BY MS. RADCLIFFE:
23        Q.    That -- for example, that you didn't
24   have any personal knowledge regarding the cost to
25   the BOP of contracting with CCA to operate any

1    particular facility.
2         MS. GRANT:  Object to the form.
3         THE WITNESS:  Prior to this
4    engagement I had not looked specifically
5    at information about CoreCivic's financial
6    relationship with the government, if
7    that's what you mean by personal
8    experience.
9         BY MS. RADCLIFFE:
10        Q.    Fair enough.
11        And prior to this engagement, did you
12   have any involvement or knowledge regarding the
13   cost to the BOP of contracting with any of
14   CoreCivic's competitors?
15        MS. GRANT:  Object to the form.
16        THE WITNESS:  No.  As I recall, I
17   had not -- I had not looked at any of
18   CoreCivic's competitors' relationships
19   with the Bureau of Prisons.
20        BY MS. RADCLIFFE:
21        Q.    And prior to your engagement in this
22   action, you didn't have any knowledge regarding
23   the quality of CCA's performance for the BOP; is
24   that fair?
25        MS. GRANT:  Object to the form.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 14 of 125 PageID #: 13024
www.LexitasCR.com
Page 45..48

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 49

1    THE WITNESS:  What do you mean by
2    quality?
3        BY MS. RADCLIFFE:
4    **Q.    Well, for example, you didn't have**
5    **any information regarding whether or not CCA**
6    **performed in accordance with its contract prior**
7    **to being hired in this action?**
8        A.    I think there's a variety of measures
9    of quality.  Conformance with a contract would be
10   one of potentially several.
11       But to answer that specific question,
12   no.  Prior to this engagement I was not -- I had
13   not reviewed any information about the -- the
14   performance of CoreCivic's contracts with the
15   BOP.
16   **Q.    And prior to being engaged in this**
17   **action, did you have any knowledge regarding**
18   **CCA's budget process?**
19       MS. GRANT:  Object to the form.
20       THE WITNESS:  If you -- if by
21   budget process we mean how CCA creates its
22   budget, I would imagine -- prior to this
23   engagement I would have imagined that
24   CCA's budget process would work like any
25   other large corporation's budget process.

Page 50

1        But specifically particular
2    information about CCA's budget process, no.
3    Prior to this engagement I -- I didn't have
4    knowledge of that.
5        BY MS. RADCLIFFE:
6    **Q.    And prior to this engagement,**
7    **would -- did you have any understanding as to the**
8    **assumptions that CCA used in order to evaluate**
9    **its costs savings to the BOP?**
10       MS. GRANT:  Object to the form.
11       THE WITNESS:  I was certainly aware
12   prior to this engagement that there was a
13   debate about the -- the extent of cost
14   savings or cost effectiveness or whichever
15   cost concept was in question.
16       As I -- as I understood it, there was
17   some -- you know, some debate about -- about
18   those cost concepts in the context of prison
19   privatization.  So I knew that that was one
20   of the big issues, was the assumptions that
21   CoreCivic and other private prison providers
22   had -- had made assumptions about the
23   populations that they were serving compared
24   to the populations the BOP was serving.
25       So I think generally, yeah, I was

Page 51

1    aware that -- that the assumptions that
2    drive these cost comparisons were one of the
3    key issues in -- in understanding the kinds
4    of cost comparisons that had been made.
5        BY MS. RADCLIFFE:
6    **Q.    And do you recall how you came to**
7    **that understanding?**
8        A.    As I sit here today, I -- it would --
9    I can't tell you for certain.  I would imagine
10   that I came across any number of different
11   academic studies or -- or even, you know, popular
12   press kinds of articles on -- on this debate
13   within the private prison industry.
14       There's been certainly lots written
15   on this and people in -- in my field who study
16   the cost of government services and -- and, by
17   extension, government procurement, because
18   government procurement is certainly one way that
19   the government goes about -- or I should say -- I
20   take that back.  I'm sorry.  Relationships with
21   private contractors, which is one way that
22   governments go about delivering services.
23       As someone familiar with that
24   literature and with the -- some of the
25   contemporary issues in government procurement,

Page 52

1    I -- I'm certain that the -- you know, the debate
2    about private sector prisons had been -- had come
3    up somewhere in my -- in my study of and in my
4    understanding of government procurement more
5    generally.
6    **Q.    So you indicated that you would**
7    **imagine.**
8        **Does that mean that you don't recall**
9    **precisely one way or another?**
10       MS. GRANT:  Object to the form.
11       THE WITNESS:  This is -- you're
12   asking specifically with reference to my
13   understanding of the assumptions that
14   CoreCivic made in its cost comparisons?
15       BY MS. RADCLIFFE:
16   **Q.    Correct.**
17       A.    Right.  So I -- I -- I'd imagine
18   means I -- I don't recall specifically as I sit
19   here today.
20   **Q.    Did you interview anyone at the BOP**
21   **in preparation of your opinion regarding its**
22   **costs?**
23       A.    No.
24   **Q.    Did you interview anyone at the BOP**
25   **regarding the cost savings of using CCA**

Page 53

1  facilities?
2      A.   No.
3      Q.   Did you interview anyone regarding
4  cost savings of using other private prison
5  operators?
6      A.   No.
7      Q.   And did CCA ask you to interview
8  anyone from the company regarding its cost
9  savings compared to the BOP?
10     A.   No.
11     Q.   Okay.  And did you, in fact,
12 interview anyone at CCA regarding its cost
13 savings compared to the BOP?
14     A.   No.
15     Q.   Did you interview anyone at CCA
16 regarding its budget for staffing?
17     A.   No.
18     Q.   Did you interview anyone at CCA
19 regarding expenditures for inmate health
20 services?
21     A.   No.
22     Q.   Did you interview anyone from CCA
23 regarding the company's statements regarding cost
24 savings?
25     A.   No.

Page 54

1      Q.   Did you interview anyone at CCA
2  regarding what those statements -- let me strike
3  that.
4           In your report you have a -- a
5  description of a summary of statements at
6  Exhibits 2.1 and 2.2.  Can you explain to me what
7  those exhibits are intended to represent?
8      A.   Exhibits 2.1 and 2.2 represent the --
9  the statements CoreCivic had made about costs
10 that I examined as part of this engagement.
11     Q.   And would that be the totality of the
12 statements that you reviewed as part of your
13 engagement?
14          MS. GRANT:  Object to the form.
15          THE WITNESS:  To the best of my
16 recollection, yes, that's a -- that's a
17 comprehensive list of the statements that
18 I evaluated.
19          BY MS. RADCLIFFE:
20     Q.   And did you interview anyone at CCA
21 with respect to the statements in Exhibit 2.1 and
22 2.2 as to what those statements were intended to
23 convey to investors?
24     A.   No.
25     Q.   Okay.  Did you interview anyone at

Page 55

1  CCA regarding the -- what support the defendants
2  relied on in making those statements in
3  Exhibits 2.1 and 2.2?
4          MS. GRANT:  Object to the form.
5          THE WITNESS:  No.
6          BY MS. RADCLIFFE:
7      Q.   Did you any -- oh, excuse me.
8           Did you interview anyone at CCA
9  regarding the basis for the individual
10 defendants' belief that the statements in 2.1 and
11 2.2 were not misleading?
12     A.   No.
13     Q.   Did you interview -- let me strike
14 that.
15          Did you ask to interview anyone at
16 CCA regarding the facts supporting CC's -- CCA's
17 cost savings claims or did you prefer not to know
18 the answer?
19          MS. GRANT:  Object to the form.
20          THE WITNESS:  So I think there's
21 two questions there.
22          The first, as I recall, was did I
23 request to interview anyone at CCA?
24          BY MS. RADCLIFFE:
25     Q.   Correct.

Page 56

1      A.   The answer is no.
2           Can you remind me what the second
3  question was?
4      Q.   Sure.
5           Why is it that you did not ask to
6  interview anyone at CCA regarding their cost
7  savings claims?
8      A.   I -- I didn't think it was necessary
9  to interview anyone at CCA because I felt that I
10 was able to arrive at a well-informed opinion,
11 given the scope of my assignment, by relying upon
12 all of the other information set forth in
13 Appendix C.
14     Q.   So you believed all the information
15 set forth in Appendix C gave you a complete
16 enough picture to render your opinion?
17          MS. GRANT:  Object to the form.
18          THE WITNESS:  I felt confident
19 rendering my opinion based on the
20 information in Appendix C, that's correct.
21          BY MS. RADCLIFFE:
22     Q.   Okay.  So just so the record's clear,
23 you didn't get to talk to a single defendant in
24 this case about -- about the action?
25          MS. GRANT:  Object to the form.

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.                                    Grae vs.
                    Corrections Corporation of America, et al.

1    THE WITNESS: Yeah, that's correct.
2    I -- I didn't speak to -- if by -- by
3    defendants you mean people at CCA, that's
4    correct. I have not spoken to anyone at
5    CCA.
6        BY MS. RADCLIFFE:
7    Q.    And in -- turning back to Appendix C,
8    did you review each of the documents listed on
9    Appendix C?
10   A.    If by review you mean was I familiar
11   with the documents and -- and was I familiar with
12   every one of these documents and how they might
13   inform an opinion, the answer is yes.
14   Q.    Okay. And just going down the -- the
15   documents here, with respect to the depositions
16   listed, did you read the entirety of the
17   deposition transcripts or only portions or none
18   at all?
19   A.    For each of those depositions, as I
20   recall, I -- I at a minimum glanced at them to
21   see if there was anything in those depositions
22   regarding costs. For those that -- where
23   there -- where there were statements made about
24   costs, I reviewed that more carefully and, where
25   appropriate, that information informed my opinion

1    and was included in my report.
2    Q.    And then moving down to the SEC
3    filings, did you read the entirety of the SEC
4    filings listed on Appendix C?
5    A.    Same answer as the -- as the previous
6    question. Certainly I'm familiar with -- with
7    the SEC filings and was able to, for every one of
8    these, glance at it, but then be able to, where
9    necessary, very quickly go to information that
10   was necessary to -- to formulate an opinion.
11   Q.    So is it fair to say when you say
12   that you would glance at it and review the
13   information necessary to formulate your opinion
14   that you did not, in fact, read the entirety of
15   the SEC filings listed?
16   A.    I think it's fair to say that SEC
17   filings contain a lot of information. And in my
18   analysis I was looking for specific points of
19   information about, in this case, CoreCivic's
20   relationship with the Bureau of Prisons and some
21   of the particular revenues that were -- that were
22   part of that relationship.
23        And so I was able to review those
24   filings and get the information that I needed as
25   necessary.

1    Q.    And did anyone else inform you as to
2    which sections of the SEC filings you should
3    review?
4    A.    No, I have a -- a -- a pretty good
5    understanding of -- of SEC filings, of -- of
6    financial reports that are filed with the SEC, so
7    I was able to, in reviewing those documents, know
8    where that information could be found.
9    Q.    And then moving to page 8, do you see
10   there's a list of Bates stamped documents that
11   goes onto page 11?
12   A.    I see it.
13   Q.    Did you review the entirety of those
14   documents listed?
15   A.    Well, the same answer here. For
16   every one of those documents I was able to
17   briefly glance at it just to see what it was and
18   understand the context for what -- what that
19   document was and -- and how that document might
20   inform my opinion. And then where there were
21   specific statements about costs and specific
22   statements about costs in a particular context, I
23   was able to spend more time understanding how
24   those statements and how information from those
25   documents might ultimately inform my opinion.

1    Q.    Okay. And then going over to the
2    federal prison system documents, did you read the
3    entirety of those documents? It's on page 7.
4    A.    Right. Same answer here. You know,
5    these are long reports that contain a lot of
6    different information. Was able to quickly with
7    each of them understand what the report was, what
8    it was designed to do and then quickly identify
9    statements, information, analysis that was
10   relevant -- depending on the specific report,
11   find analysis that was relevant to the --
12   relevant to my opinion.
13   Q.    And with respect to all of the
14   documents listed on Exhibit -- Appendix C --
15   excuse me -- do you have a recollection of
16   reviewing any of them in their entirety?
17        MS. GRANT: Object to the form.
18        THE WITNESS: Well, of course I
19   reviewed several of these documents in
20   their entirety.
21        BY MS. RADCLIFFE:
22   Q.    Which ones?
23   A.    Well, as I mentioned, every one of
24   them I had a minimum review to understand what
25   the document was and how it might inform the

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 17 of 125 PageID #:    Page 57..60
                                                            10027
www.CR.com

Page 61

1  opinion.

2      I would say I spent the -- the most

3  time and did the most in-depth and comprehensive

4  reviewing of documents, particularly around

5  the -- the research articles listed particularly

6  on page 3, although again, all of the documents

7  here I familiarized myself with to be able to

8  understand what the document was, the context

9  that that document was -- was made -- that that

10  document was portraying and how particular either

11  statements about cost or particular analysis

12  about cost or any other information that I

13  thought might be relevant I was able to consider

14  that information in the context of the document

15  as a whole to use that in forming my opinion.

16      Q.   Mr. Marlowe, we spoke a little bit

17  before regarding Cornerstone.

18      Do you recall approximately how much

19  time you spent communicating with Cornerstone

20  when preparing your expert report in this action?

21      A.   Offhand I -- I would say it was

22  certainly -- certainly more than 10 hours.

23      Q.   So, Mr. Marlowe, you've indicated

24  that you spent 10 hours conversing with

25  Cornerstone; that -- you've also indicated that

Page 62

1  your total hours in this case are 27 hours, which

2  leaves you 17 hours to read the thousands of

3  pages on Appendix C and to draft your report; is

4  that accurate?

5      MS. GRANT:  Object to the form.

6      THE WITNESS:  I'm not sure I

7  understand the -- the question.

8      BY MS. RADCLIFFE:

9      Q.   Well, you've indicated that you spoke

10  with Cornerstone for approximately 10 hours; is

11  that correct?

12      A.   Correct.

13      Q.   And that you spent 27 hours working

14  on this case; is that correct?  Or let me

15  rephrase that.

16      That you spent 27 hours up to about

17  the time that you issued your expert report in

18  this case?

19      A.   That's correct.

20      Q.   Okay.  Which leaves 17 hours for you

21  to review the documents listed on Appendix C and

22  to draft the report; is that accurate?

23      A.   There were a -- a variety of -- of

24  things that I had to do in preparation of the

25  report.  The conversations that I described with

Page 63

1  Cornerstone were conversations that were designed

2  to help Cornerstone to understand what needs I

3  had, what information I thought was relevant to

4  the report.

5      They would provide -- they would

6  provide documents at my direction that could be

7  relevant in forming the opinions.  And in the

8  course of, again, understanding a lot of these

9  documents, reviewing what they were, reviewing

10  how they informed my opinion, yes, there's

11  thousands of pages.  Most of those documents one

12  can very quickly understand what the statement

13  is, how it might inform my ultimate analysis, be

14  able to very quickly go to particularly relevant

15  statements about cost or quality or -- I'm sorry,

16  not quality -- cost or whatever other cost

17  concept was -- was most relevant and to be able

18  to take that information and include it in my

19  draft.

20      Q.   I move to strike as nonresponsive.

21      The question is, is you had 17 hours

22  for you to review the documents listed on

23  Appendix C and to draft your report; is that

24  accurate?

25      MS. GRANT:  I'm going to object and

Page 64

1  object to the motion to strike.

2      THE WITNESS:  Again, I believe I'm

3  answering your -- your question as well as

4  I can here.  I've -- I'm speaking and

5  giving you general statements about time

6  that I spent in conversation with staff at

7  Cornerstone.  I described that a lot of

8  the time that I spent with Cornerstone was

9  giving them direction so that they could

10  help me to better understand what

11  documents were out there, which documents

12  were available, which documents had

13  especially relevant information that I

14  would -- could find helpful in drafting my

15  report.

16      And so I think it's -- it's -- it's

17  difficult to be able to -- to completely

18  determine exactly how much time was spent on

19  different components of drafting and

20  creating the report, given the way that

21  you're trying to characterize the

22  relationship with CoreCivic -- with -- I'm

23  sorry, with -- with Cornerstone.

24      BY MS. RADCLIFFE:

25      Q.   It's not in terms of characterizing.

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.

Grae vs.
Corrections Corporation of America, et al.

1    Mr. Marlowe, what I'm asking you is you testified
2    you spent approximately 10 hours communicating
3    with Cornerstone and that you have spent 27 hours
4    on this action, correct?
5        A.   Correct.
6        Q.   So what I'm asking is if you have
7    spent 10 hours working with Cornerstone, that
8    leaves you 17 hours to do everything else with
9    respect to this opinion, is that correct?
10       MS. GRANT:  Object to the form.
11       THE WITNESS:  Again, I think you're
12   characterizing the conversations with
13   Cornerstone as something completely
14   independent of the rest of the work on
15   this report.  And I -- I'm not sure that I
16   agree with that.
17       And those conversations with
18   Cornerstone were to tell them information,
19   tell them the kinds of documents, the kind
20   of information that I thought would be most
21   relevant in preparing my report.
22       And so by interacting with them, that
23   was important steps toward being able to get
24   the information I needed to rely on my
25   opinions.  I think you're drawing a -- a --

1        BY MS. RADCLIFFE:
2        Q.   Let me rephrase it.
3        You spent 27 hours total in preparing
4    your expert report in this action that included
5    10 hours of conversation with Cornerstone?
6        A.   Correct.
7        Q.   Thank you.
8        Did you attempt to -- well, let me
9    strike that.
10       Who chose the documents from CCA that
11   you would get to see?
12       A.   It was a similar process to the one
13   that I described before, so I would -- I would
14   say to Cornerstone, you know, given the nature of
15   the complaint, given the statements that were --
16   that were outlined in the original complaint, I
17   made clear to staff at Cornerstone that it would
18   be important to have certain kinds of information
19   from CoreCivic, including a lot -- again, the --
20   everything that was included in Appendix C,
21   particularly their -- the financial reports,
22   the -- the 10-Ks and the 10-Qs.
23       And, you know, from there once
24   Cornerstone understood that that was my -- that
25   that was my at least my initial focus, they were

1    able to help me to identify anything else that
2    may have been relevant.  And then as depositions
3    and other information became available, they
4    alerted me that there may be information in those
5    depositions and in some of the other document
6    production that might be relevant, again, given
7    the instructions that I had given them about the
8    kind of information I thought would be most
9    relevant to my opinion.
10       Q.   And -- and did you understand that
11   Cornerstone would have had to contact CCA to
12   obtain documents?
13       MS. GRANT:  Object to the form.
14       THE WITNESS:  I -- I suppose it
15   would depend on -- on the document.  My --
16   Cornerstone's relationship to -- to
17   CoreCivic, you know, I -- I -- I didn't
18   quite -- was -- I was not familiar with
19   Cornerstone's relationship with -- with
20   CoreCivic, how they were interacting and
21   how they were -- how they were getting
22   information from CoreCivic.
23       I simply again said to staff at
24   Cornerstone here's the information I need
25   and what they were able to provide they were

1    able to provide.
2        BY MS. RADCLIFFE:
3        Q.   What about with respect to
4    CoreCivic's internal documents?  Do you have an
5    understanding of how Cornerstone obtained those
6    internal documents?
7        A.   Again, I think it would depend on the
8    specific documents in -- in question.
9    Certainly -- I'm sorry.  Your question was
10   specifically about internal documents, right?
11       Q.   Right, internal nonpublic documents.
12       A.   Right.
13       No, I -- I -- I honestly never really
14   had that -- a -- a detailed discussion with --
15   with Cornerstone about that.  I -- I knew that
16   they had lots of ways that they could get ahold
17   of that information.  And as long as I had the
18   information to work with, that's what mattered
19   the most to me.
20       Q.   How do you know that the information
21   that Cornerstone obtained from CCA was complete?
22       MS. GRANT:  Object to the form.
23       THE WITNESS:  I'm not sure what you
24   mean by -- by complete.
25

1        BY MS. RADCLIFFE:
2      Q.    For example, you cite in your report
3 some CoreCivic internal documents regarding real
4 estate costs.
5        Do you recall those?
6      A.    Yes.
7      Q.    Okay. How do you know that there are
8 not other CCA internal documents regarding real
9 estate costs that you did not receive?
10      A.    The -- the direction that I gave
11 staff at Cornerstone was to -- to give me the
12 best and most complete information available.
13 And I've worked with them before. I have always
14 had a good relationship and done quality work
15 with them before. And so when I said get me the
16 best and -- and most complete information
17 available, I believed that they would.
18      Q.    But so far as you know, CCA chose
19 what they would provide Cornerstone or not. So
20 how do you know that CCA did not provide
21 Cornerstone the best in available information?
22        MS. GRANT: Object to form and
23 foundation.
24        THE WITNESS: I'm not -- I'm not
25 sure that -- I'm not sure that I know that

1 CoreCivic decided what information to
2 provide to Cornerstone. You're asking me
3 to -- to characterize their relationship
4 and I -- again, as I said, my relationship
5 was with Cornerstone.
6        BY MS. RADCLIFFE:
7      Q.    And so you don't know what access
8 Cornerstone had to CCA's internal documents,
9 correct?
10      A.    Again, as I said, my instructions to
11 Cornerstone were to -- to provide me with the
12 best and most complete and available information.
13 And I believed that they did. And I found that
14 what they did provide was very useful and -- and
15 very helpful in arriving at the opinions that I
16 arrived at.
17      Q.    What is your basis for your belief
18 that they did provide the most complete and
19 available information if you don't know the
20 process by which Cornerstone obtained CCA's
21 internal documents?
22        MS. GRANT: Object to the form.
23        THE WITNESS: I'm sorry. Who's
24 the -- who is the they in your question?
25 Is it CoreCivic or Cornerstone?

1        BY MS. RADCLIFFE:
2      Q.    Let me repeat it:
3        What is your basis for your belief
4 that Cornerstone did provide the most complete
5 and available information if you don't know the
6 process by which Cornerstone obtained CCA's
7 internal documents?
8      A.    As I said --
9        MS. GRANT: Objection.
10        THE WITNESS: As I said, I've had
11 the same -- I've had a -- a good
12 relationship with Cornerstone in the past.
13 One of my -- my instructions to them were
14 to -- to get me the most complete and the
15 best available information. I believed
16 that they would, based on my experience
17 with them, based on the information that
18 they had provided early in the engagement.
19        And, again, the key point is that I
20 felt comfortable with the information that I
21 was provided to be able to arrive at the
22 opinion that I arrived at in a way that I
23 felt was thorough and -- and comprehensive
24 and befitting my expertise.
25

1        BY MS. RADCLIFFE:
2      Q.    So you don't understand the
3 relationship between Cornerstone and CCA with
4 respect to what internal documents CCA provided
5 Cornerstone; is that accurate?
6        MS. GRANT: Object to the form and
7 foundation.
8        THE WITNESS: Again, you're asking
9 me to -- you're asking me to characterize
10 a relationship between a party that I
11 worked with and a party that I did not
12 work with directly. So I -- I'm reticent
13 to say I -- I don't understand because I'm
14 simply saying that my relationship was
15 with Cornerstone.
16        And if you're asking me to
17 characterize Cornerstone's relationship with
18 CoreCivic, that's -- again, my relationship
19 was with Cornerstone.
20        BY MS. RADCLIFFE:
21      Q.    But it's entirely possible that CCA
22 did not provide Cornerstone with contradictory
23 information to your report or with documents that
24 might change your opinion; is that --
25        MS. GRANT: Object to form.

Case 3:16-cv-02267     Document 359-2     Filed 11/20/20     Page 20 of 125 PageID #: Page 69..72
13023
www.aptusCR.com

1          BY MS. RADCLIFFE:
2      Q.   -- correct?
3          MS. GRANT:  Sorry.
4          THE WITNESS:  I -- I think -- I
5    think lots of things are possible.  I'm
6    hesitant to comment on something that may
7    or may not be possible in CoreCivic's
8    relationship with Cornerstone.
9          BY MS. RADCLIFFE:
10     Q.   So you agree that it's possible, you
11   just don't know one way or another; is that
12   accurate?
13         MS. GRANT:  Object to the form,
14   foundation.
15         THE WITNESS:  Again, I --
16   respectfully I -- I don't agree with that.
17   And I've -- I've done the best job that I
18   can do in -- in characterizing for you my
19   relationship with Cornerstone, which,
20   again, was -- in my view, through that
21   relationship I was able to get the
22   information from CoreCivic that I needed
23   to be able to arrive at a thorough and
24   comprehensive and well-informed expert
25   opinion.

1          BY MS. RADCLIFFE:
2      Q.   But what I'm asking is, it's possible
3    that CCA did not provide Cornerstone with
4    information that is contradictory to your part?
5          MS. GRANT:  Object to form and
6    foundation.
7          THE WITNESS:  And again, I can't
8    speak to what is or is not possible in
9    Cornerstone's relationship with CoreCivic.
10         BY MS. RADCLIFFE:
11     Q.   Thank you.
12         MS. GRANT:  Willow, is now a good
13   time for a break?  We've been going for
14   about an hour and 40 minutes, hour and a
15   half.
16         MS. RADCLIFFE:  Sure.
17         (Remote transmission interference)
18         MS. RADCLIFFE:  We can do --
19         VIDEO OPERATOR:  So you guys want
20   to go off the record?
21         MS. RADCLIFFE:  10 minutes.
22         Yes, we can go off record.
23         VIDEO OPERATOR:  Okay.  The time is
24   10:05 a.m. and we are now off the record.
25

1          (Thereupon, a brief recess was
2    taken.)
3          VIDEO OPERATOR:  Okay.  The time is
4    10:19 a.m. and we are back on the record.
5          BY MS. RADCLIFFE:
6      Q.   Going back to your CV, which is
7    Exhibit A to your report -- or Appendix A --
8    excuse me -- do you have any updates to your CV
9    since it was dated in July of 2020?
10     A.   Nothing -- nothing especially
11   important.  There's another conference
12   presentation or two, that sort of thing, but
13   no -- no new publications or anything else that
14   might be especially relevant.
15     Q.   And if you turn to page 2 of your CV,
16   do you see that there is a list of journal
17   articles?
18     A.   I do.  Actually -- so I printed --
19   would you -- would -- would they mind putting
20   Appendix A up?
21     Q.   Sure.
22         MS. RADCLIFFE:  If the videographer
23   can -- if you go in the chat, I think the
24   document is there and you click on it and
25   then you'd have to scroll to Appendix A.

1          VIDEO OPERATOR:  I'm not seeing an
2    appendix -- do you know the tab number?
3          MS. RADCLIFFE:  It's tab 1 he has
4    to open and he has to --
5          VIDEO OPERATOR:  Okay, tab 1.  I've
6    got tab 1.
7          And then page number?
8          MS. RADCLIFFE:  Let's see.  It's
9    Appendix A.  It's going to be in the back.
10         VIDEO OPERATOR:  Let's see.  I'll
11   go around 50.  And should I just -- no,
12   that's Appendix B.
13         MS. RADCLIFFE:  And then it will be
14   right before that.
15         VIDEO OPERATOR:  Here we are, right
16   here.
17         THE WITNESS:  Okay.  Thank you.
18         VIDEO OPERATOR:  Yes, sir.
19         BY MS. RADCLIFFE:
20     Q.   Okay.  So we're going to turn to
21   page 2 of Appendix A.
22         And do you see here a listing of
23   journal articles?
24     A.   Yes.
25     Q.   Okay.  Were any of these articles

1   peer reviewed?

2     A.   Yes.

3     Q.   **Which ones?**

4     A.   All of them on that page.

5     Q.   **Okay. And were those double blind**

6 **peer reviews?**

7     A.   To the best of my knowledge, yes.

8 There -- editors of some of these journals you

9 have different review processes. But, to my

10 knowledge, all of them were traditional double

11 blind peer review, yes.

12     Q.   **And that would include, for example,**

13 **that the underlying assumptions and data were**

14 **fact-checked by the peer reviewers?**

15     A.   Well, you know, peer review can --

16 peer review is going to depend on lots of

17 different factors: the specific claims made in

18 the article, the specific data made available in

19 that article or specific data that that analysis

20 relied upon.

21     I think the extent of -- the extent

22 and the types of analysis that a reviewer does on

23 a journal article can vary, you know,

24 considerably.

25     Q.   **And I will say that with respect to**

1 **the -- the journal articles listed on this page,**

2 **there's several, for example, from the Municipal**

3 **Finance Journal.**

4     **Do you have an understanding of what**

5 **their peer review process was?**

6     A.   Generally speaking, yes, I -- as I

7 understand it, that is a -- a -- a

8 peer-reviewed -- a double blind, peer-reviewed

9 journal process.

10     They, as I understand it, have also

11 on occasion run symposia and -- and other kinds

12 of publications or other kinds of -- they've --

13 they've published other kinds of proceedings, but

14 where they've published proceedings that are not

15 peer-reviewed, it's made clear in some way,

16 whether it's a -- conference proceedings or a

17 practitioner commentary or whatever might be --

18 that -- that journal is one of several where, you

19 know, there's different types of submissions and

20 the -- the nature of the submission and peer

21 review process that the submission underwent

22 is -- is made clear somewhere in the journal.

23     Q.   **And do you have an understanding that**

24 **the Municipal Finance Journal is a member of**

25 **COPE, C-O-P-E?**

1     A.   I'm not familiar with COPE. Can you

2 tell me what that is?

3     Q.   **Sure.**

4     **COPE provides guidelines in terms of**

5 **journal reviews. Let me see if I can tell you**

6 **exactly what it stands for.**

7     **Committee on Publication Ethics.**

8     A.   Oh, okay. Yes, I'm -- now I'm

9 familiar with -- with what you mean by COPE, yes.

10     Q.   **Okay. And do you have an**

11 **understanding that -- that Municipal Finance**

12 **Journal was a -- a member of COPE or is -- still**

13 **is?**

14     A.   I -- I --

15     Q.   **If you don't know, that's fine. I**

16 **can rephrase the question to ask would you be**

17 **surprised to find that the Municipal Finance**

18 **Journal was a -- a member of COPE?**

19     A.   Would I be surprised. I -- I'm -- so

20 I -- I'm not sure that I would be surprised one

21 way or another. If you're asking if I was -- if

22 I was aware that they were a member, no, I was

23 unaware. But I am familiar with -- as a journal

24 editor myself, I'm familiar with some of COPE's

25 activities.

1     MS. RADCLIFFE: Okay. If we could

2 turn to page 3. Yeah. And if -- if you

3 turn -- I think that's page 4. Go up a

4 page. There you go.

5     BY MS. RADCLIFFE:

6     Q.   **Do you see here there are additional**

7 **journal articles listed on your CV?**

8     A.   Yes.

9     Q.   **Okay. Do you understand that the**

10 **articles listed here were peer-reviewed?**

11     A.   To my knowledge, everything listed

12 there was peer-reviewed, yes.

13     Q.   **And, to your knowledge, were those**

14 **double blind peer reviews?**

15     A.   Again, to my knowledge, yes.

16     Q.   **Okay.**

17     MS. RADCLIFFE: And if we could

18 turn to the next page.

19     BY MS. RADCLIFFE:

20     Q.   **There's a -- a -- a Lilley journal**

21 **entry at the top. Do you understand that**

22 **journal -- journal article to have been**

23 **peer-reviewed?**

24     A.   Yes.

25     Q.   **And, to your knowledge, was that a**

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 81

1  double blind peer review?
2      A.    To my knowledge, yes.
3      Q.    What's the importance -- let me
4  rephrase that.
5              What's your understanding of -- of
6  why a journal article would have a double blind
7  peer review?
8      A.    Well, it depends on the specific
9  editorial guidelines and editorial objective of
10  the journal in question.  Journal editors will
11  employ peer reviewers in sometimes slightly
12  different ways.  They'll put different kinds of
13  questions to peer reviewers.  They'll -- the
14  nature of the recommendation that they ask for
15  from a peer reviewer can vary.
16              Some journal editors ask peer
17  reviewers to make a specific recommendation about
18  whether an article should be published or not.
19  Some don't.  Some simply ask for the -- the
20  reviewer's comments on the paper.  Some have very
21  detailed, specific questionnaires that they --
22  that they request from reviewers.  Others request
23  just more general comments.
24              So peer reviewers -- the specific
25  work of peer review and the specific types of --

Page 82

1  of questions that are put to peer reviewers can
2  vary a lot, depending on the journal editor's
3  preferences and what the journal's editorial
4  mission is.
5              So we'd have to -- you know, to -- to
6  talk about why a double blind review is
7  important, we'd need to talk a little bit more
8  specifically about what a particular journal is
9  trying to accomplish.
10      Q.    So let's take, for example, a --
11  scholarly journals.
12              Do you have any understanding with
13  regards to the rigor of which -- for example, at
14  the University of Chicago, where you teach, as to
15  the peer-review process with respect to journal
16  articles published through the University of
17  Chicago?
18      A.    I'm not sure I follow the question
19  there.  So maybe I -- can you help me out?
20              So start with -- when you say
21  scholarly articles or scholarly journals, do you
22  have a definition in mind, what --
23      Q.    For example -- so, for example, let's
24  just take the University of Chicago.
25              Do you have an understanding of what

Page 83

1  its peer-review process is with respect to
2  journal articles, if it has one?
3      A.    So the University of Chicago
4  publishes, to my knowledge, somewhere in the
5  neighborhood of a dozen scholarly journals in
6  economics and law, in a variety of areas.  And
7  each of those journals is run by an editor and an
8  editorial board.  And many of them are connected
9  to professional associations independent of the
10  university.
11              The fact that the University of
12  Chicago hosts a journal does not necessarily mean
13  that the university is imposing its own scholarly
14  standards for peer review or rigor, as you said,
15  on a journal editor.  So I'm -- I think equating
16  a -- a scholarly journal with a university is --
17  is a -- is a stretch, because journals have all
18  kinds of different relationships with
19  universities, depending on the nature of the
20  journal and its editorial aims.
21      Q.    Okay.  I think it -- a little bit
22  broader is my question, is that do you understand
23  that the various journals from the University of
24  Chicago have guidelines with respect to their
25  peer-review process?

Page 84

1              MS. GRANT:  Object to the form.
2              THE WITNESS:  Yeah, and again, I --
3  I -- I -- I think you -- I think you -- I
4  don't know that it -- it can be as general
5  as you're asking the question.
6              The University of Chicago is a -- is
7  a top-rated institution.  The journals that
8  it hosts are, by and large, very
9  well-regarded.  I can't speak to specific
10  outlets because I'm not on those editorial
11  boards or I've not been an editor of -- of
12  those specific publications that we might
13  be -- that -- that may or may not be in
14  question here.
15              So that said, I know that many of the
16  journals that are published that are housed
17  at the University of Chicago, meaning their
18  editorial home is there -- the Journal of
19  Law and Economics as an example, the Journal
20  of Political Economy, which, as I recall, is
21  still housed at the University of Chicago --
22  have extraordinarily high standards for
23  rigor and peer review.
24              BY MS. RADCLIFFE:
25      Q.    And turning back to your CV --

1    MS. RADCLIFFE:  If you could turn
2  to page 13 of the CV, please.
3    BY MS. RADCLIFFE:
4    **Q.    And before that, I -- I just want to**
5  **ask you one question:**
6    **None of the journal articles listed**
7  **in your CV relate to correctional facilities**
8  **directly; is that correct?**
9    MS. GRANT:  Object to the form.
10    THE WITNESS:  I think a lot of the
11  work that I've done is related to
12  correctional facilities.  The --
13    BY MS. RADCLIFFE:
14    **Q.    I --**
15    A.    The very first article --
16    MS. GRANT:  Willow, if you can let
17  him finish.
18    THE WITNESS:  The very first
19  article listed under peer-reviewed
20  publications is a -- is a review of
21  Washington State's budgeting.  In the
22  course of studying state budgeting,
23  corrections budgets for the state are an
24  important component of that.  So a lot of
25  my work has a relationship with

1  corrections and -- and prisons generally.
2    BY MS. RADCLIFFE:
3    **Q.    I -- I guess -- maybe I'm reading it**
4  **backwards, but the first article I have listed**
5  **here is the Great Reckoning: Seattle's Budgeting**
6  **Post-COVID.**
7    A.    Oh.  My apologies.  Then it would be
8  the --
9    THE WITNESS:  If you wouldn't mind
10  scrolling up, make sure I get that.
11  Thanks for correcting that.  I'm sorry.
12  But go --
13    BY MS. RADCLIFFE:
14    **Q.    Page 2 of -- of the CV.**
15    A.    Yeah, right.  So it would be journal
16  article number 29, so the second one listed
17  there.
18    **Q.    So that's COVID-19's Impact on**
19  **Washington State's Budget?**
20    A.    Correct.
21    **Q.    Okay.  And -- and I understand your**
22  **testimony that there's a relationship, but -- but**
23  **none of these journal articles appear to be**
24  **focused on correctional facilities.**
25    MS. GRANT:  Object to the form.

1    THE WITNESS:  I'm not quite sure
2  what you mean by focused, but if -- if by
3  focused you mean the analysis is
4  exclusively looking at prisons, then --
5  then that's correct.  There's nothing on
6  the CV that has -- has focused
7  specifically on -- on -- on the topic as
8  you described it.
9    BY MS. RADCLIFFE:
10    **Q.    Thank you.**
11    MS. RADCLIFFE:  Okay.  If we can go
12  back to page 13 of the CV.
13    BY MS. RADCLIFFE:
14    **Q.    Under Expert Witness and Consulting,**
15  **it says, Admitted expert witness, Daubert**
16  **standard, on governing budgeting -- government**
17  **budgeting, finance and capital markets.**
18    **What case were you admitted or cases?**
19    A.    So the -- the testimony in the
20  Snohomish matter that I mentioned was -- I didn't
21  testify in that case, but was deposed and -- and
22  that report was -- was submitted.
23    **Q.    So the report was submitted.  Do you**
24  **know whether or not a court actually ruled on**
25  **whether or not your report and opinion satisfied**

1  the Daubert standard?
2    A.    In that particular case it -- it did.
3  There was a -- there was a -- yeah, it did.
4    **Q.    And do you know if the court has**
5  **agreed with your expert opinion in that matter?**
6    MS. GRANT:  Object to the form.
7    THE WITNESS:  I can't speak to
8  that.  I'm not -- it's been a while since
9  I looked at that ruling, so I can't speak
10  to how the court characterized my
11  analysis.
12    BY MS. RADCLIFFE:
13    **Q.    You understand that there's competing**
14  **experts in that case for the other side?**
15    A.    In the Snohomish matter?
16    **Q.    Yes, sir.**
17    A.    Yes.
18    **Q.    Okay.  Do you know if any of their**
19  **opinions have also been upheld under the Daubert**
20  **standard?**
21    A.    Yes, I -- I believe -- I can't recall
22  the specifics, but I know that at least one of
23  the expert reports in that matter were, yes.
24    **Q.    Okay.  So other than the Snohomish**
25  **matter, there aren't any other cases, to your**

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 24 of 125 PageID #: Page 85..88
3094
www.PohlCR.com

Page 89

1    knowledge, where the court has upheld your expert
2    opinion under the Daubert standard; is that
3    accurate?
4          MS. GRANT:  Object to the form.
5          THE WITNESS:  The -- I mentioned
6    here and also on my list of testimony that
7    I've participated in some SEC enforcement
8    actions where I provided expert testimony.
9    And, again, I -- I can't recall the
10   specifics of -- of how my analysis was or
11   was not referenced in the -- in the ruling
12   in that -- in some of those matters.
13         But, to my knowledge, in a -- in a
14   federal court ruling specifically, that's
15   correct.  That's -- the -- the Snohomish
16   matter is, to my knowledge, the only
17   instance where an expert report of mine has
18   been admitted under the Daubert standard.
19         BY MS. RADCLIFFE:
20   Q.    Okay.  So that would mean that --
21   that -- and -- and you understand that matter to
22   be in Federal District Court; is that correct?
23   A.    Yes.
24   Q.    Okay.  And so with respect to state
25   courts, you have not had any expert opinions

Page 90

1    upheld under the Daubert standard; is that
2    correct?
3          MS. GRANT:  Object to form and
4    foundation.
5          THE WITNESS:  I have some -- I have
6    done expert reports in state matters.
7    And, again, I -- to the best of my
8    recollection, there -- there were not
9    Daubert challenges.  And, again, I can't
10   speak to -- from memory what the -- how
11   the court characterized my testimony in
12   that case.
13         BY MS. RADCLIFFE:
14   Q.    Do you recall one where another --
15   whether your -- your testimony was ever -- became
16   an issue before the court or whether those
17   actions may have settled or otherwise been
18   disposed of without considering your expert
19   report?
20         MS. GRANT:  Object to the form.
21         THE WITNESS:  What -- what would
22   you mean by at -- at issue?
23         BY MS. RADCLIFFE:
24   Q.    So, for example, you -- you don't
25   know whether or not in those state court actions

Page 91

1    your expert reports were challenged under a
2    Daubert standard or something similar?
3    A.    I'm not -- I'm just saying from my
4    recollection of how the court -- of how that
5    report was submitted and -- and how -- and what
6    the -- the resolution of those cases were, to my
7    knowledge, there was -- there was not any -- any
8    challenge or any issue with -- with the testimony
9    that I provided.
10   Q.    What -- what was the matter?
11   A.    So the state court matter that I'm
12   describing there is -- is something that's
13   ongoing right now.  That's the Franklin County
14   Public Utility District case.
15   Q.    And where is that pending?
16   A.    That's in state court in Washington
17   State.
18   Q.    Okay.  And then are there any other
19   state court actions where you've submitted expert
20   reports?
21   A.    Not that I can recall.
22   Q.    Okay.  And then there's a reference
23   to SEC civil enforcement actions.
24         How many, approximately?
25   A.    Once.  Well, actually, technically --

Page 92

1    I take that back.
2          By actions, what I mean there is
3    there was one matter that I was involved with
4    that progressed through multiple stages of -- of
5    the SEC's enforcement process.
6          So I provided testimony early, in
7    fact, before -- as I recall, even before SEC
8    staff had -- had brought a formal complaint.  And
9    then I provided testimony later, after a
10   formal -- provided different testimony on a
11   different question after that, after a -- a
12   formal complaint had been written against that
13   defendant.
14   Q.    And what was the nature of your two
15   opinions with respect to this SEC civil
16   enforcement action?
17   A.    In -- those were cases where I was
18   doing analysis of -- or a -- I should say a case
19   or -- or actions where I was doing analysis of
20   the pricing of municipal securities.
21   Q.    Okay.  And with regards to the
22   Franklin County public matter, what was the
23   nature of your opinion in that case?
24   A.    Which matter, I'm sorry?
25   Q.    Franklin County public matter.

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1     A.    Right.  So in that one, that's a -- a
2   cost analysis.  What I'm doing in that case is
3   I've been asked to evaluate claims made against
4   the Franklin County Public Utility District.  And
5   those claims are that the utility district has
6   been discriminatory in its pricing practices.
7         And so I'm working for the utility.
8   And what I'm doing is an analysis of its cost
9   accounting practices, because its cost accounting
10  practices are partly at issue in the pricing
11  practices that have been called discriminatory by
12  plaintiffs in that case.
13    Q.    Okay.
14        MS. RADCLIFFE:  Can you turn to
15  Exhibit -- Appendix B of this document.
16        BY MS. RADCLIFFE:
17    Q.    Do you see here this indicates your
18  testifying experience from 2015 to 2020?
19    A.    Correct.
20    Q.    And the -- the City of Ferguson
21  matter, you submitted an expert report?
22    A.    Yes, although that report was just
23  submitted, like within the last couple days.
24    Q.    Okay.  And -- and what is the -- the
25  nature of your opinion in that case?

1     A.    In that case I'm working for
2   plaintiffs and plaintiffs in that matter are
3   bringing suit against the City of Ferguson.
4         What I'm analyzing is whether the
5   City of Ferguson's practices with respect to the
6   collection of municipal court fines and fees
7   amounted to a -- a de facto policy.
8     Q.    Okay.  And then the next case listed
9   here is -- is this the Snohomish County matter
10  that we've been talking about?
11    A.    It is.
12    Q.    Okay.  Just so we have the
13  terminology right.  The Tulalip tribes, which
14  I'll spell, T-U-L-A-L-I-P, it -- just so the
15  record's clear, that -- that was referring to the
16  Snohomish matter that we discussed earlier?
17    A.    That's correct.  Yeah, sorry for any
18  confusion on that.
19    Q.    And then this Securities and Exchange
20  Commission investigation, is this the same
21  investigation that you spoke of earlier that you
22  provided two opinions?
23    A.    Correct.
24    Q.    Okay.  And then you have two cases
25  listed against BounceBack.

1     Who did you represent in those cases?
2     A.    Well, I guess I -- I worked for
3   BounceBack in those matters.  Those are two --
4   essentially the same case in two federal courts.
5   I worked for -- BounceBack is a -- or at least at
6   the time was a provider of debt collection and
7   credit counseling services.
8         And BounceBack had been hired by
9   county prosecutors in several states as their
10  contractor, as their -- as their private provider
11  of debt collection and credit counseling
12  services.
13        And BounceBack had been sued.  And
14  I -- I offhand can't remember the exact, you
15  know, nature of the -- of the complaint against
16  them, but in that matter I did, again, a cost
17  analysis and what I was asked to do was to
18  evaluate the cost of BounceBack providing debt
19  collection and credit counseling services to --
20  the costs had -- county prosecutors had to
21  deliver those services using in-house provisions.
22    Q.    And do you see how in Appendix B that
23  you've listed five matters?
24    A.    Correct.
25    Q.    Okay.  If you could turn back to --

1   and -- and -- and just so we're clear, it's
2   five -- five matters between 2015 and 2020.
3         MS. RADCLIFFE:  If you could turn
4   back to page 13 of your CV.
5         VIDEO OPERATOR:  Do you want me --
6   page 13 of Appendix A, right?
7         MS. RADCLIFFE:  Yes.  Thank you.
8         VIDEO OPERATOR:  Yes, sir -- yes,
9   ma'am.
10        BY MS. RADCLIFFE:
11    Q.    Under the Expert Witness and
12  Consulting, there's a reference to 15 cases since
13  2014.
14        So what other 10 cases occurred in
15  2014 that were not listed on your Appendix B?
16    A.    Those are cases where I've been
17  retained, but have either not provided a formal
18  expert report or -- yeah.  I think in every one
19  of those it's -- I've provided analysis or a
20  report that was, for whatever reason, not
21  submitted as a -- as a formal expert report.
22    Q.    Have you ever had a party who
23  retained you for purposes of serving as an expert
24  witness in a court case or in a civil enforcement
25  action disagree with your report?

Page 97

1      MS. GRANT:  Object to the form.
2      THE WITNESS:  I guess that depends
3  on what you mean by -- by disagree.
4  Disagreement can -- can take many forms.
5      BY MS. RADCLIFFE:
6      Q.    I'll rephrase.
7          Have you ever had a party who
8  retained you for purposes of serving as an expert
9  witness in a court case or in a civil enforcement
10  action disagree with your expert opinion?
11      MS. GRANT:  Object to form.
12      THE WITNESS:  Again, I'm not --
13  disagreement with an opinion could take a
14  variety of forms.  Can you -- can you be
15  any more specific?
16      BY MS. RADCLIFFE:
17      Q.    I'll be -- have you ever had a party
18  who retained you for purposes of serving as an
19  expert witness in a court case or in a civil
20  enforcement action decline to submit your expert
21  opinion on the basis that they disagreed with it?
22      MS. GRANT:  Object to form.
23      THE WITNESS:  So -- well, the
24  simple answer to that question is no, I've
25  never had -- I've never been retained and

Page 98

1  had testimony that I had provided not
2  submitted for -- for whatever reason,
3  regardless of disagreement about the
4  substance of the opinion.
5      MS. RADCLIFFE:  We're going to turn
6  back to Appendix C.
7      VIDEO OPERATOR:  You said C as in
8  cat?
9      MS. RADCLIFFE:  Yes.
10      BY MS. RADCLIFFE:
11      Q.    On -- on page 3 there's a listing of
12  Research Articles and Other Publications.  And
13  that continues, it appears, on the next page.
14          Do you see that?
15      A.    Yes.
16      Q.    Who -- who chose those articles to be
17  reviewed in connection with this litigation?
18      A.    I had -- at the start of the
19  engagement, I was aware of several articles that
20  were -- that I believed would be relevant.
21          As I was working through the early
22  stages of familiarizing myself with the -- with
23  the -- you know, the broad landscape of the
24  private corrections industry and some of the
25  specific issues in this case, I had directed

Page 99

1  Cornerstone to -- to help me to find other
2  literature that was related to the kinds of
3  literature that I had highlighted for -- for them
4  as literature that I thought would be especially
5  important.  And so from there, we -- we went back
6  and forth around finding literature and
7  identifying literature that -- that I thought
8  would be relevant and ultimately then made its
9  way into the report.
10      Q.    Of the research articles listed here
11  in the documents you relied on, which are the
12  ones that you recall initially being aware of?
13      A.    I was -- again, as I -- to the best
14  of my recollection, I was familiar with the Abt
15  study, that's the -- where is that here -- yeah,
16  the -- the -- the two Douglas McDonald pieces.
17          Abt Associates is a -- you know,
18  organization that -- that does policy analysis
19  and does policy analysis in a variety of areas.
20  So I -- I believe I -- if I recall correctly, I
21  had seen a presentation, perhaps, that they --
22  that somebody from Abt Associates had done on --
23  on this work or work related to this at a
24  professional conference, the Association for
25  Public Policy Analysis and Management.

Page 100

1      Again, to -- to the best of my
2  recollection, that's where I -- I saw it.  So I
3  was aware that -- that they had done some work in
4  this space.  And so that was one of the first
5  pieces that I knew to look for as I started to do
6  some of the background work for this engagement.
7      Q.    Any others that you recall
8  becoming -- being aware of initially?
9      A.    I was familiar with certainly some of
10  the -- some of the specific outlets, Criminal
11  Justice Policy Review in particular.  So I was --
12  was aware that there were, you know, journals
13  that were looking at these issues.  So I made a
14  point of it to -- to look in some of those
15  journals as well early on.
16      Q.    Okay.  Thank you.
17          Do you see in this list that you cite
18  to a Hakim, Simon and Erwin A. Blackstone article
19  entitled Prison Break: A New Approach to Public
20  Cost and Safety?
21      A.    Yes.
22      Q.    Okay.  And do you also see that you
23  cite to a Hakim and Blackstone April 29, 2013
24  working paper?
25      A.    Yes.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 27 of 125 PageID    Page 97..100
12005
www.uslegalCR.com

1     Q.    Okay.  And -- and you relied on both
2  of those documents?
3          MS. GRANT:  Object to form.
4          BY MS. RADCLIFFE:
5     Q.    Is that correct, you relied on them?
6     A.    I -- I cite them in the -- in -- in
7  the report and so they -- they informed my -- my
8  thinking.
9     Q.    And -- and who provided you those
10 documents?
11         A.    I don't recall when -- when those
12 specific studies here.  I don't recall if that
13 was something I came across or something that
14 Cornerstone had -- had suggested at my direction.
15 So I -- I -- offhand I'm not -- I'm not sure.
16    Q.    Okay.
17         MS. RADCLIFFE:  Go ahead and put
18 that exhibit aside.  And if you could pull
19 up tab 79, please.
20         And we're going to mark tab 79 as
21 Exhibit 549.
22         (Thereupon, Marlowe Exhibit
23         Number 549 was marked for
24         identification.)
25         MS. GRANT:  Is it possible to send

1  this document through the chat so people
2  can look through it in full?
3          VIDEO OPERATOR:  Yes, I can send
4  it.  Just give me one moment.
5          All right.  Here we are.  I'll send
6  it right now.
7          There you are.
8          BY MS. RADCLIFFE:
9     Q.    So Mr. Marlowe, at the bottom of the
10 first page you're going to see a -- a -- kind of
11 a stamp and it has your name, an underscore and
12 some numbers.  And you may recall your counsel or
13 someone else asking you to -- to produce some
14 documents in your possession.  And it is our
15 understanding that these were the documents in
16 your possession and that's why they reflect those
17 stamps.
18         So do you recognize this as the study
19 that -- that you relied on in connection with
20 forming your opinion?
21         MS. GRANT:  Object to form.
22         THE WITNESS:  I -- I certainly
23 recognize the study, yes.
24         BY MS. RADCLIFFE:
25    Q.    And -- and -- and that is the study

1  that is listed that we just saw on Appendix C to
2  your report?
3          MS. GRANT:  Just to be clear, it's
4  one of the studies that you were talking
5  about before.
6          MS. RADCLIFFE:  That's fine.  It's
7  one of the studies.
8          If you turn to the -- the contents
9  page, which is the third page in of the --
10 the document.
11         There you go.  Hold on.  Okay.
12         BY MS. RADCLIFFE:
13    Q.    And if you look at the bottom of
14 that, do you see there that it says, The authors
15 of the study were partially funded by members of
16 the private corrections industry and then No
17 other funding was provided?
18    A.    Yes, I see that.
19    Q.    Okay.  Are you familiar with the
20 independent -- or the Independent Institute?
21    A.    If by familiar you mean I've -- I
22 have heard of them and am familiar with some of
23 their research, yes.
24    Q.    Okay.  And do you know what their
25 peer-review process is?

1     A.    Well, again, I think like with any
2  publication, the -- the peer-review process might
3  vary, depending on the -- the editorial goal, the
4  editorial mission of that organization.
5          So peer-review process has many
6  different variations.
7     Q.    Sorry, I didn't mean to cut you off.
8          So did you undertake any effort to
9  understand the editorial goal of the Independent
10 Institute?
11         A.    Again, I was familiar at the outset
12 with what the Independent Institute -- what --
13 what this -- you know, what this -- I was
14 familiar with that organization and certainly was
15 familiar with -- after reviewing this was
16 familiar that they had done some -- some research
17 in the space.
18         Independent analysis or independent
19 effort to understand the specific editorial
20 policy, no.  I mean, as I recall, I -- I -- I did
21 not specifically go for these particular
22 publications and try to understand -- try to find
23 a statement of editorial goals or to understand
24 the -- the -- specific editorial aims that
25 they had in making these -- these publications.

1    Q.    Okay.  Do you know who a Mr. Steve
2  Owens is at Corrections Corp.?
3    A.    As I -- as I sit here today,
4  that's -- that's not a name that sounds
5  immediately familiar.
6    Q.    Okay.  Are you -- so you didn't
7  interview Mr. Owens in preparing your expert
8  report?
9    A.    That's correct.
10    Q.    Okay.  Are you familiar with one of
11  CCA's public relations firms, Hillenby?
12    A.    Am I familiar -- no, that's not a --
13  a name that sounds familiar.
14    Q.    Okay.  So it's fair to say you didn't
15  interview anyone at -- at Hillenby in preparing
16  the expert report?
17    A.    That's correct.
18    Q.    And the -- the article we just looked
19  at, that was written by Simon Hakim and Erwin
20  Blackstone; is that accurate?
21    A.    Yes.
22    Q.    Okay.
23        MS. RADCLIFFE:  Could we pull up
24    tab 54, please.
25        VIDEO OPERATOR:  You said 54,

1  correct?
2        MS. RADCLIFFE:  54.
3        VIDEO OPERATOR:  54.
4        I don't know if I have a 54 here.
5  I'm seeing 53 and 55.  I don't have a 54.
6        MS. RADCLIFFE:  Oh, I see.  You're
7    right about that.  Hold on one second.
8  Sorry for my inability.
9        VIDEO OPERATOR:  No, you're fine.
10    Should we -- should we stay on the record?
11        MS. RADCLIFFE:  Yep.  It will just
12    take me one second.
13        VIDEO OPERATOR:  Okay.
14        MS. RADCLIFFE:  Okay.  It's 53.
15    Apologize.
16        VIDEO OPERATOR:  Okay.  Awesome.  I
17    have 53.
18        Okay.  There we go.
19        MS. RADCLIFFE:  And we'll mark that
20    as Exhibit 550.
21        (Thereupon, Marlowe Exhibit
22        Number 550 was marked for
23        identification.)
24        BY MS. RADCLIFFE:
25    Q.    Do you recognize this document,

1  Mr. Marlowe?
2        MS. GRANT:  Can we also send that
3    through the chat, please?
4        VIDEO OPERATOR:  Yes, ma'am.  Let
5    me get this ready for you.
6        MS. GRANT:  Thank you.
7        VIDEO OPERATOR:  Let me -- okay.
8        There you go.
9        BY MS. RADCLIFFE:
10    Q.    Mr. Marlowe, do you recognize what's
11  been marked as Exhibit 550 to be the working
12  paper referenced in Appendix C to your report by
13  Simon Hakim and Erwin Blackstone?
14    A.    Yes.
15    Q.    And that's dated April 29, 2013?
16    A.    Yes.
17    Q.    Okay.
18        MS. RADCLIFFE:  You can go ahead
19    and put that aside.  If you could pull up
20    tab 85, please.
21        VIDEO OPERATOR:  Okay.
22        (Thereupon, Marlowe Exhibit
23        Number 551 was marked for
24        identification.)
25

1        BY MS. RADCLIFFE:
2    Q.    So you -- you would not have seen
3  this document, perhaps, before.  So I guess I
4  should ask you:
5        Have you reviewed documents between
6  Drs. Hakim and Blackstone and anyone at CCA?
7    A.    No.
8    Q.    What about E-mails between
9  Drs. Blackstone and -- and Hadim (sic) to CCA's
10  PR firm, Hillenby?
11    A.    No.
12    Q.    Okay.  Do you see in this document
13  that there's a reference to a CCA influencer
14  meeting with Drs. Hakim and Blackstone?
15    A.    In the first bullet point?
16    Q.    Yes.
17    A.    Yes.
18    Q.    Okay.
19        MS. RADCLIFFE:  Okay.  You can go
20    ahead and put that aside.
21        BY MS. RADCLIFFE:
22    Q.    Oh, let me just ask you one thing.
23  The -- the E-mail is to Tony Grande.
24        Do you know Tony Grande from CCA?
25    A.    No.

1      Q.    Okay.  So were you aware that Tony
2  Grande has been the executive vice president and
3  chief development officer of CCA since 2008?
4          MS. GRANT:  Object to the form.
5          THE WITNESS:  I'm aware of it now.
6      BY MS. RADCLIFFE:
7      Q.    Fair enough.
8          Prior to today you were not aware; is
9  that fair to say?
10     A.    That's fair.
11     Q.    Okay.
12         MS. RADCLIFFE:  If you could pull
13     up tab 80, which we'll mark as
14     Exhibit 552.
15             (Thereupon, Marlowe Exhibit
16         Number 552 was marked for
17         identification.)
18         MS. GRANT:  And can you send this
19     through the chat so the witness can
20     actually review the document?
21     BY MS. RADCLIFFE:
22     Q.    So what's been marked as Exhibit 552
23 is an E-mail from a Katie Lilley at Hillenby to
24 Drs. Hakim, Blackstone, as well as a Mr. Andrew
25 Buck and a Steve Owen from CCA and Rob Hoppin

1  from Hillenby.
2          I take it you haven't seen this
3  document before, Mr. Marlowe?
4          MS. GRANT:  Well, he's -- sorry, it
5      still hasn't come through the chat.  And
6      if you're going to fairly ask -- I think
7      this document is fairly long, so --
8          MS. RADCLIFFE:  Well, it's really
9      only going to be concentrated on the first
10     two pages.
11         MS. GRANT:  He should still have a
12     chance to review any document that you're
13     asking him about, in fairness.
14         MS. RADCLIFFE:  If he feels he
15     needs to based on the questions.
16     BY MS. RADCLIFFE:
17     Q.    Let me know when you have the
18 document.
19     A.    Okay.  I have it.
20     Q.    Okay.  So Mr. Marlowe, I take it you
21 have not seen this E-mail before; is that
22 correct?
23     A.    As I -- I -- I don't recall seeing
24 this, no.
25     Q.    Okay.  Do you see that Ms. Hillenby

1  is sending in reference to the first item listed,
2  is Please send us the references or the actual
3  reports on the agenda driven and PPP studies.
4          Do you see that?
5          MS. GRANT:  Object to form.  I
6      think it's anti-PPP studies.
7          MS. RADCLIFFE:  Oh.  My apologies.
8      BY MS. RADCLIFFE:
9      Q.    It is agenda driven anti-PPP studies.
10         And you see that language,
11 Mr. Marlowe?
12     A.    This is in the -- the --
13     Q.    Very first, number 1.
14     A.    Okay.  I see that, yes.
15     Q.    Okay.  And do you see here that --
16 that Ms. Lilley from Hillenby is indicating that
17 she's attached several studies that might be
18 helpful?
19     A.    I see the sentence, I have attached
20 several studies that might be helpful to you.
21     Q.    Okay.  And then do you see that she
22 describes what she is attaching?
23         MS. GRANT:  Object to form.
24         THE WITNESS:  You're asking --
25

1          BY MS. RADCLIFFE:
2      Q.    Is it a fair characterization to say
3  that Ms. Lilley goes on to describe what studies
4  she's attaching?
5          MS. GRANT:  Same objection.
6          THE WITNESS:  Yeah, I -- I can't
7      characterize something someone said in
8      an -- in an E-mail that I'm seeing for the
9      first time.  I'm sorry.
10         BY MS. RADCLIFFE:
11     Q.    That's fair enough.
12         Do you see in the second paragraph
13 after number 1, it starts with, I also wanted to
14 share with you a few more positive pieces?
15         You see that language?
16     A.    I see that sentence, yes.
17     Q.    Okay.  Do you see that Ms. Lilley
18 then conveys, I sent over the Vanderbilt study
19 CCA commissioned after we had our meeting last
20 month.  I've included here a study CCA
21 commissioned in Arizona, as well as a recent
22 study from CCA competitor MTC, just for
23 background?
24         Do you see that Ms. Lilley is
25 conveying that information directly to Dr. Hakim

1   and copying several others on her communication?
2       MS. GRANT:  Object to the form.
3       THE WITNESS:  Again, I -- I -- I
4   see words in an E-mail.  What Ms. Lilley
5   was trying to convey, I'm --
6       BY MS. RADCLIFFE:
7       Q.   Well, do you see that the words say
8   that I sent over the Vanderbilt study CCA
9   commissioned after we had our meeting last month?
10      A.   Yes, I see those words.
11      Q.   Okay.  And do you see the -- the
12  words also that I've included here a study CCA
13  commissioned in Arizona, as well as a recent
14  study from competitor MTC, just for background?
15           Do you see those words?
16      A.   Yes, I see those words.
17      Q.   Okay.  Do you also see under
18  number 2 -- okay.
19           Do you see that there is some
20  language regarding a -- relevant comparison
21  between public and private-run prisons?
22      MS. GRANT:  Object to the form.
23      THE WITNESS:  Give me just a moment
24  here to read this.
25

1       BY MS. RADCLIFFE:
2       Q.   Okay.
3       A.   Okay.  I see that language after
4   number 2.
5       Q.   So in number 2 it -- it says, In a
6   second thought, the relevant comparison between
7   the public and private-run prison relates to the
8   level of security of a prison.
9            Would you disagree with that?
10      MS. GRANT:  Object to the form.
11      THE WITNESS:  I think that this is
12  a -- a statement made in a context that
13  I'm unfamiliar with.  We just talked about
14  how many of the people here are names that
15  I'm seeing for the first time.
16           I'm not reticent to agree or disagree
17  with anything that someone is saying in --
18  in an E-mail that I'm seeing for the first
19  time among people with whom I'm not all that
20  familiar.
21      BY MS. RADCLIFFE:
22      Q.   Okay.  I -- I understand that, but
23  you understand that Drs. Hakim and Blackstone
24  have drafted a working paper and an article that
25  you relied on?

1       A.   Yes, I understand that.
2       Q.   Okay.  So would you understand that
3   if -- and -- and -- and you can turn to the next
4   page of the document to see that the numbers with
5   respect to the questions relate to what Dr. Hakim
6   had asked CCA's public relations firm.  So it is
7   Dr. Hakim who asked or said, the relevant
8   comparison between public and private-run prison
9   relates to the level of security of a prison.
10           So -- so Drs. Hakim and Blackstone
11  are individuals that have written articles -- an
12  article and a working paper that you've relied
13  on.  And what is evident from this E-mail is --
14  turning back to the first page, is that CCA's PR
15  firm and CCA very much have influence over
16  Drs. Hakim and Simon because, as you look under
17  number 2, you will see that Ms. Lilley references
18  the difficulties or -- or the challenges that she
19  sees with respect to the comparison that Drs. --
20  Dr. Hakim proposes.
21           Now, she says here that there was a
22  telephone call and that it is nearly impossible
23  to ever get an apples-to-apples comparison, no
24  matter how hard you try to capture all the public
25  costs and factors.

1           Do you see that that is language that
2   she is conveying to Dr. Hakim?
3       MS. GRANT:  Object to the form and
4   to the extent that the actual question is
5   not clear.
6       THE WITNESS:  Can you -- would you
7   mind telling me again where --
8       BY MS. RADCLIFFE:
9       Q.   Sure.
10           Under number 2 in the very first
11  page --
12      A.   Okay.
13      Q.   -- if you read the paragraph below
14  that --
15      A.   Okay.
16      Q.   Okay.  Do you see that Ms. Lilley is
17  conveying that with respect to comparisons
18  between public and private-run prisons, that it's
19  nearly impossible to ever get an apples-to-apples
20  comparison, no matter how hard you try to capture
21  all the public cost factors?
22      MS. GRANT:  Object to the form.
23      THE WITNESS:  Again, I -- I'm --
24  I'm not going to characterize what
25  Ms. Lilley is or is not conveying.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 31 of 125 PageID #: 14005
www.aptusCR.com
Page 113..116

1    BY MS. RADCLIFFE:
2        Q.    Okay.  But do you agree that -- that
3    topic number 2 relates to the relevant comparison
4    between public and private-run prisons relating
5    to the level of security of a prison?
6        MS. GRANT:  Object to the form.
7        BY MS. RADCLIFFE:
8        Q.    We might consider two prisons that
9    are similar in that respect.
10        MS. GRANT:  Is there a question?
11        MS. RADCLIFFE:  I'm asking him does
12    he see the -- that number 2 relates to
13    that topic.
14        MS. GRANT:  Object to the form.
15        THE WITNESS:  I -- I -- I see the
16    words in an E-mail that say somebody is
17    saying that the relevant comparison
18    between public and private-run prisons
19    relates to the level of security of a
20    prison.
21        BY MS. RADCLIFFE:
22        Q.    Okay.  And then do you also see that
23    Ms. Hillenby (sic) is conveying to -- in this
24    E-mail to the recipients the language that I
25    think we prefer instead the idea of a regional

1    approach, where we compare CCA data on
2    cost/quality to regions of the country?
3        Do you see her conveying that in this
4    E-mail?
5        MS. GRANT:  Object to the form.
6        THE WITNESS:  Again, I -- I'm --
7        BY MS. RADCLIFFE:
8        Q.    I'll rephrase it.
9        You see that language written in this
10    E-mail to Dr. Hakim?
11        A.    I -- I see the words I think we
12    prefer instead the idea of a regional approach.
13    I see those words, yes.
14        Q.    And do you have any reason to believe
15    that Dr. Hakim and Blackstone did not receive
16    this E-mail?
17        MS. GRANT:  Object to the form.
18        THE WITNESS:  I -- I can't comment
19    on Dr. Hakim's E-mail practices.  I --
20        BY MS. RADCLIFFE:
21        Q.    Okay.  It then goes on to say, The
22    South -- and it's the third sentence down -- The
23    South and Southeast are not targets as the costs
24    are generally so low for everyone.  Keeping in
25    mind that this profession, public or private, is

1    a labor-intensive cost and that factors such as
2    pension costs are more significant and readily
3    available in the above-mentioned regions, this
4    approach seems to make more sense.  It also
5    enables us to put CCA in the best possible light
6    by averaging our performance/costs, as opposed to
7    depending on specific facilities, which may or
8    may not put our best foot forward.
9        Do you see the language in this
10    document that reflects that from Ms. Hillenby?
11        A.    I -- I see those words in this
12    E-mail, yes.
13        Q.    Okay.  In preparing your expert
14    opinion in the case, did you consider for cost
15    comparing -- comparisons considering two prisons
16    that were of similar level of security to compare
17    to determine whether or not CCA's cost
18    comparisons were reasonable?
19        MS. GRANT:  Object to the form.
20        THE WITNESS:  So, no, I made a
21    variety of cost comparisons or I -- I
22    should say I comment on a variety of -- of
23    cost comparisons, one -- one cost
24    comparison in particular in the report,
25    and I comment -- or I -- I express an

1    opinion on several of the other statements
2    that CoreCivic made about costs.
3        And at various points in the report I
4    talk about the -- the way that those cost
5    comparisons were made and I talk about the
6    relevant cost concepts that were applicable
7    in certain circumstances.
8        But, again, cost savings, cost
9    comparison is very context specific.  As I
10    talk about at length in the report, and so I
11    think if -- that I need you to -- to be a
12    little more specific here about what types
13    of costs you're talking about and what sorts
14    of adjustments you may or may not be
15    suggesting with respect to costs.
16        BY MS. RADCLIFFE:
17        Q.    Well, what I'm asking is did you
18    consider in forming your expert opinion whether
19    or not to consider comparing the costs associated
20    with a specific CCA facility with the same
21    security level as a specific BOP facility?
22        MS. GRANT:  Object to the form.
23        THE WITNESS:  Again, I -- in the
24    report I make a variety of -- of -- I
25    comment on a -- a variety of cost

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.

Grae vs.
Corrections Corporation of America, et al.

Page 121

1    comparisons that CoreCivic had made or
2    one -- again, one particular cost
3    comparison that CoreCivic had made and I
4    depend on -- or I -- I should say -- I'm
5    sorry -- I -- I opined on several of the
6    cost-related statements that CoreCivic
7    made.
8        As part of running those opinions, I
9    had to review lots of different kind of
10   assumptions, lots of different kinds of --
11   of comparisons that CoreCivic had made. And
12   so certainly if the question is were
13   differences -- you know, service delivery
14   models considered, I considered that kind of
15   information in several places in the
16   analysis that I did.
17       BY MS. RADCLIFFE:
18   Q.   So as -- as I understand, what you're
19   saying is that in preparing your expert report,
20   you didn't actually perform any cost comparisons
21   yourself?
22       MS. GRANT: Object to the form.
23       THE WITNESS: Cost comparisons
24   of -- of what?
25

Page 122

1        BY MS. RADCLIFFE:
2    Q.      Between CCA and the BOP.
3        MS. GRANT: Object to the form.
4        THE WITNESS: The -- the analysis
5    that I did, again, was to look at what --
6    to look at the statements that CoreCivic
7    had made and to evaluate whether those
8    statements were well-supported by
9    information that was available and by the
10   assumptions and methodologies that
11   CoreCivic had -- had employed.
12       In the report I talk about ways that
13   I was able to do an analysis of -- excuse
14   me -- of the -- of -- of several -- several
15   components of the costs that CoreCivic
16   had -- had made statements about.
17       So if the question is did I -- did I
18   consider -- did I consider information about
19   the different ways that CoreCivic did or did
20   not take service delivery differences into
21   account, then the answer is -- is yes. And
22   I talk about those considerations at length
23   in the report.
24       BY MS. RADCLIFFE:
25   Q.   How do you definitively know what

Page 123

1    assumptions CCA used over the period of time from
2    2011 to 2016 regarding its cost comparisons that
3    you include, for example, in Exhibit 2.1?
4        MS. GRANT: Object to the form.
5        THE WITNESS: What do you mean by
6    definitively?
7        BY MS. RADCLIFFE:
8    Q.   Well, I mean, I've reviewed your --
9    your report. I've reviewed your exhibits. I
10   don't see -- I don't see anything cited that
11   says that in 2011 CoreCivic undertook the
12   following methodology and only that methodology
13   and didn't consider others and had different
14   outcomes.
15       So I -- I'm -- and then the same
16   would apply for 2012, '13, '14, '15.
17       So I'm trying to understand how you
18   know what CCA internally looked at as -- as
19   the -- the support for its statement that --
20       MS. GRANT: Object to --
21       BY MS. RADCLIFFE:
22   Q.   -- it didn't have access to
23   additional information that may have undercut
24   their representation.
25       MS. GRANT: Is there a question?

Page 124

1        MS. RADCLIFFE: Yeah. I asked him
2    how he knew.
3        MS. GRANT: Object to the form.
4        THE WITNESS: Yeah, how I knew
5    what? I'm sorry.
6        BY MS. RADCLIFFE:
7    Q.   Sure, I'll repeat it.
8        What I'm trying to ask you is how you
9    know what methodologies CoreCivic relied on or
10   even considered when it issued its statements
11   that you outline in Exhibits 2.1 and 2.2.
12       MS. GRANT: Object to the form.
13       THE WITNESS: What I say in the
14   report is that -- what I did was I looked
15   at the specific statements that CoreCivic
16   had made. And so I think, in part, the
17   answer to your question is we need to --
18   we need to talk about specific statements.
19   There's several statements listed in
20   Exhibits 2.1 and 2.2.
21       And when I make reference to
22   methodology, what I'm saying -- and -- and I
23   talk about that at -- at length in the
24   report too. And, again -- but methodology
25   can depend on the specific type of cost

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 125

1 statement and the specific cost concept in
2 question in a specific statement or
3 statements that are outlined in Exhibit 2.1
4 and 2.2.
5 So whether one can know definitively
6 what CoreCivic was or was not assuming
7 depends, in part, on the specific statement.
8 And as -- again, as I talk about in the
9 report, my -- my analysis is designed to
10 bring all of my expertise to bear on
11 understanding whether the statements that
12 CoreCivic made were well-supported, whether
13 those statements were based on information
14 that was publicly available, whether
15 CoreCivic was using cost concepts and the
16 language of cost concepts in ways that are
17 consistent with the way that the government
18 cost accounting profession tends to use
19 those terms.
20 So I brought a lot of different kind
21 of analysis to bear on -- throughout my
22 report. And specific statements at specific
23 moments in time, again, one of the core
24 themes of my report is that I be very
25 careful and very precise in what kind of

Page 126

1 cost comparisons we're talking about, when
2 we're talking about them and what we're
3 assuming and not assuming when we make those
4 statements.
5 BY MS. RADCLIFFE:
6 Q. Do you consider yourself an expert in
7 federal securities disclosure laws?
8 A. A lot of the work that I have done
9 has certainly touched on and -- and is actually
10 quite -- quite closely related to federal
11 securities laws.
12 A lot of the work that I do in the
13 municipal securities market is around disclosure
14 of information that governments are disclosing.
15 And there's a regulatory structure that the
16 federal government has in place that -- around
17 when and how and where underwriters of municipal
18 bonds are required to disclose certain
19 information.
20 A lot of my research looks at how
21 bond investors respond to that information or
22 don't respond to the information that governments
23 are disclosing as part of their regular financial
24 disclosure processes. So a good amount of my
25 academic work and my expert work has intersected

Page 127

1 with questions of disclosure.
2 Q. So are you opining here that under
3 the federal securities laws that defendants'
4 statements were reasonable as a matter of those
5 laws?
6 A. Well, no, that's not -- that's not my
7 opinion. I -- I think you're -- you're kind of
8 conflating two things there.
9 So I was just describing my -- a
10 branch of the work that I do that is related to
11 municipal securities market and public finance
12 generally.
13 In this report what I'm opining on is
14 the statements that CoreCivic made and whether
15 those statements were supported and -- and,
16 again, based on -- or described in language that
17 in governmental cost accounting we would consider
18 to be the kind of language to characterize
19 particular cost concepts at certain points, at a
20 certain time.
21 Q. So just so to be clear, so what
22 you're opining here is that under the federal
23 securities laws that defendants had a reasonable
24 basis for their statements at the time they were
25 made?

Page 128

1 MS. GRANT: Object to form and to
2 the extent that it misstates.
3 THE WITNESS: I'm not -- I'm not
4 opining on -- in this case the -- my
5 opinion, just to restate, is that the
6 statements that CoreCivic made were
7 well-supported and based upon reasonable
8 assumptions and based on a reasonable
9 application of the core concepts in
10 governmental cost accounting.
11 How investors, you know, may or may
12 not have responded to that is going to
13 depend on which investors we're talking
14 about and at what particular point in time.
15 So the question of the investor response
16 is --
17 BY MS. RADCLIFFE:
18 Q. I -- I think you misunderstood my
19 question.
20 My question is -- is are you opining
21 here that under the federal securities laws the
22 defendants had a reasonable basis for their
23 statements at the time that they were made?
24 MS. GRANT: Object to the form.
25 THE WITNESS: What I'm opining is

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 129

1    that the statements that CoreCivic made
2    were well-supported and were consistent
3    with the concepts and language that we use
4    in governmental cost accounting.
5        BY MS. RADCLIFFE:
6        Q.    So you're not opining that the
7    defendants had a reasonable basis for their
8    statements at the time they were made?
9        MS. GRANT:  Object to the form and
10   to the extent it misstates.
11       THE WITNESS:  I'm not -- I'm not
12   sure what you mean by -- by reasonable.
13   Again, I -- my opinion is -- is based on
14   my analysis of the information that was
15   available at the time and the information
16   that was used in support of the statements
17   that CoreCivic made and the way that the
18   statements that CoreCivic made were
19   consistent with the definitions and the
20   core concepts in governmental cost
21   accounting.
22       BY MS. RADCLIFFE:
23       Q.    And what -- what -- what -- we'll go
24   back to that in a bit.
25       MS. RADCLIFFE:  Let's pull up

Page 130

1    tab 86.
2        MS. GRANT:  Willow, when you get to
3    the end of this line of questioning, can
4    we take a break?
5        MS. RADCLIFFE:  Sure.
6        And it's going to be marked as
7    Exhibit 553.
8        (Thereupon, Marlowe Exhibit
9        Number 553 was marked for
10       identification.)
11       BY MS. RADCLIFFE:
12       Q.    Okay.  I don't know if you have the
13   document yet.  Let me know.
14       VIDEO OPERATOR:  Oh, did you want
15   me to share it?  I'm sorry.
16       MS. RADCLIFFE:  I think she wants
17   them all shared.
18       MS. GRANT:  Yes.
19       VIDEO OPERATOR:  Okay.  I'm -- my
20   apologies.  Let's see.
21       All right.  I'm putting it in the
22   chat now.
23       Okay, hold on.  Hold on.  Click that
24   second link.  I put something at the end of
25   the first one.  My apologies.

Page 131

1        THE WITNESS:  Okay.  Thank you.
2        I see the document marked as --
3        BY MS. RADCLIFFE:
4        Q.    Mr. Marlowe, have you seen this
5    E-mail chain with Drs. Blackstone, Hakim and
6    then -- with the original E-mail being sent from
7    Steve Owen at CCA?
8        A.    Let me look at the rest of this here.
9        I do not recall having seen this
10   E-mail chain.
11       Q.    Okay.  In the original E-mail from
12   Steve Owen dated May 23, 2012, do you see that
13   the document reflects a -- a method of analysis
14   that is written by Steve Owen?
15       MS. GRANT:  Object to the form.
16       THE WITNESS:  I -- I see words that
17   say method of analysis and some bullet
18   points.  I -- I see words in an E-mail.
19   That's what I see.
20       BY MS. RADCLIFFE:
21       Q.    Okay.  And do you see the words in
22   the E-mail that say under Method of Analysis, We
23   view the analysis entailing two components?
24       A.    I see those words, yes.
25       Q.    Okay.  And then do you also see under

Page 132

1    Expected Outcomes, do you see that in the second
2    paragraph down it says, We anticipate that there
3    will be opportunities for immediate referrals to
4    discuss reported findings?
5        A.    I see those words, yes.
6        Q.    Okay.  And then if you turn to the
7    first page, do you see that the very top E-mail
8    that is sent from Dr. Hakim to Mr. Blackstone
9    contains the words, This is an ideal project for
10   you; just literature review?
11       A.    I -- again, I see those words, sure.
12       Q.    Okay.
13       MS. RADCLIFFE:  And then you can go
14   ahead and put that document aside and
15   we'll pull up or put in the chat tab 84.
16       This will be marked as Exhibit 554.
17       (Thereupon, Marlowe Exhibit
18       Number 554 was marked for
19       identification.)
20       BY MS. RADCLIFFE:
21       Q.    Have you seen this document before,
22   Mr. Marlowe?
23       A.    If you wouldn't mind giving me just a
24   second to --
25       Q.    Go ahead.

Page 133

1    A.    -- review.
2         Okay.  I -- no, I -- your question
3    was have I seen this before?
4         Q.    Correct.
5         A.    To my recollection, I have not seen
6    this before.
7         Q.    Okay.  And do you see at the bottom
8    of the first page of the document there's a -- an
9    E-mail sent from Steve Owen at CCA on June 11,
10   2012 to Dr. Hakim, copying Dr. Blackstone and
11   Ms. Lilley?
12        A.    This is -- it says that it was sent
13   May 30th -- Wednesday, May 30, 2012.
14        Q.    Actually, it's the bottom of the
15   first page, Monday, June 11, 2012.
16        A.    Okay.  It's from Simon Hakim,
17   cc: Blackstone, cc: Lilley.  Okay.
18        Q.    I think the wrong document might be
19   in the chat.  The one that's up is correct.
20        VIDEO OPERATOR:  You said the
21   wrong --
22        MS. RADCLIFFE:  Hmm?
23        VIDEO OPERATOR:  The wrong document
24   is in the chat you said?
25        MS. RADCLIFFE:  No, I --

Page 134

1         MS. GRANT:  They're the same Bates
2    number.
3         MS. RADCLIFFE:  Yes.
4         BY MS. RADCLIFFE:
5         Q.    So if you look at the bottom of the
6    first page of the document, there's a June 11,
7    2012 3:00 p.m. -- 3:00 p.m. E-mail.
8         A.    Yeah, I -- yeah, I see that on the --
9    on the screen.
10        Q.    Okay.  And then do you see there the
11   words that Given the cost options that you have
12   presented, we are inclined to pursue an agreement
13   based on the flat rate of $45,000?
14        A.    I see those words at the bottom of
15   that page, yes.
16        Q.    Okay.  And do you also see the last
17   sentence of that paragraph reflects, We are
18   excited at the opportunity to partner with you
19   and your colleagues at Temple and look forward to
20   finalizing an agreement so that research can
21   begin?
22        Do you see that?
23        A.    I see that.
24        Q.    Okay.  And in the next sentence --
25   paragraph it says the words We look forward to

Page 135

1    seeing the formal agreement and collaborating
2    with you and your team on this meaningful
3    project.
4         Do you see those words?
5         A.    Yes, I do.
6         Q.    Okay.
7         MS. RADCLIFFE:  Okay.  And now
8    we're going to pull up tab 83 and mark it
9    as Exhibit 555.
10        (Thereupon, Marlowe Exhibit
11        Number 555 was marked for
12        identification.)
13        BY MS. RADCLIFFE:
14        Q.    Let me know when you get that
15   document.
16        A.    Okay.
17        THE WITNESS:  This is -- 83 is
18   coming through the chat?
19        Okay.  Okay.  Thank you.  Fair
20   enough.
21        So --
22        BY MS. RADCLIFFE:
23        Q.    Okay.
24        A.    So -- hold on just a second.  I'm
25   sorry.  It looks like -- it looks like what just

Page 136

1    came through the chat as 83 is actually 84.
2         Q.    That is correct.
3         VIDEO OPERATOR:  My apologies.  I
4    just re-sent the link.  That should be the
5    right link.
6         THE WITNESS:  Okay.  I see the
7    document marked tab 83.
8         BY MS. RADCLIFFE:
9         Q.    Okay.
10        VIDEO OPERATOR:  Sorry about that,
11   guys.
12        MS. RADCLIFFE:  No worries.  We've
13   marked it for the record as Exhibit 555.
14        BY MS. RADCLIFFE:
15        Q.    Have you seen this document before?
16        A.    Do you mind if I take a second to --
17        Q.    Take your time.
18        A.    It's several pages here.
19        Okay.
20        Q.    Okay.  Have you seen this document
21   before?
22        A.    Not to my knowledge, no.
23        Q.    Okay.  Do you see that the subject
24   matter of this E-mail is Reviewed study document?
25        A.    Yes.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 36 of 125  PageID #: 4640
Page 133..136
www.CR.com

1     Q.     Okay.  And do you see the attachment
2  is referred to as a prison book with a -- a date?
3     A.     Right.  I see that -- I see that
4  that's identified as an attachment, yes.
5     Q.     Okay.  And -- and do you recall that
6  the paper that you rely on in Appendix C is also
7  referred to as the prison book?
8           MS. GRANT:  Object to form.
9           THE WITNESS:  I'm not sure --
10          BY MS. RADCLIFFE:
11    Q.     And -- and to refresh your
12 recollection, that -- well, never mind.  I'll --
13 I'll rephrase it.
14          Do you see here that the E-mail sent
15 from Ms. Lilley at Hillenby refers to I accepted
16 the changes you made to the previous version and
17 these are your new edits/thoughts on top of that?
18 And would it be fair to say that the attachment
19 includes redline edits?
20    A.     I --
21          MS. GRANT:  Object to form and
22    foundation.
23          THE WITNESS:  That assumes that --
24    that -- that's assuming that the
25    attachment to this E-mail is the

1  attachment that's -- that's in the --
2  comments.  I -- you know, I'm not -- I'm
3  not --
4           BY MS. RADCLIFFE:
5     Q.     Okay.
6     A.     -- familiar --
7     Q.     I'll represent to you that this
8  document was produced by CCA and it was produced
9  as the attachment being the family to this
10 document.
11          And with that representation, do you
12 have any reason to believe that -- that -- that
13 the redline attachment -- wait.  Strike that.
14          Do you see that attached to this
15 E-mail is a redline document --
16    A.     It --
17    Q.     -- in hard copy?
18          The following -- the document that
19 follows this E-mail is a redline document; would
20 you agree to that?
21    A.     I -- I -- yeah, I -- you -- yeah, but
22 a second ago you said the attachment to and I
23 don't -- I don't know that's -- I see -- I see an
24 E-mail and in this same document I see a redlined
25 document.

1     Q.     Okay.  And -- and you also see the
2  language I accepted the changes you made to the
3  previous version and these are new edits/thoughts
4  on top of that in the E-mail on the first page
5  from Ms. Lilley at Hillenby?
6           MS. GRANT:  Object to the form.
7           THE WITNESS:  Again, I -- I see
8     those words in this E-mail in this
9     document.
10          BY MS. RADCLIFFE:
11    Q.     And you see that Mr. Steve Owen from
12 CCA is copied on this document?
13    A.     I -- I see that he's cc'd on an
14 E-mail that is apparently reproduced in this
15 document.
16    Q.     Okay.  Now, we've looked at a series
17 of E-mails that -- that -- that you -- you were
18 not provided to -- in the course of -- of
19 providing your expert opinion in this case.
20          Would you want to have known the
21 existence of these E-mails prior to issuing your
22 expert report?
23          MS. GRANT:  Object to the form.
24          THE WITNESS:  As I said earlier, I
25    think that the -- the information that I

1  relied upon in my E-mail -- in my -- in my
2  report was -- was complete.  I felt
3  confident in that information.  I felt
4  that I could render an appropriate and
5  well-informed expert opinion based on the
6  information that I had available.
7           Certainly sometimes there --
8  there's -- there's lots of information out
9  there and -- but in the course of -- of
10 doing my analysis and -- and drawing my
11 conclusions, I really believed that the
12 information that I had put in -- that I was
13 able to -- to evaluate was adequate for --
14 for me to be able to draw the conclusions I
15 drew.
16          BY MS. RADCLIFFE:
17    Q.     Okay.  It's a yes or no question.
18          Would you would have wanted to know
19 about the existence of these E-mails prior to
20 issuing your expert report in this case?
21          MS. GRANT:  Object to the form and
22 to the instruction to limit his answer.
23          MS. RADCLIFFE:  You can stop with
24 the speaking objections, Meryn.  You can
25 stick with form.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 37 of 125 PageID #: Pages 137..140
10075
www.LexitasCR.com

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.

Grae vs.
Corrections Corporation of America, et al.

Page 141

1        BY MS. RADCLIFFE:

2      Q.   You can answer the question.

3      A.   I'm not sure that that -- that that

4  is a yes or no question.  Again, I felt as though

5  I reviewed information that I felt was adequate

6  to be able to draw the conclusions that I drew,

7  given the nature of the work that I was doing and

8  given the -- the wide variety of information that

9  I -- that I relied upon to draw those

10  conclusions.

11      **Q.   So it wouldn't bother you at all if**

12  **the facts were that CCA sought out Drs. Hakim and**

13  **Blackstone as influencers, paid for their work,**

14  **influenced their methodology and a hand in**

15  **editing their article?  That --**

16      MS. GRANT:  Object to --

17      BY MS. RADCLIFFE:

18      **Q.   -- wouldn't bother you at all?**

19      MS. GRANT:  Object to the form.

20      THE WITNESS:  I'm not sure what you

21  mean by -- by bother.

22      BY MS. RADCLIFFE:

23      **Q.   It's not information that you would**

24  **have wanted to know?**

25      MS. GRANT:  Same objection.

Page 142

1        BY MS. RADCLIFFE:

2      **Q.   Would it bear on the reliability or**

3  **the credibility of their -- of their work?**

4      MS. GRANT:  Same objection.

5      THE WITNESS:  Okay.  So there were

6  three questions there.  Would you like me

7  to -- which one would you like me to take

8  first?

9      BY MS. RADCLIFFE:

10      **Q.   Let's start with would it bother you**

11  **at all if the facts were that CCA sought out**

12  **Drs. Hakim and Blackstone as influencers, paid**

13  **for their work, influenced their methodology and**

14  **a hand in editing their work?**

15      MS. GRANT:  Object to the form.

16      THE WITNESS:  Again, I -- the

17  answer that I gave before to that was that

18  I -- I need you to tell me what you mean

19  by bother.

20      BY MS. RADCLIFFE:

21      **Q.   Well, bother is in the general sense.**

22  **You know, would -- would it it -- be something**

23  **that you would not take in a positive light?**

24      MS. GRANT:  Object to the form.

25      THE WITNESS:  Again, positive light

Page 143

1  could mean --

2      BY MS. RADCLIFFE:

3      **Q.   What do you mean by the word bother?**

4  **What would -- what is your general understanding**

5  **of the word bother?**

6      A.   Bother could mean a -- a variety of

7  things if -- depending on the -- on the

8  particular context in which you're using that

9  word.  You asked if -- you asked if it bothered

10  me.  That depends on -- on exactly what it is

11  that -- that -- I mean, what you mean by

12  bothered.  It could mean lots of different things

13  in different settings.

14      **Q.   Okay.  So let's start with the notion**

15  **that -- that -- the fact that -- if the facts are**

16  **that CCA sought out these professors as**

17  **influencers, paid for their work, influenced**

18  **their methodology and a hand in editing the**

19  **paper -- their -- their papers, would that**

20  **influence at all your views as to the reliability**

21  **of their work?**

22      MS. GRANT:  Object to the form.

23      THE WITNESS:  So there's -- there's

24  lots of different components to that

25  question.  And -- and, again, I -- you're

Page 144

1  asking me to -- to agree to a

2  characterization of facts about an E-mail

3  conversation --

4      BY MS. RADCLIFFE:

5      **Q.   I'm asking you to assume those facts.**

6  **And if those facts are true, would it -- would it**

7  **impact the way you view the reliability of their**

8  **work?**

9      MS. GRANT:  Object to form.

10      THE WITNESS:  So which facts are

11  you asking me to assume?

12      BY MS. RADCLIFFE:

13      **Q.   That CCA sought out these professors**

14  **as influencers, paid for their work, influenced**

15  **their methodology and had a hand in editing and**

16  **the content of their work.**

17      MS. GRANT:  Object to form.

18      THE WITNESS:  So can we be a little

19  more specific about what you mean by

20  influenced work?  I'm not -- if we're

21  willing to assume that, what do you mean

22  when you say influenced their work?

23      BY MS. RADCLIFFE:

24      **Q.   I said influenced their methodology.**

25  **In other words, help craft what methodology would**

1   be used.

2       A.   So if we -- if we were willing to
3   assume all those things --

4       Q.   Yes.

5       A.   -- again, I want to make clear that
6   you're asking me to make some assumptions here --
7   that if we were willing to assume all those
8   things and, again, the -- the way that that
9   relationship between researchers and any outside
10   entity is going to influence that those
11   researchers' work is going to depend on factors,
12   the subject matter that's being studied, the
13   goals and objectives of the research, I'm not
14   sure that we can characterize, you know, research
15   in any particular way based on a relationship
16   with -- with -- with any outside stakeholder.

17       And without getting into the
18   specifics of what type of influence you're
19   describing and without understanding what the
20   researchers' original objective was, whether
21   there was any change in the objective, whether
22   the methodology changed, those are all
23   considerations that we have to know a lot more
24   about if we're going to characterize something as
25   influenced and then make any statement about the

1   nature of that influence.

2       BY MS. RADCLIFFE:

3       Q.   Okay.  If you turn back to --

4       MS. RADCLIFFE:  It was tab 79,
5   Exhibit 549.

6       BY MS. RADCLIFFE:

7       Q.   You may recall that we looked at the
8   content which is on page 3 of the document.

9       A.   Right.  Okay.  I have page 3 pulled
10   up again.

11       Q.   Okay.  Do you see any disclosure
12   specifically regarding Correction Corp.'s funding
13   or role with respect to this report?

14       MS. GRANT:  Object to the form.

15       THE WITNESS:  So, I'm sorry,
16   you're -- you're asking if -- if there's a
17   specific mention of Corrections
18   Corporation?

19       BY MS. RADCLIFFE:

20       Q.   Correct.

21       A.   No, I don't see a specific mention of
22   Corrections Corporation.

23       Q.   Okay.

24       MS. RADCLIFFE:  And if you could
25   turn to what was marked -- it was tab 53

1   and it was marked 550.

2       THE WITNESS:  I have tab 53.

3       BY MS. RADCLIFFE:

4       Q.   Okay.  And, again, this was a
5   document produced by you and it is listed on your
6   Appendix C.

7       Do you know if there was any
8   disclosure in this particular working paper
9   regarding the funding that the authors received
10   at the time the working paper was issued?

11       MS. GRANT:  Object to the form.

12       THE WITNESS:  I -- I -- I would
13   have to go back and review this again to
14   know what was disclosed or -- or what was
15   not disclosed.

16       BY MS. RADCLIFFE:

17       Q.   Okay.  So are -- are you aware that
18   there was an ethics complaint filed against
19   Dr. Hakim and Blackstone for not disclosing the
20   funding of this working paper?

21       MS. GRANT:  Object to the form.

22       THE WITNESS:  You -- you asked am I
23   aware?

24       BY MS. RADCLIFFE:

25       Q.   Yes.

1       A.   No, I was not prior to you just
2   saying it.

3       Q.   And -- and -- and so no one at
4   Corrections Corp. informed you that Drs. Hakim
5   and Blackstone were subject to an ethics
6   investigation in connection with the working
7   paper that -- that you cite in your Appendix C?

8       MS. GRANT:  Object to the form.

9       THE WITNESS:  As I said before, I
10   haven't had any -- any interactions with
11   staff from CoreCivic.

12       BY MS. RADCLIFFE:

13       Q.   Okay.

14       MS. RADCLIFFE:  If you could pull
15   up tab 81, please.  And we'll mark that
16   as --

17       MS. GRANT:  Willow, if we're going
18   to a new exhibit, can we take a break?
19   It's been --

20       MS. RADCLIFFE:  This is the last
21   one on -- on this line of questioning.

22       BY MS. RADCLIFFE:

23       Q.   When you get that in the chat, let me
24   know.

25       Mr. Black -- Mr. Marlowe -- sorry --

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1  do you see here that this was a press release?
2      MS. GRANT:  Object to form.
3      THE WITNESS:  Okay.  So you just
4  pulled up tab 81.  You might give me just
5  a second here.
6      BY MS. RADCLIFFE:
7  Q.    Take your time.
8      MS. REPORTER:  Mark this as an
9  exhibit or no?
10     MS. RADCLIFFE:  Yes.  Mark it as
11 536 (sic), please.
12         (Thereupon, Marlowe Exhibit
13         Number 556 was marked for
14         identification.)
15     VIDEO OPERATOR:  Counsel, you said
16 you're marking it as what?
17     MS. RADCLIFFE:  536.
18     VIDEO OPERATOR:  536?
19     MS. RADCLIFFE:  Oh, I'm sorry, 5 --
20     VIDEO OPERATOR:  You mean 5 --
21 it -- it should be 557.  If I recall, 556
22 was tab -- oh, you know what, no.  My list
23 is wrong.  You're right.  It's 556.
24     Continue.  I'm so sorry.
25

1      BY MS. RADCLIFFE:
2  Q.    Okay.  Mr. Marlowe, sorry about that.
3      I -- I take it you have not seen this
4  document before?
5  A.    I don't recall seeing this.
6  Q.    Okay.  Do you see that this document,
7  that it contains information that -- that --
8  regarding CCA's use of a Temple University study
9  in April of -- and that would be 2013.
10     MS. GRANT:  Object to the form.
11     THE WITNESS:  I see -- I see the --
12 can you -- one -- one more time, can you
13 tell me what -- what are you asking me if
14 I see here?
15     BY MS. RADCLIFFE:
16 Q.    Sure.
17     Do you see that this document
18 reflects words that refer to a -- an indication
19 that -- that Drs. Hakim and Blackstone in their
20 Temple University study did not disclose the --
21 the matter was funded by private prison firms?
22     MS. GRANT:  Object to form.
23     BY MS. RADCLIFFE:
24 Q.    And particularly in the second
25 paragraph there's a reference to CCA has cited

1  the Temple study in its 2013 investor
2  presentation, which I believe is a topic of
3  discussion in your report.
4      MS. GRANT:  Object to form.
5      THE WITNESS:  I see those -- yeah,
6  I see those words in the second paragraph
7  here.
8      BY MS. RADCLIFFE:
9  Q.    Okay.  And you -- and you don't have
10 any reason to doubt their veracity at this point?
11     MS. GRANT:  Object to the form.
12     THE WITNESS:  I -- I'm seeing it
13 for the first time.  I -- I -- I can't
14 comment on its veracity or yes or no.
15     BY MS. RADCLIFFE:
16 Q.    Okay.  But you -- your -- your report
17 itself refers to -- references to citations to a
18 Temple study in CCA's investor presentations.
19     Do you recall that?
20     MS. GRANT:  Object to form.
21     THE WITNESS:  I -- yes, there is a
22 mention of that in my report.
23     BY MS. RADCLIFFE:
24 Q.    Okay.  And -- and do you see that
25 this document also indicates some other

1  studies -- for example, in -- in the fifth
2  paragraph down a reference to a 2000 study by
3  Vanderbilt University, which found cost savings
4  through a dual and public private (sic) system
5  was partially funded by CCA?
6      Do you see that -- words?
7      MS. GRANT:  Object to form.
8      THE WITNESS:  I see those -- in
9  those -- I see those words in the next to
10 the last paragraph, yes.
11     BY MS. RADCLIFFE:
12 Q.    Okay.  In -- in preparing your
13 report, did you take any effort to ascertain the
14 extent of CCA or the private prison industry's
15 influence over any of the studies or articles
16 that you considered in connection with your
17 report?
18 A.    Did I undertake any effort to
19 understand CCA's influence?
20 Q.    Correct.
21 A.    Certainly in reviewing all these
22 materials, I was aware that -- that there are
23 lots of different perspectives on the private
24 prison industry and that there's a variety of
25 different kinds of studies that have been done

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1 and different methodologies that had been
2 employed and lots of different studies looking at
3 many different characteristics of -- of costs.
4          And I was aware that there were, you
5 know, lots of different kinds of studies and lots
6 of different kinds of reports that were -- that
7 were available, some of them traditional academic
8 studies, some of them industry reports, lots of
9 different kinds of -- of sources, lots of
10 different kinds of information available that I
11 reviewed.
12          I'm aware that of the totality of the
13 information that I reviewed, it came from a
14 variety of different sources.
15     Q.    Okay.  And if you go to -- do you see
16 that this document at the bottom paragraph reads,
17 regarding the Reason Foundation, Although the
18 Reason Foundation receives funding from the
19 private prison industry, CCA was listed in
20 Reason's 2000 donor list as a gold level
21 supporter while private prison firm GEO was
22 listed as a platinum level supporter.  Reason
23 typically does not acknowledge such funding in
24 its articles, reports or research related to
25 privatization.

1          Do you see those words?
2     A.    I see those words.
3     Q.    Okay.  Where -- do you have any
4 knowledge regarding whether the Reason Foundation
5 discloses funding, for example, from private
6 prisons when it issues articles regarding that
7 topic?
8          MS. GRANT:  Object to form.
9          THE WITNESS:  I, again, reviewed a
10 variety of different kinds of information
11 in preparing this report.  I can -- as I
12 sit here today, I -- I don't recall being
13 aware of the Reason Foundation's policies
14 or procedures around disclosures.
15          Organizations like the Reason
16 Foundation have a variety of different ways
17 that they go about disclosing where their
18 funding comes from and -- and how they --
19 how they go about supporting different types
20 of research.  I'm not intimately familiar
21 with the Reason Foundation's practices in
22 that area.
23          MS. REPORTER:  I'm sorry.  I am or
24 am not?
25          THE WITNESS:  I -- I am not.

1          MS. REPORTER:  Thank you.
2          BY MS. RADCLIFFE:
3     Q.    And do you understand what review
4 process, peer-review process, is involved with
5 any articles that the Reason Foundation issues?
6          MS. GRANT:  Object to form.
7          THE WITNESS:  Yeah, I think the
8 Reason Foundation, like a lot of other
9 foundations, supports lots of different
10 kinds of research and all that different
11 research may be subject to different types
12 of peer-review processes.  I can't comment
13 on the Reason Foundation's practices in
14 that area in any generic sense without
15 knowing particular studies and knowing
16 their particular practices around
17 particular studies.
18          MS. RADCLIFFE:  Okay.  If you can
19 turn to the next page.
20          BY MS. RADCLIFFE:
21     Q.    The third paragraph down there's a
22 reference to a Professor Charles Thomas.  Are you
23 familiar with his research on the private prison
24 industry?
25     A.    As I sit here today, that's not a

1 name that I'm as familiar with, but that's not to
2 say I haven't reviewed it.
3     Q.    Okay.  Do -- were -- were you aware
4 that Mr. Thomas had been paid $3 million by
5 Prison Realty and CCA?
6          MS. GRANT:  Object to form.
7          THE WITNESS:  I'm -- I'm aware that
8 those words are in this document you're
9 putting in front of me now.  I can't --
10          BY MS. RADCLIFFE:
11     Q.    But prior to -- to -- to today, no
12 one at CCA had informed you that -- that Charles
13 Thomas, Professor Charles Thomas, had been paid
14 $3 million by Prison Realty and CCA and/or that
15 he was fined by the Florida Commission on Ethics?
16          MS. GRANT:  Object to form.
17          THE WITNESS:  Again, I haven't had
18 contact with anyone from -- from CCA.
19          BY MS. RADCLIFFE:
20     Q.    And do you recall that -- that your
21 report relies on a article by The Reason, by
22 Adrian Moore?
23     A.    Right.  I'm familiar with my
24 reference to that in my report.
25     Q.    Okay.  And are you familiar with

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 41 of 125 PageID #: Page 153..156
20551
www.LexitasCR.com

Page 157

1    Mr. Moore's article and that he relies on
2    Professor Thomas' work to support many of his
3    opinions in that article?
4         MS. GRANT: Object to form.
5         THE WITNESS: Sorry. Can you --
6    you were talking about one article and --
7         BY MS. RADCLIFFE:
8    Q.   Correct. We're -- Mr. Moore's
9    article in The Reason, are -- are -- do you
10   recall that -- in that article that Mr. Moore
11   relies on the work of Professor Charles Thomas in
12   that article?
13        MS. GRANT: Object to form.
14        THE WITNESS: I'd have to -- I'd
15   have to go back and refresh my memory
16   on -- on that specific article and the
17   specific citations within that article.
18        BY MS. RADCLIFFE:
19   Q.   Okay. As an -- as an expert, how --
20   does it impact your views at all regarding the
21   reliability of articles to the extent that the
22   authors are -- are violating ethical rules?
23        MS. GRANT: Object to form.
24        THE WITNESS: What do you mean by
25   reliability? Reliability can mean a

Page 158

1    variety of things.
2         BY MS. RADCLIFFE:
3    Q.   For example, would you -- would you take
4    pause if you knew prior to writing your expert
5    opinion in this case that several of the articles
6    you heavily rely on in your report were funded by
7    CCA?
8         MS. GRANT: Object to form and
9    foundation.
10        THE WITNESS: Again, you're asking
11   me to make some assumptions here about
12   CCA's relationship to these researchers.
13        The question you asked before was
14   about reliability and now you're asking a --
15   a much broader question. So --
16        BY MS. RADCLIFFE:
17   Q.   You asked for clarification, so we'll
18   start with would you take pause if you knew prior
19   to writing your report -- writing your expert
20   report in this case that several of the articles
21   you heavily rely on in your report had received
22   funding from CCA?
23        MS. GRANT: Object to form and
24   foundation.
25        THE WITNESS: Again, if -- if we're

Page 159

1    willing to assume that, the -- the
2    relationship between CCA and these
3    researchers is what you say it is, I think
4    in my report I -- I make clear that
5    there's, again, lots of different ways to
6    go about studying the costs of government
7    services and lots of different ways to go
8    about comparing the cost of government
9    services to the cost of similar services
10   provided by the private sector.
11        You know, every study is a little bit
12   different with respect to the methodology
13   that it employs. Every study is a little
14   bit different with respect to how well the
15   methodology that it's using adheres to the
16   kinds of assumptions and -- and how well it
17   adheres to the assumptions that government
18   cost accounting experts like myself bring to
19   bear on this kind of research. Every study
20   is a little bit different. The
21   methodologies that they use, the way that
22   they draw their conclusions can vary
23   considerably.
24        I think -- I think anytime that you
25   as a researcher are looking at anyone's

Page 160

1    work, you take pause and carefully consider
2    what it is that those researchers are doing,
3    what they were trying to accomplish, whether
4    their approach is consistent with your
5    expertise, your applications of -- or
6    principles of, in this case, what would
7    constitute good analysis of cost accounting
8    for government services.
9         BY MS. RADCLIFFE:
10   Q.   Do you recognize a pattern at all
11   that, assuming that CCA paid for Dr. Blackstone
12   and Dr. Hadim's (sic) work that CCA contributed
13   funds to the Reason and that CCA was involved in
14   paying Professor Charles Thomas $3 million and
15   that all three of these separate groups issued
16   articles regarding the cost of -- of private
17   prisons compared to government agencies, that is
18   troubling?
19        MS. GRANT: Object to form and
20   foundation.
21        THE WITNESS: So the first part of
22   that question was -- was about a pattern.
23   And I -- I -- I'm not sure I would
24   characterize any of this as a pattern.
25        Respectfully, you've shown me some

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1    E-mails and a press release.  I wouldn't
2    characterize anything as a pattern without
3    doing much more careful analysis to
4    understand what these relationships are, if
5    these relationships are -- and so I -- I
6    can't comment on whether a pattern is
7    troubling without knowing what that pattern
8    is and undertaking my own analysis of
9    whether there's a pattern in the first
10   place.
11        BY MS. RADCLIFFE:
12        Q.    Well --
13        MS. GRANT:  Willow, we've been
14   going for two hours now and it's been
15   about half an hour since I first asked for
16   a break.  So can you please take that --
17   that into consideration?
18        MS. RADCLIFFE:  Okay.
19        MS. GRANT:  It doesn't seem like
20   you're close to finishing this line of
21   questioning.
22        BY MS. RADCLIFFE:
23        Q.    Well, Mr. Marlowe, let me ask you
24   this:
25            You're not at all troubled that no

1    one at CCA told you about the relationship
2    between CCA and Drs. Hadim and Blackstone and the
3    ethical allegations against them?
4        MS. GRANT:  Object to form and
5    foundation.
6        THE WITNESS:  As I said before, as
7    a researcher, anytime I'm relying on
8    someone else's work, I undertake my own
9    assessment of the methodologies that were
10   used; I undertake my own assessment of
11   whether the methodologies that were used
12   were consistent with best practices and
13   the effective application of, in this
14   particular context, the principles of
15   government cost accounting; and, as part
16   of that, would have to acknowledge that
17   research comes from lots of different
18   places, that researchers are going to
19   employ different methodologies.  And my
20   job is to bring my expertise to bear on
21   understanding what a study brings to our
22   understanding, what -- how much to rely on
23   a study, what other studies' methodology
24   is consistent with what I consider to be
25   good methodology.

1        So as a researcher and as an expert
2    in this case, my job is to undertake my own
3    assessment of every single piece of research
4    that may inform the opinions that I form in
5    this or any other matter.
6        BY MS. RADCLIFFE:
7        Q.    And, Mr. Marlowe, you also relied on
8    CCA in this case to provide at least Cornerstone
9    relevant information; is that fair?
10        MS. GRANT:  Object to form and
11   foundation.
12        THE WITNESS:  As I -- as I
13   described earlier, I -- my relationship
14   with Cornerstone was such that I would ask
15   them to provide information that I thought
16   was relevant and important to -- in
17   forming my opinions and, as I said, I -- I
18   can't speak to Cornerstone's relationship
19   with CoreCivic.
20        MS. REPORTER:  This is the
21   reporter, and I really could use a break.
22        MS. RADCLIFFE:  We can go off the
23   record.  That's fine.
24        How long would you like, Meryn?
25        (Crosstalk)

1        MS. GRANT:  It -- well, it's 12:25.
2    If you have a bunch more, then I suggest
3    that we take a lunch break.
4        VIDEO OPERATOR:  Let me -- let me
5    go ahead and announce it.
6        The time is 12:24 p.m. and we are now
7    off the record.
8        (Thereupon, at 12:24 p.m. PST, a
9        lunch recess was taken.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1 AFTERNOON SESSION (1:19 p.m. PST)
2 VIDEO OPERATOR: All right. The
3 time is 1:19 p.m. and we are back on the
4 record.
5 BY MS. RADCLIFFE:
6 Q. Turning to your -- what -- your
7 expert report, Mr. Marlowe, and Exhibit -- let's
8 first go to footnote 61, which is on page 15.
9 VIDEO OPERATOR: What exhibit did
10 you want me to put up?
11 MS. RADCLIFFE: Oh, none yet. This
12 is -- we're referring to Exhibit 548.
13 VIDEO OPERATOR: Okay. The --
14 BY MS. RADCLIFFE:
15 Q. Okay. Do you see that there's a -- a
16 reference to a 2013 analyst day in footnote 61?
17 A. Yes.
18 Q. And do you see in the text of your
19 report that -- and it begins on page 14, but
20 you're referencing a -- a statement that
21 plaintiff identified?
22 A. Referencing a statement that
23 plaintiff identifies. Oh -- oh, yes. Yes.
24 Q. Okay. And -- and is that one of the
25 statements that -- that you can analyze as part

1 of your opinion?
2 A. Yes.
3 Q. Okay. And do you see in footnote 61
4 there's a reference to the date of that
5 statement, October 2, 2013?
6 A. Yes.
7 Q. Okay. And then there's a reference
8 and quote to Temple University's Center for
9 Competitive Government in April 2013 and
10 referencing an -- an article entitled Contracted
11 Prisons Cut Costs Without Sacrificing Quality?
12 MS. GRANT: Object to the form.
13 THE WITNESS: I see -- make sure I
14 understand what you're asking here.
15 You're asking is -- do I see that --
16 BY MS. RADCLIFFE:
17 Q. Well, here, I guess what I'm trying
18 to understand is that in your text you said,
19 CoreCivic identified the source for the estimate
20 and disclosed that the study received funding by
21 members of the private corrections industry.
22 And is the footnote intended to
23 convey what the source for the estimate was?
24 MS. GRANT: Object to form.
25 THE WITNESS: That footnote is --

1 is intended to convey that CoreCivic
2 identified that Temple University study as
3 the -- as the -- as part of the
4 information that they made clear as part
5 of that -- of that statement that you
6 mentioned.
7 BY MS. RADCLIFFE:
8 Q. Okay. And at this point in October
9 of 2013, the -- the reference to that particular
10 paper, at -- at this point it's a working paper;
11 is that correct?
12 A. I'd have to go back and -- and look
13 at --
14 Q. Sure.
15 Why don't you go look at tab 54,
16 which was marked --
17 MS. GRANT: I think it's tab 53.
18 MS. RADCLIFFE: Tab 53, marked
19 Exhibit 550.
20 BY MS. RADCLIFFE:
21 Q. Does this refresh your recollection
22 that -- that the working paper was issued in
23 April of 2013?
24 MS. GRANT: Object to form.
25 THE WITNESS: The -- I mean, the

1 dates, April 29, 2013, in the footnote and
2 in -- on this working paper, are the same.
3 BY MS. RADCLIFFE:
4 Q. Okay. So just so I understand, this
5 working -- the -- the footnote is referencing
6 this working paper?
7 A. Yes.
8 Q. Okay. And -- and a working paper
9 isn't a final document; is that correct?
10 A. Well, it depends on the -- on the
11 nature of the research. There are certainly
12 working papers that can become -- can become
13 widely cited and attract a lot of attention
14 before they're published.
15 In some fields working papers and --
16 and conference papers are -- are considered to be
17 close to published simply because in fast-moving
18 fields getting the information out can be very
19 important and so scholars are willing to -- to
20 draw from a working paper.
21 So really, how -- the relationship
22 between a working paper and what would be
23 considered a final draft of a -- of a paper can
24 really vary, depending on the specific field
25 we're talking --

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 44 of 125 PageID #: Page 165..168
3054
www.LexitasCR.com

Page 169

1        MS. REPORTER: I'm sorry? I didn't
2 understand the end.
3        THE WITNESS: I said the -- the
4 relationship between a -- a working paper
5 and a final version of a paper can depend
6 a -- a lot on the specific field that
7 we're talking about.
8       BY MS. RADCLIFFE:
9    **Q.   Okay. And -- and, to the best of**
10 **your knowledge, CCA did not disclose that it was**
11 **referencing a working paper; is that correct?**
12        MS. GRANT: Object to form.
13        THE WITNESS: To -- I'd have to go
14 back and look at the specific disclosure
15 to be able to -- to answer that
16 definitively.
17       BY MS. RADCLIFFE:
18    **Q.   Okay. And -- and -- and do you know**
19 **if this particular working paper was considered**
20 **a -- a final paper?**
21    A.   Again, working papers, as I said,
22 can -- can go through a variety of -- of
23 revisions, depending on the specifics of the --
24 of the -- of the authors and the intended
25 audience and particulars of that field.

Page 170

1       So, again, it would depend on -- it
2 would depend on the particulars of this paper.
3    **Q.   But you reviewed this paper in**
4 **connection with your expert opinion, right?**
5    A.   That's right. I reviewed this paper.
6    **Q.   And did -- did you make any**
7 **determination as to whether or not this was a**
8 **final paper at the time you reviewed it?**
9    A.   As I recall, like with any of the
10 work that -- that I cited, I made an effort to
11 make certain that everything that was cited was
12 the -- the -- best available, most recent
13 version of a paper based on what was available,
14 based on what could be found.
15    **Q.   Well, do you see in the footnote --**
16 **do you see it -- in footnote 61 it references**
17 **that it's citing a work paper version of the**
18 **June 2014 study?**
19        MS. GRANT: Object to form.
20       BY MS. RADCLIFFE:
21    **Q.   Wouldn't that imply that there was**
22 **further work to be done and that work was**
23 **finished in June of 2014?**
24        MS. GRANT: Object to form.
25        THE WITNESS: That wouldn't

Page 171

1 necessarily imply that. Again, working
2 papers can -- can progress in lots of
3 different ways. Sometimes working papers
4 can be revised substantially. Sometimes
5 working papers can take up a -- a
6 different question at a different point in
7 time.
8       BY MS. RADCLIFFE:
9    **Q.   Well, you've read the study that was**
10 **issued in June of 2014. You rely on it.**
11    **Did -- did you think it involved a**
12 **different question?**
13        MS. GRANT: Object to form.
14        THE WITNESS: So the -- yes, I
15 reviewed -- yes, I reviewed the working
16 paper version -- I'm sorry.
17       Yes, I reviewed the -- the April 29th
18 working paper version and, as is mentioned
19 in the footnote, the -- the study -- there's
20 a citation also to the June 2014 version, if
21 that's what you're asking.
22       BY MS. RADCLIFFE:
23    **Q.   Well, what I'm asking is if the**
24 **June 2014 study -- let me rephrase it.**
25    **In your own expert report it says**

Page 172

1 **that it is citing the working paper version of**
2 **the June 2014 study.**
3    **And thereby it -- I'm not sure how**
4 **we reconcile that we're citing a working paper,**
5 **which then leads to a June 2014 study, with your**
6 **testimony regarding whether or not a working**
7 **paper is final.**
8    **So what I'm trying to understand,**
9 **having reviewed these two -- the working paper**
10 **and the study and indicating that you rely on**
11 **them in your expert opinion, whether or not you**
12 **took any analysis as to whether this particular**
13 **working paper was a final version.**
14        MS. GRANT: Object to form.
15        THE WITNESS: So I -- to be clear,
16 I want to make sure that I'm -- you're
17 characterizing what I said correctly.
18       Yes, I reviewed the April 29, 2013
19 version of this paper. And if you're asking
20 about whether I'm aware of changes to this
21 paper between then and the version that is
22 mentioned also in the footnote, again, I'd
23 have to -- I'd have to go back and I'd have
24 to look at the versions, I'd have to refresh
25 my memory and make sure that -- I don't want

Case 3:16-cv-02267   Document 359-2   Filed 11/20/20   Page 45 of 125 Page ID Pg. 169..172
#12055
www.CSR.com

1    to characterize whether there are
2    differences or are not differences across
3    these two studies without having refreshed
4    my memory on both of them.
5         BY MS. RADCLIFFE:
6         Q.    Okay.  But is it fair to say that
7    your expert report refers to the analyst
8    presentation and indicates that it is citing the
9    working paper version of the June 2014 study?
10        A.    The -- the cite -- the -- the
11   statement that I analyzed as part of that
12   statement makes reference to a June 2014 study.
13   If -- if that's what you're asking then, yes,
14   that's -- that's correct.  The statement I
15   analyzed has that reference in it.
16        Q.    And just to be clear, it's
17   referencing the working paper version of the
18   June 2014 study?
19        A.    That's -- as I -- as I recall, that's
20   what was included in that disclosure -- I'm
21   sorry -- in that -- in that statement that I
22   analyzed.
23        BY MS. RADCLIFFE:
24        Q.    Okay.  And then if you can look at
25   the bottom of page 14, beginning of the last --

1    the last sentence there, it starts with In the
2    presentation, CoreCivic identified the source for
3    the estimate and disclosed the study received
4    funding by members of the private corrections
5    industry.  CoreCivic reported the results of and
6    made a clear reference to a publicly available
7    study.  The study outlines the methodology
8    assumptions of two Temple University economists
9    employed to arrive at the cost savings estimate.
10        And if you turn to footnote 62, you
11   were citing the June 14th article, correct?
12        A.    The point I make in -- in footnote 61
13   is that CoreCivic made reference to the June 2014
14   version.
15        Q.    How can CoreCivic make reference to
16   the June 2014 version in a statement made in
17   2013?
18        A.    If you're asking me to -- to offer an
19   opinion on something CoreCivic did or did not do,
20   I -- I'm not sure I can answer that.  What I --
21   what I did was I looked at that statement.  I
22   looked at the methodology employed in the study
23   that is cited in that statement.
24        And as I say in paragraph 31, because
25   CoreCivic made that reference, because that paper

1    was available, because the methodology that was
2    described in that paper was available, that --
3    that -- the -- the key there was then to simply
4    say that that was a statement that they had made
5    that was supported by -- by a -- a clear
6    identification of the -- the basis for the claim
7    that CoreCivic made in that statement.
8         Q.    Okay.  When you were referring to the
9    study that is cited in that statement, which
10   study are you referring to?
11        MS. GRANT:  Object to form.
12        THE WITNESS:  Again, I'd have to go
13   back and look at the specific statement to
14   be able to -- to try to parse some of
15   these differences.  Again, I've -- I've
16   represented as well as I can to you what's
17   in the footnote and the way that the
18   footnote informs the discussion in
19   paragraph 31.
20        BY MS. RADCLIFFE:
21        Q.    Okay.  And in paragraph 31 you've
22   indicated that CoreCivic reported the results of
23   and made a clear reference to a publicly
24   available study.  The study outlines the
25   methodology and assumptions the two Temple

1    University economists employ to arrive at their
2    cost savings estimate.
3         And you're citing the June 2014
4    study.  So I want to be clear that your report is
5    reflecting that in a analyst day presentation in
6    2013 that CoreCivic is citing to a 2014 study.
7         MS. GRANT:  Object to form.
8         THE WITNESS:  I'm not sure that
9    that's a fair representation of what's
10   included in my report.  Again, what I --
11   what I represent in the report is that
12   CoreCivic made the statement, that the --
13   the -- the -- the title of this section,
14   CoreCivic's Cost Comparisons Relied on
15   Publicly Available Data and Disclosed its
16   Sources is the key here.
17        The point is that CoreCivic disclosed
18   that source when it made that presentation
19   and it made that statement as part of that
20   presentation.
21        BY MS. RADCLIFFE:
22        Q.    And, again, I'm asking you to clarify
23   when you say disclosed that source, what source
24   you're referring to.
25        A.    Again, as I mentioned in the

1  footnote, the -- the working paper version of the
2  2014 study. Again, as we've said, the
3  relationship between different drafts, different
4  versions of a working paper, can really depend on
5  the specific context, the specific -- specific
6  characteristics of that study. So --
7      **Q.   And --**
8      A.   Go ahead.
9      **Q.   -- have you reviewed any -- any**
10 **evidence in this case or spoken with anyone at**
11 **CCA as to what they did with respect to the --**
12 **their reliance on this particular working paper**
13 **as opposed to a different draft?**
14     MS. GRANT: Object to form.
15     THE WITNESS: So there's a couple
16     parts to that question. Can you help me
17     unpack it so the --
18     BY MS. RADCLIFFE:
19     **Q.   Let me rephrase it.**
20     **Do you know what CCA did to ascertain**
21 **whether or not the working paper that they cited**
22 **was a -- a -- a final study?**
23     MS. GRANT: Object to form.
24     THE WITNESS: I can't comment on
25     what CCA -- CCA's internal process for --

1  on CCA's internal process.
2      What I do is -- in my report is I
3  make clear that that source was disclosed as
4  part of that presentation. Again, to the
5  extent that clear -- clear disclosure of
6  sources for claims about cost savings are
7  important, that's what CoreCivic did in this
8  case.
9      BY MS. RADCLIFFE:
10     **Q.   Okay. If you can look at**
11 **Exhibit 2.1. And under the -- the first line**
12 **there, it says, Alleged Cost-Related**
13 **Misrepresentation. Annual cost savings of**
14 **12 percent or more and CCA provides cost savings**
15 **of 12 percent or more.**
16     **Do you see that description of the**
17 **alleged misrepresentation?**
18     A.   I do.
19     **Q.   And do you see that the source listed**
20 **is a CCA at America's Leader Partnership**
21 **Corrections Presentation, 2013 Analyst Day**
22 **Durable Earnings and Significant Growth**
23 **Potential?**
24     A.   Yes, I see that.
25     **Q.   Okay. And do you see that the**

1  **support provided by CoreCivic listed is a**
2  **June 2014 article by Hakim and Blackstone?**
3      A.   Yes.
4      **Q.   Okay. So I'm trying to understand**
5  **how the source provided by CoreCivic can be a**
6  **article that has not yet been issued.**
7      MS. GRANT: Object to form.
8      THE WITNESS: And I -- and as I've
9      explained, working papers make their way
10     through the publication process in a
11     variety of ways. I can't, as I sit here
12     today, explain specifically how it is that
13     the different versions of this particular
14     paper evolved.
15         Occasionally papers are made clear
16     that they're forthcoming. Occasionally
17     papers have -- are -- are dated ahead,
18     simply because they know that they'll be
19     published at some point in the future.
20         There's many, many reasons why
21     different versions of a paper may be -- may
22     appear differently, depending on the
23     specific path that that paper takes through
24     the --
25         (Remote transmission interference)

1      MS. REPORTER: I'm sorry, through
2  the what?
3      THE WITNESS: The review and
4  publication process.
5      BY MS. RADCLIFFE:
6      **Q.   Okay. But if you turn back to**
7  **page 15, there's a reference to a publicly**
8  **available study. So if the date of the study is**
9  **June 2014, how is it publicly available in 2013?**
10     MS. GRANT: Object to form.
11     THE WITNESS: Again, I've -- I've
12     tried to answer this question as well as I
13     can. There are a variety of ways that a
14     paper makes its way through the
15     publication process. And occasionally
16     papers are -- are given dates that are
17     forthcoming or prospective publications as
18     they make their way through the
19     publication process.
20         I'd have to go back and look at the
21     specific circumstances with this particular
22     working paper to be able to answer that
23     question definitively, to say nothing for,
24     again, CoreCivic's process for identifying
25     what it did and did not make reference to in

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 47 of 125 PageID #: 17405
Pages 177..180
www.CCR.com

1    an investor day presentation.
2        BY MS. RADCLIFFE:
3        Q.    So -- but as I understand your
4    Exhibit 2.1, that reflects the source, the
5    2000 -- June 2014 article, and it's your
6    understanding that the source that CoreCivic was
7    representing was the June 2014 Hakim and
8    Blackstone article?
9        MS. GRANT:  Object to form.
10        THE WITNESS:  I -- I'm not sure I
11    agree with that characterization.  What is
12    listed in Exhibit 2.1 is the support that
13    CoreCivic provided in that -- in that
14    particular statement.
15        BY MS. RADCLIFFE:
16        Q.    Okay.  And when you say provided, are
17    you saying publicly provided?
18        A.    I'm not sure what you mean by -- by
19    publicly provided.
20        Q.    For example, are you saying that that
21    is information that was presented as the source
22    in CCA's investor presentation?
23        MS. GRANT:  Object to form.
24        THE WITNESS:  As is represented in
25    Exhibit 2.1, when CoreCivic made that

1    statement, it cited the Hakim and
2    Blackstone 2014 paper as the support for
3    that statement.
4        BY MS. RADCLIFFE:
5        Q.    And when you're saying that it cited
6    the paper as the support for that statement, do
7    you mean that it included that support in its
8    analyst presentation?
9        MS. GRANT:  Object to form.
10        THE WITNESS:  I -- I -- I think
11    you're -- I think you're saying more than
12    I'm saying.  I -- I'm simply pointing out
13    that in this presentation that CoreCivic
14    made, when they made this statement about
15    cost, annual cost savings of 12 percent or
16    more, it says it provides cost savings of
17    12 percent or more, their source for that
18    statement that was disclosed was the Hakim
19    and Blackstone study.  That's what this
20    says.
21        BY MS. RADCLIFFE:
22        Q.    And I believe you testified earlier
23    that Exhibits 2.1 and 2.2 reflect the -- the
24    statements that -- that you assessed as part of
25    your expert opinion; is that accurate?

1        A.    That's accurate.
2        Q.    Okay.
3        MS. RADCLIFFE:  If you could pull
4    up tab 92.  And probably put it in the
5    chat or -- please.
6
7        (Thereupon, Allen Exhibit
8        Number 3, previously marked for
9        identification, was referred to.)
10        BY MS. RADCLIFFE:
11        Q.    When you get a chance to look at that
12    document, Mr. Marlowe, which has been previously
13    marked as Allen Exhibit 3, do you recognize the
14    document?
15        A.    I don't see it in the chat just yet.
16        Q.    Okay.  No worries.
17        THE WITNESS:  Did you send it to --
18        MS. RADCLIFFE:  I'm sorry?
19        THE WITNESS:  I'm asking the
20    videographer if they sent this --
21        (Remote transmission interference)
22        VIDEO OPERATOR:  Oh.  Yes, sir.
23    It's in the -- it's in the chat right now.
24        THE WITNESS:  Oh, okay.  I don't
25    see it.

1        VIDEO OPERATOR:  Oh, you know what,
2    I sent it probably to somebody.  I'm
3    sorry.
4        THE WITNESS:  No problem.  Thank
5    you.
6        VIDEO OPERATOR:  Yes, sir.
7        MS. REPORTER:  And again,
8    Mr. Marlowe, you are fading in and out.
9    I'm not sure if anybody else notices it,
10    but I hear counsel just fine.
11        THE WITNESS:  Okay.  I'll -- I'll
12    do my best just to speak up.  If -- like
13    at this volume, is it okay?
14        MS. REPORTER:  Yes, sir.
15        THE WITNESS:  Okay.  Okay.  Thank
16    you.
17        MS. RADCLIFFE:  If we can go off
18    the record for just one minute just to
19    address something technical that might
20    help with this.
21        VIDEO OPERATOR:  Okay.  So you guys
22    want to go off?
23        The time is -- the time is 1:47 p.m.
24    and we are now off the record.
25        (Thereupon, a discussion was had off

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 48 of 125 PageID #: Page 181..184
9058
www.phippsCR.com

1          the record.)
2          VIDEO OPERATOR:  The time is
3    1:49 p.m. and we are now back on the
4    record.
5          Thank you, Ms. Klapper.
6          BY MS. RADCLIFFE:
7          Q.    Mr. Marlowe, do you recognize the
8    document before you that was previously marked as
9    Exhibit 3?
10         A.    Yes, as I -- best I can recall, this
11   is the original complaint.
12         Q.    Okay.  So if you look a little
13   carefully down below, it says Memorandum.
14              Do you see that?
15         A.    I do.
16         Q.    Okay.  And then if you turn to what
17   is the last page of the document, do you see that
18   the -- the document is signed by the judge?
19         A.    Okay.  Yeah.  Let me back up for a --
20   I'm sorry.  That's -- that's my mistake.
21              So this -- this is not the original
22   complaint.  I'm sorry.
23         Q.    That's fine.
24              If you look at your Appendix C --
25         A.    Right.

1          Q.    -- on the -- the court exhibits,
2    you'll see a reference -- and I'll find it for
3    you.
4          A.    Yes.  Memorandum Denying Motion to
5    Dismiss?
6          Q.    Yes.
7          A.    Okay.  Thank you.
8          Q.    You found it faster than I did.
9              So does that refresh your
10   recollection as to what this document is?
11         A.    It does, yes.
12         Q.    And -- and you've indicated that it's
13   on your Appendix C as a document that you relied
14   on?
15         A.    That's right.
16         Q.    Okay.
17              MS. RADCLIFFE:  If you could turn
18   to page 14.
19              THE WITNESS:  Of the report?
20              BY MS. RADCLIFFE:
21         Q.    Of the -- of -- of the judge's order,
22   yeah.  The judge's orders.  I'm sorry.
23         A.    Okay.
24         Q.    Okay.  Do you see under Section C
25   there's a description called Allegedly Actionable

1    Statements?
2          A.    Yes.
3          Q.    Okay.  In preparing your Exhibits 2.1
4    and 2.2, did you review the court's order as to
5    her understanding of what the actionable
6    statements were at issue?
7          A.    Would you mind giving me a second
8    just to --
9          Q.    Sure.
10         A.    -- familiarize myself here?
11              Okay.  Would you mind repeating that
12   question?
13         Q.    Sure.
14              In preparing your Exhibits 2.1 and
15   2.2, did you review the court's order as to her
16   understanding of what the actionable statements
17   were at issue?
18         A.    As I -- as I recall, I -- I did
19   review this -- the -- as -- as it relates to
20   Exhibit 2.1 or 2.2.  That I'd have to go back
21   and -- and -- and review, but I -- I am -- I
22   think, again, I did review this -- this
23   particular legal document.
24         Q.    Okay.  And under subheading 1 on
25   page 14, do you see where it says General Claims

1    of Quality & Savings?
2          A.    Yes.
3          Q.    And in the first sentence there it
4    says, Two things that appear throughout
5    CoreCivic's communications were CoreCivic's
6    providing detention and incarceration service at
7    a level of quality that its government clients
8    would consider satisfactory and its ability to
9    offer cost savings while doing so.
10              Do you see that?
11         A.    I see that.
12         Q.    Okay.  Did you -- let me just restate
13   that.
14              Are you providing any expert opinions
15   as to the level of quality of CoreCivic's
16   detention and incarceration services?
17         A.    The expert opinions that I'm offering
18   are about the statements that CoreCivic made
19   about costs and whether those statements were
20   supported by publicly available information and
21   were consistent with the methodologies and best
22   practices in cost accounting for governmental
23   services.  That's the opinion that I offered
24   here.
25              I reviewed this statement -- this --

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1    this particular judge's decision just as part of
2    reviewing all of the legal pleadings or at least
3    the legal pleadings that seemed especially
4    relevant to this case.
5         So my -- but my opinion is about --
6    is about statements that CoreCivic made about
7    cost.
8    **Q.    And do you see here that the court**
9    **considers that -- as -- that communications about**
10   **CoreCivic's ability to offer cost savings to be**
11   **in conjunction with its providing detention and**
12   **incarceration services at a level of quality that**
13   **its government clients would consider**
14   **satisfactory?**
15        MS. GRANT:  Object to form and to
16        the extent it misstates.
17        THE WITNESS:  I -- I'm -- I'm not
18        sure that I would characterize the judge's
19        statement in quite that way.  And, again,
20        what I -- what I did offer was an opinion
21        on CoreCivic's statements about cost
22        savings.
23        I'm not sure that I would
24        characterize it the way that you're
25        characterizing it.  And, again, the

1    substance of my opinion has to do with
2    CoreCivic's cost savings, statements about
3    cost savings.
4         BY MS. RADCLIFFE:
5    **Q.    And -- and you are not providing any**
6    **expert opinions about the level of quality of**
7    **CoreCivic's services; is that correct?**
8    A.    I'm not certain that's correct.  I
9    mean, to the extent that certain cost savings --
10   certain statements that CoreCivic made about cost
11   savings have some reference to a particular
12   outcome or reference to a particular objective, I
13   talk, for instance, at length about cost
14   effectiveness and cost efficiency, which are two
15   concepts where one has to think about both cost,
16   but also what those costs were incurred in the
17   process of doing or what those costs were
18   incurred in the process of trying to accomplish.
19        So to the extent that -- that
20   questions of meeting goals and objectives are
21   relevant and to the extent that quality is
22   related to that, my opinions on cost make
23   appropriate references to the goals and
24   objectives that may speak to, may speak
25   to any number of other characteristics of the

1    service that was delivered.
2    **Q.    Okay.  And -- and just to clarify,**
3    **you didn't perform any analysis in preparing your**
4    **expert opinion about the level of quality of**
5    **CoreCivic's services that it actually performed**
6    **for the -- the BOP?**
7    A.    Again, the -- the analysis that I did
8    looked at CoreCivic's statements about costs.
9    And, again, to the extent that those statements
10   about costs are statements about cost efficiency,
11   cost effectiveness, other cost concepts that
12   involve some reference or some understanding to
13   how a service is delivered and the outcomes that
14   those services are -- that the outcomes of
15   those -- of those service delivery models, then
16   the cost question is considered as -- or I'm
17   sorry, the -- the -- you know, the -- the
18   determination of whether cost savings or cost
19   efficiency has been achieved is in reference to
20   those goals, again, quality being potentially one
21   of them.
22   **Q.    Okay.  In paragraph 68 of your**
23   **report, you indicate some reference to -- that**
24   **plaintiff has identified the documents and**
25   **depositions containing the facts and constituting**

1    **the documents supporting lead plaintiff's**
2    **contention that each listed statement omitted**
3    **material information necessary to make it not**
4    **misleading.**
5         **Do you see that?**
6    A.    Yeah, I see that.
7    Q.    Okay.  And then there's a list of
8    categories of documents.
9         Do you see that?
10   A.    Yes.
11   **Q.    Okay.  And here you write, None of**
12   **these documents identified by plaintiffs provides**
13   **cost data or analysis concerning CoreCivic or the**
14   **BOP.  Instead, these documents appear to relate**
15   **to the quality and compliance of services**
16   **provided by CoreCivic under its BOP contracts.**
17   **And so as I understand your report,**
18   **you are implying that none of these types of**
19   **documents would be germane to your opinion**
20   **because they relate to the quality and compliance**
21   **of services provided by CoreCivic under its BOP**
22   **contracts.**
23        MS. GRANT:  Object to form.
24
25

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 50 of 125 PageID #: Page 189..192
3006
www.aptusCR.com

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.

Grae vs.
Corrections Corporation of America, et al.

1      EVENING SESSION    (5:00 P.M. EST)
2          THE WITNESS:  I'm afraid you --
3    you -- you don't understand parts of the
4    report because that's not a -- that's not
5    a fair characterization of this part of
6    the report.
7          What I do in the report is I make --
8    I drew an opinion on statements that
9    CoreCivic made about cost savings, cost
10   efficiency, other cost concepts.
11         And to the extent that those -- to
12   the extent that those statements, again,
13   relied upon reference to the achievement of
14   performance outcomes or the achievement of
15   certain goals, then those were appropriate
16   applications of those cost concepts.
17         I think the -- the broader question
18   of -- of quality is something that requires
19   a lot of careful attention.  Quality can
20   mean lots of different things in lots of
21   different settings.
22         My opinion is about when statements
23   were made about cost efficiency or cost
24   effectiveness, was it clear what outcomes
25   were being achieved or attempted to being

1    achieved and how did cost and cost
2    measurement and cost efficiency and cost
3    effectiveness -- how was -- how were those
4    concepts represented in those statements.
5          So I'm not sure that I agree with any
6    of your characterization just now of -- of
7    the substance of this part of the opinion.
8          BY MS. RADCLIFFE:
9      Q.   Okay.  So as part of your opinion,
10   did you rely on -- well, rephrase that.
11         As part of your opinion, did you
12   review any of the documents that are listed in
13   that paragraph?
14     A.    I want to go back and -- I mean,
15   it -- there's a lot of information there.  I
16   would have to go back and -- and make certain
17   that -- and -- and -- and refresh my memory on
18   exactly what I did and did not review.
19         Again, a lot of that -- a lot of this
20   part of the report -- again, the -- the -- the
21   statement that I'm simply making is that from my
22   vantage as an expert on cost analysis and cost
23   accounting, any statements that were made here
24   from the different documents that are identified
25   in those bullet points on page 32 were

1    statements, but that with respect to my opinion,
2    you know, the -- as I say here, those were
3    statements about quality and compliance.  And in
4    my analysis of cost I considered a particular
5    body of information that I think is well
6    identified here in the report.
7      Q.    If you turn back to what was
8    previously marked as Exhibit 3, page 14, under
9    that subheading 1, General Claims of Quality &
10   Savings, do you see the example that the judge
11   provides?  It says, several of CoreCivic's annual
12   reports characterized the company's primary
13   business strategy as providing quality
14   corrections services, offering a compelling value
15   and increasing occupancy and revenue while
16   maintaining our position as the leading owner,
17   operator and manager of privatized correctional
18   and detention facilities.
19         If this statement is not included on
20   your Exhibits 2.1 or 2.2, you did not consider
21   it; is that fair to say?
22     A.    I'm not sure that that's fair to say.
23   Again, I -- I evaluated statements that CoreCivic
24   made and the -- the specific statements that I
25   evaluated are listed here.

1          I'd have to go back and familiarize
2    myself with the way that CoreCivic statements are
3    characterized in this legal opinion.  So I'm
4    reticent to say yes or no, I did or did not
5    consider the -- the specific statement that
6    you're making reference to here.
7      Q.    Well, Exhibits 2.1 and 2.2 you've
8    indicated would include the statements that you
9    considered as part of your opinion.
10         So what I'm asking is if this
11   particular statement is not in those exhibits,
12   where else did you address it in your opinion?
13         MS. GRANT:  Object to form.
14         THE WITNESS:  Well, and what I'm
15   saying in response is you're pointing me
16   toward the judge's characterization of a
17   statement that CoreCivic made and that
18   characterization is made here in a legal
19   opinion.  That's a -- that's a different
20   thing than what we were -- than what you
21   see in Exhibit 2.1, 2.2.
22         It may very well be that some version
23   of this statement or some component of this
24   statement was something that I analyzed.
25   But you're -- you're pointing toward a

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 51 of 125 PageID #: 15561
www.LexitasCR.com
Page 193..196

1    statement that someone else -- you're --
2    you're pointing toward someone else's
3    characterization of a CoreCivic statement.
4    I analyzed actual CoreCivic statements.
5        BY MS. RADCLIFFE:
6        Q.    So are you saying that the -- the
7    court didn't actually accurately capture the
8    statement?
9        MS. GRANT:  Object to form.
10        THE WITNESS:  No, I'm not saying
11    that at all.  I'm simply saying that
12    you're giving me a characterization,
13    you're in a legal opinion.  I would have
14    to look much more carefully at exactly
15    what was said here to be able to
16    understand how this legal opinion
17    characterizes the statements that
18    CoreCivic made that I actually did
19    analyze.
20        I'm not saying anything about what
21    the court did or did not do.  I'm simply
22    trying to make clear what I actually did in
23    my report.
24        BY MS. RADCLIFFE:
25        Q.    Okay.  So the court quotes the

1    language.
2        A.    Well, the court quoted some language.
3        Q.    Yes.  And so, for example, part of
4    that language is regarding a compelling value.
5        Do you think that that would be a
6    cost-related statement?
7        MS. GRANT:  Object to form.
8        THE WITNESS:  Throughout the
9    report, again, I highlight -- I -- I make
10    clear the CoreCivic statements that I did
11    analyze.  There's statements in the report
12    about value proposition as an example.  I
13    analyzed those statements and statements
14    similar to it.
15        Again, you're pointing toward someone
16    else's characterization of CoreCivic's
17    statements.  I was very careful in doing my
18    analysis to make sure that I looked
19    specifically at statements CoreCivic had
20    made --
21        MS. REPORTER:  I'm sorry?  One
22    word.
23        THE WITNESS:  I'm saying I -- I was
24    very careful in my report to make sure
25    that I looked at the statements CoreCivic

1    actually made in attempting to --
2        (Remote transmission interference)
3        THE WITNESS:  -- my expertise --
4        MS. REPORTER:  Again, you -- it
5    happened.
6        THE WITNESS:  I was saying that I
7    was very careful in -- in my -- in my
8    report to look at the actual statements
9    CoreCivic made and to bring my expertise
10    to bear on analyzing those particular
11    statements.  Here I'm looking at a -- a --
12    you know, the judge's characterization,
13    which I'm not saying is right, wrong or
14    otherwise.  I'm simply saying that's a --
15    that's someone's characterization of other
16    statements that I actually did analyze.
17        BY MS. RADCLIFFE:
18        Q.    Okay.  So as you sit here today, what
19    I'm understanding your testimony to be is you
20    would have to go back and look to see if -- if
21    you analyzed the particular statement referenced
22    here by the judge or a -- or what was precisely
23    said in the annual report that she referenced.
24        MS. GRANT:  Object to form.
25        THE WITNESS:  No, that's -- that's

1    not a fair characterization of what I'm
2    saying.  I think what I'm saying is -- is
3    much simpler than what you're saying.
4        I'm saying I looked at a variety of
5    information.  I looked at a long list of
6    statements that CoreCivic made.  I brought
7    my expertise to bear on assessing those
8    statements.
9        What you're seeing -- what you're
10    showing me here is some quotes, a -- a
11    characterization, a representation of some
12    of those statements.  I'm not saying it's
13    wrong.  I'm not saying it's right.  I'm
14    simply saying that if -- I -- I would stand
15    by what's in the report as my analysis of
16    the statements that CoreCivic actually made.
17        BY MS. RADCLIFFE:
18        Q.    Okay.  If you can turn to your report
19    on page -- paragraph 20.
20        A.    Got it.
21        Q.    Okay.  Do you see here that -- that
22    you've indicated that Based on my review of
23    plaintiff's complaint and interrogatory
24    responses, the challenged statements include both
25    qualitative and quantitative claims about the

1   cost savings associated with the services that
2   CoreCivic provided to the BOP?
3       A.   Yes, I see that.
4       Q.   Okay.  So in -- in preparing your
5   report and, in particular, Exhibits 2.1 and 2.2,
6   you reviewed plaintiff's interrogatory responses;
7   is -- is that fair to say?
8       A.   That's fair, yep.
9       Q.   Okay.
10          MS. RADCLIFFE:  And if somebody
11      could pull up tab 5 and put it in the
12      chat.
13          BY MS. RADCLIFFE:
14      Q.   Let me know when you have the
15  document, Mr. Marlowe.
16          You good?
17      A.   Just one minute.
18      Q.   Okay.
19          MS. RADCLIFFE:  Oh, and I guess for
20      the interrogatory responses we should mark
21      these in as Exhibit 557.
22          (Thereupon, Marlowe Exhibit
23          Number 557 was marked for
24          identification.)
25

1           BY MS. RADCLIFFE:
2       Q.   Mr. Marlowe, do you recognize these
3   to have been the interrogatory responses that you
4   would have reviewed in connection with your
5   report?
6       A.   Yes.
7       Q.   Okay.  If you can go to page 9 of
8   your report and footnote 33.
9       A.   Okay.  Got it.
10      Q.   Okay.  Do you see here that you're
11  referring to response to Interrogatory Number 13
12  with respect to the cost allegations?
13      A.   Can you repeat that?
14      Q.   Sure.
15          Do you see here there's a reference
16  to Interrogatory Number 13 with respect to the
17  cost allegations?
18      A.   In footnote 33, right.
19      Q.   Correct.
20          MS. RADCLIFFE:  And if you could
21      turn to what was marked Exhibit 557 to
22      Interrogatory Number 13.
23          BY MS. RADCLIFFE:
24      Q.   Did -- in preparing your expert
25  report, did you consider -- and you need to sort

1   of look at it in conjunction with Interrogatory
2   Number 12, which asked for plaintiff to state
3   each challenged statement that you will contend
4   is false and misleading.
5           Do you see that?
6       A.   Okay.  I'm sorry.  I need you to --
7   to back up here.  So on -- on --
8       Q.   The interrogatories on page 5 with
9   reference to Interrogatory Number 12.
10      A.   Page 5 --
11          (Remote transmission interference)
12      Q.   Tab 5 and -- oh, I'm sorry, it's
13  page 5, my apologies, of the interrogatories.
14      A.   No problem.  I've got it now.
15      Q.   And -- that's not looking right.  I
16  think that's -- let's see.
17          So there's going to be these long
18  lists of objections.  I think they're called
19  general objections.
20          MS. RADCLIFFE:  You're on page
21      about 2 or 3.  So you're probably on 5 of
22      the PDF, so you just need to go down a
23      little more.  The other way.
24          VIDEO OPERATOR:  So which --
25          (Remote transmission interference)

1           MS. RADCLIFFE:  If you go up to --
2   it's page 5 of the document, Interrogatory
3   Number 12.
4           VIDEO OPERATOR:  Okay.
5           MS. RADCLIFFE:  Okay.  Okay.  You
6   see it says, State each challenged
7   statement that you still contend is false
8   and misleading.
9           VIDEO OPERATOR:  Yes.
10          MS. RADCLIFFE:  You see that?  And
11      there's a response to the interrogatory.
12      And if you can flip to the next page
13      you'll see Subject to the objections,
14      plaintiff identifies the statements in
15      response to Interrogatory Number 13.
16          VIDEO OPERATOR:  Got it.
17          BY MS. RADCLIFFE:
18      Q.   And with respect to number 13, do you
19  see that --
20          MS. RADCLIFFE:  If you scroll down
21      through the chart -- keep going --
22          BY MS. RADCLIFFE:
23      Q.   That there is then a list of
24  challenged statements and categories and omitted
25  information.  And we can take the first one, for

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 53 of 125 PageID #: Page 201..204
2963
www.aptusCR.com

1 example.

2 Do you see that the challenged

3 statement is Corrections Corp.'s entire Form 10-Q

4 filed with the SEC on November 4, 2011?

5 A. I -- okay. So you -- I see -- I see

6 that that's what's in this -- this table. You

7 had alluded a second ago to some sort of

8 characterization of this that -- that I -- I

9 don't know that I agree with. But, yes, I see

10 that it says challenged statement, CCA's Form

11 10-Q filed on -- filed with the SEC on

12 November 4, 2011.

13 Q. Okay. So in -- in preparing --

14 MS. RADCLIFFE: And you can scroll

15 down a little bit. You'll see the next

16 one is -- is -- the next one is a SOx

17 certification filed with the SEC on

18 November 4, 2011.

19 And the next one you'll see, if you

20 go down, is -- you've got to go to the next

21 page -- there we go -- is CCA's Form 10-K

22 filed with the SEC on February 27, 2012.

23 BY MS. RADCLIFFE:

24 Q. And so in preparing your expert

25 opinion, you did not consider the entirety of the

1 challenged statements that plaintiffs allege are

2 in the case; is that accurate?

3 MS. GRANT: Object to the form.

4 THE WITNESS: I'm -- I'm not sure I

5 follow your -- your question, your --

6 BY MS. RADCLIFFE:

7 Q. Okay. So Interrogatory Number 12 had

8 asked for plaintiffs to identify the challenged

9 statements remaining in the case.

10 A. Correct.

11 Q. And plaintiffs directed the response

12 to see the response to Interrogatory Number 13.

13 In Interrogatory Number 13 there is a

14 column that says Challenged Statement, of which

15 plaintiff has provided a description of the

16 challenged statement, which consists of the

17 entirety of documents, including the one before

18 us, which is CCA's Form 10-K filed with the SEC

19 on February 27, 2012.

20 In preparing your expert opinion, you

21 did not consider the entirety of CCA's form 10-K

22 when assessing the challenged statements; is that

23 accurate?

24 MS. GRANT: Object to form.

25 THE WITNESS: No, I'm not -- I

1 don't think that's accurate.

2 I -- as we had discussed earlier, we

3 were discussing Appendix C. As I had said,

4 I reviewed all of CoreCivic's disclosures,

5 all of its 10-K and 10-Q disclosures.

6 If your question is about reviewing

7 the entirety of those disclosures, I go back

8 to my -- my previous answer which is yes, I

9 did.

10 BY MS. RADCLIFFE:

11 Q. Let me rephrase it.

12 When preparing your expert opinion,

13 you didn't understand that plaintiffs were

14 challenging the entirety of certain, for example,

15 SEC filings by Corrections Corp.?

16 MS. GRANT: Object to form.

17 THE WITNESS: Was there a question

18 there? I'm sorry.

19 BY MS. RADCLIFFE:

20 Q. When -- when preparing your expert

21 opinion, did you understand that plaintiffs were

22 challenging the entirety of certain SEC filings

23 by Corrections Corp.?

24 MS. GRANT: Object to form.

25 THE WITNESS: Did I understand?

1 I'm not sure what you mean by -- by

2 understand. Was I -- was I aware of or

3 was the -- what do you mean by understand?

4 BY MS. RADCLIFFE:

5 Q. Sure.

6 Let's go with were -- were you aware

7 of.

8 MS. GRANT: Same objection.

9 THE WITNESS: I was -- I think as I

10 sit here today, I would -- again, I'd have

11 to go back and -- and review what I

12 reviewed in the course of putting the

13 opinion together. I -- I can't -- I

14 can't -- no, I can't -- I can't say

15 definitively which specific statements

16 were in dispute and -- and which

17 particular statements were not in dispute.

18 What I did, as I talk about in the

19 report, was review a variety of those

20 statements in -- in the last part of my

21 opinion.

22 BY MS. RADCLIFFE:

23 Q. And do you understand that there are

24 fraudulent scheme allegations in this case?

25 MS. GRANT: Object to form.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 54 of 125 PageID #: Page 205..208
3064
www.CR.com

1        THE WITNESS:  I'm sorry, that
2    there -- there are fraudulent which
3    allegations?
4        BY MS. RADCLIFFE:
5        Q.    Sure.
6        There were fraudulent scheme
7    allegations in this case?
8        A.    I'm aware of -- I'm -- I'm -- I'm
9    aware of the -- what -- what I looked at in my
10   report was a specific set of statements that
11   CoreCivic had made.  The questions about the --
12   the broader context of the case was -- was a bit
13   outside the scope of what I was asked to do.
14       Again, I was asked to look at whether
15   CoreCivic's statements that it did make were
16   well-supported and within the bounds of what an
17   expert in governmental cost accounting like
18   myself would consider to be appropriate types of
19   disclosures.
20       Q.    And so for those statements that you
21   did consider, those are the ones in Exhibits 2.1
22   and 2.2, correct?
23       A.    That's right.
24       Q.    Okay.
25       MS. RADCLIFFE:  Could you please

1    put tab 24 into the chat.  We're going to
2    mark tab 24 as Exhibit 558.  It's a first
3    quarter 2005 -- '15 investor presentation.
4        (Thereupon, Marlowe Exhibit
5        Number 558 was marked for
6        identification.)
7        MS. RADCLIFFE:  If you could turn
8    to page 11 of that document.
9        BY MS. RADCLIFFE:
10       Q.    Mr. Marlowe, do you understand that
11   this is one of the statements that you would have
12   reviewed as a quantitative representation?
13       MS. GRANT:  Object to form.
14       And also take your time to review the
15   document.
16       THE WITNESS:  Okay.  Yeah, just
17   give me a second here.
18       BY MS. RADCLIFFE:
19       Q.    Take your time.
20       VIDEO OPERATOR:  Counsel --
21       MS. RADCLIFFE:  Yes.
22       VIDEO OPERATOR:  I want to let you
23   know that tab 24, I have it marked as
24   Exhibit 559.
25       MS. RADCLIFFE:  That's fine.

1        VIDEO OPERATOR:  Okay.  Just making
2    sure with you.
3        BY MS. RADCLIFFE:
4        Q.    And if it's easier for you, you can
5    look at your Exhibit 2.1 on page -- the first
6    page of that, which refers to CCA's America's
7    Leader Partnership Corrections, First Quarter
8    2015 Investor Presentation.
9        A.    Okay.  Go ahead.
10       Q.    Okay.  So do you understand that this
11   was one of the quantitative statements that you
12   reviewed as part of your expert opinion?
13       A.    To the best of my recollection, this
14   was one of those.
15       Q.    Okay.  So you have provided a summary
16   of CoreCivic's alleged cost-related
17   misrepresentations in Exhibit 2.1, correct?
18       MS. GRANT:  Object to form.
19       THE WITNESS:  I've --
20       BY MS. RADCLIFFE:
21       Q.    So --
22       MS. REPORTER:  Was there an answer?
23       MS. RADCLIFFE:  I did not hear one.
24       THE WITNESS:  Nope, not yet.
25       I'm not sure I would characterize it

1    as a -- as a summary, but -- but the -- but,
2    yeah, I mean, this -- this statement is one
3    of those analyzed and included in
4    Exhibit 2.1.
5        BY MS. RADCLIFFE:
6        Q.    Okay.  Just for the record, the
7    heading of the title of Exhibit 2.1 is Summary of
8    CoreCivic's Alleged Cost-Related
9    Misrepresentation.
10       But putting that aside, okay, so the
11   information that is included in Exhibit 2.1 is
12   not exhaustive of all the information that was
13   conveyed to investors in this particular slide
14   presentation; is that accurate?
15       A.    I'm not sure that that's accurate and
16   not necessarily a fair characterization of what's
17   in this exhibit or what part of my analysis this
18   exhibit supports.
19       And what I was doing was evaluating
20   the statements that CoreCivic did make.  And what
21   you see in Exhibit 2.1 is the support that
22   CoreCivic provided for that statement.  You just
23   said something about all of the information that
24   was conveyed to investor --
25

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1    BY MS. RADCLIFFE:
2    Q.    Well --
3    A.    -- presentation.
4    Q.    The summary that you have is that
5    operational cost savings of 15 percent
6    relevant -- relative to the operating cost and
7    real estate costs of BOP facilities.
8         Is that an accurate depiction of what
9    your description is of the alleged cost-related
10   misrepresentation?
11   A.    Yes.
12   Q.    Okay.  So if you turn to the slide
13   that was provided to investors, do you see at the
14   top of the slide in big bold letters says CCA
15   Value Proposition?
16   A.    You're talking about slide 11?
17   Q.    Yes.
18   A.    Yes, I see that.
19   Q.    Okay.  And did you do any analysis
20   about how investors would perceive information
21   under a heading called CCA Value Proposition?
22   A.    I did -- throughout the -- one of the
23   sections of the report I offer some opinions on
24   whether the statements CCA made about value
25   proposition were supported and appropriate.

1    Q.    And with respect to references to
2    value, value means something different than cost,
3    correct?
4    A.    I'm sorry.  You cut out there.  Value
5    means something different --
6    Q.    Than cost.
7    A.    Well, as I -- as I talk about in the
8    report -- actually, if you wouldn't mind, maybe
9    I'll just go there.
10   Q.    Go ahead.
11   A.    This is paragraph 58, page 28 --
12        (Remote transmission interference)
13        MS. REPORTER:  I'm sorry?
14        THE WITNESS:  If we go to
15   paragraph 5 of my report, page 28, I
16   define value proposition in paragraph 58 a
17   concept that does not have a single
18   specific definition in the cost accounting
19   literature but is used to broadly refer to
20   the reasons why a customer would select a
21   given product or service and encompasses
22   quality, benefits, costs, trade-offs and
23   other factors.
24        BY MS. RADCLIFFE:
25   Q.    All right.  So you would agree that

1    one of the factors when you refer to your value
2    may include the quality of a service?
3        MS. GRANT:  Object to form.
4        THE WITNESS:  You said something
5    there about -- about my value and I'm
6    not -- I'm not quite sure what you --
7        BY MS. RADCLIFFE:
8    Q.    Sure.  I -- I apologize.
9         So when -- would you agree that one
10   of the factors when -- when there's a reference
11   to the term value, one of the factors that may be
12   implied by the use of that term includes the
13   quality of a service?
14        MS. GRANT:  Object to form.
15        THE WITNESS:  Well, to be clear,
16   the -- the term is value proposition
17   and -- but as I say in the definition in
18   paragraph 58, quality is one of several
19   factors that are incorporated into the
20   concept of -- or could be incorporated
21   into the concept of value proposition.
22        BY MS. RADCLIFFE:
23   Q.    Okay.  And -- and for Exhibit 2 --
24   for this particular reference in your
25   Exhibit 2.1, the support provided by CoreCivic

1    for this particular slide, you reference a -- an
2    average owned per diem for the quarter and the
3    sum of BOP's average daily cost per capita,
4    across all security classifications, as disclosed
5    for FY 2014 and estimated incremental real estate
6    investment and maintenance costs per capita of
7    $12.
8         Do you see that?
9    A.    I do.
10   Q.    Okay.  And so the -- there's nothing
11   in this slide deck that sport -- supports the
12   notion of value with respect to the quality of
13   CCA's service?
14        MS. GRANT:  Object to form.
15        THE WITNESS:  Is that a question?
16        BY MS. RADCLIFFE:
17   Q.    Sure.
18        There's nothing in this slide deck
19   that you've identified or in this particular
20   slide that supports the notion of value with
21   respect to the quality of CCA's services?
22        MS. GRANT:  Object to form.
23        THE WITNESS:  Well, again, you keep
24   conflating value and value proposition.
25   And as I explained, cost is in

1  consideration as part of value
2  proposition.  I don't know that I would
3  characterize -- I -- I wouldn't
4  characterize it the way you just said it,
5  that there's -- that there's nothing here
6  that investors would -- would see as
7  related to value proposition.
8      Again, what I did was evaluated that
9  specific statement about CoreCivic's claims
10  about operational cost savings.  Operational
11  cost savings are a consideration for value
12  proposition.  So I don't know that I would
13  characterize it the way that you just
14  characterized it.
15      BY MS. RADCLIFFE:
16      Q.    So do you understand that most
17  investors do not have your level of expertise
18  when it comes to the various terminology that --
19  that you've defined in -- in your expert report?
20      MS. GRANT:  Object to form and
21  outside the scope.
22      THE WITNESS:  I think investors is
23  a very broad term that encompasses lots of
24  different kinds of people with many, many
25  different levels of understanding of lots

1  of different kinds of financial
2  information.
3      BY MS. RADCLIFFE:
4      Q.    And do you see on the previous page
5  here, also discussing value, that there is a
6  reference to, at the very bottom, without
7  sacrificing quality?
8      MS. GRANT:  Object to form.
9      THE WITNESS:  So --
10      BY MS. RADCLIFFE:
11      Q.    Page 10 of the slide deck.
12      MS. RADCLIFFE:  Videographer, could
13  you move up to page 10, please.
14      THE WITNESS:  I see, okay.  On the
15  bottom of the slide, without sacrifices to
16  quality.  Okay.
17      BY MS. RADCLIFFE:
18      Q.    Okay.  And so do you understand that
19  as part of this slide deck, CCA's value
20  proposition includes short- and long-term savings
21  can be achieved by governments contracting with
22  the private sector without sacrificing quality?
23      MS. GRANT:  Object to form.
24      THE WITNESS:  I see that that
25  statement is on this slide, yes.

1      BY MS. RADCLIFFE:
2      Q.    Okay.  And -- and that would have
3  been information that was conveyed to investors?
4      MS. GRANT:  Object to form, outside
5  the scope.
6      THE WITNESS:  Again, I -- if you're
7  asking me to -- to characterize what
8  investors would or -- or would have not
9  known, I would just go back to what I've
10  been saying.  I analyzed a core set of
11  statements that CoreCivic made about its
12  costs and that information was available,
13  it was reported, it was consistent with
14  the core concepts of governmental cost
15  accounting and what investors would have
16  or -- or would not have known is outside
17  the scope of what I looked at
18  specifically.
19      MS. REPORTER:  Ms. Willow --
20      MS. RADCLIFFE:  Yes.
21      MS. REPORTER:  -- could we take a
22  convenience break?
23      MS. RADCLIFFE:  That -- that's
24  fine.  Do you want to take, whatever, five
25  minutes or 10, whatever you want?

1      MS. GRANT:  Can we take 10?
2      MS. RADCLIFFE:  Sure.
3      VIDEO OPERATOR:  Okay.  The time is
4  2:38 p.m. and we are now off the record.
5      (Thereupon, a brief recess was
6      taken.)
7      VIDEO OPERATOR:  Okay.  The time is
8  2:56 p.m. and we are back on the record.
9      BY MS. RADCLIFFE:
10      Q.    Mr. Marlowe, if you can look back at
11  what had been marked Exhibit 558, that investor
12  presentation that we were looking at, slide 10 --
13  I mean, I'm sorry, slide 11.
14      And do you see any disclaimer on this
15  slide deck that CCA was not implying that it
16  provided value with respect to the quality of its
17  services?
18      MS. GRANT:  Object to form.
19      THE WITNESS:  Do I see a -- a
20  disclaimer that implies that the --
21      BY MS. RADCLIFFE:
22      Q.    Let me put it this way:
23      Do you see any disclaimers on this
24  slide that -- that investors should not consider
25  anything, only -- consider anything other than

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 57 of 125 PageID #: 217..220
www.LexisCR.com
13067

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 221

1    the cost information that is provided in this
2    slide?
3        A.    Well, again, I -- I can't -- how
4    investors would or would not respond to
5    information is outside the scope of what I'm
6    trying to opine on here.  I -- as explained
7    before, I looked at statements CoreCivic made and
8    offered an opinion on the statements that they
9    had made.
10            Questions of how information was
11    presented to investors is a bit outside of what I
12    have actually analyzed, which is in the report,
13    which I'd be happy to talk more about.
14        Q.    And with respect to what is listed
15    here, do you see an -- it's an operating costs
16    per day in a government facility is reflected?
17        A.    That's right, the second column in
18    the table?
19        Q.    And -- yes.
20            And would that include all security
21    levels?
22            MS. GRANT:  Object to form.
23            THE WITNESS:  I'd have to go back
24        and look at the -- at the specific context
25        for the statement to refresh my memory on

1    what exactly was included in -- in that
2    figure.
3            BY MS. RADCLIFFE:
4        Q.    And with respect -- would you agree
5    that with respect to the CCA facilities, that
6    those were all low-security facilities?
7            MS. GRANT:  Object to form.
8            THE WITNESS:  You know, again, I --
9        the -- the statements that I evaluated are
10        explained in the report and I'd be happy
11        to -- to walk you through what -- the
12        actual statements that I evaluated.  And
13        to the extent that, you know, variations
14        in CoreCivic's security levels are -- are
15        a part of the analysis that I did, I'd be
16        happy to -- to talk about that.
17            BY MS. RADCLIFFE:
18        Q.    My question is -- this is one of the
19    statements that you did evaluate, correct?
20        A.    That's right.
21        Q.    Okay.  And -- and I -- I think maybe
22    we'll just start with a broader question.
23            Why don't you inform me what
24    precisely are your opinions that you're going to
25    give at trial in this case.

1            MS. GRANT:  Object to form.
2            THE WITNESS:  I -- I think that
3        makes an assumption about how the case
4        will unfold.  I -- any -- any opinions
5        that I have to offer are offered in my
6        report.
7            And as I say in the report, should
8        new information or -- should new information
9        become available, reserve the right to offer
10        another opinion.  But as it stands now, any
11        opinions that I might offer are -- are the
12        substance of the report that I've already
13        prepared.
14            BY MS. RADCLIFFE:
15        Q.    So there isn't any new information
16    that has come to your attention that would change
17    the opinions in your report?
18        A.    Not since the -- well, as I sit here
19    today, since I submitted the report I have not
20    had any information -- any new information that
21    would change any opinions.
22        Q.    And can you please articulate what
23    those opinions are, as set forth in your report?
24            MS. GRANT:  Object to form.
25            THE WITNESS:  Would you -- would

1    you like me to walk through them?  I'd --
2        I'd be happy to.
3            BY MS. RADCLIFFE:
4        Q.    I'd like you to explain, you know,
5    your own understanding of what your expert
6    opinions are in this case to date.
7            MS. GRANT:  Object to form,
8        overbroad.
9            THE WITNESS:  So, again, the
10        opinions that I've offered are outlined in
11        the report.  And if you -- and if you'd
12        like me to -- to -- to read some of the
13        summaries and whatnot, I'd -- I'd be happy
14        to.  It's -- I think the report does a
15        nice job of explaining my opinions and the
16        basis by which I concluded them.
17            BY MS. RADCLIFFE:
18        Q.    Can you articulate your opinions
19    without reading from your report?
20            MS. GRANT:  Object to form.
21            THE WITNESS:  If by articulate --
22        yes, I can --
23            BY MS. RADCLIFFE:
24        Q.    Explain what they are.
25            MS. GRANT:  Willow, if you could

1    let him finish.
2        THE WITNESS: Again, I -- I
3    think -- I think -- I think the opinions
4    are well articulated in the report as it
5    stands. I'd be happy to -- to walk you
6    through those -- those opinions if you
7    would like. It's a --
8        BY MS. RADCLIFFE:
9    **Q. So I'm asking you if you could**
10  **summarize your expert opinions in this case.**
11     A. So you're -- you're asking -- is
12  that -- I'm sorry, is that a question or a
13  statement? You're -- you're saying -- you're
14  stating that you're asking me to or are you
15  asking me to?
16      **Q. I'm asking you to.**
17     A. And, again, I feel like I've answered
18  that. I feel like the opinions are -- are well
19  articulated in the report and I stand by the
20  content of the report.
21      I'd be happy to -- if you want --
22      **Q. So you're unable to summarize your**
23  **expert opinions in this case; is -- is that your**
24  **answer?**
25     A. I --

1        MS. GRANT: Object to form.
2        THE WITNESS: I missed the -- the
3    first part of that question. I'm sorry.
4        BY MS. RADCLIFFE:
5    **Q. Sure.**
6        **The question that I asked you is if**
7  **you could please summarize your expert opinions**
8  **in this case.**
9     A. Right, and I feel like I've -- I've
10  answered that by simply saying that the substance
11  of my opinions are -- are outlined in the
12  opinion. Be happy to go and -- and walk through
13  them with you if you'd -- if you'd like.
14     **Q. So without reviewing the report,**
15  **you're unable to summarize what your expert**
16  **opinions are?**
17       MS. GRANT: Object to form.
18       Willow, that's not -- certainly an
19  inappropriate question when you have the
20  report in front of you. You're entitled to
21  ask about the specific opinions. If you
22  want him to --
23       MS. RADCLIFFE: Meryn --
24       MS. GRANT: -- summarize them at
25  length --

1        MS. RADCLIFFE: -- that's not an
2  appropriate objection and he -- he can
3  either answer whether he's able to
4  summarize what his opinions are or he
5  cannot without referring to the report.
6        MS. GRANT: And he's offered to do
7  so repeatedly. The question is harassing
8  and unclear.
9        MS. RADCLIFFE: The question is can
10  he summarize them without referring or
11  reading the report.
12        THE WITNESS: If the question is
13  can I summarize them, yes.
14        BY MS. RADCLIFFE:
15    **Q. Okay. Please do so.**
16     A. Well -- and, again, I -- the -- the
17  best answer I can give you is that the -- the
18  best summary of the report that I can offer is
19  what's outlined in the report itself. Your
20  question can I do it, yes, but I think the report
21  represents itself well enough that the best
22  source of the opinions and understanding the
23  opinions is the report itself.
24     **Q. So as I understand your answer,**
25  **you're unwilling to do so?**

1        MS. GRANT: Objection to form.
2  That's not what he said.
3        BY MS. RADCLIFFE:
4    **Q. Okay. Why don't you start -- why**
5  **don't you outline your opinions based on the**
6  **report. Why don't you direct us to them.**
7     A. Sure.
8      So the best summary of the report --
9  the best summary of my expert opinions is
10  starting on page 2, paragraph 8.
11    **Q. Okay. And why don't you explain what**
12  **the opinion is.**
13     A. ON paragraph 8 I say that The
14  statements CoreCivic made during the class period
15  regarding cost savings relative to its government
16  partners were supported by internal CoreCivic
17  documents and publicly available information.
18  The company's cost comparison statements were
19  limited to available information and reflected
20  reasonable judgments of the cost data compared.
21     That's one of the opinions.
22    **Q. And with respect to that opinion,**
23  **which CoreCivic internal documents supported**
24  **those statements?**
25       MS. GRANT: Objection, overbroad.

Case 3:16-cv-02267   Document 359-2   Filed 11/20/20   Page 59 of 125 PageID #: 16609
Pg. 225..228
www.LexCR.com

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.                                    Grae vs.
                                    Corrections Corporation of America, et al.

1          BY MS. RADCLIFFE:
2          Q.    You can categorize them.
3          A.    So is that a question?
4          Q.    Yes, if you could categorize which
5    internal documents supported the statements
6    CoreCivic made during the class period regarding
7    cost savings relative to its government partners.
8          A.    I think that's outlined in detail in
9    the report. And, again, the support for each
10   statement depends on the specific statement and
11   depends on the specific context in which that
12   statement was made.
13         Q.    Okay. The reference is to internal
14   CoreCivic documents. I'm trying to understand
15   which ones you're referring to.
16         So if you want to look elsewhere in
17   your report and tell me, then that's okay.
18         MS. GRANT: Objection to form and
19   overbroad.
20         THE WITNESS: Again, I -- I -- I
21   would give you the same answer. The --
22   the -- the particular statement in
23   question and the support for a particular
24   cost statement would -- and -- and
25   whatever support might have been provided

1    by internal CoreCivic documents is going
2    to depend on the specific statement in
3    question.
4          BY MS. RADCLIFFE:
5          Q.    Why don't you provide an example.
6          A.    An example of?
7          Q.    A statement where the internal
8    documents are identified, a support statement
9    regarding cost savings relative to CoreCivic's
10   government partners.
11         A.    I provide a variety of examples of
12   that. If you want to talk specifically about
13   the -- the statements that CoreCivic made about
14   operational cost savings, they -- those -- okay.
15         So, sorry, to back up, so I'm
16   saying -- your question is about -- is about
17   statements supported by internal CoreCivic
18   documents?
19         Q.    Yes. Your opinion here refers to
20   statements regarding cost savings relative to
21   Correction Corp.'s government partners were
22   supported by internal CoreCivic documents.
23         So what I'm trying to understand is
24   if you could provide an example of one of the
25   statements you're referring to and what internal

1    documents supported that statement.
2          A.    Part of the challenge with that is
3    that throughout the report I'm summarizing
4    statements that CoreCivic made. I'm -- I'm
5    summarizing in some cases categories of
6    statements that -- that CoreCivic made.
7          And so it can be difficult to -- to,
8    you know, separate individual statements from
9    the -- the broader way that I talk about them.
10         Q.    I guess I'm confused, because just
11   less than two minutes ago you told me that we had
12   to look at the particular statement in question.
13   So even if it's by category, if you could pick an
14   example of a category and what internal documents
15   support the category of statements regarding cost
16   savings relative -- CCA's cost savings relative
17   to its government partners, then let's look at
18   the category.
19         A.    Sure.
20         MS. GRANT: Object to form.
21         THE WITNESS: Yeah. Can you give
22   me just a second to review some of this
23   and let me make sure that I can get you a
24   good example?
25

1          BY MS. RADCLIFFE:
2          Q.    Thank you.
3          A.    Okay. So thanks.
4          And so one -- you know, one example
5    would be if you look at paragraph 39 on page 18.
6    In this section I'm talking about CoreCivic's
7    per diem cost savings estimates and that those
8    estimates were reasonable and conservative.
9          And in paragraph 39 I talk about how
10   those per diem costs were -- the cost comparisons
11   appear to be based on the per diem costs
12   exclusive of support costs. And then those
13   support costs include administrative, overhead,
14   legal expenses, payroll expenses.
15         And that's based on documents from
16   CoreCivic that made clear what those particular
17   support costs -- made -- made those particular
18   support costs clear.
19         Q.    So the reference is to the single
20   document in --
21         MS. GRANT: Object to form.
22         BY MS. RADCLIFFE:
23         Q.    -- footnote 79?
24         A.    You -- you asked for an example
25   and -- and a reference to a document. This is --

1  this is an example.  This -- this is my -- in
2  answer to your question, this is an example.
3      Q.   Okay.  And so as I understand it,
4  your support for your opinion that internal
5  documents support this per diem rate would be
6  that it is referenced in footnote 79?
7      A.   I'm talking about one particular part
8  of one cost comparison statement.  As I talk
9  about in the report, I depend on a wide variety
10 of -- of information in drawing all of these
11 conclusions.  This is --
12     Q.   So any of the internal documents that
13 you relied on for your opinion that -- that the
14 statements CoreCivic made during the class period
15 regarding cost savings relative to its government
16 partners was supported by internal CoreCivic
17 documents would be limited to those that you
18 reference in your report?
19     A.   I'm not sure that I would
20 characterize it the way that you're
21 characterizing it.  I think that the -- the
22 support for those statements that I analyzed is
23 made clear in all of the citations that I offered
24 in the report itself.
25         You're asking for an example and an

1  example of internal documents that support one of
2  those statements.  I gave this specific example.
3  Now you're asking to make a broad generalization
4  about the role of internal documents throughout
5  the report on the whole and that's not a fair
6  characterization.
7         The support for those statements is
8  clearly identified throughout the report.
9      Q.   I -- I think we're just talking over
10 the top of each other.
11         That's what -- I -- I just want to
12 clarify that those documents, those internal
13 documents that you believed supported your
14 opinion that the statements made during the class
15 period regarding cost savings relative to CCA's
16 government partners were supported by internal
17 documents, those documents would be included in
18 the references in your report when talking about
19 a particular statement or a particular category?
20         MS. GRANT:  Object to form.
21         THE WITNESS:  Okay.  I think that's
22 a slightly different characterization than
23 the one you gave a bit ago.
24         But, again, to the extent that I
25 relied on internal documents in drawing my

1  conclusions, there are references to those
2  internal CoreCivic documents throughout the
3  report.
4      BY MS. RADCLIFFE:
5      Q.   Okay.  And then you reference
6  publicly available information.
7         Generally what publicly available
8  information are you referring to?
9         MS. GRANT:  Object to form.
10        THE WITNESS:  Do you have a -- a
11 specific reference in the report that
12 you're -- a specific statement I made
13 about publicly available information that
14 you're asking about?
15        BY MS. RADCLIFFE:
16     Q.   Yes.  It's that same summary
17 conclusion that you have here, The statements
18 CoreCivic made during the class period regarding
19 cost savings relevant -- relative to its
20 government partners were supported by internal
21 CoreCivic documents and publicly available
22 information.
23         So I'm asking what publicly available
24 information are you referring to?
25     A.   Well, again, I think I made clear

1  throughout the report there's -- not just for
2  that specific cost comparison, but for lots of
3  the different cost -- or, I'm sorry, lots of the
4  cost statements generally that CoreCivic made I
5  relied on publicly available sources that are --
6  are set forth in the report.  The -- CoreCivic's
7  10-Ks and 10-Qs would be one example of a
8  publicly available document that informed this.
9      Q.   Okay.  So, for example, the per diem
10 rate that you just referenced, would -- what
11 publicly available information in the 10-Qs and
12 Ks would be information that would have supported
13 CoreCivic's statements regarding cost savings
14 relevant -- relative to its government partners
15 in those SEC filings?
16        MS. GRANT:  Object to form.
17        THE WITNESS:  Again, I'd have to --
18 I'd have to go back and -- and look at the
19 report again and -- and more carefully
20 review the specific information that --
21 that I relied on in that particular
22 comparison.
23        Again, I made -- made a -- a
24 statement about the wide variety of publicly
25 available information that I relied on.  And

1    I'm not suggesting that there was a 10-K or
2    a 10-Q reference supporting that specific
3    statement.
4         Not saying there wasn't.  I'm just
5    saying that that's a mischaracterization of
6    my answer to your previous question where I
7    was giving you a specific example of the
8    kind of information from a much broader
9    universe of information that -- publicly
10   available information that I considered in
11   drawing my opinions.
12        BY MS. RADCLIFFE:
13        Q.    And the second part of the summary
14   opinion says, The company's cost comparison
15   statements were limited to available information
16   and reflected reasonable judgments on the cost
17   data compared.
18        Do you see that?
19        Is this opinion limited to those
20   quantitative statements that you've included on
21   Exhibit 2.1?
22        A.    Were -- you're -- you're talking
23   still about paragraph 8?
24        Q.    Yes.
25        A.    Right.  Again, the -- the -- the

1    scope of the opinion is -- is what's laid out in
2    the opinion.
3         Q.    Well, this particular opinion says,
4    The company's cost comparison statements were
5    limited to available information and reflected
6    reasonable judgments on the cost data compared.
7    And the reference to cost data compared is why I
8    asked if this opinion is limited to Exhibit --
9    those statements on Exhibit 2.1 or whether or not
10   they also include those on Exhibit 2.2, which you
11   have described as qualitative as opposed to
12   quantitative.
13        MS. GRANT:  Objection, form.
14        THE WITNESS:  Again, I think
15   you're -- I think you're conflating the
16   different components of the report and the
17   different information that I relied on in
18   drawing the different conclusions within
19   the report.
20        I -- I'm not prepared to talk about
21   anything other than what's in the report.
22   The -- the scope and the support for the
23   statements that I analyzed are what are laid
24   out in the report.
25

1    BY MS. RADCLIFFE:
2         Q.    I understand, but I'm trying to
3    understand does this expert opinion apply to all
4    of the statements you set forth in Exhibit 2.1
5    and 2.2?
6         A.    I'm not sure what you mean by -- by
7    applied to all of the statements.  There's -- you
8    know, there's -- there's a variety of statements
9    that I have --
10        Q.    You have -- you have an opinion that
11   says, The statements CoreCivic made during the
12   class period regarding cost savings relative to
13   its government partners were supported by
14   internal CoreCivic documents and publicly
15   available information.
16        My question is what statements are
17   you discussing?  Are they the ones on
18   Exhibit 2.1?  Are they exhibits on 2.2?  Or are
19   they all of them?
20        MS. GRANT:  Objection, form.
21        THE WITNESS:  And, again, I -- the
22   challenge here is that in that sentence I
23   say, The statements CoreCivic made during
24   the class period regarding cost savings
25   relative to its government partners were

1    supported by internal CoreCivic documents.
2         CoreCivic made a variety of
3    statements about cost savings and I analyzed
4    those statements in different ways.  So to
5    try to limit what I said as certain support
6    or certain analysis only applying to certain
7    statements is a mischaracterization of -- of
8    the report.
9         And, again, the content of the report
10   is the best place to go to understand the
11   statements that I -- that I evaluated and
12   the support that was -- that was made for
13   those statements.
14        BY MS. RADCLIFFE:
15        Q.    But I'm trying to understand.  This
16   is -- this is a summary of your opinion as to
17   which statements it applies.  And it may apply to
18   all of them.  I'm just trying to ascertain which
19   ones.  And if you can't answer without further
20   going into your report, then just simply tell me.
21        MS. GRANT:  Object to form.
22        THE WITNESS:  I -- so there were
23   several questions there.  And, again, I --
24   I think the best answer I can give is --
25   is -- to what I think was the first

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 62 of 125 PageID #: 14703
Page 237..240
www.aptusCR.com

1    question you asked is when I say that they
2    made -- CoreCivic made statements
3    regarding cost savings relative to its
4    government partners, CoreCivic made a
5    variety of statement -- statements about
6    cost savings.
7        I evaluated those statements and the
8    support for those statements depending on
9    that -- those statements, the context those
10   statements were in, the support that was
11   provided for those statements. And to try
12   to limit -- try to characterize the report
13   as having limits on which statements I was
14   evaluating and which -- a value which
15   analysis applies to which statements is --
16   again, I -- the -- the best place to go to
17   understand and answer your question is -- is
18   the report itself, where I think I laid this
19   out quite carefully.
20       BY MS. RADCLIFFE:
21   Q.    So you don't know without further
22   reading into the report which statements
23   CoreCivic made during the class period regarding
24   cost savings relative to its government partners
25   were supported by internal CoreCivic documents

1    and publicly available information?
2        MS. GRANT: Object to form as to
3    the extent it misstates and is harassing.
4        THE WITNESS: Yeah, I -- no, I'm
5    not saying that I don't know that. I'm --
6    I'm -- I'm simply -- I'm giving the best
7    effort I can give to answer your question
8    here, which is I -- I feel like you are
9    mischaracterizing my summary of my own
10   opinion. And I'm trying to make clear to
11   you what that summary does say and how
12   that summary does, in fact, best summarize
13   everything else that you find in the
14   opinion.
15       So I don't agree with your
16   characterization of -- of that summary
17   and -- and, therefore, I can't agree or
18   disagree with the question you're asking me
19   based on that mischaracterization of the
20   summary of my own report.
21       BY MS. RADCLIFFE:
22   Q.    Okay. We'll move on.
23       Paragraph 9, is that another summary
24   of an expert opinion -- well, actually, let's go
25   back to paragraph 8 for a second. I'm sorry.

1    What was the methodology you employed
2    to reach that opinion?
3        MS. GRANT: Object to form.
4        THE WITNESS: The methodology that
5    I employed, again, I think is is -- is made
6    clear throughout the report. I brought my
7    expertise to bear on this, all of my
8    experience, all of my understanding, all
9    of my years of research and teaching
10   governmental cost accounting and cost
11   accounting for government services. And
12   that expertise drove the methodology that
13   was used to evaluate those statements and
14   I think that methodology is laid out
15   clearly.
16       Again, the methodology that was used
17   to evaluate those statements is
18   context-specific. It depends on the
19   statement that we're talking about and the
20   context in which that statement was made.
21       BY MS. RADCLIFFE:
22   Q.    Isn't the methodology that you
23   employed subjective?
24       MS. GRANT: Object to form.
25       THE WITNESS: No, I wouldn't

1    characterize it as subjective. There's
2    a -- there's a -- a body of knowledge that
3    someone with my expertise has over time
4    and applies --
5        MS. REPORTER: I'm sorry, sir?
6        THE WITNESS: So I wouldn't
7    characterize it -- that methodology as
8    subjective. There's a clear body of
9    professional knowledge that someone with
10   my expertise has and applies to this type
11   of analysis. And that methodology is
12   based on rigorous best practices and based
13   on clear experience and -- and clear --
14   yeah, based on extensive experience in
15   having applied that methodology to lots of
16   different kinds of analyses of the cost of
17   government services.
18       No, I wouldn't characterize it as
19   qualitative at all.
20       BY MS. RADCLIFFE:
21   Q.    Doesn't your methodology depend on
22   certain assumptions?
23       MS. GRANT: Object to form.
24       THE WITNESS: I don't know that the
25   methodology depends on assumptions. What

1     I'm saying throughout the report is that
2     as part of an analysis of statements of
3     cost and as part of any broader cost
4     analysis, assumptions have to be made.  We
5     can assess those assumptions.  We can
6     assess how well supported those
7     assumptions are.
8            The fact that a methodology involves
9     assumptions doesn't make it subjective --
10           MS. REPORTER:  I'm sorry, sir?
11           THE WITNESS:  The last thing I said
12     was the -- the fact that a methodology
13     requires assumptions does not make it
14     subjective at all.
15           BY MS. RADCLIFFE:
16     Q.    My follow-up question is you referred
17     to this body of knowledge.  What -- what is your
18     authority for that?  What -- what publications
19     would you say best support your understanding
20     that -- that your methodology could be reproduced
21     reliably?
22     A.    So I think the question of authority
23     versus specific publications, I think those are
24     two different -- two different ideas.  If --
25     I've -- I mean, if -- if -- if you're looking for

1     an example of a publication that I think sets
2     forth the -- is -- is an example -- not the
3     example, but certainly an example of how cost
4     analysis methodologies are employed, we can talk
5     about that.
6            But I'm not sure what you mean by
7     authority.  I'd be happy to give you other
8     examples of my own expertise if that's part of
9     your question.  I'm not sure --
10     Q.    I'm referring to literature and
11     publications.
12           MS. GRANT:  Object to form.
13           BY MS. RADCLIFFE:
14     Q.    So if you want to provide what
15     publications that you believe provide support for
16     your methodology, please do so.
17           MS. GRANT:  Object to form.
18           THE WITNESS:  Okay.  Well, that's
19     a -- that's a different question than the
20     one you asked a little bit ago.  Support
21     for the methodology versus support for my
22     expertise, I'm -- I'm confused now as to
23     what -- what you want an example of.
24           Can you help me out?
25

1           BY MS. RADCLIFFE:
2     Q.    I want -- would like to you to please
3     give me whatever academic or other publications
4     you believe provide support for the methodology
5     that you employed for this opinion.
6            MS. GRANT:  Object to form.
7     It's --
8            THE WITNESS:  And, again, I'm --
9     I'm sorry, I don't -- I'm not sure what
10     you mean by support for a methodology.
11     You know, there -- there's a methodology
12     and that methodology can be applied.  And
13     there's different examples of how
14     methodologies are applied.
15            I'm not sure what you mean by support
16     for -- for a particular methodology.
17           BY MS. RADCLIFFE:
18     Q.    Exactly.  In this case you determined
19     to undertake a specific methodology with -- in
20     order to formulate your opinions; is that
21     accurate?
22           MS. GRANT:  Object to form,
23     unintelligible.
24           THE WITNESS:  I'm not -- I'm not
25     sure that I characterized what I did as a

1     specific methodology.  What I
2     characterized what I did as -- was
3     bringing my professional expertise on cost
4     analysis for government services and
5     applying that expertise to evaluate
6     statements that CoreCivic made.
7            Knowledge of various cost analysis
8     methodologies is -- is a part of my
9     expertise.  And, as I mentioned, as I
10     described in the report in detail, different
11     types of cost statements need to be
12     evaluated in different ways.  And so I -- I
13     wouldn't characterize any of the work that
14     I've done as a specific methodology.
15            It's a -- a clear body of
16     professional knowledge that incorporates
17     different kinds of methodologies and the
18     appropriate application of different kinds
19     of methodologies.
20            But I -- I -- I wouldn't characterize
21     any of this as application of a specific
22     methodology.
23           BY MS. RADCLIFFE:
24     Q.    Well, you did employ a methodology;
25     is that correct?

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.                                    Grae vs.
Corrections Corporation of America, et al.

1        MS. GRANT:  Object to form.

2        BY MS. RADCLIFFE:

3        Q.    And maybe I'll just answer it -- ask

4    it a different way.

5             You set forth your -- an -- your

6    expert opinion in paragraph 8, correct?

7        A.    That's one --

8        Q.    One.

9        A.    -- one expert opinion, correct.

10       Q.    Okay.  And you set forth as the basis

11   for that opinion that -- as we discussed, that

12   CoreCivic's statements during the class period

13   regarding cost savings relevant -- relative to

14   its government partners was supported by internal

15   CoreCivic documents and publicly available

16   information.

17            And then you went on to say that the

18   basis for your opinion also included the

19   company's cost comparison -- that the company's

20   cost comparison statements were limited to

21   available information and reflected reasonable

22   judgments on the cost data compared.

23            That's -- is that an accurate summary

24   of your opinion and the basis for your opinion?

25            MS. GRANT:  Object to form.

1            THE WITNESS:  There's two questions

2    there.  And if I -- if I heard you

3    correctly, I think you read that

4    paragraph, which, given that it's the

5    summary of my opinion, I think it is --

6    if -- again, assuming you read it word for

7    word, that's a fair summary of -- of that

8    particular part of the opinion, the --

9        BY MS. RADCLIFFE:

10       Q.    Okay.

11       A.    And remind me what the second part of

12   that question was.

13       Q.    Sure.

14            Why don't you tell us what the basis

15   for that opinion was.

16       A.    Again, I think -- I think I've

17   answered that.  The basis for all of the opinions

18   that I offer in this matter is the extensive

19   analysis that I did of CoreCivic's statements

20   that it made about costs and cost savings and

21   bringing my own expertise to bear on examining

22   those statements.

23            How I did that, the particular

24   information that I relied upon is -- is set forth

25   in the report.  That's the -- that's the basis by

1    which I made the conclusions that I made.

2        Q.    Okay.  If you can go to paragraph 10

3    of your -- I mean, paragraph 10 of your report.

4             I'm sorry, it's page 10.

5        A.    Page 10, okay.

6        Q.    And do you see in paragraph 22

7    there's an acknowledgment that there is no one

8    universally accepted methodology for comparing

9    costs?

10       A.    Right.  I see that's the first

11   sentence in paragraph 22, right.

12       Q.    Okay.  And it appears that you also

13   acknowledged in this paragraph that comparing

14   costs across private and public correctional

15   facilities requires making initial assumptions

16   that can have a significant impact on the outcome

17   of that analysis -- that analysis.

18       A.    Are -- are you asking if that's the

19   second sentence of the --

20       Q.    I'm asking if -- if -- if that's your

21   understanding.

22       A.    If -- I'm sorry, if that's my

23   understanding of --

24       Q.    Well, you wrote this in the report.

25   Why did you include it?

1        A.    Why did I include what, that

2    sentence?

3        Q.    Well, all I'm asking you is if you're

4    acknowledging the facts that you're writing, that

5    these are inherently, for example, comparing

6    costs across private and public correctional

7    facilities requires making initial assumptions

8    that can have a significant impact on the outcome

9    of the analysis.

10            Do you agree with that statement?

11       A.    The -- that statement, yes, I agree

12   with that statement.  It's important to consider

13   that statement within the context of the rest of

14   this report.

15            What I'm trying to describe here in

16   this paragraph is that there's no universally

17   accepted methodology, but that, in fact, there's

18   different methodologies that can be employed that

19   require assumptions about how we define costs and

20   that those methodologies unfold accordingly.

21            So I'd -- I'd be careful about taking

22   that one specific sentence out of the context

23   in -- of the broader discussion that is included

24   in here in -- in the report.

25       Q.    I appreciate the clarification.

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1      In paragraph 21 do you see there --
2  there's an acknowledgment in your report that
3  comparing private and public correctional
4  facilities costs is a complex endeavor and why
5  the precise measurement of cost savings may vary
6  based on methodology and assumptions employed?
7      A.   I'm not sure I would characterize as
8  that -- I'm not sure what you mean by an
9  acknowledgment.
10      This is a statement --
11      Q.   Why did you include that information
12  in your -- in your report?
13      A.   I included that information in the
14  report because I thought it was important to be
15  able to provide the reader some -- some context
16  as to what was in this literature on comparisons
17  and why there was variation in that literature
18  in -- with respect to methodologies.
19      In -- in these -- these are
20  introductory paragraphs that are designed to set
21  the foundation for what comes later, both in this
22  section and also later in the report as a whole.
23      Q.   And when you were performing your
24  analysis and forming the opinions in your report,
25  did you ever consider whether Corrections Corp.

1  disclosed to its investors that comparising (sic)
2  private and public correctional facilities costs
3  is extremely complex?
4      A.   So you're -- you're asking did I --
5  did I consider whether CoreCivic had disclosed
6  that complexity to investors?  Is that your
7  question?
8      Q.   Yes.
9      A.   Again, I -- what I considered is --
10  is laid out in the report.  I describe that
11  complexity here in the report and -- and opining
12  on the statements that CoreCivic made and the
13  support for those statements and the context in
14  which those statements were made.
15      So what I considered and the
16  conclusions that I drew are laid out here.
17      Q.   Okay.  And in -- in this paragraph,
18  in -- in paragraphs 21 and 22, you're -- you're
19  referring to information that has been derived by
20  various articles and publications and not
21  CoreCivic public documents; is that fair to say?
22      A.   The -- again, as I -- just as I'm --
23  as I'm reviewing this now, right, to -- to the
24  best of my recollection, this section is -- is
25  focused mostly on published studies and -- and

1  academic literature.
2      Q.   Okay.  And if you can turn to
3  paragraph 25, there's an indication that it's
4  widely recognized in the academic literature that
5  addresses the issue of cost comparisons between
6  private and public correctional facilities.  The
7  data needed to establish rigorous assumptions and
8  perform a comparative analysis of even certain
9  categories of costs across private and public
10  facilities is not readily available.
11      Why did you include that information
12  in your report?
13      A.   Well, I included that information
14  because I thought it was important to -- to
15  correctly and thoroughly characterize what we
16  know from the literature about these issues.
17      Q.   And what did you do, if anything, to
18  ascertain whether CoreCivic had the necessary
19  data to perform a -- a comparative analysis of
20  its facilities with respect to BOP facilities?
21      A.   I -- again, I would go back to what
22  I -- what I actually did in the report, which was
23  to evaluate the statements that CoreCivic made,
24  and where there was support for those statements,
25  that support is -- is described in the report.

1      So what you're asking is a
2  question -- just to remind you what I -- what I
3  actually did in the report.
4      Q.   Okay.  And I don't recall anything in
5  your report that relates to an analysis of
6  whether or not CoreCivic had the necessary data
7  to perform a -- you know, a -- a -- a comparative
8  analysis.
9      A.   So --
10      Q.   And -- and -- and so if I'm wrong,
11  let me know.
12      MS. GRANT:  Object to form.
13      THE WITNESS:  So I think you
14  mischaracterized a -- a couple components
15  of my report there.
16      If I recall, you said that there
17  was -- if -- and, again, I'm not -- I might
18  be incorrectly recalling your question, but
19  I think you said that there is no
20  information about data availability or some
21  statement about data availability.  And I
22  think that's a -- that's a
23  mischaracterization.
24      I talk about data availability at
25  several points throughout the report.  And

1    whether CoreCivic had data available or not,
2    again, I would point to the particular
3    statements I analyzed and the particular
4    citations that I offer up to -- to the
5    support that CoreCivic claimed in support of
6    its own statements.
7        BY MS. RADCLIFFE:
8        Q.    I think --
9            MS. GRANT:  Willow, can we take a
10    break when you get to a stopping point?
11            MS. RADCLIFFE:  Sure.
12            BY MS. RADCLIFFE:
13        Q.    I think my question is a -- a little
14    narrower than that.  And that would be -- you
15    know, whether or not CoreCivic had certain data
16    is one thing.  My question relates to whether it
17    had enough data to make a comparative claim, a
18    definitive comparative claim as to its cost
19    savings.
20        A.    Again, I -- I'm afraid you're
21    mischaracterizing the content of the report.  The
22    word definitive comparative claim could -- could
23    mean any number of different things.
24            In my actual report I evaluated
25    several different kind of statements that

1    CoreCivic made.  Some of those statements were
2    cost comparisons.  Others were qualitative
3    statements or general statements about cost
4    savings, cost efficiency, cost effectiveness.
5        I would -- I would disagree with the
6    characterization that -- that they or anything in
7    the report points toward a -- an attempt at a
8    definitive characterization or a definitive
9    statement about cost.  Again, everything that I
10    talk about in the report is that statements about
11    cost savings and statements about cost generally
12    have to be evaluated in a particular context, a
13    particular point in time and to characterize it
14    broader than that I -- I don't know is true to
15    the content of my report.
16        Q.    And so I -- I know that you have not
17    spoken to any of the defendants, but for -- for
18    CCA to make a claim about cost savings, wouldn't
19    it want robust information regarding those
20    savings and understand whether or not there was
21    any contradictory information that might
22    undermine those claims before they informed
23    investors in their statements that, in fact, CCA
24    provided cost savings, while in conjunction also
25    telling the investors that there was value in

1    their services?
2            MS. GRANT:  Object to form.
3            THE WITNESS:  Gosh, there's a lot
4    there.
5            MS. RADCLIFFE:  You know what, I'm
6    going to strike that question.
7            I'll let everybody go on a break and
8    then we can come back.
9            MS. GRANT:  Thanks.
10            VIDEO OPERATOR:  Okay.  The time is
11    3:50 p.m. and we are now off the record.
12        (Thereupon, a brief recess was
13        taken.)
14            VIDEO OPERATOR:  The time is
15    4:04 p.m. and we are back on the record.
16            MS. RADCLIFFE:  Could you put tab 9
17    into the chat, please.
18            BY MS. RADCLIFFE:
19        Q.    Mr. Marlowe, just let me know when
20    you have --
21        A.    Okay.  I have tab 9.  Thanks.
22        Q.    Okay.  Do you recognize this document
23    as one of the documents included in your
24    Appendix C to your report as having been relied
25    on?

1        A.    Just a sec.
2            MS. REPORTER:  Is this going to be
3    an exhibit?
4            MS. RADCLIFFE:  Yes.  We're going
5    to mark it as --
6            MS. REPORTER:  559?
7            MS. RADCLIFFE:  559.
8        (Thereupon, Marlowe Exhibit
9        Number 559 was marked for
10        identification.)
11            THE WITNESS:  Okay.  Yep.
12            BY MS. RADCLIFFE:
13        Q.    Okay.  Mr. Marlowe, if you could turn
14    to page 4 of the document.
15            Do you understand the United States
16    Government Accountability Office to be presenting
17    a -- a summary of its results starting on page 4?
18        A.    Yes.
19        Q.    Okay.  And do you recall what this
20    particular inquiry of -- or study of the GAO was
21    regarding?
22        A.    Give me just a sec to --
23        Q.    Sure.
24        A.    -- refresh my memory here on this.
25            Okay.  Thanks.  So one more time with

1    the question, please.
2    Q.    Sure.
3        Do you recall generally what this
4    particular study of the GAO is regarding?
5    A.    Yes.
6    Q.    And what was that?
7    A.    Well, this was, as I recall, the --
8    the GAO trying to -- trying to evaluate or trying
9    to make a statement about the -- the
10    methodologies that could be used in doing cost
11    comparisons between -- or cost -- for evaluating
12    public and private prison costs.
13    Q.    And going back to page 4, do you see
14    the GAO summary of its results that It is not
15    currently feasible to conduct a methodologically
16    sound cost comparison of the BOP and private low
17    and minimum security facilities because these
18    facilities differ in several characteristics and
19    the BOP does not collect comparable data to
20    determine whether -- the impact of these
21    differences on cost?
22    A.    Sure, I -- I see that, the first
23    sentence of -- of that summary.
24    Q.    And you understand that to be the
25    GAO's position based on the study?

1    A.    I'm not sure I would say that that
2    makes it the -- the GAO's position.  I mean, this
3    is a -- this is a finding from one study that the
4    GAO did and they -- you know, they're making a
5    statement here about cost methodologies.  I'm not
6    sure I would say that the GAO has a -- a -- a
7    statement on -- on cost methodologies.  Or at
8    least if they have one, we would want to be
9    careful about making that statement based on one
10    study.
11    Q.    Okay.  Do you see on the next page,
12    page 5, there's a reference to private
13    contractors at the top and it indicates While
14    private contractors told us that they maintain
15    some data for their records, these officials said
16    that the data are not readily available or in a
17    format that would make it a methodologically
18    sound cost comparison at this time.
19        Did you have any conversations with
20    anyone at CCA whether or not the data in their
21    records would enable a methodologically sound
22    comparison?
23    A.    Like I said before, I -- I've not had
24    interactions with folks at -- at CCA, but I would
25    point you toward what I do say in the report,

1    which is to go into some detail about the
2    challenges of -- of doing cost comparisons of
3    this sort.  But I also try to make clear in the
4    report that cost comparisons, even with data that
5    are -- are not ideal, are still possible,
6    depending on what an analyst is willing to
7    assume, depending on what kinds of adjustments
8    and assumptions they're willing to make to be
9    able to arrive at -- at an -- at an assessment of
10    costs that is appropriate to the objective of
11    that analysis.
12        But the -- the GAO, like any internal
13    audit organization within a government, has, you
14    know, a specific way that it's going to look at
15    these questions and a specific way to -- to think
16    about what kinds of conclusions to -- to draw
17    given the objectives that it set about for
18    studying the issue in the first place.
19        So this may be appropriate for -- for
20    GAO's purposes, but cost analyses can be done for
21    lots of different reasons and can have lots of
22    different assumptions applied to them.
23        And this might be GAO's
24    characterization of their understanding of data
25    challenges and potential for comparability.  But,

1    again, they're coming at this from a particular
2    vantage that might not represent what all experts
3    in governmental cost analysis might see.
4    Q.    And do you understand that there was
5    a recommendation by the GAO that the -- the BOP
6    collect relevant data from the private
7    contractors?
8    A.    Well, you'll have to remind me.  Was
9    that -- that a recommendation as part of this
10    report?
11    Q.    Yes.
12    A.    Can you remind me where?  Is that
13    also in the summary here?
14    Q.    I believe it's actually if you look
15    on the page -- it's before the first page.  It's
16    the second page of the document, what the GAO
17    recommends, in a box at the bottom.
18    A.    Give me just a sec to find that here.
19        Okay.  I'm sorry, I'm not seeing it.
20    What 0which page was this on again, the
21    recommendation?
22    Q.    The second page of the document.
23    It's before the official page 1, so right there
24    in the box at the bottom.
25    A.    Ah, I see.  Got -- got you, What GAO

1  Recommends.  Thank you.
2       Okay.  Yeah, I'm reminded now of that
3  recommendation.
4     Q.   Okay.  Do you know if -- if that
5  recommendation was ever implemented?
6     A.   As I sit here today, I -- I -- I
7  don't know for sure if GAO implemented that
8  recommendation.
9     Q.   Okay.  I -- I think you testified
10  earlier that you -- it can be possible to make
11  cost comparisons, even though the data might not
12  be ideal.
13       Is that fair to say?
14     A.   Yeah, I think that's a fair
15  characterization of what I said.
16     Q.   Okay.  Even though it might be
17  possible to make cost comparisons under, for
18  example, a single set of assumptions, would it be
19  prudent for someone making cost comparisons to
20  look at other cost comparisons in order to make
21  their conclusions regarding the cost comparisons
22  more concrete?
23       MS. GRANT: Object to form.
24       THE WITNESS:  So I think there's
25       a -- there's a couple components to that

1     question.  I -- I -- I mean, I would say
2     as a -- as a general rule, you know, good
3     cost analysis is -- is going to try, where
4     possible, to look at costs from multiple
5     angles and using the best available data;
6     when necessary, use assumptions; and be
7     clear and transparent about those
8     assumptions; and, where possible, try to
9     provide a sensitivity analysis or -- or
10     other -- other ways to make clear how
11     sensitive a cost analysis is to those
12     assumptions and differences in those
13     assumptions.
14        So I think when you're doing a cost
15     analysis and you're trying to make
16     comparisons across different government
17     service delivery models, there's a variety
18     of ways to -- to go about doing that and
19     different vantages from which to -- to look
20     at.
21        Some of those may be entirely
22     quantitative.  Some of those might be more
23     qualitative.  There may be similar studies
24     that you could rely on to try to impute
25     assumptions or to -- take data or

1  findings that -- that someone else has
2  acquired that -- that, in your assessment as
3  an analyst, are appropriate assumptions for
4  your particular study.
5     So there's lots of information that
6  could be brought to bear from lots of
7  different kinds of sources.  And I think as
8  a general rule, cost analysts would say that
9  more perspectives and -- and more varied
10  kinds of perspectives will -- will help to
11  make an analysis better and it's up to an
12  analyst to determine which of those data
13  and -- and what level of data is necessary
14  to be able to make that comparison and --
15  and draw those conclusions, depending on
16  what data may or may not be available.
17       BY MS. RADCLIFFE:
18     Q.   And do you have an understanding, for
19  example, whether or not CCA performed a
20  sensitivity analysis with respect to its cost
21  comparison claim?
22       MS. GRANT:  Object to form.
23       THE WITNESS:  Okay.  My
24  understanding of -- of court -- of --
25  again, what -- what I did in -- in my

1  analysis was to -- to look at the
2  statements that CoreCivic made and how it
3  went about supporting those statements.
4  And, again, my assessment was that the
5  support that CoreCivic offered was
6  appropriate and, given the wide variety of
7  information that I looked at and all of my
8  own expertise that I brought to bear on
9  this, I felt that or believed that the
10  statements that CoreCivic made were
11  supported.
12       I'd imagine that there were a variety
13  of ways that CoreCivic could have done its
14  own internal cost analysis.  My assessment
15  was that the support that they offered was
16  appropriate and consistent with the best
17  practices that we apply in the context of
18  cost accounting for government services.
19       BY MS. RADCLIFFE:
20     Q.   And just so I understand, the --
21  the -- when you're referring to the support that
22  they offered, what are you referring to?
23     A.   I -- I set that out in the report.
24  There were -- the support that -- that they
25  offered took lots of different forms.  Some of it

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 69 of 125 PageID #: 12009
www.aptusCR.com
Pg 265..268

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

1    was, as we've discussed, you know, references to
2    other kinds of -- of cost analyses. Some of it
3    was their disclosures of their internal costs.
4    Some of it was their financial disclosures, their
5    10-Ks and 10-Qs.
6          They offered up a -- a variety of
7    different kinds of support for the statements
8    that they made about their costs and their cost
9    structure and their cost effectiveness and all
10   the different kinds of cost terms that -- that
11   they made claims about.
12       Q.   So any of that information would be
13   set forth in your report; is that accurate?
14       A.   Any of -- any of the information that
15   CoreCivic relied upon?
16       Q.   The support that they offered.
17   And -- and -- and let me rephrase this.
18          When you say the support that they
19   offered, the support that they offered to whom?
20       A.   Well, again, I -- I'm sorry. Maybe
21   I'm not being precise enough.
22          As I -- as I say in the report,
23   the -- the -- the publicly available information
24   that they made available or that they referenced
25   anytime they made statements about costs.

1        Q.   Okay.
2          MS. RADCLIFFE: So if you could
3    pull up tab 63 in the chat.
4          MS. REPORTER: Marking it as an
5    exhibit?
6          MS. RADCLIFFE: We're going to mark
7    it as 560.
8          (Thereupon, Marlowe Exhibit
9          Number 560 was marked for
10         identification.)
11         BY MS. RADCLIFFE:
12       Q.   Mr. Marlowe, do you recognize this
13   document?
14       A.   I do.
15       Q.   And is it one referenced as being
16   relied on in your report?
17       A.   Yes. Make sure I -- as I recall.
18   Let me make sure I find the right reference here.
19   Right. Okay. Yep, I see it.
20       Q.   Okay. And this report was issued at
21   the time Mr. Lappin was the director of the
22   Federal Bureau of Prisons.
23          Do you see that on the front page?
24       A.   According to the front page, that's
25   right.

1        Q.   Okay.
2          MS. RADCLIFFE: And if you could
3    turn to page 89 of the document.
4          BY MS. RADCLIFFE:
5        Q.   Do you see this -- this is concluding
6    remarks regarding the report to address the
7    experiences of the BOP with the private prison in
8    Taft, California that was operated by a private
9    prison operator, Wackenhut?
10       A.   Right. I see -- I see the --
11   Section VI, Concluding Remarks. That's right.
12       Q.   And do you see here that it indicates
13   that the report reached conclusions about the
14   performance of Taft Correctional Institution and
15   then it goes on to say, It is important to note
16   that cost and performance issues should be seen
17   as opposite sides of the same coin and jointly
18   examined.
19          Do you understand that this
20   particular report was focused on the performance
21   issues at Taft?
22          MS. GRANT: Object to form.
23          THE WITNESS: I'd have to go back
24      and -- and review to remind myself of
25      the -- of the -- the particular scope of

1    this report. This sentence certainly
2    suggests that performance issues were --
3    were part of that analysis, but I'd have
4    to -- I'd have to go back and reacquaint
5    myself with this report.
6          BY MS. RADCLIFFE:
7        Q.   Okay. And do you understand that the
8    concluding remarks here of the Department of
9    Justice, the Federal Bureau of Prisons, is that
10   when making or evaluating or comparing private
11   prison to the BOP, that it is viewed at -- viewed
12   cost and performance issues is viewed at -- viewed
13   jointly?
14          MS. GRANT: Object to form.
15          THE WITNESS: Well, again, I'd have
16      to go back and -- and review this report
17      to make sure that I understand that
18      conclusion in -- in the context of the
19      report overall.
20          If -- clearly that sentence that you
21      just read, it's important to note that that
22      sentence is, let's assume for the moment,
23      expressing some summary of this report.
24          But, again, I -- I don't want to say
25      that I do or do not understand what the BOP

1    is -- is claiming based just on this -- this
2    one sentence in the -- in the summary. But
3    if --
4              BY MS. RADCLIFFE:
5         Q.    I understand, but this is a document
6    that you relied on in preparation of your report,
7    correct?
8         A.    That's right.
9         Q.    Okay. And do you have any reason to
10   believe that these -- the concluding remarks of
11   the BOP are inaccurate as reflected in this
12   document?
13             MS. GRANT: Object to form.
14             THE WITNESS: I'm -- I'm not
15   suggesting that -- that the conclusion
16   is -- is inaccurate somehow. I -- I'm
17   simply saying that -- you were asking me
18   to -- to say something about a
19   characterization of the BOP's conclusions
20   here. And it's a very long report,
21   several paragraphs here in the conclusion,
22   and we're talking about one sentence
23   within that.
24             Before saying anything about the
25   overall conclusion of this report, I would

1    want to look at the entire report. But
2    absolutely this one sentence says, It is
3    important to note that cost and performance
4    issues should be seen as opposite sides of
5    the same coin and jointly examined.
6         I -- that's not in question.
7              BY MS. RADCLIFFE:
8         Q.    Okay. And -- and -- and do you
9    believe that you looked at performance issues
10   when analyzing the cost comparison statements at
11   Corrections Corp. in -- in connection with your
12   expert opinion in this case?
13             MS. GRANT: Object to form.
14             THE WITNESS: As I've said before,
15   my focus was costs and statements that
16   CoreCivic made about costs. And they made
17   lots of different kinds of statements
18   about costs, many of those statements with
19   slightly different definitions that need
20   to be considered fully and in context.
21             Some of those definitions and some of
22   those statements, things like cost
23   effectiveness and cost efficiency as good
24   examples, inherently depend upon some
25   consideration for what it is that an agency

1    or a government department or any
2    organization is trying to accomplish when it
3    delivers a service.
4         If we're going to say that you're
5    effective, it's effective relative to what,
6    effective relative to what goal or outcome.
7    And same with efficiency. Efficiency would
8    be are you -- are you -- are you
9    delivering -- are you accomplishing a given
10   outcome or a given objective with the least
11   amount of resources required.
12             So those specific cost terms really
13   require some consideration for -- well,
14   maybe not performance issues, but at a
15   minimum, the -- the goals and -- and
16   objectives that the BOP or any organization
17   is trying to accomplish when it delivers
18   those services.
19             So, again, my focus is cost. But
20   there are certain types of cost concepts
21   that require careful attentions and -- and
22   certain -- and some consideration at -- at a
23   very minimum of what it was that the agency
24   was trying to accomplish when it incurred
25   those costs in the first place.

1              BY MS. RADCLIFFE:
2         Q.    If you could turn to paragraph 53 of
3    your report, please.
4         A.    53?
5         Q.    Yeah. And there you are discussing
6    cost efficiency.
7         A.    Sure. I've got it.
8         Q.    Okay. And proceeding to -- to
9    paragraph 54, you provided a -- a single
10   assumption to support cost efficiency in
11   paragraph 54; is that fair to say?
12             MS. GRANT: Object to form.
13             THE WITNESS: I actually wouldn't
14   call it a -- an -- an assumption. You
15   know, I -- well, the point that I'm trying
16   to make in -- in paragraph 54 is that when
17   CoreCivic is -- this goes back to the
18   answer to your previous question.
19             You know, cost efficiency requires
20   some attention to a result. And so in
21   paragraph 54 what I'm trying to make clear
22   is, you know, the -- the result that
23   CoreCivic said it was attempting to
24   bring about and costs relative to trying to
25   bring that -- that particular -- that

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 277

1  particular outcome about is -- is -- is --
2  is cost efficiency.
3      That's -- that activity is consistent
4  with what we would consider to be the
5  definition of cost efficiency.
6      BY MS. RADCLIFFE:
7      Q.  I see.  But with respect to cost
8  efficiency here, you've indicated that In the
9  context of correctional services, this statement
10  can be tied to the relationship between the age
11  of a correctional facility and inmate monitoring
12  costs.
13      But there are other assumptions that
14  would be tied to cost efficiency as well; isn't
15  that true?
16      MS. GRANT:  Object to form.
17      THE WITNESS:  There -- sure.
18  There -- there could be other
19  considerations related to cost efficiency.
20      BY MS. RADCLIFFE:
21      Q.  And with respect to this statement,
22  you know, there isn't any source mentioned as to
23  what particular assumptions CoreCivic used in
24  order to support this claim regarding the modern
25  state-of-the-art facilities improve cost

Page 278

1  efficiencies?
2      MS. GRANT:  Object to form.
3      THE WITNESS:  Yeah, I'm sorry, I
4  need you to -- to run that by me again.
5  CoreCivic's support for -- which statement
6  is it?
7      BY MS. RADCLIFFE:
8      Q.  The one you reference in -- in 54.
9  You've indicated that -- a statement that
10  CoreCivic's modern state-of-the-art facilities
11  improve cost efficiencies, and it's -- I guess
12  the -- the entirety of the statement is modern
13  state-of-the-art facilities that improve safety,
14  security and cost efficiency.
15      So if -- for example, there is no
16  disclosure here regarding the assumptions that
17  CCA used to make this particular statement that
18  are referenced in your report?
19      MS. GRANT:  Object to form.
20      THE WITNESS:  Sorry.  I'm just
21  making sure I follow what you're saying
22  here.
23      Okay.  So I'm sorry, can you -- one
24  more time, can you give me that question?
25

Page 279

1      BY MS. RADCLIFFE:
2      Q.  Sure.
3      There's no disclosure or reference in
4  your report that CCA provided the public with the
5  assumptions that it used to make this particular
6  statement?
7      MS. GRANT:  Object to form.
8      THE WITNESS:  It -- I'm not sure
9  that I would characterize the report that
10  way.  Again, I -- I looked at lots of
11  different statements that -- that
12  CoreCivic made about lots of different
13  kinds of -- of cost concepts.
14      So I guess I'm not sure when -- when
15  you say any statement anywhere in the report
16  in support of -- of this particular
17  statement, I -- I -- I think there is.  And,
18  again, I think the -- early on in the report
19  I establish the -- you know, the -- the --
20  the variety of ways that the potential cost
21  efficiencies of private prisons have been
22  characterized and have been studied.
23      You know, that -- coming up with
24  that -- that list and that -- that group of
25  potential factors was, you know, an

Page 280

1  important application of -- of my own
2  expertise and my understanding of -- of this
3  field and of cost -- and by this field, I
4  mean cost accounting for government
5  services.
6      So I think the -- I think the support
7  for that statement, the foundation for that
8  statement, shows up several places in the
9  report because it was important to be able
10  to, as an expert, identify what we know
11  about the potential cost efficiency
12  implications of private prisons so that we
13  can have those -- those potential cost
14  efficiencies understood at both a conceptual
15  and then eventually a -- an empirical level.
16      So I think there's a variety of
17  support throughout the report for the --
18  and -- and -- and much of it available in
19  publicly available documents for why we
20  might expect CoreCivic and its business
21  model to realize cost efficiencies.
22      BY MS. RADCLIFFE:
23      Q.  But the -- the statement here is that
24  the modern state art (sic) facilities improve
25  safety, security and cost efficiencies.

Page 281

1      Do you see that?
2         MS. GRANT:  Object to form.
3         BY MS. RADCLIFFE:
4      Q.    Did -- did you not look at the other
5   portions of this statement?
6      A.    Which statement do -- do you mean?
7   Do you mean CoreCivic's?
8      Q.    You quote above Cost efficiency is a
9   measure of how close -- I'm sorry.
10       You quote above (sic) that Core's
11   opinion -- CoreCivic's opinion statement that its
12   modern state-of-the-art facilities improve cost
13   efficiencies is specific to one particular
14   characteristic of its services and is not a broad
15   assertion that CoreCivic improved cost
16   efficiencies in all dimensions of prison
17   management.
18       Do you see that?
19      A.    I see that, yes.
20      Q.    Okay.  So my question is in -- you
21   know, you -- you've indicated here simply that in
22   the context of correctional service, this
23   statement can be tied to the relationship between
24   the age of a correctional facility and inmate
25   monitoring costs.

Page 282

1         And what I don't see here is whether
2   or not there's any support for CoreCivic to make
3   that claim as it applied to specific facilities.
4         MS. GRANT:  Object to form and
5      asked and answered.
6         THE WITNESS:  Yeah, again, I -- I
7      think throughout particularly the early
8      part of the report I establish a -- a
9      variety of -- of sources of support for
10      the claim that CoreCivic would -- would
11      realize cost efficiencies and that private
12      prisons would realize cost efficiencies.
13         And, again, I'd be happy to -- to
14      walk back through that framework that I
15      identified and that list of potential ways
16      of which -- you see two listed here.  And
17      then -- and there are -- you know, and there
18      are others, but I think -- I think that's --
19      my -- my -- my expert opinion was that that
20      support for those statements was -- was --
21      was appropriate, given what CoreCivic was
22      claiming here.
23         BY MS. RADCLIFFE:
24      Q.    Okay.  If you could turn back to
25   page 3, please, of your report.

Page 283

1         VIDEO OPERATOR:  Sorry, what was
2      that?
3         MS. RADCLIFFE:  Page 3 of the
4      report.
5         VIDEO OPERATOR:  Oh.
6         BY MS. RADCLIFFE:
7      Q.    In paragraph 9 you set forth another
8   expert opinion.
9         Do you see that?
10      A.    Yes.
11      Q.    And you have three subsets to that
12   opinion.
13         Do you see those?
14      A.    Yes.
15      Q.    Okay.  And is it fair to say -- well,
16   let me rephrase that.
17         How did you form this opinion?
18         MS. GRANT:  Object to form.
19         THE WITNESS:  I formed this opinion
20      by reviewing a wide variety of information
21      about statements CoreCivic had made about
22      costs, of reviewing the broad literature
23      on the subject of private prisons,
24      academic literature, government reports.
25         Took all of that information.  I

Page 284

1   applied my expertise, my professional
2   experience developed over teaching and
3   research of 20 years of this subject matter
4   and reviewed that information and applied a
5   methodology appropriate to this type of
6   cost -- governmental cost accounting
7   analysis and arrived at the opinion you see
8   in paragraph 9.
9         BY MS. RADCLIFFE:
10      Q.    Okay.  And so with regards to your
11   opinion, you've indicated that CoreCivic's claims
12   about cost savings and cost effectiveness were
13   reasonably and appropriately qualified in a
14   manner consistent with research and literature on
15   the privatization of correctional facilities.
16         Do you see that?
17      A.    Yes.
18      Q.    Okay.  Did -- did you perform any
19   analysis of what investors understood Corrections
20   Corp. to be conveying by their messages of, for
21   example, controlling costs and value propositions
22   and competitive cost structures?
23      A.    So the -- the scope of what I did for
24   this analysis was, again, to review what
25   CoreCivic said and how the statements that it

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 73 of 125 PageID #: 281..284
www.aptusCR.com
12003

1    made, as I say here, were supported and -- and
2    appropriate -- appropriately qualified.
3        Q.    And --
4        A.    That was the -- that was the scope of
5    what I did.
6        Q.    Do you know -- and do you know what,
7    if anything, the defendants did to ensure that
8    the statements were reasonably and appropriately
9    qualified in a manner consistent with research
10   and literature on the privatization of
11   correctional facilities?
12           MS. GRANT:  Object to form, outside
13       the scope.
14           THE WITNESS:  And, again -- again,
15       I -- that's a -- a large part of the
16       discussion within the report.  And the --
17       you know, the question -- I -- I should
18       say -- I take that back.
19           The -- what -- what CoreCivic did
20       to -- to provide that assurance was not
21       exactly something that I looked at.  But,
22       again, what I did look at was the statements
23       they made and whether, in my expert opinion,
24       applying methodologies appropriate to this
25       field to -- to looking at those statements,

1    whether those statements were appropriate
2    and qualified and well-supported.  And my
3    assessment was that they were.
4        BY MS. RADCLIFFE:
5        Q.    And do you know one way or another
6    whether or not the defendants had any adverse
7    information that would have informed them that
8    their statements were not reasonable and
9    appropriately qualified in a manner consistent
10   with research and literature on the privatization
11   of correctional facilities?
12           MS. GRANT:  Object to form.
13           THE WITNESS:  Can you -- can you
14       help me out with what you mean by adverse
15       information?
16           BY MS. RADCLIFFE:
17       Q.    Sure.
18           Information that would have
19       contradicted that conclusion.
20           MS. GRANT:  Object to form.
21           THE WITNESS:  Information that
22       would have contradicted my opinion?
23           BY MS. RADCLIFFE:
24       Q.    And -- and I'll just rephrase it.
25       Maybe it's easier.

1        Do you know one way or another what
2    information defendants had regarding whether or
3    not its cost savings and cost effective claims
4    were sufficiently supported by documentation or
5    other information within CCA?
6           MS. GRANT:  Object to form.
7           THE WITNESS:  I -- I -- I can't
8       characterize what information CoreCivic
9       did or did not have access to.
10          And, again, the conclusions that I
11      drew in -- in my analysis I thought were
12      well-supported given the publicly available
13      information that was available and, again,
14      appropriately qualified, applied correctly
15      within the context of the specific terms
16      that were being used.
17          So my assessment was that given the
18      information that was available that the
19      statements CoreCivic made were appropriate
20      and supported.
21          BY MS. RADCLIFFE:
22      Q.    And when you say that -- information
23   that was available, what information are you
24   referring to?  Are you referring to the -- the
25   academic literature or something else?

1           MS. GRANT:  Object to form.
2           THE WITNESS:  I -- well, again, the
3       information that I -- that I reviewed as
4       part of this analysis is -- is set forth
5       in the report and in the appendices we've
6       talked about at length already today.
7           BY MS. RADCLIFFE:
8       Q.    Okay.  And for this portion of your
9    opinion, you don't appear to reference internal
10   documents; is that accurate?
11          MS. GRANT:  Object to form.
12          THE WITNESS:  Well, again, it -- I
13      think this is a question similar to the
14      one you were asking before.  I -- I think
15      if you're trying to conflate or parse the
16      different components of the opinion, I --
17      I don't know that I would agree with that.
18          Again, the opinions that I reached
19      are based on review of a wide variety of
20      information.  And some of that information
21      informed particular -- analyses of
22      particular statements and some of that
23      information informed the opinion as a whole.
24          Again, everything that I reviewed
25      is -- is set forth in the report and I

1    relied on all of it in forming my opinions.
2        BY MS. RADCLIFFE:
3        Q.    In your 9b section you reference that
4    CoreCivic identified its claims about cost
5    savings were based on certain assumptions about
6    how to define and measure cost effectiveness or
7    cost savings.
8            What were those assumptions?
9        MS. GRANT:  Object to form.
10        THE WITNESS:  When this case -- I
11    mean that the assumptions I would refer
12    back to the -- to the particular
13    definitions of those cost statements that
14    I -- that I offer up in -- in the report.
15        So, again, cost efficiency, cost
16    effectiveness, cost -- cost control, you
17    know, that those -- those statements, and
18    particularly the statements around cost
19    savings, followed from assumptions in
20    particular that -- that -- that -- that the
21    main one -- the main one specifically with
22    cost savings is that it's important to
23    understand what action was taken to try to
24    minimize cost.
25        And so when you talk about cost

1    savings, it's important to make sure that
2    you're saying that there was -- you know,
3    whatever -- whatever it was that was being
4    done to reduce costs, trying to acquire and
5    build capital facilities at -- at lower
6    cost, if possible; trying to change the
7    service delivery model in ways to realize
8    efficiencies.
9        Cost savings -- again, the -- the
10    assumption around cost savings, one of the
11    assumptions, at least, around cost savings
12    is that statements about cost savings are
13    made in reference to which costs were being
14    saved and why.
15        Just as one example of -- of an
16    assumption that CoreCivic -- an -- an
17    assumption that one would need to make to be
18    consistent with best practices in cost
19    accounting for government services and one
20    that, as I described in the opinion,
21    CoreCivic did when it was talking about cost
22    savings.
23        BY MS. RADCLIFFE:
24        Q.    And do you believe that investors
25    understood the various terms in the way that you

1    described them in your expert report?
2        MS. GRANT:  Object to the form and
3    outside the scope.
4        THE WITNESS:  Yeah, again, I -- the
5    question about investors I -- what I did
6    was to -- to look at the cost statements
7    that CoreCivic made and to evaluate those
8    statements.  That's what I did.
9        BY MS. RADCLIFFE:
10        Q.    And with respect to the -- the
11    assumptions referenced here, I guess I -- I'm --
12    you reference that they clearly articulate the
13    assumptions.  And I'm trying to understand where
14    they clearly articulated those.
15        MS. GRANT:  Object to form.
16        THE WITNESS:  So we're -- this is
17    paragraph b or section b under
18    paragraph 9?
19        BY MS. RADCLIFFE:
20        Q.    Correct.
21        A.    Right.  Well, I -- again, I talk
22    at -- at length in the report about how those
23    assumptions were articulated.  And, again, that
24    came from a variety of forms.  Again, with cost
25    savings we have to be really clear about what

1    cost it is that we're trying to save and -- and
2    how we're going about saving those costs.
3        CoreCivic made a variety of
4    statements about how it goes about acquiring and
5    building capital facilities, how it manages
6    personnel, lots of ways that -- that they -- that
7    their business model affords them opportunities
8    to -- to realize cost savings both over time and
9    with respect to their particular facilities.
10        So I think the answer to that
11    question is -- is that there's -- those -- that
12    articulation that you're asking about shows up at
13    several places in the report and especially when
14    I talk specifically about cost savings.
15        Q.    Well, let's look at one for example,
16    in paragraph 27, referring to cost effectiveness.
17    And there's a reference here to private
18    contractors have experience and expertise in
19    correctional facility design and construction.
20    And then it says, In contrast, government
21    correction agencies typically contract the design
22    and go to other parties.
23        MS. REPORTER:  I'm sorry.  Could
24    you repeat that?
25        MS. RADCLIFFE:  Sure.

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 75 of 125    Page #: 2005
Page 289..292
www.LexCR.com

1          Government corrections agencies
2    typically contract the design and
3    construction to other third parties.
4          BY MS. RADCLIFFE:
5       Q.   Do you see that?
6       A.   I do.
7       Q.   Okay.  So it seems to me that there
8    is an assumption that the BOP would not pursue
9    the building of its facilities through
10   contractors that are both experienced and who
11   would provide them with the -- best price.
12          So while I understand that you're
13   citing again these various people who have had
14   their reports paid for by CCA, I am not sure
15   that -- I think the assumption appears to be just
16   an overreach.  And it also doesn't seem to be
17   supported by any, you know, internal documents
18   reaching the same conclusion from the BOP or from
19   CCA.
20          MS. GRANT:  Object to form.  Is
21   there a question?
22          BY MS. RADCLIFFE:
23      Q.   Well, it seems to me is there an
24   assumption in this paragraph 27 that the BOP
25   would not pursue the building of its facilities

1    through contractors that are both experienced and
2    who would provide them with a competitive price?
3          MS. GRANT:  Object to form.
4          THE WITNESS:  So I'm going to go
5    back to the first version of that
6    question.  And you characterized my report
7    as depending on research paid for by
8    industry.
9          My report is based on review of
10   thousands of pages of documents from a wide
11   variety of different kinds of sources.  I
12   consider it a thorough and -- and
13   comprehensive review of the information
14   available with the application of my
15   professional expertise.
16          On your specific point, I think
17   you're mischaracterizing what I'm saying
18   here.  This paragraph is specifically
19   talking about the literature.  What I'm
20   doing here is I'm characterizing the way the
21   literature has characterized the potential
22   avenues or paths of cost effectiveness for
23   private prisons, particularly
24   construction-related costs, personnel costs
25   and private sector competition.

1          The point about government --
2    government corrections agencies contracting
3    the design and construction to other third
4    parties, this is not in any way an attempt
5    to characterize the government's practices
6    or the government's preferences.  It's
7    simply stating this is what the literature
8    tells us about how private prisons are
9    likely to save money and how they've been
10   shown by some studies to save money or to --
11   to realize cost effectiveness, to be
12   specific, and why the BOP does what it does
13   or -- or how it goes about pursuing cost
14   effectiveness is certainly an important
15   question, but not at all the subject of this
16   particular section of my report.
17          BY MS. RADCLIFFE:
18      Q.   Could you go ahead and turn to
19   Exhibit 3 of your report.
20      A.   Okay.  Got it.
21      Q.   So for Exhibit 3 do you see that it
22   refers to a Summary of Select Costs, Prison
23   Outsourcing versus In-House Prison Management?
24      A.   That's right.
25      Q.   Okay.  And what -- what -- what is

1    the purpose of Exhibit 3?
2       A.   Yeah, the goal of Exhibit 3 -- and
3    I've kind of been referencing it with respect to
4    your last couple of questions.
5          The -- the goal of Exhibit 3 is to
6    try to provide a -- a -- a characterization, a
7    summary of some of the key -- key costs that are
8    incurred under these different service delivery
9    models.
10          And so the goal with this exhibit
11   is -- is just to help, you know, the reader to
12   understand that when we talk about costs and we
13   talk about the potential for cost savings or cost
14   efficiencies that we're talking about some of the
15   same costs between outsourcing and in-house
16   management, but that we're also talking about
17   some different costs and some different key cost
18   drivers across those two different service
19   delivery models.
20      Q.   And I didn't see here listed -- what
21   about, for example, reputational costs?
22          MS. GRANT:  Object to form.
23          THE WITNESS:  Reputational costs.
24   Can you -- can you define that for me?
25

1      BY MS. RADCLIFFE:
2      Q.    For example, with respect to
3  Corrections Corp., it has had facilities shut
4  down because of its poor operating performance
5  and that has reflected badly on the government
6  agencies that had contracted with Corrections
7  Corp.  It's also, you know, resulted in
8  disruption in terms of having to then move those
9  inmates to other facilities.
10       So I'm wondering if -- if there are
11 other factors that might not be captured by
12 this -- this exhibit and --
13       MS. GRANT:  Object to the form and
14 to the extent it misstates.
15       MS. REPORTER:  I'm sorry?
16       MS. GRANT:  Object to the form and
17 to the extent that it -- it misstates the
18 facts.
19       THE WITNESS:  Well, you described a
20 couple different kinds of costs there.  If
21 I'm -- if I -- if I follow what you were
22 saying about reputational cost, it sounds
23 like that would be what we might call an
24 intangible cost or a nonpecuniary cost.
25 And those costs can be considered in -- in

1  any number of different ways.
2       I think for the point that I was
3  trying to make here is that these are the
4  costs that we know from the literature in
5  this space that tend to vary from one
6  service delivery model to the next.
7       You also made some reference to
8  different what I might characterize as
9  transaction costs around having different --
10 having to have facilities move prisoners or
11 change their service delivery models in
12 response to any number of external factors.
13 That's also a different kind of cost,
14 transaction costs, that are measured
15 differently.
16       I mean, you described a -- a -- a
17 variety of different kind of costs there.
18 I'd have to say again that the -- the goal
19 of -- of Exhibit 3 is just to try to help
20 the reader to understand the kinds of costs
21 that are incurred in these different service
22 delivery models and help the reader to
23 understand that what comes later in the
24 report, especially statements about cost
25 savings and cost effectiveness, need to be

1  considered, given the foundation that I
2  established in Exhibit 3 and the earlier
3  parts of the report about why we need to
4  think about the different cost structures
5  that these different -- I'm sorry, I should
6  say different cost drivers of different
7  types of costs that these different types of
8  service delivery models demand.
9       BY MS. RADCLIFFE:
10      Q.    And so Exhibit 3, this isn't
11 something you evaluated whether -- what -- what
12 the --
13       (Remote transmission interference)
14       MS. REPORTER:  I'm sorry?
15 Something happened.
16       MS. RADCLIFFE:  Yeah.
17       BY MS. RADCLIFFE:
18      Q.    You didn't actually evaluate what the
19 costs were in comparing -- let's just say what
20 the actual costs were for a cost comparison
21 between CCA and the Bureau of Prisons?
22       MS. GRANT:  Object to form.
23       THE WITNESS:  But we're talking
24 here about a -- a specific exhibit that
25 serves a -- a -- a very specific purpose,

1  which again is to establish that there's
2  different cost structures and different
3  cost drivers across these different
4  service delivery models.
5       Certainly throughout the report and
6  in other places I -- I talk about the cost
7  statements and the relative cost savings,
8  specifically operational cost savings that
9  CoreCivic described and talk about that
10 and -- and again conclude that those
11 statements were appropriate and -- and
12 well-supported.
13       The -- so the -- the goal of
14 Exhibit 3 is -- is, again, just to -- to lay
15 out what the different types of costs are.
16 I think -- you know, on the -- on the
17 question of doing a cost comparison or
18 making a cost comparison, I think what I've
19 established here is the different types of
20 costs that are incurred and the kinds of
21 things that we would want to pay really
22 careful attention to when we attempt to try
23 to do the sorts of cost comparisons that I
24 talk about throughout the rest of the
25 report.

Case 3:16-cv-02267     Document 359-2     Filed 11/20/20     Page 77 of 125 PageID #: Page 297..300
20573
www.LexitasCR.com

Page 301

1    So in this table this is a -- this is
2    a list.  This is a -- this is designed to --
3    to express the way that -- the way that the
4    industry and the way that the literature in
5    this space characterizes the different
6    costs.
7        And it would be a -- a really good
8    foundation for any number of different kinds
9    of analyses, including and especially the
10   analysis that I set forth in the rest of the
11   report.
12       BY MS. RADCLIFFE:
13   Q.   So, for example, in your column
14   Outsourcing, you've listed other costs and one of
15   them is inmate medical care.
16       You didn't take any -- undertake any
17   analysis of the costs of -- the BOP outsourcing
18   inmate medical care with respect to the BOP
19   facilities, did you?
20       MS. GRANT:  Object to form.
21       THE WITNESS:  And, again, the --
22   the goal of this exhibit was just to
23   highlight that there are different cost
24   drivers across the different service
25   delivery models.

Page 302

1        To the extent that inmate medical
2    care is an important cost consideration for
3    outsourced prisons, you know, that --
4    that -- that part of my -- or my analysis
5    certainly incorporates those considerations
6    when we look at, for example, the per diem
7    rates that CoreCivic quoted.  When we look
8    at some of the other cost statements that --
9    that CoreCivic made, a lot of those
10   statements were reflective of their full
11   cost structure or at least most of their
12   cost structure, including inmate medical
13   care.
14       So to the extent that inmate medical
15   care is one of many costs that are important
16   in evaluating CoreCivic's statements about
17   costs, I would say that that and other costs
18   are -- are appropriately considered as I
19   form my opinion.
20       MS. REPORTER:  Ms. Willow, could we
21   take one last break?
22       MS. RADCLIFFE:  Sure.
23       MS. REPORTER:  Sorry.
24       MS. RADCLIFFE:  No worries.
25       VIDEO OPERATOR:  All right.  The

Page 303

1    time is 5:03 p.m. and we are now off the
2    record.
3        (Thereupon, a brief recess was
4        taken.)
5        VIDEO OPERATOR:  All right.  The
6    time is 5:16 p.m. and we are back on the
7    record.
8        MS. RADCLIFFE:  Okay.  Could you
9    pull up tab 31 for me, please.
10       MS. REPORTER:  Marking it as an
11   exhibit?
12       MS. RADCLIFFE:  Yes.  So it's 561.
13       (Thereupon, Marlowe Exhibit
14       Number 561 was marked for
15       identification.)
16       BY MS. RADCLIFFE:
17   Q.   Mr. Marlowe, if you could look at
18   your report first, do you see on page 15 of your
19   report in paragraph 33 it says, To draw
20   comparisons between the BOP's operating costs
21   that and per diem, CoreCivic used its own
22   publicly disclosed data and the data publicly
23   released by the BOP.  These data sources were
24   referenced in the footnotes -- footnotes of the
25   published cost comparisons.

Page 304

1        And then in the footnote 64 it's a
2    reference to the 10-K and 10-Q for the fiscal
3    years 2011 to '16 and some other cites as well.
4        Do you see that?
5    A.   I do.
6    Q.   Okay.  So turning to what has been
7    marked as 561, which is tab 31 that's pulled up,
8    could you tell me where those disclosures are in
9    this 10-K?  And I will note for the record that
10   this was provided from your files and there are
11   certain portions of the 10-K that are
12   highlighted.
13   A.   Sure.  Sorry, let me pull up tab 31.
14       Just give me a moment to --
15   Q.   No worries.
16   A.   Oh, okay.  Thanks for -- for waiting.
17       So as best I recall -- and, again,
18   it's been a while since I drew information from
19   these documents, but to the best of my
20   recollection, the -- the footnotes that we're
21   talking about are, for example, on page 13 of
22   tab 31.  So there's information about CoreCivic's
23   facilities and then there's some footnotes that
24   talk about information about those facilities and
25   about -- information about those facilities.

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

Page 305

1    Q.    Okay.  And -- and that -- would that
2  be the only reference in the form 10-Ks?
3    A.    Not necessarily.  Again, to the best
4  of my recollection, that's -- that's one example.
5  There may be others, but --
6    Q.    Are there any others that you could
7  recall with respect to this 10-K?
8    A.    Well, again, I'm -- as I sit here
9  today, I -- I would need to spend a lot more time
10  with this to be able to -- to call out some more
11  specific examples.
12    Q.    So at this time you're not able to --
13  to recall without reviewing the document more
14  closely; is that accurate?
15    MS. GRANT:  Object to form.
16    THE WITNESS:  Again, no, I'm not --
17  I'm not saying I -- I don't recall.  I'm
18  simply saying that I would need to spend
19  some more time with this document to be
20  able to -- to pull out the specific pieces
21  of information that you're asking about.
22    BY MS. RADCLIFFE:
23    Q.    Okay.  Do you recall that there are
24  other pieces of information that would have been
25  contained in the 10-Ks besides those on page 13?

Page 306

1    MS. GRANT:  Object to form.
2    THE WITNESS:  The 10-Ks are -- the
3  10-Ks have lots of information about lots
4  of things.
5    BY MS. RADCLIFFE:
6    Q.    So as you sit here today, is there
7  any particular information that you recall that
8  would be in, for example, this form 10-K as to
9  the data sources that were referenced in
10  footnotes of published cost comparisons?
11    MS. GRANT:  Object to the form.
12    THE WITNESS:  Yeah, again, I -- I
13  would have to -- I'd have to spend more
14  time with this than -- than what I've
15  spent just now to be able to -- to answer
16  that question about the specific
17  information that's referenced here, as
18  well as -- as you're asking about any
19  other potentially relevant information.
20    Again, I --
21    BY MS. RADCLIFFE:
22    Q.    Well, I'm -- I'm just asking for the
23  data sources that you reference in paragraph 33
24  that cite to footnote 64.
25    MS. GRANT:  Object to the form.

Page 307

1    THE WITNESS:  And again, I'm -- I'm
2  trying to tell you I -- I've -- I would
3  need to -- to reacquaint myself with these
4  particular disclosures to be able to point
5  you in the direction that you're asking.
6    BY MS. RADCLIFFE:
7    Q.    Fair enough.  Okay.
8    I will reserve the remainder of my
9  time, if I have any, for rebuttal, if necessary.
10    Thank you for your time, Mr. Marlowe.
11    A.    Thank you.
12    Q.    You may not be done, but --
13    MS. GRANT:  I just have a few quick
14  follow-up questions.
15    EXAMINATION BY COUNSEL FOR DEFENDANTS
16    BY MS. GRANT:
17    Q.    So the first one is are you offering
18  an opinion on any of CoreCivic's investors' state
19  of mind?
20    A.    No.
21    Q.    And the next one is are you offering
22  an expert opinion on CoreCivic or any of
23  defendants' state of mind when they made any of
24  the statements at issue in this case?
25    A.    No.

Page 308

1    MS. GRANT:  That's all.
2    MS. RADCLIFFE:  Now we really can
3  say thank you and have a good evening.
4  We can go off the record.
5    VIDEO OPERATOR:  Is this the end?
6    MS. RADCLIFFE:  Yes.
7    VIDEO OPERATOR:  Okay.  Hold on
8  everybody.  Let's see.
9    Okay.  This concludes today's
10  deposition of Justin Marlowe.  The time is
11  5:25 p.m. Pacific Time and the date is
12  October 16, 2020.
13    We are now off the record.
14    (Thereupon, signature having not been
15    waived, at 5:25 p.m. PST the
16    deposition concluded.)
17
18
19
20
21
22
23
24
25

**Page 309**

```
1        CERTIFICATE OF NOTARY
2        I, MISTY KLAPPER, the officer before
3   whom the foregoing deposition was taken, do
4   hereby certify that the witness whose
5   testimony appears in the foregoing
6   deposition was duly sworn by me; that the
7   testimony of said witness was taken by me in
8   shorthand and thereafter reduced to
9   typewriting by me; that said deposition is a
10  true record of the testimony given by said
11  witness; that I am neither counsel for,
12  related to, nor employed by any of the
13  parties to the action in which this
14  deposition was taken; and, further, that I
15  am not a relative or employee of any
16  attorney or counsel employed by the parties
17  hereto, nor financially or otherwise
18  interested in the outcome of this action.
19       Further, that if the foregoing pertains to
20  the original transcript of a deposition in a federal
21  case, before completion of the proceedings, review of
22  the transcript [ X ] was [ ] was not requested.
23  Dated: October 28, 2020

24                        Misty Klapper, RMR, CRR
25                        and Notary Public
```

**Page 310**

```
1        DECLARATION UNDER PENALTY OF PERJURY
2   Case Name: Grae vs. Corrections
                Corporation of America, et al.
3   Date of Deposition: 10/16/2020
4   Job No.: 10073529
5
6        I, JUSTIN MARLOWE, PH.D., hereby certify
7   under penalty of perjury under the laws of the State of
8   _____ that the foregoing is true and correct.
9        Executed this _____ day of
10  _____, 2020, at _____.
11
12
13                    _____
14                    JUSTIN MARLOWE, PH.D.
15
16  NOTARIZATION (If Required)
17  State of _____
18  County of _____
19  Subscribed and sworn to (or affirmed) before me on
20  this _____ day of _____, 20__,
21  by_____,   proved to me on the
22  basis of satisfactory evidence to be the person
23  who appeared before me.
24  Signature: _____ (Seal)
25
```

**Page 311**

```
1   DEPOSITION ERRATA SHEET
2   Case Name: Grae vs. Corrections
                Corporation of America, et al.
    Name of Witness: Justin Marlowe, Ph.D.
3   Date of Deposition: 10/16/2020
    Job No.: 10073529
4   Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
5                  3. To correct transcription errors.
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24  Page _____ Line _____ Reason _____
25  From _____ to _____
```

**Page 312**

```
1   DEPOSITION ERRATA SHEET
2   Page _____ Line _____ Reason _____
3   From _____ to _____
4   Page _____ Line _____ Reason _____
5   From _____ to _____
6   Page _____ Line _____ Reason _____
7   From _____ to _____
8   Page _____ Line _____ Reason _____
9   From _____ to _____
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  _____ Subject to the above changes, I certify that the
            transcript is true and correct
23  _____ No changes have been made. I certify that the
            transcript  is true and correct.
24
25                    JUSTIN MARLOWE, PH.D.
```

**$**

**$12** 216:7

**$3** 156:4,14 160:14

**$45,000** 134:13

**0**

**0which** 264:20

**1**

**1** 23:14 76:3,5,6
111:13 112:13
187:24 195:9 264:23

**10** 61:22,24 62:10
65:2,7 66:5 74:21
96:14 218:11,13
219:25 220:1,12
251:2,3,4,5

**10-K** 205:21 206:18,
21 207:5 237:1
304:2,9,11 305:7
306:8

**10-ks** 66:22 236:7
269:5 305:2,25
306:2,3

**10-Q** 205:3,11 207:5
237:2 304:2

**10-qs** 66:22 236:7,11
269:5

**10:05** 74:24

**10:19** 75:4

**11** 42:20 59:11 133:9,
15 134:6 210:8
213:16 220:13

**12** 178:14,15 182:15,
17 203:2,9 204:3
206:7

**12:24** 164:6,8

**12:25** 164:1

**13** 85:2 87:12 96:4,6
123:16 202:11,16,22
204:15,18 206:12,13
304:21 305:25

**14** 123:16 165:19
173:25 186:18
187:25 195:8

**14th** 174:11

**15** 96:12 123:16
165:8 180:7 210:3
213:5 303:18

**16** 8:4 304:3 308:12

**17** 62:2,20 63:21 65:8

**18** 232:5

**1:19** 165:1,3

**1:47** 184:23

**1:49** 185:3

**2**

**2** 75:15 76:21 86:14
113:18 114:4,5
115:17 116:10
117:3,12 166:5
203:21 215:23
228:10

**2.1** 54:6,8,21 55:3,10
123:3 124:11,20
125:3 178:11 181:4,
12,25 182:23 187:3,
14,20 195:20 196:7,
21 201:5 209:21
211:5,17 212:4,7,11,
21 215:25 237:21
238:9 239:4,18

**2.2** 54:6,8,22 55:3,11
124:11,20 125:4
182:23 187:4,15,20

195:20 196:7,21
201:5 209:22 238:10
239:5,18

**20** 200:19 284:3

**2000** 152:2 153:20
181:5

**2005** 210:3

**2008** 109:3

**2011** 123:2,11 205:4,
12,18 304:3

**2012** 123:16 131:12
133:10,13,15 134:7
205:22 206:19

**2013** 100:23 107:15
150:9 151:1 165:16
166:5,9 167:9,23
168:1 172:18 174:17
176:6 178:21 180:9

**2014** 96:13,15
170:18,23 171:10,
20,24 172:2,5 173:9,
12,18 174:13,16
176:3,6 177:2 179:2
180:9 181:5,7 182:2
216:5

**2015** 93:18 96:2
211:8

**2016** 123:2

**2017** 10:12

**2018** 29:8,11 33:8

**2019** 34:23

**2020** 8:4 33:9 75:9
93:18 96:2 308:12

**21** 253:1 254:18

**22** 251:6,11 254:18

**23** 131:12

**24** 33:22 210:1,2,23

**25** 255:3

**27** 33:6 62:1,13,16
65:3 66:3 205:22
206:19 292:16
293:24

**28** 214:11,15

**29** 86:16 100:23
107:15 168:1 172:18

**29th** 171:17

**2:38** 220:4

**2:56** 220:8

**3**

**3** 61:6 80:2 98:11
146:8,9 183:8,13
185:9 195:8 203:21
282:25 283:3
295:19,21 296:1,2,5
298:19 299:2,10
300:14

**30** 31:11,25 133:13

**300** 8:8

**30th** 133:13

**31** 174:24 175:19,21
303:9 304:7,13,22

**32** 194:25

**33** 24:5 202:8,18
303:19 306:23

**33-page** 36:12

**39** 232:5,9

**3:00** 134:7

**3:16-cv-02267** 8:16

**3:50** 259:11

**4**

**4** 80:3 205:4,12,18

www.aptusCR.com

260:14,17 261:13

**40** 31:25 74:14

**4:04** 259:15

---

**5**

**5** 149:19,20 201:11
203:8,10,12,13,21
204:2 214:15 262:12

**50** 76:11

**53** 106:5,14,17
146:25 147:2
167:17,18 276:2,4

**536** 149:11,17,18

**54** 105:24,25 106:2,3,
4,5 167:15 276:9,11,
16,21 278:8

**548** 24:9,12 165:12

**549** 101:21,23 146:5

**55** 106:5

**550** 106:20,22 107:11
147:1 167:19

**551** 107:23

**552** 109:14,16,22

**553** 130:7,9

**554** 132:16,18

**555** 135:9,11 136:13

**556** 149:13,21,23

**557** 149:21 201:21,23
202:21

**558** 210:2,5 220:11

**559** 210:24 260:6,7,9

**560** 270:7,9

**561** 303:12,14 304:7

**58** 214:11,16 215:18

**5:00** 193:1

**5:03** 303:1

**5:16** 303:6

**5:25** 308:11,15

---

**6**

**600** 8:8

**61** 165:8,16 166:3
170:16 174:12

**62** 174:10

**63** 270:3

**64** 304:1 306:24

**68** 191:22

---

**7**

**7** 60:3

**79** 101:19,20 146:4
232:23 233:6

---

**8**

**8** 59:9 228:10,13
237:23 242:25 249:6

**80** 109:13

**81** 148:15 149:4

**83** 135:8,17 136:1,7

**84** 132:15 136:1

**85** 107:20

**86** 130:1

**89** 271:3

**8:35** 8:3

---

**9**

**9** 202:7 242:23

259:16,21 283:7
284:8 291:18

**92** 183:4

**92101** 8:9

**9b** 289:3

---

**A**

**a.m.** 8:3 74:24 75:4

**ability** 188:8 189:10

**able** 14:20 22:15 36:7
39:8 56:10 58:7,8,23
59:7,16,23 60:6
61:7,13 63:14,17
64:17 65:23 67:1,25
68:1 71:21 73:21,23
122:13 140:13,14
141:6 169:15 175:14
180:22 197:15 227:3
253:15 263:9 267:14
280:9 305:10,12,20
306:15 307:4

**above-mentioned**
119:3

**absolutely** 274:2

**Abt** 99:14,17,22

**academic** 13:6 26:5,
20,21,24 27:1 46:16,
19 51:11 126:25
153:7 247:3 255:1,4
283:24 287:25

**Academy** 39:24

**accepted** 21:19,22,23
137:15 139:2 251:8
252:17

**access** 16:7,10 27:3
70:7 123:22 287:9

**accident** 10:1,3

**accomplish** 82:9

160:3 190:18 275:2,
17,24

**accomplishing** 275:9

**account** 122:21

**Accountability**
260:16

**accounting** 12:15,16,
17 20:12,19 22:7
26:8,23 27:16 37:24
93:9 125:18 127:17
128:10 129:4,21
159:18 160:7 162:15
188:22 194:23
209:17 214:18
219:15 243:10,11
268:18 280:4 284:6
290:19

**accurate** 47:18 62:4,
22 63:24 72:5 73:12
89:3 105:20 182:25
183:1 206:2,23
207:1 212:14,15
213:8 247:21 249:23
269:13 288:10
305:14

**accurately** 197:7

**achieved** 191:19
193:25 194:1 218:21

**achievement** 193:13,
14

**acknowledge** 153:23
162:16

**acknowledged**
251:13

**acknowledging**
252:4

**acknowledgment**
251:7 253:2,9

**acquire** 290:4

**acquired** 267:2

**acquiring** 292:4

**action** 28:16,23 32:18 48:22 49:7,17 56:24 61:20 65:4 66:4 92:16 96:25 97:10, 20 289:23

**actionable** 186:25 187:5,16

**actions** 89:8 90:17,25 91:19,23 92:2,19

**activities** 79:25

**activity** 277:3

**actual** 34:3 111:2 116:4 197:4 199:8 222:12 257:24 299:20

**addition** 10:6 11:11 28:13

**additional** 80:6 123:23

**address** 184:19 196:12 271:6

**addresses** 255:5

**adequate** 14:4 140:13 141:5

**adheres** 159:15,17

**adjustments** 120:14 263:7

**Administration** 39:25

**administrative** 232:13

**admitted** 87:15,18 89:18

**Adrian** 156:22

**advance** 30:25

**adverse** 286:6,14

**advisor** 42:17

**Advisors** 42:22 43:25

**advisory** 44:5,25 45:16

**affiliated** 46:1,8

**affirm** 9:2

**afraid** 193:2 257:20

**AFTERNOON** 165:1

**age** 277:10 281:24

**agencies** 19:9 47:3 160:17 292:21 293:1 295:2 297:6

**agency** 16:17,22,23 17:4 46:13 274:25 275:23

**agency's** 41:14,18

**agenda** 111:3,9

**ago** 10:2,10 138:22 205:7 231:11 234:23 246:20

**agree** 8:21 65:16 73:10,16 114:16 117:2 138:20 144:1 181:11 194:5 205:9 214:25 215:9 222:4 242:15,17 252:10,11 288:17

**agreed** 88:5

**agreement** 21:11,21 134:12,20 135:1

**Ah** 264:25

**ahead** 11:10 23:24 101:17 107:18 108:20 132:14,25 164:5 177:8 179:17 211:9 214:10 295:18

**ahold** 68:16

**aims** 83:20 104:24

**alerted** 67:4

**allegations** 162:3 202:12,17 208:24 209:3,7

**allege** 206:1

**alleged** 178:12,17 211:16 212:8 213:9

**Allegedly** 186:25

**Allen** 183:7,13

**alluded** 205:7

**America** 8:13

**America's** 178:20 211:6

**American** 13:13

**amount** 15:25 16:4 34:4 43:6 126:24 275:11

**amounted** 94:7

**analyses** 36:1 244:16 263:20 269:2 288:21 301:9

**analysis** 17:12 30:10, 16,25 31:2 32:11 35:22 37:20 39:22 41:21 42:10 43:14 44:24 46:11 58:18 60:9,11 61:11 63:13 77:19,22 87:3 88:11 89:10 92:18,19 93:2, 8 95:17 96:19 99:18, 19,25 104:18 121:16 122:4,13 125:9,21 129:14 131:13,17, 22,23 140:10 160:7 161:3,8 172:12 191:3,7 192:13 194:22 195:4 198:18

**ahold** — duplicate handled

**analyst** 21:15 22:9, 14,16 165:16 173:7 176:5 178:21 182:8 263:6 267:3,12

**analysts** 267:8

**analytical** 43:21

**analyze** 165:25 197:19 198:11 199:16

**analyzed** 173:11,15, 22 196:24 197:4 198:13 199:21 212:3 219:10 221:12 233:22 238:23 240:3 257:3

**analyzing** 94:4 199:10 274:10

**and/or** 9:2 156:14

**Andrew** 109:24

**angles** 266:5

**announce** 164:5

**announced** 8:23

**annual** 16:13 178:13 182:15 195:11 199:23

**answer** 11:13 20:6,16 24:20 41:14 47:9 49:11 55:18 56:1

200:15 212:17 213:19 222:15 240:6 241:15 244:11 245:2,4 246:4 248:4, 7 250:19 251:17 252:9 253:24 255:8, 19 256:5,8 263:11 264:3 266:3,9,11,15 267:11,20 268:1,14 272:3 284:7,19,24 287:11 288:4 301:10,17 302:4

www.aptusCR.com

57:13 58:5 59:15 60:4 97:24 122:21 124:17 140:22 141:2 142:17 169:15 174:20 180:12,22 207:8 211:22 225:24 227:3,17,24 229:21 233:2 237:6 240:19, 24 241:17 242:7 249:3 276:18 292:10 306:15

**answered** 225:17 226:10 250:17 282:5

**answering** 64:3

**answers** 11:2

**anti-ppp** 111:6,9

**anticipate** 132:2

**anybody** 31:16 184:9

**anyone's** 159:25

**anytime** 159:24 162:7 269:25

**apologies** 24:1 86:7 111:7 130:20,25 136:3 203:13

**apologize** 16:25 23:16 106:15 215:8

**apparently** 139:14

**appear** 26:19 86:23 179:22 188:4 192:14 232:11 288:9

**appearances** 8:24

**appeared** 30:17

**appears** 26:13 98:13 251:12 293:15

**appendices** 288:5

**appendix** 23:25 24:3, 16,17,24 25:8 27:25 28:11,17,24 29:3 56:13,15,20 57:7,9

58:4 60:14 62:3,21 63:23 66:20 75:7,20, 25 76:2,9,12,21 93:15 95:22 96:6,15 98:6 103:1 107:12 137:6 147:6 148:7 185:24 186:13 207:3 259:24

**apples-to-apples** 115:23 116:19

**applicable** 120:6

**application** 128:9 162:13 248:18,21 280:1 294:14

**applications** 160:5 193:16

**applied** 239:7 244:15 247:12,14 263:22 282:3 284:1,4 287:14

**applies** 47:9 240:17 241:15 244:4,10

**apply** 123:16 239:3 240:17 268:17

**applying** 240:6 248:5 285:24

**appointed** 44:1

**appointment** 44:4

**appreciate** 252:25

**approach** 100:19 118:1,12 119:4 160:4

**appropriate** 57:25 140:4 190:23 193:15 209:18 213:25 227:2 248:18 263:10,19 267:3 268:6,16 282:21 284:5 285:2, 24 286:1 287:19 300:11

**appropriately** 284:13 285:2,8 286:9 287:14 302:18

**approximately** 22:25 23:8 31:7 33:8,22,23 42:15 61:18 62:10 65:2 91:24

**April** 100:23 107:15 150:9 166:9 167:23 168:1 171:17 172:18

**Aptus** 8:5,7

**area** 28:4,6,8 38:23 154:22 155:14

**areas** 12:9 26:22 41:22 83:6 99:19

**Arizona** 112:21 113:13

**arrangements** 46:22

**arrive** 56:10 71:21 73:23 174:9 176:1 263:9

**arrived** 70:16 71:22 284:7

**arriving** 70:15

**art** 280:24

**article** 77:18,19,23 80:22 81:6,18 85:15, 19 86:4,16 100:18 105:18 114:24 115:12 141:15 156:21 157:1,3,6,9, 10,12,16,17 166:10 174:11 179:2,6 181:5,8

**articles** 51:12 61:5 75:17 76:23,25 78:1 80:7,10 82:16,21 83:2 85:6 86:23 98:12,16,19 99:10 115:11 152:15

153:24 154:6 155:5 157:21 158:5,20 160:16 254:20

**articulate** 223:22 224:18,21 291:12

**articulated** 225:4,19 291:14,23

**articulation** 292:12

**ascertain** 152:13 177:20 240:18 255:18

**ascertaining** 19:25

**aside** 101:18 107:19 108:20 132:14 212:10

**asked** 93:3 95:17 115:6,7 124:1 143:9 147:22 158:13,17 161:15 203:2 206:8 209:13,14 226:6 232:24 238:8 241:1 246:20 282:5

**asking** 52:12 65:1,6 70:2 72:8,9,16 74:2 79:21 84:5 102:13 110:13 111:24 117:11 120:17 144:1,5,11 145:6 146:16 150:13 158:10,14 166:14,15 171:21,23 172:19 173:13 174:18 176:22 183:19 196:10 219:7 225:9, 11,14,15,16 233:25 234:3 235:14,23 242:18 251:18,20 252:3 254:4 256:1 273:17 288:14 292:12 305:21 306:18,22 307:5

**assertion** 281:15

**assess** 245:5,6

**assessed** 182:24

**assessing** 200:7
206:22

**assessment** 162:9,10
163:3 263:9 267:2
268:4,14 286:3
287:17

**assignment** 56:11

**assisted** 35:3,6

**assisting** 41:6

**associated** 120:19
201:1

**Associates** 99:17,22

**association** 40:1
99:24

**associations** 83:9

**assume** 144:5,11,21
145:3,7 159:1 263:7
272:22

**assumed** 22:9

**assumes** 137:23

**assuming** 21:15,16
125:6 126:3 137:24
160:11 250:6

**assumption** 223:3
276:10,14 290:10,
16,17 293:8,15,24

**assumptions** 50:8,
20,22 51:1 52:13
77:13 121:10 122:10
123:1 128:8 145:6
158:11 159:16,17
174:8 175:25
244:22,25 245:4,5,7,
9,13 251:15 252:7,
19 253:6 255:7
263:8,22 265:18
266:6,8,12,13,25

267:3 277:13,23
278:16 279:5 289:5,
8,11,19 290:11
291:11,13,23

**assurance** 285:20

**attached** 111:17,19
138:14

**attaching** 111:22
112:4

**attachment** 137:1,4,
18,25 138:1,9,13,22

**attempt** 66:8 258:7
295:4 300:22

**attempted** 193:25

**attempting** 199:1
276:23

**attention** 168:13
193:19 223:16
276:20 300:22

**attentions** 275:21

**attract** 168:13

**audible** 11:3

**audience** 169:25

**audio** 8:19

**audit** 263:13

**August** 33:19

**authority** 245:18,22
246:7

**authors** 103:14 147:9
157:22 169:24

**availability** 256:20,
21,24

**available** 20:13,18
64:12 67:3 69:12,17,
21 70:12,19 71:5,15
77:18 119:3 122:9
125:14 129:15 140:6
153:7,10 170:12,13

174:6 175:1,2,24
176:15 180:8,9
188:20 219:12 223:9
228:17,19 235:6,7,
13,21,23 236:5,8,11,
25 237:10,15 238:5
239:15 242:1
249:15,21 255:10
257:1 262:16 266:5
267:16 269:23,24
280:18,19 287:12,
13,18,23 294:14

**avenues** 294:22

**average** 216:2,3

**averaging** 119:6

**aware** 25:25 26:8
27:8,17 39:7 50:11
51:1 79:22 98:19
99:12 100:3,8,12
109:1,5,8 147:17,23
152:22 153:4,12
154:13 156:3,7
172:20 208:2,6
209:8,9

**Awesome** 106:16

---

**B**

**back** 13:8 17:10 18:1
29:23 33:19 39:9
51:20 57:7 75:4,6
76:9 84:25 87:12
92:1 95:25 96:4 98:6
99:5 115:14 129:24
146:3 147:13 157:15
165:3 167:12 169:14
172:23 175:13
180:6,20 185:3,19
187:20 194:14,16
195:7 196:1 199:20
203:7 207:7 208:11
219:9 220:8,10
221:23 230:15

236:18 242:25
255:21 259:8,15
261:13 271:23
272:4,16 276:17
282:14,24 285:18
289:12 294:5 303:6

**background** 28:6
100:6 112:23 113:14

**backwards** 86:4

**badly** 297:5

**based** 56:19 71:16,17
110:15 125:13
127:16 128:7,8
129:13 134:13 140:5
145:15 170:13,14
200:22 228:5
232:11,15 242:19
244:12,14 253:6
261:25 262:9 273:1
288:19 289:5 294:9

**basis** 55:9 70:17 71:3
97:21 127:24 128:22
129:7 175:6 224:16
249:10,18,24
250:14,17,25

**Bates** 59:10 134:1

**bear** 125:10,21 142:2
159:19 162:20
199:10 200:7 243:7
250:21 267:6 268:8

**becoming** 100:8

**befitting** 71:24

**began** 34:17

**beginning** 8:22 25:25
33:9 173:25

**begins** 8:10 165:19

**behalf** 17:20 45:22

**belief** 55:10 70:17
71:3

**Justin Marlowe, Ph.D.**

**Confidential Pursuant to Protective Order**

**Grae vs.
Corrections Corporation of America, et al.**

**believe** 29:10 31:23 33:6,19 64:2 88:21 99:20 118:14 138:12 151:2 182:22 246:15 247:4 264:14 273:10 274:9 290:24

**believed** 56:14 69:17 70:13 71:15 98:20 140:11 234:13 268:9

**benefits** 46:11,18,21, 24 214:22

**best** 10:23 11:14 20:5,10,13,18 31:10 34:21 37:16 54:15 69:12,16,21 70:12 71:15 73:17 77:7 90:7 99:13 100:1 119:5,8 162:12 169:9 170:12 184:12 185:10 188:21 211:13 227:17,18,21 228:8,9 240:10,24 241:16 242:6,12 244:12 245:19 254:24 266:5 268:16 290:18 293:11 304:17,19 305:3

**better** 64:10 267:11

**big** 50:20 213:14

**billed** 33:4,13

**bills** 32:13,15

**bit** 10:13 61:16 82:7 83:21 129:24 159:11,14,20 205:15 209:12 221:11 234:23 246:20

**Black** 148:25

**Blackstone** 100:18, 23 105:20 107:13 108:6,9,14 109:24 114:23 115:10

118:15 131:5 132:8 133:10,17 141:13 142:12 147:19 148:5 150:19 160:11 162:2 179:2 181:8 182:2, 19

**blind** 77:5,11 78:8 80:14 81:1,6 82:6

**board** 83:8

**boards** 84:11

**body** 20:9 43:9 195:5 244:2,8 245:17 248:15

**bold** 213:14

**Bollinger** 8:12

**bond** 126:21

**bonds** 126:18

**book** 137:2,7

**BOP** 11:23 47:16,25 48:13,23 49:15 50:9, 24 52:20,24 53:9,13 120:21 122:2 191:6 192:14,16,21 201:2 213:7 255:20 261:16,19 264:5 271:7 272:11,25 273:11 275:16 293:8,18,24 295:12 301:17,18 303:23

**BOP's** 216:3 273:19 303:20

**bother** 141:11,18,21 142:10,19,21 143:3, 5,6

**bothered** 143:9,12

**bottom** 102:9 103:13 133:7,14 134:5,14 153:16 173:25 218:6,15 264:17,24

**Bounceback** 94:25 95:3,5,8,13,18

**bounds** 209:16

**box** 264:17,24

**branch** 127:10

**branches** 13:5

**break** 11:6,10 74:13 100:19 130:4 148:18 161:16 163:21 164:3 219:22 257:10 259:7 302:21

**breaks** 11:8

**brief** 75:1 220:5 259:12 303:3

**briefly** 59:17

**bring** 125:10 159:18 162:20 199:9 276:24,25

**bringing** 94:3 248:3 250:21

**brings** 162:21

**broad** 12:8 20:5 26:9, 21 27:7,11 28:13 98:23 217:23 234:3 281:14 283:22

**broader** 83:22 158:15 193:17 209:12 222:22 231:9 237:8 245:3 252:23 258:14

**broadly** 21:18 40:17 214:19

**Broadway** 8:8

**brought** 12:3,18 92:8 125:20 200:6 243:6 267:6 268:8

**Buck** 109:25

**budget** 16:13 41:11, 14,17,18 42:3,9,18,

24 43:11,23 44:20, 24 45:7,8 49:18,21, 22,24,25 50:2 53:16 86:19

**budgeting** 39:14 41:7,24 42:7 43:14 44:16 85:21,22 86:5 87:16,17

**budgets** 16:12 42:11 85:23

**build** 290:5

**building** 292:5 293:9, 25

**bulk** 33:12

**bullet** 108:15 131:17 194:25

**bunch** 164:2

**Bureau** 11:24 44:11, 13 48:19 58:20 270:22 272:9 299:21

**business** 43:7 195:13 280:20 292:7

---

**C**

**C-O-P-E** 78:25

**California** 8:9 271:8

**call** 12:10,15 43:5 115:22 276:14 297:23 305:10

**called** 9:6 43:1 93:11 186:25 203:18 213:21

**capacities** 43:22

**capacity** 41:3

**capita** 216:3,6

**capital** 27:3,4 87:17 290:5 292:5

**capture** 115:24 116:20 197:7

**captured** 297:11

**care** 301:15,18 302:2, 13,15

**careful** 125:25 161:3 193:19 198:17,24 199:7 252:21 262:9 275:21 300:22

**carefully** 57:24 160:1 185:13 197:14 236:19 241:19

**case** 8:15 12:3 15:1,4 27:21,22 28:21 29:6 32:14,15,21,23 33:5, 24 47:15 56:24 58:19 62:1,14,18 87:18,21 88:2,14 90:12 91:14 92:18, 23 93:2,12,25 94:1,8 95:4 96:24 97:9,19 98:25 119:14 128:4 139:19 140:20 158:5,20 160:6 163:2,8 177:10 178:8 189:4 206:2,9 208:24 209:7,12 222:25 223:3 224:6 225:10,23 226:8 247:18 274:12 289:10 307:24

**cases** 28:21 39:19 87:18 88:25 91:6 92:17 94:24 95:1 96:12,14,16 231:5

**cat** 98:8

**categories** 192:8 204:24 231:5 255:9

**categorize** 229:2,4

**category** 231:13,14, 15,18 234:19

**cc** 133:17

**cc'd** 139:13

**CC's** 55:16

**CCA** 11:18 29:6 32:22 47:17,25 49:5,21 50:8 52:25 53:7,12, 15,18,22 54:1,20 55:1,8,16,23 56:6,9 57:3,5 66:10 67:11 68:21 69:8,18,20 72:3,4,21 74:3 108:6,13,24 109:3, 25 112:19,20,22 113:8,12 115:15 118:1 119:5 120:20 122:2 123:1,18 131:7 133:9 138:8 139:12 141:12 142:11 143:16 144:13 150:25 152:5,14 153:19 156:5,12,14,18 158:7,22 159:2 160:11,12,13 162:1, 2 163:8 169:10 177:11,20,25 178:14,20 213:14, 21,24 220:15 222:5 258:18,23 262:20,24 267:19 278:17 279:4 287:5 293:14,19 299:21

**CCA's** 48:23 49:18,24 50:2 55:16 70:8,20 71:6 105:11 108:9 115:6,14 119:17 150:8 151:18 152:19 158:12 177:25 178:1 181:22 205:10,21 206:18,21 211:6 216:13,21 218:19 231:16 234:15

**Center** 166:8

**central** 28:12

**certain** 11:12 21:8,20 51:9 52:1 66:18 120:7 126:18 127:19,20 170:11 190:8,9,10 193:15 194:16 207:14,22 240:5,6 244:22 255:8 257:15 275:20,22 289:5 304:11

**certainly** 26:11 27:17 31:4 38:24 39:18 45:1 50:11 51:14,18 58:6 61:22 68:9 100:9 102:22 104:14 121:12 126:9 140:7 152:21 168:11 226:18 246:3 272:1 295:14 300:5 302:5

**certification** 205:17

**certified** 40:14

**CGFM** 40:15

**chain** 131:5,10

**challenge** 91:8 231:2 239:22

**challenged** 91:1 200:24 203:3 204:6, 24 205:2,10 206:1,8, 14,16,22

**challenges** 90:9 115:18 263:2,25

**challenging** 207:14, 22

**chance** 110:12 183:11

**change** 72:24 145:21 223:16,21 290:6 298:11

**changed** 145:22

**changes** 137:16 139:2 172:20

**characteristic** 281:14

**characteristics** 153:3 177:6 190:25 261:18

**characterization** 43:19 112:2 144:2 181:11 193:5 194:6 196:16,18 197:3,12 198:16 199:12,15 200:1,11 205:8 212:16 234:6,22 242:16 258:6,8 263:24 265:15 273:19 296:6

**characterize** 19:21 21:18,21 35:12 38:17 64:21 70:3 72:9,17 112:7 116:24 127:18 145:14,24 160:24 161:2 173:1 189:18, 24 211:25 217:3,4, 13 219:7 233:20 241:12 244:1,7,18 248:13,20 253:7 255:15 258:13 279:9 287:8 295:5 298:8

**characterized** 88:10 90:11 195:12 196:3 217:14 247:25 248:2 279:22 294:6,21

**characterizes** 197:17 301:5

**characterizing** 64:25 65:12 73:18 172:17 189:25 233:21 294:20

**Charles** 155:22 156:12,13 157:11 160:14

**chart** 204:21

**Index: capture–chart**

Confidential Pursuant to Protective Order

Justin Marlowe, Ph.D.

Grae vs.
Corrections Corporation of America, et al.

chartered 40:2

chat 75:23 102:1
107:3 109:19 110:5
130:22 132:15
133:19,24 135:18
136:1 148:23 183:5,
15,23 201:12 210:1
259:17 270:3

Chicago 9:18 82:14,
17,24 83:3,12,24
84:6,17,21

chief 109:3

chose 66:10 69:18
98:16

circulating 38:14

circumstances 21:2
120:7 180:21

citation 171:20

citations 151:17
157:17 233:23 257:4

cite 69:2 100:17,23
101:6 148:7 173:10
306:24

cited 22:20 26:15
38:25 123:10 150:25
168:13 170:10,11
174:23 175:9 177:21
182:1,5

cites 304:3

citing 170:17 172:1,4
173:8 174:11 176:3,
6 293:13

Citizens 43:1

City 93:20 94:3,5

civil 91:23 92:15
96:24 97:9,19

claim 175:6 257:17,
18,22 258:18 267:21
277:24 282:3,10

claimed 257:5

claiming 273:1
282:22

claims 55:17 56:7
77:17 93:3,5 178:6
187:25 195:9 200:25
217:9 258:22 269:11
284:11 287:3 289:4

clarification 158:17
252:25

clarify 10:18 176:22
191:2 234:12

class 228:14 229:6
233:14 234:14
235:18 239:12,24
241:23 249:12

classifications 216:4

clear 38:8 47:6 56:22
66:17 78:15,22
94:15 96:1 103:3
116:5 127:21 145:5
159:4 167:4 172:15
173:16 174:6 175:5,
23 176:4 178:3,5
179:15 193:24
197:22 198:10
215:15 232:16,18
233:23 235:25
242:10 243:6 244:8,
13 248:15 263:3
266:7,10 276:21
291:25

clearly 234:8 243:15
272:20 291:12,14

click 75:24 130:23

clients 188:7 189:13

close 161:20 168:17
281:9

closely 126:10
305:14

coin 271:17 274:5

collaborating 135:1

collaborative 36:10

colleagues 134:19

collect 13:19,23
261:19 264:6

collected 12:12 14:4
15:16 16:1,5

collecting 15:10

collection 14:7 94:6
95:6,11,19

column 206:14
221:17 301:13

come 35:25 39:6,8
52:2 110:5 223:16
259:8

comes 154:18 162:17
217:18 253:21
298:23

comfortable 71:20

coming 135:18 264:1
279:23

comment 47:11 73:6
118:18 119:22,25
120:25 151:14
155:12 161:6 177:24

commentary 78:17

commented 46:24
47:2

comments 81:20,23
138:2

commercial 13:20
14:2,23 16:2 17:17

Commission 43:2
94:20 156:15

commissioned
112:19,21 113:9,13

Committee 79:7

communicating
61:19 65:2

communication
113:1

communications
188:5 189:9

communities 12:5

company 11:19 53:8

company's 53:23
195:12 228:18
237:14 238:4 249:19

comparability 263:25

comparable 261:19

comparative 255:8,
19 256:7 257:17,18,
22

compare 118:1
119:16

compared 37:22
50:23 53:9,13
160:17 228:20
237:17 238:6,7
249:22

comparing 17:21
119:15 120:19 159:8
251:8,13 252:5
253:3 272:10 299:19

comparising 254:1

comparison 113:20
114:6 115:8,19,23
116:20 117:3,17
119:24 120:9 121:3
228:18 233:8 236:2,
22 237:14 238:4
249:19,20 261:16
262:18,22 267:14,21
274:10 299:20
300:17,18

**comparisons** 16:16 17:3,8 18:9,17,19, 22,25 19:5,7,11,16, 25 21:10,12 51:2,4 52:14 116:17 119:15,18,21,23 120:5 121:1,11,20, 23 123:2 126:1 176:14 232:10 253:16 255:5 258:2 261:11 263:2,4 265:11,17,19,20,21 266:16 300:23 303:20,25 306:10

**compelling** 195:14 198:4

**compensation** 33:2

**competing** 88:13

**competition** 294:25

**competitive** 166:9 284:22 294:2

**competitor** 46:5 112:22 113:14

**competitors** 48:14

**competitors'** 48:18

**complaint** 30:13,15, 25 66:15,16 92:8,12 95:15 147:18 185:11,22 200:23

**complete** 56:15 68:21,24 69:12,16 70:12,18 71:4,14 140:2

**completely** 64:17 65:13

**complex** 253:4 254:3

**complexity** 254:6,11

**compliance** 192:15, 20 195:3

**component** 44:7 85:24 196:23

**components** 64:19 122:15 131:23 143:24 238:16 256:14 265:25 288:16

**comprehensive** 16:12 54:17 61:3 71:23 73:24 294:13

**concentrated** 110:9

**concept** 21:25 50:15 63:17 125:1 214:17 215:20,21

**concepts** 13:5 20:14 21:8,20 27:5 37:14, 21,22 38:6 50:18 120:6 125:15,16 127:19 128:9 129:3, 20 190:15 191:11 193:10,16 194:4 219:14 275:20 279:13

**conceptual** 280:14

**concerning** 192:13

**conclude** 300:10

**concluded** 224:16 308:16

**concludes** 308:9

**concluding** 271:5,11 272:8 273:10

**conclusion** 15:22 235:17 272:18 273:15,21,25 286:19 293:18

**conclusions** 22:12 140:11,14 141:6,10 159:22 233:11 235:1 238:18 251:1 254:16 263:16 265:21

267:15 271:13 273:19 287:10

**concrete** 265:22

**conduct** 261:15

**conference** 75:11 78:16 99:24 168:16

**conferencing** 8:17

**confident** 56:18 140:3

**confirmed** 44:4

**conflate** 288:15

**conflating** 127:8 216:24 238:15

**Conformance** 49:9

**confused** 231:10 246:22

**confusion** 94:18

**Congress** 40:2,3

**conjunction** 189:11 203:1 258:24

**connected** 83:8

**connection** 28:15,22 98:17 102:19 148:6 152:16 170:4 202:4 274:11

**conservative** 232:8

**consider** 17:13 61:13 117:8 119:14 120:18,19 122:18 123:13 126:6 127:17 160:1 162:24 188:8 189:13 195:20 196:5 202:25 205:25 206:21 209:18,21 220:24,25 252:12 253:25 254:5 277:4 294:12

**considerably** 15:23

77:24 159:23

**consideration** 161:17 217:1,11 274:25 275:13,22 302:2

**considerations** 122:22 145:23 277:19 302:5

**considered** 25:16,24 26:17 28:15,22,23 121:14 124:10 152:16 168:16,23 169:19 191:16 195:4 196:9 237:10 254:9, 15 274:20 297:25 299:1 302:18

**considering** 90:18 119:15

**considers** 189:9

**consistent** 125:17 129:2,19 160:4 162:12,24 188:21 219:13 268:16 277:3 284:14 285:9 286:9 290:18

**consists** 206:16

**constitute** 160:7

**constituting** 191:25

**construction** 292:19 293:3 295:3

**construction-related** 294:24

**consultant** 45:16

**Consulting** 87:14 96:12

**contact** 29:13 39:19 40:12 67:11 156:18

**contacted** 29:7,9,12

**contain** 58:17 60:5

Index: comparisons–contain
www.aptusCR.com
Case 3:16-cv-02267   Document 359-2   Filed 11/20/20   Page 89 of 125 PageID #: 13099

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

contained 305:25

containing 191:25

contains 132:9 150:7

contemporary 51:25

contend 203:3 204:7

content 35:4 144:16
146:8 225:20 240:9
257:21 258:15

contention 192:2

contents 36:16 103:8

context 27:14 45:18,
23 50:18 59:18,22
61:8,14 114:12
120:9 143:8 162:14
177:5 209:12 221:24
229:11 241:9 243:20
252:13,22 253:15
254:13 258:12
268:17 272:18
274:20 277:9 281:22
287:15

context-specific
243:18

contexts 15:2

continue 32:22
149:24

continues 98:13

contract 49:6,9
292:21 293:2

contracted 166:10
297:6

contracting 26:6
27:9,12 47:17,25
48:13 218:21 295:2

contractor 95:10

contractors 51:21
262:13,14 264:7
292:18 293:10 294:1

contracts 17:13 45:3
49:14 192:16,22

contradicted 286:19,
22

contradictory 72:22
74:4 258:21

contrast 292:20

contributed 160:12

control 289:16

controlling 284:21

convenience 219:22

conversation 22:23
23:1,6 64:6 66:5
144:3

conversations 22:22
62:25 63:1 65:12,17
262:19

conversing 61:24

convey 54:23 113:5
166:23 167:1

conveyed 212:13,24
219:3

conveying 112:25
116:2,17,25 117:23
118:3 284:20

conveys 112:18

COPE 78:25 79:1,4,9,
12,18

COPE's 79:24

copied 139:12

copy 23:9 25:5
138:17

copying 113:1 133:10

core 125:23 128:9
129:20 219:10,14

Core's 281:10

Corecivic 11:18,20
28:14,18 32:16,17
37:19 50:21 52:14
54:9 64:22 66:19
67:17,20,22 69:3
70:1,25 72:18 73:22
74:9 120:2 121:1,3,
6,11 122:6,11,15,19
123:11 124:9,15
125:6,12,15 127:14
128:6 129:1,17,18
148:11 163:19
166:19 167:1 174:2,
5,13,15,19,25 175:7,
22 176:6,12,17
178:7 179:1,5 181:6,
13,25 182:13 188:18
189:6 190:10
192:13,16,21 193:9
195:23 196:2,17
197:3,4,18 198:10,
19,25 199:9 200:6,
16 201:2 209:11
212:20,22 215:25
219:11 221:7
228:14,16,23 229:6,
14 230:1,13,17,22
231:4,6 232:16
233:14,16 235:2,18,
21 236:4 239:11,14,
23 240:1,2 241:2,4,
23,25 248:6 249:15
254:5,12,21 255:18,
23 256:6 257:1,5,15
258:1 268:2,5,10,13
269:15 274:16
276:17,23 277:23
279:12 280:20
281:15 282:2,10,21
283:21 284:25
285:19 287:8,19
289:4 290:16,21
291:7 292:3 300:9
302:7,9 303:21
307:22

Corecivic's 36:17
48:5,14,18 49:14
58:19 68:4 73:7
176:14 180:24
188:5,15 189:10,21
190:2,7 191:5,8
195:11 198:16 207:4
209:15 211:16 212:8
217:9 222:14 230:9
232:6 236:6,13
249:12 250:19
278:5,10 281:7,11
284:11 302:16
304:22 307:18

Cornerstone 22:22
23:1 29:14,15,17,21,
24,25 32:7 35:2,10,
12,17,23 36:21 37:6
38:4,14,18 39:5
61:17,19,25 62:10
63:1,2 64:7,8,23
65:3,7,13,18 66:5,
14,17,24 67:11,24
68:5,15,21 69:11,19,
21 70:2,5,8,11,20,25
71:4,6,12 72:3,5,15,
19,22 73:8,19 74:3
99:1 101:14 163:8,
14

Cornerstone's 67:16,
19 72:17 74:9
163:18

Corp 11:18 46:2,5
105:2 148:4 207:15,
23 253:25 274:11
284:20 297:3,7

Corp.'s 146:12 205:3
230:21

Corporation 8:13
146:18,22

corporation's 49:25

correct 10:8,9 12:23
16:9,10 31:22 32:1,

18,19 36:13,14
52:16 55:25 56:20
57:1,4 62:11,12,14,
19 65:4,5,9 66:6
70:9 73:2 85:8 86:20
87:5 89:15,22 90:2
93:19 94:17,23
95:24 101:5 105:9,
17 106:1 110:22
133:4,19 136:2
146:20 152:20 157:8
167:11 168:9 169:11
173:14 174:11
190:7,8 202:19
206:10 209:22
211:17 214:3 222:19
248:25 249:6,9
273:7 291:20

**correcting** 86:11

**correction** 146:12
230:21 292:21

**correctional** 38:12
39:2 42:3,10 43:15
85:7,12 86:24
195:17 251:14 252:6
253:3 254:2 255:6
271:14 277:9,11
281:22,24 284:15
285:11 286:11
292:19

**corrections** 8:13
11:18 46:1,5 85:23
86:1 98:24 103:16
105:2 146:17,22
148:4 166:21 174:4
178:21 195:14 205:3
207:15,23 211:7
253:25 274:11
284:19 293:1 295:2
297:3,6

**correctly** 99:20
172:17 250:3 255:15
287:14

**cost** 12:15,16,17
13:25 14:9,14 16:16
17:3,8,22 18:10,11,
25 19:1,12,25 20:8,
11,19 21:8,10,12,20,
25 22:7 26:6,7,22
27:6,9,16 36:2,17
37:14,20,21,23 38:6,
11 39:1 41:21 47:16,
24 48:13 50:13,14,
15,18 51:2,4,16
52:14,25 53:4,8,12,
23 55:17 56:6 61:11,
12 63:15,16 93:2,8,9
95:16,18 100:20
116:21 119:1,14,17,
21,23 120:4,6,8,25
121:2,20,23 123:2
124:25 125:1,15,16,
18 126:1 127:17,19
128:10 129:4,20
134:11 152:3 159:8,
9,18 160:7,16
162:15 174:9 176:2,
14 178:6,13,14
182:15,16 188:9,22
189:7,10,21 190:2,3,
9,10,13,14,15,22
191:10,11,16,18
192:13 193:9,10,16,
23 194:1,2,22 195:4
201:1 202:12,17
209:17 213:5,6
214:2,6,18 216:3,25
217:10,11 219:14
221:1 228:15,18,20
229:7,24 230:9,14,
20 231:15,16 232:7,
10 233:8,15 234:15
235:19 236:2,3,4,13
237:14,16 238:4,6,7
239:12,24 240:3
241:3,6,24 243:10
244:16 245:3 246:3
248:3,7,11 249:13,
19,20,22 250:20

253:5 255:5 257:18
258:2,3,4,9,11,18,24
261:10,11,16,21
262:5,7,18 263:2,4,
20 264:3 265:11,17,
19,20,21 266:3,11,
14 267:8,20 268:14,
18 269:2,8,9,10
271:16 272:11
274:3,10,22,23
275:12,19,20 276:6,
10,19 277:2,5,7,14,
19,25 278:11,14
279:13,20 280:3,4,
11,13,21,25 281:8,
12,15 282:11,12
284:6,12,22 287:3
289:4,6,7,13,15,16,
18,22,24,25 290:6,9,
10,11,12,18,21
291:6,24 292:1,8,14,
16 294:22 295:11,13
296:13,17 297:22,24
298:13,24,25 299:4,
6,20 300:2,3,6,7,8,
17,18,23 301:23
302:2,8,11,12
303:25 306:10

**cost-related** 121:6
178:12 198:6 211:16
212:8 213:9

**cost/quality** 118:2

**costs** 16:2 17:24
46:20 47:4,7 50:9
52:22 54:9 57:22,24
59:21,22 69:4,9
95:20 115:25 118:23
119:2 120:2,13,15,
19 122:15 153:3
159:6 166:11 188:19
190:16,17 191:8,10
213:7 214:22 216:6
219:12 221:15
232:10,11,12,13,17,

18 250:20 251:9,14
252:6,19 253:4
254:2 255:9 261:12
263:10 266:4 269:3,
8,25 274:15,16,18
275:25 276:24
277:12 281:25
283:22 284:21
290:4,13 292:2
294:24 295:22
296:7,12,15,17,21,
23 297:20,25 298:4,
9,14,17,20 299:7,19,
20 300:15,20 301:6,
14,17 302:15,17
303:20

**Council** 42:22 43:25

**counsel** 8:21 9:10
11:11 102:12 149:15
184:10 210:20
307:15

**counseling** 95:7,11,
19

**country** 118:2

**county** 13:15,22,24,
25 14:2,6,15,17,21
15:5,7,23 16:3,12
17:14,16,20 91:13
92:22,25 93:4 94:9
95:9,20

**county's** 16:7 17:21,
22 18:10

**couple** 12:9 14:13
93:23 177:15 256:14
265:25 296:4 297:20

**course** 40:11 44:24
60:18 63:8 85:22
139:18 140:9 208:12

**courses** 13:2

**court** 8:6,7,14 9:1
10:25 87:24 88:4,10

89:1,14,22 90:11,16, 25 91:4,11,16,19 94:6 96:24 97:9,19 186:1 189:8 197:7, 21,25 198:2 267:24

**court's** 187:4,15

**courts** 89:25 95:4

**COVID-19's** 86:18

**craft** 144:25

**create** 42:23

**created** 40:1

**creates** 49:21

**creating** 64:20

**credential** 40:15,21

**credentials** 40:15

**credibility** 142:3

**credit** 95:7,11,19

**Criminal** 100:10

**Crosstalk** 163:25

**Culpeper** 8:18

**current** 40:9

**currently** 9:17 261:15

**customer** 214:20

**cut** 31:16 104:7 166:11 214:4

**CV** 75:6,8,15 80:7 84:25 85:2,7 86:14 87:6,12 96:4

---

**D**

**daily** 216:3

**data** 16:8 77:13,18,19 118:1 176:15 192:13 228:20 237:17 238:6,7 249:22

255:7,19 256:6,20, 21,24 257:1,15,17 261:19 262:15,16,20 263:4,24 264:6 265:11 266:5,25 267:12,13,16 303:22,23 306:9,23

**date** 8:4 29:8 137:2 166:4 180:8 224:6 308:11

**dated** 75:9 107:15 131:12 179:17

**dates** 168:1 180:16

**Daubert** 87:15 88:1, 19 89:2,18 90:1,9 91:2

**day** 165:16 176:5 178:21 181:1 221:16

**days** 93:23

**de** 94:7

**deadline** 34:13

**debate** 50:13,17 51:12 52:1

**debt** 95:6,11,18

**decided** 70:1

**decision** 189:1

**deck** 216:11,18 218:11,19 220:15

**decline** 97:20

**deductions** 43:4

**defendant** 32:18 56:23 92:13

**defendants** 55:1 57:3 127:23 128:22 129:7 258:17 285:7 286:6 287:2 307:15

**defendants'** 55:10 127:3 307:23

**define** 214:16 252:19 289:6 296:24

**defined** 217:19

**definitely** 34:20

**definition** 82:22 214:18 215:17 277:5

**definitions** 37:13 129:19 274:19,21 289:13

**definitive** 257:18,22 258:8

**definitively** 122:25 123:6 125:5 169:16 180:23 208:15

**degree** 19:15

**deliver** 15:13 18:12 95:21

**delivered** 15:23 191:1,13

**delivering** 14:18 17:15,22 18:10 51:22 275:9

**delivers** 275:3,17

**delivery** 17:24 46:22 121:13 122:20 191:15 266:17 290:7 296:8,19 298:6,11, 22 299:8 300:4 301:25

**demand** 299:8

**Denying** 186:4

**department** 272:8 275:1

**depend** 21:1 67:15 68:7 77:16 121:4 124:25 128:13 145:11 169:5 170:1, 2 177:4 230:2 233:9 244:21 274:24

**depended** 19:16

**depending** 20:21 60:10 82:2 83:19 104:3 119:7 143:7 168:24 169:23 179:22 241:8 263:6, 7 267:15 294:7

**depends** 21:25 81:8 97:2 125:7 143:10 168:10 229:10,11 243:18 244:25

**depiction** 213:8

**deponent** 9:2

**deposed** 9:19 10:4,7 87:21

**deposition** 8:11,21 10:6 13:8 22:18 23:3,7,17 28:20 29:1 57:17 308:10,16

**depositions** 57:15, 19,21 67:2,5 191:25

**derived** 254:19

**describe** 112:3 252:15 254:10

**described** 62:25 64:7 66:13 87:8 127:16 163:13 175:2 238:11 248:10 255:25 290:20 291:1 297:19 298:16 300:9

**describes** 111:22

**describing** 91:12 127:9 145:19

**description** 54:5 178:16 186:25 206:15 213:9

**Deshawn** 8:5

**design** 292:19,21 293:2 295:3

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

designed 60:8 63:1 125:9 253:20 301:2

detail 36:8 229:8 248:10 263:1

detailed 68:14 81:21

detention 188:6,16 189:11 195:18

determination 170:7 191:18

determine 12:6 14:16 64:18 119:17 261:20 267:12

determined 247:18

develop 35:23

developed 14:24 284:2

development 13:20 14:2,23 16:2 17:17 109:3

Diego 8:9

diem 216:2 232:7,10, 11 233:5 236:9 302:6 303:21

differ 261:18

differences 14:10 121:13 122:20 173:2 175:15 261:21 266:12

different 12:13 13:2 15:2 21:13 25:20 26:10,22 29:22 40:25 46:21 51:10 60:6 64:19 77:9,17 78:19 81:12 83:18 92:10,11 104:6 121:9,10 122:19 123:13 125:20 143:12,13,24 152:23,25 153:1,2,3, 5,6,9,10,14 154:10,

16,19 155:9,10,11 159:5,7,12,14,20 162:17,19 171:3,6, 12 177:3,13 179:13, 21 193:20,21 194:24 196:19 214:2,5 217:24,25 218:1 234:22 236:3 238:16,17,18 240:4 244:16 245:24 246:19 247:13 248:10,12,17,18 249:4 252:18 257:23,25 263:21,22 266:16,19 267:7 268:25 269:7,10 274:17,19 279:11,12 288:16 294:11 296:8,17,18 297:20 298:1,8,9,13,17,21 299:4,5,6,7 300:2,3, 15,19 301:5,8,23,24

differently 179:22 298:15

difficult 28:3 36:7 64:17 231:7

difficulties 115:18

dimensions 281:16

direct 35:17 228:6

directed 35:5 39:4 98:25 206:11

directing 38:4

direction 35:24 63:6 64:9 69:10 101:14 307:5

directly 14:22 43:9 72:12 85:8 112:25

director 270:21

disagree 96:25 97:3, 10 114:9,16 242:18 258:5

disagreed 97:21

disagreement 97:4, 13 98:3

disclaimer 220:14,20

disclaimers 220:23

disclose 126:18 150:20 169:10

disclosed 147:14,15 166:20 174:3 176:15,17,23 178:3 182:18 216:4 254:1, 5 303:22

discloses 154:5

disclosing 126:14,23 147:19 154:17

disclosure 126:7,13, 24 127:1 146:11 147:8 169:14 173:20 178:5 278:16 279:3

disclosures 154:14 207:4,5,7 209:19 269:3,4 304:8 307:4

discriminatory 93:6, 11

discuss 132:4

discussed 94:16 207:2 249:11 269:1

discussing 207:3 218:5 239:17 276:5

discussion 40:8 68:14 151:3 175:18 184:25 252:23 285:16

Dismiss 186:5

disposed 90:18

dispute 208:16,17

disruption 297:8

distributed 33:16

district 8:15 89:22 91:14 93:4,5

document 23:20 59:19 60:25 61:8,9, 10,14 67:5,15 75:24 93:15 102:1 103:10 106:25 108:3,12 109:20 110:3,7,12, 18 115:4 119:10 130:13 131:2,13 132:14,21 133:8,18, 23 134:6 135:15 136:7,15,20,24 138:8,10,15,18,19, 24,25 139:9,12,15 146:8 147:5 150:4,6, 17 151:25 153:16 156:8 168:9 183:12, 14 185:8,17,18 186:10,13 187:23 201:15 204:2 210:8, 15 232:20,25 236:8 259:22 260:14 264:16,22 270:13 271:3 273:5,12 305:13,19

documentation 287:4

documents 22:20 25:12,16,21,24 26:4, 17 28:9,14 35:19 57:8,11,12,15 59:7, 10,14,16,25 60:2,3, 14,19 61:4,6 62:21 63:6,9,11,22 64:11, 12 65:19 66:10 67:12 68:4,6,8,10,11 69:3,8 70:8,21 71:7 72:4,23 99:11 101:2, 10 102:14,15 108:5 191:24 192:1,8,12, 14,19 194:12,24 206:17 228:17,23 229:5,14 230:1,8,18,

www.aptusCR.com

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

22 231:1,14 232:15
233:5,12,17 234:1,4,
12,13,17,25 235:2,
21 239:14 240:1
241:25 249:15
254:21 259:23
280:19 288:10
293:17 294:10
304:19

**doing** 17:12 31:2
44:24 92:18,19 93:2,
8 140:10 141:7
160:2 161:3 188:9
190:17 198:17
212:19 261:10 263:2
266:14,18 294:20
300:17

**donor** 153:20

**double** 77:5,10 78:8
80:14 81:1,6 82:6

**doubt** 151:10

**Douglas** 99:16

**dozen** 83:5

**Dr** 23:18 112:25
115:5,7,20 116:2
118:10,15,19 132:8
133:10 147:19
160:11,12

**draft** 35:10 37:6
38:13,19 62:3,22
63:19,23 168:23
177:13

**drafted** 35:12 37:4
114:24

**drafting** 34:18 35:3,6
64:14,19

**drafts** 177:3

**draw** 140:14 141:6,9
159:22 168:20
263:16 267:15
303:19

**drawing** 12:20 22:12
65:25 140:10 233:10
234:25 237:11
238:18

**drew** 12:19 140:15
141:6 193:8 254:16
287:11 304:18

**drive** 42:23 51:2

**driven** 111:3,9

**drivers** 296:18 299:6
300:3 301:24

**drove** 243:12

**Drs** 108:6,9,14
109:24 114:23
115:10,16,19 131:5
141:12 142:12 148:4
150:19 162:2

**dual** 152:4

**duly** 9:6

**Durable** 178:22

**dynamics** 32:11

_____

## E

**E-MAIL** 108:23
109:23 110:21 112:8
113:4 114:18 115:13
117:16,24 118:4,10,
16,19 119:12 131:5,
6,10,11,18,22 132:7
133:9 134:7 136:24
137:14,25 138:15,
19,24 139:4,8,14
140:1 144:2

**E-MAILS** 108:8
139:17,21 140:19
161:1

**earlier** 40:7 94:16,21
139:24 163:13
182:22 207:2 265:10

299:2

**early** 27:19 29:11
34:23 71:18 92:6
98:21 100:15 279:18
282:7

**Earnings** 178:22

**easier** 211:4 286:25

**Economic** 42:22
43:25

**economics** 13:1,3,5
83:6 84:19

**economist** 12:22,25

**economists** 174:8
176:1

**Economy** 84:20

**editing** 141:15 142:14
143:18 144:15

**editor** 79:24 83:7,15
84:11

**editor's** 82:2

**editorial** 81:9 82:3
83:8,20 84:10,18
104:3,4,9,19,23,24

**editors** 77:8 81:10,16

**edits** 137:19

**edits/thoughts**
137:17 139:3

**education** 13:3

**effective** 162:13
275:5,6 287:3

**effectiveness** 27:6
38:11 39:2 50:14
190:14 191:11
193:24 194:3 258:4
269:9 274:23 284:12
289:6,16 292:16
294:22 295:11,14
298:25

**efficiencies** 278:1,11
279:21 280:14,21,25
281:13,16 282:11,12
290:8 296:14

**efficiency** 27:6
190:14 191:10,19
193:10,23 194:2
258:4 274:23 275:7
276:6,10,19 277:2,5,
8,14,19 278:14
280:11 281:8 289:15

**effort** 104:8,19
152:13,18 170:10
242:7

**eight** 23:4

**either** 26:17 39:6
61:10 96:17 227:3

**else's** 162:8 197:2
198:16

**emphasis** 40:18

**empirical** 38:10
280:15

**employ** 81:11 162:19
176:1 248:24

**employed** 19:25 20:7
44:13 122:11 153:2
174:9,22 243:1,5,23
246:4 247:5 252:18
253:6

**employs** 159:13

**enable** 262:21

**enables** 119:5

**encompasses** 214:21
217:23

**endeavor** 253:4

**ends** 24:5

**enforcement** 89:7
91:23 92:5,16 96:24
97:9,20

**Index: doing–enforcement**

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

engaged 49:16

engagement 30:11
33:16,21 45:19,24,
25 46:7 47:11 48:4,
11,21 49:12,23 50:3,
6,12 54:10,13 71:18
98:19 100:6

engagements 30:2

ensure 285:7

entailing 131:23

entire 17:15 205:3
274:1

entirely 72:21 266:21

entirety 34:24 57:16
58:3,14 59:13 60:3,
16,20 205:25
206:17,21 207:7,14,
22 278:12

entitled 11:13 100:19
166:10 226:20

entity 16:18 17:5
39:15 41:3,6 43:1,3
145:10

entry 80:21

equal 14:5

equating 83:15

Erwin 100:18 105:19
107:13

especially 27:13,19
35:19 40:5 64:13
75:10,14 99:4 189:3
292:13 298:24 301:9

essentially 95:4

EST 193:1

establish 255:7
279:19 282:8 300:1

established 299:2
300:19

estate 69:4,9 213:7
216:5

estimate 166:19,23
174:3,9 176:2

estimated 216:5

estimates 232:7,8

et al 8:13

ethical 157:22 162:3

ethics 79:7 147:18
148:5 156:15

evaluate 50:8 93:3
95:18 122:7 140:13
222:19 243:13,17
248:5 255:23 261:8
291:7 299:18

evaluated 54:18
195:23,25 217:8
222:9,12 240:11
241:7 248:12 257:24
258:12 299:11

evaluates 43:3

evaluating 212:19
241:14 261:11
272:10 302:16

evaluation 13:25
36:17

evening 193:1 308:3

evenly 33:15 34:14

eventually 280:15

everybody 259:7
308:8

evidence 177:10

evident 115:13

evolved 179:14

exact 29:8 95:14

exactly 21:25 64:18
79:6 143:10 194:18

197:14 222:1 247:18
285:21

examination 9:6,10
307:15

examined 9:7 54:10
271:18 274:5

examining 250:21

example 18:9 26:17
36:16 37:3 39:23
43:24 45:15 47:23
49:4 69:2 77:12 78:2
82:10,13,23 84:19
90:24 123:3 152:1
154:5 158:3 181:20
195:10 198:3,12
205:1 207:14 230:5,
6,24 231:14,24
232:4,24 233:1,2,25
234:1,2 236:7,9
237:7 246:1,2,3,23
252:5 265:18 267:19
278:15 284:21
290:15 292:15
296:21 297:2 301:13
302:6 304:21 305:4
306:8

examples 230:11
246:8 247:13 274:24
305:11

exchange 14:6 94:19

excited 134:18

exclusive 232:12

exclusively 87:4

excuse 55:7 60:15
75:8 122:13

executive 109:2

exemptions 43:4

exhaustive 212:12

exhibit 23:17 24:7,11
54:21 60:14 75:7

93:15 101:18,21,22
106:20,21 107:11,22
109:14,15,22 123:3
125:3 130:7,8
132:16,17 135:9,10
136:13 146:5 148:18
149:9,12 165:7,9,12
167:19 178:11
181:4,12,25 183:7,
13 185:9 187:20
195:8 196:21
201:21,22 202:21
210:2,4,24 211:5,17
212:4,7,11,17,18,21
215:23,25 220:11
237:21 238:8,9,10
239:4,18 260:3,8
270:5,8 295:19,21
296:1,2,5,10 297:12
298:19 299:2,10,24
300:14 301:22
303:11,13

exhibits 36:13 54:6,7,
8 55:3 123:9 124:11,
20 182:23 186:1
187:3,14 195:20
196:7,11 201:5
209:21 239:18

existence 139:21
140:19

expect 280:20

Expected 132:1

expenditures 53:19

expenses 14:17
15:13 16:8 232:14

experience 18:21
39:14,18 44:16
47:16,21 48:8 71:16
93:18 243:8 244:13,
14 284:2 292:18

experienced 293:10
294:1

Index: engaged–experienced

**Justin Marlowe, Ph.D.**

**Confidential Pursuant to Protective Order** **Grae vs. Corrections Corporation of America, et al.**

experiences 271:7

expert 9:22 10:8 13:6, 10 23:9,18 25:5 26:7 27:16 28:3 30:7,18, 21 44:2,8 61:20 62:17 66:4 73:24 87:14,15 88:5,23 89:1,8,17,25 90:6,18 91:1,19 93:21 96:11, 18,21,23 97:8,10,19, 20 105:7,16 119:13 120:18 121:19 126:6,25 139:19,22 140:5,20 157:19 158:4,19 163:1 165:7 170:4 171:25 172:11 173:7 182:25 188:14,17 190:6 191:4 194:22 202:24 205:24 206:20 207:12,20 209:17 211:12 217:19 224:5 225:10,23 226:7,15 228:9 239:3 242:24 249:6,9 274:12 280:10 282:19 283:8 285:23 291:1 307:22

expertise 12:2,4,18, 20 26:11 28:8 38:23 40:16 71:24 125:10 160:5 162:20 199:3, 9 200:7 217:17 243:7,12 244:3,10 246:8,22 248:3,5,9 250:21 268:8 280:2 284:1 292:18 294:15

experts 20:11 31:2 37:24 88:14 159:18 264:2

explain 14:8 54:6 179:12 224:4,24 228:11

explained 179:9

216:25 221:6 222:10

explaining 224:15

express 119:25 301:3

expressing 272:23

extension 51:17

extensive 28:6 244:14 250:18

extent 21:21 50:13 77:21 116:4 128:2 129:10 152:14 157:21 178:5 189:16 190:9,19,21 191:9 193:11,12 222:13 234:24 242:3 297:14,17 302:1,14

external 298:12

extraordinarily 84:22

extremely 254:3

---

**F**

facilities 38:12 39:3 43:15 53:1 85:7,12 86:24 119:7 195:18 213:7 222:5,6 251:15 252:7 253:4 254:2 255:6,10,20 261:17,18 277:25 278:10,13 280:24 281:12 282:3 284:15 285:11 286:11 290:5 292:5,9 293:9,25 297:3,9 298:10 301:19 304:23,24,25

facilities' 42:11

facility 47:18 48:1 120:20,21 221:16 277:11 281:24 292:19

facility's 42:3

fact 18:9 40:7 53:11 58:14 83:11 92:7 143:15 242:12 245:8,12 252:17 258:23

fact-checked 77:14

facto 94:7

factors 77:17 115:25 116:21 119:1 145:11 214:23 215:1,10,11, 19 279:25 297:11 298:12

facts 27:20 55:16 141:12 142:11 143:15 144:2,5,6,10 191:25 252:4 297:18

faculty 42:14

fading 184:8

fair 20:25 27:23 28:1 33:11 35:11 38:12 43:18 44:10,12 48:10,24 58:11,16 105:14 109:7,9,10 112:2,11 135:19 137:18 163:9 173:6 176:9 193:5 195:21, 22 200:1 201:7,8 212:16 234:5 250:7 254:21 265:13,14 276:11 283:15 307:7

fairly 110:6,7

fairness 110:13

false 203:4 204:7

familiar 27:20 38:24 51:23 57:10,11 58:6 67:18 79:1,9,23,24 99:14 100:9 103:19, 21,22 104:11,14,15, 16 105:5,10,12,13 114:20 138:6 154:20 155:23 156:1,23,25

familiarize 187:10 196:1

familiarized 61:7

familiarizing 98:22

family 138:9

far 28:9 69:18

fast-moving 168:17

faster 186:8

favorable 32:23

feasible 261:15

February 205:22 206:19

federal 11:23 19:15 27:12 39:15,20 40:5, 6,9,13,18,20,23 41:2,5,11,12,13,17, 23 44:11,13 45:1,3 60:2 89:14,22 95:4 126:7,10,16 127:3, 22 128:21 270:22 272:9

feedback 35:16

feel 12:2 13:19 225:17,18 226:9 242:8

feels 110:14

fees 94:6

felt 56:9,18 71:20,23 140:2,3 141:4,5 268:9

Ferguson 93:20 94:3

Ferguson's 94:5

field 12:8 44:2,8 51:15 168:24 169:6, 25 280:3 285:25

fields 12:13 168:15, 18

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

fifth 152:1

figure 222:2

filed 59:6 147:18 205:4,11,17,22 206:18

files 304:10

filings 58:3,4,7,15,17, 24 59:2,5 207:15,22 236:15

final 168:9,23 169:5, 20 170:8 172:7,13 177:22

finalizing 33:18 134:20

finance 12:5,9,20 78:3,24 79:11,17 87:17 127:11

financial 12:10,14 16:11,13 39:21 40:6, 13,14,17,19,20,24 48:5 59:6 66:21 126:23 218:1 269:4

financing 27:3

find 39:7 60:11 64:14 79:17 99:1 104:22 186:2 242:13 264:18 270:18

finding 99:6 262:3

findings 36:4 132:4 267:1

fine 79:15 103:6 106:9 163:23 184:10 185:23 210:25 219:24

fined 156:15

fines 94:6

finish 11:9 85:17 225:1

finished 170:23

finishing 161:20

firm 108:10 115:6,15 153:21

firms 105:11 150:21

first 29:5,7 55:22 85:15,18 86:4 100:4 102:10 108:15 110:9 111:1,13 112:9 114:15,18 115:14 116:10 130:25 132:7 133:8,15 134:6 139:4 142:8 151:13 160:21 161:9,15 165:8 178:11 188:3 204:25 210:2 211:5, 7 226:3 240:25 251:10 261:22 263:18 264:15 275:25 294:5 303:18 307:17

fiscal 40:5,9,10 304:2

five 23:8 42:15 95:23 96:2 219:24

flat 134:13

flip 204:12

Florida 156:15

focus 66:25 274:15 275:19

focused 19:21 27:2 86:24 87:2,3,6 254:25 271:20

folks 23:1,6 24:15 262:24

follow 82:18 206:5 278:21 297:21

follow-up 245:16 307:14

followed 289:19

following 123:12 138:18

follows 9:7 138:19

foot 119:8

footnote 165:8,16 166:3,22,25 168:1,5 170:15,16 171:19 172:22 174:10,12 175:17,18 177:1 202:8,18 232:23 233:6 304:1 306:24

footnotes 303:24 304:20,23 306:10

forecasting 41:20

forecasts 42:23

form 14:11 16:19 17:6 18:13,23 19:10 20:3 21:4 25:10,18 28:25 33:25 35:1 36:22 37:8 38:15 39:16 41:8 42:4 43:16 44:18 46:14 47:5,19 48:2,15,25 49:19 50:10 52:10 54:14 55:4,19 56:17, 25 60:17 62:5 65:10 67:13 68:22 69:22 70:22 72:6,25 73:13 74:5 84:1 85:9 86:25 88:6 89:4 90:3,20 97:1,11,22 101:3 102:21 109:4 111:5, 23 113:2,22 114:10 116:3,22 117:6,14 118:5,17 119:19 120:22 121:22 122:3 123:4 124:3,12 128:1,24 129:9 131:15 137:8,21 139:6,23 140:21,25 141:19 142:15,24 143:22 144:9,17 146:14 147:11,21

148:8 149:2 150:10, 22 151:4,11,20 152:7 154:8 155:6 156:6,16 157:4,13, 23 158:8,23 160:19 162:4 163:4,10 166:12,24 167:24 169:12 170:19,24 171:13 172:14 175:11 176:7 177:14,23 179:7 180:10 181:9,23 182:9 189:15 192:23 196:13 197:9 198:7 199:24 205:3,10,21 206:3,18,21,24 207:16,24 208:25 210:13 211:18 215:3,14 216:14,22 217:20 218:8,23 219:4 220:18 221:22 222:7 223:1,24 224:7,20 226:1,17 228:1 229:18 231:20 232:21 234:20 235:9 236:16 238:13 239:20 240:21 242:2 243:3,24 244:23 246:12,17 247:6,22 249:1,25 256:12 259:2 265:23 267:22 271:22 272:14 273:13 274:13 276:12 277:16 278:2,19 279:7 281:2 282:4 283:17, 18 285:12 286:12,20 287:6 288:1,11 289:9 291:2,15 293:20 294:3 296:22 297:13,16 299:22 301:20 302:19 305:2,15 306:1,8,11, 25

formal 13:3 30:14,18,

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

20,25 31:4,5 42:16
92:8,10,12 96:17,21
135:1

**formally** 12:24 29:10
43:13

**format** 262:17

**formed** 283:19

**forming** 25:13,22
28:15,22 39:11
61:15 63:7 102:20
120:18 163:17
253:24 289:1

**forms** 97:4,14 268:25
291:24

**formulate** 58:10,13
247:20

**forth** 56:12,15 99:6
223:23 236:6 239:4
246:2 249:5,10
250:24 269:13 283:7
288:4,25 301:10

**forthcoming** 179:16
180:17

**forward** 119:8
134:19,25

**found** 59:8 70:13
152:3 170:14 186:8

**foundation** 69:23
72:7 73:14 74:6 90:4
137:22 153:17,18
154:4,16 155:5,8
158:9,24 160:20
162:5 163:11 253:21
280:7 299:1 301:8

**Foundation's** 154:13,
21 155:13

**foundations** 155:9

**frame** 23:2 33:13

**framework** 282:14

**frameworks** 20:14

**Franklin** 91:13 92:22,
25 93:4

**fraudulent** 208:24
209:2,6

**front** 24:24 156:9
226:20 270:23,24

**full** 102:2 302:10

**fully** 274:20

**funded** 103:15
150:21 152:5 158:6

**funding** 103:17
146:12 147:9,20
153:18,23 154:5,18
158:22 166:20 174:4

**funds** 160:13

**further** 170:22 240:19
241:21

**future** 179:19

**FY** 216:5

---

**G**

---

**G-A-L-L-E-Y** 29:16

**Galley** 29:16

**GAO** 260:20 261:4,8,
14 262:4,6 263:12
264:5,16,25 265:7

**GAO's** 261:25 262:2
263:20,23

**gaps** 34:5

**general** 22:6 36:17
64:5 81:23 84:4
142:21 143:4 187:25
195:9 203:19 258:3
266:2 267:8

**generalization** 234:3

**generally** 12:4 26:5,7,
23 47:12 50:25 52:5
78:6 86:1 118:24
127:12 235:7 236:4
258:11 261:3

**generic** 155:14

**GEO** 46:4,8 153:21

**germane** 192:19

**getting** 27:20 67:21
145:17 168:18

**give** 10:23 20:6 69:11
102:4 113:23 149:4
210:17 222:25
227:17 229:21
231:21 240:24 242:7
246:7 247:3 260:22
264:18 278:24
304:14

**given** 28:5 38:23
56:11 64:20 66:14,
15 67:6,7 134:11
141:7,8 180:16
214:21 250:4 263:17
268:6 275:9,10
282:21 287:12,17
299:1

**giving** 64:5,9 132:23
187:7 197:12 237:7
242:6

**glance** 58:8,12 59:17

**glanced** 57:20

**go** 8:21 10:14 11:10
17:25 20:13 23:24
27:2 36:7 38:5 51:22
58:9 63:14 74:20,22
75:23 76:11 80:3,4
86:12 87:11 101:17
103:11 104:21
106:18 107:8,18
108:19 129:23
132:13,25 147:13

153:15 154:17,19
157:15 159:6,7
163:22 164:5 165:8
167:12,15 169:13,22
172:23 175:12 177:8
180:20 184:17,22
187:20 194:14,16
196:1 199:20 202:7
203:22 204:1
205:20,21 207:7
208:6,11 211:9
214:9,10,14 219:9
221:23 226:12
236:18 240:10
241:16 242:24 251:2
255:21 259:7 263:1
266:18 271:23
272:4,16 292:22
294:4 295:18 308:4

**goal** 104:3,9 275:6
296:2,5,10 298:18
300:13 301:22

**goals** 104:23 145:13
190:20,23 191:20
193:15 275:15

**goes** 27:12 51:19
59:11 112:3 118:21
271:15 276:17 292:4
295:13

**going** 10:14 11:1 13:8
17:10 23:15 24:4
33:18 57:14 60:1
63:25 74:13 75:6
76:9,20 77:16 98:5
101:20 102:10
110:6,9 116:24
128:12 130:6 135:8
145:10,11,24 148:17
161:14 162:18
203:17 204:21 210:1
222:24 230:1 240:20
259:6 260:2,4
261:13 263:14 266:3
270:6 275:4 292:2

294:4

**gold** 153:20

**good** 9:12 59:4 69:14
71:11 74:12 126:24
160:7 162:25 201:16
231:24 266:2 274:23
301:7 308:3

**goods** 27:13

**Gosh** 259:3

**governing** 87:16

**government** 12:6,7,
10,14,15,16,17 15:3,
6 16:22 19:1,12,14,
18 20:8,12,19,22
22:8 26:6,8,10,23,25
27:12 39:20 40:14,
17,19,20,24 41:13,
18,24 42:7,8,17,24
45:1,3 46:23 48:6
51:16,17,18,19,25
52:4 87:16 125:17
126:16 159:6,8,17
160:8,17 162:15
166:9 188:7 189:13
221:16 228:15 229:7
230:10,21 231:17
233:15 234:16
235:20 236:14
239:13,25 241:4,24
243:11 244:17 248:4
249:14 260:16
263:13 266:16
268:18 275:1 280:4
283:24 290:19
292:20 293:1 295:1,
2 297:5

**government's** 40:9
41:11,13,17 295:5,6

**governmental** 16:17
17:4 27:16 37:23
46:12 47:3 127:17
128:10 129:4,20

188:22 209:17
219:14 243:10 264:3
284:6

**governments** 12:11
19:22 27:2 42:6
43:21 44:25 45:2
51:22 126:14,22
218:21

**governor** 44:2

**governor's** 42:18,22
43:25 44:5

**Grae** 8:12

**Grande** 108:23,24
109:2

**GRANT** 14:11 16:19
17:6 18:13,23 19:10
20:3 21:4 25:10,18
28:25 33:25 35:1
36:22 37:8 38:15
39:16 41:8 42:4
43:16 44:18 46:14
47:5,19 48:2,15,25
49:19 50:10 52:10
54:14 55:4,19 56:17,
25 60:17 62:5 63:25
65:10 67:13 68:22
69:22 70:22 71:9
72:6,25 73:3,13
74:5,12 84:1 85:9,16
86:25 88:6 89:4
90:3,20 97:1,11,22
101:3,25 102:21
103:3 107:2,6 109:4,
18 110:4,11 111:5,
23 112:5 113:2,22
114:10 116:3,22
117:6,10,14 118:5,
17 119:19 120:22
121:22 122:3 123:4,
20,25 124:3,12
128:1,24 129:9
130:2,18 131:15
134:1 137:8,21

139:6,23 140:21
141:16,19,25 142:4,
15,24 143:22 144:9,
17 146:14 147:11,21
148:8,17 149:2
150:10,22 151:4,11,
20 152:7 154:8
155:6 156:6,16
157:4,13,23 158:8,
23 160:19 161:13,19
162:4 163:10 164:1
166:12,24 167:17,24
169:12 170:19,24
171:13 172:14
175:11 176:7
177:14,23 179:7
180:10 181:9,23
182:9 189:15 192:23
196:13 197:9 198:7
199:24 206:3,24
207:16,24 208:8,25
210:13 211:18
215:3,14 216:14,22
217:20 218:8,23
219:4 220:1,18
221:22 222:7 223:1,
24 224:7,20,25
226:1,17,24 227:6
228:1,25 229:18
231:20 232:21
234:20 235:9 236:16
238:13 239:20
240:21 242:2 243:3,
24 244:23 246:12,17
247:6,22 249:1,25
256:12 257:9 259:2,
9 265:23 267:22
271:22 272:14
273:13 274:13
276:12 277:16
278:2,19 279:7
281:2 282:4 283:18
285:12 286:12,20
287:6 288:1,11
289:9 291:2,15
293:20 294:3 296:22

297:13,16 299:22
301:20 305:15
306:1,11,25 307:13,
16 308:1

**Great** 86:5

**greater** 13:16 15:9,24
16:4

**ground** 10:14

**grounded** 20:18

**group** 279:24

**groups** 160:15

**Growth** 178:22

**guess** 86:3 95:2 97:2
108:3 166:17 201:19
231:10 278:11
279:14 291:11

**guidelines** 79:4 81:9
83:24

**guys** 74:19 136:11
184:21

---

**H**

---

**Hadim** 108:9 162:2

**Hadim's** 160:12

**Hakim** 100:18,23
105:19 107:13
108:6,14 109:24
112:25 114:23
115:5,7,10,16,20
116:2 118:10,15
131:5 132:8 133:10,
16 141:12 142:12
147:19 148:4 150:19
179:2 181:7 182:1,
18

**Hakim's** 118:19

**half** 74:15 161:15

**hand** 141:14 142:14

143:18 144:15

**happened** 199:5
299:15

**happening** 34:9

**happy** 221:13 222:10,
16 224:2,13 225:5,
21 226:12 246:7
282:13

**harassing** 227:7
242:3

**hard** 115:24 116:20
138:17

**harder** 24:15

**heading** 212:7 213:21

**health** 14:19 53:19

**hear** 24:21 184:10
211:23

**heard** 103:22 250:2

**heavily** 158:6,21

**help** 35:17 39:5 63:2
64:10 67:1 82:19
99:1 144:25 177:16
184:20 246:24
267:10 286:14
296:11 298:19,22

**helpful** 64:14 70:15
111:18,20

**helps** 42:23

**hesitant** 73:6

**high** 84:22

**highlight** 198:9
301:23

**highlighted** 99:3
304:12

**Hillenby** 105:11,15
108:10 109:23
110:1,25 111:16
117:23 119:10

**hired** 13:24 29:5 41:2,
5 43:13 44:1 45:20
47:14 49:7 95:8

**Hmm** 133:22

**hold** 13:1 24:8 40:13
103:11 106:7 130:23
135:24 308:7

**home** 84:18

**honestly** 68:13

**Hoppin** 109:25

**hosts** 83:12 84:8

**hour** 33:23 74:14
161:15

**hours** 23:4,8 31:7,25
33:4,13,17 34:14
61:22,24 62:1,2,10,
13,16,20 63:21 65:2,
3,7,8 66:3,5 161:14

**housed** 84:16,21

---

**I**

**idea** 14:20 117:25
118:12

**ideal** 132:9 263:5
265:12

**ideas** 35:15 38:21
245:24

**identification** 24:13
101:24 106:23
107:24 109:17
130:10 132:19
135:12 149:14 175:6
183:9 201:24 210:6
260:10 270:10
303:15

**identified** 137:4
165:21 166:19 167:2

174:2 191:24 192:12
194:24 195:6 216:19
230:8 234:8 282:15
289:4

**identifies** 165:23
204:14

**identify** 39:5 60:8
67:1 206:8 280:10

**identifying** 99:7
180:24

**Illinois** 9:18

**imagine** 25:23 49:22
51:9 52:7,17 268:12

**imagined** 49:23

**immediate** 132:3

**immediately** 105:5

**impact** 86:18 144:7
157:20 251:16 252:8
261:20

**implemented** 265:5,7

**implications** 280:12

**implied** 215:12

**implies** 220:20

**imply** 170:21 171:1

**implying** 192:18
220:15

**importance** 81:3

**important** 22:8,10
44:6 65:23 66:18
75:11 82:7 85:24
99:5 163:16 168:19
178:7 252:12 253:14
255:14 271:15
272:11,21 274:3
280:1,9 289:22
290:1 295:14 302:2,
15

**imposing** 83:13

**impossible** 115:22
116:19

**improve** 277:25
278:11,13 280:24
281:12

**improved** 281:15

**impute** 266:24

**in-depth** 61:3

**in-house** 95:21
295:23 296:15

**inability** 106:8

**inaccurate** 273:11,16

**inappropriate** 226:19

**incarceration** 188:6,
16 189:12

**inclined** 134:12

**include** 28:16 63:18
77:12 123:3 196:8
200:24 215:2 221:20
232:13 238:10
251:25 252:1 253:11
255:11

**included** 26:14 27:25
28:3,24 29:2 30:6
58:1 66:4,20 112:20
113:12 173:20
176:10 182:7 195:19
212:3,11 222:1
234:17 237:20
249:18 252:23
253:13 255:13
259:23

**includes** 12:13 28:11
137:19 215:12
218:20

**including** 12:14 40:4
66:19 206:17 301:9
302:12

**incorporated** 215:19,

20

**incorporates** 26:11
248:16 302:5

**incorrectly** 256:18

**increasing** 195:15

**incremental** 216:5

**incurred** 14:17 15:13
16:9 190:16,18
275:24 296:8 298:21
300:20

**independent** 65:14
83:9 103:20 104:9,
12,18

**indicate** 191:23

**indicated** 10:7,25
52:6 61:23,25 62:9
175:22 186:12 196:8
200:22 277:8 278:9
281:21 284:11

**indicates** 93:17
151:25 173:8 262:13
271:12

**indicating** 111:16
172:10

**indication** 150:18
255:3

**individual** 43:7 55:9
231:8

**individuals** 115:11

**industry** 51:13 98:24
103:16 152:24
153:8,19 155:24
166:21 174:5 294:8
301:4

**industry's** 152:14

**influence** 115:15
143:20 145:10,18
146:1 152:15,19

**influenced** 141:14
142:13 143:17
144:14,20,22,24
145:25

**influencer** 108:13

**influencers** 141:13
142:12 143:17
144:14

**influential** 25:22

**inform** 41:23 57:17
59:1,20,25 60:25
63:13 163:4 222:23

**informal** 42:17

**information** 16:11,14
20:18 22:11 25:20
27:24 35:18 48:5
49:5,13 50:2 56:12,
14,20 57:25 58:9,13,
17,19,24 59:8,24
60:6,9 61:12,14
63:3,18 64:13 65:18,
20,24 66:18 67:3,4,
8,22,24 68:17,18,20
69:12,16,21 70:1,12,
19 71:5,15,17,20
72:23 73:22 74:4
112:25 121:15
122:9,18 123:23
125:13 126:14,19,
21,22 129:14,15
139:25 140:3,6,8,12
141:5,8,23 150:7
153:10,13 154:10
163:9,15 167:4
168:18 181:21
188:20 192:3 194:15
195:5 200:5 204:25
212:11,12,23 213:20
218:2 219:3,12
221:1,5,10 223:8,15,
20 228:17,19 233:10
235:6,8,13,22,24
236:11,12,20,25
237:8,9,10,15 238:5,
17 239:15 242:1
249:16,21 250:24
253:11,13 254:19
255:11,13 256:20
258:19,21 267:5
268:7 269:12,14,23
283:20,25 284:4
286:7,15,18,21
287:2,5,8,13,18,22,
23 288:3,20,23
294:13 304:18,22,
24,25 305:21,24
306:3,7,17,19

**informed** 27:17,19
28:7,10 43:10,22
45:5 57:25 63:10
101:7 148:4 156:12
236:8 258:22 286:7
288:21,23

**informs** 175:18

**infrastructure** 14:19
27:5 41:21

**inherently** 252:5
274:24

**initial** 35:24 37:6
38:3,13,19 66:25
251:15 252:7

**initially** 29:13 35:10,
13 37:5 99:12 100:8

**injunction** 13:22

**inmate** 53:19 277:11
281:24 301:15,18
302:1,12,14

**inmates** 297:9

**input** 36:20 37:7 38:3,
14 40:3

**inquiry** 260:20

**instance** 89:17
190:13

**Institute** 103:20
104:10,12

**institution** 84:7
271:14

**instructed** 11:13

**instruction** 140:22

**instructions** 67:7
70:10 71:13

**intangible** 297:24

**intended** 54:7,22
166:22 167:1 169:24

**interacting** 65:22
67:20

**interactions** 148:10
262:24

**interference** 31:12
74:17 179:25 183:21
199:2 203:11,25
214:12 299:13

**internal** 68:4,6,10,11
69:3,8 70:8,21 71:7
72:4 177:25 178:1
228:16,23 229:5,13
230:1,7,17,22,25
231:14 233:4,12,16
234:1,4,12,16,25
235:2,20 239:14
240:1 241:25 249:14
263:12 268:14 269:3
288:9 293:17

**internally** 123:18

**interrogatories**
203:8,13

**interrogatory** 200:23
201:6,20 202:3,11,
16,22 203:1,9 204:2,
11,15 206:7,12,13

**intersected** 126:25

**interview** 52:20,24

53:3,7,12,15,18,22
54:1,20,25 55:8,13,
15,23 56:6,9 105:7,
15

**intimately** 154:20

**introductory** 253:20

**investigation** 94:20,
21 148:6

**investment** 41:21
216:6

**investments** 27:4

**investor** 128:15
151:1,18 181:1,22
210:3 211:8 212:24
220:11

**investors** 54:23
126:21 128:11,13
212:13 213:13,20
217:6,17,22 219:3,8,
15 220:24 221:4,11
254:1,6 258:23,25
284:19 290:24 291:5

**investors'** 307:18

**involve** 191:12

**involved** 10:2,5 40:8,
23 92:3 155:4
160:13 171:11

**involvement** 48:12

**involves** 42:9 245:8

**issue** 13:18 90:16,22
91:8 93:10 187:6,17
255:5 263:18 307:24

**issued** 62:17 124:10
147:10 160:15
167:22 171:10 179:6
270:20

**issues** 40:4,6 50:20
51:3,25 98:25
100:13 154:6 155:5

255:16 271:16,21
272:2,12 274:4,9
275:14

**issuing** 139:21
140:20

**item** 111:1

**iterate** 36:3

**iterative** 34:21 35:14
36:5,10,25

---

**J**

**J-U-S-T-I-N** 9:15

**job** 73:17 162:20
163:2 224:15

**jointly** 271:17 272:13
274:5

**journal** 75:16 76:23
77:23 78:1,3,9,18,
22,24 79:5,12,18,23
80:7,20,22 81:6,10,
16 82:2,8,15 83:2,
12,15,16,20 84:18,
19 85:6 86:15,23

**journal's** 82:3

**journals** 77:8 82:11,
21 83:5,7,17,23
84:7,16 100:12,15

**judge** 185:18 195:10
199:22

**judge's** 186:21,22
189:1,18 196:16
199:12

**judgments** 228:20
237:16 238:6 249:22

**July** 10:12 75:9

**June** 133:9,15 134:6
170:18,23 171:10,
20,24 172:2,5 173:9,

12,18 174:11,13,16
176:3 179:2 180:9
181:5,7

**Justice** 100:11 272:9

**Justin** 8:11 9:5,15
23:18 308:10

---

**K**

**Kansas** 42:15

**Katie** 29:16 109:23

**keep** 204:21 216:23

**Keeping** 118:24

**key** 21:14 51:3 71:19
175:3 176:16 296:7,
17

**kind** 12:13 19:24
21:25 22:10 65:19
67:8 102:10 121:9,
14 125:20,25 127:7,
18 159:19 237:8
257:25 296:3
298:13,17

**kinds** 21:8,10,12
26:10 43:4 51:3,12
65:19 66:18 78:11,
12,13 81:12 83:18
99:2 121:10 152:25
153:5,6,9,10 154:10
155:10 159:16
217:24 218:1 244:16
248:17,18 263:7,16
267:7,10 269:2,7,10
274:17 279:13
294:11 297:20
298:20 300:20 301:8

**Klapper** 8:7 185:5

**knew** 28:4 35:19
50:19 68:15 100:5
124:2,4 158:4,18

**know** 10:17 11:7,9
21:17 23:16 24:15
28:5 30:20 31:9,13
33:15 34:7,8,18
35:11,23 36:6 37:19
38:4 39:23 44:6
45:1,4 50:17 51:11
52:1 55:17 59:7 60:4
66:14,23 67:17
68:20 69:7,18,20,25
70:7,19 71:5 73:11
76:2 77:15,23 78:19
79:15 82:5 84:4,15
87:24 88:4,18,22
90:25 95:15 98:23
99:17 100:12 103:24
104:13 105:1 106:4
108:24 110:17
121:13 122:25
123:18 124:9 125:5
128:11 130:12,13
135:14 138:2,23
140:18 141:24
142:22 145:14,23
147:7,14 148:24
149:22 153:5 159:11
169:18 177:20
179:18 184:1 191:17
195:2 199:12 201:14
205:9 210:23 217:2,
12 222:8,13 224:4
231:8 232:4 239:8
241:21 242:5 244:24
247:11 255:16
256:7,11 257:15
258:14,16 259:5,19
262:4 263:14 265:4,
7 266:2 269:1
276:15,19,22 277:22
279:19,23,25 280:10
281:21 282:17
285:6,17 286:5
287:1 288:17 289:17
290:2 293:17 296:11
297:7 298:4 300:16
302:3

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 102 of 125 PageID #:
13112

**knowing** 155:15
161:7

**knowledge** 20:10
26:11 30:23 31:3
37:12 46:23 47:24
48:12,22 49:17 50:4
77:7,10 80:11,13,15,
25 81:2 83:4 89:1,
13,16 91:7 136:22
154:4 169:10 244:2,
9 245:17 248:7,16

**known** 11:19 139:20
219:9,16

**Ks** 236:12

---

## L

**labor-intensive** 119:1

**laid** 238:1,23 241:18
243:14 254:10,16

**land** 13:21

**landscape** 98:23

**language** 37:4 111:10
112:15 113:20 114:3
116:1 117:24 118:9
119:9 125:16
127:16,18 129:3
139:2 198:1,2,4

**Lappin** 270:21

**large** 49:25 84:8
285:15

**Latham** 22:24 23:6

**law** 83:6 84:19

**laws** 126:7,11 127:3,
5,23 128:21

**lay** 300:14

**lead** 192:1

**Leader** 178:20 211:7

**leading** 44:2 195:16

**leads** 172:5

**leaves** 62:2,20 65:8

**legal** 34:10 187:23
189:2,3 196:3,18
197:13,16 232:14

**length** 120:10 122:22
124:23 190:13
226:25 288:6 291:22

**let's** 76:8,10 82:10,23
129:25 130:20
142:10 143:14 165:7
203:16 208:6 231:17
242:24 272:22
292:15 299:19 308:8

**letters** 213:14

**level** 27:10 114:8
115:9 117:5,19
119:16 120:21
153:20,22 188:7,15
189:12 190:6 191:4
217:17 267:13
280:15

**levels** 19:14 46:22
217:25 221:21
222:14

**Libor** 30:5,8 31:8
32:2,10

**light** 119:5 142:23,25

**Lilley** 80:20 109:23
111:16 112:3,17,24
113:4 115:17
116:16,25 133:11,17
137:15 139:5

**limit** 140:22 240:5
241:12

**limited** 228:19 233:17
237:15,19 238:5,8
249:20

**limits** 241:13

**line** 11:9 130:3
148:21 161:20
178:11

**link** 130:24 136:4,5

**list** 25:12,21 30:6
54:17 59:10 75:16
89:6 100:17 149:22
153:20 192:7 200:5
204:23 279:24
282:15 301:2

**listed** 26:1 28:19
57:8,16 58:4,15
59:14 60:14 61:5
62:21 63:22 78:1
80:7,10,11 85:6,19
86:4,16 94:8,25
95:23 96:15 99:10
103:1 111:1 124:19
147:5 153:19,22
178:19 179:1 181:12
192:2 194:12 195:25
221:14 282:16
296:20 301:14

**listing** 76:22 98:11

**lists** 203:18

**literature** 26:5,9,12,
20,22,24 27:7,8,11
28:7,13 38:25 39:6
51:24 99:2,3,4,6,7
132:10 214:19
246:10 253:16,17
255:1,4,16 283:22,
24 284:14 285:10
286:10 287:25
294:19,21 295:7
298:4 301:4

**literatures** 27:15
38:22

**litigation** 10:3 98:17

**little** 10:13 61:16 82:7

83:21 120:12 144:18
159:11,13,20 185:12
203:23 205:15
246:20 257:13

**local** 19:8,14,22

**located** 8:8 24:16

**long** 10:10 22:25 23:5
34:5 60:5 68:17
110:7 163:24 200:5
203:17 273:20

**long-term** 218:20

**look** 18:1 31:19
100:5,14 102:2
103:13 115:16
122:5,6 131:8 134:5,
19,25 167:12,15
169:14 172:24
173:24 175:13
178:10 180:20
183:11 185:12,24
197:14 199:8,20
203:1 209:14 211:5
220:10 221:24
229:16 231:12,17
232:5 236:18 263:14
264:14 265:20
266:4,19 268:1
274:1 281:4 285:22
291:6 292:15 302:6,
7 303:17

**looked** 22:19 46:20
48:4,17 88:9 105:18
123:18 124:14
139:16 146:7
174:21,22 191:8
198:18,25 200:4,5
209:9 219:17 221:7
268:7 274:9 279:10
285:21

**looking** 17:10 36:1
58:18 87:4 100:13
153:2 159:25 199:11
203:15 220:12

245:25 285:25

**looks** 26:6,9 27:8
126:20 135:25

**lot** 20:20 25:20 27:1
30:16 36:8 37:11
38:2 41:19 44:7
58:17 60:5 63:8 64:7
66:19 82:2 85:10,24
125:20 126:8,12,20
145:23 155:8 168:13
169:6 193:19
194:15,19 259:3
302:9 305:9

**lots** 12:13 21:13 26:9,
22 40:24 51:14
68:16 73:5 77:16
121:9,10 140:8
143:12,24 152:23
153:2,5,8,9 155:9
159:5,7 162:17
171:2 193:20
217:23,25 236:2,3
244:15 263:21
267:5,6 268:25
274:17 279:10,12
292:6 306:3

**low** 118:24 261:16

**low-security** 222:6

**lower** 290:5

**lunch** 164:3,9

---

**M**

**M-A-R-L-O-W-E** 9:16

**ma'am** 31:17 96:9
107:4

**magnitude** 16:4

**main** 12:18 289:21

**maintain** 262:14

**maintaining** 195:16

**maintenance** 216:6

**making** 16:16 17:3
55:2 104:25 194:21
196:6 211:1 251:15
252:7 262:4,9
265:19 272:10
278:21 300:18

**manage** 12:11

**management** 12:11,
14 39:21 40:4,6,13,
17,19,21,24 99:25
281:17 295:23
296:16

**manager** 40:14
195:17

**manages** 292:5

**manner** 284:14 285:9
286:9

**mark** 23:15 101:20
106:19 109:13 135:8
148:15 149:8,10
201:20 210:2 260:5
270:6

**marked** 24:12 101:23
106:22 107:11,23
109:16,22 130:6,9
131:2 132:16,18
135:11 136:7,13
146:25 147:1 149:13
167:16,18 183:8,13
185:8 195:8 201:23
202:21 210:5,23
220:11 260:9 270:9
303:14 304:7

**market** 32:12 126:13
127:11

**markets** 27:3 87:17

**marking** 149:16
270:4 303:10

**Marlowe** 8:11 9:5,12,
15 23:18,21 24:11,

21 25:9 31:23 36:12
39:13 61:16,23 65:1
101:22 102:9 106:21
107:1,10,22 109:15
110:3,20 111:11
130:8 131:4 132:17,
22 135:10 148:25
149:12 150:2 161:23
163:7 165:7 183:12
184:8 185:7 201:15,
22 202:2 210:4,10
220:10 259:19
260:8,13 270:8,12
303:13,17 307:10
308:10

**material** 192:3

**materials** 152:22

**matter** 8:12 9:23,25
12:19 13:10,11,12,
13 14:13 15:21 16:7,
15 17:2,9 25:6 29:24
30:3,5,8,19,21,24
31:6,8 32:2,10 87:20
88:5,15,23,25 89:16,
21 91:10,11 92:3,22,
24,25 93:21 94:2,9,
16 95:16 115:24
116:20 127:4 136:24
145:12 150:21 163:5
250:18 284:3

**mattered** 68:18

**matters** 32:6 89:12
90:6 95:3,23 96:2

**Mcdonald** 99:16

**mean** 15:1 16:21
18:25 22:5 23:17
34:2 36:24 44:19
45:18 47:7,21 48:7
49:1,21 52:8 57:3,10
68:24 79:9 83:12
87:2,3 89:20 90:22
92:2 97:3 103:21
104:7,20 123:5,8

129:12 141:21
142:18 143:1,3,6,11,
12 144:19,21 149:20
157:24,25 167:25
181:18 182:7 190:9
193:20 194:14
208:1,3 212:2
220:13 239:6 245:25
246:6 247:10,15
251:3 253:8 257:23
262:2 266:1 280:4
281:6,7 286:14
289:11 298:16

**meaning** 84:17

**meaningful** 135:2

**means** 22:13 52:18
214:2,5

**meant** 14:13

**measure** 281:9 289:6

**measured** 298:14

**measurement** 43:2
194:2 253:5

**measures** 49:8

**medical** 301:15,18
302:1,12,14

**meeting** 108:14
112:19 113:9 190:20

**member** 39:24 42:21,
25 43:24 78:24
79:12,18,22

**members** 103:15
166:21 174:4

**Memorandum** 185:13
186:4

**memory** 22:21 26:18
90:10 157:15 172:25
173:4 194:17 221:25
260:24

**mention** 146:17,21

151:22

**mentioned** 22:3
38:21 44:23 60:23
87:20 89:5 167:6
171:18 172:22
176:25 248:9 277:22

**Meryn** 140:24 163:24
226:23

**messages** 284:20

**met** 46:1,8

**method** 131:13,17,22

**methodologically**
261:15 262:17,21

**methodologies** 13:4
19:24 20:7,20 21:7,
9,11,22 122:10
124:9 153:1 159:21
162:9,11,19 188:21
246:4 247:14 248:8,
17,19 252:18,20
253:18 261:10
262:5,7 285:24

**methodology** 21:1,2,
19,24 22:10 123:12
124:22,24 141:14
142:13 143:18
144:15,24,25 145:22
159:12,15 162:23,25
174:7,22 175:1,25
243:1,4,12,14,16,22
244:7,11,15,21,25
245:8,12,20 246:16,
21 247:4,10,11,12,
16,19 248:1,14,22,
24 251:8 252:17
253:6 284:5

**Middle** 8:14

**military** 27:14

**million** 156:4,14
160:14

**mind** 47:8 75:19
82:22 86:9 116:7
118:25 132:23
136:16 137:12
187:7,11 214:8
307:19,23

**mine** 35:5 89:17

**minimize** 289:24

**minimum** 57:20
60:24 261:17
275:15,23

**minute** 184:18 201:17

**minutes** 74:14,21
219:25 231:11

**mischaracterization**
237:5 240:7 242:19
256:23

**mischaracterized**
256:14

**mischaracterizing**
242:9 257:21 294:17

**misleading** 55:11
192:4 203:4 204:8

**misrepresentation**
178:13,17 212:9
213:10

**misrepresentations**
211:17

**missed** 226:2

**mission** 82:4 104:4

**misstates** 128:2
129:10 189:16 242:3
297:14,17

**mistake** 185:20

**Misty** 8:7

**misunderstood**
128:18

**model** 35:24 280:21

290:7 292:7 298:6

**models** 121:14
191:15 266:17
296:9,19 298:11,22
299:8 300:4 301:25

**modern** 277:24
278:10,12 280:24
281:12

**moment** 9:3 102:4
113:23 272:22
304:14

**moments** 125:23

**Monday** 133:15

**money** 295:9,10

**monitoring** 277:11
281:25

**month** 33:23 112:20
113:9

**months** 33:22

**Moore** 156:22 157:10

**Moore's** 157:1,8

**morning** 9:12

**motion** 64:1 186:4

**motions** 34:8

**move** 63:20 218:13
242:22 297:8 298:10

**moving** 58:2 59:9

**MTC** 112:22 113:14

**multiple** 36:13 92:4
266:4

**municipal** 32:12 78:2,
24 79:11,17 92:20
94:6 126:13,17
127:11

---

**N**

**name** 8:5 9:13 102:11

105:4,13 156:1

**names** 114:14

**narrow** 18:15

**narrower** 257:14

**National** 39:24

**Native** 13:13

**nature** 13:9 27:21
30:3,11,24 32:6
66:14 78:20 81:14
83:19 92:14,23
93:25 95:15 141:7
146:1 168:11

**nearly** 115:22 116:19

**necessarily** 34:1
83:12 171:1 212:16
305:3

**necessary** 56:8 58:9,
10,13,25 192:3
255:18 256:6 266:6
267:13 307:9

**need** 11:2,6,8 21:6
67:24 82:7 120:11
124:17,18 142:18
202:25 203:6,22
248:11 274:19 278:4
290:17 298:25 299:3
305:9,18 307:3

**needed** 58:24 65:24
73:22 255:7

**needs** 63:2 110:15

**neighborhood** 31:11,
25 83:5

**never** 44:11,12,13
45:6 68:13 97:25
137:12

**new** 75:13 100:19
137:17 139:3 148:18
223:8,15,20

**nice** 224:15

Case 3:16-cv-02267    Document 359-2    Filed 11/20/20    Page 105 of 125 PageID #:
13115
www.aptusCR.com

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

**niche** 12:13

**Nikki** 8:12

**nonpecuniary** 297:24

**nonprofessional** 9:23,24

**nonpublic** 68:11

**nonresponsive** 63:20

**Nope** 211:24

**north** 13:15

**note** 271:15 272:21 274:3 304:9

**notices** 184:9

**notion** 143:14 216:12,20

**November** 205:4,12, 18

**number** 8:15 23:17 24:7,12 34:13 51:10 76:2,7 86:16 101:23 106:22 107:23 109:16 111:13 112:13 113:18 114:4,5 115:17 116:10 117:3,12 130:9 132:18 134:2 135:11 149:13 183:8 190:25 201:23 202:11,16,22 203:2, 9 204:3,15,18 206:7, 12,13 210:5 257:23 260:9 270:9 298:1, 12 301:8 303:14

**numbers** 102:12 115:4

---

**O**

---

**object** 11:11 14:11 16:19 17:6 18:13,23 19:10 20:3 21:4

25:10,18 28:25 35:1 36:22 37:8 38:15 39:16 41:8 42:4 43:16 44:18 46:14 47:5,19 48:2,15,25 49:19 50:10 52:10 54:14 55:4,19 56:17, 25 60:17 62:5 63:25 64:1 65:10 67:13 68:22 69:22 70:22 72:6,25 73:13 74:5 84:1 85:9 86:25 88:6 89:4 90:3,20 97:1, 11,22 101:3 102:21 109:4 111:5,23 113:2,22 114:10 116:3,22 117:6,14 118:5,17 119:19 120:22 121:22 122:3 123:4,20 124:3,12 128:1,24 129:9 131:15 137:8,21 139:6,23 140:21 141:16,19 142:15,24 143:22 144:9,17 146:14 147:11,21 148:8 149:2 150:10, 22 151:4,11,20 152:7 154:8 155:6 156:6,16 157:4,13, 23 158:8,23 160:19 162:4 163:10 166:12,24 167:24 169:12 170:19,24 171:13 172:14 175:11 176:7 177:14,23 179:7 180:10 181:9,23 182:9 189:15 192:23 196:13 197:9 198:7 199:24 206:3,24 207:16,24 208:25 210:13 211:18 215:3,14 216:14,22 217:20 218:8,23 219:4 220:18 221:22

222:7 223:1,24 224:7,20 226:1,17 231:20 232:21 234:20 235:9 236:16 240:21 242:2 243:3, 24 244:23 246:12,17 247:6,22 249:1,25 256:12 259:2 265:23 267:22 271:22 272:14 273:13 274:13 276:12 277:16 278:2,19 279:7 281:2 282:4 283:18 285:12 286:12,20 287:6 288:1,11 289:9 291:2,15 293:20 294:3 296:22 297:13,16 299:22 301:20 305:15 306:1,11,25

**objection** 71:9 112:5 141:25 142:4 208:8 227:2 228:1,25 229:18 238:13 239:20

**objections** 140:24 203:18,19 204:13

**objective** 81:9 145:20,21 190:12 263:10 275:10

**objectives** 145:13 190:20,24 263:17 275:16

**obtain** 67:12

**obtained** 68:5,21 70:20 71:6

**occasion** 78:11

**occasionally** 179:15, 16 180:15

**occasions** 30:1

**occupancy** 195:15

**occurred** 31:20 96:14

**October** 8:4 29:11 33:8,9 166:5 167:8 308:12

**offer** 174:18 188:9 189:10,20 213:23 223:5,9,11 227:18 250:18 257:4 289:14

**offered** 188:23 221:8 223:5 224:10 227:6 233:23 268:5,15,22, 25 269:6,16,19

**offering** 188:17 195:14 307:17,21

**offhand** 29:9 61:21 95:14 101:15

**office** 42:18 44:5 260:16

**officer** 109:3

**official** 264:23

**officials** 262:15

**oh** 55:7 79:8 86:7 106:6 108:22 111:7 130:14 149:19,22 165:11,23 183:22,24 184:1 201:19 203:12 283:5 304:16

**okay** 10:10,13,21 11:6,17,22 18:21,24 23:12,23 29:5 31:18 36:15 47:14 53:11 54:25 56:22 57:14 60:1 62:20 69:7 74:23 75:3 76:5,17, 20,25 77:5 79:8,10 80:1,9,16 83:21 86:21 87:11 88:18, 24 89:20,24 91:18, 22 92:21 93:13,24 94:8,12,24 95:25

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

100:16,22 101:1,16 103:11,19,24 105:1, 6,10,14,22 106:13, 14,16,18 107:7,17, 21 108:12,18,19 109:1,11 110:19,20, 25 111:14,15,21 112:17 113:11,17,18 114:2,3,22 115:2 116:12,15,16 117:2, 22 118:21 119:13 130:12,19,23 131:1, 11,21,25 132:6,12 133:2,7,16,17 134:10,16,24 135:6, 7,16,19,23 136:6,9, 19,20,23 137:1,5 138:5 139:1,16 140:17 142:5 143:14 146:3,9,11,23 147:4, 17 148:13 149:3 150:2,6 151:9,16,24 152:12 153:15 154:3 155:18 156:3,25 157:19 161:18 165:13,15,24 166:3, 7 167:8 168:4,8 169:9,18 173:6,24 175:8,21 178:10,25 179:4 180:6 181:16 183:2,16,24 184:11, 13,15,21 185:12,16, 19 186:7,16,23,24 187:3,11,24 188:12 191:2,22 192:7,11 194:9 197:25 199:18 200:18,21 201:4,9, 18 202:7,9,10 203:6 204:4,5 205:5,13 206:7 209:24 210:16 211:1,9,10,15 212:6, 10 213:12,19 215:23 216:10 218:14,16,18 219:2 220:3,7 222:21 227:15 228:4,11 229:13,17

230:14 232:3 233:3 234:21 235:5 236:9 242:22 246:18 249:10 250:10 251:2,5,12 254:17 255:2 256:4 259:10, 21,22 260:11,13,19, 25 262:11 264:19 265:2,4,9,16 267:23 270:1,19,20 271:1 272:7 273:9 274:8 276:8 278:23 281:20 282:24 283:15 284:10,18 288:8 293:7 295:20,25 303:8 304:6,16 305:1,23 307:7 308:7,9

**omitted** 192:2 204:24

**once** 9:22 10:8 26:18 66:23 91:25

**ones** 60:22 77:3 99:12 209:21 229:15 239:17 240:19

**ongoing** 91:13

**online** 24:16

**open** 76:4

**operate** 47:17,25

**operated** 271:8

**operating** 213:6 221:15 297:4 303:20

**operational** 213:5 217:10 230:14 300:8

**operator** 8:2 24:1 44:17,21 45:12,17, 21 46:12 74:19,23 75:3 76:1,5,10,15,18 96:5,8 98:7 102:3 105:25 106:3,9,13, 16 107:4,7,21 130:14,19 133:20,23

136:3,10 149:15,18, 20 164:4 165:2,9,13 183:22 184:1,6,21 185:2 195:17 203:24 204:4,9,16 210:20, 22 211:1 220:3,7 259:10,14 271:9 283:1,5 302:25 303:5 308:5,7

**operators** 53:5

**opine** 221:6

**opined** 121:5

**opining** 127:2,13,22 128:4,20,25 129:6 254:11

**opinion** 15:19 16:6 25:13,17,23 31:3 33:3 38:8 52:21 56:10,16,19 57:13, 25 58:10,13 59:20, 25 60:12 61:1,15 63:10 65:9 67:9 71:22 72:24 73:25 87:25 88:5 89:2 92:23 93:25 97:10, 13,21 98:4 102:20 119:14 120:1,18 127:7 128:5 129:13 139:19 140:5 158:5 166:1 170:4 172:11 174:19 182:25 188:23 189:5,20 190:1 191:4 192:19 193:8,22 194:7,9,11 195:1 196:3,9,12,19 197:13,16 205:25 206:20 207:12,21 208:13,21 211:12 221:8 223:10 226:12 228:12,22 230:19 233:4,13 234:14 237:14,19 238:1,2,3, 8 239:3,10 240:16

242:10,14,24 243:2 247:5 249:6,9,11,18, 24 250:5,8,15 274:12 281:11 282:19 283:8,12,17, 19 284:7,11 285:23 286:22 288:9,16,23 290:20 302:19 307:18,22

**opinions** 12:21 28:10,16,23 32:23 39:11 63:7 65:25 70:15 88:19 89:25 92:15 94:22 121:8 157:3 163:4,17 188:14,17 190:6,22 213:23 222:24 223:4,11,17,21,23 224:6,10,15,18 225:3,6,10,18,23 226:7,11,16,21 227:4,22,23 228:5,9, 21 237:11 247:20 250:17 253:24 288:18 289:1

**opportunities** 132:3 292:7

**opportunity** 134:18

**opposed** 119:6 177:13 238:11

**opposite** 271:17 274:4

**options** 134:11

**order** 50:8 186:21 187:4,15 247:20 265:20 277:24

**orders** 16:3 186:22

**organization** 99:18 104:4,14 263:13 275:2,16

**Organizations**

154:15

**original** 66:16 131:6, 11 145:20 185:11,21

**outcome** 190:12 251:16 252:8 275:6, 10 277:1

**outcomes** 123:14 132:1 191:13,14 193:14,24

**outlets** 84:10 100:10

**outline** 124:11 228:5

**outlined** 66:16 125:3 224:10 226:11 227:19 229:8

**outlines** 174:7 175:24

**outlook** 40:10

**outset** 104:11

**outside** 45:18,23 145:9,16 209:13 217:21 219:4,16 221:5,11 285:12 291:3

**outsourced** 302:3

**outsourcing** 295:23 296:15 301:14,17

**overall** 272:19 273:25

**overbroad** 224:8 228:25 229:19

**overhead** 232:13

**overreach** 293:16

**Owen** 109:25 131:7, 12,14 133:9 139:11

**Owens** 105:2,7

**owned** 216:2

**owner** 195:16

**P**

**p.m.** 134:7 164:6,8 165:1,3 184:23 185:3 193:1 220:4,8 259:11,15 303:1,6 308:11,15

**Pacific** 8:3 308:11

**page** 24:2,5 59:9,11 60:3 61:6 75:15 76:7,21 77:4 78:1 80:2,3,4,18 85:2 86:14 87:12 96:4,6 98:11,13 102:10 103:9 115:4,14 116:11 132:7 133:8, 15 134:6,15 139:4 146:8,9 155:19 165:8,19 173:25 180:7 185:17 186:18 187:25 194:25 195:8 200:19 202:7 203:8, 10,13,20 204:2,12 205:21 210:8 211:5, 6 214:11,15 218:4, 11,13 228:10 232:5 251:4,5 260:14,17 261:13 262:11,12 264:15,16,20,22,23 270:23,24 271:3 282:25 283:3 303:18 304:21 305:25

**pages** 62:3 63:11 110:10 136:18 294:10

**paid** 12:7 141:13 142:12 143:17 144:14 156:4,13 160:11 293:14 294:7

**panel** 40:8

**paper** 34:18,23 81:20 100:24 107:12

114:24 115:12 137:6 143:19 147:8,10,20 148:7 167:10,22 168:2,6,8,20,22,23 169:4,5,11,19,20 170:2,3,5,8,13,17 171:16,18 172:1,4,7, 9,13,19,21 173:9,17 174:25 175:2 177:1, 4,12,21 179:14,21, 23 180:14,22 182:2, 6

**papers** 143:19 168:12,15,16 169:21 171:2,3,5 179:9,15, 17 180:16

**paragraph** 112:12 116:13 132:2 134:17,25 150:25 151:6 152:2,10 153:16 155:21 174:24 175:19,21 191:22 194:13 200:19 214:11,15,16 215:18 228:10,13 232:5,9 237:23 242:23,25 249:6 250:4 251:2,3,6,11, 13 252:16 253:1 254:17 255:3 276:2, 9,11,16,21 283:7 284:8 291:17,18 292:16 293:24 294:18 303:19 306:23

**paragraphs** 253:20 254:18 273:21

**parse** 175:14 288:15

**part** 30:10 31:5 40:21 42:9 43:9 54:10,12 58:22 74:4 121:8 124:16 125:7 126:23 160:21 162:15

165:25 167:3,4 173:11 176:19 178:4 182:24 189:1 193:5 194:7,9,11,20 196:9 198:3 208:20 211:12 212:17 217:1 218:19 222:15 226:3 231:2 233:7 237:13 245:2, 3 246:8 248:8 250:8, 11 264:9 272:3 282:8 285:15 288:4 302:4

**partially** 103:15 152:5

**participated** 45:7 89:7

**particular** 14:12 15:4 16:1 19:17,18 26:20 28:10 30:19,21 35:18 36:8 37:10,14, 17 38:1,20 47:17 48:1 50:1 58:21 59:22 61:10,11 82:8 88:2 100:11 104:21 119:24 121:2 127:19 128:14 143:8 145:15 147:8 155:15,16,17 162:14 167:9 169:19 172:12 177:12 179:13 180:21 181:14 187:23 189:1 190:11,12 195:4 196:11 199:10,21 201:5 208:17 212:13 215:24 216:1,19 229:22,23 231:12 232:16,17 233:7 234:19 236:21 238:3 247:16 250:8,23 257:2,3 258:12,13 260:20 261:4 264:1 267:4 271:20,25 276:25 277:1,23 278:17 279:5,16 281:13 288:21,22

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

289:12,20 292:9 295:16 306:7 307:4

**particularly** 27:4,10 34:12 36:2 41:12 61:4,5 63:14 66:21 150:24 282:7 289:18 294:23

**particulars** 169:25 170:2

**parties** 292:22 293:3 295:4

**partly** 93:10

**partner** 134:18

**partner's** 17:23

**partners** 18:11 228:16 229:7 230:10,21 231:17 233:16 234:16 235:20 236:14 239:13,25 241:4,24 249:14

**Partnership** 178:20 211:7

**parts** 35:3,9 177:16 193:3 299:3

**party** 72:10,11 96:22 97:7,17

**path** 179:23

**paths** 294:22

**pattern** 160:10,22,24 161:2,6,7,9

**pause** 158:4,18 160:1

**pay** 32:22 43:7 300:21

**paying** 160:14

**payroll** 232:14

**PDF** 203:22

**peer** 77:1,6,11,14,15, 16 78:5,20 80:14 81:1,7,11,13,15,16, 24,25 82:1 83:14 84:23

**peer-review** 82:15 83:1,25 103:25 104:2,5 155:4,12

**peer-reviewed** 78:8, 15 80:10,12,23 85:19

**pen** 34:18

**pending** 8:14 91:15

**pension** 119:2

**people** 20:11 37:23 51:15 57:3 102:1 114:14,19 217:24 293:13

**perceive** 213:20

**percent** 178:14,15 182:15,17 213:5

**perform** 43:14 45:21 121:20 191:3 255:8, 19 256:7 284:18

**performance** 43:2 48:23 49:14 193:14 271:14,16,20 272:2, 12 274:3,9 275:14 297:4

**performance/costs** 119:6

**performed** 46:10 49:6 191:5 267:19

**performing** 253:23

**period** 33:8 123:1 228:14 229:6 233:14 234:15 235:18 239:12,24 241:23 249:12

**personal** 47:16,21,24 48:7

**personnel** 292:6 294:24

**perspectives** 152:23 267:9,10

**Ph.d.** 9:5 13:1

**physical** 8:17

**pick** 231:13

**picture** 56:16

**piece** 163:3

**pieces** 99:16 100:5 112:14 305:20,24

**place** 8:20 126:16 161:10 240:10 241:16 263:18 275:25

**places** 121:15 162:18 280:8 292:13 300:6

**plaintiff** 9:10 165:21, 23 191:24 203:2 204:14 206:15

**plaintiff's** 192:1 200:23 201:6

**plaintiffs** 93:12 94:2 192:12 206:1,8,11 207:13,21

**planning** 41:20

**platinum** 153:22

**pleadings** 189:2,3

**please** 9:13 10:17 23:14 85:2 101:19 105:24 107:3,20 111:2 148:15 149:11 161:16 183:5 209:25 218:13 223:22 226:7 227:15 246:16 247:2 259:17 261:1 276:3 282:25 303:9

**point** 30:13 71:19 100:14 108:15 128:14 151:10 167:8,10 171:6 174:12 176:17 179:19 257:2,10 258:13 262:25 276:15 294:16 295:1 298:2 307:4

**pointing** 182:12 196:15,25 197:2 198:15

**points** 58:18 120:3 127:19 131:18 194:25 256:25 258:7

**policies** 154:13

**policy** 40:4,5,9 94:7 99:18,19,25 100:11 104:20

**Political** 84:20

**poor** 297:4

**popular** 51:11

**populations** 50:23,24

**portion** 288:8

**portions** 57:17 281:5 304:11

**portraying** 61:10

**position** 195:16 261:25 262:2

**positive** 112:14 142:23,25

**possession** 102:14, 16

**possible** 22:16 72:21 73:5,7,10 74:2,8 101:25 119:5 263:5 265:10,17 266:4,8 290:6

**Post-covid** 86:6

**potential** 30:2 178:23
263:25 279:20,25
280:11,13 282:15
294:21 296:13

**potentially** 49:10
191:20 306:19

**PPP** 111:3

**PR** 108:10 115:14

**practice** 39:20 40:20,
23 41:23

**practices** 20:10,15
41:22 93:6,9,10,11
94:5 118:19 154:21
155:13,16 162:12
188:22 244:12
268:17 290:18 295:5

**practitioner** 78:17

**practitioners** 40:12

**precise** 125:25 253:5
269:21

**precisely** 52:9 199:22
222:24

**prefer** 55:17 117:25
118:12

**preferences** 43:3,5
82:3 295:6

**preparation** 23:3,6
41:12,16 42:3,8,10
43:10 45:8 52:21
62:24 273:6

**prepare** 22:17 30:7

**prepared** 30:9,22
44:20 45:7 223:13
238:20

**preparing** 27:24
38:18 41:16 61:20
65:21 66:3 105:7,15
119:13 121:19
152:12 154:11

187:3,14 191:3
201:4 202:24
205:13,24 206:20
207:12,20

**presentation** 75:12
99:21 151:2 173:8
174:2 176:5,18,20
178:4,21 181:1,22
182:8,13 210:3
211:8 212:14 213:3
220:12

**presentations** 151:18

**presented** 134:12
181:21 221:11

**presenting** 260:16

**president** 109:2

**press** 51:12 149:1
161:1

**pretty** 33:15,21 59:4

**previous** 24:23 47:9
58:5 137:16 139:3
207:8 218:4 237:6
276:18

**previously** 183:8,12
185:8 195:8

**price** 293:11 294:2

**pricing** 32:12 92:20
93:6,10

**primarily** 19:7

**primary** 195:12

**principles** 160:6
162:14

**printed** 75:18

**prior** 13:8 30:14
45:25 46:7 47:10,14
48:3,11,21 49:6,12,
16,22 50:3,6,12
109:8 139:21 140:19
148:1 156:11 158:4,

18

**prison** 44:16,21 45:4,
9,12,17,21 46:12
47:12 50:18,21
51:13 53:4 60:2
100:19 114:7,8
115:8,9 117:5,20
137:2,7 150:21
152:14,24 153:19,21
155:23 156:5,14
261:12 271:7,9
272:11 281:16
295:22,23

**prisoners** 298:10

**prisons** 11:24 44:11,
14 46:18,25 47:3
48:19 52:2 58:20
86:1 87:4 113:21
116:18 117:4,8,18
119:15 154:6 160:17
166:11 270:22 272:9
279:21 280:12
282:12 283:23
294:23 295:8 299:21
302:3

**private** 16:18 17:5,19,
23 18:11 19:2,8,13
20:1 26:24 38:11
39:2 44:16,21 45:4,
8,12,17,21 46:11,18,
25 47:3 50:21 51:13,
21 52:2 53:4 95:10
98:24 103:16 118:25
150:21 152:4,14,23
153:19,21 154:5
155:23 159:10
160:16 166:21 174:4
218:22 251:14 252:6
253:3 254:2 255:6,9
261:12,16 262:12,14
264:6 271:7,8
272:10 279:21
280:12 282:11
283:23 292:17

294:23,25 295:8

**private-run** 113:21
114:7 115:8 116:18
117:4,18

**privatization** 47:12
50:19 153:25 284:15
285:10 286:10

**privatized** 195:17

**probably** 34:23 183:4
184:2 203:21

**problem** 184:4
203:14

**procedures** 154:14

**proceed** 9:9

**proceeding** 276:8

**proceedings** 78:13,
14,16

**process** 33:18 34:21
35:14 36:5,10 37:1
41:16 42:24 49:18,
21,24,25 50:2 66:12
70:20 71:6 78:5,9,21
82:15 83:1,25 92:5
103:25 104:2,5
155:4 177:25 178:1
179:10 180:4,15,19,
24 190:17,18

**processes** 43:23 77:9
126:24 155:12

**procurement** 51:17,
18,25 52:4

**procuring** 27:2

**produce** 102:13

**produced** 138:8
147:5

**product** 214:21

**production** 67:6

**profession** 118:25

125:18

**professional** 20:10 39:14,17 44:15 45:11,14 83:9 99:24 244:9 248:3,16 284:1 294:15

**Professor** 155:22 156:13 157:2,11 160:14

**professors** 143:16 144:13

**progress** 171:2

**progressed** 92:4

**project** 132:9 135:3

**proposes** 115:20

**proposition** 198:12 213:15,21,25 214:16 215:16,21 216:24 217:2,7,12 218:20

**propositions** 284:21

**prosecutors** 95:9,20

**prospective** 180:17

**provide** 40:3 46:12 63:5,6 67:25 68:1 69:19,20 70:2,11,14, 18 71:4 72:22 74:3 163:8,15 230:5,11, 24 246:14,15 247:4 253:15 266:9 285:20 293:11 294:2 296:6

**provided** 14:2 16:3 37:6 45:15 71:18,21 72:4 89:8 91:9 92:6, 9,10 94:22 96:17,19 98:1 101:9 103:17 139:18 159:10 179:1,5 181:13,16, 17,19 192:16,21 201:2 206:15 211:15 212:22 213:13

215:25 220:16 221:1 229:25 241:11 258:24 276:9 279:4 304:10

**provider** 19:2,8 45:9 95:6,10

**providers** 17:19 45:4 50:21

**provides** 79:4 178:14 182:16 192:12 195:11

**providing** 14:6,15 15:8 17:20 95:18 139:19 188:6,14 189:11 190:5 195:13

**provision** 19:13 26:24

**provisions** 95:21

**prudent** 265:19

**PST** 164:8 165:1 308:15

**public** 12:4,8,20 14:18,19,22 16:18, 22 20:1 39:15,24 41:3,6 91:14 92:22, 25 93:4 99:25 100:19 105:11 113:21 114:7 115:6, 8,24 116:18,21 117:4,18 118:25 127:11 152:4 251:14 252:6 253:3 254:2, 21 255:6,9 261:12 279:4

**publication** 79:7 104:2 179:10 180:4, 15,19 246:1

**publications** 75:13 78:12 84:12 85:20 98:12 104:22,25 180:17 245:18,23

246:11,15 247:3 254:20

**publicly** 125:14 174:6 175:23 176:15 180:7,9 181:17,19 188:20 228:17 235:6,7,13,21,23 236:5,8,11,24 237:9 239:14 242:1 249:15 269:23 280:19 287:12 303:22

**published** 78:13,14 81:18 82:16 84:16 168:14,17 179:19 254:25 303:25 306:10

**publishes** 83:4

**pull** 23:13 101:18 105:23 107:19 109:12 129:25 132:15 135:8 148:14 183:3 201:11 270:3 303:9 304:13 305:20

**pulled** 146:9 149:4 304:7

**purport** 25:8

**purpose** 296:1 299:25

**purposes** 96:23 97:8, 18 263:20

**pursue** 134:12 293:8, 25

**pursuing** 295:13

**put** 34:18 35:15 39:18 81:12 82:1 101:17 107:19 108:20 119:5,8 130:24 132:14,15 140:12 165:10 183:4 201:11 210:1 220:22 259:16

**putting** 34:22 75:19 130:21 156:9 208:12 212:10

---

# Q

**qualified** 284:13 285:2,9 286:2,9 287:14

**qualitative** 200:25 238:11 244:19 258:2 266:23

**quality** 48:23 49:2,9 63:15,16 69:14 166:11 188:1,7,15 189:12 190:6,21,24 191:4,20 192:15,20 193:18,19 195:3,9, 13 214:22 215:2,13, 18 216:12,21 218:7, 16,22 220:16

**quantitative** 35:22 36:1 200:25 210:12 211:11 237:20 238:12 266:22

**quarter** 210:3 211:7 216:2

**question** 14:3,25 15:5,12,14,17 17:1 20:5 24:20,23,25 25:3,4 32:5 37:18 41:10 46:17 49:11 50:15 56:3 58:6 62:7 63:21 64:3 68:8,9 70:24 79:16 81:10 82:18 83:22 84:5,14 85:5 92:11 97:24 116:4 117:10 121:12 122:17 123:25 124:17 125:2 128:15,19,20 133:2 140:17 141:2,4 143:25 158:13,15

www.aptusCR.com

160:22 171:6,12
177:16 180:12,23
187:12 191:16
193:17 206:5 207:6,
17 216:15 222:18,22
225:12 226:3,6,19
227:7,9,12,20 229:3,
23 230:3,16 231:12
233:2 237:6 239:16
241:1,17 242:7,18
245:16,22 246:9,19
250:12 254:7 256:2,
18 257:13,16 259:6
261:1 266:1 274:6
276:18 278:24
281:20 285:17
288:13 291:5 292:11
293:21 294:6 295:15
300:17 306:16

**questioning** 11:10
130:3 148:21 161:21

**questionnaires** 81:21

**questions** 10:17
11:2,12 27:22 39:1
55:21 81:13 82:1
110:15 115:5 127:1
142:6 190:20 209:11
221:10 240:23 250:1
263:15 296:4 307:14

**quick** 307:13

**quickly** 58:9 60:6,8
63:12,14

**quite** 16:20 67:18
87:1 126:10 189:19
215:6 241:19

**quote** 166:8 281:8,10

**quoted** 198:2 302:7

**quotes** 197:25 200:10

---

**R**

**RADCLIFFE** 9:11

15:18 16:24 18:3,20
19:3,23 20:24 22:2
23:13,19,24 24:3,8,
14 25:2,14 26:2 29:4
31:17,21 34:16 35:8
37:2 38:9 39:12 41:1
42:1,12 44:9 45:10
47:1,13,22 48:9,20
49:3 50:5 51:5 52:15
54:19 55:6,24 56:21
57:6 60:21 62:8
64:24 66:1 68:2 69:1
70:6 71:1 72:1,20
73:1,9 74:1,10,16,
18,21 75:5,22 76:3,
8,13,19 80:1,5,17,19
84:24 85:1,3,13
86:2,13 87:9,11,13
88:12 89:19 90:13,
23 93:14,16 96:3,7,
10 97:5,16 98:5,9,10
101:4,17 102:8,24
103:6,12 105:23
106:2,6,11,14,19,24
107:9,18 108:1,19,
21 109:6,12,21
110:8,14,16 111:7,8
112:1,10 113:6
114:1,21 116:8
117:1,7,11,21 118:7,
20 120:16 121:17
122:1,24 123:7,21
124:1,6 126:5
128:17 129:5,22,25
130:5,11,16 131:3,
20 132:13,20
133:22,25 134:3,4
135:7,13,22 136:8,
12,14 137:10 138:4
139:10 140:16,23
141:1,17,22 142:1,9,
20 143:2 144:4,12,
23 146:2,4,6,19,24
147:3,16,24 148:12,
14,20,22 149:6,10,
17,19 150:1,15,23

151:8,15,23 152:11
155:2,18,20 156:10,
19 157:7,18 158:2,
16 160:9 161:11,18,
22 163:6,22 165:5,
11,14 166:16 167:7,
18,20 168:3 169:8,
17 170:20 171:8,22
173:5,23 175:20
176:21 177:18 178:9
180:5 181:2,15
182:4,21 183:3,10,
18 184:17 185:6
186:17,20 190:4
194:8 197:5,24
199:17 200:17
201:10,13,19 202:1,
20,23 203:20 204:1,
5,10,17,20,22
205:14,23 206:6
207:10,19 208:4,22
209:4,25 210:7,9,18,
21,25 211:3,20,23
212:5 213:1 214:24
215:7,22 216:16
217:15 218:3,10,12,
17 219:1,20,23
220:2,9,21 222:3,17
223:14 224:3,17,23
225:8 226:4,23
227:1,9,14 228:3
229:1 230:4 232:1,
22 235:4,15 237:12
239:1 240:14 241:20
242:21 243:21
244:20 245:15
246:13 247:1,17
248:23 249:2 250:9
257:7,11,12 259:5,
16,18 260:4,7,12
267:17 268:19
270:2,6,11 271:2,4
272:6 273:4 274:7
276:1 277:6,20
278:7 279:1 280:22
281:3 282:23 283:3,

6 284:9 286:4,16,23
287:21 288:7 289:2
290:23 291:9,19
292:25 293:4,22
295:17 297:1 299:9,
16,17 301:12
302:22,24 303:8,12,
16 305:22 306:5,21
307:6 308:2,6

**rate** 134:13 233:5
236:10

**rates** 302:7

**re-create** 22:15

**re-sent** 136:4

**reach** 243:2

**reached** 271:13
288:18

**reaching** 16:6 293:18

**reacquaint** 272:4
307:3

**read** 57:16 58:3,14
60:2 62:2 113:24
116:13 171:9 224:12
250:3,6 272:21

**reader** 253:15 296:11
298:20,22

**readily** 119:2 255:10
262:16

**reading** 86:3 224:19
227:11 241:22

**reads** 153:16

**ready** 107:5

**real** 69:3,8 213:7
216:5

**realize** 280:21
282:11,12 290:7
292:8 295:11

**really** 21:24 68:13
110:8 140:11 163:21

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

168:21,24 177:4
275:12 291:25
300:21 301:7 308:2

**realtime** 31:19

**Realty** 156:5,14

**reason** 10:22 96:20
98:2 118:14 138:12
151:10 153:17,18,22
154:4,13,15,21
155:5,8,13 156:21
157:9 160:13 273:9

**Reason's** 153:20

**reasonable** 119:18
127:4,23 128:7,8,22
129:7,12 228:20
232:8 237:16 238:6
249:21 286:8

**reasonably** 284:13
285:8

**reasons** 179:20
214:20 263:21

**rebuttal** 307:9

**recall** 10:11 18:5,8,18
26:3 29:8,22 32:9
33:17 37:9 46:3,9,15
48:16 51:6 52:8,18
55:22 57:20 61:18
69:5 84:20 88:21
89:9 90:14 91:21
92:7 99:12,20 100:7
101:11,12 102:12
104:20 110:23 131:9
137:5 146:7 149:21
150:5 151:19 154:12
156:20 157:10 170:9
173:19 185:10
187:18 256:4,16
260:19 261:3,7
270:17 304:17
305:7,13,17,23
306:7

**recalling** 256:18

**receive** 69:9 118:15

**received** 37:5 147:9
158:21 166:20 174:3

**receives** 153:18

**recess** 75:1 164:9
220:5 259:12 303:3

**recipients** 117:24

**Reckoning** 86:5

**recognize** 23:20 25:4
102:18,23 106:25
107:10 160:10
183:13 185:7 202:2
259:22 270:12

**recognized** 255:4

**recognizes** 40:16

**recollection** 11:14
31:10 34:22 37:16
47:10 54:16 60:15
90:8 91:4 99:14
100:2 133:5 137:12
167:21 186:10
211:13 254:24
304:20 305:4

**recommendation**
81:14,17 264:5,9,21
265:3,5,8

**recommendations**
43:8

**recommends** 264:17
265:1

**reconcile** 172:4

**record** 8:3,22,25 9:13
23:15 74:20,22,24
75:4 106:10 136:13
163:23 164:7 165:4
184:18,24 185:1,4
212:6 220:4,8
259:11,15 303:2,7

304:9 308:4,13

**record's** 56:22 94:15

**recording** 8:17,23

**recordings** 8:19

**records** 262:15,21

**redline** 137:19
138:13,15,19

**redlined** 138:24

**reduce** 290:4

**reduces** 43:6

**refer** 11:18,23 150:18
214:19 215:1 289:11

**reference** 52:12
91:22 96:12 108:13
111:1 124:21 150:25
152:2 155:22 156:24
165:16 166:4,7
167:9 173:12,15
174:6,13,15,25
175:23 180:7,25
186:2 190:11,12
191:12,19,23 193:13
196:6 202:15 203:9
215:10,24 216:1
218:6 229:13
232:19,25 233:18
235:5,11 237:2
238:7 262:12 270:18
278:8 279:3 288:9
289:3 290:13 291:12
292:17 298:7 304:2
305:2 306:23

**referenced** 89:11
107:12 199:21,23
233:6 236:10 269:24
270:15 278:18
291:11 303:24
306:9,17

**references** 111:2
115:17 151:17
170:16 190:23 214:1

234:18 235:1 269:1

**referencing** 165:20,
22 166:10 168:5
169:11 173:17 296:3

**referrals** 132:3

**referred** 137:2,7
183:9 245:16

**referring** 11:23 94:15
165:12 175:8,10
176:24 202:11
227:5,10 229:15
230:25 235:8,24
246:10 254:19
268:21,22 287:24
292:16

**refers** 137:15 151:17
173:7 211:6 230:19
295:22

**reflect** 102:16 182:23

**reflected** 221:16
228:19 237:16 238:5
249:21 273:11 297:5

**reflecting** 176:5

**reflective** 302:10

**reflects** 119:10
131:13 134:17
150:18 181:4

**refresh** 22:21 137:11
157:15 167:21
172:24 186:9 194:17
221:25 260:24

**refreshed** 26:18
173:3

**regarding** 15:19 16:8,
17 17:3 22:3 32:7
47:16,24 48:12,22
49:5,17 52:21,25
53:3,8,12,16,19,23
54:2 55:1,9,16 56:6
57:22 61:17 69:3,8

113:20 123:2 146:12
147:9 150:8 153:17
154:4,6 157:20
160:16 172:6 198:4
228:15 229:6 230:9,
20 231:15 233:15
234:15 235:18
236:13 239:12,24
241:3,23 249:13
258:19 260:21 261:4
265:21 271:6 277:24
278:16 287:2

**regardless** 98:3

**regards** 82:13 92:21
284:10

**regional** 117:25
118:12

**regions** 118:2 119:3

**regular** 126:23

**regulatory** 126:15

**relate** 9:25 85:7 115:5
192:14,20

**related** 11:19 15:14
33:2 41:20 85:11
99:2,23 126:10
127:10 153:24
190:22 217:7 277:19

**relates** 114:7 115:9
117:3,12,19 187:19
256:5 257:16

**relating** 117:4

**relations** 105:11
115:6

**relationship** 45:12,14
48:6 58:20,22 64:22
67:16,19 69:14 70:3,
4 71:12 72:3,10,14,
17,18 73:8,19,21
74:9 85:25 86:22
145:9,15 158:12
159:2 162:1 163:13,

18 168:21 169:4
177:3 277:10 281:23

**relationships** 48:18
51:20 83:18 161:4,5

**relative** 15:15 213:6
228:15 229:7 230:9,
20 231:16 233:15
234:15 235:19
236:14 239:12,25
241:3,24 249:13
275:5,6 276:24
300:7

**relatively** 34:14

**release** 149:1 161:1

**released** 303:23

**relevant** 26:14 27:7
35:20 38:6,22 39:8,
11 41:23 60:10,11,
12 61:13 63:3,7,14,
17 64:13 65:21 67:2,
6,9 75:14 98:20 99:8
113:20 114:6 115:7
117:3,17 120:6
163:9,16 189:4
190:21 213:6 235:19
236:14 249:13 264:6
306:19

**reliability** 142:2
143:20 144:7
157:21,25 158:14

**reliably** 245:21

**reliance** 177:12

**relied** 22:11 25:12,19
28:2,19 29:2 55:2
77:20 99:11 101:1,5
102:19 114:25
115:12 124:9 140:1
141:9 163:7 176:14
186:13 193:13
233:13 234:25
236:5,21,25 238:17

250:24 259:24
269:15 270:16 273:6
289:1

**relies** 156:21 157:1,
11

**rely** 27:24 65:24
137:6 158:6,21
162:22 171:10
172:10 194:10
266:24

**relying** 56:11 162:7

**remainder** 307:8

**remaining** 206:9

**remarks** 271:6,11
272:8 273:10

**remember** 95:14

**remind** 56:2 250:11
256:2 264:8,12
271:24

**reminded** 265:2

**remote** 8:16 31:12
74:17 179:25 183:21
199:2 203:11,25
214:12 299:13

**render** 56:16 140:4

**rendered** 28:10

**rendering** 25:16
56:19

**repeat** 25:3 71:2
124:7 202:13 292:24

**repeatedly** 227:7

**repeating** 187:11

**rephrase** 62:15 66:2
79:16 81:4 97:6
118:8 137:13 171:24
177:19 194:10
207:11 269:17
283:16 286:24

**report** 17:11 21:19
22:19,21 23:10,18,
21 24:5 25:5 27:18,
24 30:7,18,19 31:5
33:1,19 34:3,6,19,25
35:4,5,7,9 36:9,12,
25 39:1 54:4 58:1
60:7,10 61:20 62:3,
17,22,25 63:4,23
64:15,20 65:15,21
66:4 69:2 72:23 75:7
87:22,23,25 89:17
90:19 91:5 93:21,22
96:18,20,21,25 99:9
101:7 103:2 105:8,
16 107:12 119:24
120:3,10,24 121:19
122:12,23 123:9
124:14,24 125:9,22,
24 127:13 139:22
140:2,20 146:13
151:3,16,22 152:13,
17 154:11 156:21,24
158:6,19,20,21
159:4 165:7,19
171:25 173:7 176:4,
10,11 178:2 186:19
191:23 192:17
193:4,6,7 194:20
195:6 197:23 198:9,
11,24 199:8,23
200:15,18 201:5
202:5,8,25 208:19
209:10 213:23
214:8,15 217:19
221:12 222:10
223:6,7,12,17,19,23
224:11,14,19 225:4,
19,20 226:14,20
227:5,11,18,19,20,
23 228:6,8 229:9,17
231:3 233:9,18,24
234:5,8,18 235:3,11
236:1,6,19 238:16,
19,21,24 240:8,9,20
241:12,18,22 242:20

243:6 245:1 248:10 250:25 251:3,24 252:14,24 253:2,12, 14,22,24 254:10,11 255:12,22,25 256:3, 5,15,25 257:21,24 258:7,10,15 259:24 262:25 263:4 264:10 268:23 269:13,22 270:16,20 271:6,13, 20 272:1,5,16,19,23 273:6,20,25 274:1 276:3 278:18 279:4, 9,15,18 280:9,17 282:8,25 283:4 285:16 288:5,25 289:14 291:1,22 292:13 294:6,9 295:16,19 298:24 299:3 300:5,25 301:11 303:18,19

**reported** 132:4 174:5 175:22 219:13

**reporter** 8:6 9:1,3,8 10:25 24:6,10,19 25:1 31:15,18 149:8 154:23 155:1 163:20,21 169:1 180:1 184:7,14 198:21 199:4 211:22 214:13 219:19,21 244:5 245:10 260:2, 6 270:4 292:23 297:15 299:14 302:20,23 303:10

**Reporting** 8:6,7

**reports** 16:13,14 30:10,21 31:4 59:6 60:5 66:21 88:23 90:6 91:1,20 111:3 153:6,8,24 195:12 283:24 293:14

**represent** 54:7,8 95:1

138:7 176:11 264:2

**representation** 123:24 138:11 176:9 200:11 210:12

**represented** 175:16 181:24 194:4

**representing** 181:7

**represents** 227:21

**reproduced** 139:14 245:20

**reputational** 296:21, 23 297:22

**request** 55:23 81:22

**require** 252:19 275:13,21

**required** 13:19 32:11 126:18 275:11

**requires** 193:18 245:13 251:15 252:7 276:19

**research** 27:1 38:11 61:5 98:12 99:10 103:23 104:16 126:20 134:20 145:13,14 153:24 154:20 155:10,11,23 159:19 162:17 163:3 168:11 243:9 284:3, 14 285:9 286:10 294:7

**researcher** 159:25 162:7 163:1

**researchers** 145:9 158:12 159:3 160:2 162:18

**researchers'** 145:11, 20

**reservation** 13:21 15:11

**reserve** 223:9 307:8

**reside** 9:17

**resolution** 91:6

**resources** 12:12 275:11

**respect** 41:6 43:15 45:16 46:11 54:21 57:15 60:13 65:9 68:3 72:4 77:25 82:15 83:1,24 89:24 92:15 94:5 115:5,19 116:17 117:9 120:15 146:13 159:12,14 177:11 195:1 202:12,16 204:18 214:1 216:12,21 220:16 221:14 222:4,5 228:22 253:18 255:20 267:20 277:7,21 291:10 292:9 296:3 297:2 301:18 305:7

**respectfully** 73:16 160:25

**respond** 126:21,22 221:4

**responded** 128:12

**response** 11:14 128:15 196:15 202:11 204:11,15 206:11,12 298:12

**responses** 200:24 201:6,20 202:3

**rest** 65:14 131:8 252:13 300:24 301:10

**restate** 16:25 128:5 188:12

**result** 276:20,22

**resulted** 297:7

**results** 174:5 175:22 260:17 261:14

**retained** 29:10,25 30:4 32:8 96:17,23 97:8,18,25

**reticent** 72:12 114:16 196:4

**revenue** 42:23 195:15

**revenues** 14:7 15:9, 15,24,25 16:4 58:21

**review** 57:8,10 58:12, 23 59:3,13 60:24 62:21 63:22 77:9,11, 15,16 78:5,21 81:1, 7,25 82:6 83:14 84:23 85:20 100:11 109:20 110:12 121:9 132:10 133:1 147:13 155:3 180:3 187:4, 15,19,21,22 194:12, 18 200:22 208:11,19 210:14 231:22 236:20 271:24 272:16 284:24 288:19 294:9,13

**reviewed** 22:19 31:5 37:18 49:13 54:12 57:24 60:19 77:1 98:17 108:5 123:8,9 136:24 141:5 153:11,13 154:9 156:2 170:3,5,8 171:15,17 172:9,18 177:9 188:25 201:6 202:4 207:4 208:12 210:12 211:12 284:4 288:3,24

**reviewer** 77:22 81:15

**reviewer's** 81:20

**reviewers** 77:14 81:11,13,17,22,24 82:1

**Index: reported–reviewers**

**reviewing** 59:7 60:16
61:4 63:9 104:15
152:21 189:2 207:6
226:14 254:23
283:20,22 305:13

**reviews** 77:6 79:5
80:14

**revised** 171:4

**revisions** 169:23

**right** 32:4,25 33:10
52:17 60:4 68:10,11,
12 76:14,15 86:15
91:13 93:1 94:13
96:6 102:5,6 106:7
130:21 136:5 137:3
146:9 149:23 156:23
165:2 170:4,5
183:23 185:25
186:15 199:13
200:13 202:18
203:15 209:23
214:25 221:17
222:20 223:9 226:9
237:25 251:10,11
254:23 264:23
270:18,19,25
271:10,11 273:8
291:21 295:24
302:25 303:5

**rigor** 82:13 83:14
84:23

**rigorous** 244:12
255:7

**Rob** 109:25

**robust** 258:19

**role** 44:6 45:16
146:13 234:4

**roughly** 34:4

**rule** 22:6 266:2 267:8

**ruled** 87:24

**rules** 10:15 157:22

**ruling** 88:9 89:11,14

**run** 78:11 83:7 278:4

**running** 121:8

---

**S**

**S-N-O-H-O-M-I-S-H**
13:12

**sacrifices** 218:15

**sacrificing** 166:11
218:7,22

**safety** 14:19 100:20
278:13 280:25

**sales** 13:20,23 14:3

**San** 8:9

**satisfactory** 188:8
189:14

**satisfied** 87:25

**save** 47:3 292:1
295:9,10

**saved** 290:14

**saving** 292:2

**savings** 36:2,17 50:9,
14 52:25 53:4,9,13,
24 55:17 56:7 120:8
152:3 174:9 176:2
178:6,13,14 182:15,
16 188:1,9 189:10,
22 190:2,3,9,11
191:18 193:9 195:10
201:1 213:5 217:10,
11 218:20 228:15
229:7 230:9,14,20
231:16 232:7 233:15
234:15 235:19
236:13 239:12,24
240:3 241:3,6,24
249:13 250:20 253:5

257:19 258:4,11,18,
20,24 284:12 287:3
289:5,7,19,22 290:1,
9,10,11,12,22
291:25 292:8,14
296:13 298:25
300:7,8

**saw** 100:2 103:1

**saying** 18:16,18
34:11 43:19,20
72:14 91:3 114:17
117:17 121:19
124:22 148:2
181:17,20 182:5,11,
12 196:15 197:6,10,
11,20 198:23 199:6,
13,14 200:2,3,4,12,
13,14 219:10 225:13
226:10 230:16
237:4,5 242:5 245:1
273:17,24 278:21
290:2 294:17 297:22
305:17,18

**says** 87:15 103:14
114:5 115:21 123:11
132:2 133:12 134:25
171:25 178:12
182:16,20 185:13
187:25 188:4 195:11
204:6 205:10 206:14
213:14 237:14 238:3
239:11 274:2 292:20
303:19

**scheme** 208:24 209:6

**scholarly** 82:11,21
83:5,13,16

**scholars** 168:19

**scope** 56:11 209:13
217:21 219:5,17
221:5 238:1,22
271:25 284:23
285:4,13 291:3

**screen** 134:9

**scroll** 75:25 204:20
205:14

**scrolling** 86:10

**Seattle** 13:16

**Seattle's** 86:5

**sec** 58:2,3,7,15,16
59:2,5,6 89:7 91:23
92:7,15 205:4,11,17,
22 206:18 207:15,22
236:15 260:1,22
264:18

**SEC's** 92:5

**second** 56:2 86:16
106:7,12 112:12
114:6 130:24 132:1,
24 135:24 136:16
138:22 149:5 150:24
151:6 187:7 205:7
210:17 221:17
231:22 237:13
242:25 250:11
251:19 264:16,22

**section** 36:16,18,21
37:3,5,10,17 38:10,
13,20 176:13 186:24
232:6 253:22 254:24
271:11 289:3 291:17
295:16

**sections** 35:14,16,21
36:8 59:2 213:23

**sector** 20:1,2 52:2
159:10 218:22
294:25

**securities** 32:12
92:20 94:19 126:7,
11,13 127:3,11,23
128:21

**security** 114:8 115:9
117:5,19 119:16
120:21 216:4 221:20

222:14 261:17
278:14 280:25

**see** 31:19 36:19
57:21 59:9,12,17
66:11 75:16 76:8,10,
22 79:5 80:6 93:17
95:22 98:14 100:17,
22 102:10 103:14,18
106:6 108:12 110:25
111:4,10,14,15,19,
21 112:12,15,16,17,
24 113:4,7,10,11,15,
16,17,19 114:3
115:4,17 116:1,16
117:12,15,22 118:3,
9,11,13 119:9,11
123:10 130:20
131:2,12,16,18,19,
21,24,25 132:1,5,7,
11 133:7 134:8,10,
14,16,22,23 135:4
136:6,23 137:1,3,14
138:14,23,24 139:1,
7,11,13 146:11,21
149:1 150:6,11,14,
17 151:5,6,24 152:6,
8,9 153:15 154:1,2
165:15,18 166:3,13,
15 170:15,16
178:16,19,24,25
183:15,25 185:14,17
186:2,24 187:25
188:10,11 189:8
192:5,6,9 195:10
196:21 199:20
200:21 201:3
202:10,15 203:5,16
204:6,10,13,19
205:2,5,9,15,19
206:12 212:21
213:13,18 216:8
217:6 218:4,14,24
220:14,19,23 221:15
237:18 251:6,10
253:1 261:13,22

262:11 264:3,25
270:19,23 271:5,10,
12 277:7 281:1,18,
19 282:1,16 283:9,
13 284:7,16 293:5
295:21 296:20
303:18 304:4 308:8

**seeing** 76:1 106:5
110:23 112:8
114:15,18 135:1
150:5 151:12 200:9
264:19

**seen** 99:21 108:2
110:2,21 131:4,9
132:21 133:3,5
136:15,20 150:3
271:16 274:4

**sees** 115:19

**select** 214:20 295:22

**send** 101:25 102:3,5
107:2 109:18 111:2
183:17

**sending** 111:1

**sense** 119:4 142:21
155:14

**sensitive** 266:11

**sensitivity** 266:9
267:20

**sent** 112:18 113:8
131:6 132:8 133:9,
12 137:14 183:20
184:2

**sentence** 111:19
112:16 118:22
134:17,24 174:1
188:3 239:22
251:11,19 252:2,2
261:23 272:1,20,22
273:2,22 274:2

**separate** 15:14 28:4
30:1 160:15 231:8

**series** 139:16

**serve** 44:5

**serves** 299:25

**service** 17:22,23
19:17 20:21 46:21
121:13 122:20 188:6
191:1,13,15 214:21
215:2,13 216:13
266:17 275:3 281:22
290:7 296:8,18
298:6,11,21 299:8
300:4 301:24

**services** 12:16,18
14:1,5,9,14,18,22
15:3,8,13,15,22
16:2,17 17:4,15,20,
23 18:10,12 19:1,2,
12,13 20:9,12 22:8
26:7,8,10,23,25
27:9,13,17 51:16,22
53:20 95:7,12,19,21
159:7,9 160:8
188:16,23 189:12
190:7 191:5,14
192:15,21 195:14
201:1 216:21 220:17
243:11 244:17 248:4
259:1 268:18 275:18
277:9 280:5 281:14
290:19

**serving** 50:23,24
96:23 97:8,18

**SESSION** 165:1
193:1

**set** 56:12,15 209:10
219:10 223:23 236:6
239:4 249:5,10
250:24 253:20
263:17 265:18
268:23 269:13 283:7
288:4,25 301:10

**sets** 246:1

**settings** 143:13
193:21

**settled** 90:17

**share** 112:14 130:15

**shared** 130:17

**short-** 218:20

**showing** 200:10

**shown** 160:25 295:10

**shows** 280:8 292:12

**shut** 297:3

**sic** 108:9 117:23
149:11 152:4 160:12
254:1 280:24 281:10

**side** 32:24 34:10
88:14

**sides** 271:17 274:4

**signature** 308:14

**signed** 185:18

**significant** 119:2
178:22 251:16 252:8

**similar** 19:2 30:17
32:10 66:12 91:2
117:9 119:16 159:9
198:14 266:23
288:13

**Simon** 100:18 105:19
107:13 115:16
133:16

**simple** 97:24

**simpler** 200:3

**simply** 14:20 21:14
22:6,13 26:14 34:11
67:23 72:14 81:19
168:17 175:3 179:18
182:12 194:21
197:11,21 199:14
200:14 226:10
240:20 242:6 273:17

Justin Marlowe, Ph.D.

Confidential Pursuant to Protective Order

Grae vs.
Corrections Corporation of America, et al.

281:21 295:7 305:18

**single** 56:23 163:3
214:17 232:19
265:18 276:9

**sir** 76:18 88:16 96:8
183:22 184:6,14
244:5 245:10

**sit** 17:9 18:4,7,16,18
31:9 36:6 37:15 51:8
52:18 105:3 154:12
155:25 179:11
199:18 208:10
223:18 265:6 305:8
306:6

**slide** 212:13 213:12,
14,16 216:1,11,18,
20 218:11,15,19,25
220:12,13,15,24
221:2

**slightly** 81:11 234:22
274:19

**Snohomish** 13:11,15,
25 14:1,6,15,17,21
15:23 16:3,7,12
17:14 87:20 88:15,
24 89:15 94:9,16

**social** 27:9

**solicited** 35:15

**somebody** 99:22
117:16 184:2 201:10

**someone's** 199:15

**sorry** 24:19 29:22
31:15 51:20 63:15
64:23 68:9 70:23
73:3 86:11 92:24
94:17 104:7 106:8
110:4 112:9 121:5
124:5 130:15 135:25
136:10 146:15
148:25 149:19,24
150:2 154:23 157:5

169:1 171:16 173:21
180:1 183:18 184:3
185:20,22 186:22
191:17 198:21
203:6,12 207:18
209:1 214:4,13
220:13 225:12 226:3
230:15 236:3 242:25
244:5 245:10 247:9
251:4,22 264:19
269:20 278:3,20,23
281:9 283:1 292:23
297:15 299:5,14
302:23 304:13

**sort** 75:12 202:25
205:7 263:3

**sorts** 120:13 300:23

**sought** 141:12
142:11 143:16
144:13

**sound** 261:16 262:18,
21

**sounds** 105:4,13
297:22

**source** 22:20 166:19,
23 174:2 176:18,23
178:3,19 179:5
181:4,6,21 182:17
227:22 277:22

**sources** 28:2 153:9,
14 176:16 178:6
236:5 267:7 282:9
294:11 303:23
306:9,23

**South** 118:22,23

**Southeast** 118:23

**SOX** 205:16

**space** 100:4 104:17
298:5 301:5

**spaced** 34:14

**speak** 57:2 74:8 84:9
88:7,9 90:10 163:18
184:12 190:24

**speaking** 64:4 78:6
140:24

**speaks** 46:17

**specialized** 40:16

**specialty** 12:9

**specific** 15:1,21
17:11 19:15 20:20,
21,22 21:6,11 28:9
41:10 45:13 49:11
58:18 59:21 60:10
68:8 77:17,18,19
81:8,17,21,24,25
84:9,12 97:15 98:25
100:10 101:12
104:19,24 119:7
120:9,12,20,21
124:15,18,25 125:1,
2,7,22 144:19
146:17,21 157:16,17
168:24 169:6,14
175:13 177:5 179:23
180:21 195:24 196:5
208:15 209:10
214:18 217:9 221:24
226:21 229:10,11
230:2 234:2 235:11,
12 236:2,20 237:2,7
245:23 247:19
248:1,14,21 252:22
263:14,15 275:12
281:13 282:3 287:15
294:16 295:12
299:24,25 305:11,20
306:16

**specifically** 15:6
17:16 18:1,19 21:20
22:8 41:15 46:17,24
48:4 50:1 52:12,18
68:10 82:8 87:7
89:14 104:21 146:12

179:12 198:19
219:18 230:12
289:21 292:14
294:18 300:8

**specifics** 31:14 88:22
89:10 145:18 169:23

**spell** 9:13 94:14

**spend** 22:25 23:5
33:12 59:23 305:9,
18 306:13

**spends** 14:21

**spent** 33:23 61:2,19,
24 62:13,16 64:6,8,
18 65:2,3,7 66:3
306:15

**spoke** 32:7 61:16
62:9 94:21

**spoken** 29:25 57:4
177:10 258:17

**sport** 216:11

**staff** 22:22,23 29:13
32:16 35:2,22 64:6
66:17 67:23 69:11
92:8 148:11

**staffing** 53:16

**stages** 92:4 98:22

**stakeholder** 145:16

**stamp** 102:11

**stamped** 59:10

**stamps** 102:17

**stand** 200:14 225:19

**standard** 87:16 88:1,
20 89:2,18 90:1 91:2

**standards** 83:14
84:22

**stands** 79:6 223:10
225:5

**Justin Marlowe, Ph.D.**

**Confidential Pursuant to Protective Order**

**Grae vs.
Corrections Corporation of America, et al.**

**start** 34:18 82:20
98:18 142:10 143:14
158:18 222:22 228:4

**started** 26:19 28:5
34:22 100:5

**starting** 228:10
260:17

**starts** 112:13 174:1

**state** 13:16,21 15:5
19:8,14,22 27:10
42:5,6,8,24 43:1,20
44:25 45:2 85:22,23
89:24 90:6,25 91:11,
16,17,19 203:2
204:6 280:24
307:18,23

**State's** 43:10 85:21
86:19

**state-of-the-art**
277:25 278:10,13
281:12

**statement** 18:15
63:12 104:23 114:12
123:19 125:1,2,7
145:25 165:20,22
166:5 167:5 173:11,
12,14,21 174:16,21,
23 175:4,7,9,13
176:12,19 181:14
182:1,3,6,14,18
188:25 189:19 192:2
194:21 195:19
196:5,11,17,23,24
197:1,3,8 198:6
199:21 203:3 204:7
205:3,10 206:14,16
212:2,22 217:9
218:25 221:25
225:13 229:10,12,
22,24 230:2,7,8
231:1,12 233:8
234:19 235:12
236:24 237:3 241:5

243:19,20 252:10,
11,12,13 253:10
256:21 258:9 261:9
262:5,7,9 277:9,21
278:5,9,12,17 279:6,
15,17 280:7,8,23
281:5,6,11,23

**statements** 36:18
37:18 53:23 54:2,5,
9,12,17,21,22 55:2,
10 57:23 59:21,22,
24 60:9 61:11 63:15
64:5 66:15 120:1
121:6 122:6,8,16
124:10,15,18,19
125:3,11,13,22
126:4 127:4,14,15,
24 128:6,23 129:1,8,
16,18 165:25 182:24
187:1,6,16 188:18,
19 189:6,21 190:2,
10 191:8,9,10 193:8,
12,22 194:4,23
195:1,3,23,24 196:2,
8 197:4,17 198:10,
11,13,17,19,25
199:8,11,16 200:6,8,
12,16,24 204:14,24
206:1,9,22 208:15,
17,20 209:10,15,20
210:11 211:11
212:20 213:24
219:11 221:7,8
222:9,12,19 228:14,
18,24 229:5 230:13,
17,20,25 231:4,6,8,
15 233:14,22 234:2,
7,14 235:17 236:4,
13 237:15,20 238:4,
9,23 239:4,7,8,11,
16,23 240:3,4,7,11,
13,17 241:2,5,7,8,9,
10,11,13,15,22
243:13,17 245:2
248:6,11 249:12,20

250:19,22 254:12,
13,14 255:23,24
257:3,6,25 258:1,3,
10,11,23 268:2,3,10
269:7,25 274:10,15,
17,18,22 279:11
282:20 283:21
284:25 285:8,22,25
286:1,8 287:19
288:22 289:13,17,18
290:12 291:6,8
292:4 298:24 300:7,
11 302:8,10,16
307:24

**states** 8:14 42:7,13
43:14 95:9 260:15

**stating** 225:14 295:7

**stay** 106:10

**steady** 33:21 34:2

**stenographic** 8:24

**steps** 65:23

**Steve** 105:1 109:25
131:7,12,14 133:9
139:11

**stick** 140:25

**stop** 140:23

**stopping** 257:10

**strategy** 195:13

**stretch** 83:17

**strike** 41:3 54:2 55:13
63:20 64:1 66:9
138:13 259:6

**strong** 40:18

**structure** 126:15
269:9 302:11,12

**structures** 284:22
299:4 300:2

**studied** 145:12
279:22

**studies** 51:11 101:12
103:4,7 111:3,6,9,
17,20 112:3 152:1,
15,25 153:2,5,8
155:15,17 173:3
254:25 266:23
295:10

**studies'** 162:23

**study** 12:5 51:15 52:3
99:15 102:18,23,25
103:15 112:18,20,22
113:8,12,14 136:24
150:8,20 151:1,18
152:2 159:11,13,19
162:21,23 166:20
167:2 170:18 171:9,
19,24 172:2,5,10
173:9,12,18 174:3,7,
22 175:9,10,24
176:4,6 177:2,6,22
180:8 182:19 260:20
261:4,25 262:3,10
267:4

**studying** 85:22 159:6
263:18

**subheading** 187:24
195:9

**subject** 136:23
145:12 148:5 155:11
204:13 283:23 284:3
295:15

**subjective** 243:23
244:1,8 245:9,14

**submission** 78:20,21

**submissions** 78:19

**submit** 32:13,15
97:20

**submitted** 87:22,23
91:5,19 93:21,23
96:21 98:2 223:19

**subsets** 283:11

**substance** 17:11 33:3 98:4 190:1 194:7 223:12 226:10

**substantially** 171:4

**sued** 13:21 95:13

**sufficiently** 287:4

**suggest** 164:2

**suggested** 101:14

**suggesting** 120:15 237:1 273:15

**suggests** 272:2

**suing** 13:14

**suit** 94:3

**Suite** 8:8

**sum** 216:3

**summaries** 39:9 224:13

**summarize** 225:10,22 226:7,15,24 227:4, 10,13 242:12

**summarizing** 231:3,5

**summary** 54:5 211:15 212:1,7 213:4 227:18 228:8, 9 235:16 237:13 240:16 242:9,11,12, 16,20,23 249:23 250:5,7 260:17 261:14,23 264:13 272:23 273:2 295:22 296:7

**summer** 10:11 29:7

**support** 55:1 123:19 129:16 157:2 179:1 181:12 182:2,6,7 212:21 215:25 229:9,23,25 230:8 231:15 232:12,13, 17,18 233:4,5,22

234:1,7 238:22 240:5,12 241:8,10 245:19 246:15,20,21 247:4,10,15 254:13 255:24,25 257:5 268:5,15,21,24 269:7,16,18,19 276:10 277:24 278:5 279:16 280:6,17 282:2,9,20

**supported** 127:15 175:5 188:20 213:25 228:16,23 229:5 230:17,22 231:1 233:16 234:13,16 235:20 236:12 239:13 240:1 241:25 245:6 249:14 268:11 285:1 287:4,20 293:17

**supporter** 153:21,22

**supporting** 14:23 55:16 154:19 192:1 237:2 268:3

**supports** 155:9 212:18 216:11,20

**suppose** 67:14

**sure** 9:14 16:20 17:18 19:20 36:23 38:17 43:18 56:4 62:6 65:15 68:23 69:25 74:16 75:21 79:3,20 82:18 86:10 87:1 101:15 116:9 124:7 129:12 130:5 132:11 137:9 141:3,20 145:14 150:16 160:23 166:13 167:14 172:3,16,25 174:20 176:8 181:10,18 184:9 187:9,13 189:18,23 194:5 195:22

198:18,24 202:14 206:4 208:1,5 209:5 211:2,25 212:15 215:6,8 216:17 220:2 226:5 228:7 231:19,23 233:19 239:6 246:6,9 247:9, 15,25 250:13 253:7, 8 257:11 260:23 261:2,22 262:1,6 265:7 270:17,18 272:17 276:7 277:17 278:21 279:2,8,14 286:17 290:1 292:25 293:14 302:22 304:13

**surprised** 79:17,19, 20

**surrounding** 10:3

**swear** 9:1

**sworn** 9:7

**symposia** 78:11

**system** 60:2 152:4

---

## T

**T-U-L-A-L-I-P** 94:14

**T-U-L-A-L-I-P-S** 13:14

**tab** 23:13 76:2,3,5,6 101:19,20 105:24 107:20 109:13 130:1 132:15 135:8 136:7 146:4,25 147:2 148:15 149:4,22 167:15,17,18 183:4 201:11 203:12 210:1,2,23 259:16, 21 270:3 303:9 304:7,13,22

**table** 36:15 205:6

221:18 301:1

**Taft** 271:8,14,21

**take** 8:20 29:23 51:20 63:18 82:10,24 92:1 97:4,13 106:12 110:2,20 122:20 130:4 136:16,17 142:7,23 148:18 149:7 150:3 152:13 158:3,18 160:1 161:16 164:3 171:5 204:25 210:14,19 219:21,24 220:1 257:9 266:25 285:18 301:16 302:21

**taken** 8:16 13:2 28:21 75:2 164:9 220:6 259:13 289:23 303:4

**takes** 179:23

**talk** 11:1 21:19 56:23 82:6,7 120:4,5,10 122:12,22 124:18,23 125:8 190:13 208:18 214:7 221:13 222:16 230:12 231:9 232:9 233:8 238:20 246:4 256:24 258:10 289:25 291:21 292:14 296:12,13 300:6,9,24 304:24

**talked** 114:13 288:6

**talking** 15:3 19:18 20:23 21:7 22:1 94:10 103:4 120:13 126:1,2 128:13 157:6 168:25 169:7 213:16 232:6 233:7 234:9,18 237:22 243:19 273:22 290:21 294:19 296:14,16 299:23 304:21

targets 118:23

tax 15:9 43:2,4,5,6

taxes 13:20,23 14:3

teach 82:14

teaching 243:9 284:2

team 135:2

technical 184:19

technically 91:25

telephone 115:22

tell 51:9 65:18,19 79:2,5 142:18 150:13 229:17 240:20 250:14 304:8 307:2

telling 116:7 258:25

tells 295:8

Temple 134:19 150:8, 20 151:1,18 166:8 167:2 174:8 175:25

tend 20:12 37:24 298:5

tends 125:18

Tennessee 8:15

term 14:9 22:1 215:11,12,16 217:23

terminology 94:13 217:18

terms 11:14 14:9 37:25 64:25 79:4 125:19 269:10 275:12 287:15 290:25 297:8

testified 9:7 65:1 182:22 265:9

testify 87:21

testifying 8:11 93:18

testimony 10:23 13:9 28:20 29:2 30:6 31:23 43:12 86:22 87:19 89:6,8 90:11, 15 91:8 92:6,9,10 98:1 172:6 199:19

text 165:18 166:18

textbook 37:13

thank 9:8 12:1 24:10 25:1 66:7 74:11 76:17 87:10 96:7 100:16 107:6 131:1 135:19 155:1 184:4, 15 185:5 186:7 232:2 265:1 307:10, 11 308:3

thanks 86:11 232:3 259:9,21 260:25 304:16

themes 125:24

theories 13:4 20:14

thing 75:12 108:22 196:20 245:11 257:16

things 14:13 15:2 28:4 34:9 62:24 73:5 127:8 143:7,12 145:3,8 158:1 188:4 193:20 257:23 274:22 300:21 306:4

think 20:5,8 21:6 25:21 28:1 31:14 33:10,15 36:20 37:24 47:8 49:8 50:25 55:20 56:8 58:16 64:16 65:11, 25 68:7 73:4,5 75:23 77:21 80:3 83:15,21 84:3 85:10 96:18 104:1 110:6 111:6 114:11 117:25 118:11 120:11

124:16 127:7 128:18 130:16 133:18 139:25 155:7 159:3, 24 167:17 171:11 182:10,11 187:22 190:15 193:17 195:5 198:5 200:2 203:16, 18 207:1 208:9 217:22 222:21 223:2 224:14 225:3 227:20 229:8 233:21 234:9, 21 235:25 238:14,15 240:24,25 241:18 243:5,14 245:22,23 246:1 250:3,5,16 256:13,19,22 257:8, 13 263:15 265:9,14, 24 266:14 267:7 279:17,18 280:6,16 282:7,18 288:13,14 292:10 293:15 294:16 298:2 299:4 300:16,18

thinking 27:18,19 38:5 101:8

third 103:9 118:22 155:21 292:22 293:3 295:3

Thomas 155:22 156:4,13 157:11 160:14

Thomas' 157:2

thorough 71:23 73:23 294:12

thoroughly 255:15

thought 61:13 63:3 65:20 67:8 99:4,7 114:6 163:15 253:14 255:14 287:11

thoughts 34:22 35:25 38:5

thousands 62:2

63:11 294:10

three 29:22 30:1 142:6 160:15 283:11

tied 277:10,14 281:23

time 8:2,3 10:14 11:8 23:2 29:9 32:21 33:8,13 34:4,15 42:16 59:23 61:3,19 62:17 64:5,8,18 74:13,23 75:3 95:6 112:9 114:15,19 123:1 125:23 127:20,24 128:14,23 129:8,15 136:17 147:10 149:7 150:12 151:13 164:6 165:3 170:8 171:7 184:23 185:2 210:14,19 220:3,7 244:3 258:13 259:10,14 260:25 262:18 270:21 278:24 292:8 303:1,6 305:9,12,19 306:14 307:9,10 308:10,11

times 8:20 9:21 29:20

title 176:13 212:7

today 8:6 10:22 17:9 18:4,7,16,18 22:18 31:9 36:7 37:16 51:8 52:19 105:3 109:8 154:12 155:25 156:11 179:12 199:18 208:10 223:19 265:6 288:6 305:9 306:6

today's 8:4 308:9

told 162:1 231:11 262:14

Tony 108:23,24 109:1

top 11:1 80:21 132:7

137:17 139:4 213:14
234:10 262:13

**top-rated** 84:7

**topic** 87:7 117:3,13
151:2 154:7

**total** 23:4 62:1 66:3

**totality** 54:11 153:12

**touched** 126:9

**trade-offs** 214:22

**traditional** 77:10
153:7

**traffic** 10:1

**trained** 12:24

**transaction** 298:9,14

**transcripts** 57:17

**transmission** 31:12
74:17 179:25 183:21
199:2 203:11,25
214:12 299:13

**transparency** 22:4,13

**transparent** 21:15
266:7

**trial** 222:25

**tribe** 13:13,18 14:4,24
15:10 16:1

**tribes** 94:13

**tried** 180:12

**troubled** 161:25

**troubling** 160:18
161:7

**true** 144:6 258:14
277:15

**try** 11:1 22:15 104:22
115:24 116:20
175:14 240:5
241:11,12 263:3
266:3,8,24 289:23

296:6 298:19 300:22

**trying** 14:16 64:21
82:9 113:5 123:17
124:8 160:3 166:17
172:8 179:4 190:18
197:22 221:6 229:14
230:23 239:2
240:15,18 242:10
252:15 261:8 266:15
275:2,17,24 276:15,
21,24 288:15 290:4,
6 291:13 292:1
298:3 307:2

**Tulalip** 14:4,24 15:10
94:13

**Tulalips** 13:14

**turn** 23:25 36:15
75:15 76:20 80:2,3,
18 85:1 93:14 95:25
96:3 98:5 103:8
115:3 132:6 146:3,
25 155:19 174:10
180:6 185:16 186:17
195:7 200:18 202:21
210:7 213:12 255:2
260:13 271:3 276:2
282:24 295:18

**turning** 57:7 84:25
115:14 165:6 304:6

**Twice** 9:22

**two** 30:1 32:6 55:21
75:12 92:14 94:22,
24 95:3,4 99:16
110:10 117:8 119:15
127:8 131:23 161:14
172:9 173:3 174:8
175:25 188:4 190:14
231:11 245:24 250:1
282:16 296:18

**type** 124:25 145:18
244:10 284:5

**types** 13:2 18:22,24

77:22 78:19 81:25
120:12 154:19
155:11 192:18
209:18 248:11
275:20 299:7
300:15,19

**typically** 153:23
292:21 293:2

---

**U**

---

**ultimate** 42:24 63:13

**ultimately** 38:25
39:10 59:25 99:8

**unable** 225:22 226:15

**unaware** 79:23

**unclear** 227:8

**undercut** 123:23

**underlying** 77:13

**undermine** 258:22

**underscore** 102:11

**understand** 10:16,19
11:4,15,17,21,22
22:9,10 24:17 32:17
43:12 46:4 59:18
60:7,24 61:8 62:7
63:2,12 64:10 67:10
72:2,13 78:7,10
80:9,21 83:22 86:21
88:13 89:21 104:9,
19,22,23 114:22,23
115:1,2 121:18
123:17 152:19 155:3
161:4 166:14,18
168:4 169:2 172:8
179:4 181:3 192:17
193:3 197:16
207:13,21,25 208:2,
3,23 210:10 211:10
217:16 218:18
227:24 229:14

230:23 233:3 239:2,
3 240:10,15 241:17
258:20 260:15
261:24 264:4 268:20
271:19 272:7,17,25
273:5 289:23 291:13
293:12 296:12
298:20,23

**understanding** 22:14
28:7 32:20 33:1
37:12 50:7 51:3,7
52:4,13 59:5,23 63:8
68:5 78:4,23 79:11
81:5 82:12,25
102:15 125:11 143:4
145:19 162:21,22
181:6 187:5,16
191:12 199:19
217:25 224:5 227:22
243:8 245:19
251:21,23 263:24
267:18,24 280:2

**understood** 34:7
50:16 66:24 280:14
284:19 290:25

**undertake** 104:8
152:18 162:8,10
163:2 247:19 301:16

**undertaking** 161:8

**undertook** 37:20
123:11

**underwent** 78:21

**underwriters** 126:17

**unfamiliar** 114:13

**unfold** 223:4 252:20

**uniform** 21:1

**unintelligible** 247:23

**unit** 20:22

**United** 8:14 260:15

**universally** 251:8
252:16

**universe** 237:9

**universities** 83:19

**university** 42:15,19
82:14,16,24 83:3,10,
11,13,16,23 84:6,17,
21 150:8,20 152:3
167:2 174:8 176:1

**University's** 166:8

**unpack** 177:17

**unwilling** 227:25

**updates** 75:8

**upheld** 88:19 89:1
90:1

**use** 13:4 22:11 61:15
125:18 129:3 150:8
159:21 163:21
215:12 266:6

**useful** 70:14

**utility** 91:14 93:4,5,7

---

**V**

**valuation** 14:25 15:1,
17,20

**value** 14:1,5,9 15:4,7,
22,24 195:14 198:4,
12 213:15,21,24
214:2,4,16 215:1,5,
11,16,21 216:12,20,
24 217:1,7,11 218:5,
19 220:16 241:14
258:25 284:21

**Vanderbilt** 112:18
113:8 152:3

**vantage** 194:22 264:2

**vantages** 266:19

**variance** 16:13

**variation** 253:17

**variations** 104:6
222:13

**varied** 267:9

**variety** 13:2 14:18
16:11,14 17:7,19
20:7 27:13 30:9
39:22 40:3 41:22
43:21 46:21 49:8
62:23 83:6 97:14
99:19 119:21,22
120:24,25 141:8
143:6 152:24 153:14
154:10,16 158:1
169:22 179:11
180:13 200:4 208:19
230:11 233:9 236:24
239:8 240:2 241:5
266:17 268:6,12
269:6 279:20 280:16
282:9 283:20 288:19
291:24 292:3 294:11
298:17

**various** 13:4 83:23
120:3 217:18 248:7
254:20 290:25
293:13

**vary** 20:20 77:23
81:15 82:2 104:3
159:22 168:24 253:5
298:5

**veracity** 151:10,14

**version** 137:16 139:3
169:5 170:13,17
171:16,18,20 172:1,
13,19,21 173:9,17
174:14,16 177:1
196:22 294:5

**versions** 172:24
177:4 179:13,21

**versus** 8:12 16:18,22
17:4 18:10 19:1
245:23 246:21
295:23

**VI** 271:11

**vice** 109:2

**video** 8:2,16,19,23
24:1 74:19,23 75:3
76:1,5,10,15,18
96:5,8 98:7 102:3
105:25 106:3,9,13,
16 107:4,7,21
130:14,19 133:20,23
136:3,10 149:15,18,
20 164:4 165:2,9,13
183:22 184:1,6,21
185:2 203:24 204:4,
9,16 210:20,22
211:1 220:3,7
259:10,14 283:1,5
302:25 303:5 308:5,
7

**video-recorded** 8:10

**videographer** 75:22
183:20 218:12

**view** 73:20 131:23
144:7

**viewed** 272:12

**views** 143:20 157:20

**VII** 36:18

**violating** 157:22

**Virginia** 8:18

**virtual** 11:7

**volume** 184:13

---

**W**

**Wackenhut** 271:9

**wait** 138:13

**waiting** 304:16

**waived** 308:15

**walk** 222:11 224:1
225:5 226:12 282:14

**want** 30:1 47:6 74:19
85:4 96:5 130:14
139:20 145:5 165:10
172:16,25 176:4
184:22 194:14
210:22 219:24,25
225:21 226:22
229:16 230:12
234:11 246:14,23
247:2 258:19 262:8
272:24 274:1 300:21

**wanted** 36:3 112:13
140:18 141:24

**wants** 130:16

**Washington** 13:15,17
42:20 43:1,10 85:21
86:19 91:16

**wasn't** 30:12 237:4

**way** 18:5,6,8 20:16
37:22 38:7 45:2
51:18,21 52:9 64:20
71:22 73:11 78:15
79:21 99:9 120:4
125:17 129:17 144:7
145:8,15 159:21
175:17 179:9
180:14,18 189:19,24
196:2 203:23 217:4,
13 220:22 231:9
233:20 249:4
263:14,15 279:10
286:5 287:1 290:25
294:20 295:4 301:3,
4

**ways** 21:13 40:25
68:16 81:12 122:12,
19 125:16 154:16
159:5,7 171:3

179:11 180:13 240:4
248:12 266:10,18
268:13 279:20
282:15 290:7 292:6
298:1

**we'll** 11:9 106:19
109:13 129:23
132:15 148:15
158:17 222:22
242:22

**we're** 10:14 11:1,7,10
15:3 19:18 21:6 22:1
23:15 76:20 96:1
98:5 101:20 126:1,2
128:13 135:8 144:20
145:24 148:17 157:8
158:25 165:12
168:25 169:7 172:4
210:1 234:9 243:19
260:4 270:6 273:22
275:4 291:16 292:1,
2 296:14,16 299:23
304:20

**we've** 74:13 94:10
136:12 139:16
161:13 177:2 269:1
288:5

**Wednesday** 133:13

**week** 40:7

**well-accepted** 21:9

**well-informed** 56:10
73:24 140:5

**well-regarded** 84:9

**well-supported** 122:8
125:12 128:7 129:2
209:16 286:2 287:12
300:12

**went** 99:5 249:17
268:3

**West** 8:8

**whatnot** 224:13

**whichever** 50:14

**White** 8:5

**wide** 141:8 233:9
236:24 268:6 283:20
288:19 294:10

**widely** 168:13 255:4

**willing** 144:21 145:2,
7 159:1 168:19
263:6,8

**Willow** 74:12 85:16
130:2 148:17 161:13
219:19 224:25
226:18 257:9 302:20

**witness** 13:6 14:12
16:20 17:7 18:14,24
19:11 20:4 21:5
24:22 25:11,19 29:1,
6 31:13 34:1 35:2
36:23 37:9 38:16
39:17 41:9 42:5
43:17 44:19 46:15
47:6,15,20 48:3,16
49:1,20 50:11 52:11
54:15 55:5,20 56:18
57:1 60:18 62:6 64:2
65:11 67:14 68:23
69:24 70:23 71:10
72:8 73:4,15 74:7
76:17 84:2 85:10,18
86:9 87:1,14,15 88:7
89:5 90:5,21 96:11,
24 97:2,9,12,19,23
102:22 109:5,19
111:24 112:6 113:3,
23 114:11 116:6,23
117:15 118:6,18
119:20 120:23
121:23 122:4 123:5
124:4,13 128:3,25
129:11 131:1,16
135:17 136:6 137:9,
23 139:7,24 141:20

142:5,16,25 143:23
144:10,18 146:15
147:2,12,22 148:9
149:3 150:11 151:5,
12,21 152:8 154:9,
25 155:7 156:7,17
157:5,14,24 158:10,
25 160:21 162:6
163:12 166:13,25
167:25 169:3,13
170:25 171:14
172:15 175:12 176:8
177:15,24 179:8
180:3,11 181:10,24
182:10 183:17,19,24
184:4,11,15 186:19
189:17 193:2 196:14
197:10 198:8,23
199:3,6,25 206:4,25
207:17,25 208:9
209:1 210:16
211:19,24 214:14
215:4,15 216:15,23
217:22 218:9,14,24
219:6 220:19 221:23
222:8 223:2,25
224:9,21 225:2
226:2 227:12 229:20
231:21 234:21
235:10 236:17
238:14 239:21
240:22 242:4 243:4,
25 244:6,24 245:11
246:18 247:8,24
250:1 256:13 259:3
260:11 265:24
267:23 271:23
272:15 273:14
274:14 276:13
277:17 278:3,20
279:8 282:6 283:19
285:14 286:13,21
287:7 288:2,12
289:10 291:4,16
294:4 296:23 297:19
299:23 301:21

305:16 306:2,12
307:1

**wondering** 297:10

**word** 143:3,5,9
198:22 250:6,7
257:22

**words** 113:4,7,10,12,
15,16 117:16
118:11,13 119:11
131:16,18,21,24
132:5,9,11 134:11,
14,25 135:4 139:8
144:25 150:18 151:6
152:6,9 154:1,2
156:8

**work** 13:6,7 19:21
20:17 26:1,15,19
28:5 30:13 31:6,8
33:20 34:5 35:17
40:11,22 41:19 42:5
44:7,25 45:4,21
46:19 49:24 65:14
68:18 69:14 72:12
81:25 85:11,25
99:23 100:3,6 126:8,
12,25 127:10 141:7,
13 142:3,13,14
143:17,21 144:8,14,
16,20,22 145:11
157:2,11 160:1,12
162:8 170:10,17,22
248:13

**worked** 29:17,21,23
39:21 41:11,15 42:2,
6 43:20 44:11 69:13
72:11 95:2,5

**working** 32:21,22
33:23 34:3,12,13
62:13 65:7 93:7 94:1
98:21 100:24 107:11
114:24 115:12
147:8,10,20 148:6
167:10,22 168:2,5,6,

8,12,15,20,22 169:4,
11,19,21 171:1,3,5,
15,18 172:1,4,6,9,13
173:9,17 177:1,4,12,
21 179:9 180:22

**worries**  136:12
183:16 302:24
304:15

**wouldn't**  86:9 132:23
141:11,18 161:1
170:21,25 214:8
217:3 243:25 244:6,
18 248:13,20 258:18
276:13

**write**  34:24 36:3 38:7
45:3 192:11

**writing**  46:16 158:4,
19 252:4

**written**  30:15 31:1
46:10 51:14 92:12
105:19 115:11 118:9
131:14

**wrong**  31:22 133:18,
21,23 149:23 199:13
200:13 256:10

**wrote**  38:13 251:24

---

**Y**

**yeah**  24:8 32:4 50:25
57:1 80:2 84:2 86:15
88:3 94:17 96:18
99:15 112:6 124:1,4
134:8 138:21 151:5
155:7 185:19 186:22
192:6 210:16 212:2
231:21 242:4 244:14
265:2,14 276:5
278:3 282:6 291:4
296:2 299:16 306:12

**year**  14:21

**years**  10:2 39:22
42:16,20 243:9
284:3 304:3

**yep**  36:19 106:11
201:8 260:11 270:19

---

**Z**

**Zoom**  8:16

www.aptusCR.com