# EXHIBIT 11
# [Filed Under Seal]


| From: | Katie Lilley <katielilley@hillenby.com> |
| --- | --- |
| Sent: | Tuesday, October 29, 2013 7:35 PM |
| To: | SIMON HAKIM; ERWIN A. BLACKSTONE |
| Cc: | Owen, Steve |
| Subject: | Reviewed study document |
| Attachments: | Prison Book_10.29.13.docx |

Simon and Erwin,
Please find attached the most recently reviewed study document. I accepted the changes you made to the previous version, and these are new edits/thoughts on top of that. We're very hopeful that this gets us to the final stages.

Overall:

- I found some inconsistencies in the savings percentages that I have noted in the text, and I think we need one final check on this. These should be clearly marked.
- I've updated the tables, which I hope meet your specifications. You questioned in a previous email whether then needed to be numbered and referred to in the text, and I defer to your expertise on that.
- We still have inconsistency in how percentages are written in the text. Should we write out the numbers before percent or use numerals? Just want to make sure that's right.

After you have a chance to review, I think it might be worthwhile for us to have a call to walk through the edits, just to be sure we're clear. Let us know if you have some time tomorrow or Thursday to do that. Looking forward to seeing this sent back to the Independent Institute!
Best,
Katie


--
Katie Lilley
o: 703-722-3061
c: 202-253-5026
www.hillenby.com
--------------------------------------
The information contained in this communication is confidential and is intended only for use of the addressee. It is the property of Hillenby, LLC. Unauthorized use, disclosure, or copying of this communication is prohibited. If you have received this communication in error, notify Hillenby, LLC immediately and destroy this e-mail including all attachments.

CONFIDENTIAL

CORECIVIC_0955178

# Cost Analysis of Public and Contractor-Operated Prisons

**October 29, 2013**

**Drs. Simon Hakim and Erwin A. Blackstone**

**Professors of Economics at Temple University**

**Center for Competitive Government**

**Philadelphia, Pennsylvania**

**E-mail: hakim@temple.edu; Erwin.blackstone@temple.edu**

Deleted: 40

CONFIDENTIAL                                                                              CORECIVIC_0955179

# Contents

Executive Summary ............................................................................................................................ 2

1. Introduction .......................................................................................................................... 6

2. History of the Private Prison Industry

3. Literature Review

4. Structure of the Contract Prison Industry

5. Model for Estimating the State's Avoidable Costs ............................................................ 23

6. Direct Avoidable Costs for Public Prisons ...................................................................... 25

7. Indirect Avoidable Costs for Public Prisons ................................................................... 26

8. Monitoring Costs .......................................................................................................... 27

9. Capital and Finance Costs ............................................................................................ 27

10. Capital Flexibility Gained by Use of Contractor Operated Prisons .......................... 29

11. Non-Cost Performance Measures ............................................................................... 29

12. Unaccounted Benefits and Costs of Contract Prisons ............................................... 30

13. Discussion of Individual State Costs and Performance ............................................. 31

    Arizona ........................................................................................................................ 32

    California ...................................................................................................................... 33

    Florida ......................................................................................................................... 34

    Kentucky ...................................................................................................................... 37

    Maine ........................................................................................................................... 38

    Mississippi ................................................................................................................... 38

    Ohio ............................................................................................................................. 39

    Oklahoma .................................................................................................................... 40

    Tennessee .................................................................................................................... 42

    Texas ............................................................................................................................ 43

14. General Discussion of Public Costs and Private Prices ............................................. 44

    Short- Versus Long-Term Costs .................................................................................. 45

    Unfunded Pensions and Healthcare ........................................................................... 46

    Labor Costs ................................................................................................................. 47

15. Summary and Conclusions ......................................................................................... 53

References ........................................................................................................................... 59

Appendix 1: Data Sources for the Table on State Costs, Contract Prices, and Savings ...... 64

Table 1: State Costs and Private Prices ............................................................................. 75

| | Deleted: 26 |
| --- | --- |
| | Deleted: 28 |
| | Deleted: 29 |
| | Deleted: 30 |
| | Deleted: 30 |
| | Deleted: 32 |
| | Deleted: 33 |
| | Deleted: 33 |
| | Deleted: 35 |
| | Deleted: 35 |
| | Deleted: 36 |
| | Deleted: 37 |
| | Deleted: 40 |
| | Deleted: 41 |
| | Deleted: 41 |
| | Deleted: 42 |
| | Deleted: 43 |
| | Deleted: 45 |
| | Deleted: 46 |
| | Deleted: 47 |
| | Deleted: 48 |
| | Deleted: 48 |
| | Deleted: 50 |
| | Deleted: 54 |
| | Deleted: 60 |
| | Deleted: 69 |
| | Deleted: 78 |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 1

CONFIDENTIAL                                                CORECIVIC_0955180

# Executive Summary

Considerable debate continues to exist among state officials, criminal justice experts, and the media whether contract prisons provide sufficient savings and perform adequately to justify their use. This research is designed to examine the evidence using publicly available state corrections cost data as the primary source. In every scenario examined in the study, using a full and accurate comparison of all relevant costs, contractor operated prisons were found to be more cost-effective and mandated to perform at an equal to often superior level of performance than public counterparts.

To fully and accurately compare public and private prisons, a framework was developed consisting of five types of costs – avoidable costs, short run costs, long run costs, direct costs and indirect costs. Economic models are used with the state cost data to determine each state's avoidable costs, which are the overall costs the state no longer has to pay by using of private contractors. The avoidable costs are then compared against the per diem charges of the private prison operator, which are the daily costs on a per inmate basis. In cases where the private operator manages a state prison, avoidable costs include short run costs, which are those costs incurred as a result of the day-to-day operation of a correctional facility. In situations in which overcrowding exists or the state correctional institutions require modernization or replacement, long run costs, which are the short run operating costs plus the capital costs associated with the financing, planning, and construction or rehabilitation of a facility, are shown to be appropriate. This research considers all avoidable costs, including indirect costs such as underfunded pension and retiree health care costs, both of which are often ignored in other research in this area.

Individual states were analyzed to understand the role of and issues associated with the use of contract prisons. Interviews with state corrections officials and legislative oversight analysts were also conducted to provide an additional depth of understanding to this analysis.

There are three primary reasons for the use of contract prisons: 1. to generate cost savings and avoid large capital expenditures; 2. to relieve overcrowding, whether ordered by the court system or required because of threat of litigation perceived by departments of correction (DOC); and 3. the sale of a state prison to private operators for budgetary reasons. (See Appendix 2 for chart of appropriate costs to consider for each situation.)

In reference to the first reason for the use of contract prisons, cost savings and avoidance of large capital expenditures, statutory requirements in some states mandate savings of at least five to ten percent in order to contract out to private operators. States, however, are inconsistent in how they measure these savings and often fail to include important avoidable costs. In particular, there is ambiguity in the categories states use for their calculations and the measurements of the state costs that should be considered for the savings required from the private operators. The states usually do not specify whether the short or long run costs are considered. Also, often avoidable prison costs are imposed on other agencies within departments of correction (DOCs) and on other departments of state government. These costs are therefore not included in the state's calculations of cost savings. In many cases, states often fail to include artificially lower costs for state run prisons than the real value. This research includes some of these often-omitted costs, provided that the sources are from state government and/or academic reports and articles.

The savings required of private prison contracts by statute are as follows: Florida (seven percent), Kentucky (ten percent), Mississippi (ten percent), Ohio (five percent), and Texas (ten percent). The statutory requirements apply both to contractor-operated, state-owned prisons and facilities that are contractor-owned and operated. In cases like Florida and Mississippi, the contractor manages state-

CONFIDENTIAL

CORECIVIC_0955181

---

**Commented [A1]:** One overall question – do we need to make note of the timeframe for the review up front? I ask because Kentucky now has eliminated its private prisons. Also, California for the first time will be allowing inmates in the state to be housed in a private facility, although it will be operated by public workers.

**Deleted:** controversy

**Deleted:** are

**Commented [A2]:** Have attempted a Need an overarching statement to summarize here.

**Deleted:** are the savings

**Deleted:** avoids

**Deleted:** for the state emanating from the

**Deleted:** se

**Deleted:** add

**Deleted:** s

**Deleted:** by

**Deleted:** the

**Deleted:**

**Deleted:** I nsome cases,

**Deleted:**

**Deleted:** DOC

**Deleted:** unavailabl eand

**Deleted:** are

**Deleted:** for inmates

**Deleted:** such

**Deleted:** , when such costs are not incorporated in the calculation of the avoidable costs then the state cost per inmate per day

**Deleted:** are

**Deleted:**

**Deleted:** as long as

**Commented [A3]:** Simon and Erwin – need a final check on this paragraph to make sure it is ok because the edits were fairly significant, and I want to make sure it is in the right spirit.

owned prisons. Thus, short run avoidable costs are relevant. In Kentucky and Oklahoma, the inmates are transferred to privately owned prisons. Thus, long run avoidable costs are relevant. Texas uses both types of contract prisons. Thus, short run avoidable costs are relevant when state-owned prisons are used, and long run costs are appropriate when private prisons are used.

The relief of overcrowding is the second major reason for the use of private prisons and includes both out-of-state transfer of inmates and in-state use of private facilities. In California, for example, the courts required a timely reduction of overcrowding, which led directly to the use of out-of-state contract prisons, as California does not allow private facilities to be built within its borders for state use. Other examined states that have experienced overcrowding are Arizona, Kentucky, Ohio, Oklahoma, Tennessee, and Texas.

Deleted: a

Commented [A4]: Just wanted to clarify this because there are private facilities in California, they're just used for things like federal inmates.

I believe the prohibition in California deals with the State not allowing private prisons in-state. Since federal law trumps state law, the state's prohibitions do not apply to federally-contracted facilities. The state does contract for beds in privately operated community corrections facilities (not prisons).

Deleted: in state

Deleted: we

Whenever overcrowding exists, the statutory requirement is less relevant since the overcrowding must be alleviated in a timely fashion for the security and wellbeing of both inmates and staff. California is a classic example of the cost encountered for not avoiding substantial overcrowding. Overcrowding requires that the long run avoidable costs be compared against the contractor's price. The long run consideration is also relevant when the state owns old prisons that need major renovations, prisons that are subject to demolition because of age or condition, or when the state faces difficulties in raising capital.

Finally, contracting out by selling a state prison to a private operator generates an immediate lump sum amount for state coffers. This occurred in Ohio, which sold the Lake Erie Correctional Institution to a private contractor to narrow a state budgetary deficit.

The table below provides both short and long run savings in the use of contract prisons. The long run savings for Arizona's two prisons are 14.25 and 22.34 percent; California had 32.20 and 58.37 percent savings for two prisons; Kentucky's savings for its four prisons ranged between 12.46 and 23.50 percent; Ohio saved 20.28 and 26.81 percent in 2012 and 2010, respectively; Oklahoma saved on its four prisons 16.71 to 36.77 percent; Tennessee had 17.32 percent; and Texas had 44.95 percent. Maine, which does not utilize contract prisons, could have saved 49.15 percent.

| | SHORT RUN AVOIDABLE COST SAVINGS | LONG RUN AVOIDABLE COST SAVINGS |
|---|---|---|
| Arizona | -1.00% - 8.01% | 14.25% - 22.34% |
| California | 29.43% - 57.09% | 32.20% - 58.37% |
| Florida | 7.00% | 17.67% |
| Kentucky | 9.43% - 20.88% | 12.46% - 23.50% |
| Maine | 47.40% (estimated) | 49.15% (estimated) |
| Mississippi | 8.69% | 25.27% |
| Ohio | 4.14% - 13.44 | 20.28% - 26.81% |
| Oklahoma | -2.16% - 29.23% | 16.71% - 36.77% |
| Tennessee | 17.32% | 17.32% |

Commented [A5]: Check this. Table 1 says 58.37, but table on pg. 48 says 58.61. Reported in April working paper Table 1 as 58.37.

Commented [A6]: Check this. Listed as 47.65 elsewhere in body text.

Commented [A7]: Check this. Reported elsewhere in text body as 49.38. Listed as 49.15 in Table 1.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013       Page 3

CORECIVIC_0955182

| | | |
|---|---|---|
| Texas | 37.39% | 44.95% |

At least equal and often superior performance to state prisons is required for private prison contractors. For example, contractors in Florida performed above the state level in training and educating inmates, which could be attributed to competition among contractors and the desire for contract renewal. Interviews with state DOCs examined in this study reported that their contracts all mandate performance levels for private operators. Further, DOCs closely monitor adherence to these and other contract requirements. Additionally, private prisons are often required to meet the established standards of the American Correctional Association (ACA), which is the independent association of the corrections industry, and penalties can be and are frequently imposed for performance violations.

A major finding from the cost analysis and interviews with state leaders and stakeholders is that competition yields savings and better performance across the prison industry. The economics of industrial organization demonstrates the important benefits derived from the presence of even a small competitor in an otherwise monopolistic market. In this case, even though private contractors comprise less than seven percent of the industry, they have generated substantial competitive benefits.

These benefits emanate from two sources. First, as more contractors compete, the prices are lower, and the performance is better. Likewise, when private prisons become an available option, efforts are made by public prison managers to lower costs, and demands by employees are constrained, since public employees realize that the legislature might favor private corrections as a more cost effective option. Further, the greater the competition, the more managerial and technological innovations are introduced in both the public and private segments of the industry. Interestingly, the authors found that in several states where both public and private contract prisons operate, there was cooperation, mutual learning of new technologies, joint training, and adoption of efficient management practices.

This study points to a possible moderate change that could be implemented to encourage even greater competition and thereby achieve more efficient delivery of existing corrections services, which is the introduction of the model of managed competition. This model was originally initiated by Mayor Stephen Goldsmith of Indianapolis, Indiana and encouraged public workers to participate in the bidding for their services, along with private competitors, to preserve their municipal jobs. Mayor Goldsmith initiated the "yellow pages" test where he enabled contracting out of all city services whenever several providers were listed. But, he went one step further and allowed city employees to compete for the service. By so doing, public employees, as well as private contractors, had an incentive to search for managerial and technological innovations and offer the services at competitive prices.

Adopting managed competition also has implications for the current statutory savings requirements. Where they are required, state legislators have established seemingly arbitrary levels of required savings of five, seven, and ten percent. It is not clear why the percentages differ or what the basis is for these numbers. The bidding by contractors often just approaches the statutory requirement and, indeed, high percentage savings may discourage some bidders and be counterproductive. It would be more effective to allow competition to determine the price. By instituting managed competition where the public sector competes on a level field with the private sector, the market determines the savings. In such a case, the complicated calculations of what cost items should be considered as avoidable costs and how to measure these costs becomes unnecessary. Managed competition has worked for many local public services, and there is no reason why it cannot be successfully implemented in the prison industry. Our

**Deleted:** departments of corrections (

**Deleted:** )

**Deleted:** P

**Deleted:** American Correctional Association (ACA)

**Deleted:** for optimal prison performance

**Deleted:** E

**Deleted:** further

**Deleted:** .

**Deleted:** This

**Deleted:** then·

**Deleted:** , which

**Deleted:** along with the existence of private competitors

**Deleted:** s

**Deleted:** in the statutory states

**Deleted:** and

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 4

CONFIDENTIAL

CORECIVIC_0955183

suggested managed competition model is relevant for the existing state prisons and does not apply to other cases.

As can be seen from this study, public and private competition and cooperation in the provision of prison services has worked in terms of cost savings and performance measures. Indeed, public-private competition and cooperation could even be extended to further these fiscally responsible goals.

CONFIDENTIAL                                                                        CORECIVIC_0955184

## 1. Introduction

Considerable debate continues to exist among state officials, criminal justice experts, and the media whether contract prisons provide sufficient savings and perform adequately to justify their use. This research is designed to examine the evidence using federal and state cost data and interviews with state officials as the primary sources. The study uses economic models to determine each state's avoidable cost, which is then compared against the per diem charge of the private operator. When a contractor manages a state prison, avoidable cost includes only short run costs. Long run costs are appropriate when overcrowding exists, when a public prison is acquired and managed by a contractor, or when a contractor is required to pay for capital outlays.

This research considers all avoidable costs including indirect costs and frequently ignored underfunded pension and retiree health care costs, both of which are often left out of research in this area. Individual states were analyzed to provide a more complete understanding of the role of and issues associated with use of private prisons. Interviews with state corrections officials and legislative oversight analysts were conducted to provide an additional depth of understanding to this analysis. Detailed calculations were provided and savings were determined using all of these data resources.

Statutory requirements in some states mandate savings of at least five to ten percent compared to state costs in order to contract out to private operators. States, however, are inconsistent in how they measure these savings. In particular, there is ambiguity in the categories states use for their calculations and the measurements of the state costs that should be considered for the savings required from the private operators. When contractors manage an existing state prison, the short term costs are relevant. When inmates are transferred to the contractor's prison while no other state prison cells are available, the long term costs are appropriate.

Data published by government or provided by government leaders were used for this research, and the source for each item is provided in Appendix 1 to this report. We believe that this exhaustive, multi-source examination on the costs of state prisons could help alleviate some of the ambiguity on this subject.

It is important to note that this research does not address any issues with relation to enforcement of laws or sentencing policy. For example, Benson (2003) argues that contracting out prisons could lead to decreased incarceration costs and, therefore, will encourage states and the court system to enact tougher sentencing policies and reduce early release for good behavior. These issues are not the focus of this work, which deals strictly with costs and performance of prisons.

Section 5 discusses the concept of avoidable cost and how it varies according to the reason for using contract prisons. This section details the avoidable direct, indirect, and miscellaneous costs items presented in Table 1 (see Appendix), as well as the long-term avoidable cost, which includes the capital and financing costs for state prisons. When evaluating whether private prisons are socially beneficial, the analysis continues with non-monetary variables like the flexibility provided by private prisons and the performance or outcomes of both public and private prisons. For this analysis, the authors also incorporated in qualitative terms some tax considerations, as well as the costs and service considerations of overcrowding. The study concludes with some recommendations to improve the productivity and cost savings in the prison industry that are based on economic theory and empirical findings in industrial organization.

## 2. History of the Contract Prison Industry

**Deleted:** controversy

**Commented [A8]:** Just mention state data as primary source in the first paragraph of the executive summary. Do we need to make this consistent?

**Deleted:** the

**Deleted:** just

**Deleted:** often-

**Deleted:** add

**Deleted:** of

**Deleted:** calculation of the state costs that should be considered for the savings required by the private operators

**Deleted:**

**Deleted:** n

**Commented [A9]:** I lined this up with the similar paragraph in the Executive Summary. Need to ensure they stay consistent if any changes are made above.

**Deleted:** n

**Moved down [1]:** The study concludes with some recommendations to improve the productivity and cost savings in the prison industry that are based on economic theory and empirical findings in industrial organization.

**Deleted:** does not address the claim that lower incarceration costs may lead governments to greater and longer imprisonment

**Deleted:** Further, others argue that both the private prison industry and public prison unions engage in efforts to increase prison use.

**Commented [A10]:** Need to discuss this further. It's a very big issue.

Perhaps noting here that while the focus of this study is cost and performance, anecdotally there was no observable data or information that supports this argument. To the contrary, states where contracting for correctional services is in place have and are pursuing a variety of alternatives to incarceration, including sentencing reform, community-based corrections/reentry programs, etc. It's also worth noting that private operators are in that space as well, partnering with government agencies to provide such programs/services.

**Deleted:** then

**Deleted:** explaining. The discussion proceeds with detailing

**Deleted:** or

**Deleted:** the

**Deleted:** contributed

**Moved (insertion) [1]**

**Deleted:** The report concludes with a summary and recommendations on how these findings can improve provision of prison services.

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 9 of 84 PageID #: 13517

CONFIDENTIAL

CORECIVIC_0955185

Even prior to the creation of the country, corrections systems in the United States were operated by private entities. Until the late 18th century, long-term imprisonment was somewhat rare. The usual punishment was death by hanging, whipping, banishment or branding, among other corporal and social punishments.

Counties appointed jailors, and those jailors earned income from charging inmates for their food and lodging, as well as charging the county for operating the jail. Sometimes the inmates were assigned to work in order to pay for their costs. Many of the inmates were held as debtors, and their work proceeds were also used to pay their debts. The jailor, who was often also the sheriff, was in effect the first contract jail, and enjoyed monopolistic power in each county (McCrie, 1993). In addition to rarely being used for long-term confinement, jails had no rehabilitation attributes.

This early "model" of the jailor is of an unregulated, local monopolist that invited corruption and abuse of power. The county provided the jailors that monopolistic power. This enabled the jailors to charge prisoners for the services they received while in jail. In economic terms, the jailors charged inmates different prices according to their ability to pay. This is a classic case of a monopoly practicing price discrimination, which could maximize the profits of the jailors in the absence of government regulation of price or performance. Indeed, the jailors allowed rich inmates to enjoy greater privileges that poor inmates could not afford. Not surprisingly, abuse was common. There was no segregation by gender and age, the jails were highly overcrowded and unsanitary, and bribing the jailors was common. Escapes, too, were frequent (Shichor, 1995: 25).

All through the 18th century, incarceration periods were extended for both deterrence and retribution reasons. Further, prisons were eventually perceived as profit units and even owned their own farms. For example, the Huntsville, Texas prison operated its own cotton mill beginning in 1854. Prisoners were expected to generate a profit for the institution, at least covering their own way (McCrie, 1993).

In 1790, the first penitentiary was opened on Walnut Street in Philadelphia. It was originally built as a city jail in 1773 to alleviate overcrowding in the existing facility where criminals were held for short periods. The original building was U-shaped with large rooms holding groups of inmates. The Quakers of Philadelphia, however, developed the new concept of a penitentiary where rehabilitation of criminals became the goal. In the courtyard of the original complex, small cells with high windows were introduced. These were designed to hold individual inmates so that no eye contact with others or the outside world was possible. The goal was for inmates to reflect and be remorseful about their crimes. The Quakers also believed that solitary confinement for the entire prison term would yield rehabilitation. For this reason, inmates were not allowed to work because it was believed labor helped them avoid reflection about their deeds.

Penitentiaries spread to other locations in Pennsylvania including Pittsburgh and the Eastern State Penitentiary (Cherry Hill) in eastern Philadelphia in 1821, as well as to New Jersey's Trenton State Prison that same year. Based on Quaker teachings, inmates were kept in solitary confinement, which led to severe psychological problems and even suicides. Although, inmates did not initially work, they later were compensated for their work, out of which they paid for their upkeep and were able to keep the rest (McCrie, 1993: 24; Shichor, 1995: 27). The Quaker approach to inmates added for the first time the "correctional" or rehabilitative aspect to incarceration.

The penitentiary concept, including the work requirement, also spread to the state of New York. In 1797, the Newgate penitentiary was created in New York City where inmates were paid for their work but were still required to pay for their upkeep. The intent was not only reformative but also to help

**Commented [A11]:** Check this with first paragraph that says long-term imprisonment was rare until end of 18th century. Just want to make sure we're consistent.

**Deleted:** s

**Deleted:** city jail

**Deleted:** develped

**Deleted:** a

**Deleted:**

**Deleted:**

**Deleted:** ill

**Deleted:** and

**Deleted:** of

**Deleted:** in 1821

**Deleted:** and

**Deleted:** also in 1821

**Deleted:** s mentioned abo

**Deleted:** ve

**Deleted:** l

**Deleted:** but

**Deleted:** paid

**Deleted:** All through the 18th century, incarceration periods were extended for both deterrence and retribution reasons. Further, pPrisons were perceived as profit units and even owned their own farms. For example, the Huntsville, Texas prison operated its own cotton mill beginning in 1854. Prisoners were expected to generate a profit for the institution, at least covering their own way (McCrie, 1993).¶

**Deleted:** which was modified to

**Deleted:** e

**Deleted:** a

CONFIDENTIAL

CORECIVIC_0955186

defray the operational costs of the prison. An interesting innovation initiated in Newgate was that inmates were provided a share of the profits upon their release as a reward for good behavior.

In 1819, a penitentiary was opened in Auburn, New York where the solitude system was maintained, but inmates worked and ate together. Both the New York prisons contracted out prison labor to companies, and their work was conducted either within the prison or elsewhere. This contracting out of prisoners was quite profitable to the state. The change brought about by the Walnut Street Philadelphia prison and the two facilities in New York is the fact that the state government for the first time took over the operation of prisons.

1825 ushered in a new era in the management of corrections. At that time the Frankfort prison in Kentucky was incurring losses even though inmates were leased to businesses for in-prison production. A local businessman offered to operate the prison and use the inmates for work. He was offered a five-year contract in exchange for annual payment of $1,000. He found the prison to have insufficient security, so the businessman built a new 250-cell prison and paid the state the required $1,000 yearly resulting in the country's first contract prison. The arrangement was similar to the current Build-Operate-Transfer (BOT) model where the private sector builds the prison, operates it, and after a period of time, the ownership is transferred to the state. In the Frankfort case, there is no clear transfer of ownership to the state. The BOT concept will be discussed further at the end of this section.

Since 1825, essentially all states relied on convict labor and some states even contracted out entire prisons. Following the Kentucky example, Alabama contracted out the management of an existing prison in 1846, and Louisiana also leased a prison for five years for $50,000 annually. Leasing of inmates to the private sector lasted until the end of the 19th century, and the contract prisons of this era ceased to exist in the beginning of the 20th century (Shichor, 1995: 34-42).

The challenges with privatized prisons and public prisons of the time included abuse of leased inmates by both the private employers and the prison guards, lack of sufficient healthcare and food, and overwork. There were several reasons for these problematic conditions and outcomes. First, there was insufficient legal protection for inmates and news media provided little exposure to the injustice and abuse. There was also no organized oversight of prisons or the prison industry and no national standards of best practice. A key element for the lack of power held by inmates and the abuse by employers and guards was their absolute monopolistic power. Prisoner labor was the primary motivation for contract prisons. Not uncommonly, prison contracts were awarded with no apparent competition for contracts or expertise in recommended correctional practice (Shichor, 1995: 41-42).

Prisoner abuse and the growing recognition of the importance of rehabilitation led state governments in the early 20th century to reassert control of the prisons. However, even though private prisons no longer existed, private contracting of inmate labor continued. By 1940, contracting out prisoner labor finally ended (Jing, 2010: 13). State facilities still use prison labor to produce goods and services for the prison and for work on state projects like removing litter from highways or building chairs for use by the state government.

Between the early 1940s and the early 1980s, state government monopolies replaced the private monopolistic prison operators. The states' departments of corrections managed and operated their prisons, while some specific ancillary services like food, medical and education were contracted out, much under competitive bidding.

The 1980s saw increases in state budgets for corrections and other state services that led constituents to revolt against increased taxes. At the same time, more drug-related activities were labeled crimes,

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013      Page 8

CONFIDENTIAL      CORECIVIC_0955187

and users of drugs were sent to prisons with sentence lengths previously unseen for these types of offenses. Interestingly, in this period, a new form of prison industry was suggested and partially implemented. Former Chief Justice Warren Berger advocated for "replacing warehouses with factories within fences," a rehabilitation method of getting inmates to normal work habits and skills. The intention was also for inmates to support their families and possibly help compensate their victims (Berger, 1992).

Deleted: crimes

Although incarceration increased, voters declined in referendums to fund new prisons. This led to a lack of sufficient prison construction and bed capacity throughout the U.S. Limited capacity then led to prison overcrowding with no obvious solution available to governments. This situation created an opportunity for private participation in corrections. At the federal level, private contractors were used to hold illegal immigrants beginning in 1979. In 1984, Corrections Corporation of America (CCA) was formed and provided a contract to operate a prison in Hamilton County, Tennessee. This was the first entirely privately managed adult correctional facility in the modern era. In 1985, CCA began operating the Bay County Florida jail and, in January 1986, U.S. Corrections Corporation began operating a prison in St. Mary's Kentucky. By 1989, some 44 adult correctional facilities were managed by prison companies for all three levels of government housing about 15,000 inmates (Abt Associates, 1998: 6).

Commented [A12]: Think we need something that gives a sense of time b/c of privatization occurring in early American history.

In terms of construction, private companies have been building prisons for many years under government design and supervision. However, during the 1980s, private companies' role increased to include the selection of the sites, material, architectural design, and even financing (Brakel, 1992: 254-255).

This new trend of privatization differs significantly from the early privatization model that existed from 1825 through the end of the 19th century. In the current model, greater competition exists among correctional companies, contracts are bid competitively, and there is significantly greater oversight by state agencies. Additionally, there is more involvement from media, greater public concern for inmate rights and better cooperation between the public and private sectors. The early model allowed for private monopolies of both the prison and the employing companies, which led to the undesired abuse and exploitation of inmates. Later, mostly in the 20th century, public prisons created another monopoly that created inefficiency in prison operation and monopolistic power for public employees. The latest model that started in the 1980s is characterized as competitive among the private contractors with added public competition in the relevant states with government oversight.

Deleted: the
Deleted: of

Currently, the common partnership models used are Build-Operate-Transfer (BOT), (Mississippi); Build-Transfer-Operate (BTO) of a new prison, (Florida) or contract out or manage an existing prison (Kentucky); sale of a public prison (Ohio); and contracting-out inmates or "pay for use" to private facilities (California, Oklahoma). BOT is where the private company builds a prison, operates it, and at the end of a specified period that allows the company to recover construction costs, the facility is transferred to the state ownership. Under BTO the private company transfers ownership of the facility immediately to the state and in turn is paid for operating the prison, including the annualized returns on its investment. The basic difference between these two methods of public-private partnership is that in BOT the facility is private with all attendant liabilities, while in BTO the facility is public and enjoys sovereign immunity.

Deleted: ,
Deleted: which

The number of state prisoners in privately operated facilities was 71,845 in 2000, increasing to 95,249 in 2009. However, the number of state prisoners in private facilities increased just slightly from 5.87 percent in 2000 to 6.87 percent in 2009 (Reason, 2011). In 2012, almost 7 percent of state inmates were housed in privately owned or managed facilities.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 9

CONFIDENTIAL                                                                                  CORECIVIC_0955188

### 3. Literature Review

There is much writing in both the popular and professional literature on the perceived merits and disadvantages of contract prisons. Much of these references are based on hypothetical or ideological grounds. On one hand, proponents of privatization stress the merits of competition and its effects on both increased efficiency in the production and quality of services rendered and enhancing innovations. Indeed, this hypothesis has been supported in the analysis of many other industries. On the other hand, opponents of privatization base their claims on the public good aspect of correctional services where they hypothesize that the profit motives of the producers do not aligned with social welfare. Economists often support the benefits of competition. The question is whether such benefits are also evident in the private prison industry. A second question is what elements in competition lead to efficiency and innovations in the private prison industry. We do not intend to judge such arguments but rather objectively observe the evidence while maintaining an academic and neutral approach. In this section we present research done by scholars on costs and performance of public versus private prisons. We start with key articles that analyze the principles of evaluating costs and performance of prisons, followed by case studies of cost and comparisons, and ending with meta and other studies that include aggregated data.

Brakel and Gaylord (2003) evaluate the evidence on comparative costs of public and private prisons. They conclude that private prisons provide substantial and sustainable cost savings. Their conclusion was based on "almost three decades of experience." They break down cost comparisons into the categories of (1) construction (renovation), (2) management, and (3) financing of construction. They report that private firms typically achieve construction cost savings of 15 to 25 percent. They also build facilities faster than public entities. In part, private companies are able to build cheaper because of design and site differences. In terms of operating costs, Brakel and Gaylord conclude that private operation provides savings in the 10 to 15 percent range. The savings emanate from such factors as more efficient use of staff, lower pension costs, and purchasing efficiencies. Brakel and Gaylord also note some savings in terms of financing of facility construction. They conclude that the cost savings do not arise from cutting the quality of the private prisons. The authors also discuss other issues such as the morality and legality of private or contract prisons. In particular, they note that courts have clearly ruled that government can delegate its correctional responsibilities to private firms. As to the morality issue, the authors note that inmates themselves are less concerned with whether the institution is public or private but rather how fairly and lawfully they were being treated. Brakel and Gaylord also consider the important role of contracts and their provisions in terms of obtaining good contractor performance. They discuss the use of contracts to obtain desired performance but warn of excessive specification, which could reduce the flexibility and hamper cost savings and innovation.

Gaes et al. (2004) also provide an analysis of public versus private prisons. Much of the work is devoted to discussion of problems in the comparison of public versus private prison costs. The authors point out the importance of using avoidable cost for an appropriate comparison. They also note the necessity of considering unfunded liabilities such as pensions, as well as overhead costs in the avoidable cost. Gaes et al. indicate that the smaller the private portion of prison operations in a jurisdiction, the smaller the share of overhead costs that will tend to be avoided. Indications of their concern with the state of cost comparisons is the following statement: "our sense is that a meta-analysis is premature until we have settled on a coherent method of measuring the relative costs of publicly and privately managed institutions" ( Gaes et al. 2004: 104 ). They also question whether any savings in prison labor costs come at the expense of quality of the service and whether privatization and competition will improve performance. Finally, they raise questions about measuring recidivism since offenders have different

---

**Deleted:** or the lack thereof about

**Deleted:** the

**Deleted:** match and may even conflict

**Commented [A13]:** This reads out of place, like the stance of privatization opponents is just hanging there. Also, should this be a new paragraph?

**Deleted:** such

**Deleted:**

**Deleted:**

**Commented [A14]:** What was their experience in? Departments of correction?

**Deleted:**

**Deleted:** .

**Deleted:**

**Deleted:** management

**Deleted:** they

**Deleted:** such

**Deleted:** were

**Commented [A15]:** Did they actually find savings in private prisons or not? Don't seem to address that in the paragraph, if that's an issue.

**Deleted:** to

**Deleted:** . They also note the importance of correctly considering

**Deleted:** I

**Deleted:**

CONFIDENTIAL

CORECIVIC_0955189

life-course criminal trajectories before prison, suggesting the great difficulty of using measures of recidivism in evaluating prison performance.

The U.S. General Accounting Office (GAO) (1996) did a review of the five studies done by or for various states since 1991. The studies by California, Tennessee and Washington found little or no evidence of operational cost difference between similar public and private correctional facilities. Texas reported operation cost savings of between 14 and 15 percent, but the GAO noted the Texas comparison involved a hypothetical public facility and was based on various assumptions whose alteration could affect the comparison. The GAO concluded that the evidence that private facilities had lower operational costs was not proven. In terms of quality, the GAO focused on studies by New Mexico and Tennessee, which examined issues of quality in great detail. Using structured data collection instruments to assess such issues as security and safety, healthcare, management, personnel, and inmate programs and activities, New Mexico yielded equivocal results, and Tennessee reported no difference in quality. Finally, the GAO noted in any event the comparative performance is subject to change over time for many reasons including competition between public and private facilities. Accordingly, studies based on multi-year data are preferable to those based on only one or two years.

Logan and McGriff, 1989 was the first to calculate the costs for private versus public prisons. They compared the price paid to CCA for managing the 350-bed minimum-medium security Hamilton County Penal farm near Chattanooga, Tennessee to the county's total costs if it would have maintained the operation of the prison. Contracting out prison management generated annual savings of at least 4 to 8 percent, and more likely in the range of 5 to 15 percent, compared with direct county management. Logan and McGriff's innovation was the inclusion of "hidden costs" that do not appear in the correction budget, but do apply mostly to other agencies or are unidentified in the general fund. These omitted costs from the public correctional budgets amount to one-third of the included funds and include the categories of capital, finance, taxes and rent foregone, unemployment and workers' compensation, external administration, external oversight, legal services, general liabilities, property insurance, training of staff, transportation services, food provided by other agencies, interagency personnel, and healthcare and education provided by other agencies. The authors quoted a 1985 survey of state correctional officials, which concluded that these hidden costs could add up to 13.5 percent of total operating costs. Based on these survey data from these 42 states, Logan and McGriff concluded that real incarceration costs were 20-35 percent higher than the DOC's report.

Nelson, 2005 analyzed the costs of a Taft, California federal contract prison with the cost of "in-house" operation of three similar government-operated facilities for the first five years of the Taft contract. Her findings suggest that the costs of routine contract operations were very similar to government costs. Over the first two years of full-scale operations, the observed cost of the contract prison was lower than the in-house avoidable costs and higher for the last two years. When the costs for all five years were estimated, the contract prison saved $4 million or 2.6 percent over the government facility. Nelson also suggested that when a prison is contracted out, savings could potentially be achieved in government centralized support, facility activation, and on-going competition among service suppliers to the prison. In her report, she provided an extensive list of avoidable costs to be considered in the calculation of public costs.

CONFIDENTIAL

CORECIVIC_0955190

Until now we concentrated mainly on cost to government compared with prices of contracted prisons based largely on case studies. Now, we turn to performance and cost comparisons using larger databases.

Logan, 1992, in a later study, analyzed the performance of three women's state, federal and private prisons in New Mexico. He used an index developed by the Federal Bureau of Prisons, which is based on eight dimensions of prison performance aggregating a total of 333 measures of quality. The private prison outperformed to a quite substantial extent both the state and the federal prisons in six dimensions. The state prison modestly outscored the private prison in the dimension of care, while the private and the federal prisons achieved equal scores in the dimension of justice. Logan concluded that the State of New Mexico benefited by privately contracting its women's prison in both the quality of the operation and lowering the costs. Logan suggests that the high performance of the private prison emanates from better facility design, flexibility in operation, decentralization, higher morale and a sense of ownership among line staff, greater experience of top leaders, and strict rules of inmate governance.

Logan, 1996 did a study comparing a privately managed New Mexico women's prison against its previous operation as a state facility. The study sought to determine whether and to what extent private and public management contributed to differences in staff satisfaction, among other aspects. In the comparison of the prison under public and private management, the inmate populations were essentially unchanged, substantial continuity in staff existed, both prisons were trying for American Correctional Association accreditation, and both teams were operating under the same court decree. Logan thus attributed any differences to management. He looked at job satisfaction, stress and burnout, staff and management relations, staff experience, and salary and overtime. Interestingly, he surveyed for their opinions the 22 staff who worked under both public and private management. Logan considered institutional records, surveys of staff working under private or public management, and as mentioned, surveys of those who worked under both. He found high scores for the private operation on a majority of the dimensions. He concluded that private management operated a better designed facility, had greater flexibility and a decentralized style, good communication, more performance-based management, higher morale, and more experienced management, a great sense of ownership among staff, and a more formalized pattern of innate control.

Lanza-Kaduce et al., 1999 reviewed extensive literature on costs and performance of private and state prisons. She noted: "The general conclusion is that privatized correctional facilities are achieving economies and are doing so without compromising the caliber of correctional services." The crucial issue related to performance of public and private prisons is what reduces recidivism. Contracts with private firms, whether limited to specific functions or full-scale management of a prison, can assure the quantity of inputs like number of hours devoted to education programs but not the outputs like the quality of education inmates gained. Several measured outputs of correctional services eventually collapse into the extent of recidivism of inmates. Thus, according to this study, recidivism is the single most important output that should be compared in the evaluation of public and private prisons. Lanza-Kaduce et al compared a group of inmates released from privately operated prisons in Florida with that of a matched group released from state-operated facilities. The inmates were matched on factors that earlier research had shown to be associated with recidivism—type of offense, age, gender, race, security classification, and prior record. The conclusion of the researchers was that: "Private prison releases were more successful than were their public prison matches." This finding reflects substantive differences between public and private operations in Florida. Specifically, statutory and contractual requirements for private firms involved programs that are designed to reduce recidivism. The authors conclude that the internal culture and leadership at private facilities work to coordinate programming

Commented [A16]: Would include what these six dimensions are.

Commented [A17]: What does this include?

Commented [A18]: What does this include?

Deleted: designed

Deleted: n

Deleted: m

Deleted: The same prison was studied

Deleted: management

Deleted: s

Deleted: a

Deleted:

Deleted: s

Deleted: one

Deleted: it

Deleted: and internal culture

Deleted: that

Deleted: s

Case 3:16-cv-02267       Document 359-11       Filed 11/20/20       Page 15 of 84 PageID #: 13523

CONFIDENTIAL                                                                                           CORECIVIC_0955191

with other institutional demands, creating changed attitudes and behavior that are crucial to reducing recidivism. This is in contrast to the idea of "warehousing" inmates.

Camp and Gaes, 2001 report findings from a 1999 Federal Bureau of Prisons (BOP) survey of private and federal prisons intended to evaluate dimensions of quality under both confinement systems. They note that private prisons tended to house fewer maximum-security inmates who are more costly and contribute to a disproportionate number of problems in the correctional institutions. Unless care is taken in the interpretation of the information, data on inmate and guard victimization would tend to be biased in favor of contract prisons. The authors found that private prisons had high separation rates for employees, meaning that BOP prisons had staff that worked at the facility much longer than staff at contract prisons. About half of the contract prisons had to replace 50 percent of their staff during the same period that BOP had to replace at most 9 percent of its staff. The implication is that more experienced staff would provide more effective service and control. The authors further note that private prisons had higher custody staff-to-inmate rates than BOP prisons. In terms of drug misconduct, a key indication of overall security control, the authors report that 20 percent of private prisons had a rate of 10 percent or more while only one BOP prison had a rate as high as six percent. The rate of six percent is for low- or medium-security prisons, which are comparable to the contract prisons. Homicide rates of inmates were about the same, and the results of the assault rate on inmates were ambiguous. The authors conclude that while many private prisons had serious security problems, some private prisons were operating effectively.

Camp and Daggett, 2005, compared the performance of one private prison with three federal prisons for all misconduct, and specifically for violent behavior and drug use. They used data on all federal prisons for 36 months from January 1999 through December 2001 to form a general quantitative model to explain prisoner misconduct. The explanatory variables included the demographics of inmates and their criminal history, prison staff and institutional characteristics. Then, they applied the estimated model to the four prisons in order to determine whether differences occur between the public and the private prisons. Overall, the private prison did not perform as well as the three public prisons. However, the private prison's performance was exemplary on violent misconduct and security-related misconduct issues. For the other forms of misconduct, as captured by an overall category of misconduct, the performance of the public sector was better.

It is common to conduct meta-analyses when many studies are available on the same subject matter and where similar variables are included in these studies. We identified such studies that directly compared private and public managed prisons. The most recent such academic article was published by Lundahl et al., 2009 who empirically analyzed 12 studies on cost savings and confinement quality. They compared matched public and private prisons on the dimensions of cost and quality of confinement. The cost measure was per inmate per diem savings. Quality of confinement included, among other dimensions, security, safety, order, care, justice, and management. Studies included in the meta-analysis were deemed to be high quality. Fifty percent of the eight studies with cost confinement data showed that private prisons were lower cost with a range between 4.6 percent and 15.2 percent. In twenty-five percent of the studies, public prisons were less costly (10.0 and 14.2 percent). Overall, private prisons were 2.2 percent less costly. In terms of quality, the results were not clear. Of the quality indicators, 47 percent favored privately managed prisons and 44 percent favored the public prisons. For the summary measures, 50 percent were in favor of public, and 30 percent for private. The authors state: "Our conclusion is that privatization provides neither a clear advantage, nor disadvantage compared with publicity managed prisons." (Lundahl, 2009: 392).

CONFIDENTIAL                                                                                     CORECIVIC_0955192

Pratt, and Maahs, 1999, analyzed 33 cost studies and found that on the average private prisons were lower cost by $2.45 per inmate per day. The best predictors of costs were the age of the facility, the level of security, and the number of inmates served. When these factors are explicitly introduced, private prison costs are modestly lower, however shifting to private management will "...not alleviate much of the financial burden on state correctional budgets."

In a follow up study, Perrone and Pratt, 2003 again analyzed the cost-effectiveness of private versus public prisons and added the matter of quality of confinement. The researchers using none studies compared seven categories or domains for the quality of confinement. In each such study, a private prison was compared with a similar public prison. The results were inconclusive. Private prisons appear to be less expensive than public prisons by $3.40 per inmate per day. However, the researchers qualified their finding by suggesting poor matching techniques and non-accounted for differences in factors like security level, maximum capacity, and the number of programs the facility provided could help explain the differences. As for the quality of confinement the results were also inconclusive. "In the domain of safety, private prisons performed equally as well or worse, whereas they performed equally as well or better in the order and care domains."

Blumstein et al. (2007, 2008), investigated the effects that the presence of private prisons in a state has on the costs of public prisons and the rate of growth in spending for publicly held prisoners. Using all the states' data over the six-year period 1999 through 2004, the study concluded that the rate of growth of housing costs for public prisons was lower by approximately 2.64-3.125 percent per year in states where some of its prisoners were also housed in privately managed prisons. An average state's DOC without private prisons could have saved on its own state-operated prisons between $13 million and $15 million on total operating spending of $493 million or approximately 2.8 percent. These savings are in addition to any savings that the private prisons themselves could provide. These savings on the state's own operating prisons have a lag of two years, which may result from a lag between the time state prison officials feel the effects of the competition and the time they can implement changes. An alternative explanation provided is that the learning takes two years. Blumstein et al. suggest that a comprehensive social cost-benefit analysis be conducted on private versus public prisons. As often stated, a major benefit or performance variable that must be explicitly considered is the recidivism rates in both prison systems. The authors point out various studies that showed significant evidence for lower costs and better performance of private prisons.

### Summary of Prison Studies

| | Author | Type of Analysis | Data Examined | Cost Comparison | Performance Comparison | Conclusions |
|---|---|---|---|---|---|---|
| 1 | Brakel & Gaylord, 2003 | Review and analysis of studies comparing costs, performance, legal, moral issues. | No original data analysis. | Private saved on: construction 15-25%, operations 10-15%. Private built faster. | None. | Contracts with private operators should allow flexibility. |

Case 3:16-cv-02267    Document 359-11    Filed 11/20/20    Page 17 of 84 PageID #: 13525

CONFIDENTIAL                                                                    CORECIVIC_0955193

| | | | | | | |
|---|---|---|---|---|---|---|
| 2 | Gaes et al. 2004 | Review and analysis of studies on costs and performance; emphasizing methodology used. | No original data analysis. | Emphasized importance of including overheads, and unfunded pensions. | Unsure whether lower labor costs of private prisons lead to differences in performance. Recidivism measurement is unreliable due to differences in backgrounds of inmates. | Uncertain whether case studies and meta studies yield valid findings due to incorrect measurement of costs and performance. |
| 3 | US GAO, 1996 | Review of 5 studies since 1991. | No data analysis. | No evidence for lower operating costs of private facilities. | Equivocal results. Performance analysis requires multi-year data analysis. | No significance differences for costs or performance. |
| 4 | Logan, 1989 | Case study of contract price vs. the county's total costs. | Detailed cost estimates for county including hidden costs to other government agencies. | Contracting out saved at least 4-8 percent and likely 5 to 15 percent. | The contract assured at least equal performance. | Private management yields significant savings. |
| 5 | Logan, 1992 | Quality comparison of two public and one private women's prisons. | Records and surveys of staff and inmates for federal, state, and private prisons. | Not applicable. | Private prison out-performed the 2 public prisons by substantial margins across all 8 dimensions of quality. | Better managed private prison. |
| 6 | Logan, 1996 | Staff satisfaction under private prison that was | Performance measures derived from staff surveys and institutional | Not relevant. | Privately operated prison scored higher on majority of | Private prison preferred on performance. |

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 18 of 84 PageID #: 13526

CONFIDENTIAL                                                                                   CORECIVIC_0955194

Formatted: Left, None, Space Before: 0 pt, Don't keep with next, Don't keep lines together

Deleted: are

Deleted:

Deleted:

Deleted: &

Deleted: t

Formatted: Left, None, Space Before: 0 pt, Don't keep with next, Don't keep lines together

Deleted: and

| | | previously publicly managed. | records. | | quantifiable comparisons. | |
|---|---|---|---|---|---|---|
| 7 | Nelson, 2005 | Cost comparison of a private prison and three federal prisons. | Operational costs emphasizing avoidable costs over a five-year period. | Private prison less expensive by $4 M or 2.6%. | Not applicable. | Modest private prison savings. |
| 8 | Lanza-Kaduce et al., 1999 | Performance comparison of recidivism rates of releases. | 198 male inmates released from 2 private prisons in Florida were matched with public releases. | Not applicable. | Private prison group had lower rates of recidivism using various measured alternatives. Reoffenders committed less serious crimes. | Statutory and contractual requirement for private firms in Florida include programs specifically designed to reduce recidivism. |
| 9 | Camp& Gaes, 2001 | Security and performance of private prisons. | Survey of 91 of the 103 private prisons operating in the U.S. | Not applicable. | Problems in maintaining security procedures; unstable workforce in private prisons and less costly workers have not produced acceptable level of safety and inmate care. Drug misconduct higher in private than public federal prisons. | Private operators need to attract and retain qualified workers. |
| 10 | Camp & Daggett, 2005 | Performance comparison of all misconduct and | Survey of all BOP prisons and one low-security contract prison, | Not applicable. | Private prison performed in low range for low security | ? |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 16

Deleted:

Deleted: prison

Deleted: cheape

Deleted: r

Deleted:

Deleted: percent

Deleted: es

Deleted: P

Deleted:

Deleted: .

Deleted: u

Deleted:

Commented [A22]: Conclusion needed?

Formatted: Left

Deleted: &

CONFIDENTIAL                                                                    CORECIVIC_0955195

| | | | | | |
|---|---|---|---|---|---|
| | | specifically, violent and drug misconduct. | 1/1999-12/2001. | prisons. | |
| 11 | **Lundahl et al., 2009** | Meta analysis on cost and performance | Based on 12 studies of matched public and private prisons | Private prisons saved 2.2. percent. | Mixed results. | No clear differences. |
| 12 | **Pratt & Maahs, 1999** | Meta analysis on cost. | Based on 33 studies. | Cost per inmate per day lower in private by $2.45. Best predictors were facility age, size and security level. | Not applicable. | Management type less important to explain cost than the 3 predictors. |
| 13 | **Perrone & Pratt, 2003** | Meta analysis on cost and performance. | Based on 9 studies matched for quality of confinement. | Cost per inmate per day lower in private by $3.40. | Quality of confinement results were inconclusive. | Overall results were inconclusive. |
| 14 | **Blumstein et al., 2007, 2008** | Impact of private prisons on state prison cost and growth. | All state data over 6 years 1999-2004. | Public prison cost lower by 2.8% or $13M-$15M if private prisons operate in the state. | Not applicable. | Additional benefits of competition from private prisons operation. |

Our review of the literature shows the importance of considering all avoidable costs, including, among others, costs to other government agencies besides DOCs and costs that are incurred but not paid immediately like unfunded pensions and retiree costs. Further, the review points out the difficulties of correctly comparing costs of public versus private operation. Finally, performance measures analyzing recidivism are critical but their study is fraught with great difficulty.

### 4. Structure of the Prison Industry

In this section, we analyze the market definition of the prison industry, the factors that determine the extent of competition, and the resulting inferences. We incorporated here six factors that are relevant for the prison industry. This analysis helps determine whether and how to further improve performance

Deleted: ,
Deleted: ,
Deleted: &
Deleted: &
Deleted: &
Deleted: &
Deleted: -
Deleted:
Deleted: &
Deleted: corrections
Commented [A23]: Should we say that these issues are addressed in this study?
Commented [A24]: Can we say that we're strong on these points in this study?
Deleted: most
Deleted: important
Deleted: d
Deleted:

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 20 of 84 PageID #: 13528

CONFIDENTIAL                                                                    CORECIVIC_0955196

within the prison industry and, ultimately, whether and how social welfare could improve as a result. We analyze both the narrowly defined private prison industry and the industry as a whole, which also includes state prisons and county jails.

**Commented [A25]:** Should federal prisons be included here, as well?

**Concentration:** As mentioned in section 2, adult contract corrections in the modern sense began in 1984 when the then-new Corrections Corporation of America (CCA) obtained a contract to manage a prison in Hamilton County, Tennessee. States soon followed in employing private contractors. Other early private prison entrants into the market included Management Training Corporation (MTC) and U.S. Corrections Corporation. The entry of these companies into the prison industry ended a state monopoly of corrections. By 1994, 20 companies were competing to provide adult correctional services (Culp, 2011.). The number of firms has declined since the 1994 peak. At the end of December 1998, there were 14 firms in the adult corrections segment, which is the focus of this study. In 2007, the number of competitors declined to six.

The relevant market definition of adult corrections includes state and private facilities, which are close substitutes. In some cases, county jails, as in California and Texas, could also be considered substitutes since prisoners are placed there as well. Accordingly, the market share of inmates confined in contract prisons is nationally less than seven percent. More relevant, however, the share of private adult corrections in individual states ranges between 0 and 25 percent. Again, the appropriate market definition includes all good substitutes, which legally permissible. In at least 30 states, the use of private prisons is allowed so that substitution exists in those states.

**Commented [A26]:** What is a substitute in this case? Think it needs some kind of definition.

**Deleted:**

**Deleted:**

**Commented [A27]:** Is this because the inmates are serving longer sentences in these county jails or because they are sometimes housing state inmates? Need to be clearer.

**Commented [A28]:** Any need to mention federal facilities here? I think the 7% includes those inmates, as well.

A factor normally considered in market analysis is concentration, which for the purposes of this research is the number of private firms operating within the total corrections industry. We used a four-firm concentration ratio and the Herfinahl-Hirschman Index (HHI) as the two indicators of concentration for the industry. The four-firm ratio is calculated as the sum of the market shares of the largest four private companies in the industry. The HHI is the sum of the individual (percentage) market shares squared with a maximum value for a monopoly of 10,000, while less than 1,500 is considered unconcentrated or competitive.

**Commented [A29]:** Not sure why legal permissibility is relevant?

**Commented [A30]:** I do not think the lay person will understand this paragraph.

**Deleted:** the

**Deleted:** firms

In the existing private segment, both indicators suggest high concentration. We find that the four-firm concentration ratio in the adult private corrections segment of the market at the end of December 1998 was 90.1, which means that the top four firms accounted for 90.1 percent of the U.S. private capacity. The HHI was 3,753, which can be interpreted to mean that in 1998 the industry was one with an equivalent of 2.7 equal size firms. The data used for these calculations were obtained from the Bureau of Justice Association (2001: 4).

Concentration in 2007 was not far different from 1998. The four-firm concentration ratio in that year was 93, which means that the top four firms accounted for 93 percent of the private adult capacity (Avondale Partners, LLC. 2009:1). The HHI was 3,297, which means that the private industry segment had the equivalent of 3.03 equal size firms.

High concentration has been criticized because it is often thought to contribute to non-competitive behavior (Culp, 2011). However, economists, including one of the authors of this research, have pointed out that economic theory and behavior, including that of actual duopolies, suggest that high

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013        Page 18

concentration by itself is insufficient to conclude that non-competitive behavior is probable (Blackstone et. al. 2012). Indeed, the soft drink and mainframe aircraft industries, among others, illustrate that high concentration and competitive behavior are quite possible.

Further, even in 2012, contractor operated prisons comprised less than 7 percent of adult corrections. In other words, as mentioned, a good substitute, mainly state prisons, already exists. Moreover, states could and do send prisoners to other states. Private contract prisons face many alternatives so that concentration within the contract portion of the industry does not indicate any real monopolistic control of the market. Again, the market is actually all corrections facilities, and the private portion is small.

**Entry**: There are limited legal and financial barriers for new firms to enter the management of existing prison facilities. Entry into the construction and management of prisons, however, requires significant financial commitments and involves considerable risk if a significant number of cells is not occupied. In the early 1980s, there was rapid entry of at least 20 firms into burgeoning industry. Further, between 1996 and 2011, three additional small, regional firms (LaSalle Southwest Corrections, Louisiana Corrections Services (LCS), and Emerald Companies) entered, suggesting that entry remained possible. Overall, large firms can more easily enter and build entirely new prisons. Nevertheless, LCS, a small entrant, has built a new facility, although, it did so in stages. LCS started at about 200 beds and eventually reached a facility size of about 1,000 beds.

**Economies of scale**: The industry has some economies of scale both at the individual correctional facility level and at the firm level. The facility level includes the capital and operational outlays of the prison, while the firm level refers to any additional savings from operating more than one prison. Here we deal solely with the operation of one prison. A minimum efficient size (MES) prison, which is the smallest size facility to reach a baseline level of cost efficiency, has a capacity of about a 1,000 beds. At 750 beds, a facility's cost per bed will be about 15 percent higher. An indication that 1,000 beds is the approximate MES is the 2008 phase II construction of LCS's Pine Prairie Correctional Center with a bed capacity of 1,008. Also, its South Louisiana Correctional Center, completed in 2001, has 1,002 beds. The 1,000-bed threshold exists because up to this size, inmates can be added without adding much additional staff. Since labor comprises 70 percent of operating costs such a threshold exists. Small states could thus have only a few efficient size facilities because of their smaller populations. This is especially likely because prisons are normally operated with one level of custody (for example, minimum or maximum security).

Additional economies of scale are available at the firm level. Operating several facilities yields buying economies. This could be important for inputs like food or liability insurance. Moreover, a large firm may have advantages in terms of workers. For example, if a warden has to be temporarily unavailable, a large firm can move a deputy warden from another facility who is already familiar with the system operation.

**Sensitivity to prices (price elasticity)**: Private firms face a highly elastic demand for their services. The reason is that states that consider using contract prisons, especially out-of-state transfers, have many close alternative providers including county jails and other states' prisons. Further, the private share of total prison capacity is about seven percent, so price reduction (or service quality improvement) could potentially enable private contractors to successfully compete with the public sector for a much larger share of the market. Existing government policies often prevent such entry. However, a threat of entry will force the operators of existing public prisons to become more efficient and for the state DOC to loosen administrative barriers.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 19

Deleted: ry
Deleted: to
Deleted: s
Deleted: This is evidenced by
Deleted: the
Deleted: in the early 1980s
Deleted: Entry into the industry through construction of a prison, however, requires substantial capital and involves considerable risk if a significant number of cells is not occupied.
Deleted: L
Deleted: did
Deleted: d
Deleted: .
Deleted: However
Deleted: ,
Deleted: ing
Deleted: ing
Deleted: a thousand
Deleted: the
Deleted: just
Deleted:
Deleted: s
Deleted: that
Deleted: the

**Mergers:** Mergers have played an important part in the growth of private corrections companies. For example, CCA acquired U.S. Corrections Corporation, the then-third largest company in the private contractor portion of the industry in 1998. U.S. Corrections owned five facilities with a bed capacity of 5,275 and managed other facilities with a combined 5,743 beds (Culp, 2011). In 2005, GEO Group acquired Correctional Services Corporation, the seventh largest company in the industry and, in 2010, it acquired Cornell Companies, the fifth largest. Community Education Centers was a privately held company providing community based re-entry services and rehabilitation services for offenders mainly in New Jersey and Pennsylvania. In 2007, it acquired CiviGenics and, as such, became a participant in adult corrections. Other firms in vertical or horizontal-related industries are potential entrants to the contract adult prison segment.

**Buying power:** The states have considerable power in the purchasing of prison services from private corrections contractors. Obviously, the overall demand versus supply of prison beds is a factor affecting buying power. If all states are operating at or above capacity, their choices are limited, and the high demand translates to higher prices for private prisons. In terms of buying prison services, the state, after all, can always provide the services itself or possibly contract with other states or county jails. Moreover, a few buyers account for a substantial percentage of the private companies' revenues. For example, California alone accounted for 13 percent of CCA's 2010 revenue and three federal agencies provided an additional 43 percent. Four government buyers accounted for 60 percent of GEO Group's revenues (Culp, 2011). Such significant government buying power (oligopsony) can be used to obtain low prices and good quality service from private contractors.

At the same time, it subjects the contract prison companies that own their facilities to substantial risk. The contract prisons have no immediate alternative use, and therefore their dependence on a few government customers makes them quite risky and often vulnerable to pressures to lower their prices. Indicative of this are the follow-up negotiations after a contractor is selected in the bidding. Risk emanates from a possible decline in the number of inmates, a shift to self-incarceration by the state, or simply an increase the supply of cells by competitors.

The structure of the prison industry requires that the private firms must keep prices low to attract and maintain business. It is an industry with considerable risk, as well as a history of mergers, which is probably indicative of the existence of economies of scale. It also has the continued possibility of new entry. Moreover, firm exit from the industry suggests substantial competition. For example, four companies exited the industry between 1996 and 2011 (Culp, 2011). The contract prison segment must also face the possibility that states could send inmates to other states or use county jails. Competition is thus far more intense than the number of firms and concentration within the private segment indicates.

**Impact of a "small firm":** Small firms often disrupt the quiet life of a monopolist or a highly concentrated oligopoly (an industry with only a few firms). Their impact can be seen in many divergent types of industries and is often far greater than their small share of the involved markets. The private or contract prison segment collectively can be considered such a "small firm."

In transparent tape, LePage, a small firm with about 10 percent of the market, challenged the monopoly of 3M's Scotch Brand Tape in the 1990s. LePage introduced and promoted private label transparent tape to large buyers like K-Mart and Sam's Club. Such large buyers could put their own label on the tape, which was sold at prices below Scotch brand. The entry of LePage thus provided clear competition benefits. 3M's responded to the competitor's threat by bundling rebates for six products including transparent tape, which led to a substantial antitrust victory for LePage.

Formatted: Space After: 0 pt, Line spacing: single

Deleted: mer e
Formatted: Space After: 0 pt, Line spacing: single
Deleted: in the 1990s
Deleted: se
Deleted: in the form of
Deleted: ed

CONFIDENTIAL

CORECIVIC_0955199

Another example of the important competitive benefits provided by a small firm comes from the physicians' services industry. There, doctors of osteopathic medicine (D.O.s), who are fully licensed and not under the control of doctors of medicine (M.D.s), comprise about 6 percent of all physicians. D.O.s emphasize general or family practice, while M.D.s most often chose to practice specialties. D.O.s also frequently practice in urban and rural areas that are short of physicians. Most significantly, between 1980 and 2000, when M.D.s were concerned about an impending physician surplus and maintained their output of new professionals at about 17,000 per year, D.O.s increased the number of their medical schools and more than doubled their graduates. By 2000, M.D.s recognized that a shortage of providers existed. Had the D.O.s not expanded their numbers, the shortage would have been far worse. In this case and many others, having even a small competitor in an otherwise monopolistic situation can be most helpful.

In the 1980s, a small firm had a major impact in the cigarette industry. The firm Liggett had a market share of only 2.3 percent in the highly concentrated cigarette industry, where the top four had 88 percent of the industry sales. During the previous 40 years, no major company sold any non-branded cigarette, and virtually all cigarettes were sold at the identical full list price. Liggett was under severe financial pressure, producing too few cigarettes to take advantage of economies of scale, which required 3 to 5 percent of industry output. The firm in 1980 introduced generic cigarettes, which were then sold at discount prices by mass-market retailers. Other firms followed by introducing their own generics, whose share grew. A 1997 Federal Trade Commission (FTC) staff report on the industry noted: "This makes Liggett one of the most significant constraints on higher industry prices today" (Burnett, 1999: 262).

The soft drink or carbonated beverage industry, which Coca-Cola and Pepsi Cola have long dominated, also points out the desirability of small competitors. Both large firms have colas (and other flavored carbonated beverages) that have enjoyed a combined market share of almost 70 percent. However, neither major company produced a caffeine free cola until 7-UP, a company with a small market share (approximately 7 percent), introduced and heavily promoted its Like Cola in 1982. 7-UP also introduced a diet version of its caffeine free cola. Soon, Coca-Cola and Pepsi Cola introduced their own caffeine free colas, and Like Cola disappeared from the market. Incidentally, another small firm, Royal Crown (RC), had introduced its own caffeine free cola in 1980. Again, the small firm is often a maverick introducing important competition into the market.

The cereals industry also illustrates the role of small firms that serve as mavericks. The cereals industry was long dominated by a few companies. In the 1970s the top four had 85 percent of the market and the top six had 95 percent. These entrenched companies did not respond to the increase in consumer demand for "healthy" food, including natural cereals. In the early 1970s, companies like Colgate, International Multifoods, Pet, and Pillsbury introduced natural cereals, which were soon responded to by the leading companies. The share of natural foods increased from about .5 percent in 1972 to about 10 percent in 1974. All mavericks except for Pet soon exited the market. Again, the role of small firms is often to do what entrenched and established firms fail to do.

The conclusion is that small "maverick" firms can have an important competitive impact, eroding and constraining monopoly power. As these diverse examples show, even a firm with a small market share can and often does have that impact. Indeed, the U.S. Merger Guidelines reflect the understanding that such a maverick can be an important competitive force and its elimination through merger can substantially lessen competition (Baker 2002: 140). The impact of rivalry from a small firm is likely to have at least as great an impact on government monopolies as on private monopolies or concentrated

Case 3:16-cv-02267      Document 359-11      Filed 11/20/20      Page 24 of 84 PageID #: 13532
CONFIDENTIAL                                                                          CORECIVIC_0955200

oligopolies. After all, government lacks the profit incentive and is also encumbered by bureaucratic and other regulatory requirements.

**Additional insights on market structure:** One of the arguments against the use of contract prisons is that of supplier power. Suppose that a state suffers from significant overcrowding and depends upon the one prison company located within its borders. The prison company can utilize its market power and significantly raise its prices. Alternatively, suppose that the number of inmates within the state drops sharply, which may indeed occur (Section 14). Contract prisons will then own expensive facilities with no other use. Such possible conditions may indeed occur for a short period of time, and could cause severe difficulties and financial losses to either or both public and private sectors.

While these scenarios are possible, they could happen in any industry; it is not unique to corrections. Also, one must recognize the power of competition and the dynamics it creates to correct for such inevitable situations. A local contract prison company needs to maintain a good business relationship with the state and is unlikely to use its temporary market power to raise prices. Furthermore, the state DOC could always contract out inmates to other states, other companies, or with county jails.

If a local contract prison is suffering from over-supply of cells, then it could attract inmates from other states by lowering prices for its facility. In the short run, prices could be reduced to the marginal cost of additional inmates. It is important that state legislators and the courts allow easy transfer of inmates among states, which increases competition and thus improves efficiency, lowers prices, and improves the quality of service for inmates and the states. State prisons could be allowed to both send inmates to other states or private prisons and, if possible, house inmates from other states. Information on varying market conditions and opportunities could appear on the Internet in a similar fashion to how hotel supply and prices are presented on www.priceline.com.

Since significant investment may be required, especially in cases where facility construction is involved, long-term contracts for private contractors are generally necessary. The more states that participate in this market, including both public and private prisons, the more efficient prisons will be and prisoners' conditions will improve. Demonstrating what happens when competition is curtailed, legislators in California passed a law barring private prisons within the state. Such a law caused a very expensive transfer of inmates to three states, requiring intense and costly out-of-state monitoring. Any such legislation that prevents private competition within a state or impedes interstate transfer of inmates is inefficient and exacerbates severe overcrowding that adversely affects inmates and correctional staff.

The effects of increased competition on the prison industry can also imply changes to government oversight and regulation. For most industries, if firm entry occurs and competition increases, government intervention to protect consumers' interests becomes unnecessary. For example, in the competitive markets of the clothing or toy industries, customers "decide" what products are preferred, and producers that cannot deliver a quality product at the right price suffer. Thus, no government intervention is needed, and markets operate efficiently. At the same time, consumers are not familiar with the chemical contents of the clothes and toys, and usually no business entity has the incentive to conduct the necessary tests for all such products and make public their findings. Government is the only entity that would protect customers and conduct comprehensive tests on contents of both domestically produced and imported products. By contrast, the inmates are the consumer-equivalent in the prison industry. They have no power to choose the facility where they are sent and are not able to review information on the performance of the prison. Thus, even if strong competition among private and public prisons exists, government oversight on performance is necessary for both the public and private prison systems.

---

**Deleted:** the state

**Commented [A31]:** Do we need to refer back here to the "Buying Power" section on pg. 18, which already addresses some of this?

**Deleted:** as occurs

**Deleted:** not to allow

**Deleted:** entry of firms

**Deleted:**

**Deleted:** existing

**Deleted:** the

**Deleted:**

**Deleted:** es

**Deleted:** s

**Deleted:**

**Deleted:** T

**Deleted:** , and

**Deleted:** t

**Deleted:** of

**Deleted:** ing

**Deleted:** ,

**Deleted:** prison market lacks both the necessary information and the customer has no control of the product he/she receives. Unlike in the clothes and toys markets where the customers pay for the product they receive. the consumers, namely the inmates, have no power of choosing the prison and the information on the performance of the prison is not visible.

---

CONFIDENTIAL

CORECIVIC_0955201

To conclude, in this section we saw that the prison industry as a whole has become more competitive. In sections 6 through 13, we shall compute state costs versus the prices paid for contract prisons. Our calculations reflect all real costs, regardless of when they were incurred, rather then just "annual out of pocket" costs. We further suggested the possibility that even greater competition could yield greater savings. The entry of the competitive contract firms to a state's prison industry could not only provide cheaper services for its DOCs but also may force state prisons to improve their service delivery. In the discussion that follows, we shall analyze whether states that face competition by private contractors are more efficient than states that rely merely on state prisons.

**5. Model for Estimating the State's Avoidable Costs**

This study determines whether contracting out prisoners or prisons reduces a state's costs and is beneficial to the welfare of its citizens. Cost savings are usually required in order for the state to contract out inmates. When the non-monetary performance of prisons is incorporated into the analysis, it becomes more comprehensive, reflecting overall net benefits to the state's citizens. The cost savings are all expressed in monetary terms. However, the performance will be captured in more general terms since quantifiable data are sometimes not available. This study relies on government sources for all data. We imputed data, again relying on government sources, when direct data were missing. Appendix 1, the Source Appendix, provides information about where the data were obtained for each of the variables (entries) in Table 1.

The basis for a state's decision to contract out the management of existing prisons or transfer inmates to private prisons should be based on budgetary savings while at least maintaining the same performance. Budgetary savings should reflect avoidable costs to the state. In the determination of avoidable costs, we distinguish between the short run costs, or operating costs, and the long run costs, or operating costs plus capital costs.

There are three scenarios for the use of contract prisons. In the first scenario, the facility is owned or financed by the state government, so that that the avoidable costs are merely those that occur in the short run – the operating costs – which is the situation in Ohio and Tennessee. The second scenario occurs when the facility is privately owned or financed, and the avoidable costs include both the operating and the capital costs. This includes cases of overcrowding, facilities built under BOT, or privately built prisons. Examples of this scenario include California and Oklahoma. The third scenario occurs when a state facility is sold to a private operating company, as in Ohio, and thus both operating and capital costs are included. It is similar in concept to the second scenario. In all three cases, the state regulates and monitors the operation of the contract prisons. The following Glossary of Terms provides a brief discussion for the categories of costs. Appendix 2 provides a complete list of cost items included in each of the three scenarios.

**Glossary of Terms**

| TERM | DEFINITION | EXAMPLES |
|------|------------|----------|
| Avoidable Costs | Savings for the state emanating from the use of private contractor. The cost items included depend upon the reason for the use of the contractor. | See Appendix 2 for the types of costs considered avoidable for each scenario |
| Direct Costs | Costs directly associated with the handling of inmates. These costs are zero when no | Labor costs, medical costs, utilities, employee pensions, food |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013       Page 23

Commented [A32]: Seems like this sentence needs more. More competitive since the modern period begin in the 1980s?

Deleted: the

Deleted: or

Deleted: as

Deleted:

Commented [A33]: Check on the Ohio situation.

Deleted: the

Deleted: cases, namely contracting out existing public prison, overcrowding or use of contract prison, and the purchase of a public prison

CONFIDENTIAL                                                                 CORECIVIC_0955202

| | inmates are in custody. Usually defined as part of the short run costs. | |
|---|---|---|
| Indirect Costs | Costs that incur to other branches of DOC and other state agencies, which are linked to inmate and state prison operation. | Central administrative functions like classification and assignment of inmates, adjudicating inmate grievances, parole hearings, inmate transfers, liability insurance, human resources |
| Short Run Costs | Costs incurred as a result of the day-to-day operation of a correctional facility including both direct and indirect costs. | See examples above |
| Long Run Costs | Short run operating costs plus capital costs associated with the financing, planning, construction of the facility or significantly large reconstruction or rehabilitation. | Short run costs plus depreciation of facilities, interest on debt, significant repairs |

Economists assume efficient use of freed up resources even if the state chooses to under-employ such resources. For example, if inmates are transferred to a private prison and, as a result, a manager becomes idle, his or her salary is then an avoidable cost. We assume that the manager ceases duties in his or her obsolete position. It is reasonable to assume that the DOCs are efficient in their use of resources.

Also, in the calculation of avoidable costs, we distinguish between contracting out a prison and the transfer of inmates to private prisons. In the first case, a private company takes over the management of a prison for some years and then the prison returns to the DOC. In such cases, the avoidable costs include all the direct costs plus the indirect costs to the DOC and other state agencies. Recovery of capital outlays and interest payments are not avoidable if the public sector bears the renovations and rebuild of the old prison or the construction of a new prison. The issue of indirect costs will be considered below.

There are several reasons states may choose to use contract prisons, and overcrowding is a major driver. Sometimes a court order or even a threat of such an order leads to the practice. For example, an appellate court found that California in 2008 was operating at 188 percent of its designed capacity, jeopardizing the health and safety of the inmates. In fact, the U.S. Supreme Court in Brown v. Plata (2011) determined that California was operating around 200 percent of designed capacity for at least 11 years. California has been ordered to reduce its capacity utilization to 137.5 percent by December 2013. California also lost control of the healthcare delivery in its prisons to a Federal Receiver after it was determined that the state was not delivering a Constitutional level of inmate medical care because of the severe overcrowding in its prisons. Excessive overcrowding exists elsewhere, as well. Ohio, for example, in 2012 had prisons operating at 128 percent of their capacity.

When overcrowding exists, costs may appear lower as a result of lower performance. Overcrowding spreads at least the fixed costs over a larger number of prisoners, lowering costs per inmate. However, overcrowding significantly reduces prison performance, including creating greater security problems, lowering correctional officer and inmate safety, increasing violence among inmates and consequently

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 24

CONFIDENTIAL

CORECIVIC_0955203

requiring long lockdowns. Overcrowding also reduces the space available for education, training, and recreational programs. This is likely to hinder the reentry of inmates to civil society.

**Deleted:** make more difficult

Another driver for using contract prisons is when a state owns old, outdated facilities that require significant and often unavailable resources for renovations. In these conditions, prisoners are likely to sue the states for cruel or unusual punishment. For example, in Texas, a prison built in 1856 is still being used. States can fund the construction of new prisons or modernize existing prisons by issuing general obligation or revenue bonds. However, the state constitution usually limits the extent of borrowing general fund dollars for capital projects. For example, the State of Washington limits the debt service to nine percent of general state revenues for the previous three years (State of Washington, 2012). Further, our examination found that the State of Arizona has a constitutional cap on general fund bonds of $325,000. Other states require voter approval for issuing of bonds. These constraints gear states to create public-private partnerships where the capital outlays of new or renovated prisons and other infrastructure are privately financed.

**Deleted:** possibility
**Deleted:** that the
**Deleted:** and
**Deleted:** ,
**Deleted:** and where

When the state does not have to bear necessary capital costs, the avoidable costs to the state include both short and long run costs. The short run costs are direct and indirect costs. The long run costs include capital costs, which involve modernization, significant repairs, depreciation, and financing costs. Depreciation incorporates the decline in the value of the facilities, while modernization and repair include renewed and improved conditions. For example, the Legislative Budget Board of Texas recognized that in the case of overcrowding, state avoidable costs must include the long run costs related to new construction when calculating the per diem charge (Gaes et al, 2004:87-88). Clearly, when the state saves resources by contracting out the operation of a facility, more can be spent on other priorities. Because of limited ability to issue bonds, when private contractors finance facilities, the state is able to borrow more for other public infrastructure needs and save on interest payments.

**Deleted:** the facilities are financed by
**Deleted:** could

When inmates are transferred to contractor-operated prisons due to overcrowding or governmental capital shortages, the avoidable costs also include long run costs. In fact, the courts are likely to intervene and require the state to correct overcrowding or the housing of inmates remains in unsuitable conditions. Thus, both situations are unsustainable in the long term.

**Deleted:** the
**Commented [A34]:** I'm not sure what this sentence should say.

Appropriate measurement of avoidable costs will include the following categories of annual spending for each state on minimum- and medium-security male prisons, which are the most common alternative to private prisons. We have analyzed the professional literature to construct a comprehensive list of all avoidable costs. We considered in particular the works of Nelson (2005) and Belenko (1999).

**Deleted:** these
**Deleted:** not
**Deleted:** ly the

### 6. Direct Avoidable Costs for Public Prisons

Personnel services (Table 1, rows 1a, and 1b) include wages, salaries, and benefits for all prison employees. Benefits include health insurance, funded and unfunded pensions, and paid days off. When we analyzed personnel services, we recognized that some of the pension and retiree healthcare costs of then current personnel are paid by other state departments or are not paid in full. The Vera Report (2012) provided data gathered from 40 states, which we used to supplement reported personnel costs. The underfunded pensions and healthcare costs of correctional personnel are short run costs that were not included in the financial reports of the DOCs, which were used to calculate the state costs versus private fees (Table 1, rows 15a, and 15b). These underfunded personnel costs amounted to $4.3 billion out of the total unaccounted costs of $5.4 billion or 78 percent. The other unaccounted costs are capital and some inmate medical expenses.

**Deleted:** s
**Deleted:** the
**Commented [A35]:** We need some explanation on what an unaccounted cost is here. Used several times in these two paragraphs; and I don't think it's clear.

CONFIDENTIAL                                                                    CORECIVIC_0955204

Also unaccounted for are indirect costs, which appear for individual states but were not aggregated by Vera. More important is the fact that the unaccounted costs, even without the avoidable indirect costs, which were not aggregated by Vera, are 12.7 percent of the total correctional budgets. The unaccounted costs are not considered by the states in their comparison of the avoidable state correctional costs and private fees. However, these costs are appropriately included at the time they occur, even though the actual outlays take place at a future date. Much of the critique on contracting out prisoners rests on inadequate savings by the state government. However, the inclusion of these unaccounted costs and the consideration of the more relevant long run costs make the comparison more accurate. Accordingly, Table 1 includes the underfunded pensions and retiree healthcare benefits as real costs of public prisons. Vera provided these data for all the states we analyzed except Mississippi.

The underfunded information for Mississippi is available in another source (Pew, 2010) however, not specifically for corrections employees. We maintained our conservative approach and excluded the underfunded amounts for Mississippi, since no concrete data are available.

The Pew study stressed the significant amounts of underfunded retiree pensions and healthcare for the states. In 2010, a $1.38 trillion gap existed; $757 billion for pension promises and $627 billion for retiree healthcare, an increase of nine percent from just 2009. In 2008, one-third of total obligations were unfunded. Noteworthy, of the states we analyzed Oklahoma and Kentucky had more than one-third of their liabilities unfunded, and Mississippi had more than 20 percent. On the other hand, Florida was one of only four states that were fully funded.

In terms of correctional medical care, the responsibility for services differs among the states. In general, offsite medical costs often include ceilings to safeguard the contractor from unanticipated medical expenditures. On-site medical costs are normally the responsibility of the contractor, and the public-private partnership facilities often have physicians, nurses and other medical personnel to provide care, which is included in the per diem rate. For example, in Mississippi, private contractors cover the first 72 hours of care for inmates receiving treatment in outpatient facilities and, beyond that, medical care is the state's responsibility. In Oklahoma, the contractor is responsible for all medical costs per inmate under $100,000 with a $50,000 limit per episode. When we compare state costs and private fees, they should both reflect the appropriate medical expenses. However, comparisons across states are more difficult because of different practices (Table 1, rows 2a, and 2b).

Maine provided full details on its public prison expenses for food, utilities, fuel, office supplies, technology, rent, clothing of inmates, and minor repairs. However, for the other states we were able to obtain just an aggregate of such expenses. Contracted professional services include teachers, psychologists, and others. The inclusion of Maine in this study provides a benchmark for public managed prisons, as well as an example of a state that currently lacks private competition.

**7. Indirect Avoidable Costs for Public Prisons**

This category includes some of the following central administrative functions, which become avoidable when private prisons are used. Examples for such costs that become mute when contract prisons are used and should be incorporated in the calculation of the state cost per inmate per day include adjudicating some inmate grievances, inmate transfers, liability insurance, human resources (background check of potential employees, and hiring, training, administering employee records), legal (shared between the DOC and the attorney general), and transfers of inmates among public prisons. These hierarchical and intergovernmental costs are often ignored when the DOC calculates its own costs per inmate per day. Contracting out inmates allows savings that could be directed to other activities. Gaes et al., (2004: 95-96), argue that based on existing economic literature, if the state refers a small

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 26

CONFIDENTIAL                                        CORECIVIC_0955205

number of prisoners to private prisons then there is no significant decline in these indirect avoidable costs. They add (p. 98) that even when prison services are contracted out, some of the overhead costs continue to burden the public sector. For example, the state normally maintains control over classification, disciplinary, and other central office activities. Tennessee and Oklahoma calculated that when prisoners are transferred to contract prisons, approximately 75 percent of the indirect costs remain as state costs or 25 percent become avoidable costs (MGT of America, 2007; Tennessee General Assembly, 2010). In the discussion on savings below, we shall maintain our conservative approach and incorporate only 25 percent of the direct costs as indirect avoidable costs.

Moreover, indirect costs are difficult to measure and may not be fully accounted for by some states. The Bureau of Prisons/General Accountability Office (BOP/GAO) figure for indirect costs of $8.09 could serve as a standard. In fact, the reported range for most states was $3.72 to $6.64. Texas' indirect costs of $1.30 seem far too low, and, to a lesser extent, this applies to Mississippi's $2.96. The states that reported most comprehensively approximated the 11 percent of the GAO. Thus, we incorporated for all states 11 percent as indirect costs. Vera provided some data on unaccounted indirect costs, which we also incorporated. Unfortunately, Vera did not report for all for ten states including Mississippi, which may explain its reported low indirect costs.

### 8. Monitoring Costs

Monitoring costs include contract development and procurement and contract compliance monitoring costs of the contractor-operated prisons by the relevant DOC. These costs are normally included in the per diem charge of the private contract price. If not, they are added to the per diem charge. In Ohio, the private contractors must reimburse the ODRC for two monitors at their expense. In Kentucky for fiscal year 2009, the monitoring costs were $105,362 for 1,234 prisoners or $0.23 per inmate per day, a negligible amount that will not change the results even if added as an estimate for all the states. In Florida in 2009-10, the annual monitoring costs for each contractor-operated prison ranged from $54,000 to $72,000, or $0.08- $0.10 per inmate per day. In Florida and Ohio, the onsite monitoring costs are very small and are indeed included in the per diem prices paid by the contractor.

### 9. Capital and Finance Costs

Capital and finance costs should be included for all states that house inmates in private prisons to handle overcrowding or to avoid rebuilding or substantial maintenance costs. There are, after all, in excess of 290,000 prison beds in public facilities that are more than 50 years old (US BJS, 2005). The necessity to include the capital costs as avoidable costs for the public sector is recognized by the State of California's legislative research agency, which stated: "Many CDCR prisons are more than 30 years old. While still operational, many of these prisons require much greater levels of maintenance and some will require significant renovations. Long-term maintenance and renovations costs should be taken into consideration when identifying prisons to close" (California Legislative Analyst's Office, 2012B: 16).

These costs are not to be incorporated when a private company manages an existing public prison. The depreciation should be calculated for the period between major renovations. A prison, like a standard building, is assumed to be fully depreciated over a period of 50 years. In fact, a prison encounters both more wear and tear and requires more modernization, including incorporation of new technology, than a normal building. Even though prisons would be expected to require major renovations and upgrading periodically, we utilize the 50 years depreciation life as does the U.S. Bureau of Prisons (BOP). The exception is Arizona where its legislative research unit used 20 years (JLBC 2012). Since capital outlays are funded normally through the issuance of bonds, the annual interest payments should be

Deleted: then

Deleted:

Deleted: at

Deleted: nd

Deleted: These

CONFIDENTIAL                                                                                          CORECIVIC_0955206

incorporated in the calculation of public prison costs. The reason for Arizona's 20-year amortization is because contract prisons are transferred after 20 years to state ownership.

GAO, 2012 (p.10) concluded that the capital costs, including modernization and repair projects and depreciation, for the fiscal years 2009 through 2011 ranged from $4.39 to $4.82 per inmate per day. These were the fees the states paid the BOP when state prisoners were housed in federal institutions. In our calculations of the costs for state prisons, we used the average of $4.61. Depreciation is an avoidable cost. It reflects the consumption of the facility through its use and is real like any other direct or indirect cost item. Failure to include depreciation, like some states do in their calculation of state per inmate per day costs, is unjustified and biases significantly downward the public costs. Clearly, however, depreciation should be included only when the long run costs are considered.

It is important to note that states issue bonds to finance prison construction, and the cost of interest per inmate is a long run variable cost to be imputed to obtain the avoidable inmate cost per day. The correct measure should be the current construction cost of a new prison, which would reflect avoidable costs. Then, the interest on such capital costs must be used to calculate the interest per inmate per day. We chose the average interest rate for 2012 of 3.75 percent for a 20-year maturity bond. This is a conservative rate, which is especially low in 2012 (see http://www.munibondadvisor.com/market.htm). Our research shows that construction cost for a 1,500-bed medium security prison in 2012 is $225 million (see http://juneauempire.com/stories/030611/opi_795369352.shtml). Thus, the annualized interest cost per inmate per day over a 20-year life of the bond is $15.41.

Another calculation of interest costs comes from a 2007 study for the Oklahoma Legislature (MGT, 2007). The study estimated construction costs of $54,500,510 for a 660-bed maximum-security facility expansion. This yielded annual principle and interest costs of $15.37 per inmate per day for a 25-year bond. This figure is essentially identical to our calculated principle and interest cost.

However, even if we use the 2011 sale price of the then-11-year-old, 1,798-bed Lake Erie Correctional Institution in Ohio of $72.77 million, the annualized interest per inmate per day would be $4.16. We used the Construction Cost Index for buildings, utilities, and grounds of the U.S. Army Corps of Engineers (2011). The cost of construction increased by 57.9 percent since the year 2000, so that the 2011 cost would be $115 million or the interest would be $6.57 per inmate per day.

A problem arises because in recent years public prison construction was rare in the examined states. Thus, we used interest payments, when available, as reported by the individual states. As discussed above, the measure of $6.57 drawn from Ohio could be used.

Vera reported prison interest costs that should be attributed to correctional facilities rather than be part of other state budgets. The appropriate measure would be the current per inmate interest cost for the construction of a facility. Unfortunately, the Vera data refer to interest payments for prisons that might have been built long ago and do not reflect current costs. Also, the capital costs should correspond to the same number of inmates as in the relevant size prison. Since we divide by the total number of inmates, our measure of interest payment is understated. In maintaining our conservative approach, we chose to use Vera's capital cost when the states do not report their own cost.

Florida built a new public prison in 2009, and the annual interest per inmate per day was $7.05. However, in the case of Florida where private vendors operate the existing public prisons, only the short-term costs are relevant. The other states showed lower costs. Except for Florida, imputed costs of interest were lower for all other examined states than the $6.57 updated interest costs. Maintaining our conservative approach, we used Vera or the state data for all examined states except California for

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 28

CONFIDENTIAL                                                                    CORECIVIC_0955207

which interest data from Vera were missing. Including the $6.57 for California would increase the long run 2007-8 savings from contracting out from 32.20 to 35.79 percent. However, we chose to be even more conservative by not including any interest costs for California.

Deleted: for California

### 7. Capital Flexibility Gained by Use of Contractor Operated Prisons

Use of private prisons increases the flexibility of government corrections in a variety of ways. First, demand for prison cells changes over time. When demand is high, public prisons lack cells, and overcrowding results. The courts can require timely alleviation of overcrowding in such cases as California in 2013. In the absence of contract prisons, states need to build expensive new facilities while their borrowing capacity is low. On the other hand, the number of inmates is expected to diminish for such reasons as the declining cohort of young males, reduction in the use of "three strikes" sentencing, easing of drug laws as already occurred in the states of Washington and Colorado, and a possible reduction in recidivism. Prisons could then become under-occupied or even vacant, and it is difficult and expensive to transform them for other uses. Further, much of the expensive surveillance features will have to be abandoned. For example, Florida, Texas, New York, and Michigan have seen a decline in the number of prisoners and have already closed prisons. The only three states experiencing a significant increase in prisoners in 2011 were Kentucky and Tennessee, leading to an increase in the use of private prisons. However, the trend has changed between 2011 and 2013 causing the closure of 35 adult state correctional facilities in 15 states (Strumpf, 2013). Thus, contract prisons play the role of an equilibrating mechanism for equating supply and demand for cells. Regardless of a praise on the partnership between Kentucky's DOC and CCA, with the decline in the number of prisoners, private prisons closed when public prisons had sufficient cells. The same phenomenon of reduced reliance on private prisons occurred in Texas in 2013, which has even closed one state prison. This flexibility translates into large savings for state governments. When overcrowding occurs, the state saves by using private prisons instead of building new prisons that have little or no alternative use in periods of decline in the number of prisoners.

Deleted: D

Deleted: the

Deleted: the Central Unit state prison in Sugar Land, Texas lies vacant.

Deleted: that have

Deleted: ed

Deleted: a

Deleted: , ,

Deleted: causing

Deleted: a

Commented [A36]: Not sure what this is supposed to say.

These significant savings for state governments are not accounted for in our calculations of inmate per diem costs, even though they should be considered state avoidable costs. This is again an indication of our conservative approach where avoidable costs are downward biased when savings exist but cannot be comfortably estimated.

Private prison construction yields savings in both time and costs compared to state governments contracting out the construction. Cumbersome procedures in obtaining bids and selecting the winning contractor, possible rules for the use of unionized labor, and the inability to take advantage of buying power make the cost higher and often hinder timely completion. A private contractor built a 3,000-bed medium security prison for California in Arizona and began housing its first inmate just 15 months after beginning construction. Because of the regulatory requirements in California, that process would have taken much longer. These issues are discussed more fully in the individual state sections.

We do face here the typical peak load problem similar to the case of electricity. When a state faces excess demand for prison cells, then the private prison industry relieves the pressure by saving the public sector the full construction costs of building new facilities. In the electricity industry, excess demand in one region is usually satisfied by purchasing electricity from other utilities that are experiencing excess capacity. The price reflects long run costs. The same principle should apply to the prison industry.

Deleted: , which

Deleted: e

### 10. Non-Cost Performance Measures

CONFIDENTIAL

CORECIVIC_0955208

Our discussion so far has concentrated on the comparison of public costs and the fees paid for private prisons. Obviously, dimensions of quality should also be considered. To that end, there are some suggestions that the private facilities are performing at least equal to public correctional facilities.

A robust and useful practical indicator of quality in the operations and management of prisons is accreditation by the American Correctional Association (ACA). ACA accreditation allows for a standardized quality measure, and the standards themselves are established and continually revised by a dedicated committee within the organization. Generally, public-private partnership prisons must obtain and maintain accreditation by the ACA. This accreditation is often required of private prisons as part of their contracts. In 2002, there were a total of 5,000 detention facilities in the United States, of which 532 were accredited. Of the 532, 465 were public and 67 were private. At most, 10 percent of government facilities were accredited, while 45 percent of private institutions were accredited (Segal, 2002: 12).

Contracts with private prisons also include performance measures to ensure quality performance is maintained, and monetary penalties are assessed for unsatisfactory performance. The contracts often require at least equal performance to that of the state facilities. An Ohio corrections official stated that that their contracts include quantitative performance measures that ensure quality. Renewal of contracts is, of course, aided by good performance.

Private firms are often required by contract to provide measurable performance, a requirement that does not always apply for the public sector facilities. For example, in Florida, the Chamber of Commerce in 2012 provided data showing greater provision of education, training and vocational services for inmates in private facilities (see section on Florida below). This higher level of rehabilitation and intervention services can be seen in other states as well. For example, in Kentucky, the Legislative Research Commission stated in a 2009 report (p. 19) that: "All three contracted prisons offer more programming than the comparable state prisons. In particular, the state-operated Little Sandy Correctional Complex and the contracted Lee Adjustment Center have little programming in common except for work, GED, Narcotics Anonymous/Alcoholics Anonymous, and prerelease programs. The Lee Adjustment Center provides a number of vocational training opportunities not offered at Little Sandy."

Beyond the efforts to assure quality through accreditation and contracts, the existence of competition by private prisons constrains price increases of labor and improves efficiency in the use of labor. For example, the existence of the private option has changed staffing patterns in Oklahoma public prisons, which has led to useful consolidation of some case manager roles and improved food services. In Ohio, private correctional officers are trained with public officers at the same academy. Their staff meetings include both private and public wardens. This indicates identical training of officers, and collaboration between the public and private institutions that could suggest similar levels of staff knowledge, orientation and performance. This is, indeed, a practice that is highly likely to improve mutual learning and performance by both sectors.

### 11. Unaccounted Cost and Security Benefits of Contract Prisons

Private prisons provide additional benefits to state governments besides providing savings from their operation. Perhaps most significantly, private prisons pay income and property taxes while state facilities do not. In Arizona, for example, the economic consulting firm of Elliot Pollack and Company (2010: 1) determined that one private contractor paid over $26 million in taxes to the state and local governments in 2009 alone. Such state or local revenues could be used to reduce taxes or to finance other government functions. These taxes could increase the state income and employment by the familiar multiplier effect. We did not quantify such benefits, but their existence should be recognized.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 30

**Deleted: of**
**Deleted: -**
**Deleted: -run**
**Deleted: ,**
**Deleted: f**
**Deleted: T**
**Deleted: T**
**Deleted: ¶**

CONFIDENTIAL

CORECIVIC_0955209

Overcrowding diminishes both the short and long run inmate per day monetary costs. When prisons are operated over capacity, additional inmates added to the facility are significantly less expensive to house than in a facility that is operating at or below capacity. This is because in an overcrowded prison the fixed costs associated with the operation have already been accounted for. Therefore, the marginal cost of housing each additional inmate does not include any "overhead" costs. As prisons become more overcrowded, the lower marginal cost of each additional inmate drives down the facility per inmate average cost. Because state run prisons are much more likely to operate under overcrowded conditions (for example, California), the average "per inmate cost" is understated compared to private facilities operated at or even below capacity. While this is a highly significant factor in comparing costs, we have not accounted for this difference in our analysis.

In spite of achieved cost savings from overcrowding, research has shown the quality of service and the level of security are substantially reduced. In the case of California, the courts have concluded that security problems and deficient medical care resulting from overcrowding led to unwarranted deaths and suffering of the inmate population. In addition to jeopardizing inmate and staff safety, the remedies mandated by the courts far outstrip the perceived savings achieved from operating overcrowded prisons. See the discussion of judicial decision in the case of California below. Further, cost comparisons would tend to be biased against private facilities if their utilization rates were lower than public facilities.

Private prisons are monitored by state DOCs. In some states, contract prisons are monitored by on-site inspectors, while in other states' inspectors monitor randomly during the week. In any event, this is more rigorous quality control than the monitoring of state prisons. Also, managers and employees in private prisons do not enjoy sovereign immunity like public prison officials, encouraging private personnel to be more cautious in dealing with inmates. Finally, unlike public prisons, private prisons bear all liabilities, including fines and damage payments. Hence, the private sector has a greater incentive for good performance, which is largely unaccounted for in this study.

Evaluation of private versus public prisons requires consideration of legal issues and their cost implications, as well. In private correctional facilities, disciplinary actions require involvement of the aforementioned state monitors, while this may not necessarily be the case in similar public facilities. Wardens in public facilities have greater autonomy to handle these claims, as they do not generally have staff that serves in these oversight functions. This oversight (or lack thereof) has legal cost implications. As mentioned above, private correctional officers lack sovereign immunity, which means they are more vulnerable to litigation.

While the lack of sovereign immunity could be argued to reduce the willingness of officers to pursue escapees beyond the private facility (Sanders, 2012), in practice, both private and public correctional facilities normally request law enforcement involvement during incidents. Furthermore, private companies are often required by contract to involve law enforcement agencies. In fact, this use of law enforcement and planned collaboration must be laid out clearly by private contractors not only in their contracts but also in the emergency plans required for initial requests for proposal.

Further encouraging good performance of private contractors is the fact that the contract usually requires indemnifying the state for any malfeasance. On the other hand, the U.S. Supreme Court held that private correctional officers are less vulnerable for violating the Eighth Amendment to the U.S. Constitution against cruel and unusual punishment. In the case of private prisons, inmates charging violations must first exhaust any state remedies before claiming constitutional protections (see Minneci v. Pollard, 132 S. Ct. 187 (2011)).

**12. Discussion of Individual State Costs and Performance**

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013    Page 31

CONFIDENTIAL

CORECIVIC_0955210

Deleted: the

Deleted: the

Deleted: response, not just contract

Thirty of the 50 states used private prisons in 2010. The extent of usage varies from New Mexico's 43.6 percent of inmates confined in contract prisons to South Dakota at 0.1 percent. Overall, 6.8 percent of all state inmates were in contractor-operated prisons. The states that generally have a large number of private inmates were all in the south. The leading states in their overall number of private prisoners were Texas and Florida. After those two states, those with the highest number of privately held prisoners in descending order were Oklahoma, Arizona, Mississippi, Georgia, and Tennessee. These seven states accounted for 49 percent of all state-held prisoners in private facilities (U.S. Bureau of Justice Statistics, 2011; Gilroy, 2011).

Commented [A37]: In the last paragraph on pg. 16, it says the "share of private adult corrections in individual states ranges between 0 and 25 percent," which I'm not sure squares with this figure.

Deleted:

Deleted: data

In this study, we analyzed in detail six of the seven states, as well as California, which experienced a recent significant increase, and Ohio, which sold a large prison to a private contractor. A lack of available data prevented us from including Georgia. We incorporated Maine, which did not contract out for corrections services. However, it had good data for comparison of its state-operated prisons. The GAO/BOP report on the costs of federal prisons was included in order to supplement for missing data. Maine and the federal report also provided necessary benchmarks and standards to appraise the state data.

**Arizona**
Arizona has employed contract prisons since 1986. State law requires that private providers deliver the same level of service at lower cost to the state or a superior level of service at essentially the same cost. Contracts with the Arizona DOC (ADOC) also require that the state take ownership of a prison financed by the private sector when the contract term expires, typically after 20 years, and at no cost to the state (see http://www.azleg.gov/FormatDocument.asp?inDoc=/ars/41/01609-01.htm&Title=41&DocType=ARS).

Deleted: the

Deleted: after

Until a 2010 state cost report, public-private partnership prisons in Arizona were shown to achieve cost savings. The reasons why the 2010 report reached a surprising and, we believe, incorrect conclusion includes inadequately addressing depreciation and correctional officer retirement costs.

Deleted: the

Deleted: issues

The ADOC used depreciation based on original prison cost. This is significant because this approach underestimates the real cost of public prisons, which should be based on what it would cost in 2010 to finance and build a public prison. The Joint Legislative Budget Committee Staff, JLBC (2012) did such an analysis and employed a 20-year life. This yielded a state per diem per inmate cost of $10.71 instead of the $1.41 the ADOC reported. The $10.71 also includes the interest payments for capital costs paid by the ADOC. However, the budget should still have included the $0.04 interest that other state agencies incurred but Vera determined were attributable to corrections. The JLBC also found that the state retirement system was underfunding its pension contributions by overestimating expected investment returns. This correction added $2.67 per day per inmate to state costs.

Deleted: rizona

Deleted: the

Finally, medical costs were properly handled. The state provides all the required medical care at selected ADOC prisons, while private contractors have limits on the care they are required to provide as part of their contracts based on ADOC requested RFP stipulations. Accordingly, the JLBC staff simply mimicked what the ADOC did and reduced state costs for medical services by $10.08 and private contractors' by $7.64.

ADOC did not report any short run indirect costs. Instead of incorporating from the Vera Report the unaccounted $0.16 hierarchical costs, we included the 11 percent indirect costs calculated in the BOP/GAO report. The range for such costs in our analyzed states is $1.30 to $8.09 with concentration in the $5 - $6 range. Taking into account that 75 percent of the indirect costs are non-avoidable, the long run savings would be 22.34 percent for the minimum-security prison and 14.25 percent for the medium-

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 32

security prison. In the case of Arizona, which faces overcrowding conditions, the long run savings are relevant.

**California**

California contracts with private providers to assist in housing its inmate population both in-state through contracts with community correction facilities, as well as out-of-state to house approximately 9,000 medium-security inmates in prisons in Arizona, Oklahoma and Mississippi. The utilization of public-private partnership prisons by California is done primarily to reduce severe overcrowding in state prisons but has the added benefit of providing significant operational savings to the state as well. We calculate that privatizing a portion of its inmate management has saved California approximately $164 million a year. This is in addition to the billions of dollars that the state has saved by not financing construction costs to add additional prison capacity. As discussed below, the state has been able to utilize the flexibility that contract prisons provide to institute other policy measures to reduce overcrowding in its state prisons to help meet court mandates.

California experienced a substantial increase in its prison population during the 1990s and 2000s, going from 76,000 in the late 1980s to 171,000 in 2008-9. This increase was so great that by 2008, the system was operating at 188 percent of its designed capacity, and it continued to operate at almost double capacity for at least 11 years (Brown v Plata, 2011: 1924). The designed capacity is considered to be one inmate per cell, and no inmates housed in gyms or day rooms.

The overcrowding in California prisons led to problems in delivering adequate healthcare. In April 2001, Plata v Brown plaintiffs claimed in a class action suit that California provided such inadequate medical care that it violated the cruel and unusual punishment amendment to the U.S. Constitution (California Legislative Analyst's Office (LAO), 2012A). The court held that the system was "broken beyond repair" and that death and suffering had resulted. California in 2002 agreed to improve the healthcare situation. However, in 2006 the court held that insufficient progress had been made, determining that overcrowding led to security restrictions on inmate movements that prevented inmates from receiving appropriate and timely care. As a result, the court placed a federal receiver in control of inmate medical care, taking the state out of the management of the prison's healthcare system. That receiver remains in place today.

In August 2009, a three-judge panel upheld the ruling and ordered that overcrowding be reduced to at most 137.5 percent of designed capacity within two years in order to provide adequate healthcare, a decision that was affirmed by the U.S. Supreme Court in May 2011. At that time, overcrowding and its related severe medical consequences persisted. The U.S. Supreme Court in its 2011 Brown v. Plata decision (p. 1927) noted that on average one inmate died needlessly every 6 to 7 days because of the adverse consequences of overcrowding. The Supreme Court ordered that California reduce its prison population to the 137.5 percent figure by June 2013. This meant that the state had to reduce its inmate population by about 39,000 to comply with the ruling.

California responded by instituting a policy commonly referred to as "realignment," which essentially shifted the responsibility of housing inmates convicted of certain non-violent crimes from the state prison system to county jails. Realignment, coupled with the continued utilization of contract prisons, has enabled the state to reduce its inmate population by approximately 37,000. However, in 2013, despite these reductions, the state was still operating its prison system at 150 percent of capacity. The U.S. Supreme Court in August 2013 upheld the lower court order to release by the end of December 2013 almost 10,000 inmates, which would finally reduce the number of inmates to 110,000 or 137.5 percent of designed capacity (Elias, 2013).

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 33

**Deleted:** . The system wa

**Deleted:** s

**Deleted:** d

**Deleted:** of

**Deleted:** lso in 2006

**Deleted:** s

**Deleted:** .

**Deleted:** In 2011

**Deleted:** the

In 2010, the state housed 8,021 male inmates in five contracted facilities out-of-state (California LAO, 2010). The California State Auditor (2010) determined that the California Department of Corrections and Rehabilitation (CDCR) spent an average of between $3,200 and $7,800 less per inmate to house 2,226 inmates out-of-state than it would have spent in California prisons during 2007-8. These savings refer just to the short run operating costs, while the correct savings in the case of overcrowding, as discussed earlier, should relate to the long run and would be even higher. In any event, the Auditor noted the usual difficulty of determining comparable inmates.

The issue of monitoring costs for out-of-state facilities is important. For example, the CALAO reported that the out-of-state program required 73 monitoring positions for 5 contract prisons. Given that other states have one or at most three monitors per prison, the figure of 73 is unusually high.

The CALAO reported that in 2011 California paid between $61 and $72 per day per inmate in out-of-state facilities. The relevant average cost for its in state public prisons was $104, or about double the price paid to the public-private partnership prisons.

While the state has been able to enjoy substantial savings by contracting with private providers, they have begun to look at replacing older and expensive facilities through new construction. Last legislative session, California authorized its Public Works Board to sell $810 million of revenue bonds to build 2,400 dorm beds at existing state prisons at a cost of $337,500 per bed. Those beds will replace beds at the California Rehabilitation Center in Norco, California, which was originally built in 1928 as a hotel. Assuming a 20-year amortization, as was the case in the Arizona example above, with an annual interest rate of 3.75 percent, the average annual interest rate for a municipal bond, principle and interest costs to the state equates to $66.70 per inmate per day without any costs for operating the prison. The cost to house an inmate out of state in a private facility averages $64.82.

Overcrowding has been costly to California. Medical care doubled between 2007-8 and 2011-12 reaching $43.95 per inmate per day. This compares to Maine's $16.67, which was the next highest medical per inmate cost of the states we reviewed. All other examined states ranged between $6 and $11. The court order increased California's medical costs over that period by $1.08 billion annually. The other high-cost item for California is personnel services, which are primarily security related. California's per diem for personnel services is $67.01, which was second to Maine's $79.25. Texas was third with $40.92. Florida's was $38.83, while personnel services for all other states examined ranged between $20 and $30. (Oklahoma showed high costs just for its maximum-security prison, which was not a major part of our analysis.) Noteworthy, both California and Maine, which exhibit high medical and personnel services costs, are the only states in our sample that lack competing contract prisons within their borders.

**Florida**
Some states require private prisons to achieve specified savings to obtain and maintain their contracts while still satisfying performance standards. For example, under Florida law a contractor must promise and then achieve savings of at least seven percent over comparable public prisons. The Office of Program Policy Analysis and Government Accountability (OPPAGA) of the Florida Legislature conducted an analysis of four privately operated prison contracts and reported on April 20, 2010 that all four contracts achieved the required savings and recommended their consideration for renewal (OPPAGA, 2010A).

The privately operated Bay Correctional Facility had a per diem cost of $52.73 compared to the comparable public prisons of $56.98 for savings of 7.5 percent during the two-year study period. The privately operated Moore Haven Correctional Facility had two-year savings of 12.5 percent, while the

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 34

Deleted: was

contract Graceville Correctional Facility had savings of 22.1 percent for the one year when a comparison could be made. Finally, the contract Gadsden Correctional Facility had two-year savings of 28.3 percent.

OPPAGA concluded that the contractors' performance in dimensions other than costs was acceptable. Performance criteria included such security requirements as key control, perimeter cameras, and filling vacant positions in a timely manner. Health services in particular were found to be well delivered. It is also noteworthy to point out that contractor-operated prisons provided more substance abuse and education programs, according to OPPAGA, than the comparable public prisons, so much so that costs had to be added to the public prisons for appropriate comparison.

OPPAGA also noted that a major reason for the cost advantage of private prisons is the higher retirement expenses for public prison employees than those provided by private contractors. Public correction officers have an amount equal to about 21 percent of their salaries contributed to a retirement fund, whereas private correctional officers receive matching contributions to their 401K funds of up to five percent of their salaries. Other reasons for the cost advantage of private prisons include higher costs for providing educational and substance abuse programs at public facilities and a higher allocation of administrative costs.

Florida's evaluation of private prisons has yielded some important evidence about performance. Specifically, OPPAGA's Information Brief Comparing Cost of Public and Private Prisons of March 1997 noted that per diem public prisons costs rose less than 1.5 percent annually between FYs 1992-93 and 1995-96. OPPAGA noted that competition induced by the privatization of some prisons might have produced greater efficiency in the public prison system (p. 6). In a study of private prisons in Florida including a comparison of other state systems prepared for the Florida Department of Management Services (MGT of America, 006: 33), the three lowest per diem inmate costs included Texas, Georgia and Florida – all states with competing private prisons. The authors suggested that use of contract prisons lowered costs of state-operated prisons, as well. This finding is consistent with a later Vanderbilt University study conducted on all 50 states, which concluded that states with private prisons experienced 2.64-3.15 percent lower growth in public prison costs. These savings had a two-year lag. The study concluded that learning or possibly competition cause the public savings (Blumstein et al, 2007).

The Correctional Privatization Commission of Florida responded to OPPAGA's brief by claiming that the private prisons must satisfy higher performance standards than state facilities. The Commission stated that private prisons must indemnify the state against any liability, are subject to greater monitoring, must achieve and maintain accreditation by the American Correctional Association, and must provide a broad range of education and technical programs. The Commission noted that the two private prisons had achieved earlier accreditation than required by their contract and their scores were the highest ever achieved by any Florida prison (pp. 9 and 10 of brief).

The Florida Chamber of Commerce reported in 2012 that the number of inmates per staff to provide rehabilitation services was 1 per 38 in private prisons and 1 per 272 in public prisons in DOC Region IV. In fact, 79.3 percent of inmates in the private correctional facilities participated in such educational, vocational, and life skill training compared to 21.3 percent in public facilities (Florida Chamber of Commerce, 2012). At a minimum, these data show that private facilities can and do provide programs to reduce the likelihood of recidivism.

In a 2012 presentation by the Florida Department of Management Services (FLDMS) before the Florida House Appropriations committee, the per diem costs of six contract prisons were compared with the most similar public prisons in Florida. Short run savings from 2009 to 2013 ranged between 10 and 27

percent (Florida Department of Management Services, 2012: 9). Indicative of Florida's approval of the contract prisons, the presentation stated that in 1993 there was one contract prison of 800 beds, in 2004 there were five with 4,304 beds, and in 2012 there were seven with 10,128 beds (page 3).

An earlier study conducted for the Florida Department of Management Services (MGT, 2006: 26) compared the costs for the private South Bay and Lake City Correctional Facilities against imputed costs for similar public facilities. The study showed that in the period from 2004 to 2006, the percentage savings were 19.4 and 11.2, respectively.

**Deleted:** pub il c

As for the long run, some states like Florida (and Texas) employ a BTO system for private prisons whereby the private firm bids to build a prison; the state finances it, and pays the private firm for managing the construction process. The private firm then transfers ownership to the state and is given a lease to operate the facility for some years, usually renewable upon satisfactory performance. For Florida, the firm must save seven percent both in operating or short-term costs and also in construction costs compared to a state-operated and built facility.

**Deleted:** private

A 2010 study by Florida's OPPAGA has shown such additional construction benefits besides operating costs. The comparison was between a state prison for 3,288 inmates, Suwannee Correctional Institution (whose main unit was designed for 1,521 inmates) and a private prison, Blackwater River Correctional Facility, designed for 2,000 inmates. Both facilities were designed and built for close custody inmates and those with mental health problems. The state facility could accommodate more severely ill inmates.

Comparing the main unit of Suwannee and the comparable Blackwater River facility, OPPAGA determined that the per bed costs for the private and public facilities were, respectively, $57,682 and $64,277, so that the private facility was shown to have achieved about ten percent savings, in excess of the required seven percent. It is noteworthy that the facilities had about equal costs if the total facilities were compared. However, OPPAGA concluded that this would not be a fair comparison because the public facility (i.e., Suwannee), among other reasons, included a work camp whose construction was far less costly than a regular prison.

Additional site development is a major reason for public facilities having higher costs. With Suwanee and Blackwater, site infrastructure cost $12,070 per bed for the public facility compared to $4,512 for the private prison. Blackwater took advantage of Santa Rosa County's interest in encouraging companies to locate there. The county charged no impact fee other than the $3.6 million land cost. Meanwhile, Suwannee required infrastructure to bring water, gas, and sewer to the prison, which was seven miles from the City of Live Oak. The public prison had to reimburse the city $3 million for an impact fee to upgrade water facilities and replace the county sewer plant.

**Deleted:** s

The contract prison was also built quicker than the public prison. The public prison was authorized by the legislature in 2006 but was not completed until October 2009, whereas the private prison was authorized in 2008 and completed in July 2010. In general, OPPAGA reported that private prisons are built in 18 to 24 months compared to 36 months for public prisons. The private firms are not burdened by the cumbersome public sector requirements involved in selection of contractors, subcontractors, and the process of selecting site appraisers. There are also important differences in the construction itself of the prisons. Blackwater, the private prison, installed air conditioning, which obviously contributes to more comfortable living and working conditions and may alleviate inmate tensions in hot weather. The Suwanee public prison installed a less costly dehumidification system. In addition, the public prison employs a centrally located guard tower to watch over inmates, whereas the private prison employs cameras, reflecting the private prison's greater reliance on technology. Finally, the private prison does not have a central dining room but provides food in the living quarters of the inmates. The private prison

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 36

thereby reduces cost of construction, enhances inmate control, and may reduce staffing requirements (OPPAGA, 2010B).

**Kentucky**

Overcrowding in state prisons during the 1970s and 1980s led Kentucky to use private prisons. The first contract for use of private prisons occurred in 1986. The state also used county jails to house inmates. The number of inmates in private facilities increased from an average of 15,164 in fiscal year 2000 to 22,553 in fiscal year 2009 (KLRC, 2009). As we found in our analysis, the long run savings realized by Kentucky through contractor-operated prisons has been significant, ranging from 12.46 and 23.50 percent.

> **Commented [A39]:** These figures cannot be accurate. Even at CCA's peak, with three facilities full of KY inmates, we would not have come close to those population totals (in private custody). Perhaps those figures represent the total statewide populations. If so, they may also include all offenders under jurisdiction in the totals (i.e. probation and parole populations).

In fiscal year 2009, 54 percent of inmates were in state prisons, 34 percent were confined in local and regional jails, 5.5 percent were in three contract prisons, and the remaining 6 percent were in halfway houses or home custody. A rough indication of relative cost is the fact that state prisons held 54 percent of the inmates and accounted for 64 percent of the DOC's cost while contract prisons with 5.5 percent of inmates cost the state 5.3 percent.

Kentucky statutes and/or contract terms require the private prisons to achieve accreditation by the American Correctional Association. The contracted prisons must achieve savings of at least ten percent compared to comparable state institutions and must provide similar education, training, and substance abuse programs as state facilities. The contracts have required that Kentucky guarantee and pay for minimum numbers of inmates. For example, at the Otter Creek Correctional Center, the fiscal year 2009 contract required that the state pay for a minimum of 90 percent of the contracted beds or 429 beds of the 476 contracted beds. This means that the extra cost is zero for housing an inmate in a contracted prison when the state occupancy is below the guaranteed rate. Moreover, in the contracted Lee Adjustment Center, inmates from Vermont were housed to fill beds not contracted to Kentucky.

> **Commented [A40]:** Not sure I understand this statement. There has been a lot of controversy recently about the minimum occupancy requirements, so we really need to get this right. It is a major attack point for critics.

In 2013, the Kentucky Department of Corrections provided overall prison per diem costs for contract and state prisons. The public prison cost for FY2012 was $60.14 compared with $46.80 for contract prisons. In any event, the savings from contract prisons were about $13 per inmate per day or 22 percent. This is not a comparison of comparable facilities.

In an earlier study, the Legislative Research Commission (KLRC) noted that comparing public and contracted prisons was difficult both because of differences in inmate characteristics and differences in the facilities themselves. In any event, the KLRC found for fiscal year 2009 that the average cost per inmate in the privately operated Marion Adjustment Center was $40.02 and the relevant state cost was $56.75. For privately operated Otter Creek, the cost to Kentucky was $53.60 compared to $77.96 for the most comparable state facility. Privately operated Lee Adjustment Center's cost was $58.04 compared to the relevant state cost of $47.53. However, it should be noted that only 50 beds were contracted at Lee compared to 826 at Marion and 476 at Otter Creek, the other two contract prisons. The annual savings for Marion was $5,043,928, $4,232,302 for Otter, and losses of $189,983 for Lee. For all three prisons combined, the short-term annual savings for the state were $9,086,251. Further, since Kentucky contracted out for overcrowding reasons, the long-term costs for public prisons should be considered and, thus, the savings for the state were even higher.

> **Deleted:** be

If only the per diem rate were compared to the state costs, the private contractors appear more cost effective. This is because the state pays for some prescription drugs and hospital expenses for inmates of contract prisons, as well as the costs for monitoring contract compliance. Accordingly, the per diems for Marion were $34.54 and $43.62 for minimum and medium security, respectively. The blended rate at Lee was $43.62, and at Otter Creek, it was $51.17. In terms of performance, as discussed in section 7,

Case 3:16-cv-02267    Document 359-11    Filed 11/20/20    Page 40 of 84 PageID #: 13548

CONFIDENTIAL

CORECIVIC_0955216

contracted prisons offer more programming than do state prisons (KLRC, 2009: 19). In terms of safety, there is no clear difference (KLRC, 2009: 67-68). More grievances were filed in contracted prisons. However, as the KLRC (p. 70) notes, this could be because inmates feel secure enough to complain. They do not fear retaliation or they are confident that their complaints will be addressed.

## Maine

Maine, which does not utilize private prisons, has only 2,038 inmates. The state, however, maintains detailed data for almost all categories of public corrections costs. Interestingly, the short run prison costs are $117.36 per inmate and the long run prison costs per inmate are $127.95, including an imputed depreciation figure of $4.61 from the GAO/BOP. Maine's costs for both short and long run are double that of most other states examined. The reasons could be lack of economies of scale and high costs emanating from lack of competition provided by private prisons. Maine has four adult prisons, housing an average daily census in 2011 of 141, 147, 658, and 1,008 (Maine, Office of Program Evaluation and Government Accountability, 2011: 2). Thus, only one prison is efficient in size, while the others suffer from diseconomies of scale with higher costs for similar services of at least 15 percent. The short run cost per inmate per day in the other examined states is approximately $50. Adding the 15 percent cost penalty yields $57.50, while the additional cost attributed to lack of competitive pressure provided by the private prisons imposes on Maine up to $60 per day.

**Deleted:** of the

Maine's neighboring state, Vermont, contracts out inmates to prisons in Arizona, Kentucky, and Massachusetts for $65.75 compared to $137.00 for housing inmates in its own state prisons. Vermont's in-state costs are similar to those of Maine (Picard, 2011). Although Maine does not contract out inmates, it seems important to show what Maine could save if it contracted out at its neighbor Vermont's prices. In 2011, Maine was almost at capacity. Thus, if Maine chose to contract out existing inmates then the avoidable costs would be merely short run. The savings would be $69.93 per inmate per day or 51.54 percent. However, given the fact that Maine is already operating near capacity (capacity is considered in the range of 95-98 percent), savings resulting from contracting out of additional inmates would be $69.12 per inmate per day or 49.38 percent. These would be long run savings because additional inmates would require public capital expansion.

**Deleted:** prisoners

**Commented [A41]:** Listed in Table 1 as 49.15 percent. Also check against table on pg. 3.

## Mississippi

Mississippi's contracting with private firms to provide inmate correctional services began in 1994. Legislation allowed county boards to build and contract with the sheriff's department or for a private firm to operate and manage the facility. The first such facility was built in 1996 and was a combined jail and regional facility. An interview with a Mississippi DOC official revealed that in 2012, the DOC paid $29.54 per day to house 300 inmates in the original facility. Under this arrangement, Mississippi state government pays the debt services and, at the end of 20 years, the facility becomes state property. Private firms also built and operated their own prisons.

In 2012, five correctional facilities were managed and operated by private firms. They were built by counties and then leased to private firms. Four were 1,000-bed facilities, and one had 1,500 beds. A typical per diem rate was $29.74 plus medical, since the state paid all hospital expenses beyond the first 72 hours. The first 72 hours were the responsibility of the contractors.

Mississippi is a statutory savings state, which means that it must obtain the required ten percent savings over public prisons in order to have private firm operation. This constraint led to the 2011 voluntary termination of CCA's contract to operate the Delta Correctional Facility because CCA considered the required $31.16 per diem (ten percent less than the state's $34.61 cost) to be unacceptable (Reason, 2011). Mississippi was experiencing a decline in prison population, so the closure of the Delta facility could be easily accommodated by moving inmates to other facilities.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013         Page 38

The contract prisons have to meet other non-price requirements as well. They must attain American Correctional Association accreditation within 14 months of beginning operation. Further, each of the five contract facilities has a monitor who is a state employee but is paid as part of the contract per diem.

**Ohio**

Ohio began the process of private participation in correctional institutions in March 1998 when the state legislature passed a law mandating that the Ohio Department of Rehabilitation and Corrections (ODRC) engage private firms to operate and manage the North Coast Correctional Treatment Facility (NCCTF), a 552-inmate, minimum-security substance abuse treatment facility for adult males, and the Lake Erie Correctional Institution (LECI), a 1,380-inmate, minimum/medium-security facility (material supplied by ODRC).

The initial contractor for the NCCTF, Civigenics, held the contract from September 1999 until replaced by MTC in fiscal year 2002. MTC agreed to a per diem of $62.87 for fiscal years 2002 and 2003, and Ohio reported savings compared to state operation of 5.02 and 5.92 percent, respectively, for the two years. Savings for subsequent years were about 17 percent, attributed to cost containment efforts by MTC. State operations would have cost $79.77 per inmate per day, according to Ohio officials.

More recent contracts provided additional savings for inmate populations in excess of 552 up to the maximum of 612 inmates. The 2006 fiscal year rate, for example, was $42 instead of the $65.08 rate for the first 452 inmates. This is likely a result of economies of scale that extend to inmate populations of at least 1,000 in minimum/medium security prisons discussed elsewhere in this report. Moreover, subsequent contracts after 2006 held annual increases below the Consumer Price Index (CPI), and the ODRC reported savings to be about 16 percent.

The contracts required MTC to maintain staffing at or above a certain level and provide a full range of education, health, rehabilitation, and training programs. The facility also had a Community Advisory Board and community volunteers, which help inmates and assured community member integration. The facility scored 100 percent on ACA accreditation standards.

It is important to note how Ohio determined some of its state cost data, which are compared with private prices. The ODRC uses a sophisticated model that includes program-specific costs (ODRC, 2007). State costs are estimated based upon local conditions, and the experience of similar ODRC facilities adjusted for inflation. ODRC indirect costs are based on recent departmental reports.

Deleted:

LECI opened in April 2000 with MTC as the contractor. The ODRC determined that the per diem rate of $39.94 for fiscal year 2002 yielded savings of 12.55 percent compared to state operation. Additional cost savings for fiscal year 2003 were achieved by cutting 1.2 full-time equivalent staff and reducing the annual increase of prices to 0.5 percent instead of the CPI increase. Cost savings for fiscal years 2003 and 2004 were determined by the ODRC to be 12.94 and 16.69 percent, respectively. Contracts for subsequent years included lower rates for inmates between 1,380 and 1,480. Contracts for subsequent years also held per diem rate increases below the increase in the CPI, and savings were determined by the ODRC to be about six percent. Similar to NCCTF, an advisory board, community volunteers, and a 100 percent score on ACA accreditation were achieved.

Commented [A42]: Should this be a percentage or something like that?

In September 2011 the ODRC announced the sale of LECI to CCA for $72.7 million. The firm would also operate the facility and expand the capacity by 304 inmates. Annual savings of eight percent in operating costs were expected.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 39

Turning to the findings, Ohio's short run savings from contracting out prisoners were 13.44 percent for 2010 and 4.14 percent for 2012. The respective savings for the long run were 26.81 percent and 20.28 percent. The statutory requirement in Ohio is five percent, and our calculations are in line with the ODRC. The ODRC provided us with its calculated savings, which ranged between six and 23.7 percent for the fiscal years 2002 through 2008 for one facility. For the other privately operated facility, the savings ranged between 8.5 and 18.1 percent for the fiscal years 2000 through 2008. All these savings related just to the short run. In any event, the appropriate comparison should be done on a long run basis, since Ohio avoids construction of new prisons and enjoys flexibility for changing inmate population.

As for indirect costs, the only item available was Vera's administrative cost, which we termed hierarchical costs of $1.4 million or $0.08 per inmate per day for fiscal year 2010. It is likely that other indirect costs are missing, and the same discussion that we had for Arizona applies. We chose to be conservative in our calculations and ignored these costs, since Ohio's savings from contracting out were above the statutory requirements.

The difference between the public long-term costs and the price paid for private prisons in 2012 was $16 per inmate per day. This difference is attributed to capital and interest costs of $9.63 per inmate per day and unaccounted pension and healthcare costs of $2.64 per inmate per day, totaling $12.27 per inmate per day. Thus, only $3.73 per inmate per day could be attributed to all other elements of cost including labor. In other words, lower pay to correctional officers by the contractor-operated prisons is a small component for the savings. Indeed, our interviews with ODRC personnel revealed that public correctional officers earn only $1 more per hour than their private counterparts. Differences in labor productivity and purchasing power savings of private prisons are additional elements that comprise the 23 percent. Thus, differences in wage costs could not exceed 23 percent of total savings for contracting out.

**Oklahoma**

Oklahoma began contracting out inmates to private contractors operating in 1998 as a result of overcrowding in the state's public prisons. The Oklahoma Department of Corrections (OKDOC) considers overcrowding to occur when capacity utilization reaches or exceeds 95 percent. Oklahoma statute 54, section 570, "the Oklahoma Prison Overcrowding Emergency Powers Act" provides the authority for such contracting out to private contractors.

OKDOC in 1995 initially used county jails to house inmates, but capacity at county jails was soon exhausted. The OKDOC then contracted with private providers to house inmates in Texas. In December 1995, OKDOC contracted for 510 male beds and 50 female beds with Texas. As of April 15, 1997, contracts for 2,285 male inmates and 423 female inmates were in effect at eight Texas facilities operated by six companies. Monitoring of the Texas facilities proved difficult, and some problems occurred at one facility. Oklahoma had only two contract monitors and had to rely on volunteers (Oklahoma DOC, History). Accordingly, when space became available in Oklahoma private prisons, the inmates were relocated to Oklahoma. By October 1998, all inmates housed in Texas had been relocated to private prisons in Oklahoma. In December 2000, 5,824 male inmates were in five Oklahoma contract prisons operated by three companies, and 872 female inmates were in one private prison.

As of September 2011, 4,738 offenders were in Oklahoma private prisons. In 2011, the OKDOC determined that the $41.79 per diem rate at the private facilities was comparable to the $42.41 daily cost in medium-security state prisons. The OKDOC cost comparison does not include capital costs and is evidently done on a short-term basis. However, even for the short run, public prison costs should incorporate the unfunded pension and retiree healthcare for current employees. Moreover, the comparison should be done on a long-term basis. Indeed, as the OKDOC stated: "It appears continued

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 40

CONFIDENTIAL                                                                 CORECIVIC_0955219

housing in private facilities is a viable alternative to the massive capital outlay required for construction." (Document provided by OKDOC.) Thus, a true cost comparison between public and private beds in Oklahoma should consider capital costs to build a new facility, because the OKDOC currently operates close to 100 percent of capacity in its public prisons.

Of note, Oklahoma has not built a public prison since 1976; however, it did buy a 600-bed private prison in 2000 for about $27 million. Its public prisons in 2012 operated at 98 percent of capacity. Oklahoma in 2012 contracted with private prisons in the state to house almost 7,000 inmates, including out-of-state and halfway house inmates, while its state prisons held 18,000 inmates. The state contracted out medium- and maximum-security inmates. Private prisons in Oklahoma also held prisoners from Hawaii, California, Colorado, and Idaho. An OKDOC official claims that inmates who commit crimes while in Oklahoma private prisons impose a cost for adjudication and punishment by the Oklahoma justice system. On the other hand, contract prisons pay state and local taxes, provide employment, and purchase local goods and services. Determining the net financial impact of out-of-state inmates on Oklahoma is beyond the scope of this study.

Oklahoma uses public-private partnership prisons for population management. Instead of building new prisons, Oklahoma contracts with private prisons, providing important flexibility so that new prisons are not needed. If capacity utilization is low, fewer inmates are sent to private prisons. Clearly, when comparing private and public costs, the public costs should incorporate all the long run capital costs.

Contracts with prison operators require certain performance standards. For example, one such contract requires that 80 percent of inmates be involved in education and job training programs. Private prisons must pay for inmate medical costs under $100,000 with a cap of $50,000 for a single episode. The state covers the rest. As in other states, OKDOC classifies all inmates, including those with medical problems, and determines to which prison they are sent. Some contracts specify that the percentage of inmates with particular conditions mirror that in the public prisons.

A 2007 study of Oklahoma public and contractor operated prisons conducted for the state legislature concluded that private prisons in fiscal year 2006 were less expensive than the most comparable public facilities (MGT, 2007: 3-21). Specifically, the per diems were $47.14 compared to $51.94. The report noted the difficulty of determining comparable facilities. It also stated that the cost difference was in part attributable to the older age of the public prisons, which added to their security problems, requiring higher staffing levels than the newer contractor operated prisons. The study also noted that contractor operator prisons could be built quicker because the leading contractors have greater experience and expertise in building prisons than almost all states.

The contracts also were shown to provide substantial flexibility for Oklahoma. The state had the option in some of the contracts to buy the contractor operated facility "at fair market value." Under the contracts, Oklahoma can reserve beds for up to 15 days, after which it has to pay for the beds even if it does not use them (MGT, 2007: 3-30).

The report showed that the contracted prices can be so low (as also in Mississippi above) that the private operator chooses to withdraw from the contract. This occurred in the case of the Cornell contract when Oklahoma raised the per diem by only seven percent in the ten years ending in 2006 (MGT, 2007: 3-20).

We now turn to our results. To begin, the public short-term costs are understated since Oklahoma does not fully fund its employees' retirement pensions. The Vera Report (2011) stated that 2.6 percent of the total OKDOC budget, or $11.6 million, was unfunded, and our interview with an OKDOC official indicated

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 41

CONFIDENTIAL                                                                                    CORECIVIC_0955220

that 20 percent of required pension contributions were underfunded. We applied the 2.6 percent to the total short run cost per inmate per day and obtained the range of $0.99 to $1.99.

Comparing public costs with the private per diem charges for 2011, we find that in the short run, one contractor-operated, medium-security prison was 2.16 percent more expensive while the other saved 4.35 percent. However, this is an inappropriate comparison because Oklahoma's prisons were operating at full capacity even with the use of private prisons. Thus, the only alternative for Oklahoma is to build more prisons and, therefore, the long run state costs should be considered. The savings from the two medium-security prisons would then be 16.1 percent and 22.02 percent. For maximum-security facilities, the short run savings from the two private prisons were 27.56, and 29.23 percent. Again, the more appropriate long run savings were greater and, in fact, were 35.27 and 36.77 percent.

Salaries of correctional officers in public and private prisons are comparable. For example, beginning public correctional officers in 2012 earned $24,605, while private officers earned $24,190, a 1.7 percent difference. The total long run savings by contracting out medium-security prisoners were $8.63 and $11.37 per inmate per day for the two prisons, which results mostly from capital savings. The two maximum-security prisons achieved savings of $31.58, and $32.92 per inmate per day. Additional savings arose from avoided unaccounted pensions and healthcare costs of $1.29. The cost advantage of public-private partnership facilities likely arises from their greater productivity and possibly greater purchasing power. This coincides with the 15 percent greater productivity of private prisons experienced in Ohio. Thus, the long run savings from contracting out to private prisons is only marginally attributed to wage differences.

Generally, the quality of private and public prisons is thought to be comparable. The co-existence of public and private prisons has also provided important additional benefits. In response to private prisons, public prisons have changed staffing patterns to become more efficient. Public prisons have also consolidated case management and improved service as a result of the experience with PPP prisons.

**Tennessee**
Tennessee is a statutory state with a five percent required savings on private prison operations. The state owns the facilities, which are leased to private operators. Thus, like Florida, short run or operational savings are relevant.

Tennessee began the use of contract prisons because of overcrowding during the 1980s. The original 1986 law authorizing contract prisons allowed only one work camp. The legislation was amended in 1991 to allow one minimum- or medium-security contract prison. Tennessee then built three prisons, one of which was leased to a private firm under a three-year contract with a possibility of two-year renewal. This facility has between 1,500 and 1,600 beds. After the five years, the facility must be rebid. The contract prison must achieve five percent savings over a comparable public prison providing the same quality of service or higher quality at the same cost. The evaluation of contractor performance is done in the third contract year.

In 2013 and for some time prior, contractor operation has been evaluated through an annual inspection review of education services provided, the security level, and other indicia. Tennessee is still permitted to have only one contract prison. However, the state can contract with counties to house inmates, and the counties can then contract with private firms. As of 2013, Hardeman County has two contract prisons, one owned by the county and the other by the private contractor CCA. The one state-owned contract facility is South Central Correctional Center, which is leased to CCA. Each contract prison is overseen by two DOC monitors. The contract prison wardens participate in DOC meetings. One warden of a contract facility in 2013 was formerly a state prison warden. The contracts specify training

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 42

CONFIDENTIAL                                                                    CORECIVIC_0955221

requirements for correctional officers. Some private prison administrative employees receive some training in state facilities. Noteworthy, the state recently considered whether to take over South Central, sell the facility, or continue to lease it. Tennessee decided to continue leasing, suggesting state satisfaction with the arrangement.

In terms of contract specifics, Tennessee guarantees payment for 90 percent of the contract capacity even if it uses less than the 90 percent. For utilization in excess of 90 percent, it pays the normal per diem. In county contract facilities, the state has termination language that enables the department to remove inmates with notice as projected needs change.

**Deleted:** the state must give notice of 270 days before it can pay for fewer beds

**Commented [A43]:** Need to check on this. I know for certain that the state has a 90-day out at the Metro-Davidson County facility.

More important point is that the state has termination language that enables the department to remove inmates as their projected needs change.

In April 2010, the Fiscal Review Committee of the General Assembly of the State of Tennessee conducted a review of private and public prisons for the fiscal year ending in June 2009. The committee staff reported that the state costs were $53.32 per inmate per day, which meant that the contractor's price including all state associated costs had to be below $50.65 per inmate per day. The state, after all, still incurred such administrative costs for contract prisons as inmate classification and record maintenance. The relevant figure for the private facilities (per diem plus associated state cost) was, in fact, $43.99 per inmate per day, which is $9.33 below the state cost, amounting to savings of 17.5 percent.

The report stated that it was difficult to do a dollar-to-dollar comparison because the relevant facilities have different levels of healthy inmates, although the DOC could not quantify the cost of these differences. Additionally, the report states that private facility had a relatively safer inmate population based on the number of close custody and maximum-security inmates in each facility. Again, the DOC could not quantify the cost difference

Tennessee was the only one of our examined states that reported the maintenance and the central administration overheads to be added to the contract price to determine any savings. We followed Tennessee and calculated the savings considering these costs.

**Texas**
Texas began its legislative process of privatization in the late 1980s because of prison overcrowding, and the state's private prisons were built in the mid-1990s. The state also built public prisons in the same period. Initially, privatization took the form of state finance by revenue bonds, later by general obligation bonds. Later, the privately operated prisons were built by the contractors, who typically received a seven-year lease, renewable at the end of every two years. The Texas Legislature required that private contractors achieve ten percent lower costs without specifying whether the savings needed to be in operations or overall costs. In fact, Texas evaluates the savings on operating costs, which is appropriate in this particular case because the facilities are, in general, owned by the state and simply operated by private contractors. The data in Table 1 do not include medical services since Texas contracts with local medical schools for all inmate medical care. Further, if medical care requires more than 72 hours, the inmates will be transferred from the private prison to a state prison.

**Deleted:** T

**Deleted:** later

In 2012, Texas contracted with 17 contract prisons comprising one-third of its inmate population. Most private facilities are minimum-security, while some are medium-security. Most private prisons are small, built for 500 inmates, while the one described as a prototype in Table 1 is for 1,000 inmates. Of the 17 private prisons, 13 were owned by the state under the BTO arrangement, and four were built or renovated and owned by the private operators. Most of the publicly operated prisons in Texas are quite old, and the oldest was built in 1856.

**Commented [A44]:** Also need to square this with the "0 to 25 percent" range for share of private adult corrections in individual states cited on pg. 16, since this would be 33% of the TX population.

**Commented [A45]:** Do we need some discussion as to why a prototype was used?

CONFIDENTIAL                                                              CORECIVIC_0955222

In 2012, Texas had approximately 140,000 prisoners housed in public and private facilities with a total capacity of 156,000. County jails are used as a relief valve to house prisoners when excess demand occurs. In addition, some of the private prisons specialize in certain types of offenders and are able to offer special treatment. For example, the private prison in Henderson, Texas specializes in treatment of drunk drivers.

As of 2012, except for two public prisons in Houston and Dallas the remaining public and private prisons are located in rural areas or smaller cities, enhancing the local economy. Positions in these prisons are typically filled by local residents, providing jobs for the local community. Contractor-operated prisons purchase other local services, all contributing to these areas with the usual multiplier effect.

**Commented [A46]:** I think we need some kind of qualification here because the private prison in Dallas was shut down this year.

**Deleted:** E

The direct costs per inmate in Texas public prisons in 2010 were $53.77, indirect were $1.30, and hierarchal were $0.19, reaching what Texas considers average variable costs of $55.26 per inmate per day. This figure is what Texas uses in its calculation for the required ten percent savings. This would yield a price no higher than $49.73 per inmate per day for the private facilities. The appropriate avoidable costs should also include the underfunded pensions and retiree healthcare of $4.44, which means that the appropriate required price to reach is $53.73 per inmate per day for private facilities. The price paid to the contractor for the 1,000-bed prototype was $37.47. The contract varies for each prison, while prices are typically lower for larger prisons due to significant economies of scale. We learned from Florida that the costs per inmate are 15 percent higher for a 750-inmate prison than for a 1,000-inmate prison.

**Commented [A47]:** Again, think we need some explanation on why this is a prototype.

Our interviews have clearly shown the benefits of the competition among the private contractors. The private companies cannot go below the public performance standards detailed in the contracts. However, evidence suggests that competition often yields higher performance quality in order to maintain long-term contracts. In addition to competition in pricing, Texas gains additional concessions through individual negotiations that follow the selection of the contractors. Thus, the states and inmates gain more than merely the statutory lower prices in the contract negotiations.

In addition to the actual savings, we learned from our interviews with officials of the Texas Department of Criminal Justice (TDCJ) that contractor operated prisons -- to a greater extent than state facilities -- have employed electronic tracking systems instead of the manual key board system. Electronic tracking systems provide greater security since access requires personal identification. In addition, some private prisons exceed the required standard eight-times-a-day count of prisoners. In terms of annual refresher training for correction officers, some private prisons train 56 hours annually instead of the standard 40 hours for public prisons. Private and public wardens together attend the same monthly meeting held by the six regional TDCJ directors. This clearly indicates the strong partnership and cooperation between the public and private sectors.

13. **General Discussion of Public Costs and Private Prices**

The critical issue of this study is the finding for the savings state governments derived from contracting out prison services. When the state legislatures enacted the statutory requirements for savings, they usually did not specify the exact nature of the savings. In this study, we distinguished between the direct operating savings that relate to the short run and the overall savings, which relate to the long run. As indicated earlier in this report, long run savings are the correct measure, except when a private contractor manages an existing public facility. The typical motivation for public-private partnership prisons is to relieve overcrowding where the only viable alternative is for the state to build its own prisons. Further, given the aging of U.S. prisons, even without overcrowding, some substantial rebuilding

**Deleted:** contractoperated prison

CONFIDENTIAL                                                                    CORECIVIC_0955223

is often necessary, making long run costs applicable. Another lesser but related motivation is to save state resources.

Our study found that contracting out inmates to private prisons saved state governments money while maintaining performance at least at the same quality as public prisons. A head of corrections of a large state suggested that compliance with the detailed contracts helps ensure this comparable performance. Additionally, the existence of private prisons fosters competition and helps constrain spending on public prisons.

Short-term savings run the gamut from Oklahoma's loss for medium-security prisons of 2.16 percent all the way to California's savings of 57.36 percent. Texas and Oklahoma's maximum-security private prisons had relatively high short run savings of 37.39 and 29.23 percent, respectively.

As discussed earlier in section 5, the indirect costs are incorporated in the short run costs. The reported indirect costs range from $3.72 per inmate per day to $6.64 per inmate per day. We used mostly the estimates of the Vera report when available. Studies for the legislatures of Oklahoma and Tennessee concluded that about 75 percent of indirect costs continued even for the privatized inmates. In the long run, adjustments often occur and the private prisons might assume more of these currently government functions. Thus, in the long run, a greater percentage of the indirect costs may be avoided. In any case, the magnitude of the indirect costs is small and could not affect the results. As discussed in section 6, either the entire or only 25 percent of the indirect costs could be considered avoidable. We calculated in Table 1 both alternatives, however in our conclusions we maintained our conservative approach and considered only the 25 percent as avoidable costs. In any case, available data indicate that indirect costs are quite low, most in the range of $5 to $7.

Long term savings ranged between Kentucky's 12.46 percent and California's 58.61 percent, while Maine was close to California with potential savings of 49.38 percent. Maine, which does not contract out to private prisons, was incorporated in this study because of the availability of its detailed data. The extent of the details for the direct and indirect short run costs vary among the analyzed states. In the case of Maine, it is noteworthy that its lack of both private and public competition and its small prisons that cannot exploit economies of scale explain the state's high costs and great potential for savings. Indeed, additional competition among the states and private companies could be most beneficial. The extent of the savings including satisfying the statutory requirements did not change appreciably when just 25 percent avoidable indirect costs were employed. Only in the short run for medium-security prisons in Oklahoma and Arizona did the savings decline to -2.16 and -1 percent, respectively. However, the long run savings for both these states matter and those savings were maintained.

The following three factors led to lower costs of contract prisons; the issues of short versus long run avoidable costs (operating versus total costs), unfunded pensions and healthcare, and employee benefit costs.

**Short- Versus Long-Term Costs**
The state legislatures enabled contracting out in order to relieve overcrowding. In several states like Ohio, Florida, Mississippi, and Kentucky, a related objective was to achieve savings. The legislatures of these mandatory-savings states have determined that the required savings were obtained, even though they typically focused only on short-term costs.

In fact, the savings should reflect the avoidable costs to the state. Since, in general, overcrowding, along with the aging of the state prison infrastructure, means that the only alternative is state construction and major renovations, modernization, or repair, interest costs should be incorporated as the avoidable

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 45

Deleted: the

Deleted: labor costs

Commented [A48]: Thought we might need to be specific here, since the wages are comparable.

CONFIDENTIAL                                                                    CORECIVIC_0955224

costs for government, an issue recognized by the Legislative Analyst's Office in California (2012B: 16). However, the states do not report depreciation since they are not private entities.

Better data are available for the interest payments made on bonds floated to build major infrastructures. Depreciation was estimated at $4.61 by the US BOP/GAO, and we incorporated that figure in all the states that did not report depreciation. The Legislative Staff Report for Arizona determined that depreciation was $9.30, indicating that the use of $4.61 is conservative. This long-run cost added to the savings of contracting out in the range of 2-14 percentage points, with six of the 13 observations at ten or more.

**Unfunded Pensions and Healthcare**
State spending on corrections is a significant contributor to the underfunded pension and retiree healthcare problem that could lead to a national fiscal crisis. State and local governments have substantially underfunded pensions and retiree healthcare expenses since such obligations come due years down the road. Government officials tend to prefer current spending on services while creating future liabilities that come due much later, possibly under different administrations. In 2011, estimates of unfunded pension and retiree healthcare liabilities ranged between $730 billion and $4.4 trillion, which would amount to as much as 33 percent of the 2011 GDP.

Many economists believe that the correct figure is closer to $4.4 trillion (Healey, 2012:3). The magnitude of the unfunded liabilities is negatively related to the performance of the stock market. In 2001, the 126 largest public pension funds had unfunded liabilities of 5 percent. In 2008, underfunding reached 36 percent, and in 2011, it was 26 percent (Healey, 2012:8). Total state government pension debt is almost 4.5 times the state bond debt (Novy-Marx, and Rauh, 2009). An indication of the magnitude of the underfunding problem is that every U.S. household would have to pay an additional tax of $1,098 per year for 30 years to eliminate the deficit using the more realistic treasury discount rate (Healey, 2012:15). Some cities like Detroit have already filed for bankruptcy protection in part because of the underfunded pension problem.

The underfunded retiree healthcare challenge is of similar nature but much lower in magnitude (Munnell et al, 2013). The states assume 8 percent return on their pensions and healthcare funds. Thus, with the 8 percent assumed return, the states will not be considered underfunded. It is important to note that 8 percent return is very high under existing market conditions, and therefore more funds should be allocated towards these two items in order to be fully funded (Novy-Marx and Rauh, 2009).

In terms of corrections, shifting prison operations to the private sector could significantly lower states' fiscal burdens with regard to underfunded pension and healthcare benefits. Additionally, existing calculations of state prison costs usually include just "out of pocket" items, neglecting to account for the underfunded pensions and retiree healthcare costs that will occur in future years, which are still avoidable costs. Thus, existing calculations of state prison costs are below actual costs and therefore appear to favor the public sector.

Vera, 2012, collected data from the 40 states that responded to its inquiry about the total cost of corrections. Vera obtained results for all the states that we examined except for Mississippi. The Vera study includes amounts for which the state is liable but did not fully pay. It also includes short-run costs attributable to corrections but which were not in the corrections' budgets. Capital costs, which relate to the long run and are not normally part of the corrections budget, were also enumerated. For our purpose, these are avoidable costs when states contract out prisoners. These unfunded pensions and retiree healthcare contribute 1-13 percent of total long run costs with a mode of 4-5 percent.

Deleted:

Deleted: ing

Deleted: s

CONFIDENTIAL

CORECIVIC_0955225

We now examine the contribution of correctional labor costs to the underfunding problem. Table 2 provides data on employees and their wages for 2011 for the 10 examined states and the U.S. as a whole. Correctional employment and wages are the highest in Florida, Arizona and California (Novy-Marx and Rauo, 2009). We calculated for each state the number of years of total tax receipts necessary to eliminate the accumulated underfunded deficit. Following the same calculation, Column 9 in Table 2 provides the savings from contacting out prisons for all the examined states. In terms of the impact of shifting to contract prisons, Ohio has the greatest to gain. Its underfunding amounted to 47 percent of 2007 gross state product, followed by Arizona and California. If Ohio shifts to contract prison operation, almost a year of the 8.75 years needed to eliminate the state's unfunded liabilities can be saved.

Deleted:

To conclude, the problem that the states are facing for their underfunded pensions and retiree healthcare may erupt as a result of temporary recession, as in 2008, or an unexpected increase in spending as a result of, for example, a natural disaster. This could cause states to default on bonds or pensions, resulting in a significant increase in taxes (for example a tax increase of $3,600 per person in Pennsylvania, Dreyfuss, 2013) or significant reduction in major services including education and police. Indeed, the effects are already noticed where the rating of state bonds diminish, leading to an expected rise in interest rates (Dreyfuss, 2013). Contracting out correctional services could help ameliorate the problem.

**Labor Costs**
In the long run, labor costs were in the range of 43-71 percent of total costs. In general, contract prisons pay comparable wages but somewhat less in retirement benefits. For example, Ohio private correctional officers are paid $1 less per hour. In Oklahoma in 2012, the beginning base salary for a correctional officer was $2,153 per month at the public Northeast Oklahoma Correctional Center. A comparable beginning private correctional officer at the Davis Correctional facility earned $2,068 per month, 3.95 percent less than a public officer. Our interviews with state DOC officials revealed that, on occasion, private correctional officers were paid higher wages but lower pensions. The rationale provided is that young correctional officers are concerned more about their current wages than distant pensions and retiree healthcare benefits.

Deleted: the

Private contractors typically offer workers matching contributions up to five percent of their salaries for their 401k accounts, which aligns with other private industries. However, many workers choose not to contribute their share and thus lose the employer's contribution.

Private and public correctional officers are drawn from the same labor pool. Generally, the training is substantially the same, providing similar number of hours with a few course differences. See for example, Arizona RFP, at
http://www.azcorrections.gov/adc/divisions/adminservices/notice_rfp_1200001388.pdf.

In Ohio, for example, they attend the same training academy and, in another state, public correctional officers work part time in private facilities. It appears that private contractors are able to hire correctional officers of similar attributes to those hired by the state. Also, private contractors are more flexible than state governments to reflect specific market conditions and the specific preferences of employees. Private contractors provide a benchmark for labor costs for state correctional employees.

In California where only community correctional facilities operate within the state, the wages and benefits package in the correctional public sector are exceptionally high. California has 30,000 unionized correctional officers and, each year, 130,000 candidates apply to become correctional officers. This excess demand for employment in public prisons is not surprising since the starting minimum salary in 2008 was $3,774 per month, and some officers earn more than $73,000 a year. California State Auditor

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 47

CONFIDENTIAL                                                                                    CORECIVIC_0955226

(2009: 49) reports that during fiscal year 2007-8, beginning correctional officers were paid an average of $50,739 excluding any overtime. The annual pension contribution by California even for new officers was $12,000 for fiscal year 2009-10. This was $4,000 more than other state employees received. The overwhelming excess supply of applicants for correctional employment clearly suggests that the total compensation package was well above these workers' market values (CALAO, 2008). A strong union and lack of competition within the state from private contractors contributed to the exceptionally high wages and benefits. Maine, which again has no competition from private contractors and less efficient, smaller sized facilities, also had relatively high labor costs.

We wish to stress that government sources were primary for this study. Also, when calculations were made, we were conservative (biased downwards) in the state costs. The long run savings of contracting out prisoners are attributed, in declining importance, to the long-term consideration of costs, the inclusion of unfunded pensions and retiree healthcare, and the lower private costs of labor, specifically with respect to benefits. We found no evidence that the lower costs are associated with possible lower performance of private prisons. Actually, we encountered government evidence that the performance of contractor-operated prisons was, on occasion, higher than public prisons in Florida and Kentucky and comparable in the other examined states. An explanation for the at least comparable performance is the detailed contracts and the monitoring, onsite and otherwise, that emphasizes performance measures.

Other possible explanations for the savings are the purchasing power and flexibility in purchasing of the private firms. The contracting firms buy in large quantities for various prisons and can take advantage of opportunities that arise rather than be constrained by cumbersome state purchasing regulations. Also, in operation, private firms have greater flexibility in employment, perhaps taking greater advantage than government in using part-time workers (Interview with a Texas Department of Criminal Justice official, October 26, 2012). Private firms, in some cases, enjoy greater flexibility in hiring, which saves time and resources. Also, private firms can tailor their wages to specific labor market conditions, which is more difficult for public employers. For example, private correctional officers are paid less in rural communities, which usually have lower cost of living than in metropolitan areas. The state cannot differentiate wages to the same extent, and therefore overpays in rural areas or underpays in metropolitan areas. State officials in our examined states provided these explanations.

Two additional explanations for the savings achieved by the contracting firms are beyond the scope of this study. One relates to competition versus monopoly, and the other is beyond the control of state governments. Several of the interviews with state officials suggested significant competition among the firms in responding to the request for bids to operate prisons. These interviews and OPPAGA of Florida suggest that competition from private firms yield more efficient operation in public prisons. Blumstein et al. (2007) found that states with contract prisons experienced greater savings for public prisons than states that either do not contract out prisoners or contract out-of-state. Even though contract prisons house less than seven percent of all inmates, their competitive effect is strong. The lack of such competition in government often leads to less efficient operations.

Texas provides a good example of the benefits of competition. Prices of privately operated prisons increased from $37.48 per inmate per day in FY2010 to $39.13 in FY2011, and then declined to $37.97 in FY2012. Short run costs for the prototype 1,000-bed state facility over the same period varied from $44.50 to $44.89, and then declined to $41.99 (Texas Legislative Budget Board, 2013). It is typical in competitive industries that prices and costs constantly vary. Indeed, in a three-year period, we witness fluctuations in private prices and state costs, which may indicate the effects of competition.

Interestingly, state governments could become competitive and reduce expenses if states were allowed to compete for inmates and use prisons as an export base for economic development for their

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 48

Deleted: including

Deleted: touches upon all the

Commented [A49]: exactly

Commented [A50]: Should this be "a report by OPPAGA of Florida"? Sounds strange as is.

Deleted: within the state

Deleted: r

Deleted: to

CONFIDENTIAL

CORECIVIC_0955227

distressed localities. The other explanation that is beyond the control of state governments is the fact that private firms operate newer facilities, often enriched with technology, that are cheaper to operate than the older, labor intensive public prisons. The Legislative Analyst's Office (CLAO) in California recognized this advantage of newer prisons (CLAO, 2012B: 16).

One qualification relates to the medical costs. The contracts with the private contractors differ with respect to the private contractor's responsibilities towards medical services. In some states, sick prisoners were not assigned to private prisons. In other cases, the state becomes responsible for medical costs above a certain level once a prisoner from a private prison is sent to another location for medical services. Florida and Arizona tried to correct the data for the greater responsibility of public prisons for medical costs. Since a similar correction for the other states is beyond our ability to determine, we calculated how high medical expenses could become in order to just maintain the legislative mandatory savings. Noteworthy, Arizona awarded a contract for a 1,000 medium-security beds beginning January 1, 2014, which is a full-risk medical contract for the private provider (see http://www.azcorrections.gov/adc/divisions/adminservices/Request_for_Proposal_ADOC1200001388.a spx).

Deleted:

Given uncertainties about the exact financial responsibilities of the state for medical care of inmates in private correctional facilities, we determined the maximum level that medical expenses could be while the statutory requirements were just met. Then, we observed whether medical costs of that magnitude are reasonable. The actual range of per diem reported medical expenses in public prisons is $5.97 in Texas to $43.95 in California (rows 2a, and 2b). Our calculated range for maximum "allowable" additional unknown medical costs (rows 36a, and 38b) is $11.23 in Kentucky to $100.62 in California. Thus, it appears that these "allowable" medical expenses are very high and therefore contracting-out is still attractive regardless of our "unknown" additional state medical responsibilities for inmates in private facilities.

Another indicator for the validity of the savings is the ratio of the maximum allowable medical expenses to the actual medical expenses. This ratio suggests the maximum extent to which medical expenses could reach due to extra public support of contracted prisons' medical costs, while still maintaining desirability of contracting out. The range of the ratios is 0.93 for Mississippi to 3.96 for Texas. Intermediate ratios were for California and Oklahoma medium-security, both at 1.8. Thus, California could support the medical expenses of its inmates in contracted prisons by almost twice its existing level and still benefit from contracting out (rows 40a, and 42b).

The two tables below specify the short run public sector costs and long run public sector costs that are linked to the operation of state prisons. The long run costs include the short run costs, as well as depreciation and government principle and interest payments for the bonds used to finance a prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to contract prisons. Our estimation of the avoidable costs includes a few categories of actual costs that were missing in prior studies. In the short run, costs included data on underfunded pensions and retiree healthcare of current employees. Neglecting these costs lowers the state's apparent avoidable costs and most importantly distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86, while the others range from $0.55 in Florida to $4.44 in Texas.

Formatted: Space After: 10 pt

**Short Run Public Sector Cost and Savings**

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 52 of 84 PageID #: 13560

CONFIDENTIAL                                                                CORECIVIC_0955228

| State | Custody level | Year | State Costs per day | Private Contractor Costs per day | % Savings with use of private contractor | | % Private Inmates |
|---|---|---|---|---|---|---|---|
| | | | | | Prison 1 | Prison 2 | |
| AZ | Min | 2010 | $50.61 | $46.56 | 8.0 | | 23.0 |
| AZ | Med | 2010 | $52.49 | $53.02 | -1.0 | | 11.4 |
| CA | All | 2007/8 | $112.98 | $79.73 | 29.4 | | 1.3 |
| CA | All | 2011/12 | $152.01 | $64.82 | 57.4 | | 6.7 |
| FL | Min/Med | 2008/9 | $54.39 | $50.58 | 7.0 | | 11.3 |
| KY | Min/Med | 2011 | $58.13 | $47.21 | 18.8 | | 10.4 |
| KY | Min/Med | 1012 | $55.59 | $43.98 | 20.9 | | |
| KY | Med | 2011 | $52.98 | $44.14 | 16.7 | | |
| KY | Med | 2012 | $54.80 | $49.63 | 9.4 | | |
| ME | All | 2011 | $125.59 | $65.75 | 47.7 | | 0.0 |
| MS | Min | 2011 | $36.26 | | | | |
| MS | Med/Max | 2011 | $34.11 | $31.15 | 8.7 | | 24.9 |
| OH | Min/Med | 2010 | $52.98 | $45.86 | 13.4 | | 5.9 |
| OH | Min/Med | 2012 | $47.84 | $45.86 | 4.1 | | |
| OK | Min | 2011 | $41.64 | | | | |
| OK | Med | 2011 | $42.11 | $43.02 | 4.4 | -2.2 | 45.7 |
| OK | Max | 2011 | $80.01 | $56.62 | 27.6 | 29.2 | 27.1 |
| TN | Med | 2011 | $53.21 | $42.29 | 17.3 | | 18.7 |
| TX | Prototype | 2010 | $59.85 | $37.47 | 37.4 | | 11.0 |
| BOP/GAO | Low | 2011 | $67.28 | | | | |

Legend
Min = Minimum-security prison
Med = Medium-security prison
% Private Inmates = share of inmates in private prisons as percentage of all state inmates

Case 3:16-cv-02267    Document 359-11    Filed 11/20/20    Page 53 of 84 PageID #: 13561
CONFIDENTIAL                                                                    CORECIVIC_0955229



**Long Run Public Sector Cost and Savings**

| State | Custody level | Year | State Costs per day | Private Contractor Costs per day | % Savings with use of private contractor | | % Private Inmates |
|---|---|---|---|---|---|---|---|
| | | | | | Prison 1 | Prison 2 | |
| AZ | Min | 2010 | $59.95 | $46.56 | 22.3 | | 23.0 |
| AZ | Med | 2010 | $61.83 | $53.02 | 14.3 | | 11.4 |
| CA | All | 2007/8 | $117.59 | $79.73 | 32.2 | | 1.3 |
| CA | All | 2011/12 | $156.62 | $64.82 | 58.6 | | 6.7 |
| FL | Min/Med | 2008/9 | $61.43 | $50.58 | 17.7 | | 11.3 |
| KY | Min/Med | 2011 | $60.03 | $47.21 | 21.4 | | 10.4 |
| KY | Min/Med | 1012 | $57.49 | $43.98 | 23.5 | | |
| KY | Med | 2011 | $54.88 | $44.14 | 19.6 | | |
| KY | Med | 2012 | $56.70 | $49.63 | 12.5 | | |
| ME | All | 2011 | $129.90 | $65.75 | 49.4 | | 0.0 |
| MS | Min | 2011 | $47.52 | | | | |
| MS | Med/Max | 2011 | $41.68 | $31.15 | 25.3 | | 24.9 |
| OH | Min/Med | 2010 | $62.66 | $45.86 | 26.8 | | 5.9 |
| OH | Min/Med | 2012 | $57.52 | $45.86 | 20.3 | | |
| OK | Min | 2011 | $51.18 | | | | |
| OK | Med | 2011 | $51.65 | $43.02 | 22.0 | 16.7 | 45.7 |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 51

CONFIDENTIAL                                                                                      CORECIVIC_0955230

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **OK** | Max | 2011 | $89.55 | $56.62 | 35.3 | 36.8 | 27.1 |
| **TN** | Med | 2011 | $53.21 | $42.29 | 17.3 | | 18.7 |
| **TX** | Prototype | 2010 | $68.07 | $37.47 | 45.0 | | 11.0 |
| **BOP/GAO** | Low | 2011 | $71.89 | | | | |



CONFIDENTIAL

CORECIVIC_0955231



### 14. Summary and Conclusions

This study compares costs of state prisons to the prices paid for contractor-operated prisons. The data used were from government sources, interviews with officials of state departments of corrections, and analysts from state legislative oversight agencies. We analyzed nine states and incorporated detailed federal data to supplement incomplete state data. Especially detailed data were available for Maine and Mississippi.

There are three primary reasons for the use of private prisons: to save on operational costs and maintenance; to relieve overcrowding whether ordered by the courts or required because of threat of litigation perceived by DOCs; and sale of a state prison to private operators for budgetary reasons. The statutory savings requirements for private prisons are Florida (seven percent), Kentucky (ten percent), Mississippi (ten percent), Ohio (five percent), and Texas (ten percent). The statutory requirement applies both to where the contractor operates state prison and to where prisoners are placed in private prisons. In cases like Florida and Mississippi, the contractor operates state prisons. In Kentucky and Oklahoma, the prisoners are transferred to private prisons. Texas uses both models.

Overcrowding, which is the second reason for the use of private prisons includes, both the out-of-state transfer of inmates and the in-state use of private facilities. In California, the courts required a timely reduction of overcrowding, leading to the use of out-of-state contract prisons. The examined states that experienced overcrowding in addition to California were Arizona, Kentucky, Ohio, Oklahoma, Tennessee, and Texas.

Contracting out by selling a state prison to private operator generates an immediate lump sum amount to narrow a state budgetary deficit. This occurred in Ohio, which sold the Lake Erie Correctional Institution to a private contractor.

The nature of the private prison contract suggests what is appropriately included in the state avoidable costs. The calculated state costs should reflect the avoidable costs to the state when private contractors are considered. State legislators normally do not specify the costs to be considered for the statutory

CONFIDENTIAL

CORECIVIC_0955232

Deleted: The s

savings, and this is left to the interpretation of DOC staff. It is important to emphasize that even if the categories of the avoidable costs are specified, the measurements are difficult, and could be subject to individual interpretation.

Economic theory helps us determine the types of costs that should be taken into consideration because of the use of private prisons. In statutory states without overcrowding, the appropriate comparison is between the state short run or operating costs and the contractor price. When overcrowding exists, the total of the operating and capital costs should be compared to the contractor price. When a public prison is sold, as in Ohio, total or long run cost is used for the comparison with the contractor's price. When overcrowding exists, both the operating and capital costs, namely long run costs, are the avoidable costs.

Table 1 specifies the short run direct and indirect costs, which are linked to the operation of the state prisons. The long run costs include the short run costs, in addition to depreciation and the government interest payments for the bonds that are used to finance a prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to private prisons. Our estimation of the avoidable costs includes a few categories of actual costs, which were missing in prior studies. In the short run, our costs calculated included data on underfunded pensions and retiree healthcare of current public employees. These costs are easily ignored when state budgets are tight, and are not reflected in the then-current delivery of prison services. However, these costs are real and are to be paid in the future. Neglecting these costs lowers the state's apparent avoidable costs, and distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86. The others range from $0.55 per inmate per day in Florida to $4.44 in Texas. The underfunding pensions and retiree healthcare for government employees are reaching magnitudes that may lead to financial crises for state and local governments with severe repercussions throughout the entire economy. Shifting to private operation of correctional institutions would significantly ameliorate the problem. For example, it would take 8.75 years of Ohio's entire tax receipts to eliminate the underfunding problem. Shifting the operation of prisons to the private sector would reduce the 8.75 by almost one year. It is important to note that the magnitude of both tax receipts and the deficit are sensitive to the state of the economy and the stock market so that these numbers are suggestive of the problem.

The indirect costs are the administrative costs incurred by DOCs and other state agencies linked to and for inmates. These costs are difficult to obtain, especially to determine what proportion is avoidable. We used conservative estimates of these costs as derived jointly by the U.S. General Accountability Office (GAO) and the US Bureau of Prisons (BOP). Again, maintaining our conservative approach, based on data for Tennessee, we chose to include only one-fourth of the state indirect costs as avoidable.

For Florida and Mississippi where contractors manage the state prisons, we use the short run or variable costs as avoidable costs to the states. In Florida, the short run savings were seven percent as required by the state law. In Mississippi, the short run savings were 8.69 percent, slightly below the ten percent statutory requirement. The Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) found that the costs of the private contractor met the statutory requirements (Mississippi, PEER, 2011, and 2012: 1). The long run savings are irrelevant for both states.

Whenever overcrowding exists, the statutory requirement is less relevant since the overcrowding has to be alleviated in a timely fashion. California is a classic example of the cost encountered by failing to avoid substantial overcrowding and because private prisons are prevented from operating in the state. Overcrowding requires that the long run avoidable costs are compared against the contractor's price. The long run costs are appropriate because the state avoids building its own prisons. The long run

consideration is also relevant when the state owns old prisons that need major renovations, prisons that are subject to demolition, or when the state faces difficulties in raising capital. The long run savings for Arizona's two prisons are 14.25 and 22.34 percent; California had 32.20 and 58.61 percent savings for two prisons; Kentucky's savings for its four prisons ranged between 12.46 and 23.50 percent; Ohio saved 20.28 and 26.81 percent in 2012 and 2010, respectively; Oklahoma saved on its four prisons 16.71 to 36.77 percent; Tennessee had 17.32 percent savings; and Texas had 44.95 percent savings. Maine, which does not utilize contract prisons, could have saved 47.65 percent when below capacity and 49.38 percent, if overcrowding exists.

At least equal performance to state prisons is required for contracting out. Indeed, the American Correctional Association established standards for prison performance, which the contract prisons generally met. Further, interviews with state DOCs reported that their contracts mandate performance levels, and DOCs closely monitor adherence to the contract requirements. Penalties can be and are imposed for performance violations. In Florida, contractors performed above the state level in training and educating inmates, which could be attributed to competition among contractors and the desire for contract renewal. Ohio and Texas require joint meetings of public and contract wardens, a practice that leads to greater cooperation and mutual learning. This practice seems to be beneficial and could be extended to other states. The greater exposure of contract prisons to financial and personal penalties and liabilities encourages good performance.

A prison facility has limited alternative uses, capital costs are high (beyond the financing ability of most states), and the expected life span is long. At the same time, demand for prison space fluctuates and is expected to drop in the near future, leaving some public prisons vacant. The existence of private prisons enables DOCs to avoid building new prisons when demand is high and prevents waste of these facilities when demand declines. This is a major long term cost savings that is not considered in the statutory calculation of the avoidable costs by states. Thus, even if there are no costs and performance preference to private prisons, their mere existence private prisons save the public sector on construction costs, the purchase of equipment, hiring of personnel that cannot be laid off when number of inmates decline, the training of those employees, and the enlarged administrative costs that exist when the number of inmates is large and becomes partially idle when the number declines. Contract prisons provide flexibility and savings at periods both when there is a shortage in cells and also in the avoidance of unused cells when the number of inmates drops.

A major finding from the data and the interviews is that competition yields savings and better performance. The economics of industrial organization demonstrates the important benefits derived from even the presence of a small competitor in an otherwise monopolistic market. Examples include the transparent tape and physicians' services industries. In both industries, small firms have substantially increased competition and led to important gains for consumers. In the transparent tape industry, prices were reduced, and in the physicians' services industry, quality and innovations were introduced.

In the case of corrections, even though private contractors comprise less than seven percent of the industry, they have generated substantial competitive benefits. The benefits emanate from two sources. As more contractors compete, the prices are lower and the performance is better. However, savings also occur in public prisons. When private prisons become an available option, efforts are made by public managers to lower costs, and demands by public employees are constrained since they realize that the legislature might favor private corrections as a more cost effective option. Further, the greater competition, the more managerial and technological innovations are introduced in both the public and

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 55

Sidebar comments:

Deleted: 17.67

Deleted: 7

Commented [A51]: I don't have these numbers appearing anywhere else in the document. I believe it should be 47.40 percent and 49.15 if Table 1 is correct. Also need to compare against pg. 3 table.

Commented [A52]: Simon/Erwin, just noting the incorporation of this paragraph. You had a similar one here, but just used what Simon emailed (with a few grammatical edits) to ensure this is what you wanted.

Deleted: A prison facility has limited alternative uses, capital costs are high (beyond the financing ability of most states), and the expected life span is long. At the same time, demand for prison space fluctuates and is expected to drop in the near future, leaving some public prisons vacant. The existence of private prisons enables DOCs to avoid building new prisons when demand is high and prevents waste of these facilities when demand declines. This is a major long term cost savings that is not considered in the statutory calculation of the avoidable costs. Private prisons save the public sector in addition toon construction costs, the purchase of equipment, hiring of personnel that cannot be laid off when number of inmates decline, their training for those employees, and the enlarged administrative cost. Contract prisons provide flexibility and savings at periods for both shortage in cells and avoidance of unused cells when the number of inmates drops. ¶

Deleted: But

Deleted: public employees

private segments of the industry. It is important to note that the existence of public prisons also keeps in check price hikes by the private prisons. The knowledge that states could resort to the use of solely public prisons encourages private contractors to offer their services at even lower prices than the statutory requirement.

Deleted: just

This study leads to a possible moderate change that could encourage further competition in the case of operation of existing state prisons and thereby achieve more efficient delivery of prison services. This is the model of managed competition initiated by then-Mayor Stephen Goldsmith of Indianapolis, Indiana, which encouraged public workers to participate in the bidding for their services along side private competitors to preserve their, Mayor Goldsmith initiated the "yellow pages" test where he enabled contracting out of all city services whenever several providers were listed. But, he went one step further and allowed city employees to compete for the service, as well. By so doing, public employees, as well as private contractors, have an incentive to search for managerial and technological innovations and offer the service at competitive prices. This is possible when the outputs are quantifiable and the contract can clearly state what is required, and where oversight by government is relatively inexpensive. A third requirement is that a sufficient number of competitors, including the public workers, emerge. Contracting out to a monopolist private company that replaces a public provider is undesired. All relevant contractors, public and private, should be aware of upcoming contracts. The existing situation where public prisons operate indefinitely yields an unnecessary monopolistic power that could yield inefficient operation.

Deleted: jobs along with the existence of private competitors

Our discussions with state correctional executives suggested that contracts can specify the minimum performance levels required from the contractor that wins the bidding. Also, the private prison industry already includes a sufficient number of firms that compete across the United States. Thus, in each state where the legislature allows contracting out prisons, some existing state prisons could be auctioned as a "managed competition model" for a sufficient time period to encourage contractors to devote the appropriate resources for innovation and improved performance. This extension of competition could obviate to some degree the necessity for detailed contract specification and monitoring efforts. Reliance on markets like managed competition could reduce the necessity for such complicated calculations as in our Table 1.

Deleted: already

The discussion above leads to a recommendation that could be considered. State legislators in the statutory states have established arbitrary levels of required savings of five, seven, and ten percent. High percentage savings may discourage some bidders and be counterproductive. It is not clear why the percentages differ and what the basis is for these numbers. By instituting managed competition where the public sector competes on a level field with the private sector, we let the market determine the savings. In such a case, the complicated calculations of what cost items should be considered as avoidable costs and how to measure these costs becomes unnecessary. Managed competition has worked for many local public services, and there is no reason why it cannot be successfully implemented in the state prison industry. Public and private competition and cooperation in service provision has worked and should be extended.

The issue of statutory savings merits closer attention. In Mississippi, the prices based on the required savings for contracting out were so low that no contractor offered the service, and as a result the state's DOC would have to maintain the service. In competitive markets, when a price requested by a seller is too high and no one wishes to buy it, then the seller lowers the price until the product/service is sold. For example, when a homeowner sets a price for his house and receives no offers, she will lower it until the first offer is made. In the case of Mississippi, no offers were made probably because of unrealistic state costs, which did not include the unaccounted costs, and the arbitrarily stated statutory savings requirement.

Deleted: an

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 56

Now, suppose that all costs were indeed included, and the state offered a contract under a managed competition model. The state workers would then have won the contract, and the status quo would have been maintained. Now, if the state offers the contract without any required savings and a private contractor wins the contract with 3 percent savings then the state still saves and a strong incentive is established for all private and the public suppliers to become more efficient in order to win the next contract. The legislatively established statutory savings effectively shields the state's DOC from competition and enables workers to demand and gain wages that are higher than their market values. In economic terms, prices should be able to fluctuate freely, and in this case, the lowest bidder wins the contract. Thus, implementing managed competition without any arbitrary savings requirement removes the need for complicated state costs calculations, probably leads to greater savings and improved service quality, especially in the long-run, as a more competitive industry is created, and establishes a level playfield for the public and private providers. A qualification for this model is the necessity to assure that performance levels are quantifiable and maintained at a satisfactory level. Performance monitoring is thus required but is generally not a substantial expense.

This study raises some important issues related to contracting out prison services that could improve the process and outcomes and may warrant further analysis:

1. Fluctuations in demand: Demand for beds fluctuates over time and is expected to decline because of the decreasing number of youth, changes in laws like the "three strikes" statue, and easing of penalties for drug-related crimes. As a result, we may witness a decline in occupancy in some states, while demand remains high in others. Easing of legislative rules and procedures of interstate transfer of inmates could save capital outlays for some states where the cost of imprisonment is high or overcrowding exists. At the same time, inmate transfers could raise revenues for states that are efficient in service provision, enjoy economies of scale, or have unused capacity.

2. Medical services: Costs for medical services are very high, and the extent of the costs varies substantially among the states. In most states, such costs range between $6 and $11 a day. Maine's medical costs are high at $16.67, while in California, which essentially lost control of its prison healthcare to a court appointed receiver for mental and physical health because of overcrowding, per day medical costs reaches $43.95. About 20 states have outsourced medical services to private correctional medical healthcare companies in order to cut costs (Leonard, 2012). Such contracting out is independent of contracting out the management of prisons. It seems that competitively contracting out healthcare whether by DOCs or by private prison companies suggests cost savings. Based on similar experiences, the state or the private prison contractor should be held financially liable up to a certain amount for shifting inmate to the medical provider (for example, Mississippi). Clearly, the DOC or the private prison company is held liable for not referring a seriously sick inmate in order to save on costs. The same healthcare procedure should be maintained for both the state and private prisons. The analysis of medical procedures within existing contracts and a search for a socially efficient procedure that maintains business viability is desired.

3. Length of contract: Our suggested managed competition model is relevant for the existing state prisons and does not apply to other cases. An important issue that is not addressed in this study is the length of time for a contract. This period has to be long enough to recover the initial investment and maintain incentives for adopting technological and managerial innovations. At the same time, a lengthy contract prevents new competitors from entering the market with innovations that could lead to lower prices than existing contractors. However, if a sufficient number of prisons join managed competition and contracts open at varying times, lengthy contracts are possible. Economic theory suggests that as the market increases with both competitive contractors and prisons

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013        Page 57

CONFIDENTIAL

CORECIVIC_0955236

Deleted: M
Deleted: c
Deleted: special master
Commented [A53]: Is this the right word here?

available for contracting, the length of contract time could be extended, and the extent of regulation by government could be reduced. We suggest a follow-up study on the lessons of managed competition in similar states and local markets to learn of its implications for the prison industry. If indeed the model is "sound," then the study could follow with a model and stages of implementation.

The greater the competition, the more efficient both the operation and the performance of prisons becomes, and the need for public regulation could be reduced. Competition and transparency replace heavy regulation. The partnership between the public and private sectors in training of correctional officers, the joint regional coordination meetings of wardens, and mutual interests in the ownership and condition of the facilities further assures high performance and efficient operation. The conditions for success, however, are to allow entrance of firms to the industry under some necessary public regulation, and allowing the public sector to compete on a leveled playing field.

**Deleted:** become

**Deleted:** "

**Deleted:** "

CONFIDENTIAL

CORECIVIC_0955237

## References

Abt Associates, 1998. **Private Prisons in the United States: An Assessment of Current Practice**, Cambridge, Mass. July 16.

Arizona Joint Legislative Budget Committee (ULBC), Staff Memorandum, 2012. **State-Private Prison Cost Comparison**. September 19.

Arizona Governor, 2011. **The Master List of State Government Programs: Fiscal years 2010-2013.** Obtained from http://www.ospb.state.az.us/documents/2011/Masterlist2010-2013.pdf  Last visited December 11, 2012.

Avondale Partners, LLC. 2009. **Corrections Industry: Behind the Bars - An In-Depth View of the Corrections Industry.** March 2.

Baker, Jonathan B. 2002. "Mavericks, Mergers, and Exclusion: Proving Coordinated Competitive Effects Under the Antitrust Laws". **New Year Law Review**, Vol. 77. April: 135-203.

Belenko, Steven, 1999. "Literature Review of Private Prison Costs", in Judith A. Greene, **Privatization of Correctional Services: Evaluating the Role of Private Prison Management in Minnesota,** Institute of Criminal Justice, University of Minnesota Law School.

Benson, Bruce L., 2003. "Do We Want the Production of Prison Service to Be More "Efrficient"?" in Alexander Tabarrok (editor), **Changing the Guard: Private Prisons and the Control of Crime**, the Independent Institute, Oakland CA: 163-216.

Blackstone, Erwin A. et al. 2011-2012. "The Case of Duopoly: Industry Structure Is Not a Sufficient Basis for Regulation". **Regulation**. Vol. 34 (4), Winter. http://www.cato.org/sites/cato.org/files/serials/files/regulation/2012/6/v34n4-3.pdf. Last visited September 17, 2013.

Blackstone, Erwin A. 2003. "Benefits of Osteopathic", **Health Affairs,** Vol. 22 (1), January: 292.Blumstein, James F., Mark A. Cohen, and Suman Seth, 2007. "Do Government Agencies Respond to Market Pressure? Evidence from Private Prisons." Owen Graduate School of Management, Vanderbilt University. http://www.cca.com/static/assets/Blumstein_Cohen_Study.pdf  Last visited 1/20/13. Also available as

Blumstein et al, 2008. "Do Government Agencies Respond to Market Pressures? Evidence from Private Prisons". **Virginia Journal of Social Policy and the Law**, Vol. 15 (3): 446-477.

Brakel, Samuel, 1992. "Private Corrections" in Gary Bowman et al, **privatizing the United States Justice System, McFalrland & Company, Publishers, Jefferson, N.C.**

Brown Ben, 2011. "Alaskans deserve better than the not-so golden Goose Creek prison". **Juneau Empire.com**, March 6. http://juneauempire.com/stories/030611/opi_795369352.shtml  Last visited December 20, 2012.

Brakel, Samuel and Kimberley Ingersoll Maryland, 2003. "Prison Privatization and Public Policy" in Alexander Tabarrok (ed.), **Changing the Guard: Private Prisons and the Control of Crime,** The Independent Institute, Oakland, CA: 125-162.

Case 3:16-cv-02267      Document 359-11      Filed 11/20/20      Page 62 of 84 PageID #: 13570

CONFIDENTIAL                                                                    CORECIVIC_0955238

Brown v. Plata, 131 S. Ct. 1910 (2011).

Bureau of Justice Statistics, 2001. **Emerging Issues on Privatized Prisons**. NCJ 181249, February.

Burnett William B. 1999. "Predation by a Nondominant Firm: The Liggett Case (1993)" in John E. Kwoka and Lawrence J. White, <u>The Antitrust Revolution.</u> Oxford University Press, New York: 239-263.

California Legislative Analyst's Office (CALAO), 2008. **Correctional Officer Pay, Benefits, and Labor Relations,** February 7. http://www.lao.ca.gov/2008/stadm/ccpoa_pay_020708/ccpoa_pay_020708.aspx Last visited December 11, 2012.

California Legislative Analyst's Office (CALAO), 2010. **California Out-of-State Correctional Facility Program,** January 20. Presented to the Assembly Accountability and Administrative Review Committee.

California Legislative Analyst's Office (CALAO), 2012A. **Providing Constitutional and Cost-Effective Inmate Medical Care. April 19.**

**California Legislative Analyst's Office (CALAO), 2013. California's Criminal Justice System: A Primer. January.** http://lao.ca.gov/laoapp/PubDetails.aspx?id=2682 **Last visited February 3, 2013.**

**California Legislative Analyst's Office (CALAO), 2012B. The 2012-13 Budget: Refocusing CDCR After The 2011 Realignment. February 23.** http://www.lao.ca.gov/analysis/2012/crim_justice/cdcr-022312.pdf **Last visited December 11, 2012.**

**California State Auditor, 2009. California department of Corrections and rehabilitation: It Fail to Track and Use Data....September, Report 2009-107.1.**

**California State Works Board, 2012. Agenda with Analysis for Meeting September 11, 2012.**

**Camp, Scott, D. and Dawn M. Daggett, 2005. Quality of Oprations at Private and Public Prisons: Using Trends in Inmate Misconduct to Compare Prisons.** Office of Resrach and Evaluation, federal Bureau of Prisons, Washington D.C.

Camp, Scott D. and Gerald G. Gaes, 2002. "Growth and Quality of U.S. Private Prisons: Evidence from a National Survey", **Criminology and Public Policy**, Vol. 1 (3):427-450, July.

**Culp, Richard, 2011. "The Failed Promise of Prison Privatization". Prison Legal News, October 6.** http://www.inthepublicinterest.org/article/failed-promise-prison-privatization Last visited September 17, 2013.

**Dreyfuss, Rick, 2013. "Pension Crisis worsens in Pa". Philadelphia Inquires. July 30: A15.**

**Elias, Paul, 2013. "High court won't delay inmates' early release". Philadelphia Inquiere, August 4: A6.**

**Elliott Pollack and Company, 2010. Economic and Fiscal Impact of CCA-Arizona Correctional Facilities. Scottsdale, Arizona. January.** http://www.cca.com/static/assets/CCA_Arizona_Impact_Report_2009_FINAL_011810.pdf **Last visited January 28, 2013.**

Florida Chamber of Commerce, 2012. "Data shows privately run prisons can provide a better environment for effective inmate rehabilitation programs". February 13. Copy is available from the Chamber.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 60

CONFIDENTIAL                                                                    CORECIVIC_0955239

http://www.wctv.tv/blogs/editorial/Data_Privately_Run_Prisons_Can_Provide_Better_Rehabilitation_Programs_139216274.html. Last visited March 21, 2013.

Florida Department of Management Services, 2012. **Private Prison Monitoring**, Presentation before the Florida House Appropriations Committee. January 19.
http://big.assets.huffingtonpost.com/FloridaDMSJan2012.pdf Last visited January 30, 2013.

Gaes, Gerald G. et al, 2004. **Measuring Prison Performance: Government Privatization and Accountability**. Altamira Press, N.Y. NY.

Gilroy, Leonard, and Harris Kenny, 2011. **Annual Privatization Report 2011: Corrections and Public Safety**. Reason Foundation, Los Angeles, California.
http://reason.org/files/publicsafety_annual_privatization_report_2011.pdf Last visited December 14, 2012.

Healey, Thomas J. et all, 2012. **Underfunded Public Pensions in the United States: The Size of the Problem, the Obstacles to Reform and the Path Forward.** Harvard Kennedy School, M-RCBJ Faculty Working Paper No. 2012-08.
http://www.hks.harvard.edu/var/ezp_site/storage/fckeditor/file/pdfs/centers-programs/centers/mrcbg/publications/fwp/MRCBG_FWP_2012_08-Healey_Underfunded.pdf Accessed July 25, 2013.

Jing, Yijia, 2010. **Prison Privatization: A Study of the Causes and Magnitude**. Nova Science Publishers, Inc. New York, New York.

Kentucky legislative Research Commission (KLRC), 2009. **Cost of Incarcerating Adult Felons**. Research Report No. 373. http://www.lrc.ky.gov/lrcpubs/RR373.pdf Last visited November 19, 2012.

Kentucky Department of Corrections, 2013. Research and Statistics, Annual Reports**, Cost to Incarcerate.**
http://corrections.ky.gov/about/Pages/ResearchandStatistics.aspx Last visited February 5, 2013.

Lanza-Kaduce, Lonn, 1999. "A Comparative Recidivism Analysis of Releasees From Private and Public Prisons". **Crime & Delinquency**, Vol. 45 (1), January.

Leomard, Kimberly, 2012. "Privatized prison healthcare scrutinized". **Washington Post**, July 21.
http://articles.washingtonpost.com/2012-07-21/national/35486443_1_wexford-health-sources-prisoner-health-corizon

Logan, Charles H. and Bill W. McGriff, 1989. "Comparing Costs of Public and Private Prisons: A Case Study", **Research in Action**, Us Department of Justice, Office of Justice program, NIJ Reports No. 216, September/October.

Logan, Charles H. 1992. "Well Kept: Comparing quality of Confinement in Private and Public Prisons". **Journal of Criminal Law and Criminology**, Vol. 83 (3), fall.

Logan, Charles H. 1992. "Private Prison Management: A Case Comparison". **Criminal Justice Review**, Vol. 21 (1), Spring.

Lundhal, Brad W. et al, 2009. "Prison Privatization: A Meta-Analysis of Cost and Quality Indicators". **Research on Social Work**. Published online April 8, 2009.

CONFIDENTIAL                                                                CORECIVIC_0955240

Thomas, Charles W. 2004. "Correctional Privatization in America: An Assessmenr of Its Historical Origins, present Status, and Future Prospects" in Alexander Tabarrok (ed.), **Changing the Guard: Private Prisons and the Control of Crime**. Independent Institute, Oakland, California: 57-124.

McCrie, Robert D. 1993. "Private Correction: The Delicate Balance" in G. Bowman et al. (editors) **Privatizing Correctional Institutions**, Transaction Publishers, new Brunswick, N.J: 19-32.

MGT of America, 2007.**Performance Audit of the Department of Corrections for the Legislative Service Bureau of the Oklahoma Legislature: Final Report**. December 31.
http://www.okhouse.gov/Documents/OKRVSDFinalReport080103.pdf  Last visited December 21, 2012.

MGT of America, 2006. **Comparative Study of South Bay and Lake City Private Prison Facilities**, Prepared for Florida Department of Management Services. November 1.

Mississippi, Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), 2011, and 2012. **Mississippi Department of Corrections FY 2011, (and also for 2012) Cost per Inmate Day.** December 13, 2011, and December 11, 2012.

Moore, Adrian T. 1999. **Private Prisons: quality Corrections at a Lower Cost.** The Reason Foundation, RPPI Policy Study No. 240.
http://www.hawaii.edu/hivandaids/Private_Prisons__Quality_Corrections_at_a_Lower_Cost.pdf  Last visited September 25, 2013.

Motley Fool, 2012. "The Profit of Prison". http://beta.fool.com/ymwg/2012/07/09/profit-prison/6768/

Munnell, Alicia H. et al, 2013. **State and Local Pension Costs: Pre-Crisis, Post-Crisis, and Post-Reform.** Center for Retirement Resarch at Boston College, Number 30, February. http://crr.bc.edu/wp-content/uploads/2013/02/slp_30.pdf  Accessed July 25, 2013.

Nelson, Julianne Nelson, 2005. **Competition in Corrections: Comparing Public and Private Sector Operations**, the CNA Corporation, Boston, December 2005.

Novy-Marx, Robert, and Joshua D. Rauh, 2009. "The Liabilities and Risks of State-sponsored Pension Plans", in **Journal of Economic Prospectives**, Vol. 23 (4), Fall: 191-2010.

Oklahoma Department of Corrections. "History and Development of Private Bed Space in Oklahoma Department of Corrections."  Document provided by OKDOC, November 2012.

Ohio Department of Rehabilitation and Corrections (ODRC), **2011 Annual Report**.
http://www.drc.ohio.gov/web/reports/Annual/Annual%20Report%202011.pdf  Last visited February 13, 2013.

ODRC, 2007. **Basic Model for Estimating Operating Costs**. Attachment to the contracts for North Coast Correctional Treatment Facility and the Lake Erie Correctional Institution.

OPPAGA, 2010A. "Private Prisons Exceed Savings Requirements". Office of Program Policy Analysis and Government Accountability, Florida Legislature, April 20. Last visited April 8, 2013.

OPPAGA, 2010B. "Prison Construction: Research Memorandum". Florida Legislature, February 1.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 62

CONFIDENTIAL                                                                    CORECIVIC_0955241

Perrone, D., and T. C. Pratt, 2003. "Comparing the Quality of Confinement and Cost –Effectiveness of Public Versus Private Prisons: What We Know, Why We Do Not Know More, and Where Do We Go From Here?" **The Prison Journal, V**ol. 83: 301-322.

Pew, Center on the States, 2010. **The trillion dollar gap: underfunded state retirement systems and the roads to reform**. Washington D.C. February.
http://www.hartfordinfo.org/issues/wsd/taxes/the_trillion_dollar_gap_final.pdf Last visited April 8, 2013.

Pew, Center on the States, 2012. **The Widening Gap Update**. Issue Brief, June.
http://www.pewstates.org/uploadedFiles/PCS_Assets/2012/Pew_Pensions_Update.pdf

Picard, Ken, 2011. "Is It Cheaper to House Vermont Prisoners In or Out of State? It Depends".
http://7dvt.com/2011vermont-prisons Last visited November 5, 2012.

Pratt, Travis C. and Jeff Maahs, 1999. "Are Private Prisons More Cost-Effective Than Public Prisons? A meta Analysis of Evaluation Research Studies". **Crime and Delinquncy**, Vol. 45: 358-371.

Sanders, Katie, 2012. "Private Prisons Can Chase Escapees", **Tampa Bay Times**, February 14 Page 18.

Schmalensee, Richard, 1978. "Entry deliverance in the need-to-eat cereal industry", **Bell Journal of Economics. V**ol. 9 (2) Autumn: 305-327. Segal, Geoffrey F. and Adriane T. Moore, 2002. **Weighing the Watchman: Evaluating the Costs and Benefits of Outsourcing Correctional Services**. Reason Public Policy Institute, Policy Study 289, Los Angeles CA. Jan.

Shichor, David, 1995. **Punishment for Profit: Private Prison/Public Concerns**. Sage, Thousand Oaks.

State of Washington, 2012. **The Washington State Budget Process**, Office of Financial Management, Budget Division, June.

Strumpf, Dan, 2013. "With Fewer to Lock Up, Prisons Shut Doors", **The Wall Street Journal**, February 11: A-3.

US Army Corps of Engineers, 2011. **Civil Works Construction Cost Index System**, March 31, pages A-15, A-20. http://planning.usace.army.mil/toolbox/library/EMs/em1110.2.1304.pdf

Tennessee General Assembly, Fiscal Review Committee, 2010. Memorandum on "Cost Comparison: State and Private Prison Contractors". April 26.

Texas Legislative Budget Board, 2013. **Criminal Justice Uniform Cost Report: Fiscal years 2010-2012.** January.
http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal%20Justice%20Uniform%20Cost%20Report%20Fiscal%20Years%202010%20to%202012.pdf   Last visited February 11, 2013.

Texas Legislative Budget Board, 2011. **Criminal Justice Uniform Cost Report: Fiscal years 2008-2010**. January.
http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal%20Justice%20Uniform%20Cost%20Reports2008-2010.pdf Last visited February 11, 2013.

Thomas, Charles W. 2003. "Correctional Privatization in America: An Assessment of Its Historical Origins, Present Status, and Future Prospects" in Alexander Tabarrok (editor), **Changing the Guard: Private Prisons and the Control of Crime**, the Independent Institute, Oakland Ca: 163-216.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 63

US Bureau of Justice Statistics (US BJS), 2011. **Prisoners in 2010**.US DOJ. Report NCJ 236096. http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf  Last visited February 27, 2013. Appendix Table 20. Last visited February 27, 2013.

US Bureau of Justice Statistics (US BJS), 2005. **Census of State and Federal Correctional Facilities**, 2005. http://bjs.ojp.usdoj.gov/content/pub/pdf/csfcf05.pdf  Last visited February 25, 2012.

US Government Accountability Office (GAO), 2012. **Federal Bureau of Prisons: Methods for Estimating Incarceration and Community Corrections Costs and Result of the Elderly Offender Pilot**, July 27.

US Government Accounting Office (GAO), 1996. **Private and Public Prisons and Studies Comparing Operational Costs and/or Quality of Service.** Report to the Subcommittee on Crime, Committee of the Judiciary, House of Representatives. GAO/GGD-96-158, August.

Vera Institute of Justice (Vera), 2012. **The Price of Prisons: Incarceration Costs Taxpayers.** Updated March 20, 2012.The Vera Institute of Justice, New York, NY.


## Appendix 1: Data Sources for the Table on State Costs, Contract Prices, and Savings

**Arizona:** We used the following three sources:

(1) Auditor General Staff Analysis of the Department of Corrections, **Fiscal 2009 - Fiscal 2010.** http://www.azauditor.gov/Reports/State_Agencies/Agencies/Corrections_Department_of/Performance /10-08/10-08.pdf  Last visited December 24, 2012.

(2) Arizona Department of Corrections, 2011. **FY 2010 Operating Per Capita Cost Report**, Bureau of Planning, Budget and Research, April 13.

(3) Arizona Joint Legislative Budget Committee, 2012. **Staff Memorandum: State-Private Prison Cost Comparison**. September 19.

For the short run costs of male inmates in minimum- and medium-security prisons, we used data from page 3 in (2). Depreciation and other capital expenses were calculated by the Arizona Joint Legislative Budget Committee Staff, 2012 to be $10.71 instead of the $1.41 reported by the AZ DOC. A similar adjustment of $2.67 was made to account for underfunded pension liabilities as reported in (3) for Arizona.

The following unaccounted costs were obtained from the Vera Report. We calculated $0.16 to be hierarchical costs per inmate per day for both minimum and medium prisons. We did not include this figure. Instead, we used the more comprehensive figure of 11 percent, which also includes the administrative functions of DOC provided by BOP/GAO. This calculated figure for Arizona was $5.42, which falls in the range of $1.40 to $6.64 of the other examined states, and the GAO benchmark figure of $8.09. Debt service per inmate per day was $0.04. This was calculated from the $530,000 reported by

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013            Page 64

CONFIDENTIAL

CORECIVIC_0955243

Vera for 2010. To be conservative, we did not include the $2.2 million in judgment costs reported by Vera since we were unsure whether such costs should be fully allocated to public correctional facilities.

**California:** For California, wages can be separated from benefits. California State Auditor, California Department of Corrections and Rehabilitation: It Fails to Track and Use Data…, September 2009, Report 2009-107.1. For California, wages and salaries were $36.72 per inmate per day, overtime was $6.63, and benefits were $16.25. Facilities and operations include food, repair, clothing, and other items. Education and training of inmates are included in state-provided professional services. The hierarchical cost of $4.04 per inmate per day includes both administration and headquarters costs. Vera reports unattributed statewide administrative costs for corrections to be $438 million. We added the per diem per inmate of $0.62 to the $44.04 to obtain $44.66. Since no data are available on interest and depreciation for California, we therefore used the $4.61 figure from BOP/GAO. The annual price per inmate was $29,100 obtained from the above California State Auditor Report: 36. The daily fee was therefore $79.73 per inmate.

Monitoring costs for California have been exceptionally high. The state sent 73 monitors to the out-of-state facilities resulting in a total costs for oversight and monitoring for 2010/11 of $15,981,000 or $4.42 per inmate per day. The cost and inmate population were obtained from the California Budget for Department of Corrections and Rehabilitation, 2011/12: CR5, and CR15.

Data for 2011/12 were obtained from California Legislative Analyst's Office (CALAO), 2013. California's Criminal Justice System: A Primer. January, 17: 50. Obtained from http://www.lao.ca.gov/reports/2013/crim/criminal-justice-primer/criminal-justice-primer-011713.pdf Last visited March 21, 2013.

We had to make some minor adjustments to the data in this report in order to fit the categories of Table 1. However, this did not distort the values for the total short run and long run government costs. Security in the report was classified as personnel services. Facility operations, which include maintenance and utilities, were incorporated in Table 1 as utilities. The remaining items under facility operation and records were classified in Table 1 as hierarchical. "Food and Clothing" were incorporated in Table 1 under the same categories. The remaining items under the category "Inmate Food and Activities" were added to the miscellaneous category, which was classified in Table 1 as "All other." Finally, "Rehabilitation Programs" were classified in Table 1 as 'State Provided Professional Services."

Vera reported 167,276 inmates in fiscal year 2011. It reported $320.1 million in underfunded retiree healthcare contributions and $607 million in underfunded retiree healthcare contributions for current employees, totaling $927.1 million. The latest California State Auditor Report (up to November, 2012) provides the costs for 2007/8, while Vera's underfunded and statewide contributions are for 2009/10. Vera also reported education and training costs provided by the California Department of Forestry and Fire Protection of $4.5 million. Since it is unclear whether these costs are recurring expenses, we chose the conservative approach of excluding them.

**Florida:** We chose to use Table A-5 Adult Male-Size Adjusted for 2008/9 from the Office of Program Policy Analysis and Government Accountability, Private Prisons Exceed Savings Requirements. Research Memorandum, the Florida Legislature, April 20, 2010. Indirect costs entail costs imposed on the Departments of Corrections and Management Services. Our interviews revealed that there may be unfunded pensions for state employees, so the current state costs could be understated. However, Vera reported underfunding of only $0.55 per inmate per day. As for education and training programs, the cost for public facilities was $0.79 per inmate per day. However, the spending by contractor-operated male prisons for the same services, adjusted for size so as to be comparable to state facilities, was in the

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 65

CONFIDENTIAL                                                                CORECIVIC_0955244

range of $3.92 to $5.88 (Table A-5). For Table 1, we used the average of the two values, which is $4.90. Table A-7 of the above report provides the per inmate per day price of $50.68 for the Bay Correctional Facility and $50.48 for the Moore Haven Correctional Facility. The average for the two private prisons was $50.57 per inmate per day. For the construction costs, we used OPPAGA, 2010B for the publicly built, close custody Suwannee Correctional Institution of $97.8 million for 1,521 inmates. At the interest rate of four percent, the cost per inmate per day is $7.05. This cost item is presented in Table 1, but is not used in the calculation.

**GAO adjusted figures:** The calculation of costs for the individual states does not include the long-term costs for the facilities. However, it is reasonable to assume that state capital costs are similar to federal costs. We used the report by the U.S. Government Accountability Office (GAO), Incarceration Costs and Elderly Offender Pilot Results, report GAO-12-807R, Briefing before the Subcommittee on Crime, Terrorism, and Homeland Security, Washington DC, July 27, 2012 to obtain short- and long-term costs. GAO provides capital and indirect cost percentages, which allowed us to obtain labor costs. We term labor costs as personnel services. In this case, personnel services include, in addition to the usual manpower costs, education and training of inmates. The GAO reported marginal costs, which includes food and medical, so that we were able to subtract such costs from the total direct costs to obtain just labor costs.

**Kentucky:** Most of the data were obtained from officials at the Kentucky DOC and from the Kentucky Legislative Research Commission (KLRC), 2009. An official from the Kentucky DOC provided us with the following public short run direct costs for the most comparable facilities to the contract prisons:

Public prison: Roederer Correctional Complex, minimum/medium 2011, $53.78, and $51.31 for 2012; private prison: Marion Adjustment Center, $47.21, and $$43.98, respectively.

Public prison: Little Sandy Correctional Complex, minimum 2011, $48.76, and $50.53 for 2012; private prison: Otter Creek, medium $44.14, and $49.63, respectively.

For 2011:
http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Annual%20Reports/Cost%20to%20Incarcerate%202011.pdf

For 2012:
http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Annual%20Reports/Cost%20to%20Incarcerate%202012.pdf

Vera provided data on underfunded pensions, retiree healthcare contributions, underfunded retiree healthcare, and the number of inmates in the state. We used all that data to calculate the underfunded category (W19, X19, Y19, and Z19) to be (200,000+13,700,000+7,900,000)/ (21,347*365=$2.80). The short run hierarchical costs were termed statewide administrative costs in the Vera report for 2009/2010 and calculated to be $2,800,000/(21,347 inmates*365)=$0.33. Again from Vera, we obtained the total interest costs of $14.8 million. We then calculated the long run interest costs per inmate per day to be $14.8 million/ (21,347 inmates*365) =$1.90. KLRC, fiscal 2009 page 17 provided the cost of monitoring to be $105,362 for 2009. We calculated the monitoring cost to be $0.23 per inmate per day for the 1,234 private inmates. The state monitoring cost was included as Central Office Overheads attributed to Private (row 26a). The source for the amount is the KLRC, 2009, while the entries in Table 1 are for 2011 and 2012. The number of private inmates and the total number of inmates appears in the minimum/medium prison column, 2011. Again, the data on private and total inmates, as in all other examined states, come from BJS, 2011 for the year 2010. Inmate numbers change on a daily basis. Also,

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 66

CONFIDENTIAL                                                                    CORECIVIC_0955245

Vera's data refer to the fiscal year 2009/2010, while BJS refers to the calendar year 2010. The differences among the various sources are minor.

**Maine:** Main data were obtained from its Office of Program Evaluation & Government Accountability, Cost per Prisoner in the State Correctional System, June 2012. Included in the state's report are all adult prisoners of 3 levels. Personnel services include pensions and benefits. We calculated the individual items by multiplying the $42,538 annual per inmate costs by the percentage category on page 5 of the Maine report. Maine paid $1.6 million in interest. According to the Vera Report, underfunded retiree healthcare amounted to $5.1 million. Per diem underfunded retiree healthcare per inmate was then $5,100,000/ (number of inmates, 2,038* 365)= $6.85. Unaccounted hierarchical costs were $1.4 million according to the Vera Report, and Maine reported general administration costs of $2,520,425. Thus, hierarchical costs, which incorporate the two elements, are $5.27 per inmate per day. The Vera Report provides $1.6 million for capital costs which translates to $2.16 per inmate per day.

**Mississippi:** Data were derived from the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), Mississippi Department of Corrections FY2011 Cost per Inmate Day. The Mississippi Legislature, December 13, 2011. Data were extracted from page 8. For "Personnel Services," we added other costs to salary costs. Annual debt services are hypothetical costs that reflect what it would cost the MDOC to finance a new prison and are included in Table 1 as "Interest on Debt." These costs incorporate depreciation. Hierarchical costs include "Administrative Costs," which are costs imposed on other state agencies. Vera did not obtain data from Mississippi for any underfunded contributions or other unattributed costs for corrections.

Monitoring of the five private prisons is paid by the contracted prison as part of its per diem. The amount is about $60,000 per prison, where four prisons house 1,000 inmates and the fifth 1,500 inmates, and occupancy is 98 percent. Thus, the cost per inmate per day is around $0.15. Clearly, since the cost is part of the price charged by the contracted prison, it is not separately incorporated in our matrix.

**Ohio:** Ohio Department of Rehabilitation and Corrections (ODRC) must achieve at least a five percent savings in the per diem for private contracts after adding the costs of monitoring. This is the maximum price to be charged by the private company. The 2000 data were more detailed than the data in the recent years. However, since the precise source is incomplete, we chose to present the data without evaluating it. The 2010 and 2012 data were provided by the ODRC. The short run average variable cost for the public prisons of ODRC was calculated as a weighted average of the two public prisons most comparable to Lake Erie Correctional Institution, the privately contracted prison. These were Richland Correctional Institution and Southeastern Correctional Institution. The weighting was done by the inmate population. The 2010 calculation was done by ODRC, while we followed the same procedure for 2012. Vera determined that the costs for 2010 were understated by 3.8 percent, and the same should be applied for 2012. We did not make the adjustment for the higher indirect and underfunded costs of 3.8 percent. Instead, in order to avoid double counting, we added the hierarchical costs and the federally determined 11 percent indirect costs calculated on the direct costs. Hierarchical costs are derived from the Vera Report for 2010 by dividing the statewide administrative costs of $1,400,000 by the total number of inmates of 50,960 and by 365 to obtain $0.075. Underfunded retiree healthcare of $49,100,000 was similarly calculated to obtain $2.64 per inmate per day. Indirect costs were calculated in the GAO Report, 2012 as 11 percent of short run direct costs. We applied that figure to calculate Ohio's short run indirect costs.

Ohio sold a 1,570-bed male prison to CCA in 2011 for $72 million. Depreciation costs for both 2010 and 2012 were $72.7 million/20 years/1,570 inmates/365= $6.34. However, we chose to be conservative

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 67

CONFIDENTIAL                                                                 CORECIVIC_0955246

and therefore used the BOP/GAO modernization, depreciation, and repair figure of $4.61. For interest paid on state bonds we used four percent on the actual Ohio's sale price of $72.7 million to obtain a cost of $5.07 per inmate per day. Since the prison was sold in 2011, we then calculated the short and long run percentage savings just for 2012.

**Oklahoma:** Data were obtained from Oklahoma Department of Corrections, Total Cost to State, "Statement of Operating Cost per Inmate Based on FY2011 Actuals." The category "Actual Costs" is assumed to refer to labor, education, and training, including all benefits for such personnel. The unfunded pensions for 2010 were calculated as: $11,600,000/(24,549*365)=$1.29. These figures were obtained from Vera, the Oklahoma page. We included depreciation costs based on the $4.61 figure calculated by the U.S. Bureau of Prisons (US GAO, 2012), which was used to charge states for holding their inmates in federal prisons. OKDOC purchased in 2000 a 600-inmate private prison for about $27 million. Computing interest (0.04 percent) per inmate (600) per day (365) yields $4.93. Modernization, repair and depreciation of $4.61 were obtained from the U.S. GAO based on the U.S. BOP study.

The number of private and total inmates, for every state was available from the U.S. DOJ, Bureau of Justice Statistics, 2011. Prisoners in 2010. Appendix tables 1, and 20 (see http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf). For Oklahoma (and also for Mississippi and Kentucky), we included the total for the state statistics under the medium category. The prices per diem paid by OKDOC to the three medium-security male private prisons and to the one maximum-security male private prison are available at http://www.doc.state.ok.us/field/private_prisons/privates.htm. This website also includes the daily occupancy rates http://www.doc.state.ok.us/offenders/count.htm and ages of all prisons http://www.doc.state.ok.us/facilities/facilities.htm.

**Tennessee:** The Tennessee DOC provided a document from the General Assembly of the State of Tennessee Fiscal Review Committee, Memorandum on "Cost Comparison: State and Private Prison Contractors", April 26, 2010. The state is responsible for major maintenance of the privately operated prison, which is owned by the state. The central overhead allocation reflects state costs for private contract prisons. This allocation is 76-77 percent of its own cost for state prisons. Both items were added to the price by the legislature to determine whether the state five percent statutory savings were met. The data for the number of inmates (27,451), and number of inmates in private facilities (5,120) are for 2010, and derived from U.S. BJS, 2011.

**Texas:** Data were obtained from the Texas Legislative Budget Board Staff, Criminal Justice Uniform Cost Report, Fiscal Years 2008-2010, January, 2011. Personnel services include just wages and salaries. Benefits were calculated by dividing the total benefits ($564,800,000) from Vera's report, by the average number of offenders (22,798) in the 1,000-bed prototype institutions (Table 14, p. 29) to obtain the daily cost. The calculation is as follows: (564,800,000/139,061)/365=$11.12. Hierarchical costs were calculated for Texas from the Vera report as statewide administrative costs of $9,400,000/(139,061*365)=$0.19. The 139,061 number of inmates was taken from the Texas legislative report, p. 39. Interest for capital outlays to fund repairs and rehabilitation was $208.7 million in 2010, which is found in the Vera report. We ratioed the share of adult prisoners in prototype institution out of the total prisoners (22,798/139,061*208.7M)/(365*22,798)=$4.11. Texas has underfunded pensions and retiree healthcare that it has neglected to pay. The Vera Report for fiscal year 2010 provides these numbers: $48.1 million of underfunded pensions, $177.2 million underfunded retiree healthcare, adding to $225.3 million. The underfunded total per inmate per day is $225,000,000/(139,061 inmates*365)=$4.44. Indirect short term cost was $1.30 per inmate per day was reported in the Uniform Cost Report, January 2011. We chose to use the standardized BOP/GAO figure of eleven percent which is consistent with the data of most states.

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 68

CONFIDENTIAL                                                              CORECIVIC_0955247

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 72 of 84 PageID #: 13580

CONFIDENTIAL                                                                    CORECIVIC_0955248

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 73 of 84 PageID #: 13581

CONFIDENTIAL                                                                 CORECIVIC_0955249

## Appendix 2: Avoidable Costs for the Three Cases

| Cost Item | Definitions | Contracting Out Existing Prison | Overcrowding & Use of Contract Prison | Purchase of Existing State Prison |
|---|---|---|---|---|
| Personnel Services (mainly security) | Includes wages, health insurance and retirement benefits | x | x | x |
| Medical Services | Includes contracted medical, dental, pharmaceutical, and mental health services | x | x | x |
| Food | | x | x | x |
| Utilities | | x | x | x |
| Fuel | | x | x | x |
| Contracted Professional Services | Includes teachers, psychologists, and others | x | x | x |
| Office & Supplies | | x | x | x |
| State-Provided Professional Services | | x | x | x |
| Technology | | x | x | x |
| Rent | Includes leasing vehicles, and other equipment | x | x | x |
| General Operation | | x | x | x |
| Repairs | | x | x | x |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013          Page 71

CONFIDENTIAL          CORECIVIC_0955250

| | | | | |
|---|---|---|---|---|
| All Other | | x | x | x |
| **Paid Short Run Costs** | "Out-of-pocket" expenses that are direct function to the number of inmates. | x | x | x |
| Underfunded Pensions & Retiree Healthcare | Payments below the appropriate actuarial value. | x | x | x |
| **Short Run Direct Costs** | Includes the out-of-pocket expenses and expenses incurred but unpaid. | x | x | x |
| Parole Board | | | | |
| Hierarchical | | 0.25*x | 0.25*x | 0.25*x |
| Other Short Run Indirect Costs | | 0.25*x | 0.25*x | 0.25*x |
| **Short Run Indirect Costs** | Classification, assignment and tracking of inmates, adjudicating inmate grievances, parole hearing, inmate transfer, liability insurance, human resources for employees, legal, and auditing. | 0.25*x | 0.25*x | 0.25* |
| **Total Short Run Costs** | Includes direct and indirect costs associated with the number of inmates accruing to DOC and other state agencies | x | x | x |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013      Page 72

CONFIDENTIAL

CORECIVIC_0955251

| | | | | |
|---|---|---|---|---|
| | (also referred to variable costs). | | | |
| Depreciation (capital cost) | | | x | x |
| Interest on Debt | | | x | x |
| **Total Long Run Costs** | Includes all expenses directly linked to the number of inmates and capital costs. The latter includes modernization, significant repairs, depreciation, and financing costs. (The long-run costs are also referred to the sum of short run variable costs and the fixed or capital costs). | | x | x |
| State Maintenance Expense | Includes annual upkeep of facility. In most states it appears as Repairs. | | X | x |
| Monitoring Costs | Direct monitoring of private facilities including DOC's central office related expenses. In most states these expenses are incorporated in the per diem price of | | | |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013                Page 73

CONFIDENTIAL                                                                CORECIVIC_0955252

| | contractor. | | | |
|---|---|---|---|---|

CONFIDENTIAL

CORECIVIC_0955253

## Table 1: State Costs and Private Prices

| Itemized Costs by State, Custody & Year / Custody/Year | AZ Min 2010 | AZ Med 2010 | CA 2007/8 | CA All 2011/12 | FL Min-Med 2008/9 | KY Min-Med 2011 | KY Min-Med 2012 | KY Med 2011 | KY Med 2012 | ME 2011 | MS Min 2011 | MS Med-Max 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a Personnel Services (mainly security) | | | 59.60 | 67.01 | 38.83 | | | | | 79.25 | 21.19 | 20.58 |
| 2a Medical Services | | | 21.89 | 43.95 | 8.65 | | | | | 16.67 | 8.78 | 8.78 |
| 3a Food | | | | 4.61 | | | | | | 3.50 | 3.01 | 3.01 |
| 4a Utilities | | | | | | | | | | 3.38 | | |
| 5a Fuel | | | | | | | | | | 2.68 | | |
| 6a Contracted Professional services | | | | | | | | | | 2.10 | | |
| 7b Office & Supplies | | | | | | | | | | 2.10 | | |
| 8a State Provided, Professional Services | | | 4.20 | 2.54 | 4.90 | | | | | 1.52 | 2.31 | 0.83 |
| 9a Technology | | | | | | | | | | 1.28 | | |
| 10a Rents | | | | | | | | | | 0.58 | | |
| 11a General Operations | | | 9.08 | 13.91 | | | | | | 0.58 | | |
| 12a Repairs | | | | | | | | | | 0.58 | | |
| 13a All Other | | | | 2.10 | | | | | | 0.58 | | |
| 14a Paid Short Run Costs | 46.59 | 48.32 | 94.77 | 134.12 | | 53.78 | 51.31 | 48.76 | 50.53 | 114.79 | 35.29 | 33.20 |
| 15a Underfunded Pensions & Retiree Healthcare | 2.67 | 2.67 | 15.18 | 15.18 | 0.55 | 2.80 | 2.80 | 2.80 | 2.80 | 6.86 | | |
| 16a Short Run Direct Costs | 49.26 | 51.09 | 109.95 | 149.30 | 52.93 | 56.58 | 54.10 | 51.56 | 53.33 | 121.65 | 35.29 | 33.20 |
| 17a Parole Board | | | | | | | | | | | 0.15 | 0.15 |
| 18a Hierarchical | | | 4.66 | 7.11 | 0.18 | 0.33 | 0.33 | 0.33 | 0.33 | 5.27 | 2.81 | 2.81 |
| 19a Other Short Run Indirect Costs | | | | | 3.54 | 3.91 | 5.64 | 5.36 | 5.56 | 1.37 | | |
| 20b Short Run Indirect Costs | 5.42 | 5.62 | 12.09 | 7.11 | 5.82 | 6.22 | 5.95 | 5.67 | 5.87 | 13.38 | 3.88 | 3.65 |
| 21a Total short Run Costs | 54.68 | 56.51 | 122.05 | 156.41 | 58.75 | 62.80 | 60.05 | 57.23 | 59.20 | 135.03 | 39.17 | 36.85 |
| 22a Depreciation (capital cost) | 9.30 | 9.30 | 4.61 | 4.61 | | | | | | 2.15 | | |
| 23a Interest on Debt | 0.04 | 0.04 | | | 7.03 | 1.90 | 1.90 | 1.90 | 1.90 | 2.15 | 11.26 | 7.57 |
| 24a Total Long Run Costs | 64.01 | 65.84 | 126.66 | 165.44 | 65.80 | 64.93 | 62.18 | 59.36 | 61.33 | 139.33 | 50.43 | 44.42 |
| 25a State Maintenance Expense | | | | | | | | | | | | |
| 26a Central Office Overhead Added Private | | | | 4.42 | | 0.23 | 0.23 | 0.23 | 0.23 | | | |
| 27a Contractor Per Diems | 46.56 | 53.02 | 79.73 | 64.82 | 50.38 | 47.21 | 43.98 | 44.14 | 49.63 | 65.75 | | 31.15 |
| 28a # of Private Inmates | 2,979 | 1,648 | 2,170 | 9,000 | 11,796 | 2,127 | 2,127 | | | | | 5,241 |
| 29a # of All Inmates | 12,981 | 14,521 | 165,062 | 134,000 | 104,308 | 20,544 | | 20,544 | | 2,038 | | 21,067 |
| 30a SR percent Savings Prison 1 | 14.85 | 6.17 | 34.68 | 58.56 | 13.61 | 24.83 | 26.76 | 22.8 | 16.16 | 51.31 | | 15.47 |
| 31a SR Percent Savings Prison 2 | 27.27 | 19.48 | 37.05 | 60.82 | 23.13 | 27.29 | 29.57 | 25.64 | 19.07 | 32.81 | | 29.88 |
| 32a LR Percent Savings Prison 1 | | | | | | | | | | | | |
| 33a LR Percent Savings Prison 2 | | | | | | | | | | | | |
| 34a Percent Private Inmates | 22.95 | 11.35 | 1.31 | 6.72 | 11.31 | 10.35 | | 10.35 | | NR | | 24.88 |
| 35a Statutory Savings requirements per $1 | | | | 0.07 | | 0.10 | 0.10 | 0.10 | 0.10 | | | |
| 36a Max Med costs to Reach statutory Limit | 17.45 | 12.82 | 46.93 | 100.62 | 10.61 | 11.23 | 11.98 | 9.28 | 5.56 | | 45.39 | 8.83 |
| 37a Unfunded pen & Ret per inmate/day | 0.04 | 0.04 | 0.12 | 0.09 | 0.01 | 0.04 | 0.05 | 0.05 | 0.05 | 0.05 | | |
| 38a Percent labor costs of long run costs | | | 47.06 | 40.50 | 59.01 | | | | | 56.88 | 42.02 | 46.33 |
| 39a Existing & statutory Medical | | | 68.82 | 144.57 | 19.26 | 11.23 | 11.98 | 9.28 | 5.38 | | 54.17 | 17.61 |
| 40a Statutory medical/Existing_medical | | | 2.14 | 2.29 | 1.23 | | | | | | | 1.01 |
| 41a Long Run Costs | 59.95 | 61.83 | 117.59 | 155.69 | 61.43 | 60.03 | 57.49 | 54.88 | 56.70 | 129.30 | 47.52 | 41.68 |
| 42a Indirect Costs 2B Percent | 1.35 | 1.40 | 3.02 | 1.78 | 1.46 | 1.56 | 1.49 | 1.42 | 1.47 | 3.35 | 0.97 | 0.91 |
| 43a Percent SR Savings Indirect 25 | 8.01 | -1.00 | 29.43 | 57.09 | 7.60 | 18.79 | 20.88 | 16.68 | 9.43 | 47.40 | | 8.69 |
| 44a Percent LR Savings Indirect 25 | 22.34 | 14.25 | 32.20 | 58.37 | 17.67 | 21.36 | 23.50 | 19.57 | 12.46 | 49.15 | | 25.27 |

Legend: "Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison.

Case 3:16-cv-02267     Document 359-11     Filed 11/20/20     Page 78 of 84 PageID #: 13586

CONFIDENTIAL                                                                                       CORECIVIC_0955254

| Itemized Costs by State, Custody & Year | | OH Min-Med 2010 | OH 2000 | OH Mitt-Mad 2012 | OK 2010 | OK Min 2011 | OK Med 2011 | OK Max 2011 | TN Med 2011 | TX Prototype 2010 | BOP/GAO Low 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1b | Personnel Services (mainly security) | | 27.87 | | | 28.94 | 29.61 | 65.29 | | 40.92 | 41.16 |
| 2b | Medical Services | | | | | 8.28 | 9.37 | 10.56 | | 5.97 | |
| 3b | Food | | | | | | | | | 2.32 | |
| 4b | Utilities | | | | | | | | | | |
| 5b | Fuel | | | | | | | | | | |
| 6b | Contracted Professional Services | | 1.58 | | | | | | | 0.02 | |
| 7b | Office & Supplies | | 7.64 | | | 0.72 | 0.71 | 0.72 | | | |
| 8b | State Provided Professional Services | | | | | | | | | NA | |
| 9b | Technology | | | | | | | | | | |
| 10b | Rents | | | | | | | | | | |
| 11b | General Operations | | | | | | | | | 4.53 | |
| 12b | Repairs | | | | | | | | 0.43 | | |
| 13b | All other | | | | | | | | | | |
| 14b | **Paid Short Run Costs** | **48.92** | **37.09** | **43.92** | | **39.23** | **39.69** | **76.57** | **50.86** | **53.76** | **65.48** |
| 15b | Underfunded Pensions (incl  healthcare) | 2.64 | | 2.64 | | 1.29 | 1.29 | 1.29 | | 4.44 | |
| 16b | **Short Run Direct Costs** | **51.56** | **37.09** | **46.56** | | **40.52** | **40.98** | **77.86** | **51.29** | **58.20** | **65.48** |
| 17b | Parole Board | | | | | | | | | | |
| 18b | Hierarchical | | | | | | | | 2.03 | 0.19 | |
| 19b | Other Short Run Indirect Costs | 5.67 | 4.08 | 5.12 | | 4.46 | 4.51 | 8.57 | 5.64 | 6.40 | 7.20 |
| 20b | **Short Run Indirect Costs** | **5.67** | **4.08** | **5.12** | | **4.46** | **4.51** | **8.57** | **7.67** | **6.59** | **7.20** |
| 21b | **Total short Run Costs** | **57.23** | **41.17** | **51.68** | | **44.98** | **45.49** | **86.43** | **58.96** | **64.79** | **72.68** |
| 22b | Depreciation (capital cost) | 4.61 | | 4.61 | | 4.61 | 4.61 | 4.61 | | 4.11 | 4.61 |
| 23b | Interaston Debt | 5.07 | | 5.07 | | 4.93 | 4.93 | 4.93 | | 4.11 | |
| 34b | **Total Long Run Costs** | **66.92** | **41.17** | **61.37** | **0.00** | **54.52** | **55.03** | **95.97** | **60.66** | **73.01** | **77.29** |
| 25b | State Maintenance Expense | | | | | | | | 0.13 | | |
| 26b | Central Office Overhead Added Private | | | | | | | | 1.57 | | |
| 27b | Contractor Per Diems | | | | | | 43.02 | 56.67 | | | |
| 28b | Contractor Per Diem Prison1 | 45.86 | | 45.86 | | | 40.28 | 57.96 | 42.29 | 37.47 | |
| 29b | Contractor Per Diem Prison 2 | | | | | | 43.02 | 56.62 | | | |
| 30b | # of Private inmates | 3,038 | | | 6,019 | | 3,369 | 5,120 | 19,155 | | |
| 31b | # of All inmates | 51,712 | | | 2,624.52 | 6,684 | 7,802 | 961 | 27,451 | 173,649 | |
| 32b | SR percent Savings Prison 1 | 19.87% | | 11.26% | | | | | 25.39 | 42.16 | |
| 33b | SR Percent Savings Prison 2 | | | | | | 5.44 | 34.49 | | | |
| 34b | LR Percent Savings Prison 1 | 31.47 | | 25.27 | | | 21.83 | 41.00 | 30.29 | 48.68 | |
| 35b | LR Percent Savings Prison 2 | | | | | | 21.83 | 41.00 | | | |
| 36b | % Private inmates | 5.87 | | | 22.93 | | 45.74 | 27.13 | 18.70 | 11.03 | |
| 37b | Statutory Savings requirements per $1 | 0.05 | 0.05 | 0.05 | | | | | | 0.10 | NR |
| 38b | Max Med costs to Reach statutory Limit | 17.71 | | 12.44 | | | 14.75 | 38.01 | | 28.24 | |
| 39b | Unfunded pen & Ret per inmate/day | 0.04 | | 0.04 | | | 0.02 | 0.01 | | 0.06 | |
| 40b | Percent labor costs of long run costs | | 67.70 | | | 53.08 | 53.80 | 68.03 | | 56.05 | 53.25 |
| 41b | Existing & statutory Medical | 17.71 | | 12.44 | | NR | 24.12 | 48.57 | | 34.21 | |
| 42b | Statutory medical/Existing medical | | | | | | 1.57 | 3.60 | | 4.73 | |
| 43b | Indirect Costs 25 Percent | 1.42 | 1.02 | 1.28 | | 1.11 | 1.13 | 2.14 | 1.92 | 1.65 | 1.80 |
| 43b | Percent SR Savings Indirect 25 Prison 1 | 13.44 | | 4.14 | | | 4.35 | 27.56 | 17.32 | 37.39 | |
| 45b | Percent SR Savings Indirect 25 Prison 2 | | | | | | -2.16 | 29.23 | | | |
| 46b | Percent LR Savings Prison 1 indirect 25 | 26.81 | | 20.28 | | | 22.02 | 35.27 | 17.32 | 44.95 | |
| 46b | Percent LR Savings Prison 2 indirect 25 | | | | | | 16.71 | 36.77 | | | |

**Cost Analysis of Public and Contractor-Operated Prisons** – October 24, 2013

CONFIDENTIAL

CORECIVIC_0955255

Legend: "Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison.

## Table 2: Total State Government & Correctional Employees and Wages, March 2011

| State | Correctional Employment (1) | Total State Gov't employment (2) | Correctional Wages (3) | Total State Gov't Wages (4) | Percent Correctional Employment of State Gov't Employment (5) | Percent Correctional Wages of State Gov't Wages (6) | Underfunding as a percent of State Gross Product (2007)[1] (7) | Years of Total State Receipts to Eliminate Underfunding Deficit (2007)[2] (8) | Years Saved of (8) by Shifting Corrections to Private Sector (9)=(6)*(8) |
|---|---|---|---|---|---|---|---|---|---|
| AZ | 10,113 | 68,786 | 37,467,594 | 286,283,598 | 14.7 | 13.1 | 24 | 4.85 | 0.64 |
| CA | 60,007 | 407,321 | 372,328,845 | 2,402,403,913 | 14.7 | 15.5 | 26 | 4.15 | 0.64 |
| FL | 30,382 | 184,237 | 91,858,187 | 706,917,692 | 16.5 | 13.0 | 16 | 3.26 | 0.42 |
| KY | 4,183 | 81,493 | 10,886,449 | 304,185,949 | 5.1 | 3.5 | 34 | 5.35 | 0.19 |
| ME | 1,224 | 21,354 | 5,144,150 | 87,046,104 | 6.2 | 5.9 | 33 | 4.38 | 0.26 |
| MS | 3,174 | 57,656 | 8,337,540 | 207,128,461 | 5.5 | 4.0 | 41 | 5.73 | 0.31 |
| OH | 15,261 | 139,049 | 64,809,527 | 653,416,073 | 11.0 | 9.9 | 47 | 8.74 | 0.87 |
| OK | 4,864 | 68,339 | 15,329,123 | 261,290,605 | 7.1 | 5.9 | 31 | 5.16 | 0.30 |
| TN | 6,953 | 86,215 | 19,666,994 | 312,198,855 | 8.1 | 6.3 | 13 | 2.84 | 0.18 |

CONFIDENTIAL    CORECIVIC_0955256

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| TX | 43,403 | 318,370 | 128,038,407 | 1,364,972,027 | 13.6 | 9.4 | 16 | 4.67 | 0.44 |
| US | 462,549 | 4,359,380 | 1,921,450,594 | 19,971,861,990 | 10.6 | 9.6 | Not Applicable | Not Applicable | Not Applicable |

Source: US Census Bureau, Annual Survey of Public Employment and payroll, March 2011. http://www.census.gov/govs/apes/. Accessed July 26, 2013. Data for tax revenue and state product columns from Novy-Marx and Rauh, 2009: 198.

CONFIDENTIAL

CORECIVIC_0955257

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

CONFIDENTIAL

CORECIVIC_0955258

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [1] Deleted | Author |
|---|---|
| " | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [2] Deleted | Author |
|---|---|
| A | |

| Page 21: [3] Deleted | Author |
|---|---|
| The industry has long been dominated by Coca-Cola and Pepsi Company. | |

| Page 21: [3] Deleted | Author |
|---|---|
| The industry has long been dominated by Coca-Cola and Pepsi Company. | |

| Page 21: [3] Deleted | Author |
|---|---|
| The industry has long been dominated by Coca-Cola and Pepsi Company. | |

| Page 21: [3] Deleted | Author |
|---|---|
| The industry has long been dominated by Coca-Cola and Pepsi Company. | |

| Page 21: [3] Deleted | Author |
|---|---|
| The industry has long been dominated by Coca-Cola and Pepsi Company. | |

| Page 21: [3] Deleted | Author |
|---|---|
| The industry has long been dominated by Coca-Cola and Pepsi Company. | |

| Page 21: [4] Deleted | Author |
|---|---|
| 4 | |

CONFIDENTIAL

CORECIVIC_0955259

| Page 21: [4] Deleted | Author |
|---|---|
| 4 | |

| Page 21: [4] Deleted | Author |
|---|---|
| 4 | |

| Page 21: [4] Deleted | Author |
|---|---|
| 4 | |

CONFIDENTIAL

CORECIVIC_0955260