# EXHIBIT 2

07/31/2020

Garfinkle, David

Page 1

1          IN THE UNITED STATES DISTRICT COURT
       FOR THE MIDDLE DISTRICT OF TENNESSEE

2

          Civil Action No. 3:16-CV-02267

3

4     NIKKI BOLLINGER GRAE, Individually and on
   Behalf of All Others Similarly Situated,

5

          Plaintiff,

6     vs.

7     CORRECTIONS CORPORATION OF AMERICA, et al.,

8               Defendants.

       _____/

9

10

11               *** CONFIDENTIAL ***

12

13          VIDEOTAPED/ZOOM DEPOSITION OF

14               DAVID GARFINKLE

15

               Volume I

16

17

18

19

               Friday, July 31, 2020

20               9:38 a.m. - 6:27 p.m.

21

               Franklin, Tennessee

22

23

   Stenographically Reported By:

24     Debra Duran-Bornstein, CCR, RPR, LCR
   Aptus Court Reporting

25     Job No. 10071104

Case 3:16-cv-02267     Document 360-2     Filed 11/20/20     Page 2 of 33 PageID #: 13647

1

2

3

4          The video-recorded deposition via Zoom of

5     DAVID GARFINKLE was taken by Counsel for the

6     Plaintiff for all purposes under the Federal

7     Rules of Civil Procedure.

8          It is agreed that DEBRA DURAN-BORNSTEIN,

9     LCR, RPR, and CCR for the State of Tennessee,

10     may swear the witness, and that the reading and

11     signing of the completed deposition by the

12     witness are not waived.

13

14

15

16

17

18

19

20

21

22

23

24

25

1       ALL APPEARANCES via ZOOM

2

  On behalf of Plaintiff:

3

      ROBBINS GELLER RUDMAN & DOWD, LLP

4          655 West Broadway

      Suite 1900

5          San Diego, California 92101

      (619)231-1058

6          BY:  WILLOW E. RADCLIFFE, ESQ.

        JASON FORGE, ESQ.

7            CHRISTOPHER LYONS, ESQ.

        KENNETH BLACK, ESQ.

8          wradcliffe@rgrdlaw.com

9      On behalf of Defendants:

10         LATHAM & WATKINS, LLP

      555 Eleventh Street, N.W.

11         Suite 1000

      Washington, D.C. 20004-1304

12         (202)637-2200

      BY:  BRIAN GLENNON, ESQ.

13           MORGAN E. WHITWORTH, ESQ.

      brian.glennon@lw.com

14

15

      RILEY WARNOCK & JACOBSON

16         1906 West End Avenue

      Nashville, Tennessee 32703

17         (615)320-3700N

      BY: STEVE RILEY, ESQ.

18         TREY MCGEE, ESQ.

      sriley@rwjplc.com

19

20

  ALSO PRESENT:  Spencer Beneveniste, Videographer

21

22

23

24

25

1          MR. McGEE:  Trey McGee, Riley, Warnock &

2    Jacobson, on behalf of the witness and the

3    Defendants.

4          And I believe my partner, Steve Riley,

5    with Riley Warnock & Jacobson, is also on.

6          MR. RILEY:  Correct.  Thank you.

7          MR. WHITWORTH:  And Morgan Whitworth, of

8    Latham & Watkins, on behalf of the Defendants and the

9    witness.

10          THE VIDEOGRAPHER:  The court reporter

11    today is Debra Duran, and she may now swear in or

12    affirm the Deponent.

13          THE STENOGRAPHER:  Please raise your

14    right hand.

15          Do you swear that the testimony you are

16    about to give in this case will be the truth, the

17    whole truth, and nothing but the truth?

18          THE WITNESS:  Yes, I do.

19    Thereupon:

20          DAVID GARFINKLE

21    having been first duly sworn remotely was examined

22    and testified as follows:

23          DIRECT EXAMINATION

24    BY MS. RADCLIFFE:

25    Q.    Good morning, Mr. Garfinkle.

Page 10

1    A.    Good morning.

2    Q.    Would you please spell your name for the

3    record?

4    A.    Sure.

5          David, D-A-V-I-D, Garfinkle,

6    G-A-R-F-I-N-K-L-E.

7    Q.    And where do you currently reside?

8    A.    In Franklin, Tennessee.

9    Q.    And have you been deposed before?

10   A.    I was deposed once under a property tax case a

11   few years ago, and then probably a decade or so ago

12   under a 401(k) plan deposition.  So, not -- not often.

13   Q.    And I take it you haven't been deposed before

14   in connection with being employed at CoreCivic?

15   A.    Well, both of those were -- I mean, they were

16   for CoreCivic.

17         The property tax was a property tax case on

18   one facility we owned in New Mexico, and the 401(k)

19   plan was -- gosh, it was so long, I can't remember the

20   nature of the case, but I was deposed on behalf of the

21   company's 401(k) plan.

22   Q.    And when I refer to CoreCivic, or CCA, or

23   Corrections Corporation of America, do you understand

24   that that all refers to the present company named

25   CoreCivic?

1      the managing-only business, because when you don't own

2      the real estate, the customer can put the contract out

3      for bid upon its expiration, or, really, at any point,

4      for that matter, and other operators can come in and

5      bid competitively for that contract because they don't

6      have to deploy capital or have the real estate to

7      perform the -- the business.

8            And in this case, throughout -- you know, it

9      probably started shortly after I -- when I started

10     with the company, probably 25 percent of our business

11     was in the management -- what I'll refer to as the

12     manage-only business, but what we found was it was

13     very difficult when our customers weren't maintaining

14     the facilities, and -- and it provided the economics

15     very challenging.  We purposely exited the business

16     because of -- you know, we -- we found it difficult to

17     operate the facilities when customers weren't, for

18     example, keeping up with the repairs, and maintenance,

19     and life safety systems.

20            So even though we were -- even though we may

21     have been generating profit from contracts, it was

22     just such that we weren't comfortable with the

23     investment our partners were making in the facilities,

24     and so exited.

25            So over time, like I said, from when I started

1    with the business, probably 25 percent of our business

2    was within the managed-only segment, and, today, we

3    have five contracts that's probably less than

4    1 percent, maybe 2 percent, of our total business.

5    Q.      Okay.  If you go -- skipping to the State of

6    Idaho paragraph and going to the next one, and it

7    says, "Based on information available at this filing,

8    notwithstanding the contracts and facilities described

9    above, we expect to renew all other contracts that

10    have expired or are scheduled to expire within the

11    next 12 months."

12    A.      Right.

13    Q.      Do you understand that to be an accurate

14    statement at the time?

15    A.      Yes.

16    Q.      Okay.  Do you see in the next sentence, it

17    says, "We believe our renewal rate on existing

18    contracts remains high as a result of a variety of

19    reasons, including, but not limited to, the constraint

20    supply of available beds within the U.S. correctional

21    system, our ownership of the majority of the beds we

22    operate, and the quality of our operations"?

23          Do you believe that to have been a fair

24    statement -- a fair and accurate statement at the

25    time?

1    A.    I do.

2    Q.    Okay.  And what was your basis for that

3    belief?

4           MR. GLENNON:  I'm just going to instruct

5    the witness not to disclose anything that's based on

6    privileged information or privileged communications.

7           But, Mr. Garfinkle, you can go ahead and

8    answer.

9           THE WITNESS:  Okay.

10    A.    Can you repeat the question?  I'm sorry.

11    BY MS. RADCLIFFE:

12    Q.    Sure.

13           We reviewed the sentence, and I just wanted to

14    see if I could understand what was the -- the basis

15    for your belief that the statement was fair and

16    accurate, the one that begins with "we believe our

17    renewal rate on existing contracts remains high?

18    A.    Okay.  So, yes, public sector correctional

19    systems are typically overcrowded, and they use us

20    as -- as a relief valve for their correctional

21    systems.  So we have the available supply of beds,

22    where a -- a good solution for them to avoid

23    overcrowding within their systems.

24           If you have overcrowding in their systems, you

25    can have ornery -- ornery inmates who -- who don't

1    have adequate space, they may not have adequate

2    programs, and so we offer that as a service to our

3    government customers.  We can provide programming

4    space, we can provide different types of skills for

5    our inmates, and keep them occupied in building a

6    trade so that when they leave the prison system, they

7    can stay out of the prison system because they have a

8    skill.

9         So, the -- the supply of beds is -- is

10    available, and you pointed out in the earlier

11    disclosure as well, having that available capacity is

12    very important for our customers and provides them,

13    like I said, a relief valve.

14         My belief is, also, based on, you know,

15    experience in the industry.  So I've been with the

16    company over 20 years, or almost 20 years.  I work

17    very closely with many employees who have previously

18    worked in public sector facilities, and I regularly

19    obtain their feedback, and just as part of our

20    everyday business operations, work -- work with them

21    and -- and based on their experience.

22    Q.    Okay.  And with respect to your belief with

23    respect to the "renewal rate on existing contracts

24    remain high," what is your belief regarding the

25    quality of CCA's operations and how that ties in to

 1   the renewal rate?

 2   A.      Yeah.

 3            MR. GLENNON:  Objection.

 4            THE WITNESS:  Sorry.

 5   A.      I was speaking to both, so, you know, the

 6   experience of the people that we worked with, like I

 7   said, many people in the corrections industry that we

 8   have hired in our operations department previously

 9   worked in public sector facilities.  So it's my

10    interactions with them that -- that lead me to

11   understand that, you know, we provide a high quality

12   of operations.

13            But, you know, just the number of GEDs that we

14   provide in our facilities, the number of trade

15   certificates that we provide inmates within our care,

16   and, you know, studies have shown that when you

17   provide those services to inmates, and they get a

18   degree, or they get a skill or trade certificate, that

19   the recidivism rate, or the rate at which they come

20   back into the prison system, is much lower.

21            So it's knowing, you know, what works that we

22   want for having the highest number of GEDs in a

23   particular state lead me to believe statements like

24   this.

25

1      BY MS. RADCLIFFE:

2      Q.      So you indicated that the basis of your belief

3      was speaking to individuals with experience that had

4      worked in the corrections industry.

5              Anyone in particular?

6      A.      Well, Harley Lappin, I worked with.  He was

7      the head of the Federal Bureau of Prisons, so what a

8      better -- a better individual to understand the

9      comparison between the public sector prison system,

10     you know, the Federal Bureau of Prisons, which he led,

11     which is the largest correctional system in the United

12     States.  So having him as the head of our operations

13     is certainly, you know, better to be able to perform a

14     comparison.

15             But we hire many people from the -- the public

16     sector and employ them regularly.  So many people in

17     our operations department.  I can name more, if you

18     wish.

19     Q.      Well, with respect to specifically the Federal

20     Bureau of Prisons, besides Mr. Lappin, is there anyone

21     else who comes to mind?

22     A.      Yeah, Bill Dalius is in our operations

23     department.

24             Mike Daly is no longer an employee, but Don

25     Murray is a current vice president in the company,

1    think this one is pointing to the audits, the

2    extensive audits that we undergo from our government

3    customers.  We're held to a very high standard in the

4    public -- in the private sector, where they often have

5    contract monitors on site, and they perform regular

6    audits, depending on the customer, and maybe, you

7    know, quarterly, maybe semiannually, maybe annually,

8    maybe, you know, other audit procedures that are

9    performed on a weekly basis.

10          So we're subject to extensive audit, and what

11    this is saying is if -- you know, if they find

12    significant deficiencies and repeat audits, that it

13    could impact our -- our bidding and future RFPs.

14          And fines.  I'm sorry.  It can also -- the

15    similarities with the previous one is they can fine us

16    as a result of an audit for a -- for a contract

17    violation.

18      BY MS. RADCLIFFE:

19    Q.     Fair enough.

20          If you look at the end of this paragraph, it

21    says, "In February of 2014, we reached an agreement to

22    pay 1 million in compensation to the State of Idaho

23    regarding contractual disputes relating to staffing at

24    the Idaho Correctional Center stemming, in part, from

25    an audit by the Idaho Department of Corrections."

1       Do you recall the reasons why CCA received or

2    entered into this agreement to pay a million dollars?

3    A.     I do.  The details today are a little bit

4    fuzzier, but I do remember we had some employees

5    acting inappropriately, and when it came to the

6    staffing pattern in the contract for the State of

7    Idaho, they were not keeping them accurately; in fact

8    they -- they were doctoring them, so certainly not

9    condoned by us.

10       And to this day, I'm not sure why they would

11    have done that with -- without any incentive to do so,

12    but it was a long -- so Idaho did an audit, they

13    incurred extensive costs.  We worked with them, we

14    provided them with extensive data in connection with

15    that audit.  And we wanted to work with them, they had

16    been a very good partner, and wanted to compensate

17    them to -- you know, for the cost that they had

18    incurred.

19       And, you know, they were -- I don't remember

20    if it was -- I guess there was a dispute, there was a

21    contractual dispute, so this was kind of the

22    settlement over the contractual dispute and potential

23    legal actions, you know, potential civil and criminal

24    penalties that -- that were being discussed.

25    Q.     Do you know if CCA took any steps to -- to

1    prevent in the future or deter in the future similar

2    misreporting of staffing information?

3              MR. GLENNON:  Objection to the form.

4    A.     Yes, definitely.  We -- we engaged an

5    accountant to help us review the internal controls

6    over the staffing patterns, how we might be able to

7    identify problems sooner.

8              So we constantly -- this is a tough business,

9    and staffing, particularly, is difficult in the

10   industry, not unique to CoreCivic, but to hire

11   correctional officers is very challenging, so -- and

12   that's one of the reasons why they have contractual

13   staffing patterns in each contract.

14             And so we -- we were, you know, disappointed

15   in ourselves that we didn't live up to the

16   expectations of our -- of our operations, or of our

17   partner in this case, and wanted to institute

18   additional controls to make sure that this couldn't

19   happen again.  So we spent a lot of money internally

20   to set up procedures and controls to make sure that we

21   would identify any -- any staffing deficiency sooner

22   and setting -- setting up systems, so that what

23   occurred in Idaho couldn't occur if you have got the

24   proper IT system.

25

1      BY MS. RADCLIFFE:

2      Q.      And do you know, approximately, when these

3      procedures -- these new procedures were set in place?

4      A.      I don't recall exactly.  I do know we started

5      pretty quickly with the audit that -- it was KPMG that

6      did an audit for the state.  We worked with the state.

7      We found all kinds of discrepancies.

8              Staffing is a complicated area of corrections.

9      And -- and how you staff facilities and how you count

10     the hours spent against the contract staffing pattern

11     is not very simple.  And so we found -- they never

12     issued a final report because we found such -- so many

13     discrepancies with the report, I don't think they were

14     comfortable issuing a final version.

15             But -- so it was right, you know, immediately,

16     we started looking at our systems internally to figure

17     out what we could do better to prevent things like

18     that from happening.

19             I'm not sure if I answered your question.

20     Q.      Sure.

21             I think -- let me -- let me -- you indicated

22     that -- that, for example, KPMG went in and did an

23     audit, and you looked extensively at the issues

24     resolving reporting staffing, and I'd anticipate that

25     that took a bit of time; is that fair to say?

Page 54

1     Q.     Okay.  The language in this 10K refers to a

2     decision regarding not renewing the contract, and I

3     believe you just indicated that you -- CCA had lost

4     the award.

5          So this was a -- a competitive bid loss?

6     A.     Yeah, it was.

7              MR. GLENNON:  Objection to form.

8              THE WITNESS:  I'm sorry.

9     A.     It was a competitor procurement at the

10     expiration of the contract, as I recall.  So they had

11     put it out to bid for a renewal, what we -- you know,

12     we commonly refer to as renewals if we already have

13     the contract, and, like I said, fully expected to win

14     it.

15          There are -- there are, obviously, a lot of

16     judgments and estimates that go into disclosures,

17     extensive disclosures, in these documents, the Form

18     10Ks that we're looking at, and so we have to make

19     good faith estimates of what's going to happen in the

20     future.  And it's hard to predict the future and

21     things -- that's -- that's the reason the SEC has

22     these rules, is because they want companies to

23     disclose what could go wrong, what might not happen

24     that you think is going to happen.

25          And this is one of those instances where, you

1    know, we had a risk factor saying we -- we may not

2    win -- you know, we are subject to termination,

3    nonrenewals, and competitor rebids of our government

4    contracts, and this was a case that fit that -- that

5    description, and so we disclosed appropriately.

6      BY MS. RADCLIFFE:

7    Q.      Do you recall the reasons why CCA did not win

8    this competitive bid?

9    A.      I would be speculating why, because I don't

10    think the Bureau of Prisons ever told us specifically

11    why we lost the contract.

12    Q.      Do you recall any reasons why being discussed

13    within CCA?

14    A.      Well, I would say during the procurement

15    process, there were issues with cohabitation, so our

16    Northeast Ohio facility was shared between the Federal

17    Bureau of Prisons and the U.S. Marshals Service.

18         Price is always a factor in the bids, as is

19    prior performance.  So I know -- I remembered

20    discussing all three and probably more than that.

21    Q.      If you go to the next paragraph of this risk

22    disclosure, it says, "Based on the information

23    available at this filing, notwithstanding the contract

24    at the Northeast Ohio Correctional Center described

25    above, we expect to renew all other contracts that

1    have expired or are scheduled to expire within the

2    next 12 months."

3         Did you believe that to have been a fair and

4    accurate statement at the time?

5    A.     I do.

6    Q.     Do you recall whether the loss of the

7    competitive bid with respect to Northeast Ohio

8    informed CCA at all with respect to expectations

9    regarding future renewals?

10        MR. GLENNON:  Object to form.

11   A.     No, I -- I don't remember that having an

12   impact saying, well, we lost this contract, we need to

13   rethink our approach or disclosures or anything like

14   that.

15        As I mentioned before, there are a lot of

16   judgments that have to be made in preparing documents

17   like this, and it's always tough to -- to project.  I

18   mean, we have 60 facilities -- somewhere around 60,

19   probably 50 to 65, maybe 70 facilities, during the

20   period that we're talking about.

21        And, obviously, you know, everything in here

22   is subject to materiality under the SEC rules and

23   regulations and accounting rules, so we're always

24   speaking in the context of materiality.  So I'm sure

25   there may have been a minor one that -- that

1    terminated, or maybe we even expected to terminate,

2    but those aren't -- those aren't things that are

3    required to be disclosed.

4         But -- so, yeah, at the time we wrote this

5    document, I don't -- I don't remember having any --

6    any reservations about what we were expecting to

7    happen for the ensuing 12 months.

8     BY MS. RADCLIFFE:

9    Q.      And if you look at the next sentence, it says,

10    "We believe our renewal rate on existing contracts

11    remains high as a result of a variety of reasons,

12    including, but not limited to, the constraint supply

13    of available beds within the U.S. correctional system,

14    our ownership of the majority of the beds we operate,

15    and the quality of our operations."

16         And that -- you can go ahead and go back and

17    turn to Tab 2 with respect to this risk disclosure on

18    Page 28, but that's the same language as was included

19    in the prior year; is that fair to say?

20         MR. GLENNON:  Object to form.

21    A.      Yes.  Yes.  We tried to win them all and

22    believe we are the best private operator to win them.

23         So certainly having the available beds, yeah.

24    Yes.  So -- so we have a demonstrated track record.

25    This was one contract loss.  It was one I didn't like

Page 58

1    to lose, but it was one contract loss.

2          And despite this one loss, we consistently had

3    maintained a very high renewal rate, I would say

4    somewhere around 95 percent over -- I know it is

5    today, over the past five years, and I don't think

6    that -- that percentage has changed significantly

7    since the period of this 10K.

8          So, yeah, we have a demonstrated track record

9    of -- of a very high renewal rate.

10     BY MS. RADCLIFFE:

11   Q.      Do you know what the renewal rate has been

12   with respect to BOP facilities?

13   A.      I don't -- I know we had more contracts back

14   in this period of time.  As I mentioned, the -- the

15   market changed for the BOP, the customer that you're

16   referring to, in that they didn't need the number of

17   beds that they had previously outsourced to the

18   private corrections industry.  So they were able to

19   end the contracts without renewing them or -- or

20   competitively -- you know -- you know, our competitor

21   has been very aggressive at pursuing contracts like

22   this where they may submit a price that we don't find

23   is acceptable.

24          We need to -- we need to find an acceptable

25   price where we're able to safely and securely operate

1    our facilities, and so we don't always win.  We may --

2    we may -- I should say it another way.  We may -- we

3    may give up business because of price, but -- so with

4    the BOP, it became two things:  One, price continued

5    to go down, and down and down because they -- they

6    could compete them because they didn't need as many

7    beds as they had previously from, you know, prior to,

8    say, 2012.

9    Q.      So is it -- is it fair to say that the BOP

10    could give more scrutiny to its contracts with private

11    prison operators because it no longer needed as large

12    of a relief valve as it had before?

13            MR. GLENNON:  Object to form.

14    A.      I'm not sure they applied more scrutiny.  I

15    mean, they always -- they have contract monitors,

16    they -- they -- and it's a large organization.  So,

17    you know, the people scrutinizing the contracts are

18    different than the people doing the procurements.  I'm

19    sure they speak, but it is certainly true that they

20    could ask for a lower price, and if they didn't get

21    it, they didn't need to outsource it.

22            It's easy to do when -- you know, in their

23    system, it's probably around, at this time,

24    115 percent of capacity, so still over capacity, but

25    when we entered into our first contract with the BOP,

1    also filing a FOIA request?

2    A.    Yes.

3    Q.    Do you know if one was filed?

4    A.    I don't know.  I don't recall getting any

5    information --

6    Q.    That's not surprising.

7    A.    -- from the government.

8    Q.    If you -- we're going to go ahead and put that

9    exhibit to the side.

10         MR. GLENNON:  Willow, is this a good time

11    to take a very short break?

12         MS. RADCLIFFE:  Sure.

13         MR. GLENNON:  Okay.  Ten minutes.

14         MS. RADCLIFFE:  Ten minutes would be good

15    for me, too.  Thank you.

16         THE VIDEOGRAPHER:  The time is 3:53 p.m.

17    We're off the record.

18         (Recess 3:53 p.m. until 4:08 p.m.)

19         THE VIDEOGRAPHER:  We're back on the

20    record, and the time is 4:08 p.m.

21         MS. RADCLIFFE:  I'm going to mark the

22    next exhibit in order.  Tab 53 is 523.

23         THE VIDEOGRAPHER:  Did you say Tab 53?

24    I'm sorry.

25         MS. RADCLIFFE:  Yes, Tab 53 is 523.

1          (Thereupon, marked as Plaintiff

2       Exhibit 523.)

3     BY MS. RADCLIFFE:

4     Q.      Mr. Garfinkle, do you see that you received an

5     email from Mr. Hininger on January 22nd, 2015?

6     A.      I do.

7     Q.      Okay.  Do you have any reason to believe

8     what's been marked as Exhibit 523 is not a true and

9     correct copy of the email you received from

10    Mr. Hininger?

11    A.      No.

12    Q.      Okay.  In the email below in the email chain,

13    the one that's 7:59 a.m., there's an email that

14    appears that Mr. Hininger wrote, and it discusses, in

15    the third paragraph, that -- a request for a

16    debriefing.

17          Do you see that?

18    A.      I do.

19    Q.      Okay.  And he indicates that we received it on

20    January 6th.

21          Is this the debriefing that -- that you

22    indicated earlier that you likely attended?

23    A.      Yes.

24          MR. GLENNON:  Object to form.

25          THE WITNESS:  I'm sorry.

1   A.    The email, that's around that time frame where

2   I was thinking it would have occurred, and it does

3   seem like that would have been the one that I would

4   have been a participant to.

5    BY MS. RADCLIFFE:

6   Q.    Okay.  And do you see it says here that, "For

7   Part A, CCA proposed a lower price than GEO, but our

8   total proposal was unsuccessful because of two

9   weaknesses"?

10         Does that refresh your recollection as to CCA

11   proposing a lower price than GEO on Part A?

12         MR. GLENNON:  Objection, foundation.

13   A.    Yeah, I was thinking that price -- there was

14   something about the price that I thought GEO was lower

15   than us on, but I -- I can't remember the details.  I

16   don't remember the distinction between Part A and Part

17   B of that procurement.

18    BY MS. RADCLIFFE:

19   Q.    Do you have any reason to believe that

20   Mr. Hininger was incorrect in his assessment as

21   reflected in this email?

22   A.    No.

23   Q.    Okay.  And with respect to the -- the two

24   weaknesses, it says, "First, in the past performance

25   section of our proposal, concerns about our

Page 233

1    performance and medical services at our Cibola and

2    Eden facilities were raised."

3         Do you see that?

4    A.    Yes.

5    Q.    Do you understand that Mr. Hininger is

6    conveying that as part of the debrief, CCA was

7    informed that their total proposal was unsuccessful

8    because of this weakness as well as one other?

9              MR. GLENNON:  Objection, calls for

10    speculation.

11    A.    You know, I'm not sure I would even agree with

12    that was necessarily a conclusion from -- from the

13    debrief.

14     BY MS. RADCLIFFE:

15    Q.    Okay.  Do you understand that -- that

16    Mr. Hininger is indicating that that was a weakness in

17    past performance that impacted the proposal?

18              MR. GLENNON:  Same objection.

19    A.    Yes.  I mean, that's what he's saying.

20     BY MS. RADCLIFFE:

21    Q.    Okay.  Do you have any reason to disagree with

22    Mr. Hininger's observation here?

23              MR. GLENNON:  Objection, foundation.

24    A.    No.

25

Page 234

1       BY MS. RADCLIFFE:

2       Q.      Okay.  Do you have any independent

3    recollection, and you've already testified to such,

4    that these were issues that might have impacted the

5    bid with respect to Northeast Ohio?

6              MR. GLENNON:  Object to form.

7       A.      Correct, but I don't recall the BOP

8    communicating the reasons to us.

9       BY MS. RADCLIFFE:

10      Q.      Okay.  But do you recall an understanding that

11   the performance in medical services at Cibola and Eden

12   impacted the Northeast Ohio bid?

13             MR. GLENNON:  Object to form.

14      A.      I know we had, as I mentioned, a lot of energy

15   spent on some of the challenges that we had at Cibola

16   and I think, to a lesser extent, at Eden, but I think,

17   you know, without knowing -- without receiving

18   affirmative communications from the BOP, I don't know

19   that -- that the BOP attributed the decision to those

20   weaknesses.

21      BY MS. RADCLIFFE:

22      Q.      And you don't recall what the BOP informed CCA

23   at the debriefing; is that correct?

24             MR. GLENNON:  Object to the form.

25      A.      Well, I guess what I do recall in the -- in

1    the debrief is they had mentioned, you know,

2    cohabitation -- the things I mentioned in the other

3    email, the cohabitation, the medical services, and

4    price, but they didn't put a priority on them, and

5    they didn't say they were the reasons.  I just

6    remember them being part of the discussion.

7      BY MS. RADCLIFFE:

8    Q.      So if we want to go back to Tab 48, part of

9    the discussion included the cohabitation, the issues

10   noted at Adams, Cibola and Eden, as well as those

11   outweighing price?

12          MR. GLENNON:  Object to form.

13   A.      Right.  But, again, this isn't saying that

14   this is what the BOP said, this is what Bart's

15   comments were.

16     BY MS. RADCLIFFE:

17   Q.      Okay.  So my question is:  Do you know whether

18   those issues were raised during the debriefing with

19   the BOP?

20          MR. GLENNON:  Object to form.

21   A.      They were discussed, as I mentioned.

22     BY MS. RADCLIFFE:

23   Q.      Okay.  So you recall, for example, in the

24   debriefing, that the issues regarding the Adams'

25   disturbance were discussed?

1          MR. GLENNON:  Object to form.

2     A.     No.  I don't recall the Adams' disturbance

3    being discussed.

4      BY MS. RADCLIFFE:

5     Q.     Okay.  So at the debriefing, do you recall

6    issues regarding Adams being discussed?

7          MR. GLENNON:  Same objection.

8     A.     No, I don't recall Adams being discussed at

9    all during the debriefing.  I remember the health

10   services, the cohabitation, and price.

11     BY MS. RADCLIFFE:

12    Q.     Okay.  When you refer to "health services," do

13   you recall there being a discussion as to the Cibola

14   and Eden facilities with respect to health services

15   during the debriefing?

16         MR. GLENNON:  Object to form.

17    A.     I can't recall if they mentioned specific

18   facilities.

19     BY MS. RADCLIFFE:

20    Q.     But do you recall that they raised an issue of

21   health services during the debriefing?

22    A.     Yes.

23         MR. GLENNON:  Object to form.

24     BY MS. RADCLIFFE:

25    Q.     And do you recall any more specifics regarding

Page 237

1    the issues that the BOP raised regarding health

2    services during the debriefing?

3              MR. GLENNON:  Object to form.

4    A.      No.  I don't think they provided any detail

5    during the debriefing, at least not that I recall.

6    Q.      They simply mentioned health services, the

7    BOP, that's your recollection?

8              MR. GLENNON:  Object to form.

9    A.      That's correct.

10     BY MS. RADCLIFFE:

11   Q.      And do you recall whether or not they

12   mentioned that the health services being part of the

13   decision with respect to not renewing the Northeast

14   Ohio facility?

15             MR. GLENNON:  Object to form.

16   A.      No.

17     BY MS. RADCLIFFE:

18   Q.      Okay.  What -- in what context do you recall

19   the BOP raising the issue of health services in the

20   debriefing?

21   A.      Yeah, in the debriefing, I remember -- I

22   remember Bart being frustrated that the BOP had

23   mentioned health services when Northeast Ohio didn't

24   have any issues with health services, that they

25   were -- you know, so they didn't mention any, and --

Page 238

1     and so I guess we were -- we were a little bit

2     confused as to their decision when health services

3     wasn't an issue at Northeast Ohio.

4     Q.      And did you have the understanding during the

5     debriefing that the BOP was indicating that the health

6     services outside of Northeast Ohio had an impact on

7     the awarding of the bid for CAR 15?

8              MR. GLENNON:  Object to form.

9     A.      I'm sorry, could you repeat that question?

10      BY MS. RADCLIFFE:

11    Q.      Sure.

12             Did you have an understanding during the

13    debriefing that the BOP was conveying that the issue

14    of health services --

15    A.      Gotcha.

16    Q.      -- outside of the facility at Northeast Ohio

17    had an impact on the bid for CAR 15?

18    A.      My recollection is that that's the conclusion

19    that we came to because we don't remember any health

20    services issues at Northeast Ohio, so the fact that

21    they were talking about past performance issues and

22    health services, you know, was -- was a little

23    unsatisfying to us to know, you know, that -- that

24    health services was -- was -- was brought up during

25    the discussion.

1          MR. GLENNON:  I'm sorry, my computer

2    froze for a moment.  I was just going to insert an

3    object to form on that question as well.

4          You can continue.

5          MS. RADCLIFFE:  We're going to turn to

6    Tab 51.  We're going to mark it as Exhibit 524.

7          (Thereupon, marked as Plaintiff

8      Exhibit 524.)

9     BY MS. RADCLIFFE:

10   Q.     So, Mr. Garfinkle, do you see that you're a

11   recipient of an email on January 8, 2015 from

12   Mr. Hininger to yourself and others at CCA?

13   A.     Yes.

14   Q.     Okay.  Do you have any reason to believe that

15   this is not a true and correct copy of the email you

16   received on January 8, 2015?

17   A.     No.

18   Q.     Okay.  In the email below, just from

19   Mr. Beasley to several individuals, do you see that

20   Mr. Beasley is indicating that CCA would be receiving

21   a significant finding in patient care at Adams as a

22   result of this week's CFM?

23   A.     I see that, yes.

24   Q.     Okay.  Do you also understand that -- that it

25   relates to the BOP observations regarding five deaths

```
 1                    REPORTER CERTIFICATE

 2    STATE OF TENNESSEE

 3    COUNTY OF WILLIAMSON

 4            I, the undersigned, a Licensed Court Reporter

 5    of the State of Tennessee, do hereby certify:

 6            That the foregoing proceedings were taken

 7    before me at the time and place herein set forth; that

 8    any witnesses in the foregoing proceedings, prior to

 9    testifying, were duly sworn; that a record of the

10    proceedings was made by me using machine shorthand,

11    which was thereafter transcribed under my direction;

12    that the foregoing transcript is a true record of the

13    testimony given.

14            Further, that if the foregoing pertains to

15    the original transcript of a deposition in a federal

16    case, before completion of the proceedings, review of

17    the transcript [ X ] was [  ] was not requested.

18            I further certify that I am neither

19    financially interested in the action nor a relative or

20    employee of any attorney or party to this action.

21            IN WITNESS WHEREOF, I have this date

22    subscribed my name.

23    Dated: August 3, 2020

24    _____
                       Debra Duran-Bornstein
25                     RPR, CCR, LCR No. 808
```

www.aptusCR.com