# EXHIBIT 19

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and
on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CORRECTIONS CORPORATION OF
AMERICA, DAMON T. HININGER, DAVID
M. GARFINKLE, TODD J. MULLENGER,
and HARLEY G. LAPPIN,

Defendants.

Civil Action No. 3:16-cv-02267

Exhibit 545
Dodrill, D.
10/15/20
@ptus

Exhibit
545-Dodrill
10-25-20    MK

EXPERT REPORT OF D. SCOTT DODRILL
August 7, 2020

# Table of Contents

I.  Scope Of Assignment ..................................................................................................1

II.  Summary Of Opinion .................................................................................................1

III.  Qualifications And Remuneration ...........................................................................4

IV.  Materials Considered ................................................................................................7

V.  Methodology ...............................................................................................................7

VI.  Background ..................................................................................................................7

    A.  Overview Of Corrections Industry ...........................................................7

        1.  Prison Security Levels ........................................................8

        2.  Privatization .........................................................................8

    B.  Company Background .................................................................................13

        1.  Corporate History ..............................................................13

        2.  CoreCivic's Senior Officers .............................................13

    C.  Contract Terms Imposed By The BOP On The Relevant Facilities .....................14

        1.  Criminal Alien Population .................................................14

        2.  Differences In Contract Terms Based On Population ...............................16

    D.  Compliance Auditing .................................................................................18

        1.  American Correctional Association .......................................................18

        2.  Joint Commission ...............................................................20

        3.  Prison Rape Elimination Act ...........................................21

        4.  CoreCivic Internal Audit Process .....................................22

        5.  BOP Auditing Of The Relevant Facilities .................................................23

            a.  On-site Monitoring...............................................................23

            b.  Contract Facility Monitoring .........................................................24

            c.  Notice Of Concern ........................................................................24

            d.  Cure Notice ..................................................................................24

            e.  Award Fees And Deductions For Non-Conformance...................25

            f.  Contractor Performance Assessment Reporting System ..............25

            g.  Termination For Default ................................................................26

        6.  Corrective Action Plan.......................................................26

        7.  BOP Auditing Of BOP-Operated Facilities ...........................................27

VII.    Opinion ............................................................................................................27

    A.    CoreCivic Provided Quality Correctional Services On A Level That Was As Good As The BOP Facilities ...........................................................27

        1.    Contract Compliance ................................................................27

            a.    Contract Renewal Rates................................................27

            b.    Contract Performance Assessment Reviews...................29

            c.    BOP Audits Of The Relevant Facilities........................30

            d.    Award Fees .......................................................32

        2.    Third Party Accreditations/Certifications.................................33

            a.    ACA Accreditation .......................................................33

            b.    JC Accreditation...........................................................34

            c.    Prison Rape Elimination Act Compliance ....................34

    B.    Plaintiffs' Allegations Do Not Change My Opinions.........................36

        1.    Adams Disturbance...................................................................37

        2.    Cibola.......................................................................................40

        3.    Staffing.....................................................................................43

        4.    The August 2016 OIG Report...................................................44

        5.    The August 2016 Yates Memorandum ......................................49

VIII.    Conclusion .....................................................................................................50

## I.  SCOPE OF ASSIGNMENT

1.     I have been retained by Latham & Watkins LLP, counsel for CoreCivic f/k/a Corrections Corporation of America ("CC" or "CCA"), Damon T. Hininger, David M. Garfinkle, Todd H. Mullenger, and Harley G. Lappin (collectively "Defendants"), in the matter of Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated (collectively "Plaintiffs") v. Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd H. Mullenger, and Harley G. Lappin.

2.     I have been asked to evaluate the quality of five CC facilities that housed Bureau of Prisons ("BOP") inmates during the time period of February 27, 2012 through August 17, 2016 (the "Class Period") relative to the level of quality provided at BOP-operated facilities during the Class Period.  The five facilities at issue are Adams County Correctional Center ("Adams"), Cibola County Correctional Center ("Cibola"), Eden Detention Center ("Eden"), McRae Correctional Facility ("McRae"), and Northeast Ohio Correctional Center ("Northeast Ohio" or "NEOCC") (collectively, the "Relevant Facilities").

## II.  SUMMARY OF OPINION

3.     It is my opinion that during the Class Period, CC provided services to the BOP at the Relevant Facilities at a level of quality that was as good as the level of quality provided by the BOP in similar BOP-operated facilities.  In particular, my opinion is based on the following:

   a.  Each of the contracts for the Relevant Facilities contained multiple renewal options under which the BOP could decide either to end its contract with CC or renew it for a predetermined number of years.  During and after the Class Period, the BOP never terminated a CC contract for cause or default, and exercised an option to renew the contracts of all of the Relevant Facilities at least once (and multiple times with respect to certain Relevant Facilities).

   b.  In every Contract Performance Assessment Review ("CPAR") for the Relevant Facilities during the Class Period, the contracting officer stated that he or she would recommend, probably would recommend, or definitely would recommend CC for a similar contract in the future based upon contractual performance up to the date of the CPAR.  In no CPAR did the contracting officer report that he or she "would not" award the contract to CC based upon CC's performance to date.

c. The mere fact that CC received Notices of Concern ("NOC") and had deficiencies does not mean that it was not providing quality services or that its services compared less favorably to BOP-operated facilities. The Relevant Facilities had continuous third-party monitoring (unlike BOP-operated facilities) and were audited more frequently than BOP-operated facilities. Additionally, I personally reviewed Program Review findings for scores of BOP facilities over many years. Even the highest-performing institutions could have multiple deficiencies and occasionally a significant finding.

d. Award fees are distributed by the BOP to the contractor for achieving "optimum performance" and demonstrate that the BOP has determined that the facility exceeded its contract compliance obligations. Of the 18 instances in which a Relevant Facility was eligible for an Award Fee during the Class Period, the BOP awarded CC with an Award Fee 10 times (more than 50% of the time).

e. All of the Relevant Facilities maintained American Correctional Association ("ACA"), Joint Commission ("JC"), and Prison Rape Elimination Act ("PREA") compliance throughout the Class Period.

f. Due to the decision to place a specific population in contract prisons, inmates at privately-operated facilities were far more homogenous than inmates in other federal facilities, and had significantly different attributes, including a higher rate of Security Threat Group ("STG")[1] members and associates. This led to unique challenges for CC, including a higher likelihood of inmate misconduct and differences in language, culture and communication patterns between the inmates and the correctional staff charged with their management. These differences in population must be considered when attempting to compare quality between the Relevant Facilities and BOP-operated facilities.

---

[1] STG can be defined as "[a]ny organization, club, association or group of individuals, formal or informal (including traditional prison gangs), that may have a common name, identifying sign or symbol, and whose members engage in activities that would include, but are not limited to planning, organizing, threatening, financing, soliciting, committing, or attempting to commit unlawful acts or an act that would violate the departments written instructions, which would detract from the safe orderly operations of prisons," available at https://corrections.az.gov/public-resources/inspector-general/security-threat-group-unit/security-threat-group-faqs. In this report, I use the term STG and gang interchangeably.

4.     I have reviewed Plaintiffs' allegations regarding the quality of CC's services.  After reviewing in detail four prominent issues raised in the Consolidated Complaint:[2]  (1) the Adams disturbance; (2) alleged medical "deficiencies" at Cibola; and (3) alleged staffing "deficiencies;" and (4) findings in the August 2016 Office of the Inspector General ("OIG") Report,[3] my opinion that the quality of CC's correctional services was as good as that of BOP-operated facilities does not change.

a.  Plaintiffs claim that the May 2012 disturbance at Adams is evidence that the quality of service provided by CC was poor in comparison to the BOP.  However, my review of the incident does not change my opinion that the quality of service provided by CC was as good as the quality of service provided by the BOP, for several reasons:  (1) disturbances are an unfortunate reality for all correctional systems; (2) the criminal alien population is more prone to mass disturbances because of its ability to mobilize en masse; (3) the BOP found that CC's response to the emergency and corrective actions were effective; and (4) post-disturbance reviews indicate that Adams was, overall, a sound correctional facility.

b.  Plaintiffs raised certain issues regarding the provision of health care at CC's Cibola facility during the Class Period.  While Cibola faced challenges at times with the delivery of medical care and staffing, any analysis of the challenges faced at Cibola must consider (1) the challenges of health care delivery in all prisons, especially with an immigrant population; (2) the fact that these challenges were exacerbated by the specific mandate the BOP imposed on Cibola; (3) the national shortage of health care staff in prisons in rural areas; (4) the aggressive steps Cibola and CC took to hire staff and correct medical deficiencies; and (5) the broader performance indicators at Cibola.  Given the context of the difficulties of providing health care and maintaining medical staffing levels in prisons nation-wide and Cibola's continued accreditation, including in the high bar set by the JC, the medical issues raised regarding Cibola do not alter my opinion that CC provided correctional services at a level of quality that was as good as the BOP.

---

[2] *Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated* v. *Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*, United States District Court for the Middle District of Tennessee, Case No. 3:16-cv-02267, March 13, 2017 ("Consolidated Complaint").

[3] Office of the Inspector General, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," August 2016 ("August 2016 OIG Report").

c. Plaintiffs also claim that CC had inadequate staffing at the Relevant Facilities during the Class Period. Staffing is a challenge faced by all corrections providers, government and private alike. Government and BOP reports have consistently cited the BOP for inadequate staffing and have linked this deficiency to increases in violence in BOP-operated prisons. Based on the evidence I have reviewed in this matter and my experience, CC's challenges related to staffing during the Class Period does not change my analysis on the quality of their services compared to the BOP.

d. Plaintiffs cite the August 2016 OIG Report as a source for many of their quality-related allegations. In the August 2016 OIG Report, the OIG compared the Relevant Facilities to a sample of 14 low security BOP prisons. For the 29 indicators the OIG examined, CC and the BOP came in virtually tied. Specifically, CC outperformed the BOP in 14 of the 29 indicators. These results are telling given the fact that CC (1) housed a very different population (which presented unique challenges); and (2) was subject to more comprehensive and frequent auditing procedures (such that there were a greater number of documented deficiencies). Notwithstanding the challenges facing privately-operated prisons, and the fact that those challenges could conceivably lead to additional deficiencies, the August 2016 OIG Report found that the quality of correctional services at the Relevant Facilities and BOP-operated facilities was essentially equal.

## III. QUALIFICATIONS AND REMUNERATION

5.      I am currently self-employed as a correctional consultant. As a consultant, I enter into agreements with criminal justice agencies to perform a wide range of services including: reviewing policies and procedures; performing audits and inspections of all areas of a correctional institution (including but not limited to security, programs, and medical); conducting administrative investigations; developing and implementing training courses, policies and procedures; facilitating departmental and organizational meetings and conferences; and providing expert testimony. I have worked in this capacity since February 2011.

6.      I previously served as the Assistant Director of the BOP Correctional Programs Division (the "Division") from August 2009 until my retirement at the end of December 2010. In this position, I provided direct supervision to over 500 employees including remote offices in Texas, Pennsylvania, California, Colorado, and West Virginia. I provided leadership and policy

direction to all field operatives of the BOP, including 116 correctional institutions, six regional offices and approximately 300 residential re-entry centers. I developed policies and directed training efforts in all departments covered by the Division. I also directed all critical BOP inmate management and programming functions. I also oversaw the BOP's Privatization Management Branch (the "PMB") which monitors and provides oversight of all BOP contract prisons. As Assistant Director, I sat on the BOP's Executive Staff which consisted of the agency Director, six Regional Directors and seven Assistant Directors. The Executive Staff directed the activities of the BOP, including, but not limited to, setting and adjusting policies and procedures, instituting training initiatives, as well as monitoring activities, costs and performance of all BOP institutions, including training facilities, specialty programs and the BOP Central Office.

7.      I served as Regional Director of the Northeast office for the BOP, located in Philadelphia, Pennsylvania, from January 2004 to August 2009. This position, which is part of the BOP's Executive Staff, maintained oversight for the 10 states constituting the northeast section of the country (Ohio, Pennsylvania, New Jersey, New York, Connecticut, Rhode Island, Massachusetts, Vermont, New Hampshire and Maine). As Regional Director, I was responsible for monitoring 19 federal institutions (including one female facility and one medical facility), 35,000 inmates and more than 6,200 staff. One of these facilities, the Federal Medical Center in Devens, Massachusetts, was a major prison hospital that managed complex medical cases. I supervised the wardens at the 19 institutions and approximately 100 regional office staff, including the legal, medical and mental health departments. I also conducted Institution Character Profile reviews of each of these institutions at least once every three years. This process involved a review of the entire facility, including the medical department, as well as conducting extensive staff and inmate interviews. I closely monitored all audit findings for the facilities in my region including Program Reviews, ACA audits and JC audits.

8.      I served as Warden at the high-security, adult-male federal prison in Lewisburg, Pennsylvania from December 2001 to January 2004. In this role, I managed a budget of approximately $40 million, supervised over 500 staff, and oversaw an inmate population of more than 2,000. I provided executive direction and leadership to four associate wardens, a camp administrator, an intensive confinement center administrator, an executive assistant and an attorney. I provided indirect leadership to 22 department heads and additional law enforcement, professional, technical, trade and craft workers including the medical and mental health team.

9.      From June 1999 to December 2001, I served as warden at the Low Security Correctional Institution in Butner, North Carolina. I maintained similar duties at this facility as those described for the Lewisburg facility. Butner is a low security, adult-male facility that was part of a three-institution correctional complex, which included a mental health facility and prison hospital facility. The Butner complex served as a large medical complex with inmates rotating from each facility into and out of the hospital facility for chronic and acute medical treatment. I was responsible for 230 staff and 1,000 inmates. I oversaw the operations of the Federal Prison Industries textile factory, which employed approximately 200 inmates and provided direct leadership to two associate wardens, an executive assistant and an attorney.

10.     Before holding the positions listed above, I compiled over 21 years of experience with the BOP in various federal facilities at every security level around the country and at every organizational level in the BOP (institutional, regional and headquarters), as set forth in my CV (Appendix A).

11.     I have qualified as a corrections expert on several occasions in various federal courts, testified as an expert witness in various federal courts and consulted, testified and been deposed in several cases in federal court. I have been engaged both by government and by defense counsel. A list of the cases in which I have testified in the last five years is attached as Appendix B.

12.     I have not only worked at and/or toured over 85 BOP facilities, but I have toured and/or audited over 30 private facilities, over 10 state facilities, three local facilities, three facilities in other countries, and have had the opportunity to interact with leaders and staff from a broad spectrum of correctional systems.

13.     I am a current member of the ACA and the North American Association of Wardens & Superintendents ("NAAWS"), and a former member of the Association of State Correctional Administrators ("ASCA").

14.     I am being compensated at my standard billing rate of $300 per hour. I am also reimbursed for my reasonable out of pocket expenses. My compensation in this matter is not in any way contingent or based on the content of my opinion or the outcome of this or any other matter.

## IV. MATERIALS CONSIDERED

15.     I carefully reviewed various data and documents, including Plaintiffs' allegations in the Consolidated Complaint, to establish a factual foundation on which to render the opinion in this report.  Additionally, I toured Adams, Cibola, and Eden.  I planned to visit all of the Relevant Facilities, but due to the COVID-19 crisis and its lingering effects, tours of the other facilities had to be cancelled and have not yet been rescheduled.  Finally, I reviewed relevant portions of deposition testimony and have reviewed documents produced in this matter (including all deposition exhibits available to date).  The materials I considered in order to render my opinion are listed in Appendix C.

16.     My work is ongoing and I may update and revise my conclusions as I review additional information.  I reserve the right to supplement this report to the extent that additional information becomes available.

## V. METHODOLOGY

17.     As noted, I have assessed the quality of many correctional facilities over the course of my career.  The methodology I employed as part of this engagement was the same as what I historically have used to assess the quality of a facility outside of the litigation context.

18.     For this assignment, I evaluated the quality of each of the Relevant Facilities and how that quality compared to similar BOP facilities.  As part of this evaluation, I analyzed how the Relevant Facilities measure against standards and requirements that are typically used to assess the quality of similar facilities.  These include key contractual requirements, independent third-party evaluations and accreditations, and other federal, state, and local laws, regulations, codes, guidelines and policies.

## VI. BACKGROUND

### A. Overview Of Corrections Industry

19.     The federal prison system falls under the jurisdiction of the BOP, and prisoners in these facilities are under the legal authority and custody of the federal government.[4]  Federal prison

---

[4] Bureau of Justice Statistics, "State and Federal Prisoners and Prison Facilities."

facilities include secure federally-operated and privately-operated prison facilities, non-secure privately-operated community corrections facilities, and contract facilities housing juveniles.[5]

### 1. Prison Security Levels

20. The BOP almost exclusively houses adult prisoners, and has five security levels for its facilities: minimum, low, medium, high, and administrative.[6] Security levels determine both the type of housing and the security standards and features of the facility, such as staff-to-prisoner ratio and perimeter security measures.[7] Much of the discussion below focuses on low security prisons since this was the security level of each of the Relevant Facilities. As of July 2020, the BOP's low security[8] level population makes up the largest percentage (37.1%) of BOP prisoners.[9]

### 2. Privatization

21. The federal prison population grew from 24,400 inmates in 1980 to 217,800 inmates in 2012, an average annual growth rate of 7.1%.[10] Figure 1 below illustrates the rapid growth in federal inmates.

---

[5] Bureau of Justice Statistics, "Prisoners in 2016," August 7, 2018, p. 2.

[6] Federal Bureau of Prisons, "About Our Facilities," https://www.bop.gov/about/facilities/federal_prisons.jsp; Bureau of Justice Statistics, "Prisoners in 2016."

[7] Federal Bureau of Prisons "About Our Facilities," https://www.bop.gov/about/facilities/federal_prisons.jsp.

[8] Low security facilities in the BOP have double-fenced perimeters with fence detection alarms and armed perimeter security. They typically have dormitory or cubicle style housing rather than cells and a higher staff to inmate ratio than a minimum-security facility and lower staff to inmate ratio than a medium security facility. Most have controlled inmate movement and frequent inmate and housing searches. Each also has a small high security unit inside the facility with hardened cells for administrative detention or disciplinary segregation. Administrative detention is intended to be temporary and non-punitive, while disciplinary segregation is a possible sanction for inmates who are in violation of facility rules.

[9] Federal Bureau of Prisons, "Prison Security Levels," https://www.bop.gov/about/statistics/statistics_inmate_sec_levels.jsp.

[10] US Department of Justice, Bureau of Justice Statistics, "Estimated number of persons supervised by U.S. adult correctional systems, by correctional status, 1980-2016," April 26, 2018.

**Figure 1**



**Inmates in Federal Correctional Facilities[1]**
1980 – 2016

Source: US Department of Justice, Bureau of Justice Statistics, "Estimated number of persons supervised by U.S. adult correctional systems, by correctional status, 1980-2016"

Note:
[1] Includes inmates at all federal correctional facilities.

22.     The BOP was unable to accommodate this growth given the limited capacity of BOP-operated facilities. The Government Accountability Office (the "GAO") found that system-wide overcrowding in BOP-operated prisons was 36% in 2013.[11]

23.     As a result of the rapidly increasing federal prison population, the BOP began contracting with private companies to house federal inmates. As the Department of Justice stated in its 2017 budget, "Since the mid-1980s, the BOP has contracted for the confinement of sentenced

---

[11] "Bureau of Prisons Information on Efforts and Potential Options to Save Costs," *United States Government Accountability Office*, GAO-14-821, September 2014, p. 1.

offenders in secure facilities. This gives the BOP the needed flexibility to manage a rapidly growing population and help control crowding."[12]

24.     In 1996 Congress directed the BOP to begin a "5-year prison-privatization demonstration project at a federal prison in Taft, California; thereafter, the Taft Prison Facility became the first fully-privatized federal correctional institution for which an outside contractor would assume primary responsibility."[13]  Since then, as a strategy for controlling prison overcrowding, the BOP has placed only low security, criminal aliens in privately-operated prisons.

25.     In step with the overall growth of the BOP population, the percentage of federal inmates in privately-operated institutions grew from 3.0% to 19.1% from 1999 to 2016.  Figure 2 highlights the steady growth in inmates housed in privately-operated facilities.

---

[12] "FY 2017 Performance Budget Congressional Submission, Salaries and Expenses," *US Department of Justice*, p. 59.

[13] "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi," *Office of the Inspector General*, December 2016 ("December 2016 OIG Report"), p. 2.

**Figure 2**



**Inmates in Privately-operated Federal Correctional Facilities[1]**
1999 – 2016

Source: US Department of Justice, Bureau of Justice Statistics, "Number of prisoners held in private prisons under the jurisdiction of state or federal correctional authorities, December 31, 1999-2016"; US Department of Justice, Bureau of Justice Statistics, "Inmates in custody of state or federal correctional facilities, including private prison facilities, December 31, 1999-2016"

Note:
[1] Includes inmates at privately-operated federal facilities and community correctional centers.
[2] The percent of total inmates at federal privately-operated correctional facilities is calculated by taking the number of inmates in federal privately-operated correctional facilities and dividing it by the total number of inmates in federal correctional facilities.

26.　　Separate, but related to the quality of the services that CC provides to the BOP, is the fact that the existence of privately-operated facilities provides the BOP greater flexibility in managing its inmate population and allows the BOP to improve the quality of its own services in a number of ways.

27.　　First, contracting with private prisons allows the BOP to quickly add needed capacity. BOP contracts ordinarily stipulate that the contractor must accept the first inmates within 270 days if an existing facility is expanded or renovated[14] and within 120 days if the company is using an existing facility.[15]　However, for a BOP-operated facility, my experience in the activation of several BOP facilities and as a member of the BOP's Executive Capacity Planning

---

[14] *See*, e.g., Eden Facility Base Contract, Statement of Work, May 1, 2007, p. 11.

[15] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 2.

Committee (which approved any requests for new construction that were then submitted to Congress) was that the timeframe is typically four to five years to budget, construct, and activate a facility.

28.     Second, private prison capacity does not require the BOP to request construction funding through Congressional Buildings and Facilities appropriation.  Such requests are a multi-year process that require the approval of the DOJ, Office of Management and Budget, the President, the Senate, and the House.  Avoiding this budget process further expedites increases in capacity and reduces a large up-front construction cost burden on the government and taxpayers that can exceed $200 million per facility.[16]

29.     Third, private prisons give the BOP much more flexibility in capacity.  The BOP can increase or decrease capacity by soliciting or cancelling contracts without a long-term capital obligation or construction project.  Comparatively, if the BOP decides to build its own facility in order to accommodate an increasing inmate population, this requires more risk for the BOP should the inmate population decline.  Deactivating a BOP-operated facility requires Congressional approval, and is time consuming, expensive, and difficult from a labor perspective due to union issues and government reduction-in-force personnel requirements.  Additionally, private prisons provide an enhanced level of accountability for the BOP.  If the BOP is dissatisfied with the performance of a private prison it can cancel the contract, whereas a BOP-operated facility cannot simply be cancelled or closed due to poor performance.

30.     Fourth, contracting with private prisons lessens overcrowding which results in quality improvements at BOP-operated facilities.  The GAO found that overcrowding leads to significant safety and security concerns, a reduction in access to programing by inmates, and an increase in stress on infrastructure.[17]

---

[16] "Prison Construction:  Clear Communication on the Accuracy of Cost Estimates and Project Changes is Needed," *United States Government Accountability Office*, GAO-08-634, May 2008.

[17] "Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure," *United States Government Accountability Office*, GAO-12-743, September 2012, pp. 18–28.

### B.  Company Background

#### 1.  Corporate History

31.    CoreCivic, originally Corrections Corporation of America, was founded in 1983 by T. Don Hutto, Tom Beasley, and Doctor Robert Crants.[18]  CC was the first company to establish contracts with federal agencies to outsource prisons and correctional management.[19]  CC works across various business lines related to correctional services, including prison design and construction; prison, jail and detention facility management; and inmate transportation.[20]  It houses over 70,000 inmates across 70 facilities in the US.[21]  CC was listed on the New York Stock Exchange in 1994.[22]  In January 2013, CC reorganized its corporate structure to form a Real Estate Investment Trust.[23]

#### 2.  CoreCivic's Senior Officers

32.    CC's senior officers and leadership have extensive experience, including BOP experience.

33.    Damon T. Hininger is the current President and Chief Executive Officer of CC.  He joined CC as a correctional officer at the Leavenworth Detention Center in 1992.  During his tenure at CC, he has served in a variety of roles including Senior VP of Federal and Local Customer Relations – where he interacted directly with BOP leadership on CC contracts – and as Chief Operating Officer.

34.    Harley G. Lappin is currently a member of the Board of Directors at CC.  Prior to this role, he served as an Executive Vice President and Chief Correctional Officer at CC until his retirement in January 2018.  Before joining CC in 2011, Mr. Lappin served as the Director of the BOP from 2003 to 2011, where he managed more than 100 federal prisons, 250 contracts for

---

[18] "The CCA Story:  Our Company History," http://www.correctionscorp.com/our-history.

[19] "The CCA Story:  Our Company History," http://www.correctionscorp.com/our-history.

[20] "About CCA:  Who We Are," http://www.correctionscorp.com/who-we-are.

[21] "About CCA:  Who We Are," http://www.correctionscorp.com/who-we-are.

[22] "About CCA:  Who We Are," http://www.correctionscorp.com/who-we-are.

[23] "The CCA Story:  Our Company History," http://www.correctionscorp.com/our-history.

community corrections facilities, 38,000 employees, and oversaw 215,000 offenders.[24]  During his extensive BOP career, Mr. Lappin also served as a Regional Director and warden of BOP facilities.[25]

35.     David M. Garfinkle is currently CC's Executive Vice President and Chief Financial Officer.  Prior to this role, he served as Vice President of Finance and Controller from 2001 to 2014.  Mr. Garfinkle has a background in real estate and accounting.  He served as vice president and controller for Bradley Real Estate, Inc., a real estate investment trust in Chicago, and worked as a senior manager in the Audit practice at KPMG, a global accounting and auditing firm.[26]

36.     Todd H. Mullenger served as Executive Vice President and Chief Financial Officer for a portion of the Class Period.[27]  Mr. Mullenger first joined CC as Vice President, Finance in September 1998 and later served as Vice President, Treasurer from 2001 to 2007.  Prior to CC, Mr. Mullenger served as Vice President, Finance at Service Merchandise Company, Inc. and as an audit manager with Arthur Anderson LLP, where he gained experience in the private corrections industry.[28]

### C.     Contract Terms Imposed By The BOP On The Relevant Facilities

#### 1.     Criminal Alien Population

37.     In each of the contracts for the Relevant Facilities, CC was required to provide the same level of security, food, health care, correctional practices, and other essential services as a BOP-operated facility.[29]  However, there are significant differences between the inmate populations housed at the Relevant Facilities compared to similar BOP-operated facilities.  When the BOP began to work with private prisons it made a decision to house only criminal aliens (that is, non-

---

[24] CC Form Def 14A filed April 3, 2020.

[25] "CCA Announces Hiring of Harley G. Lappin as Chief Corrections Officer," *CoreCivic*, June 1, 2011.

[26] "About – Executive Leadership," available at http://www.corecivic.com/about/executive-leadership; CC Form 8-K filed April 14, 2014.

[27] Mullenger was appointed as Executive Vice President and Chief Financial Officer of CC in March 2007 and stepped down from his role in May 2014.  *See*, CC Form 8-K filed March 16, 2007; CC Form 8-K filed April 14, 2014.

[28] CC Form 8-K filed March 16, 2007; "Board Member – Todd Mullenger," available at http://ir.corecivic.com/management/todd-mullenger.

[29] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 11.

US citizens convicted of federal crimes) at each of the privately-operated facilities. These prisoners are almost universally subject to deportation upon completion of their sentences. During the Class Period, inmates in the Relevant Facilities were almost exclusively low security, non-US citizen, adult males with 90 months or less remaining on their sentences, as required by each facility's base contract.[30]

38.     Due to the decision to place a specific population in contract prisons, inmates at privately-operated facilities are far more homogenous than inmates in other federal facilities, and have significantly different attributes, including a higher rate of STG members and associates.[31] According to the August 2016 OIG report, "as of January 2014 inmates incarcerated in private facilities were primarily non-US citizens with 72.1 percent from Mexico, while the selected BOP institutions had an average of 11.8 percent non-US citizens."[32] It is my experience that criminal alien populations more strongly identify and organize by geographic areas, such as the Mexican state they are from, than U.S. citizen populations. This leads to unique challenges for CC and the other private prison providers that the BOP does not face at its facilities.

39.     As CC noted in its response to the August 2016 OIG Report, there is "robust research literature, including research conducted on BOP populations, indicating that STG-affiliated inmates are significantly more likely to be involved in violence and misconduct, even after controlling for individual characteristics of inmates that prior research has established are associated with violent predispositions."[33] The responses to the August 2016 OIG Report from the GEO Group[34] and MTC[35] further corroborate this research and my experience as a Warden

---

[30] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 11.

[31] August 2016 OIG Report, p. 70.

[32] August 2016 OIG Report, p. 14.

[33] August 2016 OIG Report, p. 71. *See* Gerald G. Gaes, et al., "The Influence of Prison Gang Affiliation on Violence and Other Prison Misconduct," *The Prison Journal*, March 9, 2001, 82 (3):359–385.

[34] August 2016 OIG Report, p. 73. "CAR facility populations are criminal aliens and not U.S. citizens. As a group, the CAR population is very homogeneous…. As such, the contract facility population responds as one to any issue, real or perceived. The group leaders can control or direct a large majority of the population in a much larger fashion than in facilities with a mixed U.S. citizenry…. This is a factor is [sic] analyzing the 8 categories as certain prohibited acts are higher in CAR facilities for this reason…. The CAR population comes with a high number of gang affiliations. That factor alone may result in increases in the level of violent incidents in the CAR facilities."

[35] August 2016 OIG Report, p. 76. "The contract prisons are holding criminal aliens… The normal practice is to disperse groups as much as practical to weaken any STG [] operating in a facility. Any difference is [sic] incident rates would be far more attributable to this factor than whether the prison is a contract prison or BOP facility."

and as the Assistant Director with oversight of the BOP's gang management strategy support the research that gang-affiliated inmates are more violent and disruptive than non-affiliated inmates.

40.     Given the higher levels of gang affiliation at the Relevant Facilities compared to low security BOP-operated facilities, one would expect more instances of inmate misconduct.[36] Additionally, the predominance of foreign-born inmates in this population also means that the language, culture and communication patterns of the inmates differ significantly from the correctional staff charged with their management. Corrections relies heavily on the ability of staff to communicate effectively with the inmates to properly manage and control them. The population assigned to private facilities created barriers to this communication that did not exist in BOP facilities. The fact that the large majority of the private prison population were from Mexico meant that large groups of inmates had a shared language and culture that made it easier for them to rapidly organize and execute group actions, such as disturbances. The combination of these factors – gang-affiliation, language and cultural barriers and a homogenous Mexican and Latino population – make it much more difficult to manage that population than a diverse, pre-dominantly US-born population at a BOP-operated facility. As will be discussed below, some of the largest disturbances that have occurred at BOP-operated facilities occurred with a homogenous, non-US population. Therefore, to accurately compare quality at the Relevant Facilities to BOP-operated facilities, one must consider that the populations at the Relevant Facilities present unique, additional challenges that are not always present at BOP-operated facilities.

### 2.     Differences In Contract Terms Based On Population

41.     Due to the population characteristics of the inmates at the Relevant Facilities and the BOP's goals with that population, the BOP requires different inmate programming and staffing requirements at the Relevant Facilities than it does at its own facilities.

42.     First, there is a difference in the correctional programming required. Because nearly all inmates at the Relevant Facilities were deported to their native countries upon release, the BOP required significantly less pre-release programming in the Relevant Facilities than BOP-operated

---

[36] Gerald G. Gaes, et al., "The Influence of Prison Gang Affiliation on Violence and Other Prison Misconduct," *The Prison Journal*, March 9, 2001, 82 (3):359–385.

facilities. For example, the BOP did not require private facilities, including the Relevant Facilities, to offer educational programs.[37]

43. Second, the BOP's contract with each of the Relevant Facilities described the staffing requirements in detail. Prior to hiring any vendor, CC (or any private contractor) was required to conduct specific hiring procedures: run a criminal history check, verify employment eligibility including that the applicant is a US citizen, run a credit check, and conduct a pre-employment interview, among others.[38] Additionally, the contracts required that "determination for employment suitability must be made using the BOP's current Guidelines of Acceptability."[39] The BOP's Guidelines of Acceptability contained 30 measurable thresholds, and if an applicant exceeds any one of these thresholds, the applicant was considered unsuitable for employment. If the applicant was deemed suitable by the contractor, the contractor will submit the applicant's information to the BOP for conditional approval.

The Statement of Work for each Relevant Facility also specified that "essential personnel with respective minimum qualification requirements" that it deemed critical for performance of the facility.[40] Each of the Relevant Facilities was required to submit an applicant for conditional approval by the BOP within 15 days of the contract award, unless an extension was requested in writing and approved by the contract officer.[41] These essential positions include Project Coordinator, Warden, and Associate Warden, each with specific minimum employment experience requirements.[42] The BOP also listed 13 other managerial and professional personnel as critical for the performance of the contract and requires a minimum of five years of experience

---

[37] If the BOP felt that these services were vital for the quality operation of privately-operated prisons, requirements for these programs would have been included in the Statement of Work. Instead, the Statement of Work for each of the Relevant Facilities sets forth "[t]he contractor may provide voluntary educational programs." *See, e.g.,* Adams Facility Base Contract, April 1, 2009, p. 58. However, I note that CC did offer educational programs during the Class Period, despite no requirement to do so. *See,* e.g., https://www.conevyt.org mx/colaboracion/servicios/metodologia_para_centros_Correccionales_ingles.pdf, dated February 2012.

[38] *See*, e.g., Adams Facility Base Contract, April 1, 2009, pp. 24–25.

[39] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 25.

[40] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 29.

[41] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 29.

[42] *See*, e.g., Adams Facility Base Contract, April 1, 2009, pp. 29–30.

in their applicable department.[43] While government personnel regulations dictated the experience levels required for staff to be hired into similar positions at BOP facilities, these required experience levels were not as explicit, and in many cases, not as extensive, as those required for the Relevant Facilities.

44. Additionally, the contracts for the Relevant Facilities required CC to maintain certain minimum average staffing levels: 90% of the BOP-approved staffing plan for correctional services and 85% for all other departments, including health services.[44] The contracts allowed staffing levels to be calculated using headcounts, *i.e.,* the number of staff employed by the facility at that time divided by the number of positions on the staffing plan.[45] If there was a staffing vacancy for over 120 days, CC incurred a fine, payable to the BOP, equal to the cost of the salary that would have been paid to that staff member.[46] This fine mechanism ensured that private contractors cannot cut costs by understaffing and that they are held accountable for their staffing levels.

> **D. Compliance Auditing**

> **1. American Correctional Association**

45. During the Class Period, the Relevant Facilities were required to maintain ACA accreditation. The ACA is a private, nonprofit organization that administers a national accreditation program for all components of adult and juvenile correctional facilities. The ACA is recognized internationally as the standard-bearer for sound correctional management.

46. The ACA grants its accreditations based on the recommendation of the Commission on Accreditation for Corrections ("CAC"). The CAC is "a private, nonprofit organization established in 1974 with the dual purpose of developing comprehensive, national standards for corrections and implementing a voluntary program of accreditation to measure compliance with

---

[43] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 30.

[44] While BOP-operated facilities have staffing goals, they do not operate under mandated staffing levels. *See*, e.g., Modification #7 to Adams Facility Base Contract, April 11, 2011, p. 2, CORECIVIC_0000501–2 at 2; Deposition of Patrick Swindle, January 9, 2019 ("Swindle Deposition"), p. 200:16–201:7.

[45] *See*, e.g., December 2016 OIG Report, p. iii ("Both the BOP and CoreCivic told us they interpreted the contract to allow the calculation of staffing levels to be based on headcounts rather than FTE.").

[46] Swindle Deposition, p. 201:25–202:12.

those standards."[47] A facility may receive initial accreditation 12 to 18 months after applying and the accreditation lasts for three years.[48] Following the completion of an on-site accreditation audit, the CAC conducts accreditation hearings where the commissioners decide whether to award a facility or program accreditation.[49]

47.      All accredited facilities sign a contract, prepare a self-evaluation report, and agree to be audited by a team of independent corrections professionals.[50] ACA auditors have relevant experience and knowledge in their assigned areas, and attend an orientation course and auditor training classes.[51] ACA auditors conduct an onsite visit at the initial accreditation stage, and follow-up reviews every three years thereafter.[52] During the three years between audits, each facility must certify in writing annually to the ACA that it continues to remain compliant with the applicable standards.[53]

48.      The ACA accreditation requires 100% compliance with 61 mandatory standards and at least 90% compliance with 468 non-mandatory standards.[54] When the ACA developed the national correctional standards, the goals of the standards were to prescribe "the best possible practices that could be achieved in the United States," and "represent leading correctional policies, procedures and practices across all areas of operation."[55] These standards represent the "national benchmark for the effective operation of correctional systems throughout the United

---

[47] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 8.

[48] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 12.

[49] ACA Manual of Accreditation Policy and Procedure, revised March 2012, pp. 44–45.

[50] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 12.

[51] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 9.

[52] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 52.

[53] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 48.

[54] ACA Manual of Accreditation Policy and Procedure, revised March 2012, p. 64, 70.

[55] American Correctional Association, "History and Standards of Accreditation," available at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/About_Us/ACA_Member/Standards_and_Accreditation/SAC_AboutUs.aspx?%E2%80%A6.

States."[56] ACA standards have been integrated into more than 1300 facilities and agencies, including all BOP facilities. [57]

## 2. Joint Commission

49.     During the Class Period, the Relevant Facilities were required to maintain JC accreditation.  The JC is a national accrediting organization for community-based clinics and hospitals that certifies that an organization meets certain healthcare performance standards. Correctional facilities are accredited under the JC's Ambulatory Health Care Standards.  JC standards are the most recognized standard in health care and are considered the industry benchmark for quality and safety.  More than 2,200 Ambulatory Care organizations are accredited by the JC, and the JC is recognized by the Centers for Medicare and Medicaid as having standards that meet or exceed Medicare's requirements.[58]

50.     JC's standards focus on important patient, individual or resident care and organization functions that are essential to provide safe, high-quality care.[59] Accreditation is based on an on-site review by JC-selected clinical and administrative medical professionals experienced in ambulatory care.  "[JC] surveyors are highly trained experts who are doctors, nurses, hospital administrators, laboratory medical technologists, and other health care professionals."[60] Surveyors provide preliminary findings on-site at the end of the survey and then work with the facility post-survey to correct findings.  Upon completion of the post-survey process, the

---

[56] American Correctional Association, "Frequently Asked Questions," available at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/About_Us/FAQs/ACA_Member/S tandards_and_Accreditation/Standards__FAQ.aspx?hkey=b1dbaa4b-91ef-4922-8e7d-281f012963ce.

[57] American Correctional Association, "Standards," available at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Standards/ACA_Member/Standar ds_and_Accreditation/StandardsInfo_Home.aspx?hkey=7c1b31e5-95cf-4bde-b400-8b5bb32a2bad.

[58] Joint Commission, "Ambulatory Care Accreditation Fact Sheet," available at https://www.jointcommission.org/-/media/tjc/documents/fact-sheets/ambulatory-care-6-1-2020.pdf?db=web&hash=E0D782135CB16C555A40D317C110BB49.

[59] Joint Commission, "Joint Commission standards Fact Sheet," available at https://www.jointcommission.org/-/media/tjc/documents/fact-sheets/joint-commission-standards-fact-sheet-08-13-18.pdf

[60] Joint Commission, Joint Commission FAQs, https://www.jointcommission.org/en/about-us/facts-about-the-joint-commission/joint-commission-faqs/.

surveyors will administer their accreditation decision.[61]  If granted, accreditation lasts for three years, however the JC provides interim support to ensure continuous compliance.  With respect to health care, JC accreditation is considered a more rigorous standard than the health care portion of the ACA standards because JC accreditation goes beyond correctional health care, and evaluates prisons using the same standards as those used in community care.

### 3.        Prison Rape Elimination Act

51.     In 2003, PREA was passed by Congress.[62]  The act created the National Prison Rape Elimination Commission to draft standards that all jails and prisons nationwide, regardless of jurisdiction, would be required to follow.[63]  These standards were published in June 2009 and were finalized on August 20, 2012.[64]  They are published in the code of Federal Regulations (28 CFR § 115) and are based on a zero tolerance for sexual abuse and sexual harassment in correctional facilities.  Institutions, including the Relevant Facilities, were required to comply with all standards starting in August 2013 and "must be audited at least every three years to be considered compliant with the PREA standards."[65]  The US Department of Justice oversees and certifies the standards, the audit process and selection of auditors.

52.     PREA audits test facilities on 43 standards including areas such as prevention planning, employee and inmate education, screening for risk of sexual victimization, inmate reporting of sexual abuse, correctional responses to allegations of abuse, medical and mental health care for victims and other areas.[66]

---

[61] Joint Commission, "On-site survey process Fact Sheet," available at https://www.jointcommission.org/-/media/tjc/documents/fact-sheets/onsite-survey-process-fact-sheet-9-11-19.pdf?db=web&hash=FF5FBEF09CCBE85D0BFB1282CBDE4B9F.

[62] "National PREA Resource Center," https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea.

[63] "National PREA Resource Center," https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea.

[64] "National PREA Resource Center," https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea.

[65] CC Forms 10-K, 2014–2016.

[66] Tim Evinger, "Are You Ready for Your Next PREA Audit?" November 19, 2018, https://www.lexipol.com/resources/blog/are-you-ready-for-your-next-prea-audit/.

### 4. CoreCivic Internal Audit Process

53.    In addition to the third-party accreditation programs and audits described above, CC has robust internal audit procedures that applied to the Relevant Facilities during the Class Period. CC's internal audits are run by its Quality Assurance Division ("QAD").[67] The Vice President of CC's QAD is Don Murray. Mr. Murray served as Managing Director of QAD for nearly 15 years before being promoted to Vice President of QAD in July 2019. As Managing Director, he "helped develop and implement companywide internal audit and compliance strategies,"[68] leading to the ACA's accreditation of multiple CC facilities. Prior to his tenure at CC, Mr. Murray worked at the BOP for over 22 years in a variety of roles.[69] While at the BOP, Mr. Murray received numerous awards for his service, including the Director's Special Recognition Award.[70]

54.    CC's QAD is organized into two operational segments: the Research and Analysis Section ("RAS") that collects and analyzes performance metrics, and the Audit and Compliance Systems Section ("ACSS") that is comprised of a full-time audit team as well as a management team that coordinates compliance, provides governance and ensures resolution of issues identified in facility reviews.[71]

55.    For each contract, including those at the Relevant Facilities, QAD developed an audit tool to facilitate its internal audits. During the Class Period, the applicable audit tool contained over 1,000 audited items across 12 major operational areas.[72] The goal of the audit tool is to allow CC to assess compliance with BOP requirements. The ACSS uses this audit tool "to discern areas of operational strength and areas in need of management attention."[73]

---

[67] CC Forms 10-K, 2011–2016.

[68] "About - Vice Presidents," available at http://www.corecivic.com/about/vice-presidents.

[69] "About - Vice Presidents," available at http://www.corecivic.com/about/vice-presidents.

[70] "About - Vice Presidents," available at http://www.corecivic.com/about/vice-presidents.

[71] CC Forms 10-K, 2011–2013.

[72] CC Forms 10-K, 2011–2016.

[73] CC Forms 10-K, 2011–2013.

### 5. BOP Auditing Of The Relevant Facilities

56.     As described below, privately-operated facilities under BOP contract were subject to far more audits by the BOP than BOP-operated facilities were. This was true for each of the Relevant Facilities during the Class Period.

### a. On-site Monitoring

57.     All private facilities under BOP contracts have two full-time BOP staff on site: a Senior Secure Institution Manager ("SSIM") and a Secure Oversight Monitor ("SOM") (collectively, the "BOP on-site monitors").[74] The BOP on-site monitors assess contract compliance and staffing levels on a daily basis and complete monthly and other checklists with detailed observation steps. The BOP on-site monitors conduct ad hoc facility reviews daily, with the goal of identifying deficiencies.[75]

58.     At least every month, the BOP on-site monitors must observe and document a list of operational items identified in the Large Secure Adult Contract Oversight Checklist, which applied to the Relevant Facilities during the Class Period. The checklist contains approximately 70 observation steps, relating to eight operational areas. The BOP on-site monitors at each privately-operated facility document their observations on the checklist and rate each operational area as "compliant" or "non-compliant."[76]

59.     In addition to continuous monitoring by the BOP on-site monitors, a regional Privatization Field Administrator ("PFA") frequently conducts on-site visits of privately-operated facilities (including the Relevant Facilities).[77] The PFA provides general guidance for all oversight activities for the facilities assigned and also serves as the Contracting Officer's Representative ("COR"). The COR is the senior BOP employee responsible for contract administration and ensures contract performance.[78]

---

[74] August 2016 OIG Report, p. 8.

[75] August 2016 OIG Report, pp. 8, 10.

[76] August 2016 OIG Report, p. 9.

[77] August 2016 OIG Report, p. 8.

[78] BOP Program Statement, 7740.02, "Oversight of Private Secure Correctional Facilities," November 21, 2014.

60.     BOP-operated facilities do not have similar monitoring mechanisms. Only privately-operated facilities have continuous, third-party on-site monitoring.

### b.     Contract Facility Monitoring

61.     Privately-operated facilities under BOP contract are also subject to regular audits by the BOP's Program Review Division ("PRD").[79] These Contract Facility Monitoring ("CFM") reviews are conducted annually based on a comprehensive audit tool designed by the BOP. The audit team issues a report of findings that may uncover first-time deficiencies, repeat deficiencies or significant findings.[80]

### c.     Notice Of Concern

62.     The BOP can also issue an NOC at any time for performance that is below a satisfactory level and when a deficiency is considered either not minor or is a repetitive deviation.[81] All NOCs require the contractor to provide and implement a corrective action plan, which is tracked by BOP on-site monitors.[82]

### d.     Cure Notice

63.     The BOP may also issue a Cure Notice to express concerns about noncompliance of a contracted facility. A Cure Notice may be issued at the BOP's discretion for a variety of reasons, including when numerous repeated deficiencies or significant findings go uncorrected over time. A Cure Notice notifies the contractor that the BOP may terminate the contract if the problem is not corrected.[83]

---

[79] August 2016 OIG Report, p. 10.
[80] August 2016 OIG Report, p. 10.
[81] August 2016 OIG Report, p. 9.
[82] August 2016 OIG Report, p. 9.
[83] August 2016 OIG Report, p. 11.

e.    **Award Fees And Deductions For Non-Conformance**

64.    In addition to the issuance of notices of deficiency through CFMs, NOCs, and Cure Notices, the BOP also has financial levers it may pull to incentivize its contractors to achieve high performance.

65.    To this end, the BOP may issue Award Fees or Deductions for Non-conformance. For all base contracts issued prior to June 2010,[84] the BOP Performance Evaluation Board ("PEB") may, at its discretion, issue financial awards on a yearly basis to privately-operated facilities for achieving "optimum performance."[85] Award Fees may be any amount up to 5% of the total contract fees.[86] Award Fees were removed from contract prison solicitations in June 2010 and all contracts issued thereafter do not include Award Fees.[87]

66.    Conversely, the BOP has the ability to assess financial deductions against a privately-operated facility for failure to comply with contract requirements.[88] "Contract requirements [are] divided into various disciplines," where "each discipline comprises a specific percentage of the overall contract requirement," and deductions are designed to "be based on these percentages applied to the overall monthly invoice."[89] The deduction mechanism is meant to enhance accountability of private operators and ensure that it is financially detrimental to cut costs or hold positions vacant in a manner that conflicts with the facility's ability to comply with contract requirements.

f.    **Contractor Performance Assessment Reporting System**

67.    The BOP, like all other federal agencies, is required by the government-wide Federal Acquisition Regulations ("FAR") to provide periodic written evaluations of contractor performance. The FAR requires the BOP to use the Contractor Performance Assessment Reporting System to provide a CPAR, which assesses a given contractor's performance during a

---

[84] August 2016 OIG Report, p. 6.

[85] BOP Program Statement 7740.02, "Oversight of Private Secure Correctional Facilities," November 21, 2014, p. 2.

[86] *See*, e.g., Adams Facility Base Contract, April 1, 2009, p. 113.

[87] August 2016 OIG Report, p. 6.

[88] August 2016 OIG Report, p. 6.

[89] *See*, e.g., Adams Facility Base Contract, April 1, 2009, pp. 105.

specific period. Each CPAR is based on objective facts and supported by program and contract management data. Additionally, each CPAR requires that the assessing official make a recommendation as to whether they would, based on what they know today (*i.e.*, at the time of the CPAR's issuance), recommend the contractor for similar requirements in the future.

68.    In the CPAR, the BOP gives the contractor one of the following quality ratings for the year: Exceptional, Very Good, Satisfactory, Marginal or Unsatisfactory.[90]

### g.    Termination For Default

69.    Failure by the contractor to maintain adequate quality control to ensure acceptable performance can result in Termination for Default.[91] Termination for Default "means the exercise of the [g]overnment's right to completely or partially terminate a contract because of the contractor's actual or anticipated failure to perform its contractual obligations."[92]

### 6.    Corrective Action Plan

70.    CC develops and implements plans of action to address areas for improvement identified by internal or external monitoring. These plans of action are referred to as Corrective Action Plans ("CAPs"). Once an area for improvement is identified, the appropriate CC department head performs a root cause analysis in an attempt to link the deficiency to a particular process or event within the department. After all root causes of the deficiency are identified, department heads will begin developing a draft CAP to "fully correct the deficiencies specific to their assigned area of responsibility."[93]

71.    Following the development of a comprehensive action plan, the department head will submit the CAP to the facility's Quality Assurance Manager (QAM). Each Relevant Facility has a full-time, on-site QAM that oversees local audits and CAP implementation (the BOP does not have dedicated on-site QAMs at BOP-operated facilities). After receipt of the draft CAP, the Quality Assurance Manager will review the plan and provide feedback. Once approved by the

---

[90] Federal Acquisition Regulation 42.1503(h).

[91] *See*, e.g., Adams Base Contract, p. 112.

[92] Federal Acquisition Regulation, p. 2.1-19, available at
https://www.acquisition.gov/sites/default/files/current/far/pdf/FAR.pdf.

[93] Policy 1-22, "Audits, Inspections, and Corrective Action," CORECIVIC_0005736–6750.

Quality Assurance Manager, the CAP will pass through a number of other reviewers including the facility's Warden/Administrator and in the case of government contracts, the BOP. Once all levels of review are completed, the CAP is submitted into the facility's approved CAP database and distributed to all parties responsible for completing any corrective action steps.[94]

### 7. BOP Auditing Of BOP-Operated Facilities

72.     BOP-operated facilities are subject to audits from the BOP's PRD—the same division that administers CFMs to privately-operated prisons. BOP-operated facilities are notified when audits will be conducted and often conduct practice audits in the weeks leading up to an audit.

73.     Each facility receives an overall rating based on its review of "superior," "good," "acceptable," "deficient" or "at risk." While privately-operated prisons are subject to annual CFMs regardless of their rating, at BOP-operated facilities, programs that receive a superior or good rating are reviewed on a 3-year basis, acceptable ratings are reviewed on a 2-year basis, deficient ratings are reviewed every 18 months, and at-risk ratings are to be reviewed upon request for closure.[95]

74.     As with CFMs, BOP Program Reviews also list deficiencies, repeat deficiencies and significant findings. PRD maintains a list of deficiencies and significant findings for each audited BOP facility that is submitted for review, on a quarterly basis, to BOP Executive Staff.

## VII.   OPINION

### A.   CoreCivic Provided Quality Correctional Services On A Level That Was As Good As The BOP Facilities

#### 1.   Contract Compliance

##### a.   Contract Renewal Rates

75.     There is perhaps no better indicator of BOP satisfaction with contract performance and quality compliance than contract renewal. Each of the contracts for the Relevant Facilities contained multiple renewal options under which the BOP could decide either to end its contract with CC or renew it for a predetermined number of years. During and after the Class Period, the

---

[94] Policy 1-22, "Audits, Inspections, and Corrective Action," CORECIVIC_0005736–6750.

[95] BOP Program Statement 1210.23, "Management Control and Program Review Manual," Chapter 2, pp. 1, 16–17.

BOP never terminated a CC contract for cause or default, and exercised an option to renew the contracts of all of the Relevant Facilities at least once (and multiple times with respect to certain of the Relevant Facilities).[96] The applicable contract terms for each of the Relevant Facilities during the Class Period are listed in Figure 3. Figure 4 details the original contract length and subsequent renewals for all of the Relevant Facilities during and after the Class Period.

**Figure 3**

## Contract Terms for Relevant Facilities

| Facility Name | Base Contract Term | Contract Date | Contract Renewal Terms |
|---|---|---|---|
| Adams | 4-year | April 1, 2009 | Three 2-year renewals |
| Cibola | 4-year | January 12, 2010 | Three 2-year renewals |
| Eden | 4-year | January 17, 2007 | Three 2-year renewals |
| McRae | 3-year; 4-year | May 30, 2002; October 27, 2011 | Seven 1-year renewals Three 2-year renewals |
| Northeast Ohio | 4-year | December 23, 2004 | Three 2-year renewals |

Source: CoreCivic SEC Filings; CORECIVIC_0000001; CORECIVIC_0000692; CORECIVIC_0001329; CORECIVIC_0002307; CORECIVIC_0003082; CORECIVIC_0003791

---

[96] CC Forms 10-K, 2011–2016.

**Figure 4**

## Contract and Renewal Timeline for Relevant Facilities[1]
## 2011 – 2017



Source: CoreCivic SEC Filings; CORECIVIC_0000001; CORECIVIC_0000692; CORECIVIC_0001329; CORECIVIC_0002307; CORECIVIC_0003082; CORECIVIC_0003791

Note:
[1] Contract start dates may differ from those shown in Figure 3 to this report. Figure 3 provides the date in which the contract was signed while this figure estimates contract start dates based on the end dates and terms provided in the CoreCivic 10-K filings.
[2] Contracts began on or before 2011.

76. As described above, the BOP had options if CC's performance was unsatisfactory. Rather than renewing its contracts with CC, the BOP could have terminated the contract and moved the population to a BOP-operated facility, built a new facility to house that population, or solicited offers from other private contractors for that population. Because of these market dynamics, contract renewals are powerful evidence of the BOP's satisfaction with CC's services.

b.    **Contract Performance Assessment Reviews**

77. CPARs not only measure contractual compliance, but they are also an indicator of the BOP's general satisfaction with its contractor and are the official federal record of past performance for a contractor.

78. CPAR entries can be accessed by any federal procurement officer and are used as a critical source selection resource in the award of future contracts, so the accuracy and objectivity of the CPAR entries is critical. In each CPAR, the contracting officer for every BOP contract is required to provide an overall assessment of the contractor, and to state whether or not they

would have awarded the contract again given the contractor's performance up to that point in time. In every CPAR for the Relevant Facilities during the Class Period, the contracting officer stated that he or she would recommend, probably would recommend, or definitely would recommend CC for a similar contract in the future based upon contractual performance up to the date of the CPAR. In no CPAR did the contracting officer report that he or she "would not" award the contract to CC based upon CC's performance to date.

79.     In each CPAR, the contracting officer also provides a qualitative rating for its contractor's performance. Figure 5 shows that the BOP rated CC's quality for the Relevant Facilities as satisfactory or better in 73% of the CPARs and that no ratings of unsatisfactory were issued.



**Figure 5**

**CPAR Quality Ratings for CoreCivic Facilities[1]**
2012 – 2016

Source: CPAR Audits 2012 – 2016

Notes:
[1] Quality ratings were received for Adams, Cibola, Eden, and McRae from 2012 – 2016, and for Northeast Ohio from 2012 – 2015.

c.     **BOP Audits Of The Relevant Facilities**

80.     At the Relevant Facilities, BOP on-site monitors assessed CC's compliance with its contractual requirements on a daily basis. The presence of this continuous third-party on-site

monitoring is a key difference between the Relevant Facilities and any BOP-operated facility. In my experience, additional on-site supervision usually leads to improved performance because it makes it more likely that deficiencies will be quickly discovered and effectively addressed.

81.     In addition to on-site monitoring, the BOP also conducted regular contract compliance audits of the Relevant Facilities during the Class Period. These audits included CFM reports and NOCs where the BOP deemed appropriate.

82.     The mere fact that CC received NOCs and had deficiencies does not mean that it was not providing quality services or that its services compared less favorably to BOP-operated facilities. Prisons are highly complex operations that provide a variety of essential services to a challenging population and involve thousands of instances of service delivery and crime prevention daily. Due to this complexity, I am aware of no facility with a quality standard of zero deficiencies. This is true for private and government-operated prisons alike. I personally reviewed Program Review findings for scores of BOP facilities over many years. Even the highest-performing institutions could have multiple deficiencies and occasionally a significant finding. Indeed, a GAO report found that "[p]rogram reviews—which document the results of [PRD's] internal reviews of programs and operations at each BOP institution—collectively cited repeated frequent control deficiencies and significant findings over multiple time periods that present inefficiencies or could increase costs."[97] In addition, the Relevant Facilities had continuous third-party monitoring (unlike BOP-operated facilities), and were audited more frequently than BOP-operated facilities.[98] Once a deficiency is cited, it can take significant time and effort to assess the situation, perform root cause analysis, and implement an appropriate measure that addresses the deficiency. Therefore, it is reasonable to expect that the Relevant Facilities would receive more repeat or multi-repeat deficiencies than BOP-operated facilities due to the fact that the Relevant Facilities were given less time to address the deficiency.

---

[97] "Bureau of Prisons: Information on Efforts and Potential Options to Save Costs," *United States Government Accountability Office*, GAO-14-821, September 2014, p. 24.

[98] Deposition of Paul Kelly, July 21, 2020, pp. 61:24–62:21.

d.  **Award Fees**

83.     Another measure of performance is the receipt of Award Fees.  As mentioned above, Award Fees are distributed by the BOP to the contractor for achieving "optimum performance"[99] and demonstrate that the BOP has determined that the facility exceeded its contract compliance obligations.  As shown in

84.     Figure 6, of the 18 instances in which a Relevant Facility was eligible for an Award Fee during the Class Period, the BOP awarded CC with an Award Fee 10 times.  In four instances, the BOP gave CC an Award Fee that was more than 50% of the maximum allowable award, and in three of those instances the Award Fee was more than 80% of the maximum allowable award.

**Figure 6**

## Award Fees Received by CoreCivic Facilities
### 2012 – 2016



Source:  Award Fee Determinations for Adams in years 2012 – 2016; Award Fee Determinations for Cibola in years 2012 – 2016; Award Fee Determination for Eden in years 2012 – 2015; Award Fee Determination for McRae in years 2012 – 2013; Award Fee Determination for NEOCC in years 2014 – 2015

Note:
[1]  Percentage of facilities receiving awards was determined by the total number of times a CoreCivic facility received an award fee divided by the number of times an award decision was made.  Over the period there were 18 award decisions made.
[2]  This chart shows the number of times an award was within the given percentage range of the maximum possible award.

---

[99] BOP Program Statement 7740.02, "Oversight of Private Secure Correctional Facilities," November 21, 2014, p. 2.

85.     For example, in 2013, the BOP issued an Award Fee for Eden for approximately $1.4 million, or 85% of the maximum Award Fee.[100]  The Award Fee amount was determined by Eden's overall rating of "Superior," which was based on "performance monitoring information and the self-assessment submitted by [CC]."[101]  As support for their Superior rating, the BOP specifically mentioned that "[m]ost notably, only two (2) [NOCs] were issued during the rating period."[102]  Thus, the existence of deficiencies or NOCs does not preclude a contract prison from achieving "superior" performance.

86.     On the other hand, because Award Fees are a mechanism for rewarding performance that *exceed* contractual expectations, the lack of an Award Fee does not indicate deficient or poor performance.[103]

## 2.     Third Party Accreditations/Certifications

### a.     ACA Accreditation

87.     All of the Relevant Facilities maintained ACA accreditation throughout the Class Period. In fact, the Relevant Facilities performed exceptionally well in ACA audits.  Each Relevant Facility during the Class period maintained 100% compliance with mandatory standards, and at least 99% compliance with the 468 non-mandatory standards (though ACA accreditation only requires 90% compliance with non-mandatory standards).  This is shown in Figure 7.

---

[100] Eden 2013 Award Fee Determination Letter, CORECIVIC_1085940–1.

[101] Eden 2013 Award Fee Determination Letter, CORECIVIC_1085940–1.

[102] Eden 2013 Award Fee Determination Letter, CORECIVIC_1085940–1.

[103] *See, e.g.,* Eden 2015 Award Fee Determination Letter, CORECIVIC_1085944–5.