**Figure 7**

# ACA Accreditation Performance for CoreCivic Facilities

| Facility | Date[1] | First ACA Accreditation | | | | | |
|---|---|---|---|---|---|---|---|
| | | Mandatory Standards | | | Non-Mandatory Standards | | |
| | | Score | Total[2] | Percentage | Score | Total[2] | Percentage |
| Adams | 11/18/13 | 60 | 60 | 100% | 429 | 429 | 100% |
| Cibola | 10/21/13 | 60 | 60 | 100% | 421 | 425 | 99% |
| Eden | 9/7/11 | 60 | 60 | 100% | 430 | 435 | 99% |
| McRae | 5/13/13 | 59 | 59 | 100% | 429 | 428 | 100% |
| Northeast Ohio[4] | 4/29/13 | 59 | 59 | 100% | 418 | 422 | 99% |

| Facility | Date[1] | Second ACA Accreditation | | | | | |
|---|---|---|---|---|---|---|---|
| | | Mandatory Standards | | | Non-Mandatory Standards | | |
| | | Score | Total[2] | Percentage | Score | Total[2] | Percentage |
| Adams | 5/16/16 | 61 | 61 | 100% | 417 | 417 | 100% |
| Cibola | 7/18/16 | 60 | 60 | 100% | 403[3] | 406 | 99% |
| Eden | 9/8/14 | 60 | 60 | 100% | 430 | 434 | 99% |
| McRae | 2/1/16 | 60 | 60 | 100% | 419 | 420 | 100% |
| Northeast Ohio[4] | 6/6/16 | 59 | 59 | 100% | 278 | 281 | 99% |

Source: ACA Accreditation Reports

Notes:
[1] Dates represent the first day of the three-day audit.
[2] Some mandatory and non-mandatory standards are deemed not applicable by the ACA for each facility, resulting in differences in the total number of standards listed.
[3] A typo in the ACA Accreditation Report reads "103"; however, the Percentage Compliance of "99.3%" for this audit confirms that "403" is intended.
[4] The manual type used for all audits was "Adult Correctional Institutions, Fourth Edition", except for the 6/6/16 of Northeast Ohio , which used "Adult Local Detention Facilities, Fourth Edition".

b. **JC Accreditation**

88.     Additionally, all of the Relevant Facilities maintained JC accreditation for the delivery of health care throughout the Class Period.  As explained in Section VI.D.2, the JC is a more rigorous standard to meet than the ACA standards for healthcare because it evaluates prison facilities using the same standard as those used for community care.

c. **Prison Rape Elimination Act Compliance**

89.     As discussed above, PREA was passed into law in 2003, but it took 9 years for its standards to be finalized and 10 years for the law to be enforced.  However, prior to the implementation of PREA standards, CC "had taken many concrete steps to begin implementing

the concepts addressed" in PREA regulations.[104]  For example, CC "established an agency wide PREA Coordinator based in [their] corporate headquarters," and established a PREA Compliance Manager at each facility as well as a Sexual Abuse Response Team.[105]

90.     Furthermore, CC examined their facilities for potential weaknesses and took corrective actions where applicable to enhance privacy.[106]  CC also provided extensive training and education to staff, contractors, and volunteers regarding their responsibilities under PREA.[107]

91.     In August 2013, PREA standards were instituted and all of the Relevant Facilities and all BOP-operated facilities were subject to compliance auditing by the DOJ at least once every three years.

92.     Figure 8 summarizes the results of the PREA audits for both the Relevant Facilities and low security BOP-operated Facilities (the same security level as the Relevant Facilities) during the Class Period.

---

[104] CC "PREA: 2013 Annual Report," p. 2.

[105] CC "PREA: 2013 Annual Report," p. 2.

[106] CC "PREA: 2013 Annual Report," p. 2.

[107] CC "PREA: 2013 Annual Report," p. 2.

**Figure 8**



**Summary of PREA Audit Findings**
2013 – 2016

Source: US Department of Justice, Bureau of Justice Assistance; PREA Resource Center

93.    The Relevant Facilities exceeded PREA standards 10.0% of the time, and did not once receive the "Does Not Meet Standard" rating.[108]  Comparatively, low security BOP-operated facilities exceeded PREA standards 5.4% of the time, and did not meet PREA standards 0.3% of the time (on four occasions).[109]

### B.    Plaintiffs' Allegations Do Not Change My Opinions

94.    In the Consolidated Complaint, Plaintiffs – who I understand are investors in CoreCivic stock seeking to recover investment losses following the August 18, 2016 memorandum written by then Deputy Attorney General Sally Yates ("Yates Memorandum") – make broad, general

---

[108] The Relevant Facilities received a "Meets Standard" rating 90% of the time and the BOP-operated facilities received a "Meets Standard" rating 94.2% of the time.

[109] Two PREA standards were not met in each of the following BOP-operated facility audits:  Butner (2014) and Loretto (2013).

allegations regarding the quality of CC's services. However, Plaintiffs do not provide the necessary context in which to view these allegations. As discussed above, a "quality standard" of zero deficiencies is unachievable for any prison system. Issues will inevitably arise at any corrections institution. The facility's response to issues is often a better indicator of performance than the existence of underlying issues themselves (particularly where those issues are identified by a more thorough or frequent audit process). Moreover, for certain incidents, the surrounding circumstances must necessarily be explored in order to fully-assess the facility's actions. That is why, after reviewing in detail four prominent issues raised in the Consolidated Complaint: (1) the Adams disturbance; (2) alleged medical "deficiencies" at Cibola; (3) alleged staffing "deficiencies;" and (4) findings in the August 2016 OIG Report, my opinion that the quality of CC's correctional services was as good as that of BOP-operated facilities does not change.

### 1. Adams Disturbance

95.    Plaintiffs claim that the May 2012 disturbance at Adams is evidence that the quality of service provided by CC was poor in comparison to the BOP.[110] There can be no dispute that this disturbance was a tragic event that resulted in the death of a correctional officer. However, my review of the incident does not change my opinion that the quality of service provided by CC was as good as the quality of service provided by the BOP, for several reasons: (1) disturbances are an unfortunate reality for all correctional systems; (2) the criminal alien population is more prone to mass disturbances because of its ability to mobilize en masse; (3) the BOP found that CC's response to the emergency and corrective actions were effective; and (4) post-disturbance reviews indicate that Adams was, overall, a sound correctional facility.

96.    First, in order to put the Adams disturbance into context, one must understand that prison disturbances and organized violence in prisons occur across all correctional systems. In the past few years, the media has detailed major disturbances at state prisons in Delaware and South Carolina that resulted in multiple homicides.[111] This is why sound correctional systems have

---

[110] Consolidated Complaint, ¶¶ 44–49.

[111] *See*, "16 inmates charged with murder in Delaware prison riot," October 17, 2017, *6abc Action News*, available at https://6abc.com/2543196/; "Delaware Inmates Sentenced in Guard's Killing During Riot," September 13, 2019, *Associated Press*, available at https://www.usnews.com/news/us/articles/2019-09-13/sentencings-set-for-delaware-inmates-in-fatal-prison-riot. *See also*, Richard Fausset, "Guards Waited Hours to Stop a Prison Riot That Left 7 Inmates Dead," April 16, 2018, *The New York Times*, available at https://www.nytimes.com/2018/04/16/us/south-

strong intelligence gathering capabilities to anticipate inmate unrest and organized violence, and why they have trained emergency response teams and command systems to address such unrest when it occurs.[112]

97.     Second, the nature of the criminal alien population with an increased presence of STG members, homogeneity of population and cultural and language barriers increases the risk of disturbances. A homogenous population, especially one with strong geographic, cultural or language ties, can organize and consolidate under one or a small number of inmate leaders more rapidly and effectively than a diverse inmate population. Another difficulty in managing the alien population is that prison officials and intelligence staff have much less knowledge regarding the inmates' criminal history, history of violence and gang affiliation than they would a US citizen. The difficulties managing these populations are clear and well documented; every major prison company under a BOP Criminal Alien contract has had a major disturbance with this population:

- Cornell Corrections in 2008 in Big Spring, Texas;
- The Geo Group in 2009 in Reeves County, Texas;
- Management and Training Corporation in 2015 in Willacy County, Texas; and
- CC in 2012 at Adams.

98.     The BOP is not immune from the challenges presented by this population. In 2008, the BOP experienced a major disturbance in Three Rivers, Texas, involving rival Latino gangs. The BOP also suffered three major disturbances, each of which involved a homogeneous non-U.S. citizen inmate population (Cuban Nationals). In November 1987, at Oakdale, Louisiana, inmates took 28 staff hostage and burned down numerous buildings. The incident lasted over a week. During the same time frame, inmates in Atlanta, Georgia, took over 100 staff hostage and burned

carolina-prison-riot html; "12 inmates were killed by other inmates in South Carolina prisons in 2017," April 16, 2018, *The Greenville News*, available at https://www.greenvilleonline.com/story/news/2018/04/16/south-carolina-prison-violence/520519002/.

[112] As a former tactical team leader for the BOP, I personally responded to major disturbances at BOP facilities including one at the Federal Correctional Institution in Memphis, TN, when a series of disturbances occurred simultaneously across multiple BOP facilities in 1995, forcing the BOP to implement its first ever national lockdown. *See* "Feds order lockdown after series of prison riots," October 21, 1995, *CNN*, available at http://www.cnn.com/US/9510/prison_riots/index.html.

down a significant portion of the institution. This incident lasted 11 days. In 1991, inmates at Talladega, Alabama, took 10 hostages. This incident lasted 10 days.[113]

99.     Third, the BOP acknowledged that CC's response to the disturbance was swift and effective: "[t]he contractor did encounter a serious disturbance during this rating period. The response from both the local facility staff, executive staff and corporate staff was very proactive. Resources, both human and fiscal, were provided to ensure the situation was contained and resolved expeditiously."[114]

100.    Fourth, CC took the necessary steps to correct any deficiencies or issues that may have contributed to the disturbance such that a similar event would be less likely in the future. On July 27, 2012, the BOP released an After-Action Report on the Adams disturbance.[115] Then, on September 21, 2012, the BOP provided an After-Action Recommendations letter to CC that provided nine recommendations based on the BOP's review.[116] On October 19, 2012, Adams responded to each of the nine BOP recommendations describing the actions CC had taken to satisfy each recommendation.[117] The 2011-2012 CPAR issued by BOP stated: "During this period, CCA staff responded to various situations and issues in an expedient manner including the serious disturbance noted previously. The contractor does an effective job of meeting

---

[113] I personally responded to the mass disturbances at Atlanta and Talladega. *See* Ralph Blumenthal, "Gang Fights in Prison Injure 22 and Kill One," *The New York Times*, available at https://www.nytimes.com/2008/03/29/us/29prison.html; "Twenty-fifth Anniversary of Talladega Riot," *Federal Bureau of Prisons*, August 31, 2016, available at https://www.bop.gov/resources/news/20160831_tdg_riot_anniv.jsp; "25 years later, Atlanta prison riots live on in captive's memory," *The Atlanta Journal-Constitution*, November 23, 2012, available at https://www.ajc.com/news/state--regional/years-later-atlanta-prison-riots-live-captive-memory/QdNBVQN3jba6o2Mim86pBO/; "Oakdale federal prison riot 32 years ago Thursday," *KPLC*, November 20, 2019, available at https://www.kplctv.com/2019/11/21/oakdale-federal-prison-riot-years-ago-thursday/.

[114] Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," Federal Bureau of Prisons, November 8, 2012, CORECIVIC_0684697–9.

[115] Frank Strada, "After-Action Report, Disturbance Adams Country Correctional Center," July 27, 2012, BOP_0293561.

[116] Memorandum from Paul Kelly, SSIM to Vance Laughlin, Warden, "RE: May 20, 2012 After Action Recommendations," September 21, 2012, CORECIVIC_1140958.

[117] Memorandum from Vance Laughlin, Warden to Paul Kelly, SSIM: "May 20, 2012 After Action Review Recommendations," October 19, 2012, CORECIVIC_1048661.

established time lines when submitting/providing responses. The contractor responded favorably to 13 technical direction letters and 15 contract modifications."[118]

101.    Fifth, many performance measures since the incident indicate that Adams continued to provide quality services. The BOP did not terminate the Adams contract after the disturbance (as it did with MTC's contract after the Willacy disturbance)[119] and, in fact, the BOP exercised two renewal contract options after the disturbance. All CPARs after the disturbance indicated that the BOP would award the contract to Adams if it were up for bid at that time due to the facility's ability to execute what they promised in their proposal.[120] In June 2016, the institution received a $277,723 Award Fee from the BOP for contract performance beyond contract requirements.[121] Additionally, Adams maintained ACA accreditation, JC accreditation and PREA certification, both prior to and after the disturbance.

### 2.    Cibola

102.    Plaintiffs raised certain issues regarding the provision of health care at CC's Cibola facility during the Class Period.[122] While Cibola faced challenges at times with the delivery of medical care and staffing, any analysis of the challenges faced at Cibola must consider (1) the

---

[118] Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," Federal Bureau of Prisons, November 8, 2012, CORECIVIC_0684697–9.

[119] Seth Freed Wessler, "The True Story of a Texas Prison Riot," June 23, 2015, *The Nation*, available at https://www.thenation.com/article/archive/the-true-story-of-a-texas-prison-riot/ ("The Willacy County Correctional Center in Raymondville, Texas, is now empty [since] prisoners so ransacked the facilities in a February riot…that the Federal Bureau of Prisons declared it 'uninhabitable.' The agency moved the inmates to other prisons and declined to renew its contract with the private corrections company that ran the facility.").

[120] In the 2012-2013 CPAR for Adams, the contracting officer's recommendation stated, "Given what I know today about the Contractor's ability to execute what they promised in their proposal, **I definitely would award to them today** given that I had a choice." *See* Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," BOP, September 26, 2013, CORECIVIC_0606109–11 (emphasis added). In the 2013–2016 CPARS for Adams, the reviewing contractor's recommendation stated, "Given what I know today about the contractor's ability to perform in accordance with this contract or order's most significant requirements, **I would recommend them** for similar requirements in the future." *See* Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," BOP, January 29, 2015, CORECIVIC_1974933–6; Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," BOP, August 3, 2016, CORECIVIC_1337363–70; Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," BOP, December 27, 2016, CORECIVIC_1337403–10; Adams County Correctional Center, "Contractor Performance Assessment Report (CPAR)," BOP, November 17, 2017, CORECIVIC_1337417–24 (emphasis added).

[121] Adams County Correctional Center Award Fee Determination, June 2, 2016, CORECIVIC_1084134–6.

[122] Consolidated Complaint, ¶¶ 72–73, 82–83.

challenges of health care delivery in all prisons, especially with an immigrant population; (2) the fact that these challenges were exacerbated by the specific mandate the BOP imposed on Cibola; (3) the national shortage of health care staff in prisons in rural areas; (4) the aggressive steps Cibola and CC took to hire staff and correct medical deficiencies; and (5) the broader performance indicators of Cibola.

103.    First, health care delivery in prisons, regardless of the operator, is difficult because prison populations present unique challenges:  the prison population in the US is aging faster than the general population; it has a higher prevalence of infectious and chronic diseases, mental illness and substance abuse; and many prisons are located in remote areas far from hospitals and doctors.[123]

104.    AmeriHealth, for example, reports that 40% of prisoners have at least one chronic condition and that prisoners are nearly twice more likely to have diabetes and 10 times more likely to have HIV than the general population.[124]  The criminal alien population presents further challenges as immigrant populations have increased health care problems related to infectious and contagious diseases and lack of prior access to adequate health care compared to U.S. born persons.[125]

105.    Second, these issues were exacerbated by the unique terms of the arrangement with Cibola by the BOP.  Unlike the other Relevant Facilities, the BOP used Cibola as a short-stay facility for criminal aliens who were receiving their deportation hearings, and, as a result, Cibola's inmate population had a higher turnover rate than a typical static prison population.

106.    The median length of stay in Cibola was only 113 days and the median sentence length was 18 months.[126]  In contrast, the BOP reports that less than 14% of its population had a

---

[123] *See*, "Managing Prison Health Care Spending," *The Pew Charitable Trusts*, October 2013; Laura M. Maruschak, et al., "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12," *Bureau of Justice Statistics*, October 4, 2016.

[124] "The Challenges of Correctional Health Care:  Balancing Cost with Quality of Care," AmeriHealth Administrators, July 2015.

[125] A. Clinton White and Robert L. Atmar, "Infections in Hispanic Immigrants," *Clinical Infectious Diseases*, Vol. 34, Issue 12, June 15, 2002, pp. 1627-1632.

[126] Consolidated Complaint, ¶ 68.

sentence length less than 3 years.[127]  This turnover rate placed a strain on medical staff to keep up with intake requirements, which include health appraisals, tuberculosis test (or "PPD") follow-up, conducting medical evaluations to establish baselines, and mental health and sexual victimization screening—the very areas where most of the repeat deficiencies at Cibola were found.

107.    Third, many of the challenges CC faced at Cibola were due to the difficulty in recruiting and retaining qualified medical staff that the BOP would approve in a rural area.  Correctional medical staffing is not a CC-specific issue; it is a national issue, including at the BOP.[128]

108.    Fourth, it appears that CC was committed to address staffing vacancies at Cibola.  CC spent significant funds on overtime, and temporary, detailed and contract medical staff and consultants to provide care.[129]  CC also filled certain medical positions, such as mid-level practitioners ("MLPs"), in excess of the required staffing plan to compensate for other vacancies and ensure adequate care.  Finally, in January 2016, Cibola hired third-party Correct Care Solutions ("CCS") to serve as the healthcare provider at the facility and to enhance CC's recruitment efforts due to CCS's local ties to the Albuquerque metropolitan area.

109.    Notwithstanding these challenges, and given the nature of the population, Cibola continued to provide essential healthcare services as evidenced by its continued ACA and JC accreditation.  Also, though not specific to Cibola, the August 2016 OIG Report found that grievances on medical issues were significantly lower at CC facilities as a whole, compared to BOP facilities.  Indeed, CC's mortality rate was 25% that of BOP facilities.  Given the context of the difficulties of providing health care and maintaining medical staffing levels in prisons nation-

---

[127] "Sentences Imposed," Federal Bureau of Prisons, available at https://www.bop.gov/about/statistics/statistics_inmate_sentences.jsp, last accessed February 4, 2020.

[128] For example, in the OIG audit of the Reeves Detention Center the OIG found that Reeves failed to meet the 85% medical staffing requirement in 34 out of 37 months.  *See* "Audit of the Federal Bureau of Prisons Contract No. DJB1PC00 Awarded to Reeves County, Texas to Operate the Reeves County Detention Center I/II Pecos, Texas," *Office of the Inspector General*, April 2015, p. 22.  The BOP has also had significant issues recruiting medical staff especially in rural locations.  A 2016 OIG audit found that only 24 of 97 BOP facilities had a medical staffing rate of 90% or higher, 12 BOP institutions had staffing levels of 71% or below and 20 BOP facilities had medical vacancy rates of 25% or more.  *See* "Review of the Federal Bureau of Prisons' Medical Staffing Challenges," *Office of the Inspector General*, March 2016, pp. i, 2.  Thus, Cibola is not unique in its medical staffing issues.

[129] "Until the remaining vacancies are filled, the facility will continue to use overtime, TDY staff and nursing agencies to cover nursing and correctional posts," Cibola response to Notice of Concern, April 20, 2015, p. 2, CORECIVIC_0098789–91 at 90.  Baxter deposition, 177:12–23, 183:17–20; Hall deposition, 153:22–154:12.

wide and Cibola's continued accreditation, including in the high bar set by the JC, the medical issues raised regarding Cibola do not alter my opinion that CC provided correctional services at a level of quality that was as good as the BOP.

### 3. Staffing

110. Plaintiffs also claim that CC had inadequate staffing at the Relevant Facilities during the Class Period.[130] Staffing is a challenge faced by all corrections providers, government and private alike. Government and BOP reports have consistently cited the BOP for inadequate staffing and have linked this deficiency to increases in violence in BOP-operated prisons. In 2005, the BOP released a report showing that higher inmate-to-staff ratios are correlated with increases in the level of inmate violence in BOP institutions.[131] In 2012, the GAO released a report stating that growth in the federal inmate population led to multiple issues including increased inmate-to-staff ratios, which contributed to "increased inmate misconduct, which negatively affects the safety and security of inmates and staff."[132] In this same report, the GAO found that according to a 2010 DOJ study on BOP's staffing, "nearly all BOP facilities had fewer correctional staff on board than needed." Additionally, the GAO found that one facility had an inmate to total staff ratio of 6:1; however, during nights and evenings so few correctional officers were on duty that the actual inmate-to-staff ratio during those occasions "was about 76:1." In 2015, the director of the BOP testified to Congress that the inmate-to-staff ratio "remains high"[133] and in 2018, the BOP stated, "[s]taffing and overcrowding present constant challenges for BOP in carrying out its mission to confine offenders in safe, humane, and cost-efficient environments."[134] The BOP has also stated that insufficient staffing was "one of the

---

[130] Consolidated Complaint, ¶¶ 4–5.

[131] "The Effects of Changing Crowding and Staffing Levels in Federal Prisons on Inmate Violence Rates," Federal Bureau of Prisons, October 2005 (cited in Nathan James, "The Federal Prison Population Buildup: Overview, Policy Changes, Issues, and Options," Congressional Research Service, January 22, 2013, footnote 70).

[132] "Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure," *United States Government Accountability Office*, GAO-12-743, September 2012.

[133] "Statement of Charles E. Samuels, Jr., Director, Federal Bureau of Prisons, U.S. Department of Justice, Before the Committee on Homeland Security and Governmental Affairs, United States Senate," August 4, 2015, p. 3.

[134] Memo from Michael E. Horowitz, Inspector General, to the Attorney General and Deputy Attorney General, "Top Management and Performance Challenges Facing the Department of Justice," *Office of the Inspector General*, October 15, 2018, p. 9.

primary challenges [it] continues to face" in 2019.[135] This is despite the decline in the BOP prison population in recent years.[136]

111.    In the end, simply looking at headcounts of the number of staff on-board does not necessarily indicate that key posts or positions are being left vacant at a facility. When there are staff vacancies, essential posts needed for the safe and secure running of the facility can be achieved through overtime, temporary details of staff from other facilities or the re-assignment of staff from less essential to more critical posts. The BOP has used these practices to address its staffing shortages as well.[137] Based on this evidence and my experience, CC's challenges related to staffing during the Class Period does not change my analysis on the quality of their services compared to the BOP.

### 4.    The August 2016 OIG Report

112.    Plaintiffs cite the August 2016 OIG Report as a source for many of their quality-related allegations.[138] In the August 2016 OIG Report, the OIG compared the Relevant Facilities to a sample of 14 low security BOP prisons.[139] During my time at the BOP, I served as the Warden at one of these sample facilities (Butner) and as Regional Director over three others (Allenwood, Elkton, and Loretto).

113.    For the 29 indicators the OIG examined, CC and the BOP came in virtually tied. Figure 9 shows the data reported by the OIG for each indicator for CC and BOP-operated facilities.

---

[135] "Top Management and Performance Challenges Facing the Department of Justice," *Office of the Inspector General*, 2019, p. 3.

[136] "Top Management and Performance Challenges Facing the Department of Justice," *Office of the Inspector General*, 2019, p. 3.

[137] "Top Management and Performance Challenges Facing the Department of Justice," *Office of the Inspector General*, 2019, p. 3 ("To address this staffing shortage, the BOP uses augmentation – assigning individuals other than correctional officers, such as teachers or healthcare professionals – to temporarily fill security posts.").

[138] Consolidated Complaint, ¶¶ 38–39.

[139] The August 2016 OIG Report states that the 14 low security BOP prisons were in the following locations: Allenwood (Pennsylvania), Bastrop (Texas), Beaumont (Texas), Big Spring (Texas), Butner (North Carolina), Elkton (Ohio), Forrest City (Arkansas), La Tuna (Texas), Loretto (Pennsylvania), Oakdale (Louisiana), Seagoville (Texas), Terminal Island (California), Texarkana (Texas), and Yazoo City (Mississippi). Throughout the Class Period, the BOP only operated 31 low security facilities in total, so the sample used in the August 2016 OIG Report represented nearly 50% of all relevant BOP-operated facilities. Federal Bureau of Prisons, Low Security Federal Correctional Institutions (FCIs), https://www.bop.gov/locations/list.jsp. One of these facilities, Fort Worth FCI, was converted from a Federal Correctional Institution to a Federal Medical Center in December 2016. *See*, e.g. "Better Planning and Evaluation Needed to Understand and Control rising Inmate Health Care Costs," *United States Government Accountability Office*, GAO-17-379, June 2017, p. 50.

Numbers in green indicate which of the two parties performed better (as defined by the OIG) in that indicator. These results are telling given the fact that CC (1) housed a very different population (which presented unique challenges); and (2) was subject to more comprehensive and frequent auditing procedures (such that there were a greater number of documented deficiencies).

**Figure 9**

## August 2016 OIG Report Findings

| Category | CoreCivic | BOP |
|---|---|---|
| *Contraband* | | |
| Cell Phones | 26.22 | **3.19** |
| Drugs | **1.40** | 3.00 |
| Tobacco | 2.30 | **1.90** |
| Weapons | **0.80** | 1.80 |
| **Contraband Indicators Outperformed** | **2** | **2** |
| *Reports of Incidents* | | |
| Assaults: Inmates on Inmates | 4.10 | **2.50** |
| Assaults: Inmates on Staff | 3.70 | **1.60** |
| Sexual Assaults: Inmates on Staff | 0.15 | **0.02** |
| Deaths | **0.30** | 1.20 |
| Fights | 5.40 | **4.00** |
| Setting a Fire | 0.10 | **0.04** |
| Suicide Attempts and Self-Mutilation | 1.10 | **0.80** |
| Suicides | 0.06 | **0.03** |
| Disruptive Behavior | **1.00** | 2.40 |
| Uses of Force | 4.30 | **3.80** |
| **Reports of Incidents Indicators Outperformed** | **2** | **8** |
| *Grievances* | | |
| All | **48.60** | 121.50 |
| Selected Safety and Security | **18.40** | 25.30 |
| Staff | 7.10 | **6.20** |
| Confinement | **0.20** | 1.20 |
| Food | **1.00** | 1.20 |
| Institutional Operations | **0.00** | 0.20 |
| Medical and Dental | **9.60** | 14.10 |
| Special Housing Unit | **0.03** | 2.40 |
| **Grievances Indicators Outperformed** | **7** | **1** |
| *Urinalysis Drug Tests* | | |
| Percentage Tested | 7.50% | **8.10%** |
| Positive Drug Tests | **2.00** | 3.40 |
| **Urinalysis Drug Tests Indicators Outperformed** | **1** | **1** |
| *Sexual Misconduct* | | |
| Guilty Findings of Inmate-on-Inmate | **7.30** | 18.10 |
| Allegations of Staff-on-Inmates | **10.40** | 14.50 |
| **Sexual Misconduct Indicators Outperformed** | **2** | **0** |
| *Other* | | |
| Full and Partial Lockdowns | 7.60 | **0.79** |
| Guilty Findings on Serious Charges | 70.70 | **64.70** |
| Inmate Phone Calls Monitored | 8.70% | **21.10%** |
| **Other Indicators Outperformed** | **0** | **3** |
| **Total Indicators Outperformed** | **14** | **15** |

Source: August 2016 OIG Report

114.     When reviewing these results, each category must be interpreted carefully because their usefulness and reliability for the purpose of measuring the relative quality vary.

115.     **Contraband**:  The frequency of contraband confiscations may be interpreted as either a negative indicator of quality (more contraband) or a positive indicator of quality (better interdiction efforts).  Indeed, the OIG conceded that they "were unable to evaluate whether higher rates of contraband finds actually indicated more contraband present in either a contract prison or a BOP institution, a more aggressive or effective program for discovering and confiscating contraband, or some combination of those or other factors."[140]  This makes it impossible to reach a definitive conclusion regarding the relative performance of CC and the BOP in this category.

116.     **Reports of Incidents:**  Given the population in privately-operated prisons (including greater homogeneity, prevalence of gang affiliates, ability to mobilize, and propensity for violence), as discussed earlier, it is not surprising that the August 2016 OIG Report found more reports of incidents at CC in the majority of indicators in this category.[141]  It should also be noted that, as mentioned in Section VI.D.5.a, privately-operated prisons have on-site monitors, which can result in an improved ability to uncover incidents, and can contribute to higher levels of incident reports.

117.     **Grievances**:  This is the only category where input directly from the inmate population is solicited.  CC performed better on nearly all indicators.  This is notable due to language and cultural barriers unique to privately-operated prisons, which often result in more misunderstandings and grievances among inmates.

118.     **Urinalysis:**  CC had a lower level of positive drug tests than the BOP.  The BOP believes that "[o]ne of the most reliable indicators of prison operations is the rate at which inmates test

_____

[140] August 2016 OIG Report, p. 17–18.

[141] Notably, however, CC performed better in the most serious subcategory, death. *See* August 2016 OIG Report, Appendix 6.

positive for the use of drugs and alcohol."[142] It should also be noted that CC drug tested 7.5% of inmates, well above the 5% of inmates that they were contractually obligated to test.[143]

119. **Sexual Misconduct**: CC performed better than the BOP on both indicators. Additionally, reports of staff-on-inmate sexual misconduct were lower at CC than the BOP.

120. **Other**:

    a. **Lockdowns**. The OIG did not "review the basis for lockdowns" in their review.[144] Therefore, it is impossible to know if the difference in the number of lockdowns between the BOP and CC is due a more conservative approach to maintain safety, the population differences, or some other reason. In my experience, privately-operated facilities use lockdowns more often than BOP-operated prisons as an operational strategy in order to control situations until they can understand the situation.

    b. **Guilty Findings**. Guilty findings on serious charges must be interpreted with caution because it is difficult to determine if the number can be attributed to additional on-site monitoring or an actual difference in the underlying rate of occurrence.

    c. **Phone Calls.** CC did not perform as well as the BOP in terms of the percent of telephone calls monitored. However, as the OIG notes in the August 2016 OIG Report, unequal access to technology affects CC's ability to monitor telephone calls.[145] Also, the BOP does not mandate how many telephone calls are monitored by their contractors; instead, they merely suggest that a minimum of 5% of calls be monitored.[146] CC monitored 8.7% of calls, well above the suggested minimum. Moreover, CC's inmate population is predominantly Spanish speaking, making monitoring of telephone calls

---

[142] Scott D. Camp, Ph.D. and Gerald G. Gaes, Ph.D., "Private Prisons in the United States, 1999: An Assessment of Growth, Performance, Custody Standards, and Training Requirements," *Federal Bureau of Prisons*, March 2000, p. 16.

[143] August 2016 OIG Report, p. 26, Appendix 6.

[144] August 2016 OIG Report, p. 22.

[145] The August 2016 OIG Report notes that "contract prisons do not have the same telephone technology that is available to BOP institutions to monitor inmate phone calls. A PMB Intelligence Specialist told us that with access to the BOP's TRUINTEL system, it was possible for staff to listen to inmates' phone calls in the BOP institutions through a desk telephone or through their desktop computers. Therefore, various staff in different departments throughout the institutions could monitor phone calls. However, staff at contract prisons do not have access to TRUINTEL or the intelligence it provides from other BOP institutions, nor are contract prison inmate phone calls recorded in TRUINTEL, all of which limits contract prisons' and the BOP's opportunities to gather intelligence." August 2016 OIG Report, p. 25.

[146] August 2016 OIG Report, pp. 24–25.

more difficult.  For most BOP calls, an English speaker may monitor the telephone calls, but at CC, Spanish speakers must be used on nearly all of the monitored telephone calls.

121.    Finally, it is important to remember the significant population differences between the Relevant Facilities and the BOP-operated facilities analyzed in the August 2016 OIG Report. These differences impact many of the comparisons made and are thus important to any quality comparison.  The BOP solely controlled which inmates were placed in CC facilities.  CC had no authority to select inmates for its facilities or authority to refuse any inmate sent to their facilities by the BOP.  Demographic variables, particularly as they relate to housing a foreign national population, have a significant impact on rates of inmate misconduct and violence.

122.    These inmate population differences were not statistically analyzed or controlled for when the OIG compared BOP and private prison statistics on safety and security.  The OIG stated that they did not determine the impact of population differences on the results of their analysis.[147]  Accordingly, the only recommendation made by the OIG regarding private prisons did not direct the BOP to eliminate or reduce its use of private prisons due to performance or quality issues, but rather, it recommended the BOP to "[c]onvene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than the BOP institutions in a number of key indicators, and identify appropriate action, if necessary."[148]

123.    Notwithstanding the challenges facing privately-operated prisons, and the fact that those challenges could conceivably lead to additional deficiencies, the August 2016 OIG Report found that the quality of correctional services at the Relevant Facilities and BOP-operated facilities was essentially equal.

### 5.    The August 2016 Yates Memorandum

124.    The Yates Memorandum stated that private prisons "compare poorly to our own Bureau facilities," "do not provide the same level of correctional services, programs, and resources" and "do not maintain the same level of safety and security" as BOP-operated prisons.[149]  The Yates

---

[147] August 2016 OIG Report, p. 21.

[148] August 2016 OIG Report, p. 45.

[149] Memorandum for the Acting Director of the Federal Bureau of Prisons from Sally Q. Yates, Deputy Attorney General, "Reducing our Use of Private Prisons," August 18, 2016.

Memorandum cites the August 2016 OIG Report in support of these conclusions.[150] However, as noted above, the data gathered by the OIG does not support the conclusion that privately-operated prisons systematically compare unfavorably to BOP-operated prisons. This is especially true as it relates to CC's services, because, for the indicators the OIG examined, CC and the BOP came in virtually tied. Moreover, there is no data that I am aware of that supports the overarching conclusions in the Yates Memorandum regarding the comparative quality of privately-operated and BOP-operated prisons.

## VIII. CONCLUSION

125.    For the reasons set forth above, it is my opinion that during the Class Period, CC provided services to the BOP at the Relevant Facilities at a level of quality that was as good as the level of quality provided by the BOP in similar BOP-operated facilities.

D. Scott Dodrill

August 7, 2020

---

[150] Memorandum for the Acting Director of the Federal Bureau of Prisons from Sally Q. Yates, Deputy Attorney General, "Reducing our Use of Private Prisons," August 18, 2016.

# Appendix A

**D. SCOTT DODRILL**
**Correctional Consultant**

**D. Scott Dodrill Consulting, Inc.**
11 Hemlock Court South - Homosassa, Florida 34446
Telephone: (352)503-2305 ● Cellular: (570)898-2497 ● E-Mail: sdodrill2002@yahoo.com

**PROFILE**
I have 33 years of prison management experience with the Federal Bureau of Prisons (BOP). I retired as the Assistant Director, Correctional Programs Division, a Senior Executive Service Staff member. I served at nine federal correctional institutions, two Regional Offices, and the Central Office on two separate occasions. I am well versed in federal prison policy and procedures and have developed many skills and abilities that are beneficial within the private and government sectors. I was personally involved in the activation of two BOP facilities, FCI Marianna, and FCI Beckley. As Regional Correctional Services Administrator in the Southeast Regional Office I provided correctional services oversight during the activations of MDC Guaynabo and FDC Miami. As regional director of the Northeast Region, I oversaw the activation of USP Canaan, and approved the final construction plans for FCI Berlin. And as Correctional Services Administrator for the BOP in Washington, D.C., I was one of three staff (Chief of Facility Design and Chief of Facility Operations were the other two) that sat on the National Design Criteria Review Committee which reviewed, investigated and made final decisions on any suggested changes in the design of BOP facilities.

**ACADEMIC BACKGROUND**

**West Virginia College of Graduate Studies**                                 Institute, WV
*M. A., Correctional Counseling and Guidance with an emphasis on Corrections*

**West Virginia University**                                                              Morgantown, WV
*B.A., Psychology, Cum Laude*

**PROFESSIONAL EXPERIENCE**

**D. Scott Dodrill Consulting, Inc.**                                           02/11 – Present
*Correctional Consultant*                                                            Homosassa, FL
- Provide correctional oriented consulting services to criminal justice professionals and the legal community
- Develop and conduct training
- Provide expert guidance in conducting administrative investigations
- Conduct audits and inspections
- Provide leadership in critical situations
- Provide expert testimony to the courts

**United States Federal Bureau of Prisons**                                08/09 – 01/11
*Assistant Director, Correctional Programs Division (CPD)*           Washington, D.C.
*Central Office*
- Provided direct supervision to over 500 employees including remote offices in Texas, West Virginia, California, Colorado, and Pennsylvania
- Provided leadership and policy direction to all field operatives of the BOP, to include 116 correctional institutions, six regional offices and approximately 300 residential re-entry centers

- Developed and wrote policies and directed training efforts in all departments covered by the CPD
- Directed all critical BOP inmate management and program functions
- Provided direct supervision to critical areas to include: intelligence gathering and sharing, counter-terrorism initiatives to include hands-on oversight of Administrative Maximum, Special Management and Communication Monitoring Unit inmates; Religious Services; National Re-entry Affairs and inmate skills development; sex offender certification reviews; Psychology Services to include Drug Abuse Programs and the delivery and development of mental health programming; Correctional Services and all institution security aspects including crisis planning and gang management/monitoring; witness security and victim witness operations; designations and sentence computations; unit and case management including female offender programs
- Sat on the Bureau of Prisons' Executive Staff

**United States Federal Bureau of Prisons** 12/03 – 08/09
*Regional Director* Philadelphia, PA
*Northeast Regional Office (NERO)*
- Chief Executive Officer (CEO) of the Northeast Region consisting of 10 states
- Managed the NERO, 19 correctional institutions and five community corrections offices which provided oversight to 42 residential re-entry centers
- Provided direct supervision of 19 wardens and 13 regional administrators and responsible for 6,200 staff, 36,000 inmates and an annual operating budget of $650 million
- Interacted closely on a daily basis with other law enforcement agencies and court officials
- Regularly responded to inquiries from the press, congressmen, senators, judges, and congressional staff members
- Oversaw the activation of USP Canaan, PA, to include making any changes to initial plans based on unique characteristics of the institutions mission
- Reviewed/changed and approved the initial construction plans for FCI Berlin, NH to accommodate the unique needs of an open compound facility situated in the extreme northeastern part of the country
- Sat on the Bureau of Prisons' Executive Staff

**United States Federal Bureau of Prisons** 12/01 – 12/03
*Warden / Correctional Institution Administrator* Lewisburg, PA
*United States Penitentiary*
- CEO of a high-security, adult, male federal prison
- Managed a budget of approximately $40 million, over 500 staff, and an inmate population of 2,000
- Oversaw the operations of the Federal Prison Industries employing approximately 350 inmates in a metal factory
- Provided executive direction and leadership to four associate wardens, a camp administrator, an intensive confinement center administrator, an executive assistant and an attorney
- Provided indirect leadership to twenty-two department heads and additional professional, technical, trade and craft workers
- Provided oversight to the "boot camp" and drug program operations
- Regularly responded to inquiries from the press, congressmen, senators, and congressional staff members

# Appendix A

- Routinely worked in cooperation with the Federal Bureau of Investigation, the United States Marshals Service, the Drug Enforcement Agency, as well as local and state law enforcement authorities
- Managed the inmate living quarters as well as the vocational, industrial, administrative, religious and food service programs

**United States Federal Bureau of Prisons**                                    06/99 – 12/01
*Warden / Correctional Institution Administrator*                              Butner, NC
*Federal Correctional Complex (FCC)*
- Maintained similar duties to those listed above
- CEO of a low-security, adult, male institution that was part of a three institution correctional complex, which included a mental health facility and prison hospital
- Responsible for 230 staff, 1000 inmates and $23 million budget
- Oversaw the operations of the Federal Prison Industries employing 210 inmates in a textile factory
- Provided oversight to two associate wardens, an executive assistant and an attorney

**Foundational Positions of Increasing Responsibility**                        1978-1999
- Correctional Officer
- Senior Officer Specialist
- Case Manager
- Lieutenant, GS-9 and Lieutenant, GS-11
- Discipline Hearing Officer
- Captain
- Regional Assistant Correctional Services Administrator
- Regional Correctional Services Administrator
- Associate Warden
- BOP Correctional Services Administrator

**PROFESSIONAL AWARDS**
- 1999 - U.S. Attorney General's Award for Excellence in Prison Management
- 2002 - Received Senior Executive Service designation from the U.S. Attorney General
- 2008 - Awarded the Meritorious Rank Award by the office of the President
- 2010 - Received the Bureau of Prisons' Distinguished Service Medal from the BOP Director

**PROFESSIONAL TRAINING**
- Introduction to Correctional Techniques, BOP
- National Institute of Corrections (NIC) – Jail Operations
- NIC - Jail Administration
- NIC - Contemporary Issues in Prison Management
- ASCA – New Wardens Training
- Inmate Monitoring, BOP
- Advanced Lieutenants Training, BOP
- Special Investigative Supervisor Training, BOP
- Advanced Correctional Techniques, BOP
- BOP National Leadership Forum
- New Captains Training, BOP
- IDC Certification, BOP

# Appendix A

- Department of Justice (DOJ) Ethics Training
- NIC - Management Strategies in Prison Disturbances
- NIC - Correctional Leadership Development Program
- Associate Wardens Training, BOP
- Strategic Planning, BOP/FBI
- New Associate Wardens Training, BOP
- Basic Prisoner Transportation, BOP
- ACA Conference training
- Crisis Management, DOJ
- New Wardens Training, BOP
- Wardens Conference, BOP
- NIC Leadership Issues in Prison Management
- Command and Control Training, FBI
- Dispute resolution, DOJ
- Aspen Institute Executive Seminar
- DOJ Critical Incident Response
- BOP Executive Staff Training
- Office of Personnel Management (OPM) Senior Executive Staff Training
- Correctional Supervision, BOP
- Executive Training with BOP Executive Staff, four times a year

# Appendix B

## Deposition and Trial Testimony of D. Scott Dodrill During the Past Five Years

1. <u>Jeremy Pinson vs. Pablo Prieto, Joshua Halstead, Richard Bourn, Joseph Norwood, Robert McFadden, and the FBOP.</u> Federal District of Northern California, San Francisco, CA. 2016.
   Provided expert opinion and deposition testimony.

2. <u>Cynthia Scott et al. vs Harold W. Clarke, et al.</u> State of Virginia, Charlottesville, VA. 2018.
   Provided expert opinion and testimony in deposition and trial.

# Appendix C
## Documents Considered by D. Scott Dodrill

| Document Title | Document Date |
|---|---|
| **Pleadings** | |
| *Nikki Bollinger Grae v. Corrections Corporation of America*, United States District Court, Middle District of Tennessee, Civil Action No. 3:16-cv-02267, Consolidated Complaint | March 13, 2017 |
| *Nikki Bollinger Grae v. Corrections Corporation of America*, United States District Court, Middle District of Tennessee, Civil Action No. 3:16-cv-02267, Memorandum of Law in Support Of Lead Plaintiff's Motion for Reconsideration of the January 18, 2019 Order Denying Class Certification, with Exhibits | February 1, 2019 |
| *Nikki Bollinger Grae v. Corrections Corporation of America*, United States District Court, Middle District of Tennessee, Civil Action No. 3:16-cv-02267, Memorandum | March 26, 2019 |
| **Depositions** | |
| Deposition of Eleanor Innes, with Exhibits | July 10, 2018 |
| Deposition of Steven Feinstein, with Exhibits | July 12, 2018 |
| Deposition of Lucy Allen, with Exhibits | October 10, 2018 |
| Deposition of Ashley Daugherty, with Exhibits | December 7, 2018 |
| Deposition of William Dubray, with Exhibits | December 12, 2018 |
| Deposition of Patrick Swindle, with Exhibits | January 9, 2019 |
| Deposition of Michael Nalley, with Exhibits | January 15, 2019 |
| Deposition of Keith Hall, with Exhibits | October 24, 2019 |
| Deposition of Tameka Smith, with Exhibits | October 29, 2019 |
| Deposition of Bart Verhulst, with Exhibits | November 5, 2019 |
| Deposition of Kim White, with Exhibits | November 15, 2019 |
| Deposition of John Baxter, with Exhibits | December 19, 2019 |
| Deposition of Natasha Metcalf, with Exhibits | December 19, 2019 |
| Deposition of Tony Grande, with Exhibits | January 15, 2020 |
| Deposition of Cameron Hopewell, with Exhibits | January 17, 2020 |
| Deposition of Emilee Beach, with Exhibits | February 11, 2020 |
| Deposition of Patrick Swindle, with Exhibits | February 21, 2020 |
| Deposition of William Dalius, with Exhibits | February 26, 2020 |
| Deposition of Damon Hininger, with Exhibits | March 3, 2020 |
| Deposition of Jeb Beasley, with Exhibits | March 10, 2020 |
| Deposition of Todd J. Mullenger, with Exhibits | March 13, 2020 |

| Document Title | Document Date |
|---|---|
| Deposition of Douglas Martz, with Exhibits | July 20, 2020 |
| Deposition of Paul Kelley, with Exhibits | July 21, 2020 |
| Deposition of Robert Bland, with Exhibits | July 23,2020 |
| Deposition of Harley Lappin, with Exhibits | July 28, 2020 |
| Deposition of John Ferguson | July 29, 2020 |
| Deposition of Damon Hininger | July 30, 2020 |
| Deposition of David Garfinkle, with Exhibits | July 31, 2020 |

**ACA Audits**

Adams County Correctional Center, Commission on Accreditation for Corrections Accreditation Reports, 2013 and 2016

Cibola County Correctional Center, Commission on Accreditation for Corrections Accreditation Reports, 2013 and 2016

Eden Detention Center, Commission on Accreditation for Corrections Accreditation Reports, 2012 and 2015

McRae Correctional Facility, Commission on Accreditation for Corrections Accreditation Reports, 2013 and 2016

Northeast Ohio Correctional Center, Commission on Accreditation for Corrections Accreditation Reports, 2013 and 2016

List of Accreditation and Other Audits, Advertisement and Sponsorship, Jan 2012 – March 2017, ACA 712–14

**ACA Reaccreditation Contracts**

| | |
|---|---|
| Adams County Correctional Center, ACA Reaccreditation Contract, ACA 013–16 | October 17, 2012 |
| Eden Detention Center, ACA Reaccreditation Contract, ACA 001–4 | January 3, 2011 |
| McRae Correctional Facility, ACA Reaccreditation Contract, ACA 009–12 | October 31, 2012 |
| Northeast Ohio Correctional Center, ACA Reaccreditation Contract, ACA 005–8 | October 31, 2012 |
| CCA of Tennessee, ACA Accreditation Contract, ACA 017–038, 2014–2017 | |

**ACA Annual Facility Reports**

Adams County Correctional Center, ACA Annual Report, ACA 073–8 and 118–20, 2015–2017

Cibola County Correctional Center, ACA Annual Report, ACA 211–216, 2015–2016

Eden Detention Center, ACA Annual Report, ACA 274–278 and 326–9, 2013 and 2016–2017

McRae Correctional Facility, ACA Annual Report, ACA 375–83, 2014–2016

| **Document Title** | **Document Date** |
|---|---|

Northeast Ohio Correctional Center, ACA Annual Report, ACA 432–433, 478–81, and 537–9; 2012, 2014–2015, and 2017

## CC Correspondence with ACA

| | |
|---|---|
| E-mail from Emilee Beach, CoreCivic, to Megan Noble, Subject: Adams County Correctional Center Annual ACA Certification, ACA 583–6 | July 24, 2017 |
| E-mail from Terri Driskill, CCA, to Megan Noble, FW: Adams County Correctional Center – ACA Audit Report, ACA 587–8 | June 17, 2016 |
| E-mail from Kayla Wactor, CCA, to Megan Noble, Subject: Adams ACI Healthcare Outcome Measures, ACA 589–98 | May 6, 2016 |
| E-mail from Emilee Beach, CCA, to Megan Noble, Subject: Adams County Correctional Center ACA Audit – Hotel Accommodations, ACA 599–600 | April 28, 2016 |
| E-mail from Emilee Beach, CCA, to Megan Noble, Subject: Notification, Inmate Death – ACCC, ACA 601–2 | March 16, 2016 |
| E-mail from Emilee Beach, CCA, to Megan Noble, Subject: ACCC Annual ACA Report, ACA 603–6 | January 25, 2016 |
| Letter from D. Berkebile, to Megan Noble, ACA 121 | March 16, 2016 |
| Letter from Joe Pryor, to Ryan Pursel, ACA 273 | March 19, 2015 |
| E-mail from Terri Driskill, CoreCivic, to Megan Noble, Subject: Cibola Correctional Center – ACA Notification, ACA 609–10 | November 1, 2016 |
| E-mail from Jan Fuson, CoreCivic, to Megan Noble, RE: Cibola County ACA Audit Report, ACA 611–4 | November 10, 2016 |
| E-mail from Terri Driskill, CCA, to Megan Noble, RE: Cibola VCRs, ACA 615–6 | September 8, 2016 |
| E-mail from Megan Noble, to Terri Driskill, Subject: Cibola County ACA Audit Report, ACA 617 | August 25, 2016 |
| E-mail from Robert Cook, CCA, to D Andraska, Subject: Cibola CCC Outcome Measures & SIS, ACA 618-628 | July 8, 2016 |
| E-mail from Jan Fuson, CCA, to Megan Noble, Re: **Updated Audit Team – Cibola County Correctional Center, ACA 629-630 | July 6, 2016 |
| E-mail from Jan Fuson, CCA, to Megan Noble, RE: Updating ACA Audit – Cibola County Correctional Center, ACA 631-2 | June 2, 2016 |
| E-mail from Robert Cook, CCA, to Megan Noble, Subject: Cibola County Correctional Center Annual Report, ACA633–6 | March 2, 2016 |
| Letter from Donald W. Murray, Jr., to Megan Noble, ACA 272 | November 18, 2016 |
| E-mail from Janet Fuessel, CoreCivic, to Megan Noble, Subject: ACA Annual Certification 2016/2017 – Eden Detention Center, ACA 637–639 | January 19, 2017 |
| E-mail from John Powell, CCA, to Megan Noble, Subject: Eden Detention Center – ACA Annual Certification Report, ACA 640–642 | February 2, 2016 |

| Document Title | Document Date |
| --- | --- |
| Letter from Donald W. Murray, Jr., to Megan Noble, ACA 330 | April 26, 2017 |
| E-mail from Darla Davis, CCA, to Megan Noble, Subject: CCA-McRae Correctional Facility Annual ACA Report, ACA 649–52 | April 1, 2016 |
| E-mail from Megan Noble, to Terri Driskill, RE: Final VCR – McRae Correctional Facility, ACA 653–55 | February 24, 2016 |
| E-mail from Nancy Dobbs, to Megan Noble, Re: VCR corrections for McRae Correctional Facility (CCA), Georgia, ACA 656–7 | February 24, 2016 |
| E-mail from Jan Fuson, to Megan Noble, Re: Upcoming Audit – McRae Correctional Facility, ACA 658-9 | December 17, 2015 |
| E-mail from Darla Davis, to Megan Noble, Subject: CoreCivic – McRae Correctional Facility – 2017 Annual ACA Report, ACA 645–8 | February 1, 2017 |
| Memorandum from Candace Rivera, to Terry Carter, Subject: Priority I Notice, ACA 575 | February 28, 2013 |
| E-mail from Lisa Antonucci, to Megan Noble, Subject: CoreCivic – Northeast Ohio Correctional Center's annual report, ACA 660–701 | July 13, 2017 |
| E-mail from Lisa Antonucci, to Megan Noble, Subject: ACA notice re: NEOCC inmate death, ACA 702–04 | September 30, 2016 |
| E-mail from Terri Driskill, to Megan Noble, Re: NEOCC – VCR Corrections, Outcome Measures and SIS, ACA 705–6 | July 12, 2016 |
| E-mail from Megan Noble, to Lisa Antonucci, Subject: ACA Audit Report – Northeast Ohio Correctional Center, ACA 707 | June 30, 2016 |
| E-mail from Megan Noble, to Terri Driskill, Subject: Upcoming Audit – Northeast Ohio Correctional Center, ACA 708 | May 9, 2016 |
| E-mail from Lisa Antonucci, to Megan Noble, Subject: Northeast Ohio Correctional Center – Annual Certification Report for 2015, ACA 709–711 | November 24, 2015 |
| Memorandum from Lisa Antonucci, to Megan Noble, Re: Priority Incident, ACA 566 | September 29, 2016 |
| E-mail from Terri Driskill, to Megan Noble, Re: January 2015 Accreditation Reports, ACA 643–4 | September 3, 2015 |
| E-mail from Terri Driskill, to Megan Noble, Subject: Corrected – CCA ACA 2016 Tracker, ACA 607–8 | October 1, 2015 |

**Inmate Letters and CC Responses**

| | |
| --- | --- |
| Inmate Jorge Robles V. Letter from Adams County Correctional Facility, ACA 153 | April 24, 2016 |
| Inmate Jorge A. Mesquioa Letter from Adams County Correctional Facility, ACA 154–163 | November 15, 2016 |
| Inmate Neale Misquitta Letter from Adams County Correctional Facility, ACA 122–152 | December 8, 2016 |
| Inmate Donald Duncan Letter from Eden Detention Center, ACA 279 | August 20, 2014 |

| Document Title | Document Date |
| --- | --- |
| Inmate Alvarez Magana Sergio Letter from McRae Correctional Facility, ACA 430–1 | April 28, 2013 |
| Inmate Letter from Northeast Ohio Correctional Center, ACA 540–2 | |
| Inmate Letter from Northeast Ohio Correctional Center, ACA 543 | |
| Inmate Bart Alexander Letter from Northeast Ohio Correctional Center, ACA 544 | April 24, 2013 |
| Inmate Douglas Coats Letter from Northeast Ohio Correctional Center, ACA 545–7 | February 5, 2013 |
| Inmate Letter from Northeast Ohio Correctional Center, ACA 548 | April 20, 2013 |
| Inmate Ryan Gustafson Letter from Northeast Ohio Correctional Center, ACA 549–51 | May 20, 2016 |
| Inmate Ryan Gustafson Letter from Northeast Ohio Correctional Center, ACA 552 | |
| Inmate Ryan Gustafson Letter from Northeast Ohio Correctional Center, ACA 553–65 | |
| Ann M. Palermo & Patricia Landers Letter on behalf of Inmate Robert Palermo from Northeast Ohio Correctional Center, ACA 568–9 | February 25, 2014 |
| Inmate Letter from Northeast Ohio Correctional Center, ACA 576–9 | May 30, 2013 |
| Inmate Victor Merced Letter from Northeast Ohio Correctional Center, ACA 581–2 | |

**Panel Action Reports**

| | |
| --- | --- |
| Adams County Correctional Center Panel Action Report, ACA 117 | August 7, 2016 |
| Adams County Correctional Center Panel Action Report, ACA 072 | February 2, 2014 |
| Cibola County Correctional Center Panel Action Report, ACA 217–8 | February 2, 2014 |
| Eden Detention Center Panel Action Report, ACA 324–5 | February 8, 2015 |
| McRae Correctional Facility Panel Action Report, ACA 428–9 | August 7, 2016 |
| McRae Correctional Facility Panel Action Report, ACA 373–4 | August 11, 2013 |
| Northeast Ohio Correctional Center Panel Action Report, ACA 535–6 | August 7, 2016 |
| Northeast Ohio Correctional Center Panel Action Report, ACA 476–7 | August 11, 2013 |

**After-Action Documents**

| | |
| --- | --- |
| Adams County Correctional Center After-Action Report for May 20–21, 2012, US 13256–80 | July 27, 2012 |
| Adams County Correctional Center Exhibit A – Affidavit of Casey Markovitz | August 8, 2012 |
| Affidavit of Deborah Temple | July 18, 2014 |
| Attachment to E-mail from Ryan Wynee to Zachary Currier | |

| Document Title | Document Date |
|---|---|
| Adams County Correctional Center Memorandum From: Vance Laughlin, To: Paul Kelly, Subject: May 20, 2012 After Action Review Recommendations | October 19, 2012 |
| Adams County Correctional Center Memorandum From: Paul Kelly, To: Vance Laughlin, RE: May 20, 2012 After Action Recommendations | September 21, 2012 |

**Award Fee Determinations**

Adams County Correctional Center Award Fee Determination 2012–2016

Cibola County Correctional Center Award Fee Determination 2012–2016

Eden Detention Center Award Fee Determination 2012–2015

McRae Correctional Facility Award Fee Determination 2011–2013

Northeast Ohio Correctional Center Award Fee Determination 2014–2015

**Contractor Performance Assessment Reports**

Adams County Correctional Center, Contractor Performance Assessment Report (CPAR), Federal Bureau of Prisons, 2010–2016

Cibola County Correctional Center, Contractor Performance Assessment Report (CPAR), Federal Bureau of Prisons, 2010–2015

Eden Detention Center, Contractor Performance Assessment Report (CPAR), Federal Bureau of Prisons, 2011–2016

McRae Correctional Facility, Contractor Performance Assessment Report (CPAR), Federal Bureau of Prisons, 2010–2016

Northeast Ohio Correctional Center, Contractor Performance Assessment Report (CPAR), Federal Bureau of Prisons, 2010–2014

**Facility Budgets**

Adams County Correctional Center, Facility Budget 2011–2016

Cibola County Correctional Center, Facility Budget 2011–2016

Eden Detention Center, Facility Budget 2011–2016

McRae Correctional Facility, Facility Budget 2011–2016

Northeast Ohio Correctional Center, Facility Budget 2011–2016

**Joint Commission Accreditation Quality Reports**

Adams County Correctional Center, "Accreditation Quality Report," The Joint Commission, 2011–2017

Cibola County Correctional Center, "Accreditation Quality Report," The Joint Commission, 2012–2015

McRae Correctional Facility, "Accreditation Quality Report," The Joint Commission, 2013–2018

Northeast Ohio Correctional Center, "Accreditation Quality Report," The Joint Commission, 2013–2016

**Letters of Inquiry**

Adams County Correctional Center, Letters of Inquiry and Responses, 2014–2017

Cibola County Correctional Center, Letters of Inquiry and Responses, 2015

Eden Detention Center, Letters of Inquiry and Responses, 2013–2016

McRae Correctional Facility, Letters of Inquiry and Responses, 2012–2016

Northeast Ohio Correctional Center, Letters of Inquiry and Responses, 2012–2013

**Notices of Concern**

Adams County Correctional Center, Notices of Concern and Responses, 2012–2016

Cibola County Correctional Center, Notices of Concern and Responses, 2012–2016

Eden Detention Center, Notices of Concern and Responses, 2012–2016

McRae Correctional Facility, Notices of Concern and Responses, 2012–2016

Northeast Ohio Correctional Center, Notices of Concern and Responses, 2012–2013

**Contract Facility Monitoring Reports**

Adams County Correctional Center, Contract Facility Monitoring Reports, including Preliminary Report, Plan of Action Reports, and Corrective Action Worksheets, 2012–2016

Cibola County Correctional Center, Contract Facility Monitoring Report and Responses, including Ad-Hoc Review Preliminary Status Update, 2012–2016

Eden Detention Center, Contract Facility Monitoring Report and Responses, 2012–2016

McRae Correctional Facility, Contract Facility Monitoring Report and Responses, including Plan of Action Reports and Corrective Action Worksheets, 2012–2016

Northeast Ohio Correctional Center, Contract Facility Monitoring Report and Responses, including Plan of Action Reports and Corrective Action Worksheets, 2012–2014

**Cure Notices**

Memorandum from Jerry Bishop, Contracting Officer, to Corrections Corporation of America Attn: Natasha K. Metcalf, Vice President, Re: DJB1PC011, Cibola County Correctional Center 2015 Cure Notice, January 9, 2014

**Facility Contracts**

Adams County Correctional Center Facility Contract DJB1PC010, CAR 8, including Modification Contracts 1–85

Cibola County Correctional Center Facility Contract DJB1PC011, CAR 10, including Modification Contracts 1–78 and Attachments 1–8

Eden Detention Center Contract DJB1PC005, including Modification Contracts 1–90

McRae Correctional Facility Contract J1PC-008, including Modification Contracts 1–110

McRae Correctional Facility Contract DJB1PC016, CAR 12, including Modification Contracts 1–40

Northeast Ohio Correctional Center Facility Contract DJB1PC022, including Modification Contracts 1–103

**PREA Documents**

PREA Annual Reports, CoreCivic, 2013–2017

PREA Audit: Auditor's Summary Reports for all CoreCivic and Low Security BOP-Operated Facilities, 2013–2017

**Facility Performance Evaluation Meeting Minutes**

Adams County Correctional Center, Monthly Performance Meeting Minutes, October 2011–March 2017

Cibola County Correctional Center, Monthly Performance Meeting Minutes, September 2011–June 2016

Eden Detention Center, Monthly Performance Meeting Minutes, March 2014–July 2016

McRae Correctional Facility, Monthly Performance Meeting Minutes, November 2011–February 2017

Northeast Ohio Correctional Center, Monthly Performance Meeting Minutes, August 2011–March 2015

**CCA Quality Assurance Presentations**

Quality Assurance Update: 2014–2016 Data Books

Quality Assurance Division: Q4 2012 – Operations Update

Managing Directors Meeting: Quality Assurance – 2013 YTD                     December 3, 2013

Quality Assurance Update – Operations                                                       August 6, 2014

CCA General Counsel Organization Chart                                                    July 12, 2016

Quality Assurance Update Presentations, 2013–2016

Quality Assurance Quarterly Update Presentations, Q2 2011–Q4 2012

**Public Materials**

"12 inmates were killed by other inmates in South Carolina prisons in 2017," *The Greenville News*, available at https://www.greenvilleonline.com/story/news/2018/04/16/south-carolina-prison-violence/520519002/, last accessed February 3, 2020                     April 16, 2018

| Document Title | Document Date |
| --- | --- |
| "16 inmates charged with murder in Delaware prison riot,", *6abc Action News*, available at https://6abc.com/2543196/, last accessed February 3, 2020 | October 17, 2017 |
| "25 years later, Atlanta prison riots live on in captive's memory," *Atlanta Journal-Constitution*, available at https://www.ajc.com/news/state--regional/years-later-atlanta-prison-riots-live-captive-memory/QdNBVQN3jba6o2Mim86pBO/, last accessed July 22, 2020 | November 23, 2012 |
| "About – Executive Leadership," available at http://www.corecivic.com/about/executive-leadership, last accessed February 3, 2020 | |
| "About – Vice Presidents," available at http://www.corecivic.com/about/vice-presidents, last accessed February 3, 2020 | |
| "About CCA: Who We Are," available at http://www.correctionscorp.com/who-we-are, last accessed June 17, 2019 | |
| "Are You Ready for Your Next PREA Audit?" *Lexipol*, available at https://www.lexipol.com/resources/blog/are-you-ready-for-your-next-prea-audit/ | November 19, 2018 |
| "Board Member – Todd Mullenger," available at http://ir.corecivic.com/management/todd-mullenger, last accessed February 3, 2020 | |
| "CCA Announces Hiring of Harley G. Lappin as Chief Corrections Officer," *CoreCivic* | June 1, 2011 |
| "Delaware Inmates Sentenced in Guard's Killing During Riot,", *U.S. News*, available at https://www.usnews.com/news/us/articles/2019-09-13/sentencings-set-for-delaware-inmates-in-fatal-prison-riot, last accessed February 3, 2020 | September 13, 2019 |
| "Feds Order Lockdown After Series of Prison Riots," *CNN*, available at www.cnn.com/US/9510/prison_riots/index.html, last accessed July 22, 2020 | October 21, 1995 |
| "Gang Fights in Prison Injure 22 and Kill One," *The New York Times*, available at https://www.nytimes.com/2008/03/29/us/29prison.html, last accessed July 22, 2020 | March 29, 2008 |
| "Guards Waited Hours to Stop a Prison Riot That Left 7 Inmates Dead," *The New York Times*, available at https://nyti.ms/2qAq3kJ | April 16, 2018 |
| "Oakdale Federal Prison Riot 32 Years Ago Thursday," *7KPLC News*, https://www.kplctv.com/2019/11/21/oakdale-federal-prison-riot-years-ago-thursday/, available at July 22, 2020 | November 20, 2019 |
| "Security Threat Group FAQs," Public Resources, Arizona Department of Corrections Rehabilitation & Reentry, available at https://corrections.az.gov/public-resources/inspector-general/security-threat-group-unit/security-threat-group-faqs | |
| "Start-up procedure for the education programs of Youth and Adults in Correctional Centers located in the United States of America," available at https://www.conevyt.org.mx/colaboracion/servicios/metodologia_para_centros_Correccionales_ingles.pdf | February 2012 |
| "The True Story of a Texas Prison Riot," *The Nation*, available at https://www.thenation.com/article/archive/the-true-story-of-a-texas-prison-riot/ | June 23, 2015 |

American Correctional Association, "History and Standards of Accreditation," available at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Abou t_Us/ACA_Member/Standards_and_Accreditation/SAC_AboutUs.aspx?%E2%80%A6

American Correctional Association, "Frequently Asked Questions," available at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Abou t_Us/FAQs/ACA_Member/Standards_and_Accreditation/Standards__FAQ.aspx?hkey =b1dbaa4b-91ef-4922-8e7d-281f012963ce

American Correctional Association, "Standards," available at http://www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Stan dards/ACA_Member/Standards_and_Accreditation/StandardsInfo_Home.aspx?hkey=7 c1b31e5-95cf-4bde-b400-8b5bb32a2bad

Bureau of Justice Statistics, "Prisoners in 2016"                                              August 7, 2018

Bureau of Justice Statistics, "State and Federal Prisoners and Prison Facilities," available at https://www.bjs.gov/index.cfm?ty=tp&tid=13#terms_def, last accessed June 12, 2019

Federal Acquisition Regulation 42.1503, available at https://www.acquisition.gov/sites/default/files/current/far/pdf/FAR.pdf, last accessed June 10, 2019

Federal Bureau of Prisons, "About Our Facilities," available at https://www.bop.gov/about/facilities/, last accessed June 12, 2019

Federal Bureau of Prisons, "Inmate Statistics, Prison Security Levels," available at https://www.bop.gov/about/statistics/statistics_inmate_sec_levels.jsp, last accessed June 10, 2019

Federal Bureau of Prisons, "Inmate Statistics, Sentences Imposed," available at https://www.bop.gov/about/statistics/statistics_inmate_sentences.jsp, last accessed February 4, 2020

Federal Bureau of Prisons, "Our Locations," available at https://www.bop.gov/locations/list.jsp, last accessed June 17, 2019

Federal Bureau of Prisons, "Twenty-fifth Anniversary of Talladega Riot," available at https://www.bop.gov/resources/news/20160831_tdg_riot_anniv.jsp, last accessed July 22, 2020

Joint Commission, "Ambulatory Care Accreditation Fact Sheet," available at https://www.jointcommission.org/-/media/tjc/documents/fact-sheets/ambulatory-care-6-1-2020.pdf?db=web&hash=E0D782135CB16C555A40D317C110BB49

Joint Commission, "Joint Commission standards Fact Sheet," available at https://www.jointcommission.org/-/media/tjc/documents/fact-sheets/joint-commission-standards-fact-sheet-08-13-18.pdf

Joint Commission, Joint Commission FAQs, https://www.jointcommission.org/en/about-us/facts-about-the-joint-commission/joint-commission-faqs/

Case 3:16-cv-02267      Document 360-24      Filed 11/20/20      Page 32 of 35 PageID #: 14180

| Document Title | Document Date |
| --- | --- |

Joint Commission, "On-site survey process Fact Sheet," available at
https://www.jointcommission.org/-/media/tjc/documents/fact-sheets/onsite-survey-
process-fact-sheet-9-11-
19.pdf?db=web&hash=FF5FBEF09CCBE85D0BFB1282CBDE4B9F

National PREA Resource Center, "Prison Rape Elimination Act," available at
https://www.prearesourcecenter.org/about/prison-rape-elimination-act-prea, last
accessed May 26, 2020

**Government Documents**

| | |
| --- | --- |
| American Correctional Association Agency Manual of Accreditation Policy and Procedure | March 2012 |
| AmeriHealth Administrators, "The Challenges of Correctional Health Care: Balancing Cost with Quality of Care" | July 2015 |
| Federal Prison System FY2017 Performance Budget Congressional Submission, Salaries and Expenses | |
| Nathan James, "The Federal Prison Population Buildup: Overview, Policy Changes, Issues, and Options," Congressional Research Service | January 22, 2013 |
| Office of the Inspector General, Audit Division 15-15, "Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas to Operate the Reeves County Detention Center I/II Pecos, Texas" | April 2015 |
| Office of the Inspector General, Audit Division 17-08, "Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi" | December 2016 |
| Office of the Inspector General, Evaluation and Inspections Division 16-06, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" | August 2016 |
| Office of the Inspector General, "Top Management and Performance Challenges Facing the Department of Justice – 2018" | October 15, 2018 |
| Office of the Inspector General, "Top Management and Performance Challenges Facing the Department of Justice – 2019" | October 18, 2019 |
| Office of the Inspector General, Evaluation and Inspections Division 16-02, "Review of the Federal Bureau of Prisons Medical Staffing Challenges" | March 2016 |
| Scott D. Camp, Ph.D. and Gerald G. Gales, Ph.D., "Private Prisons in the United States, 1999: An Assessment of Growth, Performance, Custody Standards, and Training Requirements," Federal Bureau of Prisons | March 2000 |
| The Pew Charitable Trusts, "Managing Prison Health Care Spending" | October 2013 |
| U.S. Department of Justice, "Oversight of the Bureau of Prisons: First-hand Accounts of Challenges Facing the Federal Prison System," Statement of Charles E. Samuels, Jr., Director of Federal Bureau of Prisons, for a Hearing Before the Committee on Homeland Security and Governmental Affairs, United States Senate | August 4, 2015 |
| U.S. Department of Justice, Program Statement 1210.23, "Management Control and Program Review Manual," Federal Bureau of Prisons | August 21, 2002 |

| Document Title | Document Date |
|---|---|
| U.S. Department of Justice, Program Statement 7740.02, "Oversight of Private Secure Correctional Facilities," Federal Bureau of Prisons | November 21, 2014 |
| United States Government Accountability Office, GAO-08-634, "Prison Construction: Clear Communication on the Accuracy of Cost Estimates and Project Changes is Needed" | May 29, 2008 |
| United States Government Accountability Office, GAO-12-743, "Growing Inmate Crowding Negatively Affects Inmates, Staff, and Infrastructure" | September 12, 2012 |
| United States Government Accountability Office, GAO-14-821, "Information on Efforts and Potential Options to Save Costs" | September 30, 2014 |
| United States Government Accountability Office, GAO-17-379, "Better Planning and Evaluation Needed to Understand and Control Rising Inmate Health Care Costs" | June 2017 |

**SEC Filings**

| | |
|---|---|
| CoreCivic, Inc., SEC Form 10-K for the Fiscal Year Ended December 31, 2016 | February 23, 2017 |
| CoreCivic, Inc., SEC Form 10-K for the Fiscal Year Ended December 31, 2017 | February 22, 2018 |
| CoreCivic, Inc., SEC Form 10-K for the Fiscal Year Ended December 31, 2018 | February 25, 2019 |
| Corrections Corporation of America, SEC Form 10-K for the Fiscal Year Ended December 31, 2011 | February 24, 2012 |
| Corrections Corporation of America, SEC Form 10-K for the Fiscal Year Ended December 31, 2012 | February 27, 2013 |
| Corrections Corporation of America, SEC Form 10-K for the Fiscal Year Ended December 31, 2013 | February 27, 2014 |
| Corrections Corporation of America, SEC Form 10-K for the Fiscal Year Ended December 31, 2014 | February 25, 2015 |
| Corrections Corporation of America, SEC Form 10-K for the Fiscal Year Ended December 31, 2015 | February 25, 2016 |
| Corrections Corporation of America, SEC Schedule 14A | April 3, 2020 |
| Corrections Corporation of America, SEC Form 8-K | April 14, 2014 |
| Corrections Corporation of America, SEC Form 8-K | March 16, 2007 |

**Academic Literature**

| | |
|---|---|
| A. Clinton White and Robert L. Atmar, "Infections in Hispanic Immigrants," *Clinical Infectious Diseases*, 34(12):1627–1632 | June 15, 2002 |
| Gerald G. Gaes, et al., "The Influence of Prison Gang Affiliation on Violence and Other Prison Misconduct," *The Prison Journal*, 82(3):359–385 | March 9, 2001 |
| Laura M. Maruschak, "Medical Problems of State and Federal Prisoners and Jail Inmates, 2011-12," *Bureau of Justice Statistics* | October 4, 2016 |

**Miscellaneous**

| Document Title | Document Date |
|---|---|
| Bureau of Justice Statistics, "Estimated number of persons supervised by U.S. adult correctional systems, by correctional status, 1980–2016, BJS_Total_correctional_population_counts_by_status.xlsx | April 26, 2018 |
| CoreCivic Policy No. 1-22, Audits, Inspections, and Corrective Action, for CoreCivic BOP-Contracted Facilities | April 28, 2017 |
| Memorandum from Sally Q. Yates, Deputy Attorney General, to the Acting Director of Federal Bureau of Prisons, "Reducing Our Use of Private Prisons," Office of the Deputy Attorney General | August 18, 2016 |
| Memorandum from Zachary Currier, to Michael Pugh, Warden, Re: Inmate Request Letter from Victor Mercado | May 22, 2013 |
| Memorandum from Zachary Currier, to Michael Pugh, Warden, Re: Inmate Request Letter from Amado Pupo | May 22, 2013 |
| Northeast Ohio Correctional Center Memorandum from D-Unit Team to All D-Unit Inmates, Re: Beds (Camas), ACA 567 | January 9, 2013 |
| "Violations of Human Rights Obligations under the International Covenant on Civil and Political Rights through the use of prolonged solitary confinement in United States prisons, jails, and detention centers," Center for Constitutional Rights, ACA 570–4 | |

**Note: In addition to the documents on this list, I considered all documents cited in my report.**