# EXHIBIT 44

```
1            UNITED STATES DISTRICT COURT
          MIDDLE DISTRICT OF TENNESSEE
2
   NIKKI BOLLINGER GRAE,        *
3    Individually and on Behalf *
   of All Others Similarly      *
4    Situated,                  *
           Plaintiffs,          *
5                               *  Civil Action
   VS.                          *  No. 3:16-cv-02267
6                               *
   CORRECTIONS CORPORATION OF   *
7    AMERICA, ET AL.,           *
           Defendants.          *
8
9  *****************************************************
10                     CONFIDENTIAL
11          ORAL AND VIDEOTAPED DEPOSITION OF
                        KEITH HALL
12                   OCTOBER 24, 2019
13 *****************************************************
14     VIDEOTAPED DEPOSITION of KEITH HALL, produced as
15   a witness at the instance of the Plaintiffs, and
16   duly sworn, was taken in the above-styled and
17   numbered cause on the 24th day of October, 2019,
18   from 9:35 a.m. to 3:23 p.m., before Christy R.
19   Sievert, CSR, RPR, in and for the State of Texas,
20   reported by machine shorthand, at the offices of
21   Jones Day, 2727 North Harwood Street, Suite 500,
22   Dallas, Texas 75201, pursuant to the Federal Rules
23   of Civil Procedure and the provisions stated on the
24   record or attached hereto.
25   Job No. 10061565
```

```
 1          A P P E A R A N C E S
 2
 3     FOR THE PLAINTIFF:
 4        MR. CHRIS WOOD
        Robbins, Geller, Rudman & Dowd, LLP
 5        414 Union Street, Suite 900
        Nashville, Tennessee  37219
 6        Phone:    615-244-2203
        E-mail:   cwood@rgrdlaw.com
 7
        MR. KENNETH J. BLACK
 8        Robins, Geller, Rudman & Dowd, LLP
        Post-Montgomery Center
 9        One Montgomery Street, Suite 1800
        San Francisco, California  94104
10        Phone:    415-288-4545
        E-mail:   kennyb@rgrdlaw.com
11
12     FOR THE DEFENDANTS:
13        MR. TREY MCGEE
        Riley, Warnock & Jacobson, PLC
14        1906 West End Avenue
        Nashville, Tennessee  37203
15        Phone:    615-320-3700
        E-mail:   tmcgee@rwjplc.com
16
        MR. MORGAN E. WHITWORTH
17        Latham & Watkins, LLP
        505 Montgomery Street, Suite 2000
18        San Francisco, California  94111
        Phone:    415-391-0600
19        E-mail:   morgan.whitworth@lw.com
20
     ALSO PRESENT:
21
        MIRANDA GLOVER, Videographer
22
23
24
25
```

```
 1              P R O C E E D I N G S
 2              THE VIDEOGRAPHER:  Today is
 3    October 24th, 2019.  The time is 9:35 a.m.  We are
 4    located at Jones Day, 2727 North Harwood Street,
 5    Dallas, Texas 75201.
 6         This is the videotaped deposition of Keith
 7    Hall.  The videographer is Miranda Glover, and the
 8    certified shorthand reporter is Christy Sievert,
 9    both representing Aptus Court Reporting.
10         Will counsel please state their appearance
11    for the record.
12              MR. WOOD:  Christopher Wood, Robbins,
13    Geller, Rudman & Dowd, on behalf of the plaintiffs.
14              MR. BLACK:  Kenneth Black, Robbins,
15    Geller, Rudman & Dowd, on behalf of the plaintiffs.
16              MR. MCGEE:  Trey McGee, Riley Warnock
17    & Jacobson, on behalf of the witness and defendants.
18              MR. WHITWORTH:  Morgan Whitworth with
19    Latham & Watkins, on behalf of defendants and the
20    witness.
21              KEITH HALL
22          having been first duly sworn,
23             testified as follows:
24              EXAMINATION
25    BY MR. WOOD:
```

1   Q.  Good morning, Mr. Hall.
2   A.  Good morning.
3   Q.  My name is Mr. Christopher Wood.
4       Can you state your name and address for
5   the record, please?
6   A.  Keith, K-e-i-t-h, middle initial E., Hall,
7   ████████████████████████████████████.
8   Q.  And have you ever had your deposition taken
9   before?
10  A.  Yes.
11  Q.  How many times, approximately, have you had
12  your deposition taken?
13  A.  Just a couple of times, that I can
14  remember.
15  Q.  Were any of them related to CoreCivic or
16  CCA?
17  A.  No.
18  Q.  What were they related to, in general?
19  A.  It was when I was with the federal prison
20  system.  In my capacity as assistant director over
21  human resources, I was deposed about a
22  portal-to-portal case that had been ongoing for a
23  number of years.
24      And then there was a discrimination case
25  that was brought about a warden selection that --

1 question.

2    A. Well, that's a yes-and-no type of answer in
3 a way, because you can burn people out, but you also
4 have people that want to work the overtime to make
5 the extra money so that they can buy extra things in
6 the community and do other things. So you'll have
7 some that it -- it may affect. Others would do --
8 would work every hour of the day if they could.
9 BY MR. WOOD:
10    Q. Did -- would CCA require folks to work
11 overtime -- I don't know anything, honestly, about
12 labor law, but would they require people to work
13 overtime even if they didn't want to? Like, if
14 someone's shift's over, and someone else hasn't
15 showed up, can you say, "No, you have to stay
16 because we need you in the facility"?
17    A. Well, there were systems set up that we
18 could require mandatory overtime. Usually we had --
19 and I can't remember if Adams had a sign-up sheet.
20 But generally, you would ask people if they wanted
21 to stay over. If you didn't have somebody, then you
22 might have to order them to stay. Because you had
23 to fill certain positions.
24    Q. Right. And so did -- did you find that in
25 the BOP facilities that you were responsible for,

1   that you'd have to order people to stay because not
2   enough folks would voluntarily sign up for the
3   overtime?
4       A.  I believe there were facilities, yeah, that
5   we had to do that.
6       Q.  And do you know whether or not that
7   impacted the -- you know, the -- the running of the
8   facility if folks were being forced to stay longer
9   than they liked?
10          MR. MCGEE:  Object to the form of the
11  question.
12      A.  Well, in a -- in a facility, you have a
13  number of audits that take place:  From the CFM that
14  the Bureau does, the -- the internal audit that you
15  do, the accreditations from JCO, or Joint
16  Commission, to ACA.  And they're always talking to
17  staff.  All of those audits have interviews with
18  staff, interviews with inmates, that help the
19  administration understand if things need to be
20  looked at.
21          And staff would -- staff were pretty good
22  about, in every facility I've ever been in, not
23  being afraid to say, you know, "I'm too tired to
24  work today," or, "Something's happened."  And
25  generally, people will try to figure out ways that

1　they don't stay or operationally can function at a

2　level that we feel is necessary for the place to

3　run.

4　　　　So I think there's a lot of ways that

5　people check to see whether or not -- how bad of an

6　effect it has.  But I think, as I said, some people

7　love it, some don't.  Some people will stay forever,

8　they would volunteer for every overtime that you

9　could give them.  Other people, if they had to stay

10　an hour, they don't like it.  So. . .

11　BY MR. WOOD:

12　　　Q.　Did you -- did you read some of the reports

13　you're talking about with talking to staff and -- I

14　guess we'll look at one.  But did -- did you ever

15　read that staff were afraid of bringing up issues

16　because they felt like they might get retaliated

17　against if they were critical of operations?

18　　　A.　There may have been some that I picked up.

19　I don't remember the specific ones.  Part of the

20　ethics that Ms. Daugherty was involved in was to

21　give another way of looking at getting a staff

22　member an ability to -- to talk confidentially.  I

23　mean, I think there were several things with CCA.

24　　　　Not only that, but just they could call a

25　managing director if they felt like the warden

1   wasn't doing something.  And I've had people call me
2   directly to say something's not being done, and you
3   have to figure out what -- what was going on at that
4   time.  So I think there were a variety of ways that
5   people were able to check into how the facility, how
6   staff were being worked.
7        The other thing I guess I was trying to
8   think here, it talked about the pay issue.  In -- in
9   the contract with the Bureau of Prisons, they
10  determined what your pay would be.  So I'm -- I
11  guess I'm -- I mean, it may be good that the -- at
12  someplace else, they may pay $26, but if the
13  contract says you pay $14, you pay $14.  If you
14  don't, then you would have to -- if a -- if a
15  location -- the only change to that would be if the
16  staff voted to unionize and they wanted to negotiate
17  the standard of pay.  But the unions make the
18  determination of what the pay is at that time, so --
19  in negotiating with the company.  So you could come
20  out worse or you could come out -- you might come
21  out better, but you might come out worse, also.
22  So. . .
23       Q.  Well, that -- so I don't know that that's
24  correct.  The contracts, there's a -- there's a --
25  there's a scale that the federal government gives

```
                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE,              *
Individually and on Behalf         *
of All Others Similarly            *
Situated,                          *
          Plaintiffs,              *
                                   *   Civil Action
VS.                                *   No. 3:16-cv-02267
                                   *
CORRECTIONS CORPORATION OF         *
AMERICA, ET AL.,                   *
          Defendants.              *

                    REPORTER'S CERTIFICATION
                    DEPOSITION OF KEITH HALL
                       OCTOBER 24, 2019
```

        I, CHRISTY R. SIEVERT, CSR, RPR, in and for the State of Texas, hereby certify to the following:

        That the witness, KEITH HALL, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

        I further certify that the signature of the deponent was requested by the deponent or a party and is to be returned within 30 days from date of receipt of the transcript. If returned, the attached Changes and Signature Page contains any changes and the reasons therefor;

        I further certify that I am neither counsel for, related to, nor employed by any of the

1  parties or attorneys in the action in which this
2  proceeding was taken, and further that I am not
3  financially or otherwise interested in the outcome
4  of the action.
5           Subscribed and sworn to on this the 11th
6  day of November, 2019.
7
8
9           _____
10          CHRISTY R. SIEVERT, CSR, RPR
            Texas CSR 8172
11          Expiration Date:  4-30-2021
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 169
www.aptusCR.com
Case 3:16-cv-02267   Document 361-9   Filed 11/20/20   Page 11 of 11 PageID #: 14290