# EXHIBIT 47

EXHIBIT 583
Witness: Murray
Date: 10-23-2020
Stenographer: Victoria L. Valine, CSR No. 3036



# Office of the Inspector General
## U.S. Department of Justice



# Audit of the United States Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc., to Operate the Leavenworth Detention Center Leavenworth, Kansas

Audit Division 17-22        April 2017

# AUDIT OF THE UNITED STATES MARSHALS SERVICE CONTRACT NO. DJJODT7C0002 WITH CORECIVIC, INC., TO OPERATE THE LEAVENWORTH DETENTION CENTER LEAVENWORTH, KANSAS

## EXECUTIVE SUMMARY

In January 2007, the Office of the Federal Detention Trustee (OFDT) awarded, on behalf of the U.S. Marshals Service (USMS), contract no. DJJODT7C0002 to Corrections Corporation of America, now known as CoreCivic, Inc. (CoreCivic), to provide comprehensive detention services at the Leavenworth Detention Center (LDC) in Leavenworth, Kansas.[1]  This contract is a sole-source acquisition that includes a 5-year base period with three 5-year option periods and has a total estimated value of $697 million.  Actual contract costs through January 2017 were $252 million.

The Department of Justice Office of the Inspector General (OIG) conducted this audit to assess USMS's and CoreCivic's administration of, and compliance with, contract terms and conditions in the areas of:  (1) contract management, oversight, and monitoring; (2) staffing requirements; and (3) billings and payments.  The audit time frame focused on, but was not limited to, October 2010 through May 2015.

As an initial matter, we determined that the OFDT's justification for issuing a sole source contract did not include all of the language and supporting documentation required by the Federal Acquisition Regulation (FAR).[2]  Additionally, the USMS was unable to provide evidence, as required by the FAR, that the OFDT obtained competition to the maximum extent practicable and ensured the best overall value to the government.  Specifically, the OFDT restricted contract performance to the city of Leavenworth, thus potentially limiting the pool of offerors, but it could not provide the required evidence that it had a sufficient justification for this restriction.

We also concluded that the USMS failed to provide sufficient oversight of the LDC and that this failure resulted in several significant issues with LDC operations going unaddressed for extended periods of time.  In our judgment, the USMS was inherently reactive:  instead of actively monitoring LDC operations to identify

---

[1]  CoreCivic was previously named Corrections Corporation of America, or CCA.  CoreCivic announced its renaming decision in October 2016.

[2]  Prior to its merger with the USMS in October 2012, the OFDT was a separate Department of Justice component responsible for, among other things, acquiring housing for federal detainees in USMS custody.  Therefore, the OFDT solicited and awarded the LDC contract on behalf of the USMS.  Due to the merger, OIG recommendations pertaining to past OFDT processes are directed to the USMS.

Case 3:16-cv-02267    Document 361-12    Filed 11/20/20    Page 3 of 40 PageID #: 14348

discrepancies and thwart potential incidents, the USMS often became aware of incidents after they occurred. Of particular concern, the USMS Contracting Officer's Representative (COR), who was responsible for monitoring CoreCivic's performance at the LDC on a day-to-day basis, was located offsite, had no previous contract oversight experience, and received no formal guidance and negligible detention-related training. The COR maintained an infrequent onsite presence at the LDC, did not document the inspection activities performed, and did not develop an inspection program or monitoring procedures. Furthermore, in our judgment, the USMS's lack of effective continuous monitoring at the LDC presents risks that may extend throughout all its other contract detention facilities. Upon learning of these potentially systemic weaknesses in the USMS's contract oversight, the OIG issued a Management Advisory Memorandum to the USMS so it could take immediate action to address them. In response, USMS officials stated that their goal was to improve contract monitoring by establishing an onsite detention contract monitoring program at all private detention facilities. This program would be staffed by full-time professional Contract Administrators under the supervision of the USMS's Prisoner Operations Division. The OIG Memorandum and the USMS's responses to it are detailed in the body of this report and attached as appendices.

Insufficient oversight by the USMS allowed several problems at the LDC to persist over a significant period of time. Among the issues affecting the safety and security of the LDC that we identified was its periodic understaffing. We found that from October 2012 through September 2014, the LDC's staffing was generally consistent with the facility-wide staffing plan thresholds. However, from October 2014 through September 2015, the LDC's staffing levels deteriorated and the facility-wide average vacancy rate more than doubled to 11 percent. This was primarily driven by correctional officer vacancies, which reached as high as 23 percent. These correctional officer vacancies led to several problems in 2015, including the LDC's long-term use of mandatory overtime, which LDC personnel said led to lower morale, security concerns, and fewer correctional officers available to escort medical staff and detainees to and from the health services unit.

LDC's vacancies led to the closure of security posts and reassignment of personnel, sometimes to the detriment of detainee services. Many of the closures occurred at posts that had been designated by CoreCivic as "mandatory," meaning they were required to be filled on each shift in order to run the facility in a safe and secure manner. The problem of post closures was especially acute from February 1 through March 31, 2015. During this period, the LDC closed at least one security post in all 118 shifts and closed an average of 7 posts per shift. LDC's vacancies also led to Unit Management personnel being assigned to security posts instead of performing their normal job duties, which included assisting detainees with casework and transitional services, developing individual detainee program plans, and delivering services and programs to detainees, among other duties.

Rather than take steps to address understaffing, both USMS and CoreCivic took actions that exacerbated the problem. For example, CoreCivic did not utilize all available staffing options to remedy the understaffing problem, such as by requesting temporary staff from other CoreCivic facilities. In fact, during a period

when the LDC was understaffed, CoreCivic temporarily transferred LDC personnel to other CoreCivic facilities, which in one instance led to a significant reduction in the size of the LDC's already shorthanded Special Operations Response Team, weakening its ability to operate effectively and fulfill its mission in the event of a significant incident.  We also found that the USMS allowed CoreCivic to contract with a local government to house non-federal detainees at the LDC – at a rate below that being paid by the USMS – without considering the staffing implications of the arrangement.

We also learned during our audit that, unbeknownst to the USMS, LDC officials had uninstalled beds prior to an American Correctional Association (ACA) inspection in 2011 in order to conceal from ACA that the LDC was triple bunking detainees.  Following the OIG's discovery of this issue, CoreCivic conducted an internal investigation, which revealed that similar conduct may have occurred prior to the 2005 and 2008 ACA audits and that a former CoreCivic divisional Managing Director was aware of these efforts.  CoreCivic told the OIG that in response to this finding, its Ethics & Compliance office instituted an ethics liaison program and completed training at LDC on employees' duty to report misconduct, options for reporting misconduct, and CoreCivic's non-retaliation policy for employees who report misconduct.  We were informed by ACA that it had decided not to take any action against CoreCivic, in part because the senior officials involved were no longer with CoreCivic.  Our audit further determined that the USMS has issued conflicting guidance on the allowability of triple bunking by its contractors, and that it should clearly specify in its new and existing contracts the rules and procedures governing this practice.

Additionally, we found that the USMS did not detect several weaknesses in CoreCivic's contractually-required quality control program at the LDC, which our review determined had significant shortcomings.  For example, the LDC Quality Assurance Manager received minimal instruction and guidance on how to conduct facility reviews; there was insufficient evidence proving that the LDC inspection review steps were conducted; the LDC's plans of action did not properly address deficiencies and did not provide viable long term correction; and the LDC had insufficient evidence proving that plans of action were implemented.

Despite the LDC's staffing deficiencies and the other instances of non-compliance with contract requirements, we determined that the USMS had not used available contractual mechanisms to hold CoreCivic accountable.  According to the contract and USMS policy, the USMS may issue contract price reductions for contractors' significant or repeat deficiencies, failure to fill essential staff positions, and having an unacceptable number of vacancies.  Yet we found that, from March 2006 through January 2017, the USMS had not proposed or issued any contract price reductions for any of its 15 contract detention facilities, including the LDC.  We further found that the COR for the LDC contract had never seen the USMS's price reduction guidance, and USMS officials were unable to provide us with evidence that such guidance was sent to any of the current USMS District CORs responsible for the other 14 USMS contract detention facilities.  Additionally, the USMS was not entering contractor past performance evaluations into the

Case 3:16-cv-02267    Document 361-12    Filed 11/20/20    Page 5 of 40 PageID #: 14350

government-wide electronic evaluation reporting system, as required by the FAR, or conducting Performance Evaluation Meetings as required by the contract.

Finally, the OIG determined that one of CoreCivic's employee fringe benefits called the "sick account" contained excess funds that could be interpreted as "cash equivalents" that should have been paid to employees on a regular basis. Because CoreCivic's benefits administrator withheld these funds for months or years before disbursement to employees, it is questionable whether the sick account is compliant with applicable labor standards for federal service contracts. We believe the USMS should work with the Department of Labor, and as necessary CoreCivic, to address the issue. CoreCivic also improperly requested – and the USMS improperly paid – $103,271 in salaries and benefits for commissary positions not funded through the LDC contract. These unallowable payments have a compounding effect over time because they are incorporated into each monthly invoice until the contract ends. In March 2017, the USMS issued a contract modification to CoreCivic to recover the unallowable price adjustments and to modify the Monthly Operating Price to reflect the proper monthly price.

This report makes 24 recommendations to assist the USMS in improving contractor operations and enhancing the USMS's monitoring and oversight at the LDC.

## AUDIT OF THE UNITED STATES MARSHALS SERVICE CONTRACT NO. DJJODT7C0002 WITH CORECIVIC, INC., TO OPERATE THE LEAVENWORTH DETENTION CENTER LEAVENWORTH, KANSAS

## TABLE OF CONTENTS

INTRODUCTION ............................................................................................. 1

    Background .......................................................................................... 1

        USMS Contract Administration, Monitoring, and Oversight ............... 3

        CoreCivic, Inc. ............................................................................. 5

        Leavenworth Detention Center ....................................................... 6

    OIG Audit Approach ............................................................................ 7

    Prior OIG Reports ............................................................................... 7

FINDINGS AND RECOMMENDATIONS ............................................................. 9

    Sole Source Justification .................................................................... 10

        Inadequate Analysis to Determine Price Reasonableness ............... 12

    USMS Quality Assurance Program ....................................................... 12

    USMS Monitoring of the Leavenworth Detention Center ......................... 14

        Inadequate District COR Experience and Detention-Related
            Training ........................................................................... 14

        Insufficient Continuous Monitoring Processes at the LDC ............... 15

        USMS Did Not Adequately Monitor Internal, External, and QAR
            Audit Results .................................................................... 19

        Insufficient USMS Continuous Monitoring May Be Widespread ........ 21

        Insufficient Quality Assurance Documentation .............................. 22

        USMS Did Not Use Available Mechanisms to Hold Contractors
            Accountable ...................................................................... 23

    CoreCivic Quality Control ................................................................... 26

        Inadequate LDC Oversight and Monitoring .................................... 27

LDC's QAM Needs Additional Quality Assurance Guidance ............... 32

USMS Detainee Mortality Reporting Processes......................................... 33

Observation of LDC Video Security Surveillance ..................................... 35

Staffing Requirements and Triple Bunking ............................................. 36

LDC Understaffing Led to Security Post Closures ........................... 38

LDC Did Not Promptly Address Facility Understaffing...................... 43

USMS Did Not Adequately Monitor and Hold CoreCivic Accountable for Understaffing ............................................................. 44

Impact of LDC Understaffing ...................................................... 46

Personnel-Related Decisions Increased LDC Understaffing .............. 49

LDC Officials Concealed Use of Triple Bunking from the American Correctional Association................................................... 51

USMS Contracts Do Not Contain Clear Guidance on the Use of Triple Bunking ................................................................ 53

USMS Did Not Evaluate the Implications of Wyandotte County's Use of the LDC ................................................................ 55

Comparison of USMS and BOP Contract Staffing Requirements........ 58

Billings and Payments ......................................................................... 59

Service Contract Labor Standards Statute .................................... 60

CoreCivic's "Sick Account" May Be Non-Compliant with Federal Labor Standards .............................................................. 62

Unallowable Commissary-Related Service Contract Labor Standards Price Adjustments ............................................................ 65

Transaction Testing of CoreCivic Invoices and Commissary Expenditures.................................................................... 66

Justice Prisoner and Alien Transportation System (JPATS) Transactions .................................................................. 66

Conclusion ........................................................................................ 67

Recommendations .............................................................................. 69

STATEMENT ON INTERNAL CONTROLS............................................................. 72

STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS .......................... 73

APPENDIX 1:  USMS PRIVATELY-MANAGED DETENTION FACILITIES AS OF
             FEBRUARY 2017 .................................................................. 74

APPENDIX 2:  OBJECTIVES, SCOPE, AND METHODOLOGY.................................. 75

APPENDIX 3:  OIG MANAGEMENT ADVISORY MEMORANDUM TO THE USMS ON
             OVERSIGHT OF DETENTION SERVICE CONTRACTS ................................. 79

APPENDIX 4:  USMS'S RESPONSE TO THE OIG'S MANAGEMENT ADVISORY
             MEMORANDUM ................................................................... 86

APPENDIX 5:  USMS's RESPONSE TO THE DRAFT AUDIT REPORT ...................... 88

APPENDIX 6:  CORECIVIC's RESPONSE TO THE DRAFT AUDIT REPORT.............. 95

APPENDIX 7:  OFFICE OF THE INSPECTOR GENERAL ANALYSIS AND SUMMARY
             OF ACTIONS NECESSARY TO CLOSE THE REPORT ................................ 109

# AUDIT OF THE UNITED STATES MARSHALS SERVICE CONTRACT NO. DJJODT7C0002 WITH CORECIVIC, INC., TO OPERATE THE LEAVENWORTH DETENTION CENTER LEAVENWORTH, KANSAS

## INTRODUCTION

The Department of Justice (Department) Office of the Inspector General (OIG) audited the U.S. Marshals Service (USMS) Contract No. DJJODT7C0002 awarded to Corrections Corporation of America, which is now known as CoreCivic, Inc. (CoreCivic), to provide comprehensive detention services at the Leavenworth Detention Center (LDC) in Leavenworth, Kansas.[1]  This sole-source acquisition, effective January 2007, has a 5-year base period and three 5-year option periods.  If the USMS exercised all three options, the contract would be effective through 2026 and have an estimated cost of nearly $697 million.  As of January 2017, costs incurred were approximately $252 million.  Table 1 contains the LDC contract's estimated and actual costs.

**Table 1**

**LDC Contract Costs**
**Contract No. DJJODT7C0002**

| CONTRACT PERIOD | FROM | TO | ESTIMATED COST | ACTUAL COST |
|---|---|---|---|---|
| Base Period | 1/01/2007 | 12/31/2011 | $ 143,965,195 | $ 115,536,848 |
| Option Period 1* | 1/01/2012 | 12/31/2016 | | 134,334,026 |
| Option Period 2 | 1/01/2017 | 12/31/2021 | 552,617,714 | 2,190,840 |
| Option Period 3 | 1/01/2022 | 12/31/2026 | | N/A |
| Total | | | **$696,582,909[2]** | **$252,061,714** |
| *Includes actual cost data through January 2017 | | | | |

Source:  USMS

## Background

USMS's core mission is to safeguard the federal judicial process by protecting federal judges, prosecutors, and court personnel; providing physical security in courthouses; protecting witnesses; transporting and producing prisoners for trial; executing court orders and arrest warrants; apprehending fugitives; and managing and disposing of seized property.  In addition to its core mission, the USMS

---

[1]  The contract number is also referred to as ODT-7-C-0002.  Throughout the report this contract is referred to as the "LDC contract."

[2]  Table 1's estimated costs for the Base Period and Total differ from cost estimates that the Office of the Federal Detention Trustee was required to report to the publicly accessible Federal Procurement Data System (FPDS), which were overstated in FPDS due to a calculation error.

1

manages the housing, transportation, and care of federal detainees in 15 privately managed detention facilities, including the LDC.

The Department's Office of the Federal Detention Trustee (OFDT) awarded the LDC contract to CoreCivic in early 2007. At the time, the OFDT was responsible for acquiring the housing and care of federal detainees in USMS custody, and managing and monitoring federal detention programs and services. OFDT was established in September 2001 in response to growing concerns about federal detention and to centralize the management of detention activities within the Department. OFDT acquired detention bed space through several different methods including: (1) federal detention facilities owned and operated by the federal government, such as Federal Bureau of Prisons (BOP) institutions; (2) intergovernmental agreements (IGA) with state and local jurisdictions with available bed space; and (3) privately managed detention facilities. From 1994 through 2011, the USMS's average daily detention population grew from 18,282 to 61,719. The increased demand for bed space, coupled with fewer available federal and IGA beds, led to the OFDT's increasing reliance on privately managed detention facilities.

In February 2012, the Department proposed the merger of the OFDT into the USMS, stating that it would align the accountability of resources with the responsibility of operations, eliminate unnecessary bureaucratic layers to the financial process, achieve cost savings, and allow OFDT personnel to continue their mission under a single command and control structure within the USMS hierarchy. The merger was completed in October 2012, effectively transferring the OFDT's detention resources into the USMS's Federal Prisoner Detention (FPD) appropriation and shifting OFDT's detention services and oversight responsibilities to the USMS's Prisoner Operations Division (POD). The FPD appropriation was a significant addition to the USMS's overall budget and in fiscal year (FY) 2017 the USMS sought more funds for its FPD account than for its core mission, as shown in Figure 1.

**Figure 1**

**USMS Budget**
**FYs 2013 through 2017**
**(In millions)**



*In 2015, DOJ funded $1.1 billion of the FPD account via excess unobligated balances from the Assets Forfeiture Funds, thereby fully funding the account.*

Source: USMS Budget Records

*USMS Contract Administration, Monitoring, and Oversight*

USMS's administration, monitoring, and oversight of detention programs and operations are shared by the POD and the USMS District Office responsible for each of the 15 privately managed detention facilities.[3] POD's mission is to preserve the integrity of the federal judicial process by establishing national detention policy, national strategies, and programs that provide for processing, housing, transportation, and care of federal detainees in a safe, secure, and cost effective manner. In FY 2015, POD managed an average daily detention population of 51,862 detainees of which over 10,000 were housed in the 15 privately managed detention facilities.[4] USMS District Offices are organized around the operational programs of judicial security, prisoner services, fugitive investigations, execution of court orders, asset seizure and forfeiture, and administrative functions. They are also responsible for ensuring that all non-federal detention facilities in their jurisdictions are inspected annually and that contractual agreements are being met.

---

[3] See Appendix 1 for a list of the USMS's 15 privately managed detention facilities.

[4] Of the 51,862 detainees, 31,603 were in state and local facilities (operated under USMS's approximately 1,800 intergovernmental agreements); 10,248 were in private contract facilities, 9,774 were in BOP facilities, and 237 were in non-paid medical facilities.

3

The LDC contract is administered by a Contracting Officer located in Arlington, Virginia, who is responsible for directing or negotiating any changes in contract terms, and whose authorities include increasing or decreasing the contract amount, modifying or extending the period of performance, authorizing payment under the contract, and taking formal action for unsatisfactory contractor performance. Two Contracting Officer's Representatives (COR) were designated to assist the Contracting Officer with technical monitoring and administration. One COR is a Detention Facilities Program Manager within POD, located in Arlington, Virginia. This individual oversees contractual compliance, contractor quality of work, and ensures that a Quality Assurance Review (QAR) is conducted at least annually. The second COR is a Contract Oversight Specialist located in the USMS District of Kansas and is responsible for the continuous, day-to-day monitoring of the contractor.

During this audit we primarily interacted with POD's Office of Detention Services, which is responsible for administering POD's acquisition process; monitoring compliance with federal detention standards; and evaluating detention facilities to ensure they operate in a safe, secure, and humane fashion.

**Figure 2**

**USMS Organizational Chart[5]**



Source: USMS

*CoreCivic, Inc.*

CoreCivic is a Maryland corporation that was founded in 1983 and headquartered in Nashville, Tennessee.[6] CoreCivic specializes in owning, operating, and managing prisons and other correctional facilities and providing residential, community re-entry and prisoner transportation services for governmental agencies. As of December 2015, CoreCivic had the capacity to house approximately 88,500 offenders and detainees in 77 facilities. According to CoreCivic, it is the fifth largest corrections system in the nation, behind only the federal government and three states, and in 2015 earned approximately $1.8 billion in revenue and $222 million in net income. According to the Federal Procurement Data System, CoreCivic was the Department's No. 1 contractor in terms of dollars obligated for 7 of the last 10 years, spanning FYs 2006 through 2015.

---

[5] This organizational chart does not provide a comprehensive view of all USMS subcomponents.

[6] CoreCivic was previously named Corrections Corporation of America, or CCA. CoreCivic announced its renaming in October 2016.

5

CoreCivic derives a significant amount of its revenues from the federal government. According to CoreCivic financial statements, contracts with the USMS alone accounted for approximately $283 million, or 16 percent, of CoreCivic's revenue in 2015, while overall payments by federal correctional and detention authorities – the USMS, BOP, and the U.S. Immigration and Customs Enforcement – accounted for $912 million, or 51 percent, of CoreCivic's total revenue in 2015.

*Leavenworth Detention Center*

CoreCivic owns and operates the LDC, which was opened in 1992 and declared by CoreCivic to be the first maximum-security facility managed by a corrections company under direct contract with a federal agency. LDC is a maximum security facility with a 1,120 bed capacity that houses both male and female detainees. Detainees stay at the facility on average for less than 1 year and the detainee population primarily consists of individuals charged with federal offenses that are detained while awaiting a hearing, trial, or sentencing. LDC is led by a Warden and Assistant Warden and operated by approximately 270 employees. LDC's mission is to maintain and manage the facility in accordance with applicable federal and state laws, court orders, and American Correctional Association (ACA) standards.[7]

USMS's current contract is its third award to CoreCivic to operate the LDC. The first two contracts were awarded in 1990 and 1998; the latter had a 5-year base term, followed by the USMS's exercise of several extensions including a bridge contract in 2005 to continue services for 24 months while the current contract was negotiated.[8] LDC's current contract was awarded in January 2007 and is a sole source acquisition that allows Department components, including the USMS Districts of Kansas, Nebraska, Eastern Missouri, Western Missouri, South Dakota, and Iowa; the BOP; and non-Department entities such as the U.S. Immigration and Customs Enforcement to house detainees at the facility.[9] USMS requested the LDC contract because the District of Kansas needed additional support from private entities for the housing, care, and security of detainees because the number of detainees in the district exceeded the available detention space in existing facilities.

---

[7] The American Correctional Association (ACA) develops national standards and an accreditation process that address services, programs, and operations essential to effective correctional management.

[8] According to the U.S. Government Accountability Office (GAO), a "bridge contract" is an extension to an existing contract beyond the period of performance (including option years), or a new, short-term contract awarded on a sole-source basis to an incumbent contractor to avoid a lapse in service caused by a delay in awarding a follow-on contract. GAO, *Sole Source Contracting, Defining and Tracking Bridge Contracts Would Help Agencies Manage Their Use,* GAO-16-15 (October 2015), 4.

[9] A sole source acquisition is a contract for supplies or services that is proposed or entered into by an agency after soliciting and negotiating with only one source.

6

The LDC contract requires CoreCivic to provide comprehensive detention services including receiving and discharging detainees, facility security, transportation and outside guard services, food service, and healthcare service. In addition to housing federal detainees, CoreCivic entered into a separate contract with the Unified Government of Wyandotte County and Kansas City, Kansas (Wyandotte County) to house up to 220 non-federal detainees at the LDC.

## OIG Audit Approach

The objective of this audit was to assess USMS and CoreCivic administration of, and compliance with contract terms and conditions in the areas of: (1) contract management, oversight, and monitoring; (2) staffing requirements; and (3) billings and payments. Our audit timeframe focused on, but was not limited to, October 2010 through May 2015.[10]

To assess USMS and CoreCivic compliance with contract management, oversight, and monitoring, we examined the USMS's Quality Assurance Surveillance Program (QASP) to ensure the USMS monitored the quality of LDC services and that the contract requirements were defined and satisfactorily met. We also reviewed the OFDT's justification for issuing a sole source contract and its determination that the contract price was fair and reasonable. We then reviewed CoreCivic's quality control program (QCP) to determine if CoreCivic provided and maintained an inspection system that enabled it to demonstrate positive performance and identify areas of non-compliance before the level of performance became unsatisfactory. To determine if the USMS and CoreCivic followed staffing requirements, we evaluated the LDC's staffing policies, procedures, budgeted and actual figures, and shift rosters; compared the USMS's contract staffing provisions to the BOP's; and interviewed facility staff to gain an understanding of the facility's staffing levels and conditions. Lastly, to ensure compliance with contract requirements regarding billings and payments, we assessed the accuracy of USMS payments for monthly invoices, and examined CoreCivic compliance with Service Contract Labor Standards (SCLS) and regulations addressing the payment of prevailing wages and benefits to staff based on locality.

## Prior OIG Reports

In January 2013, the OIG issued an audit report on the Department's oversight of non-federal detention facility inspections.[11] During this audit, the USMS and OFDT were still separate Department components operating independent

---

[10] According to court documents, on August 5, 2016, the Federal Public Defender for the District of Kansas (FPD) learned that meetings between detainees and their attorneys had been video recorded by LDC staff, and at times provided to the government by request. The FPD subsequently alleged that phone calls between LDC detainees and their attorneys had also been recorded. These allegations were all made after we had completed our field work and after we had substantially completed this audit, and as such were not within the audit's scope.

[11] U.S. Department of Justice Office of the Inspector General, *Audit of the U.S. Department of Justice's Oversight of Non-Federal Detention Facility Inspections*, Audit Report 13-06 (January 2013).

inspection programs.  The audit found that while the Department employed basic standards to evaluate the conditions of non-federal detention facilities, the OFDT and USMS applied these standards inconsistently, depending on the type of inspection being conducted.  For example, an OFDT review typically took 3 days to complete and was more thorough than a USMS review that took on average only 2 hours to complete.  The audit also found that the OFDT and USMS used separate processes to determine which non-federal detention facilities to review during a given fiscal year.  Neither process incorporated a risk-based assessment to ensure that the facilities most in need of review were prioritized.[12]  Lastly, the report noted a lack of coordination on the resolution of deficiencies identified during inspections.

In August 2016, the OIG issued a review of the BOP's monitoring of contract prisons, which included CoreCivic.[13]  It concluded that in comparison to federal facilities, CoreCivic contract prisons had the highest rates of inmate fights and inmate assaults on other inmates.

In December 2016, the OIG issued an audit report on the BOP's contract with CoreCivic to operate the Adams County Correctional Center in Natchez, Mississippi.  In May 2012, an inmate riot at the facility resulted in a correctional officer's death and injuries to approximately 20 staff and inmates.  A BOP after-action report found deficiencies in staffing levels, staff experience, communication between staff and inmates, and CoreCivic's intelligence systems.  The OIG audit found that 4 years after the riot, the facility was plagued by the same significant deficiencies in correctional and health services.  In 19 of the 38 months following the riot, CoreCivic staffed correctional services at an even lower level than at the time of the riot in terms of actual post coverage.  Moreover, between December 2012 and September 2015, the Adams County facility was staffed with only a single physician for 434 days (43 percent of the time) and a single dentist for 689 days (69 percent of the time).[14]

---

[12]  OFDT continued to conduct annual inspections of all privately contracted facilities (as opposed to using a risk-based approach that would review some of the private facilities) to comply with the FAR's quality assurance requirements.  After the 2012 OFDT merger, USMS continued to conduct these annual reviews at its privately contracted facilities.

[13]  U.S. Department of Justice Office of the Inspector General, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons*, Evaluation and Inspections Report 16-06 (August 2016).

[14]  U.S. Department of Justice Office of the Inspector General, *Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc., to Operate the Adams County Correctional Center in Natchez, Mississippi*, Audit Report 17-08 (December 2016).

8

# FINDINGS AND RECOMMENDATIONS

We identified weaknesses in the OFDT's sole source justification for the award of this contract to CoreCivic and determined that the USMS failed to provide sufficient oversight of the LDC and that this failure resulted in several significant issues with LDC operations going unaddressed for extended periods of time. Of particular concern, the USMS Contracting Officer's Representative (COR), who was responsible for monitoring CoreCivic's performance at the LDC on a day-to-day basis, was located offsite, had no previous contract oversight experience, and received no formal guidance and negligible detention-related training. The District COR maintained an infrequent onsite presence at the LDC, did not document the inspection activities performed, and did not develop an inspection program or monitoring procedures. We also found that the USMS did not use available mechanisms to hold CoreCivic and other contractors accountable, such as evaluating past performance and issuing price reductions for contractors' failure to perform required services. USMS's lack of effective continuous monitoring presents risks that may extend beyond the LDC to its 14 other contract detention facilities. In addition to other USMS oversight and monitoring-related discrepancies, we identified weaknesses in CoreCivic's quality control program, and identified a potential improvement to the USMS's detainee mortality reporting process.

In the area of staffing, correctional officer turnover and vacancies led to the LDC's long-term use of mandatory overtime, the closure of security posts, and diversion of Unit Management staff from their regular job duties to filling security posts. We also found that LDC officials concealed the facility's use of triple bunking from the ACA in what appears to be an effort to receive a higher accreditation score, and that the USMS has issued conflicting guidance on contractors' use of triple-bunking for USMS detainees.

Lastly, we found that CoreCivic's administration of its "sick account" benefit was questionable because CoreCivic contributed excess funds that could be interpreted as "cash equivalents." Because CoreCivic withheld these funds for months or years before disbursement to employees, its "sick account" may not be compliant with the applicable labor standards for federal service contracts. CoreCivic also improperly requested and the USMS improperly paid $103,271 in wages and fringe benefits that CoreCivic was not entitled to receive.

**Sole Source Justification**

USMS initially contracted with CoreCivic to design, build, and operate the LDC in 1990 when it issued the first award. In 1998, the USMS awarded CoreCivic a second contract that contained a 5-year base term and was followed by the USMS's exercise of several contract extensions, including a 24-month extension effective in 2005 through 2006 while the OFDT negotiated a new contract. The process culminated in the OFDT's February 2006 decision to award the current sole source contract to CoreCivic, effective January 2007.[15] We reviewed the award process and found that some actions taken by the OFDT for the justification and price reasonableness of this contract award were not in accordance with the Federal Acquisition Regulation (FAR), as described below.

FAR Part 6, *Competition Requirements,* states that Contracting Officers shall not commence negotiations for a sole source contract without justifying such an action in writing, certifying the accuracy and completeness of the justification, and obtaining agency approval of the justification.[16] OFDT completed a Justification for Other Than Full and Open Competition (justification) and fulfilled some FAR requirements such as describing the nature of the services being approved, citing the statutory authority permitting other than full and open competition, and obtaining the appropriate agency approvals. However, the OFDT did not obtain competition to the maximum extent practicable, the justification's narrative did not support its conclusions, and the justification was missing the Contracting Officer's certification that its contents were accurate and complete to the best of the Contracting Officer's knowledge.

OFDT sought to award the LDC contract using other than full and open competition in accordance with a FAR provision stating that an agency may use noncompetitive procedures when the supplies or services needed are available from only one responsible source and no other type of supplies or services will satisfy agency requirements.[17] In January 2006, the OFDT issued a "sources sought notice" to gain knowledge of potentially qualified sources. The notice said the OFDT was "*in search of [an] existing secured detention facility located within the geographic boundaries of Leavenworth, Kansas*. . ." to house persons in USMS custody. Interested offerors were required to respond to this notice and the OFDT received one response from the incumbent contractor, CoreCivic.

---

[15]  As previously noted, prior to the October 2012 merger with the USMS, the OFDT was a separate DOJ component responsible for acquiring the housing and care of federal detainees in USMS custody. Therefore, the solicitation and award of the LDC contract was performed by OFDT on behalf of the USMS. Due to the merger, OIG recommendations based on past OFDT processes are directed to the USMS.

[16]  FAR Subpart 6.3, *Other Than Full and Open Competition*, 6.303, *Justification*, 6.303-1(a), *Requirements*.

[17]  FAR Subpart 6.3, *Other Than Full and Open Competition*, 6.302, *Circumstances Permitting More than Full and Open Competition*, 6.302-1, *Only One Responsible Source and no other Supplies or Services will Satisfy Agency Requirements*.

10

We asked why the OFDT's sources sought notice restricted performance to the city of Leavenworth, thus potentially limiting the pool of offerors, instead of allowing a broader area of performance such as in the District of Kansas (which covers the entire state) or within a reasonable distance from a U.S. District Court. USMS officials responded that the OFDT specified the city of Leavenworth because the LDC was the only available facility in the State of Kansas and the OFDT was prohibited from contracting for the construction of a new facility to address its detention-space needs. USMS officials said OFDT reached this conclusion by contacting CoreCivic's competitors including The GEO Group (GEO), Cornell Corrections (later purchased by GEO), and the Management and Training Corporation, and confirmed that these vendors had no existing facilities in Kansas and were therefore not qualified sources. However, the USMS could not provide evidence of these OFDT communications, and a description of these communications was not included in the justification documents. USMS officials also could not provide FAR-required market research documentation, which also may have contained such information.[18] The justification instead stated that an award to a source other than CoreCivic was likely to result in substantial duplication of cost to the Government that was not expected to be recovered through competition. However, this reasoning was not accompanied by an estimate of the cost of duplication and how that estimate was derived, as required by the FAR.[19]

A senior POD official involved in the acquisition said the OFDT had considered issuing a competitive solicitation but thought it was improper knowing the OFDT would receive only one proposal. This official said he understood how it could appear that the OFDT was limiting competition, but that it was not the intent and had there been an existing facility elsewhere in the District of Kansas, the OFDT would have pursued it to maximize competition. USMS officials also said that one of the impediments to expanding competition was a federal statute that requires the USMS's privately contracted facilities be located in the district of need.[20] Because the USMS's private detention contracts are lengthy (lasting up to 20 years) and costly agreements, we believe it is important that the USMS maximizes competition during the acquisition process to attain the best overall value without compromising its ability to transport detainees to court, medical facilities, or other locations in a timely fashion. USMS should also better document its justifications for awarding any detention-related sole source contracts and maintain such records in the contract file as required by FAR Subpart 4.8, *Government Contract Files*. Therefore, we recommend that the USMS establish acquisition procedures to ensure that future detention pre-solicitation and solicitation notices include the widest place of performance practical, and that sole-source justifications are fully documented, maintained in the contract file, and include all FAR-required language. This language should include the certification that the justification was accurate and complete to the best of the Contracting Officer's knowledge.

---

[18] FAR Part 10, *Market Research*, 10.002(e), *Procedures*.

[19] FAR Subpart 6.3, *Other Than Full and Open Competition*, 6.303, *Justification*, 6.303-2, *Content*, 6.303-2(b)(9)(ii).

[20] 18 U.S.C. § 4013 (2017).

*Inadequate Analysis to Determine Price Reasonableness*

Having completed its justification and fulfilled other FAR requirements, a contracting agency can commence negotiations with the offeror. FAR Subpart 15.4, *Contract Pricing*, prescribes cost and price negotiation policies and procedures that require Contracting Officers purchase supplies and services from responsible sources at "fair and reasonable prices." For the LDC acquisition, the OFDT was required to use price analysis to determine whether the agreed-to price was fair and reasonable. OFDT made its determination by comparing the offeror's proposed price to the price of the prior contract. To justify use of this technique, the OFDT had to demonstrate that the services were the "same or similar" and that it considered factors affecting comparability, and that the prior price was a "valid basis for comparison." OFDT documented its determination of price reasonableness and noted that CoreCivic was providing the same services at the same location as the prior contract.

We compared the previous and current contract statements of work and found that the proposed services generally met the "same or similar" requirement contained in the FAR. However, the OFDT did not assess whether market or economic factors changed during the approximately 8 years between acquisitions. Additionally, the OFDT's determination of price reasonableness included data on a wide range of BOP and USMS facility per diem rates, but lacked an explanation of their relationship to CoreCivic's proposed price.

OFDT next compared the previous contract's annual per diem and rates of increase to those of the current offer and concluded that CoreCivic's proposal would yield substantial savings over a 20-year period, compared to the previous contract. However, the OFDT's explanation did not indicate whether the historical price was itself fair and reasonable. The FAR states that "if the reasonableness of the prior price was uncertain, then the prior price may not have been a valid basis for comparison." USMS officials could not locate or recall whether a price reasonableness analysis of the previous contract had been performed. Although the new contract included a smaller annual rate of increase than its predecessor, if the prior contract's price was not fair and reasonable, it would not be an adequate basis to assess the fairness and reasonableness of the current contract. Therefore, we recommend that USMS establish policies and procedures to ensure that, when its price analysis is based on a comparison of historical prices paid, it establishes the prior price as a valid basis for comparison.

## USMS Quality Assurance Program

Private prison contracts are among the Department's most expensive and present unique challenges because of the government's obligation to provide a safe and secure environment for detainees, staff, and the public. Contract quality assurance, or monitoring, is a critical element of federal contracts, as it enables the government to determine whether a contractor has fulfilled contractual obligations pertaining to quality and quantity. FAR Subpart 46.4, *Government Contract Quality Assurance*, requires that federal agencies perform contract quality assurance at

12

such times and places as may be necessary to determine that the services conform to contract requirements. Federal agencies articulate these requirements through quality assurance surveillance plans (QASP), which specify all work requiring surveillance and the method of surveillance.

USMS's QASP for the LDC contract states that each phase of the services rendered under this contract is subject to USMS inspection during both the contractor's operations and after completion of the tasks. USMS inspection includes two primary activities: (1) the Quality Assurance Review (QAR), which is an annual evaluation conducted at all USMS contracted facilities; and (2) continuous monitoring performed by staff in the USMS District responsible for the detention facility. The QAR is a 3-day review conducted by experienced POD and contracted staff. The purpose of the QAR is to assess contract facility compliance across several functional areas in accordance with the Federal Performance-Based Detention Standards (FPBDS) and concludes with the issuance of a final report and overall facility rating.[21] The QAR is performed at least once annually and on a more frequent basis if facility performance is found to be substandard.

To understand the QAR process, we observed the majority of the 2015 QAR performed at the Aurora Detention Facility in Aurora, Colorado.[22] Based on our observation of the Aurora Detention Facility and analysis of the QAR results at the LDC from FYs 2011 through 2015, we determined that the QAR was well structured, comprehensive, and adequately documented deficiencies in the final reports. We also concluded that POD had maintained supporting documentation to justify its findings, and obtained and approved CoreCivic's plans of action (POA) to remedy the deficiencies.

While the QAR is an important component of the USMS's inspection process, it is inherently limited by its infrequent nature and if used alone could leave a significant monitoring gap between its annual occurrences. USMS can fill this monitoring gap by continually reviewing contractor operations for adherence to contract terms and conditions. FAR 52.246-4, *Inspection of Services – Fixed Price*, provides the USMS with such authority, stating that (the OIG's emphasis in italics) "the government has the right to inspect and test all services called for by the contract, to the extent practicable *at all times and places during the term of the contract*." However, as detailed below, USMS has not established an adequate continuous monitoring program.

---

[21] The Federal Performance Based Detention Standards (FPBDS) are the criteria used by the USMS to assess contractor compliance with contract terms and conditions. It is based on ACA standards and is designed to establish the performance level required by the government to meet the detention contract requirements.

[22] We could not observe the LDC's 2015 QAR because it was conducted in May 2015, before the initiation of our audit.

13

**USMS Monitoring of the Leavenworth Detention Center**

With respect to continuous monitoring, the USMS's QASP requires payment of the contractor's monthly invoice after "services provided for each billing cycle [are] determined, based on performance, to be 'acceptable'." The Contracting Officer's Representative (COR) is responsible for reviewing CoreCivic's monthly performance and verifying compliance with contract requirements which are divided into 6 functional areas (administration and management, healthcare, security and control, food service, safety and sanitation, and services and programs) that collectively contain 46 standards areas derived from the FPBDS. For the USMS to assess the acceptability of monthly contractor services, it needs a robust, well-defined, and organized continuous monitoring program. However, we determined that the USMS's continuous monitoring efforts at the LDC were not adequate to sufficiently monitor contractor performance of a detention services contract valued at nearly $700 million. We identified several problems, including:

- inadequate District COR experience and detention-related training;

- insufficient continuous monitoring processes at the LDC;

- inadequate monitoring of internal, external, and QAR audit results;

- insufficient quality assurance documentation; and

- insufficient mechanisms to hold contractors accountable.

Furthermore, because several of these problems appear to be inherent in the USMS's overarching continuous monitoring approach, we believe they may also be occurring at the USMS's other 14 contract detention facilities. Given the significance of our concerns, in February 2016 the OIG issued a Management Advisory Memorandum to the USMS, advising it of these matters. In March 2016 USMS responded to our memorandum by proposing several actions. We believe the USMS's suggested actions demonstrate a commitment to improving its contractor oversight. In addition to both memoranda being included in Appendix 3 and Appendix 4 of this report, the following subsections detail information discussed in the memoranda and provide additional OIG analysis and recommendations.

*Inadequate District COR Experience and Detention-Related Training*

The FAR and Justice Acquisition Regulations require that CORs meet minimum eligibility standards by completing a basic COR course and obtaining ethics training.[23] CORs must receive and maintain certification and be properly designated to a contract. We found that the USMS District of Kansas COR (District COR) met these basic requirements. However, the District COR did not meet the

---

[23] The Justice Acquisition Regulations provide procurement regulations that supplement the Federal Acquisition Regulation (FAR).

FAR requirement that CORs be qualified by training and experience commensurate with the responsibilities be delegated in accordance with agency procedures.[24] The District COR was appointed in March 2011, only 3 weeks after attaining the COR certification. Prior to certification, the District COR had no contracting experience and this almost $700 million contract was the first assignment received. Furthermore, the District COR did not have experience in detention services, and relied significantly on the expertise of a Deputy U.S. Marshal to conduct LDC inspections. USMS failed to provide training to sufficiently bolster the COR's knowledge of detention services and monitoring and oversight. From this District COR's March 2011 appointment through August 2015, the only formalized detention-related training provided by the USMS was a 60-minute lecture on the roles and responsibilities of the COR during the pre-solicitation and post-award phases of the contract.

USMS officials agreed that COR training was a weakness across all districts responsible for detention facilities and that weakness needed to be addressed. USMS officials said options included obtaining training from organizations specializing in detention operations or coordinating with the BOP on a training exchange program. In response to the Management Advisory Memorandum, USMS officials said they would develop a training program for CORs assigned to detention and transportation contracts. In addition to addressing basic COR training and certification requirements, the training program would cover detention facility inspections, contract monitoring instruments, reporting requirements, and POAs. USMS officials said that each private detention facility contract would have at least one COR with a Federal Acquisition Certification for Contracting Officer's Representative (FAC-COR) Level II certification.[25] We recommend that the USMS continue to develop a training program for CORs monitoring and overseeing its detention-related contracts that ensures CORs receive and maintain a level of training and experience commensurate with their responsibilities.

*Insufficient Continuous Monitoring Processes at the LDC*

Maintaining a continuous onsite presence at a detention facility enables a more proactive approach to monitoring because the COR can witness events unfold in real-time instead of being informed of incidents after they occur. The LDC contract indicated that the USMS would have a continuous onsite presence at the facility, stating that "the government anticipates a nominal number of staff will be onsite to monitor contract performance and manage other government interests associated with operation of the facility. The contractor shall provide an onsite enclosed office space for the USMS's staff." This USMS contract language was

---

[24] FAR Subpart 1.6, *Career Development, Contracting Authority, and Responsibilities*, 1.602, *Contracting Officers*, 1.602-2, *Responsibilities*, 1.602-2(d)(3).

[25] The purpose of the Federal Acquisition Certification-Contracting Officer's Representative (FAC-COR) is to establish general training, experience, and development for CORs in civilian agencies that reflect the various types of contracts they manage. Level II is the mid-level certification generally appropriate for contracts of moderate to high complexity.

nearly identical to BOP private prison contracts, whose quality assurance staff is permanently located onsite. However, the USMS neither stationed staff at the LDC, nor did the contractor provide USMS staff any dedicated space within the LDC.[26] In fact, USMS did not co-locate staff at any of its contract detention facilities.

The responsibility for continuous monitoring was held by the District COR, located approximately 30 miles southeast of the LDC. The District COR performed onsite inspections at the LDC on a very infrequent basis. From January 2014 through September 2015, a period encompassing 21 months, the District COR visited the facility 17 times for a total of approximately 41 hours. Approximately 37 percent of this time was spent observing the QAR team's annual reviews. If these QAR-related hours are removed, the District COR spent 26 hours conducting inspections from January 2014 through September 2015, or approximately 1.2 hours per month. USMS officials agreed that this was not a sufficient amount of onsite inspection time, and said there was no standard operating procedure or formal expectation of how much time District CORs should be performing onsite inspections. For context, we compared elements of the USMS's continuous monitoring program to those of the BOP's monitoring program.

**Table 2**

**Comparison of Federal Detention Agencies'
Continuous Monitoring Efforts**

| | U.S. MARSHALS SERVICE (USMS) | FEDERAL BUREAU OF PRISONS (BOP) |
|---|---|---|
| NO. OF PRIVATE CONTRACT FACILITIES | 15 | 13 |
| NO. OF DETAINEES/INMATES[27] | 9,296 | 22,646 |
| MONITORING TEAM LOCATION | Offsite (USMS District Office) | Onsite |
| NO. OF MONITORING TEAM STAFF PER FACILITY | 1 | 3 |
| TYPICAL COMPOSITION OF MONITORING TEAM | 1 COR[28] | 2 CORs; 1 Contracting Officer |

Source: USMS and BOP

As shown in Table 2, the USMS's continuous monitoring generally consisted of one COR located offsite for each detention facility. BOP officials told the OIG that its monitoring teams are located onsite at all 13 private contract facilities and that

---

[26] As of the OIG's fieldwork in September 2015, the District COR did not have a dedicated workspace at the LDC. However, in early 2016 the District COR requested and was granted an office.

[27] This data was current as of April 2016.

[28] The District COR received periodic assistance from a Deputy U.S. Marshal that was also a COR. USMS also designates a second COR to its private detention contracts, but they are not responsible for continuous monitoring and are therefore not included in this table.

the teams consisted of three staff, including 2 CORs and an administrative Contracting Officer that spend the entire workweek performing contract-related tasks. Prior to 2001 the BOP had been structured similarly to the USMS, when its private facility administration and day-to-day oversight fell under a regional office. However, in an effort to ensure consistency in contract administration on a national basis, the BOP centralized the oversight and monitoring of private facilities under the Privatization Management Branch. When its centralization initiative was approved in 2001, BOP housed approximately 13,000 inmates in private contract facilities.

The District COR was responsible for monitoring CoreCivic's contractual compliance through inspections of the LDC in the areas of security and control, health services, personnel, training, religious services, food services, prisoner transportation, safety and emergency plans, sanitation and hygiene, prisoner rights, and other areas. To accomplish this, the COR was required to develop a project plan to define the scope of the inspection work and develop monitoring instruments. Neither of these duties was performed. Instead, the District COR utilized two USMS instruments to conduct annual inspections: (1) the Detention Facility Review (DFR) and (2) the Field Report.[29] The DFR was not designed for private contract facilities inspections, and the Field Report was not designed for inspections at all. Specifically, USMS Policy Directive 9.7, effective March 2014, stated that the DFR was designed to review jail practices at IGA facilities to verify basic, minimum requirements were met. The Chief of the USMS's Detention Standards and Compliance Branch said POD created the DFRs to provide Deputy U.S. Marshals, who are generally not detention experts, some cursory instructions when inspecting IGAs. This official said the DFRs were much less comprehensive and arduous than the annual QAR. In addition, DFRs were not to be used in lieu of potentially more intense or focused reviews, and according to USMS Policy Directive 9.7, "are not certifications, accreditations, or compliance approvals of any sort. The information obtained during DFRs is for internal USMS use only." USMS Policy Directive 9.7 did not identify Field Reports as a facility review mechanism as they were not inspection tools but generic incident reporting forms intended to document prisoner incidents such as prisoner deaths, sexual assault allegations, tactical equipment failures, vehicle accidents, and significant activities related to courtroom and facility incidents.

We analyzed the USMS District of Kansas's inspection results from FYs 2011 through 2015 to assess the breadth and depth of reviews and to consider the utility of DFRs and Field Reports as compared to the QARs. The District COR completed DFRs in 2011 and 2015 and we found they were broad in nature and primarily contained "yes/no" conclusions with minimal explanation of the work performed. The depth of review for DFRs was substantially less than that of the QAR. In 2015 the DFR was completed in approximately 4 hours by a Deputy U.S. Marshal while

---

[29] Detention Facility Reviews (DFR) were conducted using *Form USM-218, Detention Facility Monitoring Report*. Field Reports were conducted using *Form USM-210*.

the QAR took nearly 3 days to complete by a team of 6 staff.[30] The QAR process was significantly more detailed than the DFR; for example, the QAR's review of facility "Administration and Management" consisted of 162 unique review steps, while the DFR focused on only 12 steps.[31] The QAR contained 134 unique reviews steps in "Security and Control" while the DFR covered 14. The QAR included 42 review steps to assess CoreCivic compliance within the Special Housing Unit while the DFR had 1 review step. The DFRs also did not assess CoreCivic compliance with the contract's quality control requirements. When asked about other USMS contract facilities, a senior USMS official explained that other District CORs also used the DFRs to conduct their inspection work, while some developed their own inspection program. Overall, there was no standardized process for districts conducting contract facility inspections.

The District COR completed Field Reports in 2012 through 2014, and we found that they were even less suited for contract facility inspections than the DFRs. Field Reports did not contain any review steps or detail on USMS areas of inspection. Aside from reporting some facility statistics, Field Reports contained at most a single paragraph vaguely describing the results. In 2014, a Deputy U.S. Marshal completed the Field Report-driven inspection in 1 hour.

Based on our review of the DFR and Field Report results, we concluded that the USMS's continuous monitoring of the LDC was insufficient. That these inspections comprised the District's *only* formalized and documented evidence of continuous review of the LDC from FY 2011 through mid-2015 was highly concerning and the primary impetus for the OIG's issuance of a Management Advisory Memorandum to the USMS in February 2016. However, we also believe it was unrealistic for the District COR – who lacked detention experience and proper training, was located offsite, was responsible for performing numerous other duties, and relied on a Deputy U.S. Marshal to perform the formalized inspections - to establish and maintain a comprehensive continuous monitoring program for an almost $700 million private detention contract without the POD and District of Kansas providing significant guidance and monitoring tools. In fact, the POD did not provide any formal guidance and only a negligible amount of training on how to conduct adequate oversight and monitoring to the District COR and CORs in other districts overseeing USMS's 15 contract facilities, nor had it corrected the District COR's continued use of improper monitoring tools. In contrast, the BOP's Privatization Management Branch, which managed and oversaw the operation of its contract facilities, disseminated operating procedures to all its onsite monitoring teams to "provide consistent guidance for staff involved with the oversight of correctional facilities under contract with the Bureau."

A senior USMS official explained that while there was currently no standard to judge the sufficiency of District COR-led inspections, their thoroughness should

---

[30] At the time, the Deputy U.S. Marshal was COR-certified.

[31] In some instances, the QAR and DFR contained similar or identical review steps.

fall somewhere between the DFR and the QAR. USMS officials said they do not have the personnel resources or staff experience to perform reviews similar to the QAR on a continuous basis and that QAR teams were composed of subject matter experts with about 20-plus years of collective detention-related experience and often specialized in areas such as health services, safety and sanitation, or security and control. We agree that District CORs may not have the QAR team's knowledge and expertise, and may require guidance and assistance from subject matter experts to conduct QAR steps such as in the area of healthcare. However, we believe that given appropriate training, District CORs can conduct many QAR review steps and therefore the USMS should ensure its District CORs perform inspections that approximate the rigors of the QAR to the maximum extent possible.

USMS officials agreed with the need to improve its monitoring processes and tools to facilitate its oversight responsibilities. In response to the Management Advisory Memorandum, USMS officials said they would develop standard operating procedures and contract monitoring instruments similar to those used by the BOP. USMS officials also said they would establish an onsite detention contract monitoring program staffed by a full-time professional Contract Administrator (CA) at each private detention facility. The CA would be responsible for continually monitoring the conditions of confinement for USMS detainees to ensure compliance with applicable detention standards. In March 2016, the USMS finalized the position description for the CA positions, which detailed the major duties and requirements of the position, including extensive knowledge of detention-related policies, programs, and procedures. The CA position also requires maintaining a FAC-COR Level III, the highest certification available. We commend the USMS for taking immediate action to enhance its continuous monitoring and recommend that the USMS continue developing and implementing inspection guidance, monitoring tools, and its new onsite contract monitoring initiative for use at all of its privately contracted facilities, and ensure that its continuous monitoring efforts incorporate QAR steps, to the maximum extent practicable.

*USMS Did Not Adequately Monitor Internal, External, and QAR Audit Results*

The contract states that when CoreCivic is advised of any unsatisfactory condition, they shall report internal and external audit results to the COR addressing the corrective action taken and the COR must assess CoreCivic's performance and document any non-compliance.[32] Internal audit results are generated via monthly security inspections; informal inspections; quarterly facility self-monitoring audits; corporate operational audits; and the mock ACA audit, which assesses the facility's readiness for the actual ACA accreditation audit. External audit results are from accreditation reviews conducted by the ACA and National Commission on Correctional Health Care (NCCHC). We found that the USMS did not request and review these records. We believe the USMS's tracking of internal and external audit results could help identify areas of risk and determine if

---

[32] For the purpose of this discussion, internal audits refer to monitoring conducted by CoreCivic. External audits refer to reviews conducted by outside agencies.

LDC officials succeeded in addressing deficiencies in an effective and timely manner. USMS's Chief of Detention Standards and Compliance Branch agreed, and said tracking such results would help the COR and QAR team better monitor and conduct follow-up work for identified deficiencies. During the OIG's 2015 audit of the Reeves County Detention Center, we identified BOP inspection procedures for monitoring internal and external audit results that the USMS should consider implementing.[33] BOP's Privatization Management Branch required its onsite monitors track the completion and review the results of internal and external audits to determine if corrective action plans to address deficiencies were completed.

One example of the benefit of monitoring a contractor's internal and external audit results occurred in September 2015 when the USMS issued a memorandum to CoreCivic prohibiting the housing of three persons to a cell (hereafter referred to as "triple bunking"), when the physical design, square footage and unencumbered space was constructed for 2-person occupancy. If the USMS had monitored CoreCivic headquarters' mock ACA audit from January 2014, it may have identified and remedied this triple-bunking issue earlier. Specifically, CoreCivic's 2014 mock ACA audit cautioned the LDC that "the ACA auditors may voice a recommendation that the facility utilize [vacant housing pods] to eliminate the triple bunking, given that this practice impacts approximately one third of the facility's inmate population."[34] We recommend that the USMS, as part of its plans to develop contract monitoring instruments, begin requesting and incorporating internal and external audit results and POAs into its quality assurance program to ensure each identified deficiency was adequately resolved.

Next, our audit found weaknesses in the USMS's continuous monitoring of QAR-identified deficiencies. At the conclusion of a QAR, the USMS will request contractors provide POAs to address deficiencies contained in the report. USMS's Detention Standards and Compliance Branch will review the contractor's submitted POAs and if acceptable will consider the QAR report closed. However, the USMS did not have any policies or procedures to ensure that the QAR-identified deficiencies were continuously monitored between closure of the current QAR and the next year's QAR to assess whether the previously deficient processes were operating effectively. To determine if the USMS conducted any such continuous monitoring during the approximately 1-year interim period between QARs, we judgmentally selected 10 QAR-identified deficiencies from 2009 through 2014 and requested the USMS provide evidence that each deficiency was monitored. POD and the District COR could not provide any documentary evidence of such continuous monitoring having occurred for any of the 10 QAR-identified deficiencies.

---

[33] U.S. Department of Justice Office of the Inspector General, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas*, Audit Report 15-15 (April 2015)

[34] Further detail on the LDC's triple-bunking and efforts to conceal the facility's use from the ACA is described later in this report.

For example, the 2014 QAR found that during a detainee count, LDC security staff intentionally left some cell doors unsecured to allow detainees to leave their cells to perform orderly duties throughout the housing unit. A senior USMS official said this action was a violation of facility procedures and a potential safety and security issue as it could enable orderlies to distribute contraband. In response to the QAR finding, CoreCivic created a POA to remedy the matter. POD reviewed and deemed this POA acceptable, and closed the QAR. However, subsequent to this closure, the USMS - particularly the District COR - did not document any continuous monitoring of the matter, such as observing counts, reviewing CoreCivic's quality control results in this area, reviewing documents and logs, or viewing surveillance video. Such follow-up could demonstrate whether or not the POA remained effective throughout the year. Instead, the USMS did not formally reevaluate this deficiency until the next year's QAR was conducted in May 2015, nearly 300 days later. Senior POD officials agreed that the USMS needs to conduct better oversight and monitoring of QAR identified deficiencies and to better document those efforts.

We recommend that the USMS create policies and procedures requiring CORs to conduct continuous oversight and monitoring of QAR-identified deficiencies to ensure that the completed POAs are operating effectively and that the CORs document this follow-up work and communicate the results to POD.

*Insufficient USMS Continuous Monitoring May Be Widespread*

We believe the USMS's lack of effective continuous monitoring presents risks that may extend throughout all 15 of its contract detention facilities. Systematic deficiencies include insufficient detention-related training; the lack of POD-issued oversight guidance; and the inadequate monitoring of CoreCivic's internal and external audit reviews and QAR results. While the adequacy of other Districts' onsite presence is currently unknown, potential problems likely exist, including insufficient staff at other locations. For example, in Texas, one COR is responsible for the oversight of three contract facilities – the Webb County, Rio Grande, and Willacy detention facilities - which house up to approximately 2,100 USMS detainees and are operated by three different contractors. The latter two facilities are located approximately 165 miles apart.[35] In California, one COR is responsible for the continuous oversight of the Western Region Detention Facility and Otay Mesa Detention Center, which together house up to approximately 1,100 USMS detainees. In Arizona, one COR oversees the Central Arizona Detention Center and Florence Correctional Center, which together house up to 5,100 USMS detainees.[36]

Additionally, in October 2014, a senior district official overseeing a contracted facility in the southwestern U.S. shared concerns with POD about USMS's lack of

---

[35] USMS officials said that the COR in Texas receives assistance from Deputy U.S. Marshals in their collateral role as Jail Inspectors, but as previously described, the DFRs performed by Jail Inspectors are not rigorous enough for privately contracted facilities.

[36] The Florence Correctional Complex, while a separate entity than the Central Arizona Detention Center (CADC), is part of the CADC contract.

21

continuous monitoring. This official said his district needed additional oversight staff and that the current monitoring was severely limited, placing the USMS at risk. In late 2015, following a medical incident at a contract facility in his district, this senior official said the incident further demonstrated the need for additional staff to monitor day-to-day services.

Because of the USMS's decentralized approach to continuous monitoring, the adequacy and consistency of inspections performed across the 15 USMS contract facilities are unknown. The District of Kansas COR told us that she was not aware of how other district CORs operated and that they did not communicate with one another or share best practices. POD officials agreed that there was no standardization for how districts develop and execute their inspection programs and believed this was partly due to district ownership of the COR positions, instead of the positions belonging to the POD. They explained that the districts specialize in law enforcement, not facility management, and are not best positioned to oversee continuous monitoring and manage the COR positions. POD officials also said the POD maintains the organizational knowledge and experience to create, formalize, and implement a continuous monitoring strategy.

In the OIG's February 2016 Management Advisory Memorandum to the USMS, we encouraged the USMS to reassess the organizational placement of the COR positions to determine if the POD is better suited to provide guidance, training, monitoring, and responsibility for the COR positions in a manner that enhances the USMS's continuous monitoring of private detention facilities. In its March 2016 response, USMS officials stated that its goal was to improve its contract monitoring by establishing an onsite detention contract monitoring program staffed by full-time professional Contract Administrators under the supervision of POD at all private detention facilities.[37]

*Insufficient Quality Assurance Documentation*

FAR Subpart 4.8, *Government Contract Files* requires the establishment, maintenance, and disposition of contract files, including a contract administration office file containing quality assurance records. The District COR was responsible for developing and maintaining a document control system and ensuring that quality assurance-related documentation was included in the official contract file. However, with the exception of the annual inspections, the District COR did not document her quality assurance-related activities. Also, instead of maintaining an official contract file as required by the FAR, the District COR stored contract records in a manner that did not effectively document contract actions and was not readily accessible to principal users. As a result, the District COR could provide little evidence of conducting monitoring and oversight at the LDC. The USMS Chief of the Detention Standards and Compliance Branch acknowledged that some districts, including the District of Kansas, had not been sufficiently documenting their work

---

[37] In October 2016, the USMS announced the deployment of a newly hired Contract Administrator at the LDC.

and the District COR agreed, stating that additional training in this area would be beneficial.

Subsequent to our audit fieldwork, the District COR began documenting inspections and using a monthly log to track contract-related communications and activities. While this represents a process enhancement, we believe further improvements could be made by developing a more formalized document to record identified weaknesses; contractor POAs; and COR monitoring efforts, including the date of work, comments addressing the effectiveness of the contractor's corrective actions, and dates for closing the POA.

In its response to the Management Advisory Memorandum, USMS officials said they would develop standard operating procedures similar to those used by the BOP. We recommend that the USMS include in its new standard operating procedures COR requirements for developing and maintaining a document control system and for retaining quality assurance-related documentation. Standard operating procedures should also include COR guidance on formally documenting inspections that include tracking deficiencies and contractor POAs.

*USMS Did Not Use Available Mechanisms to Hold Contractors Accountable*

According to the Congressional Research Service, the federal government has several legal mechanisms it can use to hold contractors accountable without resorting to judicial proceedings.[38] Two of these mechanisms are equitable reductions in price and past performance evaluations. The first mechanism allows contracting agencies to hold contractors accountable for failure to meet contract requirements through a reduction of the contract price. Specifically, FAR 52.246-4, *Inspection of Services – Fixed Price*, states that if any services do not conform to contract requirements, the government may require the contractor to perform the services again in conformity with contract requirements, at no increase in contract amount. When the defects in services cannot be corrected by re-performance, the government may reduce the contract price to reflect the reduced value of the services performed. The LDC contract broadly described the USMS's right to reduce CoreCivic's invoice for failure to perform required services and POD guidance stated that contract price reductions should be considered for repeat deficiencies and significant findings.

We found that the USMS had not proposed or issued any contract price reductions during the life of the LDC contract, and had not issued reductions for *any* of its other 14 contracted detention facilities from October 2011 through July 2015. In contrast, during this timeframe the BOP issued nearly $24 million in contract price reductions. The last time the USMS issued a contract price reduction to a private contractor was in March 2006 when it delivered a nearly $119,000 invoice

---

[38] U.S. Congressional Research Service. Selected Legal Mechanisms Whereby the Government Can Hold Contractors Accountable for Failure to Perform or Other Misconduct (R44202; Sept. 23, 2015), by Kate M. Manuel and Rodney M. Perry.

reduction to The GEO Group due to a detainee escaping from the Western Regional Detention Facility in San Diego, California. Table 3 contains a comparison of the BOP's and USMS's invoice reduction information.

**Table 3**

**Comparison of Department Detention Agencies' Invoice Reductions
FYs 2011 through July 2015**

| | U.S. MARSHALS SERVICE (USMS) | FEDERAL BUREAU OF PRISONS (BOP) |
|---|---|---|
| No. of Private Contract Facilities | 15 | 13 |
| No. of Detainees/Inmates[39] | 9,296 | 22,646 |
| Contract Reduction Amount | $0 | $23.6 million |
| Justification for Contract Reductions | Not Applicable | Repeat deficiencies, significant findings, vacancies over 120 days, non-compliance with staffing thresholds, failure to fill essential positions, cure notices. |

Source: USMS and BOP

A senior USMS official said the LDC had not been issued an invoice reduction because there had never been an incident at the LDC where withholding money was justified.[40] Judging by the LDC's annual QARs from FYs 2011 through 2014, this statement was correct insofar as the QAR team did not identify any repeat deficiencies or significant findings. However, this does not explain the broader disparity in price reduction amounts between the USMS and BOP. Both Department components use the same contractors, offer similar programs and services, and operate facilities in accordance with standards promulgated by the ACA. Our review indicates that the USMS's contract price reduction amount of $0 through July 2015 may be due to two factors. First, the USMS's insufficient continuous monitoring of the LDC and potentially other privately contracted facilities limited its ability to identify deficiencies that result in contract price reductions. A comprehensive continuous monitoring program would require a greater scope and depth of review that would potentially yield more inspection results and findings. For example, the OIG's 2015 audit of the Reeves County Detention Center (RCDC) found that BOP onsite staff generally provided comprehensive monitoring and oversight. From 2008 through 2013, BOP issued 17 invoice reductions to RCDC, six of which were identified through BOP's continuous monitoring efforts.

---

[39] This detainee/inmate data was current as of April 2016.

[40] A USMS official provided this explanation in July 2015. In October 2015, the USMS proposed a contract price reduction to the LDC for approximately $763,000 due to CoreCivic's non-compliance with FPBDS in the areas of correctional supervision, detainee accountability, and control of contraband. In February 2017, the USMS finalized and submitted the $763,000 contract price reduction to CoreCivic. This was the USMS's first contract price reduction issued to a private contractor since March 2006.

24

Second, the District of Kansas COR had never seen the USMS's detailed price reduction guidance and POD officials had no evidence that the guidance was sent to any of the current district CORs responsible for the other 14 facilities.[41] USMS's Chief of the Office of Detention Services said that even without the guidance, district CORs were aware of the Contracting Officer's ability to issue contract price reductions for unacceptable contractor performance. While this may be the case, we found that the price reduction guidance, though outdated, provided helpful detail on what constituted unacceptable contractor performance subject to an invoice reduction.

USMS officials also explained that contract price reductions were the option of last resort and that the superior method to encourage contractor accountability was through the assessment of contractor performance, which can affect a contractor's ability to secure future contracts with the federal government. The Contractor Performance Assessment Reporting System (CPARS) is the Government-wide electronic contractor evaluation system used to ensure that current, complete, and accurate contractor performance information is available for use in procurement source selections. The FAR requires that federal agencies collect and submit performance information into CPARS at least annually, which are automatically transmitted to the Past Performance Information Retrieval System, where USMS and other contracting entities can use that information to make informed business decisions when awarding federal contracts.

Despite the USMS's recognition of the importance of evaluating contractor performance, it was not entering performance assessment reports into CPARS for the LDC contract or any other detention contracts, as required by the FAR. Consequently, USMS procurement officials and agencies that also contract for services from private prison operators such as U.S. Immigration and Customs Enforcement and the BOP would not be able to view past performance information on USMS contracts during their source selection processes. This matter was described in the OIG's February 2016 Management Advisory Memorandum. As of February 2017, the USMS had incorporated new CPARS-related language into its request for proposal template and created a draft CPARS template. We recommend that the USMS continue to input performance assessment reports for its active contracts into CPARS, and finalize policies and procedures to ensure that contractor performance data on future detention contracts is entered into CPARS.

Next, the contract required the USMS to conduct Performance Evaluation Meetings on a regular basis as determined necessary by the Contracting Officer. Performance Evaluation Meetings are an element of USMS's contract that aim to assess and discuss with the contractor any performance-related issues and how best to resolve them. USMS adopted this process from BOP private prison contracts. For example, BOP's Reeves County Detention Center in Pecos, Texas, held formalized performance meetings each month that included the BOP's

---

[41] After OFDT merged into the USMS in 2012, USMS continued to use OFDT's contract price reduction guidance. However, in 2016 the USMS issued updated price reduction guidance.

25

Contracting Officer and onsite monitoring team, and contract staff at the prison, including the Warden. During the meeting they discussed general items, areas of concern, POAs, partnering matters, inmate grievances, incident reports, and several other topics. The meetings concluded with the contractor documenting and submitting the meeting minutes to the BOP for inclusion in the contract file.

USMS never conducted Performance Evaluation Meetings at the LDC. USMS officials believed such meetings were intended to be informal, though the contract clearly describes a structured process comprised of detailing the meeting's participants, the purpose of the meetings, and a requirement for a record of the discussion. In light of our previously described findings, we believe it is critical that USMS conduct and document these meetings as stated in the contract, and therefore recommend that the USMS begin conducting Performance Evaluation Meetings, as required by the contract, at the LDC and other detention facilities as applicable.

Lastly, the District COR did not evaluate and report on CoreCivic's performance from October 2010 through October 2015, even though this responsibility was documented in the District COR's position description. The contract also required the LDC's performance be assessed monthly, stating that the USMS pay the contractor's invoice after "services provided for each [monthly] billing cycle [are] determined based on performance to be acceptable." Furthermore, the FAR states that services "shall ordinarily not be accepted before completion of government quality assurance actions."[42] The District COR thought this requirement was unnecessary because the QAR already assessed the LDC's performance. However, the QAR assessed contractor compliance annually while USMS accepted contractor services monthly. We believe that the BOP's invoice review process represents a best practice. Each month upon receipt of the contractor invoice, BOP's Contracting Officer and onsite District COR were required to verify via a jointly signed memorandum that services were satisfactorily performed. This determination was based on its continuous monitoring efforts, including performance evaluation meeting minutes, oversight monitoring checklists, and other written assessments. We recommend that during USMS's development of standard operating procedures and contract monitoring instruments, it ensures that the District COR complies with contract and USMS District requirements to evaluate contractor performance prior to the payment of monthly invoices.

**CoreCivic Quality Control**

The LDC contract and FAR 52.246-4 require CoreCivic to provide and maintain an inspection system or Quality Control Plan (QCP) to ensure that all contract requirements are met, to identify and prevent defects in the quality of services performed, and to maintain records of inspections and any corrective or preventative actions taken. CoreCivic's QCP consisted of several inspection mechanisms performed by the LDC or CoreCivic headquarters, as shown in Table 4.

---

[42] FAR 46.501, *Acceptance - General*.

**Table 4**

**CoreCivic**
**QCP Inspection Mechanisms[43]**

| INSPECTION MECHANISM | CONDUCTED BY | DESCRIPTION |
|---|---|---|
| Informal Inspections | CoreCivic-LDC | Inspection via informal means (facility walkthroughs, individual department inspections, and inspections by local facility staff) that are not conducted on a predetermined schedule. |
| Quarterly Self-Monitoring Audit | CoreCivic-LDC | Formalized audit conducted quarterly by LDC quality assurance staff using subsets of CoreCivic's comprehensive audit tool. |
| Monthly Security Inspections | CoreCivic-LDC | Monthly inspection of all physical plant security elements, conducted by the Warden and Chief of Security. |
| Annual Operational Audit | CoreCivic-HQ | Formalized annual audit performed by an experienced team from CoreCivic's corporate Quality Assurance Division, using CoreCivic's comprehensive audit tool. |
| Triennial Mock ACA Audit | CoreCivic-HQ | CoreCivic Quality Assurance Division's contracted auditors assess LDC compliance with ACA standards prior to the official ACA audit. |

Source: CoreCivic

LDC's Quality Assurance Manager (QAM) administers the facility-level QCP by conducting periodic informal inspections and quarterly self-monitoring audits, and helping the Warden and Chief of Security complete monthly security inspections. The QAM assigns inspection steps to facility staff, documents deficiencies in the quality assurance tracking system, creates and maintains quality assurance files, annually reviews LDC policies and procedures, and coordinates with the CoreCivic Facility Support Center's (FSC) Quality Assurance (QA) Division.[44] The QA Division is led by a Managing Director who reports to the Company's Executive Vice President and General Counsel and is responsible for a team of full-time auditors and staff with corrections experience. The QA Division conducts the annual operational audit and coordinates the triennial mock ACA audit that is performed by consultants. We focused our review of CoreCivic's QCP on the LDC's informal inspections and quarterly self-monitoring audits because they were intended to provide the most persistent facility oversight.

*Inadequate LDC Oversight and Monitoring*

Our goal was to determine if the LDC's periodic informal inspections and quarterly self-monitoring audits were properly completed, supported by documentary evidence, accurately input into the appropriate information system or tracking log, generated appropriate POAs to remedy deficiencies, and monitored the

---

[43] Other inspection mechanisms include external audits conducted by the ACA and NCCHC.

[44] The Facility Support Center (FSC) is CoreCivic's headquarters, located in Nashville, Tennessee.

27

POAs to ensure they were implemented and operating effectively. To complete our analysis, we judgmentally selected 51 records from January 2011 to June 2015, comprised of 25 quarterly self-monitoring audit findings and 26 informal inspection findings. We found that the LDC conducted the quarterly self-monitoring audits within the established timeframes and that the results were properly input into the contractor's quality assurance information system and tracking log. However, the quarterly self-monitoring audits and informal inspections contained several weaknesses, including insufficient evidence that audit steps were conducted and POAs that did not sufficiently address deficiencies and did not provide viable long-term correction of the deficiencies. Also, the LDC often did not request and retain audit and inspection-related results, and had insufficient evidence that POAs were implemented, closed, and subsequently monitored to identify recurrences. A summary of our results is included in Table 5, followed by detail of each weakness.

**Table 5**

**OIG Analysis of LDC Quarterly Self-Monitoring and Informal Inspection Results[45]**

| WEAKNESS | QTR. SELF-MONITORING AUDIT (OUT OF 25 INSTANCES) | INFORMAL INSPECTIONS (OUT OF 26 INSTANCES) | TOTAL (OUT OF 51 INSTANCES) |
|---|---|---|---|
| 1. Insufficient evidence that review steps were conducted | 8 | 13 | 21 (41%) |
| 2. POAs did not sufficiently address deficiencies | 5 | 10 | 15 (29%) |
| 3. POAs did not provide a viable long-term correction of the deficiency | 20 | 22 | 42 (82%) |
| 4. Did not retain the original corrective action worksheet | 13 | 17 | 30 (59%) |
| 5. Insufficient evidence that POAs were implemented | 19 | 24 | 43 (84%) |

Source: CoreCivic

Insufficient Evidence to Support that Review Steps were Conducted

CoreCivic Policy 1-15, *Retention of Records* requires the QAM maintain copies of all audits and documents produced as a part of the audit process. The QAM conducts and coordinates informal inspections and quarterly self-monitoring audits using the Corrections Corporation of America Audit Tool (CCAAT), which is an auditing document containing over 1,600 audit steps across all areas of facility

---

[45] Although the OIG did not review POAs generated as a result of CoreCivic's annual operational audits, we believe weaknesses 2 through 5 are applicable because the annual operational audits are subject to similar POA requirements as the quarterly self-monitoring audits.

28

operations.[46]  As shown in Table 5, item no. 1, for 21 of the 51 audit steps reviewed, the LDC's QAM did not maintain sufficient evidence that quality assurance personnel conducted the requirements within the audit step.  The auditors' results often did not describe the work performed, files and records reviewed, or interviews conducted.  For example, LDC correctional officers are required to conduct irregular checks of detainees in the special housing unit (SHU).  The audit step requires the auditor interview SHU officers on check procedures, observe the facility video security system, and review the daily segregation activity report or logbook for each detainee's checks.  While the auditor concluded that SHU officers were not conducting the irregular rounds in a timely manner, there was neither documentation on the frequency of the deficiency, nor was there evidence that SHU officers were interviewed.  There was also no information identifying the dates or timeframes for observing video or for reviewing activity reports or logbooks.

We also identified many audit steps that auditors rated "satisfactory" without providing sufficient information to support their conclusions.  For example, one audit step was to assess Central Control's inventory of keys; this required the auditor examine the key control log book and daily inventory records, conduct a key inventory, and interview staff.[47]  The auditor concluded that Central Control's key inventory was satisfactory, but there was no evidence to support his or her conclusion.  The LDC's QAM agreed that there was often insufficient supporting documentation to corroborate audit conclusions, and suspected that facility staff sometimes reported satisfactory ratings without conducting the work.  However, the QAM had neither followed up on this suspicion, nor had the QAM ensured that staff began providing evidence to support their conclusions.  A consequence of this lack of documentation is that the LDC's QAM may be receiving inaccurate or incomplete results and would not have sufficient information to re-perform and validate the auditor's work.  We recommend that the USMS ensure that LDC's QAM request and retain supporting audit documentation to ensure audits are properly conducted and conclusions are supported.

Insufficient Plans of Action

CoreCivic policy requires that deficiencies identified through both informal inspections and quarterly self-monitoring audits are corrected in an effective manner.  Upon identifying a deficiency, the QAM coordinates with the affected department head to formulate a POA containing a description of the noncompliance, and the strategies and action steps that provide a "viable long-term correction of the deficiency."  Department heads formulate the POAs using a corrective action worksheet and normally have 10 business days to prepare and provide them to the

---

[46]  The audit areas cover General Administration, the Prison Rape Elimination Act, Finance, Human Resources, Learning and Development, Health Services, Security and Control, Safety and Sanitation, Vehicle Management, Physical Plant, Food Service, Laundry, Classification and Unit Management, and Inmate Programs and Services.

[47]  Central Control is where the LDC's master controls for electronic security systems are located.

QAM, who ensures the corrective action worksheet is adequate and approves the POA. At this stage, the processes for the informal inspections and quarterly self-monitoring audits begin to differ. For the informal inspections, the QAM monitors and updates results within the Log of Informal Findings. For the self-monitoring audits, the QAM enters the POA into the quality assurance tracking system which allows the QAM to generate the Plan of Action Form and monitor corrective action progress. Lastly, the Warden reviews and approves the Plan of Action Form (Warden's approval is not required for POAs identified via informal inspections).

As shown in Table 5, item nos. 2 and 3, the LDC's POAs did not sufficiently address the deficiency in 15 instances (29 percent) and did not provide a viable long-term correction of the deficiency in 42 instances (82 percent). CoreCivic's Quality Assurance Managing Director said the formulation of a viable long-term correction requires identification of the root cause. Although the quality assurance tracking system provides a field to track "root cause(s)" and CoreCivic considers its use a best practice, CoreCivic does not require its use. In practice, the "root cause(s)" field was rarely used. Together, these discrepancies contributed to the LDC's insufficient POAs. For example, one LDC quarterly self-monitoring audit determined that Case Managers were not in every housing unit to address detainees' daily needs. The POA stated that "Case Managers will be in their units daily." This is not a sufficient POA. It merely states the desired outcome without identifying the issue's root cause. In another instance, an LDC informal inspection identified a deficiency with weekly chemical inventory levels; some inventories showed zero when product was in stock. The POA stated that the Safety Manager would speak to the Maintenance Supervisor, who would then speak to his staff about properly filling out inventory information. Only 10 days later this same deficiency was again identified and a new POA generated that prescribed strategies and action steps that were almost identical to the previous POA. This POA was not sufficient, as it failed to prevent recurrence of the deficiency and did not identify the root cause of why the inventory records differed from the actual count of product in stock.

The LDC's QAM and Warden share responsibility for certifying the adequacy and completion of the POAs.[48] The LDC's QAM was dissatisfied with the quality of the POAs submitted from department heads and acknowledged that she sometimes did not require they remedy the insufficient POAs, and she did not offer instruction or guidance to department heads on how to develop a sufficient POA, such as providing copies of the Strategies/Action Steps Worksheet.[49] Furthermore, several senior LDC officials said the LDC's prior warden had not recognized the importance of the facility's quality control process, treating it more as a guideline than a

---

[48] As previously noted, CoreCivic policy requires the Warden approve POAs for the quarterly self-monitoring audits but not the informal inspections.

[49] LDC policy contains a Strategies/Action Steps Worksheet (*CoreCivic Appendix 1-22AA*) instructing staff to consider the required resources, expenditures, training, changes to post orders or procedures, and practical timeframes necessary to correct a deficiency.

requirement and not holding department heads accountable for providing insufficient POAs. The LDC's QAM agreed that the LDC needed a more concerted effort to reinforce the requirements for a properly completed POA and to encourage department heads to identify and address the root causes of deficiencies. CoreCivic's Quality Assurance Managing Director told us that the "root cause(s)" field was intended as a best practice tool and potential resource rather than as a requirement.[50] However, we believe that requiring identification of the root cause is a critical step in "formulating a viable long-term correction," as required by CoreCivic policy, and could help department heads formulate POAs that identify and correct the underlying cause to prevent future occurrences, instead of simply addressing symptoms of the deficiency.

Next, as shown in Table 5, item no. 4, the LDC's QAM often did not ensure that department heads provided and retained the corrective action worksheets necessary to prepare the POAs, as required by CoreCivic policy. In 30 instances (59 percent) the LDC's QAM could not provide copies of these corrective action worksheets. For the quarterly self-monitoring audits, the LDC's QAM had previously discarded some corrective action worksheets after they were input into CoreCivic's compliance tracking system. For the informal inspections, the LDC's QAM sometimes did not require department heads complete the required corrective action worksheet, but instead entered corrective actions directly into the informal tracking log. CoreCivic's Quality Assurance Managing Director told us that the informal tracking log was not designed as a replacement for the corrective action worksheet. By not requiring that department heads complete and provide POAs using the required corrective action worksheet, the LDC's QAM may not be adequately reviewing POAs prior to department heads implementing their corrective action.

To remedy the aforementioned issues, we recommend that the USMS ensure that the LDC enforces existing CoreCivic policies and procedures for generating and approving comprehensive POAs, including: (a) drafting POAs that sufficiently address the deficiencies and requiring that department heads identify the deficiencies' root causes; (b) ensuring the LDC's QAM and Warden provide instruction and guidance to department heads on the contents of a sufficient POA, and only approve fully compliant POAs; and (c) ensuring that department heads complete and the LDC's QAM retain the corrective action worksheets.[51]

Plans of Action were Inadequately Implemented

As shown in Table 5, item no. 5, the LDC's QAM could not provide documentary evidence that POAs were implemented by LDC staff in 43 instances (84 percent). According to CoreCivic policy, after the QAM and Warden review and

---

[50] In March 2017, CoreCivic provided documentation indicating that the QAM has started to incorporate improvements to POAs.

[51] This recommendation applies to both the informal inspections and quarterly self-monitoring audits.