approve the content of the POAs, the QAM is responsible for monitoring implementation by confirming and documenting that the POA's strategies and action steps were completed. The LDC's QAM told us that she would sometimes follow up on an informal basis, such as by email or phone, but failed to retain evidence to document those efforts. Without sufficient evidence supporting the LDC's QAMs efforts to confirm and document that action steps were implemented, there is no assurance that the LDC's QAM monitored the implementation of corrective actions to resolve the deficiency. To remedy the aforementioned issue, we recommend that the USMS ensure that the LDC enforces existing CoreCivic policies and procedures by confirming and documenting that POA strategies and action steps were implemented.

*LDC's QAM Needs Additional Quality Assurance Guidance*

CoreCivic policy in the area of quality assurance primarily focuses on processes after the identification of findings, such as the generation, tracking, correction, and closure of POAs.[52] While the CCAAT provides the QAM with detailed criteria and audit steps, we found that the LDC's QAM received minimal instruction and guidance on how to conduct the facility reviews to identify deficiencies and how to continuously monitor closed POAs. CoreCivic policy does not address the frequency and breadth of reviews (e.g., developing an audit schedule); the establishment of a sample size when one is not already specified in the CCAAT; the maintenance of requisite qualifications, technical expertise, and accountability by personnel supporting the QAM's efforts; the appropriate documentary evidence necessary to validate the auditors' conclusions and enable re-performance if necessary; methods for proper retention of documentary evidence; the approval and monitoring of the LDC's inspection and audit methodologies by the FSC; and the establishment of contingency plans for conducting quality assurance-related work should the QAM be unavailable.

CoreCivic policy also does not provide guidance for QAMs to conduct continuous monitoring of a deficiency after the QAM determines that a POA's strategies and action steps are completed. During our analysis of quarterly self-monitoring and informal inspections we requested the LDC's QAM provide documentation to support monitoring efforts after closure of a POA. The LDC's QAM could not provide documented evidence for any of the 48 deficiencies we reviewed.[53] Therefore, the LDC's QAM was not proactively assessing the effectiveness of POAs until the occurrence of the next audit or inspection, which sometimes was several months later. We believe that CoreCivic can address this issue by providing QAMs additional guidance to monitor deficiencies after implementation and closure of a POA. As CoreCivic's Managing Director suggested, continuous monitoring efforts can be driven by a risk-based assessment; for example, POAs for deficiencies that impact facility security and control or detainee

---

[52] CoreCivic Policy 1-22, *Plan of Action*.

[53] Three of the 51 instances (2 informal inspections, and 1 quarterly audit) were not applicable since completion consisted of purchasing or repairing an item.

32

and staff safety should receive additional monitoring to ensure that those actions are effective.  Also, intermittent monitoring of previously non-compliant areas would be more effective than repeatedly reviewing areas already deemed compliant.

The LDC's QAM told us the CCAAT and training had provided some helpful instruction on how audits should be conducted, but not the comprehensive guidance (i.e., a procedure manual) necessary to perform day-to-day operational duties.  Instead, the LDC's QAM primarily relied on the contents of her position description to describe her roles and responsibilities.  We reviewed the position description and found that it was generic and contained little useful information on how to perform her QAM operational duties.  This resulted in an unclear, inconsistent, and questionable approach to performing informal inspections.  Specifically, the LDC's QAM informed us that when conducting informal inspections, she would sometimes request staff complete the entire CCAAT (i.e., over 1,600 detailed audit steps) in a single month.  In our judgment, this was not an efficient and effective use of the CCAAT or personnel resources, and the LDC's QAM agreed it was causing employee burnout.  CoreCivic's Managing Director for Quality Assurance said the informal inspections should not attempt to complete the entire CCAAT in a month, but should follow a risk-based approach.

In addition, the LDC's QAM believed she could not conduct many of the healthcare-related quality assurance steps due to Health Insurance Portability and Accountability Act (HIPAA) requirements.[54]  However, CoreCivic officials said there are no HIPAA requirements that prevent the LDC's QAM from accessing information to conduct audits or to follow up on findings as a result of those audits.  We believe additional guidance provided to the QAM through use of an Audit Procedure Manual or other mechanism could better clarify the QAM's job responsibilities and help ensure that facility audits and inspections are performed in an effective and efficient manner.  Therefore, we recommend that the USMS ensure CoreCivic creates an Audit Procedure Manual or some other mechanism or process to provide the LDC's QAM with comprehensive guidance on how to properly conduct facility audits and continuously monitor closed POAs.  Such guidance should, at a minimum, address the areas listed on page 32 and receive USMS approval.

**USMS Detainee Mortality Reporting Processes**

In the event of a detainee death, the LDC contract requires CoreCivic immediately notify the COR and submit a written report to the U.S. Marshal within 24 hours.  USMS Policy Directive 9.32, *Death of Federal Prisoners* contains requirements for the USMS district responsible for the detention facility to perform in the event of a detainee death, including notifying POD's Chief of Detention Operations and ascertaining whether the detainee death was from natural causes or

---

[54]  HIPAA was enacted on August 21, 1996.  The HIPAA Privacy Rule aims to define and limit the circumstances in which an individual's protected health information may be used or disclosed by covered entities.

the result of negligence or foul play. Additionally, within one week of the detainee's death the district is required to provide a report to POD's Chief of Detention Operations that includes the circumstances surrounding the detainee's death and relevant medical information, such as treatments provided, dates of visits to the detention facility's health services unit or hospital, and the cause of death. Lastly, the U.S. Marshal must provide to the POD a coroner's report or medical examiner's findings; an autopsy report, if conducted; and a death certificate.

Additionally, the National Commission on Correctional Health Care requires that all detainee deaths be reviewed to determine the appropriateness of clinical care; to ascertain whether changes to policies, procedures, or practices are warranted; and to identify issues that require further study.[55] All deaths are to be reviewed within 30 days; and a death review is to include an administrative review, clinical mortality review, and a psychological autopsy in the event of a suicide.

We determined that the USMS and LDC complied with these requirements for the seven detainee deaths occurring during the period of our review. However, we identified a potential BOP best practice that we suggest the USMS consider implementing. Specifically, the BOP is required to conduct reviews of all inmate deaths at its contract facilities to determine if medical management of the inmates' condition was in accordance with BOP policies and standards of care. According to BOP officials, the BOP uses an independent contract physician to review the contractor mortality reports and provide written recommendations to the contractor. BOP officials said the purpose of this independent review is to identify weaknesses in care provided to inmates at its contract facilities, determine the root cause of any unexpected or sudden death, obtain lessons learned to avoid repeat mistakes, and bolster its internal controls.

In contrast, the USMS does not conduct a review of the contractor-provided mortality reports to independently assess their accuracy and completeness. USMS's Office of General Counsel said USMS policy does not require such a process. POD's Chief of the Detention Standards and Compliance Branch said that while USMS's annual QAR evaluates clinical and chronic care areas, it does not ensure that detainees who died received proper medical treatment prior to their deaths. This official was receptive to the BOP's process and explained that if adopted, the QAR team possesses the technical knowledge and experience necessary to conduct independent reviews of detainee deaths and assess whether contract medical staff followed all medical protocols. We believe that conducting such a review would help USMS ensure that the contractor's medical management of detainee conditions prior to death is in accordance with USMS policies and standards of care. Accordingly, we recommend that the USMS consider implementing policies and procedures similar to those of the BOP that independently evaluate contractor-provided detainee mortality reports.

---

[55] NCCHC standard J-A-10, *Procedure in the Event of an Inmate Death*.

**Observation of LDC Video Security Surveillance**

We reviewed the LDC's video security footage to determine whether the facility complied with its policies related to facility security, detainee recreation, and irregular checks of detainee cells within the SHU.[56] Our review found that correctional officers in the SHU complied with LDC policy that requires detainees pass through metal detectors on the way to the recreation yards, and conducted irregular checks of SHU detainee cells twice per hour. However, we observed three instances where correctional officers in the SHU did not follow LDC policy requiring detainees walk out of their cells backwards.[57] Not requiring detainees to walk backwards places the correctional officer at increased risk of a detainee assault. In addition, we found that LDC recreation correctional officers were not completing thorough searches of all recreation areas, including all fences, gates, fasteners, walls, windows, bars, storm drains/manholes, locking devices and doors prior to and upon completion of each recreation period as required by CoreCivic policy and post order for outdoor recreation. Specifically, we found that in 10 of the 12 recreation periods the LDC correctional officers had not conducted thorough searches of all recreation areas, thereby increasing the risk that LDC officers would not detect instances of compromised yard security, including the potential introduction or attempted transfer of contraband items.

In early 2016, CoreCivic updated LDC policies and procedures to address these matters and improve the facility's quality assurance processes. First, CoreCivic updated the LDC's post orders to require Shift Supervisors and Assistant Shift Supervisors to observe recreation yard searches and detainee movement in the SHU on a daily basis and to perform a weekly review of the LDC's video security footage. Secondly, CoreCivic updated LDC policy to formally grant the LDC's QAM access to the facility's security system, enabling the LDC's QAM to observe recreation yard searches and detainee movement in the SHU. USMS approved these changes, which became effective in April 2016. We reviewed the changes to LDC policy and post orders and believe the POA should provide LDC officials the necessary oversight to ensure that the identified weaknesses are resolved. However, given the LDC's difficulties implementing POAs, we recommend that the USMS monitor LDC compliance with the new CoreCivic policies and post orders related to recreation yard searches and detainee movement in the SHU, to ensure they are operating effectively.

---

[56] Our review of the LDC encompassed judgmentally selected periods between August 3 through September 6, 2015, for the SHU and August 3 through August 13, 2015, for the recreation yard.

[57] CoreCivic-LDC Post Order 23 states that once the SHU cell door is opened, detainees are to be backed out of their cells. At no point are the detainees to exit the cell facing forward. The three instances were identified during a 75 minute review period on August 19, 2015. In total we reviewed approximately 22 hours of SHU video.

**Staffing Requirements and Triple Bunking**

According to the Department's National Institute of Corrections (NIC), staff is the most indispensable, important, and expensive resource in corrections.[58] Consistent with that statement, staffing dominates corrections operating budgets at both government and privately operated facilities. The LDC contract requires that CoreCivic maintain a USMS-approved staffing plan (USMS plan) throughout the term of the agreement. The purpose of the USMS plan is to identify all personnel necessary for CoreCivic's performance of the contract and to provide the number, type, and distribution of staff throughout the facility.[59] USMS, however, was not the only government entity using the facility. In July 2009, CoreCivic contracted with Wyandotte County, Kansas to confine and supervise up to 220 detainees. As a result, in addition to the USMS plan, CoreCivic maintained a facility-wide staffing plan (Facility plan). The Facility plan assesses the LDC's overall staffing needs and includes both the USMS's and Wyandotte's detainees. Unless otherwise stated, the following OIG staffing analysis was based on the Facility plan, which had a higher staffing level than the USMS plan. This was done because the USMS and Wyandotte shared personnel resources extensively; specifically, 165 of the Facility Plan's 234 FTEs (71 percent) were shared between USMS and Wyandotte. Furthermore, CoreCivic sometimes updated the Facility plan to include USMS-exclusive positions that were not always contained within the USMS plan.

We determined that the LDC's overall staffing levels from October 2012 through September 2014 were generally consistent with the Facility plan thresholds, with the monthly facility-wide vacancy rate averaging 5 percent. However, from October 2014 through September 2015, LDC staffing levels deteriorated and the average monthly facility-wide vacancy rate more than doubled to 11 percent. LDC's increased vacancy rates were primarily driven by turnover in correctional officer positions. Correctional officers are integral to the safe and secure operation of detention facilities. They supervise the activities of detainees, enforce rules and maintain order, inspect facilities, monitor detainee movement, and constantly interact with detainees. While the LDC averaged only a 4 percent monthly vacancy rate for correctional officers from October 2012 to September 2014, that rate more than tripled from October 2014 through September 2015, reaching as high as 23 percent in March 2015, as shown in Figure 3.

---

[58] The National Institute of Corrections is a component of the BOP that provides training, technical assistance, information services, and policy/program development assistance to federal, state, and local corrections agencies.

[59] The USMS plan provides the number of positions needed per shift and the number of total staff, measured in full-time equivalents (FTE), necessary to cover posts on a continuous basis. The USMS plan is organized into the following seven sections: (1) management/support, (2) security/operations, (3) unit management, (4) maintenance, (5) programs, (6) services, and (7) health services. If CoreCivic pursues any change to the USMS plan, it must request USMS's approval prior to implementation.

**Figure 3**

**LDC Monthly Vacancy Rates**
**October 2012 through September 2015**



Source: CoreCivic

The consensus among LDC staff was that high correctional officer turnover began because of regional job opportunities that offered higher pay and benefits. Our review of LDC exit interviews from January through December 2015 confirmed this, finding that 6 of the 12 respondents sought alternative employment for reasons including compensation and benefits.[60] Furthermore, when the exit interviews asked for common areas of improvement and what they liked least about working at the LDC, 8 of 12 respondents mentioned understaffing. According to NIC, vacancies can dramatically affect the availability of staff to cover posts, and regaining coverage of posts can be delayed by the processes of recruitment, training, and orientation. When problematic turnover becomes a regular occurrence, morale suffers, word spreads, vacancies occur, and recruitment becomes difficult.

In the following sections, we assess CoreCivic compliance with staffing requirements stipulated by the contract and facility policies and procedures, as well as the USMS's efforts to monitor the LDC's staffing. We analyzed the LDC's staffing levels and vacancy rates, evaluated the LDC's staffing policies and procedures, selected a sample of shift rosters to determine if the LDC was filling its security posts, reviewed the USMS's contract staffing provisions and compared them to the BOP's, and interviewed LDC staff to gain an understanding of the facility's staffing levels and conditions. We found that correctional officer turnover led to several

---

[60] Because exit interviews were optional, participation was limited.

Case 3:16-cv-02267    Document 361-13    Filed 11/20/20    Page 6 of 35 PageID #: 14391

problems in 2015, including the LDC's long-term use of mandatory overtime, the closure of a large number of security posts considered mandatory by CoreCivic, and the diversion of unit management staff from their normal job duties to filling security posts. We also found that CoreCivic was slow to react to the understaffing and did not utilize all available staffing options to remedy the problem. Finally, we found that LDC officials concealed the facility's use of triple bunking from the ACA in what appears to be an effort to receive a higher accreditation score.

CoreCivic's 2015 Annual Report noted that staffing salaries and benefits comprised approximately 59 percent of its operating expenses. As a for-profit corporation, CoreCivic and other private prison operators have a financial incentive to control staffing costs, which creates a critical need for the USMS to provide adequate oversight of the facility's staffing levels and composition. We identified two significant deficiencies concerning USMS oversight of facility staffing. First, the USMS did not conduct sufficient monitoring to ensure that the LDC maintained appropriate staffing levels. Secondly, the USMS failed to hold CoreCivic accountable for its significant understaffing throughout 2015. In fact, the USMS contributed to staffing deficiencies by authorizing CoreCivic to transfer a small contingent of its contracted LDC staff to open a U.S. Immigration and Customs Enforcement facility in Texas during a time of significant understaffing at the LDC. Additionally, the USMS allowed CoreCivic to enter into a separate contract with Wyandotte County, Kansas to house non-federal detainees at LDC at a discounted rate without first considering the impact on USMS's contracted staffing resources and the LDC contract price. As a result, staffing resources originally dedicated to the USMS detainees became shared with Wyandotte County, and Wyandotte County housed its inmates at a significantly lesser contract per diem rate than the USMS. Ultimately, USMS received little or no discernible benefit - financial or otherwise – from this arrangement.

*LDC Understaffing Led to Security Post Closures*

According to CoreCivic's technical proposal, the USMS plan ensures that a sufficient number of officers will be posted within all housing units for prompt response to emergencies or inquiries from all detainees and to ensure accountability. LDC must generate and maintain daily correctional staff assignment rosters (shift rosters) that reflect the facility's coverage needs and list the scheduled and actual assignments by shift and post. Shift rosters are essential to the security of an institution and the posts listed in the shift roster should mirror the facility's staffing plan. For example, if the staffing plan requires three correctional officers per day to address detainee recreation, the daily shift roster should contain three recreation posts. LDC's shift rosters assign various personnel across multiple 12-hour and 8-hour shifts per day. On weekdays, the LDC typically has 64 posts on the first shift (AM shift) and 29 posts on the second shift (PM shift). Weekends require fewer posts because certain functions, such as transportation, are only performed on weekdays.

We selected a sample of shift rosters to determine if the LDC had filled its security posts. If not, we counted the number of and length of post closures,

counted the posts most often closed, and described any other discrepancies. For our limited review, we chose shift rosters during two periods which we refer to as the Winter and Summer Timeframes. The Winter Timeframe was from February 1 through March 31, 2015, and consisted of 59 days and 118 shifts. The Summer Timeframe was from July 1 through August 15, 2015, and consisted of 46 days and 92 shifts.

We found that during the Winter Timeframe, the LDC closed at least one security post in all 118 shifts (100 percent) and closed approximately 7 posts per shift, which accounted for nearly 65 hours of correctional officer work that went unperformed per shift. During the Summer Timeframe, the LDC closed at least one security post in 85 of 92 shifts (92 percent) and closed approximately 7 posts per shift, which accounted for nearly 55 hours of correctional officer work that went unperformed per shift. Many of the post closures occurred at "mandatory" posts. According to CoreCivic, facility managers typically identify "mandatory" posts within their institution as those that must be filled on each shift in order to run the facility in a safe and secure manner. Mandatory posts are identified within LDC shift rosters and it is the responsibility of LDC's Shift Supervisors and Assistant Shift Supervisors to ensure that all mandatory posts are staffed. LDC's most frequently closed mandatory posts included Central Control, Pod Control 5, Housing Unit Y, Outdoor Recreation, and Utility/Search and Escort, each of which is described below.[61]

- **Central Control –** Central Control is where the LDC's master controls for electronic security systems are located. Central Control officers are tasked with controlling access in and out of the facility; tracking internal movement within the facility; monitoring the general safety and welfare of individuals and areas of the facility via video camera; responding to emergencies; handling the issuance, receipt, and inventory of key rings and equipment; and performing several other duties. According to the LDC contract, Central Control has a critical impact on the institution's orderly and secure operation. The facility-wide staffing plan requires four posts, two on both shifts, which are generally denoted as "mandatory" posts on the LDC shift rosters.

  The closures were most prevalent during the Winter Timeframe when the LDC closed at least one of four posts on 52 days (88 percent) for a total of 619 hours, or a 22 percent vacancy rate. During the Summer Timeframe, the LDC closed at least one of the four posts on 19 days (41 percent) for a total of 215 hours, or a 10 percent vacancy rate. Furthermore, the LDC closed at least one Central Control post for an entire 12-hour shift on 42 of 58 days during the Winter Timeframe and 9 of 46 days during the Summer Timeframe.

  One Central Control officer we interviewed said it was necessary to have two

---

[61] The USMS contract and staffing plan do not differentiate between mandatory and non-mandatory posts. USMS does not play any role in identifying mandatory posts.

correctional officers in Central Control at all times due to the large number of responsibilities. By closing one of the Central Control posts, the remaining Central Control officer's responsibilities double. Furthermore, if Pod Control posts are closed throughout the facility, those post's duties are typically transferred to Central Control, further increasing Central Control's workload. As described below, this did occur with the closure of certain Pod Control posts.

- **Pod Control 5 –** Pod Control maintains the internal security of the detainee housing units by continually monitoring the housing area and housing officers.[62] LDC has seven pod control posts throughout the facility, each located adjacent to two or more housing units.[63] Pod Control officers observe detainees, visitors, and staff on the premises to guard against escape, injury, theft, and damage to property.

  During the Winter Timeframe, the LDC filled the seven Pod Control posts 93 percent of the time, as measured in hours, and during the Summer Timeframe filled those posts 96 percent of the time. When closures did occur, it was most often in Pod Control 5, which was vacant 23 percent of the time during the Winter Timeframe and 10 percent of the time during the Summer Timeframe. On August 9, 2015 - one of the most understaffed days we reviewed - the LDC closed five of seven Pod Control posts in both the A.M. and P.M. shifts, which accounted for 72 hours of closure out of the 168 hours (43 percent) required for correctional officers to cover all seven Pod Control posts that day. Pod Control posts were denoted as "mandatory" on LDC shift rosters.

  LDC's former Warden said the LDC closed Pod Control 5 because it monitored detainees with a lower security level than the other Pod Control posts. When Pod Control posts close, monitoring responsibilities are typically transferred to Central Control, which as described above, was also frequently understaffed. Two LDC staff we interviewed said the closure of Pod Control posts was unnerving to Housing Unit officers. Specifically, staff expressed concerns that, were an incident to occur on the floor, Central Control officers may take longer to react than a Pod Control officer because they had assumed Pod Control duties in addition to their existing responsibilities, and also do not have the continuous direct line of sight into the housing units that Pod Control officers have.

- **Housing Unit Y –** LDC detainees are housed in multiple-occupancy cells within the facility's 22 housing units, or "pods." Housing Unit officers monitor activities within the pods, report any suspicious behavior, perform random cell searches and security checks, conduct counts, and perform other

---

[62] Pod Control units are also referred to as Housing Control or a "Bubble."

[63] Of the LDC's seven Pod Control posts, six are exclusive to USMS detainees and one is exclusive to Wyandotte County detainees.

duties.  There are 23 daily Housing Unit officer posts located throughout the facility, and most were continuously manned.  The exception was Housing Unit Y, which consisted of five Housing Unit officer posts in segregation and general housing pods.

During the Winter Timeframe, the LDC closed at least 1 of 5 Housing Unit Y posts on 46 days (78 percent) for a total of 476 hours, or a 13 percent vacancy rate.  During the Summer Timeframe, the LDC closed at least one post on 43 days (94 percent) for a total of 819 hours, or a 30 percent vacancy rate.  All Housing Unit posts were denoted as "mandatory" on LDC shift rosters.

A senior LDC official said LDC closed posts in Housing Unit Y because of declining detainee populations throughout 2015.  These declines resulted in the LDC not needing space in Housing Unit Y's general housing pod.  However, as described later in the report, the LDC was also able to close these posts in part because CoreCivic officials were triple-bunking detainees elsewhere throughout the facility.

- **Outdoor Recreation –** CoreCivic policy and ACA standards require detainees receive access to exercise opportunities, including at least 1 hour daily of physical exercise outdoors when weather permits.[64]  The facility-wide staffing plan and shift roster require three security posts during the A.M. shift to administer detainee recreation.

  During the Winter Timeframe, the LDC closed at least 1 of the 3 recreation posts on 55 days (93 percent), and the posts were vacant for a total of 1,401 hours, or a 66 percent vacancy rate.  During the Summer Timeframe, the LDC closed at least 1 of the 3 recreation posts on 41 days (89 percent), and posts were vacant for a total of 706 hours, or a 43 percent vacancy rate.  Recreation posts were denoted as "mandatory" on LDC shift rosters.

  Nearly half of the post closures during the Winter Timeframe occurred due to inclement weather and facility shakedowns, which are physical or visual searches of a specific area of the facility.[65]  LDC's former Warden said that during the most significant understaffing in 2015, LDC staff felt relief when inclement weather arose, as they could justify closing all three recreation posts for the entire day, even if the bad weather soon subsided, and did not have to vacate other facility posts to run the recreation yard.  During the Summer Timeframe, LDC began to start recreation 3 hours later than usual because, as a senior LDC official explained, they had insufficient staff early in

---

[64]  CoreCivic Policy 20-100, *Inmate/Resident Services and Programs; and ACA Standard 4-ALDF-5C-01*.

[65]  CoreCivic policy states that all outdoor recreation areas will be closed whenever the outside temperature falls below zero degrees Fahrenheit or if there is lightning, snow, ice, freezing rain, or other conditions that create an increased risk of injury to staff or detainees.

the morning and had to wait for more personnel to come onboard. Our review of shift rosters found that of 29 instances where recreation started late (excluding instances where recreation was closed entirely), in only 5 instances were recreation schedules extended to compensate for the delay. As a result, detainees began receiving less recreation time. Eight of the nine detainees we interviewed said they received less than one hour of outdoor recreation per day, and that it often lasted only 30 minutes. During our review of LDC security video surveillance, we noted that detainees only received an average of 37 minutes of recreation on August 13, 2015. Conversely, one correctional officer expressed frustration with detainees being granted outdoor recreation during a period of chronic understaffing, and wondered why a Housing Unit officer should risk his or her safety to accommodate detainee recreation. For example, a Housing Unit officer might lose his or her respective Pod Control Officer, who could be forced to vacate the Pod Control post to fill a recreation post.

- **Utility/Search and Escort –** Utility/Search and Escort posts temporarily assume or assist in the general supervision of security posts within the facility. They may provide relief to correctional officers, provide backup support during any detainee disturbance, respond to any detainees in distress or being harmed, escort detainees throughout the facility, and provide additional assistance throughout the facility.

  During the Winter Timeframe, the Facility plan required four Utility/Search and Escort posts per day and during the Summer Timeframe, the Facility plan required five Utility/Search and Escort posts per day. For both timeframes, these posts provide coverage 24 hours per day, 7 days per week. In the Winter Timeframe, LDC closed at least one of the 4 Utility/Search and Escort posts on all 59 days (100 percent) for a total of 1,704 hours, or 60 percent of the time. In the Summer Timeframe, the LDC closed at least one of the five Utility/Search and Escort posts on 41 days (89 percent) for a total of 1,203 hours, or 44 percent of the time. Utility/Search and Escort posts were generally denoted as "mandatory" on LDC shift rosters.

  CoreCivic officials explained that these Utility/Search and Escort posts are buffers to address the very understaffing that occurred at the LDC. During a time of need, they would expect this post to close first, as the Shift Supervisor would need to transfer correctional officers to a different post.

LDC's persistent closure of security posts meant that CoreCivic could not provide all of the personnel deemed necessary for the performance of the LDC contract. Furthermore, because many of these posts were considered "mandatory," or required continuous staffing, the LDC's failure to consistently fill these posts compromised its ability to run the facility in a safe and secure manner. In the following sections we describe how LDC did not promptly address the facility's understaffing problems which led to the post closures, and how the USMS did not adequately monitor and hold CoreCivic accountable for the understaffing.

42

*LDC Did Not Promptly Address Facility Understaffing*

CoreCivic facilities can address chronic understaffing through several means including use of overtime, use of temporary personnel from other CoreCivic facilities or a security service company, and adjustment to its recruiting and hiring practices. FSC officials explained that the first management strategy for addressing understaffing is the use of voluntary and mandatory overtime, and that facilities must balance their overtime use to ensure it is not leading to staff burnout, underperformance, and low morale. According to these officials, if a Warden and his or her management team begin to encounter such indicators, they can submit a request to FSC for temporary personnel from other CoreCivic facilities. FSC officials also said CoreCivic has begun hiring temporary correctional officers from a security service company. This could be a future option for the USMS to consider when addressing understaffing, though CoreCivic officials said this choice was limited by a scarcity of hirable staff with correctional officer experience.

Another strategy to address understaffing is to adjust recruitment and hiring practices, such as providing increased pay and benefits. FSC officials said this was not necessary because the LDC historically had few problems hiring staff, had maintained low turnover, and offered among the highest correctional officer wages of CoreCivic's institutions. They said that the LDC's understaffing in 2015 was an isolated incident. LDC could also bolster its hiring and recruitment by requesting CoreCivic authorization to hire more correctional officers than its staffing plan allowed. Specifically, the LDC requested and obtained an additional two correctional officer FTEs in June 2015 and four more correctional officer FTEs in September 2015. FSC officials said this was intended as a temporary option to allow the LDC to hire a larger class of correctional officers than would be necessary under stable staffing conditions, in order to compensate for any further correctional officer turnover occurring between the hiring and deployment of staff. However, this action was taken after several months of LDC understaffing and had a less immediate impact than obtaining temporary personnel from other CoreCivic facilities that could be deployed quickly. As the former Warden noted, the recruitment, training, and deployment of correctional officers is a lengthy process. Despite the LDC's efforts, understaffing and post closures continued.

In our judgment, LDC was too slow and reactive in addressing facility understaffing, which began in late 2014 and continued for most of 2015. We determined that the LDC did not utilize the staffing options available to help mitigate the understaffing, such as requesting temporary personnel from other CoreCivic facilities. While the LDC had temporarily transferred its staff to other CoreCivic facilities in Texas and Louisiana (as described later in this report), it had not requested such assistance to address its own understaffing in 2015. FSC officials believed that the LDC's former Warden did not request such help because the former Warden "believed he and his management team were managing post coverage appropriately with the staffing resources at [their] disposal, including utilization of voluntary and mandatory overtime…." An FSC official said that had the LDC requested temporary staff, FSC would have considered it. LDC's former Warden strongly disagreed, saying that while he could ask FSC for temporary staff,

43

it was unrealistic that he would receive it. However, the LDC's former Warden could not provide any evidence to validate this assertion such as documentation showing he had requested temporary staff or that FSC officials rejected or were dismissive of such requests.

Furthermore, the LDC's former Warden said that a request for temporary staff should not have been necessary because FSC knew of the LDC's understaffing. Our interviews of FSC staff and review of CoreCivic documents and reports confirmed this. These interviews and documentation indicated that FSC officials reviewed facility statistics on overtime and turnover, inquired about the existence of understaffing at the LDC and its causes, and were made aware of the LDC's understaffing. However, FSC officials said they had not reviewed the LDC's completed shift rosters, which would have shown that the LDC was consistently vacating its security posts, and we did not encounter any evidence indicating otherwise. Regardless, nothing precluded FSC from requesting and viewing the LDC's completed shift rosters.

LDC's former Warden and his management team were ultimately responsible for ensuring that their facility was adequately staffed, as they had the greatest visibility of the extent of the understaffing and its repercussions. We believe the LDC should have requested FSC assistance when its correctional officer staffing levels deteriorated and led to continuous post closures. However, we believe that FSC also bears responsibility for independently monitoring the LDC's staffing situation, and that this is best accomplished through the review of completed shift rosters. A properly completed shift roster provides important detail on how the LDC is managing and allocating its personnel to fill its posts. Therefore, we recommend that the USMS ensure that CoreCivic establishes policies and procedures that prevent the closure of mandatory posts at CoreCivic's USMS contracted facilities and require FSC to assess completed shift rosters to determine if facilities are adequately filling their security-related posts.

*USMS Did Not Adequately Monitor and Hold CoreCivic Accountable for Understaffing*

USMS's District COR and QAR team were responsible for monitoring CoreCivic compliance with the contract's staffing requirements. The District COR was required to collect vacancy and staffing complement reports on a quarterly basis and to ensure that the LDC generated POAs to address personnel vacancies.[66] The District COR had collected quarterly vacancy reports, which broadly depicted the LDC's increasing correctional officer vacancies during 2015. Vacancy reports alone, however, were not sufficient to fully assess the LDC's staffing and post coverage. Other than touring the facility, the District COR's best means to determine if the LDC had adequate personnel to fill its security posts was through reviews of shift rosters. However, the District COR could neither provide any evidence that she

---

[66] QAR team responsibilities included ensuring that the LDC conducted an annual comprehensive staffing analysis. We did not identify any discrepancies in the QAR team's annual staffing analysis.

44

reviewed shift rosters, nor did she maintain a log of when such reviews were conducted.[67]

The first documented evidence that the District COR became aware of the LDC's post closures was after an April 2015 visit by a Deputy U.S. Marshal who observed vacant control pods. By the time the USMS identified this matter, understaffing and security post closures had already been occurring for months, with correctional officer vacancies increasing in each of the preceding 4 months and peaking in March 2015 at 23 percent. In response, the District COR sought corrective action from the LDC and referred the matter to the QAR team. In May 2015 during its annual review, the QAR team reviewed the LDC's housing plan, shift rosters, and vacancy reports and concluded that LDC staffing was deficient, stating that:

> "[CoreCivic] LDC has attempted to compensate for the shortage of correctional officers by mandating correctional officer[s] report to work on their regularly scheduled days off; however, a review of actual shift roster records reveals [CoreCivic] LDC still has to routinely vacate correctional posts which are identified in their 2015 staffing analysis due to a shortage of correctional officers."

The report also noted that "an overtly confrontational prisoner spirit suggest[s] [that] the ongoing shortage of correctional officers is having an impact on the facility's operational climate." We found that when responding to the USMS's staffing-related findings, the former Warden said that the LDC was in the process of recruiting and deploying new correctional officers. However, the LDC's POAs failed to provide immediate relief and the understaffing and post closures resumed. In one instance, the LDC failed to fulfill a component of its POA that may have provided immediate relief. Specifically, in a July 2015 memorandum, the LDC's former Warden said that if overtime was insufficient to ensure that all posts were filled, the LDC would "temporarily deploy staff from other [CoreCivic] facilities until new hires are able to assume posts." LDC continued to close security posts into September 2015, yet did not request temporary staff from other CoreCivic facilities to cover posts. USMS did not hold CoreCivic accountable for its failure to comply with this provision of the corrective action plan.

In October 2015, the LDC's Contracting Officer proposed an invoice reduction to CoreCivic for approximately $763,000 due to CoreCivic's non-compliance with FPBDS in the areas of correctional supervision, detainee accountability, and control of contraband. USMS determined that the LDC's significant staffing shortages during 2015 had contributed to the non-compliance. Before finalizing the invoice reduction, CoreCivic was provided the opportunity to respond, to which it disagreed and requested the USMS reconsider the reduction amount. USMS formally issued

---

[67] The accuracy and completeness of the shift rosters can be assessed by comparing them to timekeeping records and observing whether or not personnel on the shift roster are on the required posts.

45

the $763,000 price reduction in February 2017, or 16 months later. A senior USMS official involved in the invoice reduction process said that the longer the USMS takes to decide on whether to apply a reduction, the more it harms the USMS's credibility in administering its contracts and holding contractors accountable. USMS officials said they could shorten the processing period by incorporating milestones into its price reduction guidance to ensure more efficient and expedient submission of its final price reductions decision to its contractors.

In response to the February 2016 OIG Management Advisory Memorandum, USMS said it will improve contract monitoring by establishing an onsite detention contract monitoring program and developing standard operating procedures and contract monitoring instruments. We recommend that USMS's contract monitoring program include staffing-related procedure steps that help District CORs assess facility staffing trends and determine if post closures are occurring. We also recommend that USMS incorporate milestones into its price reduction guidance. Lastly, we recommend that the USMS ensure that during periods of chronic understaffing, contractors utilize all available options, including the provision of temporary staff.

LDC's closure of posts also represents a loss of contracted value to the USMS. Using Wage Determination information, we calculated the value of security post closures based on the minimum wage and benefit rates for a correctional officer.[68] For the Winter Timeframe, the post closures amounted to $171,817 in services not received by the USMS. For the Summer Timeframe, this figure amounted to $113,308.

*Impact of LDC Understaffing*

CoreCivic officials explained that when staffing declines, the LDC requests volunteers to work overtime by posting a sign-up sheet. If there are not enough volunteers, the LDC uses mandatory overtime. In September 2014, the LDC began "drafting," or requiring employees work overtime to cover posts. Facility management could give no less than a 2-hour advance notice of the need to draft the employee and once the employee worked their draft shift, they would be rotated to the bottom of the draft list. In February 2015 the LDC switched to using a "mandate list." Under the mandate list, all security employees were scheduled to work a maximum of 12 hours of mandatory overtime on one of their days off, which was scheduled approximately a month in advance to provide employees earlier notice. LDC used the mandate list from February 2015 through June 2016, but the extent of the overtime worked varied. For example, in June 2015, each correctional officer worked an average of three mandate shifts (each shift was for 12 hours) that month. By July 2016, facility staffing had improved and each correctional officer averaged less than 1 mandate shift for the month.

---

[68] These calculations exclude the posts that were meant exclusively for Wyandotte County inmates.

46

Understaffing throughout 2015 had a significant impact on the LDC's use of overtime. LDC's use of overtime increased 93 percent from 2014 to 2015 and nearly tripled in April 2015 and July 2015 as compared to the prior year, as shown in Figure 4. In both years, security personnel accounted for at least 94 percent of facility overtime use, primarily by correctional officers.

**Figure 4**

**LDC Overtime Utilization
January 2014 to December 2015**

Source: CoreCivic

LDC personnel shared several examples of the impact of understaffing, including: (1) lower morale, due in part to frustration with understaffing; (2) security concerns; (3) fewer correctional officers available to escort medical staff and detainees to and from the health services unit; (4) fewer staff available to assist the LDC's QAM in conducting quality assurance audits, and (5) not being able to perform regular job duties while placed on security posts.

Correctional officer understaffing led the LDC to utilize members of its Unit Management Teams (Unit Team) to cover security posts instead of, or in addition to, performing their regular job duties. Unit Teams are responsible for familiarizing and communicating with detainees, which enables them to address and resolve detainee concerns and reduce the likelihood of incidents or disputes. They also streamline the delivery of services and programs to detainees in their assigned units. The Facility plan includes three Unit Teams, each consisting of one Unit Manager, two Case Managers, and two Correctional Counselors.[69] Unit Managers

---

[69] In other words, the Facility plan includes three Unit Managers, six Case Managers, and six Correctional Counselors. However, the USMS plan only includes two Unit Managers, five Case Managers, and five Correctional Counselors.

Case 3:16-cv-02267    Document 361-13    Filed 11/20/20    Page 16 of 35 PageID #: 14401

supervise the Correctional Counselors and Case Managers and ensure staff members are performing their duties. Case Managers provide case management, classification, and transitional services to detainees; develop individual detainee program plans; and help detainees adjust socially to their environment. Correctional Counselors are uniformed, security-trained staff responsible for resolving daily detainee issues before they become significant matters, incidents, or grievances. They are responsible for making daily rounds through assigned units, ensuring that services and programs are delivered to detainees, and conducting 1-on-1 meetings with detainees. Case Managers and Correctional Counselors must be accessible to detainees every day.

To determine the amount of time that Unit Team members (specifically Case Managers and Correctional Counselors) were assigned to security posts instead of their intended job duties, we selected a judgmental sample of shift rosters and timekeeping data over 33 days between July 20 and September 6, 2015. During this timeframe, Unit Team members were unable to exclusively perform their intended duties for an average of 29 hours per day, or 37 percent of their time, because they were occupying a security post. When measured in dollars over the 33-day period, the LDC's customers (primarily the USMS but also Wyandotte County) lost 832 hours of Unit Management-dedicated work worth approximately $19,972.[70]

LDC staff said that assigning Case Managers and Correctional Counselors to security posts meant that Unit Managers assumed their subordinates' responsibilities to prevent work-related backlogs. On some work days, Unit Managers would lose most of their team, and one Unit Manager commented that when this occurred, she would have to perform the work of five individuals. On July 20, 2015 - one of the worse days encountered - 9 of 11 Case Managers and Correctional Counselors working that day were assigned to security posts. Their normal job duties were assumed by their respective Unit Managers. These duties included a variety of detainee management and program functions including counseling services, handling detainee requests, and the development of individual program plans and life skills for successful re-entry into the community. We also found that some Unit Team staff were assigned to security posts on a lengthy full-time basis. In early July 2015, we observed a Correctional Counselor that was assigned to the A.M. front lobby security post on a full-time basis and this individual anticipated remaining there until the end of August 2015. Another Correctional Counselor was consistently covering the P.M. front lobby security post from July through August 2015.

---

[70] Calculated as the sum of: (1) Case Managers' 266 hours on security posts multiplied by the $24.46 wage and benefits rate, and (2) Correctional Counselors' 565 hours on security posts multiplied by the $23.80 wage and benefits rate. The difference is due to rounding.

*Personnel-Related Decisions Increased LDC Understaffing*

Despite the LDC's staffing struggles throughout 2015, CoreCivic temporarily transferred LDC personnel to other CoreCivic facilities in two instances, thereby increasing the facility's understaffing. First, in late 2014 CoreCivic requested USMS approval to temporarily transfer staff from LDC and USMS's other contracted facilities to the South Texas Family Residential Center in Dilley, Texas, a U.S. Immigration and Customs Enforcement contracted facility. CoreCivic needed temporary staff to operate the facility until it could hire permanent employees. CoreCivic told the USMS that this initiative would not adversely affect LDC's operations or required staffing levels and that transferees' assignments and responsibilities would be backfilled by existing personnel, using overtime as necessary.[71]

USMS approved CoreCivic's request on the conditions that no more than 5 percent of each CoreCivic-managed facility's total staff were transferred at any given time and that the required security posts be staffed throughout the period. From December 2014 through July 2015, LDC transferred seven staff, consisting of six correctional officers and one shift supervisor. The start dates, end dates, and length of assignment varied, but lasted on average four months per person. Because the initiative included a small proportion of LDC's total staff, the number of LDC transferees never exceeded 5 percent. However, the arrangement occurred during an 8-month period when LDC correctional officer vacancy rates ranged from 11 to 23 percent, and LDC was consistently closing mandatory operational posts, as previously described in this report. LDC personnel told the OIG they were frustrated by CoreCivic's decision to transfer staff because they were already shorthanded and working mandatory overtime. LDC's former Warden, when asked why he transferred staff despite facility understaffing, said that he did not have a choice because FSC did not request his input or approval on the matter. He also suggested that there was immense pressure to comply because the U.S. Immigration and Customs Enforcement contract was highly lucrative.[72] A senior FSC official acknowledged that CoreCivic did not explicitly ask Wardens for approval, but told us that its expectation was that Wardens would provide staff unless unable to satisfy the request. Ultimately, the LDC's former Warden could not provide evidence that he objected and by sending staff, FSC considered this an implicit agreement.

Despite the USMS's general awareness of the LDC's understaffing and having witnessed routine post vacancies during the initiative, the USMS did not hold CoreCivic accountable for failing to staff security posts, in violation of the agreement. The LDC continued to vacate security posts and the transfer

---

[71] The BOP and U.S. Immigration and Customs Enforcement also temporarily transferred personnel to the South Texas Family Residential Center.

[72] According to CoreCivic's 2015 Annual Report, the South Texas Family Residential Center accounted for nearly $245 million in revenue or approximately 14 percent of CoreCivic's total revenue in 2015.

49

arrangement continued unchanged. This is likely because the Contracting Officer and District COR - who were best suited to monitor and address non-compliance with this agreement's conditions - said they were unaware that the agreement even existed.

In the second instance of personnel transfers, CoreCivic temporarily transferred five LDC staff to the Winn Correctional Center in Winnfield, Louisiana from March 6 through March 31, 2015.[73] The purpose of this transfer was to "provide an enhanced security response … due to immediate concerns regarding population unrest [at the Winn Correctional Center] and threat of potential violence." These five staff members were selected because they were members of the LDC's Special Operations Response Team (SORT). According to CoreCivic guidance, SORT is an integral part of an institution's structure and the main response force in the event of a major disturbance that cannot be resolved by on-duty staff. CoreCivic transferred these five staff during March 2015, a month when the LDC had a 20 percent vacancy rate in correctional services. This was the highest monthly vacancy rate from January to August 2015.

Unlike the assignment to the South Texas Family Residential Center, CoreCivic failed to request USMS approval for transferring staff to the Winn Correctional Center. CoreCivic officials said this was because of the emergency nature and short duration of the assignment. USMS's Chief of the Office of Detention Services said CoreCivic should have notified the USMS, which would have wanted to ensure that the LDC's SORT was sufficiently staffed. CoreCivic had authorized the LDC to maintain a 15-member SORT, in part due to its isolated geographical location and lack of other CoreCivic facilities in close proximity. CoreCivic officials told us that this 15-member allotment was not a requirement. Instead, the LDC's Monthly Security Inspection document indicated that the facility's SORT be "at least 80 percent of the established allotment," or a minimum of 12 SORT members.[74] Prior to transferring LDC staff to the Winn Correctional Center, the LDC had nine SORT members and after the transfer only four SORT members remained.

A fully staffed 15-member SORT is generally comprised of a commander, an assistant commander, 2 squad leaders, and 11 team members. It may not always be necessary to deploy the full SORT as the strength of the deployment will depend on the nature and scope of the incident. From March 6 through March 31, 2015, the LDC's four SORT members consisted of the SORT commander, a squad leader and two team members. CoreCivic's technical proposal stated that SORT's mission is to "take prompt and decisive action to ensure public safety, protect life and property, and preserve order and control of the facility"; that it is "ready to be quickly mobilized for any emergency situation"; and that it "provide a quick

---

[73] The five staff were two Senior Correctional Officers, one Case Manager, one Correctional Officer, and one Maintenance Worker.

[74] Monthly Security Inspections – which are internal audits described in CoreCivic's technical proposal - provide monthly inspections of all physical plant security elements.

reaction force." We believe that by transferring the majority of the LDC's existing SORT to the Winn Correctional Center, CoreCivic not only further understaffed the LDC and failed to maintain the requisite size of the SORT, but compromised the SORT's ability to operate effectively and fulfill its mission in the event of a significant incident.

To address the issues within this section, we recommend that the USMS establish policies and procedures for assessing and approving contractor requests to transfer staff out of USMS contracted facilities, and: (1) obtain reasonable assurance from the facility Warden and FSC officials that such a transfer will not compromise the facility's ability to comply with contract requirements and CoreCivic policy; (2) independently assess whether the proposed transfers may jeopardize facility staffing requirements and operational readiness; and (3) ensure that the Contracting Officer and COR approve and continuously monitor the arrangement, respectively.

*LDC Officials Concealed Use of Triple Bunking from the American Correctional Association*

CoreCivic must operate the LDC in accordance with the ACA's Performance-Based Detention Standards for Adult Local Detention Facilities (ALDF). The ALDF contains standards, practices, and outcome measures that enable administrators and practitioners to monitor facility activities and measure the outcomes of their efforts. As part of the ACA's accreditation process, the LDC undergoes standards compliance audits performed every 3 years by ACA auditors. The facility must attain 100 percent compliance with the 60 mandatory standards and at least 90 percent compliance with 325 non-mandatory standards, if applicable. Several of the standards address the facility's conditions of confinement, including usable space and living environment. Compliance with these standards is dependent in part on the physical design of cells; for example, LDC detainees are housed in multiple occupancy cells – designed for 2, 8, or 10 beds. However, from at least 2005 through late 2015, LDC staff often affixed a third bed to the floor of many cells that were designed for two (hereafter referred to as "triple bunking"). Figure 5 is a USMS simulation of a triple-bunk configuration at a non-CoreCivic contract facility.

51

**Figure 5**

**Triple-Bunk Configuration at Leavenworth Detention Center**



Source: CoreCivic

During our audit, we received information from an LDC official indicating that LDC staff intentionally concealed their use of triple bunking from ACA auditors in what appears to be an effort to avoid non-compliance with three ALDF non-mandatory standards related to usable space in multi-occupancy cells, usable space in the dayroom, and sufficient ventilation within the cells.[75] Upon further review, several other LDC officials corroborated this account, telling the OIG that in advance of an ACA accreditation audit, LDC staff uninstalled the third beds bolted to the floor of several cells designed for two and removed them from the facility. Doing so was intended to increase the amount of usable space and improve air circulation, thereby averting the associated ACA findings. Thus, ACA auditors were unaware of the LDC's use of triple-bunking. After the ACA auditors completed their work and departed the facility, LDC staff would reinstall the beds. The OIG referred this matter to its Investigations Division and to CoreCivic's General Counsel. In April 2016, CoreCivic's internal investigation concluded that:

---

[75] The three ACA standards are: (1) 4-ALDF-1A-10, Multiple-Occupancy Rooms/Cells; (2) 4-ALDF-1A-12, Dayrooms; and (3) 4 ALDF-1A-19, Environmental Conditions. They state that multi-occupancy cells and dayrooms should provide a specific amount of usable space per occupant and that the facility's ventilation system should supply adequate air circulation throughout each cell, per occupant.

*"Third bunks were removed from cells originally designed for two inmates prior to the 2011 ACA Audit, intentionally to conceal the practice of triple-bunking from the ACA Audit Team in order to meet the unencumbered space requirements in general population cells."*

The CoreCivic investigation revealed that this may have also occurred prior to the 2005 and 2008 ACA audits. Interviewees stated that the LDC's Warden at the time directed LDC staff to utilize detainee labor to assist the LDC staff in the removal of approximately 100 beds from the LDC and store them at a rental facility or in a shipping container.[76] Furthermore, one of CoreCivic's former divisional Managing Directors, who was assigned oversight of the LDC and other facilities in multiple states from 2002 through 2014, was aware of this effort. Interviewees said that even though the three ALDF standards were non-mandatory, they wanted to attain the highest possible ACA score. We reviewed the LDC's ACA results for 2008 and 2011 (2005 was unavailable) and determined that had the ACA found the LDC non-compliant with the three non-mandatory standards, it still would have easily surpassed the 90 percent compliance threshold.[77] However, ACA accreditation rules state that an "intentional misrepresentation of facts [and] lack of good faith" could have subjected the LDC to a revocation hearing before its Commission on Accreditation for Corrections. CoreCivic said it was extremely disappointed to learn this had occurred and reported the results of its investigation to CoreCivic's executive staff and Board of Directors. CoreCivic said its Ethics and Compliance office completed training at the LDC on employees' duty to report misconduct, options for reporting misconduct, and CoreCivic's non-retaliation policy for employees who report misconduct. CoreCivic did not take disciplinary action against the former Wardens and Managing Director involved because they were no longer employed by CoreCivic. Officials from both CoreCivic and OIG Investigations discussed this matter with the ACA's Deputy Executive Director who decided not to take action against CoreCivic in part because the individuals involved were no longer at the LDC.

*USMS Contracts Do Not Contain Clear Guidance on the Use of Triple Bunking*

Triple bunking is not uncommon throughout the federal prison system and is often associated with addressing overcrowding. BOP said that its private prison contractors are allowed to triple bunk as long as the area utilized meets the applicable ACA standards for inmate space requirements. USMS's Chief of the Office of Detention Services said that triple bunking is acceptable to address an operational necessity on a temporary basis. This official said the operational necessity could arise from a sudden influx of detainees to a facility or if there was a disturbance that led to the closure of some housing units. What is not acceptable to the USMS, he noted, is when triple bunking is used for cost reduction purposes.

---

[76] LDC had two different Wardens from 2005 through 2011.

[77] For the 2014 ACA audit, the LDC attained a score of 100 percent compliance, despite its use of triple bunking throughout the facility.

This happened at the CoreCivic-operated Northeast Ohio Correctional Center (NEOCC) in Youngstown, Ohio. Specifically, in 2015 the QAR team determined that NEOCC was triple bunking USMS detainees despite the availability of 1,500 empty beds elsewhere in the facility. USMS determined that CoreCivic had done this for cost-reduction purposes. By triple bunking USMS detainees, CoreCivic had avoided opening and staffing another unit.[78] This instance contributed to the USMS's issuance of a September 2015 memorandum to all its private prisoner operators that prohibited triple bunking.

CoreCivic's investigation of LDC triple bunking stated that there was "no evidence to definitively conclude that inmates were moved to housing units opened specifically to facilitate the concealment of triple bunking practices from the ACA audit team." This statement alludes to the question of why the LDC had triple-bunked detainees in the first place and whether triple bunking had allowed the LDC to close and not staff other housing units within the facility. LDC's use of triple bunking was not temporary. Instead it had generally been a permanent measure, as the third beds were regularly bolted to the floor, from at least 2005 until September 2015, with infrequent exceptions. CoreCivic officials told the OIG that triple bunking at the LDC was necessary to meet its customer's needs in a highly stratified environment where detainees are separated by one or more of the following: security level, adjudication status, customer (i.e., USMS detainees are separate from Wyandotte County detainees), and gender. Some detainees, such as material witnesses, must also be kept separate. CoreCivic officials further said that triple bunking offers flexibility during times of high fluctuation in the detainee population, noting that triple bunking allows the LDC the capability to accommodate its customer needs if the demand for beds suddenly increases.

However, senior LDC officials also said triple bunking provided staffing flexibility and cost-savings. One senior LDC official told us that by using triple bunking it could consolidate detainee living space to specific locations throughout the facility and LDC officials could then close remaining detainee housing locations, thereby eliminating the need to staff the closed locations. While CoreCivic's investigation may not have "definitively" determined that this happened in 2005, 2008, and 2011, a senior LDC official told us that when the USMS prohibited triple bunking in September 2015, the LDC had to reopen and staff Y-Pod, a multi-purpose unit that had previously been closed intermittently. We analyzed LDC housing and detainee transfer records and confirmed that on September 10, 2015, the LDC responded to the USMS prohibition on triple bunking by relocating 107 detainees from a third bunk to other locations throughout the facility. During this relocation process, 52 detainees were transferred to the recently reopened Y-Pod. LDC's former Warden said that after the USMS prohibited triple bunking, there was less overall tension in the affected units, that detainee incidents decreased and staff was calmer.

_____
[78] In response to the 2015 QAR, the Northeast Ohio Correctional Center (NEOCC) ceased triple bunking. However, a year later (during the 2016 QAR) the USMS found that the NEOCC had resumed its use, again for cost reduction purposes.

The OIG's review of the LDC contract found that it contained no specific language on contractor use of triple bunking that fell outside of ACA standards. Furthermore, in late 2015 the USMS issued separate memoranda on triple bunking that conflict with one another. Specifically, the September 2015 memorandum prohibited all triple bunking. However, approximately 3 months later, the USMS issued a memorandum approving the Central Arizona Detention Center's use of triple-bunking in limited circumstances. Because of the conflicting nature of these memoranda, we believe it is important that the USMS clarify its position on the allowability of triple bunking. Therefore, we recommend that USMS clearly specify in its new and existing contracts the circumstances under which triple bunking is allowed, and what rules, procedures, and ACA standards apply to the practice.

*USMS Did Not Evaluate the Implications of Wyandotte County's Use of the LDC*

When USMS entered into the contract with CoreCivic Leavenworth, the LDC's design capacity was 767 beds. In May 2008, the LDC underwent a facility expansion that increased the design capacity to 1,033 beds. Design capacity measures the number of beds (and therefore detainees) each facility is designed to accommodate. CoreCivic allows facilities housing detainees on a short-term basis to exceed the original design capacity; at the time of our audit, the LDC had a 1,120 total bed capacity. Because the USMS's contract with CoreCivic was not to exceed 922 beds, except in emergency situations, the expansion left CoreCivic with approximately 200 non-contracted beds throughout the facility. To fill these extra beds and gain additional revenue, in July 2009 CoreCivic entered into a 3-year contract with Wyandotte County, Kansas to confine and supervise up to 220 adult minimum to medium security male detainees at the LDC.[79] USMS's Chief of the Office of Detention Services said that sharing its contracted facilities with another entity was common because the USMS does not always contract for the maximum number of beds in the facility.

USMS did not assess the staffing implications of the CoreCivic-Wyandotte arrangement. While the USMS-approved staffing plan (USMS plan) specified the number of personnel resources (measured in FTEs) necessary to fulfill contract requirements, the CoreCivic-Wyandotte contract did not establish Wyandotte County's respective staffing needs. Instead, pursuant to the Wyandotte contract, LDC staffing resources that previously worked exclusively with USMS detainees were now characterized as "shared staff" that addressed both USMS's and Wyandotte's detainees. CoreCivic created a facility-wide staffing plan (Facility plan) to account for both the USMS and Wyandotte, as shown in Table 6.

---

[79] In 2012 this arrangement was extended through August 2017.

**Table 6**

**Leavenworth Detention Center Staffing Plans**
**as of June 22, 2015**

| CoreCivic Position Groups | Facility Plan (FTEs)[80] | USMS Plan (FTEs) | Difference |
|---|---|---|---|
| Management/Support | 18.00 | 18.00 | 0.00 |
| Security Operations | 81.70 | 79.00 | 2.70 |
| Unit Management | 105.00 | 84.00 | 21.00 |
| Maintenance | 5.00 | 4.00 | 1.00 |
| Services | 4.00 | 4.00 | 0.00 |
| Health Services | 17.95 | 16.68 | 1.27 |
| Programs | 2.00 | 2.00 | 0.00 |
| **TOTAL** | **233.65** | **207.68** | **25.97** |
| **Subcontracted Health Services Staff** | **Facility Plan** (Hours) | **USMS Plan** (Hours) | **Difference** |
| Physician | 16 hours/week | 16 hours/week | 0 |
| Dentist | 27 hours/week | 27 hours/week | 0 |
| Psychologist | 32 hours/week | 32 hours/week | 0 |
| **TOTAL** | **75 hours/week** | **75 hours/week** | **0** |

Source: CoreCivic

As shown in Table 6, the Facility plan had approximately 26 more FTEs than the USMS contract. This did not mean that CoreCivic added 26 FTEs to accommodate the Wyandotte County contract. Of the 26 FTEs, approximately 9 FTEs were Wyandotte-specific correctional officers, 9 FTEs were USMS-specific correctional officers, and approximately 8 FTEs were designated as "shared."[81] This meant that while the Wyandotte contract accounted for up to 220 beds, or 20 percent of the LDC's rated capacity, Wyandotte's exclusive positions accounted for only 4 percent of overall facility positions. The number of FTEs across the areas of Management/Support, Services, and Programs were unchanged, and other areas such as Security/Operations, Maintenance, and Health Services received marginal FTE increases.[82] In June 2015, the number of facility-wide Health Services personnel was approximately 1.3 FTEs greater (8 percent) than the amount required in the USMS plan. A senior LDC Health Services official recalled receiving no additional resources when the Wyandotte detainees entered the facility and noted that Wyandotte's detainees have a lesser length of stay on average than USMS detainees. Wyandotte's highly transient population, coupled with the LDC requirement to evaluate all detainees admitted to the facility means that Wyandotte detainees require a large share of health services resources. For example, in 2015

---

[80] The Facility plan assesses the LDC's overall staffing needs and includes both the USMS's and Wyandotte's detainees.

[81] CoreCivic officials said they excluded the nine USMS-specific FTEs from the USMS plan because these FTEs were not required by the USMS contract and added to the facility's staffing at CoreCivic's own expense.

[82] Management/Support includes the Warden, Assistant Warden, Safety Manager, Investigator, and Mailroom Clerk; Services consists of Warehouse and Laundry Staff; and Programs consists of a Program Facilitator (USMS-exclusive) and Chaplain.

56

Wyandotte's detainees accounted for 1,285 of the facility's 3,887 admissions, or 33 percent. Moreover, as also shown in Table 6, the LDC subcontracted its physician, dentist, and psychologist, in accordance with the USMS plan. The execution of the CoreCivic-Wyandotte contract did not result in an increase in hours for these subcontracted staff, who assumed the care of Wyandotte's detainees, potentially diminishing the availability and value of these positions to the USMS, which funded the positions.

We also found that USMS had not assessed the cost implications of the CoreCivic-Wyandotte arrangement and therefore did not ensure it received the best possible value. While the USMS's contracted per diem ranged from $85 to $98 per detainee per day from 2009 through 2015, Wyandotte's contracted per diem ranged from $50 to $58 during the same timeframe. Both Wyandotte and the USMS followed the same ACA and Federal Performance Based Detention Standards and provided detainees the same recreation, work programs, transportation, programming, disciplinary action, rights, and commissary. CoreCivic officials said that Wyandotte County received a lower per diem rate because CoreCivic based its calculation on the incremental (variable) cost of adding detainees to the LDC. Therefore, its per diem rate did not include salaries and benefits, electricity, gas, overhead, and several other fixed costs that were included in USMS's per diem rate. In our judgment, the USMS contract subsidized Wyandotte County's lesser per diem rate.

Ultimately, while the CoreCivic-Wyandotte agreement provided favorable outcomes to both CoreCivic and Wyandotte County, the USMS received little or no discernible benefit, financial or otherwise. USMS allowed another facility user to share its contracted positions without obtaining reimbursement or a change to its negotiated per diem rate in return. POD's Chief of the Office of Detention Services said this type of arrangement was a common business practice and that USMS's primary concern was that CoreCivic covered the necessary security posts and provided quality care.[83] However, he agreed that the USMS should have pursued a reduced per diem rate. In addition, POD's Chief of the Detention Standards and Compliance Branch said that USMS's contracts do not contain language on how to apportion shared services. The USMS-CoreCivic contract allows other federal agencies such as BOP and the U.S. Immigration and Customs Enforcement to use the facility, but does not describe facility use by non-federal customers. We recommend that the USMS specify for its contractors, in their contracts or in some other appropriate manner, the use of multi-user arrangements at its existing and future contract facilities to ensure the USMS maximizes its value and assesses the impact, if any, on the USMS's contracted staffing, facility safety and security, and other institutional matters.

---

[83] POD's Chief of the Office of Detention Services said it is not unusual for state and local governments to obtain cost savings and buying efficiencies through federal contracts, referring to the General Services Administration's (GSA) Cooperative Purchasing Program. However, GSA's Cooperative Purchasing Program specifically applies to the purchase of information technology and law enforcement products and services, not detention services.

*Comparison of USMS and BOP Contract Staffing Requirements*

USMS and BOP private detention performance work statements share many of the same or similar staffing-related contract provisions and requirements. Both require that contractors hire and retain key personnel necessary for performance of the contract; maintain and update staffing plans that convey the personnel necessary for the performance of the contract; and require that contractors provide periodic reports on the facility's actual staffing levels and vacancies. However, we found that USMS's contracts contain less specific and less actionable staffing-related language than the BOP's, resulting in fewer contractual options for the USMS to hold its contractors accountable for failures to adequately staff facilities. Specifically, BOP may issue staffing-related invoice reductions to its contractors under three conditions: (1) staffing levels fall below a specific percentage for 2 months in any 3 month period; (2) any individual position is not filled within 120 days of vacancy; or (3) any essential positions become vacant. We consider the BOP's staffing requirements a best practice because it establishes facility staffing expectations and enables the BOP to hold contractors accountable for non-compliance.

For the first condition, BOP private prison contracts contain language requiring that staffing levels "not fall below a monthly average of 90 percent for Correctional Services, 85 percent for Health Services, and 85 percent for all other departments of the BOP approved staffing plan." If a contracted prison facility failed to meet these thresholds, the BOP could levy monetary reductions through the contractor's monthly invoice. Conversely, USMS's LDC contract does not include staffing percentage thresholds. A senior POD official said this was because incorporating a threshold could reduce the contractor's incentive to staff a facility above that threshold. This official said the USMS's expectation is that contractors attain 100 percent post coverage; he explained that when vacancies arise, the contractor needs to fulfill the responsibilities of those positions, even if it requires temporarily assigning staff from one of a contractor's other facilities or entering into local contracts until a replacement can be brought onboard. However, this expectation was not reflected in the LDC contract or definitively stated in USMS's other private detention contracts. This expectation was also not reflected in the LDC's actual staffing conditions, especially during 2015.

Because of the need to adequately cover posts, it is critical that vacancies be kept to a minimum and addressed in a timely fashion. The LDC contract required that CoreCivic submit quarterly vacancy reports to the USMS that listed the vacant positions, a POA to address each vacancy, and target fulfillment dates. However, unlike BOP contracts which stipulated that invoice reductions may be assessed if essential vacancies are not filled immediately and if non-essential vacancies are not filled within 120 days, the LDC contract did not define an acceptable timeframe to fill essential and non-essential vacant positions. Instead, the contract's language on contractor non-compliance was ambiguous and unrelated to staffing conditions at the facility. Specifically, the contract states that "*the contractor's failure to submit to the COR their [quarterly] vacancy status report … may result in a*

58

*deduction on the invoice."* This language only enabled the USMS to issue an invoice reduction due to the contractor's failure to submit the vacancy report. This was an arbitrary and inadequate basis for assessing an invoice reduction because it was contingent on an administrative task (i.e., submission of a report) instead of on qualitative or quantitative metrics that are representative of a facility's actual staffing conditions.

Furthermore, we identified several USMS contracts with different and often more specific and quantifiable vacancy-related requirements than what is contained in the LDC contract. USMS officials agreed that its LDC contract contained unclear staffing-related language and that there was a need to standardize the language across all facilities. In May 2016, the USMS issued a contract modification for the LDC and all other contract facilities that incorporated staffing thresholds and vacancy requirements similar to those of the BOP. Because this action addresses our concerns, we are not issuing a recommendation.

## Billings and Payments

USMS's contract with CoreCivic is a fixed-price contract. According to the FAR, this type of contract places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss and provides maximum incentive for the contractor to control costs and perform effectively. USMS's monthly payments to CoreCivic are primarily based on the Monthly Operating Price (MOP) and the Fixed Incremental Unit Price (FIUP). The MOP ensures that the contractor receives a minimum payment, regardless of the facility's actual population, and was negotiated with the understanding that USMS detainees would occupy at least 75 percent of the accepted number of contract beds.[84] The MOP provides contractors a guaranteed revenue stream, and USMS officials said it is also critical to ensure facilities maintain a consistent level of staff during periods of fluctuating detainee population.

The FIUP pricing component is a separate unit price per detainee that only applies when the daily detainee population exceeds 75 percent of contract beds in a payment period, up to 115 percent of contract beds. Although this 115 percent rate may create the impression that USMS is overpopulating the institution, at the LDC it represents the maximum number of beds allowed under the contract (922 detainees) barring an emergency, and not the LDC's total 1,120 bed capacity. Table 7 provides examples of the LDC contract's pricing scheme for January 2015 based on three different contract bed numbers.

---

[84]  The number of "contract beds" is synonymous with the number of federal detainees housed in the facility.

**Table 7**

**Examples of the LDC Contract
Monthly Pricing Structure for January 2015[85]**

| No. of Contract Beds | Percent of Contract Beds | Monthly Operating Price (MOP) $1,868,767 Per Month | Fixed Incremental Unit Price (FIUP) $97.60 Per detainee day | Total Monthly Price MOP + FIUP |
|---|---|---|---|---|
| 602 | 75% | $1,868,767 | Not applicable | $1,868,767 |
| 802 | 100% | $1,868,767 | $605,120 | $2,473,887 |
| 922 | 115% | $1,868,767 | $968,192 | $2,836,959 |
| 1,033[86] | N/A | $1,868,767 | $1,304,034 | $3,172,800 |

Source: USMS

If USMS detainees occupied 602 contract beds, CoreCivic would bill the USMS the MOP amount of $1.9 million. However, if USMS detainees instead occupied 922 contract beds, in addition to receiving the MOP of approximately $1.9 million, the FIUP rate would be applied to the number of detainees above 75 percent occupancy (922 – 602), which would total $968,192.[87] CoreCivic would then bill USMS for about $2.8 million.

*Service Contract Labor Standards Statute*

The Service Contract Labor Standards statute, formerly known as "the Service Contract Act of 1965" or "SCA," requires that employees working on federal service contracts in excess of $2,500 not be paid less than the monetary wages and fringe benefits required by law, and serves to prevent contractors from being able to underbid each other by reducing wages or fringe benefits for service employees.

Since the LDC contract exceeds the minimum award threshold, CoreCivic must provide its employees the minimum wages and fringe benefits stipulated within the applicable wage determination schedules (wage determination) issued by the Department of Labor (DOL).[88] Wage determinations list the minimum wage and fringe benefit rates for different classes of laborers, which are often adjusted over the term of a service contract. If an adjustment results in additional compensation owed to contractor employees, the contractor is entitled to request a price adjustment, that is, a request for compensation from the USMS.

---

[85] Differences in the total amounts in the tables in the report are due to rounding. The sum of individual numbers prior to rounding may differ from the sum of the individual numbers rounded.

[86] USMS's use of more than 922 beds would be allowable in an emergency situation as declared by the USMS.

[87] For detainee occupancy at 115 percent, the FIUP amount is the difference between the 75 percent and 115 percent detainee occupancy, multiplied by 31 days in January and the FIUP of $97.60.

[88] The LDC contract's wage determination rates are shown in "SCA No. 05-2307." Rate changes become effective at the beginning of each contract year, which for the LDC is January 1.

60

Table 8 is an example of wage and fringe benefit rates for three occupational codes from the DOL-issued wage determination used by CoreCivic. In the wage determination, fringe benefits such as health insurance, life insurance, sick leave, and retirement are referred to as "Health & Welfare benefits." The Health & Welfare benefits rate is the amount employers must provide as fringe benefits to their employees and is based on data from the Bureau of Labor Statistics. As shown in Table 8, this particular DOL wage determination requires that CoreCivic provides its employees Health & Welfare benefits costing no less than $4.02 per hour.

**Table 8**

**DOL Wage Determination[89]**

| OCCUPATION CODE | TITLE | WAGE RATE PER HOUR | HEALTH & WELFARE PER HOUR* |
|---|---|---|---|
| 01011 | Accounting Clerk I | $13.97 | |
| 27008 | Corrections Officer | $18.89 | $4.02 |
| 12312 | Registered Nurse II | $27.27 | |
| *The Health & Welfare benefits rate of $4.02 per hour is equivalent to $160.80 per week or $696.79 per month. | | | |

Source: DOL, Wage Determination No. 2005-2307, Revision No. 15.

CoreCivic officials, upon receipt of a new wage determination, ensure compliance with the SCLS wage rates by comparing all positions and actual pay rates with rates shown in the new DOL wage determination. CoreCivic makes these comparisons in order to determine which positions require wage and fringe benefit increases, the amount of additional compensation to provide eligible employees, and the appropriate increase to the MOP to recompense CoreCivic for the required increases to employee wages and fringe benefits. CoreCivic compliance with Service Contract Labor Standards fringe benefit requirements is administered by the Boon Group, a full service employee benefits company which allocates and tracks CoreCivic employees' fringe benefit contributions. Boon Group officials said these contributions are held in an irrevocable trust for the benefit of the employees.

In order to verify that the Boon Group and CoreCivic correctly calculated salary and fringe benefit costs and made adjustments in accordance with DOL-issued wage determinations, we selected a judgmental sample of 10 CoreCivic LDC positions. For each position we reviewed Boon Group fringe benefit reports and CoreCivic employee payroll records to verify that employees under each position type were paid salaries and benefits that met or exceeded the rates prescribed in the DOL wage determinations. We determined that CoreCivic employees were generally provided salaries and fringe benefits that met or exceeded wage determination requirements. However, we determined that CoreCivic may not have complied with Service Contract Labor Standards that

---

[89] For presentation purposes, this figure lists three occupation codes, titles, and wage rates. The actual wage determination would contain hundreds of occupational codes that span several pages.

61

require payment of any cash in lieu of fringe benefits in a timely manner.  In addition, during our commissary transaction testing, we learned that CoreCivic had requested and the USMS paid $103,271 in unallowable price adjustments for Commissary Worker positions and needed to correct future invoices to ensure that it did not pay CoreCivic any unnecessary additional funds should the contract continue through December 2026.  These matters are described below.

*CoreCivic's "Sick Account" May Be Non-Compliant with Federal Labor Standards*

CoreCivic's Health and Welfare benefits for Service Contract Labor Standards non-exempt employees include health insurance, life insurance, a 401(k) retirement account, and sick leave.  According to CoreCivic's Benefits Handbooks, eligible employees accrue 1.54 hours of sick leave per bi-weekly pay period, up to maximum of 40 hours for 2015.  The Boon Group, as part of its effort to ensure that CoreCivic employees are paid the required amount of fringe benefits, tracks the monetary cost of CoreCivic employees' sick leave.  Typically, a contractor calculates the cost of employees' annual sick leave by multiplying their respective pay rates by the maximum amount of earnable sick leave.[90]  This did not occur.  Instead, the Boon Group calculated contributions to the employee "sick account" by first aggregating the cost of other employee benefits - health insurance, life insurance, and 401(k) retirement - then subtracting this cost from the Health & Welfare benefits required by the wage determination.  The Boon Group allocated the difference to the sick account.  In essence, CoreCivic contributions to the sick account are a "plug" or reconciling figure and not based on CoreCivic's actual cost of providing sick leave.

For example, in March 2015 CoreCivic had to provide employees benefits costing $643 to comply with the wage determination.[91]  CoreCivic provided many of its full-time correctional officers with insurance and retirement benefits costing $558, and then allocated the remaining $85 to these employees' sick accounts.  However, during this timeframe these correctional officers only accrued 3.08 hours of sick leave (1.54 hours per pay period x 2 pay periods) valued at $58.  The difference of $27 represents a contribution of funds to the sick account in excess of CoreCivic's actual monetary cost of providing usable sick leave to its employees.  CoreCivic officials confirmed that the 1.54 hours of sick leave earned per pay period represents the sick leave available to employees, regardless of the amount of funds contained in the Boon Group sick account.  In other words, correctional officers could exhaust all of their accrued sick leave, yet still have a positive balance in their Boon Group sick account.  To further demonstrate the inconsistency, we selected a judgmental sample of 18 employees and compared their accrued sick leave balances maintained by CoreCivic, to their respective sick account balances

---

[90]  For example, in 2015 a full-time correctional officer would earn 40 hours of sick leave valued at $755.60 (40 hours x $18.89 pay rate).

[91]  In March 2015 there were two pay periods.

maintained by the Boon Group.[92]  As shown in Table 9, the Boon Group's sick account balances were greater than the actual accrued sick hours for 16 of 18 employees, and the 18 employees' Boon Group sick account balances contained on average 131 more hours of sick leave, worth $2,511, than their CoreCivic accrued sick leave balances.[93]

### Table 9

### Differences In CoreCivic Accrued Sick Leave and Boon Group Sick Accounts (Dollars & Hours)

| No. | EMPLOYEE POSITION | CORECIVIC ACCRUED SICK LEAVE BALANCE (HOURS) | BOON GROUP SICK ACCOUNT BALANCE (HOURS) | DIFF. (HOURS) | CORECIVIC ACCRUED SICK LEAVE BALANCE ($) | BOON GROUP SICK ACCOUNT BALANCE ($) | DIFF. ($) |
|---|---|---|---|---|---|---|---|
| 1 | Case Manager | 168 | 312 | 144 | $ 3,328 | $ 6,199 | $ 2,871 |
| 2 | Corr. Officer | 30 | 143 | 113 | 559 | 2,709 | 2,150 |
| 3 | Sr. Corr. Officer | 254 | 464 | 210 | 5,032 | 9,178 | 4,146 |
| 4 | Sr. Corr. Officer | 266 | 412 | 146 | 5,271 | 8,156 | 2,885 |
| 5 | Corr. Officer | 177 | 335 | 158 | 3,338 | 6,332 | 2,994 |
| 6 | Corr. Officer | 164 | 325 | 161 | 3,102 | 6,135 | 3,033 |
| 7 | Warehouse/ Comm. Worker | 2 | 186 | 184 | 48 | 3,588 | 3,540 |
| 8 | Corr. Officer | 27 | 19 | (8) | 506 | 355 | (151) |
| 9 | Corr. Officer | 357 | 573 | 216 | 6,747 | 10,831 | 4,084 |
| 10 | Corr. Officer | 174 | 386 | 212 | 3,295 | 7,288 | 3,993 |
| 11 | Corr. Officer | 7 | 195 | 188 | 140 | 3,693 | 3,553 |
| 12 | Corr. Officer | 120 | 249 | 129 | 2,259 | 4,704 | 2,445 |
| 13 | Corr. Officer | 31 | 229 | 198 | 577 | 4,326 | 3,749 |
| 14 | Licensed Practical Nurse | 18 | 26 | 8 | 348 | 512 | 164 |
| 15 | Case Manager | 715 | 688 | (27) | 14,616 | 14,063 | (553) |
| 16 | Corr. Counselor | 31 | 112 | 81 | 604 | 2,215 | 1,611 |
| 17 | Sr. Corr. Officer | 415 | 473 | 58 | 8,214 | 9,360 | 1,146 |
| 18 | Corr. Officer | 5 | 193 | 188 | 100 | 3,646 | 3,546 |
| | AVERAGE | 165 | 296 | 131 | $3,227 | $5,738 | $2,511 |

Source:  CoreCivic Employee Leave Statements and Boon Group Fringe Benefit Reports

Excess funds accumulate within the Boon Group sick accounts and are not available to CoreCivic personnel until their termination, transfer to a non-SCLS

---

[92]  This comparison required the OIG convert the Boon Group's sick account balance from dollars to hours.  Included in this sample are 12 individuals who have since left CoreCivic.

[93]  In some instances, CoreCivic employees' accrued sick leave balances were greater than their Boon Group sick account balances (e.g., Table 9, nos. 8 and 15).  CoreCivic officials said this may be applicable to long-tenured employees with accrued sick leave balances prior to the establishment of the Boon Group sick account.  Specifically, when the Boon Group sick account was established in 2004, employees' accrued sick leave balances were not transferred into it.  Therefore long-tenured employees could maintain more accrued sick leave than what is contained in their Boon Group sick accounts.

63

facility, or upon a change in status from a non-exempt SCLS position to an exempt position. At this time, employees are issued a check for the sick account balance. For example, one of the Correctional Officers that ended his employment at CoreCivic in 2015 (Table 9, no. 11) departed with an accrued sick leave balance of 7 hours, and in addition to receiving the cash value of this 7 hours, also received a payment of $3,553, the equivalent of 188 additional hours, based on the balance in the Boon Group sick account.

Given CoreCivic's methodology, its characterization of the sick account as a "bona fide" fringe benefit appears inconsistent with federal requirements because the primary purpose of the excess funds does not appear to be to provide systematically for the payment of benefits to employees.[94] Furthermore, to be considered a "bona fide" fringe benefit, the provision of the benefits plan must be specified and communicated in writing to the affected employees.[95] After reviewing CoreCivic's Employee Benefits Handbooks and speaking with LDC's Human Resources official, we concluded that CoreCivic had not adequately communicated the "sick account" benefit to its employees. CoreCivic Policy 3-5-1, *Paid Leave Benefits (SCA Employees)* states that employee sick leave balances are maintained by a third party administrator, but neither provides the Boon Group's name or contact information, nor does it explain the Boon Group's process for calculating the sick account contribution or that the contribution contains funds greater than the value of accrued sick leave that are paid upon an employee's termination, transfer, or upon a change in SCLS-status. LDC's Human Resources official said all LDC employees have access to an employee portal which gives their accrued sick leave balance/used, paid time off balance/used, holidays used, and projected leave amounts for the year. However, the employee portal does not provide employee's sick account balances, as maintained by the Boon Group, and the LDC's Human Resources administrator was not aware of it.

We believe that the Boon Group's sick accounts likely represent a combination of sick leave and what could be interpreted as "cash equivalents." Federal regulations state that fringe benefit obligations may be discharged by paying employees a cash amount per hour instead of fringe benefits. Importantly, such cash equivalents must be paid to employees on their *regular payday*. Because CoreCivic withheld these funds for months or years before disbursement to employees, its sick account may not comply with 29 C.F.R. § 4.177(c)(1), *Furnishing Cash Equivalents*.[96] This appears to be a systemic issue as CoreCivic uses this process at all its USMS and BOP-contracted facilities.

CoreCivic officials disagreed with the OIG's concerns and provided a DOL memorandum dated August 2003 that CoreCivic believed justified its methodology

---

[94] 29 C.F.R. §4.171(a)(2) (2013).

[95] 29 C.F.R. §4.171(a)(1) (2013).

[96] This requirement is also described in 29 C.F.R. § 4.165(a)(1) (2013), *Wage Payment and Fringe Benefits – in General*.

64

for contributing funds to its sick account.[97]  The memorandum stated that the Service Contract Act and accompanying regulations permitted use of a sick leave policy provided that the policy meets several conditions.  One of the conditions was that [OIG emphasis in italics] "the amount contributed by the contractor *approximately* represents the actual rate of costs or contributions required to provide paid sick leave benefits to each participating employee."  CoreCivic officials acknowledged that their methodology to calculate and allocate funds to the sick account may not be the most accurate, but contended that it approximates the actual cost and is therefore compliant.  However, we noted that the 18 employees we sampled had Boon Group sick account balances with an average of 131 more hours of sick leave than was accrued and usable; an 80 percent difference.  We do not agree that significant differences such as these meet a reasonable definition of "approximate."

To remedy this matter, we recommend that the USMS work with DOL, and as necessary CoreCivic, to determine whether placing funds that are significantly in excess of the actual cost of employees' accrued sick leave balances into a "sick account," and not making the excess funds available to employees on their regular payday, is a proper fringe benefit practice.  We also recommend that the USMS ensures that CoreCivic properly communicates the "sick account" benefit to its employees.

*Unallowable Commissary-Related Service Contract Labor Standards Price Adjustments*

As stated earlier, if a change in the LDC's wage determination results in additional compensation owed to CoreCivic employees, CoreCivic is entitled to a price adjustment from the USMS equal to the amount of additional wages and benefits CoreCivic was required to pay its employees.  This price adjustment is applied to CoreCivic's monthly invoice by increasing the MOP.

One of CoreCivic's obligations under the LDC contract is to operate a commissary.  CoreCivic employs two to three commissary workers and recovers their staffing costs from commissary revenue.  Therefore, these commissary workers' salaries and benefits were not priced into the LDC contract's MOP and CoreCivic is not eligible to request price adjustments for those positions.  However, CoreCivic had been incorrectly requesting price adjustments for these commissary worker positions dating back to 2008 and the USMS approved these unallowable price adjustments and increased the LDC's MOP.  Accordingly, from June 2008 to April 2016, CoreCivic received $103,271 in unallowable price adjustments.  CoreCivic officials stated that requesting price adjustments for these commissary worker positions was a mistake.

---

[97]  The memorandum was issued by the DOL's Wage and Hour Division to the Contractors Employee Benefits Association, Inc., dated August 8, 2003.

Unless the MOP is reduced, the unallowable commissary-related price adjustments will continue to be reflected in CoreCivic's monthly invoices from May 2016 through the end of the contract in December 2026, assuming all options are exercised. To determine the necessary MOP reduction, we analyzed the 9 contract modifications containing improper commissary-related price adjustments and calculated their cumulative increase to the MOP, which totaled $1,597 per month (our methodology to calculate the MOP and the questioned costs are contained in Appendix 2). In March 2017, the USMS issued a contract modification to CoreCivic to recover unallowable price adjustments and modify the MOP to reflect the proper monthly price. Therefore, we do not make any recommendations relating to the unallowable commissary-related SCLS adjustments.

*Transaction Testing of CoreCivic Invoices and Commissary Expenditures*

To ensure that CoreCivic's billings were accurate and complete, we reviewed the invoices in a sample consisting of 15 months within the scope of the contract. We found that contractor invoices for housing were generally calculated accurately, invoiced, authorized, and supported by proper documentation.

Also, in order to test the controls put in place for commissary funds we reviewed the expenditures recorded in the commissary accounting records. We selected a judgmental sample of 15 transactions to test the controls in place for the commissary checking account as well as to ensure that expenses for commissary operations and detainee welfare were appropriate.[98] We determined that the transactions were accurate, based on supporting documentation, and properly approved and received.

*Justice Prisoner and Alien Transportation System (JPATS) Transactions*

At the beginning of our audit, CoreCivic informed us that it was conducting a review of transportation services provided to USMS under the LDC contract. After the USMS raised questions about discrepancies in mileage figures recorded on a CoreCivic transportation invoice, CoreCivic discovered that it had been charging the USMS for guard hours and mileage while in transit from their duty station in Tennessee to the LDC, which did not involve the transfer of detainees. CoreCivic was only supposed to charge the USMS for guard hours and mileage associated with the transportation of detainees to or from the LDC.

To resolve the matter, CoreCivic provided what it believed was the total overpayment and correct amounts for mileage for transfers of detainees from the LDC to applicable BOP facilities.[99] We assessed the adequacy of the mileage

---

[98] Since the control of the detainee accounts is handled at the corporate level, we did not feel it would be appropriate within the scope of our audit to review the controls in place regarding detainee funds or movement of individual detainee's accounts.

[99] For our sample, we did not assess what the adequate amount charged for guard hours and for mileage since this issue is under negotiations between CoreCivic and USMS. We determined that it would not be appropriate to attempt to assess the accuracy of charges for these services.