reported for the transactions in our original sample of CoreCivic invoices to determine if this discovery could have been made sooner. Using web tools available online, we were able to assess the accuracy of the mileage reported by CoreCivic in its invoices to USMS.[100] Specifically, in 11 of the 13 months in our billings sample that included JPATS transactions, there was a significant difference between the mileage CoreCivic reported and the mileage we calculated using applications commonly available online.

We asked the District COR what steps are taken to review transportation transactions, and how the information in those transactions is used. The District COR said each USMS district verifies its trips, which include detainee information and their destination, were taken by comparing the trip reports included in the invoice to the scheduling in the Justice Detainee Information System (JDIS), which includes information on each detainee and the facility they are located in. This information is submitted to the District COR. The District COR reviews each District's submission to verify hours of travel and to ensure there are no duplications between districts; the COR then submits an invoice directly to JPATS. JPATS officials then confirm that services have been received, review the invoice for accuracy, and sign and return the invoice to the District COR. After receiving the signed JPATS invoice, the District COR also verifies the scheduled trips in the invoice to information in JDIS. The District COR also stated that they had recently changed the requirements of the invoice content because of this issue. The invoice now includes the starting and ending times and odometer reading for each trip, which the District COR confirms using a matrix of travel distance and times between transfer locations during her verification process.

In order to verify the adequacy of the matrix used by USMS, we selected three JPATS transactions from our initial CoreCivic billings sample. We then compared the appropriate mileage for these transactions using the matrix to the amounts calculated by OIG auditors. The mileage totals using USMS's matrix were not materially different from what OIG auditors had approximated using web tools available online. We also obtained a CoreCivic invoice sent after the start of our fieldwork and confirmed that the mileage matrix ensured that the invoice mileage was accurate. Therefore, we do not make any recommendations relating to the controls for JPATS transactions.

**Conclusion**

Our audit determined that the USMS failed to provide sufficient oversight of the LDC and that this failure resulted in several significant issues with LDC operations going unaddressed for extended periods of time. We believe the USMS's oversight of the LDC was inherently reactive: instead of actively monitoring LDC operations to identify discrepancies and thwart potential incidents, the USMS often became aware of incidents after they occurred. Oversight by the USMS and quality control efforts by CoreCivic were particularly hampered by lack of detention-related

---

[100] The web tools that we used in our assessment can be found at www.google.com/maps.

training and formal guidance for USMS and CoreCivic personnel. Of particular concern, the USMS COR had no previous contract oversight experience, received no formal guidance and negligible training, and was located offsite, and LDC's internal quality assurance staff also received minimal instruction and guidance, failed to conduct sufficiently thorough reviews, and failed to address deficiencies with corrective action. In our judgment, deficiencies in the USMS's monitoring at the LDC present potentially systemic weaknesses and risks that may extend throughout all of its other contract detention facilities.

Stronger oversight may have allowed the USMS to prevent or more quickly mitigate the impact of LDC's understaffing. Specifically, from October 2014 through September 2015, the LDC's staffing levels deteriorated and the facility-wide average vacancy rate more than doubled to 11 percent. This was primarily driven by correctional officer vacancies. This understaffing led to several problems in 2015, including the LDC's long-term use of mandatory overtime; the closure of security posts, many of which were designated by CoreCivic as "mandatory"; and Unit Management personnel being assigned to security posts instead of performing their normal job duties, sometimes to the detriment of detainee services. The absence of strong monitoring and oversight was further demonstrated by LDC officials' decision to intentionally conceal the facility's use of triple bunking, unbeknownst to the USMS, from the ACA in what appears to be an effort to receive a higher accreditation score by uninstalling the third beds bolted to the floor of several cells designed for two.

We also determined that CoreCivic was slow to react to the understaffing and did not utilize all available staffing options to remedy the problem, such as by requesting temporary staff from other CoreCivic facilities. CoreCivic instead exacerbated LDC understaffing by temporarily transferring its personnel to other CoreCivic facilities, which in one instance led to a significant reduction in the size of the LDC's already shorthanded Special Operations Response Team, weakening its ability to operate effectively and fulfill its mission in the event of a significant incident. The USMS also contributed to the LDC's staffing deficiencies by authorizing CoreCivic's request in 2014 to transfer a small contingent of LDC personnel to Dilley, Texas, to help CoreCivic operate the then recently opened South Texas Family Residential Center. If staff is indeed the most indispensable, important, and expensive resource in corrections as noted by the Department's National Institute of Corrections, CoreCivic's and the USMS's efforts to adequately staff the LDC should reflect that.

These issues and the others we identified in this report – such as those relating to sole sourcing, "sick accounts," and invoice deductions – should be promptly addressed.

**Recommendations**

We recommend that the USMS:

1. Establish acquisition procedures to ensure that future detention pre-solicitation and solicitation notices include the widest place of performance practical, and that sole source justifications are fully documented, maintained in the contract file, and include all FAR-required language. This language should include the certification that the justification was accurate and complete to the best of the Contracting Officer's knowledge.

2. Establish policies and procedures to ensure that, when USMS price analysis is based on a comparison of historical prices paid, it establishes the prior price as a valid basis for comparison.

3. Continue to develop a training program for CORs monitoring and overseeing its detention-related contracts that ensures CORs receive and maintain a level of training and experience commensurate with their responsibilities.

4. Continue to develop and implement inspection guidance, monitoring tools, and its new onsite contract monitoring initiative for use at all of its privately contracted facilities, and ensure that its continuous monitoring efforts incorporate QAR steps, to the maximum extent practicable.

5. Request and incorporate internal and external audit results and POAs into the USMS's quality assurance program to ensure each identified deficiency was adequately resolved.

6. Create policies and procedures requiring CORs to conduct continuous oversight and monitoring of QAR-identified deficiencies to ensure that the completed POAs are operating effectively and that the CORs document this follow-up work and communicate the results to POD.

7. Include in the USMS's new standard operating procedures COR requirements for developing and maintaining a document control system and for retaining quality assurance-related documentation. Standard operating procedures should also include COR guidance on formally documenting inspections that include tracking deficiencies and contractor POAs.

8. Continue to input performance assessment reports for its active contracts into CPARS, and finalize policies and procedures to ensure that contractor performance data on future detention contracts is entered into CPARS.

9. Conduct Performance Evaluation Meetings, as required by the contract, at the LDC and other detention facilities as applicable.

69

10. Ensure that the District COR complies with contract and USMS District requirements to evaluate contractor performance prior to the payment of monthly invoices.

11. Ensure that the LDC's QAM request and retain supporting audit documentation to ensure audits are properly conducted and conclusions are supported.

12. Ensure that the LDC enforces existing CoreCivic policies and procedures for generating and approving comprehensive POAs, including: (a) drafting POAs that sufficiently address the deficiencies and requiring department heads identify the deficiencies' root cause; (b) ensuring the LDC's QAM and Warden provide instruction and guidance to department heads on the contents of a sufficient POA, and only approve fully compliant POAs; and (c) ensuring that department heads complete and the LDC's QAM retain the corrective action worksheets.

13. Ensure that the LDC enforces existing CoreCivic policies and procedures by confirming and documenting that POA strategies and action steps were completed.

14. Ensure that CoreCivic creates an Audit Procedure Manual or some other mechanism or process to provide the LDC's QAM with comprehensive guidance on how to properly conduct facility audits and continuously monitor closed POAs. Such guidance should describe: (a) the frequency and breadth of reviews; (b) the establishment of a sample size when one is not already specified in the CCAAT; (c) the maintenance of requisite qualifications, technical expertise, and accountability by personnel supporting the QAM's efforts; (d) the appropriate documentary evidence necessary to validate the auditors' conclusions and enable re-performance if necessary; (e) methods for proper retention of documentary evidence; (f) the approval and monitoring of the LDC's inspection and audit methodologies by the FSC; (g) and the establishment of contingency plans for conducting quality assurance-related work should the QAM be unavailable. Lastly, this guidance should obtain both FSC and USMS approval.

15. Consider implementing policies and procedures similar to those of the BOP that independently evaluate contractor-provided detainee mortality reports.

16. Monitor LDC compliance with the new CoreCivic policies and post orders related to recreation yard searches and detainee movement in the SHU, to ensure they are operating effectively.

17. Ensure that CoreCivic establish policies and procedures that prevent the closure of mandatory posts at CoreCivic's USMS contracted facilities and require FSC assess completed shift rosters to determine if facilities are adequately filling their security-related posts.

18. Include in its contract monitoring program staffing-related procedure steps that help District CORs assess facility staffing trends and determine if post closures are occurring.

19. Incorporate milestones into its price reduction guidance to ensure a more efficient and expedient submission of final price reduction decisions to its contractors.

20. Ensure that during periods of chronic contractor understaffing, contractors utilize all available options, including the provision of temporary staff.

21. Establish policies and procedures for assessing and approving contractor requests to transfer staff out of USMS contracted facilities, and: (a) obtain reasonable assurance from the facility Warden and FSC officials that such a transfer will not compromise the facility's ability to comply with contract requirements and CoreCivic policy; (b) independently assess whether the proposed transfers may jeopardize facility staffing requirements and operational readiness; and (c) ensure that the Contracting Officer and COR approve and continuously monitor the arrangement, respectively.

22. Clearly specify in its new and existing contracts the circumstances under which triple bunking is allowed, and what rules, procedures, and ACA standards apply to the practice.

23. Specify for its contractors, in their contracts or in some other appropriate manner, the use of multi-user arrangements at its existing and future contract facilities, to ensure USMS maximizes its value and assesses the impact, if any, on USMS's contracted staffing, facility safety and security, and other institutional matters.

24. Work with the Department of Labor, and as necessary CoreCivic, to determine whether placing funds significantly in excess of the actual cost of employees' accrued sick leave balances in a "sick account," and not making the excess funds available to employees on their regular payday, is a proper fringe benefit practice, and that CoreCivic properly communicates the "sick account" benefit to its employees.

# STATEMENT ON INTERNAL CONTROLS

As required by *Government Auditing Standards*, we tested, as appropriate, internal controls significant within the context of our audit objectives. A deficiency in an internal control exists when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect in a timely manner: (1) impairments to the effectiveness and efficiency of operations, (2) misstatements in financial or performance information, or (3) violations of laws and regulations. Our evaluation of the U.S. Marshals Service's (USMS) administration of Contract No. DJJODT7C0002 awarded to CoreCivic, Inc. (CoreCivic), and CoreCivic's compliance with the contract requirements to operate the Leavenworth Detention Center (LDC) was not made for the purpose of providing assurance on these entities' internal control structures as a whole. USMS's and CoreCivic's management are responsible for the establishment and maintenance of internal controls.

As noted in the Findings and Recommendations section of this report, we determined that the USMS's continuous monitoring efforts at the LDC were not adequate to sufficiently monitor contractor performance of a detention services contract valued at nearly $700 million. This determination was based on several problems including:

- inadequate District Contracting Officer's Representative experience and detention-related training;

- insufficient continuous monitoring processes at the LDC;

- inadequate monitoring of internal, external, and Quality Assurance Review audit results;

- insufficient quality assurance documentation; and

- insufficient mechanisms to hold contractors accountable.

Because several of these problems appear to be inherent in the USMS's overarching continuous monitoring approach, we believe they may also be occurring at the USMS's other 14 contract detention facilities. However, because we are not expressing an opinion on the USMS's internal control structure as a whole, this statement is intended solely for the information and use of the USMS. This restriction is not intended to limit the distribution of this report, which is a matter of public record. Given the significance of our concerns, in February 2016 the OIG issued a Management Advisory Memorandum to the USMS, advising it of these matters. In March 2016 USMS responded to our memorandum by proposing several actions. We believe the USMS's suggested actions demonstrate a commitment to improving its contractor oversight.

# STATEMENT ON COMPLIANCE
# WITH LAWS AND REGULATIONS

As required by *Government Auditing Standards* we tested, as appropriate given our audit scope and objectives, selected transactions, records, procedures, and practices to obtain reasonable assurance that the USMS's and CoreCivic's management complied with federal laws and regulations for which noncompliance, in our judgment, could have a material effect on the results of our audit. USMS's and CoreCivic's management are responsible for ensuring compliance with federal laws and regulations. In planning our audit, we identified the following laws and regulations that concerned the operations of the auditees and that were significant within the context of the audit objectives.

- Federal Acquisition Regulation (FAR)

    - FAR Subpart 4.8, *Government Contract Files*
    - FAR Part 6, *Competition Requirements*
    - FAR Subpart 15.4, *Contract Pricing*
    - FAR Subpart 46.4, *Government Contract Quality Assurance*
    - FAR 52.246-4, *Inspection of Services – Fixed Price*

- Justice Acquisition Regulations

- 29 C.F.R. § 4, *Labor Standards for Federal Service Contracts*

Our audit included examining, on a test basis, the USMS's and CoreCivic's compliance with the aforementioned laws and regulations that could have a material effect on USMS's and CoreCivic's operations. We interviewed auditee personnel, assessed internal control procedures, and examined accounting records and performance reports. As noted in the Findings and Recommendations section of this report, we determined that the USMS's continuous monitoring efforts at the LDC under FAR Subpart 46.4, *Government Contract Quality Assurance*, were not adequate to sufficiently monitor contractor performance of a detention services contract valued at nearly $700 million.

Furthermore, we concluded that the Boon Group's sick accounts represent a combination of sick leave and what could be interpreted as "cash equivalents." Because CoreCivic withheld payment of these funds sometimes for months or years before disbursement to its employees, its sick account may not comply with federal regulations. Specifically, 29 C.F.R. § 4.177(c)(1), *Furnishing Cash Equivalents* states that [OIG emphasis in italics]: "fringe benefit obligations may be discharged by paying to the employee *on his regular payday*, in addition to the monetary wage required, a cash amount per hour in lieu of the specified fringe benefits, provided such amount is equivalent to the cost of the fringe benefits required."[103]

---

[103] This requirement is also addressed in 29 C.F.R. § 4.165(a)(1), *Wage Payments and Fringe Benefits – in General*.

73

## USMS PRIVATELY-MANAGED DETENTION FACILITIES
## AS OF FEBRUARY 2017

| FACILITY NAME | LOCATION | CONTRACTOR[104] | USMS POPULATION[105] | USMS MAXIMUM CONTRACT BEDS |
|---|---|---|---|---|
| Aurora Detention Facility | Aurora, Colorado | GEO | 48 | 325 |
| Catholic Charities | San Diego, California | CCS | 21 | 15 |
| Webb Co. Detention Center | Laredo, Texas | CoreCivic | 269 | 300 |
| Central Arizona Detention Facility | Florence, Arizona | CoreCivic | 3,587 | 5,100 |
| Crossroads Correctional Center | Shelby, Montana | CoreCivic | 89 | 96 |
| Leavenworth Detention Center | Leavenworth, Kansas | CoreCivic | 681 | 922 |
| Northeast Ohio Correctional Center | Youngstown, Ohio | CoreCivic | 572 | 600 |
| Nevada Southern Detention Center | Pahrump, Nevada | CoreCivic | 622 | 750 |
| Otay Mesa Detention Center | San Diego, California | CoreCivic | 301 | 400 |
| Queens Private Correctional Facility | Jamaica, New York | GEO | 215 | 222 |
| Rio Grande Detention Center | Laredo, Texas | GEO | 1,092 | 1,228 |
| Robert A. Deyton Detention Facility | Lovejoy, Georgia | GEO | 645 | 768 |
| West Tennessee Detention Facility | Mason, Tennessee | CoreCivic | 281 | 500 |
| Western Region Detention Facility | San Diego, California | GEO | 574 | 708 |
| Willacy Co. Regional Detention Facility | Raymondville, Texas | MTC | 537 | 600 |
| | | TOTAL | 9,535 | 12,534 |

Source:  USMS

---

[104]  In addition to the LDC, USMS detention contracts were also awarded to The GEO Group, Inc., Management & Training Corporation, and the Catholic Charities Diocese of San Diego.

[105]  The difference between the total USMS population and the sum of the individual figures is due to rounding.

74

# OBJECTIVES, SCOPE, AND METHODOLOGY

**Audit Objective**

The objective of this audit was to assess U.S. Marshals Service (USMS) administration of, and CoreCivic, Inc.'s (CoreCivic) compliance with contract terms and conditions in the areas of: (1) contract management, oversight, and monitoring; (2) staffing requirements; and (3) billings and payments.

**Scope and Methodology**

We conducted this performance audit in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

This was an audit of USMS Contract No. DJJODT7C0002, awarded to CoreCivic to provide comprehensive detention services at the Leavenworth Detention Center (LDC) in Leavenworth, Kansas. Our audit generally covered, but was not limited to October 2010 through May 2015.

To ensure compliance with contract management, oversight, and monitoring, we reviewed the OFDT's justification for issuing a sole source contract and for determining the contract price to be fair and reasonable. We examined the USMS's Quality Assurance Surveillance Program to ensure the USMS monitored the quality of LDC services and that the contract requirements were defined and satisfactorily met. We reviewed CoreCivic's quality control program to determine if CoreCivic provided and maintained an inspection system that enabled it to demonstrate positive performance and identify areas of non-compliance before the level of performance became unsatisfactory.

To determine if USMS and CoreCivic followed staffing requirements, we reviewed the contract's staffing provisions and compared them to the BOP's, evaluated the LDC's staffing policies, procedures, budgeted and actual figures, and shift rosters; and interviewed facility staff to gain an understanding of the facility's staffing levels and conditions.

Lastly, to ensure compliance with contract requirements regarding billings and payments, we assessed the accuracy of USMS payments for monthly invoices and examined CoreCivic compliance with Federal Acquisition Regulation requirements related to the payment of prevailing wages and benefits to staff based on locality.

*Transaction Testing for Billings and for Commissary Expenses*

During our audit, we noted that from January 2007 through May 2015 CoreCivic submitted 225 invoices to the USMS, totaling $224,646,247. We selected 37 invoices in a sample of 15 months totaling $36,400,230. When selecting our invoices for testing, we selected the 8 months that had the highest total and judgmentally selected another 7 months and tested all invoices to USMS in those months. We employed this judgmental sampling design to obtain a broad exposure to numerous facets of the contract reviewed, such as dollar amounts, invoice or deduction category, and risk. However, this non-statistical sample design does not allow a projection of the test results for all invoices or internal controls and procedures. We also selected a judgmental sample of 15 expenditures noted in the commissary records from January 2014 through June 2015 to test the controls in place for commissary funds as well as to ensure that what is being purchased for the commissary or detainee welfare is appropriate.[106] Our sample selection methodology for reviewing commissary expenses was not designed with the intent of projecting our results to the population from which the samples were selected.

*Service Contract Labor Standards-Related Calculations and Analysis*

We assessed CoreCivic's compliance with rules and regulations related to the Service Contract Labor Standards to determine if it properly accounted for and paid the requisite wages and Health & Welfare benefits to its employees; to ensure that the requests for price adjustment were accurate and justified; and to assess whether the USMS reviewed, approved, and monitored CoreCivic's requests for reimbursement. To accomplish this we obtained: (1) payroll records containing service employees' actual wages, (2) information on the cost of Health & Welfare benefits offered to employees, (3) the DOL wage determinations containing the minimum wages and benefits; and (4) CoreCivic's request for reimbursement sent to the USMS. For wages, we compared new rates from the wage determination to payroll records. If employees were entitled to a wage increase, we verified that they began receiving additional pay effective as of the beginning of the contract year, that CoreCivic accurately calculated its reimbursement from the USMS, and that the request for reimbursement was justified.

In order to verify that the Boon Group and CoreCivic correctly calculated salary and fringe benefit costs and made adjustments in accordance with DOL-issued wage determinations, we selected a judgmental sample of 10 CoreCivic LDC position types (e.g., correctional officer, accounting clerk). For each position type we reviewed Boon Group fringe benefit reports and CoreCivic employee payroll records to verify that employees under each position type were paid salaries and benefits that met or exceeded the rates prescribed in the DOL wage determinations. This was a judgmental sample of positions, so if over the course of

---

[106] Since the control of the detainee accounts is handled at the corporate level, we did not feel it would be appropriate within the scope of our audit to review the controls in place regarding detainee funds or movement of individual detainee's accounts.

a single year a position switched from one employee to another, we included the latter in the next portion of our sample.

In our analysis, we determined of the span of 8 years, all of CoreCivic's wage determinations resulted in improper price adjustments related to Commissary Worker positions. To identify the cumulative costs, we multiplied each wage determination's annual improper costs by the amount of proceeding years in which the costs repeated, ending at our cutoff date of May 1, 2015. For example, if there was an annual price adjustment of $10 for these commissary positions, this $10 cost would be repeated in every subsequent year throughout the life of the contract. Therefore, by the end of May 2015, the cumulative cost of this price adjustment would be $80 ($10 annual cost times 8 years).

For our analysis of CoreCivic's sick leave trust, we selected a sample of 18 employees. We selected 12 of the 18 employees as employees who were no longer working at the LDC, 6 of those were selected for the highest dollar value in each year reviewed and the remaining 6 were judgmentally selected. We then judgmentally selected the remaining 6 employees who were still employed at the LDC as of May 2015, focusing on including positions that were not already selected by our previous methods. For our detailed review, we judgmentally selected three of the employees that were still employed at the LDC as of May 2015 and compared CoreCivic sick leave information to Boon Group sick information from October 2010 through May 2015. Our sample selection methodologies were not designed with the intent of projecting our results to the populations from which the samples were selected.

*Shift Roster and Unit Team Analysis*

During our examination of shift closures, we selected a sample of shift rosters to determine if the LDC had filled its security posts. If not, we counted the number of and length of post closures, the posts most often closed, and described any other discrepancies. For our review, we chose shift rosters during two periods which we refer to as the Winter and Summer Timeframes. The Winter Timeframe was from February 1 through March 31, 2015, and consisted of 59 days and 118 shifts. The Summer Timeframe was from July 1 through August 15, 2015, and consisted of 46 days and 92 shifts. We compared the closure information to applicable facility-wide staffing plans to note that required posts are filled.

For our Unit Team analysis, we judgmentally selected 33 days from July 20 to September 6, 2015. For each day selected we reviewed the timesheet information for all Correctional Counselors and Case Managers at the LDC as well as the AM and PM shift rosters. First, we used the timesheet information to note the amount of time each Unit Team member clocked in at the LDC on each of our sampled days. Second, we reviewed the shift rosters of our sampled days in order to identify when Unit Team members were on post. During our analysis we made the assumption that while a Unit Team member was assigned to a post, they were not able to perform their Unit Team duties. Third, for each Unit Team member that was clocked in for each sampled day, we subtracted the amount of time on the shift

roster from the amount of time noted in the timesheet data to determine the amount of time that each Unit Team member did not spend on a post (and therefore spent on Unit Team Duties.)  Fourth, once we determined the amount of time that each Unit Team member did not spend on a post, we compared these times to the amount of work hours referred in the staffing plan for these positions. We used this comparison to show how many hours the Unit Team members should have spent on their duties instead of working on post, when referencing the required staffing plan as well as calculating the value lost to the USMS based on price adjustment information submitted by CoreCivic.  For example, if a Correctional Counselor spent 3 hours of their 8 hour workday not on a post, we can conclude that they spent 5 hours on post and did not spend those hours on their duties as required by the staffing plan.

# OIG MANAGEMENT ADVISORY MEMORANDUM TO THE USMS ON OVERSIGHT OF DETENTION SERVICE CONTRACTS



**U.S. Department of Justice**

Office of the Inspector General

February 11, 2016

MANAGEMENT ADVISORY MEMORANDUM FOR:

        DAVID HARLOW
        ACTING DIRECTOR
        UNITED STATES MARSHALS SERVICE

FROM:         MICHAEL E. HOROWITZ
        INSPECTOR GENERAL

SUBJECT:       Potential Systemic Deficiencies in U.S. Marshals Service's
        Continuous Oversight of Contracts for Detention Services

    The purpose of this memorandum is to advise you of significant issues that may be affecting the U.S. Marshals Service's (USMS) ability to adequately monitor contractor performance on its contracts for detention services. This concern arises from my office's ongoing audit of USMS Contract Number DJJODT7C0002, awarded to Corrections Corporation of America (CCA) to operate the Leavenworth Detention Center (LDC) in Leavenworth, Kansas. We initiated this audit in June 2015 with the objective to assess USMS and CCA administration of and compliance with contract terms and conditions in the areas of: (1) billings and payments; (2) staffing requirements; and (3) contract management, oversight, and monitoring. During the course of this audit, we identified significant concerns with USMS oversight and monitoring that in our judgment warrant the USMS's immediate attention and corrective action.

*Background*

    Federal Acquisition Regulation (FAR) Subpart 46.4, *Government Contract Quality Assurance*, requires federal agencies perform contract quality assurance at such times and places as may be necessary to determine that services conform to contract requirements. Federal agencies articulate these requirements through quality assurance surveillance plans (QASP), which specify all work requiring surveillance and the method of surveillance.

Case 3:16-cv-02267    Document 361-14    Filed 11/20/20    Page 13 of 55 PageID #: 14433

USMS's QASP for its LDC contract primarily consists of two components: (1) Quality Assurance Reviews (QAR), which are multi-day reviews conducted annually at contracted facilities; and (2) continuous monitoring activities performed by staff in the USMS District responsible for the detention facility. This memorandum focuses on the continuous monitoring component.[1] USMS's QASP states that "the contractor shall be paid on a monthly basis as such services provided for each billing cycle must be determined based on performance to be 'Acceptable'." The Contracting Officer's Representative (COR) is responsible for verifying CCA compliance with contract requirements, which are divided into 6 functional areas that contain 46 standard sections derived from Federal Performance-Based Detention Standards (FPBDS).

During our ongoing audit, we are finding that the USMS's continuous monitoring efforts are not adequate to sufficiently monitor contractor performance of a contract that could potentially cost $697 million. We identified several problems with the USMS's continuous monitoring of the LDC, including a limited onsite presence; inadequate COR experience and detention-related training; insufficient continuous monitoring procedures; a lack of oversight guidance; failure to monitor CCA's internal and external audit reviews; and failure to use the Contractor Performance Assessment Reporting System (CPARS) as required by the FAR. Furthermore, in light of what we have learned during the audit, we have reason to believe these discrepancies are not isolated to the LDC but are occurring, to an unknown extent, at the USMS's other contract detention facilities. Given that the continuous monitoring issues described in this memorandum are potentially systemic across all USMS contract detention facilities, we are notifying you immediately so you can consider what corrective actions are necessary to remedy the issues as expeditiously as possible.

*Limited Onsite Presence*

The LDC contract suggested that the USMS would have a continuous onsite presence at the facility, stating that "the government anticipates a nominal number of staff will be onsite to monitor contract performance and manage other government interests associated with operation of the facility. The contractor shall provide an onsite enclosed office space for the USMS's staff." The USMS used contract language similar to that found in the Bureau of Prisons' (BOP) private prison contracts, whose quality assurance staffs are

---

[1] The purpose of the Quality Assurance Review (QAR) is to evaluate facility compliance across several functional areas in accordance with the Federal Performance-Based Detention Standards. The QAR is a headquarters-managed, 3-day review that is conducted by experienced USMS and contract staff. The QAR process concludes with an annual final report and overall facility rating. We analyzed the LDC's QAR reports and observed the performance of a QAR at the Aurora Detention Facility. Thus far, we have not identified any deficiencies associated with the QAR process.

2

Case 3:16-cv-02267     Document 361-14     Filed 11/20/20     Page 14 of 55 PageID #: 14434

*permanently* located onsite. However, we have found that the USMS neither stations staff at the LDC (USMS does not co-locate staff at any of its contract detention facilities), nor does the contractor provide any dedicated space at the LDC. Rather, the responsibility for continuous monitoring is held by a USMS COR located in the USMS District of Kansas office (District COR), approximately 30 miles southeast of the LDC. We found that the District COR performed onsite inspections at the LDC on a very infrequent basis. From January 2014 through September 2015, a period encompassing 21 months, the District COR visited the facility 17 times for approximately 41 hours. Approximately 37 percent of this time was spent observing the QAR team's annual reviews, and if these QAR-related hours are removed, the District COR spent 26 hours conducting inspections from January 2014 through September 2015, or approximately 1.2 hours per month. During the audit, USMS officials acknowledged that this was not a sufficient amount of onsite inspection time, and told us that there was no standard operating procedure or formal expectation of how much time District CORs should be performing onsite inspections.

We also identified a potential LDC effort to circumvent jail standards that we believe the USMS could have detected earlier with a greater onsite presence at the LDC. Specifically, in 2005, 2008, and 2011, LDC officials may have concealed from the American Correctional Association (ACA) its use of three beds in a cell designed for two (i.e., "triple bunking") in an effort to avoid being found non-compliant with three ACA standards.[2] Several LDC staff told us that prior to the ACA reviews in those years, third beds bolted to the floor were uninstalled, removed from the facility, and subsequently reinstalled after the ACA concluded its review. We are currently engaged in discussions with CCA's Office of General Counsel and a CCA Investigator on this ongoing matter.

*Inadequate COR Experience and Training*

The District COR was appointed in March 2011, only 2 weeks after attaining her COR Certification. Prior to certification, the District COR had no contracting experience and this almost $700 million contract was her first assignment. Furthermore, the District COR did not have experience in detention services and relied on the expertise of a Deputy U.S. Marshal to conduct inspections. We found that the USMS failed to provide sufficient training to the District COR to bolster her knowledge of detention services and monitoring and oversight. From this District COR's March 2011 appointment through August 2015, her only formalized detention-related training was a

---

[2] The contract requires CCA perform in accordance with the most current edition of the ACA's Performance-Based Detention Standards for Adult Local Detention Facilities. The three ACA standards, all non-mandatory, were: (1) 4-ALDF-1A-10, Multiple-Occupancy Rooms/Cells, (2) 4-ALDF-1A-12, Dayrooms, and (3) 4-ALDF-1A-19, Environmental Conditions.

60-minute lecture on the roles and responsibilities of the COR during the pre-solicitation and post-award phases of the contract.

USMS officials acknowledged during our audit that COR training is a weakness across all Districts responsible for detention facilities that must be addressed, and said that options to address the issue include obtaining training from organizations specializing in jail operations or coordinating with the BOP on a training exchange program. USMS officials also noted that LDC's oversight arrangement was unique because COR duties were assigned to an administrative staff member instead of a Detention Management Inspector (DMI) as is done in other Districts. DMIs are Deputy U.S. Marshals that - in addition to serving as the COR - are the District's criminal investigator responsible for investigating prisoner deaths, assaults, escape attempts, and to facilitate and enforce minimum conditions of confinement standards.

*Insufficient Continuous Monitoring Procedures*

The District COR is required to "monitor contractual compliance through inspections of [the LDC]" but there was no guidance on what a sufficient inspection would entail or how often it should be performed. The District COR's only documented evidence of inspections was an annual Detention Facility Review (DFR) conducted by the District COR and a Deputy U.S. Marshal in his capacity as a Jail Inspector. However, DFRs (conducted using Form USM-218, *Detention Facility Monitoring Report*) were not intended for use on privately contracted facilities but for facilities operated under an Intergovernmental Agreement (IGA). A USMS official from the Detention Standards and Compliance Branch confirmed that DFRs are not the proper instrument to review the LDC or any other contracted facility, and are much less comprehensive and arduous than an annual QAR. USMS Policy Directive 9.7, effective March 2014, states that the DFR is designed to review jail practices at IGA facilities to verify basic, minimal requirements are met. In addition, DFRs are not to be used in lieu of potentially more intense or focused reviews, and "are not certifications, accreditations, or compliance approvals of any sort." The Chief of USMS Prisoner Operations Division's (POD) Office of Detention Services said a sufficient inspection should entail monitoring procedures more rigorous than DFRs but less than QARs.

The District COR indicated that she also performed periodic, informal inspections while onsite at the LDC, but these inspections were not documented, nor were they administered in an organized and systematic fashion. We also found that several requirements listed in the District COR's job description were not being performed, such as developing monitoring instruments and establishing a document control system. In addition, the District COR did not evaluate the performance of the LDC and prepare reports on its performance, as required. Lastly, the COR and her supervisor were

4

required to develop a project plan to define the inspection work to be performed and the scope of the work. This too had not been completed.

*Lack of Guidance for Oversight*

We believe it is unrealistic to expect a single District COR – who lacked detention experience and proper training, was located offsite, and was responsible for performing numerous other duties – to establish and maintain, a comprehensive continuous monitoring program of an almost $700 million private detention contract without the USMS POD or District of Kansas providing significant guidance and monitoring tools.[3] USMS officials confirmed that aside from the DFR procedures, which were not intended for use at private facilities, the POD did not provide the District CORs formal guidance on how to conduct adequate oversight and monitoring at contract facilities. In contrast, the BOP's Privatization Management Branch disseminated operating procedures to all its onsite monitoring teams to "provide consistent guidance for staff involved with the oversight of correctional facilities under contract with the Bureau."[4] The Privatization Management Branch operating procedures contain oversight staff responsibilities; the contract monitoring strategy and activities; and monitoring methods such as checklists, logs, written evaluations, and performance meetings. The LDC contract requires the USMS to conduct formal performance evaluation meetings "on a regular basis as determined necessary by the [Contracting Officer]", but we determined that none of these meetings were conducted.

*USMS's Failure to Monitor Contractor Internal and External Audit Results*

We also found that the USMS did not request CCA's LDC-conducted internal audit results or corrective actions to identify areas of risk and ensure that LDC officials addressed deficiencies in an effective and timely manner. For the USMS to conduct proper oversight, we believe it should, at a minimum, be requesting and incorporating into its quality assurance program all contractor internal and external audit results and corrective actions taken to ensure each identified deficiency was adequately resolved. This matter is not just particular to the LDC, but applicable to all Districts monitoring USMS contract facilities.

One example of the benefit of monitoring a contractor's internal and external audit results is the triple-bunking issue. In September 2015 the USMS issued a memorandum to CCA stating that "USMS detainees/prisoners will not be housed three persons to a cell, in which the physical design, square

---

[3] The District COR's additional duties included overseeing seven IGA facilities in Kansas, including their inspections, and processing invoices and medical pre-authorizations.

[4] The Privatization Management Branch is located within BOP's Correctional Programs Division and its responsibilities include managing the operation of secure contract facilities.

footage and unencumbered space is constructed for 2-person occupancy." If the USMS had monitored the LDC's internal audit results it may have identified this triple-bunking problem in January 2014, rather than over a year later, pursuant to CCA headquarters' Mock ACA Review, which cautioned that "... the ACA auditors may voice a recommendation that the facility utilize [vacant housing pods] to eliminate the triple bunking, given that this practice impacts approximately one-third of the facility's inmate population."

*Insufficient USMS Continuous Monitoring may be Widespread*

We believe that CCA Leavenworth is likely not the only USMS-contracted facility with a problematic approach to continuous monitoring. As detailed in this memorandum, several problems with the USMS's continuous monitoring efforts are applicable to all USMS Districts overseeing contract detention facilities including the lack of detention-related training; lack of POD-issued oversight guidance; and failure to monitor CCA's internal and external audit reviews. The adequacy of other Districts' onsite presence is currently unknown but potentially problematic, as some District CORs have oversight responsibilities for more than one facility. For example, in Texas, a single COR is responsible for the oversight of the Webb County, Rio Grande Detention, and Willacy detention facilities, which have a combined capacity of nearly 3,000 USMS beds, and the latter two facilities are located approximately 165 miles apart. Furthermore, in California a single COR is responsible for the continuous oversight of the Western Region Detention Facility and Otay Mesa Detention Center, which together house approximately 2,300 detainees. USMS officials said that the COR in Texas receives assistance from Deputy U.S. Marshals in their collateral role as Jail Inspectors, but as previously described, the DFRs performed by Jail Inspectors are not rigorous enough for privately contracted facilities.

Because of the USMS's decentralized approach to continuous monitoring, the adequacy and consistency of inspections performed across the 15 USMS contract facilities are also unknown. The District COR told us that she is not aware of how other District CORs operate and they do not communicate with one another or share best practices. USMS officials agreed that there is no standardization in how districts develop and execute their inspection programs and believe this is partly due to district ownership of the COR positions. They explained that the districts specialize in law enforcement, not facility management and are not in the best position to oversee continuous monitoring and the COR positions. They said that POD maintains the organizational knowledge and experience to create, formalize, and implement a continuous monitoring strategy.[5] We agree and believe the USMS should reassess the

---

[5] USMS officials' comments referred to the continuous monitoring of <u>privately contracted facilities</u> and not facilities operated under IGAs.

6

organizational placement of the COR positions to determine if POD is better suited to provide guidance, training, monitoring, and responsibility for the COR positions in a manner that enhances the USMS's continuous monitoring of private detention facilities.

*USMS is not Using CPARS as required by the Federal Acquisition Regulation*

We found that the USMS was not entering past performance evaluations into CPARS for any of its detention contracts, including the LDC contract, as required by FAR Subpart 42.15.[6] Consequently, agencies such as U.S. Immigration and Customs Enforcement and BOP (which also contract for services from private prison operators) are not be able to view past performance on USMS contracts during their source selection processes in the Past Performance Information Retrieval System.[7]

We are providing this information so that USMS can assess the potential systemic nature of our preliminary findings and take appropriate corrective action. Please advise us within 30 days of the date of this memorandum of any actions the USMS has taken or intends to take regarding the issues discussed herein. We are continuing our audit of the USMS contract for the Leavenworth Detention Center and intend to incorporate in our final audit report any corrective actions USMS takes in response to this memorandum. If you have any questions or would like to discuss the information in this memorandum, please contact me at (202) 514-3435 or Jason R. Malmstrom, Assistant Inspector General for Audit, at (202) 616-4633.

cc:  Carlos Uriarte
     Associate Deputy Attorney General

     Andrew Barker
     Assistant Chief Inspector
     External Audit Liaison
     Office of Professional Responsibility-Compliance Review
     United States Marshals Service

     Richard P. Theis
     Assistant Director
     Audit Liaison Group
     Internal Review and Evaluation Office
     Justice Management Division

---

[6] On January 7, 2016, a USMS official told us that the USMS had just started entering past performance evaluation information into CPARS.

[7] In May 2010, the Past Performance Information Retrieval System was designated as the government-wide single repository of contractor past performance data.

7

# USMS'S RESPONSE TO THE OIG'S MANAGEMENT ADVISORY MEMORANDUM



**U.S. Department of Justice**

United States Marshals Service

*Office of the Director*

*Washington, DC 20530-0001*

March 11, 2016

MEMORANDUM TO:    Michael E. Horowitz
                               Inspector General

FROM:    David L. Harlow
                Deputy Director

SUBJECT:    Potential Systemic Deficiencies in U.S. Marshals Service
                   Continuous Oversight of Contracts for Detention Services

On February 11, 2016, the United States Marshals Service (USMS) received your memorandum, entitled *Potential Systemic Deficiencies in U.S. Marshals Service Continuous Oversight of Contracts for Detention Services*, advising of significant issues that may be affecting the ability of the USMS to adequately monitor contractor performance on its contracts for detention services.

Your office identified several areas of concern arising out of its ongoing audit of the Leavenworth Detention Center (LDC) with regard to the continuous monitoring of contractor performance, including a limited onsite presence; inadequate Contracting Officer's Representative (COR) experience and detention-related training; insufficient continuous monitoring procedures; a lack of oversight guidance; failure to monitor the contractor's internal and external audit reviews; and failure to use the Contractor Performance Assessment Reporting System (CPARS) as required by the Federal Acquisition Regulation. You further expressed concerns that the issues identified at LDC may be systemic across all USMS private contract detention facilities.

The USMS takes its oversight responsibilities seriously, and has taken, or will take, the following steps to address these issues:

1. The USMS will improve its contract monitoring by establishing an on-site detention contract monitoring program staffed by full-time professional contract administrators (CA) for private detention facilities used to house USMS prisoners. The CAs will serve as CORs under the supervision of the Prisoner Operations Division. The first CA will be assigned to the LDC in fiscal year (FY) 2016. The CAs will complement existing and future operational Detention Management Inspectors (DMIs). The USMS will seek additional positions for the remaining facilities through the appropriations process.

2. The USMS will develop standard operating procedures and contract monitoring instruments, similar to those currently utilized by the Bureau of Prisons, to assist CAs and DMIs in monitoring detention service contract compliance.
3. The USMS will develop a training program for contract administrators/CORs assigned to detention and transportation contracts. In addition to basic COR training and certification requirements, the program will cover detention facility inspections, contract monitoring instruments, reporting requirements, and corrective action plans.
4. The USMS will conduct a Quality Assurance Review (QAR) at the LDC in May 2016, and an additional unannounced QAR in FY 2016.
5. USMS Contracting Officers have confirmed that each private detention facility contract has at least one COR with a Federal Acquisition Certification for Contracting Officer's Representatives (FAC-COR) Level II certification.
6. Effective December 2015, all active private detention contracts utilized by the USMS were loaded into CPARS, and contractor performance information is being entered into the system.

Thank you for the opportunity to comment on these important matters. I look forward to reviewing your final audit report.

cc:     Carlos Uriarte
        Associate Deputy Attorney General

        Richard P. Theis
        Assistant Director
        Audit Liaison Group
        Internal Review and Evaluation Office
        Justice Management Division

        Eben Morales
        Assistant Director
        Prisoner Operations Division
        United States Marshals Service

        Andrew Barker
        Assistant Chief Inspector and External Audit Liaison
        Office of Professional Responsibility
        United States Marshals Service

## USMS'S RESPONSE TO THE DRAFT AUDIT REPORT



**U.S. Department of Justice**

United States Marshals Service

*Office of the Associate Directors*

*Washington, DC 20530-0001*

April 6, 2017

MEMORANDUM TO:    Jason R. Malmstrom
Assistant Inspector General for Audit
Office of the Inspector General

FROM:    William D. Snelson    *William D. Snelson*
Associate Director for Operations

SUBJECT:    Response to Draft Audit Report: United States Marshals Service
Contract No. DJJODT7C0002 with CoreCivic, Inc. to Operate the
Leavenworth Detention Facility

This memorandum is in response to correspondence from the Office of the Inspector
General requesting comment on the recommendations associated with the subject draft audit
report. The United States Marshals Service appreciates the opportunity to review the Report and
concurs with the recommendations therein. Our response to each of the recommendations is
attached.

Should you have any questions or concerns regarding this response, please contact
Andrew Barker, Audit Liaison, at 703-740-9068.

Attachment

cc:    Scott Schools
Associate Deputy Attorney General

Gary Barnett
Counsel to the Deputy Attorney General

Richard P. Theis
Assistant Director
Audit Liaison Group
Internal Review and Evaluation Office
Justice Management Division

Andrew Barker
External Audit Liaison
United States Marshals Service

88

**USMS Response to OIG Draft Report**
**U.S. Marshals Service Contract No. DJJODT7C0002 with CoreCivic, Inc. to Operate**
**the Leavenworth Detention Facility**

**Recommendation 1:** Establish acquisition procedures to ensure that future detention pre-solicitation and solicitation notices include the widest place of performance practical, and that sole source justifications are fully documented, maintained in the contract file, and include all Federal Acquisition Regulations (FAR)-required language. This language should include the certification that the justification was accurate and complete to the best of the Contracting Officer's knowledge.

**Response** (Concur): We have redesigned our Sources Sought to provide specific geographic information to ensure the widest area is included while maintaining compliance with 18 USC 4013 which requires the private provider must be located in the District of need.

Additionally, we now store all Market Research electronically, as well as by paper in the contract file. We understand there was missing information from the 2007 justification. Unfortunately, we did not save in electronic format and the paper file was not located to provide the Audit Team clear supporting information for the sole source decision. Since the Office of the Federal Detention Trustee (OFDT) merged with the United States Marshals Service (USMS) we have followed the existing USMS Procurement Policies which provide specific procedures for all acquisitions.

We can provide samples of actual Sources Sought announcements to provide documentation of compliance with this recommendation. Additionally, we have issued a new Sources Sought for the District of Kansas to determine if conditions have changed since our original determination of 2007.

**Recommendation 2:** Establish policies and procedures to ensure that, when USMS price analysis is based on a comparison of historical prices paid, it establishes the prior price as a valid basis for comparison.

**Response** (Concur): Since 2007 we have developed a number of tools to assist both Contracting Officers (CO) and Intergovernmental Agreements (IGA) Specialists to determine fair and reasonable pricing. In 2008, we developed the Core Rate which is a method to determine a schedule of fair per diem reimbursement rates with private, state, and local agencies that provide bed space to house federal prisoners.

We teamed with the Federal Bureau of Prisons (BOP) and Immigrations and Customs Enforcement (ICE) to develop the Pricing Analysis Guide in 2008, which is updated biannually. It compiles pricing information from these contracts and IGAs, creating the average baseline per-day rate paid by Federal organizations. This document is meant to be used as a pre-negotiation guide for price analysis only and to help specialists determine if a proposed per-day rate is fair and reasonable in accordance with FAR Part 15.404-1.

Case 3:16-cv-02267    Document 361-14    Filed 11/20/20    Page 23 of 55 PageID #: 14443

**Recommendation 3:** Continue to develop a training program for CORs monitoring and overseeing its detention-related contracts that ensures CORs receive and maintain a level of training and experience commensurate with their responsibilities.

**Response** (Concur): The USMS will continue to develop a training program for CORs monitoring and overseeing its detention-related contracts that ensure CORs receive and maintain a level of training and experience commensurate with their responsibilities.

**Recommendation 4:** Continue to develop and implement inspection guidance, monitoring tools, and its new onsite contract monitoring initiative for use at all of its privately contracted facilities, and ensure that its continuous monitoring efforts incorporate Quality Assurance Review (QAR) steps, to the maximum extent practicable.

**Response** (Concur): The USMS will continue to develop and implement inspection guidance, monitoring tools, and its new onsite contract monitoring initiative for use at all of its privately contracted facilities, and ensure that its continuous monitoring efforts incorporate QAR steps, to the maximum extent practicable.

**Recommendation 5:** Request and incorporate internal and external audit results and POAs into the USMS's quality assurance program to ensure each identified deficiency was adequately resolved.

**Response** (Concur): The USMS has updated the Performance Work Statement to require written responses of internal and external audits, and Plan of Actions are provided to the CO and COR within 30 days of completion.

**Recommendation 6:** Create policies and procedures requiring CORs to conduct continuous oversight and monitoring of QAR-identified deficiencies to ensure that the completed POAs are operating effectively and that the CORs document this follow-up work and communicate the results to POD.

**Response** (Concur): The USMS has developed an on-site Standard Operating Procedure requiring and providing oversight tools to CORs.

**Recommendation 7:** Include in the USMS's new standard operating procedures COR requirements for developing and maintaining a document control system and for retaining quality assurance-related documentation. Standard operating procedures should also include COR guidance on formally documenting inspections that include tracking deficiencies and contractor POAs.

**Response** (Concur): The USMS has developed an on-site Standard Operating Procedure requiring and providing oversight tools to CORs.

Case 3:16-cv-02267    Document 361-14    Filed 11/20/20    Page 24 of 55 PageID #: 14444

**Recommendation 8**: Continue to input performance assessment reports for its active contracts into CPARS, and finalize policies and procedures to ensure that contractor performance data on future detention contracts is entered into CPARS.

**Response** (Concur): All existing Detention Service Contracts have been loaded into the Contractor Performance Assessment Reporting System (CPARS), and we have incorporated this requirement into our Quality Assurance Program (QAP) to match the CPARS rating system (see attached), and to include the reporting through the Past Performance Information Retrieval System (PPIRS) and the Federal Awardee Performance and Integrity System (FAPIIS) through CPARS.

We are currently processing the three (3) reports for three of our detention services contracts. We will provide OIG copies of the reports once they have been processed through CPARS.

**Recommendation 9**: Conduct Performance Evaluation Meetings, as required by the contract, at the LDC and other detention facilities as applicable.

**Response** (Concur): The USMS has developed an on-site Standard Operating Procedure that requires Performance Meetings.

**Recommendation 10**: Ensure that the District COR complies with contract and USMS District requirements to evaluate contractor performance prior to the payment of monthly invoices.

**Response** (Concur): The USMS has developed an on-site Standard Operating Procedure requiring and providing oversight tools to CORs.

**Recommendation 11**: Ensure that the LDC's QAM request and retain supporting audit documentation to ensure audits are properly conducted and conclusions are supported.

**Response** (Concur): The USMS will review and approve contractors QAM and require any changes to be approved by USMS.

**Recommendation 12**: Ensure that the LDC enforces existing CoreCivic policies and procedures for generating and approving comprehensive POAs, including: (a) drafting POAs that sufficiently address the deficiencies and requiring department heads identify the deficiencies' root cause; (b) ensuring the LDC's QAM and Warden provide instruction and guidance to department heads on the contents of a sufficient POA, and only approve fully compliant POAs; and (c) ensuring that department heads complete and the LDC's QAM retain the corrective action worksheets.

**Response** (Concur): The USMS will review and approve contractors QAM and ensure it is managed by the contractor appropriately.

**Recommendation 13**: Ensure that the LDC enforces existing CoreCivic policies and procedures by confirming and documenting that POA strategies and action steps were completed.

**Response** (Concur): The USMS will review and approve contractor's QAM and ensure it is managed by the contractor appropriately.

**Recommendation 14**: Ensure that CoreCivic creates an Audit Procedure Manual or some other mechanism or process to provide the LDC's QAM with comprehensive guidance on how to properly conduct facility audits and continuously monitor closed POAs. Such guidance should describe: (a) the frequency and breadth of reviews; (b) the establishment of a sample size when one is not already specified in the CCAAT; (c) the maintenance of requisite qualifications, technical expertise, and accountability by personnel supporting the QAM's efforts; (d) the appropriate documentary evidence necessary to validate the auditors' conclusions and enable re-performance if necessary; (e) methods for proper retention of documentary evidence; (f) the approval and monitoring of the LDC's inspection and audit methodologies by the FSC; (g) and the establishment of contingency plans for conducting quality assurance-related work should the QAM be unavailable.
Lastly, this guidance should obtain both FSC and USMS approval.

**Response** (Concur): The USMS will review and approve contractor's QAM and require any changes to be approved by USMS.

**Recommendation 15**: Consider implementing policies and procedures similar to those of the BOP that independently evaluate contractor-provided detainee mortality reports.

**Response** (Concur): The USMS will consider implementing policies and procedures similar to those of the BOP that independently evaluate contractor-provided detainee mortality reports.

**Recommendation 16**: Monitor LDC compliance with the new CoreCivic policies and post orders related to recreation yard searches and detainee movement in the SHU, to ensure they are operating effectively.

**Response** (Concur): The USMS will review and approve contractor's QAM and ensure it is managed by the contractor appropriately.

**Recommendation 17**: Ensure that CoreCivic establish policies and procedures that prevent the closure of mandatory posts at CoreCivic's USMS contracted facilities and require FSC assess completed shift rosters to determine if facilities are adequately filling their security- related posts.

**Response** (Concur): The USMS will update detention contracts and the Performance Work Statement to ensure shift rosters are reviewed adequately.

92

**Recommendation 18:** Include in its contract monitoring program staffing-related procedure steps that help District CORs assess facility staffing trends and determine if post closures are occurring.

**Response** (Concur): The USMS has developed an on-site Standard Operating Procedure requiring and providing oversight tools to CORs.

**Recommendation 19:** Incorporate milestones into its price reduction guidance to ensure a more efficient and expedient submission of final price reduction decisions to its contractors.

**Response** (Concur): We have updated our Reduction Review Manual to include milestones for the process.

**Recommendation 20:** Ensure that during periods of chronic contractor understaffing, contractors utilize all available options, including the provision of temporary staff.

**Response** (Concur): The USMS has updated the Performance Work Statement to address this recommendation.

**Recommendation 21:** Establish policies and procedures for assessing and approving contractor requests to transfer staff out of USMS contracted facilities, and: (a) obtain reasonable assurance from the facility Warden and FSC officials that such a transfer will not compromise the facility's ability to comply with contract requirements and CoreCivic policy; (b) independently assess whether the proposed transfers may jeopardize facility staffing requirements and operational readiness; and (c) ensure that the Contracting Officer and COR approve and continuously monitor the arrangement, respectively.

**Response** (Concur): The USMS has updated the Performance Work Statement and on-site Standard Operating Procedures to ensure both CO and COR approve all contractor staff

**Recommendation 22:** Clearly specify in its new and existing contracts the circumstances under which triple bunking is allowed, and what rules, procedures, and ACA standards apply to the practice.

**Response** (Concur): The USMS contract already requires compliance with ACA Standards concerning Multiple Occupancy Cells; however, we have updated the Performance Work Statement to require USMS approval prior to housing prisoners outside of the ACA Standard:

> "The Contractor shall maintain full compliance with ACA ALDF standards pertaining to: (1) Physical Plant; (2) Inmate Housing; (3) Single Occupancy Cells; (4) Multiple Occupancy Cells; (5) Cell Room Furnishings; (6) Dayrooms; (7) Washbasins; (8) Bathing Facilities; and (9) Toilets. *Under no circumstances will the contractor fail to comply with the unencumbered space requirements, a practice commonly referred to as Triple Bunking, without prior approval of the Contracting Officer and the District's Chief Deputy U.S. Marshal.*"

**Recommendation 23**: Specify for its contractors, in their contracts or in some other appropriate manner, the use of multi-user arrangements at its existing and future contract facilities, to ensure USMS maximizes its value and assesses the impact, if any, on USMS's contracted staffing, facility safety and security, and other institutional matters.

**Response** (Concur): The USMS will review existing law and regulations to determine any actions we can specify in our multiple users' contracts. We will take appropriate action if any impact affects the services USMS has contracted.

**Recommendation 24**: Work with the Department of Labor, and as necessary CoreCivic, to determine whether placing funds significantly in excess of the actual cost of employees' accrued sick leave balances in a "sick account," and not making the excess funds available to employees on their regular payday, is a proper fringe benefit practice, and that CoreCivic properly communicates the "sick account" benefit to its employees.

**Response** (Concur): The USMS will work with the Department of Labor, Wage and Hour Division, to determine if CoreCivic is in compliance with the Service Contract Act requirements.

## CORECIVIC'S RESPONSE TO THE DRAFT AUDIT REPORT



Natasha K. Metcalf
*Vice President, Partnership Development*

April 5, 2017

Jason R. Malmstrom
Assistant Inspector General for Audit
1425 New York Avenue, NW
Suite 500
Washington, DC 20530

Dear Mr. Malmstrom:

CoreCivic, Inc. (CoreCivic or "the Company"), formerly Corrections Corporation of America, appreciates the opportunity to review and comment on the Draft Audit Report of the United States Department of Justice (DOJ) Office of the Inspector General (OIG) in relation to its audit of the United States Marshals Service (USMS) contract with CoreCivic to operate the Leavenworth Detention Center (Leavenworth or LDC). The stated goals of the OIG were "to assess USMS and CoreCivic administration of, and compliance with, contract terms and conditions in the areas of: (1) contract management, oversight, and monitoring; (2) staffing requirements; and (3) billings and payments." Draft Audit Report at i. The draft audit report focuses on, but is not limited to, the time frame of October 2010 through May 2015.

We appreciate the opportunity to comment upon the draft audit report and the revisions that the OIG has made to its working draft audit report in response to the issues we raised during the exit conference. This response addresses those areas where we believe the audit would benefit from further explanation and provides an update on our efforts to meet USMS expectations and address many of the findings in the report. To briefly summarize:

- CoreCivic has increased training for its Quality Assurance Managers (QAMs) and significantly enhanced its Quality Assurance policies and procedures to ensure greater effectiveness in monitoring and improving operational performance.

- CoreCivic has worked to provide greater visibility into the staffing at LDC for its partners, and we have incentivized employees to recommend qualified staff in an effort to further strengthen recruitment.

- For nearly 15 years, CoreCivic has relied on The Boon Group, a leading employee benefits company specializing in government contracts, to administer our sick leave trust in full compliance with Department of Labor rules and regulations.

## I. Overview

### A. Our Record of Compliance at LDC

CoreCivic provides a diverse range of government solutions and has worked in close partnership with the USMS at LDC for over 26 years, supporting the USMS's need to securely and safely house individuals criminally-charged with violating federal laws. In doing so, the safety and security of our facility, staff, and those entrusted to our care has consistently been our top priority. Furthermore, we are committed to meeting all relevant contract requirements as well as the USMS Federal Performance-Based Detention Standards (FPBDS) and applicable correctional industry accreditation standards.

USMS Quality Assurance Reviews (QARs), which have been conducted at LDC since 2006, have found facility operations acceptable every time but once, and those findings were quickly addressed and corrected, resulting in a return to an "acceptable" rating.

In January 2017, the USMS conducted its most recent QAR of LDC and also rated the facility's operations as satisfactory overall. Indeed, as assessed against the FPBDS, LDC received satisfactory evaluations in every functional area, including security, safety and services, and for nearly every standard.

Other recent reviews of LDC include:

- In the most recent American Correctional Association (ACA) review conducted in March 2017, LDC received a preliminary score of 100% on both mandatory and non-mandatory standards. In August 2017, LDC will appear before the ACA Commission on Accreditation where we anticipate that the facility will receive accreditation. LDC previously appeared before the ACA Commission on Accreditation in August 2014, at which time LDC also received accreditation with a score of 100% on both mandatory and non-mandatory standards.

- In March 2017, LDC underwent an audit to assess its compliance with the Prison Rape Elimination Act (PREA) Commission standards. The on-site portion of the audit was completed on March 22, but a final report has not yet been received. Previously, LDC underwent a PREA audit in January 2015 and was found to be in 100% compliance.

- Also in 2015, the National Commission on Correctional Health Care (NCCHC), whose mission is to improve the quality of correctional health services and assist correctional facilities with providing effective and efficient care, accredited LDC with the facility meeting 100% of the essential health service standards applicable to LDC and 100% of the important health service standards applicable to the facility.

Our partnership with the USMS is important to us, and accordingly, we respect the OIG's audit process as one of the many oversight and audit tools that the Government employs to monitor

contract performance and advance overall contracting processes and procedures. As a responsible partner that strives to meet USMS's expectations and learn from the feedback we receive from our customers, the OIG, and accreditation organizations, we appreciate the draft audit report's identification of areas for improvement. Below, we provide our response and identify actions we have taken to enhance our performance at LDC and elsewhere.

### B.   Our Commitment to Enhancing Our Partnerships and Performance

CoreCivic was founded in 1983 to establish public-private partnerships for the management and operation of correctional facilities. Today, the Company, a publicly-traded real estate investment trust, is a diversified government solutions company offering high quality corrections and detention services, innovative real estate solutions, and a network of residential reentry centers to help tackle America's recidivism crisis. CoreCivic is proud of its decades-long record of partnering with the Government to meet the USMS's mission.

CoreCivic strives to deliver services in a way that honors our values of having PRIDE in all we do: Professionalism, Respect, Integrity, Duty, and Excellence. We take seriously our obligations as a responsible federal contractor and desire to serve the USMS and our other Federal government customers as a reliable, dependable partner.

Toward these ends, we have an established ethics and compliance program and system of internal compliance controls, including those administered by our Quality Assurance Division, and we have made investments in technology to permit CoreCivic to be more responsive to the needs and requirements of our government partners. We believe recent investments in these areas, some of which are discussed at greater length in this response, address several of the OIG's stated concerns and, together with management changes at the facility, continue to improve operations at LDC.

In recent years, the Company initiated significant enhancements to its ethics and compliance, investigations and quality assurance functions. Ethics and compliance became a stand-alone function within the Company, reporting directly to CoreCivic's President and Chief Executive Officer. In addition, CoreCivic management initiated an "ethics liaison" program at each of CoreCivic's secure facilities to bolster our commitment to integrity, reporting and non-retaliation. Moreover, the Company's investigations function was enhanced to improve management's ability to prevent, detect and respond to allegations of employee misconduct. The Quality Assurance Division is making improvements to its processes for auditing compliance with government partner contract requirements, initiating policy changes to improve facility-level quality control functions, and re-designing processes for responding to internal and external audit findings to improve their effectiveness and durability. From a technology perspective, management has invested in a new Workforce Management System to better manage, monitor, and report on facility staffing levels. Together, these investments demonstrate the Company's proactive efforts to promote a strong culture of ethics and compliance, meet our contractual commitments and provide high quality, efficient services to our government partners.

Case 3:16-cv-02267    Document 361-14    Filed 11/20/20    Page 31 of 55 PageID #: 14451

## II.    Quality Control

CoreCivic prides itself on maintaining a comprehensive Quality Control Plan (QCP) at LDC, administered by an on-site, full time Quality Assurance Manager (QAM). Nonetheless, as part of our focus on continuous improvement, the Company always welcomes the opportunity to improve its operations and quality assurance processes and appreciates the OIG's findings and recommendations.

As noted in the draft audit report, CoreCivic's QCP is comprised of a comprehensive multi-tiered approach to internal compliance monitoring at the facility. The procedures utilized by CoreCivic to monitor compliance at LDC include annual operational audits performed by full-time auditors, staff and inmate climate surveys, quarterly self-monitoring audits, monthly security inspections, ad hoc/informal inspections, and ACA and PREA mock audits.

The OIG chose to focus its review solely on LDC's informal inspections and quarterly self-monitoring audits. Draft Audit Report at 28. With respect to these two monitoring procedures, the draft audit report identified areas for improvement in our processes. For example, the report observes that with respect to self-monitoring and informal inspections, CoreCivic could do a better job of documenting its audits and managing its Plans of Action (POAs) developed to address identified shortcomings. The audit also found that LDC's QAM would benefit from additional guidance.

We acknowledge that LDC's audits can be improved. As part of CoreCivic's ongoing commitment to improving continuously our quality assurance processes across the organization, we have implemented a number of improvements and enhancements relevant to an evaluation of our Leavenworth program. Below is a summary of the improvements and enhancements we have initiated to date.

- **Root Cause Analysis Training**. Between July and September of 2016, we provided our facility QAMs and some department heads with refresher "Root Cause Analysis Training". This training provided instruction on the importance of and methods for determining the root cause of a deficiency and provided several real-world, corrections-based examples. Afterwards, QAMs were provided with a copy of the training materials and were encouraged to share the training with the department heads in their facilities. Going forward, root cause analysis refresher training will be provided annually to all facility QAMs. Facility wardens, Administrative Duty Officer (ADO) staff, and department heads also will be encouraged to participate in this training.

- **Plan of Action Training**. In October and November 2016, CoreCivic's Quality Assurance Division also provided training to QAMs on developing and drafting effective POAs. This training focused on the overall POA process (identify the deficiency, determine root cause, develop the POA, implement the POA, document/validate POA implementation, and verify POA effectiveness), the QAM's role in developing and processing POAs, key components of effective POAs, and tips for drafting effective POAs. Like the refresher training discussed above, the training covered several real-world, corrections-based

examples. After attending the training, QAMs received copies of the training materials and were encouraged to share the training with department heads and others at their facilities. Going forward, refresher training on developing and writing effective POAs will be provided annually to all facility QAMs. Facility wardens, ADO staff, and department heads also will be encouraged to participate in this training.

- **Enhancement of Quality Assurance Policies and Procedures.** CoreCivic is in the process of substantially revising and enhancing its POA policy and renaming it the *Audits, Inspections, and Corrective Action* policy. We believe that the revised *Audits, Inspections, and Corrective Action* policy, which we expect to finalize on or before May 1, 2017, addresses many of the recommendations outlined in the draft audit report. Once finalized, LDC will submit the revised policy to the USMS for review and approval. The enhancements in this policy address documentation, root cause analysis, development of POAs, and monitoring of POAs, as described in greater detail below:

  - o First, under the revised *Audits, Inspections, and Corrective Action* policy, QAMs will be required to capture specific audit-related information for each internal audit, including the date of the audit, the department or functional area audited, a detailed description of each deficiency identified, including, where applicable, the physical location of the deficiency (e.g., Day Room of Housing Unit Alpha); the name or description of any record(s) audited or inspected (e.g., Medication Administration Record); the date(s) or date range of any record(s) audited or inspected; the description and date(s) and, when applicable, time(s), of any activity or performance measure audited or inspected (e.g., "observed day-shift fire drill on January 1, 2017" or "interviewed four evening-shift COs on January 1, 2017").

  - o Second, the revised policy will provide specific instructions to department heads for the development of POAs, requiring identification of the root cause and the inclusion of detailed corrective action steps. The instructions require identifying the title of the person(s) responsible for completing each corrective action step, and the date each corrective action step was completed or is targeted to be completed. In addition, department heads are encouraged to consult with Facility Support Center (FSC) subject matter experts when developing draft POAs. Once the POA is drafted, it must be reviewed by the facility QAM, who is tasked with assessing whether the POA effectively addresses each component of the deficiency, appears to provide a long-term viable solution, is clear and concise, and includes all of the information listed above. In addition, the QAM is responsible for working with the department head to obtain clarifications and make revisions or amendments to the POA prior to submitting it to the Warden for review and approval. Finally, the Warden must review and approve all POAs.

  - o Third, the revised policy will improve the POA validation process at LDC. Under the revised policy, department heads must provide the QAM with evidence (*i.e.,*

proof of practice) of completion of each action step in the POA. Such evidence may consist of documentation (e.g., training records, updated policies or post orders, or work orders), photographs, or other evidence demonstrating that the corrective action steps were properly and fully completed. The QAM reviews the evidence and assesses whether it substantiates completion of the POA. If so, the QAM submits the evidence to the Warden and will request closure of the POA. If the evidence does not satisfactorily substantiate completion of the POA, the QAM is required to obtain additional information from the department head. Once both the QAM and Warden are satisfied that they have received sufficient evidence to substantiate completion of the POA, the Warden will approve closure of the POA in writing (or electronically), and the QAM will upload the evidence and Warden's written approval to the Quality Assurance data system.

o Fourth, the revised policy will require LDC to monitor the effectiveness of POAs on a monthly or quarterly basis. Under the revised self-monitoring program, if a POA is completed for a partner-identified repeat deficiency, the QAM is required to audit the applicable requirement/audit indicator at least once per month for a period of six months. If the requirement is found deficient during any of the monthly self-monitoring audits, the QAM is required to reopen the POA, work with the department head to reevaluate the root cause, and develop and implement a revised POA to address the deficiency. Once the revised POA is closed, the QAM is instructed to monitor the requirement/audit indicator on a monthly basis – repeating the process until an effective long-term solution is implemented and successfully monitored.

o Fifth, under the revised *Audits, Inspections, and Corrective Action* policy, department heads will no longer be primarily responsible for conducting facility self-monitoring audits. Instead, the QAM will have primary responsibility for conducting facility self-monitoring audits, with department heads assisting the QAM with audits in their operational areas as requested. This change will not only help ensure that only trained personnel conduct audits, but it also should provide more consistency in the audit process across all operational areas. To support this change, in May 2017, CoreCivic's Quality Assurance Division will provide QAMs with training on conducting self-monitoring audits effectively. This training will focus on how to conduct and document self-monitoring audits properly using both CoreCivic and customer audit tools. Thereafter, refresher training on conducting self-monitoring audits will be provided annually to all facility QAMs.

o Sixth, pursuant to CoreCivic's revised audit policy, LDC's Warden must designate an employee to serve as the QAM's back-up in the event of an extended absence or vacancy by the QAM.

- **Enterprise-Wide Software Enhancement.** To assist CoreCivic's Quality Assurance Division and facility QAMs with tracking and monitoring each of the POAs, CoreCivic is acquiring a new enterprise-wide software system. This system will allow CoreCivic to more effectively and efficiently manage internal audits, track and catalog internal and external audits, and develop, catalog, track, and monitor POAs. The software system has been purchased and is currently in development phase with facility roll-out projected to occur by the end of 2017.

- **QAM Job Description.** In April 2016, we revised the QAM job description. The updated job description provides more extensive details regarding the primary responsibilities of the position as well as the specific essential functions the position is expected to perform. In part, the updated job description states:

    The Manager, Quality Assurance is responsible for managing all areas of Quality Assurance to include conducting regular audits and inspections. Develops, reviews, edits and oversees the implementation of facility policies, procedures and corrective action plans, by gathering and analyzing data related to the operation and management of the facility. Ensures ongoing facility compliance in accordance with established company policies and procedures and contractual requirements.

    Manages and conducts audits and inspections of overall facility operations and maintenance to make improvement recommendations affecting the, efficiency and quality of the facility organization, security, operations, services, programs and budget. Coordinates and assists department heads with developing, reviewing, implementing, and validating corrective action plans to ensure that root causes are addressed and corrective actions are effective.

- **Audit Procedures Manual.** We agree with the OIG that in addition to the training and the revision to our *Audits, Inspections, and Corrective Action* policy discussed above, a comprehensive Audit Procedure Manual would be beneficial to our QAMs and help ensure the use of consistent auditing procedures across the Company. In response to one of the recommendations in the report, the Audit Procedure Manual will provide general instructions for establishing a sample size when one is not specified in the CoreCivic audit tool or the USMS audit tool. Our Quality Assurance Division has started development of such a manual and anticipates distribution of an initial version to all QAMs by mid-2017.

101

### III.    Staffing

The draft audit report notes that CoreCivic's staffing at LDC between October 2012 through September 2014 generally met the requirements of the facility plan thresholds, but that there was a higher vacancy rate during the period from October 2014 through September 2015. As mentioned in the draft audit report, this higher vacancy rate was likely due to other regional job opportunities at that time. We recognize that attracting and retaining qualified staff is a challenge within the corrections industry as a whole. At CoreCivic, we continue to explore ways to tackle this industry-wide issue. We, along with the USMS, have initiated several efforts to provide greater visibility into staffing and staff vacancies. We are also pursuing measures to recruit additional staff. These efforts include the following:

- **Shift Roster Verification Process**.  Under this process, the on-shift supervisor indicates on the original roster any post reassignments or vacated posts that occur throughout the shift so that the roster is a "real-time" record.  Within 24 hours of the next scheduled work day, the Chief of Security or the Chief of Unit Management is required to review the completed shift roster(s) from the previous day(s).  Each week, the Master Scheduler is required to review and verify three shift rosters from the previous week using the original rosters.  In addition, the Duty Officer (a management employee serving a weekly rotational assignment to monitor overall facility operations) performs one live review of rosters each week. During this review, the Duty Officer receives a copy of the current shift roster from the on-duty supervisor and physically visits each post to confirm that the roster accurately reflects current postings.  At the end of each week, the verified and signed rosters that document reviews by Shift Supervisors, Chiefs, and Master Schedulers, along with any supporting documentation, are forwarded to the scheduled ADO (an upper management employee serving a weekly rotational assignment that assumes the duties and responsibilities of the facility Warden during non-business hours), who conducts a final review.  All of this documentation is retained at the facility, and verified shift rosters for each week are uploaded into the Quality Assurance data system within 10 working days of ADO review.  To measure compliance with these procedures, our Quality Assurance organization audits the shift roster management process as part of the annual facility audit.

- **Workforce Management System**.  We are investing more than $9 million in a Workforce Management (WFM) system.  The system is developed by Kronos, a global leader in workforce management solutions that are used by other corrections entities including the California Department of Corrections and Rehabilitation. Our objective is to improve visibility into facility-level staffing for ourselves, including FSC management, and partners such as the USMS and to enhance our ability to make necessary staffing adjustments.  At a high level, the WFM system is intended to automate the application of policies and procedures that guide the roster management process.  This automation will connect Company employees to our rosters and to employee timecards in real time; provide an alert when mandatory posts are not filled; manage post and employee certifications/licenses by providing alerts when a certification or license is nearing expiration; provide transparency in

scheduling to include overtime assignment and post re-assignment; improve reporting to partners and establish audit trails for compliance; automate the different leave types (such as personal time off, family and medical leave, and sick leave); and generally provide supervisors with the tools to better manage staff day to day and empower employees with information to manage work-life balance. We are tentatively scheduled to launch our first pilot of the system in the third quarter of this year. After assessing the results of the pilot and making any responsive adjustments to the system, we will identify facilities for a second round of piloting.

- **Shift Roster Management Training**. Shift roster management is a core component of bi-monthly training for the Chief of Security and Master Scheduler. Shift Supervisors are also encouraged to attend this training. The training includes an examination of key elements of the detailed shift roster review process that is conducted by these staff on a daily basis to confirm that rosters are properly completed and posts are properly filled. During a previous training session, Shift Supervisors, Master Schedulers and Chiefs of Security were provided a sample shift roster that must be posted in their office for reference.

- **Enhanced Reporting of Vacancies**. Pursuant to Modification 103 of our contract with the USMS, effective July 1, 2016, CoreCivic is providing additional reporting of staff vacancies. Specifically, every month, CoreCivic submits to the Contracting Officer the current average monthly vacancy rate, by department, and indicates any individual positions that have been vacant for more than 30 days.

- **Employee Referral Program**. In an effort to hire and retain qualified employees, LDC also has approved a Correctional Officer Referral Plan. The current plan began February 27, 2017. Under the plan, the facility will pay referral awards to employees who refer an individual who is hired, completes training, and remains actively employed at the facility as a Correctional Officer for a continuous period of six months. An eligible employee who refers a candidate will receive a total award of $1,000, payable in two installments.

The draft audit report also discusses the implications of Wyandotte County's use of the LDC. Our ability to flexibly and cost-effectively meet the needs of our government partners is one of our greatest strengths. Because of our long-standing partnership, CoreCivic understands that the USMS will have significant population variability over the life of a facility. Specifically, at the LDC, the population has ranged from 510 to 1,134 over the last 10 years. We believe that housing supplementary populations in facilities that otherwise house USMS populations as an anchor provides the ability to smooth that variability while the USMS retains the first right to all of the beds in the facility. If the USMS population increases, other populations are displaced. This approach enables CoreCivic to provide a high-quality service to the USMS that meets their changing needs at a cost that provides value for taxpayers.

For background, the initial pricing for a correctional facility considers both the likely population and the cost to construct a facility to adequately meet its needs, among other factors. At Leavenworth, there is a fixed payment from the USMS that covers the cost to house 602

Case 3:16-cv-02267    Document 361-14    Filed 11/20/20    Page 37 of 55 PageID #: 14457

inmates, which falls significantly below the amount needed to cover the risk of constructing and operating the 1033 capacity facility over its life. Rather than having to hire or lay off staff in response to changes in USMS populations, requesting an increase in the fixed payment, or modifying the tier pricing structure to significantly shift the population risk to the USMS when populations decline, CoreCivic has traditionally sought other partners in need of capacity to supplement the USMS when its populations are lower. This structure helps CoreCivic continue to offer the USMS a competitive price while continuing to be able to safely and effectively operate the facility when the USMS does not have a need for the available capacity for extended periods of time.

## IV.  Billing and Payments (Particularly Administration of Sick Leave)

Although the OIG concluded that "contractor invoices for housing were generally calculated accurately, invoiced, authorized, and supported by proper documentation," the draft audit report did include observations regarding CoreCivic's compliance with the McNamara-O'Hara Service Contract Act of 1965 ("SCA"), 41 U.S.C. § 6701 *et seq.* In particular, the report questions whether service employees at LDC have received sick leave benefits that satisfy the SCA's criteria for "bona fide" fringe benefits.

As an initial matter, we appreciate the draft audit report's recognition that CoreCivic complies with its SCA obligations. As the draft audit report states, "CoreCivic officials, upon receipt of a new wage determination, ensure compliance with the [SCA] wage rates by comparing all positions and actual pay rates with rates shown in the new DOL wage determination." Draft Audit Report at 62. Even where the report disagrees with compliance efforts, the draft audit report reflects a limited impact because "CoreCivic employees were generally provided salaries and fringe benefits that met or exceeded wage determination requirements." *Id.* The draft audit report does not suggest that CoreCivic contributed less than the required Health & Welfare ("H&W") amounts to the trust, and there is also no suggestion that service employees received or will receive less than the H&W benefits that they have earned. Although the draft audit report acknowledges that CoreCivic has consistently incurred the cost of SCA wage and fringe benefits that meet or exceed the SCA's required minimum amounts, the report nevertheless suggests that the administration of the company's sick leave benefit needs improvement.

CoreCivic maintains that the plan under which the sick benefit is provided is consistent with written guidance from the U.S. Department of Labor (DOL) in 2003.[1] In that guidance, DOL determined that a plan with the same features as CoreCivic's sick leave benefit plan would qualify as a bona fide fringe benefit under the DOL regulations at 29 C.F.R. § 4.171. Since then, CoreCivic has relied on The Boon Group, a nationally recognized leader in managing SCA benefits, to administer CoreCivic's sick leave through a trust in accordance with the guidance provided in DOL's 2003 letter.

---

[1] DOL directed the written guidance, dated August 8, 2003, to Contractors Employee Benefits Association, Inc., which CoreCivic understands is the former name of Boon Administrative Services, Inc., a subsidiary of The Boon Group, Inc.

Specifically, as CoreCivic previously advised the OIG, in 2003, The Boon Group received DOL's written guidance on administering sick leave through an irrevocable trust. We have enclosed DOL's letter with this response. The letter described a sick leave package very similar to the leave available at Leavenworth: service employees receive a set number of sick leave days per 12-month period, funded by contributions from the employer to The Boon Group.

In the letter, DOL advised that the SCA and its regulations "would permit a sick leave policy provided that" the policy/practice satisfied five criteria specified in the letter. Since that time, the Boon Group has administered CoreCivic's sick leave benefits consistent with all five criteria:

| DOL Criteria | The Boon Group-Administered Trust |
|---|---|
| "[T]he contractor cannot recapture any of the contributions paid in, or in any way divert the funds to its own use or benefit (29 CFR § 4.171(a)(4))." | The Boon Group maintains CoreCivic's contributions in an irrevocable trust. CoreCivic is not and has never been able to access the funds for its own use or benefit. |
| "[T]he contractor makes payments to the sick leave plan on a periodic basis that is not less often than quarterly (29 CFR § 4.175(d))." | The Boon Group receives CoreCivic's contributions on a monthly basis. |
| "[T]he amount contributed by the contractor approximately represents the actual rate of costs or contributions required to provide paid sick leave benefits to each participating employee (29 CFR § 4.171(a)(3))." | The amounts contributed by CoreCivic to the irrevocable trust approximate the costs to provide sick leave to the covered service employees. The differences, as measured by comparing employees' wage rates to the composite rate that The Boon Group uses in its administration, are consistent with DOL guidance. The differences that remain in the trust as unused leave are also paid out to service employees, such that they remain costs incurred by CoreCivic without forfeiture or recapture. |
| "[S]ick leave contributions are fully vested for each service employee participating in the plan." | Service employees are fully vested in the sick leave benefits, with the full contribution amounts provided as sick leave and/or cashed out following any of the events specified in the next entry below. |
| "[T]he unused sick leave balance amounts in individual employee accounts are paid no later than at the conclusion of the contract or termination of employment, whichever comes first." | The Boon Group cashes out the unused balances when a service employee terminates employment, ends performance on SCA-covered contracts, or changes duties to become an SCA-exempt employee. |

105

It appears to us that the draft audit report disagrees with DOL's regulations and written guidance. Since the DOL is vested with exclusive jurisdiction to provide interpretive guidance under the SCA, we are compelled to adhere to DOL guidance in these matters. For example, the draft audit report questions whether The Boon Group's trust administration satisfies the OIG's interpretation of DOL's guidance. In particular, based on calculations involving a small "judgmental sample" reviewed for the report, Draft Audit Report at 63, the report claims that The Boon Group has administered the trust in such a way that, according to the draft report, the H&W credit calculated for the sick leave does not "meet a reasonable definition of 'approximate'" when compared to the alleged cost of providing the sick leave. *Id.* at 66.

Yet, DOL's guidance expressly recognized that differences might arise in methods of calculating sick leave by the contractor and by the benefits trustee. (CoreCivic understands that that issue is what prompted the inquiry to DOL in the first place.) DOL certainly anticipates differences will arise, and only DOL can determine whether differing calculations can reasonably "approximate" each other. DOL has not provided CoreCivic or The Boon Group further guidance on what constitutes calculations that "approximate" each other. CoreCivic is unaware of any published guidance on that point, either. Given this, we do not believe that the fact that funded amounts in the trust do not match accrual rates (or the cost credited against the H&W fringe rate) can call into question whether the sick leave is a bona fide fringe benefit.[2]

Furthermore, the draft audit report appears to question the timing of the trust's payment of unused sick leave and states that the trust should be required to provide "pay outs" of unused sick leave prior to the date employees cease working on an SCA-covered contract or upon termination of employment. The draft audit report also claims that unused sick leave must be provided as a "cash equivalent" payment on the employee's next payday. Recognizing that this is an issue for the DOL to resolve, the Company nonetheless does not believe there is support in DOL regulations or interpretive guidance for such a rule regarding contributions made to an irrevocable SCA trust.[3] Moreover, we believe that the 2003 DOL letter directly contradicts the draft report's conclusion on the timing of payment of unused sick leave. Notably, the 2003 letter states that "SCA compliance would most certainly be achieved" if payment of unused sick leave amounts are made "no later than at the conclusion of the contract or termination of employment, whichever comes first." It does not state that unused sick leave amounts must be paid to SCA-covered employees as a cash equivalent on the employees' next payday. The Boon Group's administration of sick leave satisfies this express guidance because CoreCivic service employees receive cash payouts at

---

[2] Notably, DOL auditors have not identified any "unreasonable" approximations of sick leave benefits by The Boon Group during the eight DOL SCA audits performed on CoreCivic's SCA compliance since 2005.

[3] CoreCivic also notes that the United States Court of Appeals for District of Columbia Circuit has expressly denied the DOL's claim that an employee hour bank which includes over funded fringe contributions to a fringe benefit plan must be paid as cash in an employee's paycheck at the time the employee earns it. *Tom Mistick & Sons, Inc. v. Reich,* 54 F.3d 900 (D.C. Cir. 1995). In *Mistick,* the D.C. Circuit determined that an hour bank funded with remaining fringe contributions (to satisfy Davis-Bacon Act requirements) passed the reasonable relationship test for a bona-fide fringe benefit plan because every employee received the full value of the fringe contribution *and it was not necessary that the employee received the benefit of every dollar at the time that it was earned.* Under CoreCivic's plan, every employee will receive the full value of all of the fringe contributions made on the employees' behalf, whether through use of paid sick leave or as a cash payment upon employment termination or when the employee stops working on SCA-covered contracts.

employment termination or if they stop working on SCA-covered contracts. In fact, The Boon Group's administration is more generous than DOL's guidance requires: unused sick leave is also cashed out when service employees change duties such that they become SCA exempt.

At bottom, CoreCivic incurs the costs for service employees' bona fide fringe benefits as required by the SCA. DOL regulations provide for measuring H&W benefits by the cost of those benefits to the contractor. *See generally* 29 C.F.R. §§ 4.172, 4.177(a). DOL also recognizes that third parties often administer fringe benefits on contractors' behalf. Under the regulations, contractors "may dispose of certain of the fringe benefit obligations . . . by irrevocably paying the specified contributions for fringe benefits to an independent trustee . . . pursuant to an existing 'bona fide' fund, plan, or program" for the service employees working on a covered contract. 29 C.F.R. § 4.170(b). Further, "Health and Welfare . . . payments to a 'bona fide' trust program may be made on a periodic payment basis which is not less often than quarterly." 29 C.F.R. § 4.175(d)(1).

CoreCivic believes that it not only meets but exceeds that requirement. On a monthly basis, CoreCivic contributes amounts to the irrevocable trust equal to service employees H&W benefits earned during the month. These contributions encompass the costs that CoreCivic incurs for sick leave. CoreCivic cannot recover those funds once contributed, so they are properly considered a cost of the company at that point. Thus, based on this timing, CoreCivic satisfies its H&W obligations by incurring the cost for the fringe benefits to be provided—including sick leave, specifically—through monthly contributions to The Boon Group-administered trust. Overall, CoreCivic incurs costs as required by the SCA so that The Boon Group can administer sick leave in a manner dictated by written DOL guidance—with unused leave cashed out when DOL requires or even earlier.[4]

---

[4] Although CoreCivic disagrees with the draft audit report's findings, the Company has nonetheless taken certain action in response to them. Most notably, CoreCivic has enhanced its employee communications to better explain how The Boon Group administers service employees' sick leave. CoreCivic also agrees on an annual basis to review the balance in each employee's paid sick leave account to review whether there is an unreasonable overage and, if so, assess how to best address any such overages for the employees so affected. In addition, the Company understands that it may need to assess its practices for providing fringe benefits to SCA-covered service employees as a result of the recent final rules requiring sick leave. As the OIG is likely aware, Executive Order 13706 and implementing rules now require paid sick leave for many employees performing on or in support of many SCA-covered prime contracts solicited starting January 1, 2017, or awarded outside the solicitation process starting on that date. CoreCivic and The Boon Group are still assessing next steps in connection with these changes to the sick leave rules and will keep the OIG apprised to the extent any changes affecting the sick leave plan are made.

V.    Conclusion

For more than three decades, the Company has been an innovative, dependable partner for government and we appreciate the audit's efforts to identify areas for improvement in the execution and administration of the Leavenworth contract in the future. We remain committed to continued partnership with the USMS to ensure the safe and effective delivery of services to the prisoners in our care.

Sincerely,

Natasha Metcalf

Enclosure

Case 3:16-cv-02267    Document 361-14    Filed 11/20/20    Page 42 of 55 PageID #: 14462

# OFFICE OF THE INSPECTOR GENERAL
## ANALYSIS AND SUMMARY OF ACTIONS
## NECESSARY TO CLOSE THE REPORT

The Office of the Inspector General (OIG) provided a draft of this audit report to the U.S. Marshals Service (USMS), CoreCivic, Inc. (CoreCivic), and the Boon Group. USMS's and CoreCivic's responses are incorporated into Appendix 5 and Appendix 6, respectively. The Boon Group elected not to provide a formal response. CoreCivic did not explicitly agree or disagree with many of our recommendations but provided comments that were applicable to some. In those comments, CoreCivic disagreed with our analysis of how certain employee "sick accounts" have been administered. We describe and, where appropriate, reply to these responses in the applicable recommendation below. The following provides the OIG analysis of the responses and summary of actions necessary to close the report.

**Recommendations to the USMS:**

1. **Establish acquisition procedures to ensure that future detention pre-solicitation and solicitation notices include the widest place of performance practical, and that sole source justifications are fully documented, maintained in the contract file, and include all Federal Acquisition Regulation (FAR) required language. This language should include the certification that the justification was accurate and complete to the best of the Contracting Officer's knowledge.**

   Resolved. USMS concurred with our recommendation and stated that it had redesigned its sources sought notice to ensure the widest geographic place of performance while maintaining compliance with a federal statute that requires the USMS's privately contracted facilities be located in the district of need. For example, the USMS issued a new sources sought notice for the District of Kansas to determine if market conditions have changed since its original determination in 2007. USMS also said it now stores market research information electronically and by paper in the contract file.

   This recommendation can be closed when the USMS provides us with samples of actual sole source announcements that demonstrate compliance with this recommendation, and evidence that USMS Procurement Policy ensures that future detention pre-solicitation and solicitation notices include the widest place of performance practical, and that sole source justifications are fully documented, maintained in the contract file, and include all FAR-required language.

2. **Establish policies and procedures to ensure that, when USMS price analysis is based on a comparison of historical prices paid, it establishes the prior price as a valid basis for comparison.**

   <u>Resolved.</u>  USMS concurred with our recommendation and stated that since the contract was awarded in 2007, it has developed tools to assist its staff when determining fair and reasonable pricing.  One of these tools is the "Core Rate" model, which establishes a baseline for negotiating per diem reimbursement rates with private, state, and local agencies that provide bed space to house federal prisoners.  USMS also stated that it worked with the Federal Bureau of Prisons and Immigration and Customs Enforcement in 2008 to develop a Pricing Analysis Guide which compiles pricing information from contracts and intergovernmental agreements to create an average baseline per diem rate paid by federal agencies.  USMS said this guide is meant to be used for price analysis and to help specialists determine if a per diem rate is fair and reasonable.

   This recommendation can be closed when the USMS provides evidence that USMS policies and procedures require the use of the aforementioned tools, and provides an example of their application to the USMS's more recent private detention contracts.

3. **Continue to develop a training program for Contracting Officer's Representatives (COR) monitoring and overseeing its detention-related contracts that ensures CORs receive and maintain a level of training and experience commensurate with their responsibilities.**

   <u>Resolved.</u>  USMS concurred with our recommendation.

   This recommendation can be closed when we receive evidence that the USMS developed a training program for CORs monitoring and overseeing its detention-related contracts that ensures CORs receive and maintain a level of training and experience commensurate with their responsibilities.

4. **Continue to develop and implement inspection guidance, monitoring tools, and its new onsite contract monitoring initiative for use at all of its privately contracted facilities, and ensure that its continuous monitoring efforts incorporate QAR steps, to the maximum extent practicable.**

   <u>Resolved.</u>  USMS concurred with our recommendation.

   This recommendation can be closed when we receive evidence that the USMS developed and implemented inspection guidance, monitoring tools, and its new onsite contract monitoring initiative for use at all of its privately contracted facilities, and ensure that its continuous monitoring efforts incorporate QAR steps, to the maximum extent practicable.

5. **Request and incorporate internal and external audit results and Plans of Action (POA) into the USMS's quality assurance program to ensure each identified deficiency was adequately resolved.**

   <u>Resolved.</u> USMS concurred with our recommendation and stated that it had updated the Performance Work Statement to require written responses to internal and external audits and that POAs are provided to the Contracting Officer and COR within 30 days of completion.

   This recommendation can be closed when we receive the updated Performance Work Statement and evidence that internal and external audit results and POAs are incorporated into the USMS's quality assurance program to ensure each identified deficiency was adequately resolved.

6. **Create policies and procedures requiring CORs to conduct continuous oversight and monitoring of QAR-identified deficiencies to ensure that the completed POAs are operating effectively and that the CORs document this follow-up work and communicate the results to POD.**

   <u>Resolved.</u> USMS concurred with our recommendation and stated that it has developed an onsite Standard Operating Procedure requiring and providing oversight tools to the CORs.

   This recommendation can be closed when we receive the Standard Operating Procedure and evidence that CORs are conducting continuous oversight and monitoring of QAR identified deficiencies to ensure that the completed POAs are operating effectively and that the CORs document this follow-up work and communicate the results to POD.

7. **Include in the USMS's new standard operating procedures COR requirements for developing and maintaining a document control system and for retaining quality assurance-related documentation. Standard operating procedures should also include COR guidance on formally documenting inspections that include tracking deficiencies and contractor POAs.**

   <u>Resolved.</u> USMS concurred with our recommendation and stated that it has developed an onsite Standard Operating Procedure requiring and providing oversight tools to CORs.

   This recommendation can be closed when we receive the Standard Operating Procedure and evidence that LDC's onsite COR is maintaining a document control system, retaining quality assurance-related documentation, and formally documenting inspections that include tracking deficiencies and contractor POAs.

8. **Continue to input performance assessment reports for its active contracts into the Contractor Performance Assessment Reporting System (CPARS), and finalize policies and procedures to ensure that contractor performance data on future detention contracts is entered into CPARS.**

   Resolved.  USMS concurred with our recommendation and stated that all existing detention service contracts have been loaded into CPARS, and the CPARS rating system has been incorporated into the USMS's Quality Assurance Program.  USMS also said that it was currently processing reports for three of its detention services contracts and will provide the OIG with copies of the reports once they have been processed through CPARS.  As noted in the report, as of February 2017, the USMS had incorporated new CPARS-related language into its Request for Proposal template and created a draft CPARs template.

   This recommendation can be closed when we receive copies of the three CPARS-generated reports and the finalized CPARs template that was incorporated into the USMS's Quality Assurance Program.

9. **Conduct Performance Evaluation Meetings, as required by the contract, at the LDC and other detention facilities as applicable.**

   Resolved.  USMS concurred with our recommendation and stated that its onsite Standard Operating Procedure requires Performance Meetings.

   This recommendation can be closed when we receive the Standard Operating Procedure and evidence that LDC is now conducting Performance Evaluation Meetings (e.g. meeting minutes).

10. **Ensure that the District COR complies with contract and USMS District requirements to evaluate contractor performance prior to the payment of monthly invoices.**

    Resolved.  USMS concurred with our recommendation and stated that its onsite Standard Operating Procedure requires and provides oversight tools to CORs.

    This recommendation can be closed when we receive the Standard Operating Procedure and evidence that LDC's COR is evaluating contractor performance prior to the payment of monthly invoices.

112

11. **Ensure that the LDC's Quality Assurance Manager (QAM) request and retain supporting audit documentation to ensure audits are properly conducted and conclusions are supported.**

<u>Resolved.</u>  USMS concurred with our recommendation and stated that it would require that any contractor changes to policies or procedures be approved by the USMS.

CoreCivic did not agree or disagree with this recommendation but acknowledged that there is room for improvement for the LDC's audit documentation.  CoreCivic stated that it was in the process of revising its POA policy, which will be renamed the *Audits, Inspections, and Corrective Action* policy.  This revised policy will require better documentation of facility inspection efforts and results.  Facility QAMs will need to capture specific audit-related information for each internal audit, including the date of audit, department or functional area audited, a detailed description of the deficiency, the name or description of the record reviewed, description of any activity or performance measure reviewed, and other pertinent information.  CoreCivic anticipates finalizing this revised policy on or before May 1, 2017.

This recommendation can be closed when we receive a copy of CoreCivic's USMS-approved *Audits, Inspections, and Corrective Action* policy and evidence that the LDC's QAM is now requesting and retaining supporting audit documentation to ensure audits are properly conducted and conclusions are supported.

12. **Ensure that the LDC enforces existing CoreCivic policies and procedures for generating and approving comprehensive POAs, including:  (a) drafting POAs that sufficiently address the deficiencies and requiring department heads identify the deficiencies' root cause; (b) ensuring the LDC's QAM and Warden provide instruction and guidance to department heads on the contents of a sufficient POA, and only approve fully compliant POAs; and (c) ensuring that department heads complete and the LDC's QAM retain the corrective action worksheets.**

<u>Resolved.</u>  USMS concurred with our recommendation.

CoreCivic did not agree or disagree with this recommendation but acknowledged that LDC's audits can be improved and provided a summary of improvement initiatives, including additional training, enhancements to policies and procedures, and the acquisition of a new software system.  Each is briefly described below.

CoreCivic stated that it is providing annual root cause analysis training to facility QAMs and some department heads, and providing annual POA training to QAMs on developing and drafting effective POAs.  Senior facility staff will be encouraged to participate in these trainings.  Additionally, CoreCivic plans

113

to provide annual training to facility QAMs on effectively conducting self-monitoring audits.

CoreCivic also stated that that its upcoming *Audits, Inspections, and Corrective Action* policy will: (1) provide specific instruction to department heads on the development and review of POAs, including requirements to identify the root cause of a deficiency and generate detailed corrective action steps; (2) require the QAM and Warden obtain sufficient evidence to substantiate completion of the POA; (3) transfer primary responsibility for conducting facility self-monitoring audits from department heads to the QAM, with department heads instead providing assistance to the QAM, based on their operational areas of expertise; and (4) designate an employee to serve as the QAM's backup in the event of an extended absence or vacancy by the QAM. CoreCivic anticipates finalizing this revised policy on or before May 1, 2017.

CoreCivic also stated that it is acquiring a new enterprise software system to allow CoreCivic to more effectively and efficiently manage internal audits, track and catalog internal and external audits, and develop, catalog, track, and monitor POAs. Software roll-out is projected to occur by the end of 2017.

This recommendation can be closed when we receive a copy of CoreCivic's USMS-approved and implemented *Audits, Inspections, and Corrective Action* policy and evidence that the LDC's QAM attended root cause analysis training and Plan of Action (POA) training in 2016.

**13. Ensure that the LDC enforces existing CoreCivic policies and procedures by confirming and documenting that POA strategies and action steps were completed.**

Resolved. USMS concurred with our recommendation.

CoreCivic did not agree or disagree with this recommendation but acknowledged that the LDC's audits can be improved. CoreCivic stated that its upcoming *Audits, Inspections, and Corrective Action* policy will require the LDC to monitor the effectiveness of POAs. Specifically, if a POA is completed for a partner-identified deficiency, the QAM will be required to audit the applicable requirement/audit indicator at least once per month for a period of 6 months. If the requirement is found deficient during this timeframe, the QAM is required to reopen the POA, work with department heads to reevaluate the root cause, and develop and implement a revised POA to address the deficiency. Once the revised POA is closed, the QAM must monitor it monthly until they reach an effective long-term solution. CoreCivic anticipates finalizing this revised policy on or before May 1, 2017.

This recommendation can be closed when we receive a copy of CoreCivic's USMS-approved and implemented *Audits, Inspections, and Corrective Action*

114

policy that contains updated procedures for confirming and documenting that POA strategies and action steps were completed.

**14. Ensure that CoreCivic creates an Audit Procedure Manual or some other mechanism or process to provide the LDC's QAM with comprehensive guidance on how to properly conduct facility audits and continuously monitor closed POAs. Such guidance should describe: (a) the frequency and breadth of reviews; (b) the establishment of a sample size when one is not already specified in the CCAAT; (c) the maintenance of requisite qualifications, technical expertise, and accountability by personnel supporting the QAM's efforts; (d) the appropriate documentary evidence necessary to validate the auditors' conclusions and enable re-performance if necessary; (e) methods for proper retention of documentary evidence; (f) the approval and monitoring of the LDC's inspection and audit methodologies by the Facility Support Center (FSC); (g) and the establishment of contingency plans for conducting quality assurance-related work should the QAM be unavailable. Lastly, this guidance should obtain both FSC and USMS approval.**

<u>Resolved.</u>  USMS concurred with our recommendation.

CoreCivic agreed with this recommendation, stating that a comprehensive Audit Procedure Manual would be beneficial to its QAMs and help ensure the use of consistent company-wide auditing procedures. CoreCivic said that the Audit Procedure Manual will provide general instructions for establishing a sample size when one is not specified in the QAM's audit tools, and that its Quality Assurance Division has begun development of the Audit Procedure Manual and anticipates distribution of an initial version to all QAMs by mid-2017. Also, CoreCivic stated that it revised the QAM job description to provide more detail on the QAM's primary responsibilities and the essential functions they are expected to perform.

This recommendation can be closed when we receive a copy of CoreCivic's Audit Procedure Manual that contains comprehensive guidance on how QAMs are to conduct facility audits, evidence that CoreCivic distributed the manual to facility QAMs, and a copy of the QAM's updated job description.

**15. Consider implementing policies and procedures similar to those of the BOP that independently evaluate contractor-provided detainee mortality reports.**

<u>Resolved.</u>  USMS concurred with our recommendation.

This recommendation can be closed when we receive evidence that the USMS considered implementing policies and procedures similar to those of the BOP that independently evaluate contractor provided detainee mortality reports.

**16. Monitor LDC compliance with the new CoreCivic policies and post orders related to recreation yard searches and detainee movement in the SHU, to ensure they are operating effectively.**

Resolved. USMS concurred with our recommendation.

This recommendation can be closed when we receive evidence that the USMS monitors LDC compliance with the new CoreCivic policies and post orders related to recreation yard searches and detainee movement in the SHU, to ensure they are operating effectively.

**17. Ensure that CoreCivic establish policies and procedures that prevent the closure of mandatory posts at CoreCivic's USMS contracted facilities and require FSC assess completed shift rosters to determine if facilities are adequately filling their security-related posts.**

Resolved. USMS concurred with our recommendation and stated that it will update its detention center contracts and the Performance Work Statement to ensure shift rosters are reviewed adequately.

CoreCivic did not agree or disagree with this recommendation, but stated that the USMS and CoreCivic initiated efforts to provider greater visibility into staffing and staffing vacancies, and recruit additional staff. Specifically, CoreCivic's efforts include: (1) a shift roster verification process that requires facility management review completed rosters and perform a live examination of rosters each week to confirm that the roster accurately reflects current postings, uploading the appropriate documentation into the Quality Assurance Data system, and CoreCivic's Quality Assurance Division reviewing the shift roster verification process as part of its annual facility audit; (2) a more than $9 million investment in a workforce management system that would improve visibility into facility-level staffing, and provide several features such as an alert when mandatory posts are not filled and tools for supervisors to better manage daily staffing [this system is tentatively scheduled to launch its first pilot in the third quarter of 2017]; (3) shift roster management training; (4) enhanced reporting of vacancies pursuant to a USMS-issued contract modification requiring that CoreCivic submit to the USMS the current average monthly vacancy rate, by department, and identification of any individual positions that have been vacant for more than 30 days; and (5) LDC approval of a Correctional Officer Referral Plan that will pay rewards of $1,000 to employees that refer an individual who is hired, completes training, and remains actively employed at the facility as a Correctional Officer for 6 continuous months.

This recommendation can be closed when we receive evidence that CoreCivic established policies and procedures that prevent the closure of mandatory posts at CoreCivic's USMS contracted facilities and that FSC assesses completed shift rosters to determine if facilities are adequately filling their security-related posts.

116

**18. Include in its contract monitoring program staffing-related procedure steps that help District CORs assess facility staffing trends and determine if post closures are occurring.**

<u>Resolved.</u>  USMS concurred with our recommendation and stated that its onsite Standard Operating Procedure requires and provides oversight tools to CORs.

This recommendation can be closed when we receive the USMS's Standard Operating Procedure and evidence that it includes staffing-related procedure steps that help District CORs assess facility staffing trends and determine if post closures are occurring.

**19. Incorporate milestones into its price reduction guidance to ensure a more efficient and expedient submission of final price reduction decisions to its contractors.**

<u>Resolved.</u>  USMS concurred with our recommendation and stated that it has updated its Reduction Review Manual to include milestones.

This recommendation can be closed when we receive the USMS's updated Reduction Review Manual, and evidence of its distribution, that contains milestones to ensure a more efficient and expedient submission of final price reduction decisions to its contractors.

**20. Ensure that during periods of chronic contractor understaffing, contractors utilize all available options, including the provision of temporary staff.**

<u>Resolved.</u>  USMS concurred with our recommendation and stated that it has updated the Performance Work Statement to address this matter.

This recommendation can be closed when we receive the updated Performance Work Statement that ensures that during periods of chronic contractor understaffing, contractors utilize all available options, including the provision of temporary staff.

**21. Establish policies and procedures for assessing and approving contractor requests to transfer staff out of USMS contracted facilities, and:  (a) obtain reasonable assurance from the facility Warden and FSC officials that such a transfer will not compromise the facility's ability to comply with contract requirements and CoreCivic policy; (b) independently assess whether the proposed transfers may jeopardize facility staffing requirements and operational readiness; and (c) ensure that the Contracting Officer and COR approve and continuously monitor the arrangement, respectively.**

117

Resolved. USMS concurred with our recommendation and stated that it has updated the Performance Work Statement and onsite Standard Operating Procedures to ensure both the Contracting Officer and COR approve all contractor staff transfers.

This recommendation can be closed when we receive the updated Performance Work Statement and onsite standard Operating Procedures that assess and approve contractor requests to transfer staff out of USMS contracted facilities, and meet the other conditions contained in this recommendation.

**22. Clearly specify in its new and existing contracts the circumstances under which triple bunking is allowed, and what rules, procedures, and ACA standards apply to the practice.**

Resolved. USMS concurred with our recommendation and stated that while the LDC contract already requires compliance with ACA standards, its updated Performance Work Statement requires that contractors obtain USMS approval prior to housing prisoners outside of the ACA Standard. It states that "under no circumstances will the contractor fail to comply with the unencumbered space requirements, a practice commonly referred to as Triple Bunking, without prior approval of the Contracting Officer and the District's Chief Deputy U.S. Marshal."

This recommendation can be closed when we receive the updated Performance Work Statement which describes the circumstances under which triple bunking is allowed, and what rules, procedures, and ACA standards apply to the practice; and evidence that the new Performance Work Statement has been incorporated into the USMS's new and existing contracts

**23. Specify for its contractors, in their contracts or in some other appropriate manner, the use of multi-user arrangements at its existing and future contract facilities, to ensure USMS maximizes its value and assesses the impact, if any, on USMS's contracted staffing, facility safety and security, and other institutional matters.**

Resolved. USMS concurred with our recommendation and stated that it will review existing laws and regulations to "determine any actions we can specify in our multiple users' contract." USMS stated that it would take appropriate action if multiple-user arrangements affect contracted services.

CoreCivic did not agree or disagree with this recommendation but shared its perspective on the benefits of housing supplementary populations in facilities that otherwise house USMS populations. CoreCivic said that such supplementary populations help smooth the USMS's significant population variability. CoreCivic added that by seeking other partners in need of capacity, it can avoid "having to hire or lay off staff in response to changes in USMS populations, requesting an increase in the fixed payment, or modifying

118

the tier pricing structure to significantly shift the population risk to the USMS when populations decline."

We disagree with CoreCivic's contention that the arrangement benefitted the USMS. While the USMS's contracted per diem ranged from $85 to $98 per detainee per day, Wyandotte's contracted per diem ranged from $50 to $58. In our judgment, the USMS contract subsidized Wyandotte County's lesser per diem rate and the USMS received little or no discernible benefit, financial or otherwise. We also disagree with CoreCivic's suggestion that this arrangement helped avoid the possible modification of the USMS pricing structure. The LDC contract is a firm-fixed-price contract, which according to FAR 16.202-1 "provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract." In other words, CoreCivic is not entitled to an increase in the fixed payment under this contract just because the USMS detainee population declines. Further, CoreCivic is not allowed to modify the tier pricing structure to shift risk to the USMS. In fact, the opposite is true; FAR 16.202-1 states that (the OIG's emphasis in italics) "this contract type places upon the contractor *maximum risk* and full responsibility for all costs and resulting profit or loss."

This recommendation can be closed when we receive evidence that the USMS specifies for its contractors, in their contracts or in some other appropriate manner, the use of multi-user arrangements at its existing and future contract facilities, to ensure USMS maximizes its value and assesses the impact, if any, on USMS's contracted staffing, facility safety and security, and other institutional matters.

24. **Work with the Department of Labor, and as necessary CoreCivic, to determine whether placing funds significantly in excess of the actual cost of employees' accrued sick leave balances in a "sick account," and not making the excess funds available to employees on their regular payday, is a proper fringe benefit practice, and that CoreCivic properly communicates the "sick account" benefit to its employees.**

Resolved. USMS concurred with our recommendation and stated that it will work with the Department of Labor, Wage and Hour Division, to determine if CoreCivic is in compliance with Service Contract Labor Standards.

In its response to the draft report, CoreCivic disagreed with the recommendation and maintained that its sick account was consistent with the Department of Labor memorandum dated August 2003. We note that CoreCivic's response does not accurately characterize the OIG's report in certain respects (for instance, in suggesting that the OIG "disagrees with DOL's regulations and written guidance"). However, these inaccuracies in CoreCivic's response are not critical to the resolution of the OIG's recommendation, which can be closed when we receive evidence that the USMS worked with the Department of Labor, Wage and Hour Division, to

119

determine if CoreCivic is in compliance with Service Contract Labor Standards.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig