# EXHIBIT 58

Page 1

1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF TENNESSEE

3

NIKKI BOLLINGER GRAE, Individually

4     and on Behalf of All Others

Similarly Situated,

5

          Plaintiff,          Civil Action No.

6

vs.                     3:16-cv-02267

7

CORRECTIONS CORPORATION OF

8     AMERICA, ET AL.,

9          Defendants.

10    _____

11

12        CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

13

14      VIDEOTAPED DEPOSITION OF DONNA MELLENDICK

15

16     Conducted virtually via remote videoconference

17                October 27, 2020

18

19

20

21

22

23    Reported by:

Misty Klapper, RMR, CRR

24      Job No.: 10073773

25

1              UNITED STATES DISTRICT COURT

2              MIDDLE DISTRICT OF TENNESSEE

3

NIKKI BOLLINGER GRAE, Individually

4      and on Behalf of All Others

Similarly Situated,

5

        Plaintiff,            Civil Action No.

6

vs.                          3:16-cv-02267

7

CORRECTIONS CORPORATION OF

8      AMERICA, ET AL.,

9              Defendants.

10      _____

11

12

13

14

15

16

17       Videotaped deposition of DONNA MELLENDICK, taken on

18      behalf of Defendants, via Zoom remote videoconference,

19      beginning at 10:10 a.m. CST on Tuesday, October 27, 2020,

20      before Misty Klapper, RMR, CRR.

21

22

23

24

25

1     APPEARANCES:
2     (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3     ON BEHALF OF PLAINTIFF:
4          CHRISTOPHER HAMP LYONS, ESQUIRE
       ROBBINS GELLER RUDMAN & DOWD LLP
5          414 Union Street, Suite 900
       Nashville, Tennessee 37219
6          (615) 244-2203
       E-mail:  clyons@rgrdlaw.com
7
            AND
8
       JASON A. FORGE, ESQUIRE
9          ROBBINS GELLER RUDMAN & DOWD LLP
       655 West Broadway, Suite 1900
10         San Diego, California 92101
       (619) 231-1058
11         E-mail: jforge@rgrdlaw.com
12    ON BEHALF OF DEFENDANTS:
13
       SARAH TOMKOWIAK, ESQUIRE
14         LATHAM & WATKINS, LLP
       555 Eleventh Street, N.W., Suite 1000
15         Washington, D.C. 20004-1304
       (202) 637-2335
16         E-mail: sarah.tomkowiak@lw.com
17              AND
18
       ERIC CHARLES PETTIS, ESQUIRE
19         LATHAM & WATKINS, LLP
       355 South Grand Avenue, Suite 100
20         Los Angeles, California 90071
       (213) 485-1234
21         E-mail: eric.pettis@lw.com
22
23    ALSO PRESENT:  DeSHAWN WHITE, VIDEO OPERATOR
24            D. SCOTT DODRILL
25

1            The court reporter may now swear in

2        or affirm the deponent.

3            MS. REPORTER:  One moment.

4

5    Whereupon:

6            DONNA MELLENDICK,

7    was called for examination, and, after being duly

8    sworn, was examined and testified as follows:

9            MS. REPORTER:  Thank you.

10            You may proceed.

11        EXAMINATION BY COUNSEL FOR DEFENDANTS

12            BY MS. TOMKOWIAK:

13    Q.    Good morning, Ms. Mellendick.

14    A.    Good morning.

15    Q.    We -- we spoke before we went on the

16    record, but I don't think I introduced myself.

17    So my name is Sarah Tomkowiak and I represent the

18    defendants in this matter.

19            Have you been deposed before?

20    A.    I have not.

21    Q.    Okay.  Well, this deposition is being

22    taken over Zoom, so it's even more important

23    than -- and when we're in person usually to try

24    not to talk over each other.

25            Your counsel might also object to my

1          Q.    And that's referring to your

2     experience during the time you were at the BOP

3     30-plus years through August 2015, correct?

4          A.    You -- but you were talking about

5     what I put in my report?

6          Q.    Well, I'm talking about the

7     experience that you drew upon in forming your

8     opinions as they relate to the 2012-2016 time

9     period.  The experience that you're drawing upon

10     is your experience at -- during the time that you

11     were at the BOP; is that right?

12          A.    That is right.

13          Q.    Okay.  I just have a couple other

14     questions on this LinkedIn profile and then we

15     can put it away.

16               I see under Interests that you follow

17     the GEO Group and MTC and CoreCivic.

18               Why do you do that?

19               MR. FORGE:  I'm going to object as

20          vague as to time.

21               THE WITNESS:  It's been a while.

22          Probably just kind of -- just to see

23          what's -- what they're up to, I guess.

24               It was my -- was my career for quite

25          a while, so --

1          BY MS. TOMKOWIAK:

2          Q.    All right.  And I see that you also

3     follow the ACA, the American Correctional

4     Association.

5               What's that?

6          A.    American Correctional Association?

7          Q.    Um-hmm (affirmative).

8          A.    It's -- how do I describe it?

9               Mr. Dodrill talks about it in his

10    report, but it's a organization that is comprised

11    of correctional professionals that go out and

12    audit correctional facilities and provide a

13    certification that they're meeting all the

14    standards that the ACA has developed.

15         Q.    Why do you or did you at one point

16    follow them?

17         A.    I -- throughout my career I've dealt

18    with ACA in my position in the program review

19    division, worked closely with ACA accreditations,

20    et cetera.  And -- and I know some -- or did know

21    some folks that are, you know, associated with

22    them, so --

23         Q.    Okay.  And all BOP-operated

24    facilities are required to maintain ACA

25    accreditation; is that right?

Page 59

1          A.     That is correct.

2          Q.     And same thing is true for all

3     privately operated facilities?

4          A.     Correct.

5          Q.     Okay.  We are done with that exhibit,

6     so you can close that out if you want.

7               During the time that you worked as

8     PMB administrator, the BOP was under contract

9     with CCA for the housing of federal inmates in

10     five correctional facilities; is that right?

11          A.     That is right.

12          Q.     And those are the facilities that you

13     discuss in your report.  They're Adams, Cibola,

14     Eden, McRae and Northeast Ohio?

15          A.     Yes.

16          Q.     In your role as PMB administrator,

17     you interacted with CCA and its employees, right?

18          A.     I did.

19          Q.     How frequently would you say those

20     interactions were?

21          A.     Mainly my staff were the ones that

22     interacted with CCA employees on a regular basis,

23     whether it be daily, weekly.  I would say my

24     interactions were probably maybe -- maybe

25     monthly.  I kind of think it depended on what was

Page 60

1       going on at the time.

2              Q.     And what were the nature of those

3       interactions with CCA?

4              A.     My staff's or mine?

5              Q.     Yours.

6              A.     Typically it would be working

7       together to schedule partnering meetings and if

8       there were -- we had a -- let's step back a

9       minute.

10              So the Bureau of Prisons partnered

11      with our private providers.  We wanted to work

12      together.  We wanted our private partners to be

13      successful in providing these inmates with

14      confinement beds.  And the partnering process

15      involved staff at all levels in -- in my branch,

16      in the PCC section, in the CFM section to be able

17      to interact with one another.

18              So usually I didn't interact with

19      anyone at CCA unless it was something that

20      couldn't be resolved at a lower level or it was

21      just a higher level, whether we were looking to

22      try to organize our next partnering meeting, you

23      know, the logistics and -- and the agenda,

24      et cetera.

25              Q.     Okay.  And when it did rise to the

1          A.     The same.  I highly respected him.

2          Q.     Now, you said that your staff also

3    had interactions with CCA; is that right?

4          A.     Yes.

5          Q.     And what was -- if you -- to the

6    extent of your knowledge, what were the nature of

7    those interactions?

8          A.     Well, in my branch I had -- I had

9    staff in my branch that worked on-site at each of

10    the private contract facilities.  So I typically

11    had at least two staff in my branch.  And they

12    interacted with the provider.  Whether it be CCA

13    or another company, they interacted with those

14    staff daily.  So --

15          Q.     You're referring to the -- make sure

16    I get my acronyms right, but SSIM and SOM; is

17    that right?

18          A.     That is correct.

19          Q.     Okay.  And those were the -- the

20    on-site monitors that the BOP had in place at the

21    privately operated facilities?

22          A.     Yes.

23          Q.     Did the -- do you know, did the BOP

24    have any similar type of on-site monitoring at

25    its own facilities?

1          A.     The only instance I could recall that

2     is if -- I think the BOP had at least a couple

3     facilities in which they might have contracted

4     services.  So they may have had someone

5     responsible for monitoring the contract.

6          Q.     Okay.  But as a general matter,

7     the -- the BOP facilities did not have the same

8     type of 24/7 on-site monitors as the privately

9     operated facilities did?

10         A.     They did not.  And it -- and it

11     wasn't 24/7.  I mean, my staff worked a -- an

12     eight-hour day.  So it wasn't 24/7, yeah.

13         Q.     8/7?

14         A.     Yeah.

15         Q.     Got it.

16              And -- and we -- we talked a little

17     bit about the auditing process earlier.  And

18     privately operated facilities were audited on an

19     annual basis; is that right?

20         A.     Initially when we first started back

21     in early 2000s, it was -- CFM did a -- an audit

22     every six months.  And that eventually changed to

23     an annual audit.

24         Q.     And is it fair to say that with

25     respect to BOP-operated facilities, they're not

1      always audited on an annual basis, depending upon

2      the rankings that they receive?

3          A.    Are you referring to program reviews

4      that were conducted of a discipline in a BOP

5      facility?

6          Q.    Yes.

7          A.    Yes.  So they -- it would -- it was

8      cyclic.  It would depend on -- on their last

9      rating, whether the next program review would be

10     a year out, two years out or three years.

11         Q.    And turning -- turning back to CCA in

12     your role as PMB administrator, is it accurate to

13     say that you oversaw the issuances of notices of

14     concern, for example, to CCA?

15         A.    They were brought to my attention.

16         Q.    And what does that mean?

17         A.    I was -- I was, like, in the loop.

18     You know, my staff would inform me of what was

19     going on.  I didn't approve all of them, but I

20     was aware of them.

21         Q.    What about with respect to

22     deductions?  What was your role in determining

23     whether a deduction was warranted or not?

24         A.    My staff, again, just kept me

25     informed, depending on the circumstances.

1          A.     No, it would not.

2                 MS. TOMKOWIAK:  All right.  Let's

3          go ahead and go off the record.

4                 MR. FORGE:  That's fine.

5                 Can I -- Misty, can I ask, is there

6          realtime today?

7                 VIDEO OPERATOR:  It is 11:46 a.m.

8          and we are now off the record.

9                 (Thereupon, a brief recess was

10                  taken.)

11                VIDEO OPERATOR:  Okay.  The time is

12          12:06 p.m. and we are now on the record.

13                BY MS. TOMKOWIAK:

14          Q.     Ms. Mellendick, can you turn back to

15          your report?

16          A.     Um-hmm (affirmative).

17          Q.     Okay.  And if you look at page 3,

18          paragraph one at the very top of that page.

19          A.     Okay.

20          Q.     Is that a fair summary of what you

21          were asked to opine on in this case?

22          A.     It is.

23          Q.     Is it fair to say that you are not

24          offering any opinions on CCA's performance of its

25          contracts with the U.S. Marshals?

Page 78

1          A.    Correct.

2          Q.    Is it fair to say that you're not

3    offering any opinions on CCA's performance of its

4    contracts with ICE?

5          A.    Correct.

6          Q.    Fair to say that you're not offering

7    any opinions on CCA's performance of its

8    contracts with any other business partner besides

9    the BOP?

10         A.    My opinions are only based on the

11   contracts that are listed in this report: Adams,

12   Cibola, Eden, McRae and Northeast Ohio during the

13   relevant time frame.

14         Q.    Did you make any effort to compare

15   the quality of the services provided by CoreCivic

16   relative to the quality of services provided by

17   the BOP?

18         A.    I did not.

19         Q.    You don't intend to offer any opinion

20   on that at trial, correct?

21         A.    I believe I stated in my report that

22   it is not an apples-to-apples comparison.

23   They're very different.

24         Q.    To that end, you did not conduct any

25   analysis of the number or nature of deficiencies

Page 79

1       documented at any BOP-operated facility during

2       the relevant time period?

3           A.    I did not, because it would not have

4       been a true comparison.

5               (Remote transmission interference)

6               MS. REPORTER:  Sorry?  I'm sorry.

7               THE WITNESS:  I didn't hear it

8       either.

9               BY MS. TOMKOWIAK:

10          Q.    That's not something you looked at,

11      right?

12          A.    What -- what was -- I'm sorry.  You

13      cut out and I didn't hear you, so --

14          Q.    I said but -- but just to be clear,

15      that's not something that you looked at?

16          A.    I'm not sure -- what was it --

17          Q.    I think you answered it before and

18      I -- I just wanted to be clear.

19              You said you did not conduct any

20      analysis of the number or nature of deficiencies

21      documented at any BOP-operated facility during

22      the relevant time period, right?

23          A.    Correct.

24              MR. FORGE:  Hold on.

25

1        the opinions you intend to offer in this case?

2              A.    It is.

3              Q.    What -- what do you mean by the

4        majority?

5              A.    I meant that three of the five CCA

6        facilities were not performing.

7              Q.    Okay.  And is it your opinion that

8        those three facilities -- and are you referring

9        to Adams, Cibola and Eden?

10             A.    I am.

11             Q.    Is it your opinion that their

12       performance was largely deficient for the entire

13       relevant time frame of the case?

14             A.    For the entire period, not all three

15       of them, no.

16             Q.    Okay.

17             A.    But --

18                   (Crosstalk)

19             Q.    And --

20             A.    -- a large portion of the relevant

21       time frame.

22             Q.    And just -- just help me understand

23       that.

24                   So for which -- which one of those

25       facilities would you say their performance was

1      not largely deficient for the entire relevant

2      time frame?

3                  MR. FORGE:  Object as to --

4                  THE WITNESS:  I would --

5                  MR. FORGE:  -- form.

6                  THE WITNESS:  I would say Eden.

7         Eden started to show a decline a little

8         bit later on into the relevant time

9         period.

10                 BY MS. TOMKOWIAK:

11        Q.    Okay.  And -- and we can -- we can

12     look at your report.

13                 On -- on page 18 I think you actually

14     say that Eden had achieved above satisfactory

15     performance levels for 2012 through early 2014.

16     That's on page 18.

17                 Do you agree with that?

18        A.    Yes.

19        Q.    And so with respect to the other two

20     facilities, McRae and Northeast Ohio, you found

21     CCA's performance to be well above satisfactory;

22     is that right?

23        A.    That is correct.

24        Q.    And, in fact, the -- the BOP still

25     has a contract with CCA with respect to the McRae

Page 120

1       facility today; is that right?

2              A.      Yes.

3              Q.      Going back to your opinion, what does

4       largely deficient mean?

5              A.      Among those three facilities, they

6       had numerous and serious and repetitive

7       deficiencies.

8              Q.      And when you say numerous, is there a

9       specific quantitative benchmark that you're

10       referring to?

11             A.      Just looking at their specific

12       reports in any given area, depending on which

13       report it was, you know, across that time frame.

14       But, no, I didn't have a minimal number in mind,

15       if that's what you're asking.

16             Q.      Yeah.  So there's no threshold number

17       of deficiencies that you would say is required

18       before a performance becomes largely deficient?

19             A.      Can you ask that one more time?

20             Q.      Sure.

21                     There's no threshold number of

22       deficiencies, in your opinion, required before a

23       contractor's performance becomes largely

24       deficient?

25             A.      No --

Page 144

1          deaths.  So we were seeing that deficiency

2          repeated amongst their facilities.  So --

3              Q.    Okay.  And you say on page 23 that

4      The CAR XV awards in late 2014 concretely

5      determined that -- or I'm sorry -- concretely

6      determined the BOP would not grant CCA a new

7      contract based on their poor past performance.

8                  So the CAR XV poor selection decision

9      was signed by the BOP on December 29, 2014.

10      Is -- is that the -- the date by which the -- it

11      was concretely determined that the BOP would not

12      award CCA a new contract?

13              A.    Yes, in my opinion.

14              Q.    Okay.  So when you say late 2014 by

15      referring to the CAR XV awards, you mean by

16      December 29, 2014; is that right?

17              A.    I don't disagree with that statement.

18      Yeah, that's fine.

19              Q.    Okay.  What do you mean by concretely

20      determined?

21              A.    Well, it was spelled out in the

████   ███████████████████████████████

████   ████████████████████████████████

████   ██████████████████

4          That award -- I mean, it was -- CCA

5     lost a very well-running facility, their

6     Northeast Ohio facility.  They actually bid that

████   ██████████████████████████████████

████   ███████████████████████████████

9     another provider.  So in my mind, that spoke

10     volumes.

11          Q.    And you weren't involved in that

12     decision, correct?

13          A.    I was not.

14          Q.    And so -- and your opinion is based

15     on your review of the source selection document?

16          A.    Based on the -- my review of the

17     source selection document and just my experience

18     in general in the position I was in.

19          Q.    And so by concretely determined,

20     are -- you're saying that the BOP did not grant

21     CCA the CAR XV award on that date; is that right?

22          A.    Correct.

23          Q.    So I just want to be clear.  You're

24     not speaking as you were in April 2013 about

25     hypothetical contracts that CCA may or may not

Page 146

1       get in the future, you were just referring to the

2       CAR XV award; is that right?

3              MR. FORGE:  Object --

4              THE WITNESS:  I was --

5              MR. FORGE:  -- as to form.

6              THE WITNESS:  I was referring to

7        the CAR XV award.

8              BY MS. TOMKOWIAK:

9        Q.    As of December 29, 2014, do you have

10      any opinion regarding how likely or not it would

11      have been for the BOP to award a different new

12      contract to CCA?

13             MR. FORGE:  Object as to form.

14             THE WITNESS:  Yeah, I'm not -- I'm

15       not sure I understood that question.

16       Could you repeat it?

17             BY MS. TOMKOWIAK:

18       Q.    Sure.

19             Do you have an opinion as to any

20      point after December 29, 2014 as to how likely or

21      not the BOP was to award CCA a new contract?

22             MR. FORGE:  Object as to form.

23             THE WITNESS:  I would think it

24       would depend on what period of time, but

25       what I think does speak volumes is the

1　　　fact that the bureau has awarded since

2　　　that time another 15 -- more than 15,000

3　　　bids and CCA has not won a competitively

4　　　bidded contract with the Bureau of Prisons

5　　　in nine years.  I believe 2011 was the

6　　　last time they won one.

7　　　　　　BY MS. TOMKOWIAK:

8　　　Q.　　Are you speaking just with respect to

9　　low security correctional facilities or are --

10　　you're -- you're speaking about all type of

11　　facilities?

12　　　A.　　I'm speaking in regards to these CAR

13　　facilities.

14　　　Q.　　Okay.  Well, what I'm -- I guess what

15　　I'm trying to understand is let's look at the

16　　relevant time period.

17　　　　　　From December 29, 2014 to August

18　　2016, do you have any opinion during that time

19　　frame how likely or not it was for the BOP to

20　　award CCA with a new contract?

21　　　　　　MR. FORGE:  Object as to form.

22　　　　　　THE WITNESS:  I believe it would

23　　　　have been unlikely for the BOP to award to

24　　　　CCA during that time frame.

25

1          BY MS. TOMKOWIAK:

2          Q.    So in your opinion, at -- at no point

3     after the CAR XV awards was it possible for CCA

4     to turn their performance around?

5          MR. FORGE:  Object as to form.

6          THE WITNESS:  No, I'm not saying

7      that.

8          BY MS. TOMKOWIAK:

9          Q.    Okay.  Well, in your opinion, could

10    CCA have turned things around at some point after

11    the CAR XV awards?

12         MR. FORGE:  Object as to form.

13         THE WITNESS:  We hoped that CCA

14      would have turned things around at any

15      time.

16         BY MS. TOMKOWIAK:

17         Q.    You mention in your report the -- the

18    cure notice that was issued to the -- to Cibola

19    in 2015.

20         Do you recall that?

21         A.    I do.

22         Q.    And you're aware that CCA

23    successfully responded to that cure notice and

24    that it was lifted a -- a few months later?

25         Is that a fair summary?

Page 149

1          MR. FORGE:  Object as to form.

2          THE WITNESS:  I recall that it was

3     lifted because they corrected the majority

4     of the issues that were outlined in the

5     cure notice.

6          BY MS. TOMKOWIAK:

7     Q.    And at that point in time, was it --

8     was the BOP more or less likely to award CCA a

9     new contract?

10         MR. FORGE:  Object as to form.

11         THE WITNESS:  I would have to

12    reanalyze all of the performance

13    information amongst their facilities to

14    provide an opinion on that.

15         BY MS. TOMKOWIAK:

16    Q.    Well, if that's the case, if I asked

17    you how likely it was for the BOP to -- for the

18    BOP to award CCA a new contract at any point

19    during the period of December 2014 to August

20    2016, is it your testimony that you would have to

21    look at the performance documentation at that

22    particular point in time in order to be able to

23    render an opinion on that?

24         MR. FORGE:  Object as to form.

25         THE WITNESS:  I would have to

1          rereview my notes to offer an opinion on

2          that.

3                    BY MS. TOMKOWIAK:

4          Q.     Okay.  So your opinion might change

5     based on the specific date and time that you were

6     asked to opine on?

7                    MR. FORGE:  Object --

8                    THE WITNESS:  It --

9                    MR. FORGE:  -- as to form.

10                    THE WITNESS:  -- it -- it may.  But

11          what stands out in my mind is that there

12          were subsequent competitively bid

13          contracts and CCA did not receive any of

14          them.

15                    BY MS. TOMKOWIAK:

16          Q.     To your knowledge, did anybody at the

17     BOP tell CCA after December 2014 that it was

18     unlikely that they would win any new contract

19     with the BOP?

20          A.     Not to my knowledge.

21          Q.     You mentioned that you -- this

22     opinion is based on the source selection

23     decision -- or I should say at least in part on

24     the source selection decision; is that right?

25          A.     Can you refresh my -- refresh me on

Page 151

1  which opinion you -- you're referencing or

2  what --

3   Q. Your second -- your second opinion

4  relating to the CAR XV award.

5   A. It is based on the source selection

6  decision.  It is based on my review of all of the

7  documents for this relevant time period.  It's

8  based on my recollection of their performance in

9  my capacity as PMB administrator.

10   Q. And -- and you're aware, based on

11  your review of all those materials and your

12  experience, that past performance was not the

13  only non-price consideration in CAR XV?

25   Q. Did you consider that in forming your

1      opinion?

2           A.     I relied on -- mainly for that

3      opinion was the main reason that the source

4      selection official said that CCA did not receive

5      ███████████████████████████████████

6      ████████████████████████████████████████

7      that is where the weight was, in my opinion.

8           Q.     In your opinion, was the ranking of

9      CCA's past performance as poor consistent with

10      the ratings that it had received in the CPARS

11      during the time period being evaluated?

12           A.     I don't know that you can compare the

13      two.

14           Q.     Well -- and we can -- we can look at

15      it if you'd like, but just in the interest of

16      time, I mean, the source selection document

17      itself goes through all of the ratings in the --

18      the CPARS.  You saw the categories in the CPARS.

19      So I'm just interested if you know -- sitting

20      here today if you recall -- you said you reviewed

21      the CPARS, correct?

22           A.     Um-hmm (affirmative).  That's

23      correct.

24           Q.     And you -- okay.  And you've reviewed

25      the source selection document?

```
 1                        CERTIFICATE OF NOTARY

 2              I, MISTY KLAPPER, the officer before

 3         whom the foregoing deposition was taken, do

 4         hereby certify that the witness whose

 5         testimony appears in the foregoing

 6         deposition was duly sworn by me; that the

 7         testimony of said witness was taken by me in

 8         shorthand and thereafter reduced to

 9         typewriting by me; that said deposition is a

10         true record of the testimony given by said

11         witness; that I am neither counsel for,

12         related to, nor employed by any of the

13         parties to the action in which this

14         deposition was taken; and, further, that I

15         am not a relative or employee of any

16         attorney or counsel employed by the parties

17         hereto, nor financially or otherwise

18         interested in the outcome of this action.

19              Further, that if the foregoing pertains to

20         the original transcript of a deposition in a federal

21    case, before completion of the proceedings, review

22    of the transcript [ X ] was [  ] was not requested.

23         Dated: November 3, 2020

24                                 _____
                                   Misty Klapper, RMR, CRR
                                   and Notary Public
25
```