# EXHIBIT 61



Office of the Inspector General
U.S. Department of Justice

# Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons



EXHIBIT

# EXECUTIVE SUMMARY[*]

## Introduction

The Federal Bureau of Prisons (BOP), which is the component of the Department of Justice (Department) responsible for incarcerating all federal defendants sentenced to prison, was operating at 20 percent over its rated capacity as of December 2015. To help alleviate overcrowding and respond to congressional mandates, in 1997 the BOP had begun contracting with privately operated institutions (often referred to as "contract prisons"), at first on a smaller scale and later more extensively, to confine federal inmates who are primarily low security, criminal alien adult males with 90 months or less remaining to serve on their sentences. As of December 2015, contract prisons housed roughly 22,660 of these federal inmates, or about 12 percent of the BOP's total inmate population. These contract prisons were operated by three private corporations: Corrections Corporation of America; GEO Group, Inc.; and Management and Training Corporation.[1] The BOP's annual expenditures on contract prisons increased from approximately $562 million in fiscal year (FY) 2011 to $639 million in FY 2014. In recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer.

The Office of the Inspector General (OIG) initiated this review to examine how the BOP monitors these facilities. We also assessed whether contractor performance meets certain inmate safety and security requirements and analyzed how contract prisons and similar BOP institutions compare with regard to inmate safety and security data. We found that, in most key areas, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions and that the BOP needs to improve how it monitors contract prisons in several areas. Throughout this report, we note several important corrective actions the BOP has taken, in response to findings and recommendations in our April 2015 audit of the Reeves County contract prison, to improve its monitoring of contract prisons, including in the areas of health and correctional services.[2]

The BOP's administration, monitoring, and oversight of contract prisons is conducted through three branches at BOP headquarters and on site. According to the BOP, at each contract prison, two BOP onsite monitors and a BOP Contracting Officer, in cooperation with other BOP subject matter experts, oversee each contractor's compliance with 29 vital functions within 8 operational areas, including correctional programs, correctional services, and health services. The BOP

---

[*] Redactions were made to the full version of this report for privacy reasons. The redactions are contained only in Appendix 9, the contractors' responses, and are of individuals' names or information that would enable an individual to be identified.

[1] In January 2007, the BOP awarded a contract to Reeves County, Texas, to operate the Reeves County Detention Center compounds R1 and R2 (RCDC I/II). Reeves County subcontracted operation of RCDC I/II to the GEO Group, Inc.

[2] See Department of Justice OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas*, Audit Report 15-15 (April 2015), iii.

i

monitors contractor performance through various methods and tools that include monitoring checklists, monitoring logs, written evaluations, performance meetings, and regular audits.

## Results in Brief

We found that in a majority of the categories we examined, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions. We analyzed data from the 14 contract prisons that were operational during the period of our review and from a select group of 14 BOP institutions with comparable inmate populations to evaluate how the contract prisons performed relative to the selected BOP institutions. Our analysis included data from FYs 2011 through 2014 in eight key categories: (1) contraband, (2) reports of incidents, (3) lockdowns, (4) inmate discipline, (5) telephone monitoring, (6) selected grievances, (7) urinalysis drug testing, and (8) sexual misconduct.[3] With the exception of fewer incidents of positive drug tests and sexual misconduct, the contract prisons had more incidents per capita than the BOP institutions in all of the other categories of data we examined. For example, the contract prisons confiscated eight times as many contraband cell phones annually on average as the BOP institutions. Contract prisons also had higher rates of assaults, both by inmates on other inmates and by inmates on staff. We note that we were unable to evaluate all of the factors that contributed to the underlying data, including the effect of inmate demographics and facility locations, as the BOP noted in response to a working draft of this report. However, consistent with our recommendation, we believe that the BOP needs to examine the reasons behind our findings more thoroughly and identify corrective actions, if necessary.

The three contract prisons we visited were all cited by the BOP for one or more safety and security deficiencies, including administrative infractions such as improper storage of use-of-force video footage, as well as more serious or systemic deficiencies such as failure to initiate discipline in over 50 percent of incidents reviewed by onsite monitors over a 6-month period. The contractors corrected the safety and security deficiencies that the BOP had identified. As a result, the BOP determined that each prison was sufficiently compliant with the safety and security aspects of its contract to continue with the contract during the period covered by our review. However, we concluded that the BOP still must improve its oversight of contract prisons to ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons.

Our site visits also revealed that two of the three contract prisons we visited were improperly housing new inmates in Special Housing Units (SHU), which are normally used for disciplinary or administrative segregation, until beds became available in general population housing. These new inmates had not engaged in

---

[3] We selected these categories of data to analyze as potential safety and security indicators because they provided information on areas addressed by American Correctional Association standards on security and control, inmate rules and discipline, and inmate rights, and because these data were tracked by both the contract prisons and the BOP institutions. See Appendix 1 for more information on our methodology, including our data analysis.

Case 3:16-cv-02267   Document 361-28   Filed 11/20/20   Page 4 of 40 PageID #: 14674

any of the behaviors cited in American Correctional Association standards and BOP policies that would justify being placed in such administrative or disciplinary segregation. When the OIG discovered this practice during the course of our fieldwork, we brought it to the attention of the BOP Director, who immediately directed that these inmates be removed from the SHUs and returned to the general population. The BOP Director also mandated that the contracts for all contract prisons be modified to prohibit SHU placement for inmates unless there is a policy-based reason to house them there. Since that time, the BOP informed us that the practice of housing new inmates in the SHU is no longer occurring in the contract prisons and that the BOP has not identified any further non-compliance to date regarding this issue.

Finally, we found that the BOP needs to improve the way it monitors contract prisons. We focused our analysis on the BOP's Large Secure Adult Contract Oversight Checklist (checklist) because, as described by BOP operating procedures, it is an important element of the BOP's Quality Assurance Plan, as well as a mechanism BOP onsite monitors use to document contract compliance on a daily basis. We believe onsite monitors are best positioned to provide the BOP's quickest and most direct responses to contract compliance issues as they arise. We found that the checklist does not address certain important BOP policy and contract requirements in the areas of health and correctional services. As a result, the BOP cannot as effectively ensure that contract prisons comply with contract requirements and BOP policies in these areas and that inmates in contract prisons receive appropriate health and correctional services.

For health services, the checklist does not include observation steps to verify that inmates receive certain basic medical services. For example, the observation steps do not include checks on whether inmates received initial examinations, immunizations, and tuberculosis tests, as BOP policy requires. We also found that monitoring of healthcare for contract compliance lacks coordination from BOP staff responsible for health services oversight.

For correctional services, the checklist does not include observation steps to ensure searches of certain areas of the prison, such as inmate housing units or recreation, work, and medical areas, or for validating actual Correctional Officer staffing levels and the daily Correctional Officer duty rosters.

## Recommendations

We make four recommendations to the BOP to improve the monitoring and oversight of its contract prisons, including enhancing its oversight checklist, which we believe should assist the BOP in ensuring that the significant number of inmates it houses in these facilities receive appropriate health and correctional services and that the contract prisons are safe and secure places to house federal inmates.[4]

---

[4] After incorporating the BOP's formal comments into this report, the OIG also provided a copy of the final report to each contractor. The OIG has reviewed the contractors' responses, which are attached as Appendix 9. The analysis in our report is based on information BOP has provided, and the OIG has determined that the contractors' responses do not affect our analysis or the conclusions reached in this report.

Case 3:16-cv-02267    Document 361-28    Filed 11/20/20    Page 5 of 40 PageID #: 14675

# TABLE OF CONTENTS

INTRODUCTION........................................................................................ 1

Background ...................................................................................... 2

Contract Prisons .............................................................................. 4

RESULTS OF THE REVIEW ........................................................................ 13

Contract Prisons Had More Safety and Security-related Incidents per
Capita than BOP Institutions for Most of the Indicators We Analyzed ......... 14

OIG Site Visits Revealed Safety and Security Concerns and
Inappropriate Housing Assignments .................................................... 27

The BOP's Monitoring of Contract Prisons Needs Improvement ................. 31

CONCLUSION AND RECOMMENDATIONS ...................................................... 44

Conclusion .................................................................................... 44

Recommendations .......................................................................... 45

APPENDIX 1:   METHODOLOGY OF THE OIG REVIEW ...................................... 46

Interviews .................................................................................... 46

Site Visits .................................................................................... 46

Data Analysis ................................................................................ 48

Document Review ........................................................................... 50

APPENDIX 2:   CONTRACT PERFORMANCE REQUIREMENTS AND VITAL
FUNCTIONS........................................................................ 51

APPENDIX 3:   LARGE SECURE ADULT CONTRACT OVERSIGHT CHECKLIST
OBSERVATION STEPS IN CORRECTIONAL AND HEALTH
SERVICES ......................................................................... 53

APPENDIX 4:   THE OIG'S MEMORANDUM TO THE BOP ON THE HOUSING OF
NEW INMATES IN SPECIAL HOUSING UNITS ............................. 55

APPENDIX 5:   THE BOP'S RESPONSE TO THE OIG'S MEMORANDUM ON THE
HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS .......... 58

APPENDIX 6:   COMPARISON OF SECURITY INDICATORS AMONG
CONTRACTORS ................................................................... 60

Case 3:16-cv-02267    Document 361-28    Filed 11/20/20    Page 6 of 40 PageID #: 14676

APPENDIX 7:   COMPARISON OF SECURITY INDICATORS BETWEEN CONTRACT
              PRISONS AND BOP INSTITUTIONS .......................................... 64

APPENDIX 8:   THE BOP'S RESPONSE TO THE DRAFT REPORT .......................... 68

APPENDIX 9:   THE CONTRACTORS' RESPONSES TO THE DRAFT REPORT........... 70

APPENDIX 10: OIG ANALYSIS OF THE BOP'S RESPONSE................................. 78

Case 3:16-cv-02267    Document 361-28    Filed 11/20/20    Page 7 of 40 PageID #: 14677

# INTRODUCTION

The mission of the Federal Bureau of Prisons (BOP) is to protect society by confining federal offenders in correctional facilities that are safe, humane, cost-efficient, and secure, and to provide reentry programming for the inmates to ensure their successful return to the community. Since the early 1980s, there has been an unprecedented increase in the federal inmate population — from approximately 25,000 in fiscal year (FY) 1980 to nearly 219,000 in FY 2012. According to a 2013 congressional report, since 1980 the federal inmate population has increased, on average, by 6,100 inmates each year.[5] However, since FY 2013, when the BOP inmate population reached its peak of 219,298, the population has been declining — to 197,645 in December 2015, a decrease of 21,653 inmates (or approximately 10 percent) over that 2-year period. In spite of this downward trend, the BOP currently operates at about 20 percent over its rated capacity, and costs spent on the federal prison system are predicted to continue to rise.[6]

To help alleviate overcrowding in BOP institutions and respond to congressional mandates, in 1997 the BOP began contracting with privately operated institutions (often referred to as "contract prisons"), at first on a smaller scale and later more extensively, to confine inmates who are primarily low security, criminal alien adult males.[7] Many of the inmates incarcerated in these contract prisons are Mexican nationals with convictions for immigration offenses who have 90 months or less remaining to serve on their sentences.[8] As of December 2015, contract prisons housed roughly 22,660 of these federal inmates, or approximately 12 percent of the BOP's total inmate population. These prisons were operated by three private corporations: Corrections Corporation of America (CCA); the GEO Group, Inc. (GEO); and Management and Training Corporation (MTC).

---

[5] Nathan James, *The Federal Prison Population Buildup: Options for Congress*, R42937 (Washington D.C.: Congressional Research Service, January 22, 2013) (accessed July 28, 2016).

[6] U.S. Department of Justice (DOJ), Fiscal Year 2016 Budget Summary (accessed July 28, 2016).

[7] Two congressional actions precipitated the BOP's use of contract prisons to house low security inmates. The *National Capital Revitalization Act of 1997* mandated that the BOP designate District of Columbia sentenced felons to correctional facilities operated or contracted for the BOP. Congress also recommended that the BOP operate the Taft Correctional Institution as a private facility. Since that time, the BOP has developed large scale contracts with the private sector to confine specialized populations.

[8] The BOP refers to this as a Criminal Alien Requirement when soliciting for bids that require contract prisons to house this specific type of inmate population. There are exceptions to the Criminal Alien Requirement for three facilities: (1) the Rivers Correctional Institution also houses low security adult males from Washington, D.C.; (2) the Taft Satellite Camp houses minimum security adult males who are U.S. citizens; and (3) the now-closed Willacy County Correctional Center housed criminal alien adult males serving sentences of 3 months or less.

Case 3:16-cv-02267   Document 361-28   Filed 11/20/20   Page 8 of 40 PageID #: 14678

**Background**

In recent years, disturbances in several contract prisons have resulted in extensive property damage, bodily injury, and the death of a Correctional Officer. Examples include:

- In December 2008 and January 2009, the Reeves County Detention Center had a riot on its Compound III and Compounds I and II, respectively.[9] A 2015 Office of the Inspector General (OIG) audit of the Reeves Detention Center Compounds I and II cited a BOP After-Action Report from the 2009 riot: "While low staffing levels alone were not the direct cause of the disturbances, they directly affected Security and Health Services functions."[10]

- In February 2011, inmates at the Big Springs Correctional Center physically assaulted prison staff. The contractor reported that the inmates were dissatisfied with the staff's response to a medical emergency on the compound that resulted in the death of an inmate.

- In May 2012, a Correctional Officer was killed and 20 people were injured during a riot at the Adams County Correctional Center. The disturbance involved approximately 250 inmates who, according to contemporaneous media reports, were angry about low-quality food and medical care, as well as about Correctional Officers the inmates believed were disrespectful.

- In February 2015, at the Willacy County Correctional Center, inmates set fires and caused extensive damage to the prison. As a result of the damage to the prison and the BOP's determination that the contractor could no longer perform the required services, the BOP terminated its contract for this facility.

In April 2015, the OIG issued an audit of the Reeves County Detention Center Compounds I and II, which house over 2,400 federal inmates.[11] The OIG found that the contractor had failed to comply with contractual requirements in the areas of billing and payment, correctional and health services staffing, and internal quality control. The audit identified almost $3 million in costs that were either unallowable or unsupported or funds that should be put to better use. Also, we found that from the start of the contract in January 2007 to March 2009, there were no minimum staffing requirements for the institution because the BOP had sought to reduce costs. After an inmate riot in 2009, the BOP established the minimum

---

[9] The Reeves County Detention Center is located in Reeves County, Texas, and has three compounds that house inmates for the BOP. Compounds I and II are one facility consisting of multiple housing units within a secure perimeter. Compound III is a separate facility.

[10] DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), iii.

[11] DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007.*

Correctional Officer staffing requirement in the contract. Nevertheless, the OIG's 2015 audit also found that the institution had significant issues meeting its minimum staffing requirement in health services. Additionally, the audit identified areas that needed improvement relating to internal quality control, such as fully documenting monitoring activities and tracking corrective action plans for significant deficiencies.

The OIG also found that contract prison officials at Reeves County had converted a general population housing unit into a "modified monitoring unit" that was being used to isolate and restrict movement of inmates whose behavior they believed was jeopardizing the safety of staff and other inmates. A review of the modified monitoring unit showed that there was a lack of specific policies and procedures to address inmate placement in and release from this unit, as well as its operation, and to ensure inmate due process and other rights were preserved.

In response to the aforementioned findings from the 2015 OIG audit report, the BOP took the following actions at the Reeves County facility: (1) reviewed its contract costs to identify and remedy those costs that were either unallowable or unsupported, (2) updated the BOP's oversight checklist for all the contract prisons and trained onsite monitors on how to use that tool to properly document monitoring activities, (3) issued guidance to the Reeves County contractor staff instructing them to create a corrective action plan for each significant deficiency identified during internal audits, and (4) developed new operational procedures for the modified monitoring unit at Reeves. Based on actions the BOP had taken, the OIG closed the recommendations made in its 2015 audit report.

The OIG initiated this review in order to examine how the BOP monitored its contract prisons during FY 2011 through FY 2014. In that context, we also assessed the contractors' compliance with the terms of the contract in selected areas of inmate safety and security. Finally, we analyzed data from the 14 contract prisons that were operational during the period of our review and a select group of 14 BOP institutions with comparable inmate populations to evaluate how the contract prisons performed relative to the selected BOP institutions in key areas. Our fieldwork, from April 2014 through February 2015, included interviews, data collection and analysis, and document review. We interviewed BOP officials, including Central Office administrators and staff responsible for oversight and management of contract prisons. We conducted site visits to three contract prisons: the Giles W. Dalby Correctional Facility and the Eden Detention Center in Texas and the Rivers Correctional Institution in North Carolina. During each site visit, we interviewed BOP onsite monitors, contract staff, and inmates. We also toured the sites, observed staff and inmate activities, attended staff meetings, and reviewed logs and records. Appendix 1 has a detailed description of the methodology of our review.

In this section, we discuss contract prisons that incarcerate federal inmates designated to the custody of the BOP. We then discuss the contract requirements, followed by the BOP's current structure and process for monitoring and oversight of the contract prisons.

**Contract Prisons**

At the time of our review, three private corporations, CCA, GEO, and MTC, operated 14 BOP contract prisons. Collectively, these contract prisons provided approximately 27,000 beds for federal inmates.[12] Figure 1 below shows the location and population of the BOP's contract prisons managed by each contractor as of December 2014.

---

[12] Our analysis includes data from the 14 contract prisons that were operational from FY 2011 through FY 2014. In March 2015, the BOP terminated its contract with the Willacy County Correctional Center in Texas following the February 2015 riot. The contract for the Northeast Ohio Correctional Center expired on May 31, 2015, with no option to renew. In December 2014, the BOP entered into a new contract with GEO to operate the Great Plains Correctional Facility in Oklahoma. Operations at this contract prison began in June 2015.

4

**Figure 1**

**Location and Population of BOP Contract Prisons**[13]



| Private Contract Prisons | |
|---|---|
| 1. Adams County, Mississippi | CCA |
| 2. Big Springs, Texas | GEO |
| 3. Cibola, New Mexico | CCA |
| 4. D. Ray James, Georgia | GEO |
| 5. Dalby, Texas | MTC |
| 6. Eden, Texas | CCA |
| 7. McRae, Georgia | CCA |
| 8. Moshannon Valley, Pennsylvania | GEO |
| 9. Northeast Ohio, Ohio | CCA |
| 10. Reeves Correction Institution, Texas | GEO |
| 11. Reeves Detention Center, Texas | GEO |
| 12. Rivers, North Carolina | GEO |
| 13. Taft, California | MTC |
| 14. Willacy, Texas | MTC |

**LEGEND**

● Private Prisons

Pop  Inmate Population

Source: BOP

---

[13] Figure 1 reflects the contract prisons and their population at the time of our fieldwork. In January 2007, the BOP awarded a contract to Reeves County, Texas, to operate the Reeves County Detention Center compounds R1 and R2 (RCDC I/II). Reeves County subcontracted operation of RCDC I/II to the GEO Group, Inc. Figure 1 reflects the combined population for these two facilities that are operated under two separate contracts.

5

Case 3:16-cv-02267    Document 361-28    Filed 11/20/20    Page 12 of 40 PageID #: 14682

*Contract Requirements*

The BOP's contracting process is governed by the Federal Acquisition Regulations (FAR) and the Justice Acquisition Regulations. The BOP's acquisition policy supplements the FAR and the Justice Acquisition Regulations and provides uniform acquisition procedures.[14] Contractors must comply with all applicable federal, state, and local laws and regulations, as well as all applicable executive orders, case laws, and court orders. In addition, contractors must follow a number of BOP policies and requirements as defined in their contracts.[15] One specific requirement applicable to all contract prisons is obtaining and maintaining accreditation from the American Correctional Association (ACA) and the Joint Commission on Accreditation of Healthcare Organizations.[16] Contractors also must meet 29 functions that the BOP has identified as vital to contract performance (see Appendix 2). The vital functions can range from creating an adequate security inspection system to providing nutritionally adequate meals and ensuring inmates have access to healthcare. The 29 vital functions fall under 8 operational areas, each of which is assigned a percentage that correlates with contractor performance:

1. Administration (10 percent),
2. Correctional Programs (10 percent),
3. Correctional Services (20 percent),
4. Food Service (15 percent),
5. Health Services (15 percent),
6. Human Resources (10 percent),
7. Inmate Services (15 percent), and
8. Safety and Environmental Health (5 percent).

A contract prison may receive a monetary deduction for less than satisfactory performance in any one of these areas.[17] The BOP determines the number of vital functions that were unsatisfactory under each operational area and then calculates a deduction amount based on the percentages assigned to each operational area. The BOP and the contractors have quality control mechanisms to ensure that these

---

[14] BOP Program Statement 4100.04, Bureau of Prisons Acquisition Policy (May 19, 2004).

[15] Such BOP polices include those on the use of force and inmate discipline. The contractors are permitted to develop their own policies in certain areas, such as the operation of Special Housing Units and healthcare, based on ACA and other standards. The contract contains administrative and program requirements, including all services, activities, deliverables, and the timelines for specified work throughout the life of the contract.

[16] The ACA is a private, nonprofit organization that administers a national accreditation program for all components of adult and juvenile corrections. The Joint Commission on Accreditation of Healthcare Organizations accredits and certifies healthcare organizations and programs in the United States. Joint Commission accreditation certifies that an organization meets certain healthcare performance standards.

[17] The BOP may also award a contractor an annual award fee based on exceptional performance. However, the award fees were removed from contract prison solicitations in June 2010. All contracts awarded after that date do not include an award fee. During the time of this review, 12 of the 14 contract prison contracts still contained the award fee provision.

vital functions are carried out in accordance with the contract.  The contractors' quality control is known as the quality control program, and the BOP's is known as the Quality Assurance Plan (QAP).  We describe each of these internal controls below.

### Quality Control and Quality Assurance

BOP contracts place the responsibility for quality control on the contractor rather than on the BOP.  Each contractor must maintain a quality control program with audit tools that incorporate, among other government requirements, the 29 vital functions in the 8 operational areas described above and detailed in Appendix 2.  The audit tools define the contractor's work, which is evaluated during required internal inspections.  The tools specify the documents to examine, sampling techniques, span of time for review, processes to observe, persons to interview, and desired outcomes.  A Quality Assurance Specialist and a trained team of contract staff conduct audits monthly or every other month based on their prison's specific audit tools.[18]  The contractor provides the audit results to its corporate headquarters and the BOP.  Each contractor's corporate headquarters conducts an annual audit of its prisons and provides the results to the BOP.  If the contractor identifies a deficiency, which generally is considered to be a deviation from the contract, a weakness in internal controls, or an instance of nonconformance with an ACA standard affecting the quality of service provided, the contract staff generates a corrective action plan to monitor and resolve areas of nonconformance.[19]  Onsite monitors and contract staff oversee the implementation of corrective actions until deficiencies are resolved.  When a deficiency is serious enough to affect the quality of service, the onsite monitors may suggest a nonrecurring deduction in the monthly contract payment.  We discuss deficiencies and the role of BOP onsite monitors below.

The BOP's QAP is based on contract requirements as defined in the FAR.[20]  The QAP includes oversight monitoring checklists, Contract Facility Monitoring (CFM) review guidelines, and the contractor's quality control plan.  We discuss these aspects of the BOP's QAP below.

---

[18] The Quality Assurance Specialist manages the contract prison's internal audits, reviews the results of the audits, and assists prison staff with implementing a corrective action plan for any deficiencies as discussed below.

[19] A corrective action plan is the contract prison's written plan for correcting identified deficiencies and is submitted to the BOP within 30 days after receipt of the final CFM report or other notice of deficiency.

[20] The BOP's October 14, 2015, Privitizaton Management Branch Operation Procedures state: "The contract facility QAP, oversight monitoring checklists, and random samplings of the contractor's performance, as well as their quality control program, are examples of the Bureau's QAP efforts." The BOP's QAP also includes a formal annual audit of contractor performance by the Contract Facility Monitoring team, but this annual audit does not fulfill the same function of documenting day-to-day monitoring activities between audits.  We discuss these BOP efforts in more detail below.

*Contract Monitoring and Oversight*

The BOP's administration, monitoring, and oversight of its 14 contract prisons is shared by three branches: the Privatization Management Branch (PMB) of the Correctional Programs Division; the CFM Branch of the Program Review Division; and the Privatized Corrections Contracting Section within the Acquisitions Branch of the Administration Division. These three branches work in different ways to ensure contract compliance and consistency in the monitoring and oversight of the contract prisons' operations. The PMB is responsible for general oversight of the contract prisons, the CFM Branch provides subject matter expertise in the form of operational reviews, and the Privatized Corrections Contracting Section provides contractual oversight. We discuss in more detail the role of each below.

<u>Privatization Management Branch</u>

In December 2001, the BOP created the PMB to monitor and oversee the operations of the BOP's contract prisons. A Branch Administrator oversees two sections, Field Operations and Support and Development, each led by an Assistant Administrator. The Assistant Administrator for Field Operations coordinates all field operations and manages field resources. Within Field Operations, three regional Privatization Field Administrators (PFA), two onsite monitors at each contract prison, and five discipline-specific specialists at BOP headquarters provide operational support to the PMB field staff and contract prison staff. The PMB field staffs (PFAs and onsite monitors) are responsible for oversight and liaison activities on their respective contracts to ensure contract compliance. The Assistant Administrator of Support and Development leads a team of Program Specialists and Management Analysts who provide administrative support to the field staff. The field staff uses a number of monitoring tools to directly oversee the contract prisons. We discuss the PMB's field staff and monitoring tools below.

- **Privatization Field Administrators.** PFAs provide contract management and oversight for three to five contract prisons, supervise the two onsite monitors at each prison, review all oversight work and documents, and ensure consistency among the contracts.

- **Onsite Monitors.** Each contract prison has a Senior Secure Institution Manager (SSIM) and a Secure Oversight Monitor (SOM). The SSIM, under the direction of a PFA, has primary responsibility for ensuring contract compliance onsite and provides administrative direction in accordance with the FAR. The SSIM also ensures population levels are within the contract requirements, gathers information and formulates reports for the BOP's Central Office, and assists the SOM with onsite monitoring. The SOM, under the direction of the SSIM, oversees the contract prisons' operations, mainly through daily observations and liaison with prison staff.

  The SSIM and SOM conduct routine inspections and daily reviews of the eight operational areas in all departments of their assigned contract prison. The PMB operating procedures require the SSIM and the SOM to monitor the

8

contractor's performance through various methods and tools, including monitoring checklists, monitoring logs, written evaluations, and performance meetings.

o *Large Secure Adult Contract Oversight Checklist (checklist).* The checklist contains approximately 70 observation steps, relating to the 8 operational areas, which the onsite monitors must observe and document every month.[21] Onsite monitors at each contract prison document their observations on the checklist and rate each operational area as "compliant" or "non-compliant." The appropriate PFA receives the completed checklist by the 20th of the following month.

o *Monitoring and Notice of Concern (NOC) Logs.* Onsite monitors are required to keep a monitoring log and a NOC log.[22] The monitoring log helps the onsite monitors track completion and review the results of internal and external audits required by the contract. A NOC is a memorandum the PMB staff submits to a contractor when the contractor is performing below a satisfactory level and the deficiency is more than minor or is a repetitive deviation from the contract requirements. Once a NOC is issued, the contractor must provide a written corrective action plan to the oversight staff, who ensure that the contractor implements and maintains its plan. BOP policy requires onsite monitors to use the NOC log to track NOCs until the deficiencies are resolved.

o *Written Evaluations.* The onsite monitors write evaluations of contract performance as required by the FAR, the Contracting Officer, or the PMB's internal procedures.[23] The FAR requires the BOP to use the Contractor Performance Assessment Reporting System to provide a record, both positive and negative, of a given contractor's performance during a specific period of time. In addition, the PMB's operating procedures require onsite monitors to issue the Oversight Facility Summary Report, a management-level assessment of the contractor's performance focused

---

[21] The checklist is generally standardized, but the oversight staff may vary its monitoring according to a contract's specific requirements. For example, Rivers Correctional Institution is required by contract to have a residential drug abuse treatment program because its population consists of approximately 50 percent U.S. citizens, primarily from the Washington, D.C., metropolitan area, many of whom have drug dependencies and who will return to the community when they complete their sentence.

[22] In response to recommendations in the OIG's report on the Reeves County contract prison, the BOP has incorporated the functions of the monitoring log and the NOC log into the checklist and added a step for documenting the contractor's follow-up efforts regarding identified deficiencies as the BOP no longer uses either log. See DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007.* Later in this report, we briefly discuss our findings on the BOP's use of the monitoring log during our review.

[23] The Contracting Officer ensures that the contractor adheres to the terms and conditions of the contract and has the authority to negotiate, award, cancel, and terminate contracts on behalf of the government.

primarily on quality of work and responsiveness to the BOP, annually and semiannually.

o *Performance Meetings.* The SSIM, SOM, and Contracting Officer have performance meetings with the contract prison management staff at least monthly. These meetings provide a management-level review and assessment of the contractor's quality of work and responsiveness, as well as a forum to discuss operational issues and oversight findings. Additionally, contract management staff from each operational area report on issues of significance within their respective departments.

In addition to the onsite monitors, the PMB has subject matter specialists for disciplinary hearings, intelligence, and health systems, who each provide operational assistance to the PMB field staff within their field of expertise. These specialists support the BOP's QAP, assist in monitoring contract compliance, and serve as Contracting Officer's Representatives.

Contract Facility Monitoring Branch

Within the BOP's Program Review Division, the CFM Branch consists of subject matter experts who use a comprehensive audit tool to conduct annual and ad hoc reviews of the contractor's performance in all of the vital functions, test the adequacy of internal controls, and assess risks in program and administrative areas. The CFM staff uses guidelines based on specific contract requirements, professional guidelines referenced in the contract, and applicable BOP policies. A CFM audit report can result in four levels of deficiency:

1. first-time deficiency,
2. repeat deficiency,
3. repeat repeat deficiency, and
4. significant finding.[24]

When the CFM team identifies repetitive or significant findings at a contract prison, the team may return for a follow-up assessment before the next annual audit. This follow-up may be a full or partial audit of the problematic department depending on the findings and/or level of deficiency previously identified. When a deficiency is serious enough to affect performance in the operational areas, the onsite monitors may suggest a deduction to the contractor's payment.

The CFM team includes a physician and a physician's assistant. In conjunction with CFM's annual review, the PMB's Health Systems Specialist (HSS) is tasked with the responsibility to assist in the oversight of contractor performance in

---

[24] Repeat deficiencies stem from failed internal controls that were developed to correct a noted deficiency. The BOP uses the term "repeat repeat deficiency" to describe a deficiency that is repeated twice or more. A "significant finding" generally consists of a series of related deficiencies that, taken together, constitute a failure of the program component. A significant finding can also be caused by a single event that results in a systemic program failure.

the area of health services.  The HSS conducts a thorough review of health services at each contract facility at least every 6 months, or more frequently if the HSS determines it is needed.

<u>Privatized Corrections Contracting Section</u>

The Privatized Corrections Contracting Section is responsible for contract procurement and administration, including cost agreements, and the assignment and supervision of Contracting Officers at each of the contract prisons.  The section also assists the PMB's oversight staff with contract interpretation and provides advice on contract requirements and NOC issuance.  If a CFM audit finds serious deficiencies, the onsite PMB monitor writes a deduction proposal to the Contracting Officer.  The Contracting Officer may consider other types of action, such as contract modification, in addition to deductions.  In cases of numerous "repeat repeat" or significant deficiencies that go uncorrected over time, the BOP may issue a "cure notice" to indicate to the contractor that the BOP may terminate the contract if the problem is not corrected.

<u>Expenditures on Contract Prisons</u>

From FY 2011 through FY 2014, the BOP's annual expenditures on contract prisons increased 13.7 percent, from approximately $562 million in FY 2011 to $639 million in FY 2014.  Since contracts with private prisons are fixed-price contracts, the payment amount does not change based on costs such as resources or time expended by the contractor.[25]  An accounting of costs for specific departments or operations is not provided to the BOP.  The contractors are responsible only for submitting an invoice to the BOP at the end of each month. The monthly invoice includes the monthly operating price that was negotiated prior to the start of the contract, which ensures the contractors receive a minimum payment from the BOP to staff the facilities and cover expenses as provided in the contract.

Because the BOP does not receive the breakdown of cost information under the fixed-price prison contracts, we were not able to analyze and compare costs incurred by function or department between the contract prisons and BOP institutions as part of this review.  Moreover, we were unable to compare the overall costs of incarceration between BOP institutions and contract prisons in part because of the different nature of the inmate populations and programs offered in those facilities.  The BOP does calculate the overall per capita annual and daily costs for housing its inmates in both BOP institutions and contract prisons. However, because of the factors discussed above, we do not draw, and caution

---

[25]  According to the FAR, this type of contract is preferred when contract costs and performance requirements are reasonably certain, the government wishes to motivate a contractor to enhance performance, and other incentives cannot be used because contractor performance cannot be measured objectively.  As stated in the FAR, fixed-price incentive contracts are to the government's advantage because the contractor has to "assume substantial cost responsibility and an appropriate share of the cost risk."

against drawing the conclusion from that data, which is summarized below, that contract prisons are necessarily lower cost than BOP intitutions on an overall basis. See Figures 2 and 3 for the BOP's annual costs per capita to house inmates in BOP low security institutions and contract prisons, respectively.

**Figure 2**

**Annual Per Capita Costs for BOP Institutions
FY 2011 – FY 2014**



Source: BOP

**Figure 3**

**Annual Per Capita Costs for Contract Prisons
FY 2011 – FY 2014**



Source: BOP

Based on this data from the BOP, for the 4 years of our review, the average annual costs in the BOP institutions and the contract prisons per capita were $24,426 and $22,488, respectively.

12

In this regard, the BOP's inability to analyze and compare costs for major expenditures such as medical and food-related expenses between the contract prisons and its own institutions is significant. The *Government Performance and Results Act Modernization Act of 2010* (GPRA) mandates that federal agencies post on their public websites performance plans that include all programs in the agency's budget. One of the required objectives of the performance plans is to "establish a balanced set of performance indicators to be used in measuring or assessing progress toward each performance goal, including, as appropriate, customer service, efficiency, output, and outcome indicators." The GPRA defines the efficiency measure as "a ratio of a program activity's inputs (such as costs or hours worked by employees) to its outputs (amount of products or services delivered) or outcomes (the desired results of a program)." Without the ability to compare costs, however, the BOP is unable to evaluate whether the contractors' services are consistent with the value or quality of service the BOP should be receiving based on the amount of money that is being spent and, therefore, is unable to comply with this aspect of the GPRA.[26]

The U.S. Government Accountability Office (GAO) expressed similar concerns in a December 2013 report that assessed the extent to which opportunities exist to enhance the transparency of information in the BOP's budget justifications for congressional stakeholders and decision makers.[27] The GAO found that the BOP's budget justification for FY 2014 included $2.5 billion for Inmate Care and Programs such as medical services, food service, education and vocational training, psychology services, and religious services. However, the budget justification did not include a breakdown of proposed funding amounts for each of these categories. The BOP's budget justification for FY 2014 also included $1.1 billion for "Contract Confinement," and, consistent with our discussion above, that category did not specify how those costs were to be allocated. We agree with the GAO that such data would be useful in identifying trends and cost drivers that may affect future costs.[28]

---

[26] The GPRA "directs OMB [Office of Management and Budget], each fiscal year, to determine whether each agency's programs or activities meet performance goals and objectives outlined in the agency performance plans and to submit a report on unmet goals to the agency head." See *GPRA Modernization Act of 2010,* 111th Cong., 2nd sess., S. 1116.

[27] GAO, *Bureau of Prisons: Opportunities Exist to Enhance the Transparency of Annual Budget Justifications*, GAO-14-121 (December 6, 2013) (accessed July 28, 2016).

[28] The GAO recommended that the Attorney General consult with congressional decision makers on providing additional BOP funding detail in future budget justifications and, in conjunction with the BOP, take action as appropriate. According to the GAO, the Department concurred with the GAO's recommendation and consulted with congressional Appropriations Committee staff to expand the level of detail in the two most recent budget requests, including an exhibit in the BOP's FY 2015 and FY 2016 budget submissions that provided additional details on BOP programs and activities. However, those submissions did not provide greater transparency or more cost information with regard to the BOP's expenditures on contract confinement.

13

# RESULTS OF THE REVIEW

**Contract Prisons Had More Safety and Security-related Incidents per Capita than BOP Institutions for Most of the Indicators We Analyzed**

One way to assess how effectively the BOP monitors its contract prisons is to compare the statistical profile for contract and BOP institutions on key inmate safety and security incidents. To evaluate how the contract prisons performed relative to the BOP's institutions, we analyzed data from the 14 contract prisons that were operational during the period of our review and 14 selected BOP institutions with similar population sizes, geographical locations, and security levels, comparing data in eight key areas that were relevant to American Correctional Association (ACA) standards and were tracked by both the contract prisons and the BOP institutions: (1) contraband, (2) reports of incidents, (3) lockdowns, (4) inmate discipline, (5) selected grievances, (6) telephone monitoring, (7) urinalysis drug testing, and (8) sexual misconduct.[29] With the exception of having fewer positive drug tests and sexual misconduct incidents, we found that the contract prisons had more incidents per capita than the BOP institutions in all of the other key areas.[30] We discuss the results of our analysis below. Unless otherwise stated, we calculated monthly and annual averages per 10,000 inmates. See Appendix 1 for more details regarding our methodology and Appendix 6 for the full results of our analysis.

*Contract Prisons Had More Frequent Incidents per Capita of Contraband Finds, Assaults, Uses of Force, Lockdowns, Guilty Findings on Inmate Discipline Charges, and Selected Categories of Grievances*

In three-quarters of the data categories we analyzed, the contract prisons had more safety- and security-related incidents per capita than the comparable BOP institutions. The contract prisons had more frequent incidents per capita for three of the four types of contraband we analyzed: cell phones, tobacco, and weapons. Also, we examined 10 types of reports of incidents and found that the contract prisons had higher rates of assaults and uses of force. In addition, the contract prisons had more lockdowns, more guilty findings on serious inmate discipline charges, and more grievances submitted by inmates in selected categories. Finally, although the contract prisons are not subject to a minimum requirement for

---

[29]  In this review, we were not able to evaluate all of the factors that contributed to the underlying data. Where our interviews or document analyses provided explanations for the data findings, we note this. However, we also note a number of areas where we believe the BOP needs to examine the reasons behind our findings more thoroughly and identify corrective actions. The BOP indicated in response to a working draft of this report that a number of factors, including inmate demographics and facility location, may result in variance in the data reported in these categories. According to the BOP, as of January 2014 inmates incarcerated in private facilities were primarily non-U.S. citizens with 72.1 percent from Mexico, while the selected BOP institutions had an average of 11.8 percent non-U.S. citizens. See Appendix 1 for more information on our methodology, including our data analysis.

[30]  However, overall, we found that inmates at the contract prisons filed fewer grievances in all categories (including those beyond our eight selected categories).

monitoring inmate phone calls, we found that they monitored a lower percentage. We discuss these findings in greater detail below.

In addition to the specific categories of findings discussed in this section, we looked at the overall frequency of incidents among the three private prison contractors. The extent to which one contractor's facilities performed better or worse than others on these indicators varied. Overall, the GEO Group's (GEO) contract prisons had more incidents per capita compared to those operated by the Corrections Corporation of America (CCA) and the Management and Training Corporation (MTC) for contraband finds, several types of reports of incidents, lockdowns, guilty findings on inmate discipline charges, positive drug test results, and sexual misconduct; that CCA contract prisons had the highest rates of inmate fights and inmate assaults on other inmates; and that MTC contract prisons had the highest rates of inmate grievances and monitored the lowest percentage of inmate telephone calls. Appendix 6 provides the full results of our analysis of the key indicators by contractor. Among the contract prisons, the Rivers Correctional Institution (GEO), D. Ray James Correctional Institution (GEO), and McRae Correctional Institution (CCA) most often had more incidents per capita in the categories of data we analyzed, though again the number of categories and extent of the differences varied.[31]

Contraband

We examined two sets of contraband data: (1) annual data on cell phone confiscations and (2) monthly data on confiscations of drugs, weapons, and tobacco.[32] These types of contraband are especially harmful, among other reasons because they can allow inmates to continue to operate criminal enterprises during incarceration, enable violence and support addictions, or serve as alternate forms of currency for inmates. We found that, on average, the contract prisons annually confiscated eight times as many cell phones per capita from FY 2011 through FY 2014. In terms of overall totals, contract prisons confiscated 4,849 cell phones compared to 400 confiscated in the BOP institutions.[33] Figure 4 below shows the per capita number of cell phones found at contract prisons and BOP institutions by year.

---

[31] For example, Rivers had the highest rates of contraband finds (excluding cell phones), inmate assaults on staff, uses of force, guilty findings on inmate discipline cases, inmate grievances, positive drug tests, inmate-on-inmate sexual misconduct, and the lowest phone monitoring rate. We found that D. Ray James had the highest rate of disruptive behavior incidents, as well as the second highest rate of inmate assaults on staff. McRae had the highest rate of inmate suicide attempts and self-mutilation, the second highest rate of positive drug tests, and the third highest rates of cell phones found and inmate grievances. The extent of the variation differed substantially among different indicators.

[32] The data on cell phones confiscated in the BOP institutions came from the BOP's annual Cell Phones Recovered reports, which are not broken out by month, so we analyzed annual rather than monthly data on cell phones confiscated in the contract prisons as well as other BOP institutions.

[33] These numbers include cell phones found on inmates as well as anywhere within contract prisons or BOP institutions. For the contract prisons, the contractors provided the count of cell phones.

15

**Figure 4**

**Per Capita Cell Phones Confiscated at
Contract Prisons versus BOP-managed Institutions
FY 2011 − FY 2014**



Source: OIG analysis of BOP and contractor data

The large volume of cell phones confiscated at the contract prisons compared to the BOP institutions during the period of our review was striking. Further, we found that two contract prisons (Big Springs and Adams County) accounted for 3,981 of the 4,849 (82 percent) cell phones confiscated at the 14 contract prisons.[34] Table 1 shows the total number of cell phones found at Big Springs, Adams Country, and the remaining 12 contract prisons, reflecting the substantial volume of cell phones that were confiscated.

**Table 1**

**Cell Phones Found at Big Springs, Adams County, and the
Remaining Contract Prisons, FY 2011 − FY 2014**

| Contract Prison | FY 2011 | FY 2012 | FY 2013 | FY 2014 | Total |
|---|---|---|---|---|---|
| Big Springs | 786 | 1,068 | 813 | 331 | **2,998** |
| Adams County | 8 | 24 | 390 | 561 | **983** |
| Remaining 12 Contract Prisons | 238 | 117 | 210 | 303 | **868** |
| **Totals** | **1,032** | **1,209** | **1,413** | **1,195** | **4,849** |

Source: OIG analysis of contractor data

According to contractor data, Big Springs accounted for 2,998 of 4,849 cell phones (62 percent) confiscated at the 14 contract prisons. While the number of cell phones confiscated at Big Springs peaked at 1,068 in FY 2012, confiscations decreased by 70 percent, to 331 in FY 2014. According to a Privatization Field Administrator (PFA), the high number of cell phones confiscated at Big Springs was

---

[34] As of September 2014, Big Springs' inmate population was 3,403, the largest of the contract prisons, and Adams County's was 2,304. Together, these two prisons accounted for 20 percent of the total combined population of the BOP's 14 contract prisons at that time.

Case 3:16-cv-02267   Document 361-28   Filed 11/20/20   Page 23 of 40 PageID #: 14693

due to the prison's proximity to a public road and passersby being able to throw cell phones over its perimeter fence. The PFA stated that installing a tall net around the perimeter fence in the spring of 2013 helped reduce the number of cell phones entering the prison in that manner. The PFA stated that the prison also worked to improve relations with local law enforcement so that more cell phone incidents were fully prosecuted.

By contrast, the number of cell phones confiscated at Adams County increased from 8 in FY 2011 to 561 in FY 2014. In May 2012, there was a riot at the prison, and subsequently the contractor instituted heightened security measures, including new gates, increased security staff coverage, and greater controls over inmate movements. According to the prison's self-assessment, these measures resulted in an increase in contraband finds. However, even without the cell phones confiscated at Big Springs and Adams County, there were still more than twice as many cell phones confiscated at contract prisons than at BOP institutions during the period of our review. Staff confiscated 868 phones during this period in the remaining 12 contract prisons, compared to 400 confiscated in all 14 BOP institutions.

While the numbers may not have been large relative to the cell phone confiscations, we also found that the contract prisons had more frequent weapon and tobacco confiscations per capita than the BOP institutions but less frequent drug confiscations. Table 2 shows the average monthly finds per capita for these three types of contraband over the period of our review.

**Table 2**

**Average Monthly Finds Per Capita for Weapons, Tobacco, and Drugs at Contract Prisons and BOP Institutions FY 2011 – FY 2014**

|  | Weapons | Tobacco | Drugs | Combined |
|---|---|---|---|---|
| **Contract Prisons** | 3.2 | 2.5 | 1.8 | 7.6 |
| **BOP Institutions** | 1.8 | 1.9 | 3.0 | 6.6 |

Note: Due to rounding, the combined numbers are not an exact sum of the individual contraband categories. Averages are per 10,000 inmates.

Source: OIG analysis of BOP and contractor data

On average, the contract prisons had nearly twice as many weapons confiscated as BOP institutions (3.2 compared to 1.8) monthly. Also, the contract prisons had 2.5 tobacco finds monthly, on average, compared to 1.9 in the BOP institutions. Conversely, the BOP institutions had more drug finds than the contract prisons, with 3 monthly, on average, in the BOP institutions compared to 1.8 in contract prisons. Overall, we found that the contract prisons had 7.6 contraband finds in all 3 categories combined, more than the 6.6 finds in these 3 categories in the comparable BOP institutions.

We note that not all of the contract prisons found contraband in every category over the 4 years of our review. We did not compare contraband interdiction efforts between the contract prisons and BOP institutions as part of this

17

review.[35]  Therefore, we were unable to evaluate whether higher rates of contraband finds actually indicated more contraband present in either a contract prison or a BOP institution, a more aggressive or effective program for discovering and confiscating contraband, or some combination of those or other factors. However, where the disparity between contract prisons and BOP institutions is greatest, such as in cell phone recoveries, this may reflect at least to some extent a problem that should be examined and addressed by the BOP.

### Reports of Incidents

We analyzed data on 10 types of incidents:  (1) assaults by inmates on inmates, (2) assaults by inmates on staff, (3) sexual assaults by inmates on staff, (4) inmate deaths, (5) inmate fights, (6) cell fires, (7) inmate suicide attempts and self-mutilation (combined), (8) inmate suicides, (9) disruptive behavior by inmates, and (10) staff uses of force on inmates.[36]  We found that the contract prisons had higher rates of inmate-on-inmate and inmate-on-staff assaults, as well as higher rates of staff uses of force.  We also found the contract prisons had comparatively equal rates of fights and suicide attempts and self-mutilation, and that the contract prisons had lower rates of disruptive behavior incidents.

As to the first two types of incidents, our analysis showed a higher rate of assaults in the contract prisons than in the BOP institutions, both by inmates against inmates and by inmates against staff.  Per capita, the contract prisons reported a 28 percent higher average of inmate-on-inmate assaults (3.3 assaults monthly, on average, compared to 2.5 on average in BOP institutions).[37]  An analysis of these assaults per capita by year indicated that both the contract prisons and the BOP institutions saw their numbers rise in FY 2012; but the rise was more dramatic in the contract prisons and remained high through FY 2014. Figure 5 below shows the per capita inmate-on-inmate assaults each year.

---

[35]  The OIG is separately reviewed and reported on the BOP's contraband interdiction efforts. See DOJ OIG, *Review of the Federal Bureau of Prisons' Contraband Interdiction Efforts,* Evaluation and Inspections (E&I) Report 16-05 (June 2016).

[36]  The first two categories of general assaults do not include sexual assaults by inmates on inmates or by staff on inmates, which we discuss separately under sexual misconduct, below.

[37]  See Appendix 1 for the formula used to calculate the percentage differences presented throughout this section.

**Figure 5**

**Per Capita Inmate-on-Inmate Assaults in Contract
Prisons and BOP Institutions
FY 2011 − FY 2014**



Source: OIG analysis of BOP and contractor data

With regard to inmate-on-staff assaults, we found that the contract prisons reported well more than twice as many such incidents each month on average as compared to the BOP institutions: 4.2 assaults monthly, on average, in the contract prisons versus 1.6 in the BOP institutions. One contract prison, D. Ray James, accounted for 155 of 526 (29 percent) of the assaults on staff in all contract prisons from FY 2011 through 2014, including 114 assaults on staff in FY 2012 alone. A PFA told us that D. Ray James, operated by GEO in Folkston, Georgia, was having significant performance issues on its contract during this period and that the BOP had issued a cure notice in the fall of 2012.[38]

However, the PFA said the contractor had subsequently made personnel changes at the prison and its performance had noticeably improved. Our analysis found that the number of inmate-on-staff assaults at D. Ray James was reduced after FY 2012, with only one assault recorded in FY 2014. Figure 6 below shows the per capita numbers of assaults by inmates on staff each year.

---

[38] The PFA stated that a cure notice is issued to a contract prison that is not meeting the vital functions of its contract and indicates that the BOP is on the brink of ending the contract. Federal Acquisition Regulation 49.607 specifies that a cure notice is required when a contract is to be terminated for default before the delivery date. In FY 2012, D. Ray James received 47 notices of concern (NOC), more than double the highest number of NOCs that any other contract prison received in a 1-year period during the 4-year period of our review.

19

## Figure 6

### Per Capita Assaults by Inmates on Staff in Contract Prisons Compared to BOP Institutions FY 2011 – FY 2014



Source: OIG analysis of BOP data

With regard to the other selected incidents, our analysis of BOP and contractor data also found that the contract prisons had 17 percent more use-of-force incidents; approximately the same rate of inmate fights, self-mutilations, and suicide attempts; and a 29 percent lower rate of disruptive behavior incidents. Appendix 6 shows the monthly averages and 4-year totals for each of these types of incidents.

Finally, we found few instances of inmate-on-staff sexual assaults, cell fires, and suicides in either the contract prisons or the BOP institutions. We excluded inmate deaths from the discussion above because they can occur for reasons unrelated to security, such as age-related illness, and the clinical adequacy of inmate medical care fell outside the scope of our review.[39] However, we did analyze comparative data on reports of incidents of inmate deaths to evaluate the existence of disparities in the inmate death rate between the contract prisons and BOP institutions. While we found that the contract prisons actually had a lower monthly per capita average of inmate deaths compared to BOP institutions — 0.4 inmate deaths compared to 1.2 in the BOP institutions — we still believe that any disparity in the inmate death rate bears closer examination to determine the causes for differing rates and any steps that might be taken to reduce such occurrences. See Appendix 6 for the results of our analysis for all 10 types of incident reports. Overall, we believe the BOP needs to examine the frequency of

---

[39]  In 2008 and again in 2010, the OIG completed an audit of the BOP's efforts to manage inmate healthcare. See DOJ OIG, *The Federal Bureau of Prison's Efforts to Manage Inmate Health Care,* Audit Report 08-08 (February 2008), and *Follow-up Audit of the Federal Bureau of Prisons' Efforts to Manage Inmate Health Care,* Audit Report 10-30 (July 2010). See also DOJ OIG, *Review of the Impact of an Aging Inmate Population on the Federal Bureau of Prisons,* E&I Report 15-05 (May 2015), and *Review of the Federal Bureau of Prisons' Medical Staffing Challenges,* E&I Report 16-02 (March 2016).

these different types of incidents in its contract prisons and determine what corrective action may be required to address them.

As the BOP emphasized in response to a working draft of this report, no two BOP or private facilities are identical demographically. We acknowledge that inmates from different countries or who are incarcerated in various geographical regions may have different cultures, behaviors, and communication methods. The BOP stated that incidents in any prison are usually a result of a conflict of cultures, misinterpreting behaviors, or failing to communicate well. One difference within a prison housing a high percentage of non-U.S. citizens is the potential number of different languages and, within languages, different dialects. Without the BOP conducting an in-depth study into the influence of such demographic factors on prison incidents, it would not be possible to determine their impact.

### Lockdowns

During a prison lockdown, inmates are restricted to their quarters and their movements and communication are also restricted, often in response to a disturbance or incident that threatens the secure and orderly running of the prison. According to the BOP:

> The purpose of a lockdown of a correctional facility is to ensure the security of the institution, maintain control of the inmate population, and ascertain the concerns of the inmate population. Lockdowns are often a precautionary measure used to maintain control during a period of inmate dissention. During each lockdown, oversight staff monitors the contractor's actions and progress to return the institution to normal operations as quickly as possible.

During the period of our review, contract prisons reported more lockdowns than the comparable BOP institutions. The contract prisons reported 30 partial lockdowns and 71 full lockdowns, while the BOP institutions reported no partial lockdowns and 11 full lockdowns, meaning that these security measures occurred more than 9 times as often at contract prisons.[40] Moreover, 12 of the 14 (86 percent) contract prisons reported full or partial lockdowns, while only 6 of the 14 (43 percent) BOP institutions reported lockdowns. Of the 12 contract prisons that reported a full or partial lockdown, Big Springs had the highest number, with 28 of the 101 partial and full lockdowns reported, or 28 percent of all contract prison lockdowns. Among the reasons cited in the data we obtained for lockdowns at Big Springs and other contract prisons were inmate demonstrations, fights, inmate assaults on staff, attempts to introduce significant contraband, conflicts between inmate gangs or racial groups, food strikes, inmates refusing to work, shakedowns, and local environmental or weather emergencies. In some cases, the contractors' descriptions of the circumstances surrounding lockdowns noted that inmates expressed concerns over specific issues, including medical care, commissary prices,

---

[40] A partial lockdown affects only some housing units in a prison; a full lockdown affects the entire prison.

inmate pay, movement restrictions, and television channels. While we could not review the basis for lockdowns in the context of this review, the greater number of such incidents at contract prisons suggests a need for the BOP to examine and address the issue.

Discipline

We analyzed inmate discipline data on charges such as murder, assault, sexual assault, possession of weapons or drugs, setting fires, fighting, and participating in riots or demonstrations. We found that the contract prisons had a higher number of guilty findings on these types of serious offense charges. The contract prisons had 77.9 guilty findings monthly on average (10,089 over 4 years), compared to 64.7 in the BOP institutions (7,439 over 4 years).[41] We believe that a higher incidence of substantiated misconduct may be an indication of greater inmate behavioral challenges in contract facilities, which merits further analysis and action by the BOP.

Grievances

Contract terms specify that the contract prisons must develop their own internal grievance policies and adhere to federal regulations setting forth procedures for inmates to receive formal review of issues of concern to them.[42] As part of our analysis, we selected eight categories of grievances we deemed particularly relevant to safety and security to analyze collectively and separately.[43] We selected grievances related to medical care and food because each was specifically identified among reasons that led to lockdowns at contract prisons, as detailed above. In addition to medical care and food, the grievance categories we selected as particularly relevant to this analysis were conditions of confinement, institutional operations, safety and security, sexual abuse or assault, Special Housing Units (SHU), and complaints against staff. We found that in these eight categories collectively, inmates at the contract prisons submitted 24 percent more grievances: 32.2 grievances per month, on average, compared to 25.3 for the BOP institutions.

Individually, not all of the eight grievance categories we selected had a larger number of grievances or showed notable differences.[44] However, our analysis did show that, per capita:

---

[41] Our analysis of the discipline data included sexual misconduct incidents that were also analyzed separately, as described below.

[42] 28 C.F.R. 542.

[43] Because the contract prisons sometimes used different descriptions for the same types of grievances and some descriptions were more detailed than necessary for the level of our analysis, we consolidated and standardized the grievance categories.

[44] Not all contract prisons had grievances in all of the categories. See Appendix 7 for a detailed comparison between contract prisons and BOP institutions for each of the eight grievance categories.

22

- Contract prison inmates submitted more than twice as many grievances regarding prison staff as inmates in the BOP institutions, averaging 12.9 monthly compared to 6.2 in the BOP institutions.

- There were more grievances regarding SHUs at the BOP institutions, with an average of 2.4 monthly compared to 0.2 monthly in the contract prisons.

- There were more food grievances at the contract prisons, on average 2.1 food grievances monthly compared to 1.2 in the BOP institutions.

- There was little difference in the number of medical grievances (14.3 at the contract prisons versus 14.1 at the BOP institutions on average monthly).

However, overall, we found that inmates at the contract prisons filed fewer grievances in all categories (including those beyond our eight selected categories). According to BOP data, inmates at the contract prisons filed, on average, 72.6 grievances per month compared to 121.5 grievances at the BOP institutions and a higher percentage of grievances were granted in the contract prisons. The overall rate of inmate grievances granted in the contract prisons over the 4 years of our review was 8.1 percent, while in the BOP institutions 5.2 percent were granted. Of the 8,756 total grievances filed by inmates at the contract prisons from FY 2011 through FY 2014, 1,800 (21 percent) were related to medical concerns, 1,538 (18 percent) were complaints about prison staff, and 1,186 (14 percent) were related to the inmate disciplinary process. Figure 7 below shows the most common categories of grievances in the contract prisons.

**Figure 7**

**Most Common Inmate Grievance Categories in the Contract Prisons, FY 2011 – FY 2014**



- ■ Medical/Dental (21%)
- ■ Staff Complaints (18%)
- ■ Discipline/Hearings/Appeals (14%)
- ■ Property (7%)
- ■ Sentence Computation (5%)
- ■ Programs (5%)
- ■ Food (3%)
- ■ Other (29%)

Note: Less common types of grievances included in the "Other" category (mauve) included transfers, classification, telephone and mail, institutional operations, conditions of confinement, and alleged violations of federal or state laws and regulations.

Source: OIG analysis of BOP and contractor data

By comparison, in the BOP institutions, of 14,098 total grievances filed by inmates, 3,451 (24 percent) were related to inmate discipline, hearings, and

appeals, followed by 1,609 grievances (11 percent) on medical concerns and 1,332 grievances (8 percent) on sentence computation issues. The remaining 47 percent of grievances at contract prisons and 57 percent of grievances at BOP institutions were related to categories including inmate classification, transfers, legal access, work assignments, residential reentry centers, and telephone and mail. Figure 8 below shows the most common categories of grievances in the BOP institutions.

**Figure 8**

**Most Common Inmate Grievances Categories in the BOP Institutions, FY 2011 – FY 2014**



- Discipline/Hearings/Appeals (24%)
- Medical/Dental (11%)
- Sentence Computation (9%)
- Classification (9%)
- Transfers (7%)
- Programs (6%)
- Staff Complaints (5%)
- Other (27%)

Note: Less common types of grievances included in the "Other" category (mauve) included residential reentry centers, telephone and mail, work assignments, SHUs, and legal access issues.

Source: OIG analysis of BOP and contractor data

Comparison of the distribution of grievances between the contract prisons and the BOP reveals that the concerns of inmates in the contract prisons are more focused on medical and dental issues (21 percent of the contract prison grievances as opposed to 11 percent of the BOP institution grievances). Similarly, the percentage related to staff complaints is much larger at the contract prisons than the BOP institutions (18 percent in the former compared to 5 percent in the latter). The higher focus on particular areas in contract prison grievances suggests that the BOP should examine those areas and develop plans to address any underlying issues.

Monitoring of Inmate Phone Calls

The BOP requires that BOP institutions monitor at least 5 percent of inmate phone calls.[45] Contracts do not require the contract prisons to monitor a specific percentage of inmate phone calls. However, a Privatization Management Branch (PMB) Intelligence Specialist told us that the BOP recommends that the contract

---

[45] Regional BOP Directors may set higher monitoring goals, ranging from 10 to 15 percent of calls monitored randomly for BOP institutions within their region. See DOJ OIG, *The Federal Bureau of Prisons' Monitoring of Mail for High-Risk Inmates*, E&I Report I-2006-009 (September 2006).

24

prisons monitor a minimum of 5 percent of inmate phone calls. The Intelligence Specialist stated that it is good correctional practice to monitor at least 5 percent of calls to gather intelligence. We found that all but two of the contract prisons met or exceeded the BOP's 5 percent phone call monitoring standard on average each month from FY 2010 through FY 2014. However, collectively, the contract prisons monitored fewer phone calls than the BOP institutions. Our analysis found that the BOP institutions monitored 21 percent of all inmate phone calls on average each month, compared to only 8 percent at the contract prisons.

We also found that the number of inmate phone calls that the contract prisons can monitor is limited by the unavailability of both bilingual staff and technological resources. With the exception of the Rivers Correctional Institution (Rivers), which houses approximately 50 percent of its inmates from the District of Columbia, most of the contract prison population consists of foreign national inmates, many of whom are Mexican nationals serving sentences for immigration violations.[46] At Rivers, staff told us that one full-time translator and another staff member monitored Spanish-language phone calls in addition to performing their other duties but were not able to monitor all phone calls that should have been monitored. We found similar circumstances at another contract prison we visited, where a single bilingual officer was responsible, among other duties, for monitoring all Spanish-language calls.

We were also told that the contract prisons do not have the same telephone technology that is available to BOP institutions to monitor inmate phone calls. A PMB Intelligence Specialist told us that with access to the BOP's TRUINTEL system, it was possible for staff to listen to inmates' phone calls in the BOP institutions through a desk telephone or through their desktop computers. Therefore, various staff in different departments throughout the institutions could monitor phone calls. However, staff at contract prisons do not have access to TRUINTEL or the intelligence it provides from other BOP institutions, nor are contract prison inmate phone calls recorded in TRUINTEL, all of which limits contract prisons' and the BOP's opportunities to gather intelligence.

Even though contract prisons are generally meeting the minimal monitoring standard, we believe that the lower monitoring rate at contract prisons and the personnel and technological hurdles faced there are issues that the BOP should consider and address.

*The Contract Prisons Had Fewer Incidents per Capita of Positive Drug Tests and Sexual Misconduct*

Another indicator of safety and security in a prison setting is the number of positive drug tests and sexual misconduct incidents per capita. Our analysis indicated that the contract prisons had fewer inmates who tested positive for drugs through urinalysis testing than the BOP institutions. We also found that the

---

[46] As of FY 2013, 96 percent of the BOP's inmate population in contract prisons consisted of foreign nationals.

contract prisons had lower rates of guilty findings on serious disciplinary charges of inmate-on-inmate sexual offenses. Additionally, the contract prisons had fewer allegations of sexual misconduct by staff against inmates. We discuss these findings in greater detail below.

### Urinalysis Drug Tests

According to BOP policy and contract requirements, contract prisons and other BOP institutions must drug test 5 percent of inmates every month. We found that, per capita, the contract prisons had fewer positive urinalysis drug test results, on average monthly (2.1) than the BOP institutions (3.4), with a total over 4 years of 263 positive results in the contract prisons compared to 376 in the BOP institutions. However, the contract prisons also drug-tested a slightly lower percentage (7 percent) of inmates on average each month than the BOP institutions (8 percent). Despite the lower testing percentage, on average over the 4-year period of our review, all contract prisons drug tested over 5 percent of inmates per month, exceeding contract requirements.[47] Given the limitations of the BOP's data, which included only the number of inmates tested and the number of positive and negative results, we were not able to determine whether the lower per capita positive drug test results in contract prisons reflected less drug usage, an issue with the drug testing procedures being followed in those facilities, or some combination of these; but we believe that these are issues that merit closer examination and analysis by the BOP.

### Sexual Misconduct

We analyzed two types of sexual misconduct data: (1) guilty findings on disciplinary charges of inmates committing sexual misconduct against other inmates and (2) allegations of staff sexual misconduct against inmates. In both categories, the data that we reviewed generally reflected that the contract prisons had fewer incidents per capita than the BOP institutions.

However, we found that some of the data on inmate-on-inmate sexual misconduct was recorded inconsistently, for both the contract prisons and the BOP institutions. BOP Intelligence Specialists produce monthly intelligence reports on the contract prisons with the number of reported sexual assault incidents, as well as a breakdown of categories of inmate-on-inmate sexual misconduct allegations. A PMB Intelligence Specialist told us these two types of data should be consistent with each other; however, we determined that the overall number of incidents and the number of incidents by category were frequently inconsistent. In addition, data on inmate discipline cases with sexual misconduct guilty findings indicated more inmate-on-inmate sexual misconduct in contract prisons than was recorded in the monthly intelligence reports. Further, the BOP institutions reported no inmate-on-inmate sexual misconduct incidents, even though the data on inmate discipline in the BOP

---

[47] The contract requires the contractor to adhere to BOP Program Statement 6060.8, Urine Surveillance and Narcotic Identification (March 8, 2001). The program statement stipulates that each institution should randomly drug test 5 percent of its total population each month.

institutions also showed guilty findings on sexual misconduct charges. The BOP's contract prisons are currently subject to *Prison Rape Elimination Act of 2012* (PREA) reporting requirements in their contracts, as are the BOP's noncontract institutions by statute.[48] However, since the rules for PREA took effect in August 2012, as part of this review we did not evaluate the contract prisons' compliance with PREA or how it may have affected the contract prisons' sexual misconduct incident reporting.

Given the limitations of the data on reports of incidents for inmate-on-inmate sexual misconduct, we focused our analysis on inmate discipline cases that resulted in guilty findings for charges of sexual misconduct.[49] Over the period of our study, we found that the contract prisons had approximately 9 percent less guilty findings on average annually in sexual misconduct cases than the BOP institutions. The contract prisons had 16.6 guilty findings annually, on average, as opposed to 18.1 in the BOP institutions. However, we also found that 50 of 156 (32 percent) of the contract prison inmate-on-inmate sexual misconduct guilty findings occurred at one contract prison, Rivers, between FY 2011 and 2014, and we believe that the disparity between different facilities on this issue warrants closer examination by the BOP.

Staff-on-inmate sexual misconduct is not tracked through reports of incidents, which apply only to inmate misconduct. Instead, allegations of staff misconduct against inmates must be reported to the BOP's Office of Internal Affairs (OIA). Our analysis of OIA data found that the contract prisons reported fewer misconduct allegations than the BOP institutions.[50] During our review period, the contract prisons reported 97 staff sexual misconduct allegations compared to 139 staff sexual misconduct allegations reported from the BOP institutions. Adjusting for population differences, the contract prisons averaged 9 allegations annually, compared to 15 on average in the BOP institutions. Of course, no level of sexual misconduct is acceptable, and we strongly encourage the BOP to continue to work to address this issue in both contract prisons and BOP institutions.

## OIG Site Visits Revealed Safety and Security Concerns and Inappropriate Housing Assignments

The BOP requires all of its contract prisons to provide a safe and secure setting for staff and inmates and to maintain ACA accreditation throughout the term of their contract. We found that while each contract prison we visited was cited for at least one safety or security deficiency during the period of our review, these

---

[48] PREA requires prisons to track allegations of sexual misconduct incidents. The OIG analyzed emerging issues with PREA implementation in *Progress Report on the Department of Justice's Implementation of the Prison Rape Elimination Act*, E&I Report 15-1 (October 2014).

[49] Specifically, we analyzed Codes 114 (Sexual Assault by Force), 205 (Engaging in Sexual Acts), 206 (Making Sexual Proposals or Threats to Another), and 229 (Sexual Assault without Force).

[50] Contract prisons and BOP institutions are required to report all allegations of staff sexual misconduct to the OIA. The OIA then notifies the OIG Investigations Division about the allegations, and the OIG decides which it should investigate and which should be referred back to the OIA for investigation or delegation to institutional staff to investigate.

issues were addressed by the contract prisons and each maintained ACA accreditation throughout the period covered by our review. However, during our fieldwork, we learned that two of the three facilities we visited housed newly received general population inmates in the SHU, inconsistent with ACA standards and BOP policy, and neither prison had been cited for a deficiency as a result.

*Safety and Security Deficiencies*

In addition to the concerns relating to inmate placement in the SHU detailed below, we discovered that some contract prisons experienced other safety and security issues during the period of our review. The three contract prisons we visited were each cited for one or more safety and security related deficiencies. A contract prison receives a deficiency when it violates a policy that affects the quality of service provided under the contract. These included administrative infractions, such as improper storage of use-of-force video footage, as well as other deficiencies that the BOP determined were more serious or systemic in nature, such as a failure to initiate discipline in over 50 percent of incidents reviewed by the onsite monitors over a 6-month period. However, the contractors corrected the safety and security deficiencies that the BOP identified. As a result, the BOP determined that each prison was sufficiently compliant with the safety and security aspects of its contract to continue with the contract during the period covered by our review.[51] Table 3 shows the safety and security indicators within the correctional services area and the number of deficiencies the BOP identified during our review period.[52]

### Table 3

**Number of Deficiencies Received in Contract Prisons the OIG Visited, FY 2011 – FY 2014**

| Security Indicators | Dalby | Eden | Rivers |
|---|---|---|---|
| Use of Force | 1 | 1 | 0 |
| Reports of Incidents | 0 | 1 | 0 |
| Inmate Death Notifications | 0 | 0 | 0 |
| Inmate Urinalysis Testing | 1 | 0 | 0 |
| Inmate Disciplinary Hearings | 0 | 2 | 0 |
| Sexual Assaults | 0 | 1 | 0 |
| Inmate Grievances | 0 | 0 | 0 |
| Contraband | 1 | 1 | 1 |
| Lockdowns | 0 | 0 | 0 |
| Suicides | 2 | 0 | 0 |
| **TOTAL** | **5** | **6** | **1** |

Source: BOP data

During our review period, the 3 contract prisons we visited collectively received 12 deficiencies in the security indicators we analyzed. The Giles W. Dalby

---

[51] To maintain a contract, a contract prison must remain compliant with each operational area of the contract. See Contract Requirements in the Introduction for discussion of the operational areas.

[52] The three contract prisons were also cited for deficiencies in other areas not included in Table 3, such as administration, food service, and human resources.

Correctional Facility (Dalby) received five deficiencies in four areas: use of force, inmate urinalysis testing, contraband, and suicides (two). The Eden Detention Center (Eden) received six deficiencies in five areas: use of force, reports of incidents, inmate disciplinary hearings (two), sexual assaults, and contraband. Rivers received one deficiency for contraband. Of the three contract prisons, none was found deficient in the policy requirements pertaining to the areas of inmate death notifications, inmate grievances, or lockdowns.

We determined that for each of the safety and security related deficiencies that BOP onsite monitors identified during our study period, the contractor responded to the BOP and took corrective actions to ensure the prison was in compliance with policies and the contract. Depending on the severity of the security deficiency, corrective actions included providing training or retraining to the affected staff, increasing supervisory oversight, revising policy, and/or taking disciplinary action against staff. None of the three prisons lost its ACA accreditation because of these security related deficiencies.

*Two of the Three Contract Prisons We Visited Routinely Housed Newly Received General Population Inmates in the SHU*

At two of the three contract prisons we visited, we learned that all newly received inmates were housed in the SHU due to lack of available bed space in general population housing units, which is contrary to both ACA standards and BOP policies. Dalby placed new inmates directly into administrative segregation in the SHU for an average of 20 days pending available bed space in the general population. At the time of our visit, 73 inmates were housed in the SHU at Dalby. The Warden informed us that a majority of these were new inmates awaiting beds in the general population. Similarly, Eden housed new inmates in administrative segregation in the SHU for an average of 21 days before a bed became available in the general population. At the time of our visit to Eden, 71 of the 100 inmates in the SHU were waiting for beds in the general population.

The placement of general population inmates in the SHU due to lack of bed space is inconsistent with the ACA standard that states that an inmate may be placed in administrative segregation if the inmate's continued presence in the general population poses a serious threat to life, property, self, staff, other inmates, or the security or orderly running of the institution.[53] Under ACA standards, an inmate can also be placed in the SHU for disciplinary segregation or detention only if a disciplinary committee or Disciplinary Hearing Officer has determined, after an impartial hearing, that the inmate is guilty of a serious rule violation. The placement of inmates in the SHU due to lack of bed space in the general population is also inconsistent with parallel BOP policies, which explicitly state that "when

---

[53] According to BOP policy, other appropriate reasons for placement in administrative segregation include being under investigation for an alleged rule violation or criminal act, pending investigation for a criminal trial, protective custody for the inmate, or pending transfer to another institution.

placed in the SHU, you [an inmate] are either in administrative detention status or disciplinary segregation status."[54]

Management at both Dalby and Eden acknowledged that the newly received inmates had not engaged in any conduct that warranted their placement in the SHU. Yet, once placed in the SHU, these new inmates became subject to the same security measures as inmates placed in administrative segregation for specific security related reasons. These measures included restricted and controlled movements; limited access to programs such as educational or vocational programs, as well as work details; and limited telephone calls.[55]

While using the SHU to house new inmates is inconsistent with both ACA standards and BOP policy, we found that neither contract prison had been cited for a deficiency for this practice. According to contract prison management and BOP staff, contract prisons housed new inmates in the SHU because both the BOP and its contractors had interpreted language in their contracts as permitting SHU beds to be included in the general population bed count, rather than in a separate category. Moreover, according to the contracts, "The contractor does not have a right of refusal and shall accept all designations from the BOP." We were told that the BOP sent new inmates to Eden because there appeared to be beds available based on the inmate population data provided by the contractor, even though the beds were actually in a SHU, and Eden could not refuse to accept these new inmates under its contract. Wardens at both Dalby and Eden told the OIG they believed that housing new inmates in the SHU was not good correctional practice.[56]

When the OIG learned about this practice, we brought it to the attention of the BOP Director (see Appendix 4 for the Inspector General's letter to the BOP Director). In response, the BOP Director informed the Inspector General of the following: (1) All new inmates awaiting general population bed space had been removed from the SHU and housed in the general population; (2) all movement into contract prisons was discontinued if the movement would result in SHU placement; (3) 5 of the 14 contracts were modified to address this issue (9 of the 14 contracts did not contain language that required modification prior to the Inspector General's letter); and (4) all 14 contracts prohibit SHU placement for inmates unless there is a policy-based reason to house them in administrative or disciplinary segregation. The BOP Director further stated that the onsite monitors and Contracting Officers would ensure contract compliance, especially regarding placement of inmates in the SHU. (See Appendix 5 for the BOP Director's response

---

[54] BOP Program Statement 5270.10, Special Housing Units (August 1, 2011).

[55] Inmates in administrative and disciplinary segregation may leave their cells only under handcuffed escort by Correctional Officers for 1 hour of exercise, 5 times per week, or for showers several times per week. Also, inmates must have meals provided to them in their cells. Finally, counselors and medical and other program staff are required to visit the SHU daily to meet with each inmate individually at their cell. All of these activities are very time intensive for the staff.

[56] The Warden at Dalby informed us that the prison and the BOP had just signed a contract modification to expand the number of beds in the general population and reduce the previously required number of SHU beds, thereby creating sufficient beds in the general population for newly received inmates.

Case 3:16-cv-02267    Document 361-28    Filed 11/20/20    Page 37 of 40 PageID #: 14707

to the Inspector General addressing this issue.)  Since that time, the BOP informed the OIG that the practice of housing new inmates in the SHU is no longer occurring in the contract prisons and that there has been no further non-compliance identified to date by the BOP regarding this issue.

**The BOP's Monitoring of Contract Prisons Needs Improvement**

We found two principal areas of concern with the BOP's monitoring of contract prisons:  (1) a tool the BOP onsite monitors use to monitor day-to-day contract compliance, the Large Secure Adult Contract Oversight Checklist (checklist), does not address certain important BOP policy and contract requirements in the areas of health services and correctional services and (2) the monitoring of health services for contract compliance lacks coordination among BOP staff responsible for health services oversight.  As a result, the BOP's day-to-day monitoring may be less effective in ensuring that the inmate population it houses in contract prisons receives appropriate health and correctional services.  We discuss each of these issues in more detail below.

In April 2015, the OIG issued a report on the Reeves County contract prison that included findings and recommendations related to the BOP's monitoring of all contract prisons.[57]  In response to the OIG's recommendations, the BOP took many corrective actions, including in the areas of health and correctional services.  In addition, the BOP informed us of additional steps taken in response to concerns identified in this current review.  Below, we acknowledge the BOP's efforts to improve its monitoring of contract prisons and discuss additional steps the BOP should take to further ensure that these facilities are safe and secure places to house federal inmates.

*The Onsite Monitors' Checklist*

We found that the checklist, a monthly contract monitoring tool onsite monitors use to document their day-to-day efforts to ensure contract prisons comply with BOP policy and contract requirements, could be further improved.  We focused our analysis on the onsite monitors' checklist because, as described by the PMB operating procedures, it is an important element of the BOP's Quality Assurance Plan, as well as a mechanism used to document contract compliance on a daily basis.  We believe onsite monitors are best positioned to provide the BOP's quickest and most direct responses to contract compliance issues as they arise.  The checklist has observation steps, which are instructions on how to document contractor performance requirements.  However, we determined that observation steps for health services do not contain steps to verify that inmates receive a number of basic medical services.  Also, while the BOP made revisions to the checklist in response to the findings of the OIG's Reeves County audit as discussed below, the revised checklist does not include observation steps to assess some vital

---

[57] See DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007 Awarded to Reeves County, Texas, to Operate the Reeves County Detention Center I/II, Pecos, Texas,* Audit Report 15-15 (April 2015), iii.

31

functions in the contracts related to correctional services, such as conducting adequate searches and gathering intelligence.[58] In addition, for some functions, the checklist still contains vague observation steps. Further, onsite monitors at the contract prisons we visited did not use the checklist or monitoring logs to track contractors' corrective actions. Finally, the BOP lacks a review process for the checklist to ensure that observation steps accurately verify contract compliance. As a result, the BOP may not be able to monitor as effectively whether contract prisons comply with BOP policies and contract requirements on a day-to-day basis.

### Observation Steps for Health Services Are Inadequate to Verify that Inmates Receive Basic Medical Services

To support the monitoring of contract compliance in health services, the BOP developed seven observation steps in the checklist for onsite monitors to verify that a contract prison's health services comply with its contract. At the time of this review, we determined that none of the seven health services checklist observation steps, individually or when considered together, examined whether the contractors were providing basic medical care to the inmates. Rather, the observation steps were primarily administrative procedures such as checking that biohazard procedures followed contractor policy, ensuring staff interactions with inmates were confidential, recording the percentage of inmates in chronic care, and checking that deceased inmates were properly fingerprinted. As a result, the BOP onsite monitors were not verifying each month whether inmates in contract prisons were receiving basic medical care.

Onsite monitors and PFAs told us they did not have the medical expertise to provide additional monitoring in health services beyond the observation steps in the checklist. They stated that the onsite monitor's position was intended to be that of a generalist, rather than a subject matter expert with the clinical knowledge needed to evaluate the quality of medical care provided. However, in the PMB Health Systems Specialist's (HSS) opinion, even without medical expertise, the onsite monitors could perform additional health services oversight steps to help ensure the contractors provide basic medical care.[59] The HSS is responsible for providing medical oversight training programs for PMB staff, as well as coordinating oversight of the contractors' medical services with the BOP's Contract Facility Monitoring (CFM) Branch and the Health Services Division (HSD), conducting annual reviews and site visits of contract prison medical departments, and providing clinical guidance in a written site visit report to help the contractors correct medical deficiencies. In June 2014, at an annual training conference attended by all PMB staff, the HSS trained the onsite monitors and PFAs on how they could verify whether inmates received basic medical care, such as an initial medical examination within 14 days of arrival at the prison, and whether they received immunizations,

---

[58] Appendix 3 provides sample observation steps from the health services and correctional services sections of the checklist that the onsite monitors use.

[59] In response to a working draft report, the BOP told us that the HSS whom we interviewed during the course of our review has since retired. The BOP stated that the new HSS has extensive experience in the review, analysis, and monitoring of healthcare provided to inmates.

tuberculosis tests, and chronic care appointments, all as required by BOP policy. The HSS stated that these verifications involve checking entries and corresponding dates in SENTRY and do not require any medical expertise.[60] However, the HSS told the OIG that there had been no discussion regarding whether the PMB could add these observation steps to the checklist, and he was not familiar with the checklist or its contents.

Following the OIG's 2015 report on the Reeves County contract prison, the BOP updated the checklist to include an observation step in the health services section that requires onsite monitors to run a chronic care roster in SENTRY to determine whether the contractor is current with follow-up care and appointments.[61] While the BOP has updated the checklist to include chronic care, the health services section of the checklist still does not include other steps that could help ensure basic medical care, such as verifying that initial examinations and immunizations are provided.

During our site visit to one contract prison, we learned there was no full-time physician, as required by its approved staffing plan, for the 8-month period between December 2013 and August 2014.[62] The dentist position was also vacant for approximately 6 weeks during this time. We found that despite these vacancies, which we believe are critical for ensuring basic inmate healthcare, the onsite monitor's checklists showed that the prison was in compliance with all health services observation steps. However, the BOP's annual CFM review at this prison in August 2014 resulted in a significant adverse finding in health services, with 11 deficiencies in administration and patient care, including 6 repeat deficiencies from the previous year.[63] The CFM results stated:

> There were inadequate controls in the clinical care and staffing area of Health Services to ensure compliance with established procedures and practices. These inadequacies create a lack of appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. Many issues from previous [monitoring] have not

---

[60] SENTRY is the BOP's primary mission support database. It collects, maintains, and tracks critical inmate information, including location, medical history, behavior history, and release data. SENTRY does not currently track the dates of initial medical examinations and immunizations.

[61] The BOP's updated observation step on chronic care was not in response to a specific recommendation made in the OIG's 2015 audit of the Reeves County contract prison.

[62] The OIG also found medical understaffing in the 2015 audit of the Reeves County Detention Center. DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007*, 22–26. The report raised concerns that medical understaffing on the part of the contractor was financially incentivized because it cost the contractor less to pay penalty deductions for understaffing than to staff the prison adequately.

[63] Five of the six repeat deficiencies cited were for failure to provide medical appointments and treatment required by contract and BOP policy, and a sixth deficiency was for not conducting dental appointments as policy required.

33