been corrected.  Medical needs and documentation were incomplete, including reports.[64]

Specific health services deficiencies cited in the CFM review included failing to provide prescribed antiviral therapy for inmates with hepatitis C, not following up with inmates with positive tuberculosis test results, missing preventive care evaluations and dental exams, and failing to provide some immunizations.  During the period in which these deficiencies occurred, the checklists indicated that the prison was in compliance with all seven of the health services observation steps.  However, none of the seven observation steps touched on the fundamental deficiencies cited by the CFM review.  We believe that PMB should establish additional observation steps in the monitoring checklist to ensure inmates are receiving basic healthcare as required by the contract and to enable earlier identification of deficient inmate health services.

In response to a working draft of this report, the BOP provided the OIG with a copy of a new Health Services report that is generated quarterly by the HSS to provide documentation of any issues reported to the HSS pertaining to medical services at contract prisons, which occurred during the reporting period, and information regarding unresolved issues during prior reporting periods.  According to the BOP, the purpose of the Health Services report is twofold.  First, the report provides objective data of various areas in medical services over a specified time frame.[65]  When sufficient data is collected, statistical analysis can detect significant trends and predict outcomes in contractor performance.[66]  Second, the report provides detailed information regarding how each issue originated, progressed, and resolved.[67]  Such information can be useful in retrospectively evaluating and potentially improving processes within health services.  The BOP stated that the Health Services report is submitted to the Assistant Administrator of Field Operations within 30 days following the end of the quarter.  The report is then distributed to all PMB Administrators.  Any issues warranting contractor attention are discussed by the PFA and onsite monitors for appropriate action.  Finally, the

---

[64]  BOP Program Review Division, *Contract Facility Monitoring Final Report, Eden Detention Center* (August 2014), 3.

[65]  The data sources for the quarterly reports include reports of BOP onsite staff (Senior Secure Institution Manager/Secure Oversight Monitor), contract staff, PFA reports, Office of Medical Designations, and HSS ad hoc reviews.

[66]  The new Health Services report covers Active tuberculosis, Administrative Remedy Responses, Administrative Issues, Catastrophic Cases, Contract Facility Monitoring, Critical Vacancies, Deaths, Hunger Strike, Infectious Disease – Not associated with tuberculosis, Involuntary Treatment, Joint Commission Accreditation, Other Concerns – Not Otherwise Specified, Patient Care, Policy Updates, Reduction in Sentence, Restraints, Sentinel Events/Root Cause Analysis, Subject Matter Expert On-Site Visits, Transfer Requests/Form 770, and Transfer – Treatment Complete – Form 413. The total number of events for each category is calculated and subtotaled for each facility during the reporting period.

[67]  The quarterly report provides a review of any CFM activity, as well as HSS follow-up visits, during the reporting period.  Onsite monitors use the HSS site visit report to supplement their CFM follow-up report.  The HSS site visit report provides medical-specific expertise to the CFM follow-up report.

Case 3:16-cv-02267     Document 361-29     Filed 11/20/20     Page 1 of 47 PageID #: 14711

BOP stated that a new tracking system was generated and the first HSS quarterly report was produced for the third quarter of 2015.

<u>The Checklist Does Not Include Observation Steps to Address Some Vital Functions Related to Correctional Services in the Contract</u>

While the BOP's annual CFM review provides a comprehensive annual audit of the contract prisons' compliance with BOP policy and contract requirements, onsite monitors use the checklist as a monitoring tool on a monthly basis to ensure contract prisons comply with BOP policy and contract requirements between annual audits. However, the checklist does not include observation steps to address policy requirements related to some of the vital functions in each contract. For example, one vital function in correctional services, which ensure the safety and security of the prison, states: "An adequate security inspection system is provided to meet the needs of the institution." We found that the only related observation step on the checklist does not adequately address this vital function.[68] The observation step states: "Include observation of staff routinely performing searches (use of metal detectors, pat searches at entrances/exits)." However, the checklist does not include any observation step to verify the contractor is performing searches required by BOP and contractor policies in other areas of the prison, including inmate housing units and cells, recreation, work and program areas, medical areas, and visiting areas, or that there is a comprehensive inspection system in place that ensures the safety and security of the prison.[69]

Also, there is no observation step to monitor the inmate urinalysis drug testing program. BOP policy requires that 5 percent of a prison's population be tested randomly each month. Specified inmate groups receive additional testing. For example, members of confirmed disruptive groups must be tested each month. Inmates who have been identified as suspects of prohibited acts, such as drug use, through intelligence gathering are supposed to be tested throughout an extended period of time, and inmates found to have committed prohibited drug-related acts are to be tested monthly for the subsequent 24 months.[70] Without consistent monitoring to ensure the testing is accomplished, the BOP cannot ensure that contract prisons comply with BOP policy on an ongoing basis. The annual CFM

---

[68] In response to a working draft of this report, the BOP stated that the vital function of ensuring security inspection systems can encompass an enormous number of functions and that the language in the checklist reflects this appropriately. The BOP also specified that there are two checklist steps to ensure security inspection systems are in place by the contractor. Additionally, the BOP stated that contract prisons are accredited by the ACA, which further requires the contractor to have a security inspection system in place.

[69] CCA Policy 09-05, Section 5(E) 1-2, for example, requires inmate cells to be searched randomly on a daily basis during each shift. ACA Standard 4-4192 (2014 supplement) requires that: "Written policy, procedure, and practice provide for searches of facilities and inmates to control contraband and provide for its disposition. These policies are made available to staff and inmates. The institution's search plans and procedures should include the following: unannounced and irregularly timed searches of cells, inmates, and work areas; inspection of all vehicular traffic and supplies coming into the institution; etc."

[70] BOP Program Statement 6060.08, Urine Surveillance and Narcotic Identification (November 24, 1999).

35

review does include monitoring of inmate urinalysis drug testing, as well as the security inspection system requirement discussed above, but we believe the BOP should consider adding observation steps on the monthly checklist to document compliance between CFM reviews.[71]

In addition, the checklist does not require onsite monitors to verify contract prisons' correctional services staffing levels. Correctional Officers ensure the safe and secure operation of the contract prisons. All contractors have a BOP-approved staffing plan and are required to meet certain staffing levels defined in each contract.[72] For correctional services, if contractors fall below a monthly average of 90 percent of the BOP-approved staffing plan, they are subject to deficiencies and financial deductions. However, there is no observation step to verify that the total number of Correctional Officers is consistent with the BOP-approved staffing plan. Given, for example, Correctional Officer leave, training, and part-time schedules, the actual staffing within contract prisons could fall below staffing levels as stated on monthly invoices. The PMB Administrator told us that this is an oversight activity that onsite staff could perform. We believe that adding an observation step to the checklist to periodically verify that the actual number of Correctional Officers is consistent with the BOP-approved staffing plan will ensure that staffing levels have not fallen below what is required to help ensure a safe and secure environment for staff and inmates.

In a response to a working draft of this report, the BOP stated that the PMB field staff reviews and certifies the monthly invoice and staffing reports that are submitted by the contractors. The invoice and certification memorandum are then reviewed for final certification by the PMB's Assistant Administrator, Support and Development, and routed for payment. The contractors' staffing reports indicate the number of required staff, the number of staff provided, and the percentage of staff provided based on the approved staffing plan. However, based on our review of a monthly invoice and staffing report provided by the BOP, we could not determine whether all staff on duty were actually Correctional Officers.[73] During

---

[71] In response to a working draft of this report, the BOP stated that intelligence gathering is a function obtained, tracked, and analyzed by PMB's two Intelligence Specialists. The PMB Intelligence Specialists remain in constant contact with the contractors' intelligence staff, who provide information related to disruptive groups, cell phone introduction, urinalysis testing, alcohol testing, phone monitoring, and use of force at all current contract locations. The information provided is compiled into a quarterly report that is shared with the PMB field staff. Additionally, the PMB Intelligence Specialists conduct monthly intelligence video conferences among PMB field staff to share intelligence.

[72] A staffing plan lists the number, type, and allocation of the contract prison's staff that is required to be maintained throughout the life of the contract. In addition, each contractor is required to maintain staffing level percentages in correctional services, health services, and all other departments. Appendix 1 provides more detail on staffing levels at each of the three prisons at the time of our review.

[73] Concerns regarding the verification of staffing levels were raised during our site visit to a contract prison. Some Corrections Counselors told us they were being asked to fill in as Correctional Officers in more than just temporary or relief roles, such as when Correctional Officers go to meals or to meetings. PMB onsite staff we interviewed at each contract prison we visited were not aware of such a practice, and we were unable to verify the Corrections Counselors' statements because PMB onsite monitors do not verify the approved staffing plan or the daily roster.

any 3-month period, if the contractor falls below the staffing requirement for 2 months, the PMB staff issues a deficiency.

### The Checklist Contains Vague Observation Steps

We found several vague or repetitive observation steps on the checklist that resulted in inconsistent and insufficiently documented monitoring activities or responses by onsite monitors. For example, we found that the onsite monitors are supposed to determine whether trends exist in grievances and reports of incidents, but the steps do not describe how monitors are supposed to determine and analyze trends or over what timeframe the trends are to be analyzed. We reviewed 48 months of the onsite monitors' documentation of the observation steps in these two areas and found that onsite monitors generally record "no identifiable trends" or "no trends," or do not address trends at all. However, we performed trend analysis on reports of incidents and grievances the BOP collected to determine any significant differences in total numbers from FY 2011 through FY 2013 for the three contract prisons we visited. At one contract prison, we found that reports of incidents had increased 192 percent from FY 2011 through FY 2013, yet monitors in the facility had not reported or analyzed the trend. We believe that such limited responses from onsite monitors may be the result of unclear expectations for determining, analyzing, and documenting trends on a monthly oversight tool. However, we found it troubling that the PMB's Assistant Administrator told us that he does not think it is necessary for the PMB to look at long-term trends. While the BOP's primary responsibility is to monitor the contractor, identifying and analyzing trends is crucial to enabling the BOP to identify potential problem areas that could affect inmate safety and security, to enhance monitoring efforts in those specific areas, and to notify the contractor to promptly identify causes and solutions.

Another vague observation step states: "The contractor is responsible for the movement of inmates within a 400-mile radius of the contract facility. Observe actual process of inmate movement." The observation step includes examples of inmate transportation; however, there is no guidance on what specifically should be observed and how often or how many times it should be observed.[74]

We also found that, due to such vague observation steps, onsite monitors varied in how they documented their observations and PFAs had inconsistent expectations regarding how onsite monitors were to complete the observation steps to ensure the contractor is performing in accordance with BOP standards. We showed the three regional PFAs examples of onsite monitors' documentation regarding the inmate movement observation step and asked whether the documentation met their expectations. Each PFA had a different understanding and expectation for what the observation step required and what they believed would be adequate documentation from the onsite monitors. As a result, their

---

[74] Following the OIG's 2015 Reeves County audit report, the BOP revised this observation step to include the words, "to ensure procedures are in accordance with contractual and policy requirements" (see Appendix 3 of the current report). However, the BOP's revision still does not specify how often or how many times the movements should be observed.

assessment of the adequacy of the onsite monitor's responses varied, as did the rationale for those assessments, an example of which is shown in Table 4.

**Table 4**

**Onsite Monitor Response to an Observation Step and PFA Expectations from Onsite Monitors**

| Observation Step | Onsite Monitor Response | PFAs | | |
| --- | --- | --- | --- | --- |
| | | PFA 1 | PFA 2 | PFA 3 |
| The contractor is responsible for the movement of inmates within a 400-mile radius of the contract facility. Observe actual process of inmate movement. Examples of inmate/ transportation include, but are not limited to, outside medical care, funeral and bedside trips, transfer or movement to/from other government facilities and airlift sites. | The contractor escorted nine inmates in medical trips during this observation period.

The contractor is responsible for movement inside a 400-mile radius. The contractor has been making regular weekly scheduled transfers. The contractor also receives Self Surrenders. | The response is inadequate. The onsite monitor should observe an actual inmate movement. | The response is inadequate. The PFA would expect to see if policies were followed, if there were any concerns, and any security considerations. | The response is adequate because the onsite monitor recorded what they observed. |

Sources: Large Secure Adult Contract Oversight Checklist and OIG interviews with PFAs

We also found observation steps that were repetitive. One observation step stated: "Review the results of internal/external audits conducted during this period. Determine if corrective action has been implemented as reported by contractor. This includes a sampling of corrective actions to the CFM, ACA, and corporate audits." Another observation step stated: "List all internal/external audits conducted this period." These two observation steps required onsite monitors to review the same audit documents. During the OIG audit of the Reeves County contract prison, auditors were told that having these duplicative observation steps was confusing to the monitors, with the result that the monitors did not fully complete the steps.[75]

In our 2015 audit report on the Reeves County contract prison, we recommmended that the BOP consider consolidating the two quality control observation steps in the checklist into a single observation step, as well as consider reviewing and updating guidance provided to PMB field staff to ensure the onsite monitors provided accurate and complete information in their monthly checklists. In response, the BOP combined the two repetitive observation steps into one observation step on the checklist and drafted guidance to PMB field staff to ensure that the checklist was accurate and complete. While the recommendation in the 2015 report did not ask the BOP to revise the whole checklist, the BOP chose to do

---

[75] DOJ OIG, *Audit of the Federal Bureau of Prisons Contract No. DJB1PC007,* 30.

Case 3:16-cv-02267    Document 361-29    Filed 11/20/20    Page 5 of 47 PageID #: 14715

so. We believe that, although the BOP addressed the recommendation in the 2015 report by updating the checklist, it still should address some of the observation steps that are vague, such as how monitors are supposed to analyze trends and monitor inmate movement.

<u>The BOP Lacks a Regular, Substantive Review Process for the Oversight Checklist to Ensure that Observation Steps Verify Contract Compliance</u>

Although the checklist is one of the tools the PMB onsite staff uses to monitor contractor compliance and performance, it is not substantively reviewed on a regular basis to ensure that it is the most effective and efficient tool possible. We found that the PMB does not ensure its observation steps represent the most important activities that onsite monitors should observe to ensure contract compliance. The PMB Administrator told us that the PMB reviews the operating procedures annually and that the checklist is an attachment to those operating procedures. However, the PFAs stated that revisions to the checklist usually occur only in response to a significant incident. For example, one PFA said that in 2012 the PMB added an observation step to the checklist to require the onsite monitors to review video recordings of SHUs in the aftermath of a suicide in one contract prison. We found that the checklist was last updated in 2012 in response to this and other incidents at contract prisons and has not been updated since then.[76] As a result of the lack of regular, substantive review of the oversight checklist, the BOP cannot be certain that the observation steps in its primary onsite monitoring tool effectively verify contractor compliance.

In response to the Reeves audit report, the BOP updated the checklist and provided additional guidance to PMB field staff to ensure the checklist is filled out accurately and completely. Additionally, in response to a working draft of this report, the BOP stated that the regional PFA reviews the checklist monthly to ensure the onsite monitors complete each observation step. When comments or concerns arise, the PFA annotates such by the affected step.[77] PFAs present and address appropriate information obtained from checklist during weekly PMB Administrator meetings. While the BOP's action is commendable, we believe that the BOP should review the checklist regularly and proactively, rather than reactively, such as in response to a significant incident, to determine whether the observation steps need updating.

---

[76] A PFA told us that the PFAs and BOP management planned to discuss whether the contractors' quality control programs and the BOP's Quality Assurance Plan are doing what they want, including whether the observation steps in the checklist and onsite monitor responses to the observation steps are appropriate. The PMB planned to hold this discussion in December 2014 but delayed the meeting so that it could consider the results of this review during that process.

[77] The BOP provided the OIG with a copy of an annotated checklist. According to the BOP, there is no policy or guidance regarding the reviewing and revising of the checklist. The updating of the checklist is done on an as-needed basis.

<u>Onsite Monitors at the Contract Prisons We Visited Did Not Use the
Monitoring Logs to Track Contractors' Corrective Actions</u>

When the BOP identifies deficiencies in contractor performance through CFM reviews or notices of concern (NOC), the contractor must submit a corrective action plan to the onsite monitors. The PMB operating procedures require onsite monitors to maintain monitoring logs to track and review the results of internal and external audits required by each contract. We found that onsite monitors in the three contract prisons we visited did not consistently use monitoring tools such as the monitoring logs to document whether the contractor had successfully corrected deficiencies identified by external audits.

Additionally, the onsite monitors received the results of the contractors' internal quality control audits but did not regularly document on the monitoring logs whether the contractors had corrected those deficiencies. One onsite monitor told us that he would take it as "gospel" if the contractor told him it had found and corrected deficiencies during its monthly internal audits.

Our 2015 report on the Reeves County contract prison found that onsite monitors were not using monitoring logs to document their monitoring and follow-up on the contractor's corrective actions. We recommended that the BOP take steps to ensure that PMB field staff at Reeves County document its follow-up efforts to ensure that the contractor's corrective actions are monitored and addressed in a timely manner. In response to the OIG's recommendations, the BOP has incorporated the functions of the monitoring log into the checklist to include an observation step for documenting follow-up efforts on corrective actions. We believe that the BOP's actions will help ensure the onsite staff tracks corrective actions consistently.

*Monitoring of Health Services for Contract Compliance Lacks Coordination among BOP Staff Responsible for Health Services Oversight*

One major area of concern with the BOP's monitoring of contract prison facilities is whether inmates are receiving adequate medical care. Four separate oversight activities regarding contract prison health services involve both medical and nonmedical specialists. These oversight activities are: (1) ongoing PMB onsite monitoring of contract compliance, including health services; (2) annual reviews by the PMB's HSS; (3) an annual CFM review, which includes a physician who evaluates the health services operations; and (4) contract physician mortality reviews of each contract prison inmate death when it occurs.[78] We found that communication between staff responsible for these oversight activities is limited, that they do not routinely share the results of the various reviews, and that no one person or office reviews the monitoring results. Additionally, while the onsite

---

[78] When an inmate dies in a contract prison, within 24 hours the contractor is required to conduct a mortality review and submit to the BOP a written report that includes a clinical synopsis of events leading up to the death. BOP policy then requires that a physician external to the BOP independently review the contractor's mortality review. The BOP's mortality reviews are the responsibility of the HSD.

monitors generally receive the results of the HSS and CFM reviews as well as the results of individual mortality reviews performed by the BOP's contract physician, we found that there are no procedures for them to require corrective action from the contractor when the BOP's contract physician identifies deficiencies during an individual mortality review. This resulted in deficiencies going uncorrected for extended periods. Accordingly, we determined that the BOP is unable to effectively identify problem areas among the contract prisons or contractors or to proactively take action before a problem becomes acute or systemic.

In order to ensure that inmates in contract facilities are getting appropriate healthcare, it is vital that health services information be shared among the PMB's onsite monitors, the Program Review Division's CFM physician, the PMB's HSS, and the BOP's contract physician in the HSD. The PMB's operating procedures state that "PMB staff is encouraged to maintain an open dialog with CFM staff and provide correspondence highlighting any problems or concerns." However, we identified instances in which health services information sharing was not occurring. For example:

- The HSS shares responsibility for coordination and oversight of the delivery of health services in contract prisons and, among other duties, is responsible for providing professional guidance to contract prison medical staff and developing procedures that describe how medical care of inmates is assessed, evaluated, and documented. However, we found that at the time of our review the HSS responsible for overseeing the delivery of health services in all of the contract prisons did not have input into the development of the health services observation steps in the checklist used by the onsite monitors; was unfamiliar with the checklist; and did not receive monthly copies of completed checklists from the onsite monitors.[79]

- The CFM physician and the BOP's contract physician both review the contractor's procedures and the circumstances surrounding inmate deaths at the contract prisons for the required mortality review. However, the CFM physician told the OIG that he is unsure whether the BOP's contract physician reviews all of his reports and he has never seen any of her reports.

Further regarding mortality reviews, we found that: (1) there are no procedures or guidance for the onsite monitors to require corrective action from the contractor when the BOP's contract physician identifies deficiencies and (2) the BOP's CFM physician, instead of the BOP's contract physician, was conducting the contract prisons' mortality reviews, which is inconsistent with the requirements in the contract. According to the contract, the BOP must have an external physician consultant to review all mortality records quarterly. The contract also states that, if

---

[79] In response to a working draft of this report, the BOP informed us that when the PMB revised the checklist following the OIG's 2015 report on the Reeves County contract prison, the HHS did provide input into the checklist revisions. The BOP further informed us that, "Any concerns identified by oversight staff regarding health services from the checklist steps are often discussed by field staff with the HSS and PFA to determine the level of non-compliance and what action(s) should be taken. All future revisions to the health services component on the checklist will include the HSS."

the external consultant (the BOP's contract physician) recommends improvement action, the contractor must address each recommendation and report any actions taken to the BOP Medical Director within 90 days of receiving the recommendations. When mortality reviews identified deficiencies, the reviewing CFM physician did not provide the onsite monitors with guidance on what corrective actions they should require from the contractor.[80] We found examples at both the Eden Detention Center and the Rivers Correctional Institution where the reviewing CFM physician had cited deficiencies, such as delayed or incomplete treatment, in the contractors' medical management or protocols surrounding an inmate death. In one instance, when an inmate had trouble breathing, the contract prison medical staff told him to place a sick call, which would put him on a list of inmates waiting to be seen by medical personnel instead of being treated immediately. However, after he died, the mortality reviews showing this deficiency gave the onsite monitors no guidance on what steps to take to require corrective action. As a result, contractor deficiencies went uncorrected and corrective actions were delayed at both facilities.[81] Delaying corrective action increases the likelihood that deficiencies identified in a mortality review could be repeated, thus putting other inmates at risk.[82]

We believe that the communication among the PMB, the Program Review Division, and the HSD needs to be improved, and that the roles of those responsible for ensuring health services are provided to federal inmates housed at contract prisons should be more clearly defined. Without proper information sharing and coordination in the oversight of health services at the contract prisons, there is the risk to inmates from healthcare deficiencies that may not be identified or addressed in a timely fashion, as well as a significant potential for wasted resources such as time and costs in the BOP's duplication of efforts. The latter may also result in the BOP paying for duplicate services or for services that are not actually provided.[83]

In response to a working draft of this report, the BOP stated that there is ongoing communication between those responsible for determining whether

---

[80] By contrast, when the CFM physician finds deficiencies related to inmate deaths during the annual CFM review, the onsite monitors must require corrective action from the contractor.

[81] An onsite monitor told us he had discussed the mortality review results with his supervisor, a PFA; but they decided not to issue a NOC because it was the reviewing physician's word against the contractor staff physician's and they did not have the medical expertise to judge between them. Rather, they decided to wait until the next annual CFM review for a determination of whether to require corrective action from the contractor.

[82] In response to a working draft of this report, the PMB Administrator told us that since April 2015 the CFM physician is no longer conducting the mortality reviews and that the contract physician is conducting all mortality reviews for both BOP institutions and contract prisons. The contract physician now writes recommendations for deficiencies found during the mortality review, as required by the statement of work. According to the BOP, the contract physician has conducted a total of six mortality reviews since April 2015. Of the six reviews conducted, one contained a recommendation.

[83] The Government Accountability Office (GAO) found that insufficient monitoring of corrective actions in BOP institutions leads to repeated deficiencies and significant findings that weaken the BOP's opportunity to maximize cost savings in correctional services. GAO, *Bureau of Prisons: Information on Efforts and Potential Options to Save Costs,* GAO-14-821 (September 2014) (accessed July 28, 2016).

Case 3:16-cv-02267    Document 361-29    Filed 11/20/20    Page 9 of 47 PageID #: 14719

healthcare requirements are being met in the BOP's contract prisons. The PMB Assistant Administrator, Field Operations, supervises the HSS and ensures CFM follow-up visits and quarterly reports are completed in a timely manner. The Assistant Administrator also provides guidance regarding PMB policy and operations, as well as administrative support, including travel and equipment authorizations. In addition, the HSS communicates freely with the HSD regarding any matters involving medical services at contract prisons.[84] The HSS reviews the CFM reports and working papers generated by the CFM physician and CFM Health Services Examiner. The HSS uses the CFM reports and working papers to focus the scope of the CFM follow-up site visits. The CFM staff is available to clarify any items in the CFM reports; however, according to the BOP, the need for clarification has been minimal since the CFM reports have proven to be thorough and unambiguous.

---

[84] The BOP stated that the HSS has worked closely with several staff in the HSD, including the Medical Director, Assistant Director, Senior Deputy Assistant Director, National Health Services Administrator, Assistant National Health Services Administrator, Chief of Quality Management, National Infection Control Consultant, Chief Social Worker, Chief Psychiatrist, Chief of Medical Designations, Regional Medical Director, Regional Quality Managers, Regional Social Workers, and Regional Counsel.

43

# CONCLUSION AND RECOMMENDATIONS

## Conclusion

The BOP's mission is to protect society by confining federal offenders in correctional facilities that are safe, humane, cost-efficient, and secure, and to provide reentry programming to ensure their successful return to the community. To carry out this mission, the BOP relies on contract prisons to house federal inmates and help alleviate overcrowding at its own institutions. To ensure these prisons house inmates in a safe and secure environment and that they comply with their contracts, the BOP has developed a multilayered approach to monitoring them.

In a majority of the categories we examined, we found that contract prisons incurred more safety and security incidents per capita than comparable BOP institutions and that the BOP could improve its contract monitoring efforts in several areas. Our analysis of data on safety and security indicators found that contract prisons had more incidents per capita than BOP institutions in three-quarters of the categories we examined. While the contract prisons had fewer positive inmate drug tests and sexual misconduct allegations than BOP institutions, they had more frequent incidents of contraband finds, assaults, uses of force, lockdowns, guilty findings on inmate discipline charges, and selected categories of grievances. Neither we nor the BOP know the extent to which demographic factors play a role in these differences; but, in order to ensure that federal inmates are housed in safe and secure facilities, the BOP should evaluate why contract prisons had more safety and security incidents in these categories and identify possible approaches for corrective action.

The three contract prisons we visited were all cited for one or more safety and security deficiencies during the review period. Because the contractors corrected the deficiencies the BOP had found, the BOP determined that the prisons were sufficiently compliant with the safety and security aspects of their contracts to continue their contracts with them. However, the BOP still must improve its oversight to ensure that federal inmates' rights and needs are not placed at risk when they are housed in contract prisons. We also found that contract prisons we visited housed new inmates in Special Housing Units, inconsistent with American Correctional Association standards and BOP policy. The OIG brought this to the BOP's attention, and the BOP immediately took corrective actions to address it.

In addition to the current review, in April 2015, the OIG issued an audit report on the Reeves County contract prison that included findings and recommendations related to the BOP's monitoring of all contract prisons. Throughout this report, we note several corrective actions the BOP has taken to improve its monitoring of contract prisons in response to the OIG's 2015 audit report, including in the areas of health and correctional services. We also note several steps the BOP has taken in response to concerns identified in that report. Commendable as these steps are, we identified in this review additional areas in the

BOP's monitoring of its contract prisons that could be improved. First, as a monitoring tool to ensure compliance with BOP policy and contract requirements, onsite monitors use the Large Secure Adult Contract Oversight Checklist (checklist) of observation steps related to each operational area established in the contact. However, the checklist does not address certain important policy and contract requirements in the areas of health and correctional services. For health services, the checklist does not include observation steps to verify that inmates receive a number of basic medical services. Similarly, for correctional services, the checklist does not include observation steps to address policy requirements related to some of the contracts' vital functions, such as providing an adequate security inspection system. Deficiencies related to contract prisons' security inspection systems could jeopardize the safety and security of inmates and prison staff, and the BOP should address them promptly.

Finally, we found that the checklist contains vague observation steps, which may cause confusion and may result in onsite monitors not fully completing the observation steps. With more specific observation steps and clearer expectations for how onsite monitors should document their observations, the BOP could better ensure accurate and consistent monitoring of each contract prison. Moreover, the BOP should review the checklist regularly and proactively, rather than reactively, such as in response to a significant incident, to reflect the most important activities for contract compliance and determine whether the observation steps need updating.

## Recommendations

To ensure that the contract prisons are, and remain, a safe and secure place for housing federal inmates, we recommend that the BOP:

1. Convene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions in a number of key indicators, and identify appropriate action, if necessary.

To improve monitoring and oversight of BOP contract prisons, we recommend that the BOP:

2. Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.

3. Ensure that correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.

4. Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

45

# METHODOLOGY OF THE OIG REVIEW

In this review, the OIG examined the BOP's monitoring of its 14 private contract prisons from FY 2011 through FY 2014. We also examined how the contractors performed in selected areas related to inmate safety and security and how the contract prisons compared to similar BOP institutions on those indicators. Our fieldwork, from April 2014 through February 2015, included interviews, site visits to three contract prisons, data analysis, and document reviews. The following sections provide additional information about our methodology.

**Interviews**

We interviewed 16 BOP officials and staff with roles in overseeing and monitoring contract prisons, as well as an external medical consultant. From the Correctional Programs Division's Privatization Management Branch (PMB), we interviewed the Administrator, an Assistant Administrator, two Intelligence Specialists, a Disciplinary Hearing Officer Specialist, a Health Services Specialist, and three Privatization Field Administrators. From the Program Review Division, we interviewed a Medical Officer. We also interviewed the Chief of the Quality Management Branch within the Health Services Division.

During our site visits, we interviewed five PMB onsite monitors and one Contracting Officer. The PMB briefed us on its role in managing and monitoring the contract prisons. We also interviewed 34 contract prison staff, including Wardens, Assistant Wardens, Chiefs of Security, intelligence staff, Special Housing Unit (SHU) staff, Disciplinary Hearing Officers, grievance coordinators, unit managers, counselors, case managers, compliance and quality assurance managers, and an interpreter. Finally, we interviewed 28 contract prison inmates, including 10 housed in SHUs at the time of our interviews.

**Site Visits**

We visited three contract prisons, one from each private contractor: Giles W. Dalby Correctional Facility (Management and Training Corporation (MTC)), Eden Detention Center (Corrections Corporation of America (CCA)), and Rivers Correctional Institution (GEO Group (GEO)). We selected our site visits based on a comparison of data analysis results from the 14 contract prisons for FY 2011 through FY 2013 (FY 2014 data was not yet available at the time of the site selection analysis). We requested and received from the BOP data in eight categories we considered indicators of prison safety and security:

1. contraband,
2. reports of incidents,[85]

---

[85] In this category we analyzed assaults by inmates on inmates, assaults by inmates on staff, sexual assaults by inmates on staff, deaths, fights, cell fires, suicide attempts and self-mutilation (combined), suicides, disruptive behavior, and uses of force.

3. lockdowns,
4. inmate discipline,
5. telephone monitoring,
6. grievances,
7. urinalysis drug testing, and
8. notices of concern (NOC).

We selected these categories of data to analyze as potential safety and security indicators because they provided information on areas addressed by American Correctional Association (ACA) standards on security and control, inmate rules and discipline, and inmate rights. Additionally, these data were tracked by the contract prisons.

For each type of data, we calculated monthly or annual averages per capita, then ranked the 14 contract prisons from the highest to lowest averages. Each prison that fell in the highest three averages on a measure was assigned three, two, or one points, respectively, for that measure based on whether it had the first, second, or third highest average. Additionally, we weighted some data categories that we deemed to be of greater significance for security by adding an additional point to those already given by the rankings (that is, those categories received four, three, or two points, respectively).[86] We then ranked each contract prison based on how many points it received and selected the contract prisons that received the most points from each of the three contractors for our site visits.

During the site visits, we toured the contract prisons, including the SHUs; interviewed staff and inmates; attended staff meetings; reviewed log books; and observed the activities of staff and inmates. Below is a brief profile of each contract prison at the time of our site visits.

*Giles W. Dalby Correctional Facility (Dalby)*

MTC operated the Dalby Correctional Facility in Post, Texas. As of the end of FY 2014, the prison housed an average of 1,800 inmates daily. The average age of inmates at Dalby was 38, and its average sentence length was 59 months. The top three inmate offenses at Dalby were drug trafficking (47 percent), immigration (47 percent), and violence (3 percent). At the time of our review, the staff-to-inmate ratio was 1:6 and the Correctional Officer ratio was 1:11. Dalby's overall staffing was at 92 percent; its Correctional Officer staffing was at 91 percent; and its medical staffing was at 90 percent. Dalby provided specialized vocational classes such as electrical trade, building trade, and computer-assisted drafting. Dalby offered inmate programs that exceeded the minimum requirement of its contract.

---

[86] The weighted categories were contraband, selected types of incident reports, lockdowns, discipline, selected types of grievances, positive drug tests, and NOCs.

*Eden Detention Center (Eden)*

CCA operated the Eden Detention Center in Eden, Texas.  As of the end of FY 2014, the prison housed an average of 1,458 inmates daily.  The average age of inmates at Eden was 39, and its average sentence length was 67 months.  The top three inmate offenses at Eden were drug trafficking (48 percent), immigration (46 percent), and violence (3 percent).  At the time of our review, the staff-to-inmate ratio was 1:6 and the Correctional Officer ratio was 1:9.  Eden's overall staffing was at 89 percent; its Correctional Officer staffing was at 87 percent; and its medical staffing was at 78 percent.  Specialized inmate programs included eyeglass repair, crocheting, and computer classes.  Like Dalby, Eden offered inmate programs that exceeded the minimum requirement of its contract.

*Rivers Correctional Institution (Rivers)*

GEO operated the Rivers Correctional Institution in Winton, North Carolina.  As of the end of FY 2014, the prison housed an average of 1,414 inmates daily.  The average age of inmates at Rivers was 40, and its average sentence length was 86 months.  The top three inmate offenses at Rivers were drug trafficking (43 percent), immigration (18 percent), and violence (20 percent).  At the time of our review, the staff-to-inmate ratio was 1:4 and the Correctional Officer ratio was 1:9.  Rivers' overall staffing was at 96 percent; its Correctional Officer staffing was at 94 percent; and its medical staffing was at 92 percent.  Specialized inmate programs included commercial driver's license, building construction technology, and computer applications.  In addition, Rivers offered a work program whereby inmates repaired used wheelchairs to be sent to people in need around the world.  Since Rivers housed inmates to be released and returned to the Washington, D.C., area, it also had reentry and drug abuse programs.  Like Dalby and Eden, Rivers offered inmate programs that exceeded the minimum requirement of its contract.

**Data Analysis**

We analyzed security-related data from the 14 contract prisons and a select group of 14 comparable BOP institutions to evaluate how the contract prisons performed relative to the selected BOP institutions.  The comparable BOP institutions housed male inmates with the same security level (low), similar population sizes, and similar geographical locations as the 14 contract prisons.[87]  For our comparison, we used BOP institutions in the following locations:

- Allenwood (Pennsylvania),
- Bastrop (Texas),
- Beaumont (Texas),
- Big Spring (Texas),
- Butner (North Carolina),

---

[87] Most of the contract prison inmates were criminal aliens, and many were serving time for immigration offenses; most of the inmates in the BOP institutions were U.S. citizens.

- Elkton (Ohio),
- Forrest City (Arkansas),
- La Tuna (Texas),
- Loretto (Pennsylvania),
- Oakdale (Louisiana),
- Seagoville (Texas),
- Terminal Island (California),
- Texarkana (Texas), and
- Yazoo City (Mississippi).

To conduct our analysis, we requested from the BOP eight categories of data from FY 2011 through FY 2014:

1. contraband,
2. reports of incidents,[88]
3. lockdowns,
4. inmate discipline,
5. telephone monitoring,
6. grievances,
7. urinalysis drug testing, and
8. sexual misconduct.

We selected these categories of data to analyze as potential safety and security indicators because they provided information on areas addressed by ACA standards on security and control, inmate rules and discipline, and inmate rights, and because these data were tracked by both the contract prisons and the BOP institutions.

For the contract prisons, a primary source of data for monthly inmate population snapshots, cell phone confiscations, reports of incidents, telephone monitoring, and urinalysis drug testing was the PMB Special Investigative Supervisor Monthly Tracking and Monitoring Report, which consolidated the monthly intelligence reports the individual contract prisons submitted to the PMB. The individual contract prisons provided data to the BOP on confiscations of contraband drugs, tobacco, and weapons; lockdowns; and grievances. The BOP provided information on BOP institutions and on inmate discipline in both BOP and contract prisons. Its sources included SENTRY, TRUINTEL (for confiscations of contraband drugs, tobacco, and weapons), and its annual Cell Phones Recovered reports (for confiscations of contraband cell phones). The BOP's Office of Internal Affairs provided data on allegations of sexual misconduct by staff against inmates for both the contract prisons and the BOP institutions.

Since the contract prisons and BOP institutions had a range of inmate population sizes that varied from month to month, we adjusted for these population

---

[88] The specific types of reports of incidents we analyzed in this category included assaults by inmates on inmates, assaults by inmates on staff, sexual assaults by inmates on staff, deaths, fights, cell fires, suicide attempts and self-mutilation (combined), suicides, disruptive behavior, and uses of force.

49

differences by calculating rates per capita where possible. As of September 2014, the combined inmate population of the 14 contract prisons was 27,987 and the combined population of the 14 BOP institutions was 22,562. In most cases we calculated the average annual rate per capita, or, where monthly data was available, the average monthly rate per capita. Since the per capita figures often ranged from .001 to .00001, except where otherwise noted in the body of the report, we give per capita rates per 10,000 inmates to present the numbers in an accessible format. In some cases we also provided total numbers unadjusted for population differences to give the reader additional perspective on the scope of the data we analyzed.

To perform the analysis, we calculated both summary and average monthly or annual per capita figures for each prison, the aggregate for both contract prisons and BOP institutions, and the same figures for all contract prisons by each of the three contractors. We also compared the data analysis results between individual contract prisons by examining how often each prison fell in the highest or lowest three on each indicator. To calculate the averages per capita, we used monthly and annual population snapshot data the BOP provided for each contract prison and BOP institution. To calculate percentage differences between various indicators for our comparisons between the contract prisons and BOP institutions, we used a standard formula to divide the difference between the two numbers by their average. That is, where the first value is $x$ and the second value is $y$, we used the formula $[(x-y)/([x+y]/2)]*100$. We present the results of the analysis in the color-coded Table 8 in Appendix 7. In Table 8, we designate as "roughly equal" those indicators where the average difference per 10,000 inmates times the number of months or years comprised less than 3 percent of the total number of occurrences over the 4-year period.

**Document Review**

We reviewed BOP and contractor documents, including the contracts established between the BOP and each contractor, program statements, policy documents, operating procedures, quality assurance plans, quality control plans, monthly intelligence reports, personnel position descriptions, performance work plans, contractor staffing plans, and Contractor Performance Assessment Reporting System reports. We also reviewed BOP onsite contract monitoring documents including monthly checklists, monthly performance meeting minutes, monthly logs, annual and semiannual performance reports, contractor self-assessments, Contract Facility Monitoring (CFM) reports, NOCs, letters of inquiry, and summaries of corrective actions in response to CFM deficiencies and NOCs. From the contract prisons, we reviewed sample reports of incidents, use-of-force after-action reports, contractor internal audit reports, inmate grievances, grievance logs and grievance summary reports, Disciplinary Hearing Officer reports, discipline logs, SHU reports, SHU logs, intelligence meeting minutes, and institutional intelligence reports. Finally, in the area of health services, we reviewed screenshots and tutorials from electronic recordkeeping systems, mortality reviews for contract prison inmate deaths, and CFM working papers.

# CONTRACT PERFORMANCE REQUIREMENTS AND VITAL FUNCTIONS

Table 5 lists each contract requirement and the vital functions essential to successful performance, summarizes the vital functions, and specifies the percentage of total contract value attributable to each contract requirement.

**Table 5**

**Performance Requirements Summary**

| CONTRACT REQUIREMENT: ADMINISTRATION (Quality Control) | 10% |
|---|---|
| Vital Function #1 | The contractor's Quality Control Program serves to identify deficiencies in the quality of services throughout the entire scope of the contract and implements corrective action before the level of performance becomes deficient. |

| CONTRACT REQUIREMENT: CORRECTIONAL PROGRAMS (Unit/Case Management, Grievance Procedures) | 10% |
|---|---|
| Vital Function #2 | Inmates are appropriately classified and managed commensurate with security and custody requirements to promote institution and public safety. |
| Vital Function #3 | Staff evaluates the needs of inmates and manages their program participation. |
| Vital Function #4 | Staff is accessible and communicates effectively with inmates to promote positive institutional adjustment. |
| Vital Function #5 | A program for inmate grievances exists, which provides for the expression and resolution of inmate problems. |

| CONTRACT REQUIREMENT: CORRECTIONAL SERVICES (Security/Control/Inmate Accountability/ Computer Security and Information Systems) | 20% |
|---|---|
| Vital Function #6 | A safe and secure environment is provided for staff and inmates through effective communication of operational concerns. This includes verbal and written instructions, post orders, institution supplements, information dissemination, training, and crisis prevention. |
| Vital Function #7 | Intelligence information related to security concerns is gathered for dissemination to appropriate contract and BOP staff. |
| Vital Function #8 | An adequate security inspection system is provided to meet the needs of the institution. |
| Vital Function #9 | An adequate level of emergency readiness is maintained to respond to institution emergencies. |
| Vital Function #10 | Appropriate operational and security requirements applicable to all computer and information systems are maintained. |

| CONTRACT REQUIREMENT: FOOD SERVICE | 15% |
|---|---|
| Vital Function #11 | Policy, procedures, and practices are in place for a safe, secure, and sanitary environment. |
| Vital Function #12 | Meals are nutritionally adequate, properly prepared, and attractively served. |
| Vital Function #13 | Policy, procedures, and essential resources are identified, developed, and managed to meet the operational needs of the Food Service Program. |

51

## Table 5 (Cont'd)

| CONTRACT REQUIREMENT: | HEALTH SERVICES | 15% |
|---|---|---|
| Vital Function #14 | Open access to healthcare is provided for all inmates in an environment that is safe and secure. | |
| Vital Function #15 | Quality healthcare is provided utilizing qualified personnel and resources in accordance with applicable standards. | |
| Vital Function #16 | Health information data is recorded accurately, legibly, in a timely manner and maintained in accordance with applicable BOP policy. | |
| Vital Function #17 | All inmates are screened for mental health, substance abuse, and other behavioral problems and receive appropriate intervention, treatment, and programs to promote a healthy, safe, and secure environment. | |

| CONTRACT REQUIREMENT: | HUMAN RESOURCES | 10% |
|---|---|---|
| Vital Function #18 | Adequate staffing levels are maintained. | |
| Vital Function #19 | Staff resources are properly administered and managed. | |
| Vital Function #20 | All resources are managed to ensure training requirements and needs are provided. | |

| CONTRACT REQUIREMENT: | INMATE SERVICES (Commissary/Laundry/Telephone/Trust Fund) | 15% |
|---|---|---|
| Vital Function #21 | Inmates are provided the privilege of an inmate telephone system and obtaining merchandise through the operation of a commissary. Effective security measures are in place to prevent misuse of the telephone system. | |
| Vital Function #22 | Inmate funds and property are properly maintained and accounted for during incarceration. | |
| Vital Function #23 | Clothing, linens, toiletries, and laundry services are provided to inmates. | |

| | (Education and Recreation Programs) | |
|---|---|---|
| Vital Function #24 | The needs of the inmate population are evaluated and General Educational Development, English as a Second Language, and recreational programs are provided. Programs are accessible for the inmate population, and program availability is communicated. | |

| | (Mail/Receiving and Discharge/Records) | |
|---|---|---|
| Vital Function #25 | The institution provides inmate mail services, which include timely processing and accountability of funds, special mail, and general correspondence. Special care is given to the detection of contraband and prohibited acts. | |
| Vital Function #26 | Inmates are lawfully committed and processed in a safe and secure environment, with emphasis on the detection and elimination of contraband from their persons and property. | |
| Vital Function #27 | The appropriate execution, processing, and verification of documents are performed to ensure the accurate and timely release of inmates. | |

| | (Religious Services) | |
|---|---|---|
| Vital Function #28 | Impartial religious leadership is provided through resources and programs to accommodate the free exercise of religion and diverse needs of inmates. | |

| CONTRACT REQUIREMENT: | SAFETY AND ENVIRONMENTAL HEALTH/FACILITIES | 5% |
|---|---|---|
| Vital Function #29 | All facilities are safely operated and maintained in accordance with applicable laws, codes, and regulations. | |

Source: BOP

Case 3:16-cv-02267   Document 361-29   Filed 11/20/20   Page 19 of 47 PageID #: 14729

# LARGE SECURE ADULT CONTRACT OVERSIGHT CHECKLIST OBSERVATION STEPS IN CORRECTIONAL AND HEALTH SERVICES

## Table 6

### Observation Steps in Correctional Services and Health Services

| No. | Sample Correctional Services Observation Steps |
|-----|------------------------------------------------|
| (1) | Observe to determine if the contractor is providing perimeter security in accordance with the contract. |
| (2) | Observe SHU [special housing unit] procedures during all three shifts and compare observations to contractor policy, practices, procedures, i.e., movement of inmate in appropriate restraints, property allowances, security practices, and visits by required staff. |
| (3) | The contractor is responsible for the movement of inmates within a 400-mile radius of the contract facility. Observe actual process of inmate movement to ensure procedures are in accordance with contractual and policy requirements. Examples of inmate/ transportation include, but are not limited to, outside medical care, funeral and bedside trips, transfer or movement to/from other government facilities, and airlift sites. |
| (4) | Observe vehicle sally port operations to determine if they are consistent with the contractor's policy and procedure manual. |
| (5) | Observe contractor's procedures for processing incoming packages and boxes to ensure they are in accordance with local policy. |
| No. | All Health Services Observation Steps |
| (1) | Observe access to health records and verify that access is controlled by the health authority. |
| (2) | In the event of an inmate death:<br><br>A. Did the contractor immediately notified BOP and submitted a written report within 24 hours,<br>B. Did the contractor obtained fingerprints of the deceased (right thumb or right index and dated & signed the fingerprint card and hand delivered the fingerprint card to the COR.<br>C. If death is due to violence, accident surrounded by unusual or questionable circumstances, or is sudden and the deceased has not been under immediate medical supervision did the contractor notify the coroner of the local jurisdiction to request review of the case, and if necessary, examination of the body.<br>D. Review contractor's records to determine if the deceased inmate's property was inventoried & forwarded to the designated family member, the nearest of kin, or the Consular Officer of the inmate's country of legal residence.<br><br>**Note: SSIM shall track the timely submission of the contractor's mortality review and follow up to ensure a response is received from Health Services Division.** |
| (3) | Review any allegations of sexual abuse/assault to ensure the procedures followed were in accordance with the BOP program statement. (Reported via 583, Sentry assignments keyed, follow ups conducted timely, etc) |

53

## Table 6 (Cont'd)

| No. | All Health Services Observation Steps (Cont'd) |
|-----|------------------------------------------------|
| (4) | Observe inmates housed in observation cells or cells in medical and determine if the:<br><br>A. Logs are maintained in accordance with contractor's policy?<br>B. Inmates are receiving services in a timely manner (i.e., food service, hospital rounds, etc.)?<br>C. Inmates on suicide watch are supervised in accordance with local procedures? |
| (5) | Observe Health Services staff interactions with inmates to determine if inmates are being afforded confidentiality, supervision in medical, etc. |
| (6) | Check bio-hazard procedures to ensure they are in accordance with contractor's policy. |
| (7) | Run a Chronic Care roster (SMDG eq N***/Column #4 SELD, #5 ARSD/Seq 4)  Determine if contractor is current with follow up care and appointments – any dates are past due. |

Note:  At the time of our review, the complete checklist contained nearly 70 observation steps in 8 categories, including the correctional services and health services steps listed here.  The BOP revised some of the observation steps in the checklist in response to the 2015 OIG audit on the Reeves County contract prison.  The red text above reflects some of the BOP's revisions.

Source:  BOP

# THE OIG'S MEMORANDUM TO THE BOP ON THE HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS



**U.S. Department of Justice**

Office of the Inspector General

July 28, 2014

MEMORANDUM FOR THE DEPUTY ATTORNEY GENERAL

CHARLES E. SAMUELS, JR.
DIRECTOR
FEDERAL BUREAU OF PRISONS

FROM:              MICHAEL E. HOROWITZ
                       INSPECTOR GENERAL

SUBJECT:         Housing of New Inmates in BOP Contract Institutions'
                     Special Housing Units for Extended Periods

In course of the ongoing review by the Office of the Inspector General (OIG) of the BOP's management of its private prison contracts, OIG staff recently visited two private contract facilities. During those visits, the OIG learned that both facilities were regularly housing newly received general population inmates in Special Housing Units due to space limitations in the general population. We further learned that these inmates are kept in Special Housing Units for extended periods of time until beds are available in the general population.

On July 8, 2014, an OIG review team visited the Giles W. Dalby Correctional Facility (Dalby) in Post, Texas. We found that all new inmates are placed directly in Administrative Segregation in the Special Housing Unit for an average of 20 days, pending available bed space in the general population.

On July 14, 2014, our review team visited the Eden Correctional Institution (Eden) in Eden, Texas, and learned from institution staff that the same practice was occurring there. As of July 16, 2014, 71 of 100 inmates in the Special Housing Unit were new inmates awaiting a bed in the general population. According to the Warden, new inmates at Eden spend an average of 25 days in the Special Housing Unit waiting for beds in the general population.

Institution management and staff at both Dalby and Eden told us that these new inmates did not engage in any conduct that warranted their placement in the Special Housing Unit. Thus, even though these new inmates have not been determined to pose a threat to themselves, other inmates, or to

55

the security of the institution, they are subject to the same security measures as inmates who have been assigned to Administrative Segregation for specific, security-related reasons. These security measures include limiting telephone calls and all program services available in the general population due to the restrictive physical design and location of a segregation unit.

According to institution management and BOP staff, the private contract institutions are housing new inmates in the Special Housing Units because both the BOP and its contractors have interpreted language in their contracts as permitting Special Housing Unit beds to be counted as part of the general population bed count, rather than as a separate category. Moreover, Eden's Statement of Work within the contract states, "The contractor does not have a right of refusal and shall accept all designations from the BOP."[1] We have been told that the BOP sends new inmates to Eden because they appear to have available beds even though they are actually in a Special Housing Unit, and the contract institution cannot refuse to accept these new inmates.

While this practice may not be a violation of the BOP contract, Wardens at both Dalby and Eden told us that it is not good correctional practice. Moreover, the American Correctional Association (ACA), which must accredit contract institutions, states that special management units such as Special Housing Units are appropriate for "inmates who threaten the secure and orderly management of the institution."[2] The ACA does not recognize the use of Administrative Segregation to house new general population inmates due to a lack of bed space in the general population.[3]

We are providing this information to the Department and BOP leadership so that it can consider whether to undertake corrective action while our review is ongoing. Please advise us within 60 days of the date of this memorandum of any actions the Department has taken or intends to take regarding the issues discussed in this memorandum. If you have any questions or would like to

---

[1] Contract facilities operate according to a Statement of Work or a Performance Work Statement that outlines the requirements for operating under the contract.

[2] *Standards for Adult Correctional Institutions*, 4th edition, American Correctional Association (July 1, 2003), p. 69.

[3] ACA Standard 4-4249 states, "When segregation units exist, written policy and procedure govern their operation for the supervision of inmates under administrative segregation, protective custody, and disciplinary detention." The ACA describes segregation as encompassing "administrative segregation, protective custody, and disciplinary detention." It defines administrative segregation as a special unit where inmates are placed because their "continued presence in the general population poses a serious threat to life, liberty, self, staff, or other inmates, or to the security or orderly running of the institution."

2

discuss the information in the memorandum, please contact me at (202) 514-3435.

cc:    Carla Wilson
        Chief of Staff
        Federal Bureau of Prisons

        Sara M. Revell
        Assistant Director
        Program Review Division
        Federal Bureau of Prisons

        Paul Layer
        Deputy Assistant Director
        Program Review Division
        Federal Bureau of Prisons

        Joe Pecoraio
        Deputy Administrator
        External Auditing Branch, Program Review Division
        Federal Bureau of Prisons

        Richard P. Theis
        Assistant Director, Audit Liaison Group
        Internal Review and Evaluation Office
        Justice Management Division

Case 3:16-cv-02267    Document 361-29    Filed 11/20/20    Page 24 of 47 PageID #: 14734

## THE BOP'S RESPONSE TO THE OIG'S MEMORANDUM ON THE HOUSING OF NEW INMATES IN SPECIAL HOUSING UNITS



**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*                           *Washington, D.C. 20534*

August 8, 2014

MEMORANDUM FOR MICHAEL E. HOROWITZ
                        INSPECTOR GENERAL
                        OFFICE OF INSPECTOR GENERAL

FROM:        Charles E. Samuels, Jr.
                Director
                Federal Bureau of Prisons

SUBJECT:     Response to the Office of Inspector General's
               (OIG) Request for Corrective Action Regarding
               <u>Housing of New Inmates in BOP Contract</u>
               <u>Institutions' Special Housing Units for Extended</u>
               <u>Periods</u>

I have received your memorandum dated July 28, 2014, regarding
<u>Housing of New Inmates in BOP Contract Institutions' Special
Housing Units for Extended Periods</u>. I take this matter very
seriously and am pleased to provide you with the following
information about the steps I have taken to assess and correct
the problems you have identified.

The facilities referenced in your letter, specifically,
Giles W. Dalby Correctional Facility and Eden Detention Center,
house many inmates serving short sentences and there are many
inmates transferring in and out daily. I have verified that new
commitments were often placed in the Special Housing Unit (SHU)
for a short period immediately upon arriving at the prison (the
stay in SHU generally did not exceed 25 days).

All inmates have been removed from SHU in the 14 private prisons
other than those who are subject to administrative detention or
disciplinary segregation. These inmates are now housed in a
general population environment. Moreover, we have stopped all
movement into the privates if such movement would have resulted
in placement in SHU. Nine of the 14 contracts were in

compliance prior to your letter and on August 1, 2014; the remaining five contracts were unilaterally modified to address this issue. Finally, all 14 contracts are now in compliance and prohibit SHU placement for inmates unless there is a need and a policy based reason to house them in administrative detention or disciplinary segregation.

A Senior Secure Institution Manager, a Secure Oversight Monitor, and a Contracting Officer are on-site at each private facility and will ensure contract compliance by conducting ad-hoc, systematic, and other reviews of on-site operations, especially regarding the placement of inmates in SHU.

I am confident these measures will address the concerns noted in your correspondence. If you require additional information, please contact me at (202) 307-3250.


cc:   James M. Cole
      Deputy Attorney General

2

# COMPARISON OF SECURITY INDICATORS AMONG CONTRACTORS

**Table 7**

**Comparison of Security Indicators among Contractors
FY 2011 − FY 2014**

| KEY | |
|---|---|
| **Red** | The Corrections Corporation of America's (CCA) contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Purple** | The GEO Group's (GEO) contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Blue** | The Management and Training Corporation's (MTC) contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |

| INDICATOR | | CONTRACTOR | | |
|---|---|---|---|---|
| | | **CCA** | **GEO** | **MTC** |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| *Contraband* | | | | |
| Cell Phones | Annual Average Confiscations per 10,000 Inmates | 314.6 | **462.1** | 31.3 |
| Drugs | Monthly Average Confiscations per 10,000 Inmates | 1.4 | **2.4** | 1.3 |
| Weapons | Monthly Average Confiscations per 10,000 Inmates | 2.3 | 3.2 | **5.0** |
| Tobacco | Monthly Average Confiscations per 10,000 Inmates | 0.8 | **4.8** | 0.7 |

60

## Table 7 (Cont'd)

| INDICATOR | | CONTRACTOR | | |
|---|---|---|---|---|
| | | **CCA** | **GEO** | **MTC** |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| ***Reports of Incidents*** | | | | |
| Assaults by Inmates on Inmates | Monthly Average per 10,000 Inmates | **4.1** | 3.6 | 1.5 |
| Assaults by Inmates on Staff | Monthly Average per 10,000 Inmates | 3.7 | **6.0** | 1.3 |
| Sexual Assaults by Inmates on Staff | Monthly Average per 10,000 Inmates | **0.15** | 0.07 | 0.11 |
| Deaths | Monthly Average per 10,000 Inmates | 0.3 | 0.4 | **0.5** |
| Fights | Monthly Average per 10,000 Inmates | **5.4** | 3.7 | 1.7 |
| Setting a Fire | Monthly Average per 10,000 Inmates | 0.1 | **0.2** | 0.1 |
| Suicide Attempts and Self-mutilation | Monthly Average per 10,000 Inmates | **1.1** | 1.0 | 0.5 |
| Suicides | Monthly Average per 10,000 Inmates | 0.055 | 0.000 | **0.064** |
| Disruptive Behavior | Monthly Average per 10,000 Inmates | 1.0 | **3.1** | 0.5 |
| Uses of Force (Immediate and Calculated) | Monthly Average per 10,000 Inmates | 4.3 | **5.9** | 1.8 |
| ***Lockdowns*** | | | | |
| Full and Partial Lockdowns | Total per Prison | 7.6 | **9.5** | 2 |

61

## Table 7 (Cont'd)

| INDICATOR | | CONTRACTOR | | |
|---|---|---|---|---|
| | | **CCA** | **GEO** | **MTC** |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| **Discipline** | | | | |
| Guilty Findings on Serious (100- and 200-Level) Disciplinary Incident Report Charges | Monthly Average per 10,000 Inmates | 70.7 | **92.1** | 60.2 |
| **Telephone Monitoring** | | | | |
| Inmate Phone Calls Monitored | Monthly Average Percentage of Calls Monitored | 8.7% | 7.6% | **5.8%** |
| **Grievances** | | | | |
| All Grievances | Monthly Average Submitted per 10,000 Inmates | 48.6 | 74.4 | **111.5** |
| Grievances in Selected Safety and Security Categories | Monthly Average Submitted per 10,000 Inmates | 18.4 | 28.2 | **65.6** |
| Complaints about Staff | Monthly Average Submitted per 10,000 Inmates | 7.1 | 9.6 | **30.3** |
| Conditions of Confinement | Monthly Average Submitted per 10,000 Inmates | 0.2 | 1.8 | **3.2** |
| Food | Monthly Average Submitted per 10,000 Inmates | 1.0 | 1.9 | **4.5** |
| Institutional Operations | Monthly Average Submitted per 10,000 Inmates | 0.0 | 0.9 | **3.6** |
| Medical and Dental Grievances | Monthly Average Submitted per 10,000 Inmates | 9.6 | 13.9 | **23.5** |

Case 3:16-cv-02267   Document 361-29   Filed 11/20/20   Page 29 of 47 PageID #: 14739

## Table 7 (Cont'd)

| INDICATOR | | CONTRACTOR | | |
| --- | --- | --- | --- | --- |
| | | CCA | GEO | MTC |
| | | Adams County, Cibola, Eden, McRae, Northeast Ohio | Big Springs, D. Ray James, Moshannon Valley, Reeves I & II, Reeves III, Rivers | Dalby, Taft, Willacy |
| *Grievances (Cont'd)* | | | | |
| Safety and Security | Monthly Average Submitted per 10,000 Inmates | 0.5 | 0.04 | 0.0 |
| Special Housing Unit | Monthly Average Submitted per 10,000 Inmates | 0.03 | 0.1 | 0.5 |
| *Urinalysis* | | | | |
| Percentage of Inmates Tested | Monthly Average Percentage Tested | 7.5 | 7.0 | 6.4 |
| Positive Drug Tests | Monthly Average per 10,000 Inmates | 2.0 | 2.3 | 1.6 |
| *Sexual Misconduct* | | | | |
| Allegations of Staff Sexual Misconduct against Inmates | Annual Average per 10,000 Inmates | 7.3 | 10.3 | 7.7 |
| Guilty Findings on Disciplinary Incident Charges of Inmate Sexual Misconduct against Inmates | Annual Average per 10,000 Inmates | 10.4 | 24.3 | 11.7 |

Source: OIG analysis of BOP and contractor data

Case 3:16-cv-02267   Document 361-29   Filed 11/20/20   Page 30 of 47 PageID #: 14740

# COMPARISON OF SECURITY INDICATORS BETWEEN CONTRACT PRISONS AND BOP INSTITUTIONS

## Table 8

**Comparison of Security Indicators between
Contract Prisons and BOP Institutions
FY 2011 – FY 2014**

| KEY | |
|---|---|
| **Purple** | Contract prisons had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Blue** | BOP institutions had a higher rate on this indicator (or, for telephone monitoring and drug testing, a lower average percentage). |
| **Green** | Contract prisons and BOP institutions were roughly equal on this indicator.  (See Appendix 1 for a further explanation of our criteria for determining this.) |

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| **Contraband** | | | |
| Cell Phones | 4-year Total | 4,849 | 400 |
| | Annual Average Confiscations per 10,000 Inmates | **317.1** | 38.3 |
| Drugs | 4-year Total | 220 | 330 |
| | Monthly Average Confiscations per 10,000 Inmates | 1.8 | **3.0** |
| Tobacco | 4-year Total | 397 | 214 |
| | Monthly Average Confiscations per 10,000 Inmates | **2.5** | 1.9 |
| Weapons | 4-year Total | 418 | 206 |
| | Monthly Average Confiscations per 10,000 Inmates | **3.2** | 1.8 |

64

## Table 8 (Cont'd)

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| *Reports of Incidents* | | | |
| Assaults by Inmates on Inmates | *4-year Total* | *423* | *289* |
| | Monthly Average per 10,000 Inmates | **3.3** | 2.5 |
| Assaults by Inmates on Staff | *4-year Total* | *526* | *184* |
| | Monthly Average per 10,000 Inmates | **4.2** | 1.6 |
| Sexual Assaults by Inmates on Staff | *4-year Total* | *13* | *2* |
| | Monthly Average per 10,000 Inmates | **0.1** | 0.02 |
| Deaths | *4-year Total* | *54* | *127* |
| | Monthly Average per 10,000 Inmates | 0.4 | **1.2** |
| Fights | *4-year Total* | *459* | *465* |
| | Monthly Average per 10,000 Inmates | **3.9** | **4.0** |
| Setting a Fire | *4-year Total* | *20* | *5* |
| | Monthly Average per 10,000 Inmates | **0.1** | 0.04 |
| Suicide Attempts and Self-Mutilation | *4-year Total* | *125* | *89* |
| | Monthly Average per 10,000 Inmates | **0.9** | **0.8** |
| Suicides | *4-year Total* | *4* | *4* |
| | Monthly Average per 10,000 Inmates | **0.03** | **0.03** |
| Disruptive Behavior | *4-year Total* | *256* | *274* |
| | Monthly Average per 10,000 Inmates | 1.8 | **2.4** |
| Uses of Force (Immediate and Calculated) | *4-year Total* | *548* | *455* |
| | Monthly Average per 10,000 Inmates | **4.5** | 3.8 |

65

**Table 8 (Cont'd)**

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| **Lockdowns** | | | |
| Full and Partial Lockdowns | 4-year Total | **101** | 11 |
| | Number of Facilities with Lockdowns | **12** | 6 |
| **Inmate Discipline** | | | |
| Guilty Findings on Serious (100- and 200-Level) Disciplinary Incident Report Charges | 4-year Total | 10,089 | 7,439 |
| | Monthly Average per 10,000 Inmates | **77.9** | 64.7 |
| **Telephone Monitoring** | | | |
| Inmate Phone Calls Monitored | Monthly Average Percentage of Calls Monitored | **7.6%** | 21.1% |
| **Grievances** | | | |
| All Grievances | 4-year Total | 8,756 | 14,098 |
| | Monthly Average Submitted per 10,000 Inmates | 72.6 | **121.5** |
| | Percent Granted | 8.1% | 5.2% |
| Grievances in Selected Safety and Security Categories | 4-year Total | 3,969 | 2,883 |
| | Monthly Average Submitted per 10,000 Inmates | **32.2** | 25.3 |
| Complaints about Staff | 4-year Total | 1,538 | 719 |
| | Monthly Average Submitted per 10,000 Inmates | **12.9** | 6.2 |
| Conditions of Confinement | 4-year Total | 161 | 134 |
| | Monthly Average Submitted per 10,000 Inmates | **1.5** | 1.2 |
| Food | 4-year Total | 247 | 133 |
| | Monthly Average Submitted per 10,000 Inmates | **2.1** | 1.2 |

## Table 8 (Cont'd)

| INDICATOR | | CONTRACT PRISONS | BOP INSTITUTIONS |
|---|---|---|---|
| **Grievances (Cont'd)** | | | |
| Institutional Operations | 4-year Total | *171* | *20* |
| | Monthly Average Submitted per 10,000 Inmates | **1.1** | 0.2 |
| Medical and Dental | 4-year Total | *1,800* | *1,609* |
| | Monthly Average Submitted per 10,000 Inmates | **14.3** | **14.1** |
| Safety and Security (Contract Prisons Only) | 4-year Total | 25 | *N/A* |
| | Monthly Average Submitted per 10,000 Inmates | **0.2** | **N/A** |
| Sexual Abuse or Assault (BOP Institutions Only) | 4-year Total | *N/A* | 9 |
| | Monthly Average Submitted per 10,000 Inmates | **N/A** | **0.07** |
| Special Housing Unit | 4-year Total | 27 | 259 |
| | Monthly Average Submitted per 10,000 Inmates | 0.2 | **2.4** |
| **Urinalysis Drug Tests** | | | |
| Percentage of Inmates Tested | Monthly Average | **7.1** | 8.1 |
| Positive Drug Tests | 4-year Total | 263 | 376 |
| | Monthly Average per 10,000 Inmates | 2.1 | **3.4** |
| **Sexual Misconduct** | | | |
| Guilty Findings on Disciplinary Incident Charges of Inmate Sexual Misconduct against Inmates | 4-year Total | 156 | 175 |
| | Annual Average per 10,000 Inmates | 16.6 | **18.1** |
| Allegations of Staff Sexual Misconduct against Inmates | 4-year Total | 97 | 139 |
| | Annual Average per 10,000 Inmates | 8.7 | **14.5** |

Source: OIG analysis of BOP and contractor data

Case 3:16-cv-02267   Document 361-29   Filed 11/20/20   Page 34 of 47 PageID #: 14744

# THE BOP'S RESPONSE TO THE DRAFT REPORT



**U.S. Department of Justice**

**Federal Bureau of Prisons**

_Office of the Director_        _Washington, D.C. 20534_

July 25, 2016

MEMORANDUM FOR NINA S. PELLETIER
                ASSISTANT INSPECTOR GENERAL
                OFFICE OF INSPECTOR GENERAL
                EVALUATION AND INSPECTIONS DIVISION

_Thomas R. Kane_

FROM:        Thomas R. Kane, Acting Director

SUBJECT:     Response to the Office of Inspector General's (OIG)
             DRAFT Report:  <u>OIG Review of the Federal Bureau of
             Prisons' Monitoring of Contract Prisons</u>, Assignment
             Number A-2014-003

The Bureau of Prisons (BOP) appreciates the opportunity to respond
to the open recommendations from the draft report entitled <u>OIG Review
of the Federal Bureau of Prisons' Monitoring of Contract Prisons</u>.
However, we continue to caution against drawing comparisons of
contract prisons to BOP operated facilities as the different nature
of the inmate populations and programs offered in each facility limit
such comparisons.  Despite this caution, the BOP agrees with the
recommendations as noted below.

## Recommendations

**Recommendation** 1.  Convene a working group of BOP subject matter
experts to evaluate why contract prisons had more safety and security
incidents per capita than BOP institutions in a number of key
indicators, and identify appropriate action, if necessary.

**Response:** The BOP agrees with this recommendation. A core group of subject matter experts will be selected to evaluate the rate of safety and security incidents per capita within the private contract facilities compared to other BOP institutions, and to determine appropriate action, if necessary.

**Recommendation** 2. Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.

**Response:** The BOP agrees with this recommendation. Guidance will be drafted regarding procedures to ensure Health Systems Specialists verify medical services are provided to inmates on a more frequent basis than bi-annually.

**Recommendation** 3. Ensure correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.

**Response:** The BOP agrees with this recommendation. Guidance will be drafted regarding procedures to ensure periodic validation of actual correctional officer staffing levels based on the approved staffing plan, to determine whether the contractor is meeting the required staffing levels.

**Recommendation** 4. Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

**Response:** The BOP agrees with this recommendation. A work group, to include subject matter experts, will convene annually to ensure appropriate trend analysis and updates to the checklist.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

2

# THE CONTRACTORS' RESPONSES TO THE DRAFT REPORT



America's Leader in Partnership Correctio
Federal R. Strical
Vice President. Partnership Development

August 8, 2016

Deputy Assistant Inspector General
U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division
Washington, D.C.

Dear ▮▮▮▮▮:

CCA appreciates the opportunity to review and comment on the Office of the Inspector General, U.S. Department of Justice (OIG's) draft report resulting from a review of the Federal Bureau of Prisons (BOP) monitoring of contract prisons. We share the interests of the OIG and the BOP in ensuring contract prisons are operated safely and securely and in compliance with contract requirements. We are also committed to working in partnership with the BOP to address any recommendations in furtherance of these goals.

The comments we would like to provide are regarding the section of the report titled "Contract Prisons Had More Safety and Security-related Incidents per Capita than BOP Institutions for Most of the Indicators We Analyzed." We appreciate the OIG's candor that "we were unable to evaluate all of the factors that contributed to the underlying data, including the effect of inmate demographics and facility locations." We also recognize that the OIG therefore qualified its findings regarding safety and security related incidents; for example, the analysis of contraband seized is caveated with the acknowledgement that the OIG did not examine or compare the interdiction efforts of contract and BOP-operated prisons. We therefore support the OIG's recommendation that the BOP examine the data more thoroughly. CCA is committed to continual improvement in its facility operations, especially as it relates to inmate and staff safety and security, and will cooperate with any examination conducted by the BOP of the factors leading to the incidents in contract prisons.

We believe that demographic variables, particularly as they relate to housing a homogenous foreign national population, will have a significant impact on rates of inmate misconduct. Our experience has been that the criminal alien population housed in contract prisons has a higher rate of Security Threat Group (STG) members and associates (including border, Mexican and Central American gangs) and groups of inmates that strongly define their identity by geographical areas, such as the Mexican state they are from, than U.S. citizen populations of the comparable security level housed in most BOP facilities.

10 Burton Hills Boulevard, Nashville, Tennessee 37215. Phone 615-263-3000. Fax 615-263-3090 www.cca.com

70

There is also robust research literature, including research conducted on BOP populations,[1] indicating that STG-affiliated inmates are significantly more likely to be involved in violence and misconduct, even after controlling for individual characteristics of inmates that prior research has established are associated with violent predispositions. Additionally, these STG-affiliated inmates and geographic groups often have significant rivalries based on conflicts that originate outside of the prison system, leading to inter-group conflict and violence. Furthermore, there is much less intelligence and background information available to assist correctional managers in managing foreign national inmates than most systems would have on a U.S. citizen.

We look forward to further discussions with the BOP regarding the data and recommendations in the report and collaboration on any policy or operational changes.

Sincerely,

Natasha K. Metcalf

[1] Gaes, G.; Wallace, S.; Gilman, E., Klein-Saffran, J. & Suppa, S. (2002). The influence of prison gang affiliation on violence and other prison misconduct. *The Prison Journal, 82 (3),* 359-385.

71

August 9, 2016



The GEO Group, Inc.

Corporate Headquarters
One Park Place, Suite 700
621 Northwest 53rd Street
Boca Raton, Florida 33487

TEL 561 999 5833
FAX 561 999 7739
www.geogroup.com

███████████
Deputy Assistant Inspector General
U.S. Department of Justice
Office of the Inspector General
Evaluation and Inspections Division
1425 New York Avenue, NW, Suite 6100
Washington, D.C. 20530

Re:   The GEO Group's Comments to the
      Formal Draft of Review of the Federal Bureau of Prisons' Monitoring of
         Contract Prisons
      Dated July 2016

Dear ███████:

The GEO Group, Inc. (GEO) appreciates the opportunity to comment on the formal draft of the above referenced report. We have reviewed the draft and have the following for your consideration.

One of the 3 recommendations is that a working group of subject matter experts convene to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions and identify actions. A key ingredient of that review would likely be to evaluate the settings, populations, and reporting systems of the 14 contract and 14 BOP facilities. Any evaluation will require comparisons of the salient elements of all 28 facilities. Whereas the 14 contract prisons are discussed in detail in the report, the 14 BOP facilities are only listed once in the Methodology section. There are some references that, if enhanced, would add to the understanding of the reader and to the further fulfillment of the first recommended action item:

1. Discussion of the difference in population demographics.
   There are notable differences in the population housed at the contract facilities (criminal aliens) and the BOP facilities (U.S. citizens). That difference is briefly noted in two footnotes in the report and one in Appendix 1, but the impact of the difference is not discussed anywhere in the report. The 3 footnotes acknowledge that the Criminal Alien Requirement (CAR) applies to

72



all contract facilities, except parts of 2 current facilities (noted on page 1, footnote 6). The report states that the selected BOP facilities have "similar population and security levels." (page 15, first paragraph). Appendix 1 explains it a little differently by saying on page 53 under Data Analysis that the comparable BOP housed male inmates with the "same security level (low), similar population *sizes*, and similar geographical locations…" (emphasis added) For the following reasons, GEO believes that the differences in the population demographics are critical to the understanding of the collected data:

a. CAR facility populations are criminal aliens and not U.S. citizens. As a group, the CAR population is very homogeneous, with 72.1 % being from Mexico and the majority of the rest being from a few Central American countries. (Only 11.8 % of the BOP population is non-US. citizens.) As such, the contract facility population responds as one to any issue, real or perceived. The group leaders can control or direct a large majority of the population in a much larger fashion than in facilities with a mixed U.S. citizenry. Traditional populations do not follow recognized inmate leaders in a "one for all and all for one" mentality. This is a factor is analyzing the 8 categories as certain prohibited acts are higher in CAR facilities for this reason and the need for facility lockdowns is higher.

b. An additional effect of this CAR population on the data analysis is that the contraband numbers, particularly the cell phones, are greatly affected by housing the CAR population. The Texas GEO facilities (Reeves and Big Spring) are significantly affected due to the proximity to Mexico and the large numbers of Mexican National inmates in the facilities. This issue is not significant in the BOP facilities.

c. The CAR population comes with a high number of gang affiliations. That factor alone may result in increases in the level of violent incidents in the CAR facilities. See attached report "The Influence of Prison Gang Affiliation on Violence and Other Prison Misconduct" *The Prison Journal, 82 (3), 359-385. See attached.* This 2001 report, researched and authored by 3 BOP subject matter experts, specifically discusses the citizenship factor, distinguishing the citizens of Columbia and Mexico, in part because of the high drug trafficking aspects of those populations. Gang affiliated inmates were more likely to be involved in drug, property, accountability… (page 16) Membership in some of the gangs such as the Texas Syndicate and the Mexakanemi was associated with increases in almost all forms of misconduct.

Case 3:16-cv-02267   Document 361-29   Filed 11/20/20   Page 40 of 47 PageID #: 14750



For the above reasons. GEO would request that the report include additional information on the differences in the population demographics and its effect on the data analysis.

2. Differences in Oversight and Reporting.

An additional factor that might be enhanced in the report would be a comparison of the amount and depth of existing oversight of the contract facilities with the oversight of the BOP facilities. Whereas the contract facilities operate using the BOP policies and systems to a large degree (SENTRY being one), the obligation of full and constant reporting and transparency is part of the good business relationship between GEO and the BOP. That relationship exists at the facility, regional and Washington, D.C. levels. The expectation is that GEO will report all incidents in a timely fashion and the contract facilities are evaluated on that thorough and prompt reporting in the CPARs and in the Contract Facility Monitoring. The ACA accreditation process at the contract facilities is more extensive than the same for the BOP facilities and possibly results again in additional reporting of incidents of all kinds. It seems that this difference in reporting was realized in the inconsistent numbers on the contract facility sexual misconduct as reported by the facilities and as reported in monthly intelligence reports.

In addition it should be noted that each contract facility has 2-4 on-site monitors who are not replicated at the BOP facilities. This is additional monitoring manpower dedicated to daily review of operations. daily reporting of incidents and daily tracking of compliance. There is no dedicated monitoring staff at the BOP facilities.

The current extensive review and oversight may have contributed to the higher contract facility numbers in several of the 8 categories.

GEO sincerely thanks the Office of Inspector General for this correspondence and would welcome the opportunity to add to this discussion at any time if there are questions about the above comments.

Sincerely.

Patricia McNair Persante
Executive Vice President. Contract Compliance

Page 3 of 4

74



cc:  George C. Zoley. Chairman and CEO
     J. David Donahue. SVP. U.S. Corrections
     Pablo Paez. VP. Corporate Relations
     ███████████ Dep. Asst. Inspector General. Dept. of Justice
     ███████████ Dept. of Justice

Attachment

Case 3:16-cv-02267    Document 361-29    Filed 11/20/20    Page 42 of 47 PageID #:
14752



Management
& Training
Corporation

A Leader in Social Impact

Scott Marquardt
President

August 9, 2016

███████████

DEPUTY ASSISTANT INSPECTOR GENERAL.
US DEPARTMENT OF JUSTICE

Dear ███████████

Thank you for the opportunity to comment on the Formal Draft Review of the Federal Bureau of Prisons'
Monitoring of Contract Prisons, July 2016. MTC strongly disagrees with the conclusions and inferences of
this report. Any casual reader would come to the conclusion that contract prisons are not as safe as BOP
prisons. The conclusion is wrong and is not supported by the work done by the OIG.

The comparison of two sets of prisons is comparing apples and oranges. The contract prisons are holding
criminal aliens. The OIG reports that 90% of the inmates in the contract facilities are Mexicans. If the OIG
looked into the composition of the BOP prisons, it would find a much more balanced demographic mix.
The normal practice is to disperse groups as much as practical to weaken any STG groups operating in a
facility. Any difference is incident rates would be far more attributable to this factor than whether the
prison is a contract prison or BOP facility. (This point is made on page 22 but the limitation is lost in the
body of the report. If the OIG conducted some interviews of BOP and contract officials, this fact could be
easily substantiated.)

MTC has wardens that have worked in contract prisons after careers in the BOP. They report that
contractors bend over backwards to fully disclose any incident. BOP wardens have more discretion in
reporting. The OIG should go back and interview these wardens for themselves to test our assertion.

Each of the assertion in the report should be given to the BOP for further investigation. The
inflammatory conclusions that contract prisons are less safe is not supported by the facts and should be
re written.

Specific concerns we have are:

Page i, paragraph 1; page 2, paragraph 1: Disturbances are mentioned from recent years in contract
facilities. No mention is made of disturbances in BOP facilities. The list of incidents on Page 2 in contract
facilities is very unfair without a similar list of major incidents at the 14 BOP facilities. Any reader is going
to come to an unjust conclusion without a balanced report.

Page 12 and 13. The contract facilities clearly operate at a lower cost. The OIG's information supports
this. Why does the OIG resist saying it? It's interesting to note the resistance of the OIG to report that

PO Box 10 | 500 North Marketplace Dr. | Centerville, UT 84014
Direct: (801) 693-2800 | www.mtctrains.com

contract prisons operate at a lower cost, but relies on much less reliable support for the assertion that contract prisons are less safe.

Page 15, heading. The heading makes an assertion that relies on a comparison of apples and oranges. The phrasing of the headings and initial sentences should reflect the problem in making the comparison using facilities with very different populations.

Page 15, last paragraph. The BOP facilities should not be referred to as comparable institutions in the document. They house very different populations.

Page 16 and 24 to 26. The inference that grievances represent a prison with higher safety concerns is wrong. Grievances are an integral part of conflict resolution in a positive way. Lack of grievances can indicate an inmate's lack of trust of the prison's problem resolution process. The fact that inmates are widely using the system can show it's working and resolving concerns before they become incidents. The conclusion of the report is misguided.

Page 16, last paragraph. Confiscations of more cell phones, or more contraband, doesn't necessarily mean that there is more contraband coming into the facility. It can also mean that the prison has a more effective system of detecting and removing contraband. The conclusion again is misguided. At most, this data could be an indication that further study is warranted by the BOP. Our point is made at the bottom of Page 19 but only after the questionable assertion is fully developed. The limitation should be in the first sentence of this section.

Page 26, phone calls. The report says the requirement is different for BOP and contract facilities and further reports that all private contractors are meeting the "recommendation" of 5% monitoring. But the report presents this in a negative light on contract prisons.


Thank you again for the opportunity to provide a response to this report and we look forward to ongoing evaluation of performance.

Again, we appreciate the opportunity share our perspective.


Sincerely,

Scott Marquardt

Scott Marquardt


Cc: ███████████

Case 3:16-cv-02267     Document 361-29     Filed 11/20/20     Page 44 of 47 PageID #: 14754

## OIG ANALYSIS OF THE BOP'S RESPONSE

The OIG provided a draft of this report to the BOP and the three contractors. The BOP's response is included in Appendix 8 above. The contractors' responses are included in Appendix 9. Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:** Convene a working group of BOP subject matter experts to evaluate why contract prisons had more safety and security incidents per capita than BOP institutions in a number of key indicators, and identify appropriate action, if necessary.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that a core group of subject matter experts will be selected to evaluate the rate of safety and security incidents per capita within the private contract facilities compared to other BOP institutions, and to determine appropriate action, if necessary.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide a list of the selected subject matter experts; a schedule of planned work group meetings; copies of meeting agenda for each work group meeting held by October 31, 2016; copies of BOP data or other information the subject matter experts considered to evaluate the rate of safety and security incidents per capita within the private contract facilities compared to other BOP institutions; and documentation of any appropriate action recommended, if necessary.

**Recommendation 2:** Verify on a more frequent basis that inmates receive basic medical services such as initial medical exams and immunizations.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that it will draft guidance on procedures to ensure Health Systems Specialists verify that medical services are provided to inmates on a more frequent basis than biannually.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide copies of guidance on procedures to ensure Health Systems Specialists verify that medical services are provided to inmates on a more frequent basis.

**Recommendation 3:** Ensure that correctional services observation steps address vital functions related to the contract, including periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan.

Case 3:16-cv-02267   Document 361-29   Filed 11/20/20   Page 45 of 47 PageID #: 14755

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that it will draft guidance on procedures to ensure periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan to determine whether the contractor is meeting the required staffing levels.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide copies of guidance on procedures to ensure periodic validation of actual Correctional Officer staffing levels based on the approved staffing plan to determine whether the contractor is meeting the required staffing levels.

**Recommendation 4:** Reevaluate the checklist and review it on a regular basis with input from subject matter experts to ensure that observation steps reflect the most important activities for contract compliance and that monitoring and documentation requirements and expectations are clear, including for observation steps requiring monitors to engage in trend analysis.

**Status:** Resolved.

**BOP Response:** The BOP concurred with the recommendation and stated that a work group, to include subject matter experts, will convene annually to ensure appropriate trend analysis and updates to the checklist.

**OIG Analysis:** The BOP's actions are responsive to the recommendation. By October 31, 2016, please provide a list of the selected subject matter experts; a schedule of planned work group meetings; copies of meeting agenda for each work group meeting held by October 31, 2016; copies of BOP data or other information the subject matter experts considered to ensure appropriate trend analysis; and documentation of any recommended updates to the checklist, if necessary.

The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.



Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig