# EXHIBIT 62

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE

3

4     NIKKI BOLLINGER GRAE, Individually

and on Behalf of All Others

5     Similarly Situated,

6          Plaintiff,          Civil Action No.

7     vs.                3:16-cv-02267

8     CORRECTIONS CORPORATION OF

AMERICA, ET AL.,

9

     Defendants.

10

_____

11

12     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

13

14     VIDEOTAPED DEPOSITION OF KIM WHITE

15

16     Conducted virtually via remote videoconference

17               October 30, 2020

18

19

20

21

22

23     Reported by:

Misty Klapper, RMR, CRR

24     Job No.: 10073533

25

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE

3

4      NIKKI BOLLINGER GRAE, Individually
and on Behalf of All Others

5      Similarly Situated,

6          Plaintiff,          Civil Action No.

7      vs.                    3:16-cv-02267

8      CORRECTIONS CORPORATION OF
AMERICA, ET AL.,

9

Defendants.

10

_____

11

12

13

14

15

16

17      Videotaped deposition of KIM WHITE, taken on behalf of

18      Plaintiff, via Zoom remote videoconference, beginning at

19      9:04 a.m. CST on Friday, October 30, 2020, before Misty

20      Klapper, RMR, CRR.

21

22

23

24

25

1     APPEARANCES:

2     (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)

3     ON BEHALF OF PLAINTIFF:

4          CHRISTOPHER M. WOOD, ESQUIRE

       ROBBINS GELLER RUDMAN & DOWD LLP

5          414 Union Street, Suite 900

       Nashville, Tennessee 37219

6          (615) 244-2203

       E-mail: cwood@rgrdlaw.com

7               clyons@rgrdlaw.com

8

   ON BEHALF OF DEFENDANTS:

9

       SARAH TOMKOWIAK, ESQUIRE

10          LATHAM & WATKINS, LLP

       555 Eleventh Street, N.W., Suite 1000

11          Washington, D.C. 20004-1304

       (202) 637-2335

12          E-mail: sarah.tomkowiak@lw.com

13               AND

14          MERYN C.N. GRANT, ESQUIRE

       LATHAM & WATKINS, LLP

15          355 South Grand Avenue, Suite 100

       Los Angeles, California 90071

16          (213) 485-1234

       E-mail: meryn.grant@lw.com

17

18

19     ALSO PRESENT:  DAVID CAMPBELL, VIDEO OPERATOR

20

21

22

23

24

25

1           With that, will the court reporter

2           please swear in the witness and we can

3           proceed.

4                MS. REPORTER:  One moment.

5      Whereupon:

6                KIM WHITE,

7      was called for examination, and, after being duly

8      sworn, was examined and testified as follows:

9                MS. REPORTER:  Thank you very much.

10               You may proceed.

11          EXAMINATION BY COUNSEL FOR PLAINTIFF

12          BY MR. WOOD:

13      Q.    Good morning, Ms. White.

14      A.    Good morning.

15      Q.    When -- at -- at your last deposition

16      you testified that you were still working for

17      CoreCivic.

18               Is that still the case today?

19      A.    Yes, it is.

20      Q.    And I believe you previously

21      testified that you were doing project-based work.

22               Is that -- is that accurate?

23      A.    That is still accurate, yes.

24      Q.    And what types of projects have you

25      done for CoreCivic this year?

1      documents did you look at?

2           A.      So back in the early 2000s, there was

3      a congressman, whose name escapes me right now,

4      who asked for there to be a review of private

5      prisons versus federal prisons.

6                  And the question was whether or not

7      operating prisons was inherently governmental.

8      The order was abbreviated to A-76.  That order

9      pretty much asked the Bureau of Prisons -- and I

10      believe it was done -- it might have been done by

11      the Office of Inspector General, but ultimately

12      it reviewed whether or not those services should

13      be outsourced or whether or not they should be

14      kept within the Federal Government if they were

15      deemed inherently governmental.

16                  So that report was very

17      comprehensive.  It did a side-by-side comparison.

18      And then it also looked at at what level should

19      private prisons, at least for the Federal

20      Government, take on those responsibilities, what

21      level of inmate, if you will.

22                  So that was one memorable document

23      that we looked at.

24                  The CFMs were the primary documents

25      and those were the ones that were quality

Page 15

1        assurance reviews by our own staff out of the

2        program review division.

3            Q.      Any other congressionally mandated

4        documents that you relied on?

5            A.      That was the -- probably the most

6        memorable during my tenure, but I do know that

7        there was -- there might have been one other that

8        just escapes me right now, but that was a huge

9        evaluation, the one that I mentioned that took

10        quite a few years to accomplish.  So that's the

11        one that's the most memorable for me.

12            Q.      Right.  And I'm just trying to

13        understand if there's any others that you can

14        recall that you relied on.

15            A.      As I mentioned, I don't have it in my

16        memory banks today, but I do remember there being

17        at least one other.  I just can't remember the

18        time frame or the purpose of that particular

19        review.

20            Q.      You said you'd look at any report

21        that came out that was unfavorable to the

22        facility when it came to performance.

23                   And what are you referring to there?

24            A.      So I'm referring to primarily those

25        reports that came out of our program review

Page 16

1    division that were the -- the contract facility

2    management documents or the CFM.

3            So if there were any significant

4    deficiencies, if there was ever any kind of

5    disturbance at those facilities where there was

6    an after-action review, if there was anything

7    that was considered corrective action oriented

8    during routine reviews by those facilities, all

9    of those kinds of documents and discussions would

10   happen within the executive team.

11       Q.    You weren't responsible for hiring

12   employees at private prisons while you were at

13   the BOP, right?

14       A.    No, I was not.

15       Q.    And you weren't responsible for --

16   you had no responsibility regarding medical care

17   at private prisons while you were at the BOP,

18   right?

19       A.    No, I was not.

20       Q.    You had no responsibility for issuing

21   notices of concern to private prisons while you

22   were at the BOP, right?

23       A.    No, that was not within my purview.

24       Q.    And you had no responsibility for

25   deciding whether to issue a cure notice to a

1          private prison while you were at the BOP?

2                    A.     No, I did not.

3                    Q.     You were not responsible for deciding

4          whether to renew a contract with a private

5          prison, right?

6                    A.     No, that was not my responsibility.

7                    Q.     And you weren't responsible for

8          deciding whether to rebid a contract either,

9          right?

10                   A.     Not directly, but if that was a point

11         of discussion before the executive team, as a

12         member of that team I would be involved in those

13         discussions.

14                   Q.     But you weren't responsible for the

15         decision, right?

16                   A.     I was not directly responsible for

17         the decision, no.

18                   Q.     And you weren't responsible for

19         deciding whether to terminate the contract with a

20         private prison?

21                   A.     Again, I might be a -- a part of a

22         conversation about it, but ultimately I was not

23         responsible for that final decision.

24                   Q.     Once you left the BOP and joined CCA,

25         what information did you have at that point about

Page 27

1      know what exhibit number I'm supposed to mark

2      this as.  Let's see --

3              MS. REPORTER:  591.

4              MR. WOOD:  Thank you.

5              All right.  We're going to mark this

6          as 591.

7                  (Thereupon, White Exhibit

8              Number 591 was marked for

9              identification.)

10             BY MR. WOOD:

11         Q.    And Ms. White, have you seen this

12     document before?

13         A.    Yes, I saw this yesterday.

14         Q.    Okay.  Do you recall if you had seen

15     it before yesterday?

16         A.    I don't believe so, no.

17         Q.    Okay.  You see on page 7 there's a

18     section entitled Kim White.

19         A.    Yes, I see that.

20         Q.    Okay.  And on -- and it goes onto

21     page 8, right?

22         A.    Yes, it does.

23         Q.    Okay.  So under Summary of Facts and

24     Opinions on page 8, the -- the first line reads,

25     Ms. White may testify that CoreCivic's

Page 28

1       operational performance was similar to and

2       compared favorably with the BOP's operational

3       performance in the areas of correctional facility

4       management, oversight, staffing, security and

5       related policies and procedures.

6               Do you see that?

7       A.     I do.

8       Q.     Now, do you have an opinion as to

9       whether or not CoreCivic's operational

10      performance was similar to and compared favorably

11      with the BOP's operational performance in the

12      areas of correctional facility management,

13      oversight, staffing, security and related

14      policies and procedures?

15      A.     I believe I do.

16      Q.     And what is your opinion?

17      A.     My opinion is CoreCivic and the

18      Bureau of Prisons, as well as other partners that

19      we worked with, have similar -- similar

20      attributes, similar challenges, similar outcomes

21      when it relates to oversight, staffing, security

22      and all of the related policies and procedures

23      that are listed here sort of generally.

24      Q.     What about when it comes to specific

25      facilities?

1          A.     I would say that's across the board,

2     not specific to just the BOP, but to the U.S.

3     Marshals, to immigration facilities, to all of

4     the state partners we have.  And even as we

5     developed beyond 2016 when we branched into

6     halfway houses, I believe that within the

7     industry we function very similarly.

8          Q.     But you're not making a comparison as

9     to a specific facility in terms of saying all

10     facilities run by CoreCivic are all similar in

11     these areas to all BOP facilities?

12          A.     Oh, I can say generally overall that

13     statement is absolutely true based on my

14     experience and expertise.

15          Q.     That all facilities run by CoreCivic

16     are all similar to all facilities run by the BOP?

17          A.     Overall I absolutely agree with that

18     statement.

19          Q.     So the security, for example, at a

20     low security facility run by CoreCivic is going

21     to be the same as security at a high security

22     facility run by the BOP?

23          A.     No.  I believe that a low security

24     facility run by CoreCivic would be the same as a

25     low security facility operated by the BOP.

Page 56

1        Yates memo came out and Sally Yates announced

2        that the BOP would be reducing and eliminating

3        its use of private prisons, right?

4              A.      I do remember that day in August of

5        2016, yes.

6              Q.      And did your expectations about

7        whether or not CoreCivic's BOP facilities would

8        be renewed change after the Yates memo came out?

9              A.      Based on what the acting Attorney

10       General said, yes, it did.

11             Q.      And -- and -- and how did it change?

12             A.      It changed based on her decision that

13       both the Bureau of Prisons and U.S. Marshals

14       would stop relying on the private prison

15       business, not just CoreCivic, but across the

16       industry, for that service to be provided to the

17       government.

18             Q.      So after the Yates memo came out, you

19       no longer expected CoreCivic's BOP contracts to

20       be renewed; is that fair?

21             A.      I think we all expected that the

22       reliance of the Bureau of Prisons on contract

23       facilities for any of the Department of Justice's

24       needs would curtail over time.

25             Q.      And so you -- you -- you didn't

Page 57

1       expect that CoreCivic's BOP contracts would be

2       renewed, right?

3              A.     I expected at some point that the --

4       if the Yates memo was what it said it was, that

5       contracts would not be renewed when their term

6       expired.

7              Q.     And did you have any reason to

8       believe that the Yates memo wasn't what it said

9       it was?

10             A.     Well, to be honest, in proximity to

11      the election that was coming up, we wondered,

12      depending on who went into the White House,

13      whether or not the Yates memo would apply if it

14      was not Hillary Clinton as the president.

15                    So we weren't certain.  We knew,

16      though, if the one candidate won, it would likely

17      come to fruition.  If the other candidate won, as

18      is historically the case, it would likely be

19      overturned.

20             Q.     So you believed that if Hillary

21      Clinton won, then the Yates memo directive would

22      continue and if Trump won, that it would be

23      overturned?

24             A.     That was based on my personal

25      opinion, history in government, positions where

Page 58

1      political influence changed policies very

2      quickly, yes, that's -- that is what my

3      estimation was at the time.

4           Q.     And Trump won the election, right, in

5      2016?  I think we can --

6           A.     He did.

7           Q.     -- all agree on that.

8           A.     Yes.

9           Q.     The Yates memo was, at least in part,

10      rescinded by Jeff Sessions, right?

11           A.     I believe that Yates memo was

12      rescinded in totality.

13           Q.     Okay.  It -- it was rescinded in

14      February 2017, right?

15           A.     I don't remember the exact day, but

16      it was shortly after inauguration.

17           Q.     Okay.  And CCA or, I guess,

18      CoreCivic, right, at this time, still lost the

19      Eden contract in April 2017, right?

20           A.     I'm not sure of the date, but if

21      that's what the record reflects, then I would

22      agree, yes, that did occur.

23           Q.     You -- so if we just leave the date

24      aside, you agree that after the Sessions memo

25      rescinded the Yates memo, CCA still lost its Eden

Page 59

1        contract, right?

2            A.    I believe that that contract was not

3        renewed at that point and it followed the

4        Sessions memo.

5            Q.    And same with the Adams facility,

6        right?  The Adams facility, CCA also lost that

7        contract after the Sessions memo was issued,

8        right?

9            A.    Yeah, I believe the chronology

10       reflects that.

11           Q.    Okay.  So even though the Yates memo

12       was purportedly overturned by Jeff Sessions, CCA

13       still lost the vast majority of its BOP

14       correctional facility business, right?

15           A.    The two you've referenced were not

16       renewed, that is correct, but I don't believe

17       that it had anything to do with the original memo

18       put out by Sally Yates.

19           Q.    And what did it have to do with?

20           A.    Well, in Adams it was clear that what

21       the Bureau of Prisons wanted to do with that --

22       the infrastructure of the facility was not cost

23       effective for us.  We had a much bigger compound

24       number of inmates that could be housed there --

25       or detainees, I'm sorry, that could be housed

1       make sense.

2              So we proposed a cost.  The Bureau

3       rejected it because it was higher than what they

4       desired.  And that's why that contract was not

5       renewed.

6          Q.     And what about the Eden contract?

7          A.     I believe it was for the same

8       purposes, if I'm not mistaken.  I -- that one's a

9       little bit more fuzzy because that was further

10      ago and I'm even further away from that decision

11      now.  So --

12         Q.     But you believed it was the same

13      dynamic, that the price that CoreCivic gave to

14      the BOP was higher than the BOP wanted to pay?

15         A.     I believe that it was primarily

16      pricing.  I do know that Eden struggled with a --

17      a couple of areas that were important, not

18      insurmountable, but I do believe that it was

19      primarily cost.

20         Q.     In what areas were they struggling?

21         A.     The two areas that I recall them

22      struggling with and we had been successful in

23      coming back from, one was staffing of

24      correctional officers.  We continued to struggle

25      with that in that area.  And also in medical

Page 62

1          services, just trying to get the number of nurses

2          we needed in that facility was difficult.

3                    But before that contract was not

4          renewed, we had made tremendous strides and had

5          actually staffed up to the BOP contract staffing

6          guidelines in that area.

7               Q.    Is it your understanding that the

8          staffing correctional officers and medical

9          services personnel was a factor in the BOP's

10          decision not to renew the Adams contract -- I

11          mean, the Eden contract?

12               A.    I believe it might have influenced,

13          but I can't remember if it was a factor noted for

14          their -- for the decision not to renew.  My

15          memory just is fuzzy about that specific

16          location.

17               Q.    Before the -- okay.  So before the

18          Eden contract was not renewed -- and I -- I -- I

19          have that as April 2017 --

20               A.    Okay.

21               Q.    -- did -- so prior to April 2017,

22          in -- in the months prior to that, did you have

23          an expectation one way or another as to whether

24          the Eden contract would be renewed?

25               A.    I had an expectation that the BOP

Page 63

1       contract at both Adams and Eden would be renewed.

2           Q.      In spite of the Yates memo?

3           A.      The Yates memo was null and void at

4       that point, so I absolutely expected both of

5       those contracts to be renewed.

6           Q.      And -- and you expected that even in

7       spite of the pricing numbers that CoreCivic was

8       giving to the BOP?

9           A.      Before the decision was rendered, I

10      think we did our best job to offer the services

11      we thought would meet the expectations of the

12      Bureau of Prisons at a price that we could live

13      with.  So, yes, I did expect that contract to be

14      renewed.

15          Q.      Okay.  And so with respect to Eden,

16      what -- what -- what was your basis for believing

17      that that contract would be renewed going into

18      April 2017?

19          A.      I believe our overall past

20      performance was a reason.  I believe that the

21      history of Eden on prior renewals was a factor.

22      I believe that all of the efforts that would be

23      put forth in getting the staffing levels where

24      they needed to be was a factor.

25              And I also believe, quite honestly,

Page 64

1       that the difficulty and extra work that is

2       created by having to relocate offenders is

3       something that the Bureau of Prisons tries to

4       avoid whenever possible.

5               So those are just some of the factors

6       I took into consideration when I expected that

7       contract to be approved again or renewed.  I'm

8       sorry.

9          Q.    So -- and then if we fast-forward,

10      Adams -- CCA lost that contract in May 2019,

11      right?  And by that --

12         A.    Oh, okay.

13         Q.    -- when -- by that point, CoreCivic

14      had lost the Eden contract, they'd lost the

15      Cibola contract, they'd lost the Northeast Ohio

16      contract.

17              You still believed that Adams would

18      be renewed going into May 2019, right?

19         A.    I did.

20         Q.    And what was your basis for that?

21         A.    As I mentioned before, our track

22      record; the fact that it was a -- a good

23      operating facility; the fact that it is a lift

24      for the organization to relocate the number of

25      inmates we had there; the fact that the Bureau of

Page 65

1      Prisons still needed those beds; and the fact

2      that they had ample growing room, if you will,

3      for additional detainees, if necessary.

4              I thought all of those were important

5      factors for them to consider.

6          Q.    And in spite of that, BOP didn't

7      renew the facility, right?

8          A.    That is true for the reasons I

9      previously stated.

10         Q.    Because the -- because CCA wasn't

11     able to offer low enough cost?

12         A.    And the fact that we didn't want to

13     have a reduced return on investment because they

14     needed less of the facility to operate.

15         Q.    But you didn't pull out -- CCA --

16     CoreCivic didn't pull out of the contract, right?

17         A.    I don't recall.  I believe that the

18     contract was not renewed based on pricing.

19         Q.    And how -- what is the basis for your

20     belief that the contract was not renewed based on

21     pricing?

22         A.    That's what I recall the conversation

23     surrounding the Bureau of Prisons' decision

24     including.

25         Q.    And who did you have those

Page 74

1　　　Q.　　Well, I understand that's your

2　belief.　I -- I guess I'm -- I -- I -- what I

3　want to know is whether you know specifically how

4　the BOP made the decision with respect to the

5　Cibola contract.

6　　　A.　　What I'm sharing with you are aspects

7　that I recall from my time in the Bureau of

8　Prisons.　And what I know from experiences within

9　CCA are attributes or factors that the BOP

10　considers when making those kinds of decisions.

11　　　Q.　　But you don't have any specific

12　knowledge as to the decision process that the BOP

13　made in 2016 to end the Cibola contract, right?

14　　　A.　　Not specifically, no.　I'm just going

15　by history, my experience and what the Bureau of

16　Prisons has said in writing previously.

17　　　Q.　　And by previously, do you mean when

18　you were working at the BOP?

19　　　A.　　Not only when I was working at the

20　BOP, but during renewal contract periods while I

21　was working for CoreCivic or CCA.

22　　　Q.　　And Cibola had staffing issues as

23　well, right, that you were intimately involved in

24　dealing with?

25　　　　　MS. TOMKOWIAK:　Objection.

1          THE WITNESS:  Yes, that --

2          BY MR. WOOD:

3      Q.    Go ahead.

4      A.    I do recall a -- a lot of toil and

5  effort around staffing at Cibola during my

6  tenure, yes.

7      Q.    And in spite of those staffing

8  challenges, you still expected the Cibola

9  contract to be renewed?

10     A.    Absolutely.

11     Q.    CoreCivic lost the rebid of the

12  Northeast Ohio facility in December 2014, right?

13     A.    If the record reflects that, I would

14  agree.

15     Q.    And you expected that contract -- you

16  expected CCA to win that contract as well?

17     A.    I think I can say unequivocally I, as

18  a leader of CoreCivic, expect all contracts to be

19  renewed and certainly Northeast Ohio was one of

20  those that I expected to be renewed.

21     Q.    Have you ever seen a contract at

22  CoreCivic that you didn't expect to be renewed?

23     A.    No, I don't think so.

24     Q.    Okay.  All right.  So what was the

25  basis for your belief that the Northeast -- that

1      CCA would win the rebid at Northeast Ohio in

2      2014?

3          A.    Again, I believe that the history of

4      those renewals being awarded is evidence of that.

5      Northeast Ohio was a -- a very high operating

6      facility.  It was one that had received awards

7      previously based on its performance.  I think

8      right before the contract wasn't renewed, it

9      might have received one.

10              So there -- there was evidence from

11     history, from frequency of renewals and from

12     quality -- total quality operations that led me

13     to draw that conclusion.

14         Q.    How -- how did the BOP determine

15     whether it was going to award CCA the Northeast

16     Ohio rebid?

17         A.    I think the BOP used the same process

18     that it does when it's evaluating contracts and

19     would have taken into account all of the

20     characteristics I mentioned, including cost and

21     total operation performance and the need of

22     whether or not it still needed the beds.

23         Q.    And is that -- do you have any

24     specific knowledge that that's what the BOP

25     considered with respect to the Northeast Ohio

1        contract or that's just based on your general

2        understanding?

3            A.      That's based on my understanding.

4        That's based on conversations with those

5        responsible for making those decisions.  And

6        that's based on report outs from those people who

7        receive notices from the Bureau of Prisons and

8        have conversations with the experts about what

9        they're looking for.

10           Q.      And who -- who specifically did you

11       have conversations with who were responsible for

12       making those decisions?

13           A.      Natasha Metcalf certainly was one of

14       those individuals.  The partnership development

15       team, which included Jeb Beasley, who had

16       firsthand interactions with folks within the

17       department that was responsible for renewing

18       contracts.  And also the history of what the

19       Bureau of Prisons made clear it wanted and what

20       it was looking for when evaluating those

21       contracts.

22           Q.      But your belief wasn't based on any

23       conversations that you had directly with anyone

24       at the BOP?

25           A.      No.  That is correct.

Page 78

1         Q.    If we -- just one second.

2              If we go back to Exhibit 591, the

3    penultimate sentence on page 8 before the one we

4    just read says, Ms. White may also testify about

5    challenges to the BOP's operational performance

6    in the areas of correctional facility management,

7    oversight, staffing, security and related

8    policies and procedures.

9              Do you see that?

10        A.    I do.

11        Q.    What -- what challenges did the BOP

12   have between 2012 and 2016 with respect to

13   staffing?

14        A.    Oh, they were quite similar.  And

15   specifically in the area of medical, that was one

16   of the longstanding challenges the Bureau of

17   Prisons has, not only when I was in human

18   resources, but as a regional director responsible

19   for various facilities.

20              Nursing was difficult.  Getting

21   physicians was increasingly more challenging to

22   the point where we utilized public health

23   officials in order to fulfill those roles.  And

24   there was a whole department within human

25   resources and in medical within the Bureau of

1        Prisons.  And that's all we did, was medical

2        recruiting.  So that was a significant challenge.

3                  As I mentioned earlier, there were

4        locations across the Bureau of Prisons that

5        was -- that were also struggling with staffing

6        for mechanical services folks, for substance use

7        staff, as well as for correctional officers.

8                  And between 2014 and 2016

9        specifically, when the labor force became even

10        more and more challenging across the nation, it

11        was more and more difficult for state, local and

12        federal entities, as well as the private

13        companies, to attract and retain those staff.

14        There were just too many opportunities and too

15        few people.

16                  So those challenges were quite

17        similar, both in medical staffing and

18        correctional officer staffing.  And then there

19        were some differences from the Bureau of Prisons

20        and us on some other areas that were a bit of a

21        challenge, depending on the location.

22        Q.     So what's the basis for your belief

23        that the Bureau of Prisons had issues with

24        staffing between 2014 and 2016?

25        A.     First of all, I saw, for the first

1          time ever, the Bureau of Prisons used Facebook to

2          attract people.  I saw advertisements for

3          correctional officers with incentives, quite

4          honestly, similar to ours, signing bonuses and

5          other bonuses to attract people through the front

6          door.

7                    I heard from a variety of different

8          wardens and executives with the Bureau of Prisons

9          that they were struggling with this as much as we

10         were.  And, quite interesting, at ACA there were

11         several sessions dedicated to hiring, attracting

12         and retaining correctional workers across the

13         board because it was a consistent challenge in

14         many jurisdictions, including the five or six

15         states that I mentioned earlier.

16                    So it was pervasive in the industry

17         and obviously the Bureau of Prisons would be

18         impacted as much as -- as we would be.

19         Q.     Well, I guess not obviously, right?

20         If the BOP is paying more than CCA, then they

21         maybe would not be impacted as much as CCA,

22         right?

23         A.     Interestingly enough, we found that

24         pay, while they had, perhaps, less of a problem

25         with attracting people, they had equivalent

1          you have any reason to believe that you didn't

2          get it in September 2016, especially in light of

3          this E-mail.

4                    MS. TOMKOWIAK:  Objection.

5                    THE WITNESS:  I just -- I don't

6              remember.  Yeah, I don't remember.

7                    BY MR. WOOD:

8              Q.    Okay.  But you feel more confident

9          that you were referring to the Adams report in

10          light of Mr. Vanyur's comment about disagreement

11          on vacancy rates versus the Leavenworth facility?

12              A.    I believe given what I just read,

13          which both we and the BOP vigorously disagree

14          with, it would not have been the Marshal's

15          facility, because we didn't have BOP inmates at

16          that location.

17              Q.    Okay.

18                    All right.  We can put that aside.

19              A.    Okay.

20                    MR. WOOD:  Why don't we take a

21              five-minute break if we can.

22                    VIDEO OPERATOR:  Okay.  Going off

23              the record at 11:17.

24                    (Thereupon, a brief recess was

25                    taken.)

Page 95

1              VIDEO OPERATOR:  We are back on the

2        record at 11:29.

3              BY MR. WOOD:

4         Q.     Ms. White, we -- if we go back to

5    Exhibit 591, again on page 8, about midway

6    through the Summary of Facts and Opinions

7    paragraph there's a sentence that says, Ms. White

8    may also testify to her favorable opinions

9    regarding the overall quality and cost

10    effectiveness of CoreCivic's operations in the

11    areas of correctional facility management,

12    oversight, staffing, security and related

13    policies and procedures.

14              Do you see that?

15         A.    I do.

16         Q.    And what -- what opinions do you have

17    related to that sentence?

18         A.    Oh.  My opinion would include the

19    fact I thought that CoreCivic, or CCA at the

20    time, provided quality services at a

21    cost-competitive price point that would allow the

22    Bureau of Prisons to outsource facility

23    management, oversight, staff and security and the

24    related policies and procedures that both

25    entities were responsible for executing on.  And

Page 96

1    that was based on my experience with the BOP, as

2    well as my experience as an executive of

3    CoreCivic.

4         Q.    And so your opinion is specifically

5    related to the BOP and -- or -- or CCA's ability

6    to provide services to the BOP and not other

7    clients?

8         A.    Well, this was specific to the Bureau

9    of Prisons, but I can certainly talk about those

10    same services being provided to all of our

11    partners if that is your interest.

12         Q.    Well, I'm just interested in

13    understanding what your opinion is.  And this

14    sentence says that Ms. White may testify to her

15    favorable opinion regarding the overall quality

16    and cost effectiveness of CoreCivic's operation.

17              So I guess I'm curious if your

18    opinion is that CoreCivic had quality cost

19    effective operations for every client or whether

20    your opinion is just limited to the BOP.

21         A.    For the purposes of this litigation,

22    my opinion is in being responsive to the

23    questions being asked about the BOP.  But I can

24    expand that to every partner, regardless of

25    whether it's state, local and the various federal

Page 97

1      partners we have.

2           Q.    I -- I'm just trying to understand

3      what -- what your opinion is.

4                So is your opinion that CoreCivic

5      offers quality and cost effective operations

6      to -- to every one of its partners?

7           A.    Absolutely.

8           Q.    And -- and -- and -- and same opinion

9      specifically with respect to the BOP?

10          A.    Yes, I would agree with that

11     statement.

12          Q.    And that's based on your experience

13     at the BOP and your experience at CoreCivic?

14          A.    And also, when it comes to other

15     partners, specifically to my experience with

16     CoreCivic, absolutely.

17          Q.    Right.  Because with other partners,

18     you hadn't worked for them, right?  So you

19     wouldn't have experience with -- haven't worked

20     for them.  You wouldn't have direct experience as

21     an employee, for example, with the state of

22     California, right?

23          A.    That is correct.  While I was with --

24     within the Bureau of Prisons, I had very limited

25     contact with anybody outside of the Bureau of

1      quality, are -- are you referring to specific

2      facilities or just -- or just operational quality

3      in totality?

4         A.     I'm referring to the generalized

5      statement for all facilities and I can certainly

6      get specific if there are questions relative to

7      certain locations.

8         Q.     Well, would your answer change?  I

9      mean, you -- you believe that CoreCivic had very

10     high quality and compliance with respect to

11     correctional management in each of its BOP

12     facilities?

13        A.     In totality, I do.

14        Q.     Okay.  And that's in -- in spite of

15     the notices of concern that CCA received, right?

16        A.     I do.  And let me give you an

17     example.

18          At our Eden facility we had issues

19     with meeting the contractual requirements for

20     staffing periodically.  That doesn't mean that

21     our correctional services department did not

22     operate at an effective level at that facility.

23         So that is one deficiency among many

24     standards.  So that one deficiency does not

25     completely eradicate the total quality operations

1        at that location.

2              Q.     And -- and your opinion is in spite

3        of the results of the CFM reviews that CCA got

4        from the BOP, right?

5              A.     I believe that the CFMs capture some

6        facts about operations at a facility, but not

7        all.  So that's a snapshot in time about certain

8        aspects of the operations, but it does not

9        reflect the total quality of the operations.

10             Q.     And it's in spite of the -- the cure

11       notice that the company received at Cibola,

12       right?

13             A.     It is in spite of the medical

14       challenges that we faced at Cibola which

15       ultimately led to the cure notice, yes.

16             Q.     It's in spite of the -- the riot at

17       Adams in 2012, right?

18             A.     It is in spite of that tragic event

19       that happened that day in the number of years

20       that we operated that facility, that is correct.

21             Q.     Okay.  And do you have a different

22       opinion specifically as it relates to staffing at

23       CCA's BOP facilities?  Do you believe that CCA --

24       well, what, if any, opinion do you have about

25       CCA's compliance with contractual requirements

1    relating to staffing at CCA's BOP facilities?

2        A.    I believe that overall we met

3    contractual compliance when it came to staffing.

4    Periodically we would struggle in two areas, and

5    that was primarily in medical services and with

6    correctional officers.

7        Q.    And by periodically, you're -- you're

8    including repeat, repeat deficiencies where the

9    BOP would note understaffing for 12 months or

10   more at a time, right?

11       A.    The instances when that occurred was

12   not day over day, month over month, year over

13   year.  They were deficiencies noted at a point in

14   time.  And obviously, that was not something that

15   we didn't fix over and over and over again.

16           So, no, I don't believe that the

17   reflection of repeat deficiencies in that area

18   when the snapshots are taken are indicative of

19   anything other than what I've already stated.

20       Q.    You agree, though, that -- that --

21   that CoreCivic was not complying with the

22   contractual requirements with respect to staffing

23   at its BOP facilities between 2012 and 2016,

24   right?

25       A.    I agree that there were instances

1    where we did not meet the contractual staffing

2    requirements on the day or the time that those

3    snapshots were taken.

4         Q.    Well, do you -- do you have an

5    understanding as to whether the deficiencies were

6    related to, you know, one specific day every

7    month or every three months or whether they were

8    more longstanding deficiencies?

9         A.    Some were certainly more challenging

10   than others, but I will tell you that we did meet

11   staffing requirements during those time frames as

12   well.  And there were times where we didn't meet

13   it, either because of turnover, because of other

14   challenges when it came to ensuring we had those

15   staff on board at the time the snapshots were

16   taken.

17        Q.    And those were challenges that --

18   that you were directly involved in trying to

19   overcome, right?

20        A.    Along with the operations team, I was

21   directly involved, as well as those working for

22   me.

23        Q.    And the challenges in staffing that

24   you had at the BOP facilities were at -- at the

25   top of your list in terms of dealing with

Page 110

1        staffing challenges more broadly at the company,

2        right?

3            A.     They were among many states that

4        experienced the same challenges, five of which

5        I've mentioned earlier in my testimony today.

6            Q.     So is it -- I mean, is it fair to say

7        that they were at the top of the list or they

8        were just one of many challenges you were dealing

9        with?

10           A.     They were one of many locations that

11       were at the top of the list, including those

12       other five states I mentioned.

13           Q.     None of that changes your opinion,

14       though, about CCA's compliance with its

15       contractual requirements to the BOP with respect

16       to staffing?

17           A.     It does not change my opinion, nor

18       the history.

19           Q.     Do you know what the BOP's opinion

20       was regarding CCA's compliance with its staffing

21       requirements?

22           A.     I know the BOP was as concerned as we

23       were that when they took the snapshots in time,

24       we did not meet the contractual requirements.

25       But I also believe that the Bureau of Prisons

```
 1                    CERTIFICATE OF NOTARY

 2              I, MISTY KLAPPER, the officer before

 3         whom the foregoing deposition was taken, do

 4         hereby certify that the witness whose

 5         testimony appears in the foregoing

 6         deposition was duly sworn by me; that the

 7         testimony of said witness was taken by me in

 8         shorthand and thereafter reduced to

 9         typewriting by me; that said deposition is a

10         true record of the testimony given by said

11         witness; that I am neither counsel for,

12         related to, nor employed by any of the

13         parties to the action in which this

14         deposition was taken; and, further, that I

15         am not a relative or employee of any

16         attorney or counsel employed by the parties

17         hereto, nor financially or otherwise

18         interested in the outcome of this action.

19              Further, that if the foregoing pertains to

20         the original transcript of a deposition in a federal

21    case, before completion of the proceedings, review

22    of the transcript [ X ] was [  ] was not requested.

23         Dated: November 6, 2020

24                                _____
                                  Misty Klapper, RMR, CRR
                                  and Notary Public
25
```

www.aptusCR.com