# EXHIBIT 64

Page 1

```
1           UNITED STATES DISTRICT COURT
2           MIDDLE DISTRICT OF TENNESSEE
3                    - - -
4    NIKKI BOLLLINGER GRAE,          )
Individually and on Behalf of    )
5    All Others Similarly Situated,   )
                                 )
6              Plaintiff,    )   Case No.
                                 )
7        vs.                  )  3:16-cv-02267
                                 )
8    CORRECTIONS CORPORATION OF     )
AMERICA, et al.              )
9                            )
          Defendants.    )
10   _____)
11
12
13              CONFIDENTIAL
14            FRIDAY, OCTOBER 23, 2020
15            VIDEOTAPED DEPOSITION OF
16            DONALD WILLIAM MURRAY, JR.
17            VIA REMOTE VIDEOCONFERENCE
18
19
20
21
22
23   Stenographically Reported by:
Victoria L. Valine, CSR, RMR, CRR, RSA
24   California CSR License No. 3036
25   Job No. 10073530
```

1          REMOTE APPEARANCES:

2

3    FOR PLAINTIFF:

4         ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys at Law

5         BY:  Kenneth J. Black, Esq.
          Willow E. Radcliffe, Esq.

6         Post Montgomery Center
     One Montgomery Street, Suite 1800

7         San Francisco, California  94104
     415.288.4545   FAX:  415.288.4534

8         kennyb@rgrdlaw.com

9         ROBBINS GELLER RUDMAN & DOWD LLP
     Attorneys at Law

10        BY:  Christopher M. Wood, Esq.
     414 Union Street, Suite 900

11        Nashville, Tennessee  37219
     800.449.4900   FAX:  615.252.3798

12        cwood@rgrdlaw.com

13   FOR DEFENDANTS:

14        LATHAM & WATKINS LLP
      Attorneys at Law

15        BY:  Brian T. Glennon, Esq.
          Eric C. Pettis, Esq.

16         355 South Grand Avenue, Suite 100
     Los Angeles, California 90071-1560

17         213.891.7786
     brian.glennon@lw.com

18

19

20

21   Videographer:  David Campbell

22

23     (All parties appeared remotely via videoconference.)

24

25

1    time, nor will there be an objection to it at a future

2    date.

3           Please indicate your agreement by stating your

4    name and agreement on the record, after which, I will

5    swear in the witness.

6           MR. BLACK:  This is Kenneth Black, so

7    stipulated and agreed to.

8           MR. GLENNON:  Brian Glennon, so stipulated.

9           CERTIFIED STENOGRAPHER:  Raise your right

10   hand, please.

11          Do you solemnly swear the testimony you are

12   about to give will be the truth, the whole truth, and

13   nothing but the truth, so help you God?

14          THE WITNESS:  I do.

15          CERTIFIED STENOGRAPHER:  Thank you.  Counsel,

16   you may proceed.

17                     EXAMINATION

18   BY MR. BLACK:

19     Q.   Good morning, Mr. Murray.

20          Thank you for being here this morning.  As we

21   just went over, my name is Kenny Black.  I'm here from

22   the law firm of Robbins Geller Rudman & Dowd.  I

23   represent the plaintiff in this matter.

24          Can you please state your full name, phone

25   number, and home address for the record?

1      A.   Sure. Good morning Mr. Black.

2      My name is Donald William Murray, Jr.

3      My home address is ██████████████

4      ████████████████████████.

5      My telephone number is ██████████

6      Q.   Thank you. Mr. Murray, have you been deposed

7  before?

8      A.   In relation to this case or deposed generally?

9      Q.   Let's start have you been deposed before ever?

10     A.   Yes.

11     Q.   Okay. About how many times?

12     A.   I don't know. I would have to go back and

13  count, but a number of times.

14     Q.   Would you say more than ten?

15     A.   I would say probably 10 to 12 times would be

16  accurate.

17     Q.   Have you been deposed in this matter before?

18     A.   No, I have not.

19     Q.   Have you been deposed in a securities matter

20  before?

21     A.   No.

22     Q.   Have you been deposed as an expert witness

23  before?

24     A.   Um -- yes, I have.

25     Q.   Can you describe -- first, how many times have

1    and background, also as an expert.

2    BY MR. BLACK:

3        Q.   Did you tell someone that these are the areas

4    you were prepared to testify to?

5            MR. GLENNON:  I'm going to object and instruct

6    the witness not to answer unless he can do so without

7    revealing communications he had with counsel.

8            THE WITNESS:  I believe that's privileged.

9    BY MR. BLACK:

10       Q.   You believe that's privileged.

11           Did you tell anyone at CCA that -- that these

12   subject areas were the ones you were prepared to testify

13   to?

14           MR. GLENNON:  Same objection.  Any of the

15   non-employer stuff, Mr. Murray.

16   BY MR. BLACK:

17       Q.   Mr. Murray, are you going to choose to not

18   answer this question?

19       A.   I believe that's my understanding, not to

20   answer the question.

21       Q.   Okay.  Mr. Murray, do you see under summary of

22   facts and opinions there's a paragraph that goes from

23   page 6 to 7?

24       A.   Yes, sir, I do.

25       Q.   Okay.  Can you read the first sentence,

1    please?

2        A.   "Dr. Murray may testify that CoreCivic's

3    operational performance was similar to and compared

4    favorably with BOP's operational performance in the

5    areas of correctional facility management, oversight,

6    staffing, security, and related policies and

7    procedures."

8        Q.   Okay.  Are you, in fact, prepared to testify

9    that CoreCivic's operational performance was similar to

10   and compared favorably with the BOP's operational

11   performance in the areas of correctional facility

12   management, oversight, staffing, security, and related

13   policies and procedures?

14       A.   Yes.

15       Q.   Okay.  In what ways are you prepared to so

16   testify?

17       A.   Well, mainly, Mr. Black, again it's a function

18   of my extensive experience in the corrections industry.

19   I have completed 38 years of service, 22 of which have

20   been in the Federal Bureau of Prisons, 16 years and

21   change here at CoreCivic.

22           And during that nearly four decades in the

23   corrections industry, government service and in private

24   sector, I've garnered quite a lot of information and

25   expertise across a variety of areas.

1          I've had the privilege of auditing facilities,

2    both while I was with the BOP, and auditing facilities

3    certainly in the leadership role -- management role here

4    at CoreCivic.

5          I frequently attend professional meetings, and

6    review information and standards from an ACA

7    perspective -- and ACA stands for the American

8    Correctional Association, by the way.

9          I attend the national commission on

10   correctional healthcare meetings, and participate in

11   those as well.

12         There is a large amount of information in

13   terms of standards for the industry in healthcare, and

14   very broadly in security and key operational areas that

15   we have within our facilities as managers and as

16   professionals -- correctional professionals.

17         I'm very familiar with Federal Bureau of

18   Prisons policies and procedures for more than two

19   decades.  I'm very familiar with the tools -- audit

20   tools that have been utilized by the Federal Bureau of

21   Prisons for many years and the updates to those that are

22   utilized in the customer facility and monitorings.

23         I'm very familiar with the information and

24   tools that we utilize to conduct that identical types of

25   evaluation in our facility operation.  I'm very familiar

1  with facility client surveys that we utilize that are

2  very similar to the Federal Bureau of Prisons climate

3  surveys of staff and detainees or inmates in our care

4  and custody as in their care and custody.

5          I'm very familiar with their procedures from

6  the perspective that we get updates from the Bureau of

7  Prisons that whenever we have a contractual modification

8  that we update our policies and procedures accordingly.

9          So from a variety of perspectives in terms of

10  my prior experience, more than two decades with the

11  Bureau of Prisons, from my experience hiring staff from

12  the Federal Bureau of Prisons that have left senior

13  management roles to include wardens positions, associate

14  wardens positions, to include healthcare services

15  administrators that have operated Federal Bureau of

16  Prisons healthcare divisions within facilities as audit

17  team members, I -- understanding many of the staffing

18  issues and concerns that impact not only the Bureau of

19  Prisons but staffing issues and concerns that impact

20  virtually most areas of corrections and how that's

21  certainly compounded in the health services areas and

22  other professional services such as mental health.

23          So I have many years of experience, and I'll

24  be relying on that very heavily in the formation of my

25  responses to any questions that might be posed in those

Page 98

1     areas.

2          And I think as well that my attendance at

3     professional associations and meetings staying current

4     with the latest standards, and requirements, and

5     challenges, listening to my colleagues in the industry

6     both on the government services side, as well as on the

7     private sector side, the challenges that many of us

8     share together in the corrections industry, I believe

9     all of that provides me the opportunity to provide,

10    perhaps, a unique, professional input -- expert input in

11    response to these areas.

12         Q.   Okay.  So under this section, starting with

13    number 2, summary of facts and opinions, do you see that

14    there are five sentences in this paragraph going from

15    page 6 to 7?

16         A.   Yes, sir, I do.

17         Q.   On page 7, the second to last sentence begins,

18    "Dr. Murray may also testify about challenges to the

19    BOPs."

20          Can you read that sentence, please?

21         A.   Yes, sir.  "Dr. Murray may also testify about

22    challenges to the BOP's operational performance in areas

23    of correctional facility management, oversight,

24    training, security, and related policies and

25    procedures."

1    Q.   Okay.  Did you work at the BOP between 2012

2    and 2016?

3    A.  No, sir, I did not.

4    Q.   Visit any BOP-run facilities between 2012 and

5    2016?

6    A.   Only BOP facilities I visited during that

7    timeframe were ones that we operated at CoreCivic.

8    Q.   Okay.  So no then?

9       MR. GLENNON:  Objection.  Vague.  Form.

10      THE WITNESS:  The response would be no, sir.

11   BY MR. BLACK:

12     Q.   When was the last time you stepped foot in a

13   BOP-run facility?

14      MR. GLENNON:  Objection.  Vague.

15      THE WITNESS:  It was probably during a visit

16   at an ACA meeting, when one of the local BOP facilities

17   was up for tour.  But since joining CoreCivic, I have

18   not spent a substantial amount of time -- a very limited

19   amount of time, frankly, in BOP operated facilities.

20   BY MR. BLACK:

21     Q.   Can you remind me the last time you worked for

22   the BOP was?

23     A.   Yes, sir.  I left the Federal Bureau of

24   Prisons in August of 2004.

25     Q.   Does the BOP send you reports about its

1    with them either at hire or right after hire, but I

2    believe that may have been more than eight years, as I

3    recall.

4        Q.   Have you interviewed any inmates of BOP-run

5    facilities in the last eight years about BOP operational

6    challenges?

7        A.   No, sir, I have not.

8        Q.   You worked at two facilities -- two specific

9    facilities at least when you worked at the BOP; is that

10   right?

11       A.   Yes, sir.

12       Q.   Whether or not it was in the last eight years,

13   three individuals you mentioned interviewing, did you

14   interview them about riots at BOP prisons?

15       A.   No.

16       Q.   Did you interview them about murders of

17   correctional officers at any BOP prisons?

18           MR. GLENNON:  Objection.  Vague.

19           THE WITNESS:  We -- we may have discussed some

20   of the tragedies that occurred in the BOP, perhaps, with

21   death of staff or tragedies that occurred at other

22   correctional facilities.

23           But, I'm sorry, I can't give you a specific

24   answer.  I don't recall that specifically, no, sir.

25           If we did have that discussion, I'm certain it

1    was probably in passing.

2    BY MR. BLACK:

3        Q.  Okay.  Did you interview them about the taking

4    of hostages in BOP-run facilities?

5        A.  No, sir.  I didn't -- didn't interview them

6    about the taking of hostages.

7        Q.  Mr. Murray, are you prepared to testify about

8    challenges to the BOP's operational performances in the

9    areas of say security?

10       A.  To the extent that we, as an industry, face

11   those types of challenges, I believe I would be, yes.

12       Q.  And that's even though you haven't worked for

13   the BOP in over a decade, you haven't gotten any reports

14   from the BOP about their operational performance, you

15   haven't gotten any statistics from the BOP about their

16   operational percentages; is that right?

17       A.  I --

18           MR. GLENNON:  Objection.  Vague.  Foundation.

19           You can answer.

20           THE WITNESS:  Well, Mr. Black, I don't know

21   that having reports from the BOP would, first of all,

22   would be probably inappropriate for me to have them as

23   an employee at CoreCivic.

24           Secondly, my view is that many of these are

25   challenges that we face as an industry as correctional

1    professionals.  Whether or not we work in the BOP,

2    whether or not we work in a state corrections agency,

3    whether you work for one of the privates, whether you

4    work for a city or county jail -- although sometimes the

5    missions are different, and missions can be quite

6    different even within a correctional agency, we face, as

7    an industry, very similar challenges, and I hear about

8    these all the time when I go to my professional

9    meetings, and participate with ACA and NCCHC.  Just --

10    it's, I think, fairly common knowledge.

11    BY MR. BLACK:

12        Q.   Does the BOP house high security prisoners?

13        A.   Well, let me answer that this way.  I believe

14    we may have housed some high security individuals, but

15    certainly not as -- as a standard practice.

16            You know, when you operate jail settings, you

17    oftentimes don't know who you have when they first come

18    in the door.  They may come into a facility as a jail

19    detainee and end up -- if you don't have all the

20    background on them, either through -- once you receive

21    the additional information, you learn how potentially

22    violent their histories are.

23            And candidly as well, even when people come

24    into lower security facilities initially, sometimes

25    those individuals continue to act out in a way that

1    works their way up the security ladder.

2          So just because someone comes into a jail

3    facility or a low facility initially, doesn't mean that

4    you're not housing someone that, frankly, has high

5    security potential, can be very dangerous individuals

6    regardless of the security level, the jail setting in

7    which you find them.

8          But in response more directively to your

9    question, as a general practice, no, sir, I don't

10   believe we house specifically units of the highest

11   security types of inmates or detainees, per se.

12      Q.  Does the BOP house inmates that are high

13   security inmates or high facility -- or high risk

14   facilities?

15        MR. GLENNON:  Objection.  Vague.

16        THE WITNESS:  Yes, they do.

17   BY MR. BLACK:

18      Q.  Okay.  Between 2012 and 2016, did CCA operate

19   any facilities on behalf of the BOP where the inmates

20   were anything other than low risk?

21        MR. GLENNON:  Objection.  Vague.  Form.

22        THE WITNESS:  Mr. Black, we operated

23   facilities that tended to be, you know, as I tried to

24   make, apparently unsuccessfully in my earlier comments,

25   that we did operate the lower security facilities.

1    deficiency"?

2        A.  I see that.

3        Q.  Does that mean that three different people

4    died in this manner?

5           MR. GLENNON:  Objection.  Vague.

6           THE WITNESS:  I'm not certain, but I believe

7    that would be accurate.  They're citing this as a death

8    in care and custody where the concern was that the

9    management was not in accord with the required policies

10   or their policies.  I would assume it would be the third

11   person, that would be correct.

12   BY MR. BLACK:

13       Q.  Do you know whether the BOP considered this a

14   significant problem?

15          MR. GLENNON:  Objection.  Vague.  Calls for

16   speculation.

17          THE WITNESS:  I think it's clear they're back

18   reviewing the operation of the facility, the purpose of

19   the follow-up, and evaluating the overall -- the

20   compliance of that section of our operations,

21   specifically.

22   BY MR. BLACK:

23       Q.  Do you know how many repeat, repeat

24   deficiencies resulting -- not resulting.  Let me

25   rephrase.

1          Do you know how many repeat, repeat

2   deficiencies related to the death of an inmate the BOP

3   found for CCA at the five BOP facilities between 2012

4   and 2016?

5          MR. GLENNON:  Objection.  Foundation.  Vague.

6          THE WITNESS:  I -- repeat deficiencies or

7   multiple repeat deficiencies?

8   BY MR. BLACK:

9     Q.   Multiple repeat deficiencies.

10     A.   I don't have the specific number in front of

11   me, but I'm sure it's in a report we have somewhere.

12     Q.   Do you have a number for BOP-run facilities --

13   the number of times the BOP found that their own

14   facilities engaged in similar repeat, repeat

15   deficiencies?

16          MR. GLENNON:  Objection.  Vague.

17          THE WITNESS:  I know that the Bureau of

18   Prisons certainly has repeat deficiencies.  I've

19   participated in audits of those facilities where

20   multiple repeats were found.

21          And so I can't -- excuse me, I'm -- I'm sorry.

22   That was the -- I've certainly seen some repeat, repeat

23   deficiencies in bureau operation.

24   BY MR. BLACK:

25     Q.   I'm asking now do you have the data for 2012

1    to 2016 for BOP-run facilities?

2          MR. GLENNON:  Objection.  Vague.

3          THE WITNESS:  Well, Mr. Black, I think as we

4    discussed, no, sir, they would probably not share that

5    information with me as an employee of a private

6    contract.

7    BY MR. BLACK:

8       Q.  Would you have -- sorry.

9          Would you have that data for GEO facilities?

10         MR. GLENNON:  Same objection.

11         THE WITNESS:  Would I have that data for GEO

12   facilities?  I certainly would not have that data for --

13   I don't -- for GEO facilities, no.

14   BY MR. BLACK:

15      Q.  Would you have it for any competitors of

16   CoreCivic?

17         MR. GLENNON:  Same objection.  Vague.

18         THE WITNESS:  No, I would not, except that

19   that information, to the extent that it might become

20   publicly available or, as you mentioned earlier, made

21   available through FOIA, perhaps, no, I would not have

22   that information and do not have that information.

23   BY MR. BLACK:

24      Q.  Let's move to tab 12, so the document in your

25   binder and the electronic document provided to Aptus.

1    e-mail, does it appear that health services continues to

2    be a problem for the Eden facility?

3          MR. GLENNON:  Objection.  Vague.  Calls for

4    speculation.

5          THE WITNESS:  From this e-mail, it appears

6    that, of the 23 deficiencies, 8 were found in the health

7    services area which is noted clearly here.  But relying

8    on just pure numbers of deficiencies on the line

9    sometimes doesn't provide the appropriate context to

10   determine whether or not an operational area is working

11   as effectively as we would like it to work, or expect it

12   to work or not, because many operational areas are --

13   have -- some operational areas have more complex levels

14   and more complex processes than others.  Some are

15   audited more thoroughly, if you would, or more

16   rigorously based on how they break those processes down

17   into their component parts.

18          Obviously health services and security are

19   very complex areas.  Require a very detailed review.

20   So, for example, there may be 200 items that get

21   reviewed in the security area, and 160, perhaps, just

22   for example, in a health services area, and other areas,

23   while still very important to the overall operation of

24   our facility, may have far fewer audited components

25   because they have fewer processes -- or that are

1    perceived as perhaps critical processes -- than some of

2    the areas such as health services, or correctional

3    services, security, or even food services obviously is

4    an operational area that, again, each individual inmate

5    or detainee received services from three times per day.

6         So just looking at the number of deficiencies,

7    per se, doesn't always put it in proper context if

8    that's helpful to you, sir.

9    BY MR. BLACK:

10       Q.   Okay.  Does knowing that two of the

11   deficiencies were repeat deficiencies help give some

12   context to the severity of the issues described?

13       A.   It potentially could, but respectfully not

14   necessarily, Mr. Black.  If I could just take a minute

15   and explain to you why that that's not always the case,

16   I would like to be able to do that.

17       Q.   So I haven't asked you that question.

18       MR. GLENNON:  Hold on.  Hold on.  He's allowed

19   to finish his answer.

20       MR. BLACK:  Why are you interrupting.  He

21   asked permission to give --

22       MR. GLENNON:  Because you're -- you're --

23       MR. BLACK:  Brian, make an objection, instruct

24   him not to answer.  Those are your options.  He asked me

25   a question.

1          MR. GLENNON:  No.  I started to ask you not to

2     interrupt him and let him finish his answer.  He

3     indicated that he wanted to finish his answer, and he's

4     allowed to do that.

5          Mr. Murray, were you finished with your

6     answer?

7          THE WITNESS:  No, sir, I was not.

8          MR. BLACK:  Now you're instructing the

9     witness.

10          MR. GLENNON:  You can complete your answer.

11          And then, Mr. Black, you can ask whatever

12      follow-up questions you want.

13          Go ahead, Mr. Murray.

14          THE WITNESS:  Thank you.

15          Repeat deficiencies, particularly within the

16     Bureau of Prisons processes that they utilize to conduct

17     customer facility monitoring or CFMs, and the way their

18     audit tools are designed tend to be rather hierarchal,

19     if I could use that -- make that statement.

20          That is to state -- for example, if a repeat

21     deficiency is a function of a process that was perceived

22     to have failed or perceived to have actually not been

23     fully complied with, those -- those specific areas or

24     areas of deficiency or opportunities for improvement

25     might be very discrete and very different.

1          So for example, if you have three cases that

2     involve an individual that has a liver condition, an

3     individual that has HIV, an individual that has cardiac

4     case, hypertension, an individual that has multiple

5     medical chronic care conditions, the bureau could come

6     in and find that -- on a CFM that we didn't fully comply

7     with the -- the treating physician, didn't -- or the

8     medical staff didn't fully comply with one of those

9     components, each of which could be quite different that

10    was not complied with for a patient that was a liver

11    patient, or a cardiac patient, or a patient that was an

12    HIV patient.

13          Again, there may have been one area, or one

14    step, or one test that could have been drawn that wasn't

15    drawn timely.  A variety of issues, but -- but each of

16    those deficiencies could be different deficiencies, but

17    they all roll up under the bureau's structure to -- from

18    their more hierarchal view, that the facilities --

19    health services maybe didn't fully comply with all the

20    requirements that were necessary in the treatment of

21    that patient or that patient's condition.

22          So that -- that's what I was trying to explain

23    that a repeat deficiency, in and of itself, is -- is

24    it -- they could all be different individual

25    deficiencies, but they all roll up under a type of

1    treatment that relates to something that is unique in

2    each case that is evaluated by the auditor.

3         So that's -- that was my concern about repeat

4    deficiencies.  So they, in and of themselves, do not

5    necessarily mean that the practices are not, you know,

6    are inconsistent.  It may be that they are -- each of

7    them are different deficiencies, but they all, perhaps,

8    impact the treatment in those individual cases, but each

9    of those cases could be -- could be potentially

10   differing types of deficiencies.  That's -- that's what

11   I was trying to explain.

12        (Deposition Exhibit 579 marked.)

13   BY MR. BLACK:

14       Q.  Can you turn to tab 14, please.

15        Tab 14 is going to be Exhibit 579.  The bottom

16   of page 1, do you see that you sent an e-mail that's

17   part of this e-mail thread?

18       A.  I do.  Mmmm-hmmm.  Let me look -- let me

19   review this quickly.  This is -- yes, at the bottom of

20   this page I see that.

21        Yes.  That's correct.  Mmmm-hmmm.

22       Q.  Does this appear to be a true and correct copy

23   of an e-mail thread that you participated in?

24       A.  Yes, it does.  Mmmm-hmmm.

25       Q.  Do you see in the -- above "we hope this

1    information is helpful," that last sentence of that

2    e-mail, the second to last paragraph of your e-mail

3    starts "by the way."  And it says, "while I originally

4    thought that the outlier in the number of CFM safety

5    findings at Cibola might have been more of a BOP auditor

6    issue, our internal audits of the facility this year

7    suggest that this is indeed an area that needs

8    attention, as it also scored very poorly during our

9    internal audit."

10          Do you see that?

11      A.  Yes, I do see that.

12      Q.  Do you remember why -- this is in regard to

13   the Cibola facility; is that correct?

14      A.  Yes, sir it is.

15      Q.  And can you turn to page 3 of this document.

16   At the top of page 3, I think you'll see it will say

17   "overall CFM analysis," and then at the bottom there's

18   an "NOC's analysis," and "NOC content analysis" section.

19          Do you see that?

20      A.  Yes, sir.  I do see that.

21      Q.  And NOC refers to notice of concern; is that

22   correct?

23      A.  That is correct.  Yes.

24      Q.  Okay.  And CFMs were audits conducted by the

25   BOP of CCA facilities; is that correct?

```
 1          STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION

 2                              - - -

 3          I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,

 4   RSA, certify:  That the foregoing proceedings were

 5   remotely taken before me via videoconference at the time

 6   herein set forth; at which time the witness was duly

 7   sworn; that a record of the proceedings was made by me

 8   using machine shorthand which was thereafter transcribed

 9   under my direction; and that the transcript is a true

10   record of the testimony so given.

11          Further, that if the foregoing pertains to the

12   original transcript of a deposition in a federal case,

13   before completion of the proceedings, review of

14   transcript was requested.

15          The dismantling, unsealing, or unbinding of

16   the original transcript will render the Stenographer's

17   Certificate null and void.

18          I further certify that I am not financially

19   interested in the action, and I am not a relative or

20   employee of any attorney of the parties, nor of any of

21   the parties.

22          Dated this 30th day of October, 2020.

23

24   _____
              Victoria L. Valine, CSR License #3036
25
```