# EXHIBIT 65

1   UNITED STATES DISTRICT COURT
2   MIDDLE DISTRICT OF TENNESSEE
3
4   NIKKI BOLLINGER GRAE, Individually
    and on Behalf of All Others
5   Similarly Situated,
6           Plaintiff,          Civil Action No.
7   vs.                         3:16-cv-02267
8   CORRECTIONS CORPORATION OF
    AMERICA, ET AL.,
9
        Defendants.
10
    _____
11
12      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13
14      VIDEOTAPED DEPOSITION OF D. SCOTT DODRILL
15
16      Conducted virtually via remote videoconference
17              October 15, 2020
18
19
20
21
22
23   Reported by:
     Misty Klapper, RMR, CRR
24      Job No.: 10073528
25

1       UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF TENNESSEE
3
4    NIKKI BOLLINGER GRAE, Individually
   and on Behalf of All Others
5    Similarly Situated,
6        Plaintiff,        Civil Action No.
7    vs.                  3:16-cv-02267
8    CORRECTIONS CORPORATION OF
   AMERICA, ET AL.,
9
       Defendants.
10
   _____
11
12
13
14
15
16
17    Videotaped deposition of D. SCOTT DODRILL, taken on
18    behalf of Plaintiff, via Zoom remote videoconference,
19    beginning at 10:14 a.m. CST on Thursday, October 15, 2020,
20    before Misty Klapper, RMR, CRR.
21
22
23
24
25

```
1    APPEARANCES:
2    (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3    ON BEHALF OF PLAINTIFF:
4         CHRISTOPHER M. WOOD, ESQUIRE
     ROBBINS GELLER RUDMAN & DOWD LLP
5         414 Union Street, Suite 900
     Nashville, Tennessee 37219
6         (615) 244-2203
     E-mail: cwood@rgrdlaw.com
7              clyons@rgrdlaw.com
8              AND
9         JASON A. FORGE, ESQUIRE
     ROBBINS GELLER RUDMAN & DOWD LLP
10        655 West Broadway, Suite 1900
     San Diego, California 92101
11        (619) 231-1058
     E-mail: jforge@rgrdlaw.com
12
              AND
13
     KENNETH J. BLACK, ESQUIRE
14        ROBBINS GELLER RUDMAN & DOWD LLP
     One Montgomery Street, Suite 1800
15        San Francisco, California 94104
     (415) 288-4545
16        E-mail: kennybrgrdlaw.com
17
     ON BEHALF OF DEFENDANTS AND THE DEPONENT:
18
     BRIAN T. GLENNON, ESQUIRE
19        ERIC CHARLES PETTIS, ESQUIRE
     LATHAM & WATKINS, LLP
20        355 South Grand Avenue, Suite 100
     Los Angeles, California 90071
21        (213) 485-1234
     E-mail: brian.glennon@lw.com
22             eric.pettis@lw.com
23             AND
24
25
```

```
 1    APPEARANCES (CONTINUED):
 2    (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
 3    ON BEHALF OF DEFENDANTS AND THE DEPONENT (CONTINUED FROM
      PREVIOUS PAGE):
 4
 5         SARAH TOMKOWIAK, ESQUIRE
      LATHAM & WATKINS, LLP
 6         555 Eleventh Street, N.W., Suite 1000
      Washington, D.C. 20004-1304
 7         (202) 637-2335
      E-mail: sarah.tomkowiak@lw.com
 8
 9    ALSO PRESENT:  CARRIE HOWARD, VIDEO OPERATOR
10              DONNA MELLENDICK
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1  Whereupon:
2      D. SCOTT DODRILL,
3  was called for examination, and, after being duly
4  sworn, was examined and testified as follows:
5      MS. REPORTER: Thank you, sir.
6      EXAMINATION BY COUNSEL FOR PLAINTIFF
7      BY MR. FORGE:
8    Q.   Good morning, Mr. Dodrill.
9    A.   Good morning.
10   Q.   Can you hear me all right, sir?
11   A.   I can.
12   Q.   Okay. If there's -- if at any point
13 today you have technical difficulties, as I've
14 had, please just let us know, okay?
15   A.   I will.
16   Q.   Great.
17     Mr. Dodrill, you retired from the BOP
18 in December of 2010; is that right?
19   A.   At the end of -- at the end of
20 December, yes.
21   Q.   Okay. Prior to your retirement,
22 what, if any, personal role did you have in
23 monitoring CCA's performance for the BOP?
24   A.   I didn't have any personal role.
25   Q.   That's fine. If you didn't have --

1      BY MR. FORGE:

2      Q.   Sir, we already went over it, but I

3  guess we have to go over it again.

4           At the bottom of page 17 of

5  Exhibit 432, the BOP -- this is in the

6  Conclusions section of the report, correct?

7      A.   Yes.

8      Q.   Okay.  So the BOP -- and it writes

9  ████████████████████████████████████

10 ██████████████████████████████

11 ███████████████████

12           Do you see that?

13     A.   I do.

14     Q.   You omit from your report the fact of

15 that conclusion, correct?

16          MR. GLENNON:  Objection, vague,

17 foundation.

18          THE WITNESS:  I do.

19          BY MR. FORGE:

20     Q.   Now, if you turn to paragraph 38 of

21 your report --

22     A.   Do you have a -- do you have a page

23 number?

24     Q.   Sure.  It is -- hold on.

25     A.   Never mind, I got it.

1  Q.  Here it is.  Page 38, paragraph 98.
2  Page 38, paragraph 98.
3  A.  Oh, page 38.
4  Q.  Yep.
5  A.  Okay.  I'm there.
6  Q.  Okay.  Now, in paragraph -- I'm
7  sorry.  In paragraph 97 -- in paragraph 97 on
8  page 38 you list three other for-profit prisons
9  that had what you would describe as major
10  disturbances.
11  Do you see that?
12  A.  Yes.
13  Q.  Okay.  Now, let's take them one by
14  one.
15  Did you select these or did somebody
16  else select them for you?
17  A.  I selected them.
18  Q.  Okay.  Let's take them one by one.
19  The Cornell Corrections facility in
20  Big Springs, Texas, the -- what you classify as
21  major disturbance there, compared to the 25 staff
22  members taken hostage at Adams, how many hostages
23  were taken at Cornell Corrections?
24  A.  I --
25  MR. GLENNON:  Objection, vague.

1           THE WITNESS:  I don't recall any

2       being taken.

3             BY MR. FORGE:

4       Q.    Okay.  So you agree that 25 staff

5   members taken hostage at Adams is far worse than

6   the zero staff members taken hostage at Cornell

7   Corrections?

8             MR. GLENNON:  Objection, vague.

9             THE WITNESS:  Yes.

10            BY MR. FORGE:

11      Q.    Okay.  You -- you omitted that

12  unfavorable comparison in your reference to this

13  disturbance at Cornell Corrections, right?

14      A.    Yes.

15      Q.    All right.  Now, compared to the

16  guard who was murdered in the Adams riot, how

17  many guards were murdered in the Cornell

18  Corrections disturbance?

19            MR. GLENNON:  Objection, vague.

20            THE WITNESS:  I'm sorry, was

21      somebody talking?  Hello?

22            BY MR. FORGE:

23      Q.    The floor is yours.

24      A.    Okay.  I forgot the question now.

25      Q.    Sure.

1   disturbances?

2           MR. GLENNON:  Objection,

3       foundation, vague.

4           THE WITNESS:  I do not recall on

5       the Cornell and GEO.  I know Management

6       and Training Corporation did contact them

7       quickly, so that would not be part of it.

8       I don't recall the other two.

9           BY MR. FORGE:

10      Q.   Okay.  So you don't -- you have no

11  information that the other two failed to contact

12  law enforcement for 110 minutes, correct?

13          MR. GLENNON:  Object to form,

14      foundation.

15          THE WITNESS:  That is correct.

16          BY MR. FORGE:

17      Q.   And as to any of these three other

18  disturbances that you chose, did any of them

19  result in a finding by the BOP that a lack of

20  effective intelligence operations directly

21  contributed to the loss of control at those

22  facilities?

23          MR. GLENNON:  Objection, vague and

24      foundation.

25          THE WITNESS:  Again, I don't recall

1　　　on the Cornell and GEO. Management and

2　　　Training did not. They --

3　　　　　　BY MR. FORGE:

4　　　Q.　Okay.

5　　　A.　-- did have that --

6　　　Q.　So as far as you know, you're not

7　　aware of any finding by the BOP that any of these

8　　[REDACTED]

9　　[REDACTED]

10　　disturbances you reference here, correct?

11　　　　　　MR. GLENNON: Objection, form and

12　　foundation.

13　　　　　　THE WITNESS: Correct.

14　　　　　　BY MR. FORGE:

15　　Q.　Now, in the next paragraph,

16　　paragraph 98, you list four BOP prisons that had

17　　what you described as major disturbances, right?

18　　A.　Correct.

19　　Q.　Okay. Now, just to put this in

20　　context, I think you said earlier the BOP runs

21　　about 120 prisons compared to five that CCA used

22　　to run for the BOP, right?

23　　A.　BOP has in -- in -- in excess of 120.

24　　Q.　Okay. So you omitted that ratio from

25　　your comparison here, correct?

1　　　　MR. GLENNON: Objection, vague.
2　　　　THE WITNESS: I don't understand
3　　the question.
4　　　　BY MR. FORGE:
5　　Q.　Well, the BOP has at least 24 times
6　　the number of prisons that CCA ran for the BOP,
7　　correct?
8　　　　MR. GLENNON: Objection, foundation
9　　and vague.
10　　　　THE WITNESS: My math's not very
11　　good, but they had more than 100 more,
12　　yeah, 120 more.
13　　　　BY MR. FORGE:
14　　Q.　Right. Okay. You did not mention
15　　that in this paragraph in which you find four
16　　prisons -- four BOP-run prisons that had major
17　　disturbances, do you?
18　　　　MR. GLENNON: Objection, vague and
19　　foundation.
20　　　　THE WITNESS: No. I was looking
21　　for BOP prisons that had a homogeneous
22　　population.
23　　　　BY MR. FORGE:
24　　Q.　Okay. Now, even though BOP runs over
25　　20 times more prisons than CCA ran for the BOP,

1　　　　　But I -- I withdraw the last
2　　　　objection as I understand it -- it -- it
3　　　　falls under the rubric form.  But badgering
4　　　　the witness.
5　　　　　　I'm going to instruct the witness not
6　　　　to answer.  He's answered the question a
7　　　　number of times now.
8　　　　　　BY MR. FORGE:
9　　　　Q.　Okay.  You see further down on this
10　document --
11　　　　A.　Again, what page are we on?
12　　　　Q.　This -- we're still on page 4.
13　　　　　　Six months before this prisoner
14　received inadequate oxygen after hanging himself
15　after not being given any mental health
16　treatment, six months earlier it was also -- it
17　was determined that another inmate was not
18　treated -- did not receive medical management in
19　accordance with policy and standards of care,
20　right?
21　　　　A.　I -- I was lost there for a second.
22　I'm reading.
23　　　　Q.　Okay.
24　　　　A.　Okay.  In the previous CFM from
25　October there was a similar finding.

1   Q.   Right.  So that -- and that's what
2   makes this a repeat deficiency, right?
3         MR. GLENNON:  Objection,
4   foundation, vague.
5         THE WITNESS:  Yep.  Each of those
6   standards will have several sub-standards
7   underneath of them.  So it doesn't have to
8   be exactly the same thing to be a repeat.
9   Excuse me.
10        So this -- excuse me.
11        So it doesn't have to be the exact
12  same issue to get a repeat, just under the
13  same category, and that's what this is.
14        BY MR. FORGE:
15  Q.   Right.  So it's a repeat deficiency
16  in the sense of it is another instance -- six
17  months earlier there was another inmate who did
18  not receive medical treatment in accordance with
19  policy and standards of care, correct?
20        MR. GLENNON:  Objection,
21  foundation, form.
22        THE WITNESS:  Yes.
23        BY MR. FORGE:
24  Q.   And the -- the deficiency for this
25  other inmate six months earlier was that the

1    inmate was not started on intravenous access on a
2    timely basis, correct?
3            MR. GLENNON:  Objection, foundation
4    and form.
5            THE WITNESS:  Correct.  IV.
6            BY MR. FORGE:
7    Q.   Okay.
8            MR. FORGE:  Okay.  Look, why don't
9    we take our break now.  I'll get back
10   as -- as quickly as possible, but I think
11   we can go on break now.
12           VIDEO OPERATOR:  Okay.
13           MR. GLENNON:  Hey -- hey --
14   maybe -- hold on just -- just real
15   quickly.
16           Jason, I -- you said an hour but then
17   90 minutes.  What -- what -- what exact --
18   do you -- do you have any more precision?
19           MR. FORGE:  I don't know.  What
20   I'll do, Brian, is I will E-mail you
21   when -- as soon as I have a better idea.
22   So if I'm leaving the doctor's office I'll
23   E-mail you that okay, we should be ready
24   to start in 15 minutes.
25           MR. GLENNON:  Okay.  Thank you.

```
 1
 2                    CERTIFICATE OF NOTARY
 3               I, MISTY KLAPPER, the officer before
 4      whom the foregoing deposition was taken, do
 5      hereby certify that the witness whose
 6      testimony appears in the foregoing
 7      deposition was duly sworn by me; that the
 8      testimony of said witness was taken by me in
 9      shorthand and thereafter reduced to
10      typewriting by me; that said deposition is a
11      true record of the testimony given by said
12      witness; that I am neither counsel for,
13      related to, nor employed by any of the
14      parties to the action in which this
15      deposition was taken; and, further, that I
16      am not a relative or employee of any
17      attorney or counsel employed by the parties
18      hereto, nor financially or otherwise
19      interested in the outcome of this action.
20
21                              _____
22                              Misty Klapper, RMR, CRR
                                and Notary Public
23
24
25
```