# EXHIBIT 75



# Privately Operated Federal Prisons for Immigrants:

## *Expensive. Unsafe. Unnecessary*



Judith Greene
Alexis Mazón

*A Justice Strategies Report*     www.justicestrategies.net     *September 13, 2012*

## MISSION

Justice Strategies promotes humane, effective approaches to criminal justice and immigration reform through rigorous analysis, high-quality research and practical policy solutions. This and other Justice Strategies publications may be downloaded, free of charge, at www.justicestrategies.net.

About the Cover:

Adams County Correctional Center, Natchez, Mississippi
Corrections Corporation of America Facility

Spanish language sign warning all employees and visitors to the facility, parking lot, and surrounding areas, that they are subject to searches of their persons, personal effects and vehicles.

Photograph By Alexis Mazón
7-10-2012

Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary



Strolling around the sleepy town of Natchez, Mississippi (pop. 15,672) one may never discover that a flourishing business generating hundreds of millions of dollars in lucrative contracts lies just up the Richard Wright Memorial Highway at 20 Hobo Fork Road. That's where the Corrections Corporation of America (CCA) profits by charging a per diem fee to imprison one of the country's most destitute segments of society, undocumented immigrants. More than 2,500 immigrants are confined in the CCA prison after receiving federal prison sentences for entering the country without papers. Some arrive disoriented and still wearing clothes tattered by their harrowing journey north. Most certainly have no idea they are in a tourist destination of the antebellum South and will be warehoused for months, if not years, at a prison a private corporation built especially for them.

CCA Prison Warden Vance Laughlin assumes an almost prideful air when he announces at CCA's community advisory meetings, held quarterly at the historic Dunleith Plantation, that his prisoners hail from 71 countries, with Mexico representing the largest contingency.[1] Virtually all of them will be deported.

"Having a large Hispanic population has caused a problem," Warden Laughlin told reporters in March 2010.[2] He then proceeded to admit that while 81 percent of the 2,015 prisoners were Hispanic, he only had a total of six employees who spoke Spanish.[3] At the time of these pronouncements, the prison already had been operating with prisoners for seven months.

## LUCRATIVE FEDERAL PRISON CONTRACTS ENRICH WALL STREET CORPORATIONS

In 2009, CCA was awarded a four-year contract worth $226.4 million by the Federal Bureau of Prisons (BOP) to run the new Adams County Correctional Center (ACCC), which it sited in Natchez.[4] The contract is renewable and includes a 90 percent occupancy guarantee.[5] This was the eighth of the now 13 such contracts put out for bidding by the BOP.[6] Together the prisons hold more than 23,000 immigrants for which BOP is paying companies $5.1 billion.[7] This dollar amount does not include what CCA and its biggest business competitors are paid under their contracts with various other government agencies, including Immigration and Customs Enforcement, the U.S. Marshals Service, the Department of Homeland Security and state and local governments.

---

[1] "CCA Gives Adams County Correctional Center Update," Natchez Democrat, February 23, 2011.
[2] Jennifer Edwards. "CCA Has Quiet Start at Adams County Correctional Center," Natchez Democrat, March 21, 2010.
  Jennifer Edwards.
[3] Jennifer Edwards.
[4] BOP Solicitation Number: RFP-PCC-0012," April 1, 2009, available at https://www.fbo.gov/
[5] BOP Solicitation Number: RFP-PCC-0012," April 1, 2009, available at
https://www.fbo.gov/?s=opportunity&mode=form&id=b27d34eb774bfb1f088be9be0fb2f275&tab=core&_cview=1 Accessed on
September 9, 2012.
[6] BOP Solicitation Number: RFP-PCC-0012," April 1, 2009, available at
https://www.fbo.gov/?s=opportunity&mode=form&id=b27d34eb774bfb1f088be9be0fb2f275&tab=core&_cview=1 Accessed on
September 9, 2012.
[7] "Immigrants Prove Big Business for Prison Companies," Associated Press/USA Today, August 2, 2012, available at
http://www.usatoday.com/news/nation/story/2012-08-02/immigration-prison/56689394/1 Accessed on August 19, 2012

As a result of winning contracts to lock up both immigrants and U.S. citizens in nearly half of all states, CCA reported $1.74 billion in revenue in 2011 alone.[8]  When he announced the opening of CCA's new prison in Natchez, CCA President and CEO Damon T. Hininger declared, "This new award is very exciting, because it indicates to our shareholders, to our local communities, to our customers and certainly to all of you that CCA is indeed performing well, despite the lagging economy." [9]  He also pointed out that this was in fact "the fourth facility CCA operates in Mississippi." [10]  During CCA's quarterly earnings conference call on August 9, 2012, Mr. Hininger told investors he was "excited" to have made CCA's first payout of dividends on June 22, 2012.[11] CCA's near brush with insolvency in the late 1990's, due to prisoner abuse lawsuits, management problems and dwindling contracts, must have seemed like a distant memory.

*"We're also very excited that we've kicked off officially our dividend program."*
*Damon T. Hininger, President and CEO, CCA, August 9, 2012*

The sounds of earnings records breaking and champagne glasses clinking have not been able to drown out the noise brought by scores of lawsuits for wrongful deaths and horrific abuse, or the powerful statements of the immigrant prisoners themselves, who against all odds have made their difficult circumstances known through the global media.  International condemnation of the private prison industry by human rights advocates continues to grow, while grassroots divestment campaigns spring forth, reminding Wall Street that rising prison populations and profit-making prisons have no place in healthy, democratic societies.

## DEADLY CONDITIONS

"There aren't any good prisons, but the private ones are even worse," declares Tom Fortner, a former public defender based in Hattiesburg, Mississippi, about 150 miles east of Natchez.  Fortner has become familiar with CCA's practices as they run two other abuse-ridden prisons in Mississippi.  "Everything about it is all profit," he adds.

Reports of abuses at the CCA prison in Natchez have plagued it nearly from the start, according to Bill Chandler, director of the Mississippi Immigrants Rights Alliance (MIRA) in Jackson.  Immigrants have reported to local advocates that they endured beatings by guards, discriminatory and humiliating treatment, substandard food, periods of excessive lockdown and lack of proper medical care.

---

[8] "Corrections Corp. of America Income Statement," Market Watch/Wall Street Journal, available at http://www.marketwatch.com/investing/stock/cxw/financials.  Accessed on August 19, 2012.
[9] Damon Hininger.  "Adams County Facility Officially Opening," INSIDE CCA, available at http://www.insidecca.com/cca-voices/adams-county-facility-officially-opening/  Accessed on September 8, 2012
[10] Damon Hininger.
[11] "Corrections Corporation of America's CEO Discusses Q2 2012 Results – Earnings Call Transcript,"  Seeking Alpha/The Street, August 9, 2012, available at http://www.thestreet.com/story/11659842/1/corrections-corporation-of-americas-ceo-discusses-q2-2012-results--earnings-call-transcript.html  Accessed on August 20, 2012.

One man reported to Mr. Chandler that he witnessed an elderly prisoner pass out, begin convulsing and stop breathing in full view of guards who merely stood by. He said fifteen minutes passed before any prison staff began to administer CPR.[12] According to another prisoner, there is only one doctor for all 2,500 prisoners. There are several nurses on staff who write prescriptions and conduct exams. When this prisoner asked why he was not able to see a doctor, the nurse told him "not to worry."[13]

Juan Villanueva paid the ultimate price for attempting to reunite with his family in the U.S. After being deported to Mexico in 2007, he was desperate to return to the place he had called home since the age of four, Los Angeles, California. All seven of his brothers and sisters are U.S. citizens and live in Southern California, along with his mother and a loving extended family. On his way back, he was stopped near San Diego and detained by immigration authorities. They handed him over for prosecution in the San Diego Federal Court.

Mr. Villanueva found himself sentenced to 41 months of hard time. He was shipped to the state of Mississippi, where he would be under the control of the Corrections Corporation of American (CCA) for the following three years.

## THE ROUTE TO A FOR-PROFIT PRIVATE PRISON IN MISSISSIPPI

According to his family, Mr. Villanueva had been a Legal Permanent Resident of the U.S. for most of his life. In Los Angeles in 1995, he was arrested by an infamously rogue police unit in the neighborhood where he grew up. Police officers with the Rampart CRASH Division of the LAPD accused him of killing another person. Mr. Villanueva was sentenced to 15 years for manslaughter.

Not long after Mr. Villanueva was prosecuted, CRASH took the national stage when it came to light that its officers had perpetrated what would become the largest police misconduct scandal in U.S. history. More than 3,000 criminal cases were subsequently reviewed and 106 convictions were overturned after it was found that Ramparts police had planted false evidence, framed people for murder and even maimed and killed suspects.

By 2007, Mr. Villanueva had completed 85 percent of his sentence and was released to Immigration and Customs Enforcement (ICE), which deported him to a country he had not known since he was a toddler. With few opportunities in Mexico and far away from his family, he decided to risk it all and embarked on a journey back to Los Angeles.

---

[12] Bill Chandler. Personal Communication, July 12, 2012.
[13] Bill Chandler.

After being arrested and charged for setting foot on the San Diego side of the border, he requested to serve his sentence in a California federal prison. The government sent him to Mississippi instead. According to his sister, Angélica Moreno, Mr. Villanueva went to see a prison nurse and reported that he had started coughing up blood. A prison x-ray revealed a spot on one of Mr. Villanueva's lungs. The prison staff prescribed antibiotics and assured him that he was fine and told him "not to worry." They said that it was "just the flu."

## PRISON HEALTH CARE DISASTER

The family says that Mr. Villanueva continued to deteriorate in the weeks that followed, and made repeated requests for medical attention. He was prescribed two subsequent rounds of antibiotics, which seemed to make him even more sick. He continued coughing up blood.

Mr. Villanueva was placed in isolation for three weeks after guards locked his entire unit down following a fistfight between two other people. He was removed from lockdown after prison officials finally became concerned that he was vomiting blood in his isolation cell. He was taken to the hospital, but remained there only briefly before being returned to the prison.

Mr. Villanueva's brother, Iván Ayala, had become so alarmed about his condition that he flew to Mississippi from Los Angeles to investigate the situation. He was shocked to find his formerly youthful 39-year old brother terribly underweight and looking like he had aged decades. His sister recounts, "He'd lost so much weight. It was unbelievable. He's a tall guy, six foot two or three. He was full of life. In that little amount of time he just became a totally different person."

Mr. Villanueva told his brother that he had been locked down in isolation for three weeks, vomiting blood and unable to walk. He complained that the prisoners were served dinner at 3:00 in the afternoon every day, and that the food was highly inadequate. Worried that Mr. Villanueva was suffering from cancer, his brother tried to convince the prison staff that Mr. Villanueva needed immediate medical attention.

The family reports that when prison officials transported him to the emergency room of a local hospital, the doctor detected a second spot on his other lung. They say that chemotherapy treatment was available at the hospital and it had the potential to save Mr. Villanueva's life. Although Mr. Villanueva desperately needed chemo treatment, the prison staff would not transport him for most of the appointments.

This prompted his brother to make another trip to Natchez to again demand that they provide Mr. Villanueva with the needed treatments. CCA staff claimed that BOP officials had not signed off on the treatment. His sister recalls, "He was dying little by little. They could have done something about it. But they didn't because he was just a prisoner."

She says that Mr. Villanueva told her he had witnessed another man cry and scream in agony over a period of weeks, due to pain in his side, in the area of his appendix. "For a man to cry and cry out it has to be something very strong. But the prison staff didn't pay any attention to him. They laughed at him. His appendix burst at the prison. He died."

Just days before a prisoner uprising on May 20, 2012 that thrust the CCA prison into national headlines, Mr. Villanueva disappeared from the prison. Despite numerous requests, CCA would not disclose Mr. Villanueva's whereabouts to his family. Finally, after three weeks had passed, they were notified that he had been moved out of state. Her brother's health had deteriorated so dramatically that he had been transferred to a BOP medical facility in Butner, North Carolina. His sister immediately flew to North Carolina and rushed to the prison hospital to be by his side. "He was dying in there and we couldn't do anything. It was so hard." Mr. Villanueva died in prison on July 12, 2012, just two months from his release date. "My mother, especially, was devastated," his sister says.

After Mr. Villanueva died, the BOP released Mr. Villanueva's body to his sister. She made arrangements to have his body flown back to Los Angeles for burial. The family has requested that CCA and the BOP release all of Juan's medical records, beginning from the time his symptoms began. The Mexican Consulate has also requested the records, but everyone is still waiting for a response. His sister does have a copy of Mr. Villanueva's death certificate. It indicates the cause of death to be lung cancer.

A Mexican Consulate official says that they have interviewed dozens of people in the prison, both prior to and after the May 20 uprising. Mr. Villanueva's case is one of many being investigated by the Consulate.[14] Mr. Villanueva's sister says that when her brother lay in his BOP hospital bed dying, he told her, "You have to do something. If you can do something, do it for all the people who are still there."

"You shouldn't have a death sentence because you came to the U.S.," says Gail Tyree, a long-time Mississippi resident and community organizer who mobilized several campaigns to stop the construction of private prisons in the U.S. South, including the one in Natchez. Community advocates ran a local petition drive to prevent the prison from being built. They were successful in stopping another proposed prison in a neighboring county, but were unable to collect the number of signatures in Adams County required by state law.[15] The Villanueva family, faith groups and human rights organizations remain determined to continue organizing against immigration prisons and the laws that criminalize their communities. "For my brother it is too late," his sister cries, "But we cannot let his death be in vain. I want to do something for the people who are still in that prison."

---

[14] Telephone communication with Miguel Ángel Ferreira, Mexican Consulate, New Orleans, September 6, 2012.
[15] Ryan Nave, "Private Prison, Public Problem," Jackson Free Press, June 23, 2012

> *"For my brother it is too late… but we cannot let his death be in vain.  I want to do something for the people who are still in that prison."*
>
> <i>Angélica Moreno, sister of Juan Villanueva</i>

## MAY 20, 2012:  THE PRISONER UPRISING

On a Sunday afternoon in late May around 1:30 pm, prisoners at CCA's prison in Natchez engaged in a collective refusal to return to their cells and thus began an eight-hour standoff that would leave 20 people injured, one guard dead and $1.3 million in property damage.[16]   Accounts of what occurred are still emerging, but thus far most accounts, including official court records, corroborate the original statements of prisoners themselves who insisted they made repeated requests for a meeting with prison officials to address a list of grievances about mistreatment.[17]  When these appeals were ignored, they organized themselves and reportedly planned ahead of time to present prison officials with their list that Sunday, and to disobey orders to return to their cells until their demands were met.[18]

"They always beat us and hit us. We just pay them back…  We're trying to get better food, medical, programs, clothes. We're trying to get some respect for the officers and lieutenants that call us wetback," said an unidentified prisoner when he called a Jackson television station, WAPT Channel 16.  This same prisoner told Meg Pace, a WAPT reporter, that tensions exploded when guards sprayed tear gas on prisoners.[19]   The prisoners then proceeded to seize control of the prison and took several guards hostage.

It has been reported that some of the guards perceived by prisoners to be "good," or "non-abusive" had been warned ahead of time by prisoners to call in sick that day so as to stay out of harm's way. Those reports also claim that the day before the riot, cell phones were brought into the prison and used to contact "good" guards and warn them before the disturbance. The same prisoner who telephoned WAPT Channel 16 twice during the uprising stated, "We don't have nothing against most of the officers, just the management that disrespects us all the time." [20]

This is only the second time a guard has been killed at a CCA prison in the U.S.[21]  After the disturbance was quelled, prisoners were locked down in their cells for more than two months. The FBI went in and along with internal investigators interrogated prisoners. In August, when the lockdown was partially lifted, prisoners were allowed to resume occasional phone calls and hot food was reinstated.[22]   Two prisoners have been charged with alleged involvement in the uprising. On August 27, 2012, one of them, Juan López Fuentes, pled guilty to being involved in U.S. district court. He now faces up to 10 years in prison. He was originally scheduled to be released in August from the Natchez prison and deported. [23]

---

[16] Holbrook Mohr, "One Inmate Pleads Guilty, Another Charged in Riot,"  Associated Press/San Francisco Chronicle, September 6, 2012
[17] Holbrook Mohr.
[18] Ryan Nave, "Causes of Riot Revealed,"  Jackson Free Press, August 22, 2012
[19] "Man Claiming to be Inmate Snaps Pics from Inside Riot: Inmate Sends Photos from Phone to 16 WAPT." WAPT-16, May 22, 2012 available at http://www.wapt.com/news/mississippi/Man-claiming-to-be-inmate-snaps-pics-from-inside-riot/-/9156860/13565752/-/pr4dpwz/-/index.html  Accessed on September 8, 2012.
[20] "Man Claiming to be Inmate Snaps Pics from Inside Riot: Inmate Sends Photos from Phone to 16 WAPT."
[21] Robbie Brown, "Mississippi Prison on Lockdown After Guard Dies,"  New York Times, May 22, 2012
[22] Telephone communication with Miguel Ángel Ferreira, Mexican Consulate, New Orleans, September 6, 2012
[23] Holbrook Mohr.

## FBI AGENT: PRISONERS WERE PROTESTING MISTREATMENT

To the surprise of many, the FBI conducted its own investigation of the incident and concurred with human and civil rights groups. The FBI's investigator found that prisoners were protesting what they perceived to be a lack of adequate food and health care and disrespectful treatment by guards.[24] In his affidavit, filed on August 8, 2012 in conjunction with the first set of charges brought against a prisoner for the incident, Mr. López Fuentes, FBI investigating agent Casey Markovitz wrote, "Many within the inmate population became disgruntled with what the inmates' perceived to be inadequate or substandard food, medical conditions and disrespectful staff members." He goes on to state that a group of prisoners called the "Paisas" [countrymen, in Spanish] planned to take a list of grievances to Warden Vance on May 20, 2012.[25]

The FBI agent's affidavit continues, "Granados and Arredondo instructed the Paisas to disobey orders from the staff and to remain in their housing units until Warden Laughlin met the demands of the inmates." Agent Markovitz then referenced the prisoners' specific complaints about guards, writing that, "The Paisas had compiled a list of several CO's [correctional officers] they no longer wanted working at ACCC."

He then describes how a large group of inmates moved to another prison gate and again demanded a meeting with the warden. "Granados, Arredondo and approximately two hundred Paisas went to Gate 117 along Main Street, and demanded to speak to Warden Laughlin."

Markovitz affirmed prior reports by prisoners that guards had thrown chemical agents from the prison rooftop on the protestors gathered below in the yard demanding that the warden come speak to them. "The CO's on the rooftops began deploying tear gas on the inmates gathered near Gate 117." Officer Carithers was one of the guards on the rooftop.[26]

The prison warden and local Adams County sheriff, Chuck Mayfield, had initially alleged the incident was "gang-related."[27] However, "paisas," or "countrymen," is a term commonly used in Latin America to refer informally to people from one's own country. And on the same day that Agent Markovitz's affidavit was filed, FBI spokeswoman, Deborah Madden, told the public that according to the FBI's investigation, the prisoners had no ties to organized gangs.[28]

---

[24] Aviva Shen, "FBI Agent: Deadly Riot in Corporate-Run Prison Due to Complaints of Inadequate Food and Health Care." Think Progress, August 14, 2012
[25] Affidavit of Casey Markovitz, filed August 8, 2012 in the U.S. District Court for the Northern District of Mississippi, available at http://www.jacksonfreepress.com/documents/2012/aug/14/natchez-prison-riot-affidavit/ Accessed on August 20, 2012
[26] Casey Markovitz.
[27] Holbrook Mohr, "Sheriff: Gang Started Prison Riot in Mississippi," Associated Press, May 21, 2012
[28] Holbrook Mohr. "Mississippi Riot: "Paisas" Group Led Uprising Due to Alleged Mistreatment, FBI Says. Associated Press, August 13, 2012.

## ANOTHER PRIVATE PRISON UNDER CONTRACT WITH THE BOP HAD SIMILAR PROBLEMS

The disaster at CCA's Adams County prison was certainly not the first instance of major prison violence at an immigrant prison run by a private prison company under a BOP contract. A huge prison complex run by GEO at Pecos, Texas, erupted in two major disturbances in December 2008 and January 2009. Prisoners were protesting intolerable conditions, especially a lack of adequate medical care and the use of solitary confinement to punish people who complained about their medical treatment. The Reeves County prisons hold more than 3,700 people, mostly immigrants convicted of low-level federal drug or immigration offenses and serving prison terms before being deported to their home countries. Between 2008 and 2010, five people died in the prison complex.[29]

In December 2008, a disturbance, which started after Jesús Manuel Galindo -- an epileptic prisoner -- died in solitary confinement without adequate medication. His family said that when Galindo asked to see a doctor to treat his seizure problem, he was put in solitary in the segregated housing unit. According to letters he sent to his family, he was never seen by a doctor. The uprising resulted in $1 million in repairs to the prison. A second disturbance in February 2009 cost more than $20 million. Again, a prisoner – Ramón García – had been put into solitary after asking for medical attention. [30]

Medical care at the complex was provided under a contract with the Physicians Network Association, located in Lubbock, Texas. The physicians group had already run into trouble at other prisons. At a New Mexico facility where PNA worked, Justice Department investigators had concluded in 2003 that inmates suffered "risk of serious harm from deficient medical and mental health care."

Summarizing their findings, Justice Department officials wrote: "We find that persons confined suffer harm or the risk of serious harm from deficiencies in the facility's provision of medical and mental health care, suicide prevention, protection of inmates from harm, fire safety, and sanitation… The Detention Center, through PNA, provides inadequate medical services in the following areas: intake, screening, and referral; acute care; emergent care; chronic and prenatal care; and medication administration and management." [31]


## A BRIEF HISTORY OF PRISON PRIVATIZATION IN THE U.S.

The private prison industry was spawned after a wave of political initiatives and legislative reforms geared to "getting tough" on crime and criminals. These measures were producing a national crisis of prison overcrowding. Between 1980 and 2010, the U.S. prison population grew from 328,695 to 1,605,127, an increase of 388 percent. During that same period, however, the federal prison population increased by 761 percent.

---

[29] Forrest Wilder. "How a private prison pushed immigrant inmates to the brink." The Texas Observer, October 7, 2009
[30] Peter Gorman, "Private Prisons, Public Pain Despite a long record of abuses, GEO is still running Texas prisons." Fort Worth Weekly, March 10, 2010
[31] Tom Barry. "Medical Claims and Malpractice at West Texas Immigrant Prison." Trans Border Project, February 15, 2009.

The late 1970s economic downturn, coupled with correctional pressures to expand prison capacity, provided an opportunity for "free market" ideologues at conservative think-tanks such as the Heritage Foundation and the Reason Public Policy Institute to add prisons to an agenda already loaded with a raft of private sector alternatives to government-run public services. After Ronald Reagan took office in 1981, these ideas found an eager response at the federal government level.

Launched in the era of burgeoning prison populations and a flamboyant high-finance culture, the private prison industry quickly flourished. Public officials who favored neo-liberal economic policies embraced privatization of prisons in order to appear both tough on crime and fiscally conservative.

The birth of the private prison industry was midwifed by federal immigration authorities. By 1983 the Immigration and Naturalization Service (INS) and the United States Marshals Service (USMS) were gearing up to contract for private detention services. Behavioral Systems Southwest signed a contract with the INS in 1983. The Corrections Corporation of America (CCA) – incorporated in 1983, and now the largest private prison company in the world – was launched in 1984 with a contract from the INS to open a 350-bed immigration "processing center" in Houston, Texas.[32]

By 1985, a number of firms had entered the field eager to do business with governments at all levels. These included the Wackenhut Corporation, a huge transnational security services firm which formed a small correctional services division in 1984. The parent company was established in 1954 by George Wackenhut, an FBI agent with ties to many prominent Republicans, the military and the CIA.[33] Wackenhut also received its first contract from the INS to operate an immigrant detention center in Aurora, Colorado. Wackenhut Corrections Corporation (WCC) was formally incorporated in 1988 as a wholly owned subsidiary of the parent company.

Spurred by both politics and prison crowding, prison privatization took hold quickly. The first state prison contract was won in 1985, when the Kentucky-based U.S. Corrections Corporation (later merged with CCA) signed up to run a 200-bed low-security facility in St. Mary Kentucky. A 1988 Heritage Foundation report claimed that 28 states were allowing private operation of non-secure or minimum-security correctional facilities.[34]

Until the 1980s, the federal prison population had been relatively small. But due to heightened federal law enforcement efforts and new "get tough" legislation, the 1980s brought a significant increase in the number of federal prisoners. The federal Sentencing Reform Act of 1984 introduced draconian sentencing guidelines, and tough mandatory minimum drug sentences were enacted by Congress in 1986. By the end of the decade the federal prison population had more than doubled, from just over 24,000 to almost 58,000. Over the next decade, the population more than doubled again. [35]

---

[32] Charles Logan. "Competition in the Prison Business." The Freeman. August 1985
[33] Matt Shudell. "George Wackenhut Dies, Security Pioneer." The Washington Post, January 7, 2005
[34] Dana Joel. "A Guide to Prison Privatization." Heritage Foundation Backgrounder. Washington, DC: The Heritage Foundation. 1988
[35] About the Federal Bureau of Prisons. Washington, D.C.: Federal Bureau of Prisons Office of Communications and Archives, January 2011 See http://www.bop.gov/news/PDFs/ipaabout.pdf

JUSTICE STRATEGIES

The U.S. prison population skyrocketed through the 1990s and the market for private prison beds boomed accordingly. From 1991 through 1998 the private prison capacity growth rate averaged 36 percent a year. The sharp growth curve the industry maintained for more than a decade was facilitated by a chorus of vocal proponents on Wall Street and in academia. Their voices were magnified by the phalanx of policy pundits at the nation's most powerful conservative think tanks. By the mid 1990s the industry had become the darling of Wall Street.

The industry is dominated by the two giant prison operators that had been spawned by the INS. CCA, the world's largest private prison company currently has a market capitalization of more than $3 billion. The company contracts with government at all levels, the Federal Bureau of Prisons (BOP), the U.S. Marshals Service (USMS), Immigration and Customs Enforcement (ICE), 16 states, more than a dozen local cities and counties, as well as Puerto Rico and the U.S. Virgin Islands. CCA incarcerates more than 80,000 people in more than 60 facilities containing some 90,000 prison beds.[36]

In 2002, the Wackenhut Corporation was merged with a British security company. The following year, WCC signed a repurchase agreement for its stock and became a separate entity, a fully independent corporation now traded on the New York Stock Exchange as the GEO Group (GEO). With market capitalization of $1.6 billion, GEO is the second largest private prison company, operating 109 correctional, detention and residential treatment facilities encompassing approximately 75,000 beds worldwide.

## THE INDUSTRY'S CLOSE TIES TO POLITICIANS AND PUBLIC OFFICIALS

Since its founding three decades ago, CCA has relied on its close ties with politicians and public officials to increase its market share. Tom Beasley, a Republican activist and supporter of Tennessee's Governor Lamar Alexander, rose to chairmanship of the state's Republican party. As soon as Alexander was elected to a second term, Beasley founded the company with the hope that it would take over the entire state prison system. His startup investors included Democrat Ned McWherter, then speaker of the Tennessee House of Representatives, and Honey Alexander, the Governor's wife. The company grew by leaps and bounds. Though it was never able to acquire the entire Tennessee prison system, by 1998, CCA was operating six state and local facilities in its home state.

Through the mid-1990s, CCA stock was a top performer on the New York Stock Exchange, but most Tennessee state officials had long-since divested ownership of CCA stock. Beasley, however, had already branched out into a new business venture, "Red Hot and Blue," a chain of barbeque restaurants founded by Lee Atwater, campaign manager for President George H. W. Bush. Their partners included then-Governor Don Sundquist, Tennessee state representative Matt Kisber, and the house speaker Jimmy Naifeh – whose wife, Betty Anderson, was then CCA's lead lobbyist. [37]

---

[36] See http://www.cca.com/about/ accessed September 8, 2012
[37] Richard Locker. "Personal, Political, Business Ties Bind CCA, State." The Commercial Appeal, May 25, 1997

The private-prison industry has never lacked connections with the federal government, and it has provided a particularly rewarding post-government roost for BOP executives. Michael J. Quinlan, long the chief operating officer of CCA, served as BOP director under President George H. W. Bush, and when Harley Lappin resigned his BOP directorship after a drunk driving incident in 2011, he was quickly hired by CCA to serve as executive vice president and chief corrections officer.[38] Norman Carlson, a director of the BOP under President Ronald Reagan, sits on Wackenhut's board of directors.

## SUDDENLY THE PRIVATE PRISON MARKET BUBBLE BREAKS

The private prison industry is not the only entity with a special interest in maintaining the U.S. prison boom. But these companies were founded for the explicit and paramount purpose of profiting from the surging growth curve. The imperative to grow its market share and to maximize its profits creates political pressure for expanding the carceral apparatus, even while crime rates have nose-dived and a persistently weak economy have combined to warrant downscaling.

Expansion is essential to the private prison industry. Without growth, investor confidence quickly wanes, and executive stock options lose value. Efforts to meet the quarterly growth and earnings expectations of financial analysts on Wall Street can quickly spiral out of control. Money managers also work within extremely short time horizons to show "results." Given Wall Street's late 1990s infatuation with earnings growth and booming stock prices, an "old-economy" company that failed to produce profits over a couple of quarters at a 15 percent rate annualized was judged a failing company. This was not a business environment conducive to sound management of correctional institutions.

## A CASE IN POINT

Youngstown, Ohio, had suffered severely for decades as the US steel industry collapsed in a flood of cheap foreign steel. Forty-five thousand jobs left town. Riddled with mob corruption scandals and a nose-dive in population, the town was cut adrift from its blue-collar past. City officials were desperately seeking an economic recovery scheme. In March 1996, they signed a development agreement with the Corrections Corporation of America for construction and operation of a 1,500-bed private prison. A 103-acre brownfield site within its designated enterprise zone was "sold" to CCA for $1. The company was given a multi-year 75 percent tax break and an assurance that a variety of infrastructure incentives (water, sewer, natural gas, and electricity) would be available.[39]

---

[38] Michael Santos. "Harley Lappin: Disgraced Director or April Fool?" The Huffington Post, April 1, 2011
[39] Mark Tatge. "Youngstown prison's sale for $70 million outrages officials." Cleveland Plain Dealer, January 8, 1998. In early 1998 it was reported that CCA had sold the prison and the land it stood on to a real estate investment trust it had set up as a shelter from corporate income taxes. The sale price was $70 million, through local tax records showed a combined value of $30 million for the land and the prison. The city of Youngstown got no share in the profits from the land sale.

Around this same time the troubled District of Columbia Department of Corrections was under pressure from the courts stemming from multiple legal challenges to overcrowding and sub-standard conditions of confinement in both the D.C. jail and the seven D.C. prisons that made up the Lorton prison complex on 3,000 federally-owned acres in Virginia.  In February 1996, prodded by a congressional budget directive, D.C. Mayor Marion Barry unveiled a plan to close the Lorton complex and move three-quarters of the prisoners confined there to private prisons. [40]

The activation of CCA's Northeast Ohio Correctional Center was accomplished at a brake-neck speed that seriously compromised facility safety and security.  Prison operations were commenced in mid-May 1997, with the transfer of 904 prisoners in just 17 days.  Though billed as a medium-security prison, CCA had imported 1,700 of the most violent prisoners from Washington, D.C.'s Lorton prison complex. [41]

Within the first month of operations, two prisoners had been stabbed, and in July two more.  By this time the prisoners had filed a class action suit in federal court, claiming they were being subjected to excessive force; that inadequately-trained staff were unable to protect them from physical injury and property loss; and that medical care was not adequate.

On July 25, 1998, six prisoners escaped from CCA's Youngstown prison.  They had sliced a hole in the recreation yard fence and scrambled over multiple rolls of razor ribbon in broad daylight. Prison guards did not notice them, and the perimeter alarms malfunctioned.  When Youngstown residents were informed that five of the escapees were convicted of murder, they learned that CCA had failed to screen out maximum security prisoners in what they had been assured by the company was only a medium security prison.

The mass escape drew national media attention to a prison that had been open for just a year, during which 20 prisoners had already been stabbed and two had been murdered.  The management problems that led to the operational disaster in 1998 had begun the day CCA opened the prison for business.  The financial incentive to fill the prison as rapidly as possible overrode standard correctional practice for activation of a new prison facility.

After the escapes, a federal investigation revealed that the prison was staffed with guards with little or no experience in corrections.  John Clark's investigation for the Department of Justice turned up ample evidence that CCA had failed to meet its responsibility to provide staff at Youngstown that were adequately prepared to operate a prison under normal conditions, much less to handle the busloads of "heavy-hitters" sent to Youngstown by the D.C. Department of Corrections.  CCA had pledged to recruit local residents to fill staff positions at the prison, and they seem to have made every effort to do so.  Most guard positions were filled with local residents, the overwhelming majority of whom had no prior correctional experience. [42]

---

[40] Loeb, Vernon.  "New Housing Would Allow Closing of Lorton Complex." The Washington Post.  March 11, 1996.
[41] See http://www.motherjones.com/politics/2000/05/steel-town-lockdown
[42] John Clark.  Inspection and Review of the Northeast Ohio Correctional Center.  Washington, D.C.: Office of the Corrections Trustee for the District of Columbia.  November 25, 1998.

The problem was most critical at the mid-supervisory level, where newly-hired line staff must look for experienced direction. On paper, CCA required at least three years of correctional experience for promotion to sergeant, but CCA wardens were free to waive the requirement. Of 30 sergeants hired to provide supervision of the rookie guards at Youngstown, less than half had any prior correctional experience. Of nine lieutenants, two had no prior correctional experience, and just one had as much as ten years experience in the field. Of six captains, four had less than five years' experience. The average time between date of hire for rookie guards at Youngstown and promotion to lieutenant was just 13 months. For captain it was 15 months. One rookie became a sergeant in six months, was made a lieutenant is two more months, and was elevated to captain just three months later.[43]

Until reined in by litigation, CCA shaved costs by their methods of deployment of security staff. Alphonse Gerhardstein, a civil-rights lawyer who took up representation of the CCA prisoners in a class action lawsuit filed just 10 weeks after the facility opened its doors, recalls the situation:

> Staffing problems were obvious early on – and they were major. In the beginning, CCA refused to have any overlap at security posts during shift changes. Guards were supposed to leave their posts uncovered, and meet their counterparts for the next shift at the time clock to discuss issues and problems. Of course we found that shift change was the time for major violence. But it was all about economics. Now the shift transition is supposed to be made at the posts – and there is supposed to be greater use of log books to record information to inform personnel on the next shift of any problems.[44]

Another critical area where CCA's operation had failed to provide an acceptable level of services involved medical care. The prisoners D.C. DOC had transferred to the CCA prison included a high number who were struggling with life-threatening illness. Gerhardstein was appalled by the attitudes of CCA managers about this issue:

> Medical care was another big problem area. The prison had so many prisoners with full-blown AIDS – the largest concentration of AIDS patients of any prison in Ohio – needing drug cocktails and complex medical care on a daily basis. We had four AIDS deaths before anybody even began to get a handle on the problem. They just ignored a lot of this stuff until we got medical experts in there to audit the records; to say, "Hey – what about this guy." And then the attitude was, "These are a bunch of sick inmates – it's too bad." They didn't start systematic identification of chronically ill prisoners until we got an MD in there to do regular monitoring. Over the course of time CCA had three different sub-contractors handling medical care, and over time it ended up costing them more and more money.

---

[43] Clark, John. Inspection and Review of the Northeast Ohio Correctional Center. Washington, D.C.: Office of the Corrections Trustee for the District of Columbia. November 25, 1998.
[44] Gerhardstein, Alphonse. Personal communication, May 21, 2001.

JUSTICE STRATEGIES

*"We had four AIDS deaths before anybody even began to get a handle on the problem."*
*Alphonse Gerhardstein, Civil Rights Lawyer*

CCA was not the only private-prison company with operational disasters that drew a media spotlight. Shortly after the Youngstown escapes, two prisons run by GEO (then know as the Wackenhut Corrections Corporation) in New Mexico erupted in violence and disturbances. Between December 1998 and August 1999, four prisoner-on-prisoner homicides were committed in the two facilities; and then, in August 1999, a guard was murdered as well.[45]

Soon the media was flooded with reports about gross deficiencies and abuses at private prisons. Private prison growth began to stall. CCA had lost $53.4 million in 1999 and cut nearly 40 percent of its workforce that year.[46]  In 2000, the industry capacity actually declined by almost 3,500 beds – a three-percent decline from 1999. State prison population growth had begun to level off and state officials pulled back from the trouble-plagued industry. Private prison companies found themselves over-leveraged and under-capitalized – particularly CCA, which had earlier piled on debt to build prisons "on spec."

The number of private prison beds said to be available in the US in September 2001 was 119, 023 -- but thousands of these beds were not filled at the time.[47]  The 1998-2001 period had been catastrophic for the industry. Market pressures had forced hugely ambitious business plans, but operational disasters resulted, sending stock prices to all-time lows. After the six prisoners escaped from CCA's Youngstown facility, the company's stock price slid by 20 percent in just five trading days. When the Wackenhut prison guard was killed in New Mexico, the company's stock price slid 28 percent in just two trading days.

Crime rates were falling in 2002, and a variety of factors began to slow the state prison population growth curve. As population pressures loosened and state officials assessed the many problems that privatization spawned, not a single state was soliciting new private-prison contracts. Many existing contracts were rolled back or even rescinded. CCA stock prices fell through the floor.

CCA had traded as high as $84.88 a share during its heyday as a high-flying growth stock on Wall Street.[48]  But the stock lost 93 percent of its value in 2000, and the company reported a fourth-quarter loss of more than a third of a billion dollars. The stock closed at 19 cents on December 15, 2000. Wackenhut Corrections' earnings were down from 47 cents per share to 45 cents in the first half of 2000, despite revenue growth of 30 percent. De-activation of the scandalously mismanaged Jena Juvenile Facility in Louisiana cost the company $2.3 million, and they reported sharply increased operating costs for medical care, wages, and liability insurance.[49]  The prison privatization experiment might have continued to spiral to an ignominious end, but for a resurgence in federal zeal to incarcerate immigrants.

---

[45] Greg Palast. "Free Market Human Misery." The Guardian/Observer, September 26, 1999.
[46] John T. Fakler. "Woes persist for Wackenhut corporations." The Business Journal, November 3, 2000.
[47] Charles Thomas. "Private Adult Correctional Facility Census." Gainesville, FL: Private Corrections Project, at http://web.crim.ufl.edu/pcp/ Accessed on September 4, 2001.
[48] Getahn Ward. "CCA executive Ferguson seeking to establish legacy." The Nashville Tennessean, November 8, 2000.
[49] John T. Fakler.

> *"The federal business is the best business for us. It's the most consistent business for us – and the events of September 11 is [sic] increasing that level of business."*
>
> <span style="float:right">*Steven Logan. Quarterly Earnings Teleconference transcript.*</span>

## THE PRIVATE PRISON INDUSTRY BUBBLE REINFLATES AFTER 9/11

The fortuitous dovetailing of "the public interest" with private prison profits is often touted by top company executives as they speak to stock analysts in the teleconferences that are held shortly after the companies release their quarterly earnings reports. Just a month after terrorists attacked the World Trade Towers and the Pentagon on September 11, 2001 – as smoke was still rising over lower Manhattan – Steven Logan hyped Wall Street investment analysts about the favorable "post-9/11" business prospects:

> It's clear that since September 11 there's a heightened focus on detention, both on the borders and in the US. What we are seeing is an increased scrutiny of…of… tightening up the borders, which… some of that means that people don't get through… but the other side of that is more people are gonna get caught. So I would say that's positive. And if anything, the federal system… that is already over-burdened is… is… indicating to us that they need even more help as a result of 9/11. So that's a positive for our business.
>
> The other thing that you're seeing that to be honest with you I have no idea how this is going to impact us but it's not bad – it can only be good – is with… with the focus on people that are illegal and also from middle eastern decent… um… in the United States there are over 900,000 undocumented individuals from middle eastern decent. That's… keep in mind… that's half of our entire prison population. That's a huge number. Um… and that is a… a population… for… for lot's a reasons that is being targeted. So I would say the events of 9/11… um… let me back up. The federal business is the best business for us. It's the most consistent business for us – and the events of September 11 is [sic] increasing that level of business.[50]

On the heels of 9/11, the industry re-grouped. CCA replaced its top executive team and the new lineup began slowly pulling the business back from its economic meltdown. The industry announced formation of a new trade association, the "Association of Private Correctional and Treatment Organizations," to foster an improved public image. As the group geared up, industry executives were pursuing less capital-intensive strategies that were focused on expanding existing facilities, making use of other existing facilities, and developing non-residential services. Wackenhut pursued development outside of the correctional field, seeking contracts to run mental health treatment facilities.

## A CONVOY OF CARS ARRIVES JUST IN TIME TO RESCUE CCA FROM BANKRUPTCY

After the operational disasters in 1998-99 hit the media and the state market for private prison beds began to sag, the federal government stepped up to save the day. Compared to the states, the

---

[50] Steven Logan. Quarterly Earnings Teleconference transcript. October 2001.

BOP had previously dragged its feet regarding privatization. A few intergovernmental agreements had been forged by the BOP with localities in Texas for low security beds to hold "criminal aliens," the BOPs term of art for outsourced immigrant prisoners.

In 1999, the BOP launched a massive privatization initiative. The harsh drug-sentencing laws that congress enacted in 1986 have famously played a central role in boosting the federal prison population. In 1985, just 34 percent of federal prisoners were serving time for drug offenses; today 48 percent are. But, few are aware of the impact of harsh new federal immigration laws enacted a decade later.

The 1996 Illegal Immigration Reform and Immigrant Responsibility Act greatly expanded the list of crimes designated as "aggravated felonies," for which a noncitizen must be deported after serving his or her sentence. These offenses include many violations that are neither aggravated nor even, in many other jurisdictions, felonies. The legislation helped to spur a huge law-enforcement campaign to track down crime-committing immigrants – including people charged with relatively minor offenses – and a concerted effort to target and prosecute those whose only "crime" is attempting to enter or re-enter the country.

As the state-level demand for private prison beds declined, federal laws and policies conveniently created a special population of federal prisoners: the so-called "criminal alien" population, designated by the federal government for segregation from the rest of the prison population in private contract prisons. In September 1999, on the heels of GEO's deadly disaster in New Mexico, the BOP issued its first request for low-security private prison beds to meet the prison system's "criminal alien requirements." The solicitation was termed "CAR-I" for short. The beds were to be located in California, Arizona, New Mexico, Texas, or Oklahoma.[51]

A CAR-I proposal by Cornell Corrections (a company since merged with GEO) to house almost 2,000 immigrant prisoners at a prison near Santa Fe was eliminated from the competition after many weeks of protest by a vibrant coalition of immigrant-rights advocates, civil rights activists, church leaders, and prison reformers. But in June 2000, two lucrative CAR-I contracts were signed with CCA – one for 2,304 beds at California City, California, and the other for 1,012 beds at its Cibola facility in Milan, New Mexico. The contracts were structured with an initial three-year term, with seven one-year renewal options, worth about $760 million over the following decade.

The BOP contracts were a godsend – a virtual bailout – for CCA. In 2000, the company was mired in debt, with some 10,000 empty prison beds, and was in violation of its credit agreements. The new BOP contracts were undoubtedly helpful as CCA executives worked to convince the company's creditors to extend waivers of default. Without the federal contracts, John D. Ferguson, the company's CEO, frankly admitted that CCA would likely have been forced into bankruptcy.[52]

---

[51] Judith Greene. "Bailing Out Private Jails," The American Prospect, September 10th, 2001
[52] Judith Greene.

A CAR-II solicitation was issued in 2000 for up to 1,500 beds to be located in the Alabama, Florida, Mississippi, and Georgia region. Five private companies and one Mississippi County proposed 14 possible CAR-II sites. Again, CCA appeared to have the inside track. The company had proposed a prison already built "on spec" in McRae, Georgia, and won the award.

CAR-III was issued that same year for three 1,500-bed facilities in California and Arizona. Six companies, one town, and a sheriff's department submitted 20 prospective sites.

The momentum has continued, apace, to date. On June 6, 2011 the BOP awarded the Management Training Corporation a $532,318,724 contract to operate a prison holding up to 3,000 "low security adult male inmates that are primarily criminal aliens with one year or less remaining to serve on their sentence." [53]

Currently there are 13 private prisons under contract with the BOP holding a "CAR" population. On August 2, 2012 the BOP published the CAR-XIV solicitation for an estimated range of 1,000 to 1,600 beds. The proposed facility may be located anywhere in the continental U.S. [54]

## THE CARS LURCH FORWARD

Industry executives claim that when private prisons erupt in violence, the problems that underlie such disturbances are just isolated events, confined to a handful of "underperforming" facilities. But there is ample evidence – from research, monitoring reports, facility audits, inquiry reports, and court litigation records – that critical patterns of structural deficiencies exist in many private prisons: high staff turnover; defective classification and security procedures; inadequate program services and substandard medical care. While the nation's public prisons are plagued with problems, the record shows that the private prison industry is fraught with a higher level of serious operational deficiencies than the public prison system.

In 1999, the lead author of this report directed a research project designed to compare the quality of correctional services in the Prairie Correctional Facility, a private prison run by CCA, with public prisons in Minnesota.[55] The CCA prison turned up higher levels of operational problems: program deficiencies, unreliable classification methods, and high rates of staff turnover resulting in inadequate levels of experienced, well-trained personnel. These types of operational deficiencies link directly to higher rates of problems with prison security and safety. The most troubled private facilities have shown an extremely high incidence of problems such as these.

A private prison industry survey by James Austin and Garry Coventry compared major violent incidents in medium and minimum private facilities with national data from similar public facilities.

---

[53] BOP Solicitation Number RFP-PCC-0018 (May 21, 2010). https://www.fbo.gov/utils/view?id=4956844b7db5dab41e1fec9946edcbcb Accessed September 8, 2012
[54] BOP Solicitation Number RFP-PCC-0021
https://www.fbo.gov/?s=opportunity&mode=form&id=d2f08fb6938da2fce131250e73d343eb&tab=core&_cview=1 Accessed September 8, 2012
[55] Judith Greene. "Comparing Private And Public Prison Services And Programs In Minnesota: Findings From Prisoners Interviews." in Current Issues in Criminal Justice 11:2 202 232

There were 49 percent more assaults on staff and 65 percent more prisoner-on-prisoner assaults in private facilities.[56]

Scott Camp and Gerald Gaes have identified a number of systemic difficulties in federally-contracted private prisons including an unstable workforce, and a higher incidence of prison disturbances and escapes. In their assessment of private prison performance, they cited evidence of critical lapses in security. The number of escapes from private prisons was substantially higher than what was experienced at BOP prisons.

Camp and Gaes compared the rates at which prisoners tested positive for drug use in private prisons with data from BOP-operated prisons. They found that 62 percent of the BOP prisons reported no positive results ("hits") on random urine analysis tests, compared to just 34 percent of the private prisons reporting no positive results. Forty percent of the private prisons reported "hit rates" of three percent or more, while just 16 percent of the BOP prisons reported positive "hits" of three percent or more.[57]

## THE CRACKDOWN ON IMMIGRANTS TRUMPS UNFAVORABLE FINDINGS

As the "war on terror" increased American fears that more suicide bombers from the Middle East would crash through our domestic air defenses, the policies intended to impede the flow of Latino laborers across the Mexican border became a massively expensive and heavily privatized enterprise. Federal efforts to apprehend, detain, punish and expel those that ventured North in hopes of finding manual labor opportunities became intense.

The current crackdown on immigrants seems to have adopted many aspects of the "War on Drugs," a failed campaign which was responsible for a great deal of the growth in incarceration of people of color during the 1980s and 1990s, with no appreciable reduction in national drug use. In the name of "border security," many drug enforcement strategies and tactics were retooled for use in immigrant enforcement.

The Border Patrol has moved toward "zero tolerance" of immigration violation as agents were told to wind down their long-established policy of releasing immigrants from countries other than Mexico on their own recognizance. More people who would have previously been simply deported to their countries of origin are now held for prosecution and sentenced to serve federal prison terms before being subjected to deportation.

---

[56] James Austin and Garry Coventry. Emerging Issues on Privatized Prisons. Washington, DC: Bureau of Justice Assistance. February 2001

[57] Scott D. Camp and Gerald Gaes. "Private Prisons in the United States, 1999: An Assessment of Growth, Performance, Custody Standards, and Training Requirements." Washington, DC: Federal Bureau of Prison/Office of Research and Evaluation. March 2000

## The Post-9/11 Crackdown on Immigrants

The federal government launched a massive buildup of enforcement capacity between 2003 and 2006, with much of the focus on increased detention and "zero tolerance" policies on the U.S. border with Mexico.

- **June 2003** Endgame, a strategic plan issued by ICE dated June 2003, indicated that the primary mission of the Office of Detention and Removal is to identify, locate, apprehend, process, and remove fugitive aliens from the United States.
- **December 2004** The Intelligence Reform and Terrorism Prevention Act of 2004 contained authorization for 40,000 new immigrant detention beds by 2010.
- **December 2005** Operation Streamline was introduced to target border crossers for prosecution and prison sentences.
- **November 2005** The Secure Border Initiative was launched by ICE proposing use of new congressional funding initiatives for the border wall, the virtual fence, more Border Patrol agents, and more detention beds.
- **January 2005** Rep. Sensenbrenner and five House Committee chairs sent a letter to President Bush demanding a doubling of Border Patrol agents, a tripling of immigration investigators, and the addition of 60,000 new detention beds.
- **July 2005** S.1438 was introduced by John Cornyn in the U.S. Senate proposing an increase of 20,000 detention beds.
- **December 2005** H.R.4437 (Sensenbrenner's bill) was passed by the House.
- **May 2006** CCA's most lucrative ICE contract was signed when the company repurposed its T. Don Hutto facility, a medium security prison north of Austin, Texas, as a detention facility for families with small children.
- **May 2006** The Willacy County Detention Center, a vast "tent city" detention camp was constructed virtually overnight by the Management Training Corporation in Raymondville, Texas, to hold thousands of immigrant adults facing removal by ICE.
- **June 2006** ICE officials announced that they still need 35,000 new detention beds to hold immigrants awaiting removal.
- **August 2006** ICE announced the end of "catch and release" at the border with Mexico.
- **September 2006** The daily detention population swelled to 27,521 by the end of the month, up from an average of 19,000 before July.
- **December 2006** More than 1,000 federal enforcement officers dropped a six-state dragnet on meatpacking plants owned and operated by Swift & Company, resulting in 1,282 arrests of immigrant laborers.
- **Throughout 2006** The number of ICE fugitive operation teams tripled and by the end of September the number of "immigrant fugitives" arrested had grown by 260 percent.

Just as African American drug users were demonized in the national media to inflame public opinion about the "crack crisis" of the mid-1980s and to gain political support for the "War on Drugs," lurid media depictions have cast Latino immigrants as criminals, gang members and terrorists and sparked fears of an "illegal immigration crisis."

Conservative pundits and politicians have used such anecdotal stereotypes to gain support for new laws and policies and increased funding for enforcement of criminal and immigration laws by state and local police, expanding the number of people and groups who are subject to racial and ethnic profiling. But the demand for immigrant workers in the US will not be abated by "supply side" enforcement tactics, just as militarized drug raids and mandatory sentences have not abated the demand for illegal drugs.

The fierce immigration policy debates since 9/11 and the federal enforcement crackdown have sent the price of stock in the Corrections Corporation of America and the GEO Group (formerly know as Wackenhut) soaring. While the ICE contracting bonanza proved to be an "immigrant goldmine" for the prison profiteers, the expanding load of immigrant prisoners in CAR facilities went largely unnoticed. Operation Streamline had turned the Federal District Courts along the border into judicial factories for the mass production of sentenced immigrants for distribution to a growing fleet of CAR prisons.

There were 58,002 noncitizens serving criminal sentences in federal prisons at the end of July 2012.[58]  Sixty-eight percent are Mexican citizens, and 86 percent are Latinos.[59]  Forty-three percent of the BOP's immigrant prisoners are serving a sentence for an immigration offense.  The remainder also appears to be a relatively unthreatening, low-risk group of prisoners.  The most frequent conviction charge in 2010 (47 percent) was for a non-violent drug charge.[60]  From 1985 to 1993, the number of immigrants, as well as citizens, sentenced to prison on federal drug charges soared at an annual rate of 21 percent.  But as that growth rate slowed, a surge in the number of non-citizens sentenced for immigration offenses began to take up the slack, growing at an average annual rate of 31 percent. [61]

A Bureau of Justice Statistics (BJS) report published in 2000 showed that just 1.5 percent of non-citizens were sentenced for violent offenses.   And, BJS researchers found that immigrants convicted of drug sales were likely to have played a lesser role in the transaction than did U.S. citizens convicted on sales charges.[62]

After 9/11 the federal crackdown on immigration violations greatly intensified.  While the number of federal apprehensions declined, the number of arrests for immigration violations tripled by 2010.[63]  Title 8 U.S.C 1326 makes unlawful reentry a criminal felony.  This is the fastest growing immigration charge.  More than 80 percent of people arrested on immigration charges are handled by federal courts located in 11 cities on the U.S./Mexico border.  Four-fifths of convicted immigration offenders received a prison sentence, with half sentenced to 15 months or more. [64]

The thirteen CAR prisons now hold more than 23,000 immigrant prisoners.  BOP officials have defended the CAR contracting initiative by pointing to the low-level non-serious charges on which most of the BOP's non-citizen prisoners have been convicted.  At the beginning of the CAR prison initiative, federal officials said that "criminal aliens" typically required only low-security prisons.  A BOP privatization administrator explained that because they face deportation at the end of their sentences, they do not require the kinds of education and counseling programs available in regular federal prisons.[65]

_____

[58] BOP "Quick Facts."  See http://www.bop.gov/news/quick.jsp  Accessed on September 8, 2012
[59] Government Accountability Office.  CRIMINAL ALIEN STATISTICS: Information On Incarcerations, Arrests And Costs.  Report Number GAO-11-187, March 2011
[60] Mark Motivans.  Immigration Offenders in the Federal Justice System.  Washington DC:  Bureau of Justice Assistance, July 2012
[61] Mark Motivans.
[62] John Scalia and Marika F. X. Litras.  Immigration Offenders in the Federal Criminal Justice System.  Washington DC:  Bureau of Justice Statistics.  August 2002.
[63] Mark Motivans.
[64] Government Accountability Office.
[65] Judith Greene

## CONCLUSION

Despite evidence that private prisons are substandard compared to those operated by government agencies, prison privatization is unlikely to be halted in the federal system until population growth in the federal prison system is curtailed. Halting Operation Streamline in the federal courts would be a good place to start. Efforts to reform federal drug sentencing and the harsh immigration laws and policies must continue.

The immigration laws adopted by Congress in 1996, especially as they interact with federal drug laws, represent a doubling down on punishment for noncitizens – subjecting them to severe sentences for non-violent drug offenses, and then further punishing them with detention and deportation. Coupled with the decision to prosecute border crossers as criminals, rather than using the civil enforcement provisions already available under the federal immigration laws, these harsh policies have created an extremely expensive and problem-plagued second-class penal system of segregated immigrant prisons.

## ABOUT THE AUTHORS:

**JUDITH GREENE** is a criminal justice policy analyst, a founding partner, and director of Justice Strategies, a project of the Tides Center. Justice Strategies is a nonprofit research organization dedicated to providing analysis and solutions to advocates and policymakers pursuing more humane and cost-effective approaches to criminal justice and immigration reform http://www.justicestrategies.org/. From 1985 to 1993 Judith Greene was Director of Court Programs at the Vera Institute of Justice, where she was responsible for planning and development of a variety of demonstration programs designed to improve the efficacy of both pretrial release and sentencing practices. Subsequently she served as program director for the State-Centered Program of the Edna McConnell Clark Foundation, and as a research associate for the RAND Corporation, and a senior research fellow at the University of Minnesota Law School. In 1999 she received a Soros Senior Justice Fellowship from the Open Society Institute.

Ms. Greene's articles on criminal sentencing issues, police practices, correctional policy and prison privatization have appeared in numerous publications, including The American Prospect, Corrections Today, Crime and Delinquency, Current Issues in Criminal Justice, The Federal Sentencing Reporter, The Index on Censorship, Judicature, The Justice Systems Journal, Overcrowded Times, Prison Legal News, The Rutgers Law Journal, and The Wake Forest Law Review. Her work has been cited in the New York Times, the Washington Post, and the Los Angeles Times, as well as in hundreds of local newspapers across the nation. She has also presented legislative testimony on sentencing and corrections policy in California, Colorado, Connecticut, Georgia, Maryland, Michigan, New Mexico, New Jersey, New York, Texas and before Congressional committees.

Ms. Greene may be reached at jgreene@justicestrategies.net

**ALEXIS MAZÓN** is a Researcher with Justice Strategies. She has conducted action-oriented criminal justice and immigration policy research and advocacy for the past 13 years. In her previous position at the UC Berkeley Center for Labor Research and Education, she researched and developed a popular education curriculum on barriers Latino immigrants and African Americans encounter in the labor market. While at the City of Tucson Public Defender's Office, she formulated defense strategies on behalf of clients facing criminal charges and potential immigration detention and deportation. As a Loren Warboys Fellow at the Youth Law Center in San Francisco, she advocated on behalf of immigrant youth and youth profiled as "gang affiliated" in the U.S. juvenile justice and immigration detention systems. She has a BA in Latin American Studies from Stanford University and a JD from New York University School of Law, where she was a Root Tilden Public Interest Scholar.

Ms. Mazón may be reached at alexismazon@justicestrategies.net