# EXHIBIT 78

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and on
Behalf of All Others Similarly Situated,

Plaintiffs,

vs.

CORRECTIONS CORPORATION OF AMERICA,
DAMON T. HININGER, DAVID M. GARFINKLE,
TODD J. MULLENGER, and HARLEY G. LAPPIN,

Defendants.

Civil Action No. 3:16-cv-02267

Exhibit
534-Allen
10-14-20   MK

# EXPERT REPORT

# OF

# LUCY P. ALLEN

**August 7, 2020**

**TABLE OF CONTENTS**

I.    Scope of Assignment .......................................................................................1

II.   Summary of Findings.......................................................................................1

III.  Qualifications and Remuneration ...................................................................3

      A.  Qualifications.........................................................................................3

      B.  Remuneration.........................................................................................3

IV.   Materials Considered ......................................................................................4

V.    Company Background ......................................................................................6

VI.   Methodology ...................................................................................................7

VII.  There is no loss causation and no damages as a result of the alleged fraud ....................10

      A.  Plaintiffs allege that misrepresentations about the quality and cost of CoreCivic's
          facilities inflated the Company's stock price, and that investors in CoreCivic's
          stock suffered economic losses and damages when the "truth" about the alleged
          misrepresentations was revealed to the market.........................................................10

      B.  However, the disclosures of "quality"-related issues during the Class Period,
          including the OIG Report, Adams riot, Cibola Cure Notice, and other BOP
          notices related to staffing and medical care, did not cause a decline in CoreCivic's
          stock price ............................................................................................................15

          1.  The release of the OIG Report, which the Complaint alleges revealed that
              CoreCivic's facilities "incurred more safety and security incidents per capita
              than comparable BOP institutions," did not cause a decline in the Company's
              stock price ...................................................................................................16

          2.  News of riots at CoreCivic's facilities during the Class Period did not cause a
              decline in the Company's stock price .................................................................21

          3.  The release of investigative reports by government agencies and third-party
              organizations into conditions at CoreCivic's facilities, including the BOP's
              "After-Action Report" on the Adams Riot and the Cibola Cure Notice, did not
              cause a decline in the Company's stock price ....................................................24

      C.  There is no loss causation and no damages associated with the two other alleged
          corrective disclosures – the August 18, 2016 Yates Memo, and August 3, 2016
          announcement of the Cibola non-renewal .................................................................28

          1.  There is no loss causation and no damages associated with the Yates Memo ......28

              i.   The Yates Memo did not provide the market with any new and/or
                   corrective information about the quality or cost-effectiveness of
                   CoreCivic's facilities .................................................................................28

ii. The fact that analyst reports following the Yates Memo show no change in analysts' opinion of the quality or cost-effectiveness of CoreCivic's facilities is strong evidence that the Yates Memo was not corrective of the alleged misrepresentations ............................................................................31

iii. Analyst commentary demonstrates that the Yates Memo was considered a shift in policy driven by politics, not by quality or costs ................................33

iv. CoreCivic explicitly warned both prior to and during the Class Period that political opposition to private prisons could impact the Company's business ..........................................................................................................34

v. The recovery in CoreCivic's stock price following the 2016 Presidential Election is consistent with the Yates Memo signaling to the market a policy shift driven by politics and not by the quality or cost effectiveness of CoreCivic's facilities ...................................................................................38

vi. The Yates Memo had the same or even greater impact on the stock price of GEO, CoreCivic's only publicly-traded competitor, and controlling for the movement in GEO's stock yields no reaction in CoreCivic's stock price following the Yates Memo..............................................................................41

2. There is no loss causation and no damages associated with CoreCivic's August 3, 2016 announcement of the Cibola non-renewal ....................................42

i. The price decline following the August 3 announcement cannot, in an efficient market, have been due to the Cibola non-renewal because it was not new news.....................................................................................................43

ii. The price decline following the August 3 announcement was *not* due to the BOP Cibola contract but was actually due to news of the STFRC renegotiation – an ICE contract that was around twice as large as all of CoreCivic's BOP contracts combined and over ten times larger in profits than the Cibola contract ..................................................................................44

## I. SCOPE OF ASSIGNMENT

1. I have been asked by counsel for Defendants to analyze Plaintiffs' claim of loss causation and damages to investors who purchased CoreCivic, Inc's ("CoreCivic" or "the Company") stock between February 27, 2012 and August 17, 2016 (the "Class Period").

2. I have previously submitted two reports on price impact in this matter, dated July 16, 2018 ("Allen Price Impact Report") and November 21, 2018 ("Allen Price Impact Supplemental").

## II. SUMMARY OF FINDINGS

3. I find that there is no loss causation and no damages from the alleged misrepresentations. Plaintiffs allege that misrepresentations about the quality and cost effectiveness of CoreCivic's facilities inflated the Company's stock price, and that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about the alleged misrepresentations was revealed to the market. However, the very information regarding "operational shortcomings" at CoreCivic's BOP facilities, including purported "quality"-related "deficiencies,"[1] that Plaintiffs allege were concealed by the alleged fraud were released on a number of occasions both prior to and during the Class Period to *no* statistically significant price reaction. In particular, CoreCivic's stock price did not decline following the release of the OIG Report, a date when Plaintiffs allege the "truth" about the alleged misrepresentations was revealed to the market. In addition, CoreCivic's stock price did not decline following, for example, (i) news of riots at CoreCivic's facilities, (ii) the release of investigative reports by government agencies and third-party organizations into conditions at CoreCivic's facilities, and (iii) news that CoreCivic had received a "Cure Notice" from the BOP related to medical care at Cibola – disclosures that according to the Complaint were "consistent" with the alleged corrective disclosures,[2] and indicative of "quality"-related "deficiencies" at CoreCivic's facilities. (Note that the lack of a price reaction does not imply that these incidents are not themselves negative events, but rather is consistent with the market being aware and the stock

---

[1] Complaint, ¶185.

[2] Complaint, ¶42.

price impounding the expected risk of these incidents.) The fact that CoreCivic's stock price did not decline following the release of the specific negative information that Plaintiffs allege was concealed by the alleged fraud directly contradicts Plaintiffs' claim of loss causation and damages.

4.      I find that there is no loss causation and no damages associated with the Yates Memo, the second alleged corrective disclosure according to the Complaint. I find that the Yates Memo did not provide the market with any new information about the quality or cost-effectiveness of CoreCivic's BOP facilities. I find that the Yates Memo did not change analysts' or the market's perception of the quality or cost-effectiveness of CoreCivic's facilities and, in fact, analyst reports on CoreCivic published after the Yates Memo explicitly stated that CoreCivic's facilities were cheaper than government-run prisons and provided similar quality of services. I find that analyst commentary demonstrates that the Yates Memo was considered by the market to signal a shift in policy driven by politics, and that this political shift (as opposed to any new information regarding the quality or cost-effectiveness of CoreCivic's facilities) was the cause of the market reaction to the Yates Memo. The recovery in CoreCivic's stock price following the 2016 Presidential Election further supports the finding that changes in the political environment and associated risk to CoreCivic's business, rather than the alleged misrepresentations, caused the market reaction to the Yates Memo.

5.      I find that there is no loss causation and no damages associated with CoreCivic's August 3, 2016 announcement that the BOP had declined to renew its contract with CoreCivic's Cibola County Correctional Center. Although not initially alleged in the Complaint as an alleged corrective disclosure, Plaintiffs now claim that CoreCivic's stock price declined on August 3 because of the Cibola announcement and that this announcement was a partial corrective disclosure. However, I find that news of the Cibola non-renewal was publicly reported *before* August 3 and the analysts covering CoreCivic explicitly stated after the August 3 announcement that the news about Cibola was not new but had been previously announced. Thus, the price decline following the August 3 announcement cannot, in an efficient market, have been due to the Cibola non-renewal because it was not new news. I find that a review of analyst commentary and analysts' valuations of CoreCivic's stock shows that the price decline following the August 3 announcement was not due to the Cibola announcement or the correction of the alleged misrepresentations, but rather was due to information unrelated to the alleged fraud. In particular,

the price decline following the August 3 announcement was due to news of the renegotiation of CoreCivic's South Texas Family Residential Center contract – an ICE contract that was around twice as large as all of CoreCivic's BOP contracts combined and over ten times larger in profits than the BOP Cibola contract.

## III. QUALIFICATIONS AND REMUNERATION

### A. Qualifications

6.      I am a Managing Director of NERA Economic Consulting ("NERA") and a member of NERA's Securities and Finance Practice. NERA provides practical economic advice related to highly complex business and legal issues arising from competition, regulation, public policy, strategy, finance, and litigation. NERA was established in 1961 and now employs approximately 500 people in more than 20 offices worldwide. NERA's Securities and Finance Practice, which performs research in securities and financial markets, dates from the early 1970s and employs a research staff of more than 100 professionals holding degrees in economics, finance, and mathematics. The practice group counts among its clients major securities exchanges, risk managers, principals needing valuation services, and parties in litigation.

7.      I have an A.B. from Stanford University, an M.B.A. with a concentration in Finance and Accounting from Yale University, and M.A. and M. Phil. degrees in Economics, also from Yale University. Prior to joining NERA, I was an Economist for both President George H. W. Bush's and President Bill Clinton's Council of Economic Advisers, providing economic analysis on regulation and health care policy issues. In my over 20 years at NERA, I have been engaged as an economic consultant or expert witness in numerous projects involving securities and financial economics. In the course of this work, I have analyzed the effect of information on stock prices of over 100 companies. My resume with recent publications and testifying experience is included as Appendix A.

### B. Remuneration

8.      NERA is being compensated for time spent by me and my team at standard billing rates and for out-of-pocket expenses at cost. NERA currently bills for my time at $975 per hour. NERA's fees are not in any way contingent upon the outcome of this matter.

## IV. MATERIALS CONSIDERED

9.     In preparing this report, I considered the following categories of materials:

a) Consolidated Complaint for Violation of the Federal Securities Laws, filed March 13, 2017 ("Complaint");

b) Memorandum of Law in Support of Lead Plaintiffs' Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, filed June 1, 2018 ("Plaintiffs' Motion for Class Certification");

c) Reply in Further Support of Lead Plaintiffs' Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, filed October 26, 2018, ("Plaintiffs' Class Certification Reply") including attachments;

d) Memorandum of Law in Support of Lead Plaintiffs' Motion for Reconsideration of the January 18, 2019 Order Denying Class Certification, filed February 1, 2019, ("Plaintiffs' Motion for Reconsideration") including attachments;

e) Plaintiffs' Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), filed February 1, 2019;

f) Reply in Support of Lead Plaintiff's Motion for Reconsideration of the January 18, 2019 Order Denying Class Certification, dated February 22, 2019, including attachments;

g) Expert Report of Steven P. Feinstein, dated June 1, 2018 ("Feinstein Market Efficiency Report"), including exhibits and materials relied upon;

h) Rebuttal Report of Steven P. Feinstein, dated October 26, 2018, including exhibits ("Feinstein Price Impact Rebuttal");

i) Deposition of Steven P. Feinstein, dated July 12, 2018 ("Feinstein Deposition");

j) Deposition of Patrick Swindle, CoreCivic's Chief Corrections Officer, dated January 9, 2019 ("Swindle Deposition");

k) Memorandum and Opinion on Defendants' Motion to Dismiss, dated December 18, 2017;

l) Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019;

m) Memorandum and Opinion on Plaintiffs' Motion for Reconsideration, dated March 26, 2019;

n) Analyst reports on CoreCivic and GEO Group, Inc. ("GEO") from Thomson Reuters and documents produced in discovery (see attached Appendix B);

o) CoreCivic's filings with the Securities and Exchange Commission ("SEC filings");

p) CoreCivic press releases, conference call transcripts and news stories from Factiva, Bloomberg, L.P. and CoreCivic's website;

q) Reviews and investigations of CoreCivic and other private prison facilities by U.S. government entities and other third-parties, including news organizations and the American Civil Liberties Union ("ACLU");

r) Price, trading volume and implied volatility data for CoreCivic and GEO from Bloomberg, L.P.;

s) Price data for market and industry indices from Bloomberg, L.P.;

t) Intraday price and volume data for CoreCivic from Tick Data, LLC;

u) Institutional holdings data for CoreCivic from FactSet Research Systems, Inc.;

v) Total daily cost per capita data for privately-operated vs. government-operated Federal Bureau of Prisons ("BOP") facilities from the BOP website (https://www.bop.gov/foia/#tabs-1, last accessed July 25, 2020);

w) Contractor performance assessment reports and award fee determination letters for CoreCivic's BOP-facilities produced in discovery (see attached Appendix B);

x) Internal CoreCivic and BOP documents produced in discovery (see attached Appendix B); and

y) Academic literature and textbooks on finance, securities, valuation and statistics.

## V.    COMPANY BACKGROUND

10.    CoreCivic (formerly known as Corrections Corporation of America) owns and operates correctional and detention facilities in the United States.[3] CoreCivic contracts with federal, state and local correctional and detention authorities, including the BOP, the United States Marshals Service ("USMS") and United States Immigration and Customs Enforcement ("ICE").[4]

11.    CoreCivic's contracts with the BOP accounted for between 11% and 13% of the Company's revenue and profits during the Class Period.[5] The Company operated five facilities under contract with the BOP during the Class Period: (i) Adams County Correctional Center ("Adams"), located in Natchez Mississippi;[6] (ii) Cibola County Correctional Center ("Cibola"), located in Milan, New Mexico;[7] (iii) Eden Detention Center ("Eden"), located in Eden, Texas;[8] (iv) McRae Correctional Facility ("McRae"), located in McRae, Georgia;[9] and (v) Northeast Ohio Correctional Center ("Northeast Ohio"), located in Youngstown, Ohio.[10]

---

[3]    CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5.

The Company announced that it would change its name to CoreCivic on October 28, 2016. See, "Corrections Corporation of America Rebrands as CoreCivic," *Reuters Significant Developments*, October 28, 2016.

CoreCivic began operating as a Real Estate Investment Trust ("REIT") on January 1, 2013. See, "Corrections Corp of America Completes Internal Reorganization," *Reuters Significant Developments*, January 2, 2013 and CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5.

According to CoreCivic, REIT status means that the Company is "generally not subject to federal income taxes" on its taxable income as long as it distributes at least 90% of its taxable income to its shareholders. See, CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5.

[4]    CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 5.

[5]    CoreCivic FY2013 Form 10-K, filed February 27, 2013, p. 9, and CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 10. See, also, Feinstein Market Efficiency Report, ¶23.

[6]    Complaint, ¶43.

[7]    Complaint, ¶68.

[8]    Complaint, ¶87.

[9]    Complaint, ¶108.

[10]    Complaint, fn. 2. Note that CoreCivic's contract with the BOP for this facility expired on May 31, 2015. See, for example, "Press Release: Federal Bureau of Prisons Elects Not to Renew Contract at the Northeast Ohio Correctional Center," *Dow Jones Institutional News*, December 29, 2014.

## VI. METHODOLOGY

12. To analyze Plaintiffs' claim of loss causation and damages, I reviewed Plaintiffs' allegations in the Complaint and other pleadings, as well as the two reports of Plaintiffs' expert, Dr. Feinstein, and examined the alleged misrepresentations and omissions and the alleged corrective disclosures (including what information was allegedly false, when the alleged truth was purportedly revealed to the market and what information was alleged to be corrective). In addition, I analyzed publicly available information related to CoreCivic, including analyst reports, SEC filings and news stories from Bloomberg and Factiva.[11] I focused on what the market knew about the alleged misrepresentations both prior to, during and after the Class Period, and on how the market reacted to the release of new information related to the subject matter of Plaintiffs' allegations (*i.e.*, the "quality," "performance" and cost effectiveness of CoreCivic's facilities[12]).

13. Analyst reports are periodic reports issued by professional financial analysts who perform research and analysis on specific industries and companies. Analysts analyze companies by studying information about the company and the stock, such as SEC filings, as well as participating on conference calls and attending investor conferences where they can ask questions directly to management. Analysts use this information to model and value companies and industries using financial techniques such as discounted cash flow models and valuation multiples. Using these valuations, analysts typically issue price targets (*i.e.*, what price they expect the stock of a company to be in a certain time period), provide estimates reflecting their expectations of the company's future financial performance (such as estimates of future revenue, profits and earnings per share), and give recommendations to buy, hold or sell the stock. Analysts covering a company typically issue reports after new information about the company is released, and these reports play an important role in disseminating information about a stock and can be a valuable source of information on market knowledge and sentiment at the time. The review of analyst reports is a standard and generally accepted methodology for determining what

---

[11] Bloomberg is a commonly used provider of financial data and news. Factiva is an online news reporting service and archive owned by Dow Jones & Company, Inc. that aggregates news content from nearly 33,000 sources from around the world.

[12] Complaint, ¶¶116-117.

information is important to the market in valuing a stock[13] – a proposition that is recognized by Dr. Feinstein.[14]

14.     Plaintiffs allege that CoreCivic's stock price was inflated during the Class Period as a result of the alleged misrepresentations and/or omissions, and that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about the alleged misrepresentations was revealed to the market.[15] In other words, according to Plaintiffs' claim, investors in CoreCivic's stock lost money because they purchased the stock at inflated prices (purportedly caused or maintained by the alleged misrepresentations) and then the stock price declined as information "correcting" the alleged misrepresentations was released. I examined whether there is evidence that the alleged misrepresentations inflated CoreCivic's stock price (*i.e.*, caused CoreCivic's stock price to be higher than it would have been absent the alleged misstatements), and whether there is evidence that the alleged misrepresentations caused CoreCivic's stock price to decline when corrected and investors to suffer losses. I analyzed whether there was any indication of a market reaction after the alleged corrective disclosures and/or when information corrective of the alleged misrepresentations was disclosed that could be attributed to the alleged misrepresentations, given Plaintiffs' claim of market efficiency. A market reaction that could be economically attributed to a correction of the alleged misrepresentations would be evidence in support of Plaintiffs' claim of loss causation and damages, whereas no market reaction or a market reaction that could not be economically

---

[13]  Courts have relied on analyst reports in determining what information is important to the market in valuing a stock and in determining the cause of stock price movements. See, for example, *In Re TECO Energy Inc. Securities Litigation*, 2006 U.S. Dist. LEXIS 18101 (MD Fla., March 30, 2006) ("Specifically, the analyst reports on September 3, 2002, September 23, 2002, October 8, 2002, and January 23, 2003 address ratings cuts, opinions, and predictions regarding TECO's stock value but do not reference any misstatements, omissions, or accounting practices by Defendants as the reason for the bleak forecasts or changes in market conditions.") and *Barrie v. Intervoice-Brite, Inc.*, 2006 U.S. Dist. LEXIS 69299 (N.D. Tex., Sept. 25, 2006) ("Barry's review of analyst reports and the public press also shows that those information sources did not link the June 6 disclosure to any prior earnings or revenues that were supposedly overstated."). The First Circuit has also recommended analyzing contemporaneous content for explaining stock price movements, citing a paper that specifically describes performing content analysis of analyst reports and commentary. *Bricklayers & Trowel Trades International Pension Fund v. Credit Suisse Securities (USA) LLC*, 752 F.3d 82, 92 (1st Cir. 2014), citing David Tabak, "Making Assessments About Materiality Less Subjective Through the Use of Content Analysis," 2007.

[14]  Feinstein Market Efficiency Report, ¶52 ("Securities analysts disseminate and interpret information about the companies they cover. They conduct research and provide valuation opinions, helping market participants acquire relevant information and understand the implications of that information for valuation and investment decisions. Consequently, securities analysts facilitate the flow of information and the digestion of information within the marketplace. These functions promote market efficiency.").

[15]  See, for example, Complaint, ¶¶191-192.

attributed to a correction of the alleged misrepresentations would be evidence contrary to Plaintiffs' claim.

15.   To test how CoreCivic's stock price reacted to the release of information, I used the event study methodology. An event study is a commonly accepted statistical analysis that measures the movement in a stock's price after an event or public announcement, typically adjusting for the movement in the overall market and/or industry.[16] Academics often use an event study to determine how stock prices respond to new information.[17] An event study typically uses a statistical analysis called a regression to estimate the relationship between the company's daily stock returns and the daily returns of market and/or industry indices, often over a control period.[18] Using the regression results and the returns of the indices, the predicted stock price movement and excess stock price movement (or the amount the stock price moves in excess of the predicted amount) can be calculated for the event being tested. Then, the statistical significance of the excess stock price movement can be tested.[19]

16.   I tested CoreCivic's stock price reactions using both Plaintiffs' expert Dr. Feinstein's event study from the class certification phase of the case as well as an alternative event study specification. Dr. Feinstein used the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index to control for market movements, and the S&P Midcap 400 Commercial Services & Supplies Index and FTSE NAREIT Equity REITS Index to control for industry movements. Dr. Feinstein ran two separate regressions – one for the period February 27, 2012 through February 7, 2013, and the second for February 8, 2013 through August 17, 2016. Dr. Feinstein excluded from his control periods CoreCivic's earnings and guidance announcements during the Class

---

[16]   See, for example, Janet C. Alexander, "The Value of Bad News in Securities Class Actions," *UCLA Law Review*, 41: 1994, Daniel R. Fischel, "Use of Modern Finance Theory in Securities Fraud Cases Involving Actively Traded Securities," *The Business Lawyer*, 38: 1982, and Frederick C. Dunbar and David I. Tabak, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook: The Role of the Financial Expert* (John Wiley & Sons, Inc.: New York, NY, 3rd ed., 2001), ch. 19.

[17]   See, for example, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, 35: 1997, and Robert G. Bowman, "Understanding and Conducting Event Studies," *Journal of Business Finance & Accounting*, 10(4): 1983.

[18]   Regression analysis is used to estimate the relationship between two or more variables. See, for example, Robert V. Hogg and Elliot A. Tanis, *Probability and Statistical Inference* (Prentice Hall: Upper Saddle River, NJ, 5th ed., 1997).

[19]   The results of the event study are based on the 5% significance level, the standard typically used. See, for example, David A. Freedman and David H. Kaye, "Reference Guide on Statistics," *Reference Manual on Scientific Evidence* (Washington, D.C.: The National Academies Press, 3rd ed., 2011), pp. 211-302, and Franklin M. Fisher, "Multiple Regression in Legal Proceedings," *Columbia Law Review*, 80: 1980.

Period.[20] For the alternative event study specification, I used the same event study model that I used in the Allen Price Impact Report (and which Dr. Feinstein did not challenge). The S&P 500 Index, an index of 500 large companies listed on the New York Stock Exchange and the NASDAQ, was used to control for market movements, and the S&P Composite 1500 Real Estate Investment Trusts REITs Index ("S&P REITs Index"), an off-the-shelf index of publicly traded REITs, was used to control for industry movements. A rolling control period of 252 trading days before each event tested, excluding the alleged misrepresentations and alleged corrective disclosures, was used.[21] My conclusion that there is no loss causation and no damages from the alleged misrepresentations is robust to the use of either event study model.

## VII. THERE IS NO LOSS CAUSATION AND NO DAMAGES AS A RESULT OF THE ALLEGED FRAUD

### A. Plaintiffs allege that misrepresentations about the quality and cost of CoreCivic's facilities inflated the Company's stock price, and that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about the alleged misrepresentations was revealed to the market

17. Plaintiffs allege that CoreCivic's stock price was inflated during the Class Period as a result of certain allegedly false and misleading statements and/or omissions regarding the "quality," "performance" and "cost savings" of CoreCivic's facilities.[22] In particular, Plaintiffs allege that, during the Class Period, Defendants misled investors about the "quality" of CoreCivic's correctional services, the "performance" of the Company's facilities relative to the expectations of its government clients (including the BOP), and the "cost savings" associated with the use of the Company's facilities over government-operated prisons.[23]

---

[20] Feinstein Market Efficiency Report, ¶¶113-119. For the period before the Class Period, the CRSP Total Stock Market Index was used to control for market movements as Dr. Feinstein's CRSP NYSE/AMEX/NASDAQ/ARCA Market Index was not provided for this period.

[21] Note that CoreCivic's return was removed from the return of the S&P 1500 REITS Index. See, also, Allen Price Impact Report, ¶25.

[22] Complaint, ¶¶116-117.

[23] Complaint, ¶¶116-117. See, also, Memorandum and Opinion on Plaintiffs' Motion for Reconsideration, dated March 26, 2019, pp. 1-2.

18.    Plaintiffs allege that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about Defendants' alleged misrepresentations was revealed to the market.[24] The specific "corrective disclosures" claimed by Plaintiffs, when the "truth" about the alleged fraud was purportedly revealed, have changed over time.

19.    In the Complaint, Plaintiffs alleged two corrective disclosures: (i) an August 11, 2016 report by the U.S. Department of Justice ("DOJ") Office of the Inspector General ("OIG") titled, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Report"); and (ii) an August 18, 2016 memorandum by Deputy U.S. Attorney General Sally Q. Yates titled, "Reducing our Use of Private Prisons" (the "Yates Memo"). According to the Complaint, these alleged corrective disclosures revealed the "relevant truth" about CoreCivic's business operations that had been concealed by the alleged fraud,[25] including that CoreCivic's facilities "compared poorly to government-run prisons" and "did not allow the government to save substantially on costs."[26]

20.    My first report in this matter, the Allen Price Impact Report, showed that immediately following the OIG Report there was no statistically significant reaction in CoreCivic's stock price, and no analyst commentary or reports issued on the Company.[27]

21.    Following my report, as well as the Court's decision denying Plaintiffs' Motion for Class Certification (in part due to the lack of price reaction),[28] Plaintiffs argued that the OIG Report was not actually corrective of the alleged misrepresentations. In particular, following the Court's decision, Plaintiffs argued in their Motion for Reconsideration that the OIG Report was based on "old data,"[29] and that nothing in the OIG Report actually alerted investors to the

---

Note that the while the Complaint focuses on CoreCivic's BOP operations, the alleged misstatements cited by Plaintiffs are general statements about the Company's business operations and relate to all of CoreCivic's facilities – local, state, and federal – and do not specifically focus on the Company's BOP facilities.

[24]  Complaint, ¶¶15, 192, 200. See, also, Complaint, p. 63 ("Plaintiffs Suffered Damages When [CoreCivic's] Stock Price Dropped as Information Concealed by Defendants' Fraud Was Revealed to the Market").

[25]  Complaint, ¶¶12-14.

[26]  Complaint, ¶192.

[27]  Allen Price Impact Report, ¶¶57-60.

[28]  Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019.

[29]  Plaintiffs' Motion for Reconsideration, p. 2 ("The OIG Review's focus on old data, together with its underlying assumption that current conditions were improved and contracts would continue, cogently explains the lack of a statistically significant price reaction to its publication.").

"relevant truth" that was concealed by the alleged fraud.[30] Plaintiffs have not amended the Complaint to reflect these new allegations.

22.    Plaintiffs' new claims regarding the OIG Report are contrary to Plaintiffs' prior allegations in the Complaint, Plaintiffs' class certification briefings, and the analysis and testimony of Plaintiffs' expert Dr. Feinstein. In particular, in the Complaint, Plaintiffs explicitly stated that the OIG Report *did* reveal the "alleged truth" regarding CoreCivic's business operations that was concealed by the alleged fraud.[31] Further, following the Allen Price Impact Report, both Plaintiffs and their expert Dr. Feinstein argued that the lack of market reaction following the OIG Report was due to the "countervailing" impact of letters by CoreCivic and other private prison operators that were attached to the OIG Report, rather than due to any deficiency in the OIG Report itself.[32] I have analyzed Plaintiffs' claim of loss causation and damages under both the original as well as the new allegations.

23.    In addition to the allegedly corrective Yates Memo and the OIG Report, Plaintiffs in their Class Certification briefings alleged a third corrective disclosure not claimed in the Complaint – CoreCivic's 2Q16 earnings announcement on August 3, 2016. On that date, CoreCivic announced that the BOP had declined to renew the Company's contract for Cibola, and that its contract for the South Texas Family Residential Center ("STFRC"), an ICE facility,

---

The OIG regularly issues reports and recommends policy changes based on data from prior years. For example, a report by the OIG on the BOP's handling of female inmates, published in September 2018, "analyzed BOP inmate population data, as well as BOP policies and programs from FY 2012 through FY 2016." The report made several policy recommendations based on this analysis. See, "Review of the Federal Bureau of Prisons' Management of Its Female Inmate Population," *DOJ OIG*, September 18, 2018. Similarly, another report on the standardization of operations across the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") used "ATF data from FY 2009 through FY 2016 to assess and evaluate the changes resulting from Frontline's implementation." The OIG reported several findings and made several recommendations to improve the standardization initiative based on this data. See, "Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Implementation of the Frontline Initiative," *DOJ OIG*, February 14, 2019.

[30]  Plaintiffs' Motion for Reconsideration, p. 5 ("Nothing in the OIG Review disclosed the continuing operating problems at CCA or alerted investors to the relevant "truth" that was concealed by Defendants' fraud, including that CCA's value proposition and, in turn, its contracts were in jeopardy because of systemic operational deficiencies.").

[31]  Complaint, ¶¶12-14.

[32]  Plaintiffs' Class Certification Reply, pp. 3, 17-19 and Feinstein Price Impact Rebuttal, ¶¶14, 62, 67.

Note that the Court did not accept Dr. Feinstein's theory. See, Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019, p. 17 ("Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations.").

was going to be renegotiated.[33] According to Plaintiffs, the Cibola announcement was a partial disclosure of the alleged fraud.[34] However, as shown in the Allen Price Impact Supplemental, and discussed in Section VII C 2 below, the price decline following the August 3 announcement cannot, in an efficient market, have been due to the Cibola non-renewal because it was not new news. In particular, the news about the Cibola non-renewal was reported *before* August 3 to no statistically significant price reaction, and analysts covering CoreCivic stated after the August 3 announcement that the news about Cibola had been previously announced. Further, as shown in the Allen Price Impact Supplemental and discussed below, the price decline following the August 3 announcement was not due to Cibola or the alleged misrepresentations, but rather was due to information unrelated to the alleged fraud. In particular, after the August 3 announcement, analysts were focused on the news of the STFRC renegotiation – a contract that represented up to 23% of CoreCivic's EBITDA (a measure of profits) and was over ten times larger in profits than the Cibola contract.[35]

24.     The chart below shows CoreCivic's stock price and trading volume over the entire Class Period, along with the alleged misrepresentations and alleged corrective disclosures claimed by Plaintiffs. The specific alleged misrepresentations claimed in the Complaint are listed in Appendix C.

---

[33]   "CCA Reports Second Quarter 2016 Financial Results, Increases Full Year 2016 Financial Guidance," *Globe Newswire*, August 3, 2016.

[34]   Plaintiffs' Motion for Reconsideration, p. 12. See, also, Plaintiffs' Class Certification Reply, pp. 5, 10-11, 16.

In addition, Plaintiffs' expert on market efficiency, Dr. Feinstein, claimed that that the Cibola non-renewal announcement was "a partial revelation of prior misrepresentations and omissions." See, Feinstein Price Impact Rebuttal, ¶85.

[35]   Allen Price Impact Supplemental, ¶¶6-11. See, also, *Canaccord Genuity* analyst report, dated August 4, 2016, *SunTrust* analyst report, dated August 4, 2016, and *Wells Fargo* analyst reports, dated August 4, 2016 and August 10, 2016.



**Sources:**
Data from Bloomberg, L.P. Alleged misrepresentations (M) and alleged corrective disclosures from the Complaint and Feinstein Rebuttal. Other events from news stories from Factiva.

25. The chart below is a close-up of CoreCivic's stock price and trading volume around the period of the alleged corrective disclosures:



**Close-Up of Stock Price and Trading Volume Around Alleged Corrective Disclosures**

Sources: Data from Bloomberg, L.P. Alleged corrective disclosures from the Complaint and Feinstein Rebuttal. Other events from news stories from Factiva.

**B.** **However, the disclosures of "quality"-related issues during the Class Period, including the OIG Report, Adams riot, Cibola Cure Notice, and other BOP notices related to staffing and medical care, did not cause a decline in CoreCivic's stock price**

26.    Plaintiffs allege that misrepresentations about the quality and cost effectiveness of CoreCivic's facilities inflated the Company's stock price, and that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about the alleged misrepresentations was revealed to the market. However, the very information regarding "operational shortcomings" at CoreCivic's BOP facilities, including purported "quality"-related "deficiencies,"[36] that Plaintiffs allege were concealed by the alleged fraud were released on a number of occasions both prior to and during the Class Period to *no* statistically significant price reaction. In particular, CoreCivic's stock price did not decline following the release of the OIG Report, a

_____

[36]   Complaint, ¶¶3,185.

date when Plaintiffs allege the "truth" about the alleged misrepresentations was revealed to the market. In addition, CoreCivic's stock price did not decline following, for example, (i) news of riots at CoreCivic's facilities, (ii) the release of investigative reports by government agencies and third-party organizations into conditions at CoreCivic's facilities, and (iii) news that CoreCivic had received a "Cure Notice" from the BOP related to medical care at Cibola – disclosures that according to the Complaint were "consistent" with the alleged corrective disclosures,[37] and indicative of "quality"-related "deficiencies" at CoreCivic's facilities. The fact that CoreCivic's stock price did not decline following the release of the particular negative information that Plaintiffs allege was concealed by the alleged fraud directly undermines Plaintiffs' claim of loss causation and damages.[38]

**1.    The release of the OIG Report, which the Complaint alleges revealed that CoreCivic's facilities "incurred more safety and security incidents per capita than comparable BOP institutions," did not cause a decline in the Company's stock price**

27.    In the Complaint, Plaintiffs claimed that the release of the OIG Report on August 11, 2016 "partially corrected" the alleged misrepresentations by revealing the "truth" regarding the "financial conditions, business risks and other information concealed" by the alleged fraud.[39] According to the Complaint, the OIG Report found that contract prisons "incurred more safety

---

[37]    Complaint, ¶42.

[38]    Note that the lack of any price reaction does not imply that these incidents at CoreCivic's facilities are not negative events, but rather is consistent with the market being aware of and understanding the risk that these sorts of incidents could occur. Analysts covering CoreCivic mentioned the expected risk of riots and disturbances at private prisons during the Class Period. See, for example, *Canaccord Genuity* analyst report, dated September 21, 2015 ("[N]o corrections system, public or private, is immune to these types of disturbances."), and *SunTrust* analyst report, dated May 30, 2012 ("Disturbances are a risk intrinsic to the corrections industry, despite extensive efforts to mitigate such risks.").

CoreCivic warned in its SEC filings during the Class Period that news "about an escape, riot or other disturbance or poor operational performance" at the Company's facilities could affect the Company's ability to renew or maintain existing contracts or to obtain new contracts. See, for example, CoreCivic FY2013 Form 10-K, filed February 27, 2014, p. 28.

Note that there were also reports of riots and investigations criticizing conditions at government-run prisons, including at BOP-operated facilities, during the Class Period. See, for example, "Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing," *United States Government Accountability Office*, May 31, 2013, "New York Prisons: A Human Rights Crisis in Our Own Backyard," *American Civil Liberties Union*, February 13, 2013, and "Injuries Reported at High-Security Lee County Prison After 'Multiple Fights,'" *The News & Advance*, July 9, 2015.

[39]    Complaint, ¶192.

and security incidents per capita than comparable BOP institutions."[40] In other words, according to Plaintiffs' theory as alleged in the Complaint, the alleged misrepresentations impacted CoreCivic's stock price and caused the price to be artificially inflated, and this inflation was partially eliminated by the corrective disclosures in the OIG Report.[41]

28.    The OIG Report was publicly released by the DOJ on August 11, 2016,[42] and discussed in news reports, including in articles by the *Washington Post*,[43] *The Guardian*,[44] and the ACLU.[45] However, there was no statistically significant reaction in CoreCivic's stock price following the release of the OIG Report according to both the Feinstein event study model and the alternative event study specification. In other words, CoreCivic's stock price reaction on August 11, 2016, after controlling for market and industry movements, is within the range of normal expected daily variation in the stock price, and thus, the reaction cannot be statistically distinguished from zero.[46] The fact that the release of the very information that is purportedly corrective of the alleged misrepresentations did not cause any statistically significant reaction in CoreCivic's stock price directly undermines Plaintiffs' claim of loss causation and damages from the alleged misrepresentations.

29.    Further evidence demonstrating that there was no significant market reaction to the release of the OIG Report is the fact that there were no analyst reports on CoreCivic

---

[40]   Complaint, ¶39, citing OIG Report.

[41]   Complaint, ¶¶191-192.

[42]   The DOJ provided a link to the OIG Report in a tweet published on August 11 at 6:06 a.m. The DOJ also published a press release on August 11 that mentioned CoreCivic by name and included a link to the OIG Report. See, "DOJ OIG Releases Report on the Federal Bureau of Prisons' Monitoring of Contract Prisons," *U.S. Department of Justice: Office of the Inspector General*, August 11, 2016.

[43]   "Prisons Should Not Exist Simply to Make a Profit," *Washington Post*, August 15, 2016 ("The report's central conclusion: 'We found that, in most key areas, contract prisons incurred more safety and security incidents per capita than comparable [Bureau of Prisons] institutions and that the BOP needs to improve how it monitors contract prisons in several areas.'").

[44]   "Private Federal Prisons More Dangerous, Damning DoJ Investigation Reveals," *The Guardian*, August 12, 2016 ("Privately operated government prisons, which mostly detain migrants convicted of immigration offenses, are drastically more unsafe and punitive than other prisons in the federal system, a stinging investigation by the US Department of Justice's inspector general has found.").

[45]   "End Prisons for Profit," *American Civil Liberties Union*, August 12, 2016 ("Though presented in a bureaucratic, flat style, the inspector general's findings are damning and outrageous. Sentence by sentence, the report shows how the bureau fails to impose basic standards of health, safety, and human decency on the private companies it pays to run these prisons.").

[46]   As a check, my team and I reviewed news on CoreCivic and the private prison industry released on August 11, 2016. Based on this review, we found that there was no other news announced on August 11, 2016 that could have offset any negative reaction in CoreCivic's stock price on that date.

published between August 11, 2016 (the date of the OIG Report) and August 18, 2016 (the date of the Yates Memo). As discussed above, analysts typically issue reports after new information important to investors and the stock price is released. These reports play an important role in disseminating information about the stock and can be a valuable source of information on market knowledge and sentiment at the time. The lack of analyst commentary on the OIG Report is consistent with the lack of a price reaction, demonstrating that neither the alleged misrepresentations nor information correcting the alleged misrepresentations changed or corrected analysts' valuations of CoreCivic's stock or analysts' perceptions of the quality or cost effectiveness of CoreCivic's facilities.

30.     Following the Court's January 2019 decision denying Plaintiffs' Motion for Class Certification,[47] Plaintiffs changed their story to now claim that the OIG Report was supposedly focused on "old data" and thus, could not alert investors to the "relevant truth" that was concealed by the alleged fraud.[48] However, Plaintiffs' new claim is illogical and inconsistent with their prior pleadings for a number of reasons including the following.

31.     First, Plaintiffs' new claims regarding the OIG Report are contrary to Plaintiffs' prior allegations in the Complaint. In particular, in the Complaint, Plaintiffs explicitly stated that the OIG Report *did* reveal the "alleged truth" regarding CoreCivic's business operations that was concealed by the alleged fraud.[49] In fact, the Complaint itself explicitly noted the period covered by the OIG Report, but provided no indication that the data in the report was too "old" to be meaningful to investors.[50] As a general rule most studies, including those by OIG, are based on historical rather than contemporaneous data.[51] Moreover, it is not clear why OIG would conduct a study if the data was too old to be relevant.

---

[47]   Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019. Note that the Court later reversed its decision and granted class certification, but not on the basis of any evidence or analysis put forth by Dr. Feinstein challenging the analysis in either of my previous reports.

[48]   Plaintiffs' Motion for Reconsideration, pp. 2, 5, 7.

[49]   Complaint, ¶¶12-14.

[50]   Complaint, ¶40 ("Fieldwork for the Review was conducted from April 2014 through February 2015 and included interviews of prison staff such as wardens, assistant wardens, chiefs of security, intelligence staff and others, as well as site visits to Eden.").

[51]   The OIG regularly issues reports and recommends policy changes based on data from prior years. For example, a report by the OIG on the BOP's handling of female inmates, published in September 2018, "analyzed BOP inmate population data, as well as BOP policies and programs from FY 2012 through FY 2016." The report made several policy recommendations based on this analysis. See, "Review of the Federal Bureau of Prisons'

32.     Second, Plaintiffs' expert Dr. Feinstein reviewed the OIG Report and never stated that the data in the report was too old to be meaningful to the market. In fact, Dr. Feinstein insisted that the revelations in the OIG Report *did* negatively impact CoreCivic's stock price, and attributed the lack of a price reaction to "countervailing" news (*i.e.*, the short letters by CoreCivic and other private prison operators attached to the OIG Report) rather than to any issue with the data in the OIG Report.[52]

33.     Third, the notion that the data in the OIG Report was "old" and not meaningful to the market is at odds with Plaintiffs' insistence that the private prison operators tried to "discredit" the OIG Report's findings.[53]

34.     Fourth, the OIG Report *was* mentioned in an analyst report on CoreCivic issued in January 2017, over five months after the release of the report. The analyst made no mention of the age of the data in the OIG Report, and instead stated that the report appeared to be "politically motivated" and that safety conclusions could not be drawn from such survey results:

> Many critics argue that private management leads to unsafe conditions for both prisoners and guards at these facilities, **citing the recent OIG report. We note that the report seemed politically motivated,** as public prisons, as reported by Table 8 in Appendix 7 of the report notes that public BOP institutions have more deaths, more sexual misconduct, and more grievances, while private institutions have more

---

Management of Its Female Inmate Population," *DOJ OIG*, September 18, 2018. Similarly, another report on the standardization of operations across the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") used "ATF data from FY 2009 through FY 2016 to assess and evaluate the changes resulting from Frontline's implementation." The OIG reported several findings and made several recommendations to improve the standardization initiative based on this data. See, "Review of the Bureau of Alcohol, Tobacco, Firearms and Explosives' Implementation of the Frontline Initiative," *DOJ OIG*, February 14, 2019.

[52]  Feinstein Price Impact Rebuttal, ¶¶14, 62, 67.

As discussed in the Allen Price Impact Supplemental, Dr. Feinstein has no support for his claim that the letters "boosted" CoreCivic's stock price and, moreover, the implied notion that the OIG Report had a negative significant impact while the response letter had a positive significant impact, and because of the balance no analyst mentioned either of these significant price impacts or issued any reports, is farfetched and defies logic. In addition, there was no new information included in CoreCivic's response letter that was not already publicly disclosed. See, Allen Price Impact Supplemental, ¶¶12-14.

Note that the Court did not accept Dr. Feinstein's theory. See, Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019, p. 17 ("Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations.").

[53]  Plaintiffs' Class Certification Reply, p. 19 ("[CoreCivic] itself tried to discredit the OIG Review in its attached response, disputing that it revealed more safety and security issues at private prisons by suggesting that 'inmate demographics and facility locations,' or varying 'interdiction efforts,' could explain the disparate data. It did so again, in conjunction with its competitors, following the OIG Review's publication.").

contraband (arguably positive that they are finding it), more assaults by inmates, and more grievances filed. **We don't believe overarching conclusions of safety can be drawn from such survey results.** [Canaccord Genuity, 1/13/17, emphasis added]

35.     Fifth, while Plaintiffs allege that the Yates Memo addressed more "current conditions" at CoreCivic's facilities,[54] there is no evidence that the two-page Yates Memo relied on any newer or more "current" data than was in the 86-page OIG Report. In fact, as discussed below, the Yates Memo only cited the OIG Report in finding that private prisons had "quality"-related issues.

36.     Thus, Plaintiffs' new claim that the OIG Report was not actually corrective of the alleged misrepresentations does not appear to be based on any closer or more accurate reading of the OIG Report or on any matching of the alleged misrepresentations to the disclosures in the OIG Report. Instead, Plaintiffs appear to have changed their story and abandoned the OIG Report as a corrective disclosure merely because Dr. Feinstein's event study did not yield their desired result (*i.e.*, a statistically significant price drop), and because the Court rejected Plaintiffs' alternative theory regarding the supposedly "countervailing" impact of the letters attached to the OIG Report.[55] However, it is clear that the disclosures in the OIG Report *do* match the information that Plaintiffs allege was concealed by CoreCivic. For example, Plaintiffs' alleged "truth" that outsourcing correctional services to CoreCivic "did not result in higher quality services to the BOP" corresponds to the finding in the OIG Report that in a majority of the categories "contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." Exhibit 1 shows a detailed comparison of the disclosures in the OIG Report to the alleged "truth" claimed by Plaintiffs.

37.     Dr. Feinstein testified that an event study of a corrective disclosure is "akin to a controlled experiment,"[56] in which the reaction to the release of corrective information tells you how the stock would have reacted if the alleged "truth" were disclosed earlier. In this case, the elements that might complicate such an "experiment" are not present. For example, there was no confounding information on the date of the OIG Report, there is no dispute over when the report

---

[54]  Plaintiffs' Motion for Reconsideration, pp. 2, 4-5.

[55]  Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019, p. 17 ("Professor Feinstein, however, produces no reason to think that a few letters predictably disputing a powerfully negative Report would have been sufficient to wholly offset the price impact of the Report's revelations.").

[56]  Feinstein Deposition, 122:6-7.

was made public, and there is no dispute or confusion about the statistics or the finding of the event study that the price reaction is not statistically significant. The OIG Report was claimed by Plaintiffs in their Complaint as the first corrective disclosure of the "truth" about the alleged misrepresentations and, according to Plaintiffs' own event study test, the OIG Report did not cause any statistically significant decline in CoreCivic's stock price. Thus, the result of Dr. Feinstein's "controlled experiment" directly contradicts Plaintiffs' claim that the alleged misrepresentations inflated CoreCivic's stock price and caused Plaintiffs' losses. The lack of any market reaction following the OIG Report is straightforward proof that there is no loss causation and no damages from the alleged misrepresentations.

> **2.** **News of riots at CoreCivic's facilities during the Class Period did not cause a decline in the Company's stock price**

38. In addition to no significant price reaction following the OIG Report, News of riots at CoreCivic's facilities during the Class Period did not cause a decline in the Company's stock price. In particular, event study results show that there was no statistically significant reaction in CoreCivic's stock price following news of riots at the Company's facilities, including after a May 2012 riot at Adams that is a focus of the Complaint,[57] or to events in the aftermath of riots, including public lawsuits alleging understaffing, safety and other "quality"-related concerns at CoreCivic's facilities.

39. The table below lists several events related to riots/disturbances at the Company's facilities. As the table shows, there was no statistically significant reaction in CoreCivic's stock price following any of these events according to both Dr. Feinstein's event study model and the alternative event study specification:

---

[57] Complaint, ¶¶44-50.

| | | Stat. Sig. Price Reaction? | |
|---|---|---|---|
| **Date** | **Event** | **Feinstein Event Study** | **Alternative Event Study** |
| **Price Reactions Following Events Related to Riots** | | | |
| 5/20/12 | Adams riot | No | No |
| 8/8/12 | Complaint filed for *USA v. Lopez-Fuentes* - alleges that Adams riot was preceded by inmate complaints about food, medical conditions, and staff members | No | No |
| 3/4/13 | Riot at Cimarron Correctional Facility | No | No |
| 5/8/13 | Complaint filed for *Carithers v. CCA of Tennessee et al.* - alleges that inadequate staffing and treatment of the inmates created dangerous working conditions at Adams | No | No |
| 8/9/13 | Riot at Davis Correctional Facility | No | No |
| 8/12/14 | Inmates protest at Northeast Ohio Correctional Center | No | No |
| 6/10/15 | Riot at Cimarron Correctional Facility | No | No |
| 9/12/15 | Riot at Cimarron Correctional Facility | No | No |
| 6/15/16 | Release of the BOP After-Action Report of the Adams riot | No | No |

40.     The chart below shows CoreCivic's stock price along with the events related to riots/disturbances at the Company's facilities:



**Events Related to Riots at CoreCivic Facilities**

● Alleged Corrective Disclosures
◆ Other Events

Class Period
February 27, 2012 through August 17, 2016

**5/20/12**
Adams riot. *No sig. reaction.*

**8/9/13**
Riot at Davis Correctional Facility. *No sig. reaction.*

**9/12/15**
Riot at Cimarron Correctional Facility. *No sig. reaction.*

**5/8/13**
Complaint filed for *Carithers v. CCA of Tennessee et al.* - alleges that inadequate staffing and treatment of the inmates created dangerous working conditions at Adams. *No sig. reaction.*

**6/10/15**
Riot at Cimarron Correctional Facility. *No sig. reaction.*

**3/4/13**
Riot at Cimarron Correctional Facility. *No sig. reaction.*

**6/15/16**
Release of the BOP After-Action Report of the Adams riot. *No sig. reaction.*

**8/8/12**
Complaint filed for *USA v. Lopez-Fuentes* - alleges that Adams riot was preceded by inmate complaints about food, medical conditions, and staff members. *No sig. reaction.*

**8/12/14**
Inmates protest at Northeast Ohio Correctional Center. *No sig. reaction.*

Stock Price axis: $0 – $50

X-axis dates: 8/1/11, 12/7/11, 4/18/12, 8/24/12, 1/7/13, 5/16/13, 9/24/13, 2/3/14, 6/12/14, 10/20/14, 3/2/15, 7/9/15, 11/13/15, 3/28/16, 8/3/16, 12/9/16

Sources:
Data from Bloomberg, L.P.

41.  Along with the lack of any statistically significant price reaction, a review of analyst commentary on CoreCivic during the Class Period shows that none of the analysts covering the Company made any comment that is consistent with Plaintiffs' claim that the revelation of "quality"-related issues at the Company's facilities during the Class Period negatively affected the stock and/or altered the "mix" of information in the market. Instead, in reports following riots at CoreCivic's facilities, analysts noted that riots and inmate disturbances are a risk that is "intrinsic" to the corrections industry. For example, following the Adams riot in May 2012, the SunTrust analysts covering CoreCivic stated:

> Last week, there was a riot in a CXW [CoreCivic] prison in MS. The company's response to the riot has been solid so far. Disturbances are a risk intrinsic to the corrections industry, despite extensive efforts to mitigate such risks. In the end, we believe thorough, appropriate and timely responses are what will ultimately be judged by customers. [SunTrust, 5/30/12]

23

42.     Other analyst reports also included statements regarding the expected risk of riots and inmate disturbances at correctional facilities. For example:

> Next, we note that prison incidents are no stranger to both public and private operators, it's simply an issue of the environment prison life unfortunately propagates. [Canacord Genuity, 10/5/15]

> The corrections space is subject to headline risk, including riots, deaths or escapes from facilities managed by CXW. [SunTrust, 1/31/17]

**3.     The release of investigative reports by government agencies and third-party organizations into conditions at CoreCivic's facilities, including the BOP's "After-Action Report" on the Adams Riot and the Cibola Cure Notice, did not cause a decline in the Company's stock price**

43.     The release of reports into conditions at CoreCivic's facilities did not cause a decline in the Company's stock price. In particular, event study results show that there was no statistically significant reaction in CoreCivic's stock price following the release of investigative reports by government agencies and third-party organizations into conditions at CoreCivic's facilities, including the BOP's "After-Action Report" on the Adams Riot and the Cibola "Cure Notice."

44.     The reports on each of CoreCivic's BOP facilities are summarized below:

- Adams: During the Class Period, three reports alleging issues with understaffing and other "quality"-related "deficiencies" at Adams were publicly released.

  - The first report, published on September 13, 2012, was an investigative report by *Justice Strategies* that examined the conditions for inmates at private prisons, including at Adams.[58] The *Justice Strategies* report stated that inmates at Adams had endured "beatings by guards," "discriminatory and humiliating treatment," "substandard food," "periods of excessive lockdown" and "lack of proper medical care" at the facility. There was no statistically significant price reaction following the publication of this report by *Justice Strategies*.[59]

  - The second report, dated July 27, 2012 and released publicly in June 2016, was an "After-Action Report" prepared by the BOP addressing the causes of the 2012

---

[58]  "Privately Operated Federal Prisons for Immigrants: Expensive. Unsafe. Unnecessary," *Justice Strategies*, September 13, 2012.

[59]  According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

Adams riot.[60] This report concluded that the 2012 riot could be "directly attributed to actions taken by the administration leading up to the event," and recommended implementing "stronger staffing and training requirements" for correctional officers at Adams. It appears that the BOP's After-Action Report was publicly released on June 15, 2016, two months before the Yates Memo.[61] There was no statistically significant price reaction on June 15, 2016.[62]

    – The third report, also published on June 15, 2016, was by Seth Freed Wessler, an investigative journalist at *The Nation*, and examined the BOP's use of private facilities, including of Adams.[63] This report by *The Nation* repeated the findings of the July 2012 After-Action Report, and quoted statements by the BOP's former chief of private prison contracting noting "inadequate medical care," "low staffing levels" and "food-service issues" at Adams. As noted above, there was no statistically significant price reaction on June 15, 2016.[64]

- Cibola: During the Class Period, a report alleging issues with the healthcare services at Cibola was publicly released – the same June 2016 report by *The Nation* that discussed purported "deficiencies" at Adams.[65]

    – The report by *The Nation* stated that Cibola "has accumulated more repeat deficiencies or significant findings in health services than any other private federal prison currently in operation."

    – In addition, this report disclosed that CoreCivic had received a "Cure Notice" from the BOP regarding medical services at Cibola. A "Cure Notice" is issued in cases where there are "significant deficiencies" at a facility that go uncorrected over time, and these notices mean that the BOP is "on the brink of ending the

---

60  "After-Action Report: Disturbance at Adams County Correctional Center, Natchez, Mississippi, May 20-May 21, 2012," *U.S. Department of Justice: Federal Bureau of Prisons*, July 27, 2012. Note the version of the report that is public and that I have reviewed has portions redacted, including names of individuals.

61  "They Knew Something Was Going On," *The Nation*, June 15, 2016 ("In the wake of the Adams riot, the BOP conducted an investigation. Ten bureau officials, including Martz, spent days interviewing guards and reviewing documents. The report they produced in July 2012, marked 'sensitive,' hasn't been released until now.").

62  According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

63  "They Knew Something Was Going On," *The Nation*, June 15, 2016.

64  According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

65  "They Knew Something Was Going On," *The Nation*, June 15, 2016.

contract."[66] However, there was no statistically significant decline in CoreCivic's stock price following the publication of the report by *The Nation*.[67]

- Eden: During the Class Period, two reports alleging issues with the healthcare services at Eden were publicly released.

  - The first report was published on June 9, 2014 by the ACLU, and documented the ACLU's investigation into five privately-operated BOP facilities located in Texas, including Eden, that were used by the BOP to house people convicted of immigration crimes.[68] The ACLU report stated that staff at Eden "routinely cuts corners on medical care and treatment," and highlighted issues such as delays in inmates receiving medical attention, denial of treatments and surgeries, and problems refilling prescriptions. The ACLU report also noted that staff at Eden took "extreme measures" to "stifle the dissent" of inmates, including isolating inmates in "special housing units." There was no statistically significant price reaction following the publication of this report by the ACLU.[69]

  - The second report, published on January 28, 2016 by investigative journalist Seth Freed Wessler at *The Nation*, examined incidents of prisoner deaths at privately-operated BOP facilities, including at Eden.[70] Mr. Wessler's report stated that inmates at Eden "frequently suffer without the medical care that they need." As part of his research, Mr. Wessler claimed to have reviewed over 9,000 pages of medical records of inmates at private prisons, including at Eden, and claimed to have identified "dozens of deeply questionable deaths inside the facilities, including several cases in which care was flagged as inadequate by the contractors' own mortality reviews." There was no statistically significant price reaction following the publication of this report by *The Nation*.[71]

- McRae: Prior to the Class Period, a report alleging issues with healthcare services and use of disciplinary action at McRae was publicly released.

---

[66] Complaint, fn. 6. See, also, "They Knew Something Was Going On," *The Nation*, June 15, 2016 ("It appeared that CCA had finally crossed a line. In January 2015, contracting officials issued a cure notice, warning CCA that Cibola faced closure if the company didn't turn medical care around by April. 'Cure notices are usually just a formality,' says Joshua Schwartz, a professor of government-contracts law at George Washington University. 'You send the letter and then end the contract. It should not get to that point.'").

[67] According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

[68] "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," *American Civil Liberties Union*, June 9, 2014

[69] According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

[70] "The 25 Men Whose Lives Ended Under Questionable Circumstances," *The Nation*, January 28, 2016.

[71] According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

26

- On August 8, 2011, the ACLU released a letter addressed to the BOP, that set out reasons for why the BOP should not renew its contract for McRae.[72] There was no statistically significant price reaction following the publication of the ACLU letter.[73]

- An article accompanying the letter, dated August 18, 2011, stated that McRae "has a record of violations of constitutional and BOP standards regarding the medical treatment of prisoners" and "a record of abusive disciplinary practices that violate BOP standards."[74] There was no statistically significant price reaction following the publication of the ACLU article.[75]

- <u>Northeast Ohio</u>: Prior to the Class Period, a report alleging issues with costs and inmate safety at Northeast Ohio was publicly released.

  - The report, issued by the ACLU on April 14, 2011, responded to plans by Ohio to sell five state-owned prisons to private operators (including CoreCivic) by showing that earlier prison privatizations in Ohio "resulted in serious safety and fiscal concerns."

  - In particular, the report stated that, in its first 14 months of operation, Northeast Ohio experienced 13 stabbings, 2 murders and 6 inmate escapes, and that the state incurred the costs of litigation and changes in security procedures at the facility.[76] There was no statistically significant price reaction following the publication of the ACLU report.[77]

45.    The chart below shows CoreCivic's stock price along with dates of the reports identified above:

---

[72]    "Re: Criminal Alien Requirement (CAR 12) Procurement Action," *American Civil Liberties Union*, August 8, 2011.

[73]    According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

[74]    "License to Abuse? Time for Bureau of Prisons to Sever Ties with CCA," *American Civil Liberties Union*, August 18, 2011.

[75]    According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.

[76]    "Prisons for Profit: A Look at Prison Privatization," *American Civil Liberties Union*, April 14, 2011.

[77]    According to both Dr. Feinstein's event study model and the alternative event study specification. See Section VI above for descriptions of both models.



**Public Reports/Articles Detailing "Quality"-Related Issues at CoreCivic Facilities**

Sources:
Data from Bloomberg, L.P.

C. There is no loss causation and no damages associated with the two other alleged corrective disclosures – the August 18, 2016 Yates Memo, and August 3, 2016 announcement of the Cibola non-renewal

    1. There is no loss causation and no damages associated with the Yates Memo

        i. The Yates Memo did not provide the market with any new and/or corrective information about the quality or cost-effectiveness of CoreCivic's facilities

46.     Plaintiffs in the Complaint alleged that the remaining "truth" about the quality, performance and cost savings of CoreCivic's facilities was fully revealed, and the inflation in CoreCivic's stock price was fully "eliminated," by the Yates Memo on August 18, 2016.[78] In

---

[78]   Complaint, ¶¶116, 170, 192.

particular, Plaintiffs alleged that the Yates Memo revealed that "contract prisons operated lower-quality facilities without saving substantially on costs."[79]

47.    Following the Court's January 2019 decision, which rejected Plaintiff's theory and found that the OIG Report "precluded" the Yates Memo from serving as a corrective disclosure,[80] Plaintiffs claimed that the two-page Yates Memo, in contrast to the 86-page OIG Report, addressed more "current conditions" at CoreCivic's BOP facilities.[81] However, based on a review of the Yates Memo, the OIG Report and other publicly available information, including analyst commentary, as well as the analysis and evidence presented by Plaintiffs and Dr. Feinstein, I find that Plaintiffs' new theory is not supported by the economic evidence and that the Yates Memo did not provide the market with any new and/or corrective information about the quality or cost-effectiveness of CoreCivic's facilities.

48.    First, Plaintiffs' new theory is not supported by their economic expert Dr. Feinstein. In particular, Dr. Feinstein reviewed both the OIG Report and the Yates Memo and issued a rebuttal report on price impact – yet he never stated that the reason there was no reaction to the OIG Report was that the data in the Report was too old to be meaningful to the market, and he never stated that the Yates Memo relied on newer data or otherwise provided any comparison of the data in the OIG Report and the Yates Memo. In fact, as discussed above, Dr. Feinstein insisted that the revelations in the OIG Report *did* negatively impact CoreCivic's stock price. Note that Plaintiffs in their motion for reconsideration do not provide any evidence that the Yates Memo relied on more "current" data than the OIG Report.

49.    Second, the plain language of the Yates Memo indicates that it did not rely on any newer or more "current" data than the OIG Report. In fact, the Yates Memo cited the OIG Report as the *only* support for its claim that private prisons "do not maintain the same level of safety and security."[82] Further, regarding costs, the Yates Memo stated that "time has shown" that private prisons do not save substantially on costs.[83] In other words, rather than cite any new

---

[79]   Complaint, ¶13.

[80]   Memorandum and Opinion on Plaintiffs' Motion for Class Certification, dated January 18, 2019, p. 17

[81]   Plaintiffs' Motion for Reconsideration, pp. 2, 4-5.

[82]   Yates Memo, p. 1.

[83]   Yates Memo, p. 1.

data or study, the language in the Yates Memo indicates that its statement about cost savings was not based on new analysis, but instead was something that had become clear over time.

50.     Third, as discussed below, there is no indication that the Yates Memo changed or "corrected" analysts' opinions of the quality or cost effectiveness of CoreCivic's facilities. Instead, analyst commentary demonstrates that the Yates Memo was considered by the market to signal a shift in policy driven by politics, and that this political shift (as opposed to any new information regarding the quality, performance and cost savings of CoreCivic's facilities) was the cause of the market reaction to the Yates Memo. Neither Plaintiffs nor Dr. Feinstein has cited a single statement by any analyst indicating that the Yates Memo changed analysts' perceptions of the quality or cost-effectiveness of CoreCivic's facilities, or that following the Yates Memo analysts no longer considered CoreCivic's facilities to be a quality or cost-effective option for federal corrections. In fact, analyst commentary directly contradicts Plaintiffs' claim, since, as shown below, analysts continued to believe that CoreCivic's facilities were a quality and cost-effective option for federal corrections after the Yates Memo.

51.     Note that following the Court's January 2019 decision, Plaintiffs argued that the Yates Memo "also disclosed new information that private prisons offered a lower level of correctional services, programs and resources, including rehabilitation services essential to reducing recidivism and improving public safety."[84] However, the fact that BOP contract prisons provided a different level of services and programs compared to government-run facilities was already known by the market and not "new information" as Plaintiffs claim and thus, in an efficient market, cannot be corrective of the alleged misrepresentations. For example, a June 9, 2014 report by the ACLU that documented the ACLU's investigation into five privately-operated BOP facilities stated:

> But privately run CAR [criminal alien requirement] facilities are not required to offer an equivalent range of programs under the rationale that such opportunities are unnecessary because immigrant prisoners will not remain in the United States.[85]

---

[84] Plaintiffs' Petition for Permission to Appeal Pursuant to Federal Rule of Civil Procedure 23(f), filed February 1, 2019, p. 2. Note that this claim was not made by Plaintiffs' expert Dr. Feinstein in response to my report on price impact.

[85] "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," *American Civil Liberties Union*, June 9, 2014.

ii.  **The fact that analyst reports following the Yates Memo show no change in analysts' opinion of the quality or cost-effectiveness of CoreCivic's facilities is strong evidence that the Yates Memo was not corrective of the alleged misrepresentations**

52.     There is no indication that the Yates Memo changed or "corrected" analysts' opinions of the quality or cost effectiveness of CoreCivic's facilities. In particular, a review of analyst reports published in the months following the Yates Memo shows that analysts continued to believe that CoreCivic's facilities were a quality and cost-effective option for federal corrections despite the alleged revelations regarding quality and cost savings in the Yates Memo. Moreover, no analyst stated the opposite, and neither Plaintiffs nor Dr. Feinstein has cited a single statement by any analyst showing that the Yates Memo corrected analysts' perceptions of the quality or cost-effectiveness of CoreCivic's facilities. The fact that the Yates Memo did not change analysts' opinion of the quality or cost-effectiveness of CoreCivic's facilities is strong evidence that the Yates Memo was not corrective of the alleged misrepresentations.

53.     For example, in a report published on September 1, 2016, the SunTrust analysts covering CoreCivic presented an analysis of the costs associated with private facilities compared to government-run prisons, concluding that private facilities "operate more efficiently across virtually every dimension" compared to government-run prisons. In particular, the SunTrust analysts stated:

> **What would government customers pay to acquire private facilities?**
>
> There is a wide range of considerations in this evaluation. On the high end of the spectrum is replacement cost if a state government or federal agency chooses to replace existing for-profit capacity with newly constructed beds**.** Our analysis of new and recently proposed construction by government entities suggests an average cost of $212,000 per bed. The BOP is championing the most expensive project in Lechter County in Kentucky that could cost $370,000 per bed. Our analysis of recently developed private facilities indicates an average cost per bed of $60,000. Private operators are continually land banking real estate for future development, have shortened construction periods and **operate more efficiently across virtually every dimension of the project** with the notable exception of financing costs. They are unable to match the borrowing cost of customers [*i.e.*, federal and state government agencies].
>
> **Operating Cost Comparison**
>
> **Operating efficiencies are also tilted in favor of for-profit operators**. For example, the State of Ohio required a 7% reduction in operating expenses when it sold the Lake Erie facility to CXW [CoreCivic] several years ago under a long-term lease

arrangement. The efficiencies and cost savings associated with private operators is often understated in our experience since customers rarely consider the costs of long-term liabilities such as pension and healthcare of unionized correctional employees. [SunTrust, 9/1/16, emphasis added]

These comments by the SunTrust analysts stating that private operators are more "efficient" than the government in providing correctional services directly contradicts Plaintiffs' claim that the Yates Memo corrected the market's perception about the quality and cost-effectiveness of CoreCivic's facilities.[86]

54. A review of analyst reports published after the 2016 Presidential Election similarly shows that analysts continued to believe that CoreCivic's facilities were a quality and cost-effective option for federal corrections, and similarly contradicts Plaintiffs' claim that the Yates Memo was corrective of the alleged misrepresentations.

55. For example, in a report published on January 13, 2017, around five months after the release of the OIG Report and the Yates Memo, the Canaccord analysts covering CoreCivic stated that "private prisons continue to be materially cheaper than their public counterparts":

> **Private prisons cheaper. Private prisons, as noted by BOP and some state budgets, continue to be materially cheaper than their public counterparts**. Furthermore, there are over 200,000 public prison beds that are over 75 years old, and in many cases facilities have become antiquated and inefficient. [Canaccord Genuity, 1/13/17, emphasis added]

56. The Canaccord analysts based their claim in part on the BOP's own budget, which the analysts stated showed that private facilities were between 17% to 22% cheaper than comparable government-run BOP institutions, and had become more cost-effective in recent years:

> The Federal Bureau of Prisons releases their budgets each year, and within the budget, they spell out per diems separately for privately-operated facilities vs. all other types of BOP facilities. We believe the private BOP facilities are most comparable to medium security prisons, and **by comparison, private facilities have averaged costs that are 17% cheaper over the past 7 years, and 22% cheaper during 2014 and 2015**. [Canaccord Genuity, 1/13/17, emphasis added]

---

[86] Note that the SunTrust analysts also stated in the same report that, for state government customers, the quality of the services in private facilities "generally mirror" the quality of services in government-run prisons. ("Service levels in for-profit facilities generally mirror those offered by state customers. For example if a state increases the availability of GED course work and support, then a for-profit facility housing inmates from that state would correspondingly increase its services and per diems would rise.")

Note that this report by the Canaccord analysts, issued almost five months after the Yates Memo, cites data that is *even older* than that in the OIG Report (*i.e.*, data from 2010, compared to 2011-2014 in the OIG Report), further demonstrating the infirmity of Plaintiffs' claim that the data in the OIG Report was too old to be meaningful to the market.

57. Regarding the issue of cost savings, the Canaccord analysts focused in particular on the new Attorney General Jeff Sessions, noting that reducing the cost of providing correctional services would likely be his (and the new administration's) priority:

> **Frugal**. Sessions was raised on a Depression mentality when it comes to frugality, and his record of thriftiness extends to both his career and his personal life. We believe jurisdictions' **consideration of costs are a critical factor** in the decision to move forward with private solutions. We believe there is **plenty of support in this regard for private facilities screening cheaper at both the BOP and state level.** […] The Trump administration has been public about pro-privatization, and we don't see any reason why this shouldn't carry over into the prison space, **especially in an environment where balancing the budget is as critical as ever**. [Canaccord Genuity, 1/13/17, emphasis added]

58. These comments by the Canaccord analysts stating that private prisons are "materially cheaper than their public counterparts" and that the OIG Report did not provide any "overarching conclusions" regarding the safety of private prisons is contrary to Plaintiffs' theory that the Yates Memo corrected or changed the market's perception about the quality and cost-effectiveness of CoreCivic's facilities, and directly contradicts Plaintiffs' claim of loss causation and damages.

### iii. Analyst commentary demonstrates that the Yates Memo was considered a shift in policy driven by politics, not by quality or costs

59. Analyst commentary shows that the Yates Memo was considered by the market to signal a shift in policy driven by politics, not by quality or costs, and contradicts Plaintiffs' claim that the Yates Memo was corrective of the alleged misrepresentations. In particular, analysts covering CoreCivic stated after the end of the Class Period that the "political environment" was "a large factor and driver" behind the decision in the Yates Memo to reduce the BOP's use of private prisons. For example, in a report on CoreCivic and GEO (CoreCivic's only publicly-traded competitor) published on August 23, 2016, shortly after the release of the Yates Memo, the Canaccord analysts stated:

> **[W]e believe the political environment is a large factor and driver behind the DOJ's memo**. Given 4 – 5 years between now and some of these renewals, we believe the political landscape could be very different, limiting the impact on these contracts. [Canaccord Genuity, 8/23/16, emphasis added]

60.      Similarly, in a report published on September 1, 2016, the SunTrust analysts characterized the Yates Memo as a "political shift" and a "political push to sever ties with private prisons":

> **CXW [CoreCivic], GEO - Lowering Estimates & PTs Amid Political Shift** […]
>
> We believe the BOP itself is not going to be a fan of overcrowding its system to satisfy a political push to sever ties with private prisons. Overcrowding is the single metric that correlates best with incidents of violence, mortality and other disruptions often tabulated to compare quality of facilities. [SunTrust, 9/1/16, emphasis original]

61.      Further evidence indicating that the market's reaction to the Yates Memo was due to politics, as opposed to new information about the quality or cost of private prisons, is the fact that analysts covering CoreCivic believed that the likelihood of federal and state government agencies reducing their use of private prisons was dependent on the "political landscape" (*i.e.*, which political party was in power) when the Company's contracts came up for renewal:

> Republican victory in the White House may alleviate investor concern about federal agencies severing ties with CXW [CoreCivic]. [SunTrust, 11/3/16]
>
> Upside risk: Current election cycle results in a new administration in the White House and state governments that are supportive of increased utilization of private correctional facilities. [SunTrust, 10/17/16]
>
> Given 4 – 5 years between now and some of these renewals, we believe the political landscape could be very different, limiting the impact on these contracts. [Canaccord Genuity, 8/23/16]
>
> Additionally, we would note that the majority of these states are not left leaning states, making it even less likely that these states follow the DOJ's path [in reducing private prison use]. [Canaccord Genuity, 8/23/16]

> **iv.      CoreCivic explicitly warned both prior to and during the Class Period that political opposition to private prisons could impact the Company's business**

62.      Both prior to and during the Class Period, CoreCivic warned that political opposition to privatized corrections and changes in government policy affecting incarceration rates were risks that could impact the Company's business. For example, in its Form 10-K for

FY2010, filed on February 25, 2011 (a year before the start of the Class Period), CoreCivic
stated:

> **Risks Related to Our Business and Industry**
>
> ***Our results of operations are dependent on revenues generated by our jails,
> prisons, and detention facilities, which are subject to the following risks associated
> with the corrections and detention industry.*** […]
>
> *Escapes, inmate disturbances, and public resistance to privatization of correctional
> and detention facilities could result in our inability to obtain new contracts or the loss
> of existing contracts.* The operation of correctional and detention facilities by private
> entities has not achieved complete acceptance by either governments or the public.
> The movement toward privatization of correctional and detention facilities has also
> encountered resistance from certain groups, such as labor unions and others that
> believe that correctional and detention facilities should only be operated by
> governmental agencies.
>
> Moreover, negative publicity about an escape, riot or other disturbance or perceived
> poor conditions at a privately managed facility may result in adverse publicity to us
> and the private corrections industry in general. Any of these occurrences or continued
> trends may make it more difficult for us to renew or maintain existing contracts or to
> obtain new contracts, which could have a material adverse effect on our business.[87]

63.     CoreCivic's FY2010 10-K also warned that changes in government policies that
lowered incarceration rates could impact the Company's ability to renew contracts for its
facilities:

> *Our ability to secure new contracts to develop and manage correctional and
> detention facilities depends on many factors outside our control.* Our growth is
> generally dependent upon our ability to obtain new contracts to develop and manage
> new correctional and detention facilities. This possible growth depends on a number
> of factors we cannot control, including crime rates and sentencing patterns in various
> jurisdictions and acceptance of privatization. The demand for our facilities and
> services could be adversely affected by the relaxation of enforcement efforts, leniency
> in conviction or parole standards and sentencing practices or through the
> decriminalization of certain activities that are currently proscribed by our criminal
> laws. For instance, any changes with respect to drugs and controlled substances or
> illegal immigration could affect the number of persons arrested, convicted, and
> sentenced, thereby potentially reducing demand for correctional facilities to house
> them. Legislation has been proposed in numerous jurisdictions that could lower
> minimum sentences for some non-violent crimes and make more inmates eligible for
> early release based on good behavior. Also, sentencing alternatives under
> consideration could put some offenders on probation with electronic monitoring who
> would otherwise be incarcerated. Similarly, reductions in crime rates could lead to

---

[87]   CoreCivic FY2010 Form 10-K, filed February 25, 2011, pp. 21-22 (emphasis original).

reductions in arrests, convictions and sentences requiring incarceration at correctional facilities.[88]

64.    CoreCivic repeated identical or substantially similar statements regarding the risks associated with its business operations in its 10-K for FY2011, filed on February 27, 2012 (the first day of the Class Period),[89] and in its 10-Ks for FY2012-FY2015, filed during the Class Period on February 27, 2013,[90] February 27, 2014,[91] February 25, 2015,[92] and February 25, 2016,[93] respectively.

65.    In addition, CoreCivic warned during the Class Period that declines in the federal prison population (primarily due to changes in sentencing guidelines for drug offenses) and reductions in overcrowding in BOP-operated facilities could negatively impact the Company's business. For example, in its Form 10-Q for 3Q15, filed November 5, 2015 (around nine months prior to the Yates Memo), CoreCivic stated:

> Despite our increase in federal revenue, inmate populations in federal facilities, particularly within the BOP system nationwide, have declined over the past two years. **Inmate populations in the BOP system are expected to decline further in the fourth quarter of 2015, and potentially future quarters, primarily due to the retroactive application of changes to sentencing guidelines applicable to federal drug trafficking offenses.** However, we do not expect a significant impact because BOP inmate populations within our facilities are primarily criminal aliens incarcerated for immigration violations rather than drug trafficking offenses. Further, the BOP correctional system remains overcrowded at approximately 122.4% at September 30, 2015. Nonetheless, increases in capacity within the federal system could result in a decline in BOP populations within our facilities.[94]

CoreCivic made substantially similar statements in its 10-K for FY2015, filed on February 25, 2016,[95] and its 10-Qs for 1Q16, filed on May 5, 2016,[96] and for 2Q16, filed on August 4, 2016.[97]

---

[88]  CoreCivic FY2010 Form 10-K, filed February 25, 2011, p. 22 (emphasis original).

[89]  CoreCivic FY2011 Form 10-K, filed February 27, 2012, pp. 25-26.

[90]  CoreCivic FY2012 Form 10-K, filed February 27, 2013, pp. 26-29.

[91]  CoreCivic FY2013 Form 10-K, filed February 27, 2014, pp. 27-29.

[92]  CoreCivic FY2014 Form 10-K, filed February 25, 2015, pp. 27-28.

[93]  CoreCivic FY2015 Form 10-K, filed February 25, 2016, pp. 28-31.

[94]  CoreCivic 3Q15 Form 10-Q, filed November 5, 2015, p. 38 (emphasis added).

[95]  CoreCivic FY2015 Form 10-K, filed February 25, 2016, p. 10

[96]  CoreCivic 1Q16 Form 10-Q, filed May 5, 2016, p. 34.

[97]  CoreCivic 2Q16 Form 10-Q, filed August 4, 2016, p. 40.

66.     The Yates Memo explicitly cited the decline in the federal prison population over prior years in part due to "the retroactive application of revised drug sentencing guidelines" as a key reason for the decision in the Memo to end the BOP's use of private prisons.[98]

67.     A review of analyst reports on CoreCivic published both prior to and during the Class Period shows that the market was aware of the risk that political opposition to privatized corrections and changes in government policy affecting incarceration rates could impact the Company's business, and considered this risk important to the valuation of CoreCivic's stock. For example, in a report published on February 10, 2011, over a year prior to the start of the Class Period, the Avondale Partners analysts covering CoreCivic stated that CoreCivic's business was "susceptible to public policy changes":

> **Policy Changes.** As a supplier of services to federal, state, and local governments, the private prison sector is susceptible to public policy changes that can influence demand for beds (e.g., war on drugs, immigration enforcement, etc.). [Avondale Partners, 2/10/11, emphasis original]

The Avondale Partners analysts covering CoreCivic made similar statements in reports on the Company published between February 10, 2011 and February 12, 2015.

68.     Other analysts covering CoreCivic made similar statements regarding the risk that "social backlash" or "public policy changes" could impact CoreCivic's business. For example, the Wells Fargo analysts covering CoreCivic made the following statements in reports on the Company published between December 19, 2014 and November 30, 2017:

> Risks to our thesis include a large, unexpected decline in U.S. prison populations, unforeseen contract terminations, weaker than expected per diem increases and any increased social backlash related to the idea of profiting from imprisonment. [Wells Fargo, 12/19/14-11/30/17]

Similarly, the SunTrust analysts covering CoreCivic made the following statements in reports on the Company published between January 31, 2011 and March 16, 2018:

> Political pressure related to large social programs could affect operations or cause significant changes in the existing relationships with agencies and customers. [SunTrust, 1/31/11-3/16/18]

---

[98]   Yates Memo, p. 1 ("Since then, for the first time in decades, the federal prison population has begun to decline, from nearly 220,000 inmates in 2013 to fewer than 195,000 inmates today. In part, this is due to several significant efforts to recalibrate federal sentencing policy, including the retroactive application of revised drug sentencing guidelines, new charging policies for low-level, non-violent drug offenders, and the Administration's ongoing clemency initiative.").

**v.** **The recovery in CoreCivic's stock price following the 2016 Presidential Election is consistent with the Yates Memo signaling to the market a policy shift driven by politics and not by the quality or cost effectiveness of CoreCivic's facilities**

69.     The recovery in CoreCivic's stock price after the end of the Class Period is inconsistent with Plaintiffs' claim of loss causation and damages, In particular, while Plaintiffs allege that the Yates Memo revealed that CoreCivic's facilities were no longer a quality or cost-effective option for federal corrections, the recovery in CoreCivic's stock price instead supports the finding that changes in the political environment and associated risk to CoreCivic's business, rather than the alleged misrepresentations, caused the market reaction to the Yates Memo.

70.     The chart below shows CoreCivic's stock price along with the S&P 500 Index. As the chart shows, by the time Jeff Sessions was confirmed as the new Attorney General, CoreCivic's stock price had fully recovered to its level from prior to the release of the Yates Memo, even accounting for market movements (*i.e.*, the movement in the index) during that period:



**S&P 500 Index Pegged to CoreCivic Stock Price on August 10, 2016**

Sources:
Data from Bloomberg, L.P. Other events from news stories from Factiva.

71.     Analyst commentary demonstrates that the political shift signaled to the market by the Yates Memo created uncertainty around the potential renewal of the Company's contracts with the federal government (including the loss of contracts with agencies other than the BOP, such as ICE and USMS). For example, the Canaccord analysts covering CoreCivic noted that the magnitude of CoreCivic's stock price reaction following the Yates Memo implied that the market was pricing in not just the loss of CoreCivic's BOP contracts, but also the risk that the Company might lose other federal government contracts:

> At current valuations, we believe the market is implying not only that the BoP contracts are lost immediately (assigning no value to them) but that the risk of contagion to the USMS, ICE and State contracts is a real near-term risk. We disagree on both accounts. [Canaccord Genuity, 8/23/16]

72.     Commentary in analyst reports on CoreCivic published after the 2016 Presidential Election shows that analysts believed the election of Donald Trump "materially" lowered the risk to the renewal of CoreCivic's government contracts. For example, in a report on CoreCivic and

GEO published on November 11, 2016, the day after the election, the Canaccord analysts increased their 12-month price target for CoreCivic and GEO, citing "lower risk" to contract renewals post-election:

**Raising GEO and CXW [CoreCivic] price targets on lower risk post-election**

Following Donald Trump's presidential victory, we now see materially less risk to contract renewals and the overall private prison REIT business models. […] [W]e believe it's possible that a new attorney general reverses the current plan to cancel BOP contracts upon renewal[.] […] While risk to BOP business is now far less under a Trump presidency, we still include the contract losses in our estimates until there is further clarity. [Canaccord Genuity, 11/11/16, emphasis original]

73.　　Other analyst reports on CoreCivic similarly noted that the results of the election had lowered the risk and uncertainty around the renewal of CoreCivic's contracts with the federal government:

We expect CXW's [CoreCivic's] multiple to increase in the next twelve months to 14.0x given the less uncertainty and political threat to CXW's business and enhanced outlook for continuing business with ICE and the BOP. [SunTrust, 11/14/16]

As we approach Trump's inauguration, we see low risk to contract renewals and the overall private prison business model, driving a compelling investment opportunity. [Canaccord Genuity, 1/13/17]

74.　　Note that the fact that CoreCivic's BOP facilities continued to be contracted by government agencies, including the BOP, after the Class Period is further evidence contrary to Plaintiffs' claim of loss causation and damages. In particular, of the three prisons CoreCivic was operating under BOP contracts at the time of the Yates Memo, two facilities – Adams and McRae – were renewed when the contracts expired (*after* the end of the Class Period).[99] The third, Eden, was not renewed by the BOP, but this facility was later contracted jointly by USMS and ICE.[100] The two other facilities, Cibola and Northeast Ohio, which were not renewed by the BOP during the Class Period, were also contracted by ICE in late-2016.[101]

---

[99] "CoreCivic Extends Contract for the McRae Correctional Facility," *GlobeNewswire*, November 15, 2016, and CoreCivic FY2017 Form 10-K, filed February 22, 2018, p. 10 ("[I]n July 2017, the BOP exercised a two-year renewal option at our 2,232-bed Adams County Correctional Center").

[100] "CoreCivic Enters into New Management Contract to Activate the Eden Detention Center," *Globe Newswire*, May 23, 2019.

[101] "CCA Awarded New Management Contract at the Cibola County Corrections Center," *Globe Newswire*, October 31, 2016 and "CoreCivic Awarded Management Contract at the Northeast Ohio Correctional Center," *Globe Newswire*, December 14, 2016.

**vi.    The Yates Memo had the same or even greater impact on the stock price of GEO, CoreCivic's only publicly-traded competitor, and controlling for the movement in GEO's stock yields no reaction in CoreCivic's stock price following the Yates Memo**

75.    The Yates Memo had the same or even greater impact on the stock price of GEO, CoreCivic's only publicly-traded competitor. Therefore, controlling for the movement in GEO's stock yields no reaction in CoreCivic's stock price following the Yates Memo. In particular, following the Yates Memo, CoreCivic's stock price declined by 35.5%, while GEO's stock price declined by 39.6%, as shown in the table below.

### CoreCivic and GEO Return on August 18, 2016

| Date | Price | | Return | |
|------|-----------|--------|-----------|--------|
| | CoreCivic | GEO | CoreCivic | GEO |
| 8/17/16 | $27.22 | $21.53 | | |
| 8/18/16 | $17.57 | $13.01 | -35.5% | -39.6% |

Sources:
  Data from Bloomberg, L.P.

76.    The chart below shows the magnitude of the decline in GEO's stock price compared to CoreCivic following the Yates Memo:



GEO Pegged to CoreCivic's Stock Price on August 17, 2016

Sources:
Data from Bloomberg, L.P.

### 2. There is no loss causation and no damages associated with CoreCivic's August 3, 2016 announcement of the Cibola non-renewal

77.     As discussed above, Plaintiffs in their Class Certification briefings alleged a third corrective disclosure not claimed in the Complaint: CoreCivic's 2Q16 earnings announcement on August 3, 2016. On that date, CoreCivic announced that the BOP had declined to renew the Company's contract for Cibola, and that its contract for the STFRC, an ICE facility, was going to be renegotiated.[102] According to Plaintiffs, the Cibola announcement was a partial corrective disclosure of the alleged fraud.[103] However, the price decline following the August 3 announcement cannot, in an efficient market, have been due to the Cibola non-renewal because it

---

[102] "CCA Reports Second Quarter 2016 Financial Results, Increases Full Year 2016 Financial Guidance," *Globe Newswire*, August 3, 2016.

[103] Plaintiffs' Motion for Reconsideration, p. 12. See, also, Plaintiffs' Class Certification Reply, pp. 5, 10-11, 16.

In addition, Plaintiffs' expert, Dr. Feinstein, claimed that that the Cibola non-renewal announcement was "a partial revelation of prior misrepresentations and omissions." See, Feinstein Price Impact Rebuttal, ¶85.

was not new news. Further, the price decline following the August 3 announcement was not due to Cibola or the alleged misrepresentations, but rather was due to information unrelated to the alleged fraud.

### i. The price decline following the August 3 announcement cannot, in an efficient market, have been due to the Cibola non-renewal because it was not new news

78.     The price decline following the August 3 announcement cannot, in an efficient market, have been due to the Cibola non-renewal because it was not new news. In particular, the information regarding the Cibola non-renewal that Plaintiffs claim was announced on August 3, 2016 was in fact announced to the market earlier – in a news article published on August 1, after market close, by KOAT Albuquerque, the ABC-affiliate in New Mexico where the Cibola facility is located. The article stated:

> Cibola County Sheriff Tony Mace confirmed Monday that the cibola county correctional center in Milan near Grants, New Mexico, will be closing Oct. 1. The closure will affect an estimated 300 jobs. It is a privately run, low-level security facility and has been operated by the Corrections Corporation of America since 1998.[104]

79.     The news regarding the Cibola non-renewal was repeated in another news story, published the next day, August 2, by *The Gallup Independent*, a local newspaper in the Cibola area:

> Corrections Corporation of America will be closing its doors at midnight Oct. 1, displacing 254 workers at the Cibola County Correctional Center.

> Andrea Cooper, senior director for CCA human resources compliance, faxed a letter Monday afternoon to Grants Mayor Martin 'Modey' Hicks, informing him that the federal Bureau of Prisons had notified CCA of its decision not to exercise its option to renew its contract at the Cibola facility.[105]

80.     The fact that the August 3 announcement regarding Cibola was not new to the market is apparent from the Wells Fargo analyst report on CoreCivic issued the following day, which explicitly stated that the news regarding the Cibola non-renewal had been previously announced:

---

[104] "Cibola County Correctional Center Closing," *KOAT Albuquerque*, August 1, 2016.

[105] "Milan Prison to Close; 254 Facing Layoffs," *The Gallup Independent*, August 2, 2016.

Cibola County Corrections Center. **Announced earlier this week**, the Bureau of Prisons (BOP) has decided not to renew its contract at CXW's Cibola County Corrections Center (1,129 beds) in New Mexico which expires on September 30th. [Wells Fargo, 8/4/16, emphasis added]

As discussed below, in contrast to the Cibola non-renewal, the Wells Fargo analyst stated that news of the STFRC renegotiation, also announced on August 3, was a "new disclosure" that was "likely to weigh on" (*i.e.*, negatively impact) CoreCivic's stock price.

81.     Event study results show that there was no statistically significant reaction in CoreCivic's stock price on August 2, following the earlier news of the Cibola non-renewal, according to both Dr. Feinstein's event study model and the alternative event study specification. Thus, not only was the information regarding the Cibola non-renewal that Plaintiffs claim was announced on August 3 not new, but there was no decline in CoreCivic's stock price when the non-renewal was announced earlier.

> ii.     **The price decline following the August 3 announcement was *not* due to the BOP Cibola contract but was actually due to news of the STFRC renegotiation – an ICE contract that was around twice as large as all of CoreCivic's BOP contracts combined and over ten times larger in profits than the Cibola contract**

82.     A review of analyst commentary and analysts' valuations of CoreCivic's stock shows that any price decline following the August 3 announcement was *not* due to the BOP Cibola contract. Instead, all three analysts that issued reports following the August 3 announcement focused on the announcement that the Company's contract for the STFRC, an ICE contract that was around twice as large as all of CoreCivic's BOP contracts combined and over ten times larger than the Cibola contract,[106] was going to be renegotiated. According to CoreCivic and analysts covering the Company, the reason for the renegotiation was to reduce the scale of services provided by the facility.[107] Statements by all three analysts are shown below:

Wells Fargo: The Wells Fargo analyst covering CoreCivic stated that the "uncertainty" around the STFRC renegotiation was "likely to weigh heavily" on CoreCivic's share price and that they

---

[106] Analysts expected the STFRC contract to make up between $68.2 million and $96.3 million (or 15% to 23%) of CoreCivic's adjusted EBITDA in FY2016, over ten times greater than the amount expected from Cibola. See, *Canaccord Genuity* analyst report, dated August 4, 2016, *SunTrust* analyst report, dated August 4, 2016, and *Wells Fargo* analyst reports, dated August 4, 2016 and August 10, 2016.

[107] "CCA Reports Second Quarter 2016 Financial Results, Increases Full Year 2016 Financial Guidance," *Globe Newswire*, August 3, 2016.

expected CoreCivic to "underperform" its peer group following the news of the STFRC renegotiation:

> **CXW: First Look--South TX Uncertainty Likely To Weigh On Shares**
>
> Summary. We **expect shares of CXW to underperform** the peer group average following its quarterly earnings release last night. While the company reported Q2 Funds-From-Operations (FFO)/sh ahead of consensus/our estimate/mgmt's previously provided guidance range and increased the midpoint of full-year FFO and EBITDA (adjusted) guidance ranges, **new disclosure** around potential modifications to the company's current Immigration & Customs Enforcement (ICE) contract at its **South Texas Family Residential Center is likely to weigh heavily on shares** given its large EBITDA contribution (undisclosed by the company, but 20% by our estimates) and uncertainty around the magnitude of any changes. As it relates to the facility, CXW states in its release that it "can provide no assurance that we will be awarded a new contract for family unit detention." [Wells Fargo, 8/4/16, emphasis added]

Canaccord Genuity: The Canaccord analysts covering CoreCivic stated that investors were "focused" on the news of the STFRC renegotiation and stated that the "ambiguity" created by the news would "limit" any upside to CoreCivic's share price:

> **Lowering Target Price**
>
> **2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD**
>
> CXW's 2Q print was solid from an earnings perspective, but investors focused on the high probability of material EBITDA loss from renegotiation of the contract between ICE and the STFRC. As CXW has a 23% EBITDA exposure to this facility, we believe it will be difficult for investors to step in front of the outcome of this renegotiation, limiting near-term upside. [Canaccord Genuity, 8/4/16, emphasis original]

SunTrust: The SunTrust analysts covering CoreCivic lowered their estimates of CoreCivic's future FFO (*i.e.*, funds from operations, a measure of a REIT's cash flow) and attributed their lowered estimates to the STFRC renegotiation:

> **Renegotiation With ICE Ongoing; Maintain Neutral**
>
> **What's Incremental To Our View**
>
> CXW is in the midst of renegotiating its contract with ICE regarding the South Texas Family Residential Center. **ICE is seeking to lower the scale and cost of services currently provided at the facility**. We maintain our Neutral rating and adjust our 2016E normalized FFO estimate to $2.66 from $2.63. [SunTrust, 8/4/16, emphasis added]

83.　　In sum, the economic evidence contradicts Plaintiffs' claim of loss causation from the August 3, 2016 announcement of the Cibola non-renewal. The news of the Cibola non-renewal was publicly reported before August 3 and the analysts covering CoreCivic explicitly stated after the August 3 announcement that the news about Cibola was not new but had been previously announced. A review of analyst commentary and analysts' valuations of CoreCivic's stock shows that the price decline following the August 3 announcement was not due to the Cibola announcement or the correction of the alleged misrepresentations, but rather was due to information unrelated to the alleged fraud. In particular, the price decline following the August 3 announcement was due to news of the renegotiation of CoreCivic's STFRC contract – an ICE contract that was twice as large as all of CoreCivic's BOP contracts combined and over ten times larger in profits than the BOP Cibola contract.

_Lucy P. Allen_

Lucy P. Allen

# Exhibit 1: Alleged Misrepresentations Compared to Statements in OIG Report, Yates Memo and Other Disclosures

| Alleged Misstatement Category | Alleged Misstatement Date | Alleged "Truth" according to Plaintiff | Corrective Statements in OIG Report | Similar Earlier Disclosure | Corrective Statement in Yates Memo | Analyst Commentary Post-Yates Memo |
|---|---|---|---|---|---|---|
| The outsourcing of correctional services to CoreCivic resulted in improving correctional services for government agencies, including the BOP. (¶3) | 2/27/12 (¶¶125, 129); 5/7/12 (¶¶129-130); 8/9/12 (¶¶129-130); 11/8/12 (¶¶129-130); 2/27/13 (¶¶126-127, 129-130); 5/9/13 (¶¶129-130); 8/8/13 (¶¶129-130); 10/2/13 (¶149); 11/7/13 (¶¶129-130); 2/27/14 (¶¶126-127, 129-130); 5/8/14 (¶¶129-130); 8/7/14 (¶¶129-130); 11/5/14 (¶¶129-130); 2/25/15 (¶¶126-127, 129-130); 5/7/15 (¶¶129-130); 8/6/15 (¶¶129-130); 11/5/15 (¶¶129-130); 2/25/16 (¶¶126-127, 129-130); 5/5/16 (¶¶129-130); | Outsourcing correctional services to CoreCivic did not result in higher quality services to the BOP. (¶11) | "The BOP's annual expenditures on contract prisons increased from approximately $562 million in fiscal year (FY) 2011 to $639 million in FY 2014. In recent years, disturbances in several federal contract prisons resulted in extensive property damage, bodily injury, and the death of a Correctional Officer." "We found that in a majority of the categories we examined, contract prisons incurred more safety and security incidents per capita than comparable BOP institutions." | "Indeed, CCA, the largest owner and operator of privatized correctional and detention facilities in the U.S., has had a reputation for poor management, neglect, and turning a blind eye to abuses within its facilities for over 20 years."[1] "But privately run CAR facilities are not required to offer an equivalent range of programs under the rationale that such opportunities are unnecessary because immigrant prisoners will not remain in the United States."[2] "In 2011, the Texas Commission on Environmental Quality found that Eden's drinking water contained unacceptable levels of | "[T]ime has shown that they [private prisons] compare poorly to our own Bureau facilities. They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security." | "Service levels in for-profit facilities generally mirror those offered by state customers. For example if a state increases the availability of GED course work and support, then a for-profit facility housing inmates from that state would correspondingly increase its services and per diems would rise." [SunTrust, 9/1/16] "We believe the BOP itself is not going to be a fan of overcrowding its system to satisfy a political push to sever ties with private prisons. Overcrowding is the single metric that correlates best with incidents of violence, mortality and other disruptions often tabulated to compare quality of facilities. Private operators house |

[1] "License to Abuse? Time for Bureau of Prisons to Sever Ties with CCA," *American Civil Liberties Union*, August 18, 2011.

[2] "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," *American Civil Liberties Union*, June 9, 2014.

**Exhibit 1: Alleged Misrepresentations Compared to Statements in OIG Report, Yates Memo and Other Disclosures**

| Alleged Misstatement Category | Alleged Misstatement Date | Alleged "Truth" according to Plaintiff | Corrective Statements in OIG Report | Similar Earlier Disclosure | Corrective Statement in Yates Memo | Analyst Commentary Post-Yates Memo |
|---|---|---|---|---|---|---|
| | 8/4/16 (¶¶129-130) | | | radioactive contamination that exceeded the maximum contaminant level[.]"[2] "Many federal prisons struggle to fully staff their medical departments, but Cibola was operating without a single doctor."[3] | | criminal aliens for the BOP who may be deported after completing their sentence. We believe these inmate populations to be more violent and likely to be gang members than comparable security inmates housed in the BOP's general population." [SunTrust, 9/1/16] "Many critics argue that private management leads to unsafe conditions for both prisoners and guards at these facilities, citing the recent OIG report. We note that the report seemed politically motivated[.] […] We don't believe overarching conclusions of safety can be drawn from such survey results." [Canaccord Genuity, 1/13/17] |

[3] "Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System," *American Civil Liberties Union*, June 9, 2014.