# EXHIBIT 79


EXHIBIT 562
Witness: Dalrymple
Date: 10-22-2020
Stenographer: Victoria L. Valine, CSR No. 3036

# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE

§
§
NIKKI BOLLINGER GRAE, Individually §
and on Behalf of All Others Similarly §
Situated, §
§
    Plaintiff, §
§
vs. §
§
CORRECTIONS CORPORATION OF §
AMERICA, DAMON T. HININGER, DAVID §
M. GARFINKLE, TODD J. MULLENGER, §
AND HARLEY G. LAPPIN, §
§
    Defendants. §

Civil Action No. 3:16-cv-02267

Honorable Aleta A. Trauger

---

# EXPERT REPORT OF
# W. SCOTT DALRYMPLE, CFA
# AUGUST 7, 2020

---

# CONFIDENTIAL
# AUGUST 7, 2020



**TABLE OF CONTENTS**

<u>Page</u>

I. Scope of the Engagement ..................................................................................................... 1

II. Credentials and Compensation............................................................................................ 2

III. Information Considered......................................................................................................... 2

IV. Summary of Opinions............................................................................................................ 3

V. Background ............................................................................................................................. 4

    A. The Class ....................................................................................................................... 4

    B. CCA................................................................................................................................. 4

    C. Allegations..................................................................................................................... 5

    D. Overview of Disclosures ............................................................................................. 6

VI. Analysis of Corrective Disclosures................................................................................... 12

    A. Event Study ................................................................................................................. 13

    B. Corrective Disclosures .............................................................................................. 15

    C. Calculation of abnormal returns .............................................................................. 16

        1) Cibola Contract Loss...................................................................................... 16

        2) Yates Memorandum........................................................................................ 16

    D. Analysis of the corrective disclosures .................................................................... 18

        1) Cibola Contract Loss...................................................................................... 18

        2) Yates Memorandum........................................................................................ 20

VII. Share Price Inflation ............................................................................................................ 23

    A. Inflation at the time of the corrective disclosures.................................................. 24

    B. Inflation during the Class Period .............................................................................. 26

VIII. Per Share Damages.............................................................................................................. 28

IX. Further Work ......................................................................................................................... 29





| 7250 Dallas Parkway | 1000 Louisiana Street | 205 East 42nd Street |
| Suite 200 | Suite 6925 | Floor 20 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10017 |
| 972.377.0300 | 713.457.3125 | 212.364.1926 |

Re: Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated vs. Corrections Corporation of America ("CCA"),[1] Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin ("Defendants")

## I.    Scope of the Engagement

1.    I have been retained by Robbins Geller Rudman & Dowd LLP in the above-styled case to analyze and quantify the effect of plaintiff's allegations that the Defendants engaged in a scheme to defraud investors and made materially false and misleading statements and omissions regarding CCA's business and operations that led to artificially inflated share prices between February 27, 2012 and August 17, 2016 (the "Class Period").

2.    Generally, I understand plaintiff alleges that Defendants concealed the extent of risk related to CCA's business and operations, including by falsely stating that:

   a.    the outsourcing of correctional services to CCA resulted in improving correctional services for government agencies, including the Federal Bureau of Prisons ("BOP");

   b.    CCA's facilities were operated "in accordance with" applicable policies, procedures and contractual requirements;

   c.    CCA's renewal rate on contracts was and would remain high because of the "quality" of services it provided to government customers; and

   d.    the outsourcing of correctional services to CCA resulted in significant costs savings for government agencies, including the BOP.[2]

3.    These and other alleged misrepresentations and omissions, according to plaintiff, resulted in artificially inflated share prices during the Class Period.

---

[1]    Defendant Corrections Corporation of America, commonly abbreviated "CCA," trades on the New York Stock Exchange under the ticker symbol "CXW." (*See* "The CCA Story: Our Company History," available at http://www.correctionscorp.com/our-history.) In October 2016, Corrections Corporation of America announced that it was rebranding its corporate enterprise as "CoreCivic." (*See* press release, "Corrections Corporation of America Rebrands as CoreCivic," October 28, 2016). For the purposes of this report, unless otherwise noted, CCA, CXW, Corrections Corporation of America and CoreCivic are used interchangeably.

[2]    Consolidated Complaint for Violation of the Federal Securities Laws dated March 13, 2017 ("Consolidated Complaint"), ¶ 3.



## II. Credentials and Compensation

4.      I, W. Scott Dalrymple, am a Partner at BVA Group LLC ("BVA Group"). I am an economist and a CFA charter holder with extensive experience in economic, financial and statistical analyses.  During my career, I have worked on issues relating to the analysis of economic damages involving securities litigation, business valuation, structured finance, financial derivatives, antitrust, intellectual property and breach of contract.  I have advised clients in the U.S., Europe and Australia on a range of matters, including valuation and securities analysis, market structure, capital restructurings, financial and economic modelling and quantitative methods.

5.      I have been retained as a consulting and testifying expert in a wide range of matters involving financial markets and securities, including equities, fixed income, structured products, and derivatives.  I have been involved in shareholder class action matters in the US and Australia on issues related to share price inflation, market efficiency and shareholder damages.   I have provided expertise on numerous litigation matters involving financial, economic, statistical, and valuation analysis.

6.       I hold a Master of Science in economics with a concentration in Industrial Organization from the London School of Economics and Political Science and a Bachelor of Business Administration in the Business Honors Program and Finance from the University of Texas at Austin.  I have written about and presented on various economic and financial topics, including financial markets and securities analysis.  My full curriculum vitae, including testimony history and publications, is attached as **Appendix A**.

7.      BVA Group is being compensated at the rate of $675 per hour for my work in this matter.  As part of performing my analysis, I utilized a team of BVA Group personnel who worked under my direction and supervision.  BVA Group is being compensated for time incurred by other professionals who have supported my analysis in this matter at rates of $250 to $600 per hour.  Neither BVA Group's nor my compensation depends on opinions provided herein or on the outcome of this litigation.

## III. Information Considered

8.      I have prepared this report to state my expert opinions; to describe the bases for those opinions and the reasons underlying them; to disclose the facts and data I considered in reaching my opinions; and to make other appropriate disclosures.[3]  The work that I conducted in this matter has been informed by my education, knowledge, and experience in economics and finance.  The information in this report is based upon discovery to date and the information that is currently available.  A listing of the materials I have considered in my work for this matter as of the date of this report is contained in **Appendix B**, as well as the citations presented in this report.[4]   In addition, I have had discussions with Donna Mellendick.

---

[3]     **Use of the first person "I" in my** report refers either to me or to those working under my direct supervision.

[4]     In addition to documents referenced in this report and attached appendices, I relied on my education, background, skills, and experience, including a body of knowledge derived from numerous other treatises and case law not specifically identified herein.



9.     I may review, evaluate, and analyze additional data, facts, or information as they become available.  I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me.  Therefore, the analyses and opinions described herein may be subject to change based upon additional information that becomes available or other developments that occur.

## IV.  Summary of Opinions

10.    I understand plaintiff alleges that the following corrective disclosures were in the zone of the risk concealed by Defendants' fraud:

> a.     CCA's announcement on August 4, 2016 that its BOP contract for the Cibola County Corrections Center would not be renewed (the "Cibola Contract Loss");
>
> b.     The memorandum released by Deputy Attorney General Sally Yates on August 18, 2016 titled "Reducing our Use of Private Prisons" (the "Yates Memorandum").

11.    I have measured the loss caused by the materialization of the allegedly concealed risks by reference to the share price reactions corresponding to the corrective disclosures, adjusting for the impact of factors other than the revelation of allegedly concealed risks.  Based on this analysis, I have estimated share price inflation over the Class Period, as summarized in the following table:

**Table 1.  Per Share Inflation: February 27, 2012 to August 17, 2016**

| February 27, 2012 to February 7, 2013 | February 8, 2013 to August 1, 2016 | August 2, 2016 to August 17, 2016 |
|:---:|:---:|:---:|
| $4.51 | $6.94 | $6.62 |

12.    The above share price inflation figures would apply as of the date that the trier-of-fact determines that information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud.  Subject to these findings of fact and statutory limitations as set forth herein, one may compute damages for any member of the class of investors who acquired CCA stock during the Class Period (the "Class") based on share price inflation corresponding to the above purchase dates for shares sold or held on or after August 2, 2016.[5]

---

[5]     I understand that the Class includes "[a]ll persons who purchased or otherwise acquired Corrections Corporation of America, Inc. ("CCA") [now "CoreCivic"] securities between February 27, 2012 and August 17, 2016, inclusive, and who were damaged thereby. Excluded from the Class are: (a) CCA, its parents, subsidiaries and any other entity owned or controlled by CCA; (b) Damon T. Hininger, Todd J. Mullenger, and Harley G. Lappin; (c) all other executive officers and directors of CCA or any of its parents, subsidiaries or other entities owned or controlled by CCA; (d) all immediate family members of the foregoing, including grandparents, parents, spouses, siblings, children, grandchildren and steprelations of similar degree; and (e) all predecessors and successors in interest or assigns of any of the foregoing.  *See* Memorandum dated March 26, 2019, pp. 12 and 36; Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel dated June 1, 2018, p. 1.



## V.    Background

### A.    The Class

13.    I understand that the Class in this matter are persons who acquired CCA securities between February 27, 2012 and August 17, 2016, inclusive.[6]  I understand that this class has been granted class certification.[7]

### B.    CCA

14.    CCA is an owner of private correctional, detention and residential reentry facilities and one of the largest private prison operators in the United States.[8]  CCA was founded in 1983 as a company with the capability to "design, finance, build, operate and manage correctional facilities of many types in direct partnership with government agencies."[9]  During the Class Period, CCA owned between 45 and 49 correctional and detention facilities, managed between 11 and 22 additional correctional and detention facilities owned by government institutions, and housed an average compensated population of between 66 and 81 thousand people.[10]

15.    On February 7, 2013 after close of trading, CCA announced it reorganized from a corporation to a real estate investment trust ("REIT") for federal income tax purposes effective January 1, 2013.[11]  As a REIT, CCA was generally not subject to federal income tax on its taxable income and gains that it distributed to its shareholders, and was generally required to distribute annually to its shareholders at least 90% of its REIT taxable income.[12]

16.    During the Class Period, CCA's clients consisted of U.S. governmental agencies at the federal, state and local levels.[13]  Federal customers, primarily the BOP, United States Marshals Service ("USMS"), and U.S. Immigration and Customs Enforcement ("ICE") constituted 43 to 52 percent of total CCA revenue

---

[6]    Consolidated Complaint, ¶ 1.
[7]    Memorandum dated March 26, 2019, p. 36.
[8]    Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 5.
[9]    CoreCivic website, "The CCA Story: Our Company History," *available at* http://www.correctionscorp.com/our-history.
[10]    As of December 31, 2011, CCA owned 46 correctional and detention facilities, operated 20 additional government owned correctional and detention facilities, and housed an average compensated population of 81,016.  As of December 31, 2016, CCA owned 49 correctional and detention facilities, operated 11 additional government owned correctional and detention facilities, and housed an average compensated population of 66,112.  *See* Corrections Corporation of America Form 10-K for period ending December 31, 2011, pp. 5 and 47; CoreCivic, Inc. 10-K for period ending December 31, 2016, pp. 5 and 64.
[11]    CCA press release, "CCA Board of Directors Authorizes REIT Conversion," February 7, 2013; Barclays Capital, "CXW Receives Its PLR; 11am Call," February 8, 2013; Macquarie Capital (USA), "Positive PLR to 'Unlock' Value in CXW," February 8, 2013; SunTrust Robinson Humphrey, "Favorable Ruling and Details on REIT Conversion," February 8, 2013
[12]    Corrections Corporation of America Form 10-K for period ending December 31, 2015, pp. 5-6.
[13]    *See, e.g.,* Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 9.



during the Class Period, and BOP revenues constituted 9 to 13 percent of total CCA revenues, as set forth in the following table:[14]

**Table 2. BOP Revenues as a Fraction of Total CCA Revenues**[15]

|  | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|---|---|
| BOP Revenues % | 12% | 12% | 13% | 13% | 11% | 9% |
| Federal Revenues % | 43% | 43% | 44% | 44% | 51% | 52% |

## C. Allegations

17.    Plaintiff generally alleges that CCA materially misrepresented that its correctional services offered sufficient quality and cost savings that would result in government entities continuing to renew its contracts.[16] The Court described plaintiff's claims as "a single, central theory of liability: that CoreCivic and its executives falsely touted its services as offering cost savings to governments while delivering an acceptable level of quality—defined, in some instances, in relation to compliance with particular standards—such that CoreCivic was an attractive option for continued and future government contracts."[17]

18.    I understand that plaintiff alleges that CCA engaged in a scheme to mislead investors with claims that their services "were of a high quality, specifically, in the eyes of their government clients."[18] CCA allegedly conveyed that its "cost-effective" offerings "provide quality corrections services" and "offer a compelling value."[19] For example, Damon Hininger, CCA's President and CEO, wrote in CCA's March 2016 Annual Letter to its shareholders that "[w]e take pride in our strong record of operational excellence that has earned CCA the confidence of our government partners."[20]

19.    Plaintiff alleges that these statements concealed the reality that CCA's relationship with the BOP had deteriorated, putting their BOP contracts in jeopardy.[21] The Consolidated Complaint includes numerous examples of CCA deficiencies and BOP complaints regarding those deficiencies, particularly

14    Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. 7; Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 9; Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 6; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 5; CoreCivic, Inc. Form 10-K for period ending December 31, 2016, pp. 6 and 10.

15    Corporation of America Form 10-K for period ending December 31, 2012, p. 9; Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 9; Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 6; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 5; CoreCivic Form 10-K for period ending December 31, 2016, pp. 6 and 10.

16    Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, p. 3.

17    Memorandum dated December 18, 2017, pp. 25-26.

18    Memorandum dated March 26, 2019, p. 4.

19    Consolidated Complaint, ¶¶ 120-125.

20    2015 CCA Annual Report, p. 10.

21    Memorandum dated March 26, 2019, p. 6-7.



with regard to significant deficiencies in the staffing levels and medical care in BOP facilities.[22]  According to the Court:

> Plaintiff "has identified numerous instances where CoreCivic was cited by the BOP for deficiencies in crucial service areas.  It has identified statistics comparing private prisons, including CoreCivic, to the public prisons with which they compete.  It has linked CoreCivic's alleged deficiencies to negative outcomes up to and including deaths.  Finally, It has identified the harsh evaluations of CoreCivic and other private prison operators in the OIG Review and Yates Memorandum—evaluations that are doubly important because the authors were both (1) well-situated and knowledgeable in the field of incarceration and detention and (2) in a position to precipitate or direct the withdrawal of a substantial amount of CoreCivic's business.[23]

20.    For example, I understand CCA's BOP contract at Cibola County Corrections Center was the subject of repeated Notices of Concern regarding the quality of its services and CCA's failure to provide adequate remedies.[24]  I also understand that the BOP sent CCA numerous Notices of Concern detailing deficiencies at CCA's  Cibola County Correctional Center throughout the Class Period, including a "Cure Notice" in January 2015 noting "numerous and repetitive items of critical non-conformance in the area of Health Services, specifically, Patient Care...."[25]  According to the Court, CCA's internal "correspondence during the Class period echoes…concerns about the BOP's assessment of CoreCivic's services and the possibility of lost contracts as a result."[26]  I understand, however, that CCA did not disclose this information to investors.

21.    According to plaintiff, the share price of CCA stock was artificially inflated as a result of Defendants' alleged fraud, which led the markets to believe that CCA's governmental customers, including the BOP, were sufficiently satisfied with the cost savings and level of quality of CCA's correctional services that they would continue to be CCA customers, thereby concealing the extent of the risk associated with such contracts.[27]

## D.    Overview of Disclosures

22.    From an economic perspective, CCA's ability to operate within applicable policies and contractual requirements while delivering high quality services and cost savings to its customers was key to its value proposition.  During the Class Period, CCA repeatedly claimed that it operated its correctional services in compliance with the policies and procedures of its governmental customers.

---

[22]    Consolidated Complaint, ¶¶ 43-114; Memorandum dated December 18, 2017, pp. 5-12.
[23]    Memorandum dated December 18, 2017, pp. 26-27.
[24]    Consolidated Complaint, ¶¶ 68-86; Memorandum dated March 26, 2019, pp. 6-7.
[25]    Consolidated Complaint, ¶¶ 68-86; Memorandum dated March 26, 2019, pp. 6-7.
[26]    Memorandum dated March 26, 2019, p. 8.
[27]    Consolidated Complaint, ¶ 31; Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, p. 3.



a. "The [Quality Assurance Division] management team coordinates overall operational auditing and compliance efforts across all CoreCivic facilities.… Our QAD also contracts with teams of ACA certified correctional auditors to evaluate compliance with ACA standards at accredited facilities."[28]

b. "The Audit and Compliance Systems Section includes a team of full-time auditors, who provide subject matter expertise from all major disciplines within institutional operations. Annually, and with no advance notice, these auditors conduct rigorous, on site evaluations of each facility we operate. The audit teams use highly specialized, discipline-specific audit tools, containing over 1,400 audited items across twelve major operational areas, in this detailed, comprehensive process. The results of these on-site evaluations are used to discern areas of operational strength and areas in need of management attention. The audit findings also comprise a major part of our continuous operational risk assessment and management process. Audit teams are also available to work with facilities on specific areas of need, such as meeting requirements of new partner contracts or providing detailed training of new departmental managers."[29]

c. "[G]overnment partners hold CCA accountable through strong oversight by utilizing a combination of formalized facility and operational standards, on-site contract monitors and detailed audit procedures to ensure strict contract compliance and to evaluate the quality of CCA's operations."[30]

23. In addition, CCA emphasized its focus on maintaining safe, high-quality correctional services. For instance:

a. "The Quality Assurance Division provides governance for all efforts by our facilities to deliver high quality services and operations, with an absolute commitment to continuous quality improvement through the efforts of two major sections: the Research and Analysis Section and the Audit and Compliance Systems Section."[31]

b. "We focus relentlessly on continuous improvement on our operations, from running even safer and more secure facilities to offering evidence-based reentry progress proven to help prepare inmates for success when they return to our communities. Ensuring our operations are performed with integrity and deliver high-quality services while creating meaningful value allows us to achieve this high level of contract retention."[32]

---

[28] Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 8. *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 8.

[29] Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 8.

[30] Corrections Corporation of America Annual Letter to shareholders for year ending December 31, 2015, p. 10.

[31] Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. 8.

[32] Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014, p. 5.



Page 7 of 29

  c. "**Every day we remain focused on providing** high-quality, safe and secure facilities that **meet the needs of our government partners.**... "**[w]e take pride in our strong record of** operational excellence that has earned CCA the confidence of our government **partners.**"[33]

24. CCA consistently claimed that its privatized services offered substantial cost savings to its governmental customers in comparison with publicly-operated correctional facilities.

  a. "**We believe that we offer a cost-effective** alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension **obligations for their employees and large capital investments in new prison beds.**"[34]

  b. "**Now this is because of what I've been trying** to highlight for several years, which is that State DOC budgets typically do not fully embed the cost of pensions, healthcare cost and capital outlays as it relates to the corrections departments. With all these factors, all these costs factored in which clearly has not been the case in the past, when cost comparisons are done between us and the public sector, our value proposition grows even further."[35]

  c. "**We collaborate with our government partners to provide flexible, timely and cost-effective solutions to address their unique needs.**"[36]

25. Analysts' commentary on the quality and cost savings of CCA's services were, likewise, generally positive.  Analysts echoed CCA's claims, in some cases citing the same study and evidence that CCA promoted.

  a. "**There is growing evidence that customer**s achieve cost savings. The VERA Institute for **Justice's recent report found fully loaded** taxpayer costs were 14% higher than DOC budgets when including hidden costs shouldered by other departments (e.g. unfunded **benefits, legal, and maintenance).**"[37]

  b. "A projected annual demand for beds is being met with below-average supply...  This coupled with the access to capital, time efficiencies, and cost savings (particularly in light of cash-strapped budgets) offered by the private operators makes companies like GEO and CXW good investments for the long-term-oriented investor, in our opinion."[38]

---

[33] Corrections Corporation of America Annual Letter to shareholders for year ending December 31, 2015, p. 10.
[34] Corrections Corporation of America Annual Letter to shareholders for year ending December 31, 2015, p. 10.  *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 18; Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 19; Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. 19.
[35] Corrections Corporation of America, Q2 2016 Earnings Call, February 14, 2013, p. 8.
[36] Corrections Corporation of America, Q2 2016 Earnings Call, August 04, 2016, p. 4.
[37] SunTrust Robinson, "Corrections Future Is Solid Despite FL Decision," February 17, 2012.
[38] Barclays Capital, "Awaiting PLRs but Returning as REITs," January 8, 2013.



c. "There are many older and inefficient prisons that need to be replaced (over 215,000 pubic prison beds are located in facilities over 75 years old). These older facilities are much more expensive to maintain and manage than more modern facilities…Replacing older public prisons saves money on operating costs and improves safety…Going forward we anticipate strong growth in private prisons over publicly constructed and managed prisons for the following reasons…It is more cost effective to privatize the management of prisons, with savings primarily resulting from labor efficiencies and lower pension expenses."[39]

d. "[O]n top of the capital deployment benefit there is also the potential for operating cost savings. Studies on this topic are more mixed, but we generally believe that the private industry operates more efficiently than government entities. While there are exceptions to that blanket statement, we believe it applies to the prison industry for the most part. CXW provides a schedule of three agencies in particular, where such savings are in excess of 15% relative to government-run properties."[40]

e. "[W]ith ever-dwindling budgets, we believe the commitment of building an entirely new project (which could take many months, if not years), as well as the capital devoted to such an endeavor, is very burdensome to a jurisdiction. With CXW's quality in operations and simply writing a monthly lease payment, it's far easier to flip a switch to turn the lights back on in order to alieve [sic] the capacity issues."[41]

26. In addition, CCA pointed to historical customer retention rates as an important driver of stable and predictable cash flow. For instance, according to CCA:

…a majority of our contracts have terms between one and five years, and we have historically experienced customer retention of approximately 90%, which contributes to our relatively predictable and stable revenue base. This stream of revenue combined with our low maintenance capital expenditure requirement translates into steady predictable cash flow.[42]

27. The retention of customer relationships and contracts were key drivers of CCA's revenue and earnings during the Class Period. As CCA claimed:

a. "We have an above-average dividend payout ratio and also a historical customer retention rate in excess of 90%."[43]

---

[39] CRT Capital, "Initiating Coverage of CXW; Expect Earnings Revisions, "FV," $35 PT," January 23, 2014.

[40] Cannacord Genuity, "Positive on Prison REITs: We're dancin' to the Jailhouse Rock," July 13, 2015.

[41] Cannacord Genuity, "Behind the Bars: Bi-Weekly Prison Update 10-5-15,", October 5, 2015.

[42] Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 17. *See also* Corrections Corporation of America Form 10-K for period ending December 31, 2014, p. 17; Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 20; CoreCivic, Inc. Form 10-K for period ending December 31, 2016, p. 23.

[43] Corrections Corporation of America, Q2 2013 Earnings Call, Aug 08, 2013, p. 8.



  b. "Historical customer retention rate is in excess of 90%, which we expect to maintain based on our renewal activity this year."[44]

  c. "And for many years, CCA has enjoyed strong customer retention rates in excess of 90%, and each spring late summer we renew many of our contracts with our state partners."[45]

  d. "…over the last 6, 7 years, again with changes in leadership both at state and federal level, we've had renewal rates on our contracts north of 90%."[46]

28. Analysts covering CCA echoed management's comments, referring to the company's high retention rates:

  a. "CXW has been successful in retaining its customers over history, with retention rates averaging about 91% since 2009. The company has had slightly more success with its owned & managed contracts, which have averaged 92%, versus its managed only contracts, which have averaged 87%."[47]

  b. "Government RFPs for contracts in the private prison sector tend to be very sticky and long-term in nature, with average terms of 3-5 years excluding renewal options. Furthermore, both GEO and CXW have historically operated with a strong renewal rate over the past few years, in excess of 90% for both companies annually."[48]

  c. "[W]e note that CXW still boasts a high, ~85%+ retention rate."[49]

29. Based on my review, neither CCA nor analysts distinguished the risk to the BOP relationship stemming from CCA's performance issues.  Similarly, I have seen no evidence to suggest that market participants understood the extent of the risks that the company faced as a result of its deteriorating relationship with the BOP.

30. On August 3, 2016, after the close of trading and as part of its second quarterly announcement of earnings and financial guidance, CCA announced that the BOP contract for Cibola was not being renewed.[50]  Following the announcement of the Cibola Contract Loss and other news in its earnings release, CCA's closing share price dropped from $31.03 on August 3, 2016 to $29.11 on August 4, 2016.[51]

---

[44] Corrections Corporation of America, Q1 2014 Earnings Call, May 08, 2014, p. 9.
[45] Corrections Corporation of America, Q2 2014 Earnings Call, Aug 07, 2014, p. 5.
[46] Corrections Corporation of America, Q1 2016 Earnings Call, May 05, 2016, p. 14.
[47] Wells Fargo, "CXW: Initiating Coverage With A Market Perform Rating," December 19, 2014.
[48] Cannacord Genuity, "Positive on Prison REITs: We're dancin' to the Jailhouse Rock," July 13, 2015, p. 23.
[49] Macquarie Capital (USA), "Federal Contract Escapes CXW," December 29, 2014.
[50] Press release, "CCA Reports Second Quarter 2016 Financial Results," August 3, 2016.
[51] Bloomberg, LP.



31.     On August 11, 2016, the OIG published "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" (the "OIG Review").[52]   According to plaintiff, the OIG Review reported that between 2011 through 2014, private prisons incurred more safety and security incidents per capita than comparable BOP institutions without offering significant cost savings.[53]   CCA's closing share price fell from $27.56 on August 10, 2016 to $27.39 on August 11, 2016.[54]

32.     On August 18, 2016, Deputy Attorney General Sally Yates released a memorandum titled "Reducing our Use of Private Prisons" from the Office of the Deputy Attorney General to the Acting Director of the Federal Bureau of Prisons.   The Yates Memorandum stated that "[p]rivate prisons served an important role during a difficult period" when the federal inmate population was increasing.[55]   However, the federal prison population was beginning to decline.   According to the Yates Memorandum,

> …time has shown that [private prisons] compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security.[56]

33.     Consequentially, the Yates Memorandum stated that "as each contract reaches the end of its term, the Bureau should either decline to renew that contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population."[57]   The Yates Memorandum noted "that the Bureau is already taking steps in this direction," referring to the Cibola Contract Loss in which "the Bureau declined to renew a contract for approximately 1,200 beds."[58]   It also stated that, "concurrent with the release of this memo, the Bureau is amending an existing contract solicitation to reduce an upcoming contract award from a maximum of 10,800 beds to a maximum of 3,600."[59]

34.     The price of CCA shares dropped substantially immediately after the Yates Memorandum was released, from a closing price of $27.22 on August 17, 2016 to a closing price of $17.57 on August 18, 2016.[60]

---

[52]  Office of the Inspector General, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," August 11, 2016.
[53]  Consolidated Complaint, ¶ 12, 38-42.
[54]  Bloomberg, LP.
[55]  Yates Memorandum.
[56]  Yates Memorandum.
[57]  Yates Memorandum.
[58]  Yates Memorandum.
[59]  Yates Memorandum.
[60]  Bloomberg, LP.



Page 11 of 29

## VI. Analysis of Corrective Disclosures

35.   As a general proposition, modern finance theory holds that, in an efficient market, the market price of a share is the present value of the market's expectations of future economic benefits available to shareholders, discounted at the opportunity cost of capital, which reflects the risk associated with those benefits.[61]   All else equal, the market price of a share will be reduced when the amount of expected future cash flows is reduced and/or the riskiness associated with expected future cash flows is increased.

36.   When a firm conceals or misleads the market about the expected amount and/or extent of the risk of future cash flows, this may inflate its share price to a price that is higher than it would otherwise have been had the firm not concealed the relevant information.   In the event that the market receives new information that partially or completely reveals the true expectations and/or risk, the new market equilibrium (as reflected in the share price) reflects investors' new consensus about expected future economic benefits and risk.

37.   In order to estimate inflation based on a company's share price reaction, certain conditions must hold.   Importantly, the corrective disclosure must contain information relevant to the alleged contraventions, such that the disclosure of the relevant information may be used to infer how market participants adjusted expectations in response to the news.   When a corrective disclosure also contains information unrelated to the allegations, known as *confounding information*, it is necessary to remove the effects of this confounding information in order to isolate the share price reaction to information pertaining to the alleged contraventions.

38.   I understand that courts have considered evidence that a security traded in a market characterized by the semi-strong form of the efficient market hypothesis ("EMH") —under which all publicly available information is incorporated into the price of an actively traded asset—as evidence that it is appropriate to invoke the "fraud on the market" presumption with respect to that security in the context of securities litigation.[62]   The consequence of the semi-strong form of the EMH is that share prices adjust quickly to reflect the discounted value of expected future cash flows, and that investors' expectations as to future cash flows reflect the appropriate, risk-adjusted discount rate.[63]   This ensures that the share price

---

[61]   The value of an asset or security is generally driven by the discounted value of future cash flows it is expected to generate. Discounted cash flows refers to cash flows that have been adjusted to their present value on the basis that a dollar received today is worth more than a dollar received in the future, taking into account the time value of money as well as the risk that future cash flows may not materialize.   *See, e.g.* Pratt, Shannon, P., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies*, 5th ed., McGraw Hill (2008), p. 175.

[62]   *Basic*, 485 U.S. at 245-46; Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, pp. 22.

[63]   According to an *amici curiae* brief of testifying economists submitted to the Supreme Court, "economists do *not* generally disagree about whether market prices respond to new material information. In particular, there is little doubt that the stock price will increase reasonably promptly after favorable news about a company is released and decline after unfavorable news."   Brief of Financial Economists as Amici Curiae in Support of Respondent, *Halliburton Co. and David Lesar v. Erica P. John Fund, Inc., FKA Archdiocese of Milwaukee Supporting Fund, Inc.*, February 5, 2014, pp. 8-9 (emphasis in original).



after the corrective disclosure reflects investors' revised expectations and, therefore, that the share price reaction is indicative of the corrective disclosure's effect on the company's value.[64]

39. I have concluded that CCA traded in a market that was semi-strong form efficient during the Class Period.[65] My discussion and analysis of market efficiency is found in **Appendix C** of this report.

A. **Event Study**

40. Having established that CCA traded in a market that was semi-strong form efficient during the Class Period, one may then look to the share price decline following the revelation of allegedly withheld information to assess the impact of those disclosures when they were made.

41. In order to examine the extent to which CCA's share price responded to information disclosed through the corrective disclosures at issue in this matter, I apply a widely accepted technique known as an event study.[66] Event studies examine share price returns corresponding to a particular *event window*, during which the event in question occurred. An event study may be used to isolate the impact of an announcement corresponding to a particular event from other factors that would have affected the share price at that time, such as macroeconomic news affecting broad market indices.

42. A widely used application of the event study is known as the market model.[67] The market model is based on regression analysis, which provides a statistical framework for examining the nature and form of the relationship between two or more variables. In this case, a market model may be used to explain or predict changes in the dependent variable, in this case CCA's share price returns, as a function of changes in the values of the independent variables, such as returns to the overall U.S. stock market and an industry sector index.

---

[64] While market participants have different perceptions and expectations regarding the characteristics of assets, which determine their willingness to pay for a security, the confluence of these differences determines a market equilibrium value. *See* Campbell, John, Andrew W. Lo and A. Craig MacKinlay, *The Econometrics of Financial Markets*. Princeton, New Jersey: Princeton University Press (1997), pp. 20-25. *See also* Fama, Eugene, "Random Walks in Stock Market Prices," *Financial Analysts Journal*, January-February (1995), pp.3-4.

[65] I considered, but did not rely on, the expert reports of Professor Steven P. Feinstein, Ph.D., CFA, the plaintiff's expert on market efficiency. Professor Feinstein also concluded that CCA's stock traded in an efficient market during the Class Period. I note that that "CoreCivic has conceded that its stock traded on an efficient market" (see Memorandum dated January 18, 2019, p. 9), and that the Court arrived at the same conclusion. *See* Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA dated June 1, 2018, ¶¶ 17-19; Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA dated October 26, 2018, ¶ 1; Memorandum dated March 26, 2019, p. 35 ("Because Amalgamated has established that CoreCivic stock traded on an efficient market and the defendants' statements were public and made during the Class Period…").

[66] Campbell, John; Lo, Andrew W.; and MacKinlay, A. Craig, *The Econometrics of Financial Markets*, Princeton, New Jersey: Princeton University Press, 1997, Chapter 4. See also *Halliburton II*, 573 U.S. at 280-81.

[67] Campbell, John, Andrew W. Lo and A. Craig MacKinlay. *The Econometrics of Financial Markets*. Princeton, New Jersey: Princeton University Press (1997), Chapters 4-6. *See also*, A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature*, Vol. 35. No. 1, Mar. 1997.



43. The market model works by predicting what the share price return would have been based on movements in market indices on a particular day.[68] By subtracting predicted returns from the actual returns, **one can estimate the change in the company's share** price that is not explained by wider market phenomena, which is known as the *abnormal return*. Thus, the abnormal return is the difference between the return predicted by the market model and the actual return associated with the event at issue.

44. In cases where the abnormal return is statistically significant, it may be reasonable to conclude that it was caused by the event in question, provided the news became available to the market at the time of (or just prior to) the abnormal movement.[69] If no confounding information was released at the same time, **the abnormal return may be used as an estimate of the corrective disclosure's effect on the value of a company's shares; otherwise, it is** necessary to disaggregate the effect of the corrective disclosure from the portion of the abnormal return attributable to the confounding information.

45. The market model can control for broad market movements as well as industry-specific information that is not specific to the company. In addition, market models may also include indicator variables to control for other events, such as earnings announcements, that one would expect to affect share price returns on days outside the event window.[70]

46. The market model I apply uses the S&P 500 Total Return Index to control for broad market movements along with two different indexes:[71]

    a. **Between February 27, 2012 through February 7, 2013, prior to CCA's announcement** that it was converting to a REIT, I use the S&P Midcap 400 Commercial Services & Supplies Index (the "**S&P 400 Index**") to control for industry specific performance.

    b. Between February 8, 2013 and August 17, 2016, I use the FTSE Nareit All Equity REITs **Index (the "REIT Index") adjusted to exclude the** returns of CCA to control for REIT sector performance in addition to the S&P400 Index.

---

[68] Share price returns are computed as the percentage movements in the security price. For the purposes of estimating the market model, share price returns are typically expressed as logarithmic returns, or log returns. Specifically, a log return is the natural logarithm of the ratio of two daily closing security prices: $\ln(P_t/P_{t-1})$, **where 'ln' is the natural logarithm, '$P_t$' refers to the security** price on day $t$ **and '$P_{t-1}$' refers to the security price one trading day prior to day** $t$.

[69] Statistical significance represents the likelihood that a result or observed relationship between two variables is unlikely under a specific hypothesis. Hypothesis testing is traditionally employed to determine if a result is statistically significant or not. This provides a "p-value" representing the probability of observing data as extreme as that which was measured if the null hypothesis is indeed true. A statistically significant result at the one percent significance level is one in which there is a less than one percent probability of observing this data if the null hypothesis were true. Such p-values are also often described in terms of confidence levels by subtracting the p-value from 100 percent, as done above. *See*, for instance, Wooldridge, Jeffrey M., *Introductory Econometrics*, 6th ed., Boston, MA: Cengage Learning (2016), p. 119.

[70] Indicator variables take a value of one on the relevant day and zero on all other days.

[71] Details of this model are set forth in **Appendix C**.



47.     In addition to the market and industry indices, I include indicator variables for each day on which CCA released earnings results, which measure CCA's returns on those days when one may expect statistically significant abnormal returns.[72]

48.     I estimate the market model over the one year period preceding the corrective disclosures.[73] Results of my analysis are presented in **Exhibit 1** and **Exhibit 2**.

## B.     Corrective Disclosures

49.     According to plaintiff's allegations, "[i]t was not until the Yates Memorandum announced that CoreCivic contracts would be terminated and stated that BOP was 'already taking steps in this direction,' that CoreCivic's deficient services were specifically linked to the loss of business—and to Defendants' misrepresentations that its relationship with governmental entities would remain strong because of the quality of its services."[74]  In its memorandum certifying the Class in this case, the Court wrote that the plaintiff "argued that price impact was established by the decline in price following the release of the Yates Memorandum, via a 'materialization of risk' theory."[75]

50.     I understand plaintiff alleges, *inter alia*, that information contained in the Yates Memorandum and the Cibola Contract Loss (which was referenced in the Yates Memorandum) were corrective disclosures that revealed to the market relevant information that had been previously withheld.[76]  Through these announcements, plaintiff alleges that market participants learned of CCA's true business condition and the extent of the risks concealed from investors.  As a result, according to plaintiff, CCA's share price was artificially inflated, and declined as a result of these announcements.[77]

51.     While the information contained in the OIG Review also related to certain information allegedly concealed in this matter, it is my understanding that plaintiff contends that this information did not reveal the truth about the concealed risks.[78]  In addition, I understand that the Court has found that, "due to limitations on its date range, subject matter, and methodology," the OIG Review failed to "bridge the gap

---

[72]     The market and industry indices include returns for Geo Group, Inc. ("GEO"), a publicly-traded prison operator whose share price also was impacted by the Yates Memorandum.  Including or excluding GEO from these indices does not significantly affect the results of my analysis.

[73]     The market model in this matter may be estimated over different time periods (*estimation windows*) within the Relevant Period and using alternative specifications.  Using alternative estimation windows and specifications, however, does not materially affect the resulting abnormal returns.

[74]     Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, p. 17 (internal citations omitted).

[75]     Memorandum dated March 26, 2019, p. 25.

[76]     Consolidated Complaint, ¶¶ 192, 196-199.

[77]     Consolidated Complaint, ¶¶ 196-199.

[78]     Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, pp. 4-5, 16-18.



between CoreCivic's representations and the truth."[79]  Accordingly, I do not consider the OIG Review as a corrective disclosure.

## C.    Calculation of abnormal returns

### 1)  Cibola Contract Loss

52.    CCA announced the Cibola Contract Loss in conjunction with its second quarter 2016 earnings results after the market had closed on August 3, 2016, such that the market's reaction to this announcement was reflected in CCA's share price on August 4, 2016.  On that day, CCA's price fell from $31.03 to $29.11, a decline of 6.2 percent.  The abnormal return was negative 5.9 percent and was statistically significant at the 1 percent level, as set forth in **Exhibit 1**.[80]

53.    It appears that news of the Cibola Contract Loss was first published in a news article after market close on August 1, 2016 by a local Albuquerque news station, followed by another news story on August 2, 2016 in the *Gallup Independent*, a local newspaper in Gallup, New Mexico.[81]  CCA's share price fell from $32.54 on August 1, 2016 to $31.86 on August 2, 2016 and again to $31.03 on August 3, 2016 (declines of 2.1 percent and 2.6 percent, respectively).  Although CCA's shares experienced negative abnormal returns on both days, neither of these daily price declines was statistically significant (at the five percent level).[82]

### 2)  Yates Memorandum

54.    On August 18, 2016, the Yates Memorandum was released.  The Yates Memorandum stated that "time has shown that [private prisons] compare poorly to our own Bureau facilities.  They simply do not provide the same level of correctional services, programs, and resources; they do not save substantially on costs; and as noted in a recent report by the Department's Office of Inspector General, they do not maintain the same level of safety and security."[83]  The Yates Memorandum further directed the BOP to "either decline to renew [BOP] contract[s] or substantially reduce [their] scope in a manner consistent with law and the overall decline of the Bureau's inmate population."[84]

---

[79]    Memorandum dated March 26, 2019, pp. 32-33.
[80]    Statistical significance is the likelihood that a result or observed relationship between two variables is unlikely under a specific hypothesis.  Hypothesis testing is traditionally employed to determine if a result is statistically significant or not.  This provides a "p-value" representing the probability of observing data as extreme as that which was measured if the null hypothesis is indeed true.  A statistically significant result at the 1 percent significance level is one in which there is a less than 1 percent probability of observing this result if the null hypothesis were true.  See, *e.g.*, Wooldridge, Jeffrey M., Introductory Econometrics, 6th ed., Boston, MA: Cengage Learning, 2016, p. 119.
[81]    "Cibola County Correctional Center Closing," *KOAT Albuquerque*, August 1, 2016; "Milan Prison to Close; 254 Facing Layoffs," *The Gallup Independent*, August 2, 2016.
[82]    **Exhibit 1**.
[83]    Yates Memorandum.
[84]    Yates Memorandum.



55.     **Following the Yates Memorandum, CCA's shar**e price declined from $27.22 to close at $17.57 on August 18, 2016, a decline of $9.65 (35.5 percent).[85]  The share price reaction following the Yates Memorandum on August 18, 2016 was significant and negative.  As set forth in **Exhibit 2, CCA's abnormal** return on this day was negative 35.5 percent.  This abnormal return was significant at the 1 percent level.

56.     Before the markets opened on August 19, 2016, CCA issued a press release announcing a conference call later that day to respond to the Yate**s Memorandum, stating that "we are disappointed with the BOP's decision to reduce its utilizati**on of privately operated facilities to meet their capacity needs, and **believe our value proposition remains strong."**[86]  The press release also stated that its BOP contracts **"represent approximately $131.2 million in annual revenues,** or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio **average."**[87]

57.     On the conference call, Damon Hininger generally conveyed that the Yates Memorandum did not impact its contracts with the Marshals Service, ICE, and state governments, **and told listeners that "we** clearly save money for taxpayers in the United States under our BOP contracts, and this memo doesn't dispute that fact, but that savings does**n't come at the risk of lower quality."**[88]  He also stressed that they were not surprised by the r**eduction in BOP procurement of private prison facilities in the face of the BOP's** success in reducing their system population.[89]

58.     In addition to this conference call, analysts also released commentary discussing the impact of the Yates Memorandum, such that the share price reac**tion on this day would have reflected the market's** further reaction to this news (as no additional information about CCA appears to have been released).

59.     **On August 19, 2016, CCA's** stock increased by $1.51 (8.59 percent), to close at $19.08.[90]  As set forth in **Exhibit 2**, the abnormal return on August 16, 2016 was positive 9.1 percent and was significant at the 1 percent level.[91]

---

[85]     Bloomberg, LP.

[86]     **CCA press release, "CCA Responds to the Department of Ju**stice's Decision to Reduce Reliance on Privately Operated Prisons **and Announces Investor and Analyst Conference Call," August 19, 2016.**

[87]     **CCA press release, "CCA Responds to the Department of Ju**stice's Decision to Reduce Reliance on Privately Operated Prisons **and Announces Investor and Analyst Conference Call," August 19, 2016.**

[88]     CoreCivic, Inc. Special Call, August 19, 2016, pp. 6-7.

[89]     **CoreCivic, Inc. Special Call, August 19, 2016, pp. 5, 12 ("**I think that's what we're seeing happen with CAR XVI, that they have their system population come down by 26,000 in May, so they do have the capacity within their system.  So I think that's why you're seeing, with the CAR XVI action, is a pulling back of some of the beds they've got within the private sector because they **have had that reduction.")  I understand plai**ntiff contends that the information provided through this call was misleading.

[90]     Bloomberg, LP.

[91]     See **Exhibit 2**.



#### D.    Analysis of the corrective disclosures

##### 1)    Cibola Contract Loss

60.    As previously discussed, I understand that news of the Cibola Contract Loss was first published in a news article after market close on August 1, 2016 by the local press in New Mexico.  While the local news articles indicated that the BOP had elected not to renew the Cibola contract, there appears to have been no analyst reaction to the news until after CCA provided further information in its press release after the close of daily trading on August 3, 2016, nor were the abnormal returns on August 2, 2016 and August 3, 2013 statistically significant (at the five percent level).

61.    On August 3, 2016, after the close of daily trading and as part of its second quarterly announcement of earnings and financial guidance, CCA announced that the BOP contract for Cibola contract was not being renewed.[92]  On the next day, August 4, 2016, **CCA's President, CEO and Director** Damon T. Hininger told analysts:

> …**I would like to provide a brief update on other recent business developments. Last week,** we received word from the BOP that they intend not to renew our contract at the 1,129-bed Cibola County Corrections Center which is set to expire on September 30, 2016. Of course, we are disappointed with the Bureau's decision not to renew, but the federal inmate population has declined by nearly 25,000 in the last 3 years, resulting in reduced overcrowding in BOP operated facilities. Today, the BOP is operating at approximately 117% of their rate of capacity, down from a roughly 140% 3 years ago. We are committed to work with the BOP through the transition of Cibola and continue to operate 3 additional correctional facilities on behalf of the BOP.[93]

62.    Executive VP and CFO David Garfinkle added that guidance was being reduced by $0.01 for the fourth quarter for the non-renewal of Cibola.[94]  Other news in that earnings announcement were mixed.  CCA reported funds from operations ("**FFO**") per share for the quarter above consensus, raised its FFO guidance, but slightly lowered its **adjusted FFO ("AFFO") guidance for 2016.**[95]  CCA also discussed the renegotiation of its ICE contract at the South Texas Family Residential **Center ("STFRC"), which analysts** understood accounted for approximately 15 to 23% of its earnings.[96]

63.    CCA's earnings results were met with generally negative reactions by analysts, who expressed concern over the Cibola Contract Loss and STFRC renegotiation.  Analysts expected a rate cut for the

---

[92]    Press release, "CCA Reports Second Quarter 2016 Financial Results," August 3, 2016.

[93]    CoreCivic, Inc. FQ2 2016 Earnings Call Transcript, August 4, 2016, p. 7.

[94]    CoreCivic, Inc. FQ2 2016 Earnings Call Transcript, August 4, 2016, p. 8.

[95]    **CoreCivic, Inc. FQ2 2016 Earnings Call Transcript, August 4, 2016, pp. 8-9; Wells Fargo, "CXW:** First Look--South TX Uncertainty **Likely To Weigh On Shares," August 4, 2016.  CCA announced second-quarter AFFO of $0.65 per share, ahead of May's** previous guidance of $0.61 to $0.63 per share.  CCA also raised 2016 FFO guidance from $2.64 to $2.68 (up from $2.60 to $2.66) and slightly lowered 2016 full-year AFFO/share guidance to $2.53 - $2.57 (from $2.53 - $2.59).

[96]    **Cannacord Genuity, "Takeaways from meetings with management: cash flow risk lower than perceived," March 21, 2016;** Cannacord Genuity, "2Q review: STFRC renegotiation ambiguity limits near-term upside; **reiterate HOLD," August 4, 2016;** SunTrust Robinson, "Renegotiation With ICE Ongoing; Maintain Neutral," August 4, 2016; Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To **Limit Upside," August 10, 2016.**



STFRC contract, which had been negotiated at a high per diem and accounted for a disproportionate share of CCA profits.[97]  With respect to the Cibola Contract Loss, analysts considered the loss of approximately $0.04 FFO per year into their valuations along with other revisions that CCA made to its guidance.[98]

64.   While the renegotiation of the STFRC facility was the main headline, the Cibola Contract Loss **also attracted analysts' attention:**

      a.   **"Closing of the Cibola facility** will result in $0.01 cut from quarterly EPS, which is reflected **in the company's guidance."**[99]

      b.   **"The decision comes after the BOP has reduc**ed populations by 25k over the past three years, and the outsized 140% of BOP design capacity of three years ago has dipped to **a more reasonable 117% of design capacity."**[100]

      c.   **"Notably, our updated 2017 estimate assume**s a full-year negative impact related to the announced non-renewal of a Bureau of Prisons (BOP) contract at **the company's Cibola County Corrections Center."**[101]

65.   **CCA's share price fell by approximately 6.2** percent between August 3 and August 4, 2016 with an abnormal return of approximately 5.9 percent.[102]

66.   The Cibola Contract Loss, which was referenced in the Yates Memorandum two weeks later as a step in the direction of reducing reliance on private prisons, was a partial corrective disclosure to the extent it reduced the value of the BOP relationship that **plaintiff alleges caused CCA's stock to be inflated.**[103] The announcement of the Cibola Contract Loss, however, did not reveal the extent to which the BOP relationship had deteriorated nor did it link the **loss of the contract to CCA's poor performance.**

67.   The extent to which the Cibola Contract Loss **was reflected in CCA's share price reaction is not** directly observable due to: 1) the lack of a significant price reaction to the initial news about the Cibola **Contract Loss on August 1, 2016 (consistent with the facility's relatively small contribution to FFO); and** 2) the substantial confounding information disclosed in conjunction with additional news about the Cibola Contract Loss on August 4, 2016 (*i.e.* risk to the STFRC and other earnings news).  Therefore, in order to **estimate the extent to which CCA's share price was** inflated as a result of the concealed risks associated with the Cibola Contract Loss, I look to the extent to which earnings from this facility had driven previous

---

[97] Cannacord Genuity, "2Q review: STFRC rene**gotiation ambiguity limits near-term upside; reiterate HOLD," August 4, 2016; Wells Fargo, "CXW: Updating Estimates & Valuation Range After Ea**rnings Uncertainty Around South TX Facility Likely To Limit **Upside," August 10, 2016.**

[98] SunTrust Robinson, "**Renegotiation With ICE Ongoing; Remain Neutral," August 4, 2016; Wells Fargo, "CXW: Updating** Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To **Limit Upside," August 10, 2016.**

[99] SunTrust Robinson, "Renegotiation With ICE Ongoing; Remain Neutral," August 4, 2016

[100] Cannacord Genuity, "2Q review: STFRC renegotiation ambiguity limits near-term upside; reiterate HOLD," August 4, 2016.

[101] Wells Fargo, "CXW: Updating Estimates & Valuation Range After Q2 Earnings Uncertainty Around South TX Facility Likely To **Limit Upside," August 10, 2016.**

[102] **Exhibit 1.**

[103] Yates Memorandum.



expectations. Analysts covering CCA generally looked to the company's FFO, a widely used measure of performance for REITs, which CCA also reported in its public filings and on its earnings calls.[104]

68. Although market participants would not have known the precise amount of the Cibola contract's contribution to CCA's FFO until August 4, 2016, it was previously known that this contract accounted for well less than five percent of CCA's business. Before the corrective disclosure, Canaccord Genuity had estimated in 2015 that the Cibola contract contributed $0.08 in annual FFO/share.[105] When the Cibola Contract Loss was announced, however, CCA stated that the loss reduced quarterly FFO by $0.01 per share and expected annual FFO by $0.04 per share.[106] For the purpose of this analysis, $0.04 per share is a reasonable estimate of the reduction in FFO expectations associated with the Cibola Contract Loss.

69. At the time of the Cibola Contract Loss, CCA was trading at a multiple of approximately 11.5x FFO.[107] I have seen no evidence to suggest that risk and growth expectations associated with CCA's BOP business was significantly higher or lower than the company's overall business, which suggests that one may apply CCA's overall multiple to estimate the value associated with the Cibola contract. Applying this multiple to the $0.04 per share reduction in FFO associated with the Cibola facility implies that the total value of the Cibola Contract Loss was approximately $0.46 per share, which falls well within the aggregate share price decline that corresponded to the partial corrective disclosure.[108]

## 2) Yates Memorandum

70. In contrast to the partial corrective disclosure associated with the Cibola Contract Loss, I understand plaintiff alleges the Yates Memorandum revealed to the market the extent to which the BOP relationship had deteriorated. Namely, the Yates Memorandum resulted in changes to the market's perception of CCA's value proposition, reductions in expectations related to CCA's existing BOP business and CCA's ability to secure future business, along with increased concerns over wider implications for CCA's other federal and state contracts. That the impact of the Yates Memorandum extended beyond the value of the BOP contracts is unsurprising, since the corrective disclosure would have resulted in an increase in the perceived risk of CCA's other profit streams due to the BOP's decision and CCA's failure to disclose the extent of this risk prior to the Yates Memorandum.[109]

---

[104] *See, for instance*, Corrections Corporation of America Form 10-K for period ending December 31, 2015, p. 85; Corrections Corporation of America Form 10-Q for period ending June 30, 2016, pp. 55-56; . Second Quarter 2016 Earnings Call, August 4, 2016, p. 8; and SunTrust Robinson, "Renegotiation With ICE Ongoing; Maintain Neutral," August, 4 2016, p. 3.

[105] Cannacord Genuity, "Behind the Bars: Bi-Weekly Prison Update 10-5-15," October 5, 2015, at Figure 3.

[106] CoreCivic, Inc. Second Quarter 2016 Earnings Call dated August 4, 2016, pp. 11 and 14.

[107] Exhibit 5. At the time of the corrective disclosures, CCA's business was characterized by relatively stable cash flow expectations and dividend payments. In such an environment, it is typical to view the value of a company through the lens of an earnings multiple, as analysts often did for CCA.

[108] Exhibit 2. I note that the above estimate would understate the share price impact associated with the Cibola Contract Loss to the extent that the loss of this facility also contributed to an increase in CCA's perceived risk (and therefore a lower multiple) for the rest of its operations.

[109] *See, for instance*, Karpoff, Jonathan, Lee, D. Scott, and Martin, Gerald S., "The Cost to Firms of Cooking the Books," *Journal of Financial and Quantitative Analysis* 43(3) Sept. 2008, 581-612, p. 581;



71.     Analysts responded to the Yates Memorandum by reducing their price targets by approximately 20 to 40 percent:

### Table 3.  Analysts' Revisions to Price Targets [110]

| Analyst | Prior Update | Revision Date | PT Prior | PT New | PT Change | PT Pct. Change |
|---------|-------------|--------------|----------|--------|-----------|----------------|
| Canaccord | 8/4/2016 | 8/23/2016 | $30 | $21 | ($9) | (30%) |
| Suntrust | 8/4/2016 | 9/1/2016 | $34 | $20 | ($14) | (41%) |
| Wells Fargo | 8/10/2016 | 8/19/2016 | $26-$28 | $17-$22 | ($6)-($9) | (21%)-(35%) |

72.     Analysts' price target reductions were driven by both lower expected earnings and higher expected risk, as reflected by significantly lower FFO expectations and corresponding multiples:

### Table 4.  Analyst Revisions to Estimated 2017 FFO [111]

| Analyst | Prior Update | Revision Date | FFO Prior | FFO New | FFO Change | FFO Multiple Prior | FFO Multiple New | FFO Multiple Change |
|---------|-------------|--------------|-----------|---------|------------|--------------------|-------------------|----------------------|
| Canaccord | 8/4/2016 | 8/23/2016 | $2.26 | $1.82 | ($0.44) | 13.27x | 11.54x | (1.73x) |
| Suntrust | 8/4/2016 | 9/1/2016 | $2.64 | $1.97 | ($0.67) | 12.88x | 10.15x | (2.73x) |
| Wells Fargo | 8/10/2016 | 8/19/2016 | $2.49 | $2.39 | ($0.10) | 10.84x | 8.16x | (2.68x) |

73.     Analysts acknowledged that CCA's sharp share price decline reflected a reduction in expected future earnings and an increase in the risk associated with those earnings, with commentary that reflected the perspective that CCA's BOP business faced significant increased risk.

    a.     Wells Fargo wrote, "We expect shares of both CXW and GEO to remain weak until more clarity around specific outcomes and timing around contract losses surface."[112]

    b.     Canaccord Genuity wrote, "[w]e maintain concerns surrounding BoP contract cancellation headlines, a likely CXW dividend cut, and risk of a CXW covenant breach that could all weigh on both GEO and CXW shares in the near-term. As such, while we believe most of these concerns are priced in, we believe they could limit upside to both stocks."[113]

---

[110] **Analysts' revisions to AFFO were** consistent with their changes to FFO.
[111] **Analysts' revisions to AFFO were consistent with their** changes to FFO; Wells Fargo based on the midpoint of its range.
[112] Wells Fargo, "DOJ Creates Uncertainty Around Private Corrections," August 19, 2016.
[113] Cannacord Genuity, "Private prisons aren't going anywhere, but risks could continue to weigh on stocks," August 23, 2016.



    c.    SunTrust Robinson wrote, "[w]e believe that BOP business is at-risk over five years, ICE and US Marshals business is substantially more secure and we see higher likelihood of declines in CA inmate populations resulting from Prop 57."[114]

    d.    Compass Point wrote, "[t]his policy shift is clearly a negative for the publicly-traded for-profit prison companies but it is far from a death sentence."[115]

74.    Commentary surrounding the Yates Memorandum also tended to reflect CCA's position that the Yates Memorandum could be limited to BOP contracts and expressed some skepticism that the BOP business would not be renewed.

    a.    Wells Fargo Securities: "In our view, the recent Department of Justice (DOJ) announcement pertains only to Bureau of Prisons (BOP) contracts, more specifically those up for renewal/rebid as part of Criminal Alien Requirement (CAR) XVI, and does not pertain to US Marshals or Immigration & Customs Enforcement (ICE). We believe angst around a larger government pullback from private prison business will likely persist, particularly in light of news that ICE is reworking its contract with CXW at its South Texas Family Residential Center well ahead of scheduled expiration."[116]

    b.    Canaccord Genuity: "At current valuations, we believe the market is implying not only that the BoP contracts are lost immediately (assigning no value to them) but that the risk of contagion to the USMS, ICE and State contracts is a real near-term risk. We disagree on both accounts."[117]

    c.    SunTrust Robinson: "CXW emphasized the DoJ's directive to the BOP was to reduce and eliminate the use of private facilities over time, not to end existing contracts...U.S. Marshals Service (USMS) and ICE contracts will not be impacted by the DoJ's directive, in our view, as USMS and ICE cannot overcrowd existing non-private facilities and have special constraints that must be met unlike the BOP."[118]

    d.    Compass Point: "Our sense is that infrastructure limitation, political dynamics, and budgetary constraints will shield state-level contracts. Furthermore, the cash flow being generated by existing contracts appears safe as the memo directs review at the end of term. Finally, the language in this memo signals that termination is not the only option as the BOP appears to have sufficient latitude to renew expiring contracts so long as the scope is 'substantially reduce[d].'"[119]

---

[114] SunTrust Robinson, "CXW, GEO - Lowering Estimates & PTs Amid Political Shift," September 1, 2016.
[115] Compass Point, "Quick Thoughts on DOJ's For-Profit Prison Memo", August 18, 2016.
[116] Wells Fargo Securities, "DOJ Creates Uncertainty Around Private Corrections, "August 19, 2016.
[117] Cannacord Genuity, "Private prisons aren't going anywhere, but risks could continue to weigh on stocks," August 23, 2016.
[118] SunTrust Robinson, "Conference Call Takeaways," August 19, 2016.
[119] Compass Point, "Flash Note: Quick Thoughts on DOJ's For-Profit Prison Memo," August 18, 2016.



75.     Despite any skepticism that **analysts expressed about the market's reaction to the Yates** Memorandum, their reassessment of **the extent of CCA's business risks** and expected performance was ultimately reflected in significantly reduced price targets.[120]

76.     **The extent of the risk to CCA's business re**vealed by the Yates Memorandum was reflected in **CCA's share price decline imm**ediately after the announcement.[121] As set forth in **Exhibit 3**, CCA's share price declined by an additional 25.6 percent from its closing price on August 19 until November 8, 2016, exceeding its August 19 close price only once (on August 20) during that period.

77.     I have examined the period surrounding the Yates Memorandum and found there is no other information or news other than the Yates Memorandu**m and related responses that would explain CCA's** share price reaction.  The evidence indicates that the entirety of the share price decline on August 18, 2016 as well as the increase on August 19, 2018 was driven by the Yates Memorandum and reactions to this announcement.  It is my understanding that plaintiff contends that the information disclosed by CCA on August 19, 2016 was misleading.  Nevertheless, it is possible that market participants continued to react to the disclosure of the Yates Memorandum on August 19, 2016, such that the cumulative impact of this disclosure may not have been reflected until the end of trading on that day.

78.     The abnormal return as measured by my event study may be used to estimate the reduction in value per share associated with the Yates Memorandum corrective disclosure.  To ensure the abnormal return captures the cumulative reaction attributable to the Yates Memorandum, I have computed a two-day **abnormal return based on CCA's share price reaction on August 18-19, 2016.  To the extent this** share price reaction reflected information disclosed on CCA**'s conference call that was misleading, this** would represent a conservative estimate of **the market's reaction to the revelation of concealed risk alleged by** plaintiff (*i.e.* it would understate the impact of corrective information contained in the Yates Memorandum).  For the Yates Memorandum, the abnormal dollar return over the two-day event window is equal to $8.06, as set forth in **Exhibit 2**.

### VII.  Share Price Inflation

79.     **According to plaintiff's allegations, CCA s**hould have disclosed the risk to its BOP business caused by its inadequate performance and the deteriorations of its relationship with the BOP.  Had such a **disclosure been made, CCA's share price would have** declined to reflect the extent of this risk.

---

[120]  **Table 3**.

[121]  *See, e.g.*, **Cannacord Genuity, "Raising GEO and CXW price targets on lower risk post-election," November 11, 2016; SunTrust Robinson, "Increasing PT to $26 On Outlook For Rising Estimates," November 14, 2016; Cannacord Genuity, "Upgrading CXW** to BUY following dividend cut, lowered risk, and exter**nal growth opportunity," December 12, 2016.**



### A.    Inflation at the time of the corrective disclosures

80.    To measure the extent to which CCA's share price was inflated at the time of the corrective disclosures, I begin with my estimates of the share price impacts of the corrective disclosures related to the allegations:

> a.    The impact of the Cibola Contract Loss of $0.46 is limited to the direct effect of the Cibola contract, which reflects my understanding that the full information was released over multiple days and announced along with confounding information about the STFRC renegotiation and other news unrelated to the allegations.

> b.    The abnormal return of $8.06 on August 18-19, 2016 relates entirely to the information contained in the Yates Memorandum and its consequent effects, all of which relates to the allegations.

81.    Before the corrective disclosures, market participants' expectations reflected a relatively low probability of CCA losing its BOP business.    After the corrective disclosures, market participants' expectations changed to reflect a significantly higher likelihood that CCA would lose the BOP contracts, in addition to the perception that the rest of CCA's business faced higher risks.

82.    It is possible that the share price would have declined in response to the Cibola Contract Loss and Yates Memorandum, even in the counterfactual in which CCA had disclosed the extent of the allegedly concealed risks.[122]    In this counterfactual, market participants still would have reassessed the value of CCA's BOP contracts (which would have been lower since CCA would have disclosed the extent of the risks), such that the Cibola Contract Loss and Yates Memorandum still would have changed the (relatively high) likelihood of losing these contracts to an even higher likelihood (or near certainty).    In other words, in the counterfactual, the realization of the disclosed risks could have had a (smaller) negative effect on the price of CCA's shares than the impact of these announcements attributable to the corrective disclosures.

83.    Conceptually, the portion of the abnormal returns explained by the increased likelihood of CCA losing its BOP contracts may be estimated as the difference between the counterfactual values of those contracts before and after the corrective disclosures.    As an upper bound, one may assess the counterfactual value of these contracts before the corrective disclosures, assuming that the BOP contracts contributed no value to CCA's share price after the corrective disclosures.

84.    One indicator of CCA's counterfactual value is its share price after it reflected the information disclosed through the Yates Memorandum along with what CCA purported to be the BOP's contribution to its earnings.    On August 19, 2016, CCA's stock closed at $19.08.    Assuming this post-announcement price placed little to no value on the BOP contracts, one may infer what the value of the share price would have

---

[122]   This is consistent with the Supreme Court's decision in *Dura*, which requires losses to shareholders to have been caused by the alleged contraventions.    *See Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S.Ct. 1627 (2005).



been based on CCA's statement that the BOP contracts represented approximately seven percent of its annual revenue and earnings.[123] All else equal, this suggests that CCA's shares would have been worth $20.52 ($19.08 / (1 – 0.07)) in a scenario under which it was expected to retain the BOP contracts. This indicates that the BOP contracts' counterfactual value would have been approximately $1.44 ($20.52 – $19.08) based on the market's assessment of CCA's risk after the Yates Memorandum.

85. One may expand this approach to estimate the counterfactual value of the Cibola contract by applying that contract's proportional contribution of earnings. As I explain in **Appendix D**, the Adams, McRae, and Eden contracts accounted for approximately $0.40 of CCA's FFO. Comparing Cibola's FFO contribution of $0.04 to the FFO contribution of $0.40 for the other three facilities suggests that Cibola would account for approximately $0.14 (10% times $1.44) based on CCA's share price after the Yates Memorandum.

86. Estimating the value of the BOP contracts under this approach, however, would tend to overstate the value of these contracts in the counterfactual, in which CCA would have distinguished its BOP relationship as subject to greater risk than the rest of its business. In order to account for this, I have examined how earnings from CCA's BOP contracts would have interacted with the information that I understand plaintiff contends would have been known in the counterfactual. As set forth in **Appendix D**, I have estimated the counterfactual value of CCA's BOP contracts based on:

    a. the BOP contracts' residual FFO contribution through the contract terms assuming plaintiff's contention that CCA could not have reasonably expected to retain its BOP contracts after they terminated;

    b. the counterfactual multiple of FFO that would have been associated with the BOP contracts assuming plaintiff's contention that CCA should have disclosed that it was unlikely to renew its BOP contracts or win any competitive bids.

87. As set forth in **Appendix D**, my analysis of the BOP contracts' counterfactual values suggests that these values would have ranged from $1.08 to $1.12 for Adams, McRae, and Eden, and from $0.11 to $0.13 for Cibola. These estimates, however, are conservative to the extent they reflect certain observed valuation parameters (*e.g.*, perceived risk) rather than valuation parameters that would have existed in the counterfactual since, in the counterfactual, CCA would have distinguished these BOP contracts as subject to greater risk than the rest of its business. In addition, as previously discussed, these estimates represent upper bound estimates of the counterfactual share price declines that would have corresponded to the corrective disclosures since they are based on the estimate of the BOP contracts' total (rather than the change in) counterfactual value.

---

[123] According to CCA, the BOP contracts "represent approximately $131.2 million in annual revenues, or approximately seven percent of CCA's total annual revenue, at operating margins consistent with CCA's owned and managed facility portfolio average." CCA Form 8-K dated August 19, 2016. This suggests that the BOP contracts' contributions to CCA's profits were proportional to their revenue contribution.



88.     For the purpose of this analysis, a conservative estimate of the value of the BOP contracts at the time of the Yates Memorandum suggests that the portion of the share price reaction explained by the loss of these contracts (had the extent of their allegedly concealed risks been known) would not have exceeded:

  a. $0.14 associated with the expected loss of the Cibola contract, which would have been realized as a result of the Cibola Contract Loss;

  b. $1.44 associated with the expected loss of the Adams, McRae, and Eden contracts, which would have been realized as a result of the Yates Memorandum.

89.     Subtracting the above values from the total impacts related to the Cibola Contract Loss and the Yates Memorandum represents a conservative measure of inflation arising from the allegations at the time of the corrective disclosures, as set forth in the following table.

**Table 5.  Inflation at the time of the corrective disclosures**

|  | Cibola Contract Loss | Yates Memorandum | Total |
|---|---|---|---|
| Impact of the Corrective Disclosures | $0.46 | $8.06 | $8.52 |
| Less: Counterfactual Value of BOP Contracts | (0.14) | (1.44) | (1.58) |
| **Total** | **$0.32** | **$6.62** | **$6.94** |

**B.     Inflation during the Class Period**

90.     If the trier-of-fact finds that Defendants' alleged fraud fell within the zone of risk revealed through the corrective disclosures, the inflation estimates set forth in **Table 5** would have been present in CCA's shares beginning at the time that the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk.  As previously discussed, the inflation arising from the Cibola Contract Loss would have been present through August 1, 2016 while the inflation arising from the non-disclosures revealed through the Yates Memorandum would have persisted through August 17, 2016.

91.     My share price inflation estimates are based on a finding that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud, such that the extent of share price inflation remains constant from the time that the trier-of-fact makes such a finding until inflation is eliminated through the Cibola Contract Loss and the Yates Memorandum.  The impact of any concealed risks on CCA's share price, however, would have been different before the company announced its conversion to a REIT on February 7, 2013.

92.     From an economic perspective, the primary difference between a corporation and a REIT is the obligation of the company to pay corporate income tax.  A corporation's earnings are generally subject



to corporate income tax whereas those of a REIT **are generally exempt; according to CCA's 2013 10-K,** **"CCA will be entitled to a deduction for dividends paid, r**esulting in a substantial reduction in the amount of **federal income tax expense it recognizes."**[124] Thus, any reduction in value measured for CCA as a corporation (before converting to a REIT) would have been attenuated by offsetting corporate tax obligations on expected future earnings and, therefore, value.

93.   In the three years prior to **the conversion (2010, 2011, and 2012), CCA's effective tax rate was** approximately 36.8 percent;[125] following its conversion to a REIT, its average income tax rate fell to approximately 3.6% for the full years of 2014, 2015, and 2016.[126] During the portion of the Class Period before CCA converted to a REIT, the prevailing marginal corporate tax rate was 35 percent.[127] Thus, any reduction in value arising from the concealed risks would have been partially offset by the marginal corporate tax rate.[128] Accordingly, I reduce my estimates of share price inflation by 35 percent before February 8, 2013.

94.   The following table summarizes share price inflation during the Class Period, including this adjustment.

**Table 6.  Inflation: February 27, 2012 to August 17, 2016**

|  | February 27, 2012 to February 7, 2013 | February 8, 2013 to August 1, 2016 | August 2, 2016 to August 17, 2016 |
|---|---|---|---|
| Cibola Contract Loss | $0.21 | $0.32 | $ - |
| Yates Memorandum | $4.30 | $6.62 | $6.62 |
| **Total inflation** | **$4.51** | **$6.94** | **$6.62** |

95.   The above inflation estimates are based on an approach known as the constant dollar method, in which the dollar value of inflation is held constant during the Class Period, adjusted to reflect the difference in the impact of the allegedly concealed **risk before/after the Cibola Contract Loss and CCA's**

---

[124] Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. F-28.

[125] Based on income total tax expense of $279.4 million and pretax income of $758.6 million from 2010 through 2012. Corrections Corporation of America Form 10-K for period ending December 31, 2012, p. F-4.

[126] Based on income total tax expense of $23.6 million and pretax income of $652.1 million from 2014 through 2016. CoreCivic, Inc. 10-K for period ending December 31, 2016, p. F-4.

[127] IRS Publication 542 (Rev. March 2012), p.17 based on the marginal **tax rate for taxable income over $18.3 million (CCA's** pre-tax income exceed this level in each year of the Class Period).

[128] **Prior to CCA's REIT conversion, CCA paid "qualified dividends" that "generally are sub**ject to tax at preferable rates. Subject to limited exceptions, dividends payable by REITs are not eligible for those reduced rates and are taxable at ordinary income tax **rates... [Post-conversion dividends] are gene**rally taxable to our stockholders as ordinary income. However, our dividends are **eligible for the lower rate applicable to 'qualified dividends' to** the extent they are attributable to income that was previously **subject to corporate income tax."** Corrections Corporation of America Form 10-K for period ending December 31, 2013, p. 43. Adjusting share price inflation by the marginal corporate tax rate is therefore conservative (would tend to understate inflation) to the extent that the net impact of tax savings to shareholders associated with the REIT conversion was lower.



conversion to a REIT. The constant dollar method is a widely accepted approach to estimating share price inflation and is consistent with the legal framework for measuring damages.[129]

96.     In the generally declining share price environment at issue in this case, in which CCA's stock generally traded higher during the Class Period than at the time of the corrective disclosures, a constant dollar approach results in inflation as a proportion of share price being generally lower during the Class Period than at the time of the corrective disclosures.[130] I also note that CCA's implied multiple relative to expected FFO during the Class Period was rarely below its value at the time of the corrective disclosures, which suggests that the above estimates are conservative, since the impact of the concealed risk would only have increased in a higher multiple environment.[131] Similarly, the above estimates do not consider the declining value of the BOP business; in earlier periods, the contribution of the BOP business to CCA's share price was higher, which suggests that the value of the concealed risk also would have been higher.[132]

97.     In my opinion, the above inflation estimates represent reasonable and conservative estimates of the impact of the allegedly concealed risks during the Class Period.

### VIII. Per Share Damages

98.     To the extent the trier-of-fact determines that the information revealed by the corrective disclosures was within the zone of risk concealed by Defendants' alleged fraud, then the share price inflation figures corresponding to the purchase dates set forth in **Table 6** would apply to any member of the Class who bought CCA stock during the Class Period and sold or held shares on or after August 2, 2016. I note that the above estimates are additive and separable, such that the impacts of each corrective disclosure may be considered jointly or individually at any time during the Class Period.

99.     I understand that an individual plaintiff's recoverable damages are based on the difference between: (a) share price inflation associated with shares purchased at the time they were purchased; and (b) share price inflation associated with shares sold at the time they were sold after one or more corrective disclosures. Under the Private Securities Litigation Reform Act of 1995 ("PSLRA") a "plaintiff's damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis

---

[129] The constant dollar approach also is consistent with *Dura*, which requires that inflation not exceed losses caused by the revelation of the alleged wrongdoing.

[130] See **Exhibit 4**.

[131] See **Exhibit 5**. Said differently, the value of the concealed risk would have been higher to the extent the market placed a higher value on CCA's earnings.

[132] For instance, until December 30, 2014, CCA's share price would have reflected expected earnings associated with the Northeast Ohio Correctional Center. See, Wells Fargo, "CXW: Loses Federal Bureau Of Prisons Contract At Its Northeast Ohio Correctional Center," December 30, 2014.



for the action is disseminated to the market."[133]  Additionally, "if the plaintiff sells or repurchases the subject security prior to the expiration of the 90-day period," then "damages shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the security and the mean trading price of the security during the period beginning immediately after dissemination of information correcting the misstatement or omission and ending on the date on which the plaintiff sells or repurchases the security."[134]

100.   As set forth in **Exhibit 3,** I have computed CCA's mean trading price between August 19, 2016 and each of the following days during the 90-day period through November 16, 2016 based on CCA's closing price on each day.  Based on the inflation figures in **Table 6** and the mean share prices set forth in **Exhibit 3**, one may compute damages for any class member based on their relevant transactions within the Class Period.

**IX.   Further Work**

101.   My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available to me.

W. Scott Dalrymple, CFA

---

[133]   15 U.S.C. § 78u-4 (2011).
[134]   15 U.S.C. § 78u-4 (2011).






## SCOTT DALRYMPLE, CFA

**Appendix A**

PARTNER

| Direct | +1.214.619.4960 |
| Mobile | +1.214.842.0078 |
| Email | sdalrymple@bvagroup.com |

Scott Dalrymple is an economist specializing in quantitative valuation, econometrics, statistics, securities analysis, antitrust, financial markets, and intellectual property.

Mr. Dalrymple has led numerous consulting, commercial litigation, and restructuring engagements on behalf of multinational companies, investors, financial institutions, and government agencies in the U.S., Europe, and Australia. He has testified in federal and state court and has advised clients in areas including:

- Application of economic, statistical, and quantitative methods used in business interruption matters, securities analysis, financial forecasting, valuation, and antitrust analyses;

- Construction of event studies, market efficiency tests, and other financial econometric models to assess share price artificiality associated with alleged misrepresentations and non-disclosures;

- Quantification of multibillion-dollar claims related to the securitization of residential mortgage-backed assets;

- Estimation of price artificiality arising from alleged manipulations in crude oil futures and options markets through monopolization of cash forward contracts;

- Valuation of residual interests in mortgage-backed securitizations based on loan-level econometric models and simulations;

- Analysis of reasonable royalty and lost profits damages arising from patent infringement claims;

- Development of economic and financial forecast models for purposes of capital restructurings, evaluating investment opportunities, and managing working capital; and

- Design of sampling procedures and statistical inferences drawn from samples used in fraud investigations, product evaluations, accounting reviews, and class certification analyses.

Mr. Dalrymple holds a Master of Science in Economics with a concentration in Industrial Organization from the London School of Economics and Political Science and a Bachelor of Business Administration in Finance and Business Honors from the University of Texas at Austin. He has presented to chapters of the American Bar Association, the Licensing Executives Society, and other organizations on topics including patent infringement damages, quantitative analysis, and macroeconomic trends. Mr. Dalrymple also contributed to the AICPA Practice Aid on Intellectual Property Infringement Damages and has been published in Law360. He is a member of the CFA Society of Dallas–Fort Worth.

Prior to joining BVA, Mr. Dalrymple was with AlixPartners and was an economist in the London office of a global economics consulting firm. Mr. Dalrymple began his career at PricewaterhouseCoopers and also worked in corporate finance and transaction advisory roles for a publicly-traded technology company.

**bva**group®

Valuation.
Disputes.
Advisory.

| 7250 Dallas Parkway | 1000 Louisiana Street | 340 Madison Avenue |
| Suite 200 | Suite 6925 | 19th Floor |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10173 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

## TESTIMONY AND PUBLICATIONS

**DEPOSITION:**

*Leaf Trading Cards, LLC v. The Upper Deck Company*
Civil Action No. 3:17-CV-03200-N
United States District Court, Northern District of Texas, Dallas Division

***Samsung Electronics America, Inc., v. Yang Kun "Michael" Chung, Thomas Porcarello, Yoon-Chul "Alex" Jang, Jin****-Young Song, All Pro Distributing, Inc.*
Civil Action No. 3:15-CV-04108-D
United States District Court, Northern District of Texas, Dallas Division

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. The Bank of New York Mellon, as Trustee*
Cause No. 14-CV-6502
United States District Court, Southern District of New York

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. HSBC Bank USA, National Association, as Trustee*
Cause No. 14-CV-08175
United States District Court, Southern District of New York

*Avaya Inc., v. Interactive Intelligence, Inc.*
Cause No. 01-16-0004-7193
AAA Commercial Arbitration

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Wells Fargo Bank, N.A., as Trustee*
Cause No. 14-CV-9764
United States District Court, Southern District of New York

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. U.S. Bank National Association, as Trustee*
Cause No. 14-CV-2590
United States District Court, Southern District of New York

*Galt Strategies, LLC v. Critter Control, Inc., Kevin Clark, ABCN Services Corp., Animal Intrusion Prevention Systems Holding Co., LLC, Jezek, Inc. d/b/a Critter Control St. Louis, Critter Control of Reno, LLC, CRICO, Inc., Salmick, Inc. d/b/a Critter Control Greater Hudson Valley, and MOAN, LLC*
Cause No. DC-15-05281
162nd Judicial District Court, Dallas County, Texas

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

Case 3.16-cv-02267   Document 362-9   Filed 11/20/20   Page 35 of 44 PageID #: 15140

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Deutsche Bank National Trust Company, as Trustee*
Cause No. 14-CV-4394
United States District Court, Southern District of New York

**Maxus Healthcare Partners, LLC ("Maxus"), v. Texas RHH, LLC d/b/a Renew Home Health ("Texas RHH"), Misty Chaney**-Brady, BP Chaney, Zera, Inc., Curtis James Brady, Furtek & Associates, L.L.C. and Richard E. Furtek
Cause No. 017-275219-14
17th Judicial District Court, Tarrant County, Texas

*GTG Holdings, Inc. v. Amvensys Capital Group, LLC, ACG Telecom, LLC, and Z. Edward Lateef*
Case No. 3:13-cv-03107-M
United States District Court, Northern District of Texas, Dallas Division

*In The Matter of the Marriage of Jessica L. Jones and David E. Jones and in the Interest of David E. Jones, Jr., Jackson H. Jones and William A. Jones, Children*
Case No. D-1-FM-13-001139
250th Judicial District Court, Travis County, Texas

**TRIAL AND HEARING:**

*Shirley Jones, Individually and on Behalf of Her IRAs, et al., v. WFG Investments, Inc., WFG Advisors, LP, Wilson H. Williams, and David W. Williams*
Case No. 16-03743
Financial Industry Regulatory Authority

*Smith Walker v. E\*Trade Securities LLC and E\*Trade Clearing LLC*
Case No. 16-03022
Financial Industry Regulatory Authority

*Avaya Inc., v. Interactive Intelligence, Inc.*
Cause No. 01-16-0004-7193
AAA Commercial Arbitration

**Maxus Healthcare Partners, LLC ("Maxus"), v. Texas RHH, LLC d/b/a Renew Home Health ("Texas RHH"), Misty Chaney**-Brady, BP Chaney, Zera, Inc., Curtis James Brady, Furtek & Associates, L.L.C. and Richard E. Furtek
Cause No. 017-275219-14
17th Judicial District Court, Tarrant County, Texas

*Galt Strategies, LLC v. Critter Control, Inc., Kevin Clark, ABCN Services Corp., Animal Intrusion Prevention Systems Holding Co., LLC, Jezek, Inc. d/b/a Critter Control St. Louis, Critter Control of Reno, LLC, CRICO, Inc., Salmick, Inc. d/b/a Critter Control Greater Hudson Valley, and MOAN, LLC*
Cause No. DC-15-05281
162nd Judicial District Court, Dallas County, Texas

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



bvagroup®

Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

*Edward Kennard Andrew and Mark L. Hepworth v. Southwest Securities, Inc.*
Case No. 14-02566
Financial Industry Regulatory Authority

*In the Matter of the Marriage of Jessica L. Jones and David E. Jones and in the Interest of David E. Jones, Jr., Jackson H. Jones and William A. Jones, Children*
Case No. D-1-FM-13-001139
250th Judicial District Court, Travis County, Texas

## PRESENTATIONS AND PUBLICATIONS:

Co-Author (with Joseph R. Mason and Jody Bland), "Collateralized Loan Obligations: Overview and Challenges," *BVA Group*, May 14, 2020.

Co-Author (with Robert Manz and Emily Chiu), "COVID-19 Business Interruption Claims: Causation May be Key," *BVA Group*, April 24, 2020.

Co-Author (with Joseph R. Mason and Jeffrey D. Balcombe), "Financial Supervision and Regulation in the US: Dodd-Frank Reform," *European Parliament*, December 2018.

Contributing Author, Hitchner, James R., *Financial Valuation: Applications and Models*, Fourth Edition, April 2017.

*Series N and Super Priority Preferred: The Unintended Consequences of Increasing Complexity in Today's Capital Markets*, Houston Bar Association Securities Litigation and Arbitration Section, April 11, 2017.

Co-Author, "Don't Shoot the Methodology: Use and (Mostly) Misuse of the Nash Bargaining Solution," *Law360*, March 2014.

*Economic Factors That Influence Royalties: Application of Game Theory*, LES Seattle Chapter Presentation, November 14, 2013.

*Bargaining Power in Licensing Negotiations*, LES San Diego Chapter Presentation, March 12, 2013.

*Bargaining Theory in Reasonable Royalty Calculations,* ABA Webinar, December 14, 2012.

Contributing Author, "Calculating Intellectual Property Infringement Damages," AICPA Practice Aid 06-1, 2012.

## AFFILIATIONS:

The Economic Club of Washington D.C., panelist judge for the Philip M. Dearborn and Vernon E. Jordan fellowships for graduate students pursuing doctoral degrees in the fields of economics, finance, and business, 2014 to present.

CFA Institute and CFA Society of Dallas–Fort Worth.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

# SCOTT DALRYMPLE, CFA

PARTNER

## PARTIAL LIST OF CASES

Mr. Dalrymple has been involved with the following types of cases in a consulting and/or testifying capacity:

### VALUATION AND SECURITIES ANALYSIS

- Provided expert and rebuttal opinions on share price inflation and aggregate damages on behalf of a former Australian electronics retail chain.

- Provided expert testimony on damages and losses on behalf of a broker/dealer arising from a series of private placement investments and offerings.

- **Quantified the impact of trustees' alleged failures to repurchase loans on behalf of a residential mortgage backed securitization (RMBS) investor.**

- Developed a class-wide damage model arising from suitability claims against an investment bank.

- Provided expert testimony in support of class certification on behalf of residential mortgage backed securitization (RMBS) holders.

- Analyzed market efficiency in support of fairness and solvency opinions related to shares of publicly traded companies in the energy sector.

- Prepared event studies and damages analyses based on various share matching (LIFO, FIFO, offsets) and account consolidation conventions on behalf of security holders evaluating class action opt outs.

- Analyzed trading activity and valuations of restricted and unrestricted shares associated with an alleged pump-and-dump scheme following a reverse merger.

- Provided expert opinions and rebuttal of opposing expert analysis regarding share price inflation damages on behalf of an Australian industrial conglomerate involved in a shareholder class action lawsuit.

- Served as a testifying expert in an arbitration matter involving the liquidation of margin positions.

- Provided economic and statistical analysis of loan collateral characteristics, performance, and alleged misrepresentations associated with residential and commercial mortgage-backed securities on behalf of multinational financial institutions and investors.

- Developed econometric models to establish relationships between crude oil futures and options prices and numerous industrial, financial, and macroeconomic variables in a securities class action lawsuit.

- Provided expert testimony on the valuation of a healthcare services company.

- Served as a consulting expert for government agencies in negotiations of multibillion-dollar settlements involving the origination, sale, and securitization of residential mortgages.

- Negotiated the value of residual interests in Canadian mortgage-backed securities on behalf of the bankrupt sponsor based on econometric models and Monte Carlo simulations used to predict future cash flows from individual mortgages.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



| 7250 Dallas Parkway | 1000 Louisiana Street | 340 Madison Avenue |
| Suite 200 | Suite 6925 | 19th Floor |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10173 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

- Provided expert opinions the solvency of a debtor subsidiary in the telecom industry facing fraudulent transfer allegations.

- Analyzed the economic merits of civil penalties assessed by the U.S. SEC related to the sale of restricted stock.

- Assessed the appropriateness of certain private equity investments related to the investment policy statement of a family limited partnership.

- Evaluated the economic merits of breach of fiduciary duty claims related to options trading strategies in a jointly-held investment account.

- Quantified share price inflation damages on behalf of an Australian contracting and development company involved in a shareholder class action lawsuit.

- Evaluated share price inflation allegations against an Australian real estate investment trust and quantified damages based on multiple share purchase matching approaches and detailed trading data in a shareholder class action lawsuit.

- Analyzed plaintiff and defendant shareholder damages models related to claims against an Australian commodities company in a shareholder class action lawsuit.

- Investigated quantitative methods used to value the structured credit portfolios of a global investment and insurance company.

- Advised a major U.S. bank on the write-down of its structured finance portfolio.

- Quantified share price inflation and corresponding damages based on allegations against an Australian gaming corporation in a shareholder class action lawsuit.

- **Analyzed the effects of management representations on a U.S. technology firm's share price in a shareholder class** action lawsuit.

- Examined the impact of accounting scandal revelations on the share price of a U.S. media firm in a shareholder class action lawsuit.

- Constructed a Monte Carlo simulation to estimate the value of performance-based incentives in the UK media industry.

## ANTITRUST AND REGULATION

- Provided expert testimony on relevant market definitions, market power, and vertical restraints of competition on behalf of a manufacturer in a case involving allegations of market foreclosure.

- Quantified damages on behalf of a plaintiff class alleging overcharges on purchases of accessory items.

- Provided expert opinions in support of class certification in a case involving alleged overcharges of building materials.

- Quantified the impact of price artificiality associated with alleged market manipulations in crude oil futures and options markets.

- Assessed the impact of monopolization claims on prices in the European automobile parts market.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

bva group®  Valuation. Disputes. Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

## PARTNER

- Evaluated monopolization claims in the market for remanufactured printer cartridges.

- Analyzed the price impact of alleged false advertising claims in the market for fruit juices.

- Assisted a European competition authority in a review of its financial services sector based on event studies used to estimate the effect of firm entry on lending rates.

- Examined the impact of competition policies on the personal banking sector in a national European market based on quantitative analysis of current account activity associated with major banks.

- **Analyzed the impact of a UK pharmaceutical firm's alleged predatory pricing** behavior on sales of its primary competitor.

- Quantified the impact of regulatory and commercial changes on a portfolio of media and gambling rights in the UK.

- Developed an industrial analysis framework used to evaluate competitive drivers across several manufacturing sectors for purposes of valuing a European manufacturing firm.

## INTELLECTUAL PROPERTY

- **Provided testimony rebutting an opposing expert's lost profits cal**culations arising from claims of intellectual property infringement, trade secret misappropriations, tortious interference and other allegations.

- Led the analysis of reasonable royalty damages on behalf of more than 150 defendants alleged to infringe a single patent covering widely-used website features related to geographic location services.

- Provided expert testimony regarding the economics of contractual royalty calculations on behalf of a U.S. communications company.

- Served as a testifying expert on behalf of a consulting firm seeking damages arising from alleged misappropriations of trade secrets.

- Assessed the merits of trade secret misappropriation claims against a global energy services company.

- Evaluated reasonable royalty claims associated with alleged U.S. patent infringements related to numerous technologies, including:

    o Telephony and cellular network;

    o Network architecture;

    o Hardware and software technology;

    o Digital media;

    o Remote access technologies;

    o Power converter architectures;

    o E-commerce;

    o Garments and apparel;

    o Automotive parts;

    o Food processing;

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

**bva**group®

Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

- o Methods for check payment processing;

- o Geographic location services; and

- o Oil and gas exploration.

- Advised patent holders on strategic opportunities and licensing strategy for purposes of monetizing patent portfolios in the network technology and electronic storage industries.

- Computed lost profits, unjust enrichment, and reasonable royalty damages arising from theft of trade secrets claims brought by a specialized provider of electronic components against former employees.

- Assessed damages associated with contingency fee agreements between a law firm and former client arising from the settlement of a patent litigation lawsuit.

- Analyzed lost profits damages arising from patent infringement claims covering a wide range of network, software, and industrial applications.

- Composed a series of intellectual property valuations submitted to European tax authorities on behalf of a global steel manufacturer.

- Assessed the economic merits of an injunction claims against a major provider of rail track inspection services.

- Evaluated price erosion claims on behalf of defendants accused of patent infringement in industrial applications.

- Assessed damages arising from trade secret claims involving tens of millions of transactions in the freight industry.

- Evaluated damages arising from trademark infringement claims against companies in the financial services, technology, and automotive industries.

## COMMERCIAL LITIGATION AND INVESTIGATIONS

- Designed sampling procedures and advised on statistical inferences drawn from samples used in numerous fraud investigations, accounting reviews, and class certification analyses.

- Provided expert opinions based on statistical and econometric models used to evaluate employee allegations of discrimination under U.S. Title VII.

- Led the sampling, investigation, and extrapolation of results from transaction data retrieved from various accounting systems for purposes of identifying unreported IT costs in a breach of contract dispute involving a major U.S. hospital network.

- Provided expert opinions on lost wages associated with an alleged wrongful termination of a public services officer.

- Assessed damages associated with contingency fee agreements between a law firm and former client arising from the settlement of a patent litigation lawsuit.

- Constructed a series of econometric and financial models used to evaluate breach of contract claims in the freight and shipping industry based on the analysis of tens of millions of individual shipping records.

- Quantified the effects of a U.S. publicity scandal on Japanese sales of celebrity-sponsored products based on a quantitative analysis of sales data, controlling for numerous macroeconomic factors.

- Analyzed the forgone acquisition value of a UK retailer due to an alleged breach of fiduciary duty.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



| 7250 Dallas Parkway | 1000 Louisiana Street | 340 Madison Avenue |
| Suite 200 | Suite 6925 | 19th Floor |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10173 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

## TURNAROUND AND RESTRUCTURING

- Assisted a regional hospital in preparing for Chapter 11 proceedings.

- Implemented a weekly cash projection process and advised on working capital strategies that enabled a U.S. manufacturer to operate within its asset-based facility.

- Managed the implementation of financial models and weekly cash management processes on behalf of a U.S. metals distributor.

- Developed a series of integrated financial models that enabled a public U.S. technology firm to evaluate restructuring opportunities and secure long-term and short-term funding.

- Implemented a short-term cash management tool and monthly strategic model for a private equity portfolio company

- Developed cash forecast and liquidation models on behalf of creditors of a U.S. metal fabricator.

- Assisted a U.S. hospital operator in developing financial plans used to secure additional funding.

- **Estimated the impact of an audit firm's alleged misrepresentations on the unsecured claims against a** U.S. **company's** bankrupt estate.

- Quantified the value of life insurance and executive benefit claims against a U.S. bankruptcy estate based on various actuarial assumptions.

- Advised on the reliability of a U.S. **distributor's financial model and business plan bas**ed on a series of financial and statistical tests.

- Negotiated the settlement of numerous claims on behalf of a U.S. bankruptcy estate.

- Managed bankruptcy proceedings on behalf of a regional U.S. electronics chain.

## BUSINESS ADVISORY AND CORPORATE FINANCE

- Designed econometric models to measure revenue impacts of product placements for a global consumer product company.

- Advised a U.S. freight company on the design and implementation of financial and economic forecasting tools.

- Designed sampling procedures to optimize new sporting goods product tests given limited access to college-level athletes.

- Identified demand drivers for an equipment manufacturer based on econometric analyses of distribution channels and inventory levels.

- Developed a comprehensive IT framework that enabled a U.S. manufacturer to project short-term borrowing requirements in a consolidated database/ERP system.

- Designed weekly cash management and monthly financial reporting tools for multiple private equity portfolio companies in the marketing and broadcast industries.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



bva group®

Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

- Managed numerous projects for a public U.S. technology firm, including: product pricing and bundling analysis, development of operational metrics, and the redesign of the commission structure.

- Designed and implemented automation tools used in numerous business planning and reporting applications for clients in the retail, shipping, and manufacturing sectors.

- Advised a commercial real estate client on the sale of a major U.S. shopping mall.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

**bva**group®  Valuation.
Disputes.
Advisory.

7250 Dallas Parkway
Suite 200
Dallas, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

340 Madison Avenue
19th Floor
New York, New York 10173
+1.212.364.1926

**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v.
Corrections Corporation of America, et al.**
**Appendix B - Information Considered**

**Court Documents:**
(1) Consolidated Complaint For Violation Of The Federal Securities Laws, dated 3/13/17
(2) Defendants' Memorandum Of Points And Authorities In Support Of Their Motion To Dismiss Plaintiff's Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated 5/12/17
(3) Declaration Of Milton S. McGee, III In Support Of Defendants' Motion To Dismiss, with Exhibits, dated 5/12/17
(4) Plaintiff's Opposition To Defendants' Motion To Dismiss Plaintiff's Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated 6/26/17
(5) Defendants' Reply Memorandum In Further Support Of Their Motion To Dismiss Plaintiff's Amended Consolidated Class Action Complaint For Violations Of The Federal Securities Laws, dated 7/26/17
(6) Memorandum, dated 12/18/17
(7) Answer To Consolidated Complaint For Violation Of The Federal Securities Laws, dated 2/2/18
(8) Revised Stipulation and Protective Order, dated 2/12/18
(9) Lead Plaintiff's Motion for Class Certification, Appointment of Class Representative and Appointment of Class Counsel, dated 6/1/18
(10) Memorandum Of Law In Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, dated 6/1/18
(11) Declaration Of Christopher M. Wood In Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, dated 6/1/18
(12) Defendants' Memorandum In Opposition To Plaintiff's Motion For Class Certification, Appointment Of Class Representative, and Appointment Of Class Counsel, dated 7/16/18
(13) Declaration Of Milton S. McGee, III In Support Of Defendants' Opposition To Plaintiff's Motion For Class Certification, Appointment Of Class Representative, And Appointment Of Class Counsel, dated 7/16/18
(14) Reply In Further Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, dated 10/26/18
(15) Declaration Of Christopher M. Wood In Support Of Reply In Further Support Of Lead Plaintiff's Motion For Class Certification, Appointment Of Class Representative And Appointment Of Class Counsel, with Exhibits, dated 10/26/18
(16) Memorandum, dated 1/18/19
(17) Petition For Permission To Appeal Pursuant To Federal Rule Of Civil Procedure 23(f), dated 2/1/19
(18) Memorandum Of Law In Support Of Lead Plaintiff's Motion For Reconsideration Of The January 18, 2019 Order Denying Class Certification, dated 2/1/19
(19) Declaration Of Willow E. Radcliffe In Support Of Memorandum Of Law In Support Of Lead Plaintiff's Motion For Reconsideration Of The January 18, 2019 Order Denying Class Certification, with Exhibits, dated 2/1/19
(20) Defendants' Opposition To Lead Plaintiff's Motion For Reconsideration Of The January 18, 2019 Order Denying Class Certification, dated 2/15/19
(21) Petitioner's Voluntary Dismissal With Prejudice Pursuant To Fed. R. App. P. 42(B), dated 3/28/19
(22) Memorandum, dated 3/26/19
(23) Order, dated 3/29/19
(24) Petition For Permission To Appeal Class Certification Order Pursuant To Federal Rule Of Civil Procedure 23(F), dated 4/9/19
(25) Plaintiff-Respondent's Opposition To Petition For Permission To Appeal Class Certification Order Pursuant To Federal Rule Of Civil Procedure 23(F), dated 4/19/19
(26) Order, dated 8/23/19
(27) Order Setting Case for Trial, dated 9/3/19
(28) Revised Case Management Order, dated 3/20/20

**Expert Reports:**
(1) Report on Market Efficiency, Professor Steven P. Feinstein, Ph.D., CFA dated 6/1/18
(2) Expert Report of Lucy Allen, dated 7/16/18
(3) Rebuttal Report of Professor Steven P. Feinstein, Ph.D., CFA dated 10/26/18
(4) Supplemental Report of Lucy Allen, dated 11/21/18

**Deposition Transcripts:**
(1) Deposition of Steven Feinstein, dated 7/12/18
(2) Deposition of Lucy Allen, dated 10/10/18

**Analyst Reports:**
(1) 2011-02-09 Barclays 4Q'10 First Look-Strong Beat & Good FY'11 Guidance; 11am Conf Call.pdf
(2) 2011-02-10 Barclays 4Q'10 Post Call-Q Helped by USMS Delays; Pipeline Growing; Awaiting Budgets; 2-EW.pdf
(3) 2011-02-11 Macquarie CCA Solid Q4A-Q1E.pdf
(4) 2011-02-11 SunTrust CCA 4Q10 Results; Adjusting Estimate and Reiterate Buy.pdf
(5) 2011-03-02 Barclays GEO's Continuum of Care, including Electronic Monitoring.pdf
(6) 2011-03-15 Barclays GEO UK Border Contract for First Scottish Facility.pdf

Appendix B Page 1 of 20
bvagroup