# EXHIBIT 94

| | |
|---|---|
| 1 | UNITED STATES DISTRICT COURT |
| | MIDDLE DISTRICT OF TENNESSEE |
| 2 | _____ |
| 3 | NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, |
| 4 | |
| | Plaintiff, |
| 5 | |
| vs. | Case No. 3:16-cv-02267 |
| 6 | |
| | CORRECTIONS CORPORATION OF AMERICA, et al., |
| 7 | |
| | Defendants. |
| 8 | _____ |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | CONFIDENTIAL |
| 15 | Video Recorded Deposition of: |
| 16 | JOHN BAXTER |
| 17 | Taken on behalf of the Plaintiff |
| | December 19, 2019 |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | Reported by: |
| 24 | Jenny Checuga, LCR, RPR |
| 25 | Job No. 10064037 |

```
 1            A P P E A R A N C E S
 2
 3     For the Plaintiff:
 4         MR. Jason Forge
       Attorney at Law
 5         Robbins Geller Rudman & Dowd LLP
       414 Union Street, Suite 900
 6         Nashville, TN 37219
       (615)252-3798
 7         jforgergrdlaw.com
 8
 9     For the Defendants:
10
       MR. BRIAN GLENNON
11         MR. ERIC PETTIS
       Attorneys at Law
12         Latham & Watkins LLP
       355 South Grand Avenue, Suite 100
13         Los Angeles, CA 90071
       (213)891-7741
14         brian.glennon@lw.com
       eric.pettis@lw.com
15
16
17
18
19
20
21
22
23
24
25
```

1              * * *

2             JOHN BAXTER,

3 was called as a witness, and having first been duly

4 sworn, testified as follows:

5

6             EXAMINATION

7 QUESTIONS BY MR. FORGE:

8   Q.    Good morning, sir.

9   A.    Good morning.

10  Q.    Could you please state and spell your name

11 for the record?

12  A.    Yes. My name is John Douglas Baxter,

13 J-O-H-N, D-O-U-G-L-A-S, B-A-X-T-E-R.

14  Q.    Do you prefer Dr. Baxter or Mr. Baxter?

15  A.    Either -- either is fine.

16  Q.    So Mr. Baxter, have you ever been deposed

17 before?

18  A.    Yes, I have.

19  Q.    Approximately how many times?

20  A.    I've been deposed a couple of times in

21 personnel matters and have given testimony as an

22 expert witness years ago in a federal case.

23  Q.    Once as an expert?

24  A.    Yes.

25  Q.    How many years ago was that?

1   and two of those have multiple parts in them.

2   BY MR. FORGE:

3   Q.   Three of those have multiple parts, right?

4   A.   I'm sorry?

5   Q.   Three of those have multiple parts, correct?

6   A.   Yes. Pardon me, three, correct.

7        MR. FORGE: Next is 216.

8        (WHEREUPON, a document was marked as

9   Exhibit Number 216.)

10  BY MR. FORGE:

11  Q.   Does Exhibit 216 appear to be a true and

12  correct copy of a notice of concern dated

13  September 23, 2014, from the Bureau of Prisons to Joe

14  Pryor, the warden at Cibola?

15  A.   Yes, it does.

16  Q.   One of those areas of concerns identified is

17  human resources; do you see that?

18  A.   I do.

19  Q.   And do you see that with regard to health

20  services, that the staffing levels at Cibola fell

21  below 85 percent of the minimum staffing requirement

22  for the months of July and August- -

23  A.   Yes.

24  Q.   -- 2014?

25  A.   I see that.

1  Q.    Fair to say that staffing was always a
2  challenge at these BOP facilities?
3  A.    Not in all of their facilities. In the case
4  of Cibola, in this specific case, there were
5  challenges. Many of the staff who worked in the
6  facility lived in the Albuquerque area, which is
7  about an hour-and-15-minute drive. And to add other
8  context, as we could identify staff willing to come
9  on, there was a government clearing process that
10 those staff had to go through before the Bureau would
11 clear them to work. And so any vacancy becomes a
12 challenge, not only in finding a person to fill the
13 role, but also then getting them through a clearance
14 process that may take up to six months.
15       And so depending on the number of people, if
16 there's turnover in a facility, there may be times
17 when the staffing level would dip below 85 percent
18 and we would work to address that.
19 Q.    And my question was -- I should focus more on
20 Cibola for now.
21       Staffing health services was always a
22 challenge at Cibola, correct?
23 A.    Staffing of health services was a challenge
24 at Cibola, whether nursing staff or, at some points,
25 provider staff, yes.

1      MR. FORGE: Next one is going to be
2   Exhibit 217.
3      (WHEREUPON, a document was marked as
4   Exhibit Number 217.)
5   BY MR. FORGE:
6   Q.   Does that appear to be a true and correct
7   copy of an e-mail -- you have to help me with the
8   pronunciation of this name, an e-mail from --
9   A.   Ashley Odubeko.
10  Q.   Can you please spell that for for the record?
11  A.   O-U -- excuse me. O-D-U-B-E-K-O.
12  Q.   To Natasha Metcalf?
13  A.   Correct.
14  Q.   Does it appear to be a true and correct copy
15  of an e-mail from Ms. Odubeko to Ms. Metcalf from
16  June 5, 2015?
17  A.   Yes.
18  Q.   Including attachments?
19  A.   It does include attachments, yes.
20  Q.   Do you know Ms. Odubeko?
21  A.   I've met her, I did not interact frequently
22  with her, but she was part of the team working with
23  Ms. Metcalf.
24  Q.   What do you understand her job to be -- to be
25  at that time?

1  document consist of two pages, first one Bates number

2  225, second one Bates number ending 226?

3  A.　Yes.

4  Q.　The top of the first page says, "Cibola

5  discussion"?

6  A.　Yes.

7  Q.　Do you recognize this document?

8  A.　I recognize it as one that I have seen,

9  although I don't recall who -- who would have

10  produced the document, but it looks like it reflects

11  a number of the areas that we were monitoring closely

12  and steps that we were putting in place to address

13  the underlying issues.

14  Q.　Do you think this -- I'll just represent to

15  you that, at least as produced, you were indicated as

16  the custodian of this record.

17  A.　Yes, yeah.

18  Q.　Do you believe this is a document you would

19  have created or received from somebody else?

20  A.　Yeah, it looks very much like one that I

21  could have created as a summary of talking points to

22  have a discussion around, yes.

23  　　　　MR. FORGE:  Next one's going to be

24  Exhibit 222.

25

1  (WHEREUPON, a document was marked as
2  Exhibit Number 222.)
3  BY MR. FORGE:
4  Q.  Does Exhibit 222 appear to be a copy of a two
5  e-mail e-mail chain that concludes with an e-mail
6  from Don Houston to you, Mr. Lappin, Jorge Dominicis?
7  A.  Dominicis.
8  Q.  Dominicis, dated July 26, 2016, including
9  attachments?
10 A.  Yes, it does.
11 Q.  This -- first of all, who is Mr. Houston?
12 A.  Don Houston is -- or at that time was the
13 president of Correct Care Solutions prisons division.
14 Correct Care Solutions was a medical subcontractor
15 that provides care in a numbers of correctional
16 settings around the country.
17 Q.  I'll just refer to them as CCS, if that's
18 okay with you?
19 A.  Yes, that's fine.
20 Q.  Did CCA contract with CCS to provide medical
21 care at any of the BOP facilities we've been
22 discussing today?
23 A.  At Cibola, yes, we did contract with CCS.
24 Q.  At any of the other BOP facilities did you
25 contract with CCS?

1   A.   No other -- other than Cibola, no.
2   Q.   What was the scope of CCS's responsibility
3   with respect to Cibola?
4   A.   To provide the full range of care that was
5   expected under the contract.
6   Q.   When did that contract commence?
7   A.   Our contract with them, I believe, began in
8   2016, in January.
9   Q.   Who made the decision to effectively
10  outsource the health services function at Cibola?
11  A.   That was a decision that was reached by
12  CoreCivic executive leadership, certainly with my
13  input and involvement.
14  Q.   Which members of the executive leadership at
15  CCA?
16  A.   It would have -- certainly Harley Lappin
17  would have been involved, Damon Hininger. Other
18  members of the executive staff would have been
19  briefed related to the decision.
20  Q.   Who else?
21  A.   That's --
22  Q.   When you say other members of the executive
23  staff, who?
24  A.   So anyone at the senior executive level, the
25  senior vice-president level.

1　Q.　Who would that include?

2　A.　So that would have included our executive

3　vice-president over HR, executive vice-president over

4　finance.

5　Q.　Who are those individuals, give me some

6　names?

7　A.　So David Garfinkle, Kim White, Lucibeth

8　Mayberry would have been the executive vice-president

9　over real estate. I don't know whether this decision

10　necessarily would have gone to her or not, but

11　generally this kind of thing would be talked about

12　among our executive team.

13　Q.　From your perspective, why was the decision

14　made ultimately to outsource the health services at

15　Cibola?

16　A.　Because CCS had a much more robust ability to

17　recruit, certainly in that state. They already had a

18　presence in the Albuquerque area and employed a

19　number of people working in a correctional hospital,

20　working in the large county jail in the Albuquerque

21　area. And as a result of that, we wouldn't be at --

22　you know, competing against each other to try to

23　identify and bring to bear additional staff resources

24　to address turnover and the like.

25　　So not only were they viewed as a trusted

1　A.　Yes.

2　Q.　In Mr. Hall's e-mail he notes that "We were

3　successful in getting the repeat deficiencies in

4　health services reduced from six to four, but they

5　did not remove the significant finding;" do you see

6　that?

7　A.　Yes, I do.

8　Q.　And although that is literally true, the

9　realty is that change was just a matter of combining

10　different deficiencies into one deficiency that we

11　discussed earlier about the immunizations, right?

12　A.　Yes, I recall that, yes.

13　Q.　So it's still the same number of deficiencies

14　repeated, but the way they were combined changed,

15　right?

16　　　　MR. GLENNON:　Objection, mischaracterizes

17　his testimony.

18　　　　THE WITNESS:　The way -- my understanding

19　is the way they counted them reflected what their

20　prior practice was instead of a change in their audit

21　tool that they had implemented.

22　BY MR. FORGE:

23　Q.　So it was a counting issue, rather than a

24　deficiencies issue?

25　　　　MR. GLENNON:　Same objection.

1　　　　　THE WITNESS: Correct.

2　　BY MR. FORGE:

3　　Q.　So if you turn to -- does the first Bates

4　　number on your exhibit end 648?

5　　A.　Yes.

6　　Q.　If you turn to Bates page -- well, 649, does

7　　this appear to be a true and correct copy of a letter

8　　from the BOP to Warden Bedard of Eden that reflects

9　　the agency's response to the Contractor's dispute of

10　　the CFM report?

11　　A.　Yes, it does appear to be.

12　　Q.　If you look at Page 5 of that letter, which

13　　is Bates Page 653, do you see under staffing it

14　　states that "At the time of the review, August 5th

15　　through 7th, 2014, CFM reviewing staff were informed

16　　by the HSA contractor personnel and BOP on-site staff

17　　that the on-site physician quit his full-time

18　　position in December 2013. Since then he only

19　　performed on-site services on occasional (not every)

20　　weekends. Additionally, your response verifies that

21　　an on-site full-time physician was only recently

22　　hired August 11, 2014."

23　　　　　Do you see that?

24　　A.　Yes, I do.

25　　Q.　Is that paragraph accurate, as far as you

1  know?

2  A.     As far as I know, yes, it is.

3  Q.     So does that mean that there were

4  approximately eight months without a doctor on site

5  most of the time?

6         MR. GLENNON:  Objection, foundation.

7         THE WITNESS:  Certainly it reflects that

8  we did not have a full-time person in that role for

9  about eight months.  The relative number of hours

10  that were contributed would have varied based on the

11  doctor's availability in coming back to us on

12  weekends.

13  BY MR. FORGE:

14  Q.     Well, it says, "He only performed on-site

15  services on occasional weekends," right?

16  A.     That's correct.

17  Q.     So that still leaves a majority of the time

18  of a week in which there's no doctor available,

19  right?

20  A.     Yes.

21  Q.     And the next under -- next paragraph it says,

22  "It was also determined during the review that nine

23  other positions were vacant, six nurses, a dentist, a

24  medical records clerk, and a dental assistant, as

25  indicated on a document obtained during the review."

1　　　　Is that accurate?

2　A.　I trust that it is as stated.

3　Q.　Next paragraph it says, "Your claim to be

4　unaware of documentation discrepancies is

5　contradicted by this CFM review findings, which were

6　reported to you in detail."

7　　　　Do you have any understanding as to why it is

8　that CCA responded with a defense that was

9　contradicted by the CFM review findings?

10　　　　MR. GLENNON: Objection, foundation,

11　assumes facts.

12　　　　THE WITNESS: I can't speculate without

13　seeing the response and seeing the review, working

14　papers.

15　BY MR. FORGE:

16　Q.　Turning to Page 657, which is Page 9 of the

17　actual letter, do you see the repeat deficiency for

18　health services medical management of inmate prior to

19　death?

20　A.　Yes.

21　Q.　Do you see that the final CFM decision was

22　that the repeat deficiency is supported and remains

23　as originally written?

24　A.　Yes.

25　Q.　And it goes on to say, "The incident you

# REPORTER'S CERTIFICATE

STATE OF TENNESSEE

COUNTY OF SUMNER

    I, JENNY CHECUGA, Licensed Court Reporter, with offices in Nashville, Tennessee, and Registered Professional Reporter, hereby certify that I reported the foregoing video recorded deposition of JOHN BAXTER by machine shorthand to the best of my skills and abilities, and thereafter the same was reduced to typewritten form by me.

    I further certify that I am not related to any of the parties named herein, nor their counsel, and have no interest, financial or otherwise, in the outcome of the proceedings.

    Further, that if the foregoing pertains to the original transcript of a deposition in a federal case, before completion of the proceedings, review of the transcript [ X ] was [  ] was not requested.

    I further certify that in order for this document to be considered a true and correct copy, it must bear my original signature and that any unauthorized reproduction in whole or in part and/or transfer of this document is not authorized, will not be considered authentic, and will be in violation of Tennessee Code Annotated 39-14-104, Theft of Services.

Dated: January 7, 2020

_____
JENNY CHECUGA, LCR, RPR
Licensed Court Reporter (TN)
Notary Public State of Tennessee

My Notary Commission Expires: 5/22/2023
LCR #690 - Expires: 6/30/2020