# EXHIBIT 96

Page 1

1          IN THE UNITED STATES DISTRICT COURT

        FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5    Situated,

6                Plaintiff,

vs.                    CASE NO.

7                      3:16-CV-02267

CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                Defendants.

10

11

12

13              CONFIDENTIAL

14     VIDEO DEPOSITION OF HARLEY G. LAPPIN

15     Reported Remotely through Videoconference

16              July 28, 2020

17

18

19

20   Reported by:

21   Elisabeth A. Miller Lorenz

22   RMR, CRR, LCR No. 66

23

24   Job No.:  10071101

25

1          IN THE UNITED STATES DISTRICT COURT

           FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4     NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5     Situated,

6                    Plaintiff,

vs.                        CASE NO.

7                          3:16-CV-02267

CORRECTIONS CORPORATION OF

8     AMERICA, et al.,

9                    Defendants.

10

11

12

13

14

15

16

17          Video deposition of HARLEY G. LAPPIN was

18     taken on behalf of Plaintiff, Reported Remotely

19     through Videoconference, beginning at

20     11:08 A.M. EST, and ending at 10:28 p.m. EST, on

21     Tuesday, July 28, 2020, before Elisabeth A. Miller

22     Lorenz, RMR, CRR, and LCR No. 66.

23

24

25

1    APPEARANCES:
2      For the Plaintiff:
3        ROBBINS GELLER RUDMAN & DOWD
      BY:  CHRISTOPHER H. LYONS
4        BY:  CHRISTOPHER WOOD
14 Union Street
5        Suite 900
      Nashville, Tennessee 37219
6        615.252.3798
      clyons@rgrdlaw.com
7        cwood@rgrlaw.com
8        ROBBINS GELLER RUDMAN & DOWD
      BY:  JASON A. FORGE
9        655 West Broadway
      Suite 1900
10        San Diego, California 92101
      619.231.1058
11        jforge@rgrdlaw.com
12
13      For the Defendants:
14        RILEY, WARNOCK & JACOBSON
      BY:  TREY McGEE
15        1906 West End Avenue
      Nashville, Tennessee 37203
16        615.320.3700
      tmcgee@rwjplc.com
17
      LATHAM & WATKINS
18        BY:  ERIC C. PETTIS
      BY:  BRIAN T. GLENNON
19        355 South Grand Avenue
      Los Angeles, California 90071-1560
20        213.485.1234
      eric.pettis@lw.com
21        brian.glennon@lw.com
22
23      Also Present:
24      Kirill Davidoff, Videographer
25

1                     * * *

2                 HARLEY G. LAPPIN

3    was called as a witness, and after having been first

4    duly sworn, testified as follows:

5                 THE VIDEOGRAPHER:  Please proceed.

6                 E X A M I N A T I O N

7    BY MR. FORGE:

8    Q      Good morning, Mr. Lappin.  This is

9    Jason Forge.

10           Can you hear me?

11   A      Yes, I can, sir.

12   Q      Mr. Lappin, I think we've all gotten an

13   introduction to Zoom over the past several months.

14           Have you used Zoom previously?

15   A      Infrequently.  I have used Skype, so there

16   are some similarities.

17   Q      So you know that everything we say generally

18   speaking can only be transmitted on one side at a

19   time.  So if I'm talking, it doesn't really work if

20   you're talking at the same time.

21           Okay?

22   A      Yes, sir.

23   Q      Of course, that works in reverse.  Whenever

24   you're talking, I'll do my best to avoid cutting you

25   off or speaking over you.

1    guidelines had multiple parts, so there was an

2    overarching subject matter area with a number of

3    parts that -- that were utilized as part of that one

4    guideline.

5             So it very well could be that you met

6    all the criteria with the exception of one part, and

7    it would be a repeat -- or a finding.  You come back

8    the next time, and you've got that piece fixed, but

9    one of the other parts -- so these cascade.

10             And so I just want to make sure I'm

11    clear that it could occur that we missed the same

12    part each time, but oftentimes we had corrected that

13    deficiency but then missed another part within that

14    same deficiency, which would result in a repeat or a

15    repeat repeat and so on.

16             So it's not like these deficiencies,

17    which there were many guidelines, many guidelines,

18    especially in medical, an enormous amount of detail

19    within each of those guidelines.

20             So I don't even want to guess at how

21    many guidelines there were applicable to medical.

22    But even within those guidelines, there were a

23    cascading array of -- of components, somewhat

24    related to the overarching guideline.

25             So reality is, you may fix one part

1    that was deficient previously and come back and

2    you've corrected that, but a second part of that

3    same guideline was deficient.  The entire deficiency

4    is then a repeat.  So the bar is very, very high and

5    in an area of significant challenge with lots of

6    detail and lots of requirements.  So I just wanted

7    to make sure that was clear.

8              But, no, I do not recall us publishing,

9    again, or informing the public or others.

10             Now, again, I was not at many of the

11   analyst days, and I didn't -- I didn't get an

12   overview of what was released.

13             But to my knowledge, we did not

14   publicly announce or inform about the internal

15   workings of the monitoring of the Bureau of

16   Prisons -- of our contracts with the Bureau of

17   Prisons.

18   BY MR. FORGE:

19   Q     And by internal workings, in this context,

20   you're saying you did not publicly disclose whenever

21   you received significant findings in health

22   services, for example?

23             MR. GLENNON:  Objection to form.

24             THE WITNESS:  No, I mean, there was

25   always -- I'm just going -- whether I was in the

1    Bureau of Prisons and receiving audits from our

2    facilities on medical reviews or in CoreCivic, there

3    were always deficiencies in medical, always.  It was

4    not unique to CoreCivic.  It was the nature of the

5    business, given the complexity of managing and

6    providing health and mental health care in a prison

7    setting and the rigorous requirements requested by

8    the customer.

9            So at the Bureau of Prisons, my own

10    audit process, never could I remember getting a

11    clean audit in medical.

12            So I just want to put it into

13    perspective, very, very challenging area, very

14    detailed, very rigorous, and -- so this is not at

15    all uncommon -- an uncommon outcome in the

16    correctional setting, at least in my experience, my

17    30-plus years of experience in the Bureau of Prisons

18    and CoreCivic, let alone the communication I had

19    with other directors of corrections who are

20    similarly situated with challenges in -- in

21    providing mental -- medical and mental health care.

22    BY MR. FORGE:

23    Q     So if we could just kind of redirect your

24    attention to the actual question I posed to you,

25    which was, you did not publicly disclose whenever

1    you received significant findings in health

2    services, did you?

3    A      Did not.

4    Q      You could have disclosed the fact that you

5    were receiving significant findings in health

6    services and given that entire explanation you just

7    gave to us, right?  You could have done that?

8            MR. GLENNON:  Objection, foundation.

9            THE WITNESS:  We could have done that.

10   BY MR. FORGE:

11   Q      I'm sorry?

12   A      We could have done that.

13   Q      But you didn't, did you?

14   A      Again, I --

15           MR. GLENNON:  Objection, foundation.

16           THE WITNESS:  We did not publicly

17   disclose these unless we were asked about them, and

18   it was a common -- I -- I think amongst most of our

19   investors they understood that deficiencies occurred

20   as we have audits and reviews.

21   BY MR. FORGE:

22   Q      So tell me -- tell me -- identify for me a

23   single investor who acknowledged to you an awareness

24   that CCA was receiving significant findings in

25   health services for Cibola and Eden?

1   A      I can't --

2            MR. GLENNON:  Objection, foundation

3   and -- and compound.

4            THE WITNESS:  Yeah, so I -- I didn't

5   interact with the investors that much, and so at our

6   annual meeting, there were occasions when someone

7   brought this -- raised the issue of findings,

8   whether it's state, federal, local, wherever it was

9   being initiated.

10           And we responded to those openly,

11   acknowledged, yes, there were some deficiencies in

12   these areas, and here's what we're doing to correct.

13   So it was not a secret by any means.

14           My guess is, anybody that gets audited

15   and the auditors are doing their jobs -- that's what

16   auditors do.  They look for problems; they look for

17   issues.

18           So this is commonplace far beyond

19   corrections.  Hospitals, schools, so on and so

20   forth.

21           So I think -- I think -- I would assume

22   that most shareholders that have any interest

23   recognize that when you're being reviewed and

24   audited, you're going -- there's going to be some

25   deficiencies.

1    inmate speaks Spanish, correct?

2    A       I would assume that it does if the probation

3    officer had done the job they are expected to do.

4    Q       So as chief corrections officer, you would

5    agree with me that effective intelligence gathering

6    is critical to the safe operation of a prison,

7    correct?

8            MR. GLENNON:  Objection, vague.

9            THE WITNESS:  Yes.

10   BY MR. FORGE:

11   Q       You would agree that effective intelligence

12   gathering is critical to the effective operation of

13   a prison, correct?

14   A       Could you repeat it?

15           MR. GLENNON:  Same objection.

16   BY MR. FORGE:

17   Q       Yes.

18          Effective intelligence gathering is critical

19   to the, I'll say, efficient operation of a prison?

20           MR. GLENNON:  Same objection.

21           THE WITNESS:  Yes.

22   BY MR. FORGE:

23   Q       In all your career with all the BOP

24   facilities you oversaw, can you identify any

25   systemic failure in intelligence gathering that was

1    worse than CCA's failure to have a single

2    Spanish-speaking intelligence officer for the

3    intelligence section at Adams?

4          MR. GLENNON:  Objection, vague,

5    foundation.

6          THE WITNESS:  Repeat the question.

7    BY MR. FORGE:

8    Q      Sure.

9          In all of your career, can you identify for

10   me a single systemic failure in intelligence

11   gathering that was worse than CCA's failure to have

12   a single Spanish-speaking intelligence officer at

13   Adams?

14         MR. GLENNON:  Same objection.

15         THE WITNESS:  I don't -- I don't

16   consider it a failure.  I think -- I think it's not

17   uncommon, in my experience, 30-plus years, lots of

18   prisons with many Spanish-speaking inmates and

19   inmates from other countries, to have an

20   intelligence office that may not have a

21   Spanish-speaking member.

22         That has never, in my experience,

23   precluded us from gathering the intelligence we

24   needed to monitor the inmate population.

25

1    BY MR. FORGE:

2    Q      Can you identify for me a single BOP

3    facility with a -- where the majority of the

4    population was Spanish speaking, yet the BOP

5    facility lacked a single Spanish-speaking

6    intelligence officer?

7    A      There are no Bureau of Prisons -- at least

8    while I was director of Bureau of Prisons and prior,

9    there were no Bureau of Prisons facilities that

10   operated with a majority or 100 percent of their

11   facility being Spanish speaking.  Did not exist.

12   Q      Okay.

13   A      It didn't exist --

14          MR. GLENNON:  Hold on.  Hold on.  Hold

15   on, Jason.  Let him answer the question, please.

16          THE WITNESS:  It didn't exist because

17   they knew that a safer prison was one that had a

18   more balanced population, that is a mixture of

19   non-U.S. citizens, a mixture -- non-U.S. citizens

20   with U.S. citizens, a balance in the way of race,

21   age, and -- age, race, gangs, in the way of gangs.

22          So the Bureau operated internally a

23   balanced inmate population as best they could,

24   taking into consideration the number of non-U.S. and

25   U.S. citizens, the number of -- number of different

1          THE WITNESS:  Again, I -- I don't have

2    a -- an e-mail reflecting that.  I don't recall the

3    conversation.  I would have probably pushed back on

4    Mike.  I think he was emotional and overreacting a

5    little bit about the situation.  He's a guy that

6    expects perfection.  And it wasn't meeting his

7    expectation, and he was sharing that with his

8    colleague.

9    BY MR. FORGE:

10   Q      So did you disagree with the sentiment that

11   we have addressed these issues -- and I'm talking

12   about medical -- health services issues -- we have

13   addressed health services issues too many times

14   without any positive results?  Did you disagree with

15   that sentiment?

16   A      I would disagree --

17          MR. GLENNON:  Object to form.

18          THE WITNESS:  I would disagree with

19   that sentiment.

20   BY MR. FORGE:

21   Q      But you don't know whether you ever actually

22   expressed your disagreement, right?

23   A      I don't.

24   Q      And next he states, My crew stands ready to

25   assist you in whatever means necessary to correct

1　the continuous medical problems at our Cibola

2　facility.

3　　　　Do you agree or disagree that there were

4　continuous medical problems at the Cibola facility?

5　　　　　MR. GLENNON:  Objection, vague.

6　　　　　THE WITNESS:  We continued to have some

7　deficiencies.  I -- I think the situation was much

8　improved in the aftermath of the cure notice, and we

9　were -- we were moving in a positive direction.

10　BY MR. FORGE:

11　Q　　If you could, please, turn to Tab 103.

12　　　　　MR. FORGE:  I'm going to mark this as

13　Exhibit 487.

14　　　　　(Marked Exhibit No. 487.)

15　　　　　MR. GLENNON:  Jason, did you post this

16　to the chat box?

17　　　　　MR. FORGE:  I'm doing that right now.

18　BY MR. FORGE:

19　Q　　Is Exhibit 487, Mr. Lappin, is that a

20　document that bears a Bates No. 0058340?

21　A　　Yes.

22　Q　　Does that appear to be a -- an e-mail chain

23　between various CCA employees that begin with an

24　e-mail from John Baxter to you, among others?

25　A　　Yes.

1    Q      And is the subject -- is it dated June 16th,

2    2016?

3    A      The e-mail from John is dated June 15th; the

4    e-mail above that is dated June 16th.

5    Q      And the subject for the e-mail was Cibola

6    medical review, correct?

7    A      Yes.

8    Q      Do you see that Jeb Beasley wrote, We are

9    dead?  Do you see that?

10   A      I do.

11   Q      Did you agree as of June 16th, 2016, that

12   CCA was in jeopardy of not getting a renewal of the

13   Cibola contract?

14            MR. GLENNON:  Objection, foundation,

15   calls for speculation.

16            THE WITNESS:  I was not part of that --

17   part of that e-mail, and, you know, I can't recall

18   exactly what I was thinking on that date.  I never

19   give up.  And until I'm told otherwise, I made the

20   assumption we were going to be running Cibola into

21   the future.

22   BY MR. FORGE:

23   Q      So -- so irrespective of the --

24   A      I was not in agreement that we were dead.

25   Q      But I didn't ask you if you were dead.  I

1 asked you if you felt as of June of 2016 that CCA

2 was in jeopardy of losing the Cibola facility as far

3 as not getting it renewed.

4    MR. GLENNON:  Same objections.

5    THE WITNESS:  Again, remained

6 optimistic and allowed them to work through the

7 process.

8 BY MR. FORGE:

9 Q  So you did not consider there to be any

10 unusual risk as of June of 2016 concerning --

11    MR. GLENNON:  Objection.

12 BY MR. FORGE:

13 Q  -- on the --

14    MR. GLENNON:  I'm sorry, Jason, I

15 didn't mean to cut you off.

16    Objection, vague.

17    THE WITNESS:  Given the way our

18 contracts are written, they're -- they're always at

19 risk.  Most of the contracts have a 30- or 60-day

20 out.  Anybody could come along at any time and say,

21 Geez, we don't need the beds anymore; we want -- we

22 want to end the contract.

23    So, you know -- from my perspective, I

24 was running prisons, and I was doing the level best

25 we could to perform at the highest level.  And so I

1    didn't get too bogged down in this.  I was very

2    optimistic that we could continue to perform at an

3    adequate level, and we continued in that direction.

4    BY MR. FORGE:

5    Q       So to answer my question, you did not -- as

6    of June of 2016, you did not consider there to be an

7    unusual risk of losing Cibola?

8               MR. GLENNON:  Object to form, vague.

9               THE WITNESS:  Again, always thought

10   there was risk, granted.  Given some of the

11   challenges we had at Cibola, I -- I probably would

12   lean towards more concern than I had at other

13   contracts.

14   BY MR. FORGE:

15   Q       If you can, please, turn to the next tab,

16   which is 104.

17              MR. FORGE:  I will mark that as

18   Exhibit 488.

19              (Marked Exhibit No. 488.)

20              THE WITNESS:  Okay.

21              MR. GLENNON:  Jason, I trust this is

22   going to come up on the chat -- chat box.

23              MR. FORGE:  You got it.

24              MR. GLENNON:  Thank you.

25

1    BY MR. FORGE:

2    Q       The Bates number that you're looking at,

3    0045369?

4    A       Yes.

5    Q       And do you see that Bart VerHulst --

6    Bart VerHulst is -- wrote on June 16th, 2016, to

7    Jeb Beasley, I see no way to save Cibola?

8    A       I see that.

9    Q       You see that?

10           And I think you said earlier you disagree

11   with that sentiment.

12           MR. GLENNON:  Objection, vague,

13   foundation.

14           THE WITNESS:  I wasn't a part of this

15   discussion.

16           But if you're asking me -- as I said

17   prior, I remained very optimistic about all of our

18   facilities until someone says otherwise.

19           So, no, I -- I continued to perform --

20   work with the expectation we could continue to

21   perform at Cibola satisfactorily.

22   BY MR. FORGE:

23   Q       Did you say continue to perform at Cibola

24   satisfactorily?

25   A       Yes.

Page 242

1    reasons the BOP conveyed for the loss of that

2    contract was CCA's past performance, correct?

3              MR. GLENNON:  Objection, foundation.

4              THE WITNESS:  That's typical of any

5    review.  But -- yeah, they look at past performance.

6    BY MR. FORGE:

7    Q      But you're aware that the BOP conveyed that

8    one of the reasons why CCA did not receive -- why it

9    lost the Northeast Ohio Correctional Center contract

10   was due to past performance, correct?

11             MR. GLENNON:  Objection, foundation,

12   vague, form.

13             THE WITNESS:  They -- they evaluate

14   past performance, and typically that's at the

15   facility that's being rebid.

16   BY MR. FORGE:

17   Q      But in this particular instance, the BOP

18   actually said it was poor past performance at other

19   facilities that contributed to CCA's failed bid,

20   correct?

21             MR. GLENNON:  Same objection.

22             THE WITNESS:  Yeah, not that I recall.

23   I mean, I'm reading the response from the BOP, and

24   it's pretty generic.

25             And there was a lot of variation in --

1    you know, I don't -- I don't know exactly what all

2    they considered.

3    BY MR. FORGE:

4    Q      So is it your testimony that you were

5    completely unaware of the BOP conveying that one of

6    the reasons CCA did not obtain the contract for

7    Northeast Ohio Correctional Center was due to past

8    performance in other facilities?

9              MR. GLENNON:  Object to form.

10             THE WITNESS:  I don't recall -- I don't

11   recall that specifically.  Again, I'm relying

12   somewhat on my experience in -- in the Bureau, and

13   we focused on the performance at the facility.

14             I acknowledge there was discussions

15   about that as well as the -- the shared -- the

16   shared population at Northeast Ohio.  But, you know,

17   I relied solely on their written response as to

18   their reasons for not awarding the contract.

19   BY MR. FORGE:

20   Q      You're -- you're aware there was a debrief

21   with the BOP in which the BOP provided the reasons,

22   correct?

23             MR. GLENNON:  Object to form.

24             THE WITNESS:  As I recall, there was.

25

1    BY MR. FORGE:

2    Q      And you're aware that during that debrief,

3    the BOP explained that one of the reasons was

4    because of past performance at other facilities,

5    correct?

6           MR. GLENNON:  Objection, form,

7    foundation.

8           THE WITNESS:  And I don't recall that

9    specific discussion given how long ago it was and

10   all the other things that were -- were going on at

11   the time.  So I don't recall that specifically.

12   I -- I do not.

13   BY MR. FORGE:

14   Q      Do you recall discussing with anyone at CCA

15   the BOP's source selection decision for this

16   contract?

17          MR. GLENNON:  Objection, vague.

18          THE WITNESS:  Source selection

19   decision?

20   BY MR. FORGE:

21   Q      Yes.

22          As -- as -- you might know it as SSD.

23   A      Sorry, doesn't ring a bell.

24   Q      That doesn't ring a bell with the BOP in

25   your experience?

**Harley G. Lappin**
**Confidential**       **Grae vs.**
**Corrections Corporation of America, et al.**

```
 1              I, the undersigned, a Licensed Court

 2   Reporter of the State of Tennessee, do hereby

 3   certify:

 4              That the foregoing proceedings were

 5   taken before me at the time and place herein set

 6   forth; that any witnesses in the foregoing

 7   proceedings, prior to testifying, were duly sworn;

 8   that a record of the proceedings was made by me

 9   using machine shorthand, which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is a true record of the testimony given.

12              Further, that if the foregoing pertains

13   to the original transcript of a deposition in a

14   federal case, before completion of the proceedings,

15   review of the transcript [ X ] was [  ] was not

16   requested.

17              I further certify I am neither

18   financially interested in the action nor a relative

19   or employee of any attorney or party to this action.

20              IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: August 3, 2020

23   _____

24              Elisabeth A. Miller Lorenz
                RMR, CRR, LCR No. 66
25              Georgia CR No. 5266-8739-6377-3952
```

www.aptusCR.com