# EXHIBIT 97

```
 1            UNITED STATES DISTRICT COURT
 2            MIDDLE DISTRICT OF TENNESSEE
 3
 4     NIKKI BOLLINGER GRAE, Individually
       and on Behalf of All Others
 5     Similarly Situated,
 6            Plaintiff,        Civil Action No.
 7     vs.                      3:16-cv-02267
 8     CORRECTIONS CORPORATION OF
       AMERICA, ET AL.,
 9
              Defendants.
10
       _____
11
12
13
14       VIDEOTAPED DEPOSITION OF WILLIAM DALIUS
15
16     Conducted virtually via remote videoconference
17               October 28, 2020
18
19
20
21
22
23     Reported by:
       Misty Klapper, RMR, CRR
24       Job No.: 10073531
25
```

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF TENNESSEE
 3
 4     NIKKI BOLLINGER GRAE, Individually
       and on Behalf of All Others
 5     Similarly Situated,
 6             Plaintiff,        Civil Action No.
 7     vs.                       3:16-cv-02267
 8     CORRECTIONS CORPORATION OF
       AMERICA, ET AL.,
 9
               Defendants.
10
       _____
11
12
13
14
15
16
17       Videotaped deposition of WILLIAM DALIUS, taken on
18       behalf of Plaintiff, via Zoom remote videoconference,
19       beginning at 10:30 a.m. CST on Wednesday, October 28, 2020,
20       before Misty Klapper, RMR, CRR.
21
22
23
24
25
```

```
 1   APPEARANCES:
 2   (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
 3   ON BEHALF OF PLAINTIFF:
 4        CHRISTOPHER HAMP LYONS, ESQUIRE
      ROBBINS GELLER RUDMAN & DOWD LLP
 5        414 Union Street, Suite 900
      Nashville, Tennessee 37219
 6        (615) 244-2203
      E-mail: clyons@rgrdlaw.com
 7
              AND
 8
      KENNETH J. BLACK, ESQUIRE
 9        ROBBINS GELLER RUDMAN & DOWD LLP
      Post Montgomery Center
10        One Montgomery Street, Suite 1800
      San Francisco, California 94104
11        (415) 288-4545
      E-mail: kennyb@rgrdlaw.com
12
13
14
15   ON BEHALF OF DEFENDANTS:
16        MILTON S. McGEE, III, ESQUIRE
      RILEY, WARNOCK & JACOBSON
17        1906 West End Avenue
      Nashville, Tennessee 37203
18        (615) 320-3700
      E-mail: tmcgee@rwjplc.com
19
              AND
20
      MORGAN E. WHITWORTH, ESQUIRE
21        LATHAM & WATKINS, LLP
      505 Montgomery Street, Suite 2000
22        San Francisco, California 94111-2562
      (415) 391-0600
23        E-mail: morgan.whitworth@lw.com
24
25   ALSO PRESENT:  DeSHAWN WHITE, VIDEO OPERATOR
```

1　　　　　　The court reporter may now swear in
2　　　　or affirm the deponent.
3　　　　　　MS. REPORTER: One moment.
4　　Whereupon:
5　　　　　　WILLIAM DALIUS,
6　　was called for examination, and, after being duly
7　　sworn, was examined and testified as follows:
8　　　　　　MS. REPORTER: You may proceed.
9　　　　EXAMINATION BY COUNSEL FOR PLAINTIFF
10　　　　　BY MR. LYONS:
11　　　Q.　Good morning, Mr. Dalius. How are
12　　you?
13　　　A.　Good morning. Doing well. How are
14　　you?
15　　　Q.　Good. Thanks.
16　　　　　So you -- you recall, I assume, that
17　　you -- you had your deposition taken once in this
18　　case already, right?
19　　　A.　That's correct.
20　　　Q.　And you were under oath in that
21　　deposition, right?
22　　　A.　Correct.
23　　　Q.　The testimony you gave was -- was the
24　　whole truth and nothing but the truth; is that
25　　right?

```
 1    looked at the overall picture when we did
 2    evaluations of prisons.
 3        Q.   Did you compare the numbers of
 4    correctional staff deaths between CCA-operated
 5    prisons and BOP-operated prisons?
 6        A.   No, sir.  As I indicated, we looked
 7    at it as a whole.
 8        Q.   Did you compare the number of inmate
 9    deaths due to inadequate delivery of medical
10    services between CCA-operated -- operated prisons
11    and BOP-operated prisons?
12        A.   We looked at -- we -- we -- we
13    evaluated deaths as a system overall.
14        Q.   Did you compare the numbers of
15    significant findings between BOP-operated prisons
16    and CCA-operated prisons?
17        A.   I personally did not, but I will say
18    that significant findings happen at every prison,
19    so they -- all prisons have findings, whether
20    they be private prisons or BOP prisons.
21        Q.   Did you compare the numbers of repeat
22    deficiencies at CCA-operated prisons to
23    BOP-operated prisons?
24        A.   No, sir.  As I indicated before, we
25    looked at -- when I was doing evaluations I
```

1  looked at all the facilities. BOP and CoreCivic
2  and -- every prison has repeat deficiencies.
3  It's unavoidable. It's the nature of the
4  business.
5      Q.   Did you compare the numbers of double
6  repeat deficiencies between CCA-operated prisons
7  and BOP-operated prisons?
8      A.   I did not. Again, as I indicated, we
9  looked at -- at universe overall.
10     Q.   Did you compare the numbers of triple
11 repeat deficiencies between CCA-operated prisons
12 and BOP-operated prisons?
13     A.   I -- I -- I would give you the same
14 answer. It -- it -- it -- whether you get to
15 that point and you have systemic issues that
16 occur, that would be brought to somebody's
17 ==attention, but it's not uncommon for facilities==
18 ==to have repeat deficiencies.==
19     Q.   So you'd agree that a triple repeat
20 deficiency indicates that you have a systemic
21 problem that is occurring, right?
22          MR. MCGEE: Object to the form of
23     the question.
24          THE WITNESS: It depends on the
25     deficiency.

1　　　　I'm sorry.
2　　　　BY MR. LYONS:
3　　Q.　And did you compare the numbers of
4　quadruple repeat deficiencies between the
5　CCA-operated BOP prisons and the BOP-operated
6　prisons?
7　　A.　Again, we reviewed all facilities'
8　operations. And if there are systemic issues, we
9　would look at the magnitude, what the
10　deficiencies are and whether or not we had to
11　provide some type of correction action --
12　corrective action, whether it be a BOP facility
13　or a private facility.
14　　Q.　But in terms of your analysis
15　comparing CCA's operational performance to the
16　BOP's operational performance, you didn't do
17　any -- any rigorous analysis of the numbers of
18　all those types of repeat deficiencies and
19　significant findings between CCA-operated prisons
20　and BOP prisons, did you?
21　　A.　I personal --
22　　　　MR. MCGEE: Object to the form of
23　the question.
24　　　　THE WITNESS: I personally did not
25　do that. We had staff in our program

1       (Thereupon, a discussion was had off
2        the record.)
3       (Thereupon, at 12:44 p.m. CST, a
4        lunch recess was taken.)
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1　　　　　AFTERNOON SESSION　(1:22 p.m. CST)

2　　　　　VIDEO OPERATOR: The time is

3　1:22 p.m. and we are now on the record.

4　　　　　MR. LYONS: Thanks.

5　　　　　BY MR. LYONS:

6　　　Q.　Mr. Dalius, could you please turn

7　back to Exhibit 589, which is defendants'

8　disclosures.

9　　　A.　Was that --

10　　　Q.　It was tab 1 if that helps, T1.

11　　　A.　Oh, that's the -- the FRCP 26?

12　　　Q.　Yes.

13　　　A.　Okay. I'm -- I'm there.

14　　　Q.　Looking under the -- that first

15　heading, number 1, Subject Matter of Testimony,

16　do you see where the last sentence says,

17　Mr. Dalius may also testify about his

18　expectations for the renewal and retention of

19　CoreCivic's BOP contracts?

20　　　　You see that?

21　　　A.　Yes.

22　　　Q.　And then also looking at the last

23　sentence under heading 2, do you see where it

24　says, Mr. Dalius may also testify that he

25　expected CoreCivic's BOP contracts to be renewed

1　　based on the knowledge and experience he gained
2　　from serving as a senior executive with the BOP
3　　and CoreCivic?
4　　　　A.　Yes, sir.
5　　　　Q.　You see that?
6　　　　　　At what time do you plan to testify
7　　that you expected CoreCivic's BOP contracts to be
8　　renewed?
9　　　　　　MR. MCGEE:　Object to the form of
10　　　the question.
11　　　　　　THE WITNESS:　So was this -- was
12　　　this in my prior role or my current role?
13　　　　　　BY MR. LYONS:
14　　　　Q.　That's my question partly.
15　　　　A.　I -- in my current role I expect them
16　　all to be renewed.
17　　　　Q.　But do you plan to testify that as of
18　　February 27, 2012 to August 17, 2016 you
19　　specifically expected CoreCivic's BOP contracts
20　　to be renewed?
21　　　　A.　I expected all private contracts to
22　　be renewed unless there was just some really
23　　undistinguished or something -- something that
24　　may have occurred that -- that they would have
25　　violated the contract.

1  Q. So if -- if the BOP did not renew a
2  contract, that would mean that something --
3  something bad happened that -- that violated the
4  contract?
5         (Crosstalk)
6         MR. MCGEE: Object -- object to the
7  form of the question.
8         Go -- go ahead, Bill.
9         THE WITNESS: Okay. And -- and I'm
10 sorry to the court reporter. I know I
11 jumped in.
12        Not necessarily -- not -- not
13 necessarily, sir. Contracts were not
14 renewed for a number of reasons, but
15 typically, from my recollection, the reason
16 contracts were not awarded was a cost
17 reason.
18        So if the contracts were currently at
19 a higher level than what the market was
20 showing, the -- the possibility of not
21 getting renewal occurred.
22        BY MR. LYONS:
23 Q. So what about contracts rebids? Did
24 you expect that when CoreCivic's BOP contracts
25 were rebid that CoreCivic would win the -- the

1      Q.    Is there a document somewhere that
2      shows somebody telling you that we are awarding
3      this contract to GEO instead of CCA exclusively
4      because of the housing of multiple populations?
5      A.    I don't know the answer to that.
6      Could be. Don't know.
7      Q.    And if Mr. Hininger told CCA's board
8      of directors that one of the two reasons that the
9      CCA proposal for requirement A was unsuccessful,
10     was -- in the past performance section of our
11     proposal, concerns about our performance in
12     medical services at our Cibola, New Mexico and
13     Eden, Texas facilities were raised, was he
14     misleading the CCA board of directors?
15            MR. MCGEE: Object to the form of
16        the question.
17            THE WITNESS: I -- I can't speak
18        for Mr. Hininger. I'm not sure what he
19        told the board of directors.
20            BY MR. LYONS:
21     Q.    Looking back at Exhibit 589, the
22     penultimate sentence, you see it begins with
23     Mr. Dalius may also testify that CoreCivic
24     delivers comparable correctional services at a
25     lower cost than the BOP and describe the various

1    cost components supporting that opinion?
2    A.    Yes, sir, I see that.
3    Q.    Do you plan to give that testimony?
4    A.    Yes, sir.
5    Q.    What are the cost components you plan
6    to testify about in that regard?
7    A.    I -- I can tell you the major drivers
8    and the difference between cost between CoreCivic
9    and the BOP are the BOP does not include capital
10    expenditures.  So if they go build a $350 million
11    low security prison, that is not included in
12    their daily per capita that they publish to the
13    Congress.
14         BOP pensions from retirees are not
15    included in the BOP per capita.  They -- they
16    average national -- what they would call
17    national-type expenses that are, like, phone and
18    postage and things that are captured nationally
19    and prorate that across the system.  So it
20    could -- could -- could be off a little bit by
21    those areas.  But the major drivers are the CapEx
22    things and any -- any -- when I say CapEx, the
23    construction of the facilities themselves is not
24    included, any major -- any major renovations over
25    $10,000 would not be included in their

1   per capita, whereas with CoreCivic, we have to
2   include those in our costs. I mean, that's
3   what -- we've -- we've got to maintain -- we've
4   got to cover all of our cost of operations in
5   order to function.
6           So there -- there's -- there's a -- a
7   multitude of things that the BOP omits. If they
8   have a riot in a facility, they take those
9   expenses out against that facility. Say they had
10  a riot in a low security facility. They would
11  exclude those. If they've got a major medical
12  catastrophic -- say a guy had a heart attack,
13  went downtown and it cost 300,000 to fix the
14  heart attack or an inmate put on a med that cost
15  several hundred thousand, they -- they exclude
16  those costs.
17          And I know that because I developed
18  the per capita for the Bureau of Prisons when I
19  worked in budget execution. So it's -- it's --
20  it's really -- you can make an apples-and-apples
21  by adding those things back into BOP's
22  per capita, but the -- clearly the cost for
23  CoreCivic is much lower than it is for the BOP.
24      Q.  Are there any other cost components
25  that you plan to testify about?

1  A. They would be the major components
2  that -- that have the biggest impact on -- on the
3  differences.
4  Q. So any other components you don't
5  think would have a material impact?
6  A. They would have the most material
7  impact.
8  Q. Can you think of any others that
9  would have a material impact?
10 A. Not as material as those, but the --
11 the pension and the -- the -- the construction of
12 the actual facilities and the repairs and
13 maintenance of anything over $10,000 are -- are
14 huge components of the cost factors.
15 Q. And then what about on the CCA side
16 of the equation? What costs do you include?
17 A. Well, that's a given because BOP
18 knows exactly what they're paying for the
19 per diem. So they're all -- they're all
20 included. When we bid on a job, we've got to
21 include all of our costs.
22 Q. So the only cost to the government of
23 CCA operating a BOP prison is a per diem that the
24 government pays to CCA; is that your testimony?
25 A. That's correct. That's correct.

1  Q.  Is there something called a
2  privatization management branch in the BOP?
3  A.  Yes.
4  Q.  Who pays for that?
5  A.  The government, taxpayers, the Bureau
6  of Prisons.
7  Q.  Are there public sector employees who
8  write the contract for a private prison?
9  A.  Anybody that works for the BOP is a
10  public employee.
11  Q.  Is that a yes?
12  A.  Yes.
13  Q.  Okay. Sorry, I didn't mean to cut
14  you off.
15    And who pays for the public sector
16  employees who write the contracts for a private
17  prison?
18  A.  The Bureau of Prisons.
19  Q.  Is it -- it's BOP employees that
20  decide and -- and manage the process of awarding
21  a contract to CCA, right?
22  A.  Yes, sir.
23  Q.  And who pays for that?
24  A.  And -- and -- and the other
25  components.

William Dalius

Grae vs.
Corrections Corporation of America, et al.

```
 1                CERTIFICATE OF NOTARY
 2            I, MISTY KLAPPER, the officer before
 3     whom the foregoing deposition was taken, do
 4     hereby certify that the witness whose
 5     testimony appears in the foregoing
 6     deposition was duly sworn by me; that the
 7     testimony of said witness was taken by me in
 8     shorthand and thereafter reduced to
 9     typewriting by me; that said deposition is a
10     true record of the testimony given by said
11     witness; that I am neither counsel for,
12     related to, nor employed by any of the
13     parties to the action in which this
14     deposition was taken; and, further, that I
15     am not a relative or employee of any
16     attorney or counsel employed by the parties
17     hereto, nor financially or otherwise
18     interested in the outcome of this action.
19            Further, that if the foregoing pertains to
20     the original transcript of a deposition in a federal
21 case, before completion of the proceedings, review
22 of the transcript [ X ] was [ ] was not requested.
23     Dated: November 4, 2020
                                     _____
24                                   Misty Klapper, RMR, CRR
                                     and Notary Public
25
```