# EXHIBIT 99





# THE FEDERAL BUREAU OF PRISON'S EFFORTS TO MANAGE INMATE HEALTH CARE

U.S. Department of Justice
Office of the Inspector General
Audit Division

Audit Report 08-08
February 2008

# THE FEDERAL BUREAU OF PRISONS' EFFORTS TO MANAGE INMATE HEALTH CARE

## EXECUTIVE SUMMARY

The Federal Bureau of Prisons (BOP) is responsible for confining federal offenders in prisons that are safe, humane, cost-efficient, and secure.  As part of these duties, the BOP is responsible for delivering medically necessary health care to inmates in accordance with applicable standards of care.

As of November 29, 2007, the BOP housed 166,794 inmates in 114 BOP institutions at 93 locations.[1]  During FY 2007, the BOP obligated about $736 million for inmate health care.  The BOP provides health care services to inmates primarily through:  (1) in-house medical providers employed by the BOP or assigned to the BOP from the Public Health Service, and (2) contracted medical providers who provide either comprehensive care or individual services.

To control the rising cost of health care, since the early 1990s the BOP has implemented initiatives aimed at providing more efficient and effective inmate health care.  The BOP's on-going initiatives include assigning most inmates to institutions based on the care level required by the inmate, installing an electronic medical records system that connects institutions, implementing tele-health to provide health care services through video conferencing, and implementing a bill adjudication process to avoid costly errors when validating health care-related invoices.  We include a discussion of these cost-cutting initiatives and the effect the initiatives have had on controlling inmate health care costs in the Findings and Recommendations section of this report.

### OIG Audit Approach

The Department of Justice Office of the Inspector General (OIG) initiated this audit to determine whether the BOP:  (1) appropriately contained health care costs in the provision of necessary medical, dental, and mental health care services; (2) effectively administered its medical

---

[1] Appendix V contains a list of the Bureau of Prisons (BOP) institutions.  The BOP housed an additional 33,354 inmates in privately managed, contracted, or other facilities.  For the purposes of this audit, we focused on the medical care provided to inmates housed in BOP facilities.

services contracts; and (3) effectively monitored its medical services providers.

We performed audit work at BOP headquarters and at the following BOP institutions: the United States Penitentiary (USP) Atlanta (Georgia), USP Lee (Virginia), Federal Medical Center (FMC) Carswell (Texas), Federal Correctional Complex (FCC) Terra Haute (Indiana), and FCC Victorville (California). In addition, we surveyed the 88 BOP locations where we did not perform on-site work. The details of our testing methodologies are presented in the audit objectives, scope, and methodology contained in Appendix I.

This audit report contains 3 finding sections. The first finding discusses the BOP's efforts to contain the growth of health care costs and to deliver necessary health care to inmates in a cost-effective manner. The second finding discusses the BOP's administration of medical services contracts. The third finding discusses the BOP's efforts to monitor its medical services providers, both in-house and contract staff.

**Results in Brief**

We found that the BOP has implemented or begun numerous cost containment initiatives since fiscal year (FY) 2000 that appear to have helped it contain inmate health care costs. Although the BOP generally did not maintain analytical data to assess the impact that the individual initiatives had on health care costs, our audit found that the BOP has kept the growth of inmate health care costs at a reasonable level compared to national health care cost data reported by the Departments of Health and Human Services and Labor.

However, we also determined that each of the BOP institutions we tested did not always provide recommended preventive health care to inmates. Our audit found that for almost half of the preventive health services we tested, more than 10 percent of the sampled inmates did not receive the medical service.

In addition, OIG audits of BOP medical contracts have found multiple contract-administration deficiencies, such as inadequate review and verification of contractor billing statements. Several of the contract-administration deficiencies appeared to be systemic. While the BOP had taken action to address individual deficiencies at local institutions, we also found that other BOP institutions lacked appropriate controls in the deficiency areas identified by prior OIG contract audits.

Case 3:16-cv-02267    Document 362-30    Filed 11/20/20    Page 5 of 46 PageID #: 15362

We also identified weaknesses in the BOP's monitoring of health care providers. Specifically, the BOP: (1) did not develop agency-wide guidance to correct apparent systemic problems found during medical-related internal reviews and external audits; (2) did not provide health care providers with current authorization to practice medicine on BOP inmates through privileges, practice agreements, or protocols; (3) had not performed required initial and renewal peer reviews for providers; and (4) had not implemented an effective performance measurement system related to the provision of health care at BOP institutions.

In our report, we make 11 recommendations regarding the BOP's provision of medical care for inmates. These recommendations include: establishing procedures to assess whether individual initiatives are cost-effective and producing the desired results; determining the necessity of performing medical services that generally were not performed by most BOP institutions; providing guidance and procedures to all BOP institutions for performing certain contract administration functions related to inmate health care; and ensuring that privileges, practice agreements, or protocols are established for all practitioners, as applicable.

The remaining sections of this Executive Summary describe in more detail our audit findings.

**Cost Containment**

Since FY 2000, the BOP has implemented or developed at least 20 initiatives designed to improve the delivery of health care to inmates, improve the administration and management of health care, and reduce or contain rising health care costs. As of December 2007, the BOP had implemented 11 of these initiatives and was in the process of implementing the remaining 9 initiatives.

In the following table, we provide a description of four of the BOP's major initiatives. Appendix II contains a description of the 20 initiatives.

| Initiative | Description |
| --- | --- |
| Medical Designations Program | This initiative involves: (1) assigning each inmate a care level from 1 to 4, with 1 being the healthiest inmates and 4 being inmates with the most significant medical conditions; (2) assigning each BOP institution a care level designation from 1 to 4 based on the inmate care level that the institution is staffed and equipped to handle; (3) staffing each institution based on its designated care level; and (4) moving inmates between institutions to match each inmate's care level to the care level of the institution. |
| Medical Staff Restructuring | Under this initiative, the BOP established staffing guidelines for Care Level 1, 2, and 3 institutions. Because institution staffing did not always match the care level staffing guidelines, the BOP had to move medical staff throughout the BOP to implement the guidelines. Institutions that had staff in positions contrary to the guidelines were required to either move the staff to another facility or reassign the staff to another authorized position in the facility. |
| Tele-medicine | This initiative involves the remote delivery of health care using telecommunications technologies such as video-conferencing. |
| Electronic Medical Records | This initiative involves automating the medical records for inmates. The initial system included the capability to: (1) track comprehensive history and physical examination information, (2) schedule inmate medical visits when required, and (3) track medical-related supplies and equipment issued to inmates. The BOP subsequently added a pharmacy module to the system to manage the medications provided to inmates. |

We attempted to determine the effect that the BOP's initiatives had on inmate health care costs. However, while the initiatives had a primary or secondary purpose of reducing or containing health care costs, the BOP could not provide either preliminary cost-benefit analyses or any post-implementation analyses to identify costs reduced or contained by these initiatives. BOP officials believed that preliminary cost-benefit analyses had been performed, but said the documentation of the analyses was no longer available. As for post-implementation analyses, BOP officials told us that the BOP does not collect and maintain cost-related data that would allow it to analyze the cost-effectiveness of each of its health care initiatives. As a result, we recommend that the BOP collect cost-related data for each initiative and use the data collected to analyze whether the initiatives are providing the anticipated cost benefits.

Because the BOP did not maintain cost data for its health care initiatives, we were also unable to assess the impact of each initiative

individually.  Instead, we analyzed the overall effect of the BOP's initiatives on total medical costs.  We compared the BOP's per capita health care costs for calendar years 2000 through 2006 to similar data reported by the Department of Health and Human Services (HHS) and the Department of Labor (DOL).  We found that although the BOP experienced growth in excess of the HHS national average for medical costs and the DOL Consumer Price Index (CPI) for medical costs during some of the earlier years of our review period, the BOP's growth rates since 2002 have declined significantly, even though the growth rates in the HHS national average and the DOL CPI have not.  The following graph shows the results of our comparison.

**Comparison of the Growth Rates of Health Care Costs for BOP HHS, and DOL Health Care Data for Calendar Years 2000 through 2006[2]**



**Source:** BOP Office of Research and Evaluation, BOP Budget Execution Branch, Department of Health and Human Services, and Department of Labor

The above comparison indicates that the BOP has been effective in containing the growth of health care costs.

---

[2]  The BOP's, the Department of Health and Human Services' (HHS) and the Department of Labor's (DOL) per capita health care medical costs are not fully comparable. The BOP's medical per capita costs include costs for services not included in HHS's and the DOL's per capita medical costs and vice versa.  Even though the costs are not fully comparable among the three measures, we believe the cost measures are sufficiently similar for comparison purposes.  The HHS national average cost data was obtained from the HHS report, *National Health Expenditures Aggregate, Per Capita Amounts, Percent Distribution, and Annual Percent Change by Source of Funds: Calendar Years 2005 – 1960* (January 2007).  An updated report showing cost data for 2006 was not available.

**Preventive Health Care**

The BOP periodically develops program statements to disseminate policy on a variety of BOP programs. Appendix VI contains a brief description of the BOP program statements related to the provision of medical, dental, and mental health services to inmates.

The BOP has also established 16 clinical practice guidelines containing diagnostic procedures for specific medical areas, such as preventative health care, coronary artery disease, and hypertension. The Introduction section of this audit report contains a list of the 16 medical areas covered by the clinical practice guidelines. While the guidelines have not been incorporated into the BOP's program statements as policy, the BOP Medical Director told us that BOP institutions are expected to provide the services in the guidelines to the inmates. The Medical Director also told us that the institutions have discretion in whether to follow the guidelines on a case-by-case basis. However, BOP institutions must request and receive approval from the Medical Director to not implement a specific guideline requirement.

To determine whether the institutions were providing expected medical services to inmates, we selected and tested specific medical services listed in the BOP's Preventive Health Care Clinical Practice Guideline. We chose this particular BOP guideline because:

- It addressed care for all inmates, instead of only inmates with specific illnesses;

- It included diagnostic procedures for 9 of the 11 chronic conditions addressed in the other 15 guidelines;

- It contained clearly defined medical services that could be reasonably tested;

- Health promotion and disease prevention is a primary objective of the BOP's efforts to contain costs; and

- The BOP Medical Director told us that testing of the preventive health care guideline would provide useful information to the BOP because its per capita cost of providing health care should be reduced by implementing a good preventive health program, and he expects the institutions to provide the services contained in the guideline.

We specifically selected and tested 30 medical services contained in the preventive health care guideline, including whether: (1) inmates received a measles, mumps, and rubella vaccine; (2) inmates received a hepatitis A vaccine; (3) inmates received a cholesterol check in the last 5 years; (4) female inmates received a chlamydia test; and (5) female inmates received a bone density screening test.[3]

To perform our testing of the 30 medical services, we selected a sample of 1,110 of the 14,026 inmates assigned to 5 BOP locations as of March 24, 2007, as shown in the table below. Appendix IV contains an explanation of our sampling methodology.

**Inmate Population and Inmates Sampled**

| BOP Facility | Inmate Population as of March 24, 2007 | Inmates Sampled |
|---|---|---|
| USP Atlanta (Georgia) | 2,494 | 251 |
| USP Lee (Virginia) | 1,808 | 133 |
| FCC Terre Haute (Indiana) | 3,343 | 249 |
| FMC Carswell (Texas) | 1,677 | 127 |
| FCC Victorville (California) | 4,704 | 350 |
| Totals | 14,026 | 1,110 |

**Source:** OIG sample from BOP inmate population data

For each inmate sampled, we reviewed the inmate's medical record and determined whether the inmate received the 30 preventive services, as applicable. The 30 services were not applicable to all inmates sampled for reasons such as certain services applied to only female inmates, certain services were only for inmates over a certain age, and other services applied only if the inmate had certain risk factors. To validate our testing, we asked a Health Services Unit official at each of the facilities tested to confirm our results and ensure that we had not overlooked the provision of any service.

While the BOP guideline suggests that all inmates should receive the applicable services, we recognize that 100 percent compliance is unlikely given the movement of inmates between prisons, staffing shortages, and other reasons. Therefore, we noted a deficiency when 10 percent or more of the inmates for whom the service was applicable had not received it.

As demonstrated in the following two charts, the combined results for all 5 locations showed that for 16 of the 30 services tested, 90 percent or more of the inmates received the preventive service as appropriate. For the

---

[3] Appendix III shows all 30 medical services we tested.

Case 3:16-cv-02267   Document 362-30   Filed 11/20/20   Page 10 of 46 PageID #: 15367

remaining 14 services, more than 10 percent of the sampled inmates did not receive the medical service.[4] For example, 94 percent of the inmates who should have received a cardiovascular risk calculation had not received one in the last 5 years, as recommended by BOP guidelines. Additionally, 87 percent of the sampled inmates needing a measles, mumps, and rubella vaccine had not received this service.

**Overall Results of the OIG's Testing of Medical Services Provided to Inmates[5]**



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 1,044 | 99% | 1% |
| 2. Medical assessment completed by medical practitioner at intake | 1,044 | 99% | 1% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 1,043 | 99% | 1% |
| 4. Inmate received rapid plasma regain test during intake screening to test for syphilis | 403 | 92% | 8% |
| 5. Female inmate tested for chlamydia | 25 | 36% | 64% |
| 6. Female inmate received a measles/mumps/rubella vaccine | 128 | 81% | 19% |
| 7. Inmate received a complete physical within 14 days of intake | 1,044 | 95% | 4% |
| 8. Inmate received a pneumococcal vaccine | 93 | 74% | 23% |
| 9. Inmate received an annual influenza vaccine | 210 | 71% | 29% |
| 10. Inmate born after 1956 received a measles/ mumps/rubella vaccine | 932 | 13% | 87% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 1,042 | 50% | 49% |
| 12. Inmate received a hepatitis A vaccine | 263 | 57% | 42% |
| 13. Inmate received a hepatitis B test or vaccine | 343 | 90% | 9% |
| 14. Inmate received a hepatitis C test | 267 | 91% | 8% |

---

[4] The percentages in the chart are based on the number of inmates for whom the service was applicable.

[5] Some percentages in the chart total less than 100 percent because documentation was not available to determine if the service was performed for some inmates.

Case 3:16-cv-02267    Document 362-30    Filed 11/20/20    Page 11 of 46 PageID #: 15368



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 15. Inmate received an HIV-1 test | 381 | 93% | 6% |
| 16. Inmate received an HIV-2 test | 130 | 98% | 2% |
| 17. Inmate received a tuberculosis test in the past year | 869 | 98% | 2% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 339 | 98% | 2% |
| 19. Inmate received a cholesterol check in the last 5 years | 678 | 71% | 29% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 402 | 6% | 94% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 324 | 84% | 12% |
| 22. Inmate received a current blood pressure check | 1,043 | 96% | 4% |
| 23. Inmate received a current body mass index calculation | 1,036 | 12% | 88% |
| 24. Inmate received a fecal occult blood test | 189 | 46% | 54% |
| 25. Inmate received a vision screening test | 58 | 93% | 7% |
| 26. Inmate received a hearing screening test | 35 | 51% | 49% |
| 27. Inmate received an abdominal ultrasound test | 6 | 100% | |
| 28. Female inmate received a papanicolaou test (PAP smear) | 142 | 99% | 1% |
| 29. Female inmate received a current mammogram | 89 | 100% | |
| 30. Female inmate received a bone density screening test | 8 | 38% | 62% |

**Source:** OIG testing of BOP medical records

We found that the institutions either did not usually provide or were inconsistent in providing 18 of the 30 medical services we tested. For example, the cardiovascular risk calculation was rarely performed in the 5 institutions we tested. Moreover, as shown in the chart below, we found that the percentage of applicable inmates not receiving a cholesterol check within the past 5 years ranged from 68.1 percent at USP Lee to 8.3 percent at FMC Carswell. This disparity in medical service provision indicates a need for better BOP headquarters oversight and guidance.



**Source:** OIG testing of BOP medical records

We asked officials at each of the five locations for an explanation of why some services were not provided to a significant number of inmates. FMC Carswell medical officials declined our requests for an explanation, stating that BOP headquarters would provide a response after we issued our report. The following are examples of explanations given to us by officials from the other four locations.

- The vaccine was not always available to give to the inmate.

- The officials believed that a requirement applicable to all inmates only applied to women.

- The officials used alternative methods in place of certain services.

- The officials considered the service unnecessary.

- The inmates failed to return the test cards.

- The officials overlooked the requirement.

- The officials believed the procedures were too costly.

- Staffing inadequacies and scheduling constraints precluded the officials from providing the service.

Another factor that could have contributed to expected medical services not being provided consistently is that four of the five institutions had not fully implemented the Primary Care Provider Teams (PCPT) as required by the BOP's patient care policy. Under the PCPT model, each inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs. The

PCPT model is designed to provide inmates with better and more consistent medical care because the inmate is examined by the same provider team each time the inmate requires medical attention. If the same provider team examines an inmate during each visit, the inmate should be less likely to miss some services because the provider team would be familiar with the services previously provided to the inmate. According to the BOP's Preventive Health Care Clinical Practice Guideline, the most efficient and cost-effective way to implement the guideline is to assign appropriate responsibilities to each PCPT member. However, we found that only the FMC Carswell had implemented the PCPT concept. The other four institutions had not fully implemented the PCPT concept primarily because of limited staffing.

**Contract Administration**

The BOP relies on contractors to provide a substantial amount of medical services to inmates, and the OIG periodically performs audits of the BOP's comprehensive medical contracts. From August 2004 through March 2007, the OIG issued nine audit reports on BOP medical contracts. Appendix X contains a summary of these audits. Eight of the nine OIG contract audits identified major internal control deficiencies. The deficiencies included management control weaknesses pertaining to calculating medical service discounts, reviewing and verifying contractor invoices and billing statements, paying bills, and managing the overall administration of the contracts. The audits indicated several of the weaknesses were systemic, such as:

- Six of the contract audits found weaknesses in verifying and reviewing the accuracy of invoices for medical services provided by the contract providers.

- Five of the contract audits found weaknesses in obtaining supporting documentation for contractor billing statements.

- Four of the contract audits found errors in the Medicare or diagnostic-related groups discount rates.

- Three of the contract audits found that the contractor did not provide the services stated in the contract, and the contractor's performance reports were either inaccurate or submitted in an untimely fashion.

The audits usually found that the identified weaknesses were attributable to the lack of written procedures and other internal controls. As of November 2007, the BOP had implemented corrective actions for all the

Case 3:16-cv-02267    Document 362-30    Filed 11/20/20    Page 14 of 46 PageID #: 15371

recommendations in seven of the nine contract audits. For the other two audits the BOP agreed to take corrective actions concerning our recommendations, and those actions were either completed or in progress as of November 2007. In response to six of the nine audits, the BOP strengthened management controls by establishing written procedures for processing and monitoring contract medical claims. However, these actions were limited to correcting the deficiencies only at the institutions where the deficiencies were found.

As part of this larger audit of BOP medical services we tested whether the BOP as a whole had strengthened controls related to the deficiencies identified in the contract audits. We interviewed BOP officials at the five BOP locations tested. For the remaining 88 BOP locations, we sent survey questionnaires and asked whether the institutions had established management control procedures for their comprehensive medical contracts, including:

- reviewing contractor invoices for accuracy,

- ensuring contractor invoices are supported by adequate documentation,

- ensuring that invoice discounts are properly applied,

- ensuring that contractor performance reports are complete and accurate, and

- ensuring that contractor timesheets are verified by a BOP employee.

We found that up to seven BOP institutions lacked critical controls for certain contract administration functions, and about half the institutions with critical controls had not documented the procedures associated with the controls.

Our analysis of survey responses found that 77 of the 88 BOP institutions surveyed had comprehensive medical service contracts. Generally, officials at each institution responded that they had established internal control procedures for administering its contracts. However, we found that about half the institutions had not formalized these procedures in written policy for the controls we tested, as noted in the chart below.

**Controls Established by BOP Institutions for
Comprehensive Medical Services Contracts**

| Contract Administration Function | Number of Institutions | | | |
|---|---|---|---|---|
| | Procedures not Established | Procedures Established | Procedures Established but not Written | Percent of Established Procedures not Written |
| Reviewing contractor invoices for accuracy | 1 | 76 | 39 | 51% |
| Ensuring contractor invoices are supported by documentation | 3 | 74 | 36 | 49% |
| Ensuring invoice discounts are properly applied | 7 | 70 | 34 | 49% |
| Ensuring contractor performance reports are complete and accurate | 2 | 75 | 35 | 47% |
| Ensuring contractor timesheets are verified by a BOP employee | 2 | 75 | 43 | 57% |

**Source:** BOP responses to OIG survey questionnaire

The lack of written procedures increases the risk that appropriate controls will not be fully and consistently implemented, especially when staff assignments and duties change. We found during our medical service contract audits that the lack of management controls resulted in questionable payments to contractors, and we believe it is possible based on these results that similar errors may have occurred for medical contracts in other BOP facilities. It is essential that the BOP strengthen controls over administering its contracts by providing guidance and procedures to its institutions to help ensure that systemic deficiencies are corrected BOP-wide.

**Monitoring Health Care Providers**

The BOP has established numerous mechanisms to monitor its health care providers. Some of the mechanisms include:

- conducting internal program reviews to determine whether each institution is properly implementing BOP policies, including policies related to inmate health care;

- granting clinical privileges and establishing practice agreements and protocols based on health care providers' qualifications, knowledge, skills, and experience;[6]

- conducting peer reviews of health care providers to review the current knowledge and skills of the providers; and

- requiring each institution to accumulate and report performance data on a quarterly basis for specific health-related areas.

The primary purpose of these monitoring mechanisms is to improve the quality and efficiency of health care delivered to inmates by: (1) identifying and correcting deficiencies in the provision of health care, and (2) authorizing duties for health care providers commensurate with their skills and capabilities.

Our audit found that the BOP corrects deficiencies at the institutions at which deficiencies are found, but generally does not develop and issue agency-wide guidance to correct systemic deficiencies found during internal program reviews. We also found that the BOP allowed several health care providers to practice medicine without valid authorizations. Additionally, providers had not had their medical practices evaluated by a peer as required by BOP policy. Moreover, while institutions were accumulating and reporting data on health-related performance measures, the BOP does not develop agency-wide corrective actions when the performance is below target levels. These issues are summarized in the following sections.

*Program Reviews*

The BOP's Program Review Division monitors health care services provided to inmates through periodic reviews generally conducted once every 3 years, or more frequently if significant problems are identified. From FYs 2004 to 2006, the Program Review Division conducted 110 health care program reviews at 88 BOP locations. We analyzed the 110 review reports and determined that 40 of the 110 reviews found medical services deficiencies. The Program Review Division required institutions to certify completion of corrective actions for the deficiencies identified.

The Program Review Division also prepared quarterly summary reports of the program reviews. The summary reports identified the most frequent deficiencies found during the reviews and were distributed to the Chief

---

[6] Clinical privileges and practice agreements authorize the specific clinical or dental duties that health care providers may provide to BOP inmates.

Executive Officers within the BOP, including the Health Services Division Medical Director. However, a senior Health Services Division official told us that the BOP probably would not change its policy when program reviews find problems in a certain area, but it might provide training to improve staff knowledge and compliance. The official told us that the Health Services Division relies on the BOP Regional Offices and institutions to correct identified problems.

We analyzed the 40 BOP reviews and found that 25 different medical services were not provided to inmates and 14 of the 25 deficiencies were noted at multiple institutions. For example, as shown in the table on page 32 of this report, the Program Review Division found inmates with chronic care conditions who were not monitored as required at 16 institutions. Also, the reviews found inmates who were not monitored for psychotropic medical side effects at 11 institutions. We believe the BOP should use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic weaknesses and issue the guidance to all BOP institutions.

*Privileges, Practice Agreements, and Protocols*

In the provision of inmate health care, BOP institutions use the following health care providers.

- **Licensed independent practitioners** are medical providers authorized by a current and valid state license to independently practice medicine, dentistry, optometry, or podiatry.

- **Non-independent practitioners** are graduate physician assistants (certified or non-certified), dental assistants, dental hygienists, nurse practitioners, and unlicensed medical graduates.

- **Other practitioners** are those not included in the above categories and include clinical nurses and emergency medical technicians.

To improve the quality of medical care that these medical providers provide to inmates, the BOP: (1) grants clinical privileges to licensed independent practitioners based on the practitioner's qualifications, knowledge, skills, and experience; (2) establishes practice agreements between its licensed independent practitioners and its non-independent practitioners, such as mid-level practitioners; (3) establishes protocols that must be followed by other health care providers; and (4) performs periodic peer reviews of all providers who function under clinical privileges or practice agreements.

The BOP grants clinical privileges to its in-house and contracted practitioners. Clinical privileges are the specific duties that a health care provider is allowed to provide to BOP inmates. BOP policy states that clinical privileges can be granted for a period of not more than 2 years, and that newly employed physicians can be granted privileges for a period of not more than 1 year. Practitioners are prohibited from practicing medicine within the BOP until they have been granted privileges to do so by an authorized BOP official.

The individual institutions establish practice agreements between their licensed independent practitioners and their non-independent practitioners. Practice agreements delegate specific clinical or dental duties to non-independent practitioners under a licensed independent practitioner's supervision and are valid for no more than 2 years. Non-independent practitioners are prohibited from providing health care within the BOP until a practice agreement has been established.

The BOP's other health care providers, such as clinical nurses and emergency medical technicians, must work under protocols approved by licensed independent practitioners. A protocol is a plan for carrying out medical-related functions such as a patient's treatment regimen.

To determine whether the BOP maintained current privileges, practice agreements, and protocols for each of its practitioners, we included relevant questions in our survey questionnaire sent to 88 BOP institutions. Based on the responses to our questionnaires, we identified 134 practitioners out of 1,536 (9 percent) who were allowed to provide medical services to BOP inmates without current BOP privileges, practice agreements, or protocols.

**BOP Medical Practitioners without Current
Privileges, Practice Agreements, or Protocols**

| Type of Authorizing Document | Practitioners Requiring Authorizing Document | Practitioners without Authorizing Document | Percent without Authorizing Document |
|---|---|---|---|
| Privileges | 680 | 72 | 11% |
| Practice Agreement | 466 | 42 | 9% |
| Protocol | 390 | 20 | 5% |
| Totals | 1,536 | 134 | 9% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

Based on this data, it is apparent that BOP officials do not fully understand the type of authorization different health care providers should receive, or ensure that the health care providers have them.

Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. In addition, the BOP could be subjected to liability claims by inmates if improper medical services are provided by these practitioners.

*Peer Reviews*

BOP policy requires that BOP health care providers have a periodic peer review. A peer is defined as another provider in the same discipline (physician, dentist, mid-level practitioner, or others) who has firsthand knowledge of the provider's clinical performance. The peer review should evaluate the professional care the provider has given using a sample of the provider's primary patient load and comment on specific aspects of the provider's knowledge and skills, such as actual clinical performance, judgment, and technical skills. BOP health care providers who are privileged or working under a practice agreement must have at least one peer review every 2 years. Each Clinical Director, Chief Dental Officer, and Clinical Psychiatrist must also have a peer review at least once every 2 years.

In our survey questionnaire sent to 88 BOP institutions, we requested the last peer review date for all providers with privileges or practice agreements. For the 891 such providers, the responses to the questionnaire indicated that 430 (48 percent) had not received a current peer review. We asked BOP officials about the lack of peer reviews. The officials responsible for more than half of the non-current peer reviews did not provide an explanation. The officials responsible for the remaining non-current peer reviews cited the following reasons.

- The officials rely on contractors to do peer reviews.

- The officials believed that the peer review requirement did not apply to mid-level practitioners, dental assistants, or dental hygienists.

- The officials relied on performance reviews instead of doing the required peer reviews.

Without a current peer review, the BOP has a higher risk of providers giving inadequate professional care to inmates, thus subjecting the BOP to formal complaints and lawsuits. Also, if inadequate professional care goes

undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care.

*Performance Measures*

The BOP has also established national performance measures for health care to include annual targets or goals for management of: (1) hypertension, (2) cholesterol, (3) diabetes, (4) HIV, (5) tuberculosis, (6) asthma, (7) breast cancer, (8) cervical cancer, and (9) pregnancy. The BOP institutions voluntarily report results for these performance measures to the BOP Health Services Division on a quarterly basis.

In our survey questionnaire, we asked institution officials if they had completed the performance measure calculations for the nine performance measures for calendar year 2004 through the first quarter of calendar year 2007. The following table details the 99 responses from officials at the 88 BOP locations.[7]

| Performance Measure Calculations Completed for Calendar Year | BOP Response | | | |
|---|---|---|---|---|
| | Yes | No | Not Applicable | No Response |
| 2004 | 59 | 28 | 10 | 2 |
| 2005 | 77 | 14 | 4 | 4 |
| 2006 | 87 | 11 | 0 | 1 |
| 2007 (1st Quarter) | 90 | 7 | 1 | 1 |

**Source:** BOP responses to OIG survey questionnaires

Based on the responses, the number of institutions not completing the performance measure calculations decreased each year since 2004. However, when asked why the calculations were not always completed, BOP officials usually could not provide an explanation and said that the person who was responsible for completing the calculations was no longer at the institution. The officials who did provide an explanation usually attributed not completing the performance measure calculations to staffing shortages.

We also analyzed the performance measure reports from the BOP and found that the institutions often did not meet the target levels established for the nine target goals. For the nine health care performance measures we tested, we found that the institutions reported performance below the target level for more than 20 percent of the quarters reported for seven of

---

[7] The total responses (99) to our survey questions was more than the 88 BOP locations surveyed because 6 of the locations surveyed submitted separate responses for the 17 BOP institutions at the locations. Performance measures were not applicable for some institutions primarily because the institutions are new and were not active for the years tested.

the nine performance measures. For example, for the clinical management of lipid level measure, 79 institutions reported results for 723 quarters between January 1, 2004 and March 31, 2007. The results reported were below the target level for 437 (60 percent) of the quarters reported. In another example related to the clinical management of diabetes, the 79 institutions reported below target level performance for 285 (39 percent) of the 729 quarters reported.

We discussed with BOP Health Services Division officials their review of and response to the performance reports. The officials told us that they review the reports, perform a trend analysis, and summarize the results in the Office of Quality Management's Annual Report. However, the officials also told us that institution participation in reporting the performance measures is voluntary and they do not develop agency-wide corrective actions when the performance is below target levels. We believe it is essential that the BOP take corrective actions when performance is below targets to help ensure that inmates are provided adequate medical care.

In addition, we found that instructions are needed to help ensure performance data are consistently accumulated and reported. The BOP did not provide institutions with instructions on accumulating and reporting such data. According to a BOP Health Services Division official, the institutions are inconsistent in how they accumulate and report performance data. If this is the case, the summary data compiled by the BOP may not be meaningful. This BOP Health Services Division official also told us that because of the inconsistencies in data reported, the BOP is developing a training program to educate institution staff on how to properly accumulate and report performance data. According to the Chief of the BOP's Quality Management Section, a meeting was held in December 2007 with the institution Health Services Administrators to discuss the collecting of national performance measure data. Another meeting is planned for January 2008 to discuss with Regional Medical Directors any adjustments needed to the performance measurement system.

**Conclusion and Recommendations**

In general, we found that in comparison to other national health care cost indices, the BOP was successful at containing the growth of inmate health care costs. However, our audit concluded that the BOP could make improvements to help ensure that: (1) inmates are provided recommended preventative medical care, (2) contract administration deficiencies are addressed BOP-wide, and (3) monitoring of medical service providers is strengthened. If the deficiencies we noted in these areas are not corrected, we believe the BOP could experience:

- higher costs for providing health care,

- decreases in the quality of health care,

- a higher number of medical-related complaints from inmates, and

- greater liability for lack of adequate medical care.

To assist the BOP in improving medical care for inmates, we made 11 recommendations to the BOP. These recommendations include: (1) establishing procedures for collecting and evaluating data for current and future health care initiatives to assess whether individual initiatives are cost-effective and producing the desired results; (2) reviewing the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determining whether the medical services are necessary or whether the medical service requirement should be removed from the program statements or clinical practice guidelines, as appropriate; (3) providing additional guidance to the institutions to ensure that medical services deemed necessary are provided to the inmates, (4) providing additional guidance and procedures to all BOP institutions for performing certain contract administration functions; (5) developing and issuing agency-wide guidance to correct systemic deficiencies found during internal program reviews; and (6) ensuring that privileges, practice agreements, or protocols are established for all practitioners, as applicable.

# TABLE OF CONTENTS

**Page**

**INTRODUCTION** ................................................................... 1
Health Care Responsibilities............................................. 2
Health Care Costs ......................................................... 3
Controlling Health Care Costs ........................................ 4
The Provision of Health Care Services .............................. 4
Necessary Medical Care ................................................. 5
BOP Policy Guidance...................................................... 8
Prior Audits, Inspections, and Reviews ............................. 9
OIG Audit Objectives and Approach ............................... 14

**FINDINGS AND RECOMMENDATIONS**........................................... 15

**1. HEALTH CARE DELIVERY AND COST IMPACT**........................ 15
Improving the Delivery of Health Care to Inmates ............................ 15
Cost Impact of the BOP's Health Care Initiatives............................. 21
Providing Medical Services to Inmates........................................... 24
Conclusion ...................................................................... 34
Recommendations................................................................. 35

**2. BOP CONTRACT ADMINISTRATION**...................................... 37
Conclusion ...................................................................... 42
Recommendation ................................................................. 42

**3. MONITORING BOP HEALTH CARE PROVIDERS** ..................... 45
The BOP's Program Review Results............................................... 46
The BOP's Credential Verification, Privileges, and Practice
    Agreement Program ....................................................... 47
The BOP's Health Care Performance Measures................................. 51
Conclusion ...................................................................... 54
Recommendations................................................................. 55

**STATEMENT ON COMPLIANCE WITH LAWS AND REGULATIONS** .... 57

**STATEMENT ON INTERNAL CONTROLS**........................................ 59

**ACRONYMS AND ABBREVIATIONS** ............................................. 62

**APPENDIX I – Audit Objectives, Scope, and Methodology** ............. 63

**APPENDIX II – BOP Initiatives since FY 2000 to Improve the Effectiveness and Efficiency of Inmate Health Care** ................. 67

**APPENDIX III – Medical Services Selected for Testing from the BOP's Preventive Health Care Clinical Practice Guideline** .......... 73

**APPENDIX IV – Sample Methodology** ........................................... 77

**APPENDIX V – BOP Institutions and Inmates Housed as of November 29, 2007** .................................................................. 79

**APPENDIX VI – Summary of BOP Program Statements Related to the Provision of Medical, Dental, and Mental Health Services** ................................................................................. 85

**APPENDIX VII – Results of the OIG's Testing of the Provision of Medical Care at BOP Institutions** .......................................... 89

**APPENDIX VIII – The BOP's Health Care Performance Measures** .. 99

**APPENDIX IX – Types of BOP Institutions** ................................... 101

**APPENDIX X – Department of Justice, Office of the Inspector General Audits of BOP Medical Contracts from August 2004 through March 2007** ................................................................ 103

**APPENDIX XI – The BOP's Response to the Draft Audit Report** .... 111

**APPENDIX XII – Office of the Inspector General, Audit Division, Analysis and Summary of Actions Necessary to Close the Report** .............................................................................. 117

# INTRODUCTION

The Federal Bureau of Prisons (BOP) is responsible for confining federal offenders in prisons and community-based facilities. As of November 29, 2007, the BOP housed 166,794 inmates in 114 BOP institutions at 93 locations. In addition, the BOP housed 33,354 inmates in privately managed, contracted, or other facilities.[8]

The BOP institutions include Federal Correctional Institutions (FCI), United States Penitentiaries (USP), Federal Prison Camps (FPC), Metropolitan Detention Centers (MDC), Federal Medical Centers (FMC), Metropolitan Correctional Centers (MCC), Federal Detention Centers (FDC), the United States Medical Center for Federal Prisoners (MCFP), and the Federal Transfer Center (FTC). When multiple institutions are co-located, the group of institutions is referred to as a Federal Correctional Complex (FCC). Some institutions are located within federal correctional complexes that contain two or more institutions. Appendix IX describes the various types of BOP facilities. Appendix V contains a list of the BOP institutions. The map below depicts the location of BOP facilities.



**Source:** OIG mapping of BOP facilities based on data provided by the BOP

---

[8] This audit focused on the medical care provided to only those inmates housed in Bureau of Prison (BOP) facilities.

1

**Health Care Responsibilities**

As part of the BOP's responsibility to house offenders in a safe and humane manner, it seeks to deliver medically necessary health care to its inmates in accordance with proven standards of care. This responsibility stems from a 1970s court case *Estelle* v. *Gamble,* in which the U.S. Supreme Court concluded that an inmate's right to medical care is protected by the U.S. Constitution's Eighth Amendment guarantee against cruel and unusual punishment.[9] The Supreme Court concluded that "deliberate indifference" – purposefully ignoring serious medical needs of prisoners – constitutes the inappropriate and wrongful infliction of pain that the Eighth Amendment forbids.[10]

According to BOP Program Statement P6010.02 Health Services Administration, the BOP's responsibility for delivering health care to inmates is divided among the following BOP headquarters, regional offices, and local institution officials.

- **Director of BOP**: The Director has overall authority to provide for the care and treatment of persons within the BOP's custody. The Director has delegated this authority to the Assistant Director, Health Services Division (HSD).

- **Assistant Director, HSD**: The Assistant Director, HSD, is responsible for directing and administering all activities related to the physical and psychiatric care of inmates. The Assistant Director has delegated this authority as it pertains to clinical direction and administration to the BOP Medical Director.

- **Medical Director**: The Medical Director is the final health care authority for all clinical issues and is responsible for all health care delivered by BOP health care practitioners.

- **Regional Health Services Administrators**: The Regional Health Services Administrators in the BOP's six regional offices are responsible for responding to health care problems at all institutions within their region. The Administrators also advise the Regional

---

[9] *Estelle* v. *Gamble*, 429 U.S. 97, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

[10] "Your Right to Adequate Medical Care," in *A Jailhouse Lawyer's Manual* (New York: Columbia University, School of Law, Chapter 18, page 494, which cited the following reference: *Estelle* v. *Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L. Ed. 2d 251, 260 (1976) (citing *Gregg* v. *Georgia*, 428 U.S. 153, 173, 97 S. Ct. 2909, 2925, 49 L. Ed. 2d 859, 874 (1976)).

2

Director and Deputy Regional Director in all matters related to health care delivery.

- **Institution Officials**: The responsibility for the delivery of health care to inmates at the institution level is divided among various officials, staff, contractors, and others. Each institution has a Health Services Unit (HSU) responsible for delivering health care to inmates. The organization of the HSUs varies among institutions depending upon security levels and missions, but each HSU ordinarily has a Clinical Director and a Health Services Administrator who report to the Warden or Associate Warden. The Clinical Director is responsible for oversight of all clinical care provided at the institution. The Health Services Administrator implements and directs all administrative aspects of the HSU at the institution. Both the Clinical Director and the Health Services Administrator have responsibilities related to the supervision and direction of health services providers at the institution.

## Health Care Costs

The BOP funds inmate health care through its Inmates Care and Programs appropriation. The BOP does not budget a specific amount for health care services. As inmates require medical care, the BOP provides funding for these services and obligates funds for health care as expenses occur. From fiscal year (FY) 2000 through FY 2007, the BOP obligated about $4.7 billion to inmate health care. The following chart shows the BOP's annual health care obligations during this period.



**BOP Health Care Costs
FYs 2000 through 2007**

**Source:** BOP Budget Execution Branch

**Controlling Health Care Costs**

To control the rising cost of health care, since the early 1990s the BOP has implemented several initiatives aimed at providing more efficient and effective inmate health care. These initiatives include: (1) sharing health care resources with other federal agencies such as the Veterans Administration, (2) establishing medical reference laboratories within the BOP for routine laboratory analysis, and (3) obtaining medical equipment through the Defense Supply Center at General Services Administration pricing.

On-going BOP initiatives include: (1) assigning most inmates to institutions based on the care level required by the inmate, (2) installing an electronic medical records system that connects institutions, (3) implementing tele-health to provide health care services through video conferencing, and (4) implementing a bill adjudication process to avoid costly errors when validating invoices. We include a discussion of these cost-cutting initiatives and the effect the initiatives have had on controlling inmate health care costs in the Findings and Recommendations section of this report.

**The Provision of Health Care Services**

The BOP provides health care services to inmates primarily through in-house medical providers employed by the BOP or assigned to the BOP from the Public Health Service (PHS) and contracted medical providers who supply either comprehensive or individual medical services.

*In-house Medical Providers*

The HSUs at each of the BOP's 114 institutions provide routine, ambulatory medical care. These units provide care for patients with moderate and severe illnesses, including hypertension and diabetes, as well as care for patients with serious medical conditions, such as Human Immunodeficiency Virus (HIV) infection and Acquired Immunodeficiency Syndrome (AIDS). HSU outpatient clinics provide diagnostic and other medical support services for inmates needing urgent and ambulatory care. The HSUs are equipped with examination and treatment rooms, radiology and laboratory areas, dental clinics, pharmacies, administrative offices, and waiting areas. The HSUs are staffed by a combination of BOP health care employees and PHS personnel consisting of physicians, dentists, physician assistants, mid-level practitioners, nurse practitioners, nurses, pharmacists, psychiatrists, laboratory technicians, x-ray technicians, and administrative

4

personnel. At each institution, the Clinical Director directs the clinical care of inmates and supervises the BOP and PHS health care staff.

As part of its internal health care network, the BOP operates several medical referral centers (MRC) that provide advanced care for inmates with chronic or acute medical conditions. The MRCs provide hospital and other specialized services to inmates, including full diagnostic and therapeutic services and inpatient specialty consultative services. Inpatient services are available only at MRCs. BOP medical personnel refer inmates to the MRCs or an outside community care provider when the inmates have health problems beyond the capability of the HSU.

*Contracted Medical Providers*

When the BOP's internal resources cannot fully meet inmates' health care needs, the BOP awards comprehensive and individual contracts to supplement its in-house medical services. Comprehensive contracts provide a wide range of services and providers, while individual contracts usually provide specific specialty services.

The comprehensive contracts and individual contracts exceeding $100,000 are awarded by the BOP's Field Acquisition Office in Grand Prairie, Texas. The individual contracts not exceeding $100,000 are awarded by each institution's contracting personnel.

According to data provided to the OIG by officials at the 114 BOP institutions, as of May 2007 these institutions had 108 comprehensive services contracts or blanket purchase agreements and 343 individual services contracts. From the beginning of the contracts through May 2007, BOP officials reported total expenditures of more than $249 million related to these 451 contracts and agreements.[11]

**Necessary Medical Care**

According to BOP Program Statement P6010.02 Health Services Administration, the BOP is responsible for delivering health care to inmates in accordance with proven standards of care without compromising public safety concerns. The BOP's Patient Care policy delineates the following five categories of health care services provided to inmates. In this audit, we could not associate how much of the BOP's medical obligations related to

---

[11] The length of the BOP's medical contracts varied, but most of the contracts included a base year and 4 option years. Accordingly, the expenditures related to the 451 active contracts and agreements covered the time each contract began through May 2007.

each of these categories because the BOP does not segregate medical cost data by these categories.

- **Medically Necessary – Acute or Emergent**. Services in this category cover medical conditions that are of an immediate, acute, or emergent nature, which without care may be life threatening or would cause rapid deterioration of the inmate's health or significant irreversible loss of function. Conditions in this category warrant immediate treatment that is essential to sustain life or function. Examples of conditions considered acute or emergent include, but are not limited to:

    o myocardial infarction;
    o severe trauma such as head injuries;
    o hemorrhage;
    o stroke;
    o precipitous labor or complications associated with pregnancy; and
    o detached retina, sudden loss of vision.

- **Medically Necessary – Non-emergent**. Services in this category cover medical conditions that are not immediately life-threatening, but without care the inmate has a significant risk of:

    o serious deterioration leading to premature death;
    o significant reduction in the possibility of repair later without present treatment; or
    o significant pain or discomfort, which impairs the inmate's participation in activities of daily living.

    Examples of conditions considered medically necessary – non-emergent include but are not limited to:

    o chronic conditions (diabetes, heart disease, bipolar disorder, schizophrenia);
    o infectious disorders in which treatment allows for a return to previous state of health or improved quality of life (HIV, tuberculosis); and
    o cancer.

- **Medically Acceptable – Not Always Necessary**. Services in this category cover medical conditions that are considered elective procedures that may improve the inmate's quality of life. Examples in this category include, but are not limited to:

6

- o joint replacement;
- o reconstruction of the anterior cruciate ligament of the knee; and
- o treatment of non-cancerous skin conditions, such as skin tags and lipomas.

These therapeutic interventions always require review by the institution's Utilization Review Committee to determine whether the proposed treatment should be approved.[12]  The factors that should be considered in approving the proposed treatment include, but are not limited to:

- o the risks and benefits of the treatment,
- o available resources,
- o natural history of the condition, and
- o the effect of the intervention on inmate functioning in activities of daily living.

- **Limited Medical Value**.  Services in this category cover medical conditions for which treatment provides little or no medical value, are not likely to provide substantial long-term gain, or are expressly for the inmate's convenience**.**  Procedures in this category are usually excluded from the scope of services provided to BOP inmates.  Examples in this category include, but are not limited to:

  - o minor conditions that are self-limiting,
  - o cosmetic procedures, or
  - o removal of non-cancerous skin lesions.

  Any treatment in this category that a health care provider recommends and the Clinical Director feels is appropriate requires review by the institution's Utilization Review Committee.

- **Extraordinary**.  Services in this category cover medical interventions that are deemed extraordinary because they affect the life of another individual, such as organ transplantation, or are considered investigational in nature.

---

[12]  Every BOP institution is required to have a Utilization Review Committee, chaired by the institution's Clinical Director, that reviews various aspects of inmate health care, such as the need for outside medical, surgical, and dental procedures; requests for specialist evaluations and treatments with limited medical value; and considerations for extraordinary care.

7

Any treatment provided in this category requires the BOP Medical Director's review and approval with notification to the Regional Director.

## BOP Policy Guidance

The BOP provides policy and guidance to BOP institutions primarily in the form of program statements. As of October 2007, the BOP had 20 program statements related to the management and administration of health care. Appendix VI contains a summary of these program statements. In addition to the program statements, the BOP has established the following 16 clinical practice guidelines describing specific medical, dental, and mental health services that BOP management expects to be provided to inmates.

- Preventive Health Care
- Management of Asthma
- Management of Coronary Artery Disease
- Management of Major Depressive Disorder
- Detoxification of Chemically Dependent Inmate
- Diabetes
- Gastroesophageal Reflux Disease Dyspepsia and Peptic Ulcer Disease
- Management of Headaches
- Viral Hepatitis
- Management of Human Immunodeficiency Virus (HIV)
- Hypertension
- Management of Lipid Disorders
- HIV, Hepatitis-B, Hepatitis-C, Human Bites and Sexual Assaults
- Management of Methicillin-Resistant Staphylococcus Aureus (MRSA) Infections
- Management of Tuberculosis (TB)
- Management of Varicella Zoster Virus Infections

The Preventive Health Care guideline contains procedures that BOP management officials expect to be provided to all inmates. The other 15 guidelines address a particular health condition and contain procedures specific to servicing that condition. The Preventive Health Care guideline,

8

which was updated in April 2007, contains the preventive health and diagnostic procedures found in 9 of the other 15 guidelines, but it does not contain the specific procedures related to treatment of the health conditions covered by the other guidelines. The Preventive Health Care guidelines also do not contain the preventive health procedures from four guidelines that are not considered chronic care (MRSA Infections, Headaches, Varicella Zoster Virus Infections, and Detoxification of Chemically Dependent Inmates); and two guidelines that are considered chronic care (Asthma and Gastroesophageal Reflux Disease Dyspepsia and Peptic Ulcer Disease).

For this audit, we focused on the procedures in the BOP's Preventive Health Care guideline because:

- It addressed care for all inmates and not just inmates with specific illnesses;

- It contained medical services that BOP management officials expected to be performed at all institutions; and

- According to the BOP, health promotion and disease prevention is a primary objective of the BOP in its efforts to contain costs.

**Prior Audits, Inspections, and Reviews**

Several previous audits, inspections, and reviews by the Department of Justice (DOJ) Office of the Inspector General (OIG) and the Government Accountability Office (GAO) have reported on the provision of health care by the BOP. These audits, inspections, and reviews are briefly summarized below.

*Office of the Inspector General Reports*

Individual Audits of BOP Contracts for Medical Services

From August 2004 through March 2007, the OIG issued nine audit reports on BOP contracts for medical services. The OIG identified major internal control deficiencies for eight of the nine medical services contract audits. The deficiencies included weaknesses in procedures or processes for calculating discounts, reviewing and verifying invoices and billings, paying bills, and managing the overall administration of the contracts. Finding 2 and Appendix X of this report contain more details about the results of these audits.

Audit of BOP Pharmacy Services

In a November 2005 report on pharmacy services within the BOP, the OIG reported on the BOP's efforts to: (1) reduce increasing costs of its prescription medications; (2) ensure adequate controls and safeguards over prescription medications; and (3) ensure its pharmacies complied with applicable laws, regulations, policies, and procedures.[13] The OIG found numerous deficiencies, including the:

- BOP's cost-benefit analysis of its prescription medication program contained errors and incorrect assumptions that could result in increased prescription medication costs rather than savings;

- BOP needed to improve efforts to reduce prescription medication costs associated with waste;

- BOP was not adequately accounting for and safeguarding prescription medications;

- BOP lacked adequate internal controls for purchasing prescription medications, including ordering, receiving, and paying; and

- BOP pharmacies did not always comply with applicable policies and procedures for dispensing and administering prescription medications.

The OIG made 13 recommendations for improving the administration of the BOP's pharmacy services. The recommendations sought to ensure that:

- a cost-benefit analysis is conducted for all cost savings initiatives,

- institutions accurately account for and safeguard prescription medications,

- institutions implement controls over ordering and receiving prescription medications, and

- institutions comply with applicable laws and BOP policies.

_____

[13] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons Pharmacy Services,* Audit Report Number 06-03 (November 2005).

The BOP agreed with the audit recommendations. The BOP implemented corrective action for each recommendation and the OIG closed the audit report based on the BOP's corrective actions.

Inspection of Inmate Health Care Costs in the BOP

In November 1996, the OIG reported on factors contributing to inmates' health care costs and the BOP's initiatives to contain these costs.[14] The OIG also reported on the BOP's corrective actions in response to the Department of Justice's FY 1992 Management Control Report.[15] The OIG found the following.

- The BOP had implemented numerous inmate health care cost containment initiatives to combat rising costs and to meet the health care demands of a growing inmate population.

- The BOP's initiatives kept per capita costs from rising significantly.

- The BOP's costs for community provider services, medical guard escort services, and salaries continued to increase in spite of containment efforts; and the BOP needed to take additional actions to control some costs.

The OIG recommended that the BOP:

- ensure that appropriate institutions are utilizing contract guard services,

- instruct the wardens to review their mid-level practitioner and nurse staffing and restructure where appropriate, and

- pursue the proposal of charging inmates a co-payment fee for medical services.

---

[14] Department of Justice, Office of the Inspector General, *Inmate Health Care Costs in the Bureau of Prisons*, Inspections Report Number I-97-01 (November 1996).

[15] The Federal Managers Financial Integrity Act of 1982 (Act) required the head of each executive agency to prepare a statement indicating that the agency's systems of internal accounting and administrative control either fully or do not fully comply with the requirements of the Act. If the control systems do not fully comply with the Act, the agency head is required to include a report, called a Management Control Report, identifying any material weaknesses in the agency's systems of internal accounting and administrative control and the plans and schedule for correcting the weakness.

The BOP generally agreed with the recommendations. The BOP also took corrective action on each recommendation and the OIG closed the inspection report based on the BOP's corrective actions.

*Government Accountability Office Reports*

GAO Testimony Regarding BOP Medical Cost Containment

In April 2000, GAO staff testified to Congress that the BOP had initiated cost containment efforts such as restructuring medical staffing, obtaining discounts through bulk purchases, leveraging resources through cooperative efforts with other governmental entities, and privatizing medical services. The BOP also had placed tele-medicine in eight facilities and planned to equip all the BOP facilities during FY 2000.[16]

The GAO staff also testified that planned cost-saving measures required legislative action. These measures consisted of a $2 fee for each health care visit requested by a prisoner (as a deterrent to unnecessary visits), and a Medicare-based cap on payments to community hospitals that treat inmates.[17] The GAO recommended that the BOP negotiate more cost-effective contracts with community hospitals that could require bidders to propose a "Medicare federal rate" adjusted by markups or discounts, which was expected to simplify the comparison of prices under consideration.[18]

Report on Inmates Access to Health Care

In a February 1994 report, the GAO reported on the adequacy of the BOP's medical services and the effectiveness of its medical service's quality assurance program.[19] The GAO reviewed care for inmates with special medical needs, the BOP's quality assurance systems, qualification of BOP physicians and of other health care providers used by the BOP, and the

---

[16] Tele-medicine is a method of providing health care from a remote location using technology such as video conferencing modified to include peripheral devices that produce images of diagnostic quality.

[17] The BOP implemented the $2 fee for inmate health care visits as discussed in more detail on page 20 of this report.

[18] The "Medicare federal rate" is a common or standard benchmark rate for specific medical services identified in Medicare diagnosis-related groups.

[19] U.S. General Accounting Office, *BUREAU OF PRISONS HEALTH CARE, Inmates' Access to Health Care Is Limited by Lack of Clinical Staff,* GAO/HEHS-94-36 (February 1994), 1.

BOP's consideration of cost effective alternatives to meet rising needs for medical services. The GAO found the following.

- Inmates with special needs, including women, psychiatric patients, and patients with chronic illnesses, were not receiving all of the health care services they needed because of staffing shortages.

- Quality assurance programs identified actual and potential quality-of-care problems, but did not always include corrective action.

- Physician assistants in the BOP lacked generally required education and certification and were not adequately supervised.

- The BOP was planning a major hospital acquisition program without fully assessing whether inmates' medical needs justified the acquisition and without planning how to recruit and retain the clinical staff necessary to operate these facilities.

The GAO recommended that the BOP:

- prepare a needs assessment of the medical services required by inmates and determine the medical services it can efficiently and effectively provide in-house;

- determine the most cost-effective approaches to providing appropriate health care to current and future inmate populations;

- revise the BOP's hiring standards for physician assistants to conform to current community standards of training and certification; and

- re-emphasize to the wardens of medical referral centers the importance of taking corrective action on identified quality assurance problems.

While the BOP did not agree with the GAO's conclusion regarding the medical care it is able to provide to inmates in the facilities GAO visited, the BOP agreed with the GAO's specific findings. The BOP agreed to take corrective action on first two recommendations. However, the BOP believed that the intent of the GAO's remaining two recommendations was being dealt with through existing systems and plans. The GAO did not fully agree with the BOP's position on the last two objectives and indicated in the report that the BOP still needed to take additional actions on these issues.

**OIG Audit Objectives and Approach**

The OIG initiated this audit to determine whether the BOP: (1) appropriately contained health care costs in the provision of necessary medical, dental, and mental health care services; (2) effectively administered its medical services contracts; and (3) effectively monitored its medical services providers.

We performed audit work at BOP headquarters and at the following BOP institutions: the USP Atlanta (Georgia), USP Lee (Virginia), FMC Carswell (Texas), FCC Terra Haute (Indiana), and FCC Victorville (California). In addition, we surveyed the 88 BOP locations where we did not perform on-site work. The details of our testing methodologies are presented in the audit objectives, scope, and methodology contained in Appendix I.

This audit report contains 3 finding sections. The first finding discusses the BOP's efforts to contain the growth of health care costs and to deliver necessary health care to inmates. The second finding discusses the BOP's administration of medical services contracts. The third finding discusses the BOP's efforts to monitor its medical services providers, both in-house and contract staff.

14

## FINDINGS AND RECOMMENDATIONS

## 1. HEALTH CARE DELIVERY AND COST IMPACT

The BOP has implemented multiple cost containment strategies over the past several years to provide health care to inmates in a more effective and efficient manner.  However, the BOP generally did not maintain analytical data to assess the impact that the individual initiatives had on health care costs.  Yet, our audit found that the BOP has kept the growth of inmate health care costs at a reasonable level compared to national health care cost data reported by the Departments of Health and Human Services and Labor.  With respect to inmate health care, we found that BOP institutions did not always provide recommended preventive medical services to inmates.  We also found that BOP institutions did not consistently provide medical services recommended by BOP guidelines to inmates.

## Improving the Delivery of Health Care to Inmates

Since FY 2000, the BOP has implemented or developed at least 20 initiatives designed to improve the administration, management, and delivery of health care to inmates, and to reduce or contain rising health care costs.  As of December 2007, the BOP had fully implemented 11 initiatives, while the remaining 9 were in progress.  The following sections summarize 10 of the BOP's initiatives and discuss their cost impact.  Appendix II contains a complete list of the initiatives identified by the BOP and a brief description of each initiative.

*Medical Designations Program*

BOP officials assign each inmate a medical classification or care level based on the inmate's individual health condition.  Care levels range from *Care Level 1* for the healthiest inmates to *Care Level 4* for inmates with the most serious medical conditions.

- **Care Level 1** inmates are less than 70 years old and are generally healthy but may have limited medical needs that can be easily managed by clinician evaluations every 6 months.  Sub-specialty care is limited in that it is not regularly required and is completed in less than 3 months.  This care level includes inmates with stable mental-health conditions requiring chronic care appointments and individual psychology or health services contacts no more than once every 6 months.  The acute services required, such as crisis

15

intervention, are less than 3 months duration, occur no more than every 2 years, and can be resolved without hospitalization.

- **Care Level 2** inmates are stable outpatients with chronic illnesses requiring at least quarterly clinician evaluations. These inmates independently perform daily living activities. The care level includes inmates with mental health conditions that can be managed through chronic care clinics or individual psychology or health services contacts no more frequently than monthly to quarterly. The acute services required, such as crisis intervention, are less than 3 months duration, occur no more than every 2 years, and can be resolved without hospitalization.

- **Care Level 3** inmates are fragile outpatients with medical conditions that require daily to monthly clinical contact. These inmates may have chronic or recurrent mental illnesses or ongoing cognitive impairments that require daily to monthly psychiatric health services or psychology contacts to maintain outpatient status. These inmates may also require assistance in performing some activities of daily living, but do not require daily nursing care. Inmates in this care level may periodically require hospitalization to stabilize the inmate's medical or mental health condition.

- **Care Level 4** inmates have acute medical or chronic mental health conditions resulting in severe impairments to physical and cognitive functioning. These inmates require services at Medical Referral Centers (MRC), such as the BOP's Federal Medical Centers (FMC), and may require varying degrees of nursing care.

In addition to assigning each inmate a care level based on overall health, effective in 2004 the BOP also assigned a medical designation to each institution. The medical designation corresponds with the medical classification of the inmates that the institution is staffed and equipped to handle. Appendix V shows the care level designation for each BOP institution. Designating institution care levels has three advantages for the BOP. First, it allows the BOP to establish guidelines for the number and mix of medical staff to assign to each facility consistent with the care level population at each facility. Second, it allows the BOP to evaluate every inmate for appropriateness of placement and to initiate movement of inappropriately housed inmates through routine transfers rather than waiting until the inmate experiences a crisis requiring direct air or ground transportation at a higher cost. Third, it allows the BOP to consolidate inmates with similar medical conditions at facilities where appropriate services and providers are available.

16

To coordinate its placement of inmates in institutions commensurate with their care levels, the BOP developed the following phased implementation plan.

- Phase I – classify individual inmates as Care Level 1, 2, 3, or 4.

- Phase II – designate institutions as Care Level 1, 2, 3, or 4, and establish beds and staffing at each institution.

- Phase III – realign health care staff as needed.

- Phase IV – final implementation to include movement of inmates to the appropriate care level institutions.

As of October 1, 2007, the BOP was in Phase IV of the implementation plan. According to a BOP management official, all Care Level 3 inmates who could be moved from Care Level 1 facilities had been moved. Some inmates could not be moved for custody reasons, such as an inmate that must be housed in a maximum security facility. According to this BOP official, such exceptions were rare. As of June 2007, the BOP was in the process of identifying and prioritizing the movement of Care Level 3 inmates out of Care Level 2 facilities. According to the BOP official, approximately 1,200 Care Level 3 inmates remained to be moved. The BOP plans to complete Phase IV by December 2008.

*Medical Staff Restructuring*

During FY 2005, the BOP established staffing guidelines for Care Level 1, 2, and 3 institutions. Since the existing staffing of the institutions did not always match the care level staffing guidelines, the BOP had to move medical staff throughout the BOP to implement the guidelines. Institutions that had staff in positions contrary to the guidelines were required to either move the staff to another facility that needed them or reassign the staff to another authorized position in the facility. According to a BOP management official, this process resulted in approximately 144 staff members in the Health Services Units throughout the BOP being transferred to another facility or reassigned to another position. This process also freed up a number of positions that were returned to the BOP's Health Services Division and subsequently redistributed to institutions that were understaffed.

17

*Tele-medicine*

Tele-medicine involves the remote delivery of health care using telecommunications technologies. For example, a psychiatrist may provide psychiatric services via video conferencing equipment to inmates throughout the BOP. From September 1996 to December 1997, the BOP participated in a demonstration project to test the use of tele-medicine in three of its institutions. Based on the success of the demonstration project, during FY 2000, the BOP purchased videoconferencing equipment for every facility. Since that time the BOP has purchased videoconferencing equipment for each new institution. The BOP primarily uses tele-medicine to provide psychiatry and radiology services. A BOP management official told us that in the future the BOP plans to expand the use of tele-medicine to other disciplines, including orthopedics, wound care, physical therapy, social services, nutritional counseling, psychology, dentistry, cardiology, dermatology, podiatry, obstetrics and gynecology, and oncology. As of September 2007, the BOP had not developed a specific schedule for the expansion. The BOP believes that tele-medicine can make medical services more readily available while also containing and even reducing medical costs.

*Electronic Medical Records*

Through automation of inmate medical records, the BOP expects to reduce the paper records being produced, decrease the number of lost records, diminish the need to fax records from place to place, and improve the review and analysis of medical data. In March 2006, the BOP began actively using its Bureau Electronic Medical Record (BEMR) system. The initial BEMR system included the capability to: (1) track comprehensive medical history and physical examination information, (2) schedule inmate medical visits when required, and (3) record medical-related supplies and equipment issued to inmates. The BOP subsequently added a pharmacy module to the system (BEMRx) to manage the medications provided to inmates.

As of October 30, 2007, the BOP had deployed the BEMR system to 63 institutions, of which 24 included the BEMRx pharmacy module. The BOP plans to deploy the electronic medical records system to the rest of its facilities by September 30, 2008. The BOP also plans that the completed

18

BEMR electronic medical records system will include access to the tele-radiology archive and the Laboratory Information System.[20]

*Medical Claims Adjudication*

The BOP developed an initiative to target medical claims adjudication to ensure that medical claims are properly paid and that the BOP complies with the requirements of the Prompt Payment Act. Past OIG audits of BOP medical contracts identified systemic contract-administration deficiencies and erroneous contractor billings. In response to those findings, in April 2004 the BOP began researching the use of third-party medical claims processing services. In October 2004, the BOP received a presentation by the Department of Veterans Affairs (VA) regarding the medical claims processing services it provides to other government agencies. From February 2005 to December 2005, the VA's Financial Services Center demonstrated the viability of the VA services in adjudicating ("testing") the accuracy of medical payment vouchers previously paid at nine BOP institutions. The VA's Financial Services Center determined that the BOP had overpaid as much as $325,000 for the payments tested.

After the VA test, the BOP developed a Statement of Work defining requirements for medical claims adjudication services. In July 2006, the BOP issued a Request for Information asking interested vendors to submit information about the medical claims processing services they could provide for the BOP. The vendor responses indicated that the services sought are readily available and can be acquired through contracting actions. Beginning in July 2006, the BOP refined its requirements and finalized the Statement of Work in September 2007. The BOP expects to award a contract for medical claims adjudication services early in calendar year 2008.

*Medical Reference Laboratory*

Medical Reference Laboratories (MRL) perform laboratory tests of patient specimens. A doctor or nurse usually collects the specimen and sends it to the MRL for testing. The MRL then performs the requested tests on the specimen and returns the test results to the requestor. In 2001, the BOP established a mandatory MRL system at the following federal medical centers:

---

[20] The tele-radiology archive stores digital radiographic images and associated interpretations without the risk of damage or loss applicable to film-based radiographs. The Laboratory Information System stores laboratory test results which can be retrieved by BOP personnel much quicker and easier than having the results mailed or faxed to them.

- United States Medical Center for Federal Prisoners, Springfield, Illinois;

- Federal Medical Center, Rochester, Minnesota; and

- Federal Medical Center, Butner, North Carolina.

This initiative was designed to contain or reduce health care costs by having medical staff at non-medical center institutions collect and ship specimens to one of the three MRLs where the laboratory tests could be performed by BOP staff at a lower cost than through individual contracts for laboratory services at each BOP institution.

*Medical Equipment*

The BOP also implemented an initiative in 1997 requiring that a senior official at BOP headquarters approve all purchases of medical equipment with a single item value of more than $1,000. The BOP subsequently raised the approval threshold to $5,000. To obtain approval, the requesting institution must submit a Major Equipment Justification and include evidence that the institution researched alternatives to find the best value for the equipment being acquired. This helps ensure that BOP institutions are not frivolous with equipment requests and spending. Under the initiative, the BOP also consolidates like purchases submitted for approval, which permits better pricing on bulk purchases through one of the Department of Defense's Defense Supply Centers. The Defense Supply Centers primarily purchase items such as food, clothing and textiles, pharmaceuticals, medical supplies, construction items, and other equipment to support the U.S. military. The centers also use their purchasing power to obtain such items for other federal agencies at a lower cost.

*Inmate Co-payment*

In October 2005, the BOP began requiring inmates to pay a $2 co-payment fee for certain types of medical evaluations. The BOP does not charge indigent inmates a co-payment fee. The BOP also does not charge inmates for certain medical services such as visits related to a chronic medical condition, preventive health visits, or evaluations related to pregnancy. The BOP designed the initiative to reduce the number of unnecessary inmate-initiated medical visits. A BOP analysis of data for the first 6 months of implementation showed a 33-percent reduction in the number of inmate-initiated medical visits as compared to the 6-month period prior to implementation.

20

*Medical Coverage*

Prior to January 2005, the BOP required 24-hour on-site medical coverage at all institutions. In January 2005, the BOP discontinued the requirement and instead required each institution to have a plan in place for providing emergency and urgent care services when needed. According to BOP Program Statement P6031.01 Patient Care, the plan should include a team of first responders trained to use the automatic external defibrillator and perform cardiopulmonary resuscitation. According to a BOP management official, this change allowed institutions to reassign staff to the day shift when inmates require the most medical care. This BOP official said that the reduction in premium pay for the overnight periods resulted in significantly reduced staffing costs.

*Staffing Provider Teams*

The BOP traditionally provided health care to inmates based on a "military" model using the concept of sick call and same day treatment. Under this concept, inmates were evaluated by an available provider that day. According to BOP officials, this led to inmates "practitioner shopping" where they would go from provider to provider for treatment of the same complaints. In 2005, the BOP began implementing the Patient Care Provider Team concept where inmates are assigned to a primary provider team that manages both the chronic and episodic care of the inmate. The BOP designed this approach to improve the consistency of treatment and eliminate the ability of the inmate to consume valuable staff resources by practitioner shopping. According to a BOP management official, implementation of this concept has reduced duplicate diagnostic tests, consultations, and treatments, thereby reducing overall medical costs.

## Cost Impact of the BOP's Health Care Initiatives

One of the primary purposes of the BOP's health care initiatives was to reduce or contain health care costs. However, the BOP could not provide us with cost benefit analyses for its 20 health care initiatives. Therefore, we were unable to assess the cost benefits of BOP initiatives on an individual basis. We were, however, able to analyze the BOP's overall inmate medical costs during our review period.

*Efforts to Measure Cost Benefits of BOP Health Care Initiatives*

For the 20 health care initiatives listed in Appendix II, we asked BOP officials for any cost-benefit analyses to justify implementation of the initiatives and any post-implementation analyses to determine their cost