impact. Although the initiatives usually had a primary or secondary purpose of reducing or containing health care costs, the BOP could not provide documentation of any preliminary cost-benefit analyses or any post-implementation analyses to identify costs reduced or contained.

BOP management officials believed that preliminary cost-benefit analyses had been performed for many of the initiatives, but the analyses would have been done by BOP staff previously responsible for the initiatives and the documentation of the analyses was no longer available. As for post-implementation analyses, BOP management officials told us that the BOP does not collect and maintain cost-related data that would allow it to analyze the cost-effectiveness of its individual health care initiatives.

While we are encouraged by the BOP's efforts to develop new initiatives to improve health care for inmates and to reduce and contain health care costs, we believe the BOP should collect cost-related data for each initiative and analyze the collected data to determine whether the initiatives are providing the anticipated cost benefits. Without such analyses, the BOP may expend funds on initiatives that are not cost-effective.

*Cost Impact of the BOP's Health Care Initiatives*

Absent cost data for individual health care initiatives, we analyzed the overall effect of the BOP's initiatives on total medical costs. For calendar years (CY) 2000 through 2006, we compared the BOP's per capita health care costs to the national average per capita cost for medical expenses as reported by the Department of Health and Human Services' (HHS) National Health Statistics Group and to the Consumer Price Index (CPI) for Medical Care published by the Department of Labor's (DOL) Bureau of Labor Statistics. As shown in the following graph, we found that although the BOP experienced growth in health care costs in excess of the HHS national average and DOL CPI for some of the earlier years of our review period, the BOP's growth rates since 2002 have declined significantly while the growth rates in the HHS national average and the DOL CPI have not.

22

**Comparison of the Growth Rates of Health Care Costs for BOP, HHS, and DOL Health Care Data for Calendar Years 2000 through 2006[21]**



**Source:** BOP Office of Research and Evaluation, BOP Budget Execution Branch, Department of Health and Human Services, and Department of Labor

We recognize that the BOP's, HHS's, and DOL's per capita health care medical costs are not exactly comparable. The BOP's medical per capita costs include costs for services not included in the HHS's and the DOL's per capita medical costs and vice versa. For instance, the BOP's medical per capita costs include costs for medical guard escort services, airlift expenditures, and costs for replacement equipment, while the HHS's and the DOL's per capita medical costs do not include these items. In contrast, the HHS's and the DOL's medical per capita costs include cost for health insurance, home health care, and over-the-counter drugs, while the BOP's per capita medical costs do not include these items. Even though the costs are not fully comparable between the three measures, we believe the cost measures are sufficiently similar for comparison purposes and show that the BOP appears to be controlling the growth in health care costs.

---

[21] The BOP's, the Department of Health and Human Services' (HHS) and the Department of Labor's (DOL) per capita health care medical costs are not fully comparable. The BOP's medical per capita costs include costs for services not included in HHS's and the DOL's per capita medical costs and vice versa. Even though the costs are not fully comparable between the three measures, we believe the cost measures are sufficiently similar for comparison purposes. The HHS national average cost data was obtained from the HHS report, *National Health Expenditures Aggregate, Per Capita Amounts, Percent Distribution, and Annual Percent Change by Source of Funds: Calendar Years 2005 – 1960* (January 2007). An updated report showing cost data for 2006 was not available.

**Providing Medical Services to Inmates**

In addition to analyzing the BOP's efforts to contain health care costs, we also evaluated whether the BOP was providing inmates with expected preventive medical services. Both our audit testing and reviews by the BOP's Program Review Division found that BOP institutions do not always provide expected preventive medical services to inmates.

*OIG Testing*

As discussed in the Introduction, the BOP established 16 Clinical Practice Guidelines providing guidance to its institutions concerning health care services for inmates. The BOP Medical Director considered the guidelines to be "best medical practices" and told us that while the guidelines have not been incorporated into the BOP's program statements as policy, he expects BOP institutions to provide these services to inmates.[22] The Medical Director also informed us that institutions have discretion to depart from the guidelines on a case-by-case basis. However, institutions must request and receive approval from the Medical Director to not implement a specific guideline requirement.

To determine whether institutions were providing these medical services to inmates, we selected and tested services listed in the BOP's Preventive Health Care Clinical Practice Guideline. We chose this particular BOP guideline because:

- It addressed care for all inmates, instead of only inmates with specific illnesses;

- It included diagnostic procedures for 9 of the 11 chronic conditions addressed in the other 15 guidelines;

- It contained clearly defined medical services that could be reasonably tested;

- Health promotion and disease prevention is a primary objective of the BOP's efforts to contain costs; and

- The BOP Medical Director told us that our testing of the preventive health care guideline would provide useful information to the BOP

---

[22] The BOP publishes its mandatory policies and procedures in program statements. The BOP also publishes clinical practice guidelines that contain specific procedures and tests that the BOP expects its providers to follow when providing medical care to inmates.

because its per capita cost of providing health care should be reduced by implementing a good preventive health program, and he expects the institutions to provide the services in the guideline.

We identified 30 specific preventive health care services in the BOP's Preventive Health Care Clinical Practice Guideline with clearly defined requirements that allowed for testing whether the services were provided. Appendix III shows the 30 services we tested, which included whether: (1) inmates received a measles, mumps, and rubella vaccine, (2) inmates received a hepatitis A vaccine, (3) inmates received a cholesterol check in the last 5 years, (4) female inmates received a chlamydia test, and (5) female inmates received a bone density screening test.

To perform our testing of the 30 medical services, we selected a sample of 1,110 of the 14,026 inmates assigned to 5 BOP facilities as of March 24, 2007, as shown in the table below. Appendix IV contains an explanation of our sampling methodology.

**Inmate Population and Inmates Sampled**

| BOP Facility | Inmate Population as of March 24, 2007 | Inmates Sampled |
|---|---|---|
| USP Atlanta (Georgia) | 2,494 | 251 |
| USP Lee (Virginia) | 1,808 | 133 |
| Federal Correctional Complex Terra Haute (Indiana) | 3,343 | 249 |
| Federal Medical Center Carswell (Texas) | 1,677 | 127 |
| Federal Correctional Complex Victorville (California) | 4,704 | 350 |
| Totals | 14,026 | 1,110 |

**Source:** OIG sample from BOP inmate population data

For each inmate sampled, we reviewed the inmate's medical record and determined whether the inmate received the 30 preventive services, as applicable. The 30 services were not applicable to all inmates sampled because certain services applied only to female inmates, the services applied only to inmates over a certain age, and the services applied only if the inmate had certain risk factors. To validate our testing, we asked a Health Services Unit official at each of the facilities tested to confirm our results and ensure that we had not overlooked the provision of any service.

As shown in the following two charts, the combined results for all 5 locations showed that, for 16 of the 30 services tested, 90 percent or more of the inmates received the preventive service as appropriate. For the remaining 14 services, more than 10 percent of the sampled inmates did not

25

receive the medical service.[23]  For example, 94 percent of the inmates who should have received a cardiovascular risk calculation had not received one in the last 5 years as required by BOP policy.  Additionally, 87 percent of the sampled inmates needing a measles, mumps, and rubella vaccine had not received this service.

**Overall Results of the OIG's Testing of
Medical Services Provided to Inmates[24]**



---

[23]  The percentages in the chart are based on the number of inmates for whom the service was applicable.

[24]  Some percentages in the chart total less than 100 percent because documentation was not available to determine if the test was performed for some inmates.



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 15. Inmate received an HIV-1 test | 381 | 93% | 6% |
| 16. Inmate received an HIV-2 test | 130 | 98% | 2% |
| 17. Inmate received a tuberculosis test in the past year | 869 | 98% | 2% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 339 | 98% | 2% |
| 19. Inmate received a cholesterol check in the last 5 years | 678 | 71% | 29% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 402 | 6% | 94% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 324 | 84% | 12% |
| 22. Inmate received a current blood pressure check | 1,043 | 96% | 4% |
| 23. Inmate received a current body mass index calculation | 1,036 | 12% | 88% |
| 24. Inmate received a fecal occult blood test | 189 | 46% | 54% |
| 25. Inmate received a vision screening test | 58 | 93% | 7% |
| 26. Inmate received a hearing screening test | 35 | 51% | 49% |
| 27. Inmate received an abdominal ultrasound test | 6 | 100% | |
| 28. Female inmate received a papanicolaou test (PAP smear) | 142 | 99% | 1% |
| 29. Female inmate received a current mammogram | 89 | 100% | |
| 30. Female inmate received a bone density screening test | 8 | 38% | 62% |

**Source:** OIG testing of BOP medical records

We could not determine if some services were provided because information was either not recorded or was missing from the inmates' medical records. Appendix VII contains our test results at each of the five BOP facilities. For each BOP location tested, the following chart presents the percentages of inmates not receiving a calculation for cardiovascular risk. As the chart shows, inmates at all five facilities rarely received this service.



**Source:** OIG testing of BOP medical records

Medical staff at three of the five institutions told us that they usually did not perform this service because they considered the service unnecessary or they use an alternate method to evaluate the inmate for this condition. Medical staff at another institution told us they did not perform this service because of staffing inadequacies and scheduling constraints. Officials at the other institution, FMC Carswell, declined to provide us with an explanation for not performing these services, stating that BOP headquarters would respond to the finding after we issued our report.

We also found a large inconsistency among the institutions in providing other medical services. For example, as shown in the chart below, we found that the percentage of applicable inmates not receiving a cholesterol check within the past 5 years ranged from 68 percent at USP Lee to 8 percent at FMC Carswell. This disparity indicates a need for better BOP headquarters oversight and guidance of the extent to which institutions implement expected services.



**Source:** OIG testing of BOP medical records

28

In another example, as shown in the following chart, we found that the percentage of applicable inmates not receiving a tetanus vaccine in the past 10 years ranged from 72 percent at USP Lee to 5 percent at USP Atlanta.



**Source:** OIG testing of BOP medical records

Additional inconsistencies between the five institutions can be seen by reviewing our results in Appendix VII. These include large inconsistencies among the institutions in performing tests for chlamydia, hepatitis C, HIV, vision, and hearing; and providing vaccines for pneumonia; influenza; and measles, mumps, and rubella.

We asked officials at each of the five institutions for an explanation of why some services were not provided to a significant number of inmates. The explanations provided by institution officials are discussed below.

**USP Atlanta.** USP Atlanta officials did not give us an explanation for why inmates were not provided a cholesterol test and a fasting glucose test, but gave the following explanations for not supplying other medical services to inmates.

- Influenza vaccine – Officials told us that the vaccine was not always available.

- Measles, Mumps, and Rubella vaccine – Officials said they believed that the requirement only applied to women.

- Cardiovascular risk calculation – Officials told us that they used alternative methods for determining cardiovascular risk.

- Body Mass Index calculation – Officials said they considered this calculation unnecessary.

- Fecal Occult Blood test – Officials told us that the inmates share the responsibility for completion of this test and that generally the inmates fail to return the test cards.

- Hearing Screening – Officials said that there was no occupational risk at the institution, and they overlooked the requirement for screening inmates age 65 and over.

Health Services Unit management officials at USP Atlanta said they viewed the Preventive Health Care Clinical Practice Guideline as a recommended, but not mandatory, regimen of health care practices and had identified certain tests or procedures that they did not consider necessary and therefore did not perform routinely. The USP Atlanta had not requested and received a waiver from the BOP Health Services Division to deviate from any of the guidelines.

USP Atlanta had not yet implemented BOP's Primary Care Provider Teams (PCPT), and this may have contributed to expected medical services not being provided. Under the PCPT model, each inmate is assigned to a medical team of health care providers and support staff who are responsible for managing the inmate's health care needs. The PCPT model is designed to provide inmates with better and more consistent medical care because the inmate is examined by the same provider team each time the inmate requires medical attention. The inmate should be less likely to miss some services because the provider team would be familiar with the services previously provided the inmate. According to the BOP's Preventive Health Care Clinical Practice Guideline, the most efficient and cost-effective way to implement the guideline is to assign appropriate responsibilities to each PCPT member. However, USP Atlanta officials told us that as a result of limited staffing they have been unable to establish the Primary Care Provider Teams.

After we performed audit tests at USP Atlanta, we met with the BOP's Medical Director and other management officials from the BOP's Health Services Division to clarify the BOP's expectations for institutional compliance with the Preventive Health Care Clinical Practice Guideline. BOP management officials told us that because of frequent changes in the guidelines and the lengthy process to change or update BOP policy in its program statements, they did not incorporate the clinical practice guidelines into the BOP's program statements. However, the Medical Director told us that he considers the clinical practice guidelines to be "best medical practices" and he expects the institutions to follow the guidelines when providing medical care to inmates. The Medical Director said that institution officials could use discretion and professional judgment when determining

whether to follow the guidelines on a case-by-case basis. However, the Medical Director told us that if institution officials decide not to follow a guideline on an institution-wide basis, then the institution officials must request and receive his approval to do so. The USP Atlanta had not done so.

**USP Lee.** USP Lee medical officials told us that they did not provide routine tests and vaccines because of the cost of the procedures and the overall good health of USP Lee's Care Level 1 population. USP Lee officials said that they rely heavily on the inmates' responsibility for improving their health and seeking preventive health care. As was the case at USP Atlanta, medical officials at USP Lee also had not fully implemented the PCPT and did not use the Preventive Health Care Model. Medical personnel at USP Lee told us that they had not fully implemented the PCPT because USP Lee was a Care Level 1 facility and its staff was limited.

**FCC Terre Haute.** FCC Terre Haute medical officials told us that they did not provide routine tests and vaccines because of staffing inadequacies and scheduling constraints. The medical officials at FCC Terre Haute also had not fully implemented the PCPT because of staffing shortages and did not use the Preventive Health Care Model.

**FMC Carswell.** FMC Carswell medical officials declined our requests for an explanation of why certain services were not provided to inmates. The officials said that BOP headquarters would provide a response after we issued our report. Medical officials at FMC Carswell had implemented PCPT. Officials told us while staff members and inmates were assigned to provider teams, nurses had to assist on multiple teams because of the limited number of nurses on staff. As a result of our audit, staff at FMC Carswell identified areas for improvement, such as providing a chlamydia test to all females who were under 25 years of age. This institution began providing the chlamydia test in accordance with the Clinical Practice Guideline immediately following our site visit.

**FCC Victorville**. FCC Victorville medical officials told us that they did not provide routine tests and vaccines because it was too costly due to its large inmate population. For instance, because of the high cost for vaccines, FCC Victorville generally provided vaccines such as tetanus to inmates with open injuries rather than every 10 years as required by the guideline. Medical officials at FCC Victorville also had not fully implemented the PCPT. Medical staff had assigned inmates to a mid-level practitioner, but staffing of provider teams was not complete. As a result of our audit, staff at Victorville began implementing additional practices, such as bone density screening for female inmates, in accordance with the Preventive Health Clinical Practice Guideline.

31

*Testing by the BOP's Program Review Division*

The BOP's Program Review Division also has identified instances where institutions did not provide required medical services to inmates. The Program Review Division performs reviews at BOP institutions, generally on a 3-year cycle, to determine whether the institutions are in compliance with a variety of BOP policies. As part of these reviews, the teams determine whether the institution provided certain required medical services to inmates.

From FYs 2004 through 2006, the BOP's Program Review Division conducted 110 reviews at 88 locations. Of the 110 reviews, 40 reviews (36 percent) identified a total of 25 required medical services that institutions did not always provide to inmates. The following table shows the number of institutions that did not provide certain services.

| Medical Service not Provided | Number of Institutions Where Problem Found |
|---|---|
| 1. Inmates with chronic care conditions were not monitored as required. | 16 |
| 2. Some inmates were not monitored for psychotropic medical side effects. | 11 |
| 3. The Hepatitis-B vaccine was not offered to inmates in a high-risk work detail. | 8 |
| 4. Inmates did not receive adequate dental screening. | 7 |
| 5. Inmates did not receive a gynecological examination. | 6 |
| 6. HIV positive inmates did not receive counseling. | 5 |
| 7. Inmates admitted at a local hospital were not adequately monitored by a medical doctor. | 5 |
| 8. Inmates did not receive a timely intake physical. | 3 |
| 9. HIV positive inmates did not receive recommended vaccine. | 3 |
| 10. Inmates did not receive a baseline liver function test before isoniazid treatment. | 2 |

| Medical Service not Provided | Number of Institutions Where Problem Found |
|---|---|
| 11. Inmate physicals were missing vital signs. | 2 |
| 12. Inmates taking TB medications were not monitored for side effects. | 2 |
| 13. Tests ordered by physicians were not completed. | 2 |
| 14. Isoniazid treatment for latent tuberculosis was not extended when treatment was missed. | 2 |

**Source:** OIG analysis of BOP program review reports

*Potential Effect of Not Providing Services*

For a variety of reasons, inmates should be provided the medical services that BOP policies require or that BOP management expects. If expected medical services are not provided, an inmate's medical condition may worsen and the BOP may be faced with much higher medical treatment costs for an extended period of time.

During FYs 2004 through 2006, the BOP received 12,960 medical-related complaints. The BOP granted relief for 1,970 of these complaints. Over the same period, 6,030 medical-related complaints were appealed to the BOP's regional offices and 2,987 complaints were appealed to BOP headquarters. The BOP granted relief for 202 and 9 of these complaints, respectively.

For the same 3-year period, decisions were made on 233 medical-related lawsuits and appeals against the BOP. Of the 233 lawsuits and appeals, 221 were dismissed, 1 was decided favorably for the BOP, and 11 were settled out of court for a total of $2,036,790. The 11 settlements involved 3 claims of wrongful deaths and 8 claims of inadequate, improper, or negligent medical care. In a recent case, an inmate died 6 days after his first chronic care visit to a BOP medical provider. The BOP's mortality review for this case indicated that the inmate did not receive appropriate medical care during his incarceration. Specifically, upon intake at the facility on November 27, 2006, the inmate was referred to the chronic care clinic based on a history of severe scoliosis and chronic low back pain. However, the inmate was not seen in the chronic care clinic until 5 months later on April 27, 2007. A follow-up Electrocardiogram (EKG) was performed on May 1, 2007, and noted to be abnormal. However, the EKG results were not reviewed by a medical doctor until May 3, 2007, the day the inmate died of a heart attack.

33

## Conclusion

The BOP has implemented numerous health care initiatives aimed at reducing or containing health care costs. We were able to evaluate the BOP's overall health care costs, and we found that the BOP has done well in effectively controlling the overall rate of increase in its per capita health care costs, particularly when compared to national health care cost data reported by the Departments of Health and Human Services and Labor. However, the BOP did not maintain cost data to measure the effect of its individual initiatives on specific and overall medical service costs. Therefore, we could not determine the cost effectiveness of BOP health care initiatives on an individual basis. We recommend that the BOP begin collecting and analyzing cost data for its medical services to determine the effectiveness of each of its initiatives in controlling and reducing the costs of specific medical services and overall inmate health care. Without such analysis, the BOP cannot determine which initiatives are most effective and which are not producing desired results.

Additionally, we found that BOP institutions did not always provide inmates with the medical services expected by BOP management and identified in BOP guidance. Our review, as well as evaluations performed by the BOP's Program Review Division, identified medical services that BOP institutions did not always provide to inmates. The BOP Medical Director stated that he expects the institutions to provide these medical services to inmates.

The failure to correct these deficiencies could lead to higher costs for providing health care, decreases in the quality of health care provided, exacerbation of inmate medical conditions, medical-related complaints and lawsuits from inmates, and BOP liability for lack of adequate medical care.

We recommend that the BOP review the required medical services that the OIG and the BOP's Program Review Division determined were not provided consistently to inmates and decide whether the BOP still considers these services necessary. If the BOP deems any of the services unnecessary, it should remove them from the guidelines that recommend the services be provided. For services that the BOP determines are necessary, the BOP should develop a mechanism to ensure its institutions are consistently complying with BOP policy concerning these medical services.

**Recommendations**

We recommend that the BOP:

1. Establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results.

2. Review the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determine whether those medical services are necessary, or whether the medical service requirement should be removed from the clinical practice guidelines.

3. Issue clarifying guidance to the institutions regarding the medical services that BOP decides are necessary for BOP medical providers to perform.

Case 3:16-cv-02267   Document 362-31   Filed 11/20/20   Page 14 of 47 PageID #: 15417

This page intentionally left blank.

## 2. BOP CONTRACT ADMINISTRATION

Prior OIG audits of BOP medical contracts have identified multiple contract-administration deficiencies, such as inadequate review and verification of contractor invoices and inadequate supporting documentation for billings. Several of these deficiencies appeared to be systemic. The deficiencies primarily resulted from inadequate or non-existent guidance or procedures regarding critical management controls over these contracts. After these previous audits, the BOP took action to address individual deficiencies at the institutions we audited. However, in this audit we found that other BOP institutions lacked appropriate controls in the same areas identified by our prior contract audits, which indicates the existence of systemic weaknesses that are not being adequately addressed by the BOP.

From August 2004 through March 2007, the OIG issued the following nine audit reports on BOP medical contracts. Appendix X contains summaries of these audits.

**OIG Audits of BOP Medical Contracts**
**August 2004 through March 2007**

| Report Title and Number | Institution | Month and Year Issued |
|---|---|---|
| The Bureau of Prisons' Contract with the Parkview Medical Center for the Acquisition of Medical Services (J40604c-030), Audit Report GR-60-04-008 | FCI Florence | August 2004 |
| Correctional Medical Services' Compliance with the Federal Bureau of Prisons' Contract J21451c-009, Audit Report GR-70-04-009 | FCI Fort Dix | September 2004 |
| The Federal Bureau of Prisons' Contract with Medical Development International for the Acquisition of Medical Services at its Leavenworth, Kansas Facilities (Contract No. DJB40804003), Audit Report GR-60-05-003 | USP Leavenworth | February 2005 |
| The Federal Bureau of Prisons' Medical Services Contract with Wayne Memorial Hospital, Jesup, Georgia (Contract J30703c-020), Audit Report GR-40-05-006 | FCI Jesup | April 2005 |
| The Federal Bureau of Prisons' Contract Number DJB21602-004 with Salem Community Hospital in Salem, Ohio, Audit Report GR-50-05-012 | FCI Elkton | June 2005 |

| Report Title and Number | Institution | Month and Year Issued |
|---|---|---|
| The Federal Bureau of Prisons' Medical Services Contract with Hospital Corporation of America - HealthONE, L.L.C., Contract No. J40303c-146, Audit Report GR-60-06-006 | FCI Englewood | March 2006 |
| The University of Massachusetts Medical School and UMass Memorial Health Care, Incorporated's Compliance with the Federal Bureau of Prisons' Contract DJB20507032, Audit Report GR-70-06-006 | FMC Devens | March 2006 |
| The Federal Bureau of Prisons' Medical Services Contract with John C. Lincoln Health Network Contract No. DJB60803144, Audit Report GR-60-06-009 | FCI Phoenix | August 2006 |
| The Bureau of Prisons' Management of the Medical Services Contract with Medical Development International, Butner, North Carolina, Contract No. DJB10611-00, Audit Report GR-40-07-003 | FCC Butner | March 2007 |

**Source:** OIG Audit Reports

Eight of the nine OIG contract audits identified major internal control deficiencies. The deficiencies included management control weaknesses pertaining to calculating medical service discounts, reviewing and verifying invoices and billings, paying bills, and managing the overall administration of the contracts. Based on the results of these audits, the following weaknesses appeared to be systemic.

- Six of the contract audits found weaknesses in verifying and reviewing the accuracy of invoices for medical services provided by the contract providers.

- Five of the contract audits found weaknesses in obtaining supporting documentation for contractor billings.

- Four of the contract audits found errors in the Medicare or diagnostic-related groups discount rates.

- Three of the contract audits found that the contractor did not provide the services stated in the contract, and the contractor's performance reports were either inaccurate or submitted in an untimely fashion.

The OIG contract audits identified about $12.3 million in questionable payments to the contractors. The audits usually found that the identified

38

weaknesses were attributable to the lack of written procedures and other internal controls.

As of November 2007, the BOP's Program Review Division said that corrective actions had been implemented for all recommendations in seven of the nine contract audits. For the other two audits, the BOP agreed to take corrective actions on our recommendations, and those actions were either completed or in progress as of November 2007.

In response to six of the nine audits, the BOP strengthened management controls by establishing written procedures for processing and monitoring contract medical claims. However, these actions were limited to correcting the deficiencies only at the institutions where the deficiencies were found. We found no indication that the corrective actions on the systemic weaknesses found in these audits were shared with other BOP institutions. Further, as discussed on page 19, in response to OIG findings on BOP's payment of medical claims, the BOP began an initiative in 2004 designed to ensure medical claims are properly paid. However, the BOP does not expect to award a contract for medical claims adjudication services until early in calendar year 2008. We found no indication that the BOP issued any interim guidance agency-wide to address the problems the OIG found with paying medical claims.

To address the OIG audit findings nationally, BOP officials told us that the following actions have been taken.

- The BOP's Field Acquisition Office staff visit institutions about 2 to 3 months after the award of a comprehensive medical contract to provide contract orientation, bill verification training, and a contract administration briefing.

- The BOP issued a memorandum to its regional directors and chief executive officers in February 2005 to heighten awareness of recurring findings in OIG audits. The BOP included a Contract Administration Checklist with the memorandum, but stated that use of the checklist was optional.

- The BOP provided training to almost 200 BOP institution contracting staff at Advanced Procurement Training classes that covered comprehensive medical contracts, contract administration guidance, and recurring findings in OIG audits.

As part of this larger audit of BOP medical services we tested other BOP institutions for controls related to the deficiencies identified in our nine

individualized BOP contract audits.  Internal control is a major part of managing an organization.  It includes the plans, methods, and procedures used to meet missions, goals, and objectives and, in doing so, supports performance-based management.  Internal controls on all transactions and other significant events need to be clearly documented, and the documentation should be readily available for examination.  The documentation should appear in management directives, administrative policies, or operating manuals and may be in paper or electronic form.  In addition, the documentation and records should be properly managed and maintained.

We interviewed BOP officials at the five BOP institutions where we conducted fieldwork during this audit and sent survey questionnaires to the remaining 88 BOP institutions.  Through the interviews and surveys we inquired if BOP institutions had established internal control procedures for their comprehensive medical services contracts, including:

- reviewing contractor invoices for accuracy,

- ensuring contractor invoices are supported by adequate documentation,

- ensuring that invoice discounts are properly applied,

- ensuring that contractor performance reports are complete and accurate, and

- ensuring that contractor timesheets are verified by a BOP employee.

If the institutions responded that procedures were established, we asked whether the procedures were in writing.  Despite the training conducted and the guidance issued by the BOP, we found that up to seven BOP institutions lacked critical controls for certain contract administration functions.  We also found that approximately half the institutions with critical controls had not documented the procedures associated with the controls.  Our analysis of survey responses found that 77 of the 88 BOP institutions surveyed had comprehensive medical service contracts.  Generally, officials at each institution responded that they had established internal control procedures for administering their institution's contracts.  However, we found that about half the institutions had not formalized these procedures in written policy for the controls we tested, as noted in the chart below.

**Controls Established by BOP Institutions for Comprehensive Medical Services Contracts**

| Contract Administration Function | Number of Institutions | | | |
| --- | --- | --- | --- | --- |
| | Procedures not Established | Procedures Established | Procedures Established but not Written | Percent of Established Procedures not Written |
| Reviewing contractor invoices for accuracy | 1 | 76 | 39 | 51% |
| Ensuring contractor invoices are supported by documentation | 3 | 74 | 36 | 49% |
| Ensuring invoice discounts are properly applied | 7 | 70 | 34 | 49% |
| Ensuring contractor performance reports are complete and accurate | 2 | 75 | 35 | 47% |
| Ensuring contractor timesheets are verified by a BOP employee | 2 | 75 | 43 | 57% |

**Source:** BOP responses to OIG survey questionnaire

The lack of written procedures increases the risk that appropriate controls will not be fully and consistently implemented, especially when staff assignments and duties change. In the nine individual contract audits, failure to effectively implement the five controls had multiple effects. For example, in one audit of a major medical services contract, the OIG found that the BOP did not adequately review contractor invoices for accuracy, ensure contractor invoices were supported by documentation, and assure contractor timesheets were verified by a BOP employee. As a result of these weaknesses, the audit identified $2,428,345 in questioned costs related to:

- instances in which invoices contained transactions that were not within the billings' service period;

- transactions for which the contractor billed the BOP at a rate higher than specified in the contract;

- transactions in which the contractor billed the BOP for a cardiologist's reading of echocardiography results, which was not covered by the contract;

- transactions for timesheets that were either miscalculated, overstated, understated, or unsupported;

41

- transactions where the hours billed for contractor employees were greater than the hours recorded in the institution's contractor time logs;

- transactions where the hours billed were for contractor employees whose names did not appear in the contractor time logs; and

- inadequate support for billings for "on call" services provided under the contract.

Similar weaknesses were noted in the other contract audits. In short, if controls are not established, documented, and applied BOP-wide to address these contract administration functions, the BOP could experience similar negative effects on its medical contracts all across the BOP, such as paying contractor invoices that contain unallowable or unsupported costs.

**Conclusion**

This audit, along with prior OIG audits of individual BOP medical contracts, found that BOP institutions lacked adequate management controls to ensure the effective administration of critical medical service contract functions. The absence of such controls appears to stem from BOP headquarters not identifying systemic weaknesses and implementing the necessary policies and internal control procedures to remedy the issues. We found in our individual BOP medical contract audits that the lack of management controls resulted in the BOP making questionable payments to contractors. In total, the OIG contract audits identified about $12.3 million in questionable payments to the contractors. We believe our findings in this review and in the individual audits on BOP medical contract administration illustrate the likelihood that similar weaknesses exist in medical contracts in other BOP institutions that we have not audited. We recommend that the BOP strengthen controls by providing guidance and procedures to its institutions to help ensure that systemic deficiencies are corrected throughout the BOP.

**Recommendation**

We recommend that the BOP:

4. Strengthen management controls to ensure proper administration of BOP medical contracts by providing guidance and procedures to all BOP institutions for:

42

- reviewing contractor invoices for accuracy,

- ensuring contractor invoices are supported by adequate documentation,

- ensuring that invoice discounts are properly applied,

- ensuring that contractor performance reports are complete and accurate, and

- ensuring that contractor timesheets are verified by a BOP employee.

This page intentionally left blank.

### 3. MONITORING BOP HEALTH CARE PROVIDERS

The BOP monitors its health care providers by performing program reviews of institution operations, reviewing medical provider skills and qualifications and providing authorization documents based on the review results, and requiring institutions to accumulate and submit to BOP headquarters data on health-related performance measures. However, while the BOP corrected deficiencies at the specific institutions where its program reviews found weaknesses, it did not develop and issue guidance to correct systemic deficiencies found during the reviews. Additionally, we determined that the BOP allowed some health care providers to practice medicine without valid authorizations. Also, health care providers did not have their practices peer reviewed to ensure the quality of their medical care as required by BOP policy. Moreover, while BOP institutions accumulated and reported data on health-related performance measures, the methods used to do so were inconsistent and the data was not analyzed to evaluate the performance of BOP institutions.

The BOP uses numerous mechanisms to monitor its health care providers. Some of the mechanisms include:

- conducting internal program reviews to determine whether each institution is properly implementing BOP policies, including policies related to inmate health care;

- granting clinical privileges and establishing practice agreements and protocols based on health care providers' qualifications, knowledge, skills, and experience;[25]

- conducting peer reviews of health care providers to assess the competency of the providers; and

- requiring each institution to accumulate and report performance data on a quarterly basis for specific health-related areas.

The primary purpose of these monitoring mechanisms is to help ensure the quality and efficiency of health care delivered to inmates by identifying and correcting deficiencies in the provision of health care, and in

---

[25] Clinical privileges and practice agreements authorize the specific clinical or dental duties that health care providers may provide to BOP inmates.

authorizing duties for health care providers commensurate with their skills and capabilities.

**The BOP's Program Review Results**

Program Statement P1210.23, Management Control and Program Review Manual, requires that the BOP's Program Review Division perform a comprehensive review of each program or operation at each BOP institution in accordance with published program review guidelines. The program reviews are generally conducted once every 3 years, or more frequently if the reviews identify overall performance that is less than a certain level. Program Review Guideline G6000I.04, Health Services, provides the specific review steps for the Program Review Division to complete when performing a program review of the health services function at BOP institutions.

From FYs 2004 to 2006, the Program Review Division conducted 110 program reviews of health care at 88 BOP locations. We reviewed the resulting reports and determined that the Program Review Division consistently identified deficiencies related to inmate health care. As discussed in Finding 1 of this report, 40 of the 110 reviews found medical services deficiencies.

In response to these reviews, the Program Review Division required institutions to certify completion of corrective actions addressing the deficiencies it identified. The Program Review Division also prepared quarterly program summary reports that identified the most frequent deficiencies found during the program reviews. The Division provided the summary reports to all BOP Chief Executive Officers, including the BOP Health Services Division Medical Director. However, a senior Health Services Division official told us that the BOP probably would not change policy when program reviews find problems in a certain area, but it may provide training to improve staff knowledge and compliance. The official said the Division relies on the BOP Regional Offices and institutions to correct the problems.

We analyzed the 40 BOP reviews and found that 25 different medical services were not provided to inmates and that 14 of the 25 deficiencies were identified for multiple institutions. For example, as shown in the table on page 32, the Program Review Division found inmates with chronic care conditions that were not monitored at 16 BOP institutions as required by BOP policy. Also, the reviews found inmates that were not monitored for psychotropic medical side effects at 11 institutions.

46

We recommend that the BOP use the program summary reports to develop or clarify guidance to correct systemic deficiencies identified during the internal program reviews.

**The BOP's Credential Verification, Privileges, and Practice Agreement Program**

In providing inmate health care, BOP institutions employ or contract for the following health care providers.

- **Licensed independent practitioners** are medical providers authorized by a current and valid state license to independently practice medicine, dentistry, optometry, or podiatry.

- **Non-independent practitioners** are graduate physician assistants (certified or non-certified), dental assistants, dental hygienists, nurse practitioners, and unlicensed medical graduates.

- **Other practitioners** are those not included in the above categories and include clinical nurses and emergency medical technicians.

The BOP's Program Statement P6027.01 provides guidance for implementing the BOP's Health Care Provider Credential Verification, Privileges, and Practice Agreement Program. Under this program, the BOP: (1) grants clinical privileges to licensed independent practitioners based on the practitioner's qualifications, knowledge, skills, and experience; (2) establishes practice agreements between its licensed independent practitioners and its non-independent practitioners, such as mid-level practitioners; (3) establishes protocols that must be followed by other health care providers, such as clinical nurses and emergency medical technicians; and (4) performs peer reviews of all providers who function under clinical privileges or practice agreements.

*Privileges, Practice Agreements, and Protocols*

The BOP grants clinical privileges to its in-house and contracted practitioners. Clinical privileges are the specific duties that a health care provider is allowed to provide to BOP inmates. The following authority is assigned to grant institution specific clinical privileges.

- The BOP Medical Director grants privileges for institution physicians designated as the Clinical Director, including a physician who is appointed as Acting Clinical Director while the permanent position is vacant. The BOP Medical Director also grants privileges for Clinical

Specialty Consultants and Chief Dental Officers. The Medical Director delegated privilege-granting authority for the Chief of Psychiatry at BOP institutions to the BOP's Chief Psychiatrist.

- The institution's Clinical Director grants privileges for other licensed independent practitioners who deliver medical health care at the institution, including contractors, consultants, and those involved in tele-health.

- The BOP Chief Dental Officer grants privileges for all institution Chief Dental Officers.

- The institution Chief Dental Officer grants privileges for institution dentists.

BOP policy states that clinical privileges can be granted for a period of not more than 2 years, and that newly employed physicians can be granted privileges for a period of not more than 1 year. Independent practitioners are prohibited from practicing medicine within the BOP until they have been granted privileges to do so by an authorized BOP official.

The individual institutions establish practice agreements between licensed independent practitioners and non-independent practitioners. Practice agreements delegate specific clinical or dental duties to non-independent practitioners under a licensed independent practitioner's supervision and are valid for no more than 2 years. Non-independent practitioners include graduate physician assistants, nurse practitioners, and unlicensed medical graduates who must be directly supervised by a licensed independent practitioner. BOP policy prohibits non-independent practitioners from providing health care within the BOP until a practice agreement has been established.

The BOP's other health care providers, such as clinical nurses and emergency medical technicians, must work under protocols approved by licensed independent practitioners. A protocol is a plan for carrying out medical-related functions such as a patient's treatment regimen.

To determine whether the BOP maintained current privileges, practice agreements, and protocols for each of its practitioners, we sent survey questionnaires to 88 BOP institutions. We asked BOP staff at each location to provide the date and a copy of the latest: (1) privilege-granting document for licensed independent practitioners, (2) practice agreement for non-independent practitioners, and (3) protocol for other health care providers. We analyzed the BOP responses to identify instances when the

appropriate authorization document was either not provided to new medical providers or not renewed for existing medical providers. We identified 134 practitioners who did not have current privileges, practice agreements, or protocols as shown in the following table.

**BOP Medical Practitioners without Current Privileges, Practice Agreements, or Protocols**

| Type of Authorizing Document | Practitioners Requiring Authorizing Document | Practitioners without Authorizing Document | Percent without Authorizing Document |
|---|---|---|---|
| Privileges | 680 | 72 | 11% |
| Practice Agreement | 466 | 42 | 9% |
| Protocol | 390 | 20 | 5% |
| Totals | 1,536 | 134 | 9% |

**Source:** Responses by BOP institution officials to OIG survey questionnaire

We also found that 28 of the 42 practitioners without a current practice agreement had medical service privileges authorized. These practitioners were non-independent practitioners who should not require privileges based on the BOP's policy. While there may be rare instances where it is appropriate to grant non-independent practitioners privileges instead of practice agreements, the large number of practitioners incorrectly authorized indicates that BOP institution officials did not have a good understanding of BOP policies regarding medical practitioner authorization. We also noted a similar situation for 9 of the 20 practitioners without current protocols. These nine practitioners had been granted privileges or were given practice agreements instead of protocols as required by BOP policy. In addition, the BOP's response to our survey questionnaires showed that 267 practitioners were provided multiple levels of authority. For example, 146 practitioners were provided both practice agreements and privileges. Again, we believe this indicates that BOP staffs at the institutions do not consistently understand BOP authorization policies.

Based on the responses we received from BOP institution officials regarding why the practitioners did not have current privileges, practice agreements, or protocols, we believe that confusion exists among the officials as to which type of authorization different health care providers should receive.

Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. As a result, the BOP could be subjected to liability

49

claims by inmates if improper medical services are provided by these practitioners.

The BOP should ensure that practitioners are properly authorized to provide medical care to inmates. To accomplish this, it is essential that the BOP establish privileges, practice agreements, or protocols for all practitioners, as applicable. The BOP must also reevaluate and renew the privileges, practice agreements, and protocols in a timely manner. Moreover, the BOP must emphasize the importance of valid privileges, practice agreements, or protocols and not allow practitioners without current authorizations to practice medicine in BOP institutions.

*Peer Reviews*

BOP policy requires that BOP health care providers have a periodic peer review. A peer is defined as another provider in the same discipline (physician, dentist, mid-level practitioner, or others) who has firsthand knowledge of the provider's clinical performance. Using a sample of the provider's primary patient load, the peer reviewer should evaluate the professional care the provider has given and comment on the provider's:

- actual clinical performance;

- appropriate utilization of resources;

- participation in, and results of, performance improvement activity;

- clinical judgment; and

- technical skills.

BOP health care providers who are privileged or working under a practice agreement must have at least one peer review every 2 years. Each Clinical Director, Chief Dental Officer, and Clinical Psychiatrist must also have a peer review at least once every 2 years.

In our survey questionnaire sent to 88 BOP institutions, we asked the BOP to provide the date of the last peer review for all providers who were privileged or working under practice agreements. For the 891 such providers, the responses to the questionnaire indicated that 430 (48 percent) had not received a peer review within the past 2 years.

We asked BOP officials about the lack of peer reviews. The officials responsible for more than half of the non-current peer reviews did not

provide an explanation. The officials responsible for the remaining non-current peer reviews cited the following reasons.

- The officials rely on the contractors to do peer reviews.

- The officials believed that the peer review requirement did not apply to mid-level practitioners, dental assistants, or dental hygienists.

- The officials relied on other types of performance reviews instead of doing the required peer reviews.

Without current peer reviews, the BOP has a higher risk of not detecting circumstances where providers may not be giving adequate medical care to inmates. If inadequate professional care goes undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care. Moreover, inadequate care by a practitioner without a current peer review also increases the risk of BOP liability arising from any formal complaints or medical malpractice suits filed by inmates.

**The BOP's Health Care Performance Measures**

The BOP has also established national performance measures for health care, including annual targets or goals, for management of: (1) hypertension, (2) cholesterol, (3) diabetes, (4) HIV, (5) tuberculosis, (6) asthma, (7) breast cancer, (8) cervical cancer, and (9) pregnancy. Appendix VIII shows how each performance measure is calculated and the target percentage, or goal, that BOP established each performance measure.

A BOP official told us that the BOP had not established written procedures to be followed by institutions in accumulating and submitting performance measure data to headquarters. According to the official, the institutions have been asked since 2004 to submit quarterly reports containing data for the performance measures to BOP's Health Services Division. However, the official noted that compliance to this request was voluntary.

In our survey questionnaire, we asked institution officials if they had completed the performance measure calculations for the nine performance measures for calendar year 2004 through the first quarter of calendar year 2007. The following table details the 99 responses from officials at the 88 BOP locations.

| Performance Measure Calculations Completed for Calendar Year | BOP Response[26] | | | |
|---|---|---|---|---|
| | Yes | No | Not Applicable | No Response |
| 2004 | 59 | 28 | 10 | 2 |
| 2005 | 77 | 14 | 4 | 4 |
| 2006 | 87 | 11 | 0 | 1 |
| 2007 (1st Quarter) | 90 | 7 | 1 | 1 |

**Source:** BOP responses to OIG survey questionnaires

Based on the responses, institutions completing the performance measure calculation increased each year since 2004. We followed up with BOP officials for institutions that did not complete performance measure calculations and the officials usually could not provide an explanation for why the measures were not completed and said that the person who was responsible for completing the calculations was no longer at the institution. Officials who did provide an explanation usually attributed not completing the performance measures to staffing shortages.

In our survey, we also asked the BOP to provide a copy of the performance measure reports completed. We analyzed performance measure reports and found that BOP institutions often did not meet the target levels established for the nine target goals. For the 9 health care performance measures we tested, we found that the institutions reported performance below the target level for more than 20 percent of the quarters reported for 7 of the 9 performance measures as shown in the following table.

| Performance Measure | Number of Reporting Institutions | Number of Quarters Reported | Number of Quarters Below Target | Percentage of Quarters Below Target |
|---|---|---|---|---|
| Clinical Management of Hypertension | 79 | 728 | 153 | 21% |
| Clinical Management of Lipid Level | 79 | 723 | 437 | 60% |
| Clinical Management of Diabetes – HbA1C Level | 79 | 729 | 285 | 39% |
| Clinical Management of HIV/ Ribonucleic Acid Level | 79 | 723 | 184 | 25% |

---

[26] The 99 total responses to our survey questions was more than the 88 BOP locations surveyed because 6 of the locations surveyed submitted separate responses for the 17 BOP institutions at the locations. Performance measures were not applicable for some institutions primarily because the institutions are new and were not active for the years tested.

| Performance Measure | Number of Reporting Institutions | Number of Quarters Reported | Number of Quarters Below Target | Percentage of Quarters Below Target |
|---|---|---|---|---|
| Completion of Isoniazid Treatment | 79 | 602 | 169 | 28% |
| Asthma Related Hospitalization or Mortality | 79 | 601 | 51 | 8% |
| Breast Cancer Screening | 13 | 131 | 27 | 21% |
| Cervical Cancer Screening | 13 | 131 | 27 | 21% |
| Pregnancy Test at Intake | 13 | 131 | 13 | 10% |

**Source:** OIG analysis of BOP performance data

We asked a BOP official at the Health Services Division if the division staff review the performance reports submitted and take action to help the institutions improve their performance and reach target levels. The official informed us that the Office of Quality Management staff receive the performance reports, perform a trend analysis of the results, and summarize the results in the Office of Quality Management's Annual Report. However, the official also told us that institution participation in reporting the performance measures is voluntary and they do not develop agency-wide corrective actions when the performance is below target levels. We concluded that unless BOP officials more closely monitor the performance data submitted and take actions to help the institutions improve performance in areas not meeting target levels, the institutions will likely continue to not provide the expected level of health care to inmates.

The BOP official also stated that instructions have not been provided to the institutions on how to properly accumulate and report data related to the performance measures. Consequently, a BOP Health Services Division official said that the institutions are inconsistent in how they accumulate and report performance data. We were informed by this official that the BOP is developing a training program to educate institution staff on how to properly accumulate and report performance data. According to the Chief of the BOP's Quality Management Section, a meeting was held in December 2007 with the institution Health Services Administrators to discuss collecting of national performance measure data. Another meeting is planned for January 2008 to discuss with Regional Medical Directors any adjustments needed to the performance measurement system.

**Conclusion**

The BOP monitors its health care providers through various methods such as performing program reviews of institution operations, reviewing medical provider skills and qualifications and providing authorization documents based on the review results, and requiring institutions to accumulate and submit to BOP headquarters data on health-related performance measures. We found that the BOP has corrected deficiencies at the institutions where deficiencies were found, but it does not generally develop and issue guidance to correct systemic deficiencies found during the reviews. We believe that unless BOP-wide guidance is issued for systemic deficiencies identified through program reviews, deficiencies existing at other BOP institutions likely will remain uncorrected.

We also found that the BOP allowed health care providers to practice medicine without valid authorizations. Allowing practitioners to provide medical care to inmates without current privileges, practice agreements, or protocols increases the risk that the practitioners may provide medical services without having the qualifications, knowledge, skills, and experience necessary to correctly perform the services. In addition, the BOP could be subjected to liability claims by inmates if improper medical services are provided by these practitioners.

In addition, providers have not had their medical practices evaluated by a peer as required by BOP policy. Without a current peer review the BOP has a higher risk of providers giving inadequate professional care to inmates. Also, if inadequate professional care goes undetected, the providers may not receive the training or supervision needed to improve the delivery of medical care.

Institutions report performance measure data to BOP's Office of Quality Management, which performs trend analyses of the results and summarizes the results in its annual report. However, a senior official told us that the BOP does not develop agency-wide corrective actions when the performance is below target levels. We believe it is essential that the BOP take corrective actions when performance is below targets to help ensure that inmates are provided adequate medical care.

**Recommendations**

We recommend that the BOP:

5.  Develop a process to use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic deficiencies found during program reviews.

6.  Ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.

7.  Ensure privileges, practice agreements, and protocols are revaluated and renewed in a timely manner.

8.  Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

9.  Ensure that peer reviews of all providers are performed within the prescribed timeframes.

10. Until the training program on accumulating and reporting performance data is implemented, issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data.  Once the training program is fully developed, ensure that appropriate institution staff receive the training.

11. Establish a process for reviewing the health care performance measures reported by institutions that includes actions that will be taken when institutions are not meeting the target performance levels.

This page intentionally left blank.

# STATEMENT ON COMPLIANCE WITH
# LAWS AND REGULATIONS

The Federal Managers Financial Integrity Act of 1982 requires agencies to establish and maintain internal controls to provide assurance that agency funds are safeguarded against waste, loss, unauthorized use, or misappropriation.  The Office of Management and Budget Circular No. A-123, Management's Accountability and Control defines management's responsibilities related to internal control.  The BOP's controls for providing necessary medical care to inmates are established primarily by BOP program statements and clinical practice guidelines.  To obtain reasonable assurance that the BOP complied with laws and regulations that, if not complied with, could have a material effect on the BOP's provision of health care to inmates, we tested the BOP's compliance with BOP's guidelines for providing inmate health care contained in the following BOP program statements and clinical practice guidelines.

- P1210.023 Management Control and Program Review

- P6010.02, Health Services Administration

- P6013.01, Health Services Quality Improvement

- P6027.01, Health Care Provider Credential Verification, Privileges, and Practice Agreement Program

- P6031, Patient Care

- P6190.03, Infectious Disease Management

- P6270.01, Medical Designations and Referral Services for Federal Prisoners

- Preventive Health Care Clinical Practice Guideline

Except for instances of noncompliance identified in the Findings and Recommendations section of this report, we did not identify any other instances of noncompliance with the policies we tested.

This page intentionally left blank.

# STATEMENT ON INTERNAL CONTROLS

In planning and performing our audit of the BOP's Efforts to Manage Inmate Health Care, we considered the BOP's internal controls for the purpose of determining our auditing procedures.  The evaluation was not made for the purpose of providing assurance on the internal control structure as a whole; however, as shown below, we noted certain matters that we consider reportable conditions under generally accepted government auditing standards.[27]

**Finding I**

- The BOP did not maintain documentation of any preliminary cost-benefit analyses or post-implementation analyses to identify costs reduced or contained for its health care initiatives.

- The BOP's institutions did not always provide recommended preventative medical services to inmates.

**Finding II**

- The BOP institutions had not established controls to ensure that contract administration deficiencies found during OIG audits of medical contracts at other BOP institutions were corrected.

- The BOP had not addressed agency-wide the systemic deficiencies found during OIG audits of BOP medical contracts.

**Finding III**

- The BOP had not addressed agency-wide the systemic deficiencies found during the Program Review Division's program reviews at BOP institutions.

- The BOP had not established effective controls to ensure that BOP health care providers were provided privileges, practice agreements, or protocols as required by BOP policy.

---

[27] Reportable conditions involve matters coming to our attention relating to significant deficiencies in the design or operation of the internal control structure that, in our judgment, could adversely affect the ability of the BOP to administer health care to inmates.

59

- The BOP had not established effective controls to ensure that BOP health care providers received an internal peer review as required by BOP policy.

- The BOP had not established an effective system for monitoring institution progress against performance measures and taking actions when performance was below target levels.

Because we are not expressing an opinion on the BOP's overall internal control structure, this statement is intended solely for the information and use of the BOP in managing inmate health care.

60

# ACRONYMS AND ABBREVIATIONS

| | |
|---|---|
| Act | Federal Managers Financial Integrity Act of 1982 |
| AIDS | Acquired Immunodeficiency Syndrome |
| BEMR | Bureau Electronic Medical Records |
| BEMRx | Bureau Electronic Medical Records Pharmacy Module |
| BOP | Federal Bureau of Prisons |
| CD | Clinical Director |
| CMS | Correctional Medical Services |
| COSTEP | Commissioned Officer Student Training Extern Program |
| CPI | Consumer Price Index |
| CY | Calendar Year |
| DOL | Department of Labor |
| FCC | Federal Correctional Complex |
| FCI | Federal Correctional Institute |
| FDC | Federal Detention Center |
| FMC | Federal Medical Center |
| FPC | Federal Prison Camp |
| FSC | Financial Services Center |
| FSL | Federal Satellite Low |
| FTC | Federal Transfer Center |
| FY | Fiscal Year |
| GAO | Government Accountability Office |
| HbA1C | Hemoglobin A1C test |
| HealthONE | Hospital Corporation of America-HealthONE, L.L.C. |
| HHS | Department of Health and Human Services |
| HIV | Human Immunodeficiency Virus |
| HSD | BOP's Health Services Division |
| HSU | Health Services Unit |
| MCC | Metropolitan Correctional Center |
| MDC | Metropolitan Detention Center |
| MDI | Medical Development International |
| MED | Medium Security |
| MRC | Medical Referral Centers |
| MRI | Magnetic Resonance Imaging |
| MRL | Medical Referral Laboratory |
| MRSA | Methicillin-Resistant Staphylococcus Aureus |
| OIG | Office of the Inspector General |
| PAP | Papanicolaou Test |
| PCPT | Primary Care Provider Team |
| PHS | Public Health Service |
| PMC | Parkview Medical Center |
| TB | Tuberculosis |
| UMass | Joint venture between the University of Massachusetts *Medical School and UMass Memorial Health Care, Incorporated* |
| USMCFP | United States Medical Center for Federal Prisoners |

Case 3:16-cv-02267    Document 362-31    Filed 11/20/20    Page 40 of 47 PageID #: 15443

| USP | United States Penitentiary |
|-----|---------------------------|
| VA | Department of Veterans Affairs |
| WMH | Wayne Memorial Hospital |

# Audit Objectives, Scope, and Methodology

## Objectives

The objectives of this audit were to determine whether the BOP: (1) appropriately contained health care costs in the provision of necessary medical, dental, and mental health care services; (2) effectively administered its medical services contracts; and (3) effectively monitored its medical services providers.

## Scope and Methodology

We performed the audit in accordance with *Government Auditing Standards* and included tests and procedures necessary to accomplish the objectives. We performed the audit from January 16, 2007, to November 14, 2007. We conducted fieldwork at the following locations:

| | |
|---|---|
| BOP Headquarters | Washington, D.C. |
| USP Atlanta | Atlanta, Georgia |
| FMC Carswell | Forth Worth, Texas |
| USP Lee | Jonesville, Virginia |
| FCC Terre Haute | Terre Haute, Indiana |
| FCC Victorville | Victorville, California |

*Health Care Costs*

To determine whether the BOP appropriately contained health care costs we:

- obtained and analyzed health care cost data from FYs 2000 to 2007 to identify long-term trends in costs;

- identified the major BOP cost containment initiatives since FY 2000;

- reviewed each BOP initiative to identify the original implementation plan, budget, and anticipated impact on costs and then assessed the implementation of each initiative; and

- evaluated the cumulative effect of the initiatives on health care costs.

63

*Medical Care Services Provided*

We initially determined that the BOP's Preventive Health Care Clinical Practice Guideline included the appropriate provisions to use in testing the BOP's overall inmate health care. We selected this guideline as the basis for our testing because it:

- addressed care for all inmates, instead of just inmates with specific illnesses;

- included the diagnostic procedures for all but 2 of the chronic conditions addressed in the other 15 guidelines;

- contained definitive and finite medical services that could be tested for completion, while testing of services in the other 15 guidelines would require medical expertise; and

- is a primary objective of the BOP in its efforts to contain costs and promote health and prevent disease.

From the medical procedures listed in the guideline, we developed a list of 30 medical procedures to test. We selected a preliminary statistical sample of 251 inmates at USP Atlanta, because our sample was representative of the inmates incarcerated there. We reviewed the medical records of the inmates in our sample and determined if they received the applicable service required based on age or medical need. To validate our testing, we asked a USP Atlanta Health Service Unit official to verify the results of our review to ensure that we had not overlooked any reference to the provision of any medical service tested. Our preliminary test results showed that inmates did not receive all the necessary health care services, and we expanded our testing to include other BOP institutions.

For our expanded audit testing, we selected 859 additional inmates at 4 additional BOP locations within 4 of the BOP's regions. Including the preliminary sample reviewed at USP Atlanta, our sample consisted of 1,110 inmates at 5 BOP locations in 5 BOP regions. Appendix IV explains our sampling methodology. The sample size we tested at each location is shown in the following table.

64

| Location of Institutions | Sample Size |
|---|---|
| USP  Atlanta | 251 |
| USP  Lee | 133 |
| FCC Terre Haute | 249 |
| FMC Carswell | 127 |
| FCC Victorville | 350 |
| Total | 1,110 |

**Source:** OIG sample from BOP inmate population data

*Medical Services Contractor Oversight*

To determine whether the BOP effectively administered its medical services contracts we:

- reviewed previous OIG audits of comprehensive BOP medical services contracts and identified similar conditions and causes of contract administration deficiencies existing at multiple BOP institutions;

- interviewed personnel at five BOP institutions and determined if the causes for the deficiencies also existed at those BOP facilities;

- used a questionnaire to survey all other BOP institutions to determine if the causes for the deficiencies also existed at those institutions; and

- determined whether the BOP developed and issued policies and procedures to address any systemic deficiencies.

To determine whether the BOP effectively monitored its medical services providers we:

- evaluated the BOP's review process for monitoring contractor performance at the national, regional, and institutional levels;

- determined whether the five BOP institutions selected for testing had implemented adequate monitoring processes of their health care providers;

- surveyed BOP institutions through a questionnaire to determine if they had implemented adequate monitoring processes for health care providers;

65

- assessed whether the BOP's monitoring system for health care is capable of detecting the types of deficiencies identified in this and prior OIG audits; and

- determined whether the BOP performed trend analyses of its program review findings to identify systemic deficiencies and issued BOP-wide guidance to address the weaknesses.

Case 3:16-cv-02267   Document 362-31   Filed 11/20/20   Page 45 of 47 PageID #: 15448

# BOP Initiatives since FY 2000 to Improve the Effectiveness and Efficiency of Inmate Health Care

| Initiative | Description |
|---|---|
| 1. Medical Designations Program | This initiative involves: (1) assigning each inmate a care level from 1 to 4, with 1 being the healthiest inmates and 4 being inmates with the most significant medical conditions; (2) assigning each BOP institution a care level designation from 1 to 4 based on the care level of inmates the institution is staffed and equipped to handle; (3) staffing each institution based on its designated care level; and (4) moving inmates between institutions to match each inmate's care level to the care level of the institution. |
| 2. Medical Staff Restructuring | Under this initiative, the BOP established staffing guidelines for Care Level 1, 2, and 3 institutions. Because the existing staffing of the institutions did not always match the care level staffing guidelines, the BOP had to move medical staff throughout the BOP to implement the guidelines. Institutions that had staff in positions contrary to the guidelines were required to either move the staff to another facility or reassign the staff to another authorized position in the facility. |
| 3. Tele-medicine | This initiative involves the remote delivery of health care using telecommunications technologies, such as video-conferencing. |
| 4. Electronic Medical Records | This initiative involves automating the medical records for inmates. The initial system included the capability to: (1) track comprehensive history and physical examination information, (2) schedule inmate medical visits when required, and (3) track medical-related supplies and equipment issued to inmates. The BOP subsequently added a pharmacy module to the system to manage the medications provided to inmates. |
| 5. Medical Claims Adjudication | This initiative is designed to ensure the BOP properly pays medical claims and complies with requirements of the Prompt Payment Act. In April 2004, the BOP began researching the feasibility of using third-party medical claims processing services. The BOP developed a Statement of Work defining its requirements for medical claims adjudication services and in July 2006, the BOP issued a Request for Information asking interested commercial vendors to submit specific information about the claims processing services they provide. From July 2006 to September 2007, the BOP refined its requirements and finalized the Statement of Work in September 2007. The BOP expects to award a contract for the medical claims adjudication services early in calendar year 2008. |

| Initiative | Description |
|---|---|
| 6. Medical Reference Laboratory | In 2001, the BOP established a Medical Reference Laboratory (MRL) system at the: (1) United States Medical Center for Federal Prisoners, Springfield, Illinois; (2) Federal Medical Center, Rochester, Minnesota; and (3) Federal Medical Center, Butner, North Carolina. This initiative was designed to contain or reduce health care costs by enabling non-medical facilities within the BOP to collect and ship specimens to one of the three MRLs, where the laboratory tests could be performed at a lower cost than through individual contracts throughout the country. |
| 7. Medical Equipment | The BOP implemented this initiative in 1997 requiring that a senior official at BOP headquarters approve all purchases of medical equipment with a single item value of more than $1,000. BOP subsequently raised the threshold to $5,000. To obtain approval, the requesting institution must submit a Major Equipment Justification and include evidence that the institution researched alternatives to find the best value for the equipment being acquired. This helps ensure that BOP institutions are not frivolous with equipment requests and spending. Under the initiative the BOP also consolidates like purchases submitted for approval, which permits better pricing on bulk purchases through one of the Department of Defense's Defense Supply Centers. The Defense Supply Centers primarily purchase items such as food, clothing and textiles, pharmaceuticals, medical supplies, construction items, and other equipment to support the U.S. military. The centers also use their purchasing power to obtain such items for other federal agencies at a lower cost. |
| 8. Inmate Co-payment | This initiative was implemented in October 2005 and required inmates to pay a $2 fee when requesting certain types of medical evaluations. The BOP does not charge indigent inmates a co-payment fee. The BOP also does not charge inmates for certain medical services such as visits related to a chronic medical condition, preventive health visits, or evaluations related to pregnancy. The initiative was designed to reduce the number of unnecessary inmate initiated medical visits. A BOP analysis of data for the first year of implementation showed a significant decrease in the number of inmate initiated medical visits. |

68