| Initiative | Description |
|---|---|
| 9. Medical Coverage | In January 2005, the BOP discontinued the requirement for 24-hour on-site medical coverage at non-medical institutions. Instead of 24-hour on-site medical coverage, each institution is now required to have a plan in place for providing emergency and urgent care services to inmates consistent with American Correctional Association standards. The plan should include a team of first responders trained to use the automatic external defibrillator and perform cardiopulmonary resuscitation as clinically indicated. This change allowed institutions to reassign staff to the day shift when inmates require the most medical care. According to the BOP, the reduction in premium pay for the 8-hour overnight period that is no longer staffed resulted in significantly reduced staffing costs. |
| 10. Staffing Provider Teams | The BOP has traditionally provided health care to inmates based on a "military" model utilizing the concept of sick call and same-day treatment. Any available provider evaluated an inmate, and this led to "practitioner shopping" by the inmates, and inconsistency in the approach to treatment of episodic complaints. In 2005, the BOP began implementing the Patient Care Provider Team concept, where inmates are assigned to a primary provider team that manages both the chronic and episodic care of the inmate. This approach is designed to improve the consistency of treatment and eliminate the ability of the inmate to consume valuable staff resources by going from provider to provider for treatment for the same complaint. According to the BOP, implementation of provider teams has reduced duplicate diagnostic tests, consultations, and treatments. |
| 11. Federal Resource Sharing | This is an ongoing initiative through which the BOP has existing contracts with the Department of Veterans Affairs to obtain local medical services at the facility level, such as laboratory services, tele-medicine, HIV tests, and others. The initiative is designed to contain or reduce costs for these medical services by taking advantage of the "economies of scale" available through the Department of Veterans Affairs that are not available to the BOP or private sector laboratories. |

69

| Initiative | Description |
|---|---|
| 12. Health Promotion | In 2000, the BOP had a three-person team in its Health Services Division that worked on Health Promotion and Disease Prevention initiatives. In recent years, the BOP disbanded this team and the functions of promoting health within the inmate population were realigned to appropriate groups within the Health Services or other divisions. In 2005, the Health Services Division issued its Preventive Health Care Clinical Practice Guidelines outlining risk-based screening for inmates to identify and monitor those at risk for developing serious medical conditions such as diabetes, sequels of HIV infection, and heart disease. This initiative is designed to promote better health among inmates beginning at admission to the facility and continuing throughout the inmate's incarceration. This guideline was revised in April 2007. |
| 13. Consolidation Pilot Project with the United States Marshals Service | This project was conducted in FY 2000 at three BOP institutions and was designed to determine the financial, personnel, medical, and other resources that would be necessary for the BOP to assume responsibility for medical services for the United States Marshals Service's inmates housed in BOP facilities. The project was deemed successful and expanded to include the following BOP institutions: all existing Federal Medical Centers (FMC) in June 2000; the Brooklyn Metropolitan Detention Center (MDC) in May 2005; and the Guaynabo MDC, Fort Devens FMC, Seagoville FCI, and Atlanta FCI in October 2006. The Marshals Service reimburses the BOP for expenses incurred by the BOP for providing community-based medical care to the U.S. Marshals Service's prisoners housed at BOP institutions. |
| 14. National Cardiopulmonary Resuscitation and Automated External Defibrillator Contract | This initiative is designed to provide cardiopulmonary resuscitation and automated external defibrillator training and certification to BOP health care staff through a nationally negotiated contract with standardized pricing. The BOP approved and submitted a Request for Contracting Action in May 2007 and the BOP expects to award the contract early in calendar year 2008. |
| 15. National Medical Air Transportation Contract | This initiative is designed to provide a single nationwide contract for medical air transportation services for all BOP institutions at standardized and best-value pricing. During FY 2007, the BOP conducted market research and issued a Request for Information. The BOP plans to award the contract during FY 2008. |
| 16. National Comprehensive Medical Contract and Preferred Provider Organization | This initiative is designed to provide a contract for health care services for all of the BOP's institutions at standardized and best-value pricing. At the end of FY 2007, the BOP was conducting market research for this initiative. |

| Initiative | Description |
|---|---|
| 17. Catastrophic Case Management | This initiative is designed to: (1) implement a catastrophic case management system to provide clinical oversight and intervention of complex and specialized care cases, and (2) provide funding reimbursement to the institutions to mitigate the fiscal impact those cases have on the institutions' medical budgets. As of the end of FY 2007, the BOP had drafted preliminary procedures and protocols for internal review and comment. The BOP anticipates submitting this initiative to the BOP's Executive Staff for consideration in FY 2008. |
| 18. Mobile Surgery | This initiative is designed to provide a national contract for mobile surgery services at standardized and best-value pricing. The contract is expected to provide on-site surgical services through a mobile surgical unit in lieu of sending inmates outside of the institutions for surgery. The BOP formed a workgroup during FY 2007 and identified three institutions in the Southeast Region to pilot this initiative. Further implementation will be predicated on the success of the pilot, status of existing medical services contracts, and the ability of the contractor to expand the services to other BOP institutions. |
| 19. Magnetic Resonance Imaging, Computerized Axial Tomography, and Mammography | This initiative is designed to provide a national contract for magnetic resonance imaging, computerized axial tomography, and mammogram services at standardized and best-value pricing. The BOP began market research during FY 2007. |
| 20. Staffing and Recruiting | Through this initiative begun in FY 2007, the BOP is attempting to identify novel, unique, and unconventional strategies to recruit and retain health care workers, with the understanding that there is and will continue to be shortages of trained and qualified health care workers in the United States and worldwide. |

**Source:** Data provided by BOP officials

71

This page intentionally left blank.

# Medical Services Selected for Testing from the BOP's Preventive Health Care Clinical Practice Guideline

| Medical Service | Applicability |
|---|---|
| 1. The Inmate History, Part 1 of Form 360, was completed by the inmate during intake screening. | All inmates. |
| 2. The Medical Assessment, Part 2 of Form 360 was completed by the medical practitioner during intake screening. | All inmates. |
| 3. New inmates were tested for tuberculosis (TB), or transferred inmates were confirmed for TB testing within 48 hours of entering the institution. | All inmates. |
| 4. Inmates were given a rapid plasma reagin test during intake screening to test for syphilis. | All female inmates and male inmates with identified risk factors. |
| 5. Inmates were given a test for chlamydia during intake screening. | All females inmates under age 25 with identified risk factors. |
| 6. Inmates were given a Measles, Mumps, and Rubella vaccine during intake screening. | All female inmates of child-bearing-age if not received as an adult. |
| 7. Inmates were given a complete physical examination within 14 days of arriving at the institution to include: (1) medical and mental assessments, (2) dental assessment, and (3) appropriate laboratory and diagnostic tests. Also, the completion of the physical examination was signed off on the Standard Form 88 by the institution Clinical Director. | All inmates. |
| 8. Inmates had received or refused a current pneumococcal immunization. | All inmates age 65 or over and inmates under age 65 with identified risk factors. |
| 9. Inmates had received or refused an annual influenza immunization. | All inmates over age 50. |
| 10. Inmates had received or refused a current Measles, Mumps, and Rubella vaccination. | All inmates born after 1956. |
| 11. Inmates had received or refused a current tetanus vaccination. | All inmates every 10 years. |
| 12. Inmates had received or refused a current Hepatitis A vaccine. | All inmates with identified risk factors. |
| 13. Inmates had received or refused a current Hepatitis B test. | All inmates with identified risk factors. |
| 14. Inmates had received or refused a current Hepatitis C test. | All inmates with identified risk factors. |

73

| Medical Service | Applicability |
|---|---|
| 15. Inmates had received or refused an HIV-1 test. | All inmates with identified risk factors. |
| 16. Inmates had received or refused an HIV-2 test. | All inmates with identified risk factors. |
| 17. Inmates tested for TB annually (past positive determination or X-ray if confirmed past positive). | All inmates. |
| 18. Inmates with chronic care conditions were evaluated every 6 months. | All inmates with chronic care conditions. |
| 19. Inmates had their cholesterol and high-density lipoproteins checked once every 5 years. | All male inmates age 35 and over, all female inmates age 45 and over, and all other inmates age 20 and over with identified risk factors. |
| 20. Inmates had received a calculation of their risk for cardiovascular disease every 5 years. | All diabetic inmates age 40 and over, all male inmates age 40 and over, and all female inmates age 45 and over. |
| 21. Inmates had received a fasting plasma glucose test for diabetes every 3 years. | All inmates age 45 and over with identified risk factors. |
| 22. Inmates had been checked for hypertension by having their blood pressure checked either annually or every 3 years, as applicable. | Annually - All inmates age 50 or over.  Every 3 Years – All inmates under age 50. |
| 23. Inmates had been checked for obesity by receiving a calculation of their body mass index either annually or every 3 years, as applicable. | Annually - All inmates age 50 or over.  Every 3 Years – All inmates under age 50. |
| 24. Inmates had received a fecal occult blood test to check for colorectal cancer as recommended. | All inmates age 50 and over. |
| 25. Inmates had received a vision screening as recommended. | All inmates age 65 and over. |
| 26. Inmates had received a hearing screening as recommended. | All inmates age 65 and over and all other inmates in an occupational risk assignment. |
| 27. Inmates had received an abdominal ultrasound test to check for an abdominal aneurysm. | All male inmates with a history of smoking and age 65 or over. |
| 28. Inmates had received a papanicolaou test (Pap smear) to test for cervical cancer either annually or every 3 years, as applicable. | Annually - All female inmates under age 31.  Every 3 Years – All female inmates age 31 to 65. |

74

| Medical Service | Applicability |
|---|---|
| 29. Inmates received a mammogram to check for breast cancer either annually or every 2 years, as applicable. | Annually – Offered to all female inmates and given to all female inmates age 40 and over with identified risk factors.<br><br>Every 2 Years – All female inmates age 40 and over without identified risk factors. |
| 30. Inmates received bone density screening to check for osteoporosis as recommended. | All female inmates age 60 to 64 with identified risk factors and all female inmates age 65 and over. |

**Source:** BOP Preventive Health Care Clinical Practice Guideline

This page intentionally left blank.

Case 3:16-cv-02267    Document 362-32    Filed 11/20/20    Page 8 of 52 PageID #: 15458

# Sample Methodology

The population was defined as the Federal Prison inmates in multiple federal facilities at five different locations. The defined population contained 14,026 inmates (sampling units) in multiple BOP facilities located in the following five BOP locations.

- Atlanta, Georgia

- Carswell, Texas

- Lee County, Virginia

- Terre Haute, Indiana

- Victorville, California

Considering that the inmate health care administration could vary from location to location, we employed a stratified random sampling design to provide effective coverage and to obtain precise estimates of the statistic. In addition, the characteristics of the population that affect the test questions are the inmate age, gender, and facility type. Incorporating these additional variables into the sampling plan, a multi-stage stratified sample design was employed. The primary strata was BOP facility locations. The secondary strata was facility type. The last strata was age groups. The sample allocation considered to different strata was proportional to the population sizes. The details of sample sizes, sample allocation to different locations, and the test result statistics are presented in the body of the report.

This page intentionally left blank.

## BOP Institutions and Inmates Housed
## As of November 29, 2007[28]

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 1. ALDERSON FPC | WV | 2 | 1,141 |
| 2. ALLENWOOD LOW FCI | PA | 2 | 1,388 |
| 3. ALLENWOOD MED FCI | PA | 2 | 1,431 |
| 4. ALLENWOOD USP | PA | 2 | 1,129 |
| 5. ASHLAND FCI | KY | 2 | 1,233 |
| ASHLAND-CAMP | KY | 2 | 325 |
| 6. ATLANTA USP | GA | 2 | 2,108 |
| ATLANTA-CAMP | GA | 2 | 506 |
| 7. ATWATER USP | CA | 1 | 1,126 |
| ATWATER-CAMP | CA | 1 | 129 |
| 8. BASTROP FCI | TX | 2 | 1,218 |
| BASTROP-CAMP | TX | 2 | 186 |
| 9. BEAUMONT LOW FCI | TX | 2 | 1,861 |
| 10. BEAUMONT MED FCI | TX | 2 | 1,707 |
| 11. BEAUMONT USP | TX | 2 | 1,496 |
| BEAUMONT USP-CAMP | TX | 2 | 538 |
| 12. BECKLEY FCI | WV | 2 | 1,602 |
| BECKLEY-CAMP | WV | 2 | 417 |
| 13. BENNETTSVILLE FCI | SC | 2 | 1,650 |
| BENNETTSVILLE-CAMP | SC | 2 | 139 |
| 14. BIG SANDY USP | KY | 2 | 1,483 |
| BIG SANDY-CAMP | KY | 2 | 130 |
| 15. BIG SPRING FCI | TX | 2 | 1,616 |
| BIG SPRING-CAMP | TX | 2 | 181 |
| 16. BROOKLYN MDC | NY | 2 | 2,565 |

[28] As of November 29, 2007, the BOP housed an additional 33,354 inmates in privately managed, contracted, or other facilities. Some BOP locations incorporate more than one BOP institution. For instance, the BOP has two facilities at its Ashland, Kentucky, location: Ashland FCI and Ashland-CAMP.

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 17. BRYAN FPC | TX | 2 | 971 |
| 18. BUTNER FMC | NC | 4 | 956 |
| 19. BUTNER LOW FCI | NC | 3 | 1,308 |
| 20. BUTNER MED I FCI | NC | 3 | 725 |
| BUTNER-CAMP | NC | 3 | 314 |
| 21. BUTNER MED II FCI | NC | 3 | 1,245 |
| 22. CANAAN USP | PA | 2 | 1,513 |
| CANAAN-CAMP | PA | 2 | 125 |
| 23. CARSWELL FMC | TX | 4 | 1,540 |
| CARSWELL-CAMP | TX | 4 | 257 |
| 24. CHICAGO MCC | IL | 2 | 730 |
| 25. COLEMAN I USP | FL | 2 | 1,627 |
| 26. COLEMAN II USP | FL | 2 | 1,635 |
| 27. COLEMAN LOW FCI | FL | 2 | 2,017 |
| 28. COLEMAN MED FCI | FL | 2 | 1,727 |
| COLEMAN MED FCI-CAMP | FL | 2 | 489 |
| 29. CUMBERLAND FCI | MD | 2 | 1,160 |
| CUMBERLAND-CAMP | MD | 2 | 297 |
| 30. DANBURY FCI | CT | 2 | 1,248 |
| DANBURY-CAMP | CT | 2 | 193 |
| 31. DEVENS FMC | MA | 4 | 993 |
| DEVENS-CAMP | MA | 4 | 121 |
| 32. DUBLIN FCI | CA | 2 | 1,140 |
| DUBLIN-CAMP | CA | 2 | 333 |
| 33. DULUTH FPC | MN | 2 | 812 |
| 34. EDGEFIELD FCI | SC | 2 | 1,647 |
| EDGEFIELD-CAMP | SC | 2 | 542 |
| 35. EL RENO FCI | OK | 2 | 1,115 |
| EL RENO-CAMP | OK | 2 | 262 |
| 36. ELKTON FCI | OH | 2 | 1,860 |
| ELKTON-FSL | OH | 2 | 581 |

Case 3:16-cv-02267   Document 362-32   Filed 11/20/20   Page 12 of 52 PageID #: 15462

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 37. ENGLEWOOD FCI | CO | 2 | 905 |
| ENGLEWOOD-CAMP | CO | 2 | 158 |
| 38. ESTILL FCI | SC | 2 | 1,118 |
| ESTILL-CAMP | SC | 2 | 304 |
| 39. FAIRTON FCI | NJ | 2 | 1,437 |
| FAIRTON-CAMP | NJ | 2 | 113 |
| 40. FLORENCE ADMAX USP | CO | 2 | 484 |
| FLORENCE USP-CAMP | CO | 2 | 534 |
| 41. FLORENCE FCI | CO | 2 | 1,208 |
| 42. FLORENCE HIGH USP | CO | 2 | 987 |
| 43. FORREST CITY FCI | AR | 2 | 2,021 |
| FORREST CITY FCI-CAMP | AR | 2 | 310 |
| 44. FORREST CITY MED FCI | AR | 2 | 1,666 |
| 45. FORT DIX FCI | NJ | 2 | 2,051 |
| FORT DIX-CAMP | NJ | 2 | 413 |
| 46. FORT WORTH FCI | TX | 3 | 1,754 |
| 47. GILMER FCI | WV | 2 | 1,708 |
| GILMER-CAMP | WV | 2 | 131 |
| 48. GREENVILLE FCI | IL | 2 | 1,192 |
| GREENVILLE-CAMP | IL | 2 | 315 |
| 49. GUAYNABO MDC | RQ | 2 | 1,357 |
| 50. HAZELTON USP | WV | 2 | 1,651 |
| HAZELTON-CAMP | WV | 2 | 130 |
| HAZELTON-FEMALE CAMP | WV | 2 | 622 |
| 51. HERLONG FCI | CA | 1 | 923 |
| HERLONG-CAMP | CA | 1 | 122 |
| 52. HONOLULU FDC | HI | 2 | 641 |
| 53. HOUSTON FDC | TX | 2 | 1,010 |
| 54. JESUP FCI | GA | 2 | 1,101 |
| JESUP-CAMP | GA | 2 | 152 |
| JESUP-FSL | GA | 2 | 639 |

Case 3:16-cv-02267    Document 362-32    Filed 11/20/20    Page 13 of 52 PageID #: 15463

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 55. LA TUNA FCI | TX | 2 | 1,060 |
| LA TUNA-CAMP | TX | 2 | 242 |
| LA TUNA-FSL (EL PASO) | TX | 2 | 411 |
| 56. LEAVENWORTH USP | KS | 2 | 1,602 |
| LEAVENWORTH-CAMP | KS | 2 | 404 |
| 57. LEE USP | VA | 1 | 1,523 |
| LEE USP-CAMP | VA | 1 | 131 |
| 58. LEWISBURG USP | PA | 2 | 1,531 |
| LEWISBURG-CAMP | PA | 2 | 571 |
| 59. LEXINGTON FMC | KY | 4 | 1,476 |
| LEXINGTON-CAMP | KY | 4 | 297 |
| 60. LOMPOC FCI | CA | 2 | 1,538 |
| 61. LOMPOC USP | CA | 2 | 1,785 |
| LOMPOC USP-CAMP | CA | 2 | 504 |
| 62. LORETTO FCI | PA | 2 | 1,305 |
| LORETTO-CAMP | PA | 2 | 150 |
| 63. LOS ANGELES MDC | CA | 2 | 953 |
| 64. MANCHESTER FCI | KY | 1 | 1,115 |
| MANCHESTER-CAMP | KY | 1 | 513 |
| 65. MARIANNA FCI | FL | 2 | 1,215 |
| MARIANNA-CAMP | FL | 2 | 297 |
| 66. MARION USP | IL | 2 | 891 |
| MARION-CAMP | IL | 2 | 304 |
| 67. MCCREARY USP | KY | 2 | 511 |
| MCCREARY-CAMP | KY | 2 | 136 |
| 68. MCKEAN FCI | PA | 2 | 1,247 |
| MCKEAN-CAMP | PA | 2 | 320 |
| 69. MEMPHIS FCI | TN | 2 | 1,202 |
| MEMPHIS-CAMP | TN | 2 | 337 |
| 70. MIAMI FCI | FL | 2 | 1,100 |
| MIAMI FCI-CAMP | FL | 2 | 385 |
| 71. MIAMI FDC | FL | 2 | 1,696 |

Case 3:16-cv-02267    Document 362-32    Filed 11/20/20    Page 14 of 52 PageID #: 15464

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 72. MILAN FCI | MI | 2 | 1,479 |
| 73. MONTGOMERY FPC | AL | 2 | 911 |
| 74. MORGANTOWN FCI | WV | 2 | 1,118 |
| 75. NEW YORK MCC | NY | 2 | 752 |
| 76. OAKDALE FCI | LA | 2 | 1,338 |
| 77. OAKDALE FDC | LA | 2 | 497 |
| OAKDALE FDC-CAMP | LA | 2 | 152 |
| 78. OKLAHOMA CITY FTC | OK | 2 | 1,541 |
| 79. OTISVILLE FCI | NY | 2 | 1,094 |
| OTISVILLE-CAMP | NY | 2 | 118 |
| 80. OXFORD FCI | WI | 2 | 1,084 |
| OXFORD-CAMP | WI | 2 | 206 |
| 81. PEKIN FCI | IL | 2 | 1,153 |
| PEKIN-CAMP | IL | 2 | 303 |
| 82. PENSACOLA FPC | FL | 2 | 685 |
| 83. PETERSBURG FCI | VA | 2 | 1,312 |
| PETERSBURG FCI-CAMP | VA | 2 | 346 |
| 84. PETERSBURG MED FCI | VA | 2 | 1,828 |
| 85. PHILADELPHIA FDC | PA | 2 | 1,181 |
| 86. PHOENIX FCI | AZ | 2 | 1,080 |
| PHOENIX-CAMP | AZ | 2 | 325 |
| 87. POLLOCK USP | LA | 1 | 1,494 |
| POLLOCK-CAMP | LA | 1 | 133 |
| 88. RAY BROOK FCI | NY | 2 | 1,220 |
| 89. ROCHESTER FMC | MN | 4 | 873 |
| 90. SAFFORD FCI | AZ | 1 | 804 |
| 91. SAN DIEGO MCC | CA | 2 | 994 |
| 92. SANDSTONE FCI | MN | 1 | 1,224 |
| 93. SCHUYLKILL FCI | PA | 2 | 1,317 |
| SCHUYLKILL-CAMP | PA | 2 | 308 |
| 94. SEAGOVILLE FCI | TX | 2 | 1,908 |
| SEAGOVILLE-CAMP | TX | 2 | 170 |

Case 3:16-cv-02267   Document 362-32   Filed 11/20/20   Page 15 of 52 PageID #: 15465

| Institution | State | Care Level | Inmates |
|---|---|---|---|
| 95. SEATAC FDC | WA | 2 | 976 |
| 96. SHERIDAN FCI | OR | 2 | 1,355 |
| SHERIDAN-CAMP | OR | 2 | 499 |
| 97. SPRINGFIELD USMCFP | MO | 4 | 1,117 |
| 98. TALLADEGA FCI | AL | 2 | 995 |
| TALLADEGA-CAMP | AL | 2 | 367 |
| 99. TALLAHASSEE FCI | FL | 2 | 1,249 |
| 100. TERMINAL ISLAND FCI | CA | 3 | 1,063 |
| 101. TERRE HAUTE FCI | IN | 3 | 1,226 |
| TERRE HAUTE FCI-CAMP | IN | 3 | 399 |
| 102. TERRE HAUTE USP | IN | 3 | 1,530 |
| 103. TEXARKANA FCI | TX | 2 | 1,444 |
| TEXARKANA-CAMP | TX | 2 | 354 |
| 104. THREE RIVERS FCI | TX | 1 | 1,157 |
| THREE RIVERS-CAMP | TX | 1 | 362 |
| 105. TUCSON FCI | AZ | 3 | 778 |
| 106. TUCSON USP | AZ | 3 | 775 |
| TUCSON-CAMP | AZ | 3 | 123 |
| 107. VICTORVILLE MED I FCI | CA | 2 | 1,513 |
| 108. VICTORVILLE MED II FCI | CA | 2 | 965 |
| VICTORVILLE MED II-CAMP | CA | 2 | 242 |
| 109. VICTORVILLE USP | CA | 2 | 1,485 |
| 110. WASECA FCI | MN | 2 | 1,080 |
| 111. WILLIAMSBURG FCI | SC | 1 | 1,622 |
| WILLIAMSBURG-CAMP | SC | 1 | 140 |
| 112. YANKTON FPC | SD | 1 | 859 |
| 113. YAZOO CITY FCI | MS | 1 | 1,863 |
| YAZOO-CAMP | MS | 1 | 137 |
| 114. YAZOO CITY MED FCI | MS | 1 | 1,474 |
| **Total Inmates** | | | **166,794** |

**Source:** BOP website

## Summary of BOP Program Statements Related to the Provision of Medical, Dental, and Mental Health Services

The BOP has developed and issued the following program statements that provide BOP policy and guidance related to the provision of medical, dental, and mental health services to BOP inmates.

**P6010.02 Health Services Administration** — requires the BOP to deliver necessary health care to inmates effectively in accordance with proven standards of care without compromising public safety concerns inherent to the BOP's overall mission.

**P6013.01 Health Services Quality Improvement** — requires the BOP to establish an outcome-based quality improvement system in the health care programs at every BOP institution.

**P6031.01 Patient Care** — requires the BOP to effectively deliver medically necessary health care to inmates in accordance with proven standards of care without compromising public safety concerns inherent to the agency's overall mission. The statement requires every BOP institution to establish a Utilization Review committee chaired by the Clinical Director to review:

- outside medical, surgical, and dental procedures;
- requests for specialist evaluations, in-house or escorted trips to the specialist's office;
- requests for "Limited Medical Value" treatments and procedures;
- retrospective review of all cases sent to the community hospital during hours when no health care provider was on duty at the institution;
- case considerations for extraordinary care;
- concurrent review of inpatients at community hospitals; and
- other services the primary care provider or the Clinical Director have recommended.

**P6031.02 Inmate Copayment Program** — provides that the BOP may under certain circumstances charge an inmate under the BOP's custody, a fee for providing inmate health care services. However, inmates are not to be denied access to necessary health care because of the inmate's inability to pay the copay fee.

**P6270.01 Medical Designations and Referral Services for Federal Prisoners** — specifies procedures and criteria for transporting inmates who require medical care. The Central Office Medical Designator, Office of Medical Designations and Transportation, makes medical designations, referrals, and denials based on:

- urgency of need;
- cost-effectiveness;
- BOP institution capabilities;
- expected service period, including recuperation;
- current bed space availability;
- security; and
- consultation with BOP physicians at the sending and receiving institutions.

**P6090.01 Health Information Management** — provides guidance for ensuring that accurate and complete health records and qualified health record practitioners are available for delivering health services.

**P6400.02 Dental Services** — requires the BOP to stabilize and maintain the oral health of inmates in BOP institutions. Dental care is to be conservative, providing necessary treatment for the greatest number of inmates within available resources. Dental care should be provided to inmates by health care providers, who provide quality care consistent with professional standards.

**P6340.04 Psychiatric Services** — requires the BOP to provide psychiatric services that address the physical, medical, psychological, social, vocational and rehabilitative needs of inmates in the BOP's custody who suffer from mental illnesses and disorders.

**P6360.01 Pharmacy Services** — requires the BOP to provide inmates access to quality, necessary, cost-effective pharmaceutical care.

**P6370.01 Laboratory Services** — provides guidance to ensure that laboratory services will be regularly available to meet the needs of inmates at all BOP institutions.

**P6541.02 Over-the-Counter Medications** — establishes a program allowing inmates improved access to over-the-counter medications. The statement provides that inmates may buy over-the-counter medications that are available at the institution commissary. Inmates may also obtain over-the-counter medications at sick call if the inmate does not already have the medication and if: (1) health services staff determine that the inmate has

an immediate medical need which must be addressed before his or her regularly scheduled commissary visit, or (2) the inmate does not have funds to purchase the medication at the commissary.

**P6027.01 Health Care Provider Credential Verification, Privileges, and Practice Agreement Program** — provides that each Health Services Unit will ensure that professional credentials for all health care providers inside the institution are verified at the primary source (the issuer of the credential). Providers include BOP staff, Public Health Services (PHS) staff, part-time staff, contract and consultant staff, and those who provide a diagnosis or treatment using tele-health.

**P6021.04 Commissioned Officer Student Training Extern Program (COSTEP)** — encourages all BOP institutions to actively consider the COSTEP Program of the PHS as a viable recruitment supplement. The objectives of using COSTEPs are:

- eligible COSTEP students will be recruited for health care work in BOP facilities, and

- some COSTEP students will return to careers in the BOP after graduation.

**P6190.03 Infectious Disease Management** — provides that the BOP will manage infectious disease in the confined environment of a correctional setting through a comprehensive approach which includes testing, appropriate treatment, prevention, education, and infection control measures.

**P6070.05 Birth Control, Pregnancy, Child Placement and Abortion** — establishes guidance for BOP institutions to provide inmates with medical and social services related to birth control, pregnancy, child placement, and abortion.

**P6590.07 Alcohol Surveillance and Testing Program** — requires the BOP to maintain a surveillance program to deter and detect the illegal introduction or use of alcohol in its institutions.

**P6080.01 Autopsies** — provides that the Warden of a BOP institution may order an autopsy and related scientific or medical tests to be performed when:

- in the event of homicide, suicide, fatal illness or accident, or unexplained death, the Warden determines that the autopsy or test

87

is necessary to detect a crime, maintain discipline, protect the health or safety of other inmates, remedy official misconduct, or defend the United States or its employees from civil liability arising from the administration of the facility; or

- the Warden obtains the written consent of a person (coroner, next-of-kin, the decedent's consent in the case of tissue removed for transplanting) authorized to permit the autopsy or post-mortem operation under the law of the State in which the facility is located.

**P6311.04 Plastic Surgery and Identification Records** — provides that the BOP does not ordinarily perform plastic surgery on inmates to correct preexisting disfigurements (including tattoos) on any part of the body. In circumstances where plastic surgery is a component of a presently medically necessary standard of treatment (for example, part of the treatment for facial lacerations or for mastectomies due to cancer) or it is necessary for the good order and security of the institution, the necessary surgery may be performed.

**6010.01 Psychiatric Treatment and Medications, Administrative Safeguards for** — provides guidelines for providing administrative safeguards for psychiatric treatment and medication.

**P6060.08 Urine Surveillance and Narcotic Identification** — requires that BOP institutions must establish programs of urine testing for drug use to monitor specific groups or individual inmates who are considered as high risk for drug use, such as those in community activities, those with a history of drug use, and those inmates specifically suspected of drug use.

88

# Results of the OIG's Testing of the Provision of Medical Care at BOP Institutions[29]

## United States Penitentiary – Atlanta



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 191 | 99% / 1% |
| 2. Medical assessment completed by medical practitioner at intake | 191 | 96% / 3% |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 191 | 97% / 3% |
| 4. Inmate received a rapid plasma regain test during intake screening to test for syphilis | 34 | 94% / 6% |
| 5. Female inmate tested for Chlamydia | 0 | Test not applicable for any inmates at this facility |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 0 | Test not applicable for any inmates at this facility |
| 7. Inmate received a complete physical within 14 days of intake | 191 | 94% / 5% |
| 8. Inmate received a pneumococcal vaccine | 31 | 90% / 7% |
| 9. Inmate received an annual influenza vaccine | 46 | 83% / 17% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 167 | 7% / 93% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 191 | 94% / 5% |
| 12. Inmate received a hepatitis A vaccine | 30 | 97% |
| 13. Inmate received a hepatitis B test or vaccine | 50 | 96% / 2% |
| 14. Inmate received a hepatitis C test | 45 | 98% |
| 15. Inmate received an HIV-1 test | 77 | 100% |
| 16. Inmate received an HIV-2 test | 4 | 100% |
| 17. Inmate received a tuberculosis test in the past year | 171 | 99% / 1% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 64 | 95% / 3% |

---

[29] Some percentages in the charts total less than 100 percent because documentation was not available to determine if the test was performed for some inmates.

# United States Penitentiary – Atlanta



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 135 | 70% / 29% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 82 | 100% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 67 | 45% / 34% |
| 22. Inmate received a current blood pressure check | 190 | 95% / 5% |
| 23. Inmate received a current body mass index calculation | 190 | 4% / 96% |
| 24. Inmate received a fecal occult blood test | 34 | 12% / 88% |
| 25. Inmate received a vision screening test | 5 | 100% |
| 26. Inmate received a hearing screening test | 5 | 100% |
| 27. Inmate received an abdominal ultrasound test | 0 | Test not applicable for any inmates at this facility |
| 28. Female inmate received a papanicolaou test (PAP smear) | 0 | Test not applicable for any inmates at this facility |
| 29. Female inmate received a current mammogram | 0 | Test not applicable for any inmates at this facility |
| 30. Female inmate received a bone density screening test | 0 | Test not applicable for any inmates at this facility |

# United States Penitentiary – Lee



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 133 | 99% Yes / 1% No |
| 2. Medical assessment completed by medical practitioner at intake | 133 | 99% Yes / 1% No |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 133 | 99% Yes / 1% No |
| 4. Inmate received a rapid plasma regain test during intake screening to test for syphilis | 58 | 91% Yes / 7% No |
| 5. Female inmate tested for Chlamydia | 0 | Test not applicable for any inmates at this facility |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 0 | Test not applicable for any inmates at this facility |
| 7. Inmate received a complete physical within 14 days of intake | 133 | 90% Yes / 9% No |
| 8. Inmate received a pneumococcal vaccine | 2 | 50% No |
| 9. Inmate received an annual influenza vaccine | 8 | 50% Yes / 50% No |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 127 | 99% No |
| 11. Inmate received a tetanus vaccine in the last 10 years | 133 | 27% Yes / 72% No |
| 12. Inmate received a hepatitis A vaccine | 43 | 26% Yes / 72% No |
| 13. Inmate received a hepatitis B test or vaccine | 40 | 68% Yes / 30% No |
| 14. Inmate received a hepatitis C test | 30 | 73% Yes / 23% No |
| 15. Inmate received an HIV-1 test | 53 | 74% Yes / 25% No |
| 16. Inmate received an HIV-2 test | 4 | 75% Yes |
| 17. Inmate received a tuberculosis test in the past year | 105 | 96% Yes / 3% No |
| 18. Inmate received a chronic care evaluation in the last 6 months | 21 | 86% Yes / 10% No |

# United States Penitentiary – Lee



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 69 | 30% / 68% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 46 | 98% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 5 | 60% / 40% |
| 22. Inmate received a current blood pressure check | 133 | 90% / 10% |
| 23. Inmate received a current body mass index calculation | 133 | 1% / 99% |
| 24. Inmate received a fecal occult blood test | 17 | 71% / 29% |
| 25. Inmate received a vision screening test | 0 | Test not applicable for any inmates at this facility |
| 26. Inmate received a hearing screening test | 1 | 100% |
| 27. Inmate received an abdominal ultrasound test | 0 | Test not applicable for any inmates at this facility |
| 28. Female inmate received a papanicolaou test (PAP smear) | 0 | Test not applicable for any inmates at this facility |
| 29. Female inmate received a current mammogram | 0 | Test not applicable for any inmates at this facility |
| 30. Female inmate received a bone density screening test | 0 | Test not applicable for any inmates at this facility |

# Federal Correctional Complex – Terra Haute



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 248 | 100% | |
| 2. Medical assessment completed by medical practitioner at intake | 248 | 100% | |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 248 | 99% | |
| 4. Inmate received a rapid plasma regain test during intake screening to test for syphilis | 48 | 98% | 2% |
| 5. Female inmate tested for Chlamydia | 0 | Test not applicable for any inmates at this facility | |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 0 | Test not applicable for any inmates at this facility | |
| 7. Inmate received a complete physical within 14 days of intake | 248 | 98% | 1% |
| 8. Inmate received a pneumococcal vaccine | 21 | 91% | 9% |
| 9. Inmate received an annual influenza vaccine | 51 | 86% | 14% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 223 | 1% | 99% |
| 11. Inmate received a tetanus vaccine every 10 years | 248 | 40% | 60% |
| 12. Inmate received a hepatitis A vaccine | 86 | 48% | 52% |
| 13. Inmate received a hepatitis B test or vaccine | 75 | 91% | 9% |
| 14. Inmate received a hepatitis C test | 69 | 96% | 4% |
| 15. Inmate received an HIV-1 test | 89 | 99% | 1% |
| 16. Inmate received an HIV-2 test | 70 | 99% | 1% |
| 17. Inmate received a tuberculosis test in the past year | 215 | 98% | 2% |
| 18. Inmate received a chronic care evaluation in the last 6 months | 102 | 100% | |

93

# Federal Correctional Complex – Terra Haute



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 187 | 87% / 13% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 98 | 18% / 82% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 120 | 95% / 5% |
| 22. Inmate received a current blood pressure check | 248 | 98% / 2% |
| 23. Inmate received a current body mass index calculation | 248 | 36% / 64% |
| 24. Inmate received a fecal occult blood test | 55 | 80% / 20% |
| 25. Inmate received a vision screening test | 21 | 100% |
| 26. Inmate received a hearing screening test | 18 | 78% / 22% |
| 27. Inmate received an abdominal ultrasound test | 4 | 100% |
| 28. Female inmate received a papanicolaou test (PAP smear) | 0 | Test not applicable for any inmates at this facility |
| 29. Female inmate received a current mammogram | 0 | Test not applicable for any inmates at this facility |
| 30. Female inmate received a bone density screening test | 0 | Test not applicable for any inmates at this facility |

# Federal Medical Center – Carswell



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 127 | 100% | |
| 2. Medical assessment completed by medical practitioner at intake | 127 | 100% | |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 127 | 100% | |
| 4. Inmate received rapid plasma regain test during intake screening to test for syphilis | 126 | 91% | 9% |
| 5. Female inmate tested for Chlamydia | 24 | 38% | 62% |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 116 | 80% | 19% |
| 7. Inmate received a complete physical within 14 days of intake | 127 | 100% | |
| 8. Inmate received a pneumococcal vaccine | 14 | 50% | 50% |
| 9. Inmate received an annual influenza vaccine | 39 | 59% | 41% |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 117 | 80% | 20% |
| 11. Inmate received a tetanus vaccine in the last 10 years | 127 | 80% | 19% |
| 12. Inmate received a hepatitis A vaccine | 25 | 24% | 76% |
| 13. Inmate received a hepatitis B test or vaccine | 87 | 97% | 3% |
| 14. Inmate received a hepatitis C test | 37 | 84% | 16% |
| 15. Inmate received an HIV-1 test | 48 | 92% | 8% |
| 16. Inmate received an HIV-2 test | 1 | | 100% |
| 17. Inmate received a tuberculosis test in the past year | 111 | 100% | |
| 18. Inmate received a chronic care evaluation in the last 6 months | 84 | 100% | |

# Federal Medical Center – Carswell



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 72 | 92% / 8% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 45 | 2% / 98% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 74 | 93% / 7% |
| 22. Inmate received a current blood pressure check | 127 | 100% |
| 23. Inmate received a current body mass index calculation | 127 | 23% / 77% |
| 24. Inmate received a fecal occult blood test | 29 | 52% / 48% |
| 25. Inmate received a vision screening test | 26 | 96% / 4% |
| 26. Inmate received a hearing screening test | 5 | 20% / 80% |
| 27. Inmate received an abdominal ultrasound test | 0 | Test not applicable for any inmates at this facility |
| 28. Female inmate received a papanicolaou test (PAP smear) | 123 | 99% / 1% |
| 29. Female inmate received a current mammogram | 77 | 100% |
| 30. Female inmate received a bone density screening test | 6 | 50% / 50% |

96

# Federal Correctional Complex – Victorville



| Medical Service Tested | Inmates Tested | Yes / No |
|---|---|---|
| 1. Inmate medical history provided by inmate at intake | 345 | 99% Yes / 1% No |
| 2. Medical assessment completed by medical practitioner at intake | 345 | 99% Yes / 1% No |
| 3. New inmate tested for tuberculosis or previous test for transferred inmate confirmed, within 48 hours of intake | 344 | 100% Yes |
| 4. Inmate received rapid plasma reagin test during intake screening to test for syphilis | 137 | 91% Yes / 9% No |
| 5. Female inmate tested for Chlamydia | 1 | 100% No |
| 6. Female inmate received a measles/ mumps/rubella vaccine | 12 | 83% Yes / 17% No |
| 7. Inmate received a complete physical within 14 days of intake | 345 | 92% Yes / 5% No |
| 8. Inmate received a pneumococcal vaccine | 25 | 60% Yes / 36% No |
| 9. Inmate received an annual influenza vaccine | 66 | 61% Yes / 38% No |
| 10. Inmate born after 1956 received a measles/ mumps/ rubella vaccine | 298 | 6% Yes / 94% No |
| 11. Inmate received a tetanus vaccine every 10 years | 345 | 32% Yes / 68% No |
| 12. Inmate received a hepatitis A vaccine | 79 | 79% Yes / 19% No |
|  | 91 | 89% Yes / 9% No |
| 14. Inmate received a hepatitis C test | 86 | 93% Yes / 5% No |
| 15. Inmate received an HIV-1 test | 114 | 95% Yes / 4% No |
| 16. Inmate received an HIV-2 test | 51 | 100% Yes |
| 17. Inmate received a tuberculosis test in the past year | 267 | 98% Yes / 2% No |
| 18. Inmate received a chronic care evaluation in the last 6 months | 68 | 99% Yes / 1% No |

# Federal Correctional Complex – Victorville



| Medical Service Tested | Inmates Tested | Yes | No |
|---|---|---|---|
| 19. Inmate received a cholesterol check in the last 5 years | 215 | 64% | 36% |
| 20. Inmate received a cardiovascular risk calculation in the last 5 years | 131 | 2% | 98% |
| 21. Inmate received a fasting plasma glucose test in the last 3 years | 58 | 95% | 5% |
| 22. Inmate received a current blood pressure check | 345 | 96% | 4% |
| 23. Inmate received a current body mass index calculation | 338 | | 100% |
| 24. Inmate received a fecal occult blood test | 54 | 20% | 80% |
| 25. Inmate received a vision screening test | 6 | 50% | 50% |
| 26. Inmate received a hearing screening test | 6 | 33% | 67% |
| 27. Inmate received an abdominal ultrasound test | 2 | 100% | |
| 28. Female inmate received a papanicolaou test (PAP smear) | 19 | 95% | 5% |
| 29. Female inmate received a current mammogram | 12 | 100% | |
| 30. Female inmate received a bone density screening test | 2 | | 100% |

# The BOP's Health Care Performance Measures

| Description | Numerator | Denominator | Target Percentage |
|---|---|---|---|
| **Clinical Management of Hypertension** | Number of hypertensive patients on medication evaluated this reporting quarter with a blood pressure reading of less ≤140/≤ 90 millimeters of mercury | Number of patients being treated for hypertension with medication, for a minimum of 6 months, who are evaluated this reporting quarter | 2004 - 70% 2005 – 70% 2006 – 70% 2007 – 70% |
| **Clinical Management of Lipid Level** | Number of patients on lipid reduction medication, with a history of cardiovascular risk or two cardiac risk factors, with a low density lipoprotein level ≤ 100 milligrams reported this reporting quarter | Number of patients on lipid reduction medication for a minimum of 6 months, who have lipids measured this reporting quarter and meet requirements listed in the numerator statement | 2004 - 65% 2005 – 50% 2006 – 50% 2007 – 65% |
| **Clinical Management of Diabetes – HbA1C Level** | Number of diabetic patients on insulin or oral medication with an HbA1C level measured 8% or less, as a result of a test this reporting quarter | Number of diabetic patients on insulin or oral medication for a minimum of 6 months with HbA1C level measured this reporting quarter | 2004 - 65% 2005 – 65% 2006 – 65% 2007 – 65% |
| **Clinical Management of HIV/ Ribonucleic Acid Level** | Number of inmates on antiretroviral therapy with HIV/ Ribonucleic Acid levels < 50 cps/ml, as confirmed by ultra-sensitive method this reporting quarter | Number of inmates on antiretroviral therapy with known HIV/ Ribonucleic Acid standard level of < 400 cps/ml who have had the ultra-sensitive method test this reporting quarter < 50 cps/ml, as confirmed by ultra-sensitive method this reporting quarter | 2004 - 60% 2005 – 60% 2006 – 60% 2007 – 85% |

| Description | Numerator | Denominator | Target Percentage |
|---|---|---|---|
| **Completion of Isoniazid Treatment** | Number of inmates on treatment for Latent Tuberculosis Infection who have completed bi-weekly isoniazid therapy during this reporting quarter | Number of inmates previously started on treatment for Latent Tuberculosis Infection who should have completed treatment within this reporting quarter | 2005 – 90%<br>2006 – 90%<br>2007 – 90% |
| **Asthma-related Hospitalization or Mortality** | Number of patients diagnosed with asthma, who are taking chronic asthma medication, and who were not hospitalized, or did not expire from asthma this reporting quarter | Number of patients diagnosed with asthma, who are taking chronic asthma medication, and who were in the institution this reporting quarter | 2005 – 100%<br>2006 – 100%<br>2007 – 98% |
| **Breast Cancer Screening** | Number of females screened by mammography this reporting period | Number of females who require mammography screening this reporting period | 2004 - 50%<br>2005 – 50%<br>2006 – 50%<br>2007 – 50% |
| **Cervical Cancer Screening** | Number of female patients who received screening by PAP this reporting period | Number of female patients who would require screening by PAP | 2004 - 50%<br>2005 – 50%<br>2006 – 50%<br>2007 – 50% |
| **Pregnancy Testing at Intake** | Number of new intake females tested for pregnancy this reporting period | Number of new female intakes (pre-menopausal) arriving in the institution this reporting period | 2004 - 90%<br>2005 – 90%<br>2006 – 90%<br>2007 – 90% |

# Types of BOP Institutions

The BOP operates institutions at five different security levels in order to confine offenders in an appropriate manner. The security levels are based on such features as the presence of external patrols, towers, security barriers, or detection devices; the type of housing within the institution; internal security features; and the staff-to-inmate ratio. Each institution is given a security designation of either minimum, low, medium, high, or administrative.

**Minimum Security**

Minimum security institutions, also known as Federal Prison Camps (FPC), have dormitory housing, a relatively low staff-to-inmate ratio, and limited or no perimeter fencing. These institutions are work-oriented and program-oriented. Many of these institutions are located adjacent to larger institutions or on military bases, where inmates help serve the labor needs of the larger institution or base.

**Low Security**

Low security Federal Correctional Institutions (FCI) have double-fenced perimeters, mostly dormitory or cubicle housing, and strong work and program components. The staff-to-inmate ratio in these institutions is higher than in minimum security facilities.

**Medium Security**

Medium security FCIs have strengthened perimeters often with double fences and electronic detection systems, mostly cell-type housing, a wide variety of work and treatment programs, an even higher staff-to-inmate ratio than low security FCIs, and even greater internal controls.

**High Security**

High security institutions, also known as United States Penitentiaries (USP), have highly-secured perimeters featuring walls or reinforced fences, multiple-occupant and single-occupant cell housing, the highest staff-to-inmate ratio, and close control of inmate movement.

**Correctional Complexes**

A number of BOP institutions belong to Federal Correctional Complexes (FCC). At FCCs, institutions with different missions and security levels are located in close proximity to one another. FCCs increase efficiency through the sharing of services, enable staff to gain experience at institutions that have many security levels, and enhance emergency preparedness by having additional resources within close proximity.

**Administrative**

Administrative facilities are institutions with special missions, such as the detention of pretrial offenders; the treatment of inmates with serious or chronic medical problems; or the containment of extremely dangerous, violent, or escape-prone inmates. Administrative facilities include Metropolitan Correctional Centers (MCC), Metropolitan Detention Centers (MDC), Federal Detention Centers (FDC), and Federal Medical Centers (FMC), as well as the Federal Transfer Center (FTC), the Medical Center for Federal Prisoners (MCFP), and the Administrative-Maximum (ADX) USP. Administrative facilities are capable of holding inmates in all security categories.

**Satellite Camps**

A number of BOP institutions have a small, minimum-security camp adjacent to the main facility. These camps, often referred to as satellite camps, provide inmate labor to the main institution and to off-site work programs. FCI Memphis has a non-adjacent camp that serves similar needs.

**Satellite Low Security**

The BOP has two FCIs that have a small, low-security satellite facility adjacent to the main institution. The BOP also has one FCI that has a low-security facility affiliated with, but not adjacent to, the main institution.

# Department of Justice, Office of the Inspector General Audits of BOP Medical Contracts from August 2004 through March 2007

From August 2004 through March 2007, the OIG issued nine audit reports on BOP contracts for medical services. The OIG reported on major internal control deficiencies for eight of the nine medical services contract audits. Deficiencies included weak procedures or processes for calculating discounts, reviewing and verifying invoices and billings, paying bills, and managing the overall administration of the contracts. As of November 2007, the BOP's Program Review Division said that corrective actions had been implemented for all recommendations in seven of the nine contract audits. For the other two audits (Correctional Medical Services at Fort Dix, New Jersey and Medical Development International at FCC Butner, North Carolina), the BOP agreed to take corrective actions on the OIG's recommendations, and those actions were either completed or in progress as of November 2007. The OIG's findings and recommendations for the nine audits are summarized below.

**Parkview Medical Center**

In an August 2004 audit report on the BOP's contract with the Parkview Medical Center (PMC), the OIG reported on the purchase of inpatient and outpatient facility and physician services for inmates at the Federal Correctional Complex in Florence, Colorado.[30] The OIG found that: (1) PMC did not provide documentation to support billings for pharmacy items, (2) PMC billed for prescription drugs that were not on the BOP's approved formulary, (3) PMC did not provide the required Summary Paid Billing Analysis Reports to the BOP each quarter, and (4) the BOP could improve contract administration by better analyzing contract modifications prior to the acceptance of new terms.

The OIG recommended the BOP:

- remedy $424,638 in questioned costs paid to the PMC for unsupported pharmacy items,

---

[30] Department of Justice, Office of the Inspector General, *The Bureau of Prisons' Contract with the Parkview Medical Center for the Acquisition of Medical Services (J40604c-030)*, Audit Report GR-60-04-008 (August 2004).

- remedy the $94,774 in questioned costs paid to the PMC for drugs not listed in an applicable BOP formulary,

- implement controls to ensure the PMC submits the Quarterly Summary Paid Billing Analysis Report on time, and

- analyze future contract modifications to accurately determine the effect on the contract prior to acceptance.

**Correctional Medical Services**

In a September 2004 report on the BOP's contract with Correctional Medical Services (CMS), the OIG reported on the acquisition of comprehensive medical services for inmates at the FCI facility at Fort Dix, New Jersey.[31]

The OIG found that: (1) CMS did not schedule and provide outpatient institutional and physician services within the time allowed by the contract after receiving a request from the FCI, (2) the BOP had obtained services outside the contract because CMS could not provide agreed-upon services, (3) CMS did not provide a Quality Assurance and Improvement Program and quarterly Summary Paid Billing Analysis Reports to the BOP, (4) CMS did not provide replacement non-Medicare personnel in a timely manner, (5) CMS charged for duplicative services and for services cancelled by the BOP, and (6) CMS billed for Magnetic Resonance Imaging (MRI) services after the MRI portion of the contract had expired.

The OIG recommended the BOP:

- ensure that CMS provides outpatient institutional and physician services in accordance with the terms and conditions of the contract,

- remedy the $9,321,106 paid to the CMS because the government awarded the contract based on services in the CMS's proposal that the CMS did not have the capability to deliver,

- acquire biomedical services from the CMS at the prices set forth in the contract,

---

[31] Department of Justice, Office of the Inspector General, *Correctional Medical Services' Compliance with the Federal Bureau of Prisons' Contract J21451c-009*, Audit Report GR-70-04-009 (September 2004).

104

- ensure that the CMS provides a Quality Assurance and Improvement Program and the Summary Paid Billing Analysis Reports in accordance with the contract,

- remedy the $1,600 in duplicative orthopedic examination costs paid to the CMS,
- remedy the $7,096 paid to the CMS for services cancelled by the BOP, and

- remedy the $31,620 that the CMS billed for MRI services after the MRI portion of the contract had expired.

## Medical Development International at the United States Penitentiary and Federal Prison Camp in Leavenworth, Kansas

In a February 2005 report on the BOP's contract with Medical Development International (MDI), the OIG reported on the acquisition of medical services for the United States Penitentiary and Federal Prison Camp in Leavenworth, Kansas.[32] The OIG found that: (1) MDI did not obtain certification of residency forms from all medical providers as required by the contract, (2) the BOP Contracting Officer's Technical Representative did not submit contractor monitoring reports on a quarterly basis as required, and (3) the BOP Contracting Officer's Technical Representative did not use the BOP's rating guidelines on monitoring reports submitted.

The OIG recommended the BOP:

- obtain the required residency certification forms for all medical personnel who provide off-site care for inmates, and

- require the Contracting Officer's Technical Representative to submit contractor monitoring reports in a timely manner and use the rating guidelines when evaluating the contractor's performance.

## Wayne Memorial Hospital

In an April 2005 report on the BOP's contract with the Wayne Memorial Hospital (WMH), the OIG reported on the acquisition of comprehensive

_____

[32] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract with Medical Development International for the Acquisition of Medical Services at its Leavenworth, Kansas Facilities (Contract No. DJB40804003)*, Audit Report GR-60-05-003 (February 2005).

inmate medical services provided by WMH to inmates at FCI, Jesup.[33]  The OIG found that:  (1) WMH did not always provide Inmate Discharge Summary Reports in a timely manner, (2) FCI Jesup obtained medical services from providers outside the contract when the contractor was able to provide some of those services, (3) WMH billed and was paid for medical services that were calculated using incorrect billing practices, (4) WMH billed and was paid for medical services that were not supported with adequate documentation, and (5) FCI Jesup paid for medical services with billings that were unsupported.

The OIG recommended the BOP:

- ensure the contract accurately specifies services that are to be provided and other specific terms and conditions of the contract,

- ensure the contractor provides Inmate Discharge Summary Reports in a timely manner,

- remedy more than $76,000 charged to the contract because the contractor used incorrect rates when it prepared the billing statements or because adequate documentation was not maintained to support the billing statements, and

- ensure the FCI strengthens its controls for reviewing and processing invoices for payment.

**Salem Community Hospital**

In a June 2005 report on the BOP's Contract with the Salem Community Hospital, the OIG reported on the acquisition of comprehensive medical services for inmates at FCI Elkton facility in Salem, Ohio.[34]  The OIG found that:  (1) the Salem Community Hospital overcharged for services it provided during the first 8 months of the contract by using incorrect rates to calculate invoice discounts, (2) the Salem Community Hospital made additional errors in the discounts charged and in the time charges for

---

[33]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Medical Services Contract with Wayne Memorial Hospital, Jesup, Georgia (Contract J30703c-020)*, Audit Report GR-40-05-006 (April 2005).

[34]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract Number DJB21602-004 with Salem Community Hospital in Salem, Ohio,* Audit Report GR-50-05-012 (June 2005).

operating and recovery room services, and (3) FCI Elkton had no formal written procedures for reviewing and verifying the accuracy of its invoices.

The OIG recommended the BOP:

- direct FCI Elkton to remedy $744 in overcharges paid to Salem Community Hospital,

- direct FCI Elkton to ensure the Salem Community Hospital implemented control procedures to ensure charges and discounts on invoices were correctly calculated,

- direct FCI Elkton to review and revise its review procedures to ensure invoices approved for payment were accurate, and

- direct FCI Elkton to formalize its invoice review procedures in writing.

**Hospital Corporation of America-HealthONE**

In a March 2006 report on the Medical Services contract with the Hospital Corporation of America-HealthONE, L.L.C. (HealthONE), the OIG reported on the acquisition of comprehensive medical services for inmates at the FCI Englewood facility in Littleton, Colorado.[35] The OIG found that: (1) HealthONE did not submit quarterly Summary Paid Billing Analysis Reports to FCI Englewood as required, (2) the BOP Contracting Officer's Technical Representative could not provide documentation supporting the information reported in the quarterly contractor performance reports, (3) FCI Englewood had no written procedures for monitoring and reviewing of the contractor's billing process, and (4) FCI Englewood had no documentation supporting a review process for exercising each option of the contract.

The OIG recommended the BOP:

- document the criteria used to assess contractor performance and document the quantitative results of the evaluations,

- prepare quarterly statistical reports as required,

---

[35] Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract with* Hospital Corporation of America-HealthONE, L.L.C., Contract No. J40303c-146, Audit Report GR-60-06-006 (March 2006).

- document procedures for verifying the accuracy of the invoices for supplies and services, and

- ensure the contractor submitted quarterly Summary Paid Billing Analysis Reports.

## University of Massachusetts Medical School and the UMass Memorial Health Care, Inc.

In a March 2006 report on the medical services contract with the University of Massachusetts Medical School and the UMass Memorial Health Care, Inc. (collectively UMass), the OIG reported on the contractor's compliance with the contract for providing medical services to inmates at FMC Devens in Ayer, Massachusetts.[36] The OIG found that: (1) UMass did not consistently provide services at the location most advantageous to the government, (2) UMass lacked a detailed electronic database containing individual charges which prevented tests of the charges, (3) the FMC was not able to independently verify contract charges based on the Medicare hospital inpatient prospective payment system, and (4) the contract contained terms and requirements that were unreasonable or imprecisely written and were ignored by both parties.

The OIG recommended the BOP:

- require the contractor to provide detailed data on all contract charges electronically and use this data to analyze and manage contractor performance and costs;

- develop and implement management tools to ensure services were consistently provided at the location most advantageous to the government;

- develop the capability to independently verify contractor charges for inpatient hospital services based on the Medicare inpatient prospective payment system; and

- improve contract administration by requiring the contractor to adhere to all terms and conditions of the contract, and when

---

[36] Department of Justice, Office of the Inspector General, *The University of Massachusetts Medical School and UMass Memorial Health Care, Incorporated's Compliance with the Federal Bureau of Prisons' Contract DJB20507032*, Audit Report GR-70-06-006 (March 2006).

appropriate, amend the contract to ensure all contract terms were reasonable, clear, and enforceable.

## John C. Lincoln Health Network

In an August 2006 report on the medical services contract with the John C. Lincoln Health Network, the OIG reported on the acquisition of hospital facility services for the United States Penitentiary and the Federal Prison Camp in Phoenix, Arizona (FCI Phoenix).[37]  The OIG found that: (1) FCI Phoenix had not formalized in writing the procedures or policies for monitoring and reviewing contractor billings, (2) FCI Phoenix's payments to the contractor were not processed in a manner consistent with the Prompt Payments Act, (3) the BOP Contracting Officer's Technical Representative did not maintain adequate supporting documentation for performance reports, and (4) the BOP Contracting Officer did not review the performance reports in a timely manner.

The OIG recommended the BOP:

- finalize draft procedures for monitoring contractor billing and performance,

- identify procedural hindrances to full compliance with the Prompt Payments Act,

- implement new procedures for documenting supporting justification for evaluative rankings in performance reports,

- implement a policy to define and require a timely review of performance reports by the Contracting Officer, and

- ensure that the Contracting Officer either maintained or had accessed to a comprehensive listing of all contract expenditures to assist in contract monitoring.

## Medical Development International at FCC Butner and FMC Butner

In a March 2007 report on another BOP contract with MDI, the OIG reported on the acquisition of comprehensive medical services provided to

---

[37]  Department of Justice, Office of the Inspector General, *The Federal Bureau of Prisons' Contract with the John C. Lincoln Health Network, Contract No.* DJB60803144, Audit Report GR-60-06-009 (August 2006).

109

inmates at FCC Butner and FMC Butner in Butner, North Carolina.[38]  The OIG found that:  (1) the BOP's procedures for reviewing and approving billing rates were weak; (2) MDI's invoices contained transactions that were not within the service period being billed; (3) MDI billed the BOP for some transactions at a rate higher than specified in the contract; (4) MDI billed the BOP for some services not covered by the contract; (5) the BOP did not sign off on the timesheets submitted by the contractor; (6) MDI submitted timesheets that were either miscalculated, overstated, understated or not supported; (7) MDI billed for transactions where the hours billed were greater than the hours recorded in the institutions' sign-in and out logs; (8) MDI billed for transactions where the hours billed were for MDI contractors whose names did not appear in the sign-in and sign-out logs; and (9) MDI did not provide adequate support for billing statements for "on call" services provided under the contract.

The OIG recommended the BOP:

- remedy the $2,428,345 in questioned costs;

- implement various internal controls to ensure the BOP paid for services allowed by the contract, actually provided by the contractor, and at rates contained in the contract;

- improve contract administration to ensure the contractor adhered to all terms of the contract; and

- include specific terms and requirements for the billing of personnel services in the pricing and billing sections for future medical services contracts.

---

[38]  Department of Justice, Office of the Inspector General, T*he Bureau of Prisons' Management of the Medical Services Contract with Medical Development International, Butner, North Carolina, Contract No. DJB10611-00*, Audit Report Number GR-40-07-003 (March 2007).

# The BOP's Response to the Draft Audit Report



**U.S. Department of Justice**

Federal Bureau of Prisons

Office of the Director                    Washington, DC 20534

February 19, 2008

MEMORANDUM FOR RAYMOND J. BEAUDET
                ASSISTANT INSPECTOR GENERAL FOR AUDIT
                OFFICE OF THE INSPECTOR GENERAL

FROM:        Harley G. Lappin, Director
             Federal Bureau of Prisons

SUBJECT:     Response to the Office of Inspector General's
             (OIG) Draft Audit Report:  The Federal Bureau of
             Prisons' Efforts to Manage Inmate Health Care

The Bureau of Prisons (Bureau) appreciates the opportunity to
comment on and respond to the recommendations from the OIG's
draft audit report entitled The Federal Bureau of Prisons'
Efforts to Manage Inmate Health Care.

We are requesting OIG's Statement on Internal Controls, Finding
I, Page 55, stating the Bureau "did not provide necessary medical
care to inmates," be removed from the report.  We do not believe
it accurately portrays the state of medical care in the Bureau.
While the Bureau strives for 100% compliance with its policies
and guidance, it is unrealistic to expect such results.  The
audit was based on the Clinical Practice Guideline, "Preventive
Health Care," which was adapted from recommendations of the U.S.
Preventative Services Task Force.  This guideline is a recent
issuance that emphasizes the importance of prevention in order to
avoid disease.  Full implementation is a long-term effort and
discretion is accorded to providers to ascertain medical
priorities within the prevention model.  The Bureau fully
anticipated it would take a period of years to achieve full
implementation.  The Bureau is glad OIG focused on the Bureau's
Preventative Health Care Guidelines because we are proud to have
issued cutting edge guidance.  However, the generalized statement
that the "Bureau is not providing necessary medical care to
inmates" is an unfortunate view which fails to take into account
that while prevention is a desirable goal, in balancing health

care needs, the Bureau must place priority on lifesaving measures and care.

Please find below listed the Bureau's response to each individual recommendation:

**Recommendation #1:** Establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results.

**Response:** The Bureau agrees with this recommendation and will establish protocols for collecting and evaluating data. We are not a stand-alone healthcare service and unlike the private sector, our health services are delivered within the constraints of a correctional environment.

For those initiatives for which we have or can collect hard data, we will make every effort to assess cost-effectiveness. For example, in our third-party bill adjudication initiative, we will be able to measure cost pre- and post-contracting beginning in FY2008. For some of our initiatives, it will not be feasible, however, to create or retrieve data to use in cost comparisons. Also, not all initiatives are intended to produce cost savings. Certain initiatives do not generate cost savings, but promote better medical outcomes and continuity of care.

**Recommendation #2:** Review the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determine whether those medical services are necessary, or whether the medical service requirement should be removed from the clinical practice guidelines.

**Response:** The Bureau agrees with this recommendation. In January 2008 we reviewed all of the Bureau's Clinical Practice Guidelines. Based on that review, certain guidelines have been identified for revision (http://www.bop.gov/news/medresources.jsp). We will highlight quarterly reports from Program Review Division in on-line training sessions with Health Services staff, the first of which will take place in April 2008.

**Recommendation #3:** Issue clarifying guidance to the institutions regarding the medical services that BOP decides are necessary for BOP medical providers to perform.

**Response:** The Bureau agrees with this recommendation and will issue guidance to institutions underscoring the importance of the Clinical Practice Guidelines. This will be completed by

2

April 1, 2008.

**Recommendation #4:** Strengthen management controls to ensure proper administration of BOP medical contracts by providing guidance and procedures to all BOP institutions for:

A.  reviewing contractor invoices for accuracy,
B.  ensuring contractor invoices are supported by adequate documentation,
C.  ensuring that invoice discounts are properly applied,
D.  ensuring that contractor performance reports are complete and accurate, and
E.  ensuring that contractor timesheets are verified by a BOP employee.

**Response:** The Bureau agrees with this recommendation and will issue guidance to all Bureau Contracting Officers and Health Services Administrators regarding Medical Contract Administration procedures. Guidance will be completed and distributed by April 1, 2008.

**Recommendation #5:** Develop a process to use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic deficiencies found during program reviews.

**Response:** The Bureau agrees with this recommendation and will issue guidance regarding systemic deficiencies found during program reviews through periodic on-line training sessions, the first of which will begin in May 2008.

**Recommendation #6:** Ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable.

**Response:** The Bureau agrees with this recommendation and will issue guidance clarifying to institutions the importance of ensuring that applicable privileges, practice agreements, protocols, and peer reviews are handled in a timely manner, and the potential consequences of failure to do so. Guidance will be issued by April 1, 2008.

**Recommendation #7:** Ensure privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner.

**Response:** See response to Recommendation #6.

3

**Recommendation #8:** Ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols.

**Response:** See response to Recommendation #6.

**Recommendation #9:** Ensure that peer reviews of all providers are performed within the prescribed timeframes.

**Response:** See response to Recommendation #6.

**Recommendation #10:** Until the training program on accumulating and reporting performance data is implemented, issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data. Once the training program is fully developed, ensure that appropriate institution staff receive the training.

**Response:** The Bureau agrees with this recommendation. Guidance will be issued to all institutions by May 1, 2008, on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data. Data collection and reporting will also be addressed in on-line training.

**Recommendation #11:** Establish a process for reviewing the health care performance measures reported by institutions that includes actions that will be taken when institutions are not meeting the target performance levels.

**Response:** The Bureau agrees with this recommendation and has a process in place to assess performance measures. A memorandum was issued on February 12, 2008, to all Bureau wardens, notifying them of changes to the national performance measures and reiterating the policy requirement to collect and report these measures. An on-line training session for institution Health Services staff was conducted February 13, 2008, to discuss the changes and the reporting requirements. The Health Services Division's Office of Quality Management will be collecting and reviewing this data semiannually and reporting to the regional medical directors when institutions are not meeting the expected target levels. Each regional medical director will ensure that national performance measures are addressed at each institution under his or her oversight. Regional medical directors will assess target level failures, provide recommendations for improvement, and follow-up during Clinical Director Peer Reviews.

4

If you have any questions regarding this response, please contact
VaNessa P. Adams, Senior Deputy Assistant Director, Program
Review Division, at (202) 616-2099.

This page intentionally left blank.

## Office of the Inspector General, Audit Division, Analysis and Summary of Actions Necessary to Close the Report

We provided the draft report to the BOP for review and requested written comments. The BOP's written response is included as Appendix XI of this report. The BOP agreed with all of our recommendations and proposed corrective action appropriate to resolve the recommendations. However, in its only comment on the extensive content of the draft report, the BOP objected to a sentence on page 55 reading "The BOP institutions did not provide necessary medical care to inmates." This sentence was included in the draft report as a very brief summary of Finding 1, which is also referenced on page 55. In response to the BOP's statement, we reviewed our draft report's language on page 55 and revised it to summarize more precisely Finding 1. The revised statement on 55 now reads "The BOP's institutions did not always provide recommended preventative medical services to inmates."

We provide below our analysis of the BOP's response to the recommendations.

1. **Resolved.** We recommended the BOP establish procedures for collecting and evaluating data for each current and future health care initiative to assess whether individual initiatives are cost-effective and producing the desired results. The BOP agreed and stated that it will establish protocols for collecting and evaluating data. The recommendation can be closed when we review the procedures the BOP establishes to assess the cost effectiveness of its initiatives.

2. **Resolved.** We recommended the BOP review the medical services that the OIG and the BOP's Program Review Division identified as not always provided to inmates and determine whether those medical services are necessary, or whether the medical service requirement should be removed from the Clinical Practice Guidelines. The BOP agreed with the recommendation. It stated that in January 2008, it reviewed all of its Clinical Practice Guidelines and identified certain guidelines for revision. The BOP also stated that it will highlight its Program Review Division's quarterly reports in on-line training sessions, with the first session taking place in April 2008. We request that the BOP provide us with a list of guidelines identified for revision and the time frame for accomplishing the revisions. The recommendation can be closed when we review revisions to the Clinical Practice Guidelines.

117

3. **Resolved.** We recommended the BOP issue clarifying guidance to the institutions regarding the medical services that the BOP decides are necessary for BOP medical providers to perform. The BOP agreed and stated that by April 2008 it will issue guidance to its institutions underscoring the importance of the Clinical Practice Guidelines. The recommendation can be closed when we review the BOP's clarifying guidance.

4. **Resolved.** We recommended the BOP strengthen management controls to ensure proper administration of BOP medical contracts by providing guidance and procedures to all BOP institutions. The BOP agreed and stated that by April 2008 it will issue guidance to all Bureau Contracting Officers and Health Services Administrators regarding medical contract administration procedures. The recommendation can be closed when we review the BOP's guidance.

5. **Resolved.** We recommended the BOP develop a process to use the program summary reports prepared by the Program Review Division to develop or clarify agency-wide guidance on systemic deficiencies found during program reviews. The BOP agreed and stated that it will issue guidance regarding systemic deficiencies found during program reviews through periodic on-line training sessions, the first of which will begin in May 2008. The recommendation can be closed when we receive documentation showing the BOP has developed a process and issued guidance.

6. **Resolved.** We recommended the BOP ensure initial privileges, practice agreements, or protocols are established for all practitioners, as applicable. The BOP agreed and stated that by April 1, 2008, it will issue guidance clarifying to institutions the importance of ensuring that applicable privileges, practice agreements, protocols, and peer reviews are handled in a timely manner, and the potential consequences of failure to do so. While we agree that clarified guidance is, in part, appropriate to address this recommendation, it is not clear to us how the issuance of clarified guidance alone will ensure the establishment of privileges, practice agreements, and protocols. We believe that ensuring the establishment of these items requires a mechanism such as testing during program reviews, submission of periodic certification statements, submission of periodic reports by institutions, or some other appropriate verification technique. We request that the BOP explain how the implementation of the clarified guidance will be verified. The

recommendation can be closed when we review the BOP's clarifying guidance and documentation for the verification mechanism.

7. **Resolved.** We recommended that the BOP ensure privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner. The BOP agreed and stated that the guidance it plans in response to Recommendation 6 will also address this recommendation. As with Recommendation 6, we agree that clarified guidance is, in part, appropriate to address this recommendation, but it is not clear to us how the issuance of clarified guidance alone will ensure that privileges, practice agreements, and protocols are reevaluated and renewed in a timely manner. We believe a verification technique also is needed for this recommendation, and we request that the BOP explain how the implementation of the clarified guidance will be verified. The recommendation can be closed when we review the BOP's clarifying guidance and documentation for the verification mechanism.

8. **Resolved.** We recommended the BOP ensure that practitioners are not allowed to practice medicine in BOP institutions without current privileges, practice agreements, or protocols. The BOP agreed and stated that the guidance it plans in response to Recommendation 6 will also address this recommendation. As with Recommendation 6, we agree that clarified guidance is, in part, appropriate to address this recommendation, but it is not clear to us how the issuance of clarified guidance alone will ensure that practitioners are not allowed to practice absent current privileges, practice agreements, or protocols. We believe a verification technique also is needed for this recommendation, and we request that the BOP explain how the implementation of the clarified guidance will be verified. The recommendation can be closed when we review the BOP's clarifying guidance and documentation for the verification mechanism.

9. **Resolved.** We recommended the BOP ensure that peer reviews of all providers are performed within the prescribed time frames. The BOP agreed and stated that the guidance it plans in response to Recommendation 6 will also address this recommendation. As with Recommendation 6, we agree that clarified guidance is, in part, appropriate to address this recommendation, but it is not clear to us how the issuance of clarified guidance alone will ensure that peer reviews are performed within the prescribed time frames. We believe a verification technique also is needed for this recommendation, and we request that the BOP explain how the implementation of the clarified guidance will be verified. The recommendation can be closed when we

review the BOP's clarifying guidance and documentation for the verification mechanism.

10. **Resolved.** We recommended to the BOP that, until the training program on accumulating and reporting performance data is implemented, it issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data. We also recommended that, once the training program is fully developed, the BOP ensure that appropriate institution staff receives the training. The BOP agreed and stated that by May 1, 2008, it will issue guidance to all institutions on how to accumulate and report data for the health care performance measures to ensure consistency in the way institutions collect and report performance data. Data collections and reporting will also be addressed in on-line training. The recommendation can be closed when we review the BOP's guidance to institutions and receive documentation showing that appropriate institution staff have received the on-line training.

11. **Resolved.** We recommended the BOP establish a process for reviewing the health care performance measures reported by institutions that includes actions that will be taken when institutions are not meeting the target performance levels. The BOP agreed and stated that it issued a memorandum on February 12, 2008, to all Bureau Wardens, notifying them of changes to the national performance measures and reiterating the policy requirement to collect and report these measures. An on-line training session for institution Health Services staff was conducted February 13, 2008, to discuss the changes and the reporting requirements. The BOP stated that the Health Services Division's Office of Quality Management will be collecting and reviewing this data semiannually and reporting to the Regional Medical Directors when institutions are not meeting the expected target levels. The BOP stated that Regional Medical Directors will ensure that national performance measures are addressed at each institution under their oversight. The BOP further stated that Regional Medical Directors will assess target level failures, provide recommendations for improvement, and follow-up during Clinical Director peer reviews. The recommendation can be closed when we review the February 12, 2008, memorandum and documentation for the on-line training conducted on February 13, 2008, showing the subjects covered.