# EXHIBIT 100

Page 1

1       IN THE UNITED STATES DISTRICT COURT

     FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5    Situated,

6                 Plaintiff,

vs.                     CASE NO.

7                       3:16-CV-02267

CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                 Defendants.

10

11

12              CONFIDENTIAL

13        VIDEO DEPOSITION OF BART VERHULST

14            Nashville, Tennessee

15            November 5, 2019

16

17

18

19    Reported by:

20    Elisabeth A. Miller Lorenz

21    RMR, CRR, LCR No. 66

22

23    Job No.:  10061569

24

25

1　　　IN THE UNITED STATES DISTRICT COURT

　　FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4　　NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5　　Situated,

6　　　　　　　　Plaintiff,

vs.　　　　　　　　CASE NO.

7　　　　　　　　　3:16-CV-02267

CORRECTIONS CORPORATION OF

8　　AMERICA, et al.,

9　　　　　　　　Defendants.

10

11

12

13

14

15

16

17　　　Video deposition of BART VERHULST was taken

18　　on behalf of Plaintiff, at Riley, Warnock &

19　　Jacobson, 1906 West End Avenue, Nashville,

20　　Tennessee, beginning at 9:32 a.m., and ending at

21　　2:56 p.m., on Tuesday, November 5, 2019, before

22　　Elisabeth A. Miller Lorenz, RMR, CRR, and LCR No.

23　　66.

24

25

1 APPEARANCES:
2  For the Plaintiff:
3  ROBBINS GELLER RUDMAN & DOWD
 BY:  KENNETH J. BLACK
4  BY:  WILLOW RADCLIFFE
 One Montgomery Street
5  Suite 1800
 San Francisco, California 94104
6  415.288.4545
 kennyb@rgrdlaw.com
7  wradcliffe@rgrdlaw.com
8
For the Defendants:
9
 RILEY, WARNOCK & JACOBSON
10  BY:  TREY McGEE
 1906 West End Avenue
11  Nashville, Tennessee 37203
 615.320.3700
12  tmcgee@rwjplc.com
13  LATHAM & WATKINS
 BY:  ERIC C. PETTIS
14  355 South Grand Avenue
 Los Angeles, California 90071-1560
15  213.485.1234
 eric.pettis@lw.com
16
17
Also Present:
18
David Drumel, Videographer
19  Bailey Magos
20
21
22
23
24
25

1          MR. PETTIS:  Eric Pettis of Latham &

2     Watkins on behalf of the witness and the defendants.

3          THE VIDEOGRAPHER:  Thank you.

4          The court reporter today is Elisabeth

5     Lorenz, and she may now swear in the witness.

6                    * * *

7          BART VERHULST

8     was called as a witness, and after having been first

9     duly sworn, testified as follows:

10              E X A M I N A T I O N

11    BY MR. BLACK:

12    Q      Good morning.  My name --

13    A      Good morning.

14    Q      My name is Kenny Black.  I'm from the -- I'm

15    from the law firm of Robbins Geller Rudman & Dowd.

16    I represent plaintiffs in this matter.

17          Can you state your full name, phone number,

18    and home address for the record, please?

19    A      Bart VerHulst, ███████████████.

20    ████████████████████████████.

21    Q      Mr. VerHulst, have you been deposed before?

22    A      I have not.

23    Q      I'm going to go over the procedures for this

24    deposition so that they're clear.

25          Do you understand that even though we're not

Page 68

1    A      I do.

2    Q      What are the missteps reversed -- referred

3    to?

4            MR. McGEE:  Object to the form of the

5    question.

6            THE WITNESS:  Based on what I'm reading

7    and my recollection, I couldn't tell you.

8    BY MR. BLACK:

9    Q      So the same sentence mentions GEO

10   performance negatives.

11           Do you know what performance negatives GEO

12   had?

13   A      I do not.

14   Q      Who was responsible for cataloging GEO

15   performance negatives?

16           MR. McGEE:  Object to the form of the

17   question.

18           THE WITNESS:  I don't know.

19   BY MR. BLACK:

20   Q      Do you remember whether GEO won this

21   contract because they were better on cost?

22           MR. McGEE:  Object to the form of the

23   question.

24           THE WITNESS:  I don't know that.

25

Page 69

1    BY MR. BLACK:

2    Q       Do you remember whether GEO won this

3    contract because they were better on quality?

4            MR. McGEE:  Object to the form of the

5    question.

6            THE WITNESS:  I -- I don't -- I have

7    not been made aware of that.

8    BY MR. BLACK:

9    Q       Do you remember why GEO won this contract?

10           MR. McGEE:  Object to the form of the

11   question.

12           THE WITNESS:  I'd be speculating.

13   BY MR. BLACK:

14   Q       Okay.  Can you speculate, please?

15           MR. McGEE:  Object to speculation.

16           THE WITNESS:  Knowing the procurement,

17   the competition, knowing the BOP's preference, and

18   through conversations, it was clear even during the

19   existing term of the contract that the BOP did not

20   like shared facilities.  We had a lot of back and

21   forth.  We did a lot of work to try to mitigate

22   their concerns.

23           If I'm speculating knowing what I know

24   now, it's clear that there is a -- it's clear today

25   that they specifically have a desire for their own

1    facilities and not to cohabitate with anybody.

2            You know, their future solicitations

3    prohibited cohabitation.

4    BY MR. BLACK:

5    Q       And for CoreCivic or at the time

6    Corrections Corp., the northeast Ohio facility was a

7    cohabitation between BOP and Marshals Service

8    populations; is that right?

9    A       It was.  And if I can talk about that for a

10   second.

11           Prior to my time with the Bureau of Prisons,

12   whoever, CCA, CoreCivic, Corrections Corp., Congress

13   created a department in the Department of Justice

14   called the Office of the Federal Detention Trustee.

15           And the premise of the Office of the Federal

16   Detention Trustee was to have one entity that would

17   procure all prison and detention beds for the three

18   agencies that detained, so Bureau of Prisons,

19   Immigration and Customs Enforcement, and the

20   United States Marshals Service.

21           So the thought was that the government

22   wasn't getting best value because these three

23   entities were competing against each other for the

24   same space.  So if you look at the subsequent OFDT

25   contracts, they still have great value to government

1    in cohabitation, sharing costs, reducing overall

2    cost for facilities.

3        ICE and the U.S. Marshals Service used the

4    OFDT.  The Bureau of Prisons never bought into the

5    OFDT and refused to participate and continued to

6    procure their own beds.  That made it very

7    difficult.  What we do have, a number of contracts

8    that still exist today that were under the Office of

9    the Federal Detention Trustee, mainly contracts

10   through Marshals Service and ICE share.

11       It was a great, in my mind, premise without

12   the BOP fully buying in.

13       Eventually ICE pulled out, went back to

14   procuring their own beds.  The OFDT survived for a

15   period of time by just procuring U.S. Marshals

16   Service beds until a few years ago when it was

17   folded back into the Marshals Service.

18   Q      If cohabitation was the main issue at

19   northeast Ohio, why are GEO performance negatives

20   relevant to that?

21       MR. McGEE:  Object to the form of the

22   question.

23       THE WITNESS:  First of all, I would

24   start by saying you asked me to speculate.

25       Second of all, I would say that in my

1        Let me first ask, did you have health

2    struggles at the Eden and Cibola facilities?

3            MR. McGEE:  Object to the form of the

4    question.

5            THE WITNESS:  I remember issues related

6    to both.

7    BY MR. BLACK:

8    Q      What types of issues?

9    A      Health services issues.

10   Q      Let me ask this way.

11       Did you have poor performance in health

12   services at those two facilities, or did you have a

13   problem with being perceived to have poor

14   performance in health services at those two

15   facilities?

16           MR. McGEE:  Object to the form of the

17   question.

18           THE WITNESS:  I believe that we as a

19   company had identified issues, and we worked

20   comprehensively to try to address those and fix

21   those issue -- and mitigate those issues in numerous

22   ways.

23   BY MR. BLACK:

24   Q      Do you think you were successful in doing

25   so?

1    A      I do.

2    Q      By what point do you think you had been

3    successful in doing so?

4    A      I don't remember the dating of everything

5    and how it -- the timing when everything played out.

6    Q      Can you say whether or not it was before

7    2016?

8    A      I cannot.

9    Q      You said you identified -- or that CoreCivic

10   had identified problems in health services at these

11   two facilities; is that correct?

12   A      Sure.  I mean, health services is a very

13   difficult component of what we do.  From time to

14   time, we have issues much like anybody that operates

15   a prison, jail, or detention center, whether it be

16   city, county, state, federal government, or private

17   operator.

18   Q      Is it not the case the BOP identified for

19   you the deficiencies or issues in health services?

20          MR. McGEE:  Object to the form of the

21   question.

22          THE WITNESS:  I think it was identified

23   by the BOP.  I don't know that their identification

24   predated our own.

25

1    BY MR. BLACK:

2    Q      You don't remember whether or not -- who

3    first identified --

4    A      No.  I mean --

5    Q       -- issues in health services?

6    A       -- we obviously watch our performance on a

7    daily basis, so it wouldn't -- I don't think it

8    would have come as a surprise to us that we had

9    health services issues that we weren't already

10   addressing.

11   Q      Do you have any reason to think that

12   Jeb Beasley has inaccurately described any of the

13   issues that are included in this document?

14          MR. McGEE:  Object to the form of the

15   question.

16   BY MR. BLACK:

17   Q      And feel free to take time to review it

18   if -- if you wish.

19          MR. McGEE:  I'll restate my objection.

20          THE WITNESS:  I mean, I would say that

21   I can -- it's not my entry, and I'm sure that Jeb

22   wrote to the best of his knowledge and ability an

23   accurate description of the situation.

24   BY MR. BLACK:

25   Q      Reading -- reviewing this document, do you

1      I, the undersigned, a Licensed Court

2   Reporter of the State of Tennessee, do hereby

3   certify:

4          That the foregoing proceedings were

5   taken before me at the time and place herein set

6   forth; that any witnesses in the foregoing

7   proceedings, prior to testifying, were duly sworn;

8   that a record of the proceedings was made by me

9   using machine shorthand, which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is a true record of the testimony given.

12          Further, that if the foregoing pertains

13   to the original transcript of a deposition in a

14   federal case, before completion of the proceedings,

15   review of the transcript [ X ] was [  ] was not

16   requested.

17          I further certify I am neither

18   financially interested in the action nor a relative

19   or employee of any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: November 18, 2019

23   _____

24   Elisabeth A. Miller Lorenz

25   RMR, CRR, LCR No. 66

**www.aptusCR.com**