# EXHIBIT 132

Page 1

1      IN THE UNITED STATES DISTRICT COURT

   FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5    Situated,

6                    Plaintiff,

vs.                    CASE NO.

7                         3:16-CV-02267

CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                    Defendants.

10

11

12                CONFIDENTIAL

13        VIDEO DEPOSITION OF WILLIAM DALIUS

14              Nashville, Tennessee

15              February 26, 2020

16

17

18

19

20

21

22    Reported by:

23    Elisabeth A. Miller Lorenz

24    RMR, CRR, LCR No. 66

25    Job No.:  10066903

1        IN THE UNITED STATES DISTRICT COURT

   FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5    Situated,

6                    Plaintiff,

vs.                    CASE NO.

7                        3:16-CV-02267

CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                    Defendants.

10

11

12

13

14

15

16

17        Video deposition of WILLIAM DALIUS was taken

18    on behalf of Plaintiff, at Riley, Warnock &

19    Jacobson, 1906 West End Avenue, Nashville,

20    Tennessee, beginning at 9:39 a.m., and ending at

21    1:37 p.m., on Tuesday, February 26, 2020, before

22    Elisabeth A. Miller Lorenz, RMR, CRR, and LCR No.

23    66.

24

25

1   APPEARANCES:

2   For the Plaintiff:

3   ROBBINS GELLER RUDMAN & DOWD
BY: WILLOW RADCLIFFE

4   One Montgomery Street
Suite 1800

5   San Francisco, California 94104
415.288.4545

6   wradcliffe@rgrdlaw.com

7   BY: CHRISTOPHER H. LYONS
414 Union Street

8   Suite 900
Nashville, Tennessee 37219

9   615.252.3798
clyons@rgrdlaw.com

10

11

For the Defendants:

12

RILEY, WARNOCK & JACOBSON

13   BY: TREY McGEE
1906 West End Avenue

14   Nashville, Tennessee 37203
615.320.3700

15   tmcgee@rwjplc.com

16   LATHAM & WATKINS
BY: MORGAN E. WHITWORTH

17   505 Montgomery Street
Suite 2000

18   San Francisco, California 94111-6538
415.395.8011

19   morgan.whitworth@lw.com

20

21   Also Present:

22   David Drumel, Videographer

23

24

25

1    Latham & Watkins, on behalf of defendants and the

2    witness.

3              THE VIDEOGRAPHER:  Thank you.

4              Will the court reporter please swear in

5    the witness.

6                   * * *

7              WILLIAM DALIUS

8    was called as a witness, and after having been first

9    duly sworn, testified as follows:

10              E X A M I N A T I O N

11    BY MS. RADCLIFFE:

12    Q      Can you please spell your name for the

13    record?

14    A      William Dalius; W-I-L-L-I-A-M, D-A-L-I-U-S.

15    Q      And where do you presently reside?

16    A      In Nolensville, Tennessee.

17    Q      And have you been deposed before?

18    A      Yes, ma'am.

19    Q      How many times?

20    A      Several.

21    Q      When was the first time you were deposed?

22    A      I don't recall.

23    Q      What was the nature of the action if you

24    recall?

25    A      It was, geez, probably -- probably an EEO

Page 64

1    versus the BOP or private prisons versus --

2    A      Not that I would have seen.

3    Q      Did you ever ask for any such analysis to be

4    done?

5    A      No, ma'am.

6    Q      And at CCA, you haven't seen any such

7    analysis?

8    A      No, ma'am.

9              MS. RADCLIFFE:  We'll mark the next

10   one.

11              (Marked Exhibit No. 317.)

12   BY MS. RADCLIFFE:

13   Q      Mr. Dalius, the document before you appears

14   to be an indication of a meeting being scheduled.

15      Who is Jamie Warren?

16   A      She worked for Harley Lappin.  She was

17   either his executive secretary or -- I don't know

18   her exact title, but she worked for Mr. Lappin.

19   Q      Did she regularly set up meetings on

20   Mr. Lappin's behalf?

21   A      Yes.

22   Q      Did she regularly send e-mails on

23   Mr. Lappin's behalf?

24   A      I don't know that she sent e-mails on his

25   behalf.

Page 65

1    Q      We recalled earlier that you had first

2    started consulting work in January of 2016 related

3    to CCA.

4    A      Correct.

5    Q      Do you have any recollection what this

6    meeting would have discussed?

7    A      I have no idea.

8    Q      When you first started at -- consulting work

9    at CCA, do you recall any specific areas of inquiry

10    that CCA had with you?

11    A      Not specifically.

12    Q      Generally, do you recall the nature of the

13    subject matters of your work?

14    A      It would have been prison operations.

15    Q      Have you ever seen any analysis of cost

16    comparisons of CCA versus its competitors?

17    A      I've seen cost analysis of private companies

18    versus BOP and --

19    Q      And what -- sorry.

20    A      There's a document the BOP puts out annually

21    on per diem costs.  It's really not an

22    apples-to-apples match because BOP does not reflect

23    all the costs in their per diem that the

24    privatization folks do.

25    Q      So when you say you've seen analysis of

1    private companies versus the BOP, this per diem cost

2    is what you're referring to?

3    A       Yes.  I used to complete it.

4    Q       And as I understand your testimony, the per

5    diem cost is not an apples-to-apples comparison; is

6    that correct?

7    A       That is correct.

8    Q       And then what about, have you seen any cost

9    comparisons of CCA versus its competitors?

10   A       Not that I recall specifically.

11   Q       And with respect to the per diem cost

12   that you -- that you completed, did that include any

13   analysis of the quality of performance of CCA?

14   A       No, it was strictly financial analysis.

15   Q       And I'll take it your answer to be saying

16   that it didn't include any analysis of the quality

17   of the performance of the BOP?

18   A       It was strictly per diem, financial.

19   Q       Do you recall what the purposes of

20   calculating the per diem cost was?

21   A       It was to show Congress comparisons of...

22   Q       And who did you work with in preparing those

23   per diem costs?

24   A       My budget staff.

25   Q       And did the budget staff substantially

Page 67

1    assist you in preparing those per diem costs?

2    A      They assisted me.  I don't know about

3    substantially, but they definitely assisted me.

4    They had access to all the systems.

5    Q      The information that you used to calculate

6    the per diem cost, was that all publicly available?

7    A      I don't know the answer to that.  I -- I

8    suspect.

9    Q      I don't want you to guess.

10   A      I know I can't guess, so I'm sorry.  After I

11   said that, I thought --

12   Q      So is --

13   A      I -- I don't know then if -- if the

14   government documents are all public or not.

15   Q      Do you recall what the criteria used were to

16   calculate the per diem cost?

17   A      Yes.

18   Q      And what was it?

19   A      Well, there's a lot of criteria.  I mean,

20   it's generally -- for the BOP prisons, the criteria

21   was just their annual operating budget.  It excluded

22   things like construction costs, high

23   maintenance-type items, national expenses that would

24   be charged to all the prisons.  And it was just kind

25   of prorated.

1        So if you did a true cost comparison, those

2    things were omitted from the per diem, the BOP's,

3    and that was just a decision made by the BOP years

4    ago to provide it that way.

5        Whereas, the privates, they have everything

6    included, the real estate taxes, the -- all the

7    salaries, all the retirement, everything, all the

8    construction, maintenance that goes into their

9    costs.

10   Q     So while at the BOP, for example, when

11   you -- the -- strike that.

12       The per diem costs, you calculated those

13   annually for the BOP?

14   A     Correct, at the end of each fiscal year.

15   Q     And did anybody have responsibilities for

16   reviewing your calculations prior to them being

17   published?

18   A     My budget staff and myself.

19   Q     And --

20   A     And the director signed off on it.

21   Q     And let's say, for example -- let's take the

22   year 2014.

23   A     Uh-huh.

24   Q     Without having access to the BOP documents,

25   would you be able to replicate exactly how you

1    calculated that per diem cost?

2    A      If I had the data, I could go back and

3    replicate it, yes.

4    Q      But if you didn't have the data, you would

5    not be able to replicate it?

6    A      That's correct.

7    Q      And then I believe you -- you mentioned the

8    private prison operators, that they had provided

9    information regarding their per diem costs.

10   A      We knew exactly what their per diem cost was

11   because they bid for the contract.

12   Q      And so the private prison operators would

13   provide you with information regarding their per

14   diem costs; is that --

15   A      They would provide a per diem cost.

16   Q      So a fixed per diem cost?

17   A      Well -- yes.

18   Q      And you would have to rely on what the

19   private prison operators told you regarding what

20   constituted that per diem cost?

21          MR. McGEE:  Object, that assumes facts

22   that aren't in evidence.

23          THE WITNESS:  Yeah, I -- they bid on

24   the job, that per diem.

25

Page 80

1    Q      And when were you informed of that audit?

2    A      I don't recall.

3    Q      Do you recall whether you were informed near

4    the onset or after the fact?

5    A      I would have known towards the onset.

6    Q      Were you interviewed for that audit?

7    A      Don't recall.  Don't -- I interviewed for

8    that.  We had a division that all the audits fell

9    under.

10   Q      And who was responsible for that division?

11   A      That would been the program review division.

12   Q      And during the 2012 to 2015 time period, who

13   would have been responsible for -- for that

14   division?

15   A      I don't know without going back.  We saw a

16   couple signatures earlier on that one document that

17   had the -- I think Ms. Revell was one and -- I don't

18   know who the others would have been.

19   Q      Fair enough.  It's not a memory test.

20          MS. RADCLIFFE:  We're going to mark the

21   next document in order.

22          (Marked Exhibit No. 322.)

23          MR. McGEE:  Sorry, what was this again?

24          MS. RADCLIFFE:  322.

25

1    BY MS. RADCLIFFE:

2    Q     Mr. Dalius, I'm going to direct you to the

3   first bullet point.

4    A     Okay.

5    Q     If you could go ahead and read that.

6    A     Okay.

7    Q     Do you see that Mr. Beasley is indicating to

8   Ms. Baker that -- that CCA had argued that the scope

9   of their contract description of services changed,

10   and, therefore, we have received reduction in

11   compensation to beds being take -- taken offline?

12    A     I see that.

13    Q     Do you recall discussing this issue with

14   CCA?

15    A     I do not.

16    Q     Do you recall the issue at all?

17    A     Not really.

18    Q     Do you recall a change in CAR 15?

19    A     There were, like, 25 CARs, so I cannot

20   remember all the CARs -- changes.

21    Q     Do you recall discussing with CCA changes to

22   any of the CARs?

23    A     Not specific discussions, no.

24    Q     Do you recall any general discussions?

25    A     Not -- not really.

1    Q      Do you recall who you would have had those

2    discussions with?

3    A      No, ma'am.

4    Q      You can go ahead and put that document

5    aside.  Thank you.

6           MS. RADCLIFFE:  I'm going to mark as

7    Exhibit 323...

8           (Marked Exhibit No. 323.)

9           THE WITNESS:  Thank you.

10   BY MS. RADCLIFFE:

11   Q      Mr. Dalius, in this document, do you see

12   that you sent an e-mail to Mr. Beasley on June 8,

13   2015?

14   A      Yes, ma'am, yep.

15   Q      Do you have any reason to believe that you

16   did not send this e-mail to Mr. Beasley?

17   A      No, ma'am.

18   Q      Do you see here that in June of 2015, you

19   have recused yourself from all contracts and

20   operations with private prison providers?

21   A      I do.  I indicated that earlier.  I didn't

22   know what month it was, but...

23   Q      So after this time, is it fair to say that

24   you had not involved yourself in the contract -- in

25   contract -- in existing contracts with any private

1    example, GEO and MTC?

2    A      I don't know the answer to that.

3    Q      Do you know what the purpose is at CCA of

4    tracking the inmate population?

5    A      The exact purpose?  I don't know.  They

6    probably have been doing it for years.  I don't know

7    what -- why they would have started doing it.

8    Q      Do you, in your position at CCA, use the

9    BOP -- or inmate population at CCA for any

10    particular purpose?

11    A      No.

12          MS. RADCLIFFE:  We're going to mark the

13    next one.

14          (Marked Exhibit No. 327.)

15    BY MS. RADCLIFFE:

16    Q      Mr. Dalius, if you look at what's been

17    marked as Exhibit 327, do you see that you're one of

18    the recipients of this e-mail?

19    A      Yes, ma'am.

20    Q      Do you know who Michael Grant is?

21    A      Yes.

22    Q      And who is Mr. Grant?

23    A      He worked for CoreCivic.  I don't know his

24    exact title.

25    Q      Do you recall generally what functions

1    Mr. Grant performs?

2    A      I don't know exact -- I don't know what his

3    job title is, what his specific functions are.

4    Q      Do you recall receiving a weekly trend

5    reports such as the one before you?

6    A      Yes.

7    Q      And do you have any reason to believe that

8    you did not receive this particular trend report in

9    the course of your employment at CCA?

10   A      No, ma'am.

11   Q      Do you see here that this trend report shows

12   the weekly change in population of inmates between

13   CoreCivic, GEO, and MTC?

14   A      Yes.

15   Q      Does this refresh your recollection of

16   whether CCA monitored the inmate population at its

17   competitors?

18   A      I don't have a recollection.  It appears,

19   based on the report, that that's what they're

20   looking at.

21   Q      If you turn to the -- the next page of this

22   document, ending in 7888, do you see that there's

23   generally a downward trend from July 2013 to

24   August 2016 with respect to the BOP population?

25   A      Yes, ma'am.

Page 99

1    Q      And if you turn to the next page, do you see

2    that generally, with respect to the BOP inmates in

3    privately managed facilities, there's also a

4    downward trend reflected from June of 2014 to August

5    of 2016?

6    A      Repeat that, please.

7    Q      Sure.

8           Do you see that this chart reflects

9    generally a downward trend, with respect to the BOP

10   inmates in the privately managed facilities, for the

11   period reflected, which is approximately June of

12   2014 to August of 2016?

13   A      Yes, ma'am.

14   Q      If you turn to the next page, little chart

15   there, on -- on this particular chart, if you look,

16   there's a number, 12.75 percent and 11.75 percent,

17   which shows a jump sort of in -- in the decrease in

18   the number of privately managed facilities share of

19   the BOP population.

20          Do you see that number --

21   A      The decrease from 12.75 to 11.75?

22   Q      Yes.

23   A      Yes.

24   Q      Do you know what the reason was for that

25   decrease?

1       Do you recall discussing with anyone about

2   the DOJ planning to make an announcement regarding

3   private prisons?

4   A     No --

5       MR. McGEE:  Object to the form of the

6   question.

7       THE WITNESS:  No, ma'am.

8   BY MS. RADCLIFFE:

9   Q     Do you see that Mr. Wiley is -- has

10   indicated in his e-mail that includes you as a

11   recipient that he had heard the same thing from

12   GEO's CEO the day before?

13   A     I see that, yes.

14   Q     But you don't have any specific

15   recollections of discussing the upcoming --

16   A     No.

17   Q     No?  Okay.

18       You can go ahead and put that aside.  Thank

19   you.

20       MS. RADCLIFFE:  Going to mark the next

21   document.

22       (Marked Exhibit No. 336.)

23   BY MS. RADCLIFFE:

24   Q     Mr. Dalius, do you see that you were a

25   recipient of this e-mail from Katie Lilley on

1    August 18, 2016?

2    A      Yes.

3    Q      Do you have any reason to believe that you

4    did not receive that -- this e-mail or its

5    attachment while -- during the course of your

6    employment at CCA?

7    A      No.

8    Q      Do you know who Ms. Lilley is?

9    A      I have no idea.

10   Q      Do you recall reading the memo at this --

11   about this time?

12   A      I don't recall reading it, but I'm certain I

13   did it.

14   Q      Is your recollection that you would have

15   read the memo roughly about the time you received

16   it, that day or so?

17   A      Sometime that day.

18   Q      Do you recall discussing that memo with

19   anyone?

20   A      Don't recall.

21   Q      You don't recall discussing that memo with

22   Mr. Lappin?

23   A      Not specifically, no.

24   Q      Were you surprised by the memo?

25   A      Yes.

1    Q      There wasn't anyone at the BOP who had

2    informed you that this memo would be forthcoming?

3    A      No, ma'am.

4    Q      Or the DOJ?

5    A      No, ma'am.

6    Q      Do you know if you used more than one e-mail

7    address?  I only say this because in the "to" line

8    your name is listed three times.

9    A      To CCA -- I don't know.  I was only using

10   one at CCA.

11   Q      Fair enough.

12          And the use of the CCA.com would reflect

13   that you were employed at CCA at the time?

14   A      Correct.

15   Q      And -- okay.  You can go ahead and put that

16   aside.

17          Do you recall any concern regarding the memo

18   after it was released?

19   A      Concern for what?

20          MR. McGEE:  Object to the form of the

21   question as vague.

22   BY MS. RADCLIFFE:

23   Q      Do you recall anyone at CCA expressing

24   concern about the Yates memo and its impact on CCA?

25          MR. McGEE:  Same objection.

1        THE WITNESS: No.

2   BY MS. RADCLIFFE:

3   Q     Do you recall that the memo was generally

4   perceived as negative?

5        MR. McGEE: Object to the form of the

6   question.

7        THE WITNESS: I can't answer for other

8   folks at CCA.

9   BY MS. RADCLIFFE:

10   Q     Did you perceive the memo to generally be

11   negative?

12   A     It wasn't -- I would say it was probably a

13   negative memo.

14   Q     And if you can go back to the document

15   itself --

16        MR. McGEE: This is Exhibit 336?

17        MS. RADCLIFFE: This is Exhibit 336.

18   BY MS. RADCLIFFE:

19   Q     -- if you go to the attachment, the document

20   ending in 7914, the second to the last paragraph

21   starts with, I am aware that the Bureau is already

22   taking steps in this direction.

23   A     Uh-huh.

24   Q     Three weeks ago, the Bureau declined to

25   renew a contract for approximately 1200 beds.

William Dalius

**Confidential**

Grae vs.
Corrections Corporation of America, et al.

```
 1              I, the undersigned, a Licensed Court
 2    Reporter of the State of Tennessee, do hereby
 3    certify:
 4              That the foregoing proceedings were
 5    taken before me at the time and place herein set
 6    forth; that any witnesses in the foregoing
 7    proceedings, prior to testifying, were duly sworn;
 8    that a record of the proceedings was made by me
 9    using machine shorthand, which was thereafter
10    transcribed under my direction; that the foregoing
11    transcript is a true record of the testimony given.
12              Further, that if the foregoing pertains
13    to the original transcript of a deposition in a
14    federal case, before completion of the proceedings,
15    review of the transcript was requested.
16              I further certify I am neither
17    financially interested in the action nor a relative
18    or employee of any attorney or party to this action.
19              IN WITNESS WHEREOF, I have this date
20    subscribed my name.
21    Dated: March 11, 2020
22
23    _____
24    Elisabeth A. Miller Lorenz
25    RMR, CRR, LCR No. 66
```