# EXHIBIT 134



Exhibit 548

Marlowe, J.

10/16/20

@ptus

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and
on Behalf of All Others Similarly Situated,

Plaintiff,

v.

CORRECTIONS CORPORATION OF
AMERICA, DAMON T. HININGER, DAVID
M. GARFINKLE, TODD J. MULLENGER,
and HARLEY G. LAPPIN,

Defendants.

Civil Action No. 3:16-cv-02267

EXPERT REPORT OF DR. JUSTIN MARLOWE, PH.D., CGFM
August 7, 2020

# Table of Contents

I. Qualifications ........................................................................................................... 1

II. Scope of Assignment ................................................................................................ 1

III. Summary of Expert Opinions .................................................................................. 2

IV. Background ............................................................................................................... 3

    A. Prison Privatization in the U.S. ...................................................................... 3

    B. Federal Agencies' Commitment to Cost Effectiveness .................................. 5

    C. CoreCivic's Business and Relationship with the BOP ................................... 6

    D. Summary of Cost Savings Allegations ........................................................... 8

V. Empirical Research on Cost Effectiveness of Private Correctional Facilities ................ 10

    A. Overview of Cost Comparison Considerations .............................................. 10

    B. Numerous Factors Support Private Correctional Facility Cost Effectiveness ...... 12

VI. Evaluation of CoreCivic's Quantification of Its Cost Savings to the BOP ..................... 14

    A. CoreCivic's Cost Comparisons Relied on Publicly Available Data and Disclosed Its Sources ........................................................... 14

    B. CoreCivic's Real Estate Cost Adjustment Was Reasonable .......................... 16

    C. CoreCivic's Per Diem Cost Savings Estimates Were Reasonable and Conservative .................................................................... 18

VII. Evaluation of CoreCivic's General Cost Savings Statements .......................................... 21

    1. Cost Savings ................................................................................................... 22

    2. Cost Effectiveness .......................................................................................... 24

    3. Cost Efficiency ............................................................................................... 25

    4. Competitive Cost Structure and Economies of Scale ..................................... 26

    5. Value Proposition ........................................................................................... 28

    6. Cost Control ................................................................................................... 28

VIII. Evaluation of Documents Identified by Plaintiff In Support of Its Cost Allegations ....... 29

    A. The OIG Report and Yates Memorandum Do Not Provide An Analysis of Costs ....................................................................... 29

    B. The Documents and Testimony Listed in Plaintiff in Its Interrogatory Responses Do Not Provide Support for Its Cost Allegations ............................. 31

## I.  Qualifications

1.       I am currently a Research Professor at the Harris School of Public Policy, and the Associate Director of the Center for Municipal Finance at the University of Chicago.  From 2014 to 2020, I was the Endowed Professor of Public Finance and Civic Engagement at the Daniel J. Evans School of Public Policy & Governance at the University of Washington.  I have published four books and more than 50 scholarly articles on a variety of issues in government budgeting, cost analysis, and financial management.  I have also served as an expert witness on government finance-related cases in federal courts, state courts, and Securities and Exchange Commission ("SEC") enforcement actions.  I received my Bachelor of Arts in public administration and Master of Public Administration degrees from Northern Michigan University, and a Doctor of Philosophy degree in political science from the University of Wisconsin-Milwaukee.  I am also an elected Fellow of the National Academy of Public Administration, and a Certified Government Financial Manager ("CGFM").  The CGFM credential is administered by the Association of Governmental Accountants.  It recognizes specialized skills and knowledge in government financial reporting, auditing, and budgeting.

2.       I have performed academic research on the costs of various state and local public health service delivery models, and have served as a technical advisor on cost analysis methods for both the National Academies of Science and the Governmental Accounting Standards Board.  I have provided expert analysis in the context of litigation in various matters, including:  an analysis of the costs of pre-trial diversion programs delivered by county prosecutors in Washington State compared to the costs of similar programs delivered by third-party providers; an analysis of the value of citizen access to services delivered by a large county government; and an assessment of alleged discrimination following from local utility cost accounting practices.

3.       Copies of my curriculum vitae and summary of recent testifying experience are attached hereto as **Appendix A** and **Appendix B.**

## II.  Scope of Assignment

4.       I have been retained by Latham & Watkins LLP, counsel for CoreCivic, Inc. (f/k/a Corrections Corporation of America or "CCA") ("CoreCivic," or "the Company"), Damon T.

Hininger, David M. Garfinkle, Todd H. Mullenger, and Harley G. Lappin (collectively, "Defendants"), in the above-captioned matter.

5.     I understand that Plaintiff in this litigation claims that certain statements regarding the relative cost of services provided by CoreCivic to the Federal Bureau of Prisons ("BOP") were misleading.[1]   I have therefore been asked to evaluate statements CoreCivic made between February 27, 2012 and August 17, 2016 (the "Class Period") regarding cost savings CoreCivic provided to the BOP and, relatedly, statements comparing CoreCivic's cost of services to the BOP's cost of services.

6.     As part of this assignment, I have reviewed various materials including legal pleadings in this matter, deposition testimony and accompanying exhibits, SEC filings, research articles and academic publications, governmental agency publications, investor presentations, press releases, BOP documents, and other materials produced in this matter.  A list of the materials I have relied upon is set forth in **Appendix C**.

7.     I am being compensated at my standard billing rate of $650 per hour.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.   My compensation in this matter is not in any way contingent or based on the content of my opinion or the outcome of this or any other matter.  My work in this matter is ongoing, and I reserve the right to update my analysis or revise my conclusions if additional documents or information become available to me, including to respond to any expert reports submitted by the Plaintiff.

### III.     Summary of Expert Opinions

8.     The statements CoreCivic made during the Class Period regarding cost savings relative to its government partners were supported by internal CoreCivic documents and publicly available information.  The Company's cost comparison statements were limited to available information and reflected reasonable judgments on the cost data compared.[2]

---

[1] Consolidated Complaint for Violation of the Federal Securities Laws, *Nikki Bollinger Grae, et al. v. Corrections Corporation of America, et al.*, March 13, 2017 ("Consolidated Complaint").

[2] Moreover, as shown in Section VIII, information identified by Plaintiff in interrogatory responses do not provide cost data or analysis concerning CoreCivic and/or the BOP.  Instead, documents and testimony identified by Plaintiff appear to relate to the quality and compliance of service provided by CoreCivic under its BOP contracts.

9.     CoreCivic made specific statements regarding cost savings and cost effectiveness, using terms that did not guarantee an absolute delivery of cost savings compared to BOP-run facilities under any and all assumptions, methodologies, and calculations.  CoreCivic's claims about cost savings and cost effectiveness were reasonably and appropriately qualified in a manner consistent with research and literature on the privatization of correctional facilities.  Specifically:

    a.  CoreCivic presented quantitative cost comparisons that were based on the BOP's own published cost figures, and identified instances in which it defined costs differently than the BOP.

    b.  CoreCivic acknowledged and identified that its claims about cost savings were based on certain assumptions about how to define and measure cost effectiveness or cost savings.  These assumptions were clearly articulated, were consistent with findings in the literature that evaluates the relative cost of the private prison industry, and were conservative.

    c.  CoreCivic's more generic, qualitative statements about cost comparisons were clearly articulated and supported by the available research and data.  They were made in the context of the well-documented public debate on the overall cost effectiveness of the private correctional facility industry.  CoreCivic used specific terms—such as cost effectiveness and cost efficiency—that are widely used in the literature and understood to not guarantee an absolute delivery of cost savings under any and all assumptions, methodologies, and calculations.

## IV.     Background

### A.     Prison Privatization in the U.S.

10.     A surge in the incarceration rate in the 1980s and the resulting increase in the prison population gave rise to contracting by state and federal governments for the private management and operation of correctional facilities.  Between 1980 and 2000, the U.S. incarceration rate more than tripled,[3] and the estimated total number of people incarcerated in federal correctional facilities

---

[3] Culp, Richard F., "The Rise and Stall of Prison Privatization:  An Integration of Policy Analysis Perspectives," *Criminal Justice Policy Review* 16, no. 4 (December 2005), pp. 412–442, at p. 419.

increased nearly six-fold.[4]  As part of the federal government's efforts to resolve the operational and budgetary issues caused by prison overcrowding,[5] Congress authorized the BOP to begin contracting out the housing of certain inmates in 1997.[6]  According to the BOP, rising prisoner populations constituted the primary driver of new service costs, which the agency estimates each year by assessing how to distribute inmates across its own facilities and privately operated ones.[7] The BOP routinely emphasized its use of private correctional facilities as part of its strategy for dealing with overcrowded facilities, which was consistent with its fiscal responsibility goals.[8]

---

[4] Bureau of Justice Statistics, Key Statistics, Total Correctional Population, 1980-2016, available at https://www.bjs.gov/index.cfm?ty=kfdetail&iid=488.

[5] Culp, Richard F., "The Rise and Stall of Prison Privatization:  An Integration of Policy Analysis Perspectives," *Criminal Justice Policy Review* 16, no. 4 (December 2005), pp. 412–442, at pp. 419–420, Figure 1, U. S. Incarceration Rate 1925 to 2000.  Pratt, Travis C. and Jeff Maahs, "Are Private Prisons More Cost-Effective Than Public Prisons? A Meta-Analysis of Evaluation Research Studies," *Crime & Delinquency* 45 no. 3 (July 1999), pp. 358–371, at p. 358 ("Coupled with inmate crowding, the high cost of maintaining correctional facilities has resulted in a search for alternative practices designed to alleviate the financial burden placed on state and federal correctional systems").

[6] Public Law 104–208 104th Congress, September 30, 1996 available at https://www.treasury.gov/resource-center/sanctions/Documents/pl104_208.pdf; United States Department of Justice, Office of the Inspector General, "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons," Evaluation and Inspections Division 16-06, August 11, 2016 ("OIG Report"), p. i.  Prior to 1997, the BOP did not have direct experience with the private prison sector but it had had contracts for the housing of certain inmates, with city governments that were using private prisons.  *See* United States General Accounting Office, "Private Prisons: Cost Savings and BOP's Statutory Authority Need to Be Resolved," Report to the Chairman, Subcommittee on Regulation, Business Opportunities and Energy, Committee on Small Business, House of Representatives, February 1991, p. 18.

[7] United States Government Accountability Office, "Bureau of Prisons Methods for Cost Estimation Largely Reflect Best Practices, but Quantifying Risks Would Enhance Decision Making", GAO-10-94, November 2009, p. 37.

[8] *See, e.g.*, U. S. Department of Justice, FY 2016 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities, p. 5 ("As a strategy to try to effectively manage the large inmate population and overcrowding, the BOP continues to rely on a combination of contracts with private, state, and local vendors; increasing use of residential reentry centers and home confinement; expansions of existing facilities where infrastructure permits; acquisition and renovation of existing structures; and new prison construction, as funding permits").

*See also, e.g.*, Statement of Charles E. Samuels Jr., Director, Federal Bureau of Prisons, U.S. Department of Justice, before the Committee on Homeland Security and Governmental Affairs, United States Senate for a Hearing Entitled Oversight of the Bureau of Prisons:  First-Hand Accounts of Challenges Facing the Federal Prison System, August 4, 2015, available at https://www.bop.gov/resources/news/pdfs/080415_written_statement.pdf, at p. 3, ("We…began to rely upon private corrections to provide additional capacity to help maintain safety and security due to crowding concerns.  In 1997, Congress required the Bureau to privatize one of our newly-built facilities; Taft Correctional Institution.  As a result, we began being funded for additional private prison capacity, which we used primarily to house low security criminal aliens. Following the mandate that the Bureau house the District of Columbia (DC) Superior Court offenders, we used private prison bedspace for many of these offenders, allowing them to remain close to the many reentry and social services available in DC. While we would prefer to house all federal offenders in Bureau-operated facilities, we have appreciated the support of the private prison industry to provide low-security capacity in the wake of our population growth").

## B. Federal Agencies' Commitment to Cost Effectiveness

11.     Federal agencies must respond to a variety of legal considerations surrounding the costs of the goods and services they deliver.  To ensure compliance with these requirements, federal agencies are held accountable for the manner in which they manage their budget and achieve program objectives.  Indeed, federal agencies are subject to the Government Performance and Results Act, which requires them to prepare multi-year strategic plans describing missions and goals, and laying out how they might be achieved, as well as annual program performance reports to review progress toward annual performance goals.[9]  In addition, federal agencies are overseen by the Office of Management and Budget ("OMB"), which relies on the Government Accountability Office's ("GAO") audits and evaluations of federal agencies.[10]  The GAO regularly conducts performance audits of agencies, including the BOP, "to support the U.S. Congress in meeting its constitutional responsibilities and help improve the performance and ensure the accountability of the federal government for the benefit of the American people."[11]  Both the OMB and GAO have developed guidelines that underscore the importance of conducting cost-benefit analyses.[12]  For example, according to the OMB's guidelines, federal agencies should consider whether a capital expenditure is "cost-beneficial" before its undertaking, which involves considering possible alternatives, including service contracts, and selecting those that offer the best value.[13,14]

---

[9] United States Government Accountability Office, "GAO Cost Estimating and Assessment Guide Best Practices for Developing and Managing Capital Program Costs," Applied Research and Methods, GAO-09-3SP (March 2009), Chapter 3, p. 26.  *See also* Government Performance and Results Act, Public Law 103-62, August 3, 1993.

[10] Executive Office of the President of the United States, Office of Management and Budget, "Circular No. A–11, Preparation, Submission and Execution of the Budget," (June 2015), Section 10, p. 7.

[11] United States Government Accountability Office, "Performance Auditing: The Experiences of the United States Government Accountability Office," Statement of J. Christopher Mihm, Managing Director, Strategic Issues, GAO-13-868T, September 25, 2013, Highlights.

[12] *See* Executive Office of the President of the United States, Office of Management and Budget, "Circular No. A–11, Preparation, Submission and Execution of the Budget," (June 2015), Capital Programming Guide. *See also* United States Government Accountability Office, "GAO Cost Estimating and Assessment Guide: Best Practices for Developing and Managing Capital Program Costs," Applied Research and Methods, GAO-09-3SP (March 2009). While those guidelines are specific to the acquisition of capital assets, they can be applied when alternatives involve pursuing service contracts.

[13] Executive Office of the President of the United States, Office of Management and Budget, "Circular No. A–11, Preparation, Submission and Execution of the Budget," (June 2015), Capital Programming Guide, pp. 12, 15.

[14] In addition, Economy Act, 31 U.S.C. § 1535–1536, which was passed to permit federal agencies to procure goods and services from other federal agencies, touches on the use of private contractors and the cost effectiveness imperative.  It stipulates that as part of the four basic conditions that should be met before engaging in inter-agency transactions, a federal agency should determine that it cannot obtain the goods or services at issue "as conveniently or

12.     In defining and expending its budget, the BOP considers both the U.S. Department of Justice ("DOJ") and its own strategic objectives, which includes providing "cost-effective confinement…"[15] As outlined in its mission statement, the BOP is responsible for the custody and care of federal offenders in "facilities that are safe, humane, cost-efficient, and appropriately secure."[16] Indeed, as part of the BOP's FY 2015 Budget Request, Mr. Charles Samuels Jr, then director of the BOP, stated before the U.S. House of Representatives Committee on Appropriations:

> The BOP continues to strategically assess current and prospective operations to ensure that mission requirements are met at the lowest possible cost to the U.S. taxpayer.  The BOP remains committed to acting as a sound steward of valuable taxpayer dollars.  The BOP will continue to seek cost avoidance and find efficiencies throughout the agency, while successfully executing our mission responsibilities.[17]

### C.     CoreCivic's Business and Relationship with the BOP

13.     During the Class Period, CoreCivic was one of "the nation's largest owner of privatized correctional and detention facilities and one of the largest prison operators in the United States."[18] As of January 1, 2013, CoreCivic was organized as a Real Estate Investment Trust ("REIT"), "specializing in owning, operating, and managing prisons and other correctional facilities and providing residential, community re-entry, and prisoner transportation services for governmental agencies."[19] CoreCivic's government partners consisted of federal, state, and local entities.[20] The

---

cheaply" from a private contractor.  *See* United States Government Accountability Office, "Principles of Federal Appropriations Law," Office of the General Counsel, 3rd ed., vol. 3 (Washington, D.C.: September 2008), Chapter 12, p. 29.  *See also* Economy Act, 31 U.S.C. § 1535(a)(4).

[15] U.S. Department of Justice, Federal Prison System FY 2015 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities, p. 7.

[16] BOP Mission, available at https://www.bop.gov/about/agency/agency_pillars.jsp, last accessed 7/29/2020.  The BOP's mission statement is consistent with the DOJ's strategic objectives to "provide safe, secure, humane, and cost-effective confinement and transportation of federal detainees and inmates."  United States Department of Justice, Fiscal Years 2014–2018 Strategic Plan, p. 48.

[17] Statement of Charles E. Samuels, Jr., Director of the Federal Bureau of Prisons Before the U.S. House of Representatives Committee on Appropriations Subcommittee on Commerce, Justice, Science and Related Agencies Federal Bureau of Prisons FY 2015 Budget Request,  April 10, 2014,  p. 1.

[18] Corrections Corporation of America Corrections Corporation of America Form 10-K for the fiscal year ended December 31, 2015, filed on February 25, 2016, p. 5.

[19] Corrections Corporation of America Form 10-K for the fiscal year ended December 31, 2015, filed on February 25, 2016, p. 5.

[20] *See* Corrections Corporation of America Form 10-K, for the fiscal years 2013–2016, "Business Development".

BOP was one of the Company's federal partners, alongside the United States Marshals Service ("USMS") and U.S. Immigration and Customs Enforcement ("ICE"), and the BOP accounted for approximately 12% of CoreCivic's revenues, on average, between 2011 and 2016 (see **Exhibit 1**). During the Class Period, CoreCivic housed BOP inmates at five of its facilities.[21]

14.     CoreCivic's relationship with the BOP is governed by contracts that are awarded upon successful completion of a competitive Request for Proposal ("RFP") process that enables the BOP to select the most advantageous service offering.  For example, in a 2008 RFP, the BOP solicited bids from any organization able to manage and operate an existing correctional facility, including faith-based and community-based organizations.[22]  The solicitation required potential offerors to propose a price and describe how they planned to meet the technical requirements of the contract.[23]  Notably, it specified that the "[a]ward w[ould] be made to the responsible offeror whose proposal [was] the most advantageous to the Government."[24]

15.     According to its contracts with the BOP, CoreCivic was principally to house a "criminal alien population" of low security non-U.S. citizen, adult males with 60–90 months or less remaining to serve on their criminal sentences.[25]  As a result, CoreCivic's facilities principally housed non-U.S. citizen criminal aliens whereas, for example, low-security facilities operated by

---

[21] The five facilities were: Adams County Corrections Center, Northeast Ohio Correctional Center, McRae Correctional Facility, Eden Detention Center, Cibola County Corrections Center. *See* Corrections Corporation of America Forms 10-K and 10-Q for the fiscal years 2011–2016.

[22] U.S. Department of Justice, Federal Bureau of Prisons, Criminal Alien Requirement VIII - RFP-PCC-0012 materials, April 29, 2008 available at https://beta.sam.gov/opp/f900f4355784f3c545fed8ca4461d324/view, available under "COVER_THRU_C.pdf," "D_THRU_I.pdf," and "J_THRU_M". I note that this RFP culminated in a contract that was awarded to CoreCivic for its Adams County Corrections Center. *See* CoreCivic, "Corrections Corporation of America Announces Contract Award with Federal Bureau of Prisons," April 1, 2009.

[23] U.S. Department of Justice, Federal Bureau of Prisons, Criminal Alien Requirement VIII - RFP-PCC-0012 materials, April 29, 2008 available at https://beta.sam.gov/opp/f900f4355784f3c545fed8ca4461d324/view, at pp. 199–211, available under "COVER_THRU_C.pdf," "D_THRU_I.pdf" and "J_THRU_M".

[24] U.S. Department of Justice, Federal Bureau of Prisons, Criminal Alien Requirement VIII - RFP-PCC-0012 materials, April 29, 2008 available at https://beta.sam.gov/opp/f900f4355784f3c545fed8ca4461d324/view, at pp. 212–215, available under "COVER_THRU_C.pdf," "D_THRU_I.pdf," and "J_THRU_M". The price evaluation factor was described as follows: "Prices proposed for each year of the Base Period and Option Periods will be evaluated in total.  Award is based on best value." *See* p. 215.  The non-price evaluation factors were Past Performance, Technical Proposal, Environment, Notification and Small Disadvantaged Business Utilization. The solicitation further stipulates that "[t]he combined non-price evaluation criteria are significantly more important than price.  Price becomes a major factor in award selection when other criteria are substantially equal." *See* p. 213.

[25] Facilities and Facility Management Contracts, 2009–2016 (CORECIVIC_0000001–191 at 012; CORECIVIC_0000692–870 at 703; CORECIVIC_0001329–544 at 389; CORECIVIC_0002307–547 at 326; CORECIVIC_0003082–321 at 097; CORECIVIC_0003791–962 at 801). The population housed at the McRae facility was to "ordinarily be low security adult non-U.S. citizen males with 60 months or less remaining to serve on their sentence."

the BOP principally housed U.S. citizens. In the "Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons" issued by the Department of Justice's Office of the Inspector General ("OIG") on August 11, 2016 (the "OIG Report") comparing private facilities to select BOP low security facilities, the BOP noted that "as of January 2014 inmates incarcerated in private facilities were primarily non-U.S. citizens with 72.1 percent from Mexico, while the selected BOP institutions had an average of 11.8 percent non-U.S. citizens."[26]

16.     In exchange for its services, CoreCivic was contractually entitled to a guaranteed fixed payment (the Monthly Operating Price or "MOP") up to 90% occupancy for that facility, and in addition a fixed per diem payment (the Fixed Incremental Unit Price or "FIUP") for each inmate housed above the 90% occupancy.[27]

### D.     Summary of Cost Savings Allegations

17.     Plaintiff claims that, throughout the Class Period, Defendants "engaged in a scheme to defraud and made numerous materially false and misleading statements and omissions to investors regarding [CoreCivic's] business and operations, including by falsely stating that: … (iv) the outsourcing of correctional services to [CoreCivic] resulted in significant costs savings for government agencies, including the BOP."[28] Plaintiff references the OIG Report and claims that "as the Review by the OIG concluded and other sources have shown, costs are comparable, at best, with BOP facilities; and any savings result not from 'efficiencies' but from understaffing and hiring underqualified staff, thus contributing to the serious safety and security issues at these facilities."[29]

18.     More specifically, Plaintiff alleges that CoreCivic's cost comparison disclosures were false and misleading for at least the following three reasons:

---

[26] OIG Report, p. 14.

[27] *See, e.g.*, Adams Facility Base Contract, April 1, 2009, CORECIVIC_0000001–191 at 008. In the initial contract for the McRae facility, CCA was entitled to a fixed MOP of 95% of the facility's occupancy. *See* McRae Facility Base Contract, May 15, 2001, CORECIVIC_0002307–547 at 320.

[28] Consolidated Complaint, ¶3.

[29] Consolidated Complaint, ¶117.

1) As the OIG Report identified, the OIG was unable to conduct a direct comparison of the overall costs of incarceration between BOP institutions and contract correctional facilities, in part because comparable data were not provided by private operators and the BOP.[30]

2) Quantitative comparisons of the BOP's per diem rate to house inmates compared to CoreCivic's per diem rate fails to account for costs incurred by the BOP in providing monitoring and oversight of private prisons.[31]

3) In providing quantitative comparisons of the BOP's per diem rate to CoreCivic's per diem rate, CoreCivic relied on an adjustment to increase the BOP rate to account for real estate-related costs.[32]

19. I also understand that Plaintiff, in its response to interrogatories from Defendants, has summarized its cost allegations as, "[p]ut simply, … despite Defendants' constant refrain, they were not providing the same level of quality while offering cost savings." Plaintiff further states that there were "numerous internally and externally flagged problems in various forms (including Notices of Concern, multiple deficiencies (including crucial services), repeat deficiencies, and worse), deductions for nonconformance, and understaffing," which were "due in large part to CoreCivic's artificial cost 'savings' (cheaper wages, worse benefits, and more remote locations, not greater efficiency)."[33]

20. Based on my review of Plaintiff's Complaint and interrogatory responses, the challenged statements include both qualitative and quantitative claims about the cost savings associated with the services CoreCivic provided to the BOP. Summaries of the alleged misrepresentations are presented in **Exhibits 2.1** and **2.2**. Because these qualitative and quantitative statements have different meanings in this context, I will evaluate them separately in Sections VI and VII.

---

[30] Consolidated Complaint, ¶187.
[31] Consolidated Complaint, ¶188.
[32] Consolidated Complaint, ¶188.
[33] Plaintiff's Objections and Responses to Defendant CoreCivic, Inc.'s Second Set of Interrogatories to Plaintiff, May 1, 2020, Response to Interrogatory No. 13, p. 7.

## V.    Empirical Research on Cost Effectiveness of Private Correctional Facilities

### A.    Overview of Cost Comparison Considerations

21.    In evaluating CoreCivic's statements, it is useful to consider the empirical studies that exist on the privatization of correctional facilities. A broad set of literature addresses cost comparisons between private and state or federal correctional facilities.[34] Many studies find that outsourcing generates cost savings and cost efficiencies for governmental agencies.[35] As would be expected given the complexity in measuring and comparing costs between private and public correctional facilities, however, some divergent opinions exist—often along partisan lines.[36] At the very least, cost comparison research highlights at least four core reasons why comparing private and public correctional facilities costs is a complex endeavor, and why the precise measurement of cost savings may vary based on the methodology and assumptions employed.

22.    First, there is no one universally accepted methodology for comparing costs.[37] Methodologies used to assess costs vary study-by-study, including at the most basic level—the definition of costs to compare.[38] Inherently, comparing costs across private and public correctional facilities requires making initial assumptions that can have a significant impact on the outcome of the analysis.[39] Results therefore vary substantially depending on the choice of costs to measure

---

[34] McDonald, Douglas, et al., "Private Prisons in the United States: An Assessment of Current Practice," Abt Associates Inc. (July 16, 1998), pp. 35–37; Friedmann, Alex, "Apples-To-Fish: Public and Private Prison Cost Comparisons," *Fordham Urban Law Journal* 42, no. 2 (2014), pp. 503–567; Mumford, Megan, et al., "The Economics of Private Prisons," Brookings Institute: The Hamilton Project (2016).

[35] *See, e.g.*, Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 10–15; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 4–5; McDonald, Alex, et al., "Private Prisons in the United States: An Assessment of Current Practice," Abt Associates Inc. (July 16, 1998), pp. 44–45.

[36] *See, e.g.*, Friedmann, Alex, "Apples-To-Fish: Public and Private Prison Cost Comparisons," *Fordham Urban Law Journal* 42, no. 2 (2014), pp. 503–567. Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 9: "There is much writing in both the popular and professional literature on the perceived merits and disadvantages of contract prisons. Many of these references are based on hypothetical or ideological grounds."

[37] Gaes, Gerald G., "The Current Status of Prison Privatization Research on American Prisons," Selected Works (August 2010), pp. 1–47, at pp. 1, 5.

[38] *See, e.g.*, Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 11–12; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 14; Friedmann, Alex, "Apples-To-Fish: Public and Private Prison Cost Comparisons," *Fordham Urban Law Journal* 42, no. 2 (2014), pp. 503–567, at p. 510.

[39] McDonald, Douglas, et al., "Private Prisons in the United States: An Assessment of Current Practice," Abt Associates Inc. (July 16, 1998), pp. 35–37; Friedmann, Alex, "Apples-To-Fish: Public and Private Prison Cost Comparisons," *Fordham Urban Law Journal* 42, no. 2 (2014), pp. 503–567, at p. 510.

and methodology employed.[40]  Any evaluation of a cost-comparison must look at the assumptions and definitions employed to determine whether they are reasonable and appropriate.

23.     Second, differences in age, design, management, location, prison population, and security needs require the use of assumption-based cost adjustments to compare private and public facilities.[41]  Indeed, private and public correctional facilities that do not share similar populations have different staff, inmate safety, and public security needs.[42]  For example, BOP facilities generally confine U.S. citizens and include programs that are designed to teach inmates skills that they can use when they are released into the general population.  By contrast, the BOP primarily houses criminal alien populations that are not necessarily expected to return to U.S. communities or BOP custody at private correctional facilities, and the BOP has instituted different contractual requirements with respect to programming at those contract facilities.[43]

24.     Third, evaluating whether outsourcing is more effective than operating a correctional facility "in-house" from a cost standpoint requires one to consider different types of cost factors.  As detailed in **Exhibit 3**, the costs that are relevant when outsourcing include those incurred to pay the contractor and monitor its compliance with the contract, whereas those that are relevant when managing a correctional facility "in-house" include the costs incurred to acquire/construct, operate, and maintain the facility.

25.     Finally, as is widely recognized in the academic literature that addresses the issue of cost comparisons between private and public correctional facilities, the data needed to establish rigorous assumptions and perform a comparative analysis of even certain categories of costs across private and public facilities is not readily available.[44]  This was evident in the OIG Report, which

---

[40] *See, e.g.*, Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 11–12; Hakim, Simon and Erwin A. Blackstone, "Prison Break:  A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 14; Friedmann, Alex, "Apples-To-Fish:  Public and Private Prison Cost Comparisons," *Fordham Urban Law Journal* 42, no. 2 (2014), pp. 503–567, at p. 510.

[41] Adrian T. Moore, "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), p. 10.

[42]  McDonald, Douglas and Carl Patten, Jr., "Governments' Management of Private Prisons," Abt Associates, Inc., (September 15, 2003), at pp. 43–44.

[43] U.S. Government Accountability Office, "Cost of Prisons:  Bureau of Prisons Needs Better Data to Assess Alternatives for Acquiring Low and Minimum Security Facilities," GAO-08-6 October 2007, available at http://www.gao.gov/assets/270/267839.pdf, p. 11.  U. S. Department of Justice, FY 2015 Performance Budget Congressional Submission Federal Prison System Salaries and Expenses, at p. 55. *See also* OIG Report, pp. 11–13.

[44] Mumford, Megan, et al., "The Economics of Private Prisons," Brookings Institute:  The Hamilton Project (2016), p. 4: "In order to compare the cost of both public and private prisons, it is important to include capital costs of the

noted that the OIG could not perform a comparison of costs by function or department across the BOP and its private contractors due to data limitations.[45]

26.     The debate over cost savings in the context of prison outsourcing is well publicized: numerous news articles have been published on this topic,[46] and it has been at the center of congressional hearings.[47]     Equity analysts following CoreCivic during the Class Period acknowledged this debate, discussed the methodological challenges underlying cost comparisons, and recognized benefits and cost savings from privatization.[48]

## B.     Numerous Factors Support Private Correctional Facility Cost Effectiveness

27.     The literature shows that there are three principal bases for the cost savings generated by private correctional facilities:   construction-related costs, personnel costs, and private-sector competition.  Private contractors have experience and expertise in correctional facility design and construction.   In contrast, government corrections agencies typically contract the design and

---

prison facility and monitoring costs for the state agency that oversees the contract with the prison. In addition, one must account for differences in required security levels and inmate needs, which affect the expense of running a prison. Private companies are not required to release many details of their operations, including details on the cost of the services they provide, which limits the ability to make comparisons. The Government Accountability Office has concluded multiple times that the data are not sufficient to definitively claim that either type of prison is more cost-effective."

[45] OIG Report, p. 11.

[46] *See*, e.g., Volokh, Sasha, "Don't End Federal Private Prisons," *The Washington Post,* August 19, 2016, available at https://www.washingtonpost.com/news/volokh-conspiracy/wp/2016/08/19/dont-end-federal-private-prisons/; Oppel, Jr., Richard A., "Private Prisons Found to Offer Little in Savings," *New York Times,* May 18, 2011, available at https://www nytimes.com/2011/05/19/us/19prisons.html.

[47]*See* Federal Bureau of Prisons "Hearing Before the Subcommittee on Crime, Terrorism, Homeland Security, and Investigations of the Committee on the Judiciary House of Representatives One Hundred Thirteenth Congress," First Session, Serial No. 113–50, September 19, 2013, available at https://www.govinfo.gov/content/pkg/CHRG-113hhrg82847/html/CHRG-113hhrg82847 htm.  *See also* Hearings before the Committee on the Judiciary United States Senate One Hundred Eleventh Congress, Second Session, Part 8, Serial No. J-111-4, September 29, 2010 and November 17, 2010 available at https://www.congress.gov/111/chrg/shrg66817/CHRG-111shrg66817.htm.

[48] "Opportunities for Growth; Reiterate Buy," SunTrust Robinson Humphrey, May 23, 2011.  The report identified the following reasons why effectiveness studies may understate the benefits of privatization:  (1) "Often do not consider the positive impact of tax revenue to the State – private operators pay taxes;" (2) "Often do not consider the total costs of public pension benefits or healthcare because they are difficult to quantify. It is our view that public pension benefits are often higher than private operators;" (3) "Most studies are adjusted for factors such as age of facilities (oldest facilities are often public) – but building newer, more efficient and well maintained facilities is a benefit of privatization that should be included;" (4) "There is evidence of greater efficiency – less escapes, lower violence, etc. with private prisons;" (5) "The time it takes to build a facility is shorter with privatization – allowing for alleviation in overcrowding sooner rather than later also prevents large capital outlays by the States in the near term (ability to manage cash flow)."  *See also*, "Corrections Future Is Solid Despite FL Decision," SunTrust Robinson Humphrey, February 17, 2012; "Positive on Prison REITs: We're Dancin' to the Jailhouse Rock," Canaccord Genuity, July 13, 2015, pp. 8–9.

construction to other third-party entities.[49] Private contractors are typically more nimble and better positioned to build new correctional facilities faster and cheaper than government agencies.[50] In addition, private correctional facilities are not limited by location and reduce construction costs by locating certain facilities in less expensive areas.[51] As a result, substantial savings in construction cost and time to build a new correctional facility can be achieved through private prison operators.[52]

28.    Additionally, private correctional facilities reduce overall personnel costs. Approximately two-thirds of correctional facilities' operational costs are devoted to personnel.[53] As noted above, private correctional facilities tend to be newer, more modern facilities located in lower cost areas due to the flexibility of site choice by private prison operators, greater access to capital via the capital markets, and lower budgetary and regulatory hurdles in order to approve new construction of a facility.[54] As a result, private correctional facilities can reduce labor costs in numerous ways, including through (a) newer, more efficiently designed facilities that require less staff due to improved design capabilities (e.g., improved sight lines and technology that allow inmates to be monitored with fewer correctional personnel); (b) reducing administrative staffing by avoiding the larger, bureaucratic structures of government correctional departments; and (c) lowering the cost-per-employee, including by limiting pension costs.[55]

---

[49] United States Government Accountability Office, "Prison Construction: Clear Communication of the Accuracy of Cost Estimates and Project Changes is Needed," Report to the Subcommittee on Commerce, Justice Science, and Related Agencies, Committee on Appropriations, U.S. Senate, GAO-08-634, May 2008, at p. 3.

[50] *See* Kish, Richard J. and Amy F. Lipton, "Do Private Prisons Really Offer Savings Compared With Their Public Counterparts?," *Institute of Economic Affairs* 33, no. 1 (2013), pp. 93–108, at p. 95.

[51] *See, e.g.*, Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), pp. 9–10.

[52] *See, e.g.*, Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 4–6; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), pp. 9–10; 22–23; 27.

[53] Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), p. 16.

[54] *See, e.g.*, Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 4–6; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), pp. 9–10; 22–23; 27.

[55] Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 16–17; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), pp. 9–10; Kish, Richard J. and Amy F. Lipton, "Do Private Prisons Really Offer Savings Compared With Their Public Counterparts?" *Institute of Economic Affairs* 33, no. 1 (2013), pp. 93–108.

29.     Finally, an often-cited economic driver of lower costs is competition in the private sector. Competition among private prison firms to win, and keep, government contracts exerts pressure on the costs of such contracts.[56]  As discussed in Section IV.B, the BOP's prison outsourcing contracts are awarded, after an RFP process, to the organization that made the "most advantageous" proposal.

## VI.     Evaluation of CoreCivic's Quantification of Its Cost Savings to the BOP

30.     Plaintiff claims that CoreCivic "quoted specific percentages of savings that it claimed to generate for the BOP," and yet "knew that these comparisons were, at best, misleading."[57] CoreCivic acknowledged and identified that its claims about cost savings were based on certain assumptions about how to define and measure cost effectiveness or cost savings.  As explained in this section, these assumptions were clearly articulated, were consistent with findings in the literature that evaluates the relative cost of the private prison industry, and were conservative.

### A.     CoreCivic's Cost Comparisons Relied on Publicly Available Data and Disclosed Its Sources

31.     The quantitative disclosures made by CoreCivic are summarized in **Exhibit 2.1.**  Two of the statements identified by Plaintiff reference cost savings estimates contained in a publicly available study published by two Temple University economists.[58]  In particular, Plaintiff identifies a statement in CoreCivic's 2013 Analyst Day presentation that CoreCivic provides "[a]nnual costs savings of 12% or more substantiated by Temple University study."[59, 60]  In the

---

[56] *See, e.g.*, Moore, Adrian T., "Private Prisons:  Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), p. 15: "Undeniably, the key to the lower costs of the private sector is competition. In order to win contracts—and keep them—a firm must be efficient. Rising costs, or cuts that lead to poor quality, would soon take a firm to where it could win no more contracts."

[57] Consolidated Complaint, ¶186.

[58] Hakim, Simon and Erwin A. Blackstone, "Prison Break:  A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 4.

[59] Consolidated Complaint, ¶153, referencing CCA, America's Leader Partnership Corrections Presentation, "2013 Analyst Day Durable Earnings and Significant Growth Potential," October 2, 2013, p. 15.

[60] Consolidated Complaint ¶ 155.  The other statement identified by Plaintiff was not a statement contained in a CCA press release or filing.  Instead, it was a *Times Free Press* article discussing a statewide campaign against CoreCivic started by the ACLU.  The article included a statement that "Citing Temple University economists, [CoreCivic] company spokesman Jonathan Burns said in a prepared statement that for-profit prisons save taxpayers 17 percent in corrections costs."  Brogdon, Louis, "Critics Point Finger at CoreCivic: For-Profit Prison Operator Taken to Task for Campaign Giving, Operations," *Times Free Press*, May 5, 2014.

presentation, CoreCivic identified the source for the estimate and disclosed that the "study received funding by members of the private corrections industry."[61] CoreCivic reported the results of, and made a clear reference to, a publicly available study. The study outlines the methodology and assumptions the two Temple University economists employed to arrive at the cost savings estimate.[62] Therefore, I will focus the remainder of this section on the other quantitative statements identified by Plaintiff.

32.     The other category of quantitative cost comparison statements identified by Plaintiff are comparisons that CoreCivic provided of "operational cost savings" between CoreCivic and the BOP, which appeared in each quarterly investor presentation from 3Q 2014 to 1Q 2016. CoreCivic compared the BOP's reported daily operating cost per inmate ("per diem") to CoreCivic's average per diem revenue across all of its facilities (BOP and non-BOP), estimating operational cost savings that ranged between 9% and 18% for 3Q 2014 to 1Q 2016, as shown in **Exhibit 2.1**.

33.     To draw comparisons between the BOP's operating costs and its per diem, CoreCivic used its own publicly disclosed data and the data publicly released by the BOP.[63] These data sources were referenced in the footnotes of the published cost comparisons.[64] The BOP's "operating cost per day" was derived from the limited data released by the BOP on its per diem costs and annual cost of operating its correctional facilities and contracting out to privately operated institutions.[65]

---

[61] CCA, America's Leader Partnership Corrections Presentation, "2013 Analyst Day Durable Earnings and Significant Growth Potential," October 2, 2013, p. 15 ("Temple University's Center for Competitive Government in April 2013: Contracted Prisons Cut Costs without Sacrificing Quality. This study received funding by members of the private corrections industry."), citing the working paper version of the June 2014 study. *See* Hakim, Simon and Erwin A. Blackstone, "Cost Analysis of Public and Contractor-Operated Prisons," April 29, 2013; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014).

[62] Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014).

[63] *See* Deposition of Bill Dalius, February 26, 2020 ("Dalius Deposition"), pp. 65:15–68:14.

[64] Corrections Corporation of America Form 10-K and 10-Q for the fiscal years 2011–2016; CCA, America's Leader Partnership Corrections, Investor Presentations, 2014–2016. *See also* Dalius Deposition, pp. 65:15–68:9.

[65] Federal Prison System Per Capita Costs FY 2009-2017. The BOP reports average annual per capita costs by security classification level, both inclusive and exclusive of support costs (allocated overhead costs). *See, e.g.*, Federal Prison System Per Capita Costs, FY 2015, February 11, 2016. Within the BOP cost accounting system, the term "support costs" refers to a set of common or joint expenditures that are budgeted and tracked centrally. The four major categories of BOP support costs are training, regional office costs, national programs, and central office costs. *See* Nelson, Julianne, "Competition in Corrections: Comparing Public and Private Sector Operations," The CNA Corporation, (December 2005), pp. 23–25. In the BOP per capita cost sheets, support costs are allocated across prison security levels as a percent of annual "obligations."

34.    CoreCivic's "average owned per diem" figures were consistent with the average per diem revenue figures presented in its SEC filings.[66]  CoreCivic used company-wide average per diem for its SEC filings—the per diem rates for all of the facilities it runs for government partners.  But as explained in Section VI. C. below, it would have reported even greater cost savings estimates if it had based its cost savings calculation on the per diem revenue it earned for BOP-contract facilities only.

**B.    CoreCivic's Real Estate Cost Adjustment Was Reasonable**

35.    In calculating the per diem cost differential between the BOP and CoreCivic, CoreCivic took into account an estimate of the real estate costs incurred by the BOP.  The approach used by the Company was appropriate for at least the following two reasons.  First, as discussed in Section V above, land, construction, and maintenance expenditures together constitute an area in which governments can realize significant cost savings through outsourcing.  Second, adding an estimate of real estate costs to the BOP's per diem costs made the BOP's operating costs more comparable to the per diem cost of outsourcing prison operations to CoreCivic.  Indeed, besides not including support costs such as administrative overhead, legal and pension expenses,[67] the per diem costs reported by the BOP do not include the costs it incurs to build or maintain correctional facilities.[68]  In contrast, CoreCivic's per diem price is an "all in" rate that is meant to compensate CoreCivic for all variable and fixed expenses, including capital outlays—in other words, CoreCivic's per diem revenue is similar to an analysis that attempts to answer the question of "but-for" the private prison industry, what would the total cost be to the government.[69]  It was reasonable

---

[66] Compare, *e.g.*, CCA, America's Leader Partnership Corrections, "First Quarter 2016 Investor Presentation," May 2016, p. 13 to Corrections Corporation of America Form 10-Q for the quarterly period ended March 31, 2016, filed on May 5, 2016, p. 33.

[67] *See* CORECIVIC_1327566–593, at -573. *See also* McDonald, Douglas C. and Kenneth Carlson, "Contracting for Imprisonment in the Federal Prison System:  Cost and Performance of the Privately-Operated Taft Correctional Institution," Abt Associates, Inc. (October 1, 2005), at p. 40.

[68] The per diem costs reported by the BOP do not include Buildings and Facilities costs, which include new prison construction, modernization, and repairs costs above $10,000. *See* United States Government Accountability Office, "Federal Bureau of Prisons: Methods for Estimating Incarceration and Community Corrections Costs and Results of the Elderly Offender Pilot," Enclosure I, Briefing for Congressional Requesters, GAO-12-807R, Enclosure I, p. 17.

[69] Deposition of Patrick Swindle - 30(b)(6), January 9, 2019 ("Swindle - 30(b)(6) Deposition"), pp. 90:23–92:61: "So when [BOP] look at individual per diem level, you've got capital costs that are excluded. So is it purely the operating per diem for that facility…We include all of those, plus capital recovery in ours. So our …cost structure assumes the recovery of capital…So we have our operating cost and our capital recovery embedded in our per diem." *See also* Dalius Deposition, pp. 65:15–68:9; 85:25–87:14.

for CoreCivic to adjust the BOP's per diem costs for real estate costs to approximate what they would be if they reflected the full costs of operating a correctional facility,[70] which is especially true given that the BOP's construction and maintenance costs have been increasing. As shown in **Exhibit 4**, data on the actual costs incurred by the BOP between 1998 and 2015 for new prison construction show that the agency's average construction costs per diem have risen since 1998 and are similar to the amount of CoreCivic's real estate adjustment.

36.    CoreCivic disclosed that it estimated the BOP's real estate costs to be $12.00–$20.00 per diem.[71]  The real estate adjustment that CoreCivic used as part of its cost comparison was conservatively based on the minimum of the range, or $12.00 per diem.  The calculation of this estimate was reasonable as it reflected the Company's estimate of the average total cost to the BOP per bed of building a new correctional facility ($175–$250 million per 1,000 beds), amortized over the estimated useful life of a prison.[72]  Moreover, CoreCivic's real estate adjustment was consistent with the average per diem construction cost incurred by the BOP during the ten-year period spanning 2006–2015 (see **Exhibit 4**),[73] and was in line with estimates of prison construction costs that exist in the research literature on public and private correctional facilities.[74]  Finally, the real estate adjustment was consistent with, and conservative relative to, estimates presented by CoreCivic in an internal analysis comparing private prison per diem rates with those of the BOP. According to that analysis, the BOP's estimated real estate cost per day was $19.53 in 2011.[75]

---

[70] A 2012 GAO report indicates that "[a]ccording to BOP officials, reported total daily costs do not represent the full cost of operating BOP facilities," and specifically, "total daily costs do not include construction, M&R [maintenance & repairs], or depreciation…"  *See* "United States Government Accountability Office, "Federal Bureau of Prisons: Methods for Estimating Incarceration and Community Corrections Costs and Results of the Elderly Offender Pilot," Enclosure I, Briefing for Congressional Requesters, GAO-12-807R, July 27, 2012, Enclosure I, p. 18.

[71] *See*, *e.g.*, CCA, America's Leader Partnership Corrections,  "First Quarter 2016 Investor Presentation," May 2016, p. 13.

[72] Swindle - 30(b)(6) Deposition, p. 288:1–4: "And [BOP is] building at 175,000 to 250,000 to -- Letcher County is over 300,000 [dollars] a bed – the capital win is a meaningful cost savings."

[73] While the average per diem construction cost incurred by the BOP between 1998 and 2015 is $11.39, that average rises to $16.74 when considering the 2006–2015 period, and $17.50 when focusing on 2011–2015.

[74] Hakim, Simon and Erwin A. Blackstone, "Prison Break:  A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 26.

[75] *See* Deposition of Patrick Swindle, February 21, 2020, Deposition Exhibit 300, CORECIVIC_1327565–593, at - 572.

## C. CoreCivic's Per Diem Cost Savings Estimates Were Reasonable and Conservative

37.     The observations that I have derived from analyzing CoreCivic's actual per diem revenues from BOP contracts are consistent with CoreCivic's quantitative assertions of cost savings. As reflected in **Exhibit 5,** throughout the relevant period the average per diem cost to the BOP of contracting with CoreCivic was lower than the per diem cost it incurred to operate its own low security facilities.[76] Also, as shown in **Exhibit 5**, during the same period, each of CoreCivic's BOP-contract facilities reported lower per diem revenues than the BOP's per diem cost for low security facilities.[77]

38.     Further, CoreCivic's cost comparisons were conservative for several reasons. First, the BOP represented only 12% of CoreCivic's revenue on average between 2011 and 2016, while 35% was attributable to ICE and the USMS, 45% was derived from contracts with state agencies, and 8% from other customers (see **Exhibit 1**). As shown in **Exhibit 6**, the per diem revenue used as a basis for CoreCivic's "average owned per diem" in the cost comparisons was higher than the per diem revenue CoreCivic received on average for its BOP-contracted facilities. Had CoreCivic based its cost savings calculation on the per diem revenue it earned for BOP-contract facilities alone, it would have reported even greater cost savings estimates. This demonstrates that CoreCivic's estimates were conservative and reflected the fact that CoreCivic received comparatively lower rates from its BOP contracts than from contracts with other government partners.

39.     Second, while the BOP reports its per diem operating costs, both inclusive and exclusive of support costs, CoreCivic's cost comparisons appear to be based on the per diem costs *exclusive* of support costs.[78] Support costs include administrative overhead, legal expenses, and payroll

---

[76] Including support costs and adjusting for real estate costs for BOP facilities. While there is variation over time, these results generally hold even without adjusting for real estate costs and without adjusting for support costs.

[77] Including support costs and adjusting for real estate costs for BOP facilities, and estimated support costs for CoreCivic's BOP-contracted facilities.

[78] For example, the Q3 2014 and Q4 2014 investor presentations report a per diem for the BOP of $73.00, which appears to reflect the BOP's per diem for all security classifications, excluding support costs, of $73.03 for FY 2013. *Compare, e.g.*, CCA, America's Leader Partnership Corrections, "Fourth Quarter 2014 Investor Presentation," February 2015, p. 11 to Federal Prison System Per Capita Costs, FY 2013, dated December 20, 2013.

expenses,[79] and such costs are covered by the "all in" contract rate that is meant to compensate CoreCivic for all variable and fixed expenses. Thus, CoreCivic's choice of source data was conservative. An alternative, less conservative yet still appropriate comparison would utilize the average per diem cost for low security BOP facilities *inclusive* of support costs. Indeed, had CoreCivic relied on the BOP's low security per diem costs inclusive of support costs, it would have estimated even greater cost savings relative to the BOP.[80,81]

40. Finally, the context in which BOP operates correctional facilities and manages its population levels further lend support to CoreCivic's quantitative statements about cost savings to the BOP. While prison populations declined during the Class Period, overcrowding increased until 2013 and remained an issue for the BOP.[82] In addition, as discussed by CoreCivic during the Class Period:

---

[79] *See* CORECIVIC_1327566–593, at -573. *See also* McDonald, Douglas C. and Kenneth Carlson, "Contracting for Imprisonment in the Federal Prison System: Cost and Performance of the Privately-Operated Taft Correctional Institution," Abt Associates, Inc. *(*October 1, 2005), at p. 40.

[80] Had CoreCivic relied on the BOP's low security per diem costs inclusive of support costs, it would have estimated its cost savings relative to BOP per diem costs of $75.03 for FY 2013 instead of $73.00 and $77.88 for FY 2014 instead of $76.00. *See* Federal Prison System Per Capita Costs, FY 2013, dated December 20, 2013; Federal Prison System Per Capita Costs, FY 2014, dated December 19, 2014.

[81] I understand that Plaintiff claims that contract monitoring and oversight costs should also have been considered. However, it is reasonable not to include oversight costs that are incurred by federal agencies, such as the OIG, in comparisons of costs across the BOP and private prisons because they are independent bodies whose costs are kept separate from the agencies they oversee. Indeed, the OIG is an independent entity within the DOJ that reports directly to both the Attorney General and Congress. To preserve its independence, its budget appropriations are maintained separately from that of the DOJ's other agencies. The OIG is in charge of auditing and investigating all complaints of misconduct pertaining to a multiplicity of DOJ agencies including the FBI, USMS, BOP and Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), among others. Given the number of agencies that fall under its purview, even if its costs were to be allocated to the BOP, on a per diem per inmate basis, the resulting amount would likely be negligible. For context, in 2014 the OIG's enacted budget appropriations were 1% of that of the BOP, and 0.4% of the DOJ's discretionary federal budget. *See* Office of the Inspector General (OIG), FY 2015 Budget Request At A Glance, https://www.justice.gov/sites/default/files/jmd/legacy/2013/11/18/oig.pdf; U. S. Department of Justice, "Summary of Budget Authority by Appropriation," https://www.justice.gov/sites/default/files/jmd/legacy/2014/05/26/ba.pdf. As for the BOP's specific contract monitoring costs, they are fixed overhead costs that are not likely to vary for marginal changes in private prison contracting because these monitoring functions cover all private contracts. Further, the literature that quantifies these costs suggest an increase to the cost of outsourcing of approximately 1.95%–2.25% of total estimated contracting costs. Accordingly, none of the conclusions regarding cost savings would be altered had these been included. *See* McDonald, Douglas C. and Kenneth Carlson, "Contracting for Imprisonment in the Federal Prison System: Cost and Performance of the Privately-Operated Taft Correctional Institution," Abt Associates, Inc. (October 1, 2005), at pp. 15; 20. *See also* Nelson, Julianne, "Competition in Corrections: Comparing Public and Private Sector Operations," The CNA Corporation (December 2005), p. 23.

[82] *See* CORECIVIC_1224206; Dalius Deposition, p. 98:21–25. U. S. Department of Justice, FY 2017 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities, at p. 5.

It is important to note that as [the] rate of overcrowding and the BOP's own facilities decline [*sic*], the average cost to house an offender in a BOP-operated facility per day continues to increase, which only improves CCA's value proposition to the BOP.[83]

41. Specifically, under the formulas provided in the BOP contracts, the BOP's per capita outsourcing costs will be lower if the BOP fully utilizes the contracted capacity than if it does not. **Exhibit 7.1** illustrates that the per diem cost to the BOP varies substantially depending on the extent to which the BOP chooses to utilize the available contracted capacity at CoreCivic's facilities.

42. Similarly, even though overcrowding of its own facilities is likely not in the BOP's best interest, the mathematical result of overcrowding is that the BOP's per capita costs decrease as overcrowding worsens because fixed and overhead costs are allocated across a larger inmate population.[84] Thus, as shown in **Exhibit 7.2**, the BOP's per diem costs are negatively correlated, at least in part, with the extent to which its correctional facilities are overcrowded. Consistent with this finding, an internal comparison of private prison and BOP per diem rates conducted by CoreCivic in 2011 noted that overcrowding at BOP low security facilities skewed cost comparisons and made the BOP (whose facilities have no firm capacity cap) appear more operationally efficient than the private sector, whose capacity is contractually capped.[85] For example, in FY 2014 BOP correctional facilities operated at an average occupancy of 137% whereas CoreCivic's average compensated occupancy in that year for its BOP-contracted facilities was approximately 107%.[86]

---

[83] Corrections Corp. of America at REITWeek: NAREIT's Investor Forum, June 5, 2014.

[84] Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 29: "As prisons become more overcrowded, the lower marginal cost of each additional inmate drives down the facility per inmate average cost. Because state-run prisons are much more likely to operate under overcrowded conditions (for example, California), the average 'per inmate cost' is understated compared to private facilities operated at or even below capacity. … Further, cost comparisons would tend to be biased against private facilities if their utilization rates were lower than public facilities." *See also* Deposition of Cameron Hopewell, January 17, 2020, pp. 60:14–61:11; Hopewell Deposition, Exhibit 179, CORECIVIC_1021829–891, at -840.

[85] *See* CORECIVIC_1327566–593, at -570. "BOP fills its Low Security facilities at greater than 150% of capacity thus enjoying greater operating efficiencies than the private sector which is limited to 115% of capacity."

[86] U. S. Department of Justice, FY 2017 Performance Budget Congressional Submission Federal Prison System Buildings and Facilities, at p. 5. Corrections Corporation of America, Supplemental Financial Information for the Quarters Ended December 31, 2013, March 31, 2014, June 30, 2014, and September 2014. The BOP's FY2014 spans from the fourth quarter of 2013 through the third quarter of 2014. CoreCivic's average compensated occupancy for FY 2014 (using BOP's fiscal year period) of 107% represents the weighted average compensated occupancy across the five facilities over the four quarters, based on their stated design capacity.

43.     In summary, the approach CoreCivic followed in comparing its per diem revenue to the per diem costs reported by the BOP for low security prisons is consistent with the underlying cost and revenue data, and conservative given the manner in which the BOP accounts for support and real estate costs.

## VII.    Evaluation of CoreCivic's General Cost Savings Statements

44.     CoreCivic made cost-related statements that are supported by the available published research and its own internal metrics.  When read in the context of available published literature, CoreCivic's statements used specific cost terms and appropriately qualified its statements such that they did not guarantee an absolute cost savings under any and all possible assumptions, methodologies, or calculations.  These statements were supported and reasonable.

45.     Plaintiff alleges that, "[c]ontrary to their representations to investors, defendants knew or recklessly disregarded … that [CoreCivic] did not create cost savings for the BOP."[87]  However, Plaintiff does not define or explain what is meant by "create cost savings," and does not point to any particular methodology or data that would serve to evaluate that claim.  To the extent Plaintiff's allegations regarding CoreCivic's qualitative cost savings statements are based on the quantitative cost comparisons CoreCivic disclosed, such statements are addressed in Section VI.

46.     The qualitative cost statements made by CoreCivic in connection with the cost of its services were statements that did not constitute guarantees that CoreCivic's services generated cost savings under any and all possible assumptions, methodologies, or calculations.[88]  These statements were not direct comparisons of total costs across different service delivery models.  Rather, CoreCivic used various cost-related terms that, in the context of cost-comparison literature, do not all have a single definition that is identical to "create cost savings."

47.     The alleged qualitative misrepresentations made by CoreCivic in connection with the cost of its services, which are presented in **Exhibit 2.2,** can be broadly categorized as follows:  (1) descriptions of a "competitive cost structure" that provides economies of scale;[89] (2) descriptions

---

[87] Consolidated Complaint, ¶11.
[88] *See* **Exhibit 2.1.**
[89] *See, e.g.,* Consolidated Complaint ¶123 ("Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the

of CoreCivic's services as a cost control solution;[90] (3) descriptions of CoreCivic's services as a "cost-effective alternative;"[91] (4) references to cost efficiency;[92] (5) varied descriptions of cost savings, including operational cost savings, short-term savings, and long-term savings;[93] and (6) description of a compelling "value proposition."[94] The terms "cost savings," "cost effectiveness," "cost efficiency," "competitive cost structure," "cost control," and "value proposition" convey CoreCivic's opinions regarding the relative cost of its services in the context of private prison outsourcing. However, the use of those terms does not equate to an all-encompassing comparison of costs across different approaches to service delivery—i.e. an absolute comparison of costs that the BOP would have incurred if it did housed the same inmates as opposed to CoreCivic. In this section, I discuss the meaning of the various cost terms used by CoreCivic, as they are understood in academic literature, in the practice of government procurement cost accounting generally, and specifically in the context of evaluating government contracts.

### 1. Cost Savings

48.     The term cost savings can take on several meanings and is necessarily a relative measure of the effects of the measures that companies or governments enact to reduce costs. In trying to define cost savings, the National Association of State Procurement Officers' ("NASPO") Benchmarking Task Force[95] (the "Task Force") reckons that "[t]here are as many definitions for

---

number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration.").

[90] *See, e.g.*, Consolidated Complaint ¶126 ("We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. We believe our customers discover that partnering with private operators to provide residential services to their inmates introduces competition to their prison system, resulting in improvements to the quality and cost of corrections services throughout their correctional system.").

[91] *See, e.g.*, Consolidated Complaint ¶122 ("We believe that we offer a cost-effective alternative to our government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds.").

[92] *See, e.g.*, Consolidated Complaint ¶162 ("Modern, state-of-the-art facilities that improve safety, security and cost efficiencies.").

[93] *See, e.g.*, Consolidated Complaint ¶¶122, 159–160.

[94] *See, e.g.*, Consolidated Complaint ¶120 ("Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities.").

[95] NASPO is the main professional association for state contracting and procurement officials and one of the leading organizations on professional standards for procurement practices at all levels of government. *See* National Association of State Procurement Officials, "Who We Are," available at https://www.naspo.org/about/, last accessed

cost savings and cost avoidance as there are business school professors who espouse a particular business philosophy," and that "neither of these types of cost reductions has universally accepted definitions or methods by which it is tracked and applied to a business enterprise's financials."[96] NASPO's work in this area shows that there is no uniform definition of "cost savings" and that any claims about cost savings for government contracting should be: 1) examined in reference to a specific set of cost savings actions, and 2) evaluated considering the measurement assumptions and benchmarks that are appropriate and relevant to those specific actions.[97]

49.     CoreCivic's statements about cost savings were not claims that CoreCivic offered the lowest cost alternative under any set of cost savings assumptions or methodology. The references that CoreCivic made to "cost savings" were limited by the clear context in which they were made. As explained in this section, these assumptions and context were disclosed in the documents in which the references appeared. For example, CoreCivic stated in its forms 10-K in for the years ended on December 31, 2011–2014:

> We believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services. The use of facilities owned and managed by private operators allows governments to expand prison capacity without incurring large capital commitments or debt required to increase correctional capacity. Outsourcing correctional services to private operators also enables government agencies to avoid costly long-term pension obligations. We believe these advantages translate into significant cost savings for government agencies.[98]

50.     This statement referred to specific areas in which prison outsourcing can provide benefit to public correctional agencies: 1) operational flexibility, 2) new correctional facilities

---

7/28/2020. In 2007, the Benchmarking Task Force developed an analytical framework to assist government officials in measuring the effectiveness of their cost control efforts.

[96] National Association of State Procurement Officers, NASPO Benchmarking Workgroup, "Benchmarking Cost Savings and Cost Avoidance," Research Brief, September 2007, pp. 3-4.

[97] National Association of State Procurement Officers, NASPO Benchmarking Workgroup, "Benchmarking Cost Savings and Cost Avoidance," Research Brief, September 2007, p. 5.

[98] Corrections Corporation of America Forms 10-K for the fiscal years 2011–2014.

construction, and 3) pension obligations.[99] These asserted benefits are congruent with those described in academic research in connection with the privatization of correctional facilities.[100]

### 2. Cost Effectiveness

51. "Cost effectiveness" is a "measure of whether costs are minimized for the desired *outcome*."[101] Key to the concept of cost effectiveness is that it considers both the costs and the outcomes of different service delivery models. Stated differently, "cost-effectiveness analysis takes account of both the costs and effects of selecting alternatives, making it possible to choose those alternatives that provide the best results for any given resource outlay or that minimize the resource utilization for any given outcome."[102] As a result, a cost effective service delivery approach may or may not produce the lowest total cost or lowest marginal cost compared to other potential service delivery approaches.

52. CoreCivic's opinion statements about cost effectiveness were generally related to a specific outcome. For example, CoreCivic disclosed in the "Business" section of its Form 10-K: "we believe that we offer a cost-effective alternative to its government partners by reducing their correctional services costs while allowing them to avoid long-term pension obligations for their employees and large capital investments in new prison beds."[103] Embedded in this statement about cost effectiveness is the notion that CoreCivic provides its government partners an *alternative* to an in-house prison management system, and thereby helps them minimize the amount of resources spent on specific areas such as pensions and new construction. Thus, it would generally be more

---

[99] Similarly, CoreCivic's statement that "[S]hort- and long-term savings by governments can be achieved by contracting with the private sector without sacrificing quality" as part of its investor presentations was not made in reference to its services to any specific customer. It was a reference to the conclusions reached in a study conducted by the two Temple University economists in June 2014, which CoreCivic cited in its investor presentations. The same study was cited as support for a statement made about cost savings in CoreCivic's 2013 Analyst Day Presentation. *See* CCA, America's Leader Partnership Corrections, 3Q14–1Q16 Investor Presentations; CCA, America's Leader Partnership Corrections Presentation, "2013 Analyst Day Durable Earnings and Significant Growth Potential," October 2, 2013, p. 15; Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 4.

[100] *See* Section V. B.

[101] Finkler, Steven A., Robert M. Purtell, Thad D. Calabrese, and Daniel L. Smith, *Financial Management for Public, Health, and Not-for-Profit Organizations*, 4th Edition (New York: Pearson, 2013), p. 623 (emphasis in original).

[102] Levin, Henry M., *Cost-Effectiveness: A Primer* (Newbury Park, CA: Sage, 1983), p. 11.

[103] Corrections Corporation of America Forms 10-K for the fiscal years 2011–2016. *See, e.g.*, Consolidated Complaint ¶122. I note that this particular statement does not discuss quality of service, which is referred to in other sections of Corrections Corporation of America Form 10-K (see, e.g., Business Strategy section of Form 10-K, for the fiscal years 2011–2016).

cost effective for the BOP to leverage existing private correctional facilities, than build or acquire new facilities and hire additional employees, because that would cause the BOP to incur large yet avoidable expenditures.[104] Notably, the identification of these areas as providing opportunities for cost minimization is consistent with the findings of academic research (see Section V. B.). For example, outsourcing allows the BOP to manage increases in inmate populations more flexibly than it could if it were to solely rely on its own facilities.[105]

### 3. Cost Efficiency

53. "Cost efficiency" is a measure of how close an organization comes to minimizing the amount of resources used for the result attained.[106] A product, service, method, or process achieves a cost efficiency if it can produce the same output at a lower cost, or can produce a greater output for the same cost. Unlike cost effectiveness, cost efficiency does not necessarily imply a focus on broad outcomes like improving overall organization effectiveness or accommodating a surge in demand for a service. Rather, it can and often does refer to a narrower focus on the resources required for specific service delivery tasks or processes.

54. CoreCivic's opinion statement that its "[m]odern, state-of-the-art facilities [] improve… cost efficiencies"[107] is specific to one particular characteristic of its services, and is not a broad assertion that CoreCivic improved cost efficiencies on all dimensions of prison management or that it offered the lowest cost alternative under any set of cost savings assumptions or methodology. In the context of correctional services, this statement can be tied to the relationship between the age of a correctional facility and inmate monitoring costs. This statement too is supported by

---

[104] *See, e.g.,* Moore, Adrian T., "Private Prisons: Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), pp. 4–6.
[105] Hakim, Simon and Erwin A. Blackstone, "Prison Break: A New Approach to Public Cost and Safety," *Independent Policy Report* (June 2014), p. 23.
[106] Finkler, Steven A., Robert M. Purtell, Thad D. Calabrese, and Daniel L. Smith, *Financial Management for Public, Health, and Not-for-Profit Organizations*, 4th ed. (New York: Pearson, 2013), p. 295.
[107] *See, e.g.,* Consolidated Complaint ¶162 ("Modern, state-of-the-art facilities that improve safety, security and cost efficiencies[…]"); CCA, America's Leader Partnership Corrections, "Fourth Quarter 2014 Investor Presentation," February 2015, p. 29; CCA, America's Leader Partnership Corrections, "First Quarter 2016 Investor Presentation," May 2016, p. 29.

published research that finds that a better facility layout and improved technology can help monitor the same number of inmates with fewer staff, thus generating cost efficiencies.[108]

### 4. Competitive Cost Structure and Economies of Scale

55.     "Cost structure" or cost function generally refers to "a mathematical description of how a cost changes with changes in the level of an activity relating to that cost."[109]  The cost structure or cost function for public services like corrections is a blend of three different types of costs:  fixed costs, variable costs, [110] and step-fixed costs it incurs as it increases or decreases its volume of service.  Fixed costs are the same regardless of the level of activity.  Wages and benefits for salaried employees are examples of fixed costs for corrections services, as they typically do not change as the number of inmates housed increases or decreases.  Variable costs, by contrast, vary directly in proportion to the number of inmates housed.  Inmate meal costs, for instance, increase and decrease directly in response to the number of inmates housed.  "Step-fixed" or "mixed" costs have both a fixed and a variable component.   For example, insurance costs are generally based on tiered premiums where a company pays a flat amount to insure, say, 0-100 employees, but that premium then increases to a higher flat rate to insure 101-200 employees, and so forth.

56.     CoreCivic's opinion statements about "competitive cost structure" speak to the characteristics of its cost structure as a business.  CoreCivic stated in the Business section of its Form 10-K that its "competitive cost structure offers prospective customers a compelling option for incarceration."[111]  Notably, CoreCivic's statement was not specific to the BOP and instead referred to all of its customers, which include other organizations besides the BOP (see **Exhibit 1**).[112]  This statement does not indicate that CoreCivic's government partners would

---

[108] Moore, Adrian T., "Private Prisons:  Quality Corrections at a Lower Cost," Reason Public Policy Institute, *Policy Study No. 240* (1999), p. 16.

[109] Horngren, Charles T., Srikant M. Datar, and Madav V. Rajan, *Cost Accounting: A Managerial Emphasis*, 14th ed. (New York:  Prentice Hall, 2012), p. 341.

[110] Horngren, Charles T., Srikant M. Datar, and Madav V. Rajan, *Cost Accounting: A Managerial Emphasis*, 14th ed. (New York:  Prentice Hall, 2012), pp. 30–31.

[111] *See*, e.g. Corrections Corporation of America Form 10-K for the year ended December 31, 2011.  Complaint ¶123 ("Our industry benefits from significant economies of scale, resulting in lower operating costs per inmate as occupancy rates increase. We believe we have been successful in increasing the number of residents in our care and continue to pursue a number of initiatives intended to further increase our occupancy and revenue. Our competitive cost structure offers prospective customers a compelling option for incarceration.").

[112] Corrections Corporation of America Form 10-K for the fiscal years 2011–2016, Item 1- Business.  *See e.g.* **Exhibit 2.2**; Corrections Corporation of America Form 10-K for the fiscal year ended December 31, 2015, filed on

necessarily achieve cost savings in all circumstances, or that CoreCivic's services are always the lowest cost option. Instead, it expresses a belief that CoreCivic's cost structure, which is a mix of fixed, variable, and step-fixed costs, is "compelling" compared to that of other competing correctional options.

57.     Similarly, CoreCivic's opinion statements about industry-wide "benefits from significant economies of scale" refer to the flexibility it and its peers offer governments to control or reduce per inmate costs, and are not claims that CoreCivic offers the lowest cost alternative under any set of cost savings assumptions or methodology. As part of the previously mentioned statement on cost structure, CoreCivic commented: "[o]ur industry benefits from significant economies of scale."[113] This reference to "economies of scale" was a broad commentary on the private prison industry as a whole that conveys an opinion that the size and cost structure of private correctional operations allows them to manage costs in ways that government-run correctional facilities cannot. The term economies of scale refers to the decrease in the unit cost of a service, as output (i.e. the number of users of that service) increases.[114] For instance, in an existing facility, CoreCivic may be able to add inmates with little to no new fixed or step-fixed costs whereas government-run correctional facilities may not be able to deliver those same economies of scale. In addition, the incremental cost per facility to owning and managing additional correctional facilities may decrease as certain firm-level fixed and step-fixed costs may not vary with additional facilities (e.g., corporate salaries).[115]

---

February 25, 2016, at p. 5 ("Our customers consist of federal, state, and local correctional and detention authorities. Federal correctional and detention authorities primarily consist of the Federal Bureau of Prisons, or the BOP, the United States Marshals Service, or the USMS, and ICE. Payments by federal correctional and detention authorities represented 51%, 44%, and 44% of our total revenue for the years ended December 31, 2015, 2014, and 2013, respectively.)

[113] *See* Corrections Corporation of America Form 10-K for the fiscal years 2011–2016.

[114] Pindyck, Robert S. and Daniel L. Rubinfeld, *Microeconomics*, 7th ed. (Upper Saddle River: Pearson Education, 2009), pp. 255–256.

[115] McDonald, Douglas, et al., "Private Prisons in the United States: An Assessment of Current Practice," Abt Associates Inc. (July 16, 1998), pp. 34–37.

### 5. Value Proposition

58. "Value proposition" is a concept that does not have a single, specific definition in the cost accounting literature but is used to broadly refer to the reasons why a customer would select a given product or service, and encompasses quality, benefits, costs, trade-offs, and other factors.[116]

59. CoreCivic's opinion statements about its value proposition were general commentary on the private correctional sector and did not convey that CoreCivic offers the lowest cost alternative under any set of cost savings assumptions or methodology. CoreCivic used the term "value proposition," for example, in reference to a chart depicting an increase in the percentage of inmate population housed by private correctional facilities, and CoreCivic stated, "[c]ompelling value proposition has driven privatized market penetration higher."[117] This statement refers to the private correctional sector as a whole, and it was an expression of an opinion about the factors driving outsourcing to that sector. Moreover, the reference to value proposition did not include any specific data, or, as would be expected with any quantitative cost statement, employ a defined methodology and set of assumptions for evaluating such savings that may be achieved through private correctional facility services. As Mr. Cameron Hopewell (CoreCivic's Managing Director of Investor Relations) testified:

> [P]rice is one of many factors that go into our value proposition, and so that -- the statement about price was not intended to suggest that that's the only issue, the only -- the only thing that a potential government customer looks at.[118]

### 6. Cost Control

60. Cost control is "the process of ensuring that the cost of operation for an organization does not exceed its target cost and that there are no cost overruns."[119] "Process" is central to this definition. According to one of the leading texts on government managerial accounting, "[w]hile occasional cost overruns are not unlikely because of events and circumstances over which an

---

[116] Kotler, Philip, and Kevin Lane Keller, *Marketing Management*, 15th ed. (Harlow: Pearson Education Limited, 2016) at p. 298.

[117] *See, e.g.*, **Exhibit 2.2**; Complaint ¶120 ("Our primary business strategy is to provide quality corrections services, offer a compelling value, and increase occupancy and revenue, while maintaining our position as the leading owner, operator, and manager of privatized correctional and detention facilities.").

[118] Deposition of Cameron Hopewell, January 17, 2020, p. 77:20–25.

[119] Khan, Aman, *Cost and Optimization in Government*, 2nd Edition (New York: Routeledge), p. 136.

organization may not have enough control, it is important that all organizations, large or small, adopt measures that would ensure cost control as part of their normal operation."[120] In other words, cost control is fundamentally about implementing policies and processes that can help to keep costs at or near target levels. In the context of privatization of government services, this does not imply a specific set of cost savings relative to some comparison group or relative to a specific cost trend over time.

61. CoreCivic's opinion statements about cost control do not describe a specific set of cost savings. CoreCivic stated in its Form 10-K: "[w]e believe the outsourcing of prison management services to private operators allows governments to manage increasing inmate populations while simultaneously controlling correctional costs and improving correctional services."[121] This statement referenced the fact that outsourcing provides governments the flexibility of utilizing a third-party service provider, which, in turn, helps them manage and control cost overruns. Similarly, the OIG Report specifically recognized this benefit: "[s]ince contracts with private prisons are fixed-price contracts, the payment amount does not change based on costs such as resources or time expended by the contractor," and "[a]ccording to the FAR, fixed-price incentive contracts are to the government's advantage because the contractor has to 'assume substantial cost responsibility and an appropriate share of the cost risk'."[122]

## VIII. Evaluation of Documents Identified by Plaintiff In Support of Its Cost Allegations

### A. The OIG Report and Yates Memorandum Do Not Provide An Analysis of Costs

62. Plaintiff claims that "as the Review by the OIG concluded and other sources have shown, costs are comparable, at best, with BOP facilities; and any savings result not from 'efficiencies' but from understaffing and hiring underqualified staff, thus contributing to the serious safety and security issues at these facilities."[123] However, neither the OIG Report nor the Yates

---

[120] Khan, Aman, *Cost and Optimization in Government*, 2nd Edition (New York: Routeledge), p. 136.
[121] Corrections Corporation of America Forms 10-K for the fiscal years 2011–2016.
[122] OIG Report, p. 11. *See also, e.g.*, McRae Award/Contract, CORECIVIC_0003082–3321 at -158.
[123] Consolidated Complaint, ¶117.

Memorandum[124] provided data or analysis that contributed to, or otherwise informed, the debate on cost savings and cost effectiveness that is robustly covered in the body of literature on private correctional facility costs. The OIG Report acknowledged challenges of conducting cost comparisons that have been well documented and publicized.[125] Indeed the available literature notes that the data needed to establish rigorous assumptions and perform a comparative analysis of even certain categories of costs across private and public facilities is not readily available.[126]

63.     Furthermore, neither the OIG Report nor the Yates Memorandum provide an analysis of costs that address the accuracy of CoreCivic's cost-related statements. The OIG Report presented the same high-level BOP data as that used by CoreCivic in its cost comparisons to compare the annual per capita costs of BOP-operated facilities to those of privately operated facilities generally.[127] The OIG Report did not put forth new cost comparison data or analysis. Instead, it acknowledged that due to data limitations, the OIG had not analyzed and compared costs incurred by function or department between the contract correctional facilities and BOP institutions.[128] In addition, the OIG Report indicated that it had not compared the overall costs of incarceration between BOP institutions and contract correctional facilities in part because of the different nature of the inmate populations and programs offered in those facilities.[129]

64.     The Yates Memorandum offers even less, simply expressing an opinion that private correctional facilities do not "save substantially on costs."[130] It did not offer any additional information that complemented, contributed to, or contradicted the wealth of academic literature

---

[124] United States Department of Justice, "Memorandum for the Acting Director Federal Bureau of Prisons from Sally Yates, Deputy Attorney General, Subject: "Reducing our Use of Private Prisons," August 18, 2016 (the "Yates Memorandum").

[125] OIG Report, p. 11.

[126] Mumford, Megan, et al., "The Economics of Private Prisons," Brookings Institute: The Hamilton Project (2016), p. 4: "In order to compare the cost of both public and private prisons, it is important to include capital costs of the prison facility and monitoring costs for the state agency that oversees the contract with the prison. In addition, one must account for differences in required security levels and inmate needs, which affect the expense of running a prison. Private companies are not required to release many details of their operations, including details on the cost of the services they provide, which limits the ability to make comparisons. The Government Accountability Office has concluded multiple times that the data are not sufficient to definitively claim that either type of prison is more cost-effective."

[127] OIG Report, pp. 11–12. The charts display that the costs incurred by the BOP for contract prisons were 7.9% lower on average over FY2011–2014 than those it incurred for comparable BOP facilities, and 10.8% and 12.2% lower in FY 2013 and FY 2014 respectively. However, the OIG report warned against drawing any conclusions from that data.

[128] OIG Report, p. 11.

[129] OIG Report, p. 11.

[130] Yates Memorandum.

discussed above in Section V, which demonstrates that a comparison of cost savings is a highly complex proposition that cannot be reduced to simple statements or global conclusions.

65.     In sum, the OIG Report and Yates Memorandum do not provide data or analysis that assist in evaluating the reasonableness of and bases for CoreCivic's cost-related statements.

**B.     The Documents and Testimony Listed in Plaintiff in Its Interrogatory Responses Do Not Provide Support for Its Cost Allegations**

66.     I understand that Plaintiff, in its response to interrogatories from Defendants, has summarized its cost allegations as "[p]ut simply, … despite Defendants' constant refrain, they were not providing the same level of quality while offering cost savings." Plaintiff further states that there were "numerous internally and externally flagged problems in various forms (including Notices of Concern, multiple deficiencies (including crucial services), repeat deficiencies, and worse), deductions for nonconformance, and understaffing," which were "due in large part to CoreCivic's artificial cost 'savings' (cheaper wages, worse benefits, and more remote locations, not greater efficiency)."[131]

67.     As discussed in Section V, the literature generally finds that two of the principal bases for cost savings generated by private correctional facilities emanate from:  1) construction-related costs, including locating in less expensive areas, and 2) personnel costs, including by limiting pension costs and locating facilities in areas where wage rates are lower for comparable occupations.  Thus, the factors Plaintiff identifies as "artificial" cost savings are instead some of the very factors that the literature identifies as the common bases for "actual" cost savings provided by private correctional facilities.  If anything, such factors are supportive of CoreCivic's cost statements and do not contradict them.

68.     I further understand that Plaintiff has identified "the documents and depositions containing the facts and constituting the documents supporting Lead Plaintiff's contention that each listed

---

[131] Plaintiff's Objections and Responses to Defendant CoreCivic, Inc.'s Second Set of Interrogatories to Plaintiff, May 1, 2020, Response to Interrogatory No. 13, p. 7.

statement omitted material information necessary to make it not misleading."[132]  The documents
Plaintiff identifies can be categorized as:[133]

- Deductions assessed for contract non-conformance;[134]
- Award fee determinations;[135]
- Contract facility monitoring reports and response and closure reports;[136] and
- Notice of concern/non-conformance memoranda.[137]

None of these documents identified by Plaintiff provides cost data or analysis concerning
CoreCivic or the BOP.  Instead, these documents appear to relate to the quality and compliance of
services provided by CoreCivic under its BOP contracts.

69.     Plaintiff also states, without identifying specific documents or portions of testimony, that
"the deposition testimony and deposition exhibits of the following individuals contain factual
support for Plaintiff's contention that this statement omitted material information which was
necessary to make these statements not misleading: John Baxter, Emilee Beach, Jeb Beasley, Tony
Grande, Keith Hall, Cameron Hopewell, Damon Hininger, Natasha Metcalf, Todd Mullenger,
Michael Nalley, Patrick Swindle (as Fed. R. Civ. P. Rule 30(b)(6) and fact witness), Bart Verhulst,

---

[132] Plaintiff's Objections and Responses to Defendant CoreCivic, Inc.'s Second Set of Interrogatories to Plaintiff,
May 1, 2020, Response to Interrogatory No. 13, pp. 6–144.

[133] Plaintiff also identifies a spreadsheet titled "Bi-Weekly FTE Report: Business Unit 1" for the current pay period
of December 15, 2013 – December 28, 2013.  *See* CORECIVIC_1398031.  It is unclear how this spreadsheet relates
to Plaintiff's interrogatory response.  Regardless, the spreadsheet does not appear to provide relevant data or
information concerning CoreCivic's costs relative to the BOP.

[134] *See* CORECIVIC_0660304; CORECIVIC_0660298; CORECIVIC_0660301; CORECIVIC_0991634;
CORECIVIC_0683222; CORECIVIC_2155593; CORECIVIC_0043786; CORECIVIC_0960355;
CORECIVIC_0502774; CORECIVIC_1088594; CORECIVIC_0507792; CORECIVIC_1331967;
CORECIVIC_0994540.

[135] *See* CORECIVIC_1089461; BOP_0008068; CORECIVIC_0990129; CORECIVIC_0990186;
CORECIVIC_0990200; CORECIVIC_0990221; CORECIVIC_1001311; CORECIVIC_0044374;
CORECIVIC_0044795.

[136] *See* CORECIVIC_2079558; CORECIVIC_2079567; CORECIVIC_0125304; CORECIVIC_1848098;
CORECIVIC_0050272; CORECIVIC_0050274; CORECIVIC_0961357; CORECIVIC_0050276;
CORECIVIC_0050255; CORECIVIC_1086703; CORECIVIC_1086664; CORECIVIC_1272221;
CORECIVIC_1048594; CORECIVIC_0375313; CORECIVIC_0080462; CORECIVIC_1086670;
CORECIVIC_1001430; CORECIVIC_1273149; CORECIVIC_1057091; CORECIVIC_1868591;
CORECIVIC_1062079; CORECIVIC_0056731; CORECIVIC_2037897; CORECIVIC_0944767;
CORECIVIC_0426167; CORECIVIC_1051670; CORECIVIC_0945968.

[137] *See* CORECIVIC_1084355; CORECIVIC_1131928; CORECIVIC_0024796; CORECIVIC_0761728;
CORECIVIC_1084392; CORECIVIC_1969691; CORECIVIC_1084370; CORECIVIC_1233702;
CORECIVIC_1084364; CORECIVIC_1084374; CORECIVIC_1084378; CORECIVIC_0024798;
CORECIVIC_1272428; CORECIVIC_1084381; CORECIVIC_1145995; CORECIVIC_0059412;
CORECIVIC_1048148; CORECIVIC_1084397; CORECIVIC_0024802; CORECIVIC_1084401;
CORECIVIC_1084409; CORECIVIC_1164202; CORECIVIC_1086031; CORECIVIC_1084413;
CORECIVIC_1168850; CORECIVIC_1501382; CORECIVIC_0024804; CORECIVIC_1084426;
CORECIVIC_1153235; CORECIVIC_1153773; CORECIVIC_1084430; CORECIVIC_0252572;
CORECIVIC_1048125.

and Kim White." In short, my review of the deposition testimony and exhibits for these individuals did not reveal data, information, or analysis that would lead me to alter the cost savings conclusions reached throughout this report.

_____
Dr. Justin Marlowe, Ph.D., CGFM
August 7, 2020