# EXHIBIT 135

United States Government Accountability Office

**GAO**

Report to the Subcommittee on
Commerce, Justice, Science, and
Related Agencies, Committee on
Appropriations, U.S. Senate

May 2008

# PRISON CONSTRUCTION

# Clear Communication on the Accuracy of Cost Estimates and Project Changes Is Needed



GAO-08-634

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 2 of 34 PageID #: 15779

MARLOWE_0005967

May 2008

# PRISON CONSTRUCTION

## Clear Communication on the Accuracy of Cost Estimates and Project Changes Is Needed



G A O

Accountability•Integrity•Reliability

# Highlights

Highlights of GAO-08-634, a report to the Subcommittee on Commerce, Justice, Science, and Related Agencies, Committee on Appropriations, U.S. Senate

## Why GAO Did This Study

The federal Bureau of Prisons (BOP) is responsible for the custody and care of more than 201,000 federal offenders. To provide housing for the federal prison population, BOP manages the construction and maintenance of its prison facilities and oversees contract facilities. GAO was asked to look into recent increases in estimated costs for Federal Correctional Institution (FCI) construction projects located in Mendota, CA; Berlin, NH; and McDowell, WV, which have led to almost $278 million or 62 percent more being provided in funding than initially estimated. This report addresses (1) the reasons for the changes to the estimated costs and (2) the actions BOP has taken—or plans to take—to control future cost increases and delays. GAO reviewed and analyzed BOP's fiscal years 2001 to 2009 budget documents, files for these three projects, and project management guidance. GAO also reviewed government and industry guidance on project management and met with BOP officials.

## What GAO Recommends

GAO recommends that the Attorney General of the United States instruct the Director of BOP to clearly communicate in DOJ's annual congressional budget submission (1) the extent to which project costs may vary from initial estimates and (2) changes that may impact the functionality of projects. BOP agreed with GAO's recommendations.

To view the full product, including the scope and methodology, click on GAO-08-634. For more information, contact Terrell Dorn at (202) 512-6923 or dornt@gao.gov.

## What GAO Found

For these three projects, delays in starting construction or disruptions in available funding that interrupted construction contributed to increases in cost estimates due to inflation and unexpected increases in construction material costs. According to BOP officials, delays resulted from problems with selecting and approving the sites for the prisons and with the availability of funding. BOP officials stated that they expected costs to increase by the inflation rate during the delay period, but did not anticipate that market forces would cause the construction costs to increase above the inflation rate, as they did. For example, steel prices rose about 60 percent and oil prices rose by almost 170 percent between the time that BOP prepared the initial cost estimates for these projects and when construction was ready to begin. In addition, because BOP estimates initial project costs early in the planning process, generally before an actual prison location is selected, variance from the initial estimates would be expected to some extent, even if the projects are not delayed. BOP, like other agencies, is not required to communicate how much it expects costs may vary from its estimates in its budget documents. Without such information, Congress and other stakeholders do not know the extent to which additional funding may be required to complete the project, even absent any project delays.

BOP eliminated or reduced portions of two projects to remain within the amount that was funded and plans to use its construction management policies and procedures to control further cost increases and schedule delays. When awarding the contract for FCI Mendota in 2007, BOP eliminated a UNICOR facility, which would have provided additional employment and job skills training opportunities for inmates, and the minimum-security prison camp. At FCI Berlin, BOP eliminated the UNICOR facility when it awarded the contract in 2007, but subsequently added a smaller UNICOR facility to the project, which will be paid for by UNICOR. Intended to reduce costs, these changes also reduced the functionality of the two prisons, deviating from what BOP planned and requested funding for. In the subsequent budget submission to Congress and other stakeholders, BOP did not clearly communicate these changes, since BOP does not provide such detailed project information. Now that BOP has awarded the construction contracts for the three projects, BOP officials believe that their construction management policies and procedures will allow them to control cost increases and schedule delays. These policies and procedures reflect current government and industry project management practices to monitor and track projects, and to report on their status. Furthermore, BOP officials said that they plan to continue to avoid making changes that would increase construction costs after construction begins. GAO did not evaluate the effectiveness of BOP's construction policies and procedures in controlling cost increases and schedule delays on these projects because while construction contracts were awarded, little construction had been done.

_____ **United States Government Accountability Office**

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 3 of 34 PageID #: 15780

MARLOWE_0005968

# Contents

| Letter | | 1 |
|---|---|---|
| | Results in Brief | 2 |
| | Background | 4 |
| | Project Delays Contributed to Increased Cost Estimates, and the Imprecise Nature of Estimates Was Not Communicated to Congress and Other Stakeholders | 7 |
| | BOP Has Eliminated or Reduced Portions of Two Projects, and Plans to Use Its Construction Management Policies and Procedures to Control Cost and Schedule Changes | 14 |
| | Conclusions | 18 |
| | Recommendations for Executive Action | 19 |
| | Agency Comments | 19 |

| Appendix I | Objectives, Scope, and Methodology | 20 |
|---|---|---|

| Appendix II | FCI Mendota, FCI Berlin, and FCI McDowell Project Estimates, Budget Requests, and Funding for Fiscal Years 2001–2009 | 22 |
|---|---|---|

| Appendix III | Comments from the Department of Justice, Federal Bureau of Prisons | 24 |
|---|---|---|

| Appendix IV | GAO Contact and Staff Acknowledgments | 28 |
|---|---|---|

| Table | | |
|---|---|---|
| | Table 1: Bureau of Labor Statistics' Indexes | 12 |

| Figure | | |
|---|---|---|
| | Figure 1: FCI Mendota in California and FCI Forest City in Arkansas | 9 |

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 4 of 34 PageID #: 15781

MARLOWE_0005969

## Abbreviations

| | |
|---|---|
| BOP | Bureau of Prisons |
| CII | Construction Industry Institute |
| CPC | Capacity Planning Committee |
| DOJ | Department of Justice |
| EPA | Environmental Protection Agency |
| FCI | Federal Correctional Institution |
| ICIPPI | *Inputs to Construction Industries Producer Price Index* |
| LRPC | Long-Range Planning Committee |
| OMB | Office of Management and Budget |

This is a work of the U.S. government and is not subject to copyright protection in the United States. The published product may be reproduced and distributed in its entirety without further permission from GAO. However, because this work may contain copyrighted images or other material, permission from the copyright holder may be necessary if you wish to reproduce this material separately.

Case 3:16-cv-02267   Document 363-29   Filed 11/20/20   Page 5 of 34 PageID #: 15782

MARLOWE_0005970



**United States Government Accountability Office**
**Washington, DC 20548**

May 29, 2008

The Honorable Barbara A. Mikulski
Chairman
The Honorable Richard C. Shelby
Ranking Member
Subcommittee on Commerce, Justice,
   Science, and Related Agencies
Committee on Appropriations
United States Senate

The federal Bureau of Prisons (BOP), within the Department of Justice (DOJ), is responsible for the custody and care of more than 201,000 federal offenders. To accommodate the current and future confinement needs of the U.S. federal prison population, BOP manages the construction and maintenance of its prison facilities. BOP also contracts with other facilities to house about 17 percent of the federal offenders. Cost estimates that BOP provided to Congress for BOP's three current prison construction projects that are located in Mendota, California; Berlin, New Hampshire; and McDowell, West Virginia, have increased significantly beyond the initial estimates. For the purposes of this report, we refer to these Federal Correctional Institution (FCI) construction projects as FCI Mendota, FCI Berlin, and FCI McDowell. To date, additional funding has been provided for these projects totaling almost $278 million, or 62 percent more than the projects' initial estimates.

To assist the Subcommittee in its oversight role and in making future funding decisions, you requested that we examine the circumstances surrounding the increases in the cost estimates for the three current construction projects. Accordingly, for the three prisons currently under construction, this report addresses (1) the reasons for the changes to the estimated costs to date and (2) the actions BOP has taken—or plans to take—to control future cost increases and schedule delays.

To assess the reasons for the changes to the estimated costs related to the three prisons currently under construction, we analyzed DOJ's congressional budget submissions for BOP from the first year that project funding was requested in fiscal years 2001 through 2009, and relevant appropriation laws. We also reviewed and analyzed BOP's cost estimates, project files, and capital planning guidance. We analyzed the Office of Management and Budget's (OMB) guidance on capital planning and

GAO-08-634 Bureau of Prisons Construction Program

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 6 of 34 PageID #: 15783

MARLOWE_0005971

preparing budget submissions. In addition, to identify the rate of inflation and other price indicators that could have affected the cost estimates for the three project schedules, we analyzed the Department of Labor, Bureau of Labor Statistics, pricing indexes for 2003 through 2007, and interviewed BOP officials in Washington, D.C.

To assess the actions taken by BOP—or that BOP plans to take—to control cost increases and schedule delays on the three current construction projects, we analyzed BOP's construction guidance and BOP's project files. Furthermore, we reviewed federal government and construction industry data concerning project cost management and compared them with BOP's guidance. We also interviewed BOP headquarters officials in Washington, D.C. We discuss the scope and methodology of this report in more detail in appendix I.

We conducted this performance audit from June 2007 through May 2008, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

## Results in Brief

Delays in starting project construction or disruptions in available funding that interrupted construction contributed to increases in cost estimates due to inflation and unexpected increases in construction material costs. According to BOP officials, problems with selecting and approving the sites for FCI Mendota, FCI Berlin, and FCI McDowell, along with receiving funding later than assumed in the initial estimates, delayed the three prison projects. BOP officials stated that costs increased by the associated inflation that occurs over time, but BOP could not anticipate construction industry costs that increased at an accelerated rate due to other market factors. For example, steel prices rose by about 60 percent and oil prices rose by almost 170 percent from the time that BOP prepared the initial cost estimates for these projects until the projects were ready to proceed with construction. In addition, because BOP estimates its initial project costs and requests funding early in the planning process—generally, before an actual location for a prison has been selected—variance from the initial estimates would be expected to some extent, even if the projects are not delayed. BOP, like other agencies, is not required to communicate how much it expects costs might vary from its estimates in the budget documents submitted to Congress and other stakeholders. Without such

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 7 of 34 PageID #: 15784

MARLOWE_0005972

information, however, Congress and other stakeholders do not know the extent to which additional funding may be required to complete the project, even absent any project delays.

BOP eliminated or reduced portions of two projects to remain within the amount funded, and it plans to use its construction management policies and procedures to control further cost increases and schedule delays. When awarding the construction contract for FCI Mendota in 2007, BOP eliminated a Federal Prison Industries facility (UNICOR), which would have provided additional employment and job skills training opportunities for inmates, and the minimum-security prison camp. At FCI Berlin, BOP eliminated the UNICOR facility when it awarded the contract in 2007, but it subsequently added a smaller UNICOR facility to the project, which will be paid for by UNICOR. Although intended to reduce costs, these changes also reduced the functionality of the two prisons and deviated from what BOP planned and requested funding for. In the subsequent budget submission to Congress and other stakeholders, BOP did not clearly communicate these changes, since it does not provide such detailed project information. Now that BOP has awarded contracts to construct these three projects, BOP officials believe that their construction management policies and procedures will allow them to control cost increases and schedule delays. These policies and procedures reflect current government and industry project management practices to monitor and track projects, and to report on their status. In addition, BOP officials told us that their use of the Design-Build project delivery system will help to control cost increases during construction. Under this system, the contractor designs and builds the project and generally has the responsibility for costs associated with design errors, should they occur. Furthermore, BOP officials told us that they plan to continue to carefully consider and approve changes that would increase construction costs after construction begins. We did not evaluate the effectiveness of BOP's construction policies and procedures in controlling cost increases and schedule delays on these three projects because while design and construction contracts were awarded, little construction had been done.

To improve accountability and transparency, we are making two recommendations to the Attorney General of the United States to instruct the Director of BOP to clearly communicate the following to Congress and other stakeholders in DOJ's annual congressional budget submission, in which BOP provides its requests for funding and reports the status of construction projects: (1) the extent to which project costs might vary from initial estimates and (2) the changes that might impact the functionality of projects. BOP concurred with our recommendations.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 8 of 34 PageID #: 15785

MARLOWE_0005973

# Background

BOP's mission is to protect society by confining offenders in the controlled environments of prisons and community-based facilities that are safe, humane, cost-efficient, and appropriately secure, and that provide work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens. BOP is organized into six regions of the country—Mid-Atlantic, North Central, Northeast, South Central, Southeast, and Western. BOP manages the construction of and operates institutions at five security levels—minimum, low, medium, high, or administrative security—to confine offenders in an appropriate manner. Institutions constructed for a given security level generally have the same design and features. For example, FCIs, which are medium-security institutions, generally have strengthened perimeter fencing, cell-type housing, and a wide variety of work and treatment programs. As such, FCI construction projects typically include a UNICOR facility that employs and provides job skills training to inmates.[1] UNICOR is a government corporation administered by DOJ, with the Director of the Bureau of Prisons as its Chief Executive Officer. FCI construction projects also generally include an adjacent work- and program-oriented minimum-security Federal Prison Camp, where inmates help serve the labor needs of the larger, higher-security FCI.

We have previously reported that BOP follows a centralized, long-term capacity planning process, with the aim of ensuring sufficient institutional capacity while maintaining prison populations at safe-and-secure targeted levels.[2] BOP has two planning committees that are involved in the capital decision-making process to identify new facility prison construction projects: the Capacity Planning Committee (CPC) and the Long-Range Planning Committee (LRPC).[3] According to BOP headquarters officials, CPC proposes new projects by BOP region using the Capacity Plan, which provides projections of inmate population and rates of prison overcrowding. BOP develops initial budget estimates for the projects that CPC proposes, and LRPC ranks the proposed new prison facility

---

[1] BOP provides job opportunities for inmates in many areas of the institutions, including food service, commissary, facility maintenance, landscaping/grounds work, barber shop, and cleaning. The general population BOP inmates are required to work and are given a job, if they are medically able.

[2] GAO, *Budget Issues: Agency Implementation of Capital Planning Principles Is Mixed*, GAO-04-138 (Washington, D.C.: Jan. 16, 2004).

[3] CPC consists of senior-executive-level staff of several BOP divisions and subject matter experts from the Administration Division. LRPC consists of members of the Administration Division who are senior-executive-level staff, senior managers, and branch chiefs.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 9 of 34 PageID #: 15786

MARLOWE_0005974

construction projects and makes specific funding recommendations to the Director of BOP. The new construction projects are ranked on the basis of agency need, funding, and the speed with which the projects can be constructed.

BOP includes its proposed new construction projects in its annual Federal Prison System budget request made to DOJ. As part of the DOJ annual congressional budget submission, BOP also provides its Federal Prison System Status of Construction report (status report), which provides information on the status of construction for major projects that have received funding. The specific information provided is as follows: each project's descriptive title, with name, type, and location; the amounts funded, by fiscal year; the total project cost estimates; the funds obligated to date; the estimated year of use; and a brief status of the project. However, detailed project information is not provided in this status report. Although BOP provides information to Congress about the specific projects that it plans to support with the funds it requests, funding for BOP construction is provided as a lump sum into its "Buildings and Facilities Account," rather than by the specific project. As a result, BOP can shift funds within this account to fund cost increases on different projects.

In the last 10 years, BOP has completed 30 prison projects at a cost totaling over $3.6 billion. BOP has received about $710 million for the 3 prison projects currently under construction—FCI Mendota, FCI Berlin, and FCI McDowell. BOP has plans for 10 additional prison projects that have received about $363 million in funding to date, as listed in its fiscal year 2009 congressional budget submission.[4]

## Developing Initial Project Cost Estimates

To request funding for construction projects such as a prison, an agency must develop an initial project cost estimate several years before it plans to begin construction. Cost estimating requires both science and judgment. Since answers are seldom—if ever—precise, the goal is to find a reasonable "answer."[5] Cost estimates are based on many assumptions,

---

[4] One of these 10 planned prison projects, a secure female FCI to be built in Aliceville, Alabama, received funding for construction in fiscal year 2008. We did not include this FCI in our review because it had not received construction funding at the time that we started our work in June 2007.

[5] GAO, *Cost Assessment Guide: Best Practices for Estimating and Managing Program Costs, Exposure Draft,* GAO-07-1134SP (Washington, D.C.: July 2007).

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 10 of 34 PageID #: 15787

MARLOWE_0005975

including the rate of inflation and when construction will begin. Generally, the more information that is known about a project and is used in the development of the estimate, the more accurate the estimate is expected to be.[6] OMB's guidance for preparing budget documents identifies many types and methods of estimating project costs. The expected accuracy of the resulting project cost estimates varies, depending on the estimating method used.

As part of the project planning and budgeting process, BOP officials develop an initial cost estimate when the need is identified for a prison in a particular region of the country. Given that its prisons for a specific security level generally have the same design features, BOP uses cost and pricing information from a previous project to create a national average cost for construction as the basis for its initial estimate of a new project. To develop an initial cost estimate, BOP adjusts its national average cost by assumptions for various factors, such as the difference in construction costs for different regions of the country, the difficulty of construction, and the expected inflation until construction is planned to begin. For example, in 1999, BOP created a national average construction cost for an FCI on the basis of the average of the 1998 bids for FCI Petersburg, Virginia, the most recently available FCI construction cost information. BOP adjusted FCI Petersburg's pricing information to take into account inflation between 1998 and 1999 and the relative construction costs in Petersburg. To establish the initial estimate for FCI Mid-Atlantic—which became FCI McDowell, located in McDowell County, West Virginia—BOP adjusted the national average to take into account the relative construction costs and difficulty of construction for the Mid-Atlantic region of the country and inflation adjustment to 2001, which is when BOP expected to begin construction. BOP used this estimate as the basis for requesting funding.

BOP's process of using cost information from an earlier project to estimate the cost of a similar proposed project is one of the types of estimates discussed in OMB's guidance. Because this type of cost estimate is based on a single overall project cost, guidance indicates that actual

---

[6]Office of Management and Budget, *Planning, Budgeting, Acquisition, and Management of Capital Assets*, OMB Circular A-11, Part 7, Section 300, "Planning, Budgeting, Acquisition, and Management of Capital Assets," Supplement to Part 7, "Capital Programming Guide" (Washington, D.C.: June 2006); and GAO-07-1134SP.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 11 of 34 PageID #: 15788

MARLOWE_0005976

project costs may vary from such an estimate by as much as ± 40 percent.[7] Actual costs may vary by this percentage even if the project begins as assumed in the estimate because detailed project information, such as quantities of particular construction components, was not used in developing the estimate. A BOP official stated that he believes BOP's estimates are more accurate than ± 40 percent because it uses its own historical project information, and the similarities shared by BOP projects.

## Project Delays Contributed to Increased Cost Estimates, and the Imprecise Nature of Estimates Was Not Communicated to Congress and Other Stakeholders

Delays in starting project construction or disruptions in available funding, which interrupted construction, contributed to increases in cost estimates due to inflation and to unexpected increases in construction material costs. According to BOP officials, problems associated with selecting sites for FCI Mendota, FCI Berlin, and FCI McDowell and with receiving the funding later than planned in the initial estimates contributed to the increase in the cost estimates. During the time that the projects were delayed, construction costs rose at a rate higher than inflation. Also, cost estimates are imprecise and should be expected to vary from the initial estimates, but Congress and other stakeholders were not informed about the extent to which costs might vary from the initial estimates.

### Problems with Site Selection and the Availability of Funding Contributed to Project Construction Delays

According to BOP officials, all three projects experienced delays in beginning construction because of problems associated with selecting and approving the sites for the prisons as well as with the availability of funding. FCI Mendota also experienced disruptions in available funding that led to an interruption in construction. See appendix II for project estimates, budget requests, and funding for the three projects.

FCI Mendota

In fiscal years 2001 and 2002, about $150 million was appropriated for a high-security United States Penitentiary in California as requested in the President's budget. Funding was reduced in fiscal year 2002 when BOP applied a rescission of about $5.7 million to the project. When BOP initially estimated the cost for this project, it expected the contract to be awarded in fiscal year 2001 and the construction to begin in fiscal year 2002. However, BOP did not award the contract to design and construct

---

[7]OMB Circular A-11, Part 7, refers to the Department of Energy's "Cost Estimating Guide," DOE G 4301.1-1 (Washington, D.C.: Mar. 28, 1997).

GAO-08-634 Bureau of Prisons Construction Program

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 12 of 34 PageID #: 15789

MARLOWE_0005977

the prison until fiscal year 2004. Mendota was selected as the prison site in fiscal year 2002, at which time BOP changed the project to a medium-security FCI.[8] Subsequent environment impact studies and approvals, which included review and approval by the Environmental Protection Agency (EPA), were completed in fiscal year 2004. In addition, the continued availability of funding for this project came into question in fiscal year 2004, when Congress rescinded almost $52 million of funding.[9] Furthermore, in fiscal year 2005 an amendment to the President's Budget proposed canceling $55 million from the unobligated balances in the Buildings and Facilities Account previously provided for the FCI Mendota project.

Despite this disruption in the available funding, BOP continued with the FCI Mendota project because it expected that the rescinded funds would be restored the following year. Partly as a result of the rescission, BOP officials separated the work for this project into several pieces. This decision enabled BOP to award a single contract for the project's design and construction in September 2004. The contract was structured for the contractor to begin with design and allowed BOP to decide when and what pieces of the construction would be done on the basis of the availability of funding. In December 2004, with the funding it had, BOP directed the contractor to construct the central utility plant, water tower, and general housing units. The contract required BOP to award the remaining pieces necessary to complete the facility—such as the support structures, UNICOR factory, and Federal Prison Camp—no later than 2006 or the option to do this work under the contract would expire. BOP did not exercise the contract option because it had not received additional funds. As a result, when the contractor completed its work, BOP could not house prisoners at FCI Mendota. Figure 1 shows a comparison of the uncompleted FCI Mendota in California to the completed FCI Forest City in Arkansas.

---

[8]BOP identified Mendota, California, as the site for this prison in its budget documents in fiscal year 2006.

[9]In fiscal year 2004, Congress rescinded $51,895,000 of the unobligated balances available for Federal Prison System, Buildings and Facilities. The conference report indicated that the rescission was to apply from prior year unobligated balances originally made available for the FCI California prison construction project. H.R. Conf. Rep. No. 108-401, at 646 (2003) accompanying Pub. L. No. 108-199, 118 STAT. 3, 106 (2004).

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 13 of 34 PageID #: 15790

MARLOWE_0005978

**Figure 1: FCI Mendota in California and FCI Forest City in Arkansas**



Source: BOP.
Incomplete: FCI Mendota, CA



Source: United States Geological Survey.
Complete: FCI Forest City, AR

Before BOP could solicit for construction bidders to complete the required work at FCI Mendota, it had to contract for additional engineering services to prepare construction documents. This was necessary to inform bidders about what work had been done and what work remained to be completed. In September 2007 after it received additional funding, BOP awarded the contract to complete FCI Mendota.

We have previously raised concerns about this type of construction management. For example, we have reported that nonconcurrent construction—that is where different phases of a project are constructed at different times—increases the overall cost to the government because it requires additional and expensive mobilization of contractor staff and equipment, security, work to procure building materials, and construction management oversight.[10] We also have raised concerns in prior work about starting capital projects without all of the funding necessary to complete the project or, if the project is divisible into stages, to complete a stand-alone stage that would result in a useable asset.[11] While BOP had funding for the pieces for which it awarded a contract, the pieces did not result in a usable asset because it did not have enough of the pieces of the project

---

[10]GAO, *Embassy Construction: Achieving Concurrent Construction Would Help Reduce Costs and Meet Security Goals*, GAO-04-952 (Washington, D.C.: Sept. 24, 2004).

[11]GAO, *Budget Issues: Alternative Approaches to Finance Federal Capital*, GAO-03-1011 (Washington, D.C.: Aug. 21, 2003).

**GAO-08-634 Bureau of Prisons Construction Program**

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 14 of 34 PageID #: 15791

MARLOWE_0005979

completed to house prisoners safely and securely. Although BOP shifted some funds to help pay for the Mendota project, according to BOP officials, sufficient funds were not available to fully fund the Mendota project without delaying or canceling other projects that BOP had told Congress it planned to begin.

To date, the total funding for FCI Mendota has exceeded the initial fiscal year 2001 estimate by about $72 million, or almost 45 percent. However, the latest project estimate is over $6 million, or 2.8 percent, more than the current funding. BOP officials have told us that they do not plan to request any more funding for this project, and that BOP will shift funds within its Buildings and Facilities Account as necessary to complete FCI Mendota.

## FCI Berlin and FCI McDowell

In fiscal year 2004, about $154 million was appropriated for FCI Berlin, and about $40 million was appropriated for an FCI in the Mid-Atlantic region.[12] When BOP initially estimated the costs for these projects, it expected to receive funding for design and construction of these facilities in fiscal years 2004 and 2002, respectively. BOP did not award contracts for the design and construction of these projects until fiscal years 2007 and 2006, respectively. According to BOP, both projects experienced delays in selecting the locations for the prisons and the environment impact studies. For FCI Berlin, the property was acquired and EPA completed its approval process in fiscal year 2007. For FCI McDowell, these events occurred in fiscal years 2006 and 2005. In addition, BOP officials stated that they were reluctant to proceed with construction because of OMB's moratorium on new construction for fiscal years 2005 through 2007. Also, the President's Budget included proposed cancellations of unobligated funds from BOP's Buildings and Facilities Account for fiscal years 2004, 2006, and 2007.[13]

To date, the total funding for FCI Berlin and FCI McDowell has exceeded the initial estimates by about $93.5 million and $112.3 million, or 56 percent and 89 percent, respectively. However, the latest project estimates are more than $11 million and $9 million, or 4.2 percent and 3.7 percent, more than the current funding for FCI Berlin and FCI McDowell, respectively. BOP officials told us that they do not plan to request any

---

[12]McDowell, West Virginia, was selected by BOP in fiscal year 2005 and was identified in BOP's budget documents as FCI McDowell beginning in fiscal year 2007.

[13]GAO, *Status of Funds Proposed for Cancellation in the President's Fiscal Year 2007 Budget*, GAO-B-308011 (Washington, D.C.: Aug. 4, 2006).

GAO-08-634 Bureau of Prisons Construction Program

more funding for these projects, and that BOP will shift funds within its Buildings and Facilities Account as necessary to complete them.

## Construction Costs Increased at a Rate Higher Than the Rate of Inflation

BOP factors into its estimates the project's expected start date and duration, on the basis of when BOP expects to receive funding. Generally, if a project does not start as assumed in the cost estimate, the estimated cost of the project should be expected to change at least by the rate of inflation that occurs during the time that elapses between the expected start date and the actual start date. BOP officials stated that during the time that these projects were delayed, construction industry costs increased at a rate greater than inflation. Costs for materials used in construction, such as concrete, steel, copper, and oil, rose substantially. For example, steel prices rose by about 60 percent and oil prices rose by almost 150 percent between 2003 and 2007—a time between when the initial cost estimates were prepared and when the projects were ready to proceed with construction.[14]

We analyzed national data on construction material costs from 2003 through 2007 to provide some context on increases to construction prices. Specifically, to identify nationwide trends in the costs of many of the materials used in construction—from concrete to electrical equipment—we analyzed the Department of Labor, Bureau of Labor Statistics' *Inputs to Construction Industries Producer Price Index* (ICIPPI).[15] As shown in table 1, from 2003 through 2007, the ICIPPI increased more than the consumer price index, indicating that construction costs increased at a higher rate than other costs.[16]

---

[14]Department of Labor, Bureau of Labor Statistics, *Producer Price Index-Commodities, Metals and metal products, Steel mill products*, Series ID WPU1017 (Washington, D.C.: Nov. 15, 2007); and *Producer Price Index-Commodities, Fuels and related products and power, Crude petroleum (domestic production)*, Series ID WPU056 (Washington, D.C.: Nov. 15, 2007).

[15]Department of Labor, Bureau of Labor Statistics, *Producer Price Index Industry Data, Inputs to construction industries*, Series ID PCUBCON—BCON (Washington, D.C.: Nov. 15, 2007).

[16]Department of Labor, Bureau of Labor Statistics, *Consumer Price Index-All Urban Consumers*, Series ID CUUR0000SA0 (Washington, D.C.: Nov. 15, 2007).

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 16 of 34 PageID #: 15793

MARLOWE_0005981

**Table 1: Bureau of Labor Statistics' Indexes**

| Fiscal year | Consumer Price Index-All Urban Consumers | | Producer Price Index-Inputs to Construction Industries | |
|---|---|---|---|---|
| | CPI | Percentage increase | ICIPPI | Percentage increase |
| 2003 | 185.0 | 2.0% | 142.4 | 3.2% |
| 2004 | 190.9 | 3.2 | 156.6 | 10.0 |
| 2005 | 199.2 | 4.3 | 170.1 | 8.6 |
| 2006 | 201.8 | 1.3 | 175.6 | 3.2 |
| 2007 | 208.9 | 3.5 | 182.4 | 3.9 |
| Total[a] | | 12.9% | | 28.1% |

Source: GAO analysis of Department of Labor, Bureau of Labor Statistics, data.

[a]To align with the federal government fiscal year, we compared October data.

## Cost Estimates Are Imprecise, and Congress and Other Stakeholders Were Not Informed of the Extent to Which They Might Vary

Because BOP estimates its initial project costs and requests funding early in the planning process, generally before the specific location for the prison has been selected, actual project costs can be expected to vary from the initial estimates to some extent. This variance would be in addition to any cost implications of a change in the project, such as a delay in beginning construction. As we have previously noted in this report, the extent to which one might expect actual costs to vary from estimates typically depends on the type of estimating process used.

In developing its initial estimate prior to the selection of a site for the prison, BOP relies on the cost of a previous prison as the foundation of its estimate. However, BOP has more detailed information available than just the cost of a previous prison, which, if used, would likely result in a more accurate estimate. For example, BOP could analyze the design documents or itemized costs that contractors on previous projects included in their bills. In addition, when the project sites have been selected, actual local market pricing for labor and material costs could be used.[17] More BOP resources would be needed to develop such an analysis.

[17]Office of Management and Budget, *Planning, Budgeting, Acquisition, and Management of Capital Assets*, OMB Circular A-11, Part 7, Section 300, "Planning, Budgeting, Acquisition, and Management of Capital Assets," Supplement to Part 7, "Capital Programming Guide" (Washington, D.C.: June 2006); and GAO-07-1134SP.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 17 of 34 PageID #: 15794

MARLOWE_0005982

According to government guidance, BOP's method of using total cost information from a prior project as the basis for its estimate may result in actual project costs varying from the estimate by as much as ± 40 percent. A BOP official stated that BOP's estimating method results in more precise estimates than ± 40 percent, but an analysis of the accuracy of BOP's estimating method has not been done.

Regardless of the estimating method used, Congress relies on information provided by agencies when making funding decisions. Although BOP, like other agencies, is not required to communicate the extent to which actual costs may be expected to vary from its estimates in budget documents or reports on project status, we have recently identified providing such information as a best practice.[18] BOP has not provided this information to Congress and other stakeholders. Thus, BOP has not alerted them of the risks that BOP might require additional funding to complete the projects as originally planned. OMB guidance points out that estimating inaccuracy—both overestimating and underestimating—can adversely affect other projects. With overestimating, an agency may request and be provided with more resources than it will actually need for the project, thereby resulting in less resources being available for other projects or programs. Underestimating projects can lead an agency to request less resources than it will actually need to complete the project, potentially leading to a significant reduction in the project scope, termination of the project, or the shifting of funds from other projects. Inaccurate estimates also reduce confidence in the accuracy of future estimates provided by an agency. Consequently, BOP's ability to inform Congress and other stakeholders about the extent to which costs may vary from its initial project cost is important as it plans additional prison projects and submits subsequent funding requests.

---

[18]GAO-07-1134SP.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 18 of 34 PageID #: 15795

MARLOWE_0005983

## BOP Has Eliminated or Reduced Portions of Two Projects, and Plans to Use Its Construction Management Policies and Procedures to Control Cost and Schedule Changes

BOP eliminated or reduced portions of two projects, but did not clearly communicate these changes to Congress and other stakeholders. BOP also plans to use its construction management policies and procedures to control cost increases and schedule delays during construction.

## BOP Has Eliminated or Reduced Facilities at FCI Berlin and FCI Mendota, but Did Not Clearly Communicate These Changes to Congress and Other Stakeholders

Congress appropriated funds for fiscal year 2007 that BOP indicated in its status report were required to complete the three prison projects. However, BOP eliminated portions of the FCI Berlin and FCI Mendota projects when it awarded contracts in May and September 2007, respectively, to keep the projects within the estimated costs provided to Congress. According to BOP officials, the contractors' bids for FCI Berlin and FCI Mendota were higher than expected. In response, at FCI Berlin, BOP chose to eliminate the UNICOR facility where inmates were to be employed and provided with job skills training. Subsequently, UNICOR has agreed to pay for the cost of constructing a smaller than originally planned facility, which has now been added back to the project. At FCI Mendota, BOP eliminated both the UNICOR facility and the minimum security Federal Prison Camp. Eliminating or reducing the UNICOR facilities affects BOP's mission to provide work and other self-improvement opportunities for inmates. As a result, these two projects are no longer the same as those for which BOP initially sought and received appropriated funds.

While eliminating or reducing portions of two projects enabled BOP to award contracts, the resulting facilities will not provide the same range of services as originally planned. As part of its annual congressional budget submission, BOP reports on the status of projects that have received funding in the past. This status report includes the following information: each project's descriptive title, with name, type, and location; the amounts funded, by fiscal year; the total project cost estimates; the funds obligated to date; the estimated year of use; and a brief status of the project. However, detailed project information is not provided in this status report. In reviewing the BOP Status of Construction report in DOJ fiscal year 2009 budget documents, we found that the report does not discuss the

GAO-08-634 Bureau of Prisons Construction Program

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 19 of 34 PageID #: 15796

MARLOWE_0005984

elimination of the UNICOR facility at FCI Mendota.[19] Furthermore, BOP did not mention that the Federal Prison Camp had been eliminated from FCI Mendota. The only indication of this change is that the project title no longer includes the words "with camp." While BOP receives a lump-sum appropriation for prison construction, Congress makes its appropriation on the basis of, among other things, the project information provided by BOP in its annual congressional budget submission. For FCI Berlin and FCI Mendota, BOP did not clearly communicate to Congress or other stakeholders that the facilities being constructed differed from those for which funds were requested and appropriated.[20] In addition, if BOP should decide to construct these omitted facilities in the future and fulfill these projects' initial designs, it would likely cost more than if the facilities had been constructed as one project. We have previously reported that nonconcurrent construction of a project increases the overall cost to the government because such construction requires additional and expensive (1) mobilization of contractor staff and equipment, (2) security, (3) work to procure building materials, and (4) construction management oversight.

## BOP Plans to Use Its Policies and Procedures to Control Cost Increases and Schedule Delays during Construction

BOP officials told us that they will have more ability to control project costs because they have awarded design and construction contracts for the three projects. These officials believe that using their construction management policies and procedures will allow them to control cost increases and schedule delays. Controlling schedule delays is critical because such delays can lead to cost increases. BOP officials said they will use their *Design and Construction Procedures* and *Construction Management Guidelines* to manage the construction of prison projects. Within BOP, the Design and Construction Branch is responsible for the oversight and management of prison construction, and each project has a BOP project manager.

BOP's *Design and Construction Procedures* outlines the specific tasks that the Design and Construction Branch must complete to manage the coordination, execution, oversight, and monitoring of the activities required to construct the projects. For example, this guidance states that the project manager must monitor and report on the contractor's

---

[19]This is the first report submitted after the construction contracts were awarded in 2007 for FCI Berlin and FCI Mendota, and after the decision to eliminate portions of the projects was made.

[20]According to a BOP official, stakeholders within BOP, DOJ, and OMB are advised by BOP staff of significant changes and receive a monthly updated copy of the status report.

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 20 of 34 PageID #: 15797

MARLOWE_0005985

performance during construction and review changes or a modification to the contract to evaluate the extent to which BOP can hold the contractor reasonably liable and, therefore, responsible for the resulting costs.[21] To accomplish these tasks, BOP's *Construction Management Guidelines* provides additional guidance, which identifies the processes that BOP staff must follow to monitor the requirements and implementation of BOP construction projects. For example, this guidance requires BOP officials and the contractor to hold numerous design and construction meetings throughout the duration of the project's schedule to ensure good communication and effective management of the project.

In addition, the *Construction Management Guidelines* requires specific reports—including weekly status reports, monthly project progress reports, performance evaluations of the contractor's team members, and other reports—to facilitate oversight and monitoring of the projects within BOP. For example, this guidance requires the use of critical path method scheduling that breaks a project down into a sequence of necessary activities, which are placed into a project schedule that the project manager can closely monitor. With this management tool, BOP has the ability to monitor and track a project's current progression of work in relation to its initial schedule. This tool also gives the project manager the ability to evaluate proposed construction changes or modifications to the project and to understand their resulting impacts on the project's schedule. This evaluation step remains crucial because once BOP awards the contract, any construction changes that impact the project schedule may also lead to cost changes.

BOP's guidance establishes clear lines of responsibility and documentation requirements. The bureau's *Construction Management Guidelines* also outlines a detailed process that BOP must follow to manage and approve any changes or contract modifications to the project. For example, this guidance states that BOP's project manager should review any proposed changes or modifications to the project and determine if the changes or modifications need further review by BOP's Design and Construction Branch chief. If further review is warranted, sufficient background information supporting the changes or modifications should be provided to the branch chief, along with the proposal. In addition, this guidance states that all change or modification proposals should be discussed at regularly scheduled—or specially

---

[21]For the technical discussion of change orders and modifications, see the Federal Acquisition Regulation, Part 43, Contract Modifications.

**GAO-08-634 Bureau of Prisons Construction Program**

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 21 of 34 PageID #: 15798

MARLOWE_0005986

scheduled—progress meetings with the contractor. If the changes or modifications will affect the work, more detailed information should be provided to justify them, and the project management team must also evaluate them to ensure they are in compliance with BOP's contract requirements. Furthermore, to document the process, the guidance requires that detailed files be created and maintained for all changes or modifications.

We found that BOP's construction guidance—specifically, its *Design and Construction Procedures* and *Construction Management Guidelines*—generally conform to government and industry management practices. We compared BOP's existing construction management policies and procedures with existing guidance from OMB,[22] the General Services Administration's *Construction Excellence Features*, the Department of Energy's *Project Management for the Acquisition of Capital Assets*, and the Construction Industry Institute's (CII) *Guidelines for Implementation of CII Concepts: Best Practices for the Construction Industry*.[23] Our review showed that BOP's construction management policies and procedures required systems for monitoring, tracking, analyzing, forecasting, and reporting the status of a project. For example, we found that BOP has procedures for reporting important project information—such as cost and schedule, and their deviations from trends—to the appropriate personnel, including management. Furthermore, BOP has procedures for corrective actions when deviations in cost and schedule occur as well as procedures for controlling project changes or modifications.

In addition to the guidance, BOP officials said that the use of the Design-Build delivery system for two of these projects will help to reduce the risk of additional costs being incurred during construction.[24] This type of project delivery system places the project design and construction under one contract. This can reduce the risk of design errors being identified during construction and leading to project delays or cost increases. To provide some context to the extent that Design-Build contracting is

---

[22]Office of Management and Budget, *Planning, Budgeting, Acquisition, and Management of Capital Assets*, OMB Circular A-11, Part 7, Section 300, "Planning, Budgeting, Acquisition, and Management of Capital Assets," Supplement to Part 7, "Capital Programming Guide" (Washington, D.C.: June 2006).

[23]Construction Industry Institute, *Guidelines for Implementation of CII Concepts: Best Practices for the Construction Industry*, Special Publication 42-2 (Austin, TX: September 1995).

[24]The Design-Build delivery system was not used for the current FCI Mendota construction phase.

Case 3:16-cv-02267      Document 363-29      Filed 11/20/20      Page 22 of 34 PageID #: 15799

MARLOWE_0005987

effective in managing construction, we reviewed the National Institute of Standards and Technology and the CII study of the performance of the Design-Build delivery method versus the traditional Design-Bid-Build delivery system.[25] The study found that for maintaining the project's schedule, as well as for managing any changes or rework needed during the project's construction, when the project was managed by its owner the Design-Build system performed better than the Design-Bid-Build system.

BOP officials stated that they have more ability to control costs while the project is under construction, and that for the FCI Mendota, FCI Berlin, and FCI McDowell prison projects, they plan to continue to carefully consider and approve changes after construction has begun to stay within its budget. Since construction of the projects has just begun, it is too early to evaluate the effectiveness of BOP's construction policies and procedures in controlling cost increases and schedule delays.

# Conclusions

When BOP asks Congress or other stakeholders to fund or support projects, it is important for them to be aware of the extent to which actual project costs may vary from the initial estimate. Given the continual competition for limited funds, understanding that a proposed project may need an additional 30 percent in funding as opposed to an additional 10 percent may influence their approval and funding decisions. In addition, BOP is developing its estimates and requests funding on the basis of the various facilities it intends to include in each project. If elements of a proposed and funded project that can affect its functionality are eliminated, the project may not fulfill decision makers' expectations. In addition, later construction of the omitted facilities would likely cost more than if they had been constructed as one project. As the need for prison space continues to grow, BOP's ability to complete projects within budget and with the elements initially anticipated will be important to demonstrating BOP's ability to manage its construction program. By providing information on the accuracy of its cost estimates and clearly communicating changes that could impact the projects functionality, BOP would establish more accountability and transparency to its stakeholders.

---

[25]United States Department of Commerce, Technology Administration, National Institute of Standards and Technology, Office of Applied Economics, Building and Fire Research Laboratory, *Measuring the Impacts of the Delivery System on Project Performance—Design-Build and Design-Bid-Build* (Gaithersburg, MD: November 2002).

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 23 of 34 PageID #: 15800

MARLOWE_0005988

## Recommendations for Executive Action

To improve accountability and transparency, we are making two recommendations to the Attorney General of the United States to instruct the Director of BOP to clearly communicate to Congress and other stakeholders in DOJ's annual congressional budget submission, in which BOP provides its requests for funding and reports on the status of construction projects:

the extent to which project costs may vary from initial estimates and

changes that may impact the functionality of projects.

## Agency Comments

We provided a draft of this report to the Department of Justice for its review and comment. The Director of the Federal Bureau of Prisons provided written comments on this draft. BOP concurred with our recommendations and stated it would incorporate information on the extent to which project costs may vary from initial estimates and changes that may impact the functionality of projects in DOJ's annual congressional budget submission. BOP also provided technical corrections, which we incorporated in this report where appropriate. BOP's comments are reproduced in appendix III.

We will send copies of this report to the appropriate congressional committees and the Attorney General of the United States. Additional copies will be sent to interested congressional committees and the Director of the Office of Management and Budget. We will also make copies available to others upon request. The report will be available at no charge on the GAO Web site at http://www.gao.gov.

If you have any questions about this report, please contact me at (202) 512-6923 or at dornt@gao.gov. Contact points for our Offices of Congressional Relations and Public Affairs may be found on the last page of this report. GAO staff who made key contributions to this report are listed in appendix IV.

Terrell G. Dorn, PE

Terrell Dorn
Director, Physical Infrastructure Issues

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 24 of 34 PageID #: 15801

MARLOWE_0005989

# Appendix I: Objectives, Scope, and Methodology

To assess the extent to which costs changed for the three prisons currently under construction and the reasons for those changes, we obtained and analyzed the President's budgets, the Department of Justice's budget justifications for the federal Bureau of Prisons (BOP) for fiscal years 2001 through 2009, and appropriation laws for fiscal years 2001 through 2008. We obtained and analyzed BOP's project files for three Federal Correctional Institution (FCI) construction projects in Mendota, California; Berlin, New Hampshire; and McDowell, West Virginia. To determine the rate of inflation and other price indicators for the duration of the three projects' schedules, we obtained and analyzed the following Department of Labor, Bureau of Labor Statistics' data: (1) *Producer Price Index-Commodities, Metals and metal products, Steel mill products*; (2) P*roducer Price Index-Commodities, Fuels and related products and power, Crude petroleum (domestic production)*; (3) *Producer Price Index Industry Data, Inputs to construction industries*; and (4) *Consumer Price Index-All Urban Consumers*. We obtained and analyzed (1) BOP's initial cost estimates for FCI Mendota, FCI Berlin, and FCI McDowell and (2) information on prison projects completed from 1998 to 2007—10 years prior to our review—to learn about BOP historical costs. We reviewed BOP's capital planning guidance. We obtained and analyzed the Office of Management and Budget's (OMB) guidance for Capital Planning and Budget Submission. We interviewed BOP construction, budget, and financial officials in Washington, D.C.

To assess the actions BOP has taken—or plans to take—to control cost increases and schedule delays on the three current construction projects, we obtained and analyzed BOP's construction guidance and BOP's project files for FCI Mendota, FCI Berlin, and FCI McDowell. We obtained and analyzed government and construction industry data concerning project cost management and guidance from OMB's Circular A-11, the General Services Administration's *Construction Excellence Features*, the Department of Energy's *Project Management for the Acquisition of Capital Assets*, and the Construction Industry Institute's (CII) *Best Practices for the Construction Industry*. We obtained and analyzed government and construction industry data concerning the performance of the Design-Build delivery method versus the traditional Design-Bid-Build delivery system from the National Institute of Standards and Technology and the CII study. We interviewed BOP construction, budget, and financial officials in Washington, D.C. We did not evaluate the effectiveness of BOP's construction policies and procedures in controlling cost increases and schedule delays on these projects because although design and construction contracts were awarded, little construction had been done.

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 25 of 34 PageID #: 15802

MARLOWE_0005990

We conducted this performance audit from June 2007 through May 2008, in accordance with generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 26 of 34 PageID #: 15803

MARLOWE_0005991

# Appendix II: FCI Mendota, FCI Berlin, and FCI McDowell: Project Estimates, Budget Requests, and Funding for Fiscal Years 2001–2009

Dollars in thousands

| Fiscal year/Project information category | Prison construction project | | |
|---|---|---|---|
| | FCI Mendota | FCI Berlin | FCI McDowell |
| **2001** | | | |
| Estimate | $158,930[a] | N/A | $126,430[a] |
| Request | 11,930 | N/A | 5,430 |
| Funded | 8,930 | N/A | 2,430 |
| **2002** | | | |
| Estimate | 158,930 | $166,000[a] | 126,430 |
| Request | 147,000 | 9,963 | 91,047 |
| Funded | 141,256[b] | 5,000 | 94,047 |
| **2003** | | | |
| Estimate | 158,930 | 173,039 | 131,314 |
| Request | 0[c] | 0[c] | 0[c] |
| Funded | 0[c] | 20,000 | 0[c] |
| **2004** | | | |
| Estimate | 150,186 | 179,500 | 136,777 |
| Request | 0[c] | Cancellation[d] | Cancellation[d] |
| Funded | (48,895)[e] | 154,500 | 40,300 |
| **2005** | | | |
| Estimate | 150,186 | 179,500 | 136,777 |
| Request | (55,000) | 0[c] | 0[c] |
| Funded | 1,900 | 0[c] | 0[c] |
| **2006** | | | |
| Estimate | 165,291 | 179,500 | 136,777 |
| Request | 0[c] | Cancellation[d] | Cancellation[d] |
| Funded | 4,000 | 0[c] | 0[c] |
| **2007** | | | |
| Estimate | 196,291 | 179,500 | 136,777 |
| Request | 0[c] | Cancellation[d] | Cancellation[d] |
| Funded | 122,050 | 80,000 | 102,000 |
| **2008** | | | |
| Estimate | 225,000 to 235,000 | 250,000 to 275,000 | 225,000 to 235,000 |
| Request | 115,000 | 0[c] | 0[c] |
| Funded | 2,000 | 0[c] | 0[c] |

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 27 of 34 PageID #: 15804

MARLOWE_0005992

| Fiscal year/Project information category | Prison construction project | | |
|---|---|---|---|
| | FCI Mendota | FCI Berlin | FCI McDowell |
| 2009 | | | |
| Estimate | 238,000 | 271,000 | 248,000 |
| Request | 0[c] | 0[c] | 0[c] |
| Funded | [f] | [f] | [f] |
| **Total funding** | **$231,241** | **$259,500** | **$238,777** |
| **Minus initial estimate** | **158,903** | **166,000** | **126,430** |
| **Dollar increase** | **$72,311** | **$93,500** | **$112,347** |
| **Percentage increase** | **45%** | **56%** | **89%** |

Source: GAO analysis of Department of Justice, Bureau of Prisons, data.

Note: In the President's fiscal year 2005 budget, a moratorium on new prison construction was announced. This moratorium was in place for fiscal years 2005, 2006, and 2007.

[a]Initial estimate of project costs.

[b]Includes a rescission to the Buildings and Facilities Account of $5.744 million, which was applied by BOP.

[c]The use of "zeros" indicates either no budget requests or no project funding.

[d]The term "cancellation" refers to a proposal by the President to reduce budget resources.

[e]The Appropriation Conference Report named the project, which became FCI Mendota, to apply the rescission to the Buildings and Facilities Account. In fiscal year 2004, BOP shifted $3 million to this project.

[f]Fiscal year 2009 funds have not been determined.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 28 of 34 PageID #: 15805

MARLOWE_0005993

# Appendix III: Comments from the Department of Justice, Federal Bureau of Prisons



**U.S. Department of Justice**

Federal Bureau of Prisons

*Office of the Director*

*Washington, DC 20534*

May 16, 2008

Terrell Dorn, Director
Physical Infrastructure Issues
Government Accountability Office
Washington, DC 20548

Dear Mr. Dorn:

The Bureau of Prisons (Bureau) appreciates the opportunity to formally respond to the Government Accountability Office's (GAO's) draft report entitled <u>Prison Construction: Clear Communication on the Accuracy of Cost Estimates and Project Changes Needed</u>.

The purpose of this report is to explain (1) the reasons for the changes to the estimated costs for federal correctional institution construction projects located in Mendota, California; Berlin, New Hampshire; and McDowell, West Virginia; and (2) the actions the Bureau has taken – or plans to take – to control future costs and schedule changes.

The Bureau has the following specific comments:

- Summary Page - The GAO Report should note the Status of Construction Exhibit (in the Bureau's budget) does not normally discuss specific details regarding various program areas of each prison project - such as UNICOR work areas.

- Page 3, 2nd paragraph and thereafter - We suggest the following wording change be included: "Inmates are employed in many areas of BOP institutions (food service, commissary, facility maintenance, landscaping/grounds work, barber shop, cleaning, etc.) not just UNICOR." The GAO's current statement might lead the reader to believe there will be no work opportunities for inmates at these locations without a UNICOR operation. In fact, all sentenced general population BOP inmates at all locations are required to work and are given a job if they are medically able.

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 29 of 34 PageID #: 15806

MARLOWE_0005994

- Page 4, 9th line beginning with, "Furthermore,..." - We suggest the sentence should read, "Furthermore, BOP officials told us they will continue to carefully consider and analyze before approving changes that would increase construction costs after construction begins."

- Page 5, 6th line from the top beginning with, "UNICOR is a..." - We suggest the sentence read, "The Director of the Federal Prison System, Chief Executive Officer, and a board of six Directors, appointed by the President, reviews and approves the policy of the Corporation."

- Page 6, footnote #3: Add the underlined words to the footnote "One of the ten, a secure female FCI to be built in Aliceville, AL,..."

- Page 8, Title - Project Delays Contributed to Increased Cost Estimates and Imprecise Nature of Estimates Not Communicated to Stakeholders, we suggest replacing "Project Delays" with "Delays Related to Funding".

- Middle of Page 8, Title - Problems with site selection and receiving funding later then planned contributed to project construction delays we suggest replacing then with than.

- Page 8, 2nd paragraph beginning with, "FCI Mendota also experienced..." Change to make more accurate/precise, "FCI Mendota also experienced a number of disruptions in available funding including proposals for and actual rescissions of funds that led to delays and an interruption in construction."

- Page 8, end of 2nd paragraph, please add, "For example, the Administration offered a FY 2005 Budget Amendment to rescind $55 million from the Mendota project, which was eventually denied in Congressional action (Attachment 4)."

- Page 9, top of page where the 2004 rescission is referenced, please include the FY 2002 rescission amount of $5.744 million which was applied to the Mendota project.

- Page 11, 1st paragraph, 8th line, containing "...EPA completed its approval process ..." Instead of EPA, we suggest... "the environmental review and approval process was completed..."

2

Case 3:16-cv-02267     Document 363-29     Filed 11/20/20     Page 30 of 34 PageID #:
15807

MARLOWE_0005995

- Page 11 and Appendix II beginning with, "Also, the
  President's Budget..." The OMB did call these rescissions
  in the budget documents and only clarified, after submission
  of the FY 2007 President's Budget, that they were proposed
  cancellations (Attachment 1).

- Page 16, Line 8, "For FCIs Berlin and Mendota, BOP did not
  clearly communicate..." Changes are included in the Status
  of Construction Report which shows any planned satellite
  camp right after the name of the project. The Bureau did
  clearly change this on the Status report (Attachment 3) that
  went to all shareholders after award of the construction
  contract that did not include the camp.

- Page 23, table should be updated to reflect FY 2002
  rescission of $5.744 million applied to the Mendota project.
  Further, budget documents (Attachment 2) clearly state
  "rescinds" not "cancel" for projects prior to FY 2007. The
  table should be updated to reflect this issue. In addition,
  as agreed upon in George Depaoli's May 6, 2008, e-mail,
  please correct the FY 2005 Request Line entry and identify
  the $55 million Mendota rescission proposal in the
  Administration's budget amendment (Attachment 4).

In addition to the above concerns, our response to the
Recommendations for Executive Action is as follows:

**Recommendations:** To improve accountability and transparency, we
are making two recommendations to the Attorney General to
instruct the Director of the BOP to clearly communicate to
Congress and other stakeholders in DOJ's annual congressional
budget submission, in which BOP provides its requests for funding
and reports on the status of construction projects:

- the extent to which project costs may vary from initial
  estimates; and
- changes that may impact the functionality of projects.

**Response:** The Bureau concurs with these recommendations and will
incorporate these elements into the next required DOJ annual
congressional budget submission.

3

MARLOWE_0005996

If you have any questions regarding this response, please contact
VaNessa P. Adams, Senior Deputy Assistant Director, Program
Review Division, at (202) 616-2099.

Sincerely,

*Thomas R. Kane*

for Harley G. Lappin
Director

Attachments

cc:  Richard Theis, Assistant Director
     Audit Liaison Group, JMD

4

MARLOWE_0005997

# Appendix IV: GAO Contact and Staff Acknowledgments

## GAO Contact

Terrell Dorn, (202) 512-6923 or dornt@gao.gov

## Staff Acknowledgments

In addition to the individual listed above, Maria Edelstein, Assistant Director; George Depaoli; Anne Dice; Carlos Diz; Colin Fallon; and Susan Michal-Smith made significant contributions to this report.

Case 3:16-cv-02267    Document 363-29    Filed 11/20/20    Page 33 of 34 PageID #: 15810

MARLOWE_0005998

| | |
|---|---|
| **GAO's Mission** | The Government Accountability Office, the audit, evaluation, and investigative arm of Congress, exists to support Congress in meeting its constitutional responsibilities and to help improve the performance and accountability of the federal government for the American people. GAO examines the use of public funds; evaluates federal programs and policies; and provides analyses, recommendations, and other assistance to help Congress make informed oversight, policy, and funding decisions. GAO's commitment to good government is reflected in its core values of accountability, integrity, and reliability. |
| **Obtaining Copies of GAO Reports and Testimony** | The fastest and easiest way to obtain copies of GAO documents at no cost is through GAO's Web site (www.gao.gov). Each weekday, GAO posts newly released reports, testimony, and correspondence on its Web site. To have GAO e-mail you a list of newly posted products every afternoon, go to www.gao.gov and select "E-mail Updates." |
| **Order by Mail or Phone** | The first copy of each printed report is free. Additional copies are $2 each. A check or money order should be made out to the Superintendent of Documents. GAO also accepts VISA and Mastercard. Orders for 100 or more copies mailed to a single address are discounted 25 percent. Orders should be sent to: |

U.S. Government Accountability Office
441 G Street NW, Room LM
Washington, DC 20548

To order by Phone: Voice: (202) 512-6000
TDD: (202) 512-2537
Fax: (202) 512-6061

| | |
|---|---|
| **To Report Fraud, Waste, and Abuse in Federal Programs** | Contact: |

Web site: www.gao.gov/fraudnet/fraudnet.htm
E-mail: fraudnet@gao.gov
Automated answering system: (800) 424-5454 or (202) 512-7470

| | |
|---|---|
| **Congressional Relations** | Ralph Dawn, Managing Director, dawnr@gao.gov, (202) 512-4400 U.S. Government Accountability Office, 441 G Street NW, Room 7125 Washington, DC 20548 |
| **Public Affairs** | Chuck Young, Managing Director, youngc1@gao.gov, (202) 512-4800 U.S. Government Accountability Office, 441 G Street NW, Room 7149 Washington, DC 20548 |

PRINTED ON RECYCLED PAPER