# EXHIBIT 138

**Exhibit 550**

Marlowe, J.
10/16/20
*@ptus*



Working Paper

# Cost Analysis of Public and Contractor Operated Prisons

April 29, 2013

**Dr. Simon Hakim and Dr. Erwin A. Blackstone**

**Professors of Economics at Temple University**

**Center For Competitive Government**

**Philadelphia, Pennsylvania**

**E mail: hakim@temple.edu; Erwin.blackstone@temple.edu**

*Updated May 23, 2013*

# Contents

Executive Summary ............................................................................................................................................ 2

1. Introduction ......................................................................................................................................... 5
2. Model for Estimating the State's Avoidable Costs ............................................................................. 5
3. Direct Avoidable Costs for - ublic - risons ....................................................................................... 7
4. Indirect Avoidable Costs for - ublic - risons ................................................................................... 8
5. Miscellaneous Costs ........................................................................................................................... 8
6. Capital and Finance Costs .................................................................................................................. 9
7. Capital Flexibility Gained by Use of Contractor Operated - risons ............................................... 10
8. Non-Cost - erformance Measures ..................................................................................................... 11
9. Unaccounted Benefits and Costs of Contract - risons .................................................................... 11
10. Discussion of Individual State Costs and - erformance ................................................................. 12

   Arizona ............................................................................................................................................ 13

   California ........................................................................................................................................ 13

   Florida ............................................................................................................................................ 15

   Kentucky.......................................................................................................................................... 17

   Maine .............................................................................................................................................. 18

   Mississippi....................................................................................................................................... 18

   Ohio ................................................................................................................................................ 19

   Oklahoma ....................................................................................................................................... 20

   Tennessee ....................................................................................................................................... 22

   Texas ............................................................................................................................................... 23

11. General Discussion of - ublic Costs and - rivate - rices ................................................................ 25

    Short- Versus Long-Term Costs. ..................................................................................................... 25

    Unfunded - ensions and Healthcare.............................................................................................. 26

    Labor Costs..................................................................................................................................... 26

12. Summary and Conclusions ............................................................................................................... 28

References ..................................................................................................................................................... 33

Appendix 1: Data Sources for the Table on State Costs, Contract - rices, and Savings............................ 36

Table 1: State Costs and - rivate - rices..................................................................................................... 41

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 3 of 22 PageID #: 15889

MARLOWE_0008001

# Executive Summary

Considerable controversy exists among state officials, outside experts, and the media whether contract prisons provide sufficient savings and perform adequately in other dimensions to justify their use. This research is designed to examine the evidence using state data as the primary source. The study uses economic models to determine each state's avoidable costs, which are then compared against the per diem charges of the private operator. In cases where the operator manages a state prison, avoidable costs include just short run costs. Where overcrowding exists or when the state correctional institutions require modernization or replacement, long run costs are shown to be appropriate. The research considers all avoidable costs including indirect costs and often-ignored underfunded pension and retiree health care costs. Interviews with state corrections officials and legislative oversight analysts were conducted. Individual states were analyzed to understand the role and issues associated with the use of contract prisons.

Statutory requirements in some states mandate savings of at least five to ten percent in order to contract out to private operators. In particular, there is ambiguity in the categories and the measurements of the state costs that should be considered for the savings required by the private operators. In some cases, avoidable state prison costs imposed on other departments of state government are unavailable.

There are three primary reasons for the use of contract prisons: to generate cost savings and avoid large capital expenditures; to relieve overcrowding, whether ordered by the courts or required because of threat of litigation perceived by departments of correction (DOC); and the sale of a state prison to private operators for budgetary reasons. The savings required of private prison contracts by statute are Florida (seven percent), Kentucky (ten percent), Mississippi (ten percent), Ohio (five percent), and Texas (ten percent). The statutory requirements apply both to where the contractor operates a state-owned prison and to where prisoners are placed in contract prisons. In cases like Florida and Mississippi, the contractor manages state-owned prisons. In Kentucky and Oklahoma, the prisoners are transferred to privately owned prisons. Texas uses both types of contract prisons.

The relief of overcrowding is the second major reason for the use of private prisons and includes both out-of-state transfer of inmates and in-state use of private facilities. In California, for example, the courts required a timely reduction of overcrowding, leading to the use of out-of-state contract prisons. In addition to California, the examined states that have experienced overcrowding were Arizona, Kentucky, Ohio, Oklahoma, Tennessee, and Texas.

Contracting out by selling a state prison to a private operator generates an immediate lump sum amount to narrow a state budgetary deficit. This occurred in Ohio, which sold the Lake Erie Correctional Institution to a private contractor.

The table below specifies the short run direct and indirect costs that are linked to the operation of the state prison. The long run costs include the short run costs in addition to the depreciation and the government principle and interest payments for the bonds that are used to finance a prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to contract prisons. Our estimation of the avoidable costs includes a few categories of actual costs that were missing in prior studies. In the short run, costs included data on underfunded pensions and retiree healthcare of current employees. Neglecting these costs lowers the state's apparent avoidable costs and distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86, while the others range from $0.55 in Florida to $4.44 in Texas.

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 4 of 22 PageID #: 15890

MARLOWE_0008002

Whenever overcrowding exists, the statutory requirement is less relevant since the overcrowding must be alleviated in a timely fashion. California is a classic example of the cost encountered for not avoiding substantial overcrowding. Overcrowding requires that the long run avoidable costs are compared against the contractor's price. The long run consideration is also relevant when the state owns old prisons that need major renovations, prisons are subject to demolition because of age or condition, or when the state faces difficulties in raising capital.

The table below provides both short and long run savings in the use of contract prisons. The long run savings for Arizona's two prisons are 14.25 and 22.34 percent; California had 32.20 and 58.61 percent savings for two prisons; Kentucky's savings for its four prisons ranged between 12.46 and 23.5 percent; Ohio saved 20.28 and 26.81 percent in 2012 and 2010, respectively; Oklahoma saved on its four prisons 16.77 to 36.77 percent; Tennessee had 17.32 percent; and Texas had 44.95 percent. Maine, which does not utilize contract prisons, could have saved 47.65 percent when below capacity and 49.38 percent if overcrowding exists.

At least equal performance to state prisons is required for contracting out. Indeed, the American Correctional Association established standards for prison performance, which the contract prisons generally met. Further, interviews with state DOCs reported that their contracts mandate performance levels, and DOCs closely monitor adherence to the contract requirements. - enalties can be and are imposed for performance violations. In Florida, contractors performed above the state level in training and educating inmates, which could be attributed to competition among contractors and the desire for contract renewal.

A major finding from the data and the interviews is that competition yields savings and better performance. The economics of Industrial organization demonstrates the important benefits derived from the presence of even a small competitor in an otherwise monopolistic market. Even though private contractors comprise less than seven percent of the industry, they have generated substantial competitive benefits. The benefits emanate from two sources. As more contractors compete, the prices are lower, and the performance is better. Likewise, when private prisons become an available option, efforts are made by public prison managers to lower costs, and demands by employees are constrained, since public employees realize that the legislature might favor private corrections as a more cost effective option. Further, the greater the competition, the more managerial and technological innovations are introduced in both the public and private segments of the industry. Interestingly, we found that in several states where both public and private contract prisons operate, there was cooperation, mutual learning of new technologies, joint training, and adoption of efficient management.

This study leads to a possible moderate change that could encourage further competition and thereby achieve more efficient delivery of existing corrections services. This is the model of managed competition initiated by then Mayor Stephen Goldsmith of Indianapolis, Indiana, which encouraged public workers to participate in the bidding for their services to preserve their municipal jobs along with the existence of private competitors. Mayor Goldsmith initiated the "yellow pages" test where he enabled contracting out of all city services whenever several providers were listed. But, he went one step further and allowed city employees to compete for the service. By so doing, public employees, as well as private contractors, have an incentive to search for managerial and technological innovations and offer the service at competitive prices.

Adopting managed competition also has implications for the current statutory savings requirements. State legislators in the statutory states have established arbitrary levels of required savings of five, seven, and ten percent. High percentage savings may discourage some bidders and be counterproductive. It is not clear why the percentages differ and what is the basis for these numbers.

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 5 of 22 PageID #: 15891

MARLOWE_0008003

The bidding by contractors often just approaches the statutory requirement. It could be more effective to let open competition determine the price. By instituting managed competition where the public sector competes on a level field with the private sector, we let the market determine the savings. In such a case, the complicated calculations of what cost items should be considered as avoidable costs and how to measure these costs becomes unnecessary. Managed competition has worked for many local public services, and there is no reason why it cannot be successfully implemented in the prison industry. Indeed, public and private competition and cooperation in the provision of prison services has worked and could even be extended.

## State Prison Costs, Contract Prices, and State Savings
### Costs Presented are Costs Per Day

| States | Custody/ Year* | Short Run Costs | Long Run Costs | Contractor Per Diem | Short Run % Savings | | Long Run % Savings | | % Private Inmates |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | Prison 1 | Prison 2 | Prison 1 | Prison 2 | |
| AZ | Min 2010 | $50.61 | $59.95 | $46.56 | 8.01 | | 22.34 | | 22.95 |
| AZ | Med 2010 | $52.49 | $61.83 | $53.02 | -1.00 | | 14.25 | | 11.35 |
| CA | 2007-8 | $112.98 | $117.59 | $79.73 | 29.43 | | 32.20 | | 1.31 |
| CA | All 2011/12 | $152.01 | $156.62 | $64.82 | 57.36 | | 58.61 | | 6.72 |
| FL | 2008/9 | $54.39 | $61.43 | $50.58 | 7.00 | | 17.67 | | 11.31 |
| KY | Min/Med11 | $58.13 | $60.03 | $47.21 | 18.79 | | 21.36 | | 10.35 |
| KY | Min/Med12 | $55.59 | $57.49 | $43.98 | 20.88 | | 23.50 | | |
| KY | Med 2011 | $52.98 | $54.88 | $44.14 | 16.68 | | 19.57 | | |
| KY | Med 2012 | $54.80 | $56.70 | $49.63 | 9.43 | | 12.46 | | |
| ME | 2011 | $125.59 | $129.90 | $65.75 | 47.65 | | 49.38 | | 0.0 |
| MS | Min 2011 | $36.26 | $47.52 | | | | | | |
| MS | Med/Max11 | $34.11 | $41.68 | $31.15 | 8.69 | | 25.27 | | 24.88 |
| OH | 2010 | $52.98 | $62.66 | $45.86 | 13.44 | | 26.81 | | 5.87 |
| OH | 2012 | $47.84 | $57.52 | $45.86 | 4.14 | | 20.28 | | |
| OK | Min 2011 | $41.64 | $51.18 | | | | | | |
| OK | Med 2011 | $42.11 | $51.65 | $43.02 | 4.35 | -2.16 | 22.02 | 16.71 | 45.74 |
| OK | Max 2011 | $80.01 | $89.55 | $56.62 | 27.56 | 29.23 | 35.27 | 36.77 | 27.13 |
| TN | Med 2011 | $53.21 | $53.21 | $42.29 | 17.32 | | 17.32 | | 18.7 |
| TX | Proto 2010 | $59.85 | $68.07 | $37.47 | 37.39 | | 44.95 | | 11.03 |
| BOP/GAO | Low 2011 | $67.28 | $71.89 | | | | | | |

*"Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison

The study received funding by members of the private corrections industry.

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 6 of 22 PageID #: 15892

MARLOWE_0008004

### 1. Introduction

Considerable controversy exists among state officials, outside experts, and the media whether contract prisons provide sufficient savings and perform adequately in other dimensions to justify their use. This research is designed to examine the evidence using state data as the primary source. The study uses economic models to determine each state's avoidable cost, which is then compared against the per diem charge of the private operator. In cases where the operator manages a state prison, avoidable cost includes just short run costs. Where overcrowding exists or when the state correctional institutions require modernization or replacement, long run costs are shown to be appropriate. The research considers all avoidable costs including indirect costs and often-ignored underfunded pension and retiree health care costs. These two items are addressed in detail. Interviews with state corrections officials and legislative oversight analysts were conducted. Detailed calculations were provided and savings were determined. Individual states were also analyzed to provide a more complete understanding of the role and issues associated with use of private prisons.

Statutory requirements in some states mandate savings of at least five to ten percent in order to contract out to private operators. In particular, there is ambiguity in the categories and the calculation of the state costs that should be considered for the savings required by the private operators.

Data published by government or provided by government executives were used, and the source for each item is provided in the Appendix to this report. We believe that this academic study on the costs of state prisons could help alleviate some of the ambiguity on this subject. The study concludes with some recommendations that are based on economic theory and empirical findings in industrial organization on methods to improve productivity and cost savings to the prison industry.

Section 2 discusses the concept of avoidable cost and how it varies according to the reason for using contract prisons. Then, we discuss in detail the avoidable direct, indirect, and miscellaneous costs items presented in Table 1. The discussion proceeds with detailing the long-term avoidable cost or the capital and financing for the state prisons. When evaluating whether private prisons are socially beneficial the analysis continues with non-monetary variables like the flexibility contributed by private prisons and the performance or outcomes of public and private prisons. We incorporated in qualitative terms some tax considerations, and the costs and service considerations of overcrowding. The report concludes with a summary and recommendations that stem from the report and could improve efficient provision of prison services.

### 2. Model for Estimating the State's Avoidable Costs

This study determines whether contracting out prisoners or prisons reduces state costs and is beneficial to the welfare of its citizens. Cost savings are usually required in order for the state to contract out inmates. When the non-monetary performance of the prisons is incorporated into the analysis, it becomes more comprehensive, reflecting overall net benefits to the state's citizens. The cost savings are all expressed in monetary terms. However, the performance will be captured in more general terms since quantifiable data are sometimes not available. This study relies on government sources for most data. We imputed data, again relying on government sources, when direct data were missing. The source Appendix provides information about where the data were obtained for each of the variables (entries) in Table 1.

The basis for a state decision to contract out the management of existing prisons or transfer inmates to private prisons should be based on budgetary savings while at least maintaining the same performance. Budgetary savings should reflect avoidable costs to the state. We distinguish in this study between a state owned and managed prison and a - ublic-- rivate-- artnership (- - - ) type prison of Build-Transfer-Operate (BTO) (e.g. Florida), where a private company leases either a state prison or a privately built and

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 7 of 22 PageID #: 15893

MARLOWE_0008005

operated prison, regulated and monitored by the state. Another option is that the private company buys and operates a formerly public prison under state supervision and regulation.

Economists assume efficient use of freed up resources even if the state chooses to under-employ such resources. For example, if inmates are transferred to a private prison and, as a result, a manager becomes idle, his salary is then an avoidable cost. We assume that the manager ceases in his/her obsolete position. It is reasonable to assume that the DOC is efficient in its use of resources. Also, in the calculation of avoidable costs, we distinguish between contracting out a prison and the transfer of inmates to private prisons. In the first case, a private company takes over the management of a prison for a few years and then the prison returns to the DOC. In such a case, the avoidable costs include all the direct costs plus the indirect costs to the DOC and other state agencies. Recovery of capital outlays and interest payments are not avoidable if the public sector bears the renovations and rebuild of the old prison or the construction of a new prison. The issue of indirect costs will be considered below.

Inmates are transferred to - - - prisons, sometimes to relieve overcrowding as a result of court rulings. An appellate court found that California in 2008 was operating at 188 percent of its designed capacity, jeopardizing the health and safety of the inmates. California has been ordered to reduce its capacity utilization to 137.5 percent by December 2013. California also lost control of the healthcare delivery in its prisons to a Federal Receiver after it was determined that the state was not delivering a Constitutional level of inmate medical care because of the severe overcrowding in its prisons. Excessive overcrowding exists elsewhere, as well. Ohio, for example, in 2012 had prisons operating at 128 percent of their capacity.

There is another infeasible alternative. The state could house inmates in overcrowded conditions, which spreads the fixed costs over a larger number of prisoners, lowering costs per inmate. However, overcrowding significantly reduces performance, including creating greater security problems, lowering correctional officer and inmate safety, and contributing to higher wages as the job becomes increasingly dangerous and difficult. Further, this is a non-viable alternative since the courts are likely to intervene.

Another possibility is that the state owns old and outdated facilities that require significant and often unavailable resources for renovations, and where prisoners are likely to sue the states for cruel or unusual punishment. For example, in Texas, a prison built in 1856 is still being used. States can fund the construction of new prisons or modernize existing prisons by issuing general obligation or revenue bonds. However, the state constitution usually limits the extent of borrowing general fund dollars for capital projects. For example, the State of Washington limits the debt service to nine percent of general state revenues for the previous three years (State of Washington, 2012). Further, our examination found that the State of Arizona has a constitutional cap on general fund bonds of $325,000. Other states require voter approval for issuing of bonds. These constraints gear states to create - - - s where the capital outlays of new or renovated prisons and other infrastructure are privately financed.

When the state does not have to bear necessary capital costs, the avoidable costs to the state include both short and long run costs. The short run costs are direct and indirect costs. The long run costs include capital costs, which involve modernization, significant repairs, depreciation, and financing costs. Depreciation incorporates the decline in the value of the facilities, while modernization and repair include renewed and improved conditions. For example, the Legislative Budget Board of Texas recognized that in the case of overcrowding, state avoidable costs must include the long run costs related to new construction when calculating the per diem charge (Gaes et al, 2004:87-88). Clearly, when the state saves resources by contracting out the operation of a facility, more can be spent on other priorities. Because of limited ability to issue bonds, when the facilities are financed by private contractors, the state could borrow more for other public infrastructure and save on interest payments.

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 8 of 22 PageID #: 15894

MARLOWE_0008006

When inmates are transferred to- - -  prisons due to overcrowding or governmental capital shortages, the avoidable costs also include the long run costs. In fact, the courts are likely to interven e and require the state to correct overcrowding or the housing of inmates in unsuitable conditions. Thus, these conditions are not feasible and sustainable in the long term. However, it is important to note that including the costs of both the adverse effects of overcrowding and, at the same time, the capital and finance costs to avoid the overcrowding involves double counting and is inappropriate.

Appropriate measurement of avoidable costs will include the following categories of annual spending for each state on minimum- and medium-security male prisons, which are most commonly the alternative to private prisons. We have analyzed the professional literature to construct a comprehensiv e list of all avoidable costs. We considered in particular the works of Nelson (2005) and Belenko (1999).

### 3. Direct Avoidable Costs for Public Prisons

- ersonnel Services (Table 1, rows 1a, and 1b) include wages, salaries, and benefits for all prison employees.  Benefits include health insurance, funded and unfunded pensions, and paid days off. When we analyzed the personnel services, we recognized that some of the pension and retiree healthcare costs of then current personnel are paid by other state departments or are not paid in full. The Vera Report (2012) provided data gathered from 40 states, which we used to supplement reported personnel costs. The underfunded pensions and healthcare costs of correctional personnel are short run costs that were not included in the financial reports of the DOCs, which were used to calculate the state costs versus private fees (Table 1, rows 15a, and 15b). These underfunded personnel costs amounted to $4.252 billion out of the total unaccounted costs of $5.4 billion or 78 percent. The other unaccounted costs are capital and some inmate medical expenses.

Also unaccounted for are indirect costs, which appear for individual states but were not aggregated by Vera. More important is the fact that the unaccounted costs, even without the avoidable indirect costs, which were not aggregated by Vera, are 12.7 percent of the total correctional budgets. The unaccounted costs are not considered by the states in their comparison of the avoidable state correctional costs and private fees. However, these costs are appropriately included at the time they occur, even though the actual outlays take place at a future date. Much of the critique on contracting out prisoners rests on inadequate savings by the state government. However, the inclusion of these unaccounted costs and the consideration of the more relevant long run costs make the comparison more accurate. Accordingly, Table 1 includes the underfunded pensions and retiree healthcare benefits as real costs of public prisons. Vera provided these data for all the states we analyzed except for Mississippi

The underfunded information for Mississippi is available in another source (- ew, 2010) however, not specifically for corrections employees. We maintained our conservative approach and excluded the underfunded amounts for Mississippi, since no concrete data are available.

The - ew study stressed the significant amounts of underfunded retiree pensions and healthcare for the states. In 2010, a $1.38 trillion gap existed; $757 billion for pension promises and $627 billion for retiree healthcare, an increase of nine percent from just 2009. In 2008, one-third of total obligations were unfunded. Noteworthy, of the states we analyzed Oklahoma and Kentucky had more than one-third of their liabilities unfunded, and Mississippi had more than 20 percent. On the other hand, Florida was one of only four states that were fully funded.

In terms of medical care, t he responsibility for services differs among the states. In general, offsite medical costs often include c eilings to safeguard the contractor from unanticipated medical expenditures. Onsite medical costs are normally the responsibility of the contractor, and the - - - facilities often have physicians, nurses and other medical personnel to provide care, which is included in the per diem. For example, in Mississippi, private contractors cover the first 72 hours of care for inmates

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 9 of 22 PageID #: 15895

MARLOWE_0008007

receiving treatment in outpatient facilities and, beyond that, medical care is the state's responsibility. In Oklahoma, the contractor is responsible for all medical costs per inmate under $100,000 with a $50,000 limit per episode. When we compare state costs and private fees they should both reflect the appropriate medical expenses. However, comparisons across states are more difficult because of different practices (Table 1, rows 2a, and 2b).

Maine provided full details on its public prison expenses for food, utilities, fuel, office supplies, technology, rent, clothing of inmates, and minor repairs. However, for the other states we were able to obtain just an aggregate of such expenses. Contracted professional services include teachers, psychologists, and others. Inclusion of Maine in this study provides a benchmark for public managed prisons, as well as an example of a state that currently lacks private competition.

### 4.    Indirect Avoidable Costs for Public Prisons

This category includes central administrative functions like adjudicating inmate grievances, parole hearings, inmate transfers, liability insurance, human resources (background check of potential employees, and hiring, training, administering employee records), legal (shared between the DOC and the Attorney General), and auditing of the private prisons, which are potentially avoided when prisoners are transferred to private institutions. These costs, which other state agencies incur, are often not accounted for when the DOC calculates its own avoidable costs. The avoidable indirect costs accrue to other state agencies or to higher levels within the administration of the DOC. Contracting out inmates allows savings in such costs or resources could be directed to other activities. Gaes et al., 2004, argue that based on existing economic literature, if the state refers a small number of prisoners to private prisons then there is no significant decline in these indirect avoidable costs (Gaes, 2004:95-96). They add (p. 98) that even when prison services are contracted out, some of the overhead costs continue to burden the public sector. For example, the state normally maintains control over classification, disciplinary, and other central office activities. Tennessee and Oklahoma calculated that when prisoners are transferred to contract prisons then approximately 75 percent of the indirect costs remain as state costs or 25 percent become avoidable costs (MGT of America, 2007; Tennessee General Assembly, 2010). In the discussion on savings below, we shall maintain our conservative approach and treat only 25 percent as avoidable indirect costs.

Moreover, indirect costs are difficult to measure and may not be fully accounted for by some states. The Bureau of - risons/General Accountability Office (BO- /GAO) figure for indirect costs of $8.09 could serve as a standard. In fact, the reported range for most states was $3.72 to $6.64. Texas' indirect costs of $1.30 seem far too low, and, to a lesser extent, this applies to Mississippi's $2.96.The states that reported most comprehensively approximated the 11 percent of the GAO. Thus, we incorporated for all states eleven percent as indirect costs. Vera provided some data on unaccounted indirect costs, which we also incorporated. Unfortunately, Vera did not report at all for ten states including Mississippi which may explain its reported low indirect costs.

### 5.    Miscellaneous Costs

These include contract development and procurement and contract compliance monitoring costs of the contractor-operated prisons by the relevant DOC. These should be considered as costs to the private prisons. Clearly, the monitoring of the private prisons should be reimbursed by the contractors or subtracted from the costs of the public prisons. In Ohio, the private contractors must reimburse the ODRC for two monitors and their expenses. In Kentucky for fiscal year 2009, the monitoring costs were $105,362 for 1,234 prisoners or $0.23 per inmate per day, a negligible amount that will not change the results even if added as an estimate for all the states. In Florida in 2009-10 the annual monitoring costs

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 10 of 22 PageID #: 15896

MARLOWE_0008008

for each - - - prison ranged from $54,000 to $72,000, or $0.08- $0.10 per inmate per day. In Florida and Ohio, the onsite monitoring costs are very small and are indeedncluded in the per diem prices.

**6.    Capital and Finance Costs**

These costs should be included for all states that house inmates in private prisons to handle overcrowding or to avoid rebuilding or substantial maintenance costs. There are, after all, in excess of 290,000 prison beds in public facilities that are older than 50 years (US BJS, 2005). The necessity to include the capital costs as avoidable costs for the public sectoris recognized by the State of California's legislative research agency, which stated: "Many CDCR prisons are more than 30 years old. While still operational, many of these prisons require much greater levels of maintenance and some will require significant renovations. Long-term maintenance and renovations costs should be taken into consideration when identifying prisons to close" (California Legislative Analyst's Office, 2012B: 16). These costs are not to be incorporated when a private company manages an existing public prison. The depreciation should be calculated for the period between major renovations. A prison, like a standard building, is assumed to be fully depreciated over a period of 50 years. In fact, a prison encounters both more wear and tear and requires more modernizatio, including incorporation of new technology, than a normal building. Even though prisons would be expected to require major renovations and upgrading periodically, we utilize the 50 years depreciation life as does the U.S. BO- . The exception is Arizona where its legislative research unit used 20 years (JLBC 2012). Since capital outlays are funded normally through the issuance of bonds, the annual interest payments should be incorporated in the calculation of public prison costs.  The reason for Arizona's 20-year amortization is because contract prisons are transferred after 20 years to state ownership.

GAO, 2012 (p.10) concluded that the capital costs, including modernization and repair projects and depreciation, for the fiscal years 2009 through 2011 ranged from $4.39 to $4.82 per inmate per day. These were the fees the states paid the Federal Bureau of - risons (BO- ) when state prisoners were housed in federal institutions. In our calculations of the costs for state prisons, we used the average of $4.61.

It is important to note that states issue bonds to finance prison construction  , and the cost of interest per inmate is a long run variable cost to be imputed to obtain the avoidable inmate cost per day. The correct measure should be the current construction cost of a new prisonwhich would reflect avoidable costs. Then, the interest on such capital costs must be used to calculate the interest per inmate per day. We chose the average interest rate for 2012 of 3.75 percent for a 20-year maturity bond. This is a conservative rate, which is especially low in 2012 (see http://www.munibondadvisor.com/market.htm). Our research shows that construction cost for a 1,500-bed medium security prison in 2012 is $225 million (see http://juneauempire.com/stories/030611/opi_795369352.shtml). Thus, the annualized interest cost per inmate per day over a 20-year life of the bond is $15.41.

Another calculation of interest costs comes from a 2007 study for the Oklahoma Legislature (MGT, 2007). The study estimated construction costs of $54,500,510 for a 660-bed maximum-security facility expansion. This yielded annual principle and interest costs of $15.37 per inmate per day for a 25-year bond. This figure is essentially identical to our calculated principle and interest cost.

However, even if we use the 2011 sale price of the then 11-year-old 1,798-bed Lake Erie Correctional Institution in Ohio of $72.77 million, the annualized interest per inmate per day would be $4.16. We used the Construction Cost Index for buildings, utilities, and grounds of the U.S. Army Corps of Engineers (2011). The cost of construction increased by 57.9 percent since the year 2000, so that the 2011 cost would be $115 million or the interest cost would be $6.57 per inmate per day.

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 11 of 22 PageID #: 15897

MARLOWE_0008009

A problem arises because in recent years public prison construction was rare in the examined states. Thus, we used interest payments, when available, as reported by the individual states. As discussed above, the measure of $6.57 drawn from Ohio could be used.

Vera reported prison interest costs that should be attributed to correctional facilities rather than be part of other state budgets. The appropriate measure would be the current per inmate interest cost for the construction of a facility. Unfortunately, the Vera data refer to interest payments for prisons that might have been built long ago and do not reflect current costs. Also, the capital costs should correspond to the same number of inmates as in the relevant size prison. Since we divide by the total number of inmates, our measure of interest payment is understated. In maintaining our conservative approach , we chose to use Vera's capital cost when the states do not report their own cost.

Florida built a new public prison in 2009. The annual interest per inmate per day was $7.05. However, in the case of Florida where private vendors operate the existing public prisons, only the short-term costs are relevant. The other states showed lower costs. Except for Florida, imputed costs of interest were lower for all other examined states than the $6.57 updated interest costs. Maintaining our conservative approach, we used Vera or the state data for all examined states except California for which interest data from Vera were missing. Including the $6.57 for California would increase the long run 2007-8 savings from contracting out from 32.20 to 35.79 percent. However, we chose to be even more conservative by not including for California any interest cost.

### 7.    Capital Flexibility Gained by Use of Contractor Operated Prisons

Use of private prisons increases the flexibility of government correctionsin a variety of ways. Demand for prison cells changes over time. When demand is high, public prisons lack cells, and overcrowding results. The courts usually require timely alleviation in such cases as California in 2013. In the absence of contract prisons, the states need to build expensive new facilities while their borrowing capacity is low. On the other hand, the number of inmates is expected to diminish for such reasons as the declining cohort of young males, reduction in the use of "three strikes" sentencing, easing of drug laws as already occurred in the states of Washington and Colorado, and a possible reduction in recidivism. - risons could then become under-occupied or even vacant, and it is difficult and expensive to transform them for other uses. Further, much of the expensive surveillance features will have to be abandoned. For example, the Central Unit state prison in Sugar Land, Texas lies vacant. Florida. Texas, New York, and Michigan have seen a decline in the number of prisoners and have already closed prisons. The only three states that have experienced a significant increase in prisoners are Kentucky, Oklahoma, and Tennessee. In fact, 35 adult U.S. correctional facilities have closed between 2011 and 2013 (Stumpf, 2013). Thus, contract prisons play the role of an equilibrating mechanism for equating supply and demand for cells. This flexibility translates into large savings for state governments.

These significant savings for state governments are not accounted for in our calculations of inmate per diem costs, even though they should be considered state avoidable costs. This is again an indication of our conservative approach where avoidable costs are downward biased when savings exist but cannot be comfortably estimated.

- rivate prison construction yields savings in both time and costs compared to state governments contracting out the construction. Cumbersome procedures in obtaining bids and selecting the winning contractor, possible rules for the use of unionized labor, and the inability to take advantage of buying power make the cost higher and often hinder timely completion. A private contractor built a 3,000-bed medium security prison for California in Arizona and began housing its first inmate just 15 months after beginning construction. Because of the regulatory requirements in California, that process would have taken much longer. These issues are discussed more fully in the individual state sections.

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 12 of 22 PageID #: 15898

MARLOWE_0008010

We do face here the typical peak load problem similar to the case of electricity. When a state faces excess demand for prison cells, then the private prison industry relieves the pressure by saving the public sector the full construction costs. In the electricity industry, excess demand in one region is usually satisfied by purchasing electricity from other utilities which experience excess capacity. The price reflects long run costs. The same principle should apply to the prison industry.

### 8.    Non-Cost Performance Measures

Our discussion so far has concentrated on the comparison of public costs and the fees paid for private prisons. Obviously, dimensions of quality should also be considered. An important indication of quality of operation and management of prisons is accreditation by the American Correctional Association (ACA).

There are some suggestions that the private facilities are performing at least equal to public correctional facilities. Generally, - - - prisons must obtain and maintain accreditation by the ACA. In 2002, there were a total of 5,000 detention facilities in the United States, of which 532 were accredited. Of the 532, 465 were public and 67 were private. At most, 10 percent of government facilities were accredited, while 45 percent of private institutions were accredited (Segal, 2002: 12).

Contracts also ensure quality performance, since monetary penalties are assessed for unsatisfactory performance. The contracts sometime require equal performance, as in the case of Ohio.  Renewal of contracts is, of course, aided by good performance. In Florida, the Chamber of Commerce in 2012 provided data showing greater provision of education, training and vocational services in private facilities (see section on Florida below).

The existence of competition by private prisons constrains price increases of labor and improves efficiency in the use of labor. The existence of the private option has changed staffing patterns in Oklahoma public prisons, which has led to consolidation of some case manager roles and improved food services.

In Ohio, private correctional officers are trained with public officers at the same academy. The staff meetings include both private and public wardens. This indicates identical training of officers, and collaboration between the public and private institutions that could suggest similar levels of performance. This is, indeed, a practice that is highly likely to improve mutual learning and performance by both sectors.

In Kentucky, the Legislative Research  Commission stated in a 2009 report (p. 19) that: "All three contracted prisons offer more programming than the comparable state prisons. In particular, the state-operated Little Sandy Correctional Complex and the contracted Lee Adjustment Center have little programming in common except for work, GED, Narcotics Anonymous/Alcoholics Anonymous, and prerelease programs. The Lee Adjustment Center provides a number of vocational training opportunities not offered at Little Sandy."

### 9.  Unaccounted Benefits and Costs of Contract Prisons

- rivate prisons provide additional benefits to state governments besides providing savings from their operation. - rivate prisons pay income and property taxes while state facilities do not. In Arizona, for example, the economic consulting firm of Elliot - ollack and Company (2010: 1) determined that one private contractor paid over $26 million in taxes to the state and local governments in 2009. Such state or local revenues could be used to reduce taxes or to finance other government functions. These taxes could increase the state income and employment by the familiar multiplier effect. We did not quantify such benefits, but their existence should be recognized.

---

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 13 of 22 PageID #: 15899

MARLOWE_0008011

Overcrowding diminishes both the short and long run inmate per day monetary costs. When prisons are operated over capacity, additional inmates added to the facility are significantly less expensive to house than in a facility that is operating at or below capacity. This is because in an overcrowded prison the fixed costs associated with the operation have already been accounted for. Therefore, the marginal cost of housing each additional inmate does not include any "overhead" costs. As prisons become more overcrowded, the lower marginal cost of each additional inmate drives down the facility per inmate average cost. Because state run prisons are much more likely to operate under overcrowded conditions (for example, California), the average "per inmate cost" is understated compared to private facilities operated at or even below capacity. While this is a significant factor in comparing costs, we have not accounted for this difference in our analysis.

In spite of achieved cost savings from overcrowding, the quality of service and the level of security are substantially reduced. In the case of California, the courts have concluded that security problems and deficient medical care resulting from overcrowding led to unwarranted deaths and suffering of the inmate population. Often, the remedies mandated by the courts far outstrip the perceived savings achieved from operating overcrowding prisons. See the discussion of judicial decision in the case of California below. Further, cost comparisons would tend to be biased against private facilities if their utilization rates were lower than public facilities.

Evaluation of private versus public prisons requires consideration of legal issues. In private correctional facilities, disciplinary actions require involvement of the state monitors, while in similar public facilities the warden has greater autonomy. Further, private correctional officers lack sovereign immunity, which means they are more vulnerable to litigation. The lack of sovereign immunity could be argued to reduce the willingness of officers to pursue escapees beyond the private facility (Sanders, 2012). In practice, however, both private and public correctional facilities normally request law enforcement involvement during incidents. Further encouraging good performance of private contractors is the fact that the contract usually requires indemnifying the state for any malfeasance. On the other hand, the U.S. Supreme Court held that private correctional officers are less vulnerable for violating the Eighth Amendment to the U.S. Constitution against cruel and unusual punishment. In the case of private prisons, inmates charging violations must first exhaust any state remedies before claiming constitutional protections (see Minneci v. - ollard 132 S. Ct. 187 (2011)).

### 10. Discussion of Individual State Costs and Performance

Thirty of the 50 states used private prisons in 2010, while the extent of usage varies from New Mexico's 43.6 percent of inmates confined in contract prisons to South Dakota at 0.1 percent. Overall, 6.8 percent of all state inmates were in contractor-operated prisons. The states that generally have a large number of private inmates were all in the south. The leading states in their overall number of private prisoners were Texas and Florida. After those two states, those with the highest number of privately held prisoners in descending order were Oklahoma, Arizona, Mississippi, Georgia, and Tennessee. These seven states accounted for 49 percent of all state held prisoners in private facilities data (U.S. Bureau of Justice Statistics, 2011; Gilroy, 2011).

In this study, we analyzed in detail six of the seven states, as well as California, which experienced a recent significant increase, and Ohio, which sold a large prison to a private contractor. A lack of available data prevented us from including Georgia. We incorporated Maine, which did not contract out for corrections services. However, it had good data for comparison of its state-operated prisons. The GAO/BO- report on the costs of federal prisons was included in order to supplement for missing data. Maine and the federal report also provided necessary benchmarks and standards to appraise the state data.

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 14 of 22 PageID #: 15900

MARLOWE_0008012

**Arizona**

Arizona has employed contract prisons since 1986. State law requires that private providers deliver the same level of service at lower cost to the state or a superior level of service at essentially the same cost. Contracts with the Arizona DOC (ADOC) also require that the state take ownership of the prison financed by the private sector after the contract term expires, typically after 20 years, and at no cost to the state (see http://www.azleg.gov/FormatDocument.asp?inDoc=/ars/41/01609-01.htm&Title=41&DocType=ARS).

Until the 2010 cost report, - - - prisons in Arizona were shown to achieve cost savings. The reasons why the 2010 report reached a surprising and, we believe, incorrect conclusion includes inadequately addressing depreciation and correctional officer retirement issues.

The Arizona DOC used depreciation based on the original cost. This approach underestimates the real cost of public prisons, which should be based on what it would cost in 2010 to finance and build a public prison. The Joint Legislative Budget Committee Staff, JLBC (2012) did such an analysis and employed a 20-year life. This yielded a state per diem per inmate cost of $10.71 instead of the $1.41 the ADOC reported. The $10.71 also includes the interest payments for capital costs paid by the ADOC. However, the budget should still have included the $0.04 interest that other state agencies incurred but Vera determined were attributable to corrections. The JLBC also found that the state retirement system was underfunding its pension contributions by overestimating expected investment returns. This correction added $2.67 per day per inmate to state costs.

Finally, medical costs were properly handled. The state provides all the required medical care at selected ADOC prisons, while private contractors have limits on the care they are required to provide as part of their contracts based on ADOC requested RF- stipulations. Accordingly, the JLBC staff simply mimicked what the DOC did and reduced state costs for medical services by $10.08 and private contractors' by $7.64.

ADOC did not report any short run indirect costs. Instead of incorporating from the Vera Report the unaccounted $0.16 hierarchical costs, we included the 11 percent indirect costs calculated in the BO- /GAO report. The range for such costs in our analyzed states is $1.30 to $8.09 with concentration in the $5 - $6 range. Taking into account that 75 percent of the indirect costs are non-avoidable, the long run savings would be 22.34 percent for the minimum-security prison and 14.25 percent for the medium-security prison. In the case of Arizona, which faces overcrowding conditions, the long run savings are relevant.

**California**

California contracts with private providers to assist in housing its inmate population both in state through contracts with community correction facilities, as well as out-of-state to house approximately 9,000 medium-security inmates in prisons in Arizona, Oklahoma and Mississippi. The utilization of - - - prisons by California is done primarily to reduce severe overcrowding in state prisons but has the added benefit of providing significant operational savings to the state as well. We calculate that privatizing a portion of its inmate management has saved California approximately $164 million a year. This is in addition to the billions of dollars that the state has saved by not financing construction costs to add additional prison capacity. As discussed below, the state has been able to utilize the flexibility that - - - prisons provide to institute other policy measures to reduce overcrowding in its state prisons to help meet court mandates.

California experienced a substantial increase in its prison population during the 1990s and 2000s going from 76,000 in the late 1980s to 171,000 in 2008-9. This increase was so great that by 2008, the system

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 15 of 22 PageID #: 15901

MARLOWE_0008013

was operating at 188 percent of its designed capacity. The designed capacity is considered to be one inmate per cell and no inmates housed in gyms or day rooms.

The overcrowding in California prisons led to problems in delivering adequate healthcare. In April 2001, -lata v Brown plaintiffs claimed in a class action suit that California provided such inadequate medical care that it violated the cruel and unusual punishment amendment to the U.S. Constitution (California Legislative Analyst's Office (LAO), 2012A). The court held that the system was "broken beyond repair" and that death and suffering had resulted. California in 2002 agreed to improve the healthcare situation. However, in 2006 the court held that insufficient progress had been made, determining that overcrowding led to security restrictions on inmate movements that prevented inmates from receiving appropriate and timely care. Also in 2006, the courts placed a federal receiver in control of inmate medical care, taking the state out of the management of the prison's healthcare system. That receiver remains in place today.

In August 2009, a three-judge panel upheld the ruling and ordered that overcrowding be reduced to at most 137.5 percent of designed capacity within two years in order to provide adequate healthcare decision that was affirmed by the U.S. Supreme Court in May 2011. The Supreme Court ordered that California reduce its prison population to the 137.5 percent figure by June 2013. This meant that the state had to reduce its inmate population by about 39,000 to comply with the ruling.

California responded by instituting a policy commonly referred to as "realignment," which essentially shifted the responsibility of housing inmates convicted of certain non-violent crimes from the state prison system to county jails. Realignment, coupled with the continued utilization of - - - prisons, has enabled the state to reduce its inmate population by approximately 37,000. However, despite these reductions, the state is still operating its prison system at 150 percent of capacity.

In 2010, the state housed 8,021 male inmates in five co ntracted facilities out-of-state (California LAO, 2010). The California State Auditor (2010) determined that the California Department of Corrections and Rehabilitation (CDCR) spent an average of between $3,200 and $7,800 less per inmate to house 2,226 inmates out-of-state than it would have spent in California prisons during 2007-8. These savings refer just to the short run operating costs, while the correct savings in the case of overcrowding, as discussed earlier, should relate to the long run and would be even higher. In any event, the Auditor noted the usual difficulty of determining comparable inmates.

The issue of monitoring costs for out-of-state facilities is important. For example, the CALAO reported that the out-of-state program required 73 monitoring positions for 5 contract prisons. Given that other states have one or at most three monitors per prison, the figure of 73 is unusually high.

The CALAO reported that in 2011 California paid between $61 and $72 per day per inmate in out-of-state facilities. The relevant average cost for its in state public prisons was $104, or about double the price paid to the - - - prisons.

While the state has been able to enjoy substantial savings by contracting with private providers, they have begun to look at replacing older and expensive facilities through new construction. Last legislative session, California authorized its - ublic Works Board to sell $810 million of revenue bonds to build 2,400 dorm beds at existing state prisons at a cost of $337,500 per bed. Those beds will replace beds at the California Rehabilitation Center in Norco, California, which was originally built in 1928 as a hotel. Assuming a 20-year amortization, as was the case in the Arizona example above, with an annual interest rate of 3.75 percent, the average annual interest rate for a municipal bond, principle and interest costs to the state equates to $66.70 per inmate per day without any costs for operating the prison. The cost to house an inmate out of state in a - - - facility averages $64.82.

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 16 of 22 PageID #: 15902

MARLOWE_0008014

Overcrowding was costly to California. Medical care doubled between 2007-8 and 2011-12 reaching $43.95 per inmate per day. This compares to Maine's $16.67, which was the next highest medical per inmate cost of the states we reviewed. All other examined states ranged between $6 and $11. The court order increased California's medical costs over that period by $1.08 billion annually. The other high-cost item for California is personnel services, which are primarily security related. California's per diem for personnel services is $67.01, which was second to Maine's $79.25. Texas was third with $40.92. Florida's was $38.83, while personnel services for all other states examined ranged between $20 and $30. (Oklahoma showed high costs just for its maximum-security prison, which was not a major part of our analysis.) Noteworthy, both California and Maine, which exhibit high medical and personnel services costs, are the only states in our sample that lack competing contract prisons within their borders.

**Florida**

Some states require private prisons to achieve specified savings to obtain and maintain their contracts while still satisfying performance standards. For example, under Florida law a contractor must promise and then achieve savings of at least seven percent over comparable public prisons. The Office of - rogram - olicy Analysis and Government Accountability (O- - AGA) of the Florida Legislature conducted an analysis of four privately operated prison contracts and reported on April 20, 2010 that all four contracts achieved the required savings and recommended their consideration for renewal (O- - AGA, 2010A).

The privately operated Bay Correctional Facility had a per diem cost of $52.73 compared to the comparable public prisons of $56.98 for savings of 7.5 percent during the two-year study period. The privately operated Moore Haven Correctional Facility had two-year savings of 12.5 percent, while the contract Graceville Correctional Facility had savings of 22.1 percent for the one year when a comparison could be made. Finally, the contract Gadsden Correctional Facility had two-year savings of 28.3 percent.

O- - AGA concluded that the contractors' performance in dimensions other than costs was acceptable. - erformance criteria included such security requirements as key control, perimeter cameras, and filling vacant positions in a timely manner. Health services in particular were found to be well delivered. It is also noteworthy to point out that contractor operated prisons provided more substance abuse and education programs, according to O- - AGA, than the comparable public prisons, so much so that costs had to be added to the public prisons for appropriate comparison.

O- - AGA also noted that a major reason for the cost advantage of private prisons is the higher retirement expenses for public prison employees than those provided by private contractors. - ublic correction officers have an amount equal to about 21 percent of their salaries contributed to a retirement fund, whereas private correctional officers receive matching contributions to their 401K funds of up to five percent of their salaries. Other reasons for the cost advantage of private prisons include higher costs for providing educational and substance abuse programs at public facilities and a higher allocation of administrative costs.

Florida's evaluation of private prisons has yielded some important evidence about performance. Specifically, O- - AGA's Information Brief Comparing Cost of - ublic and - rivate - risons of March 1997 noted that per diem public prisons costs rose less than 1.5 percent annually between FYs 1992-93 and 1995-96. O- - AGA noted that competition induced by the privatization of some prisons might have produced greater efficiency in the public prison system (p. 6). In a study of private prisons in Florida including a comparison of other state systems prepared for the Florida Department of Management Services (MGT of America, 006: 33), the three lowest per diem inmate costs included Texas, Georgia and Florida – all states with competing private prisons. The authors suggested that use of contract prisons lowered costs of state-operated prisons, as well. This finding is consistent with a later Vanderbilt University study conducted on all 50 states, which concluded that states with private prisons

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 17 of 22 PageID #: 15903

MARLOWE_0008015

experienced 2.64-3.15 percent lower growth in public prison costs. These savings had a two-year lag. The study concluded that learning or possibly competition cause the public savings (Blumstein et al, 2007).

The Correctional - rivatization Commission of Florida responded to O- - AGA's brief by claiming that the private prisons must satisfy higher performance standards than state facilities. The Commission stated that private prisons must indemnify the state against any liability, are subject to greater monitoring, must achieve and maintain accreditation by the American Correctional Association, and must provide a broad range of education and technical programs. The Commission noted that the two private prisons had achieved earlier accreditation than required by their contract and their scores were the highest ever achieved by any Florida prison (pp. 9 and 10 of brief).

The Florida Chamber of Commerce reported in 2012 that the number of inmates per staff to provide rehabilitation services was 1 per 38 in private prisons and 1 per 272 in public prisons in DOC Region IV. In fact, 79.3 percent of inmates in the private correctional facilities participated  in such educational, vocational, and life skill training compared to 21.3 percent in public facilities (Florida Chamber of Commerce, 2012).  At a minimum, these data show that private facilities can and do provide training to reduce the likelihood of recidivism.

In a 2012 presentation by the Florida Department of Management Services   (FLDMS) before the Florida House Appropriations committee, the per diem costs of six contract prisons were compared with the most similar public prisons in Florida. Short run savings over the 2009 to 2013 ranged between 10 and 27 percent (Florida Department of Management Services, 2012: 9). Indicative of Florida's approval of the contract prisons, the presentation stated that in 1993 there was one contract prison of 800 beds, in 2004 there were five with 4,304 beds, and in 2012 there were seven with 10,128 beds(page 3).

An earlier study conducted for the Florida Department of Management Services (MGT, 2006: 26) compared the costs for the public South Bay and Lake City Correctional Facilities against imputed costs for similar public facilities. The study showed that in the period from 2004 to 2006, the percentage savings were 19.4 and 11.2, respectively.

As for the long run, some states like Florida (and Texas) employ a BTO system for private prisons whereby the private firm bids to build a private prison; the state finances it, and pays the private firm for managing the construction process. The private firm then transfers ownership to the state and is given a lease to operate the facility for some years, usually renewable upon satisfactory performance. For Florida, the firm must save seven percent both in operating or short-term costs and also in construction costs compared to a state-operated and built facility.

A 2010 study by Florida's O- - AGA has shown such additional construction benefits besides operating costs. The comparison was between a state prison for 3,288 inmates, Suwannee Correctional Institution (whose main unit was designed for 1,521 inmates) and a private prison, Blackwater River Correctional Facility, designed for 2,000 inmates. Both facilities were designed and built for close custody inmates and those with mental health problems. The state facility could accommodate more severely ill inmates.

Comparing the main unit of Suwannee and the comparable Blackwater River facility, O- - AGA determined that the per bed costs for the private and public facilities were, respectively, $57,682 and $64,277 so that the private facility was shown to have achieved about ten percent savings, in excess of the required seven percent. It is noteworthy that the facilities had about equal costs if the   total facilities were compared. However, O- - AGA concluded that this would not be a fair comparison because the public facility (i.e. Suwannee), among other reasons, included a work camp whose construction was far less costly than a regular prison.

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 18 of 22 PageID #: 15904

MARLOWE_0008016

Additional site development is a major reason for public facilities having higher costs. Site infrastructure cost $12,070 per bed for the public facility compared to $4,512 for the private prison. Blackwater took advantage of Santa Rosa County's interest in encouraging companies to locate there. The county charged no impact fee other than the $3.6 million land cost. Meanwhile Suwannee required infrastructure to bring water, gas, and sewer to the prison, which was seven miles from the City of Live Oak. The public prison had to reimburse the city $3 million for an impact fee to upgrade water facilities and replace the county sewer plant.

The contract prison was also built quicker than the public prison. The public prison was authorized by the legislature in 2006 but was not completed until October 2009, whereas the private prison was authorized in 2008 and completed in July 2010. In general, O- - AGA reported that private prisons are built in 18 to 24 months compared to 36 months for public prisons. The private firms are not burdened by the cumbersome public sector requirements involved in selection of contractors, subcontractors, and the process of selecting site appraisers. There are also important differences in the construction itself of the prison. Blackwater, the private prison, installed air conditioning which obviously contributes to more comfortable living and working conditions and may alleviate inmate tensions in hot weather. The Suwanee public prison installed a less costly dehumidification system. In addition, the public prison employs a centrally located guard tower to watch over inmates, whereas the private prison employs cameras, reflecting the private prison's greater reliance on technology. Finally, the private prison does not have a central dining room but provides food in the living quarters of the inmates. The private prison thereby reduces cost of construction, enhances inmate control, and may reduce staffing requirements (O- - AGA, 2010B).

### Kentucky

Overcrowding in state prisons during the 1970s and 1980s led Kentucky to use private prisons. The first contract for use of private prisons occurred in 1986. The state also used county jails to house inmates. The number of inmates in private facilities increased from an average of 15,164 in fiscal year 2000 to 22,553 in fiscal year 2009 (KLRC, 2009). As we found in our analysis, the long run savings realized by Kentucky through - - - prisons has been significant, ranging from 12.46 and 23.50 percent.

In fiscal year 2009, 54 percent of inmates were in state prisons, 34 percent were confined in local and regional jails, 5.5 percent were in three contract prisons, and the remaining 6 percent were in halfway houses or home custody. A rough indication of relative cost is the fact that state prisons held 54 percent of the inmates and accounted for 64 percent of the DOC's cost while contract prisons with 5.5 percent of inmates cost the state 5.3 percent.

Kentucky statutes and/or contract terms require the private prisons to achieve accreditation by the American Correctional Association. The contracted prisons must achieve savings of at least ten percent compared to comparable state institutions and must provide similar education, training, and substance abuse programs as state facilities. The contracts have required that Kentucky guarantee and pay for minimum numbers of inmates. For example, at the Otter Creek Correctional Center, the fiscal year 2009 contract required that the state pay for a minimum of 90 percent of the contracted beds or 429 beds of the 476 contracted beds. This means that the extra cost is zero for housing an inmate in a contracted prison when the state occupancy is below the guaranteed rate. Moreover, in the contracted Lee Adjustment Center, inmates from Vermont were housed to fill beds not contracted to Kentucky.

In 2013, the Kentucky Department of Corrections provided overall prison per diem costs for contract and state prisons. The public prison cost for FY2012 was $60.14 compared with $46.80 for contract prisons. In any event, the savings from contract prisons were about $13 per inmate per day or 22 percent. This is not a comparison of comparable facilities.

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 19 of 22 PageID #: 15905

MARLOWE_0008017

In an earlier study, the Legislative Research Commission (KLRC) noted that comparing public and contracted prisons was difficult both because of differences in inmate characteristics and differences in the facilities themselves. In any event, the KLRC found for fiscal year 2009 that the average cost per inmate in the privately operated Marion Adjustment Center was $40.02 and the relevant state cost was $56.75. For privately operated Otter Creek, the cost to Kentucky was $53.60 compared to $77.96 for the most comparable state facility. rivately operated Lee Adjustment Center's cost was $58.04 compared to the relevant state cost of $47.53. However, it should be noted that only 50 beds were contracted at the Lee compared to 826 at Marion and 476 at Otter Creek, the other two - - - prisons. The annual savings for Marion was $5,043,928, $4,232,302 for Otter, and losses of $189,983 for Lee. For all three prisons combined, the short-term annual savings for the state were $9,086,251. Further, since Kentucky contracted out for overcrowding reasons, the long-term costs for public prisons should be considered and, thus, the savings for the state were even higher.

If only the per diem rate were compared to the state costs, the private contract ors appear more cost effective. This is because the state pays for some prescription drugs and hospital expenses for inmates of - - - prisons, as well as the costs for monitoring contract compliance. Accordingly, the per diems for Marion were $34.54 and $43.62 for minimum and medium security, respectively. The blended rate at Lee was $43.62 and at Otter Creek it was $51.17. In terms of performance, as discussed in section 7, contracted prisons offer more programming than do state prisons (KLRC, 2009: 19). In terms of safety, there is no clear difference (KLRC, 2009: 67-68). More grievances were filed in contracted prisons However, as the KLRC (p. 70) notes, this could be because inmates feel secure enough to complain. They do not fear retaliation or they are confident that their complaints will be addressed.

**Maine**
Maine, which does not utilize private prisons, has only 2,038 inmates. The state, however, maintains detailed data for almost all categories of pubic costs. Interestingly, the short run prison costs are $117.36 per inmate and the long run prison costs per inmate are $127.95, including an imputed depreciation figure of $4.61 from the GAO/BO- . Maine's costs for both short and long run are double most of the other states examined. The reasons could be lack of economies of scale and high costs emanating from lack of competition provided by private prisons. Maine has four adult prisons, housing an average daily census in 2011 of 141, 147, 658, and 1,008 (Maine, Office of - rogram Evaluation and Government Accountability, 2011: 2). Thus, only one prison is efficient in size, while the others suffer from diseconomies of scale with higher cost for similar services of at least 15 percent. The short run cost per inmate per day in the other examined states is approximately $50. Adding the 15 percent cost penalty yields $57.50, while the additional cost attributed to lack of competitive pressure provided by the private prisons imposes on Maine up to $60 per day.

Maine's neighboring state, Vermont contracts out prisoners to prisons in Arizona, Kentucky, and Massachusetts for $65.75 compared to $137.00 for housing inmates in its own state prisons. Vermont's in-state costs are similar to those of Maine (- icard, 2011). Although Maine does not contract out inmates, it seems important to show what Maine could save if it contracted out at its neighbor Vermont's prices. In 2011, Maine was almost at capacity. Thus, if Maine chose to contract out existing inmates then the avoidable costs would be merely short run. The savings would be $69.93 per inmate per day or 51.54 percent. However, given the fact that Maine is already operating near capacity (capacity is considered in the range of 95-98 percent), savings resulting from contracting out of additional inmates would be $69.12 per inmate per day or 49.38 percent. These would be long run savings because additional inmates would require public capital expansion.

**Mississippi**
Mississippi's contracting with private firms to provide inmate correctional services began in 1994. Legislation allowed county boards to build and contract with the sheriff's department or for a private

Case 3:16-cv-02267     Document 363-32     Filed 11/20/20     Page 20 of 22 PageID #: 15906

MARLOWE_0008018

firm to operate and manage the facility. The first such facility was built in 1996 and was a combined jail and regional facility. An interview with a Mississippi DOC official revealed that in 2012 the DOC paid $29.54 per day to house 300 inmates in the original facility. Under this arrangement, Mississippi state government pays the debt services and, at the end of 20 years, the facility becomes state property. - rivate firms also built and operated their own prisons.

In 2012, five correctional facilities were managed and operated by private firms. They were built by counties and then leased to private firms. Four were 1,000-bed facilities, and one had 1,500 beds. A typical per diem rate was $29.74 plus medical, since the state paid all hospital expenses beyond the first 72 hours. The first 72 hours were the responsibility of the contractors.

Mississippi is a statutory savings state which means that it must obtain the required ten percent savings over public prisons in order to have private firm operation. This constraint led to the 2011 voluntary termination of CCA's contract to operate the Delta Correctional Facility because CCA considered the required $31.16 per diem (ten percent less than the state's $34.61 cost) to be unacceptable (Reason, 2011). Mississippi was experiencing a decline in prison population so the closure of the Delta facility could be easily accommodated by moving inmates to other facilities.

The contract prisons have to meet other non-price requirements as well. They must attain American Correctional Association accreditation within 14 months of beginning operation. Further, each of the five contract facilities has a monitor who is a state employee but is paid as part of the contract per diem.

### Ohio

Ohio began the process of private participation in correctional institutions in March 1998 when the state legislature passed a law mandating that the Ohio Department of Rehabilitation and Corrections (ODRC) engage private firms to operate and manage the North Coast Correctional Treatment Facility (NCCTF), a 552-inmate, minimum-security substance abuse treatment facility for adult males, and the Lake Erie Correctional Institution (LECI), a 1,380-inmate, minimum/medium-security facility (material supplied by ODRC).

The initial contractor for the NCCTF, Civigenics, held the contract from September 1999 until replaced by MTC in fiscal year 2002. MTC agreed to a per diem of $62.87 for fiscal years 2002 and 2003, and Ohio reported savings compared to state operation of 5.02 and 5.92 percent, respectively, for the two years. Savings for subsequent years were about 17 percent, attributed to cost containment efforts by MTC. State operations would have cost $79.77 per inmate per day, according to Ohio officials .

More recent contracts provided additional savings for inmate populations in excess of 552 up the maximum of 612 inmates. The 2006 fiscal year rate, for example, was $42 instead of the $65.08 rate for the first 452 inmates. This is likely a result of economies of scale that extend to inmate populations of at least 1,000 in minimum/medium security prisons discussed elsewhere in this report. Moreover, subsequent contracts after 2006 held annual increases below the Consumer - rice Index (C- I), and the ODRC reported savings to be about 16 percent.

The contracts required MTC to maintain staffing at or above a certain level and provide a full range of education, health, rehabilitation, and training programs. The facility also had a Community Advisory Board and community volunteers, which help inmates and assured community member integration. The facility scored 100 percent on ACA accreditation standards.

It is important to note how Ohio determined some of its state cost data  , which are compared with private prices. The ODRC uses a sophisticated model that includes program specific costs (ODRC, 2007). State costs are estimated based upon local conditions, and the experience of similar ODRC facilities adjusted for inflation. ODRC indirect costs are based on recent departmental reports.

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 21 of 22 PageID #: 15907

MARLOWE_0008019

LECI opened in April 2000 with MTC as the contractor. The ODRC determined that the per diem rate of $39.94 for fiscal year 2002 yielded savings of 12.55 percent compared to state operation. Additional cost savings for fiscal year 2003 were achieved by cutting 1.2 full-time equivalent staff and reducing the annual increase of prices to 0.5 percent instead of the C- I increase. Cost savings for fiscal years 2003 and 2004 were determined by the ODRC to be 12.94 and 16.69 percent, respectively. Contracts for subsequent years included lower rates for inmates between 1,380 and 1,480. Contracts for subsequent years also held per diem rate increases below the increase in the C- I, and savings were determined by the ODRC to be about six percent. Similar to NCCTF, an advisory board, community volunteers, and a 100 percent score on ACA accreditation were achieved.

In September 2011 the ODRC announced the sale of LECI to CCA for $72.7 million. The firm would also operate the facility and expand the capacity by 304 inmates. Annual savings of eight percent in operating costs were expected.

Turning to the findings, Ohio's short run savings from contracting out prisoners were 13.44 percent for 2010 and 4.14 percent for 2012. The respective savings for the long run were 26.81 percent and 20.28 percent. The statutory requirement in Ohio is five percent, and our calculations are in line with the ODRC. The ODRC provided us with its calculated savings, which ranged between six and 23.7 percent for the fiscal years 2002 through 2008 for one facility. For the other privately operated facility, the savings ranged between 8.5 and 18.1 percent for the fiscal years 2000 through 2008. All these savings related just to the short run. In any event, the appropriate comparison should be done on a long run basis, since Ohio avoids construction of new prisons and enjoys flexibility for changing inmate population.

As for indirect costs, the only item available was Vera's administrative cost, which we termed hierarchical costs of $1.4 million or $0.08 per inmate per day for fiscal year 2010. It is likely that other indirect costs are missing, and the same discussion that we had for Arizona applies. We chose to be conservative in our calculations and ignored these costs, since Ohio's savings from contracting out were above the statutory requirements.

The difference between the public long-term costs and the price paid for private prisons in 2012 was $16 per inmate per day. This difference is attributed to capital and interest costs of $9.63 per inmate per day and unaccounted pension and healthcare of $2.64 per inmate per day, totaling $12.27 per inmate per day. Thus, only $3.73 per inmate per day could be attributed to all other elements of cost including labor. In other words, lower pay to correctional office rs by the contractor-operated prisons is a small component for the savings. Indeed, our interviews with ODRC personnel revealed that public correctional officers earn only $1 more per hour than their private counterparts. Differences in labor productivity and purchasing power savings of private prisons are additional elements that comprise the 23 percent. Thus, differences in wage costs could not exceed 23 percent of total savings for contracting out.

### Oklahoma
Oklahoma began contracting out inmates to private contractors operating in 1998 as a result of overcrowding in the state's public prisons. The Oklahoma Department of Corrections (OKDOC) considers overcrowding to occur when capacity utilization reaches or exceeds 95 percent. Oklahoma statute 54, section 570, "the Oklahoma - rison Overcrowding Emergency - owers Act" provides the authority for such contracting out to private contractors.

OKDOC in 1995 initially used county jails to house inmates, but capacity at county jails was soon exhausted. The OKDOC then contracted with private providers to house inmates in Texas. In December 1995, OKDOC contracted for 510 male beds and 50 female beds with Texas. As of April 15, 1997, contracts for 2,285 male inmates and 423 female inmates were in effect at eight Texas facilities

Case 3:16-cv-02267    Document 363-32    Filed 11/20/20    Page 22 of 22 PageID #: 15908

MARLOWE_0008020