Management Services (MGT of America, 2006: 33), the three lowest per-diem inmate costs included Texas, Georgia, and Florida—all states with competing private prisons. The authors suggested that use of contract prisons lowered costs of state-operated prisons, as well. This finding is consistent with a later Vanderbilt University study conducted on all fifty states, which concluded that states with private prisons experienced 2.64 to 3.15 percent lower growth in public prison costs. These savings had a two-year lag. The study concluded that learning or possibly competition cause the public savings (Blumstein et al., 2007).

The Correctional Privatization Commission of Florida responded to OPPAGA's brief by claiming that the private prisons must satisfy higher performance standards than state facilities. The Commission stated that private prisons must indemnify the state against any liability, are subject to greater monitoring, must achieve and maintain accreditation by the American Correctional Association, and must provide a broad range of education and technical programs. The Commission noted that the two private prisons had achieved earlier accreditation than required by their contract and their scores were the highest ever achieved by any Florida prison (OPPAGA, 1997: 9–10).

The Florida Chamber of Commerce reported in 2012 that the number of inmates per staff to provide rehabilitation services was 1 per 38 in private prisons and 1 per 272 in public prisons in DOC Region IV. In fact, 79.3 percent of inmates in the private correctional facilities participated in such educational, vocational, and life skill training compared to 21.3 percent in public facilities (Florida Chamber of Commerce, 2012). At a minimum, these data show that private facilities can and do provide programs to reduce the likelihood of recidivism.

In a 2012 presentation by the Florida Department of Management Services (FLDMS) before the Florida House Appropriations committee, the per-diem costs of six contract prisons were compared with the most similar public prisons in Florida. Short-run savings from 2007 to 2009 ranged between 10 and 27 percent (Florida Department of Management Services, 2012, p. 9, and documents provided by Florida Department of Management Services, November 12,

2013). Indicative of Florida's approval of the contract prisons, the presentation stated that in 1993 there was one contract prison of 800 beds, in 2004 there were five with 4,304 beds, and in 2012 there were seven with 10,128 beds (p. 3).

An earlier study conducted for the Florida Department of Management Services (MGT, 2006, p. 26) compared the costs for the private South Bay and Lake City Correctional Facilities against imputed costs for similar public facilities. The study showed that in the period from 2004 to 2006, the percentage savings were 19.4 and 11.2, respectively.

As for the long run, some states like Florida (and Texas) employ a BTO system for private prisons whereby the private firm bids to build a prison and the state finances it and pays the private firm for managing the construction process. The private firm then transfers ownership to the state and is given a lease to operate the facility for some years, usually renewable upon satisfactory performance. For Florida, the firm must save 7 percent both in operating or short-term costs and also in construction costs compared to a state-operated and built facility.

A 2010 study by Florida's OPPAGA (2010b) has shown such additional construction benefits besides operating costs. The comparison was between a state prison for 3,288 inmates, Suwannee Correctional Institution (whose main unit was designed for 1,521 inmates), and a private prison, Blackwater River Correctional Facility, designed for 2,000 inmates. Both facilities were designed and built for close custody inmates and those with mental health problems. The state facility could accommodate more severely ill inmates.

Comparing the main unit of Suwannee and the comparable Blackwater River facility, OPPAGA determined that the per-bed costs for the private and public facilities were, respectively, $57,682 and $64,277, so that the private facility was shown to have achieved about 10 percent savings, in excess of the required 7 percent. It is noteworthy that the facilities had about equal costs if the total facilities were compared. However, OPPAGA concluded that this would not be a fair comparison because the public facility (i.e., Suwannee), among other reasons, included a work camp whose construction was far less costly than a regular prison.

Case 3:16-cv-02267     Document 363-36     Filed 11/20/20     Page 1 of 42 PageID #: 15975

MARLOWE_0007919

Additional site development is a major reason for public facilities having higher costs. With Suwanee and Blackwater, site infrastructure cost $12,070 per bed for the public facility compared to $4,512 for the private prison. Blackwater took advantage of Santa Rosa County's interest in encouraging companies to locate there. The county charged no impact fee other than the $3.6 million land cost. Meanwhile, Suwannee required infrastructure to bring water, gas, and a sewer to the prison, which was seven miles from the City of Live Oak. The public prison had to reimburse the city $3 million for an impact fee to upgrade water facilities and replace the county sewer plant.

The contract prison was also built quicker than the public prison. The public prison was authorized by the legislature in 2006 but was not completed until October 2009, whereas the private prison was authorized in 2008 and completed in July 2010. In general, OPPAGA reported that private prisons are built in eighteen to twenty-four months compared to thirty-six months for public prisons. The private firms are not burdened by the cumbersome public sector requirements involved in selection of contractors, subcontractors, and the process of selecting site appraisers. There are also important differences in the construction itself of the prisons. Blackwater, the private prison, installed air conditioning, which obviously contributes to more comfortable living and working conditions and may alleviate inmate tensions in hot weather. The Suwanee public prison installed a less costly dehumidification system. In addition, the public prison employs a centrally located guard tower to watch over inmates, whereas the private prison employs cameras, reflecting the private prison's greater reliance on technology. Finally, the private prison does not have a central dining room but provides food in the living quarters of the inmates. The private prison thereby reduces cost of construction, enhances inmate control, and may reduce staffing requirements (OPPAGA, 2010b).

### Kentucky

Overcrowding in state prisons during the 1970s and 1980s led Kentucky to use private prisons. The first contract for use of private prisons occurred in 1986. The state also used county jails to house inmates. The number of inmates in all correctional facilities increased from an average of 15,164 in fiscal year 2000 to 22,553 in fiscal year (FY) 2009 (KLRC, 2009). As we found in our analysis, the long-run savings realized by Kentucky through contractor-operated prisons has been significant, ranging from 12.46 and 23.50 percent.

In FY 2009, 54 percent of inmates were in state prisons, 34 percent were confined in local and regional jails, 5.5 percent were in three contract prisons, and the remaining 6 percent were in halfway houses or home custody. A rough indication of relative cost is the fact that state prisons held 54 percent of the inmates and accounted for 64 percent of the DOC's cost while contract prisons with 5.5 percent of inmates cost the state 5.3 percent.

Kentucky statutes and/or contract terms require the private prisons to achieve accreditation by the American Correctional Association. The contracted prisons must achieve savings of at least 10 percent compared to comparable state institutions and must provide similar education, training, and substance abuse programs as state facilities. The contracts have required that Kentucky guarantee and pay for minimum numbers of inmates. For example, at the Otter Creek Correctional Center, the FY 2009 contract required that the state pay for a minimum of 90 percent of the contracted beds or 429 beds of the 476 contracted beds. This means that the extra cost is zero for housing an inmate in a contracted prison when the state occupancy is below the guaranteed rate. Moreover, in the contracted Lee Adjustment Center, inmates from Vermont were housed to fill beds not contracted to Kentucky.

The required occupancy agreement is a common business practice. Kentucky saves capital outlays for building a prison when it has no unused capacity. Savings may also arise from avoiding labor costs, facility maintenance, and other operating costs when occupancy of the state prison is well below capacity. At the same time, the private contractor has to be protected against possible significant losses when occupancy is below a certain level. In the absence of such required occupancy, contractors may not build facilities and the state will bear higher costs.

MARLOWE_0007920

In 2013, the Kentucky Department of Corrections provided overall prison per-diem costs for contract and state prisons (Kentucky Department of Corrections, 2013). The public prison cost for FY 2012 was $60.14 compared with $46.80 for contract prisons. In any event, the savings from contract prisons were about $13 per inmate per day or 22 percent. This is not a comparison of comparable facilities.

In an earlier study, the Kentucky Legislative Research Commission (KLRC, 2009) noted that comparing public and contracted prisons was difficult both because of differences in inmate characteristics and differences in the facilities themselves. In any event, the KLRC found for FY 2009 that the average cost per inmate in the privately operated Marion Adjustment Center was $40.02 and the relevant state cost was $56.75. For privately operated Otter Creek, the cost to Kentucky was $53.60 compared to $77.96 for the most comparable state facility. Privately operated Lee Adjustment Center's cost was $58.04 compared to the relevant state cost of $47.53. However, it should be noted that only fiftybeds were contracted at Lee compared to 826 at Marion and 476 at Otter Creek, the other two contract prisons. The annual savings for Marion was $5,043,928, $4,232,302 for Otter, and losses of $189,983 for Lee. For all three prisons combined, the short-term annual savings for the state were $9,086,251. Further, since Kentucky contracted out for overcrowding reasons, the long-term costs for public prisons should be considered and, thus, the savings for the state were even higher.

If only the per-diem rate were compared to the state costs, the private contractors appear more cost effective. This is because the state pays for some prescription drugs and hospital expenses for inmates of contract prisons, as well as the costs for monitoring contract compliance. Accordingly, the per diems for Marion were $34.54 and $43.62 for minimum and medium security, respectively. The blended rate at Lee was $43.62, and at Otter Creek, it was $51.17. In terms of performance, as discussed in Section 10, contracted prisons typically offer more programming than do state prisons (KLRC, 2009:19). In terms of safety, there is no clear difference (KLRC, 2009: 67–68). More grievances were filedin contracted prisons.

However, as the KLRC (p. 70) notes, this could be because inmates feel secure enough to complain. They do not fear retaliation or they are confidentthat their complaints will be addressed.

**Maine**

Maine, which does not utilize private prisons, has only 2,038 inmates. The state, however, maintains detailed data for almost all categories of public corrections costs. Interestingly, the short-run prison costs are $117.36 per inmate and the long-run prison costs per inmate are $127.95, including an imputed depreciation figureof $4.61 from the US GAO (2012: 13). Maine's costs for both short and long run are double that of most other states examined. The reasons could be inability to exploit economies of scale and high costs emanating from lack of competition provided by private prisons. Maine has four adult prisons, housing an average daily census in 2011 of 141, 147, 658, and 1,008 (Maine Office of Program Evaluation and Government Accountability, 2012: 2). Thus, only one prison is efficient in size, while the others suffer from diseconomies of scale with higher costs for similar services of at least 15 percent. The short-run cost per inmate per day in the other examined states is approximately $50. Adding the 15 percent cost penalty yields $57.50, while the additional cost attributed to lack of competitive pressure provided by the private prisons imposes costs on Maine of up to $60 per day.

Maine's neighboring state, Vermont, contracts out inmates to prisons in Arizona, Kentucky, and Massachusetts for $65.75 compared to $137.00 for housing inmates in its own state prisons. Vermont's in-state costs are similar to those of Maine (Picard, 2011). Although Maine does not contract out inmates, it seems important to show what Maine could save if it contracted out at its neighbor Vermont's prices. In 2011, Maine was almost at capacity. Thus, if Maine chose to contract out existing inmates then the avoidable costs would be merely short run. The savings would be $69.93 per inmate per day or 51.54 percent. However, given the fact that Maine is already operating near capacity (capacity is considered in the range of 95 to 98 percent), savings resulting

MARLOWE_0007921

from contracting out of additional inmates would be $69.12 per inmate per day or 49.15 percent. These would be long-run savings because additional inmates would require public capital expansion.

### Mississippi

Mississippi's contracting with private firms to provide inmate correctional services began in 1994. Legislation allowed county boards to build and contract with the sheriff's department or for a private firm to operate and manage the facility. The first such facility was built in 1996 and was a combined jail and regional facility. An interview with a Mississippi DOC official revealed that in 2012, the DOC paid $29.54 per day to house 300 inmates in the original facility. Under this arrangement, Mississippi state government pays the debt services and, at the end of twenty years, the facility becomes state property. Private firms also built and operated their own prisons.

In 2012, five correctional facilities were managed and operated by private firms. They were built by counties and then leased to private firms. Four were 1,000-bed facilities, and one had 1,500 beds. A typical per-diem rate was $29.74 plus medical, since the state paid all hospital expenses beyond the first seventy-two hours. The latter was the responsibility of the contractors.

Mississippi is a statutory savings state, which means that it must obtain the required 10 percent savings over public prisons in order to have private firm operation. This constraint led to the 2011 voluntary termination of CCA's contract to operate the Delta Correctional Facility because CCA considered the required $31.16 per diem (10 percent less than the state's $34.61 cost) to be unacceptable (Gilroy, 2011).

Mississippi was experiencing a decline in prison population, so the closure of the Delta facility could be easily accommodated by moving inmates to other facilities.

The contract prisons have to meet other non-price requirements as well. They must attain American Correctional Association accreditation within fourteen months of beginning operation. Further, each of the five contract facilities has a monitor who is a state employee but is paid as part of the contract per diem.

### Ohio

Ohio began the process of private participation in correctional institutions in March 1998 when the state legislature passed a law mandating that the Ohio Department of Rehabilitation and Corrections (ODRC) engage private firms to operate and manage the North Coast Correctional Treatment Facility (NCCTF), a 552-inmate, minimum-security substance abuse treatment facility for adult males, and the Lake Erie Correctional Institution (LECI), a 1,380-inmate, minimum/medium-security facility (material supplied by ODRC).

The initial contractor for the NCCTF, Civigenics, held the contract from September 1999 until replaced by MTC in fiscal year 2002. MTC agreed to a per diem of $62.87 for fiscal years 2002 and 2003, and Ohio reported savings compared to state operation of 5.02 and 5.92 percent, respectively, for the two years. Savings for subsequent years were about 17 percent, attributed to cost containment efforts by MTC. State operations would have cost $79.77 per inmate per day, according to Ohio officials.

More recent contracts provided additional savings for inmate populations in excess of 552 up to the maximum of 612 inmates. The 2006 fiscal year rate, for example, was $42 instead of the $65.08 rate for the first 452 inmates. This is likely a result of economies of scale that extend to inmate populations of at least 1,000 in minimum/medium-security prisons discussed elsewhere in this report. Moreover, subsequent contracts after 2006 held annual increases below the Consumer Price Index (CPI), and the ODRC reported savings to be about 16 percent.

The contracts required MTC to maintain staffing at or above a certain level and provide a full range of education, health, rehabilitation, and training programs. The facility also had a Community Advisory Board and community volunteers, which help inmates and assured community member integration. The facility scored 100 percent on ACA accreditation standards.

It is important to note how Ohio determined some of its state cost data, which are compared with private prices. The ODRC uses a sophisticated model that includes program-specific costs (ODRC, 2007). State costs are estimated based upon local condi-

MARLOWE_0007922

tions, and the experience of similar ODRC facilities adjusted for inflation.ODRC indirect costs are based on recent departmental reports.

LECI opened in April 2000 with MTC as the contractor. The ODRC determined that the per-diem rate of $39.94 for fiscalyear 2002 yielded savings of 12.55 percent compared to state operation. Additional cost savings for fiscalyear 2003 were achieved by cutting 1.2 full-time equivalent staff and reducing the annual increase of prices to 0.5 percent instead of the CPI increase. Cost savings for fiscalyears 2003 and 2004 were determined by the ODRC to be 12.94 and 16.69 percent, respectively. Contracts for subsequent years included lower rates for inmates between 1,380 and 1,480. Contracts for subsequent years also held per-diem rate increases below the increase in the CPI, and savings were determined by the ODRC to be about 6 percent. Similar to NCCTF, an advisory board, community volunteers, and a 100 percent score on ACA accreditation were achieved.

In September 2011 the ODRC announced the sale of LECI to CCA for $72.7 million. The firm would also operate the facility and expand the capacity by 304 inmates. Annual savings of 8 percent in operating costs were expected.

Turning to the findings,Ohio's short-run savings from contracting out prisoners were 13.44 percent for 2010 and 4.14 percent for 2012. The respective savings for the long run were 26.81 percent and 20.28 percent. The statutory requirement in Ohio is 5 percent, and our calculations are in line with the ODRC. The ODRC provided us with its calculated savings, which ranged between 6 and 23.7 percent for the fiscalyears 2002 through 2008 for one facility. For the other privately operated facility, the savings ranged between 8.5 and 18.1 percent for the fiscal years 2000 through 2008. All these savings related just to the short run. In any event, the appropriate comparison should be done on a long-run basis, since Ohio avoids construction of new prisons and enjoys flexibility for changing inmate population.

As for indirect costs, the only item available was Vera's administrative cost,which we termed hierarchical costs of $1.4 million or $0.08 per inmate per day for fiscalyear 2010. It is likely that other indirect costs are missing, and the same discussion that we had for Arizona applies. We chose to be conservative in our calculations and ignored these costs, since Ohio's savings from contracting out were above the statutory requirements.

The difference between the public long-term costs and the price paid for private prisons in 2012 was $16 per inmate per day. This difference is attributed to capital and interest costs of $9.63 per inmate per day and unaccounted pension and healthcare costs of $2.64 per inmate per day, totaling $12.27 per inmate per day. Thus, only $3.73 per inmate per day, or 23 percent of the savings, could be attributed to all other elements of cost including labor. In other words, lower pay to correctional officers by the contractor-operated prisons is a small component of the savings. Indeed, our interviews with ODRC personnel revealed that public correctional officersearn only $1 more per hour than their private counterparts. Differences in labor productivity and purchasing power savings of private prisons are additional elements that comprise the 23 percent. Thus, differences in wage costs could not exceed 23 percent of total savings for contracting out.

### Oklahoma

Oklahoma began contracting out inmates to private contractors in 1998 as a result of overcrowding in the state's public prisons. The Oklahoma Department of Corrections (OKDOC) considers overcrowding to occur when capacity utilization reaches or exceeds 95 percent. Oklahoma statute 54, section 570, the Oklahoma Prison Overcrowding Emergency Powers Act, provides the authority for such contracting out to private contractors.

OKDOC in 1995 initially used county jails to house inmates, but capacity at county jails was soon exhausted. The OKDOC then contracted with private providers to house inmates in Texas. In December 1995, OKDOC contracted for 510 male beds and 50 female beds with Texas. As of April 15, 1997, contracts for 2,285 male inmates and 423 female inmates were in effect at eight Texas facilities operated by six companies. Monitoring of the Texas facilities proved difficult,and some problems occurred at one facility. Oklahoma had only two contract monitors and had to rely on volunteers (Oklahoma Depart-

MARLOWE_0007923

ment of Corrections, 2012). Accordingly, when space became available in Oklahoma private prisons, the inmates were relocated to Oklahoma. By October 1998, all inmates housed in Texas had been relocated to private prisons in Oklahoma. In December 2000, 5,824 male inmates were in fiveOklahoma contract prisons operated by three companies, and 872 female inmates were in one private prison.

As of September 2011, 4,738 offenders were in Oklahoma private prisons. In 2011, the OKDOC determined that the $41.79 per-diem rate at the private facilities was comparable to the $42.41 daily cost in medium-security state prisons. The OKDOC cost comparison does not include capital costs and is evidently done on a short-term basis. However, even for the short run, public prison costs should incorporate the unfunded pension and retiree healthcare for current employees. Moreover, the comparison should be done on a long-term basis. Indeed, as the OKDOC stated: "It appears continued housing in private facilities is a viable alternative to the massive capital outlay required for construction" (document provided by OKDOC). Thus, a true cost comparison between public and private beds in Oklahoma should consider capital costs to build a new facility, because the OKDOC currently operates close to 100 percent of capacity in its public prisons.

Of note, Oklahoma has not built a public prison since 1976; however, it did buy a 600-bed private prison in 2000 for about $27 million. Its public prisons in 2012 operated at 98 percent of capacity. Oklahoma in 2012 contracted with private prisons in the state which housed almost 7,000 inmates, including out-of-state and halfway house inmates, while its state prisons held 18,000 inmates. The state contracted out medium- and maximum-security inmates. Private prisons in Oklahoma also held prisoners from Hawaii, California, Colorado, and Idaho. An OKDOC officialclaims that inmates who commit crimes while in Oklahoma private prisons impose a cost for adjudication and punishment by the Oklahoma justice system. On the other hand, contract prisons pay state and local taxes, provide employment, and purchase local goods and services. Determining the net financial impact of out-of-state inmates on Oklahoma is beyond the scope of this study.

Oklahoma uses public-private partnership prisons for population management. Instead of building new prisons, Oklahoma contracts with private prisons, providing important flexibility so that new prisons are not needed. If capacity utilization is low, fewer inmates are sent to private prisons. Clearly, when comparing private and public costs, the public costs should incorporate all the long-run capital costs.

Contracts with prison operators require certain performance standards. For example, one such contract requires that 80 percent of inmates be involved in education and job training programs. Private prisons must pay for inmate medical costs under $100,000 with a cap of $50,000 for a single episode. The state covers the rest. As in other states, OKDOC classifies all inmates, including those with medical problems, and determines to which prison they are sent. Some contracts specify that the percentage of inmates with particular conditions mirror that in the public prisons.

A 2007 study of Oklahoma public and contractor-operated prisons conducted for the state legislature concluded that private prisons in fiscal year 2006 were less expensive than the most comparable public facilities (MGT, 2007: 3–21). Specifically,the per diems were $47.14 compared to $51.94. The report noted the difficultyof determining comparable facilities. It also stated that the cost difference was in part attributable to the older age of the public prisons, which added to their security problems, in requiring higher staffinglevels than the newer contractor operated prisons. The study also noted that contractor operator prisons could be built more quickly because the leading contractors have greater experience and expertise in building prisons than almost all states.

The contracts also were shown to provide substantial flexibility for Oklahoma. The state had the option in some of the contracts to buy the contractor-operated facility "at fair market value." Under the contracts, Oklahoma can reserve beds for up to fifteen days, after which it has to pay for the beds even if it does not use them (MGT, 2007: 3–30).

The report showed that the contracted prices can be so low (as also in Mississippi above) that the private operator chooses to withdraw from the contract. This

MARLOWE_0007924

occurred in the case of the Cornell contract when Oklahoma raised the per diem by only 7 percent in the ten years ending in 2006 (MGT, 2007: 3–20).

We now turn to our results. To begin, the public short-term costs are understated since Oklahoma does not fully fund its employees' retirement pensions. The Vera report (2012) stated that 2.6 percent of the total OKDOC budget, or $11.6 million, was unfunded, and our interview with an OKDOC official indicated that 20 percent of required pension contributions were underfunded. We applied the 2.6 percent to the total short-run cost per inmate per day and obtained the range of $0.99 to $1.99.

Comparing public costs with the private per-diem charges for 2011, we find that in the short run, one contractor-operated, medium-security prison was 2.16 percent more expensive while the other saved 4.35 percent. However, this is an inappropriate comparison because Oklahoma's prisons were operating at full capacity even with the use of private prisons. Thus, the only alternative for Oklahoma is to build more prisons and, therefore, the long-run state costs should be considered. The savings from the two medium-security prisons would then be 16.71 percent and 22.02 percent. For maximum-security facilities, the short-run savings from the two private prisons were 27.56, and 29.23 percent. Again, the more appropriate long-run savings were greater, in fact, 35.27 and 36.77 percent.

Salaries of correctional officers in public and private prisons are comparable. For example, beginning public correctional officers in 2012 earned $24,605, while private officers earned $24,190, a 1.7 percent difference. The total long-run savings by contracting out medium-security prisoners were $8.63 and $11.37 per inmate per day for the two prisons, which results mostly from capital savings. The two maximum-security prisons achieved savings of $31.58, and $32.92 per inmate per day. Additional savings arose from avoided unaccounted pensions and healthcare costs of $1.29. The cost advantage of public-private partnership facilities likely arises from their greater productivity and possibly greater purchasing power. This coincides with the 15 percent greater productivity of private prisons experienced in

Ohio. Thus, the long-run savings from contracting out to private prisons is only marginally attributed to wage differences.

Generally, the quality of private and public prisons is thought to be comparable. The coexistence of public and private prisons has also provided important additional benefits. In response to private prisons, public prisons have changed staffing patterns to become more efficient. Public prisons have also consolidated case management and improved service as a result of the experience with Public Private Partnership (PPP) prisons.

### Tennessee

Tennessee is a statutory state with a 5 percent required savings on private prison operations. The state owns the facilities, which are leased to private operators. Thus, like Florida, short-run or operational savings are relevant.

Tennessee began the use of contract prisons because of overcrowding during the 1980s. The original 1986 law authorizing contract prisons allowed only one work camp. The legislation was amended in 1991 to allow one minimum- or medium-security contract prison. Tennessee then built three prisons, one of which was leased to a private firm under a three-year contract with a possibility of two-year renewal. This facility has between 1,500 and 1,600 beds. After the five years, the facility must be rebid. The contract prison must achieve 5 percent savings over a comparable public prison providing the same quality of service or higher quality at the same cost. The evaluation of contractor performance is done in the third contract year.

In 2013 and for some time prior, contractor operation has been evaluated through an annual inspection, review of education services provided, the security level, and other indicia. Tennessee is still permitted to have only one contract prison. However, the state can contract with counties to house inmates, and the counties can then contract with private firms. As of 2013, Hardeman County has two contract prisons, one owned by the county and the other by the private contractor CCA. The one state-owned contract facility is South Central Correctional Center, which is leased to CCA. Each contract prison is overseen by

MARLOWE_0007925

two DOC monitors. The contract prison wardens participate in DOC meetings. One warden of a contract facility in 2013 was formerly a state prison warden. The contracts specify training requirements for correctional officers. Some private prison administrative employees receive some training in state facilities. Noteworthy, the state recently considered whether to take over South Central, sell the facility, or continue to lease it. Tennessee decided to continue leasing, suggesting state satisfaction with the arrangement.

In terms of contract specifics, Tennessee guarantees payment for 90 percent of the contract capacity even if it uses less than the 90 percent. For utilization in excess of 90 percent, it pays the normal per diem. In county contract facilities, the state has termination language that enables the department to remove inmates with notice as projected needs change.

In April 2010, the Fiscal Review Committee of the General Assembly of the State of Tennessee conducted a review of private and public prisons for the fiscal year ending in June 2009. The committee staff reported that the state costs were $53.32 per inmate per day, which meant that the contractor's price including all state associated costs had to be below $50.65 per inmate per day. The state, after all, still incurred such administrative costs for contract prisons as inmate classification and record maintenance. The relevant figure for the private facilities (per diem plus associated state cost) was, in fact, $43.99 per inmate per day, which is $9.33 below the state cost, amounting to savings of 17.5 percent.

The report stated that it was difficult to do a dollar-to-dollar comparison because the relevant facilities have different levels of healthy inmates, although the DOC could not quantify the cost of these differences. Additionally, the report states that private facility had a relatively safer inmate population based on the number of close custody and maximum-security inmates in each facility. Again, the DOC could not quantify the cost difference.

Tennessee was the only one of our examined states that reported the maintenance and the central administration overheads to be added to the contract price to determine any savings. We followed Tennessee and calculated the savings considering these costs.

**Texas**

Texas began its legislative process of privatization in the late 1980s because of prison overcrowding, and the state's private prisons were built in the mid-1990s. The state also built public prisons the same period. Initially, privatization took the form of state finance by revenue bonds, later by general obligation bonds. Later, the privately operated prisons were built by the contractors, who typically received a seven-year lease, renewable at the end of every two years. The Texas Legislature required that private contractors achieve 10 percent lower costs without specifying whether the savings needed to be in operations or overall costs. In fact, Texas evaluates the savings on operating costs, which is appropriate in this particular case because the facilities are, in general, owned by the state and simply operated by private contractors. The data in Table Appendix 3.1 do not include medical services since Texas contracts with local medical schools for all inmate medical care. Further, if medical care requires more than seventy-two hours, the inmates will be transferred from the private prison to a state prison.

In 2012, Texas contracted with seventeen private prisons comprising one-third of its inmate population. Most private facilities are minimum security, while some are medium security. Most private prisons are small, built for 500 inmates while the one described as a prototype state prison in Table Appendix 3.1 is for 1,000 inmates. Of the seventeen private prisons, thirteen were owned by the state under the BTO arrangement, and four were built or renovated and owned by the private operators. Most of the publicly operated prisons in Texas are quite old, and the oldest was built in 1856. The prototype state prison is a hypothetical construct developed to compare public cost against private price by the Texas Legislative Budget Board.

In 2012, Texas had approximately 140,000 prisoners housed in public and private facilities with a total capacity of 156,000. County jails are used as a relief valve to house prisoners when excess demand occurs. In addition, some of the private prisons specialize in certain types of offenders and are able to offer special treatment. For example, the private prison in Henderson, TX, specializes in treatment of drunk drivers.

Case 3:16-cv-02267   Document 363-36   Filed 11/20/20   Page 8 of 42 PageID #: 15982

MARLOWE_0007926

As of 2012, except for two public prisons in Houston and Dallas, the remaining public and private prisons are located in rural areas or smaller cities, enhancing the local economy. Positions in these prisons are typically filledby local residents, providing jobs for the local community. Contractor-operated prisons are typical export-based industries that yield income and employment generated from outside the region. These prisons provide jobs and purchase directly and indirectly local goods and services, contributing to the region income and employment by the usual multiplier effect. The contribution of a prison to the economy of a small city is more significant.

The direct costs per inmate in Texas public prisons in 2010 were $53.77, indirect were $1.30, and hierarchal were $0.19, reaching what Texas considers average variable costs of $55.26 per inmate per day. This figureis what Texas uses in its calculation for the required 10 percent savings. This would yield a price no higher than $49.73 per inmate per day for the private facilities. The appropriate avoidable costs should also include the underfunded pensions and retiree healthcare of $4.44, which means that the appropriate required price to reach is $53.73 per inmate per day for private facilities. The price paid to the contractor for the 1,000-bed prototype was $37.47. The contract varies for each prison, while prices are typically lower for larger prisons due to significanteconomies of scale. We learned from Florida that the costs per inmate are 15 percent higher for a 750-inmate prison than for a 1,000-inmate prison.

Our interviews have clearly shown the benefitsof the competition among the private contractors. The private companies cannot go below the public performance standards detailed in the contracts. However, evidence suggests that competition often yields higher performance quality in order to maintain long-term contracts. In addition to competition in pricing, Texas gains additional concessions through individual negotiations that follow the selection of the contractors. Thus, the states and inmates gain more than merely the statutory lower prices in the contract negotiations.

In addition to the actual savings, we learned from our interviews with officialsof the Texas Department of Criminal Justice (TDCJ) that contractor-operated prisons—to a greater extent than state facilities—have employed electronic tracking systems instead of the manual keyboard system. Electronic tracking systems provide greater security since access requires personal identification. In addition, some private prisons exceed the required standard eight-times-a-day count of prisoners. In terms of annual refresher training for correction officers, some private prisons train fifty-sixhours annually instead of the standard forty hours for public prisons. Private and public wardens together attend the same monthly meeting held by the six regional TDCJ directors. This clearly indicates the strong partnership and cooperation between the public and private sectors.

## 13 | A General Discussion of Public Costs and Private Prices

The critical issue of this study is the findingfor the savings state governments derived from contracting out prison services. When the state legislatures enacted the statutory requirements for savings, they usually did not specify the exact nature of the savings. In this study, we distinguished between the direct operating savings that relate to the short run and the overall savings, which relate to the long run. As indicated earlier in this report, long-run savings are the correct measure, except when a private contractor manages an existing public facility. The typical motivation for public-private partnership prisons is to relieve overcrowding where the only viable alternative is for the state to build its own prisons. Further, given the aging of U.S. prisons, even without overcrowding, some substantial rebuilding is often necessary, making long-run costs applicable. Another lesser but related motivation is to save state resources.

Our study found that contracting out inmates to private prisons saved state governments money while maintaining performance at least at the same quality as public prisons. A head of corrections of a large state suggested that compliance with the detailed contracts helps ensure this comparable performance. Additionally, the existence of private prisons fosters competition and helps constrain spending on public prisons.

Short-term savings run the gamut from Oklahoma's loss for medium-security prisons of 2.16 percent all the way to California's savings of 57.36 percent. Texas and Oklahoma's maximum-security private prisons had relatively high short-run savings of 37.39 and 29.23 percent, respectively.

As discussed earlier in Section 6, the indirect costs are incorporated in the short-run costs. The reported indirect costs range from $3.72 per inmate per day to $6.64 per inmate per day. We used mostly the estimates of the Vera report when available. Studies for the legislatures of Oklahoma and Tennessee concluded that about 75 percent of indirect costs continued even for the privatized inmates. In the long run, adjustments often occur and the private prisons might assume more of these currently government functions. Thus, in the long run, a greater percentage of the indirect costs may be avoided. In any case, the magnitude of the indirect costs is small and could not affect the results. As discussed in Section 6, either the entire or only 25 percent of the indirect costs could be considered avoidable. We calculated in Table 1 both alternatives, however in our conclusions we maintained our conservative approach and considered only the 25 percent as avoidable costs. In any case, available data indicate that indirect costs are quite low, most in the range of $5 to $7.

Long-term savings ranged between Kentucky's 12.46 percent and California's 58.61 percent, while Maine was close to California with potential savings of 49.15 percent. Maine, which does not contract out to private prisons, was incorporated in this study because of the availability of its detailed data. The extent of the details for the direct and indirect short-run costs varies among the analyzed states. In the case of Maine, it is noteworthy that its lack of both private and public competition and its small prisons that cannot exploit economies of scale explain the state's high costs and great potential for savings. Indeed, additional competition among the states and private companies could be most beneficial. The extent of the savings including satisfying the statutory requirements did not change appreciably when just 25 percent avoidable indirect costs were employed. Only in the short run for medium-security prisons in Oklahoma and Arizona did the savings decline to -2.16 and -1 percent,

respectively. However, the long-run savings for both these states matter and those savings were maintained.

The following three factors led to lower costs of contract prisons; the issues of short- versus long-run avoidable costs (operating costs versus total costs), unfunded pensions and retiree healthcare, and employee benefit costs.

## Short- Versus Long-Term Costs

The state legislatures enabled contracting out in order to relieve overcrowding. In several states like Ohio, Florida, Mississippi, and Kentucky, a related objective was to achieve savings. The legislatures of these mandatory-savings states have determined that the required savings were obtained, even though they typically focused only on short-term costs.

In fact, the savings should reflect the avoidable costs to the state. In general, overcrowding, along with the aging of the state prison infrastructure, means that the only alternative is state construction or major renovations, modernization, or repair. Accordingly, financing costs should be incorporated as the avoidable costs for government, an issue recognized by the Legislative Analyst's Office in California (CALAO, 2012b: 16). However, the states do not report depreciation since they are not private entities.

Better data are available for the interest payments made on bonds floated to build major infrastructures. Depreciation was estimated at $4.61 by the US GAO (2012: 13), and we incorporated that figure in all the states that did not report depreciation. The Legislative Staff Report for Arizona determined that depreciation was $9.30, indicating that the use of $4.61 is conservative. This long-run cost added to the savings of contracting out in the range of 2 to 14 percentage points, with six of the thirteen observations at 10 or more.

## Unfunded Pensions and Retiree Healthcare

State spending on corrections is a significant contributor to the underfunded pension and retiree healthcare problem that could lead to a national fiscal crisis. State and local governments have substantially underfunded pensions and retiree healthcare expenses since such obligations come due years down the road. Government officials tend to prefer current spending on services while creating future liabilities that come

MARLOWE_0007928

due much later, possibly under different administrations. In 2011, estimates of unfunded pension and retiree healthcare liabilities ranged between $730 billion and $4.4 trillion, which would amount to as much as 33 percent of the 2011 GDP.

Many economists believe that the correct figure is closer to $4.4 trillion (Healey et al., 2012: 3). The magnitude of the unfunded liabilities is negatively related to the performance of the stock market. In 2001, the 126 largest public pension funds had unfunded liabilities of 5 percent. In 2008, underfunding reached 36 percent, and in 2011, it was 26 percent (Healey et al., 2012: 8). Total state government pension debt is almost 4.5 times the state bond debt (Novy-Marx and Rauh, 2009). An indication of the magnitude of the underfunding problem is that every U.S. household would have to pay an additional tax of $1,098 per year for thirty years to eliminate the deficit using the more realistic treasury discount rate (Healey et al., 2012, p. 15). Some cities like Detroit have already filed for bankruptcy protection in part because of the underfunded pension problem.

The underfunded retiree healthcare challenge is of similar nature but much lower in magnitude (Munnell et al., 2013). The states assume 8 percent return on their pensions and healthcare funds. Thus, with the 8 percent assumed return, the states will not be considered underfunded. It is important to note that 8 percent return is very high under existing market conditions, and therefore more funds should be allocated towards these two items in order to be fully funded (Novy-Marx and Rauh, 2009).

In terms of corrections, shifting prison operations to the private sector could significantly lower states' fiscal burdens with regard to underfunded pension and healthcare benefits. Additionally, existing calculations of state prison costs usually include just "out of pocket" items, neglecting to account for the underfunded pensions and retiree healthcare costs that will occur in future years, which are still avoidable costs. Thus, existing calculations of state prison costs are below actual costs and therefore appear to favor the public sector.

Vera (2012) collected data from the forty states that responded to its inquiry about the total cost of corrections. Vera obtained results for all the states that we ex-

amined except for Mississippi. The Vera study includes amounts for which the state is liable but did not fully pay. It also includes short-run costs attributable to corrections but which were not in the corrections' budgets. Capital costs, which relate to the long run and are not normally part of the corrections budget, were also enumerated. For our purpose, these are avoidable costs when states contract out prisoners. These unfunded pensions and retiree healthcare contribute 1 to 13 percent of total long-run costs with a mode of 4 to 5 percent.

We now examine the contribution of correctional labor costs to the challenge of underfunded pensions and retiree healthcare benefits for state workers. Table Appendix 3.2 provides data on public employees and their wages for 2011 for the ten examined states and the United States as a whole. Correctional employment and wages are the highest in California, Arizona, and Florida where employee pay represents respectively 15.5 percent, 13.1 percent, and 13.0 percent of total state wages (Novy-Marx and Rauh, 2009). We also calculated for each state the number of years of total tax receipts necessary to eliminate the accumulated underfunded deficit. These figures demonstrate how significant this financial burden is. With correctional wages contributing a relatively high percent of state government wages, contracting for corrections services is one alternative that would help diminish the current unfunded liabilities and avoid some future underfunded pensions and retiree healthcare expenses altogether. Alternatively, the underfunded problem could be solved by simply raising taxes or reducing spending.

To conclude, the problem that the states are facing for their underfunded pensions and retiree healthcare may erupt as a result of temporary recession, as in 2008, or an unexpected increase in spending as a result of, for example, a natural disaster. This could cause states to default on bonds or pensions, resulting in a significant increase in taxes (for example, a tax increase of $3,600 per person in Pennsylvania (Dreyfuss, 2013)) or significant reduction in major services including education and police. Indeed, the effects are already noticed where the rating of state bonds diminish, leading to an expected rise in interest rates (Dreyfuss, 2013). Contracting out correctional services could help ameliorate the problem.

MARLOWE_0007929

### Labor Costs

In the long run, labor costs were in the range of 43 to 71 percent of total costs. In general, contract prisons pay comparable wages but somewhat less in retirement benefits.For example, Ohio private correctional officers are paid $1 less per hour. In Oklahoma in 2012, the beginning base salary for a correctional officerwas $2,153 per month at the public Northeast Oklahoma Correctional Center. A comparable beginning private correctional officer at the Davis Correctional facility earned $2,068 per month, 3.95 percent less than a public officer.Our interviews with state DOC officials revealed that, on occasion, private correctional officers were paid higher wages but lower pensions. The rationale provided is that young correctional officers are concerned more about their current wages than distant pensions and retiree healthcare benefits.

Private contractors typically offer workers matching contributions, or defined contribution, up to 5 percent of their salaries for their 401k accounts, which aligns with other private industries. Under this method, the market risk is borne by the employee. In fact, many workers choose not to contribute their share and thus lose the employer's contribution. State employees, on the other hand, have defined benefits which shift the risk to the employer. Defined contribution plans require the employer to contribute the specified amount in a timely fashion. A state's defined benefit method enables non-timely or insufficient contributions which is a significant cause for the underfunding problem.

Private and public correctional officers are drawn from the same labor pool. Generally, the training is substantially the same, providing similar number of hours with a few course differences. See for example, Arizona Department of Corrections.

In Ohio, for example, they attend the same training academy and, in another state, public correctional officers work part time in private facilities. It appears that private contractors are able to hire correctional officers of similar attributes to those hired by the state. Also, private contractors are more flexible than state governments to reflect specific market conditions and the specific preferences of employees. Private contractors provide a benchmark for labor costs for state correctional employees.

In California where until 2013 only private community correctional facilities operated within the state, the wages and benefits package in the correctional public sector compared to other states is high. The starting minimum salary for public correctional employees in 2008 was $3,774 per month, and some officers earned more than $73,000 a year. The California State Auditor (2009: 49) reports that during fiscal year (FY) 2007–2008, beginning correctional officers were paid an average of $50,739 excluding any overtime. The annual pension contribution by California, including new officers, was $12,000 for FY 2009–2010. This was $4,000 more than other state employees received. California has 30,000 unionized correctional officers and, each year, 130,000 candidates apply to become correctional officers (CALAO, 2008). Maine, which again has no competition from private contractors and less efficient, smaller sized facilities, also had relatively high labor costs.

We wish to stress that government sources were primary for this study. Also, when calculations were made, we were conservative (biased downwards) in the state costs. The long-run savings of contracting out prisoners are attributed, in declining importance, to the long-term consideration of costs, the inclusion of unfunded pensions and retiree healthcare, and the lower private costs of labor, specifically with respect to benefits. We found no evidence that the lower costs are associated with possible lower performance of private prisons. Actually, we encountered government evidence that the performance of contractor-operated prisons was, on occasion, higher than public prisons in Florida and Kentucky and comparable in the other examined states. An explanation for the at least comparable performance is the detailed contracts and the monitoring, on-site and otherwise, that emphasizes performance measures.

Other possible explanations for the savings are the purchasing power and flexibility in purchasing of the private firms. The contracting firms buy in large quantities for various prisons and can take advantage of opportunities that arise rather than be constrained by cumbersome state purchasing regulations. Also, in operation, private firms have greater flexibility in employment, perhaps taking greater advantage than government in using part-time workers (Interview with a Texas Department of Criminal Justice official,

MARLOWE_0007930

October 26, 2012). Private firms,in some cases, enjoy greater flexibilityin hiring, which saves time and resources. Also, private firmscan tailor their wages to specificlabor market conditions, which is more difficult for public employers. For example, private correctional officersare paid less in rural communities, which usually have lower cost of living than in metropolitan areas. The state cannot differentiate wages to the same extent, and therefore overpays in rural areas or underpays in metropolitan areas. State officialsin our examined states provided these explanations.

Two additional explanations for the savings achieved by the contracting firmsare beyond the scope of this study. One relates to competition versus monopoly, and the other is beyond the control of state governments. Several of the interviews with state officials suggested significantcompetition among the firms in responding to the request for bids to operate prisons. Our interviews and a report prepared for the Florida Department of Management by MGT (2006) suggests that competition from private firmsyield more efficient operation in public prisons. Blumstein, Cohen, and Seth (2007) found that states with contract prisons experienced greater savings for public prisons than states that either do not contract out prisoners or contract out-of-state. Even though contract prisons house less than 7 percent of all inmates, their competitive effect is strong. The lack of such competition in government often leads to less efficient operations.

Texas provides a good example of the benefits of competition. Prices of privately operated prisons increased from $37.48 per inmate per day in FY 2010 to $39.13 in FY 2011, and then declined to $37.97 in FY 2012. Short-run costs for the prototype 1,000-bed state facility over the same period varied from $44.50 to $44.89, and then declined to $41.99 (Texas Legislative Budget Board, 2013). It is typical in competitive industries that prices and costs constantly vary. Indeed, in a three-year period, we witness fluctuationsin private prices and state costs, which may indicate the effects of competition.

Interestingly, state governments could become competitive and reduce expenses if states were allowed to compete for inmates and use prisons as an export base for economic development for their distressed localities. The other explanation that is beyond the

control of state governments is the fact that private firms operate newer facilities, often enriched with technology, that are cheaper to operate than the older, labor-intensive public prisons. The Legislative Analyst's Office(CALAO) in California recognized this advantage of newer prisons (CALAO, 2012b: 16).

One qualification relates to medical costs. The contracts with the private contractors differ with respect to the private contractor's responsibilities toward medical services. In some states, sick prisoners were not assigned to private prisons. In other cases, the state becomes responsible for medical costs above a certain threshold once a prisoner from a private prison is sent to another location for medical services. Florida and Arizona tried to correct the data for the greater responsibility of public prisons for medical costs. Since a similar correction for the other states is beyond our ability to determine, we calculated how high medical expenses could become in order to just maintain the legislative mandatory savings. Noteworthy, Arizona awarded a contract for a 1,000 medium-security beds beginning January 1, 2014, which is a full-risk medical contract for the private provider. (See Arizona Department of Corrections, 2012: 1.1.9.)

Given uncertainties about the exact financial responsibilities of the state for medical care of inmates in private correctional facilities, we determined the maximum level that medical expenses could be while the statutory requirements were just met. Then, we observed whether medical costs of that magnitude are reasonable. The actual range of per-diem reported medical expenses in public prisons is $5.97 in Texas to $43.95 in California (rows 2a and 2b). Our calculated range for maximum "allowable" additional unknown medical costs (rows 36a and 38b) is $11.23 in Kentucky to $100.62 in California. Thus, it appears that these "allowable" medical expenses are very high and therefore contracting out is still attractive regardless of our "unknown" additional state medical responsibilities for inmates in private facilities.

Another indicator for the validity of the savings is the ratio of the maximum allowable medical expenses to the actual medical expenses. This ratio suggests the maximum extent to which medical expenses could reach due to extra public support of contracted prisons' medical costs, while still maintaining desirability of contracting out. The range of the ratios is 0.93 for Mississippi to 3.96

MARLOWE_0007931

for Texas. Intermediate ratios were for California and Oklahoma medium security, both at 1.8. Thus, California could support the medical expenses of its inmates in contracted prisons by almost twice its existing level and still benefit from contracting out (rows 40a and 42b).

The following tables specify the short- and long-run public sector costs that are linked to the operation of state prisons. Again, to be conservative, we attributed only 25 percent of the indirect costs as avoidable. State costs per day in tables 13.1 and 13.2 are the same as subtracting 75 percent of the indirect cost. The long-run costs include the short-run costs, as well as depreciation and government principle and interest payments for the bonds used to

finance construction of a prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to contract prisons. Our estimation of the avoidable costs includes a few categories of actual costs that were missing in prior studies. In the short run, costs included data on underfunded pensions and retiree healthcare of current employees. Neglecting these costs lowers the state's apparent avoidable costs and most importantly distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86, while the others range from $0.55 in Florida to $4.44 in Texas.

**Table 13.1. Short-Run State Prison Cost, Contractor Prices and Savings**

| State | Custody Level | Year | State Costs per Day | Private Contractor Prices per Day | % Savings with Use of Private Contractor | | % Private Inmates |
|-------|---------------|------|---------------------|-----------------------------------|-------------------------------------------|----------|-------------------|
| | | | | | Prison 1 | Prison 2 | |
| AZ | Min | 2010 | $50.61 | $46.56 | 8.0 | | 23.0 |
| AZ | Med | 2010 | $52.49 | $53.02 | –1.0 | | 11.4 |
| CA | All | 2007/8 | $112.98 | $79.73 | 29.4 | | 1.3 |
| CA | All | 2011/12 | $152.01 | $64.82 | 57.1 | | 6.7 |
| FL | Min/Med | 2008/9 | $54.39 | $50.58 | 7.0 | | 11.3 |
| KY | Min/Med | 2011 | $58.13 | $47.21 | 18.8 | | 10.4 |
| KY | Min/Med | 1012 | $55.59 | $43.98 | 20.9 | | |
| KY | Med | 2011 | $52.98 | $44.14 | 16.7 | | |
| KY | Med | 2012 | $54.80 | $49.63 | 9.4 | | |
| ME | All | 2011 | $125.59 | $65.75 | 47.4 | | 0.0 |
| MS | Min | 2011 | $36.26 | | | | |
| MS | Med/Max | 2011 | $34.11 | $31.15 | 8.7 | | 24.9 |
| OH | Min/Med | 2010 | $52.98 | $45.86 | 13.4 | | 5.9 |
| OH | Min/Med | 2012 | $47.84 | $45.86 | 4.1 | | |
| OK | Min | 2011 | $41.64 | | | | |
| OK | Med | 2011 | $42.11 | $43.02 | 4.4 | –2.2 | 45.7 |
| OK | Max | 2011 | $80.01 | $56.62 | 27.6 | 29.2 | 27.1 |
| TN | Med | 2011 | $53.21 | $42.29 | 17.3 | | 18.7 |
| TX | Prototype | 2010 | $59.85 | $37.47 | 37.4 | | 11.0 |
| BOP/GAO | Low | 2011 | $67.28 | | | | |

**Legend**
Min = Minimum-security prison    Med = Medium-security prison
% Private Inmates = share of inmates in private prisons as percentage of all state inmates
Prison 1, Prison 2 = In Oklahoma, there were two comparative prisons for each custody level, Med and Max

MARLOWE_0007932



Figure 13.1. Short-Run Public Sector Cost and Savings

Table 13.2. Long-Run Public Sector Cost, Contractor Prices and Savings

| State | Custody Level | Year | State Costs per Day | Private Contractor Prices per Day | % Savings with Use of Private Contractor | | % Private Inmates |
| | | | | | Prison 1 | Prison 2 | |
|---|---|---|---|---|---|---|---|
| AZ | Min | 2010 | $59.95 | $46.56 | 22.3 | | 23.0 |
| AZ | Med | 2010 | $61.83 | $53.02 | 14.3 | | 11.4 |
| CA | All | 2007/8 | $117.59 | $79.73 | 32.2 | | 1.3 |
| CA | All | 2011/12 | $156.62 | $64.82 | 58.4 | | 6.7 |
| FL | Min/Med | 2008/9 | $61.43 | $50.58 | 17.7 | | 11.3 |
| KY | Min/Med | 2011 | $60.03 | $47.21 | 21.4 | | 10.4 |
| KY | Min/Med | 1012 | $57.49 | $43.98 | 23.5 | | |
| KY | Med | 2011 | $54.88 | $44.14 | 19.6 | | |
| KY | Med | 2012 | $56.70 | $49.63 | 12.5 | | |
| ME | All | 2011 | $129.90 | $65.75 | 49.2 | | 0.0 |
| MS | Min | 2011 | $47.52 | | | | |
| MS | Med/Max | 2011 | $41.68 | $31.15 | 25.3 | | 24.9 |
| OH | Min/Med | 2010 | $62.66 | $45.86 | 26.8 | | 5.9 |
| OH | Min/Med | 2012 | $57.52 | $45.86 | 20.3 | | |

MARLOWE_0007933

**Table 13.2. Long-Run Public Sector Cost, Contractor Prices and Savings** *(Continued)*

| State | Custody Level | Year | State Costs per Day | Private Contractor Prices per Day | % Savings with Use of Private Contractor Prison 1 | Prison 2 | % Private Inmates |
|---|---|---|---|---|---|---|---|
| OK | Min | 2011 | $51.18 | | | | |
| OK | Med | 2011 | $51.65 | $43.02 | 22.0 | 16.7 | 45.7 |
| OK | Max | 2011 | $89.55 | $56.62 | 35.3 | 36.8 | 27.1 |
| TN | Med | 2011 | $53.21 | $42.29 | 17.3 | | 18.7 |
| TX | Prototype | 2010 | $68.07 | $37.47 | 45.0 | | 11.0 |
| BOP/GAO | Low | 2011 | $71.89 | | | | |

**Legend**

Min = Minimum-security prison    Med = Medium-security prison

% Private Inmates = share of inmates in private prisons as percentage of all state inmates



Figure 13.2. Long-Run Public Sector Cost and Savings

MARLOWE_0007934

Figure 13.3. Short- and Long-Run Savings (%)

## 14 | Conclusions

This study compares costs of state prisons to the prices paid for contractor-operated prisons. The data used were from government sources, interviews with officials of state departments of corrections, and analysts from state legislative oversight agencies. We evaluated nine states and incorporated detailed federal data to supplement incomplete state data. Especially detailed data were available for Maine and Mississippi.

There are three reasons for the use of private prisons: to save on operational costs and maintenance; to relieve overcrowding whether ordered by the courts or required because of threat of litigation perceived by DOCs; and sale of a state prison to private operators for budgetary reasons. The statutory savings requirements for private prisons are Florida (7 percent), Kentucky (10 percent), Mississippi (10 percent), Ohio (5 percent), and Texas (10 percent). The statutory requirement applies both to where the contractor operates a state prison and to where prisoners are placed in private prisons. In cases like Florida and Mississippi, the contractor operates state prisons. In

Kentucky and Oklahoma, the prisoners are transferred to private prisons. Texas uses both models.

Overcrowding, which is the second reason for the use of private prisons, includes both the out-of-state transfer of inmates and the in-state use of private facilities. In California, the courts required a timely reduction of overcrowding, leading to the use of out-of-state contract prisons. The examined states that experienced overcrowding in addition to California were Arizona, Kentucky, Ohio, Oklahoma, Tennessee, and Texas.

Contracting out by selling a state prison to private operator generates an immediate lump sum amount to narrow a state budgetary deficit. This occurred in Ohio, which sold the Lake Erie Correctional Institution to a private contractor.

The nature of the private prison contract suggests what is appropriately included in the state avoidable costs. The calculated state costs should reflect the avoidable costs to the state when private contractors are considered. State legislators normally do not specify the costs to be considered for the statutory savings, and this is left to the interpretation of

MARLOWE_0007935

DOC staff. It is important to emphasize that even if the categories of the avoidable costs are specified,the measurements are difficult,and could be subject to individual interpretation.

Economic theory helps us determine the types of costs that should be taken into consideration because of the use of private prisons. In statutory states without overcrowding, the appropriate comparison is between the state short-run or operating costs and the contractor price. When overcrowding exists, the total of the operating and capital costs should be compared to the contractor price. When a public prison is sold, as in Ohio, total or long-run cost is used for the comparison with the contractor's price. When overcrowding exists, both the operating and capital costs, namely long-run costs, are the avoidable costs.

Table Appendix 3.1 specifiesthe short-run direct and indirect costs, which are linked to the operation of the state prisons. The long-run costs include the short-run costs, in addition to depreciation and the government interest payments for the bonds that are used to financea prison. These two items, which are also termed capital costs, become avoidable costs when a DOC avoids building new prisons by sending inmates to private prisons. Our estimation of the avoidable costs includes a few categories of actual costs, which were missing in prior studies. In the short run, our calculated costs included data on underfunded pensions and retiree healthcare of current public employees. These costs are easily ignored when state budgets are tight and are not reflectedin the then- current delivery of prison services. However, these costs are real and are to be paid in the future. Neglecting these costs lowers the state's apparent avoidable costs, and distorts legislative intent. California has by far the highest underfunded costs at $15.18 per inmate per day, followed by Maine's $6.86. The others range from $0.55 per inmate per day in Florida to $4.44 in Texas. The underfunding pensions and retiree healthcare for government employees are reaching magnitudes that may lead to financialcrises for state and local governments with severe repercussions throughout the entire economy. Shifting to private operation of correctional institutions would significantly ameliorate the problem. For example, it would take 8.75 years of Ohio's

entire tax receipts to eliminate the underfunding problem. Shifting the operation of prisons to the private sector would reduce the 8.75 by almost one year. It is important to note that the magnitude of both tax receipts and the deficitare sensitive to the state of the economy and the stock market so that these numbers are suggestive of the problem.

The indirect costs are the administrative costs incurred by DOCs and other state agencies linked to and for inmates. These costs are difficultto obtain, especially to determine what proportion is avoidable. We used conservative estimates of these costs provided by the U.S. Government Accountability Office(US GAO, 2012: 13) based on work by the U.S. Bureau of Prisons (BOP). Again, maintaining our conservative approach, based on data for Tennessee, we chose to include only one-fourth of the state indirect costs as avoidable.

For Florida and Mississippi where contractors manage the state prisons, we use the short-run or variable costs as avoidable costs to the states. In Florida, the short-run savings were 7 percent as required by the state law. In Mississippi, the short-run savings were 8.69 percent, slightly below the 10 percent statutory requirement. The Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) found that the costs of the private contractor met the statutory requirements (Mississippi, PEER, 2011; and 2012: 1). The long-run savings are irrelevant for both states.

Whenever overcrowding exists, the statutory requirement is less relevant since the overcrowding has to be alleviated in a timely fashion. California is a classic example of the cost encountered by failing to avoid substantial overcrowding and because private prisons are prevented from operating in the state. Overcrowding requires that the long-run avoidable costs be compared against the contractor's price. The long-run costs are appropriate because the state avoids building its own prisons. The long-run consideration is also relevant when the state owns old prisons that need major renovations, when it owns prisons that are subject to demolition, or when the state faces difficultiesin raising capital. The long-run savings for Arizona's two prisons are 14.25 and 22.34 percent;

Case 3:16-cv-02267     Document 363-36     Filed 11/20/20     Page 18 of 42 PageID #: 15992

MARLOWE_0007936

California had 32.20 and 58.61 percent savings for two prisons; Kentucky's savings for its four prisons ranged between 12.46 and 23.50 percent; Ohio saved 20.28 and 26.81 percent in 2012 and 2010, respectively; Oklahoma saved on its four prisons 16.71 to 36.77 percent; Tennessee had 17.32 percent savings; and Texas had 44.95 percent savings. Maine, which does not utilize contract prisons, could have saved 47.40 percent when below capacity and 49.15 percent, if overcrowding exists.

Overcrowding as in California and Ohio reduces both the short- and long-run costs per inmate per day and at the same time diminishes the quality of incarceration and security of inmates and correctional officers. Clearly, the overcrowding reduces the state per-inmate costs compared to the private contractor's price at the facility's designed occupancy rate. This means that in the case of overcrowding state costs are biased downward. This lower cost-per-inmate issue was recognized by a 2013 Florida administrative law decision (CCA of Tennessee, LLC vs. [Florida] Department of Management Services, 2013: 7).

At least equal performance to state prisons is required for contracting out. For example, contracts can specify the minimum quantity and nutritional quality as provided in state prisons. Indeed, the American Correctional Association established standards for prison performance, which the contract prisons generally met. Further, interviews with state DOCs reported that their contracts mandate performance levels, and DOCs closely monitor adherence to the contract requirements. Penalties can be and are imposed for performance violations. In Florida, contractors performed above the state level in training and educating inmates, which could be attributed to competition among contractors and the desire for contract renewal. Ohio and Texas require joint meetings of public and contract wardens, a practice that leads to greater cooperation and mutual learning. This practice seems to be beneficial and could be extended to other states. The greater exposure of contract prisons to financial and personal penalties and liabilities encourages good performance.

A prison facility has limited alternative uses, capital costs are high (beyond the financing ability of most states), and the expected life span is long. At the same time, demand for prison space fluctuates and is expected to drop in the near future, leaving some public prisons vacant. The existence of private prisons enables DOCs to avoid building new prisons when demand is high and prevents waste of these facilities when demand declines. This is a major long-term cost savings that is not considered in the statutory calculation of the avoidable costs by states. Thus, even if there are no costs and performance preference to private prisons, the mere existence of private prisons saves the public sector from construction costs, the purchase of equipment, hiring of personnel that cannot be laid off when number of inmates declines, the training of those employees, and the enlarged administrative costs that exist when the number of inmates is large and becomes partially idle when the number declines. Contract prisons provide flexibility and savings in periods both when there is a shortage in cells and also in the avoidance of unused cells when the number of inmates drops.

A major finding from the data and the interviews is that competition yields savings and better performance. The economics of industrial organization demonstrates the important benefits derived from even the presence of a small competitor in an otherwise monopolistic market. Examples include the transparent tape and physicians' services industries. In both industries, small firms have substantially increased competition and led to important gains for consumers. In the transparent tape industry, prices were reduced, and in the physicians' services industry, quality and innovations were introduced.

In the case of corrections, even though private contractors comprise less than 7 percent of the industry, they have generated substantial competitive benefits. It is a common in many other industries for small firms to have significant and desirable effects in terms of price, new products, and technological innovations. The benefits emanate from two sources. As more contractors compete, the prices are lower and the performance is better. However, savings also occur in public prisons. When private prisons become an available option, efforts are made by public managers to lower costs, and demands by public employees

are constrained since they realize that the legislature might favor private corrections as a more cost-effective option. Further, the greater the competition, the more managerial and technological innovations are introduced in both the public and private segments of the industry. It is important to note that the existence of public prisons also keeps in check price hikes by the private prisons. The knowledge that states could resort to the use of solely public prisons encourages private contractors to offer their services at even lower prices than the statutory requirement.

This study leads to a possible moderate change that could encourage further competition in the case of operation of existing state prisons and thereby achieve more efficient delivery of prison services. This is the model of managed competition initiated by then-Mayor Stephen Goldsmith of Indianapolis, IN, which encouraged public workers to participate in the bidding for their services alongside private competitors to preserve their jobs. Mayor Goldsmith initiated the "yellow pages" test where he enabled contracting out of all city services whenever several providers were listed. But, he went one step further and allowed city employees to compete for the service, as well. By so doing, public employees, as well as private contractors, have an incentive to search for managerial and technological innovations and offer the service at competitive prices. This is possible when the outputs are quantifiable and the contract can clearly state what is required, and where oversight by government is relatively inexpensive. A third requirement is that a sufficient number of competitors, including the public workers, emerge. Contracting out to a monopolist private company that replaces a public provider is undesired. All relevant contractors, public and private, should be aware of upcoming contracts. The existing situation where public prisons operate without a threat of competition yields an unnecessary monopolistic power that could yield inefficient operation.

Contracts should specify desired outcomes or performance and refrain from requiring what inputs to use or the method of "production." Contractors should have the freedom to decide how best to meet the required outcomes. Obviously, contracts could be difficult to enforce when outcomes cannot be quantified. Our discussions with state correctional executives suggested that contracts can specify the minimum performance levels required from the contractor that wins the bidding. Also, the private prison industry already includes a sufficient number of firms that compete across the United States. Thus, in each state where the legislature allows contracting out prisons, some existing state prisons could be auctioned as a "managed competition model" for a sufficient time period to encourage contractors to devote the appropriate resources for innovation and improved performance. This extension of competition could obviate to some degree the necessity for detailed contract specification and monitoring efforts. Reliance on markets like managed competition could reduce the necessity for such complicated calculations as in our Table Appendix 3.1.

The discussion above leads to a recommendation that could be considered. State legislators in the statutory states have established arbitrary levels of required savings of 5, 7, and 10 percent. High percentage savings may discourage some bidders and be counterproductive. It is not clear why the percentages differ and what the basis is for these numbers. By instituting managed competition where the public sector competes on a level field with the private sector, we let the market determine the savings. In such a case, the complicated calculations of what cost items should be considered as avoidable costs and how to measure these costs becomes unnecessary. Managed competition has worked for many local public services, and there is no reason why it cannot be successfully implemented in the state prison industry. Public and private competition and cooperation in service provision has worked and should be extended.

The issue of statutory savings merits closer attention. In Mississippi, the prices based on the required savings for contracting out were so low that no contractor offered the service, and as a result the state's DOC would have to maintain the service. In competitive markets, when a price requested by a seller is too high and no one wishes to buy it, then the seller lowers the price until the product/service is sold. For example, when a homeowner sets a price for his or her house and receives no offers, he or she will lower it until the

MARLOWE_0007938

firstoffer is made. In the case of Mississippi, no offers were made probably because of unrealistic state costs, which did not include the unaccounted costs, and the arbitrarily stated statutory savings requirement.

Now, suppose that all costs were indeed included, and the state offered a contract under a managed competition model. The state workers would then not necessarily have won the contract. Now, if the state offers the contract without any required savings and a private contractor wins the contract with even 3 percent savings, then the state still saves and a strong incentive is established for all private and the public suppliers to become more efficient in order to win the next contract. The legislatively established statutory savings effectively shields the state's DOC from competition and enables workers to demand and gain wages that exceed their market values. In economic terms, prices should be able to fluctuatefreely, and in this case, the lowest bidder wins the contract. Thus, implementing managed competition without any arbitrary savings requirement removes the need for complicated state costs calculations, probably leads to greater savings and improved service quality, especially in the long run, as a more competitive industry is created, and establishes a level playfieldfor the public and private providers. A qualificationfor this model is the necessity to assure that performance levels are quantifiableand maintained at a satisfactory level. Performance monitoring is thus required but is generally not a substantial expense.

This study raises some important issues related to contracting out prison services that could improve the process and outcomes and may warrant further analysis:

1. Fluctuations in demand: Demand for beds fluctuates over time and is expected to decline because of the decreasing number of youths, changes in laws like the "three strikes" statute, and easing of penalties for drug-related crimes. As a result, we may witness a decline in occupancy in some states, while demand remains high in others. Easing of legislative rules and procedures of interstate transfer of inmates could save capital outlays for some states where the cost of imprisonment is high or overcrowding exists. At the same time,

inmate transfers could raise revenues for states that are efficient in service provision, enjoy economies of scale, or have unused capacity.

2. Medical services: Costs for medical services are very high, and the extent of the costs varies substantially among the states. In most states, such costs range between $6 and $11 a day. Maine's medical costs are high at $16.67, while in California, which essentially lost control of its prison healthcare to a court-appointed receiver for mental and physical health because of overcrowding, per-day medical costs reaches $43.95. About twenty states have outsourced medical services to private correctional medical healthcare companies in order to cut costs (Leonard, 2012). Such contracting out is independent of contracting out the management of prisons. It seems that competitively contracting out healthcare, whether by DOCs or by private prison companies, suggests cost savings. Based on similar experiences, the state or the private prison contractor should be held financially liable up to a certain amount for shifting inmates to the medical provider (for example, see discussion in Section 12 on Mississippi). Clearly, the DOC or the private prison company is held liable for not referring a seriously sick inmate in order to save on costs. The same healthcare procedure should be maintained for both the state and private prisons. The analysis of medical procedures within existing contracts and a search for a socially efficient procedure that maintains business viability are desired.

3. Length of contract: Our suggested managed competition model is relevant for the existing state prisons and does not apply to other cases. An important issue that is not addressed in this study is the length of time for a contract. This period has to be long enough to recover the initial investment and maintain incentives for adopting technological and managerial innovations. At the same time, a lengthy contract prevents new competitors from entering the market with innovations that could lead to lower prices than existing contractors. However, if a sufficient number of prisons

MARLOWE_0007939

join managed competition and contracts open at varying times, lengthy contracts are possible. Economic theory suggests that as the market increases with both competitive contractors and prisons available for contracting, the length of contract time could be extended, and the extent of regulation by government could be reduced. We suggest a follow-up study on the lessons of managed competition in similar states and local markets to learn of its implications for the prison industry. If indeed the model is "sound," then the study could follow with a model and stages of implementation.

The greater the competition, the more efficient both the operation and the performance of prisons become, and the need for public regulation could be reduced. Competition and transparency replace heavy regulation. The partnership between the public and private sectors in training of correctional officers, the joint regional coordination meetings of wardens, and mutual interests in the ownership and condition of the facilities further assure high performance and efficient operation. The conditions for success, however, are to allow entrance of firms to the industry under some necessary public regulation, and allowing the public sector to compete on a leveled playing field.

## Appendix 1 | Data Sources for the Table on State Costs, Contract Prices, and Savings

### Arizona

We used three sources (Arizona Department of Corrections, 2010; Arizona Department of Corrections, 2011; Arizona JLBC, 2012). For the short-run costs of male inmates in minimum- and medium-security prisons, we used data from page 3 in Arizona Department of Corrections (2011). Depreciation and other capital expenses were calculated by the Arizona JLBC (2012) to be $10.71 instead of the $1.41 reported by the Arizona DOC. A similar adjustment of $2.67 was made to account for underfunded pension liabilities as reported in Arizona JLBC (2012) for Arizona.

The following unaccounted costs were obtained from the Vera report (2012). We calculated $0.16 to be hierarchical costs per inmate per day for both minimum and medium prisons. We did not include this figure. Instead, we used the more comprehensive figure of 11 percent, which also includes the administrative functions of DOC provided by US GAO (2012: 17). This calculated figure for Arizona was $5.42, which falls in the range of $1.40 to $6.64 of the other examined states, and the GAO benchmark figure of $8.09. Debt service per inmate per day was $0.04. This was calculated from the $530,000 reported by Vera for 2010. To be conservative, we did not include the $2.2 million in judgment costs reported by Vera since we were unsure whether such costs should be fully allocated to public correctional facilities.

### California

For California, wages can be separated from benefits (California State Auditor, 2009). For California, wages and salaries were $36.72 per inmate per day, overtime was $6.63, and benefits were $16.25. Facilities and operations include food, repair, clothing, and other items. Education and training of inmates are included in state-provided professional services. The hierarchical cost of $4.04 per inmate per day includes both administration and headquarters costs. Vera (2012) reports unattributed statewide administrative costs for corrections to be $438 million. We added the per diem per inmate of $0.62 to the $44.04 to obtain $44.66. Since no data are available on interest and depreciation for California, we therefore used the $4.61 figure from US GAO (2012: 13). The annual price per inmate was $29,100 obtained from the above California State Auditor Report (p. 36). The daily fee was therefore $79.73 per inmate.

Monitoring costs for California have been exceptionally high. The state sent seventy-three monitors to the out-of-state facilities resulting in a total costs for oversight and monitoring for 2010–2011 of $15,981,000 or $4.42 per inmate per day. The cost and inmate population were obtained from the California Budget for Department of Corrections and Rehabilitation (2011/2012: CR5 and CR15).

MARLOWE_0007940

Data for 2011–2012 were obtained from California Legislative Analyst's Office (CALAO, 2013).

We had to make some minor adjustments to the data in this report in order to fit the categories of Table Appendix 3.1. However, this did not distort the values for the total short-run and long-run government costs. Security in the report was classified as personnel services. Facility operations, which include maintenance and utilities, were incorporated in Table Appendix 3.1 as utilities. The remaining items under facility operation and records were classified in Table Appendix 3.1 as hierarchical. "Food and Clothing" were incorporated in Table Appendix 3.1 under the same categories. The remaining items under the category "Inmate Food and Activities" were added to the miscellaneous category, which was classified in Table Appendix 3.1 as "All other." Finally, "Rehabilitation Programs" were classified in Table Appendix 3.1 as "State Provided Professional Services."

Vera (2012) reported 167,276 inmates in fiscal year (FY) 2011. It reported $320.1 million in underfunded retiree healthcare contributions and $607 million in underfunded retiree healthcare contributions for current employees, totaling $927.1 million. The latest California State Auditor Report (up to November 2012) provides the costs for 2007–2008, while Vera's underfunded and statewide contributions are for 2009–2010. Vera also reported education and training costs provided by the California Department of Forestry and Fire Protection of $4.5 million. Since it is unclear whether these costs are recurring expenses, we chose the conservative approach of excluding them.

### Florida

We chose to use Table A-5 "Adult Male-Size Adjusted for 2008/9" from the Office of Program Policy Analysis and Government Accountability (OPPAGA, 2010a). Indirect costs entail costs imposed on the Departments of Corrections and Management Services. Our interviews revealed that there may be unfunded pensions for state employees, so the current state costs could be understated. However, Vera reported underfunding of only $0.55 per inmate per day. As for education and training programs, the cost for public facilities was $0.79 per inmate per day.

However, the spending by contractor-operated male prisons for the same services, adjusted for size so as to be comparable to state facilities, was in the range of $3.92 to $5.88 (OPPAGA, 2010a, Table A-5). For Table Appendix 3.1, we used the average of the two values, which is $4.90. Table A-7 of the above report provides daily price per inmate of $50.68 for the Bay Correctional Facility and $50.48 for the Moore Haven Correctional Facility. The average for the two private prisons was $50.57 per inmate per day. For the construction costs, we used OPPAGA (2010b) for the publicly built, close-custody Suwannee Correctional Institution of $97.8 million for 1,521 inmates. At the interest rate of 4 percent, the cost per inmate per day is $7.05. This cost item is presented in Table Appendix 3.1 but is not used in the calculation.

### GAO Adjusted Figures

The calculation of costs for the individual states does not include the long-term costs for the facilities. However, it is reasonable to assume that state capital costs are similar to federal costs. We used the report by the U.S. Government Accountability Office (US GAO, 2012) to obtain short- and long-term costs. GAO provides capital and indirect cost percentages, which allowed us to obtain labor costs. We term labor costs as personnel services. In this case, personnel services include, in addition to the usual manpower costs, education and training of inmates. The GAO reported marginal costs, which includes food and medical, so that we were able to subtract such costs from the total direct costs to obtain just labor costs.

### Kentucky

Most of the data were obtained from officials at the Kentucky DOC and from the Kentucky Legislative Research Commission (KLRC) (2009). An official from the Kentucky DOC provided us with the following public short-run direct costs for the most comparable facilities to the contract prisons:

Public prison: Roederer Correctional Complex, minimum/medium, $53.78 (2011) and $51.31 (2012); private prison: Marion Adjustment Center, $47.21, and $43.98, respectively.

Public prison: Little Sandy Correctional Complex, minimum, $48.76 (2011), and $50.53 (2012); private prison: Otter Creek, medium $44.14, and $49.63, respectively.

For 2011: http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Annual%20Reports/Cost%20to%20Incarcerate%202011.pdf

For 2012: http://corrections.ky.gov/about/Documents/Research%20and%20Statistics/Annual%20Reports/Cost%20to%20Incarcerate%202012.pdf

Vera (2012) provided data on underfunded pensions, underfunded retiree healthcare, and the number of inmates in the state. We used all that data to calculate the underfunded category (row 15a in Table Appendix 3.1) to be (200,000 + 13,700,000 + 7,900,000) / (21,347 * 365 = $2.80). The short-run hierarchical costs were termed statewide administrative costs in the Vera report for 2009/2010 and calculated to be $2,800,000/(21,347 inmates * 365) = $0.33. Again from Vera, we obtained the total interest costs of $14.8 million. We then calculated the long-run interest costs per inmate per day to be $14.8 million / (21,347 inmates * 365) = $1.90. KLRC (2009, p. 17) provided the cost of monitoring to be $105,362 for 2009. We calculated the monitoring cost to be $0.23 per inmate per day for the 1,234 private inmates. The state monitoring cost was included as Central Office Overheads attributed to Private (row 26a). The source for the amount is the KLRC (2009), while the entries in Table Appendix 3.1 are for 2011 and 2012. The number of private inmates and the total number of inmates appears in the minimum/medium prison column, 2011. Again, the data on private and total inmates, as in all other examined states, come from U.S. BJS (2011) for 2010. Inmate numbers change on a daily basis. Also, Vera's data refer to the fiscalyear 2009/2010, while U.S. BJS refers to the calendar year 2010. The differences among the various sources are minor.

**Maine**

Maine data were obtained from its Office of Program Evaluation & Government Accountability (2012). Included in the state's report are all adult prisoners of three levels. Personnel services include pensions and benefits. We calculated the individual items by multiplying the $42,538 annual per-inmate costs by the percentage category on page 5 of the Maine report. Maine paid $1.6 million in interest. According to the Vera report (2012), underfunded retiree healthcare amounted to $5.1 million. Per-diem underfunded retiree healthcare per inmate was then $5,100,000 / (2,038 inmates * 365) = $6.85. Unaccounted hierarchical costs were $1.4 million according to the Vera report, and Maine reported general administration costs of $2,520,425. Thus, hierarchical costs, which incorporate the two elements, are $5.27 per inmate per day. The Vera report provides $1.6 million for capital costs which translates to $2.16 per inmate per day.

**Mississippi**

Data were derived from the Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER) (2011). Data were extracted from page 8. For "Personnel Services," we added other costs to salary costs. Annual debt services are hypothetical costs that reflectwhat it would cost the MDOC to financea new prison and are included in Table Appendix 3.1 as "Interest on Debt." These costs incorporate depreciation. Hierarchical costs include "Administrative Costs," which are costs imposed on other state agencies. Vera did not obtain data from Mississippi for any underfunded contributions or other unattributed costs for corrections.

Monitoring of the five private prisons is paid by the contracted prison as part of its per diem. The amount is about $60,000 per prison, where four prisons house 1,000 inmates and the fifth1,500 inmates, and occupancy is 98 percent. Thus, the cost per inmate per day is around $0.15. Clearly, since the cost is part of the price charged by the contracted prison, it is not separately incorporated in our matrix.

**Ohio**

Ohio Department of Rehabilitation and Corrections (ODRC) must achieve at least a 5 percent savings in the per diem for private contracts after adding the costs of monitoring. This is the maximum price to be charged by the private company. The 2000 data were more detailed than the data in the recent years. How-

ever, since the precise source is incomplete, we chose to present the data without evaluating it. The 2010 and 2012 data were provided by the ODRC. The short-run average variable cost for the public prisons of ODRC was calculated as a weighted average of the two public prisons most comparable to Lake Erie Correctional Institution, the privately contracted prison. These were Richland Correctional Institution and Southeastern Correctional Institution. The weighting was done by the inmate population. The 2010 calculation was done by ODRC, while we followed the same procedure for 2012. Vera (2012) determined that the costs for 2010 were understated by 3.8 percent, and the same should be applied for 2012. We did not make the adjustment for the higher indirect and underfunded costs of 3.8 percent. Instead, in order to avoid double counting, we added the hierarchical costs and the federally determined 11 percent indirect costs calculated on the direct costs. Hierarchical costs are derived from the Vera report for 2010 by dividing the statewide administrative costs of $1,400,000 by the total number of inmates of 50,960 and by 365 to obtain $0.075. Underfunded retiree healthcare of $49,100,000 was similarly calculated to obtain $2.64 per inmate per day. Indirect costs were calculated in the US GAO (2012: 17) report as 11 percent of short-run direct costs. We applied that figure to calculate Ohio's short-run indirect costs.

Ohio sold a 1,570-bed male prison to CCA in 2011 for $72 million. Depreciation costs for both 2010 and 2012 were $72.7 million / 20 years / 1,570 inmates / 365 = $6.34. However, we chose to be conservative and therefore used the US GAO (2012: 13) modernization, depreciation, and repair figure of $4.61. For interest paid on state bonds we used 4 percent on the actual Ohio's sale price of $72.7 million to obtain a cost of $5.07 per inmate per day. Since the prison was sold in 2011, we then calculated the short- and long-run percentage savings just for 2012.

**Oklahoma**

Data were obtained from Oklahoma Department of Corrections, Total Cost to State, "Statement of Operating Cost per Inmate Based on FY2011 Actuals." The category "Actual Costs" is assumed to refer to labor,

education, and training, including all benefits for such personnel. The unfunded pensions for 2010 were calculated as: $11,600,000 / (24,549 * 365) = $1.29. These figures were obtained from Vera (2012), the Oklahoma page. We included depreciation costs based on the $4.61 figure calculated by the U.S. Bureau of Prisons (US GAO, 2012: 13), which was used to charge states for holding their inmates in federal prisons. OKDOC purchased in 2000 a 600-inmate private prison for about $27 million. Computing interest (0.04 percent) per inmate (600) per day (365) yields $4.93. Modernization, repair, and depreciation of $4.61 were obtained from the U.S. GAO based on the U.S. BOP study.

The number of private and total inmates, for every state was available from the U.S. BJS (2011, Appendix tables 1 and 20) http://www.azcorrections.gov/adc/divisions/adminservices/notice_rfp_1200001388.pdf. For Oklahoma (and also for Mississippi and Kentucky), we included the total for the state statistics under the medium category. The prices per diem paid by OKDOC to the three medium-security male private prisons and to the one maximum-security male private prison are available at http://www.doc.state.ok.us/field/private_prisons/privates.htm. This website also includes the daily occupancy rates (http://www.doc.state.ok.us/offenders/count.htm) and ages of all prisons (http://www.doc.state.ok.us/facilities/facilities.htm).

**Tennessee**

The Tennessee DOC provided a document from the General Assembly of the State of Tennessee Fiscal Review Committee (2010). The state is responsible for major maintenance of the privately operated prison, which is owned by the state. The central overhead allocation reflects state costs for private contract prisons. This allocation is 76 to 77 percent of its own cost for state prisons. Both items were added to the price by the legislature to determine whether the state five percent statutory savings were met. The data for the number of inmates (27,451) and number of inmates in private facilities (5,120) are for 2010, and derived from U.S. BJS (2011).

**Texas**

Data were obtained from the Texas Legislative Budget Board (2011). Personnel services include just

wages and salaries. Benefits were calculated by dividing the total benefits ($564,800,000) from Vera's report, by the average number of offenders (22,798) in the 1,000-bed prototype institutions (2012, Table 14, p. 29) to obtain the daily cost. The calculation is as follows: (564,800,000 / 139,061) / 365 = $11.12. Hierarchical costs were calculated for Texas from the Vera report as statewide administrative costs of $9,400,000 / (139,061 * 365) = $0.19. The 139,061 number of inmates was taken from the Texas legislative report (Texas Legislative Budget Board, 2011, p. 39). Interest for capital outlays to fund repairs and rehabilitation was $208.7 million in 2010, which is found in the Vera report. We divided the number of adult prisoners in the prototype institution by the total prisoners (22,798 / 139,061 * 208.7M) / (365 * 22,798) = $4.11. Texas has underfunded pensions and retiree healthcare that it has neglected to pay. The Vera report for fiscal year 2010 provides these numbers: $48.1 million of underfunded pensions, $177.2 million underfunded retiree healthcare, adding up to $225.3 million. The underfunded total per inmate per day is $225,000,000 / (139,061 inmates * 365) = $4.44. Indirect short-term cost was $1.30 per inmate per day was reported in the *Criminal Justice Uniform Cost Report* (Texas Legislative Budget Board, 2011). We chose to use the standardized US GAO (2012: 17) figure of 11 percent which is consistent with the data of most states.

**Table Appendix 2.1. Avoidable Costs for Three Cases**

| Cost Item | Definitions | Contracting Out Existing Prison | Overcrowding and Use of Contract Prison | Purchase of Existing State Prison |
|---|---|---|---|---|
| Personnel Services (mainly security) | Includes wages, health insurance, and retirement benefits | x | x | x |
| Medical Services | Includes contracted medical, dental, pharmaceutical, and mental health services | x | x | x |
| Food | | x | x | x |
| Utilities | | x | x | x |
| Fuel | | x | x | x |
| Contracted Professional Services | Includes teachers, psychologists, and others | x | x | x |
| Office & Supplies | | x | x | x |
| State-Provided Professional Services | | x | x | x |
| Technology | | x | x | x |
| Rent | Includes leasing vehicles and other equipment | x | x | x |
| General Operation | | x | x | x |
| Repairs | | x | x | x |
| All Other | | x | x | x |
| **Paid Short-Run Costs** | "Out-of-pocket" expenses that are direct function to the number of inmates | x | x | x |

MARLOWE_0007944

| Cost Item | Definitions | Contracting Out Existing Prison | Overcrowding and Use of Contract Prison | Purchase of Existing State Prison |
|---|---|---|---|---|
| Underfunded Pensions & Retiree Healthcare | Payments below the appropriate actuarial value | x | x | x |
| **Short-Run Direct Costs** | Includes the out-of-pocket expenses and expenses incurred but unpaid | x | x | x |
| Parole Board | | | | |
| Hierarchical | | 0.25*x | 0.25*x | 0.25*x |
| Other Short-Run Indirect Costs | | 0.25*x | 0.25*x | 0.25*x |
| **Short-Run Indirect Costs** | Classification, assignment and tracking of inmates, adjudicating inmate grievances, parole hearing, inmate transfer, liability insurance, human resources for employees, legal, and auditing | 0.25*x | 0.25*x | 0.25*x |
| **Total Short-Run Costs** | Includes direct and indirect costs associated with the number of inmates accruing to DOC and other state agencies (also referred to variable costs) | x | x | x |
| Depreciation (capital cost) | | | x | x |
| Interest on Debt | | | x | x |
| **Total Long-Run Costs** | Includes all expenses directly linked to the number of inmates and capital costs. The latter includes modernization, significant repairs, depreciation, and financingcosts. (The long-run costs are also referred to as the sum of short-run variable costs and the fixed or capital costs.) | | x | x |
| State Maintenance Expense | Includes annual upkeep of facility. In most states it appears as Repairs. | | x | x |
| Monitoring Costs | Direct monitoring of private facilities including DOC's central office related expenses. In most states these expenses are incorporated in the per diem price of contractor. | | | |

MARLOWE_0007945

Table Appendix 3.1. State Costs and Private Contractor Prices (Per Inmate Per Day)

| Itemized Costs by State, Custody, and Year | AZ Min 2010 | AZ Med 2010 | CA 2007/8 | CA All 2011/12 | FL Min Med 2008/9 | KY Min Med 2011 | KY Min Med 2012 | KY Med 2011 | KY Med 2012 | ME 2011 | MS Min 2011 | MS Med-Max 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1a Personnel Services (Mainly Security) | | | 59.60 | 67.01 | 38.83 | | | | | 79.25 | 21.19 | 20.58 |
| 2a Medical Services | | | 21.89 | 43.95 | 8.65 | | | | | 16.67 | 8.78 | 8.78 |
| 3a Food | | | | 4.61 | | | | | | 3.50 | 3.01 | 3.01 |
| 4a Utilities | | | | | | | | | | 3.38 | | |
| 5a Fuel | | | | | | | | | | 2.68 | | |
| 6a Contracted Professional Services | | | | | | | | | | 2.10 | | |
| 7a Office and Supplies | | | | | | | | | | 2.10 | | |
| 8a State-Provided Professional Services | | | 4.20 | 2.54 | 4.90 | | | | | 1.52 | 2.31 | 0.83 |
| 9a Technology | | | | | | | | | | 1.28 | | |
| 10a Rents | | | | | | | | | | 0.58 | | |
| 11a General Operations | | | 9.08 | 13.91 | | | | | | 0.58 | | |
| 12a Repairs | | | | | | | | | | 0.58 | | |
| 13a All Other | | | | 2.10 | | | | | | 0.58 | | |
| 14a Paid Short-Run Costs | 46.59 | 48.32 | 94.77 | 134.12 | | 53.78 | 51.31 | 48.76 | 50.53 | 114.79 | 35.29 | 33.20 |
| 15a Underfunded Pensions and Retiree Healthcare | 2.67 | 2.67 | 15.18 | 15.18 | 0.55 | 2.80 | 2.80 | 2.80 | 2.80 | 6.86 | | |
| 16a Short-Run Direct Costs | 49.26 | 51.09 | 109.95 | 149.30 | 52.93 | 56.58 | 54.10 | 51.56 | 53.33 | 121.65 | 35.29 | 33.20 |
| 17a Parole Board | | | | | | 0.33 | 0.33 | 0.33 | 0.33 | | 0.15 | 0.15 |
| 18a Hierarchical | | | 4.66 | 7.11 | | 5.91 | 5.64 | 5.36 | 5.56 | 5.27 | 2.81 | 2.81 |
| 19a Other Short-Run Indirect Costs | | | | | 3.54 | | | | | 1.37 | | |
| 20a Short-Run Indirect Costs | 5.42 | 5.62 | 12.09 | 7.11 | 5.82 | 6.22 | 5.95 | 5.67 | 5.87 | 13.38 | 3.88 | 3.65 |
| 21a Total Short-Run Costs | 54.68 | 56.51 | 122.05 | 156.41 | 58.75 | 62.80 | 60.05 | 57.23 | 59.20 | 135.03 | 39.17 | 36.85 |
| 22a Depreciation (Capital Cost) | 9.30 | 9.30 | 4.61 | 4.61 | | | | | | 2.15 | | |
| 23a Interest on Debt | 0.04 | 0.04 | | | 7.05 | 1.90 | 1.90 | 1.90 | 1.90 | 2.15 | 11.26 | 7.57 |
| 24a Total Long-Run Costs | 64.01 | 65.84 | 126.66 | 165.44 | 65.80 | 64.93 | 62.18 | 59.36 | 61.33 | 139.33 | 50.43 | 44.42 |
| 25a State Maintenance Expense | | | | | | | | | | | | |

MARLOWE_0007946

| Custody/Year | AZ Min 2010 | AZ Med 2010 | CA 2007/8 | CA All 2011/12 | FL Min-Med 2008/9 | KY Min-Med 2011 | KY Min-Med 2012 | KY Med 2011 | KY Med 2012 | ME 2011 | MS Min 2011 | MS Med-Max 2011 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 26a Central Office Overhead Added Private | | | | 4.42 | | 0.23 | 0.23 | 0.23 | 0.23 | | | |
| 27a Contractor Per Diems | 46.56 | 53.02 | 79.73 | 64.82 | 50.58 | 47.21 | 43.98 | 44.14 | 49.63 | 65.75 | | 31.15 |
| 28a Number of Private Inmates | 2,979 | 1,648 | 2,170 | 9,000 | 11,796 | 2,127 | | 2,127 | | | | 5,241 |
| 29a Number of All Inmates | 12,981 | 14,521 | 165,062 | 134,000 | 104308 | 20,544 | | 20,544 | | 2,038 | | 21,067 |
| 30a Short-Run Percent Savings Prison 1 | 14.85 | 6.17 | 34.68 | 58.56 | 13.91 | 24.83 | 26.76 | 22.8 | 16.16 | 51.31 | 45.39 | 15.47 |
| 31a Short-Run Percent Savings Prison 2 | | | | | | | | | | | | |
| 32a Long-Run Percent Savings Prison 1 | 27.27 | 19.48 | 37.05 | 60.82 | 23.13 | 27.29 | 29.27 | 25.64 | 19.07 | 52.81 | 54.17 | 29.88 |
| 33a Long-Run Percent Savings Prison 2 | | | | | | | | | | | | |
| 34a Percent Private Inmates | 22.95 | 11.35 | 1.31 | 6.72 | 11.31 | 10.35 | | 10.35 | | | | 24.88 |
| 35a Statutory Savings Requirements per $1 | | | | | 0.07 | 0.10 | 0.10 | 0.10 | 0.10 | NR | 0.10 | 0.10 |
| 36a Max Med Costs to Reach Statutory Limit | 17.45 | 12.82 | 46.93 | 100.62 | 10.61 | 11.23 | 11.98 | 9.28 | 5.56 | | | 8.83 |
| 37a Unfunded Pension & Retirement per $1 Long-Run Cost | 0.04 | 0.04 | 0.12 | 0.09 | 0.01 | 0.04 | 0.05 | 0.05 | 0.05 | 0.05 | | |
| 38a Percent Labor Costs of Long-Run Costs | | | 47.06 | 40.50 | 59.01 | | | | | 56.88 | 42.02 | 46.33 |
| 39a Existing and Statutory Medical | | | 68.82 | 144.57 | 19.26 | 11.23 | 11.98 | 9.28 | 5.38 | | 54.17 | 17.61 |
| 40a Statutory Medical/Existing Medical | | | 2.14 | 2.29 | 1.23 | | | | | | | 1.01 |
| 41a Long-Run Costs | 59.95 | 61.83 | 117.59 | 155.69 | 61.43 | 60.03 | 57.49 | 54.88 | 56.70 | 129.30 | 47.52 | 41.68 |
| 42a Indirect Costs 25 Percent | 1.35 | 1.40 | 3.02 | 1.78 | 1.46 | 1.56 | 1.49 | 1.42 | 1.47 | 3.35 | 0.97 | 0.91 |
| 43a Percent Short-Run Savings Indirect 25 | 8.01 | -1.00 | 29.43 | 57.09 | 7.00 | 18.79 | 20.88 | 16.68 | 9.43 | 47.40 | | 8.69 |
| 44a Percent Long-Run Savings Indirect 25 | 22.34 | 14.25 | 32.20 | 58.37 | 17.67 | 21.36 | 23.50 | 19.57 | 12.46 | 49.15 | | 25.27 |

Legend: "Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison

Case 3:16-cv-02267 Document 363-36 Filed 11/20/20 Page 29 of 42 PageID #: 16003

MARLOWE_0007947

Table Appendix 3.1 (continued). State Costs and Private Contractor Prices (Per Inmate Per Day)

| Itemized Costs by State, Custody, and Year | | OH | OH | OH | OK | OK | OK | OK | TN | TX | BOP/GAO |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Custody/Year | Min-Med 2010 | Med 2010 | Min-Med 2012 | 2010 | Min 2011 | Med 2011 | Max 2011 | Med 2011 | Prototype 2011 | Low 2011 |
| 1b | Personnel Services (Mainly Security) | | 27.87 | | | 28.94 | 29.61 | 65.29 | | 40.92 | 41.16 |
| 2b | Medical Services | | | | | 8.28 | 9.37 | 10.56 | | 5.97 | |
| 3b | Food | | | | | | | | | 2.32 | |
| 4b | Utilities | | | | | | | | | | |
| 5b | Fuel | | | | | | | | | | |
| 6b | Contracted Professional Services | | 1.58 | | | | | | | 0.02 | |
| 7b | Office and Supplies | | 7.64 | | | 0.72 | 0.71 | 0.72 | | | |
| 8b | State-Provided Professional Services | | | | | | | | | NA | |
| 9b | Technology | | | | | | | | | | |
| 10b | Rents | | | | | | | | | | |
| 11b | General Operations | | | | | | | | 0.43 | 4.53 | |
| 12b | Repairs | | | | | | | | | | |
| 13b | All Other | | | | | | | | | | |
| 14b | Paid Short-Run Costs | 48.92 | 37.09 | 43.92 | | 39.23 | 39.69 | 76.57 | 50.86 | 53.76 | 65.48 |
| 15b | Underfunded Pensions and Retiree Healthcare) | 2.64 | | 2.64 | | 1.29 | 1.29 | 1.29 | | 4.44 | |
| 16b | Short-Run Direct Costs | 51.56 | 37.09 | 46.56 | | 40.52 | 40.98 | 77.86 | 51.29 | 58.20 | 65.48 |
| 17b | Parole Board | | | | | | | | 2.03 | 0.19 | |
| 18b | Hierarchical | | | | | | | | | | |
| 19b | Other Short-Run Indirect Costs | 5.67 | 4.08 | 5.12 | | 4.46 | 4.51 | 8.57 | 5.64 | 6.40 | 7.20 |
| 20b | Short-Run Indirect Costs | 5.67 | 4.08 | 5.12 | | 4.46 | 4.51 | 8.57 | 7.67 | 6.59 | 7.20 |
| 21b | Total Short-Run Costs | 57.23 | 41.17 | 51.68 | | 44.98 | 45.49 | 86.43 | 58.96 | 64.79 | 72.68 |
| 22b | Depreciation (Capital Cost) | 4.61 | | 4.61 | | 4.61 | 4.61 | 4.61 | | 4.11 | 4.61 |
| 23b | Interest on Debt | 5.07 | | 5.07 | | 4.93 | 4.93 | 4.93 | | 4.11 | |
| 34b | Total Long-Run Costs | 66.92 | 41.17 | 61.37 | 0.00 | 54.52 | 55.03 | 95.97 | 60.66 | 73.01 | 77.29 |
| 25b | State Maintenance Expense | | | | | | | | 0.13 | | |
| 26b | Central Office Overhead Added Private | | | | | | | | 1.57 | | |
| 27b | Contractor Per Diems | | | | | | 43.02 | 56.62 | | | |

MARLOWE_0007948

Itemized Costs by State, Custody, and Year

| Custody/Year | OH Min-Med 2010 | OH Med 2010 | OH Min-Med 2012 | OH 2010 | OK Min 2011 | OK Med 2011 | OK Max 2011 | TN Med 2011 | TX Prototype 2011 | BOP/GaO Low 2011 |
|---|---|---|---|---|---|---|---|---|---|---|
| 28b Contractor per Diem Prison1 | | | 45.86 | | | 40.28 | 57.96 | 42.29 | 37.47 | |
| 29b Contractor per Diem Prison 2 | | | | | | 43.02 | 56.62 | | | |
| 30b Number of Private Inmates | 3,038 | | | 6,019 | 6,684 | 3,569 | 261 | 5,120 | 19,155 | |
| 31b Number of All Inmates | 51,712 | | | 26,252 | 6,684 | 7,802 | 961 | 27,451 | 173,649 | |
| 32b Short-Run Percent Savings Prison 1 | 19.87% | | 11.26% | | | 11.46 | 32.94 | 25.39 | 42.16 | |
| 33b Short-Run Percent Savings Prison 2 | | | | | | 5.44 | 34.49 | | | |
| 34b Long-Run Percent Savings Prison 1 | 31.47 | | 25.27 | | | 21.83 | 41.00 | 30.29 | 48.68 | |
| 35b Long-Run Percent Savings Prison 2 | | | | | | 21.83 | 41.00 | | | |
| 36b Percent Private Inmates | 5.87 | | | 22.93 | | 45.74 | 27.13 | 18.70 | 11.03 | |
| 37b Statutory Savings Requirements per $1 | 0.05 | 0.05 | 0.05 | | | | | | 0.10 | NR |
| 38b Max Med Costs to Reach Statutory Limit | 17.71 | | 12.44 | | | 14.75 | 38.01 | | 28.24 | |
| 39b Unfunded Pensions and Retirement per $1 Long-Run Cost | 0.04 | | 0.04 | | | 0.02 | 0.01 | | 0.06 | |
| 40b Percent Labor Costs of Long-Run Costs | | 67.70 | | | 53.08 | 53.80 | 68.03 | | 56.05 | 53.25 |
| 41b Existing and Statutory Medical | 17.71 | | 12.44 | | NR | 24.12 | 48.57 | | 34.21 | |
| 42b Statutory Medical/Existing Medical | | | | | | 1.57 | 3.60 | | 4.73 | |
| 43b Indirect Costs 25 Percent | 1.42 | 1.02 | 1.28 | | 1.11 | 1.13 | 2.14 | 1.92 | 1.65 | 1.80 |
| 44b Percent Short-Run Savings Indirect 25 Prison 1 | 13.44 | | 4.14 | | | 4.35 | 27.56 | 17.32 | 37.39 | |
| 45b Percent Short-Run Savings Indirect 25 Prison 2 | | | | | | -2.16 | 29.23 | | | |
| 46b Percent Long-Run Savings Indirect 25 Prison 1 | 26.81 | | 20.28 | | | 22.02 | 35.27 | 17.32 | 44.95 | |
| 47b Percent Long-Run Savings Indirect 25 Prison 2 | | | | | | 16.71 | 36.77 | | | |

Legend: "Min," refers to minimum-security prison; "Med," refers to medium-security prison; "Max," refers to maximum-security prison.

MARLOWE_0007949

Table Appendix 3.2. Total State Government and Correctional Employees and Wages, March 2011

| State | Correctional Employment (1) | Total State Government Employment (2) | Correctional Wages (3) | Total State Government Wages (4) | Percent Correctional Employment of State Government Employment (5) | Percent Correctional Wages of State Government Wages (6) | Underfunding as a Percentage of Gross State Product (2007) (7) | Years of Total State Receipts to Eliminate Underfunding Deficit (2007) (8) |
|---|---|---|---|---|---|---|---|---|
| AZ | 10,113 | 68,786 | 37,467,594 | 286,283,598 | 14.7 | 13.1 | 24 | 4.85 |
| CA | 60,007 | 407,321 | 372,328,845 | 2,402,403,913 | 14.7 | 15.5 | 26 | 4.15 |
| FL | 30,382 | 184,237 | 91,858,187 | 706,917,692 | 16.5 | 13.0 | 16 | 3.26 |
| KY | 4,183 | 81,493 | 10,886,449 | 304,185,949 | 5.1 | 3.5 | 34 | 5.35 |
| ME | 1,224 | 21,354 | 5,144,150 | 87,046,104 | 6.2 | 5.9 | 33 | 4.38 |
| MS | 3,174 | 57,656 | 8,337,540 | 207,128,461 | 5.5 | 4.0 | 41 | 5.73 |
| OH | 15,261 | 139,049 | 64,809,527 | 653,416,073 | 11.0 | 9.9 | 47 | 8.74 |
| OK | 4,864 | 68,339 | 15,329,123 | 261,290,605 | 7.1 | 5.9 | 31 | 5.16 |
| TN | 6,953 | 86,215 | 19,666,994 | 312,198,855 | 8.1 | 6.3 | 13 | 2.84 |
| TX | 43,403 | 318,370 | 128,038,407 | 1,364,972,027 | 13.6 | 9.4 | 16 | 4.67 |
| US | 462,549 | 4,359,380 | 1,921,450,594 | 19,971,861,990 | 10.6 | 9.6 | Not Applicable | Not Applicable |

*Source:* U.S. Census Bureau, 2011, *Annual Survey of Public Employment and Payroll*, March. Retrieved July 26, 2013,
http://www.census.gov/govs/apes/. Data for tax revenue and state product columns from Novy-Marx and Rauh (2009, p. 198).

Case 3:16-cv-02267    Document 363-36    Filed 11/20/20    Page 32 of 42 PageID #: 16006

MARLOWE_0007950

### References

Abt Associates. 1998, July 16. *Private Prisons in the United States: An Assessment of Current Practice.* Cambridge, MA: Abt Associates.

Arizona Department of Corrections. 2010, September. *Auditor General Staff Analysis of the Department of Corrections, Fiscal Year (FY) 2009–FY 2010.* Retrieved December 24, 2012, from http://www.azauditor. gov/Reports/State_Agencies/Agencies/Corrections_ Department_of/Performance/10-08/10-08.pdf

Arizona Department of Corrections. 2011, April 13. *FY 2010 Operating Per Capita Cost Report*, Bureau of Planning, Budget and Research.

Arizona Department of Corrections. 2012 Request for Proposals to Build and Operate a Medium Security Prison. Retrieved April 22, 2014, from http://www.azcorrections.gov/adc/divisions/ adminservices/notice_rfp_1200001388.pdf

Arizona State legislature. 2014. Adult incarceration contracts; criteria. Retrieved April 21, 2014 from http:// www.azleg.gov/FormatDocument.asp?inDoc=/ ars/41/01609-01.htm&Title=41&DocType=ARS

Arizona Joint Legislative Budget Committee (LBC). 2012, September 19. *State–Private Prison Cost Comparison.* Staff Memorandum.

Avondale Partners, LLC. 2009, March 2. *Corrections Industry: Behind the Bars—an In-Depth View of the Corrections Industry.*

Baker, Jonathan B. 2002. Mavericks, Mergers, and Exclusion: Proving Coordinated Competitive Effects under the Antitrust Laws. *New York Law Review, 77*(April):135–203.

Benson, Bruce L. 2003. Do We Want the Production of Prison Service to Be More "Efficient"?In Alexander Tabarrok (Ed.), *Changing the Guard: Private Prisons and the Control of Crime:*163–216. Oakland, CA: The Independent Institute.

Berger, Warren. 1992. More Warehouses, or Factories with Fences. In Gary Bowman, et al. (Eds.). *Privatizing the United States Justice System.* Jefferson, NC: McFarland & Company. 330–335.

Blackstone, Erwin A. 2003. Benefitsof Osteopathic. *Health Affairs, 22*(1, January), 292.

Blackstone, Erwin A., et al. 2011–2012. The Case of Duopoly: Industry Structure Is Not a Sufficient Basis for Regulation. *Regulation, 34*(4, Winter), 12–17. Retrieved September 17, 2013, from http://www.cato.org/sites/cato.org/files/serials/ files/regulation/2012/6/v34n4-3.pdf

Blumstein, James F., Cohen, Mark A., & Seth, Suman. 2007. Do Government Agencies Respond to Market Pressure? Evidence from Private Prisons. Owen Graduate School of Management, Vanderbilt University. Retrieved January 20, 2013, from http://www.cca.com/static/assets/Blumstein_ Cohen_Study.pdf. Also available as Blumstein et al. 2008. Do Government Agencies Respond to Market Pressures? Evidence from Private Prisons. *Virginia Journal of Social Policy and the Law, 15*(3): 446–477.

Brakel, Samuel. 1992. Private Corrections. In Gary Bowman, et al. (Eds.), *Privatizing the United States Justice System.* Jefferson, NC: McFarland & Company, 254–274.

Brakel, Samuel, & Kimberley Ingersoll Gaylord. 2003. Prisons and Corrections. In Alexander Tabarrok (Ed.), *Changing the Guard: Private Prisons and the Control of Crime* (pp. 125–162). Oakland, CA: The Independent Institute.

Brown, Ben. 2011, March 6. Alaskans Deserve Better than the Not-So Golden Goose Creek Prison. *Juneau Empire.com.* Retrieved December 20, 2012, from http://juneauempire.com/stories/030611/opi_ 795369352.shtml

*Brown v. Plata.* 2011. 563 U.S. ___, 131 S. Ct. 1910.

Burnett, William B. 1999. Predation by a Non-Dominant Firm: The Liggett Case (1993). In John E. Kwoka and Lawrence J. White (Eds.), *The Antitrust Revolution* (pp. 239–263). New York: Oxford University Press.

California Governor Budget for Department of Corrections and Rehabilitation (2011/2012). Section 5225, 3-yr Expenditures and Personnel Years, actual 2010-11, pp CR5, CR15. Retrieved April 22, 2014,

MARLOWE_0007951

from http://www.ebudget.ca.gov/2012-13-EN/pdf/GovernorsBudget/5210/5225_fig1f.pdf

California Legislative Analyst's Office (CALAO). 2008, February 7. *Correctional Officer Pay, Benefits, and Labor Relations*. Retrieved December 11, 2012, from http://www.lao.ca.gov/2008/stadm/ccpoa_pay_020708/ccpoa_pay_020708.aspx

California Legislative Analyst's Office(CALAO). 2010, January 20. *California Out-of-State Correctional Facility Program*. Presented to the Assembly Accountability and Administrative Review Committee.

California Legislative Analyst's Office (CALAO). 2012a, April 19. *Providing Constitutional and Cost-Effective Inmate Medical Care*.

California Legislative Analyst's Office (CALAO). 2012b, February 23. *The 2012–13 Budget: Refocusing CDCR After The 2011 Realignment*. Retrieved December 11, 2012, from http://www.lao.ca.gov/analysis/2012/crim_justice/cdcr-022312.pdf

California Legislative Analyst's Office (CALAO). 2013, January. *California's Criminal Justice System: A Primer*. Retrieved February 3, 2013, from http://lao.ca.gov/laoapp/PubDetails.aspx?id=2682

California Public Works Board. 2012. Agenda with Analysis, September 11.

California State Auditor. 2009, September. *California Department of Corrections and Rehabilitation: It Fail to Track and Use Data . . . .* Report 2009-107.1. http://www.bsa.ca.gov/pdfs/sr2011/2009-107.1.pdf

California State Works Board. 2012. *Agenda with Analysis for Meeting September 11, 2012*. Retrieved November 16, 2013, from http://www.spwb.ca.gov/archives/agendas/documents/09-11-12_Agendaw_Analysis.pdf

Camp, Scott D., & Daggett, Dawn M. 2005. *Quality of Operations at Private and Public Prisons: Using Trends in Inmate Misconduct to Compare Prisons*. Washington, DC: Office of Research and Evaluation, Federal Bureau of Prisons.

Camp, Scott D., & Gaes, Gerald G. 2002. Growth and Quality of U.S. Private Prisons: Evidence from a National Survey. *Criminology and Public Policy, 1*(3), July: 427–450.

*CCA of Tennessee vs. Department of Management Services*. 2013, July 12. State of Florida, Division of Administrative Hearings, Case No. 13-0880BID.

Culp, Richard. 2011, October 6. The Failed Promise of Prison Privatization. *Prison Legal News*. Retrieved September 17, 2013, from http://www.inthepublicinterest.org/article/failed-promise-prison-privatization

Diroll, David J. 2011. *Prison Crowding: The Long View, With Suggestions*. The 2011 Monitoring Report of the Ohio Criminal Sentencing Commission, March. Retrieved April 21, 2014, from http://www.supremecourt.ohio.gov/boards/Sentencing/resources/publications/monitoringreport2011.pdf

Dreyfuss, Rick. 2013, July 30. Pension Crisis Worsens in Pa. *Philadelphia Inquirer*, A15.

Elias, Paul. 2013. High Court Won't Delay Inmates' Early Release. *Philadelphia Inquirer*, A6.

Elliott Pollack and Company. 2010, January. *Economic and Fiscal Impact of CCA-Arizona Correctional Facilities*. Scottsdale, AZ: Elliot Pollack & Co. Retrieved January 28, 2013, from http://www.cca.com/static/assets/CCA_Arizona_Impact_Report_2009_FINAL_011810.pdf

Florida Chamber of Commerce. 2012, February 13. Data Shows Privately Run Prisons Can Provide a Better Environment for Effective Inmate Rehabilitation Programs. Copy is available from the Chamber. Retrieved March 21, 2013, from http://www.wctv.tv/blogs/editorial/Data_Privately_Run_Prisons_Can_Provide_Better_Rehabilitation_Programs_139216274.html.

Florida Department of Management Services, 2012, January 19. *Private Prison Monitoring*. Presentation before the Florida House Appropriations Committee. Retrieved January 30, 2013, from http://big.assets.huffingtonpost.com/FloridaDMSJan2012.pdf

Florida Legislature Office of Program Policy Analysis And Government Accountability, 2013. March. *Information Brief Comparing Costs of Public and Private Prisons*. Retrieved June 10, 2014, from http://

MARLOWE_0007952

www.oppaga.state.fl.us/MonitorDocs/Reports/pdf/9669rpt.pdf

Florida Officeof Program Policy Analysis and Government Accountability (OPPAGA), 1997. Information Brief Comparing Costs of Public and Private Prisons, March. Report No. 96-69. Florida Legislature.

Florida Officeof Program Policy Analysis and Government Accountability (OPPAGA). 2010a, April 20. Private Prisons Exceed Savings Requirements. Florida Legislature.

Florida Office of Program Policy Analysis and Government Accountability (OPPAGA). 2010b, February 1. Prison Construction: Research Memorandum. Florida Legislature.

Gaes, Gerald G., et al. 2004. *Measuring Prison Performance: Government Privatization and Accountability*. New York: Altamira Press.

Gilroy, Leonard, & Kenny, Harris. 2011. *Annual Privatization Report 2011: Corrections and Public Safety*. Los Angeles: Reason Foundation. Retrieved December 14, 2012, from http://reason.org/files/publicsafety_annual_privatization_report_2011.pdf

Harris, Craig, 2013. Arizona faces growing cost of private prisons. *The Arizona Republic*. December 29. Retrieved April 21, 2014 from http://www.azcentral.com/news/arizona/articles/20131204arizona-private-prisons-growing-cost.html

Healey, Thomas J., et al. 2012. *Underfunded Public Pensions in the United States: The Size of the Problem, the Obstacles to Reform and the Path Forward*. Harvard Kennedy School, M-RCBJ Faculty Working Paper No. 2012-08. Retrieved July 25, 2013, from http://www.hks.harvard.edu/var/ezp_site/storage/fckeditor/file/pdfs/centers-programs/centers/mrcbg/publications/fwp/MRCBG_FWP_2012_08-Healey_Underfunded.pdf

Jing, Yijia. 2010. *Prison Privatization: A Study of the Causes and Magnitude*. New York: Nova Science Publishers.

Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER), Mississippi Department of Corrections. 2011, December 13. *FY 2011 Cost per Inmate Day*. The Mississippi Legislature.

Kentucky Department of Corrections. 2013. *Cost to Incarcerate*. Research and Statistics, Annual Reports. Retrieved February 5, 2013, from http://corrections.ky.gov/about/Pages/Researchand Statistics.aspx

Kentucky Legislative Research Commission (KLRC). 2009. *Cost of Incarcerating Adult Felons*. Research Report No. 373. Retrieved November 19, 2012, from http://www.lrc.ky.gov/lrcpubs/RR373.pdf

Lanza-Kaduce, Lonn, Karen F. Parker, and Charles W. Thomas, 1999. A Comparative Recidivism Analysis of Releases from Private and Public Prisons. *Crime & Delinquency, 45*(1). January: 28–47.

Leonard, Kimberly. 2012, July 21. Privatized Prison Healthcare Scrutinized. *Washington Post*. Retrieved April 22, 2014 from http://articles.washingtonpost.com/2012-07-21/national/35486443_1_wexford-health-sources-prisoner-health-corizon

Logan, Charles H. 1992. Well Kept: Comparing Quality of Confinement in Private and Public Prisons. *Journal of Criminal Law and Criminology, 83*(3, Fall): 577–613.

Logan, Charles H. 1996. Private Prison Management: A Case Comparison. *Criminal Justice Review, 21*(1, spring): 62–85.

Logan, Charles H., & McGriff, Bill W. 1989, September/October. Comparing Costs of Public and Private Prisons: A Case Study. *Research in Action*. U.S. Department of Justice, Officeof Justice Program, NIJ Reports No. 216.

Lundahl, Brad W., et al. 2009. Prison Privatization: A Meta-Analysis of Cost and Quality Indicators. *Research on Social Work, 19*(4), 383–394. DOI: 10.1177/1049731509331946

Maine Officeof Program Evaluation & Government Accountability. 2012, June. *Cost per Prisoner in the State Correctional System*. Retrieved April 22, 2014, from http://www.maine.gov/legis/opega/GOC/GOC_meetings/Current_handouts/6-8-12/Final%20CPP%20Info%20Brief%206-8-12.pdf

McCrie, Robert D. 1993. Private Correction: The Delicate Balance. In G. Bowman, et al. (Eds.),

MARLOWE_0007953

*Privatizing Correctional Institutions* (pp. 19–32). New Brunswick, NJ: Transaction Publishers.

MGT of America. 2006, November 1. *Comparative Study of South Bay and Lake City Private Prison Facilities*. Prepared for Florida Department of Management Services.

MGT of America. 2007, December 31. *Performance Audit of the Department of Corrections for the Legislative Service Bureau of the Oklahoma Legislature: Final Report*. Retrieved December 21, 2012, from http://www.okhouse.gov/Documents/OKRVSD-FinalReport080103.pdf

Mississippi Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER). 2011, December 13. *Mississippi Department of Corrections' FY 2011, Cost per Inmate Day*. Retrieved from http://www.peer.state.ms.us/reports/rpt557.pdf

Mississippi Joint Legislative Committee on Performance Evaluation and Expenditure Review (PEER). 2012, December 11. *Mississippi Department of Corrections' FY 2012, Cost per Inmate Day*. Retrieved from http://www.peer.state.ms.us/reports/rpt565.pdf

Moore, Adrian T. 1999. *Private Prisons: Quality Corrections at a Lower Cost*. The Reason Foundation, RPPI Policy Study No. 240. Retrieved September 25, 2013, from http://www.hawaii.edu/hivandaids/Private_Prisons__Quality_Corrections_at_a_Lower_Cost.pdf

Munnell, Alicia H., et al. 2013. *State and Local Pension Costs: Pre-Crisis, Post-Crisis, and Post-Reform*. Center for Retirement Research at Boston College, Number 30, February. Retrieved July 25, 2013, from http://crr.bc.edu/wp-content/uploads/2013/02/slp_30.pdf

Nelson, Julianne Nelson. 2005, December. *Competition in Corrections: Comparing Public and Private Sector Operations*. Boston, MA: CNA Corporation.

Novy-Marx, Robert, & Rauh, Joshua D. 2009. The Liabilities and Risks of State-sponsored Pension Plans. *Journal of Economic Perspectives, 23*(4, Fall), 191–210.

Ohio Department of Rehabilitation and Corrections (ODRC). 2007. *Basic Model for Estimating Operating Costs*. Attachment to the contracts for North Coast Correctional Treatment Facility and the Lake Erie Correctional Institution.

Ohio Department of Rehabilitation and Corrections (ODRC). *2011 Annual Report*. Retrieved February 13, 2013, from http://www.drc.ohio.gov/web/reports/Annual/Annual%20Report%202011.pdf

Oklahoma Department of Corrections (OKDOC). 2011. *Total Cost to State. Statement of Operating Cost per Inmate Based on FY 2011 Actual*. Report supplied by the Oklahoma Department of Corrections.

Oklahoma Department of Corrections (OKDOC). 2012. *History and Development of Private Bed Space in Oklahoma Department of Corrections*. Document provided by OKDOC, November 2012.

Perrone, D., & Pratt, T. C. 2003. Comparing the Quality of Confinement and Cost-Effectiveness of Public Versus Private Prisons: What We Know, Why We Do Not Know More, and Where Do We Go From Here? *The Prison Journal, 83*: 301–322.

Pew, Center on the States. 2010, February. *The Trillion Dollar Gap: Underfunded State Retirement Systems and the Roads to Reform*. Washington, DC: Pew. Retrieved April 8, 2013, from http://www.hartfordinfo.org/issues/wsd/taxes/the_trillion_dollar_gap_final.pdf

Pew, Center on the States. 2012, June. *The Widening Gap Update*. Issue Brief. Retrieved November 4, 2013, from http://www.pewstates.org/uploaded-Files/PCS_Assets/2012/Pew_Pensions_Update.pdf

Picard, Ken. 2011. Is It Cheaper to House Vermont Prisoners In or Out of State? It Depends. Retrieved November 5, 2012, from http://7dvt.com/2011vermont-prisons

Pratt, Travis C. & Maahs, Jeff. 1999. Are Private Prisons More Cost-Effective Than Public Prisons? A Meta-Analysis of Evaluation Research Studies. *Crime and Delinquency, 45*: 358–371.

Sanders, Katie. 2012, February 14. Private Prisons Can Chase Escapees. *Tampa Bay Times*, 18.

Schmalensee, Richard. 1978. Entry Deliverance in the Need-To-Eat Cereal Industry. *Bell Journal of Economics, 9*(2, Autumn), 305–327.

MARLOWE_0007954

Segal, Geoffrey F., & Moore, Adriane T. 2002, January. *Weighing the Watchman: Evaluating the Costs and Benefits of Outsourcing Correctional Services*. Policy Study 289. Los Angeles: Reason Public Policy Institute.

Shichor, David. 1995. *Punishment for Profit: Private Prison/Public Concerns*. Thousand Oaks, CA: Sage.

State of Washington. 2012, June. *The Washington State Budget Process*. Office of Financial Management, Budget Division.

Strumpf, Dan. 2013, February 11. With Fewer to Lock Up, Prisons Shut Doors. *Wall Street Journal*, A-3.

Tang, Norman. 2012, July 9. The Profit of Prison. *Motley Fool*. Retrieved November 4, 2013, from http://beta.fool.com/ymwg/2012/07/09/profit-prison/6768/

Tennessee General Assembly, Fiscal Review Committee. 2010, April 26. Memorandum on Cost Comparison: State and Private Prison Contractors.

Texas Legislative Budget Board. 2011, January. *Criminal Justice Uniform Cost Report: Fiscal Years 2008–2010*. January. Retrieved February 11, 2013, from http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal%20Justice%20Uniform%20Cost%20Reports 2008-2010.pdf

Texas Legislative Budget Board. 2013, January. *Criminal Justice Uniform Cost Report: Fiscal Years 2010–2012*. January. Retrieved February 11, 2013, from http://www.lbb.state.tx.us/Public_Safety_Criminal_Justice/Uniform_Cost/Criminal%20Justice%20Uniform%20Cost%20Report%20Fiscal%20Years%202010%20to%202012.pdf

Thomas, Charles W. 2004. Correctional Privatization in America: An Assessment of Its Historical Origins, Present Status, and Future Prospects. In Alexander Tabarrok (Ed.), *Changing the Guard: Private Prisons and the Control of Crime* (pp. 57–124). Oakland, CA: The Independent Institute.

U.S. Army Corps of Engineers. 2011, March 31. Civil Works Construction Cost Index System. Retrieved November 4, 2013, from http://planning.usace.army.mil/toolbox/library/EMs/em1110.2.1304.pdf

U.S. Bureau of Justice Statistics (U.S. BJS). 2001, February. *Emerging Issues on Privatized Prisons*. NCJ 181249.

U.S. Bureau of Justice Statistics (U.S. BJS). 2005. *Census of State and Federal Correctional Facilities, 2005*. Retrieved February 25, 2012, from http://bjs.ojp.usdoj.gov/content/pub/pdf/csfcf05.pdf

U.S. Bureau of Justice Statistics (U.S. BJS). 2011. *Prisoners in 2010*. U.S. DOJ Report NCJ 236096. Retrieved February 27, 2013, from http://bjs.ojp.usdoj.gov/content/pub/pdf/p10.pdf

U.S. Government Accountability Office (US GAO). 2012, July 27. *Federal Bureau of Prisons: Methods for Estimating Incarceration and Community Corrections Costs and Result of the Elderly Offender Pilot*.

U.S. Government Accountability Office (US GAO). 1996, August. *Private and Public Prisons and Studies Comparing Operational Costs and/or Quality of Service*. Report to the Subcommittee on Crime, Committee of the Judiciary, House of Representatives. GAO/GGD-96-158.

Vera Institute of Justice (Vera). 2012, March 20. *The Price of Prisons: Incarceration Costs Taxpayers*. New York: Vera Institute of Justice.

W M Financial Services, 2014. *Rates Over Time—Interest Rate Trends*. Retrieved April 21, 2014 from http://www.munibondadvisor.com/market.htm

Case 3:16-cv-02267    Document 363-36    Filed 11/20/20    Page 37 of 42 PageID #: 16011

MARLOWE_0007955

## Acknowledgements

The authors thank the officialsin the state corrections departments, state legislators, and state oversight agencies, as well as relevant federal officials,who provided the data and interviews used in this research. We also thank Corrections Corporation of America, GEO Group, and Management and Training Corp., members of the private corrections industry, for their partial funding of this project. Last but certainly not least, the authors gratefully acknowledge the helpful referees' comments that have significantlyimproved this study through peer review. Any omissions or errors are the responsibility of the authors.

MARLOWE_0007956

## About the Authors



**Simon Hakim** is research fellow at The Independent Institute and professor of economics and the director of the Center for Competitive Government at Temple University. He edits a book series on Protecting Critical Infrastructures with Springer Publisher. He earned M.A and Ph.D. degrees in Regional Science from the University of Pennsylvania. He also earned a M.Sc. degree in City and Regional Planning from the Technion, Israel Institute of Technology, and a B.A. in Economics at Hebrew University in Jerusalem. His special areas of research and teaching are economics of privatization and public-private-partnerships, economics of crime and security, private/public police, and homeland security. Dr. Hakim has published sixty-one scientific articles in leading economic, criminal justice, security, and public policy journals. He has written over forty professional articles and edited sixteen books. Along with Erwin A. Blackstone, he wrote a major textbook on the electronic security industry. He is invited to lecture and teach classes on privatization and international economics in MBA and city planning programs worldwide.

Dr. Hakim conducted many funded research and consulting projects on public-private partnerships, security, and public finance issues for the U.S. Departments of Justice and Labor; the Commonwealth Foundation; The Independent Institute; the Alarm Industry Research and Education Foundation; the private prison industry; the cities of Philadelphia, Newark, and New Castle County, DE; the Philadelphia International Airport; ADT; Vector Security; law firms; and other leading security companies. For the complete Curriculum Vitae see http://d3iovmfe1okdrz.cloudfront.net/cms/wp-content/uploads/2012/09/simonvitae_1.pdf

For the Center for Competitive Government see http://www.fox.temple.edu/ccg.



**Erwin A. Blackstone** is research fellow at The Independent Institute and has taught economics for over forty years. Prior to coming to Temple in 1976, Dr. Blackstone taught at Dartmouth College and Cornell University. His research areas and publications include the economics of industrial organization, antitrust, health economics, and privatization. He has published on a variety of topics including hospital mergers, competition in police services, economics of biopharmaceuticals, tying agreements and collusion. His publications include over fifty articles in major economics and public policy journals, chapters in books, two edited books, a monograph on private policing, and a book on the electronic security industry. Dr. Blackstone has taught courses from the introductory to the Ph.D. level. He was given in 1976 the Clark Award for distinguished teaching at Cornell and at Temple, the Andrisani-Frank Award for Excellence in teaching in 2001, and the Musser Excellence in Leadership Award for teaching in 2006. Professor Blackstone holds a Ph.D. from the University of Michigan.

71

MARLOWE_0007957

MARLOWE_0007958

# Independent Studies in Political Economy

THE ACADEMY IN CRISIS | *Ed. by John W. Sommer*

AGAINST LEVIATHAN | *Robert Higgs*

ALIENATION AND THE SOVIET ECONOMY | *Paul Craig Roberts*

AMERICAN HEALTH CARE | *Ed. by Roger D. Feldman*

ANARCHY AND THE LAW | *Ed. by Edward P. Stringham*

ANTITRUST AND MONOPOLY | *D. T. Armentano*

AQUANOMICS | *Ed. by B. Delworth Gardner & Randy T. Simmons*

ARMS, POLITICS, AND THE ECONOMY | *Ed. by Robert Higgs*

BEYOND POLITICS | *Randy T. Simmons*

BOOM AND BUST BANKING | *Ed. by David Beckworth*

CAN TEACHERS OWN THEIR OWN SCHOOLS? | *Richard K. Vedder*

THE CAPITALIST REVOLUTION IN LATIN AMERICA | *Paul Craig Roberts & Karen Araujo*

THE CHALLENGE OF LIBERTY | *Ed. by Robert Higgs & Carl P. Close*

CHANGING THE GUARD | *Ed. by Alexander Tabarrok*

THE CHE GUEVARA MYTH AND THE FUTURE OF LIBERTY | *Alvaro Vargas Llosa*

THE CIVILIAN AND THE MILITARY | *Arthur A. Ekirch, Jr.*

CRISIS AND LEVIATHAN, 25TH ANNIVERSARY EDITION | *Robert Higgs*

CUTTING GREEN TAPE | *Ed. by Richard L. Stroup & Roger E. Meiners*

THE DECLINE OF AMERICAN LIBERALISM | *Arthur A. Ekirch, Jr.*

DELUSIONS OF POWER | *Robert Higgs*

DEPRESSION, WAR, AND COLD WAR | *Robert Higgs*

THE DIVERSITY MYTH | *David O. Sacks & Peter A. Thiel*

DRUG WAR CRIMES | *Jeffrey A. Miron*

ELECTRIC CHOICES | *Ed. by Andrew N. Kleit*

THE EMPIRE HAS NO CLOTHES | *Ivan Eland*

THE ENTERPRISE OF LAW | *Bruce L. Benson*

ENTREPRENEURIAL ECONOMICS | *Ed. by Alexander Tabarrok*

FAULTY TOWERS | *Ryan C. Amacher & Roger E. Meiners*

FINANCING FAILURE | *Vern McKinley*

FIRE & SMOKE | *Michael I. Krauss*

THE FOUNDERS' SECOND AMENDMENT | *Stephen P. Halbrook*

FREEDOM, FEMINISM, AND THE STATE | *Ed. by Wendy McElroy*

GLOBAL CROSSINGS | *Alvaro Vargas Llosa*

GOOD MONEY | *George Selgin*

GUN CONTROL IN THE THIRD REICH | *Stephen P. Halbrook*

HAZARDOUS TO OUR HEALTH? | *Ed. by Robert Higgs*

HOT TALK, COLD SCIENCE | *S. Fred Singer*

HOUSING AMERICA | *Ed. by Randall G. Holcombe & Benjamin Powell*

JUDGE AND JURY | *Eric Helland & Alexander Tabarrok*

LESSONS FROM THE POOR | *Ed. by Alvaro Vargas Llosa*

LIBERTY FOR LATIN AMERICA | *Alvaro Vargas Llosa*

LIBERTY FOR WOMEN | *Ed. by Wendy McElroy*

LIVING ECONOMICS | *Peter J. Boettke*

MAKING POOR NATIONS RICH | *Ed. by Benjamin Powell*

MARKET FAILURE OR SUCCESS | *Ed. by Tyler Cowen & Eric Crampton*

MONEY AND THE NATION STATE | *Ed. by Kevin Dowd & Richard H. Timberlake, Jr.*

NEITHER LIBERTY NOR SAFETY | *Robert Higgs*

THE NEW HOLY WARS | *Robert H. Nelson*

NO WAR FOR OIL | *Ivan Eland*

OPPOSING THE CRUSADER STATE | *Ed. by Robert Higgs & Carl P. Close*

OUT OF WORK | *Richard K. Vedder & Lowell E. Gallaway*

PARTITIONING FOR PEACE | *Ivan Eland*

PATENT TROLLS | *William J. Watkins, Jr.*

PLOWSHARES AND PORK BARRELS | *E. C. Pasour, Jr. & Randal R. Rucker*

A POVERTY OF REASON | *Wilfred Beckerman*

THE POWER OF HABEAS CORPUS IN AMERICA | *Anthony Gregory*

PRICELESS | *John C. Goodman*

PRIVATE RIGHTS & PUBLIC ILLUSIONS | *Tibor R. Machan*

PROPERTY RIGHTS | *Ed. by Bruce L. Benson*

THE PURSUIT OF JUSTICE | *Ed. by Edward J. López*

RACE & LIBERTY IN AMERICA | *Ed. by Jonathan Bean*

RECARVING RUSHMORE | *Ivan Eland*

RECLAIMING THE AMERICAN REVOLUTION | *William J. Watkins, Jr.*

REGULATION AND THE REAGAN ERA | *Ed. by Roger E. Meiners & Bruce Yandle*

RESTORING FREE SPEECH AND LIBERTY ON CAMPUS | *Donald A. Downs*

RESURGENCE OF THE WARFARE STATE | *Robert Higgs*

RETHINKING GREEN | *Ed. by Robert Higgs & Carl P. Close*

RISKY BUSINESS | *Ed. by Lawrence S. Powell*

SCHOOL CHOICES | *John Merrifield*

SECURING CIVIL RIGHTS | *Stephen P. Halbrook*

STRANGE BREW | *Douglas Glen Whitman*

STREET SMART | *Ed. by Gabriel Roth*

TAXING CHOICE | *Ed. by William F. Shughart, II*

TAXING ENERGY | *Robert Deacon, Stephen DeCanio, H. E. Frech, III, & M. Bruce Johnson*

THE TERRIBLE 10 | *Burton A. Abrams*

THAT EVERY MAN BE ARMED | *Stephen P. Halbrook*

TO SERVE AND PROTECT | *Bruce L. Benson*

TWILIGHT WAR | *Mike Moore*

VIETNAM RISING | *William Ratliff*

THE VOLUNTARY CITY | *Ed. by David T. Beito, Peter Gordon, & Alexander Tabarrok*

WINNERS, LOSERS & MICROSOFT | *Stan J. Liebowitz & Stephen E. Margolis*

WRITING OFF IDEAS | *Randall G. Holcombe*



THE INDEPENDENT INSTITUTE is a non-profit, non-partisan, scholarly research and educational organization that sponsors comprehensive studies in political economy. Our mission is to boldly advance peaceful, prosperous, and free societies, grounded in a commitment to human worth and dignity.

Politicized decision-making in society has confined public debate to a narrow reconsideration of existing policies. Given the prevailing influence of partisan interests, little social innovation has occurred. In order to understand both the nature of and possible solutions to major public issues, the Independent Institute adheres to the highest standards of independent inquiry, regardless of political or social biases and conventions. The resulting studies are widely distributed as books and other publications, and are debated in numerous conference and media programs. Through this uncommon depth and clarity, the Independent Institute is redefining public debate and fostering new and effective directions for government reform.

Additional copies of this Independent Policy Report are available for $10.00 each.
To order, visit www.independent.org or call 510-632-1366.
The Independent Institute • 100 Swan Way • Oakland, CA 94621 • info@independent.org • www.independent.org

MARLOWE_0007960