# EXHIBIT 151

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| Document Title: | Contracting for Imprisonment in the Federal Prison System: Cost and Performance of the Privately Operated Taft Correctional Institution |
| Author(s): | Douglas C. McDonald, Ph.D; Kenneth Carlson |
| Document No.: | 211990 |
| Date Received: | November 2005 |
| Award Number: | 1999-IJ-CX-K018 |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.



**Abt Associates Inc.**

# Contracting for Imprisonment in the Federal Prison System:

# Cost and Performance of the Privately Operated Taft Correctional Institution

Cambridge, MA
Lexington, MA
Hadley, MA
Bethesda, MD
Chicago, IL

October 1, 2005

*Prepared for*
National Institute of Justice
Office of Justice Programs
U.S. Department of Justice
Washington, D.C. 20531

*Prepared by*
Douglas C. McDonald, Ph.D.
Kenneth Carlson

Abt Associates Inc.
55 Wheeler Street
Cambridge, MA 02138

MARLOWE_0007432

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

MARLOWE_0007433

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

This project was supported by Grant No. 99-IJ-CX-K018 awarded by the National Institute of Justice, Office of Justice Programs, U.S. Department of Justice. Points of view in this document are those of the authors and do not necessarily represent the official position or policies of the U.S. Department of Justice or Abt Associates Inc.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Contents

Acknowledgments ...................................................................................................................... v

Summary.................................................................................................................................... vii

Chapter 1: Introduction ........................................................................................................ 1
    A Government vs. Private Firm Competition........................................................................ 3
    The Bureau's Changing Relationship to Privatization ....................................................... 4
    Our Approach to Assessing the Taft Correctional Institution .......................................... 5
        Financial Costs and Savings .......................................................................................... 5
        Institutional Performance ............................................................................................... 5
    The Structure of This Report ................................................................................................. 7

Chapter 2: Does Contracting Cost Less Than Government Operation?.......................... 9
    Roadmap to This Chapter ...................................................................................................... 10
    The Framework for the Cost Comparisons .......................................................................... 11
        The Structure of Circular A-76 Analyses.................................................................... 11
        Modifying the A-76 Procedures for the Present Study ................................................ 12
    The Cost of Contracting for Prison Operations at the Taft Facility.................................. 14
        Payments to the GEO Group, Inc. for Contracted Services.......................................... 16
        Award Fees .................................................................................................................... 17
        Contract Administration Costs...................................................................................... 18
        Government Overhead Costs ......................................................................................... 18
        Insurance Costs ............................................................................................................. 20
        Cost of Preparing the Facility Before Going Fully Operational ................................... 21
        Conversion Costs .......................................................................................................... 22
        Income Tax Payments.................................................................................................... 22
        Summary: Total Net Cost of Contracting During FY1998-2002................................. 23
    What Would the Bureau of Prisons Have Spent to Operate the Taft Facility During
        FY 1998–2002? ............................................................................................................ 23
        Personnel Costs ............................................................................................................ 26
        Materials, Supplies, and Miscellaneous Other Costs ................................................... 36
        Other Specifically Attributable Costs ........................................................................... 38
        Overhead Costs ............................................................................................................. 40
        Costs of Preparing for Operations................................................................................ 41
        What is the Margin of Error in These Estimated Costs of Federal Operation?.............. 41
        Summary: Estimated Total Cost of Government Operation During FY 1998-2002...... 43
    The Total Cost of Contracting Compared to the Estimated Cost of Bureau of
        Prisons Operation.......................................................................................................... 44
        How Do These Costs Compare to Spending at Other Bureau-Operated
            Federal Prisons? ..................................................................................................... 45
    Cost Drivers of Contracted Services and Federal Government Operation.............................. 49
        Salaries and Wages ....................................................................................................... 52
        Non-Labor Costs ........................................................................................................... 55
        Monitoring, Award Fees, Tax Payments, and Federal Government Overhead .............. 56

Case 3:16-cv-02267   Document 365-7   Filed 11/20/20   Page 7 of 44 PageID #: 16433

MARLOWE_0007436

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Chapter 3: Comparing the Facility's Performance to Contractual Obligations** ........................ 59
Linking Contractual Obligations to the Bureau's Strategic Objectives .................................... 60
Emphasizing Performance Rather Than Process .................................................................... 61
    Performance-Based Contracting .................................................................................... 61
    Internalizing Quality Control Responsibilities ............................................................... 63
    Financial Incentives to Perform Well ............................................................................ 63
Procedures for Assessing TCI's Performance During the First Five Years of the Contract ..... 64
Deductions to Fee for Non-Compliance .............................................................................. 65
Awarding Good Performance .............................................................................................. 66
Subjectivity in the Monitoring Process ............................................................................... 68
The Bureau Standardizes Monitoring Procedures in 2002 .................................................... 69
    Changes in the Performance Assessment Process in 2002 ............................................ 71
    The Shift from "We Versus They" to "Partnership" ...................................................... 71
Has GEO Complied with the Contract? ............................................................................... 72
    Summary Assessments of GEO's Performance ............................................................. 73
    Awards for Good Performance ...................................................................................... 74
    Deductions ................................................................................................................... 75
    Performance Ratings of Different Services .................................................................... 76
Trends in Performance During the First Six and One-Half Years ........................................... 79
    Start-Up Difficulties ..................................................................................................... 80
    Contract Facility Monitor (CFM) Team Reviews ........................................................... 81
Performance Trends in Selected Areas of Service ................................................................ 83
    Administration ............................................................................................................. 84
    Quality Control ............................................................................................................ 85
    Human Resource Management and Employee Development .......................................... 89
    Security, Control, and Inmate Accountability ................................................................ 92
    Inmate Admission, Classification, and Transfer ............................................................ 94
    Correctional Programs/Inmate Case Management ......................................................... 99
    Facilities Maintenance and Repair .............................................................................. 102
    Safety ........................................................................................................................ 104
    Food Services ............................................................................................................. 105
    Healthcare Services .................................................................................................... 106
    Psychological Services ................................................................................................ 111
    Education, Recreation, and Religion Services .............................................................. 112
    Inmate Services: Inmate Funds/Commissary, Telephone, and Laundry ...................... 114
Summary ........................................................................................................................... 117

**Chapter 4: Comparing Performance of the Taft Correctional Institution With Government-Operated Federal Prisons** ........................................................ 119
The Bureau's Performance Monitoring System ................................................................... 119
Goal Number 1: Population Management ........................................................................... 122
    Vital Function: Ensure that Inmates are Placed in an Institution Commensurate
      with their Security and Custody Requirements ..................................................... 122
    Vital Function: Maintain Adequate Staffing Levels ..................................................... 122
    Vital Function: Evaluate the Needs of Inmates and Offer a Wide Range
      of Programs ......................................................................................................... 123

Case 3:16-cv-02267     Document 365-7     Filed 11/20/20     Page 8 of 44 PageID #: 16434

MARLOWE_0007437

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Goal Number 3:  Security and Facility Management .............................................................. 123
    Vital Function:  Provide a Safe and Secure Environment for Staff and Inmates
        through Effective Communication of Operational Concerns ................................ 123
    Vital Function:  Provide Effective Monitoring and Discipline Programs
        for Inmates .............................................................................................. 128
    Vital Function:  Provide Administrative Remedies and Procedures to Hear
        Prisoners' Grievances ............................................................................. 135
Goal Number 4:  Correctional Leadership and Effective Public Administration ................... 141
    Vital Function:  Provide Independent, Objective Oversight to Reduce Waste, Loss,
        Unauthorized Use, Misappropriation of Funds and Assets, and to Help
        Improve the Performance and Efficiency of BOP Programs. ............................. 141
Goal Number 5:  Inmate Programs and Services ................................................................... 142
    Vital Function Regarding Patient Care:  To Identify and Provide a Timely and
        Effective Response by Qualified Health Care Staff to Legitimate Health Care
        Needs for Inmates. ................................................................................... 142
    Vital Function Regarding *Resource Management*:  To Identify, Develop, and
        Manage Essential Resources that Best Meet the Operation Needs of the
        Health Care Program ............................................................................... 142
Summary ................................................................................................................................ 143

**Appendix:  Statistical Procedures for Estimating What Materials, Supplies, and Miscellaneous Other Items Would Have Cost Under Direct Bureau Management ................................................................................................... 145**

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 9 of 44 PageID #: 16435

MARLOWE_0007438

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Case 3:16-cv-02267      Document 365-7      Filed 11/20/20      Page 10 of 44 PageID #: 16436

MARLOWE_0007439

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Acknowledgments

This report was requested by Congress, which required an evaluation of the Taft Correctional Institution, which had been established as a demonstration to test the desirability of contracting with private firms to operate prisons holding federal prisoners. Abt Associates Inc. won the competition to conduct this evaluation, which has been funded and administered by the National Institute of Justice, the research, development, and evaluation agency of the U.S. Department of Justice. This study examines the performance of the Taft Correctional Institution over a six and one-half year period, from 1998 through March, 2004.

Abt Associates is a non-partisan research organization that has been evaluating public programs for almost forty years. This study aims to provide an objective empirical analysis of the cost and performance of this privately operated facility. We take no position in this study on the question of whether the federal government should or should not contract with private firms to operate prisons that house federal prisoners. This is a question of policy rather than scientific analysis. Our intent is to inform policy decisions with the findings of analyses presented in the following chapters.

The National Institute of Justice has supported and protected this non-partisan approach. Laura Winterfield served as the first Project Officer for the National Institute until October 2000, when Voncile Gowdy took over, a responsibility that was assumed subsequently by Christopher Innes. A scientific advisory committee for this study was appointed by the National Institute, and it met in December 1999 to review the proposed research design for the study. Members of this committee reviewed a draft of an early progress report that presented preliminary findings for fiscal years 1998 and 1999 and made many helpful suggestions. Members of this committee included Professor Alfred Blumstein, Carnegie Mellon University; Richard L. Stalder, Secretary of the Louisiana Department of Public Safety and Corrections; Professor Kenneth Adams, University of Central Florida; Kathy Gookin, Criminal Justice Planning Services; and Professor John Robert Hepburn, Arizona State University; as well as managers at the of The GEO Group and the Bureau of Prisons.

A number of persons at Abt Associates worked on this project during this time, in addition to the authors. These included Darcy Carr, Joanna Heliotis, Lisa Zeytoonjian, and Alex Miller, who assisted in the cost analyses; Carl Patten, Jr., Ryan Kling, Caity Baxter, Patrick Johnston, Michael Shively, Stephen Crawford, Hannah Gardener, and Mary-Ellen Perry. I am grateful to all of them for their contributions to this study.

Several of the staff at the Bureau of Prisons provided assistance in obtaining information for this study. These included Gerald Gaes, then Director of the Office of Research and Evaluation, and William Saylor, who assumed Dr. Gaes' position; Scott Camp, also of the Office of Research and Evaluation; Carol Durkee, Chief, Budget Execution Branch, Administrative Division; Teresa La Forgia, Deputy Chief, Trust Fund Branch; Jennifer Batchelder, Anthony Iwaszko, and Nick Howells in the Office of Research and Evaluation. Information about semi-annual performance awards was provided by Richard Cherwinski, in the Bureau's Western Regional Office. Bureau of Prisons staff located at the Taft Correctional Institution—Charles F. Neff, the Assistant Contract Administrator (now retired), Glenn Harvey, Oversight Specialist, and Connie Gill, secretary, and Theresa Vaughn, the contract administrator—gave us access to the facility and provided us with a great deal of information about the facility, both historical and contemporary.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 11 of 44 PageID #: 16437

MARLOWE_0007440

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

We are also indebted to the cooperation and assistance provided us by The GEO Group, Inc. (previously the Wackenhut Corrections Corporation), which has operated the Taft Correctional Institution during the period examined here. This firm and its staff have been responsive to all inquiries and have provided all requested information about their operations and costs. We are especially grateful to Ron Maddux, Vice President for Project Development, for serving as GEO's liaison to this study. Financial information was assembled and provided to us by Gerald O'Rourke, Chief Financial Officer. Warden Ray Andrews at Taft Correctional Institution made his staff available to us and provided us with information that we requested. In addition, many of GEO's staff were generous with their time during a visit to the facility.

Finally, two anonymous reviewers read and commented upon the penultimate version of this report, as did readers at the Bureau of Prisons and Julianne Nelson, presently of CNA Corporation. Having the benefit of such expert reviewers is a luxury, and many of their suggestions were taken. This report has been improved as a result of their contributions.

Douglas McDonald, Ph.D.
Principal Associate
Abt Associates Inc.
Cambridge, Massachusetts

MARLOWE_0007441

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Summary

In 1997, the Bureau of Prisons (BOP) signed a contract with the Wackenhut Corrections Corporation (now The GEO Group) to manage and operate a new government-owned low-security correctional facility in Taft, California, designed to hold a total of 2,048 adult male inmates. This study compares the cost of contracting for operations at Taft to what the government would have spent if the BOP had operated it directly during its first five years of operation, FY 1998 through FY 2002. It also evaluates how well GEO and the Taft Correctional Institution (TCI) performed during the first six and one-half years.

**Does Contracting Cost Less Than Government Operation?**

Although the government and GEO agreed to a fixed price for each of the ten years, there were provisions for incremental payments if the inmate population rose beyond a predetermined level and for bonuses ("award fees") that could be paid by the government to reward performance that went beyond mere contract compliance. In addition, the Bureau incurred some expenses to administer and monitor the contract. Offsetting these costs to the government were federal income tax revenues paid by the contractor. Thus, the *net cost* to the federal government equals total payments by the federal government minus total federal tax revenues. (Taxes paid to local governments are ignored from this examination of costs to the federal government.)

During these five years, the government paid GEO a total of $139.5 million in fees and an additional $2.2 million in bonuses (Table 1). This counts only the time when the prison was operational, excluding the first two and a half months of FY 1998 (i.e., before December 30, 1997), when GEO was preparing the facility for prisoners. In addition, the Bureau spent $2.8 million over the five years to monitor the contract. GEO paid the federal government an estimated $2.4 million in corporate income taxes during this period. The net cost to government of contracting for the facility's operation during these five years was therefore about $142.1 million.

MARLOWE_0007442

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 1**

**Estimated Total Cost to Government of Contracting for Operation of Taft Correctional Facility: FY 1998–2002, by Year and Category of Cost**

| | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| **Payments to Contractor for Services** | | | | | | |
| Fee with adjustments | $20,889,519 | $27,214,375 | $28,210,157 | $31,139,352 | $32,037,139 | $139,490,541 |
| Award fees | 182,240 | 361,730 | 408,333 | 545,833 | 733,333 | 2,231,470 |
| *Subtotal payments to contractor* | 21,071,759 | 27,576,105 | 28,618,490 | 31,685,186 | 32,770,472 | 141,722,011 |
| **BOP Monitoring/ Contract Admin.** | | | | | | |
| Salaries | 319,714 | 402,911 | 310,296 | 435,435 | 320,336 | 1,788,692 |
| Premium comp. | 2,633 | 2,607 | 504 | 4,543 | 3,258 | 13,545 |
| Fringe benefits | 99,557 | 128,112 | 108,007 | 124,196 | 92,991 | 552,864 |
| Other direct expenses | 64,395 | 47,227 | 22,374 | 1,840 | 2,011 | 137,847 |
| *Allocated Bureau overhead* | 39,490 | 64,036 | 50,257 | 67,701 | 49,990 | 271,474 |
| *Subtotal monitoring/contract admin.* | 536,927 | 644,893 | 491,438 | 633,715 | 468,586 | 2,775,560 |
| **Est. federal corporate income tax offset** | -729,426 | -695,766 | -240,963 | -331,213 | -422,653 | -2,420,023 |
| **Total** | $20,879,259 | $27,525,231 | $28,868,965 | $31,987,688 | $32,816,405 | $142,077,549 |

*Note*: FY 1998 is a partial year, beginning with operational phase on December 20, 1997. Award fees are pro-rated to correspond to the fiscal years during which performance periods occurred.

*Sources*: Computed by Abt Associates Inc. using data provided by the Bureau of Prisons and The GEO Group. See text for details.

***Estimating What the Government Would Have Spent to Operate the Taft Facility Directly***

Following the logic of cost estimation procedures established in OMB's Circular A-76 (with some modifications), estimates of what the Bureau would have spent to operate the Taft facility are developed, including costs of

- personnel, including salaries, and premium pay;
- fringe benefits, retirement fund contributions, and other associated liabilities;
- materials and supplies;
- casualty and personnel liability costs, and
- "indirect" or "overhead" expenditures for governmental administration that were not directly incurred by specific prisons but which supported all federal prisons. (See Table 2.)

The estimated total cost over the five-year period would have approximately $154.9 million (Table 3); some estimates are subject to error, so that the probable range of costs would have been between $151.6 and $158.6 million (Table 4).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2**

## Assumptions for Estimating the Government's Operating the Taft Facility During FY 1998–2002

| Category of Expense | Assumptions |
|---|---|
| **Salaries and Wages** | |
| Permanent salaries and wages | Abt Associates, Inc. Calculation: Assume staffing model was identical to that at FCI Elkton, that employees were paid a mid-grade levels, and that staff vacancy rates (9 percent) were identical to those observed at all low security federal prisons during FY 1998-2002. |
| Premium compensation and other than permanent salaries & wages | Abt Associates, Inc. Calculation: Assume rates of premium compensation and other than permanent salaries and wages was identical to average observed at 14 low security federal facilities during each of five fiscal years. |
| Subtotal adjusted salaries and wages | Abt Associates, Inc. Calculation: Sum of adjusted salaries and wages and premium compensation/other than permanent salaries and wages |
| **Fringe benefits** | |
| Retirement fund contributions | A-76 Prescribed Cost factor: 37.7% of adjusted salaries and wages |
| Federal employee insurance & health benefits | A-76 Prescribed Cost factor: 5.6% of adjusted salaries and wages |
| Medicare benefit contributions | A-76 Prescribed Cost factor: 1.45% of adjusted salaries and wages |
| Misc. fringe benefits | A-76 Prescribed Cost factor: 1.7% of adjusted salaries and wages |
| Subtotal fringe benefits | Abt Associates, Inc. Calculation: Sum of fringe benefits |
| **Subtotal personnel costs** | Abt Associates, Inc. Calculation: Sum of salaries, wages, and fringe benefits |
| **Materials, supplies, and other non-personnel costs** | Abt Associates, Inc. Calculation: Estimated based upon statistical analysis of observed expenditures at 14 low security federal prison. |
| **Other specifically attributable costs** | |
| Casualty liability (annualized cost) | A-76 Prescribed Cost factor: 0.5% of net value of capital (excludes costs of materials and supplies) |
| Personnel liability (annualized cost) | A-76 Prescribed Cost factor: 0.7% of government facilities total personnel costs—salaries, wages, premium compensation, benefits |
| **Subtotal other specifically attributable costs** | Abt Associates, Inc. Calculation: Sum of other specifically attributable costs |
| Subtotal, all categories | Abt Associates, Inc. Calculation: Sum of personnel, materials and supplies, other specifically attributable costs |
| **Overhead** | A-76 Prescribed Cost Factor 12% of "subtotal personnel costs" above. |
| **Total estimated cost for government operation of Taft Correctional Institution** | Abt Associates, Inc. Calculation: Sum of personnel, materials and supplies, other specifically attributable costs, and overhead |

MARLOWE_0007444

Case 3:16-cv-02267   Document 365-7   Filed 11/20/20   Page 15 of 44 PageID #: 16441

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 3**

**Total Estimated Cost of Government Operation of the Taft Correctional Institution During FY 1998-2002**

| Salaries and Wages | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| Permanent salaries and wages | $10,636,157 | $14,149,290 | $14,776,170 | $15,281,143 | $15,935,658 | $70,778,418 |
| Staff vacancy adjustment | -850,893 | -1,131,943 | -1,182,094 | -1,222,491 | -1,274,853 | -5,662,273 |
| Adjusted est. salaries/wages | 9,785,264 | 13,017,347 | 13,594,077 | 14,058,652 | 14,660,805 | 65,116,145 |
| Premium compensation and other than permanent salaries and wages | 782,821 | 1,158,544 | 1,291,437 | 1,321,513 | 1,524,724 | 6,079,039 |
| *Subtotal salaries and wages* | 10,568,085 | 14,175,891 | 14,885,514 | 15,380,165 | 16,185,529 | 71,195,184 |
| **Fringe benefits** | | | | | | |
| Retirement fund contributions | 3,984,168 | 5,344,311 | 5,611,839 | 5,798,322 | 6,101,944 | 26,840,584 |
| Federal employee insurance & health benefits | 591,813 | 793,850 | 833,589 | 861,289 | 906,390 | 3,986,930 |
| Medicare benefit contributions | 153,237 | 205,550 | 215,840 | 223,012 | 234,690 | 1,032,330 |
| Misc. fringe benefits | 179,657 | 240,990 | 253,054 | 261,463 | 275,154 | 1,210,318 |
| *Subtotal fringe benefits* | 4,908,876 | 6,584,701 | 6,914,321 | 7,144,087 | 7,518,178 | 33,070,163 |
| **Subtotal personnel costs** | 15,476,961 | 20,760,592 | 21,799,835 | 22,524,252 | 23,703,707 | 104,265,347 |
| **Materials, supplies, and other non-personnel costs** | 3,861,735 | 7,686,902 | 8,288,809 | 7,677,233 | 8,039,963 | 35,554,642 |
| **Other specifically attributable costs** | | | | | | |
| Casualty (self-insurance) | 292,500 | 375,000 | 375,000 | 375,000 | 375,000 | 1,792,500 |
| Personnel liability (self-insurance) | 108,339 | 145,324 | 152,599 | 157,670 | 165,926 | 729,857 |
| *Subtotal other specifically attributable costs* | 400,839 | 520,324 | 527,599 | 532,670 | 540,926 | 2,522,357 |
| Subtotal, all categories | 19,739,535 | 28,967,818 | 30,616,243 | 30,734,154 | 32,284,596 | 142,342,346 |
| Overhead | 1,857,235 | 2,491,271 | 2,615,980 | 2,702,910 | 2,844,445 | 12,511,842 |
| **Total estimated cost** | $21,596,770 | $31,459,089 | $33,232,223 | $33,437,065 | $35,129,041 | $154,854,188 |

*Note:* FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.

*Sources:* Computed by Abt Associates Inc. See text for sources of data and assumptions.

MARLOWE_0007445

Case 3:16-cv-02267   Document 365-7   Filed 11/20/20   Page 16 of 44 PageID #: 16442

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 4**

**Range of Estimated Costs of Government Operation of Operation of the Taft Correctional Institution During FY 1998–2002**

|  | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| High estimate | $22,263,257 | $31,928,256 | $33,793,265 | $34,566,504 | $36,065,834 | $158,617,116 |
| Low estimate | 20,930,283 | 30,968,437 | 32,671,182 | 32,884,422 | 34,192,248 | 151,646,572 |

*Note:* FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.

*Sources:* Computed by Abt Associates Inc. See text for sources of data and assumptions.

*Comparing the Estimated Cost of Contracting with the Estimated Cost of Government Operation*
The net cost to the government of contracting with GEO during these years was less than what we estimate the federal government would have spent if the Bureau of Prisons had operated the facility directly. The total savings over the five years would have been between $9.6 and $16.5 million, or between 6 and 10 percent (Table 5).

During all five years, the net cost of contracting was less than the lowest estimate of direct Bureau operation. The estimated savings associated with contracting were greatest during the second and third year, when the base fee paid to GEO was fixed at $27.6 million. Savings during the second and third years each were estimated to be $3.9 and $4.4 million (or about 13 percent). When the Bureau exercised its first option to renew the contract for a fourth year (FY 2001), the base fee increased to nearly $29.5 million, and additional fees were paid to house more prisoners than the agreed-upon base population of 1,946 prisoners. The result of this was that the difference between the cost of contracting and our estimates of government operation diminished.

During the five years examined here, the Taft Correctional Institution housed prisoners at a lower daily per prisoner cost than the Bureau experienced at fourteen low-security federal prisons for which costs could be assigned unambiguously.[1] Estimates of what the Bureau would have spent are within the range of costs actually experienced at three low-security federal facilities that are architecturally similar—which reinforces our confidence in the accuracy of the estimates (Table 6).

---

[1]   See the text for the discussion of this selection and for an explanation of how these per prisoner/day costs were calculated. These costs do not match the Bureau's reported costs for these years because accounting guidelines in OMB Circular A-76 are followed.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 17 of 44 PageID #: 16443

MARLOWE_0007446

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 5**

**Total (Net) Cost to the Federal Government of Contracting Versus Estimated Total Cost If the Bureau of Prisons Operated the Taft Prison, Fiscal Years 1998–2002**

| | FY1998 | FY1999 | FY2000 | FY2001 | FY2002 | Total |
|---|---|---|---|---|---|---|
| Net Cost of Contracting | $20,879,259 | $27,525,231 | $28,868,965 | $31,987,688 | $32,816,405 | $142,077,549 |
| Estimated Cost of Bureau Operation (Point Estimate) | $21,596,770 | $31,459,089 | $33,232,223 | $33,437,065 | $35,129,041 | $154,854,188 |
| High Estimate | 22,263,257 | 31,928,256 | 33,793,265 | 34,566,504 | 36,065,834 | 158,617,116 |
| Low Estimate | 20,930,283 | 30,968,437 | 32,671,182 | 32,884,422 | 34,192,248 | 151,646,572 |
| Contracting Compared to: | | | | | | |
| *Point Estimate of Govt. Costs* | -717,511 | -3,933,858 | -4,363,258 | -1,449,377 | -2,312,636 | -12,776,639 |
| *(Percent)* | -3.3% | -12.5% | -13.1% | -4.3% | -6.6% | -8.3% |
| *High Estimate of Govt. Costs* | -1,383,997 | -4,403,025 | -4,924,300 | -2,578,816 | -3,249,429 | -16,539,567 |
| *(Percent)* | -6.2% | -13.8% | -14.6% | -7.5% | -9.0% | -10.4% |
| *Low Estimate of Govt. Costs* | -51,023 | -3,443,206 | -3,802,217 | -896,734 | -1,375,843 | -9,569,023 |
| *(Percent)* | -0.2% | -11.1% | -11.6% | -2.7% | -4.0% | -6.3% |

*Note:*    FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.

*Sources:*    See text for calculations and assumptions.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 18 of 44 PageID #: 16444

MARLOWE_0007447

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6**

**Costs Per Prisoner/Day: Comparing Costs of Contracting at Taft Facility, Estimated Cost of Bureau Operation, and Actual Costs at Fourteen Other Low Security Federal Prisons, FY 1998–2002**

| | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Taft Correctional Institution (Contractor-Operated) | $52.43 | $33.82 | $33.25 | $36.88 | $38.37 |
| *Est. Cost of Bureau Operation of Taft* | 54.23 | 38.65 | 38.27 | 38.56 | 41.08 |
| High Estimate | 55.91 | 39.23 | 38.92 | 39.86 | 42.17 |
| Low Estimate | 52.56 | 38.05 | 37.63 | 37.92 | 39.98 |
| FCI Elkton | 46.59 | 39.72 | 39.77 | 44.75 | 46.38 |
| FCI Forrest City | 44.20 | 39.46 | 39.84 | 41.65 | 43.61 |
| FCI Yazoo City | 44.15 | 41.46 | 40.05 | 43.65 | 42.15 |
| FCI Ashland | 69.96 | 62.75 | 63.47 | 64.12 | 63.38 |
| FCI Bastrop | 56.75 | 53.75 | 52.67 | 57.15 | 52.97 |
| FCI Big Spring | 58.80 | 54.71 | 51.03 | 67.99 | 70.88 |
| FCI Butner | 51.78 | 45.76 | 47.04 | 50.93 | 54.27 |
| FCI Latuna | 58.47 | 56.47 | 57.36 | 71.39 | 60.02 |
| FCI Loretto | 62.59 | 61.42 | 63.22 | 49.32 | 50.86 |
| FCI Milan | 73.93 | 66.77 | 62.97 | 62.56 | 63.23 |
| FCI Petersburg | 65.79 | 61.79 | 61.79 | 56.97 | 60.59 |
| FCI Safford | 58.65 | 56.51 | 58.57 | 58.51 | 58.69 |
| FCI Seagoville | 61.48 | 59.41 | 61.03 | 77.40 | 75.83 |
| FCI Texarkana | 49.29 | 47.52 | 49.68 | 53.34 | 55.55 |

*Notes*:  Per diem costs of federal prisons do not correspond to Bureau of Prisons' reports because costs were calculated following Circular A-76 rules. Per diem cost of GEO-operated Taft facility in FY 1998 is computed using only costs incurred by government during operational phase, and uses adjusted average daily population shown in Table 2.17.

*Sources*:  Cost of Contracting, from Table 1 above; estimated cost of Bureau Operation from Tables 3 and 4, above; cost of all other federal prisons from Bureau of Prisons, "Federal Prison System, Per Capita Costs," for FY 1998 through FY 2002.

One reason that the cost of contracting is less than what the Bureau would have spent is that GEO's fringe benefit rate is less than half the Bureau's rate (20 percent compared to the Bureau's 46.45 percent). However, GEO staffed the facility with a larger number of positions than the Bureau would have, which made the difference in total labor costs ($7.6 million) narrower than it would have been if both organizations staffed with the same number of employees.

The determination of the contractor's wage levels is not left entirely to market forces but is governed by the Service Contract Act of 1965, which requires that federal contractors pay at least as much as the U.S. Department of Labor determines prevailing wages to be in the region where the contractor operates. The wage determinations for the county in which the Taft facility is located set a high wage

MARLOWE_0007448

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

for correctional officers, largely because the California correctional officers' union has won high wage levels for its members. During FY 1998, the wage determinations for correctional officers in this area required annual pay of $35–36,000, and were increased at a fast rate so that by May of 2002, the required wage was at least $46,821 per year. If the Taft facility had been located in another part of the nation where prevailing wages were lower, the difference between the contractor's and the Bureau's labor costs would have been much greater. For example, if the facility had been located in Yazoo City, Mississippi (the site of one of the similar federal facilities), GEO's labor costs would have been 24 percent lower than payroll costs at Taft. If the facility had been in Forrest City, Arkansas (where another of the similar federal facilities is), payroll would have been 18 percent less costly than at Taft.

Another reason why contracting is estimated to cost less is that a substantial cost of governmental overhead (12 percent of total labor costs) is assigned to Bureau-operated facilities, whereas Circular A-76 guidelines assume that all governmental overhead costs are captured in the cost of contract administration and monitoring. Over the course of the five years, government overhead would have cost approximately $12.5 million if the Bureau had operated the Taft facility. This OMB accounting rule of 12 percent probably underestimates the actual cost of government overhead because this is nearly equal to the cost of the Bureau's national and regional headquarters and other indirect accounts in the Bureau's budget. This does not include any costs of other governmental agencies such as the Office of Management and Budget, the Office of Personnel Management, or the U.S. Department of Justice, among others. This is not to say that the taxpayers saved an estimated $12.5 million in overhead spending, however, because the Bureau did not cut its overhead costs by this amount after the decision to contract was made.

**Assessing Performance at the Taft Correctional Institution**

In mandating the demonstration of prison contracting at the Taft facility, Congress sought to determine if contracting poses significant security and safety concerns. To date, there have been no strikes or other labor actions at the facility. There were two "disturbances"—mass refusals by inmates to obey orders to disperse in the early days of the Taft Correctional Institution's operation—but these were resolved by the private firm's managers without having to call upon public law enforcement or correctional authorities.

To assess GEO's performance at the facility more broadly, we compared the contractor's performance against the requirements of the contract and, in separate analyses, compared institutional performance, measured variously, at Taft and at low-security federal prisons operated by the Bureau.

*Did The GEO Group Do What the Contract Requires?*
To assess GEO's performance vis-à-vis the Bureau's contractual obligations, we obtained and analyzed information from a variety of sources including periodic monitors' reports, reports of deductions to fee for deficient services, summaries compiled by the Bureau to inform the semi-annual decisions about awarding bonuses, interviews with Bureau monitors and GEO staff, among others

For nearly all of the period between December,1997 and March, 2004, the Bureau's monitors rated GEO's overall performance as "good" (Figure 1). "Good" is defined as "very efficient performance, fully responsive to contract requirements, more than adequate results, reportable deficiencies but with little identifiable effect on overall performance." Both the Bureau monitors and GEO managers recognize that the start-up phase was difficult and that performance faltered in some areas. At times

MARLOWE_0007449

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

since then and in particular areas of service, performance has sometimes fallen below expectations. Over the life of the contract, however, the institution's managers and staff was judged to deliver what it promised and what the Bureau expected of it. The Bureau exercised its option to renew the contract after the three-year base period and in every subsequent year. Most of the deductions from the contractor's fee for inadequately provided services occurred early in the life of the contract and were reduced by close to two-thirds in FY2001 and further reduced to zero in FY2002. During the first five years, these deductions totaled approximately 0.6 percent of the total amount paid to the contractor; over the seven years of the contract, the percentage has been reduced to half of that amount. Consequently, GEO has been given bonuses for performing above and beyond the requirements for mere contract compliance in all of the semi-annual performance periods.

**Figure 1**

**The Performance Evaluation Board's Assessment of GEO's Overall Performance During the First Six and One-Half Years (August 1997–February 2004)**



*Note:* Ratings are described according to categories used before August, 2002 and new rating categories following that date. After August, 2002, the highest rating was "superior."

*Sources:* Bureau of Prisons Semi-annual Contract Monitoring Summaries

***Measuring Performance of the Taft Facility and Low-Security Federal Prisons***
To obtain a more direct comparison of TCI's performance with that found in other low-security prisons operated by the Bureau, we conducted statistical comparisons of data developed by the Bureau to monitor its own operations to determine if specific objectives are being met. One such objective is to provide a safe and secure environment for staff and inmates, measured by a variety of indicators, including assaults on inmates or staff, homicides, suicides, and escapes. Rates of assault are lower at the Taft facility than the average for low-security federal prisons operated by the Bureau, but within the range observed at these federal prisons. There have been no homicides at Taft. There have been two escapes from the secure section of the prison, however. One occurred in 1998,

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 21 of 44 PageID #: 16447

MARLOWE_0007450

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

signaling a clear deficiency in institutional security procedures, which were remedied. A second occurred in December of 2003, when an inmate found an escape route through a trash compactor. In contrast, the Bureau experienced only two escapes from all of its low-security facilities between late 1997 and January 2004.

Another measure of security is the extent of illegal drug use in the prisoner population. All prisons containing federal prisoners, including the Taft facility, test prisoners at random for drug use. The Taft facility reported higher rates of failed drug tests than low-security federal prisons between March 1999 and June 2004. Statistical analyses were conducted to account for differences in prisoner populations that may affect illegal drug use, but the reported rates at the Taft facility were still significantly higher during this period—at least twice as high as high as at federal low-security facilities.

Another of the Bureau's objectives is to provide prisoners with procedures for expressing grievances and seeking redress. Between September 2000 and August 2004, the rate of submitting grievances by Taft prisoners about 13 percent higher than prisoners at other federal low security prisons, after accounting for other factors that may affect these rates. No explanation for this difference was identified.

Still another of the Bureau's strategic objectives is to "provide independent, objective oversight to reduce waste, loss, unauthorized use, misappropriation of funds and assets, and to help improve performance and efficiency." GEO has sought and won accreditation from the American Correctional Association, the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) for its health services, and from the International Organization for Standardization (ISO) for its quality assurance system. However, during the earlier years of the contract, the Bureau's monitors reported that GEO's quality control systems were not being implemented effectively, although this was largely resolved in subsequent years.

Finally, the Bureau established the objective of providing adequate healthcare to prisoners. Prisoners at the Taft facility are attended to by healthcare professionals at about the same rate as at low security federal prisons, although it staffs its healthcare services differently than Bureau does.

**Is Contracting for the Taft Correctional Institution's Operation More Cost-Effective Than Government Operation?**

No attempt was made to develop a precise estimate of cost effectiveness because the numerous indicators of performance examined here were not distilled into a single measure or index of effectiveness that could be used to compare the Taft facility with federal facilities. Instead, the costs of contracting and direct government operation are estimated separately from the analyses of performance. These analyses lead to the conclusion that the cost to the government of contracting for the Taft Correctional Institution's operation was lower during FY 1998 through 2002 than what the Bureau would have spent to operate the prison directly. (Even though the cost of operation is estimated to be lower at the privately-managed Taft facility, the Bureau did not shrink its overhead spending proportionally, so the overhead costs that would be associated with direct government operation of the facility were not avoided.) On the most comprehensive and in-depth measure of performance—the extent to which GEO met its performance obligations established in the contract— the firm performed at levels above and beyond mere compliance with these contractual requirements. This measure lacks clear correspondence with other Bureau-operated facilities, however, because

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

federal facilities do not operate under contractual agreements. Comparison of selected numbers of performance indicators that are collected for Taft and all federal prisons paints a mixed picture. On some measures, institutional performance of the Taft facility is better than the average observed at federal low security prisons, while on others performance looks worse than the average, and on still other measures, performance looks about the same.

MARLOWE_0007452

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Case 3:16-cv-02267     Document 365-7     Filed 11/20/20     Page 24 of 44 PageID #: 16450

MARLOWE_0007453

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 1

# Introduction

For most of the latter half of the Twentieth Century, it was a principle of national policy that government should not compete with private sector.[2] Accordingly, the government sought to provide directly–with government employees—only those services that the private markets failed to provide effectively or those that were "non-delegable" as a matter of principle (e.g., warfare and national defense). During the late 1970s and 1980s, however, notions about what constituted intrinsically governmental functions began to change, spurred in large measure by the policy interests of the Reagan administration in this country and the Thatcher administration in Great Britain. During this period, imprisonment services began to be offered by private firms and federal, state and local governments began to contract with these firms to hold prisoners in their jurisdictions.[3] These developments ignited an intense debate, and the propriety of contracting with private firms to imprison remains controversial to this day. Fifty years after the Eisenhower administration announced that governments should not compete with the private sector, in 2003, the Bush administration declared that federal policy now embraces the principle that private firms should be able to compete for services heretofore provided by governments and asserted a vision of "market-based government."[4]

In 1996, in its FY1997 appropriations act for the Department of Justice, Congress required the Bureau of Prisons to contract out the operation and management of a federal prison. This was conceived of as a "demonstration project" to give the administration and Congress an opportunity to monitor safety and operational concerns that had been voiced earlier by the Department of Justice.[5] A year before, the Clinton administration's budget proposal (for FY1996) had called for the privatization of some federal prisons.[6] The Bureau of Prisons and others in the Department of Justice greeted this proposal with considerable reluctance, and the Department ultimately registered its concerns about the risks of

---

[2] This was enunciated in Bureau of the Budget bulletins issued in 1955, 1957, and 1960; see memorandum issued August 4, 1983 (Revised 1999), by Office of Management and Budget, *Re: Performance of Commercial Activities*.

[3] For a discussion of these developments, see Douglas C. McDonald (ed.), *Private Prisons and the Public Interest* (Rutgers University Press, 1990) and Douglas McDonald, Elizabeth Fournier, Malcolm Russell-Einhorn, and Stephen Crawford, *Private Prisons in the United States: An Assessment of Current Practice* (Abt Associates Inc., 1998).

[4] Federal Register, "Revision to Office of Management and Budget Circular No. A-76 *Performance of Commercial Activities*." Vol. 68, No. 103, May 29, 2003, pp. 32135.

[5] Conference Report to Accompany H.R. 3610, *Making Omnibus Consolidated Appropriations for Fiscal Year 1997*, P.L. 104-208, September 23, 1996.

[6] Gerth, Jeff and Stephen Labaton. "The Pitfalls of Private Penitentiaries." *The New York Times*, November 24, 1995, A1.

---

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 25 of 44 PageID #: 16451

MARLOWE_0007454

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

strikes or walk-outs by private corrections officers and, to a lesser extent, the risks of other
disruptions and inmate disturbances.[7]

On November 27, 1996, the Bureau issued a request for proposals (RFP) for the management and
operation of a newly constructed government-owned correctional facility in Taft, California. The
facility includes a low-security correctional institution and a separate, adjacent minimum-security
institution—called a "camp" in Bureau of Prisons parlance. The facility was constructed to hold a
total of 2,048 adult male inmates, including 275 criminal aliens in the Institution Hearing Program
who would be under INS orders to be deported when their sentences expire. In addition, the facility
has a 128-bed special housing unit used to segregate persons charged with disciplinary infractions or
crimes, or who request protection.

On July 21, 1997, the Bureau announced that the Wackenhut Corrections Corporation would be
awarded the contract to manage the facility. At the time, this firm was one of the largest private
correctional firms in the country and in the world. Founded as a division of The Wackenhut
Corporation in 1984, it became a subsidiary in 1988 and a separately traded public company in 1994.
Its first imprisonment facility contract, in 1987, was with the U.S. Immigration and Naturalization
Service to build and operate a detention center for illegal immigrants in Aurora, Colorado. In 2003,
the firm changed its name to The GEO Group, Inc. By the end of that year, it had grown to the point
where it operated facilities in this country and abroad. As of December 2003, the company operated
41 facilities in the U.S., Canada, New Zealand, Australia, and South Africa, with an aggregate design
capacity of approximately 36,000 beds.[8] At the time of signing the contract with the Federal Bureau
of Prisons, the Taft Correctional Institution was the largest correctional facility that it operated, with
its capacity of 2,048 inmates, as well as its first federal prison.

This was also an important development for the federal prison system. The Bureau of Prisons has a
long and proud tradition of managing correctional facilities. It was established in 1930 and has grown
to the point by mid-2004 where it comprised 104 institutions, six regional offices, a central office (the
agency's headquarters is in Washington, D.C.), three staff training centers, and 28 community
corrections offices that oversee large numbers of community corrections centers and some home
confinement programs. By November, 2004, the number of federal offenders under the Bureau's
jurisdiction had grown to approximately 181,400. Most of these (or 153,800 offenders) were
confined in Bureau-operated correctional institutions or detention centers. Another 17,700 were held
in privately operated institutions like the Taft Correctional Institution, and another 9,800 were held in
jails, community corrections centers, or in home confinement.[9] Prior to the contract with Wackenhut,
the Bureau had engaged the private sector to operate small and non-secure community treatment
centers. It had also contracted for secure facility operation at Eloy, Arizona and had transferred
prisoners to privately owned secure facilities in Texas (by means of intergovernment agreements).
Issuing a long-term performance-based contract to operate a secure government-owned federal prison
was a new venture for the Bureau in 1998.

---

[7]    Letter from Stephen R. Colgate, Assistant Attorney General for Administration, to Hon. Harold Rogers,
Chairman, Subcommittee on the Departments of Commerce, Justice and State, the Judiciary, and Related
Agencies, Committee on Appropriations, U.S. House of Representatives, June 5, 1996.

[8]    The GEO Group, Inc. *2003 Annual Report.*

[9]    Federal Bureau of Prisons, "Weekly Population Report," November 11, 2004, at http://www.bop.gov.

---

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The contract with Wackenhut was for a base period of three years with seven one-year options. The Bureau's design of the contract was innovative as it differed from those usually written by state departments of corrections. Rather than being structured as a cost-reimbursement indefinite delivery/indefinite quantity contract, the Bureau designed it as a firm fixed-price performance-based contract. Wackenhut agreed to operate the facility for a fixed price ($27.6 million a year during the first three-year period), for which it and would cover all costs for operation and maintenance of the facility, including medical services, associated with an average daily population of 1,946 inmates. Incremental fees were established to cover the costs associated with housing larger numbers of inmates. To encourage the contractor to do more than comply with the terms of the contract and to perform well, above and beyond mere compliance, the Bureau designed a procedure for determining if semi-annual awards should be given to the contractor, which could increase the contractor's revenues by as much as five percent above the annual fixed price.

The Bureau gave the contractor notice in August 1997 to proceed with preparing the facility for prisoners. At this stage, the contractor was continuing a process begun earlier by the Bureau. Prior to Congress' mandate, the Bureau had planned to operate the facility directly and had begun to equip it and to relocate senior management and their families to the Taft area. After Congress ordered a change of plan, some of these senior managers were reassigned the task of monitoring the contract. Wackenhut then assigned its managers to the facility and staff were hired. In December 1997, the facility received its first prisoners, as the Bureau began to transfer men from other federal prisons. By October 1998, it was fully occupied, with 2,159 prisoners under custody, exceeding the facility's rated capacity. During FY1999, the facility's average daily population exceeded rated capacity by nine percent, with 2,230 prisoners.

## A Government vs. Private Firm Competition

By turning to Wackenhut to manage the Taft facility, Congress created a de facto competition between the private firm and the Bureau of Prisons. Taft was one of four federal prison facilities that were built at about the same time according to nearly identical blueprints. The other three were the Federal Correctional Institution (FCI) at Yazoo City, Mississippi, which began taking prisoners in March 1997; FCI Forrest City in Arkansas, which opened in the following month; and FCI Elkton, in Ohio, which began operations in August 1997. Like the Taft facility, these three prisons were built to hold a total of 1,536 low-security prisoners in three dormitory-style housing units. The Taft facility differs from the other three in having a fourth housing unit built to hold 512 prisoners outside the secure perimeter. This is essentially a separate facility, without perimeter security, for housing minimum-security prisoners. (The Bureau refers to these as "camps," even though the physical structure and the amenities bear no relation to a camp.) FCI Elkton has a smaller satellite camp, designed to hold 256 prisoners. FCI Forrest City opened a satellite camp during FY1999 that had a capacity of 128 prisoners during the latter half of that year, and then expanded capacity to 256 in December 1999. FCI Yazoo City has no minimum-security camp.

Although these three prisons are not completely identical to Taft (because of differences in the minimum-security housing), it was assumed by many that these four facilities were in a horserace of sorts, pitting private against government management. All housed low-security prisoners, so the challenges that prisoners present to prison managers were similar. All buildings were of the same age, which equalized one of the important factors that affects cost of operations. More important was the fact that all shared the same physical design. The layout of a prison largely determines the

Case 3:16-cv-02267     Document 365-7     Filed 11/20/20     Page 27 of 44 PageID #: 16453

MARLOWE_0007456

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

number of staff needed to operate it safely, which in turn constitutes the largest cost of operations. During the first several years, Bureau officials and GEO managers have assumed that they were in competition with one another and that these four prisons were the horses in the race.

## The Bureau's Changing Relationship to Privatization

Prior to 1998, Bureau officials were ambivalent about turning to the private sector for secure imprisonment. There was strong interest among some members of Congress for a greater reliance upon the private sector—to the extent that the location of the privately operated "demonstration project" in Taft, California was determined by Congress rather than the Bureau. But there was no doubt some resistance in the Bureau to having Congress rather than correctional managers make decisions about where to contract and for what purposes. Since the early 1980s, the Bureau had relied entirely upon private firms to operate non-secure community correctional centers. But the rise of the private corrections industry in the mid-1980s polarized thinking about what the private/public relationship should look like. Private firms offered to take over entire state prison systems, and what was once thought of as "contracting" for services turned into a larger ideological argument about the "privatization" of once-public services and the proper role of government.[10]  Public employee unions rallied to confront what they saw as a threat to their jobs; advocates for privatization argued on behalf of a more expansive role for private firms; and all found allies in Congress.

Congress required the Bureau to contract for the operation of the Taft, California prison, and the Bureau carried this out. In the Bureau, there was a sense that this created a competition between the privately operated Taft facility and other government-operated facilities. With the continued growth of the federal prison population, however, the Bureau increased its reliance upon the private sector to house prisoners in secure facilities. By November, 2004, for example, the Bureau was contracting with private firms to hold more than 17,700 federal prisoners in ten different secure facilities.

Within the past year, the Bureau has reoriented its relationship to contracting, to the point where it seeks a partnership with the private sector to manage a growing federal prisoner population. In the summer of 2003, the Bureau convened meetings with contractors and senior Bureau staff to redefine their relationship as one of public/private collaboration and to adopt a "partnership" style of contracting and contract management—an approach to contracting and contract administration that had been customary in the Bureau when contracting for facility construction but not previously for facility management. As discussed in Chapter Three, the Bureau centralized its monitoring of contracts in 2002 to improve consistency from one contract facility to another; it has standardized its contracts; and has promulgated new roles and orientations for on-site monitors. This new attitude of partnering and the associated procedures and practice were not part of the climate within which Wackenhut/The GEO Group and its client, the Bureau of Prisons, operated for most of the period examined here.

---

[10]   The move that galvanized the policy controversy about private prisons was the Correctional Corporation of America's bid in the mid-1980s to assume responsibility for the entire state prison system in Tennessee. See Aric Press, "The Good, the Bad, and the Ugly:  Private Prisons in the 1980s," in McDonald, *Private Prisons in the Public Interest*, pp. 28–30.

Case 3:16-cv-02267      Document 365-7      Filed 11/20/20      Page 28 of 44 PageID #: 16454

MARLOWE_0007457

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Our Approach to Assessing the Taft Correctional Institution

This report examines the government's cost of contracting for the Taft Correctional Institution during
five year period, from FY 1998 through 2002. It also examines the performance of this prison for a
longer period—from October 1997 through March 2004. Our principal purpose is to determine if the
policy objectives established by Congress and the Bureau of Prisons have been accomplished.

## Financial Costs and Savings

Neither Congress nor the Bureau stated explicitly that one of the objectives of the demonstration was
to save the taxpayer's money, even though this has been a commonly voiced rationale for
privatization. The Bureau's standards for evaluating bidders' proposals indicate that it considered
financial savings a secondary objective. In the request for proposals, bidders were told that their
offers would be ranked most heavily according to each bidder's past performance and experience as
well as the quality of the bidder's technical proposal.[11] Price was deemed to be of lesser importance,
and the government retained the right not to award the contract to the lowest bidder.[12] In contract
procurement parlance, these evaluation criteria were designed to enable the government to pick the
bid that offers the "best value" for the government. "Best value" is generally understood to mean the
combination of performance and cost that is most advantageous to the government.[13]

This suggests that the ideal comparison would be between the overall value of contracting for the Taft
Correctional Institution's operation (combining measures of both cost and performance) relative to an
identical Bureau-operated facility. However, no such facility exists, although the three sister facilities
(FCI's Elkton, Forrest City, and Yazoo City) are similar. Our approach to evaluating the cost of
contracting, described fully in Chapter 2, is to estimate the total cost to the government of operating
the Taft facility under contract during the first five years and to compare this to an estimate of what
the government would have spent if the Bureau of Prisons had operated *that same facility*. A
methodology for such cost comparisons was established by the Office of Management and Budget
and is specified in OMB Circular A-76.[14] This method is adopted here, with some modifications.
Separate estimates are developed for each of the five fiscal years, beginning with the first year of the
contract (FY1998), when the facility was being activated and filled with prisoners.

## Institutional Performance

As discussed above, Congress mandated contracting for the management of this facility principally to
determine if contracting posed significant security and safety concerns, such as greater risks of strikes
or walk-outs by private corrections officers and, to a lesser extent, greater risk of disruptions and
inmate disturbances. To date, there have been no strikes or other labor actions at the facility. The
risk of such events is probably higher than in government-operated facilities because employees of

---

[11] "Quality" was defined as the degree to which the bidder offered to accomplish the required tasks, the
soundness and anticipated effectiveness of the proposed approach, and the bidder's understanding of the
requirements relative to the mission of the Bureau and the institution.

[12] Bureau of Prisons, *Solicitation*, Section M, pp. 120–121.

[13] Ibid., p. 19.

[14] Office of Management and Budget, Executive Office of the President, Circular No. A-76, 1983, and revised
since then.

---

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 29 of 44 PageID #: 16455

MARLOWE_0007458

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

private firms have different rights regarding strikes than government employees, but lacking any such occurrences at Taft, we are unable to estimate how much greater these risks actually are.

There were two "disturbances"—mass refusals by inmates to obey orders to disperse in the early days of TCI's operation—but these were resolved by the private firm's managers without having to call upon public law enforcement or correctional authorities. Such events are infrequent events in prisons, both publicly and privately operated. At issue is whether they are more common at the Taft facility than in governmental operated facilities. Our approach to answering this question is to compare the frequency of such occurrences at Taft and at other low-security federal prisons operated directly by the Bureau of Prisons.

Although answers to these few questions might resolve questions posed explicitly in the congressional mandate, our study also addresses objectives that were established by the Bureau of Prisons for the Taft demonstration and by the National Institute of Justice for the evaluation of the demonstration. The Bureau of Prisons' objectives for the privatization demonstration are consistent with Congress's but also go beyond them. The solicitation for the Taft contract states that:

> The contractor shall ensure that the institution is operated in a manner consistent with the mission of the Bureau of Prisons (BOP). The BOP's mission is the protection of society by confining offenders in a safe, humane and appropriately secure facility that provides work and other self-improvement opportunities to assist offenders in becoming law-abiding citizens.[15]

To assess the extent to which managers at the Taft Correctional Institution have succeeded in operating the facility "in a manner consistent with the Bureau's mission," we examine the institutional performance as measured by two yardsticks—the written contract between the Bureau of Prisons and The GEO Group, and the performance of other Bureau-operated low-security federal prisons.

Compliance with the contract is a relevant measure of performance because the contract establishes numerous performance objectives for all aspects of facility operations, which derive from the Bureau's mission statement and from the Bureau's system for managing *all* federal prisons, not just privately-operated ones. Determining the extent to which operations at Taft Correctional Institution conform to the contract thereby indicates the extent to which managers there have succeeded in accomplishing the Bureau's objectives with respect to federal prisons generally and Taft Correctional Institution specifically. Additionally, the contract allows the Bureau to award GEO bonuses for performance that goes beyond simple compliance and furthers the Bureau's performance objectives. The record of GEO's contract compliance at Taft Correctional Institution as well as its success in obtaining bonuses is described in Chapter 3.

If contract compliance were the only measure of institutional performance, one could argue that no independent evaluation is needed because the Bureau has awarded Wackenhut bonuses for performance above and beyond simple compliance, and because the Bureau has exercised its option to renew the contract five times since the end of the first three-year period. We assume, however, that compliance with the contract is not the only available measure of performance of interest to Congress

---

[15] Federal Bureau of Prisons, *Solicitation No. RFP PCC-0001* (dated Nov. 27, 1996), p. 4.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 30 of 44 PageID #: 16456

MARLOWE_0007459

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

and the Bureau. We assume that officials in these organizations are interested as well in how the Taft facility's performance compares to that of other low-security federal prisons operated directly by the government. Fortunately, the Bureau and Wackenhut collect information for a number of indicators designed to measure the extent to which institutional performance conforms to the Bureau's strategic objectives. This system of performance measurement—called the Key Indicators/Strategic Support System—was developed long before any thought was given to privatization, and it provides a means of uniform comparison across all federal prisons, whether operated by government or by private firms. The data in this system are therefore used to compare performance as measured by these indicators at the Taft facility with performance at government-operated low-security prisons. These analyses of these data are described and summarized in Chapter 4.

The findings of these two different lines of analysis—measuring Taft's performance against contractual obligations and, separately, against the practices of other low-security facilities—are then considered side-by-side in an effort to develop a consistent, albeit preliminary, description of the prison's performance. This requires interpretation and judgment because the comparison standards embodied in the contract and in institutional practice diverge in significant ways. Moreover, federal prisons are required to adhere to formal standards, but they are not enforced as a matter of contract as they are at the Taft facility. In addition, only the Taft facility is subject to full-time monitoring by several on-site inspectors. These monitors are conducting a task that has no precedent in the Bureau. In other low-security facilities, compliance with formal standards and operating procedures is assessed by teams of Bureau employees who conduct "program reviews" and security audits. These reviews and audits occur infrequently—once every two years—and the opportunities for discovering noncompliant performance are correspondingly fewer. Finally, compliance is assessed differently at Taft. Not only is the contract a unique standard in the Bureau; the contract monitors also have no real peers in the agency. Rather than being trained as reviewers or auditors, they were transferred to the facility for the purpose of managing it, prior to Congress's subsequent mandate to contract for operations.[16]

## The Structure of This Report

Chapter 2 compares the cost to the government of contracting for operations at the Taft facility during FY 1998 through FY 2002 to the estimated cost of direct governmental operation during these same years. This yields an estimate of the savings that may have been produced by contracting for Taft's operations rather than having the Bureau of Prisons operate it. Chapter 3 examines performance at the Taft facility relative to what the Bureau expects and requires in its contract. Chapter 4 compares the performance of the Taft facility and other low-security federal prisons as measured by a number of performance indicators.

---

[16] In late 2002, the Bureau centralized and standardized procedures for monitoring all contractor-operated facilities.

---

Abt Associates Inc.                                             Introduction        7

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Case 3:16-cv-02267      Document 365-7      Filed 11/20/20      Page 32 of 44 PageID #: 16458

MARLOWE_0007461

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 2

# Does Contracting Cost Less Than Government Operation?

One of the primary objectives of this private prison demonstration was to determine if contracting was more cost effective than direct operation by the federal Bureau of Prisons. It was not a matter of signing a contract that saved money without regard for the quality of service. Rather, the criteria used to evaluate proposals submitted by private firms emphasized "best value" to the government, or what appears to promise the best combination of performance and cost.[17]

There are several commonly asserted reasons why private provision of services is thought to be more cost effective than government provision. One is that incentives felt by managers of private firms encourage them to be more cost-conscious and more aggressive in controlling costs than government managers. Firms have to compete with one another for the government's business, and the price of their offered services matters. Private firms are also less constrained than governments in how they purchase goods and services and how they manage their workforce (even though there is a great deal of variation in how constrained private firms are in these respects). This mix of profit-maximizing incentives and weak constraints results, it is argued, in the creation of market-sensitive and efficient organizations.

Another claim is that allowing private firms to compete with government agencies to provide publicly funded services produces still broader savings in government spending. That is, if government managers must compete with private firms to provide a particular service (such as operating a prison or jail), incentives are created to stimulate more cost-effective organizations within government. In a description of the federal government's guidelines for making contracting decisions, published in 1988 as Circular A-76, then Director of the Office of Management and Budget, James C. Miller, stated explicitly that the government intended to improve efficiency both by contracting when it is more cost-efficient and by using public/private competitions to spur greater cost-efficiency in government provision.

> The Circular describes how to use competition to foster improved quality, increased efficiency, and savings. Quality service and reduced cost are emphasized in two ways: (1) by providing an incentive to Federal agencies to clearly define their performance standards and to reduce the cost of Government operations in order to compete with private industry; and (2) by offering the commercial sector an opportunity to meet these Government needs when they can do so more economically. In either case, the American public are the true beneficiaries since costs are reduced whether the government or industry "wins" the competition… [18]

---

[17]   Bureau of Prisons, *Solicitation*, Section M, pp. 119–21.

[18]   Office of Management and Budget, Office of Federal Procurement Policy, *Enhancing Governmental Productivity Through Competition: A New Way of Doing Business Within the Government to Provide Quality Government at Least Cost, A Progress Report on OMB Circular No. A-76 "Performance of Commercial Activities*." August 1988.

**Abt Associates Inc.**                    **Cost of Contracting vs. Government Operation        9**

Case 3:16-cv-02267      Document 365-7      Filed 11/20/20      Page 33 of 44 PageID #: 16459

MARLOWE_0007462

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Two different questions can therefore be asked of the test of prison privatization at the Taft Correctional Institution. First: has contracting for private operation of this federally-owned prison resulted in the government spending less than it would have spent if the Bureau had operated the prison directly, as it does in nearly all other federal prisons? Secondly, is there any evidence that the mere fact of creating a "market" for federal prison management, and government agencies having to compete with private firms, has stimulated not only greater cost consciousness in other federally operated prisons but also actual cost-efficiencies?

This chapter explores the first question only. The analysis was structured to estimate the cost differences between what contracting cost the government compared to the alternative. The question of whether competition with private firms, or the threat of further privatization in the Bureau, has resulted in greater cost control in Bureau-operated facilities is not examined here. Neither Congress nor the National Institute of Justice requested that this issue be addressed. To obtain the information required to explore this matter would have required more resources than were available

## Roadmap to This Chapter

The first section describes the approach followed here to estimate and compare the costs of contracting and the estimated cost of government operation of the Taft facility. The Department of Justice requested that the methodology prescribed in OMB's Circular A-76 be used to develop estimates for both government-provided and contractor-provided services. Accordingly, we have adopted this estimation approach, with some modifications, which are discussed in detail below.

The cost to the federal government of contracting for the operation of the Taft facility is then computed. Some of these costs involve reasonably straightforward calculations, where some require estimation.

The next section considers what the federal government would have spent if the Bureau of Prisons had operated the facility directly. Because the government never operated the facility before turning the building over the contractors, and because it never worked up a detailed budget plan, it is necessary to estimate what the government would have spent. The strategy used here involves building up each of the different components of cost—staff payrolls, fringe benefits, materials and supplies, overhead/support costs, etc. Because the calculations so derived are estimates, we also consider the likely range of possible error in each of these calculations (even though the conventional methods prescribed OMB's Circular A-76 does not require this). This results in a point estimate of what the government would have spent to operate the Taft prison directly during FY 1998 through FY 2002, as well as a low and a high estimate of costs in each of these five fiscal years.

The estimated costs of contracting and of direct government operation are then compared, providing not only point estimates of costs or savings associated with contracting in each of the five fiscal years but also low and high estimates of costs and savings. To place the estimated cost of the Bureau's operating the Taft facility in context and to assess the reasonableness of the estimate, costs of contracting and government operation of that facility are compared to annual operating costs of low-security federal prisons.

MARLOWE_0007463

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The final section examines how the various component costs differ under the two different arrangements (contracting as opposed to direct government operation) and under what conditions these differences are likely to be larger or smaller. The principal cost driver examined is the cost of labor. These costs vary in different geographical regions of the nation and this affects substantially the extent to which contracting costs more, less, or about the same as government operation.

## The Framework for the Cost Comparisons

The Department of Justice requested that the methods used to develop the cost comparisons follow those prescribed in the Office of Management and Budget's Circular No. A-76. This circular was first issued in 1966 to guide government officials in thinking about whether to contract for production of a good or service rather than produce the good/service directly by a public agency with public employees. By the early 1980s, discussions of contracting had evolved into a broader policy debate about privatization and, in 1983, the Reagan Administration revised Circular A-76 to provide further direction in considering "make/buy" decisions. This document was revised again in May 2003.

Both the older and the revised Circular A-76 prescribe a process to be undertaken *prior* to the make/buy decision, and *are designed to inform that decision, rather than to evaluate the results of these decisions retrospectively.* Because the purpose of this evaluation is to estimate costs and savings associated with a contracting decision that was made several years ago, we are unable to conduct a strict A-76 analysis and must make certain modifications. The next section describes both the structure of a traditional A-76 analysis and the necessary adjustments made for conducting this analysis.

### The Structure of Circular A-76 Analyses

At the time that this study was undertaken, the A-76 guidelines that were in effect were those established in the version prior to the 2003 revisions. In general, the A-76 process, as prescribed by the Office of Management and Budget, consists of six major components:

- *Developing a Performance Work Statement and Quality Assurance Surveillance Plan.* Typically, these are developed by the governmental agency—the Bureau of Prisons, in this case.

- *A management study to determine the government's most efficient organization ("MEO") for delivering the service directly.* This results in a management plan, typically developed by the government agency, which describes how the government will provide the service directly rather than contracting for it. It must reflect the scope of the Performance Work Statement and identify the organizational structures, staffing, operating procedures, equipment, transition and inspection plans necessary to ensure that the in-house activity is performed in an efficient and cost effective manner. Circular A-76 permits agencies to consider existing management reinvention, consolidation, re-engineering, personnel classification, market and other analyses to develop the MEO.

- *Estimating the cost of the government delivering the service by means of this most efficient organization.* This estimate details all costs associated with the performance of the MEO, calculated in accordance with Part II of the Supplement to Circular A-76.

MARLOWE_0007464

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- *Review and certification.* A-76 procedures call for an independent review by the agency's A-76 Independent Review Officer (in this case, the Department of Justice's officer). This officer is charged with certifying that the data contained in the management plan are reasonable and that the in-house cost estimates of government operation are "fully justified and calculated in accordance with the procedures described in [the A-76 guidelines manual]." The certifying official may be any technically competent individual: (a) organizationally independent of the function under study or (b) at least two levels above the most senior official included in the in-house cost estimate. The certifying official must also be able to commit to the provision of necessary resources to perform the activity. Such certification is made before the review of bids or proposals from potential contractors.

- *Issuing a request for proposal or invitation for bid to elicit contractors' bid prices.*

- *Comparing the estimated cost of direct government provision with bidder's proposed prices.*

- *An Administrative Appeal Process.* This is designed to assure that all costs estimated for government-provided and contractor-provided services are fair, accurate and are calculated in accordance with the steps specified in Circular A-76.[19]

**Modifying the A-76 Procedures for the Present Study**

Because an A-76 analysis was not performed before the contracting decision, we must do so retrospectively. Our approach follows the general methodology specified by Circular A-76 in effect until 2003, with some modifications. The most basic changes include our assumptions about the work statement, how the Bureau would have managed the facility, certification of the cost estimates of Bureau operation, and the range of prices offered by contractors. Because this analysis was not done prospectively, but for years now passed, information about actual costs incurred are used rather than forecasted costs for some categories of expense.

*Performance work statement.* Rather than develop a separate performance work statement, we assume that the statement of work issued in the request for proposals reflects the work that the government would have performed.[20] In addition, we assume that the Bureau of Prisons would have employed its existing quality assurance procedures if the Bureau had operated this facility directly. Those procedures were not listed as part of the RFP because the government asked contractors to develop and propose their own plan for quality assurance.

The statement of work issued by the Bureau did *not* include responsibility for operating the federal prison industries at the Taft facility, which was operated and managed directly by the Federal Bureau of Prison's industry program, UNICOR.[21] Accordingly, any and all costs associated with the

---

[19] Part I, Chap. 3, section A, at http://www.whitehouse.gov/omb/circulars/a076/a076s1.html#3a).

[20] Federal Bureau of Prisons, *Solicitation No. RFP PCC-0001*, dated Nov. 27, 1996, Section C (Statement of Work).

[21] The Bureau closed the UNICOR operation at the Taft facility in March, 2003 and transferred it to other federal prisons.

Case 3:16-cv-02267   Document 365-7   Filed 11/20/20   Page 36 of 44 PageID #: 16462

MARLOWE_0007465

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

industrial program are *not* included in either the estimated cost of direct government operation of the Taft facility or the estimated cost of contracting for such operation.

*Management plan.* The Bureau did not specify its most efficient organization for operating the Taft facility, nor did we request that the Bureau do so retrospectively for purposes of this analysis. Instead, we assumed that this most efficient organizational structure would be similar to the Bureau's organization at three other government facilities that were built at the same time as the Taft facility and which have operated more or less in competition with Taft: FCI Elkton (Ohio), FCI Forrest City (Arkansas), and FCI Yazoo City (Mississippi). These three facilities and the Taft facility were all built according to nearly identical architectural plans and differ only in the minimum security units ("camps") that have been constructed outside the secure perimeter.

Analysis of staffing and spending at these and eleven other low-security federal facilities supports this decision.[22] At FCIs Elkton, Forrest City and Yazoo City from FY1999 through FY2002, there was an average of 6.7 prisoners per 1 staff member, compared to 4.6 prisoners per 1 staff at the other eleven low security facilities during the same period. This resulted in lower per prisoner costs at these three FCIs. During this five-year period, the average per inmate cost was 28% lower at the same three facilities ($14,681) compared with $20,462 at the other low security facilities (Table 2.1), even though average costs *per employee* were approximately equal at all these facilities.

**Table 2.1**

**Comparing Efficiency of Operating FCIs Elkton, Forrest City, and Yazoo City and Eleven Other Low-security Prisons, FY 1999–2002**

| Facilities | Prisoner: Staff Ratio | Cost Per Employee | Cost Per Inmate |
|---|---|---|---|
| FCIs Elkton, Forrest City, Yazoo City | 6.7:1 | $93,083 | $14,681 |
| Average Of Other 11 Low-Security Facilities | 4.6:1 | $92,786 | $20,462 |

*Notes:* Staffing ratios computed from monthly reports for twelve months, obtained from Bureau of Prisons' Key Indicators/Strategic Support System. Counts of prisoners includes holdovers. FY 1998 ratios are excluded because these facilities were being activated progressively throughout that year. Costs per inmate and per employee computed using data provided by Bureau of Prisons.

*Source:* Computed by Abt Associates Inc.

*Using information about actual rather than estimated costs.* The Office of Management and Budget promulgated Circular A-76 to guide analyses that are conducted to inform a future decision about whether to contract or not. Because of this prospective orientation, the circular requires that the government *estimate* what it would spend to provide the service directly, and the circular prescribes accounting rules to make these estimates. In contrast, our analysis is retrospective and can take advantage of the fact that costs of operating similar federal prisons are now known. Use of information about actual expenditures rather than forecasted costs yields a more accurate estimate of

---

[22] These eleven low-security prisons include FCI Ashland , FCI Bastrop, FCI Big Spring, FCI Butner, FCI La Tuna , FCI Loretto, FCI Milan, FCI Petersburg , FCI Safford, FCI Seagoville, and FCI Texarkana.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 37 of 44 PageID #: 16463

MARLOWE_0007466

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

what the Bureau would have spent during fiscal years 1998-2002 to operate the Taft facility as a
federal prison.

*Review and certification.* No attempt has been made to enlist an officer of the Bureau of Prisons to
certify that the cost estimates developed here are realistic. We believe them to be realistic, as they are
built upon analyses of the Bureau's planning documents and information about expenditures at
similar federal prisons.

*Information about bidders' prices.* The A-76 guidelines require obtaining bidders' price proposals to
identify the future cost of contracting throughout the full term of the period under assessment (the
term of the contract). Again, the A-76 approach involves forecasting future costs, even though those
contractually agreed upon costs may vary from what is actually paid for various reasons. That is,
after making the decision to contract for the service, the government could impose deductions to
reduce payments or could pay award fees in differing amounts than anticipated. Our approach differs
from the A-76 accounting model. First, we use data for actual payments by the federal government to
the contractor during the five years examined here, rather than using only the winning contractor's
proposed price for the five years into the future. Second, we have no knowledge of what the lowest
offered price was. We assume that the government selected the proposal that offered the best value.

## The Cost of Contracting for Prison Operations at the Taft Facility

In July, 1997, the Bureau of Prisons signed a ten-year contract with the Wackenhut Corrections
Corporation to operate the Taft facility. Although the government and the firm agreed to a fixed price
for each of the ten years, there were provisions for incremental payments if the inmate population
rose beyond a predetermined level, and other provisions existed for bonuses ("award fees") that could
be paid by the government to reward performance that went beyond mere contract compliance.

The total cost of contracting for prison operations at the Taft facility includes these and other costs
born by the government. Specifically, the total cost is the sum of the following:

- the price charged by the contractor and paid by the government to perform the required
  work,
- adjustments for deductions against fee, if any,
- payments of incentive or award fees, if any,
- the costs to government of administering the contract, and
- any additional costs by the government that would be avoided if the operation of the
  facility had not been contracted.

Offsetting these costs to the government are federal income tax revenues, if any, paid by the
contractor. Thus, the *net cost* to the federal government equals total payments by the federal
government minus total federal tax revenues. Revenues paid to state or local governments (sales
taxes, for example) are ignored in A-76 analyses because OMB is focused on costs/revenues to the
*federal* government, even though they might reasonably be included in a broader accounting of costs
and benefits of contracting.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 38 of 44 PageID #: 16464

MARLOWE_0007467

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The OMB Circular A-76 cost comparison methodology provides guidelines for estimating future costs associated with contracting, but we now have the advantage of knowing exactly how much the government has paid. A strict A-76 analysis would this ignore information and would substitute assumptions prescribed by the guidelines. At this point in time, it makes little sense to pretend that we are living in 1997 and are trying to estimate future costs of contracting. Therefore, the costs of contracting from FY 1999 through FY 2002 are developed here using information about actual costs paid by the government and estimated federal income tax payments.

Table 2.2 summarizes the estimated total cost to the government of contracting for TCI's operation during the five-year period from FY 1998-2002. During FY 1998, the Taft facility was not in its operational phase for the entire fiscal year, as the period of preparing the facility and staff for receiving prisoners ended on December 20th. This pre-operational period lasted from August 19— December 19, 1997, the costs of which are treated separately in the analysis below. Therefore, the cost of operations during FY 1998 are computed only for the period from December 20, 1997 through the end of the FY 1998 fiscal year, or September 30, 1998. Each of the component estimated costs of operations are discussed in detail below.

**Table 2.2**

**Estimated Total Cost to Government of Contracting for Operation of Taft Correctional Facility: FY 1998-2002, by Year and Category of Cost**

| | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| **Payments to Contractor for Services** | | | | | | |
| Fee with adjustments | $20,889,519 | $27,214,375 | $28,210,157 | $31,139,352 | $32,037,139 | $139,490,541 |
| Award fees | 182,240 | 361,730 | 408,333 | 545,833 | 733,333 | 2,231,470 |
| *Subtotal payments to contractor* | 21,071,759 | 27,576,105 | 28,618,490 | 31,685,186 | 32,770,472 | 141,722,011 |
| **BOP Monitoring/ Contract Admin.** | | | | | | |
| Salaries | 319,714 | 402,911 | 310,296 | 435,435 | 320,336 | 1,788,692 |
| Premium comp. | 2,633 | 2,607 | 504 | 4,543 | 3,258 | 13,545 |
| Fringe benefits | 99,557 | 128,112 | 108,007 | 124,196 | 92,991 | 552,864 |
| Other direct expenses | 64,395 | 47,227 | 22,374 | 1,840 | 2,011 | 137,847 |
| *Allocated Bureau overhead* | 39,490 | 64,036 | 50,257 | 67,701 | 49,990 | 271,474 |
| *Subtotal monitoring/contract admin.* | 536,927 | 644,893 | 491,438 | 633,715 | 468,586 | 2,775,560 |
| **Est. federal corporate income tax offset** | -729,426 | -695,766 | -240,963 | -331,213 | -422,653 | -2,420,023 |
| **Total** | **$20,879,259** | **$27,525,231** | **$28,868,965** | **$31,987,688** | **$32,816,405** | **$142,077,549** |

*Note*: FY 1998 is a partial year, beginning with operational phase on December 20, 1997. Award fees are pro-rated to correspond to the fiscal years during which performance periods occurred.

*Sources*: Computed by Abt Associates Inc. using data provided by the Bureau of Prisons and The GEO Group. See text for details.

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 39 of 44 PageID #: 16465

MARLOWE_0007468

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Payments to the GEO Group, Inc. for Contracted Services**

The federal government and The GEO Group Inc. agreed to a fixed-price contract that obligated the government to pay GEO $27,641,997 annually for three years in return for which the firm would manage, operate, and maintain the Taft Correctional Institution (Table 2.3). This fixed price agreement covered *all* costs for operation and maintenance associated with an average daily population of 1,946 inmates. This price was to be paid even if the average daily population was far below the 1,946 level. The Bureau of Prisons therefore took the risk of not utilizing the prison's capacity efficiently (which was a small risk because it controlled the assignment of prisoners to prisons). During any month when the population exceeds 1,946 inmates, the contractor can charge the government an additional fixed-price daily increment. During the first three base years, this increment equaled $5.58 per inmate/day. When the contract was renewed after the base period, the prices of increments in each of the subsequent option years increased. All payments to GEO are made on a monthly basis.

---

**Table 2.3**

**Contract Prices for Taft Correctional Institution and Fixed Incremental Unit Price for Additional Prisoners, By Year**

| Contract Period | Annual Contract Payment | Fixed Incremental Unit Price |
|---|---|---|
| Base years: | | |
| 1 | $27,641,996.64 | $5.58 |
| 2 | 27,641,996.64 | 5.58 |
| 3 | 27,641,996.64 | 5.58 |
| Option years: | | |
| 1 | 29,471,365.00 | 5.75 |
| 2 | 29,913,435.00 | 5.84 |
| 3 | 29,521,932.00 | 5.92 |
| 4 | 29,964,761.00 | 6.01 |
| 5 | 30,414,232.00 | 6.10 |
| 6 | 30,870,446.00 | 6.19 |
| 7 | 31,333,502.00 | 6.29 |

*Source:* Award to Wackenhut Corrections Corporation by Federal Bureau of Prisons, dated July 30, 1997.

---

The payments to the GEO Group are *prices* paid to the firm for its services, rather than reimbursements for *costs* incurred plus some agreed upon fee. GEO's actual costs—the expenses it incurs to deliver the services—are less relevant to the basic question examined here. That is, we are concerned with comparing the *cost to the government* of either contracting for the Taft facility's operation or for providing that service directly by the Federal Bureau of Prisons.

During this five-year period, there were a number of contract modifications that resulted in increased payments to the contractor for services rendered as well deductions for services not received. During 1998, the facility's average daily prisoner population was 1,091, below the 1,946 level (which did not result in a reduced payment). During that year, the Bureau paid an additional $3,370 for housing prisoners above that level, and in all subsequent years, the number of prisoners exceeded this level

---

MARLOWE_0007469

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

frequently. During FY1999, GEO received an additional $578,748 for exceeding the 1,946 threshold, and then $883,799 during FY 2000, $902,991 in FY 2001, and $848,543 during FY 2002, for a total of $3,217,451 million during the five fiscal years.[23]

During these five years, a number of deductions were imposed for not delivering various services at the levels required by contract. These totaled $906,158 over the five years.[24] These were deducted from the base fees payable to the contractor.

The net result of these adjustments to base fees for deductions and additions for holding prisoners above the 1,946 was a total payment of $139.5 million by the federal government to The GEO Group for services performed during the five fiscal years for its operating the facility (Table 2.2).[25] Excluded here are the costs that were incurred during the first two and a half months of FY 1998 for GEO's preparing the facility for full operations.

**Award Fees**

Consistent with the performance-oriented structure of the contract, the government agreed to award Wackenhut additional money for good performance above and beyond mere compliance with the terms of the contract. These bonuses, awarded on a semi-annual basis, can equal as much as 5 percent of paid invoices during each period. These provisions and how they were administered are discussed in greater detail in Chapter Three.

For each of the five fiscal years 1998–2002, the award fees actually paid ($2.2 million in total) are included in the tally of total cost to the government for GEO's operating the facility (Table 2.2).[26] This is a departure from the A-76 methodology. For the purpose of estimating the *future* cost to the government when incentive or award-fee contracts are employed, Circular A-76 assumes that 65 percent of the maximum potential award fee will be paid to the contractor. As discussed in Chapter Two, the Bureau's officers issued awards throughout these five years that were substantially smaller—31 percent of the maximum eligible amounts, on average. If award fees were at the 65 percent level, the total cost to government would have been $2.5 million higher.

---

[23] Computed from data provided by The GEO Group and the Bureau of Prisons. Payments and receipts in each fiscal year are not identical in both sources because GEO posts payments at the time of receipt, while the Bureau uses accrual-based accounting procedures and assigns expenditures to period of performance rather than to date paid.

[24] Ibid.

[25] By contract, GEO is not permitted to keep any revenue it receives for inmate telephone services (rebates, etc.). GEO adjusts its monthly bills, deducting the amounts of any such revenues from the base fee. During this five-year period, GEO passed a total of $2.5 million in these rebates to the federal government. These resulted in a deduction to the government's cost of contracting.

[26] Excluded here is an award fee of $58,257 that was given to GEO for its performance during the pre-operational phase when it was preparing the facility to receive and hold prisoners. Moreover, some of these award fees (for the performance periods between August 20 and February 20) straddle two different federal fiscal years. Consequently, we have allocated one-sixth of these payments to the one year and five-sixths to the second. This differs from the Bureau's accounting, which assigns the entire payment to the second fiscal year.

---

Case 3:16-cv-02267   Document 365-7   Filed 11/20/20   Page 41 of 44 PageID #: 16467

MARLOWE_0007470

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Contract Administration Costs**

Costs were incurred by the Bureau of Prisons to administer and monitor the contract, all of which would have been avoided if the Bureau operated the facility directly. Accordingly, Circular A-76 prescribes that the total cost to the government includes "the cost of reviewing compliance with the terms of the contract, processing payments, negotiating change orders, and monitoring the closeout of contract operations." Not to be included are expenditures associated with "inspection and other administrative requirements that would be common to the contract and government performance to assure acceptable performance."

During the five years examined here, the cost of contract monitoring ranged between $469,000 and $645,000 per year, for a total of about $2.8 million (Table 2.2).[27] (This includes an allocation of 12 percent overhead on these monitoring costs.) This differs somewhat from the costs that would have been forecast if assumptions prescribed by Circular A-76 were adopted. These A-76 guidelines assume that ten persons would be required to administer a contract for a service that the government could provide directly with 350 staff (assuming its most efficient organizational structure).[28] Following this guideline, the cost of contract administration would have been calculated as approximately $800,000–900,000 during FY 1999.[29] Over the five fiscal years studied here, monitoring and administration would have cost approximately $4 to $4.5 million at this rate, compared with the actual expenditure of $2.8 million.

**Government Overhead Costs**

Circular A-76 does not prescribe assignment of government overhead costs to contracted operations. Therefore, no overhead cost factor is included in the estimated cost of contracting for operations at TCI. Most of the Bureau's support to GEO at TCI was provided by the contract monitors and administrators, and the costs are of these activities have already been captured (see above). During the five year period examined here, the Bureau provided minimal support services to GEO other than those provided by these contract monitors and administrators.

Not assigning government overhead costs to contracted activities has been a controversial issue among those involved in estimating costs of public and private competitions under Circular A-76 rules. Some argue that contracting for a service does not avert spending for many government overhead functions because the costs of many of these functions are relatively fixed and should be spread to all government-funded activities, whether performed by government or by contractors. This is the position taken by one consulting economist to the Bureau of Prisons who has developed a cost analysis of the Taft facility for FY 1999.[30] She undertook an analysis of the Bureau's support costs

---

[27] Bureau of Prisons, Budget Execution Branch, reports of obligations during FY 1998–2002. A small portion of these costs were incurred in support of the Bureau's contract for the facility in Eloy, Arizona. For some periods during these five years, the contract administrator stationed at the Taft facility assumed some of the administration functions for the Eloy contract. Contract monitors, in contrast, were fully dedicated to the Taft facility. No attempt was made to estimate the small amount of time spent during these five years by the contract administrator for the Eloy contract.

[28] Circular A-76, Part II, p. 41.

[29] This is an imprecise and tentative estimate extrapolating from what the Bureau of Prisons spent during FY 1998 and 1999.

[30] Julianne Nelson, "Taft Prison Facility: Cost Scenarios," unpublished, November, 1999.

---

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 42 of 44 PageID #: 16468

MARLOWE_0007471

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

and estimated the cost of those activities that might be avoided by contracting (such as the costs of training staff) and those that would not (costs of central and regional offices, for example). She estimated that the overhead cost of contracting during FY 1999 at 8.19 percent, compared to 11.84 percent for government-operated facilities.

Assigning fixed overhead costs in proportion to direct costs, or direct labor hours, or direct materials is a common accounting procedure. This assumes that all activities call upon these fixed overhead resources equally. (This approach is called "cost smoothing" because overhead costs are assigned evenly without regard to how overhead resources are actually called upon.) Following this logic, it may seem reasonable to assume that it makes no difference for overhead assignment if the facility is operated by a contractor rather than by the Bureau of Prisons.

A competing school of thought argues that overhead costs should be assigned as accurately as possible to the activities that actually receive support, in proportion to the support received. Advocates of this "activity-based" cost accounting argue that it provides a more accurate representation of the resources required to produce specific goods or services—and, therefore, a more accurate representation of what specific activities actually cost. Indeed, some services may require a great deal of administrative and management overhead support, while other services provided by the same organization may demand little. If the organization is profit seeking, it will be advantageous to know the full cost of producing the former services so that they can be priced appropriately. In any organization, public or private, knowing the resources required of different types of services will facilitate more informed decisions about how to allocate available resources. Simply spreading fix overhead costs in proportion to direct costs obscures how overhead resources are actually spent.

Following this logic of activity-based cost accounting, it is reasonable *not* to assign some portion of the costs of Bureau overhead and support activities to the Taft facility and to the cost of contracting. By contracting, the Bureau avoided providing the broad range of support and oversight functions its affords federal prisons. As a matter of policy, the Bureau providing minimal support to the contractor during this period, with the exception of that provided by the on-site contract monitors—and the cost of this support has already been captured in our analysis. There were, no doubt, some overhead costs that were incurred for the Taft facility. Bureau officers have argued, for example, that the Key Indicators/Strategic Support performance indicator system pulled data for the Taft facility as well as for all federal facilities and that some portion of this expense should be assigned to the Taft contract. However, unlike wardens of federal prisons, GEO's warden at the Taft facility was never given access to these data. Unless such resources are used to support managers at the facility level, it is difficult to argue that these costs should be assigned to the Taft contract.

In FY 2003, the Bureau began to change its relationship to GEO and to all other contractors that operate facilities holding federal prisoners. It sought to transform its relationships with contractors as partnerships rather than the competitive relationships that had existed previously. A new contract monitoring team was developed as well as a new approach to quality assurance at all contractor-operated facilities, all of which is being done at the national headquarters level. (See Chapter Three for a discussion of this.) The costs of these supportive activities could be included as a cost of contracting during FY 2003 and afterwards, although they should be considered monitoring costs rather than general overhead costs.

Abt Associates Inc.                    Cost of Contracting vs. Government Operation        19

Case 3:16-cv-02267    Document 365-7    Filed 11/20/20    Page 43 of 44 PageID #: 16469

MARLOWE_0007472

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

It is important to recognize that the Bureau did not *avoid* spending $12 to 17 million for fixed overhead expenses because these costs were not assigned to the Taft facility's operation.[31] Rather, these fixed costs were still incurred and are assigned to the Bureau-operated facilities as an indirect cost of operating those prisons.

Bureau of Prisons officials and their consulting economist, Julianne Nelson, object strenuously to this treatment of overhead spending.[32] Dr. Nelson's approach is to estimate costs that are *avoided* by contracting with GEO to operate the Taft facility. This is a somewhat different question that we are asking in this report ("what are the costs to the government of contracting for TCI, compared to the cost of direct government operation"). Dr. Nelson is correct in assuming that nearly all the overhead costs of the Bureau are quite fixed and that the *marginal savings* to overhead (or "avoided costs") are minimal if only one out of more than 100 federal prisons is contracted out. If, however, the Bureau contracts for fifty prisons, it is reasonable to assume that overhead costs would decline if these contracted prisons call upon overhead resources in the same fashion as does the Taft Correctional Facility. In other words, overhead costs are not fixed but no doubt vary according to the size of the enterprise being managed. Exactly how elastic these overhead costs are is not easily estimated.

### Insurance Costs

Payments to plaintiffs who win lawsuits against governments or private correctional firms are real costs of imprisonment, as are the costs of insuring against such losses. The federal government—like other governments—is not able to shield itself legally from liability claims,[33] so it might seem

---

[31] $12 million is the amount that would be assigned according to Nelson's assumptions; $17 million equals 12 percent of all payments to GEO over the five fiscal years for operations (excluding activation costs during the beginning of FY 1998).

[32] Bureau of Prisons officials were given the opportunity to review and comment upon an earlier version of this report. Dr. Julianne Nelson was also contracted, through the CNA Corporation, to review it. Dr. Nelson had earlier been engaged directly by the Bureau as a consultant to develop her own cost comparisons of direct government operation of the Taft facility and contracted operation. See Nelson, "Taft Prison Facility: A Comparison of Evaluation Methods," (Alexandria, VA: The CNA Corporation, July 2005.

[33] The courts have ruled that private prisons are treated as "state actors" for purposes of civil rights suits and that governments remain exposed to liability claims (See *West v. Atkins*, 487 U.S. 42 (1988), also *Street v. Corrections Corp. of America,* 102 F. 2d 810, 814 (6th Cir. 1996); *Payne v. Monroe County*, 779 F. Supp. 1330, 1335 (M.D. Fla. 1991). In practice, however, a government's exposure is substantially lower if a private contractor is running a private facility, compared to when it operates prisons directly. The contractor will be the primary defendant in inmate litigation, and government authorities generally will not have direct responsibility for the actions of contractor employees. In the vast majority of inmate cases— including most prisoner civil rights litigation where individual, rather than systemic, group harms are at issue—governments will not be deemed to have specific knowledge of, and therefore bear responsibility for, the specific acts and injuries alleged. In "Section 1983" civil rights litigation—which represents the overwhelming majority of inmate claims—a firm and its supervisory employees must be shown to have been directly involved in an alleged violation, have known about the violation or its likelihood of occurring, and been "deliberately indifferent" toward the risk, or have generated or validated a policy or custom that led to the violation. (See, e.g., *Street v. Corrections Corp. of America, supra* at 818. See also generally *Monell v. Dept of Social Services,* 436 U.S. 658, 694 (1978).) Since public correctional authorities will have entrusted day-to-day management of prisons to private contractors, they will be less likely to have notice or knowledge of specific harms alleged to have caused injury to individual inmates. While reliance on a private contractor will not prevent government authorities from being named in

---

MARLOWE_0007473