This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

reasonable to estimate the annualized cost to the Bureau of insurance or self-insurance. However, the Bureau's contract with GEO indemnifies it against any costs arising out of any personnel-related liability claims. This effectively avoids all personnel liability insurance costs.

Similarly, the government owns the facility but its contract with The GEO Group requires that the facility, equipment, and furnishings be insured against damages and destruction up to $75 million dollars. The cost of such indemnification is included in the insurance premium paid by the company and, correspondingly, in the contractor's fee. Wackenhut spent more than $500,000 annually during FY1998 and FY1999 to insure itself against all liability claims at the Taft Correctional Institution. (In subsequent years, the cost to the contractor of total insurance and self-insurance combined reached $1.4 million per year, but this combined total includes some self-insurance for prisoner health care costs, and the annual expenditures for premiums for liability and casualty insurance cannot be isolated.) We therefore estimate that the cost to the government for insuring itself against liabilities at Taft, above and beyond the amount included in the contract price, is zero.

### Cost of Preparing the Facility Before Going Fully Operational

The Bureau began to prepare the facility for operation before the decision was made to contract. The Bureau spent approximately $7,000,000 for miscellaneous materials and supplies, which it turned over the contractor.[34] The Bureau then paid GEO its monthly fee for services between August 19, 1997, when the notice to begin preparing the facility for prisoners was issued, and December 20, 1997, when the Bureau declared these preparations completed and ordered the transfer of prisoners to the facility. GEO's charges during this period totaled $9,213,999, and it was also given an award fee of $58,257 for good performance during this pre-operations period. GEO offset these costs to the government in part by paying corporate income taxes to the U.S. Treasury, estimated to have been approximately $208,408 (see the discussion below of how these taxes were estimated). The total net cost to the Bureau of preparing the Taft facility was therefore approximately $16,063,848.

A full reckoning of the costs would include these expenditures incurred before the first prisoners arrived, but it is difficult to estimate what the Bureau would have spent if it continued its own preparations and then operated the facility. There are also different ways of treating these pre-operational expenditures (e.g., recognizing them fully as expenses in FY 1997 and FY 1998 or amortizing them across the useful life of the equipment and supplies, or across the ten-year life of the contract). Therefore, this report ignores these expenditures by the government for the period before December 20, 1997. We do not aim to develop a complete accounting of what the Bureau spent to have GEO prepare the facility for operations as well as operate it. Instead, our focus is on a comparison of the known costs of contracting and the estimated costs of the government's *operation* of a prison.

---

lawsuits or being exposed to liability for widespread or obvious problems relating to facility conditions, private contracting will greatly lessen the liability of government supervisory officials for most inmate claims alleging individual harm. These claims represent the most common type of prisoner lawsuit and assume a significant proportion of a correctional agency's litigation budget.

[34] Memoradum from Carol Durkee, Bureau of Prisons, Budget Execution Branch to Douglas McDonald, August 9, 2000.

---

MARLOWE_0007474

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Conversion Costs**

*Labor-related costs*. Circular A-76 requires accounting for labor-related conversion costs, such as "health benefit costs, severance pay, homeowner assistance, relocation and retraining expenses and initial contractor security clearance requirements."[35] These are not relevant because Taft was not staffed by federal employees at the time of the "conversion" to private operation.

**Income Tax Payments**

Because contractors may earn profits for providing their services, payments of corporate income taxes offset the cost to the federal government of contracting. Circular A-76 guidelines recommend computing estimated federal income tax payments for "other services" as equivalent to 0.5 percent of the total annual contract price. Following this accounting rule, we would estimate that GEO would have paid a total about $760,400 during these five fiscal years.

This is a conservative assumption that is probably unrealistic. Assuming a federal corporate income tax rate of 35 percent, the true profit rate would have to be about 1.5 percent of total revenue for the A-76 guideline to be accurate. Some federal contracts may earn this little, although there no doubt exists substantial variation from one industry to another. Moreover, the federal government has no reliable way to estimate the average profit realized from fixed price contracts for services.

GEO was asked to provide its federal and state income taxes for purposes of this study. GEO pays taxes on profits earned in calendar rather than federal fiscal years, and has apportioned its total corporate tax payment in proportion to the revenues earned by all its contracts. During this period, revenues from Bureau of Prisons for operation of the Taft facility equaled 7 to 8 percent of its total revenues for correctional services; consequently, GEO assigned 7 to 8 percent of its federal income tax liability to the Taft facility contract, depending upon the year. Following these assumptions, GEO's federal income tax payments would have ranged between $240,963 during 2000 to $729,426 during 1998, and the firm's total federal tax liability associated with the Taft facility during the five years would have been approximately $2.4 million.[36]

It is possible that the real rate of profit at the Taft facility was higher or lower than the average rate produced by all the firm's correctional services. Nonetheless, the apportioned tax payments reported by GEO are probably closer to the firm's actual federal tax liabilities than the OMB estimate and are therefore used here.

---

[35] Office of Management and Budget. "Circular A-76 Supplemental Handbook: Part II: Preparing the Cost Comparison Estimates." A-76 Competitive Sourcing Internet Library and Directory (www.dla.mil/J-8/A-76/A-76SupplementaryHandbookPart%20I.html).

[36] GEO provided its computations based upon the firm's calendar year accounting, and it assigned revenues to the period in which they were received rather than accrued; the calculation of total annual revenue therefore differs somewhat from the Bureau's accounting. FY 1998 estimates are adjusted to count only taxes on revenues received after December 20, 1997, when the prison became operational.

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 2 of 45 PageID #: 16472

MARLOWE_0007475

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Although tax payments to state or local governments are not considered relevant to the federal government's calculation of comparative costs of contracting vs. direct provision, Wackenhut/GEO paid the State of California an estimated $662,100 in corporate income taxes during this period.[37]

**Summary: Total Net Cost of Contracting During FY1998–2002**

Following the accounting procedures specified in Circular A-76, the net cost to the government of contracting for the operation of the Taft Correctional Institution during FY 1998 was $20.9 million (Table 2.2). By FY 2002 the cost had risen to almost $32.8 million. The total net cost to the federal government for all five years combined was approximately $142.1 million (excluding the weeks during FY 1998 prior to the facility's going operational on December 20, 1997.)

## What Would the Bureau of Prisons Have Spent to Operate the Taft Facility During FY 1998–2002?

What the federal government would have spent to operate the Taft facility during these five years cannot be known with certainty and can only be estimated. As discussed above, the federal Office of Management and Budget has established a method (in its Circular A-76 and various revisions) for making these estimates.

However, the Bureau of Prisons did not conduct an A-76 analysis prior to contracting, and did not develop a fully specified budget for operating the Taft facility as a federal prison. Therefore, it is necessary to do this retrospectively. In this section, what the government would have spent to operate the facility during FY 1998–2002 is estimated. Following the general logic of the A-76 approach (with some modifications, as indicated), expenditures are estimated for:

- personnel, including salaries and premium pay;
- fringe benefits and retirement fund contributions, and other associated liabilities;
- materials and supplies;
- casualty and personnel liability costs; and
- expenditures for governmental administration that are not directly incurred by specific prisons but which support all prisons (and are, consequently, "indirect" or "overhead" expenditures).

Table 2.4 summarizes how each of these various costs were estimated. The estimated costs following these assumptions are then shown in Table 2.5. During FY 1998, the government would have spent a total of $21.6 million to operate the facility as a federal prison (after December 20, 1997). This would have risen in subsequent years to $35.1 million during FY 2002. The estimated total cost over the five-year period would have been $154.9 million.

---

[37] The allocation of California tax liability was made by assigning such liability in proportion to revenues received by all its contract operations in that state.

**Abt Associates Inc.**     **Cost of Contracting vs. Government Operation**    **23**

Case 3:16-cv-02267   Document 365-8   Filed 11/20/20   Page 3 of 45 PageID #: 16473

MARLOWE_0007476

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Table 2.4

### Assumptions for Estimating the Government's Operating the Taft Facility During FY 1998–2002

| Category of Expense | Assumptions |
|---|---|
| **Salaries and Wages** | |
| Permanent salaries and wages | Abt Associates, Inc. Calculation: Assume staffing model was identical to that at FCI Elkton, that employees were paid a mid-grade levels, and that staff vacancy rates (9 percent) were identical to those observed at all low security federal prisons during FY 1998-2002. |
| Premium compensation and other than permanent salaries & wages | Abt Associates, Inc. Calculation: Assume rates of premium compensation and other than permanent salaries and wages was identical to average observed at 14 low security federal facilities during each of five fiscal years. |
| Subtotal adjusted salaries and wages | Abt Associates, Inc. Calculation: Sum of adjusted salaries and wages and premium compensation/other than permanent salaries and wages |
| **Fringe benefits** | |
| Retirement fund contributions | A-76 Prescribed Cost factor: 37.7% of adjusted salaries and wages |
| Federal employee insurance & health benefits | A-76 Prescribed Cost factor: 5.6% of adjusted salaries and wages |
| Medicare benefit contributions | A-76 Prescribed Cost factor: 1.45% of adjusted salaries and wages |
| Misc. fringe benefits | A-76 Prescribed Cost factor: 1.7% of adjusted salaries and wages |
| Subtotal fringe benefits | Abt Associates, Inc. Calculation: Sum of fringe benefits |
| **Subtotal personnel costs** | Abt Associates, Inc. Calculation: Sum of salaries, wages, and fringe benefits |
| **Materials, supplies, and other non-personnel costs** | Abt Associates, Inc. Calculation: Estimated based upon statistical analysis of observed expenditures at 14 low security federal prison. |
| **Other specifically attributable costs** | |
| Casualty liability (annualized cost) | A-76 Prescribed Cost factor: 0.5% of net value of capital (excludes costs of materials and supplies) |
| Personnel liability (annualized cost) | A-76 Prescribed Cost factor: 0.7% of government facilities total personnel costs—salaries, wages, premium compensation, benefits |
| **Subtotal other specifically attributable costs** | Abt Associates, Inc. Calculation: Sum of other specifically attributable costs |
| Subtotal, all categories | Abt Associates, Inc. Calculation: Sum of personnel, materials and supplies, other specifically attributable costs |
| **Overhead** | |
| Total estimated cost for government operation of Taft Correctional Institution | A-76 Prescribed Cost Factor 12% of "subtotal personnel costs" above.<br>Abt Associates, Inc. Calculation: Sum of personnel, materials and supplies, other specifically attributable costs, and overhead |

MARLOWE_0007478

Table 2.5

**Total Estimated Cost of Government Operation of the Taft Correctional Institution During FY 1998-2002**

| Salaries and Wages | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| Permanent salaries and wages | $10,636,157 | $14,149,290 | $14,776,170 | $15,281,143 | $15,935,658 | $70,778,418 |
| Staff vacancy adjustment | -850,893 | -1,131,943 | -1,182,094 | -1,222,491 | -1,274,853 | -5,662,273 |
| Adjusted est. salaries/wages | 9,785,264 | 13,017,347 | 13,594,077 | 14,058,652 | 14,660,805 | 65,116,145 |
| Premium compensation and other than permanent salaries and wages | 782,821 | 1,158,544 | 1,291,437 | 1,321,513 | 1,524,724 | 6,079,039 |
| *Subtotal salaries and wages* | 10,568,085 | 14,175,891 | 14,885,514 | 15,380,165 | 16,185,529 | 71,195,184 |
| **Fringe benefits** | | | | | | |
| Retirement fund contributions | 3,984,168 | 5,344,311 | 5,611,839 | 5,798,322 | 6,101,944 | 26,840,584 |
| Federal employee insurance & health benefits | 591,813 | 793,850 | 833,589 | 861,289 | 906,390 | 3,986,930 |
| Medicare benefit contributions | 153,237 | 205,550 | 215,840 | 223,012 | 234,690 | 1,032,330 |
| Misc. fringe benefits | 179,657 | 240,990 | 253,054 | 261,463 | 275,154 | 1,210,318 |
| *Subtotal fringe benefits* | 4,908,876 | 6,584,701 | 6,914,321 | 7,144,087 | 7,518,178 | 33,070,163 |
| *Subtotal personnel costs* | 15,476,961 | 20,760,592 | 21,799,835 | 22,524,252 | 23,703,707 | 104,265,347 |
| **Materials, supplies, and other non-personnel costs** | 3,861,735 | 7,686,902 | 8,288,809 | 7,677,233 | 8,039,963 | 35,554,642 |
| **Other specifically attributable costs** | | | | | | |
| Casualty (self-insurance) | 292,500 | 375,000 | 375,000 | 375,000 | 375,000 | 1,792,500 |
| Personnel liability (self-insurance) | 108,339 | 145,324 | 152,599 | 157,670 | 165,926 | 729,857 |
| *Subtotal other specifically attributable costs* | 400,839 | 520,324 | 527,599 | 532,670 | 540,926 | 2,522,357 |
| Subtotal, all categories | 19,739,535 | 28,967,818 | 30,616,243 | 30,734,154 | 32,284,596 | 142,342,346 |
| **Overhead** | 1,857,235 | 2,491,271 | 2,615,980 | 2,702,910 | 2,844,445 | 12,511,842 |
| **Total estimated cost** | $21,596,770 | $31,459,089 | $33,232,223 | $33,437,065 | $35,129,041 | $154,854,188 |

*Note:* FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.
*Sources:* Computed by Abt Associates Inc. See text for sources of data and assumptions.

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 5 of 45 PageID #: 16475

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

For several components of these estimates, error ranges were calculated, which resulted in developing a low and a high estimate of total costs in each of the five years (Table 2.6). The error range was small: plus or minus about 2 percent, with some small variation among the five years. Consequently, our best estimate is that the total cost of government operations during the five years combined would have been between $151.6 and $158.6 million.

**Table 2.6**

**Range of Estimated Costs of Government Operation of Operation of the Taft Correctional Institution During FY 1998–2002**

|  | 1998 | 1999 | 2000 | 2001 | 2002 | Total |
|---|---|---|---|---|---|---|
| High estimate | $22,263,257 | $31,928,256 | $33,793,265 | $34,566,504 | $36,065,834 | $158,617,116 |
| Low estimate | 20,930,283 | 30,968,437 | 32,671,182 | 32,884,422 | 34,192,248 | 151,646,572 |

*Note:* FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.

*Sources:* Computed by Abt Associates Inc. See text for sources of data and assumptions.

Details of how these costs were estimated are described below. Attention is given first to developing the point estimates; consideration of error ranges and sensitivity of the estimates is then discussed.

**Personnel Costs**

An indication of what the government would have spent to staff the Taft facility is evident in the Bureau's early planning documents for this facility. The Bureau built the facility and first assumed that it would operate it. In July 1996, the Bureau's Resource Management Subcommittee approved a proposal to authorize 350 positions at the facility, not including staff for the prison industry program. This proposal was adopted subsequently by the Bureau's Budget Execution Branch on September 20, 1996.

As is customary in the Bureau, these positions were authorized only for functional areas ("decision units")—food services, medical services, and security services, for example. Exactly how these functional areas were to be staffed—the specific positions to be filled and their pay grades—was left to regional headquarters and to the warden. The Bureau has provided staffing guidelines that specify the number and types of positions required for all facilities, with adjustments for facility size, but wardens retain some discretion in these staffing decisions. Further specification of staffing at Taft was suspended within the Bureau once Congress mandated that the Taft facility was to be operated by a contractor.

How the Bureau would have filled these 350 positions can be estimated using information about staffing of the three other low-security FCIs that are architecturally similar and which opened at roughly the same time at Taft—FCIs Elkton, Forrest City, and Yazoo City. Because staffing is driven primarily by a prison's physical design and its security level, and because the design of these three facilities resembled Taft's so closely, we can assume that a federal prison warden at Taft would have staffed that facility similarly.

MARLOWE_0007479

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

All four of these facilities have identical low-security sections. At each, there are three dormitory-style units, each designed for 512 prisoners, for a total of 1,536 low-security prisoners. The Bureau allocated 315 positions to each of these four low-security facilities.[38] At both Taft and Elkton, a fourth 512-bed unit was built for minimum-security inmates. At these prisons, this latter unit is separated from the rest of the facility and is designated a "camp"—a misnomer, as it looks like all other units in the prison, except that it lacks a perimeter fence. The Bureau had authorized an additional 35 employees for these minimum-security camps to both FCI Taft (when it was assumed that the Bureau would operate it) and to FCI Elkton (Table 2.7).

**Table 2.7**

**Numbers of Authorized Staff Positions for Government-Operated Federal Prisons at Taft, Elkton, Forrest City, and Yazoo City, by Security Level (FY 1996)**

|  | Taft | Elkton | Forrest City | Yazoo City |
|---|---|---|---|---|
| Low-Security Units | 315 | 315 | 315 | 315 |
| Minimum-Security camps | 35 | 35 | 0 | 0 |
| Total | 350 | 350 | 315 | 315 |

*Notes:* Excludes federal prison industry positions and inmate trust fund positions. Includes all other staff positions (Public Health Services staff, B&F, S&E, and VCRP).

*Sources:* Requests for Personnel Action, dated 9/20/96 (FCI Taft), 4/22/96 (FCI Forrest City). Undated (FCI Yazoo City), and 11/18/96 (FCI Elkton).

Table 2.8 shows how the leadership at each of these three bureau-operated facilities translated authorized positions into specific staff positions. In most functional areas, differences in numbers of full-time staff positions were small. The principal differences stemmed from the fact that Elkton was to house a larger number of inmates than the other two facilities. This required more staff assigned to unit management and to inmate systems (record keeping and sentence-computation responsibilities) at Elkton.

---

[38] In addition to these staff, some positions were authorized at each facility to manage and operate the inmate trust fund accounts. These are not included here because their salaries and benefits are paid by revenues generated by inmate commissary profits and not (ultimately) by taxpayers. As mentioned above, staff assigned to the federal prisons industries were authorized but are excluded from this analysis.

Abt Associates Inc.          Cost of Contracting vs. Government Operation          27
Case 3:16-cv-02267     Document 365-8     Filed 11/20/20     Page 7 of 45 PageID #: 16477
MARLOWE_0007480

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.8**

**Planned Staffing for Government-Operated Federal Prisons at Taft, Elkton, Forrest City, and Yazoo City, by Functional Department (FY 1996)**

|  | Taft | Elkton | Forrest City | Yazoo City |
|---|---|---|---|---|
| Food Service | 18 | 18 | 15 | 13 |
| Medical Services | 23 | 25 | 26 | 22 |
| Inmate Services | 3 | 4 | 2 | 2 |
| Correctional Services | 130 | 122 | 122 | 132 |
| Unit Management, Inmate Systems | 78 | 72 | 55 | 57 |
| Education | 15 | 17 | 13 | 12 |
| Recreation | 8 | 9 | 7 | 7 |
| Religious Services | 4 | 2 | 3 | 3 |
| Psychology Services | 4 | 5 | 6 | 3 |
| Executive Office, Human Resources, Financial Mgt., Computer Services | 36 | 44 | 37 | 36 |
| Employee Development | 2 | 3 | 2 | 2 |
| Facilities, Safety | 29 | 29 | 27 | 26 |
| Total | 350 | 350 | 315 | 315 |

*Notes:*   Excludes federal prison industry positions and inmate trust fund positions.  Includes all other staff positions (Public Health Services staff, B&F, S&E, and VCRP).

*Sources:*   Requests for Personnel Action, dated 9/20/96 (FCI Taft), 4/22/96 (FCI Forrest City).  Undated (FCI Yazoo City), and 11/18/96 (FCI Elkton).

Because the numbers of authorizations for Taft and Elkton facilities were identical, as were the plans for numbers of prisoners to be housed at each, FCI Elkton's staffing offers the best indicator of how the Bureau would have staffed Taft and at what cost. Table 2.9 shows how these 350 authorizations had been translated into specific staff position titles at FCI Elkton, as of March, 1999.[39]  Also shown are the pay grades associated with each of the positions during FY 1998, the associated pay schedule (mostly General Schedule but some staff were paid according to the Federal Wage System schedule), and the estimated annual compensation paid to staff in each of these positions.  Within each grade, employees can earn somewhat different annual salaries or wages, depending upon the number of years they have occupied that grade.  For developing estimated average salaries or wages within each grade, OMB specifies that one assume that employees are paid at the midpoint for GS grades (step 5) and at step 4 for employees on the Federal Wage System schedules (even though step 4 is higher than the mid-point).[40]  For simplicity's sake, these steps are termed "mid-grade" pay levels here.

---

[39]   FCI Elkton data from Federal Bureau of Prisons, FMIS Report $PRDPOS, "Report of Authorized Positions for Institutions, for Elkton," produced on 03/30/99.  By March, 1999, the Bureau had scaled back its plans for FCI Elkton's camp and staffed it to hold 384 rather than 512 prisoners.  Eight positions at the camp were thereby "de-authorized," leaving the total number of authorized positions (exclusive of prison industries) at 342 for FY 1999.  All eight of these de-authorized positions were for institutional security.  Given the ratio of correctional officers to supervisors at the facility, we assume that seven were line officers, and one position was for a correctional supervisor.  To estimate the costs of the original staff of 350 positions in FY 1998, these eight positions were added back onto the roster.

[40]   OMB, *Circular No. A-76, Revised Supplemental Handbook* (revised March 1996), p. 20. Revisions to the Federal Wage System pay schedules took effect in April or May of each year and pay raises were instituted

---

MARLOWE_0007481

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Following these assumptions, total expenditures during FY 1998 for staff salaries and wages for 350 positions are estimated to have been $13,636,098 for the fully fiscal year at a *fully staffed* FCI Elkton, or $10,636,157 for the period following activation on December 20, 1997. We assume that the Bureau would have spent approximately the same during that year to staff fully the Taft facility if it had operated it directly. Wage and salary scales are the same in both locations; no adjustments are required for differences in cost of living in Taft, California or in Elkton, Ohio. Nor are any adjustments made to this estimate for possible changes in staffing levels in response to a varying number of prisoners in custody.

Estimates for staff salaries and wages for the subsequent fiscal years (FY 1999-2002) were based upon the assumptions that the number of authorized positions would not have changed. OMB-prescribed mid-grade salary or wage amounts, which incorporated annual increases in federal employee compensation, were used to estimate salaries and wages for each fiscal year.

### Accounting for Vacant Positions

Although Circular A-76 does not require estimating vacant staff positions and the consequent cost savings, this fully staffed, 350-position configuration overestimates what the Bureau would have spent to operate the Taft facility. In most federal prisons, some proportion of authorized positions remain vacant at any one time. Staff turnover results in some vacancies; wardens keep some positions empty to reduce costs; and the Bureau's national headquarters sets vacancy targets to contain costs throughout the agency. Because costs are incurred only for staff actually employed rather than for authorized positions, an accounting has to be made of probable vacancy rates. We assume that if the Bureau had operated the Taft facility, it would have experienced a 9 percent vacancy rate during each of the five fiscal years—which was the average rate observed at all low security federal prisons during this time.[41] Because these vacancies were most likely to occur in lower pay grades, a 9 percent vacancy rate would have resulted in staff costs that would have been approximately 8 percent lower than the estimated cost of the fully staffed facility.[42] Over the course

---

within 45 days of this. Therefore, the wage rate in effect throughout the twelve months of the federal fiscal year spanned two editions of the schedule. The effective step 4 rate for these schedules was computed as 5/12 of the annual rate after April/May and 7/12 of the annual rate prior to that date. It was assumed, furthermore, that an FTE for Federal Wage System employees equaled 2,087 hours annually, as per Circular A-76 Guidelines.

[41] Computed by Abt Associates from Key Indicators datasets; staff vacancy rates were reported for June in each fiscal year.

[42] If one assumes that vacancies were distributed evenly throughout the pay grades, one could estimate that the cost of staff salaries and wages at a government-operated Taft facility having an 9 percent vacancy rate would have been 91 percent of the estimated cost of full staffing. However, it is unlikely that vacancies typically occur so evenly. Turnover is likely to be most prevalent among the lower grades, and wardens are more likely to keep vacancies in the lower ranks than in middle and upper management. An analysis of estimated expenditures and vacancies at FCIs Elkton and Forrest City supports this assumption. At the end of FY 2000, Elkton had 5.6 percent of its authorized positions empty. Based on the grades of those staff that were on board at this time, and assuming that they would have been paid at mid-grade rates, salary and wage costs would have been approximately 4.4 percent lower than if all authorized positions were filled. A similar pattern was evident in the differences in estimated costs at FCI Forrest City. A 10.4 percent vacancy rate there resulted in an estimated reduction of salary and wage costs of 9.3 percent. It is therefore

---

**Abt Associates Inc.**          **Cost of Contracting vs. Government Operation**          **29**

Case 3:16-cv-02267     Document 365-8     Filed 11/20/20     Page 9 of 45 PageID #: 16479

MARLOWE_0007482

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

of the five fiscal years, the savings resulting from these vacant positions would have been about $5.7 million (Table 2.5).

Even though FCI Elkton is used as the most comparable federal facility for purposes of labor cost estimation, vacancies at this facility were not used to estimate what the Bureau would have experienced at the Taft facility. Being in competition with the privately managed Taft facility may have affected the speed with which Elkton's managers filled empty positions. (Holding positions vacant is the surest way to contain spending at a prison, since labor costs represent the lion's share of spending for operations.) Therefore, the average vacancy rates observed at all low security facilities, including those not identified as Taft's direct competitors, offer a more easily justified basis for estimation.

---

reasonable to estimate the difference in spending for labor is about 1 percent less than the estimated vacancy rates.

MARLOWE_0007483

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.9**

**Estimated Staff Compensation at FCI Elkton (and a Federally-Operated Taft Prison), with 350 Authorized Positions Filled, FY 1998, by Functional Area**

| Functional Area | Position/Title | Salary/Wage Grade | No. Positions | Mid-Grade Annual Pay | Est. Total Annual Pay |
|---|---|---|---|---|---|
| **Food & Farm Services** | | | | | |
| | Accounting Tech | 7 | 1 | 33,024 | 33,024 |
| | Asst Food Svc Admin | 11 | 2 | 43,739 | 87,478 |
| | Cook Frm* | 8 | 11 | 42,123 | 463,349 |
| | Food Service Admin | 12 | 1 | 52,423 | 52,423 |
| | Material Handler Frm* | 4 | 1 | 34,721 | 34,721 |
| **Medical Services** | | | | | |
| | Dental Officer | 12 | 1 | 52,423 | 52,423 |
| | Gen Dental Officer | 12 | 1 | 52,423 | 52,423 |
| | Health Info Tech | 6 | 2 | 30,504 | 61,008 |
| | Health Sys Admin | 12 | 1 | 52,423 | 52,423 |
| | Med Radiology Tech | 9 | 1 | 37,215 | 37,215 |
| | Med Records Library | 9 | 1 | 37,215 | 37,215 |
| | Medical Officer | 15 | 2 | 86,652 | 173,304 |
| | Nurse | 9 | 3 | 37,215 | 111,645 |
| | Nurse Practitioner | 11 | 2 | 43,738 | 87,476 |
| | Nurse Other | 10 | 1 | 40,982 | 40,982 |
| | Pharmacist | 11 | 2 | 43,738 | 87,476 |
| | Physicians Assistant | 11 | 5 | 43,738 | 218,690 |
| | Secretary | 6 | 1 | 30,504 | 30,504 |
| | Supv Phys Asst | 11 | 2 | 43,738 | 87,476 |
| **Other Inmate Services** | | | | | |
| | Laundry Plant Mgr | 10 | 1 | 40,982 | 40,982 |
| | Ldry Mach Opr Frm* | 5 | 3 | 36,649 | 109,948 |
| **Institution Security** | | | | | |
| | Admin Assistant | 8 | 2 | 34,653 | 69,306 |
| | Chief Corr Supvr | 12 | 1 | 52,423 | 52,423 |
| | Corr Officer | 7 | 77 | 33,024 | 2,542,848 |
| | Corr Supervisor | 9 | 5 | 37,215 | 186,075 |
| | Corr Supervisor | 11 | 8 | 43,738 | 349,904 |
| | Secretary | 6 | 1 | 30,504 | 30,504 |
| | Security Officer | 8 | 1 | 34,653 | 34,653 |
| | Security Officer | 9 | 1 | 37,215 | 37,215 |
| | Security Officer | 10 | 1 | 40,982 | 40,982 |
| | Senior Off Spec | 8 | 36 | 34,653 | 1,247,508 |
| **Unit Management** | | | | | |
| | Asst Case Mgmt Coor | 11 | 1 | 43,738 | 43,738 |
| | Asst Inm Sys Mgr | 11 | 1 | 43,738 | 43,738 |
| | Case Mgmt Coor | 12 | 1 | 52,423 | 52,423 |
| | Corr Counselor | 9 | 15 | 37,215 | 558,225 |
| | Corr Trmt Spec | 11 | 14 | 43,738 | 612,332 |

MARLOWE_0007484

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.9**

**Estimated Staff Compensation at FCI Elkton (and a Federally-Operated Taft Prison), with 350 Authorized Positions Filled, FY 1998, by Functional Area**

| Functional Area | Position/Title | Salary/Wage Grade | No. Positions | Mid-Grade Annual Pay | Est. Total Annual Pay |
|---|---|---|---|---|---|
| | Inmate Sys Offcr | 8 | 6 | 34,653 | 207,918 |
| | Inmate Sys Supv | 9 | 2 | 37,215 | 74,430 |
| | Inmate Systems Mgr | 12 | 1 | 52,423 | 52,423 |
| | Legal Instr Examiner | 8 | 7 | 34,653 | 242,571 |
| | Secretary | 6 | 10 | 30,504 | 305,040 |
| | Unit Manager | 12 | 6 | 52,423 | 314,538 |
| Gen. and Occupat. Education | | | | | |
| | Education Tech | 7 | 2 | 33,024 | 66,048 |
| | Supvr of Education | 12 | 1 | 52,423 | 52,423 |
| | Teacher | 11 | 12 | 43,738 | 524,856 |
| | Teacher Supervisor | 11 | 1 | 43,738 | 43,738 |
| | Training Insr | 11 | 1 | 43,738 | 43,738 |
| Leisure Programs | | | | | |
| | Recreation Spec | 9 | 8 | 37,215 | 297,720 |
| | Recreation Supvr | 11 | 1 | 43,738 | 43,738 |
| Religious Services | | | | | |
| | Administrative Asst | 7 | 1 | 33,024 | 33,024 |
| | Chaplain | 12 | 1 | 52,423 | 52,423 |
| | Supv Chaplain | 12 | 1 | 52,423 | 52,423 |
| Psychological Services | | | | | |
| | Chief Psyc Prgs | 13 | 1 | 62,337 | 62,337 |
| | Clinical Psyc | 12 | 1 | 52,423 | 52,423 |
| | Drug Abuse Prog Coor | 13 | 1 | 62,337 | 62,337 |
| | Drug Treatment Spec | 11 | 1 | 43,738 | 43,738 |
| | Secretary | 6 | 1 | 30,504 | 30,504 |
| Inst. Administration | | | | | |
| | Accountant | 9 | 1 | 37,215 | 37,215 |
| | Accounting Tech | 7 | 4 | 33,024 | 132,096 |
| | Associate Warden | 14 | 2 | 73,664 | 147,329 |
| | Asst Pers Off | 11 | 1 | 43,738 | 43,738 |
| | Budg&Acctg Officer | 11 | 1 | 43,738 | 43,738 |
| | Budget Analyst | 9 | 1 | 37,215 | 37,215 |
| | Camp Administrator | 13 | 1 | 62,337 | 62,337 |
| | Computer Spec | 11 | 1 | 43,738 | 43,738 |
| | Computer Spec | 12 | 1 | 52,423 | 52,423 |
| | Contract Spec | 9 | 1 | 37,215 | 37,215 |
| | Dis Hearing Officer | 12 | 1 | 52,423 | 52,423 |
| | Executive Asst | 13 | 1 | 62,337 | 62,337 |
| | Financial Manager | 13 | 1 | 62,337 | 62,337 |
| | Human Resource Mgr | 12 | 1 | 52,423 | 52,423 |
| | Invent Mgmt Spec | 9 | 1 | 37,215 | 37,215 |
| | Material Handlr Frm* | 4 | 3 | 34,721 | 104,162 |
| | Material Handlr Frm* | 6 | 1 | 38,509 | 38,509 |
| | Paralegal Spec | 11 | 1 | 43,738 | 43,738 |

MARLOWE_0007485

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.9**

**Estimated Staff Compensation at FCI Elkton (and a Federally-Operated Taft Prison), with 350 Authorized
Positions Filled, FY 1998, by Functional Area**

| Functional Area | Position/Title | Salary/Wage Grade | No. Positions | Mid-Grade Annual Pay | Est. Total Annual Pay |
|---|---|---|---|---|---|
| | Per Mgmt Spec | 9 | 5 | 37,215 | 186,075 |
| | Personnel Asst | 7 | 2 | 33,024 | 66,048 |
| | Procurement Asst | 7 | 1 | 33,024 | 33,024 |
| | Secretary | 6 | 2 | 30,504 | 61,008 |
| | Secretary | 7 | 2 | 33,024 | 66,048 |
| | Secretary | 8 | 1 | 34,653 | 34,653 |
| | Suprvy Contract Spec | 11 | 1 | 43,738 | 43,738 |
| | Supv Oper Acct | 9 | 1 | 37,215 | 37,215 |
| | Warden | 15 | 1 | 86,652 | 86,652 |
| **Staff Training** | | | | | |
| | Emp Dev Mgr | 12 | 1 | 52,423 | 52,423 |
| | Empl Dev Spec | 9 | 2 | 37,215 | 74,430 |
| | Volunteer Coord | 11 | 1 | 43,738 | 43,738 |
| **Inst. Maintenance** | | | | | |
| | Air Cond Eq Mech Frm* | 9 | 2 | 43,860 | 87,720 |
| | Auto Mech Frm* | 8 | 1 | 42,123 | 42,123 |
| | Carpenter Frm* | 8 | 1 | 42,123 | 42,123 |
| | Electrical Wrk Frm* | 9 | 2 | 43,860 | 87,720 |
| | Electronic Techn | 11 | 2 | 43,738 | 87,476 |
| | Engineering Techn | 11 | 1 | 43,738 | 43,738 |
| | Facilities Mgr | 12 | 1 | 52,423 | 52,423 |
| | Facility Asst | 7 | 1 | 33,024 | 33,024 |
| | Gardener Frm* | 7 | 1 | 40,389 | 40,386 |
| | Maint Mech Frm* | 8 | 4 | 42,123 | 168,490 |
| | Maint Mech Gen Frm* | 14 | 2 | 53,149 | 106,298 |
| | Pipefitter Frm* | 9 | 1 | 43,860 | 43,860 |
| | Plumber Frm* | 8 | 1 | 42,123 | 42,123 |
| | Safety Officer | 11 | 1 | 43,738 | 43,738 |
| | Safety Specialist | 9 | 2 | 37,215 | 74,430 |
| | Utly Sys Rep/Opr Frm* | 8 | 7 | 42,123 | 294,858 |
| **Totals** | | | 350 | | $13,636,098 |

*Notes*: *Denotes Federal Wage System position.
"Mid-grade compensation" is assumed to be Step 5 for all General Schedule (GS) positions and Step 4 for Federal Wage
System (FWS) positions, as per OMB's Circular A-76 (1996 revised version). Eight security positions that were abolished
were added back in. FWS pay rates change in April/May of each year; rates for FY 1998 are computed by blending two
years' rates.

*Sources*: Numbers of Staff Data: Federal Bureau of Prisons, FMIS Report $PRDPOS, "Report of Authorized Positions for
Institutions, for Elkton," produced on 03/30/99. Eight positions were added to recreate FY 1998 levels. Estimated cost of
GS staff from Office of Personnel Management, "Salary Table 1998-RUS (LEO), Rates of Pay for Law Enforcement
Officers, Including Special Salary Rates at GS-3 Through GS-10 and Incorporating the 2.30% General Schedule Increase
and a Locality Payment of 5.42% for the Locality Pay Area of Rest of U.S., Effective January 1998." Cost of FWS staff
from DOD Civilian Personnel Management Service, "Federal Wage System Regular and Special Production Facilitating
Wage Rate Schedules for the Fresno, California Wage Area," issued 20 April 1999.

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 13 of 45 PageID #: 16483

MARLOWE_0007486

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### *Estimating Premium Pay and Other Than Permanent Salaries/Wages*

If the Taft facility had been operated by Bureau employees, staff would have been paid premium compensation in addition to their regular salaries and wages. Premium pay includes, for example, incentive awards, overtime compensation, supervisory differentials, retention allotments, and recruitment and relocation bonuses. To estimate how much this would have cost the government, patterns of expenditures were examined at 14 federal low security facilities during fiscal years 1998 through 2002.[43] Not all low-security federal facilities could be included in this analysis because spending at some cannot not be segregated from expenditures for larger constellations of facilities located within large compounds ("campuses"). At some of these campuses, facilities share services, and each cannot be easily treated as a separate cost center. Therefore, we restrict our analysis here to those low-security facilities to which expenditures can be assigned unambiguously, and which do not share the cost of services with other units. The 14 included facilities include:

- FCI Elkton (plus camp),
- FCI Yazoo City,
- FCI Forrest City (plus camp),
- FCI Ashland (plus camp),
- FCI Bastrop (plus camp),
- FCI Big Spring (plus camp),
- FCI Butner,
- FCI La Tuna (plus camp),
- FCI Loretto,
- FCI Milan,
- FCI Petersburg (plus camp),
- FCI Safford,
- FCI Seagoville, and
- FCI Texarkana (plus camp).

During the five-year period from FY 1998 through 2002, average expenditures for premium compensation and "other than permanent salary and wages" at these 14 facilities increased progressively, from 8.0 percent in FY 1998 of permanent salaries to 10.39 percent in FY 2002 (Table 2.10). To estimate what premium compensation would have been at a Bureau-operated Taft facility during this period, we assume that the ratio of premium pay to regular/permanent pay would have been identical to the 14-prison average during each fiscal year. This additional compensation would have added another $783,000 to $1.5 million a year to the cost of staffing the Taft facility with federal employees, for a total of $6.1 million over the five years (Table 2.5).

---

[43] The rationale for using expenditures at 14 low security federal prisons rather than just FCI Elkton's is the same as for estimation of staff vacancy rates. The demand for premium compensation varies from one institution to another for a variety of different reasons, not all of which are predictable. Moreover, it is possible that Elkton's managers were more vigilant about labor costs than they would have been in the absence of the competition with the privately managed Taft facility. Therefore, we assumed that the average tendency for all low security prisons afforded a better estimate of premium compensation.

---

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 14 of 45 PageID #: 16484

MARLOWE_0007487

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.10**

**Premium Pay As a Percentage of Permanent Salaries and Wages: 14 Low-Security Federal Prisons, FY 1998–2002**

|  | FY 1998 | FY 1999 | FY 2000 | FY 2001 | FY 2002 |
|---|---|---|---|---|---|
| Elkton | 7.75% | 7.85% | 8.81% | 13.49% | 14.83% |
| Forrest City | 7.05% | 7.70% | 7.70% | 7.53% | 7.32% |
| Yazoo City | 7.91% | 10.64% | 13.03% | 9.96% | 13.28% |
| Ashland | 8.66% | 9.24% | 8.17% | 7.41% | 7.64% |
| Bastrop | 8.11% | 7.55% | 9.17% | 9.04% | 9.34% |
| Big Spring | 8.32% | 9.19% | 8.97% | 8.10% | 9.15% |
| Butner | 7.95% | 11.00% | 8.18% | 8.20% | 9.82% |
| Latuna | 7.15% | 12.25% | 14.56% | 9.52% | 10.43% |
| Loretto | 7.62% | 7.33% | 7.47% | 7.40% | 6.83% |
| Milan | 8.04% | 8.38% | 8.42% | 8.48% | 10.20% |
| Petersburg | 10.74% | 10.38% | 12.72% | 15.30% | 16.90% |
| Safford | 6.82% | 6.62% | 7.59% | 6.37% | 5.89% |
| Seagoville | 7.34% | 6.58% | 8.81% | 11.16% | 12.67% |
| Texarkana | 8.58% | 9.62% | 9.14% | 9.19% | 11.13% |
| **Average** | **8.00%** | **8.88%** | **9.48%** | **9.37%** | **10.39%** |

*Source:* Calculated by Abt Associates using data provided by Bureau of Prisons.

### *Fringe Benefits*

The estimated cost of fringe benefits that would have been paid to federal employees if they worked at the Taft facility can be estimated directly using formulae prescribed in Circular A-76. This includes spending for retirement fund contributions, insurance and health benefits, and miscellaneous other fringe benefits. All combined, these various benefits would have equaled 46.45 percent of base payroll (which includes regular compensation and premium pay).[44] During the five fiscal years examined here, fringe benefits would have equaled about $4.9 million in FY 1998, rising annually to $7.5 million in FY 2002, totaling $33.1 million over the course of all five years (Table 2.5).

### *Retirement Costs*

The biggest share of the fringe benefits—equaling $26.8 of the $33.1 million total—would have been paid into the federal employees' retirement fund (Table 2.5). As required by A-76 methodology, the standard retirement cost factor for law enforcement (which includes correctional employees) during

---

[44]    Estimating liabilities associated with future expenditures for pensions and retired persons' federal health benefits is inherently uncertain. Moreover, it is not uncommon for governments to understate these liabilities, or to under-fund retirement accounts to improve their balance sheets. Even if some federal agencies may not pay the full contribution to retirement fund or health accounts (which may therefore require drawing down the Treasury's general fund to cover the future expense), the OMB requires that the full cost of the government's liabilities be captured in the A-76 estimates. The cost factors prescribed in the A-76 circular appear to have been calculated according to the principles established by the Federal Accounting Standards Advisory Board. The 46.45 percent cost factor for all fringe benefits combined appears to be a reasonable estimate of current and future liabilities associated with compensating staff.

---

**Abt Associates Inc.**                    **Cost of Contracting vs. Government Operation       35**

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 15 of 45 PageID #: 16485

MARLOWE_0007488

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

FY 1998–2002 was 37.7 percent of base payroll. This represents the federal government's complete share of the weighted CSRS/FERS retirement cost to the government, based upon the full dynamic normal cost of retirement systems, the normal cost of accruing retiree health benefits based on average participation rates, Social Security, and Thrift Savings Plan contributions.

*Federal Employee Insurance and Health Benefits*
The prescribed rate for these benefits from FY 1998–2002 was 5.6 percent of payroll costs, which would have added $4.0 million to the cost of fringe benefits over the five years (Table 2.5). Another 1.45 percent of payroll costs (or $1.0 million over five years) would have been contributed to Medicare accounts.

*Miscellaneous Other Fringe Benefits*
The cost factor for workmen's compensation, bonuses and awards, and unemployment programs is specified by A-76 as 1.7 percent of payroll for FY 1998–2002, or $1.2 million total (Table 2.5)

### Total Estimated Personnel Costs of Government Operation at Taft

Summing these estimates for payroll and fringe benefits earned by federal employees, the estimated personnel cost of the federal government's direct operation of prison at Taft would have ranged between $15.5 million in FY 1998 (for that part of the year after the facility preparation phase ended) to $23.7 million in FY 2002 (Table 2.5).

### Materials, Supplies, and Miscellaneous Other Costs

The A-76 procedure requires examining the performance work statement developed by the government for the facility and developing a list of all required materials, supplies, and services by the quantities needed, their unit prices, with escalation of costs for out-years. The Bureau did not develop such a list, so these costs are estimated based upon analyses of observed expenditures at 14 other low-security federal prisons for which costs could be identified unambiguously. This is the same set of facilities used to estimate premium compensation, discussed above. Reported expenditures at each facility for each fiscal year (1998 through 2002) were obtained from the Bureau of Prisons. These were reported for the categories of expense listed in Table 2.11, which shows the average annual spending for these purposes at each of these 14 facilities.

The largest of these costs was for supplies, which accounts for about half the cost in each year. Travel, "other services," and utilities make up most of the remaining cost.

MARLOWE_0007489

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.11**

**Average Annual Costs Per Facility For Materials, Supplies, and Miscellaneous Services in 14 Federal Prisons, FY 1998–2002**

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Supplies | $2,385,687 | $2,615,494 | $2,975,432 | $3,311,462 | $3,063,407 |
| Other Services | 1,300,603 | 1,169,364 | 1,347,078 | 1,424,356 | 1,712,686 |
| Communications, Utilities, &. Misc. | 967,038 | 936,543 | 1,002,148 | 1,198,238 | 1,123,395 |
| Travel | 173,690 | 162,198 | 182,498 | 192,515 | 174,326 |
| Equipment | 139,350 | 110,191 | 145,098 | 44,084 | 41,574 |
| Transportation | 64,337 | 70,652 | 66,817 | 52,568 | 62,630 |
| Grants Subsidies | 13,624 | 12,150 | 12,518 | 10,050 | 11,749 |
| Other | 2,961 | 6,269 | 17,315 | 6,541 | 17,373 |
| **Total** | **$5,047,290** | **$5,082,861** | **$5,748,904** | **$6,239,813** | **$6,207,139** |

*Notes:* "Other" includes insurance claims, other rent, printing & reproduction, land & structures, and STD level user fees. Government–furnished facilities, equipment, and materials, which are provided by the Bureau, are considered common costs under A-76 and are not included here in this analysis or in the cost comparison.

*Source:* Expenditure reports from Budget Execution Branch, Bureau of Prisons.

Spending for these various items at the 14 federal prisons depends mainly on the size of the facility, measured as the average daily prisoner population. Other determinants, such as the facility's age and geographical location, may affect some minor cost components, such as travel and cost of utilities. To estimate what the Bureau would have spent for these items if it had operated the Taft facility, statistical analyses were conducted to examine the extent to which these costs varied according to the number of prisoners held by these prisons during each of the five years. Because the levels of expenditure might be affected by differing proportions of low and minimum-security prisoners at the prisons, the numbers of prisoners in low security units and minimum security camps were included as separate variables in a multivariate estimation model. The statistical model also takes into account costs that vary according to the numbers of prisoners in the facility and costs that are more fixed, such as expenditures for utilities. (See Statistical Appendix at end of this chapter for a description of the estimation assumptions and methods used.)

The resulting estimates of what the Bureau of Prisons would have spent for materials, supplies and miscellaneous other expenses at a federal prison in Taft during each of these five fiscal years are

Abt Associates Inc.                    Cost of Contracting vs. Government Operation          37

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 17 of 45 PageID #: 16487

MARLOWE_0007490

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

shown in Table 2.12. Also shown are the margins of error in these estimates. In FY 2002, for example, the estimate is $8.0 million, plus or minus about $525,435.[45]

The estimate for the first (partial) year, FY 1998—$3.9 million—may be low. The statistical model uses data for 14 prisons, all of which were fully operational during the years examined, whereas the Taft facility was still in its start-up phase in FY 1998, with an average of only 1,091 prisoners. The model may not provide robust estimates of expenditures during these atypical periods. Consequently, the estimates for subsequent years are probably more accurate representations of what the Bureau would have spent for materials, supplies and these miscellaneous other costs.

The estimates for all years may also be low because California experienced high energy costs during this period, relative to other parts of the United States, partly because of price manipulation by energy suppliers. The Taft facility is located in the desert and high daytime temperatures require significant expenditures for electrical air conditioning. Although other low-security federal prisons are located in parts of the country requiring air conditioning or, conversely, heating during the winter, no attempt was made to include regional differences in energy costs in the statistical model used to estimate costs. Doing so may have resulted in a different estimate of what the Bureau would have spent if it had operated Taft directly.

**Table 2.12**

**Estimated Costs of Materials and Supplies, Assuming Federal Operation of the Taft Facilities, Fiscal Years 1998-2002**

|      | Average Daily Population | Estimated Cost | 95% confidence interval | |
|------|--------------------------|----------------|-------------------------|-------------|
| 1998 | 1,091 | $3,861,735 | $3,276,000 | $4,447,469 |
| 1999 | 2,230 | 7,686,902 | 7,411,100 | 7,962,704 |
| 2000 | 2,379 | 8,288,809 | 7,997,011 | 8,580,608 |
| 2001 | 2,376 | 7,977,233 | 7,449,442 | 8,505,024 |
| 2002 | 2,343 | 8,039,963 | 7,514,528 | 8,565,398 |

*Note:* Estimated costs in FY98 assume partial year after end of pre-operational phase.

*Source:* Computed by Abt Associates Inc. using data described in Table 2.11; see Appendix for detailed calculations.

**Other Specifically Attributable Costs**

Circular A-76 requires estimation of several other costs that are often (but not always) attributable to operation of federal facilities.

*Depreciation, Cost of Capital, and Rent*
Because the government owns the facility and provides it to the contractor, depreciation costs are borne by the government regardless of which organization operates it. Costs associated with

---

[45] This confidence interval (computed at the 95 percent level) is based upon the standard error of the prediction; that is, it includes an estimate of the error in estimating the regression equation, but does not include error due to random variation among institutions or from year to year at a single prison.

MARLOWE_0007491

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

depreciation can therefore be ignored for our purposes. Similarly, the cost to the government of capital invested in the asset is unchanged if the contractor or by the Bureau of Prisons operates the facility. Nor are rents incurred.

### Maintenance and Repair

If the Bureau operated the Taft facility directly, maintenance and repair activities would be performed by regular Bureau of Prisons employees and by other vendors. The staffing assumptions described above include maintenance employees on the Bureau's payroll and the costs of these persons are included in the estimated total cost of labor. Payments to vendors who provide maintenance and repair services are included as a component of the combined estimate for materials, supplies, and other miscellaneous services (Table 2.12). Similarly, all non-labor direct costs that would be incurred for maintenance and repair are also included in the estimated combined cost.

### Utilities

All utilities costs that would be incurred by the government are included in the combined estimate of material and supply costs above (Table 2.12).

### Insurance

The federal government bears the full cost associated with lawsuits and losses resulting from damage or destruction of the physical plant at all federally operated prisons. In contrast to private firms, the federal government does not buy insurance policies from third parties. Rather, it assumes losses and liability costs as they occur. To compare the costs of contracting and direct operation, the estimated annualized cost of self-insurance must be added to the other costs of Bureau-operated facilities.

The Office of Management and Budget Circular A-76 stipulates that annual personnel-related liability costs equal approximately 0.7 percent of a government facility's total personnel costs, including salaries, wages, premium compensation, and benefits. The annualized costs of self-insurance again liability claims would therefore have ranged between $108,300 and $165,900 during these five fiscal years if the government had operated the Taft facility (Table 2.5).

Annualized costs of self-insurance against damage, destruction, and loss of facilities, equipment, or furnishings must also be estimated. OMB's Circular A-76 stipulates that the annual "casualty premium equivalent cost" to the government is approximately equal to 0.5 percent of the net value of capital plus materials and supplies.[46] The contract with Wackenhut obligates the firm to insure the facility, equipment, and furnishings for no less than $75 million dollars. Using this as an estimate of the value of the physical assets at Taft, and following Circular A-76's estimation rule, the annual casualty insurance premium equivalent would be approximately $375,000 per year if the government were to operate this facility directly (Table 2.5).

---

[46] This estimate was not developed specifically for correctional facilities, and may be too high. Correctional facilities are built as "hard" facilities and are less susceptible to fire and damage than other government offices and installations. Commercial insurers charge private prison firms somewhat annual lower rates, on average: between 0.1 and 0.3 percent of the value of capital assets. (Michael Davis, U.S. Risk Insurance Group, Inc.; telephone communication with Douglas McDonald, December 1, 2000).

---

**Abt Associates Inc.**      **Cost of Contracting vs. Government Operation**      **39**

Case 3:16-cv-02267  Document 365-8  Filed 11/20/20  Page 19 of 45 PageID #: 16489

MARLOWE_0007492

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Overhead Costs**

Circular A-76 specifies that overhead costs associated with direct governmental provision being analyzed should be estimated at 12 percent of total personnel costs, including compensation and all fringe benefits. According to OMB, this includes general and administrative overhead, and represents costs for "salaries, equipment, space and other activities related to headquarters management, accounting, personnel, legal support, data processing management and similar common services performed outside the activity, but in support of the activity."[47] In the case of federal prisons, this would include costs associated with regional and national headquarters and other overhead costs allocated to the Bureau's overhead account. It is meant to represent also the cost of various governmental activities that support prison operations, but which are not fully attributable to specific federal prison operations. These costs would include, for example, some share of the expenditures for various agencies in the executive branch, such as the Office of Personnel Management, the Office of Management and Budget, and the General Services Administration, among others.

This overhead rate may not reflect the actual cost of federal government overhead activity. Given the structure of the federal accounting system, computing actual costs of federal government overhead is exceedingly difficult. Rather than attempting to compute the actual cost of overhead, the OMB prescribed the 12 percent overhead rate because it was thought to be close to the midpoint of overhead rates proposed by private companies and government agencies (although there was not strong empirical support for this assumption).[48] If a federal agency seeks to create a different overhead rate for A-76 purposes, agency officials are required to publish their assumptions and methods in the *Federal Register* and to subject their analyses to public review and comment.[49] Historically, no federal agencies have done this and have instead used the prescribed 12 percent to estimate overhead.

For an analysis of federal prisons, this 12 percent accounting rule *must underestimate the actual cost* of governmental overhead associated with federal operation of prisons. This percentage amount equals almost exactly the cost of the Bureau's regional and national headquarters as well as the costs of various programs that support prison operations, all of which are included in the Bureau of Prisons' annual budgets. These Bureau overhead/support costs ranged between 10.61 and 11.98 percent of all direct costs incurred by specific prisons during the five fiscal years examined here. This does *not* include the costs of any other governmental overhead activities outside the Bureau, such as the Office of Personnel Management, the Office of Management and Budget, and the General Services Administration, among others. These costs outside the Bureau's budget are certainly greater than zero, but OMB provides no guidance for estimating these component costs.

Lacking any better estimate of the total overhead and support cost of the federal government, the OMB-prescribed overhead rate is used: 12 percent of estimated total personnel costs. This would

---

[47]   OMB, Circular A-76 Revised Supplemental Handbook (March 1996), p. 23.

[48]   United States General Accounting Office. "Defense Outsourcing: Better Data Needed to Support Overhead Rates for A-76 Studies," GAO/NSIAD-98-62, February 1998.

[49]   United States General Accounting Office. "Defense Outsourcing: Better Data Needed to Support Overhead Rates for A-76 Studies," GAO/NSIAD-98-62, February 1998.

MARLOWE_0007493

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

have added another $1.9 to 2.8 million in each of the fiscal years, totaling $12.5 million for the five-year period.

**Costs of Preparing for Operations**

As discussed above, our focus is on comparing the costs of contracting and direct government provision for an *operational* prison. The net cost to the government of preparing the facility prior to December 20, 1997 was approximately $16 million, including purchases of equipment and supplies that it left for the contractor and payments to the contractor for services up to that date. No attempt was made to estimate what the government would have spent before transferring prisoners if the Bureau had operated it. If this were to be done, the sensible way to integrate these costs with subsequent costs of operations would be to amortize at least some portion of these start-up costs over a multi-year period. At FCI Elkton, for example, the Bureau spent $7 million for equipment, $10 million for supplies, and another $2 million for other services during an eighteen-month period that encompassed both the pre-operational phase and the period of operations up to the point when the prison was filled to 95 percent of its capacity. This represented about half of all expenditures during this period.[50] Some of these should be treated as capital investments rather than as operating costs and should be amortized across the useful life of the investment.[51] Rather than attempting to estimate what the Bureau would have spend during the pre-operational phase alone, which corresponded to GEO's activities before December 20, 1997, we focused instead on the estimated costs of the operational phase.

**What is the Margin of Error in These Estimated Costs of Federal Operation?**

This estimated cost of the Bureau operating the Taft facility rests on several assumptions that may not be correct. These include assumptions about:

- the types of staff who would have been used to fill personnel positions;
- the compensation levels for employees, as well as the additional pay they would have earned for overtime and other work paid at premium rates;
- staff vacancy levels during each of the five years; and
- predicted spending for materials and supplies.

Even though OMB's Circular A-76 does not require estimating the range of error associated with the projected cost of direct government operation, it seems prudent to do so.

***Is FCI Elkton's the Wrong Model for Estimating Personnel Costs?***

Estimated personnel costs are based on plans that the government developed for staffing the facility as a federal facility, and we assumed that the precise mix of staffing titles and grades would have been nearly identical to that implemented at FCI Elkton. Would selecting one of the other two architecturally similar facilities have affected our estimates of personnel costs? A comparison of average costs per staff at FCIs Elkton, Forrest City and Yazoo City indicates that the staffing models at each of these facilities were quite consistent and that the average cost of staff was nearly identical (Table 2.13).

---

[50]   Bureau of Prisons data reported in Nelson, "Taft Prison Facility: A Comparison of Evaluation Methods."

[51]   Nelson (Ibid.) recommends amortizing these costs across a ten-year period because this is the length of the GEO contract, but equipment may have a longer useful life than this.

---

MARLOWE_0007494

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

In this comparison, it is assumed that the three facilities were staffed at 100 percent. The staffing model assumes that 350 staff were employed, with occupational titles and grades observed in Elkton's actual staffing during FY 1999, and at pay rates prescribed by OMB's A-76 estimation rules (the assumptions here are the same as those discussed above). The distribution of positions and salary/wage grades at FCIs Forrest City and Yazoo City is as observed in FY1999, and staff are assumed also to have been paid at A-76 prescribed rates. For purposes here, all staff were assumed to earn fringe benefits at the same rate at all three facilities (46.45 percent of total salary/wages), and that no premium pay was awarded.

**Table 2.13**

**Estimated Staff Compensation and Average Estimated Cost Per Authorized Position, FY1999: FCIs Elkton, Forrest City, and Yazoo City (Assumes All Staff Were Paid at Mid-Grade Levels)**

|  | FCI Elkton | FCI Forrest City | FCI Yazoo City |
|---|---|---|---|
| Total estimated personnel compensation | $14,149,290 | $13,186,265 | $11,927,833 |
| Fringe benefits | 6,584,701 | 6,125,020 | 5,540,478 |
| Total personnel costs | 20,726,592 | 19,311,285 | 17,468,311 |
| Number of authorized positions | 350 | 328 | 294 |
| **Cost per authorized position** | **$59,316** | **$58,876** | **$59,416** |
| Cost relative to FCI Elkton |  | (440) | 100 |
| Percent difference, relative to FCI Elkton |  | -0.75% | 0.17% |

*Note*: Number of authorized positions at FCI Elkton increased to 350 to match the Bureau's plan for Taft under Bureau management. See Table 2.9.

*Source*: Computed by Abt Associates, based upon staffing data supplied by Bureau of Prisons.

The average cost per authorized position at a fully staffed, 350 employee FCI Elkton during 1999 would have been $59,316. The cost per position that year at FCI Yazoo City was only $100 higher—a difference of 0.17 percent. The cost per position at FCI Forrest City was slightly lower (-$440), or 0.75 percent less. If the staffing model at FCI Yazoo City had been used instead, and adjusted to 350 to match the larger number of beds to be filled at the Taft prison, the estimated cost of staff would have been only $35,000 higher during FY 1999. If the staffing at FCI Forrest City had been used instead as a model and adjusted to the 350 positions level, staff costs would have been about $154,000 less during FY 1999. This indicates that using FCI Elkton's staffing as a basis for extrapolating how the Bureau would have manned the Taft facility is not biased and that the choice of either of the other two facilities would have produced nearly identical estimates of labor costs.

***Margin of Error in Assumptions about Vacancy Rates***
There was very little variation among low security prisons in the staff vacancy rate during each of the five years, so that using the average rate of vacancy for the entire group of facilities is not subject to any significant error.

MARLOWE_0007495

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### Ranges Associated with Different Assumptions about Premium Pay

There were some significant differences in the rates at which premium pay was earned at 14 low security federal prisons during the five fiscal years examined here. During FY 2002, for example premium pay as a percentage of total compensation ranged between 5.6 percent (at FCI Safford) to 14.8 percent (at FCI Elkton). To establish a margin of possible error around the estimates based upon the annual average rates of premium compensations, the standard error was computed for each of the five annual averages, which was then used to compute the range within which we are 95 percent confident that the annual average fell in each of the years. The end-points of these ranges provide low and high estimates of premium pay at a federally-operated Taft facility during each of the five years (Table 2.14).

This estimate may be subject to greater error than calculated here because it is based simply upon observed averages at other federal prisons. Premium compensation may be associated with various conditions at each of the prisons that were not measured or analyzed here. A multivariate statistical model that included information about correlates of high and low use of premium-compensated worktime may have provided a different estimate of what the Bureau would have incurred had it operated the Taft facility.

### Error Margin in the Estimates of Material and Supply Costs

As discussed above, the estimates of what the government would have spent for materials and supplied if operated the Taft facility directly were derived from statistical models, which provide error margins for the estimates for each of the five years (Table 2.12).

---

**Table 2.14**

**Annual Average Rates of Premium Pay at Low Security Federal Prisons, Standard Errors, and Low/High Estimates of Premium Pay at Federally-Operated Taft Facility, by Fiscal Year**

|  | FY1998 | FY1999 | FY2000 | FY2001 | FY2002 |
|---|---|---|---|---|---|
| Annual Average | 8.0% | 8.9% | 9.5% | 9.4% | 10.4% |
| Standard Error | 0.27% | 0.48% | 0.62% | 0.69% | 0.87% |
|  |  |  |  |  |  |
| Low Estimate (%) | 7.5% | 7.9% | 8.3% | 8.0% | 8.7% |
| High Estimate (%) | 8.5% | 9.8% | 10.7% | 10.7% | 12.1% |
|  |  |  |  |  |  |
| Low Estimate ($) | $733,895 | $1,028,370 | $1,128,308 | $1,124,692 | $1,275,490 |
| High Estimate ($) | $831,747 | $1,275,700 | $1,454,566 | $1,504,276 | $1,773,957 |

*Notes:*  Averages and standard errors computed using expenditure information for 14 low security federal prisons. Low and high estimates computed based upon 95% confidence level. FY 1998 estimate based on partial year of operations, following December 20, 1997.

*Source:*  Calculated by Abt Associates Inc. using expenditure data provided by Bureau of Prisons.

---

### Summary: Estimated Total Cost of Government Operation During FY 1998–2002

Had the Bureau of Prisons operated the prison facility in Taft, California during FY 1998–2002, the total estimated cost to the federal government would have been approximately $154.9 million, plus or

---

**Abt Associates Inc.**                    **Cost of Contracting vs. Government Operation        43**

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 23 of 45 PageID #: 16493

MARLOWE_0007496

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

minus about 2 percent, or between approximately $151.6 million and $158.6 million (Table 2.15). The estimated cost would have been lowest during FY 1998 (between $20.9 and $22.3 million) and would have increased each year. By FY 2002, the cost would have been between $34.2 and $36.1 million.

**Table 2.15**

**Estimated Total Cost to the Federal Government if the Bureau of Prisons Operated the Taft Prison: Summary Estimates and High/Low Estimates, by Fiscal Year**

|  | FY1998 | FY1999 | FY2000 | FY2001 | FY2002 | Total |
|---|---|---|---|---|---|---|
| Point estimate | $21,596,770 | $31,459,089 | $33,232,223 | $33,437,065 | $35,129,041 | $154,854,188 |
| High estimate | 22,263,257 | 31,928,256 | 33,793,265 | 34,566,504 | 36,065,834 | 158,617,116 |
| Low estimate | 20,930,283 | 30,968,437 | 32,671,182 | 32,884,422 | 34,192,248 | 151,646,572 |

*Notes*: FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.

*Source*: Calculated by Abt Associates Inc. using data provided by Bureau of Prisons.

## The Total Cost of Contracting Compared to the Estimated Cost of Bureau of Prisons Operation

The net cost to the government of contracting with The GEO Group during fiscal years 1998-2002 was less than what we estimate the federal government would have spent if the Bureau of Prisons had operated the facility directly, with federal employees. The total savings over the five years would have been between $9.6 and $16.5 million, or between 6 and 10 percent, depending upon whether one uses the low or high estimate of what the Bureau would have spent (Table 2.16).

During each of the five fiscal years, the net cost of contracting was less than the lowest estimate of direct Bureau operation. The estimated savings associated with contracting were greatest during the second and third year, when the base fee paid to The GEO Group was fixed at $27.6 million. Savings during the second and third years each were estimated to be $3.9 and $4.4 million (or about 13 percent). When the Bureau exercised its first option to renew the contract for a fourth year (FY 2001), the base fee increased to nearly $29.5 million, and additional fees were paid to house more prisoners than the agreed-upon base population of 1,946 prisoners. The result of this was that the difference between the cost of contracting and our estimates of government operation diminished.

MARLOWE_0007497

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.16**

**Total (Net) Cost to the Federal Government of Contracting Versus Estimated Total Cost If the Bureau of Prisons Operated the Taft Prison, Fiscal Years 1998–2002**

|  | FY1998 | FY1999 | FY2000 | FY2001 | FY2002 | Total |
|---|---|---|---|---|---|---|
| Net Cost of Contracting | $20,879,259 | $27,525,231 | $28,868,965 | $31,987,688 | $32,816,405 | $142,077,549 |
| Estimated Cost of Bureau Operation (Point Estimate) | $21,596,770 | $31,459,089 | $33,232,223 | $33,437,065 | $35,129,041 | $154,854,188 |
| High Estimate | 22,263,257 | 31,928,256 | 33,793,265 | 34,566,504 | 36,065,834 | 158,617,116 |
| Low Estimate | 20,930,283 | 30,968,437 | 32,671,182 | 32,884,422 | 34,192,248 | 151,646,572 |
| Contracting Compared to: |  |  |  |  |  |  |
| *Point Estimate of Govt. Costs* | -717,511 | -3,933,858 | -4,363,258 | -1,449,377 | -2,312,636 | -12,776,639 |
| *(Percent)* | -3.3% | -12.5% | -13.1% | -4.3% | -6.6% | -8.3% |
| *High Estimate of Govt. Costs* | -1,383,997 | -4,403,025 | -4,924,300 | -2,578,816 | -3,249,429 | -16,539,567 |
| *(Percent)* | -6.2% | -13.8% | -14.6% | -7.5% | -9.0% | -10.4% |
| *Low Estimate of Govt. Costs* | -51,023 | -3,443,206 | -3,802,217 | -896,734 | -1,375,843 | -9,569,023 |
| *(Percent)* | -0.2% | -11.1% | -11.6% | -2.7% | -4.0% | -6.3% |

*Note*:   FY 1998 costs include only those estimated for operational phase, beginning December 20, 1997.

*Sources*:   See text for calculations and assumptions.

**How Do These Costs Compare to Spending at Other Bureau-Operated Federal Prisons?**

The analyses presented so far have been limited to comparing the costs of contracting at the Taft facility with the estimated cost of a hypothetical condition: that the Bureau of Prisons had instead operated the facility during these five years. One way to assess the accuracy of our estimates of this hypothetical is to compare what the Bureau actually spent in the three other nearly identical facilities that were built at about the same time: FCI Elkton (Ohio), FCI Yazoo City (Mississippi), and FCI Forrest City (Arkansas). As discussed in Chapter 1, all four were built with identical housing facilities for low-security prisoners, but differed in their minimum-security wings. Taft was the only one that opened with a 512-bed minimum security camp. FCI Elkton opened with a 256 bed camp, FCI Forrest City with a 128 bed camp that was doubled in December 1999, and FCI Yazoo City had no camp.

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 25 of 45 PageID #: 16495

MARLOWE_0007498

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Taft was consequently the largest of the four and, indeed, the largest of the fourteen other low-security federal prisons for which cost data were examined to develop estimates of what the Bureau would have spent to operate Taft. Table 2.17 shows the average daily population of prisoners at the Taft Correctional Institution during FY 1998 through 2002, as well as the average daily population at its three sister facilities.[52] For sake of context and comparison, the average daily populations of fourteen other low security federal prisons are shown

Costs per prisoner/day were computed for the Taft facility and the fourteen federal prisons during FY 1998-2002 using these average daily population counts (Table 2.18). Also shown is the estimated per prisoner/day cost of the Bureau's operating the Taft facility during these five fiscal years. (The table includes both the point estimate of what the Bureau would have spent as well as high and low estimates.) These costs do not correspond exactly to the Bureau's accounting of costs at these fourteen federal prisons because we have applied several of the A-76 guidelines for the sake of consistency in comparison.[53]

Our estimates of what the Bureau would have spent to operate the Taft facility during FY 1999 through 2002 are consistent with the average daily per prisoner costs at the three facilities most like Taft (FCIs Elkton, Yazoo City and Forrest City). The estimated costs of Bureau operation at Taft during FY 1998 are higher than those calculated for the three sister facilities, however. This is because the Bureau initiated operations at these three federal prisons in the spring and summer of 1997, before the contract with GEO was signed for the Taft facility, and these prisons were operating close to capacity by the time FY 1998 began. The Taft facility did not begin to take prisoners until mid-December of 1997, and it took several months of prisoner transfers to reach fully operational population levels. Therefore, the average daily populations at the three federal facilities were substantially higher than at Taft during FY 1998, which makes the per prisoner costs lower than Taft's during this year. For the sake of comparison here, we assume that the pace of transferring prisoners into the facility would have been the same if the Bureau had begun operations in December 1997. Estimates for operating Taft in FY 1998 should therefore not be compared with the cost of fully operational federal prisons.

---

[52] The average daily population during FY 1998 at Taft was reported as 1,091. Because the facility was not activated until December 20, 1997, the daily population should be averaged over 285 days it was operational rather than the full 365. The average daily population at Taft during this operational period alone is estimated to have been 1,397.

[53] Fringe benefits were recalculated at 46.45 percent of all salaries and wages. Overhead costs were calculated at 12 percent of total personnel costs. All insurance claims that were reported as paid during these fiscal years were not counted and instead we estimated that annualized personnel liability self-insurance would equal 0.7 percent of total personnel costs. Annualized costs of casualty self-insurance could not be calculated accurately for all federal prisons for lack of information about the value of the capital, but we assumed that the physical plants at FCIs Elkton, Forrest City and Yazoo City were of the same value as at the Taft facility, and we assumed that the annualized cost of self-insurance at these facilities equaled $375,000 per year, or 0.5 percent of the value of the capital asset. Calculations of per prisoner/day costs at eleven other federal prisons do not include any estimate of casualty self-insurance and therefore underestimate the daily costs slightly—by less than a half-dollar.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

By FY 1999, the Taft facility was fully operational. The estimated per prisoner costs of Bureau operation that year and in each of the subsequent years are in the same range as those of the three sister federal prisons.

During the four years when GEO was operating the Taft facility at full capacity (FY 1999-2002), daily costs per prisoner were lower at Taft than at any of the fourteen low-security federal prisons (Table 2.18). The average cost per prisoner/day at Taft during those four years under GEO's management was $35.58—17 percent less than the average cost at FCI Elkton ($42.65) during this same period and 14 percent less than the average cost at FCI Forrest City ($41.14). All of the other federal prisons held inmates at still higher costs, which is expected as most are older and less efficient to staff than the Taft, Forrest City, Elkton and Yazoo City facilities.

**Table 2.17**

**Average Daily Prisoner Population, FY 1998-2002, at Taft Correctional Institution and Fourteen Low-Security Federal Prisons**

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Taft Correctional Institution | 1397 | 2230 | 2379 | 2376 | 2343 |
| FCI Elkton | 1697 | 2013 | 2238 | 2268 | 2335 |
| FCI Forrest City | 1566 | 1780 | 2085 | 2045 | 2016 |
| FCI Yazoo City | 1538 | 1649 | 1880 | 1870 | 2034 |
| FCI Ashland | 1145 | 1309 | 1353 | 1341 | 1394 |
| FCI Bastrop | 1173 | 1244 | 1320 | 1318 | 1445 |
| FCI Big Spring | 1049 | 1119 | 1259 | 985 | 927 |
| FCI Butner | 1091 | 1241 | 1330 | 1256 | 1259 |
| FCI Latuna | 1216 | 1322 | 1346 | 1297 | 1728 |
| FCI Loretto | 820 | 837 | 875 | 1173 | 1214 |
| FCI Milan | 1277 | 1369 | 1474 | 1570 | 1594 |
| FCI Petersburg | 1303 | 1389 | 1504 | 1547 | 1447 |
| FCI Safford | 740 | 777 | 802 | 807 | 810 |
| FCI Seagoville | 1170 | 1196 | 1274 | 1126 | 1189 |
| FCI Texarkana | 1564 | 1655 | 1674 | 1632 | 1571 |

*Note*: Average daily population of Taft facility during FY 1998 was adjusted by Abt Associates to refer only to period when facility was operational, following December 20, 1997.

*Source*: Bureau of Prisons, "Federal Prison System, Per Capita Costs," for FY 1998 through FY 2002.

Case 3:16-cv-02267   Document 365-8   Filed 11/20/20   Page 27 of 45 PageID #: 16497

MARLOWE_0007500

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.18**

**Costs Per Prisoner/Day: Comparing Costs of Contracting at Taft Facility, Estimated Cost of Bureau Operation, and Actual Costs at Fourteen Other Low Security Federal Prisons, FY 1998-2002**

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Taft Correctional Institution (Contractor-Operated) | $52.43 | $33.82 | $33.25 | $36.88 | $38.37 |
| *Est. Cost of Bureau Operation of Taft* | 54.23 | 38.65 | 38.27 | 38.56 | 41.08 |
| High Estimate | 55.91 | 39.23 | 38.92 | 39.86 | 42.17 |
| Low Estimate | 52.56 | 38.05 | 37.63 | 37.92 | 39.98 |
| FCI Elkton | 46.59 | 39.72 | 39.77 | 44.75 | 46.38 |
| FCI Forrest City | 44.20 | 39.46 | 39.84 | 41.65 | 43.61 |
| FCI Yazoo City | 44.15 | 41.46 | 40.05 | 43.65 | 42.15 |
| FCI Ashland | 69.96 | 62.75 | 63.47 | 64.12 | 63.38 |
| FCI Bastrop | 56.75 | 53.75 | 52.67 | 57.15 | 52.97 |
| FCI Big Spring | 58.80 | 54.71 | 51.03 | 67.99 | 70.88 |
| FCI Butner | 51.78 | 45.76 | 47.04 | 50.93 | 54.27 |
| FCI Latuna | 58.47 | 56.47 | 57.36 | 71.39 | 60.02 |
| FCI Loretto | 62.59 | 61.42 | 63.22 | 49.32 | 50.86 |
| FCI Milan | 73.93 | 66.77 | 62.97 | 62.56 | 63.23 |
| FCI Petersburg | 65.79 | 61.79 | 61.79 | 56.97 | 60.59 |
| FCI Safford | 58.65 | 56.51 | 58.57 | 58.51 | 58.69 |
| FCI Seagoville | 61.48 | 59.41 | 61.03 | 77.40 | 75.83 |
| FCI Texarkana | 49.29 | 47.52 | 49.68 | 53.34 | 55.55 |

*Notes*: Per diem costs of federal prisons do not correspond to Bureau of Prisons' reports because costs were calculated following Circular A-76 rules. Per diem cost of GEO-operated Taft facility in FY 1998 is computed using only costs incurred by government during operational phase, and uses adjusted average daily population shown in Table 2.17.

*Sources*: Cost of Contracting, from Table 2.2 above; estimated cost of Bureau Operation from Tables 2.5 and 2.6, above; cost of all other federal prisons from Bureau of Prisons, "Federal Prison System, Per Capita Costs," for FY 1998 through FY 2002.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Cost Drivers of Contracted Services and Federal Government Operation

There are significant differences in how costs are structured for contracted operations and for direct federal operation. This section explores the component costs of government operation of federal prisons—including estimates of what the Bureau would have spent to run the Taft facility—and the costs incurred by the government for contracting with GEO.

The various cost components that make up what the Bureau would have spent at the Taft facility are detailed in Table 2.19. These estimates are identical to those developed in the previous sections of this chapter.

For the contractor's costs, GEO voluntarily provided upon request tables detailing costs by object and purpose, using the categories employed by the Bureau's accounting system to permit comparison. These do not, however, represent costs to The GEO Group but include assigned overhead and other indirect costs as well as whatever profit GEO earned in each of the fiscal years. These overhead/indirect and profits were allocated by GEO in proportion to its direct costs. As such, they represent the cost of each component *to the government*. Put another way: GEO has decomposed its revenues received from the Bureau of Prisons so that they are proportionate to GEO's direct costs at the facility, fully loaded with all indirect cost and profits.[54]

For clarity of presentation, Table 2.19 shows the *point estimates* of what the Bureau would have spent to operate the facility without the ranges of possible error (i.e., the high and low estimates).

---

[54] The data provided by GEO was organized according to federal fiscal years but did not correspond exactly to the adjusted annual revenues computed by Abt Associates (shown in Table 2.2). As discussed above, these adjustments were made to assign receipts and award fees to periods of performance, sometimes splitting them across fiscal years. Data for federal fiscal year 1998 was segregated for period of operations, beginning on December 20, 1997. The component costs were then recomputed following the percentage distribution reported for each federal fiscal year in GEO's statements of fully loaded costs.

Case 3:16-cv-02267     Document 365-8     Filed 11/20/20     Page 29 of 45 PageID #: 16499

MARLOWE_0007502

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2.19**

**Component Costs at Taft Correctional Institution:   Estimated Costs of Direct Operation by Bureau of Prisons and Fully Burdened Costs of Contracting**

| | FY1998 | FY1999 | FY2000 | FY2001 | FY2002 | Total |
|---|---|---|---|---|---|---|
| **Permanent Salaries & Wages** | | | | | | |
| Bureau | $9,785,264 | $13,017,347 | $13,594,077 | $14,058,652 | $14,660,805 | $65,116,145 |
| GEO | 10,887,947 | 12,890,239 | 12,714,144 | 13,087,753 | 13,731,806 | 63,311,888 |
| **Premium Comp. & Other Than Permanent Salaries/Wages** | | | | | | |
| Bureau | 782,821 | 1,158,544 | 1,291,437 | 1,321,513 | 1,524,724 | 6,079,039 |
| GEO | 523,488 | 2,780,628 | 2,710,506 | 3,910,197 | 3,214,403 | 13,139,222 |
| **Subtotal Salaries & Wages** | | | | | | |
| Bureau | 10,568,085 | 14,175,891 | 14,885,514 | 15,380,165 | 16,185,529 | 71,195,184 |
| GEO | 11,411,435 | 15,670,867 | 15,424,649 | 16,997,950 | 16,946,209 | 76,451,110 |
| **Benefits** | | | | | | |
| **Retirement fund contributions** | | | | | | |
| Bureau | 3,984,168 | 5,344,311 | 5,611,839 | 5,798,322 | 6,101,944 | 26,840,584 |
| GEO | | | | | | |
| **Employee insurance & health benefits** | | | | | | |
| Bureau | 591,813 | 793,850 | 833,589 | 861,289 | 906,390 | 3,986,930 |
| GEO | | | | | | |
| **Medicare benefit contributions** | | | | | | |
| Bureau | 153,237 | 205,550 | 215,840 | 223,012 | 234,690 | 1,032,330 |
| GEO | | | | | | |
| **Misc. fringe benefits** | | | | | | |
| Bureau | 179,657 | 240,990 | 253,054 | 261,463 | 275,154 | 1,210,318 |
| GEO | | | | | | |
| **Subtotal fringe benefits** | | | | | | |
| Bureau | 4,908,876 | 6,584,701 | 6,914,321 | 7,144,087 | 7,518,178 | 33,070,163 |
| GEO | 2,242,164 | 3,042,209 | 2,941,640 | 3,553,739 | 3,866,382 | 15,646,134 |
| **Subtotal Personnel Costs** | | | | | | |
| Bureau | 15,476,961 | 20,760,592 | 21,799,835 | 22,524,252 | 23,703,707 | 104,265,347 |
| GEO | 13,653,599 | 18,713,075 | 18,366,289 | 20,551,690 | 20,812,590 | 92,097,244 |

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 30 of 45 PageID #: 16500

MARLOWE_0007503

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Materials, Supplies, and Other Non-Labor Costs** | | | | | | |
| **Travel** | | | | | | |
| Bureau | | | | | | |
| GEO | 211,061 | 87,495 | 95,031 | 71,342 | 67,455 | 532,385 |
| **Transportation** | | | | | | |
| Bureau | | | | | | |
| GEO | 5,112 | 17,754 | 37,254 | 33,510 | 35,679 | 129,308 |
| **Communications, Utilities, Misc.** | | | | | | |
| Bureau | | | | | | |
| GEO | 1,590,778 | 1,943,382 | 2,093,598 | 2,436,131 | 2,706,673 | 10,770,563 |
| **Printing & Reproduction** | | | | | | |
| Bureau | | | | | | |
| GEO | 20,268 | 8,106 | 6,568 | 7,967 | 7,029 | 49,938 |
| **Other Services** | | | | | | |
| Bureau | | | | | | |
| GEO | 1,032,725 | 1,583,398 | 2,252,135 | 2,553,246 | 2,664,303 | 10,085,806 |
| **Supplies** | | | | | | |
| Bureau | | | | | | |
| GEO | 2,572,507 | 3,787,757 | 4,122,004 | 3,888,148 | 4,130,719 | 18,501,135 |
| **Equipment** | | | | | | |
| Bureau | | | | | | |
| GEO | 1,362,666 | 595,871 | 431,488 | 281,072 | 190,759 | 2,861,856 |
| **Subtotal Materials, Supplies, and Other Non-Labor Costs** | | | | | | |
| Bureau | 3,861,735 | 7,686,902 | 8,288,809 | 7,677,233 | 8,039,963 | 35,554,642 |
| GEO | 6,795,117 | 8,023,763 | 9,038,079 | 9,271,417 | 9,802,617 | 42,930,992 |
| **Other specifically attributable costs: insurance** | | | | | | |
| **Casualty insurance** | | | | | | |
| Bureau | 292,500 | 375,000 | 375,000 | 375,000 | 375,000 | 1,792,500 |
| GEO | | | | | | |
| **Personnel liability** | | | | | | |
| Bureau | 108,339 | 145,324 | 152,599 | 157,670 | 165,926 | 729,857 |
| GEO | | | | | | |
| **Subtotal insurance costs** | | | | | | |
| Bureau | 400,839 | 520,324 | 527,599 | 532,670 | 540,926 | 2,522,357 |
| GEO | 440,802 | 477,536 | 805,789 | 1,316,246 | 1,421,932 | 4,462,304 |
| **Monitoring Costs** | | | | | | |
| Bureau | 0 | 0 | 0 | 0 | 0 | 0 |
| GEO | 536,927 | 644,893 | 491,438 | 633,715 | 468,586 | 2,775,560 |
| **Federal Govt. Overhead** | | | | | | |
| Bureau | 1,857,235 | 2,491,271 | 2,615,980 | 2,702,910 | 2,844,445 | 12,511,842 |
| GEO | 0 | 0 | 0 | 0 | 0 | 0 |

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 31 of 45 PageID #: 16501

MARLOWE_0007504

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

| | | | | | | |
|---|---|---|---|---|---|---|
| **Corporate Income Tax Offset** | | | | | | |
| Bureau | 0 | 0 | 0 | 0 | 0 | 0 |
| GEO | -729,426 | -695,766 | -240,963 | -331,213 | -422,653 | -2,420,023 |
| **Award Fees** | | | | | | |
| Bureau | 0 | 0 | 0 | 0 | 0 | 0 |
| GEO | 182,240 | 361,730 | 408,333 | 545,833 | 733,333 | 2,231,470 |
| **Total Est. Cost of Bureau Operation** | $21,596,770 | $31,459,089 | $33,232,223 | $33,437,065 | $35,129,041 | $154,854,188 |
| **Total Cost of Contracting \*** | $20,879,259 | $27,525,231 | $28,868,965 | $31,987,688 | $32,816,405 | $142,077,548 |

*Notes:* The GEO Group's reports of federal fiscal year cost components have been adjusted to represent FY 1998's operational period only, after December 20, 1997, and to reflect the adjustments made by Abt Associates to assign revenues to periods of performance, not dates of booking receipts.

*Sources:* Data on fully burdened costs of Taft facility operation from The GEO Group, memoranda to Douglas ald; costs of monitoring and award fees from Bureau of Prisons; estimated cost of Bureau operation computed by ociates Inc.; see text for discussion of assumptions and data.

## Salaries and Wages

Prison operations are labor intensive services. Compensation to labor—including salaries, premium pay, and fringe benefits—represent about two-thirds to three-quarters of the total cost of operating federal prisons. How organizations structure their labor and compensate it therefore has the biggest impact on costs.

GEO's labor costs were lower than what the Bureau's would have been at the Taft facility. This was not a result of GEO paying lower salaries to staff across the board. During FY 1998, for example, the mid-grade annual salary of grade 7 correctional officers in federal prisons was $33,024.[55] At the Taft facility, GEO paid its correctional officers approximately $35,173 during that same year, or about 7 percent more than the Bureau officers'.[56] However, GEO's fringe benefit costs were significantly lower than the federal government's. As discussed above, Circular A-76 prescribes that the full cost of benefits be calculated at 46.45 percent of permanent salaries and wages and premium compensation—a calculation followed here. In contrast, GEO paid fringe benefits for its employees over the five years at the rate of 20 percent. No doubt the biggest source of difference was the cost of contributions to retirement accounts. Federal government contributions to employee retirement accounts equaled 37.7 percent of base payroll—almost twice the rate of all GEO fringe benefits combined. GEO employees may be awarded stock options, at the discretion of the Board of Directors but the ultimate value of these depends upon the future health of the company and the market.

In addition to compensation levels, labor costs are also determined by how organizations staff prisons. GEO's bid to operate the facility promised a staff of 383.55 FTEs and agreed contractually to maintain that level of staffing. In contrast, the Bureau would have created 350 staff positions and

---

[55] See Table 2.9 above.

[56] Rates from proposal to Bureau of Prisons for Taft facility, provided by The GEO Group.

Case 3:16-cv-02267     Document 365-8     Filed 11/20/20     Page 32 of 45 PageID #: 16502

MARLOWE_0007505

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

at any one time approximately 9 percent would have been vacant, leaving as staff of about 319. The Bureau's per employee labor costs (salary and fringe benefits) were higher than GEO's, however, so that the payroll cost of these 319 employees would have been higher than GEO's, with even with GEO's larger staff. Largely because of these differences in fringe benefit costs, the total cost of GEO's labor was an estimated $12.5 million less than would have been the case if the Bureau operated the facility. GEO fully burdened cost of labor—including, that is, some apportioned share of the firm's overhead and profit—was $92.1 million over the five years, compared to an estimated $104.6 million if the Bureau had operated the facility.

Ultimately, staffing levels (and, by extension, labor costs) are determined not only by the contractor but by the purchaser—in this case, the Bureau of Prisons. The rules governing federal procurement allow the government to request that bidders revise their proposals to reflect different assumptions or requirements. If the Bureau thought that a different staffing arrangement was more appropriate for this facility (based upon its knowledge of how federal prisons are customarily staffed), it could have asked for bidders to propose fewer staff.

### *What Determines Labor Compensation*

Differences in how labor is compensated goes to the heart of the comparison of federal and privately operated prisons. Federal prisons pay employees according to federal government-wide pay scales, with precisely determined adjustments for cost of living differences in certain regions of the country. In contrast, contractors can pay labor at whatever the local labor market permits. In federal contracting, however, contractors are not free to set compensation at any level above the federal minimum wage. Instead, they must also abide by the provisions of the Service Contract Act of 1965, a federal law that establishes minimum salary, wage, and fringe benefit rates to be paid to employees working for any private firm providing services under contract with the federal government.[57]

As required by the Act, the U.S. Department of Labor issues periodic "wage determinations" for a variety of occupational categories, which are based upon labor market surveys in different geographical regions. These purport to reflect prevailing wages for these types of workers. The Bureau's contract with GEO stipulates that GEO must pay employees in specified occupational categories at least the hourly wages established by wage determinations for Kern County, California (where the Taft facility is located). These wage rates are quite high compared to other parts of the nation for several categories of staff, such as correctional officers, which no doubt results from the wages levels that the correctional officers' union in the California State prison system has won. Local jails in the area pay staff at lower rates, indicating that the effective market rate for correctional staff may be lower than the Department of Labor's wage determined rates, but this has no consequence for what GEO must pay under its federal contract.

Wage determinations are revised periodically (see Table 2.20 for changes in the Kern County wage determinations for correctional officers). When these wage levels rise, GEO is required to raise salaries of persons in these covered occupations to those levels. In these instances, GEO is permitted to increase its fee to the government to capture these increased labor costs, *but only for staff in occupational categories for which wage determinations are issued.* Some occupational categories are

---

[57]  41 U.S.C. 351, et seq.

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 33 of 45 PageID #: 16503

MARLOWE_0007506

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

not subject to wage determinations or to these mandatory wage increases. But when staff in one category get substantial raises as a result of new wage determinations, pressure is created to raise others as well for the sake of equity and for differentiating higher and lower status positions. Without making such adjustments, the differences in wages among different levels of employees becomes compressed and distorted. GEO has been forced to increase its salaries for staff not subject to wage determinations but has not been able to modify its fees to the federal government to compensate for these higher wages. The result has been that labor costs have risen faster than expected, which must put pressure on GEO's profit margin.

In some instances, the DOL-determined wages rates are below the effective market rate and GEO has been unable to find certain types of staff. GEO's healthcare staff has been below full strength for periods of time because the firm was unable to attract nurses willing to work for DOL-determined wages. The U.S. has experienced a shortage of trained nurses, which is probably most acute in rural areas like Taft, California. GEO could have offered to pay what the market required to get the needed staff, but the Bureau will not adjust its payments to GEO to accommodate these higher labor costs without a formal modification. Ultimately, such a modification was agreed to so that GEO could offer more competitive wages to nurses and pass the cost on to the government.

**Table 2.20**

**Wage Determinations for Correctional Officers' Compensation in Kern County, California, As Revised Periodically (1997–2002)**

| Effective Date | Annual Salary | Health and Welfare Benefits | Total | Percent Increase |
|---|---|---|---|---|
| 5/20/1997 | $35,173 | $5,325 | $40,498 | |
| 11/3/1998 | 35,984 | 5,325 | 41,309 | 2.00% |
| 6/9/2000 | 39,125 | 5,325 | 44,450 | 7.60% |
| 5/7/2002 | 46,821 | 5,325 | 52,146 | 17.31% |

*Source:* Department of Labor, Wage Determinations, revisions 6, 9, 11, 15.

Therefore, the competitive advantage of contracting over direct federal government provision depends in large measure upon the difference between a wage rate established by the U.S. Department of Labor for a specific area of the country and the salary and wage scales for federal government employees. This suggests that savings associated with contracting will be greater or lesser in areas where the gap between the two wage rates is larger or smaller.

***Contracting Would Have Been More Advantageous to the Government in Areas With Lower Prevailing Wages***

To illustrate the impact of location for the cost difference between contractor and government operations of a prison, consider what labor costs would have been if the Taft facility had been located instead in less costly parts of the country, such as Yazoo City, Mississippi or Forrest City, Arkansas, where two of similar federal prisons are located. For this analysis, The GEO Group created staffing and payroll for the Taft facility as if it were located in these two cities, assuming that the staff

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

configuration and the numbers of staff (383.5 FTEs) were identical to that existing at the California facility. Not included here is any compensation that may be paid at premium rates (or overtime, working on holidays, etc.). The contractor's salary and wage rates conform to the wage determinations established by the Department of Labor in these two regions in 1998.

The effect of different prevailing wages (or wage determinations) in these regions is significant (Table 2.21). If the Taft facility had been located in Yazoo City and had been operated by The GEO Group, labor costs would have been 24 percent lower than what the firm paid in Taft, California. If the facility had been located in Forrest City, Arkansas, the payroll would have been 18 percent lower than in California.

**Table 2.21**

**Estimated Difference in The GEO Group's Payroll in Taft, California, Yazoo City, Mississippi, and Forrest City, Arkansas (FY1998)**

|  | Contractor-Operated Facilities | | |
|  | Taft | Yazoo City | Forrest City |
|---|---|---|---|
| Payroll Costs | $12,774,513 | $9,710,039 | $10,411,555 |
| Fringe benefits | 2,554,903 | 1,942,008 | 2,082,311 |
| Total labor cost | 15,329,416 | 11,652,047 | 12,493,866 |

*Notes:* Includes only regular salary and wages; excludes premium compensation and other-than-regular salaries/wages. For purposes of comparison, it is assumed that all positions are occupied for the entire year. Fringe benefits are assumed to be paid at the rate of 20 percent for contract employees. Wages for labor categories covered by Servide Contract Act are set at wage determined rates for Kern County, California, for Forrest City (Wage Determination WD 94-2297, Revision 12, 8/11/1998 ), and for Yazoo City, Mississippi (Wage Determination 94-2495, Revision 12, 7/28/1998). Wages for staff in positions not covered by the Service Contract Act were estimated following same distribution of salary and wage rate as in GEO's proposal to operate the Taft facility.

*Sources*: Cost of payroll for identical staff in Taft California, Yazoo City and Forrest City was computed by The GEO Group.

**Non-Labor Costs**

The comparison here provides little evidence of a competitive advantage to either the contractor or to the government in purchasing materials, supplies, and other non-labor items, including insurance. GEO spent more for materials, supplies, and other non-labor items than what we estimate that the Bureau would have spent. GEO reported spending a total of $43 million, whereas the Bureau may have spent less—about $36 million over the five years, or perhaps as much as $38.5 million. As discussed above, the estimate of what the Bureau would have spent during fiscal year 1998 seems excessively low because the statistical model may not have produced reliable estimates for that year, during which time the Taft facility was being activated. GEO spent $6.8 million in this year, mostly for supplies, equipment, communications, utilities and "other services," while the cost of these items if the Bureau had operated the facility would have been an estimated $3.3 million.

MARLOWE_0007508

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Nor did the statistical estimates of supplies account for regional differences in energy prices during
this five year period. GEO spent a larger percentage of its materials and supplies costs on
"communications, utilities and miscellaneous other" items than did 14 other low-security federal
prisons, on average, which may reflect higher costs of electricity in California. If the Bureau operated
the facility, it would have had to pay the same energy costs.

Comparisons of GEO's spending for insurance and self-insurance costs and the estimates of what the
Bureau would have spent are not counting similar things. According to OMB's A-76 rules, the
federal cost includes only the cost of casualty and personnel liability self-insurance, whereas the GEO
costs include self-insurance for healthcare as well. Therefore, the costs of insurance/self-insurance
were significantly higher than the estimate of what the Bureau would have had to spend—$4.5
million versus $2.5 million. This does not indicate any inherent difference in how private contractors
and the federal government insure themselves. Rather, it reflects the high cost to this specific
contractor of insuring against a disease that it did not know about when it designed its bid to operate
the facility. GEO's spending for insurance and self-insurance nearly tripled between FY 1998 and
2002, largely due to the unanticipated costs of treating patients and staff infected with Valley Fever,
or *Coccidioidomycosis*, a sometimes deadly disease caused by an infectious fungus that is endemic in
the San Joaquin Valley, where Taft is located.[58] GEO's contract assumes all costs for healthcare and
it has experienced high costs of hospitalization and care. Because of the facility's location, GEO has
been unable to obtain third-party insurance that costs less than the cost of self-insurance, and GEO
has consequently chosen to bear these costs on its own. If the Bureau of Prisons were operating this
facility, its costs of self-insurance for medical care would be substantial, although would be counted
not in the category of "insurance" but as another type of expense (perhaps "other services" in
"materials, supplies, and other").

**Monitoring, Award Fees, Tax Payments, and Federal Government Overhead**

The differences associated with contracting and direct government provision are sharpest for four
categories of cost: contract monitoring and administration, award fees, corporate income tax
payments to the federal government that offset costs, and federal government overhead. The costs of
contract monitoring and administration are incurred when contractors provide the service for the
Bureau and are avoided altogether if the Bureau operates the prison directly. When the Bureau
operates its prisons, monitoring is done by regional and national headquarters staff but is paid out of
overhead accounts. Similarly, award fees are available to the contractor but not to Bureau employees.
Because the contractor is a private for-profit firm, it is required to pay corporate income taxes to
federal and state governments—a cost that is avoided by governmental departments of correction—
but which also offset the costs of contracting to the federal government.

---

[58] *Coccidioides immitis* grows in the arid soil of the Central Valley of California, southern Arizona, and parts
of Nevada, New Mexico, Utah, and Texas, as well as northern Mexico and parts of Central and South
America (State of California, Health and Human Services Agency, "Valley Fever (*Coccidioidomycosis*,"
undated at Internet http://www.dhs.ca.gov/ps/dcdc/disb/disb-qa.htm). A large proportion of all reported
infections in the U.S. are reported in California, and the San Joaquin Valley is the epicenter of the disease
(Amber E. Barnato, Gillian D. Sanders, and Douglas K. Owens, "Cost-Effectiveness of a Potential Vaccine
for Coccidioides immitis," *Emerging Infectious Diseases*, Vol. 5, no. 7 (Sept./October 2001).

---

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Whether or not there are intrinsic differences between contractor-operated and Bureau-operated prisons in how federal government overhead is assigned is less straightforward. If the Bureau were to have operated the Taft facility directly, the apportioned cost of the Bureau's overhead activities would have to be assigned to the facility's cost. These are real costs of operation, as regional and national headquarters' activities support all federally-operated prisons. (As discussed above, the actual cost of *all* overhead activities of the federal government is probably greater than the 12 percent overhead rate prescribed by the OMB's Circular A-76 because nearly all of that prescribed rate represents the cost of overhead within the Bureau of Prisons alone and not any of the other supporting federal agencies.) If a facility is operated by a contractor, OMB's A-76 does not prescribe assigning general government overhead (as it is probably assumed that overhead costs are captured adequately in the cost of contract monitoring and administration). Because so few of the Bureau's national and regional headquarters' resources were provided to GEO during the five years examined here, assigning no government overhead to the cost of contracting seems justified. This is not to say, however, that the government *avoided* spending an equivalent amount (12 percent of the cost of contracting) by the regional and national headquarters as a result of contracting out this single prison. The Bureau manages over a hundred separate facilities (or nearly two hundred, depending upon how one counts facilities that are often adjacent to one another). For isolated privatization experiments, the Bureau's overhead costs appear relatively inelastic. If, however, the Bureau can contract out prison operations without applying significant overhead resources, it is likely that these overhead resources would not remain so fixed if a large number of facilities were operated under contract.

Case 3:16-cv-02267   Document 365-8   Filed 11/20/20   Page 37 of 45 PageID #: 16507

MARLOWE_0007510

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Case 3:16-cv-02267     Document 365-8     Filed 11/20/20     Page 38 of 45 PageID #: 16508

MARLOWE_0007511

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 3

# Comparing the Facility's Performance to Contractual Obligations

Assessing the performance of a contractor-operated prison is in many ways more straightforward than assessing performance of government operated institutions.  Unlike publicly run agencies and institutions, they operate within the framework of a legally established and explicit statement of what the contracting agency expects of its contractor.  Good contracts establish rights and responsibilities with precision, and often specify these requirements in ways that support measurement of how well they are met.  Therefore, one direct measure of how well The GEO Group performed in its management of the Taft Correctional Institution is the extent to which it did what the Bureau required in its contract.

This chapter examines the extent to which GEO's performance at the Taft facility conformed to what the Bureau expected as a matter of contract.  This includes descriptions of how the contract is structured to emphasize performance that is consistent with the Bureau's general strategic objectives and mission; descriptions of how contractual performance is assessed; and findings of the Bureau's assessments of GEO's performance during the first five years of the operation.  Toward the end of the fifth year, the Bureau reorganized its system for monitoring contractor performance, which is discussed briefly, along with summary findings of GEO's performance during year six and part way through year seven (through March, 2004, that is).  Our understanding of how well or poorly GEO is performing in relation to the contract is based in large part upon information developed by Bureau officials—especially the contract monitors.  The extent to which this lens provides a clear view of the contractor's performance and the conclusions that can be drawn from these findings are addressed in the conclusion of the chapter.

To assess TCI's performance vis-à-vis the Bureau's contractual obligations, we have obtained and analyzed information from a variety of sources:

- the statement of work in the contract, which establishes the performance objectives and quality control requirements;
- periodic monitors' reports evaluating each aspect of the contractor's performance (these reports were first written on a bimonthly basis and then on a quarterly basis);
- contract modifications, indicating deductions for services deemed deficient or absent;
- the Bureau of Prison's quality assessment program documents, used to structure the monitors' ongoing assessment of the contractor's performance;
- GEO's semi-annual memorandum to the Award Fee Determination Board listing what it sees as its accomplishments during the period;
- interviews with Bureau monitors and GEO staff; and
- findings from the Bureau of Prisons' internal assessment of the contract monitoring activities at the Taft facility.

MARLOWE_0007512

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Linking Contractual Obligations to the Bureau's Strategic Objectives

The Bureau structured its contractual relationship with The GEO Group to ensure that the performance of the Taft Correctional Institution complied with the Bureau's mission and advanced the agency's strategic objectives. In addition, the contract places great emphasis on achieving performance objectives rather than simply adhering to required procedures. It establishes objectives, allows the contractor considerable latitude in deciding how it accomplishes these objectives, and provides financial incentives for good performance.

These objectives derive from the Bureau's system for managing all federal prisons, and not just privately-operated ones. This performance management system, first developed in the mid-1980s, involves:

- defining performance goals for the agency and for facilities in terms of outcomes to be achieved;
- developing sub-goals for all major aspects of facilities' operation, the attainment of which would contribute to the overall facility's and agency's goals;
- defining these sub-goals in operational terms that are susceptible to being measured; and
- specifying the functions, or activities, that have to be carried out to accomplish the goals (the Bureau calls these 'vital functions').

The Bureau's mission is to protect public security, to protect inmates and staff, to provide inmates with appropriate and humane levels of care, and to give inmates opportunities to become better citizens. How these are to be accomplished is set forth in the Bureau's 'vision statement':

> The Bureau provides for public safety by assuring that no escapes and no disturbances occur in its facilities. The Bureau ensures the physical safety of all inmates through a controlled environment, which meets each inmate's need for security through the elimination of violence, predatory behavior, gang activity, drug use, and inmate weapons. Through the provision of health care, mental, spiritual, educational, vocational and work programs, inmates are well prepared for a productive and crime free return to society.[59]

The contract for TCI sets the same performance goals as the Bureau sets for all other facilities. Moreover, it adopts the same 'vital functions' identified as necessary to accomplish the Bureau's strategic objectives at all federal prisons. These vital functions are stated as specific objectives rather than instructions in how to accomplish the objectives. For example, the following describe requirements pertaining to institutional security, control, and inmate accountability.

> *Vital Function #1*: Provide a safe and secure environment for staff and inmates through effective communication of operational concerns. This includes verbal and written instructions, post orders, institution supplements, information dissemination, training, and crisis prevention.

---

[59] Bureau of Prisons, *Vision Statement*, undated.

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 40 of 45 PageID #: 16510

MARLOWE_0007513

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*Vital Function #2*: Gather intelligence information related to security concerns for dissemination to appropriate contractor and Federal Bureau of Prisons staff.

*Vital Function #3*: Provide an adequate security inspection system to meet the needs of the institution.

*Vital Function #4*: Maintain an adequate level of emergency readiness to respond to institution emergencies.

*Vital Function #5*: Maintain a level of occurrence for the following listed incidents at, or below, the average rate of occurrence at other BOP facilities of the same security level.

> Assaults without weapons on other inmates
> Assaults with weapons on staff
> Assaults with weapons on other inmates
> Homicides
> Suicides
> Escapes

## Emphasizing Performance Rather Than Process

Whereas the Bureau relies on self-monitoring to keep performance aligned with the agency's mission, it devised a different set of instruments to manage the performance of a contractor. First, it designed an innovative performance-based contract. Second, it created financial incentives to encourage the contractor to perform well. Third, it gave GEO responsibility for managing its own quality control system at the Taft Correctional Institution.

### Performance-Based Contracting

Rather than specifying in detail precisely how the contractor will deliver all its services, the Bureau established objectives (vital functions) that TCI's managers are contractually obliged to accomplish.[60] This accords with Federal Acquisition Regulations and the Office of Federal Procurement Policy (OFPP), which encourage the use of performance-based contracts. As described by OFPP, "performance-based service contracting (PBSC) emphasizes that all aspects of an acquisition be structured around the purpose of the work to be performed as opposed to the manner in which the work is to be performed or through broad, imprecise statements of work which preclude an objective assessment of contractor performance."[61]

---

[60] At the time of writing this contract, this was an uncommon feature of correctional contracting, as performance-based contracts are rarely used by state and local governments contracting for privately-operated imprisonment. Since then, other Bureau of Prisons contracts have adopted the same approach. Whether state and local contracting practices have begun to use such procedures was not determined.

[61] Office of Federal Procurement Policy, *A Guide to Best Practices for Performance-Based Service Contracting* (Washington, D.C.: Executive Office of the President's Publications Office, 1996), p. 3 (Italics added).

---

Case 3:16-cv-02267    Document 365-8    Filed 11/20/20    Page 41 of 45 PageID #: 16511

MARLOWE_0007514

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

This emphasis on performance rather than process is reinforced by the statement of work in the
contract. Whereas some contracts for imprisonment services, written by state or local governments,
go to great lengths to detail exactly how the private operator is to structure its operations, the TCI
contract leaves such decisions largely to the contractor. What is specified in the statement of work is
quite short, essentially listing activities that are deemed absolutely essential to the Bureau of Prisons,
and which clarify where the contractor's responsibilities begin and end relative to the Bureau's. (The
statement of work also incorporates by reference, however, a more extensive list of standards for
facility operations established by the American Correctional Association.[62]) For example, the section
in the statement of work that specifies required institutional security procedures is quite short—
slightly longer than three pages. Insofar as maintaining security and control are the most important
objectives for a prison, the brevity of the prescribed procedures is quite striking. For example, the
specification of procedures required of the contractor include the following: [63]

- At least one inmate count every 24 hours shall be a stand-up count. All counts shall be
  documented in separate logs maintained in the inmate housing unit, control center and
  shift supervisor's office and shall be maintained for a minimum of 30 days.

- Policy and procedures for the maintenance and security of keys and locking mechanisms
  shall be developed. The procedures shall include, but are not limited to: (1) method of
  inspection to expose compromised locks or locking mechanisms and method of
  replacement for all damaged keys and/or locks; (2) a preventive maintenance schedule for
  servicing locks and locking mechanisms and method of logging all work performed on
  locks and locking mechanisms;…

- Staff responsible for lock maintenance shall receive training and be certified from a
  [contracting officer]-approved training program specializing in the operation of locks and
  locking mechanisms.

- The contractor is responsible for the movement of all inmates within a one hundred and
  fifty mile radius of the institution… The contractor shall utilize restraint equipment
  identical to the BOP's when one-for-one equipment exchange is required (e.g., airlifts).

- Contractor-developed procedures regarding clothing for inmates transferred from the
  institution to other Government facilities must incorporate the following conditions:
  [conditions listed here]…

- Policy and procedures for collecting, analyzing and disseminating intelligence
  information regarding issues affecting safety, security and the orderly running of the
  institution shall be developed… This information should include, but not be limited to
  gang affiliations (white supremacy groups, domestic terrorist groups, street gangs, prison
  gangs, organized crime, etc.), tracking of inmates having advanced skills in areas of
  concern (locksmiths, gunsmiths, explosives, computers, etc.). The contractor shall also
  monitor narcotics trafficking, mail and correspondence, inmate financial information,

---

[62]   Taft Correctional Institution Contract, Statement of Work, p. 7.

[63]   Taft Correctional Institution Contract, Statement of Work, pp. 24–27.

MARLOWE_0007515

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

visiting room activity and high profile inmates. The contractor shall share all intelligence information with the Government.

- All intervention equipment (e.g., weapons, munitions, chemical agents, electronics/stun technology, etc.) shall be approved by the contract officer before being used for the contract. P.S. 5500.07, *Correctional Services Manual* contains guidance regarding current BOP standards for intervention equipment.

- By award of this contract, the Government delegates to the contractor its own limited authority to use force to maintain security of the institution consistent with Government policy as outlined below. All use of lethal force by the contractor pursuant to this delegation or any other authority shall be in compliance with P.S. 5558.12, *Firearms and Badges* and P.S. 5568.04, *After Action Reporting and Review*.

- The contractor shall report all criminal activity related to the performance of this contract to the appropriate authorities…

- The contractor shall immediately report all serious incidents to the CO. Serious incidents include, but are not limited to the following: [a list of specified activities follows]…

- The contractor shall maintain a urine surveillance program which complies with P.S. 6060.05, *Urine Surveillance to Detect and Deter Illegal Drug Use* to detect and deter illegal drug use…

- The BOP may investigate any incident pertaining to performance of this contract. The contractor shall cooperate with the Government on all such investigations.

**Internalizing Quality Control Responsibilities**

The contract requires GEO to develop and implement its own quality control program to ensure that TCI's management meets the various requirements and accomplishes its performance objectives.[64] This was done so that the contractor would provide continuous self-assessment that would lead to self-directed improvements. The Bureau could have chosen to extend its own quality control management system employed at all other federal prisons—"program reviews," or on-site inspections by Bureau-staffed program review teams dispatched from central and regional headquarters. It chose otherwise because it sought to provide a better test of private management.

**Financial Incentives to Perform Well**

The contract establishes financial incentives to encourage the TCI's managers to achieve performance goals that go beyond simple compliance in such areas as quality, timeliness, technical ingenuity and cost effective management. Twice a year, Bureau officials rate TCI's performance to determine if and how much additional money could be awarded to the contractor. These bonuses can be substantial—equaling as much as five percent of the amounts paid to the contractor for its services.

---

[64]  Taft Contract, Statement of Work, p. 7.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The size of the award is determined by the government's judgmental evaluation of the contractor's performance according to criteria stated in the contract.

## Procedures for Assessing TCI's Performance During the First Five Years of the Contract

There are two distinct but interrelated performance assessment procedures used by the Bureau—one to monitor GEO's compliance with the contract, and a second one to determine how much money to award GEO for its performance.

To assess the contractor's performance once the facility was activated, the Bureau employed between six and eight employees who were all located at the facility. These included the contracts administrator, who directs the administration of contracts with GEO for TCI's operation (and who also spends part of her time on the contract with the Corrections Corporation of America to operate the Eloy Detention Center in Eloy, Arizona), and contract monitors. At Taft, all technical monitors were at the facility full-time, year-round. The intensity of such monitoring is unusual in the industry.[65]

Most—if not all—of these monitors were initially transferred to the area before Congress mandated that facility operations were to be contracted out. They were slated to be managers at the facility, but were then reassigned to monitoring tasks once it became clear that the Bureau was not going to operate the prison directly. Consequently, these monitors came with a great understanding of Bureau-operated federal prisons, as they had worked in such prisons for many years. At the same time, however, they were not trained to be contract monitors. Rather, their careers had been in operations. Being transferred to managerial positions at the Taft facility was to be a step up on the career ladder. They lost these opportunities for advancement when Congress changed the mission of the institution. (There was no equivalent career ladder for contract monitors.) This contributed to some tension between monitors and GEO staff. Indeed, there was a pronounced sense of "us" and "them" during the first five years of the contract.[66]

Lacking formal training and an established contract review program, monitors developed a quality assurance program in early 1998 to guide them in their job of assessing contract compliance.[67] The resulting document summarizes the various obligations required of the contract, incorporating the contract's statement of work, professional standards that are referenced by the contract (e.g., ACA and JCAHO standards), applicable Bureau policy, and any other requirements in the contract. The authors of this document categorized obligations according to nineteen different types of services

---

[65] In about half of all contracts with privately-operated facilities, state government monitors spend an average of less than one-quarter of a single FTE, with infrequent visits to the facility. In the other half of the contracts, the most common practice is to assign one person full-time to monitor, on-site. This was the finding of a survey of state and federal correctional agencies' contracting practices at the end of 1997. See Douglas McDonald, Elizabeth Fournier, Malcolm Russell-Einhorn, and Stephen Crawford, *Private Prisons in the United State: An Assessment of Current Practice* (Cambridge, MA: Abt Associates Inc., 1998).

[66] This was evident in Douglas McDonald's meetings with GEO staff and BOP monitors.

[67] Bureau of Prisons, *Quality Assurance Plan: Taft Correctional Institution, Evaluation Techniques for Quality Assurance of Contractor Performance,* February 2, 1998.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

provided.[68] Because of their experience at other federal prisons, each monitor had developed expertise in different aspects of prison operation, and they divided their monitoring responsibilities accordingly. (There were not enough monitors to have technical expertise in each of the nineteen different areas, however.)

In addition to this quality assurance program, the contract monitors also relied on information from the contractor's own quality control program, to the extent that such a program existed. That is, the contractor was required to identify deficiencies in its own operations and to document them, and then to track the extent to which those deficiencies were remedied. The Bureau's monitors had available to them all the documentation developed by the contractor for these purposes. As discussed below, GEO did not develop an effective quality control program quickly. This resulted in the Bureau monitors playing a more active role in ensuring quality control directly—a role that the Bureau did not anticipate.[69]

## Deductions to Fee for Non-Compliance

Compliance with the contract is, in principle, an all-or-nothing matter. However, the contractor can be in and out of compliance from one day to the next. Monitors were therefore obliged to use their discretion to determine when written notices were to be given to the contractor for non-compliance.[70] These notices could result in the contract officer modifying the contract to deduct money from the monthly fee to GEO for service not rendered. Bureau officials did not intend to impose deductions as punishments but rather to withhold pay for services not delivered.

Identifying the monetary value of discrete services not performed is often difficult because the contract did not price all services separately. The Bureau therefore created provisions in the contract that established broad guidelines to assist the contract officer in determining how much money to deduct from the monthly fee. It defined performance in eight different areas as well as the relative value the Bureau placed on performance in these areas (see Table 3.1). Not surprisingly, institutional security and control were seen as being the most important, and were assigned 20 percent of the total value of what the contractor was required to do. For example, if GEO failed utterly to comply with the various contractual requirements pertaining to institutional security, control, and inmate accountability, it would be liable to lose up to twenty percent of its monthly fee for services not rendered. Complete failure to perform rarely occurs, however. More often, service is deficient by degrees. This requires Bureau officers to make a subjective judgment to determine the amount of the deduction, guided by the upper limits shown in Table 3.1.

---

[68] These areas of services were called "departments" by the Bureau, although some departments provided more than one area of service. Performance in each of the nineteen different service areas was rated separately by monitors, and each area was rated separately.

[69] Federal Bureau of Prisons, "Review of 'Contracting for Imprisonment in the Federal Prison System," memorandum dated July 11, 2005.

[70] In the early months of the contract, monitors issued "Inspection Reports" to the contractor to advise them of procedures that needed to be improved. The GEO staff complained that they were not given enough room to develop their own procedures, and the monitors stepped back. Some months later, however, they began relying on formal Non-Compliance Reports whenever repeated non-compliance was observed.

Case 3:16-cv-02267     Document 365-8     Filed 11/20/20     Page 45 of 45 PageID #: 16515

MARLOWE_0007518