This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 3.1**

**How the Contract Defines the Relative Value of the Contractor's Functional Responsibilities**

| Contract Requirements | Total Contract Value Attributed |
|---|---|
| Security/control/inmate accountability | 20% |
| Inmate admission, classification, programs and transfer | 20% |
| Facility maintenance and repair | 15% |
| Personnel | 10% |
| Health services | 10% |
| Food services | 10% |
| Quality control | 10% |
| Inmate services | 5% |

*Source*: Taft Correctional Institution Contract, Section J, Attachment C, pp. 2-6.

## Awarding Good Performance

The Taft contract permitted financial awards ("award fees") to be paid if the contractor met established performance goals. The process for making these decisions throughout the first five years of the contract is described schematically in Figure 3.1.



Figure 3.1    Steps for Determining Award Fee

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 1 of 42 PageID #: 16516

MARLOWE_0007519

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The job of measuring how well the contractor meets the performance goals was given to the contract monitoring staff located at TCI. The monitors' six-month reports rated performance in each of nineteen different functional areas, such as institutional security, safety, mail, educational services, laundry, among others. For each, monitors evaluated three dimensions of performance: the *quality of the work* (not just whether it complied with the terms of the contract), the *contractor's 'responsiveness,'* and the sufficiency of the contractor's own *quality control management*, all of which were defined as follows:

*Quality of Work*
- Results of quality assurance inspections and observations of government personnel

*Contractor Responsiveness*
- Timeliness, effectiveness and appropriateness of response to both routine and unusual institution events
- Timely response to BOP concerns
- Reaction to changing service requirements

*Management of Quality Control Program*
- Effectiveness of quality control program
- Self-initiated service improvements

When asked how evaluating performance differed from assessing compliance, the former contract administrator answered, "Judging compliance is like deciding whether somebody passes or fails a course. Judging performance is like giving them grades."[71] These grades range from "unsatisfactory" to "outstanding." Because the Bureau intended to award bonuses only for performance that goes beyond simple compliance with the contract, only performance rated "good" or better warranted an award. How the Bureau defined and interpreted these ratings, and how much weight it assigned to each, is shown in Table 3.2. If, for example, the contractor's performance was rated "outstanding" in all aspects, it would have been eligible for 80 to 100 percent of the maximum possible award fee. In contrast, if it received ratings of "good" in all functional areas, the bonus could range between 1 and 39 percent of the maximum award.

The monitors' evaluations were then passed to the Performance Evaluation Board, consisting of government officials, and the Fee Determination Officer. The contractor was given the opportunity to submit a letter that summarizes its accomplishments during the period, highlighting "implementation of any innovative approaches or performance above and beyond contract requirements," which was reviewed by the contract monitors and forwarded to the Performance Evaluation Board. The Board considered all the information and made a recommendation. Following further discussions among the various parties, the Fee Determination Officer made a unilateral decision about the amount of the award and ordered the award to be issued. This decision was not subject to dispute.[72] Although the contractor learned the amount of the award, neither the monitors nor other Bureau officials shared with the contractor precisely how the monitors had ranked performance in all the various functional areas.

---

[71] Ray Marshall, the Bureau's first contract administrator at Taft, in a telephone conversation with Douglas McDonald in 1999.

[72] FAR 16.412-2.

---

MARLOWE_0007520

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 3.2**

**Performance Evaluation Rating Used to Determine Award Fees During First Five Years of Contract**

| Rating | Performance Description | Range of Points |
|---|---|---|
| Outstanding | Superlative level of performance; achievement of distinguished results and effectiveness. No deficiencies | 80-100% |
| Excellent | Of exceptional merit; exemplary performance in a timely, effective and professional manner. Very minor deficiencies. No effect on overall performance. | 40-79% |
| Good | Very efficient performance; fully responsive to contract requirements; more than adequate results; reportable deficiencies but with little identifiable effect on overall performance. | 1-39 % |
| Fair | Effective performance; responsive to contract requirements; adequate results. Reportable deficiencies with identifiable, but not substantial effects on overall performance. | 0% |
| Marginal | Meets minimum acceptable standards; useful levels of performance but suggested remedial action; reportable deficiencies which adversely affect overall performance. | 0% |
| Unsatisfactory | Below minimum acceptable standards; poor performance; inadequate results; requires prompt remedial action; significant deficiencies. | 0% |

*Source:* Taft Correctional Institution Contract, Section J, Attachment F, pp. 6–7.

In some areas of performance, there appears to have been general agreement between what GEO managers and contract monitors reported. There were other areas of performance that were much disputed, however. Interviews with monitors and GEO managers surfaced a great deal of disagreement about how well the monitoring function worked during most of the first five years, about the standards that were being applied, the deductions from fee that were imposed, and the amounts awarded by the Bureau for good performance. GEO managers were not given the opportunity to see the detailed rankings of quality, responsiveness, and quality control management that the Bureau officials assigned to institutional performance twice a year as part of its award determination process. If they had been given such opportunities, there is no doubt that they would have disputed many of the assessments.

## Subjectivity in the Monitoring Process

Where compliance or non-compliance is obvious, one might imagine that objectivity is relatively easy to come by, and that monitoring assessments are straightforward. Most issues regarding contract compliance are not so black and white, however, especially when a statement of work sets forth relatively few procedural regulations and focuses instead on objectives to be accomplished.

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 3 of 42 PageID #: 16518

MARLOWE_0007521

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Determining how well, and to what extent, such objectives have been accomplished often requires subjective judgments. If guidelines are available for measuring the extent to which objectives are accomplished, subjectivity is reduced or, at least, bounded.

Other than the quality assurance plan the monitors created, the Bureau had not developed guidelines for monitors to follow. Monitors therefore lacked standards to ensure consistency in their judgments, from one monitor to another and from one time period to another. Lacking formally established standards and guidelines, there was no body of operating procedures that could be relied upon for training purposes. Monitors had no peers in the Bureau who could be consulted. It was not until April 2000 that the Bureau undertook its first program review of the contract oversight function— essentially its own internal quality control program. It was unable to do so before that time because a set of written standards for such reviews was not available until December 1999.

Following a three-day on-site review by a 23-member review team in April 2000, the team concluded:

> [One team member] stated that he believes that oversight of the Taft contract by BOP on site staff is pretty good. [Another member] expressed concern with the number of deductions taking place with regard to sentence computations. He feels that these deductions are over relatively minor issues and that they have caused an adversarial relationship to develop between BOP and Wackenhut staff. [He] also pointed out that with the start up of Taft, the staff assigned to provide oversight did not have contract oversight experience and that much of how to monitor this contract has been learned along the way.

> [One of the contract monitors/administrators] pointed out that the staff have had what he felt is little or no guidance from the start of this project in terms of how to monitor the contract. He also pointed out that Taft was to be a pilot project. He also pointed out that they had not done an operational review. Program Review Guidelines were just published December 10, 1999.

> [Two other members of the review team] expressed concerns similar to the [Western Regional Office] staff. Deductions appear to be frequent and for relatively minor infractions; over and above what we hold BOP staff accountable. Basically, they would like to know if our approach to taking deductions and granting award fees is sound and effective? Both expressed that communication between the contractor and the oversight staff is a concern; it has been adversarial in the past. They also wanted us to look at whether adequate oversight training has been provided to BOP on-site staff.[73]

## The Bureau Standardizes Monitoring Procedures in 2002

To bring more consistency to the monitoring process, the Bureau standardized its contract monitoring procedures in August of 2002. This changed somewhat the procedures for assessing and rating performance, so this change in described in some detail here before turning to the question of how GEO's performance was evaluated by the Bureau.

---

[73]    Program Review Division, Federal Bureau of Prisons, "Summary of Indicators," undated.

MARLOWE_0007522

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The lack of consistency and uniformity in monitoring became especially apparent in 2002 as the Bureau had expanded its contracting with private firms to hold increasing numbers of federal prisoners in other facilities. The Bureau had employed the statement of work in the Taft facility contract in its subsequent contracts, so it was able to create a single auditing instrument and Quality Assurance Plan for all these contract facilities. As with the quality assurance program developed by the Taft monitors, this standardized plan incorporated the contracts' common statements of work; professional standards that are referenced in the contracts, including standards established by the American Correctional Association (ACA), the Joint Commission on the Accreditation of Healthcare Organizations (JCAHO), and the Code of Federal Regulations, among others; applicable Bureau policy; and any other requirements specified in the contracts.[74] The relative value assigned to the contractor's functional responsibilities for the purposes of determining deductions to award fees and the process for assessing those deductions (see Table 3.1) also remained the same.

In addition to standardizing the auditing standards, the Bureau created a Contract Facility Monitoring (CFM) team, which now operates out of the Bureau's central office and is responsible for reviewing "technical" performance (contract compliance) at all contract facilities. This is modeled after the Bureau's program review teams that provide quality assurance for all federal prisons. Program reviews of government-operated facilities are conducted every two years and are designed to assess a facility's compliance with the Bureau's rules, regulations, policies, and procedures. In contrast, the CFM team reviews have been more frequent and are somewhat less comprehensive than the program reviews. Like the program review function, the CFM aims to identify any operational deficiencies and indicate required remedies. Unlike program review, however, it seeks to assess compliance with the contracts and incorporated standards (the CFM's work is therefore structured by the Quality Assurance Plan for these contract facilities). The organization of the CFM also adopted the staffing model used for program review teams. That is, the team includes one "discipline expert" for each functional areas of service to be examined. This may have strengthened contract monitoring at Taft, because the smaller monitoring staff that had worked at Taft until then lacked the same degree of specialization in all areas that the CFM brings. The establishment of the CFM team did not change the importance of the contractor's own Quality Control Program, which is required by contract to identify deficiencies in operations and to monitor remediation efforts.

The creation of the CFM did not displace the role of the on-site monitors. CFM reviews are structured tightly, and do not go beyond established audit steps. On-site monitors are not bound by such restrictions and have a more general range of performance to review. Moreover, the CFM reviews take place during short periods of time, while the monitors report on activities throughout the year. Monitors still develop the semi-annual summary reports of the contractor's performance, which incorporate findings of the CFM review teams with their own observations.

The first CFM team review took place at the Taft facility in December 2002, which covered the evaluation period between August 2002 and March 2003. The second took place in May 2003, and the third review was conducted in November 2003, examining performance during the evaluation period that ran from October 1, 2003 through the end of March, 2004.

---

[74] Bureau of Prisons, "Contract Facility Quality Assurance Plan," February 5, 2004.

MARLOWE_0007523

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Changes in the Performance Assessment Process in 2002**

When the Bureau overhauled its contract monitoring procedures, it also simplified procedures for measuring performance, which took effect for the review period ending August, 2002. These were redesigned to minimize the necessity of making subjective rankings on too fine a scale. The on-site contract monitors had been measuring performance in each of the nineteen service areas along three different dimensions (the quality of the work, the contractor's "responsiveness," and the sufficiency of the contractor's own quality control management). The new assessment procedure still addresses these three dimensions but now requires the on-site monitors to provide one combined score for performance in each service area. The number of service areas to be assessed was also reduced from nineteen to twelve (some areas were collapsed into a single one). Moreover, the Bureau changed the guidelines for how these individual assessments are to be translated into points, which results in determining the award fee. Under the old system (Table 3.1), there were three rating levels indicating performance above and beyond contractual requirements, and the adjectives that were used to distinguish these three levels were somewhat ambiguous. In the revised system (Table 3.3), there are only two such levels and the definitions of these levels are clearer. One result of this was to raise the ceiling on the maximum possible award fees for performance rated as "good." Under the older rules, "good" performance warranted an award up to 39 percent of the maximum possible award; the revised rules raised this to 49 percent.

**The Shift from "We Versus They" to "Partnership"**

During the period studied here, a change occurred in the relationship between the Bureau's on-site monitors and GEO staff. As discussed above, these monitors were first sent to Taft to manage the facility for the Bureau and were then directed to stay on as contract monitors after Congress determined that the prison was to be operated by a private firm. This was not the job for which they had been trained, nor the job that they sought as they worked their way up the career ladder in the Bureau. GEO's difficulties in organizing its operations at the facility, especially during the early years, were difficult for the monitors to watch, especially when they had hoped to be managing rather than monitoring.[75] GEO staff bonuses depended upon the firm's winning award bonuses for performance, and this added to tension between staff and monitors.

By 2003, the relationship began to shift, in part because the Bureau had chosen a path that involved a substantial amount of contracting for imprisonment services. Indeed, it had grown into the largest purchaser of beds in privately owned or operated facilities. The Bureau organized a two-day meeting held in August, 2003 with Bureau officers—including contract administrators and monitors, among others—and GEO managers to forge a new relationship. The aim was to change the model of the relationship into a "partnership." Partnership models of contracting have long been common in construction contracting, even in the Bureau, but this was a new vision for the Taft contract. A good description of this model comes from the U.S. Army Corps of Engineers:

> Partnering is the creation of an owner-contractor relationship that promotes achievement of mutually beneficial goals. It involves an agreement in principle to share the risks involved in completing the project, and to establish and promote a nurturing partnership environment… Partnering seeks to create a new cooperative attitude in completing government contracts. To

---

[75] This was communicated to Douglas McDonald in interviews with monitors.

MARLOWE_0007524

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

create this attitude, each party must seek to understand the goals, objectives, and needs of the other—their win situation—and seek ways that these objectives can overlap.[76]

Teambuilding workshops were held, participants gave voice to their concerns, and activities were designed to instill a sense of working together to accomplish mutually held goals rather than against each other.[77] At the end of the meeting, parties signed an agreement to pursue a number of common goals, which included obvious ones such as "maintaining a safe, secure and well-run institution" and "ensuring contract compliance." More significant were other goals that were designed to change the we/they relationship: to maximize award fees, minimize deductions, and resolve issues at the lowest level. Issues are to be communicated openly, procedures for resolving difficulties will be discussed and agreed upon, rather than relying first upon formalized written notifications and responses. According to those interviewed in the Bureau and at GEO, this meeting and the other changes in monitoring procedures have been successful in shifting the tone and practice of how both organizations work together.

## Has GEO Complied with the Contract?

During the first five years of the contract examined here it appears from several indicators that GEO generally performed at the Taft facility as expected and as contractually obliged. The Bureau exercised its option to renew the contract beyond the base period, and it has continued to exercise the option in each of the subsequent years as well (although some Bureau officials disagree with this interpretation that renewal indicated satisfaction with contractor's performance).[78] On-site monitors have rated GEO's overall performance during most of this period as "good." During each of the semi-annual review periods since the beginning of the contract, through March, 2004, GEO has been awarded bonus payments for its performance above and beyond strict compliance with the contract.

---

[76] Lester Edelman (Chief Counsel, U.S. Army Corps of Engineers) et al., *Partnering: Alternative Dispute Resolution Series,* Pamphlet 4 (December 1991), IWR Pamphlet 91-ADR-P-4, pp 1–2.

[77] Partnering Consultants International, "Teambuilding Workshops for BOP & Wackenhut Privatization Contracts," 6–7 August, 2003 (Phoenix, AZ).

[78] A panel of Bureau officials who reviewed an earlier draft of this report argued that we "assign greater significance about GEP performance at TCI than is warranted to the fact that the BOP renewed the contract in the option years. They do not acknowledge the simple fact that the BOP based this decision in large part upon the need for the beds to house inmates." Memorandum entitled, "Review of 'Contracting for Imprisonment in the Federal Prison System.'" (Bureau of Prisons, dated July 11, 2005).

---

MARLOWE_0007525

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 3.3**

**Revised Performance Evaluation Rating Used to Determine Award Fees (As Of August 2002)**

| Rating | Performance Description | Range of Points |
|---|---|---|
| Superior | The program is performing all of its function in an exceptional manner and has excellent internal quality controls. Deficiencies are infrequent in number and not serious in nature. Program performance exceeds expectations and demonstrates initiative and exceptional effort. | 50 – 100% |
| Good | The program is performing all of its vital functions and there are few deficient procedures within any function. Internal quality controls are such that there are limited procedural deficiencies. Overall performance is above acceptable level | 1 – 49% |
| Acceptable | This is the "baseline" for the rating system. The vital functions of the discipline are being adequately performed. Although numerous deficiencies may exist, they do not detract from the acceptable accomplishment of the vital functions. Internal quality controls are such that there are no performance breakdowns that would keep the program from continuing to accomplish its mission. | 0 % |
| Deficient | One or more vital functions of the program is not being performed at an acceptable level. Internal quality controls are weak, thus allowing for serious deficiencies in one or more program areas. | 0% |
| At Risk | The program is impaired to the point that it is not presently accomplishing its overall mission. Internal quality controls are not sufficient to reasonably assure that acceptable performance can be expected in the future. | 0% |

*Source:* Taft Correctional Institution Contract, Section J, Attachment F.

**Summary Assessments of GEO's Performance**

For each six month period, the Bureau's Fee Determination Official and the Performance Evaluation Board considered all aspects of the contractor's performance, including the monitors' and CFM's reports, and arrived at an overall rating of performance. To be eligible for an award, this overall performance had to be rated "good" or better. For twelve of the first thirteen review periods, from 1997 through the first half of FY2004, the government considered GEO's performance to be "good," meaning above and beyond simple compliance with contractual requirements (Figure 3.2). During one period ending in February 2001, GEO was rated as complying with contractual requirements, but no better. (In Figure 3.2 and all similar ones that follow, the labeled ratings categories use the original terminology used during the first nine periods, even though the words used to describe these categories changed in August, 2002. The principal difference is that after August, 2002, there was only one category higher than "good" ("superior"), whereas there were two categories before. The

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

criteria used to rank performance in the "good" category and the three below that remained essentially the same throughout the thirteen rating periods examined here.)

---

**Figure 3.2**

**The Performance Evaluation Board's Assessment of GEO's Overall Performance During the First Six and One-Half Years (August 1997–February 2004)**



---

*Note:*   Ratings are described according to categories used before August, 2002 and new rating categories following that date.  After August, 2002, the highest rating was "superior."

*Source:*  Bureau of Prisons Semi-annual Contract Monitoring Summaries.

---

**Awards for Good Performance**

Because of these performance ratings, GEO received award bonuses for each of the thirteen review periods, through March, 2004 (Figure 3.3).  This includes the review period ending February 2001 in which GEO's *overall* performance was considered only "fair" and therefore not deserving of an award.  Even though the Performance Evaluation Board found that performance in most areas was only "fair," the board noted that performance in three areas was "good" and thereby awarded GEO $125,000.

For the first period (August 1997–February 1998), the BOP awarded $58,257 to GEO.  This entire bonus award was for GEO's efforts in preparing the facility to receive inmates, which took four of the six months in that period.  The award fee almost tripled in the subsequent period, to $159,440.  The largest award was for $428,128 in the twelfth review period.  During these six and a half years, the Bureau has awarded GEO a total of $3.3 million.  Throughout, the award amounts have fallen far short of the maximum eligible awards for all review periods (Figure 3.3).  Because performance

---

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 9 of 42 PageID #: 16524

MARLOWE_0007527

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

ratings have fallen in the "good" category in all but one period, the maximum award fee possible has been 39 percent of the total award pool.

---

**Figure 3.3**

**Award Fees:  Comparison of Amounts Possible and Amounts Awarded
(August 1997 – March 2004)**



*Source*:  Computed from data provided by Bureau of Prisons.

---

In principle, one might argue that awards represent a good single, distilled indicator of overall performance.  However, the award process yields a somewhat more ambiguous result.  A review of the material used by the Performance Evaluation Board shows that the procedures for assessing performance and translating these into award amounts had been evolving throughout these first years.  Bureau officials involved in making these determinations also showed an absence of complete agreement about what constituted performance above and beyond required compliance.  Some stated that the job of the contractor was to do good work and that it shouldn't get rewarded for doing good work, just as managers of government-operated prisons cannot get extra compensation for excellent work.  Because the standards that guided the Bureau's process of assigning dollar values to performance was not uniformly anchored throughout the first several years, a more direct indicator of how the monitors judged the contractor's performance can be seen in their written assessments.

**Deductions**

By the close of the three-year base period of the contract (ending in FY2000), the Bureau had imposed a total of $648,658 in deductions of payments to the GEO for failures to provide required services.  Most of these deductions occurred early in the contract.  For example, nearly one-third of these deductions ($191,120) as of FY99 were imposed because GEO did not fill staff positions as quickly as required to in the earliest months of operation.  Other deductions, for a total of $165,000 as of FY1999, were imposed for failure to compute prisoners' release dates accurately.  This is a technically complicated task because the prisoners' files do not always contain all the information

---

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 10 of 42 PageID #: 16525

MARLOWE_0007528

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

that is needed to determine credits for pretrial detention, time spent in jail while held on warrants, and the like. GEO staff responsible for this work had no prior experience in the Bureau and had to develop these skills on the job. The contractor was also docked $92,000 for failing to provide adequate security, which was signaled by an inmate escaping from the facility by walking out of the visiting room. (When the facility opened, GEO permitted inmates considerable latitude in choice of clothing. This made it difficult to distinguish visitors from inmates, thereby creating the possibility for an inmate to walk out the visiting area through the prison's front door.) There have been other walk-aways from the minimum-security camp, which lacks a fence, and several of these persons were apprehended. In December, 2003, an inmate managed to get outside the prison's fence by crawling into a trash compactor; he was apprehended in the nearby community that afternoon.

Translating deficiencies into dollar amounts has been problematic. Bureau officials stated that it was often very difficult to assign a dollar value to services not delivered. What, for example, is the appropriate deduction for the contractor failing to notify a victim/witness when a prisoner (that the witness testified against) is released? Is this worth a $5,000 or a $50,000 deduction? The Bureau did not undertake an economic impact analysis of such failings and relied upon reasoned judgments—but reasonable people did not necessarily agree upon what constituted an appropriate deduction.

No doubt, close to $650,000 deducted from the fee during the three base contract years is a substantial penalty to the contractor, whether or not it is intended to be such by the Bureau. However, the total fee for services exceeded $28 million a year, so over half a million dollars out of $86 million is a relatively small share—less than one percent.

Deductions in subsequent fiscal years (FY2001 and FY2002) were significantly less. In FY2001, BOP imposed a total of $257,500 of deductions and imposed none in FY2002. In sum, over a five-year period, the BOP deducted $900,000 out of approximately $147 million.[79]

**Performance Ratings of Different Services**

The contract monitors found that GEO performed some of the required services better than others. During the five year period ending August 2002 (when the Bureau's monitoring procedures were reorganized), contract monitors rated performance in nineteen functional areas of service. As described above, each of these different operational activities were rated according to:

- the quality of the work in each category,
- the contractor's responsiveness to concerns raised by the monitors and the contract administrators, and
- GEO's quality control management.

To facilitate comparison of monitors' ratings of different areas of service, we assigned a number from 0 to 5 for each rating (0 = unsatisfactory, 1 = marginal, 2 = fair, 3 = good, 4 = excellent, and 5 = outstanding).[80] These ratings for each type of service were then averaged across nine of the ten semi-annual periods for each of nineteen areas of service (Table 3.4).

---

[79] Information about any deductions imposed subsequent to FY 2002 was not obtained, as the analysis of expenditures for the Taft Correctional Institution was limited to FY 98 through 2002.

[80] All review periods were included except February 2000–August 2000, for which data were missing.

---

MARLOWE_0007529

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Comparing these average ratings with the overall ratings by the Performance Evaluation Board and the award fees during these five years suggests a contradiction, because the average ratings were nearly all below 3.0 (indicating "good" performance). Ratings must be "good" or better to earn award fees. While it is true that the *average* score for all nineteen areas of service may have fallen below the threshold for deserving an award fee, there were a number of areas during most semi-annual periods that were given "good" or "excellent" ratings. The Performance Evaluation Board did not calculate the amounts of the award fees based upon its average ratings or upon averages of the monitors' ratings. Rather, it computed the amounts based upon the *number* of specific areas of service for which performance was rated as "good" or better. Consequently, GEO was given a pro-rated portion of the award fee in each of the review periods, and not the full 39 percent of the maximum award fee that have been awarded if all areas of service had been scored "good."

For the five-year period as a whole, three areas of facility operation were rated between "good" and "excellent." Facilities administration earned the highest average ratings throughout this period, followed by employee development, health care services, computer services commissary/inmate funds operation, safety, and laundry.

In contrast, TCI's overall performance for this five-year period in correctional programs was rated between "marginal" and "fair." Performance was found to be inadequate during the first year and a half of operations but was seen to improve after that. Performance in the records office was considered "fair." The low rating given to the records office largely reflects the Bureau's dissatisfaction with GEO's work on prisoners' sentence calculation and computation of the prisoners' expected release dates. (This is discussed in greater detail below.)

In all remaining areas of service, TCI's performance was rated between "fair" and "good." In general, GEO's responsiveness to the Bureau's concerns was rated more highly than the quality of its work and its internal quality control (Table 3.4). For the entire period between August 1997 and August 2002, the average rating for "responsiveness" was 2.8, or almost "good." Quality of work throughout this period was ranked slightly lower, on average (2.4), while GEO's quality control was rated the weakest (2.3).

MARLOWE_0007530

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 3.4**

**Monitors' Ratings of Services Performed at Taft Correctional Institution, August 1997– August 2002 (Average of Ratings in All Semi-Annual Periods)**

| Type Service | Combined Average | Quality of Work | Responsiveness | Management of QCP |
|---|---|---|---|---|
| Facilities administration | 3.4 | 3.6 | 3.4 | 3.2 |
| Health care services | 3.1 | 3.1 | 3.4 | 2.7 |
| Employee development | 3.0 | 2.8 | 3.3 | 3.1 |
| Computer services | 2.9 | 2.9 | 3.1 | 2.7 |
| Commissary/inmate funds | 2.9 | 2.6 | 3.6 | 2.4 |
| Safety | 2.9 | 2.9 | 3.0 | 2.7 |
| Laundry | 2.9 | 2.9 | 3.4 | 2.5 |
| Inmate tel. service | 2.7 | 2.5 | 3.4 | 2.1 |
| Correctional services (security functions) | 2.7 | 2.4 | 3.0 | 2.7 |
| Educational services | 2.4 | 2.4 | 2.6 | 2.3 |
| Food service | 2.4 | 2.2 | 2.7 | 2.4 |
| Administration | 2.3 | 2.4 | 2.6 | 2.0 |
| Psychology services | 2.2 | 2.3 | 2.4 | 1.9 |
| H.R. management | 2.1 | 2.1 | 2.0 | 2.1 |
| Receiving & discharge | 2.3 | 2.3 | 2.3 | 2.4 |
| Mail room | 2.1 | 2.1 | 2.3 | 2.0 |
| Religious services | 2.1 | 2.2 | 2.3 | 1.8 |
| Record office | 2.0 | 1.9 | 2.2 | 1.8 |
| Correctional programs | 1.5 | 1.3 | 2.0 | 1.2 |
| **Average ratings for all periods, all services** | **2.5** | **2.4** | **2.8** | **2.3** |

*Notes:* Five performance levels, from "unsatisfactory" to "outstanding," in each category of service in each of ten semi-annual rating periods were scored from 0.0 to 5.0. Unsatisfactory=0, marginal=1, fair=2, good=3, excellent=4, outstanding=5.

*Source:* Computed from six-month summary reports, written by Bureau of Prisons' monitors at Taft Correctional Institution.

Average ratings for the tenth through thirteenth semi-annual review periods, which fell between August 19, 2002 and March, 2004, are shown separately in Table 3.5. The process for rating performance had changed, as described above. The contractor's performance in each of these fewer areas of service were rated by a single measure rather than according to three different dimensions of quality, unlike earlier practice.

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 13 of 42 PageID #: 16528

MARLOWE_0007531

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 3.5**

**Monitors' Ratings of Services Performed at Taft Correctional Institution, August 2002—March 2004 (Average of Ratings for All Semi-Annual Periods)**

| Type Service | All-Services Average |
|---|---|
| Inmate systems | 3.7 |
| Inmate service | 3.7 |
| Education and recreation | 3.7 |
| Human resources | 3.0 |
| Religious services | 3.0 |
| Computer security and information systems | 2.7 |
| Correctional services  (security functions) | 2.7 |
| Administration | 2.5 |
| Safety & environmental health/facilities | 2.3 |
| Correctional programs | 2.3 |
| Food service | 2.0 |
| Health services | 1.7 |
| **Average ratings for all periods, all services** | **2.8** |

*Notes:*   Five performance levels, from "unsatisfactory" to "superior" in each category of service in  each of three semi-annual rating periods were scored from 0.0 to 5.0.   At risk=0, deficient=1, acceptable=2, good=3, superior=4.

*Source:*  Computed from Oversight Facility Summary Reports,  written by Bureau of Prisons' monitors at Taft Correctional Institution.

## Trends in Performance During the First Six and One-Half Years

These two snapshots, summarizing the five-year period and, separately, the subsequent eighteen month period, obscure the variation from one review period to another during this six and one half years.  To represent these trends, averages in rated quality of work were computed for all service areas during each period.  Averages were similarly computed for the ratings of contractor's responsiveness and, separately, for the contractor's management of its quality control processes. Trends in the monitors' ratings of these three dimensions of GEO's performance during the first five years is shown in Figure 3.4.  The detailed ratings of specific services during the February-August, 2000 period were not available and could not be included.  (The Performance Evaluation Board's memo summarized overall performance as "good" during this period, however.)  After August 2002, monitors stopped distinguishing three different dimensions of performance and provided an overall rating, which is shown in the figure for the last three review periods.

In general, GEO's responsiveness had been rated most highly of the three dimensions of performance throughout the first five years. (As defined above, this includes the timeliness, effectiveness and appropriateness of responses to routine and unusual events, to changing service requirements, and to the Bureau's concerns.)  Quality control had generally been rated as the weakest of the three.  Trends

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 14 of 42 PageID #: 16529

MARLOWE_0007532

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

in several specific areas of service are discussed in more detail below, as well as ratings of GEO's quality control procedures, which cut across all areas of the contractor's services.

**Figure 3.4**

**Monitors' Ratings of Performance Quality, Responsiveness, and Quality Control, Averaged for All Types of Services (August 1997 – 2002)**



*Sources:* Bureau of Prisons, Performance Monitoring Reports, Six-Month Summaries.

**Start-Up Difficulties**

All parties to the contract—GEO's managers, the Bureau's monitors, contract officers, and award fee officers—agree that the first several months of operating the prison were difficult and that performance in a number of areas suffered. (The four months before the inmates began to be transferred to the prison went well.) This was GEO's largest prison contract to date, and its first prison in the federal system. Had the Bureau opened this facility, it would have first transferred all required senior staff and about half of all others from other federal prisons; the remaining staff would have been hired locally. This cohort of experienced Bureau staff would have facilitated a relatively seamless integration of this new prison into the federal system, with its distinctive rules, regulations, and procedures. GEO lacked this critical resource. Its experienced prison hands were recruited mostly from state correctional agencies, which operated quite differently than the federal Bureau of Prisons. GEO also committed itself to hiring a large number of people locally—about ninety percent of its staff—with the result that it began with a sizable proportion of "green" correctional staff. This decision was consistent in large measure with Congress's intent of locating this new prison in this particular region to create jobs. Although the contract required that GEO conform to federal prison procedures, rules and regulations, management and its new staff experienced a long learning curve.

Because Congress had established this as a test of privatization within the federal prison system, the Bureau elected not to provide assistance to GEO's managers and staff. This amounted to creating a

MARLOWE_0007533

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

"sink or swim" situation for GEO. The monitors were the only federal prison staff who knew federal procedures well, but they sought to maintain their stance as monitors rather than active supervisors or trainers. Monitors expressed unhappiness in watching GEO's staff create new systems that did not always work well and not being able to jump in and direct staff to set things up the "Bureau way." This was probably especially difficult because these persons had been sent initially to Taft with the assignment of managing a new federal facility, and then had their jobs downgraded to be contract monitors. Even when performance may not have been considered technically out of compliance with the contract (because the contract gave GEO latitude in determining how it constituted its operations), procedures were not always consistent with the Bureau's procedures and with what the monitors expected. Into the second year of the contract, GEO began hiring a number of retired Bureau staff to manage the facility, including a former Bureau warden, which speeded the process of creating systems that were more consistent with the Bureau's requirements. Those in the Bureau who designed the contract for the Taft facility sought to give private firms discretion in how services would be organized, but to fit into the federal prison system, GEO had to "bureau-ize" its operations at this facility, as one GEO officer put it.

GEO's overall performance during the first five years was rated lowest between August 2000 and February 2001 (Figure 3.2), when the Performance Evaluation Board rated it as only "fair." The Board determined that GEO was responsive to contract requirements but that performance was deficient in a number of areas. Monitors and the Board reported that the GEO was not complying with proper procedures for clearing new employees, and that staffing levels in education and health services were low, "which may impact their performance."[81] Monitors also cited "repeat discrepancies" in victim witness notification procedures, inmates' Financial Responsibility Program documentation, central inmate monitoring procedures, inmate work and performance pay, sex offender notification, among others. GEO would not have received any award fee for this period had the Bureau not singled out three areas of performance that were above and beyond contractual requirements and thereby deserving of some award fee ($125,000). GEO's response to these findings was to upgrade its performance so that monitors gave it higher ratings in the subsequent period, ending August, 2001 (Figure 3.4).

### Contract Facility Monitor (CFM) Team Reviews

The first CFM team review at the Taft facility in December, 2002 identified one significant "finding" and 51 specific deficiencies. The significant deficiency was in the "lack of adequate monitoring and controls in the storage, issuance, proper identification, usage, and purchase of flammable, toxic, and caustic chemicals." The monitors pointed out that this deficiency contributed to a serious inmate injury that occurred during the week of the review. [82] Discovery of a deficiency in a particular functional area did not result in a more general finding of unacceptable performance, however. Indeed, of the twelve functional areas that were reviewed by the CFM team, four received a "good" rating (all had either none or only one deficiency noted); seven received "acceptable" ratings, despite being cited for various specific deficiencies; and one area (Safety and Environmental Health/Facilities) was declared to be deficient (with over a dozen deficiencies cited, in addition to the significant finding). Many of the deficiencies cited in Safety and Environmental Health/Facilities were evidence for the significant finding and were related to not performing weekly fire safety and

---

[81]   Conrad Lopez, *Memorandum for Dyan Griffin, Fee Determination Official* (April 2, 2001), p. 2.

[82]   Contract Facility Monitoring Final Report: December 2–5, 2002.

Case 3:16-cv-02267      Document 365-9      Filed 11/20/20      Page 16 of 42 PageID #: 16531

MARLOWE_0007534

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

sanitation inspections, not training all inmates on use of protective gear, and problems with the Fire Safety Emergency Response plan and documentation of fire safety procedures.[83] The CFM returned in April 2002 to review the "significant finding" and determined that it had been remedied satisfactorily.

The CFM team conducted its second review in May 2003 and identified one significant finding and 33 deficiencies. The significant finding involved the "lack of clinical oversight in the management of patients with serious acute and/or chronic medical conditions [that has] led to a level of clinical care not commensurate with recognized medical standards," placing patients at risk for "increased morbidity and mortality."[84] Of the 33 deficiencies, five were repeats from the previous monitoring visit. Two of the recurring deficiencies were related to Food Service, i.e., potentially hazardous food not being cooled according to code and equipment used to prepare food not being cleaned or sanitized every 24 hours to prevent contamination. The other three recurring deficiencies were in Health Services and concerned inmates in chronic care clinics not always receiving follow-up monitoring, PPD positive inmates being improperly classified, and registered and licensed vocational nurses working outside their scope of practice.[85] Of the twelve functional areas that were reviewed by the CFM team, five received a "superior" rating (all had either none or only one deficiency noted); two received a "good" rating, which included the previously deficient Safety and Environmental Health/Facilities; four received an "acceptable" rating (despite having multiple deficiencies); and one area (Health Services) was declared to be deficient (with over a dozen deficiencies cited). In addition to the significant finding and the recurring deficiencies cited above, other deficiencies included medical records of prisoners in transit not being prepared in layman's terms, problems with infirmary care services, and mental health treatment plans not being developed for patients on psychotropic medication, among others.[86]

The CFM team conducted its third review in November 2003 and identified 17 deficiencies, and no serious findings. Of the 17 deficiencies, one was a repeat from the previous monitoring visit involving medical records of prisoners in transit not being prepared in layman's terms.[87] Of the twelve functional areas that were reviewed by the CFM team, five received a "superior" rating (all had no deficiency noted); and the remaining six received a rating of "good," including the previously deficient Health Services.[88]

Despite the positive review, the on-site monitors downgraded three of the CFM team's ratings in their six-month summary report. The monitors downgraded the Correctional Services performance from "good" to "acceptable," because of an inmate escape after the CFM's review that was attributed to weak inmate accountability and to security deficiencies, and for not following corrective action related to the escape, among other cited deficiencies.[89] The monitors also disputed the Food Service

---

[83]  Ibid.

[84]  Contract Facility Monitoring Final Report: May 12–16, 2003.

[85]  Ibid.

[86]  Ibid.

[87]  Contract Facility Monitoring Final Report: November 3–6, 2003.

[88]  Reviewers only evaluated 11 areas, leaving out Administration.

[89]  Oversight Facility Summary, Period: October 1, 2003–March 31, 2004.

Case 3:16-cv-02267     Document 365-9     Filed 11/20/20     Page 17 of 42 PageID #: 16532

MARLOWE_0007535

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

rating, also downgrading it to "acceptable," because of deficiencies in the area of sanitation and inmate complaints that Food Service ran out of scheduled menu items and had to substitute with other foods.[90] Lastly, the on-site monitors disputed the CFM team's rating of Health Services as "good," feeling that Health Services did not deserve a rating higher than "acceptable." The monitors stated that the CFM review did not "encompass a clinical assessment of the department" and that a clinical follow-up "indicated that issues regarding delivery of quality health care continues to exist."[91] The monitors agreed with all other performance assessments.

**Table 3.6**

**Monitors' Ratings of Services Performed at Taft Correctional Institution, August 2002 – March 2004**

| Type Service | Combined Average | Period 11 | Period 12 | Period 13 |
|---|---|---|---|---|
| Inmate Systems | 3.7 | 3 | 4 | 4 |
| Education and Recreation Programs | 3.7 | 3 | 4 | 4 |
| Inmate Services | 3.7 | 3 | 4 | 4 |
| Human Resources | 3.0 | 2 | 4 | 3 |
| Religious Services | 3.0 | 3 | 2 | 4 |
| Correctional Services | 2.7 | 2 | 4 | 2 |
| Computer Security and Information Systems | 2.7 | 2 | 2 | 4 |
| Administration | 2.5 | 2 | 3 | |
| Correctional Programs | 2.3 | 2 | 2 | 3 |
| Safety and Environmental Health/Facilities | 2.3 | 1 | 3 | 3 |
| Food Service | 2.0 | 2 | 2 | 2 |
| Health Services | 1.7 | 2 | 1 | 2 |
| **Average ratings for all periods, all services** | **2.8** | **2.3** | **2.9** | **3.2** |

*Notes*: 0=at risk; 1=deficient; 2=acceptable; 3= good; 4=superior.

*Source*: Computed from six-month summary reports, written by Bureau of Prisons' Contract Facility Monitoring (CFM) Team.

## Performance Trends in Selected Areas of Service

A more detailed view of GEO's performance (as reported by Bureau officials) is afforded by examining the ratings of each type of service delivered at the Taft facility. The nineteen service areas that were reviewed by contract monitors during the first five years were demarcated by the monitors in the quality assurance plan they created, which was derived from the contract's statement of work and from a summary of the performance requirements that was attached to the statement of work.[92]

---

[90]   Ibid.

[91]   Ibid.

[92]   Contract between Bureau of Prisons and Wackenhut Corrections Corporation, effective July 30, 1997; "Statement of Work," and Section J, Attachment C, "Performance Requirements Summary Table."

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 18 of 42 PageID #: 16533

MARLOWE_0007536

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Most of these service areas corresponded with performance objectives ('vital functions') in the Bureau's strategic management and quality control system for its own facilities.

**Administration**

During the first five years, monitors rated GEO for its performance in administering the prison. The 1998 quality assurance plan defined this performance objective broadly: "The contractor shall ensure that the institution is operating in a manner consistent with the mission of the BOP, as required by contract."[93] A variety of more specific objectives were established, including compliance with the Services Contract Act, public posting of employment notices, availability of payroll records, compliance with subcontracting requirements of the FAR, and even extremely specific objectives such as "is the contractor submitting paper documents that are printed/copied double sided in recycled paper, as encouraged by FAR?"

When the Bureau standardized its contract facilities monitoring system in 2002, administration was more narrowly identified as the operation of the contractor's quality control program. Prior to that, as discussed above, quality control had been assessed as an aspect of performance in *all* nineteen different service areas.

GEO's administration of the prison was not rated in some review periods, and ratings data were not available during one. During the nine periods for which ratings of performance were available, GEO's administration was rated as being in compliance with contractual requirements in all semi-annual periods except for one—the period between August 1998 and February, 1999, when it was rated as "unsatisfactory." During this period, GEO was cited for not having an adequate quality control program and for repeated violations of the Privacy Act of 1974 and the Freedom of Information Act. The company argued that its files were not subject to disclosure under the FOIA and that it was willfully not in compliance, whereas the Bureau asserted that BOP records maintained by GEO (inmate central files and medical records) were legally subject to FOIA requests. Moreover, monitors reported that GEO was responding to requests for information about inmates without having always received the inmates' consent beforehand.[94] These issues were worked out and GEO's performance in the administration domain during the following period was rated as "good."

---

[93]    Bureau of Prisons, *Quality Assurance Plan,* section 1.0.

[94]    Bureau of Prisons, Performance Monitor Report (August 20,1998-October 19, 1999).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.5**

**Prison Administration:  Contract Monitors' Assessment of GEO's Performance (August 1997–March 2004)**



*Note:*    This service area was not rated in all review periods.

*Source:*  Bureau of Prisons Semi-annual Contract Monitoring Summaries.

Through the first five years, when monitors distinguished between three dimensions of performance in each functional area of service, GEO was rated most highly for the "responsiveness" of the administration, slightly less highly for the quality of its administrative work, and lowest for quality control (Table 3.3).

**Quality Control**

Management of quality control was not defined as a specific area of service in the Bureau's 1998 quality assurance plan (QCP) and in the monitoring system.  Rather, as described above, quality control was a dimension of performance used to evaluate all services.  In all service areas, Bureau monitors assessed the effectiveness of the QCP in identifying problems and the extent to which GEO initiated service improvements rather than doing so after the Bureau's monitors identified the problems.  In the reorganization of monitoring in 2002, quality control was defined as a sub-area within administration, rather than a dimension of performance to be scored for all areas.  For purposes of analysis, quality control  can be considered a discrete service.  Monitors' rating of quality control in all areas of rated services were averaged in each of the review period to provide a single measure of GEO's quality control during these periods.  For the three semi-annual review periods following the 2002 reorganization of contract monitoring, the Performance Evaluation Board's assessments of overall quality control performance were identified.  The results are shown in Figure 3.6.

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 20 of 42 PageID #: 16535

MARLOWE_0007538

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

During the first review period, GEO's quality control was rated as "fair," although quality control was considered relevant only during the last two months of the period, when the facility had begun to receive prisoners. (During the first four months, GEO was preparing the facility for prisoners, and the Bureau did not require that it have an operational quality control program.) During the second review period, GEO's QCP received "unsatisfactory" or "marginal" ratings in eleven of the nineteen departments. This is because GEO had not yet implemented quality controls throughout all aspects of its operations. A BOP monitor assessing education services during the second evaluation period wrote, "The contractor's QCP is non-existent. The contractor has submitted no reports demonstrating an effective use of their QCP."[95] Assessing the QCP in the Records Office, a BOP monitor wrote, "The contractor's Quality Control Program (QCP) appears to be no more than responding to inspection and non-conformance reports submitted by the BOP."[96] Commenting upon GEO's performance in the area of correctional programs, one BOP monitor wrote:

> The numerous and repetitive deficiencies identified during this evaluation period clearly indicate the absence of a Quality Control Program (QCP) and lack of oversight. Technical and management oversight of unit and case management staff (to ensure contract compliance with SOW requirements) [has] been non-existent. Deficiencies identified during this evaluation period, in addition to the contractor's unresponsiveness to reports issued by the Bureau of Prisons, is directly attributable to the lack of oversight. The contractor's Quality Control Program (QCP) is non-existent, and the contractor has submitted no reports demonstrating an effective use of their QCP.[97]

---

[95] Performance Monitor Report Six Month Summary, Period: February 20, 1998 to August 19, 1998.

[96] Ibid.

[97] Ibid.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.6**

**The Bureau's Assessment of GEO's Quality Control Systems
(August 1997–March 2004)**



*Notes*: Computed by averaging the ratings of quality control for all rates areas of service in each review period, prior to August, 2002. In three subsequent periods, Performance Evaluation Board's assessment of overall quality control are used here.

*Sources*: Bureau of Prisons' Six-Month Monitoring Summaries and memoranda for Performance Evaluation Board.

When departments received favorable ratings for quality control during the second evaluation period, BOP monitors commented that it was the efforts of those departments alone that earned the rating. Rating the correctional services department QCP as "good," a monitor wrote that, "Correctional Services continues to monitor their department with the perpetual audit system established by the Chief of Security. This method of quality control continues to be effective."[98] Giving the computer services department the same rating, a monitor wrote, "The computer services department is utilizing the self-assessment as their Quality Control Program (QCP). The department has submitted no report demonstrating the use of their QCP during this period."[99] Then, when a department's QCP was effective, it was reportedly due to the efforts of individual department heads, not a facility-wide quality control program.

During the first half of the second year of the contract, Bureau monitors rated the QCP much higher. Service areas that improved most noticeably were education services, health care services, receiving and discharge, mailroom, commissary/inmate funds, laundry, and inmate telephone services. Health care services improved the most—jumping from an "unsatisfactory" rating for the second review

[98]    Ibid.

[99]    Ibid.

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 22 of 42 PageID #: 16537

MARLOWE_0007540

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

period to an "excellent" rating for the third period. The Bureau monitor stated that during the second period, the QCP was non-existent in the health care services department.[100] However, during the third evaluation period, the monitor praised the QCP in this department and wrote, "The contractor's effective administration of their QCP directly attributes to their achieving contract compliance and JCAHO accreditation."[101]

However, quality control reportedly remained deficient in the administration, records office, correctional services, and corrections programs departments. The BOP monitor who assessed the correctional services department during this period noted that although the contractor had exercised its QCP, the administration of the plan in this department was ineffective. "It appears that supervisors are reluctant to identify and report deficiencies to their department head."[102] However, the monitor added that, "Once the deficiency is identified by the BOP or [GEO] staff, management is quick to respond with the action necessary to comply."[103] A Bureau monitor also noted that the correctional programs department's administration of the QCP also continued to be ineffective. The monitor stated that, "The contractor's failure to effectively administer their QCP directly attributes to deductions taken in correctional programs and to the contractor's inability to achieve contract compliance in correctional programs."[104]

GEO continued to develop its quality control procedures and in 1999 received its ISO 9002 registration.[105] This credential, issued by the International Organization for Standardization, certifies that the Taft Correctional Institution meets "international standards in the structure and implementation of its QCP." Registration audits are performed every two years to maintain the credential.[106] In this year, GEO also created the position of Assistant Warden for Quality Control and Contract Compliance.[107] During the second the third year of the contract, monitors continued to rate quality control as generally on par with other dimensions of performance (Figure 3.4).

Monitors assessed quality control as slipping during the August 2000–February 2001 period. In four departments (correctional programs, human resources, food service, and safety), performance was rated "marginal." Laundry, receiving and discharge, and employee development were rated "good" while the rest of the departments received the rating of only "fair." In the correctional programs department, it was noted that the contractor continued to focus on the same remedies that had already proven to be unsuccessful. In the comments for the human resources department and the safety departments, the auditor noted that the departments did not provide a QCP report for the entire first half of the reviewing period. In the food service department the QCP process was not completed during the rating period. In subsequent periods (February 2001–August 2002), GEO's quality control

---

[100] Performance Monitor Report Six-Month Summary, Period: February 20, 1998 to August 19, 1998.

[101] Performance Monitor Report Six-Month Summary, Period: August 20, 1998 to February 19, 1999.

[102] Ibid.

[103] Ibid.

[104] Ibid.

[105] Taft Correctional Institution Self Assessment Report, p. 5, August 25, 1999.

[106] Taft Correctional Institution Self Assessment Report, p. 13, February 26, 1999.

[107] Taft Correctional Institution Self-Assessment Report, p. 5, August 25, 1999.

---

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 23 of 42 PageID #: 16538

MARLOWE_0007541

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

was rated as having improved, on average, and was considered at the same level as other dimensions of service (Figure 3.4).

During the six months following the reorganization of the Bureau's monitoring procedures in August, 2002, monitors wrote that GEO's quality control program "continues to evolve into a positive management tool." "The Quality Control Program has finally reached the point where the contractor staff is comfortable with identifying areas within their own department which do not meet contractual requirements." But, they reported, the program is not yet "evolved enough to ensure [that] contractor staff self-identify all areas of concern." During this period, GEO staff had identified 113 deficiencies, but missed some that monitors and the CFM spotted.[108] Overall, however, monitors rated quality control during this period as being "good."

During the last review period examined here (October 2003 through March 2004), monitors continued to view GEO's quality control program as being "good," but with some persisting shortcomings. GEO revised its quality control plan in the fall of 2003, so that a team of GEO staff conduct performance audits in eighteen different functional areas of service, resulting in 118 different reports during one quality control cycle. The team is trained to identify deficiencies, to implement corrective action, and to create and implement internal controls to ensure continuing compliance. The monitors identified recurrences of identified and corrected deficiencies in some areas, which indicated slippage in the quality control program. Monitors attributed this to lack of training, high staff turnover, and the inability of the corrective actions to resolve the deficiencies.[109]

### Human Resource Management and Employee Development

In its 1998 quality assurance plan that was used during the first five years to evaluate GEO's performance, the performance objective for human resource management is to "review the contractor's staffing guidelines and procedures to determine if adequate staffing levels are being maintained. Also, verify that approvals are obtained."

GEO had specified in its proposal the staffing that it planned to use, and this staffing plan and staff levels became established as a contractual requirement. Monitors tracked staffing levels to be sure that they were within acceptable ranges. The Bureau's 1998 quality assurance plan also directed monitors' attention to other specific performance objectives. These included determining if the contractor met all personnel hiring requirements, that all requirements for investigating candidates were met, and that all other essential personnel requirements are met. The contractor's performance regarding employee training and career development was also evaluated separately as a distinct functional area of service. These human resources management tasks were considered by the Bureau to constitute 10 percent of the total value of the contract.

---

[108] Oversight Facility Summary Report, April 11, 2003.

[109] Oversight Facility Summary Report, April 6, 2004.

MARLOWE_0007542

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.7**

**Human Resources Management: Contract Monitors' Assessments of GEO's Performance (August 1997–March 2004)**



*Notes:* Data were missing for February–August 2000 period; ratings were not provided for the February–August 1998 period.

*Sources:* Bureau of Prisons Semi-annual Contract Monitoring Summaries and Oversight Facility Summary Reports.

GEO's performance in human resources management has been rated quite differently through the six a half years examined here. In period three, for example, monitors rated the work quality of this department as "excellent," a significant improvement from the first evaluation period where the department received a "fair" rating.[110] However, monitors gave human resources management a "marginal" rating for the fourth evaluation period. The Bureau issued a Non-Conformance Report to GEO for discrepancies found in the employee background checks. These included:

- lack of proof of employment for the previous five years;
- lack of verification of education;
- residences not checked by sources other than credit check;
- lack of source documents such as employment applications;
- lack of proof of citizenship;
- lack of personal interviews;

---

[110] The rating for the Human Resources Management department for the second evaluation period was not provided.

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 25 of 42 PageID #: 16540

MARLOWE_0007543

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- lack of proof of law enforcement checks over last five years; and not asking law enforcement questions.[111]

Bureau monitors also reported that the contractor was not meeting time requirements for processing background certifications. As of June 11, 1999, 114 background checks had exceeded the 180-day investigation time limit.[112] A rating was not provided for the fifth evaluation period. In the seventh period, the human resources department was rated "marginal." It was noted that employees were not following steps in the hiring process, and there were some problems addressing outstanding financial debts for new hires. GEO, in its self-assessment report, recognized its shortcomings, made changes its staffing of this function, and added extra auditing steps to certify its employees.[113] In period eight, staffing levels were cited as a significant problem, though the department improved slightly to earn a "fair" rating. GEO was rated as performing better in subsequent periods, although monitors reported some episodic difficulties with staffing levels and in new hire screening processes.

Monitors rated GEO's performance in employee training and career development as consistently good and even excellent during some periods (Figure 3.8).

**Figure 3.8**

**Employee Development Ratings: Contract Monitors' Assessments of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

---

[111] Non-Conformance Report Number 037, June 11, 1999.

[112] Ibid.

[113] Wackenhut Corrections Corporation, "Self-Assessment Performance Evaluation, August 20, 2000 through February 19, 2001," p. 7.

---

Case 3:16-cv-02267     Document 365-9     Filed 11/20/20     Page 26 of 42 PageID #: 16541

MARLOWE_0007544

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Security, Control, and Inmate Accountability**

This is considered to be the single most important service to be delivered to the Bureau, and is defined by contract being worth 20 percent of total contract value.[114] The specific performance requirements include:

- Provide a safe and secure environment for staff and inmates through effective communication of operational concerns. This includes verbal and written instructions, post orders, institution supplements, information dissemination, training and crisis prevention.

- Gather intelligence information related to security concerns for dissemination to appropriate contractor and Federal Bureau of Prisons staff.

- Provide an adequate security inspection system to meet the needs of the institution.

- Maintain an adequate level of emergency readiness to respond to institution emergencies.

- Maintain a level of occurrence for the following listed incidents at, or below, the average rate of occurrence at other BOP facilities of the same security level. The minimum security and low security institutions will be measured separately.[115]

  o Assaults without weapons on staff
  o Assaults without weapons on other inmates Assaults with weapons on staff
  o Assaults with weapons on other inmates Homicides
  o Suicides
  o Escapes.[116]

The Bureau's 1998 quality assurance plan translates these requirements into 20 pages of more specific requirements and items to be inspected. These cover all aspects of security, including perimeter security, drug surveillance, inmate discipline, use of force against inmates, inmate visiting, entry/exit procedures, contraband, management of the institution's armory, inmate counts, special housing, prisoner transportation, airlift procedures, inmate searches, responses to emergencies, intelligence gathering, key and tool control, among others.

---

[114] Contract, Section J, Attachment C.

[115] GEO was not given access to the Bureau's performance indicator system, which tracks incidents at all federal prisons, and could not, therefore, monitor its performance against this baseline.

[116] Ibid.

MARLOWE_0007545

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.9**

**Security, Control and Inmate Accountability:  Contract Monitors' Assessments of GEO's Performance (August 1997–March 2004)**



*Notes:*    Data were missing for February-August 2000 period.

*Sources:*    Bureau of Prisons Semi-Annual Contract Monitoring Summaries and Oversight Facility Summary Reports.

Throughout the six and a half years, GEO's performance has been rated as being in compliance with the contract, generally ranging between "fair" and "good."  The exception occurred in the period ending September 2003, when GEO's overall performance in this area was rated as being "superior."

There have been two serious breaches of security and control, however.  During the August 1998– February 1999 period, an inmate escaped by walking out of the facility from the institution's visiting room.  The monitors noted that

> visiting room policy established by [the contractor] was adequate and provided the necessary guidance to prevent the escape.  It was determined that [the contractor] failed to ensure that supervision was provided to the visiting room staff.  This observation was corrected by roster adjustments and training.[117]

Another escape occurred in December, 2003, when an inmate evaded perimeter controls by hiding inside a trash compactor.  (He was captured in the nearby community later that day.)  Monitors reported that the contractor had, in the prior review period, eliminated the afternoon census count "which decreased inmate accountability."  Moreover, "the contractor failed to implement appropriate security controls and inmate accountability, which contributed to the escape."  Escapes from federal

---

[117]    Bureau of Prisons, "Performance Monitor Report, August 20, 1998–February 19, 1999."

MARLOWE_0007546

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

prisons are rare events. Despite this, the Bureau rated its correctional services functions for the period as a whole as "good." [118]

### Inmate Admission, Classification, and Transfer

Of equal importance, from the Bureau's point of view, is the cluster of services associated with processing inmates in and out of the Taft Correctional Institution. (These services combined were considered 20 percent of the total value of the contract to the Bureau.) The contract identifies performance requirements for these services ('vital functions'), as well as the specific objectives to be accomplished.[119] The Bureau's 1998 quality assurance plan sorted these various requirements according to three broad functional areas, or departments—*receiving and discharge, records, and mail management*. Each of these areas were monitored, scored, and reported separately. When monitoring procedures were changed in 2002, these three functions were no longer rated separately. Instead, a rating was given for performance of all functions combined.

The activities and requirements associated with each of the three component functions included the following:

#### *Receiving and Discharge*
- Identify inmates and review paperwork for proper commitment or release. Determine that property and inmates are thoroughly searched for contraband. All inmate property is properly inventoried and stored in a secure area not accessible to inmates and unauthorized staff.
- The appropriate review authority is clearing the movement activities of those identified under one or more assignments in the CIM System.
- The intake screening process includes thorough interviews, documentation is complete and decisions by staff performing intake procedures are appropriate.
- The procedures used to determine policy and guidelines are being applied appropriately in the areas of inmate program reviews and Security Designations and Custody Classification.
- Evaluate the needs of the inmate population and provide a wide range of programs which encourage purposeful participation and promote opportunities for self-improvement. Programs are accessible to the inmate population, program availability is effectively communicated and perpetual evaluation of program formulation, attendance, and productivity occur.
- Ensure that inmates are screened for mental health problems and appropriate intervention is implemented.
- Ensure that potentially suicidal inmates are properly identified and treated.
- Provide necessary management of community resources to determine qualifications, adequacy, appropriateness and equitableness in meeting needs of inmate population.

#### *Records*
- *Sentence Computations*. Determine the accurate computation of all sentences. All inmates are released on the correct release date.

---

[118] Bureau of Prisons, "Oversight Facility Summary Report," (October 1, 2003–March 31, 2004), p. 2.

[119] Contract, Section J, Attachment C.

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 29 of 42 PageID #: 16544

MARLOWE_0007547

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- *Detainers/IAD/Writs*. The appropriate execution, processing and verification of IAD documents and detainers are performed. Special care will be given to identifying the inmate to be released and the authorized receiving law enforcement agents.

- The identity and location of those inmates whose security requires confidentiality is not released to those not authorized to receive that information.

- Maintains appropriate operational and security requirements applicable to all computer equipment and services.

### Mail Management
- Mail service is provided to inmates and staff alike. This includes the timely processing, accountability, and proper handling of special mail including inmate funds. Special care is given to the detection of contraband and prohibited acts.

During the first five years, monitors rated GEO's performance in these three functional areas as meeting the requirements of the contract. The most common rating for all three functional areas, and for the three dimensions of rated performance (quality of work, responsiveness, and quality control) was "fair." In some review periods, performance in some areas and dimensions were rated as "good" or, less often, as "excellent," along with a few "marginal" performance ratings in the early years. After the monitoring procedures were changed and the CFM team began auditing GEO's performance, the combined ratings for all of these related functions improved:

| Review Period | Performance Rating |
| --- | --- |
| August 20, 2002–March 30, 2003 | Good |
| April–September, 2003 | Superior |
| October, 2003–March, 2004 | Superior |

### Rated Performance of the Records Office
In the monitors' eyes, the weakest area of GEO's performance in this area was the records office during the first three and a half years. Perhaps the most critical activity in this office is the computation of the inmates' sentences. This is often a complicated matter, as inmates receive credits for time served in detention prior to being committed (or recommitted) to federal prison, for "good time" awards, among other arcane and not always well documented issues. (Records from local jails may not always be readily understood if prisoners come in an out of detention while awaiting trial or afterwards.) Indeed, this function is often not delegated to private imprisonment firms by state and local correctional authorities because the risks of errors in release dates are substantial. The Bureau's choice was to delegate this function and to monitor performance closely. (One of the contract monitors assigned to the Taft facility was an inmates records specialist, who had initially been sent to Taft to manage its records office.)

When federal inmates are transferred from one prison to another, the receiving institution is required to review, verify, and update records, including computations of sentences. During the first years of the contract, monitors identified errors and delays in processing these sentence computations, including tardy calculation of release dates, missing or incomplete documentation, incorrect processing of fingerprint cards and incorrect dates on ensuing release lists. Of the first 49 Non-

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 30 of 42 PageID #: 16545

MARLOWE_0007548

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Conformance reports issued by BOP monitors, eight were for incorrect dates on ensuing release lists and one was for tardy processing of an ensuing release list. As of March 2, 2000, incorrect information on ensuing release lists had cost GEO $97,500 in BOP payment deductions.[120]

GEO's early difficulties stemmed from not having records managers who were experienced in working with federal prisoner records. None had ever worked in the federal system. The on-site monitor, who had long experience managing inmate records systems in the Bureau, was charged with monitoring but not training GEO's staff. This resulted in a great deal of tension between monitors and GEO's staff. In its self-assessment report submitted for the semi-annual period ending August, 2001, GEO addressed its difficulties:

> The contractor is within the requirements of the contract. The contractor is unable to secure the services of a qualified ISM [inmate systems manager] and has requested a waiver for a records office manager. The contractor in four years of this contract has had an ISM who met the minimum requirements for approximately eight months. The contractor continues to assure the Bureau that they are actively recruiting for an ISM.[121]

GEO also contested the deductions against its fee for identified errors in records management (to no avail.) It argued that the Bureau was holding it to a 100 percent error-free standard while no other federal prisons were expected to perform at this level. Indeed, GEO conducted a study of a sample of records for prisoners who had been transferred to Taft and found a significant proportion of them had errors in their sentence computations. The Bureau's contract with GEO did not establish an acceptable error rate for these activities, however, but instead a requirement that these services be provided.

---

[120] Wackenhut Corrections Corporation, Fifth Self Assessment Report, Attachment F, August 20, 1999 to February 19, 2000.

[121] Wackenhut Corrections Corporation, "Self-Assessment Performance Report, February 20, 2001 through August 19, 2001," p. 29.

MARLOWE_0007549

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.10**

**Records Office Ratings: Contract Monitors' Assessments of GEO's Performance (August 1997–August 2002)**



*Source*: Bureau of Prisons Semi-annual Contract Monitoring Summaries.

In April 2000, a team of Bureau officials reviewed the performance of the contract monitors at Taft and they recognized—at least implicitly—the validity of some of GEO's objections. One member of the review team "expressed concern over the number of deductions taking place with regard to sentence computations. He feels that these deductions are over relatively minor issues..." [122] Another team member stated that [d]eductions appear to be frequent and for relatively minor infractions; over and above what we hold Bureau of Prisons staff accountable."[123]

Monitors' ratings of records office performance finally rose to "good" during the twelve months ending August, 2002, with which the CFM concurred in its December, 2002 audit. The subsequent CFM audits found GEO's records office to be performing well (thereby contributing to the "superior" performance rating that inmates systems functions received during the year between April, 2003 and March, 2004).

***Rating GEO's Receiving and Discharge Activities***
During the first eight months of operation at the Taft facility, GEO received prisoners transferred from other federal facilities, and the monitors rated their performance in managing these functions as

---

[122] Program Review Division, "Summary Indicators," undated.

[123] Ibid.

Case 3:16-cv-02267 Document 365-9 Filed 11/20/20 Page 32 of 42 PageID #: 16547

MARLOWE_0007550

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

'marginal" or "fair" during the first two months of operation, depending upon the particular dimension of performance being rated. In subsequent periods, GEO's performance was rated "fair" or "good," complying with contract requirements.

**Figure 3.11**

**Receiving/Discharge Ratings: Contract Monitors' Assessments of GEO's Performance (August 1997–August 2002)**



*Sources:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

### Mail

Managing prisoners' mail is a critical function with respect both to security and prisoners' rights. Mail coming to prisoners can be a source of contraband and all incoming items must be checked. Federal courts have also established that prisoners cannot be isolated from authorized correspondents, and that they have constitutionally protected rights to communicate with their attorneys.

GEO's performance in managing inmates' mail got off to a rough start in the early months (earning a "marginal" for quality of work during the first few months of operation). Early on, the Bureau expressed concerns about the contractor's tardiness and delivery method of inmates' special/legal mail.[124] GEO's performance improved and in nearly all subsequent periods, GEO's mail management was rated as "fair." Monitors continued to identify shortcomings in various aspects, but GEO improved its operations by making changes in procedures.

---

[124] Special and legal mail must be delivered within 24 hours. Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.12**

**Mail Room Ratings: Contract Monitors' Assessments of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

**Correctional Programs/Inmate Case Management**

In addition to responsibilities for processing prisoners in and out of the facilities, the Bureau's 1998 quality assurance plan identified a number of other inmate processing activities, which were monitored as a distinct cluster (which was termed "correctional programs," or "case management"). These included:

- Pre-arrival screening ("Objective: ensure staff are assessing the appropriateness of designations prior to the inmate's arrival"),
- Intake screening ("ensure thorough interviews are conducted, documentation is complete, and decisions are appropriate"),
- Admissions and orientation program ("review the institution and unit admissions and orientation programs to ensure that inmates are property oriented to the institution and their assigned unit"),
- Inmate classification ("ensure inmates are being appropriately classified in accordance with policy, to include proper processing of inmates eligible for Treaty Transfer"), and
- Judicial inquiries, program recommendations, and Congressional responses ("determine if adequate controls exist to respond to judicial inquiries, program recommendations, and congressional correspondence to ensure a positive relationship is maintained with all levels of the Federal Judiciary, and that all inquiries are responded to in a timely manner").

Case 3:16-cv-02267   Document 365-9   Filed 11/20/20   Page 34 of 42 PageID #: 16549

MARLOWE_0007552

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.13**

**Correctional Programs: Contract Monitors' Assessments of GEO's Performance (August 1997–August 2002)**



*Source*: Bureau of Prisons Semi-annual Contract Monitoring Summaries.

GEO's performance of these tasks in during the first fifteen months was poor, according to the monitors. The quality of work performed and the contractor's quality control procedures were rated "unsatisfactory," and the contractor's responsiveness to the monitors' and the Bureau's requests was only slightly better ("marginal"). Indeed, during the second valuation period, BOP monitors termed the contractor's quality of work in this area as "at risk."

> Even though the contractor's responses to reports issued by the BOP are timely, the effectiveness and appropriateness of the responses are not. The contractor's responses to non-conformance and inspection reports have consistently been returned due to the contractor's failure to demonstrate corrective action taken and failure to identify what internal controls have been implemented to ensure compliance.[125]

During the first evaluation period, BOP monitors identified discrepancies in several areas within the correctional programs department: inmate central files, classification and program review of inmates, Inmate Financial Responsibility Program (IFRP)/Cost of Incarceration Fee (COIF), Freedom of Information Act, Privacy Act, and SENTRY Data.[126] GEO reportedly continued to have problems in

---

[125] Performance Monitor Report Six Month Summary, Period: February 20, 1998 to August 19, 1998.

[126] Performance Monitor Report Six Month Summary, Period: August 20, 1997 to February 19, 1998.

MARLOWE_0007553

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

many of these areas during the third evaluation period. Additionally, during this period, BOP monitors pointed out problems in security designation and custody classification, pre-arrival screening, intake screening, the admission and orientation program, judicial recommendations and congressional inquiries. During the third evaluation period, BOP monitors recommended deductions for five major deficiencies with respect to work quality in the correctional programs department. These included:

- Admission and Orientation Program – $35,000.[127]

The contractor failed to develop lectures and lesson plans that covered all required subject areas.[128]

- Inmate Financial Responsibility Program – $23,000.[129]

In a non-conformance report issued in August of 1998, a BOP monitor identified several deficiencies in the Inmate Financial Responsibility Program (IFRP). IFRP mandates that inmates establish a payment plan to meet legitimate financial obligations in accordance with 28 CFR 505 and 545.10. Prison administrators did not identify all prisoners who were liable for these obligations .[130] Other problems included failure to take mandatory deductions out of inmates' UNICOR pay as well as insufficient documentation of inmate consent and compliance with the IFRP.[131]

- Community Protection and Release Paperwork – $110,000[132]

The contract requires the contractor to comply with the Violent Crime Control and Law Enforcement Act of 1994.[133] This law requires correctional facilities to inform violent and/or drug abuse offenders of local treatment programs upon release. It also requires correctional facilities to notify proper authorities of these inmates' release. According to BOP monitors, GEO did not properly notify inmates of local treatment facilities, and local authorities were not properly notified of the release of violent and/or drug abuse offenders in their communities.[134] A review of central files of released inmates revealed improperly processed Supervised Release Plans and transfer paperwork and failures to document release gratuities ("gate money") adequately.[135]

- Congressional Inquiries/Privacy Act of 1974 – $50,000.[136]

---

[127] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

[128] Non-Conformance Report Number: 98-025-PGM, October 14, 1998.

[129] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

[130] Non-Conformance Report Number: 98-021-PGM, August 10, 1998.

[131] Ibid.

[132] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

[133] Taft Contract Statement of Work, p. 30.

[134] Non-Conformance Report Number: 99-030-PGM, January 20, 1999.

[135] Ibid.

[136] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

---

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Correctional facilities receive congressional inquiries from time to time. Responses to these inquiries may include information about inmates protected by the Privacy Act of 1974. To disclose this information legally, correctional facilities must obtain the consent of inmates. Correctional facilities may keep congressional correspondence in inmates' files which, if maintained properly, will also include documentation of the inmates' implied consent to release protected information. Otherwise, an inmate must provide consent by signing a Release of Information Consent Form. Upon reviewing the central inmate files, BOP monitors discovered these that packets were not in the files of inmates and that there were no Release of Information Consent forms on file. BOP monitors reported these observations in October of 1998[137] and March of 1999.[138]

- Congressional Inquiries – $20,000.[139]

  GEO failed to respond in a timely manner to several congressional inquiries regarding individual inmates. The contract requires that the contractor respond within 30 days. In a Non-Conformance Report dated October 16, 1998, a BOP monitor noted that GEO did not respond to 45 percent of congressional inquiries reviewed.[140] Furthermore, several inmate files were missing the required documentation of congressional inquiries and responses to those inquiries.

GEO's work quality in the corrections programs department improved over the fourth and fifth evaluation periods where it received a "fair" rating each period. During these evaluation periods, BOP monitors noted concerns in many of the same areas mentioned above, but those concerns were not as serious as those expressed in previous reports.[141] In the seventh review period, the quality of work in the corrections programs department was rated as "marginal." The monitors reported that although the contractor recognized many areas of nonconformance, no remedial action was being taken. However, in period eight, the contractor improved. The monitors reported that most discrepancies and nonconformance issues were discovered by GEO's Quality Control Program and the overall number of discrepancies decreased. This earned GEO as a rating of "good" in this area of responsibility. In period nine it was noted that improvement was continuing, in terms of contractor accountability, though at a slower rate than it had during period eight. In period ten the department was rated as "fair" and a number of problems were noted.

**Facilities Maintenance and Repair**

Because the federal government owns the facility, the contract imposes upon GEO the obligation of maintaining the government's capital investment. The value to the Bureau of meeting these requirements is defined as 15 percent of the total value of services delivered by GEO. The contractual performance requirements associated with this obligation include the following:

---

[137] Non-Conformance Report Number: 98-026-PGM, October 16, 1998.

[138] Non-Conformance Report Number: 98-032-PGM, March 3, 1999.

[139] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

[140] Non-Conformance Report Number: 98-026-PGM, October 16, 1998.

[141] Ibid.

Case 3:16-cv-02267   Document 365-9   Filed 11/20/20   Page 37 of 42 PageID #: 16552

MARLOWE_0007555

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- The process used to gather, file and retrieve information required for efficient operation and management of the facility is in compliance with contract requirements.

- The preventative maintenance program ensures that appropriate equipment has been identified, is incorporated into the maintenance program and work has been completed as scheduled and required in compliance with contract requirements.

- The periodic inspections requirements of the facility and all equipment have been identified, documented, and acted upon and adequate controls are in place which ensure that all inspections are conducted.

This requirement was considered a discrete area of service to be monitored and reported upon during the first five years, and throughout this period, GEO's performance in its stewardship of federal property was highly rated (Figure 3.14).

MARLOWE_0007556

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.14**

**Facilities Maintenance and Repair: Contract Monitors' Assessment of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

**Safety**

Prisons are subject to a variety of workplace safety and environmental protection regulations and laws, and Bureau's contract with GEO established these obligations. The 1998 quality assurance plan developed by the monitors identifies specific performance objectives for inspections, training in OSHA and other contract requirements, management of workmans compensation and OSHA claims, occupational safety regulations, management of hazardous materials, compliance with all federal, state, and local environmental laws and regulations, compliance with the 1990 Clean Air Act, the Resource and Recovery Act (pertaining to underground storage tanks), water standards, as well as various life safety and fire protection requirements. The contract also required GEO to implement an plan to mitigate environmental damage or hazards to endangered species resulting from the prison's operation (which even included notifying federal and state authorities upon finding dead San Joanquin Kit Foxes or Blunt Nosed Lizards).

Through the six and a half year period, GEO has performed at levels above contract compliance and often well above that (Figure 3.15).

Case 3:16-cv-02267　　　Document 365-9　　　Filed 11/20/20　　　Page 39 of 42 PageID #: 16554

MARLOWE_0007557

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.15**

**Safety Ratings:  Contract Monitors' Assessments of GEO's Performance (August 1997–March 2004)**



*Notes*:  During the last three review periods, monitors did not always provide a summary rating that used the precise adjective descriptions established in the ratings schemes.  In the period ending March, 2003, for example, on-site monitors referred to performance as "exemplary," which we have coded as "excellent."  During the subsequent two periods, on-site monitors did not offer summary ratings but instead reported the findings of the Contract Facility Monitoring Team's audits.

*Sources*:  Bureau of Prisons Semi-annual Contract Monitoring Summaries and Oversight Facility Summary Reports.

**Food Services**

Throughout the six and a half years, monitors' ratings of food services at the Taft facility have ranged between "fair" and "good" (Figure 3.16).

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 40 of 42 PageID #: 16555

MARLOWE_0007558

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.16**

**Food Service Ratings: Contract Monitors' Assessments of GEO's Performance (August 1997–August 2002)**



*Source*: Bureau of Prisons Semi-annual Contract Monitoring Summaries.

**Healthcare Services**

Standards for care in American prisons have changed dramatically during the past thirty years, a consequence of both the federal courts' expansion of inmates' constitutional rights and of the corrections profession's progress in establishing national standards for prisons and jails. The contract requires GEO to have the Taft Correctional Institution certified as complying with standards promulgated by the American Correctional Association and to have the facility's health care unit certified by the Joint Commission on Accreditation of Health Care Organizations (JCAHO). In addition, GEO is required to adhere to all applicable federal, state and local laws and regulations governing the delivery of health services.

Medical care is especially important, and complaints about inadequate health care have been the source of much litigation.[142] In 1976, the U.S. Supreme Court took the opportunity in *Estelle v. Gamble* to refine constitutional principles governing the states' obligation to provide medical care to prisoners.[143] Later rulings have established that because prisoners cannot obtain their own medical services, the Constitution obligates correctional authorities to provide prisoners with "reasonably

---

[142] For a review of health care in prisons, see Douglas C. McDonald, "Medical Care in Prisons," in Michael Tonry and Joan Petersilia (eds.), *Prisons (*a volume in the series *Crime and Justice: A Review of Research,* University of Chicago Press, Vol. 2. 26 (1999), pp. 427–428.

[143] 429 U.S.98, 97 Sup. Ct. 285 (1976).

---

Case 3:16-cv-02267    Document 365-9    Filed 11/20/20    Page 41 of 42 PageID #: 16556

MARLOWE_0007559

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

adequate" medical care.[144] "Adequate" medical services have been interpreted to mean "services at a level reasonably commensurate with modern medical science and of a quality acceptable within prudent professional standards."[145] In *Tillery v. Owens*, "adequate" services were defined as those affording "a level of health services reasonably designed to meet routine and emergency medical, dental and psychological or psychiatric care."[146]

The result of this history is that the Bureau's performance requirements for healthcare are among the most detailed.[147] These include the following:

- Only qualified health care providers are employed and all mandatory training and Continuing and Professional Education requirements have been met.
- Inmates admitted to the inpatient facility are receiving a level of care commensurate with the requirements of the contract.
- Outpatient care is provided in a manner consistent with the contract and in accordance with principles of professional practice that reflect concern for the acceptability, accessibility, availability, and cost of services.
- Pathology and medical laboratory services are available to meet the needs of the inmate population.
- Health records are documented accurately, legibly, and in a timely manner, are readily accessible, are promptly retrievable, are stored securely, the contents are filed and are maintained as required.
- The pharmacy is operating in accordance with Drug Enforcement Administration regulations and contract requirements.
- Radiology services are adequate to support the clinical capabilities of the institution. Radiation safety practices and protective equipment are utilized and adequate controls are in place to protect patients and staff from unnecessary radiation exposure.
- The Dental Program: (1) provides dental care in a manner consistent with principles of professional practice that reflects concern for the accessibility and cost of services; (2) maintains dental records which are documented accurately and are readily accessible; and (3) protects staff and patients from unnecessary exposure to potential health hazards.
- A system to identify, monitor, and. treat communicable diseases is in place to prevent the spread of disease.
- Appropriate health care is provided to all inmates.

---

[144] *Newman v. Alabama*, 559 F.2d 283, 291 (5th Cir.) *cert. denied*, 438 U.S. 915 (1978); *accord, Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982); *Wolfish v. Levi*, 573 F.2d 118, 125 (2d Cir. 1978), *rev'd on other grounds sub nom. Bell v. Wolfish*, 441 U.S. 520 (1979), *Langley v. Coughlin*, 888 F.2d 252, 254, (2d Cir. 1989).

[145] *Fernandez v. United States*; *United States v. DeCologero*, 821 F.2d 39, 43 (1st Cir. 1987); *Tillery v. Owens*, 719 F. Supp. 1256, 1305 (W.D.Pa. 1989), *aff'd*, 907 F.2d 418 (3d Cir. 1990). In *Tillery v. Owens* (719, F.Supp. at 1301; *accord, Ramos v. Lamm*, 639 F.2d 559, 574 (10th Cir. 1980), *cert. denied*, 450 U.S. 1041 (1981).

[146] *Tillery v. Owens*, at 1301.

[147] Contract, Section J, Attachment C.

---