This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- The safety controls in the Health Services Unit are adequate and provide an environment that ensures safe conditions for both inmates and staff in both routine and emergency situations.

The 1998 quality assurance plan that the monitors developed extends these requirements into a nineteen-page list of specific performance objectives that are monitored regularly by the Bureau.

*How GEO Organizes Healthcare Services at the Taft Facility*

Primary health care in the Taft Correctional Institution and in other federal prisons is provided by staff health care workers—medical doctors, nurses, psychologists, and others. Inmates are given the opportunity to see these staff frequently by means of "sick call," whereby they have the opportunity to be taken to health care providers at a scheduled time each day or have health care workers come to their living areas. Specialist care is typically provided in periodic "clinics," usually by consulting specialist physicians who come into the prison on a scheduled basis to see prisoners who have been referred by primary care providers. Prisoners needing acute emergency care can be taken to hospitals in the neighboring communities. Those needing non-urgent surgical, medical, or mental health services that cannot be delivered adequately at the institution can be transferred to one of five Federal Medical Centers operating within the Bureau of Prisons.[148]

Primary health care visits occur at about the same rate at Taft as in other low security facilities.[149] (See Chapter 4.) It staffs its medical care services differently than the Bureau does, however. The Bureau relies upon physicians, physicians' assistants, nurse practitioners and nurses to deliver services. Mental health care is delivered by psychiatrists and psychologists. At Taft, primary care is delivered principally by doctors, registered nurses, and licensed practical nurses. Consequently, Taft inmates are more likely to see a doctor than in other low security federal facilities (see Figure 4.7 in next chapter).

---

[148] Transferring sick prisoners to Federal Medical Centers has the effect of off-loading costly prisoners to another institution or, in the case of TCI, to the federal government. This has the result of lessening the risk of incurring higher costs at the facility, although this effect is enjoyed by any and all facilities in the federal prison system, whether managed by public or private organizations. It appears that GEO enjoys no special benefits in this respect, as it is not able to control decisions to transfer prisoners to Federal Medical Centers. All such decisions follow the prescribed procedures for all other federal prisons, and are made by Bureau of Prisons officials in regional headquarters. It remains possible that the Bureau's decisions regarding transfer or denial of transfer requests may differ from those requested by other federal prisons, and that these decisions may have differential effects on expenditures for health care at Taft as compared to other federal prisons. Identifying any systematic differences in decision-making would be difficult, given that these are relatively rare events and slight differences in the health status of inmates at facilities no doubt account for most of these differences. At any rate, the effect of a "discriminatory" decision practice on overall expenditures at one or another prison are likely to be small, at best.

[149] Computed from data in Key Indicators: A Strategic Support System for the Bureau of Prisons.

---

MARLOWE_0007561

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*Inmates' Health Conditions*

As in federal prisons, the prevalence rates of tuberculosis, hepatitis, and mental health problems vary somewhat from one facility to the next. These differences result from the types of prisoners assigned to these facilities rather than being a consequence of the conditions at any of the prisons. However, one particular illness is attributable to living at the Taft Correctional Institution: Valley Fever, which is caused by *Coccidioides immitis*, a fungus found in the Southwestern US and Central and South America and in the San Joaquin Valley, where Taft in located. Spread by airborne spores, infected persons can develop flu-like symptoms that can last for several weeks and, in a small number of cases, to severe pneumonia, meningitis, and even death if not properly treated. Persons with compromised immune systems are at special risk and GEO requests that they be transferred to federal prisons in other regions of the country, although these requests are not always granted. According to the warden at Taft, there are more cases of diagnosed Valley Fever at his facility than in all other federal prisons combined. (As mentioned in Chapter 2, Kern County—where the facility is located—has one of the highest prevalence rates of Valley Fever in the U.S.) Although evidence of this claim was not obtained from the Bureau of Prisons, this risk was not known by the Bureau or by GEO until cases began to appear, and this has placed an unexpected burden on the facility's healthcare system. GEO's expenditures for hospital care is much higher than its anticipated; the firm is spending more for Valley Fever patients than it spends to treat HIV-positive inmates at its facility in Winton, North Carolina. To date, one prisoner has died from the disease.

*Rated Performance of GEO's Healthcare*

During the first three years, GEO was rated by monitors as delivering "good" and even "excellent" healthcare. This was one of the strongest areas of performance for the company. Monitors cited good performance in written plans and procedures, resources, inmate health records and outpatient care.[150] The facility received its accreditation from the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) six months ahead of schedule.[151] Furthermore, JCAHO gave the department a 99 percent score for its behavioral health care and a 98 percent score for ambulatory care.[152]

---

[150] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

[151] Ibid.

[152] Taft Correctional Institution Self Assessment Report, p. 8, February 26, 1999.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 2 of 44 PageID #: 16559

MARLOWE_0007562

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.17**

**Healthcare Services: Contract Monitors' Assessments of GEO's Performance (August 1997–March 2004)**



*Note:* Data were missing for February–August 2000 period.

*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

In addition to high quality of work, Bureau monitors reported that GEO was generally very responsive during this period. They commented that deficiencies rarely occurred in this service area and the contractor was quick to take corrective action to implement new or revised internal controls.[153] Bureau monitors also noted that, "Health Services personnel have become proactive in attempting to identify possible Bureau of Prisons concerns."[154] One example of this was GEO's identification of discrepancies of its inmate health records—a reflection on its formal Quality Control Program. GEO corrected the discrepancies and provided remedial training to teach staff proper formatting and documentation of BOP inmate health records. In the fifth evaluation period, a BOP monitor noted that "Technical direction is rarely required, and when it is provided it is well received."[155] Monitors reported that the health services department had received a high level of inmate complaints, but that the health services staff always responded in a timely manner to the requests, concerns and suggestions of the reviewer.

---

[153] Performance Monitor Report Six Month Summary, Period: February 20, 1999 to August 19, 1999.

[154] Performance Monitor Report Six Month Summary, Period: August 20, 1998 to February 19, 1999.

[155] Performance Monitor Report Six Month Summary, Period: August 20, 1999 to February 19, 2000.

MARLOWE_0007563

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

During the August 2000–February 2001 review period, the quality of healthcare services was seen as slipping, primarily for lack of adequate staffing, and monitors rated service delivery as "fair." Difficulties in recruiting and keeping healthcare staff are nearly endemic in correctional facilities throughout the country, especially in rural areas such as Taft, California. The Taft facility is in the middle of the desert, which imposes a handicap in attracting qualified healthcare professionals who have plentiful opportunities elsewhere. The salary levels that the Bureau accepts for GEO's staff (which are tied to U.S. Department of Labor regional wage determinations) are below market and GEO is having to offer higher wages to attract and keep staff. Turnover of healthcare administrators has been frequent and GEO has lacked strong healthcare managers at the facility throughout much of the contract period.

During May, 2001, the facility's healthcare services were found not be in compliance and deductions to fee were imposed. GEO responded by developing a more aggressive approach to recruiting qualified staff (including signing bonuses and higher salaries) and for retaining them. GEO also detailed its national and regional-level managers to become more active in managing Taft's healthcare. Subsequently, GEO succeeded in hiring a health services administrator at the facility. Staffing issues have continued to be problematic, and performance has generally been rated to be in compliance, "good" in some periods, but not at the same level that existed in the earlier years.

**Psychological Services**

Provision of psychological services to inmates and staff was monitored separately from healthcare, prior to the 2002 reorganization of monitoring procedures. There were several "vital functions" specified in the contract under health services requirements, but the Bureau's 1998 quality assurance plan distinguished these services as one of the nineteen to be reported regularly. Required psychological services included screening inmates for mental health problems, appropriate management of mentally ill inmates, crisis intervention services, suicide prevention programming, and drug abuse education and treatment.

The Bureau of Prisons operates in its facilities a comprehensive drug abuse program that includes drug education, non-residential drug abuse treatment, and residential drug abuse treatment. The system is designed to provide coordinated services in the various prisons so that inmates who are transferred from one prison to another can participate in the program. Bureau-wide procedures were therefore developed to define eligibility and processing through the various components of the program.

Throughout most of the five-year period when these services were rated separately from healthcare services, monitors found that Taft was in compliance with the contract, but that the performance of these services did not generally rise above the level of "fair." Recruiting and retaining psychologists and other mental health professionals has been challenging, and the Taft facility was understaffed for long periods of time.

MARLOWE_0007564

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.18**

**Psychological Services Ratings: Contract Monitors' Assessment of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

**Education, Recreation, and Religion Services**

The contract requires GEO to provide mandatory literacy and English as a second language programs, to maintain a law library in compliance with federal regulations and professional standards, to maintain a "leisure" library, and to provide an appropriate recreation program. GEO has gone beyond this, developing relationships with the Taft Community College, which offers many courses to inmates, as well as distance learning courses. Mexican nationals are given the opportunity to earn their Mexican GED equivalency. Throughout the six and a half years examined here, GEO's education and recreation programming have been rated well, and sometimes as "excellent" or "superior" (Figure 3.19). This no doubt reflects, at least in part, GEO's financial investment in educational services at the facility. It spends a significant proportion of its budget to prisoners' vocational training and education.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.19**

**Education Ratings: Contract Monitors' Assessment of GEO's Performance
(August 1997–March 2004)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

The contract also requires that GEO provide religious services and leadership for prisoners of diverse faiths. GEO has been successful in satisfying the religious needs of prisoners in the most popular denominations, but monitors report less success in providing services for Jewish, Muslim, Native American and Buddhist prisoners (which is challenging in a geographically isolated location). Monitors have rated GEO's performance in this area as always meeting the requirements of the contract, and sometimes as performing extremely well (Figure 3.20).

Case 3:16-cv-02267 Document 365-10 Filed 11/20/20 Page 6 of 44 PageID #: 16563

MARLOWE_0007566

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.20**

**Religious Services Ratings: Contract Monitors' Assessment of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

**Inmate Services: Inmate Funds/Commissary, Telephone, and Laundry**

The contract specified a number of requirements for providing various services to inmates. Contract monitors develop separate ratings for each of three component services, but with the reorganization of the monitoring procedures in August, 2002, a single rating was given for all inmate services combined. During the first five years, monitors always found GEO's service provision in compliance with requirements and often "good" or "excellent" (Figures 3.21–3.23). During the three review periods after August, 2002, inmate services received overall ratings of "good" or "superior."

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 7 of 44 PageID #: 16564

MARLOWE_0007567

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.21**

**Laundry Ratings: Contract Monitors' Assessment of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 8 of 44 PageID #: 16565

MARLOWE_0007568

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.22**

**Commissary/Inmate Funds Ratings:  Contract Monitors' Assessment of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

MARLOWE_0007569

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 3.23**

**Inmate Telephone Services Ratings: Contract Monitors' Assessment of GEO's Performance (August 1997–August 2002)**



*Source:* Bureau of Prisons Semi-annual Contract Monitoring Summaries.

## Summary

During the six and one-half years examined here, monitors rated GEO's overall performance as being "good", according to contractually established standards. Both the Bureau monitors and GEO managers recognize that the start-up phase was difficult and that performance faltered in some areas. Moreover, at times since then and in particular areas of service, performance has sometimes fallen below expectations. Over the life of the contract, however, the institution's managers and staff delivered what it promised to do and what the Bureau obligated it to do. The Bureau exercised its option to renew the contract after the three-year base period and in every subsequent year. Most of the deductions from the contractor's fee for inadequately provided services occurred early in the life of the contract and were reduced by close to two-thirds in FY2001 and further reduced to zero in FY2002. During the first five years, these deductions totaled approximately 0.6 percent of the total amount paid to the contractor; over the seven years of the contract, the percentage has been reduced to half of that amount. Although there has been some variation in how contract monitors have rated some services from one period to another, and how some aspects of each services ("work quality," "responsiveness," and "quality control") have been rated, these monitors and the Bureau's Performance Evaluation Board have rated GEO's performance as "good" (Table 3.2)—meaning "very efficient performance, fully responsive to contract requirements, more than adequate results, reportable deficiencies but with little identifiable effect on overall performance." Consequently, GEO has been given bonuses—"award fees"—for performing above and beyond the requirements for mere contract compliance in all of the semi-annual performance periods. Based upon the assessments of

Case 3:16-cv-02267　　　Document 365-10　　Filed 11/20/20　　Page 10 of 44 PageID #: 16567

MARLOWE_0007570

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

the Bureau's own monitors and the Performance Evaluation Board, one would have to conclude that GEO has been successful in providing the Bureau with the services and the performance that it requires. Because the contract and the monitoring procedures were informed by the specification of the Bureau strategic objectives, one must conclude that GEO's performance at the Taft facility has been consistent with those objectives.

Even though the contract for Taft was designed to advance the various strategic objectives of the Bureau—objectives that apply to all federal prisons, whether government or privately-operated—the standard of contract compliance lacks any direct parallel with standards of performance for other federal prisons. To be sure, they are roughly similar, but we cannot assume that being ranked low by the contract monitors indicates performance inferior to that found in other federal prisons. GEO officials have complained on occasion that they are being held to a higher standard than exists in other government-operated facilities. In response to one such complaint, the Bureau's contract administrator reported in his minutes of a meeting that there probably are other BOP institutions having problems with these same matters. "However," he wrote, " the issues discussed are based on the contract requirements and not how other institutions perform."[156] To obtain a more direct comparison of TCI's performance with the performance of other low-security prisons operated by the Bureau of Prisons, we conducted statistical comparisons of data developed by the Bureau to monitor its own operations, which are presented in the following chapter.

---

[156]   Ray Marshall, "Meeting concerning issues in records area," memorandum dated 7/17/98, p. 2.

MARLOWE_0007571

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 4

# Comparing Performance of the Taft Correctional Institution With Government-Operated Federal Prisons

The performance of Bureau-operated federal prisons provides a second yardstick for assessing GEO's performance at the Taft facility. For the past decade and a half, the Bureau has been measuring the performance of all federal prisons to monitor how well they have been accomplishing the agency's objectives. The information collected for this monitoring system affords us a means of comparing Taft Correctional Institution's performance with that of other federal prisons operated directly by the Bureau. This section first describes the framework that the Bureau has developed for monitoring institutional performance. It then compares GEO's performance at the Taft facility on several dimensions to that of other Bureau-operated facilities.

## The Bureau's Performance Monitoring System

The Bureau began in the mid-1980s to develop a performance management system that includes a definition of the agency's goals and sub-goals for all major aspects of facility operations in terms that could be measured, and a specification of "vital functions" that have to be carried out to accomplish these goals. (See below. "VF" refers to vital functions; following some of these are performance indicators associated with these functions.)

To monitor institutional performance with respect to these various vital functions or activities, the Bureau developed the Key Indicators/Strategic Support System. On a monthly basis, the Bureau's Office of Research and Evaluation provides all facility managers with both current and historical measures of performance with respect to these key indicators of vital functions, not only for the facility they manage but also for all other federal prisons. This gives managers knowledge of how their facility's operation stands vis-à-vis their own past performance, the performance of other comparable facilities, and their own performance relative to the Bureau's goals.

All federal prisons feed information into this performance monitoring system and have done so since 1989. In contrast, facilities operating under contract provide only limited data to this system. Moreover, they have no access to the Key Indicators/Strategic Support System to monitor their own performance or that of federal facilities. Consequently, only a limited set of performance dimensions are monitored with uniform data for both TCI and Bureau-operated facilities. GEO operates its own performance monitoring system and collects its own information.

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 12 of 44 PageID #: 16569

MARLOWE_0007572

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## The Bureau of Prisons' Strategic Goals, Vital Functions ("VF"), and Performance Indicators

**GOAL #1:  POPULATION MANAGEMENT**
VF:     Management administration and planning.
VF:     Ensure that inmates are placed in an institution commensurate with their security and custody requirements.
VF:     Maintain adequate staffing levels.
       –Inmate to staff ratio
       –Staff-inmate demographic comparisons
VF:     Evaluate the needs of inmates and offer a wide range of programs.  This is accomplished through accessibility, effective communication, program formulation and review.
       –Residential drug abuse program

**GOAL #2:  HUMAN RESOURCES MANAGEMENT**
VF:     Maintain adequate staffing levels.
       –Staffing
       –BOP experience level of staff
VF:     Manage training resources based on mandatory requirement and needs.

**GOAL #3:  SECURITY AND FACILITY MANAGEMENT**
VF:     Provide a safe and secure environment for staff and inmates through effective communication of operational concerns.
       –Total assaults without weapons
       –Total assaults with weapons
       –Guilty findings for prohibited acts
         –assaults on staff
         –assaults on inmates
       –Total inmate homicides
       –Total inmate suicides
       –Escapes
VF:     Provide effective monitoring and discipline programs for inmates.
       –Positive urinalysis
       –Random tests
       –Suspected tests
       –Alcohol refuse
VF:     Provide a safe and secure environment for staff and inmates through effective communication of operational concerns.
       Use of force
VF:     Administrative remedies
       –Classification
       –Staff
       –Institutional operations
       –Medical

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 13 of 44 PageID #: 16570

MARLOWE_0007573

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

–Food
–UDC (disciplinary actions) appeals
–Other

VF:    Advise management of environmental health an occupational safety concerns by conducting inspections, overseeing regulatory compliance, and providing responsive technical assistance to institutional staff.
–Staff injuries
–Preventive maintenance program
–Inmate work related injuries

## GOAL#4: CORRECTIONAL LEADERSHIP AND EFFECTIVE PUBLIC ADMINISTRATION

VF:    Provide independent, objective oversight to reduce waste, loss, unauthorized use, misappropriation of funds and assets, and to help improve the performance and efficiency of BOP programs.
–JCAHO accreditation type

## GOAL #5: INMATE PROGRAMS AND SERVICES

VF:    *Patient Care*: To identify and provide a timely and effective response by qualified health care staff to legitimate health care needs for inmates.

VF:    *Resource Management*: To identify, develop, and manage essential resources that best meet the operation needs of the health care program
–Infectious diseases
–HIV prevalence
–Tuberculosis incidence

VF:    *Evaluate the needs of inmates and offer a wide range of programs*. This is accomplished through accessibility, effective communication, program formulation and review.

VF:    *Inmate Management and Control*: Provide meaningful work skills for inmates in a correctional environment.
–UNICOR Employment Data

## GOAL #6: BUILDING PARTNERSHIPS

Volunteers
Community Relations Board

This chapter compares GEO's performance to low-security federal prisons on a several (but not all) dimensions measured by the Bureau's Key Indicators/Strategic Support System.[157] Some of federal prisons also had minimum security satellite camps. For some indicators, information was collected separately for the low security populations, while other information was available only for the combined low- and minimum-security populations where there were such populations in satellite camps. For some measures, this mixing of inmates from both the low and minimum security facilities introduces problems with respect to comparability.

---

[157]   The low security federal correctional institutions (FCIs) operated directly by the Bureau are FCI Allenwood (Pennsylvania), FCI Ashland (Kentucky), FCI Bastrop (Texas), FCI Big Spring (Texas), FCI Beaumont (Texas), FCI Butner (North Carolina), FCI Coleman (Florida), FCI Elkton (Ohio), FCI Forrest City (Arkansas), FCI La Tuna (New Mexico-Texas), FCI Lompoc (California), FCI Petersburg (Virginia), FCI Loretto (Pennsylvania), FCI Milan (Tennessee), FCI Texarkana (Texas), FCI Waseca (Minnesota), FCI Yazoo City (Mississippi), FCI Safford (Arizona), FCI Seagoville (Texas), and FCI Sandstone (Minnesota).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

It is possible that the information collected for various reporting systems from which Key Indicators are drawn is not reported uniformly at all prisons. To the extent that managers are evaluated for institutional performance as measured by Key Indicators, an obvious incentive exists to underreport occurrences of unwanted events. No attempt was made to assess the reliability of data reporting at the facilities examined here.

## Goal Number 1: Population Management

Associated with this strategic goal are several different functional objectives and indicators thereof. Only some performance dimensions can be attributed to GEO's activities.

**Vital Function: Ensure that Inmates are Placed in an Institution Commensurate with Their Security and Custody Requirements**

GEO has little effective control over the prisoners placed in its custody at the Taft facility because institutional assignment decisions are made by the Bureau of Prisons, following the Bureau's assessment of its prisoners. GEO has a contractual right to request that certain prisoners be transferred back to the Bureau's custody, although the Bureau is not required to honor these requests.

**Vital Function: Maintain Adequate Staffing Levels**

GEO's staffing level was determined by its proposal and the subsequent contract. As discussed in Chapter 2, GEO offered to staff the facility with a significantly larger number of persons than the Bureau would have employed and a larger number than the Bureau employs at the three sister facilities (FCIs Elkton, Yazoo City, and Forrest City). GEO has been required by contract to maintain its staffing levels, and these certainly have to be considered "adequate," given how the Bureau staffs its low security prisons. GEO has not been assessed a deduction for inadequate staffing or excessive vacancy rates. Moreover, the indicator in the Key Indicators/Strategic Support System of adequate staffing—the inmate to staff ratio—is in part a function of the number of prisoners assigned to the facility, and GEO has no real control over this.

One of the other performance indicators related to adequate staffing (the comparison of staff demographic characteristics and inmate demographics) is of questionable relevance as a measure of GEO's performance because (a) the Bureau selects the prisoners to be transferred to Taft and thereby determines its demographic composition and (b) because GEO was constrained to hire from the local labor pool. Nonetheless, a comparison of the racial/ethnic composition of the prison population and the staff at both the Taft facility and at all low-security federal prisons combined shows that the GEO's staff is generally similar to the Bureau's and that it is appropriately matched to its prisoner population (Table 4.1).

MARLOWE_0007575

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 4.1**

**Comparing Ethnic Composition of Prisoners and Staff at Taft Correctional Institution and All Other Bureau of Prisons Low Security Facilities**

|  | Prisoners | | Staff | |
| --- | --- | --- | --- | --- |
|  | Taft Correctional Institution | Federal Low-Security Prisons | Taft Correctional Institution | Federal Low-Security Prisons |
| White Non-Hispanic | 29% | 21% | 83% | 63% |
| African-American | 15% | 36% | 9% | 22% |
| Asian | 1% | 2% | 5% | 2% |
| American Indian | 5% | 1% | 2% | 1% |
| Hispanic | 50% | 40% | 22% | 12% |
| Total | 100% | 100% | 100% | 100% |

*Note*: Taft data from end of 2004; Bureau of Prisons staffing and inmate data from October , 2002. These percentages have varied only slightly.

*Sources: Taft Correctional Institution Fact Card, 2nd Quarter 2004 and Bureau of Prisons, Key Indicators/Strategic Support System*

**Vital Function: Evaluate the Needs of Inmates and Offer a Wide Range of Programs**

Prisoners transferred from the Bureau of Prisons to the Taft facility are given the same assessments as all other federal prisoners, and they come to the Taft facility with these needs already documented. GEO provides a wide range of programs for educational and vocational development and large numbers of prisoners are enrolled in these programs. (Precise comparisons among federal facilities and the Taft facility were not developed to account for differences in prisoners' needs, average daily population and prisoner turnover.)

# Goal Number 3: Security and Facility Management

**Vital Function: Provide a Safe and Secure Environment for Staff and Inmates through Effective Communication of Operational Concerns**

A federal prison's success in maintaining a safe environment for staff and inmates is measured by several different indicators, including:

- assaults without weapons
- assaults with weapons
- guilty findings for prohibited acts
  - −assaults on staff
  - −assaults on inmates
- inmate homicides
- inmate suicides, and
- escapes.

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 16 of 44 PageID #: 16573

MARLOWE_0007576

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*Assaults*

Inmates of the Taft facility and low-security federal prisons rarely commit serious assaults. During the 66 months of our observation period (March 1999–August 2004), a total of 39 serious assaults on staff members and 184 serious assaults on other inmates were recorded in all 21 prisons combined (i.e., in the Taft Correctional Institution and 20 federal low security prisons). Less serious assaults are still rare, but more common than serious ones. In an average prison, one staff member is non-seriously assaulted approximately every two months,[158] and an inmate is non-seriously assaulted once per month.[159] (Figure 4.1 shows numbers of assaults on staff and on inmates per 5,000 inmate/months at each of 20 federal low security prisons and the Taft Correctional Institution. The details are difficult to discern in these graphs, but the basic patterns in rates are evident from cursory visual inspection. The pattern at the Taft facility does not stand out as exceptional.) Because serious assaults and assaults on staff are infrequent, in this analysis we combine all categories and compare Taft's total assault rate with the totals from low-security federal prisons.

Differences among prisons in the rates of assaults on either inmates or staff cannot be attributed entirely to the actions or inaction of each prison's mangers. Prisoners do not all pose the same risk of assault, and some prisons may have larger proportions of higher risk prisoners, even in facilities having the same security level. Other group dynamics also affect the likelihood of attacks. Prisons with large number of gang members and the numbers of different gangs represented in a prison generally experience larger numbers of assaults and killings. In these settings, the composition of the entire prison population, rather than the several risk levels of individual inmates, may contribute to violence.[160] The likelihood of conflicts among inmates is also higher where prison systems have not adequately separated known enemies or inmates who have testified against each other, or who have histories of assaulting other specific prisoners. Therefore, a comparison of assault rates among prisons calls for taking account of other characteristics of the prisons and their inmates that may affect these rates, apart from whatever the managers at a single prison can do.

Statistical analyses were conducted to identify correlates of variation in assault rates at Taft and at 20 federal facilities. One such correlate is time: the frequency of each type of assault has decreased significantly over the observation period. The total number of assaults fell about 1½ percent per month.[161]

*Separatees And Offense Severity*

Although we do not know why the frequency of total assaults has decreased in recent years, we observe that two factors possibly associated with assaults have shown strongly related trends. The number of inmates whose offenses were classified as severity level 1 (about one-sixth of the prisoners) fell from 20% in 1999 to 13% in 2004, and the number of separatees increased from 32%

---

[158]  Mean = 0.40 assaults per month, standard deviation = 0.85

[159]  Mean = 0.84, standard deviation = 1.40

[160]  All our analyses were conducted at the prison level, using the composition of the prison population, rather than the characteristics of individual inmates, to predict the prison's total rate of violence. BOP conducted a similar analysis with inmate-level data and reached similar conclusions. In our analysis, we make no inference about individual prisoners' propensities to violence, but limit our discussion to the overall prison climate.

[161]  The rate per 1,000 inmates fell about 1.5% per month, with a standard deviation of 0.1% per month.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 17 of 44 PageID #: 16574

MARLOWE_0007577

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

MARLOWE_0007578

**Figure 4.1**

Numbers of Assaults on Staff and Inmates per 5,000 Inmate/Months at Each of 20 Federal Low Security Prisons and the Taft Correctional Institution (March 1999–August 2004)





Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 18 of 44 PageID #: 16575

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

to 36% over the same period. Both are significantly associated with assault rate, even when time is accounted for in statistical estimation models as a covariate.

*Demographic Factors*

The race, and ethnic distribution of inmate populations is not related to the frequency of assaults. The proportion of young inmates (30 or younger) has fallen from 34% in 1999 to 29% in 2004. This variable remains a significant predictor of assaults when time (and the other variables) are included in statistical models.

*Age And Crowding Of Prison Facilities*

Neither the date of prison construction nor the ratio of average daily population to design capacity appears significantly related to the frequency of assaults.

**Multivariate Statistical Analyses**

A statistical (regression) model was developed to estimate the differences in assault rates (per 1,000 inmates per month) at the Taft facility compared with 20 other low-security federal prisons, accounting for several other variables. These other variables included the month during which the rate was measured, the proportion of inmates who are housed in segregation units, proportions of prisoners convicted of grave offenses, proportions aged 18–30 years old, and percent overcrowded (calculated as the average daily population/rated capacity).[162]

Table 4.2 shows the coefficients of this regression equation. Taft Correctional Institution has an assault rate significantly lower than the average of its peers. Since the coefficients model the natural log of the assault rate, we estimate that Taft's rate is 58% of the level that would be expected if the pattern observed at all low-security prisons prevailed at Taft (given the interaction of the measured characteristics listed in the table). The 95 percent confidence interval for this estimate lies entirely below 100 percent, so we conclude that the difference between Taft and the average for all low-security facilities examined here is statistically significant.

Figure 4.2 shows that several prisons have assault rates even lower than Taft's. Thus, while Taft's performance is better than the average Federal prison, it is well within the range of performance observed throughout the system. In summary: statistical analyses of assault rates indicate that GEO has maintained a safe environment for staff and inmates as effectively as the Bureau of Prisons has done in its low security federal facilities.

---

[162] The number of assaults in a month is a counted incidence rate, and therefore cannot be less than zero. Thirty-eight percent of the observations have a value of exactly zero, and another 29% show exactly one assault in a month. If assault incidents were unrelated to each other, we could model this variable with a Poisson distribution, but it appears that assaults sometimes occur in clusters. That is, we see more multiple assaults than we would expect if the process were truly Poisson. To correct for this, we fit a negative binomial model, which adds a parameter (assumed to vary randomly among prisons) to adjust the distribution to fit the dispersion of a Poisson process (Stata procedure xtnbreg). We use the prison's average daily population as the exposure rate in the model, so that estimates reflect the rate per inmate month.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 19 of 44 PageID #: 16576

MARLOWE_0007579

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 4.2**

**Negative Binomial Regression Of Total Assaults**

| | Coefficient | Standard Error | z | P>\|z\| |
|---|---|---|---|---|
| Month | -0.008 | 0.003 | -3.050 | 0.002 |
| Proportion Inmates who are separatees | 3.887 | 1.244 | 3.130 | 0.002 |
| Proportion Inmates severity of offense=1 | 3.688 | 1.106 | 3.340 | 0.001 |
| Proportion Inmates age 18 to 30 | 3.286 | 1.572 | 2.090 | 0.037 |
| Average Daily Population / Rated Capacity | -0.100 | 0.140 | -0.720 | 0.472 |
| Indicator for Taft FCI | -0.546 | 0.277 | -1.970 | 0.048 |
| Constant | -5.362 | 1.905 | -2.810 | 0.005 |

*Source:* Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

**Figure 4.2**

**The Observed Assault Rates per 1,000 Prisoner/Months Compared to Rates Predicted by a Multivariate Statistical Model: Taft Correctional Institution and Twenty Low Security Federal Facilities, (March 1999–August 2004)**



*Source:* Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 20 of 44 PageID #: 16577

MARLOWE_0007580

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### Homicides

There have been no killings of inmates or staff at the Taft Correctional Institution. Few such events happen in low-security federal prisons; only four inmates have been killed by other prisoners in all low-security federal prisons between 1991 and 2002. During this same period, no staff have been killed.

### Escapes

Escapes are also rare phenomena in federal prisons, especially from the secure section of a prison (these are termed "inside escapes"). TCI experienced one such escape in September 1998, when a prisoner was apparently mistaken for a visitor and walked out of the visiting area and through the prison doors. This was a serious failure of security. In response to this, TCI changed its clothing regulations and strengthened security regarding visits. In December, 2003, another prisoner escaped by crawling into a trash compactor and then getting outside the wall. This prisoner was arrested shortly afterwards.

Inside escapes are even more rare in federal low security prisons. Between late 1997 and January 2004, only two prisoners had escaped from secure sections of any low-security facility in the federal system.

Between late 1997 and January 2004, seven prisoners escaped while being transferred to community treatment centers—non-secure treatment facilities that are operated under contract by private providers. About the same number of prisoners escaped in similar circumstances while being transferred from other federal low security facilities.

**Vital Function: Provide Effective Monitoring and Discipline Programs for Inmates**

In low security prisons, seven to ten percent of inmates are selected each month for tests of unauthorized drugs. Some of these tests are administered to inmates who were found to be using drugs on a previous test, or are otherwise suspected of having a high risk of drug use, but the largest number—about 65 tests per prison per month—are administered to a randomly selected five percent sample of inmates.[163] More than three percent of inmates suspected of drug use test positive in low-security facilities. This is about five times the rate for randomly selected prisoners. The rate of positive outcomes for tests of suspected prisoners depends both on prisoners' behavior and on the institution's threshold of suspicion. Assuming that tests are now allocated to the most questionable prisoners, increasing the number of these tests would tend to decrease the rate of positive test results. The outcomes of all non-random tests are jointly affected by inmate behavior and institutional choice. Therefore we decided to examine only the randomly administered drug tests as indicators of institutional performance.

GEO began administering random drug tests in February 1999. It tested two prisoners that month, and 83 in March. The number of tests administered to randomly selected Taft inmates fluctuated during 1999, ranging from 24 in April to 155 in June. In 2000 and 2001, approximately 4 percent of Taft's inmates were randomly tested each month, slightly below the practice of other Bureau facilities, where about 5 percent of inmates are randomly tested each month. Beginning in September 2002, Taft raised its testing rate to more than 100 tests per month. This analysis is based on tests

---

[163] We are not sure that inmates suspected of drug use are also eligible for random tests. If not, the results of random tests are slightly biased estimates of total drug prevalence.

MARLOWE_0007581

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

administered between March 1999 and July 2004. As with the comparisons among prisons in rates of assaults, the rate of testing positive for drug use varies systematically according to various characteristics of the prisoner populations in the examined facilities. To estimate differences in drug use rates at Taft compared with federal prisons, statistical models were developed to hold constant the effects of these other differences in prisoner populations that affect positive test rates. These other characteristics include whether prisoners were convicted of drug offenses; the proportion of the prisoner population nearing completion of sentence; prisoners' ages, race, and ethnicity; and the proportion of inmates within a prison who were held in separate units from other specified inmates ("separates").

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 22 of 44 PageID #: 16579

MARLOWE_0007582

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 4.3**

**Positive Drug Tests, by Prison and Month (March 1999–July 2004)**



*Note:*  Excludes months with fewer than 25 tests.  Excludes non-random tests.

*Source:*  Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*Convicted of Drug Offenses*

The number of prisoners with histories of drug offenses is recorded by three variables in the Bureau's Key Indicators/Strategic Support System. One counts offenders whose most serious sentence is for a drug offense. The other two count offenders with sentences exceeding five years for a drug offense, and offenders with drug sentences only of five years or less. About 50 percent of all low-security federal prisoners had a drug sentence of five years or less. Another 18 percent of all inmates of these institutions were serving a sentence of more than five years for a drug offense. Under current[164] Federal sentencing guidelines, a five-year sentence would require importing or distributing at least 20 grams of heroin or 20 kilograms of marijuana by an offender with a very substantial record of prior convictions. A first offender would be unlikely to receive such a sentence for less than 80 grams of heroin or 80 kilograms of marijuana. We can assume, therefore, that the category of offenders with drug sentences exceeding 5 years comprises mostly mid-to upper-level drug wholesalers and importers.

From 1999 to 2000, the number of drug offenders with longer sentences increased slightly among the federal low security prisons, remaining at about 17½ percent from 2001 to 2004. The Taft facility had a greater than average proportion of this kind of offenders on the day it opened, and rapidly accumulated more (Figure 4.4). During its first nine months of operation, Taft had between 50 percent and 75 percent more of these offenders than the average for other prisons at the same security level. After March 2000, the number of such offenders at Taft decreased toward the average of other federal low-security prisons.

---

**Figure 4.4**

**Drug Offenders with Sentences Exceeding Five Years, by Month (March 1999–August 2004)**



*Source*: Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

---

[164] http://www.ussc.gov/2002guid/2d1_1.htm

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 24 of 44 PageID #: 16581

MARLOWE_0007584

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The presence of these higher-level drug traffickers is directly related to the availability of drugs within prisons. Prisons with the highest concentrations of such offenders had three to five times as many positive drug tests as prisons with the lowest concentrations. The concentration of lower-level drug offenders, in contrast, seems completely unrelated to in-prison drug use.[165]

*Inmates Nearing The End Of Their Sentence*
Median sentences in these institutions ranged from five years (at FCI Allenwood and FCI Big Spring) to eight years (at FCI Butner and FCI Petersburg). On average, about a quarter of the inmates were within a year of their projected release date, and about a sixth were within eight months of projected release. Misconduct at this point could significantly delay an inmate's release, so it is reasonable to hypothesize that inmates approaching their release dates are more likely to avoid the risk of getting caught using drugs, and hence that the concentration of such inmates in a prison population would be related to its overall drug use. Indeed, the incidence of drug use is negatively related to the concentration of inmates nearing their release dates. The rate of positive tests is about twice as high in the prisons with the lowest numbers of such inmates as it is in those with the highest numbers.

During the five years covered by our data, median sentences increased significantly (from about six years in the spring of 1999 to eight years in 2004). Consequently, the proportion of inmates nearing their release dates fell, both at the Taft facility and at the federally operated institutions. With the exception of a few months in the winter of 1999-2000, however, about as many inmates at Taft were within eight months of their release as inmates at other prisons.

*Separatees*
In 2004, 36 percent of inmates in these prisons were administratively separated from some or all of the rest of the prison population, generally as a safety precaution. The number of such separatees has increased gradually since 2001, both at Taft FCI and at other federal institutions. By itself, the number of separatees shows little relation to the incidence of drug use. However, when both time left to serve and the proportion of separatees are considered together, each is significantly correlated with drug use.

*Age*
The average age of inmates in these prisons is about 37 years. Twelve percent are 25 years old or younger, and five percent are over the age of 50. Among the general population, young people use considerably more drugs than their elders. We cannot observe this pattern directly in the prison data, because we analyzed only prison-level information, but we do observe that prisons with higher concentrations of older inmates also have lower levels of drug use, while those with higher concentrations of inmates in their early thirties have higher levels of drug use. Until 2001, Taft had slightly fewer older inmates than the average of other low-security prisons; thereafter, it had slightly more.

*Race and Ethnicity*
The racial composition of federal prisons is quite varied. In 2004, 37 percent of inmates of government-operated low security prisons were African-American, and 36 percent were Hispanic.[166]

---

[165] As with assaults, these analyses are conducted entirely with prison-level data, and do not support inference about individual prisoners. For example, we would not infer that the drug dealers are the individuals using the drugs; the contrary is more probably true.

[166] Hispanics may be of any race.

MARLOWE_0007585

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

In five of low security federal prisons (FCI Ashland, FCI Butner, FCI Milan, FCI Petersburg, and FCI Yazoo City) more than half the inmates were African-American. In six others, including Taft, fewer than 20 percent of the inmates were African-American. In six prisons more than half the inmates were Hispanic (FCI Bastorp–59 percent, FCI Big Spring–64 percent, FCI La Tuna–74 percent, FCI Safford–59 percent , and Taft Correctional Institution–57 percent). In the prisons with a majority of African-American inmates, 9 to 17 percent of inmates were Hispanic.

Drug use is slightly more prevalent in prisons where a majority of the inmates are African-American than in those with lower concentrations. We do not find a direct correlation between the concentration of Hispanic inmates and drug use, but only because the concentration of Hispanic inmates is negatively correlated with the concentration of African-American inmates.[167] When the concentrations of both African-American and Hispanic inmates are considered simultaneously, a one percent increase in either one corresponds to a 2 percent increase in drug use.[168] During this period, Taft had significantly more Hispanic inmates (more than 50 percent) than other prisons (under 40 percent), and significantly fewer African-American inmates (18 percent) than other prisons (34 percent). The net result is that Taft had fewer minority inmates than most other prisons throughout the period, with the gap widening over time.

### *Estimating Differences in Drug Test Outcomes at Taft and Federal Prisons*

During the period when Taft examined here, Taft and the 20 low security facilities operated by the Bureau of Prisons administered a total of 93,752 random drug tests, averaging more than 4500 tests per institution. Some prisons went through several months without a single inmate testing positive for any unauthorized substance. Five prisons reported fewer than ten positive test results since March 1999.[169] Others registered one or more positive results in most months (Figure 4.3). Within each month, the rate of positive test outcomes can be viewed as a sample estimate of the rate for all prisoners. The estimate of the rate is $r = \dfrac{p}{n}$, where n is the total number of tests administered in the month and p is the number of positive test results. The variance of the estimate is

$Var(r) = \dfrac{p(n-p)}{n}$. Thus the variance of the estimate depends on both the number of tests performed and the hit rate. This violates the ordinary least squares regression assumption that the errors are identically and independently distributed.

Instead we use the generalized linear model[170] $\ln\left(\dfrac{E(r)}{1 - E(r)}\right) = x\beta \qquad r \sim \text{Binomial(n, p)}$. This is the standard logistic model commonly used for proportions. We also tested the simpler model $E(r) = x\beta$ with the same binomial distribution. With a single categorical independent variable, this model has the interpretation of a weighted average of the rates for each category. When additional variables are introduced, the interpretation becomes less intuitive. The two formulations give very similar results. We present only the logistic form, which fits the data slightly better.

---

[167]  r = -.82

[168]  The coefficient is greater than one because we are analyzing the composition of the entire prison population, rather than the behavior of specific individuals.

[169]  FCI Safford (2), FCI Loretto (5), FCI Waseca (6), FCI Allenwood (9), and FCI Sandstone (9).

[170]  STATA procedure GLM

---

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

To highlight the effects of prisons on drug use, the model is rewritten as follows:

$$\ln\left(\frac{E(r)}{1-E(r)}\right) = x\beta + \mu_{prison} + \varepsilon \qquad r \sim \text{Binomial}(n, p)$$

where $\mu_{prison}$ is the effect for a specific prison. We estimate $\mu_{prison}$ by random effects generalized estimating equation. The rates observed in each prison are nearly uncorrelated from one month to the next ($r = 0.07$)

Although prison demographics and sentencing information explain much of the variation in drug test outcomes, Taft Correctional Institution still has significantly more failures than would be expected based on the composition of its population. Table 4.3 shows the results of a binomial regression where the dependent variable is the log of the odds that a random drug test will return an unauthorized positive result. When other variables are taken into account, race and ethnicity are no longer significant predictors of drug use. The coefficients associated with most individual age groups are also not statistically significantly different from zero, but the when these variables are tested jointly, we find some evidence of a relationship. We simplified the distribution of time left to serve by computing a linear combination of the proportions in each category that is approximately equal to the prison's average remaining time. Prisons with higher averages are associated with higher drug use. Taft's coefficient is +1.3 with a standard error of 0.3. Because the outcome is measured in the log-odds metric, this means that the odds of a positive drug test at Taft are $e^{1.3} = 3.5$ times as high as in other institutions, even after accounting for differences in inmate population composition.

MARLOWE_0007587

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 4.3**

**Binomial Regression of Random Drug Test Results**

| | Coefficient | Standard Error | z | Probability |
|---|---|---|---|---|
| Ethnicity: Proportion of | | | | 0.415 |
| African-American inmates | 1.089 | 1.194 | 0.910 | 0.362 |
| Hispanic inmates | -0.083 | 1.123 | -0.070 | 0.941 |
| Age: proportion of inmates | | | | 0.037 |
| 26-30 | -4.615 | 4.973 | -0.930 | 0.353 |
| 31-35 | 8.175 | 4.513 | 1.810 | 0.070 |
| 36-40 | 1.744 | 4.636 | 0.380 | 0.707 |
| 41-45 | -1.817 | 5.223 | -0.350 | 0.728 |
| 46-50 | 6.752 | 5.516 | 1.220 | 0.221 |
| 51 and over | 4.130 | 6.418 | 0.640 | 0.520 |
| Drug Sentences: Proportion of inmates with drug sentences | | | | 0.001 |
| 5 years or less | 2.933 | 0.836 | 3.510 | 0.000 |
| Greater than 5 yrs | 2.858 | 1.906 | 1.500 | 0.134 |
| Proportion of inmates who are separates | -6.643 | 2.233 | -2.970 | 0.003 |
| Average years left to serve | 0.377 | 0.145 | 2.610 | 0.009 |
| Indicator for Taft FCI | 1.267 | 0.314 | 4.030 | 0.000 |
| Constant | -8.224 | 2.709 | -3.040 | 0.002 |

*Notes*: Two-tailed z-test. For groups of variables, probability is Wald test that all coefficients are jointly equal to zero.

*Source*: Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

This difference is unlikely to be the result of chance variation in test outcomes. The probability of observing such a value is less than 1 in 1,000 under the hypothesis that Taft actually has the same rate of drug use as the other prisons.

In summary: We have approximately 95 percent confidence that drug use at Taft was at least twice as high as at other low security federal institutions during this period. We have no explanation of this finding. Drugs can be brought into prisons by visitors, by staff, and by smuggling them into the prisons in the mails or other goods brought by visitors. GEO's managers hypothesize that there may be larger numbers of inmates at Taft using drugs as a result of the large numbers of visitors the prison receives each week. Although inmates are searched following visits, processing visitors in and out of the facility and prisoners in and out of the visiting rooms creates some holes in the membrane of security surrounding prisons. GEO's managers believe that the Taft facility manages a larger number of visitors than do most other low security federal facilities, which may affect the availability of illegal drugs in the prison population. No attempt was made to test this hypothesis.

**Vital Function: Provide Administrative Remedies and Procedures to Hear Prisoners' Grievances**

The numbers of grievances filed by inmates may be an indicator of inmates' perceptions of how fair and adequate is their treatment. To be sure, perceptions of unfairness and dissatisfaction are

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

pervasive in prison and are endemic to imprisonment. Nonetheless, differences from one federal prison to another in the numbers of grievances filed may be useful indicators of the *relative* fairness of Taft as compared to other facilities, as perceived by inmates, at least.

Prisoners make a formal request for administrative redress of a grievance by submitting a form (BP-10 in the federal prisons). At the twenty government-operated prisons, about one-third of all submitted such forms are rejected and not filed. Administrators at the Taft facility reject nearly half of the forms their inmates submit. Because action on complaints represents the combined effect of the inmate's filing and the administrator's decision, only the number of forms submitted are analyzed here, and not the number filed.[171]

In certain months, the data about these BP-10 forms in the Key Indicators/Strategic Support System seem suspiciously anomalous. In December of 2003, for example, thirteen of the 21 prisons reported exactly zero forms submitted.[172] In several months, Safford reported numbers of BP-10 submissions that exactly equaled their average daily populations. We there excluded both zero and 100 percent values of numbers of submissions from the analysis. Figure 4.5 shows both the raw data (left panel) and the cleaned data (right panel).

Prisoners at the Taft facility submitted these at a higher rate than at all other prisons (about .66 submissions per inmate per month, compared to an average of about .57 per inmate/month in all low security federal facilities combined), although rates at three federal correctional institutions were nearly the same (FCIs Waseca, Safford, and Lompoc). A comparison of the reasons for filing these grievances shows that Taft's inmates were substantially more likely to be complaining about housing-related matters and disciplinary matters than at other low security federal prisons (Table 4.4).

---

[171] Even this may be subject to some administrative influence. Prisoners must file a form BP–9 to request form BP-10. An administrator might use this procedure or others to influence prisoners' willingness to resort to formal procedures.

[172] In other months, the average prison reports about 800 forms submitted.

MARLOWE_0007589

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Figure 4.5

**Administrative Remedies Sought, By Prison (September 2000 To August 2004)**



MARLOWE_0007590

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 30 of 44 PageID #: 16587

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 4.4**

**Requests to Submit Grievances at Taft Correctional Institution and Bureau-Operated Low Security Federal Correctional Institutions, by Reason (September 2000–August 2004)**

| Subject of Grievance | Federal FCIs | Taft Correctional Institution |
|---|---|---|
| Housing | 26.8% | 36.3% |
| Staff | 10.5% | 5.7% |
| Medical | 8.4% | 5.5% |
| Disciplinary Actions | 7.0% | 16.5% |
| Classification | 7.3% | 6.4% |
| Transfer | 7.1% | 8.2% |
| Sentence Computation | 4.9% | 3.0% |
| Jail Time Credit | 4.5% | 2.6% |
| Institutional Programming | 4.5% | 2.2% |
| Institutional Operations | 3.3% | 3.9% |
| Pre-release | 2.4% | 3.2% |
| Legal | 2.6% | 0.7% |
| Work Assignments | 2.4% | 2.0% |
| Special Housing | 2.3% | 0.9% |
| Mail | 1.3% | 0.6% |
| Records Management | 1.0% | 0.2% |
| Visiting | 0.8% | 0.4% |
| Education, Recreation, Leisure | 0.8% | 0.1% |
| Food | 0.7% | 0.3% |
| Communication | 0.6% | 0.2% |
| Dental | 0.3% | 1.0% |
| Disability | 0.2% | 0.1% |
| Searches & Restraints | 0.2% | 0.0% |
| Mental Health Care | 0.1% | 0.1% |
| Control | 0.1% | 0.0% |
| **Total** | **100%** | **100%** |
| *(Number)* | *(23,031)* | *(1,684)* |

*Source:* Computed by Abt Associate Inc. using data from Bureau of Prisons Key Indicators/Strategic Support system.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 31 of 44 PageID #: 16588

MARLOWE_0007591

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

To estimate the differences among Taft and other low security federal facilities in rates of submitting grievances, accounting for other observed factors that may affect the these rates, we constructed a regression model of the number of grievances submitted (Table 4.5). The model is

$$S_j = \sum x_i \beta_i + \mu_j + \varepsilon \text{ , where}$$

$S_j$ = Number of form BP-10s submitted per inmate in prison j

$x_i$ = Characteristics of the inmate population, and other independent variables

$\mu_j$ = The effect of prison j

$\varepsilon$ = Error term

The number of submissions per inmate increased modestly over the period examined here (September 2000–August 2004). Prisons with high concentrations of African-American or Hispanic inmates reported a relatively lower rate of submission than those with smaller proportions of minority prisoners. Other characteristics did not show a significant relationship to submission rates. (In our model, we retained information about the distribution of inmates' time left to serve. Conclusions about Taft are unaffected by whether this information is considered or ignored.) When these characteristics are taken into account, the differences are similar to the simple differences in rates without accounting for any other differences among prisons and prisoners. That is, prisoners at Taft submit more requests (about 13 percent more) for administrative relief than do prisoners at other low-security Federal prisons, on average (Table 4.5 and Figure 4.4).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 4.5**

**Regression Analysis of Grievances Submitted**

| | |
|---|---|
| Month | 0.001** |
| Proportion of African-American Prisoners | -0.028 |
| Interaction: African-American x Hispanic | -0.499 |
| Proportion of Hispanic inmates | -0.198 |
| Proportions left to serve < 4 mos. | -0.201 |
| Proportions left to serve 5-8 mos. | 0.94 |
| Proportions left to serve 9-12 mos. | -0.532 |
| Proportions left to serve 13-24 mos. | 0.204 |
| Proportions left to serve 25-60 mos. | 0.152 |
| Proportions left to serve 61-120 mos. | 0.02 |
| Indicator for Taft FCI | 0.128*** |
| Indicator for December, 2003 | -0.168*** |
| Constant | -0.017 |

*Notes:*   * $p<.05$; ** $p<.01$, *** $p<.001$

*Source:*   Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

MARLOWE_0007593

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 4.6**

**Number of Grievances Per Inmate Month (September 2000–August 2004)**



*Note:* Based on number of Form BP 10s submitted. In months when a prison reported exactly zero submissions, or exactly one submission per inmate, we substituted the average rate for other months in that prison.

*Source:* Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

# Goal Number 4: Correctional Leadership and Effective Public Administration

**Vital Function: Provide Independent, Objective Oversight to Reduce Waste, Loss, Unauthorized Use, Misappropriation of Funds and Assets, and to Help Improve the Performance and Efficiency of BOP Programs.**

GEO has sought and won accreditation from the American Correctional Association, the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) for its health services, and from the International Organization for Standardization (ISO) for its quality assurance system.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 34 of 44 PageID #: 16591

MARLOWE_0007594

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Goal Number 5: Inmate Programs and Services

**Vital Function Regarding Patient Care: To Identify and Provide a Timely and Effective Response by Qualified Health Care Staff to Legitimate Health Care Needs for Inmates.**

**Vital Function Regarding *Resource Management*: To Identify, Develop, and Manage Essential Resources that Best Meet the Operation Needs of the Health Care Program**

Prisoners at the Taft facility are attended to by healthcare professionals at about the same rate as at low security federal prisons (Figure 4.7). GEO's staffing of its healthcare services differs from the Bureau's, however. Most federal prisons rely on a combination of physicians' assistants, doctors, and registered nurses to provide routine care. GEO does not employ physicians' assistants, so that many more patients at this facility see a registered nurse or nurse practitioner. In addition, Taft prisoners are substantially more likely to see physicians than are inmates at other federal institutions (Figure 4.7). Thus, while the total number of patient visits is about the same, the type of care may be substantially different.

**Figure 4.7**

**Medical Care Visits, by Type Of Provider — September 2000 to August 2004**



*Source:* Computed by Abt Associates using data obtained from Bureau of Prisons' Key Indicators/Strategic Support System.

Case 3:16-cv-02267    Document 365-10    Filed 11/20/20    Page 35 of 44 PageID #: 16592

MARLOWE_0007595

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Summary

On a variety of measures, GEO's performance in operating the Taft facility is similar to the Bureau's performance in low-security federal prisons. GEO has obtained for the Taft facility accreditation from national and international organizations. The firm has generally maintained adequate staffing levels (and has experienced low staff turnover). It has provided a variety of programs to prisoners (although it lost a significant source of inmate employment when the Bureau pulled the prison industry program out of Taft in 2003 so that it could be relocated in a federal prison to provide employment opportunities there). Prisoners are able to access health care at the same rates as in federal prisons, and are more likely to see a physician than in federal facilities. GEO has succeeded in providing inmates and staff with a safe living and working environment. No prisoners or staff have been killed at the facility. Rates of assault on staff and other prisoners have been lower than the average rates in all low security federal prisons combined, although within the range observed in the safest federal facilities.

On some other dimensions, however, GEO's performance has differed from other federal institutions. It has experienced two escapes, one during the early period (1998), and it has changed procedures to prevent repeats, and another more recently that was does not signal lax security because it was thought impossible to escape through a trash compactor.

There is also evidence that illegal drugs are significantly more pervasive than in low-security federal prisons. In these federal facilities, fewer than 1 percent of all prisoners tested at random for drug use are tested positive. This is not a constant pattern at federal facilities, because some of these low security prisons report higher rates of positive drug tests that others, and rates can vary significantly from one time period to the next at a single facility. At the Taft facility, the odds of a prisoner testing positive if picked at random was about 3 times as high, on average, throughout the period examined here.

Finally, prisoners at the Taft facility are somewhat (approximately 12 percent) more likely to submit grievances, largely because of higher rates of complaints about their housing situation and about disciplinary practices.

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 36 of 44 PageID #: 16593

MARLOWE_0007596

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

MARLOWE_0007597

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Appendix

# Statistical Procedures for Estimating What Materials, Supplies, and Miscellaneous Other Items Would Have Cost Under Direct Bureau Management

The A-76 procedure requires examining the performance work statement developed by the government for the facility and developing a list of all required material, supplies, and services by the quantities needed, unit prices, and escalation for out-years. The Bureau did not develop such a list, so these costs are estimated based on observed expenditures at 14 other low-security federal prisons for which costs could be identified unambiguously. This is the same set of facilities used to estimate premium compensation, discussed in Chapter 2. Reported expenditures at each facility for each fiscal year (1998 through 2002) were obtained from the Bureau of Prisons. These were reported for the categories of expense shown in Table 2.11 in Chapter 2.

Spending for these various items at these 14 federal prisons depends mainly on the size of the facility, measured as the average daily prisoner population. Other determinants, such as the facility's age and geographical location, may affect some minor cost components such as travel and cost of utilities. To estimate what the Bureau would have spent for these items if it had operated the Taft facility, statistical analyses were conducted to examine the extent to which these costs varied according to the number of prisoners held by these prisons during each of the five years. Because the levels of expenditure might be affected by differing proportions of low and minimum-security prisoners at the prisons, the numbers of prisoners in low security units and minimum security camps were included as separate variables in a multivariate estimation model.

Each fiscal year for each prison contributes one observation, so the analysis is based on a total of 70 observations. The observations are not independent, however, because the three observations within each prison are correlated. Our estimates take this lack of independence into account.

Ten budget categories contribute to non-staff costs (Table A.1). The largest of these categories is supplies, which accounts for about half the cost in each year. Travel, "other services," and utilities make up most of the remaining cost.

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 38 of 44 PageID #: 16595

MARLOWE_0007598

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table A.1**

**Average Annual Costs Per Facility for Materials, Supplies, and Miscellaneous Services in 14 Federal Prisons, FY 1998–2002**

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Supplies | $2,385,687 | $2,615,494 | $2,975,432 | $3,311,462 | $3,063,407 |
| Other Services | $1,300,603 | $1,169,364 | $1,347,078 | $1,424,356 | $1,712,686 |
| Communications, Utilities, Misc | 967,038 | 936,543 | 1,002,148 | 1,198,238 | 1,123,395 |
| Travel | $173,690 | $162,198 | $182,498 | $192,515 | $174,326 |
| Equipment | $139,350 | $110,191 | $145,098 | $44,084 | $41,574 |
| Transportation | $64,337 | $70,652 | $66,817 | $52,568 | $62,630 |
| Grants Subsidies | $13,624 | $12,150 | $12,518 | $10,050 | $11,749 |
| Other [a] | $2,961 | $6,269 | $17,315 | $6,541 | $17,373 |
| **Total** | **$5,047,290** | **$5,082,861** | **$5,748,904** | **$6,239,813** | **$6,207,139** |

[a] Includes Insurance Claims, Other Rent, Printing & Reproduction, Land & Structures, STD Level User.

*Source:* Expenditure reports from Budget Executive Branch, Bureau of Prisons.

The period 1998-2002 was one of relatively low inflation. The GDP deflator was rising at 1.8% annually. OMB specifies a series of inflation assumptions for FY1998 to FY2002.[173] These assumptions lead to the price indices shown in table A.2. To convert actual spending to constant 2002 dollars, we divided each figure by the index for its year.

---

[173] OMB Circular A-76, Transmittal Memorandum No. 21 and 25.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table A.2**

**Average Materials and Supply Costs for 14 Prisons, FY 1998–2002**

|  | 1998 | 1999 | 2000 | 2001 | 2002 |
|---|---|---|---|---|---|
| Materials and supplies cost (actual) | $5,047,290 | $5,082,861 | $5,748,904 | $6,239,813 | $6,207,139 |
| Price Index | 93.02% | 94.23% | 95.65% | 97.85% | 100.00% |
| Cost in 2002 dollars | $5,425,756 | $5,393,874 | $6,010,514 | $6,377,089 | $6,207,139 |
| ADP (average of 14 prisons) | $1,239 | $1,350 | $1,458 | $1,445 | $1,497 |
| Cost per ADP | $4,378 | $3,995 | $4,122 | $4,412 | $4,145 |
| Taft ADP | $1,091 | $2,230 | $2,379 | $2,376 | $2,343 |
| Taft at average cost | $4,776,817 | $8,909,880 | $9,806,318 | $10,483,197 | $9,712,664 |

Expressed in constant 2002 dollars, spending for materials, supplies, and other non-personnel items prisons rose from an average of $5.4 million in FY1998 to $6.2 million in FY2002 (an annual rate of 3.3%). During this period, the average daily population of these prisons rose from 1,239 to 1,497 (an annual rate of 4.8%). This yields an average annual constant dollar cost per inmate during this period that varies between $4,000 (in FY 1999) and $4,400 (in FY1998 and FY2001). In FY2002, the Taft Correctional Institution housed an average of 2,343 inmates. At the average annual cost of the 14 other prisons that year, this would have cost $9.7 million.[174]

However, the Taft Correctional Institution is both the newest (1997) and the largest (2,343) of the facilities making up this estimate, and consequently might not experience "average" costs, since prisons might experience economies (or diseconomies) of scale. To account better for differences in population size, a different estimate was developed.

This estimate assumes that costs can be divided into two categories: variable and fixed. The former vary quite directly according to the average daily population (ADP) of prisoners in a facility (for example, the cost of meals); whereby the latter are associated with operating the facility regardless of whether the facility is fully occupied, or half occupied (such as heating or cooling). This leads to the equation

$$\frac{cost}{price\ index} = fixed\ cost + (variable\ cost) \times (average\ daily\ population) + \varepsilon$$
$$= \$552,019 + \$3,411 \times (adp) + \varepsilon$$

This equation estimates the cost for each of the three years. The cost is adjusted for each of the years by the price index—the OMB-prescribed escalation rates for FY 1999 and FY 2000.

---

[174] That is, $3,886 X 2231 inmates=$8.7M. This estimate has a 95% confidence interval of $\pm$ $750,000.

Case 3:16-cv-02267     Document 365-10     Filed 11/20/20     Page 40 of 44 PageID #: 16597

MARLOWE_0007600

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Figure A.1 shows that costs increase with the size of the institution, but it also shows considerable variation among costs for institutions of similar size. Some of this variation is systematic. In the figure, circles show prisons without camps, and prisons with camps are shown by triangles. Prisons with camps appear to have slightly higher costs than non-camp prisons of similar size.

**Figure A.1**

**Costs of Materials and Supplies at Low Security Prisons (2002 dollars) 1998–2002, by Average Daily Population and Presence of Camps**



In addition, the newest prisons (especially those opened in 1997) appear to have lower average costs than older institutions (Figure A.2). This suggests that we expand the equation to reflect the security mix of the population and the age of the facility. Table A.3 shows the regression estimate based on these variables. This equation uses two variables (an indicator variable and the number of camp inmates) to express the existence and size of the camp. The estimated coefficients for both of these variables have very large standard errors (about as large as the estimates themselves). This is because the two variables are correlated.[175] Moreover, the variable cost per camp inmate ($3.253) is indistinguishable from the variable cost per walled inmate ($3,422). This suggests a simplified version of the equation that treats the variable costs for both security levels as equal. This simplified equation is shown in table A.3, and is the one used in our calculations.

---

[175] r=0.82

MARLOWE_0007601

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure A.2**

**Costs Per Inmate of Materials and Supplies at Low Security Prisons (2002 dollars) 1998–2002, by Age of Facility**



Table A.5 shows the result of applying the equation in table A.3 to Taft's population during five years, FY 1998 through FY 2002. This table shows the results in constant 2002 dollars and current dollars; the confidence intervals are expressed in current dollars only. For example, in FY 2002 the estimate is $8.0 million, with a 95% confidence interval of $525,435—which means that the estimate probably ranges between $7.515 and $8.565 million. This confidence interval is based on the standard error of the prediction; that is, it includes an estimate of the error in estimating the regression equation, but does not include error due to random variation among institutions or from year to year at a single prison.

Estimates for FY1998 were then adjusted to account for the fact that the operational phase would have not lasted a full year, but instead from December 20, 1997 through September 30, 1998. (See Chapter 2 for adjusted estimates.) The fixed portion of the FY 1998 estimate was therefore reduced by 22 percent to reflect the partial year of operation. The variable cost estimate was not adjusted because it is based upon the average daily population of the facility during the entire year, and this measure was averaged at the Taft facility using the entire year's data, including months when there were no prisoners.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table A.3**

**Regression Equation for Materials and Supply Costs (Including Two Variables for Camp Costs)**

| Cost in 2002 dollars | Coefficient | Standard Error | t | P>t | [95% Confidence Interval] | |
|---|---|---|---|---|---|---|
| Non-camp inmates | 3,422 | 244 | 14.02 | <.001 | 2,895 | 3,949 |
| Camp inmates | 3,253 | 2,026 | 1.61 | 0.132 | -1,125 | 7,630 |
| Camp fixed cost | 535,406 | 532,559 | 1.01 | 0.333 | -615,117 | 1,685,928 |
| Age | 23,040 | 3,318 | 6.94 | <.001 | 15,872 | 30,209 |
| Non-camp fixed cost | 29,668 | 351,373 | 0.08 | 0.934 | -729,427 | 788,764 |

*Note*:   Age is measured in years older than Taft (1997=0, 1996=1, etc.).

*Source*:  Computed by Abt Associates Inc.

**Table A.4**

**Regression Equation for Materials and Supply Costs (Including One Variable for Camp Costs)**

| Cost in 2002 dollars | Coefficient | Standard Error | t | P>t | [95% Confidence Interval] | |
|---|---|---|---|---|---|---|
| Total inmates | 3,411 | 255 | 13.36 | <.001 | 2,859 | 3,962 |
| Camp fixed cost | 503,027 | 242,810 | 2.07 | 0.059 | (21,532) | 1,027,586 |
| Age | 22,885 | 3,780 | 6.05 | <.001 | 14,718 | 31,052 |
| Non-camp fixed cost | 48,992 | 400,248 | 0.12 | 0.904 | (815,692) | 913,676 |

*Note*:    Age is measured in years older than Taft (1997=0, 1996=1, etc.).

*Source*:  Computed by Abt Associates Inc.

**Table A.5**

**Regression Estimate for Materials and Supply Costs at Taft FCI, 1998–2002 (in Current and Constant FY 2002 Dollars)**

| | Average Daily Population | Estimated Cost | | 95% confidence interval | |
|---|---|---|---|---|---|
| | | Constant Dollars | Current Dollars | | |
| 1998 | 1091 | $4,151,510 | $3,861,735 | $3,276,000 | $4,447,469 |
| 1999 | 2230 | 8,157,595 | 7,686,902 | 7,411,100 | 7,962,704 |
| 2000 | 2379 | 8,665,770 | 8,288,809 | 7,997,011 | 8,580,608 |
| 2001 | 2376 | 8,152,512 | 7,977,233 | 7,449,442 | 8,505,024 |
| 2002 | 2343 | 8,039,963 | 8,039,963 | 7,514,528 | 8,565,398 |

*Note*:    Estimates for FY98 adjusted for partial year of operations.  Confidence intervals refer to current dollar costs.

*Source*:  Computed by Abt Associates Inc.

Case 3:16-cv-02267         Document 365-10        Filed 11/20/20        Page 43 of 44 PageID #: 16600

MARLOWE_0007603

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

MARLOWE_0007604