# EXHIBIT 157

Exhibit 563

Dalrymple, S.
10/22/20
@ptus



UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | § § § § § | Civil Action No. 3:16-cv-02267 |
| Plaintiff | § § § | Honorable Aleta A. Trauger |
| v. | § § | |
| CORRECTIONS CORPORATION OF AMERICA, DAMON T. HININGER, DAVID M. GARFINKLE, TODD J. MULLENGER, AND HARLEY G. LAPPIN, | § § § § § | |
| Defendants. | § § | |

---

**REBUTTAL EXPERT REPORT OF
W. SCOTT DALRYMPLE, CFA
SEPTEMBER 18, 2020**

---

**CONFIDENTIAL**



**TABLE OF CONTENTS**

Page

I.      Introduction and Summary of Opinions ..........................................................................................1

II.     Overview of the Allen Report ......................................................................................................2

III.    Opinions on the Allen Report ......................................................................................................3

        A.      Ms. Allen Ignores Plaintiff's Theory of Liability Upheld by the Court ..................................3

        B.      Ms. Allen's Attribution of CCA's Stock Price Decline Following the Yates Memorandum
                to a Political Shift Is Irrelevant and Does Not Support her Conclusions ............................6

        C.      Ms. Allen's Discussion of Events After the Yates Memorandum is Inapt ..........................8

        D.      Ms. Allen's Comparison of CCA to GEO is Improper and Further Demonstrates the
                Impact of the Yates Memorandum on CCA ....................................................................10

        E.      Ms. Allen's Opinions Regarding the Cibola Contract Loss are Flawed and Inconsistent
                with Economic and Valuation Principles ........................................................................12

IV.     Further Work ..........................................................................................................................12





7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

Re: Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated vs. Corrections Corporation of America ("CCA"),[1] Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin ("Defendants")

## I.  Introduction and Summary of Opinions

1.      I have been retained by Robbins Geller Rudman & Dowd LLP in the above-styled case to provide opinions on share price inflation arising from Defendants' alleged scheme to defraud investors and make materially false and misleading statements and omissions regarding CCA's business and operations. I previously submitted a report in this matter dated August 7, 2020 (the "Dalrymple Report") in which I measured the inflation in CCA's stock price caused by the materialization of the allegedly concealed risks between February 27, 2012 and August 17, 2016 (the "Class Period").[2]

2.      Since issuing the Dalrymple Report, I have been asked to review and analyze the opinions of Lucy P. Allen provided in her expert report dated August 7, 2020 ("Allen Report"). In the Allen Report, Ms. Allen sets forth her opinion that there was "no loss causation and no damages" associated with the alleged misrepresentations and omissions, or the corrective disclosures that plaintiff contends were in the zone of the risk concealed by Defendants' fraud.[3]

3.      In my opinion, Ms. Allen's opinions are disjoined from plaintiff's theory of liability in this matter and are therefore irrelevant to the assessment of share price inflation and damages arising from Defendants' alleged fraud. In addition, it is my opinion that the Allen Report suffers from multiple other flaws, which render Ms. Allen's opinions unreliable. Specifically, Ms. Allen:

    a.      ignores the theory of liability upheld by the Court in her analysis of share price inflation;

    b.      attributes CCA's price decline following the Yates Memorandum to a "political shift" that she erroneously concludes is unrelated to the alleged contraventions;

    c.      bases her opinions on irrelevant events after the corrective disclosures that have no bearing on share price inflation attributable to Defendants' alleged fraud;

    d.      relies on improper comparisons of CCA and GEO share price movements; and

---

[1]     Defendant Corrections Corporation of America, commonly abbreviated "CCA," trades on the New York Stock Exchange under the ticker symbol "CXW." (See "The CCA Story: Our Company History," available at http://www.correctionscorp.com/our-history.) In October 2016, Corrections Corporation of America announced that it was rebranding its corporate enterprise as "CoreCivic." (See press release, "Corrections Corporation of America Rebrands as CoreCivic," October 28, 2016). For the purposes of this report, unless otherwise noted, CCA, CXW, Corrections Corporation of America and CoreCivic are used interchangeably.

[2]     Defined terms in this report have the same meanings as in the Dalrymple Report unless otherwise noted.

[3]     Allen Report, ¶¶ 3-5.



> e.  improperly finds that CCA's loss of the Cibola contract had no effect on its share price.

4.  My credentials and qualifications are set forth in the Dalrymple Report. A list of additional materials I have considered in this matter is set forth in **Rebuttal Appendix B** to this report as well as in the citations to the text presented in this report.

5.  I will review, evaluate, and analyze additional data, facts, or information as it becomes available. I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me. The analyses and opinions described herein may, therefore, change based upon additional information that becomes available or other developments that occur.

## II.  Overview of the Allen Report

6.  According to Ms. Allen, she was instructed "to analyze Plaintiffs' claim of loss causation and damages to investors" who purchased shares of CCA stock during the Class Period.[4] Ms. Allen generally critiques what she characterizes as the plaintiff's theory of loss causation, which she summarizes in her findings as follows:

> I find that there is no loss causation and no damages from the alleged misrepresentations. Plaintiffs allege that misrepresentations about the quality and cost effectiveness of CoreCivic's facilities inflated the Company's stock price, and that investors in CoreCivic's stock suffered economic losses and damages when the "truth" about the alleged misrepresentations was revealed to the market. However, the very information regarding "operational shortcomings" at CoreCivic's BOP facilities, including purported "quality"-related "deficiencies," that Plaintiffs allege were concealed by the alleged fraud were released on a number of occasions both prior to and during the Class Period to *no* statistically significant price reaction.[5]

7.  Ms. Allen generally opines that CCA's stock did not have statistically significant price responses to news and information regarding the quality and safety of CCA's private prisons.[6] She cites a number of news reports, disturbances in CCA facilities, and the release of the OIG Review, opining that the lack of statistically significant market reactions to these events and information releases "directly contradicts Plaintiffs' claim of loss causation and damages."[7]

8.  Ms. Allen also opines that her understanding of plaintiff's theory of loss causation and damages is inconsistent with the lack of a statistically significant price reaction following the release of the OIG Review, which she states allegedly revealed the truth about certain cost and quality deficiencies in private prisons.[8] Ms. Allen also opines that plaintiff's arguments about the OIG Review have been inconsistent.

---

[4]  Allen Report, ¶ 1.
[5]  Allen Report, ¶ 3 (emphasis in original)
[6]  Allen Report, Section VII.B.
[7]  Allen Report, Section VII.B and ¶ 3.
[8]  Allen Report, Section VII.B.1 and ¶ 30.



9.    Ms. Allen further opines that there is not loss causation and no damages associated with the Yates Memorandum and the Cibola Contract Loss.[9]

      a.    <u>Yates Memorandum</u>: Ms. Allen argues that the Yates Memorandum did not reveal new information about CCA's quality or cost savings, beyond the information that had been previously revealed in the OIG Review.  She opines that the Yates Memorandum did not change analysts' perceptions of CCA quality or cost savings in the subsequent months after its release.  Ms. Allen states that a "shift in policy driven by politics… (as opposed to any new information regarding the quality, performance and cost savings of CoreCivic's facilities) was the cause of the market reaction to the Yates Memo."[10]  She further opines that risk associated with changes in the political environment was clearly conveyed to the market by CCA.[11]  According to Ms. Allen, the recovery of CoreCivic's stock price following the presidential election demonstrates that a shift driven by politics, rather than CCA's misrepresentations, is responsible for the stock price loss.[12]

      b.    <u>Cibola Contract Loss</u>:  According to Ms. Allen, the loss of the Cibola contract was reported in New Mexico press before August 3, 2016 and had no price impact.  It was not new information on August 3, so "any price decline following August 3" cannot be due to the loss of the Cibola contract.[13]  She contends that the significant price reaction on August 4, 2020 was attributable to the news that the STFRC contract was being renegotiated, which was more financially significant than the Cibola Contract Loss, and which was the main subject of analyst commentary following CCA's second quarter 2016 earnings announcement.[14]

10.    Ms. Allen also compares the changes in GEO's and CCA's stock price loss immediately following the Yates Memorandum, observing that the two stocks experienced a similar price decline.[15]

### III.    Opinions on the Allen Report

#### A.    Ms. Allen Ignores Plaintiff's Theory of Liability Upheld by the Court

11.    Ms. Allen devotes significant portions of her report to a discussion of her views and representations of plaintiff's allegations.  Ms. Allen contends that the risks concealed by CCA's alleged fraud "were released on a number of occasions" and reiterates that plaintiff previously alleged that the

---

9    Allen Report, Section VII.C.
10    Allen Report, ¶¶ 50, 59-61.
11    Allen Report, ¶¶ 62-68.
12    Allen Report, ¶¶ 69-74.
13    Allen Report, ¶¶ 77-81.
14    Allen Report, ¶¶ 82-83.
15    Allen Report, ¶¶ 75-76.



OIG Review conveyed new information to the market and served as a corrective disclosure.[16] She also notes that other events were not associated with stock price declines, including: "(i) news of riots at CoreCivic's facilities, (ii) the release of investigative reports" regarding CoreCivic's facilities and "(iii) news that CoreCivic had received a "Cure Notice" from the BOP related to medical care at Cibola." Ms. Allen characterizes these events as additional examples of "disclosures that according to the Complaint were 'consistent' with the alleged corrective disclosures, and indicative of 'quality'-related 'deficiencies' at CoreCivic's facilities."[17]

12.    Ms. Allen's opinions hinge on her characterizations of the allegations, which she generally understands to be CCA's alleged concealment of issues related to quality, performance, and cost-savings.[18] Her report, however, ignores the key elements of plaintiff's claims upheld by the Court, which as I explain in the Dalrymple Report are that "CCA materially misrepresented that its correctional services offered sufficient quality and cost savings *that would result in government entities continuing to renew its contracts*."[19] The Court described plaintiff's claims as "a single, central theory of liability: that CoreCivic and its executives falsely touted its services as offering cost savings to governments while delivering an acceptable level of quality—defined, in some instances, in relation to compliance with particular standards—such that CoreCivic was an attractive option for continued and future government contracts."[20] The Court further described plaintiff's theory of liability, writing that:

> …CoreCivic and its executives had, for years, provided the public with an image of CoreCivic's contract performance that sharply diverged from the truth apparent behind the scenes. CoreCivic did not claim to be perfect, but it did publicly claim to be providing services that were, at least generally, in line with client expectations…At some point, DOJ leadership began to seriously question whether its continued reliance on private prison contractors, such as CoreCivic, should continue. The Yates Memorandum was the result.[21]

13.    Rather than evaluating the impact of the materialization of the risk that CCA's BOP business would be lost as a result of issues related to quality, performance, and cost-savings, Ms. Allen attempts to assess whether these issues affected CCA's share price *before* market participants became of aware of the deterioration of CCA's relationship with the BOP, and any link between these issues and CCA's ability to renew BOP contracts. While the Allen Report attempts to support the conclusion that investors did not react to allegations of poor quality in CCA facilities during the Class Period in the abstract, that is not plaintiff's claim. Instead, plaintiff argues that CCA concealed that these incidents had caused its

---

[16] Allen Report, ¶ 3; ¶¶ 31-36. Ms. Allen repeatedly refers to the 2017 Consolidated Complaint in reference to the OIG Review, ignoring subsequent filings and Court decisions regarding the extent to which various events represent corrective disclosures. *See* Memorandum dated March 26, 2019, pp. 32-33 and fn. 9 ("the court has concluded that the OIG Report included substantive deficiencies that undermined its ability to be corrective with regard to the entire Class Period.")

[17] Allen Report, ¶ 3.

[18] Allen Report, ¶ 17.

[19] Dalrymple Report, ¶ 17. Emphasis added.

[20] Memorandum dated December 18, 2017, pp. 25-26.

[21] Memorandum dated March 26, 2019, p. 3 (emphasis added). *See also* pp. 6-9.



relationship with the BOP to deteriorate, causing it to lose contracts and putting its business at risk.[22] Because she misconstrues the allegations put forward by the plaintiff and upheld by the Court, Ms. Allen fails to address any measure of inflation that is relevant to this case.

14.    Ms. Allen relies on the same flawed arguments that she made in her class certification reports about press coverage and public information, which do not address the impact of the allegedly concealed information.[23]  News reports and other public information that alleged quality and cost-savings issues, but which did not link these issues to problems with CCA's BOP relationship, are not relevant to assessing plaintiffs' claims.[24]  Similarly, statistical tests of share price reactions to allegedly false statements and discussions of CCA's performance and quality are inapplicable since they are not grounded in a plausible economic hypothesis based on facts or allegations in the case.  Said differently, there is no *ex ante* reason that one would expect a significant share price reaction to information that CCA *failed* to disclose.[25]

15.    For the same reasons, Ms. Allen's discussion of the OIG Review is inapt.  Furthermore, Ms. Allen ignores the Court's finding that "due to limitations on its date range, subject matter, and methodology," the OIG Review failed to "bridge the gap between CoreCivic's representations and the truth."[26]  Plaintiff contends that the information in the OIG Review did not fully reveal the truth about the concealed risks that the company faced as a result of its deteriorating relationship with the BOP, and the Court generally agreed.[27]

16.    Ms. Allen also disregards the Court's discussion in support of the Yates Memorandum as a corrective disclosure.  As the Court stated:

> Amalgamated argues…that the severity of the drop [following the Yates Memorandum] did not need to be as great as it was.  Rather, the steepness of the decline was, at least in part, attributable to the fact that CoreCivic and its executives had, for years, provided the public with an image of CoreCivic's contract performance that sharply diverged from the truth apparent behind the scenes.  CoreCivic did not claim to be perfect, but it did publicly claim to be providing services that were, at least generally, in line with client expectations.  Meanwhile, the feedback that CoreCivic was actually receiving from the BOP painted a different picture.  The BOP routinely sent "Notices of Concern" and other forms of notification informing CoreCivic of shortcomings at specific facilities.  Among the most commonly addressed issues were CoreCivic's chronically inadequate staffing and its failure to provide sufficient medical services to its inmates.  As the Class Period progressed, warnings to CoreCivic that it was falling short of expectations piled up. At some point, DOJ

---

[22]    Memorandum dated March 26, 2019, p. 3.

[23]    Expert Report of Lucy P. Allen dated July 16, 2018, at § VII.C.

[24]    Ms. Allen points to analyst commentary which is generally supportive of the general level of quality and cost savings (Allen Report, ¶¶ 41-42), ignoring that this only supports the notion that CCA's misrepresentations were sufficiently convincing to persuade analysts that CCA quality was sufficient and that cost savings were real.

[25]    Ms. Allen ignores the context of the information she cites and how it relates to plaintiff's allegations.  For instance, that the ACLU raised concerns over private prisons is not necessarily something that would be unexpected by market participants; *i.e.* it is not a surprise that "[t]he release of investigative reports by government agencies and third-party organizations into conditions at CoreCivic's facilities… did not cause a decline in the Company's stock price" (Allen Report, p. 24), as there is no evidence that market participants linked the ACLU's concerns to a deterioration in CCA's relationships and business.

[26]    Memorandum dated March 26, 2019, pp. 32-33 and fn. 9.

[27]    Plaintiff-Respondent's Opposition to Petition for Permission to Appeal Class Certification Order Pursuant to Federal Rule of Civil Procedure 23(f), dated April 19, 2019, pp. 4-5, 16-18; Memorandum dated March 26, 2019, p. 6-7.



eded

<u>leadership began to seriously question whether its continued reliance on private prison contractors, such as CoreCivic, should continue. The Yates Memorandum was the result.</u>[28]

17. Nevertheless, Ms. Allen contends that "[t]here is no loss causation and no damages associated with the Yates Memo" based on her assertion that it "did not provide the market with any new and/or corrective information about the quality or cost-effectiveness of CoreCivic's facilities."[29] By focusing on whether the Yates Memorandum revealed new information about CCA's quality and cost effectiveness, Ms. Allen misses the point. The Yates Memorandum allegedly revealed to the market the link between CCA's quality issues and its ability to retain the BOP business, which is the core of plaintiff's allegations upheld by the Court.

## B. Ms. Allen's Attribution of CCA's Stock Price Decline Following the Yates Memorandum to a Political Shift Is Irrelevant and Does Not Support her Conclusions

18. Ms. Allen attempts to explain away CCA's stock price decline following the Yates Memorandum as the result of a "shift in policy driven by politics…(as opposed to any new information regarding the quality, performance and cost savings of CoreCivic's facilities)."[30] She cites various analyst reports which contend that the Yates Memorandum was "politically motivated" or the product of a "political shift,"[31] and argues that "changes in the political environment and associated risk to CoreCivic's business, *rather than the alleged misrepresentations*, caused the market reaction to the Yates Memo."[32]

19. Again, Ms. Allen ignores the relevant allegations and the Court's previous conclusions in the case.[33] As the Court articulated at the class certification stage:

> CoreCivic argues that the Yates Memorandum instead merely revealed a "political decision" to move away from relying on private prisons. That argument, though, <u>hinges on the mistaken assumption that the "politics" of the federal government's private prison use are somehow separable from issues such as whether CoreCivic's prisons were safe for inmates, whether inmates were receiving adequate medical care, whether BOP considered its money to be well spent, and whether CoreCivic was able to meet the BOP's basic quality expectations.</u> Nothing in the record, however, supports this vision of politics as an external

---

28    Memorandum dated March 26, 2019, p. 3 (emphasis added).

29    Allen Report, VII(C) and VII(C)(1).

30    Allen Report, ¶¶ 50, 59-61.

31    Allen Report, ¶¶ 34, 59-61.

32    Allen Report, ¶ 4 (emphasis added).

33    Ms. Allen's approach appears to be grounded in the flawed reasoning that the Yates Memorandum did not disclose precisely the same information allegedly withheld by Defendants (see, for instance, Allen Report, Exhibit 1). But as the Court explained:

> The "materialization of risk" theory of demonstrating loss causation flows from the common sense assumption that concealed risks are sometimes revealed by events, not admissions. For example, if a company makes a fortune selling what it claims to be unbreakable widgets, its value will go down if it admits that the widgets are, in fact, breakable—but its value will also go down if it keeps silent but the widgets *just start breaking* and the public finds out about it. In either hypothetical, the value of the company has decreased because the public has learned the same truth. In either hypothetical, an unsuspecting shareholder would have been harmed by the same lie. To claim that only the hypothetical involving an admission represents an instance of loss causation by fraud would make little sense. (Memorandum dated January 18, 2019, pp. 12-13 (emphasis in original)).



Case 3:16-cv-02267   Document 365-18   Filed 11/20/20   Page 9 of 16 PageID #: 16798

force unrelated to the BOP's quality concerns. Indeed, the Yates Memorandum's own account of the DOJ's decision placed those concerns front and center.[34]

20.     In addition, the Court has addressed Ms. Allen's assertion that analysts viewed the Yates Memorandum to be political, stating:

> In her Report, Allen cites market analysts who characterized the BOP's proposed shift away from private prisons as "political," which CoreCivic suggests is evidence that the decision embodied by the Yates Memorandum was unrelated to quality or value of services. <u>A decision's being, in some sense, "political," however, is not mutually exclusive with its being related to the quality concerns that Amalgamated has raised. To the contrary, the record suggests that, insofar as the Yates Memorandum can be said to reflect a political decision, that political decision was driven by precisely the deficiencies that Amalgamated has highlighted.</u> When a company chooses, like CoreCivic has, to enter into a line of business that requires it to rely on government customers, then there is no neatly separating its client relationships from the underlying politics. <u>Perhaps the Yates Memorandum did reflect a political decision—the political decision to not keep using such low-quality services.</u>[35]

21.     Ms. Allen cites a number of quotations from analysts' commentaries, purporting that analysts did not change their perceptions of the quality or cost effectiveness of private prisons in the months following the Yates Memorandum.[36]     She fails to recognize, however, that analysts significantly altered their perceptions of risk and earnings expectations after the Yates Memorandum.  The same analysts whose opinions Ms. Allen claims were unchanged by the Yates Memorandum significantly reduced CCA's price targets, FFO expectations and price multiples following the Yates Memorandum, notwithstanding their commentary, as I discuss in the Dalrymple Report.[37]     These revisions reflected the broad market expectation of lower earnings and previously undisclosed risks to CCA's business after the Yates Memorandum.[38]     Ms. Allen makes no attempt to reconcile analysts' changes in expectations and price targets to the commentary she selects from their reports.

22.     Ms. Allen presents no reason for assuming that analysts' commentary would be reflective of the true state of the BOP relationship or that it is indicative of the true state of CCA's operations.  More generally, Ms. Allen's characterization of the Yates Memorandum as "political" and her implication that the Yates Memorandum fell outside the zone of the risk allegedly concealed by Defendants is not an economic opinion; rather, it is commentary on a finding that I understand is for the trier-of-fact.[39]

---

[34]     Memorandum dated January 18, 2019, p. 14 (citations omitted; emphasis added).
[35]     Memorandum dated January 18, 2019, p. 14 (citations omitted; emphasis added).
[36]     Allen Report, ¶¶ 50, 52-58.
[37]     Dalrymple Report, Tables 3 and 4.
[38]     Dalrymple Report, ¶¶ 70-78.
[39]     Ms. Allen puts forward other non-economic arguments regarding the facts of the case, claiming "CoreCivic warned that political opposition to privatized corrections and changes in government policy affecting incarceration rates were risks that could impact the Company's business." (Allen Report, ¶ 62).  She cites language from CCA 10-Ks that she asserts disclose the risk of resistance to private prisons and changes in government policies that lowered incarceration rates (¶¶ 62-64) as well as CCA's declining housed federal prisoner population (¶¶ 65-66).  Ms. Allen also cites to analysts' commentary noting that CCA's business was susceptible to public policy changes (¶¶ 67-68).  Ms. Allen does not appear to have performed any analysis in support of these assertions.



23.    Whether or not analysts asserted that the Yates Memorandum was politically motivated is beside the point.  For investors' purposes, the Yates Memorandum revealed the DOJ had assessed the quality of private prisons' quality, services, and cost savings, and concluded that "the [BOP] should either decline to renew [each private prison] contract or substantially reduce its scope in a manner consistent with law and the overall decline of the Bureau's inmate population."[40]  The market responded by reassessing CCA's value in light of this revelation, resulting in a decline in CCA's stock price to reflect this information.[41] Neither Ms. Allen's nor analysts' characterization of the Yates Memorandum as "political" suggests that this decision was unrelated to, or unexpected in light of, the deficiencies and facts that Defendants allegedly concealed.

**C.    Ms. Allen's Discussion of Events After the Yates Memorandum is Inapt**

24.    Ms. Allen claims "[t]he recovery in CoreCivic's stock price after the end of the Class Period is inconsistent with plaintiff's claim of loss causation and damages."[42]  According to Ms. Allen, CCA's recovery supports her contention that "changes in the political environment and associated risk to CoreCivic's business, rather than the alleged misrepresentations, caused the market to react to the Yates Memo."[43]

25.    To link the share price recovery with changes in the "political environment and associated risk to CoreCivic's business," Ms. Allen characterizes analyst reports describing the results of the 2016 presidential election as reflecting reduced "risk and uncertainty around the renewal of CoreCivic's contracts with the federal government."[44]  Ms. Allen also claims that "the fact that CoreCivic's BOP facilities continued to be contracted by government agencies, including the BOP, after the Class Period" supports her contentions.[45]  Ms. Allen cites the BOP's renewal of CCA's contracts at its Adams and McRae facilities to purportedly support her claims.[46]

26.    Ms. Allen's discussion of events after the corrective disclosures are irrelevant and unrelated to plaintiff's allegations.  Ms. Allen relies on arbitrary dates (*e.g.* the confirmation of Jeff Sessions as Attorney General) to evaluate CCA's share price recovery.[47]  By Ms. Allen's standards, any stock price change months or years following a corrective disclosure could be used as evidence against loss causation.

27.    That CCA's economic circumstances may have changed nearly three months after the Yates Memorandum does not demonstrate that the information revealed about CCA's BOP relationship did

---

[40]    Yates Memorandum.
[41]    Dalrymple Report, ¶¶ 70-78.
[42]    Allen Report, ¶ 69.
[43]    Allen Report, ¶ 69.
[44]    Allen Report, ¶¶ 69, 72-73.
[45]    Allen Report, ¶ 74.
[46]    Allen Report, ¶ 74.
[47]    Allen Report, ¶ 70. Ms. Allen even claims in her own Class Certification Report that a "structural break" was observed between the date of the Yates Memorandum and the confirmation of Sessions, indicating the relationship between CCA's stock price and market and industry changed in late 2016. *See* Expert Report of Lucy P. Allen dated July 16, 2018, ¶ 86.



not reduce the value of the company's stock at the time. The subsequent events that Ms. Allen identifies (*e.g.* the presidential election) are irrelevant to the share price inflation that was concealed prior to the corrective disclosures. What caused CCA's share price to decline was the materialization of the previously concealed risk that CCA would lose its BOP business based on the information available to market participants at the time. Ms. Allen's attempt to refute loss causation by examining CCA's share price at different points in time under different sets of market conditions and information is inapt.

28.     Even if CCA's supposed reversal of fortunes with the BOP were relevant, which it is not, Ms. Allen makes no attempt to separate any positive impact from the 2016 election on CCA's relationship with the BOP from the improvement in its share price related to expected new future business from ICE and other customers. As analysts explained after the 2016 election:

       a.     "[W]e believe the opportunity set created by the new administration will drive long-term value for CXW shareholders… Trump has been vocal when it comes to immigration policy, vowing to ramp up border security and detain more illegals for longer, resulting in a need for more capacity."[48]

       b.     "[W]e expect new contracts with Immigration and Customs Enforcement (ICE), state customers and increasing momentum for new real estate-only solutions."[49]

       c.     "Our valuation range increases to $30-$34 from $20-$24 based on a higher 13.0-14.0x EV-EBITDA multiple (more than one standard deviation above historical averages), given increased expectations for potential new ICE contract wins as a result of President Trump's strict border initiatives, or 13.0-15.0x 2017E FFO/sh."[50]

       d.     "We are encouraged by increasing ICE populations spurring guidance higher and anticipate new contract signing opportunities in 2017 driving FFO growth of 20% in 2018…Catalysts: (1) new contracts generally utilizing 9 idle facilities totaling 8,700 beds; (2) lease of the idle OK facility by Oklahoma; (3) new ICE contract for an idle facility in CO; (4) KY contracting for 1-3 idle facilities; (4) greater understanding of how stricter border enforcement by ICE could fuel population growth across all 3 federal customers; and (5) potential dividend increases in 2018."[51]

29.     Ms. Allen makes no attempt to disentangle these and other revisions to expectations from those that she improperly claims are related to the supposed reversal of CCA's prospects with the BOP after the corrective disclosures (which actually did not occur, as I discuss in the next section).

---

[48]    Canacord Genuity, "Raising GEO and CXW price targets on lower risk post-election," November 11, 2016.
[49]    SunTrust, "Sales Momentum Building; Raising Estimates and PT," December 15, 2016.
[50]    Wells Fargo, "CXW: Initiating 2018 Est & Updating Val Range Post Q4 Earnings," February 21, 2017.
[51]    SunTrust, "Utilizing Idle Beds to Fuel Rising Estimates; Increasing PT," February 9, 2017.



**D.    Ms. Allen's Comparison of CCA to GEO is Improper and Further Demonstrates the Impact of the Yates Memorandum on CCA**

30.    Ms. Allen claims "controlling for the movements in GEO's stock yields no reaction in CoreCivic's stock price following the Yates Memo."[52]  Ms. Allen attempts to support this claim by noting that the day of the Yates Memorandum, GEO's stock price declined by 39.6 percent, while CoreCivic's declined by 35.5 percent.[53]

31.    From these statements, Ms. Allen seems to suggest that, if she were to include GEO in an event study or other analysis of CCA's abnormal return, the extent of CCA's share price decline related to the allegations would somehow be eliminated or mitigated.  Ms. Allen, however, does not actually perform any corresponding analysis beyond the comparison of CCA and GEO's returns on August 18, 2016.  She also does not explain why GEO's price return in reaction to the Yates Memorandum is informative beyond a casual reference to GEO as CCA's "only publicly-traded competitor."[54]

32.    If Ms. Allen had expanded her examination by even one day to account for additional impact of the Yates Memorandum reflected in CCA's share price on August 19, 2016, she would have found that GEO's two-day return was negative 26.7 percent, compared to CCA's two-day return of negative 29.9 percent.  In other words, with a one-day window, GEO's percentage stock drop was about 4 percentage points *greater* than CCA's; with a two-day window, GEO's percentage drop was about 3 percentage points *less* than CCA's, a 7 percentage point fluctuation resulting from extending the observation period by one day.  While I do not believe such a comparison is appropriate, it demonstrates that Ms. Allen's one-day comparison is superficial and uninformative.

33.    Further, had Ms. Allen compared the course of GEO's BOP business to CCA's, she would have found that, after the Yates Memorandum, CCA continued to lose BOP contracts while GEO gained new ones.

      a.    On April 30, 2017, CCA's contract with the BOP at the 1,422-bed Eden Detention Center expired and was not renewed.[55]

      b.    On May 1, 2019, the BOP announced that it was not renewing CCA's contract at the 2,322-bed Adams County Correction Center.[56]

---

[52]    Allen Report, ¶ 75.
[53]    Allen Report, ¶¶ 75-76.
[54]    Allen Report, ¶ 75.
[55]    CoreCivic, Inc. Form 10-K for period ending December 31, 2017, p. F-19.  The facility was subsequently idled; *see id.*
[56]    CoreCivic, Inc. Form 10-K for period ending December 31, 2019, p. 66.  CCA subsequently entered into a new contract to use the facility to house adult detainees for ICE.  *See id.*



34.     These contract losses left McRae as CCA's sole remaining BOP correctional contract as of December 31, 2019.[57]  In contrast, in the years following the Yates Memorandum, GEO won multiple new BOP contracts.[58]

      a.     On May 26, 2017, GEO announced that it had been awarded two 10-year BOP contracts to house criminal aliens in its company-owned 1,800-bed Big Spring Facility and its company-owned 1,732 Flight Line Facility in Texas.[59]

      b.     On May 2, 2019, the GEO Group announced new contracts with the BOP to reactivate an 1,800-bed facility at North Lake Correctional Facility, and to provide management consulting and support services at the county-owned facilities with 1,376 beds.[60]

35.     Furthermore, notwithstanding the irrelevance of GEO's share price performance, had Ms. Allen extended her comparison of GEO's and CCA's performance to include the dates she identifies after the Yates Memorandum (in support her argument that CCA recovered after the presidential election), she would have found that GEO significantly outperformed CCA over this time.  In particular, Ms. Allen would have found that GEO's cumulative return was *15 to 20 percentage points higher* than that of CCA if she had extended her analysis through: November 8, 2016 (the presidential election); November 9, 2016 (the day after the presidential election); February 8, 2017 (the date of Jeff Sessions' confirmation as Attorney General); and February 23, 2017 (the date of Attorney General Sessions' rescission of the Yates Memorandum).[61]

36.     CCA's underperformance relative to GEO undermines Ms. Allen's claim that GEO is a relevant benchmark.  If GEO's price fell for the same reasons as CCA's in response to the Yates Memorandum, and the price reaction was driven by a "policy shift," then one would expect CCA and GEO to have rebounded in a proportional fashion as it supposedly became more likely that said policy shift would be reversed.[62]  Similarly, if CCA's stock price decline was solely the product of the industry-wide effect of a "policy shift," then the future trajectory of CCA's and GEO's BOP business should have proceeded on generally parallel tracks.  Instead, GEO significantly outperformed CCA as previously discussed.  This disparity demonstrates that GEO's and CCA's reactions to the Yates Memorandum were driven by factors specific to each company and that Ms. Allen's reference to GEO as a benchmark is inappropriate.

---

[57]   CoreCivic, Inc. Form 10-K for period ending December 31, 2019, pp. 17-22.

[58]   These facts also contradict Ms. Allen's suggestion that CCA's fortunes with the BOP reversed after the presidential election.

[59]   The GEO Group, Inc. Form 10-K for period ending December 31, 2017, pp. 4-5.

[60]   Press release, "The GEO Group Announces Contracts with Bureau of Prisons for Company-Owned North Lake, Michigan Correctional Facility and Reeves County, Texas Detention Centers I, II and III," May 2, 2019.

[61]   Bloomberg, LP dividend-adjusted returns from August 17, 2016; Allen Report, ¶ 75.

[62]   Allen Report, § VI.C.1.v.



**E.    Ms. Allen's Opinions Regarding the Cibola Contract Loss are Flawed and Inconsistent with Economic and Valuation Principles**

37.    Ms. Allen argues that "[t]here is no loss causation and no damages associated with CoreCivic's August 3, 2016 announcement of the Cibola non-renewal" because CCA's stock price did not experience a statistically significant abnormal return on August 2 or August 3, 2016 (as the news of the Cibola Contract Loss allegedly trickled into the marketplace).[63]  She attributes the statistically significant return on August 4, 2016, to the renegotiation of the STFRC contract, not the Cibola Contract Loss.[64]

38.    While the Cibola Contract Loss may not have been directly observable in CCA's share price, Ms. Allen presents no evidence (and I am aware of none) to suggest that the loss of this contract was known or anticipated before the evening of August 1, 2016.  From an economic perspective, the Cibola Contract Loss necessarily reduced CCA's value, which as I explain in the Dalrymple Report may be measured based on the Cibola contract's contribution to CCA's FFO.[65]

39.    Again, Ms. Allen ignores plaintiff's allegations and performs nothing more than a superficial examination of the Cibola Contract Loss in support of her conclusion that it had no impact on CCA's share price.  As I discuss in the Dalrymple Report, the Cibola contract had been expected to contribute $0.04 per share per year to FFO, and market participants reduced their expected earnings accordingly after learning of the Cibola Contract Loss.[66]  Ms. Allen provides no basis to support the conclusion that the loss of these anticipated earnings should have *no* impact on CCA's stock price.  Such a conclusion is inconsistent with economic and valuation principles.

## IV.    Further Work

40.    My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available.

W. Scott Dalrymple, CFA
BVA Group
Partner

---

63    Allen Report, § VI.C.2.  Ms. Allen reports that event studies find no statistically significant stock price reaction on August 2, 2016, but she does not appear to test August 3. See Allen Report, ¶ 81.
64    Allen Report, ¶¶ 23, 82-83.
65    Dalrymple Report, ¶¶ 67-69.
66    Dalrymple Report, ¶¶ 62-64.



**Nikki Bollinger Grae, Individually and on Behalf of All Others Similarly Situated v.**
**Corrections Corporation of America, et al.**
**Rebuttal Appendix B - Additional Information Considered**

**Expert Reports:**
(1) Expert Report of Lucy Allen, dated August 7, 2020

**CCA SEC Filings (2017-2019):**
(1) CoreCivic, Inc. Form 10-K, for the fiscal year ended December 31, 2017
(2) CoreCivic, Inc. Form 10-K, for the fiscal year ended December 31, 2018
(3) CoreCivic, Inc. Form 10-K, for the fiscal year ended December 31, 2019
(4) CoreCivic, Inc. Form 10-Q, for the quarterly period ended March 31, 2017
(5) CoreCivic, Inc. Form 10-Q, for the quarterly period ended June 30, 2017
(6) CoreCivic, Inc. Form 10-Q, for the quarterly period ended September 30, 2017
(7) CoreCivic, Inc. Form 10-Q, for the quarterly period ended March 31, 2018
(8) CoreCivic, Inc. Form 10-Q, for the quarterly period ended June 30, 2018
(9) CoreCivic, Inc. Form 10-Q, for the quarterly period ended September 30, 2018
(10) CoreCivic, Inc. Form 10-Q, for the quarterly period ended March 31, 2019
(11) CoreCivic, Inc. Form 10-Q, for the quarterly period ended June 30, 2019
(12) CoreCivic, Inc. Form 10-Q, for the quarterly period ended September 30, 2019
(13) CoreCivic, Inc. Form 10-Q, for the quarterly period ended March 31, 2020
(14) CoreCivic, Inc. Form 10-Q, for the quarterly period ended June 30, 2020

**GEO Group SEC Filings (2016-2019):**
(1) The GEO Group, Inc. Form 10-K, for the fiscal year ended December 31, 2016
(2) The GEO Group, Inc. Form 10-K, for the fiscal year ended December 31, 2017
(3) The GEO Group, Inc. Form 10-K, for the fiscal year ended December 31, 2018
(4) The GEO Group, Inc. Form 10-K, for the fiscal year ended December 31, 2019

**Other Sources:**
(1) GEO Group Press Release, "The GEO Group Announces Contracts with Bureau of Prisons for Company-Owned North Lake, Michigan Correctional Facility and Reeves County, Texas Detention Centers I, II and III," May 2, 2019