# EXHIBIT B

# EXHIBIT 6
## [Filed Under Seal]

Videotaped Deposition of

# William Dalius

October 28, 2020

Grae

vs.

Corrections Corporation of America, et al.

Page 1

```
1              UNITED STATES DISTRICT COURT
2              MIDDLE DISTRICT OF TENNESSEE
3
4    NIKKI BOLLINGER GRAE, Individually
     and on Behalf of All Others
5    Similarly Situated,
6         Plaintiff,          Civil Action No.
7    vs.               3:16-cv-02267
8    CORRECTIONS CORPORATION OF
     AMERICA, ET AL.,
9
          Defendants.
10
     _____
11
12
13
14       VIDEOTAPED DEPOSITION OF WILLIAM DALIUS
15
16     Conducted virtually via remote videoconference
17              October 28, 2020
18
19
20
21
22
23   Reported by:
     Misty Klapper, RMR, CRR
24   Job No.: 10073531
25
```

Page 2

```
1              UNITED STATES DISTRICT COURT
2              MIDDLE DISTRICT OF TENNESSEE
3
4    NIKKI BOLLINGER GRAE, Individually
     and on Behalf of All Others
5    Similarly Situated,
6         Plaintiff,          Civil Action No.
7    vs.               3:16-cv-02267
8    CORRECTIONS CORPORATION OF
     AMERICA, ET AL.,
9
          Defendants.
10
     _____
11
12
13
14
15
16
17       Videotaped deposition of WILLIAM DALIUS, taken on
18   behalf of Plaintiff, via Zoom remote videoconference,
19   beginning at 10:30 a.m. CST on Wednesday, October 28, 2020,
20   before Misty Klapper, RMR, CRR.
21
22
23
24
25
```

Page 3

```
1    APPEARANCES:
2    (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3    ON BEHALF OF PLAINTIFF:
4         CHRISTOPHER HAMP LYONS, ESQUIRE
          ROBBINS GELLER RUDMAN & DOWD LLP
5         414 Union Street, Suite 900
          Nashville, Tennessee 37219
6         (615) 244-2203
          E-mail: clyons@rgrdlaw.com
7
               AND
8
9         KENNETH J. BLACK, ESQUIRE
          ROBBINS GELLER RUDMAN & DOWD LLP
          Post Montgomery Center
10         One Montgomery Street, Suite 1800
          San Francisco, California 94104
11        (415) 288-4545
          E-mail: kennyb@rgrdlaw.com
12
13
14
15   ON BEHALF OF DEFENDANTS:
16        MILTON S. McGEE, III, ESQUIRE
          RILEY, WARNOCK & JACOBSON
17        1906 West End Avenue
          Nashville, Tennessee 37203
18        (615) 320-3700
          E-mail: tmcgee@rwjplc.com
19
               AND
20
          MORGAN E. WHITWORTH, ESQUIRE
21        LATHAM & WATKINS, LLP
          505 Montgomery Street, Suite 2000
22         San Francisco, California 94111-2562
          (415) 391-0600
23        E-mail: morgan.whitworth@lw.com
24
25   ALSO PRESENT:  DeSHAWN WHITE, VIDEO OPERATOR
```

Page 4

```
1              C O N T E N T S
2    WITNESS:       EXAMINATION BY:        PAGE:
3    William Dalius     Mr. Lyons          6
4
5
6
7
8              E X H I B I T S
9    DALIUS EXHIBITS
10   NO.:     DESCRIPTION:            PAGE:
11   Exhibit 589 Defendants Disclosures Pursuant to
12        Federal Rule of Civil Procedure
13        26(a)(2)(C)dated 8-7-20        53
14
15
16
17
18   EXHIBITS REFERRED TO:          PAGE
19   Dalius Exhibit 312        38
20   Dalius Exhibit 332        154
21
22
23
24
25
```

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1  P R O C E E D I N G S
2  VIDEO OPERATOR:  Time on the record
3  is 10:30 a.m. Central Time.  Today's date
4  is October 28, 2020.  My name is DeShawn
5  White of Aptus Court Reporting.  The court
6  reporter today is Misty Klapper of Aptus
7  Court Reporting, located at 600 West
8  Broadway, Suite 300, San Diego,
9  California, 92101.
10  This begins the video-recorded
11  deposition of William Dalius, testifying in
12  the matter of Nikki Bollinger Grae versus
13  Corrections Corporation of America, et al.,
14  pending in the United States District Court,
15  Middle District of Tennessee, Case Number
16  3:16-cv-02267, taken by Zoom video remote
17  conferencing, physical recording in
18  Culpeper, Virginia.
19  The video and audio recordings will
20  take place at all times during this
21  deposition unless all counsel agree to go
22  off of the record.  The beginning and end of
23  each video recording will be announced.
24  Counsel appearances will be on a
25  stenographic record.

1  The court reporter may now swear in
2  or affirm the deponent.
3  MS. REPORTER:  One moment.
4  Whereupon:

5  WILLIAM DALIUS,
6  was called for examination, and, after being duly
7  sworn, was called and testified as follows:
8  MS. REPORTER:  You may proceed.
9  EXAMINATION BY COUNSEL FOR PLAINTIFF
10  BY MR. LYONS:
11  Q.  Good morning, Mr. Dalius.  How are
12  you?
13  A.  Good morning.  Doing well.  How are
14  you?
15  Q.  Good.  Thanks.
16  So you -- you recall, I assume, that
17  you -- you had your deposition taken once in this
18  case already, right?
19  A.  That's correct.
20  Q.  And you were under oath in that
21  deposition, right?
22  A.  Correct.
23  Q.  The testimony you gave was -- was the
24  whole truth and nothing but the truth; is that
25  right?

1  A.  Yes, sir.
2  Q.  And you understand that you're under
3  oath again here today, right?
4  A.  Yes, sir.
5  Q.  And there's nothing different about
6  that, even though we're doing this by video
7  conference, right?
8  A.  Yes, sir.
9  Q.  Have you -- you had the opportunity
10  to review the transcript of your -- of your prior
11  deposition, right?
12  A.  Yes, sir.
13  Q.  Did you do that?
14  A.  Yes, sir.
15  Q.  And then you submitted what's called
16  an errata list, reflecting any changes you wanted
17  to be made to the transcript of your deposition;
18  is that right?
19  A.  That's correct.
20  Q.  Who prepared that -- that list?
21  A.  Who prepared the list?
22  Q.  Um-hmm (affirmative).
23  A.  The -- the list that I did?
24  Q.  Yes.
25  A.  I would have prepared it.

1  Q.  And other than the changes that are
2  reflected on the -- the list of errata that you
3  submitted, does the transcript of your prior
4  deposition accurately reflect your sworn
5  testimony?
6  A.  Yes, sir, as far as I recall.
7  Q.  Let's see.  Now, in -- I believe you
8  testified before that in July 2015, which was
9  before you retired from the BOP, you traveled to
10  Nashville and had lunch with CCA executives,
11  including Mr. Hininger and Mr. Lappin; is that
12  right?
13  A.  That's correct.
14  Q.  And this was in connection with you
15  looking for a new job; is that right?
16  A.  Potentially.  I was weighing options.
17  Q.  Okay.  What were the options you were
18  weighing?
19  A.  Just any options for employment once
20  I -- I was mandatory retirement in October of '15
21  and I wasn't sure if I wanted to work or not, so
22  I was just pursuing options.
23  Q.  Were there other potential employers
24  that you were considering at that time?
25  A.  I -- I was pretty open.

1  with Mr. Hininger and Mr. Lappin in that meeting?
2  　　A.　I -- I did make that -- make them
3  aware of that, because I could not work strictly
4  with BOP for two years.
5  　　Q.　And what was the discussion about --
6  about that cooling-off period?
7  　　A.　I don't recall much discussion. I
8  mean, I -- it's pretty well-known in government
9  that that's the case and not -- not only in
10  federal government, but a lot of states have
11  similar rules.
12  　　Q.　Who paid for your flight out to
13  Nashville in July 2015?
14  　　A.　I don't recall, but I assume
15  CoreCivic did.
16  　　Q.　And who paid for your accommodation?
17  　　A.　I -- I would assume that if CoreCivic
18  paid for the flight, they paid for the
19  accommodations. It was just -- it was -- it was
20  just one day. In fact, I -- if -- if I recall, I
21  think I just flew in and out same day.
22  　　Q.　And I assume -- I assume CoreCivic
23  also paid for lunch then?
24  　　A.　I -- I assume they did. Yeah, I
25  didn't pay for lunch.

1  　　Q.　And was it -- this was just a -- was
2  it a -- a lunch meeting? Where -- where did it
3  take place?
4  　　A.　It was -- it was in a conference room
5  downstairs.
6  　　Q.　At the -- at CoreCivic's --
7  　　A.　At CoreCivic --
8  　　Q.　-- offices?
9  　　A.　-- yes, sir.
10  　　Q.　And did you -- did you have any
11  meetings other than the lunch there or was that
12  it?
13  　　A.　No, sir, that was it. I turned
14  around and flew home.
15  　　Q.　Did you fly first class or economy?
16  　　A.　I'm sure I flew Southwest in economy.
17  　　Q.　And so then -- you already said that
18  you retired from the BOP in October 2015, right?
19  　　A.　Correct.
20  　　Q.　Before -- before that, before your
21  retirement, what, if any, personal role did you
22  have in monitoring CCA's performance at the Adams
23  County Correctional Center?
24  　　A.　Didn't have a personal role. I had
25  oversight. I had -- contracting reported to me

1  and we -- you know, the BOP in general had a -- a
2  correctional programs group that also monitored
3  operations at Adams and -- and all private
4  facilities. So I had staff that monitored. I
5  didn't personally do it.
6  　　Q.　And as -- in -- as somebody who
7  wasn't personally doing the -- the monitoring,
8  did you get all the detailed reports of -- of the
9  deficiencies at Adams County Correctional Center?
10  　　MR. MCGEE: Object to the form of
11  the question.
12  　　Bill, you can answer. I'm sorry. Go
13  ahead.
14  　　THE WITNESS: Oh, okay.
15  　　MR. MCGEE: If you can.
16  　　THE WITNESS: Okay. Yep.
17  Can you please repeat that?
18  BY MR. LYONS:
19  　　Q.　As somebody who wasn't doing --
20  personally doing the monitoring, did you get all
21  the detailed reports of deficiencies at the Adams
22  County Correctional Center?
23  　　A.　No, sir, I would not have got all
24  details.
25  　　MR. MCGEE: Object to the form of

1  the question.
2  　　Go ahead, Bill.
3  　　THE WITNESS: I -- I would not have
4  gotten all details of every contract. And
5  I -- I was responsible for a $7 billion
6  budget, so I didn't get involved in every
7  detail of every transaction that occurred
8  within the agency.
9  　　BY MR. LYONS:
10  　　Q.　How many facilities were you in
11  charge of?
12  　　A.　We had 122 prisons. We had contracts
13  with -- oh, geez -- hundreds, I guess, of halfway
14  houses. And then I think there -- at that time
15  there were, I'm guessing, 12 to 15 private
16  prisons in addition to the 122 that the Bureau of
17  Prisons ran.
18  　　Q.　Okay. So -- yeah. So the 122
19  prisons that you -- you mentioned would be the
20  BOP-operated prisons; is that right?
21  　　A.　That's -- that's -- that's correct.
22  　　Q.　I assume the answer -- so if I were
23  to ask the same question, you know, what --
24  what -- did you get the detailed reports of
25  deficiencies at CCA's other BOP prisons, your

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1  answer would be the same, you didn't get the --
2       MR. MCGEE:  Object --
3       BY MR. LYONS:
4  Q.    -- details of the deficiencies?
5       MR. MCGEE:  Object to the form of
6  the question.
7       Bill, you -- you can answer after my
8  objection if -- if --
9       THE WITNESS:  Okay.
10      MR. MCGEE:  -- if you're able.
11      THE WITNESS:  Okay.
12      BY MR. LYONS:
13  Q.    Unless -- unless -- unless Mr. McGee
14  instructs you not to answer, you can go ahead
15  and --
16  A.    Okay.  Okay.  Sorry.  This is kind of
17  confusing in the Zoom --
18  Q.    Yeah.
19  A.    -- here, so --
20      MR. MCGEE:  Sure.
21      THE WITNESS:  I -- I -- I -- I --
22  you know, again, I would get -- I get many
23  reports.  Now, whether I got detailed
24  reports of every facility, probably not.
25

1       BY MR. LYONS:
2  Q.    Were you personally aware of the
3  number of performance deficiencies found as to
4  CCA during your time at -- as CFO of the BOP?
5  A.    Oh, no, I would not have been aware
6  of all deficiencies.  I mean, we had deficiencies
7  at all 122 prisons, plus 12 -- like I said, 12 to
8  15 private prisons.  So I -- I certainly did not
9  keep track of every deficiency of every facility.
10  Q.    Were you personally aware during your
11  time as the CFO of the BOP of the number of times
12  that CCA's deficient health services contributed
13  to an inmate's death?
14      MR. MCGEE:  Object to the form of
15  the question.
16      THE WITNESS:  Can you please repeat
17  that?
18      BY MR. LYONS:
19  Q.    During your time as the CFO of the
20  BOP, were you personally aware of the number of
21  times that CCA's deficient health services
22  contributed to an inmate's death?
23      MR. MCGEE:  Object to the form of
24  the question.
25      THE WITNESS:  I -- I would have

1  known of -- I would have heard of deaths
2  from the entire agency, not necessarily
3  CCA, but I would have not known if they
4  were the result of any kind of deficiency
5  in healthcare.
6       I mean, there was a -- there's deaths
7  that occur every day in prisons across the
8  country and across the BOP and across
9  CoreCivic and GEO and MTC.
10      BY MR. LYONS:
11  Q.    And then before you retired, did you
12  personally speak with anybody from the BOP about
13  their monitoring specifically of CCA's
14  performance for BOP?
15  A.    Did I specifically talk about -- I
16  mean, I talked to a lot of folks and, you know,
17  we would -- I had -- I had obviously contracting
18  staff that reported to me that had responsibility
19  for private prisons.  We -- we -- we -- you know,
20  we had overview of -- or oversight of all 122
21  facilities within the bureau as well, so I -- I
22  could have had general communications about any
23  of -- any of the facilities, whether it be -- you
24  know, we -- we looked at the private facilities
25  as an extension of BOP facilities.  We had a need

1  for the private prisons because of bed space.  We
2  looked at them as a partner and an extension of
3  services run in BOP, so we look at them as the
4  same as BOP facilities from my view.
5  Q.    Let's see.  So would you have
6  specifically met with the people who were doing
7  the monitoring to go over, you know, the
8  individual deficiencies and repeat deficiencies
9  at, you know, for example, Adams County
10  Correctional Center?
11  A.    Not typically.  That -- my
12  contracting staff and working with the program
13  staff in the correctional programs division would
14  work -- work through most of those things.
15  Q.    So before you retired from the BOP,
16  you had no personal knowledge or -- or personal
17  experience regarding CCA's performance for BOP,
18  right?
19      MR. MCGEE:  Object to the form of
20  the question.
21      THE WITNESS:  I assume that their
22  performance was comparable to BOP
23  performance in every regard, as well as
24  MTC's and GEO's, which is why we
25  maintained contracts with all of them.

William Dalius

Grae vs.
Corrections Corporation of America, et al.

BY MR. LYONS:

Q.    You assumed that?

A.    Yes, sir.

Q.    All right.  We touched briefly on your cooling-off period earlier, but -- so after you retired, that meant that there was two years where you were not able to speak directly to anybody at the BOP about BOP business; is that right?

A.    That's correct.

Q.    And so would that be from October 2015 to October 2017 that you didn't speak to anybody at the BOP about BOP business?

A.    That's correct.

Q.    In terms of your consulting roles, I think you said that you first started discussing potentially consulting for CCA around December 2015; is that right?

A.    That's my recollection.  That -- that would have been in the ballpark.  That's about the time I was starting to get bored and needed to look for something to do.

Q.    How did that conversation start?

A.    I think I contacted Harley Lappin at the time and just to see if they had any

opportunities to explore.

Q.    So -- so you reached out to Mr. Lappin; is that right?

A.    Yes, sir.  He was -- he was my prior boss obviously in the Bureau of Prisons.  He was my director at one time, so I -- I did have a relationship with him.

Q.    And he was -- by that time he was chief corrections officer at CCA; is that right?

A.    That's -- that's the role he held at CCA, yes.

Q.    And what was the -- what was the process from -- from December 2015 when you contacted Mr. Lappin about potentially -- well, actually, strike that.

When -- when you contacted Mr. Lappin, were you -- were you contacting him about a consulting role or about employment with CCA?

A.    I was looking for opportunities of either.  And at the time they didn't have any vacancies, so they -- they were open to consulting.

Q.    And so can you just walk me through the process from when you contacted Mr. Lappin in

December 2015 to when -- when you started doing consulting work?

A.    They -- they -- they worked -- once they agreed that I could be a consultant for them, they had their attorneys draw up a agreement, a contract, I guess it would be, for consulting services.

Q.    Did you discuss the possible consulting role with anybody other than Mr. Lappin?

A.    Not that I recall.

Q.    Did you -- did you come back in and interview again or did you just communicate from --

A.    I -- I don't -- I don't recall going back in to interview.  I think we just did it via telephone.

MS. REPORTER:  Let me remind everybody, please, to speak one at a time.

THE WITNESS:  I'm sorry.

I -- I was going to add I also consulted for another company at the same time.

BY MR. LYONS:

Q.    And that was the Keefe Group; is that

right?

A.    That's correct.

Q.    Were there any other companies you consulted for in that time frame?

A.    No, sir.

Q.    When did you start consulting for the Keefe Group?

A.    It was around the same time.

Q.    And so while you were in your consulting role at -- was it Perimeter Consulting; is that right?

A.    Yeah, that was -- that was my own company I created for tax purposes.

Q.    So about 75 percent of your work was for CCA; is that right?

A.    That sounds about right.

Q.    And then it was -- but what did you do in your consulting role for CCA?

A.    Whatever they asked me to do.  If they wanted me to go to a meeting, help on papers, go to -- I mean, typically it was going to meetings and those type of things.

Q.    What meetings would you go to?

A.    I had met in D.C. with -- we've got folks that work directly with the Hill and, with

William Dalius

Grae vs.
Corrections Corporation of America, et al.

Page 33

1    but it would have been shortly after I went to
2    work for them.
3        Q.    Did you -- did you use that E-mail
4    address to do consulting work for your other
5    client?
6        A.    No.
7        Q.    So you had a separate E-mail address
8    you used for Keefe Group business?
9        A.    As far as I recall, that's correct.
10   I had a Perimeter Management E -- E-mail account.
11       Q.    But you -- you didn't use the
12   Perimeter Management E-mail account to consult
13   for CCA; is that right?
14       A.    I -- I probably used both.  Once they
15   set my account up, they asked that I utilize the
16   Core- -- or at the time CCA account, so I did.
17       Q.    Now, what was your salary when you
18   started at CCA?
19       A.    My -- when I was consulting or when I
20   went to work for them?
21       Q.    When you went -- when you became
22   employed by CCA.
23       A.    Oh, taxing my memory now.  I don't
24   know the exact number, but it was probably
25   with -- my -- my -- my salary was probably

Page 34

1    140,000, 150, and then I had potential to make
2    bonuses and stock awards that could be added onto
3    that.
4        Q.    And did you, in fact, make or receive
5    a bonus?
6        A.    I -- I -- I imagine I -- I think I
7    did when I was eligible.  You've got to work a
8    year or whatever -- whatever the criteria was,
9    but I think the first year I was eligible I --
10   I -- I did and I received stock as well.
11       Q.    Did you receive stock when you joined
12   or after?
13       A.    No, after I earned it.  I had to earn
14   it as part of the cycle.
15       Q.    And then you -- you received raises
16   since -- after starting at CCA, right?
17       A.    I -- I changed jobs, yes, sir.
18       Q.    So your compensation stayed the same
19   the whole time you were in a -- a purchasing
20   role; is that right?
21       A.    Say that again, please.
22       Q.    Any -- well, first -- your first role
23   was -- was it managing director of purchasing; is
24   that right?
25       A.    That's correct.

Page 35

1        Q.    And so your compensation stayed
2    the -- the same for the whole time you had that
3    role; is that right?
4        A.    That -- that's correct.
5        Q.    And then once you became -- well,
6    what was your next role?
7        A.    I was vice president of facility
8    operations, which is my current role.
9        Q.    And so you got a raise with that
10   role; is that right?
11       A.    Yes, sir.
12       Q.    And how much did you make when you
13   first became vice president of facility
14   operations?
15       A.    I think my base salary is around
16   220,000 and then again with potential for bonus
17   and stock options.
18       Q.    And what is it today?
19       A.    It's the same.
20       Q.    Same --
21       A.    It may have -- it may have got
22   percentage increase with inflation.
23       Q.    How much do you -- have you received
24   in bonuses since becoming vice president of
25   facility operations?

Page 36

1        A.    I don't know the exact amount.  I'd
2    say a couple hundred thousand.
3        Q.    And how much have you received in --
4    in stock awards?
5        A.    Similar.
6        Q.    And are you holding all of the stock
7    awards that you received or you've sold some?
8        A.    I've not sold any.
9        Q.    And so when you say similar, it's --
10   you mean you have roughly couple hundred thousand
11   dollars' worth of CCA stock?
12       A.    I'd say that's in the ballpark, but
13   depending on -- you know, stock has gone down a
14   bit and gone up a bit, so it varies day by day,
15   depending on the rate.
16       Q.    Have you ever testified at trial on
17   behalf of CCA?
18       A.    No, sir.
19       Q.    Other than your deposition in this
20   case, how many times have you testified at
21   deposition?
22       A.    Several over my career.
23       Q.    At -- in your role at CCA.
24       A.    Oh.  That's -- that's the only one,
25   the last time I did it.

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1    the needs were they wanted to meet with.

2        Q.    But these would be -- these would be

3    meetings in like the DOJ's offices; is that

4    right?

5        A.    Yes, if it was a DOJ meeting.  Or --

6    or we'd meet at OMB for OMB meetings or on the

7    Hill for whatever congressional representatives

8    wanted to meet with you.

9        Q.    Okay.  That -- the part I think I'm

10   struggling within the bullet -- in the bullet

11   there is the concept of testifying before

12   Department of Justice.

13       So is that -- was testimony taken

14   or -- or was it just a meeting?

15       A.    They were more meetings than -- there

16   was not necessarily testimony taken, except for

17   the formal hearing that -- that the director

18   would typically be the primary individual doing

19   the testimony.

20       Q.    And by -- by the formal hearing, you

21   mean the congressional committee or subcommittee

22   hearings; is that right?

23       A.    Subcommittee for appropriations.

24       Q.    So I -- I assume that's the same

25   about -- like the Office of Management and

1    Budget, where it says, Selected to testify before

2    Office of Management and Budget, that would be

3    meetings between you and the staff of the Office

4    of Management and Budget, right?

5        A.    That's correct.

6        Q.    And then -- so you said for the

7    formal hearing the director would typically be

8    the primary individual doing the testimony, but

9    did you actually provide testimony in this role?

10       A.    If -- if a question came up in a

11   congressional, we would pass in a note to the

12   director, it became part of the formal record.

13       Q.    But you would -- you wouldn't be,

14   like, actually speaking --

15       A.    I -- I --

16       Q.    -- to testify to the --

17       A.    -- I was not the actual -- I was not

18   the actual person assigned for the testimony.

19   That would have been the director.

20       Q.    And so if we were to look at the

21   records of these appropriations subcommittee

22   hearings, would there be any way to tell what

23   information you had provided?

24       A.    Probably not, because in most cases

25   the director would relay what we provided him or

1    her.

2        Q.    If there was, like, written

3    information provided or included in the record,

4    maybe you might have written it, but you wouldn't

5    necessarily be listed as the author; is that

6    right?

7        A.    That's correct.  It would have been

8    the director.  And I had many staff that assisted

9    in that preparation.  I didn't do it all myself.

10       Q.    I'm sure.

11       A.    A $7 billion budget's a big budget.

12       Q.    Give that siren a second.

13       So just -- just to make sure I have

14   it right, there weren't any instances where you

15   actually testified to -- to the congressional

16   subcommittee on appropriations; is that right?

17       MR. MCGEE:  Object to the form of

18   the question.

19       THE WITNESS:  I would have not been

20   the primary speaker, whatever you want to

21   call it, for the case, but I was there to

22   provide assistance if needed.

23       BY MR. LYONS:

24       Q.    Okay.  So if -- if I was looking for

25   a transcript of testimony that you gave before

1    the -- the appropriations subcommittee, there

2    wouldn't be one, right?

3        A.    It would show up under Harley Lappin.

4        Q.    Got you.

5        A.    Or Kathleen Hawk.

6        Q.    Do you recall my colleague

7    Ms. Radcliffe asking you in your prior deposition

8    whether you had been asked to provide an expert

9    opinion in this case?

10       A.    Vaguely.

11       Q.    Do you recall that you said no?

12       A.    That would have been correct.

13       Q.    Since your prior deposition, have you

14   been asked to provide an expert opinion in this

15   case?

16       A.    If the court deems my testimony to be

17   expert, I can -- certainly with my background and

18   knowledge of 30-plus years correctional

19   experience could be potentially used as a expert

20   in this case, knowing prison operations,

21   financial operations.

22       Q.    When did you first discuss the

23   possibility of your testimony being potentially

24   used as an expert in this case?

25       MR. MCGEE:  Bill, I just -- you can

1    answer the question.  To the extent that
2    the answer would reveal any communications
3    between you and your counsel, I would
4    advise you not to reveal the substance of
5    those communications.
6           So you -- you can answer --
7           THE WITNESS:  Yeah, so -- so --
8           MR. MCGEE:  -- the question from a
9    timing perspective, but not from
10   substance --
11          THE WITNESS:  It would have been --
12   it would have been recently, sir.
13          BY MR. LYONS:
14   Q.     Could you put a month on it?
15   A.     October.
16   Q.     What -- what expert opinion have you
17   been asked to provide in this case?
18   A.     I've not been asked to provide an
19   expert opinion, but I can provide an expert
20   opinion on both CoreCivic and Bureau of Prisons
21   facility operations, financial operations, things
22   of that matter, considering I've got 30-plus
23   years of correctional experience and obviously a
24   lot of financial experience being the CFO of --
25   of the Federal Bureau of Prisons managing a

1    $7 billion budget.
2           MR. LYONS:  DeShawn, why don't we
3    go ahead and drop -- excuse me.
4           Why don't we go ahead and drop the --
5    T1 into the chat box, please.
6           THE WITNESS:  Can I take the other
7    one down?
8           MR. LYONS:  Yes, that's fine.
9           I think -- it looks like that's the
10   same link to tab 4, DeShawn.  Can you -- can
11   you try again with tab 1?
12          THE WITNESS:  That's what I see as
13   well.
14          VIDEO OPERATOR:  My apologies.  It
15   should be fixed now.
16          MR. LYONS:  No problem.  That looks
17   right to me.
18          MR. MCGEE:  Just so we're clear,
19   Chris, tab -- we should be looking at
20   Defendants' Disclosures Pursuant to the
21   Federal Rule of Procedure 26(a)(2)(C); is
22   that right?
23          MR. LYONS:  That's right.
24          MR. MCGEE:  Okay.  Thanks.
25

1           BY MR. LYONS:
2    Q.     Have you seen this document before,
3    Mr. Dalius?
4    A.     Can you just wait one second?  It
5    keeps pulling my prior --
6    Q.     Sure.
7           If it helps, if you look in the chat
8    box, I think it's the link that -- if you click
9    on the link that ends in 10F.
10   A.     10F.
11   Q.     I don't know if you see that.
12   There's sort of two links there.
13   A.     Okay.  I do.
14   Q.     It's the second one.
15          MR. MCGEE:  Bill, this document is
16   also in the -- in the binder that my -- my
17   office sent to you today.
18          THE WITNESS:  I -- I think -- it --
19   it came up.  Thank you.
20          MR. MCGEE:  Okay.
21          THE WITNESS:  I'm -- I'm ready,
22   sir.
23          BY MR. LYONS:
24   Q.     Okay.  So I think my first question
25   was have you seen this document before.

1    A.     I have.
2    Q.     What is your understanding of what it
3    is?
4    A.     It's a recap of -- a summary of what
5    I'm prepared to testify about, you know, give an
6    opinion that -- that I can be -- I -- I can
7    testify as an expert in facility operations and
8    security staffing, safety policies, financial
9    issues regarding both BOP and CoreCivic.
10   Q.     Did you write any portion of this
11   document?
12   A.     I did not.  But it's a good summary
13   of what -- based on my review, it's -- it's
14   accurate and it clearly states the -- the areas
15   that I believe I can render a -- an opinion on
16   BOP/CoreCivic operations showing that CoreCivic
17   is cheaper to run than the BOP at low security
18   facilities.
19          MS. REPORTER:  Is this an exhibit?
20          MR. LYONS:  That is good.  You
21   know, it already was, but that's a good
22   question.
23          Let's -- let's go ahead and mark this
24   as -- I think we're at -- because I don't
25   think we have a marked copy of the one

Case 3:16-cv-02267    Document 374-2    Filed 12/04/20    Page 11 of 24 PageID #: 17049
www.aptusCR.com
Page 49..52

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1    that -- that is already an exhibit.  So
2    let's mark this as the next exhibit, which I
3    think is going to be 589.
4         Thank you, Misty.
5         MS. REPORTER:  My pleasure.
6         (Thereupon, Dalius Exhibit
7         Number 589 was marked for
8         identification.)
9         MR. MCGEE:  That slipped past me
10    too, Chris.
11         BY MR. LYONS:
12    Q.    Did you have any input on any portion
13    of the document that's now been marked as
14    Exhibit 589?
15    A.    Other than previous conversations
16    with my lawyers and my last testimony, like I
17    said, I -- I -- in reviewing it, it -- it's --
18    looks factual and -- and accurate.
19    Q.    So did you review it in draft form at
20    any time?
21    A.    No, sir.
22    Q.    But looking at it today, you think
23    it's factual and accurate, right?
24    A.    Yes, sir.
25    Q.    So there aren't any changes that you

1    would make to it; is that right?
2    A.    No, I -- it looks accurate to me.
3         MR. LYONS:  I'm tripping my over --
4    over my own computer over here.  Hold on
5    just a second.  Sorry.
6         MR. MCGEE:  Chris, we've been going
7    for about an hour, what -- so whenever's
8    convenient for you to take --
9         MR. LYONS:  Yeah, sure, since
10    I'm -- I'm fumbling through my documents
11    here.  So why don't we go ahead and take a
12    break now.
13         MR. MCGEE:  Okay, great.  Thanks.
14         VIDEO OPERATOR:  Do you want to go
15    off the record?
16         MR. LYONS:  Yes, please.  Go off
17    the record.
18         VIDEO OPERATOR:  Okay.  The time
19    now is 11:31 a.m. and we are now off the
20    record.
21         (Thereupon, a brief recess was
22         taken.)
23         VIDEO OPERATOR:  Okay.  The time
24    11:45 a.m. and we are now on the record.
25         MR. LYONS:  Thank you.

1         BY MR. LYONS:
2    Q.    Before moving on with that exhibit,
3    Mr. Dalius, I just wanted to make sure that I
4    understood a little bit of your testimony before,
5    right?
6         So am I right that you -- you
7    currently make about $220,000 a year in salary,
8    you've made about $200,000 total in bonuses since
9    being promoted to vice president of operations in
10    2017 and you've received about $200,000 total in
11    stock awards since that promotion; is that right?
12    A.    That's in the ballpark.  It may not
13    be exact, but it's -- it's --
14    Q.    Understood.  Thank you.
15         Looking back at the document that we
16    have marked as Exhibit 589, on -- on the third
17    page under number 1, Subject Matter of
18    Testimony -- do you see that heading there?
19    A.    Yes.
20    Q.    -- it begins, Mr. Dalius is expected
21    to testify about the BOP's and CoreCivic's
22    operations in the areas of correctional facility
23    management, oversight, staffing, security and
24    related policies and procedures.
25         Do you see that?

1    A.    Yes, sir.
2    Q.    Is that a complete list of areas that
3    you're planning to testify about with respect to
4    operations?
5    A.    That's a pretty comprehensive list of
6    correctional management which I've been involved
7    in over my career.  You know, having been a
8    warden, assistant director and now vice president
9    over many facilities, that covers a lot of the
10    areas that I would be responsible for and would
11    be able to provide an expert opinion on.
12    Q.    So are you planning to testify about
13    the provision of medical services to inmates?
14    A.    I am not a medical expert.  I know
15    generally how medical works, but I always had
16    medical professionals that worked for me.
17    Q.    Do you have any medical training?
18    A.    No, sir.
19    Q.    Are you a medical expert?
20    A.    I'm not a medical expert, but I've
21    had the ability -- when I was the warden at
22    Butner medical center --
23         (Remote transmission interference)
24         MS. REPORTER:  I'm sorry, sir, you
25    cut off.  I'm sorry, sir, you cut off.

William Dalius

Grae vs.
Corrections Corporation of America, et al.

Page 57

1    THE WITNESS:  Can you hear me now?
2    MR. MCGEE:  Yeah, that's -- that's
3 better, Bill.  I think it just glitched a
4 little bit, so if you want to make the
5 record clean, perhaps we could read back
6 the question and you could start your
7 answer over.
8    MR. LYONS:  Would you mind doing
9 that, please, Misty?
10    MS. REPORTER:  One moment.
11    (Thereupon, the record was read back
12      as requested.)
13    THE WITNESS:  So -- so you want me
14 to respond now?
15    BY MR. LYONS:
16    Q.    Yes, please.
17    A.    Okay.  I'm sorry.
18        I am not medically trained.  I've had
19 the opportunity when I was a warden at the Butner
20 medical complex to oversee medical operations at
21 a -- at -- at the facility where I was a warden
22 at.  So I dealt with a lot of medical issues
23 during that time, but I -- I'm not medically
24 trained.
25    Q.    Did you have medical professionals

Page 58

1 who were responsible for the actual provision of
2 health care?
3    A.    Yes, sir.
4    Q.    Now, looking at that sentence we just
5 read in Exhibit 589, it says, Mr. Dalius is
6 expected to testify about the BOP's and
7 CoreCivic's operations.
8        For what period do you expect to
9 testify about the BOP's operations?
10    A.    Well, as I stated earlier, sir, I
11 worked for the BOP from 1985 to 2015.  Throughout
12 that time I had been a warden -- assistant
13 warden, warden, assistant director, deputy
14 assistant director.  So I held many roles over my
15 30-year career.
16        So I would base my testimony on my
17 30 years of experience in the BOP, holding and
18 assuming the -- the -- the many different roles
19 that I had.
20    Q.    So you would testify about the BOP's
21 operations during the time you worked there, so
22 1985 to 2015; is that right?
23    A.    That's correct.  And I can generally
24 speak about prison operations today because it
25 hasn't -- prison operations have not changed

Page 59

1 drastically.
2    Q.    And with respect to CCA's operations,
3 you first took an operational role at CCA in --
4 in -- was it July of 2017?
5    A.    It would have been August of 2000 --
6 you mean when I was a vice president?
7    Q.    Yeah.  When did you first take an
8 operation -- well, when did you -- well, your
9 first role at CCA was -- was purchasing, right?
10    A.    That's correct, which reported --
11 in -- in the operations division.
12    Q.    But you didn't have oversight of any
13 prisons in that role?
14    A.    Not specific oversight, though we
15 dealt with the, you know, purchasing for all the
16 facilities.
17    Q.    So when did you first have oversight
18 over CCA prisons?
19    A.    That would have been in 2017 when I
20 became vice president.
21    Q.    So for what period do you expect that
22 you would testify about CoreCivic's operations?
23    A.    Well, I've known about CoreCivic's
24 operations even when I worked at the BOP because
25 the -- we -- as -- as I indicated earlier, we

Page 60

1 considered our private prisons as an extension of
2 BOP prisons.  So I was aware of CoreCivic
3 operations at that time.  And I became probably
4 more intimately aware with daily day-to-day
5 operations when I became a vice president at
6 CoreCivic.
7    Q.    Because you were not intimately aware
8 of day-to-day operations of CCA's prisons when
9 you were the CFO of the BOP, right?
10    MR. MCGEE:  Object to the form of
11 the question.
12    THE WITNESS:  No, sir.  We had
13 staff on-site at all the private
14 facilities that monitored the day-to-day
15 operations.  I would be notified if there
16 were big issues that occurred throughout
17 the facilities, whether it be a BOP
18 facility or a private facility.
19    BY MR. LYONS:
20    Q.    What do you recall about the big
21 issues that you were notified about that occurred
22 at CCA's facilities while you were CFO of the
23 BOP?
24    A.    I don't recall specifically issues,
25 but typically you would be notified of inmate

Case 3:16-cv-02267    Document 374-2    Filed 12/04/20    Page 13 of 24 PageID #: 13705
www.aptusCR.com
57..60

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1    deaths, if there were riots, if there were
2    ongoing systemic issues that would have occurred
3    at -- at a customer's facility, whether it be a
4    BOP facility or a private facility.
5        Q.    So would you have been notified
6    about, for example, significant findings that
7    were issued at CCA's facilities?
8        A.    Potentially.
9        Q.    Would you have been notified of
10   multiple repeat deficiencies that occurred at CCA
11   facilities?
12             MR. MCGEE:  Object to the form of
13       the question.
14             THE WITNESS:  It -- it would depend
15       on the magnitude of the repeat deficiency
16       just like it would in a BOP facility.
17             BY MR. LYONS:
18       Q.    Would you be notified when a -- a
19   cure notice was issued to a -- a CCA prison?
20             MR. MCGEE:  Object to the form of
21       the question.
22             THE WITNESS:  It would depend on
23       the magnitude of the cure notice.  As I
24       indicated, issues arose to my level,
25       whether it be a BOP facility, a CoreCivic

1    facility or a GEO facility, depending on
2    the magnitude of the issue.
3        BY MR. LYONS:
4        Q.    Were you, in fact, notified of the
5    cure notice that was issued to -- to CCA with
6    respect to its Cibola prison?
7        A.    When did that occur, sir?
8        Q.    You're the witness, so -- it occurred
9    during your time as CFO.  Do -- but do you recall
10   that happening while you were there?
11       A.    I -- I don't recur (sic) specifically
12   that, no.
13       Q.    Let's see.  How is this?
14             Now, you see under the heading
15   number 2, Summary of Facts and Opinions, where it
16   says, Mr. Dalius may testify -- sorry.
17             You see -- you see the heading, first
18   of all?
19       A.    Yes, sir.
20       Q.    You see where it says, Mr. Dalius may
21   testify that CoreCivic's operational performance
22   was similar to and compared favorably with the
23   BOP's operational performance in the areas of
24   correctional facility management, oversight,
25   staffing, security and relating -- related

1    policies and procedures?
2        Do you see that?
3        A.    Yes, sir.
4        Q.    What's the analysis by which you
5    reached this conclusion?
6        A.    So CoreCivic runs safe, secure
7    prisons, just like the BOP does.  They -- they --
8    their operations are very similar to BOP
9    operations.  They -- they -- the -- probably the
10   major driving -- driver -- difference is the
11   cost.  It's cheaper for CoreCivic to do it than
12   it is for the Bureau of Prisons to do it.
13             But as far as actual prison
14   operations, CoreCivic runs very good prisons, as
15   does the BOP.
16       Q.    Is there some quantifiable objective
17   metric by which you compared the -- the CoreCivic
18   prisons and the BOP prisons?
19       A.    I wouldn't say there's quantifiable,
20   other than I've got 30 years of experience of
21   oversight of prisons, operating prisons.  In the
22   BOP I currently have oversight of 22 to 25
23   prisons in my current role.
24             So I -- I've -- I've been in
25   virtually the majority of the BOP prisons.  I've

1    seen how they operate.  I was an AW at a low
2    security prison that -- that managed criminal
3    aliens, just like CoreCivic does.  And I see very
4    similar operations in both -- both CoreCivic and
5    the Bureau of Prisons.  They both run very good
6    prisons.
7        Q.    But taken as a whole, looking at the
8    BOP body of prisons and the CCA-operated BOP
9    prisons, there are -- there are significant
10   differences between those sets of prisons, right?
11       A.    There are differences.  I would say
12   the CoreCivic prisons are more up to date, more
13   modern, more -- I'd -- I'd say clearly better
14   designs than the older -- because in the Bureau
15   of Prisons what they did with the low security
16   facilities, they were typically old medium secure
17   facilities that they managed down to low security
18   when populations grew.
19             So they're not very efficient.
20   They're not very modern, as -- as it compared to
21   the CoreCivic facilities, most of which are very
22   modern and to the new standards of constructing
23   prisons.
24       Q.    Most but not all of the CCA
25   facilities are --

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1 about how CCA's operational performance compared
2 to GEO's operational performance, do you?
3     A.    Can you -- can you hang on just one
4 minute?  For some reason my screen left.
5     Q.    Yes.
6     A.    Oh, you're back.
7     Q.    Great.
8     A.    So I'm sorry --
9     Q.    Maybe that's a good thing.  I don't
10 know.
11     A.    Can you please repeat the question?
12     Q.    Yes.
13        So the -- you don't expect to testify
14 about how CCA's operational performance compared
15 to GEO's operational performance, do you?
16     A.    I -- I don't have the in-depth daily
17 knowledge of GEO's performance, but having -- in
18 my prior role I've got a general understanding of
19 how their operations are.  You know, they --
20 they -- them, CoreCivic and MTC, all ran prisons
21 very similar and compatible to what the Bureau of
22 Prisons runs.  I've been in their facilities when
23 I was in my prior roles.
24     Q.    So you do plan to testify about
25 whether or not CCA's operational performance was

1 similar to and compared favorably with GEO's
2 operational performance?
3     A.    I -- I -- I can testify that based on
4 the data that I was provided and the visits that
5 I had in facilities, GEO and -- and CoreCivic ran
6 prisons as safely as the Bureau of Prisons runs
7 its prisons and matched infrastructure,
8 et cetera.  And both did it cheaper than the
9 Bureau of Prisons.
10     Q.    And would your answer be the same if
11 I were to ask about a comparison between CCA
12 operational performance and MTC operational
13 performance?
14     A.    Yes, sir.
15     Q.    So for purposes of -- of your, I
16 guess, comparison of CCA's operational
17 performance to BOP's operational performance,
18 which -- which specific BOP-operated prisons do
19 you compare to CCA-operated prisons?
20     A.    Well, if we're trying to do a -- a
21 true comparison, it would be low security.
22     Q.    All low security?
23     A.    Yeah.  I mean, they're -- CoreCivic
24 manages low security inmates, as does BOP.  So I
25 would -- that would be the -- the -- the

1 comparable between the two as -- if you're just
2 comparing BOP.
3        As I indicated before, CoreCivic does
4 manage high security inmates as well, you know,
5 medium, high, different levels.  But for
6 comparing BOP to -- to CoreCivic, the natural
7 comparison would be to compare low security
8 facilities.
9     Q.    Now, for purposes of your conclusion
10 that CCA's operational performance was similar to
11 and compared favorably with the BOP's operational
12 performance, did you compare the frequency of
13 prison riots between BOP-operated prisons and
14 CCA-operated prisons?
15     A.    No, sir, I didn't compare frequency
16 of either.  There's -- I mean, riots happened in
17 private prisons, BOP prisons, state prisons every
18 day.  So I -- I -- I would not have been looking
19 at that specifically.
20     Q.    Did you compare the number of staff
21 taken hostage in CCA-operated prisons to
22 BOP-operated prisons?
23     A.    No, sir.  We looked at -- as I
24 indicated at the beginning, we looked at the
25 private prisons as an extension of the BOP, so we

1 looked at the overall picture when we did
2 evaluations of prisons.
3     Q.    Did you compare the numbers of
4 correctional staff deaths between CCA-operated
5 prisons and BOP-operated prisons?
6     A.    No, sir.  As I indicated, we looked
7 at it as a whole.
8     Q.    Did you compare the number of inmate
9 deaths due to inadequate delivery of medical
10 services between CCA-operated -- operated prisons
11 and BOP-operated prisons?
12     A.    We looked at -- we -- we -- we
13 evaluated deaths as a system overall.
14     Q.    Did you compare the numbers of
15 significant findings between BOP-operated prisons
16 and CCA-operated prisons?
17     A.    I personally did not, but I will say
18 that significant findings happen at every prison,
19 so they -- all prisons have findings, whether
20 they be private prisons or BOP prisons.
21     Q.    Did you compare the numbers of repeat
22 deficiencies at CCA-operated prisons to
23 BOP-operated prisons?
24     A.    No, sir.  As I indicated before, we
25 looked at -- when I was doing evaluations I

William Dalius

Grae vs.
Corrections Corporation of America, et al.

Page 81

1    looked at all the facilities.  BOP and CoreCivic
2    and -- every prison has repeat deficiencies.
3    It's unavoidable.  It's the nature of the
4    business.
5        Q.    Did you compare the numbers of double
6    repeat deficiencies between CCA-operated prisons
7    and BOP-operated prisons?
8        A.    I did not.  Again, as I indicated, we
9    looked at -- at universe overall.
10       Q.    Did you compare the numbers of triple
11   repeat deficiencies between CCA-operated prisons
12   and BOP-operated prisons?
13       A.    I -- I would give you the same
14   answer.  It -- it -- it -- whether you get to
15   that point and you have systemic issues that
16   occur, that would be brought to somebody's
17   attention, but it's not uncommon for facilities
18   to have repeat deficiencies.
19       Q.    So you'd agree that a triple repeat
20   deficiency indicates that you have a systemic
21   problem that is occurring, right?
22           MR. MCGEE:  Object to the form of
23       the question.
24           THE WITNESS:  It depends on the
25       deficiency.

Page 82

1        I'm sorry.
2           BY MR. LYONS:
3        Q.    And did you compare the numbers of
4    quadruple repeat deficiencies between the
5    CCA-operated BOP prisons and the BOP-operated
6    prisons?
7        A.    Again, we reviewed all facilities'
8    operations.  And if there are systemic issues, we
9    would look at the magnitude, what the
10   deficiencies are and whether or not we had to
11   provide some type of correction action --
12   corrective action, whether it be a BOP facility
13   or a private facility.
14       Q.    But in terms of your analysis
15   comparing CCA's operational performance to the
16   BOP's operational performance, you didn't do
17   any -- any rigorous analysis of the numbers of
18   all those types of repeat deficiencies and
19   significant findings between CCA-operated prisons
20   and BOP prisons, did you?
21       A.    I personal --
22           MR. MCGEE:  Object to the form of
23       the question.
24           THE WITNESS:  I personally did not
25       do that.  We had staff in our program

Page 83

1    review areas and our oversight areas that
2    looked at those type of things and would
3    get with the regional director responsible
4    for those areas and put corrective action
5    plans -- corrective action plans together,
6    whether it be a BOP facility or a private
7    facility.
8           BY MR. LYONS:
9        Q.    And for purposes of your analysis
10   comparing CCA's operational performance to the
11   BOP's operational performance, did you compare
12   the staffing levels at CCA-operated prisons to
13   BOP prisons?
14       A.    We looked at staffing at all
15   facilities and -- and -- I don't know if we did a
16   comparison between private prisons and -- and
17   public prisons, but every prison has staffing
18   vacancies.  So we -- we -- we looked at all those
19   areas.
20       Q.    So you looked at all of them in your
21   role as -- you're saying as in your role at the
22   BOP as the CFO; is that right?
23       A.    And I currently look at -- I look at
24   vacancies now as my role as a vice president.
25       Q.    In your role as vice president you

Page 84

1    don't look at -- you don't look at the staffing
2    vacancies at BOP prisons, though, do you?
3    BOP-operated prisons, sorry.
4        A.    I -- I would not have access to that
5    anymore.
6        Q.    For purposes of your comparison, did
7    you compare the medical staffing levels at
8    CCA-operated prisons to the medical staffing
9    levels at BOP-operated prisons?
10       A.    As I indicated before, we looked at
11   staffing levels across the board and medical was
12   one particular area, as well as food service,
13   correctional services, other service -- other
14   areas within the facilities that we looked to
15   fill vacancies at both CoreCivic and BOP when I
16   was there.
17       Q.    So for purposes of your comparison of
18   CCA's operational performance to the BOP's
19   operational performance, did you compare the
20   levels of turnover in staffing at CCA-operated
21   prisons to the levels at BOP-operated prisons?
22       A.    I did not specifically do that
23   myself.  Folks may have looked at turnover rates.
24   I mean, you look at vacancies in general.  And --
25   and if you look at corrections in general,

William Dalius

Grae vs.
Corrections Corporation of America, et al.

Page 85

1  turnover is hard. People don't grow up up to be
2  correctional officers, correctional workers.
3  Whether it be in correctional services, unit
4  management, the business office, medical,
5  wherever it may be, you know, every prison looks
6  to reduce turnover. The reality is, whether it
7  be BOP or CoreCivic, staff turnover.
8      Q.   For purposes of your comparison, did
9  you compare the experience levels of the staff
10  that were present at CCA-operated prisons to the
11  staff at BOP-operated prisons?
12     A.   I specifically, again, did not do
13  that myself, but I can say from my history of
14  working prisons, it's nice to have senior staff
15  in your facility. So it's -- obviously you --
16  you like to have longevity with your staff where
17  you can and -- and whether that -- whether it be
18  CoreCivic or whether it be BOP.
19     Q.   For purposes of your comparison, did
20  you compare how many staff at the CCA-operated
21  prisons spoke the same language as the inmates
22  and did you compare that number to the -- to the
23  number at BOP-operated prisons?
24     A.   Again, I did not specifically do
25  that, but I would say in virtually every prison

Page 86

1  in the country there -- there are limited numbers
2  of staff that speak different languages or are
3  languages similar to the populations. That's
4  never an issue. I had the same problem when I
5  was at Fort Dix as an AW. Inmates find a way to
6  communicate with you.
7      Many, many of these individuals that
8  are -- that are considered to speak only one
9  language, whether it be Spanish or whatever, also
10  speak English. So they find ways to communicate
11  with you and communicate with staff and have the
12  ability to get necessary information to the
13  leadership where -- where necessary.
14     Q.   And for purposes of your comparison
15  of CCA operational performance to BOP operational
16  performance, did you compare how many staff in --
17  specifically in intelligence functions spoke the
18  same language as the inmates in CCA-operated
19  prisons as compared to at BOP-operated prisons?
20     A.   I would say it would be fairly
21  similar. The majority of the staff in this
22  country speak English and their intelligence
23  staff are similar to that.
24     But, as I just indicated in my
25  previous response, there's ways that many of the

Page 87

1  population, even though they're Spanish-speaking,
2  also speak English. They -- they bring
3  interpreters with them. If there's information
4  that needs to be brought forward, they find a way
5  to do that. We've got translation lines that are
6  available for inmates to speak to staff through a
7  translator.
8      So there's many ways that
9  investigators can get that information outside of
10  being able to speak the language.
11     Q.   So did you compare the levels of --
12  maybe I'll just repeat my question to you.
13     For purposes of your comparison of
14  CCA operational performance to BOP operational
15  performance, did you compare how many staff
16  specifically in intelligence functions spoke the
17  same language as the inmates in CCA-operated
18  prisons as compared to at BOP-operated prisons?
19     A.   I did not specifically do that
20  analysis, but I provided rationale as to why
21  that -- that's not as significant as it would
22  seem.
23     Q.   Now, all private prison providers
24  have an opportunity to earn performance awards,
25  right?

Page 88

1      A.   Depends on the contract, as far as
2  I'm -- based on my -- I -- based on my
3  experience, that has occurred over the years. I
4  don't think that's in every contract anymore.
5      Q.   To your knowledge during the -- the
6  2012 to 2016 time frame, did all private prison
7  providers that contracted with the BOP have an
8  opportunity to earn performance awards from the
9  BOP?
10     A.   I don't know --
11     MR. MCGEE: Object to the form of
12  the question.
13     THE WITNESS: I -- I don't know the
14  answer to that.
15     BY MR. LYONS:
16     Q.   Have you done any analysis of what
17  percentage of the potential award fees CCA could
18  have earned from the BOP during the period 2012
19  to 2016 that they actually earned?
20     A.   I -- I did not do that analysis.
21     Q.   Have you -- well, not having done
22  that analysis, I assume you have -- have no way
23  to compare the level of performance awards that
24  CCA received to the level of performance awards
25  that any other private operator received, right?

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1     MR. MCGEE:  Object to the form.
2     THE WITNESS:  That's correct.
3  That's correct.  I don't know the answer
4  to that.
5     BY MR. LYONS:
6     Q.    What -- what is the objective measure
7  by which you conducted your comparison of CCA's
8  operational performance to the BOP's operational
9  performance?
10     MR. MCGEE:  Object to the form of
11  the question.
12     THE WITNESS:  Sir, as I indicated
13  earlier, I've got 30 years of experience
14  in the Bureau of Prisons.  I was a warden.
15  I was an assistant warden.  I've got
16  over -- that I -- I had general oversight
17  over 120-some facilities.  I've got
18  oversight -- direct oversight over 20 to
19  25 facilities now.
20     So I've been able to gain a vast
21  knowledge and experience in prison
22  operations.  It gives me the -- the ability
23  to compare two facilities or multiple
24  facilities to each other.
25

1     BY MR. LYONS:
2     Q.    So it's your -- your general sense,
3  based on your experience at the BOP and at CCA;
4  is that right?
5     MS. REPORTER:  I'm sorry.  Could
6  you repeat that?
7     BY MR. LYONS:
8     Q.    So it's your general sense, based on
9  your experience at the BOP and at CCA; is that
10  right?
11     MR. MCGEE:  Object to the form of
12  the question.
13     THE WITNESS:  Can you please repeat
14  the question, Mr. Lyons?
15     MR. LYONS:  Misty, would you mind
16  reading that back.
17     MS. REPORTER:  Sure.  One moment.
18     And again, it's very difficult as now
19  three people are speaking at the same time.
20     One moment.
21     MR. LYONS:  We apologize.
22     (Thereupon, the record was read back
23     as requested.)
24     MR. MCGEE:  Object to the form of
25  the question.

1     Go ahead, Bill.
2     THE WITNESS:  So, yes, sir.  My --
3  it's not my general sense.  It's my
4  experience and knowledge of both CCA and
5  CoreCivic working for both components that
6  I'm able to do that.
7     BY MR. LYONS:
8     Q.    There's no specific metric that
9  you're using, right?
10     A.    No, just 34 years of experience.
11     Q.    So if you wanted to, like, put up a
12  chart to show the jury how CCA prisons compare to
13  BOP-operated prisons, there's no -- there's no
14  way you could put your analysis in a chart, is
15  there?
16     MR. MCGEE:  Object to the form of
17  the question.
18     THE WITNESS:  Again, sir, it would
19  depend on what analysis you're looking
20  for.  But if you're looking at overall
21  operational standards, the standards are
22  similar for both BOP and CoreCivic.
23     BY MR. LYONS:
24     Q.    Did you perform any sort of
25  statistical analysis comparing the CCA-operated

1  prisons to the BOP-operated prisons?
2     A.    No, sir.
3     Q.    Did you perform any written analysis
4  of the operational performance of CCA prisons
5  compared to BOP-operated prisons?
6     A.    Years ago, when I first -- when I was
7  a consultant, I prepared a financial analysis.
8     Q.    And was that analysis of operational
9  performance or of costs?
10     A.    Strictly costs.
11     Q.    Is there any sort of scoring system
12  that you could use or you have used, rather, to
13  compare the operational performance of CCA
14  prisons to BOP prisons?
15     MR. MCGEE:  Object to the form of
16  the question.
17     THE WITNESS:  There is no scoring
18  system that I have.
19     BY MR. LYONS:
20     Q.    Is there any system that you use to
21  compare CC -- CCA-operated prisons to
22  BOP-operated prisons that someone other than you
23  objectively could -- could test or verify your
24  conclusions?
25     MR. MCGEE:  Object to the form of

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1    the question.
2            THE WITNESS: My cost analysis was
3    very clear, which showed CoreCivic
4    operations are much cheaper than BOP
5    operations.
6            BY MR. LYONS:
7    Q.    I'm asking you about operational
8    performance.
9            Is there any -- is there any system
10   that somebody objective could use to compare
11   CCA's operational performance to -- you know, at
12   the CCA-operated BOP prisons to BOP's operational
13   performance at the BOP-operated prisons?
14           MR. MCGEE: Object to the form of
15   the question.
16           THE WITNESS: There's -- there --
17   there is nothing that I personally
18   developed.
19           BY MR. LYONS:
20   Q.    And nothing that you used either,
21   right?
22   A.    In my analysis of -- of -- I mean,
23   I -- I've used my -- as I indicated before, I can
24   walk in a prison and fairly quickly walk the
25   compound, get a feel for the compound, how safe

1    the compound is based on inmates communicating
2    with you and staff communicating with you, is the
3    place clean, does the food taste good.
4            I mean, those are the types of things
5    that I base my analysis on.
6    Q.    So if somebody else wanted to come in
7    and attempt to replicate your analysis, they
8    would have to walk in to the same places and just
9    see if they had the same feeling?
10           MR. MCGEE: Object to the form of
11   the question.
12           THE WITNESS: The answer to that
13   would be if you had somebody that's got
14   35 years in corrections, they could do the
15   similar thing that I do. The -- the
16   difference being is the majority of the
17   folks that would -- could do that,
18   they're -- they're rare because I've got
19   the -- the luxury of having a
20   financial background, as well as an
21   operations background, to be able to
22   evaluate facilities.
23           BY MR. LYONS:
24   Q.    To your knowledge, is there any
25   academic literature that supports assessing the

1    relative performance of a private prison operator
2    by trying to compare to -- to dissimilar BOP
3    facilities as opposed to comparing performance to
4    similarly -- similarly situated private
5    operators?
6            MR. MCGEE: Object to the form of
7    the question.
8            THE WITNESS: There was a --
9    when -- when the BOP initially got into
10   privatization, there was some study done
11   back either the late '80s or early '90s, I
12   don't remember who it was, and it
13   basically, I think, was inconclusive.
14   Basically saying that private prisons ran
15   as comparable to BOP prisons.
16           BY MR. LYONS:
17   Q.    Was it inconclusive or it -- or it
18   reached the conclusion that you just described?
19   A.    When I say inconclusive, I think
20   there were -- I -- again, I -- that was 30 years
21   ago, so I -- I'm -- I'm taxing my memory to go
22   back and figure out what the -- but that was a
23   study that was done years and years ago.
24   Q.    Who authored that study?
25   A.    I don't know the answer to that.

1    Q.    Is there any academic literature that
2    supports assessing the relative performance of a
3    for-profit prison operator by trying to
4    compare -- well, by ignoring all of the
5    unfavorable performance criteria we just
6    discussed, such as significant findings, riots,
7    repeat deficiencies?
8            Is there any academic literature that
9    supports comparing private to government prisons
10   without looking at all of those factors?
11           MR. MCGEE: Object to the form of
12   the question.
13           THE WITNESS: Not that I'm aware
14   of.
15           BY MR. LYONS:
16   Q.    To your knowledge, has anybody else
17   ever performed an analysis like -- like you have
18   apparently performed to compare operational
19   performance of private prisons and government
20   prisons?
21           MR. MCGEE: Object to the form of
22   the question.
23           THE WITNESS: I -- I don't know if
24   there's anybody else that's done that.
25

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1    BY MR. LYONS:
2        Q.    Other than for -- for this case, do
3    you have any experience assessing the relative
4    performance of a for-profit prison operator by
5    trying to compare to BOP-operated prisons?
6            MR. MCGEE:  Object to the form of
7        the question.
8            THE WITNESS:  Just the cost
9        analysis that we had done and we did every
10       year.
11           BY MR. LYONS:
12       Q.    So not -- you don't have any
13   experience, other than for this case, comparing
14   the operational performance of CCA-operated
15   prisons or any private prison company-operated
16   prisons to BOP-operated prisons, right?
17           MR. MCGEE:  Object to the form of
18       the question.
19           THE WITNESS:  Other than ongoing
20       operational performance in the Bureau of
21       Prisons and program review teams and teams
22       that went out and assessed, but no -- no
23       third party that I'm aware of.
24           BY MR. LYONS:
25       Q.    And no -- no actual comparison by you

1    either, right?
2        A.    I have not done a comparison, other
3    than my being in and out of prisons and
4    understanding how prisons operate.
5        Q.    To your knowledge, are there any
6    classes that teach what you've done to compare
7    the operational performance of CCA to the
8    operational performance of BOP-operated prisons?
9    Are there any classes that teach that method as a
10   sound methodology?
11           MR. MCGEE:  Object to the form of
12       the question.
13           THE WITNESS:  Not that I'm aware
14       of.
15           BY MR. LYONS:
16       Q.    To your knowledge, are there any
17   textbooks or treatises that embrace your methods
18   as reliable?
19           MR. MCGEE:  Object to the form of
20       the question.
21           THE WITNESS:  Not that I'm aware
22       of, but there are a lot of criminal
23       justice classes out there I may use.
24           BY MR. LYONS:
25       Q.    To your knowledge, are there any --

1    is there any publication that's ever published an
2    article applying the methodology you used to
3    compare CCA's operational performance to BOP's
4    operational performance?
5            MR. MCGEE:  Object to the form of
6        the question.
7            THE WITNESS:  Not that I'm aware
8        of.
9            BY MR. LYONS:
10       Q.    To your knowledge, has any court ever
11   ruled that the methodology you used to compare
12   CCA's operational performance to the BOP's
13   operational performance is admissible in
14   evidence?
15           MR. MCGEE:  Object to the form of
16       the question.
17           THE WITNESS:  Not that I'm aware
18       of.
19           BY MR. LYONS:
20       Q.    So the methodology you used is --
21   hasn't been tested by anybody else, has it?
22           MR. MCGEE:  Object to the form of
23       the question.
24           THE WITNESS:  I -- I don't know.
25       This is the first time I've testified.

1            BY MR. LYONS:
2        Q.    Did you consider any documents in
3    forming your opinions with respect to the
4    comparison of CCA's operational performance to
5    the BOP's operational performance?
6        A.    Not that I'm aware of.  I -- I mean,
7    I -- I -- again, I -- I -- I -- I base my
8    analysis of the operations on actual hands-on
9    being in the facilities, seeing what they're
10   doing, both in my previous 30 years in the Bureau
11   of Prisons and my four years at CoreCivic.  That
12   give -- gives me the ability to assess how
13   facilities are operating.
14       Q.    But so there's -- there's no document
15   that you could -- you could hand to me and say
16   look here, here's a document that shows that
17   CCA's operational performance was similar to and
18   compared favorably with the BOP's operational
19   performance, right?
20       A.    I -- I don't have a document.  The
21   BOP may have documents from their program reviews
22   where -- where they assess.  If you look at all
23   the BOP program reviews and the -- the reviews
24   that are done of the privatization companies,
25   they may have documents that would -- that would

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1  give that comparison for you in addition to
2  having expertise review facilities.
3      Q.   So they may have those documents, but
4  you don't -- if they exist you don't have them,
5  right?
6      A.   I -- I would have any document --
7  or -- or I -- I would have had access to a
8  document.  I don't have any documents personally,
9  but at -- at CoreCivic I would have had access to
10  whatever reviews were done.
11      Q.   But you didn't actually, like, look
12  at those -- the types of documents that you're
13  describing to -- to perform some comparison of
14  CCA's operational performance to the BOP-operated
15  prisons' operational performance, did you?
16      A.   Not specifically.
17      Q.   Is there anything you're relying on
18  for that, other than your memory of the
19  performance of BOP prisons?
20          MR. MCGEE:  Object to the form of
21  the question.
22          THE WITNESS:  No, sir.  But
23  30 years of working in the BOP, I've --
24  I've had a lot of --
25          (Remote transmission interference)

1          MS. REPORTER:  A lot of what?
2          THE WITNESS:  A lot of oversight of
3  the facilities, so I -- I -- I saw how BOP
4  facilities operated.
5          BY MR. LYONS:
6      Q.   Did you interview anybody from the
7  BOP about how CCA's operational performance
8  compares to BOP-operated prisons' operational
9  performance?
10      A.   No, sir.
11      Q.   Did CCA's lawyers ask you to
12  interview anybody about how CCA's performance
13  compared to BOP-operated prisons' operational
14  performance?
15      A.   No, sir.
16      Q.   Did you talk to any of the defendants
17  in this case about CCA's operational performance
18  for BOP during the class period?
19      A.   Did I talk to who?
20          MR. MCGEE:  Object to the form --
21          BY MR. LYONS:
22      Q.   Any of the defendants in this case.
23      A.   Oh, no, sir.
24      Q.   Speaking of which, do you know who
25  the defendants are in this case?

1      A.   Don't believe I do.
2      Q.   Are you aware that CCA or now
3  CoreCivic is one of the defendants in the case?
4      A.   I'm assuming that's why I'm
5  testifying.
6      Q.   Are you aware that Damon Hininger is
7  one of the defendants in this case?
8      A.   Just generally.
9      Q.   Are you aware that Mr. Lappin, Harley
10  Lappin, is a defendant in the case?
11      A.   Generally, as with Mr. Hininger.
12      Q.   Who do you report to at CCA?
13      A.   Right now?
14      Q.   Yes.
15      A.   Patrick -- Patrick Swindle.
16      Q.   And who does he report to?
17      A.   Damon Hininger.
18      Q.   Did you speak to any of the
19  defendants' other purported experts about this
20  case?
21      A.   No, sir.
22      Q.   So did you speak to Scott Dodrill
23  about this case?
24      A.   No, sir.
25      Q.   Did you speak to Justin Marlowe?

1      A.   No, sir.
2      Q.   Did you speak to Lucy Allen?
3      A.   No, sir.
4      Q.   Did you speak to Don Murray about
5  this case?
6      A.   No, sir.
7      Q.   Did you speak to Harley Lappin about
8  this case?
9      A.   No, sir.
10      Q.   And did you speak to Kim White about
11  this case?
12      A.   No, sir.
13          MR. MCGEE:  Chris, we've been going
14  about an hour, so whenever you reach a
15  good break -- a -- a good breaking point.
16          MR. LYONS:  Yeah.  You know,
17  this -- this is a -- a decent breaking
18  point, so why don't we go ahead --
19          VIDEO OPERATOR:  Do you want to go
20  off the record?
21          MR. LYONS:  -- and go off the
22  record, yeah.
23          VIDEO OPERATOR:  Okay.  The time is
24  12:44 p.m. and we are now off the record.
25          MR. LYONS:  Thanks.

William Dalius

Grae vs.
Corrections Corporation of America, et al.

Page 121

1  to be the same as costs?
2      A.    Similar.
3      Q.    So, like, in other words, I could buy
4  a beat-up used Suzuki for $9,000 or a brand-new
5  Ferrari for $10,000.  Is the Suzuki the more
6  cost-effective purchase?
7      A.    I guess it depends on your style.
8      Q.    Is there anything else you would use
9  to measure cost effectiveness other than just
10  price?
11      A.    Well, the -- well, I mean, you --
12  you've got to follow the contract too.  And, you
13  know, as long as your quality -- you're running a
14  quality operation, which CoreCivic runs quality
15  operations, and your cost -- when you say cost
16  effective, I -- I consider cost effectiveness as
17  being we're -- we're doing the same or -- or
18  equal operations as the BOP at a lower rate.
19  That's cost effective for the government.
20      Q.    And how will you measure whether or
21  not CCA is doing the same or equal operations as
22  the BOP?
23      A.    As I mentioned previously, I've been
24  in virtually every BOP prison.  I've been in many
25  private prisons.  I've seen the operations of

Page 122

1  both.  I've got 30 years' experience to evaluate
2  and -- and -- and compare the two.  And CoreCivic
3  operations run as effectively and efficiently as
4  BOP's.
5      Q.    But there's no metric you can point
6  me to for that, right?
7      MR. MCGEE:  Object to the form --
8      THE WITNESS:  Metrics would be --
9  I'm sorry.
10      The -- the metrics would be, you
11  know, the -- the thousands of reports I've
12  reviewed over the years, talking to hundreds
13  of thousands -- or -- or hundreds of wardens
14  and thousands of staff probably over the
15  years, reviewing documentation over my
16  career and -- and being inside facilities.
17      BY MR. LYONS:
18      Q.    On this point of cost effectiveness,
19  are you aware that in December 2014, the BOP
20  opted not to award a contract to CCA and instead
21  awarded it to GEO, even though GEO was offering a
22  price that was ██████ percent higher than CCA's
23  price?
24      A.    Don't recall that, no.
25      Q.    Are you aware that -- that in that

Page 123

1  instance, the -- the inmates were actually going
2  to have to be transferred from CCA's facility to
3  the GE -- the GEO facility?
4      A.    I don't recall that, sir.
5      Q.    You were the -- the CFO of BOP in
6  December 2014, right?
7      A.    I was.
8      Q.    Were you involved in the decisions
9  with respect to CAR XV?
10      A.    Typically, no, I would not have been
11  involved in that decision.  As I indicated
12  before, the procurement executive and his team
13  had warrants and decisions.  I didn't have a
14  warrant.  They awarded the contracts.
15      Q.    So did you discuss the source
16  selection decision with those procurement
17  executives for CAR XV?
18      A.    I'm pretty confident they would have
19  notified me of -- of that.  But you've got to
20  remember I had a $7 billion budget and 150
21  facilities to worry about.  I didn't get into
22  every detail of every contract action that
23  occurred.
24      Q.    So you don't recall discussing the
25  specific thought process that went into the

Page 124

1  decision to award that contract to GEO instead of
2  CCA; is that right?
3      A.    That's correct.
4      Q.    Are you aware that in awarding this
5  contract to GEO instead of CCA, the BOP concluded
6  that, quote, ███████████████████████████
███████████████████████████████████████████
███████████████████████████████████████ end
10  quote?
11      MR. MCGEE:  Chris, what are you
12  reading from?
13      MR. LYONS:  It's -- I haven't
14  introduced it.  I'm just --
15      MR. MCGEE:  In -- in --
16      MR. LYONS:  I'm asking whether he's
17  aware of the BOP reaching that conclusion.
18      MR. MCGEE:  For what contract?
19      MR. LYONS:  For CAR XV.
20      THE WITNESS:  Well, it could have
21  been 10 -- it could have been 10 contracts
22  for CAR XV.
23      BY MR. LYONS:
24      Q.    Okay.  With respect to the --
25  requirement A under CAR XV of the decision

William Dalius

Grae vs.
Corrections Corporation of America, et al.

Page 161

1    A.    It was when I was consulting for CCA
2  at the time.
3    Q.    Would that have just been one
4  instance in connection with your D.C. meetings
5  with Mr. Wiley and company?
6    A.    That -- that would have -- I don't
7  know if I did it for that meeting or I did it for
8  somebody else, but it was just one instance.
9    Q.    And then since you started working
10  for CCA, have you done written analyses comparing
11  the cost of CCA-operated prisons to BOP-operated
12  prisons?
13    A.    No, sir.  The theory doesn't change.
14    Q.    But so in connection with -- with
15  this case, for example, you haven't done any
16  written analyses comparing the cost of
17  CCA-operated prisons to BOP-operated prisons,
18  right?
19    A.    No, sir.
20    Q.    Just to make sure we have our -- our
21  yeses and nos right, that means no, you haven't
22  done those analyses, right?
23    A.    I -- I have not done anything since
24  the initial one.
25    Q.    Now, when you did the initial written

Page 162

1  analysis comparing CCA-operated prisons' costs to
2  BOP-operated prisons' costs, what data did you
3  use?
4    A.    For -- for BOP or CoreCivic?  It was
5  mostly -- mostly -- it -- well, it was all public
6  data.  At -- at the time, you know, BOP puts in
7  their annual budget, at least they used to at the
8  time, their annual per capita by classification,
9  minimum, low, medium, high, privatization
10  overall.  So that data was publicly available.
11        At the time they -- they produced a
12  report that was called the Monday Morning
13  Highlights that showed --
14        MS. REPORTER:  I'm sorry, sir?
15        THE WITNESS:  It was called the
16    Monday Morning -- Monday Morning
17    Highlights that showed the populations, so
18    I was able to -- take that report and
19    extract the low security facilities to
20    come up with the mandates.
21        BY MR. LYONS:
22    Q.    So they -- they published a report
23  that was called the Monday Morning Highlights; is
24  that right?
25    A.    Yes -- yes, sir.  They did that every

Page 163

1  week.  They don't do it anymore, but they used
2  to.
3    Q.    And where was that published?
4    A.    It was on the BOP website.
5    Q.    Was there any other data that you
6  used for the BOP side of the equation?
7    A.    No, sir.
8    Q.    Then what about the CCA side of the
9  equation?
10    A.    The CCA side was on the BOP data, on
11  that report that shows privatization costs
12  compared -- they send a -- it's become part of
13  the budget document for Congress.
14    Q.    So that -- that document showed the
15  per diem rate for each CCA facility?
16    A.    No, it showed the average rate for
17  all private facilities.
18    Q.    So was your comparison of
19  BOP-operated prisons compared to all private
20  prisons?
21    A.    It was -- it was -- it compared low
22  security BOP prisons to all low security private
23  prisons.
24    Q.    So it wasn't CCA-specific?
25    A.    No, sir.

Page 164

1    Q.    And, again, you didn't -- you didn't
2  have any internal BOP data for that exercise,
3  right?
4    A.    No, sir.  When I left BOP, that data
5  stayed.  The only thing I found was on public
6  websites.
7    Q.    Did the public data that you found
8  have any information about the overhead costs at
9  the BOP level attributable to private prisons?
10    A.    Not unless it was on that one
11  document, that one-page document.  There's --
12  there's overhead on that document.  I don't know
13  where -- I -- I can't recall exactly where --
14  where it shows up in that report.
15    Q.    And just to be clear, when -- when
16  you -- when you refer to that document, you're
17  talking about this Monday Morning Highlights
18  report that was published on a weekly basis?
19    A.    No, sir.  That was just populations.
20    Q.    Oh.
21    A.    The -- the document was -- and I'm
22  talking about referenced low security $69 a day
23  for BOP, privatization amount $60, medium
24  security $70, high security -- and I -- I'm
25  making up numbers, but that's kind of what it

Case 3:16-cv-02267     Document 374-2     Filed 12/04/20     Page 23 of 24 PageID #: 7763
Page 161..164
www.aptusCR.com

William Dalius

Grae vs.
Corrections Corporation of America, et al.

1 looks like.
2     Q.    So would -- this would have been in
3 the annual budget request from the BOP that went
4 to Congress? Is that what that is?
5     A.    Which document are you talking about?
6     Q.    The -- the document you were just
7 describing with the --
8     A.    The --
9     Q.    -- the breakdown of --
10     A.    -- the -- the per diem document?
11     Q.    Um-hmm (affirmative).
12     A.    I believe that's part of the
13 submission. It was a public document they put
14 out. I don't -- I -- and I'm fairly certain it
15 was in the actual budget submission.
16     Q.    To Congress?
17     A.    To Congress.
18     Q.    Have you ever been charged with a
19 crime, Mr. Dalius?
20     A.    Not that I'm aware of, unless a
21 speeding ticket. Maybe -- I may have gotten a
22 speeding ticket.
23     Q.    So -- so never charged with a crime
24 other than a speeding ticket to your knowledge;
25 is that right?

1     A.    That's -- to my knowledge, yes.
2     Q.    Have you ever been accused of any
3 misconduct involving dishonesty?
4     A.    No, sir.
5     Q.    Have you ever been accused of any
6 misconduct involving fraud?
7     A.    No, sir.
8     Q.    Have you ever been accused of any
9 misconduct involving theft?
10     A.    No, sir.
11     Q.    Have you ever been accused of any
12 misconduct involving embezzlement?
13     A.    No, sir.
14     Q.    Have you ever been accused of breach
15 of fiduciary duty?
16     A.    No, sir.
17     Q.    When you were at the BOP, you were
18 accused on multiple occasions of violating the
19 United States Department of Justice standards of
20 employee conduct, right?
21     A.    That's correct.
22     Q.    When was the first time you were --
23 you were alleged to have violated the DOJ
24 standards of conduct?
25     A.    I don't know the specific date.

1     Q.    Approximately when would it have
2 been?
3     A.    2000 -- I -- I don't know. I really
4 don't know the date.
5     Q.    What position would you have been in,
6 in terms of your job at the time at the BOP?
7     A.    I would have been the assistant
8 director, if I recall.
9     Q.    So the first -- the first allegation
10 that you violated the DOJ standards of conduct
11 would have been when you were the assistant
12 director at the -- at -- in the administration
13 division; is that right?
14     A.    That's -- that's what I recall.
15     Q.    What was the first -- what were the
16 allegations the first time you were alleged to
17 have violated the DOJ --
18     A.    It was --
19     Q.    -- standards of conduct?
20     A.    It was allegations of -- of actions
21 unbecoming a senior executive staff member.
22     Q.    And what did that mean?
23     A.    There was an allegation of a
24 relationship with an employee in a different state
25 in the country.

1     Q.    A relationship with an employee in a
2 different state in the country.
3     Did the -- did -- did the state that
4 people -- that the employee was in have something
5 to do with the allegation?
6     A.    No. It was just an allegation that
7 it was unbecoming of a senior executive official
8 to do that.
9     Q.    And what is the -- the that that you
10 were alleged to have done?
11     A.    Had a relationship.
12     Q.    Was there any truth to the
13 allegations against you?
14     A.    It was an allegation. There was
15 partial truths. It wasn't fully as the
16 allegations occur.
17     Q.    Can you briefly explain to me what
18 you mean by that?
19     MR. MCGEE: Chris, what -- what --
20 what relevance does this have? You guys
21 followed around on this in the last
22 deposition. I -- I don't understand
23 the -- the -- the relevance this has to
24 his 26 -- Rule 26 disclosure.
25     MR. LYONS: I don't know yet. I'm