# EXHIBIT A

# EXHIBIT 1
# [Filed Under Seal]

Videotaped Deposition of

# Harley G. Lappin

October 29, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential Pursuant to the Protective Order**



Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

```
                                                    Page 1
 1          UNITED STATES DISTRICT COURT
 2          MIDDLE DISTRICT OF TENNESSEE
 3
 4   NIKKI BOLLINGER GRAE, Individually
     and on Behalf of All Others
 5   Similarly Situated,
 6           Plaintiff,              Civil Action No.
 7   vs.                             3:16-cv-02267
 8   CORRECTIONS CORPORATION OF
     AMERICA, ET AL.,
 9
             Defendants.
10
     _____
11
12       CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13
14       VIDEOTAPED DEPOSITION OF HARLEY G. LAPPIN
15
16    Conducted virtually via remote videoconference
17                  October 29, 2020
18
19
20
21
22
23   Reported by:
     Misty Klapper, RMR, CRR
24   Job No.: 10073532
25
```

```
                                                    Page 2
 1          UNITED STATES DISTRICT COURT
 2          MIDDLE DISTRICT OF TENNESSEE
 3
 4   NIKKI BOLLINGER GRAE, Individually
     and on Behalf of All Others
 5   Similarly Situated,
 6           Plaintiff,              Civil Action No.
 7   vs.                             3:16-cv-02267
 8   CORRECTIONS CORPORATION OF
     AMERICA, ET AL.,
 9
             Defendants.
10
     _____
11
12
13
14
15
16
17      Videotaped deposition of HARLEY G. LAPPIN, taken on
18   behalf of Plaintiff, via Zoom remote videoconference,
19   beginning at 10:43 a.m. CST on Thursday, October 29, 2020,
20   before Misty Klapper, RMR, CRR.
21
22
23
24
25
```

```
                                                    Page 3
 1   APPEARANCES:
 2   (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
 3   ON BEHALF OF PLAINTIFF:
 4          JASON A. FORGE, ESQUIRE
            ROBBINS GELLER RUDMAN & DOWD LLP
 5          655 West Broadway, Suite 1900
            San Diego, California 92101
 6          (619) 231-1058
            E-mail: jforge@rgrdlaw.com
 7
                   AND
 8
            KENNETH J. BLACK, ESQUIRE
 9          ROBBINS GELLER RUDMAN & DOWD LLP
            One Montgomery Street, Suite 1800
10          San Francisco, California 94104
            (415) 288-4545
11          E-mail: kennybrgrdlaw.com
12
     ON BEHALF OF DEFENDANTS AND THE DEPONENT:
13
            BRIAN T. GLENNON, ESQUIRE
14          ERIC CHARLES PETTIS, ESQUIRE
            LATHAM & WATKINS, LLP
15          355 South Grand Avenue, Suite 100
            Los Angeles, California 90071
16          (213) 485-1234
            E-mail: brian.glennon@lw.com
17                  eric.pettis@lw.com
18
19   ALSO PRESENT:  WILLIAM GEIGERT
20
21
22
23
24
25
```

```
                                                    Page 4
 1                C O N T E N T S
 2   WITNESS:           EXAMINATION BY:         PAGE:
 3   Harley G. Lappin   Mr. Forge                  6
 4                      Mr. Glennon              121
 5
 6
 7
 8                E X H I B I T S
 9   LAPPIN EXHIBITS:
10   NO.:        DESCRIPTION:                   PAGE:
11   Exhibit 590 Transcript of the confidential
12               videotaped deposition of Harley
13               G. Lappin taken on 7-28-20       59
14
15   Note:  Exhibits marked and attached to original.
16
17   EXHIBITS REFERRED TO:                      PAGE:
18   Dodrill Exhibit 546                          83
19   Hininger Exhibit 346                         81
20   Kelly Exhibit 432                            71
21
22
23
24
25
```

Case 3:16-cv-02267   Document 380   Filed 12/07/20   Page 4 of 17 PageID #: 17782
www.aptusCR.com
Page 1..4

Harley G. Lappin
Confidential Pursuant to the Protective Order
Grae vs. Corrections Corporation of America, et al.

Page 5

1  P R O C E E D I N G S
2      VIDEO OPERATOR: Good morning. We
3  are now on the record.
4      My name is Bill Geigert and I am a
5  videographer with Aptus Court Reporting.
6  Today's date is October 29, 2020 and the
7  time is 10:43 a.m.
8      This deposition is being held via
9  remote Zoom in the matter of Nikki Bollinger
10 Grae versus Corrections Corporation of
11 America, et al. The deponent today is
12 Harley Lappin.
13     All parties to this deposition are
14 appearing remotely and have agreed to the
15 witness being sworn in remotely. All
16 appearances have been noted on the
17 stenographic record.
18     The court reporter is Misty Klapper
19 and she will now administer the oath to the
20 witness.
21     MS. REPORTER: One moment.
22 Whereupon:
23     HARLEY G. LAPPIN,
24 was called for examination, and, after being duly
25 sworn, was examined and testified as follows:

Page 6

1      MS. REPORTER: Please proceed.
2      EXAMINATION BY COUNSEL FOR PLAINTIFF
3      BY MR. FORGE:
4   Q.  Good morning, Mr. Lappin.
5   A.  Good morning.
6   Q.  Mr. Lappin, that oath you just took,
7  what does it mean to you?
8   A.  Tell the truth, the whole truth and
9  nothing but the truth.
10  Q.  Now, you've provided sworn testimony
11 before Congress previously, correct?
12  A.  Yes.
13  Q.  You've provided sworn testimony in
14 other settings previously, correct?
15  A.  Yes.
16  Q.  Has that oath always meant the same
17 thing to you as you just told us it means to you
18 today?
19  A.  Yes.
20  Q.  So do you think you're entitled to
21 provide false testimony after taking that oath?
22  A.  No.
23  Q.  Do you think it's a crime to provide
24 false testimony after being sworn in as you were
25 today?

Page 7

1      MR. GLENNON: I'm going to just
2  object on the grounds that it calls for a
3  legal conclusion.
4      MS. REPORTER: Answer?
5      THE WITNESS: Repeat the question.
6      BY MR. FORGE:
7   Q.  Yes.
8      Do you think it's a crime to provide
9  false testimony after being sworn in as you were
10 today?
11     MR. GLENNON: Same objection.
12     THE WITNESS: Yes.
13     BY MR. FORGE:
14  Q.  Have you ever provided false
15 testimony while under oath?
16  A.  No.
17  Q.  Now, Mr. Lappin, prior to going on
18 CCA's payroll, you worked for the Bureau of
19 Prisons, correct?
20  A.  Yes.
21  Q.  What, if any, personal role -- while
22 you were at the Bureau of Prisons, what, if any,
23 personal role did you have in monitoring CCA's
24 performance for the BOP?
25  A.  We had on-site monitors --

Page 8

1      MS. REPORTER: Sorry, sir. You are
2  breaking up. Please try again.
3      THE WITNESS: Okay.
4      So there were a number of ways we
5  monitored contractual compliance. We had
6  on-site monitors full time at all locations
7  that monitored day-to-day operations. We
8  had an audit staff who audited those
9  facilities. We required ACA accreditation
10 as part of the oversight. We had a -- a
11 team dedicated just overseeing the
12 management of those facilities that was
13 centralized in -- in the correctional
14 programs department in Washington, D.C.
15     There were -- there was contract
16 oversight provided by a team of staff in the
17 administration division of the Bureau of
18 Prisons.
19     BY MR. FORGE:
20  Q.  Okay. You did not fill any of those
21 roles within those different teams and monitors
22 and staff you described, did you, you personally?
23  A.  I over --
24     (Remote transmission interference)
25     MR. GLENNON: Mr. -- Mr. Lappin,

Case 3:16-cv-02267   Document 380   Filed 12/07/20   Page 5 of 17 PageID #: 17783
www.aptusCR.com
Page 5..8

Harley G. Lappin
Confidential Pursuant to the Protective Order
Grae vs. Corrections Corporation of America, et al.

Page 9

1  I -- I think your answer might have gotten
2  cut off.
3       THE WITNESS:  Could you repeat the
4  question?
5       BY MR. FORGE:
6  Q.   Sure.
7       You did not personally -- you were
8  not personally a part of the team overseeing the
9  contract administration, were you?
10 A.   Not as director.  I was -- I oversaw
11 the supervision of staff responsible for those
12 duties.
13 Q.   So you oversaw the people who oversaw
14 them, correct?
15 A.   I did.
16 Q.   So you didn't -- you didn't oversee
17 that staff doing the contract administration.
18 You did not directly oversee them, correct?
19 A.   I was not their direct supervisor.
20 Q.   Okay.  You were not part of the team
21 dedicated to overseeing the management of the
22 operations of those facilities, correct?
23      MR. GLENNON:  Object to form.
24      THE WITNESS:  I -- I supervised the
25 staff that oversaw that, but in doing so,

Page 10

1  I had personal knowledge of the activities
2  that they carried out and the results of
3  their reviews.
4       BY MR. FORGE:
5  Q.   Well, you had personal knowledge of
6  what the people you reported reported about what
7  the people they supervised reported, correct?
8       MR. GLENNON:  Objection, vague.
9       THE WITNESS:  Not unlike any other
10 supervisor relationship in carrying out my
11 responsibilities as a supervisor, I was
12 briefed and I was informed on significant
13 issues, general oversight by the
14 leadership of those teams that carried out
15 those responsibilities.
16      BY MR. FORGE:
17 Q.   And all I'm trying to get at is you
18 were at least two levels removed from actually
19 being on the ground and directly monitoring CCA's
20 performance, correct?
21 A.   One or two.  It depends on which
22 function.
23 Q.   Okay.  So at least one and other
24 times two, correct?
25 A.   Yes.

Page 11

1  Q.   You weren't part of the BOP's audit
2  staff that audited CCA's performance, were you,
3  sir?
4  A.   Not as director.  So prior to my --
5  in my prior tour in Washington, D.C. I was in the
6  audit division and played a -- some role in the
7  auditing of all facilities, private and public
8  alike, but not as director.
9  Q.   Were you ever a part of the audit
10 staff that audited CCA's performance for the BOP?
11 A.   No.
12 Q.   You were not part of the BOP's --
13 you -- you were not one of the BOP's on-site
14 monitors at any of the prisons that CCA ran under
15 contract for the BOP, were you, sir?
16 A.   No.
17 Q.   You've never personally conducted a
18 review of a BOP-run prison's medical services,
19 have you, sir?
20      MR. GLENNON:  Objection, vague.
21      THE WITNESS:  Could you repeat?
22      BY MR. FORGE:
23 Q.   Yes.
24      You've never personally conducted a
25 review of a BOP-run prison's medical services,

Page 12

1  have you?
2       MR. GLENNON:  Same objection.
3       THE WITNESS:  I was the warden of a
4  federal medical center and conducted
5  internal audits, participated in internal
6  audits as a warden at a federal medical
7  center.  But, no, I have not -- as
8  director, I did not personally participate
9  in a audit or program review of a medical
10 program in a bureau facility or in a
11 private contract facility.
12      BY MR. FORGE:
13 Q.   When is the last time that you
14 personally conducted a review of a BOP-run
15 prison's corrections services?
16      MR. GLENNON:  Objection, vague.
17      THE WITNESS:  Could you repeat,
18 please?
19      BY MR. FORGE:
20 Q.   Yes.
21      When is the last time, if ever, you
22 personally conducted a review of a BOP-run
23 prison's corrections services?
24      MR. GLENNON:  Same objection.
25      THE WITNESS:  1990 or 1991.

Case 3:16-cv-02267    Document 380    Filed 12/07/20    Page 6 of 17 PageID #: 17764
Page 9..12
www.aptusCR.com

Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

Page 13

1  BY MR. FORGE:
2  Q. When is the last time, if ever, you
3  personally conducted a review of a BOP-run
4  prison's drug treatment program?
5      MR. GLENNON: Same objection.
6      THE WITNESS: Let -- let me back
7  up.
8      I -- I -- I personally participated
9  in audits '91, '92. In '94, '5 and '6 I
10 worked in the program review division. This
11 was after the consolidation of the audit
12 functions in the bureau.
13     And as part -- and as -- in that
14 role, I did go out and participate on audits
15 as an observer to oversee the process, so
16 technically went out on audits during my
17 responsibilities when assigned to the
18 program review division of the Bureau of
19 Prisons '94, '95, '96.
20     I have not participated in a audit of
21 a Bureau of Prisons contract facility.
22     BY MR. FORGE:
23 Q. So since you watched the folks at the
24 program division do their job, are you aware that
25 program review does not review clinical medical

Page 14

1  services?
2  A. I beg to differ. Applicable to
3  Bureau of Prisons' audit guidelines, there were
4  medical practitioners on those audit teams.
5  Q. That's not what I asked you, sir.
6      Are you aware that the program review
7  division does not -- or I guess we'll ask you
8  back when you were last there, because maybe it
9  was different back in the '90s.
10     Back in '94, '95 and '96 when you
11 were an observer for the program review division
12 folks actually reviewing the -- the BOP's prison
13 services, were you aware that the program review
14 division did not conduct a review of the clinical
15 medical care provided at the BOP prisons?
16 A. No, I don't --
17     MR. GLENNON: Object --
18     THE WITNESS: -- recall --
19     MR. GLENNON: Object.
20     Hold -- hold -- hold on, Mr. Lappin.
21 Just let me get my objection in there,
22 please.
23     Object to form and foundation.
24     THE WITNESS: So as I recall, they
25 did review clinical care. There were

Page 15

1  medical professionals on those teams that
2  provided the assessment of the medical
3  programs in the Bureau of Prisons.
4      BY MR. FORGE:
5  Q. When is the last time, if ever, you
6  personally conducted a review of a BOP-run
7  prison's drug treatment program?
8      MR. GLENNON: Object to form.
9      THE WITNESS: I don't recall ever
10 participating in a review, again, unless I
11 happened to be out on one as an observer,
12 applicable to drug treatment programs.
13     BY MR. FORGE:
14 Q. When is the last time, if ever, you
15 personally conducted a review of a BOP-run
16 prison's educational programming?
17 A. A similar response. I could have
18 been on one as an observer, but I did not
19 participate personally in an education review.
20 Q. So none that you can recall?
21 A. None that I can recall.
22 Q. Same thing with the drug treatment
23 program, none that you can recall?
24 A. Yes.
25 Q. So you know you didn't participate

Page 16

1  and you can't recall even observing one, correct?
2      MR. GLENNON: Objection, vague.
3      THE WITNESS: That's a long, long
4  time ago and, no, I cannot recall.
5      BY MR. FORGE:
6  Q. But you know you -- but you know you
7  didn't participate in the review, correct?
8      MR. GLENNON: Objection, vague,
9  form.
10     THE WITNESS: That is correct.
11     BY MR. FORGE:
12 Q. When is the last time, if ever, you
13 personally participated in a review of a BOP-run
14 prison's vocational programming?
15 A. I don't recall participating in a
16 vocational training program review.
17 Q. So when you worked for the BOP, you
18 relied on communications from others regarding
19 the BOP's actual performance regarding medical
20 services, correct?
21     MR. GLENNON: Objection, foundation
22 and form.
23     THE WITNESS: Typically, yes.
24     BY MR. FORGE:
25 Q. And when you worked for the BOP, you

Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

Page 25

1 deficiencies and types of deficiencies that the
2 BOP found at CCA's BOP-run facilities, correct?
3     A.    As I recall, there was a report that
4 generated -- compiled the deficiencies identified
5 at audits carried out at bureau -- Bureau of
6 Prisons facilities as well as our private
7 contract facilities.
8         And, you know, I -- I don't recall
9 how often that was compiled, but it was one set
10 of statistics that we did review. And that would
11 have been prior to my leaving the Bureau of
12 Prisons in 2011.
13     Q.    And that's all I'm trying to confirm.
14 You have not received those reports
15 regarding a for-profit prison, such as CCA, since
16 leaving the Bureau of Prisons in 2011, correct?
17         MR. GLENNON: Objection, vague --
18         THE WITNESS: Not --
19         MR. GLENNON: -- form.
20         THE WITNESS: Not to my knowledge,
21 no.
22         BY MR. FORGE:
23     Q.    It's -- it is -- so what I said is
24 correct?
25         MR. GLENNON: Object to form.

Page 26

1         THE WITNESS: That is correct.
2         BY MR. FORGE:
3     Q.    Have you ever testified as an expert
4 before?
5         MR. GLENNON: Objection, calls for
6 a legal conclusion.
7         THE WITNESS: Yes.
8         BY MR. FORGE:
9     Q.    When?
10     A.    I believe it was -- I -- I'm -- I
11 testified as the Bureau of Prisons' expert on the
12 execution protocol, the federal execution
13 protocol carrying out the death penalty in the
14 Bureau of Prisons, probably around 2004 or 2005.
15 I -- I can't remember the date, but it was in the
16 aftermath of the first three federal executions
17 carried out by the Bureau of Prisons in 2001 and
18 2003.
19         So I -- I cannot remember the date.
20 I'm not sure I could remember the year. I just
21 know that I testified extensively on the Federal
22 Bureau of Prisons' execution protocol and
23 procedures.
24     Q.    When you say you testified
25 extensively, in what forum did you testify

Page 27

1 extensively?
2     A.    A deposition.
3     Q.    And by extensively, do you mean for
4 more than one day?
5     A.    For more than one day.
6     Q.    More than one week?
7     A.    No.
8     Q.    Other than your testimony in a
9 deposition regarding the federal execution
10 protocols concerning carrying out the death
11 penalty back in 2004/2005, have you ever
12 testified as an expert?
13     A.    No.
14         MR. GLENNON: Objection.
15 Objection, calls for a legal conclusion.
16         THE WITNESS: Not that I recall.
17         BY MR. FORGE:
18     Q.    To your knowledge, has any court ever
19 accepted or admitted into evidence any opinion
20 from you?
21         MR. GLENNON: Objection, vague.
22         THE WITNESS: I really don't know.
23 There -- there were a lot of opinions
24 rendered under the name of the director of
25 the Bureau of Prisons. I was not privy to

Page 28

1 what was submitted or what was accepted.
2 So I -- I really -- I really don't know.
3         BY MR. FORGE:
4     Q.    Have you written any reports that set
5 forth any opinions that you may have reached in
6 this case?
7     A.    No.
8     Q.    Have you made any notes related to
9 any opinions you may have reached in this case?
10     A.    No.
11     Q.    Did you personally put in writing any
12 opinions that you may have reached in this case?
13         MR. GLENNON: Objection, vague,
14 form.
15         THE WITNESS: Could you repeat the
16 question?
17         BY MR. FORGE:
18     Q.    Yes.
19 Did you personally put in writing any
20 opinions you've reached in this case?
21     A.    No.
22         MR. GLENNON: Same objection.
23         THE WITNESS: No.
24         BY MR. FORGE:
25     Q.    Did you verbally dictate to anyone

Page 29

1 the -- any opinions you may have reached in this
2 case?
3    MR. GLENNON: Same objections.
4    THE WITNESS: No.
5    BY MR. FORGE:
6    Q. Did anyone else tell you the opinions
7 they intend for you to give in this case?
8    A. No.
9    Q. Did anyone else inform you in any way
10 of the opinions they intend for you to give in
11 this case?
12    MR. GLENNON: Objection, vague,
13    form.
14    THE WITNESS: No.
15    BY MR. FORGE:
16    Q. Are you aware of any opinions that
17 you've reached in this case?
18    A. I'm not sure I understand what you
19 mean by that.
20    Q. Have you reached any opinions in this
21 case?
22    A. I have my own opinions of this case.
23 And those are based on my experience and
24 oversight of the correctional programs or
25 correctional responsibilities at CCA.

Page 30

1    Q. Have you shared those opinions with
2 anyone?
3    A. Only through this deposition.
4    Q. Other than that, you have not shared
5 them with anyone?
6    A. Well, I'm -- let's see here.
7    MR. GLENNON: Mr. Lappin, you --
8    (Crosstalk)
9    MR. GLENNON: Mr. -- Mr. Lappin,
10    you can answer to the extent it doesn't
11    disclose attorney/client privilege.
12    BY MR. FORGE:
13    Q. No, I'm -- I'm asking if he shared
14 with anyone. I'm not asking you to identify
15 anyone. I'm just asking if you shared with
16 anyone.
17    A. So I have had very little contact
18 with people other than my attorneys on this case.
19 This -- this all evolved after I retired from
20 the -- or after I left CCA and moved on to the
21 board.
22    So I have shared opinions about some
23 issues related to this case obviously that were
24 work related, but not specifically related to
25 this case.

Page 31

1 So, I -- I mean, I can't deny we've
2 had conversations about issues related to
3 this case, such as in the aftermath of the
4 Yates memo or some other related issues, but
5 I can't -- don't recall having a -- a
6 conversation with anyone other than my
7 attorneys about -- specific to this case.
8    BY MR. FORGE:
9    Q. Okay. Now, you said that -- that the
10 opinions you have in this case are based on your
11 experience and oversight of the correctional
12 programs or correctional responsibilities at CCA,
13 correct?
14    A. Yes.
15    Q. And your experience and oversight of
16 the correctional programs and correctional
17 responsibilities at CCA was primarily based on
18 communications with other CCA employees, correct?
19    MR. GLENNON: Objection, vague,
20    foundation.
21    THE WITNESS: In part. Granted,
22    I -- as the chief corrections officer, I
23    oversaw a lot of employees, many of whom I
24    relied heavily on for their supervision of
25    the programs and operations applicable to

Page 32

1 carrying out a quality correctional
2 program.
3    I went out and observed. I was out
4 in facilities myself, visited, engaged with
5 staff, observed the programs being provided.
6 So it was a combination of the input and the
7 dialogue that occurred between myself and my
8 subordinate supervisors, my vice presidents,
9 the managing directors, the wardens, the
10 associate wardens and line staff that I
11 engaged with over the course of my
12 responsibilities.
13    So I don't believe it was solely
14 based on just information I received from my
15 subject matter experts, but my observation
16 of those programs when I visited those
17 facilities, as well as the review of reports
18 from audits and other evaluations that were
19 conducted over the course of business.
20    BY MR. FORGE:
21    Q. And by communications, I didn't mean
22 to limit you to just verbal communications. I'm
23 including in that written communications.
24    So your communicate -- with that
25 understanding in mind, the communications with

Page 33

1. other employees at CCA, those were the primary
2. source of information upon which you based any
3. opinions you may have formed in this case,
4. correct?
5.     MR. GLENNON: Objection, vague,
6. form.
7.     THE WITNESS: I am speaking to my
8. experience applicable to the day-to-day
9. operations. If you're speaking to the
10. stock drop, completely out of my area of
11. expertise, knowledge.
12.     BY MR. FORGE:
13.     Q. No, I'm not -- I'm assuming you have
14. not rendered any opinion -- you have not -- I'm
15. assuming you have not made any opinions regarding
16. the stock drop, right?
17.     A. None.
18.     Q. Okay. So that's --
19.     A. Other than -- other than my own.
20.     Q. Other than your own stock drop?
21.     A. Oh, only my own, you know, opinion
22. of, you know, why -- you know, again, as we
23. discussed the last time, first time I'd ever
24. worked for a private company. It's the first
25. time I've worked with a company that had

Page 34

1. stockholders and shareholders and so on and so
2. forth and so completely outside my area of
3. expertise.
4.     And, granted, involved in some
5. discussions whenever there was a -- some
6. fluctuation in stock, but I was on the periphery.
7. I -- I was not in the -- in the -- in -- a
8. subject matter expert in any way on this issue.
9.     Q. And that's why we're -- we're -- so
10. when we're talking about any opinions you may
11. have formed in this case, I'm talking about
12. opinions that you described earlier regarding
13. corrections services or corrections programs at
14. CCA, okay?
15.     A. Yes. So my opinions of -- of --
16.     Q. No, I asked you -- I'm not asking for
17. the opinions now. I'm just asking you to -- if
18. you understand that's the -- those are the types
19. of opinions we're talking about.
20.     A. My opinions applicable to our level
21. of performance, quality of programs, my opinions
22. of the challenges we encountered, all of those
23. issues applicable to the day-to-day operations,
24. my opinions were generated by my communications
25. with my vice presidents, managing directors,

Page 35

1. other supervisory and subject matter experts, as
2. well as my review of reports and documents and my
3. own observations that I made as I visited our
4. facilities throughout the book of business,
5. throughout the country.
6.     And -- and, I -- I should say,
7. included discussions with partners, without a
8. doubt, partners, my discussions with inmates.
9. All -- all of those interactions influenced
10. obviously my opinion of our performance, quality
11. of performance, the challenges we had.
12.     So many vehicles by which I was
13. gathering information that ultimately would
14. result in my opinion of -- of what we needed to
15. do and what we didn't need to do and -- and how
16. to carry out our day-to-day operations.
17.     Q. Given that broad array of vehicles,
18. to use your term, can you identify any specific
19. communications in particular that had a high
20. degree of influence over your opinions or do they
21. all kind of combine together?
22.     MR. GLENNON: Objection, vague.
23.     THE WITNESS: Yeah, I -- I can't --
24. it -- it really depended on the situation
25. and -- and what the issue was. But I

Page 36

1. cannot pick a particular vehicle or piece
2. of communication or type of communication
3. that was more influential than others.
4. So, no, I -- I cannot.
5.     BY MR. FORGE:
6.     Q. So, for example, I'm sure one form of
7. communication which -- you know, which was a
8. basis for whatever opinions you may have formed,
9. I'm sure one form of communication were E-mails
10. you received; is that right?
11.     A. That was a form of communication,
12. yes.
13.     Q. And you can't identify for me any
14. particular E-mails that stand out as particularly
15. helpful or unhelpful in forming your opinions,
16. can you?
17.     MR. GLENNON: Objection, vague.
18.     THE WITNESS: No, I cannot.
19.     BY MR. FORGE:
20.     Q. And some of those you -- you
21. described certain categories of CCA employees
22. with whom you had these communications.
23.     Did you have communications that
24. involved -- I'm not asking for the substance of
25. them, but did these communications you've

Page 37

1 described as being one of the vehicles that
2 helped you form your opinion, did these
3 communications involve CCA's in-house counsel
4 from time to time?
5   A.   Had discussions with the in-house
6 counsel on appropriate operational --
7        MR. GLENNON:  Let me -- let me --
8   let me stop you, Mr. Lappin.  That's --
9   that's not really the question that he was
10  asking you and I don't want you to divulge
11  the content of communication --
12       THE WITNESS:  Okay.
13       BY MR. FORGE:
14  Q.   But you don't have to --
15       MR. GLENNON:  -- between you and
16  counsel.
17       BY MR. FORGE:
18  Q.   And -- and again, Mr. Lappin, you
19 don't have to get into the substance of the
20 communications that involve counsel.  I'm just
21 trying to confirm that this -- this category,
22 this vehicle that helped you form the opinions
23 that you may have formed in this case, that those
24 included communications that involved in-house
25 counsel.  And you don't have to tell me --

Page 38

1   A.   In -- in this case.  You're narrowing
2 it down to this case?
3   Q.   Correct.
4   A.   I have not -- I don't recall having a
5 conversation with the general counsel.
6   Q.   I'm -- I'm sorry.  I -- I meant
7 communications related to this -- this case.
8 So -- or, I'm sorry, opinions related to this
9 case.
10       So remember, opinions related to this
11 case, we're talking about CCA's performance of
12 its corrections responsibilities and its
13 corrections operations.
14       And you said one of the vehicles upon
15 which you based whatever opinions you might have
16 consisted of communications with CCA employees,
17 correct?
18  A.   Yes, but primarily applicable to
19 operations, I was talking with operations staff.
20  Q.   Okay.  So would you have not had any
21 communications involving CCA's in-house counsel
22 that concerned CCA's operations?
23       MR. GLENNON:  I'm going to object
24  and instruct the witness not to answer on
25  the grounds of attorney/client privilege.

Page 39

1       BY MR. FORGE:
2   Q.   I'm not asking you for the substance.
3 I'm asking you for the -- the -- the -- the
4 subject matter.
5       Did you ever have any
6 communications -- were you ever a participant in
7 any, let's say, E-mail that involved CCA's
8 in-house counsel and where the E-mail or an
9 attachment to the E-mail concerned CCA's
10 operations?
11       MR. GLENNON:  I'm going to --
12  same -- same objection.  I'm going to
13  instruct the witness not to answer.  I --
14  I don't think there's any way he can
15  answer, given --
16       (Remote transmission interference)
17       MS. REPORTER:  You broke up,
18  Mr. Glennon.
19       MR. GLENNON:  I'm sorry.  Can
20  you -- I didn't hear what you said, Misty.
21       MS. REPORTER:  I said you broke up,
22  Mr. Glennon.
23       MR. GLENNON:  Oh, okay.  Can you
24  hear me okay now?
25       MS. REPORTER:  Yes, sir.

Page 40

1       MR. GLENNON:  Okay.  Sorry about
2  that.  I'll just restate my objection.
3       I -- I'm objecting on the basis of
4  attorney/client privilege and instruct the
5  witness not to answer because I don't think
6  as framed, the witness can answer without
7  revealing the subject matter of the
8  communications he may have had with in-house
9  counsel.
10       BY MR. FORGE:
11  Q.   So all of those vehicles that you've
12 been describing, Mr. Lappin, do you maintain any
13 summaries of all of those inputs?
14  A.   No, I do not.
15  Q.   So, for example, if someone wanted to
16 compare your opinion to the basis for your
17 opinion, could you point me to a stack of
18 documents that you are presently relying on for
19 any opinions you might have related to this case?
20  A.   No.
21  Q.   If someone wanted to compare your
22 opinion to the basis for your opinion, could you
23 point me to a specific conversation you had with
24 any identifiable individual?
25       MR. GLENNON:  Objection, vague.

Case 3:16-cv-02267   Document 380   Filed 12/07/20   Page 11 of 17 PageID #: 17693
Pages 37..40
www.aptusCR.com

Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

Page 41

1    THE WITNESS:  No.
2    BY MR. FORGE:
3    Q.  If someone wanted to compare your
4    opinions to the basis for your opinions, could
5    you point me to any specific E-mails on which you
6    relied or which you considered for your opinions?
7    MR. GLENNON:  Objection, vague.
8    THE WITNESS:  I personally have
9    retained nothing.  What you have is what
10   you received from the company, some of
11   which may have -- I have -- I probably
12   reviewed, but I -- I have no E-mails.  I
13   have no documents.  I -- I -- and this is
14   not just true of CCA.  I relied on the
15   company's retention policy to provide
16   disclosure, documents, E-mails, not only
17   at CCA.  I took the same approach at the
18   Bureau of Prisons.
19   So I -- I didn't retain anything.  I
20   have nothing that I can point to, other than
21   what you may already have, that's been
22   provided by the company.
23   BY MR. FORGE:
24   Q.  So you're relying on your memory?
25   MR. GLENNON:  Objection,

Page 42

1    mischaracterizes the testimony,
2    foundation.
3    THE WITNESS:  Yeah, I -- I don't
4    agree with that.  I mean, obviously I
5    reviewed documents.  I -- I interacted
6    with people on a day-to-day course of
7    action.  And -- and in doing so, you --
8    you -- you develop a -- a -- a sense of
9    understanding and, as a consequence, an
10   opinion.
11   But I don't have a stack of documents
12   or E-mails or voicemails or anything else
13   that -- on anything, not just this case.  I
14   don't have it on anything applicable to the
15   operations of CCA.  I don't -- I didn't
16   retain any of those things.
17   BY MR. FORGE:
18   Q.  And -- and you haven't had any of
19   those things for years, correct?
20   MR. GLENNON:  Objection, vague,
21   foundation, mischaracterizes the
22   testimony.
23   MR. FORGE:  Brian, the objection is
24   form.  We just went over this yesterday
25   with Sarah.  Your two partners, both Sarah

Page 43

1    Tomkowiak and David Schindler, have
2    managed to comport themselves consistent
3    with the agreement that you object as to
4    form.
5    If you're going to continue to object
6    beyond that, let's just stop and call
7    Judge Frensley.
8    The objection is form.  We have
9    specifically said that that objection
10   enables you to preserve any objections that
11   you could articulate.
12   MR. GLENNON:  I -- I -- I don't
13   understand that to be the agreement.  My
14   understanding is different in scope.
15   If -- if we want to speak with Judge
16   Frensley, we can.  I think my --
17   MR. FORGE:  Then let's -- then
18   let's stop.  Let's stop.  When -- when the
19   witness is saying yeah after you -- after
20   you give a -- a speaking objection, it's
21   pretty clear that you're coaching him.  So
22   let's -- let's stop and let's call Judge
23   Frensley's chambers unless you're going to
24   agree now that you will limit your
25   objections to simply saying form with the

Page 44

1    understanding that I'm allowing that word
2    to preserve any preservable objections you
3    could make.
4    MR. GLENNON:  I -- I'm not willing
5    to agree with that.  As I -- as I
6    understand it --
7    MR. FORGE:  Okay.
8    MR. GLENNON:  I -- let -- let me
9    just make my record, if I could, and --
10   MR. FORGE:  Sure.
11   MR. GLENNON:  -- do it -- I'll do
12   it in -- in general form.
13   I understood Judge Frensley's
14   direction in that regard as relating to a
15   specific objection and not what you would
16   view as typical objections under the Federal
17   Rules of Civil Procedure.  And -- and I
18   would take issue with categorizing the last
19   objection, which triggered this discussion,
20   as being a speaking objection.  But I'm --
21   I'm happy to seek clarification from the
22   special master.
23   MR. FORGE:  Sure.
24   Let's take a break and call -- let's
25   go off the record.

Page 45

1  MR. GLENNON: Or excuse me. Excuse
2  me, Magistrate Judge Frensley. Excuse me.
3  MR. FORGE: Let's -- let's go off
4  the record and call Magistrate Judge
5  Frensley.
6  VIDEO OPERATOR: Going off the
7  record at 11:31 a.m.
8  (Thereupon, a brief recess was
9  taken.)
10 VIDEO OPERATOR: We are back on the
11 video record at 11:39 a.m.
12 BY MR. FORGE:
13 Q. So, Mr. Lappin, before we broke you
14 were saying that you -- I -- you said, I don't
15 have a stack of documents or E-mails or
16 voicemails or anything else. I don't have --
17 have it on anything applicable to the operations
18 of CCA. I didn't retain any of those things.
19 Right?
20 MR. GLENNON: Objection,
21 foundation, vague.
22 THE WITNESS: That is correct.
23 I -- I did not personally retain those
24 materials.
25

Page 46

1  BY MR. FORGE:
2  Q. Okay. And so you -- you can only
3  rely on your memory of those materials, correct?
4  MR. GLENNON: Object to form.
5  THE WITNESS: At the -- at the
6  moment, yes. I don't have those documents
7  in my possession.
8  BY MR. FORGE:
9  Q. Now, do your experiences -- and I
10 know you can't remember the documents in your
11 possession, but would the type of documents that
12 helped you form whatever opinions you have
13 related to CCA's operations, would those types of
14 documents include, for example, CCA's own
15 after-action reports at its different facilities?
16 MR. GLENNON: Objection, vague.
17 THE WITNESS: Yes.
18 BY MR. FORGE:
19 Q. Would they concern E-mails that
20 related to CCA's general company operations and
21 BOP contracts?
22 MR. GLENNON: Same objection.
23 THE WITNESS: I'm sure there were
24 E-mails. I didn't do a -- a extensive
25 communication via E-mails, but -- but

Page 47

1  there were probably some E-mails
2  applicable to our operations, yes.
3  BY MR. FORGE:
4  Q. And -- and what I'm trying to get at,
5  though, I know there were E-mails applicable to
6  operations. I'm just asking you is that type of
7  communication -- and I'm not going to quiz you on
8  what was in them, but is that the type of
9  communication that we're talking about as would
10 have helped you form your opinions regarding
11 CCA's operations?
12 MR. GLENNON: Same objection.
13 THE WITNESS: Oh, certainly there
14 were E-mails. But there were also many,
15 probably more, extensive phone
16 conversations on -- on issues of concern.
17 So when -- whenever we had a -- a
18 significant incident or concern, depending
19 on the urgency, there were a lot of
20 primarily phone communication applicable
21 to those issues.
22 So whether it was report, E-mail,
23 phone conversation, all of these things
24 combined were used as -- as valuable
25 information on a variety of -- of issues

Page 48

1  applicable to correctional operations.
2  BY MR. FORGE:
3  Q. And by valuable information, you mean
4  all of those things combined helped you form your
5  opinions regarding the correctional operations?
6  A. Yes.
7  MR. GLENNON: Same objection.
8  BY MR. FORGE:
9  Q. Okay. And so --
10 A. Yes.
11 Q. And so -- believe me, if you and I
12 were just talking, you know, over a drink or
13 something, throwing all those different things
14 together at once would be by far the better way
15 to communicate. But I just have to take it step
16 by step. So please don't misinterpret -- when I
17 give you a -- a type of document, I'm not trying
18 to imply that that was the only type of document
19 or the only basis or even the most significant
20 one.
21 So I -- I hear you on the
22 conversations. I assume, you know, you can't
23 remember specific conversations any more than you
24 can remember specific documents, correct?
25 MR. GLENNON: Objection, vague.

Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

Page 49

1  THE WITNESS: Correct.
2  BY MR. FORGE:
3  Q. But you know that conversations with your coworkers helped you form whatever opinions you have about CCA's corrections operations, right?
7  MR. GLENNON: Objection. Same objection.
9  THE WITNESS: Yes.
10  BY MR. FORGE:
11  Q. And among the types of E-mails that helped you form your opinions would be E-mails that related to CCA's general company operations, correct?
15  MR. GLENNON: Same objection.
16  THE WITNESS: Yes.
17  BY MR. FORGE:
18  Q. Also among the documents that would have helped you form your opinions related to CCA's corrections operations would have been E-mails related to BOP contracts, correct?
22  MR. GLENNON: Same objection.
23  THE WITNESS: Yes.
24  BY MR. FORGE:
25  Q. E-mails related to OIG audits,

Page 50

1  correct?
2  MR. GLENNON: Same objection and vague.
4  THE WITNESS: A bit too specific, didn't have a whole lot of OIG audits in the private sector, but I can't deny -- I can't say there were no E-mails, but it's -- it's a very infrequent occurrence in -- or it has been in the -- in the past OIG audits. So -- but there could have been E-mails applicable to that.
12  BY MR. FORGE:
13  Q. And -- and to the extent there were E-mails related to OIG audits, that -- that would go in the mix with all these other things to help you form your opinion, correct?
17  MR. GLENNON: Objection --
18  THE WITNESS: Yes.
19  MR. GLENNON: -- vague.
20  THE WITNESS: Yes.
21  BY MR. FORGE:
22  Q. E-mails relating to Cibola after-action analysis, that would have gone into the mix to help you form your opinions, correct?
25  MR. GLENNON: Objection, vague,

Page 51

1  foundation.
2  THE WITNESS: Yes.
3  BY MR. FORGE:
4  Q. Actual after-action reports related to Cibola would go into this mix of information that helped you form your opinions, correct?
7  MR. GLENNON: Same objections, foundation.
9  THE WITNESS: Yes.
10  BY MR. FORGE:
11  Q. After -- actual after-action reports for Adams would go into the general mix of information that helped you form your opinions, correct?
15  MR. GLENNON: Same objection.
16  THE WITNESS: Yes.
17  BY MR. FORGE:
18  Q. E-mails related to, for example, CCA's CAR XV proposal would go into this same mix to help you form your opinions, correct?
21  MR. GLENNON: Same objection.
22  THE WITNESS: Pretty specific. I -- I -- if there were E-mails applicable to CAR XV that had an operational nature, would have been considered.

Page 52

1  BY MR. FORGE:
2  Q. So, for example, if there are E-mails related to CAR XV that concerned CCA's past performance of the facilities, that would go into the mix of information that you considered in forming your opinions, correct?
7  MR. GLENNON: Same objections.
8  THE WITNESS: Yes.
9  BY MR. FORGE:
10  Q. Now, Mr. Lappin, have you read -- have you received the transcript from your July 28, 2020 deposition in this case?
13  A. Yes.
14  Q. Have you read every line of it?
15  A. I can't say I read every line of it, but I read through the deposition.
17  Q. When?
18  A. Probably a day or two after I got a copy of it.
20  Q. When did you get a copy of it?
21  A. I -- I -- I don't know when I got a copy of it. It was a week, 10 days, I think, after the deposition.
24  Q. Did you receive that copy electronically or in paper form?

Case 3:16-cv-02267   Document 380   Filed 12/07/20   Page 14 of 17 PageID #: 17724
Page 49..52
www.aptusCR.com

Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

Page 97

1    that it didn't happen.
2        BY MR. FORGE:
3    Q.   As you sit here today, you cannot
4    identify a single BOP-run low security facility
5    that failed to notify local law enforcement for
6    nearly [redacted] later than required in the event
7    of a riot, can you, sir?
8        MR. GLENNON:  Object to form,
9    vague.
10       THE WITNESS:  Too many -- too many
11   incidents to recall.  I'd have -- again,
12   there were disturbances in Bureau of
13   Prisons facilities.
14       No, I -- I can't sit here and recall
15   in each of those incidents the timing of
16   which law enforcement was notified.
17       BY MR. FORGE:
18   Q.   You have not performed any
19   statistical analysis of CCA's -- this year, in
20   the year 2020, you have not performed any
21   statistical analysis of CCA's performance for the
22   Bureau of Prisons back in the 2012 through 2016
23   time frame, have you, sir?
24   A.   No.
25   Q.   You have not asked anyone else to

Page 98

1    perform any statistical analysis for you
2    regarding CCA's performance for the BOP back in
3    2012 through 2016, have you, sir?
4    A.   No.
5    Q.   You have not reviewed any statistical
6    analysis of CCA's -- this year you have not
7    reviewed any statistical analysis of CCA's
8    performance for the Bureau of Prisons in the 2012
9    through 2016 time frame, have you, sir?
10   A.   Not that I recall.
11   Q.   And those answers would all be the
12   same for the year 2019, correct, sir?
13       MR. GLENNON:  Objection, vague.
14       THE WITNESS:  For their performance
15   in 2019?
16       BY MR. FORGE:
17   Q.   Yes, sir.
18   A.   That is correct.
19   Q.   Now, you mentioned a number of things
20   earlier that the BOP provides for a private
21   prison operator, such as on-site monitors, audit
22   staff, a team dedicated to overseeing management,
23   a team that oversees contract administration.
24       Do you remember all of those
25   different support items that you identified?

Page 99

1    A.   Yes.
2    Q.   You agree that it would be
3    indefensible to suggest that these overhead costs
4    of the BOP should not be counted against a
5    for-profit operator if there is to be an accurate
6    accounting of how much it costs to incarcerate
7    inmates in a for-profit prison, correct?
8        MR. GLENNON:  Object.  Objection,
9    vague, form, foundation.
10       THE WITNESS:  That's a pretty
11   general question.
12       I will not deny that there are --
13   within that group, there are a -- a number
14   of personnel whose sole responsibility is to
15   provide the support oversight for the
16   operation of private prisons.  And I
17   wouldn't deny that those costs could be
18   included in the cost of the -- the
19   operations applicable to private prisons.
20       There are a few of those folks who
21   did this as part of a -- as part of their
22   normal duties.  They weren't -- they weren't
23   designating -- I'll -- I'll give you an
24   example, contracting staff.
25       There were probably contracting staff

Page 100

1    that served both the bureau needs in the way
2    of contracts, as well as private.  So there
3    may be some exceptions to that, but, you
4    know, there were -- there were a number of
5    staff designated to support and oversee
6    private prisons, primarily those that were
7    in the prisons and certainly those that were
8    in the privatization branch.
9        And -- no, I -- I could see where
10   that would be appropriate to calculate as
11   part of the cost to operate in the private
12   prisons.
13       BY MR. FORGE:
14   Q.   You have previously stated, have you
15   not, sir, that it would be indefensible to
16   suggest that these overhead costs of the BOP
17   should not be counted against a private operator
18   if there is to be an accurate accounting of how
19   much it costs to incarcerate inmates in a private
20   prison?
21       MR. GLENNON:  Objection, form,
22   foundation.
23       THE WITNESS:  I'm not sure I
24   understand your question.  I -- I thought
25   I answered it.

Page 101

1 -- I believe that it would be appropriate to count those costs as part of the expense of operating a private prison.

BY MR. FORGE:

Q. I'm -- I'm not just asking you if it would be appropriate. I'm asking you to confirm that you've previously stated, whether verbally or in writing, that it would be indefensible to suggest that these overhead costs of the BOP should not be counted against the private operator if there is to be an accurate accounting of how much it costs to incarcerate inmates in a private prison.

MR. GLENNON: Objection, foundation, form.

THE WITNESS: Again, I'm not -- I'm not sure I understand what you're asking. It sounds like you're saying that previously I've said those costs should not be counted.

BY MR. FORGE:

Q. No, just the opposite.

What I'm saying is -- and you can either confirm or deny that you said this in -- in -- in writing or verbally.

Page 102

You actually said it would be indefensible to suggest that these overhead costs should not be counted against a private operator if there is to be an accurate accounting of how much it costs to incarcerate inmates in a private prison.

A. Yes, these costs should be part of the calculation.

Q. Okay.

MR. GLENNON: And I just want to instruct -- I want to insert an objection to form.

And, Mr. Lappin, if you could give me a -- a second to do that, please.

THE WITNESS: I apologize. I'm sorry, Brian.

I -- I'm going to need to take a break.

MR. FORGE: Okay. Ten minutes?

MR. GLENNON: I think that's good. Mr. Lappin, is that okay with you?

THE WITNESS: Yes, that's fine with me.

MR. FORGE: Okay. See you all back at -- I guess it would be 1:00 Central,

Page 103

2:00 Eastern.

VIDEO OPERATOR: Going off the record at 12:50 p.m.

(Thereupon, a brief recess was taken.)

VIDEO OPERATOR: We are back on the record at 1:12 p.m.

BY MR. FORGE:

Q. Welcome back, Mr. Lappin.

What did you do -- did you talk with anybody during the break?

A. Right now you are breaking up.

Q. Okay. Can you hear me now?

A. That's better.

Q. Did you speak with anyone during the break?

A. I talked to my wife --

Q. And --

A. -- and I talked with -- I talked with my attorneys.

Q. How long did you spend talking to your attorneys on the break?

A. Five minutes.

Q. Did you talk about the deposition?

MR. GLENNON: I'm going to object

Page 104

and instruct the witness not to answer.

MR. FORGE: I'm not going to ask anything beyond that.

BY MR. FORGE:

Q. Did you talk about the deposition?

MR. GLENNON: Mr. Lappin, you can answer yes or no.

THE WITNESS: Yes.

BY MR. FORGE:

Q. Did you talk about your testimony during this deposition?

MR. GLENNON: I'm going to shut down that line of questions. I'm going to instruct the witness not to answer.

BY MR. FORGE:

Q. Mr. Lappin, before we broke we were talking about including BOP's overhead costs associated with private prisons and your private -- prior statements regarding that topic.

Would you agree with me that an approach that excludes the BOP's overhead costs that we went over earlier would grossly underestimate the true costs of contracting for prison services?

MR. GLENNON: Object to form,

Confidential Pursuant to the Protective Order
Harley G. Lappin
Grae vs. Corrections Corporation of America, et al.

Page 105

vague.

THE WITNESS: You know, I -- I'm not sure that -- again, I -- I wasn't the one doing the calculations. It was outside of my area of expertise and responsibility as far as the details of the financial calculation. So I -- I'm not sure that some -- those -- those costs were not included.

But the -- the -- a cost associated with that, given my personal assessment of the number of people and salaries, would be a drop in the bucket compared to the overall cost of the contract.

So don't know for sure if those costs were included or not, but either way, it would -- I am very confident, based on my knowledge of how many people would fall into that category, that the additional cost would be insignificant, unlike if you included the cost of retirement in the Bureau of Prisons cost estimate, which is not included.

So there are variations either way. Again, I'm not the expert necessarily on

Page 106

what was in the calculation or what should or shouldn't be, but I -- if it were, I'm confident the additional cost would be very, very small.

BY MR. FORGE:
Q. Got it.
So I -- I -- I appreciate you clarifying that you're -- you're not the expert. You're not an expert on necessarily what should be in these cost comparison calculations, correct?
A. I -- I don't consider -- I -- I think you've got other people that are -- have more expertise in this area than me.
Q. And, in fact, you don't know what -- exactly what components went into any prior cost comparisons between CCA and the BOP, correct?
MR. GLENNON: Objection --
THE WITNESS: Well --
MR. GLENNON: -- form, vague.
THE WITNESS: -- I -- I know that the -- the costs of the contract, obviously, and associated expenses with that I am -- believe we included the expense associated with the staff in the

Page 107

facilities.

But, again, long -- a long time ago, didn't do the calculation, obviously, myself. I don't know about the -- the support staff in the central office, if those costs were included or not. But if they were, given how few staff were in those components, the costs spread over the millions and millions and millions of dollars and the up to 30,000 inmates would be insignificant.

BY MR. FORGE:
Q. Again, you don't know what costs were or were not included in any calculations that you've previously considered, correct?
A. No.
MR. GLENNON: Object -- object to form.
THE WITNESS: No.
BY MR. FORGE:
Q. So no meaning it's correct you don't know?
MR. GLENNON: Same objection.
THE WITNESS: I don't know exactly what costs were included in that

Page 108

calculation, but I know that our staff, who have that expertise, are accessible and on your -- on your list of people to be deposed.

BY MR. FORGE:
Q. Okay. But that's not you?
A. That's correct.
MR. GLENNON: Object to form.
THE WITNESS: That is correct.
BY MR. FORGE:
Q. And you don't know whether there was, for example, any attempt to account for the fact that BOP corrections officers have to have a college degree or equivalent experience, whereas CCA corrections officers do not? You don't know if there was any attempt to put a financial figure on that, do you, sir?
MR. GLENNON: Object to form.
THE WITNESS: So, a Bureau of Prisons correctional officer does not require a degree. The minimum qualifications for a person considered for employment in the Bureau of Prisons, at least through the time I was in the bureau, through and including the time as

Case 3:16-cv-02267   Document 380   Filed 12/07/20   Page 17 of 17 PageID #: 17715
Page 105..108
www.aptusCR.com