# EXHIBIT C

# EXHIBIT 7
# [Filed Under Seal]

Videotaped Deposition of

# Donald William Murray, Jr.

October 23, 2020

Grae

vs.

Corrections Corporation of America, et al.

**Confidential**



www.aptusCR.com / 866.999.8310

**Confidential**

Donald William Murray, Jr.

Grae vs.
Corrections Corporation of America, et al.

**Page 1**

```
 1              UNITED STATES DISTRICT COURT
 2              MIDDLE DISTRICT OF TENNESSEE
 3                    -  -  -
 4  NIKKI BOLLLINGER GRAE,            )
    Individually and on Behalf of     )
 5  All Others Similarly Situated,    )
                                      )
 6              Plaintiff,            )   Case No.
                                      )
 7      vs.                           )  3:16-cv-02267
                                      )
 8  CORRECTIONS CORPORATION OF        )
    AMERICA, et al.                   )
 9                                    )
                Defendants.           )
10  _____)
11
12
13              CONFIDENTIAL
14          FRIDAY, OCTOBER 23, 2020
15          VIDEOTAPED DEPOSITION OF
16          DONALD WILLIAM MURRAY, JR.
17          VIA REMOTE VIDEOCONFERENCE
18
19
20
21
22
23  Stenographically Reported by:
    Victoria L. Valine, CSR, RMR, CRR, RSA
24  California CSR License No. 3036
25  Job No. 10073530
```

**Page 2**

```
 1              REMOTE APPEARANCES:
 2
 3  FOR PLAINTIFF:
 4      ROBBINS GELLER RUDMAN & DOWD LLP
        Attorneys at Law
 5      BY:  Kenneth J. Black, Esq.
             Willow E. Radcliffe, Esq.
 6      Post Montgomery Center
        One Montgomery Street, Suite 1800
 7      San Francisco, California  94104
        415.288.4545   FAX:  415.288.4534
 8      kennyb@rgrdlaw.com
 9      ROBBINS GELLER RUDMAN & DOWD LLP
        Attorneys at Law
10      BY:  Christopher M. Wood, Esq.
        414 Union Street, Suite 900
11      Nashville, Tennessee  37219
        800.449.4900   FAX:  615.252.3798
12      cwood@rgrdlaw.com
13  FOR DEFENDANTS:
14      LATHAM & WATKINS LLP
        Attorneys at Law
15      BY:  Brian T. Glennon, Esq.
             Eric C. Pettis, Esq.
16      355 South Grand Avenue, Suite 100
        Los Angeles, California 90071-1560
17      213.891.7786
        brian.glennon@lw.com
18
19
20
21  Videographer:  David Campbell
22
23   (All parties appeared remotely via videoconference.)
24
25
```

**Page 3**

```
 1                    INDEX
 2          EXAMINATION BY COUNSEL
 3
 4                                    Page No.
 5  Examination by Mr. Black             10
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1                    EXHIBITS
 2
 3  Exhibit    Description           Page No.
 4  Exhibit 573  Objections and Responses of   27
                 Don Murray, William Dalius,
 5               Harley G. Lappin, and Kim White
                 to Lead Plaintiff's Notice of
 6               Depositions
 7  Exhibit 574  Defendants' Disclosures Pursuant   79
                 To Federal Rule of Civil
 8               Procedure 26(A)(2)(C)
 9  Exhibit 575  Preliminary Findings Report   125
                 CPM Section, Program Review
10               Adam's County Correctional
                 Center, Mississippi Dated
11               March 29, 2012
                 Bates No. CORECIVIC_1084159 -
12               CORECIVIC_1084162
                 CONFIDENTIAL
13
    Exhibit 576  E-mail Thread                 166
14               Bates No. CORECIVIC_0988510 -
                 CORECIVIC_0988512
15               CONFIDENTIAL
16  Exhibit 577  E-mail Thread                 181
                 Bates No.  CORECIVIC_2208742 -
17               CORECIVIC_2208745
                 CONFIDENTIAL
18
    Exhibit 578  E-mail with Attachment        192
19               Bates No. CORECIVIC_1008611 -
                 CORECIVIC_1008634
20               CONFIDENTIAL
21  Exhibit 579  E-mail Thread                 197
                 Bates No. CORECIVIC_0137095 -
22               CORECIVIC_0137099
                 CONFIDENTIAL
23
    Exhibit 580  E-mail with Attachments       204
24               Bates No. CORECIVIC_0097307 -
                 CORECIVIC_0097320
25               CONFIDENTIAL
```

```
                                            Page 5
1                    EXHIBITS
2
3   Exhibit      Description              Page No.
4   Exhibit 581  Letter to Lucibeth Mayberry   207
                 Dated May 21, 2014
5                CORECIVIC_1051551 -
                 CORECIVIC_1051563
6                CONFIDENTIAL
7   Exhibit 582  Evaluation of the Taft        229
                 Demonstration Project Performance
8                Of a Private-Sector Prison and
                 the BOP Dated October 7, 2005
9
    Exhibit 583  Office of the Inspector General  232
10               Audit of the United States
                 Marshals Service Contract
11               No. DJJODT7C0002 with CoreCivic,
                 Inc., to Operate the Leavenworth
12               Detention Center, Leavenworth,
                 Kansas, April 2017
13
    Exhibit 584  Letter to James A. Gondles, Jr.  235
14               Dated May 31, 2019 From
                 Elizabeth Warren
15
16
17                    --o0o--
18
19
20
21
22
23
24
25
```

```
                                            Page 6
1            PREVIOUSLY MARKED EXHIBITS
2   Exhibit                            Page No.
3   Exhibit 76                          156
4   Exhibit 204                         199
5   Exhibit 225                         215
6   Exhibit 230                         170
7   Exhibit 232                         173
8   Exhibit 297                         148
9   Exhibit 432                         127
10  Exhibit 546                         142
11
12                    --o0o--
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
                                            Page 7
1        UNITED STATES DISTRICT COURT
2        MIDDLE DISTRICT OF TENNESSEE
3             - - -
4   NIKKI BOLLINGER GRAE,          )
     Individually and on Behalf of  )
5   All Others Similarly Situated,  )
                                     )
6         Plaintiff,    )   Case No.
                                     )
7     vs.              )  3:16-cv-02267
                                     )
8   CORRECTIONS CORPORATION OF       )
     AMERICA, et al.         )
9                          )
         Defendants.   )
10   _____)
11
12              --o0o--
13        BE IT REMEMBERED, that on Friday, October 23,
14  2020, commencing at the hour of 10:42 a.m. Central
15  Daylight Time thereof, all parties appearing via Zoom
16  videoconference, before me, Victoria L. Valine,
17  Certified Shorthand Reporter of the State of California,
18  appeared
19        DONALD WILLIAM MURRAY, JR.
20  called as a witness by the Plaintiffs, who, being by me
21  remotely sworn, was thereupon examined and interrogated
22  as hereinafter set forth.
23              --o0o--
24        THE VIDEOGRAPHER:  The time on the record is
25  10:42 a.m. Central Time.  Today's date is
```

```
                                            Page 8
1   October 23, 2020.
2        My name is David Campbell of Aptus Court
3   Reporting.
4        The Court Reporter today is Victoria Valine of
5   Aptus Court Reporting located at 600 West Broadway,
6   Suite 300, San Diego, California, 92101.
7        This begins the video recorded deposition of
8   Don Murray testifying in the matter of Nikki Bollinger
9   Grae versus Corrections Corporation of America, et al.
10  This is pending in the United States District Court
11  Middle District of Tennessee.  Case number
12  3:16-cv-02267.
13        This is a remote Zoom video deposition.  The
14  video and audio recordings will take place at all times
15  during this deposition unless all counsel agree to go
16  off the record.  The beginning and end of each video
17  recording will be announced.
18        At this time the attorneys will please
19  announce themselves for the record, after which the
20  Court Reporter will please swear in the witness and we
21  can proceed.
22        MR. BLACK:  Good morning.  This is Kenneth
23  Black from Robbins Geller Rudman & Dowd for the
24  plaintiffs.
25        MS. RADCLIFFE:  Good morning.  Willow
```

**Confidential**

Donald William Murray, Jr.

Grae vs.
Corrections Corporation of America, et al.

1 Radcliffe from Robins Geller Rudman & Dowd for the
2 plaintiff.
3       MR. GLENNON:  Good morning.  Brian Glennon and
4 Eric Pettis of Latham & Watkins on behalf of the
5 defendants and the witness.
6       CERTIFIED STENOGRAPHER:  Good morning.
7       My name is Victoria Valine.
8       I'm a Certified Shorthand Reporter with
9 California License No. 3036.  I also hold the National
10 Court Reporters Association's nationally recognized
11 certifications of Registered Merit Reporter and
12 Certified Realtime Reporter.
13       I am the deposition officer for today's
14 deposition.  This proceeding will be stenographically
15 reported by me.
16       All parties in today's deposition will be
17 appearing remotely to comply with the guidance of the
18 Centers for Disease Control in response to the COVID-19
19 pandemic occurring in our country at this time.
20       Before we proceed, I will ask counsel to
21 stipulate on the record that we are proceeding according
22 to Rule 30 of the Federal Rules of Civil Procedure, and
23 that this deposition officer may swear in the deponent
24 even though I am not in the physical presence of the
25 deponent, and that there is no objection to that at this

1 time, nor will there be an objection to it at a future
2 date.
3       Please indicate your agreement by stating your
4 name and agreement on the record, after which, I will
5 swear in the witness.
6       MR. BLACK:  This is Kenneth Black, so
7 stipulated and agreed to.
8       MR. GLENNON:  Brian Glennon, so stipulated.
9       CERTIFIED STENOGRAPHER:  Raise your right
10 hand, please.
11       Do you solemnly swear the testimony you are
12 about to give will be the truth, the whole truth, and
13 nothing but the truth, so help you God?
14       THE WITNESS:  I do.
15       CERTIFIED STENOGRAPHER:  Thank you.  Counsel,
16 you may proceed.
17             EXAMINATION
18 BY MR. BLACK:
19       **Q.  Good morning, Mr. Murray.**
20       **Thank you for being here this morning.  As we**
21 **just went over, my name is Kenny Black.  I'm here from**
22 **the law firm of Robbins Geller Rudman & Dowd.  I**
23 **represent the plaintiff in this matter.**
24       **Can you please state your full name, phone**
25 **number, and home address for the record?**

1       A.  Sure.  Good morning Mr. Black.
2       My name is Donald William Murray, Jr.
3       My home address is ██████████████████
4 ████████████████████████
5       My telephone number is ████████████.
6       **Q.  Thank you.  Mr. Murray, have you been deposed**
7 **before?**
8       A.  In relation to this case or deposed generally?
9       **Q.  Let's start have you been deposed before ever?**
10       A.  Yes.
11       **Q.  Okay.  About how many times?**
12       A.  I don't know.  I would have to go back and
13 count, but a number of times.
14       **Q.  Would you say more than ten?**
15       A.  I would say probably 10 to 12 times would be
16 accurate.
17       **Q.  Have you been deposed in this matter before?**
18       A.  No, I have not.
19       **Q.  Have you been deposed in a securities matter**
20 **before?**
21       A.  No.
22       **Q.  Have you been deposed as an expert witness**
23 **before?**
24       A.  Um -- yes, I have.
25       **Q.  Can you describe -- first, how many times have**

1 **you been deposed?**
2       A.  I would say, again, 10 to 12 times in total,
3 but as an expert witness, probably four or five times.
4 It depends, and I might want to confer with counsel and
5 check the deposition as to whether or not reports that
6 I've submitted to the court would count as professional
7 opinions rendered to the federal courts as to whether or
8 not that would be considered an actual deposition.
9       I probably think that may not be considered an
10 actual deposition, but I have submitted a number of
11 reports to federal courts in my career.
12       **Q.  And these are reports rather than testimony?**
13 **Are you drawing a distinction?  Sorry.**
14       A.  Yes.
15       The vast majority of the reports I have
16 completed in my career and recommendations and opinions
17 submitted to the federal courts, that's correct.
18       **Q.  Do those include oral testimony?**
19       A.  Most of those.  The vast majority did not
20 include oral testimony.
21       **Q.  Did any of them include oral testimony?**
22       A.  I would have to go back and look, but I
23 believe a couple of them at least did at different
24 points.
25       **Q.  All four or five of those were in federal**

1 the plaintiffs and the court, we do that.

2     Q.   Are you aware of how many documents have been

3 withheld in this case?

4         MR. GLENNON:  Objection.  Vague.

5         THE WITNESS:  I'm sorry.  I'm not aware of how

6 many documents, if any, have been held in this

7 case, no.

8 BY MR. BLACK:

9     Q.   Are you -- do you know how many documents from

10 your own custodial file have been withheld as privileged

11 in this case?

12        MR. GLENNON:  Same objection.  Foundation.

13        THE WITNESS:  No.  I'm sorry, I don't.

14 BY MR. BLACK:

15    Q.   Would it surprise you to learn that it was

16 approximately three hundred?

17        MR. GLENNON:  Objection.  Foundation.  Vague.

18        THE WITNESS:  I don't really have an opinion

19 on that one way or the other.

20 BY MR. BLACK:

21    Q.   Okay.  So we are talking about what you did to

22 prepare for this deposition.

23        Did you meet with anyone else, other than the

24 two attorneys you mentioned?

25    A.   No.

1     Q.   Did you speak to anyone else at CCA about your

2 deposition?

3     A.   No.

4     Q.   You didn't interview anyone or talk to anyone

5 to refresh your recollection?

6         MR. GLENNON:  Objection.  Form.

7         THE WITNESS:  No.

8 BY MR. BLACK:

9     Q.   Did you speak to anyone outside of CCA about

10 your deposition?

11    A.   Yes.

12    Q.   Who did you talk to about your deposition?

13    A.   Mr. Pettis and Mr. Glennon.

14    Q.   Okay.  But no one else -- you didn't call

15 someone at the BOP to refresh your recollection about

16 the issues that might be covered today?

17    A.   No.

18    Q.   To your knowledge, did plaintiff request any

19 documents pursuant to or related to your deposition

20 today?

21        MR. GLENNON:  Objection.  Vague.

22        THE WITNESS:  I'm -- I believe they did

23 request documents, yes.

24 BY MR. BLACK:

25    Q.   Did you produce documents pursuant to that

1 request?

2     A.   We produced --

3         MR. GLENNON:  Objection.  Vague.

4         THE WITNESS:  I'm sorry?

5         MR. GLENNON:  You can go ahead and answer.

6         My objection was vague, in case it's not on

7 the record.  Thank you.

8         Go ahead, Mr. Murray.

9         THE WITNESS:  Yes.  I believe we did produce

10 documents.  We did produce documents.

11 BY MR. BLACK:

12    Q.   Pursuant to a request related to this

13 deposition?

14        MR. GLENNON:  Objection.  Vague.

15        THE WITNESS:  I'm assuming, you know, perhaps

16 inaccurately, but I'm assuming that the documents that

17 were requested, as they pertained to my deposition, were

18 also requested in the initial request for documents.

19        MR. BLACK:  I'm going to ask the videographer

20 to introduce what is going to be Exhibit 573 which is

21 described as tab 20.

22        (Deposition Exhibit 573 marked.)

23 BY MR. BLACK:

24    Q.   Mr. Murray, are you able to pull up that

25 document?

1         This is not one of the ones in the box -- the

2 binder you received.

3     A.   Okay.  Is that in my chat box and I would

4 click the link, would that be accurate?

5     Q.   Yes.

6     A.   Okay.  I'm terribly sorry.  I'm clicking on

7 the link.  I see a box in my other screen, but I don't

8 see any content in that box.

9         Let me try it again.

10    Q.   It's working on my end, so I don't know what

11 the difficulty might be.

12    A.   I'm very sorry.  All I have is something that

13 says Box Internet Explorer, and it opens and there's

14 nothing there.

15        MR. BLACK:  Is anyone else able to open this

16 document?

17        MR. GLENNON:  I was able to open it, Kenny.

18 It did take awhile to download, though.

19 BY MR. BLACK:

20    Q.   Mr. Murray, is there anyone who can

21 troubleshoot this on your end?

22    A.   I can call the I.T. division very quickly if

23 you'd like to take a break for a minute, unless you need

24 me to stay on the record as I'm calling the I.T.

25 division --

**Confidential**

Donald William Murray, Jr.

Grae vs.
Corrections Corporation of America, et al.

Page 73

1 expertise is developed by actually doing the work,
2 overseeing the work, or auditing the work, and managing
3 a very large number of facilities, managing a large
4 number of staff.
5    So there's a variety of ways to achieve
6 expertise, you know, outside of simply just taking a
7 place, or multiple classes, or achieving a certain
8 degree.
9    **Q.  Is it your understanding that you can be an**
10 **expert just by virtue of your experience?**
11    A.  Typically you would expect -- that's certainly
12 an important part of it, but you would typically expect
13 individuals to have some training, exposure, management
14 experience, perhaps audit experience in these areas as
15 well.
16    **Q.  Okay.  Earlier you had testified that the four**
17 **to five cases you had served as an expert in issues**
18 **related to corrections; is that right?**
19    A.  To the best of my recollection, Mr. Black,
20 that's accurate.
21    **Q.  Okay.  Starting with the earliest of those**
22 **experiences, can you describe the experience serving as**
23 **an expert?**
24    A.  Mr. Black, I'm sorry, it's been quite a period
25 of time.  I would have to refresh my memory and try to

Page 74

1 go back and find documents that might refresh my memory
2 in that area.
3    **Q.  Okay.**
4    A.  But --
5    **Q.  Sitting here today -- sorry.  Let me let you**
6 **finish.  Let me ask you, are you done?**
7    A.  I am finished.  Sorry, I don't have any
8 specific recollection of those -- of those cases.
9    THE VIDEOGRAPHER:  Can you take a scoot to
10 your right?  You're sliding out of frame.
11    THE WITNESS:  Okay.
12    THE VIDEOGRAPHER:  Thank you, sir.
13 BY MR. BLACK:
14    **Q.  I believe you testified that in one of these**
15 **experiences, at least, you were testifying to a grand**
16 **jury; is that right?**
17    A.  Yes, sir.  That's correct.
18    **Q.  Do you remember the general subject area that**
19 **you were testifying as to?**
20    A.  Yes.
21    **Q.  Can you describe it please?**
22    A.  Sure.
23    MR. GLENNON:  Kenny, can we just pause?
24    If we need to go off the record, we can
25 discuss this.  I would like to check to make sure that

Page 75

1 he's permitted to describe this matter.
2    I'm happy to talk off the record, but -- I'll
3 just ask in front of you.
4    Mr. Murray, do you know whether or not you're
5 permitted to talk about this?
6    Is this public information or is this sealed
7 grand jury information?
8    THE WITNESS:  I believe this is sealed grand
9 jury information as far as that goes, Mr. Glennon, but
10 again that's a fair number of years ago, but that's my
11 understanding.
12    MR. BLACK:  Brian, let me take a different
13 line.  Okay?
14    MR. GLENNON:  Sure.
15 BY MR. BLACK:
16    **Q.  Mr. Murray, have you ever testified as an**
17 **expert as to staffing issues?**
18    A.  No, sir --
19    MR. GLENNON:  Objection.  Vague.
20    THE WITNESS:  No, sir.  I have not.
21 BY MR. BLACK:
22    **Q.  Mr. Murray, have you ever testified as an**
23 **expert as to security issues?**
24    A.  No, sir.  I have not.
25    **Q.  Have you ever testified as an expert as to**

Page 76

1 **oversight issues?**
2    MR. GLENNON:  Same objection.
3    THE WITNESS:  No.
4 BY MR. BLACK:
5    **Q.  Have you ever testified as an expert as to the**
6 **comparative operational performance of different**
7 **facilities?**
8    MR. GLENNON:  Objection.  Vague.
9    THE WITNESS:  No.
10 BY MR. BLACK:
11    **Q.  Have you ever testified as an expert as to the**
12 **cost effectiveness of correctional services?**
13    MR. GLENNON:  Objection.  Vague.
14    THE WITNESS:  No.
15 BY MR. BLACK:
16    **Q.  Have you ever testified as an expert as to**
17 **the -- the overall quality effectiveness of correctional**
18 **services?**
19    MR. GLENNON:  Objection.  Vague.
20    THE WITNESS:  I'm sorry, Mr. Black, would you
21 please repeat that question?
22    Maybe it's my speakers.  Let me adjust those
23 if I could.  I'm sorry, would you please repeat that?
24    MR. BLACK:  Yes.
25    /////

Donald William Murray, Jr.

1 BY MR. BLACK:

2    Q. Have you ever testified as an expert
3 concerning the overall quality or effectiveness in the
4 areas of correctional facility management?

5    A. No.

6      MR. GLENNON: Objection --

7      THE WITNESS: No.

8 BY MR. BLACK:

9    Q. Would it be fair to say that all of your prior
10 testimony as an expert related to your expertise as a
11 psychologist?

12      MR. GLENNON: Objection. Vague.

13      THE WITNESS: I believe it would be accurate
14 to say that most of the testimony I've given previously
15 has either been as a fact witness or has been in
16 relationship to my expertise as a mental health
17 practitioner.

18 BY MR. BLACK:

19    Q. Can you think of a single instance in which --
20 in which you testified as your expert -- expertise as to
21 anything other than a mental practitioner?

22      MR. GLENNON: Objection. Vague.

23      THE WITNESS: No, sir, I cannot.

24 BY MR. BLACK:

25    Q. Okay. Have you prepared an expert report in

1 this case?

2    A. No, sir. I didn't realize I was going to be
3 required or asked to do that, but I did not prepare an
4 expert report in this case.

5    Q. Have you ever prepared an expert report?

6    A. I have prepared many reports for the federal
7 courts, as I believe we discussed earlier, and I believe
8 those reports would qualify as sharing my expertise.
9 And those have been literally hundreds of those reports
10 over the years.

11    Q. Okay. Were any of those reports related to
12 anything other than mental health -- to your expertise
13 as a mental health practitioner?

14      MR. GLENNON: Objection. Vague.

15      THE WITNESS: No, sir.

16 BY MR. BLACK:

17    Q. Has anyone asked you to prepare an expert
18 report in this case?

19      MR. GLENNON: Objection. Form.

20      THE WITNESS: No, sir. I have not been asked
21 to prepare a report.

22 BY MR. BLACK:

23    Q. Has anyone discussed with you a possibility of
24 preparing an expert report at a future time period?

25    A. No.

1    Q. If you were asked to prepare an expert report
2 related to this matter, how much time do you think you
3 would need?

4      MR. GLENNON: Objection. Calls for
5 speculation.

6      THE WITNESS: Mr. Black, I'm not certain how
7 much time it would take. It would depend on the
8 questions posed and the amount of research required to
9 do a thorough, comprehensive, objective assessment in
10 response to those questions.

11     So I don't have a timeframe that I could
12 present to you in response to that question, not knowing
13 the questions necessarily.

14 BY MR. BLACK:

15    Q. Mr. Murray, could you please open the package
16 you received.

17    A. Sure.

18    Q. And I'll ask the Court Reporter to submit
19 tab 1.

20    A. You see the package remains sealed.

21    Q. Thank you, sir.

22      MR. BLACK: This should be Exhibit 574.

23      (Deposition Exhibit 574 marked.)

24      THE WITNESS: Okay. I have the binder in
25 front of me.

1 BY MR. BLACK:

2    Q. Before you look at anything. As you sit here
3 today, have you formed any expert opinions about this
4 case?

5      MR. GLENNON: Objection. Calls for a legal
6 conclusion.

7      THE WITNESS: Well, I certainly have a number
8 of opinions that I'm happy to discuss, but -- I'm sorry,
9 I'm not exactly sure which questions or which specific
10 areas you would -- for which you might like me to opine.

11 BY MR. BLACK:

12    Q. We're going to have, you know, all day to ask
13 about your opinions, but right now I just want to know
14 whether, you know, beyond just having opinions about the
15 case based on whatever you have looked at, do you have
16 something that would satisfy you as being an expert
17 opinion related to this case?

18      MR. GLENNON: Objection. Vague. Calls for
19 speculation.

20      THE WITNESS: I think there's a number of
21 areas that, you know, I can provide some insights into
22 and suggest my views given my tenure in corrections, and
23 my training, and my expertise, and certainly my
24 background in the internal audit division and quality
25 assurance division.

1    I think there's a number of opinions I would
2 be prepared to offer if posed, but it depends on, you
3 know, what those questions might be.
4 BY MR. BLACK:
5    **Q.  Do you understand that an expert opinion**
6 **doesn't have to be -- doesn't necessarily have to be in**
7 **response to a specific question?**
8        MR. GLENNON:  Objection.  Vague.
9        THE WITNESS:  I believe the best opinions are
10 provided, typically, in response to specific questions.
11 BY MR. BLACK:
12    **Q.   And so -- let me ask it this way.**
13    **Has anyone asked you any specific questions**
14 **that you have since formed an expert opinion about?**
15        MR. GLENNON:  Objection --
16        CERTIFIED STENOGRAPHER:  I'm sorry,
17 Mr. Glennon, what was the objection?
18        MR. GLENNON:  No problem.  It was objection.
19 Vague.  Foundation.
20        CERTIFIED STENOGRAPHER:  Thank you.
21        THE WITNESS:  Do I have opinions with regard
22 to the operation of our facilities and the comparative
23 operation of our facilities versus others?  Yes.
24        Do I have opinions with regard to other
25 aspects of our services, yes, sir, I do have -- I do

1 have viewpoints on that, that I'm happy to share.
2 BY MR. BLACK:
3    **Q.  Do you consider those opinions to be expert**
4 **opinions?**
5        MR. GLENNON:  Objection.  Foundation.  Legal
6 conclusion.
7        THE WITNESS:  I believe many would think that
8 my background, training, and expertise, my work in the
9 internal audit division over the years, and having held
10 position at a facility at a regional and national level,
11 and having the privilege of serving as, you know, a
12 managing director and vice president at the officer
13 level in this corporation, I believe that many people
14 would consider my opinions to have a level of expertise
15 with them, yes, sir, I do believe that.
16 BY MR. BLACK:
17    **Q.   Have you committed any of these opinions to**
18 **writing?**
19        MR. GLENNON:  Objection.  Vague.
20        THE WITNESS:  No, sir, I have not.
21 BY MR. BLACK:
22    **Q.   Have you shared these opinions with anyone**
23 **else?**
24        MR. GLENNON:  Vague.
25        THE WITNESS:  No, sir.

1 BY MR. BLACK:
2    **Q.   So, as I understand your answer, is it**
3 **accurate to describe it as you believe you have**
4 **expertise and experience that if called upon or if**
5 **subjected to direct questioning, might qualify as an**
6 **expert opinion?**
7        MR. GLENNON:  Objection.  Vague.
8        THE WITNESS:  That, in addition to additional
9 training, and analytic skills, and abilities, you know,
10 taking a strong database approach to evaluating
11 responses to questions and situations, yes, sir.
12 BY MR. BLACK:
13    **Q.   You just mentioned a database approach.**
14    **Have you conducted a database approach related**
15 **to this matter?**
16        MR. GLENNON:  Objection.  Vague.
17        THE WITNESS:  No, sir.
18    We collect data all the time and do
19 comparative analyses, but I present that information for
20 consumption by many stakeholders within the corporation,
21 and share information.
22 BY MR. BLACK:
23    **Q.   So I understand that if called upon, you might**
24 **be able to collect information and combine it into a**
25 **report.**

1    **I'm asking is there something that you have**
2 **already done that informs an expert opinion?**
3        MR. GLENNON:  Objection.  Vague.
4 BY MR. BLACK:
5    **Q.   Let me ask the question like this.  For**
6 **example, is there a report that you have already**
7 **created, say, for the CEO of CCA, that you feel you**
8 **could submit in court, you know, next week as an expert**
9 **report?**
10        MR. GLENNON:  Objection.  Vague.  Foundation.
11        THE WITNESS:  No.  I don't believe that would
12 be possible.
13 BY MR. BLACK:
14    **Q.   Okay.  Do you have anything else that might be**
15 **similar, that is either already created on paper or**
16 **electronically that you think would already qualify as**
17 **an expert report or an expert opinion?**
18        MR. GLENNON:  Objection.  Vague.  Calls for a
19 legal conclusion.
20        THE WITNESS:  We have prepared a number of
21 reports that are very detailed, and I'm certainly
22 prepared to evaluate, interpret, and do comparative
23 analytics across those reports, and evaluate a
24 performance from that perspective.  But I think that's
25 the extent of it, Mr. Black.  It's pretty much what I do

1 day in and day out in our division.
2 BY MR. BLACK:
3   Q.  Okay.  Are you prepared to testify in this
4 matter as an expert?
5       MR. GLENNON:  Objection.  Vague.
6       THE WITNESS:  Well, I certainly believe I'm
7 qualified to testify in this matter based on the
8 document requests and information coming from our
9 division from the company that I believe we've provided,
10 I'm probably the person that may be in the best position
11 to interpret, or share information, or put that
12 information into proper context.
13      And to the extent that that qualifies as
14 expertise, yes, sir, I do believe that I'm -- I would be
15 qualified to do that.
16 BY MR. BLACK:
17  Q.  Aside from qualifications, I want to focus on
18 preparation.  So if you were called on to testify today,
19 do you think you would be prepared to testify as an
20 expert as to the issues in this litigation?
21      MR. GLENNON:  Objection.  Foundation.
22      THE WITNESS:  I believe it would depend on the
23 questions posed, but yes, I do believe I do have
24 expertise, I can address the matters that I think are
25 facing -- facing us.  So yes, I'm pleased to offer my

1 opinions.
2 BY MR. BLACK:
3   Q.  Okay.  Let me ask it slightly a different way.
4 If someone said we want to call you as a witness -- as
5 an expert witness at trial, would you say you wanted a
6 certain amount of time to prepare, or would you say
7 let's do it this very day?
8       MR. GLENNON:  Same objection.  Form.
9       THE WITNESS:  It's best certainly to have time
10 to review the issues, and concerns, and the questions
11 that are posed, and to be able to provide the ideal
12 response or the best response based on a thorough
13 research and review of the documents and the evidence,
14 and make your decisions based on that.
15      But I believe I'm very familiar with many of
16 the documents that have been requested.  I guess I'll
17 know in a minute when I open the notebook, but I believe
18 I'm very familiar with the work products that we have
19 produced.  I believe I'm very familiar with the audit
20 tools that we have utilized for years in the company,
21 and how those have progressively changed over the years
22 and been modified and improved.
23      I believe I'm the person that is best prepared
24 to provide that expertise if I were asked to do so
25 today, yes, sir.

1 BY MR. BLACK:
2   Q.  Okay.  You said I believe I'm very familiar
3 with the documents that have been requested.  I'm very
4 familiar with the work products that we have produced.
5       How many documents are you very familiar with
6 that have been produced?
7   A.  Well, let me qualify my earlier response,
8 Mr. Black, if I could.
9       I'm familiar with the types of documents that
10 we generate as a division, if that's helpful to you in
11 clarifying my response.
12      The exact numbers on those pages, the exact
13 findings, you know, the exact dates, the areas that were
14 evaluated and audited, the precise outcomes of each of
15 those audits, the exact contents or types of rollup
16 reports that we do to senior management and to
17 leadership and to the operations executives to help
18 improve quality of operations, I would have to look at
19 each of those specifically.
20      But I'm very familiar with the types of
21 documents that we generate, and have been for some
22 period of time.  So it -- does that help clarify it for
23 you, sir?
24  Q.  I think it does.  Let me ask a different
25 question.

1       You're familiar with documents that have been
2 produced to plaintiff as a general matter; is that
3 right?
4   A.  Yes, sir --
5       MR. GLENNON:  Mr. Murray, if you could give me
6 a second to object.
7 I object to form.
8 You can go ahead.
9       THE WITNESS:  Yes, sir, I believe I am.
10 BY MR. BLACK:
11  Q.  Okay.  Are you familiar with them because you
12 have reviewed the documents that that -- as they have
13 been produced to plaintiffs?
14      MR. GLENNON:  Objection.
15      THE WITNESS:  Not specifically, Mr. Black.
16 Again, to clarify -- and I don't mean to overstate this,
17 but our division has generated the types of documents
18 that -- that I believe were requested, you know, to a
19 confident were requested that our division produces and
20 has produced for years, and so -- that we generate
21 routinely as a matter of our normal business practices,
22 our normal internal audit practices.
23      So again, these are -- these are typical
24 reports, typical rollup documents, typical heat maps,
25 typical charting.

Donald William Murray, Jr.

1    So from that perspective, sir, I'm very
2  familiar with the information -- I should say the
3  processes and the document forms.  But I would have to
4  look at each document, per se, to bring context to it
5  and to bring a focused understanding and interpretation
6  of that.
7        MR. BLACK:  Thank you.
8  BY MR. BLACK:
9     Q.  That answered my question.
10        So you're familiar with, for example, audits
11  because you routinely generate and review audits; is
12  that right?
13     A.  Yes, sir.
14     Q.  But you don't know for sure whether or not
15  plaintiff received every audit that you generate and
16  review in the course of your business; is that correct?
17        MR. GLENNON:  Objection.  Vague.
18        THE WITNESS:  I -- I know that we would have
19  done everything requested, and that we would have
20  certainly produced it for review by our attorneys.
21        And, you know, beyond that, Mr. Black, I can't
22  tell you whether or not every document was -- I know we
23  produced everything, whether or not there were
24  objections provided by our counsel, I'm sorry, I just --
25  I don't know.

1  BY MR. BLACK:
2     Q.  That sounds like an honest answer and I
3  appreciate it.  Thank you.
4        MR. BLACK:  Okay.  Now can you please open to
5  the first document in the binder.  They should be
6  numbered with tabs, and I'll ask the Court Reporter to
7  introduce tab 1 as Exhibit 574.
8        THE WITNESS:  Okay.  Page 1?
9  BY MR. BLACK:
10     Q.  Yes.
11     A.  Okay.
12     Q.  Okay.  Do you recognize this document?
13     A.  Give me just a minute, Mr. Black, if you
14  would, please.
15     Q.  Yeah.  Take your time and flip through it.
16        CERTIFIED STENOGRAPHER:  Excuse me, if you
17  would, Mr. Black, there was a previous document that you
18  marked as Exhibit 574.  This one should be marked as
19  Exhibit 575.
20        MR. BLACK:  Yes.  Exhibit 575.
21        THE VIDEOGRAPHER:  Sorry, I posted tab 1 as
22  Exhibit 574.
23        Did you say another tab after that?
24        MR. BLACK:  The opposite.  It should be
25  Exhibit 575.  We're still tab 1.  Tab 1 should be 575.

1        MR. GLENNON:  Just for clarification sake,
2  that is the link that was previously dropped into the
3  chat box, even though it says 574, it's still tab 1 --
4        CERTIFIED STENOGRAPHER:  Mr. Glennon, you're
5  cutting out.  I didn't get what you said.
6        MR. GLENNON:  Sure.  I just wanted to clarify
7  in the chat box, what was put in there was 574 under
8  tab 1.
9        Is it the same link to what is now being
10  marked as 575, or should I disregard this link?  I'm
11  just trying to make sure I'm looking at the correct
12  document?
13        CERTIFIED STENOGRAPHER:  I don't have access
14  to that.  It's the videographer that's doing the
15  exhibits today.
16        MR. GLENNON:  Maybe I could shortcut this.
17  Kenny, is this defendants' disclosures pursuant to dot,
18  dot, dot?
19        MR. BLACK:  Yes.
20        THE VIDEOGRAPHER:  Just so I'm clear, before
21  that I posted tab 20 which was Exhibit 573, did we skip
22  574?  Or is that something else?
23        MR. BLACK:  I think -- I think I messed both
24  up.  We should have started with 573, and then gone to
25  574.  Tell me how -- what is the easiest way to fix

1  this.  So tab 20 should be the first exhibit, and tab 1
2  should be the second exhibit.
3        CERTIFIED STENOGRAPHER:  Can we go off the
4  record to fix this?
5        MS. RADCLIFFE:  Tab 20 was Exhibit 573, tab 1
6  is Exhibit 574 is what I have.
7        MR. GLENNON:  That's consistent with what I
8  have as well.
9        MR. BLACK:  That's what I meant to do, and
10  then I messed up the numbers.
11        THE VIDEOGRAPHER:  And then whatever is next
12  will be 575?
13        MR. BLACK:  Yes.
14        MS. RADCLIFFE:  Correct.
15        THE VIDEOGRAPHER:  Okay.  Thank you.
16        MS. RADCLIFFE:  We can go back on the record.
17        MR. GLENNON:  I'm not sure we came off.
18        THE VIDEOGRAPHER:  We're still on the record.
19        THE WITNESS:  Okay, Mr. Black.
20  BY MR. BLACK:
21     Q.  Okay.  So I think my question was:  Do you
22  recognize this document?
23     A.  Yes, sir.
24     Q.  Okay.  Did you contribute in any way to the
25  content of this document?

1        MR. GLENNON:  Objection.  Vague.

2        THE WITNESS:  No, sir, I did not.

3 BY MR. BLACK:

4     Q.   Okay.  If you go in this document, if you turn

5 to -- actually, let me -- if you turn to page 5, please.

6     A.   Yes, sir.

7     Q.   Okay.  You see that your name appears in, I

8 guess towards the bottom of page 5?

9     A.   I do.

10    Q.   And going from page 5, to 6, to 7, it

11 describes your background, and there's a paragraph for

12 subject matter testimony, and then one for summary of

13 facts and opinions.

14        Do you see that?

15    A.   Yes, I do.

16    Q.   Do you know where this information came from?

17        MR. GLENNON:  Objection.  Vague.

18        THE WITNESS:  Well, some of the information is

19 I believe posted on the website in terms of my Vita and

20 my bio.

21        In terms of the subject matter testimony,

22 these are areas that, you know, I deal with day in and

23 day out from an auditing perspective, and I believe I

24 was asked to serve potentially as both a fact witness,

25 and given my extensive training and years of experience

1 and background, also as an expert.

2 BY MR. BLACK:

3     Q.   Did you tell someone that these are the areas

4 you were prepared to testify to?

5        MR. GLENNON:  I'm going to object and instruct

6 the witness not to answer unless he can do so without

7 revealing communications with his counsel.

8        THE WITNESS:  I believe that's privileged.

9 BY MR. BLACK:

10    Q.   You believe that's privileged.

11        Did you tell anyone at CCA that -- that these

12 subject areas were the ones you were prepared to testify

13 to?

14        MR. GLENNON:  Same objection.  Any of the

15 non-employer stuff, Mr. Murray.

16 BY MR. BLACK:

17    Q.   Mr. Murray, are you going to choose to not

18 answer this question?

19    A.   I believe that's my understanding, not to

20 answer the question.

21    Q.   Okay.  Mr. Murray, do you see under summary of

22 facts and opinions there's a paragraph that goes from

23 page 6 to 7?

24    A.   Yes, sir, I do.

25    Q.   Okay.  Can you read the first sentence,

1 please?

2     A.   "Dr. Murray may testify that CoreCivic's

3 operational performance was similar to and compared

4 favorably with BOP's operational performance in the

5 areas of correctional facility management, oversight,

6 staffing, security, and related policies and

7 procedures."

8     Q.   Okay.  Are you, in fact, prepared to testify

9 that CoreCivic's operational performance was similar to

10 and compared favorably with the BOP's operational

11 performance in the areas of correctional facility

12 management, oversight, staffing, security, and related

13 policies and procedures?

14    A.   Yes.

15    Q.   Okay.  In what ways are you prepared to so

16 testify?

17    A.   Well, mainly, Mr. Black, again it's a function

18 of my extensive experience in the corrections industry.

19 I have completed 38 years of service, 22 of which have

20 been in the Federal Bureau of Prisons, 16 years and

21 change here at CoreCivic.

22        And during that nearly four decades in the

23 corrections industry, government service and in private

24 sector, I've garnered quite a lot of information and

25 expertise across a variety of areas.

1        I've had the privilege of auditing facilities,

2 both while I was with the BOP, and auditing facilities

3 certainly in the leadership role -- management role here

4 at CoreCivic.

5        I frequently attend professional meetings, and

6 review information and standards from an ACA

7 perspective -- ACA stands for the American

8 Correctional Association, by the way.

9        I attend the national commission on

10 correctional healthcare meetings, and participate in

11 those as well.

12        There is a large amount of information in

13 terms of standards for the industry in healthcare, and

14 very broadly in security and key operational areas that

15 we have within our facilities as managers and as

16 professionals -- correctional professionals.

17        I'm very familiar with Federal Bureau of

18 Prisons policies and procedures for more than two

19 decades.  I'm very familiar with the tools -- audit

20 tools that have been utilized by the Federal Bureau of

21 Prisons for many years and the updates to those that are

22 utilized in the customer facility and monitorings.

23        I'm very familiar with the information and

24 tools that we utilize to conduct that identical types of

25 evaluation in our facility operation.  I'm very familiar

**Confidential**

Donald William Murray, Jr.                                    Grae vs.
                                          Corrections Corporation of America, et al.

1 with facility client surveys that we utilize that are
2 very similar to the Federal Bureau of Prisons climate
3 surveys of staff and detainees or inmates in our care
4 and custody as in their care and custody.
5         I'm very familiar with their procedures from
6 the perspective that we get updates from the Bureau of
7 Prisons that whenever we have a contractual modification
8 that we update our policies and procedures accordingly.
9         So from a variety of perspectives in terms of
10 my prior experience, more than two decades with the
11 Bureau of Prisons, from my experience hiring staff from
12 the Federal Bureau of Prisons that have left senior
13 management roles to include wardens positions, associate
14 wardens positions, to include healthcare services
15 administrators that have operated Federal Bureau of
16 Prisons healthcare divisions within facilities as audit
17 team members, I -- understanding many of the staffing
18 issues and concerns that impact not only the Bureau of
19 Prisons but staffing issues and concerns that impact
20 virtually most areas of corrections and how that's
21 certainly compounded in the health services areas and
22 other professional services such as mental health.
23         So I have many years of experience, and I'll
24 be relying on that very heavily in the formation of my
25 responses to any questions that might be posed in those

1 areas.
2         And I think as well that my attendance at
3 professional associations and meetings staying current
4 with the latest standards, and requirements, and
5 challenges, listening to my colleagues in the industry
6 both on the government services side, as well as on the
7 private sector side, the challenges that many of us
8 share together in the corrections industry, I believe
9 all of that provides me the opportunity to provide,
10 perhaps, a unique, professional input -- expert input in
11 response to these areas.
12     Q.   Okay.  So under this section, starting with
13 number 2, summary of facts and opinions, do you see that
14 there are five sentences in this paragraph going from
15 page 6 to 7?
16     A.   Yes, sir, I do.
17     Q.   On page 7, the second to last sentence begins,
18 "Dr. Murray may also testify about challenges to the
19 BOPs."
20         Can you read that sentence, please?
21     A.   Yes, sir.  "Dr. Murray may also testify about
22 challenges to the BOP's operational performance in areas
23 of correctional facility management, oversight,
24 training, security, and related policies and
25 procedures."

1     Q.   Okay.  Did you work at the BOP between 2012
2 and 2016?
3     A.   No, sir, I did not.
4     Q.   Visit any BOP-run facilities between 2012 and
5 2016?
6     A.   Only BOP facilities I visited during that
7 timeframe were ones that we operated at CoreCivic.
8     Q.   Okay.  So no then?
9         MR. GLENNON:  Objection.  Vague.  Form.
10        THE WITNESS:  The response would be no, sir.
11 BY MR. BLACK:
12     Q.   When was the last time you stepped foot in a
13 BOP-run facility?
14        MR. GLENNON:  Objection.  Vague.
15        THE WITNESS:  It was probably during a visit
16 at an ACA meeting, when one of the local BOP facilities
17 was up for tour.  But since joining CoreCivic, I have
18 not spent a substantial amount of time -- a very limited
19 amount of time, frankly, in BOP operated facilities.
20 BY MR. BLACK:
21     Q.   Can you remind me the last time you worked for
22 the BOP was?
23     A.   Yes, sir.  I left the Federal Bureau of
24 Prisons in August of 2004.
25     Q.   Does the BOP send you reports about its

1 operational performance?
2     A.   I'm sorry.  Does it send me reports about its
3 operational performance?
4     Q.   Yes.
5     A.   No, sir, it does not.
6     Q.   Does the BOP send you statistics about its
7 operational performance?
8     A.   No, sir, it does not.
9     Q.   Have you FOIA'd information about the BOP's
10 operational performance in the last eight years?
11     A.   I'm sorry.  Have I FOIA'd?
12     Q.   Yes.
13     A.   I'm just having trouble with the verb tense,
14 I'm sorry.
15     Q.   Have you obtained via FOIA requests
16 information about the BOP's operational performance in
17 the last eight years?
18     A.   No, sir, I have not.
19     Q.   Have you interviewed any BOP employees about
20 operational challenges in the last eight years?
21     A.   Yes.
22     Q.   Which BOP employees have you interviewed about
23 challenges?
24     A.   When I was making hiring decisions in terms
25 of -- or we brought them on board in terms of the

**Confidential**

Donald William Murray, Jr.           Grae vs.
Corrections Corporation of America, et al.

Page 101

1 challenges sometimes that we faced as an industry in
2 looking at their reactions to how they might face those
3 challenges.
4    **Q. How many BOP employees have you interviewed**
5 **about operational challenges at the BOP in the last**
6 **eight years?**
7    A. Probably three individuals, whenever we were
8 bringing them on or slightly after we had already hired
9 them, perhaps, we had those discussions.
10   **Q. What are the individuals' names?**
11   A. The individuals' names would be -- let me go
12 to my roster here very quickly. Mr. Steve Morris, who
13 was a former warden at the Beaumont facility -- I'm
14 sorry again, Mr. Black, would you help me clarify that.
15      Are you asking a specific timeframe during
16 which I may have conducted these interviews or not?
17   **Q. Yeah. The last eight years.**
18   A. Okay. I'm going to have to look at the
19 specific hire dates of these individuals to see if that
20 was in the last eight years. I may have answered
21 inaccurately, but I have hired a number of individuals.
22 I believe all three of these individuals have more than
23 eight years of tenure with the corporation. So I may
24 need to correct myself on the record.
25      I may have had these discussions or interviews

Page 102

1 with them either at hire or right after hire, but I
2 believe that may have been more than eight years, as I
3 recall.
4    **Q. Have you interviewed any inmates of BOP-run**
5 **facilities in the last eight years about BOP operational**
6 **challenges?**
7   A. No, sir, I have not.
8    **Q. You worked at two facilities -- two specific**
9 **facilities at least when you worked at the BOP; is that**
10 **right?**
11   A. Yes, sir.
12    **Q. Whether or not it was in the last eight years,**
13 **three individuals you mentioned interviewing, did you**
14 **interview them about riots at BOP prisons?**
15   A. No.
16    **Q. Did you interview them about murders of**
17 **correctional officers at any BOP prisons?**
18     MR. GLENNON: Objection. Vague.
19     THE WITNESS: We -- we may have discussed some
20 of the tragedies that occurred in the BOP, perhaps, with
21 death of staff or tragedies that occurred at other
22 correctional facilities.
23     But, I'm sorry, I can't give you a specific
24 answer. I don't recall that specifically, no, sir.
25     If we did have that discussion, I'm certain it

Page 103

1 was probably in passing.
2 BY MR. BLACK:
3    **Q. Okay. Did you interview them about the taking**
4 **of hostages in BOP-run facilities?**
5   A. No, sir. I didn't -- didn't interview them
6 about the taking of hostages.
7    **Q. Mr. Murray, are you prepared to testify about**
8 **challenges to the BOP's operational performances in the**
9 **areas of say security?**
10   A. To the extent that we, as an industry, face
11 those types of challenges, I believe I would be, yes.
12    **Q. And that's even though you haven't worked for**
13 **the BOP in over a decade, you haven't gotten any reports**
14 **from the BOP about their operational performance, you**
15 **haven't gotten any statistics from the BOP about their**
16 **operational percentages; is that right?**
17   A. I --
18     MR. GLENNON: Objection. Vague. Foundation.
19     You can answer.
20     THE WITNESS: Well, Mr. Black, I don't know
21 that having reports from the BOP would, first of all,
22 would be probably inappropriate for me to have them as
23 an employee at CoreCivic.
24     Secondly, my view is that many of these are
25 challenges that we face as an industry as correctional

Page 104

1 professionals. Whether or not we work in the BOP,
2 whether or not we work in a state corrections agency,
3 whether you work for one of the privates, whether you
4 work for a city or county jail -- although sometimes the
5 missions are different, and missions can be quite
6 different even within a correctional agency, we face, as
7 an industry, very similar challenges, and I hear about
8 these all the time when I go to my professional
9 meetings, and participate with ACA and NCCHC. Just --
10 it's, I think, fairly common knowledge.
11 BY MR. BLACK:
12    **Q. Does the BOP house high security prisoners?**
13   A. Well, let me answer that this way. I believe
14 we may have housed some high security individuals, but
15 certainly not as -- as a standard practice.
16     You know, when you operate jail settings, you
17 oftentimes don't know who you have when they first come
18 in the door. They may come into a facility as a jail
19 detainee and end up -- you don't have all the
20 background on them, either through -- once you receive
21 the additional information, you learn how potentially
22 violent their histories are.
23     And candidly as well, even when people come
24 into lower security facilities initially, sometimes
25 those individuals continue to act out in a way that

**Confidential**

Donald William Murray, Jr.                                    Grae vs.
                                        Corrections Corporation of America, et al.

1 works their way up the security ladder.

2      So just because someone comes into a jail

3 facility or a low facility initially, doesn't mean that

4 you're not housing someone that, frankly, has high

5 security potential, can be very dangerous individuals

6 regardless of the security level, the jail setting in

7 which you find them.

8      But in response more directively to your

9 question, as a general practice, no, sir, I don't

10 believe we house specifically units of the highest

11 security types of inmates or detainees, per se.

12      **Q.  Does the BOP house inmates that are high**

13 **security inmates or high facility -- or high risk**

14 **facilities?**

15      MR. GLENNON:  Objection.  Vague.

16      THE WITNESS:  Yes, they do.

17 BY MR. BLACK:

18      **Q.  Okay.  Between 2012 and 2016, did CCA operate**

19 **any facilities on behalf of the BOP where the inmates**

20 **were anything other than low risk?**

21      MR. GLENNON:  Objection.  Vague.  Form.

22      THE WITNESS:  Mr. Black, we operated

23 facilities that tended to be, you know, as I tried to

24 make, apparently unsuccessfully in my earlier comments,

25 that we did operate the lower security facilities.

1      But individuals that come into those

2 facilities, again, have the potential to act out and --

3 in some cases, and can react quite violently, as I think

4 we're all aware.

5 BY MR. BLACK:

6      **Q.  In your experience did the inmates of low**

7 **security prisons act out, as you say, more often or less**

8 **often than those in high security prisons?**

9      MR. GLENNON:  Objection.  Incomplete

10 hypothetical.

11      THE WITNESS:  Typically individuals that are

12 housed in lower security or even low-medium facilities

13 have a -- shorter sentences oftentimes, they maybe have

14 stronger family connections, less history of violence.

15      So by virtue of their history and background,

16 they tend not to have the same level of disruptive

17 behavior that we sometimes see in medium security

18 facilities.  Although, I will say that an individual, by

19 the time he works his way up -- he or she works his or

20 her way up to a high security facility, the levels of

21 controls in -- it makes it very, very difficult for

22 somebody to act out and create a disruptive event among

23 the highest security facilities that are operated.

24 BY MR. BLACK:

25      **Q.  Would you say the highest security prisons are**

1 **operated in a different way then?**

2      MR. GLENNON:  Objection.  Vague.

3      THE WITNESS:  Well, my response to that would

4 be that it's pretty straightforward that if you go to a

5 facility that's operated say in California like a

6 Pelican Bay, or if you go to the bureau operated

7 facility in Colorado, high security facility, that there

8 are different procedures in place that manage and

9 control the liberty and behavior, if you would, of those

10 individuals, compared to the work at the -- the policies

11 and procedures that are in place at a medium or lower

12 security facility.

13      Typically lower security facilities offer more

14 out of cell time, recreation time, educational programs,

15 vocational programs, training, et cetera.  So there's

16 generally more openness, if you would, to the

17 environment than what you're going to find that is

18 required to manage highly violent offenders that,

19 through their behavior, demonstrated that they require

20 that level of control compared to those that have not

21 worked their way up to that level of management requirement.

22 BY MR. BLACK:

23      **Q.  So the differences in inmate population**

24 **require corresponding differences in operation?**

25      MR. GLENNON:  Objection.  Vague.  Foundation.

1      THE WITNESS:  Typically that would be

2 accurate, yes, sir.

3 BY MR. BLACK:

4      **Q.  Okay.  Can we return to the first sentence of**

5 **this paragraph that starts "summary of facts and**

6 **opinions."**

7      **"Dr. Murray may testify that CoreCivic's**

8 **operational performance was similar to and compared**

9 **favorably with the BOP's."**

10      A.  Sure.

11      **Q.  Okay.  So we just went over it.  You haven't**

12 **worked at the BOP in over a decade, you haven't been to**

13 **BOP facilities in over a decade, you interviewed maybe**

14 **three people from the BOP, the BOP hasn't been sending**

15 **you reports about operation and performance, hasn't been**

16 **sending you statistics about operation and performance.**

17 **How do you plan to measure the BOP's operational**

18 **performance?**

19      MR. GLENNON:  Objection.  Vague.  And

20 compound.

21      You can answer.

22      THE WITNESS:  I can, again refer, Mr. Black,

23 to my experience and look at the challenges that are

24 common to many correctional systems.

25      / / / / /

**Confidential**

Donald William Murray, Jr.                                    Grae vs.
                                          Corrections Corporation of America, et al.

1 BY MR. BLACK:

2     Q.   And sorry, Mr. Murray --

3         MR. GLENNON:  Hold on.  Hold on, Mr. Black.

4     Mr. Murray, were you finished with your

5     answer?

6         THE WITNESS:  Yes.  May I finish?

7         MR. BLACK:  Please continue, although I don't

8     believe you're answering the question.

9         MR. GLENNON:  He's allowed to answer it, and

10    then you can decide whether or not he's answered it.

11         You can finish.

12         THE WITNESS:  I believe that my substantial

13    experience while with the bureau, including my knowledge

14    of BOP's operational audit tools for CFM facilities, and

15    my experience in looking at the management requirements

16    and staffing issue that we all face, the security

17    challenges we all face in managing certain types of

18    inmates, our policies and procedure, I feel comfortable

19    in providing a comparative analysis.

20 BY MR. BLACK:

21    Q.   Mr. Murray, how are you going to compare --

22    scratch that.

23         Between 2012 and 2016, what experience do you

24    have with the BOP's operational performance?

25         MR. GLENNON:  Objection.  Vague.

1         THE WITNESS:  Well, it was very clear that, as

2     a part of the CFM audit tools produced by the Federal

3     Bureau of Prisons and from a quality control

4     perspective, that we also created internal audit tools

5     that we would utilize that not only included all the

6     areas that the BOP felt to be important, but areas that

7     we felt to be important as a company as well.

8         We would submit those tools to the BOP for

9     approval for utilization as a part of our quality

10    control procedures.  So the Federal Bureau of Prisons

11    approved the work that we were doing, they would inform

12    that we provided them, and if there were any issues or

13    concerns with the quality of work, the quality of our

14    internal audits, the interviews that were conducted by

15    internal audit teams on-site during our facility

16    internal audits of BOP facilities, we would receive

17    feedback in that manner as well.

18         So I believe there's a number of ways to

19    compare our performance and the way the BOP was looking

20    at us and evaluating our performance with the bureau's

21    own performance.

22         If there had been significant concerns, I'm

23    certain that they would have let us know that.

24 BY MR. BLACK:

25    Q.   Are you testifying that if the BOP had

1     concerns about their own facilities, they would have

2     told you about that?

3         THE WITNESS:  No, sir, but when they make

4     policy and procedural changes and modify, you know, a

5     contract, for example, it I may well be because there

6     are areas that they're experiencing in their own

7     populations.

8         For example, if you go to a revised audit tool

9     that they're using, and for example, there's an

10    increased focus on patients or inmates that have HIV,

11    and there's new procedures or there are new protocols

12    they would like for you to follow, the assumption very

13    logically is that this is what the Bureau of Prisons is

14    doing currently, and they've modified their practices

15    and of course we need to modify our practices to be

16    consistent with the Bureau of Prisons' practices.

17         It would be similarly true with Hep C or other

18    medical issues or concerns that they were seeing emerge

19    in their populations, that they would expect us to also

20    provide additional focus on.

21         If there are modifications to suicide

22    prevention policies and procedures and protocols --

23    which, by the way, the Bureau of Prisons approved all of

24    our policies and procedures, and I believe approved many

25    of the key staff as well as the background checks that

1     were required, the updates, and if there were additional

2     information that the bureau needed from us, we had a

3     partnership, and we would certainly expect that

4     information to flow to us to move to that performance to

5     help improve performance or at least achieve and

6     maintain performance that was expected by the bureau.

7         So granted I am inferring some information,

8     but I think reasonably and logically inferring based on

9     changes to the Bureau of Prisons' policies, procedures,

10    their CFM audit tools, communications that local

11    facility staff had with the senior secure institution

12    monitors that are on-site almost daily at BOP

13    facilities.

14         So there was a free exchange of information,

15    Mr. Black, back and forth.  Is that helpful?

16         MR. BLACK:  No.  That's nonresponsive.

17 BY MR. BLACK:

18    Q.   So this question asks about operational

19    performance.

20         Do you see that -- not question, this sentence

21    says, "Dr. Murray may testify about operational

22    performance."

23         Do you see the term operation performance in

24    there?

25    A.   Yes, sir, I do.

Confidential

Donald William Murray, Jr.                                                                                 Grae vs.
                                                                        Corrections Corporation of America, et al.

1    Q.  Does it say that Dr. Murray is going to
2 testify that he can infer from BOP's auditing tools that
3 he is able to determine what the BOP's operational
4 performance was?
5        MR. GLENNON:  Object to form.  Harassing the
6 witness.  Asked and answered.
7 BY MR. BLACK:
8    Q.  So you can answer?
9    A.  Oh.  Okay.  Mr. Black, I believe that if there
10 are policy and procedure changes made by the Bureau of
11 Prisons, they implement new policies and procedures for
12 the contract providers, I think it's only logical and
13 appropriate to assume that this is how they would like
14 us to perform operationally, and that's what we did,
15 sir.
16    Q.  So you testified that you knew how the BOP
17 wanted you to perform?
18        MR. GLENNON:  Object to form.
19        THE WITNESS:  I'm sorry, Mr. Black, I believe
20 that it's very clear that in the statement of work and
21 in the manuals there were provided, that there were clear
22 expectations for us in terms of our performance based
23 on --
24 BY MR. BLACK:
25    Q.  I'm not asking you whether there were

1 expectations.
2        I'm asking you whether your testimony is going
3 to be that CCA performed similarly to the BOP because
4 the BOP had expectations of CCA --
5        MR. GLENNON:  Object to form.
6 BY MR. BLACK:
7    Q.  -- is that going to be your expert testimony?
8        MR. GLENNON:  Object to form.  Incomplete
9 hypothetical.
10        THE WITNESS:  No, sir.  My testimony is going
11 to be that we followed BOP policies and procedures -- or
12 BOP-approved policies and procedures, clinical services
13 manuals, and had regular communication with on-site
14 monitors that gave us regular feedback about our
15 performance.
16        And I believe in looking to the changes that
17 were made in their audit tools, and their policies and
18 procedures, statement of work, any additions or contract
19 addenda that that would be informing as to what the
20 Bureau of Prisons performance expectations were based on
21 their own performances.
22 BY MR. BLACK:
23    Q.  You testify -- testified, "I believe that the
24 BOP approved many of the key staff as well as the
25 background checks that were hired."

1        How does that relate to a comparison between
2 the BOP's operational performance in the course of its
3 operational performance?
4    A.  Well, Mr. Black, as you know, the BOP also
5 approves and subjects every staff member that they hire
6 to a full tilt background check and evaluation.
7        And so from that perspective, there's a number
8 of commonalities and expectations that they have for
9 their own staff that are also, I believe, stipulated in
10 our contractual obligations with them, which is why our
11 staff are required to go through background checks, and
12 they also require approvals of staffing key positions.
13        So I think comparatively that's -- if that's
14 what they're doing and that's what their requirements
15 are for us operationally, and if they change their
16 policies and procedures so that we are required to
17 follow those policies and procedures, then it would
18 follow to me, logically, that the performance
19 expectation would be analogous to what the Bureau of
20 Prisons facilities' own performances were.
21    Q.  So your inference then is that as long as CCA
22 is meeting its BOP mandated requirements under its
23 contract with the BOP, then CCA is necessarily comparing
24 favorably to the BOP's operational performance?
25        MR. GLENNON:  Object to form.

1 Mischaracterizes the testimony.
2        THE WITNESS:  My belief is that if we were not
3 performing at that level, and they were not making the
4 changes to their audit tools, and policies and
5 procedures, and various contract addenda, and clinical
6 service manuals, updates, et cetera, that we would
7 certainly be aware of that.
8        And I think it would be appropriate to have a
9 takeaway from those changes that these were areas of
10 improvement that the bureau was also looking to do for
11 one reason or another, and also expecting those of us
12 with whom they've contracted to also deliver those same
13 services in the manner that the Bureau of Prisons is
14 doing.
15 BY MR. BLACK:
16    Q.  So I don't think this was responsive.
17        I'm asking how you're going to compare CCA's
18 operational performance to BOP's operational performance
19 when we've already established that you don't have
20 anything showing the BOP's operational performance?
21        It sounds to me you like have a way of
22 inferring it from CCA's operational performance and the
23 changing requirements of BOP contracts with CCA.
24        MR. GLENNON:  Objection --
25        / / / / /

Confidential

Donald William Murray, Jr.                                    Grae vs.
                                    Corrections Corporation of America, et al.

1  BY MR. BLACK:

**2      Q.  I'm just asking if that's correct?**

3          MR. GLENNON:  Okay.  I'm going to object in

4  regard to counsel testifying and mischaracterizing the

5  testimony.  Vague.  Compound.  And form.

6          THE WITNESS:  I'm not sure how to respond to

7  that, Mr. Black.  Perhaps I could go another direction.

8          If you could take a look at the requirements,

9  for example, for accreditation, which is a contract

10  requirement by the American Correctional Association --

11  BY MR. BLACK:

**12     Q.  Where -- where have you --**

13         MR. GLENNON:  Hold on.  Hold on.  Hold on.

14         MR. BLACK:  No.  We're going to move to strike

15  this.  This is nonresponsive.

16         MR. GLENNON:  That's fine.  You can --

17         MR. BLACK:  He's talking about BOP

18  operational performance and he's talking about the ACA.

19  It's unrelated.

20         MR. GLENNON:  Mr. Black --

21         MR. BLACK:  He's on a soapbox --

22         MR. GLENNON:  Mr. Black, I don't need you

23  bashing my witness please.  And turn down your volume

24  just a little bit.

25         You asked the question, let him answer.  If

1  you feel the need to move to strike, you're permitted to

2  do so, but let him finish his question.

3          MR. BLACK:  Okay.  And --

4          MR. GLENNON:  And please don't -- please

5  don't -- let's please don't yell at my witness.

6          MR. BLACK:  Brian, make an objection or stop

7  talking.

8          MR. GLENNON:  I can ask you not to yell at my

9  witness.  I object that you're harassing and badgering

10  the witness.

11         MR. BLACK:  Just state your objection.

12         MR. GLENNON:  I don't need you to tell me how

13  to do my job, but thank you.

14         Were you done with your answer, Mr. Murray?

15         THE WITNESS:  No, sir.  I was not.

16         MR. GLENNON:  You can finish it.

17         THE WITNESS:  Mr. Black, one of the key

18  operational performance requirements of our contracts

19  with the Federal Bureau of Prisons was to achieve ACA

20  accreditation, that is a critically important

21  operational requirement that our facilities achieve and

22  maintain accreditation by the independent American

23  Correctional Association.

24         That's another example of how I believe that

25  through the changing standards of ACA that the bureau

1  has to meet and that we also have to meet, that's

2  another example of the comparability of our facilities

3  meeting those important standards.

4          I'm sorry that I'm not able to make it more

5  clear for you, and I certainly don't mean to upset you.

6          MR. BLACK:  Okay.  I know it's later there.

7  Why don't we take a break.

8          Do you guys want a longer break for lunch?

9          MR. GLENNON:  Thanks for asking, Kenny.

10  I'm -- Mr. Murray, how much time would you like for the

11  break?  We're -- we can be flexible on this end.  That's

12  fine with me.

13         THE WITNESS:  I've just got a couple of Kind

14  bars here, so whatever it takes to do that.

15         MR. GLENNON:  Mr. Black, do you want to do a

16  half an hour?

17         We'll aim for 20 minutes, since there always

18  seems to be a 10-minute --

19         MR. BLACK:  I'll be here.

20         CERTIFIED STENOGRAPHER:  Counsel, I would like

21  30 minutes for lunch, please.

22         THE VIDEOGRAPHER:  I'll take us off the record

23  at 1:19.

24         (The lunch recess was taken at 1:19 p.m.)

25                   --o0o--

1          (The proceedings resumed after the lunch break

2  at 2:02 p.m.)

3          THE VIDEOGRAPHER:  We are back on the record

4  at 2:02.

5          MR. BLACK:  Welcome back, Mr. Murray.

6          THE WITNESS:  Thank you, Mr. Black.

7  BY MR. BLACK:

**8      Q.  Do you know who Donna Mellendick is?**

9      A.  She's a BOP -- former BOP employee or warden,

10  as I recall.  I'm not sure what her highest level of

11  achievement or rank was at the bureau, but she is a

12  former BOP employee as I recall.

**13     Q.  Have you read an expert report she's prepared**

**14  in this matter?**

15     A.  No, sir, I have not.

**16     Q.  Have you read the expert reports for**

**17  defendants by Messrs. Dodrill and Marlowe?**

18     A.  No, sir, I have not.

**19     Q.  Can we go back to the document we were looking**

**20  at, which is tab 1 in your binder and is exhibit -- it**

**21  should be 574 still -- or again.**

22     A.  Sure.

23         And what page would you like me to turn to,

24  Mr. Black?

**25     Q.  Can we turn back to page 6, please?**

1   A.  Page 6.  Mmmm-hmmm.

2   Q.  When we left off, we had been discussing there

3   were five sentences covering over pages 6 and 7, we had

4   talked about two of those, the first and the fourth.

5        Can you read -- if you look at the second one,

6   please it starts, "Dr. Murray may also testify about

7   CoreCivic's compliance"?

8   A.  Yes, sir.

9        "Dr. Murray may also testify about CoreCivic's

10  compliance with contractual requirements, company

11  standards, and third party standards in the areas of

12  correction facility management, oversight, staffing,

13  security, and related policies and procedures."

14  Q.  Okay.  And are you prepared to testify as to

15  those issues?

16  A.  Yes, sir, I am.

17  Q.  Okay.  And can you read the next sentence

18  after it, please?

19  A.  Yes, sir.

20       "Dr. Murray may also testify to his favorable

21  opinions regarding the overall quality and cost

22  effectiveness of CoreCivic's operations in the area of

23  correctional facility management, oversight, staffing,

24  security, and related policies and procedures."

25  Q.  And are you prepared to testify as to those

1   issues?

2   A.  Yes, sir, I am.

3   Q.  Are you an expert in cost effectiveness?

4   A.  Well, I am -- certainly from a comparative

5   perspective in terms of what services might cost on the

6   government side versus what we're able to do

7   contractually from the private sector side, I certainly

8   can offer my view points on that and where the savings

9   might be achieved.

10  Q.  Okay.  For the last eight years, how would you

11  know what services cost for the government?

12  A.  Well, fundamentally when they're issuing a

13  contract with us, that's because we are offering

14  services at the same level as the Bureau of Prisons, but

15  typically at a lower cost, or otherwise they would be

16  providing those services themselves.

17  Q.  Do you have a degree in finance?

18  A.  No, sir, I do not.

19  Q.  Degree in business?

20  A.  No, sir.

21  Q.  Okay.  Any other specialized expertise or

22  training in cost effectiveness?

23  A.  As an executive with the corporation, as an

24  officer and manager we receive specialized training in

25  looking at doing work from a proper budgeting and cost

1   effectiveness perspective, different seminars that I've

2   attended over the years, different trainings that have

3   been brought in-house to us to ensure that we are doing

4   things prudently and from a level of fiscal

5   responsibility.

6   Q.  Okay.  And can you read the last sentence

7   under summary of facts and opinions.  This is towards

8   the top of page 7, above the words "Kim White."

9   A.  Yes.  The last sentence of that first

10  paragraph on the page?

11  Q.  Yes, please.

12  A.  States, "Dr. Murray may also testify that

13  CoreCivic's quality assurance division conducted

14  effective audits of CoreCivic's facilities to ensure

15  that they complied with accreditation standards and

16  other high quality services."

17  Q.  And are you prepared to testify as to those

18  issues?

19  A.  I am.

20  Q.  Can you take a brief look through the document

21  and see for Mr. Dalius on page 3, Mr. Lappin on page 5,

22  and Ms. White on page 8, there's a summary of facts and

23  opinions for each of those three individuals.  I'll give

24  you a minute to take a look at those sections.

25  A.  Okay.  Mr. Black, you're asking me to look at

1   3, 5, and 8 exhibits; is that correct, sir?

2   Q.  I'm sorry.  Pages 3, 5, and 8 of tab 1 in your

3   binder.

4   A.  I'm sorry.

5   Q.  Of Exhibit 374.

6   A.  Thank you for clarifying.

7   Q.  In particular, I'm asking you to look at the

8   summary of facts and opinions.

9   A.  Okay.  On pages 3, 5, and 8?

10  Q.  Yeah.

11  A.  Okay.

12  Q.  My question is:  Comparing those sections to

13  the same section describing the testimony that you might

14  provide, do you see any significant differences?

15       MR. GLENNON:  Objection.  Vague.

16       THE WITNESS:  Yes, sir, the last bullet point

17  in my summary of facts and opinions relates to the

18  quality assurance division's conducting of effective

19  audits of our facilities to ensure they comply with

20  accreditation standards and provide high quality

21  services.

22       That seems to be the significant -- most

23  significant difference.

24       MR. BLACK:  Okay.  Thank you.

25       / / / / /

Confidential

Donald William Murray, Jr.                                    Grae vs.
Corrections Corporation of America, et al.



**Page 133**

1 facility that did not have --
2 BY MR. BLACK:
3    **Q. A BOP-run facility, yeah.**
4    A. I don't believe I can.
5      Again, I believe that perhaps many of these
6 staff are bilingual in nature, but if it's a specific
7 language, per se, that we're talking about, native
8 language, I'm just not aware of that, no.
9    **Q. Okay. Can you name a BOP-run facility for**
10 **which the BOP found that** ████████████████
████████████████████████████?
12      MR. GLENNON: Objection. Vague. Foundation.
13      THE WITNESS: No. Again, this is the first
14 time I'm seeing this report. So no, I have not had an
15 opportunity to review and do any research or
16 comparisons, no.
17 BY MR. BLACK:
18    **Q. And to be clear, my questions now are not**
19 **about the report, they're whether similar findings have**
20 **been made by the BOP about BOP-run facilities.**
21      MR. GLENNON: Objection. Foundation.
22 BY MR. BLACK:
23    **Q. Okay. Can we go to page 14 of the report**
24 **which will be page 16 of the exhibit.**
25      **In the first full paragraph it ends** ████

**Page 134**

1 █████████████████████████████
3      **And the next paragraph it says,** ████████
█████████████████████████████
7      **Do you see that?**
8    A. Yes.
9    **Q. And this is saying, right, that** ████████
11      MR. GLENNON: Objection. Mischaracterizes the
12 evidence in the document.
13      THE WITNESS: Again, I'm not sure what -- what
14 they're relying on to make these decisions, what
15 evidence that they have for that.
16      Again, I'm not disputing it, I'm just saying
17 I'm not sure how they reached these conclusions without
18 having an opportunity to look at the information on
19 which they base their opinions.
20      I know, for example, oftentimes when there are
21 staff vacancies, that many staff are traditionally
22 assigned temporary duty and assigned to those positions
23 to assure that those posts are filled, and that the
24 responsibilities of the facility are carried out
25 contractually.

**Page 135**

1 BY MR. BLACK:
2    **Q. So my question is not whether or not policies**
3 **were in place to ensure that the contract was complied**
4 **with. I'm asking did the BOP find that** ████████████
████████████████████████
6      MR. GLENNON: Objection. Vague. Assumes
7 facts. Foundation.
8      THE WITNESS: I don't know how to respond,
9 except that that's what I see here in front of me
10 written in this report.
11 BY MR. BLACK:
12    **Q. Okay. Moving to the next page, so this is**
13 **page 15 and 17 of the exhibit.**
14    **In the middle of this large paragraph under**
15 **the bullets it says,** ████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████████
████████████████████████████
21      **Do you see that?**
22    A. Yes, I do, Mr. Black.
23    **Q. Okay. Are you aware of any incidents in which**
24 **a BOP-run facility** ████████████████████████
████████████████████████████

**Page 136**

1      MR. GLENNON: Objection. Vague.
2      THE WITNESS: No, sir, I'm not.
3 BY MR. BLACK:
4    **Q. Okay.**
5    A. I do know that sometimes these disruptive
6 events, when they take place, can also be very chaotic
7 and disorganized, and it takes awhile to basically try
8 to contain them.
9      But I'm not aware of notification to law
10 enforcement officials taking that period of time. I
11 just don't have the knowledge of that.
12    **Q. That's right.**
13    **In fact, if you go back to page 11, doesn't it**
14 **say that the review team indicates the** ████████████
██████████████████████████████
17      MR. GLENNON: Objection. Foundation. Form.
18      THE WITNESS: The very nature of disruptive
19 events oftentimes, Mr. Black, are that they are highly
20 ████████████████, and staff that are in the
21 middle of them do the very best they can to assess them,
22 to try to get control as immediately as possible when
23 those disruptive events take place.
24 BY MR. BLACK:
25    **Q. Does this document say that the staff did the**

1 low security facilities or are we speaking of facilities
2 generally?
3 BY MR. BLACK:
4    Q.   Yeah.  Let's make the question about low
5 security facilities.
6    A.  No, sir, I'm not.
7    Q.   Are you aware of a facility -- a BOP-run
8 facility -- a BOP low security BOP-run facility where a
9 riot or murder happened where hostages were taken, and
10 not only was the facility plagued by the same
11 significant deficiencies four years later, but for
12 roughly half of the months that the staffing shortages
13 were even lower than at the time of the riot?
14       MR. GLENNON:  Objection.  Vague.  Compound.
15       THE WITNESS:  No, I'm not.
16 BY MR. BLACK:
17    Q.   Is there a bigger failure for a prison than to
18 lose control at the prison?
19       MR. GLENNON:  Objection.  Vague.
20       THE WITNESS:  Than to lose control of the
21 prison?
22 BY MR. BLACK:
23    Q.   Yeah.
24    A.  Yes.  In my opinion, there is.
25    Q.   Would it include the murder of a corrections

1 officer?
2       MR. GLENNON:  Objection.  Vague.
3       THE WITNESS:  The loss of life of any
4 correctional staff member would always be tragic and is
5 always tragic.  Any correctional worker, whether they're
6 an officer or not in a facility.
7       To your earlier question, in terms of a
8 greater failure, I think one of the most important
9 things facilities do is to protect society, to protect
10 the public.
11       So, Mr. Black, from my viewpoint the
12 permitting of someone to escape, and go out into the
13 community, and injure a citizen -- to murder a citizen,
14 to harm the community, yes I think most of us in the
15 corrections industry, we understand the risks when we
16 decide to enter this profession.  We understand the
17 challenges of operating facilities for felons and people
18 that are very dangerous individuals.
19       Whether they're low security, medium security,
20 the bottom line is there's always risk in operating
21 prisons.  And for most of us, I think, as corrections
22 professionals and managers, permitting someone to escape
23 that's a violent offender that would do harm to those in
24 the community would, I think, probably be what many of
25 us, if not most of us, would consider to be the greatest

1 failure that we could have occur.
2       We certainly don't want to see any of our
3 staff injured.  We certainly don't want to see any of
4 our staff suffer this type of -- this type of death,
5 injury, just it's -- it's a terrible thing that happens.
6       You don't want to see that, but the bottom
7 line is, are there -- are there, perhaps, what most of
8 us as correctional professionals would believe to be a
9 greater failure?
10       Yes, sir.  I think it would be an escape where
11 harm happens to an innocent citizen.  We know the risks
12 when we're going in there and doing the work that we do.
13       But, you know, we're charged with protecting
14 the public in any respect -- in many respects.  So
15 that's why I think that that, respectfully, might be
16 considered a larger failure or bigger failure, if you
17 would, than perhaps even the loss of life of one of our
18 dedicated staff in the facilities that we operate or
19 even the dedicated bureau staff from my time and tenure
20 with the bureau where many -- or a number of officers
21 who also were -- or a number of staff members were taken
22 hostages at multiple facilities during the bureau --
23 at -- during my tenure.
24 BY MR. BLACK:
25    Q.   Okay.  So your testimony is it was not the

1 biggest -- that's not the biggest failure for a prison
2 operator to experience?
3       MR. GLENNON:  Objection.  Vague.
4       THE WITNESS:  My testimony is, I think there
5 are -- there would be a greater failure in the
6 permitting of dangerous felons to escape into the
7 community and to basically harm an innocent citizen.
8       Yes, sir, that is my testimony.
9 BY MR. BLACK:
10    Q.   Okay.  And you testified that you're aware of
11 the risks?
12       MR. GLENNON:  Objection.  Vague.
13       THE WITNESS:  Yes, Mr. Black, I think all of
14 us that are in the profession are aware of the risks
15 that our dedicated staff take day in and day out when
16 they go in and out of prisons or secure facilities, yes,
17 sir.
18 BY MR. BLACK:
19    Q.   Hold on one second.  Okay.  Let's move on to
20 this document.
21       Can we turn to tab 10, which will be both in
22 Mr. Murray's binder number 10, and has been previously
23 marked as Exhibit 76.
24    A.  Okay.  I believe I have it, Mr. Black.
25    Q.   Okay.  I think everyone else has it, too.

Confidential

Donald William Murray, Jr.                                    Grae vs.
                                          Corrections Corporation of America, et al.

1    All right. Who are --
2        MR. GLENNON: Can you just give us one moment?
3 It's still downloading. The link just popped up. All
4 right. We're good. Thank you.
5        MR. BLACK: Okay.
6 BY MR. BLACK:
7    Q.  Who are Michael Nalley and Keith Hall?
8    A.  Mike Nalley was the former vice president of
9 one of our business units that included BOP facilities,
10 and Mr. Hall is a former managing director of operations
11 over one of the divisions within Mr. Nalley's business
12 unit.
13   Q.  Okay. And you see the first page of this
14 document appears to be an e-mail to Mr. Nalley and
15 Mr. Hall explaining that a third party AMI is conducting
16 a series of ethical culture evaluations.
17       Do you see that?
18   A.  Yes, sir, I do.
19   Q.  Okay. And if you turn the page, this document
20 is what was attached to that e-mail.
21   A.  I'm sorry. I'm going to adjust my keyboard
22 for one minute to push things back so I can easily
23 access the notebook which is getting a little wider
24 here. Okay.
25       Thank you. Is that still good for the

1 videographer?
2        Yes, sir. I see the attachment here.
3    Q.  Okay. Do you recognize this document?
4    A.  I have not seen this document before, no, sir.
5    Q.  Okay. You understand -- or do you see the
6 title of it is "Briefing Report on Adams Correctional
7 Facility"?
8    A.  Yes, sir. I do see that.
9    Q.  Okay. And you see that this was sent in 2015?
10   A.  Yes, sir. I believe it was July 27, 2015.
11   Q.  Okay. Do you want to just maybe review the
12 first four paragraphs of the report and get a sense of
13 what it is? You don't have to read out loud, just so
14 you understand.
15   A.  Okay. Sure. Just give me a moment here
16 please.
17   Q.  Yeah. Take your time.
18   A.  Okay.
19   Q.  Okay. So Mr. Murray, when we earlier reviewed
20 what's tab 1 of your binder, the disclosures about some
21 of the things you might testify as to, one of the issues
22 was CoreCivic's compliance with contractual
23 requirements, but also company standards and third party
24 standards.
25       Do you remember that?

1    A.  Yes.
2    Q.  Okay. And Affiliated Monitors is a third
3 party that reviewed the Adams facility; is that correct?
4        MR. GLENNON: Objection. Foundation.
5        THE WITNESS: That -- yes, sir. I believe
6 that would be accurate based upon this report to
7 Mr. Craddock.
8 BY MR. BLACK:
9    Q.  Does this report appear to concern the Adams
10 riot we were just talking about or does it appear to be
11 more broad than that?
12       MR. GLENNON: Objection. The document speaks
13 for itself. Vague. Foundation.
14       THE WITNESS: I haven't read all of it, but it
15 appears to be more broad than just focused in that area.
16 Excuse me.
17 BY MR. BLACK:
18   Q.  So you see on -- starting on page 2, it has
19 observations -- or at least there is a headline that
20 says "Observations," and then under that the first thing
21 it says, "management challenges have impacted staff
22 moral and ethical culture."
23   A.  Yes. I see that.
24   Q.  Okay. Can you turn to the next page, please.
25 And if you need a moment to review anything, just let me

1 know.
2        Do you see that the first area addressed on
3 page 3 of this document -- well, page 3 of the report,
4 page 4 of the exhibit is "High Turnover Rate" --
5    A.  Yes. Mmmm-hmmm.
6    Q.  -- on staffing.
7        Do you see on the next page -- so this is the
8 page -- actually if you look at the bottom right corner,
9 it says Daugherty_995 or if you look at the top it says
10 page 4.
11   A.  And that would be starting with "perception of
12 a lack of appreciation," is that accurate?
13   Q.  Yes.
14   A.  Is that the correct page?
15   Q.  Top of page 4.
16   A.  Yes. Uh-huh. I see that.
17   Q.  Okay. And do you see there's a section on
18 "fear of retaliation"?
19   A.  Yes. I see that section, yes, sir.
20   Q.  Okay. And take a moment to read this
21 paragraph.
22   A.  Okay. I've completed it.
23   Q.  Do you see where it says, "the overwhelming
24 feedback we received from corrections officers in
25 particular is that they fear they will be retaliated

Confidential

Donald William Murray, Jr.

Grae vs.
Corrections Corporation of America, et al.

1 against if they raise any issue reporting a concern"?

2     A. Yes, sir. I do see that.

3     Q. As an expert, how do you measure the fear of

4 retaliation at CCA's facilities versus the fear of

5 retaliation at BOP-run facilities?

6     MR. GLENNON: Objection. Vague.

7     THE WITNESS: I don't know that the BOP has

8 ever had Affiliated Monitors, Inc. ever conduct a

9 similar type of survey or evaluation of the staff

10 climate at the Federal Bureau of Prisons.

11     So, I'm sorry, I don't have a basis to

12 compare, since we obviously have retained one group that

13 I don't believe the Federal Bureau of Prisons has

14 retained to do a similar analytic comparison of their

15 facilities.

16 BY MR. BLACK:

17     Q. Do you know whether the BOP has ever retained

18 Affiliated Monitors, Inc.?

19     A. No, sir, I do not. I do know that they used

20 to conduct staff and inmate climate surveys because I

21 used to participate in those.

22     Q. Okay.

23     A. In fact, I helped draft some of the climate

24 survey questions that were utilized in assessing staff

25 perspectives and perceptions of facility operations and

1 the climate of BOP facilities.

2     So I -- if that's helpful. The Affiliated

3 Monitors group, I don't know whether they have or have

4 not conducted a review of BOP facilities in a similar

5 manner as what they were asked to review CoreCivic's

6 facilities.

7     Q. Going back to page 3, in the middle section

8 under "perceived lack of respect," do you see in the

9 second to last sentence it says, "Adams was not a good

10 place to work"?

11     A. Yes, sir, I do see that --

12     MR. GLENNON: I'm sorry. Kenny,

13 can you direct me?

14     I mean, we're jumping around a little bit.

15 I'm not seeing.

16     Where exactly are you?

17     MR. BLACK: Page 3.

18     MR. GLENNON: Yep.

19     MR. BLACK: Under "perceived lack of respect."

20     MR. GLENNON: Okay.

21     MR. BLACK: The second to last sentence and

22 that's the last half of that second to last sentence.

23     The full sentence reads, "staff indicated that

24 the work environment had become unstable, and therefore

25 Adams was not a good place to work."

1     MR. GLENNON: Okay. Found it. Thank you.

2 BY MR. BLACK:

3     Q. Okay. Sorry. We're going to turn back one

4 more time to page 2, which has a -- directly under

5 "observations," the title is "management challenges have

6 impacted staff morale and ethical closure."

7     So my question is similar to the one I just

8 asked, how do you measure the degree to which -- or the

9 existence of whether management challenges have impacted

10 staff morale and ethical culture?

11     MR. GLENNON: Objection. Vague.

12     THE WITNESS: I'm sorry, Mr. Black, could you

13 help me clarify what you're -- what you're asking?

14 I'm --

15 BY MR. BLACK:

16     Q. Okay --

17     A. I want to answer fully, I'd like to clarify

18 what it is that you're --

19     Q. Let me try to make it clearer and I'll maybe

20 break it into two parts.

21     A. Thank you.

22     Q. AMI has stated right here on page 2,

23 "management challenges have impacted staff morale and

24 ethical culture."

25     Do you see that?

1     A. Yes.

2     Q. So that's a conclusion that they have made?

3     A. Mmmm-hmmm.

4     MR. GLENNON: Objection. Foundation.

5 BY MR. BLACK:

6     Q. Whether or not that's accurate, how would you

7 go about measuring whether or not management challenges

8 have impacted morale or culture between the BOP and CCA

9 on prisons?

10     A. That's a very good question in the sense that

11 I'm not sure how Affiliated Monitors actually reached

12 that conclusion. I don't know what they utilized or

13 what's in their -- I believe proprietary surveys, what

14 types of questions they utilized to, you know, to help

15 make that determination versus what might be used by

16 other type of survey materials.

17     So I -- I would like to be able to answer

18 that, but not having access to Affiliated Monitors'

19 tools that they used to interview and evaluate this

20 section in terms of generating an idea about management

21 challenges, I'm afraid I can't be very illuminating.

22     Q. Okay. Can we turn to page 8, please -- sorry.

23 Do you have an objection, Brian?

24     MR. GLENNON: Are we turning to page 8?

25     MR. BLACK: Yes. So page 8 of the report.

**Confidential**

Donald William Murray, Jr.                                    Grae vs.
                                    Corrections Corporation of America, et al.

1      So if you look in the top left corner it will
2  say page 8 and the bottom right corner will end in 999.
3  BY MR. BLACK:
4      Q.  All right.  In the middle of the page it says,
5  "language barrier issues," and under there it says, "we
6  learned another issue at Adams is a language barrier
7  between staff and the inmates."
8          Is that finding consistent with what the BOP
9  found and what the OIG found when they reviewed Adams?
10      MR. GLENNON:  Objection.  Vague.
11      THE WITNESS:  It sounds, perhaps similar,
12  Mr. Black, but I don't know if that's relating
13  specifically to the concerns regarding staff in the
14  ███████████ not speaking the native language
15  appropriately, or if this is a more generalized
16  assertion that -- of that concern.
17      So it sounds similar, perhaps it is, but again
18  the others seem much more specific to the ████████
███████████████  of the facility, and this seems to
20  be a little bit, perhaps, more broad.
21  BY MR. BLACK:
22      Q.  Okay.  Let's move to the next page.  This is
23  page 9.  And looking at "safety issues."
24          The second paragraph under "safety issues"
25  starts, "the other major concern reported to us was that

1  generally, because of staffing shortages, there is only
2  one person running a unit.  Some feel unsafe in that
3  situation."
4          Do you see that?
5      A.  Yes, sir.
6          That's the full second paragraph under "safety
7  issues," that's correct.  I do see that.
8      Q.  Okay.  And that's a pretty unfavorable
9  statement about the quality of security at this
10  facility, is it not?
11      MR. GLENNON:  Objection.  Vague.  Foundation.
12      THE WITNESS:  It's a statement of concern
13  about staffing shortages and that some of the people
14  interviewed did not feel completely safe, is how I would
15  read the statement.
16      MR. BLACK:  Okay.  Thank you.
17  BY MR. BLACK:
18      Q.  Let's -- let's move to tab 23, which is not in
19  your binder.  We should be on Exhibit 576.
20          (Deposition Exhibit 576 marked.)
21      MR. BLACK:  And David, I'll ask you to put it
22  on the screen for everybody.
23  BY MR. BLACK:
24      Q.  Do you see this exhibit, Mr. Murray?
25      A.  Yes, I do.

1      Q.  Okay.  Does the first page appear to be a true
2  and correct copy of an e-mail you received?
3      A.  Yes, it does.  Mmmm-hmmm.
4      Q.  Okay.
5      MR. BLACK:  David, can you scroll down to the
6  second page now, please.
7          The second page is blank.  Can you scroll down
8  to the third page -- I'll represent the second and third
9  pages were both attached to the e-mail.
10  BY MR. BLACK:
11      Q.  And can you just, you know, take a moment to
12  look at this?
13          Mr. Murray, if you're ready, let me know.
14      A.  Yeah, I'm sorry.  I'm just going through this
15  in a little bit more -- looking at the various
16  categories.
17      Yes.  I see the document.  Mmmm-hmmm.
18      Q.  Okay.  And you see under "comments," the
19  second sentence says, "the facility has been without a
20  doctor for approximately three months," and then in the
21  sentence after that, that "13 of the 15 findings related
22  to the facility not having an MD"?
23      A.  Yes.  I do see that.
24      Q.  Okay.  And those are negative findings; is
25  that right?

1      MR. GLENNON:  Objection.  Vague.
2      THE WITNESS:  They're just objective
3  statements of deficiencies that are found by virtue of
4  the facility not having a medical doctor position
5  filled, in that position.
6      Although, I can't -- I can't tell whether or
7  not they had a temporary doctor in the position or an
8  agency doc somebody else brought in, but ideally these
9  findings would not be present, but were clearly reported
10  that these were areas of concern.
11  BY MR. BLACK:
12      Q.  Okay.  So a facility doesn't want to have more
13  findings; is that right?
14      MR. GLENNON:  Objection.  Vague.
15      THE WITNESS:  No, of course not.
16  BY MR. BLACK:
17      Q.  Okay.  Let's move on to the next document.
18      So this is --
19      MR. GLENNON:  Kenny, I don't want to interrupt
20  your flow, but if you're between exhibits here would
21  this be a time for us to take a break and see if we can
22  get his computer fixed?  I think we've been on the
23  record for an hour.
24      MR. BLACK:  Let's do that.  How much time do
25  you want?

1    A.  Tab 12 in my binder.  Okay.

2    **Q.  And this should be -- this is going to be**

3  **introduced as Exhibit 577.**

4        (Deposition Exhibit 577 marked.)

5  BY MR. BLACK:

6    **Q.  Do you have the document now?**

7    A.  Yes, I do.  I have it.

8    **Q.  And does this appear to be an e-mail or an**

9  **e-mail thread that you were on and received?**

10    I see that I'm copied on it, yes.

11    **Q.  Yeah.**

12        **And do you see that this e-mail also concerns**

13  **the -- a CFM at Eden?**

14    A.  That it concerns our Eden facility, is that

15  the question?

16    **Q.  Yes.**

17    A.  Yes, I do, mmmm-hmmm.

18    **Q.  And it concerns the BOP CFM for Eden -- or at**

19  **least -- let me ask a different question.**

20        **It concerns a plan of action in response to a**

21  **BOP CFM at Eden?**

22    A.  Yes.  That's what it appears to be, yes, sir.

23    **Q.  Okay.  The second e-mail from the top, the one**

24  **that comes from Terry Jackson and goes to you and other**

25  **people, do you see that one?**

1    A.  Yes.  Mmmm-hmmm.

2    **Q.  Okay.  Do you see the second sentence in that**

3  **e-mail it says, "there is no QAM at this facility"?**

4    A.  Yes.  I see that sentence.

5    **Q.  Okay.  A QAM is a quality assurance manager?**

6    A.  That is correct.

7    **Q.  And do CCA facilities typically have a quality**

8  **assurance manager?**

9        MR. GLENNON:  Objection.  Vague.

10        THE WITNESS:  Yes.  Those are -- those are

11  typically positions that are at our facilities -- our

12  secure facilities, absolutely.

13  BY MR. BLACK:

14    **Q.  Is it important to have a quality assurance**

15  **manager at a low security facility like Eden?**

16        MR. GLENNON:  Objection.

17        THE WITNESS:  I think it's important to have

18  quality assurance managers at all of our facilities that

19  manage all of our contracts.

20        What I'm unclear on here is whether or not the

21  QAM -- when -- Ms. Jackson's statement is that there's

22  no QAM at this facility, I don't know whether or not

23  she's meaning that they're out temporarily, or that the

24  position is vacant at the facility, so I can't surmise

25  that from this e-mail, and I don't have recollection as

1  to whether or not there was a QAM vacancy at Eden at the

2  time.  So...

3  BY MR. BLACK:

4    **Q.  The second half of the sentence says, "and**

5  **their health services department is very limited."**

6        **Do you see that?**

7    A.  I do see that, yes.  Mmmm-hmmm.

8    **Q.  To your knowledge, is that referring to the**

9  **lack of a doctor and also the absence of nurses and**

10  **other medical professionals?**

11        MR. GLENNON:  Objection.  Vague.  Calls for

12  speculation.

13        THE WITNESS:  I -- I don't know that that's

14  the case.  Again, I would have to ask Ms. Jackson what

15  she was referring to, but it possibly related to their

16  staffing.

17  BY MR. BLACK:

18    **Q.  Okay.  And this is the same facility that just**

19  **received a repeat, repeat deficiency from the BOP**

20  **pursuant to it's follow-up CFM; is that correct?**

21        MR. GLENNON:  Foundation.

22        THE WITNESS:  I believe that's accurate, yes,

23  sir.  Mmmm-hmmm.

24  BY MR. BLACK:

25    **Q.  Okay.  And as managing director and then vice**

1  **president of quality assurance, your expertise is in**

2  **oversight and staffing, is that accurate?**

3        MR. GLENNON:  Objection.  Vague.

4        THE WITNESS:  Well, my expertise is in a

5  variety of areas, but most recently at CoreCivic,

6  certainly.  And internal audit processes, and evaluating

7  contract compliance, and making -- sharing that

8  information broadly as appropriate to help the facility

9  operate contractually and in a compliant manner.

10  BY MR. BLACK:

11    **Q.  Would it be one of your responsibilities to**

12  **ensure that there were quality assurance managers at**

13  **facilities that needed them?**

14        MR. GLENNON:  Objection.

15        CERTIFIED STENOGRAPHER:  Excuse me --

16        THE WITNESS:  My responsibilities include --

17        CERTIFIED STENOGRAPHER:  -- excuse me,

18  Mr. Glennon --

19        THE WITNESS:  -- helping facility wardens --

20        CERTIFIED STENOGRAPHER:  -- I didn't hear your

21  objection.

22        THE WITNESS:  -- hire quality assurance

23  managers, and when there are vacancies, we certainly do

24  just that.

25        We help in terms of the interview process to

**Confidential**

Donald William Murray, Jr.                                      Grae vs.
                                    Corrections Corporation of America, et al.

Page 185

1  the extent we can, recruiting and evaluating the best
2  candidates for those positions.  But the ultimate
3  authority for hiring is not a direct line or dark line
4  function to me directly or to the QA division at the
5  FSC.
6         The hiring authority, although I approve the
7  hires, the bottom line is that it's ultimately the
8  warden's responsibility locally and by our structure to
9  hire the local QAM, and they report directly to the
10  warden.
11  BY MR. BLACK:
12     **Q.  Who -- whose responsibility is it at CCA, if**
13  **anyone, to punish wardens that fail to hire people that**
14  **need to be hired?**
15         MR. GLENNON:  Objection.  Vague.  Foundation.
16         THE WITNESS:  Respectfully, Mr. Black, I don't
17  know that it's anyone's responsibility that's a
18  respective leader in our company to punish anyone in a
19  leadership role.  Our goal is to support our leaders and
20  give them the resources, support them in the resources
21  that they need to help operate their facilities.
22         So from a -- I -- I take issue with -- with
23  the question from a punishment perspective.  I don't
24  believe that's how we operate.  In fact, I know that's
25  not how we operate at the company.

Page 186

1         We support our leaders, try to ensure that
2  they have the resources they need to operate their
3  facilities, assist them with their recruiting needs, and
4  support them in the challenging areas that they have --
5  of the many operational areas that they have.
6         And, again, certainly health services is only
7  one of many, many important operational areas that
8  wardens have direct responsibility for in our secure
9  facilities throughout the company.
10         So our goal is not to punish, our goal is to
11  provide the resources and support for them to enable
12  them to hire the staff properly and to have them working
13  and trained.  We also participate in providing
14  onboarding training with the quality assurance managers,
15  and support them in achieving contract compliance.
16         So our goal is not punishment.  In fact,
17  removing someone as a leader from our facilities is --
18  is done with a great deal of consideration and a great
19  deal of review of how they're managing that facility,
20  and the resource constraints they may be dealing with,
21  geographic constraints imposed perhaps by being able to
22  recruit professionals in very, very challenging areas to
23  include healthcare, mental healthcare professionals.
24         It varies significantly by area in terms of
25  our ability to recruit sometimes.  And, again, this is

Page 187

1  not a business that's for everybody.  It can be a very
2  challenging business.  So the turnover rate can be
3  impacted by people that enter our facilities and
4  decide -- maybe for the first time -- and spend a few
5  months, or several months, or a year, or two years and
6  decide this is not the environment which they would like
7  to operate.
8         The healthcare area, in particular, is a very
9  challenged area, and has always been historically a very
10  challenged area to recruit healthcare, mental healthcare
11  professionals because frankly they have other attractive
12  venues to operate and to practice their professions.
13         So it -- it can be quite challenging,
14  Mr. Black, at times to recruit and maintain
15  professionals in these areas, and also line staff at
16  times because many of them are staff that are just
17  starting out or just entering the corrections
18  profession, and after a period of time and reflection
19  they decide this is not a line of work for them.
20         CERTIFIED STENOGRAPHER:  Excuse me, counsel,
21  can we go off the record?  I'm having a problem with my
22  computer.
23         THE VIDEOGRAPHER:  Going off the record at
24  4:06.
25         (Off the record at 4:06 p.m.  Back on the

Page 188

1  record at 4:15 p.m.)
2         --o0o--
3         THE VIDEOGRAPHER:  Back on the record at 4:15.
4         MR. BLACK:  Welcome back, Mr. Murray.
5         One housekeeping item.  Did we set what this
6  exhibit is?
7         So tab 13, did we set that as Exhibit 578?
8         THE VIDEOGRAPHER:  Did you introduce tab 13
9  yet?
10         MR. BLACK:  Have I not done that yet?  Oh,
11  were we talking about 12?
12         MR. GLENNON:  12 is 577.
13  BY MR. BLACK:
14     **Q.  Mr. Murray, before we went off the record, we**
15  **were talking about some of the challenges CCA faces at**
16  **some facilities.**
17         **When CCA enters into a contract with a**
18  **government partner, it knows where that facility will be**
19  **located for that contract; is that correct?**
20     A.  Yes.
21     **Q.  And CCA does an evaluation of what -- what the**
22  **labor market is like in that area?**
23         MR. GLENNON:  Objection.  Vague.
24         THE WITNESS:  I'm certain they evaluate the
25  markets based on where we built and constructed our

1 prisons, but markets are dynamic, they go up, they go
2 down, there's changes and challenges. It's not limited
3 to CoreCivic.
4        It's something that virtually every
5 correctional system faces at some of their locations at
6 different times for various reasons.
7 BY MR. BLACK:
8    **Q. And I'm sorry.**
9        **Yes, CCA does know what the labor market is**
10 **like?**
11       **No, it doesn't?**
12       **Or yes, it does, but it changes?**
13   MR. GLENNON: Object to form.
14       THE WITNESS: Typically we review -- in fact
15 we do review the labor markets in advance of our
16 contracts and are aware of those, but again they're
17 dynamic --
18 BY MR. BLACK:
19   **Q. You're aware of the terms of the contract**
20 **before you enter into it?**
21   A. Yes. As is the BOP. Of course --
22   **Q. And there's provisions typically in the**
23 **contract for modifications to the contract?**
24   A. Yes. That's correct.
25   **Q. So if a warden is struggling -- you just**

1 **mentioned that the labor market might be dynamic, things**
2 **might change. If a warden struggles, say he racks up a**
3 **number of deficiencies including repeat, repeat**
4 **deficiencies related to inmate deaths, and is unable to**
5 **hire doctors, has a very limited medical staff, is**
6 **unable to hire a quality assurance manager, does CCA not**
7 **punish him because it's the fault of the contract they**
8 **entered into?**
9    MR. GLENNON: Objection. Compound. Vague.
10       THE WITNESS: Again, I'm not saying,
11 Mr. Black, there's not consequences for management that,
12 upon review by leadership -- operations leadership, that
13 there are not consequences for those that do not reach
14 the objectives or perform at a level of expectation -- -
15 the high-level expectations that we have for those
16 contracts.
17       And clearly there are consequences, it's just
18 that those decisions are made prudently, respectfully,
19 and after a thorough review of the issues and concerns
20 operationally.
21 BY MR. BLACK:
22   **Q. Do you believe staffing is a challenge because**
23 **of the nature of the work?**
24   A. Yes.
25   **Q. Do you want to look at the AMI document again**

1 **where it said that Adams is a bad place to work?**
2    A. I'm sorry. Would you -- would you like me to
3 turn to that document and read it again?
4    **Q. Let me just ask it this way.**
5        **Considering that finding, do you think that**
6 **turnover is a result only of the difficult nature of the**
7 **work or are there lots of other reasons?**
8        MR. GLENNON: Objection. Compound.
9 Foundation. Assumes facts.
10       THE WITNESS: Again, I don't know how AMI
11 reached those conclusions. I don't know the totals, the
12 number of interviews that were conducted. I don't know
13 how representative they are of the facility's total
14 staff or if it was a unique limited number of staff that
15 were interviewed.
16       I don't know how they reached their
17 conclusions, but, you know, that was their opinion. And
18 again, this is the first time today that I've seen this
19 document, just a few hours ago. So I -- I can't offer
20 sort of opinions in that regard in terms of their
21 perspectives on Adams being a bad place to work or not.
22 BY MR. BLACK:
23   **Q. Okay. Let's look at a document you have seen.**
24 **Tab 13 in your binder, also tab 13 as submitted to**
25 **Aptus. And this will now be Exhibit 578.**

1        (Deposition Exhibit 578 marked.)
2 BY MR. BLACK:
3    **Q. This is an e-mail and attachment. I'm just**
4 **going to ask you to look at the e-mail.**
5        **Does this appear to be a true and correct copy**
6 **of an e-mail you received?**
7    A. This is the one from Natasha Metcalf dated
8 September 28, 2015?
9    **Q. Yes.**
10   A. In which I'm one of the recipients listed --
11 I'm copied on this e-mail. I see where I'm copied, yes.
12 Yes, it does appear to be.
13   **Q. Okay. Does the e-mail summarize the**
14 **conclusions of the BOP's, this time, full CFM?**
15       MR. GLENNON: Objection. Foundation.
16       THE WITNESS: I would have to compare it with
17 the actual CFM findings, but in reading this, I would
18 have to -- again, to be completely accurate, but I
19 believe Ms. Metcalf probably summarized it based on the
20 report she received, and made everyone on this
21 distribution of where the opportunities for improvement
22 lie, and by which major -- by which operational area the
23 bureau found those opportunities for improvement.
24 BY MR. BLACK:
25   **Q. Just looking at Natasha Metcalf's short**

**Confidential**

Donald William Murray, Jr.                                                    Grae vs.
Corrections Corporation of America, et al.

1 CAR 15 related document that asked about past
2 performance; is that right?
3        If you want to reopen tab 18 in your binder,
4 feel free.
5        MR. GLENNON: Objection. Foundation.
6        THE WITNESS: Yes. It appears they're both
7 related to the CAR 15. That is correct, Mr. Black.
8 BY MR. BLACK:
9     Q. Okay. And can you turn to what is the third
10 page or piece of paper in -- sorry.
11        This is now on the electronic version, so
12 Exhibit 581. Yes. So it will be the third page of the
13 PDF, and at the top it will say "CCA," and under that
14 "past performance."
15        All right, if it helps in the bottom right
16 corner it will say CoreCivic_1051553.
17     A. Okay. Yes.
18     Q. And then if you could scroll up to the top of
19 the page, please.
20        Okay. So here it also says "past
21 performance."
22        Do you see that?
23     A. Yes. Mmmm-hmmm.
24     Q. It says the ███████████████████
█████████████████████

1        Do you see that?
2     A. I do. Mmmm-hmmm.
3     Q. And so just reading this whole section right
4 here, does this indicate███████████████████
████████████████████████████████████████
████████████████████
8        MR. GLENNON: Objection. Assumes facts.
9 Foundation. Calls for speculation.
10        THE WITNESS: I believe the BOP is simply
11 stating tha████████████████████████████
██████████████ That's -- that's my understanding, just
14 quickly reading this, that's what it would seem to
15 indicate.
16 BY MR. BLACK:
17     Q. Okay. Would oversight of staffing be part of
18 your responsibilities as managing director of quality
19 assurance?
20     A. We review our contracts, but that is largely a
21 function of the HR team in terms of the evaluative work,
22 that is something that is constantly ongoing.
23        But when we're in our facilities and
24 reviewing, we do look at where we have vacancies and
25 turnovers, and when we have those concerns, they're

1 reported.
2     Q. Do you know if CCA cooperated with this FBI
3 investigation?
4        MR. GLENNON: Objection. Vague.
5        THE WITNESS: I would imagine fully, but I --
6 when you have an outside law enforcement agency asking
7 you to cooperate, you certainly are going to want to
8 cooperate with them.
9        So I -- I believe that we did, but I can't --
10 I'm not aware of all the details that may have
11 transpired with regard to the investigation. I would
12 imagine we cooperated fully.
13 BY MR. BLACK:
14     Q. Speaking generally about investigations such
15 as this one or investigations into the Adams riot, did
16 CCA expend resources complying with those
17 investigations?
18        MR. GLENNON: Objection. Vague.
19        THE WITNESS: Can you be more clear?
20        Are you asking if we spend money or resources
21 to conduct investigations, or After-Action Reviews, or
22 in response to the allegations against the company, or
23 both?
24 BY MR. BLACK:
25     Q. So all of the above, yes.

1        Let's take it one piece at a time.
2        Do you expend resources complying with an
3 investigation -- an investigation?
4        For example, if the FBI requests that you make
5 personnel available or provide documents, do you spend
6 money or man hours doing that?
7     A. I'm certain, yes, that we do.
8     Q. Do you expend resources hiring counsel to
9 cooperate with investigations?
10     A. I would certainly believe that we would do
11 that and have done that, yes, sir.
12     Q. Do you expend resources conducting your own
13 internal investigations?
14     A. I believe the operations division does very
15 quickly look into matters of concern and tries to
16 evaluate the opportunities for improvement and what
17 these concerns might be.
18        Yes, sir, I do believe they spend resources
19 and have staff reviewing those areas.
20     Q. How do you compare how much CCA spends
21 cooperating with investigations against how much the BOP
22 spends cooperating with investigations into BOP-run
23 facilities?
24        MR. GLENNON: Objection. Vague. Calls for
25 speculation.

Confidential

Donald William Murray, Jr.                                    Grae vs.
                                    Corrections Corporation of America, et al.

1  THE WITNESS: That's -- would be very
2 difficult for me to be able to do as the Department of
3 Justice, obviously, is the agency in which the Federal
4 Bureau of Prisons is found and responded to.
5      So it depends on -- I would imagine depends on
6 what the Bureau of Prisons does in evaluating their
7 performance versus what the DOJ might do in evaluating
8 areas of concern within BOP facilities, and whether or
9 not they have independent investigators assigned from
10 the DOJ or the FBI to come over and evaluate things.
11     I know for a fact certainly that DOJ and the
12 FBI have, in fact, investigated bureau facilities and
13 activities in bureau facilities involving potential
14 staff misconduct and suicides, et cetera.
15     So I do know that DOJ and the FBI,
16 independently, have, in the past expended resources to
17 investigate concerns, allegations within BOP facilities.
18     So yes, sir, I think -- I think we all expend
19 resources to evaluate performance concerns or other
20 areas of concern and to get to the bottom of it.
21 BY MR. BLACK:
22     Q. But you don't have the information necessary
23 to compare how much the BOP spends relative to how much
24 CCA spends cooperating with investigations --
25     MR. GLENNON: Object to form.

1 BY MR. BLACK:
2     Q. -- is that right?
3     MR. GLENNON: Same objection.
4     THE WITNESS: I'm not sure that I would
5 really -- the answer would be no. And I'm not sure the
6 answer -- I'm not sure the BOP spends -- they have the
7 additional resources of DOJ, so I'm not sure that gets
8 billed back to the Bureau of Prisons, if that makes any
9 sense.
10     The FBI has its separate budget, DOJ attorneys
11 and investigators have their own budgets, and of course
12 the BOP has its own budget as well. So you would have
13 to ask them what those expenses would be.
14 BY MR. BLACK:
15     Q. To your knowledge did CCA employees falsify
16 staffing counts or records between 2012 and 2016?
17     CERTIFIED STENOGRAPHER: I'm sorry,
18 Mr. Glennon, what was that?
19     MR. GLENNON: I'm sorry. I said objection.
20 Vague. And assumes facts.
21     CERTIFIED STENOGRAPHER: Thank you.
22     THE WITNESS: I would have to see the specific
23 statements and conclusions from those reports to -- to
24 determine that to respond to that.
25     That was an allegation, but I would have to

1 see the response to that.
2     MR. BLACK: Right.
3 BY MR. BLACK:
4     Q. You don't know?
5     A. I don't have the reports in front of me that
6 verify the accuracy of those allegations.
7     Q. Let's move to tab 19, which is in your binder.
8 And this is going to be previously marked Exhibit 225.
9     A. I have tab 19 open in front of me. It's the
10 one e-mail from Damon Hininger to John Baxter with copy
11 to Harley Lappin?
12     Q. Yes. Thank you. That is the correct exhibit.
13     Can you read the paragraph -- so it's the
14 third paragraph starting "as is customary for these
15 federal procurements"?
16     A. Okay.
17     Q. Is that paragraph indicating that although CCA
18 had the lower price for a bid, it doesn't say under
19 CAR 15, but -- in this paragraph, but is it your
20 understanding that this is the bid under -- or pursuant
21 to the CAR 15 that CCA lost the bid to GEO?
22     MR. GLENNON: Objection. Document speaks for
23 itself. Foundation. Calls for speculation.
24     THE WITNESS: Yes. I have the document. I've
25 read through the paragraphs you've asked me to.

1 BY MR. BLACK:
2     Q. Okay. Do you see the paragraph that has a
3 number 1 in front of it?
4     A. Yes, I do.
5     Q. Okay. It says "first, in the past performance
6 section of our proposal, concerns about our performance
7 in medical services at our Cibola, New Mexico and Eden,
8 Texas facilities were raised."
9     A. Mmmm-hmmm.
10     Q. You're aware, sir, that CCA did not receive a
11 renewal of the Northeast Ohio contract from the BOP?
12     A. Yes, I did. I'm aware of that.
13     Q. And you understand this e-mail is from
14 Mr. Hininger and he's explaining why CCA did not receive
15 that renewal?
16     MR. GLENNON: Objection. Foundation. Calls
17 for speculation.
18     THE WITNESS: I see that, but I also see -- I
19 don't know if we're looking -- I have some stuff on my
20 document that appears to be faded at the top, and I'm
21 not -- it's not reproduced in a manner that I can
22 determine what's Mr. -- Mr. Hininger's name. The
23 e-mail that I'm looking at, at the top states from Damon
24 Hininger to John Baxter to Harley Lappin.
25     / / / / /

Confidential

Donald William Murray, Jr.

Grae vs.
Corrections Corporation of America, et al.

1 BY MR. BLACK:

2    Q.   So I'll represent I don't know whether there

3 was supposed to be information there, and I'm not asking

4 about that information.

5    A.   Okay.

6    Q.   What I am asking about is below the e-mail

7 from Mr. Hininger to Mr. Baxter and Mr. Lappin, there's

8 an e-mail from Mr. Hininger, and it says to Hininger --

9 to Damon Hininger.

10        So presumably he forwarded an e-mail he sent

11 otherwise to himself.  And it says, "CEO update to CCA

12 BOD."

13        Do you see that?

14    A.   Yes.  I do see that.  Yes, sir.

15    Q.   And BOD is typically an acronym meaning board

16 of directors?

17        MR. GLENNON:  Objection.

18        THE WITNESS:  Yes, sir.  It's often used in

19 that way.

20 BY MR. BLACK:

21    Q.   And Mr. Hininger is the CEO of CoreCivic, or

22 at this time CCA?

23    A.   Yes.  CoreCivic.

24    Q.   Okay.  And in that e-mail on the bottom half

25 of the page you see that there are -- there is a

1 paragraph with a one in front of it?

2    A.   I do.

3    Q.   Okay.  Do you see above that one it says, "for

4 part A, CCA proposed a lower price than GEO, but our

5 total proposal was unsuccessful because of two

6 weaknesses."

7        Then it says number one "first, in the past

8 performance section of our proposal concerns about our

9 performance in medical services at our Cibola, New

10 Mexico and Eden, Texas facilities were raised."

11        Do you see that?

12    A.   Yes.

13    Q.   Can you identify any other for-profit prison

14 operator who lost a bid despite being the lowest bidder

15 where the BOP said one of the two reasons was past

16 performance in medical services at other facilities?

17        MR. GLENNON:  Objection.  Foundation.

18        THE WITNESS:  Mr. Black, I don't know simply

19 because I don't have access to all bureau communications

20 with other private providers with whom they contract.

21 And I don't --

22 BY MR. BLACK:

23    Q.   I'm not asking -- sorry.  Were you done?

24    A.   No.  I wasn't.

25        So I think also there is some -- this is only

1 one of the factors or reasons that was given, and I

2 don't know how the BOP weighted these factors.

3        I do know that the bureau typically likes to

4 have facilities all to themselves, that they typically

5 like facilities that operate solely and only according

6 to BOP contract requirements.

7        And the proposal -- our plan at Northeast Ohio

8 certainly involved more than one partner group occupying

9 the facility at the same time.  So it would be difficult

10 for me to tell you which of these reasons for the

11 non-reward was foremost and forefront in the thinking of

12 the BOP decision-makers, and which of these reasons was

13 weighed most heavily.

14    Q.   I didn't ask you what was in the forefront of

15 BOP decision-makers' minds.  I'm asking you what Damon

16 Hininger said the first reason was in an e-mail that

17 appears to be to the board of directors.

18        MR. GLENNON:  Objection.  Document speaks for

19 itself.

20        Is there a question pending?

21        THE WITNESS:  Respectfully, I -- it's pretty

22 clear what the documents state.

23 BY MR. BLACK:

24    Q.   So I read the document as clearly stating that

25 "for part A, CCA proposed a lower price than GEO, but

1 our total proposal was unsuccessful because --" first,

2 "in the past performance section of our proposal

3 concerns about our performance in medical services at

4 our Cibola, New Mexico and Eden, Texas facilities were

5 raised.  We have had challenges in the past 18 months in

6 the staffing and management of these two medical

7 departments."

8        Did I inaccurately read that?

9        MR. GLENNON:  The sentence goes on.

10 BY MR. BLACK:

11    Q.   Let's go on to more of this.

12        In subsection A --

13        MR. GLENNON:  Well, okay.  All I'm saying is

14 you stopped short of the sentence.  That's all.  I

15 didn't want the witness to be --

16        MR. BLACK:  Okay.  Noted for the record that I

17 stopped short of the end of the sentence.

18 BY MR. BLACK:

19    Q.   It goes on in subsection A to 1, to say "as

20 for these two locations presently, over the last 12

21 months we have terminated positions at both locations in

22 addition to terminating the health services

23 administrator at Cibola as a result of the BOP and our

24 quality assurance and operations teams noting in

25 frequent reviews and audits that their performance was

1 not at the level expected by us or the BOP."

2     Do you see that?

3     A.   Yes, Mr. Black, I do see that.

4     Q.   That's an unfavorable opinion regarding

5 overall quality of CoreCivic's operations; is that

6 right?

7         MR. GLENNON:  Objection.  Vague.

8         THE WITNESS:  That's an opinion, from my

9 perspective, as to a specific concern in two facilities

10 operated for the bureau by the Bureau of Prisons in one

11 specific operational area, not the entire wide-ranging

12 areas of operations that we have in our facilities that

13 we operated.  And only in two of the five, I believe at

14 that time.

15 BY MR. BLACK:

16    Q.   Two of five is 40 percent?

17    A.   Yes, Mr. Black, that would be 40 percent.

18    Q.   And the problems, no matter how broad or

19 specific, cost CCA 20 percent of its BOP contracts; is

20 that correct?

21        MR. GLENNON:  Objection.  Foundation.  Calls

22 for speculation.

23        THE WITNESS:  You would have to ask the

24 bureau, Mr. Black, as to whether or not that was the

25 reason or not.

1 BY MR. BLACK:

2     Q.   So I'm reading an e-mail that says "as

3 customary for these federal procurements, we asked for a

4 debriefing from the BOP and we received it."

5         It sounds to me like CCA did ask the bureau,

6 and the bureau told them.

7         MR. GLENNON:  Objection.  Foundation.  Vague.

8 BY MR. BLACK:

9     Q.   Is that wrong?

10        MR. GLENNON:  Calls for speculation.

11        THE WITNESS:  Mr. Black, I was not a part of

12 that debriefing, so you would have to ask those that

13 were present.

14 BY MR. BLACK:

15    Q.   Okay.  You don't know the answer?

16    A.   I was not -- I was not at the debriefing, so I

17 don't know if that's the principal reason that the

18 bureau made those decisions or not.

19    Q.   Okay.  Let me ask a broader question.

20        How many BOP prisons does CCA -- scratch that.

21 Let me ask it another way.

22        How many contracts to run low security prisons

23 for the BOP does CCA currently have?

24    A.   We have, I believe, one contract, and that

25 would be the McRae facility that we've operated for many

1 years.

2     Q.   How many contracts did CCA have at the

3 beginning of 2014?

4     A.   I'd have to refresh my memory, I believe it

5 was five.

6     Q.   And would those be Adams, Cibola, Eden, McRae,

7 and Northeast Ohio?

8     A.   Yes, sir.  That would be accurate.

9     Q.   So CCA has since lost four of those contracts?

10        MR. GLENNON:  Objection.  Vague --

11        CERTIFIED STENOGRAPHER:  I'm sorry,

12 Mr. Glennon, all I got was --

13        MR. GLENNON:  Sorry.  I said -- I'm sorry.  I

14 said objection.  Vague, comma, lacks foundation.

15        CERTIFIED STENOGRAPHER:  Thank you.

16 BY MR. BLACK:

17    Q.   You can answer the question.

18    A.   We are currently operating only one facility

19 for the Bureau of Prisons, and that's our McRae

20 facility.

21    Q.   Okay.  In terms of CCA's competitiveness

22 compared to other for-profit prison operators, you're

23 aware that CCA has not won a single competitively bid

24 contract since 2011?

25        MR. GLENNON:  Objection.  Foundation.

1         THE WITNESS:  I believe that's accurate.

2         MR. BLACK:  Okay.  Why don't we take a break --

3         THE WITNESS:  Excuse me, Mr. Black, may I

4 qualify my answer?

5 BY MR. BLACK:

6     Q.   Yes.

7     A.   Did you ask the question -- I'm sorry.  I

8 should have been listening more specifically.  I'm doing

9 my best here.

10        Did you say low security facility?

11    Q.   I believe I said low security facility, yes.

12 Let me pull up the -- did that answer your question?

13    A.   Yes.  You did ask about low security

14 facilities?

15    Q.   Correct.

16    A.   The reason I asked is because we have had

17 other BOP contracts that we have won since that time

18 period.  So I -- I want to make sure I was answering

19 accurately for you and for the record.

20    Q.   Okay.  Have you completed qualifying your

21 answer?

22    A.   Yes, sir, I have.  Thank you.

23        MR. BLACK:  Okay.  I was going to propose that

24 we go off the record.  Does that -- does that work for

25 everyone?