# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | ) | Civil Action No. 3:16-cv-02267 |
| | ) | |
| Plaintiff, | ) | Honorable Aleta A. Trauger |
| | ) | |
| | ) | Magistrate Judge Jeffrey S. Frensley |
| vs. | ) | |
| | ) | |
| CORRECTIONS CORPORATION OF AMERICA, et al., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## <u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF JUSTIN MARLOWE</u>

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................................1

II.   QUALIFICATIONS AND OPINIONS.................................................................4

    A.    Dr. Marlowe's Qualifications ...............................................................4
    B.    Dr. Marlowe's Opinions .......................................................................5

III.  LEGAL STANDARD.............................................................................................8

IV.   ARGUMENT ........................................................................................................9

    A.    Dr. Marlowe Is Qualified In The Field Of Government Cost Accounting.............9
    B.    Dr. Marlowe's Opinion Is Reliable And Based On His Experience....................11
        1.    Dr. Marlowe Applied Experience And Literature To Reach His Opinions...........11
        2.    Plaintiff's Argument That No Sound Methodology Exists Is A Red Herring.........14
        3.    Dr. Marlowe Is Not Required To Draw Conclusions Regarding The Quality Of Prison Services To Provide An Opinion On Cost ...........16
        4.    Plaintiff's Factual Challenges Do Not Provide A Basis For Exclusion.............18
    C.    Dr. Marlowe's Opinions Are Relevant And Helpful ...........................................20
    D.    Dr. Marlowe's Opinions Do Not Constitute Legal Conclusions .........................23

V.    CONCLUSION......................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

### CASES

*Aguirre v. Mitsubishi Motors N. Am., Inc.*,
No. 3:11-CV-00225, 2012 WL 4506009 (M.D. Tenn. Sept. 28, 2012).............................9, 16

*Aventis Envtl. Sci. USA LP v. Scotts Co.*,
383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005).................................................................19

*Avery Dennison Corp. v. Four Pillars Enter. Co.*,
45 F. App'x 479 (6th Cir. 2002) ...............................................................................17

*Babb v. Maryville Anesthesiologists P.C.*,
942 F.3d 308 (6th Cir. 2019) .................................................................8, 23, 24

*Berry v. City of Detroit*,
25 F.3d 1342 (6th Cir. 1994) ...........................................................................23, 24

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) .................................................................................20

*Dilts v. United Grp. Servs., LLC*,
500 F. App'x 440 (6th Cir. 2012) ........................................................................9, 10

*In re Heparin Prods. Liab. Litig.*,
803 F. Supp. 2d 712 (N.D. Ohio 2011).....................................................................12

*Kiker v. SmithKline Beecham Corp.*,
No. 2:14-CV-2164, 2016 WL 8189286 (S.D. Ohio Dec. 15, 2016).......................................12

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999).......................................................................................8, 11

*Lee v. Metro. Gov't of Nashville & Davidson Cty.*,
596 F. Supp. 2d 1101 (M.D. Tenn. 2009), *aff'd in part on other grounds*, 432
F. App'x 435 (6th Cir. 2011) ...............................................................................11

*Little v. Budd Co.*,
No. 16-4170-DDC-KGG, 2018 WL 6065263 (D. Kan. Nov. 20, 2018) ................................21

*Matter of J.M. ex rel. Mata v. Tennessee Dep't of Educ.*,
No. 3:17-CV-00405, 2018 WL 8693347 (M.D. Tenn. July 3, 2018) ..................................9, 16

*McMahan & Co. v. Wherehouse Ent., Inc.*,
900 F.2d 576 (2d Cir. 1990)....................................................................................20

ii

*Medlin v. Clyde Sparks Wrecker Serv., Inc.*,
  59 F. App'x 770 (6th Cir. 2003) ........................................................................24

*In re Nat'l Prescription Opiate Liab. Litig.*,
  No. 1:17-MD-2804, 2019 WL 4011855 (N.D. Ohio Aug. 26, 2019)......................................17

*In re Nat'l Prescription Opiate Litig.*,
  No. 1:17-MD-2804, 2019 WL 4043943 (N.D. Ohio Aug. 26, 2019)......................................12

*Neal v. Fort*,
  No. 3:15-CV-0425, 2017 WL 395006 (M.D. Tenn. Jan. 30, 2017) ................................13, 14

*Pagan-Aponte v. McHugh*,
  No. 3:09-cv-0800, 2011 WL 1789962 (M.D. Tenn. May 10, 2011), *aff'd*, 510
  F. App'x 438 (6th Cir. 2013) ........................................................................22

*Rose v. Matrixx Initiatives, Inc.*,
  No. 07-2404-JPM/tmp, 2009 WL 902311 (W.D. Tenn. 2009)................................................16

*Schlueter v. Ingram Barge Co.*,
  No. 3:16-CV-02079, 2019 WL 5683371 (M.D. Tenn. Nov. 1, 2019)....................................20

*Secs. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*,
  215 F. Supp. 3d 267 (S.D.N.Y. 2016)..............................................................10, 13

*In re Skechers USA, Inc. Secs. Litig.*,
  444 F. Supp. 3d 498 (S.D.N.Y. 2020)..................................................................20

*Smith v. Pfizer Inc.*,
  714 F. Supp. 2d 845 (M.D. Tenn. 2010)..............................................................9, 13

*Spears v. Cooper*,
  No. 1:07-CV-58, 2008 WL 5552336 (E.D. Tenn. Nov. 17, 2008) ........................................11

*Stagl v. Delta Air Lines, Inc.*,
  17 F.3d 76 (2d Cir. 1997) ..............................................................................10

*Tamraz v. Lincoln Elec. Co.*,
  620 F.3d 656 (6th Cir. 2010) ............................................................................9

*Tyus v. Urban Search Mgmt.*,
  102 F.3d 256 (7th Cir. 1996) ..........................................................................21

*United States v. Akers*,
  No. 7:19-CR-7-REW-EBA, 2020 WL 1923179 (E.D. Ky. Apr. 21, 2020)..........................24

*United States v. Arrow-Med Ambulance, Inc.*,
  No. 17-CR-73-JMH, 2018 WL 1902682 (E.D. Ky. Apr. 20, 2018) ........................................24

iii

*United States v. Frazier*,
    442 F. Supp. 3d 1012 (M.D. Tenn. 2020) ................................................................8

*United States v. Hall*,
    93 F.3d 1337 (7th Cir. 1996) ..............................................................................21

*United States v. L.E. Cooke Co.*,
    991 F.2d 336 (6th Cir. 1993) ..............................................................................11

*United States v. Mallory*,
    902 F.3d 584 (6th Cir. 2018) ..............................................................................11

*United States v. Ramer*,
    883 F.3d 659 (6th Cir. 2018) ..............................................................................11

*United States v. Romano*,
    859 F. Supp. 2d 445 (E.D.N.Y. 2012), *aff'd*, 794 F.3d 317 (2d Cir. 2015) ..........................19

*Waite v. All Acquisition Corp.*,
    194 F. Supp. 3d 1311 (S.D. Fla. 2016) ................................................................21

## RULES

Fed. R. Civ. P. 26(a)(2) ..............................................................................12, 13

Fed. R. Civ. P. 37 ..........................................................................................12

Fed. R. Evid. 702 ...............................................................................9, 20, 21, 22

Fed. R. Evid. 704 ..........................................................................................23

iv

## I. INTRODUCTION

Plaintiff challenges, among other statements, certain of CoreCivic, Inc.'s ("CoreCivic") statements regarding cost savings relative to its government partners. Consolidated Complaint ¶¶ 148, 150, 153, 156, 158, 163, ECF No. 57 ("Compl."). There is no shortage of peer-reviewed research, studies, academic literature, and analyses (privately funded and by the government itself) of cost comparisons, aimed to answer the complex and politically charged question of whether private prisons, on the whole, save the government money. The equivocal conclusions reached in those studies stem, in part, from the reality that public and private prison operators do not track costs in the same manner. No "apples-to-apples" comparison of *all* costs associated with operating public versus private prisons can be done, and there is no universally accepted methodology for comparing public versus private prison service delivery models. *See infra* Section IV.B.2. Thus, an evaluation of CoreCivic's statements regarding relative cost savings requires the jury to understand CoreCivic's methodology for cost comparison, including adjustments made and assumptions used (for example, how per diem rates are calculated)—and what terms of art like "cost effectiveness," used by CoreCivic, mean in the context of a private service delivery model.

For this reason, CoreCivic retained Dr. Justin Marlowe, an expert in public finance and governmental cost accounting. Dr. Marlowe is an academic with decades of experience working with and advising government agencies in evaluating the cost of services, including comparing public and private models for delivering government services. His knowledge will help the jury understand the evidence as it relates to cost savings and the methodologies used by CoreCivic to compare costs. Plaintiff raises a host of scattershot challenges to his opinions, none of which provides a legal basis to exclude Dr. Marlowe's testimony:

*First*, Plaintiff's argument that Dr. Marlowe is "no more qualified than an average juror" is a non-starter. *See* Mem. of Law in Supp. Of Pl.'s Mot. to Exclude Expert Test. of Justin Marlowe

at 1, ECF No. 358, ("Mem.").  Plaintiff cannot seriously question Dr. Marlowe's wealth of experience comparing costs of public and private service delivery models.  The fact that he has not, until now, applied that expertise to *prisons* makes no difference.  Nor does it matter that Dr. Marlowe never worked for the Bureau of Prisons ("BOP") or CoreCivic.  He is an expert; not a percipient witness.

*Second*, Plaintiff's various arguments that Dr. Marlowe's opinions are unreliable are equally flimsy.  Specifically:

- Plaintiff claims that Dr. Marlowe employed "no discernable methodology."  Mem. at 5.  A review of his 35-page August 7, 2020 expert report, appendices and exhibits thereto confirms otherwise.  Ex. 1[1], ECF No. 359-1 ("Report").  Dr. Marlowe permissibly relied on his experience and academic literature on government cost accounting to evaluate CoreCivic's cost comparison methodologies and resulting cost savings statements, and did so with the same intellectual rigor as he would apply (and has applied) in evaluating cost comparisons for any government agency or conducting a peer review.

- Plaintiff asserts that "no sound methodology" exists, because cost comparisons can vary widely depending on the assumptions used and the data needed to perform a comparison of *all* costs between public and private prisons is unavailable.  Mem. at 6.  This is a red herring.  The limitations of cost comparisons are well-documented, but that does not mean such comparisons are not, and cannot be, performed.  Dr. Marlowe acknowledged these limitations.  Moreover, Dr. Marlowe did not seek to perform his own cost comparison.  Rather, he opined on the reasonableness of CoreCivic's cost comparison statements based on his own analyses conducted using the data that *was* available and the data actually used by CoreCivic, in light of the standards set forth in government cost accounting and academic literature.

- Plaintiff points out that Dr. Marlowe does not opine on the quality of CoreCivic's services, which also bears on certain of the challenged statements in this case.  *Id.* at 7-8, 10.  But there is no legal requirement that an expert address every aspect of Plaintiff's claim.  Consistent with his expertise, Dr. Marlowe addressed only the cost comparisons

---

[1] Unless otherwise specified, the exhibits labeled numerically herein refer to the exhibits to the Declaration of Willow Radcliffe (ECF No. 359) filed in support of Plaintiff's Motion to Exclude the Testimony of Justin Marlowe, and the exhibits labeled alphabetically herein refer to the exhibits to the concurrently filed Declaration of Meryn C. N. Grant.

embedded in CoreCivic's public statements.  (Defendants'[2] expert Scott Dodrill will testify to the quality of CoreCivic's services relative to the BOP).

Plaintiff also raises several minute factual challenges to citations in Dr. Marlowe's Report.  None of those challenges are correct, and in any event, they are not a basis to exclude his opinions.

*Third*, Plaintiff's argument that Dr. Marlowe's opinions will not be helpful to the jury because CoreCivic's cost savings statements were made "in the English language" is just silly. Mem. at 1.  If this were the standard, experts would never be needed, because all jurors can read. Dr. Marlowe's testimony is relevant and helpful because laypersons cannot be expected to have any knowledge of the methodologies of comparing costs of government versus private services, nor can they be expected to conduct the analyses of available data necessary to assess the accuracy of CoreCivic's statements.  *See, e.g.*, Ex. 1 at Exs. 4, 5, 6, 7.1 & 7.2.  Numerous courts have admitted similar opinions providing jurors with industry standards and academic literature from which to draw upon in evaluating statements made "in English."

*Fourth*, Plaintiff's argument that Dr. Marlowe's opinions should be excluded as legal conclusions ignores the fact that Dr. Marlowe expressly disavowed providing an opinion on any legal issue, including anyone's (Defendants' or investors') state of mind.  That his opinions might bear on the ultimate issue of whether CoreCivic's cost savings statements were truthful or made with a reasonable basis is perfectly permissible, and indeed the whole point of expert testimony.

Plaintiff has not shown a legally sufficient basis to exclude Dr. Marlowe's opinions.  If anything, Plaintiff's challenges go to the weight, not the admissibility, of Dr. Marlowe's opinions. Accordingly, Plaintiff's Motion should be denied.

---

[2] Individual Defendants Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin together with CoreCivic.

## II.    QUALIFICATIONS AND OPINIONS

### A.    Dr. Marlowe's Qualifications

Dr. Marlowe is a Research Professor at the Harris School of Public Policy and the Associate Director of the Center for Municipal Finance at the University of Chicago. Ex. 1 ¶ 1. From 2014 to 2020, he was the Endowed Professor of Public Finance and Civic Engagement at the Daniel J. Evans School of Public Policy & Governance at the University of Washington. *Id*. Dr. Marlowe holds a Doctor of Philosophy in Political Science, and both a Masters and a Bachelor of Arts in Public Administration. *Id*. He is also a Certified Government Financial Manager ("CGFM").[3] *Id*.

Within the field of public finance, Dr. Marlowe has over 20 years of experience in government cost accounting. Ex. 2 12:4-19, 284:3, ECF No. 359-2; Ex. 1 ¶ 1. The field of cost accounting "[m]easures, analyzes, and reports financial and nonfinancial information relating to the costs of acquiring or using resources in an organization." Ex. A at 4. Government cost accounting is a unique field because "federal agencies are held accountable for the manner in which they manage their budget and achieve program objectives." Ex. 1 ¶ 11. As a result, government agencies specify and employ specific standards for cost accounting to develop, manage and evaluate cost estimates for various service delivery models. *See* Ex. B at i; *see also* Ex. C. Generally, these standards require government agencies to evaluate both the costs and timing of the provision of a particular service in order to determine the best method of providing the service—*i.e.* the "service delivery model"—including whether it is more efficient for government to provide the service itself or to contract with private entities who provide the same or similar services. *See* Ex. 1 ¶ 11; Ex. 5 at -924.

---

[3] The CGFM credential is administered by the Association of Governmental Accountants. It recognizes specialized skills and knowledge in government financial reporting, auditing, and budgeting. Ex. 1 ¶ 1.

As reflected in his Report, Dr. Marlowe has extensive experience in comparing costs of different service delivery models for government agencies, and evaluating cost comparisons of government functions performed by others. Throughout his career, Dr. Marlowe has conducted "comparisons of [the] cost of government services to a private provision of services across all levels of government, state, local [and] federal . . . ." Ex. 2 19:11-19. And, he has taught courses on public finance and budgets, and specifically public-private partnerships. Ex. 1, App. A at 12. Dr. Marlowe has published "four books and more than 50 scholarly articles on a variety of issues in government budgeting, cost analysis, and financial management," including publications addressing how to apply cost accounting principles to the public sector. *See id*. ¶ 1. Dr. Marlowe has also served in various advisory capacities to government agencies, including "as a technical advisor on cost analysis methods for both the National Academies of Science and the Governmental Accounting Standards Board," Exhibit 1 ¶ 2, as a member of the National Academy of Public Administration, which "provide[s] input to Congress on . . . federal financial management issues," Exhibit 2 at 39:24-25, 40:3-6, and as an advisor to government budget offices for the states of Kansas and Washington. *Id*. 42:13-44:8. Dr. Marlowe has also served as an expert witness on government finance-related cases in federal courts, state courts, and Securities and Exchange Commission ("SEC") enforcement actions. Ex. 1, App. B.

B.      **Dr. Marlowe's Opinions**

Dr. Marlowe was asked to evaluate cost comparisons made by CoreCivic between corrections services provided by the BOP and corrections services provided by CoreCivic, which were embedded within certain challenged statements regarding cost savings and cost effectiveness. Ex. 1 ¶ 5; *see also id.* at Exs. 2.1 & 2.2.

Dr. Marlowe began his analysis by setting forth the basic principles of government cost accounting, including the "legal considerations surrounding the costs of the goods and services"

delivered by federal government agencies. Ex. 1 ¶ 11. Dr. Marlowe outlined the guidelines and best practices for government expenditures and budgeting set forth by the Office of Management and Budget ("OMB") and explained that the OMB relies on the Government Accountability Office ("GAO") to evaluate compliance with regulations and guidelines. *Id*. He also explained how those requirements apply to government agencies such as the BOP, specifically, that the OMB directs the BOP to consider the use of private contractors before spending public money. *Id.*

Dr. Marlowe next summarized existing academic literature comparing costs of public and private prison operators. *Id.* ¶ 21. Several key points guide his later analysis:

- According to academic literature, the "four core reasons why comparing private and public correctional facilities['] costs is a complex endeavor, and why the precise measurement of cost savings may vary based on the methodology and assumptions employed" are: (1) "there is no one universally accepted methodology for comparing costs"; (2) differences between public and private corrections facilities require any cost comparisons to use "assumption-based cost adjustments"; (3) such a cost comparison also requires consideration of certain different types of cost factors inherent to outsourcing versus operating a facility "in-house"; and (4) the data needed to perform this type of cost comparison is not readily available. *Id.* ¶¶ 21-25.

- Cost comparison studies, cumulatively, identify "three principal bases for the cost savings generated by private correctional facilities: construction-related costs, personnel costs, and private-sector competition." *Id.* ¶¶ 27-29.

- Due to the limited availability of data, in order to conduct cost comparisons between public and private prisons, it is necessary to make assumptions and adjustments. *See id.* ¶¶ 21-22. Thus, "[a]ny evaluation of a cost-comparison must look at the assumptions and definitions employed to determine whether they are reasonable and appropriate." *Id.* ¶¶ 22, 25.

Based on the applicable industry standards, academic literature and his own experience evaluating the costs of service delivery models for government agencies, Dr. Marlowe then evaluated the statements made by CoreCivic regarding its cost savings and cost effectiveness, including the cost comparison methodologies used by CoreCivic to support those statements. *See id.* ¶¶ 30-61.

*First*, Dr. Marlowe evaluated "CoreCivic's quantification of its cost savings [relative] to the BOP," summarized in Exhibit 2.1 of his Report. *See id.* ¶¶ 30-43; *id.* at Ex. 2.1. Dr. Marlowe

6

identified two types of "quantitative" statements: (1) cost savings estimates referencing a publicly available study, *id.* ¶ 31 ("[a]nnual costs savings of 12% or more substantiated by Temple University study"); and (2) comparisons of "operational cost savings" between CoreCivic and the BOP (along with other government agencies) in CoreCivic's investor presentations. *Id.* ¶ 32 ("estimating operational cost savings that ranged between 9% and 18% for 3Q 2014 to 1Q 2016"). For the first category, Dr. Marlowe reviewed the publicly available study cited by CoreCivic, noted that CoreCivic (and the study itself) disclosed it was funded by private corrections industry, and found that it "outlines the methodology and assumptions . . . employed to arrive at the cost savings estimate." *Id.* ¶ 31. For the second category, Dr. Marlowe reviewed the data used, and the assumptions employed, by CoreCivic in its comparison of BOP's published operational costs with CoreCivic's "per diem costs." *See id.* ¶¶ 31-35 (analyzing CoreCivic's disclosed data sources), ¶¶ 35-36 and Ex. 4[4], ¶¶ 37-42 and Exs. 5, 6, 7.1 & 7.2 (analyzing CoreCivic's per diem cost savings estimates).[5] He concluded that, "CoreCivic acknowledged and identified that its claims about cost savings were based on certain assumptions about how to define and measure cost effectiveness or cost savings" and "[t]hese assumptions were clearly articulated, were consistent with findings in the literature that evaluates the relative cost of the private prison industry, and were conservative." *Id.* ¶ 30; *see also id.* ¶ 43. Dr. Marlowe concluded that CoreCivic's quantitative statements—*i.e.* estimations of operating cost savings—were "supported by internal CoreCivic documents and

---

[4] In Exhibit 4, Dr. Marlowe analyzed the BOP's historical construction costs by facility to assess the real estate adjustment that CoreCivic used in calculating the per diem cost differential between the BOP and CoreCivic.

[5] Dr. Marlowe calculated CoreCivic's daily operating costs per capita and compares those costs to publicly available BOP data (Exhibit 5), calculated CoreCivic's average revenue per "Manday" (*i.e.* per day for each inmate) at only BOP-contract facilities and compared those numbers to the numbers used in CoreCivic's statements (Exhibit 6), and analyzed the impact of utilization and occupancy on CoreCivic's revenue per Manday, using CoreCivic's contractual pricing formulas (Exhibits 7.1 and 7.2).

7

publicly available information" and "reflected reasonable judgments on the cost data compared." *Id.* ¶ 8.

*Second*, Dr. Marlowe evaluated "qualitative" cost comparisons in CoreCivic's statements, summarized in Exhibit 2.2 of his Report. *See id.* ¶¶ 44-61; *id.* at Ex. 2.2. Dr. Marlowe concluded that these statements were well supported by academic literature and internal CoreCivic analyses. *Id.* ¶ 44. As part of the basis for this opinion, Dr. Marlowe explained that the terms used by CoreCivic in these qualitative statements have particular meaning in the context of government cost accounting and academic literature. *See id.* ¶¶ 9(c), 47; *id.* ¶¶ 48-50 (analyzing CoreCivic's statements about "cost savings"), ¶¶ 51-52 ("cost effectiveness"), ¶¶ 53-54 ("cost efficiency"), ¶¶ 55-57 ("competitive cost structure and economics of scale"), ¶ 58 ("value proposition"), ¶¶ 60-61 ("cost control"). For example, Dr. Marlowe opined that the term "cost effectiveness" is a "measure of whether costs are minimized for the desired *outcome*," *id.* ¶ 51, and "cost efficiency" is a "measure of how close an organization comes to minimizing the amount of resources used for the results attained." *Id.* ¶ 53. Based on how the terms are used and understood in the academic literature, Dr. Marlowe explained that these terms "did not guarantee an absolute cost savings under any and all possible assumptions, methodologies, or calculations." *Id.* ¶ 44.

## III. LEGAL STANDARD

"Federal Rule of Evidence 702 permits 'qualified' persons to testify as an 'expert' in support of a party, and to offer 'reliable' 'opinions' on relevant matters within their expertise." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019). An expert may "draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999); *accord United States v. Frazier*, 442 F. Supp. 3d 1012, 1017 (M.D. Tenn. 2020) ("When evaluating the reliability of non-scientific expert

testimony . . . the district court may forgo the Daubert factors and focus on the reliability of the expert's personal knowledge or experience.").

"Rule 702 does not 'require anything approaching absolute certainty.'" *Matter of J.M. ex rel. Mata v. Tennessee Dep't of Educ.*, No. 3:17-CV-00405, 2018 WL 8693347, at *4 (M.D. Tenn. July 3, 2018) (Trauger, J.) (quoting *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 656, 671-72 (6th Cir. 2010)). "Under Daubert, experts are 'permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline.'" *Id.* (quoting *Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 445 (6th Cir. 2012)). Where an opposing party argues that an expert "has drawn the wrong conclusions" it "go[es to] the weight of [the expert's] opinion, not its admissibility." *Aguirre v. Mitsubishi Motors N. Am., Inc.*, No. 3:11-CV-00225, 2012 WL 4506009, at *13 (M.D. Tenn. Sept. 28, 2012) (Trauger, J.).

## IV.    ARGUMENT

Plaintiff argues that Dr. Marlowe is not qualified, his opinions are unreliable, and his testimony will be unhelpful to a jury. Each of these challenges fails under Rule 702 and applicable case law governing non-scientific expert testimony.

### A.    Dr. Marlowe Is Qualified In The Field Of Government Cost Accounting

Plaintiff does not dispute that Dr. Marlowe is an expert in public finance generally and government cost accounting specifically, with extensive experience evaluating cost of government services and comparing the costs of service delivery models. *See* Mem. at 3-4; Ex. 1, Appx. A. And, Dr. Marlowe's opinions "all arise directly from" that undisputed expertise. *Smith v. Pfizer Inc.*, 714 F. Supp. 2d 845, 849-50 (M.D. Tenn. 2010) (Trauger, J.) (declining to exclude expert testimony where "opinions all arise directly from [the expert's] area of undisputed expertise"). Nonetheless, Plaintiff asserts that Dr. Marlowe is unqualified because he has never (1) worked for

a private prison operator; (2) worked for the BOP; or (3) commented on prison privatization. Mem. at 4. But Plaintiff does not identify any authority supporting these meritless arguments.

Dr. Marlowe is not a percipient witness. There is no reason why Dr. Marlowe needs to have previous work experience at the BOP, CoreCivic, or with any private prison operator (or in cost comparisons of private versus public prisons) in order to render his expert opinions. Plaintiff offers no explanation as to why comparing the costs of public or private service delivery models is any different for the BOP such that Dr. Marlowe's experience with myriad other government agencies is not applicable. There is none (and imposing such a requirement would render incompetent all academic scholarship and analysis by individuals with no personal experience in this narrow industry). Dr. Marlowe's opinion is based on the procedures and regulations applicable to agencies in the federal government generally, *see* Exhibit 1 at ¶ 11, and his professional and academic experience analyzing costs of myriad services delivery models for different types of government services. Dr. Marlowe's lack of prior personal experience with the specific subject matter of prisons does not negate his extensive qualifications and 20 years of experience in the government cost accounting field. *See Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 446 (6th Cir. 2012) ("An expert's lack of experience in a particular subject matter does not render him unqualified so long as his general knowledge in the field can assist the trier of fact"); *see also Secs. & Exch. Comm'n v. Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d 267, 273-74 (S.D.N.Y. 2016) ("If the expert has educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent" (quoting *Stagl v. Delta Air Lines, Inc.*, 17 F.3d 76, 80 (2d Cir. 1997)). Plaintiff also observes that Dr. Marlowe does not have experience "conveying [cost] comparisons to investors," Mem. at 4,

but Dr. Marlowe made clear that he is not an expert in the federal securities laws (and was not offering testimony on what investors would have understood). *See, e.g.,* Ex. 2 127:2-129:4, 219:6-18, 221:3-9, 284:18-285:5, 307:17-20.

Dr. Marlowe is qualified. Ultimately, "[w]hether [Dr. Marlowe's] . . . experience [is] too limited go[es] to the weight of his testimony, not its admissibility." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 596 F. Supp. 2d 1101, 1122 (M.D. Tenn. 2009) (Trauger, J.) (declining to exclude expert testimony), *aff'd in part on other grounds*, 432 F. App'x 435 (6th Cir. 2011).

**B.     Dr. Marlowe's Opinion Is Reliable And Based On His Experience**

Plaintiff next argues that Dr. Marlowe's opinions are unreliable and speculative because (1) Dr. Marlowe specifies no discernable methodology; (2) there is no sound methodology to compare all costs between public and private prisons; (3) Dr. Marlowe fails to address the quality of services provided by CoreCivic; and (4) Dr. Marlowe's opinions are not supported by the facts. Mem. at 4-9. None of these arguments hold water.

1.     Dr. Marlowe Applied Experience And Literature To Reach His Opinions

Where, as here, an expert is not offering *scientific* testimony, "the relevant reliability concerns may focus upon [the expert's] personal knowledge or experience." *United States v. Mallory*, 902 F.3d 584, 593 (6th Cir. 2018) (quoting *Kumho Tire Co.*, 526 U.S. at 150, 119 S.Ct. 1167); *see also Kumho Tire Co.*, 526 U.S. at 156 ("[A]n expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Such non-scientific testimony is admissible if it "has a reasonable factual basis." *United States v. Ramer*, 883 F.3d 659, 680 (6th Cir. 2018) (quoting *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993)); *see also Spears v. Cooper*, No. 1:07-CV-58, 2008 WL 5552336, at *5 (E.D. Tenn. Nov. 17, 2008) (holding it is "sufficient that [the expert] has provided sufficient explanation of his experience and how he has applied that knowledge to demonstrate that his conclusions are reliably

11

based on experience formulated in a manner indicative of reliable methodology utilized in that field."). Courts have also "admitted expert testimony as reliable where experts extrapolate their opinions from their knowledge and experience combined with a review of the relevant scientific literature." *In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 4043943, at *4 (N.D. Ohio Aug. 26, 2019) (quoting *In re Heparin Prods. Liab. Litig.*, 803 F. Supp. 2d 712, 738 (N.D. Ohio 2011)); *Kiker v. SmithKline Beecham Corp.*, No. 2:14-CV-2164, 2016 WL 8189286, at *9-10 (S.D. Ohio Dec. 15, 2016) (admitting expert opinion based on his experience, following a review of "the published peer-reviewed [] literature . . . [and] GSK's own public statements").

This is exactly what Dr. Marlowe did. Dr. Marlowe applied his experience in government cost accounting, combined with a review of relevant academic literature on the private prison industry and the available cost data, to evaluate CoreCivic's cost comparisons and related statements in the same manner that he would in the ordinary course of his work, akin to a peer review. Dr. Marlowe evaluated the terminology, data and assumptions used by CoreCivic to determine whether its cost comparisons were consistent with the principles of government cost accounting, applicable guidelines set by the federal government, standards in academic literature and publicly available data. This is the same type of work Dr. Marlowe has done and regularly does for different government agencies and in academic scholarship in comparing or evaluating comparisons of costs for different service delivery models. The methodology reflected in his Report was no less rigorous than the procedures employed by Dr. Marlowe as a matter of ordinary course in professional engagements, outside of litigation.[6]

---

[6] Plaintiff's one-sentence argument that Dr. Marlowe's 35-page report, appendices and exhibits (with extensive citations to literature on government cost accounting and studies comparing the costs of public and private prisons) was incomplete under Federal Rule of Civil Procedure 26(a)(2) is absurd, and Plaintiff's vague reference in a footnote to sanctions under Federal Rule of Civil Procedure 37 should likewise be disregarded. Mem. at 5 & n.4. Plaintiff criticizes Dr. Marlowe

Dr. Marlowe's analysis is not *ipse dixit* and he does not just ask this Court to "take his word for it," as Plaintiff suggests. Mem. at 5 (quoting *Neal v. Fort*, No. 3:15-CV-0425, 2017 WL 395006, at *4 (M.D. Tenn. Jan. 30, 2017) (Trauger, J.)). In addition to explaining how his own experience led to the conclusions he reached, *see, e.g.*, Exhibit 1 at ¶ 47 ("I discuss the meaning of the various cost terms used by CoreCivic, as they are understood in academic literature, in the practice of government procurement cost accounting generally, and specifically in the context of evaluating government contracts."), Exhibit 2 at 244:8-17 ("There's a clear body of professional knowledge that someone with my expertise has and applies to this type of analysis. And that methodology is based on . . . extensive experience in having applied that methodology to lots of different kinds of analyses of the cost of government services."), Dr. Marlowe cited a number of secondary sources and literature regarding cost comparisons of private and public service delivery models for prisons. This is commonly accepted. *See, e.g., Revelation Cap. Mgmt., Ltd.*, 215 F. Supp. 3d at 278 (denying motion to exclude expert testimony where the expert "does not rely simply on *ipse dixit* or his credentials" but "cites a number of secondary sources to support his understanding of industry practice"); *Pfizer Inc.*, 714 F. Supp. 2d at 856 (declining to exclude expert because "a review of King's report shows that . . . he relies on and frequently cites scholarly articles and studies" and then applies that understanding to the facts of the case).[7]

---

for referring back to his Report in response to an overly-broad question posed at his deposition, which asked him to outline his "methodology." *Id*. at 5 (citing Ex. 2 234:1-15); *but see also* Ex. 2 243:15-20. There is nothing improper about that. Rule 26(a)(2) simply requires Dr. Marlowe's Report to contain the full basis for his opinions. Mem. at 5. Dr. Marlowe's Report does just that, and his reference back to it made perfect sense under the circumstances.

[7] The only case Plaintiff cites, *Neal v. Fort*, No. 3:15-CV-0425, 2017 WL 395006, at *1 (M.D. Tenn. Jan. 30, 2017) (Trauger, J.), is distinguishable. There, the defendant's expert opined on "how he believe[d] [an] accident occurred," purportedly by applying the "principles[s] of physics," but the only mention of physics was in the expert report's "Summary of Conclusions," which asserted that the expert's conclusion was based on the "Principle Direction of Force" without further explanation. *Id*. at *1, *3. Nor did the expert provide any "explanation of how [his]

2. Plaintiff's Argument That No Sound Methodology Exists Is A Red Herring

Plaintiff next posits that "[w]ithout the proper data (which Marlowe does not have), there is no sound methodology to compare costs." Mem. at 6. This overly broad and unsupported assertion attacks a straw man.

No one, including Dr. Marlowe, disputes the difficulties in conducting a direct or "apples-to-apples" comparison of *all* costs between the BOP and its private operators. But that does not mean there is no sound methodology for CoreCivic, third parties, or the BOP to compare relative costs or specific categories of costs using the data that does exist. Plaintiff's argument ignores the wealth of peer-reviewed studies that compare costs of public and private prisons (cited in Dr. Marlowe's Report), based on the limited data that *is* available, using a variety of methods, adjustments and assumptions. *See, e.g.,* Exs. D, E & F; *see generally* Ex. 1 ¶¶ 21-29. And, Plaintiff further ignores the fact that government institutions like the BOP are legally required to evaluate and compare costs of different service delivery models, again, using the data they have and applying reasonable assumptions and judgments. Ex 1 ¶ 11.

Dr. Marlowe's understanding of the well-known limitations of cost comparisons was, in fact, one of the foundations of his analysis. *See* Ex. 1 ¶¶ 22-25. As Dr. Marlowe explained, "[m]ethodologies used to assess costs vary study-by-study" such that "[a]ny evaluation of a cost-comparison must look at the assumptions and definitions employed to determine whether they are reasonable and appropriate." *Id*. ¶ 22; *see also* Ex. 2 252:16-20 ("[T]here's different methodologies that can be employed that require assumptions about how we define costs and []

---

experience informed his conclusions." *Id*. at *4. Any scrutiny confirms the expert report at issue in *Neal* is a far cry from Dr. Marlowe's Report, which describes his analysis step-by-step, with extensive citations to source documents, and attaches exhibits addressing each cost comparison he evaluated.

those methodologies unfold accordingly.").  Plaintiff's argument for exclusion seems to rest on the faulty premise that Dr. Marlowe disregarded this issue and nevertheless then attempted to perform an "apples-to-apples" cost comparison.  To be clear, he did not.  Dr. Marlowe did not perform his own cost comparison of CoreCivic versus the BOP ("apples-to-apples," or otherwise), or even a cost comparison of public versus private prisons generally.  Rather, Dr. Marlowe evaluated the cost comparisons performed, and resulting statements made, by CoreCivic, akin to a peer review of a third party's work.  *See supra* Section II.B.  Because such cost comparisons can vary depending on the methodology used, Dr. Marlowe evaluated the definitions and assumptions employed in CoreCivic's quantitative comparisons of cost (or references to quantitative studies), to determine whether they reflected reasonable judgments based on the internal and public data that *was* available, just as any peer reviewer might do.  Ex. 1 ¶¶ 30-43.  He further evaluated CoreCivic's qualitative statements regarding "cost savings" and "cost effectiveness" and explained that the use of such terminology in the context of government cost accounting did not guarantee any actual, absolute or overall cost savings, but were instead appropriately qualified.  *Id.* ¶¶ 44-61.

Plaintiff can cross-examine Dr. Marlowe and attempt to establish that the conclusions he has reached are contrary to CoreCivic's internal documents or the government's research.[8]  But

---

[8] Plaintiff identifies two documents to support its argument that "no reliable methodology exists." *See* Mem. at 7.  The first is an email where a public relations contractor for CoreCivic recommends that researchers not attempt to directly compare the costs of two facilities because "[i]t's also nearly impossible to ever get an apples-to-apples comparison."  Ex. 4 at -080, ECF No. 359-4. That email is consistent with Dr. Marlowe's own acknowledgement of the well-known limitations of cost comparisons.  (And to the extent Plaintiff disagrees, Plaintiff can cross-examine him to test whether it is contrary to Dr. Marlowe's opinion.)  The second is a 2007 GAO study, which stated that "a methodologically sound cost comparison analysis of BOP and private low and minimum security facilities is not currently feasible because BOP does not gather data from private facilities that are comparable to the data collected on BOP facilities."  Ex. 5 at -924, ECF No. 359-5. Whether the BOP had sufficient data to do a methodologically sound cost comparison in 2007 has no bearing on whether CoreCivic had sufficient data five years later (let alone any bearing on Dr.

any such attack goes to the weight, not the admissibility, of Dr. Marlowe's opinions.  *See Aguirre*, 2012 WL 4506009, at *9 (finding that the argument "that the studies and articles on which [the expert] relies are distinguishable, that he has drawn the wrong conclusions . . . go[es] [to] [sic] the weight of [the expert's] opinion, not its admissibility.").  Ultimately, Plaintiff should not be permitted to pursue its substantive theory—that there is "no reliable methodology for the [cost] comparisons which are the subject of [CoreCivic]'s representations"—under the guise of a procedural motion to exclude Dr. Marlowe's opinions.  Mem. at 7.  By seeking exclusion on these grounds, Plaintiff improperly seeks an advisory ruling on the merits of its claims regarding CoreCivic's cost savings statements.  *See Matter of J.M.*, 2018 WL 8693347, at *3-4 ("[T]he gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" (quoting *Rose v. Matrixx Initiatives, Inc.*, No. 07-2404-JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. 2009)).

3.   <u>Dr. Marlowe Is Not Required To Draw Conclusions Regarding The Quality Of Prison Services To Provide An Opinion On Cost</u>

The fact that Dr. Marlowe did not address the quality of CoreCivic's services, Mem. at 7-8, is not surprising, but in any event provides no basis to exclude Dr. Marlowe's opinions regarding the costs of CoreCivic's services.  As an initial matter, many of the challenged statements concern only the cost of building or operating prisons, divorced from any value proposition that factors in the quality of CoreCivic's services.  *See, e.g.*, Defs' Mot. For Summ. J., App. A Stmt. Nos. 6-15, 21-39, 46, 51, 53-54, 56-69; 77-90, ECF No. 352-1.  But even with respect to challenged statements where costs are discussed in conjunction with quality, there is no legal or factual requirement that Dr. Marlowe (or any single expert or witness) address every aspect of Plaintiff's

_____

Marlowe's opinions), but again, Plaintiff is free to present this study to Dr. Marlowe on cross examination.

claims in order to make his (or her) testimony admissible.[9]  *See In re Nat'l Prescription Opiate Liab. Litig.*, No. 1:17-MD-2804, 2019 WL 4011855, at *5 (N.D. Ohio Aug. 26, 2019) ("That [the expert] does not respond to every issue Defendants identify, or that Plaintiffs will need to address at trial, does not make his opinions inadmissible.").  If that were the case, testimony from Plaintiff's own industry expert, Donna Mellendick—who explicitly disavows providing any opinion on CoreCivic's cost savings or cost comparisons—would be inadmissible on this basis.  Defendants are entitled to, as they have done, offer testimony from a separate expert, Scott Dodrill, on the quality of CoreCivic's services compared to the quality of the BOP's own services.  *Id.* (recognizing plaintiff permissibly "engaged a number of experts to piece together various elements of their case").

Plaintiff is free to argue at trial that Defendants' cost-related statements must be analyzed "in conjunction with the quality of CCA's services," Mem. at 8, but that does not mean that Defendants must likewise be required to present *evidence* on quality and costs together.  Whether cost and quality must go hand in hand is a question for the jury to decide, and not one that should be decided on a procedural motion to exclude expert testimony.  *See Avery Dennison Corp. v. Four Pillars Enter. Co.*, 45 F. App'x 479, 486-87 (6th Cir. 2002) (affirming denial of motion to exclude expert testimony because "[t]he 'facts' challenged . . . are rather the central questions of liability in the case, which were properly presented to the jury.").[10]

---

[9] The two government reports cited by Plaintiff, from years before the Class Period, do not establish that any cost comparison of private and public prisons *must* consider quality.  Mem. at 7.  In fact, to the contrary, one of those reports—a 2005 BOP report, Exhibit 6, ECF No. 359-6—addresses only the quality (not the costs) of a specific facility.  In its conclusion, the report states that "[i]t is important to note that cost and performance issues should be seen as opposite sides of the same coin and jointly examined," *id.* at 89, but directs the reader to a *separate* report addressing costs.

[10] Plaintiff also argues that Dr. Marlowe's opinion is unreliable because it fails to consider the cost or quality of services provided by CoreCivic's competitors.  Mem. at 8.  But the quoted

4.    Plaintiff's Factual Challenges Do Not Provide A Basis For Exclusion

Finally, Plaintiff generally claims that Dr. Marlowe's opinions are "not supported by the facts." Mem. at 8-9. These arguments are demonstrably wrong and fail as a matter of law.

*First*, Plaintiff challenges Dr. Marlowe's statement that "[t]o draw comparisons between the BOP's operating costs and its per diem, CoreCivic used its own publicly disclosed data and the data publicly released by the BOP, [which were] referenced in the footnotes of the published cost comparisons." Ex. 1 ¶ 33; Mem. at 8. Plaintiff claims that, in his deposition, Dr. Marlowe was unable to identify any footnotes in CoreCivic's "Forms 10-K or 10-Q" that reference per diem rates. Mem. at 8. That is because the "published cost comparisons" cited in Dr. Marlowe's Report are investor presentations—not Form 10-Ks or 10-Qs. Ex. 1 ¶ 33 & n.64 (citing the investor presentations and the SEC filings for comparison). A review of those investor presentations confirms that they contain footnotes with citations to CoreCivic's per diems. *See id.* n.64; *see, e.g.*, Decl. of M. Grant in Supp. of Defs.' Mot. for Summ. J., Ex. 147 at -117, ECF No. 365-03 (citing to "Operating Costs as reported by [BOP]" and CoreCivic's "Average Per Diem for All Facilities for the Months ended September 30, 2015"); *see also* Ex. 1 at Ex. 2.1 (identifying each statement and the data sources). Plaintiff simply asked the wrong question.[11]

---

hypothetical from this Court's opinion on Defendants' motion to dismiss does not remotely support Plaintiff's argument. The Court was comparing two hypothetical versions of CoreCivic. *See* Mot. to Dismiss Mem. Op. at 31, ECF No. 76 (reasoning that Plaintiff sufficiently pled materiality by alleging that CoreCivic's statements falsely represented that CoreCivic was more similar to Company B than Company A). More to the point, Defendants' statements compared the costs of services of CoreCivic and the BOP. Defendants did not make any statements comparing its costs to those of other private contractors.

[11] Plaintiff's counsel never asked Dr. Marlowe what footnotes he was referring to, hence the confusion. Neither Plaintiff's failure to ask the right question nor Dr. Marlowe's good faith attempts to answer the wrong question provides any basis to exclude Dr. Marlowe's opinion.

18

*Second*, Plaintiff claims Dr. Marlowe's reliance on "internal [CoreCivic] documents" is insufficient, because one of those documents is supposedly a "draft" created months before the Class Period. Mem. 8-9 (citing Ex. 7). That characterization seems to be based upon the fact that the document in question, a PowerPoint, was attached to an email that invited further input. Ex. 7, ECF No. 359-7. But "draft" or not, Plaintiff offers no explanation for why Dr. Marlowe cannot rely upon that PowerPoint, which contains numerous comparisons of categories of operational costs between the BOP and CoreCivic. *See id*. Such "a challenge to the facts or data relied upon by [Dr. Marlowe] does not go to the admissibility of his testimony, but only to the weight of his testimony." *United States v. Romano*, 859 F. Supp. 2d 445, 459 (E.D.N.Y. 2012) (quoting *Aventis Envtl. Sci. USA LP v. Scotts Co.*, 383 F. Supp. 2d 488, 514 (S.D.N.Y. 2005)), *aff'd*, 794 F.3d 317 (2d Cir. 2015).

*Third*, Plaintiff takes issue with Dr. Marlowe's statement that CoreCivic's 2013 Analyst Day presentation referenced "a publicly available study published by two Temple University economists," because Plaintiff claims the study was not published until April 2014. Mem. at 9 (citing Ex. 1 ¶ 31). That too is factually incomplete and thus inaccurate. *See* Ex. 7 (citing Temple University Study). Dr. Marlowe explained that in 2013 the working paper version of the study was available, and it was later published in 2014. Ex. 1 ¶ 31 n.61.[12]

---

[12] Plaintiff also asserts that it is "troubling" that Dr. Marlowe relied on a consultant, Cornerstone Research ("Cornerstone"), to provide him with internal CoreCivic documents. Mem. at 2-3. But Plaintiff does not explain why the Court should be troubled by this standard practice. Plaintiff's own industry expert, Donna Mellendick, testified that she relied entirely on *Plaintiff's counsel* to select the documents that she reviewed in forming her opinions. *See* Defs.' Mem. in Supp. of Their Mot. to Exclude the Test. of Donna Mellendick at 3 n.3, ECF No. 336-1. Dr. Marlowe testified that he directed Cornerstone's work, and had all of the documents necessary to render his opinions. *See* Ex. 2 39:4-11, 63:5-19, 64:7-15, 71:2-24. Tellingly, Plaintiff does not identify any document that Dr. Marlowe did not review that would contradict his opinions.

### C.  Dr. Marlowe's Opinions Are Relevant And Helpful

Plaintiff argues that Dr. Marlowe's opinions should be excluded as not helpful to the jury and irrelevant.  Mem. at 9-11.  Plaintiff is wrong.  Expert testimony is permitted if it "will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702(a).  In other words, testimony is admissible where it will "assist the trier of fact to understand matters that are generally outside the knowledge of the average lay juror."  *Schlueter v. Ingram Barge Co.*, No. 3:16-CV-02079, 2019 WL 5683371, at *8 (M.D. Tenn. Nov. 1, 2019) (Trauger, J.).

Here, the jurors are unlikely to be familiar with (1) government cost accounting, (2) the procedures and regulations applicable to federal government agencies' selection of public or private service delivery models, (3) academic research on cost comparisons between public and private corrections facilities, and (4) the academic or industry standards for evaluating the methodologies, assumptions and even terminology applicable to cost comparisons of government service delivery models.  The jurors are further unlikely to be able to compile the data and conduct the calculations necessary to analyze CoreCivic's statements.  *See, e.g.* Ex. 1 at Exs. 4, 5, 6, 7.1 & 7.2.  Dr. Marlowe's opinions will help the jury understand the context in which CoreCivic's statements were made—in terms of both the academic literature available on cost comparisons and terms of art used in government cost accounting—and will assist the jury in evaluating whether or not those statements were false.  *See In re Skechers USA, Inc. Secs. Litig.*, 444 F. Supp. 3d 498, 516 (S.D.N.Y. 2020) ("The key question . . . is 'whether defendants' representations, taken together and in context, would have misle[d] a reasonable investor,'" (alteration in original) (quoting *McMahan & Co. v. Wherehouse Ent., Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)); *see also City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005) ("The context of statements is often telling").  Each of Plaintiff's arguments to the contrary is unavailing.

*First*, Plaintiff argues that, because the allegedly misleading statements are in English, the jury does not require assistance in understanding them. Mem. at 9. That is not (and cannot be) the standard. All jurors can read and will have some understanding of what it means to save costs. But "a trial court is not compelled to exclude expert testimony 'just because the testimony may, to a greater or lesser degree, cover matters that are within the average juror's comprehension.'" *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996) (quoting *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996) (reversing trial court exclusion of expert testimony). Dr. Marlowe's expertise goes beyond a layperson's understanding.

*Second*, Plaintiff asserts that jurors are qualified to evaluate the cost comparisons themselves. Mem. at 9. Even if it were possible for jurors to piece together various aspects of cost comparisons—and Defendants do not believe that it is—they have no rubric to evaluate their reliability (without reviewing hundreds of pages of academic studies or text books on cost accounting). Rule 702 permits the efficient presentation of evidence on complex subjects where "[a] jury could not possibly examine every . . . publication reviewed and analyzed by Dr. [Marlowe] in his more than [two] decades of practice and research." *Little v. Budd Co.*, No. 16-4170-DDC-KGG, 2018 WL 6065263, at *10 (D. Kan. Nov. 20, 2018) (quoting *Waite v. All Acquisition Corp.*, 194 F. Supp. 3d 1311 (S.D. Fla. 2016)) (denying motion to exclude expert testimony summarizing literature). Put differently, lay jurors have no basis to evaluate whether assertions regarding costs or cost savings in the context of the provision of government services are accurate, inaccurate or within the realm of reason.

*Third*, Plaintiff repackages its argument that Dr. Marlowe is required to endorse its new theory of the case by addressing both quality and cost in order to "fit" the questions presented. Mem. at 9-10. That argument fares no better here. Dr. Marlowe's systematic and thorough

evaluation of cost comparisons in the challenged statements directly rebuts Plaintiff's allegation that CoreCivic did not provide the BOP cost savings but misrepresented that it did, and therefore is tethered both to the facts of the case and at least one of the questions presented.[13]  *Compare* Ex. 1 at Exs. 2.1 & 2.2 *with* Compl. ¶¶ 148, 150, 153, 156, 158, 163.

*Finally*, Plaintiff's argument that Dr. Marlowe's testimony that the terminology used by CoreCivic did not guarantee "an absolute delivery of cost savings" is irrelevant.  Mem. at 10-11.  But the fact that CoreCivic used specific terminology—such as "cost efficiencies" and "cost effectiveness"—that has precise meanings in the context of government cost accounting and comparison of delivery models for government services is of course relevant to an evaluation of those statements.  While one of the questions for the jury is, as Plaintiff identifies, whether reasonable investors (not an expert) would have been misled by this language, Plaintiff doesn't explain why Dr. Marlowe's opinion will not be helpful in answering this question.  *Id*. at 10-11.  Dr. Marlowe explains that "[e]quity analysts following CoreCivic during the Class Period acknowledged [the debate over cost savings in the context of prison outsourcing], discussed the methodological challenges underlying cost comparisons, and recognized benefits and cost savings from privatization."  Ex. 1 ¶ 26, *see also id*. n.48.  That equity analysts discussed the same rubric and context used by Dr. Marlowe to evaluate CoreCivic's statements confirms the relevance and helpfulness of his opinion.  *See* Fed. R. Evid. 702.

---

[13] The sole case Plaintiff cites in support of this argument, *Pagan-Aponte v. McHugh*, No. 3:09-cv-0800, 2011 WL 1789962, at *1 (M.D. Tenn. May 10, 2011), *aff'd*, 510 F. App'x 438 (6th Cir. 2013), does not support Plaintiff's attempt to require Dr. Marlowe to endorse its theory of the case. There, the court excluded expert testimony in an employment discrimination case regarding flaws in the interview process because it was irrelevant, as a matter of law, to the legal analysis of discrimination.  *See id*. at *2-3.  The Court further excluded the remaining testimony opining on the subjectivity of the interview scoring process because its subjectivity was "[s]o obvious . . . that the Court [did] not believe" the jury needed the expert to make the point.  *Id*. at n.3.

### D. Dr. Marlowe's Opinions Do Not Constitute Legal Conclusions

In a final throw-away argument, Plaintiff asserts that Dr. Marlowe's opinions will confuse the jury because they address the "reasonableness of certain statements" and therefore constitute legal conclusions. Mem. at 11. Plaintiff is (again) incorrect.

It is axiomatic that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Experts are permitted to state "opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Babb*, 942 F.3d at 317-18 (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)). "Thus, [the Sixth Circuit has] generally excluded expert testimony for stating a 'legal conclusion' *only* when the witness explicitly testifies, in 'specialized' legal terminology, that a defendant violated (or did not violate) the law." *Id*. To the contrary, here, Dr. Marlowe explicitly testified that he is not offering any legal conclusions regarding Defendants' violations of the federal securities laws. *See, e.g.,* Ex. 2 127:2-129:4. As he repeatedly made clear, he is not offering any opinion on either Defendants' state of mind when making the challenged statements, or an objective investor's state of mind when considering them. *See, e.g.*, Ex. 2 307:21-25 ("[A]re you offering an expert opinion on CoreCivic or any of defendants' state of mind when they made any of the statements at issue in this case? A. No."); *see also id*. 127:2-7, 127:21-128:10, 128:20-129:4 (reiterating the same); *id*. 307:17-20 ("[A]re you offering an opinion on any of CoreCivic's investors' state of mind? A. No."); *see also id*. 219:6-18, 221:3-9, 284:18-285:5 (reiterating the same). Rather, he opined that the cost-related statements at issue "were supported by internal CoreCivic documents and publicly available information," Ex. 1 ¶ 8, and "were reasonably and appropriately qualified in a manner consistent with research and literature on the privatization of correctional facilities." *Id*. ¶ 9. These opinions merely "give the jury" additional information "from which it can draw inferences as to the ultimate issue," which is entirely

permissible. *Babb*, 942 F.3d at 317 (quoting *Berry*, 25 F.3d at 1353); *accord United States v. Akers*, No. 7:19-CR-7-REW-EBA, 2020 WL 1923179, at *2 (E.D. Ky. Apr. 21, 2020) (declining to exclude expert opinion as legal conclusion, observing that "an expert may supply all ingredients needed to allow the jury to come to the legal conclusion presented, essentially, all the steps but the terminal legal inference").

Nor does Dr. Marlowe's use of the term "reasonableness" change this result. Mem. at 11. Dr. Marlowe does not use "reasonable" as a legal term of art, or opine that Defendants "had a reasonable basis for their statements," to convey a legal conclusion regarding intent. *Id.* He simply uses reasonable in the ordinary sense of the word to convey that the assumptions and adjustment employed in cost comparisons were well-supported by data and consistent with the academic literature.[14] The jury will not be confused by the use of such a common word. *See Akers*, 2020 WL 1923179, at *2 ("[W]here terms have common or regular significance in the vernacular, in typical usage, the dangers [of jury confusion] lessen"); *Medlin v. Clyde Sparks Wrecker Serv., Inc.*, 59 F. App'x 770, 778-79 (6th Cir. 2003) (affirming district court holding that expert's use of the term "reasonable care" did not convey a legal conclusion to the jury).

## V.     CONCLUSION

For the reasons set forth above, Plaintiff's Motion should be denied.

---

[14] For this reason, Plaintiff's cases are readily distinguishable. *See* Mem. at 11 (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994) (expert testimony was "carefully couched in the precise language used in case law, either indicating a keen awareness by [the expert] of the direction in which he had to head, or else careful coaching prior to his testimony"), *United States v. Arrow-Med Ambulance, Inc.*, No. 17-CR-73-JMH, 2018 WL 1902682, at *4 (E.D. Ky. Apr. 20, 2018) ("If this opinion testimony were credited, the jury would be forced to conclude that the defendant did not act with intent to defraud.").

DATED: January 22, 2021                    Respectfully submitted:

 /s/ Steven A. Riley
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

Morgan E. Whitworth (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600
F: (415) 395-8095
morgan.whitworth@lw.com

*Attorneys for Defendants Corrections Corporation*
*of America, Damon T. Hininger, David M.*
*Garfinkle, Todd J. Mullenger, and Harley G.*
*Lappin*

25

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System and via electronic mail:

Paul Kent Bramlett
Robert Preston Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

David J. Schindler
Brian T. Glennon
Morgan E. Whitworth
LATHAM & WATKINS LLP
355 South Grand Ave.
Los Angeles, CA 90071
david.schindler@lw.com
brian.glennon@lw.com
morgan.whitworth@lw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 South La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Avenue of the Stars, Suite 100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Avenue
Suite 601
Knoxville, TN 37902
cain@scottandcain.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike
Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER
RUDMAN & DOWD LLP
414 Union Street
Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union Street
Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

this 22nd day of January, 2021.

/s/ Steven A. Riley
Steven A. Riley (TN #6258)

2