# EXHIBIT D
# Part 1 of 14



# Private Prisons in the United States

## An Assessment of Current Practice

July 16, 1998

Douglas McDonald, Ph.D.
Elizabeth Fournier
Malcolm Russell-Einhourn, J.D.
Stephen Crawford

*With the assistance of:*
Julianne Nelson, Ph.D.
Gerald G. Gaes, Ph.D.
Scott D. Camp, Ph.D.
William G. Saylor

55 Wheeler Street − Cambridge Massachusetts
USA − 02138-1168 − 617 492-7100 telephone −
617 492-5219 facsimile

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 2 of 18 PageID #: 18395

MARLOWE_0007009

# Contents

Foreword ................................................................. i

Summary ............................................................... iii
    Does Contracting for Prison Operations Save Money? ............................ iv
    Do Privately Operated Facilities Provide Better Services? ...................... v
    Legal Issues Relevant to Contracting for Imprisonment ......................... vi
    Implications for Federal Prisons ............................................. vii

1.   **Introduction** ......................................................... 1
    The Structure of This Report .............................................. 2

2.   **An Overview of the Private Imprisonment Industry, Past and Present** ........ 4
    A Short History of Correctional Privatization ............................... 4
    Why the Private Prisons Industry Emerged ................................... 7
    State and Federal Experience with Private Prisons .......................... 10
    Contracting for Secure Confinement ........................................ 14
        Reasons for Contracting or Not Contracting ............................ 15
    Characteristics of Privately Operated Prisons ............................. 17
        Industry Concentration ............................................... 19
        Where Private Prisons are Located .................................... 19
        Facility Ownership ................................................... 20
        Facility Size ........................................................ 22
        The Functions of Private Prisons ..................................... 23
        The Private Sector's Experience with Medium and High-Security Prisoners .......... 24
        Comparing Security Classifications in Louisiana and the Bureau of Prisons ......... 27
        Inmate Programming ................................................... 29
    Expected Demand for Prison Space and Plans for Contracting with
        Privately Operated Facilities ........................................ 29

3.   **Does Contracting for Prison Operations Save Money?** ........................ 33
    Privately and Publicly Operated Facilities May Not Be Sufficiently Comparable ....... 34
    Inconsistent Accounting Procedures ........................................ 35
        Different Treatment of Capital Spending .............................. 35
        Dispersed Costs ...................................................... 36
        Assigning Overhead Costs ............................................. 37
    Studies Comparing Privately and Publicly Operated Correctional Facilities ........... 37
        State Prisons in Tennessee ........................................... 38
        Adult Prisons in Louisiana ........................................... 40
        Adult Prisons in Florida ............................................. 41
        Adult Prisons in Texas ............................................... 43
        Arizona's Prison for Men and Women ................................... 45
    Summary ................................................................... 46

| | | |
|---|---|---|
| 4. | **How Well Do Privately Operated Prisons Perform?** | 47 |
| | What Does "Performance" Mean With Respect to Prisons, Public or Private? | 47 |
| | What States Ask Contractors to Do | 49 |
| | Monitoring Contractors' Compliance | 50 |
| | Monitoring Performance as Outcomes | 51 |
| | How Well Do Privately Operated Facilities Perform Relative to Government Operated Ones? | 53 |
| | Systematic Research to Evaluate Performance of Privately Operated Prisons | 54 |
| | Summary | 56 |
| 5. | **Legal Issues Relevant to Private Prisons** | 57 |
| | The Legality of Delegating Correctional Services | 57 |
| | Liability for Private Prison Conditions | 59 |
| | Employment and Labor Relations Issues | 61 |
| | Inmate Labor Questions | 62 |
| | Other Important Legal Issues | 62 |
| |     Access to Private Prison Records | 63 |
| |     Private Contractor Access to Criminal History Records | 63 |
| |     Bankruptcy | 64 |
| |     Use of Force | 65 |
| |     Environmental Law Concerns | 66 |
| | Regulating Interjurisdictional Private Prison Contracting | 66 |
| | Legal Dimensions of Contracting | 67 |
| **Appendix 1:** | **Comparing Public and Private Prison Costs, by Julianne Nelson, Ph.D.** | 1 |
| | 1  Preliminary Findings and a Basis for Comparison | 2 |
| | 2  The Tennessee Experience: The 1995 Report of the Fiscal Review Committee (supplemented with data from the Washington State Legislative Budget Committee) | 5 |
| |     Operating Cost Estimates | 5 |
| |     Per Diem Estimates Reconciled | 6 |
| |     Spending Patterns Compared | 7 |
| | 3  The Louisiana Experience: Archambeault and Deis (1996) | 8 |
| |     Consistency and Accuracy | 9 |
| |     Appropriateness | 9 |
| |     Intertemporal Comparisons | 10 |
| |     Interpreting Regression Results | 12 |
| |     The Net Effect | 13 |
| | 4  The Florida Experience: (i) The Florida Department of Corrections; (ii) The Florida Correctional Privatization Commission; and (iii) The Florida Office of Program, Policy Analysis and Government Accountability | 13 |
| | 5  Experience with Privatization Elsewhere | 15 |
| |     The Texas Case | 15 |
| |     The U. K. Experience | 15 |
| | 6  Recommendations for Further Study | 16 |

**Appendix 2: The Performance of Privately Operated Prisons: A Review of Research, by Gerald G. Gaes, Ph.D., Scott D. Camp, Ph.D., and William G. Saylor** ............ 1
   Massachusetts and Kentucky ...................................................... 3
   California Evaluation ............................................................ 6
   Tennessee Evaluation ............................................................ 7
   Washington State Review ........................................................ 10
      Review of Quality ......................................................... 10
      Qualitative Observations of Operations in Louisiana and Tennessee .................. 11
   Arizona Evaluation ............................................................. 12
   Louisiana Evaluation ............................................................ 17
   New Mexico Evaluation ......................................................... 23
      The Probable Bias in Institution Performance Indicators Based on Staff Perceptions ..... 24
      Interpreting Institution Performance Indicators ................................... 25
      Putting the Public-Private Comparison in Perspective ............................. 27
      Other Methodological Problems .............................................. 28
   Florida Evaluation .............................................................. 28
   Summary of Existing Studies ..................................................... 31
   Outline of How the Taft Evaluation Meets the Criteria of a Sound Evaluation .............. 33
   Concluding Remarks ............................................................ 35

**Appendix 3: Legal Issues Relevant to Private Prisons, by Malcolm Russell-Einhorn, J.D.**
   1. Introduction ............................................................... 1
   2. The Legality of Delegating Correctional Services to Private Contractors Generally ....... 3
   3. Liability for Private Prison Conditions ......................................... 13
   4. Employment and Labor Relations Issues ........................................ 27
   5. Inmate Labor Questions ..................................................... 34
   6. Other Important Legal Issues ................................................ 37
   7. Regulating Interjurisdictional Private Prison Contracting ......................... 47
   8. Legal Dimensions of Contracting .............................................. 55

**Appendix 4: State and Federal Prisoners in Government and
      Privately Operated Facilities, December 31, 1997** ................................. 1

# Foreword

In the National Capital Revitalization and Self-Government Improvement Act of 1997 (Pub. L. No.105-33 § 11201(c)(3)(A)), Congress mandated that the Attorney General "conduct a study of correctional privatization, including a review of relevant research and related legal issues, and comparative analysis of the cost effectiveness and feasibility of private sector and Federal, State, and local governmental operation of prisons and corrections programs at all security levels...." In response to this, the National Institute of Corrections issued a cooperative agreement (#98K38GIG5) to Abt Associates Inc. to conduct the study.

We are grateful to Kathleen Hawk Sawyer, Director of the Federal Bureau of Prisons, who facilitated our work by asking state correctional directors to take the time to respond to our survey. We are also grateful for the support of the National Institute of Corrections, and especially to Larry Solomon, Deputy Director, who facilitated the cooperative agreement, and to Brenda Maynor, the project monitor for the Institute.

This project relied heavily upon many officials who responded to our survey requesting information about contracting practices. These include the directors of correctional systems in 48 states, in Puerto Rico, the District of Columbia, and the Virgin Islands; the administrators in these agencies who manage 91 different contracts; and the monitors of these contracts. All devoted a substantial amount of time to providing us much detailed information about these contracts, their procurement and monitoring practices, their past experience with privatization, and their future plans. We were also assisted by a number of people who responded to early drafts of the questionnaire, including staff from the Bureau of Prisons; Dale Parent and Brad Snyder, colleagues at Abt Associates; and James Austin and Darlene Grant, of the National Council on Crime and Delinquency.

The National Council on Crime and Delinquency provided us information from a survey its staff conducted of privately operated facilities; we thank James Austin, Darlene Grant, and Owen Tulloch for their assistance. Preliminary data were also obtained from the 1995 census of state and federal correctional facilities, conducted by the Bureau of Justice Statistics (BJS) and the Bureau of Census. Allen Beck at BJS facilitated this, as did the Inter-University Consortium for Political and Social Research.

Tom Rolfs, retired Director, Division of Institutions in the State of Washington's Department of Corrections, devoted a substantial amount of time interviewing by telephone a number of persons in several states who responded to our survey. We are grateful to both Mr. Rolfs and to those he interviewed, as our understanding of contracting at state government levels was enlarged by them. A number of private correctional firms also responded to inquiries from us and provided us a substantial amount of information about their operations.

Malcolm Russell-Einhorn's review of the legal issues associated with privatization benefitted from the help and guidance of several individuals. These included Richard Crane, formerly Chief Legal Counsel for the Louisiana Department of Corrections and later Vice President and General Counsel for the Corrections Corporation of America. Mr. Crane provided his reactions and suggestions at several stages in the work, including reviewing drafts of this document (included here in appendix 3).

Others who provided valuable assistance included William Collins, editor of the *Correctional Law Reporter*, Harold Sklar of the Federal Bureau of Investigation's Criminal Justice Information Division, and Michael McManus of the Texas Department of Criminal Justice. Mr. Russell-Einhorn is especially grateful to four law student interns who helped with the legal research: Valerie Simons and Charles Everage of Georgetown University Law Center, Russell Drazin of George Washington Law School, and Steve Mercer of Washington College of Law, American University.

Four others made an especially valuable contribution to this study. Julianne Nelson, Ph.D., of NW Partners, undertook an assessment of the best and most recent cost analyses of private and public correctional facilities. Her report, included here as appendix 1, was supported by a separate cooperative agreement from the National Institute of Corrections. We have relied heavily upon her work in chapter 3. A similar review of studies comparing the performance of private and public facilities was undertaken in connection with this report by Gerald Gaes, Ph.D., Scott Camp, Ph.D. and William Saylor, all of the Federal Bureau of Prisons' Office of Research and Evaluation. This review, included here as appendix 2, provides such a detailed assessment of the most significant studies in the field that we have not attempted to do more than summarize their findings in the main body of this report.

Special thanks are owed to the staff at Abt Associates, who have worked extremely hard on this project. This includes, most significantly, Joan Gilbert and Ruthel Watson, as well as Susan Anderson, and Patricia Harmon. Carl Patten's reading of several sections was also valuable.

Douglas C. McDonald, Ph.D.

# Summary

This report examines the current state of practice, law, and research with respect to privately operated prisons in the United States, at all levels of security. The body of current law relevant to privately operated prisons is reviewed, including federal and state statutes, regulations, and case law. Current knowledge regarding the cost and cost-effectiveness of privately operated prisons is assessed by means of reviews and evaluations of existing research on cost and quality of performance.

The report's focus is limited principally to contracting by state and federal governments for the private management and operation of facilities that are analogous to secure state or federal prisons. Although the private imprisonment industry also provides secure detention for defendants awaiting trial, for illegal immigrants, for prisoners transitioning back into their community, and for juveniles, such facilities are not examined here. Contracting for these latter facilities was excluded from this study for several reasons. First, state and federal correctional agencies are responsible for sending most of the prisoners held in privately operated facilities&about 80 percent of all privately held prisoners at year-end 1997. Second, most of the studies comparing cost and performance of privately and publicly operated facilities examine state prisons or their private equivalents, rather than local jails and privately operated detention facilities. To survey more than 3,000 local governments to identify their practices of contracting for privately operated detention would have required more time and resources than were available for this study.

By 1997, the numbers of adults in privately operated secure facilities of all sorts&prisons, jails, and illegal immigrant detention centers&reached about 64,000, which constituted less than three percent of the entire United States population of confined adults. The number of facilities had grown to approximately 140, and the industry's revenues probably approached $1 billion.

Information about the subset of the industry that encompasses state and federal contracting for secure imprisonment was obtained from a variety of sources, including a survey of contracting practices conducted by Abt Associates Inc. of prison administrators in all state and federal governments, in the District of Columbia, Puerto Rico, and the Virgin Islands. All but two jurisdictions provided information. This survey determined that 28 of these jurisdictions had 91 active contracts at year-end 1997 with 84 different privately operated facilities. These facilities reportedly held 37,651 prisoners at that time. The surveyed jurisdictions also reported having an additional 14,719 prisoners in still other privately operated facilities. Many of these prisoners had been transferred to another jurisdiction under the authority of an intergovernmental agreement, and the receiving government had placed them in a privately operated facility with which it had a contract. Others were held in non-secure facilities with which the governments contracted.

Ten correctional agencies were responsible for placing the vast majority of prisoners in privately operated facilities. These were, in descending order, the Federal Bureau of Prisons, the States of Texas, Florida, Oklahoma, Louisiana, Tennessee, California, Mississippi, and Colorado, and the District of Columbia. The most commonly reported reason for contracting with private management was not to reduce costs but to alleviate overcrowding in the public system and to acquire needed beds quickly. It is not surprising, therefore, that most (sixty percent) of the privately operated facilities are privately owned. In most places, contracting for imprisonment services was not taken at the initiative

of the correctional agency, but was instead mandated by either the legislature or the chief executive of the jurisdiction, typically the governor.

## Does Contracting for Prison Operations Save Money?

Even though the quest for financial savings was not given by prison administrators as their primary reason for contracting, it is no doubt a common hope among policymakers that governments will save money by doing so. Some proponents argue that evidence exists of substantial savings as a result of privatization. Indeed, one asserts that a typical American jurisdiction can obtain economies in the range of 10 to 20 percent. Our analysis of the existing data does not support such an optimistic view.

Comparing public and private prisons' costs is complicated for a variety of reasons. Comparable public facilities may not exist in the same jurisdiction. Private facilities may differ substantially from other government facilities in their functions (e.g., the private facility in Arizona houses men and women, or some in Texas that are used for drug abuse treatment services or for pre-release populations placed in halfway houses by other jurisdictions). Or they may differ in their age, design, or the security needs of inmates housed, all of which affect the cost of staffing them. Cost comparisons are also difficult because public and private accounting systems were designed for different purposes; that is, public systems were not designed principally for cost accounting. Spending to support imprisonment is often borne and reported by agencies other than the correctional department, and computation of these costs is often difficult for lack of data. The annual costs of "using up" the physical assets are not counted in the public sector, as capital expenditures are generally valued only in the year that they are made, rather than being spread across the life of the assets. Nor is the cost to the taxpayer of contracting readily apparent from tallies of payments to contractors. Governments incur expenses for contract procurement, administration, and monitoring; for medical costs above amounts capped by contracts; and for sentence computation, transportation, and other activities performed by governments. Cost comparisons often fail to account for such expenditures.

Of the approximately 140 secure confinement facilities currently in existence, or the 84 that held active contracts with state or federal agencies at the end of 1997, only a handful have been studied to learn if contracting is less costly to the taxpayer. Fewer still have employed reasonably strong research designs and reported the data in sufficient detail to permit an assessment of the validity of the findings. The results are mixed and subject to different interpretations.

Some studies report finding that contracting saved the taxpayers money; others report small differences, if any. Some of these apparent differences may not reflect actual savings but may instead be accounting artifacts, especially those associated with lower estimated costs of government overhead activities. That is, signing lower overhead costs to privately operated facilities may not result in actual savings because these costs are quite fixed. Savings will accrue to taxpayers only if (a) overhead activities are cut back as a result of contracting (an unlikely event where only a few facilities are contracted in a larger public system), or (b) if planned increases in overhead costs are averted as a result of contracting. It is unclear in the studies reviewed if purported savings associated with reduced use of government overhead functions actually resulted in less spending.

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 9 of 18 PageID #: 18402

MARLOWE_0007016

Other apparent sources of savings in some states reflect lower spending for prisoner health care and, perhaps, in other aspects of facility operations, including lower salaries for line staff in some jurisdictions. In some states, payments to contractors may be offset somewhat by accounting deductions or adjustments for contractors' tax payments to governments.

Our conclusion regarding costs and savings is that the few existing studies and other available data do not provide strong evidence of any general pattern. Some states may be willing to pay high prices for private imprisonment if they need the beds to solve short-term deficiencies. In other states, expenditures for contracting may indeed be lower than for direct public provision. However, the bottom line with respect to costs and savings is difficult to discern given the data and the assumptions made by the analysts. Drawing conclusions about the inherent superiority of one or the other mode of provision, based on a few studies, is premature.

## Do Privately Operated Facilities Provide Better Services?

Interest in better imprisonment services was infrequently given as a reason for contracting, but the issue of whether governments or private firms seek lower costs by sacrificing service quality is a major concern, especially in an environment where public safety and staff and inmate lives are at risk, and where lawsuits are common. Unfortunately, assessing the quality of imprisonment services is controversial, in part because the various objectives government and the larger society establish for prisons do not always suggest unambiguous measures. At a minimum, we expect prisons to meet the standards established by the courts.

Most contracts require that privately operated facilities conform to the law, rules, and regulations that prevail in the public correctional agency of that jurisdiction. Performance objectives are thereby framed in procedural terms, rather than outcomes to be achieved by means of imprisonment. Contract monitoring is highly variable from one jurisdiction to another, with about half of the contracts involving daily on-site monitoring by government officials.

Few studies have been conducted to compare the relative performance of privately and publicly operated prisons. Most are affected by a variety of methodological problems that severely limit the conclusions that one can draw from them. These include insufficiently comparable public facilities and insufficient attention to the possibility that observed differences resulted from dissimilar populations of prisoners or dissimilar facility designs. Given these shortcomings and the paucity of systematic comparisons, one cannot conclude whether the performance of privately managed prisons is different from or similar to that of publicly operated ones.

With respect to public safety and inmate programming, the available data do not support definite conclusions. Programs for inmates are especially important in prisons because they prepare offenders to become reintegrated into society upon their release. Well designed and implemented programs increase the likelihood that prisoners will become law-abiding citizens. The available surveys of either privately or publicly operated facilities do not provide the information needed to compare the quality of such programs or the extent of prisoners' engagement with them.

# Legal Issues Relevant to Contracting for Imprisonment

Whereas the legality of governments delegating correctional authority to private firms was much debated in the 1980s, it now appears that objections to prison privatization on constitutional delegation grounds have little force. Unless a government has absolutely no persuasive statutory authority for entering into private prison contracts, courts will be reluctant to invalidate contacts on delegation grounds. Only delegated rulemaking and adjudication functions that directly purport to exercise a government power are deemed to require special constitutional due process safeguards and to be subject to heightened judicial scrutiny. No clear case law has been developed to define with precision how general due process standards will be applied to private prisons. These issues have been handled in some states through legislation, and through contracts in others.

With respect to liability, private prisons are generally treated as "state actors" for purposes of civil rights suits, so that all relevant constitutional requirements apply with equal force to private as well as public facilities. Private prison employees do not have the advantage of "qualified immunity" shields, nor are they protected by other governmental immunities that limit monetary damages available to inmates suing over prison conditions. Governments cannot shield themselves entirely from liability by means of contracting, but they can lessen their exposure by doing so. In the vast majority of suits brought by prisoners, alleging individual rather than systemic group harms, governments will generally not be deemed to have knowledge of the specific acts and injuries, and will not be held responsible. Public correctional authority's litigation costs can be kept as low as possible by requiring that a private contractor indemnify them and have relevant public entities named as an insured on the contractor's comprehensive general liability insurance policy.

While the right to strike exists in privately operated prisons, the risk of such disruptions can be minimized by private firms seeking to have employees agree, individually or collectively, to no-strike pledges. Moreover, contractors can also insist on notification requirements that allow them to make arrangements for assumption of certain essential responsibilities in the event of a labor action.

The possibility of bankruptcy has excited much concern regarding private imprisonment, but this has not yet been a problem in the industry. The few exceptions involved some small firms that speculated by building facilities in the absence of contracts with an agency. Public correctional agencies should nonetheless seek to protect themselves against the untoward consequences of bankruptcy by means of proper monitoring and careful contracting.

Regarding the use of force, including deadly force: the major legal issue is whether the use of force is properly mandated by the relevant laws of the jurisdiction. Without proper enabling legislation or contractual provisions authorizing the use of force by designated private prison officials, it is possible that such persons and their firms could face civil and criminal liability.

Sending prisoners from one jurisdiction to privately operated prisons in another poses some special legal questions. Several jurisdictions rely not on contracts but instead on intermediary governments to place prisoners in private facilities. Several jurisdictions also lease bed space directly from private contractors in foreign jurisdictions, sometimes in prisons that are built and operated on a speculative basis. These interjurisdictional arrangements have raised questions about the sufficiency of legal authority and regulation. For example, receiving facilities may lack legal authority to allow them to

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 11 of 18 PageID #: 18404

MARLOWE_0007018

respond to a variety of critical situations, including escapes and other prison emergencies. Legislation may be needed to govern these practices.

The success or failure of a private prison arrangement may depend upon the skill with which contracts are designed and negotiated. Public authorities must give close attention to the purposes served by contracting and the degree of specificity that they seek to build into the agreement.

## Implications for Federal Prisons

Bureau of Prisons officials assert that the private sector's experience in operating higher security prisons or managing inmate populations with higher security needs is too limited to warrant the privatization of such facilities in the federal system. (Correctional authorities distinguish between the physical security of prisons and and the security needs of inmates.) To be sure, maximum security facilities and prisoners remain almost entirely in the government-operated sector: only four percent (1,661) of prisoners in privately operated facilities were classified as maximum security, whereas 20 percent (or 200,000) of all prisoners in government facilities were so classified.

The private sector's experience with what the Federal Bureau of Prisons terms medium security prisoners is more ambiguous, however. Surveyed correctional agencies reported that half of their prisoners housed in private facilities under contract at year-end 1997 were classified as medium security. But procedures for classifying prisoners according to their security needs vary from one jurisdiction to the next. It is not clear that a prisoner classified as medium security in one will be classified the same in all others. For example, a comparison of prisoners classified by Louisiana and the Federal Bureau of Prisons suggests that the private sector's experience in at least this one state may not be comparable to the federal government's practices at the medium security level.

Eighty percent of all prisoners in two privately operated facilities and in a third government operated facility in Louisiana were classified by the state as being medium security; the remaining prisoners were split evenly between maximum and minimum security. A random sample of prisoners from these three facilities was picked and they were classified according to federal procedures, which uses a four- rather than a three-tiered classification system: high, medium, low, and minimum security. Approximately 33 percent of these prisoners would have been classified as medium-security in federal prisons; 29 percent and 28 percent would have been classified as "low" and "minimum" security, respectively. The proportion of high security prisoners was the same as classified by Louisiana (10 percent). This distribution of prisoners so classified is not characteristic of medium-security prisons in the federal prison system. Rather, it is closer to that found in low-security prisons. Lacking similar data from other states, it is not possible to determine how the security needs of inmates housed in other privately operated facilities correspond to those prisoners held in federal facilities.

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 12 of 18 PageID #: 18405

MARLOWE_0007019

# 1. Introduction

This report examines the current state of practice, law, and research with respect to privately operated prisons in the United States, at all levels of security. The body of current law relevant to privately operated prisons is reviewed, including federal and state statutes, regulations, and case law. Current knowledge regarding the cost and cost-effectiveness of privately operated prisons is assessed by means of reviews and evaluations of existing research on cost or performance.

The focus of this report is limited principally to contracting by state and federal correctional agencies for the private management and operation of facilities that are analogous to *secure* state or federal prisons. Although several private firms operate correctional or pretrial detention facilities under contracts with local governments that are functionally equivalent to local jails, this report does not attempt to identify or study them. Nor does it attempt to study the practice of contracting for detention centers designed to hold illegal immigrants pending deportation, for juvenile detention or correctional facilities, or for privately operated non-secure institutions, such as halfway houses or work-release facilities, in the adult or juvenile system. Reference is made to such facilities in the historical overview of privatization in chapter two, but no sustained attention is given to them elsewhere. Also beyond the study's purview are contracts for services narrower than management and operation of the entire facility, such as contracts for health care or food services.

Several sources of information were relied upon for this report.

**Survey of state and federal correctional agencies.** To obtain the information needed to describe the breadth and variety of current practice, a mailed survey was conducted by Abt Associates, Inc., in February&March, 1998, of all correctional agencies in state governments, the federal government (the Bureau of Prisons), the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands. The questionnaire sought information about a wide range of issues. The response rate was high: all questionnaires were returned with the exception of those from two states. The findings of this survey are reported below.

**Survey of private facility operators.** A complementary survey was conducted by the National Council on Crime and Delinquency (NCCD) during early 1998. This survey was sent by mail to the firms that manage privately operated facilities in the United States; information was returned for approximately half of those facilities in existence at the time of the survey. NCCD provided Abt Associates with the applicable findings of the survey for this report.

**Surveys by other private and federal agencies.** Information about privately operated facilities was also obtained from the Center for Studies in Criminology and Law at the University of Florida. Professor Charles Thomas and his associates in Florida publish an annual census of private prisons and jails in the United States and abroad.[1]

---

[1] The most recent is Charles Thomas, Diane Bollinger, and John Badalamenti, *Private Adult Correctional Facilities Census*, Tenth Edition (Gainesville, FL: Center for Studies in Criminology and Law, University of Florida, 1997). Preliminary results from the 1998 survey (which provides data for 1997) were obtained from the center's website (http://web.crim.ufl.ed/pcp).

**Research studies.** During the past decade, a number of analysts have studied certain privately operated facilities, comparing their cost and/or performance to certain publicly operated ones. These studies, and their findings, are reviewed and assessed.

**Review of contracts, requests for proposals, and other documents.** In addition to information from the surveys, documents pertaining to specific contracting arrangements in a selected number of governments were examined. These include, variously, the requests for proposals that specify the scope and nature of the privatization project, the resulting contracts, formal requirements for monitoring contractors' performance, audit and monitoring reports, and the like.

**Interviews.** A variety of interviews were conducted with officials in state governments to clarify information reported to Abt Associates in the mail survey described above.

**Review of relevant law.** The body of law relevant to private prisons was reviewed, including federal and state statutes and regulations, as well as case law. In addition, a wide range of pertinent legal articles was consulted.

## The Structure of This Report

A brief overview of the private corrections industry in the United States is provided in chapter two. This includes: a short history of the industry's development and the reasons for it; the industry's growth; the prevalence of privately operated facilities, their size, types of prisoners held, scope of services provided, and various other characteristics; and a discussion of the prospects for future growth in the industry.

It also examines the various arrangements by which private correctional services are obtained by governments. This includes, among other arrangements: contracting with private firms to design, build, and operate privately owned facilities; contracting with private firms to manage and operate government-owned facilities; "renting" beds in privately operated and/or owned facilities on a per diem or similar basis; and using intergovernmental agency agreements to transfer prisoners to other jurisdictions, wherein they are then placed in private facilities. Chapter two also discusses the legal authorization for these various relationships, some common differences in contractual structures, payment provisions, and monitoring activities, and other topics.

State correctional administrators sometimes chose not to report non-contractual arrangements for housing prisoners in private facilities, because they were not the contracting party. (Such situations occur when a state sends prisoners to another government correctional agency, using the vehicle of the intergovernmental agency agreement, and the receiving state then places the prisoners in a contracted facility.) Although the survey attempted to identify such arrangements, we did not generally obtain much information about them.[2] The surveyed agencies did provide us with the numbers of prisoners held in privately operated facilities under such agreements, however.

---

2   Correctional agencies were not reluctant to provide these data. Rather, the Abt Associates survey failed to request specific information about them, as our questionnaire asked about contractual relationships.

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 14 of 18 PageID #: 18407

MARLOWE_0007021

Consequently, the analysis that follows is generally limited to facilities that operated under contract with state or federal governments.

What is known about the costs and savings associated with privately operated prisons is examined in chapter three. A number of studies are reviewed and their findings discussed. The data in a selected number of studies are reanalyzed for the purpose of clarifying the differences in expenditures for privately and publicly operated correctional facilities.

How the performance of privately operated facilities is measured and assessed by contracting agencies is examined in chapter four. Contracts vary in the extent to which they require performance achievement. The Abt Associates survey collected information about whether and how contracts attempt to bolster performance. Few contracts have been evaluated for cost and/or performance achievement. However, there is some research literature regarding measured performance of private and public prisons. The methods and findings of eight such studies are discussed.

The principal legal issues associated with privatization are reviewed in chapter five. It addresses both the legality of delegating the incarceration management function to private entities and the impact that this delegation has on the liability exposure of both private prison contractors and public correctional authorities.

# 2. An Overview of the Private Imprisonment Industry, Past and Present

This chapter offers a thumbnail portrait of correctional privatization. Its focus is generally on the practice of contracting with state and federal correctional agencies to hold prisoners, mostly convicted, who would otherwise be in government operated prisons. It begins with a brief history of the industry since the mid-1960s and a discussion of why private prisons emerged. It then describes several different constellations of public/private involvement in owning and operating prisons, state-to-state variation in experience with privately operated prisons, reasons why some state or federal agencies have chosen to contract or not to contract, where privately operated facilities are located, their size, their experience with housing higher-security prisoners and with operating programs for prisoners. Finally, correctional agencies' plans regarding growth and future privatization are discussed.

## A Short History of Correctional Privatization

The phenomenon of private prisons and jails came into the public eye in the mid-1980s, when the fledgling Corrections Corporation of America (CCA) offered to take over the entire State of Tennessee's troubled prison system, with a 99-year lease from the state, for which it would pay $250 million dollars. CCA would, in return, house the state's convicted prisoners for a negotiated per diem payment. Moreover, it would guarantee that the prisons would meet the standards set by a federal judge, who had earlier found the state's correctional system to be in violation of the U.S. Constitution because of the conditions of confinement in its prisons. The state refused, but the offer ignited widespread press attention and public debate.

Despite the apparent novelty of the idea, privately operated correctional facilities were not new in this country.[3] Private imprisonment had been common in earlier centuries in both England and the United States. By the beginning of this century, however, governments nearly everywhere had assumed responsibility for imprisonment and most other criminal justice functions.[4] By mid-century, the notion that governments were responsible for the administration of justice, and especially imprisonment, had become so well entrenched that many argued that imprisonment is an "intrinsic" or "core" function of government.[5] But even though state responsibility for imprisonment was well

---

3   A longer discussion of this history can be found in Douglas McDonald, "Private Penal Institutions," in Michael Tonry (ed.), *Crime and Justice: A Review of Research* (Chicago, IL: University of Chicago Press, 1992); "Introduction," in Douglas McDonald (ed.), *Private Prisons and the Public Interest* (New Brunswick, NJ: Rutgers University Press, 1990); and Aric Press, "The Good, the Bad, and the Ugly: Private Prisons in the 1980s," in McDonald (ed.), *Private Prisons*, pp.19-41.

4   W.S Holdsworth, *A History of English Law*, Vol. 4, 3rd ed., (London: Cambridge University Press, 1922-24), p. 397; A. Crew, *London Prisons of Today and Yesterday* (London: I. Nicholson & Watson, 1933), p. 50; Blake McKelvey, *American Prisons: A History of Good Intentions* (Montclair, NJ: Patterson Smith, 1977), p. 197-216.

5   American Bar Association, *Report to the House of Delegates* (Chicago, IL: American Bar Association, February 13, 1989), p. 3; John J. DiIulio, Jr., "The Duty to Govern: A Critical Perspective on the Private Management of Prisons and Jails," in McDonald (ed.), *Private Prisons*, p. 172-177; Ira P. Robbins, *The Legal Dimensions of Private Incarceration* (Washington, DC: American Bar Association, 1988), p. 44.

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 16 of 18 PageID #: 18409

MARLOWE_0007023

established, contracting continued for a variety of services associated with imprisonment, including facility management and operation, albeit confined to various niches of the juvenile and adult correctional systems. Private, mostly not-for-profit charities and organizations had played a long and distinguished role in operating facilities for juvenile offenders. Indeed, the private Society for the Reformation of Juvenile Delinquents established the first house of refuge in New York City in 1825. By the mid-nineteenth century, private cottages had been established in several states.[6] During the 1960s, the number of privately operated juvenile facilities began to grow rapidly. By the time a national census of juvenile correctional facilities in the United States was conducted in 1989, the number of privately operated facilities had grown to 2,167, compared to 1,100 public ones.[7] The private facilities were very different from the public ones, however. Most were small community-based group homes or halfway houses, whereas most of the government facilities were training schools and detention centers.

In the adult correctional system, private firms had long been contracting with federal and state governments to provide a variety of specific services to correctional facilities, such as food services, maintenance, education, vocational training, health care, prison industries programs, and counseling.[8] Such contracting received little attention because it did not seem to pose fundamental questions about the state's authority to incarcerate prisoners. Nor were questions raised when the Bureau of Prisons began in the late 1960s to contract with private firms to operate community treatment centers, halfway houses to which federal prisoners were transferred prior to being released or paroled.[9] These were outside the mainstream of secure prisons.

The private sector began to approach that mainstream in 1979 when the U.S. Immigration and Naturalization Service (INS) began contracting with private firms to detain illegal immigrants pending hearings or deportation, some of whom had finished terms in state or federal prisons, in secure confinement facilities. These contracts provided the seedbed for the contemporary private imprisonment industry in the United States, as several of the now-significant players in the industry started with them. This includes the Corrections Corporation of America (CCA), a Tennessee-based firm that incorporated in 1983 and opened its first detention center in Houston, Texas, the following year. Wackenhut, Inc., a long-established private security firm, entered the private imprisonment business when it won a contract to build a detention facility outside Denver, Colorado, for the INS. Similarly, the Correctional Services Corporation (formerly ESMOR) won a contract in 1989 to operate a immigrant detention facility in Seattle, Washington.

---

6   Philip B. Taft, Jr., "The Fiscal Crisis in Private Corrections," (Part I), *Corrections Magazine* VIII, no. 6 (December 1982):27-32.

7   *Biannual Census of Public and Private Juvenile Detention, Correctional, and Shelter Facilities* (Washington, DC: U.S. Bureau of the Census, 1989 census).

8   Camille G. Camp and George M. Camp, *Private Sector Involvement in Prison Services and Operations* (South Salem, NY: Criminal Justice Institute, 1984).

9   Matthew J. Bronick, *The Federal Bureau of Prisons' Experience with Privatization* (Washington, DC: Federal Bureau of Prisons, March 1989).

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 17 of 18 PageID #: 18410

MARLOWE_0007024

These developments drew little attention, but this changed in 1985 and 1986 when governments began to contract with private firms to operate secure facilities that functioned as county jails and state prisons. In 1985, CCA contracted with Bay County, Florida, to operate its jail and with Santa Fe County, New Mexico in 1986, to operate its jail. In January 1986, U.S. Corrections Corporation opened a 350-bed prison in St. Mary's, Kentucky to hold sentenced prisoners for the state. At approximately the same time, a small privately operated facility was opened in rural Cowansville, Pennsylvania, and the District of Columbia government arranged to transfer 55 inmates from the District's overcrowded jails to it. Their arrival created an uproar. Local residents came together and patrolled the streets with shotguns, fearing escapes. A prison reform group in Philadelphia learned of this and successfully petitioned the state legislature to declare a moratorium on privately operated prisons in that state.[10]

These events set off a nationwide debate about the legality, propriety, and desirability of private imprisonment. Congress held hearings in 1986; the National Institute of Justice convened a conference; and many criminal justice professional associations took a stand. The latter included the American Federation of State, County, and Municipal Workers (opposed), the National Sheriff's Association (opposed), the American Correctional Association (cautious support), and the American Bar Association (which asked for a moratorium pending further study).[11] The American Bar Association (ABA) study concluded that delegating operating authority to private entities posed "grave constitutional and policy problems."[12] This debate did not stop correctional privatization in its infancy, however. By the end of 1989, there were 44 secure private facilities in this country, housing about 15,000 prisoners.[13] By the close of 1997, the total number of privately operated secure facilities for adult prisoners in the United States had grown to 142, and the number of prisoners held in them to 64,086, according to the most recent estimates developed by Charles Thomas and his associates.[14]

Comparisons between conditions prevailing in 1986 and 1996 give some measure of the rapid growth experienced in this industry. (1996 is the most recent year for which a consistent data series is available, developed by Professor Charles Thomas).[15] The number of beds in privately operated facilities in operation or under construction in the U.S. increased at an average annual rate of 45

---

10  Joint State Government Commission, *Report of the Private Prison Task Force* (Harrisburg, PA: General Assembly of the Commonwealth of Pennsylvania, March 1982).

11  U.S. House of Representatives, *Privatization of Corrections: Hearings before the Subcommittee on Courts, Civil Liberties, and the Administration of Justice of the Committee of the Judiciary, House of Representatives, Ninety-ninth Congress, First and Second Sessions on Privatization of corrections, November 13, 1985, and March 18, 1986* . (Washington, DC: U.S. Government Printing Office, 1986).; John Peterson, *Corrections and the Private Sector: A National Forum* (Washington, DC: U.S. Department of Justice, National Institute of Justice, 1988), Conference Proceedings.

12  American Bar Association, *Report to the House of Delegates* (Chicago, IL: American Bar Association, February 13, 1989).

13  Douglas McDonald, "Private Penal Institutions," in Michael Tonry (ed.), *Crime and Justice: A Review of Research* (Chicago, IL: University of Chicago Press, 1992).

14  Charles Thomas, Private Corrections Project (Gainesville, FL: Center for Studies in Criminology and Law, University of Florid a, June 29, 1998) http://web.crim.ufl.ed/pcp/.

15  Thomas, Bolinger, and Badalamenti, *Private Adult Correctional Facility Census* , Tenth Edition (Gainesville, FL: Center for Studies in Criminology and Law, University of Florida, 1997). These annual census of privately operated facilities use similar rules f or including facilities in each. Generally, they include only "secure" facilities.

Case 3:16-cv-02267   Document 383-4   Filed 01/22/21   Page 18 of 18 PageID #: 18411

MARLOWE_0007025