# EXHIBIT D
# Part 2 of 14

percent. Few of these beds were empty: the occupancy rate of all private adult facilities averaged 96 percent during 1996. In 1987, there were about 3,000 prisoners in such facilities. By 1996, the number had soared to more than 85,000. During 1996 alone, the number of prisoners increased 30 percent.[16]

As a result of these trends, growth in the private correctional industry's revenues has been explosive: from about $650 million in 1996 to about $1 billion in 1997.[17] Wall Street and individual investors have been impressed with these growth statistics and with the apparently bright prospects for future growth (private facilities have less than 3 percent of the "market share" of prisoners held in state and federal prisons and in local jails in the United States).[18] Stock prices of the four publicly traded firms consequently have been bid up very high, providing these companies with substantial amounts of cash to finance further expansion.

## Why the Private Prisons Industry Emerged

The contemporary private imprisonment industry owes its emergence to several dynamics, other than the obvious fact that entrepreneurs saw business opportunities and seized them. One was the desire of many government correctional agencies to expand their capacity quickly. For example, the INS, faced with the need for more beds to house illegal aliens, turned to private firms to design, build, and operate detention facilities. This could be done quickly, using funds budgeted for detention operations, rather than waiting months or years for a capital appropriation to be requested and approved.

For cities and counties, contracting for private imprisonment resolved certain problems peculiar to local governments. In Bay County, Florida, for example, the county commissioners were displeased with the pace at which the independently elected sheriff was making improvements to the local jail, which had been found by the state to be in violation of established standards. The commissioners turned to the Corrections Corporation of America, which promised to make the necessary improvements quickly and to get the state off the county's back within a matter of months. In Santa Fe, New Mexico, the county had built a larger jail than it needed, resulting in a higher per prisoner expenditure than anticipated. County officials decided that it would be more economically advantageous to contract with a private firm to operate the facility and to pay only for the space used, leaving the rest of the facility to be used for housing prisoners in other "markets": for example, prisoners from other counties that lacked sufficient bed space or federal prisoners being transported by the U.S. Marshals Service.

---

16  C.W. Thomas, *Private Adult Correctional Facility Census* (1997).

17  1996 data from Nzong Xiong, "Private Prisons: A Question of Savings," *The New York Times*, July 13, 1997; 1997 data from Alex M. Singal and Raymond F. Reed, *An Overview of the Private Corrections Industry: Industry Analysis*, (Baltimore, Md: Legg Mason Wood Walker, Inc., July 16, 1997), p. 12. Singal and Reed estimate the "revenue power" of the industry to have been about $1 billion in mid-1997; we have not attempted to determine the actual revenues received by year-end.

18  On June 30, 1997, a total of 1.2 million persons were held in state and federal correctional facilities, and 570,000 in local jails. As discussed below, the private industry's share of the state and federal market is slightly larger, about 4.2 percent.

Case 3:16-cv-02267  Document 383-5  Filed 01/22/21  Page 2 of 20 PageID #: 18413

MARLOWE_0007026

Different dynamics created business opportunities for the private sector in state governments. Beginning in 1973, the nation's state and federal prison population began growing rapidly, and by 1986, it had almost tripled, growing more than fifteen times faster than the general population. To accommodate the increase from 1985 to 1986 alone&about 43,000 additional prisoners&seven new medium-sized (500-bed) prisons were needed each month.[19] Governments did not build facilities quickly enough to handle this flood of prisoners, and severe overcrowding became the norm. By 1986, all but seven states were operating their prisons in excess of 95 percent capacity; 38 were either full or above capacity; and seven states exceeded capacity by more than 50 percent. The federal prison system was also operating at somewhere between 27 and 59 percent above capacity. Throughout the nation, prisoners were sleeping in hallways, day rooms, gymnasiums, sometimes even in bathrooms, or were doubled up in small cells.

Overcrowding exacerbated another serious problem: a large proportion of the nation's penal facilities were outmoded and even obsolete by contemporary standards. A government survey conducted in 1983 found that half of all state and federal prisons in operation at the time were more than 35 years old and a substantial number more than a hundred.[20] Only about one-fifth of all state and federal prisons had been accredited by the Commission on Accreditation for Corrections. The confluence of these dynamics resulted in a spate of lawsuits challenging the constitutionality of the conditions under which prisoners were being confined. By mid-1988, 39 states, the District of Columbia, Puerto Rico, and the Virgin Islands were operating prisons and jails under court orders to remedy unconstitutional conditions. Several states were even forced to release prisoners ahead of time to bring occupancy levels down to mandated levels.

Correctional administrators found themselves in a difficult position, unable to stanch the flow of prisoners and constrained in the ability to build more prisons quickly. Following the passing of Proposition 13 in California in 1978, expenditure controls or revenue restrictions were placed on many state and local governments. Federal aid to state and local governments had also been shrinking since 1980. By 1986, the general revenue sharing program was dead, leaving many local governments without any federal assistance. Many state governments were reaching their debt ceilings and were unable to issue more bonds to finance prison construction. Even though voters were supporting legislation to send more criminal offenders to prison and for longer times, they often voted down prison construction debt proposals.

Turning to the private sector to provide new prison beds was an attractive solution to many governments facing debt restrictions. If a private firm financed, constructed, and operated a new prison, payments to the firm by governments for housing the state's prisoners could be charged against operations budgets, rather than capital budgets, thereby avoiding any need for increasing debt. Some jurisdictions relied on a variant of this arrangement: private corporations were brought into being, operating on behalf of a government, which would issue bonds to finance the construction of a new prison that would then be leased to the state. Lease payments could be paid using government

---

19  McDonald (ed.), *Private Prisons*, p. 4.

20  Bureau of Justice Statistics, *Prisoners in State and Federal Institutions on December 31, 1983* (Washington, DC: Department of Justice, 1986), Table 16.

operating funds, and the state's corrections department could operate the facility as if the state owned it outright.[21]

To this day, the market for private imprisonment is largely confined to the provision of *new* beds in state and federal prisons, rather than takeovers of existing government operated facilities. Although privatization came onto the public stage with the Corrections Corporation of America's bid to take over Tennessee's prisons in 1985, such a transfer of assets has occurred only once. Effective January 30, 1997, CCA acquired a twenty-year lease on the District of Columbia's Correctional Treatment Facility for which it pays $233,000 a month. CCA also has a twenty-year contract to operate the facility.

The growth and development of the private imprisonment industry received important support from broader political and ideological developments in the mid-1980s. On both sides of the Atlantic, in the United States and in Great Britain, conservative governments held sway and launched concerted attacks on the institutional structures and ideology of the welfare state. "Privatization" initiatives gained influential proponents, although the opportunities in this country were fewer, largely because governments here hold fewer assets that can be privatized and because a wide variety of services funded by governments had long been delivered by private contractors. Despite this, the public landscape in the United States was combed in search of targets for privatization or contracting, and prisons were identified by some as promising opportunities for expanding private sector involvement.[22]

For a variety of reasons, the belief emerged that contracting for services, including correctional services, was superior to direct government provision.[23] Private firms were said to be more efficient as they are not mired in the "red tape" that encumbers public agencies, especially in procurement and labor relations. Private managers can hire and fire without the constraints of civil services and restrictions on creating budget lines for new employees; labor can be disciplined and reassigned with far greater ease in the private sector, especially if labor is not unionized.

Another purported advantage of the private sector was its greater efficiency in the face of competition. According to this line of argument, public agencies have monopolies on services, and few incentives exist to discover and implement ways of improving efficiency. Shielded from the demands of the marketplace, public managers may not strive for greater productivity but for maintaining their positions by avoiding risks. Government positions and agency budgets, once established, are difficult

---

21  Jan Chaiken and Stephen Mennemeyer, *Lease-Purchase Financing of Prison and Jail Construction* (Washington, DC: U.S. Department of Justice, National Institute of Justice, 1987).

22  President's Commission on Privatization, *Privatization: Toward More Effective Government*, (Washington, DC: President's Commission on Privatization, 1988).

23  The arguments in support of this belief are offered in, for example: E.S. Savas, *Privatizing the Public Sector: How to Shrink Government* (Chatham, NJ: Chatham House Publishers, 1982); Stuart Butler, *Privatizing Federal Spending: A Strategy to Eliminate the Deficit* (New York, NY: Universe Books, 1986); James K. Stewart, "Costly Prisons: Should the Public Monopoly Be Ended?" in Patrick B. McGuidan and Jon S. Pascale (eds.) *Crime and Punishment in Modern America* (Washington, DC: The Institute for Government and Politics of the Free Congress Research and Education Foundation, 1986), pp. 365-388; President's Commission on Privatization, *Privatization: Toward More Effective Government* (Washington, DC: President's Commission on Privatization, 1988).

Case 3:16-cv-02267　　Document 383-5　　Filed 01/22/21　　Page 4 of 20 PageID #: 18415

MARLOWE_0007028

to reduce because constituencies are created inside and outside government that press legislatures for continued funding. In contrast, competition in the private marketplace, and the risk of losing money or going out of business, supposedly stimulates the search for increased efficiency.

Critics of privatization have challenged these beliefs, however. For example, Donahue argues that there is little room for technological innovation in prisons because of their labor intensive nature.[24] Others argue that the high priority given to maximizing profits creates incentives to minimize costs, which may lead to reductions in service quality.[25] Critics also point to examples of flagrant overcharging by contractors to state and local governments for shoddy goods and poor services.[26] Some opponents of privatization in corrections point to the dismal experience with the convict leasing arrangements that pervaded the South during the Civil War decades. The conditions of those privately operated facilities were generally appalling, and the death rates in them were considerably higher than in public prisons.[27]

## State and Federal Experience with Private Prisons

There were a total of 142 privately operated secure facilities at the end of 1997, according to Professor Charles Thomas' census. The focus of this report is on a subset of these: privately operated *prisons*, rather than jails or detention centers. That is, we examine the experience of privately operated secure confinement facilities that are most equivalent to secure confinement facilities in state or federal prison systems and which contract with the correctional agencies in the surveyed jurisdictions to provide prison space. In contrast with jails, prisons are designed to hold inmates for longer terms and have a variety of programs for the inmates. We exclude from our purview: all privately operated facilities that function as jails; detention centers for illegal immigrants or others; facilities operating under contract with the U.S. Marshals Service, the U.S. Immigration and Naturalization Service, or local governments; all privately operated non-secure facilities; and all juvenile facilities.

To identify the subset of privately operated facilities that most closely correspond to state or federal prisons, we mailed questionnaires to the heads of all correctional agencies in all states, the Federal Bureau of Prisons, the District of Columbia, the Commonwealth of Puerto Rico, and the U.S. Virgin Islands. (Hereafter, these governmental entities are referred to as "jurisdictions.") This questionnaire had two sections. The first inquired about the agencies' practices and plans regarding privatization. The second section was designed to obtain information about each contract, its administration, and monitoring. Of the 55 surveyed government agencies,[28] all but two responded to the survey.

---

24  John D. Donahue, *The Privatization Decision* (New York, NY: Basic Books, 1990).

25  American Bar Association, *Report to the House of Delegates*, unpublished document (Chicago: American Bar Association), p. 4.

26  American Federal, State, County, and Municipal Employees (AFSME) AFL-CIO, *Passing the Bucks: The Contracting Out of Public Services.* (American Federation of State, County and Municipal Employees, AFL-CIO, 1984).

27  George Cable, "The Convict Lease System," in *The Silent South (*Montclair, NJ: Patterson Smith, 1969).

28  Two agencies contract for private prisons in Florida: the state Department of Corrections and the Florida Privatization Commission. Both responded to the survey.

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 5 of 20 PageID #: 18416

MARLOWE_0007029

Twenty-three states reported having contracts with private firms on December 31, 1997, to house prisoners, as did the District of Columbia, the Federal Bureau of Prisons, and the Commonwealth of Puerto Rico. In addition, two other states reported placing prisoners in private facilities located in other states through an agreement between two public agencies (hereafter, an "intergovernmental agency agreement" or "IGA"). These were reported by the two respondents as equivalent to contracts, and we have included them in our analysis. (In the discussion that follows, we call all reported agreements "contracts," even if this is not technically accurate in the case of these two jurisdictions.) These 28 jurisdictions reported having a total of 91 active contracts on that date, with 84 different private facilities. (The number of contracts exceeded the number of private facilities because some facilities contracted with more than one political jurisdiction.) These 84 facilities held a total of 37,651 prisoners at year-end 1997.

In addition, surveyed agencies reported having active contracts on the same day with 529 community-based facilities, such as work-release or educational-release facilities or half-way houses. For the purposes of our survey, "community-based facilities" were defined as they are in the periodic Bureau of Justice Statistics census of state and federal prisoners. That is, a community-based facility is one in which 50 percent or more of the inmates are regularly permitted to depart unaccompanied for work or study release or for other rehabilitation programming.

In addition to the 84 privately operated secure facilities that received prisoners *under contract* directly from correctional agencies in the surveyed jurisdictions, others held these jurisdictions' prisoners via a more circuitous route. That is, some state or federal correctional agencies sent prisoners to a local government agency using an intergovernmental agency agreement. These local governments in turn contracted with private companies to house the prisoners. By requesting information about only those facilities with which correctional agencies in the surveyed jurisdictions *contracted*, private facilities receiving prisoners through the intermediary of a local government were not reported in our survey.[29] The numbers of *prisoners* in these facilities can be estimated from the information provided in the survey, however. All surveyed jurisdictions reported a total of 52,370 prisoners housed in privately operated facilities on December 31, 1997, 14,719 more than they accounted for in the 91 contracts they identified as being active on that date. We assume that those prisoners housed in privately operated facilities through intergovernmental agency agreements were included in this number. We cannot assume that all of these nearly 15,000 prisoners were held in secure facilities, however. Because of some ambiguity in the wording of the question posed to correctional administrators, some respondents may also have counted among these 14,719 inmates those held in non-secure community-based private facilities.

In summary, the 53 responding agencies reported that privately operated facilities held a total of 52,370 prisoners on December 31, 1997.[30] This included all prisoners under the correctional authority

---

29 The two exceptions to this were the two states that reported such IGA agreements as though they were contracts; their responses are included in this report.

30 This number differs dramatically from that reported by the Bureau of Justice Statistics in its *1995 Census of State and Federal Correctional Facilities* (Washington, DC: U.S. Government Printing Office, 1997). This census identified 29 privately operated secure confinement facilities, holding 12,534 inmates. This discrepancy does not reflect simply a two-year difference in data collection points. Rather, it is a result of different inclusion rules in the Abt Associates and the Bureau of Justice Statistics censuses. The former asked correctional officials to report on *all* facilities under contract to hold their prisoners, whereas the BJS census asked

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 6 of 20 PageID #: 18417

MARLOWE_0007030

of these surveyed jurisdictions who were held in privately operated secure facilities (whether by direct contracts or through intermediary local governments), and some in non-secure facilities. This figure represents 4.3 percent of the nation's 1.2 million prisoners held by state and federal correctional agencies.

Table 2.1 and Figure 2.1 report how each responding state's prisoners were housed & in government or privately operated facilities, in-state or out-of-state. Most of these (36,441) were held in facilities located within the political boundaries of the state. (This does not include the 9,951 federal prisoners held in private facilities.) A small number (5,978) were held in facilities located in other states. These included, most notably 1,725 prisoners from the District of Columbia held outside the district; 1,008 prisoners from Colorado held principally in Minnesota facilities; and 933 prisoners from Oklahoma held in Texas facilities. Most of these prisoners "exported" by state or federal correction agencies to other jurisdictions were being held in Texas, where private firms have established contractual relationships with local county governments.

At the close of 1997, ten correctional agencies were responsible for the vast majority (41,965) of the 52,370 privately held prisoners. The Federal Bureau of Prisons reported having 9,951 prisoners, or 10 percent of its total population of 98,631 sentenced prisoners in privately operated facilities. Texas had the second largest number of prisoners in private facilities & 7,223, or 5 percent of its state prisoners.[31] Other high-use states include: Oklahoma (4,588), Florida (3,877), Louisiana (3,581), Tennessee (2,958), California (2,948), Colorado (2,390), Mississippi (2,522), and the District of Columbia (1,927).

Although the Federal Bureau of Prisons, Florida, and Texas report having jurisdiction of the most prisoners held in privately operated prisons, other states rely on private facilities to house larger proportions of their state prison populations. Oklahoma, for example, housed 23 percent of its state prisoners in such facilities on December 31, 1997, the highest percentage of any state or federal correctional agency in the nation. The District of Columbia followed, with 22 percent of its 8,590 prisoners in privately operated facilities. Other heavy users included Colorado, with 21 percent of its state prisoner population in private facilities, Tennessee (20 percent), Louisiana (19 percent), and Mississippi (16 percent).

---

correctional officials to exclude private facilities in which fewer than 50 percent of the prisoners were from state or federal agencies. Correctional officials may have been unable to make that determination effectively, especially because many facilities accept prisoners from a number of different federal or state agencies and no single agency may know the total state/federal share.

31   The State of Texas contracted with private firms to house other prisoners as well but in facilities that functioned as local jails.

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 7 of 20 PageID #: 18418

MARLOWE_0007031

### Figure 2.1
Number of State or Federal Prisoners in Government and Privately Operated Facilities on December 31, 1997, By State



Source: Abt Associates survey of state and federal correctional administrators

Notes:
1. Alaska and Maine are not described in the figure; no survey response was received from these jurisdictions.
2. Jurisdictions above the line report using private facilities to house prisoners; those below the line do not.

Case 3:16-cv-02267    Document 383-5    Filed 01/22/21    Page 8 of 20 PageID #: 18419

MARLOWE_0007032

Table 2.1

The Housing of State and Federal Prisoners, December 31, 1997

|  | In-State Facilities | Out-of-State Facilities | Total |
|---|---|---|---|
| **Prisoners in Government Facilities** | 1,162,357 (95.2%) | 5,840 (.5%) | 1,168,197 (95.7%) |
| **Prisoners in Private Facilities** | 46,392 (3.8%) | 5,978 (.5%) | 52,370 (4.3%) |
| **Total** | 1,208,749 (99%) | 11,818 (1%) | 1,220,567 (100%) |

Notes:
1. "Private facilities" include all those privately operated, regardless of facility's ownership.
2. "In-state" facilities are located in the geographic boundaries of the relevant governmental unit, "out-of-state" facilities are not.
3. Excludes prisoners in privately operated facilities that function as jails in Texas, even though they are under contract with the State of Texas.
4. Prisoners in out-of-state government facilities for the Federal Bureau of Prisons includes prisoners in a correctional facility operated by any other governmental agency at state or local levels.
5. For this table, some responding agencies included prisoners housed in community-based facilities (such as halfway houses, home confinement, etc.) in the reported figures, especially those describing private facilities. These facilities and prisoners are not included elsewhere in this report. However, we were unable to disaggregate them from the figures reported here.

Source: Computed from data supplied to Abt Associates Inc. in its survey of state and federal correctional administrators.

## Contracting for Secure Confinement

The survey indicated that certain jurisdictions have far greater experience in contracting with private firms for secure beds than others (see table 2.2). The Texas Department of Criminal Justice reported having 14 active contracts on December 31, 1997 for secure imprisonment services (excluding contracts with six privately operated jails). The State of Florida, either through the Department of Corrections or the Florida Privatization Commission, reported five active contracts on that day; Oklahoma reported seven; California reported ten.

Case 3:16-cv-02267　　Document 383-5　　Filed 01/22/21　　Page 9 of 20 PageID #: 18420

MARLOWE_0007033

### Table 2.2

**Number of Active Contracts for Secure Confinement on December 31, 1997, by Contracting Jurisdiction**

| | | | |
|---|---|---|---|
| Arkansas | 2 | Nevada | 1 |
| Arizona | 3 | New Mexico | 3 |
| California | 10 | North Carolina | 2 |
| Colorado | 5 | North Dakota | 1 |
| Florida | 5 | Oklahoma | 9 |
| Georgia | 2 | Oregon | 1 |
| Hawaii | 3 | Tennessee | 4 |
| Idaho | 3 | Texas | 14 |
| Indiana | 2 | Utah | 1 |
| Kentucky | 3 | Virginia | 1 |
| Louisiana | 2 | Wyoming | 1 |
| Minnesota | 1 | Federal Bureau of Prisons | 2 |
| Mississippi | 3 | District of Columbia | 2 |
| Montana | 2 | Puerto Rico | 3 |
| | | **Total Contracts** | **91** |

*Source*: Abt Associates Inc. survey of state and federal correctional administrators.

### Reasons for Contracting or Not Contracting

Responding agencies that reported having contracts for secure facilities on the last day of 1997 were asked to rank their reasons for turning to private firms. The most commonly cited reason was to reduce overcrowding in their public prison system; fourteen of the 28 agency directors listed this as their state's primary objective. All but five surveyed correctional departments that were contracting with private firms were operating their prisons in excess of 100 percent of reported capacity.[32] Being overcrowded was not a distinguishing characteristic of those jurisdictions that chose to contract with private firms, however. Most other states also reported operating prison systems that were filled beyond the design capacity of their prisons. The most commonly cited second reason was the need to acquire new bed space quickly&suggesting that the private sector was able to create the needed space faster than the public agency. The most commonly cited third reason was to gain "operational flexibility" (see table 2.3).

---

32  This was computed by comparing actual prisoner population on December 31, 1997, with the reported "design" capacity in existence on that same day.

## Table 2.3

**Reported Objectives, by Rank, for Contracting with Private Correctional Firms**

|  | Rank | | | | | Number (and Percent) of States Citing this Objective |
|---|---|---|---|---|---|---|
|  | 1st | 2nd | 3rd | 4th | 5th-8th |  |
| Reducing overcrowding | 14 | 2 | 3 | 3 | 2 | 24 (86%) |
| Speed of acquiring additional beds | 2 | 9 | 4 | 1 | 4 | 21 (75%) |
| Gaining operational flexibility | 1 | 0 | 8 | 2 | 5 | 17 (61%) |
| Operational cost savings | 8 | 3 | 1 | 3 | 1 | 16 (57%) |
| Construction cost savings | 0 | 6 | 3 | 4 | 3 | 16 (57%) |
| Improving caliber of services | 1 | 0 | 0 | 1 | 9 | 12 (43%) |
| Reducing legal liability exposure | 0 | 0 | 1 | 2 | 7 | 11 (39%) |
| Other | 3 | 2 | 0 | 0 | 1 | 6 (21%) |

*Note:* One state listed several objectives without ranking them. Its responses are counted in the column on the right summing the responses, but not in the columns indicating rank. The sum total reported here does not, therefore, always equal the total of the ranked objectives.

*Source:* Abt Associates survey of state and federal correctional administrators.

Among those *not* citing the need to reduce overcrowding as the principal reason for contracting, the most common reason for contracting was the desire to save money by virtue of reducing operating costs (8 of the 28 states). Two states reported that their primary objective was to acquire bed space quickly: two others sought to gain operational flexibility, and two others sought to improve the "caliber of services."

Table 2.3 also indicates the frequency with which various reasons were reported, regardless of their rank order. These responses from correctional administrators indicate that the driving force behind contracting for privately operated prisons is the desire to reduce crowding, to acquire additional beds speedily, or to gain operational flexibility. Less frequently mentioned concerns were interests in reducing the operating costs of imprisonment or saving money in construction. Reasons given least often were improving the service quality in the prisons, and reducing exposure to legal liability.

Interestingly, contracting in most of the jurisdictions surveyed did not result from the correctional agencies' initiative. Of the 28 jurisdictions that were contracting with private firms in the closing days of 1997, 11 reported that the initiatives were mandated by the legislature, five by the governor, and three resulted from a court order or consent decree. Only seven reported taking the initiative to contract for private prisons.[33]

---

33  This probably oversimplifies the dynamics by which privatization programs were initiated.

Case 3:16-cv-02267    Document 383-5    Filed 01/22/21    Page 11 of 20 PageID #: 18422

MARLOWE_0007035

The Abt Associates survey asked the 25 jurisdictions that reported not having contracts with private imprisonment firms on December 31, 1997 their reasons for not doing so; seventeen provided reasons. Four reported not having contracts because their prison systems either already had sufficient space or because planned construction was expected to be sufficient to handle the demand. Three others cited legal prohibitions that prevented them from contracting; four reported that contracting was not under consideration because of concerns about labor relations or because of labor opposition; two reported that the issue of contracting was under study or that a decision was pending; two were not convinced that cost savings would result; one reported that no funding was available for such contracting; and one reported having concerns about accountability and the quality of private management.

## Characteristics of Privately Operated Prisons

This section describes, in summary fashion, those privately operated prisons that were reported to be contracting with state and federal correctional agencies at the end of 1997. This includes information about their geographical location, ownership, size, type (e.g., general confinement, parole violator confinement), reported levels of physical security, and numbers and proportions of prisoners classified according to the risk they pose.

Unfortunately, we lack uniform information about all privately operated facilities. The Abt Associates survey of state and federal correctional agencies was designed primarily to obtain information about the *correctional agencies'* contracting practices for privately operated imprisonment. Much less information was obtained for their partners in these contractual relationships&the private firms and their facilities. For this latter information, we have obtained data from the National Council on Crime and Delinquency (NCCD), which undertook to survey private correctional firms in early 1998, and data from the Bureau of Justice Statistics' 1995 census.

Reliance on these two different sources of information about private facilities at year-end 1997 creates some difficulties because the Abt Associates and NCCD surveys obtained information for different subsets of facilities. The NCCD survey collected information from six private corrections management firms that reported information about only 43 of the facilities identified in the Abt Associates survey. Figure 2.2 compares the numbers of facilities counted in both the Abt Associates survey of government administrators and the NCCD survey of facility administrators, classified according to the management firms that operated them.

For reasons not determined, information was not obtained in the NCCD survey for 41 others that Abt Associates identified as having active contracts with state and federal agencies on the same date. Information is missing in the NCCD survey for facilities operated by some of the smaller firms, but also for several facilities operated by CCA and Wackenhut&the two industry leaders. *Because of this selective reporting and incomplete data collection, the data collected by NCCD cannot be considered representative of the entire set of privately operated facilities*. Readers must keep this limitation in mind when considering these data characterizing privately operated facilities in the following pages. These characterizations can only be considered tentative, at best.

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 12 of 20 PageID #: 18423

MARLOWE_0007036

## Figure 2.2
Comparing Numbers of Privately Operated Facilities Reported in NCCD Survey and Abt Associates Survey of State and Federal Correctional Agencies, by Management Firm



*Sources:* Abt Associates survey of state and federal correctional administrators; NCCD survey of private facility administrators.

Case 3:16-cv-02267    Document 383-5    Filed 01/22/21    Page 13 of 20 PageID #: 18424

MARLOWE_0007037

**Table 2.4**

**Management Firms who Operate Facilities Reported in NCCD Survey and Abt Associates Survey**

Corrections Corporation of America
Wackenhut Corrections Corporation
U.S. Corrections Corporation
Cornell Corrections Inc.
Correctional Services Corporation
Management and Training Corporation
The Bobby Ross Group
Civigenics Incorporated/Fenton Securities
Alternative Programs, Inc.
Capital Corrections Resources, Inc.
GRW Corporation
CCA Prison Realty Trust
Marantha Production Company, LLC
Louisiana Corrections Services
Turning Point of Central California

*Sources:* Abt Associates survey of state and federal correctional administrators; NCCD survey of private facility administrators.

### Industry Concentration

Two firms—CCA and Wackenhut—dominate the market, holding 61 of all 91 reported contracts with state and federal agencies that were active on December 31, 1997. CCA had 41 active contracts with state or federal correctional agencies, Wackenhut 20. (This reflects the dominance of these two in contracting with all governments generally, not just state and federal.) The third-ranking firm, U.S. Corrections Corporation, lagged behind the two leaders with seven contracts.

Long dominated by a few big players, the industry appears to be experiencing still further consolidation, as well as some diversification. Smaller firms are being acquired by larger ones, and some are developing new capacities—such as drug treatment services—to augment their "core" capabilities. Firms that have been focusing on the adult corrections market are also moving into juvenile corrections.

### Where Private Prisons are Located

Most of the privately operated prisons holding state or federal prisoners in this country are located in the West and in the South (see table 2.5). Texas is home to the most such facilities by far—23, not including six privately managed jails under contract with the state and some others not reported because state or federal government agencies relied on intergovernmental agency agreements to place prisoners in them. California is the state next most populated with such facilities, having 11 within its

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 14 of 20 PageID #: 18425

MARLOWE_0007038

boundaries. Three other states have five each (Arizona, Tennessee, and Florida). In the remaining 15 states, the District of Columbia, and in Puerto Rico, three or fewer facilities hold state or federal prisoners.

**Table 2.5**

**Number of Private Facilities Contracted by State and Federal Correctional Agencies, by State of Location**

| | | | |
|---|---|---|---|
| Arkansas | 2 | Mississippi | 3 |
| Arizona | 5 | North Carolina | 2 |
| California | 11 | New Mexico | 2 |
| Colorado | 4 | Nevada | 1 |
| District of Columbia | 1 | Ohio | 1 |
| Florida | 5 | Oklahoma | 3 |
| Georgia | 3 | Puerto Rico | 3 |
| Indiana | 1 | Tennessee | 5 |
| Kentucky | 3 | Texas | 23 |
| Louisiana | 3 | Utah | 1 |
| Minnesota | 1 | Virginia | 1 |
| | | **Total Facilities** | **84** |

*Source*: Abt Associates survey of state and federal correctional administrators.

### Facility Ownership

Of the 84 facilities that contract with state or federal correctional agencies to house their prisoners, 34 are owned by governments (see table 2.6). Fifty others are owned by the management firms that operate the facilities or by other private entities. Several of these latter facilities are only nominally private, as they have been created by governments to own the facility on behalf of the government.[34]

---

34 For example, the Industrial Development Authority of Brunswick County owns Lawrenceville Correctional Center on behalf of Brunswick County.

**Table 2.6**
**Number of Privately Operated Facilities, by Ownership**

| Private Owners | Facilities |
|---|---|
| Corrections Corporation of America (CCA) | 16 |
| Wackenhut Corrections Corporation | 5 |
| United States Corrections Corporation | 6 |
| Cornell Corrections, Inc. (CCI) | 4 |
| Corrections Services Corporation (CSC) | 3 |
| Management and Training Corporation | 2 |
| Civigenics Incorporated/Fenton Securities | 1 |
| Marantha Production Company, LLC | 1 |
| Dove Development Corporation | 1 |
| Industrial Development Authority of Brunswick Co. | 1 |
| Delta Correctional Authority | 1 |
| Appelton Prison Corporation | 1 |
| Louisiana Corrections Facility Corporation | 2 |
| Louisiana Corrections Services | 1 |
| Mooreland Corporation | 1 |
| CCA Prison Realty Trust | 1 |
| Turning Point of Central California | 1 |
| Wilkinson County Industrial Development Authority | 1 |
| Hardeman County Correctional Facility Corporation | 1 |
| **Subtotal Private Owners** | **50** |
| **Government Owners** | |
| Arkansas | 2 |
| Bear County, TX | 1 |
| Crystal City, TX | 1 |
| Brown field, TX | 1 |
| Mansfield, TX | 1 |
| Odessa, OK | 1 |
| Davidson County, TN | 1 |
| Florida | 4 |
| Frio County, TX | 1 |
| Hamilton County, TX | 1 |
| Karnes County, TX | 1 |
| Limestone County, TX | 1 |
| Mississippi | 1 |
| Marion County, IN | 1 |
| Newton County, TX | 1 |
| Puerto Rico | 3 |
| Teller County, CO | 1 |
| Tennessee | 1 |
| Texas Department of Criminal Justice | 8 |
| Utah | 1 |
| Federal Bureau of Prisons | 1 |
| **Subtotal Government Owners** | **34** |

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 16 of 20 PageID #: 18427

MARLOWE_0007040

## Table 2.6
## Number of Privately Operated Facilities, by Ownership

| | |
|---|---|
| Total | 84 |

Note: Includes only facilities holding prisoners under contracts with state or federal correctional agencies on December 31, 1997; excludes privately operated state jails contracting with State of Texas.

Source: Abt Associates Inc. survey of state correctional administrators

### Facility Size

Privately operated facilities that held state or federal prisoners under contract at the end of 1997 were approximately the same size, on average, as all government operated prisons in this country. Table 2.7 shows the average "rated capacity" for facilities that had active contracts with state or federal governments on this date, as reported both by the facility administrators in the NCCD survey and by correctional agencies administrators in the Abt Associates survey, and as well as the average for all government operated prisons in the nation on June 30, 1995.[35] (The rated capacity of a correctional facility is assigned by a rating official and is meant to reflect the available space to house prisoners and the ability to staff and operate the facility.)

## Table 2.7

## Comparing Capacities of Privately Operated and Government Operated Prisons in the United States

| | Privately Operated | | Government Operated |
|---|---|---|---|
| | NCCD Survey | Abt Associates | |
| Rated capacity | | | |
| Average | 834 | 716 | 797 |
| Range | 224 – 2,192 | 45 – 2,048 | 20 – 6,381 |
| Average daily population | 643 | NA | 811 |

Sources: NCCD survey of private facility administrators, Abt Associates survey of state and federal correctional administrators, 1995, Bureau of Justice Statistics census of state and federal correctional facilities.

Although the average capacity of the privately operated facilities was similar to those in the public sector, the average daily populations differed from that reported by all government operated confinement facilities on June 30, 1995. This suggests that privately operated facilities were less crowded than government operated ones, but this is largely an artifact of the way questions were asked in the survey. Respondents were asked for facility capacity at year-end, but average daily

---

35 1995 capacity figures computed from data provided by the Bureau of Justice Statistics, *1995 Census of State and Federal Correctional Facilities* (1997).

population throughout the year. Facilities that expanded their capacity late in the year only appear to be underutilized, whereas they actually used their available capacity heavily. Most facilities operated at high occupancy rates throughout the year.

In most cases (60 percent of all contracts reported in the Abt Associates survey), contractors are allowed to determine whether single- or multiple-bed housing arrangements are used. Among the 36 contracts that specified occupancy arrangements, most allowed double bunking and dormitory housing. Only three required single cells; two others did specify single cells for particular offenders. One state specified (in 6 of its contracts) that its inmates may not be housed with another state's inmates nor with any federal prisoners unless a detailed plan for such housing is submitted and approved in advance by the contract monitor.

### The Functions of Private Prisons

General adult confinement is the usual function of state and federal prisons, whether privately or publicly operated. According to the NCCD survey of privately operated facilities, 91 percent of those that responded provided general confinement services of adult prisoners (Table 2.8). Eighty-seven percent of all secure government operated facilities in operation in June 1995 were so characterized. However, it appears the range of functions served by privately operated prisons is somewhat different than that found in state and federal prisons operated by governments throughout the nation.

Somewhat larger proportions of privately operated prisons served as drug and alcohol treatment units (26 percent of the privates, compared to 16 percent of government operated prisons), and as facilities for parole violators returned to custody (16 percent compared to 7 percent).[36] In contrast, proportionately fewer private prisons contracting with state and federal correctional agencies provide "reception center" functions of diagnosing and classifying newly admitted prisoners, or confinement of special inmate populations (such as those needing mental health services, those sentenced to death, or geriatric patients).

Although this study did not address the question explicitly, it appears that governments may be utilizing private corrections firms to fulfill particular needs in their correctional systems. Indeed, 'gaining operational flexibility' was the most common third-ranked objective of correctional administrators choosing to contract with private correctional firms. It appears that correctional systems may be achieving this flexibility by writing contracts that specify a particular inmate profile for each facility. Thus, the type of prisoner housed in the contracted facility is restricted. Twenty-nine (29) surveyed contracts provide for the contractor's right to refuse custody of individual prisoners. When asked, contract administrators explained that the return of prisoners was usually based on a decision that the prisoner did not meet the facility's profile, either because of custody classification or medical needs.

Prisoner assignments designed to select appropriate prisoners for a facility's profile in turn affect the typical profile of the public facilities in the system. Some state administrators and public facility superintendents reported a higher concentration of badly behaved, unhealthy, or otherwise difficult

---

36  Facilities can serve more than a single function; the sum of facilities providing each of the discrete functions therefore exceeds the total number of private and government facilities in operation on the date of the survey or census.

Case 3:16-cv-02267    Document 383-5    Filed 01/22/21    Page 18 of 20 PageID #: 18429

MARLOWE_0007042

prisoners housed in the public facilities. For example, few private operators are being called upon to provide facilities capable of hospital confinement. In fact, administrators for 63 contracts reported that their contracts limited the contractor's medical liability. The limit is set either by an annual dollar amount ($500 -$10,000) or by specifying a length of hospital stay (48 hours - 5 days) beyond which the agency takes over both medical and security responsibilities. (Some correctional agencies reported paying for all offsite medical care.) This differentiation of privately and publicly operated facilities may make sense from an administrative point of view, but it creates an obstacle to comparing their performance.

**Table 2.8**

**Comparing Functions Served by Privately Operated and Government Operated Facilities**

|  | Number of Private Facilities (n=43) | Number of Public Facilities (n= 1167) |
|---|---|---|
| General adult population confinement | 39 (91%) | 1015 (87%) |
| Alcohol/ Drug treatment confinement | 11 (26%) | 186 (16%) |
| Primarily for persons returned to custody (e.g., parole violations | 7 (16%) | 83 (7%) |
| Reception/ diagnosis/ classification | 4 (9%) | 155 (13%) |
| Work release/ prerelease | 4 (9%) | 137 (12%) |
| Medical treatment/ hospitalization confinement | 2 (5%) | 176 (15%) |
| Youthful offenders | 2 (5%) | 39 (3%) |
| Boot Camp | 0 | 53 (4%) |
| Other | 3 ( 7%) | 246 (21%) |

Figures sum to more than the total number of facilities because facilities may serve more than one function.

Source: NCCD survey of private corrections firms (1998), and Bureau of Justice Statistics, *1995 Census of State and Federal Correctional Facilities* (1997).

### The Private Sector's Experience with Medium and High-Security Prisoners

As discussed above, the private sector got its start outside of the correctional mainstream, in community-based or less secure facilities. In recent years, however, increasing numbers of facilities are designated as offering higher levels of security. This section examines the experience of the private sector in managing criminals who pose high security risks. It also explores the relevance of this experience with respect to managing federal prisoners.

Prisons differ according to their *physical security*. Minimum security institutions often lack secure perimeters. Medium security prisons have secure perimeters—often two fences with a bank of razor wire between them or, in older facilities, high concrete walls ringed with razor wire and fences. Maximum security prisons typically have secure perimeters and guard towers, in which armed officers are posted. There are many variations in these general configurations, and classification of the

Case 3:16-cv-02267   Document 383-5   Filed 01/22/21   Page 19 of 20 PageID #: 18430

MARLOWE_0007043

physical security also depends on the architecture of the housing units and the procedures that are followed inside the prison.

Some private facilities have the physical characteristics to meet ACA standards for medium and higher security facility ratings. Among those surveyed by NCCD in early 1998, and which were identified as contracting with state and federal correctional agencies, two-thirds (69 percent) reported their facilities as offering medium or maximum physical security (Table 2.9). The one privately operated maximum security prison (South Bay Correctional Facility in Florida, operated by Wackenhut) held 866 maximum security prisoners at year-end 1997.[37] It appears, then, that only one of the 295 maximum/close/high security prisons in the United States in 1995 was operated by the private sector.[38]

Table 2.9

**Physical Security of Privately Operated Confinement Facilities**

|  | Number | Proportion |
|---|---|---|
| Maximum/Close/High | 1 | 2% |
| Medium | 29 | 67% |
| Minimum | 13 | 30% |
| **Total** | **43** | **100%** |

Source: NCCD survey of privately operated facilities.

Operating medium and high security prisons is not the same as managing medium and high security *prisoners*, however. Almost all correctional agencies classify prisoners according to the risk that they pose to staff, to other inmates and to the public. One common convention is to use a three-tiered classification: minimum-security, medium-security, and maximum-security (sometimes called 'high-security' or 'close supervision'). Many jurisdictions use procedures employing objective criteria rather than subjective assessments to classify prisoners.

The Abt Associates survey of correctional agencies asked respondents to report the numbers of prisoners in each of the privately operated facilities under contract with that agency, by the prisoners' security classifications. Fifty percent of all prisoners held in privately operated prisons under contract with these governments on December 31, 1997 were classified as medium-security; 4 percent were maximum-security, and 45 percent were minimum/low security (Table 2.10). This compares with 39

---

[37] Charles Thomas has also reported in his annual census that this facility is the only privately operated maximum security pris on. in the nation

[38] The Bureau of Justice Statistics' *1995 Census of State and Federal Correctional Facilities* reported identifying this number in existence on June 30, 1995. The number of government-operated high-security facilities has grown slightly since then.

Abt Associates Inc.     Private Prisons     25
Case 3:16-cv-02267    Document 383-5    Filed 01/22/21    Page 20 of 20 PageID #: 18431
MARLOWE_0007044