# EXHIBIT D
# Part 3 of 14

percent medium-security prisoners housed in all state and federal prisons on June 30, 1995, 20 percent maximum-security prisoners, and 33 percent minimum security.

**Table 2.10**

**Classification of Prisoners' Custody Levels in Confinement Facilities**

|  | Privately-Operated (1997) | All State and Federal (1995) |
|---|---|---|
| Maximum/Close/High | 1,661 (4%) | 201,996 (20%) |
| Medium | 18,823 (50%) | 404,256 (39%) |
| Minimum | 16,993 (45%) | 337,779 (33%) |
| Not Classified | 174 (0.4%) | 39,302 (4%) |
| **Total** | 37,651 | 992,333 |

Notes: The Abt Associates Inc. survey counted prisoners in custody in privately operated state and federal correctional agencies on December 31, 1997.
The BJS census counted prisoners in custody on June 30, 1995 and includes unsentenced prisoners. Numbers do not sum to total shown here; data computed from that reported as shown in BJS *Census*. The BJS census includes all prisoners in custody in confinement facilities (i.e., not community-based) in state and federal correctional agencies. These include a small number of privately-managed facilities.

Sources: Abt Associates Inc. survey of state and federal correctional administrators; and Bureau of Justice Statistics, *1995 Census of State and Federal Correctional Facilities* (1997), Table 13.

To further characterize private facilities' experience with more dangerous prisoners, surveyed correctional administrators were also asked if they send violent offenders to the privately operated facilities with which they contract. Administrators replied that this was done in 63 of the 91 total contracts that were active on December 31, 1997. They did not report the number or security classification of the violent offenders actually placed in private facilities.

The private sector's experience with higher risk prisoners is not fully described in Table 2.10, however, for several reasons. First, classification procedures vary from one jurisdiction to another, and a prisoner classified as 'medium security' in one may be classified as minimum in another. (Indeed, some respondents to the Abt Associates survey had difficulty conforming to our requested categories of minimum, medium, and high security.) Second, prisoner classifications are not static. Rather, each prisoner's security rating may change throughout his institutional career, depending upon his behavior, among other things. That is, prisoners may be classified as medium security, for example, but may be housed in lower security facilities by virtue of their sustained good behavior. Indeed, it is not uncommon for maximum security prisoners to be placed in lower security institutions and then subsequently be reclassified to medium security (or they may simply keep their initial designation). Prisoners classified as medium-security, therefore, may include persons who pose substantial risk as well as those seen as posing relatively little risk. Some respondents reported that the private facilities were used to house "better" inmates, although others reported that the most troublesome prisoners were transferred to private facilities. It is difficult to know, therefore, whether the medium-security prisoners held in private facilities were equivalent, as a whole, to the populations of medium-security prisoners in the same jurisdiction's government facilities.

Case 3:16-cv-02267    Document 383-6    Filed 01/22/21    Page 2 of 17 PageID #: 18433

MARLOWE_0007045

## Comparing Security Classifications in Louisiana and the Bureau of Prisons

The congruence between different jurisdictions' classification procedures was explored in a comparison of the Federal Bureau of Prison's procedures with those used in Louisiana. State correctional administrators reported, in the Abt Associates survey, that 80 percent of all prisoners in three medium security facilities in Louisiana (the privately operated Allen and Winn Correctional Centers and the government-operated facility, Avoyelles Correctional Center) were classified as medium security. Ten percent were maximum-security prisoners, and another ten percent were classified as minimum-security. (These were the prisoners' current classifications, reflecting their institutional behavior, rather than their classifications at time of entry to the prisons system.)

To determine how these prisoners would be classified in the Federal Bureau of Prisons, BOP staff classified, using the bureau's procedures, a random sample of prisoners from these institutions Unlike the State of Louisiana, the bureau's classification procedures produce a four-tiered rating: high, medium, low, and minimum-security. Bureau staff determined that 10 percent of the Louisiana prisoners would be classified in the federal system as high security, 33 percent as medium security, 29 percent as low security, and 28 percent as minimum security. Table 2.11 compares the numbers of prisoners in each security level, as classified by the State of Louisiana and the facilities, and the estimated proportions of prisoners at each level according to the Bureau of Prisons' standards. (These latter estimates are shown in ranges, because bureau staff estimated the classification of all prisoners by means of a small random sample. This small sample indicates a projected proportion for the entire population within a specified range of error.[39]) Although both the facility and the State of Louisiana's correctional department had classified the majority of these prisoners as medium-security, it appears that about half of the Louisiana prisoners would not be considered medium security in a bureau facility. Rather, they would be classified as minimum or low security.[40]

---

39  Ranges were defined as being within a 95 percent confidence level.

40  These comparisons may be distorted somewhat by the fact that the distribution of security levels reported by Louisiana referred to prisoners' current classification, whereas the bureau staff computed a classification that would have been made at the time of the prisoners' admission to the prisons. Bureau staff did not classify prisoners' institutional behavior.

Abt Associates Inc.                                                                                          Private Prisons                    27

Case 3:16-cv-02267    Document 383-6    Filed 01/22/21    Page 3 of 17 PageID #: 18434

MARLOWE_0007046

**Table 2.11**

**Classification of Prisoners' Security Levels in Two Privately Operated Facilities and One State Prison, According to Louisiana Standards and to Federal Bureau of Prisons Standards**

| Prisoner Classification | Louisiana | Bureau of Prisons |
|---|---|---|
| Maximum/Close/High | 10% | 10% ± 4.9 |
| Medium | 80% | 33% ± 7.7 |
| Low | ---- | 29% ± 7.4 |
| Minimum | 10% | 28% ± 7.3 |

*Notes:* Louisiana reported the *current classification* of all prisoners. The Bureau of Prisons used *initial classification* sources to classify a sample (n=153) of prisoners from the same facilities. The range reported for the Bureau's classification categories reflects a 95% confidence interval.

*Sources:* Louisiana Department of Public Safety and Corrections; and Bureau of Prisons classification team.

This distribution of prisoners is not characteristic of medium-security prisons in the Federal Bureau of Prisons. In all medium-security federal prisons, 63 percent of the prisoners are classified at admission as medium custody (Table 2.12). These facilities hold very few minimum and low security prisoners (18 percent). The security classification profile in the Louisiana prisons more closely resembles the profile of BOP inmates in low physical security institutions (with 21 percent medium-security inmates, 41 percent low-security, and 36 percent minimum-security). Thus, from the Bureau of Prisons perspective, private sector experience, in Louisiana, at least, has been closer to what the Bureau calls low security facilities than medium or high security ones. How Louisiana's experience corresponds with others states' experience with 'medium' security prisoners was not determined.

**Table 2.12**

**Distribution of Prisoners, by Their Security Classifications, in Federal Bureau of Prisons Facilities**

| Prisoner Classification | Physical Security Level | | | |
|---|---|---|---|---|
| | minimum | low | medium | high |
| Maximum/Close/High | .3% | 2% | 19% | 66% |
| Medium | 8% | 21% | 63% | 27% |
| Low | 22% | 41% | 13% | 4% |
| Minimum | 70% | 36% | 5% | 3% |

*Source:* Bureau of Prisons KI/SSS data for initial classification of prisoners in all BOP prisons of each type.

**Table 2.13**

**Comparison of Louisiana Medium Security Profile to Bureau of Prisons Profiles**

| Prisoner Classification | Louisiana Facilities | Bureau of Prisons Facilities | |
|---|---|---|---|
| | | low | medium |
| Maximum/Close/High | 10.2% ± 4.9 | 2% | 19% |
| Medium | 33.1% ± 7.7 | 21% | 63% |
| Low | 28.7% ± 7.4 | 41% | 13% |
| Minimum | 28.0% ± 7.3 | 36% | 5% |

Notes: Louisiana reported the *current classification* of all prisoners in 3 medium security facilities (2 private, 1 public).
The Bureau of Prisons used *initial classification* sources to classify a sample (153) of prisoners from the same facilities. The range reported for the Bureau's classification categories reflects a 95% confidence interval.

Sources: Bureau of Prisons classification team and Bureau's KI/SSS data.

In summary: the private sector has very limited experience in managing high security prisoners. Only one maximum-security facility was being operated by a private company. Some other facilities, even though classified as medium-security, held a number of high risk offenders. For example, one medium-security prison—the Prairie Correctional Facility, operated by CCA, held 586 maximum security prisoners. Twelve other privately operated medium-security facilities were reported holding an average of 47 maximum security inmates. The private sector's experience with managing medium-security prisoners is much more substantial. Given the variability from state to state in classification procedures, however, it is difficult to determine how many of these prisoners so classified in one state would be similarly classified in another.

**Inmate Programming**

An important aspect of prison management is the extent and quality of programs designed to prepare inmates for their release and their lawful reintegration into society. Unfortunately, the national surveys of programming in prisons, whether public or private, do not reveal much. Both the NCCD survey of private facilities, and the Bureau of Justice Statistics census which was used as a model, simply ask whether programs were available and the proportions of prisoners enrolled. No measure is used to assess quality, or even intensity of program involvement. Moreover, the NCCD survey was returned by only half of the private facilities in existence at the end of 1997. The representativeness of the survey's findings is therefore unknown and we do not report them here.

## Expected Demand for Prison Space and Plans for Contracting with Privately Operated Facilities

Many jurisdictions project substantial increases in the demand for prisons beds. Several states plan to rely upon privately operated prisons to meet at least some of this demand. If these private prison beds are indeed contracted at the scale currently planned, it will result in significant growth for the private prison industry.

Case 3:16-cv-02267   Document 383-6   Filed 01/22/21   Page 5 of 17 PageID #: 18436

MARLOWE_0007048

The Abt Associates survey asked each correctional agency administrator to report the increase in numbers of prisoners expected by the end of five years (i.e., by December 31, 2002), or by the end of their forecasting horizon, whichever is sooner. Most (83 percent) reported projects for this five-year period. Others reported projected increases within shorter planning horizons. For all responding agencies, the total projected increase during this five-year period was expected to be 356,771, or 29 percent more prisoners than were in custody on December 31, 1997. Adjusting for the different planning periods reported by agencies, this amounts to an increase of nearly 71,000 prisoners each year.[41]

Anticipating these increases in demands, the responding agencies reported having definite plans to expand the overall capacity of their systems by 240,967 beds (Table 2.14). Most of this planned increase (85 percent of all beds) will be made in government operated facilities; agencies plan to contract for the remaining 15 percent, or 36,752 beds.[42]

Correctional agencies differ widely in their plans regarding private prison beds. Twenty-six reported planning not to procure beds in privately operated prisons (Table 2.14). Twenty-one others did have definite plans to do so. California's Department of Corrections plans the largest procurement of beds in privately operated facilities: 15,000 by the year 2000. This represents 45 percent of all additional beds to be acquired or built by the department during this period. Five other states plan to rely heavily upon the private sector to meet the expected demand for prison beds. Four plan to rely entirely, or nearly so, on private facilities for additional beds: New Mexico (1,800 new beds), Mississippi (500), Connecticut (500), Idaho (96 percent of planned expansion, or 1,250), and Oklahoma (87 percent of planned expansion, or 4,000 beds). Like California, Utah and Wisconsin plan to rely on the private sector for about 40-45 percent of their capacity expansion needs.

Interestingly, those agencies that are currently contracting for the largest numbers of beds reportedly plan little further utilization of privately operated prisons. Texas plans to rely entirely upon expanded or new government operated facilities; Arizona has plans to contract for 1,000 more beds (which represents only 18 percent of its planned expansion); Florida's Department of Corrections reports no plans for such contracting, and the Florida Privatization Commission reports not having any definite plans regarding further privatization.

It is difficult to estimate how many state and federal prisoners will be held in privately operated facilities at the end of this five-year period. However, if one assumes that the state and federal agencies that now rely upon private facilities to house approximately 55,500 prisoners continue to do so at this level, and that the planned expansion of nearly 37,000 beds does not replace the existing stock of privately held prisoners, the total number of private beds for state and federal prisoners would be nearly 93,000 by the end of 2002, or 40 percent more than were held at year-end 1997. This may be an overestimate. The responding correctional administrators may have counted these recompetitions or re-procurements of existing contracts in their answers to the Abt Associates survey.

---

41  This number may be an overestimate, as the two Florida agencies may have reported each other's plans.

42  It is possible that agencies' plans for relying upon privately operated facilities are even more ambitious. The survey asked about *definite* plans for *contracting* with the private sector. Agencies that plan to rely upon intergovernmental agency agreements to transfer prisoners ultimately to privately operated prisons may not have included these prisoners in their counts.

Case 3:16-cv-02267  Document 383-6  Filed 01/22/21  Page 6 of 17 PageID #: 18437

MARLOWE_0007049

Table 2.14 (continued)

Table 2.14

Planned Increases in Capacities of Government and Privately Operated Facilities (as of December 31, 1997), by State

|  | Total Number of Planned Beds | By Year | Government Facilities | | Private Facilities | |
|---|---|---|---|---|---|---|
|  |  |  | Additional Beds | Percent of New Beds | Additional Beds | Percent of New Beds |
| Alaska | -- | -- | -- | -- | -- | -- |
| Alabama | 1,300 | 1999 | 1,300 | 100 | 0 | 0 |
| Arkansas | 683 | 2001 | 683 | 100 | 0 | 0 |
| Arizona | 5,610 | 2002 | 4,610 | 82 | 1,000 | 18 |
| California | 33,593 | 2000 | 18,593 | 55 | 15,000 | 45 |
| Colorado | 4,078 | 1999 | 2,478 | 61 | 1,600 | 39 |
| Connecticut | 500 | n/a | 0 | 0 | 500 | 100 |
| Delaware | 1,800 | 2000 | 1,500 | 83 | 300 | 17 |
| Florida DOC | 22,078 | 2002 | 22,078 | 100 | 0 | 0 |
| Florida CPC* | 27,025 | 2002 | 27,025 | 100 | don't know | 0 |
| Georgia | 4,764 | 2000 | 3,264 | 69 | 1,500 | 31 |
| Hawaii | 2,980 | -- | 2,980 | 100 | 0 | 0 |
| Iowa | 1,550 | 2002 | 1,550 | 100 | 0 | 0 |
| Idaho | 1,302 | 2005 | 52 | 4 | 1,250 | 96 |
| Illinois | 8,170 | 2001 | 8,170 | 100 | 0 | 0 |
| Indiana | 4,548 | 2002 | 4,448 | 98 | 100 | 2 |
| Kansas | 309 | 1999 | 309 | 100 | 0 | 0 |
| Kentucky | 2,409 | 2002 | 2,409 | 100 | 0 | 0 |
| Louisiana | 3,742 | 2002 | 3,026 | 81 | 716 | 19 |
| Maine | -- | -- | -- | -- | -- | -- |
| Massachusetts | 1,024 | 1998 | 1,024 | 100 | 0 | 0 |
| Maryland | 896 | 2003 | 896 | 100 | 0 | 0 |
| Michigan | 7,052 | 2000 | 6,572 | 93 | 480 | 7 |
| Minnesota | 742 | 2002 | 692 | 93 | 50 | 7 |
| Missouri | 9,111 | 2002 | 9,111 | 100 | 0 | 0 |
| Mississippi | 500 | 2002 | 0 | 0 | 500 | 100 |
| Montana | 1,418 | 2002 | 918 | 65 | 500 | 35 |
| North Carolina | 4,104 | 2003 | 3,048 | 74 | 1,056 | 26 |
| North Dakota | 380 | 2001 | 380 | 100 | 0 | 0 |
| Nebraska | 1,336 | 2001 | 1,336 | 100 | 0 | 0 |
| New Hampshire | 700 | 2001 | 700 | 100 | 0 | 0 |
| New Jersey | 1,625 | 1999 | 1,625 | 100 | 0 | 0 |
| New Mexico | 1,800 | -- | 0 | 0 | 1,800 | 100 |

|  | Total Number of Planned Beds | By Year | Government Facilities | | Private Facilities | |
|---|---|---|---|---|---|---|
|  |  |  | Additional Beds | Percent of New Beds | Additional Beds | Percent of New Beds |
| Nevada | 3,350 | 2002 | 3,350 | 100 | don't know | 0 |
| New York | 3,300 | 1999 | 3,300 | 100 | 0 | 0 |
| Ohio | 6,837 | 2002 | 4,837 | 71 | 2,000 | 29 |
| Oklahoma | 4,600 | 1998 | 600 | 13 | 4,000 | 87 |
| Oregon | 1,739 | 1999 | 1,739 | 100 | 0 | 0 |
| Pennsylvania | 4,321 | 2002 | 4,321 | 100 | 0 | 0 |
| Rhode Island | -- | -- | -- | -- | 0 | -- |
| South Carolina | 3,804 | 2002 | 3,804 | 100 | 0 | 0 |
| South Dakota | 624 | 2002 | 624 | 100 | 0 | 0 |
| Tennessee | 1,922 | 2001 | 1,922 | 100 | N/A | 0 |
| Texas | 4,200 | 1999 | 4,200 | 100 | -- | 0 |
| Utah | 1,856 | 2003 | 1,056 | 57 | 800 | 43 |
| Virginia | 6,504 | 2002 | 6,504 | 100 | 0 | 0 |
| Vermont | 466 | 2004 | 466 | 100 | 0 | 0 |
| Washington | 5,460 | 2006 | 5,460 | 100 | 0 | 0 |
| Wisconsin | 3,600 | 2003 | 2,100 | 58 | 1,500 | 42 |
| West Virginia | 5,140 | 2005 | 5,140 | 100 | 0 | 0 |
| Wyoming | 500 | 2000 | 400 | 80 | 100 | 20 |
| Federal BOP* | 23,553 | 2003 | 21,553 | 92 | 2,000 | 8 |
| District of Columbia | 0 | N/A | 0 | -- | -- | -- |
| Puerto Rico | 2,000 | 2002 | 2,000 | 100 | 0 | 0 |
| Virgin Islands | 62 | 1998 | 62 | 100 | -- | 0 |
| Totals | 240,967 |  | 204,215 | 84.7% | 36,752 | 15.3% |

*Note:* Projected Federal BOP number does not include provision of section 11201(c)(1)(B) of the National Capital Revitalization and Self-Government Improvement Act of 1997. Florida's Correctional Privatization commission may be double-counting beds to be added by the Department of Corrections.

*Source:* Abt Associates survey of state and federal correctional administrators

# 3. Does Contracting for Prison Operations Save Money?

Even though cost containment is not the most frequently reported reason for contracting with private firms to operate prisons (as discussed in chapter 2), it is no doubt a common hope among policymakers that governments will indeed save money by doing so. Whether contracting for prison operations actually saves the taxpayers' money remains an open question, however. Professor Charles Thomas of the University of Florida, commenting on the last decade's experience with privatization, states that a:

> reasonable assessment of the available cost analyses lends at least qualified support to the claims of privatization proponents that meaningful costs savings can be achieved by contracting out. To be sure, there is little one can find in this body of evidence that would support an expectation of massive cost savings. All other things being equal, for example, a typical American jurisdiction could anticipate economies in the rough range of 10 to 20 percent would be realized by privatization—perhaps at the low end of the range for initiatives focusing on the privatization of existing facilities and at the high end of the range for new design-finance-construct-manage projects. It would be quite misleading to describe cost savings of this magnitude as trivial. [43]

This is consistent with one assessment of the United Kingdom's experience. Studies by Coopers & Lybrand and Her Majesty's Prison Service found that the operating costs of four privately operated prisons in the U.K. were between 9 and 30 percent lower than comparable publicly managed prisons.[44] Others draw more cautious conclusions from the research literature. The U.S. General Accounting Office, reviewing the five studies deemed to have the strongest designs and methods among those published between 1991 and mid-1996, concluded that "because the studies reported little cost difference and/or mixed results in comparing private and public facilities, we could not conclude whether privatization saved money."[45] Julianne Nelson's assessment of several recent studies, in appendix 1, generally concurs with the GAO's.

At first glance, this controversy may seem surprising. It is reasonable to expect that one could easily answer the question by comparing expenditures for imprisoning offenders in a public correctional agency to the payments to private firms. Unfortunately, such comparisons are usually not so straightforward and, indeed, are often misleading for three principal reasons. First, the facilities may differ in ways that confound comparison of costs. Second, differences between public and private sector accounting procedures make the very identification of comparable costs difficult. Although

---

43  Charles W. Thomas, *Comparing the Cost and Performance of Public and Private Prisons in Arizona* (Unpublished report to the Arizona Department of Corrections, August 21, 1997), pp. 50-51.

44  Jo Woodbridge, *Review of Comparative Costs and Performance of Privately and Publicly Operated Prisons*, Prison Service Research Report No. 3 (UK: HM Prison Service, Home Office, Offenders and Corrections Unit, Research and Statistics Directorate, December 1997).

45  U.S. General Accounting Office, *Private and Public Prisons & Studies Comparing Operational Costs and/or Quality of Service*, (Washington, DC: Report to the Subcommittee on Crime, Committee on the Judiciary, House of Representatives, August 1996), p. 7.

Case 3:16-cv-02267　　Document 383-6　　Filed 01/22/21　　Page 9 of 17 PageID #: 18440

MARLOWE_0007052

several studies comparing public and private correctional costs have sought to overcome these and other difficulties, not all have succeeded fully. Analysis of the studies' methods and assumptions, and reanalysis of their findings, suggests in some instances that the purported cost advantages, if any, of privately operated facilities may be less dramatic than reported.

## Privately and Publicly Operated Facilities May Not Be Sufficiently Comparable

Determining whether and how privatization saves the government money is difficult in many jurisdictions because no publicly managed prisons exist that are similar enough to warrant direct comparison with the private facilities. In New Mexico, for example, the one women's prison in the state's correctional department is operated by a contractor. Finding a comparable publicly operated facility in the state is impossible, as women's prisons are operated quite differently than facilities for men and generally cost more. In Arizona, the one facility for men and women is contractor-operated, and no comparable prison exists in the Department of Corrections. Similar problems of comparability exist for other privately managed facilities that have specialized missions, such as substance abuse treatment programming or return-to-custody facilities for parole violators.

Nor is comparability assured if one compares non-specialized facilities having a common security classification—two medium-security prisons for men, for example. The cost of imprisonment generally varies according to the *mix* of different types of prisoners held by the facility. In general, health care costs vary according to prisoners' ages, and staffing costs vary according to the security levels of the inmates. Medium-security prisons generally house a mix of differently classified inmates, including some maximum-security ones and some classified as minimum-security, as discussed in chapter 2. Publicly managed prisons may differ from privately managed ones in the distribution of older and younger, healthy and unhealthy prisoners, as well as in the distribution of high, medium, and low-risk prisoners.

The cost of prisons is also a function of their size, as larger facilities benefit from economies of scale up to a certain point.[46] How full—or overcrowded—they are also affects their cost. Other things being equal, more heavily utilized prisons, and even more overcrowded ones, are less costly on a per-prisoner basis because staffing levels in prisons are relatively fixed. Privately operated prisons are probably less likely to be overcrowded than public ones, and thus, finding similarly utilized public prisons in the same jurisdiction may be difficult.[47]

Another source of non-comparability stems from facility design. When states turn to private firms for facility construction and operations contracts, these firms have the opportunity to build the most labor-efficient buildings possible. Comparing the cost of operating these facilities to older and less

---

46  In their 1984 study, Schmidt and Witte analyzed facilities in the Federal Bureau of Prisons and concluded the "prisons are cheapest to run when they are quite large but not behemoth." Peter Schmidt and Ann D. Witte, *An Economic Analysis of Crime and Justice* (Orlando, FL: Academic Press, Inc., 1984), p. 355.

47  At a minimum, one would have to adjust cost estimates to account for such differences if utilization levels were dissimilar.

Case 3:16-cv-02267   Document 383-6   Filed 01/22/21   Page 10 of 17 PageID #: 18441

MARLOWE_0007053

efficiently designed public prisons may lead to misleading conclusions about the reasons for an apparent cost advantage attributed to privatization.

Finally, public and privately operated prisons may differ in the levels and quality of services provided. In general, one would expect costs to be higher for more extensive and higher-quality programs and services. The most telling comparison, therefore, would be between the cost of delivering an equivalent service of equivalent quality by both a public and a privately managed facility. Measuring the quality of imprisonment services is not a straightforward task, as chapter four discusses.

## Inconsistent Accounting Procedures

The accounting procedures followed by public and private organizations differ, which makes comparison of costs incurred by the two types of organizations difficult. Accounting methods developed for private firms are designed to value all inputs used for producing goods and services; a large proportion of costs incurred are thereby captured. In contrast, public accounting systems were designed not to identify costs but to control the allocation of appropriated public funds through agencies and to detect misuse of taxpayers' money.[48] Three characteristics of public accounting procedures make cost identification especially difficult in government: the deficient treatment of capital expenses, the focus on the agency rather than the service delivered, and methods for allocating overhead costs.

### Different Treatment of Capital Spending

Private firms have adopted accounting conventions to spread expenditures for capital assets (e.g., buildings, land, equipment) throughout the period of the assets' useful life, so that the year-to-year cost of a service includes some portion of the physical assets that are "consumed" in the production of that service. Public accounting systems make no such attempt. In the public sector, capital expenses are counted only in the year that they are made. Because no attempt is made to spread these costs across subsequent years, it is impossible to determine how much it actually costs to deliver a service without conducting an inventory and appraisal of existing capital assets. The commonly cited costs of imprisonment by public agencies are, therefore, often lower than they would be if physical assets were capitalized. In years where large capital construction projects are undertaken, however, the operating costs will be *overestimated* as a result of "expensing" these costs fully in that same year rather than spreading them across the useful life of the asset.
Among those facilities identified by the Abt Associates survey of correctional administrators as being under contract with state or federal correctional agencies on December 31, 1997, 59 percent were owned by the contracting firms. Because the fees charged by these firms for their services are generally designed to recover capital investments in these facilities, the appropriate comparison is the cost of ongoing operations in a similar public institution plus some annualized portion of the capital investments by governments in this institution. Because the latter costs are, for all practical purposes, uncounted, comparing the relative cost of private owner-operated facilities to public facilities is subject to considerable uncertainty.

---

48  Herman B. Leonard, *Checks Unbalanced: The Quiet Side of Public Spending* (New York, NY: Basic Books, 1986); Douglas C. McDonald, *The Cost of Corrections: In Search of the Bottom Line* (Washington, DC: National Institute of Corrections, 1989).

Case 3:16-cv-02267    Document 383-6    Filed 01/22/21    Page 11 of 17 PageID #: 18442

MARLOWE_0007054

**Dispersed Costs**

The practice of assuming that the cost of public imprisonment is equivalent to the correction department's expenditures often obscures the true cost to government for another reason as well. In many jurisdictions, several costs of operating prisons and jails are borne not by the correctional agency but by a number of different agencies or different government accounts. For example:

- employee benefits may be paid out of separate overhead government accounts rather than the correctional department's account;

- some medical care of inmates may be charged to the government's health care agencies or may be subsidized variously by state hospitals, mental health departments, and the like;

- utilities may be charged to the department of public works;

- legal work in support of prisons may be borne by the attorney general or equivalent;

- the true cost of insurance may be overlooked, as governments generally self-insure by paying for unpredictable costs when they are incurred, rather than spreading these costs over all years;

- the true cost of supplies and equipment may be understated if they are purchased and stored by a separate agency (such as the federal General Services Administration); and

- payments for contracted services (such as food or health care) may be made by central or regional offices rather than by the facilities.

To identify all such dispersed costs of correctional operations, special studies are needed, rather than simple reliance on measures of costs based on the correctional agency's budget or reported expenditures. Overlooking expenditures by other agencies or accounts may undercount actual costs by as much as 30-40 percent. One study of New York State's prisons estimated that only 77 percent of the direct cost of imprisonment in the state's prisons were covered by the department's budget. The remainder was paid by general government accounts or by other agencies.[49]

A parallel problem exists with respect to identifying all costs to government for contracting. Private firms may not always bear all the costs of imprisonment, even when they own the buildings and all the assets. Some services might be performed by the public correctional agency, and the cost of those services should be counted along with the contractors' costs. For example, surveyed government officials who were charged with managing contracts with privately operated facilities reported that the following types of activities were sometimes necessary to support private facilities but were paid by government:

- contract monitoring and oversight;
- inspection and licensing;
- personnel training;

---

[49] Douglas C. McDonald, *The Price of Punishment: Public Spending for Corrections in New York*. (Boulder, CO: Westview Press, 1980), p. 16.

Case 3:16-cv-02267    Document 383-6    Filed 01/22/21    Page 12 of 17 PageID #: 18443

MARLOWE_0007055

- medical and/or dental care (contracts often limit the contractor's liability for such care, placing the risk for high-cost and catastrophic care on the government);
- inmate transportation;
- inmate case management;
- background checks for visitors and volunteers;
- reviews for pardon and/or parole boards;
- correctional industries programming;
- disciplinary and grievance appeals processes;
- accounting and banking of inmate funds;
- payment of inmate wages; and
- response teams for emergencies.

As with public correctional departments, agreements with private facilities must be scrutinized to determine if these or similar costs are paid not by the facility itself but by the government agency with which it contracts. All such costs, or estimates thereof, need to be included as costs to government of contracting.

### Assigning Overhead Costs

Some "overhead" expenditures incurred by various agencies of government in support of prisons and prison administration must be assigned to both government operated and privately operated facilities in a jurisdiction. The methods by which these costs are allocated affect the calculation of operating costs of each facility and, consequently, the estimation of difference in public and private facility costs. As Julianne Nelson writes in her paper (in appendix 1, at note 11), most analysts addressing the question of public and private imprisonment costs have estimated the costs assigned to facilities according to the *use* made of central office services by either public or private facility managers. She argues that this tends to overstate the relative cost of public facilities. This is because the cost of governmental overhead activities are quite fixed. That is, the marginal cost associated with increasing a prison system by one or two more facilities is quite small, regardless of whether the additional facilities are operated by government or a private firm. The appropriate method for allocating the cost of these fixed overhead costs is to assign identical amounts to all facilities in the jurisdiction, whether public or private. The only conditions in which privatization would lower overhead costs in government would be (a) where the expansion of overhead activities were averted by relying upon privatization or (b) where contracting for privately operated prisons resulted in cutting back government overhead operations, which is not likely to occur.

## Studies Comparing Privately and Publicly Operated Correctional Facilities

A number of research studies have been reported since the early 1980s that aimed to compare the cost of privately operated facilities with publicly operated ones. Most have been focused on facilities for adult prisoners, although some have examined juvenile facilities. Only those pertaining to adult facilities are examined here. Moreover, attention is restricted to those few studies that have employed

reasonably rigorous research designs, and which report their methods and data in sufficient detail to assess the strength of their findings.[50]

**State Prisons in Tennessee**

In 1991, the State of Tennessee contracted with the Corrections Corporation of America (CCA) to operate the South Central Correctional Center (SCCC), a 961-bed, multi-custody (minimum-to-maximum-security) facility. As required by state law, the Tennessee Fiscal Review Committee (FRC) undertook to "compare the full costs of the contractor with the state's full costs of operating similar facilities." [51] Two publicly operated prisons were selected for comparison: Northwest Correctional Center (NWCC) and Northeast Correctional Center (NECC).

The FRC study is a model cost comparison. It allocated "line item" cost data for each prison to specific management functions (administration, security, etc.). Adjustments were made to operating costs (also reported by management function), which included netting out commissary revenues against commissary expenses, allowing for changes in food services inventories and non-comparable programs, eliminating depreciation expenses as a public facility expense (because there were corresponding sets of expenses in the private facility), and adding monitoring costs to the expenses reported for the private facility. After such adjustments, the FRC found that the daily operating cost during FY 1994, *exclusive of any costs allocated to central office*, averaged $31.95 in the two public facilities, compared to $33.78 in the CCA facility. By this measure, the private facility was 5.7 percent more costly than the two public facilities, on average. (Both public facilities were less costly: $30.91 at NECC and $33.06 at NWCC.) When adjustments were made for differences in the size of the facilities to equalize the comparison (more specifically, in the average numbers of prisoners under custody in each one), the cost difference diminished to one percent. Adding in an allocated share of the Department of Corrections's central office costs to the three facilities changed the estimates slightly. The CCA facility was then found to be one percent *less costly*, on average, than the public facilities.

The FRC report did not directly address the question of whether or not privatization actually saves money for the taxpayers of Tennessee. This question was addressed by the Washington State Legislative Budget Committee (LBC) as it tackled its own version of the prison privatization

---

50  The studies not reviewed here include the following: A. Brown et al., *Private Sector Operation of Correctional Institution: A Study of the Jack and Ruth Eckert Youth Development Center, Okeechobee, Florida* (Washington, DC: National Institute of Corrections, 1985); John D. Donahue, *The Privatization Decision* (New York, NY: Basic Books, 1990), Chapter 8; Keon S. Chi, "Private Contractor Work Release Centers: The Illinois Experience," in *Innovations* (Lexington, KY: Council of State Governments, 1982).; Joint State Government Commission, *Report of the Private Prison Task Force* (Harrisburg, PA: General Assembly of the Commonwealth of Pennsylvania, 1987).; Douglas C. McDonald, "The Costs of Public and Private Correctional Facilities," in McDonald (ed.) *Private Prisons and the Public Interest* (New Brunswick, NJ: Rutgers University Press, 1990).; Douglas C. McDonald, "The Costs of Public and Private Correctional Facilities," in McDonald (ed.) *Private Prisons and the Public Interest* (New Brunswick, NJ: Rutgers University Press, 1990); Charles H. Logan and Bill W. McGriff, "Comparing Costs of Public and Private Prisons: A Case Study," *NIJ Reports* (No. 216, 1989), pp. 2-8.; and Dale K. Sechrest and David Shichor, *Final Report: Exploratory Study of California's Community Corrections Facilities* (San Bernardino: California State University, 1994).

51  State of Tennessee Legislative Fiscal Review Committee, *Cost Comparison of Correctional Centers* ( Nashville, TN, 1995), p. 1; for a detailed analysis of this study, see Julianne Nelson's paper, in appendix 1 of this report.

question.[52] The LBC conducted further analyses of the Tennessee data but followed a slightly different tack. Instead of analyzing the *cost incurred by* CCA of operating SCCC, the LBC started with the *revenues received by* CCA and adjusted these data for differences between public and private management responsibilities. The FRC had excluded medical expenses for CCA from its analysis because it lacked sufficient data. It was necessary to estimate these costs in order to compute CCA's operating surplus and to compare private per diem rates with those derived for the state-run facilities NWCC and NECC. The LBC concluded that the estimated total daily cost to the taxpayers of the privately operated CCA facility was $37.65, as compared to $40.16 at NECC and $40.19 at NWCC.

Julianne Nelson undertook further analysis of the Tennessee data, reported in both the FRC and the LBC studies, to discern differences in how costs were allocated in the CCA facility compared to the two public facilities. (This study was commissioned by the National Institute of Corrections in conjunction with the Abt Associates study and is included in appendix 1.) She found that:

- Non-medical operating costs per inmate day were virtually identical in the public and private prisons studied.

- At the CCA facility, more was spent on administration and less on security, relative to the public facilities, including corporate overhead and monitoring by state officials.

- Contracting for SCCC may have saved money for Tennessee's taxpayers by averting expenditures for state government overhead activities. That is, the observed state-level overhead expenses were lower than what they would have been had SCCC been publicly managed.

- Labor costs were lower at the private facility: $16.89 per prisoner/day at the CCA facility, as opposed to $19.63 at NECC and $20.96 at NWCC. Security staff costs were also lower: $9.96 per prisoner/day at the CCA facility, versus $12.57 at NECC and $14.55 at NWCC.

- Employee benefits were also lower at the CCA facility. The average employee benefit rates were 28 and 29 percent at the two public facilities, and 22 percent at the CCA facility. Wide variation existed among CCA staff: administrative employees enjoyed a benefit rate of almost 80 percent, while others received benefits at the rate of 13-14 percent of salary.

She summarized that the pattern of expenditures indicates that "the bulk of reported cost savings at the privately managed prison studied in Tennessee can be attributed to differences in per-inmate medical expenditures and allocated state overhead costs. (Labor cost savings were offset by the increased administrative cost...)."

What remains unclear, however, is whether the apparently lower overhead costs are merely accounting artifacts rather than reductions in expenditures. It is unlikely that overhead activities were

---

52 Washington Legislative Budget Committee, *The Tennessee Experience: The 1995 Report of the Fiscal Review Committee* (Seattle, WA, 1996), appendix 3. In particular, LBC analysts both estimated the medical expenses incurred by CCA on behalf of prisoners at SCCC and obtained an unofficial report of these expenses directly from CCA. The LBC analysts also collected data on the fees paid by Tennessee to CCA for operating SCCC. This information was collected after the FRC report was published.

Case 3:16-cv-02267    Document 383-6    Filed 01/22/21    Page 15 of 17 PageID #: 18446

MARLOWE_0007058

actually cut back, or that significant increases in expenditures for overhead were averted by contracting for a single facilities. The actual difference in expenditures was therefore small, if any.

**Adult Prisons in Louisiana**

The State of Louisiana contracted with two different private correctional firms—the Corrections Corporation of America and Wackenhut Corrections Corporation—to operate two prisons for men. The former firm contracted to operate the Winn Correctional Center, the latter the Allen Correctional Center; both opened in 1990. In 1996, William Archambeault and Donald Deis, professors at Louisiana State University, reported the findings of their study which compared the cost and performance of these two facilities with a third, the Avoyelles Correctional Center, operated by the Louisiana Department of Public Safety and Corrections.[53]

The basic question addressed by Archambeault and Deis was how the full cost per inmate-day in a publicly managed prison (i.e., Avoyelles Correctional Center) compared with the full per diem cost of housing an inmate in either of two privately managed facilities. Their choice of comparison institutions was appropriate. All three institutions were built by the state and shared a common design. The capacities of all three were identical—1,474 beds. They are located in the same section of rural Louisiana and draw from the same general labor pool. All three house maximum, medium, and minimum security prisoners in approximately the same proportions. Moreover, the private facilities appear to be well-integrated into the ongoing operations of the state's public correctional agency. They adopted the same rules and procedures that govern the state's prisons, and the upper management of these two privately operated prisons participate in agency-wide management functions. A number of the potentially confounding factors are thereby held constant, permitting a comparison of institutions that vary only in their being managed and operated by either the state correctional agency or by private firms.

Archambeault and Deis compared expenditure data for all three prisons for five fiscal years, 1992 through 1996. As they were interested in assessing the total cost and savings to the taxpayers, they based their analysis upon the state's fees paid to the management firms and sought to identify all costs incurred to support either the privately operated or the government operated facilities, including all costs incurred by other agencies or other government accounts. They also sought to estimate a variety of costs not accounted for on an annualized basis, such as self-insurance. Numerous other adjustments were made, such as for costs associated with prison industry programs and services provided by local vocational/technical schools. After such adjustments, Archambeault and Deis concluded that the taxpayers of Louisiana saved an average of 12.75 percent for both private facilities combined, throughout the five years studied, relative to what taxpayers spent for the Avoyelles facility during the same period. The average five-year savings were greater for the Allen facility operated by Wackenhut: 13.80 percent, as opposed to 11.69 percent at the CCA facility in Winnfield.

At approximately the same time as Archambeault and Deis were conducting their study, the State of Washington's Legislative Budget Committee examined expenditure data for the same three facilities

---

[53] William G. Archambeault and Donald R. Deis, Jr., *Cost Effectiveness Comparisons of Private Versus Public Prisons in Louisiana: A Comprehensive Analysis of Allen, Avoyelles, and Winn Correctional Centers* (Baton Rouge, LA: School of Social Work, Louisiana State University, 1996).

and drew different conclusions about the savings.[54] The LBC's report was released before Archambeault and Deis released theirs. Comparing the two reveals that they took different approaches to estimating some costs or made different assumptions. In the end, the LBC concluded that the state could expect to break even on its two contracts during FY 1996 when all facilities were operating at full capacity. Whereas the CCA facility was costing about one percent more than the state facility during that year, according to the LBC's analysts, the Wackenhut facility was saving the state an equivalent amount. (The LBC suggested that costs of the three private and public facilities had recently converged and that the private facilities had been costing the state approximately four percent less during FY 1994.)

Julianne Nelson reviewed both the Archambeault and Deis study and the LBC report and identified a number of difficulties in the former. (See appendix 1) She concluded that the savings associated with private operation in the Winn and Allen facilities are more in the range estimated by the LBC analysts. That is, during fiscal year 1996, the savings were more likely to be below 5 percent than above 12 percent. Savings to the taxpayers could be greater, she argues, if contracting out operations of facilities results in cutbacks in state-level overhead expenses.

**Adult Prisons in Florida**

The controversy over the appropriate measure of operating costs in Florida prisons shows how hard it is to get all sides to agree on whether or not privatization saves money. Current state law helps identify the participants in this debate. Chapter 89-526 of the Florida state statutes, enacted in 1989, first authorized the state Department of Corrections (DOC) to enter into contracts with private prison management companies. The subsequent Chapter 93-406, adopted in 1994, created the Correctional Privatization Commission (CPC), to expedite prison privatization; it is housed in the state Department of Management Services and operates independently of the Department of Corrections. Chapter 957.05 qualifies the authority of the CPC, requiring it to demonstrate—before any contract is signed—that private prison management will result in *at least* a 7 percent savings (relative to the cost of allowing the state Department of Corrections (DOC) to run the prison). Chapter 957.07 also empowers the state Auditor General to decide whether or not this condition has been satisfied before any contract with a vendor has been signed.

In the summer of 1995, two prisons opened under contract with the Correctional Privatization Commission. One, the Bay Correctional Facility, is operated by CCA; the second, the Moore Haven Correctional Facility, is operated by Wackenhut Corrections Corporation. Both are 750-bed prisons that were designed for medium-security inmates, although the department has been assigning a large percentage of minimum-security prisoners to them (about half, during FY 1997).[55]

To provide for ongoing independent oversight, Florida state law requires the Office of Program Policy Analysis and Government Accountability (OPPAGA) [56] to review the performance of all management

---

54  State of Washington Legislative Budget Committee. *Department of Corrections Privatization Feasibility Study, Report 96-2* (Olympia, WA, 1996).

55  Florida OPPAGA, *Review of Bay Correctional Facility and Moore Haven Correctional Facility*, Report No. 97-68 (Florida OPPAGA, April 1998).

56  Although the OPPAGA is a unit of the Office of the Auditor General, it reports directly to the state legislature.

Case 3:16-cv-02267    Document 383-6    Filed 01/22/21    Page 17 of 17 PageID #: 18448

MARLOWE_0007060