# EXHIBIT D
# Part 4 of 14

companies that operate private prison facilities in Florida (this may include both vendors under contract to the CPC and those under contract to the DOC). A separate oversight board, the Florida Corrections Commission, was established in 1994 and is "charged with reviewing the effectiveness and efficiency of [Florida's] correctional efforts, recommending policies, and evaluating the implementation of approved policies."[57]

Not surprisingly, these different parties do not always favor the same measure of privatization benefits. In its *Annual Report* for the fiscal year 1996-97, the DOC argued that *all three* privately managed adult prison facilities were *more expensive* than similar publicly run facilities would have been.[58] Using a somewhat different approach, the OPPAGA reached a similar conclusion. Nevertheless, the OPPAGA report included responses from the Correctional Privatization Commission, the Corrections Corporation of America, and Wackenhut proposing alternative methodologies—ones that led to conclusions directly opposed to those reported by the DOC and the OPPAGA.

The Department of Corrections' estimates are somewhat biased against the privately managed firms. The per diem rate for the men's public prison is derived as the *average* of nine other facilities; all but one of these public facilities is substantially larger than any of the private facilities being analyzed.[59] Given the economies of scale in prison operation, this approach understates the public sector cost of running a prison comparable in size to Bay or Moore Haven.

Nevertheless, the OPPAGA reached a similar conclusion from a more appropriate starting place. It compared two private men's facilities (Bay and Moore Haven) with a single comparably-sized public facility, the Lawtey Correctional Institution. In its analysis, the OPPAGA started with the management fee due to CCA and Wackenhut (for running Bay and Moore Haven, respectively); it then deducted monitoring costs paid by the management companies, property taxes *not* paid, and medical insurance co-payments collected from prisoners and retained by the prison operators. For the Lawtey facility, the OPPAGA used the annual cost of operations, health services, and education programs reported for this facility by the Department of Corrections in its *Annual Report*. All three cost estimates were then adjusted for differences in scale economies, the scope of management responsibilities and the quality of services provided.

The OPPAGA estimated that Moore Haven was more expensive to operate than its public sector equivalent; it also argued that the Bay facility was only 0.2 percent cheaper. Neither private facility achieved the 7 percent cost savings required by law.

---

[57] Commissioners are appointed by the Governor and with the approval of the state Senate. The Commission's mission statement appears on its web site, located at http://www.dos.state.fl.us/fgils/agencies/fcc/.

[58] These estimates are reproduced and analyzed in Florida Department of Corrections, *Privatization in the Florida Department of Corrections* (1998). Available at web site (time stamped April 28) www.dc.state.fl.us/administrative/reports/privatize/index.html.

[59] Apart from the one public facility with an ADP of 733, the remaining public prisons housed between 1214 and 1719 inmates on average. In contrast, the observed average daily populations for the privately operated Bay and Moore Haven facilities were 70 8 and 706 respectively. If these two prisons were assumed to operate at 95 percent of capacity, they would house approximately 7 13 inmates on average. Each of these private facilities has a contract maximum of 750 beds.

Case 3:16-cv-02267   Document 383-7   Filed 01/22/21   Page 2 of 16 PageID #: 18450

MARLOWE_0007061

In response to this finding, CCA proposed some adjustments that substantially change the interpretation of the data: they argue that private management at Bay and Moore Haven *saved* taxpayers, respectively, 8.3 and 6.0 percent of state costs. This difference arises primarily from three simple changes: an increase in the CCA's credit for taxes paid to the state, an increase in CCA's credit for the "Inmate Welfare Trust Fund Net Revenue;" [60] and a decrease in the state's adjustment for "medical costs for higher medical grade inmates at Lawtey." [61] The OPPAGA itself rejected these three CCA amendments, observing that CCA sought to claim credit for more tax revenue than was properly attributable to its Bay facility, [62] that it retained custody over Inmate Welfare Trust Fund balances, [63] and that Lawtey inmates had considerably more medical needs than those at the Bay facility.

This debate is further complicated by an adjustment that the OPPAGA could have made but ultimately rejected. As in Louisiana, the state retirement system was not fully funded by past payroll deductions. To eliminate this shortfall, a surcharge of 5.78 percent was included in the the payroll costs reported for Lawtey. The OPPAGA justified counting this surcharge, stating that "it is still a cost to the taxpayers. Privates do not pay this and thus should be able to reduce costs in comparison to state by at least 5.78% of payroll."[64]

This accounting decision biases the comparison against the public facilities, however. The unfunded liability was incurred in the past; the surcharge was imposed to collect the funds needed to cover that liability. To compare the *current* costs of operating public and private facilities, the surcharge should not be counted. In other words, payroll costs at the Lawtey facility should be 5.78 percent lower than what is reported by OPPAGA. Omitting this surcharge brings the cost of the public and private facilities yet closer together, although the end result does not change the basic conclusion: there is no strong evidence indicating that contracting for these facilities rather than direct government operations saved taxpayers' money in Florida.

**Adult Prisons in Texas**

In 1987, the Texas State Legislature enacted a law authorizing the Texas Department of Corrections to contract with private vendors and county commissioners to finance, construct, operate, maintain or manage correctional facilities. In June of that year, a request for proposals was issued offering the opportunity to operate four 500-bed prisons, to be structured as pre-release centers, with programming designed to reintegrate prisoners back into society upon their release. Such programming would

---

60  This trust fund is an account containing the revenue (in excess of expenses) from the prison commissary, vending concessions and inmate telephone service.

61  A fourth small adjustment by CCA remains unexplained: the "unadjusted" per diem reported by CCA for Lawtey exceeds that found in the OPPAGA report by $.36, OPPAGA, p. 38.

62  According to the OPPAGA report (p. 59), CCA sought to claim credit for taxes paid on income from other facilities.

63  According to the OPPAGA report (p. 13), this trust account is established in the name of the private contractor operating the prison. However, current law requires the contractor to obtain the approval of the CPC commissioner before using these funds for anythi ng other than the purchase of items for resale. In contrast, state profits from the prison commissary and inmate phone usage are used to offset prison operating costs.

64  OPPAGA, p. 36.

Case 3:16-cv-02267   Document 383-7   Filed 01/22/21   Page 3 of 16 PageID #: 18451

MARLOWE_0007062

include educational and vocational programs as well as counseling and treatment for drug and alcohol abuse, domestic difficulties, and other problem areas. Contracts were ultimately awarded to the Corrections Corporation of America (CCA) for two facilities, and to the Wackenhut Corrections Corporation for two other 500-bed facilities.[65] The two facilities operated by CCA were located in Cleveland and at Venus, Texas. The two operated by Wackenhut were in Bridgeport, and Kyle, Texas. These facilities began receiving prisoners during the summer of 1989.

The law specified that the state could not contract with a private vendor without an assurance that services would cost at least 10% less than the state would have to spend for an equivalent facility. The task of determining if the private firms were delivering the service at least 10% below the state's cost was given to the Sunset Advisory Commission. The challenge was to find comparison institutions operated by the state. The statute specified that the commission should analyze the cost and quality of services in the private prisons as compared to the cost and quality of any similar state services. However, as the commission noted in its 1991 report, "The development of a cost estimate was complicated by the fact that the TDCJ did not, and still does not, operate a comparable facility."[66]

The commission therefore requested that the Texas Department of Criminal Justice develop two cost estimates: (1) the total cost to the state of contracting for the operation of the privately operated prisons, and (2) the total cost to the state if TDCJ operated the facilities directly. The estimate of the former cost included actual contract costs plus a number of other direct and overhead costs borne by the state in support of this contract. The second estimate included all direct and indirect costs that would be associated with direct government operation of the CCA facilities and, separately, the Wackenhut facilities. The commission concluded, from a comparison of the actual costs and the estimated costs, that contracting saved the state 14-15 percent—more than the required 10 percent. However, some of the savings to the state was in the form of payments by each of the firms to local governments that approximated the taxes that the firms would have paid if the property were privately owned. Because the state owned the facilities, with the firms contracted to operate them, it makes little sense to require the firms to be liable for any such taxes. Moreover, the cost to the state of the capital asset is the same, regardless of whether the facilities are managed by the private firms or the TDCJ. Not counting these payments in lieu of taxes, private operation appears to cost the state 8.8 or 9.7 percent less than direct TDCJ operation, depending upon the facility—or slightly less than the savings required by statute. The payments in lieu of taxes appear to be simply a fee paid by the private firms to governments so that the net cost of contracting to Texas exceeds the 10 percent threshold.

An examination of the commission's report indicates that the principal sources of savings associated with contracting, apart from this payment, were lower operating costs and a lower overhead expenditure by the state. Operating costs were $1.53 to $1.96 lower on a daily per prisoner basis, state overhead costs were $1.36 less for the private facilities. The precise reason for the lower operating costs cannot be identified because the report provides only aggregate-level expenditure data.

---

65   The RFP initially requested that contractors construct the prisons as well as operate them, but the state subsequently decided that it was less expensive for the state to construct the facilities and to own them. Consequently, the contract was written as an operations contract only.

66   The State of Texas, Sunset Advisory Commission, Recommendations to the Governor of Texas and Members of the 72nd Legislature: Final Report (March 1991).

In short: the evidence from Texas suggests that the private firms are delivering a service that would cost the government approximately 9-10 percent more if the state's corrections department operated the facilities directly. This assumes that the estimates of the department's costs of direct operation are accurate, of course. Lacking more information about how these costs were estimated, it is not possible to evaluate them.

**Arizona's Prison for Men and Women**

In 1993, the Arizona Department of Corrections awarded a contract to the Management and Training Corporation to design, construct, operate, and own a 450-bed minimum security state prison for men and women. This prison, the Marana Community Correctional Treatment Facility, was evaluated by Charles Thomas to assess how the facility's cost and performance compared with other comparable institutions in Arizona.[67] Unfortunately, no equivalent facility operated by the Department of Correction existed in the state. The Marana Facility is the only one in the state that houses both men and women. Other things being equal, that fact alone would affect any cost comparison significantly because women prisoners are generally more costly to house than men. Thomas acknowledged a variety of differences between the Marana facility and others. For example, many of the publicly operated prisons used for comparison housed prisoners in tents, which no doubt affected the level of per inmate expenditure in these facilities. Moreover, the Marana Facility, by design and legislative wish, provides a higher level of programming—both in the types of programs and the level of inmate involvement in them—than other Arizona facilities generally. Thomas's solution to this was to compare costs at Marana to the average costs of all 15 minimum-security prisons operated directly by the state's Department of Corrections.

During fiscal year 1996, the operating costs of the Marana Facility, including adjustments for payments by the management for *ad valorem* property taxes, were $13,140 per prisoner per year, or $35.90 per day. This compared to an average operating cost for the 15 state-operated minimum security prisons that year of $15,766 per prisoner per year, or $43.08 per day, a difference of almost 17 percent.

However, the Marana Facility was not the least expensive of the minimum security prisons operating during FY 1996. Three publicly operated facilities were less costly (before crediting the private facility for payment of property tax). Indeed, seven of the fifteen publicly operated facilities were within five percent of the cost of the Marana Facility. Even after adjusting for payment of property taxes by the management firm, Marana still remained more expensive to operate than two of the public facilities. In light of this, Thomas concluded "Given the limitations of the available data and the heterogeneity of the facilities, it would be speculative to conclude that a precise cost savings had been achieved."[68]

---

67   C.W. Thomas, *Comparing the Cost and Performance of Public and Private Prisons in Arizona* (Gainesville, FL: Center for Studies in Criminology and Law, University of Florida, 1997).

68   C.W. Thomas, *Comparing the Cost and Performance of Public and Private Prisons in Arizona* (1997), p. 93.

Case 3:16-cv-02267   Document 383-7   Filed 01/22/21   Page 5 of 16 PageID #: 18453

MARLOWE_0007064

# Summary

Perhaps the main finding of this review is that only a very small percentage of those facilities operated by private firms have been evaluated systematically to determine how much more or less the relevant government would spend in the absence of contracting for operations. Ninety-one contracts existed on December 31, 1997 with privately operated secure confinement facilities that held prisoners on that day, and some undetermined number of facilities also held prisoners sent to them through non-contractual means (that is, via an intergovernmental agency agreement). The number of contracts that have been issued during the past decade is much higher. But only a handful have been subjected to close scrutiny with respect to their costs, relative to the cost of directly government provision. Moreover, some of these studies examined contracts that were negotiated in the early days of this industry. It is difficult to have much confidence in conclusions about the relative costs of public versus private provision when we have systematic cost comparisons of such a small and dated subset.

In Florida and Arizona no strong evidence of significant savings exists. In Louisiana, Tennessee, and Texas, the studies find that contracting did reduce costs to government. Some of the savings reportedly associated with contracting are seen to flow from lower spending by state governments for "overhead" administrative functions. These savings may only be apparent, an artifact of how government expenditures are allocated to all correctional facilities in the state. Governments will not actually realize these savings unless they actually reduce overhead spending in conjunction with contracting, rather than merely shifting the allocated share of an unchanged expenditure to the government-operated facilities.

Generally unstudied in these few evaluations is the potential for either governments or private firms to control specific types of costs, such as spending for prisoner health care. Expenditures for prisoner health care has been rising at a much faster rate than for other non-medical correctional activities, in part because prisons are subject to the same inflationary pressures experienced in the broader health care marketplace. However, prisons have generally lagged behind other sectors in developing procedures for managing these costs. Private firms that operate prisons are certain to implement "managed care" strategies to contain costs, all of which could also be adopted by public correctional agencies.[69]

---

[69] See Douglas C. McDonald, *Managing Health Care and Costs* (Washington, DC: National Institute of Justice, 1995).

# 4. How Well Do Privately Operated Prisons Perform?

If the principal objective of contracting out the management and operations of prisons is, as surveyed correctional administrators most often reported, to expand capacity in order to alleviate overcrowding, then privatization no doubt achieves that purpose. But advocates of privatization often proclaim other goals. For example, the President's Commission on Privatization, established by President Reagan, described contracting—and broader private participation in government generally—as means not only of increasing the efficiency but also the effectiveness of public administration. Thus: "Contracting the administration of jails and prisons at the federal, state and local levels could lead to improved, more efficient operation." [70] More recently, the National Performance Review has also supported privatization as one means of improving effectiveness as well as efficiency. Is there any evidence that contracting has, indeed, improved prison operations or, more broadly, the performance of prisons? Or, does it appear that the increased attention to cost containment has resulted in *reduced* service quality?

Some read the studies to date as providing favorable support for privatization on this question. Charles Thomas and his associates write that studies of private prison operations in Florida, Louisiana, and the United Kingdom "demonstrate that these cost savings are often matched with performance improvements (e.g., fewer disturbances, fewer escapes, increased prisoner involvement in work programs, and more programs aimed at reducing recidivism)." [71] Others are more cautious. Analysts at the U.S. Government Accounting Office (GAO) reviewed what they thought were the strongest studies and concluded that they "offer little generalizable guidance for other jurisdictions about what to expect regarding comparative operational costs and quality of service if they were to move toward privatizing correctional facilities." [72]

This chapter discusses different approaches to defining and monitoring performance, both with respect to government services generally and to prisons specifically. The current practice of monitoring and evaluating the performance of privately operated prisons is described, reporting results of the Abt Associates survey of correctional administrators. Finally, it reviews and assesses several studies that have sought to evaluate the relative performance of privately and government operated facilities.

## What Does "Performance" Mean With Respect to Prisons, Public or Private?

Much of current thinking about performance in government has been framed, at least at the federal level, by the Government Performance and Results Act of 1993 (GPRA), the Clinger-Cohen Act of

---

[70] President's Commission on Privatization, *Privatization: Toward More Effective Government* (Washington, DC: President's Commission on Privatization, 1988), p. xviii.

[71] Thomas, Bolinger, and Badalamenti, *Private Census*, 1997, p. vi.

[72] General Accounting Office, *Private and Public Prisons: Studies Comparing Operational Costs and/or Quality f Service* (Washington, DC: U.S. General Accounting Office, 1996), p. 3.

Case 3:16-cv-02267   Document 383-7   Filed 01/22/21   Page 7 of 16 PageID #: 18455

MARLOWE_0007066

1996, the revised handbook to the Office of Management and Budget Circular A-76, and the Clinton Administration's major management reform initiative—the National Performance Review (NPR). All have stimulated greater attention to improving government performance. More importantly, GPRA aims to improve the operations of federal government programs by changing management emphasis from *inputs* and *processes,* to *performance* and *results*. It mandates that each federal agency develop a strategic plan describing the agency's goals, objectives, and operations. Each agency is, in turn, to derive from its strategic plan an annual performance plan for each of its program activities, defining program-level goals, operations, and performance indicators.

The Senate Report accompanying GPRA emphasizes that measures of program performance should, to the extent possible, concentrate on *outcomes*, rather than *outputs*. Outcomes refer to "the actual results, effects, or impact of a program activity compared to its intended purpose," whereas outputs refer to actual levels of activity or effort that are realized. The report provides an example of the distinction: eligible clients completing a job training program are outputs, but an increase in their rate of long-term employment is an outcome. "While recognizing that outcome measurement is often difficult, and is infeasible for some program activities," notes the report, "the Committee views outcome measures as the most important and desirable measures, because they gauge the ultimate success of government activities."

But how does one gauge the success of prison operations? What are the outcomes of prisons intended to be, whether publicly or privately operated? Reaching agreement on those questions has been difficult.

Throughout the two-hundred-year history of prisons in America, penal administrators, theorists, reformers, and lawmakers generally have sought to advance different goals through imprisonment, or, at least, to give certain ones more salience than others. Establishment of the nation's first penitentiary, in Pennsylvania, was animated in great measure by a desire to civilize punishment (depriving persons of newly-valued liberty rather than more "barbaric" corporeal punishments and executions), to save souls, and to teach self-discipline. Later reformers, and then penal administrators, embraced prisoner rehabilitation, which could be accomplished more by the application of scientific principles. "Penitentiaries" became "reformatories" and later "correctional institutions."

Conceiving of imprisonment's purpose as rehabilitation or reformation of criminal offenders suggests an obvious outcomes-based performance measure: offenders' criminality following release from prison. But recidivism rates of prisoners have been depressingly high, and advocates of imprisonment have generally turned away from justifying their existence and assessing their performance according to such measures. Many have embraced, in recent years, a more minimalist conception of the purposes of imprisonment: the containment, or "incapacitation," of criminals. If nothing else, prisons do remove prisoners from civil society and prevent their committing crimes outside the walls.

Simple incapacitation cannot be the only purpose, however. Rather, containment must also be constitutional. Faced with claims of appalling conditions in prisons, the federal courts began in the early 1970s to intervene in prison administration. Entire state prison systems were found to be in violation of the Eighth Amendment's prohibition of "cruel and unusual punishment," and nearly all states were forced to spend large amounts of money to institute the required improvements.

In response to the perceived absence of national standards, correctional professional associations began to promulgate such standards for prison administration. Most prominent are those established by the American Correctional Association (ACA), first in the mid 1970s. Since then, the ACA has published standards for many different types of correctional facilities, including detention centers, boot camps, juvenile facilities, and adult confinements. The ACA also established an auditing system to accredit facilities.[73] Other standards for health care services were established by the National Commission for Correctional Health Care. Both sets of standards primarily prescribe procedures. The great majority are written in this form: "The facility shall have written policies and procedures on . . . ." They emphasize the important benefits of procedural regularity and effective administrative control, which flow from written procedures, and the careful documentation of practices and events.

For the most part, the prevailing professional standards prescribe neither the goals that ought to be achieved nor the indicators that would let officials know if they are making progress toward those goals over time. Two facilities could conform equally to an ACA standard by having a written policy on a particular issue, yet they could have diametrically opposite practices and outcomes on that issue. For example, both could have a written policy on the use of isolation, each of which covers topics like when isolation may be used, how long inmates can be isolated, and how reviews should be conducted to extend periods of isolation. One facility, however, might use isolation rarely, if at all, while the other could use it prodigiously.

The effect of these various trends has generally been to conceive of prison performance quite narrowly as conformance to law, state rules and regulations, and professional standards.[74] That is, performance tends to be measured according to procedural compliance, or *outputs*, in the language of the above-mentioned U.S. Senate report. The dominant focus is not on *outcomes*, other than achieving compliance or accreditation—which arguably, is not a true outcomes-oriented measure of institutional performance. However, procedural compliance is what most state correctional agencies contract with private facilities to do.

## What States Ask Contractors to Do

In general, state and federal governments demand in their contracts that privately operated facilities perform like their public sector counterparts. Statements of work in the contracts generally specify that compliance will be required with the same procedural rules, regulations, and standards that are in force in the public facilities. Although the Abt Associates survey did not explicitly ask if compliance with departments of corrections' rules and regulations was required of contractors, monitors for eleven contracts volunteered that such compliance was indeed specified as a performance objective in the contract. An examination of a selected number of contracts also found this to be true. Correctional administrators also reported that 57 of the contracts in force at the end of 1997 required that facilities achieve ACA accreditation within a specified time. In addition, administrators reported that 61 contracts explicitly required compliance with conditions established in consent decrees or other court-mandated standards.

---

[73] ACA accreditation requires a facility to meet all mandatory standards during a three-day inspection by an ACA audit team. The facility receives a score based on the proportion of optional standards the facility meets. To maintain accreditation, the facility must pass inspection every three years.

[74] There are some exceptions to this, as discussed below.

There is no doubt that inclusion of such procedural requirements in contracts is necessary. As discussed in chapter five, governments may remain liable for the performance of contractors. Compliance with national standards and laws provides governments a measure of protection against lawsuits. However, examples of contracts that go beyond these to specify other performance outcomes are rare.

## Monitoring Contractors' Compliance

Governments' practices of monitoring privately operated facilities vary widely. All contracts receive some oversight from the contracting agency. This ranges from minimal attention from a centrally located contract administrator to a combination of a contract administrator and one or more on-site monitors. Of the 28 state and federal government agencies surveyed by Abt Associates that reported having active contracts with privately operated facilities on December 31, 1997, twenty reported using monitors in addition to contract administrators. Several states required a strong background and knowledge of a government agency or corrections as prerequisites for monitoring correctional contracts. Others required experience as an internal auditor or investigator. Most governments required at least some level of formal training (up to 40 hours annually) in areas such as auditing, establishing performance standards and measures, ethics, and reporting disputes and conflicts. Contract monitors surveyed by Abt Associates often reported receiving more training than was required. One reportedly received more than 120 hours of training as a contract monitor. However, only 12 states reported providing training specifically geared towards the monitoring of privately operated correctional facilities.

The amount of time and labor spent on monitoring privately operated facilities also varied widely: from full-time monitors who spend a substantial proportion of their time on-site to virtually no monitoring at all. Of the 91 contracts for which we have information, 46 (52 percent) reported having monitors on-site on a daily basis (see table 4.1). These monitors generally worked full-time on these assignments, although some had responsibilities for more than one contract. A smaller number of contracts (16) had part-time monitors, who averaged about one day a week, visiting the facilities on a monthly basis. Ten contracts had monitors who devoted about the same level of attention to the contract, but visited only quarterly.

Case 3:16-cv-02267    Document 383-7    Filed 01/22/21    Page 10 of 16 PageID #: 18458

MARLOWE_0007069

Table 4.1

**Contract Monitoring Practices, by Frequency of Visits to Facility**

|  | Daily Visits | Weekly Visits | Monthly Visits | Quarterly Visits | No On-site Monitoring |
|---|---|---|---|---|---|
| Number of monitors | 35 | 3 | 7 | 6 | 2 |
| Number of contracts | 46 | 5 | 16 | 10 | 3 |
| Average hours per month spent on site, per contract | 145 | 57.6 | 19 | 6.7 | 0 |
| Average hours per visit, per contract | 7.25 | 14.4 | 19 | 20 | 0 |
| Total monitoring time (% FTE), per contract | 84% | 43.3% | 18.6% | 23.1% | 0% |

*Note:* Assumes a 40 hour work week. Nine contracts are not included in this table. Monitors of these contracts reported other arrangements for site visits, including visiting on an "as needed" basis or on an annual or semi-annual basis.

*Source:* Abt Associates survey of state and federal correctional administrators.

## Monitoring Performance as Outcomes

An alternative to conceiving of prisons' performance as procedurally based is to frame goals as *outcomes* and to identify and measure indicators that assess the facility's progress toward accomplishing these goals. This conforms to how many correctional administrators see their job. Even though legislators, governors, correctional theorists, and other parties may differ in how they define the mission of the prison, correctional administrators in public and private facilities generally agree with one another on both the general and specific goals of their assignment. Prisons should be operated to maximize public safety, either by keeping prisoners behind walls or maintaining strong controls over those who are released for short periods of work or education or for short furloughs and the like. Prisons should also be safe internally, for both prisoners and staff alike. Prisoners should be occupied rather than idle. Health care should be sufficient, more or less equivalent to the standards prevailing in the free community (if only because the courts have so required). Each of these objectives could be translated into specific outcomes that are amenable to measurement. Public safety could be measured by numbers of escapes, for example, or institutional safety by numbers of assaults by prisoners on other prisoners or on staff.

Case 3:16-cv-02267    Document 383-7    Filed 01/22/21    Page 11 of 16 PageID #: 18459

MARLOWE_0007070

Professor Charles Logan attempted to formalize such an approach in his definition of what he calls a "confinement model" of corrections and associated performance indicators.[75] This model does not assume the success of prisons is determined by their effects on criminality in the larger society. Rather, goals are limited to aspects that prison officials have the ability and resources to affect. Thus, the mission of corrections is to "keep prisoners in, keep them safe, keep them in line, keep them healthy, and keep them busy—and do it with fairness, without undue suffering, and as efficiently as possible." The goals associated with this mission statement are security ("keep them in"), safety ("keep them safe"), order ("keep them in line"), care ("keep them healthy"), activity ("keep them busy"), justice ("do it fairly"), conditions ("without undue suffering"), and management ("as efficiently as possible"). These goals are then given operational objectives and detailed performance measures, some of which rely on objective data (e.g., escape rates), some on subjective data (e.g., inmates' perception of their risk of being assaulted). Logan has used this approach, and his model, to compare the performance of a privately managed facility in New Mexico to a federal facility.[76] (See below for a discussion of these studies.)

Even though most contracts for private operations of facilities do not incorporate outcomes-oriented performance objectives in a *systematic* way, monitors do report measuring such indicators in many instances. Monitors for 71 contracts reported in the Abt Associates survey that they track variously specified incidents occurring in the privately operated facilities. Sixty-nine reported monitoring inmate misconduct, 68 monitor escapes, 73 monitor inmate programming, and 49 staff turnover. How these measures were used to assess the contractors' performance was not reported in the surveys. It does not appear that thresholds were contractually established to define acceptable or unacceptable ranges.

Nor do most contracts tie performance on such indicators to financial rewards. One exception is the Federal Bureau of Prisons' contract with Wackenhut for the operation of the Taft Correctional Institution in California, which contains provisions for an award-fee incentive worth up to 5 percent of paid invoices. The contract also has provisions for reducing payment for poor performance. The other exception is a contract between the District of Columbia and the Corrections Corporation of America for the operation of the Correctional Treatment Facility, which permits financial rewards for meeting targets based on performance indicators.

In summary: even though most correctional administrators could agree upon a number of outcomes that could be used to assess their success, in addition to compliance with various procedural rules and regulations and recognized standards, most contracts have not taken such an approach. Rather, good performance is seen as complying with the terms of the contract—the rules, regulations, and standards included explicitly in the statement of work or by reference.

---

75  Charles Logan, "Criminal Justice Performance Measures for Prison," in John J. DiIulio et al., *Performance Measures for the Criminal Justice System* (Washington, DC: Bureau of Justice Statistics, 1993), pp. 19-59).

76  Charles H. Logan, *Well Kept: Comparing Quality of Confinement in a Public and a Private Prison* (Washington, DC: U.S. Department of Justice, National Institute of Justice, 1991.

# How Well Do Privately Operated Facilities Perform Relative to Government Operated Ones?

The Abt Associates survey of state administrators asked contract monitors to assess the performance of each of the facilities that were operated under contract with their agencies. More specifically, the monitors of these contracts were asked, "In your professional opinion, does the quality of service provided in this facility fall below, equal, or exceed (a) that of the contract requirements? (b) the quality of service in other reasonably comparable facilities in your system operated directly by public correctional authorities?" Most (68 of the 80 responses) reported that the contractors' performance met the contractual requirements; only three exceeded requirements; ten were seen as failing to meet requirements. Similarly, most (58) were assessed to be the equals in terms of performance to similar facilities operated by the government correctional agency; ten were thought to exceed the performance of these government facilities; and twelve were deemed inferior. Thus, about three-quarters of those facilities under contract with state or federal agencies in the closing days of 1997 were assessed as delivering performance equivalent to that found in comparable government operated facilities in the same jurisdictions.

Another indicator of contractor performance is whether contracts are terminated or whether contractors are found to be in violation of the terms of contract. The Abt Associates survey of state and federal correctional administrators asked for information about contract terminations and contract violations. However, these inquiries focused on contracts that were active as of December 31, 1997. Terminations occurring before this date were reported summarily, with little characterizing information. Based on the data reported in the survey, it is not possible to determine whether contracts terminated before this date were terminated as a result of contract violations. Of the sixteen terminations reported, nine agencies reported that their sole reason for terminating their contracts was reduced need for beds. In probably only five instances, terminations occurred as a result of vendor violations.

- North Carolina terminated its contract with the Limestone County Detention Center in Texas citing operational problems and a reduced need for contractor capacity.
- Oklahoma also terminated its contract with Limestone County Detention Center in Texas for use of excessive force, idleness, and lack of attention to need. Reduced need for beds also contributed to the decision to terminate this contract.
- Colorado terminated its contract with Bowie County Correctional Facility in Texas citing "conditions."
- Utah terminated its contract with Frio County Detention Center and Crystal City Detention in Texas citing several escapes with legal inability to prosecute.[77]
- Montana terminated its contract with Dickens County Correctional Facility in Texas citing unsuitability of facility for long term inmate housing.

In each of these cases, the agency and the contracting facility were located in different states. These facilities were typically engaged to house prisoners in what amounts to a temporary "bed renting" arrangement to alleviate crowding in the state's prisons.

---

77  See chapter 5 for further discussion on prosecutorial jurisdiction and statutory authorization.

Case 3:16-cv-02267   Document 383-7   Filed 01/22/21   Page 13 of 16 PageID #: 18461

MARLOWE_0007072

Eight agencies reported issuing violations to eleven facilities. For example, the Federal Bureau of Prisons reported several escapes occurring at Eloy Detention Center, which is operated under contract. Other agencies reported four other security-related violations. Oklahoma reported violations of inmate rights which included excessive use of force, disciplinary measures, idleness, and lack of attention to need.[78] Other common violations involved case management and medical issues.

That some private facilities have been found in violation of their contracts reveals little, if anything, about their relative performance vis-a-vis their public counterparts. Sub-par performance exists in publicly operated prisons, but no equivalent mechanism exists for finding the facilities in violation of written agreements (other than court orders or consent decrees). Superintendents of public facilities do not contract with their superiors to deliver institutional performance specified in legally binding terms. Moreover, many public facilities fail to achieve American Correctional Association accreditation, and federal courts have found the performance of many public prisons deficient.

## Systematic Research to Evaluate Performance of Privately Operated Prisons

Eight research studies have been conducted and reported during the past decade of privately operated secure confinement facilities in the United States. All but one were described in chapter three, as each sought to evaluate both cost and performance of private and public facilities.

Perhaps the most striking aspect of this research literature is that it is so sparse and that so few government agencies have chosen to evaluate the performance of their contractors formally. Even though there exist over a hundred privately operated secure confinement facilities, there have been very few systematic attempts to compare their performance to that of public facilities. Most government agencies have been satisfied with monitoring compliance with the terms of the contracts. An examination of the available literature indicates that only a few states have sought formal evaluations of a contractor facility's performance. In a small number of other states, researchers have received grants to conduct research and have gotten agreements from private and public facilities to be studied.

The authors of these studies measured institutional performance using a variety of different indicators. These included outcomes-oriented measures such as post-release recidivism, numbers of escapes, uses of force, disciplinary problems, and major disturbances. Some studies also measured the extent to which prisoners were engaged in productive activities, including educational programming. Some assessed compliance with standards; some conducted audits, especially of security procedures. Others surveyed staff and inmates to learn their subjective assessments of the facilities. For an assessment of these studies, see the paper by Gerald Gaes, Scott Camp, and William Saylor, in appendix 2.

Some of the researchers argued that their findings indicated superior performance in the private facility studied. Charles Thomas, for example, concluded that the performance of the privately

---

78  Oklahoma was the only state to report violations which caused termination. Strict adherence to our questionnaire, as noted, would not permit such a report.

Abt Associates Inc.                                   Private Prisons              54

Case 3:16-cv-02267    Document 383-7    Filed 01/22/21    Page 14 of 16 PageID #: 18462

MARLOWE_0007073

operated Marana Community Correctional Facility in Arizona was comparable and in some respect superior to the average performance of all other 15 state-operated minimum-security facilities.[79] However, as discussed in chapter three, this facility was a specialized one for which no comparable government-run facility existed. Comparing its performance to an average of all other minimum-security prisons obscures the fact that it did better than some and worse than other public facilities. The more reasonable conclusion to draw from the data is that the Marana facility appears to have delivered a level of service within the same range found in the other fifteen facilities.

In his ten-year old study of New Mexico's only facility for women, Logan reported finding superior performance under private management, compared to the direct government management of the same facility one year earlier and compared to the performance of a federal prison in West Virginia.[80] Although a large number of dimensions were measured, using both objective data and subjective assessments of staff, the small size of the sample limits the generalizability of the findings. Moreover, the claim of superiority relies mostly upon the subjective data obtained from staff surveys, which were possibly biased in favor of private management, if only because contractors were invited into New Mexico to remedy an unsatisfactory system for housing women offenders.

Only a few studies had the advantage of comparing similar public and private facilities in the same jurisdiction. The State of Tennessee compared three facilities, two publicly operated and one privately operated, and concluded that all three were operating at essentially the same level of performance.[81] In Louisiana, William Archambeault and Donald Deis compared two privately operated facilities with one government facility that was similar in design and mission. Performance was measured by a number of different indicators. On some measures, the authors interpreted the data as evidence of the private facilities' superiority; on others, the reverse was thought to be the case. In general, however, they concluded that the two private facilities outperformed the public one used as a comparison. We read the study and the data differently. We see no compelling evidence of the private facilities' superiority with respect to performance.

In their review of several studies comparing public and private prisons' performance, Gaes, Camp and Saylor reach the same general conclusion that GAO reported: that all of the existing evaluations are flawed in fundamental ways, and there is little information that is widely applicable to various correctional settings (see appendix 2). Accordingly, they believe that it is not possible to make any general statements about the ability of private contractors to ensure quality correctional services in comparison to public prison management.

The authors argue that the existing evaluations fail to coherently examine factors other than management differences that might influence correctional outcomes. That is, the existing evaluations assume that any observed differences in performance of public and private prisons can be attributed to management practices, when these differences may be caused by a variety of other factors that often

---

79  Thomas, *Comparing Cost and Performance*, 1997.

80  Logan, *Well Kept*, 1992.

81  State of Tennessee Select Oversight Committee on Corrections, *Comparative Evaluation*, 1995, p. 68.

Case 3:16-cv-02267   Document 383-7   Filed 01/22/21   Page 15 of 16 PageID #: 18463

MARLOWE_0007074

are not under the direct control of management. Such factors include dissimilarities in the prisoner populations and the architecture of the facilities.

Gaes, Camp and Saylor note also that none of the existing evaluations tried to determine the extent to which management practices, ideas, and personnel were shared among public and private sectors. Little research attention has been given to the impacts that contracting may have had upon the public prison systems that have relied upon contracting for private imprisonment. Moreover, few researchers have attempted to document innovations developed by private contractors to improve services and/or reduce costs.

## Summary

In general, it appears that state and federal governments are getting what they ask for in privately operated prisons, with some notable exceptions. Where contractors are sought to operate facilities owned by the contracting agencies, the contract procurement and monitoring procedures appear to be designed to obtain a facility that is a close equivalent to the public facility, differing mainly in the legal status of the operator (i.e., private rather than government). Rules and regulations to be followed are consistent with, if not identical to, those promulgated in the public corrections agency. Governments monitor contractors to ensure that they comply with standards, rules and regulations, and court orders, if for no other reason than to reduce their exposure to lawsuits. Great variability exists in the time and attention government monitors spend on their tasks, with some devoting virtually no time at all and others spending all of their time at a single facility. Where monitoring is so limited, it is unlikely that contracting agencies are able to provide more than a cursory assessment of the contractor's performance.

When state governments house prisoners in out-of-state facilities, they are looking more for beds on a temporary basis than for another facility that will be integrated into the states' public correctional agency. Although these contractual relationships were not studied closely, it is likely that the threshold for acceptable performance differs from that applied to management contracts in state-owned or perhaps privately-owned, in-state facilities. How well these out-of-state facilities are integrated into the public correctional agency is an issue, and expectations may be lower. Whether or not private prisons have gone beyond contract compliance and actually perform better on other measures of outcome is not well documented.

Only a few of the more than a hundred privately operated facilities in existence have been studied, and these studies do not offer compelling evidence of superiority.