# EXHIBIT D
# Part 5 of 14

# 5. Legal Issues Relevant to Private Prisons

The legal issues surrounding the privatization of prisons have elicited considerable interest and concern from public correctional officials and the general public since private prisons became a reality in the mid- to late 1980s. Over the past decade, however, the thrust of this interest and concern has changed as practical experience and legal precedent have answered some questions and raised others. A host of subsidiary legal and contractual matters continue to receive attention and provoke discussion. These range from questions about the use of force by private prison guards to highly-publicized problems resulting from certain states' lack of legislation governing out-of-state prisoners in private prisons.

With these and other legal matters increasingly well illuminated, it becomes possible to discern how relatively few legal topics turn on public-private distinctions. To a considerable extent, the legal requirements applicable to public correctional agencies—most notably the constitutional standards governing incarceration—are the same for their private counterparts. Meanwhile, only a handful of the legal issues peculiar to private correctional facilities have elicited legislative treatment. For the most part, the contracting process has become the real focus of legal innovation. In the coming decade, more of the resulting contractual arrangements will be carefully scrutinized and modified by public correctional officials and the courts.

This chapter briefly focuses on the major legal issues that have emerged in prison privatization over the past decade. The broad conclusions contained herein are treated at greater length in appendix 3.

## The Legality of Delegating Correctional Services

While the legality of governments delegating the incarceration function to private entities generated considerable controversy in the 1980s,[82] it would now appear that objections to prison privatization *per se* on constitutional delegation grounds have relatively little potency. To begin with, the federal constitutional delegation doctrine, grounded in separation-of-powers principles, is rarely invoked and has little direct application to private delegations.[83] Unless a government has absolutely no persuasive statutory authority for entering into private prison contracts, courts will be extremely reluctant to invalidate privatization arrangements strictly on delegation grounds. More generally, privatization is usually viewed merely as a delegation of certain *administrative* functions related to incarceration. Accordingly, only delegated rulemaking and adjudication functions that directly purport to exercise a government power are deemed to require special constitutional due process safeguards and to be subject to heightened judicial scrutiny.[84]

---

82   See, e.g., Field, Note, *Making Prisons Private: An Improper Delegation of a Government Power*, 15 Hofstra L. Rev. 649 (1987); I. Robbins, The Legal Dimensions of Private Incarceration 396-413 (1988).

83   The Supreme Court has not invalidated a private delegation since the New Deal-era case of *Carter v. Carter Coal*, 298 U.S. 238 (1936).

84   See generally Lawrence, *Private Exercise of Governmental Power,* 61 Ind. L.J. 647, 650-653.

Case 3:16-cv-02267   Document 383-8   Filed 01/22/21   Page 2 of 17 PageID #: 18466

MARLOWE_0007076

These constitutional due process mandates—often subsumed under a broader "delegation" heading—appear to require that certain types of rulemaking and adjudication be kept in public correctional agency hands.[85] As a practical matter, these mandates have generally meant that private delegations are permissible where the private entity's role is subordinated to adequate public oversight and/or approval.[86] In this context, a due process or delegation challenge might be sustained if, for example, private correctional authorities had the final say in functions like writing rules on release or making disciplinary decisions.

The courts have yet to determine whether a private contractors' *potentially* strong interest (it need not actually be shown to exist) in maximizing their inmate populations[87] would disqualify them from making rules or decisions directly affecting inmates' liberty interests, including rules and decisions involving sentencing, parole, release dates, furloughs, discipline, and other matters affecting "good time" credits.[88] Still, numerous states have enacted legislation directed at retaining ultimate release-related decision-making and rulemaking in the public sector.[89] Other states have sought to retain such powers by contracts. In most cases, these statutory or contractual provisions have mandated that initial decisions or recommendations, even where formulated by private contractors, must be subject to final approval or ratification by public authorities.

---

85  The Due Process Clause has given use to an influential line of Supreme Court cases invalidating the delegation of discretionary rulemaking or adjudication powers to financially interested & or potentially interested & parties. In the rulemaking context, *see, e.g., Eubank v. City of Richmond*, 226 U.S. 137 (1912) (striking down local ordinance authorizing majority of landowners to impose set-back requirements on neighbors); *Carter v. Carter Coal Co., supra.* In the adjudication context, *see, e.g., Sniadach v. Family Finance Corp. of Bay View*, 395 U.S. 337 (1969) (invalidating law authorizing private parties to garnish employee wages before employees can respond to garnishment in court); *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973) (striking down state optometry board's adjudication of conduct by corporate salaried optometrists where board was composed of individual optometrists with financial interest in reducing corporate competition). Note that these standards are applicable to the federal and state governments alike, since the constitutional restrictions on private delegations apply to the fifty states through the Fourteenth Amendment. *See* Liebman, *Delegation to Private Parties in American Constitutional Law*, 50 Ind. L. J. 650, 652-54 (1975).

86  *See, e.g., Currin v. Wallace*, 306 U.S. 1, 15-16 (1939) (creation of market controls by producers judged constitutionally acceptable based on government-imposed requirement that 2/3 of producers waive antitrust restrictions); *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 399 (1940) (industry officials allowed to propose non-binding minimum prices where officials functioned "subordinately" to a public commission); *Fuentes v. Shevin*, 407 U.S. 67, 80-83 (1972) (state-sanctioned prejudgment repossession of property by private companies permissible only if property owners have opportunity to resist seizure before a judge).

87  In some cases, the nature of the contract between the responsible agency and the private provider eliminates any financial interest on the part of the provider to maximize the inmate population & for example where the contract sets a fee that is independent of the number of inmates housed.

88  The most persuasive guidance, albeit in a property rights, rather than liberty interest, context, are the so-called "Todd Standards" first articulated in the case of *Todd & Co. v. SEC*, 557 F.2d 1008 (3d Cir. 1973). Under *Todd*, three factors were presented that enabled rulemaking and adjudicatory functions by private securities associations to accord with due process. First, the private entity's rules had to be approved by a governmental authority before becoming effective. Second, all private decisions regarding rule violations and penalties had to be subject to governmental review. Finally, all such private adjudications had to be governed by a *de novo* standard of review giving no particular deference to the earlier decision. While the third factor has not been accorded much attention, many states have interpreted the first two factors to require that rulemaking for private prisons and adjudications by private prison contractors be subject to final government review and approval. *See, e.g.,* the state statutes mentioned in fn. 7 below.

89  Taking just a few examples of the many statutory restrictions of this nature, *see, e.g.,* Va. Code Ann. § 53.1-265 (barring private contractors from developing and implementing procedures for calculating inmate release and parole eligibility dates); Ariz. Rev. Stat. Ann. § 1609.01 (prohibiting contractors from taking any disciplinary action against an inmate); Colo. Rev. Stat. Ann. § 1 7-1-203 (preventing private contractors from making conclusive recommendations about parole of particular inmates); Fla. Stat. Ann. § 957.06 (preventing private prison contractors from granting, denying or revoking inmates' good-time credits).

# Liability for Private Prison Conditions

Of central importance to governments contemplating correctional privatization is the question of how privatization affects liability for the conditions in private prisons. For some time, relatively extravagant claims were made by both advocates and opponents of privatization that the advent of private prisons would insulate governments from liability exposure.[90] Claims were also made that privatization would substantially shield private contractors from inmate civil rights suits alleging constitutional harms.[91] The following questions hung heavily over the debate: Can prisoners' rights—including those established under the Constitution—be adequately protected in a private correctional context? Does the delegation of day-to-day responsibility for facility management to a private contractor yield lower potential liability exposure for government correctional authorities? And does correctional privatization result in a lower litigation price tag for the government?

The answer appears to be a qualified "yes" to the first and second questions and a "maybe" to the third. As to the matter of safeguarding inmate rights, it is generally accepted that private prisons will be treated as "state actors" for purposes of civil rights suits,[92] so that all relevant constitutional requirements will apply with equal force to private as well as public correctional facilities. Moreover, private prison employees will not be covered by the "qualified immunity" that shields from liability public correctional authorities who reasonably believe that their discretionary actions are lawful.[93] Finally, private prisons and officials will not be protected by other governmental immunities that may otherwise limit the monetary damages available to inmates suing over prison conditions.[94]

As for liability exposure, a government's exposure will generally be lower if a private contractor is running a private facility. A contractor will be the primary defendant in inmate litigation, and government authorities generally will not have direct responsibility for the actions of contractor employees. In the vast majority of inmate cases—including most prisoner civil rights litigation where individual, rather than systemic, group harms are at issue—governments will not be deemed to have specific knowledge of, and therefore bear responsibility for, the specific acts and injuries alleged.[95]

---

90  *See, e.g.,* Wash. Post, March 23, 1986, at F6, col. 2 (describing how some politicians believed that government could escape liability through use of private prisons); M. Walzer, "Hold the Justice," New Republic, April 1985, at 12 (privatization may result in an "escape from the enforcement of constitutional norms").

91  *See, e.g.,* Sullivan, *Privatization of Corrections: A Threat to Prisoners' Rights, in* G. Bowman, et al., eds., Privatizing Correctional Institutions 139 (1994).

92  *See West v. Atkins,* 487 U.S. 42 (1988). *See also, e.g., Street v. Corrections Corp. of America,* 102 F. 2d 810, 814 (6th Cir. 1996); *Payne v. Monroe County,* 779 F. Supp. 1330, 1335 (M.D. Fla. 1991).

93  *Richardson v. McKnight,* 117 S. Ct. 2100 (1997).

94  The Eleventh Amendment and state sovereign immunity statutes may prevent inmates from suing federal or state correctional agencies and supervisory officials in their official capacities. In these cases, plaintiffs may be limited to suits for monetary damages against officials in their personal capacity.

95  Under "Section 1983" civil rights litigation — which represents the overwhelming majority of inmate claims — a firm and its supervisory employees must be shown to have been directly involved in an alleged violation, have known about the violation or its likelihood of occurring, and been "deliberately indifferent" toward the risk, or have generated or validated a policy or custom that led to the violation. *See, e.g., Street v. Corrections Corp. of America, supra* at 818. *See also generally Monell v. Dep't of Social Services,* 436 U.S. 658, 694 (1978). Since public correctional authorities will have entrusted day-to-day management of prisons to private contractors, they will be less likely to have notice or knowledge of specific harms alleged to have caused injury to individual inmates.

Case 3:16-cv-02267　　Document 383-8　　Filed 01/22/21　　Page 4 of 17 PageID #: 18468

MARLOWE_0007078

While reliance on a private contractor will not prevent government authorities from being named in lawsuits or being exposed to liability for widespread or obvious problems relating to facility conditions, private contracting will greatly lessen the liability of government supervisory officials for most inmate claims alleging individual harm. These claims represent the most common type of prisoner lawsuit and assume a significant proportion of a correctional agency's litigation budget.

Government litigation costs at a particular facility may or may not be lower with prison management in the hands of a private contractor. A great deal depends on the nature of the facilities involved, the profile of the inmate population, and the risk management approaches taken by particular public versus private authorities. The latter approaches can themselves vary greatly according to the overall management plan, quality of staff, and claims handling procedures employed by those administering a specific prison facility or system. While it may be contended that private authorities can exercise greater flexibility than their public sector counterparts in given situations, this assertion cannot be readily substantiated.[96] Thus, even though a prudent government correctional agency will insist as a matter of course that a contractor indemnify and hold it harmless against all acts and omissions of the contractor arising under a management contract—and even though such an agency will similarly insist that it be named as an insured on any private comprehensive general liability insurance policy covering particular prison facilities—there is no way to tell for sure whether its litigation expenditures under privatization will be lower.[97]

While some degree of liability exposure will still attach to governments that have privatized certain prison facilities, such exposure can be further reduced through the sensible use of monitoring personnel. Having on-site monitoring provides a mechanism by which government supervisory officials can take remedial steps upon learning of certain problems, thereby limiting the potential for a negligence lawsuit.[98]

---

96  Some privatization proponents have asserted that private firms may prove more responsive to inmates and the general public in remedying problems that result in prison litigation. They content that a private contractor can more more expeditiously to correct a problem or settle a lawsuit when political pressures are absent, fewer approvals are needed, and funding is more readily accessible. Also, a private firm's concern with market reputation and profitability is alleged to create incentives for flexibility and holding costs down. There remains no solid evidence or study to support these contentions, however plausible they may be.

97  Clear answers to this question are likely to be exceedingly difficult to obtain. To begin with, public entities do not carry third party liability insurance, so direct cost comparisons are impossible. Also, public correctional authorities and contractors alike would find it very hard to isolate with any precision all of their relevant litigation costs (staffing costs, particularly in the public sector, are hard to attribute exclusively to litigation-related functions), and may be reluctant to disclose their damage awards paid out. Ascertaining what portion of the contractor's per diem is attributable to litigation defense would probably be quite speculative. Finally, it would be extremely difficult to control for potentially wide differences in prison populations, facility conditions, and the past history of litigation at one or more facilities. Still, one could surmise that public authorities have a number of factors that could aid them in keeping certain litigation defense costs relatively low. These include the judicious use of salaried government attorneys to handle virtually all prison litigation, possibly less expensive claims handling, and the lack of a profit mark-up. Private contractors, by contrast, might feature relatively more expensive claims handling and legal assistance (e.g., though contract attorneys billing at market rates), as well as that portion of their fee allocated to such work.

98  Government correctional authorities may be liable for their own negligence in oversight even though management of a correctional facility has been turned over to an independent contractor. *See Logue v. United States,* 412 U.S. 521, 532-33 (1973). A monitor can prevent such negligence from occurring. Moreover, in Section 1983 cases, a monitor can keep supervisory officials accurately informed about situations that, if left unattended to, could give rise to charges of "deliberate indifference."

# Employment and Labor Relations Issues

Employment and labor relations questions pose a number of important issues to government correctional authorities as well as private contractors, including concerns about private employees' right to strike. As a preliminary matter, it is important for a government correctional agency to ensure that a private prison management company is indeed treated as an independent contractor, with its own responsibility for compliance with all legal requirements imposed on private industry, including the Fair Labor Standards Act and relevant federal and state nondiscrimination laws.[99] It is also important for government officials to ensure that they have adequate statutory authorization to privatize corrections from the standpoint of civil service laws.[100]

Private contractors will be subject to the National Labor Relations Act (NLRA), rather than labor legislation governing public employees. At an entirely new facility, this will mean that a contractor will not be permitted to interfere with any concerted activity taken by its employees. At an existing facility, however, it is extremely unlikely that a contractor will have to bargain with an existing union or adopt an existing union contract. Under the NLRA, an incumbent public employees' union will not be able to represent prison guards in a private employment setting.[101] Only a special guards union—such as the United Plant Guard Workers of America—can represent prison guards under the NLRA. Even in the extremely rare case where guards at a public facility are already represented by such a union, a private contractor would not be bound by the substantive provisions of the existing labor contract unless the contractor were to indicate affirmatively that it would hire most of the named correctional officers at a facility or would explicitly consent to the terms of the existing contract.

While the right to strike clearly exists at private prisons, the potential for work interruptions also exists in the public sector, i.e., work slowdowns and "blue flu" outbreaks. Still, the potential for more serious disruption of prison operations can be blunted in two important ways. First, a private contractor can seek to have employees agree, individually or collectively, to a no-strike pledge.[102] Contractors can also seek notification requirements that allow contractors to make arrangements for assumption of certain correctional responsibilities in the event of a work interruption.

---

99  If a management company were not an independent contractor, it could be deemed a "joint employer" with the government, which would prevent the contractor from having unfettered discretion over a range of personnel issues. This might emerge most critic ally where a government, as joint employer, was deemed to retain civil service control over employees, thereby negating the purport ed benefits of personnel flexibility that are supposed to attend privatization.

100  For example, in Washington and Colorado, courts have ruled that those states' civil service laws bar privatization. *See Colo. Ass'n of Public Employees v. Dep't of Highways,* 809 P.2d 988, 995 (Colo. 1991)( *en banc*); *Wash. Fed'n of State Employees v. Spokane Community College,* 585 P. 2d 474, 476 (Wash. 1978)( *en banc*).

101  Under the NLRA, "no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership. . . . employees other than guards." NLRA § 9(b)(3), 29 U.S.C. §159(b)(3).

102  Unions often agree to the inclusion of such clauses in labor contracts in return for a management agreement to seek peaceful settlement of contract disputes through an agreed-upon grievance procedure. The U.S. Bureau of Prisons contract for its privati zed Taft, California facility provides that any collective bargaining agreement entered into during the period of the contract "sho uld provide that grievances and disputes involving the interpretation or application of the agreement will be settled without resor ting to strike, lockout or other interruption of normal operations." Taft Contract at 14.

Case 3:16-cv-02267   Document 383-8   Filed 01/22/21   Page 6 of 17 PageID #: 18470

MARLOWE_0007080

# Inmate Labor Questions

The Thirteenth Amendment to the U.S. Constitution excepts convicted prisoners from its bar against "involuntary servitude."[103] Courts, accordingly, acknowledge this "convict labor exception" and uphold laws mandating prison labor while finding no prisoner right to remuneration for prison work.[104] Against this backdrop, there is little reason to believe that private prisons, merely based on their for-profit nature, would create a persuasive basis for a Thirteenth Amendment objection.

In fact, federal and state regulatory schemes governing prison industry labor are designed to prevent exploitative situations from developing. In the federal system, a government corporation known as Federal Prison Industries ("Unicor") manages all prison industry labor (roughly 20% of all federal inmates) and cannot sell its products and services in regular interstate commerce. Moreover, because they do not work voluntarily, prisoners working for Unicor are not "employees" under the Fair Labor Standards Act.[105] In the case of state prisons, the federal government has largely preempted state legislation by generally restricting the flow of prison products and services in interstate commerce.[106] While the Prison Industry Enhancement (PIE) Act of 1994 does allow prison-made goods from 50 pilot industry programs in various states to be sold in interstate commerce, prisons employing inmates in these programs must pay them prevailing or minimum wages and provide them with workers' compensation coverage.[107] Questions remain as to whether private prisons will be authorized to operate prison industry programs pursuant to the PIE Act.

The biggest worry about inmate labor does not relate to such prison industries, but to increasing use of inmate labor to perform ordinary prison maintenance or service work. There is understandable concern that inmate labor may increasingly be used by for-profit contractors to handle more aspects of prison operation—including tasks traditionally performed by government employees. One way to draw boundaries in such situations is to use the same inmate staffing plans for private prisons that are used in public facilities. This creates a level playing field and allows for reasonable cost comparisons. Public correctional authorities should also attempt to ensure that, wherever possible, prison labor staffing innovations are accompanied by commensurate reductions in the per diem rates charged to the government by private contractors.

# Other Important Legal Issues

A number of other legal issues have important implications for correctional privatization. These include public access to private prison records; private contractor access to criminal history records;

---

103 Only pretrial detainees are protected from involuntary labor. *See, e.g., Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997).

104 *See, e.g., Berry v. Bunnell*, 39 F.3d 1056 (9th Cir. 1994).

105 *See, e.g., Vanskike v. Peters*. 974 F. 2d 806, 810 (7th Cir. 1992), *cert. denied*, 507 U.S. 928 (1993); *Nicastro v. Reno*, 882 F. Supp. 1128 (D.D.C. 1995), *aff'd*, 84 F.3d 1446 (D.C. Cir. 1996).

106 *See* the Sumners-Ashurst Act, 18 U.S.C. § 1761.

107 18 U.S.C. § 1761(c).

Case 3:16-cv-02267   Document 383-8   Filed 01/22/21   Page 7 of 17 PageID #: 18471

MARLOWE_0007081

the impact of bankruptcy laws on possible private contractor insolvency; private contractor use of force; and environmental law responsibilities. These topics merit brief discussion in turn.

**Access to Private Prison Records**

The shift toward private prisons has prompted concern that the public may be cut off from access to information necessary for proper accountability. A few key principles have emerged from the federal FOIA framework; state analogues, though too numerous and various to catalogue here, are likely to follow the same pattern. First, records relating to privatized facilities that are generated by public correctional authorities will be subject to public disclosure. Second, only private contractor records obtained *and held* by public agencies will be similarly available for public review.[108] Even then, however, exemptions for confidential "financial or commercial information" may limit disclosure, particularly if public authorities determine that disclosure might cause substantial competitive harm to a contractor.[109] Such is often the case with private prison proposals in competitive bidding processes. While the systematic collection of private contractor documents by public authorities might ensure adequate public access, other, less burdensome solutions include contractual requirements that simply require contractor compliance with FOIA.[110]

**Private Contractor Access to Criminal History Records**

To perform its prison management duties properly, private correctional contractors need access to criminal history records for two purposes: (1) to classify inmates properly and take other steps for the proper safety and care of prisoners; and (2) to screen potential private correctional employees. Of necessity, both of these needs affect the privacy rights and expectations of inmates and private citizens seeking employment in the field of law enforcement and corrections. As it turns out, there exist two related, but distinct, legal regimes at the federal level that safeguard these privacy rights and that would be accessible to private contractors.

The federal mechanisms established to permit transfer of selected federal criminal history records information (CHRI) to private firms represent a compromise between full disclosure and redacted or edited data which could hamper contractors' ability to perform their contractual obligations.[111] For prisoner data, private contractors may rely on the Federal Bureau of Investigation's National Crime Information Center (NCIC), which is able to link local, state, and federal criminal justice agencies for the purpose of exchanging CHRI. Public correctional authorities must first obtain such information

---

108 *See Dep't of Justice v. Tax Analysts,* 429 U.S. 136 (1989).

109 *See, e.g., Critical Mass Energy Project v. Nuclear Regulatory Commission,* 975 F.2d 871, 878 (D.C. Cir. 1992)( *en banc), cert. denied,* 507 U.S. 984 (1993).

110 In the future, another solution might be special legislation that mandates such a result for all privatized facilities. *See* N. Casarez, *Furthering the Accountability Principle in Privatized Federal Corrections: The Need for Access to Private Prison Records,* 28 U. Mich. J. L. Reform 249, 301 (1995).

111 At the state level, the policies are governed by state law, which reflects varied approaches too numerous to summarize within the scope of this report. Most of the mechanisms at the state level parallel and intersect with those employed by federal authorities.

Case 3:16-cv-02267   Document 383-8   Filed 01/22/21   Page 8 of 17 PageID #: 18472

MARLOWE_0007082

and then summarize or characterize it for use by private firms.[112] Access thus far has not appeared to be a problem.

A separate federal regulatory regime, which embraces employment screening, governs the use of CHRI for purposes unrelated to the "administration of criminal justice." CHRI can only be used for screening and licensing purposes pursuant to state and local statutes or regulations that are certified by the FBI's Criminal Justice Information Division, Access Integrity Unit, and that are administered by designated state and local agencies. Here too, contractor access has not appeared to pose a problem. It is worth noting, however, that the Federal Bureau of Prisons has decided to conduct criminal background and records checks itself in the case of the Taft facility. This would obviously maintain consistent screening procedures.

**Bankruptcy**

Few topics surrounding privatization seem to generate as much concern as bankruptcy, yet generally speaking, such concern seems exaggerated. Bankruptcies involving private prisons have been virtually nonexistent over the decade-and-a half of privatization and have been confined to those firms concentrating on the building of private prisons on a speculative basis. More important, public correctional authorities should be able to protect themselves against the untoward consequences of a potential contractor bankruptcy through proper monitoring and contracting.

A properly monitored contract should provide public authorities with some warning that financial problems exist. Annual financial investigations provide a baseline, while interim signals, such as complaints by certain vendors about missed payments, provide additional guidance that may militate in favor of prompt contract termination and the selection of another contractor (or resumption of public control). Public correctional agencies can also protect themselves by insisting in the contract that a contractor purchase business interruption insurance that names the relevant public agency as an insured.

Careful contracting and the competitive nature of the private prison industry are the best safeguards against serious problems developing from a bankruptcy. A general "termination for convenience" clause with a ninety-day phase-out or transition period can keep the public authorities outside the bankruptcy process (removing a facility from the bankruptcy process' automatic stay and control by a bankruptcy trustee) [113] and permit the public authority time to resume management of a facility or find another private operator. Moreover, a 90-day transition period also provides a government facing an impending private contractor bankruptcy with a significant financial resource with which to engineer a successful transition and cover most expected or unexpected damages. Due to the lag time in contractor invoicing—usually 30 days, followed by another 30 to 60 days for payments to be due—public authorities can withhold payment and use these sums for purposes of covering current operations and securing a new contractor.

---

112 *See generally* 20 C.F.R. §§ 20.21(b)(3), (c)(3).

113 The pre-petition termination of the contract can be ensured by a contractual requirement that notice of a filing of bankruptcy be given to the contractor several days or weeks in advance. *See* Ruben, *Legislative and Judicial Confusion Concerning Executory Contracts in Bankruptcy*, 89 Dickinson L. Rev. 1029, 1058-59 (1995).

MARLOWE_0007083

### Use of Force

Legal questions about the use of force often revolve around subtle matters of proper statutory authorization. The major issue for private prisons is whether the use of force generally, or specific variants thereof, including the use of deadly force, is properly mandated by the relevant law of the jurisdiction. Without proper enabling legislation or contractual provisions authorizing the use of force by designated private prison officials, it is possible that such personnel and the private firm could face criminal and civil liability.

The applicable legal standards for the use of force vary tremendously from place to place. Some laws may adequately treat the use of force generally, but insufficiently address the use of deadly force in a variety of situations. Other states, for example, recognize a common law right of any citizen to use deadly force in certain circumstances, including the apprehension of one previously arrested for a felony.[114] For states that have adopted the Model Penal Code, which permits correctional officers to use deadly force under certain conditions, private correctional firms may be so authorized if their employees are brought statutorily within the definition of "correctional officers."[115] A still different approach is taken by some states like Louisiana, which, in its correctional privatization statute, specifically authorizes private firms to use force and further prescribes standards and procedures for licensing private correctional employees to use weapons.[116]

Even if a contractual solution is adopted on a case-by-case basis—delegating certain use of force and weapons use powers to private correctional management firms—care must be taken to explore all of the nuances involved in various scenarios, including escapes and actions taken outside of a correctional facility. American Correctional Association (ACA) standards address many dimensions of the use of force in generic ways,[117] but specific policies and procedures are necessary to comply with state statutes and case law that have evolved under the Eighth Amendment. So-called rent-a-cop statutes delegating certain use of force powers to private security companies may not be sufficient to cover many of the circumstances encountered by private contractor guards. Also, correctional officials must be sensitive to interjurisdictional issues about the use of force, particularly in the case of escapes where use of certain types of force may not be authorized beyond a facility's perimeter. All of this requires government correctional officials and their legal staffs to think through very carefully all of the possible scenarios requiring different kinds of force and to ensure that there is proper authorization for their use.

---

114 This is ostensibly the case, for example, in Michigan. *See, e.g., People v. Whitty,* 96 Mich. App. 403, 292 N.W. 2d 214 (1980).

115 *See* Model Penal Code §§ 3.04-3.07, *cited in* Wooley, *Prisons for Profit: Policy Considerations for Government Officials,* 90 Dickinson L. Rev. 307, 323 (1985).

116 *See* La. Rev. Stat. Ann. § 39:1800.4(D)(5), (6). Note, for example, that the State of Ohio similarly requires a private correctional officer working at a correctional facility housing out-of-state prisoners in Ohio to carry and use firearms only if the officer is certified as having satisfactorily completed an approved training program designed to qualify persons for positions as special policemen, security guards or persons otherwise privately employed in a police capacity. Ohio Rev. Code § 9.07(E).

117 *See, e.g.,* ACA Standard 2-4206, for example, which simply requires a written policy and procedures to restrict the use of force as a last resort in cases of justifiable self-defense, protection of others, protection of property, and prevention of escapes. Elaboration is left to prison officials.

Case 3:16-cv-02267　　Document 383-8　　Filed 01/22/21　　Page 10 of 17 PageID #: 18474

MARLOWE_0007084

## Environmental Law Concerns

Environmental concerns unique to a privatized correctional facility are few. The only major questions concern responsibility for environmental impact statement (EIS) preparation in the case of new prison construction and proper allocation of the risk of hazardous waste cleanup liability.

The former issue will usually be the responsibility of the public correctional agency. Although a project proponent could be public or private, the government agency most involved with the project is the party responsible for the preparation of an EIS.[118] The latter issue revolves around the way in which public correctional agencies and private contractors choose to allocate their risk through carefully drawn indemnification agreements. Due to the transfer of land and property rights that may occur between governments and private contractors in a particular construction, sale, or lease arrangement, hazardous waste liability presents real concerns. Experience has shown that contracting parties need to articulate indemnification arrangements expressly to minimize the risk of non-indemnification.[119]

## Regulating Interjurisdictional Private Prison Contracting

Prison privatization, as commonly conceived, involves a government correctional agency contracting out correctional management work to a private contractor that operates within the agency's political jurisdiction and is subject to statutes and regulations promulgated by that jurisdiction. Correctional privatization can, however, involve other arrangements between public and private correctional entities that span multiple jurisdictions. These arrangements can encompass the transfer of prisoners to private contractors in distant localities and the interplay of several jurisdictions' laws that affect such a transfer. Two basic patterns characterize this phenomenon of interjurisdictional contracting. The first involves indirect arrangements where public correctional authorities send inmates to another jurisdiction via an intergovernmental agreement or contract, and the receiving jurisdiction in turn subcontracts to a private contractor to run the facility where the inmates are housed. The second arrangement involves the leasing of bed space directly from a private contractor in a foreign jurisdiction. Many of these prisons are built and operated on a speculative basis.

Both of these interjurisdictional arrangements have generated considerable controversy and legal problems. Correctional specialists have criticized the fact that the receiving facility may not have the legal authorities to allow it to cope with a variety of critical situations, including inmate escapes and

---

118 See Seattle Audobon Society v. Lyons, 871 F. Supp. 1291, 1318 (W.D. Wash. 1994) ("Agencies may not delegate the responsibility of preparing an EIS to private parties...."). This is the standard enunciated with respect to the federal National Environmental Policy Act (NEPA). State environmental protection acts (SEPAs) may have different requirements. See, e.g., G. McGregor, Environmental Law and Enforcement 10 (1994). Moreover, some SEPAs require different EIS preparations depending on whether a project is deemed public or private in nature. See, e.g., Wash. Rev. Code § 43.21C.030. In most cases, however, a private prison should be deemed a public project based on its governmental function. Cf. Weyerhauser v. Pierce County, 873 P.2d 498, 504-07 (1994) (en banc) (holding that a private contractor's construction and operation of a landfill is a public project because the handling and disposal of waste is a governmental function).

119 See Hill, Contractual Indemnification for Environmental Liabilities, 21 Colo. Law. 943, 944 (1992).

prison emergencies. The law in most cases has lagged behind these correctional realities.[120] A good example is the case of two Oregon prisoners who escaped a few years ago from a private prison in Texas and yet were unable to be charged with a crime, since Texas law at the time did not recognize escape from a private prison as a felony.[121] More recently, a lack of legal oversight mechanisms was highlighted in the case of the privately-operated Northeast Ohio Correctional Center (NOCC) in Youngstown, Ohio, which accepted out-of-state prisoners from the District of Columbia. The NOCC experienced two fatal prison stabbings within a year of its opening, allegedly due in part to the acceptance of out-of-jurisdiction inmates without an adequate classification system and without standards requiring sufficient criminal history information about the prisoners.[122]

In response, many states have recently crafted detailed legislative solutions. Two notable examples are Ohio (in direct response to the NOCC difficulties) and Texas.[123] These new statutes attempt to give state correctional agencies greater authority to prescribe minimal operating standards for such facilities and to eliminate gaps and inconsistencies that have emerged in the legal treatment of private facilities housing in-state versus out-of-state inmates. They address in particular the need for private prisons with out-of-state inmates to be inspected by state authorities, maintain proper staffing, coordinate closely with local law enforcement officials, reimburse them for the costs associated with prison escapes and disturbances, and reject foreign prisoners if necessary for a variety of reasons, including patterns of institutional violence in their correctional record. More such legislation can be expected in coming years.

## Legal Dimensions of Contracting

Today, the success or failure of a private prison arrangement may critically depend on the skill with which contracts are negotiated. Public authorities must give close attention to the purposes served by contracting and the degree of specificity which they seek to build into the agreement. In the absence of an adequate statutory or regulatory framework, a contract may have to import from the outside and treat in detail a number of issues that would otherwise govern various aspects of prison operation. Correctional authorities should also be sensitive to the need to create, wherever possible, a level playing field between public and private prisons to promote fairness, increase competition, and allow for meaningful cost comparisons.[124] Requests for Proposals (RFPs) can be structured in such a way as to elicit many kinds of contractor information and plans which public officials can scrutinize and evaluate in putting together a tight and effective contract.

---

120  *See* Associated Press, Private Prisons Shackle Texas with Confusion: State Laws Haven't Caught Up with New Phenomenon, Chicago Tribune, Nov. 7, 1996 at 34.

121  *See* Prison Brake: Texas Needs More Scrutiny of Private Prisons, Houston Chronicle, Sept. 3, 1996 at 18A.

122  *See* Washington Post, February 23, 1998 at B1.

123  Ohio House Bill 293, effective March 17, 1998; Texas Senate Bill 367, May 7, 1997.

124  A good example of this is ensuring that private contractors do not make money from things like inmate phone service, commissary sales, and the like. Income from these, if it exists, should be reflected in lower per diem rates or should be paid into the general fund.

Case 3:16-cv-02267    Document 383-8    Filed 01/22/21    Page 12 of 17 PageID #: 18476

MARLOWE_0007086

Contracts themselves can ensure better performance and cost effectiveness through well-drafted provisions, the inclusion of objective standards, relatively short contract periods (e.g., 3-4 years) and renewal opportunities, and broad termination clauses and penalty provisions. Contracts can even specify cost savings requirements, which can be phrased in terms of a provider delivering correctional services at significantly less cost or with significantly better services at the same or less cost than that which public correctional authorities would need to pay if they did the job themselves.[125] Drafters must be careful, however, not to inadvertently bestow third-party contract beneficiary rights on inmates or the public.[126]

Public correctional authorities should also be wary of excessive use of alternative dispute resolution provisions in a contract—particularly those relating to arbitration—to handle disputes with contractors. Although arbitration is appropriate for handling issues surrounding payment and possibly certain issues regarding the satisfaction of certain technical standards (including certain American Correctional Association standards), its use in other contexts can deprive public officials of the effective contractual and legal tools they need to ensure prompt contractor compliance. In cases where mandatory ACA standards are at issue, or where resort to injunctive relief may be necessary (which covers a good deal of contractual content), maintaining a public agency's flexibility to seek immediate recourse in the courts is essential.

---

[125] The State of Tennessee actually mandates by law that private prison management contracts be at least 5% less expensive than the likely full cost of the state providing correctional services itself. *See* Tenn. Code Ann. § 41-24-1-4(c)(1)(E).

[126] Prisoners do not automatically possess such rights. A contract must intend to grant them legally enforceable rights to sue under the contract, which can occur through conscious adoption of contractual language or through a court reading such an intent into a contract and its surrounding circumstances. There is some precedent for courts reading an implicit intent to bestow third-party beneficiary status on prison inmates, so drafters must explicitly disavow such an intent if they do not wish to create such rights in prisoners. *See, e.g., Owens v. Haas,* 601 F.2d 1242 (2d Cir.), *cert. denied,* 444 U.S. 980 (1979) (court finds intent to bestow third-party beneficiary status on federal inmate housed in county jail based on U.S. Bureau of Prisons statutory policy to safeguard federal prisoners while in the care of county governments).

# Appendix 1

# Comparing Public and Private Prison Costs

by

Julianne Nelson, Ph.D.
N. W. Partners
4200 Cathedral Ave., N.W.
Suite 412
Washington, D. C. 20016
(202) 363-8163
jnelson@nwpartners.com

May 15, 1998

MARLOWE_0007088

How much money do taxpayers save when a prison is privatized? What are the sources of these savings? These questions have received increasing attention from elected officials, civil servants, academics and policy analysts as more and more prisons are transferred to private management. Today, roughly 5 percent of adult jail and prison inmates in the United States are housed in privately-run facilities.[1] This proportion is likely to increase as states come to rely more heavily on private companies to supervise expanding prison populations. For example, the Governor of Tennessee announced his support early in 1998 for proposed legislation that would "privatize the management of up to 70 percent of the state's prison system."[2] Some analysts predict that the private sector's share of the prison "market" will more than double in the next five years.[3]

This privatization movement has stirred considerable controversy, on both philosophical and financial grounds.[4] Among those invoking financial data, supporters of prison privatization cite potential cost savings as high as 50 percent; others claim that the evidence to date in support of these claims is ambiguous at best.[5] The strength of these claims ultimately depends on the extent to which they can be replicated in carefully-designed studies that compare cost reports for a number of years from similar privately- and publicly-managed facilities. Although studies published to date do not yet attain this level of rigor, it is still possible to draw several conclusions and to formulate a number of hypotheses that merit further testing.

# 1 Preliminary Findings and a Basis for Comparison

Not surprisingly, reported costs per inmate-day are highly sensitive to

i. the assumptions made about public sector overhead and indirect costs; and
ii. the definition of variable costs used to adjust for differences in inmate populations across facilities in a particular jurisdiction.

Some of the more extravagant claims made on behalf of prison privatization can be traced to inappropriate handling of these issues. This chapter reviews the evidence from a number of recent privatization studies, with particular attention paid to data reported for Tennessee, Louisiana and Florida. ***These three reports seem to indicate that the cost savings attributable to privatization have been (and will continue to be) far less than 10 percent of state spending on comparable facilities.***

---

1   Johnston (1998), p. 35.  Once CCA merges with the REIT that it created in July 1997 (i.e., CCA Prison Realty Trust), then slightly more than 2.5 percent of all U. S. adult inmates will be housed in facilities managed by a single company.

2   Sundquist (1998), Wade (1998). Death-row inmates would remain in a state-operated facility. Although the sponsors of the bill later decided that they lacked the support needed to gain passage this year, they will "probably" try again in 1999. Locker (1998), Humphrey (1998).

3   Bates (1998).

4   See Murrell (1997) for a statement of the arguments against privatization and Logan (undated) for a refutation of the most common objections.

5   The US-GAO (1996) report concluded that existing evidence was inconclusive. This report has been strongly criticized by those generally favorable toward privatization initiatives. See, for example, Logan (1996) and Thomas (1996). See Florida Corrections Commission (1996) and Zupan (1996) for more extensive annotated bibliographies.

Case 3:16-cv-02267   Document 383-8   Filed 01/22/21   Page 15 of 17 PageID #: 18479

MARLOWE_0007089

*Reports for California, Arizona, Texas, and the United Kingdom paint a far rosier picture of the gains to be realized from privatization, but the aggregate nature of the data published in these reports makes it difficult to evaluate these claims. Nevertheless, in every study that itemized expenditures and adjustments, much of the <u>reported</u> difference between public and private sector cost estimates can be traced to differences in the allocated burden of state-level overhead costs. If this is reported difference is to reflect <u>actual</u> cost savings, then privatization must induce cutbacks in state spending on central office operations before taxpayers realize this benefit.[6]*

The review of two public and one private facility undertaken by the Tennessee Fiscal Review Committee (1995, hereafter cited as the FRC report) stands out as the most detailed of the studies now available. To a considerable extent, this report could serve as a model for future privatization studies. Supplemented with data gathered for the same three facilities by the Washington State Legislative Budget Committee, the Tennessee privatization experience suggests some systematic differences between privately- and publicly-managed prisons. In particular, audited prison cost data for the fiscal year ending June 30, 1994 indicate that

    i.    non-medical operating costs per inmate-day were virtually identical in the public and private facilities studied in Tennessee;

    ii.    non-medical operating costs were allocated differently in public and private facilities studied in Tennessee: more was spent on corporate overhead and administration (including monitoring by state officials) in the private facility (and correspondingly less was spent on security);

    iii.    the level of spending on prison employees differed substantially between the public and private facilities studied in Tennessee: the amount spent on wages and salaries per inmate-day was higher in the publicly-managed prison;

    iv.    the *nature* of labor costs also differed between the public and private facilities studied in Tennessee: benefits paid to administrative staff at privately-managed prisons averaged almost 80% of salary; benefits paid to other employees at these facilities averaged 14%; in contrast, the ratio of benefits to salary paid to staff at public facilities ranged from just under 22% to almost 32%;

    v.    the bulk of reported cost savings at the privately-managed prison studied in Tennessee can be attributed to differences in per-inmate medical expenditures and allocated state overhead costs. (Labor cost savings were offset by the increased administrative cost cited above.)

These findings have yet to be confirmed for other years and other jurisdictions. (They were, in fact, not directly stated in the FRC report itself; they were merely implied in the data.) These findings do, nevertheless, indicate a number of hypotheses that merit further study. In particular, the supplemented FRC report suggests that

    i.    privatization changes the way taxpayer dollars are spent on prison inmates: less is spent on employees having direct daily contact with prisoners; more is spent on prison-level

---

6    These "cutbacks" in overhead cost are defined relative to the central office expenses that would have been incurred had the p risons *not* been privatized. The *only* justification for assigning different overhead rates to private and public facilities is that the central office expenses are smaller in a system with one or more private prisons.

  administration, monitoring activities by state officials, corporate overhead and corporate profits;

ii.  the lower labor cost found in private sector firms does not alone produce significant savings from privatization; it is offset by increased administrative expenses (including monitoring); significant cost savings do occur when private sector managers cut spending on prisoner health care and induce the state to scale back its own administrative overhead.

  How could these hypotheses be tested rigorously? An analyst undertaking such a project would start by selecting roughly comparable public and private prisons and then collecting several years' worth of data on the cost to the state of each facility.[7] Ideally, these costs would be recorded as line item amounts (wages, salaries, supplies, etc.) allocated to functional areas (administration, security, food service, etc.)[8] Next, the amounts budgeted for publicly-managed prisons and the amounts paid by the state to private prison management companies would be adjusted to ensure the direct comparability of estimated per-inmate costs. In particular, the analyst would need to identify the costs that depend directly on the number and/or type of inmates and would need to adjust estimated operating costs for any differences found in inmate populations.[9] Allowances would also have to be made for differences in public and private sector operating responsibilities and in the quality of services received by inmates.[10] Other adjustments to on-site operating cost include the amount spent by the state when monitoring the privately-run facility, the taxes paid to the state by the private management company and allowances for services provided by state employees not working for the local department of corrections.

  A final adjustment for state "overhead" cost often proves the most logically complex (and hence the most controversial). In principle, the state overhead allocated to a privately-run prison should be less than that imputed to a publicly-managed one *only if* the amount spent by the state department of corrections on central office activity *shrinks* as more prisons come under private management. If the budget for the state department of corrections central office does not change with the extent of privatization, then per diem overhead allocations should be identical in publicly- and privately-managed facilities.[11]

---

7   The task of selecting fully comparable prisons is difficult, if not impossible. Differences in the age, health, gender, and security risk of inmates would imply differences in the reported cost per inmate-day even among equally efficient prison facilities. The same may be said for differences in the size of the inmate population and regional differences in the cost of labor and materials. One could use regression analysis to "correct" for these differences if there were a large enough number of roughly comparable prisons in a given system. In the absence of such data, the only available alternative is to adjust on a case-by-case basis. Not surprisingly, this approach leaves room for considerable disagreement over the appropriate scale of the adjustment factors.

8   This program/performance budgeting approach has become an essential element of the campaign to "reinvent" government.

9   These costs would typically include food service, health care, security staff, and other "variable costs". The amount spent per inmate on these items would, of course, depend on the health, gender, and security risk of the inmate population.

10   For example, in some jurisdictions the state would be responsible for installing and maintaining certain equipment at privately-run facilities. These costs would have to be either (a) added to the amounts paid directly by the state to the private management company or (b) subtracted from the amount budgeted for the state facility before private sector per diem rates are computed.

11   This "incremental" (or marginal) approach to overhead allocation is not generally the one followed in the literature on the cost of corrections. Instead, analysts have generally sought to estimate the *use* of central office services by private and public prison managers. This approach tends to overstate the relative cost of public prisons to the extent that central office expenses are truly

Case 3:16-cv-02267  Document 383-8  Filed 01/22/21  Page 17 of 17 PageID #: 18481

MARLOWE_0007091