# EXHIBIT D
## Part 6 of 14

This idealized "model" study provides a standard against which existing research can be measured. The remainder of this chapter provides an in-depth analysis of the methodology used in two recent studies of prison privatization in Tennessee and Louisiana. It also provides briefer discussions of privatization studies for prisons in Florida, California, Arizona, Texas and the United Kingdom.

## 2 The Tennessee Experience: The 1995 Report of the Fiscal Review Committee (supplemented with data from the Washington State Legislative Budget Committee)

As required by state law, the Tennessee Fiscal Review Committee (FRC) undertook to "compare the full costs of the contractor [authorized to operate a prison to house Tennessee inmates] with the state's full costs of operating similar facilities."[12] Three prisons were selected: Northwest Correctional Center (NWCC), Northeast Correctional Center (NECC), and South Central Correctional Center (SCCC). The first two are operated by the state; the last is operated by Corrections Corporation of America.

This study is unique in its attention to detail: it follows the procedure described in the previous section for the "ideal" study, allocating "line item" cost data for each prison to specific management functions (administration, security, etc.). There are, nevertheless, several limitations to the FRC report. It covers a single year, it excludes medical expenses incurred by the private contractor, and it does not directly address the question of whether or not privatization actually saves money for the taxpayers of Tennessee. The first of these limitations is not surprising: the FRC report was intended to serve as a template for future cost studies. Happily, the second and third issues were addressed with considerable success by the Washington State Legislative Budget Committee (LBC) as it tackled its own version of the prison privatization question.[13]

**Operating Cost Estimates:**

By combining the data found in the FRC report with that available from the Washington State LBC, it is possible to compare the pattern of spending at public and private facilities and to gain some insight into the profitability of the latter.[14] For the sake of completeness (and to illustrate the nature of adjustments needed to ensure the comparability of data), Tables 1-3 reproduce the cost data found in FRC report (Appendices A, B, C and the CCA Statement of Department Expenditures). Adjustments

---

fixed. In the tables that accompany this chapter, we use the overhead allocations as reported by the jurisdictions in question and discuss the extent to which these reported allocations reflect an incremental approach.

12    Fiscal Review Committee (1995), p. 1.

13    Washington Legislative Budget Committee (1996), Appendix 3. In particular, LBC analysts both estimated the medical expenses incurred by CCA on behalf of prisoners at SCCC and obtained an unofficial report of these expenses directly from CCA. The LBC analysts also collected data on the fees paid by Tennessee to CCA for operating SCCC. Bob Thomas of the LBC graciously provided spreadsheets containing the supplemental information (as promised in the LBC report itself). This information was collected after the FRC report was published.

14    It is also possible -- as suggested by Logan (1996) -- to reconcile the apparent differences between the conclusions found i n the Tennessee and Washington studies.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 2 of 16 PageID #: 18483

MARLOWE_0007092

to operating costs (reported by management function) include: netting out commissary revenues against commissary expenses, allowing for changes in food services inventories and non-comparable programs, eliminating depreciation expenses as a public facility expense (because there is no corresponding set of expenses in the private facility) and adding monitoring costs to the expenses reported for the private facility. These three tables indicate how sensitive the reported cost per inmate is to the scale of operations at a particular facility. Although the privately-managed SCCC appears to have the highest per diem operating cost ($33.78 as opposed to $33.06 at NWCC and $30.91 at NECC), it also has the smallest number of prisoners (1053 as opposed to 1070 and 1149 at NWCC and NECC respectively). Adjustments for scale and for amounts actually paid to the private management company lead to somewhat different conclusions.

Table 4 reflects a different approach to the task of comparing public and private facilities. Instead of analyzing the *cost incurred by* CCA of operating SCCC, this approach starts with the *revenues received by* CCA and adjusts this data for differences between public and private management responsibilities.[15] Unfortunately, the FRC did not report medical expenses for CCA; it is therefore necessary to estimate these costs in order to (a) compute CCAs operating surplus and (b) compare private per diem rates with those derived for the state-run facilities NWCC and NECC.

The first half of Table 4 reports the operating surplus earned by CCA using two different estimates of medical costs: these are deducted —along with "official" reports of non-medical operating costs —from the revenues received by CCA to derive the benefit (before taxes) that the company realizes from operating the prison facility.[16] It is clear from these estimates that operations at SCCC make a significant contribution to corporate overhead.[17]

The second half of Table 4 provides two estimates of the *cost to the State of Tennessee* of the privately-operated facility. To estimate this cost, revenue received by CCA was reduced by estimated medical expenses and augmented by the relevant adjustments for state expenses contained in the FRC report. These expense estimates were further reduced by an estimate of the tax revenue received by the state from CCA operations.[18]

**Per Diem Estimates Reconciled:**

Table 5 illustrates the impact of these various approaches on per diem rate estimates —and hence on the estimated cost savings to be realized from privatization. Once cost reports are adjusted

---

15  This is the approach followed by the Washington State Legislative Budget Committee as it reviewed the research available at the time. It is also the approach used in most other privatization studies.

16  The first surplus estimate assumes that CCA medical expenses are equal (on a percentage basis) to the average of the amount spent at state-run facilities. (This is the basis for the per diem rates found in the LBC report.) The second surplus estimate uses an unofficial report of CCA medical expenses (a fax from D. Massengale at CCA to Bob Thomas at LBC).

17  It is not clear from these data whether or not CCA is earning a profit over and above the facility's allocated share of corp orate overhead of $970,417. Using one estimate of medical expenses, CCAs operating surplus (i.e., facility revenue net of facility expenses) is below the share of corporate overhead allocated to SCCC. Under an alternative estimate of medical expenses, the reverse holds true.

18  The LBC supplemental data contained tax revenue estimates.

Case 3:16-cv-02267   Document 383-9   Filed 01/22/21   Page 3 of 16 PageID #: 18484

MARLOWE_0007093

for differences in the average daily population of inmates (ADP)[19], we find the surprising result that the non-medical per diem operating cost of the privately-managed SCCC is virtually identical to the cost of the two public facilities.[20] This conclusion obtains whether (a) one starts with individual line item costs and aggregates to find total cost or (b) one starts directly with management fees received by the private prison operator. It is also independent of the way in which one handles estimates for taxes paid by CCA to the State of Tennessee.[21] It follows that the savings to be realized from the privatization of SCCC must arise elsewhere.

When official state overhead allocations and medical expense estimates are included in the estimated cost of operating the three facilities, the picture changes yet again: the estimated *total* cost per inmate day at the privately-run SCCC is as low as $37.65, while the estimated total cost of the public facilities ranges from $40.16 (at NECC) to $40.19 (at NWCC). (See Table 5.) In other words, the differences among these estimated per diem rates can be attributed to a lower overhead allocation for SCCC (a $.78 difference); a credit for taxes paid by SCCC (a $.83 difference); and lower medical costs ($3.07 at SCCC as compared with $4.37 at NWCC and $4.89 at NECC).

*These tables indicate that (for at least the fiscal year ending June 30, 1994) privatizing SCCC saved money for Tennessee taxpayers, if at all, by reducing spending on prisoner health care, by inducing "cuts" in the central office (or state overhead) expenses of the Tennessee Department of Corrections, and generating tax revenues for other parts of the state government*[22] Other savings from restructuring employee compensation appear to be offset by the increased cost of monitoring by state employees. Obviously, this estimate of cost savings understates (overstates) the benefit of privatization to the extent that savings in DOC state-level overhead expenses amount to more (less) than $.78 (i.e., $2.38-$1.60) per prisoner.[23] It also understates (overstates) the benefit of privatization to the extent that health care is qualitatively better (worse) in the private facility.

**Spending Patterns Compared:**

There are more insights to be gleaned by returning briefly to the *operating cost* data reported in the FRC study. Even though public and private operating costs appear to be roughly comparable,

---

19    These adjustments reflect the assumption that not all operating costs vary directly with the number of inmates. A sufficien t, but not necessary, justification for this assumption would be "economies of scale" in prison operations.

20    Slight differences in the "equalized" operating cost estimates reported by the FRC and the LBC can be attributed to differen ces in the way that size adjustments were handled in the two reports. The Washington State study allocated FRC adjustments (for non-comparable programs, supervision of industrial work crews, etc.) to specific line items and recomputed variable cost estimates accordingly.

21    It is not clear from the FRC report whether or not the cost data given for SCCC include taxes paid by CCA. The per diem rat es given in Table 5 reflect the assumption that these data *do* include taxes paid (since the report was supposed to indicate the *full* cost to CCA of its operations).

22    Here "cuts" refers to the differences between observed state-level overhead expenses and the overhead expense that the state   would have incurred had SCCC been publicly managed.

23    The per diem rates reported in Table 5 use the LBC estimates for overhead allocations. The LBC allocations for the publicl y-run prisons are lower than those found in the FRC report, as the LBC analysts sought to estimate an *average* annual cost for major maintenance at all three facilities. The FRC report uses *observed* major maintenance expenses for SCCC, an approach that -- for the year in question -- appears to understate the expected annual cost of maintenance.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 4 of 16 PageID #: 18485

MARLOWE_0007094

Tables 6-8 provide evidence of some systematic differences between public and private prisons. From Table 6, it appears that CCA is spending considerably more per prisoner on administration and less on security. This result obtains even when monitoring costs are excluded from the per diem estimates. Table 7 provides evidence of the substantially lower labor costs at the private facility: $16.89 per prisoner/day at SCCC as opposed to $19.63 at NECC and $20.96 at NWCC. Much of this savings comes from the smaller amount spent on security staff: $9.96 per prisoner at SCCC as opposed to $12.57 at NECC and $14.55 at NWCC.[24] The average employee benefit rates (i.e., the ratio of fringe benefits to salary) found in Table 8 indicate that the *nature* of employee compensation also differs between the public and private facilities in Tennessee. CCA administrative employees enjoyed a benefit rate of almost 80 percent, while the rates received by other CCA employees ranged from just under 13 percent to just over 14 percent. The average rate for CCA employees was 21.84 percent. In contrast, there was much less variance in benefit rates across functional areas in the two public facilities: the rates ranged from a low of just under 22 percent to almost 32 percent. The average benefit rate was 29.19 percent at NECC and 28.38 percent at NWCC.

These differences in the structure of employee compensation at public and private prisons have been strongly criticized. Bates (1998) cites testimony given before the Tennessee state legislature indicating that SCCC has an employee turnover rate that is more than double the one found at Tennessee public facilities. According to Bates (ibid.), many staff members who continue to work at SCCC blame this high turnover on low wages and poor treatment by supervisors. The long-run consequences remain to be seen. Nevertheless, Bates (ibid.) notes that members of the state legislature who oppose privatization are quite ready to blame last year's higher reported incidence of violence and drug usage among inmates on the inexperience of the SCCC staff.

In conclusion, the FRC report provides a detailed look at the structure of prison costs and suggests a number of hypotheses whose testing must await the availability of additional data.

## 3    The Louisiana Experience:  Archambeault and Deis (1996)

The basic question addressed by William Archambeault and Donald Deis (A&D 1996) was quite similar to the one underlying the Tennessee FRC report:  "How does the full cost per inmate-day in a publicly-managed prison (i.e., Avoyelles Correctional Center) compare with the full per diem cost of housing an inmate in either of two privately managed facilities (i.e., Wackenhut's Allen and CCA's Winn Correctional Centers)?"  On one level, A&D appear to adhere more closely to the model for the "ideal" study proposed in section 1 of this chapter: they use data from five years (instead of just the single year found in the FRC report); and they use management fees paid to private prison operators to address directly the question of taxpayer savings. They find that the publicly-managed prisons are 12 to 14 percent more expensive to operate than the privately-managed alternatives. (A&D, p. 439) Nevertheless, the aggregate nature of the data presented and a variety of analytical quirks call into question the strength of this conclusion.

---

24    These per prisoner data were derived from the "observed cost" information found in the FRC report.  As a result, they do not   reflect adjustments for the scale of operations or the LBC allocation of general adjustments to specific line item categories (like sal aries, wages, materials, etc.)

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 5 of 16 PageID #: 18486

MARLOWE_0007095

A review of the methodology used by Archambeault and Deis helps identify the range of difficulties that arise when using data that cover a span of years. Table 9 reproduces the data used in the A&D study, along with the adjustments made in the interests of comparability. An analyst wishing to use this data must make a number of assumptions about its consistency, accuracy, and appropriateness, as well as choose a basis for making intertemporal comparisons. These assumptions will, in part, determine the insights to be gleaned from regression results. Consider each of these issues in turn.

**Consistency and Accuracy:**

Archambeault and Deis' discussion of the annual state budget allocation for Avoyelles (see the top of Table 9 in this report) provides an example of a classic data consistency problem. They observe (pp. 428-9) that this facility generally tends to be "under budget" and that the warden therefore ends up returning unused funds to the state at the end of each fiscal year. Unfortunately, final data were not available for FY 1995-96 when Archambeault and Deis finalized their report. As a result, they used the full annual allocation for Avoyelles thereby (probably) overstating public sector costs . Table 10 illustrates an alternative approach: the gross appropriation for FY 1995-96 is reduced by same *proportion* (1.7 percent) as the gross appropriation for FY 1994-95.

Louisiana budget data collected by the Washington State Legislative Budget Committee also illustrate the difficulty of obtaining accurate estimates. The Washington State LBC estimates for insurance costs at Allen and Winn are respectively $83,732 and $83,061; the data reported by Archambeault and Deis are $66,534 and $66,001, a difference of almost 26 percent.[25]

The aggregate nature of the Avoyelles budget reported by A&D makes it difficult to evaluate the scope of the costs covered. However, the data reported by Washington State researchers suggest that some relevant costs may have been omitted. The WA-LBC cost estimates for FY 1995-96 include allowances for a state-funded "record system analyst" at both Allen and Winn (at a cost of $26,255 and $29,193 respectively). Table 10 reflects this adjustment.

**Appropriateness:**

The fact that data are reported precisely does not guarantee that they provide relevant information. The discussion of vocational education costs found in A&D illustrates this point. The cost concept of interest is the full burden borne by the state for each prison. It is therefore appropriate that A&D add grant money awarded by the state to Allen (for its vocational education programs) to the other costs reported for this institution. It is also appropriate that A&D augment the cost reported for Avoyelles by the value of services obtained from the local technical school. Ideally, this adjustment would reflect the *opportunity cost* to the state of the time and materials used. In other words, the operating cost reported for Avoyelles should be adjusted upwards only to the extent that

---

25    Bob Thomas graciously provided us with the spreadsheets used to generate the tables found in the WA-LBC (1996) analysis of Louisiana prison costs. Oddly enough, the ratio of the A&D insurance cost estimate to the corresponding LBC estimate is identi cal out to five decimal places. This suggests that the DOC Risk Management Division inadvertently used a different algorithm when deriving the two sets of cost estimates from previously reported data. This may be due to the fact that A&D reported the cost  of "fire and property" insurance, whereas the LBC reported the cost of  "property and boiler" insurance. One would suppose that the appropriate figure would cover the cost of fire, property  *and* boiler insurance.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 6 of 16 PageID #: 18487

MARLOWE_0007096

other divisions of state government spent money to acquire these goods and services. Time and materials donated by volunteers have no opportunity cost to the state and hence would not be reportable as a prison operating cost.

A similar problem arises when adjustments are made for the "prison industries" operated at the Allen and Winn facilities. Before computing private sector per diem rates, Archambeault and Deis deducted the costs incurred by CCA and Wackenhut when inmates are assigned to work in prison industries. They reasoned that since the state received the profits from these ventures it should also bear the costs. This is not the relevant frame of reference: the adjustment should reflect the net benefit to the state of these activities. The adjustment should also be made in a way that renders the private sector data comparable with those reported for the publicly-operated facility. Ideally, an estimate of the *value* of services rendered should be subtracted from the cost of each of the three prisons. However, since no value is assigned to the work done by inmates at Avoyelles, the same procedure should be followed for Allen and Winn. The cost to CCA and Wackenhut of running their respective prison industries simply becomes one of the services they provide under the terms of their contracts. This is the approach followed in Table 10: the benefits imputed to prison industries (and originally subtracted from the state's cost of operating Allen and Winn) are added back before per diem rates are computed.

The perennial problem of allocating overhead costs provides yet another version of this opportunity cost problem. In principle, the share of state overhead cost allocated to privately-managed facilities should be lower than that allocated to public facilities (all other things being equal) *only if* the fact of privatization reduces the amount spent on the "central office" of the state department of corrections.[26] In all other cases, the overhead amounts allocated on the same basis to all institutions, no matter who manages them. It is unlikely that overhead cost allocations based on the methodology found in OMB Circular A-27 follow this rule. In Table 10, "indirect cost allocations" used by Archambeault and Deis are subtracted from the other costs reported for each facility so that per diem operating costs of *facilities* (excluding state corrections overhead) can be computed.[27]

**Intertemporal Comparisons:**

The Archambeault and Deis study illustrates a number of problems that arise when comparing data reported at different points in time. These include (i) adjustments for inflation, (ii) the treatment of "pre-paid" costs, and (iii) the treatment of accrued liabilities. Consider each of these issues in turn.

The data reported for a given fiscal year should reflect consistent assumptions about prevailing prices. Archambeault and Deis failed to allow for this when they constructed the time series used to adjust private sector costs for the effects of prison industries and the taxes paid by CCA and Wackenhut. As discussed in the previous section, the credit for prison industries should be deleted altogether. A further problem with these adjustments is the fact that they are all expressed in prices

---

26   Again, the relevant point of comparison is the amount that would have been spent on state overhead if all prisons had remain  ed under state supervision. Bob Thomas (of the Washington State LBC) also makes this point in a letter dated March 7, 1997 and addressed to William Archambeault.

27   Analysts at the Washington State LBC also followed this approach.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 7 of 16 PageID #: 18488

MARLOWE_0007097

appropriate to the fiscal year FY95-96.  Although Archambeault and Deis say that the prison industries adjustments reflect a 4 percent rate of inflation, the cost savings actually reported for Allen and Winn do not do so.[28]  It also appears from the text of A&D (1996) that no adjustment for inflation was even contemplated when past observations for tax benefits to the state were constructed.  As a consequence, past estimates for these state benefits are likely to be too high —and past estimates for per diem rates at privately-managed prisons are likely to be too low.

The treatment of ACA accreditation costs is curious for several reasons.  Since the ACA is chartered as a non-profit organization (not as a government agency), it is not clear why Archambeault and Deis treat the accreditation fees paid to the ACA by CCA and Wackenhut as a benefit to the state government.[29]  Even if it were appropriate to reduce the estimated cost to the state by the amount of these accreditation fees, the full amount should not be allocated to a single year:  the accreditation is good for three years.  It would be more appropriate to treat these fees as prepaid expenses, i.e., an asset to be consumed over time.

The treatment of insurance costs poses a somewhat different intertemporal "smoothing" problem.  The cost of risk management insurance at Avoyelles appears to reflect the actual number of claims made in a given year, since the costs reported do not correspond to differences inmate populations.[30]  A more realistic approach would be to compute the *expected* (or average) annual cost of such claims and use this as the basis for computing annual per diem rates.

The treatment of accrued pension and compensated leave liabilities poses yet another intertemporal smoothing problem.  Archambeault and Deis (1996, p. 434) chastise the authors of the Washington State LBC study for deducting from the Avoyelles budget a contribution of $410,000 used to help amortize the unfunded pension liability accrued for employees working at the facility prior to 1988.  Archambeault and Deis claim that privatizing Louisiana prisons has the potential to reduce this accrued liability.  In response, Bob Thomas (1997) cites the Legislative Actuary for the State of Louisiana as his authority for assuming that this liability would be invariant to the extent of privatization.  The revised operating cost estimate in Table 10 follows the approach found in the LBC study.

Archambeault and Deis augment the cost budgeted for Avoyelles by the amount of unused sick and annual leave accrued by current employees.[31]  It would be more appropriate to base this adjustment on the *expected* (or average) annual leave accumulation —this would more accurately reflect the average annual cost of operating a state facility.

---

28   See Table 9.  The reported year-to-year differences in cost savings are directly proportional to annual changes in the pris on population.

29   The ACA web site indicates that publicly-managed prisons are not exempt from inspection fees.

30   Specifically, the reported cost of insurance fell by 40 percent between FY 93-94 and FY 94-96 even though the number of pris oners housed at Avoyelles rose slightly.  There is also no cost reported whatsoever for risk management insurance at Avoyelles in FY  95-96.

31   These accrued leave hours represent a future liability to the state, as departing employees may be compensated for up to 300   hours of annual.  Hours in excess of this limit are used to compute retirement benefits.

**Interpreting Regression Results:**

These data problems combine to make it difficult to interpret the regression results found in Table XI-8 of Archambeault and Deis (1996, p. 449). The simplest specification (Model A) reflects the assumption that per-inmate variable costs are independent of the size of the facility and tests to see whether or not the fixed cost of operating a prison is significantly different in the private sector.[32] This is a reasonable starting point, but the regression coefficients should not be computed until the data are adjusted for inflation.[33] Since this adjustment was not made, the coefficient reported for "average inmates per day" does *not* provide an estimate of the impact on total cost of an increase in the average daily population. Nor does the coefficient for the public/private dummy variable indicate the impact of privatization.

The specification of Model B has the same "inflation problem" as Model A, with a further wrinkle. Archambeault and Deis assume that the number of "Vo-Ed Slots Filled" helps explain the total cost of operating a prison facility. When they find that the coefficient for this variable is negative and statistically significant, they conclude that "lower operating costs are associated with increases in the use of vocational education" (p. 439) and that "placing inmates in vocational education programs is a less costly strategy than alternative work assignments" (p. 440).

Unfortunately the reported coefficients do not support this conclusion. Ignoring (for the moment) the inflation adjustment problems mentioned above, the negative coefficient for inmates placed in vo-ed may simply reflect economies of scale in prison operation. To see why, note that the "average number of inmates per day" will generally be positively correlated with the number of inmates placed in vocational education in a given facility.[34] Note also the specification of Model A is not quite right: over at least part of the relevant range of inmate populations, the marginal cost of an additional inmate is likely to be falling as the inmate population grows.[35] It is quite likely that the "prediction errors" of the simplistic Model A are correlated in some way with the differences between the growth rates in inmate population and vo-ed placement. This correlation implies nothing about the relative cost effectiveness of vocational education, prison industries or roadside trash pickup. It is merely the result of the "linearity" restriction imposed by the specification of Model A.[36]

Model C presents another version of this specification problem: in this model, the privatization dummy is replaced by the number of security staff positions at each facility. The inflation and

---

32  I.e., the cost of operating a prison is assumed to take the form $C(x) = F_i + vx$, where the index $i$ is either "private" or "public."

33  In other words, the data should be adjusted for inflation so that all observations reflect the same assumptions about prevailing prices. For example, if FY95-96 were chosen as the "base year" and if the relevant rate of inflation were assumed to be 4 percent per annum, then observations for FY91-92 would be increased by the factor $(1.04)^4$, observations for FY92-93 would be increased by the factor $(1.04)^3$, etc.

34  The larger the inmate population, the more inmates there are to place.

35  In other words, the prison "technology" exhibits economies of scale.

36  An alternative specification would have been to use the *proportion* of inmates placed in vocational programs as an explanatory variable. Nevertheless, this would still only establish a correlation between prison costs and vo-ed.; it would not prove that vocational education actually caused cost savings.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 9 of 16 PageID #: 18490

MARLOWE_0007099

correlation problems described above again make it difficult to interpret these coefficients.[37]  The approach used in the Tennessee FRC report provides a much more useful method of uncovering the sources of cost savings.

**The Net Effect:**

It is clear from Table 10 that the cumulative impact of these additional adjustments may drastically reduce the estimated cost savings from privatization:  for the fiscal year 1995-96, it appears that the actual savings in *operating* costs is more likely to be below 5 percent than above 12 percent. However, as in the Tennessee case, the *total* cost savings from privatization will increase if it induces cutbacks in state-level overhead.

# 4    The Florida Experience:  (i) The Florida Department of Corrections ; (ii) The Florida Correctional Privatization Commission; and (iii) The Florida Office of Program, Policy Analysis and Government Accountability

The controversy over the appropriate measure of operating costs in Florida prisons provides yet another indication of just how hard it is to get all sides to agree on whether or not privatization saves money.  Current state law helps identify the participants in this debate. Chapter 89-526 of the Florida state statutes, enacted in 1989, first authorized the state Department of Corrections (DOC) to enter into contracts with private prison management companies.  The subsequent Chapter 93-406, adopted in 1994, created the Correctional Privatization Commission (CPC), to expedite prison privatization;  it is housed in the state Department of Management Services and operates independently of the Department of Corrections.  Chapter 957.05 qualifies the authority of the CPC, requiring it to demonstrate —before any contract is signed —that private prison management will result in *at least* a 7 percent savings (relative to the cost of allowing the state Department of Corrections (DOC) to run the prison).[38]  Chapter 957.07 also empowers the state Auditor General to decide whether or not this condition has been satisfied before any contract with a vendor has been signed.

To provide for on-going independent oversight, Florida state law requires the Office of Program Policy Analysis and Government Accountability (OPPAGA)[39] to review the performance of all management companies that operate private prison facilities in Florida (this may include both vendors under contract to the CPC and those under contract to the DOC).  A separate oversight board, the Florida Corrections Commission, was established in 1994 and is "charged with reviewing the

---

37    For example, if we continue to the regression interpret coefficient as a measure of fixed cost, then the results reported fo r Model C indicate that the annual fixed cost for operating a prison is -$5,000,000.

38    The CPC is state housed in the state Department of Management Services; it operates independently of the Department of Corrections.

39    Although the OPPAGA is a unit of the Office of the Auditor General, it reports directly to the state legislature.

Case 3:16-cv-02267     Document 383-9     Filed 01/22/21     Page 10 of 16 PageID #: 18491

MARLOWE_0007100

effectiveness and efficiency of [Florida's] correctional efforts, recommending policies, and evaluating the implementation of approved policies."[40]

Not surprisingly, these distinct entities do not always favor the same measure of privatization benefits. In its *Annual Report* for the fiscal year 1996-97, the DOC argued that *all three* privately-managed adult prison facilities were *more expensive* than similar publicly-run facilities would have been.[41] Using a somewhat different approach, the OPPAGA (1998) reached a similar conclusion. Nevertheless, the OPPAGA report included responses from the Correctional Privatization Commission, the Corrections Corporation of America, and Wackenhut proposing alternative methodologies —ones that led to conclusions directly opposed to those reported by the DOC and the OPPAGA.

Tables 11-13 (reproduced from the DOC and OPPAGA reports) help sort out this difference of opinion. The Department of Corrections estimates, found in Table 11, are somewhat suspect: the per diem rate for the men's public prison is derived as the *average* of nine other facilities; all but one of these public facilities is substantially larger than any of the private facilities being analyzed.[42] Given the economies of scale in prison operation, this approach understates the public sector cost of running a prison comparable in size to Bay or Moore Haven.

Nevertheless, Table 12 shows how the OPPAGA (1998) reached a similar conclusion with from a more appropriate starting place: it compares two private men's facilities (Bay and Moore Haven) with a single comparably-sized public facility. In its analysis, the OPPAGA started with the management fee due to CCA and Wackenhut (for running Bay and Moore Haven respectively); it then deducted monitoring costs paid by the management companies, property taxes *not* paid, and medical insurance co-payments collected from prisoners and retained by the prison operators. For the publicly-managed Lawtey prison, the OPPAGA used the annual cost of operations, health services, and education programs reported for this facility by the Department of Corrections in its *Annual Report*. All three cost estimates were then adjusted for differences in scale economies, the scope of management responsibilities and the quality of services provided.

The OPPAGA inferred from its calculations that Moore Haven was more expensive to operate than its public sector equivalent; it also argued that the Bay facility was only 0.2 percent cheaper. The OPPAGA nevertheless rated the performance of both CCA (at Bay) and Wackenhut (at Moore Haven) as "satisfactory," while noting in passing that neither private facility achieved the 7 percent cost savings required by law.

Table 13 reproduces the response by CCA to this finding. The adjustments proposed by this management company substantially change the interpretation of the data: they indicate that the private

---

40   Commissioners are appointed by the Governor and with the approval of the state Senate. The Commission's mission statement appears on its web site, located at http://www.dos.state.fl.us/fgils/agencies/fcc/ .

41   These estimates are reproduced and analyzed in Florida Department of Corrections (1998).

42   Apart from the one public facility with an ADP of 733, the remaining public prisons housed between 1214 and 1719 inmates on average. In contrast, the observed average daily populations for the privately-operated Bay and Moore Haven facilities were 70 8 and 706 respectively. If these two prisons were assumed to operate at 95 percent of capacity, they would house approximately 7 13 inmates on average. Each of these private facilities has a contract maximum of 750 beds.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 11 of 16 PageID #: 18492

MARLOWE_0007101

management at Bay and Moore Haven *saved* taxpayers respectively 8.3 and 6.0 percent of state cost of running the facility. This difference arises primarily from three simple changes: an increase in the CCA's credit for taxes paid to the state, an increase in CCA's credit for the "Inmate Welfare Trust Fund Net Revenue"[43]; and a decrease in the state's adjustment for "medical costs for higher medical grade inmates at Lawtey" (OPPAGA (1998), p. 38).[44] The OPPAGA itself rejected these three CCA amendments, observing (i) that CCA sought to claim credit for more tax revenue than was properly attributable to its Bay facility,[45] (ii) that it retained custody over Inmate Welfare Trust Fund balances,[46] and (iii) that Lawtey inmates had considerably more medical needs than those at the Bay facility.

This debate is further complicated by an adjustment that the OPPAGA could have made but ultimately rejected. As in Louisiana, the state retirement system was not fully funded by past payroll deductions. To eliminate this shortfall, a surcharge of 5.78 percent was included in the the payroll costs reported for Lawtey. The OPPAGA justified leaving this surcharge in place by stating that

> it is still a cost to the taxpayers. Privates do not pay this and thus should be able to reduce costs in comparison to state by at least 5.78% of payroll. (OPPAGA, p. 36).

This reasoning is not generally consistent with the basic question at issue, to wit, "How much money will privatization save for Florida taxpayers?" If the unfunded portion of pension liabilities was incurred *in the past*, then prison privatization does not help *taxpayers* avoid its consequences. Any decease in DOC contributions toward this *existing* liability would necessarily be offset by increases elsewhere in the Florida state budget.

Although there are many differences of opinion over particular line items, the OPPAGA report tends to support the hypotheses suggested by the Tennessee data. The public and private facilities reviewed appear to have quite similar non-medical operating costs; the potential cost savings can be traced to medical expenses and to overhead allocation policies. If this conclusion is confirmed over time, it then follows that prison privatization in Florida saves money through cutbacks in spending on prisoner health care and state-level DOC staff.

## 5     Experience with Privatization Elsewhere

The cost comparisons reported by other states are generally less elaborate than those found in the three cases reviewed thus far; they also tend to predict higher cost savings from privatization. For

---

43  This trust fund is an account containing the revenue (in excess of expenses) from the prison commissary, vending concessions    and inmate telephone service.

44  A fourth small adjustment by CCA remains unexplained:  the "unadjusted" per diem reported by CCA for Lawtey exceeds that found in the OPPAGA report by $.36.

45  According to the OPPAGA report (p. 59), CCA sought to claim credit for taxes paid on income from other facilities.

46  According to the OPPAGA report (p. 13), this trust account is established in the name of the private contractor operating th  e prison. However, current law requires the contractor to obtain the approval of the CPC commissioner before using these funds for anythi  ng other than the purchase of items for resale.  In contrast, state profits from the prison commissary and inmate phone usage are   used to offset prison operating costs.

Case 3:16-cv-02267     Document 383-9     Filed 01/22/21     Page 12 of 16 PageID #: 18493

MARLOWE_0007102

example, Sechrest and Shichor (1994) report savings on the order of 25 percent from the privatization of community correctional facilities in California, and Thomas (1997, p. 93) concludes that "operating cost savings [in Arizona] quite probably falls in the range of 13-17 percent." Unfortunately, these studies essentially report only aggregate costs, making it impossible to evaluate or interpret their findings.

Two other analyses of privatization ─one for Texas and one for the U.K. ─have at least one theme in common: much of the difference in estimates of public and private sector costs per prisoner can be traced directly to differences in state overhead allocations.

**The Texas Case:**

A Texas law passed in 1987 authorized prison privatization only if the state can demonstrate that it would lead to "a savings of not less than 10 percent over an equivalent state-run program." (Texas Sunset Commission (1991, p. 7). In its review of the state's prison system, the Texas Sunset Commission compared public and private sector costs to "construct and operate a 500-man pre-release center, and found that "taking into account the tax revenues paid to local governments organized by the state, the private prisons were operating at 14 percent below the state." (*Ibid.*)

Despite the aggregate nature of the reported data, it is clear that the rule for allocating state overhead allocation contributes substantially to this cost difference. Table 14 reproduces the cost analysis found in Exhibit C of the Sunset Commission report. Once again, day-to-day operating operations account for a relatively small part of the difference between public and private sector costs. The combined contract payment and monitoring cost at a hypothetical facility designed by CCA is reported as $29.71 per inmate day; the cost at a comparable facility designed by Wackenhut is reported as $29.54. The estimated state cost per inmate day of operating these same facilities is estimated to be $31.24 and $31.50 respectively. The remainder of the 14 percent cost savings lies in the presumed tax benefit to the state from privatization ($2.19 per inmate day) and the estimated decrease in administrative costs at the Texas Department of Criminal Justice (a difference of $1.36 per inmate day).

**The U. K. Experience:**

Woodbridge (1997, p. 29) predicts "an operational cost saving of 8 to 15% in 1996-97" from prison privatization. Table 15 provides the aggregate data used in the U.K. study, and reports per diem rates for adjusted operating costs. Two things are immediately obvious: (i) the average cost per inmate day is much higher than in the studies from the United States; and (ii) the difference in cost between the public and private sector prisons is much larger than in the United States. Without more detailed cost data it is difficult to identify the reason for this difference. Nevertheless, it is clear that the allocation of central office costs contributes substantially to the reported differences between in public and private sector per diem estimates.

# 6    Recommendations for Further Study

This survey of recent cost studies does not resolve the question of whether privately-managed prisons are cheaper than publicly-managed ones. The evidence is mixed, with the more detailed studies indicating the smallest cost savings from privatization.

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 13 of 16 PageID #: 18494

MARLOWE_0007103

Nevertheless, it is possible to draw some preliminary conclusions. There do appear to be some consistent differences between the public and private facilities, particularly if the Tennessee experience can be applied to other jurisdictions. It appears likely that in privately-managed facilities, the wage bill for non-administrative staff will be lower and prison-level administrative expenses will be higher; that health care costs will be lower and that the *imputed* cost of state overhead will be lower.

These generalizations suggest a number of questions for further study. These include:

1. Do the higher administrative costs found in the privately-managed prisons offset the savings from different staffing patterns and compensation packages?
2. How can health care costs be cut without sacrificing quality?
3. Do the differences in *reported* public and private overhead rates reflect the overhead costs actually *avoided* through privatization?

A yet broader question lurks in the background of this debate: "Is privatization *necessary* for cost savings, or does the mere *threat* of privatization suffice?" In other words, will the risk of being "reinvented" induce an appropriate set of changes in public sector practices? This question is familiar from other public sector contexts. Experiments with "market testing" in Indianapolis indicate that public employees can successfully compete against private firms and win city contracts. For the last two decades, the rationale for deregulating telephones, airlines, trucking, and electric utilities has also depended, in part, upon this sort of threat from *potential* (not actual) competitors.

It remains to be seen whether or not these market analogies —and their policy implications —readily translate to the corrections context. Nevertheless, these analogies do suggest an alternative the question of when and how privatization saves money. A more appropriate form of this question is likely to be "Does *competition* make it possible to provide an appropriate level of service at a lower price?"

Case 3:16-cv-02267    Document 383-9    Filed 01/22/21    Page 14 of 16 PageID #: 18495

MARLOWE_0007104

Insert table 1 —Tables 1 through 15 are in the file app3_tab.pdf. The file can be downloaded from the same site as the text of the report.

MARLOWE_0007105

Insert table 2

Case 3:16-cv-02267     Document 383-9     Filed 01/22/21     Page 16 of 16 PageID #: 18497

MARLOWE_0007106