# EXHIBIT D
## Part 7 of 14

Insert table 3

Case 3:16-cv-02267   Document 383-10   Filed 01/22/21   Page 2 of 28 PageID #: 18499

MARLOWE_0007107

Insert table 4

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 3 of 28 PageID #: 18500

MARLOWE_0007108

Insert table 5

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 4 of 28 PageID #: 18501

MARLOWE_0007109

Insert table 6

Case 3:16-cv-02267   Document 383-10   Filed 01/22/21   Page 5 of 28 PageID #: 18502

MARLOWE_0007110

Insert table 7

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 6 of 28 PageID #: 18503

MARLOWE_0007111

Insert table 8

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 7 of 28 PageID #: 18504

MARLOWE_0007112

Insert table 9

MARLOWE_0007113

Insert table 10

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 9 of 28 PageID #: 18506

MARLOWE_0007114

Insert table 11

MARLOWE_0007115

Insert table 12

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 11 of 28 PageID #:
18508

MARLOWE_0007116

Insert table 13

MARLOWE_0007117

Insert table 14

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 13 of 28 PageID #: 18510

MARLOWE_0007118

Insert table 15

MARLOWE_0007119

Archambeault and Deis. 1996. "Cost Effectiveness Comparisons of Private Versus Public Prisons in Louisiana: A Comprehensive Analysis of Allen, Avoyelles, and Winn Correctional Centers."

Bates, Eric. 1998. "Over the Next 5 Years Analysts Expect the Private Share of the Prison "Market" to More than Double." *The Nation*, January 5, p. 11.

Florida Corrections Commission. 1996. *Annual Report, Appendix 5-4.*. Available at web site **www.dos.state.fl.us/fgils** .

Florida Department of Corrections. 1998. "Privatization in the Florida Department of Corrections." Available as a web page (time-stamped April 28) at site **www.dc.state.fl.us/administrative/reports/privatize/index.html** .

Florida OPPAGA. 1998. *Review of Bay correctional Facility and Moore Haven Correctional Facility*, Report No. 97-68. April.

Humphrey, Tom. 1998. "Private Prisons Bill bites Dust for this Year." *Knoxville News-Sentinel*. April 15, p. A1.

Johnston, David Cay. 1998. "Merger of Prison Operator Into REIT Sends Both Stocks Down." *New York Times*, April 21.

Locker, Richard. 1998. "Vote-Starved Prison bill Dies." *The Commercial Appeal.* April 15., p. A1.

Logan, Charles. 1996. "Letter to the Honorable Bill McCollum, Chairman, Subcommittee on Crime, Committee on the Judiciary, U. S. House of Representatives," dated September 2. Available at web site **www.ucc.uconn.edu/~logan/** .

----------. Undated. "Prison Privatization: Objections and Refutations." Available at web site **www.ucc.uconn.edu/~logan/** .

Murrell, David. 1997. "An Investigation into Privatization." *Roll Call*, Florida PBA, December. Available at web site **www.flpba.org/publications/dec97.html** .

Sechrest, Dale and D. Sichor. 1994. "Final Report: Exploratory Study of California's Community Correctional Facilities." July 30.

Sundquist, Don. 1998. "State of the State/Budget Address." February 2. Available at web site **www.state.tn.us/governor/sos1998.htm** .

Tennessee, State of. 1995. Fiscal Review Committee. Cost Comparison of Correction Centers. January 30.

Texas Sunset Advisory Commission. *Final Report*. "Chapter 4: Information Report on Contracts for Correction Facilities and Services." March 1991.

---

Thomas, Bob.  1997.  "Letter to Dr. William Archambeault," dated March 7.  Copy obtained directly
     from B. Thomas.

Thomas, Charles.  1996.  "Letter to the Honorable Bill McCollum, Chairman, Subcommittee on
     Crime, Committee on the Judiciary, U. S. House of Representatives," dated September 1.
     Available at web site **www.ucc.uconn.edu/~logan/** .

Thomas, Charles.  1997.  "Chapter 4:  Comparing the Operating costs of Correctional Services for
     Public and Private Prisons in Arizona."  *Comparing the Cost and Performance of Public and
     Private Prisons in Arizona.*  Available at web site web.crim.ufl.edu/pcp/html/test_iii.html .

United States Government Accounting Office.  1996.  *Private and Public Prisons:  Studies
     Comparing Costs and/or Quality of Service*  (GAO/GD-96-158).  August.

Wade, Paula.  1998.  "Sundquist Hits Hard for Bill to Privatize Prisons."  *The Commercial Appeal.*
     January 21, p. A1.

Woodbridge, Jo.  1997.  "Review of Comparative Costs and Performance of Privately and Publicly
     Operated Prisons 1996-97."  *Prison Service Research Report*, No 3. (December).

Zupan, Linda.  1996.  *Privatization of Prison and Jail Operations:  An Annotated Bibliography*.
     Available at web site **www-cj.nmu.edu/cf/fin/forward.htm** .

# Appendix 2

# The Performance of Privately Operated Prisons:
# A Review of Research

Gerald G. Gaes, Ph.D.
Scott D. Camp, Ph.D.
William G. Saylor

U.S. Bureau of Prisons
Office of Research and Evaluation
320 First Street, N.W.
Washington, D.C. 20534
(202) 307-3198

June 10, 1998

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 17 of 28 PageID #: 18514

MARLOWE_0007122

There are good and bad public sector prisons, just as there are good and bad private sector prisons. As Thomas and others have noted (Casile 1994; Thomas 1997a), whether improvements in quality can be expected depends upon how well or poorly public-sector institutions are run by the respective government agencies. In a public system with good management, good labor relations, and adequate funding, the potential for improving quality by contracting prisons to private contractors is less than where these conditions do not exist in the public sector.

Despite the paucity of evidence, those who argue for the private operation of prisons do so based on one or two premises. They claim privatization introduces competition into an otherwise public monopoly and this enhances services throughout the system while lowering the overall costs. Secondly, they claim that private prisons can deliver the same or better services at a lower cost than the public sector because "the marketplace" compels efficiency, ingenuity, and innovation.

Moore (1998) has published a recent review of the privatization research. He argues that private companies save money through "new management approaches, new monitoring techniques, and administrative efficiencies (p. 15)." Since labor is about two-thirds of correctional operating budgets, labor cost savings, according to Moore, have been achieved through efficient facility design, reduction in administrative personnel, minimization of overtime, and greater freedom to manage personnel. Moore offers little evidence of these innovations and does not indicate how such savings translate into affective inmate supervision and management. He cites the Archambeault and Deis study (which we review in great detail), claiming the private sector can reduce significant incidents, such as prison disturbances, relative to the public sector prisons. We found that evidence to be misleading, and, in some cases, quite inaccurate. Moore makes the assumption that "... incidents lead to lawsuits, which increase personnel costs." He argues that market pressures and the competition for contracts result in better direct services to inmates. This is typical of the argument-without-proof that is often found in this literature. Anecdote is combined with "glittering generalities" to produce a conclusion having little or no foundation. Rather than critically evaluating each study on its own merits, Moore's review of the prison quality literature merely cites those conclusions reached by the individual authors.

In this paper, we take a more systematic and critical approach to reviewing the research literature on privatization. We examine the relative performance of publicly and privately operated prisons. However, we also look beyond that comparison to see if there is evidence that privatization has an effect on the entire public prison system and whether there is evidence that privately operated prisons introduce ingenuity and innovation into the management of correctional institutions.

We critically analyze the literature that has accumulated which compares the quality of publicly and privately managed prisons focusing on studies done in the United States. There have also been evaluations conducted on prisons in the United Kingdom and Australia. Since we are unfamiliar with the way these systems function, and we are unsure of the applicability of these studies to privately operated prisons in the United States, we have excluded those studies from our analysis.

We review evaluations done in Massachusetts, Kentucky, California, Tennessee, Arizona, Louisiana, New Mexico,  Florida, as well as the Washington State review of the literature. We systematically analyze these evaluations in terms of the methodology employed, in particular, whether the evaluations compared institutions on the basis of performance measures and/or an audit/compliance approach. We examine the evaluations with respect to how well they meet other methodological criteria. These criteria were also identified by the Government Accounting Office (1996: 13) and

MARLOWE_0007123

include whether equivalent facilities (and inmates) were compared; whether multiple indicators or data sources were utilized for cross-validation; and whether the assessments were based on one-shot or multi-year comparisons. Finally, we review the reports to assess the types of innovations (if any) employed in the private (or public) sector that are intended to produce improvements in the quality of services provided to inmates.

Although we are very critical of most of the studies that have been conducted, in our conclusion of this paper, we try to build upon these criticisms and propose an optimal design for assessing performance among institutions. This design can be used to evaluate aggregate measures of institution performance regardless of whether one is interested in the private/public comparison or in an understanding of those aspects of institution operations that produce positive or negative outcomes.

## Massachusetts and Kentucky

The Urban Institute undertook a study between 1987 and 1988 to fill the void of empirical findings available to aid states and local governments in making choices about private corrections (Urban Institute 1989). While prison population growth and associated costs had led some to advocate the privatization of corrections, opponents of privatization questioned the propriety, legality, and constitutionality of private prisons. Advocates had argued that competition and less red tape would enable private contractors to achieve lower costs and faster procurement of facilities and equipment than was possible for government agencies.

Nevertheless, at the time of this study, there had been little empirical data used to test the assumption that the cost and quality of private sector correctional facilities were superior to that of public sector facilities. The Institute's objective in this study was to assess and identify any differences in cost, service quality, and effectiveness between publicly and privately run facilities and to identify reasons for any differences that were found. Legal, propriety, and philosophical issues of private corrections were intentionally not addressed by the study.

The study compared three pairs of facilities, one pair of minimum security adult facilities in Kentucky and two pairs of facilities which housed violent juveniles in Massachusetts. Each pair consisted of one private and one public facility.

Common methodological procedures were employed during the collection of data in both states. The procedures included:

1. Extraction of data from agency records reflecting the number of escapes or attempted escapes, returns to prison after release, results of facility inspections, and cost data.
2. Surveys of inmates and staff at each institution using a modified version of the Prison Social Climate Survey (PSCS) questionnaire designed by the Office of Research and Evaluation of the Federal Bureau of Prisons (Saylor 1984).
3. Interviews with operations and oversight personnel at each facility.
4. A physical inspection of each facility by Urban Institute project staff using a visual inspection rating form designed for the inspections.

The data collection took place between January 1987 and September 1988. It appears that considerable effort was made to select pairs of facilities that were similar in mission and in the types of inmates they housed. The authors acknowledge some major differences in the physical characteristics of the facilities. For example, the Kentucky facilities housed minimum security adults while the Massachusetts facilities housed violent juveniles. The public sector adult facility housed more inmates than did the private sector adult facility (the public facility had an average daily population of 353 while the private facility had an average daily population of 206). And, the juvenile facilities all housed small numbers of inmates. Three of the facilities had 15-bed capacities and one of the facilities had a 16-bed capacity. Presumably each facility was operating at capacity throughout the duration of the study.

Some concern was expressed about the comparability of the inmate populations in the matched facilities, particularly the adult facilities in Kentucky. However, after an examination of the inmate characteristics in each pair of facilities, the evaluation team believed the comparison populations were reasonably equivalent. It appears to us, however, that the initial concerns expressed by the researchers were well founded. The differences appear greatest in the adult population, with the public sector facility housing the more difficult population. Conversely, the private sector facilities appear to have the more difficult juvenile population, with a larger segment of more serious criminal offenders.

In the adult population, the public sector facility had 14 percent more violent offenders. The private facility had 11 percent more new offenders while the public facility had 10 percent more returnees with new offenses. The public facility inmates had a median number of years to serve that was 3 years greater than the inmates in the private facility, with 38 percent of the public inmates serving more than 10 years as compared to 22 percent of the private facility inmates serving sentences of more than 10 years. Additionally, the median age of the public sector inmates was 5 years greater than the median age of the inmates in the private sector facility, with 15 percent of the public facility inmates over the age of 45 compared to 2 percent of the inmates in the private sector facility.

For the juvenile population, the primary differences were in race and offense. The public facilities were composed of 50 percent black and 27 percent white inmates, while the private facilities were composed of 30 percent black and 48 percent white inmates. While 52 percent of the juveniles in the public facilities were committed for offenses against the person, 79 percent of the juvenile population in the private facilities had committed an offense against the person. Furthermore, public facility populations were composed of inmates who committed more property (27 percent) and miscellaneous offenses (18 percent) than their private facility counterparts (12 percent property and 6 percent miscellaneous offenses).

Although the study employed common data collection methods in both states, the analysis and reporting were produced independently for each state. Consequently, there was considerable loss of comparability in the application and interpretation of the measures and in the construction of the tables that were used to summarize the findings. It seems that this lack of integration defeats any benefit that might have derived from a common methodology. Admittedly, the differences in the nature of the facilities and their populations might have diminished the comparability anyway, particularly given the univariate nature of their analysis.

The report describes the sampling method employed for obtaining the adult inmate observations. The warden initiated the process by drawing several numbers from a hat. These numbers were used to

MARLOWE_0007125

select inmates from a list based on whether the 2 or 3 numbers drawn by the warden appeared in the last digit of the inmates DOC identification number. A stronger sampling design for the Kentucky inmates would have increased the comparability between the sample and the population. The remainder of the staff and inmate observations from both states were intended to be a census of the population.

The authors used a chi-square test of statistical significance throughout the report, although it is only relevant to the tables of figures for the Kentucky inmates where a sample was drawn. The inferential test was inappropriate for the remaining data since these were population characteristics of staff and inmates at the facilities. Their use of the chi-square statistic as a measure of importance is inappropriate both because (except for the adult sample) the study is an analysis of the populations and also because it confuses statistical significance and substantive significance. The evaluators attribute substantive significance to differences in group means simply because the chi-square was statistically significant, while the metric and substance of the measure suggest that there is little importance in the observed difference.

The principal findings of the study were that the quality of services and programs were superior at the privately run facilities. The method for determining superior performance in the provision of services was based on counting the number of measures (from each of the four types of data: agency records, inmate and staff survey questionnaires, interviews with facility officials, and visual inspection ratings) on which each private or public facility exceeded, or performed better, than its comparison facility. Based on this method, the private facilities uniformly had a larger number of positive evaluations on the set of measures. Many of the differences that favored the private facilities were obtained from the staff questionnaire data. Ironically, the authors admit that juveniles in both the public and private facilities had virtually indistinguishable responses to questionnaire items about service delivery .

The greatest deficiency of the study was its reliance on univariate analyses. The statistical analysis consisted of univariate group mean comparisons. This method of statistical analysis created comparability problems in spite of the researchers' efforts to select comparable pairs of facilities. The reality is that without an experimental design, it is virtually impossible to obtain two facilities that are similar enough to provide meaningful comparisons without statistically adjusting for potentially confounding aspects of each facility. A multivariate analysis would have been more appropriate.

There were no coherent or systematic models specifying desirable performance outcomes and structural or operational processes that would be expected to accelerate or inhibit those levels of performance. The absence of theories or models to guide the analysis resulted in a much more voluminous and unwieldy report. Performance models would have allowed the evaluators to test for institutional differences in a more systematic, precise manner, explicitly acknowledge preexisting differences, and adjust the expected outcomes accordingly. The methods employed resulted in arbitrary decisions and attributions about degrees of comparability and levels of performance, and in general obfuscated the meaning of any public and private sector differences in the measurement set.

Statistical models of the sort proposed by Saylor (1996) and Camp et. al. (1997; 1998) could have minimized the need for presumptions about comparability and would have made the determination of performance differences, and the interpretation of those differences, straight- forward. Such performance models would specify certain outcome measures and the process measures that are believed to influence or control those selected outcome measures. The complexity of these models

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 21 of 28 PageID #: 18518

MARLOWE_0007126

would necessarily be limited by the small number of observations available. However, with thoughtful preparation, meaningful models that fell within the limits of the number of staff and inmate observations could have been identified. This same criticism can be applied to virtually every study we reviewed. Rather than repeat that criticism throughout the report, we highlight the problem here and in our summary of this research literature.

The study methods did meet the subsequent GAO (1996) criteria for evaluating the quality of service delivery in correctional facilities; however, there were still quite a few deficiencies as we have noted. There is no discussion of the types of innovations employed to achieve better quality of services and programs.

## California Evaluation

In adult corrections, California entered into contracting out for prison services around 1991 by allowing cities, counties, and private companies to operate Community Corrections Facilities (CCFs). Originally, these facilities were intended to house only inmates who had been returned to custody for parole violations. But given the crowding pressures in the state of California, the decision was soon made to allow new admissions into the facilities. Originally, there were 12 of these facilities, but by the time of the Sechrest and Shichor study (1994), the number had declined to 11.

Sechrest and Shichor (1994) conducted an exploratory study of 3 of the 11 facilities. Two of the facilities were run by public entities, one by the police department of a small community in the San Joaquin valley and the other directly by the city administration of a small city in the Mojave Desert. The privately operated facility was run by Management and Training Corporation (MTC) of Utah. It is important to note that none of the comparison facilities were actually operated by the California Department of Corrections (CDC).

Two types of data were collected for the quality comparisons. First, surveys were administered to staff and inmates at each of the three study facilities as well as staff and inmates at two CDC facilities: the California Institution for Men at Chino and the California Rehabilitation Center at Norco. Additionally, interviews were conducted with the wardens at the three study facilities. The survey data and on-site visits were used to assess conditions of confinement. The second source of data came from official inmate data as provided by the Offender Information Services Branch of the CDC. In addition to providing background information about the types of inmates at the respective institutions, the official records also allowed the inmates to be tracked for recidivism (parole violation for a new offense, technical violation of a condition of parole, or no violation).

The survey instruments used were taken from the surveys used in the study of private facilities in Massachusetts and Kentucky undertaken by the Urban Institute (1989). Unfortunately, because of study constraints, the surveys were administered to a fairly small number of inmates, and these inmates were not chosen randomly. As such, it is not clear what confidence can be placed on the results from the inmate surveys. The survey of staff suffered from the same problems, although the number of surveys is even smaller (68 total surveys from all 5 facilities). Since the results cannot be generalized to the staff and inmate populations from which they were drawn, we see no reason to review the results. We simply do not know what they mean.

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 22 of 28 PageID #: 18519

MARLOWE_0007127

There are also methodological problems in terms of using the data on recidivism. We concur with the summarization of the California study drawn by the General Accounting Office (1991: 31):

> ... Sufficient data were not available to adequately complete the analysis comparing the inmates released from the community correctional facilities to inmates released from other correctional institutions in the state.

In summary, the California study's methodological limitations prohibit drawing any overall conclusions about quality of service.

## Tennessee Evaluation

The Tennessee prison system, like prison systems in many jurisdictions, came under intense capacity pressures in the 1980s that resulted in litigation (Grubbs v. the State of Tennessee, 1985). As a result, the state legislature approved a substantial building program that started in 1985 and resulted in the building of six prisons along similar architectural lines as well as a special needs facility. In 1991, the state adopted legislation enabling the contracting out of correctional services to private contractors. A decision was made to turn over one multi-custody facility to a private contractor (Corrections Corporation of America as it turned out) to see what could be learned about best practice. The enabling legislation required a research component to assess quality and cost (Tennessee Select Oversight Committee on Corrections 1995). As stated:

> TCA 41-24-105 (d) The contract may be renewed only if the contractor is providing at least the same quality of services as the state at a lower cost, or if the contractor is providing services superior in quality to those provided by the state at essentially the same cost.

As a result, a bi-partisan committee from both houses of the General Assembly, the Select Oversight Committee on Corrections (SOCC), brought together staff from the Tennessee Department of Correction (TDOC) with executives from CCA to formulate a methodology for conducting the quality and performance assessment. With the assistance of the Vanderbilt Institute of Public Policy Services, formal meetings between TDOC and CCA produced a comparative methodology that was admittedly not an academic research project, but it fulfilled the requirements of the legislation. Importantly, both the public and private sectors agreed to the essence of the comparative methodology. Essentially, the process entailed that an audit/compliance check would provide the basic methodology for comparing the South Central Correctional Center (SCCC) operated by Corrections Corporation of America (CCA) with the two state-operated facilities, the Northeast Correctional Center (NECC) and the Northwest Correctional Center (NWCC). The three facilities chosen for comparison were all based on the same general architectural design as discussed above. SOCC wanted to insure a "level playing field" for all three facilities, consequently, in addition to similar physical design, all facilities came on line at approximately the same time. By mid-1992, all three facilities were operational.

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 23 of 28 PageID #: 18520

MARLOWE_0007128

There were six elements in the comparative methodology used, although only three of the elements actually received weight in computing the final aggregate score.[47] The audit portion counted for 60 percent of the total score. A list of 200 elements was compiled. Joint teams comprising staff from both TDOC and CCA conducted the audits. Ratings of compliance in the areas of Administration, Safety and Conditions, Health Services, Mental Health, Treatment, and Security were compiled as well as an overall rating of compliance. Two inspections were held at each of the three facilities. In general, the results showed comparable levels of performance at each of the institutions. On the first inspection, the overall compliance rates for the two public-operated facilities (NECC and NWCC) were respectively 90.67 percent and 90.08 percent. For the SCCC facility operated by CCA, the overall compliance rate was 84.53 percent. Both of the public institutions scored slightly better than the private facility, although the differences are modest. On the second inspection, the three facilities were virtually identical with 95.28 percent and 97.23 percent compliance at NECC and NWCC, respectively, and 97.48 percent compliance at SCCC.

A security and safety index was the second element that received weight, and accounted for 25 percent of the final aggregate score. The parties agreed not to assign an objective score on this dimension, even though the factors considered included disciplinary reports, use of force, assaults (both inmate-on-inmate and inmate-on-staff), deaths, injuries, escapes, and a residual category for other security and safety concerns. SOCC felt that scoring this area relied too heavily upon professional judgment. The working assumption used in the evaluation was that all institutions were in full compliance with safety and security standards, and the review would only note deficiencies in safety and security practices.

As might be expected, even though the evaluation reports on differences in the factors of safety and security, the conclusion is pretty mild. "Each of the institutions met the security and safety requirements of the two annual inspections and an ACA audit. Their respective scores were exceptionally high and almost identical. The administrative choices of how and when to use force, how to dispose of disciplinary charges, or how many disciplinary tickets to write is really the prerogative of management. However, in reviewing the entire period, in our judgment there was very little difference in security and safety among the three facilities" (Tennessee Select Oversight Committee on Corrections 1995: 56).

The final element that received weight (15 percent) was an index of programs and activities. Generally, this was a review of the numbers of inmates in education programs and work status. The indicator that received the most attention in the report was inmates in job waiting status. Because of a lack of an operational industry program at SCCC (operated by CCA) and NWCC by the second year

---

47  The elements not used were the nature of inmates, professional standards, and a survey of staff and inmates. As noted in the report, there is a need to make level-playing field comparisons, and as such, a need to control for the nature of inmates. However, this was not done, and the report showed that there was substantial variation in inmate characteristics at the three facilities. For exa mple, 47.5 percent of the inmates at SCCC (operated by CCA) were black, as compared to 22.6 percent at NECC and 78.2 percent at NWCC. While these percentages may reflect the racial backgrounds of the regions of Tennessee where the prisons are located, the priso ns themselves are hardly comparable on this item. Similar differences were noted for custody classification of inmates.

The professional standards, those set by the American Correctional Association (ACA), State Fire Marshal reports, State Educati on Department, and local and state health and sanitation standards, were considered minimum standards. However, the audit items cr eated as discussed above closely mirror items of concern in CCA accreditation inspections.

The surveys were intended only to provide subjective measures of satisfaction from staff and inmates and to provide insights in to operational issues.

MARLOWE_0007129

of operation, these two institutions had higher percentages of inmates in job waiting status. At the time of the review, SCCC was not in compliance with the policy that inmates job structures comprise 6 hours. CCA responded, though, that they changed their practice to be in compliance.

In determining a final weighted rating score to compare the institutions, the scores on security and safety as well as program and activity were meaningless as all three institutions received the maximum number of points on these scores. The only scores that differed among the three institutions were for the percentage of compliance captured in the second audit. The scores for the first audit (where CCA scored lower than the two public facilities) were not used. Since the CCA facility had a slightly higher compliance rate (97.48 percent as compared to 97.23 at NWCC and 95.28 at NECC), it came out slightly higher on the final weighted score (finals scores: SCCC, 98.49; NWCC, 98.34; NECC, 97.17). But as SOCC (1995: 68) noted, "In reviewing the ratings we considered the range of difference of up to 3 percent among the three facilities as essentially comparable. Therefore, our conclusion was that all three facilities were operated at essentially the same level of performance." Despite this conclusion, the New York Times ran an article at the time the Tennessee evaluation was released that concluded that there was strong evidence that CCA ran a better facility than the two public comparisons in terms of quality and cost  (Butterfield 1995).

The Tennessee evaluation is often cited as one of the more sound methodological attempts at comparing private and public prisons. For one, it compares institutions that were of a similar architectural design, were opened at about the same time, and were designed to house inmates of similar custody levels. Nonetheless, there are some serious shortcomings to the Tennessee evaluation.

First, the review is based solely on operational audits of the three facilities. This means that no performance measures were used in actually comparing the prisons, even though some attempt was made to gather performance data related to inmate misconduct, programs provided to inmates (primarily education), and the like. Generally, the position taken was that on the measures that could be developed as performance indicators (measures of safety, security, and program activity), there were no differences among the institutions. All institutions were comparable and received the maximum number of points in these areas. However, even a cursory examination of the actual tables presented on misconduct, education, and the like makes this conclusion suspect.

Second, it is not clear that the facilities provide an apples to apples and oranges to oranges comparison.  Even though all three facilities were multi-custody, they housed quite different types of inmates in terms of the socio-demographic characteristics reported, age and race, criminal history, and custody classification. Of course, these differences did not have as much impact upon the Tennessee evaluation as they would have if factors other than operational compliance had been used to calculate the final weighted scores of performance.

Third, the evaluation is a one-shot comparison even though data were collected over two years. For whatever reason, the compliance data from the first audit at each institution is reported but not used in determining the final comparative scores.

Fourth, only a single source of data, the compliance audit, was used to construct the final scores for the three institutions. As mentioned previously, this flows post hoc from the decision to award all three institutions the maximum number of points on safety and security as well as programs and activities. It is not that multiple data sources were not compiled, it is that they were ineffectively used (if used at all) in drawing the final comparisons between the private prison and the two public prisons.

Fifth, there was no attempt to document how the private sector had employed innovations in maintaining or improving quality while at the same time holding down or maintaining costs. There is not even any reference as to how the respective institutions were staffed. While not stated directly in the report, it even appears that private sector innovation was deliberately thwarted by making the private sector provider, CCA, abide by TDOC policy in running SCCC. In other words, it appears that Tennessee took the position that SCCC was simply another TDOC facility, to be run by TDOC policy, and that CCA would simply be given the opportunity to see if they could out-TDOC the TDOC. If this were the case, then obviously this limits the knowledge that can be gleaned about the benefits of privatization. Additionally, the design of the facility was set by the state, and the private contractor (CCA) did not have the opportunity to incorporate potential design efficiencies into the facility. Presumably, though, design considerations would impact more upon cost than quality.

Finally, there is no mention in the evaluation about the consequences of privatization for the TDOC and how TDOC operations may have changed.

## Washington State Review

As part of a wider inquiry into the privatization of government services, the Legislative Budget Committee (LBC) of the state of Washington was asked to submit a report by January of 1996 on the feasibility of privatizing Washington State Department of Corrections facilities. Part of the feasibility study included an examination of quality issues.

The researchers did not collect original data for their assessment of the impact upon quality created by contracting for correctional services. Instead, they reviewed studies conducted by Logan (1991) and the Tennessee Select Oversight Committee (1995). Both of these studies are reviewed at length elsewhere in this report.

The LBC also performed cost analyses of public and private prisons in Tennessee and Louisiana. They collected published data for conducting this component along with additional data from the respective state agencies and private contractors. The LBC researchers also went onsite to observe operations. While we are not concerned with the cost analyses here, they did make some qualitative observations about operations in Tennessee and Louisiana. It is these observations that are of interest here.

### Review of Quality

The LBC researchers concluded that the Logan (1991) and Tennessee (Tennessee Select Oversight Committee on Corrections 1995) studies demonstrated no significant differences in quality between the publicly and privately operated prisons. They actually do not provide any information about how they reached this conclusion. This is surprising since their conclusion is at odds with Logan's claim that the private contractor provided better quality than the state and federal prisons in his study.

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 26 of 28 PageID #: 18523

MARLOWE_0007131

**Qualitative Observations of Operations in Louisiana and Tennessee**

The LBC researchers examined several questions to address the issue of whether similarities exist between the inmate populations and behaviors both within and between states. The LBC sought to examine whether the experiences with privatization in Louisiana and Tennessee could be generalized to the state of Washington, and this led to the inter-state comparisons. For our purposes, the within state comparisons are of more interest as they address how the private and public prisons compared in Louisiana and Tennessee.

The LBC researchers concluded that inmates in the public and private prisons within each state behaved about the same. They based this conclusion in part upon an examination of the number of escapes, the major infraction rate, the minor infraction rate, and the percentage of inmates in school. In part, though, it appears that the conclusion was based upon subjective evaluations. The LBC researchers note that "(t)here were comments made to us in both Louisiana and Tennessee about a belief of under reporting of infractions and incidents at the private prisons, but headquarters administrators said they thought all of the prisons were safe and secure" (Thomas, Gookin, Keating, Whitener, Williams, Crane, and Broom 1996: A4-4). In fact, in Louisiana, both the major and minor infraction rates were higher at the state-operated prison, although little emphasis is given to this fact.

Other areas briefly covered in the Washington study are demographic and criminal history characteristics of inmates, classification policies, inmate idleness, and program opportunities. Most of the relevant comparisons for these factors were between states. However, the LBC researchers did note that the private prison in Louisiana run by CCA had a lower percentage of inmates enrolled in education as a result of CCA losing federal grant monies upon which they were dependent. Otherwise, the public and private prisons were seen as fairly comparable. As the LBC researchers note: "The prisons we visited appeared clean and orderly. ... Staff were professional both in appearance and performance. There did not appear to be major differences in operations." (Thomas et al. 1996: A4-9)

There are several shortcomings to the LBC report with regards to quality assessment. First, the LBC review depends upon reviewing performance data (such as escapes, infractions, etc.), but it is not clear how the individual data elements were pulled together to reach a general conclusion. Likewise, even though there is recognition that reported incidents depend upon the nature of inmates and reporting procedures, there was no attempt to adjust rates for these factors.

Second, as discussed in the reviews of the studies by the Tennessee Select Oversight Committee (1995) in Tennessee and Archambeault and Deis (1996) in Louisiana, the evaluations do seem to provide more apples-to-apples comparisons than are generally found in other evaluations. However, unanswered questions remain about how much the institutional averages for inmate behavior are influenced by race differences (e.g., Tennessee) or classification differences (e.g., Louisiana).

Third, the analysis does not address the time dimension. Generally, even though they review data from two separate states, the data are for a single point in time. This does not allow for an assessment of how quality in the public and private sectors may vary over time.

Fourth, there was no systematic attempt to obtain information on sources of innovation available to private sector operators to improve *quality*. This was not the case for private-sector costs. The LBC does attempt to disaggregate sources of cost savings for private-sector operators into savings from using different staffing patterns, savings from providing different employee benefits, and savings from

Case 3:16-cv-02267     Document 383-10     Filed 01/22/21     Page 27 of 28 PageID #: 18524

MARLOWE_0007132

salaries. In general, they claim that the private-sector operators use staff in more than one area, and they have more flexibility in using staff. In addition to providing little detail about these claims, the LBC researchers do not go on to discuss how these changes affected quality in the respective prisons.

Finally, there is only limited information on the impact of privatization on public-sector operations in Tennessee and Louisiana, and most of those insights pertain to costs. In noting that the cost savings in Louisiana have become smaller over time, the LBC offered this possibility (but no direct evidence):

> One explanation for the convergence of costs over time may be the effect of competition. This is an argument made by the private companies that was also mentioned by some state correctional officials. Lean budget years may also have made a difference. For some years the inflationary increases built into the private contracts has been greater than the increases in the corrections budget. So while the per diem cost for the private prisons has inflated, it has not inflated for the public facility (Thomas et al. 1996: 12).

It is worth emphasizing that the Washington State study is a presentation and analysis of data that can also be found elsewhere (Archambeault and Deis 1996; Tennessee Select Oversight Committee on Corrections 1995). While the results of the LBC study generally mirror those of the Tennessee Select Oversight Committee about the experiences with privatization in Tennessee, the LBC conclusions about the experiences in Louisiana conflict with the data analysis presented by Archambeault and Deis (1996).

## Arizona Evaluation

The Utah-based firm Management and Training Corporation (MTC) won a contract from the state of Arizona in 1993 to operate a 450-bed minimum security, mixed gender institution. The institution is now known as the Marana Community Correctional Treatment Facility. MTC began receiving inmates in October 1994. Generally speaking, the contract stipulates that MTC run the Marana facility in a manner similar to that in which the state would have operated the prison. MTC must abide by all applicable policy stipulating how Arizona state prisons are run (Nink 1998). By law, the contract with MTC could not be renewed unless there was evidence of either 1) cost savings and comparable quality or 2) comparable costs and superior quality. Dr. Charles Thomas was selected to conduct the corresponding evaluation.

Thomas was faced at the outset with a number of serious methodological problems. First, the Marana facility is a dual gender facility, but there are no dual gender facilities operated by the state of Arizona to serve as a point of comparison. Twenty-two percent of the inmates incarcerated at Maranna are female. Second, the prisoner population profile is different from those of the publicly operated minimum security prisons in Arizona. In particular, Marana houses a much higher percentage of DWI inmates (24.8 percent) than is true of all other Arizona facilities (with the exception of Papago, 98.9 percent, which is almost exclusively a DWI center). Also, the Arizona Department of Corrections contractually agreed not to send to Marana prisoners who "have serious or chronic medical problems, serious psychiatric problems, or are deemed unlikely to benefit from the substance abuse program" (Thomas 1997a: 73). Third, the classification of the inmate population "tilts" toward being less serious at Marana than at the other Arizona facilities (Thomas 1997a: 106). In particular, all of the inmates at Marana are public risk 1 or 2 inmates (with 1 being the lowest risk), as they are, for the most part, at the other Arizona prisons. However, whereas the other Arizona prisons have inmates

Case 3:16-cv-02267    Document 383-10    Filed 01/22/21    Page 28 of 28 PageID #: 18525

MARLOWE_0007133