# EXHIBIT D
# Part 8 of 14

with internal risks greater than 2 (i.e, inmates who require more supervision), Marana has practically no inmates with an internal risk factor greater than 2 (Thomas 1997a: Appendix A, Table 3: A9). This is important as higher risk classification scores are generally predictive of misconduct. In other words, 14.11 percent of public risk level 1 or 2 inmates at publicly operated Arizona prisons have an internal risk greater than 2. Only 0.24 percent of the inmates at Marana have a similar classification. Fourth, the contract with MTC calls for providing a "heavier" load of programming to Marana inmates than is the case in publicly-operated minimums. And, finally, the physical design of Marana is unlike that of other Arizona facilities, primarily because it is newer.

Within these constraints, Thomas decided to compare cost and quality performance measures at Marana against the average for all minimum security institutions under public operations. Arguably, Thomas did not have many good options, but it is not clear that the choice he made is completely satisfactory. Very different types of institutions make up the full contingent of minimum security facilities in Arizona. We reserve this discussion for later. As Thomas notes in his chapter on comparing quality, "Any or all differences could be caused by nothing more or less than the fundamental dissimilarities between the Marana Community Correctional Facility and the fifteen state-operated facilities" (Thomas 1997a: 108).

Even recognizing the serious limitations to the study, Thomas drew 13 conclusions from his study, 7 of which pertain directly to the issues associated with quality as determined in the Arizona evaluation. We largely ignore Thomas' review of existing literature on quality comparisons as the relevant studies that Thomas reviewed are also reviewed as part of this report. We also exclude his conclusions about cost. Thomas' seven conclusions about quality of operations in Arizona are worth reporting in full, however. They provide the basis for our examination of the methodological issues raised in the Thomas study. The conclusions appear in full in both the Executive Summary and body of the report (Thomas 1997a: ii-iv, 157-159):

> Conclusion #4: There is a high risk that operating cost and performance comparisons of the Marana Community Correctional Treatment Facility could yield misleading results because there is no state-operated prison in Arizona that houses inmates similar to Marana or runs similar programs.
>
> Conclusion #7: The performance comparison on the dimension of protecting the public safety interest as measured by the frequency of escapes, major disturbances, and injuries caused to visitors revealed that the record for the Marana Community Correctional Treatment Facility was superior to that of the state-operated Level Two (minimum) prisons.
>
> Conclusion #8: The performance comparison on the dimension of protecting staff and prisoners from the risk of personal injury or death caused by homicide, battery, assault, and arson revealed that the record of the Marana Community Correctional Treatment Facility was superior to that of the state-operated Level Two prisons.
>
> Conclusion #9: The performance comparison on the dimension of educational, treatment, and work programs resulted in a best professional judgment that the dissimilarities between the programs offered at the Marana Community Correctional Treatment Facility and those found at the state-operated Level Two prisons were so great that no fair comparative conclusions could or should be reached.

> Conclusion #10: The performance on the dimension of compliance with professional standards as measured by routine Department performance audits, litigation initiated by either prisoners or staff members, inmate grievances, and compliance with in-service training requirements for staff members revealed that the overall record of the Marana Community Correctional Treatment Facility was superior to that of the state-operated Level Two prisons.
>
> Conclusion #11: A balanced consideration of the entire set of individual performance indicators revealed that the overall performance record of the Marana Community Correctional Treatment Facility was superior to that of the state-operated Level Two prisons.
>
> Conclusion #13: Notwithstanding the conclusion that, when compared with all state-operated Level Two prisons, the quality of performance at Marana was superior to that of the state-operated prisons, it was found that one or more individual state-operated prisons had performance records that were equivalent or superior to that of Marana.

Thomas justified drawing these conclusions by pointing to the necessity to have the information for policy purposes (Thomas 1997a: 103). Also, he claimed that the limitations cause the findings only to have "fuzzy" rather than "crisp" edges (Thomas 1997a: 104).

Nonetheless, Thomas recognized the risk associated with the comparisons he makes and that while Marana fared the best in his comparisons against the average for Level Two prisons in Arizona, some individual prisons had better performance measures than Marana. To Thomas' credit, he did report the performance measures individually for the 15 publicly-operated prisons.

Of the conclusions about quality listed above, Conclusions 7, 8, and 10 are based on direct examination of data presented by Thomas. As such, we review each of these conclusions in more detail. Thomas' other conclusions regarding quality are more subjective or global, and we do not discuss them specifically, although these quality conclusions (Conclusions 4, 9, 11, and 13) are reviewed in general.

Conclusion 7, the conclusion about public safety, is based on comparing rates of major incidences, escapes, and injuries to visitors. Thomas concluded that Marana's performance was "superior." However, as Thomas noted, none of the facilities (including Marana) had a single major disturbance, only 4 escapes occurred at the 15 state facilities (3 from Papago where the DWI cases are incarcerated) while there were none at Marana, and no injuries to visitors were reported at any minimum security prison (including Marana). None of these findings are surprising given that the facilities house minimum security inmates. What is surprising is that Thomas concluded, even with the cautionary remark in the *body* of the report that "readers must refrain from making more of this difference than is fair and reasonable" (Thomas 1997a: 111), that Marana was *superior* to the state facilities because 2 of the 15 state-run facilities had escapes.

Case 3:16-cv-02267   Document 383-11   Filed 01/22/21   Page 3 of 11 PageID #: 18528

MARLOWE_0007135

It seems that reasonable commentators could conclude that Marana was exactly equivalent to 13 of the 15 state-operated facilities on the dimension of public safety, and that Marana -- and the 13 publicly-operated prisons -- were marginally better than two of the publicly operated facilities. The term marginal seems appropriate because there was a difference on only one of the three indicators, and the frequencies for the one indicator were not unusual. While escapes are rare, they do nonetheless occur (from private as well as public prisons).

Similar problems exist for Conclusion 8 about protecting staff and inmates. Thomas again gave ample warning about the tenuous nature of his conclusion, nonetheless concluding that Marana was superior. The rates of the types of serious misconduct considered by Thomas are very low at any minimum security prison. In essence, most of the forms of misconduct (like inmate-on-inmate assault), occurred only a few times -- if at all -- and at a limited number of institutions. Thus, comparisons of Marana to 15 other facilities is fraught with difficulties, especially when one considers that 22 percent of the inmates at Marana were female, a group with low rates of the types of misconduct considered.

In addition to Marana, three publicly operated facilities had perfect records on offenses related to protecting staff and inmates from serious injury. Two of the three publicly operated facilities (Globe and Maricopa) housed male inmates.

Thomas reported the rates of all Type A offenses (serious) charged and found guilty at each of the 16 prisons in his study. (He also reported comparable information for the less serious Type B and Type C offenses, but we ignore these for our purposes, since less serious offenses typically involve a great deal of discretion and, therefore, are often unreliable indicators of the "true" underlying pattern of misconduct). What is interesting about the Type A offenses is that they occur often enough to provide some confidence in the respective rates, although collapsing all serious offenses together means information is lost about what types of offenses are being reported at the respective institutions.

The rate at which Type A offenses are charged at Marana (0.33) compared very favorably to the rate (0.55) for the average of the 13 publicly operated facilities listed in Table 6 (Thomas 1997a: Appendix A, page 12). Nonetheless, in addition to the two female minimum-security institutions, two other male institutions (Globe and Piacho) had lower or comparable rates of Type A offenses (0.20 and 0.33 respectively). When we factor in that 22 percent of Marana inmates are female and females commit almost no Type A offenses (the rates for charging inmates at the female prisons in Arizona were 0.04 and 0.00), the rate of 0.33 at Marana is not as impressive.

Assuming that the 22 percent of the females at Marana were charged with Type A offenses at the rate of 0.04 (the highest rate noted in an Arizona female, minimum-security prison), then males at Marana were charged for Type A offenses at the rate of 0.41. At this adjusted rate, we see that Globe and Piacho compared favorably to Marana, as did San Pedro where the rate was 0.37. This still means that Marana was doing well, with a lower rate than 8 of the male, publicly operated minimum-security facilities. Nevertheless, Marana was higher than 3 of the publicly operated males facilities, and it was obviously higher than the rate at the two publicly operated female facilities. At best, Marana is comparable to the best public facilities, but it is hard to argue that Marana is superior if we trust the data on Type A offenses.

Regarding Conclusion 10, the factors considered included the comprehensive annual quality audits conducted by Arizona DOC (including an audit of Marana), litigation filed against the prison, inmate

grievances, and compliance with staff training requirements. Marana was the only minimum security institution that did not receive an overall rating of excellent on the audit. Thomas implied, however, that the internal audits may have been stacked against Marana. Regarding litigation, there were only 14 lawsuits initiated by prisoners. This involved inmates at 8 of the 15 publicly operated facilities and none at Marana. There were two lawsuits initiated by staff, both at publicly operated prisons. For the rate of inmate grievances, the rate at Marana (0.26 per 100 inmates) was second only to Papago where the rate was 0.20. On the dimension of training, there was no difference between the publicly operated prisons and the Marana facility operated by MTC.

Despite the mix of evidence on performance -- including the fact that Marana did not score as highly as some state-run facilities, that some kinds of infrequently occurring events transpired at some of the fifteen state facilities but not at Marana (e.g., litigation), and the problematic audit review -- Thomas nonetheless concluded that, on balance, a superior ranking "must" be assigned to Marana.

Thomas was faced with a host of methodological problems, some of which may have been insurmountable. Nonetheless, an evaluation was mandated before the contract could be renewed, and as Thomas correctly noted, the conditions of policy reviews seldom meet the pristine conditions of laboratory research. In this context, let us review then how this research effort fulfills the conditions of sound comparative research.

First, the review seemed to use both performance and audit data, relying most heavily upon performance data. The audit data came from the normal audit cycle of the Arizona Department of Corrections. As such, the audit data are suspect as Thomas implied in his analysis. Unlike the audits performed as part of the Tennessee evaluation (Thomas 1997a: 73), where the protocols were developed by both public and private officials, and where audit teams were comprised of members from both the public and private sectors, the Arizona auditors were all Arizona Department of Corrections employees conducting a standard Department of Corrections audit. At the very least, this creates the appearance that bias may have been built into the audit of Marana. In our opinion, Thomas was correct to not emphasize the audit results in his analysis. However, we are not so sanguine about his uses of the performance data, as noted in the review above.

Second, it is abundantly clear that this evaluation does not provide an apples-to-apples comparison. Thomas himself was aware of this fact, as was the Arizona Department of Corrections when they contracted for the evaluation. It seems there was no comparable facility to Marana in the entire Arizona prison system. Still, this does not justify the strategy Thomas followed of comparing the Marana facility to the average of the other publicly operated facilities. If an average had been used, it should have been an average of facilities that most closely resembled Marana. Using Thomas' approach, the comparisons are not that informative. More informative are the comparisons made in the body of the text of Marana to individual state facilities, but these comparisons do not provide the basis for the findings presented in his 13 conclusions. For the most part, the 13 conclusions presented by Thomas are based upon comparisons of Marana to the averages for the 15 publicly operated facilities with the exception that Thomas does point to the facility-by-facility comparisons as conditioning the other conclusions (see Conclusions 4 and 13).

Third, the study suffers from being a one-point-in-time comparison. A problem not noted above, but which may be relevant, is the timing of the study. Generally, the Marana facility was in an activation phase for most of the course of the study, which probably had some influence upon the types of

behaviors observed there. Whether patterns noted for this time period will hold as the facility matures is unknown.

Fourth, there was no attempt to document how MTC employed innovations to facilitate changes in quality (or cost for that matter). In part, this inattention may have resulted from the model of privatization followed in Arizona. Basically, the State of Arizona has taken the position that a private contractor should be given the opportunity to demonstrate it can out perform the state in running an Arizona prison according to Arizona Department of Corrections policy. Some states take the position that a private contractor should be given a great deal of flexibility and freedom in developing its own foundation of policy and procedures, while holding the contractor to some minimum standards such as those developed by ACA. While their approach may make some things easier for the Arizona Department of Corrections (conducting audits for one thing), it certainly provides little room for the private contractor to innovate. This means that differences in quality must arise from better performance by the private contractor's line staff and management.

Fifth, there was no attempt to assess whether the operation of the Marana facility by MTC has brought about system changes to the Arizona Department of Corrections.

## Louisiana Evaluation

The State of Louisiana has funded an evaluation of its prison privatization efforts. Archambeault and Deis (1996) have produced a report comparing 3 institutions which have the same architectural design, accommodate approximately the same number of inmates, were built and activated at approximately the same time, are located in rural areas of the state, and house inmates of comparable security levels. Allen Correctional Center is operated by Wackenhut Corrections Corporation (WCC). Avoyelles Correctional Center is operated by the Louisiana Department of Public Safety and Corrections, and Winn Correctional Center is operated by the Corrections Corporation of America (CCA).

The primary purpose of the Archambeault and Deis evaluation was to compare the two privately operated and one publicly operated facilities on measures of cost and performance. The performance data used in this report came primarily from official records normally reported to the Secretary of Public Safety and Corrections by all adult correctional institutions within the state. The researchers made one field visit to each of the three sites. Based on the site visits and supporting documentation, Archambeault and Deis characterized the management philosophies existing at the time of the study. They rated the Wackenhut operated facility as most authoritarian, the publicly operated facility as intermediate, and the CCA operated facility as the least authoritarian of the three. At the time of the study, WCC employed 335 staff, the public facility 384 staff, and the CCA facility 340 staff. The CCA facility employed more women and minorities than the other 2 prisons, while the public facility employed predominantly white and male staff.

According to Archambeault and Deis, the Louisiana Department of Public Safety and Corrections Secretary, Richard Stalder, standardized the policies and procedures of the three prisons in 1992 and instituted a common reporting procedure that was used by the evaluators as their primary source of data. In a letter to Archambeault, written by Robert C. Thomas, the Principal Management Auditor/Supervisor for the State of Washington's Joint Legislative Audit and Review Committee,

Thomas expressed his concerns about the validity of the reporting mechanism (Thomas 1997b). In his letter, Thomas raised the possibility that "...different incentives can be at work in the private facilities than in the public facilities (p. 3)." Although we agree with this criticism, without further information, it is difficult to sort out the relationship between reporting incentives and the actual behavior underlying these reports. While private prisons may have an incentive to under report unfavorable incidents to bolster the impression that they are performing well, there is a counterbalancing incentive for private prisons to report all significant incidents as failure to report could provide grounds for contract termination. On the other hand, a public facility may want to over report incidents as an argument to receive more resources, unless the public facility is in "competition" with private sector providers of prison services.

Because it is difficult to disentangle accurate reporting from this subtle incentive structure, we assume for the present purposes that the reporting mechanism is a true reflection of underlying conduct. Nonetheless, we prefer that reporting mechanisms occur more as a by-product of institution operations than as an additional requirement. As an example of what we mean, consider two separate reporting mechanisms used by the Bureau of Prisons for representing serious inmate misconduct. One mechanism is similar to the one adopted by Louisiana. On a daily basis, institutions report any serious incident (e.g., fire, serious assault, disturbance) to both the Regional and Central Offices. There is a certain amount of discretion in what people choose to report. The second mechanism of reporting these incidents occurs as a by-product of the normal adjudication process that occurs in the Bureau of Prisons institutions. A serious assault will typically result in an administrative action culminating in an adjudication of the misconduct by a disciplinary hearing officer (assuming that the assailant is known). Whether or not there is a sustained finding (conviction), all of the procedures and actions will be recorded in an automated database of disciplinary hearings. The Bureau is able to cull aggregated information on disciplinary actions for any and all of its institutions from this individual level database. We have data demonstrating that this latter mechanism has much less reporting discretion than the former.

To establish comparability of the three institutions, Archambeault and Deis assessed information on the physical plant, its history of expansions, State-imposed policies and standards, comparability of ACA standards, and the number and ethnicity of inmates during the evaluation period. While acknowledging that a limitation of their study was that they lacked information on the characteristics of the inmate populations, the evaluators minimized this limitation by stating that an "ideal evaluation design" would include such data. We would characterize information on the characteristics of the inmate population as fundamental in a comparison of institution performance measures. Almost every institution performance measure used by Archambeault and Deis was a summary or aggregate indicator of individual performance data. Since it is well known that inmate behavior whether prosocial or antinormative is strongly correlated to criminal history, demographics (age, race, ethnicity), and other social and actuarial predictors, these background data are a sine qua non of valid institution performance comparisons. What may appear to be differences in institution performance may be nothing more than differences in the background characteristics of inmates housed in the different institutions that predispose them toward more or less favorable behavior.

Over 200 measures were collected and analyzed by Archambeault and Deis. These measures covered issues about safety, risk, effectiveness, performance, and cost. The data covered several years (fiscal years 1992 through part of fiscal year 1995) and represented monthly occurrences of the phenomenon. Typically, the researchers would compute an average of the monthly data and use that average as the

MARLOWE_0007139

performance indicator. In some cases, the researchers compared averages for different periods of time when they thought changes in reporting or other artifactual problems might influence the data. Unfortunately, the researchers did not capitalize on the trend data to evaluate performance over time.

The performance measures included data on escapes, assaults on staff and inmates, assault outcomes (i.e., whether they involved serious injury), sex offenses, aggravated sex offenses, institutional disturbances, deaths due to violence, suicide, or illness, disciplinary actions, gunshots, grievances, drug tests, communicable diseases, inmate education and vocational training participation, GED's earned, basic literacy, college participation, and various indicia of medical care. Staffing data included use of sick and maternity leave, resignations, and grievances. Each performance measure was analyzed separately; however, scales of these measures were also constructed and analyzed.

As an example of how Archambeault and Deis evaluated the three institutions, consider the first performance measure—escapes from the institution. Over the study period, the public institution reported no escapes, the CCA-operated facility reported 5 escapes and the WCC-operated facility reported 3 escapes. Archambeault and Deis submitted the month-to-month data to an analysis of variance and contrasted the three average escape rates using a Scheffe post hoc comparison technique. Using these methods, there was no statistical difference among the average of the monthly escapes over the study period. The F- and Scheffe tests used by these researchers were probably inappropriate techniques to compare such rarely occurring events and since they were measuring population differences, not samples, the use of any statistical test to compare the averages may have been inappropriate. Even more important is the interpretation of the absolute differences in the number of escapes for the 3 institutions. Protecting the public is one of the most significant missions of a prison system and clearly the public institution was doing a much better job than either of the two private institutions. The researchers do acknowledge the public institution's superiority but also claimed that "each of the three prisons are fully meeting the obligation of protecting the public (p. 121)." From our point of view the two private prisons were deficient in this obligation.

In chapters V through X of their report, Archambeault and Deis analyzed the remainder of nearly 200 performance measures. This was clearly an ambitious assessment of the comparative quality of the three institutions. On some of the more important dimensions, data were also collected and reported on the four other adult correctional institutions in Louisiana: Hunt, Dixon, Angola, and Wade. Comparisons involving all 7 institutions were made primarily on serious misconduct such as escapes, serious assaults on staff, inmate on inmate sex offenses, other serious inmate offenses, and institutional disturbances. While the three primary comparison sites had almost identical inmate population counts over the period of this study, the other four institutions used in some of their comparisons had widely discrepant population counts. It appears to us that Archambeault and Deis reported these performance measures without accounting for the large differences in the average monthly inmate populations of the other four comparison institutions. Angola had an average monthly inmate population almost 4 times as high as the 3 comparison institutions. Another institution, Wade, had an average monthly population almost 20 percent lower than the 3 comparison sites. The comparison of raw averages is meaningless given the huge disparity in the monthly inmate population counts.

Since these serious misconduct measures were important indicators and the raw data were available, we re-computed the performance measures by taking the data reported in Archambeault and Deis and dividing the average monthly counts by the average monthly inmate population then multiplying the

result by 1,000. This results in a performance measure that is an average monthly rate per 1,000 inmates. A completely different picture emerges when you compare the raw counts, i.e., the average number of incidents versus the rates adjusted by the average monthly population. Table 1 represents the monthly counts, Table 2 the rates. Whereas Archambeault and Deis reported that the risk of assaults by inmates on staff resulting in serious injury is marginally higher at the public facility than the two privately operated facilities, Table 2 indicates that at least one other public facility had an equally low rate of such assaults. The data in Tables 1 and 2 represent information on staff and inmate safety. We are not confident that a statistical test is warranted, thus, for each performance indicator, we have color coded the best rate in blue, the second best rate in green, and the worst rate in red. It is clear that when the data are represented as counts, Dixon (public), and perhaps Allen (WCC) and Avoyelles (public), were the best performing institutions on these performance indicators. Angola (public) was the worst by far. Looking at Table 2, using the more appropriate rates, Dixon (public) was still the best, Hunt (public) perhaps the second best, and Angola (public) -- while still the worst -- did not look nearly as bad. It is not clear why the penitentiary at Angola should be included in any of these analyses, since by reputation, this facility houses the most hardened prisoners in the Louisiana system. Data on the background characteristics of these inmates would go a long way toward answering these issues of comparability.

We have also included other counts and rates in Tables 1 and 2, for which there is no information reported by Archambeault and Deis on the other public institutions, as well as information on total disciplinary actions and gunshots. We did not color code disciplinary actions and gunshots because, unlike Archambeault and Deis, we are not convinced that lower rates indicate better performance. Archambeault and Deis cite Clear and Cole (1997) who argue that high levels of disciplinary infractions indicate staff and inmates are intolerant of each other. We can think of other scenarios in which high levels of misconduct can be interpreted as a sign that management is strict about enforcing rules but fair in the disciplinary process. Alternatively, low levels of misconduct may indicate a lax environment, and tolerance of nuisance behaviors that invite more serious misconduct. Misconduct data can be very misleading unless we are knowledgeable of the institutional context. Looking at Table 2, we can see that Angola, which had the worst record with respect to serious incidents, had the lowest overall misconduct rate in that time period. Dixon, which had the best record with respect to serious incidents, had a total disciplinary rate intermediate to the lowest and highest rates among the 7 institutions. If misconduct were related to serious incidents, we would expect institutions with the highest misconduct rate to have the highest serious incident rate. The data argue against any conclusion that low rates of misconduct indicate better performance.

The urinalysis "hit" rate was another important indicator of institution safety and security although Archambeault and Deis treat the indicator as a measure of health risk. The rate at which inmates are randomly detected using drugs is an indication of the extent to which an institution is able to control the importation and use of drugs. These data were only available on the 3 comparison institutions. The data showed that the public institution was much more likely to use urinalysis to test for drugs and that the random tests revealed that the public institution had far fewer inmates testing positive for drug use than either of the privately operated facilities. Overall, these data seem to indicate that each institution had certain safety and security deficiencies and each had certain strengths; however, the best performing institution was a publicly operated one during the period of this study while the worst was the notorious penitentiary at Angola. All of these conclusions should be tempered by the fact we have no basis for determining whether these differences resulted from institution management or

MARLOWE_0007141

merely from housing inmates with different propensities toward violence and other serious misconduct.

Other data were collected by Archambeault and Deis to indicate health risk. Information on communicable diseases, including HIV infection and tuberculosis, were analyzed. Archambeault and Deis used information on the incidence and prevalence of HIV and tuberculosis. They used various indicators of HIV and AIDS which depended on the level of seriousness of the infection and the year in which the data were recorded. For example, they separately assessed group I, group II, group III, group IV-A, group IV-B, group IV-C, group IV-D, group IV-E, and the number of inmates receiving AZT for fiscal years 1992-1993. In fiscal years 1993-1994, they categorized the infection into separate subgroups that depended on the T-cell count and whether the cases were characterized as category A, B, or C and levels 1,2, or 3. Similar measures were compiled on tuberculosis cases. The researchers also created a composite health risk of these measures and included the drug testing measures. This resulted in an index composed of 60 indicators.

They found that the WCC-operated facility had the highest medical risk score, the CCA-operated facility the second highest, and the public facility the lowest. We question the validity of this composite health risk predictor. Unless they could measure the quality of care delivered by the different institutions, it is difficult to credit or fault an institution for its level of health problems. Health problems can be related to the demographic characteristics of the inmate population and totally unrelated to the health care delivery system at the institution. The drug assessment did indicate the public institution had the lowest drug utilization rate and the highest use of random and total number of drug tests and the lowest percentage of inmates testing positive among the random tests. This is evidence that the public institution was actively combating drug use at least partly through the use of testing.

In Chapter IX of their report, Archambeault and Deis assess the work environment of correctional personnel. Their first set of indicators examines the relationship between the number of positions allocated and the actual number of staff working on a daily basis. They found that the public institution had more positions allocated to custody but a lower proportion of those positions were used on a daily basis. In their comments, Archmbeault and Deis provide the explanation for this discrepancy. When the public facility opened, many of the personnel transferred from other state institutions. Employees with more tenure accrue more leave and therefore, more staff were needed to cover the same shifts. Archambeault and Deis did not have sufficient data to investigate this possibility.

Chapter X of their report examined the use of administrative remedy procedures by the inmates, indicators of education and vocational opportunities, inmates' medical duty status, and the number of inmates evaluated and transferred to pre-release programs and community correctional centers. The WCC-operated facility had the highest monthly total of administrative remedy complaints. The public and CCA-operated facilities were almost identical in those rates. The public facility was the least likely to accept a complaint.

The CCA-operated facility had the most complaints regarding medical care and quality of life. The WCC-operated facility had the most complaints regarding property, legal issues, rules, threats, communication, records, finances, institution programs, discipline, and classification. The public facility had the most complaints about discrimination and protection.

Data on program enrollment and completions in education and vocational training programs indicated that the CCA-operated facility was doing a better job in providing educational and vocational training to inmates than either the public or the WCC-operated facility. However, the authors noted that the public institution involved more inmates and volunteers in the education process, had more inmates enrolled who completed the basic literacy program, and had more inmates enrolled in college courses. Archambeault and Deis concluded that the CCA-operated facility was far more effective in its education performance than the WCC-operated facility or the public facility. This conclusion was partly based on efficiency ratings in which the CCA-operated facility had higher rates of completions on some indicators.

Finally, Archambeault and Deis collected data on the duty statuses for inmates and whether the institutions screened inmates for transfer and community rehabilitation and work centers. The CCA-operated facility had the most occurrences of screening and highest ratio of transfers to the community centers. The CCA-operated facility also had the highest ratio and most inmates on some form of limited duty status. In the absence of any additional contextual information, it is almost impossible to make any sense of the limited duty status data.

Archambeault and Deis concluded that the two private prisons outperformed the public institution on most of the performance measures, including critical incidents, safer working environment for staff, a safer environment for inmates, judicious use of disciplinary actions, more efficient use of security personnel, higher inmate program participation, and higher use of inmate transfer to community settings. The public institution was credited with outperforming the private institution on measures of escape, aggravated sex offenses, substance abuse, the breadth of education and vocational training in the number of inmates served, and the breadth of treatment, recreation, social services, and habilitative services to inmates.

As we have already noted, a re-analysis of the safety and security data using the information on all of the Louisiana institutions shows that the public facilities were the best and the worst. However, this conclusion and any other conclusion should be strongly tempered since Archambeault and Deis were unable to collect information on characteristics of the inmate population that could have been used to control for potential inmate population differences among the institutions. We suspect that the penitentiary at Angola probably houses the most hardened and violent prisoners incarcerated by the State and that there are structural reasons (both architectural and sociological) that make it a difficult prison to manage.

In Thomas' (1997b) letter (mentioned earlier), he was also critical of Archambeault and Deis' conclusion on the role of privatization for other jurisdictions, although as far as we can tell, that conclusion was misstated in the Thomas letter. Thomas wrote that Archambeault and Deis claimed, "Private prisons have a definite place in any state's total prison system (p. 3 of the Thomas letter)." The closest comment we can find in the Archambeault and Deis report is the statement "Privately operated prisons have a definite place in the planning of any state's total prison system (p. 573)." Thomas argued that the conclusion was unwarranted by the study and that a private alternative may not be in the best interests of the state. In fact, the Archambeault and Deis conclusion was more guarded and those authors went on to state that privatization of prison beds should be limited to ensure that the incentive to compete is not lost.