# EXHIBIT D
# Part 10 of 14

# References

Archambeault, William G. and Donald R. Deis. 1996. "Cost Effectiveness Comparisons of Private Versus Public Prisons in Louisiana: A Comprehensive Analysis of Allen, Avoyelles, and Winn Correctional Centers." Louisiana State University, Baton Rouge, LA.

Bureau of Research and Data Analysis. 1998. "Preliminary Assessment of a Study Entitled: 'A Comparative Recidivism Analysis of Releasees from Private and Public Prisons in Florida'." Florida Department of Corrections, Tallahassee, FL.

Butterfield, Fox. 1995. "For Privately Run Prisons, New Evidence of Success." Pp. 7 in *New York Times*. New York.

Camp, Scott D. 1998. "Private Adult Prisons: What Do We Know and Why Don't We Know More?" Federal Bureau of Prisons, Washington, D.C.

Camp, Scott D., William G. Saylor, and Miles D. Harer. 1997. "Aggregating Individual-Level Evaluations of the Organizational Social Climate: A Multilevel Investigation of the Work Environment at the Federal Bureau of Prisons." *Justice Quarterly* 14:739-761.

Camp, Scott D., William G. Saylor, and Kevin N. Wright. 1998. "Creating Performance Measures from Survey Data: A Practical Discussion." *Corrections Management Quarterly* (forthcoming).

Casile, Maureen. 1994. "The New Boss: How Privatization Changes the Strategy and Structure of Formerly Public Organizations." SOC 396M, Professor Ekland-Olson.

General Accounting Office. 1991. "Private Prisons: Report to the Chairman, Subcommittee on Regulation, Business Opportunities and Energy, Committee on Small Business, United States House of Representatives." U.S. General Accounting Office, Washington, D.C.

General Accounting Office. 1996. "Private and Public Prisons: Studies Comparing Operational Costs and/or Quality of Service." U.S. General Accounting Office, Washington, D.C.

Harding, Richard W. 1997. *Private Prisons and Public Accountability*. New Brunswick, NJ: Transaction Publishers.

Harer, Miles D. 1994. "Recidivism Among Federal Prison Releasees in 1987: A Preliminary Report." Federal Bureau of Prisons, Washington, D.C.

Harer, Miles D., Loren Karacki, and Gerald G. Gaes. 1995. "A Critical Analysis of Charles Logan's "Well Kept"." Federal Bureau of Prisons, Washington, D.C.

James, Adrian L., A. Keith Bottomley, Alison Liebling, and Emma Clare. 1997. *Privatizing Prisons: Rhetoric and Reality*. Thousand Oaks, CA: Sage.

Lanza-Kaduce, L and K.F. Parker. 1998. "A Comparative Recidivism Analysis of Releasees from Public and Private Prisons in Florida." Private Corrections Project, Center for Studies in Criminology and Law, University of Florida, Gainesville, FL.

Logan, Charles H. 1990. *Private Prisons: Cons and Pros*. New York: Oxford University Press.

Logan, Charles H. 1991. "Well Kept: Comparing Quality of Confinement in a Public and a Private Prison." National Institute of Justice, Washington, D.C.

Logan, Charles H. 1992. "Well Kept: Comparing Quality of Confinement in Private and Public Prisons." *The Journal of Criminal Law and Criminology* 83:577-613.

Moore, Adrian T. 1998. "Private Prisons: Quality Corrections at Lower Cost." Reason Public Policy Institute, Los Angeles.

Nink, Carl. 1998. "Comments at National Workshop on Privatization." Program sponsored by the Corrections Program Office, Office of Justice Programs, U.S. Department of Justice.

Office of Research and Evaluation. 1998. "Proposal to Evaluate the Performance of a Privately Operated Bureau of Prisons' Facility." Federal Bureau of Prisons, Washington, D.C.

Pelissier, Bernadette, William Rhodes, Gerald G. Gaes, Scott D. Camp, Joyce O'Neil, Susan Wallace, and William G. Saylor. 1998. "Alternative Solutions to the Problem of Selection Bias in an Analysis of Federal Residential Drug Treatment Programs." Federal Bureau of Prisons, Office of Research and Evaluation, Washington, D. C.

Saylor, William G. 1984. "Surveying Prison Environments." Federal Bureau of Prisons, Washington, D.C.

Saylor, William G. 1996. "Modeling and Graphing Organizational Processes in Pursuit of Performance Benchmarks: Methods for Establishing and Evaluating Performance Measures." Federal Bureau of Prisons, Washington, D.C.

Sechrest, Dale K. and David Shichor. 1994. "Final Report: Exploratory Study of California's Community Correctional Facilities." Parole and Community Services Division, California Department of Corrections.

Tennessee Select Oversight Committee on Corrections. 1995. "Comparative Evaluation of Privately-Managed Corrections Corporation of America Prison (South Central Correctional Center) and State-Managed Prototypical Prisons (Northeast Correctional Center, Northwest Correctional Center)." Tennessee Select Oversight Committee on Corrections. Nashville, TN.

Thomas, Charles W. 1997a. "Comparing the Cost and Performance of Public and Private Prisons in Arizona." Center for Studies in Criminology & Law, University of Florida (for the Arizona Department of Corrections).

Thomas, Robert C. 1997b. "Letter to William G. Archambeault, P.D., School of Social Work, Louisiana State University from Robert C. Thomas, Principal Management Auditor/Supervisor." Joint Legislative Audit and Review Committee, Washington State.

Thomas, Robert C., Kathy Gookin, Beth Keating, Valerie Whitener, Robert M. Williams, Richard Crane, and Cheryle Broom. 1996. "Department of Corrections Privatization Feasibility Study." Legislative Budget Committee, State of Washington.

Urban Institute. 1989. *Comparison of Privately and Publicly Operated Correctional Facilities in Kentucky and Massachusetts*. Washington, D.C.: NIJ.

Vagg, Jon. 1994. *Prison Systems: A Comparative Study of Accountability in England, France, Germany, and the Netherlands*, Edited by R. Hood. New York: Oxford University Press.

| Table 1. Average Monthly Counts | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Institution Operated By: Wackenhut Corrections Corporation (WCC), Corrections Corporation of America (CCA), State of Louisiana (Public) | | | | | | |
| | WCC | Public | CCA | Public | Public | Public | Public |
| Institution | Allen | Avoyelles | Winn | Hunt | Dixon | Angola | Wade |
| Mean Inmate Population | 1206.9 | 1227.2 | 1214.9 | 1775.5 | 1367.4 | 4741.8 | 1021.9 |
| Performance Measure | | | | | | | |
| escapes | 3 | 0 | 5 | 5 | 4 | 6 | 1 |
| assaults on staff with injury | 1.78 | 1.06 | 2.26 | 1.64 | 1.31 | 24.11 | 1.33 |
| assaults on staff/serious injury | 0.0455 | 0.1389 | 0 | 0 | 0.139 | 0.278 | 0.556 |
| assaults on staff/non-serious injury | 1.73 | 0.917 | 2.261 | 1.639 | 1.167 | 24.08 | 1.278 |
| Cat. I,II,III incidents | 28 | 38.5 | 30 | 55.8 | 26.4 | 154.1 | 22.3 |
| aggravated sex offenses | 11.1 | 4.3 | 8.5 | 6.1 | 2 | 27.9 | 3.9 |
| aggravated cat I sex offenses | 2.023 | 2.028 | 1.217 | 2.861 | 1.056 | 7.222 | 1.611 |
| aggravated class II sex offenses | 9.114 | 2.222 | 7.283 | 3.251 | 0.9444 | 20.667 | 2.778 |
| institutional disturbances | 0.9555 | 4.5 | 4.457 | 17.556 | 1.444 | 26.694 | 1.694 |
| major inst. disturbances | 0.114 | 0.194 | 0.0455 | 0.0278 | 0 | 1.0556 | 0.0833 |
| minor inst disturbances | 0.841 | 4.306 | 4.413 | 17.556 | 1.444 | 24.694 | 1.694 |
| assaults/inmate on inmate | 13.455 | 26.278 | 17.421 | 28.083 | 18.417 | 67.778 | 14.083 |
| assaults/serious injuries | 0.136 | 1.056 | 0.304 | 0.1389 | 0.3043 | 0.5556 | 0.111 |
| assaults/non-serious injuries | 13.318 | 25.222 | 13.978 | 27.944 | 18.028 | 67.222 | 13.318 |
| assaults/weapon | 2.523 | 3.861 | 2.652 | 0.0833 | 0.1111 | 0.0556 | 0.0556 |
| assaults/no weapon | 10.932 | 22.417 | 11.63 | 19.778 | 16.417 | 38.639 | 11.778 |
| assaults/weapon and serious injury | 0.068 | 0.528 | 0.261 | | | | |
| assaults/weapon and no serious injury | 2.455 | 3.333 | 2.391 | | | | |
| assaults/no weapon/serious injury | 0.068 | 0.528 | 0.043 | | | | |
| assaults/no weapon/no serious injury | 10.864 | 21.889 | 11.587 | | | | |
| total disciplinary actions | 374.1 | 859.8 | 459.6 | 567.1 | 687.2 | 1009 | 1779 |
| schedule A disciplinary actions | 42.3 | 282.3 | 153.9 | 103.4 | 102.2 | 258.9 | 396.7 |
| schedule B disciplinary actions | 325.9 | 515.4 | 291.7 | 399.1 | 558.9 | 697.8 | 1274.1 |
| monthly gunshots | 0.25 | 2.25 | 0.152 | 0.9722 | 2.5833 | 7.222 | 1 |

| Table 2. Average Monthly Rates / 1,000 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Institution Operated By: Wackenhut Corrections Corporation (WCC), Corrections Corporation of America (CCA), State of Louisiana (Public) | | | | | | |
| | WCC | Public | CCA | Public | Public | Public | Public |

Case 3:16-cv-02267　　Document 383-13　　Filed 01/22/21　　Page 4 of 16 PageID #: 18555

MARLOWE_0007160

| Institution | Allen | Avoyelles | Winn | Hunt | Dixon | Angola | Wade |
|---|---|---|---|---|---|---|---|
| Mean Inmate Population | 1206.9 | 1227.2 | 1214.9 | 1775.5 | 1367.4 | 4741.8 | 1021.9 |
| Performance Measure | | | | | | | |
| escapes | 2.4857 | 0 | 4.1156 | 2.8161 | 2.9253 | 1.2653 | 0.9786 |
| assaults on staff with injury | 1.4749 | 0.8638 | 1.8602 | 0.9237 | 0.958 | 5.0846 | 1.3015 |
| assaults on staff/serious injury | 0.0377 | 0.1132 | 0 | 0 | 0.1017 | 0.0586 | 0.5441 |
| assaults on staff/non-serious injury | 1.4334 | 0.7472 | 1.8611 | 0.9231 | 0.8534 | 5.0782 | 1.2506 |
| Cat. I,II,III incidents | 23.2 | 31.372 | 24.693 | 31.428 | 19.307 | 32.498 | 21.822 |
| aggravated sex offenses | 9.1971 | 3.5039 | 6.9965 | 3.4357 | 1.4626 | 5.8838 | 3.8164 |
| aggravated cat I sex offenses | 1.6762 | 1.6525 | 1.0017 | 1.6114 | 0.7723 | 1.5231 | 1.5765 |
| aggravated class II sex offenses | 7.5516 | 1.8106 | 5.9947 | 1.831 | 0.6907 | 4.3585 | 2.7185 |
| institutional disturbances | 0.7917 | 3.6669 | 3.6686 | 9.8879 | 1.056 | 5.6295 | 1.6577 |
| major inst. disturbances | 0.0945 | 0.1581 | 0.0375 | 0.0157 | 0 | 0.2226 | 0.0815 |
| minor inst disturbances | 0.6968 | 3.5088 | 3.6324 | 9.8879 | 1.056 | 5.2077 | 1.6577 |
| assaults/inmate on inmate | 11.148 | 21.413 | 14.339 | 15.817 | 13.469 | 14.294 | 13.781 |
| assaults/serious injuries | 0.1127 | 0.8605 | 0.2502 | 0.0782 | 0.2225 | 0.1172 | 0.1086 |
| assaults/non-serious injuries | 11.035 | 20.552 | 11.505 | 15.739 | 13.184 | 14.176 | 13.033 |
| assaults/weapon | 2.0905 | 3.1462 | 2.1829 | 0.0469 | 0.0812 | 0.0117 | 0.0544 |
| assaults/no weapon | 9.0579 | 18.267 | 9.5728 | 11.139 | 12.006 | 8.1486 | 11.526 |
| assaults/weapon and serious injury | 0.0563 | 0.4302 | 0.2148 | 0 | 0 | 0 | 0 |
| assaults/weapon and no serious injury | 2.0341 | 2.7159 | 1.9681 | 0 | 0 | 0 | 0 |
| assaults/no weapon/serious injury | 0.0563 | 0.4302 | 0.0354 | 0 | 0 | 0 | 0 |
| assaults/no weapon/no serious injury | 9.0016 | 17.837 | 9.5374 | 0 | 0 | 0 | 0 |
| total disciplinary actions | 309.97 | 700.62 | 378.3 | 319.4 | 502.56 | 212.79 | 1740.9 |
| schedule A disciplinary actions | 35.048 | 230.04 | 126.68 | 58.237 | 74.74 | 54.6 | 388.2 |
| schedule B disciplinary actions | 270.03 | 419.98 | 240.1 | 224.78 | 408.73 | 147.16 | 1246.8 |
| monthly gunshots | 0.2071 | 1.8334 | 0.1251 | 0.5476 | 1.8892 | 1.5231 | 0.9786 |

Case 3:16-cv-02267　　　Document 383-13　　　Filed 01/22/21　　　Page 5 of 16 PageID #: 18556

MARLOWE_0007161

# Appendix 3

# Legal Issues Relevant to Private Prisons

by

Malcolm Russell-Einhorn, J.D.
Abt Associates Inc.

# TABLE OF CONTENTS

Appendix 3

Legal Issues Relevant to Private Prisons

1. Introduction .................................................................. 1

2. **The Legality of Delegating Correctional Services to Private Contractors Generally** ... 3
   A. The Current Limits of Federal and State Delegation Principles ..................... 4
   B. Addressing Possible Due Process Concerns in Correctional Privatization ............ 7
      1. Basic Due Process Principles Governing Delegation Scenarios ................ 7
      2. Specific Ways of Addressing Due Process Concerns in Correctional
         Privatization ............................................................. 9

3. **Liability for Private Prison Conditions** ....................................... 13
   A. The Impact of Privatization on Liability Exposure .............................. 13
      1. Inmates' Overwhelming Reliance on Section 1983 Cases to Redress Grievances .. 14
      2. Are Private Prison Contractors Amenable to Suit under Section 1983? .......... 15
      3. Do Private Prison Officials Have a 'Qualified Immunity' Under Section
         1983? ..................................................................... 17
      4. Private Contractor and Governmental Liability Exposure in Section 1983 Litigation 19
   B. The Role of Indemnification, Insurance and Monitoring in Reducing Liability and
      Litigation Costs ............................................................... 21
      1. Indemnification and Insurance ............................................. 21
      2. Monitoring to Safeguard Against Liability Resulting from Government
         Duties .................................................................... 24

4. **Employment and Labor Relations Issues** ....................................... 27
   A. Potential Civil Service Impediments ........................................... 27
   B. The Significance of Private Correctional Firms' Independent Contractor
      Status ......................................................................... 28
   C. Effects of Privatizing an Existing Unionized Facility .......................... 30
   D. The Right to Strike ............................................................ 31
      1. No-Strike Clauses ......................................................... 32
      2. Strike Notification/Mandatory Delays ...................................... 32

5. **Inmate Labor Questions** ..................................................... 34
   A. Constitutional Dimensions ..................................................... 34
   B. Federal prisons and inmate labor .............................................. 35
   C. State Prisons and Inmate Labor ................................................ 35

| | | |
|---|---|---|
| 6. | **Other Important Legal Issues** | 37 |
| | A. Access to Private Prison Records | 37 |
| | B. Private Contractor Access to Criminal History Records | 39 |
| | C. Bankruptcy | 40 |
| | D. Use of Force | 43 |
| | E. Environmental Law Concerns | 45 |
| 7. | **Regulating Interjurisdictional Private Prison Contracting** | 47 |
| | A. Interjurisdictional Contracting Out and Legal Problems | 48 |
| | B. Some Regulatory Solutions | 52 |
| 8. | **Legal Dimensions of Contracting** | 56 |
| | A. Regulatory Purposes and Contract Specificity | 56 |
| | B. The Importance of Objective Standards | 58 |
| |    1. Special Attention to Staffing and Training | 59 |
| | C. Effective Contract Performance and Enforcement | 60 |
| |    1. Contract Term and Renewal | 60 |
| |    2. Bolstering Good Performance | 61 |
| |    3. Contract Enforcement through Termination | 61 |
| |    4. Contract Enforcement Through Fines and Penalties | 62 |
| |    5. Dispute Resolution | 63 |

# 1. Introduction

The legal issues affecting private prisons have attracted nearly as much attention as the moral, cost, and performance-related issues surrounding the correctional privatization movement. From questions about the constitutionality of delegating the incarceration function in the first place, to the legality of private prison guards going on strike, the legal dimensions of correctional privatization have often elicited great concern from public correctional officials and the general public. Specific concerns have, however, changed over time, as practical experience and legal precedent have provided answers to many previously unresolved questions. For example, a fundamental issue that arose in the mid-1980s along with the birth of the private prison industry was whether private prisons would be considered "state actors" amenable to inmate civil rights suits and subject to all of the constitutional standards applicable to public prisons. Over the past several years, courts have affirmatively answered that question. Likewise, the Supreme Court last year ruled on another significant matter, deciding that private prison guards may not share public correctional officers' qualified immunity from suit in federal civil rights actions.[1]

While a host of subsidiary legal and contractual matters continue to receive attention and provoke discussion, governments are becoming more active in passing legislation, issuing regulations, and insisting on contractual provisions that limit contractor discretion in important areas of public policy. Public correctional authorities and their lawyers are becoming more sophisticated about the pitfalls of private prison contracting and how governments can protect themselves from both a cost and performance standpoint. One highly-publicized example of this phenomenon involves states passing legislation to address the growing number of private prisons that accept prisoners from outside the state.

Few attempts have been made to address the entire breadth of legal issues surrounding private prisons in a relatively succinct form.[2] This appendix makes such an attempt, employing a straightforward presentation that should be useful to correctional specialists and laypersons alike. It relies on a variety of sources for its information, including private prison contracts and requests for proposals (RFPs), law review and other journal articles, federal and state statutory and case law, survey information gleaned from federal and state officials summarized in other parts of this report, and interviews with public and private correctional authorities and specialists.

This appendix traces the legal system's accommodation of prison privatization as the latter has evolved over the past 15 years. The report begins with the broadest constitutional questions, raised at the outset of the privatization debate, and concludes with a discussion of the latest efforts of state legislatures to gain greater control over the incarceration of out-of-state inmates in private prisons within their borders. Only legal issues that significantly turn on private entities as prison operators are examined.

---

1   *Richardson v. McKnight,* 117 S. Ct. 2100 (1997).

2   One such early effort, which was quite detailed, nevertheless failed to treat some issues in depth, e.g. public access to private prison records. Moreover, this study is now a decade old and has been superseded in many subjects by recent legal developments. *See* I. Robbins, The Legal Dimensions of Private Incarceration 396-413 (1988).

Case 3:16-cv-02267    Document 383-13    Filed 01/22/21    Page 9 of 16 PageID #: 18560

MARLOWE_0007165

The focus of the report is on practical issues of a kind most likely to confront public and private corrections officials. It also focuses on contracts for the management of private prisons, rather than on contracts for the design and construction and management of future correctional facilities: except for detailed public finance issues that vary from jurisdiction to jurisdiction, there are few issues of any significance peculiar to private prison design construction. Finally, the report addresses both publicly- and privately-owned facilities managed by private contractors, although there is a slightly greater emphasis on publicly-owned prisons. Where relevant, legal distinctions that turn on ownership are noted (e.g., in the case of potential contractor bankruptcies).

This report does not make any recommendations *per se*, but occasionally notes where certain statutory or contractual mechanisms have yielded positive and negative results. The major issues are arranged by section.

## 2. The Legality of Delegating Correctional Services to Private Contractors Generally

When the whole enterprise of correctional privatization has been challenged, the legal basis for such an action has often been couched in terms of constitutional 'delegation' issues. At the heart of these constitutional considerations is the worry that political accountability and disinterested decision making may be lost when administration and operation of places of incarceration are turned over to the private sector -- something that, prior to the mid-1980's, had not been encountered. Critics have also raised particular concerns about private correctional contractors' financial interests leading them to minimize releases and maximize sentences to keep their facilities filled. These core concerns have seemed to reinforce doubts about the overall propriety of delegating the state's power to incarcerate to private, for-profit corporations.

Despite these worries, no serious delegation challenge has been mounted against a statute or contract allowing the private sector to incarcerate inmates. Although delegation concerns were prominently raised in the 1980s as a potential roadblock to correctional privatization,[3] few observers today believe that, with certain safeguards in place, a government may not legally contract out its power to incarcerate.[4] There now appears to be broad agreement that delegation concerns, if any, do not hinge on the overall policy choice of entrusting the day-to-day management of prisons to private parties, but rather on the details of how such transfers of responsibility are structured (including the rules by which such prisons are intended to operate), and who has ultimate authority for a number of decisions affecting inmate rights and welfare.

As discussed below, the often diffuse "delegation" concerns expressed about prison privatization tend to subsume or confuse several discrete legal issues, including the federal constitutional "delegation doctrine," state constitutional delegation standards, the due process requirements of the U.S. Constitution (made applicable to states and local governments through the Fourteenth Amendment), and specific questions about statutory enabling authorization that may vary from jurisdiction to jurisdiction. It is apparent, however, that while modern challenges to correctional privatization may be couched in terms of "delegation," the analytical basis for these challenges will usually turn on due process concerns. A due process analysis is particularly sensitive to the need to have state correctional officials retain responsibility for promulgating many kinds of prison rules and making final decisions on release-related matters such as sentencing, parole, discipline, 'good time' awards, work assignments, and possibly classification. A second type of delegation challenge is often based on inadequate privatization enabling legislation.

---

3    *See, e.g.,* Field, Note, *Making Prisons Private: An Improper Delegation of a Government Power*, 15 Hofstra L. Rev. 649 (1987); Robbins, The Legal Dimensions of Private Incarceration, *supra* note 2 at 396-413.

4    Perhaps acknowledging the contemporary importance of privatization generally, as well as the history of private prisons in this country, no one appears to have convincingly argued that the running of prisons, as opposed to the decisional control over the incarceration of inmates in the first place (a police power), is so much a 'core' governmental function that it may *never,* even with proper safeguards, be delegated to private parties as a *legal* (as opposed to moral or ethical) matter. While at least one article has made that argument, it tends to ignore the details of delegation jurisprudence and the degree to which government oversight and accountability can be built into a prison privatization arrangement. *See Making Prisons Private: An Improper Delegation of a Government Power, supra* note 3.

## A. The Current Limits of Federal and State Delegation Principles

Delegation principles at the federal and state level safeguard against the transfer of government powers to public and private bodies without proper constraints. However, reflecting political reality as much as legal doctrine, courts today are unlikely to invalidate an entire prison privatization arrangement on delegation grounds.[5] The reason is twofold. First, in the modern era, courts have given political leaders wide discretion in determining how to implement policy decisions, including reliance on the private sector.[6] The tendency is to view most of the functions transferred to private agencies (as well as subordinate public agencies) as largely or purely *administrative* in nature. Only delegated rule making and adjudication functions -- which directly purport to exercise a government power -- are usually deemed to require special judicial scrutiny.[7]

Second, the delegation doctrine at the federal level has effectively become moribund over the last half-century,[8] a telling reflection of the rise of the administrative state. Delegations to administrative agencies have been so liberally construed that private delegations have tended to be viewed in the same light despite their significantly different factual and ethical attributes. Reflecting this trend, the Supreme Court has sometimes enunciated the principle of nondelegation, but has almost without exception sustained the constitutionality of challenged delegations. As discussed below, rather than invalidating private delegations outright, the Court has used the due process provisions of the Fifth and Fourteenth Amendments of the Constitution to protect the fundamental interests of those affected by a delegation. At the state level, courts have breathed more life into state constitutions concerning delegation questions, but their analysis has generally tended to recapitulate the due process concerns identified by federal courts.

The weakness of the federal delegation doctrine is starkly indicated by the fact that in the area of *private delegations*, as opposed to delegations of power to executive branch agencies, the Supreme Court has not invalidated a delegation since the New Deal-era case of *Carter v. Carter Coal Co.*[9] Since that time, the Court has only haphazardly addressed the delegation doctrine, and even then, only in public delegation contexts where property, rather than liberty, interests were at stake.[10] Insofar as these cases collectively have any indirect application to the privatization context, they simply stand for the proposition that delegations of legislative and policy-making power must be narrowly

---

5    Possible exceptions may include privatization arrangements where due process is violated or where little or no statutory authority for the delegation exists. *See* pp. 5-6 *infra*.

6    *See e.g. Berman v. Parker*, 348 U.S. 26, 33-34 (1954) (upholding reliance on private companies to implement federal urban redevelopment policy).

7    *See generally* Lawrence, *Private Exercise of Governmental Power*, 61 Ind. L.J. 647, 650-653.

8    *See generally, e.g.,* K. Davis, Administrative Law Treatise § 3. *See also* Robbins, *The Impact of the Delegation Doctrine on Prison Privatization*, 35 U.C.L.A. L. Rev 911, 917-920, 926 (1988).

9    298 U.S. 238 (1936). The Court struck down a federal statute allowing a majority of miners and producers to agree on wages and hours that would be binding on minority members of the industry.

10    *See, e.g., Industrial Union Dep't v. American Petroleum Institute (the Benzene Case)*, 448 U.S. 607 (1980); *Immigration and Naturalization Service v. Chadha*, 462 U.S. 919 (1983). The Court did once, in 1958, allude to the fact that it would apply a stricter standard for cases involving liberty interests, *see Kent v. Dulles*, 357 U.S. 116, but this principle, has never received further elaboration.

construed and have a clear, unambiguous statutory basis.[11] In particular, these cases favor standards ensuring that elected officials make important policy choices, private officials have a sufficiently clear "intelligible principle" to channel their delegated discretion, and "ascertainable standards" exist by which reviewing courts can evaluate such discretion.[12]

Under *a post-Carter* delegation analysis, a legitimate delegation challenge might be sustained if a new prison privatization arrangement were undertaken with no statutory authorization, or pursuant to a statutory or contractual scheme that left broad areas of sensitive decision-making implicating due process requirements -- for example, disciplinary proceedings or the formulation of release-related rules -- to private correctional officials' discretion. This is generally how various states have applied their own delegation doctrines: courts have struck down statutes granting rulemaking and adjudication authority to private parties where the state did not retain ultimate authority to accept, reject, or modify administrative rules and review adjudicative determinations.[13]

As a matter of practical and political reality, courts may be wary of invalidating on delegation grounds fully operational privatization contracts, even if they lack what would otherwise be viewed as proper statutory authorization.[14] Moreover, contract provisions agreed to by governments and private contractors may obviate otherwise defective statutes, depriving potential litigants of an actual harm or controversy. Still, in the case of new or planned operations, delegation-type challenges based on deficient legislation might emerge that require statutory remediation.[15]

Both for reasons of litigation prevention and sound public policy, few would argue against the long-term wisdom of adopting some kind of meaningful and comprehensive statutory authorization. Adopting some minimal statutory scheme strengthens the public legitimacy of privatization and can ensure that there is some set of minimal standards below which contractual arrangements may not fall.

---

11  The underlying purpose of delegation principles derives from the separation of powers notions, which protects the polity from uncontrolled discretionary power. The weakness of the delegation principles' relevance to private delegations is underscored by the fact that insofar as the purpose of the separation-of-powers requirement underlying the delegation doctrine is to protect individual liberty by dispersing power, then private delegations "actually promote that very goal, because power is spread still further [beyond state bodies]. One need not carry the argument that far, however, to see that the separation-of-powers principle is a weak foundation for limiting private delegations." Lawrence, *Private Exercise of Governmental Power, supra* note 7 at 665-66 (1986).

12  *See, e.g., Industrial Union Dep't, supra* note 10 at 686. The meaning of "intelligible principle" has varied somewhat from case to case but generally implies a well articulated rationale as to why a delegation is warranted in the first place. *See, e.g., J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928).

13  *See* Robbins, *The Impact of the Delegation Doctrine on Prison Privatization, supra* note 8 at 930-950, for a comprehensive discussion of state law approaches to the delegation doctrine. For example, in one leading case, a court invalidated the Oregon Public Service Commission's attempt to adopt, without discussion, safety code revisions (including future revisions) proposed by private committees of interested parties. *Hillman v. Northern Wasco County Peoples' Utility District*, 213 Ore. 264, 323 P.2d 664 (1958), *overruled on other grounds, Maulding v. Clackamas County*, 278 Ore. 359, 563 P.2d 731 (1977).

14  This would be especially true in the case of a newly-constructed private facility where millions of dollars of public funds had already been invested in the project.

15  Although even in that case, the speculative or premature nature of some legal challenges may result in dismissal. *See, e.g., Ohio Patrolmen's Benevolent Ass'n. v. Repke*, 1995 Ohio App.; LEXIS 5876 (1995) (nondelegation issue deemed premature, not ripe for review).

To date, however, some 20 states have not expressly authorized private prisons,[16] and of those, five have gone ahead with some form of private contracting for imprisonment.[17] The federal government, though possibly without a broad authorization to privatize,[18] has nevertheless secured congressional authorization to pursue two privatization arrangements.[19] The tendency among many jurisdictions moving ahead with correctional privatization has been to rely on contractual safeguards to address the due process problems potentially raised by an inadequate statutory framework.

In sum, while sound, detailed enabling legislation may help to create a firmer basis for private correctional accountability, only in certain situations is a statutory deficiency likely to give rise to a delegation challenge that jeopardizes an entire privatization enterprise.[20] Challenges to

---

16  The 20 states are Alabama, California, Delaware, Hawaii, Indiana, Iowa, Maine, Maryland, Massachusetts, Minnesota, Missouri, New Jersey, New York, North Dakota, Rhode Island, South Dakota, South Carolina, Vermont, Washington, and Wisconsin. The state of Illinois actually expressly *prohibits* private prisons.

17  Kansas, Hawaii, Idaho, Minnesota, and Missouri. Kansas has required its inmates to be placed in private in-state facilities, while the other states have sent some of their prisoners to out-of-state private prisons.

18  The general legislative basis for the Federal Bureau of Prisons entering into contracts for the incarceration of prisoners in the private sector has not been entirely clear. The BOP has, since 1983, maintained that it has the authority to make contracts for the secure confinement of adult prisoners in the private sector. At least one scholarly commentator, as well as the General Accounting Office, have argued that BOP lacks such authority. *See* Robbins, The Legal Dimensions of Private Incarceration, *supra* note 2 at 396-413; U.S. General Accounting Office, *Private Prisons: Cost Savings and BOP's Statutory Authority Need to be Resolved,* GAO Report No. GAO/GGD-91-21 (Feb. 1991) at 45-50. After several years of intensive debate, the momentum to create a more explicit basis for overall federal prison privatization has appeared to die down, and BOP has pushed ahead with new privatization plans specific statutory authority being employed. *See* fn. 19, *infra*.

BOP maintains that 18 U.S.C. § 3621(b) provides the Bureau with independent authority to contract with the private sector for secure adult prison facilities. The section states:

(b) PLACE OF IMPRISONMENT.-- The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habitability established by the Bureau, *whether maintained by the Federal Government or otherwise.* . . .

(emphasis supplied). Because several other provisions in Title 18 specify the kinds of arrangements that BOP may make to obtain prison facilities, and allow the use of only one category of nonfederal facilities -- those operated by state and local governments and furnished to the federal government by way of contract -- some observers charge that the general language in § 3621(b) cannot extend to *private* facilities. The clear inference, they maintain, is that Congress failed to provide for any arrangements such as private incarceration that are not expressly authorized. *See* 2A Sutherland on Statutory Construction § 47.23 (4th ed. 1984) (designation of specific provisions for executing certain functions implies exclusion of other, more general provision). Thus, 18 U.S.C. § 4002 provides that the Attorney General may contract with state and local governments for "the imprisonment, subsistence, care, and proper employment" of prisoners for up to three years, and 18 U.S.C. § 4003 authorizes the Attorney General to build new prison facilities if such state or local governments are unwilling or unable to enter into such contracts or if suitable facilities are not available at a reasonable cost. There are no provisions addressing places of prisoner confinement in the private sector. By contrast, other statutes involving the confinement of persons have explicitly authorized the use of private sector facilities for such confinement. *See, e.g.,* 18 U.S.C. § 4013 (authorizing the U.S. Marshals Service to contract with private facilities for the housing of federal pretrial detainees); 18 U.S.C. §§ 5040 (permitting the housing of juvenile offenders in private facilities).

19  The BOP's privately-managed facility in Taft, California was authorized in a 1996 appropriations bill (Conference Report 104-863 to Public Law 104-208, Sept. 28, 1996), while the privatization dimension of the federal takeover of the District of Columbia's Lorton, Virginia facility was provided for in the National Capital Revitalization and Self-Government Act of 1997 (Pub. L. No. 105-33 §§ 11201(c)(1).

20  Certainly, without a proper legislative mandate defining with some specificity what can and cannot be undertaken in the way of private sector operation of government correctional facilities, the allocation of public and private responsibilities may become confused and public trust eroded. This has been manifested most clearly in the case of states that have sought to gain more control over the housing of out-of-state inmates within the state, *see, e.g.,* the recently-passed Ohio House Bill 293, effective March 17,

privatization based on a lack of proper statutory authorization should be relatively rare because most prison privatization arrangements feature *some* type of statutory authorization sufficient to reflect a general policy choice in favor of correctional privatization. A more potent regulatory challenge involves litigation seeking to invalidate a particular kind of private contractor authority or conduct, based on due process concerns, as discussed below.[21] Most private prisons operate according to statutes and/or contracts that retain some critical oversight, rulemaking and decision making in the hands of government correctional authorities.

## B. Addressing Possible Due Process Concerns in Correctional Privatization

The most serious constitutional challenges to contracting out the management of prisons may arise when private contractors are deemed to have excessive power over prison rulemaking and decisions affecting inmates' basic liberties. These situations indicate issues of possible financial bias and unchanneled discretion in prison management that raise potential due process concerns. While these concerns can give rise to specific civil rights challenges by inmates and their legal representatives, such due process objections may also serve as the basis for courts to invalidate certain arrangements on "delegation" grounds. As with statutory authorization deficiencies, however, it may only be certain aspects of the overall privatization scheme that are so invalidated.

### 1. Basic Due Process Principles Governing Delegation Scenarios

The Due Process Clause has given rise to an influential line of Supreme Court cases invalidating the delegation of discretionary rulemaking or adjudication powers to financially interested parties.[22] It has also generated support for the idea that private delegations are permissible where the private entity's role is subordinated to adequate public involvement, oversight, and/or approval.[23] These standards are applicable to the federal and state governments alike, since the Due Process Clause has the effect of making constitutional restrictions on private delegations applicable to

---

1998, discussed *infra* in section 7.B.

21  As discussed above, due process considerations and the delegation doctrine share a concern about the exercise of arbitrary, unaccountable government power. Indeed, private delegation cases tend to rely on a due process analysis, due to fuzziness of t he delegation doctrine, its origins in separation-of-powers jurisprudence and its general disuse. Due process analysis has in fact guided most of the key federal court decisions invalidating private party delegations, including *Carter v. Carter Coal Co.* But these decisions have unfortunately blurred the separate and distinct nondelegation and due process issues and standards. *See* Abramson, *A Fifth Branch of Government: The Private Regulators and Their Constitutionality,* 16 Hastings Const. L. Q. 165, 204 (1989).

22  In the rulemaking context, *see, e.g., Eubank v. City of Richmond,* 226 U.S. 137 (1912) (striking down local ordinance authorizing majority of landowners to impose set-back requirements on neighbors); *Carter v. Carter Coal Co., supra.* In the adjudication context, *see, e.g., Sniadach v. Family Finance Corp. of Bay View,* 395 U.S. 337 (1969) (invalidating law authorizing private parties to garnish employee wages before employees can respond to garnishment in court); *Gibson v. Berryhill,* 411 U.S. 564, 579 (1973) (striking down state optometry board's adjudication of conduct by corporate salaried optometrists where board was composed of individual optometrists with a financial interest in reducing corporate competition).

23  *See, e.g., Currin v. Wallace,* 306 U.S. 1, 15-16 (1939) (creation of market controls by producers judged constitutionally acceptable based on government-imposed requirement that 2/3 of producers waive antitrust restrictions); *Sunshine Anthracite Coal Co. v. Adkins,* 310 U.S. 381, 399 (1940) (industry officials allowed to propose non-binding minimum prices where officials functioned "subordinately" to a public commission); *Fuentes v. Shevin,* 407 U.S. 67, 80-83 (1972)(state-sanctioned prejudgment repossession of property by private companies permissible only if property owners have opportunity to resist seizure before a judge).

the fifty states through the Fourteenth Amendment.[24] In general, it would appear that the more *administrative* the role of private companies -- that is, the more they are responsible for carrying out predetermined policy choices by government officials -- the more likely it is that significant privatization schemes will pass constitutional muster.

While explicit direction from the Supreme Court about due process standards in the private delegation context is lacking, the best guidance by way of analogy may come from federal appeals courts that have ruled on regulatory and adjudicatory standards for securities markets adopted by private securities associations pursuant to the federal Maloney Act. The so-called "Todd Standards," first articulated in the case of *Todd & Co. v. SEC*,[25] set forth three factors that enabled the regulatory scheme at issue to accord with due process. First, the private entity's rules had to be approved by a governmental authority before becoming effective. Second, all private decisions regarding rule violations and penalties had to be subject to governmental review. Finally, all such private adjudications had to be governed by a *de novo* standard of review, whereby government officials would draw their own factual and legal conclusions about the violation and penalty in each case.[26]

The Todd Standards are by no means dispositive of the application of due process to private prisons. Indeed, the *Todd* case dealt with property rights, not the liberty interests that are at stake in the case of private prisons. Yet perhaps for that very reason -- the more serious liberty interests at issue in the latter case -- the Todd Standards would seem to suggest by analogy certain baseline requirements for private prisons.

Accordingly, these standards suggest that private prisons should not have uncontrolled power to make adjudicatory or rulemaking decisions that would disfavor inmates' individual liberties. In particular, as discussed in greater detail below, private contractors presumed financial interests should disqualify them from having the power to make sensitive release-related decisions, including those involving sentencing, parole, release dates, furloughs, discipline and other matters affecting 'good time' credits, and specific work assignments and work credits. These types of decisions generally overlap with the release-related rights that were recently deemed by the Supreme Court in *Sandin v. Connor* to define the general contours of due process within prisons.[27]

Meanwhile, the presumed lack of private contractors' financial disinterestedness should also disqualify private contractors from making *rules* that govern any of these subjects. The reasons are obvious: because private contractors have a *potentially* strong (it need not actually be strong) interest in maximizing their inmate populations, they may have an incentive to write release-related rules and make release-related decisions that affect good time calculations and ultimately disfavor prisoners. In some cases, this potential bias can be avoided by having a contract specify a contractor fee that is

---

24  See Liebman, *Delegation to Private Parties in American Constitutional Law*, 50 Ind. L. J. 650, 652-54 (1975).

25  557 F.2d 1008 (3d Cir. 1973).

26  *Id.* at 1012.

27  In *Sandin,* 515 U.S. 472 (1995), the Supreme Court moved to scale back the scope of prison due process protections arising directly under the U.S. Constitution to those situations which impose "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Despite this significant, albeit hazy constriction of due process protections within prison confines, the *Sandin* ruling leaves in place any protections that would ultimately affect the timing of a prisoner's release.