# EXHIBIT D
## Part 11 of 14

independent of the number of inmates housed at a facility.[28] As the key due process cases have shown, private rulemaking and adjudication must avoid even the appearance of bias.[29]

While the "Todd Standards" have never been passed on by the Supreme Court, they provide general guidance to correctional officials attempting to place limits on private prison rulemaking and decision making, particularly since prisons affect liberty interests rather than the mere property interests at issue in the *Todd* case. Translating *Todd* in a relatively straightforward manner to a correctional context suggests the following principles: (1) rules authored by private prison contractors should be reviewed and approved by government authorities before going into effect; and (2) all private contractor decisions relating in any way to matters affecting release should be subject to governmental review and approval.[30]

### 2. Specific Ways of Addressing Due Process Concerns in Correctional Privatization

Even with the substantial expansion of private corrections over the past decade, most states and the federal government have yet to craft specific, detailed standards that address each of the principles embodied in the Todd Standards.[31] To be sure, *contractual* provisions addressing due process concerns can obviate most, if not all potential deficient legislation. In fact, most jurisdictions have appeared to be content to allow contracting parties to build due process protections into their privatization agreements rather than adopt specific legislation on the subject. Most commentators however, believe that a statutory basis for fundamental due process protections is advisable to obviate due process concerns.[32] Legislatively enacted due process standards may highlight a bright line public policy choice and ensure that constitutional principles are not sacrificed at the margins by contracting parties.

Few reported decisions exist that purport to apply any kind of due process analysis to general matters of private prison decision making. In Tennessee, appeals courts have twice upheld a section

---

28  This is the approach taken in the BOP's contract for the Taft, California medium-security prison.

29  *See In re Murchison,* 349 U.S. 133, 136 (1955) ("our system of law has always endeavored to prevent even the probability of unfairness").

30  Part of the third *Todd* standard, requiring a *de novo* review, would not appear to be easily translated into a private prison context. First, it would be incredibly burdensome to the system. Second, it is not clear what such a review would look like, since the Supreme Court only requires that "some evidence" support a disciplinary decision. *See* fn. 42, *infra.* However a major question arises: if the government's review is not truly *de novo*, must its review be mandatory and automatic (so that a decision is not deemed to have been rendered until the public correctional authority acts) or can the government's review simply be satisfied by allo wing an inmate to appeal as of right the private contractor's decision? *Todd* suggests that the *de novo* review requirement is the equivalent of an independent decision being entered by a public agency; thus, if there is no *de novo* review, due process would seem to require that a first-instance decision *in all cases* be formally approved or rendered by a public official. This is what many states require in the case of disciplinary hearings. *See* text at fns 38-40, *infra.*

31  Neither the federal government nor eleven different states with prison privatization statutes attempt to place any type of st atutory due process limits on private exercise of government-mandated correctional authority. The states are Alaska, Georgia, Kentucky , Montana, Nevada, New Hampshire, New Mexico, Oklahoma, Oregon, Pennsylvania, and Utah. For a comprehensive survey of federal and state regulation of private prisons relative to due process concerns, *see* Ratliff, *The Due Process Failure of America's Prison Privatization Statutes,* 21 Seton Hall Legis. J. 371 (1997).

32  *See, e.g.,* R. Crane, *Wanted: A Model Law to Regulate Privatization,* Correctional Law Reporter 83 (April/May 1998); Ratliff, *The Due Process Failure of America's Prison Privatization Statutes, supra* note 31 at 398-409.

---

MARLOWE_0007173

of the relevant state code governing disciplinary proceedings by a "private management company" and stated, albeit without any real analysis, that the statute comports with due process. For example, in one of the cases, *Davis v. Rose*,[33] the Tennessee Court of Appeals validated that part of the state code and associated Department of Corrections disciplinary procedures that allow a private contractor panel to recommend disciplinary action subject to review and final approval by a designated Department of Corrections employee.[34] In the absence of detailed kind of court guidance, government corrections officials must use their good judgment and general due process case law to determine where to draw statutory and contractual boundaries around private contractor rulemaking and decision making. A brief survey of some of this experience with such line-drawing follows.

### a.    *Rulemaking Generally*

Consistent with due process jurisprudence, some states have barred private prison contractors from unilaterally developing or adopting rules affecting disciplinary proceedings or pertaining to other liberty interests.[35] A handful of states have also sought to prohibit private operators from formulating rules or procedures for calculating inmate release and parole eligibility dates or developing and implementing procedures for calculating and awarding sentence (good time) credits.[36] Some observers have suggested that the best way to deal with rulemaking problems is to require explicitly that private contractors adopt pertinent rules and procedures employed by the contracting agency.[37] While notions of fairness might at first blush suggest a presumption that all or virtually all private prison rules should parallel those for public correctional institutions, and be approved by government authorities, such guidance might be ill-advised. According to many privatization advocates, having a boilerplate transfer of government rules would remove room for flexibility and innovation in many areas of prison operation.

### b.    *Disciplinary Decisions*

Governments have generally interpreted due process to require that limits be placed on correctional contractors' ability to render final disciplinary decisions. Such decisions can affect both good-time credits (and hence, release dates) and in-prison privileges. While only three states have explicitly prohibited contractors from taking any disciplinary action against an inmate,[38] several states have mandated that any preliminary decisions that are taken by contractors be reviewed and approved

---

33    1997 WL 83671 (Tenn. App.. 1997).

34    *See also, e.g., Jackson v. CCA,* 1997 WL 337021 (Tenn. App.. 1997) (same result).

35    *See* Fla. Stat. Ann. § 957.06 ; N.C. Gen. Stat. § 148-37; Va. Code Ann. § 53.1-265; Colo. Rev. Stat. Ann. § 17-1-203; Wyo. Stat. § 7-22-112.

36    *See, e.g.,* Va. Code Ann. § 53.1-265 (barring private contractors from [developing and implementing procedures for calculating inmate release and parole eligibility dates"); Tenn. Code Ann. § 41-24-110 (prohibiting private contractor adoption of rules fo r calculating inmate release or parole eligibility dates, as well as calculation and award of sentence credits).

37    *See, e.g.,* The Council of State Governments (CSG) and the Urban Institute, Issues in Contracting for the Private Operation of Prisons and Jails (hereinafter "CSG Report") 70 (1987).

38    *See* Ariz. Rev. Stat. Ann. § 41-1609.01; Tenn. Code Ann. § 41-24-110; Va. Code Ann. § 53.1-265. Two states have a different formulation to the effect that private contractors may take short-term or emergency disciplinary action subject to final review by public corrections authorities. *See* Fla. Stat. Ann.§ 957.06; Colo. Rev. Stat. Ann. § 17-1-203.

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 3 of 15 PageID #: 18570

MARLOWE_0007174

by public correctional officers.[39] At least a few others have done so contractually.[40] Notably, the BOP's contract for its Taft, California facility does not have such a requirement.[41] Some commentators have also gone so far as to argue that due process requires a public official to participate in disciplinary hearings, at least those involving major rule infractions.[42] Still, no court has ruled that this is required by due process, nor do the Todd Standards (albeit in a property rights context) seem to suggest this is necessary. There is little guidance as to the type of review to be undertaken by public correctional representatives. In the meantime, the most cautious approach would direct a private contractor to make factual findings and a preliminary determination thereon according to the Supreme Court's "some evidence" standard,[43] but not treat that decision as final until the matter is ruled on, or approved by, a public official.[44]

## c.    *Parole Decisions*

Because most -- but not all -- private prison contractors are paid according to the number of inmates kept in their custody, such contractors may be seen to have a financial interest in parole decisions. This creates a potential - even if not actual - incentive to supply parole boards with biased or misleading information.[45] Because of this possibility of bias, due process arguably requires that

---

39  Ariz. Rev. Stat. Ann. § 41-1609-01,-Colo. Rev. Stat. Ann. § 17-1-203; Fla. Stat. Ann. § 957, 06; La. Rev. Stat. Ann. § 15:117  7; Tenn. Code Ann. §§ 301-265; Wyo. Stat. Ann. § 7-22-112.

40  *See* Contract Between Corrections Corp. of America and the Commonwealth of Virginia Department of Corrections, July 11, 1996 (hereinafter "CCA-Va. Contract") at § 4.21,  p. 20.

41  *See* Taft, California Low and Medium Security Correctional Facilities Contract Between U.S. Bureau of Prisons and Wackenhut Corporation, § C.1, Part II.J ("Discipline"). The BOP's contract simply provides for contractor decisionmaking in the first in stance, with an appeal as of right by the inmate through ordinary grievance channels. It is an open question whether due process requi res a first-instance decision to be automatically reviewed and approved by a public official.

42  That was the position taken by the Council of State Governments (CSG) and the Urban Institute in a jointly authored report is sued in 1987. See CSG Report, *supra* note 37 at 10 (1987). *Cf.* C. Ring, Contracting For the Operation of Private Prisons: Pros and Cons 21 (1987) (suggesting disciplinary panels could be made up of public and private personnel). This is also the position adopted in  the contract between the Virginia DOC and CCA. *See* CCA-Va. Contract at § 4.21, p. 20. Note that Ira Robbins, author of an early study for the American Bar Association of prison privatization, took a more radical position that all disciplinary hearings sho uld be conducted by public corrections officials. Robbins' view, shared by some, is that simple reliance on public involvement at the review stage may in practice turn out to be a rubber stamp on decisions that are effectively made at the hearing stage by priva te contractors tinged with a financial interest in the outcomes. Vested with considerable discretion, private prison contractors a re seen as even less predisposed than their public counterparts to permit the calling of certain witnesses. *See* I. Robbins, The Legal Dimension of Private Incarceration, *supra* note 2 at 319. According to this view,  the dominance of the private contractor in making preliminary disciplinary hearing decisions is seen as subverting the mandate of *Wolff v. McDonnell*. *See* Note, *Inmates' Rights and the Privatization of Prisons*, 86 Columbia L. Rev. 1475, 1187 (1986) (suggesting that private officials should be excluded from disciplinary committees).

43  In *Superintendent, Massachusetts Correctional Institution, Walpole v. Hill*, 472 U.S. 445 (1985), the Supreme Court enunciated a standard that permitted revocation of an inmate's good time credits upon a showing of "some evidence" in the record - a lower standard of proof than a "preponderance of proof" standard.

44  In the end the practical realities of efficient administration and deference to be paid to factual determinations by on-site  private contractor personnel make it unlikely that a court would insist on a *de novo* standard of review to ensure compliance with due process -- even though that is arguably what the application of the "Todd Standards" might require in a liberty interest contex t. If, however, an equivalent degree of independent public authority decisionmaking is required by *Todd* in the prison setting, then it would seem necessary for public authorities at least to approve or ratify every first-instance disciplinary decision made by pr ivate contractor personnel.

45  That this is a largely a possible, rather than actual problem is partly indicated by the fact that most inmates are allowed t o review their files for inaccuracies.

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 4 of 15 PageID #: 18571

MARLOWE_0007175

private companies not be given a prominent role in the parole process, including the ability to make overall parole recommendations. Several states have endeavored legislatively to prevent private contractors from being able to play this pivotal 'yes or no' recommending role in the parole process.[46] Wyoming, for example, provides that prison contractors may not "recommend that the parole board either deny or grant parole, provided the contractor may submit written reports that have been prepared in the ordinary course of business unless otherwise requested by the parole board."[47] These state efforts represent a safeguard for a corrections agency to ensure that decisions about release itself do not in any way appear tainted. A more relaxed standard might be used, however, if, as in the case of the BOP's existing private facility, the private contractor's fee is not tied to the size of the inmate population.

### d.      Other Direct or Indirect Release-Related Decisions

Public authorities may also need to retain responsibility for decisions concerning the calculation of good time credits and release dates, as well as work assignments, furlough decisions or security classification determinations that might directly or indirectly bear on the foregoing.[48] All of these decisions may accelerate or delay an inmate's release date or eligibility for parole, directly affecting his fundamental liberty interests. Even if actual financial bias is not present, constitutional considerations suggest that even the appearance of self interest should be banished. For example, the possibility that private prison administrators could manipulate prisoners' work assignments to affect their release credits necessitates public decision making. To this end, only a handful of states have enacted statutory restrictions, or insisted on contractual solutions to the same effect.[49]

---

46    *See* Colo. Rev. Stat. Ann. § 17-1-203; Fla. Stat. Ann. § 957.06; Miss. Code Ann. § 47-5-1225; Ohio Rev. Code Ann. § 9.06; W. Va. Code § 25-5-14; Wyo. Stat. Ann. § 7-22-112.

47    Wyo. Stat. Ann. § 7-22-112.

48    Although it is unclear how infrequently this might happen, a particular security classification, for example, might determi ne not only the specific security conditions of incarceration, but indirectly -- though for example, special work assignments that att ach to a particular classification -- the maximum good-time credits a prisoner might receive. In the case of furloughs, a private prison operator might be swayed to restrict furlough opportunities to cut down on the loss of per diem revenues associated with an inm ate being absent from the prison. Although in most cases, furloughed prisoners remain part of a private contractor's designated population.

49    For example, only eleven states appear to prevent private prison operators from granting, denying or revoking inmates' good- time credits. *See* Ariz. Rev. Stat. Ann. § 41-1609.01; Ark. Code Ann. § 12-50-108; Fla. Stat. Ann. § 957.06; La. Rev. Stat. Ann. § 39:1800.5; Miss. Code Ann. § 47-5-1225; Ohio Rev. Code Ann. § 9.06; Tenn. Code Ann. § 41-24-110; Tex. Rev. Civ. Stat. Ann. Art. 495.004; Va. Code Ann. § 53.1-265; W. Va. Code § 25-5-14; Wyo. Stat. § 7-22-112. Some state DOC's like Virginia's, contractually insist that release computations be done by public officials. *See* e.g., CCA-Va. Contract at § 4.24, p. 22.

      With the exception of Texas and the addition of Colorado (at Colo. Rev. Stat. Ann. § 17-1-203), the above eleven states also ba r private operators from determining the kind of work that inmates may perform *or* determining the credits that working inmates may receive thereby. Although they do not specifically address the impact of classification on release, seven state statutes appea r to prohibit private prison operators from making classification determinations. *See* Ariz. Rev. Stat. Ann. § 41-1609.01; Fla. Stat. Ann. § 957.06; Miss. Code Ann. § 47-5-1225; Ohio Rev. Code Ann. § 9.06; Tenn. Code Ann. § 41-24-110; Va. Code Ann. § 53.1-265; Wyo. Stat. Ann. § 7-22-112.

      Finally, it appears that nine states have prohibited contractors from deciding the type of work or work credits that individual inmates may receive. *See* Ariz. Rev. Stat. Ann. § 1609.61; Ark. Code Ann. §§ 12-50-108; Colo. Rev. Stat. Ann. § 17-1-203; La. Rev. Stat. Ann. § 39:1800.5; Miss. Code Ann. §47-5-1225; Ohio Rev. Code Ann. § 9.06; Tenn. Code Ann. § 41-24-110; Va. Code Ann. §§ 53.1-265; W. Va. Code § 25-5-14.

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 5 of 15 PageID #: 18572

MARLOWE_0007176

# 3.  Liability for Private Prison Conditions

Of central importance to governments contemplating correctional privatization is the question of how privatization affects liability for the operations of, and conditions in, private prisons.  Matters of liability exposure have a critical bearing on accountability and cost:  can prisoners' rights be vindicated in a private correctional context, and if so, is there a lesser liability exposure for the government where a private contractor is the principal defendant?  For some time, relatively extravagant claims were made by both advocates and opponents of privatization that the advent of private prisons would insulate governments from liability exposure.[50]  Claims were also made that privatization would substantially shield private contractors from the most potent and costly form of inmate litigation -- civil rights suits involving alleged constitutional rights violations.[51]

These assertions may have confused some government correctional officials and troubled civil rights and prisoner's advocacy groups, but the impact of privatization on public and private correctional authorities appears to be less dramatic, and potentially more beneficial, than initially thought. As discussed in greater detail below, privatization will not result in any diminution of litigation exposure for private contractors.  They will be treated as "state actors" to whom federal constitutional standards apply with equal force.  At the same time, due to the nature of most inmate civil rights litigation, governments involved in contracting out correctional management will generally find a slight reduction in exposure to liability.

This section addresses first, the impact that privatization can have on private contractors' and contracting governments' liability exposure, and second, the impact that a broad indemnification arrangement and a contractor's comprehensive general liability insurance policy -- naming the government as an insured -- can have on keeping the relative litigation costs of privatization low. While the second topic is ultimately more salient, its impact cannot be fully appreciated without a review of how privatization affects the calculus of liability between private and public defendants and how it specifically reduces government liability exposure. There follows a review of the importance of monitoring by government, and how effective monitoring can ensure that public correctional authorities avoid acts and omissions of their own that might give rise to liability.

## A.  The Impact of Privatization on Liability Exposure

One cannot understand the impact of privatization on governments' and private contractors' liability exposure without appreciating the central place that so-called "Section 1983" cases -- federal civil rights claims alleging constitutional violations -- occupy in correctional litigation.  The mechanics of Section 1983 affect the liability of governments and contractors in different ways.

---

50    *See, e.g.,* Wash. Post, March 23, 1986, at F6, col. 2 (describing how some politicians believed that government could escape liability through use of private prisons); M. Walzer, "Hold the Justice," New Republic, April 1985, at 12 (privatization may result in an "escape from the enforcement of constitutional norms").

51    *See, e.g.,* Sullivan, *Privatization of Corrections: A Threat to Prisoners' Rights, in*  G. Bowman, et al., eds., Privatizing Correctional Institutions 139 (1994).

Case 3:16-cv-02267     Document 383-14     Filed 01/22/21     Page 6 of 15 PageID #: 18573

MARLOWE_0007177

## 1.    Inmates' Overwhelming Reliance on Section 1983 Cases to Redress Grievances

Prisoners litigating suits involving allegations of deficient prison conditions or individual harm suffered at the hands of prison authorities can bring a variety of legal claims to court, but only Section 1983 cases offer an effective means of addressing *constitutional* grievances and obtaining significant monetary damages.  The reasons are clear: under  Section 1983 litigation, inmates can seek to remedy violations of their constitutional rights by private contractors as well as by state or local government authorities who have contracted out prison management.  Analogous actions against federal correctional officials may be brought under so-called *Bivens* actions.[52]  Inmates can also obtain not only actual, or compensatory damages (reimbursing them for direct harms),[53] but also nominal damages (if a constitutional deprivation causes no actual injury),[54] punitive damages (monetary awards solely for the purpose of setting an example in especially egregious cases),[55] and declaratory and injunctive relief.[56]  They may also sue state or local officials in their individual capacities.[57]  Equally important, prisoners prevailing as plaintiffs in Section 1983 actions can win attorneys' fees, which provide a significant incentive for inmates bringing lawsuits.[58]  Finally, Section 1983 cases are heard in federal courts, which are perceived as being more fair and impartial than state courts.

By contrast, state court actions alleging negligence or intentional conduct on the part of private contractors and state officials usually face numerous kinds of limitations on the types of relief

---

52    "Section 1983" refers to the provision's codification in Volume 42 of the United States Code, Section 1983, or as it is most commonly abbreviated, 42 U.S.C. § 1983. Section 1983 actions are designed to offer redress to individuals who have suffered a deprivation "under color of state law" of "rights, privileges, or immunities secured by the Constitution and laws of the United States." Although there exists no comparable statute for suits against federal officials, the Supreme Court recognized in  *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,*  403 U.S. 388 (1971), that similar actions can be brought for violations allegedly committed under federal auspices.

53    Compensatory damages can include those for emotional or mental distress, although the 1996 Prison Litigation Reform Act limi  ts such recovery to cases where mental or emotional injuries accompany a physical injury.

54    *See Carey v. Piphus*, 435 U.S. 247 (1978).

55    *See Smith v. Wade,*  461 U.S. 30 (1983).  Punitive damages can be awarded as long as the defendant acted with "reckless or callous indifference to the federally protected rights of others."  *Id.* at 56.  Most lower courts have also held that a plaintiff who recovers only nominal damages in a § 1983 suit can still be awarded punitive damages.  *See, e.g., Brewer v. Chauvin,* 938 F.2d 860, 864 (8th Cir. 1991) (*en banc*).

56    *See City of Los Angeles v. Lyons,*  461 U.S. 95 (1983). A declaratory judgment usually entails a finding that a governmental statute or regulation is unconstitutional. If a court provides the plaintiff with some type of injunctive relief, the court goes even furt  her -- directing a defendant to refrain from taking certain unconstitutional actions in the future or requiring the defendant to take   certain steps to avoid future violations of the Constitution.  Compensatory and punitive damages, as well as injunctive relief, are als  o available to plaintiffs in *Bivens* actions.

57    *Bivens* suits can also be maintained against federal officials in their individual capacities.

58    Fees are authorized under 42 U.S.C. § 1988, although no fees are available for plaintiffs proceeding under federal Bivens act  ions. To be considered a 'prevailing party' under § 1988, a plaintiff need not win the central claim asserted, but can rather succeed   on "any significant issue in litigation which achieves] some of the benefit the parties sought in bringing suit."  *Texas State Teachers Association v. Garland Independent School District,*  489 U.S. 782, 791, 792 (1989).  Although the Prison Litigation Reform Act has placed a cap on attorneys' hourly rates in prisoner suits,  *see* 18 U.S.C. § 3006A(d), as well as the total fees recovered as a proportion of the relief obtained, *see* 42 U.S.C. § 1997e(d)(1)(B)(i), the availability of any fees at all still makes Section 1983 an attractive vehicle for prisoner's rights litigation.

Case 3:16-cv-02267     Document 383-14     Filed 01/22/21     Page 7 of 15 PageID #: 18574

MARLOWE_0007178

that can be obtained,[59] especially where the common law or state legislatures may have immunized states and/or state officials from suit for actions arising from official conduct.[60] Moreover, governments generally cannot be sued for the negligent acts of their independent contractors,[61] and most federal and state tort claims acts bar claims that involve "discretionary functions," which could include both the contracting out of the correctional function[62] and the placement of an individual inmate in a privatized facility.[63] Only tort suits involving allegations of negligent oversight or monitoring of a private prison are likely to succeed under a state or federal tort claims act, as the case may be.[64]

Three major questions under Section 1983 and *Bivens* litigation that arose in the mid-1980's in the wake of the first significant correctional privatizations were (1) could private prison contractors be sued as defendants acting "under color of state law?" (or federal law, in the case of *Bivens* suits); (2) if private prisons were indeed "state actors" amenable to suit under Section 1983 and *Bivens,* would private prison contractor officials be able to share the "qualified immunity" defense that public officials "acting under color of state law" enjoyed? and (3) if private prison contractors were deemed "state actors" amenable to suit under Section 1983, what kind of liability, if any, would still attach to *public* correctional officials who might still have various kinds of continuing responsibilities toward private facilities? These questions assumed great significance as policy makers sought to ascertain the true costs and benefits of privatization, and as the public sought to learn whether private prisons would permit governments to avoid their constitutional responsibilities toward inmates.

**2.      Are Private Prison Contractors Amenable to Suit under Section 1983?**

The Supreme Court appeared to answer the "state action" question in 1988 in the case of *West v. Atkins.*[65] In *West,* the Court concluded that a private physician who worked in a state prison several days each week could constitute a defendant under Section 1983. The Court dismissed the notion that the private doctor was not covered by Section 1983 simply because he was a not a state employee and worked part-time in the prison. What mattered, according to the Court, was the "function within the state system" that the doctor played within the prison: he had agreed to assume the government's responsibility, delegated specifically to him, to furnish medical care required by the Eighth

---

59    Ordinary tort actions may be severely circumscribed by state tort claims acts, and usually provide only for the award of compensatory damages. Except in the possible case of medical malpractice cases, such damages are in any event usually exceedingly modest, given the status of prisoners and the fact that most of their needs are furnished by the prison.

60    *See, e.g.,* Utah Code Ann. § 63-30-10(j) (explicitly excepting prisoners' suits from waiver of sovereign immunity).

61    *See* Restatement (2d), Torts, § 409. This principle is statutorily codified in the Federal Tort Claims Act at 28 U.S.C. § 2671.

62    *See, e.g., Gotha v. United States,* 115 F.3d 176, 179-80 (3d Cir. 1997)(discussing situations where major government decisions "susceptible to policy analysis" constitute "discretionary functions" immune from suit under the Federal Tort Claims Act, 28 U. S.C. § 2680(a). As such, the 'discretionary function' exemption would appear to bar any negligence suit based on a theory of "negli gent selection" of a private contractor. Everyday oversight over a private contractor via a prison monitor may conceivably still ex pose a corrections agency to negligence liability, but this will undoubtedly arise in the context of a larger Section 1983 suit.

63    *See, e.g., Bailor v. Salvation Army,* 51 F.3d 678 (7th Cir. 1995)(pre-release placement of inmate in half-way house deemed discretionary function immune from suit).

64    *See* discussion on Section 3.B.2, *infra.*

65    487 U.S. 42 (1988).

Case 3:16-cv-02267     Document 383-14     Filed 01/22/21     Page 8 of 15 PageID #: 18575

MARLOWE_0007179

Amendment to the Constitution. His specific function in the unique prison setting was to discharge the state's medical care responsibilities which he "possessed by virtue of state law and [which were] made possible only because [he was] clothed with the authority of state law."[66]

There should be no reason to doubt the application of *West v. Atkins* to private contractors running entire prison facilities, either on legal or policy grounds. The special, all-encompassing role that private contractors play in the day-to-day management of privatized facilities -- their "function within the state system"[67] -- together with the understanding that contractors have assumed responsibility for protecting inmates' constitutional rights, make it highly unlikely that a private prison management company could escape Section 1983 liability. This would seem to be the case even if the reasoning in another Supreme Court state action case were applied.[68] At least one federal circuit court has explicitly endorsed the application of *West v. Atkins* to private correctional management.[69]

It is important to note that, at present, notwithstanding the *West v. Atkins* holding, it is an untested proposition in many areas of the country whether *Bivens* actions may be brought against federal prison contractors as "state actors." Only four judicial circuits have unambiguously recognized private contractors as appropriate *Bivens* action defendants, while most of the circuits have

---

66  *Id.* at 55.

67  *Id.* This reference to the doctor's function in the state system may or may not signal reliance on a line of Supreme Court cases finding state action where the activity at issue has been a "public function" -- defined by the Court to be "traditionally excl usively reserved to the state." *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 352 (1974). Because prisons cannot, strictly speaking, be said to have been "traditionally exclusively reserved" to the state due to the 19th century legacy of private prisons -- someth ing the Supreme Court itself acknowledged in the recent case of *Richardson v. McKnight*, 117 S. Ct. 2100, 2104 (1997) -- there is still some debate as to whether the "public function" test is applicable to Section 1983 cases in the new correctional privatization envir onment.

68  One of the most interesting questions regarding private prisons and 'state action' is why the Supreme Court, in the recent de cision of *Richardson v. McKnight,* 117 S. Ct. 2100 (1997) -- a case that involved a private prison run by Corrections Corporation of America -- instructed the trial court on remand to analyze the state action question under the holding not of *West,* but of *Lugar v. Edmonson Oil Co.,* 457 U.S. 922 (1982). The best explanation is that *Lugar* actually enunciated a test to determine state action, while *West* was less clear about its governing principles. The real question, however, is whether by referring to *Lugar,* the Court was signaling a reaffirmation of the increasingly restrictive approach to state action that it began to develop in the 1980's. But the resul t in the private prison context is in fact likely to be the same regardless of which decision is relied on. The two-part test in *Lugar* requires first, that a constitutional deprivation "must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible"; and second, that "the party charged with the deprivation must be a person who may fairly be said to be a state actor." The definition of state actor in the second part of the test includes a person jointly acting with state officials, or who "has obtained significant aid from state officials," or " *whose conduct is otherwise chargeable to the State." Id* . at 937 (emphasis supplied). Thus, although the *Lugar* decision itself revolved around a finding of joint activity by public and private parties, the last phrase of the two-pronged test would appear to be expansive e nough to attribute liability to almost any kind of private prison company assuming all or virtually all management functions at a facili ty.

69  *See Skelton v. Pri-Cor, Inc.* , 963 F.2d 100, 102 (6th Cir. 1991) *cert. denied,* 503 U.S. 989 (1992*), quoting Plain v. Flicker* , 645 F. Supp. 898, 907 (D.N.J. 1986)("[I]f a state contracted with a private corporation to run its prisons it would no doubt subject the private prison employees to § 1983 suits under the public function doctrine"). *See also Street v. Corrections Corp. of America,* 102 F.3d 810, 814 (6th Cir. 1996) (private operation of prison is a public function). At least one district court has reasoned sim ilarly. *See Payne v. Monroe County* , 779 F. Supp. 1330, 1335 (S.D. Fla. 1991)(Wackenhut Corp., operator of county jail, deemed state actor performing public function).

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 9 of 15 PageID #: 18576

MARLOWE_0007180

not ruled on the issue. One circuit has refused to allow *Bivens* suits against private parties.[70] Lower courts confronted with private contractor defendants in *Bivens* actions generally continue to find ways to avoid ruling on the issue.[71] Still, it is hard to see how these remaining judicial circuits will be able to resist the logic of *West* in the Section 1983 context if and when an analogous *Bivens* case appears before them.[72] Interestingly, the current Bureau of Prisons facility in Taft, California falls within the 9th Circuit, which has in fact recognized private contractors as appropriate *Bivens* defendants.

### 3.      Do Private Prison Officials Have a 'Qualified Immunity' Under Section 1983?

Even with increasing general agreement that private prison contractors and employees are "state actors" subject to Section 1983 liability, it remained uncertain until recently whether such employees could raise the defense of "qualified immunity" that is extended to public officials defending against monetary claims in such litigation.[73] Such immunity shields from liability officials exercising discretionary functions if, in light of the clearly established law existing at the time, they could reasonably believe that their conduct was lawful. The immunity is therefore helpful in protecting officials from liability in situations where the applicable law is in flux and they must operate with resolve and confidence in volatile environments. Proponents of extending qualified immunity to private prison officials argued that officials acting "under color of state law" in managing a prison should have same defenses available to public employees. This would allegedly create an "even playing field" allowing fair competition between public and private entities.[74]

Last year, in *Richardson v. McKnight,*[75] the Supreme Court rejected such an approach, ruling that private prison guards cannot raise a qualified immunity defense to a Section 1983 action. The Supreme Court's reasoning relied on both history and public policy. The Court found that the "mere performance of a governmental function" by a private defendant could not, alone, entitle that defendant to claim qualified immunity.[76] The purpose of qualified immunity is to prevent public

---

70   The four circuits that have found *Bivens* actions to be appropriate against private defendants are the D.C., 5th, 6th, and 9th Circuits. *See, e.g., Reuber v. U.S.*, 750 F.2d 1039, 1053-57 (D.C. Cir. 1984); *Dobyns v. E-Systems, Inc.*, 667 F.2d 1219 (5th Cir. 1982); *Yiamouyiannis v. Chemical Abstracts Service*, 521 F.2d 1392 (6th Cir. 1975); *Schowengerdt v. General Dynamics Corp.*, 823 F.2d 1328, 1337-38 (9th Cir. 1987). The one circuit that has found to the contrary is the First. *Fletcher v. Rhode Island Hosp. Trust National Bank*, 496 F.2d 927, 932 n. 8 (1st Cir.), *cert. denied*, 419 U.S. 1001 (1974). Other circuits have either not dealt with the issue or have purposely left it untreated. *See DeVargas v. Mason & Hanger-Silas Mason Co.*, 844 F.2d 714, 720 n.5 (cataloguing status of private party amenability to suit by circuit).

71   *See, e.g., Smith v. United States*, 896 F. Supp. 1183 (M.D. Fla. 1995) (court merely assumes private half-way house is proper defendant under *Bivens* action against half-way house and U.S. Bureau of Prisons; *McChan v. CCA*, 1997 WL 104110 (D. Kan. 1997)(same assumption in case involving privately-managed federal detention center); *Gleave v. Graham*, 954 F. Supp. 599, 604 (W.D.N.Y. 1997)(court does not rule on issue, where private half-way house is the principal defendant).

72   Indeed, the Supreme Court has noted how liability standards in *Bivens* cases generally track those in Section 1983 litigation. *See Siegert v. Gilley*, 500 U.S. 226 (1991).

73   The qualified immunity defense applies only to actions against officials for monetary relief.

74   *See, e.g.,* Thomas, *Resolving the Problem of Qualified Immunity for Private Defendants in Section 1983 and Bivens Damage Suits,* 53 La. L. Rev. 449, 454 (1992).

75   117 S. Ct. 2100 (1997).

76   The Court noted that "[h]istory does not reveal a 'firmly rooted' tradition of immunity applicable to private employed prison guards," *id.* at 2104, and further observed that "[c]orrectional functions have never been exclusively public" in the U.S. by virtue of the history of private jails and prisons in the 18th and 19th centuries. *Id.*

---

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 10 of 15 PageID #: 18577

MARLOWE_0007181

officials, who have civil service protection and less strict oversight, from exhibiting "unwarranted timidity" in the face of liability. The Court noted, however, that private companies and their employees have other incentives, generated by state monitoring and the marketplace, to spur them to perform their duties zealously. Moreover, such contractors can obtain relatively inexpensive liability insurance for their employees that will further minimize any disincentives for good performance. [77] The Court concluded that its decision to deny qualified immunity should apply to any situation where "a private firm, systematically organized to assume a major lengthy administrative task...with limited direct supervision by the government, undertakes that task for profit and potentially in competition with other firms."[78]

Despite the narrow decision in *McKnight* and an agitated dissent by the minority justices, the ruling is likely to apply to virtually all private contractors managing prisons, even where competitive market pressures may be relatively weak.[79] The bigger question is whether the case's significance to current private prison operations is more modest than it initially appeared. To begin with, qualified immunity by its terms is generally most helpful to public officials when the legal standards governing their work are unclear and a reasonable official might believe that his conduct was lawful. In the case of prison litigation, however, constitutional law standards that might have seemed confused or unsettled in the 1970s and 1980s have now reached a degree of clarity and relative stability that render the qualified immunity defense far less valuable than in earlier years. Moreover, in monetary terms, the impact of *McKnight* on private prison contractors has been negligible, since the additional insurance necessary to cover individual prison officials' liability is only marginally higher than that necessary to cover the corporate liability of the firms themselves.[80] Finally, the *McKnight* decision left open the possibility that a potentially equally meaningful "good faith" defense to liability -- rather than an absolute defense to suit -- still might be asserted by private prison officials who genuinely believed their actions were in accord with prevailing law.[81] In the end, the slight increase in private contractors' exposure to liability appears not to have had any discernible impact on those firms' costs.[82]

---

77    *See id.* at 2106-07. The Court argued that if private companies or their employees flag in their duties, they may be replaced in the competitive procurement process or through the action of market and reputation forces.

78    *Id.* at 2107. The *McKnight* decision would also appear to put to rest the notion that a private contractor could avail itself, in federal actions against states and their high-ranking officials, of the defense of absolute "sovereign immunity" that would also shield it from Section 1983 liability. Although the Supreme Court did not address this issue explicitly, its reasoning extends to both types of immunity for private prison contractors and their employees.

79    While the minority opinion, written by Justice Scalia, emphasized that the private prison industry is dominated by a few major players and often driven by political lobbying and decision making, it does not necessarily follow that the basic profit motive, and its incentives for private guards to perform effectively, are weak. There are still significant contract and market pressures at work. *See, e.g.,* Thomas & Logan, *The Development, Present Status, and Future Potential of Correctional Privatization in America, in* G. Bowman, et al., eds., Privatizing Correctional Institutions 233 (1993) (noting that profitability and share value are usually tied to meeting government contractual expectations and enhancing firm's public reputation).

80    Not only did private prison contractors not assume that their officials were protected by qualified immunity prior to *McKnight,* but their insurance policies before and after *McKnight* typically indemnify private prison officials for all liability relating to their prison work.

81    117 S. Ct. at 2108.

82    In this regard, it also does not seem persuasive to suppose, as did the *McKnight* minority, that private contractors will "down-play discipline" and otherwise exhibit timidity in their work so as to reduce the cost of § 1983 litigation. Anecdotal evidence suggests that private firms are not deterred from entering or profiting in the market . *See generally* Note, *Qualified Immunity -- Privatized*

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 11 of 15 PageID #: 18578

MARLOWE_0007182

### 4. Private Contractor and Governmental Liability Exposure in Section 1983 Litigation

With private prison contractors deemed "state actors" amenable to suit under Section 1983, and with contractor personnel not immune from suit, it becomes possible to analyze the general contours of how liability would be distributed among contractors and government correctional authorities in a privatized correctional environment, and whether, and to what degree, privatization helps or harms governments and prisoners involved in inmate litigation. The most important factor, from a cost standpoint, is simply the availability to contractors and governments of a contractor's comprehensive general liability insurance policy. Still, even from the standpoint of exposure to suit, it is clear that the interposition of a private contractor handling the day-to-day management of a correctional facility will tend to reduce significantly the exposure of governments and senior public correctional authorities, particularly in cases involving isolated or individual incidents. It should not, meanwhile, affect adversely the ability of prisoners to obtain relief for legitimate constitutional complaints. To understand these effects, it is useful to examine the respective Section 1983 liabilities of private contractors and government entities (i.e., local governments, states, federal government).

#### a. *Private Correctional Firm Liability*

As a private entity functioning as a "state actor," a private correctional contractor would be amenable to suit under Section 1983 or *Bivens,* and subject to both monetary damages and injunctive relief if it were found to have violated one or more inmates' constitutional rights. Hence, a private contractor would be subject to the same liability standards established by the Supreme Court for public actors, including those relating to causation and state of mind.[83] Since, however, there is no so-called *respondeat superior* liability for *any* employers under Section 1983 -- meaning, no automatic liability of an employer for the actions of its employees[84] -- a firm and its supervisory employees must be shown to have been directly involved in the alleged violation, have known about the violation or its likelihood of occurring and been "deliberately indifferent toward the risk, or have generated or validated a policy or custom that led to the violation.[85]

As in the case of public employers, in practice this means that while inmate cases may succeed against private correctional officers, it may be much more difficult to reach supervisory personnel. Such higher-level personnel may be insulated from liability in cases involving isolated

---

*Government Functions,* 111 Harvard L. Rev. 390, 398-400 (1997) (private firms appeared undeterred by lack of immunity in aggressively operating prisons). Also, since litigation costs are merely possible future costs, firms will usually prefer to r eap savings through immediate staffing and training efficiencies rather than through presumed litigation savings. *See id.* at 400 n. 75.

83   In the case of an Eighth Amendment claim alleging safety problems stemming from other inmates, for example, a plaintiff would need to show that the private correctional officials' actions or omissions had a causal connection to the injuries alleged, and that the officials displayed "deliberate indifference to a substantial risk of serious harm." *Farmer v. Brennan,* 511 U.S. 825, 828 (1994).

84   *See Monell v. Department of Soc. Serv.* , 436 U.S. 658, 694 (1978). Although *Monell* involved a municipal corporation, all federal circuit courts have agreed that there is no *respondeat superior* liability for private corporations as well. *See Street v. Corrections Corp. of Am., supra* 102 F.3d at, 818.

85   *See, e.g., Street v. Corrections Corp. of Am., supra* (private prison contractor and warden not proper defendants for alleged Eighth Amendment violation by prison guard; no showing of custom or policy); *Nelson v. Pennsylvania*, 1997 WL 793060, at 3 (E.D. Pa. 1997)(allegations against private prison warden and assistant warden dismissed due to lack of participation in or knowledge of and acquiescence in activity alleged to have caused constitutional deprivation).

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 12 of 15 PageID #: 18579

MARLOWE_0007183

incidents and lower level personnel (e.g., guards or medical staff),[86] depending on their particular level of knowledge or lack of forewarning of specific problems or risks. Even in cases where a failure to train correctional officers is at issue, the failure to train must be accompanied by officials' "deliberate indifference" to the risk that deficient training will result in constitutional violations.[87] Mere negligence -- on the part of line employees or their supervisors -- does not give rise to a Section 1983 claim.[88]

On the basis of *comparative* recovery of damages, it can be said that privatization may bring certain benefits to inmates bringing meritorious Section 1983 suits. First, in the case of state and federal corrections (although not local government corrections), due to the Eleventh Amendment and/or statutes on sovereign immunity, state and federal correctional employees are not amenable to suits for monetary damages except in their personal capacity.[89] This means that only damages against their individual assets may be obtained, thereby significantly limiting the amount of money that can be obtained in such cases.[90] By contrast, damages obtained against private correctional employees can be paid out of the employing firm's assets, which could be quite large. Moreover, federal, state and local governments may have statutory limits on damage awards or be exempted from certain types of damages,[91] while private contractors are not similarly restricted.

### b. Government Correctional Authority Liability

Contracting for prison management services also means lower overall liability exposure for governments. This lower liability profile results directly from the Section 1983 causation and state of mind standards discussed immediately above: insofar as public corrections authorities will have entrusted day-to-day management of prisons to private contractors, they will be less likely to have advance notice or knowledge of specific harms alleged to have caused injury to individual inmates. While reliance on a private contractor will obviously not insulate government authorities from being named in lawsuits[92] or being exposed to liability for widespread or obvious problems with prison conditions, it will greatly lessen the liability of government supervisory officials for most inmate claims alleging individual harm. These claims represent the most common type of inmate lawsuit, and assume a significant proportion of a corrections authority's litigation budget.

---

86   Thus, for example, in an Eighth Amendment inmate freedom from harm case, if supervisory officials were to be held liable, an inmate would have to show not only that front-line guards were "deliberately indifferent" to a strong likelihood that the inmate's safety was in danger, but that the supervisory officials had similar knowledge of a risk and recklessly and consciously disregarded it. *See, e.g., Payne v. Monroe County*, *supra* at 1334 (claims against private jail management firm dismissed; no showing of deliberate indifference on part of firm).

87   *See City of Canton v. Harris*, 489 U.S. 378 (1989).

88   *See Daniels v. Williams*, 474 U.S. 327 (1986); *Davidson v. Cannon*, 474 U.S. 344 (1986).

89   Also by virtue of sovereign immunity, states themselves are not amenable to suit. *See, e.g., Will v. Michigan Dept. of State Police*, 491 U.S. 58 (1989).

90   Although the government cannot be tapped directly for damages, it can, by statute and based on discretion, choose to indemnify government employees sued in their personal capacities. States, are, however, liable for attorneys' fees under 42 U.S.C. § 1988 in cases for injunctive relief where state officials were sued in their official capacity and lost.

91   In addition, the Supreme Court has held that punitive damages are not obtainable against municipal governments. *See City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247 (1981).

92   As one commentator has noted, "[T]he government cannot hide behind its private operator. An inmate can sue either party." M. Gold, *The Privatization of Prisons*, 28 The Urban Lawyer 359, 380 (1996).

MARLOWE_0007184

Governments will still be subject to injunctive relief if they permit obviously unconstitutional conditions to arise in private prisons.[93] Municipalities and county governments, unprotected by sovereign or qualified immunity, will also face monetary damages, including punitive damages in such situations where a "policy or custom" bearing on the alleged harm is deemed to exist.[94] But municipalities, together with state and federal officials, will face monetary liability in cases of individual harm only if, based on Section 1983 state of mind requirements, they authorize improper conduct by a private contractor, or have knowledge of that conduct and consciously fail to take steps to correct it. In most cases involving these kinds of allegations, courts will dismiss claims against upper level officials, who are deemed entitled to rely on the judgment and professionalism of private contractors reacting to the day-to-day challenges of prison management.[95]

## B.    The Role of Indemnification, Insurance and Monitoring in Reducing Liability and Litigation Costs

This section addresses the importance to public correctional authorities of (a) being covered by a broad indemnification agreement covering the contractor's acts and omissions, and (b) being named as an insured on a private contractor's comprehensive general liability insurance policy. These important advantages are discussed in greater detail below. This section also reemphasizes how Section 1983 will not impose liability on government officials unless they not only know about a problem but are *deliberately indifferent* toward it. Prudent monitoring of private facilities by the government has the clear benefit of alerting public officials to serious and systemic problems in a facility that, if responsibly dealt with, will not generate damaging litigation -- not to mention public relations problems -- in the first place. Perhaps equally important from a liability and cost standpoint, an effective monitor can prevent public authorities from committing their own acts and omissions that are *not* generally covered by the contractor's insurance policy.

### 1.    Indemnification and Insurance

It goes without saying that any expectations about privatization's purported litigation cost advantages would prove completely illusory without government insistence on an effective

---

93    See, e.g., *Nelson v. Prison Health Serv., Inc.,* 1997 WL 821531 (M.D. Fla.1997) (county could be found liable for deficient medical care at private jail based on repeated receipt of monitoring reports identifying problems).

94    Sometimes, courts have viewed municipal government liability broadly as non-delegable where contracting decisions are viewed as constituting a "policy or custom." *See, e.g., Ancata v. Prison Health Services,* 769 F.2d 700, 705-06 nn. 9 & 11 (11th Cir. 1985) (county liable together with private prison health provider for inadequate medical care furnished to inmates); *Blumel v. Mylander,* 954 F. Supp. 1547, 1556 (M.D. Fla. 1997) (county liable with private contractor CCA for Fourth Amendment violation where county policy entrusted CCA with policy making authority on subject at issue). Custom has been interpreted broadly to include a "widespread practice, that, although not authorized by written law or express municipal policy, is so permanent and well settle d as to constitute a custom or usage with the force of law." *St. Louis v. Praprotnik,* 485 U.S. 112, 127 (1988), *quoting Adickes v. S.H. Kress and Co.,* 398 U.S. 144, 167-68 (1970). If a custom is shown to be so longstanding and widespread that it is considered to have been "authorized by the policy-making officials because they must have known about it but failed to stop it," liability may attach u nder § 1983. *See Payne v. Monroe County*, *supra* at 1334 (section 1983 prison suit against county and private contractor dismissed where no showing that inmate safety problem was known or should have been known).

95    *Cf., e.g., Calvert v. Hun,* 798 F. Supp. 1226, 1232-33 (N.D. W.Va. 1992) (Eighth Amendment claims against state prison officials dismissed where no showing that such officials actively or tacitly approved provision of allegedly incompetent medical care to individual inmate by private health provider).

Case 3:16-cv-02267    Document 383-14    Filed 01/22/21    Page 14 of 15 PageID #: 18581

MARLOWE_0007185

indemnification and insurance scheme. By demanding full indemnification and compensation of the government for all acts and omissions of the private contractor that may give rise to liability surrounding the operation of a private facility, public corrections authorities can ensure that there is no litigation cost increase attending privatization. Being named as an insured on a private contractor's comprehensive general liability policy can provide governments with the security they need in order to turn over complete operation of a prison and to focus their attention on specific matters of facility oversight and proper contractor performance.

To ensure that they deliver their full benefit, indemnification clauses typically indemnify, defend, and hold harmless the government and all of its employees, agents, and officers from any claims or losses -- including all damages, costs, fines, and/or settlements -- stemming from the contractor's acts or omissions in connection with performance of a privatization contract.[96] They are also typically written in such a way as to apply to all subcontractors, agents, or any other persons supplying services or supplies in connection with the contract. Beyond these basics, a contract may explicitly provide for indemnification for specific harms, including prison escapes, failure to comply with federal, state, or local legislation (particularly labor laws), and unsanctioned use of information or data collected or used in the course of performance of the contract (e.g., research or personal data implicating privacy, copyright, or trade secret concerns).[97] It may also address government requirements that the government be a signatory to any settlement or explicitly approve any settlement in excess of insurance limits.

Insurance provisions in a contract constitute a logical extension of the indemnification clauses. A contracting government agency will usually be named as an insured on any and all insurance policies written for the private contractor managing one or more prison facilities.[98] By being named explicitly as a direct insured party -- rather than as merely a beneficiary -- a government can strengthen its indemnification provisions vis-a-vis the contractor and its rights against the insurer. Among the most important of those rights is the right to advance notice of any nonpayment or cancellation of the policy by the contractor. Without these direct rights -- contained in the insurance policy or in the contract with the private contractor[99] -- the government's protection may be illusory. The contracting agency may also insist that it be given advance notice of, and opportunity to approve, a new certificate of insurance that replaces an expiring policy.[100]

---

96  It is important that the indemnification extend to performance of the *contract* in all of its dimensions (including by implication all manner of omissions), rather than simply the operation of the facility in question, which might otherwise narrow the coverage o f the hold harmless benefit.

97  See generally, e.g., Contract Between Commonwealth of Kentucky and U.S. Corrections Corporation for the Operation of Three Minimum Security Facilities, December 9, 1993 (hereinafter "Kentucky Contract"), at 33.

98  There appears to be unanimous agreement that third-party insurance obtained by the contractor is the safest and most cost-eff ective means that governments have of being properly insured. *See* Robbins, The Legal Dimensions of Private Incarceration, *supra* at 854, n. 644 (discussing problems with contractors self-insuring).

99  *See, e.g.,* Kentucky Contract at 34; CCA-Va. Contract at § 7.4, p. 38.

100  *See, e.g.,* State of California Department of Corrections Standard Contract, Attachment B (General Terms and Conditions), ¶ 19 at 6, furnished as Attachment 1 to RFP for Expansion and Operation of Medium Security Community Correctional Facility, October 13, 1995.

---

MARLOWE_0007186