# EXHIBIT D
# Part 12 of 14

In developing specific provisions for insurance coverage, governments generally seek to cover all possible liabilities arising from the operation of the privatized facility, including both personal injury claims and Section 1983 litigation. Liability areas include those for personal injury, professional (malpractice) liability (including medical malpractice), contract liability, property damage, worker's compensation liability, theft and fraud, and automobile liability (to protect against damages stemming from transport of inmates). Insurance policies are also generally sought that explicitly provide for the payment of *litigation defense costs*.[101] Depending on risk calculations specific to individual facilities, governments will also seek to prescribe insurance amounts that insurance policies should contain.[102] In addition to liability insurance, contracts may also provide that contractors furnish performance bonds as a means of ensuring proper performance of the contracted-for services, although the usefulness of this tool is limited.[103]

Government indemnification and coverage under a contractor's third-party liability policy go hand-in-hand with the practical reality that public officials have turned over day-to-day prison management to private firms that must, as a matter of ordinary accountability and proper market pricing, bear the direct costs of damages they may cause in executing their responsibilities. Attentive governments will closely monitor both the quality of insurance initially obtained by the contractor, as well as changes in coverage and premiums that may have an impact on the overall savings derived from the management contract. While market pressures and profitability concerns should, over time, be expected to result in lower premiums for contractors that perform responsibly, governments can still be expected to monitor contractor performance closely to make sure that there is no offsetting tendency to cut back on staffing, training, and other inputs affecting the bottom line.

It should be noted that government litigation costs at a particular facility may or may not be lower with prison management in the hands of a private contractor. A great deal depends on the nature of the facilities involved, the profile of the inmate population, and the risk management approaches taken by particular public versus private authorities. The latter approaches can themselves vary greatly according to the overall management plan, quality of staff, and claims handling procedures employed by those administering a specific prison facility or system. While it may be contended that private authorities can exercise greater flexibility than their public sector counterparts in given situations, this assertion cannot be readily substantiated.[104] Thus, even though a prudent

---

101 *See, e.g.,* CAA-Va. Contract at § 7.3, p. 38.

102 For example, Virginia has required a contractor managing a medium security facility to carry comprehensive general liability insurance in an amount no less than $2 million per occurrence and $5 million in the aggregate. *See* CCA-Va. Contract, *supra* at § 7.3, p. 37. Kentucky requires commercial general liability insurance to be carried by a contractor for a minimum security facility in the amount of $2 million per person and $3 million per occurrence. *See* Kentucky Contract, supra at 35. Most specialists seem to think that $5 million per occurrence is a completely adequate amount for a medium security prison with 500-1000 beds. For medical malpractice insurance, the U.S. Bureau of Prisons prescribed an amount of $1 million per medical speciality per occurrence. See RFP for Minimum Security Prison, Taft, California, Nov. 27, 1996 (hereinafter "Taft RFP"), at 72.

103 Although performance bonds have been viewed by some as useful where the contracting agency wishes to protect itself from events such as contractor bankruptcy, default, strikes, or a takeover by or merger into, a new firm, many believe they are unnecessary since they usually require replacement of a private contractor by a vendor of the insurer's choosing, and because it is usually easier and cheaper for public authorities to resume control.

104 Some privatization proponents have asserted that private firms may prove more responsive to inmates and the general public in remedying problems that result in prison litigation. They content that a private contractor can more expeditiously to correct a problem or settle a lawsuit when political pressures are absent, fewer approvals are needed, and funding is more readily accessible. Also, a private firm's concern with market reputation and profitability is alleged to create incentives for flexibility and holding costs down. There remains no solid evidence or study to support these contentions, however plausible they may be.

government correctional agency will insist as a matter of course that a contractor indemnify and hold it harmless against all acts and omissions of the contractor arising under a management contract -- and even though such an agency will similarly insist that it be named as an insured on any private comprehensive general liability insurance policy covering particular prison facilities -- there is no way to tell for sure whether its litigation expenditures under privatization will be lower.[105]

2. **Monitoring to Safeguard Against Liability Resulting from Government Duties**

Indemnification and insurance covering the acts and omissions of the private contractor will not necessarily shield public correctional authorities for failing to exercise that degree of oversight deemed appropriate to particular contract circumstances. As the Supreme Court acknowledged in the case of *Logue v. United States*,[106] government correctional authorities may be liable for their own negligence even though management of a correctional facility has been given over to an independent contractor.[107] To safeguard against the continuing possibility of liability for their own conduct, as well as to ensure proper contractor performance and compliance with contract terms, most governments have statutorily[108] or contractually provided for public corrections monitors to oversee private prison operations. Monitors may be individuals who fulfill roles significantly different from those performed by auditors, inspectors, and performance evaluators whose interventions are less frequent and less concerned with day-to-day operations. Without such frequent oversight, it is possible that a government could be found negligent -- according to an evolving standard of reasonableness in the corrections community -- for negligent or deficient monitoring.[109]

---

105  Clear answers to this question are likely to be exceedingly difficult to obtain. To begin with, public entities do not carry third party liability insurance, so direct cost comparisons are impossible. Also, public correctional authorities and contractors alike would find it very hard to isolate with any precision all of their relevant litigation costs (staffing costs, particularly in the public sector, are hard to attribute exclusively to litigation-related functions), and may be reluctant to disclose their damage awards paid out. Ascertaining what portion of the contractor's per diem is attributable to litigation defense would probably be quite speculative. Finally, it would be extremely difficult to control for potentially wide differences in prison populations, facility conditions, and the past history of litigation at one or more facilities. Still, one could surmise that public authorities have a number of factors that could aid them in keeping certain litigation defense costs relatively low. These include the judicious use of salaried government attorneys to handle virtually all prison litigation, possibly less expensive claims handling, and the lack of a profit mark-up. Private contractors, by contrast, might feature relatively more expensive claims handling and legal assistance (e.g., though contract attorneys billing at market rates), as well as that portion of their fee allocated to such work.

106  412 U.S. 521 (1973).

107  *See id.* at 532-33. In *Logue,* the Court acknowledged that a U.S. Marshal could be found negligent for his own acts of negligence in failing to take certain precautions in placing a federal inmate in a county jail under an intergovernmental agreement pursuant to 18 U.S.C. § 4002. While indemnification and insurance covering a private contractor will help with litigation stemming from prison condition problems, it will not obviate government officials liability for negligent selection or oversight of a contractor. As discussed above, Section 1983 litigation has in recent years confirmed this same fact in the context of private prison contractors specifically, *see* § 3.A, *supra*.

108  *See, e.g.,* Fla. Stat. Ann. § 957.04(1)(g) (requiring full-time monitor with unlimited access to private facility); Ky. Rev. Stat. Ann. § 197.510(29) (requiring frequent monitoring); N.M. Stat Ann. § 33-1-17(D)(7) (requiring monitoring of compliance).

109  See CSG Report, *supra* note 37, at 533. Lack of monitoring or grossly deficient monitoring could also figure as a major grounds for voiding a contract on grounds of excessive delegation.

In some jurisdictions, and pursuant to certain contracts, monitors are full-time Department of Corrections employees who work at private facilities,[110] while in other cases, monitors may only visit intermittently.[111] In still other cases, a monitor may be an independent contractor who visits a facility only several days per month.[112] RFPs or contracts may require a private prison operator to set aside space for a government monitor and to assume all costs associated with the monitor's work other than his or her salary.[113] The monitor's mandate in many cases may be a broad and active one, in which ongoing guidance is provided to the private contractor.[114] A wide-ranging, ongoing document review -- including paperwork on population, classification, discipline, grievances, serious incidents, and programming[115] -- can complement direct observation. In many cases, the level of oversight received by a private contractor may ultimately exceed that received by publicly-operated prisons.[116]

A review of alternative approaches to monitoring and the many deficiencies that may attend many of these approaches,[117] lies beyond the scope of this review. For present purposes, it is important simply to recapitulate the legal implications of using -- or not using -- a monitor. The problems of government negligence liability resulting from deficient monitoring or a failure to monitor at all have already been addressed.[118] If a monitor is employed, however, public corrections authorities should make every effort to take the monitor's role -- and the information he or she relays to the public agency -- seriously. Otherwise, public correctional officials may find themselves exposed to "deliberate indifference" allegations in a Section 1983 action for failing to respond appropriately to information provided by the monitor.

---

110 *See, e.g.,* Florida, where this is statutorily required.

111 *See, e.g.,* North Carolina Department of Corrections RFP for Two 500-Cell Medium Security Institutions, Dec. 19, 1995 (hereinafter N. Carolina RFP), at 19.

112 This arrangement exists in the case of the contract between the District of Columbia and the Northeast Corrections Center in Youngstown, Ohio, operated by Corrections Corp. of America. Although this arrangement was apparently selected in light of concerns that the D.C. Government could not perform the job properly, it is far from an ideal situation, given that the monitor resides out of state and only visits the facility a few days per month. This may or may not be viewed as a modest, though important, contributing factor in the D.C. Government's failure to respond appropriately to repeated problems of inmate violence at the prison.

113 *See, e.g.,* N. Carolina RFP at 19.

114 For example, the contract monitor for the U.S. Bureau of Prisons' Taft, California, minimum security facility is empowered to provide "technical direction" to "all work performed" under the contract, which can include "[d]irections to the contractor which redirect the contract effort, shift work emphasis between areas or tasks, require pursuit of certain lines of inquiry, fill in details or otherwise serve to accomplish the contractual scope of work." Taft RFP, *supra* note 102, at 56.

115 *See* Keating, *Public Over Private: Monitoring the Performance of Privately Operated Prisons and Jails, in* D. McDonald, ed., Private Prisons In the Public Interest 130, 145 (1990). Many private prison contracts require full access to prison facilities and private contractor books and records, without notice. *See, e.g.,* CCA-Va. Contract at § 4.38, p. 27.

116 *See* Calabrese, *Low Cost, High Quality, Good Fit: Why Not Privatization, in* G. Bowman, et al., eds, Privatizing Correctional Institutions, *supra* at 184-85.

117 Among the most thorny issues are monitors being co-opted by contractors, *see, e.g.,* D. Shichor, Punishment for Profit 121-22 (1993); confusion and blurring of the chain of command that occurs when prison administrators must answer to government officials, *id.* at 120; and governments having insufficient funds to undertake effective, regular monitoring. *See, e.g.,* J. Prager, *Contracting Out: Theory and Policy,* 25 N.Y.U. J. Int'l L. & Pol. 73, 1099-1100 n. 71 (1992). Indeed, the high cost of monitoring may offset many of the financial advantages of contracting out.

118 *See* Section 3.A.1, *supra*.

Case 3:16-cv-02267    Document 383-15    Filed 01/22/21    Page 4 of 17 PageID #: 18586

MARLOWE_0007189

Note that other problems can develop with independent contractors or monitors: a public correctional agency can be unnecessarily exposed to additional liability if an independent monitor does not agree to indemnify the agency for any and all acts and omissions and if he or she fails to carry adequate professional liability and comprehensive general liability insurance naming the agency as an insured.[119] In sum, monitoring acts as a double-edged sword: it can create as well as forestall liability depending on how intelligently it is structured and conducted.

---

119 The problems of liability and conflict of interest are graphically illustrated by Wisconsin's having several years ago appoi nted an independent prison monitor to oversee a private facility in Texas that housed Wisconsin inmates. The monitor's salary was shar ed by Wisconsin and the private contractor, making the monitors allegiances and responsibilities unnecessarily confused.

# 4. Employment and Labor Relations Issues

Some of the most important legal questions surrounding prison privatization relate to employment and labor relations. Specifically, can prison employees engage in collective bargaining under the National Labor Relations Act? Can they go on strike? Unionized employees in public correctional facilities have traditionally worried about governments contracting out jobs to private contractors who may not be required to recognize or negotiate with their collective bargaining representatives. For their part, private correctional management companies have sometimes resisted taking over a once-publicly run facility if in doing so they may be deemed a 'successor employer' bound to the terms of an existing labor contract. These and other questions bearing centrally on labor relations will be examined in this section, along with a discussion of how public and private correctional authorities can practically address prison employees' right to strike. First, however, the section discusses the impact of privatization on existing civil service arrangements, as well as the significance of private prison companies remaining independent contractors rather than "joint employers" with public correctional authorities.

## A. Potential Civil Service Impediments

State courts differ about whether civil service regimes -- constitutional or statutory schemes designed to eliminate political spoils systems and increase governmental efficiency through the creation of a merit-based employment system -- can prevent or facilitate the privatization of government services.[120] Several state courts have held that civil service laws in fact neither bar nor impede privatization.[121] These courts have concluded that privatization is not contrary to the purpose of their civil service laws: privatization is deemed a cost savings measure -- not a reintroduction of the political spoils system.[122] However, at least two prominent state court decisions have held that state civil service laws bar privatization.[123] Both courts found that the states lacked statutory or regulatory authorization to contract with private service providers and held that privatization is inconsistent with the purpose of the civil service laws (i.e., to provide full civil service protections to everyone performing a traditional state function).[124]

Other state courts have not found civil service laws to bar privatization, but have held that such laws impose significant restrictions on contracting out state-provided services, and impede

---

120  *See* Nancy Buonanno Grennan, Note, *A Legal Roadmap to Privatizing Government Services in Washington State*, 72 Wash. L. Rev. 153, 157-59 (1997).

121  *See Moore v. Department of Transp. and Pub. Facilities*, 875 P.2d 765, 771 (Alaska 1994); *In re Local 195, Int'l Fed'n of Prof'l and Technical Employees*, 443 A.2d 187, 193 (N.J. 1982); *Conn. State Employees Assn. v. Board of Trustees of the Univ. of Conn.*, 345 A.2d 36, 40 (Conn. 1974); *Kiger v. Nixon*, 1996 WL 512031, at *7 (Tenn. Ct. 1996); *Mich. State Employees Assn. v. Civil Serv. Comm'n*, 367 N.W.2d 850, 852 (Mich. Ct. App. 1985) *(per curiam)*.

122  *See id.*

123  *See Colo. Assn. of Pub. Employees v. Dept. of Highways*, 809 P.2d 988, 995 (Colo. 1991) (*en banc*); *Wash. Fed'n of State Employees v. Spokane Community College*, 585 P.2d 474, 476 (Wash. 1978) *(en banc)*.

124  *See id.*

privatization.[125] For example, courts have held that a state can privatize a traditional government function if a public entity controls the private contractor, or the privatization is not a subterfuge to evade civil service laws or an arbitrary or capricious reorganization.[126] Ultimately, whether civil service laws impede or bar privatization seems to depend not on specific constitutional or statutory language but rather on a court's policy choice between purported cost savings and civil service protections for everyone performing a traditional government service. In any case private contractors will need, in practical terms, to devise attractive inducements to persuade civil servants to move over to the private sector.[127]

## B. The Significance of Private Correctional Firms' Independent Contractor Status

Once initial impediments to contracting out correctional services have been addressed, it remains to analyze a private contractor's responsibilities relative to employment and labor relations obligations. The contractor's status as an independent contractor bears significantly on such questions.

As an independent contractor, a prison management company would retain full authority and responsibility for establishing, maintaining, and/or modifying the wages, hours, and working conditions of its employees, including a presumptive right to select and hire its own complement of employees. A different result would obtain if public correctional authorities retained significant control over basic employee relations. In that case, the corrections firm and public authorities would be considered "joint employers" with important ramifications for employment and labor relations obligations. In brief, as a joint employer, a firm does not have unfettered discretion over a wide range of personnel issues. Many observers of privatization believe that many of the benefits of privatization may be lost if government retains significant control over a private firm's personnel issues.

From the standpoint of employment law, a private corrections firm with independent contractor status would have to comply with all legal standards that apply to private industry, including the Fair Labor Standards Act (FLSA),[128] the Service Contract Act if applicable (providing for the payment of prevailing wages by government contractors with service contracts with the federal government or the District of Columbia),[129] and a host of other applicable employment laws, including

---

125 See State ex rel. Sigall v. Aetna Cleaning Contractors, Inc., 345 N.E.2d 61, 65 (Ohio 1976) (per curiam); University of Nev. v. State Employees Assn., Inc., 520 P.2d 602, 606-07 (Nev. 1974); Ball v. Board of Trustees of State Colleges, 248 A.2d 650, 654 (Md. 1968); Crowin v. Farrell, 100 N.E.2d 135, 139 (N.Y. 1951).

126 See id.

127 These could include special retirement buyouts and other incentive packages. In some cases, contractors have offered special annuity plans for senior public officials nearing retirement, while ensuring that other employees can, at a minimum, roll over their retirement benefits to the maximum extent possible.

128 29 U.S.C. §§ 201-219. The FLSA requires employers to pay their employees a minimum hourly wage and overtime compensation at the rate of one and one-half times their regular hourly wage for work in excess of 40 hours per work week.

129 41 U.S.C. §§ 351-358. The Act requires contractors to pay their employees wages and benefits that either meet or exceed the levels that are "prevailing .... in the locality" as determined by the Secretary of Labor, or that are determined by a collective bargaining agreement. 41 U.S.C. §§ 351(a)(1), (2).

Case 3:16-cv-02267   Document 383-15   Filed 01/22/21   Page 7 of 17 PageID #: 18589

MARLOWE_0007192

laws on discrimination and possible affirmative action requirements. The contractor would also be responsible for meeting any additional personnel or employment requirements that the contracting agency may have included in an RFP. These could embrace a number of fundamental standards promulgated by the American Correctional Association. In general, however, these ACA Standards for Adult Correctional Facilities (hereinafter "ACA standards") tend to be generic, requiring the contractor to have policies regarding various personnel issues, but not addressing their content.[130] It is likely that a privatizing public corrections agency would seek to develop tailored contractual requirements for personnel issues at a particular facility, including specific guidelines to ensure that the contractor does not achieve cost savings through unreasonable personnel practices.

Genuine independent contractor status also has important implications for a private corrections management firm's labor relations obligations. So long as a firm is not a "joint employer," it will qualify as an "employer" subject to the National Labor Relations Act (NLRA) and therefore as an entity with whom employees can potentially collectively bargain and hold the right to strike.[131] Indeed, since the landmark decision of the National Labor Relations Board (NLRB) in *Management Training Corp. and Teamsters, Chauffeurs, Warehousemen, and Helpers of America, Local 222*,[132] -- a decision explicitly supportive of flexibility in privatization scenarios -- virtually any government contractor can so qualify as an "employer," even if a contracting government agency retains some control over wages, benefits and other essential personnel matters.[133] The determination is essentially up to the contracting parties. As such, the private contractor's employees will presumptively not be considered "public employees" subject to special public labor regulatory authorities and potentially barred from striking under federal or state law.[134] Rather, they will

---

130 American Correctional Association Standards for Adult Correctional Institutions (3d ed. 1993 & 1998 Supp.) ACA standards require such basic policies as confidential personnel records, annual performance reviews, appropriate ethics rules, and a personnel policy manual covering all major aspects of personnel organization, qualifications, hiring, training, evaluation, promotion, termination, and dispute resolution. *See* ACA Standards 2-4054-4078. Only wages are addressed in terms of substance: "Compensation and benefit levels for all institution personnel are comparable to similar occupational groups in the state or region." ACA Standard 2-4064.

131 The NLRA has no jurisdiction over public entities. 29 U.S.C. § 182.

132 317 N.L.R.B. 1355 (1995)

133 Until this case, the NLRB had long held, pursuant to the case of *Res-Care, Inc.*, 280 NLRB 670 (1986), that a firm would not be subject to the NLRA if an "exempt entity" -- like a public agency -- had significant control over, and final approval of, wages and benefits. With *Management Training Corp.*, the NLRB decided that the prior test was unduly restrictive of possible privatization arrangements, and it would allow private contractors and their employees to determine for themselves whether collective bargaining could address any number of terms and conditions of employment, including wages. It specifically noted that government approval of wage packages left considerable room for private employer flexibility, including possible scenarios where a private employer might absorb certain costs itself without passing them on to the government. This more flexible, open standard has since been repeatedly upheld. *See, e.g., Teledyne Econ. Dev. v. NLRB*, 108 F.3d 56 (4th Cir. 1997); *Pikeville United Methodist Hospital of Kentucky, Inc. v. United Steel Workers of America*, 109 F.3d 1146 (6th Cir. 1997); *Landscape & Property Management, Inc. and Service Employees Int'l Union*, 324 NLRB No. 44 (1997).

134 Unlike private employees, public employees do not ordinarily have a right to strike. Federal employees are completely barred from striking under 5 U.S.C. § 7311, and are subject to criminal penalties for violation of the statute. *See* 18 U.S.C. § 1918. Also, federal employees may only join "labor organizations" that are defined to expressly exclude organizations that participate in strikes against a government agency. 5 U.S.C. § 7103. State employees, meanwhile, are usually subject to the same kinds of provisions, although as many as eleven states have now created specific exceptions to the general rule that allow certain classes of public employees to strike. *See* J. Fisher, *Reinventing a Livelihood: How United States Labor Laws, Labor-Management Cooperation initiatives, and Privatization Influence Public Sector Labor Markets*, 34 Harv. J. Legis. 557 (1997). Still, virtually all states have retained clear

Appendix 3                                                                                   Private Prisons                                                                                  29
Case 3:16-cv-02267     Document 383-15     Filed 01/22/21     Page 8 of 17 PageID #: 18590

MARLOWE_0007193

constitute private employees who are subject to the broad exclusive jurisdiction of the NLRA and able to exercise the full panoply of rights under the Act. The major implications of NLRA coverage, including employees' right to strike, are discussed below.

## C. Effects of Privatizing an Existing Unionized Facility

If a private prison contractor assumes control of an entirely new facility, it will be subject to the NLRA and will not be permitted to interfere with any concerted activities taken by its employees. Even if a private firm takes over an existing public facility, however, it is unlikely that the employer will have to collectively bargain with an existing union or be bound by an existing collective bargaining agreement.

Under the NLRA, if a private firm is awarded a public contract, substantially maintains the operations of the predecessor public institution and hires a majority of its correctional officer work complement from the unionized workforce, the contractor can be considered a "successor employer" with an obligation to bargain with the current union representative.[135] This requirement can exist even where the original bargaining obligation may have arisen under a state or other public employees labor regulatory authority, rather than the NLRB.[136] A firm's duty to bargain arises as soon as a "substantial and representative complement" of its workforce is in place.[137]

Despite this general presumption, no bargaining obligation should generally arise in any private company takeover of a public correctional facility. The reason is that in almost all prison privatization scenarios, the incumbent public employees' union will not be able to represent prison guards in a private employment setting. Under the NLRA, "no labor organization shall be certified as the representative of employees in a bargaining unit of guards if such organization admits to membership....employees other than guards."[138] In other words, only special guards unions -- such as the United Plant Guard Workers of America -- can represent prison guards under the NLRA.[139] In a prison privatization context this means that a union with a more diverse membership that previously

---

prohibitions against strikes by employees whose functions are essential to the public welfare, a category that would include pr ison employees. *Id.* at 572-73. Only Ohio appears to permit "non-safety" public employees to strike. *See* Ohio Rev. Code Ann. § 4117.01-4117.23.

135  *See NLRB v. Burns International Security Services, Inc* ., 472 U.S. 272 (1972). *See also Fall River Dyeing & Finishing Corp. v. NLRB,* 482 U.S. 27 (1987).

136  *See Base Services, Inc.,* 296 NLRB 172, 174-75 (1989) (NLRB not precluded from finding successorship merely because predecessor employer not covered by the NLRA); *Harbert International Services,* 299 NLRB 472, 476 (1990) . Still, there is some question about this requirement if, as in the case of most public labor agreements, there is no successorship clause.

137  *See Fall River Dyeing & Finishing Corp., supra* note 135, at 51-53. The duty to bargain would arise upon the private contractor taking over operations if it was "perfectly clear," even before the contractor, as successor, hired its full complement of empl oyees, that it was going to employ a majority of the predecessor's employees. *See Kingswood Services,* 302 NLRB 247 (1991).

138  NLRA § 9(b)(3), 29 U.S.C. § 159(b)(3).

139  Corrections officers have been deemed "guards" for purposes of the NLRA. *See Crossroads Community Correctional Center,* 308 NLRB 558 (1992). The reason for this provision is to prevent conflicts of interest from developing in situations involving, am ong other things, employee theft or deceit, where guards could find themselves as witnesses testifying against fellow union members .

Case 3:16-cv-02267   Document 383-15   Filed 01/22/21   Page 9 of 17 PageID #: 18591

MARLOWE_0007194

represented public correctional officers -- i.e. a union representing many kinds of employees, such as the American Federation of State, County, and Municipal Employees (AFSCME) -- *cannot* be certified as a bargaining representative under the NLRA when a private contractor assumes operational control of a correctional facility. An obligation to bargain collectively with the workforce would only materialize upon an appropriate *new* guards union being selected by the employees and certified under the NLRA.

Even in the extremely rare case that guards at a public facility are already represented by a special guards union, a private contractor will not necessarily be bound by the substantive provisions of the existing labor contract. This is true even if a prison management firm states that it may make employment opportunities available to all existing correctional officers at a facility. So long as the firm expressly reserves the right to establish initial terms and conditions of employment as well as initial job assignments, it will not be required to adopt the terms of the current labor agreement.[140] Indeed, only if the company were to indicate explicitly and affirmatively that it would hire most of the correctional officer workforce at a facility -- or alternatively, would explicitly consent to be bound by the existing guards' collective bargaining agreement -- would an extant labor contract be imposed on the firm.[141] The private contractor will have to determine what kinds of statements and actions it will take toward the hiring of existing correctional officers, and carefully articulate whether it will be establishing new terms and conditions of employment.[142] Under these circumstances, it will be quite rare that a new prison contractor taking over existing facilities will have an obligation either to bargain collectively, or abide by the terms of the existing collective bargaining agreement.[143]

## D.  The Right to Strike

Any employees covered by the NLRA possess the right to strike. Though the right is not absolute -- there exists no constitutional right to strike for public or private employees[144] -- the extension of NLRA coverage to a wide variety of possible private contractors in the wake of the *Management Training* decision means that the right to strike becomes a presumptive right of prison guards at privatized correctional facilities. In fact, the NLRB has upheld the right of private prison

---

140  *See, e.g., United States Can Co.,* 304 NLRB 1127 (1992).

141  *See NLRB v. Burns Int'l Security Services, supra* note 135. Although a successor employer may be found to "constructively adopt" a predecessor contract through particular actions or conduct, merely retaining a particular provision of the predecessor contract that was required by law does not constitute "adoption." *See, e.g., EG & G Florida, Inc.,* 279 NLRB 444, 453 (1986) (paying prevailing wages as required by statute and provided for in predecessor contract does not constitute "adoption" of such contract).

142  Whether these legal doctrines applicable to successorship situations represents good public policy or not is open to debate by labor and corrections specialists, but its practical implications appear quite clear. Nevertheless many observers may be displeased by the degree to which successor employers can keep existing unionized employees in a state of turmoil and limbo as new operations and policies are put into place prior to a substantial and representative complement of employees being deployed. Moreover, more generally, as with the debate about out-sourcing correctional management in the first place, see section IV.A, *supra,* many may view the avoidance of a civil service regime as a sure way to eliminate the training, professionalism, and *esprit de corps* that may characterize certain public corrections departments.

143  It will however, need to permit public union access to the facility if there are public, unionized employees operating a prison industry on-site.

144  *See United Federation of Postal Clerks v. Blount,* 325 F. Supp. 879 (D.D.C. 1971).

Case 3:16-cv-02267    Document 383-15    Filed 01/22/21    Page 10 of 17 PageID #: 18592

MARLOWE_0007195

guards to strike on at least one occasion in the case of *U.S. Corrections Corp. and United Plant Guard Workers of America*.[145] There, the Board found that guards were entitled to go on strike at a minimum security institution without perimeter fences or guard towers, and simply with unarmed guards on duty.

An important question remaining in the wake of the *U.S. Corrections Corp.* case is whether the NLRB would decline to exercise jurisdiction -- and by extension, permit the right to strike -- at a more secure facility. This question remains unanswered, but significantly, the Board has assumed jurisdiction and permitted strikes at other types of facilities that involved public safety concerns. For example, in *NLRB v. E.C. Atkins & Co.*, the Board exercised jurisdiction over private guards at a defense plant who served as civilian auxiliaries to the plant's military police. In *Career Systems Development Corp.* and *Correctional Medical Systems*, the Board similarly acknowledged guards' right to strike in situations involving a juvenile correctional facility and security services provided to the United States Coast Guard and U.S. Navy, respectively.[146] While the Board or a court might conceivably determine in a given case involving a medium or maximum security facility that matters of public security warranted a decision to decline jurisdiction, this seems unlikely to evolve as a general principle. If correctional authorities seek to limit the right to strike by guards, they will do better to turn to two practical mechanisms discussed below -- no strike clauses in labor contracts, and mandatory notification and strike delays accompanied by binding arbitration.

1. **No-Strike Clauses**

Even if private prison employees enjoy the right to strike, a private prison contractor can seek to have the employees agree, individually, or collectively (in a labor contract) to the incorporation of a no-strike pledge. Unions often agree to the inclusion of such clauses in labor contracts in return for a management agreement to seek peaceful settlement of contract disputes through an agreed-upon grievance procedure extending to third-party arbitration if necessary.[147] As one court has noted, "a no-strike obligation, express or implied, has been seen as the *quid pro quo* for a grievance arbitration agreement."[148] Consequently, an employer can seek to enjoin any strike in violation of a no-strike pledge.[149]

2. **Strike Notification/Mandatory Delays**

Either due to the expiration of a labor contract or the refusal of a union to agree to a no-strike clause, private correctional employers may also seek to negotiate other special provisions to blunt the

---

145  304 NLRB 934 (1991)
146  *See Champlain Security Services*, 243 NLRB 755 (1979); *Career Systems Development Corp.*, 301 NLRB 59 (1991).
147  The BOP's Taft RFP provides that any collective bargaining agreement entered into during the period of the contract "should provide that grievances and disputes involving the interpretation or application of the agreement will be settled without resor ting to strike, lockout or other interruption of normal operations." Taft RFP at 14.
148  *AFSCME v. Executive Dept.*, 52 Ore. App. 457, 479, 628 P.2d 1228, 1242 (1980), citing *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 455 (1957); *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235 (1970).
149  *See Boys Markets, Inc., supra.*

impact of a potential strike on prison operations.[150] First, in the case of contract expiration, the parties may agree to use their best efforts to reach an early and peaceful settlement to any labor dispute that might arise in the interim. Whether or not a contract had expired, the parties might also agree to a notice provision that would potentially allow the private contractor to make arrangements for an impending dispute, including arrangements for notify in a public corrections authorities of the dispute and enabling the latter to prepare to assume possible operation of the facility in the event of an actual strike.[151] Some prison contractors have reportedly also stated that they can enter into special emergency preparedness agreements with government authorities to permit the National Guard to intervene in a timely manner. While this scenario is hardly a congenial one -- relocating replacement guards, supervisors, medical staff, etc. from public corrections facilities to unfamiliar (and sometimes remote) institutions on relatively short notice[152] -- it represents the best that corrections officials can expect in the absence of a no-strike agreement.

---

[150] *See* Robbins, The Legal Dimensions of Private Incarceration, *supra*, at 310-11.

[151] *See id.* Robbins suggests a 60-day notice period in cases where a labor agreement is set to terminate, and immediate notification upon an employer learning of a potential dispute.

[152] This could prove even more difficult if privatization expands and there are fewer available public correctional employees to assume key positions on short notice.

# 5. Inmate Labor Questions

The question of inmate labor, though it constitutes a fairly straightforward area of the law, reverberates with the controversial legacy of an earlier era in American history where the shameful treatment of private prison labor ultimately provided a major impetus for the modern public corrections movement. Today, the federal government and most states have in place a regulatory scheme that simultaneously guards against inmate exploitation while ensuring that prison-generated products and services do not gain an unfair competitive foothold in the marketplace. Against this backdrop, it does not appear that privatized corrections would raise any significant legal issues.

## A. Constitutional Dimensions

The Thirteenth Amendment to the U.S. Constitution excepts convicted prisoners from its bar against "involuntary servitude."[153] Courts continue to recognize this "convict labor exception," upholding laws mandating prison labor, and finding no constitutionally protected right not to work, or right to reimbursement.[154] Because prison labor has been found under the 13th Amendment to be an acceptable component of punishment, only pretrial detainees are protected from involuntary labor.[155] Meanwhile, the courts have not viewed the Eighth Amendment's prohibition against "cruel and unusual punishment" as providing an obstacle to prison labor per se, or a basis for redress of inmate claims of unfair working conditions.[156]

While it may be possible to imagine policy grounds on which to mount a Thirteenth Amendment objection to inmate labor at privatized facilities based on potential financial incentives for abuse,[157] it is not clear whether these arguments would find a receptive audience in the courts. Even in the event that private prisons were given the freedom to profit from inmate labor -- something not envisioned at present (see below) -- it is unclear whether the Thirteenth Amendment would directly speak to the problem at issue.[158]

---

153  U.S. CONST., Amend. XIII.

154  *See, e.g., Berry v. Bunnell*, 39 F.3d 1056 (9th Cir. 1994).

155  *See, e.g., Channer v. Hall*, 112 F.3d 214 (5th Cir. 1997).

156  *See, e.g., Ray v. Mabry*, 556 F.2d 881 (8th Cir. 1977); *Woodall v. Partilla* 581 F. Supp. 1066 (N.D. Ill. 1984).

157  *See* I. Robbins, The Legal Dimensions of Private Incarceration, *supra*, at 125.

158  The theory in favor of a Thirteenth Amendment objection would likely be that for-profit facilities would have financial incentives to exploit inmate workers, and particularly to conceive of ways to keep inmate workers incarcerated. Ultimately, the profit orientation would be seen to overwhelm the penological justification for incarceration of which prison labor is a subordinate part. Still, it is unlikely that for-profit prison labor would ever be permitted to become a dominant part of the correctional environment and it is unclear how useful the Thirteenth Amendment would be as a bar to this phenomenon. It should be remembered that it was labor movement and business community pressure to eliminate cheap prison labor (i.e., the cold logic of economics), not the Thirteenth Amendment and human rights concerns, that led to the elimination of private corrections facilities during the early part of this century.

## B. Federal prisons and inmate labor

For decades, Congress has delegated the management of federal prison labor to a governmental corporation known as Federal Prison Industries ("FPI") or "Unicor." Unicor's mandate is to provide employment for all physically fit inmates, so far as practicable. Currently, Unicor employs roughly 20% of all federal inmates in some hundred or so individual operations (two or more may be located at a particular correctional facility). It can, however, only operate under a "state use" principle, whereby products and services are sold solely to federal departments and agencies and not to the public in competition with private enterprise.[159] Moreover, because they are not working voluntarily, *prisoners are not deemed to be "employees" under the Fair Labor Standards Act, and are not entitled to receive minimum wage*.[160]

Privatization of federal facilities with Unicor operations should not face major difficulties, assuming jurisdictional lines are properly drawn. In the context of the federal regulatory framework, federal prisons are prohibited from contracting out prison labor to "any person or corporation."[161] This provision is interpreted to bar both the leasing of prison labor or the relinquishing of control of Unicor industries to any private entity. A private federal prison would therefore require either a 'carve-out' of Unicor facilities -- which would need to continue to be operated by the federal government -- or a legislative change to the applicable statutory impediment, 18 U.S.C. § 436. While the need for continuous, coordinated interaction between federal and private management systems might otherwise seem to create administrative difficulties that could undercut the purported overall cost benefits of privatization, in fact such administrative integration has not proven a deterrent.[162]

## C. State Prisons and Inmate Labor

Each state has different laws governing inmate labor. Some distinguish between county and state prisoners and specify in detail the kinds of work that they may perform.[163] Others are more vague. To prevent inmate exploitation, as well as to mollify private business and labor interests concerned about uncompetitive impacts, many states prohibit the use of prisoners in the private sector.[164] In virtually all cases, these statutes were intended to reach situations where prisoners are

---

159 Moreover, even in the context of sales to the federal government, Unicor must operate its shops in such a way that no private industry shall be forced to bear an undue burden of competition from the prison-made products and services.

160 *See, e.g., Vanskike v. Peters*, 974 F. 2d 806, 810 (7th Cir. 1992), *cert. denied*, 507 U.S. 928 (1993); *Nicastro v. Clinton*, 882 F. Supp. 1128 (D.D.C. 1995), *aff'd* 84 F.3d 1446 (D.C. Cir. 1996).

161 18 U.S.C. § 436.

162 A "carve out" of this nature is precisely the arrangement adopted at the Bureau of Prisons Taft facility. See Taft RFP at 4- 5.

163 *See, e.g.,* Fla. Stat. § 951.01 (1987) and Fla. Admin. Code § 33-8 (1987) (convicted county prisoners can be employed at a facility, on public works projects, or on projects that benefit a county or municipality); Fla. Stat. §§ 946.002, 946.40 (1987) and Fla. Admin. Code. § 33-3.017 (1987) (state Department of Corrections ("DOC") prisoners may be used to perform prison labor, as well as contracted out to other government agencies, political subdivisions, and nonprofit corporations for use in public works project s, with compensation to be determined by DOC rules).

164 *See, e.g.,* Fla. Stat. § 951.10 (1997).

used to produce commercial goods for sale (including instances where prison labor is leased out to private for-profit businesses), not where they are tasked with prison maintenance or service work.

Whatever the particular construction of state rules, the federal government has significantly preempted local legislation in this area by generally restricting the flow of prison products and services in commerce. Thus, the Sumners-Ashurst Act[165] makes it a federal offense to transport prisoner-made goods in interstate commerce -- thereby restricting the use of prison labor to the state or non-profit sector. More recently, though, the Prison Industry Enhancement (PIE) Act of 1994 explicitly permits prison-made goods from 50 non-federal pilot programs to be sold in interstate commerce if the prisoners used at such facilities participate voluntarily, receive prevailing or minimum wages, and are covered by workers' compensation.[166] It is unclear to what degree increasing prison privatization and potential use of inmate labor will have on federal and state regulation. Certainly state correctional authorities and private prison contractors can apply for PIE Program certification, which, if granted, will require inmates to be adequately remunerated in a PIE Program, based on specific guidelines.

Meanwhile, even if state laws prohibiting the contracting out of prison labor to 'private interests' are deemed not to address the situation where a private corporation takes over the operation of an entire correctional facility, concerns will persist about potential exploitation of inmates in *ordinary prison maintenance jobs*. Will inmate labor increasingly be used by private for-profit contractors to handle more aspects of prison operation -- substituting for tasks traditionally performed by government employees in public correctional settings?

The latter scenario could raise significant questions about private companies' commitment to prison welfare rather than their own bottom line. These companies' profit margins are known to be quite modest. All of them, particularly those whose stock trades in public markets, confront quarterly pressures to show improving profits. The temptation to save on certain prison maintenance costs through targeted use of inmate labor could make it hard to distinguish between normal prison labor undeserving of special protection, and work specifically helping prison contractors meet their profit targets. Lines between these should not be too difficult to draw,[167] but public policy should ensure that inmate work responsibilities are non-exploitative and are properly accounted for, and reflected in, lower per diem rates charged to the government by private contractors.

---

165 18 U.S.C. § 1761.

166 18 U.S.C. § 1761(c). For a detailed examination of the PIE Program, see Note, *Factories with Fences: An Analysis of the Prison Industry Enhancement Certification Program in Historical Perspective*, 33 Am. Crim. L. Review 411 (1996). Note that ordinarily, states exclude state inmates from minimum wage and workers' compensation coverage. *See, e.g.,* Fla. Stat. § 946.002(5) (1996). *Kofoed v. Industrial Commission of Utah*, 872 P. 2d 484 (Utah 1994) (no workers' compensation coverage).

167 Contractors may be required to "build up from the bottom" their costs for each maintenance position and justify the use of p rison labor therefore. One easy way to draw lines is use the same inmate staffing plans for private prisons that are used in public facilities. This creates a level playing field and allows for relatively easy cost comparisons. This is the contractual approach taken by the Commonwealth of Virginia, *see, e.g.,* CCA-Va. Contract at § 4.27, p. 24 ("contractor will be allowed to use Inmate labor for facility operations and maintenance to the same extent Inmate labor is utilized in department facilities. However, *Contractor shall not receive a direct financial benefit from the labor of Inmates*") (emphasis supplied). Still, if this method is not used, line-drawing may be complicated by differing notions of what constitutes 'normal' or traditional areas of inmate maintenance responsibilities w ithin a 'traditional' prison, as well as varied opinions about what qualifies as an acceptable threshold of non-exploitative 'basic' wo rk functions for inmates.

# 6. Other Important Legal Issues

A number of other legal issues have important implications for correctional privatization. These include public access to private prison records, private contractor access to criminal history records, the impact of bankruptcy laws on a possible private contractor insolvency, private contractor use of force, and contractors' environmental responsibilities and liabilities. These topics receive brief treatment in turn.

## A. Access to Private Prison Records

As government correctional authorities move to privatize one or more prison facilities, concerns have emerged that the public may lack access to private prison records under state or federal freedom of information acts. The shift to private prisons is viewed as potentially cutting off a major source of information necessary for proper public accountability. While public prison officials have traditionally sought to limit the types of records obtainable through freedom of information act requests, a more fundamental impediment to records access due to privatization would both frustrate the purpose of such acts and undermine public confidence in prison systems that undertake privatization initiatives. While a review of the impact of privatization on state public records legislation lies beyond the scope of this report due to the number and variety of such statutes, this section seeks to examine this general issue by focusing, by way of example, on the federal context, i.e., the degree of accessibility to federal private prison facility records afforded by the federal Freedom of Information Act (FOIA).[168]

Based on accumulated case law interpretation, a number of fundamental records access questions have reached a certain level of clarity over the past decade. First, not surprisingly, records relating to privatized facilities that the U.S. Bureau of Prisons itself generates and holds in its possession would be subject to FOIA disclosure. Private prison operators, as mere federal contractors, however, would not be directly subject to FOIA, since they would not find themselves subject to the kind of day-to-day supervision by the BOP necessary to characterize them as part of a federal "agency."[169] As to private prison records generated specifically *for* the BOP by a prison contractor, they would be presumptively accessible under FOIA only if they were actually *obtained and held* by the BOP at the time of the FOIA request.[170]

Even if private prison records are accessible by virtue of their retention by BOP, a key FOIA exemption might limit disclosure of certain types of information. Exemption Four of the FOIA protects from disclosure privileged or confidential "financial or commercial information."[171]

---

168  5 U.S.C. § 552.

169  *See Forsham v. Harris*, 445 U.S. 169, 180 n. 11 (1980) (research funded by the Dept. of Health, Education and Welfare and supervised by the Food and Drug Administration did not constitute "substantial federal supervision" triggering FOIA requirement s); *Public Citizen Health Research Group v. Dept. of Health, Education & Welfare*, 668 F.2d 537, 554 (D.C. Cir. 1981) (agency contracts mandating numerous requirements for privatized medical peer review group does not render private entity an "agency" f or FOIA purposes).

170  *See Department of Justice v. Tax Analysts*, 492 U.S. 136 (1989).

171  5 U.S.C. § 552(b)(4).

Case 3:16-cv-02267    Document 383-15    Filed 01/22/21    Page 16 of 17 PageID #: 18598

MARLOWE_0007201

Confidential commercial or financial information has in turn been interpreted to constitute data "of a kind that would customarily not be released to the public by the person from whom it was obtained."[172] Even if such information is voluntarily provided to the BOP by private contractors, it can be withheld by the BOP for no reason other than its confidential nature.[173] Meanwhile, if transmission of information of this nature is compelled by statute or contract, the BOP could still prevent disclosure if either the agency would find it hard to obtain the information in the future or disclosure might cause "substantial harm to the competitive position" of the private contractor in question.[174]

How these FOIA doctrines -- and potential state law analogues patterned generally on them -- would affect the general flow of private prison information to the public remains somewhat uncertain. Certainly, if there is to be maximum public scrutiny of private prison operations, the BOP and other public correctional authorities would want to compel contractually the production of, and retain, the widest variety of private prison records consistent with physical and information management constraints. This would result in at least certain key types of information being regularly collected and retained.[175] At the same time, considerable portions of the overall information obtained might end up being withheld if it were interpreted by the agency to constitute confidential financial or commercial information. A flexible interpretation of the latter might extend to a variety of supposedly "commercially relevant" information covering staffing and procurement -- i.e., well beyond such customarily withheld data such as sensitive cost information contained in proposals submitted in response to RFPs.

Because public oversight might suffer under the foregoing defects even if public officials mandated the collection of voluminous private prison records, one commentator has suggested the adoption of federal legislation to expand disclosure.[176] A more practical and congenial option, employed by the BOP, is to subject a private contractor *contractually* to FOIA requirements.[177] While this kind of solution addresses the critical problem of public agency retention of the records in question, the fact is that privatization itself may continue to shield from disclosure many kinds of privately-generated, "confidential" information that might otherwise be available for public scrutiny if produced by a public corrections department.

---

172 *Critical Mass Energy Project v. Nuclear Regulatory Commission*, 975 F.2d 871 (D.C. Cir. 1992) (*en banc*), *cert. denied*, 507 U.S. 984 (1993), quoting *National Parks and Conservation Association v. Morton*, 498 F.2d 765, 766 (D.C. Cir. 1974).

173 The reasoning is that the flow of information of this kind that is voluntarily provided to an agency might dry up if it were released to the public, or information might end up being less candid and accurate. *See Critical Mass Energy Project*, 975 F.2d at 879-80.

174 *Id. at* 878. This justification is frequently cited by public officials in shielding from disclosure financial and other commercial information submitted by private contractors in response to an RFP.

175 Even a fairly selective information collection mandate would have to steer a difficult course between information overload on the one hand and significant blind spots in agency and public oversight on the other. *See* N. Casarez, *Furthering the Accountability Principle in Privatized Federal Corrections: The Need for Access to Private Prison Records*, 28 U. MICH. J. L. Reform 249, 293-96 (1995) (noting the enormous burdens that a comprehensive records delivery program would place on the public agency).

176 *See id.* at 196-301. Casarez would have federal legislation mandate that all prison records created and maintained by private companies be subject to FOIA. The processing of FOIA requests could continue through the channels already in place at the public agency, but the costs of processing the additional requests could be allocated under the privatization contract with the private prison operator.

177 *See* Taft RFP at 17-18.