# EXHIBIT D
## Part 13 of 14

## B. Private Contractor Access to Criminal History Records

To perform its prison management duties properly, private correctional contractors need access to criminal history records for two purposes: (1) to classify inmates properly and take other steps for the proper safety and care of prisoners; and (2) to screen potential private correctional employees. By implication, both of these needs affect the privacy rights and expectations of inmates and private citizens seeking employment in the field of law enforcement and corrections. As it turns out, there exist two related, but distinct legal regimes at the federal level that safeguard these privacy rights. The federal mechanisms established to permit transfer of selected federal criminal history records information ("CHRI") to private firms such as private prison contractors represent a compromise between full disclosure and heavily redacted or edited data that would hamper the contractors' ability to perform their contractual obligations. At the state level, the policies are governed by state law, which reflects varied approaches too numerous to summarize within the scope of this report. At least some of the mechanisms at the state level, however, roughly parallel those employed by federal authorities.

The regime governing the sharing of federal CHRI for law enforcement and corrections purposes is governed by regulations found at 28 C.F.R. Part 20. These address functions related to the "administration of criminal justice." Under 28 C.F.R. § 20.31, the Department of Justice empowers the Federal Bureau of Investigation to operate a National Crime Information Center ("NCIC"), which is able to link local, state, and Federal criminal justice agencies for the purpose of exchanging NCIC-related criminal history information. Pursuant to 28 C.F.R. § 534, and 20 C.F.R. § 20.21(c)(5), the NCIC is able to share full criminal records information with these law enforcement bodies. Those agencies, however, may only summarize or characterize that information if they transmit it to private entities like prison management companies for law enforcement or correctional purposes (such as inmate classification).[178] While access to such information has not appeared to be a problem for private contractors in terms of the quality or promptness of the information provided, private contractors may ultimately benefit from planned revisions to the federal regulations that acknowledge the growth of privatization and that will make more CHRI available to government contractors directly.[179]

A separate federal regulatory regime governs the use of CHRI for uses unrelated to "the administration of criminal justice," which includes employment screening. Since the 1971 decision in *Menard v. Mitchell*[180] and the 1972 passage of legislation in P.L. 92-544,[181] CHRI can only be used for employment screening and licensing purposes pursuant to state and local statutes or regulations that are certified by the FBI's Criminal Justice Information Division, Access Integrity Unit, and that are

---

178  28 C.F.R. §§ 20.21(b)(3), (c)(3). Transfer of information to private entities such as private prison contractors can only oc cur "pursuant to a specific agreement with a criminal justice agency to provide services required for the administration of crimina l justice pursuant to that agreement. The agreement shall specifically authorize access to data, limit the use of data to purpose s for which given, insure the security and confidentiality of the data consistent with these regulations, provide sanctions for viola tion thereof." 28 C.F.R. § 20.21(b)(3).

179  Legislation is reportedly being developed to accomplish these objectives.

180  328 F. Supp. 718 (D.D.C. 1971) (disclosure of criminal suspect's arrest record for employment purposes enjoined).

181  P.L. 92-544 is not codified.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 2 of 15 PageID #: 18601

MARLOWE_0007203

administered by designated state and local agencies. Generally, disclosure parameters are narrowly drawn for the specific purposes involved. Here too, private prison contractors appear to have had few problems in obtaining all relevant CHRI necessary for hiring correctional officers. On the other hand, reports have surfaced of problems with the speed with which such information is transmitted, prompting some private contractors to "end run" the regulations by asking public correctional authorities to make CHRI requests on their behalf.

State regulation of CHRI is too diverse to summarize easily. Suffice it to say that while many of the fundamental principles utilized in the federal scheme are recapitulated at the state levels. To take just one example, Florida has a general statute providing that upon the furnishing of identifying information, "persons in the private sector" may obtain criminal history information -- but not direct records information -- "upon tender of appropriate fees."[182] For employment screening purposes, Florida law requires all private correctional officers to submit to fingerprint and background checks, and all counties and private entities running incarceration facilities are entitled to CHRI provided that they are not the direct recipient of criminal records.[183] Although most states will ensure the availability of CHRI,[184] one alternative to having private contractors seek the information -- with its possible attendant bureaucratic delays -- is to have government corrections authorities retain some or all screening duties. Under the BOP Taft RFP, for example, the BOP conducts key criminal background and records checks. This would operate to maintain consistent screening procedures.[185]

## C.  Bankruptcy

Of the many topics mentioned in connection with correctional privatization, few seem to generate as much concern and controversy as bankruptcy. Yet, as discussed below, these concerns appear greatly exaggerated. Since privatization became a reality in the mid-1980s, many observers have worried that the security-oriented, politically sensitive nature of the corrections business would make it especially difficult for a government to grapple with a private contractor bankruptcy and ensure a smooth transition to a successor arrangement. They especially worried about the potential for a serious interruption in the provision of correctional services pending the engagement of a new or reorganized provider, as well as the loss of contractual control that government authorities might suffer in the formal bankruptcy process if it were invoked. These concerns have persisted to some extent, even though governments can, as discussed below, protect themselves with certain contract termination clauses and even though private contractor bankruptcies have been very rare.[186]

---

182  Fla. Stat. § 943.053(3).

183  Fla. Stat. § 951.063.

184  *See generally* U.S. Dep't of Justice, Compendium of State Privacy and Security Legislation: 1997 Overview  (1998).

185  *See* Taft RFP at 11-12.  Of course, the government would have to bear the liability for any mistakes omissions in the screening process. Also, the government would have to determine whether to offset any costs under the contract as a result of undertaking   this work.

186  Bankruptcies have been virtually non-existent except in the case of companies that have concentrated on building prisons on   a speculative basis.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 3 of 15 PageID #: 18602

MARLOWE_0007204

In fact, the bankruptcy of a private prison contractor should not in most instances pose any insuperable problems for the responsible public entity, especially if the prison is owned by the government. Of course, a good public correctional authority that has carefully selected a private service provider based on a thorough investigation of its capabilities and financial status (and that has properly monitored its contract with that provider) should not have to face a provider bankruptcy in the first place, at least not without sufficient advance warning to permit contract termination and other contractual arrangements to be made. Annual financial investigations provide a baseline for monitoring, while interim signals, such as complaints by certain vendors about missed payments, provide additional guidance that may militate in favor of prompt contract termination and selection of another contractor (or resumption of public control). Public corrections authorities may also insist in their contract with a private contractor that the latter maintain a certain net worth at all times[187] and have purchased business interruption insurance that names the relevant public entity as an insured.

As described in greater detail below, even if serious financial problems with a private contractor were to develop quickly, public authorities that own their facilities and that have contracted properly should be able to terminate their agreement with a troubled provider quickly before filing of a bankruptcy petition. It should then be able to settle on a successor arrangement -- either a resumption of public operation or selection of a new contractor -- and have enough funds on hand (from monies that would otherwise have been used to pay the defaulting provider) to be able to pay for the new arrangement and offset any losses incurred in the process. Even in the case of a contractor-owned facility, a sale of the facility to the government at a low price, but sufficient to pay off creditors, should be feasible due to the alignment of interests of all relevant parties.

How is the foregoing possible? First, public correctional authorities must draft a contract that allows for rapid termination in the event of incipient or current financial problems. A general "termination for convenience" clause can serve this purpose. Assuming proper operation of this kind of termination clause, most contracts provide for a ninety-day phase-out or transition period, and may specify special procedures and requirements for the transition.[188] Quickly disengaging from a contract allows the public authority adequate time to resume management of a facility or find another private operator. Today, the private corrections industry is sufficiently active and aggressive, even if concentrated, that reasonably good alternative providers can be accessed relatively quickly.[189] Perhaps the most vital input to prison management -- trained human resources in the form of incumbent correctional officers -- live in the surrounding community and will be ready and willing to continue working for a successor provider.[190]

---

187   See, e.g., Contract between Corrections Corp of America and Metropolitan Gov't of Nashville and Davidson County, May 30, 1997 (hereinafter "CCA-Nashville Contract") at § 7.6.

188   See, e.g., M. Gold, *The Privatization of Prisons* 379 (citing Puerto Rico prison contracts); *see also* CCA-Nashville Contract at § 8.9.

189   This might of course, be problematic at any given time in an expanding private prison market with tight labor conditions. M any observers would further contend not only that the market as a whole is quite concentrated, but that the higher quality-end of t he market is exceedingly concentrated, resulting in less than ideal competitive conditions. Others, however, would point to the y outh of the industry as a reason why competition has been so healthy thus far and signs of true entrenchment have yet to appear.

190   Public authorities can also take special measures, such as payment of overtime to officers or the hiring of additional law e nforcement personnel, to help keep operations intact during a transition period.

Appendix 3                                                    Private Prisons                                                    41

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 4 of 15 PageID #: 18603

MARLOWE_0007205

The reason that a pre-petition notice of termination based on insolvency or "convenience" will be so effective is that it removes from the bankruptcy process what would normally be deemed an "executory contract"[191] otherwise subject to the process's automatic stay and to control by the bankruptcy trustee.[192] Accordingly, a contract providing for automatic termination with or without notice to the private contractor, and *prior to the contractor filing for bankruptcy*, deprives the contractor of protection under the Bankruptcy Code, since the contract terms are enforceable and preempt the Code.[193] By having a contract clause mandating notice of the filing of a petition in bankruptcy by the private contractor several days or weeks in advance, public correctional officials can ensure that they can invoke the termination for convenience provisions of the contract beforehand. Such a clause becomes critical if a contract monitor is unable to detect incipient financial problems on the part of the private contractor.

Note that, as alluded to above, a 90-day or so transition period also provides a government facing an impending private contractor bankruptcy with a significant financial resource with which to engineer a successful transition and cover any expected or unexpected damages. Because private contractors typically invoice their services at least a month after they are rendered, and then demand payment up to 60 days or so later, public authorities can withhold payment and use the sums that would otherwise be due for the purpose of covering current operations, securing a new contractor, or offsetting damages caused by the bankrupt contractor. The amounts involved are usually very significant and place public corrections authorities in an advantageous position relative to other potential creditors. Meanwhile, a public authority may also benefit from a contractor's business interruption insurance, if the latter had purchased such insurance and named the public entity as an insured. However, the withholding of amounts payable to the contractor may well prove to be the more significant financial cushion.[194]

---

191 Generally, a contract is deemed "executory" if performance remains due on both sides throughout the life of the contract. P rison management contracts would fit this definition. *See* C. Holley, *Privatization of Corrections: Is the State Out On a Limb When the Company Goes Bankrupt?* 41 Vand. L. Rev. 317, 330 (1988).

192 A termination based "solely" on grounds of the debtor's insolvency, so long as it is invoked prior to the filing of a bankru ptcy petition, has been repeatedly upheld as legitimate, and outside the reach of the bankruptcy process. *See, e.g., In re LJP, Inc.,* 22 Bankr. 556 (Bankr. S.D. Fla. 1982). Moreover, a termination at will clause may also avoid the effect of Section 365(e)(1) of t he Bankruptcy Code, which generally invalidates bankruptcy termination clauses by providing that an executory contract may not be modified or terminated after the commencement of an action in bankruptcy based on the insolvency or financial condition of the debtor. *See* Ruben, *Legislative and Judicial Confusion Concerning Executory Contracts in Bankruptcy,* 89 Dick. L. Rev. 1029, 1059 (1985). Even if a termination clause were invoked after a petition for bankruptcy was filed by a private contractor, a Bankruptcy Court might sanction termination of a prison management contract for reasons involving "other factors" besides the insolvency itself -- reasons that could rest on a variety of pubic policy grounds. *Cf., id.* at 1043.

193 One commentator has suggested use of all purpose termination at will clause that allows for a pre-petition notice of termina tion by a government entity:

[The state] may terminate this agreement upon thirty days written notice to [the private contractor]. [The state] must inform [ the private contractor] of its intention to file a petition in bankruptcy at least five days prior to filing such a petition. Debto r's filing without confirming to this requirement shall be deemed a material, pre-petition incurable breach.

Ruben, *supra* note 192, at 1058-59.

194 Business interruption insurance may not have been purchased with very large policy limits, either as a business decision of the private contractor or due to the public authorities' unwillingness to have a certain level of premium charges passed through to them as a segment of the overall per diem cost of operating the prison facility.

---

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 5 of 15 PageID #: 18604

MARLOWE_0007206

Although the case of bankruptcy of a contractor-owned facility is much more serious, even here the system should work to the ultimate advantage of public authorities. To begin with, public correctional authorities should be able to terminate the private prison contract and keep it outside of the bankruptcy process, as described above. Insofar as that process ultimately results in a reorganization or liquidation of the private contractor, a resolution acceptable to the government is eminently possible. It should be kept in mind that the interests of public correctional officials and creditors in this situation are not likely to be in conflict. The former seek control of the facility or seek to have it taken over by another qualified private contractor; the latter simply want to be paid debts owed to them. It is highly likely that the debtor in possession (assuming a Chapter 11 reorganization) or the trustee in bankruptcy (in the case of a Chapter 7 liquidation), would agree with the government and the creditors -- on financial as well as public policy grounds -- that the facility should be sold to a new management company or to government authorities at a price advantageous to the public and sufficient to pay off all or most outstanding debts to creditors.

Finally, if for any reason (despite the foregoing) a government did not properly contract to have a termination at will clause -- or failed to invoke it and became subject to the bankruptcy process -- the government would still potentially retain some important rights. To begin with, a government may still have been alert enough to have inserted a non-assignment clause in its contract. This will prevent a trustee in bankruptcy from assigning a prison management contract to other vendors who may or may not be qualified to assume that responsibility, notwithstanding the pressures from other creditors to do so.[195] Moreover, a government is not stayed by the bankruptcy process from actions to enforce its police or regulatory power.[196] Consequently, any action brought by public correctional authorities regarding the custody and control of prisoners would fall squarely within the police power and should not be stayed by the bankruptcy of the private contractor. This would include legal or other actions to enjoin continued operation of a prison facility or otherwise to safeguard the safety and care of inmates.[197] Only if a private prison contract were actually assigned or rejected by a trustee -- something a trustee would be loath to do on public policy grounds -- would government corrections authorities be truly legally disadvantaged.[198]

## D.　Use of Force

Legal questions about the use of force often revolve around subtle matters of proper statutory authorization. The major issue for private prisons is whether the use of force generally, or specific variants thereof -- including the use of deadly force -- are properly mandated by the relevant law of the jurisdiction. Without proper enabling legislation or contractual provisions authorizing the use of force

---

195　*See, e.g., In re Pioneer Ford Sales, Inc.,* 729 F.2d 27, 29 (1st Cir. 1984).

196　*See* 11 U.S.C. §§ 362(b)(4), (5).

197　Note, however, that a stay would suspend all prison inmate litigation or special claims by the government against the firm. *See* 11 U.S.C. § 362(a).

198　In the case of a trustee rejecting the contract -- where, for example, the contractor faces extraordinary liabilities for ci vil actions under the contract -- the government would become an unsecured creditor with a claim for damages for breach of the contract as if the breach occurred prior to the filing of the petition. *See* 11 U.S.C. § 365(g). In this event, the government might not be able to recoup all of its expenses incurred in resuming operation of the private prison facility.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 6 of 15 PageID #: 18605

MARLOWE_0007207

by designated private prison officials, it is possible that such personnel and the private contractor could face criminal and civil liability.

The applicable legal standards for the use of force vary tremendously from place to place. Some states' laws may adequately treat the use of force generally, but insufficiently address the use of deadly force in a variety of situations. Other states, for example, recognize a common law right of any citizen to use deadly force in certain circumstances, including the apprehension of one previously arrested for a felony.[199] For states that have adopted the Model Penal Code, which permits correctional officers to use deadly force under certain conditions, correctional firms may be so authorized if their employees are statutorily brought within the definition of "correctional officers."[200] A still different approach is taken by some states like Louisiana, which, in its correctional privatization statute, specifically authorizes private firms to use force and further prescribes standards and procedures for licensing private correctional employees to use weapons.[201]

Even if a contractual solution is adopted on a case-by-case basis -- delegating certain use of force and weapons use powers to private correctional management firms[202] -- care must be taken to explore all of the nuances involved in various scenarios, including escapes and actions taken outside of a correctional facility. ACA Standards for Adult Correctional Institutions address many dimensions of the use of force in generic ways,[203] but specific policies and procedures are necessary to comply with state statutes and case law that have evolved under the Eighth Amendment. So-called rent-a-cop statutes delegating certain use of force powers to private security companies may not be sufficient to cover many of the circumstances encountered by private contractor guards. Also, correctional officials must be sensitive to interjurisdictional issues about the use of force, particularly in the case of escapes where use of certain types of force may not be authorized beyond a facility's perimeter. All of this requires government correctional officials and their legal staffs to think through very carefully all of the possible scenarios requiring different kinds of force, and to ensure that there is proper authorization for their use.

---

199  This is ostensibly the case, for example, in Michigan. *See, e.g., People v. Whitty,* 96 Mich. App. 403, 292 N.W. 2d 214 (1980).

200  *See* Model Penal Code §§ 3.04-3.07, *cited in* Wooley, *Prisons for Profit: Policy Considerations for Government Officials,* 90 Dickinson L. Rev. 307, 323 (1985).

201  *See* La. Rev. Stat. Ann. § 39:1800.4(D)(5), (6). Note, for example, that the state of Ohio similarly requires a private correctiona l officer working at a correctional facility housing out-of-state prisoners in Ohio to carry and use firearms only if the officer is certified as having satisfactorily completed an approved training program designed to qualify persons for positions as special policemen, security guards or persons otherwise privately employed in a police capacity. Ohio Rev. Code Ann. § 9.07(E).

202  For example, Virginia's DOC specifies the use of non-deadly and deadly force by private contractors in its contracts with pr ivate prison management firms. *See, e.g.,* CCA-Va. Contract, *supra* at § 4.22, pp. 20-21.

203  *See, e.g.,* ACA Standard 2-4206, for example, which simply requires a written policy and procedures to restrict the use of force as a last resort in cases of justifiable self-defense, protection of others, protection of property, and prevention of escapes. Elab oration is left to prison officials.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 7 of 15 PageID #: 18606

MARLOWE_0007208

## E.    Environmental Law Concerns

Prison privatization appears to raise no significant environmental issues except whether and how governments and private contractors allocate responsibilities for environmental review of prison construction and the risks associated with hazardous waste cleanup. Some guidance exists as to various allocation arrangements.

At the federal level, Section 102(2)(c) of the National Environmental Policy Act (NEPA)[204] requires federal agencies to prepare detailed statements of environmental impact for major federal actions that could significantly affect the quality of the human environment.[205] Federal actions include projects undertaken directly by an agency, agency support of private projects through contracts, grants, subsidies, loans, or other forms of funding assistance, agency issuance to a private project proponent of a lease, permit, license, certificate, or other 'entitlement for use,'[206] or agency sale of government land to a private project proponent.[207] Although a project proponent could be public or private, the federal agency most involved with a project is solely responsible for the preparation of an environmental impact statement (EIS).[208] In the private prison context, if a construction project involving the Bureau of Prisons and a private prison contractor triggers the EIS requirement of NEPA, then the BOP would be responsible for EIS preparation.

Responsibility for environmental review is less certain at the state and local levels. Most states have state environmental policy acts (SEPAs) modeled after NEPA; however, some SEPAs contain important differences.[209] Unlike NEPA, some SEPAs require private project proponents to prepare an EIS if the EIS requirement of the SEPA is triggered.[210] Additionally, some SEPAs require different EIS preparations depending on whether a project is considered public or private in nature. For example, the Washington State Environmental Policy Act (SEPA)[211] requires state agencies to consider alternative project sites only if the project is public; if the project is private, then state agencies need not consider alternative sites. [212] Under NEPA, federal agencies must always consider alternatives to a proposed project.[213] Under the SEPAs that distinguish between public and private

---

204  *See* 42 U.S.C. §§ 6901-6992k.

205  *See* 42 U.S.C. § 4332(2)(c).

206  *See* McGregor, *Environmental Law and Enforcement*  10 (1994).

207  *See, e.g., Lockhart v. Kenops* , 927 F.2d 1028, 1035, (8th Cir. 1991) ("When the government sells or exchanges federal land, it must consider the environmental impact of the proposed use of the federal land by the private purchaser . . . .").

208  *See Seattle Audubon Soc'y v. Lyons* , 871 F. Supp. 1291, 1318 (W.D. Wash. 1994) ("Agencies may not delegate the responsibility of preparing an EIS to private parties . . . .").

209  *See* McGregor, *supra* note 206, at 14.

210  *See id.*

211  *See* Wash. Rev. Code. §§ 43.21C.010-43.21C.914.

212  *See* Wash. Rev. Code § 43.21C.030.

213  *See* 42 U.S.C. § 4332(2)(c)(iii).

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 8 of 15 PageID #: 18607

MARLOWE_0007209

projects, courts would almost certainly consider private prisons to be public projects because they perform a governmental function.[214]

Due to the transfer of land and property rights that may occur between governments and private prison contractors in a particular construction, sale or lease arrangement, hazardous waste liability presents some concerns. Under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA or Superfund),[215] liability for environmental cleanup costs is strict, joint, several, retroactive and prospective: any former, current, or future party who generated, transported, treated, stored, or disposed of hazardous waste is liable for all of the associated cleanup costs without regard to fault.[216] CERCLA does not bar indemnification agreements; however, a liable party can transfer only its responsibility for cleanup costs -- not its underlying liability to the Government.[217] Experience has shown that contracting parties need to state indemnification agreements expressly to minimize the risk of non-indemnification.[218] This applies to private prison contracts no less than other business agreements. Meanwhile, state environmental laws vary, but almost every state has statutes compelling cleanup of hazardous materials.[219] In this arena as well, both government agencies and private prison contractors could be liable for cleanup costs and might rely upon indemnification agreements to shift those costs to the other party.

---

214  *Cf. Weyerhaeuser v. Pierce County*, 873 P.2d 498, 504-07 (1994) (*en banc*) (holding that a private contractor's construction and operation of a landfill is a public project because the handling and disposal of waste is a governmental function).

215  *See* 42 U.S.C. §§ 9601-9675.

216  *See* 42 U.S.C. § 9607.

217  *See* 42 U.S.C. § 9607(e); *Purolator Prod. Corp. v. Allied-Signal, Inc.*, 772 F. Supp. 124, 128-30 (W.D.N.Y. 1991).

218  *See* Rhonda K. Hill, *Contractual Indemnifications for Environmental Liabilities*, 21 Colo. Law. 943, 943-44 (1992).

219  *See* McGregor, *supra* note 206, at 40.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 9 of 15 PageID #: 18608

MARLOWE_0007210

# 7. Regulating Interjurisdictional Private Prison Contracting

Prison privatization, as commonly conceived , involves a government corrections agency contracting out correctional management and/or construction work to a private contractor that operates within the agency's political jurisdiction and is subject to statutory and regulatory authorities promulgated by that jurisdiction. Thus, for example, the U.S. Bureau of Prisons selects a contractor to build and operate a new minimum security prison on federal land; a state department of corrections enters into an agreement with a private corrections company to take over the management of an existing maximum security facility in one of the state's metropolitan areas; a county government, pursuant to state law, authorizes its sheriff to contract out the operation of a county jail. In each case, there exists a close legal and contractual correspondence between the public agency doing the privatizing and the private entity responsible for providing the correctional services.

Correctional privatization can, however, involve other arrangements between public and private correctional specialists that span multiple jurisdictions. These arrangements, which involve the leasing of bed space by public authorities facing prison overcrowding, can implicate the transfer of prisoners to private contractors in distant localities as well as the political and legal interplay of several different jurisdictions that have a stake in such a transfer. Definite legal confusion and ambiguities can result. Two basic factual patterns characterize this phenomenon of interjurisdictional contracting out. The first encompasses indirect arrangements where public corrections authorities send inmates to other jurisdictions via intergovernmental agency agreements (IGA's) -- and the other jurisdictions in turn rely on private contractors to run the particular facilities where the inmates are housed. One example of this arrangement is the State of Montana, which for two years sent prisoners to Dickens County, Texas through an IGA before terminating the agreement for contract violations.[220] Dickens County had in turn contracted with a private contractor, BRG Operations, a division of the Bobby Ross Group, to run the prison where the Montana prisoners were sent.

The second arrangement involves the leasing of bed space directly from a private contractor, but in a foreign jurisdiction. Many of these prisons are operated on a speculative basis, without having been chartered by their home jurisdictions or having been opened on the basis of a contract providing for a certain minimum level of occupancy. The motivating force behind the opening of several such private facilities may have been to reap the supposed economic development benefits of correctional privatization. A prominent example of this phenomenon is the District of Columbia Department of Corrections' contract with Corrections Corporation of America to house medium security prisoners in a new facility -- the Northeast Ohio Correctional Center (NOCC) -- that was built on a speculative basis in Youngstown, Ohio.[221]

---

220  The IGA is denominated an "Inmate Housing Agreement" ("Dickens County IHA") between the Montana Department of Corrections and Dickens County, and runs for three years, with an option for annual renewal for a period not to exceed seven years. *See* Dickens County IHA at 2.

221  As discussed in more detail below, the City of Youngstown entered into a "Development Agreement" with CCA whereby the city transferred land to CCA and provided for a three-year tax exemption in return for construction and operation of a private priso n within Youngstown city limits that was expected to provide construction and management jobs for the surrounding area.

MARLOWE_0007211

Both types of arrangements have generated considerable controversy. Relatives complain about family members housed in distant localities. Concerned citizens express their displeasure with the lack of accountability that attends the transfer of prisoners hundreds or thousands of miles away to places where no one from their home jurisdiction may be present to monitor the governing contract or represent or acknowledge their interests and grievances. Perhaps most fundamentally, correctional specialists criticize the fact that the receiving facility may not have legal authorities sufficient to allow it to cope with a variety of critical situations, including inmate escapes and prison emergencies. The law may simply lag behind new correctional realities. This is in fact what happened in the widely-publicized case of two Oregon prisoners who a few years ago escaped from a private prison in Texas, and yet were unable to be charged with a crime since Texas law at the time did not recognize escape from a private prison as a felony.[222] Lack of legal oversight mechanisms also played a prominent role in the decision of the Ohio legislature to pass a law earlier this year subjecting the NOCC and any future private prisons in Ohio housing out-of-state inmates to a variety of additional statutory requirements.

Across the country, it is these inter-jurisdictional private prison arrangements that have seemed to generate the worst performance problems, spawned the most critical articles on private prisons and reflected most poorly on the correctional privatization movement as a whole. While many of these troubles can be traced to poor or hasty arrangements or the difficulties of ensuring proper contract monitoring from afar, a surprisingly large number of problems stem from inadequate legal or contractual frameworks, unsuited to the role of regulating private either contractor conduct outside a particular jurisdiction or the incarceration of out-of-state inmates within that jurisdiction. This section examines briefly a few of the major legal problems that affect interjurisdictional contracting out of prison services, as well as the kinds of legislative and contractual provisions that public corrections authorities have adopted to minimize these problems.

## A.    Interjurisdictional Contracting Out and Legal Problems

Few public corrections authorities view the transfer of prisoners to other jurisdictions as anything but an unfortunate necessity caused by overcrowding and inadequate or inappropriate facilities at a particular time. Certain transfers to public prisons have occurred for many years pursuant to different statutory mechanisms, including the Interstate Corrections Compact.[223] Still,

---

222  *See, e.g.*, Associated Press, Private Prisons Shackle Texas with Confusion; State Laws Haven't Caught Up with New Phenomenon, Chicago Tribune, Nov. 7, 1996 at 34. Further reflecting the huge legal loopholes often opened up as a result of cross-jurisdic tional prison arrangements, even the State of Oregon was unable to prosecute the inmates for escape, since Oregon law did not cover escapes outside of the state. *See* Prison Brake; Texas Needs More Scrutiny of Private Prisons, Houston Chronicle, Sept. 3, 1996 at 18A.

223  Various states have adopted the Interstate Corrections Compact, which allows the transfer of convicts to penal institutions   in other states that are parties to the compact. *See, e.g.*, 730 Ill. Comp. Stat. 5/3-4-4; 61 Pa. Cons. Stat. § 1601. In addition, there are state statutes authorizing transfers of state prisoners to federal penitentiaries, *see, e.g.*, Mass. Gen. Laws., ch. 127, § 97A; Conn. Gen. Stat. § 18-91. Such transfers do not, by themselves, trigger due process requirements, *see, e.g., Olim v. Wakinekona*, 461 U.S. 238 (1983), or implicate the equal protection strictures of the Constitution. *See, e.g., Tucker v. Angelone*, 954 F. Supp. 134 (E.D. Va.), aff'd, 116 F.3d 473 (4th Cir. 1997) (Virginia inmate who lost certain benefits upon transfer to Tennessee facility no denied eq ual protection of the laws).

---

Case 3:16-cv-02267     Document 383-16     Filed 01/22/21     Page 11 of 15 PageID #: 18610

MARLOWE_0007212

many jurisdictions have been surprisingly willing to go one step further and enter into arrangements whereby their inmates are housed in *private* facilities outside the jurisdiction. In the case of agreements with other jurisdictions, public contracting through an IGA or similar contract mechanism may allow correctional authorities in the sending jurisdiction to avoid procurement requirements mandating competitive bidding for private contracts. There may also be the perception that public authorities in the foreign jurisdiction have developed some kind of legal framework for private prison operation on which the sending jurisdiction can rely. Finally, the sending jurisdiction may believe that the interposition of the receiving jurisdiction between it and the private contractor can act as a buffer relative to various kinds of inmate litigation.

Actual experience with these arrangements may or may not bear out the foregoing suppositions. Certainly contracting can be more rapidly effected through a sole-source agreement with another public entity that may only seek to address the most important legal and inmate care topics. It is understood that certain details can be left to a separate agreement (which may or may not be explicitly referenced in the intergovernmental agreement) between the receiving jurisdiction and the management company actually providing the incarceration services. But that other agreement, and the surrounding legal framework established by the receiving jurisdiction, may prove deficient in a number of significant ways, such as the provision of liability insurance and the handling of escapes. Since even the most egregious, systemic misconduct in the out-of-jurisdiction facility may be beyond the ken of the sending correctional authorities due to the difficulties of long-distance monitoring and responding promptly to problems identified by the contractor, the public authorities may find themselves facing more liability exposure than expected.[224] Finally, the sending jurisdiction may continue to have potential liability for its own negligence in sending inmates to such a facility in the first place or in overseeing the long-distance arrangement.

The experience of Montana correctional officials in the case of the Dickens County, Texas private prison at least partially illustrates these problems. Montana ran out of prison space in 1995, and was forced to look for out-of-state solutions when county jails could no longer accommodate the overflow of inmates. Because out-of-state public facilities were unavailable at that particular time, Montana explored private facilities and eventually settled on the Dickens County facility. In June, 1996, Montana entered into a three-year Inmate Housing Agreement with Dickens County to house up to 400 Montana inmates. It was explicitly understood that actual operation of the prison facility would be in the hands of BRG Operations, part of the Bobby Ross Group, which had a separate Management and Maintenance Agreement with Dickens County. The Inmate Housing Agreement was deemed to be "assigned" or "delegated" to BRG Operations through the Management and Maintenance Agreement.[225] Ultimately, about 260 Montana prisoners were incarcerated in Dickens County.

---

224  Even if the sending jurisdiction were in the process of taking steps to remedy problems in the foreign jurisdiction, "delibe rate indifference" could still be demonstrated in a Section 1983 action if tangible signs of remediation were delayed or lacking in   the facility at issue.

225  Inmate Housing Agreement at 17-18.

MARLOWE_0007213

Montana terminated the contract well short of its 3-year completion after it found problems with a wide variety of prison conditions, including inadequate food, medical care, and security and housing arrangements inconsistent with a long-term, medium-security facility.[226] Montana's designated prison monitor ended up spending much more time and money than expected addressing these problems. From the standpoint of liability exposure, it was clear to Montana officials that the situation in Dickens County could generate a number of legal claims but the state would not be in the best position to extract prompt compliance from the private prison operator, due both to problems of distance and lack of a direct contractual relationship.

A number of legal and contractual problems common to foreign jurisdiction contracting are illustrated by the Dickens County example. The biggest problem is a lack of communications and reporting requirements. According to Montana officials, the lack of these in the contract meant that it would often take many days before correctional authorities were alerted to the fact that serious disturbances had occurred. This problem loomed very large given the absence of an on-site monitor. Another problem was the failure of the contract to prescribe any level of liability insurance to be provided by the county or the private contractor acting in its stead, something that is standard in in-state private contracts. Also, insofar as the Dickens County contract appeared to allow for Texas county personnel or private contractor personnel to pick up inmates in Montana for transfer to Texas,[227] it is not clear that Montana law permitted either type of officials to use force while transporting inmates within the state or attempting to apprehend them following an escape.

Even more fundamental and serious legal questions may attend *direct contracting* by a corrections authority with a private contractor in a foreign jurisdiction, particularly if the contractor is operating a prison on a largely speculative basis. Many of the problems are the same as those noted above, such as proper authority for use of force and apprehension of escaped inmates. But direct contracting with a contractor in a foreign jurisdiction highlights even more numerous legal problems that may bedevil the receiving jurisdiction if local public corrections oversight is inadequate. These legal problems include potential deficiencies in prison operation and governance, facility standard-setting, state corrections authority oversight, and coordination with local law enforcement.

Many of these problems have emerged into public view recently with the much-publicized troubles surrounding the NOCC, run by CCA in Youngstown, Ohio. The NOCC was essentially built on a speculative basis through a "Development Agreement" between CCA and the City of Youngstown in March, 1996. When CCA later began operations in May, 1997 on the strength of a five-year, $182 million contract with the District of Columbia to house medium security prisoners, the City of Youngstown was essentially a bystander; no local government or law enforcement agency was a party to the contract. This only heightened the legal problems and problems of accountability that

---

226   Telephone Interview of Tom Rolfs, consultant to Abt Associates, with Janice Wunderwald, Contracts Manager, Montana Dept. of Corrections, March 27 and 30, 1998; April 15, 1998. It was reported that there were also drug problems at the facility, and a small riot involving the Montana prisoners and inmates from Hawaii.

227   The overall delegation of prison management under the contract left unclear whether private contractor personnel might be tasked with pick-up of the Montana prisoners.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 13 of 15 PageID #: 18612

MARLOWE_0007214

are inherent in this type of three-way arrangement (unlike the case of the Dickens County contract where at least the public entity had some responsibilities for the activities of the private contractor).

These problems received increasing attention in the NOCC's first year of operation. The District began sending prisoners to NOCC as part of its gradual shutdown of the Lorton prison complex, a facility plagued for years by lax discipline and mismanagement. Over the next nine months, the prison witnessed a significant inmate disturbance that prompted prison guards to use gas on inmates, allegations of deficient medical care, and a number of violent assaults on prisoners by other inmates, including two fatal stabbings. A lawsuit was brought in the fall of 1997 alleging use of excessive force, failure to protect inmates, and substandard medical care. The suit also questioned the authority of CCA to operate the prison under Ohio law. After the second fatal inmate stabbing, the judge in the case ordered a preliminary injunction requiring CCA to reexamine the classification of all inmates who had been involved in violence at the institution; and halting the further delivery of prisoners from the District to NOCC pending a satisfactory classification system being put in place.[228]

The lawsuit and Youngstown community fears of further prison disturbances raised a host of questions about the legal basis for CCA's operation of the prison, and about the legal framework necessary for any state or locality to regulate properly the incarceration of out-of-state prisoners. Like many states, Ohio had a private prison statute that only envisioned the incarceration of state prisoners by its own corrections authorities. The lawsuit also drew particular attention to the problem of localities in home rule states taking it upon themselves to enter into private prison contracts -- usually for reasons wholly centered on economic development -- with little or no oversight by the state department of corrections.

Based on community pressure, state legislators highlighted a number of legal gaps and deficiencies overlooked in the Youngstown community's haste to reap the benefits of its new prison facility. These included inadequate standards for: acceptance by private prisons of foreign inmates; coordination of law enforcement activities in the case of riot, rebellion or escape, and reimbursement of state and local governments for the costs therefor; qualifications in hiring of private prison guards; state inspection of private prisons for compliance with applicable standards of care; and release of foreign inmates in their home jurisdictions. These kinds of legal inadequacies have spurred a number of states to consider or enact special legislation giving state corrections authorities and local law enforcement authorities greater regulatory authority over private prisons that may choose to accept foreign inmates. Two examples of such legislation, which recently passed in Ohio and Texas, respectively, are discussed below.

---

228   Washington Post, February 23, 1998 at B1.

Case 3:16-cv-02267     Document 383-16     Filed 01/22/21     Page 14 of 15 PageID #: 18613

MARLOWE_0007215

## B.    Some Regulatory Solutions

Two states -- Ohio and Texas -- have recently passed legislation that attempts to remedy some of the more egregious legal deficiencies that private prisons have exposed over the past several years as some of them incarcerated out-of-state inmates.  Both enactments seek to give state correctional authorities greater overall authority to prescribe minimal operational standards for such facilities and to eliminate gaps and inconsistencies that emerged between the treatment of public and private prisons, and between private facilities that do and do not accept foreign prisoners.

The Ohio legislation passed in March 1998[229] represents a version of a bill introduced in late September, 1997 in the wake of the filing of the Youngstown lawsuit.[230]  The bill enacted into law generally limits the operation of correctional facilities housing out-of-state prisoners[231] and provides comprehensive criteria for the establishment and operation in Ohio of such prisons.  The most salient provision of the bill created a new statute, Ohio Stat. §9.07, that specifically requires the direct involvement of a local public entity and the indirect involvement of the state's Department of Rehabilitation and Corrections (DRC) in any private prison arrangement with a foreign jurisdiction.[232] Moreover, the local public entity is permitted to enter into a contract with an out-of-state jurisdiction to house out-of-state prisoners in Ohio only if the locality and the foreign jurisdiction jointly submit to the DRC a statement that certifies the facility's intended use, projected prisoner population, custody level, and if the DRC reviews and comments on the plans for the design or renovation of the facility concerning its intended use.[233]  A contract for the housing of out-of-state prisoners must also contain a provision requiring the sending jurisdiction to assume all responsibilities for housing and transportation of its prisoners should the facility close or cease operations for any reason.[234]

The new legislation then mandates a considerable number of provisions for inclusion in any private prison contract entered into by a local public entity with a private contractor for the operation of a correctional facility.  These requirements, which have also been made applicable to CCA at its NOCC facility,[235] obligate the private contractor to do the following:

---

229   Ohio House Bill 293, effective March 17, 1998.

230   The original bill, Senate Bill 174, was introduced by Senator Robert Hagan of Youngstown, who emphasized the need for privat e prisons housing out-of-state inmates to meet certain minimal state-prescribed standards and to permit adequate access to, and coordination with, private prisons by local law enforcement authorities in the case of illegal activities or prison disturbance s.

231   Among other things, the legislation keeps the state out of the business of accepting out-of-state prisoners in private facil ities and instead limits such arrangements to Ohio localities, subject to the considerable oversight requirements of the new statute.  *See* Ohio Rev. Code Ann. § 9.06; Ohio State Legislative Service Commission, Final Analysis of Am. Sub. H.B. 293 at 3.

232   The new statute also seeks to create greater accountability by requiring a local entity and private contractor contemplating a prison contract to hold a public hearing in the locality and by specifically requiring the local public entity to authorize the locati on and operation of the facility. Ohio Rev. Code Ann. § 9.07(C)(3).

233   Ohio Rev. Code Ann. § 9.07(C)(1).

234   *See id.* at § 9.07(C)(2).

235   The legislation requires the parties operating under a "preexisting contract" to reach agreement on inclusion of these provi sions no later than 180 days after the act's effective date -- in the case of CCA and the City of Youngstown, by mid-September, 1998. Oh io Rev. Code Ann. § 9.07(I).  Reportedly, however, CCA was supportive of the legislation, although it did engage in considerable lobbying over several specific provisions.

Case 3:16-cv-02267    Document 383-16    Filed 01/22/21    Page 15 of 15 PageID #: 18614

MARLOWE_0007216