# EXHIBIT D
# Part 14 of 14

- seek and obtain ACA accreditation within 2 years after accepting its first out-of-state prisoner;

- report to local law enforcement agencies all criminal offenses or delinquent acts committed in or in connection with the facility, and report to the DRC all escapes or disturbances at the facility, as well as "unusual incidents," according to reporting rules applicable to state correctional facilities;

- enter into a written agreement with the DRC setting forth a plan and procedure to coordinate law enforcement activities with state and local police; and permit law enforcement officers to enter into the facility to investigate any criminal offense or delinquent act allegedly committed there;

- reimburse the state or any political subdivision for any costs incurred by state or local law enforcement in responding to an escape or disturbance at the facility;

- maintain a staffing plan adequate to ensure inmate supervision and security maintenance, as well as other operational needs, including programming and transportation;

- indemnify, hold harmless, and reimburse any legal defense costs of the state or the local public entity and their employees, officers, and agents in connection with claims arising from operation of the prison facility;

- develop a security classification system appropriate to the institution;

- reject any out-of-state inmate for whom it has not received an institutional record and medical records; or whose institutional record shows a pattern of violence involving use of a deadly weapon;

- cooperate with the state's Correctional Institution Inspection Committee, whose jurisdiction is extended to private facilities housing out-of-state inmates;

- not employ any person until a criminal records check is performed, and not employ any person whose records check indicates previous malfeasance;

- return out-of-state inmates who have completed their term to the sending jurisdiction and agree with that jurisdiction to return to that jurisdiction any inmate who commits a crime while housed in Ohio; and

- certify its correctional officers to carry firearms consistent with Ohio law requirements.[236]

---

236 Ohio Rev. Code Ann. §§ 9.06, 9.07. Other important obligations placed by the new law on private prison contractors for the protection of local public entities and the general public include the following: (1) compliance with all federal, Ohio, and lo cal laws, rules or regulations, including specifically laws on sanitation, food service, safety, and health; (2) sending of all copies of all

The legislation also makes it clear that any act or omission considered a criminal offense or delinquent act or criminal offense if committed at a state correctional institution will be deemed as such if it is committed at a private correctional facility; and that an escape from a "detention facility is specifically deemed to include escape from a private prison.

The Ohio legislation governing private contractors housing out-of-state inmates is one of the most ambitious attempts by public authorities to gain greater control over a phenomenon that appeared recently to overwhelm state and local authorities with legal and operational confusion. The Ohio act consciously sought to patch up all manner of gaps and inconsistencies in a statutory framework not originally intended to cover interjurisdictional contracting for private correctional services. Quite likely, a number of other jurisdictions will pass similar types of acts in the next few years.

Ohio's legislation itself followed by a few months Texas' effort to accomplish some of the same purposes. Texas, which has the greatest concentration of private prisons in the country, had been plagued for several years by problems of accountability and a legal framework riddled with gaps and loopholes concerning the operation of private correctional facilities. The Texas legislation, effective September 1, 1997, similarly provides for interjurisdictional contracting only if a local public entity is directly involved and submits to the Texas Commission on Jail Standards information on custody level capacity and availability as well as a law enforcement coordination plan. The Commission, in turn, is supposed to inspect the facility and certify to the local public entity that the facility is appropriate for the intended use.[237]

Some of the Texas provisions represent noteworthy variations on, or additions to the type of scheme adopted by Ohio. The Texas act requires any private prison contract involving out-of-state inmates to be sent to the Commission on Jail Standards, and empowers the Commission to adopt rules regulating the number of federal and out-of-state prisoners housed in private facilities in the state. The act also requires all employees at the private facility to maintain certification as required by the Texas Commission on Law Enforcement Officer Standards and Education.[238] From a financial standpoint, the act allows the Commission to require a sending jurisdiction, rather than merely the private contractor, to reimburse the state for any cost incurred by a state agency in responding to a riot, escape, or other emergency situation,[239] and also permits the Commission to charge a private contractor a reasonable fee to cover the costs of regulating a privately-run facility.[240] Perhaps most

---

inspection reports to the DRC's Director and to the local public entity; (3) provision of appropriate perimeter and internal security necessary to protect the staff and prisoners at the facility, as well as the general public; (4) agreement with the local public entity for a conversion plan that will be followed if for any reason the facility is closed or ceases operations; and (5) agreement to include in its contract with a local public entity provision for fines to be imposed if the private contractor fails to perform its contractual duties. *See id.*

237 Texas Senate Bill 367, May 7, 1997, § 9 (a)-(e). The Texas act., like the Ohio act, also requires certain minimal facility standards to be met, and certain information to be supplied to the facility by the sending jurisdiction before foreign inmates can be accepted there. *See id.* at § 9(d).

238 *See id.* at § 9(f).

239 *See id.* at § 9(i).

240 *See id.* at § 9(g).

significant, the act requires the Commission to review the qualifications of any private contractor prior to that vendor entering into a contract with a local public entity.[241]

The unmistakable trend of states and localities extracting greater accountability from private contractors who seek to house out-of-jurisdiction inmates can be said to mark the beginning of a third major phase of the prison privatization experience. The first phase was characterized by heated political debates and tentative state experiments. The second phase featured a number of significant state and federal initiatives to rely on private contractors at selected facilities, and witnessed the rapid growth of the private prison industry. The third phase represents a thoughtful and nuanced stock-taking of correctional privatization (both intra- and interstate), with an emphasis on using legal and other tools to ensure local political control of the contracting process and adequate oversight of prison operations. As experience grows, so does the sophistication of those responsible for contract negotiations. Increasingly, a number of experienced lawyers, both public servants and independent consultants, are providing expert advice to correctional authorities on all manner of contracting issues. Some are providing model contracts and legislation that are gaining wide notoriety.[242] Based on this advice and the publicity accorded many privatization failures -- including the interjurisdictional incarceration examples discussed above -- it appears less and less likely that states and localities will enter into private prison contracts without a significant array of legal protections at their disposal.

---

241  *See id.* at § 9(h).

242  To take just one prominent example, Richard Crane, a former public corrections lawyer and former general counsel for CCA who now does independent consulting on contracting for correctional services, has published a widely circulated model law for regulating private corrections. In it, he prescribes many of the regulatory tools adopted by the Ohio and Texas legislatures, as discussed above. In addition, he has some important other recommendations, including requirements for competitive bidding for private prison contracts, basic requirements for private contractor qualifications, delegating contract monitoring functions to local authorities when the sending jurisdiction is distant and may be unable to provide sufficiently frequent monitoring by its own personnel, and state review and approval of all private correctional facility construction, so as to curtail the building of sp eculative facilities. *See* R. Crane, *Wanted: A Model Law for Regulating Privatization,* Correctional Law Reporter 83 (April/May 1998).

Case 3:16-cv-02267   Document 383-17   Filed 01/22/21   Page 4 of 15 PageID #: 18618

MARLOWE_0007219

# 8. Legal Dimensions of Contracting

A significant number of legal issues with a direct bearing on contracting approaches and provisions have already received some discussion in this review. Some of them, relating to reduction of liability exposure -- including matters of indemnification, insurance, and monitoring -- have already been discussed in Section 3, above. This section addresses somewhat more general legal concerns associated with contracting, such as careful drafting, the use of objective standards, contract duration, termination, other enforcement mechanisms, and dispute resolution. While contracting parties can easily reduce most policy choices to simple legal provisions, a few of these policy matters have a determinative impact on the efficacy of private prison contracts as a whole. This section will discuss just a few of these critical contracting matters.

## A. Regulatory Purposes and Contract Specificity

Some of the most important contracting questions relate to the broad purposes to be served by a particular prison privatization contract and the degree of specificity believed to be necessary to effect those purposes. Contracts may vary substantially in their approach and detail depending on the correctional ideas animating public officials and the kind of regulatory framework and capacity that exists in the public sector. Is there a dense web of regulatory requirements applicable to private prisons, along with capable governmental monitoring, inspection and/or licensing bodies? If not, then a contract may have to import from the outside and treat in detail a number of provisions and mechanisms that would otherwise be expected to govern, at least in part, a private prison arrangement[243] Are standards for private prisons similar to those guiding public prison operation? And is a level playing field desired to promote fairness, increase competition, and allow for meaningful cost comparisons?[244] If not -- because in part, a host of innovations are required -- a contract will need to cover more uncharted territory for the parties than might otherwise be the case. Finally, how new are the parties to contracting? Depending on their experience and track record, public and private authorities alike may be more comfortable with more -- or less -- detail in a contract and definition of terms.

Some of the most critical contents of private prison contracts may be imposed at two distinct levels. First, legislation can require mandatory contract provisions, and provide for a competitive bidding process that prevents industry concentration and entrenchment as much as possible. Second, public corrections officials can use RFPs to dictate both what subjects a proposal must address and which provisions will form the basis of an eventual contract. Of great practical importance are RFPs that mandate inclusion of certain provisions in a contract, and that insist on contractors providing evidence of how they would address certain requirements. This allows for considerable adaptation on

---

243 For example, statutes or regulations may specify requirements for topics such as the procedures or grounds for termination o f a contract. *See, e.g.,* N.M. Stat. Ann. § 33-3-27(F) (specifying bases for termination of a contract); N.M. Stat. Ann. § 33-3-4 (requiring inspections of private prisons by governing bodies of counties and municipalities).

244 For example, public authorities need to be especially careful not to permit private contractors to make money from inmate ph one service, commissary sales and the like. Income from these should be reflected in lower per diem rates or should be paid into th e general fund.

Case 3:16-cv-02267    Document 383-17    Filed 01/22/21    Page 5 of 15 PageID #: 18619

MARLOWE_0007220

the part of both contracting parties. It also permits both sides an opportunity to question the judgments of each other early on in the contracting process. Contractors can politely suggest possible changes to the statement of work where demands are viewed as unrealistic. Government officials, meanwhile, can ask for practical illustrations and plans that reveal strengths and weaknesses well before they are applied to actual prison operations. Better contracts, speedier contract negotiations,[245] and a more candid contractual relationship may result.

Based on the degree to which public officials view privatization as specifically benefitting the public, officials may insert into a contract more or less specific language concerning expected cost savings. Cost savings requirements may be phrased in terms of a provider delivering correctional services at significantly less cost or significantly better services at the same or less cost than that which public corrections authorities would need to pay if it did the job itself.[246]

The possibility of intentionally or inadvertently bestowing third-party contract beneficiary status on inmates -- allowing them to sue for contractual deficiencies alongside possible tort and Section 1983 actions -- should also receive careful attention from public corrections officials. Prisoners do not automatically possess such rights. A contract must intend to grant them legally enforceable rights to sue under the contract, which can occur through conscious adoption of contractual language or by a court implicitly reading such an intention into the contract and its surrounding circumstances.[247] If government corrections officials wish to confer such rights on inmates as an means of bolstering the policing (and inevitably raising the cost) of the contract, they can make an explicit statement to that effect in the contract.[248] If they do not wish to encourage additional litigation,[249] even for a laudable monitoring purpose, they can deprive prisoners of third-

---

245 However, inclusive -- even if not necessarily overly detailed -- RFP's may or may not establish proper expectations and more efficient negotiations, depending on the specific circumstances.. If RFPs ask for *illustrative* approaches to a variety of subjects, they can indeed result in informative negotiations. If, on the other hand, specific approaches are mandated up front, public corrections officials may artificially circumscribe the negotiations and deprive themselves of otherwise valuable information that could be presented.

246 The State of Tennessee has enacted a statutory requirement to this effect. *See* Tenn. Code Ann. § 41-24-105(c)-(f).

247 *See* Restatement of Contracts (2d) §§ 302(1)(b), 308. There is some precedent for courts reading an implicit intent to bestow third-party beneficiary status on prison inmates. In *Owens v. Haas,* 601 F. 2d 1242 (2d Cir.), *cert. denied,* 444 U.S. 980 (1979), wherein a federal prisoner was beaten and injured while housed in a county jail, a court found such an intent by reference to a statutory policy by the U.S. Bureau of Prisons to safeguard federal prisoners while in the care of county governments pursuant to an intergovernmental agreement under 18 U.S.C. § 4002 (providing for "suitable quarters for the safekeeping, care, and subsistence " of federal prisoners). *See also Cherry v. Crow,* 845 F. Supp. 1520 (M.D. Fla. 1994) (intent to benefit inmate found in contract between county and prison health service provider). *But see, e.g., Oliver v. Vose,* 1991 WL 97453 (D. Mass. 1991) (no third-party beneficiary rights conferred on federal prisoner in custody of Massachusetts Department of Corrections; contract language merely embodies constitutional right to be free of "cruel and inhumane treatment," rather than specific guarantee of a particular level of care).

248 Some commentators have specifically viewed such third-party suits as a valuable, though by no means dominant, component of an overall contract enforcement scheme. *See, e.g.,* Gentry, Note, *The Panopticon Revisited: The Problem of Monitoring Private Prisons,* 96 Yale L. J. 353, 367 (1986).

249 While such litigation will not usually involve expensive relief -- actual contract damages will be small, and most actions will be seeking to enjoin the private contractor to deliver certain services as promised -- it will create additional transaction costs for the contractor and government agency, since such suits may be independent of tort and Section 1983 actions, and may require a lesser showing of harm.

Case 3:16-cv-02267    Document 383-17    Filed 01/22/21    Page 6 of 15 PageID #: 18620

MARLOWE_0007221

party beneficiary rights by curtailing certain language in the contract [250] or by explicitly renouncing any intent to allow third party suits.[251] The important thing is for public authorities to choose their words as carefully as possible to avoid inadvertent ratification or endorsement of these rights.

## B.    The Importance of Objective Standards

Substantive standards of inmate care and treatment under applicable constitutional provisions and state law will apply to private prisons just as they do to public correctional institutions, thanks to the "state action" doctrine. Still, public correctional authorities have reason to be concerned that private prison managers, operating outside of direct public scrutiny and the political process, and animated by a powerful cost-consciousness, will attempt to reduce staffing and resources in such as way as to spark increased litigation over alleged constitutional harms. This concern remains strong despite the protection afforded by the contractor's private liability insurance and the contractor's market-driven pressures to provide adequate service. Potential harms resulting from defective due process mechanisms have already been discussed in the broader context of delegation concerns. Other harms, resulting from the excessive use of force, poor inmate safety, or inadequate medical care, may cause unnecessary Eighth Amendment violations to occur. As discussed below, contracting governments can attempt to reduce the frequency of these problems by adopting contractual standards that provide a superior foundation for inmate care and treatment.

Like monitoring, having correctional standards in place may act as a powerful means to judge contractor performance and prevent conditions from developing that could prompt litigation. Some states, like Florida, have an elaborate statutory framework that prescribes some operational standards.[252] Most relevant standards, however, will derive from contract terms specifically made a condition of contracting by an RFP. While a detailed discussion of standards lies beyond the scope of this legal review, it is important for present purposes to acknowledge the importance of standards generally, and particularly the importance of standards that constitute measurable, objective management norms.[253] These can form the basis of meaningful performance evaluations as well as a means -- if backed up by fines or other enforcement mechanisms -- of ensuring compliance with fundamental constitutional obligations.

Most available norms address only the minimum operational requirements. Even the ACA Standards for Adult Correctional Institutions, many of whose requirements are mandated by some contracting agencies to be included in private prison contracts, usually provide only general criteria

---

250  *See, e.g.,* CCA-Va. Contract at § 9.7, p. 53. In this case, officials will also have to be alert to the use of preambular language appearing specifically to benefit inmates and provide them with a certain standard of care -- arguably a laudable purpose other wise consistent with one of the major premises of successful privatization.

251  *See, e.g.,* Oklahoma Dept. of Corrections Contract with Capital Correctional Resources, Inc., Dec. 3, 1996 at 18.

252  *See, generally* Fla. Stat., Chapter 944. Some other states address individual standards, albeit vaguely, by statute. *See, e.g.,* N.M. Stat. Ann. § 33-3-6 ("independent contractors shall supply prisoners with food of a good and wholesome quality and sufficient in quantity for the proper maintenance of life").

253  For example, food requirements can be phrased in terms of caloric intake and types of food rather than generalities like "th ree balanced meals per day."

Case 3:16-cv-02267   Document 383-17   Filed 01/22/21   Page 7 of 15 PageID #: 18621

MARLOWE_0007222

for the treatment of inmates. The standards are general in nature, are intended for institutions of all types and varieties, and tend to leave prison administrators considerable discretion in developing specific policies and procedures. Moreover, only 41 of the code's nearly 500 provisions are deemed "mandatory." However, public correctional authorities frequently specify in a contract that a contractor shall achieve ACA accreditation within 18 months or 2 years of contract signature, and that it comply with 100% of the mandatory ACA standards.[254] Specific application in a particular facility and contract requires that the standards be refined and adapted to local needs. At the same time government may chose not to spell out requirements in detail in the belief that innovation and alternative approaches would be stifled.

### 1. Special Attention to Staffing and Training

Adequate, quality staffing and training constitute two of the most critical contract provisions public corrections authorities may address in private prison agreements. Both represent likely areas in which private contractors will seek to reduce expenditures, either through the payment of lower wages and benefits, the hiring of less experienced personnel, the deployment of innovative staffing patterns, or the introduction of special technology (e.g., specialized surveillance equipment).

To prevent unnecessary and unwanted risk-taking in this area, public authorities have often addressed staffing matters in detail. Some observers have suggested including provisions on minimum required personnel per shift, the number of days per week to be worked by each person, and the positions that, for reasons of security, must be filled at all times.[255] Others believe such provisions are sometimes difficult to prescribe up front in an RFP (particularly in the case of new prison construction) and may remove opportunities for creative staffing proposals.[256] Accordingly, public officials have crafted RFPs that define "key personnel"[257] but then specifically require illustrative staffing patterns to be included in private contractors' proposals, so as to help ensure that contractors can deliver the kind of adequate staffing sought by the contracting agency.[258]

Training requirements may loom as large as staffing level requirements in ensuring that private contractors meet their inmate care responsibilities. Some governments have, like the state of

---

254  *See, e.g.,* CCA-Va. Contract at p. 11.

255  *See* Gold, *supra* at 393. Gold cites Puerto Rico private correctional contracts that he has negotiated in which these and other matters are addressed through a formula to yield the total number of persons required to fully staff each position in a facility. Such contracts also define which positions are required to be filled, which can remain vacant for some periods, and which are to be filled on an independent contract basis.

256  Richard Crane, a veteran negotiator of private prison contracts, believes that governments are wise to give weight to contra ctors' competing staffing plans during the proposal evaluation process. Telephone interview with Mr. Crane, June 2, 1998.

257  The BOP's Taft RFP, for example, sets forth 14 positions deemed "essential personnel" with specific qualifications and backg round experience specified. Taft RFP at 15-16.

258  Contracting officials can also incorporate into RFP's and contracts requirements that private contractors meet applicable AC A standards on staffing. These address the need for ongoing review of staffing requirements, the development of an appropriate formula of time and persons necessary to yield a proper staffing pattern, and policies and procedures governing all types of s taffing needs. *See* ACA Standards for Adult Correctional Institutions 4-4072, 4-4073, 4-4074, and 4-4075. *See also, e.g.,* the states of Tennessee and New Mexico, which specifically provide that prison employees do not need to have the same training as sate correctional officers. *See* Tenn. Code. Ann.. 41-24-111(3); N.M. Stat. Ann. 33-3-28(B).

Florida, mandated that private operators meet the same training requirements that public authorities must satisfy. While many contractors and some correctional authorities have wrongly believed that such a requirement is too inflexible,[258] having the same training standards in fact, ensures that proper safety requirements are met and creates a level playing field between public and private facilities, building public trust in the latter and allowing for helpful cost comparisons.[258] While ACA standards address a host of training issues,[259] public authorities can add specialized training requirements for particular purposes or types of employees. And while some corrections authorities may require that the private contractor pay for all necessary training, others like the U.S. Bureau of Prisons, may view certain types of training as so unique, and uniformity of service so important, that they will supply certain types of training themselves at no cost to the contractor.[260]

## C. Effective Contract Performance and Enforcement

Effective contract performance and enforcement encompasses far more than the liability reduction mechanisms discussed earlier in Section 3 above. A well-designed and well-written private prison contract obviously looks to superior contractor performance on a variety of fronts, including cost-effectiveness and delivery of services. It also seeks to avoid liability problems and litigation altogether by encouraging flexible preventive systems to operate effectively.

### 1. Contract Term and Renewal

A good contract seeks to prevent contractor entrenchment and complacency with respect to the agreement as a whole. Rebidding contracts at regular intervals and having shorter-term contracts forces an incumbent firm to emphasize good performance and undertake innovative practices that can keep its costs low and position it advantageously for a re-bid or contract renewal. A shorter contract term will also, particularly at the onset of privatization, relieve the parties of having to foresee and write into an initial contract all types of eventualities. If, however, public authorities set a contract term that is too short, contract incentives will be lessened and contractors will not have sufficient opportunity to demonstrate innovations or returns on certain human or capital investments. Contracting agencies' "availability of funds" restrictions may also prohibit contracting that extends beyond a certain budget period. Most observers seem to believe that three or four years represents an ideal

---

258  By the same token, however, if public standards themselves are viewed as lax, others concerned about inmates' rights may believe that such training parity is inadequate. *See, e.g.,* Robbins, The Legal Dimensions of the Prison Privatization, *supra* at 276-77. Robbins suggests that contractors meet the higher of applicable ACA Adult Correctional Institution standards or locally applicable state, local, or agency-specific training requirements.

259  *See* ACA Standards 2-4079 through 2-4101.

260  *See* Taft RFP at 16-17 (highlighting as many as 19 different types of training to be provided to a contractor on a one-time basis upon request).

contracting period.[261] Consistent with an overall preference for relatively shorter contracting terms, renewal periods should also be limited in number and duration, although they may provide for renegotiation of the contract price.[262]

### 2. Bolstering Good Performance

A variety of contractual mechanisms can support good performance on the part of contractors. These include promulgation of clear objectives, and where possible, measurable standards, active monitoring of the contract by government corrections authorities, inmates, and the public,[263] and progressive compliance with certain target indicators or compilations of standards. Requiring a contractor to comply over time with a collection of ACA standards or obtain ACA accreditation[264] represents another approach to encouraging good performance that acknowledges the time necessary for some contractors to demonstrate adequate or superior service delivery in particular institutions. In addition to reliance on generic standards such as these, public corrections officials may fashion performance benchmarks of their own, focusing on indicators like numbers of complaints against staff, numbers of disruptive or violent incidents among inmates or against the staff, number and nature of disciplinary actions against inmates and staff, rates at which inmates complete certain programs successfully, etc. These could conceivably serve as the basis for certain kinds of reward or incentive payments, although the record of employing such bonus payments is relatively poor, and their use tends to muddy comparisons with the private sector, which receives no such bonuses. Also, to prevent complacency, most correctional specialists believe that in a market context, renewal of a contract should serve as a perfectly adequate incentive or award.[265]

### 3. Contract Enforcement through Termination

Contract termination remains the ultimate lever to ensure contract compliance. Most contracts recognize the following as possible grounds for termination: nonperformance, noncompliance with monitoring or auditing findings, failure to meet minimum standards and conditions of incarceration specified in the contract, replacement of key personnel with unsuitable successors, serious conflicts of interest,[266] the filing of a petition in bankruptcy, reorganization or

---

261 *See, e.g.,* Robbins, Legal Dimensions of Private Incarceration *supra* at 186 (three years balances competing interests in efficiency and practicality); D. Shichor, Punishment For Profit 113 (governments often prefer short contracts up to three years in light of possible changes in political administration). Tennessee and New Mexico statutorily limit the duration of contracts to three years.

262 Shorter renewal periods will act against unnecessary entrenchment while allowing a successful contracting relationship to continue without unnecessary disruption or additional costs. Adequate notice, however, should precede a contracting agency's determination to either exercise a renewal option or re-bid a contract. *See generally* CSG Report *supra* at 98-100 (noting that in no case should automatic renewals exceed five years).

263 Many observers believe significant public access to, and monitoring of, private prisons can support monitoring efforts by public officials and inmates. *See, e.g.,* Gentry, *The Panopticon Revisited, supra* at 364-67; Keating, *Monitoring Private Prison Performance, supra* at 151-53.

264 *See* text at fn. 254, *supra*. The BOP's Taft RFP calls for a 24 month period to obtain accreditation.

265 Many believe that causation and measurement problems make reward payments of this nature problematic.

266 Some contracts may include detailed conflict of interest provisions. These provision loom more important today, given controversies that have erupted in recent years about unseemly relationships developing between private contractor officials and public authorities, including both legislators and correctional officials.

liquidation, or unavailability of funds. Virtually all government authorities will also insist on termination without cause, or "for convenience,"[267] as well as specific steps and emergency plans to be deployed in the event the government reassumes control of a facility or turns operation over to another party. As is obvious, however, termination represents an exceedingly blunt instrument for remedying contractual problems that fall short of default or grossly deficient performance. "Even the opening up to rebidding of an existing contract can prove traumatic if the contract involves heavy capital commitments, considerable staff, and a significant number of prisoners."[268]

### 4. Contract Enforcement Through Fines and Penalties

Fines or performance penalties provide contracting agencies with a more flexible tool to spur contractor compliance with a prison contract. Fines can be set in such a way that they tap market-oriented motivations and provide contractors with a continuous incentive to innovate and improve conditions over time. Although some commentators enthusiastically endorse penalties for significant acts or omissions such as deaths in custody, escapes or instances of recidivism, or incidence of illnesses or injuries,[269] others may question whether these are proper measures for penalties, and whether more objective criteria related to day-to-day performance might be utilized.

Given the pervasiveness, acceptability, and relative neutrality of the ACA Adult Correctional Institution Standards, some have built a performance penalty regime around them. For example, one contract negotiator has recounted the use of monetary payments to the government tied to criteria such as failure to meet a mandatory or essential ACA standard or failure to fill a particular position.[270] While correctional specialists can disagree about reliance on specific ACA or staffing criteria to generate penalties, incorporating some measures like these into a private prison contract can at least provide an early 'tripwire' for informed discussion by contractor and public corrections personnel about performance concerns. This represents an enormous advance over adversarial termination

---

267 Both Arizona and Tennessee have formally enacted termination for convenience statutes. Ariz. Rev. Stat. Ann. § 41. 1609.01(C ); Tenn. Code Ann. 41- 24-104(a)(4). Each of these statutes provides for 90 days notice to the contractor.

268 Keating, *Monitoring Private Prison Performance supra*, at 142.

269 *See, e.g.,* Gentry, *The Panopticon Revisited, supra* at 362. Gentry also believes that fines can be set in such a way "as to counter the perverse incentive for the firm to create demand for its own product [which it could do] by fomenting violence among current inmates in order to scuttle parole chances, arbitrarily reducing good time, or "dehabilitating prisoners so that they are more prone to recidivism. Such actions will, either directly or indirectly, increase the firm's fine costs." Many would question whether fin es are necessary to create the proper incentives for contractors in these particular areas, or would question whether contractors have sufficient control over certain environmental factors to make such penalties as effective and targeted as are generally presume d.

270 *See, e.g.,* Gold, *The Privatization of Prisons, supra* at 395-97. In the Puerto Rico contracts that he showcases in this article, the author states that "monetary payments to the government can be thought of either as performance penalties, liquidated damages , or payment adjustments for the operator's failure to provide services or staff or to meet standards being paid for by the governme nt." *Id.* at 395. In one contract, Gold alludes to monetary penalties of $750 per day per failure for failure to meet a mandatory ACA standard. He also states that a failure to obtain ACA accreditation may "incur several such penalties per day since all of the thirty-eight [now 41] Mandatory ACA Standards must be met for accreditation." Finally, Gold cites as a typical penalty for an unfilled position -- e.g., failure to staff a fixed post -- "the amount of the salary not paid, time a multiplier for fringe benefits, p lus a penalty of 10 percent." *Id.* at 397. The penalty rises to 20 percent for vacancies in excess of 30 days for a nonprofessional and 45 days for a professional employee.

discussions by lawyers, which usually occur long after performance problems have manifested themselves or shown themselves susceptible to effective solutions.

## 5. Dispute Resolution

Given the popularity of alternative dispute resolution (ADR), it is to be expected that the parties to a correctional privatization contract might contemplate incorporation of certain ADR mechanisms into such an agreement. While mediation effects no major change in the rights of either party -- so long as there is some time limit on its use and the parties retain their rights to utilize the judicial process should mediation fail -- arbitration is another story. Under arbitration, parties typically agree to submit a dispute to neutral third parties (typically industry experts) who will enter a decision that, based on the specific contractual terms, will be either binding or non-binding on the parties. While arbitration is generally seen as less costly and formal than recourse to judicial mechanisms, its use by public correctional authorities should be weighed carefully.

One drawback is that arbitration provides for a less formal discovery process, so that a public correctional agency could find it difficult to obtain promptly all of the materials and evidence it needs to prove its case. In many cases there is no substitute for prompt and effective injunctive relief -- something that only a court can render. There is also no substitute for contract termination in many circumstances. Finally, there are also many situations where public policy dictates use of an open, public forum to resolve a dispute, with a detailed, complete elaboration of issues on the record that cannot be obtained through arbitration. In general, public correctional authorities are likely to want to retain as much flexibility as possible to avoid ADR and the extended discussions and delays it can engender. Only on matters involving payment disputes (where industry standards might be important), or relatively inconsequential disagreements (e.g., involving non-mandatory ACA standards) will a public correctional agency be likely to consider submitting disputes to arbitration.

# Appendix 4

# State and Federal Prisoners in Government and Privately Operated Facilities, December 31, 1997

## Table 4.A
### State and Federal Prisoners in Government and Privately Operated Facilities, December 31, 1997

| | Privately Operated | | | Government Operated | | | Total |
|---|---|---|---|---|---|---|---|
| | In-State Facilities | Out-of-State Facilities | Total Private | In-State Facilities | Out-of-State Facilities | Total Government | |
| Alaska | — | — | — | — | — | — | — |
| Alabama | 0 | 0 | 0 | 21,870 | 420 | 22,290 | 22,290 |
| Arkansas | 0 | 0 | 0 | 10,200 | 255 | 10,455 | 10,455 |
| Arizona | 1,335 | 0 | 1,335 | 23,866 | 0 | 23,866 | 25,201 |
| California | 2,948 | 0 | 2,948 | 153,937 | 514 | 154,451 | 157,399 |
| Colorado | 1,382 | 1,008 | 2,390 | 8,842 | 0 | 8,842 | 11,232 |
| Connecticut | 588 | 0 | 588 | 15,558 | 66 | 15,624 | 16,212 |
| Delaware | 0 | 0 | 0 | 4,801 | 0 | 4,801 | 4,801 |
| Florida DOC | 798 | 0 | 798 | 60,713 | 162 | 60,875 | 61,673 |
| Florida CPC | 3,079 | 0 | 3,079 | 0 | 0 | 0 | 3,079 |
| Georgia | 0 | 0 | 0 | 38,109 | 0 | 38,109 | 38,109 |
| Hawaii | 0 | 600 | 600 | 2,762 | 0 | 2,762 | 3,362 |
| Iowa | 0 | 0 | 0 | 6,932 | 49 | 6,981 | 6,981 |
| Idaho | 0 | 613 | 613 | 3,333 | 0 | 3,333 | 3,946 |
| Illinois | 0 | 0 | 0 | 40,788 | 0 | 40,788 | 40,788 |
| Indiana | 0 | 69 | 69 | 16,520 | 0 | 16,520 | 16,589 |
| Kansas | 0 | 0 | 0 | 7,914 | 96 | 8,010 | 8,010 |
| Kentucky | 1,490 | 0 | 1,490 | 9,330 | 0 | 9,330 | 10,820 |
| Louisiana | 3,581 | 0 | 3,581 | 14,889 | 0 | 14,889 | 18,470 |
| Maine | — | — | — | — | — | — | — |
| Massachusetts | 0 | 0 | 0 | 11,738 | 403 | 12,141 | 12,141 |
| Maryland | 0 | 0 | 0 | 21,840 | 0 | 21,840 | 21,840 |
| Michigan | 0 | 0 | 0 | 45,348 | 20 | 45,368 | 45,368 |
| Minnesota | 50 | 0 | 50 | 5,151 | 125 | 5,276 | 5,326 |
| Missouri | 58 | 0 | 58 | 23,643 | 0 | 23,643 | 23,701 |
| Mississippi | 2,522 | 0 | 2,522 | 12,910 | 0 | 12,910 | 15,432 |
| Montana | 357 | 380 | 737 | 1,802 | 0 | 1,802 | 2,539 |
| North Carolina | 0 | 0 | 0 | 31,545 | 0 | 31,545 | 31,545 |
| North Dakota | 0 | 50 | 50 | 770 | 0 | 770 | 820 |
| Nebraska | 0 | 0 | 0 | 3,327 | 0 | 3,327 | 3,327 |
| New Hampshire | 0 | 0 | 0 | 2,140 | 75 | 2,215 | 2,215 |
| New Jersey | 0 | 0 | 0 | 27,776 | 0 | 27,776 | 27,776 |
| New Mexico | 704 | 354 | 1,058 | 3,486 | 132 | 3,618 | 4,676 |

Appendix 4 — Private Prisons — 1

Table 4.A
State and Federal Prisoners in Government and Privately Operated Facilities, December 31, 1997

| | Privately Operated | | | Government Operated | | | Total |
|---|---|---|---|---|---|---|---|
| | In-State Facilities | Out-of-State Facilities | Total Private | In-State Facilities | Out-of-State Facilities | Total Government | |
| Nevada | 496 | 0 | 496 | 8,340 | 188 | 8,528 | 9,024 |
| New York | 0 | 0 | 0 | 70,026 | 0 | 70,026 | 70,026 |
| Ohio | 0 | 0 | 0 | 47,808 | 0 | 47,808 | 47,808 |
| Oklahoma | 3,655 | 933 | 4,588 | 15,846 | 0 | 15,846 | 20,434 |
| Oregon | 0 | 71 | 71 | 7,723 | 0 | 7,723 | 7,794 |
| Pennsylvania | 0 | 0 | 0 | 34,964 | 0 | 34,964 | 34,964 |
| Rhode Island | 0 | 0 | 0 | 2,647 | 66 | 2,713 | 2,713 |
| South Carolina | 0 | 0 | 0 | 21,314 | 24 | 21,338 | 21,338 |
| South Dakota | 70 | 0 | 70 | 2,151 | 18 | 2,169 | 2,239 |
| Tennessee | 2,958 | 0 | 2,958 | 12,153 | 0 | 12,153 | 15,111 |
| Texas | 7,223 | 0 | 7,223 | 136,680 | 13 | 136,693 | 143,916 |
| Utah | 378 | 6 | 384 | 4,395 | 85 | 4,480 | 4,864 |
| Virginia | 0 | 0 | 0 | 28,870 | 0 | 28,870 | 28,870 |
| Vermont | 0 | 0 | 0 | 1,291 | 6 | 1,297 | 1,297 |
| Washington | 0 | 0 | 0 | 12,002 | 0 | 12,002 | 12,002 |
| Wisconsin | 0 | 0 | 0 | 14,080 | 819 | 14,899 | 14,899 |
| West Virginia | 0 | 0 | 0 | 3,172 | 0 | 3,172 | 3,172 |
| Wyoming | 0 | 99 | 99 | 1,283 | 0 | 1,283 | 1,382 |
| District of Columbia | 202 | 1,725 | 1,927 | 6,083 | 580 | 6,663 | 8,590 |
| Federal BOP | 9,951 | 0 | 9,951 | 87,099 | 1,581 | 88,590 | 98,631 |
| Puerto Rico | 2,567 | 0 | 2,567 | 12,137 | 46 | 12,183 | 14,750 |
| Virgin Islands | 0 | 70 | 70 | 453 | 97 | 550 | 620 |
| Totals | 46,392 | 5,978 | 52,370 | 1,162,357 | 5,840 | 1,168,197 | 1,220,567 |
| | (3.8%) | (.5%) | (4.3%) | (95.2%) | (.5%) | (95.7%) | (100%) |

Notes:

1. "Private facilities" include all those privately operated, regardless of facility's ownership.
2. "In-state" facilities are located in the geographic boundaries of the relevant governmental unit; "out-of-state" facilities are not.
3. Texas data excludes prisoners in privately operated facilities that function as jails, even though they are under contract with the state of Texas.
4. Prisoners in out-of-state government facilities for the Federal Bureau of Prisons includes prisoners in a correctional facility operated by any other governmental agency at state or local levels.
5. For this table, some responding agencies included prisoners housed in community-based facilities (such as halfway houses, home confinement, etc.) in the reported figures, especially those describing private facilities. These facilities and prisoners are not included elsewhere in this report. However, we were unable to disaggregate them from the figures reported here.

Source: Computed from data supplied to Abt Associates Inc. in its survey of state and federal correctional administrators.