# EXHIBIT E

# Fordham Urban Law Journal

Volume 42
Number 2 *Prison Privatization: Impacts on Urban*        Article 4
*Communities*

April 2016

# Apples-To-Fish: Public and Private Prison Cost Comparisons

Alex Friedmann
*Human Rights Defense Center*

Follow this and additional works at: https://ir.lawnet.fordham.edu/ulj

⚙ Part of the Civil Rights and Discrimination Commons, Law and Economics Commons, Law and Politics Commons, Law and Race Commons, and the Law Enforcement and Corrections Commons

### Recommended Citation

Alex Friedmann, *Apples-To-Fish: Public and Private Prison Cost Comparisons*, 42 Fordham Urb. L.J. 503 (2014).
Available at: https://ir.lawnet.fordham.edu/ulj/vol42/iss2/4

This Article is brought to you for free and open access by FLASH: The Fordham Law Archive of Scholarship and History. It has been accepted for inclusion in Fordham Urban Law Journal by an authorized editor of FLASH: The Fordham Law Archive of Scholarship and History. For more information, please contact tmelnick@law.fordham.edu.

MARLOWE_0007818

# APPLES-TO-FISH: PUBLIC AND PRIVATE PRISON COST COMPARISONS

### Alex Friedmann[*]

Introduction ...........................................................................................504
I. Background .......................................................................................505
    A. Studies with Favorable Findings ...........................................506
    B. Equivocal and Adverse Research Results .........................507
II. Difficulties in Public-Private Comparisons ..................................509
III. Cost-Shifting Factors.....................................................................513
    A. Prisoner Population Differences .........................................517
    B. Security Level Limitations.................................................521
    C. Medical Cost-Shifting ........................................................523
        1. HIV, HCV, and Other Specified Medical
           Conditions ......................................................................524
        2. Caps on Medical Costs................................................526
        3. Prisoner Eligibility Criteria ...........................................528
        4. Combining Medical Cost-Shifting Factors ..................530
    D. Transportation Costs ...........................................................531
    E. Prisoner Labor Costs ...........................................................533
    F. Administrative Overhead ....................................................534
    G. Law Enforcement and Criminal Prosecutions....................538
    H. Bed Guarantees....................................................................540
    I. Long-Term Costs .................................................................542
        1. Per Diem Increases .......................................................543
        2. Deferred Maintenance..................................................545
        3. Recidivism Rates...........................................................545

[*] Alex Friedmann serves as Associate Director of the Human Rights Defense Center, a non-profit organization, and Managing Editor of HRDC's monthly publication, Prison Legal News (www.prisonlegalnews.org). He also serves in a non-compensated capacity as President of the Private Corrections Institute (www.privateci.org), which opposes the privatization of correctional services. He served ten years behind bars, including six years at a CCA-operated prison in Tennessee, prior to his release in 1999. Special thanks are extended to the staff of the Fordham Urban Law Journal for their review of this Article and helpful critiques. Any errors are the sole responsibility of the author.

Case 3:16-cv-02267   Document 383-18   Filed 01/22/21   Page 3 of 68 PageID #: 18632

MARLOWE_0007819

       4. Bond Financing.................................................................548
    J. Fraud and Corruption..........................................................550
IV. Quality of Service Comparisons..................................................553
    A. Violence Levels.................................................................555
    B. Staff Turnover.................................................................556
    C. ACA Accreditation.............................................................558
    D. Recidivism Rates Redux........................................................561
V. Opportunity Costs.................................................................563
Conclusion...........................................................................567

## INTRODUCTION

It sounds like such a simple question: do private prisons save money? The answer, however, is dependent on a number of factors — including how "saving money" is defined.

Consider that in 2013, the nation's largest for-profit prison company, Corrections Corporation of America (CCA), made $300.8 million in net profit on gross revenue of $1.69 billion.[1] Thus, the company achieved $300.8 million in savings over operational expenses at its prisons, jails, and other detention facilities. But how much of that $300.8 million went to taxpayers or reverted to state treasuries or county coffers?

None. Those "savings" went to CCA in the form of corporate profit.

Over the past three decades there have been dozens of reports and studies on and analyses of cost comparisons between public and privately-operated prisons — by academics, government agencies, and independent organizations — all attempting to answer the elusive question of whether private prisons save money.[2] This is not one of those attempts.

Instead, rather than trying to determine if prison privatization results in savings due to the shifting of costs from public agencies, this Article takes an opposite approach by identifying costs that are shifted from privately-operated facilities to the public sector. An examination of such cost-shifting factors is essential when evaluating

---

1. CORR. CORP. OF AM., FORM 10-K 53–54 (2013).

2. See, e.g., CODY MASON, THE SENTENCING PROJECT, TOO GOOD TO BE TRUE: PRIVATE PRISONS IN AMERICA 7–9 (2012); Gerald G. Gaes, The Current Status of Prison Privatization Research on American Prisons, 3–8, 19–20 (2012) (unpublished manuscript), http://works.bepress.com/cgi/viewcontent.cgi?article=1000&context=gerald_gaes.

MARLOWE_0007820

cost comparisons, to better understand how private prisons externalize expenses while internalizing profits.

In short, public agencies want to save money while private prison companies have an inherent need to make money—and the latter necessarily comes at the expense of the former.[3]

Part I of this Article examines previous public-private prison cost comparison studies, while Part II discusses various factors that make such comparisons difficult. Part III provides an exhaustive look at cost shifting factors, whereby costs are shifted from private prisons to public contracting agencies, and Part IV examines quality of service comparisons—including levels of violence and staff turnover at private prisons, accreditation by the American Correctional Association, and recidivism rates. Part V addresses opportunity costs associated with privately-operated prisons, while the Conclusion proposes an alternative approach when considering whether prison privatization results in cost savings.

## I. BACKGROUND

There is no dearth of research on whether privately-operated correctional facilities are more cost effective or provide equivalent quality of service in comparison to public prisons; numerous studies have reached equally numerous and disparate conclusions.[4] As noted by Alexander Volokh, an Associate Professor at Emory Law School, "somewhat surprisingly, for all the ink spilled on private prisons over the last thirty years, we have precious little good information on what are surely the most important questions: when it comes to cost or quality, are private prisons better or worse than public prisons?"[5] Or, as candidly stated by CCA vice president Steve Owen in reference to whether private prisons save money: "[t]here is a mixed bag of research out there . . . . It's not as black and white and cut and dried as we would like."[6]

---

3. Although this Article focuses on private prisons, that is not to imply that public prisons are without their problems and faults; further, issues related to prison privatization are tied to the larger problem of mass incarceration in the United States, considering that the vast majority of correctional facilities are operated by public agencies.

4. See generally PRISON PRIVATIZATION: THE MANY FACETS OF A CONTROVERSIAL INDUSTRY (Byron Eugene Price & John Charles Morris, eds., 2012) (compiling scholarly works from various commentators on prison privatization).

5. Alexander Volokh, Prison Accountability and Performance Measures, 63 EMORY L.J. 339, 347 (2013).

6. Richard A. Oppel, Jr., Private Prisons Found to Offer Little in Savings, N.Y. TIMES, May 18, 2011, http://www.nytimes.com/2011/05/19/us/19prisons.html.

## A.  Studies with Favorable Findings

That mixed bag includes studies that have identified cost savings and other benefits resulting from prison privatization, such as research conducted in the 1990s by Professor Charles W. Thomas at the University of Florida; a 2008 study by researchers at Vanderbilt University; various reports by the Reason Foundation; and most recently a study by two Temple University economics professors, published in July 2014.  What do they have in common?  All received funding from the private prison industry.

Professor Thomas served as director of the Private Corrections Project at the University of Florida, which studied the private prison industry and produced research and statistical data concerning prison privatization.[7]  He also owned stock in the private prison firms he was researching, served on the board of Prison Realty Trust, a CCA spin-off, and received $3 million in payments from CCA/Prison Realty.[8]  Thomas retired after these conflicts became known; he was later fined $20,000 by the Florida Commission on Ethics, which stated his "contractual relationships with private corrections companies, or companies related to the private corrections industry . . . conflicted with his duty to objectively evaluate the corrections industry through his research with the University of Florida."[9]  Regardless, proponents of prison privatization still occasionally cite his work.[10]

The 2008 Vanderbilt study, which found competitive benefits through a shared system of public and privately-operated prisons, was partly funded by CCA and the Association for Private Correctional and Treatment Organizations (APCTO), an industry trade group.[11]  The Reason Foundation, which strongly favors privatization, has

---

7. See Alex Friedmann, *University Professor Shills for Private Prison Industry*, PRISON LEGAL NEWS (Feb. 15, 1999), https://www.prisonlegalnews.org/news/1999/feb/15/university-professor-shills-for-private-prison-industry; Dara Kam, *Ethics Board Fines Former UF Professor $20,000*, SARASOTA HERALD-TRIB., Oct. 22, 1999, at 1B, 4B.

8. See Friedmann, supra note 7; Kam, supra note 7.

9. Fla. Comm. on Ethics, Final Order No. 99-21 (1999), available at http://www.ethics.state.fl.us/orders/1997/97-100fo.html.

10. See, e.g., LEONARD C. GILROY ET AL., REASON FOUND. & HOWARD JARVIS TAXPAYERS ASS'N, PUBLIC-PRIVATE PARTNERSHIPS FOR CORRECTIONS IN CALIFORNIA: BRIDGING THE GAP BETWEEN CRISIS AND REFORM (2011), available at http://reason.org/files/private_prisons_california.pdf; SIMON HAKIM & ERWIN A. BLACKSTONE, PRISON BREAK: A NEW APPROACH TO PUBLIC COST AND SAFETY (2014), available at http://www.independent.org/pdf/policy_reports/2014-06-30-prison_break.pdf.

11. James F. Blumstein et al., *Do Government Agencies Respond to Market Pressures? Evidence from Private Prisons*, 15 VA. J. SOC. POL'Y & L. 446 (2008).

Case 3:16-cv-02267   Document 383-18   Filed 01/22/21   Page 6 of 68 PageID #: 18635

MARLOWE_0007822

received funding from private prison companies since at least the 1990s.[12] For example, a 2009 Reason Foundation donor list included the GEO Group—the nation's second-largest for-profit prison firm— as a Platinum Level supporter, while CCA was listed as a Gold Level supporter.[13] And the report by Temple University professors Simon Hakim and Erwin A. Blackstone, which found substantial cost savings through prison privatization, received funding from the nation's three largest private prison companies: CCA, the GEO Group, and Management & Training Corp. (MTC).[14] That funding was not disclosed in their initial working paper, but it was mentioned when the study was subsequently published by The Independent Institute.[15]

Of course, the mere fact that these studies received funding from the private prison industry does not mean their findings are faulty. Such studies do, however, stand in contrast to another body of research—not funded by for-profit prison companies—that has reached contrary conclusions.

### B. Equivocal and Adverse Research Results

As early as 1996 a report by the then-U.S. General Accounting Office (GAO) reviewed five studies on prison privatization, and concluded that cost savings were inconclusive: "regarding operational costs, because the studies reported little difference and/or mixed results in comparing private and public facilities, we could not conclude whether privatization saved money."[16]

A 2003 review of public and private prison cost comparisons published in The Prison Journal concurred, finding that "neither side of the correctional privatization debate should, at this time, be able to legitimately claim that the weight of the empirical evidence is on their

---

12. PRIVATE CORR. INST., POLICY BRIEF: DO PRIVATE PRISONS SAVE MONEY? 2 (2012), available at http://www.privateci.org/private_pics/PCI%20policy%20brief% 20on%20private%20prison%20costs%202012.pdf.

13. REASON FOUND., CARRYING THE TORCH OF FREEDOM (2009), available at https://www.prisonlegalnews.org/media/publications/reason_magazine_supporters_in cl_private_prisons_2009.pdf.

14. HAKIM & BLACKSTONE, supra note 10, at 70; see also Martha Woodall, Temple Completes Probe of Profs' Prison Study, PHILA. INQUIRER, July 18, 2014, http://articles.philly.com/2014-07-18/news/51663586_1_ethics-complaint-alex-friedmann-temple-university.

15. See Woodall, supra note 14; see also HAKIM & BLACKSTONE, supra note 10, at 70.

16. U.S. GEN. ACCOUNTING OFFICE, GAO/GGD-96-158, PRIVATE AND PUBLIC PRISONS: STUDIES COMPARING OPERATIONAL COSTS AND/OR QUALITY OF SERVICE 7 (1996), available at http://www.gao.gov/archive/1996/gg96158.pdf.

Case 3:16-cv-02267   Document 383-18   Filed 01/22/21   Page 7 of 68 PageID #: 18636

MARLOWE_0007823

side."[17]  More recently, a meta-analysis by the University of Utah's Criminal Justice Center, published in 2009, found that, "[c]ost savings from privatizing prisons are not guaranteed and appear minimal."[18] The researchers, who examined a dozen studies, concluded that "prison privatization provides neither a clear advantage nor disadvantage compared with publicly managed prisons. Neither cost savings nor improvements in quality of confinement are guaranteed through privatization."[19]    Similarly, an August 2010 review by Professor Gerald G. Gaes at Florida State University concluded that "[d]irect comparisons of cost and quality neither favor the public nor the private sector."[20]

Yet, a 2010 report by Arizona's Office of the Auditor General, based on data from the Department of Corrections, noted that privately-operated prisons were actually more expensive than their public counterparts.[21]  The report stated:

> [A]ccording to the Department's Fiscal Year 2009 Operating Per Capita Cost Report, the State paid private prisons a higher per inmate rate than it spent on equivalent services at state-operated facilities in fiscal year 2009.  After adjusting state and private rates to make them more comparable, the Department's study found that rates paid to private facilities were higher for both minimum- and medium-custody beds—the two categories of beds for which the Department contracts.[22]

Specifically, after adjusting "for healthcare costs, depreciation costs, and costs for functions provided only by the State," the Auditor's Office reported that the fiscal year (FY) 2009 per diem cost for minimum-security prisoners at state facilities was $46.81, compared with $47.14 at private prisons, while the per diem cost for

17. Dina Perrone & Travis C. Pratt, Comparing the Quality of Confinement and Cost-Effectiveness of Public Versus Private Prisons: What We Know, Why We Do Not Know More, and Where to Go from Here, 83 PRISON J. 301, 315–16 (2003), available at http://tpj.sagepub.com/content/83/3/301.full.pdf.

18. Brad W. Lundahl et al., Prison Privatization: A Meta-Analysis of Cost and Quality of Confinement Indicators, 19 RES. ON SOC. WORK PRAC. 383, 383 (2009), available at http://www.epsu.org/IMG/pdf/luhndahl-prisons-.pdf.

19. Id. at 392.

20. Gaes, supra note 2, at 8.

21. STATE OF ARIZ. OFFICE OF THE AUDITOR GEN., REPORT NO. 10-08, DEPARTMENT OF CORRECTIONS—PRISON POPULATION GROWTH (2010), available at http://www.azauditor.gov/Reports/State_Agencies/Agencies/Corrections_Department_of/Performance/10-08/10-08.pdf.

22. Id. at 19–20.

medium-security prisoners at state facilities was $48.13, compared with $55.89 at private prisons.[23]

Somewhat similar results were reported by the Arizona Department of Corrections (ADC) in an April 2011 report that found the FY 2010 adjusted daily per capita cost for minimum-security prisoners at state prisons was $46.59, just slightly higher than the $46.56 cost at in-state privately-operated facilities.[24]  The adjusted per capita cost for medium-security prisoners was $48.42 at state prisons—significantly lower than the $53.02 cost at in-state private prisons.[25]

In Georgia, cost allocations by the state Department of Corrections found, based on FY 2012 data, that the average per diem cost at state prisons was $51.27 while the cost at privately-operated facilities was $52.75, or around 2.88% higher.[26]  Considering only state funds and excluding proration of central office expenses, the average per diem cost at state prisons was $49.69 compared with $52.30—around 5.2% higher—at privately-operated facilities.[27]

Apparently, the results of the existing body of research on public-private prison cost comparisons depend in part on who performs the study, and partly on what factors are considered when evaluating cost measures; for example, how per diem rates are calculated.

## II. Difficulties in Public-Private Comparisons

Why are there such dissimilar research outcomes, with some studies finding cost savings through prison privatization, others not being able to determine if savings occur, and yet others concluding that private prisons result in higher costs?  In one case, separate studies by the Federal Bureau of Prisons (BOP) and Abt Associates[28] examined the same four facilities, three public and one private, over

---

23. Id. at 20.
24. ARIZ. DEP'T OF CORR., FY 2010 OPERATING PER CAPITA COST REPORT 3 (2011), available at http://archive.azcentral.com/ic/pdf/0904prison.pdf.
25. Id.
26. GA. DEP'T OF CORR., FY 2013 ALLOCATION OF COST TO INMATES, PROBATIONERS, ETC. 1 (2014), available at http://www.dcor.state.ga.us/pdf/CorrectionsCosts.pdf.
27. Id.
28. Abt Associates, a private firm, frequently conducts research for government agencies. See ABT ASSOCIATES, www.abtassociates.com (last visited Nov. 12, 2014).

the same time period, and reported markedly different results.[29]  A number of factors make an apples-to-apples comparison difficult.

It is hard to compare private and public prisons unless they share similar security levels, population types (including gender, average age of offenders, medical and mental health care needs, etc.), staffing levels, programming, age of the facility, and other relevant characteristics.[30]   Absent comparable facilities, researchers lack comparable data.   Thus, some studies have attempted to analyze hypothetical public and private prisons rather than actual ones.[31]  In other cases, studies have concluded that such comparisons simply are not possible; as noted by the GAO in an October 2007 report:

> A methodologically sound cost comparison analysis of BOP and private low and minimum security facilities is not currently feasible because BOP does not gather data from private facilities that are comparable to the data collected on BOP facilities . . . . [W]ithout comparable data, BOP is not able to analyze and justify whether confining inmates in private facilities would be more cost-effective than other confinement alternatives such as constructing new BOP facilities or renovating existing BOP facilities.[32]

Or as stated by Davidson County, Tennessee, Sheriff Daron Hall, past president of the American Correctional Association and a former CCA program manager, "I've seen so many different attempts to compare the two [public and private prisons] that I don't know if there is a simple way to evaluate one versus the other."[33]

Consider that when comparing public and privately-operated prisons, the costs of the former are just as important as those of the latter.   While the focus tends to be on expenses at private prisons, without accurate costs for public prisons such comparisons are meaningless.   In some cases the methodology for determining baseline operating expenses at public prisons has been faulted, which

---

29. See Gerry Gaes, Cost, Performance Studies Look at Prison Privatization, NAT'L INST. JUST. J., March 2008, at 32, available at https://www.ncjrs.gov/pdffiles1/nij/221507.pdf; see also Volokh, supra note 5.

30. See DOUGLAS MCDONALD ET AL., PRIVATE PRISONS IN THE UNITED STATES: AN ASSESSMENT OF CURRENT PRACTICE iv–v (1998), available at http://www.abt associates.com/Reports/priv-report.pdf.

31. See, e.g., U.S. GEN. ACCOUNTING OFFICE, supra note 16, at 26.

32. U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-08-6, COST OF PRISONS: BUREAU OF PRISONS NEEDS BETTER DATA TO ASSESS ALTERNATIVES FOR ACQUIRING LOW AND MINIMUM SECURITY FACILITIES 10 (2007), available at http://www.gao.gov/assets/270/267839.pdf.

33. Annmarie Timmins, N.H. Officials Mull Private Prison Bids, CONCORD MONITOR, Apr. 8, 2012, http://www.concordmonitor.com/article/322211/nh-officials-mull-private-prison-bids (quoting Daron Hall).

MARLOWE_0007826

undermines public-private prison cost comparisons. In Hawaii, which houses almost a third of its prisoners in privately-operated facilities on the U.S. mainland, a December 2010 report by the state Auditor's office cited problems with the way the Hawaii Department of Public Safety (PSD) calculated costs at in-state public prisons.[34] According to the Auditor, "PSD reports that it spends about twice as much to maintain an inmate in-state. However, we found that these cost estimates are based on a flawed methodology designed around what is easiest for the department to report, or, as one PSD official characterized, 'quick and dirty' numbers."[35] Consequently, the "true costs are unknown."[36] The Auditor's office released a follow-up report in April 2013, noting that the PSD had "improved the accuracy of its incarceration data, employing a more systematic process that utilizes comparable costs and cost-accounting methodology."[37] However, the report also found that due to various factors, "the department's calculation on per capita incarceration costs for the various inmate populations is still inaccurate and skews overall inmate costs."[38]

But private prison companies and their proponents make it sound so easy: as one theoretical example, say the average per diem cost for housing a prisoner at a state facility is $55 while the average cost at a private prison is $45. Thus, obviously, the privately-operated prison saves money. That comparison, however, falls somewhere between the "damned lies" and "statistics" of the well-known aphorism variously attributed to Mark Twain or Benjamin Disraeli: "[t]here are three kinds of lies: lies, damned lies and statistics."[39] Some comparisons of public versus private prison costs rely heavily on statistical prevarication. Take, as an example, a joint report released by the Reason Foundation and the Howard Jarvis Taxpayers Association (HJTA) in 2010.[40] The report advocated sending 25,000

---

34. HAW. OFFICE OF THE AUDITOR, REPORT NO. 10-10, MANAGEMENT AUDIT OF THE DEPARTMENT OF PUBLIC SAFETY'S CONTRACTING FOR PRISON BEDS AND SERVICES (2010), available at http://files.hawaii.gov/auditor/Reports/2010/10-10.pdf.

35. Id.

36. Id. at 15.

37. HAW. OFFICE OF THE AUDITOR, REPORT NO. 13-03, REPORT ON THE IMPLEMENTATION OF STATE AUDITOR'S 2010 RECOMMENDATIONS 45 (2013), available at http://files.hawaii.gov/auditor/Reports/2013/13-03.pdf.

38. Id. at 47.

39. For an exhaustive discussion on the origin of this saying, see Lies, Damned Lies and Statistics, UNIV. OF YORK, http://www.york.ac.uk/depts/maths/histstat/lies.htm (last revised July 19, 2012).

40. GILROY ET AL., supra note 10.

MARLOWE_0007827

California prisoners to out-of-state privately-operated facilities, claiming savings of up to $1.8 billion over a five-year period based on an estimated $162 per diem cost at in-state prisons.[41]  California currently houses around 9000 prisoners in out-of-state facilities.[42]

The Private Corrections Institute (PCI),[43] which opposes the privatization of correctional services, issued a press release on May 21, 2010, stating:

> The $162 per diem rate cited in the report, which was obtained by simply dividing the state's corrections budget by its prison population, grossly misrepresents the actual cost of incarceration. For example, the inflated per diem rate in the Reason-HJTA report inaccurately includes parole supervision and administrative costs, which are part of the prison system's budget; medical and mental health care expenses, which are under the control of the federally-appointed receiver; and central office administrative overhead. The report's exaggerated per diem rate also apparently includes prison design and construction expenses, which are not factored into private prison cost analyses.  The report fails to consider that privately-run prisons do not house maximum-security California prisoners, death row prisoners, female prisoners, juveniles or prisoners with serious mental health or medical conditions, all of whom are more expensive to incarcerate. In the latter regard, medical costs for California inmates held in private prisons are capped at $2,500 per prisoner; the state must pay medical expenses above that amount, plus all treatment costs for inmates who are HIV-positive.[44]

In fact, the California Legislative Analyst's Office (LAO) reported in a January 2007 letter that, "the state now budgets on average about $56 per inmate per day for each additional prison inmate—often referred to as overcrowding costs per inmate.  By comparison, the contracted rate for . . . new out of state prison beds is higher, about $63 per inmate per day."[45]  The LAO further noted that the per diem

---

41. Id.

42. See Out of State Population Capacity, CAL. DEP'T CORRECTIONS & REHABILITATION, http://www.cdcr.ca.gov/Visitors/CA_Out_Of_State_Facilities.html (last visited Nov. 12, 2014).

43. PRIVATE CORRECTIONS INST., www.privateci.org (last visited Nov. 12, 2014). Note: the author serves as president of the Private Corrections Institute.

44. Press Release, Private Corr. Inst., Report on Prison Privatization Plagued with Conflicts of Interest, Faulty Data, Political Connections (May 25, 2010), available at http://penknifepresscop.blogspot.com/2010/05/report-on-prison-privatization-plagued.html.

45. Letter from Elizabeth G. Hill, LAO Legislative Analyst, to Gloria Romero, Cal. State Senator (Jan. 5, 2007), available at https://www.prisonlegalnews.org/media/

MARLOWE_0007828

rate for prisoners in out-of-state private prisons did not include transportation costs, the cost of oversight by state officials or medical expenses above the $2500 cap.[46]

This led PCI executive director Ken Kopczynski to observe: "[c]ontrasting the inaccurate per diem rate in the [Reason-HJTA] report with the cost of housing inmates in out-of-state private prisons cannot even be considered an apples-to-oranges comparison. It's more like an apples-to-fish comparison."[47]

## III. COST-SHIFTING FACTORS

Typically, private prison contracts are based on a per diem model; the public contracting agency, such as a state Department of Correction or sheriff's office, pays a set amount per prisoner, per day to the private prison company; therefore, to reduce costs, contracting agencies are incentivized to contract with the company offering the lowest per diem rate. But as indicated above and discussed below, there are a number of factors that can result in costs to public agencies beyond the contractual per diem rate. Such cost-shifting factors, which include differences in prisoner populations and security levels, medical expenses, transportation costs, and administrative overhead, serve to inflate the costs paid by the public contracting agency while deflating the expenses of private prison companies. Many of the earlier studies that compared costs at public and private prisons failed to adequately address relevant cost-shifting factors, including long-term expenses.[48] The importance of adjusting for factors that shift costs from private prisons to the public sector is demonstrated by the following examples.

As noted above, a 2010 report by Arizona's Office of the Auditor General found that privately-operated prisons were more expensive than public prisons when using an adjusted per capita rate. Using a non-adjusted rate, the report found the cost for housing minimum-security prisoners in private facilities was $54.78—significantly less than the non-adjusted per capita rate of $58.80 at public prisons.[49]

---

publications/CA%20LAO%20report%20on%20out%20of%20state%20private%20prisons.pdf.

46. Id.

47. Press Release, Private Corr. Inst., supra note 44.

48. See supra Part I.

49. STATE OF ARIZ. OFFICE OF THE AUDITOR GEN., supra note 21, at 20. The non-adjusted rate of medium-security prisons still indicated that privately-operated facilities cost more than state prisons, though the difference was around sixty percent smaller. Id.

The non-adjusted rate indicated cost savings to the state, while the adjusted rate indicated a net loss—evidencing the need to adjust for cost-shifting factors.[50]

Also, according to a 2009 report by the Hawaii Department of Public Safety related to expenditures for housing offenders in out-of-state private prisons, such costs were $48.04 million in FY 2009 based on contractual per diem rates.[51] However, those costs did not include certain medical expenses, transportation expenses, staffing costs, the cost of prisoners' wages, and various overhead expenses.[52] When those costs were factored in, the adjusted expenditures for housing Hawaii prisoners at private facilities totaled $57.38 million—a 19.4% increase.[53] Nor was this an anomaly. The Hawaii Department of Public Safety's expenditure report for FY 2008 indicated a 14.7% increase between the contractual housing costs ($48.39 million) and adjusted expenditures including medical care, prisoner wages, transportation, staffing, and other expenses ($55.52 million).[54] For FY 2007, there was a 14.9% increase between contractual housing costs ($43.76 million) and adjusted expenditures ($50.29 million).[55]

Given that prior research has found any cost savings resulting from prison privatization are often equivocal, even small variations due to cost-shifting factors can mean the difference between a net gain or loss by public contracting agencies. This is of heightened importance in states that have statutory cost saving requirements as a condition of prison privatization, including Tennessee (minimum 5% savings required), Ohio (5%), Florida (7%), and Mississippi, Texas, and Kentucky (all 10%).[56] The consideration of cost-shifting factors is

---

50. Adjusted per capita cost data was discontinued beginning in 2012; since then the Arizona Department of Corrections has only reported unadjusted per capita costs, after the Arizona legislature repealed a state law requiring private prison cost comparisons. See Private Prisons: Let's See Hidden Cost Comparisons, AZCENTRAL (Jan. 1, 2014), www.azcentral.com/opinions/articles/20140101private-prisons-hidden-cost-comparisons.html.

51. STATE OF HAW. DEP'T OF PUB. SAFETY, REPORT TO THE 2010 LEGISLATURE, HCR 312, Exhibit A (2009), available at https://www.prisonlegalnews.org/media/publications/Hawaii%202009%20report.pdf.

52. Id.

53. Id.

54. Id.

55. Id. at Exhibit B.

56. See FLA. STAT. ANN. § 957.07(1) (West 2010); KY. REV. STAT. ANN. § 197.510(13) (West 2007); MISS. CODE ANN. § 47-5-1211(3)(a) (West 2012); OHIO REV. CODE ANN. § 9.06(A)(4) (West 2011); TENN. CODE ANN. §§ 41-24-104(c)(2)(B), 41-24-105(c) (West 2014); TEX. GOV'T CODE § 495.003(c)(4) (West 2013).

MARLOWE_0007830

essential in such cases to determine whether the statutory mandate is being met.

Yet even in states that require prison privatization to result in a minimum level of cost savings, it is still difficult to determine whether such savings are in fact realized; just because the law says private prisons must save money does not necessarily mean they do. As put bluntly by the Florida Center for Fiscal and Economic Policy in a 2010 report, which described in detail the state's process for determining whether prison privatization results in statutory cost savings: "[t]here is no compelling evidence that the privatization of prisons has actually resulted in savings . . . . It is very difficult to ensure that a private prison is in fact 7% less costly to operate than a comparable public prison."[57] And in Ohio, which requires privately-operated prisons to achieve cost savings of at least 5%, Policy Matters Ohio, a non-profit policy research organization, released a report in April 2011 that sharply criticized the methodology used by state officials to calculate estimated savings.[58] "A detailed examination of those calculations shows them not only to be riddled with errors, oversights and omissions of significant data, but also potentially tainted by controversial accounting assumptions that many experts consider deeply flawed," the report stated.[59] "[O]nce past errors in the state calculations are corrected and revisions made, the private-prison savings computed by the state over the years appear to shrink dramatically."[60]

Policy Matters Ohio estimated that for the 2006–2007 biennium, prison privatization actually cost the state between $380,000 and $700,000 per year based on corrections to the state's statistical data, and in 2008–2009 private prison costs ranged from a potential 1.2% savings to a 0.3% deficit.[61] Further, the estimated savings from prison privatization for 2010 and 2011 dropped below the 5% threshold required by state law once statistical revisions were made.[62]

Of course there are also prison privatization-related factors that shift costs away from the public sector. As just one example, some

---

57. FLA. CTR. FOR FISCAL & ECON. POLICY, ARE FLORIDA'S PRIVATE PRISONS KEEPING THEIR PROMISE? 4–5 (2010), available at http://www.fcfep.org/attachments/20100409--Private%20Prisons.

58. See BOB PAYNTER, POLICY MATTERS OHIO, CELLS FOR SALE: UNDERSTANDING PRISON COSTS & SAVINGS i–ii (2011), available at http://www.policy mattersohio.org/wp-content/uploads/2011/09/CellsForSale2011.pdf.

59. Id. at i.

60. Id. at ii.

61. Id.

62. Id.

MARLOWE_0007831

research studies, including the Hakim and Blackstone study referenced above, have argued that prison privatization reduces costs to public agencies by cutting payroll, benefit, and pension expenses associated with (typically unionized) public corrections employees.[63] That argument assumes corrections employees are terminated when public agencies contract with private prison companies, but this is not always the case.    Rather, public corrections employees may be transferred to other positions within the same agency or to other agencies—thus resulting in continued payroll, benefit, and pension costs in addition to any costs of privatization.[64] Absent evidence that corrections employees are terminated or otherwise depart public service when public agencies contract with private prison companies, such savings are strictly theoretical.

For instance, when Ohio privatized the North Central Correctional Institution (NCCI) in 2011, the state noted that it had vacant positions within the Department of Rehabilitation and Correction (DRC) to accommodate employees who did not want to work for the contractor.[65] According to a memo provided to staff at the facility, in answer to the question "[w]ill a correction officer currently employed at NCCI be able to find employment at another state run prison if they do not wish to work for the private operator?" the state's response was: "Yes. NCCI currently employs 208 correction officers, and DRC has 278 vacant correction officer positions in its North Region."[66]    Thus, any public employee who wanted to remain employed by the state was able to do so.[67]  In fact, according to the

---

63. HAKIM & BLACKSTONE, supra note 10, at 42.

64. Comparatively, when public prisons close, the employees at those facilities are often transferred to other positions in the Department of Correction, not terminated. See, e.g. Christopher Petrella & Alex Friedmann, Slowly Closing the Gates: A State-by-State Assessment of Recent Prison Closures, PRISON LEGAL NEWS (June 15, 2013). https://www.prisonlegalnews.org/news/2013/jun/15/slowly-closing-the-gates-a-state-by-state-assessment-of-recent-prison-closures.

65. OHIO DEP'T OF REHAB. & CORR., PRISON SALE ANNOUNCEMENT QUESTIONS AND ANSWERS, available at http://www.drc.ohio.gov/Public/privatizationfaqs.pdf.

66. Id. at 2.

67. Also consider that if public corrections employees do leave public service as a result of prison privatization, there may be costs associated with their departures. When Florida considered privatizing around one-quarter of the state's prison system in 2011, affecting over 4000 state workers, the Department of Corrections estimated the plan would incur $25 million in payments to departing employees for "accumulated vacation time, sick leave and special compensatory time for working on holidays." See Steve Bousquet, Florida's Private Prison Plan Comes with Unexpected $25 Million Cost to Taxpayers, TAMPA BAY TIMES, Aug. 16, 2011, http://www.tampabay.com/news/publicsafety/crime/floridas-private-prison-plan-comes-with-unexpected-25-million-cost-to/1186300.

MARLOWE_0007832

DRC, when the 2700-bed NCCI was privatized only twenty-three public employees lost their jobs—fifteen were laid off, one was terminated, three resigned, and four retired.[68]

The focus of this Part, however, is on factors that shift costs from private prison companies to the public sector, which include costs related to population differences at privately-operated facilities, such as security levels and prisoner medical care, as well as operational expenses—including transportation, prisoner labor, administrative overhead, and bed guarantees—plus the long-term costs of per diem increases, deferred maintenance, recidivism rates, and private prison bond financing.

### A. Prisoner Population Differences

To fulfill their public safety function, public prisons must house all types of offenders, including those with serious medical and mental health conditions, maximum-security prisoners, those on death row,[69] female prisoners, and juveniles convicted as adults. Prisoners in these categories are more expensive to incarcerate due to medical, security/staffing, or programming-related costs (e.g., female prisoners generally have higher medical expenses).[70] Thus, the average per diem cost at public prisons is inflated, as it necessarily includes the more expensive prisoners that public prison systems must incarcerate.

In most cases, private prisons house minimum- and medium-security adult male prisoners. No privately-operated facilities house prisoners sentenced to death, and only a few hold maximum-security or female prisoners.[71] As a result, the average per diem cost at

---

68. Email from Daniel Flowers, Ohio Dept. of Rehab. & Corr. (Aug. 22, 2014) (on file with author). Further, when Ohio's North Central Correctional Institution was privatized in late 2011, seventy state employees were hired by the contractor (MTC), while "297 transferred to other state jobs, and eight retired." Julie Carr Smyth, Marion Prison Ready to Go Private on Saturday, COLUMBUS DISPATCH, Dec. 30, 2011, http://www.dispatch.com/content/stories/local/2011/12/30/marion-prison-ready-to-go-private-on-saturday.html.

69. That is, in the thirty-two states that have the death penalty. See States With and Without the Death Penalty, DEATH PENALTY INFO. CTR., http://www.death penaltyinfo.org/states-and-without-death-penalty (last visited Nov. 12, 2014).

70. See, e.g., infra Table 1 (breaking down prison costs for Florida); infra Table 2 (breaking down prison costs for Tennessee).

71. For example, according to the 2013 annual report for CCA—the nation's largest private prison contractor—of the company's sixty-eight owned, operated, and leased facilities, only two were designated maximum-security. None housed death row inmates, and just two were designated women's prisons or detention centers. See CORR. CORP. OF AM., supra note 1, at 11–15; see also Find a Facility, CORR. CORP. AM., www.cca.com/locations (last visited Nov. 12, 2014).

MARLOWE_0007833

privately-operated facilities is reduced due to differences in prisoner populations. Also as a result, private prisons have been accused of housing only healthier, lower-security prisoners who are less costly to incarcerate.[72] "It's cherry-picking," exclaimed Texas State Rep. Chad Campbell.[73] "They leave the most expensive prisoners with taxpayers and take the easy prisoners."[74] Or, as stated in an April 2010 policy brief by the Florida Center for Fiscal and Economic Policy, "[t]here are differences between inmates in private and public prisons: those who are more costly to handle are usually incarcerated in public prisons, such as those who are the highest security risks and those with extensive medical issues."[75] Both private prison companies and public contracting agencies are complicit in such "cherry-picking," as limitations on the types of prisoners held at privately-operated facilities are usually specified in the contracts signed by both parties.

An examination of public and private prison per diem costs in Florida illustrates how population differences impact cost comparisons. The following table, produced by the Florida Department of Corrections (FDOC), provides "average inmate costs" for FY 2012–2013.[76] Approximately ten percent of Florida state prisoners are held in seven privately-operated prisons, including five facilities that house adult male offenders, one facility that houses adult females, and one that houses youthful males (ages nineteen to twenty-four).[77]

---

72. See, e.g., IN THE PUB. INTEREST, THE COSTS OF PRIVATE PRISONS 5 (2014), available at http://www.inthepublicinterest.org/sites/default/files/Prison%20Costs%20Backgrounder%20Brief_Template.pdf.

73. Richard A. Oppel, Jr., Private Prisons Found to Offer Little in Savings, N.Y. TIMES, May 18, 2011, http://www.nytimes.com/2011/05/19/us/19prisons.html.

74. Id.

75. FLA. CTR. FOR FISCAL AND ECON. POLICY, supra note 57, at 3.

76. See Budget, 2012–2013 Agency Statistics, FLA. DEP'T CORRECTIONS, http://www.dc.state.fl.us/pub/annual/1213/budget.html (last visited Nov. 12, 2014).

77. See Private Prison Monitoring, FLA. DEP'T OF MGMT. SERVICES, www.dms.myflorida.com/business_operations/private_prison_monitoring (last visited Nov. 12, 2014).

MARLOWE_0007834

TABLE 1.  FLORIDA PER DIEM COSTS FOR FY 2012–2013[78]

| Category | Per Diem |
|---|---|
| Total all facilities (exc. private) | $47.50 |
| Adult male custody | $37.33 |
| Male youthful offender custody | $64.46 |
| Reception centers | $88.97 |
| Adult and youthful female custody | $53.19 |
| Specialty institutions | $52.76 |
| Work release centers | $28.02 |
| Contracted facility | $29.35 |
| Private institutions | $43.86 |

The above per diem figures "do not include indirect and administrative cost of $0.67 for private institutions and $2.75 for state facilities."[79]  Thus, after adding the indirect and administrative costs, the total average per diem cost for all state prisons, excluding privately-operated facilities, is $50.25, while the average per diem cost for private institutions is $44.53.[80]

It is apparent that the per diem cost at private institutions is lower than the cost at public prisons. However, the average per diem cost for state prisons includes the higher rates at reception centers (all of which are operated by the state), male youthful offender facilities (of which one is run by the state and one is privatized), adult and youthful female offender facilities (of which four are operated by the state and one by a private contractor), and specialty institutions (all of which are operated by the state).[81]  Therefore, due to the higher-cost

---

78. FLA. CTR. FOR FISCAL & ECON. POLICY, supra note 57, at 3.

79. Budget, supra note 76. The Summary of Average Inmate Costs table includes a useful breakdown of per diem costs by security operations, health services, and education services.

80. The term "contracted facility" in the table refers to Community Release Centers, not prisons. Email from Jessica Cary, FDOC Dir. of Comm. (Aug. 20, 2014) (on file with author).

81. Facility Directory, FLA. DEP'T. CORRECTIONS (last updated Jan. 5, 2015), http://www.dc.state.fl.us/orginfo/facilitydir.html.

MARLOWE_0007835

facilities, the vast majority of which are publicly-operated, the average per diem cost at state prisons is skewed upwards while five of the seven private prisons house adult male offenders—the least expensive to incarcerate, according to the table.

For another example of the impact of population differences, consider the FY 2012–2013 per diem costs for housing adult prisoners in the Tennessee Department of Correction (TDOC), where almost one-quarter of the state's prison population—approximately 5000 of 21,000 prisoners—is held in privately-operated facilities:

TABLE 2. TENNESSEE PER DIEM COSTS FOR FY 2012–2013

| Facility | Security | Per Diem |
|---|---|---|
| Tenn Prison for Women | Max | $89.10 |
| Turney Center Corr Complex | Med | $65.28 |
| Mark Luttrell Corr Fac | Close | $99.39 |
| Charles Bass Corr Complex | Med | $92.47 |
| Bledsoe County Corr Complex | Max | $110.39 |
| Hardeman Co. Corr Facility * | Med | $53.63 |
| Whiteville Corr Facility * | Med | $55.66 |
| West TN State Penitentiary | Max | $61.92 |
| Riverbend Max Security Inst. | Max | $103.74 |
| Northeast Corr Complex | Med | $61.57 |
| South Central Corr Center * | Med | $45.67 |
| Northwest Corr Complex | Med | $60.63 |
| DeBerry Special Needs Fac | Max | $189.03 |
| Morgan County Corr Complex | Max | $70.65 |
| **Total Adult Facilities** | | **$71.79** |

Facilities designated with (*) are privately operated.[82]

---

82. Emails from Tashonda Burton, Office of Commc'ns & Pub. Relations, Tenn. Dep't of Corr. (July 1–2, 2014) (on file with author). The "annual cost per inmate [does] not include the Administration, Tennessee Correctional Academy, Office of Investigation and Compliance, or Major Maintenance costs." Id.

MARLOWE_0007836

First, per the TDOC, the Total Adult Facilities per diem cost does not equal an average of the individual facility costs because the latter are weighted by population level. Rather, the total average per diem cost is "based on system wide Payroll expenses plus system wide Operating expenses minus system wide Revenue collections divided by our system wide Average Daily Census divided by 365 to obtain the average system wide cost per day."[83]

The three privately-operated prisons—all run by CCA—are medium-security facilities that house adult male prisoners.[84] Of the eleven public prisons, six are maximum-security, one is close-security (a step between medium and maximum) and four are medium-security.[85] The four facilities with the highest per diem costs, all state prisons, include the Lois M. DeBerry Special Needs Facility (a prison hospital for offenders with serious medical and mental health needs); Riverbend (maximum-security and death row prisoners); Bledsoe County (an intake diagnostic center that also houses female prisoners); and Mark Luttrell (female prisoners).[86]

Because state facilities house prisoners who are more expensive to incarcerate—maximum security, death row, medical and mental health patients, and female prisoners—their average per diem cost is increased. As the CCA-operated prisons do not have such higher-cost populations, their average per diem costs are decreased. However, note that the per diem costs at medium-security state prisons (Northeast, Charles Bass, Turney Center, and Northwest) are still higher than the costs at privately-operated medium-security facilities (South Central, Hardeman County, and Whiteville). Why is this the case? As discussed in the sections that follow, a number of other cost-shifting factors serve to further inflate per diem costs at public prisons.

### B.  Security Level Limitations

Security levels correlate with incarceration costs; minimum-security prisoners are usually the least expensive to incarcerate while maximum-security prisoners, including those held in segregation, are

---

83. Id.
84. TENN. DEP'T OF CORR., FY 2013 STATISTICAL ABSTRACT 46 (2013), available at http://www.tn.gov/correction/pdf/StatisticalAbstract2013.pdf.
85. Id.
86. See State Prisons, TENN. DEP'T CORRECTIONS, www.tn.gov/correction/institutions/stateprisons.html (last visited Nov. 12, 2014).

MARLOWE_0007837

the most costly.[87]  With respect to security levels at public and privately-operated prisons, a 2004 article in Federal Probation noted that:

> [T]he private sector houses approximately 21% fewer inmates at the maximum and close security levels and approximately 15% more inmates at the minimum security level than does the public sector. Thus, 90% of the private sector's inmate population is classified at the medium or minimum levels, whereas only 69% of the public sector's inmate population are so designated.[88]

The State of Hawaii contracts with private prison companies to house prisoners at facilities on the U.S. mainland.  A January 2005 report by the Hawaii Department of Public Safety is instructive in regard to limitations on the types of Hawaii prisoners eligible for transfers to private prisons in various other states.[89]  Those limitations included that no Hawaii prisoners above medium security, or with "Escape 1," "Murder 1," or sex offenses, be housed at facilities in Oklahoma.[90]  No maximum-security prisoners could be held in prisons in Arizona or Mississippi, and Colorado facilities only housed prisoners up to medium security with no "sex offenses with lengthy terms" and no life sentences.[91]  This list of exclusions illustrates how only lower-security Hawaii prisoners who have not been convicted of the most serious offenses (murder, sex crimes), and are a lesser security risk (no life sentences, maximum security, or history of escape) are transferred to privately-operated facilities.  Public prisons, of course, must incarcerate the higher-security offenders not eligible for such transfers, which translates to higher costs for Hawaii's state prison system.

---

87. For costs related to prisoners held in solitary confinement, see SAL RODRIGUEZ, FACT SHEET: THE HIGH COST OF SOLITARY CONFINEMENT (2011), available at http://solitarywatch.com/wp-content/uploads/2011/06/fact-sheet-the-high-cost-of-solitary-confinement.pdf.  More generally, for costs that escalate by security level, see NANCY LA VIGNE & JULIE SAMUELS, THE GROWTH & INCREASING COST OF THE FEDERAL PRISON SYSTEM: DRIVERS AND POTENTIAL SOLUTIONS 2 (2012), available at www.urban.org/uploadedpdf/412693-the-growth-and-increasing-cost-of-the-federal-prison-system.pdf (providing costs by security level in federal prisons).

88. Curtis R. Blakely & Vic W. Bumphus, Private and Public Sector Prisons— A Comparison of Select Characteristics, FED. PROBATION, June 2004, at 27, 28.

89. HAW. DEP'T OF PUB. SAFETY, RESPONSE TO ACT 200, PART III, SECTION 58 SESSION LAWS OF HAWAII 2003 AS AMENDED BY ACT 41, PART II, SECTION 35 SESSION LAWS OF HAWAII 2004 (2005), available at http://dps.hawaii.gov/wp-content/uploads/2012/11/2005-Report4.pdf.

90. Id.

91. Id.

MARLOWE_0007838

Another example of security level differences in public and private prisons is found in a 2012 contract between Idaho and CCA to house offenders at the company's Kit Carson Correctional Center in Colorado. In response to questions posed during the request for proposal (RFP) process, state officials wrote that the transfer criteria used by the Idaho Department of Correction to send prisoners to the privately-operated facility include: "2. No escape history from a secure facility . . . [and] 4. No class A disciplinary actions (Disciplinary Offense Report) within last 12 months."[92] Thus, only lower-risk prisoners and those who are better behaved—i.e., do not have a recent history of serious institutional misconduct—are eligible for placement at the CCA facility. Those who are higher-risk and have committed serious disciplinary offenses remain in Idaho, and the cost of incarcerating such prisoners is shifted to the state.

### C.  Medical Cost-Shifting

Medical expenses represent a significant and growing portion of corrections agencies' budgets. The FDOC, for example, spent 19.1% of its budget on healthcare services in FY 2012–2013.[93] The California Department of Corrections and Rehabilitation (CDCR) allocated 24% of its $8.9 billion budget for FY 2013–2014 to medical, dental, mental health, and ancillary health care services.[94] As mentioned previously, public prisons must incarcerate all types of prisoners, including those with serious and expensive medical and mental health conditions.[95] Frequently, though, private prison companies minimize medical expenses through various contractual provisions that shift those costs to the public sector.

This is a significant cost-shifting factor because medical care can be very expensive, especially treatment for diseases that are more prevalent in the correctional setting than in the general population, such as HIV and hepatitis C (HCV),[96] as well as for costly medical procedures such as chemotherapy, dialysis, and even organ

---

92. Contract Purchase Order between Dep't of Corr., Idaho, and Corr. Corp. of Am. for Kit Carson Correctional Center, No. CPO02476 27 (July 11, 2012).

93. See Budget, supra note 76.

94. CDCR's Budget for Fiscal Year 2013–2014, CAL. DEP'T CORRECTIONS & REHABILITATION, http://www.cdcr.ca.gov/Budget/Budget_Overview.html.

95. See supra Part III.A.

96. See The State of HIV and Hepatitis C Care in NYS Prisons, CORRECTIONAL ASS'N N.Y., (Oct. 9, 2013), http://www.correctionalassociation.org/news/the-state-of-hiv-and-hepatitis-c-care-in-nys-prisons-2013.

transplants.[97] Prisoners have all of the same medical ailments as non-prisoners and require medical care that is just as expensive. By capping the cost of medical care, excluding certain medical costs entirely and limiting prisoners with medical and mental health conditions from being housed at private prisons, the per diem costs at those facilities are decreased. This results in a corresponding increase in medical expenses for public corrections agencies, which are responsible for medical and mental health care costs both at public prisons and—when specified by contractual provisions—at private prisons, too. Consequently, cost comparisons of public and privately-operated facilities must include adjustments for contractual limits on medical expenses that shift costs to public agencies.

As the Arizona Department of Corrections stated in an April 2011 report, when calculating per capita costs at public and private prisons:

> An inmate health care cost factor is identified and deducted due to the limitations imposed by the private contractors concerning inmates [sic] physical and mental health . . . . This adjustment is needed because unlike the private contractors, the ADC is required to provide medical and mental health services to inmates regardless of the severity of their condition(s).[98]

### 1. HIV, HCV, and Other Specified Medical Conditions

Private prison contracts often contain provisions that exempt private prison companies from costs associated with specified medical conditions, most commonly HIV and HCV. For example, a 2011 contract between the California Department of Corrections and Rehabilitation and CCA specifies that the CDCR is required to pay for "[a]ll HIV or AIDS related inpatient and outpatient medical costs and the costs of providing AZT or other medications therapeutically indicated and medically necessary . . . for the treatment of offenders with HIV or AIDS."[99]

Similarly, a 2007 contract between the State of Tennessee and CCA to operate the South Central Correctional Center provides that "[t]he Contractor shall not be responsible for the cost of providing

---

97. See Prisoner Organ Transplants, Donations Create Controversy, PRISON LEGAL NEWS (Apr. 15, 2014), https://www.prisonlegalnews.org/news/2014/apr/15/prisoner-organ-transplants-donations-create-controversy.

98. ARIZ. DEP'T. OF CORR., supra note 24, at 2.

99. Offender Relocation/Housing, Agreement between State of Cal. and Corr. Corp. of Am., Agreement No. C06.298-0 17 (2011).

MARLOWE_0007840

2014] APPLES-TO-FISH anti-retroviral medications therapeutically indicated for the treatment of inmates with AIDS or HIV infection."[100]

A 2008 contract between the Hawaii Department of Public Safety and Pinal County, to house prisoners at CCA-operated facilities in Arizona, states the company "shall not be responsible for the cost of medication or regimens specifically aimed at the treatment of conditions associated with Acquired Immune Deficiency Syndrome (AIDS) and Hepatitis C."[101] Identical language was included in a 2008 contract between Hawaii and CCA to house female prisoners at the company's Otter Creek Correctional Center in Kentucky.[102] In FY 2009, Hawaii paid $6.37 million in medical costs not included in the per diem rates in its contracts to house prisoners at CCA facilities.[103]

Also, a 2009 contract between CCA and the Metropolitan Government of Nashville and Davidson County, Tennessee states that "[m]edical costs for AIDS . . . , oncology and dialysis treatments are considered reimbursable expenses"; i.e., the cost for treating prisoners with those conditions shall be paid by the Metro Government, not by CCA.[104]

Sometimes the exclusion of certain medical expenses is not as obvious as the explicit contractual provisions cited above. For example, a 2012 contract between the State of Idaho and CCA to house prisoners at the company's Kit Carson Correctional Center includes "Option A" for healthcare services from the state's RFP. Under Option A, "[t]he Contractor is solely responsible for all costs associated with provision of care as provided for within [subsections related to] Healthcare, Mental Health, and Dental Services."[105]

Thus, under Option A in the contract and RFP, it would appear that CCA is responsible for all medical-related costs, including expensive treatments for HIV and HCV.

---

100. Contract between Dep't of Corr., State of Tenn., and Corr. Corp. of Am. for the South Central Correctional Center, RFS-329.44-004 13 (2007). This provision was not included in the superseding 2013 contract.

101. Contract between Dep't of Pub. Safety, State of Haw., and Pinal County, Ariz., Contract No. 55331 18 (2008).

102. Contract between Dep't of Pub. Safety, State of Haw., and Corr. Corp. of Am. for Otter Creek Correctional Center, Contract No. PSD 08-ID/MB24 16 (2008).

103. STATE OF HAW. DEP'T OF PUB. SAFETY, supra note 51, at Exhibit A.

104. Management Services Contract between Corr. Corp. of Am. and the Metro. Gov't of Nashville and Davidson Cnty., Contract No. 18612 26 (2009).

105. Contract Purchase Order between Dep't of Corr., Idaho, and Corr. Corp. of Am., supra note 92, at 115.

Case 3:16-cv-02267 Document 383-18 Filed 01/22/21 Page 25 of 68 PageID #: 18654

MARLOWE_0007841

That is not the case, however. The contract incorporates the state's responses to questions submitted by private prison companies during the RFP process, and those responses include: "[t]he IDOC does not anticipate sending Offenders with chronic healthcare and/or mental health issues to the Facility (to include HIV treatment or HCV treatment),"[106] and "[t]he transfer criteria IDOC will use includes the following: 1. No chronic mental health or health care issues . . . ."[107] The RFP was amended to include "no chronic mental health or health care issues" as the "primary criteria in evaluating offenders" for placement at the CCA-operated prison.[108]

Thus, although CCA is responsible for "all costs associated with provision of care" under Option A in the contract and RFP, it is really only responsible for such costs based on the medical needs of the prisoners housed at the facility. Since Idaho does not send prisoners with "chronic healthcare" conditions—including HIV and HCV—to the CCA prison, the company is not liable for those costs.

### 2.   Caps on Medical Costs

Some private prison contracts include caps on certain medical expenses paid by the private prison company, based on specified dollar amounts or time limits.

For example, a 2011 contract between CCA and the CDCR states that the CDCR will pay "[a]ll expenses in excess of $2,500 annually per inmate for medically necessary, off site hospital or emergency care. This includes, but is not limited to medical, surgical, mental health, and dental care delivered in an Emergency Room, practitioner's office, or inpatient or outpatient hospital setting."[109] A 2013 contract between the State of Tennessee and CCA to operate the South Central Correctional Center specifies: "[i]f the inmate is hospitalized, the Contractor shall not be responsive for Inpatient-Hospital Costs which exceed $4,000.00 per Inmate per admission."[110] Hospitalization costs above the $4000 cap, no matter how expensive,

---

106. Id. at 251 (responding to a question asking how many offenders with chronic healthcare or mental health issues will be transferred to the new facility).

107. Id. at 248 (responding to a question asking what transfer criteria the IDOC will use to determine which offenders will be transferred to the new facility).

108. Id. at 27.

109. Offender Relocation/Housing, Agreement between State of Cal. and Corr. Corp. of Am., supra note 99, at 17.

110. Contract between Dep't of Corr., State of Tenn., and Corr. Corp. of Am. for South Central Correctional Center, RFP-32944-00006 17 (2013).

MARLOWE_0007842

are paid by the state.[111] A 2010 contract between the State of Texas and MTC to operate the West Texas Intermediate Sanctions Facility provides that, "[i]f an Offender requires continued hospitalization after the initial forty-eight (48) hour period, the [Texas Department of Criminal Justice] shall be responsible for all reasonable and appropriate medical costs."[112]

Both dollar amount and time limit caps were included in 2006–2007 contracts between Florida and CCA to operate the Gadsden, South Bay, and Lake City correctional facilities. The contracts all state: "The CONTRACTOR shall not be responsible for inpatient hospitalization costs, including any surgery and specialty services, in amounts greater than $15,000 per inmate per admission, or for costs incurred after five (5) days of hospitalization, whichever comes first."[113] Notably, while medical care expenses may be capped for private prison companies, there is no cap on the amount public corrections agencies must pay for prisoner medical care.

In other cases, private prisons simply are not responsible for providing any medical services. A 2011 contract between the State of Texas and CCA to manage the Bartlett State Jail provides that the Texas Department of Criminal Justice "will contract with the Correctional Managed Health Care Committee (CMHCC) to provide complete health care services including medical, dental, mental health, pharmaceutical, medical records, emergency care and sick call services for Offenders assigned to the Facility."[114] Similar provisions are included in the state's 2010 contracts with CCA to operate the Bradshaw State Jail, Lindsey State Jail, and Willacy County State Jail.[115]

---

111. Id.

112. Solicitation, Offer and Award between State of Tex. and Management & Training Corp. for operation of the West Texas Intermediate Sanction Facility, Contract No. 696-PF-12-13-C029 28 (June 15, 2010), available at http://www.texas prisonbidness.org/files/facilities/contracts/WestTexas2010.pdf.

113. See, e.g. Operations & Management Services Contract between State of Fla. and Corr. Corp. of Am. for Gadsden Correctional Facility, DMS Contract No. 06/07-093 17 (2007), available at https://www.prisonlegalnews.org/media/publications/fdoc_cca_contract_for_gadsden_facility_2009.pdf.

114. Solicitation, Offer and Award between Dep't of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Bartlett State Jail, Contract No. 696-PF-11-13-C064 36 (Apr. 1, 2010). The Correctional Managed Health Care Committee is a state agency that contracts with the University of Texas Medical Branch and Texas Tech University Health Sciences Center to provide medical care for state prisoners. See Correctional Managed Health Care, TEX. DEP'T CRIM. JUST., http://tdcj.state.tx. us/divisions/cmhc/partner_agencies.html (last visited Nov. 12, 2014).

115. See Solicitation, Offer and Award between Dep't of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Bradshaw State Jail, No. 686-PF-

MARLOWE_0007843

528     FORDHAM URB. L.J.     [Vol. XLII

Removing medical services from private prison contracts usually
results in lower contractual per diem rates. However, it also shifts all
medical expenses to the public agency, including costs associated with
prisoners who have serious medical and mental health conditions.

### 3. Prisoner Eligibility Criteria

Some contracts go beyond exempting private prisons from costs
associated with specified medical conditions, as discussed above, and
exclude prisoners with certain conditions from even being housed at
privately-operated facilities, or limit the number of such prisoners.

For example, contracts between Florida and the GEO Group
include restrictions on prisoners with specific medical and mental
health classifications. The FDOC assigns a health classification to
each state prisoner ranging from M1 to M5 (plus M9 for those who
are pregnant).[116] Prisoners also receive a mental health grade, ranging
from S1 to S6.[117] According to the Florida Correctional Medical
Authority, "[t]he number assigned to an inmate is based on the
severity or acuity of the medical or mental health condition with one
indicating the lowest level of need."[118] The state's current contracts
with the GEO Group to operate the Bay, Moore Haven, and
Graceville correctional facilities include a population cap of 16% for
prisoners with medical grade M3 (with a 2% variance), and 18% for
those with mental health grade S3 (with a 5% variance).[119] Florida's
2010 contract with the GEO Group to house prisoners at the
Blackwater River Correctional Facility provides that no prisoners
with medical grade M3 or mental health grade S3 will be sent to the
prison, and only 2% of the population can be HIV-positive.[120]

---

11-13-C063, at 36–37 (2010); Solicitation, Offer and Award between Dep't of Crim.
Justice, State of Tex., and Corr. Corp. of Am. for operation of the Lindsey State Jail,
No. 696-PF-11-13-C061, at 36–37 (2010); Solicitation, Offer and Award between Dep't
of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Willacy
County State Jail, No. 696-PF-11-13-C060, at 36–37 (2010).

116. STATE OF FLA. CORR. MED. AUTH., 2012–2013 ANNUAL REPORT AND REPORT
ON AGING INMATES 22 (2013), available at http://www.flgov.com/wp-content/uploads/
pdfs/correctional_medical_authority_2012-2013_annual_report.pdf.

117. Id.

118. Id.

119. Operations and Management Service Contract, Bay Corr. Facility, Contract
No. DMS 13/14-0009A (2014); Operations and Management Service Contract, Moore
Haven Corr. Facility, Contract No. DMS 13/14-0009B (2014); Operations and
Management Service Contract, Graceville Corr. Facility, Contract No. DMS 09/10-
052 (2010).

120. Operations and Management Service Contract, Blackwater River Corr.
Facility, Contract No. DMS 09/10-053, Transfer Agreement 2 (2010).

MARLOWE_0007844

Such provisions led Florida's Office of Program Policy Analysis and Government Accountability (OPPAGA) to note that the state's contracts with private prison companies do not

> [A]ssure that private prisons serve inmates with comparable medical and mental health conditions as those housed in public prisons . . . .
> As special needs inmates are more expensive to serve than other inmates, the difference in the populations of public and private prisons results in the state shouldering a greater proportion of the cost of housing these inmates.[121]

Consequently, OPPAGA said the statutory requirement that privately-operated prisons "operate [at] a 7% lower cost than state facilities is undermined."[122]

As another example of prisoners with certain medical conditions being excluded from private prisons, UC Berkeley researcher Christopher Petrella published an "open letter" to CCA in July 2014 that addressed some of the shortcomings of the Hakim and Blackstone cost comparison study, with a focus on California (which accounts for around 12% of CCA's total revenue).[123] According to Petrella, a number of policies serve to exclude expensive-to-incarcerate California prisoners from being housed at out-of-state CCA facilities, including prisoners with certain medical and mental health conditions.[124] Petrella found that 12% of prisoners held in state facilities had HCV, compared with 6.55% in CCA-operated prisons.[125] Also, according to a May 5, 2014 letter from California Correctional Health Care Services, "HIV+ inmate-patients are not transferred outside of California. If an inmate-patient is diagnosed with HIV+ [sic] while residing in an out-of-state institution they are returned to California as soon as possible."[126] In addition, Petrella found that California prisoners with "High Health Risk Priority 1 & 2" ratings comprised 11% of the state's prison population, while those with a disability comprised 6%, those 65 years and older comprised

---

121. OFFICE OF PROGRAM POLICY ANALYSIS & GOV'T ACCOUNTABILITY, WHILE DMS HAS IMPROVED MONITORING, IT NEEDS TO STRENGTHEN PRIVATE PRISON OVERSIGHT AND CONTRACTS, REPORT NO. 08-71 4–5 (2008), available at www.prisonlegalnews.org/media/publications/oppaga_fl_audit_report_on_private_prison_monitoring_2008.pdf.

122. Id. at 5.

123. CHRISTOPHER PETRELLA, AN OPEN LETTER TO THE CORRECTIONS CORPORATION OF AMERICA (2014), available at https://www.aclu.org/sites/default/files/assets/open_letter_to_cca_final.pdf.

124. Id. at 3.

125. Id.

126. Id. at 3, 8.

MARLOWE_0007845

4.4%, and those designated "Mental Health EOP" [Enhanced Outpatient] comprised 4.2%.[127]   The percentage of California prisoners in those same categories housed at out-of-state privately-operated prisons? Zero.[128]

4.   Combining Medical Cost-Shifting Factors

Standing alone, contractual provisions that cap healthcare costs, exclude expenses for HIV and HCV treatment, and limit prisoners with specified medical conditions at private prisons shift a certain amount of medical costs to public contracting agencies. When such provisions are combined, however, the costs increase accordingly.

As an extreme example of cost-shifting related to medical expenses, a 2011 contract between CCA and the Vermont Department of Corrections (VTDOC) includes a cap on medical costs, restrictions on specified medical expenses, and exclusions for prisoners with certain medical and mental health conditions.[129] The contract provides: "[t]he Contractor shall be responsible for inpatient hospital and surgery charges for the first Twenty Thousand Dollars ($20,000.00) in costs per inmate, per incident. Thereafter, VTDOC shall be liable for all inpatient hospital and surgery charges."[130]

At first blush, $20,000 for in-patient hospitalization and surgery sounds like a generous cap—unless the reader is familiar with the costs of medical care in the United States. Consider that a California study found the average cost to remove an appendix—a fairly routine procedure—was $33,000.[131] More complex medical procedures are correspondingly more expensive—yet CCA's maximum liability for hospitalization and surgery is capped at $20,000 per prisoner.

Also, for some of the most expensive medical procedures and treatment, the company does not have to pay anything pursuant to the following contractual provision:

> Provided that the VTDOC is aware or has been notified prior to the hospitalization of the inmate, the Contractor shall not be responsible for inpatient hospitalization costs, including any surgery and specialty services, associated with the treatment of persons with known Acquired Immune-Deficiency Syndrome (AIDS), as defined

---

127. Id. at 3.
128. Id.
129. Contract for Services between Dep't of Corr., State of Vt. and Corr. Corp. of Am., Contract No. 19863 (2011).
130. Id. at 38.
131. Study: Appendix Surgery Costs Differ Around U.S., CBS NEWS, Apr. 23, 2012, http://www.cbsnews.com/news/study-appendix-surgery-costs-differ-around-us.

MARLOWE_0007846

by the Center for Disease Control, organ transplants, renal dialysis, cancer treatment and Hep C treatment. The Contractor shall be responsible for inpatient and outpatient hospitalization costs for HIV infected patients, as noted above when not associated with treatment of their HIV disease. The Contractor shall not be responsible for the cost of providing AZT, or other medications therapeutically indicated for the treatment of inmates with AIDS or HIV infection. Such treatment will be at the VTDOC's discretion and expense and requires pre-authorization. The VTDOC will screen all transfers to exclude inmates currently being treated for active AIDS, cancer, renal dialysis and Hep C.[132]

But what about prisoners with serious mental health conditions? The contract covers that too, by minimizing costs to CCA. "Vermont Department of Corrections agrees to review the mental health needs and stability of all inmates proposed for placement with CCA facilities," the contract states.[133] "CCA may request the prompt return to Vermont of any inmate whose mental health cannot be readily maintained while out of state."[134] Further, the state is responsible for the cost of prosthetics: "With the prior approval by the Vermont Health Services Director Contractor shall provide prosthetic devices to inmates as medically indicated . . . . The costs associated with providing prosthetics shall be borne by the State."[135]

Therefore, costs associated with hospital and surgery expenses above the $20,000 cap, as well as costs related to prisoners who have HIV, HCV, and cancer, or who require dialysis or organ transplants, or have serious mental health conditions, plus the cost of prosthetics, are all shifted to the public sector.

### D. Transportation Costs

The cost of transporting prisoners to and from privately-operated facilities is sometimes paid by the public agency rather than the private prison company. For example, a 2010 contract between Florida and MTC for operation of the Gadsden Correctional Institute provides: "The CONTRACTOR shall not be responsible for inmate transportation from the [FDOC] to the Facility or from the Facility to the inmate's destination upon transfer except as provided for in

---

132. Contract for Services between Dep't of Corr., State of Vt. and Corr. Corp. of Am., supra note 129, at 39 (emphasis added).
133. Id. at 35.
134. Id.
135. Id. at 33.

MARLOWE_0007847

Section 5.13 [related to specific types of transfers]."[136] Also, a 2013 contract between the Tennessee Department of Correction and CCA to house prisoners at the South Central Correctional Facility specifies that, "[t]he Department will be responsible for all other Inmate transportation via connection at Turney Center Industrial Complex [the closest state prison] for Department-mandated moves of prisoner groups for assignment purposes."[137] Transportation costs may be minimal, particularly when prisoners are moved to facilities within the same state. However, consider that over 10,500 prisoners are housed in out-of-state private prisons, according to a 2013 report by Grassroots Leadership.[138] Prisoners from California, Idaho, Vermont, and Hawaii are held in CCA-operated facilities in other states, and are transferred back and forth via ground transportation or airplane.

Who pays for these more expensive interstate transportation costs? According to a 2008 contract between the Hawaii Department of Public Safety and Pinal County to house prisoners at CCA facilities in Arizona, "[t]he STATE shall be responsible for the cost of transporting Inmates to and from the STATE."[139] Similar language was included in a 2008 contract between Hawaii and CCA to house prisoners at the company's Otter Creek Correctional Center in Kentucky.[140] A 2011 contract between California and CCA states that "CDCR shall reimburse CONTRACTOR for the cost of transporting offenders between the transfer point in California and Facility, and between Facility and transfer point in California . . . ."[141] Those costs include "cost of airframe and crew," as well as expenses associated with CCA transportation officers, including the "cost of salary and fringe benefits for each guard accompanying the transportation of offenders," plus CCA "shall be entitled [to] administrative overhead on said amounts calculated for guarding at a rate of 15%."[142]

---

136. Operations & Management Services Contract between State of Fla. and Corr. Corp. of Am. for Gadsden Correctional Facility, supra note 113, at 19.

137. Contract between Dep't of Corr., State of Tenn., and Corr. Corp. of Am. for South Central Correctional Center, supra note 110, at 19.

138. GRASSROOTS LEADERSHIP, LOCKED UP & SHIPPED AWAY: INTERSTATE PRISONER TRANSFERS AND THE PRIVATE PRISON INDUSTRY (2013), available at http://grassrootsleadership.org/sites/default/files/uploads/locked_up_shipped_away.pdf.

139. Contract between Dep't of Pub. Safety, State of Haw., and Pinal County, Ariz., supra note 101, at 2.

140. Contract between Dep't of Pub. Safety, State of Haw., and Corr. Corp. of Am. for Otter Creek Correctional Center., supra note 102, at 2.

141. Offender Relocation/Housing Agreement between State of Cal. and Corr. Corp. of Am., supra note 99, at 7.

142. Id.

MARLOWE_0007848

Such costs can be substantial. According to a 2009 report by the Hawaii Department of Public Safety, transportation expenses for sending prisoners to and from private prisons on the mainland totaled $1,506,144 in FY 2009 alone.[143] Particularly with regard to interstate transfers to private prisons, the shifting of transportation costs to public agencies can be significant.

### E.  Prisoner Labor Costs

Most correctional facilities rely on prisoner labor to perform essential functions such as kitchen, laundry, janitorial, maintenance, clerical, and grounds keeping services.  While private prison companies benefit from prisoners' labor, the wages that prisoners receive are sometimes paid or reimbursed by the contracting public agency.

Pursuant to a 2008 contract between the Hawaii Department of Public Safety and Pinal County to house prisoners at CCA facilities in Arizona, "[t]he State shall reimburse the [private prison contractor] for Inmate pay, which amount shall be included as a separate item on the monthly invoice."[144]  Identical language was included in a 2008 contract to house Hawaii prisoners at a CCA-operated facility in Kentucky.[145]  At immigration detention centers, private prison contractors benefit from detainees employed in "voluntary" work programs.[146]  Immigration and Customs Enforcement (ICE) reimburses private contractors for wages paid to such detainees, at the rate of $1.00 per day for each worker.[147]  For example, a 2010 Intergovernmental Service Agreement between ICE and Karnes County, Texas, to house detainees at the GEO Group-operated Karnes County Civil Detention Center states that in addition to the per diem rate, ICE will provide compensation of one dollar a day for "Detainee Work Program Reimbursement."[148]

Prisoners' wages, while typically paltry, add up due to the number of prisoners who work each day, year after year. According to a 2009

---

143. STATE OF HAW. DEP'T OF PUB. SAFETY, supra note 51, at Exhibit A.

144. Contract between Dep't of Pub. Safety, State of Haw., and Pinal County, Ariz., supra note 101, at 14.

145. Contract between Dep't of Pub. Safety, State of Haw., and Corr. Corp. of Am. for Otter Creek Correctional Center., supra note 102, at 12.

146. See Ian Urbina, Using Jailed Migrants as a Pool of Cheap Labor, N.Y. TIMES, May 24, 2014, http://www.nytimes.com/2014/05/25/us/using-jailed-migrants-as-a-pool-of-cheap-labor.html.

147. Id.

148. Intergovernmental Service Agreement between U.S. Dep't of Homeland Sec., Immigration & Customs Enforcement and Karnes Cnty., EROIGSA-11-004 2 (2010).

Hawaii Department of Public Safety report, the cost for wages paid to prisoners held at CCA facilities in FY 2009 was $607,344—a cost shifted to the state, while CCA benefited from the prisoner labor.[149] According to Professor Jacqueline Stevens at Northwestern University, as a result of cut-rate detainee labor costs at immigration detention facilities, private contractors achieve substantial savings— though when detainee wages are reimbursed by ICE, those savings come at a cost that is shifted to the public sector.[150] Using the minimum wage to calculate the relative value of detainee labor at privately-operated immigration detention centers, Professor Stevens found that "[f]or 2012, GEO brought in an estimated $33 to $72 million profits from labor savings, and CCA an estimated $30 to [$66] million from its labor savings, or about 25% of the company's total profits."[151]

Public prisons use prisoner labor, too, of course. But if private prisons had to pay for the prisoner labor they use and from which they benefit, their operating costs would be higher. Instead, expenses related to prisoners' wages are sometimes shifted to the public contracting agency.

### F.    Administrative Overhead

According to one study, administrative overhead costs at correctional facilities range from eight to twenty percent,[152] and not all of those costs can be shifted to private prison contractors.

Even when prisoners are housed at privately-operated facilities, there are certain functions that still must be performed by public officials. These administrative overhead duties, sometimes called central office functions, include, among others:

> Calculating prisoners' sentences and applying good time credits;
>
> Recordkeeping related to prisoners' institutional files and/or trust fund accounts;
>
> Intake and initial classification for prisoners entering the prison system;
>
> Reviewing grievance appeals;

---

149. STATE OF HAW. DEP'T OF PUB. SAFETY, supra note 51, at Exhibit A.

150. See generally Jacqueline Stevens, One Dollar Per Day: The Slaving Wages of Immigration Jail Work Programs (Working Paper v. 2, 2014), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2434006.

151. Id. at 11.

152. GAES, supra note 2, at 18.

MARLOWE_0007850

    Reviewing and/or approving disciplinary decisions by private prison employees;

    Planning, procurement and budget development related to private prison contracts, including the development of RFPs and evaluation of bids by private prison companies;

    Parole hearings and parole-related services; and

    Responding to public records requests.

These tasks require the expenditure of staff time and resources by public contracting agencies, and therefore should be factored into cost comparisons.[153] Additionally, most private prisons are subject to monitoring by public corrections officials. In some cases those expenses are paid by the private prison company, while in others the public contracting agency is wholly or partially responsible for the cost of monitoring. A 2012 contract between the State of Idaho and CCA to house Idaho prisoners at the company's Kit Carson Correctional Center in Colorado provides that CCA will pay for the

---

153. These are all functions typically performed by public corrections agencies. Private prisons do not calculate prisoners' sentences or good time credits; prisoner record-keeping and trust fund accounts are usually maintained by Departments of Correction through a centralized computer system. When prisoners enter the prison system they go through a classification process, including medical and mental health screening and security classification, which is conducted at a public reception facility before prisoners are transferred to private prisons. For example, in the Tennessee Department of Correction (TDOC), which contracts with CCA to house state prisoners at three facilities, "[a]ll sentence computations, including calculation of Inmate release and parole dates, shall be done by the Department . . . ." Contract between Dep't of Corr., State of Tenn., and Corr. Corp. of Am. for South Central Correctional Center, supra, note 110, at 22. The TDOC uses a computer system called TOMIS to manage information about offenders, and "[a]ll computer equipment and communication lines necessary to interface with the Department's . . . (TOMIS) will be provided by the Department at no cost to the Contractor." Id. at 3, 23. The TDOC's intake/reception facility is the Bledsoe County Correctional Complex (BCCX), which "is the intake diagnostic center for all male offenders sentence [sic] to the [TDOC]. All offenders receive a comprehensive diagnostic assessment which will determine their medical, mental health and programming needs." Bledsoe County Correctional Complex, TENN. DEPARTMENT CORRECTIONS, www.tn.gov/correction/institutions/bccx.shtml (last visited Apr. 15, 2015). BCCX is operated by the state, which bears the cost of all intake and diagnostic services. See id. While private prisons have their own grievance and disciplinary procedures, grievance and disciplinary appeals are usually handled by public prison officials. See, e.g., Mandela v. Campbell, 978 S.W.2d 531 (Tenn. 1998). Parole hearings and related services are provided by public agencies—there are no privatized parole boards. With respect to public records laws, most state public records statutes do not specifically extend to private prison companies, and the federal Freedom of Information Act only applies to federal government agencies, not to private contractors. See Mel Motel, Reintroducing the Private Prison Information Act: An Interview, PRISON LEGAL NEWS (Feb. 15, 2013), https://www.prisonlegalnews.org/news/2013/feb/15/reintroducing-the-private-prison-information-act-an-interview.

monitor's salary and benefits. However, the state "is responsible for all costs associated with the IDOC Contract Monitor other than salary and benefits," including expenses, travel and lodging.[154] In this case, travel and lodging costs are higher than usual as the prisoners are housed at an out-of-state facility.

Costs associated with private prison monitoring may be minimal, such as when one or two employees are assigned to oversee one facility. But in other cases state prison systems have an entire department devoted to private prison contract monitoring and compliance, such as the Mainland/FDC Branch of the Hawaii Department of Public Safety,[155] the Private Facility Contract Monitoring/Oversight Division of the Texas Department of Criminal Justice (TDCJ),[156] and Florida's former Correctional Privatization Commission.[157]

As of 2010, California's Contract Beds Unit (CBU) reportedly had seventy-three staff members assigned to monitor out-of-state private prisons—an usually high number with a correspondingly higher cost to the state.[158] According to the CBU, monitoring costs are paid by the state and not by the private contractors.[159] The CBU's proposed budget for FY 2014–2015 was $398,284, representing costs shifted to the public sector for private prison monitoring.[160]

Finally, public agencies sometimes must absorb administrative costs related to litigation involving private prisons, such as when both private prison officials and state officials are named as defendants in lawsuits. A 2013 report by Hawaii's state Auditor noted that state prison officials were not including litigation expenses when

---

154. Contract Purchase Order between Dep't of Corr., Idaho, and Corr. Corp. of Am., supra note 92, at 237.

155. See STATE OF HAW. DEP'T OF PUB. SAFETY, supra note 51.

156. See Private Facility Contract Monitoring/Oversight Division, TEX. DEPARTMENT CRIM. JUST., http://tdcj.state.tx.us/divisions/pf/index.html (last visited Nov. 12, 2014).

157. Florida's Correctional Privatization Commission was abolished in May 2004, the same month that the agency's director, Alan Duffee, resigned. See Joni James, Ex-Prisons Official Admits Thefts, ST. PETERSBURG TIMES, Feb. 14, 2006, http://www.sptimes.com/2006/02/14/Tampabay/Ex_prisons_official_a.shtml. Duffee pleaded guilty to embezzling almost $225,000 from a maintenance fund set up for private prisons and was sentenced to thirty-three months in federal prison. See id.

158. HAKIM & BLACKSTONE, supra note 10, at 31.

159. Telephone Interview with Lt. Shawn Simpson, Pub. Info. Officer, CBU (Aug. 5, 2014).

160. 5225 Corrections and Rehabilitation, CAL. GOVERNOR'S BUDGET 2014–2015, http://www.ebudget.ca.gov/2014-15/StateAgencyBudgets/5210/5225/department.html (last visited Nov. 12, 2014). Note: The CBU also oversees in-state contract facilities.

MARLOWE_0007852

calculating private prison-related costs. "[T]hese costs, if included, would have the biggest impact on per capita costs for housing inmates in out-of-state facilities, since the biggest lawsuits involve these facilities," the Auditor wrote.[161]

One researcher has noted that even when private prison companies indemnify the public agencies with which they contract, costs of litigation absorbed by the companies may be passed on to those agencies through cost increases when the contracts are renewed or rebid: "[l]itigation expenses, settlement agreements, and adverse court judgments against private prison operators and their employees augment the Government's expenses by way of contract pricing increases and a higher degree of liability exposure than would exist under a purely public system."[162]

Other litigation expenses are incurred by the public sector when private prison companies sue government agencies, such as after a contentious contract termination. Examples include when CCA filed suit against Hernando County, Florida, in 2010 over a dispute about deferred maintenance and repairs at the county jail,[163] and when GEO Group unsuccessfully sued Michigan officials for $5.4 million after the state canceled its contract to house offenders at the GEO-operated North Lake Correctional Facility.[164] In the latter regard, according to a 2012 report released by public employee unions, GEO Group "sued the state to keep the facility open—or continue to make lease payments even if it were empty. GEO pursued the claim through complaint after amended complaint, litigating it all the way up to the Supreme Court of Michigan."[165]

---

161. HAW. OFFICE OF THE AUDITOR, supra note 37, at 47.

162. Lucas Anderson, Note, Kicking the National Habit: The Legal and Policy Arguments for Abolishing Private Prison Contracts, 39 PUB. CONT. L.J. 113, 131–32 (2009).

163. Complaint, Corr. Corp. of Am. v. Hernando County (M.D. Fla. 2010) (No. 8:10-cv-02182), 2010 WL 4018750; see also Barbara Behrendt, Former Hernando County Jail Operator CCA Sues Over Money, Equipment, TAMPA BAY TIMES, Sept. 30, 2010, http://www.tampabay.com/news/localgovernment/former-hernando-county-jail-operator-cca-sues-over-money-equipment/1125116.

164. GEO Group v. Mich. Dep't of Corr., No. 273466, 2007 Mich. App. LEXIS 1658 (Mich. Ct. App. June 21, 2007).

165. MICH. CORR. ORG., PITFALLS AND PROMISES: THE REAL RISKS TO RESIDENTS AND TAXPAYERS OF PRIVATIZING PRISONS AND PRISON SERVICES IN MICHIGAN 10 (2012), available at http://www.mco-seiu.org/files/2012/02/MCO-Private-Prison-Report-v8.pdf.

MARLOWE_0007853

### G.   Law Enforcement and Criminal Prosecutions

Private prison contracts often include reimbursement provisions for costs incurred by public law enforcement agencies due to escapes from or riots at privately-operated facilities. One shortcoming of such provisions, however, is that they may only apply to the parties to the contract. Thus, for example, if a state contracts with CCA and state employees assist in searching for an escapee from the CCA-operated facility, then the state can seek reimbursement for those costs. But if a county sheriff's office, city police department, or other public law enforcement agency assists in the search, reimbursements for those costs might not be covered by the contract. Contractual provisions may also limit reimbursements to public agencies.

A 2011 contract between CCA and the State of Vermont specifies that "[a]ny reasonable and actual costs up to $50,000.00 incurred by VTDOC in connection with any escape and or rendition and extradition process shall be chargeable to and borne by Contractor."[166] Costs above the $50,000 cap are shifted to the state, and the contract does not address costs incurred by federal or local law enforcement agencies—only by the VTDOC.[167]

Further, public agencies may incur expenses related to escapes from privately-operated facilities located in other jurisdictions. The high-profile escape of three prisoners from an MTC-managed facility in Kingman, Arizona, in July 2010 serves as an instructive example. The escapees, Tracy Province, Daniel Renwick, and John McCluskey, were eventually captured—one (plus an accomplice) in Arizona, one in Colorado, and one in Wyoming.[168] While on the run they had murdered a couple, Gary and Linda Haas, in New Mexico.[169] The escape resulted in a three-week nationwide manhunt involving dozens of law enforcement agencies.[170] While news reports indicated that MTC had reimbursed some of the costs associated with the escape,[171] it is highly unlikely that all of the law enforcement agencies that

---

166. Contract for Services between Dep't of Corr., State of Vt. and Corr. Corp. of Am., supra note 129, at 28.

167. Id.

168. Bob Ortega, Arizona Prisons Slow to Fix Flaws in Wake of Kingman Escape, ARIZ. REPUBLIC (June 26, 2011), http://www.azcentral.com/news/articles/2011/06/26/20110626arizona-prison-safety-improvements.html.

169. Id.

170. Id.

171. Jayne Hanson, County Reimbursed for Prison Break Costs, TODAY'S NEWS-HERALD (Jan. 25, 2011), http://www.havasunews.com/news/county-reimbursed-for-prison-break-costs/article_fed1b958-3c25-55c8-8aa9-5cc0fdf43ab6.html.

MARLOWE_0007854

participated in the nationwide search, including the FBI, recovered their costs from the company.

The externalized cost of criminal prosecutions resulting from incidents at private prisons is another cost-shifting factor often overlooked in public-private prison cost comparisons. To continue with the example of the 2010 escape from the MTC-operated facility in Arizona, following their capture the three escapees were prosecuted in federal court in New Mexico for a number of crimes, including the murders of Gary and Linda Haas.[172] Prosecutors sought the death penalty against McCluskey;[173] death penalty cases are the most expensive types of prosecutions.[174] McCluskey and Province were sentenced to life, while Renwick received a forty-eight year sentence in Colorado.[175] Their accomplice, Casslyn Welch, was sentenced to forty years in federal prison.[176] The costs of prosecuting the escapees, as well as their future incarceration costs (including life sentences for two of the defendants), were shifted to public agencies; MTC was not held responsible for those costs even though gross security lapses by the company had contributed to the escape.[177]

In another case, after a prisoner escaped from a CCA-operated prison in Mississippi in 2009, the escapee and an accomplice shot a Tennessee police officer, Mark Chesnut, five times during a traffic stop.[178] They were prosecuted in Tennessee and sentenced to forty-five and thirty-one years in prison, respectively.[179] The cost of their prosecution and future incarceration was shifted to public agencies in Tennessee even though the escape occurred at a CCA prison in Mississippi.

---

172. See Scott Sandlin, 40 Years for Woman's Role in Murders, ALBUQUERQUE J., June 3, 2014, http://www.abqjournal.com/409968/news/40-years-for-womans-role-in-murders.html.

173. See id.

174. See Financial Facts About the Death Penalty, DEATH PENALTY INFO. CENTER, www.deathpenaltyinfo.org/costs-death-penalty#financialfacts (last visited Nov. 12, 2014).

175. See Sandline, supra note 172.

176. See id.

177. See ARIZ. DEP'T OF CORR., ASP-KINGMAN HISTORY (2010), available at https://afsc.org/sites/afsc.civicactions.net/files/documents/adoc-report-on-kingman-escapes.pdf.

178. Kate Howard, Mark Chesnut, Officer Shot on Interstate, Sues CCA for More than $14 Million, TENNESSEAN, Oct. 30, 2009, available at http://www.hollins legal.com/wp-content/uploads/2012/03/mark-chesnut-officer-shot.pdf.

179. Brian Hass, Former Metro Police Sgt. Mark Chesnut Settles Suit in Prison Break Case, TENNESSEAN, Sept. 14, 2011, available at http://www.hollinslegal.com/wp-content/uploads/2012/03/Former-Metro-Police-Sgt.-Mark-Chesnut-settles-suit-in-prison-break-case.pdf.

MARLOWE_0007855

Further, Hawaii prisoner Bronson Nunuha was murdered at the CCA-operated Saguaro Correctional Center in Arizona in February 2010.[180] The two prisoners who killed him, Miti Maugaotega, Jr. and Micah Kanahele, were prosecuted by Arizona officials, who initially sought the death penalty.[181]   Four months after Nunuha was murdered, another Hawaii prisoner at Saguaro, Clifford Medina, was killed by his cellmate, Mahina Uli Silva.[182]   Silva also was prosecuted in Arizona and initially faced the death penalty.[183]   The County Attorney's Office assumed prosecution costs, and, although both murders involved Hawaii prisoners at a CCA facility, the future incarceration expenses for Maugaeotega, Kanahele, and Silva will be funded by Arizona taxpayers.

As indicated by the above examples, the costs of prosecuting prisoners who commit serious offenses at privately-operated facilities are shifted to public agencies, as are incarceration costs resulting from those prosecutions—even when the offenses are due to security lapses by private prison companies.

### H.  Bed Guarantees

According to a September 2013 report by In the Public Interest (ITPI) titled Criminal: How Lockup Quotas and 'Low-Crime Taxes' Guarantee Profits for Private Prison Corporations, forty-one of the sixty-two private prison contracts surveyed in the report (around 65%) contained minimum occupancy "bed guarantee" provisions. Such provisions ensure that private prison companies receive per diem payments for a minimum percentage of beds at a facility—even if they are not being used.[184]   The bed guarantees identified in the ITPI report ranged from 80 to 100%; for example, three private prison contracts in Arizona included 100% bed guarantees, while three in Oklahoma had 98% guarantees.[185]   The most common bed guarantee was 90%, and all three of the nation's largest private prison

180. See Gregg K. Kakesako, Third Hawaii Inmate Faces Death Penalty in Arizona, HONOLULU STAR ADVERTISER (Sept. 4, 2010), http://www.staradvertiser.com/news/20100904_third_hawaii_inmate_faces_death_pen alty_in_arizona.html?id=102211349.

181. Id.

182. Id.

183. Id.

184. IN THE PUB. INTEREST, CRIMINAL: HOW LOCKUP QUOTAS AND "LOW-CRIME TAXES" GUARANTEE PROFITS FOR PRIVATE PRISON CORPORATIONS (2013), available at http://www.inthepublicinterest.org/sites/default/files/Criminal-Lockup%20Quota-Report.pdf.

185. Id. at 14–16.

MARLOWE_0007856

firms—CCA, the GEO Group, and MTC—utilized bed guarantee provisions in their contracts.[186]

In some cases bed guarantees have resulted in cost-shifting by private prisons, as public agencies were required to pay for unused or unneeded bed space. As one example, following the 2010 escape from an MTC-run prison in Arizona described above, state officials removed hundreds of high-risk prisoners from the facility as a security precaution.[187] However, MTC filed a claim against the state based on a 97% bed guarantee in its contract, and Arizona ended up paying the company more than $3 million for empty beds at the prison.[188]

Also, The Tennessean reported that a 90% bed guarantee for female prisoners at the CCA-operated Metro-Davidson County Detention Facility in Nashville had cost taxpayers over $487,000 for vacant beds from 2011 to 2013.[189]

Even when private prison contracts do not include bed guarantees, that does not guarantee such provisions are inapplicable. According to the ITPI report, Colorado officials agreed to pay CCA $20,000 each for at least 3300 prisoners during FY 2013, even though there were available beds at state facilities that could have accommodated some of those prisoners—and even though the state's contracts with CCA specified that "the state does not guarantee any minimum number of offenders will be assigned to the contractor's facility."[190]

This end-run around the contractual language was achieved after "CCA negotiated the insertion of a bed guarantee provision in the state budget for all three of its facilities [in Colorado] for the 2013 fiscal year."[191] How was the company able to accomplish this legislative sleight of hand? By cutting a deal with state officials for the bed guarantees in exchange for CCA agreeing not to close one of its facilities, as it had threatened.[192] "CCA has said that if we don't figure something out, they will be in a situation where they have to close a prison," stated Roxane White, chief of staff for Colorado

---

186. Id.

187. Id. at 9.

188. Id.

189. See TN Taxpayers Pay $500K for Empty Prison Beds in Quota Contract, CRIME REP. (Oct. 11, 2013, 5:51 P.M.), http://www.thecrimereport.org/news/crime-and-justice-news/2013-10-tn-funding-empty-prison-beds.

190. Ann Imse, Colorado Paying Millions for Unneeded Private Prisons, COLO. PUB. NEWS (Mar. 10, 2013), http://www.cpt12.org/news/index.php/colorado-paying-millions-for-unneeded-private-prisons; see also IN THE PUB. INTEREST, supra note 184, at 7–8.

191. IN THE PUB. INTEREST, supra note 184, at 7–8.

192. Id.

Governor John Hickenlooper, in a March 10, 2013 news report.[193] "The General Assembly and the governor agreed to have a year where no other communities were affected by a prison closure," added Eric Brown, a spokesman for the governor's office.[194] The cost for both the private prison beds and maintaining the unused bed space in public prisons—estimated at $2 million—was shifted to the state.[195]

Bed guarantees can also have a significant impact on long-term costs, as private prison contracts may extend up to twenty years. As part of Ohio's 2011 sale of the Lake Erie Correctional Institution to CCA, state officials agreed to a twenty-year lease agreement that includes per diem rates, an annual ownership fee, and a 90% bed guarantee.[196] In the latter regard, if Ohio's prison population drops over the next two decades, and the state no longer needs to house offenders at the CCA facility—or decides to expand the use of less costly sanctions such as community corrections or supervised release—it still must fill 90% of Lake Erie's 1800 beds pursuant to the bed guarantee provision in its contract with the company.[197]

In February 2012, CCA sent letters to the governors in forty-eight states, offering to purchase state prisons under similar conditions, with 90% bed guarantees and twenty-year terms.[198]

Public prisons, of course, do not have bed guarantees because they do not need to house a minimum number of prisoners to ensure a guaranteed profit margin.[199]

## I.   Long-Term Costs

Comparisons between public and privately-operated prisons often focus on short-term expenses and may neglect the following long-term cost-shifting factors: (1) per diem increases; (2) deferred maintenance; (3) recidivism rates; and (4) expenses related to bond financing.

---

193. Imse, supra note 190.

194. Id.

195. IN THE PUB. INTEREST, supra note 184, at 7.

196. OHIO DEP'T OF REHAB. & CORR., supra note 65.

197. IN THE PUB. INTEREST, supra note 184, at 10.

198. Chris Kirkham, Private Prison Corporation Offers Cash in Exchange for State Prisons, HUFFINGTON POST (Feb. 14, 2012), http://www.huffingtonpost.com/2012/02/14/private-prisons-buying-state-prisons_n_1272143.html. A copy of the CCA letter is posted at https://www.prisonlegalnews.org/media/publications/ccaletter.pdf.

199. Since bed guarantees ensure a minimum profit margin for private prison companies, a more accurate term for such contractual provisions may be "profit guarantees."

MARLOWE_0007858

1. Per Diem Increases

The per diem rates specified in private prison contracts often increase over time as a result of contractually-required annual cost adjustments. For example, a 2012 article in The Spokesman-Review reported that Idaho's budget for private prisons was expected to increase pursuant to "a contract requirement that per-inmate payments to the Corrections Corporation of America, which operates the Idaho Correctional Center south of Boise for the state, rise by 3 percent next year."[200] "This is all on contract, and this is the rate which is in the contract," said State Rep. Darrell Bolz.[201] According to The Spokesman-Review: "Rep. Diane Bilyeu, D-Pocatello, noted that after the increase, the daily rate per inmate of $42.73 for the first 1,894 inmates [held at the CCA-run facility] will be slightly higher than the state's rate to house state inmates in county jails."[202]

In fact, escalating per diem rates in private prison contracts are fairly common. Pursuant to a 2013 contract between the Tennessee Department of Correction and CCA to operate the South Central Correctional Center, the per diem rate that CCA receives increases from $45.69 in 2013–2014, to $46.70 in 2014–2015, then to $47.73 in 2015–2016, to $48.78 in 2016–2017, and finally to $49.85 in 2017–2018 (the latter two increases only apply if the contract is extended).[203] This represents an increase of 9.1% over the potential five-year contract period, from a total annual contract amount of $27.38 million in 2013–2014 to $29.87 million in 2017–2018.[204]

Similarly, per diem payments escalate in a 2009 contract between CCA and the Metropolitan Government of Nashville and Davidson County. The contract specifies per diem costs of $43.36 per male prisoner and $46.42 per female prisoner for the first year, increasing to $48.80 per male prisoner and $52.24 per female prisoner by year five—a 12.5% increase.[205]

A 2011 contract between CCA and the State of Vermont provides that in the first year, the state will pay a per diem of $61.72 per

---

200. Betsy Z. Russell, *Prison Budget Set; Includes 3% Increase for Private Prison Firm CCA*, SPOKESMAN-REV. (Mar. 5, 2012), http://www.spokesman.com/blogs/boise/2012/mar/05/prison-budget-set-includes-3-increase-private-prison-firm-cca.

201. Id.

202. Id.

203. Contract between Dep't of Corr., State of Tenn., and Corr. Corp. of Am. for South Central Correctional Center, *supra* note 110, at 1, 28.

204. Id.

205. Management Services Contract between Corr. Corp. of Am. and the Metro. Gov't of Nashville and Davidson Cnty., *supra* note 104, at 25.

MARLOWE_0007859

prisoner housed at CCA's Lee Adjustment Center in Kentucky and $68.00 per prisoner held at the company's Florence Correctional Center in Arizona.[206] Those rates rise incrementally to $67.43 and $74.30, respectively, in year four of the contract—a 9.25% increase.[207]

The State of Texas contracts with CCA to operate a number of correctional facilities, and a 2010 contract to manage the Bartlett State Jail is representative of such agreements. That contract, which includes optional extensions to 2017, provides for a per diem rate of $28.66 for a state jail offender during the first year, increasing to $29.23 in year three under the base term of the contract, then to $31.64 in the final extension year—or an almost 10.4% increase over the full contract term, including extensions.[208]

Similar provisions are included in the state's 2010 contracts with CCA to operate the Bradshaw State Jail, Lindsey State Jail, and Willacy County State Jail—all of which include per diem increases of approximately 10.3% over the full contract term.[209] Thus, the contractual costs for private prisons are not fixed but tend to increase over time, which might not be reflected in short-term or "snapshot" cost comparison studies.

While costs at public prisons may increase over time, such as due to inflation, they also may decrease—for example, as a result of declining populations. According to the U.S. Department of Justice's Bureau of Justice Statistics, beginning in 2009 the total state prison population in the United States began a very gradual decline, and twenty-eight states reported prison population reductions from 2011 to 2012.[210] However, private prison contracts that include escalating per diem rates, such as those cited above, are guaranteed to result in higher costs over the term of the contract, unlike public prisons which do not have contractually-required cost increases.

---

206. Contract for Services between Dep't of Corr., State of Vt. and Corr. Corp. of Am., supra note 129, at 4.

207. Id.

208. Solicitation, Offer and Award between Dep't of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Bartlett State Jail, supra note 114, at 13–14.

209. See Solicitation, Offer and Award between Dep't of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Bradshaw State Jail, supra note 115; Solicitation, Offer and Award between Dep't of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Lindsey State Jail, supra note 115; Solicitation, Offer and Award between Dep't of Crim. Justice, State of Tex., and Corr. Corp. of Am. for operation of the Willacy County State Jail, supra note 115.

210. E. ANN CARSON & DANIELA GOLINELLI, U.S. DEP'T. OF JUSTICE, BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2012—ADVANCE COUNTS 3 tbl.2 (2013), available at http://www.bjs.gov/content/pub/pdf/p12ac.pdf.

MARLOWE_0007860

## 2.    Deferred Maintenance

Another long-term cost is deferred maintenance by private prison companies that manage, but do not own, correctional facilities. When CCA decided in 2010 to terminate its contract with Hernando County, Florida, to operate the county's jail, local officials found the facility was in need of significant repairs due to deferred maintenance by the company.[211] CCA had managed the jail for twenty-two years.[212] "If they had performed routine maintenance as they should have and as their contract required," said Major Michael Page with the Hernando County Sheriff's Office, "this building would look [ten] times better."[213]

Maintenance problems at the jail included "rusted doors, windows discolored and compromised by long-term water damage, cracked walls and floors, ceiling tiles and walls bubbled and stained by leaks from a faulty roof."[214]    According to an engineering report commissioned by the county, CCA was responsible for almost $1 million in repairs due to deferred maintenance.[215]

County officials withheld a $1.86 million final payment pending resolution of the repair work at the jail, and CCA filed suit against the county.[216] The case settled in 2012, with the company paying only $100,000.[217] The county had to absorb the remainder of the repair costs.[218]

## 3.    Recidivism Rates

A different type of long-term cost rarely addressed in comparisons of public and privately-operated prisons relates to recidivism rates,[219]

---

211. See John Woodrow Cox & Barbara Behrendt, Hernando County's Takeover of Jail Brings Year of Sweeping Changes, TAMPA BAY TIMES, Aug. 27, 2011, http://www.tampabay.com/news/localgovernment/hernando-countys-takeover-of-jail-brings-year-of-sweeping-changes/1188387.

212. Id.

213. Id.

214. Id.

215. See Barbara Behrendt, Hernando County, Jail Contractor Reach Settlement Over Withheld Payment, TAMPA BAY TIMES, Jan. 24, 2012, http://www.tampabay.com/news/localgovernment/hernando-county-jail-contractor-reach-settlement-over-withheld-payment/1212123.

216. Id.

217. Id.

218. Id.

219. Note that recidivism may be measured in various ways, e.g., by rearrest, reconviction, or reincarceration. So long as the same measure is applied to public and private prisons, such comparisons are valid; however, a more accurate

MARLOWE_0007861

and one researcher has argued that, "[i]ncreased criminal recidivism among inmates in private institutions presents perhaps the largest hidden financial cost of privatization."[220] At best, prior research has found that private prisons have no better recidivism outcomes than their public counterparts; at worst, based on recent studies, recidivism rates are higher at private prisons—meaning prisoners released from such facilities are more likely to be reincarcerated, resulting in significant cost-shifting from private prison companies to the public sector over the long term.[221]

Beginning in 1999, a series of studies in Florida examined the recidivism rates of offenders held in both public and privately-operated prisons. The initial studies, which had various methodological weaknesses, concluded that private prisons achieved lower recidivism rates.[222] The final study, jointly conducted by the Florida Department of Corrections, Florida State University, and Florida's Correctional Privatization Commission, and published in 2005, was "the most rigorous" of the Florida recidivism reports.[223] The final study found there was little difference in recidivism rates between public and privately-operated facilities.[224] "In summary, in only one of thirty-six comparisons was there evidence that private prisons were more effective than public prisons in terms of reducing recidivism," the authors concluded in a December 2003 version of the study posted on the FDOC's website.[225]

A January 2011 joint study by the University of Hawaii and Hawaii's Attorney General examined recidivism rates for 660 prisoners who were paroled after serving time both in public prisons and in privately-operated facilities on the mainland.[226] The study

comparison would involve public and privately-operated facilities that offer similar rehabilitative programs.

220. ANDERSON, supra note 162, at 9.

221. See, e.g. MATTHEW T. KING, Private Prisons and Recidivism, in PRISON PRIVATIZATION: THE MANY FACETS OF A CONTROVERSIAL INDUSTRY, supra note 4, at 161.

222. GRANT DUWE & VALERIE CLARK, THE EFFECTS OF PRIVATE PRISON CONFINEMENT IN MINNESOTA ON OFFENDER RECIDIVISM 4–5, 28 (2013), available at http://www.doc.state.mn.us/pages/files/9613/9206/2382/MN_Private_Prison_Evaluatio n_Website_Final.pdf.

223. Id. at 5–6, 28; see also William Bales et al., Recidivism of Public and Private State Prison Inmates in Florida, 4 CRIMINOLOGY & PUB. POL'Y 57 (2005).

224. Bales et al., supra note 223, at 78–80.

225. William Bales et al., Recidivism: An Analysis of Public and Private State Prison Releases in Florida, FLA. DEPARTMENT CORRECTIONS (Dec. 2003), http://www.dc.state.fl.us/pub/recidivismfsu/summary.html

226. UNIV. OF HAW. AT MANOA DEP'T OF SOCIOLOGY & HAW. DEP'T OF THE ATTORNEY GEN., HAWAII'S IMPRISONMENT POLICY AND THE PERFORMANCE OF

MARLOWE_0007862

2014]

found the recidivism rate for parolees from state prisons was 56% compared with 53% for those from private prisons; however, that finding was "not statistically significant."[227]  Further, there were differences between the two prisoner cohorts, including with respect to gender and type of commitment offense, and the study did not examine recidivism rates for prisoners who completed their sentences and were released from public and private prisons without being placed on parole. The report concluded, "[s]ince there is no empirical justification for the policy argument that private prisons reduce recidivism better than public prisons, the State of Hawaii should decide whether to continue, discontinue, expand, or contract its reliance on private prisons based on other criteria."[228]

Other research has reached opposite conclusions.  A July 2003 study of for-profit, non-profit, and public juvenile correctional facilities in Florida, published by the Economic Growth Center at Yale University, determined that "for-profit management has a statistically significant impact on recidivism as measured by both 1-year recidivism rates (approximately 5 to 8 percent higher than the other management types in terms of adjudications and charges) and by daily hazard rates (approximately 13 to 19 percent higher)," relative to non-profit and public facilities.[229]

Further, a 2008 study of Oklahoma prisoners in public and private prisons found "a significantly greater hazard of recidivism among private prison inmates in six of the eight models tested . . . . In every categorical model (including the two that were non-significant), private prison inmate groups had a greater hazard of recidivism than did public inmate groups."[230]  The study noted that the more time a prisoner spent at a private facility, the greater the hazard of recidivism; conversely, the more time served at a public prison, the lower the hazard of recidivism—though the effects were modest.[231]

---

PAROLEES WHO WERE INCARCERATED IN-STATE AND ON THE MAINLAND 1–2 (2011), available at http://ag.hawaii.gov/cpja/files/2013/01/AH-UH-Mainland-Prison-Study-2011.pdf.

227. Id. at 23.

228. Id.

229. Patrick Bayer & David E. Pozen, The Effectiveness of Juvenile Correctional Facilities: Public Versus Private Management, 48 J.LAW & ECON. 549 (2005), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=441881.

230. Andrew L. Spivak & Susan F. Sharp, Inmate Recidivism As a Measure of Private Prison Performance, 54 CRIME & DELINQUENCY 482 (2008).

231. Id.  Spivak opined that higher recidivism rates at private prisons may be a result of more difficult prisoners being sent to those facilities by public corrections agencies—a type of "reverse cherrypicking." See id.  However, he offered no evidence to support that claim.

The study, which controlled for prisoners' age, education, race, prior incarceration, offense type, discharge conditions, sentence length, time served, time spent in public and private prisons, and proportion of sentence served, concluded that prisoners held in private facilities were up to 16.7% more likely to recidivate.[232]

Most recently, the results of a 2013 study conducted by the Minnesota Department of Corrections indicated:

> [T]hat offenders who had been incarcerated in a private prison had a greater hazard of recidivism in all 20 models, and the recidivism risk was significantly greater in eight of the models. The evidence presented in this study suggests that private prisons are not more effective in reducing recidivism, which may be attributable to fewer visitation and rehabilitative programming opportunities for offenders incarcerated at private facilities.[233]

To the extent that prisoners released from private prisons in fact have higher recidivism rates, cost comparisons of public and privately-operated facilities should examine the reincarceration expenses that result due to those higher rates—which represent costs shifted to the public sector over the long term. Such costs can be substantial; according to a 2012 study by the Vera Institute of Justice, the average cost of incarceration is $31,286 per prisoner per year.[234]

As noted in the 2003 study of Florida juvenile facilities:

> Relative to all other management types, for-profit management leads to a statistically significant increase in recidivism, but, relative to nonprofit and state-operated facilities, for-profit facilities operate at a lower cost to the government per comparable individual released. Cost benefit analysis implies that the short-run savings offered by for-profit over nonprofit management are negated in the long run due to increased recidivism rates, even if one measures the benefits of reducing criminal activity as only the avoided costs of additional confinement.[235]

### 4. Bond Financing

A final long-term cost-shifting factor involves the construction of jails to generate revenue for cities and towns. Such projects usually

---

232. Id.; see also King, supra note 221, at 170.
233. DUWE & CLARK, supra note 222.
234. CHRISTIAN HENRICHSON & RUTH DELANEY, VERA INST. OF JUSTICE, THE PRICE OF PRISONS: WHAT INCARCERATION COSTS TAXPAYERS 9 (2012), available at http://www.vera.org/sites/default/files/resources/downloads/Price_of_Prisons_updated_version_072512.pdf.
235. Bayer & Pozen, supra note 229, at 549.

MARLOWE_0007864

include municipal or private bond financing to build jails that are operated by private companies; the host town receives a portion of the revenue from housing prisoners at the facility. Sometimes the projects are not successful, though, leaving public officials with empty jails, ongoing maintenance costs, and large bond or loan payments.

Examples include the town of Hardin, Montana, which built the Two Rivers Detention Center that was supposed to be operated by Emerald Corrections and then by Civigenics, both private prison contractors, but which, until recently, has remained vacant since 2007.[236] Hardin defaulted on $27 million in bond payments and the bondholders took over the facility in 2013.[237]

The $10 million Bill Clayton Detention Center in Littlefield, Texas, remained empty for three years after the GEO Group pulled out in 2009, leaving the city with monthly loan payments of $65,000.[238] City officials raised property taxes, increased water and sewage fees, fired employees to avoid defaulting, and used reserve funds to cover the payments.[239] The facility remained vacant as of October 2014; meanwhile, the city's bond rating has suffered.[240]

According to another report:

> Clayton, New Mexico issued $63 million in revenue bonds to contract with GEO to build a medium security, 625-bed institution to house mostly state inmates. As prison populations declined, a study conducted for the Legislative Finance Committee reported that the actual cost of the prison will exceed the estimated construction cost of $61 million. It estimated that over the course of twenty years, the state will pay $132 million in construction and

---

236. Alex Friedmann, Improbable Private Prison Scam Plays Out in Hardin, Montana, PRISON LEGAL NEWS (Dec. 15, 2009), https://www.prisonlegalnews.org/news/2009/dec/15/improbable-private-prison-scam-plays-out-in-hardin-montana.

237. Id. The Hardin facility began receiving its first prisoners in August 2014. See Developers Turn Over Hardin Jail to Bondholders, HELENA INDEP. REC., Apr. 19, 2012, http://helenair.com/news/state-and-regional/developers-turn-over-hardin-jail-to-bondholders/article_40291f16-89e5-11e1-bb8d-001a4bcf887a.html; Long Empty, Hardin Jail to House Native American Inmates, MISSOULIAN, Oct. 9, 2014, http://missoulian.com/news/state-and-regional/long-empty-hardin-jail-to-house-native-american-inmates/article_f48374e4-4fad-11e4-964e-6fa7dbfcf380.html.

238. Matt Clarke, Texas Towns Saddled with Empty, Expensive Privatized Prisons and Jails, PRISON LEGAL NEWS (Feb. 15, 2012), https://www.prisonlegalnews.org/news/2012/feb/15/texas-towns-saddled-with-empty-expensive-privatized-prisons-and-jails.

239. Id.

240. Id.; see also Matt Clarke, Towns Defaulting on Prison and Jail Bonds, PRISON LEGAL NEWS (Mar. 15, 2011), https://www.prisonlegalnews.org/news/2011/mar/15/towns-defaulting-on-prison-and-jail-bonds.

MARLOWE_0007865

finance costs and still not own the building. Of the $95.33 per diem
inmate costs for housing, $27.81 will go toward construction costs.[241]

In such cases, the costs associated with maintenance for shuttered
facilities, public funds used to cover bond payments, increased
property taxes and other fees, and lowered bond ratings are shifted to
the public sector when contracts with private prison companies do not
work out.

There are also costs associated with "backdoor" financing of
privately-operated prisons and immigration detention centers through
the use of revenue bonds.[242] According to a 2007 exposé by Kevin
Pranis, then a policy analyst with Justice Strategies, there are
significant long-term expenses associated with prison and jail
financing schemes. "A review of recent prison, jail, and detention
expansion initiatives shows that federal, state, and local governments
are using backdoor financing mechanisms to borrow hundreds of
millions of dollars to build facilities that the public does not want and
cannot afford," Pranis wrote.[243] "Easy access to investment capital
permits policy makers to commit to thousands of new prison beds that
will cost billions of dollars to operate over the coming decades while
putting, as they say in the car commercials, 'nothing down.'"[244]

### J. Fraud and Corruption

While some level of corruption is likely present in all corrections
systems, both public and private, government-operated prisons do not
have a profit motivation—the need to make money—that is
conducive to fraudulent practices. Private companies do have a profit
motivation. Unsurprisingly, then, there have been several examples
of private prison contractors engaging in corruption, fraud, or other
unethical practices, which constitutes another cost-shifting factor
when comparing public and private prisons.

In 2005, an audit by Florida's Department of Management Services
(DMS) reported that over an eight-year period, CCA and the GEO
Group were overpaid around $12.7 million—including $4.7 million for

---

241. ELAINE RIZZO & MARGARET HAYES, AN ASSESSMENT OF THE RISKS AND
BENEFITS OF PRISON PRIVATIZATION 3 (2012), available at https://www.prison
legalnews.org/media/publications/rizzo_report_on_assessment_of_risks_and_benefits
_of_prison_privatization_2012.pdf.

242. Kevin Pranis, Doing Borrowed Time: The High Cost of Backdoor Prison
Finance in PRISON PROFITEERS: WHO MAKES MONEY FROM MASS INCARCERATION
36–51 (Tara Herivel & Paul Wright eds., 2007).

243. Id. at 36.

244. Id. at 40.

MARLOWE_0007866

vacant employee positions, $5 million in "salary additives," and $2.85 million paid to CCA for facility maintenance the company did not perform.[245] "Our review showed numerous instances where [private prison] vendors' interests were considered over the State's interests," the DMS report stated.[246] The GEO Group argued that the overpayments were authorized pursuant to its contract with the state, and agreed to repay only $402,541.[247] CCA agreed to pay $1.55 million—leaving the state approximately $10.7 million short.[248]

More recently, CCA issued a press release on April 11, 2013, acknowledging that employees at the company's Idaho Correctional Center (ICC) had falsified staffing records and billed the state for almost 4800 hours for vacant positions.[249] "[E]mployees were being placed on the shift schedule who were not present within the building or who were actually working in other areas and in some cases were no longer employees of CCA," said Boise attorney T.J. Angstman, who represents prisoners in a federal lawsuit related to high levels of violence at ICC.[250]

As a result of the falsified records and understaffing at the prison, in September 2013 CCA was held in civil contempt in a class-action suit filed by the ACLU of Idaho, for failing to comply with the terms of a settlement agreement involving staffing levels at ICC.[251] CCA agreed to pay $1 million to Idaho to cover the cost of the falsified staffing hours.[252] However, it is unknown whether that compensated

---

245. OFFICE OF INSPECTOR GEN., CONTRACT MANAGEMENT OF PRIVATE CORRECTIONAL FACILITIES i–iii (2005) available at https://www.prisonlegalnews.org/media/publications/office%20of%20the%20ig%2C%20fl%20private%20prison%20audit%20report%2C%202005.pdf.

246. Id. at 7.

247. David M. Reutter, No Criminal Wrongdoing Found in Overpayments to Florida Private Prisons, PRISON LEGAL NEWS (Jan. 15, 2008), https://www.prisonlegalnews.org/news/2008/jan/15/no-criminal-wrongdoing-found-in-overpayments-to-florida-private-prisons.

248. Id.

249. CCA Admits to Falsified Staffing Records, Violating Contract with Idaho DOC, PRISON LEGAL NEWS (May 15, 2013), https://www.prisonlegalnews.org/news/2013/may/15/cca-admits-to-falsified-staffing-records-violating-contract-with-idaho-doc.

250. Id.

251. Complaint, Kelly v. Wengler, No. 1:11-cv-00185-EJL (D. Idaho Apr. 27, 2011); Idaho: Federal Court Unseals Pleadings, Holds CCA in Contempt for Violating Settlement Agreement, PRISON LEGAL NEWS (Oct. 15, 2013), https://www.prisonlegalnews.org/news/2013/oct/15/idaho-federal-court-unseals-pleadings-holds-cca-in-contempt-for-violating-settlement-agreement.

252. Rebecca Boone, Prison Company CCA to Pay Idaho $1M Over Staffing, ASSOCATED PRESS (Feb. 4, 2014), http://bigstory.ap.org/article/prison-company-cca-pay-idaho-1m-over-staffing.

MARLOWE_0007867

the state for all of its losses; state officials commissioned an independent audit, which estimated that CCA had understaffed ICC by more than 26,000 hours in one year alone.[253] The company has contested the audit findings.[254]

Another example of corruption involves Christopher B. Epps, former director of the Mississippi Department of Corrections and former president of the American Correctional Association, who was indicted in November 2014 on federal bribery and kickback charges.[255] Epps was accused of accepting almost $2 million in bribes in connection with prison vendor contracts; he allegedly received the bribes from Cecil McCrory, who, among other positions, served as a paid consultant to Management and Training Corporation—a private prison firm with contracts in Mississippi.[256] Epps' indictment led to calls to examine the state's contracts with private prison companies.[257] Epps and McCrory pleaded guilty to corruption charges in February 2015.[258]

Further, a report issued by the Office of the Inspector General of the U.S. Department of Justice found that with respect to a contract to house BOP prisoners at the GEO Group-operated Reeves County Detention Center in Texas, "Reeves County improperly requested and the BOP improperly paid $1.95 million in fringe benefits it was not entitled to receive, including $175,436 in payroll taxes and workers' compensation insurance that were incorrectly calculated."[259] While perhaps not rising to the level of fraud or corruption, this evidences another way that private prison costs are shifted to the public sector, through improper or unjustified contractual payments.

---

253. Rebecca Boone, *Private Prison Firm to Fight Staffing Audit Result*, ASSOCIATED PRESS (Feb. 12, 2014), http://bigstory.ap.org/article/private-prison-firm-fight-staffing-audit-result.

254. Id.

255. See Timothy Williams, *Christopher Epps, Former Chief of Prisons in Mississippi, Is Arraigned*, N.Y. TIMES, Nov. 6, 2014, http://www.nytimes.com/2014/11/07/us/christopher-epps-former-chief-of-prisons-in-mississippi-is-arraigned.html.

256. Id.

257. See Sid Salter, *Epps Corruption Probe Should Bring Investigation of State's Private Prisons*, GULFLIVE.COM (Nov. 26, 2014), http://blog.gulflive.com/mississippi-press-opinion/2014/11/epps_corruption_probe_should_b.html.

258. Alan Blinder, *2 Former Mississippi Officials Plead Guilty in a Graft Case Involving Private Prisons*, N.Y. TIMES, Feb. 25, 2015, http://www.nytimes.com/2015/02/26/us/christopher-epps-former-mississippi-prisons-chief-pleads-guilty-in-corruption-case.html.

259. OFFICE OF THE INSPECTOR GEN., AUDIT OF THE FEDERAL BUREAU OF PRISONS CONTRACT NO. DJB1PC007 AWARDED TO REEVES COUNTY, TEXAS TO OPERATE THE REEVES COUNTY DETENTION CENTER I/II PECOS, TEXAS i–ii (2015), available at http://www.justice.gov/oig/reports/2015/a1515.pdf.

MARLOWE_0007868

The Inspector General's report also noted that between February 2007 and December 2014, the Reeves County facility:

> [W]as rated "deficient" or "unsatisfactory" in 6 of 12 award fee evaluation periods. BOP's award fee rating reports reflected that [the facility] consistently struggled to meet or exceed baseline contractual standards, received an unacceptable number of deficiencies and notices of concern; was unresponsive to BOP inquiries; struggled with staffing issues in health services and correctional services; and frequently submitted inaccurate routine paperwork, including erroneous disciplinary hearing records and monthly invoices.[260]

Other forms of fraud and corruption involving private prison companies likely go undetected, and thus the associated losses—and costs to public agencies—are unknown and impossible to quantify.

## IV. QUALITY OF SERVICE COMPARISONS

Thus far this Article has focused on factors related to cost comparisons between public and private prisons.[261] Whether or not private prisons "save money," however, is not the sole consideration; whether they provide an equivalent quality of service is important, too. After all, cheaper is not always better with respect to our criminal justice system. We tend to get what we pay for.

As stated in the 1996 GAO report:

> Although comparative costs are very important, they are not the only factors considered by policymakers in deciding the direction or extent of corrections privatization. A principal concern is whether private contractors can operate at lower costs to the taxpayers, while providing the same or even a better level of service as the public sector, particularly with respect to safety and security issues.[262]

Also, as noted by Associate Professor Alexander Volokh in an article addressing the need for performance measures at privately-operated facilities, "[i]f we find that a private prison costs less, how do we know that it did not achieve that result by cutting quality?"[263] Volokh suggested using performance-based private prison contracts—although in practice, cost considerations may be more important to public agencies dealing with strained budgets.

---

260. Id. at ii.
261. See supra Part III.
262. U.S. GEN. ACCOUNTING OFFICE, supra note 16, at 9.
263. Volokh, supra note 5, at 361.

Additionally, cost and quality of service are directly related: lower costs typically lead to lower quality, while a performance-based contract that calls for higher quality service outcomes can be expected to result in higher costs. Again, we get what we pay for, and when public agencies contract carceral functions to the lowest bidder, high quality of service should not be expected.

As with cost comparison studies, research on quality of service in public versus private prisons has reached equivocal conclusions.[264] According to the 2009 meta-analysis by the University of Utah:

> Our conclusion is that prison privatization provides neither a clear advantage nor disadvantage compared with publicly managed prisons. Neither cost savings nor improvements in quality of confinement are guaranteed through privatization. Across the board, effect sizes were small, so small that the value of moving to a privately managed system is questionable.[265]

One researcher has suggested incentivizing private prison companies to achieve desired performance outcomes through refundable tax credits—termed a "private prisoner rehabilitation" (PPR) credit.[266] According to this proposal:

> Through the tax codes of participating governments, private prison companies could claim the various PPR credits upon meeting specific, tangible, state-mandated benchmarks. For example, a benchmark might consist of a five percent annual decrease in rape incidents, a five percent annual decrease in prison assault incidents, increased employee training through a state-certified program, implementation of transitional programming that sixty percent of inmates attend with eighty percent of them meeting certain educational goals, or other specific goals.[267]

Potential weaknesses with this approach include the fact that CCA and GEO Group, the nation's two largest private prison firms, are both real estate investment trusts (REITs) with very low tax

---

264. Michael Montgomery, Performance Measures and Private Prisons, in PRISON PRIVATIZATION: THE MANY FACETS OF A CONTROVERSIAL INDUSTRY, supra note 4, at 187.

265. Lundahl et al., supra note 18, at 392.

266. Cassandre Monique Davilmar, Note, We Tried to Make Them Offer Rehab, but They Said, "No, No, No!": Incentivizing Private Prison Reform Through the Private Prisoner Rehabilitation Credit, 89 N.Y.U. L. REV 267 (2014).

267. Id. at 286.

MARLOWE_0007870

burdens;[268] also, performance data for the proposed benchmarks would be largely self-reported by the privately-operated prisons.

## A. Violence Levels

While quality-of-service comparisons are often subjective, some benchmarks, such as levels of institutional violence in public and private prisons, can be more readily analyzed. Several studies have found higher rates of violence at privately-operated facilities despite the fact that they usually house minimum- and medium-security prisoners while public prisons hold offenders of all security levels, including maximum-security.

For example, a 2004 article in Federal Probation found that private prisons had more than twice as many prisoner-on-prisoner assaults than in public prisons,[269] and a 2001 Bureau of Justice Assistance report found privately-operated facilities reported 50% more prisoner-on-prisoner assaults and almost 50% more prisoner-on-staff assaults than in public prisons with comparable security levels.[270]

According to a 2008 report by Idaho DOC investigator Tim Higgins, known as the Higgins report: "[s]ince the beginning of 2008, incidents of violence at the Idaho Correctional Center has [sic] steadily increased to the point that there are four incidents for every one that occurs in the rest of the Idaho state operated facilities combined."[271] The CCA-operated Idaho Correctional Center, discussed previously, is also called the "Gladiator School" due to such high levels of violence.[272]

Further, a Human Rights Defense Center analysis of violent incidents at public and private prisons in Tennessee, conducted by this author based on data provided by state officials pursuant to public records requests, found that rates of violence at private prisons

---

268. Kristen Gwynne, *The Corrections Corporation of America's Latest Shady Business? Tax Evasion*, ALTERNET (Apr. 26, 2013), www.alternet.org/corrections-corporation-americas-latest-shady-business-tax-evasion.

269. Blakely & Bumphus, *supra* note 88, at 27–31.

270. JAMES AUSTIN & GARRY COVENTRY, EMERGING ISSUES ON PRIVATIZED PRISONS 57 (2001), *available at* https://www.ncjrs.gov/pdffiles1/bja/181249.pdf.

271. Memorandum from Tim Higgins, Investigation & Intelligence Coordinator, to Randy Blades, Warden of the Virtual Prison, Idaho Dep't of Corr., on Initial Analysis of Violence at the Idaho Correctional Center (Aug. 7, 2008), *available at* https://www.prisonlegalnews.org/media/publications/idaho%20icc%20higgins%20report%20on%20violence%202008.pdf.

272. *FBI Takes Over Investigation of Idaho Prison Nicknamed 'Gladiator School'*, N.Y. DAILY NEWS (Mar. 7, 2014), http://www.nydailynews.com/news/national/fbi-takes-investigation-idaho-gladiator-school-article-1.1714357.

MARLOWE_0007871

were 29% higher in 2010, 15.7% higher in 2011, 22.7% higher in 2012, and 15.8% higher in 2013 compared with state prisons.[273] The analysis used data related to prisoner-on-prisoner assaults, prisoner-on-staff assaults, and institutional disturbances, and violent incident rates were calculated based on the population levels at public and privately-operated Tennessee prisons.[274]

Additionally, a 2013 report by Ohio's Correctional Institution Inspection Committee found that within the first year after CCA purchased and began operating the Lake Erie Correctional Institution, the rate of prisoner-on-prisoner assaults was "significantly higher than the rate for comparator prisons," though slightly lower than the state prison system average.[275] Further, the rate of prisoner-on-staff assaults "was significantly higher" than the rate at comparison prisons as well as the state prison system average, and the total number of disturbances at the facility "doubled in comparison to prior years."[276] The rate of use-of-force incidents was lower than the prison system average, but "more than 1.5 times the average of comparator prisons."[277]

### B.  Staff Turnover

Staff turnover rates can constitute another quality of service benchmark. High staff turnover means there are fewer experienced staff at a facility, more new "green" employees, and thus potentially greater institutional instability. Increased staff turnover may also reflect employee dissatisfaction with the quality of the prison work environment, including safety and security.

Historically, private prisons have had significantly higher staff turnover rates than public prisons. According to the last available self-reported data from private prison companies, from The 2000 Corrections Yearbook, the average turnover rate at privately-

---

273. HUMAN RIGHTS DEF. CTR., TDOC VIOLENT INCIDENTS REPORTED, JANUARY 2010 THROUGH MAY 2014 (2014), https://www.prisonlegalnews.org/media/publications/TDOC%20violence%20stats%20Jan%202010%20to%20May%202014%20FINAL_1.pdf.

274. Id.

275. GREGORY GEISLER, CORRECTIONAL INSTITUTION INSPECTION COMMITTEE REPORT ON THE INSPECTION AND EVALUATION OF THE LAKE ERIE CORRECTIONAL INSTITUTION 4–5 (2013), available at http://www.ciic.state.oh.us/docs/lake_erie_correctional_institution_2013.pdf.

276. Id.

277. Id.

operated prisons was 52.2% while the average rate at public prisons was 16%.[278]

More recently, according to a December 2008 Texas Senate Committee on Criminal Justice report: "[d]uring FY 2008 the correctional officer turnover rate at the seven private prisons [in Texas] was 90 percent (60 percent for the five privately-operated state jails), which in either case is higher than the 24 percent turnover rate for TDCJ correctional officers during FY 2008."[279]

Other examples include a 2013 report by Ohio's Correctional Institution Inspection Committee, which noted higher staff turnover rates at the CCA-owned and operated Lake Erie Correctional Institution. "In December 2012, the staff turnover rate for total staff exceeded 20 percent. Correctional officer turnover rate was reported as 19.7 percent," the report found.[280] "In comparison, the DRC [state corrections department] staff turnover rate is reportedly 12.7 percent."[281]

Further, a March 2013 report by MGT of America, commissioned by New Hampshire officials to evaluate responses to the state's RFP for a private prison contract, stated:

> In prior MGT studies of private correctional facility operations, we have found private correctional facilities with annual staff turnover rates of 42 percent compared to 13.3 percent for nearby public facilities. High turnover, which can result from non-competitive compensation levels, produces a chronically inexperienced work force with direct implications for the integrity of facility security and safety.[282]

Consequently, when comparing quality of service at private versus public prisons, staff turnover and the impact it has on facility operations can constitute a useful performance measure.

---

278. See Employees Leaving Private Correctional Facilities and Correctional Officer Turnover During 1999, in THE 2000 CORRECTIONS YEARBOOK 100 (2000); Correctional Officer Turnover During 1999, in THE 2000 CORRECTIONS YEARBOOK, supra, at 152.

279. TEX. SENATE COMM. ON CRIM. JUSTICE, INTERIM REPORT TO THE 81ST LEGISLATURE 9 (2008), available at http://www.senate.state.tx.us/75r/senate/commit/c590/c590.InterimReport80.pdf.

280. GEISLER, supra note 275, at 60.

281. Id.

282. MGT OF AMERICA, INC., FINAL REPORT: CORRECTIONAL FACILITY RFP EVALUATIONS 13 (2013), available at https://admin.state.nh.us/purchasing/MGT%20Final%20Report%20MGT.pdf.

MARLOWE_0007873

## C.  ACA Accreditation

The Hakim and Blackstone study cited standards established by the American Correctional Association (ACA) as an appropriate measure for quality of service, calling ACA accreditation a "robust and useful practical indicator of quality in the operations and management of prisons."[283] However, using ACA accreditation as a benchmark for correctional quality is problematic and impractical for several reasons.

According to the 1996 GAO report:

> Comparing the quality of service at private and public prisons also presents challenges and, in fact, can be more difficult than comparing costs. The concept of 'quality' is neither easily defined nor measured. For example, although the American Correctional Association (ACA) sets accreditation standards for prisons, accredited facilities can vary widely in terms of overall quality. According to ACA officials, such variances occur because ACA accreditation means that a facility has met minimum standards.[284]

In fact, the ACA is a private organization, primarily composed of and directed by current and former corrections officials, that establishes its own standards with no oversight beyond the ACA itself.[285] The ACA basically "sells" accreditation to correctional facilities (both public and private) by charging substantial fees. According to the ACA's pricing chart, accreditation fees range from $8100 to $19,500 depending on the number of days and auditors involved, and the number of facilities being accredited.[286] The ACA relies heavily on such fees; it reported receiving more than $4.5 million in accreditation fees in 2011—almost half its total revenue that year.[287] The organization thus has a financial incentive to "sell" as many accreditations as possible.

There is also a potential conflict of interest relative to ACA accreditation being used as a quality of service measure for private prisons, because close connections exist between the ACA and the private prison industry. The ACA's past president, Davidson County,

---

283. HAKIM & BLACKSTONE, supra note 10, at 31.

284. U.S. GEN. ACCOUNTING OFFICE, supra note 16, at 4 (emphasis added).

285. See  Executive  Office,  ACA,  http://www.aca.org/ACA_Prod_IMIS/ ACA_Member/About_Us/Executive_Office/ACA_Member/AboutUs/Executive_ Office_Home.aspx (last visited Nov. 12, 2014).

286. See  Message  From  Executive  Director,  ACA  http://www.aca.org/ ACA_Prod_IMIS/ACA_Member/Standards_and_Accreditation/SAC_AccCosts.aspx (last visited Nov. 12, 2014).

287. AM. CORR. ASSOC., FORM 990 (2012).

MARLOWE_0007874

Tennessee, Sheriff Daron Hall, is a former CCA program manager, while CCA vice president Harley Lappin and CCA warden Cherry Lindamood serve on the ACA's Standards Committee.[288]  Among other companies, the ACA's 2015 Winter Conference listed CCA, the GEO Group, and MTC as sponsors.[289]   Further, the ACA accreditation process is basically a paper audit; the ACA does not provide oversight or ongoing monitoring of correctional facilities, but only verifies whether a facility has policies that comply with the ACA's self-promulgated standards.[290]

As a result, some facilities have experienced significant problems despite being accredited.  For example, the CCA-operated Otter Creek Correctional Center in Kentucky was accredited by the ACA in 2009 when at least five prison employees were prosecuted for raping or sexually abusing prisoners.[291]  Two states withdrew their female prisoners from Otter Creek following the sex scandal, but the facility retained its ACA accreditation.[292]

288. Standing Committees, ACA, http://www.aca.org/ACA_Prod_IMIS/ACA_Member/About_Us/Our_Committees/ACA_Member/AboutUs/Committees.aspx (last visited Nov. 12, 2014).

289. AM. CORR. ASS'N, ACA'S 2015 WINTER CONFERENCE EXHIBITOR PROSPECTUS 8–11 (2014), http://register.aca.org/aca_prod_imis/Docs/Conference/WC2015/ExhibitorProspecuts_2015WC.pdf.

290. DOUGLAS MCDONALD & CARL PATTEN, JR., ABT ASSOCIATES, GOVERNMENTS' MANAGEMENT OF PRIVATE PRISONS viii (2003) ("Achieving ACA accreditation is not an outcomes-based performance goal. Rather, ACA standards primarily prescribe procedures. The great majority of ACA standards are written in this form: 'The facility shall have written policies and procedures on . . . .' The standards emphasize the important benefits of procedural regularity and effective administrative control that flow from written procedures, and careful documentation of practices and events. But, for the most part, the standards prescribe neither the goals that ought to be achieved nor the indicators that would let officials know if they are making progress toward those goals over time."), https://www.prisonlegalnews.org/media/publications/Governments%20Management%20of%20Private%20Prisons%20-%20September%202003.pdf.

291. Ian Urbina, Hawaii to Remove Inmates Over Abuse Charges, N.Y. TIMES, Aug. 25, 2009, http://www.nytimes.com/2009/08/26/us/26kentucky.html. The CCA-operated Otter Creek facility was accredited by the ACA before the sex abuse scandal. See 2008 ACA Round-Up: A Year of Excellence in Accreditation, CCA (Jan. 9, 2009), http://www.cca.com/insidecca/2008-aca-round-up-a-year-of-excellence-in-accreditation.

292. On July 20, 2011, after the sex abuse scandal, CCA announced that Otter Creek had been reaccredited by the ACA. Thirteen CCA Facilities Earn ACA Reaccreditation, CCA (July 20, 2011), www.cca.com/insidecca/thirteen-cca-facilities-earn-aca-reaccreditation. Both Hawaii and Kentucky removed their female prisoners from Otter Creek following the scandal. First Hawaii, Now Kentucky Orders Pullout from Prison, STAR BULLETIN (Jan. 10, 2010), http://archives.starbulletin.com/content/20100110_First_Hawaii_now_Kentucky_orders_pullout_from_prison.

MARLOWE_0007875

The privately-operated Walnut Grove Youth Correctional Facility in Mississippi was accredited by the ACA even though the U.S. Department of Justice found "systemic, egregious practices" at the facility, including "brazen" sexual activity between staff and offenders that was "among the worst that we've seen in any facility anywhere in the nation."[293] When approving a settlement in a class-action lawsuit against Walnut Grove in 2012, a U.S. District Court Judge wrote that the facility had "allowed a cesspool of unconstitutional and inhuman acts and conditions to germinate, the sum of which places the offenders at substantial ongoing risk."[294]

More recently, as noted above, the ACA-accredited, CCA-operated Idaho Correctional Center has been cited for extremely high levels of violence, understaffing, and fraudulent reporting of staffing hours.[295] A video of CCA officers failing to intervene while one prisoner was brutally beaten by another has been widely circulated.[296] CCA was held in contempt by a federal court in September 2013 for violating a settlement in a class-action lawsuit against the facility,[297] and a separate suit alleges that CCA employees collaborated with gang members to maintain control at the prison.[298] The state assumed management of the Idaho Correctional Center on July 1, 2014, and the FBI is currently conducting an investigation into CCA's staffing fraud.[299] Regardless, the prison remains accredited by the ACA.[300]

---

293. CIVIL RIGHTS DIV., U.S. DEP'T OF JUSTICE, INVESTIGATION OF THE WALNUT GROVE YOUTH CORRECTIONAL FACILITY 1 (2012), available at www.justice.gov/crt/about/spl/documents/walnutgrovefl.pdf.

294. Order Approving Settlement at 5, Depriest v. Epps, No. 3:10-cv-00663-CWR-FKB (S.D. Miss. Mar. 26, 2012), available at https://www.aclu.org/files/assets/order.pdf.

295. See supra Parts III.J, IV.A.

296. Douglas Stanglin, Prison Video Shows Inmate Beating as Guards Look On, USA TODAY (Nov. 30, 2010), http://content.usatoday.com/communities/ondeadline/post/2010/11/prison-video-shows-inmate-beating-as-guards-look-on/1#.U-BUgPldUxA.

297. See Kelly v. Wengler, 979 F. Supp. 2d 1104 (D. Idaho 2013).

298. Idaho: Federal Court Unseals Pleadings, Holds CCA in Contempt for Violating Settlement Agreement, PRISON LEGAL NEWS (Oct. 15, 2013), https://www.prisonlegalnews.org/news/2013/oct/15/idaho-federal-court-unseals-pleadings-holds-cca-in-contempt-for-violating-settlement-agreement.

299. Rebecca Boone, APNewsBreak: FBI Investigates Prison Company, ASSOCIATED PRESS (Mar. 7, 2014), http://bigstory.ap.org/article/apnewsbreak-fbi-investigates-prison-company-cca.

300. To determine whether a facility is accredited, the ACA provides a searchable online directory. See Search ACA Accredited Facilities, ACA, www.aca.org/ACA_Prod_IMIS/ACA_Member/Standards___Accreditation/Accredited_Facilities/Facility_Directory/ACA_Member/Standards_and_Accreditation/Accredited_Facility_Directory.aspx (last visited Nov. 12, 2014).

MARLOWE_0007876

Further, federal courts have held it is "absurd" and "simply ludicrous" to defer to accreditation as a defense to claims of unconstitutional prison and jail conditions.[301]

These examples illustrate that ACA accreditation is a poor measure of quality of service, whether for public or privately-operated correctional facilities.

### D.  Recidivism Rates Redux

As discussed previously, a number of studies have measured recidivism outcomes in public and private prisons. Yet recidivism is typically not used as a quality of service benchmark with respect to prison privatization; only recently has one state decided to adopt recidivism rates as a performance measure.

In 2013, Pennsylvania officials announced they would provide financial incentives to privately-operated community corrections facilities—halfway houses—that are able to reduce recidivism rates of offenders released from those facilities.[302]

The initiative followed a report that found high recidivism rates in the state, with prisoners released from halfway houses (most of which are privately-operated) having higher rates than those released directly from prison.[303] An average recidivism rate based on data from the report is used as a baseline, and privately-operated community corrections facilities must meet the baseline rate within a standard deviation or risk losing their contracts.[304] Those that achieve rates at least 10% lower than the baseline will receive a financial bonus of one percent of the contract amount.[305]

301. Gates v. Cook, 376 F.3d 323, 337 (5th Cir. 2004); Boulies v. Ricketts, 518 F. Supp. 687, 689 (D. Colo. 1981); see also Alex Friedmann, How the Courts View ACA Accreditation, PRISON LEGAL NEWS (Oct. 10, 2014), https://www.prisonlegalnews.org/news/2014/oct/10/how-courts-view-aca-accreditation.

302. Joe Palazzolo, Curbing Inmate Round Trips, WALL ST. J., Dec. 5, 2013, http://online.wsj.com/news/articles/SB10001424052702303329045792244327127645l4.

303. NICOLETTE BELL ET AL., PENN. DEPT. OF CORR., RECIDIVISM REPORT 2013 27–36 (2013), available at http://ccjs.umd.edu/sites/ccjs.umd.edu/files/PA%20DOC%20Recidivism%20Report%20final_0.pdf.

304. Alex Friedmann, Recidivism Performance Measures for Private Halfway Houses in Pennsylvania, PRISON LEGAL NEWS (Sept. 19, 2014), https://www.prisonlegalnews.org/news/2014/sep/19/recidivism-performance-measures-private-halfway-houses-pennsylvania; see also PA DOC Community Corrections Contract Appendix L Re Recidivism Measures 2014, PRISON LEGAL NEWS (Apr. 24, 2015), https://www.prisonlegalnews.org/news/publications/pa-doc-community-corrections-contract-appendix-l-re-recidivism-measures-2014.

305. Palazzolo, supra note 302.

MARLOWE_0007877

"It's not unreasonable for us to expect them to have an impact on crime, because that's what we're paying them to do," said Pennsylvania Department of Corrections Secretary John E. Wetzel.[306] "We want to measure performance. We want quantifiable performance," added Kristofer Bret Bucklen, director of the DOC's Office of Planning, Research and Statistics.[307]

The DOC's community corrections contracts were rebid in 2013 to include the recidivism rate performance measure provisions.[308] According to Bucklen, the initial performance measure period was based on recidivism data for an abbreviated three-month span from December 2013 to March 2014, while future periods will cover six-month spans.[309]

Bucklen said the state's approximately forty privately-operated community corrections facilities achieved an average 16.4% reduction in the benchmark recidivism rate during the initial three-month performance measure period.[310]

Nine of the facilities significantly reduced recidivism rates during the initial period and qualified to receive a bonus; one facility significantly exceeded the benchmark and was placed on warning status.[311] This indicates that, given the proper incentives (financial bonuses) and disincentives (potential loss of contracts), private contractors can be motivated to meet specified performance standards. Future recidivism performance measures by the Pennsylvania DOC will demonstrate whether positive results are achieved on an ongoing basis.[312]

---

306. Id.

307. Paula Reed Ward, Pennsylvania Will Offer Incentives to Combat Recidivism, PITTSBURGH POST-GAZETTE, Mar. 1, 2013, http://www.post-gazette.com/hp_mobile/2013/03/01/Pennsylvania-will-offer-incentives-to-combat-recidivism/stories/201303010145.

308. Friedmann, supra note 304.

309. Telephone Interview with Kristofer Bret Bucklen, Dir. Of Planning, Research, and Statistics, Penn. Dep't of Corr. (Aug. 19, 2014).

310. Id.; emails from Susan Bensinger, Deputy Press Sec'y, Penn. Dep't of Corr. (Aug. 18–19, 2014) (on file with author).

311. Telephone Interview with Kristofer Bret Bucklen, supra note 309.

312. One weakness of the Pennsylvania DOC's approach is that, according to Mr. Bucklen, recidivism rates are considered only for the discrete benchmark periods (six months each after the initial period), but not cumulatively over longer periods of time. Id. That is, one-year and three-year recidivism rates for privately-operated community corrections facilities are tracked but not considered for performance measure purposes, even though longer-term recidivism rates at such facilities may in fact be higher than the corresponding benchmarks for those time periods if offenders recidivate at higher rates over an extended period of time (i.e., if they have delayed failure rates). Id.

MARLOWE_0007878

Similarly, in early 2015, news reports indicated that a private prison in Australia would operate under a contract that provides a financial bonus if the facility reduces recidivism rates. The 1000-bed Ravenhall prison will be constructed and operated by the GEO Consortium, which includes GEO Group Australia.[313]

## V. OPPORTUNITY COSTS

Finally, there is one last cost factor that should be taken into consideration when comparing public and privately-operated prisons: the opportunity cost of contracting with for-profit prison companies rather than pursuing alternative solutions to prison overcrowding and mass incarceration.

The prison and jail population in the United States has increased dramatically over the past several decades, from around 646,000 in 1983 to more than 2.2 million as of 2012,[314] coinciding with our nation's incessant War on Crime and War on Drugs.[315] In the 1980s and 1990s, a series of I-can-be-tougher-on-crime-than-you laws were enacted, spurred by the aforementioned domestic wars and a steady drumbeat of violent crime coverage by the news media.[316] Such laws included mandatory minimums, truth-in-sentencing statutes, and three-strikes laws, which require lengthy prison terms or life sentences for certain offenders.[317]

Consequently, more people were arrested (mainly for drug-related offenses), prosecuted, convicted, and sent to prison, where they

---

313. Bonus for Vic Prison if Reoffending Cut, NEWS.COM.AU (Feb. 12, 2015), http://www.news.com.au/national/breaking-news/bonus-for-vic-prison-if-reoffending-cut/story-e6frfku9-1227217300075; see also Ravenhall Prison Prject, DEPARTMENT TREASURY & FIN., http://www.dtf.vic.gov.au/Infrastructure-Delivery/Public-private-partnerships/Projects/Ravenhall-Prison-project (last updated Feb. 12, 2015).

314. SEE LAUREN E. GLAZE & ERINN J. HERBERMAN, CORRECTIONAL POPULATIONS IN THE UNITED STATES, 2012, at 10 (2013), available at http://www.bjs.gov/content/pub/pdf/cpus12.pdf; Jail, Prison, Parole, and Probation Populations in the US, 1980–2009, PROCON.ORG, http://felonvoting.procon.org/view.resource.php?resourceID=004353 (last updated Jan. 28, 2015).

315. More accurately, the War on Mostly Poor People Who Commit Crimes and the War on Mostly Poor People Who Use Certain Kinds of Drugs.

316. The coverage of violent crime by the news media does not always reflect the reality of crime rates, but it can influence public perception of crime. See, e.g., Sara Tiegreen & Elana Newman, Violence: Comparing Reporting and Reality, DART CTR. FOR JOURNALISM & TRAUMA (Feb. 18, 2009), http://dartcenter.org/content/violence-comparing-reporting-and-reality#.VFnAGfnF-ik.

317. See Earl Smith & Angela Hattery, Private Prisons and the Growth of Prison Populations, in PRISON PRIVATIZATION: THE MANY FACETS OF A CONTROVERSIAL INDUSTRY, supra note 4, at 241–44.

MARLOWE_0007879

served longer sentences.[318]   Prison release policies concurrently
became more restrictive; for example, parole in the federal prison
system was abolished in 1987.[319]   With more people entering the
prison system to serve longer sentences, and fewer leaving, the U.S.
prison population expanded rapidly—increasing about 350% from
1983 to the present.[320]

The growing prison population in turn created a market for
additional prison and jail beds, and for-profit companies such as CCA
(founded in 1983) and the GEO Group (founded as Wackenhut
Corrections in 1984) were established to capitalize on that market
demand.[321]

At the beginning of the 1980s there were no privately-operated
adult correctional facilities in the United States.[322]   As of 2012,
approximately 128,300 state and federal prisoners were held in for-
profit lock-ups—around 8.6% of that total population.[323]   This does
not include thousands more in privatized immigration detention

318. The arrest rate for drug possession/use increased from about 200 per 100,000
population in 1980 to around 500 per 100,000 population in 2005. HOWARD N.
SNYDER, BUREAU OF JUSTICE STATISTICS, ARREST IN THE UNITED STATES, 1980–2009
at 12, fig.37 (2011), available at http://www.bjs.gov/content/pub/pdf/aus8009.pdf. The
jail and prison populations in the United States increased dramatically over the past
thirty five years, from a combined total of just over 501,800 in 1980 to more than 2.3
million in 2013. Jail, Prison, Parole, and Probation Populations in the US, 1980–2009,
supra note 314. The federal prison population alone increased "from approximately
25,000 in FY1980 to over 219,000 in FY2013." NATHAN JAMES, CONG. RESEARCH
SERV., R42937, THE FEDERAL PRISON POPULATION BUILDUP: OVERVIEW, POLICY
CHANGES, ISSUES, AND OPTIONS, CONGRESSIONAL RESEARCH SERVICE 2 (2014).
Further, the average length of prison sentences increased from 1990 to 2009 by 24%
for property crimes, 36% for drug-related crimes, and 37% for violent crimes. See
THE PEW CTR. ON THE STATES, TIME SERVED: THE HIGH COST, LOW RETURN OF
LONGER PRISON TERMS 3 (2012), available at http://www.pewtrusts.org/~/
media/legacy/uploadedfiles/wwwpewtrustsorg/reports/sentencing_and_corrections/Pri
sonTimeServedpdf.pdf.
319. Parole in the Federal Probation System, U.S. COURTS (May 2011),
http://www.uscourts.gov/news/TheThirdBranch/11-05-01/Parole_in_the_Federal_
Probation_System.aspx.
320. GLAZE & HERBERMAN, supra note 314; Jail, Prison, Parole, and Probation
Populations in the US, 1980–2009, supra note 314.
321. AM. CIV. LIBERTIES UNION, BANKING ON BONDAGE: PRIVATE PRISONS AND
MASS INCARCERATION 10–12 (2011), available at https://www.aclu.org/files/assets/
bankingonbondage_20111102.pdf.
322. The inception of the modern private prison industry occurred when CCA was
founded in 1983; the modern era of private prisons is differentiated from the convict
lease system, a version of prison privatization that existed in the late 1880s and early
1900s. See, e.g., Devon Douglas-Bowers, Slavery by Another Name: The Convict
Lease System, HAMPTON INST. (Oct. 30, 2013), http://www.hamptoninstitution.org/
convictleasesystem.html#.VTsx7iHONHw.
323. GLAZE & HERBERMAN, supra note 314, at 10.

centers and local jails.[324]  So long as public officials confronted with
expanding prison populations could house their excess prisoners in
privately-operated facilities, they did not have to pursue politically
unpopular "soft-on-crime" options such as sentencing reforms, early
releases, or alternatives to incarceration.  To use an analogy, as a
steady stream of offenders filled the prison system bucket to
overflowing, the extra bed space provided by the private prison
industry allowed prisoners to be siphoned into an "overflow" bucket,
so the stream could continue flowing unabated.  Indeed, some states
have become dependent on private prisons to house their bloated
prison populations.  As of the end of 2011, eight states held more than
20% of their prisoners in privately-operated facilities, including New
Mexico (40.8%), Montana (38.6%), Alaska (31.0%), and Idaho
(30.1%).[325]

Absent private prisons and the additional bed space they provide,
policy makers would have been forced to turn to other solutions to
address problems associated with prison overcrowding and mass
incarceration—solutions that are only now being implemented due to
the recent Great Recession and its impact on government budgets.[326]

Such solutions include sentencing reform, early prisoner releases,
justice reinvestment initiatives, expanded clemency projects,
alternatives to incarceration, more funding for reentry programs, and
even marijuana decriminalization and legalization.[327]  A growing

324. See, e.g. BETHANY CARSON & ELEANA DIAZ, GRASSROOTS LEADERSHIP, PAYOFF: HOW CONGRESS ENSURES PRIVATE PRISON PROFIT WITH AN IMMIGRANT DETENTION QUOTA 6 (2015), available at http://grassrootsleadership.org/sites/default/files/reports/quota_report_final_digital.pdf; CODY MASON, DOLLARS AND DETAINEES: THE GROWTH OF FOR-PROFIT DETENTION (2012), available at http://sentencingproject.org/doc/publications/inc_Dollars_and_Detainees.pdf.

325. E. ANN CARSON & WILLIAM J. SABOL, PRISONERS IN 2011, at 32 (2012), available at http://www.bjs.gov/content/pub/pdf/p11.pdf.

326. David Reutter, Economic Crisis Prompts Prison Closures Nationwide, but Savings (and Reforms) Are Elusive, PRISON LEGAL NEWS (April 15, 2009), https://www.prisonlegalnews.org/news/2009/apr/15/economic-crisis-prompts-prison-closures-nationwide-8232but-savings-and-reforms-are-elusive.

327. For example, the legalization of marijuana in Washington State and Colorado, and the legalization of medical marijuana in a growing number of other states. See Marijuana Resource Center: State Laws Related to Marijuana, OFFICE NAT'L DRUG CONTROL POL'Y, www.whitehouse.gov/ondcp/state-laws-related-to-marijuana (last visited Nov. 12, 2014).

MARLOWE_0007881

number of states are reducing their prison populations[328] and even closing correctional facilities.[329]

Private prison companies, however, have little incentive to seek reductions in incarceration levels. As stated in CCA's 2013 annual report, with respect to business and industry risk factors:

> Our growth is generally dependent upon our ability to obtain new contracts to develop and manage new correctional and detention facilities. This possible growth depends on a number of factors we cannot control, including crime rates and sentencing patterns in various jurisdictions, governmental budgetary constraints, and governmental and public acceptance of privatization. The demand for our facilities and services could be adversely affected by the relaxation of enforcement efforts, leniency in conviction or parole standards and sentencing practices or through the decriminalization of certain activities that are currently proscribed by criminal laws.[330]

Specifically, CCA noted that risk factors for the company included "changes with respect to drugs and controlled substances or illegal immigration," which "could affect the number of persons arrested, convicted, and sentenced, thereby potentially reducing demand for correctional facilities to house them."[331] Additionally, "reductions in crime rates or resources dedicated to prevent and enforce crime could lead to reductions in arrests, convictions and sentences requiring incarceration at correctional facilities."[332]

In summary, by providing additional overflow bed space for the past three decades, the private prison industry has helped to stymie sentencing and other criminal justice reforms that would have reduced the prison population, and thus the overall cost of our justice

---

328. See NANCY G. LAVIGNE ET AL., JUSTICE REINVESTMENT INITIATIVE STATE ASSESSMENT REPORT (2014), available at http://www.urban.org/UploadedPDF/412994-Justice-Reinvestment-Initiative-State-Assessment-Report.pdf.

329. Petrella & Friedmann, supra note 64.

330. CORR. CORP. OF AM., supra note 1, at 28. CCA claims that its "policy prohibits [it] from engaging in lobbying or advocacy efforts that would influence enforcement efforts, parole standards, criminal laws, and sentencing policies." Id. at 29. This is the subject of a larger debate that will not be addressed here. This Article posits that the provision of additional bed space by private prison companies directly contributed to decades of delay with respect to sentencing reforms and prison population reductions, independent of lobbying efforts and political contributions by such companies, or allegations that they have influenced sentencing laws and criminal justice policies through participation in the American Legislative Exchange Council (ALEC) or other means.

331. Id. at 28.

332. Id. at 28–29.

MARLOWE_0007882

system—which is currently estimated at $60 to $70 billion annually.[333] This is the opportunity cost of contracting with for-profit prison companies rather than pursuing other options to address our nation's reliance on mass incarceration.

## CONCLUSION

Ultimately, cost comparisons between private and public prisons may best be accomplished by examining actual costs incurred during separate time periods when the same facility is privately and publicly operated, and houses a similar prisoner population. That would, in theory, constitute an apples-to-apples comparison rather than apples-to-oranges—or fish. Fortunately there are several instructive examples in this regard.

CCA managed the Hernando County jail in Florida for twenty-two years, until the company and county parted ways in 2010.[334] According to the Tampa Bay Times, one year after the switch from private to public management, "[i]n total, with an annual jail budget of $10.9 million, jail officials say they're saving taxpayers more than $1 million this year, compared to what CCA would have charged the county."[335] According to another news report, CCA's "actual costs" for operating the Hernando County jail in 2009 were $12.3 million, with projected costs of $11 million for 2010.[336] County officials confirmed that after the Sheriff's Office assumed management of the jail, the budget in FY 2011—the first full year of operation—was $10.9 million.[337] The budget for FY 2012 was $10.62 million, while the budget for FY 2013 was $10.53 million—all less than what the county had been paying CCA.[338]

---

333. HENRICHSON & DELANEY, supra note 234; see also JOHN SCHMITT ET AL., THE HIGH BUDGETARY COST OF INCARCERATION 2 (2010) (estimating national criminal justice costs to be $75 billion), available at http://www.cepr.net/documents/publications/incarceration-2010-06.pdf.

334. Barbara Behrendt, Former Hernando County Jail Operator CCA Sues Over Money, Equipment, TAMPA BAY TIMES, Sept. 30, 2010, http://www.tampabay.com/news/localgovernment/former-hernando-county-jail-operator-cca-sues-over-money-equipment/1125116.

335. Cox & Behrendt, supra note 211.

336. Michael D. Bates, CCA Wants Out of Jail Contract, HERNANDO TODAY (Apr. 28, 2010), http://hernandotoday.com/news/hernando-sports/2010/apr/28/CCA-wants-out-of-jail-contract-ar-295110/.

337. Email from Denise M. Moloney, Cnty./Media Relations Manager, Hernando Cnty. Sheriff's Office (Aug. 20, 2014) (on file with author).

338. Id.

CCA also operated the Bay County Jail in Florida until 2008, when the Sheriff took over management of the facility.[339] Local officials confirmed that during the last year of the CCA contract (FY 2007–2008), the county paid the company $16.6 million.[340] During the first year after the Sheriff's Office assumed management at the jail (FY 2008–2009), actual operational costs were $15.9 million; during the second year (FY 2009–2010), actual operational costs were $16.5 million.[341] The county noted that "if CCA had continued operating the jail at the figures it had proposed before an impasse was reached and they walked away," the costs would have been $16.7 million in FY 2008-09 and $17.1 million in FY 2009-10.[342] Also, according to county officials, those savings did "not include about $600,000 the county has saved from using inmate labor to clean roads, parks, buildings and cemeteries."[343]

In spite of these real world examples, and this Article's extensive discussion of cost-shifting factors, the original question remains: do private prisons save money? Considering the numerous and complicated factors involved in cost comparisons of public and privately-operated facilities, and the corresponding difficulties in conducting such studies, it is possible that we are simply asking the wrong question.

The right one may be: should we incarcerate people in private, for-profit prisons even if they do save money? Regardless, to paraphrase the late Richard Culp, Associate Professor at the John Jay College of Criminal Justice, if three decades of experience with and research related to prison privatization have not led to demonstrable cost savings or quality of service outcomes, resulting in articles such as this one, then we need to take a different approach relative to our nation's carceral policies, practices, and priorities.[344]

---

339. Felicia Kitzmiller, Bay County Jail Shows Privatization Isn't Always Best, NEWS HERALD, Feb. 4, 2012, available at http://www.privateci.org/private_pics/Bay%20Co%20experience.htm.

340. Email from Valerie Lovett, Pub. Info. Officer, Bay Cnty., Fla. (Aug. 19, 2014) (on file with author).

341. Id.

342. Id.

343. Kitzmiller, supra note 339.

344. Richard Culp, The Failed Promise of Prison Privatization, PRISON LEGAL NEWS (Oct. 15, 2011), https://www.prisonlegalnews.org/news/2011/oct/15/the-failed-promise-of-prison-privatization ("Albert Einstein suggested that insanity is doing the same thing over and over again and expecting different results. If a quarter century of experience with prison privatization has not led to better quality and cost outcomes, it is time to take a more sane approach.").

MARLOWE_0007884