# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,

*Plaintiff,*

vs.

CORRECTIONS CORPORATION OF AMERICA., *et al.,*

*Defendants.*

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:16-cv-02267

<u>CLASS ACTION</u>

Honorable Aleta A. Trauger

## <u>MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF DEFENDANTS' NON-RETAINED EXPERTS WILLIAM DALIUS, HARLEY LAPPIN, DON MURRAY, AND KIM WHITE</u>

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ..................................................................................................1

II. PROCEDURAL HISTORY....................................................................................3

III. ARGUMENT ........................................................................................................6

    A. The Hybrid Witnesses Are Qualified And Their Opinions Are Reliable ...............6

        1. Harley Lappin ..........................................................................................8

        2. William Dalius.......................................................................................12

        3. Donald Murray.......................................................................................14

        4. Kimberly White .....................................................................................17

    B. The Hybrid Witnesses' Opinions Are Not "Cumulative"....................................20

    C. Plaintiff's Requested Relief Is Ambiguous, Overbroad, And Prejudicial ............22

IV. CONCLUSION....................................................................................................23

**TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*In re Air Crash Disaster*,
86 F.3d 498 (6th Cir. 1996) ......................................................................20

*Barnes v. CSXT Transp., Inc.*,
No. 3:13- CV-00525-DJH, 2017 WL 1334303 (W.D. Ky. April 7, 2017) ..............................6

*Call v. City of Riverside*,
No. 3:13-cv-133, 2014 WL 2048194 (S.D. Ohio May 19, 2014) ..............................6

*Cantu v. United States*,
No. CV 14-00219 MMM, 2015 WL 12743881 (C.D. Cal. April 6, 2015) .................20, 21

*Daubert v. Merrell Dow Pharm., Inc.*,
509 U.S. 579 (1993) ...............................................................................7, 22

*Dickenson v. Cardiac and Thoracic Surgery of E. Tenn.*,
388 F.3d 976 (6th Cir. 2004) .........................................................7, 9, 16

*Downey v. Bob's Disc. Furniture Holdings, Inc.*,
633 F.3d 1 (1st Cir. 2011) ..........................................................................6

*Eagle Servs. Corp. v. H2O Indus. Servs. Inc.*,
No 2:02-CV-36-PRC, 2005 WL 5988646 (N.D. Ind. Sept. 30, 2005) ....................6

*Engebretsen v. Fairchild Aircraft Corp.*,
21 F.3d 721 (6th Cir. 1994) ....................................................................20

*First Tenn. Bank Nat'l. Ass'n v. Barreto*,
268 F.3d 319 (6th Cir. 2001) ...............................................................7, 19

*Highland Cap. Mgmt., L.P. v. Schneider*,
379 F. Supp. 2d 461 (S.D.N.Y. 2005) .................................................14

*Hudson Henley Grp. v. Love Ins. Grp. LLC.*,
No. 3:15-CV-3078-L, 2018 WL 1631143 (N.D. Tex. Apr. 4, 2018) .................7, 18

*Jahn v. Equine Servs., PSC*,
233 F.3d 382 (6th Cir. 2000) ...............................................................16, 20

*Jones v. Wiseman*,
No. 20-5105, 2020 WL 7587481 (6th Cir. Dec. 22, 2020) .............................20

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)........................................................................................8, 14, 17, 18

*Marshall v. Commonwealth Aquarium,*
    611 F.2d 1 (1st Cir. 1979)....................................................................................11

*Memorial Hall Museum, Inc. v. Cunningham*
    455 F. Supp. 3d. 347 (W.D. Ky. 2020)..........................................................8, 9, 18, 19

*Mineral Inv'rs, Ltd. v. Lamb,*
    No. 92-5765, 1993 WL 424955 (6th Cir. Oct. 19, 1993) .....................................10

*Nay Co. v. Navigators Specialty Ins. Co.,*
    No. 3:16-CV-02675-N, 2018 WL 1536341 (N.D. Tex. Jan. 19, 2018)....................7

*Nelson v. Tenn. Gas Pipeline Co.,*
    243 F.3d 244 (6th Cir. 2001) ..............................................................................17

*Owens-Hart v. Howard Univ.,*
    317 F.R.D. 1 (D.D.C. 2016)...........................................................................7, 11

*Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Trust Co.,*
    73 F. 653 (6th Cir. 1896) .....................................................................................11

*Smith v. Pfizer, Inc.,*
    714 F.Supp. 2d 845 (M.D. Tenn. 2010).......................................................9, 14, 17

*Tucker v. Nelson,*
    390 F. Supp. 3d 858 (S.D. Ohio 2019) ................................................................20

*United States v. L.E. Cooke Co.,*
    991 F.2d 336 (6th Cir. 1993) .....................................................................10, 12, 16, 19

*United States v. Ramer,*
    883 F.3d 659 (6th Cir. 2018) ...............................................................................16

*United States v. Rey,*
    923 F.2d 1217 (6th Cir. 1991) .............................................................................20

*Vasques v. Robert Bosch Tool Corp.,*
    No. H-07-4473, 2009 WL 10694786 (S.D. Tex. July 13, 2009) .........................8, 14

## RULES

Fed. R. Civ. P. 26..........................................................................................................6

Fed. R. Civ. P. 26(a)(2)(C) ................................................................................ *passim*

Fed. R. Evid. 403 .....................................................................................................20, 21

Fed. R. Evid. 702 ...............................................................................................................7, 8

Fed. R. Evid. 703 .............................................................................................................16, 20

Fed. R. Evid. 704 ...............................................................................................................10

L.R. 39.01(5)(A) ................................................................................................................5

# I.  INTRODUCTION

Plaintiff's Motion to Exclude Testimony of Defendants' Non-Retained Experts (ECF No. 351) ("Mot.") and Memorandum in Support (ECF No. 354) ("Mem.") concerns the anticipated opinions of four current and former employees of both the Federal Bureau of Prisons (the "BOP") and CoreCivic:  Harley Lappin (who is also a named Defendant), William Dalius, Donald Murray, and Kimberly White.  Collectively, these witnesses have 130 years of experience in the corrections industry, including more than a century of experience at the BOP.  All four witnesses were listed on both parties' initial (and/or amended) disclosures, and prior to the end of discovery, Plaintiff had taken the depositions of all four witnesses (three of whom Plaintiff deposed twice).

At the close of fact discovery, Defendants[1] concluded that some of the testimony – although provided in a percipient witness capacity – could be considered expert opinions.  In order to testify truthfully and completely about certain facts relevant to this case – *e.g.*, facts concerning jail conditions, inmate disturbances, health care, overcrowding, and costs – these four witnesses necessarily drew upon a wealth of industry experience.  This can hardly come as a surprise.  It would be implausible – if not impossible – for these witnesses to testify about the issues in a vacuum based solely on their experiences at CoreCivic, while effectively ignoring a lifetime of prior work.  Defendants, therefore, timely designated all four as percipient witnesses whose testimony may contain information considered expert in nature, pursuant to Federal Rule of Civil Procedure 26(a)(2)(C).

Stripped of the rhetoric and unwarranted accusations leveled at defense counsel, the Motion offers two overarching bases for excluding these witnesses' testimony.  First, cherry-picking

---

[1] Defendant CoreCivic, Inc. ("CoreCivic" or the "Company") together with Individual Defendants Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin.

certain passages of Defendants' Disclosures Pursuant to Federal Rule of Civil Procedure 26(A)(2)(C) (Wood Declaration, Ex. 2 (ECF No. 356-2) (the "Hybrid Witness Disclosure"), and then applying standards traditionally reserved for "retained" experts, Plaintiff broadly contends that these four witnesses are not qualified and/or their opinions are not reliable. But if these witnesses are not qualified as corrections experts given their long and successful careers in the industry, it is hard to imagine anyone who would be. Moreover, the deposition testimony makes clear that the opinions they would provide at trial are based on their own personal experiences in the industry; they are not only reliable, they are essential for providing the context necessary for a complete understanding of Plaintiff's allegations and Defendants' responses. Second, based on general descriptions of the witnesses' testimony, Plaintiff contends that the anticipated testimony is "cumulative." Plaintiff ignores, however, the indisputable fact that these witnesses occupied different roles (both at CoreCivic and at the BOP) at different points of time; thus, each offers a unique perspective on different aspects of the corrections industry. The fact that there is some understandable (in fact, unavoidable) overlap does not and cannot justify the wholesale exclusion of their opinion testimony in this case.

Perhaps most fundamentally, while Plaintiff generally seeks to exclude "William Dalius, Harley Lappin, Don Murray and Kim White as expert witnesses" (Mot. at 1), or to preclude Defendants "from eliciting expert testimony from the Non-retained Opinion Witnesses" (Mem. at 15), the motion is deafeningly silent on the *precise* relief Plaintiff is seeking, including how the Court should fashion such a remedy. Surely, Plaintiff is not asking the Court to exclude the testimony of these four witnesses altogether; they are percipient witnesses and one is a named defendant. Nor can Plaintiff preemptively seek to exclude all potential expert opinions because none has been provided. Plaintiff is well aware of the subjects and substance of the testimony

these witnesses will give, so there is no risk of surprise. Indeed, the Court allowed Plaintiff to depose each of these witnesses (three of them for a second time) specifically about their opinions. The reality is that Plaintiff simply does not like the testimony that these witnesses will provide; but that is not a sufficient basis to exclude their testimony. And of course, Plaintiff will have the opportunity to cross-examine these hybrid witnesses in the same way they might cross-examine any other percipient or expert witness. In the end, no matter what relief Plaintiff seeks through this Motion, it is better addressed and resolved on a question-and-answer basis at trial, with the benefit of foundation, facts, and context. The Motion should be denied.

## II.    PROCEDURAL HISTORY

On February 23, 2018, Defendants identified Mr. Lappin, Dr. Murray, and Ms. White in their Initial Disclosures; that same day, Plaintiff identified Mr. Lappin and Ms. White. *See* Declaration of Eric C. Pettis ("Pettis Decl."), Ex. 1 (Defs.' Initial Disclosures, Feb. 23, 2018); *id.*, Ex. 2 (Pl.'s Initial Disclosures, Feb. 23, 2018). On January 3, 2020, Defendants added Mr. Dalius, Pettis Decl., Ex. 3 (Defs.' Suppl. Initial Disclosures, Jan. 3, 2020), and on March 11, 2020 Plaintiff added Mr. Dalius and Dr. Murray. Pettis Decl., Ex. 4 (Pl.'s Suppl. Initial Disclosures, Mar. 11, 2020). Thereafter, during fact discovery, Plaintiff deposed Mr. Lappin, Mr. Dalius, and Ms. White. Plaintiff noticed Dr. Murray's deposition, but later took that deposition off calendar.

Defendants timely designated Mr. Lappin, Mr. Dalius, Dr. Murray, and Ms. White (the "Hybrid Witnesses") as experts pursuant to the Federal Rules of Civil Procedure. In accordance with Rule 26(a)(2)(C), the Hybrid Witness Disclosure contained "(i) the subject matter on which the witness is expected to present evidence…; as well as a (ii) summary of the facts and opinions to which the witness is expected to testify." *See* Fed. R. Civ. P. 26(a)(2)(C). The Hybrid Witness Disclosure was understandably broad and inclusive given the breadth of collective industry experience each witness possesses, the overlap of the witnesses' respective roles and subject matter

3

expertise, and the scope of Plaintiff's shifting allegations (which span a four-year class period and have morphed throughout discovery). Specifically, Defendants disclosed that each Hybrid Witness:

> [M]ay testify that CoreCivic's operational performance was similar to and compared favorably with the BOP's operational performance in the areas of correctional facility management, oversight, staffing, security, and related policies and procedures. [They] may also testify about CoreCivic's compliance with contractual requirements, company standards, and third-party standards in the areas of correctional facility management, oversight, staffing, security, and related policies and procedures. [The non-retained expert witnesses] may also testify to [their] favorable opinions regarding the overall quality and cost-effectiveness of CoreCivic's operations in the areas of correctional facility management, oversight, staffing, security, and related policies and procedures. [They] may also testify about challenges to the BOP's operational performance in the areas of correctional facility management, oversight, staffing, security, and related policies and procedures. [They] may also testify that CoreCivic delivers comparable correctional services at a lower cost than the BOP, and describe the various cost components supporting that opinion. [They] may also testify that [they] expected CoreCivic's BOP contracts to be renewed based on the knowledge and experience [they] gained from serving as a senior executive with the BOP and CoreCivic.

*See* ECF No. 356-2 §§ A(2), B(2), C(2), D(2).

But the Hybrid Witness Disclosure *also* provided specific facts relating to each witness, based on critical differences in their roles and responsibilities, which included unique areas on which each Hybrid Witness may testify. Indeed, the Hybrid Witness Disclosure made clear that each was approaching the relevant issues from a different perspective, informed by different experiences and different job titles, during different points in time. The Hybrid Witness Disclosure provided the following additional information for each Hybrid Witness:

> Mr. Lappin is expected to testify about the BOP's and CoreCivic's operations in the areas of correctional facility management, oversight, staffing, security, and related policies and procedures. Mr. Lappin may also testify about his expectations for the renewal and retention of CoreCivic's BOP contracts.

*Id.* § B(1).

> Mr. Dalius is [] expected to testify about components of the BOP's budget, including capital costs, real estate costs, facility operating costs, and employee

compensation, pensions, and benefits. Mr. Dalius may also testify about his expectations for the renewal and retention of CoreCivic's BOP contracts.

*Id.* § A(1).

Dr. Murray is [] expected to testify about the design and implementation of CoreCivic's Quality Assurance Program and operations of the Quality Assurance Division.

*Id.* § C(1).

Ms. White may [] testify about her expectations for the renewal and retention of CoreCivic's BOP contracts based on her experience serving as a senior executive with both the BOP and CoreCivic.

*Id.* § D(1).

On September 4, 2020, Plaintiff requested a meet and confer regarding Defendants' Hybrid Witness Disclosure, and the parties conferred telephonically five days later. During that call, Defendants explained that the Hybrid Witness Disclosure was made out of an abundance of caution and to fully apprise Plaintiff of all evidence that may constitute a mixture of "fact" and "expert" testimony at trial. During that conference, Plaintiff refused to agree that it would not move to exclude any of these fact witnesses' testimony on the basis that it should have been designated as expert testimony. *See* Pettis Decl., Ex. 14 (Ltr. to C. Wood, Sept. 14, 2020). Plaintiff requested a telephonic conference with the Court, which occurred on September 16, 2020. *See* ECF No. 301.

At the telephonic conference, Plaintiff argued that had it known the Hybrid Witnesses would potentially provide a mixture of "fact" and "expert" testimony at trial, it would have asked them different questions during their depositions. Plaintiff further contended that Defendants' Hybrid Witness Disclosure violated Local Rule 39.01(5)(A), which limits each party to three expert witnesses on any one subject. *See* ECF No. 302. The Court rejected Plaintiff's arguments, but gave Plaintiff an opportunity to depose all four of the witnesses (*i.e.*, three of them for a second

time).  *See id*.  Plaintiff took these four depositions on October 23, 28, 29 and 30, 2020.  Plaintiff

then filed this Motion.

## III.    ARGUMENT

### A.    The Hybrid Witnesses Are Qualified And Their Opinions Are Reliable

Plaintiff argues that the Hybrid Witnesses are "unqualified" and their opinions are

"unreliable because they [do not] rely [] on data or methodology."  *See, e.g.*, Mem. at 2, 5.

Regarding the witnesses' qualifications, Plaintiff broadly asserts that the Hybrid Witnesses are not

qualified to provide any of the opinion testimony described in the Hybrid Witness Disclosure.  But,

as discussed below, in making this argument Plaintiff selectively excerpts certain passages from

the Hybrid Witness Disclosure while simultaneously ignoring the wealth and range of experience

and expertise pertaining to each witness.  *See* Mem. at 6, 8-10, 12-14, 17-18.

In 2010, the Federal Rules of Civil Procedure Advisory Committee amended Rule 26 to

add subpart 26(a)(2)(C), which allows parties to offer opinion testimony from witnesses who have

"ground-level involvement in the events giving rise to the litigation" without requiring them to

write a report.  *Call v. City of Riverside*, No. 3:13-cv-133, 2014 WL 2048194, at *5 (S.D. Ohio

May 19, 2014) (quoting *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir.

2011)); *see also* Fed. R. Civ. P. 26 advisory committee's notes to 2010 amendment.  Accordingly,

courts have permitted opinion testimony under Rule 26(a)(2)(C) from a wide variety of "percipient

witness[es] who happen[] to be [] expert[s]."  *Downey*, 633 F.3d at 6; *see, e.g.*, *Eagle Servs. Corp.

v. H2O Indus. Servs. Inc.*, No 2:02-CV-36-PRC, 2005 WL 5988646, at *4-5 (N.D. Ind. Sept. 30,

2005) (permitting former employee who drafted safety programs to provide expert testimony

related to her work); *Barnes v. CSXT Transp., Inc.*, No. 3:13- CV-00525-DJH, 2017 WL 1334303,

at *15-18 (W.D. Ky. Apr. 7, 2017) (permitting employees of Kentucky Office for the Blind,

optometrist and psychologist to testify as hybrid experts).  Rather than serve a report, parties

6

seeking to introduce witnesses who may provide a mixture of fact and expert testimony are required to disclose the subject matter of the anticipated testimony and a summary of the facts and opinions that the witness may provide. *See* Fed. R. Civ. P. 26(a)(2)(C); *see also Owens-Hart v. Howard Univ.*, 317 F.R.D. 1, 3 (D.D.C. 2016) (citing advisory committee notes in holding Rule 26(a)(2)(C) does not "requir[e] undue detail" but merely the "subject matter" and a "summary of the facts and opinions to which the witness is expected to testify.").

With respect to the issue of qualifications, in accordance with Rule 702 which "expressly contemplates that an expert may be qualified on the basis of experience," *Dickenson v. Cardiac and Thoracic Surgery of East Tennessee*, 388 F.3d 976, 980-81 (6th Cir. 2004), courts assess whether a hybrid witness's experience is applicable to that which he or she is being asked to opine on. *See Nay Co. v. Navigators Specialty Ins. Co.*, No. 3:16-CV-02675-N, 2018 WL 1536341, at *1 (N.D. Tex. Jan. 19, 2018) (holding that hybrid witness had "decades of experience in billing and bidding agricultural millwright projects," and despite not having any "formal qualifications . . . [he] has made a career of overseeing similar projects, and his experience qualifies him as an expert in this case."); *Hudson Henley Grp. v. Love Ins. Grp. LLC.*, No. 3:15-CV-3078-L, 2018 WL 1631143, at *5 (N.D. Tex. Apr. 4, 2018) (holding that a Rule 26(a)(2)(C) witness is qualified to offer expert testimony due to 32 years of experience in the industry and that defendant's "arguments regarding Amos's qualifications to perform a job he has performed for more than thirty years are unpersuasive and unsupported by evidence in the record.").

In terms of "reliability," the Sixth Circuit has held that the traditional *Daubert* factors are particularly "unhelpful" when "expert testimony derive[s] largely from [an expert's] own practical experiences" because these opinions "do not easily lend themselves to scholarly review or to traditional scientific evaluation." *First Tenn. Bank Nat'l. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th

Cir. 2001). Unlike scientific experts, who must articulate a "scientific method" in reaching their opinions, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 590 (1993), courts routinely permit hybrid witnesses (like other non-scientific experts) to rely predominately on their own personal experience. *See, e.g.*, *Mem'l Hall Museum, Inc. v. Cunningham*, 455 F. Supp. 3d. 347, 366 (W.D. Ky. 2020) (holding that "the relevant reliability concerns may focus upon personal knowledge or experience," and that the expert's "personal experience and knowledge gained as collector of Civil War artifacts over the course of four decades show a sufficient reliability to testify on the traits and characteristics of Civil War uniforms."); *Vasques v. Robert Bosch Tool Corp.*, No. H-07-4473, 2009 WL 10694786, at *10 (S.D. Tex. July 13, 2009) (hybrid witness's opinions "based on his observation, knowledge, and experience" are "sufficiently reliable to be helpful in assisting the trier of fact and to be admissible under Rule 702."). Indeed, as the Supreme Court has observed, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 156 (1999).

Applying this experience-based approach to both the analysis of the qualifications and reliability of the Hybrid Witnesses in this case, it is readily apparent that each has precisely the type of "extensive and specialized" experience required under the law to testify about, and form opinions on, the relevant issues. Plaintiff can certainly claim that each witness may harbor a bias, given the witnesses' direct connection to CoreCivic, but this is not a basis to exclude his or her testimony.

### 1. Harley Lappin

In terms of qualifications, Mr. Lappin's resume speaks for itself. Mr. Lappin worked at the BOP for 26 years, serving as Director of the BOP for eight years, where he was in charge of operations for all private and public correctional facilities and managed over 35,000 employees.

*See* ECF No. 356-2; Pettis Decl., Ex. 5 at 11:14-21, 17:21-18:10 (Lappin Dep. Tr. (July 28, 2020)). Before becoming Director of the BOP, Mr. Lappin served as an Associate Warden, an executive in the Program Review Division, Warden, and Regional Director of the Mid-Atlantic Regional Office of the BOP. *See id.* at 14:19-17:20. After retiring from the BOP, Mr. Lappin transitioned to the private sector where, in 2011, he became the Chief Corrections Officer at CoreCivic. *See id.* at 18:11-21, 34:15-17. As Chief Corrections Officer, Mr. Lappin spearheaded many operational initiatives, and he worked directly with the Vice Presidents of Operations to manage each region of the Company's correctional facilities. *Id.* at 37:2-18.

Mr. Lappin's qualifications are supported by his deposition testimony. *See* Pettis Decl., Ex. 5 at 11:14-18:21 (describing various roles he held in the corrections industry beginning in 1985 as case manager for BOP, to Director of the BOP, to Chief Corrections Officer of CoreCivic); *id.* at 141:2-142:4, 154:23-156:10; Pettis Decl., Ex. 6 at 91:7-92:19 (Lappin Dep. Tr. (Oct. 29, 2020)). At his (second) deposition, Mr. Lappin limited his testimony and opinions to facts on which he had personal knowledge. *See* Pettis Decl., Ex. 6 at 29:22-25 ("I have my own opinions of this case. And those are based on my experience and oversight of the correctional programs or correctional responsibilities at CCA."). This is exactly what the law requires of hybrid witnesses. *See Smith v. Pfizer, Inc.*, 714 F.Supp. 2d 845, 852 (M.D. Tenn. 2010) (allowing hybrid witness "to testify regarding her personal involvement in the drug application process and the opinions she held at the time."); *Mem'l Hall Museum, Inc.*, 455 F. Supp. 3d. at 365; *Dickenson*, 388 F.3d at 980-81 (expert may be qualified on experience alone).[2]

---

[2] Plaintiff's argument that Mr. Lappin does not have any "direct experience assessing CCA's performance," (Mem. at 1, 7), is just wrong. First, Mr. Lappin's responsibilities at the BOP included reviewing and assessing the contractual compliance of private contractors. *See* Pettis Decl., Ex. 6 at 25:3-12 (Mr. Lappin testifying that he reviewed "report[s] that compiled the deficiencies identified at audits carried out at . . . our private contract facilities."). Moreover, as

Mr. Lappin's opinions are also reliable because he articulated the "reasonable factual basis" upon which they were based. *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993); *see also, e.g.*, Pettis Decl., Ex. 6 at 29:22-25; *id.* at 31:9-32:12 ("Q. [T]he opinions you have in this case are based on your experience and oversight of the correctional programs or correctional responsibilities at CCA, correct? . . . A. Yes. . . . I went out and observed. I was out in facilities myself, visited, engaged with staff, observed the programs being provided. So it was a combination of the input and the dialogue that occurred between myself and my subordinate supervisors, my vice presidents, the managing directors, the wardens, the associate wardens, and line staff that I engaged with over the course of my responsibilities."). This testimony notwithstanding, Plaintiff advances a variety of arguments in an attempt to exclude Mr. Lappin's opinions; each fails as a matter of fact and law.

*First,* Plaintiff claims that Mr. Lappin "attempt[s] to introduce testimony on 'ultimate issues' in his own defense." Mem. at 6. But, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704. In any event, the Hybrid Witness Disclosure does not speak directly to any ultimate issue in this case. *See* ECF No. 356-2 Rather, it speaks to operational performance, contractual compliance, and cost-effectiveness in the areas of correctional facility management, as well as oversight, staffing, security, and related policies and procedures. *See* ECF No. 356-2 § B(2). That these facts may inform a jury's consideration of the ultimate issues in dispute is beside the point, and does not transform Mr. Lappin's testimony to opinions on issues of ultimate fact. *See Min. Invs., Ltd. v. Lamb*, No. 92-5765, 1993 WL 424955, at *4 (6th Cir. Oct. 19, 1993) (affirming admission of expert testimony that "assist[ed] the jury on

---

Chief Corrections Officer at CoreCivic, Mr. Lappin "was routinely briefed and [ ] had rigorous discussions about the numbers, types of deficiencies identified by the BOP reviews, as well as internal audits completed by CCA auditors." *Id.* at 22:13-17.

the question of what was reasonable for plaintiffs to do with the information they had" when plaintiffs' reasonableness was an ultimate issue). In any event, Mr. Lappin is a named Defendant, and thus should be permitted to testify about his subjective belief regarding the truth of the statements at issue. *Penn Mut. Life Ins. Co. v. Mechanics' Sav. Bank & Trust Co.*, 73 F. 653, 654 (6th Cir. 1896) ("A man may testify directly to his knowledge and intention if they are in issue…"); *Marshall v. Commonwealth Aquarium*, 611 F.2d 1, 3 (1st Cir. 1979) ("We would agree that in general, where a defendant's intent is in issue, he should be given latitude to testify concerning his intent…").[3]

*Second*, Plaintiff takes issue with the fact that Mr. Lappin did not provide an expert report or identify and produce documents upon which he may have relied. But the plain language of Rule 26(a)(2)(C) does not require that a hybrid witness, like Mr. Lappin, prepare a report or produce documents upon which he or she relied in forming his or her opinions. Fed. R. Civ. P. 26(a)(2)(C) ("Witnesses Who Do Not Provide a Written Report"); *see also Owens-Hart*, 317 F.R.D. at 5-6 (party not required to produce any reports from treating physician designated under 26(a)(2)(C)). This is particularly true here, where the expertise and reliability of the witnesses are based upon decades of public and private correctional service, as described above.[4]

---

[3] Plaintiff tries to downplay Mr. Lappin's industry expertise by arguing that he is not qualified to testify about any cost comparison or "describe the various costs components supporting that opinion." *See* Mem. at 7; ECF No. 356-2 § B(2). But as Mr. Lappin made clear, while he had general involvement in calculating – and general awareness of – operating costs, there are other witnesses (including, but not limited to, Mr. Dalius) who have more experience and more detailed opinions on cost components and cost comparisons. *See* Pettis Decl., Ex. 6 at 106:12-14 ("I think you've got other people that are – have more expertise in this area than me.").

[4] Plaintiff repeatedly accuses the Hybrid Witnesses of relying on privileged documents that were wrongfully withheld on privilege grounds. *See* Mem. at 8 ("Moreover, Lappin admitted that whatever opinions he formed related to this case were based in part on the exact documents Defendants withheld as privileged"); *see also id.* at 2, 7, 14. At this point in the case, these tired

*Finally,* Plaintiff argues that Mr. Lappin has "not articulated" his opinions (Mem. at 6); but to the extent there is any truth to that assertion, it is an issue of Plaintiff's own making. At his deposition, Mr. Lappin attempted to offer opinions, but was foreclosed from doing so by Plaintiff's counsel. *See* Pettis Decl., Ex. 6 at 34:15-19 ("A. Yes. So my opinions of…. Q. No, I asked you - - I'm not asking for the opinions now. I'm just asking you to – if you understand that's the -- those are the types of opinions we're talking about."). Plaintiff never went back and had Mr. Lappin put his opinions on the record. *See L.E. Cooke Co.*, 991 F.2d at 342 (noting "it is up to opposing counsel" to elicit testimony regarding the expert's opinion).[5]

## 2. William Dalius

Mr. Dalius has over 30 years of employment experience in the corrections industry, including serving in the role of Chief Financial Officer for the BOP where he managed a $7 billion budget. *See* ECF No. 356-2; Pettis Decl., Ex. 8 at 49:23-50:1 (Dalius Dep. Tr. (Oct. 28, 2020)). Mr. Dalius also worked as an Assistant Warden, Warden, Assistant Director, and Deputy Assistant Director during his time at the BOP. Pettis Decl., Ex. 8 at 58:11-15. Upon moving to the private sector, he served as the Managing Director of Purchasing and Vice President of Facility Operations for CoreCivic. *Id.* at 34:22-25; 35:7-8.[6]

---

allegations have been considered by two judges and a Special Master (a retired federal judge) and have been determined to be without merit. *See* ECF No. 381.

[5] Plaintiff on one hand accuses the Hybrid Witnesses of not offering an opinion, but on the other hand simultaneously accuses Defendants' counsel of "scripting" the witnesses' opinions. Mem. at 1 ("to reach their so-called 'opinions.'"); *id.* at 2 ("…the 'opinions' counsel have scripted…"); *id.* at 3 ("…opinions defense counsel scripted for these witnesses…"). This (contradictory) argument can be laid to rest in short order. First, to the extent the Hybrid Witnesses did not provide an opinion on the record, that is Plaintiff's fault. The Court allowed Plaintiff to depose all four Hybrid Witnesses after their designation as such (three of whom for a second time). Second, there is no evidence to suggest that defense counsel somehow "scripted" any opinions in this case.

[6] As the former CFO of the BOP, Plaintiff barely even challenges Mr. Dalius' qualifications and expertise on cost comparison issues. *See* Mem. at 8-12. As noted above, Mr. Dalius is one of,

Mr. Dalius' deposition makes clear that he has amassed a substantial amount of personal experience calculating and assessing the "components of the BOP's budget, including capital costs, real estate costs, facility operating costs, and employee compensation, pensions, and benefits" and completing annual cost analyses, specifically including those that compare private and public correctional facilities. *See* ECF No. 356-2 §§ A(1)-(2); Pettis Decl., Ex. 8 at 97:8-10; 97:19-23; 58:16-19; 58:23-59:1; 92:3-10. Mr. Dalius oversees 20-25 CoreCivic prisons, including, at one period of time, a majority of the facilities CoreCivic operated for the BOP. Pettis Decl., Ex. 8 at 115:24-116:4 ("Having been a warden, worked in facilities, had oversight of 122 facilities, communicated with hundreds of wardens throughout my career, I've got a pretty good understanding of facility operations.").

Mr. Dalius' deposition testimony demonstrates that his opinions are reliable. Indeed, he repeatedly explained how his "observation[s], knowledge, and experience" support his opinions in this case. S*ee* Pettis Decl., Ex. 8 at 63:24-64:5 ("I've been in virtually the majority of the BOP prisons. I've seen how they operate. . . . And I see very similar operations in both CoreCivic and the Bureau of Prisons."); *id.* at 64:7-65:24 (testifying to differences and similarities between CoreCivic and BOP prisons); *id.* at 93:23-94:5 ("As I indicated before, I can walk in a prison and fairly quickly walk the compound, get a feel for the compound, how safe the compound is based on inmates communicating with you and staff communicating with you, is the place clean, does the food taste good. I mean, those are the types of things that I base my analysis on."); *id.* at 100:7-13 ("I base my analysis of the operations on actual hands-on being in the facilities, seeing what they're doing, both in my previous 30 years in the Bureau of Prisons and my four years at

---

among others, the individuals Mr. Lappin referred to in his deposition when he testified that there were others who had greater expertise in the area of cost comparisons. *See* Pettis Decl., Ex. 6 at 106:12-14.

CoreCivic. That gives me the ability to assess how facilities are operating."). Again, this type of first-hand experience is all the law requires under the circumstances. *See Vasques*, 2009 WL 10694786, at *10; *Kumho Tire Co., Ltd.*, 526 U.S. at 156. [7]

Finally Plaintiff (mistakenly) contends that Mr. Dalius was required to perform after-the-fact analyses of certain unspecified evidence. *See* Mem. at 10-11. This is not a proper basis to exclude Mr. Dalius' opinions, and Plaintiff offers no support to suggest otherwise. *Id.* As a hybrid witness, Mr. Dalius was not required to "review" facts and documents to form (or even confirm) an opinion on an issue for which he has decades of experience. Contrary to Plaintiff's position, Mr. Dalius was designated as hybrid witness precisely because he can both testify in a percipient witness capacity, but also provide opinions that might be considered expert by virtue of his extensive employment experience. *See Smith*, 714 F.Supp. 2d at 852 ("The court finds that, as a fact witness who was involved in the events underlying this case, McCormick is allowed to testify regarding her personal involvement in the drug application process and the opinions she held at the time.").

### 3. Donald Murray

As a trained psychologist, Dr. Murray began his career with the BOP where he served for over 20 years. *See* ECF No. 356-2. During that time he developed a national drug treatment program, worked as a clinical psychologist, and audited BOP facilities. *See* Pettis Decl., Ex. 9 at 47:23-48:3; 48:24-49:4; 96:1-4 (Murray Dep. Tr.). Following his employment at the BOP, Dr.

---

[7] Plaintiff suggests that Mr. Dalius' opinions are "conclusory." *See* Mem. at 10 (citing *Highland Cap. Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 473 n.2 (S.D.N.Y. 2005)). But in making this argument, Plaintiff selectively cites summary passages of his deposition, while completely ignoring other testimony where Mr. Dalius explains the facts supporting his opinions. *See* Pettis Decl., Ex. 8 at 64:7-65:24 (explaining that "CoreCivic prisons are more up to date, more modern" which makes them more "efficient."); *see also id.* (describing experience as assistant warden for BOP facility with a "predominant[ly] criminal alien population").

Murray was hired by CoreCivic, where he was instrumental in developing and leading the Quality Assurance Division ("QAD"). *Id.* at 56:25-58:5. As Dr. Murray explained, CoreCivic created the QAD because of "the importance of rigorous auditing, corrective action plans, [and] the importance of trying to provide the best possible assurances and information available with regard to a facility's operational performance…" *Id*. at 62:2-25. As head of the QAD, Dr. Murray supervised the Company's quality control procedures, including its extensive internal audit processes and partner and third-party compliance monitoring. *See id.* at 110:8-17; *see also id.* at 88:15-25.

At his deposition, Dr. Murray expanded on his vast expertise in operational management, policies and procedures, and quality assurance. *See* ECF No. 356-2 § C(1). Dr. Murray testified about the audits he performed at both BOP and CoreCivic facilities, (*see* Pettis Decl., Ex. 9 at 96:1-4), his familiarity with the "large amount of information in terms of standards for the industry," "[BOP] policies and procedures," "audit tools that have been utilized by the [BOP] for many years," (*id.* at 96:12-97:8), and operational challenges faced by the BOP and CoreCivic alike. *Id.* at 97:17-22 ("[M]any of the staffing issues and concerns that impact not only the Bureau of Prisons but staffing issues and concerns that impact virtually most areas of corrections and how that's certainly compounded in the health services areas and other professional services such as mental health.").

Dr. Murray's fact and expert testimony is particularly important here, considering that he will testify about the internal audit function, and the process through which deficiencies are identified, reviewed, and remediated. Here, Plaintiff has disparaged the role and competence of the auditors from the various third-party accreditation agencies since the outset of this case. *See, e.g.*, Pettis Decl., Ex. 12 at 216:18-20 (Dodrill Dep. Tr.) (Plaintiff's counsel: "Have you ever

spoke with an ACA *so-called auditor* about what he or she did to *supposedly audit a private prison*?" (emphasis added)). Dr. Murray can and will testify that CoreCivic's internal audit function was not only more comprehensive and more frequently used than the BOP's internal audit process, it was broader and more robust than any program administered by any third-party accreditation agency.

Dr. Murray's deposition testimony establishes that his opinions in this regard are "supported by extensive relevant experience." *Dickenson*, 388 F.3d at 982. In other words, Dr. Murray explained how his own personal experience supports his opinions. *See* Pettis Decl., Ex. 9 at 95:15-98:11 (explaining that through 38 years of service in the industry, he gathered "information and expertise across a variety of areas" and became "familiar" with industry "policies and procedures"); *see also id.* at 110:1-23 (explaining feedback from the BOP regarding "the quality of work, the quality of our internal audits" during the audit tool approval process informed his "evaluat[ion of] our performance with the bureau's own performance."); *id.* at 111:3-111:16 (explaining that the BOP's "policy and procedural changes" provided insight into "what the Bureau of Prisons is doing currently, and [how] they've modified their practices and of course we need to modify our practices to be consistent with the Bureau of Prisons' practices."). Plaintiff's assertion that Dr. Murray lacks "direct information on the BOP's operations" is thus belied by the evidence. *See* Mem. at 14-15; *see also L.E. Cooke Co.*, 991 F.2d at 342 (expert opinion is reliable if it rests on a "reasonable factual basis"); *United States v. Ramer,* 883 F.3d 659, 680 (6th Cir. 2018) (same).

Finally, Plaintiff argues that Dr. Murray's opinions should be excluded because they rely on hearsay and inferences. *See* Mem. at 12, 15-16. But experts can rely on hearsay and inferences "[i]f experts in the particular field would reasonably rely on those kinds of facts or data" and they

"employ[] in the courtroom the same level of intellectual rigor that characterizes the practice in the relevant field." *See* Fed. R. Evid. 703; *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 152).[8] Dr. Murray's discussions with industry professionals, (*see* Mem. at 15), are exactly the type of information upon which other proposed experts in this field, including Plaintiff's own retained expert, Ms. Donna Mellendick, rely. *See* Pettis Decl., Ex. 13 at 59:21-60:24 (Mellendick Dep. Tr.) ("Mainly my staff were the ones that interacted with CCA employees on a regular basis…so I usually didn't interact with anyone at CCA unless it was something that couldn't be resolved at a lower level or it was just a higher level…"); 67:17-20 ("I was, like, in the loop. You know, my staff would inform me of what was going on [regarding CCA notices of concern].").[9]

### 4. Kimberly White

Ms. White spent 26 years with the BOP, where she served as a correctional officer, Warden, Regional Director, and ultimately Assistant Director of the Human Resources Management Division, where she exercised oversight for the hiring, training, and retention of 38,000 BOP employees. *See* ECF No. 356-2; *see also* Pettis Decl., Ex. 10 at 12:9-24 (White Dep. Tr. (Nov. 15, 2019)). In 2012, she started at CoreCivic in the role of Managing Director of Inmate Programs, where she was "responsible for all the inmate-related programs within the facilities, which included religious services, addictions treatment, and education." Pettis Decl., Ex. 10 at 17:7-20.

---

[8] Plaintiff's reliance on *Nelson* is misplaced. *Compare Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 253 (6th Cir. 2001) ("Without any factual basis from which a jury could infer [specific fact], the reasoning and methodology underlying the testimony is not scientifically valid.") (cited in Mem. at 16) *with e.g.*, Pettis Decl., Ex. 9 at 110:1-112:15 (explaining the factual basis for inference that changes to audit tool indicate areas of operational concern for the BOP).

[9] As it did with respect to Mr. Dalius, Plaintiff argues that Dr. Murray should have performed an after-the-fact analyses of certain evidence. *See* Mem. at 14. As explained above, this argument fails as a matter of law. *See Smith*, 714 F. Supp. 2d at 852.

In 2013, she was promoted to Vice President, Correctional Programs, where she supervised "investigators who did inmate-related investigations," organized employee trainings, and had full responsibility for facility staffing and rosters. *Id.* at 17:21-18:6; 19:10-16. Ms. White eventually moved to Human Resources, first serving as Senior Vice President of Human Resources in late 2013 and later being promoted to Executive Vice President of Human Resources in 2015. Pettis Decl., Ex. 11 at 115:5-10 (White Dep. Tr. (Oct. 30, 2020)); *see id.*, ECF No. 356-2 at 7-8. In these roles, Ms. White was "responsible for hiring, firing, recruiting, retaining, promotions, classifications of the responsibilities, [and] learning development." Pettis Decl., Ex. 10 at 13:3-9.

Ms. White's expertise in corrections, and in particular, hiring, training, and staffing corrections facilities, is (again) undeniable. At her deposition, Ms. White testified competently about specific staffing-related issues faced by both the BOP and CoreCivic. *See, e.g.*, Pettis Decl., Ex. 10 at 43:18-23 ("We had challenges in retaining employees at the BOP in the state of Georgia, Tennessee, Colorado and Oklahoma. Those were the kind of six markets where we were struggling. And a lot of it had to do with the market of those locations."). Ms. White described labor force and employee retention analyses that CoreCivic regularly conducted in an effort to address staffing needs. *See id.* at 42:3-17 (describing "labor force analyses"); *id.* at 44:9-45:10 (explaining the Company's "quality assurance reports," "inmate grievances," "turnover," "number of candidates," as well as "a variety of different metrics"). Ms. White has established that, by virtue of her three decades of work in the corrections industry, her expertise and experience are both "extensive and specialized." *Kumho Tire Co., Ltd.*, 526 U.S. at 156; *see Mem'l Hall Museum, Inc.*, 455 F. Supp. at 364-65; *see also Hudson Henley Grp.*, 2018 WL 1631143, at *5 (same).[10]

---

[10] It is worth noting that Plaintiff implicitly conceded Ms. White's expertise through the questions they posed at her first – percipient witness – deposition. *See* Pettis Decl., Ex. 10 at 146:16-20 ("Q.

Far from being based on "bare assumption[s]," as the motion suggests, (*see* Mem. at 18-20), the record makes clear that Ms. White's opinions are founded on a "reasonable factual basis." *See L.E. Cooke Co.*, 991 F.2d at 342. As Ms. White concisely explained at her deposition, her opinions are based upon, among other things, labor analyses, (*see* Pettis Decl., Ex. 11 at 42:3-17), internal reporting (*see id.* at 44:9-45:6), and external audit reports, (*see id.* at 15:20-16:10). This is, of course, on top of the decades of day-to-day supervisory, staffing, training, and human resources management experience described above. *See* Pettis Decl., Ex. 10 at 17:14-20; 18:1-6; 19:10-16; Pettis Decl., Ex. 11 at 115:5-10.

That Ms. White did not independently collect her own data or perform an empirical analysis of those data adds nothing to Plaintiff's argument. *See* Mem. at 19. Courts do not require such data-driven analyses where, as here, a pragmatic, experience-based analysis is more appropriate. *See Mem'l Hall Museum, Inc.*, 455 F. Supp. at 66 (quoting *First Tenn. Bank Nat. Ass'n*, 268 F.3d at 335) (stressing, "however, that *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.... In some cases ... the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience."). Ms. White's personal experience provides more than enough support for her testimony, and is far more helpful than any so-called data-driven analysis under the circumstances. *See First Tenn. Bank Nat. Ass'n*, 268 F.3d at 335 (stating that the *Daubert* factors are particularly "unhelpful" when "expert testimony derive[s] largely from [expert's] own practical experiences"

---

But it was based on something, right? I mean, you have a long -- decades' long experience at the BOP and in corrections, right? You're an expert in this stuff? A. I am.").

because these opinions "do not easily lend themselves to scholarly review or to traditional scientific evaluation.").[11]

## B. The Hybrid Witnesses' Opinions Are Not "Cumulative"

Plaintiff further argues that the opinions of the Hybrid Witnesses should be excluded because their testimony is needlessly cumulative under Fed. R. Evid. 403. *See* Mem. at 5. This argument also fails.

Courts may exclude evidence under Federal Rule of Evidence 403, but only if the "danger of... needlessly presenting cumulative evidence" *substantially outweighs* its probative value. Fed. R. Evid. 403. The plain language of Rule 403 demonstrates that a court's power in this regard is discretionary. *Id.* In exercising this discretion, a court may not exclude evidence solely because it is "strongly persuasive or compellingly relevant." *In re Air Crash Disaster*, 86 F.3d 498, 538 (6th Cir. 1996) ("[T]he truth may hurt, but Rule 403 does not make it inadmissible on that account."). Rather, Rule 403 requires courts to view the evidence "in a light most favorable to the proponent, maximizing its probative value and minimizing its prejudicial effect." *Jones v. Wiseman*, No. 20-5105, 2020 WL 7587481, at *9 (6th Cir. Dec. 22, 2020) (citing *United States v. Rey*, 923 F.2d 1217, 1222 (6th Cir. 1991)). Accordingly, courts routinely permit similar or even overlapping testimony from multiple experts if the experts offer distinct perspectives or shed light on different aspects of the same issue. *See, e.g.*, *Cantu v. United States*, No. CV 14-00219 MMM, 2015 WL 12743881, at *7 (C.D. Cal. Apr. 6, 2015); *Tucker v. Nelson*, 390 F. Supp. 3d 858, 868

---

[11] Plaintiff's argument that Ms. White's opinions should be excluded because they rely on hearsay and inferences (*see* Mem. at 19-20) can and should be rejected for the same reasons discussed above. *See infra* at III.A.3; *see also* Fed. R. Evid. 703; *Engebretsen v. Fairchild Aircraft Corp.*, 21 F.3d 721, 728 (6th Cir. 1994); *Jahn*, 233 F.3d at 388.

(S.D. Ohio 2019) (denying motion to exclude an expert witness as the two experts "will testify to different aspects of the case.").

Plaintiff concedes that the four Hybrid Witnesses have experience "working at the BOP and CCA," (Mem. at 5), but Plaintiff ignores the differing roles, differing experiences, and therefore unique views and opinions on the relevant issues each provide. As discussed above, Mr. Lappin, the former Director of the BOP, can and will testify about challenges faced by the corrections industry as a whole, inmate threat level designations, disturbances, the dangers associated with overcrowding, and the difficulties associated with hiring and retaining staff. *See, e.g.*, Pettis Decl., Ex. 5 at 12:16-24; 155:13-18; 25:3-9; Pettis Decl., Ex. 6 at 109:14-21. Mr. Dalius, the former CFO of the BOP, can and will testify about cost comparisons, including how corrections industries incur and record costs and expenses. *See, e.g.*, Pettis Decl., Ex. 7 at 67:19-25 (Dalius Dep. Tr. (Feb. 26, 2020)); Pettis Decl., Ex. 8 at 137:7-138:23. Dr. Murray, who served as the head of CoreCivic's QAD, can and will testify about how corrections institutions, and in particular, the BOP and CoreCivic, employ internal audits and deficiency findings to improve services. *See, e.g.*, Pettis Decl., Ex. 9 at 110:1-23; 184:4-9. And, Ms. White, who worked her way up to Executive Vice President, Human Resources at CoreCivic after serving in a variety of positions at both the BOP and CoreCivic, will testify about hiring, staffing, training, and employee retention issues in the corrections industry generally. *See, e.g.*, Pettis Decl., Ex. 10 at 76:11-22; 85:1-8; Pettis Decl., Ex. 11 at 44:9-45:10.

The testimony of these witnesses is not only unique, it is fundamental to obtaining a full and complete understanding of the issues in this case, including the context surrounding the decades-old relationship between the BOP and CoreCivic. Although their corrections industry experience is broad, and the areas of expected testimony may overlap in certain limited respects,

that is not enough to exclude the opinions of the Hybrid Witnesses as "cumulative" in violation of

Rule 403. *See Cantu*, 2015 WL 12743881, at *7 ("Although [non-retained and retained witnesses]

have similar qualifications and are likely to offer opinions on similar topics, the distinct evidence

on which each will apparently rely suggests, that, while there may be some overlap, the expert

testimony the government seeks to offer will not be *needlessly* cumulative.").[12]

## C. Plaintiff's Requested Relief Is Ambiguous, Overbroad, And Prejudicial

The motion fails to clearly articulate what additional relief (beyond that already provided)

Plaintiff contends it is entitled, or the method by which the Court should provide it. Defendants

respectfully submit that any concern about the opinions of the Hybrid Witnesses are more properly

addressed via cross-examination, not through a misguided attempt to prevent the witnesses from

testifying altogether. *See Daubert*, 509 U.S. at 596 ("Vigorous cross examination, presentation of

contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate

means of attacking shaky but admissible evidence."). Defendants respectfully submit that the

witnesses' testimony is not cumulative, but this is an issue more properly assessed at trial once the

Court has heard the direct testimony of each witness. The motion provides no basis whatsoever

for any broader relief at this time.

---

[12] The testimony and opinions of Mr. Lappin, Mr. Dalius, Dr. Murray and Ms. White not only differ among one another, they are not cumulative of the testimony and opinions proffered by Defendants' retained experts. Unlike Defendants' retained experts, the four witnesses at issue here offer the unique perspective of having been employed both in the government sector and later at CoreCivic during the relevant time period. *See* ECF No. 356-2 at 2-3 (Mr. Dalius), 4 (Mr. Lappin), 5-6 (Dr. Murray), 7-8 (Ms. White).

22

## IV.  CONCLUSION

Defendants respectfully request that the Court deny Plaintiff's Motion to Exclude Expert Testimony of Defendants' Non-Retained Experts William Dalius, Harley Lappin, Don Murray, and Kim White.

DATED:  January 22, 2021

Respectfully submitted:

 /s/ *Steven A. Riley*
Steven A. Riley (TN #6258)
Milton S. McGee, III (TN #024150)
RILEY WARNOCK & JACOBSON, PLC
1906 West End Avenue
Nashville, TN 37203
T: (615) 320-3700
F: (615) 320-3737
sriley@rwjplc.com
tmcgee@rwjplc.com

David J. Schindler (admitted *pro hac vice*)
Brian T. Glennon (admitted *pro hac vice*)
Meryn C. N. Grant (admitted *pro hac vice*)
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
T: (213) 485-1234
F: (213) 891-8763
david.schindler@lw.com
brian.glennon@lw.com
meryn.grant@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

Morgan E. Whitworth (admitted *pro hac vice*)
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
T: (415) 391-0600

23

F: (415) 395-8095
morgan.whitworth@lw.com

*Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*

## CERTIFICATE OF SERVICE

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System and via electronic mail:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike,  Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com


this 22nd day of January, 2021.

            /s/ *Steven A. Riley*
            Steven A. Riley