# EXHIBIT 5

Page 1

1      IN THE UNITED STATES DISTRICT COURT

       FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5    Situated,

6                  Plaintiff,

vs.                    CASE NO.

7                        3:16-CV-02267

CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                  Defendants.

10

11

12

13              CONFIDENTIAL

14       VIDEO DEPOSITION OF HARLEY G. LAPPIN

15       Reported Remotely through Videoconference

16              July 28, 2020

17

18

19

20   Reported by:

21   Elisabeth A. Miller Lorenz

22   RMR, CRR, LCR No. 66

23

24   Job No.:  10071101

25

```
 1    APPEARANCES:
 2    For the Plaintiff:
 3        ROBBINS GELLER RUDMAN & DOWD
      BY:  CHRISTOPHER H. LYONS
 4        BY:  CHRISTOPHER WOOD
14 Union Street
 5        Suite 900
      Nashville, Tennessee 37219
 6        615.252.3798
      clyons@rgrdlaw.com
 7        cwood@rgrlaw.com
 8        ROBBINS GELLER RUDMAN & DOWD
      BY:  JASON A. FORGE
 9        655 West Broadway
      Suite 1900
10        San Diego, California 92101
      619.231.1058
11        jforge@rgrdlaw.com
12
13    For the Defendants:
14        RILEY, WARNOCK & JACOBSON
      BY:  TREY McGEE
15        1906 West End Avenue
      Nashville, Tennessee 37203
16        615.320.3700
      tmcgee@rwjplc.com
17
      LATHAM & WATKINS
18        BY:  ERIC C. PETTIS
      BY:  BRIAN T. GLENNON
19        355 South Grand Avenue
      Los Angeles, California 90071-1560
20        213.485.1234
      eric.pettis@lw.com
21        brian.glennon@lw.com
22
23    Also Present:
24    Kirill Davidoff, Videographer
25
```

```
1              P R O C E E D I N G S
2              THE VIDEOGRAPHER:  We are now on the
3    record.  Today's date is July 28th, 2020, and the
4    time is 11:08 a.m. Eastern Time.  This is the video
5    deposition of Harley Lappin being taken in the
6    matter of Nikki Bollinger Grae versus Corrections
7    Corporation of America on behalf of the plaintiffs
8    pending in the United States District Court, Middle
9    District of Tennessee, Case No. 3:16-CV-02267.
10             We are in a remote deposition.  My name
11   is Kirill Davidoff of Aptus Court Reporting, located
12   at 1000 Wilshire Boulevard, Suite 1900, Los Angeles,
13   California, 90017.
14             Would counsel please identify
15   yourselves and state whom you represent.
16             MR. FORGE:  This is Jason Forge on
17   behalf of the plaintiff and the class.
18             MR. GLENNON:  Brian Glennon on behalf
19   of the defendants of Latham & Watkins.
20             THE VIDEOGRAPHER:  The court reporter
21   today is Elisabeth Lorenz, and she may now swear in
22   or affirm the deponent.
23
24
25
```

1                           * * *

2                   HARLEY G. LAPPIN

3     was called as a witness, and after having been first

4     duly sworn, testified as follows:

5                   THE VIDEOGRAPHER:  Please proceed.

6                   E X A M I N A T I O N

7     BY MR. FORGE:

8     Q      Good morning, Mr. Lappin.  This is

9     Jason Forge.

10             Can you hear me?

11    A      Yes, I can, sir.

12    Q      Mr. Lappin, I think we've all gotten an

13    introduction to Zoom over the past several months.

14             Have you used Zoom previously?

15    A      Infrequently.  I have used Skype, so there

16    are some similarities.

17    Q      So you know that everything we say generally

18    speaking can only be transmitted on one side at a

19    time.  So if I'm talking, it doesn't really work if

20    you're talking at the same time.

21             Okay?

22    A      Yes, sir.

23    Q      Of course, that works in reverse.  Whenever

24    you're talking, I'll do my best to avoid cutting you

25    off or speaking over you.

1    A     I was a farmer, and I worked on my family

2    farm in the years between 1978 and 1985 and worked

3    part-time at a juvenile detention facility in the

4    local county.

5    Q     Was that local county in Indiana?

6    A     No, I'm from Kent, Ohio.  It was in

7    Portage County, Ohio.

8    Q     Just out of curiosity, where is

9    Portage County geographically?  Is it south --

10   A     It's just outside of Akron, Ohio, south --

11   about 45 minutes south of Cleveland just outside of

12   Akron, Ohio.

13   Q     On the family farm, what did you all grow or

14   raise?

15   A     We were a vegetable farm.  We had an acre

16   and a half of greenhouse where we raised greenhouse

17   tomatoes.  Had a farmer's market.  We raised

18   70 acres of sweet corn.  We raised celery for

19   Campbell's Soup and a variety of other vegetables.

20   But we were primarily a vegetable and flower farm.

21   Q     What inspired you to go back to grad school?

22   A     Uncertainty in what I wanted to do in life.

23   As much as I enjoyed farming, a small family farm

24   was a very difficult way to make a living.  I had

25   two children at the time, and so I decided to

1    continue my education just in case I decided to

2    transition to another occupation.

3          And while in graduate school, I did an

4    internship at a federal prison in Milan, Michigan.

5    And about three, four months after I completed my

6    degree, I applied for a position with the

7    Federal Bureau of Prisons and transitioned from

8    farming to working in a correctional system.

9    Q        Did you go to grad school full-time, or were

10    you still working while you were going to grad

11    school at night?

12    A        I went to grad school at night.  I went

13    part-time.

14    Q        What was that first position you had with

15    the BOP?

16    A        I was a case manager in a federal prison in

17    Texarkana, Texas, so my position was like a

18    probation officer or parole officer inside of a

19    prison.  I managed a caseload of about 200 inmates.

20    Q        That was 1985 when you started that job?

21    A        Yes, sir, October, I believe, of 1985.

22    Q        And what year did you have your next

23    position with the BOP?

24    A        All right.  I have to guess a little bit at

25    the dates, but it was around I think March of 1988.

1     I was promoted to a job -- a position in

2     San Francisco, California, worked in a regional

3     office.  The Bureau of Prisons has a main office in

4     Washington, D.C. and six regional offices.  And

5     those regional offices oversee at that time 15 to 20

6     prisons in a geographic area, in this case, in the

7     western region of the United States.

8          I was a designator and a central inmate

9     monitoring coordinator, so my primary

10    responsibilities were to designate inmates convicted

11    in federal court after sentencing, after completion

12    of their presentence report, designating them to an

13    appropriate facility in the Bureau of Prisons for

14    service of their sentence and the management of

15    central inmate monitoring issues.

16          So a short -- short overview of that, about

17    40 percent of the inmates in the Federal Bureau of

18    Prisons are separated from other inmates primarily

19    because they testified against each other in federal

20    court.  And as part of the designation process and

21    the transfer process, we ensure that inmates who had

22    testified against each other or had a conflict in

23    the community or in prisons were not housed in the

24    same institution.

25    Q      So all of those requests for designations

1    which were pretty much the last thing set at a

2    sentencing hearing when people want to be designated

3    to a facility near their family members, that's

4    what -- that's what would drive you crazy because

5    federal judges would just say, Hey, put everybody

6    in, you know -- I don't know -- in Los Angeles so

7    they can be close to their family members?

8           MR. GLENNON:  Objection, vague.

9           THE WITNESS:  Really not a frustration.

10   We were committed, whenever possible, to put

11   individuals as close to home as we possibly could in

12   the appropriate security level in a safe location.

13   And part of that safe location was, not housed with

14   someone who testified against them or they had a

15   conflict with.

16           So consequently, you couldn't always

17   support that recommendation, but each and every

18   recommendation was considered primarily to make sure

19   we're in a safe place and put them as close to home

20   as possible in the appropriate security level.

21   BY MR. FORGE:

22   Q      Got it.

23           So what was your next position after you

24   were done from being a designator and inmate

25   coordinator?

1    A       It was around 1991, I believe.  I can't

2    remember the dates exactly, but I think it was in

3    the summer of '91, I was promoted to camp

4    administrator at a brand-new correctional facility

5    in Jesup, Georgia, which is about 45 miles west of

6    Brunswick, Georgia.

7            So the Bureau of Prisons was in a huge

8    growth spurt.  We were building prisons around the

9    country.

10           And I had the fortune of opening a brand-new

11   federal correctional institution in Jesup, Georgia,

12   where I oversaw the operation of the camp, satellite

13   camp that sat adjacent to the secure --

14   medium-secure facility at that location.

15   Q       How long did you serve as camp administrator

16   at FCI Jesup?

17   A       About 18 months.

18   Q       So are we now into '92, '93?

19   A       Yeah, around '93, was promoted to associate

20   warden at another new facility.  It was not new

21   construction, but it was a facility in -- outside of

22   Baton Rouge, Louisiana, in Gonzales, Louisiana, that

23   had run for 40, 50, 60 years as a public health

24   service hospital serving -- serving Hansen's disease

25   patients.

1          They were housed there.  The old term was

2     leprosy.  Transitioned to Hansen's disease once they

3     realized it was not contagious as they once thought.

4          And so they were phasing that out, and I

5     went there as associate warden to participate in

6     the -- to help manage the transition of that

7     facility from the Public Health Service to the

8     Bureau of Prisons to operate a minimum security

9     medical facility for the Bureau of Prisons.

10    Q     How long did you remain as associate warden

11    including the transition and then after the

12    transition?

13    A     About 18 months.

14    Q     So now we've getting close to '95, in that

15    ballpark?

16    A     '95, '96, yes.

17    Q     What's next?

18    A     I was promoted to a position in

19    Washington, D.C. in a program review division, which

20    is the audit component of the Bureau of Prisons.

21    And there I was responsible for a variety of issues.

22    I was -- I can't exactly remember the title, but it

23    was an executive position in that division of the

24    Bureau of Prisons.

25          I oversaw all external audits during that

1    time for the Bureau of Prisons.  So when audits or

2    reviews or investigations were requested by the OIG,

3    the GAO, OMB, OPM, part of my role was to oversee,

4    along with my staff, the management of those

5    external audits.

6          I oversaw the strategic planning process for

7    the Bureau of Prisons and a number of other

8    associated responsibilities with some oversight of

9    the audit process for the Bureau.

10   Q       How long did you remain in that position?

11   A       Three years.

12   Q       What came next?

13   A       I was promoted to warden at the

14   Federal Correctional Institution in Butner, North

15   Carolina, just outside of Raleigh-Durham.  It was a

16   Federal Correctional Institution with a primary

17   responsibility for mental health care.

18          So I had a large component of mentally ill

19   inmates, some of whom were being assessed to

20   determine if they were competent to stand trial,

21   some to determine if they were competent at the time

22   of the arrest or the offense, as well as other

23   long-term mental health offenders.

24          It was a mixed population of about 500

25   mentally ill in the mentally ill unit -- mental

1    health unit, and the balance of about 800 or so

2    general population medium security inmates.

3    Q    How long did you remain as warden at Butner?

4    A    Three years.  So --

5    Q    What came next?

6    A    It was about 1999, I was promoted -- I was

7    promoted to warden of the United States Penitentiary

8    in Terre Haute, Indiana, a large, high security

9    institution with about 12-, 1300 high security

10   offenders and a 300-bed minimum security satellite

11   camp.

12   Q    How long did you remain in Terre Haute?

13   A    Three years.

14   Q    And where did you go next?

15   A    I was then promoted to regional director of

16   the Mid-Atlantic Regional Office based in -- just

17   outside of Baltimore.  Oversaw about 18 to 20

18   federal prisons as regional director, supervised the

19   wardens, and had oversight responsibility for the

20   day-to-day operations of those 20 or so facilities.

21   Q    And how long did you remain in that

22   position?

23   A    About 18 month -- 18 to 20 months, and I was

24   promoted again in April of 2003.

25   Q    To what?

1    A        I was promoted to director of the

2    Federal Bureau of Prisons.  I had oversight

3    responsibility ultimately for about 35-, 36,000

4    employees; by the time I retired, about 215,000

5    inmates; an annual operating budget of about

6    $8 billion, in addition to a billion dollar building

7    budget, BNE budget -- BNF budget, and served in that

8    capacity for eight years.

9    Q        So it was 2011 when you left?

10   A        It is.

11   Q        Did you go directly to another job, or did

12   you just retire from the BOP?

13   A        I retired from the Bureau of Prisons.  And

14   soon after retiring, I interviewed with a number of

15   companies, primarily the three private prison

16   companies at the time.  There were other -- some

17   other opportunities, but I -- I interviewed with a

18   number of companies and businesses.

19           And about -- let's see, it was around July

20   of '11 that I went to work for CCA, now known as

21   CoreCivic.

22   Q        Let me ask you before we put the BOP too far

23   in the rear view mirror, what was the highest salary

24   you ever received while working for the BOP?

25   A        I think the base salary at the time I left

1    was around a hundred and -- between 180- and

2    $185,000 a year.

3    Q      And what was the highest bonus you ever

4    received?

5    A      Around $20,000.

6    Q      And that -- so are you looking at about

7    $205,000 maximum compensation even when you were the

8    director of the entire BOP?

9    A      Yes, sir.

10    Q      So how long after you left the BOP was it

11    before you interviewed with -- I'm going to refer to

12    Corrections Corp. as CCA.

13            Is that okay, sir?

14    A      Yes, sir.

15    Q      So approximately how long was it after you

16    left the BOP before you interviewed with CCA?

17    A      So not long after I announced my retirement,

18    I was contacted by companies, but I decided to wait

19    until I was out of the Bureau of Prisons to

20    interview.  So I would say -- let me think here.  I

21    would say within 60 days of my departure from the

22    Bureau of Prisons, I participated in some

23    interviews.

24    Q      Was CCA one of the companies that contacted

25    you after your announcement?

1    unbelievable growth.

2         There were years we were adding 8- to 10,000

3    inmates to the base a year.  We could not build beds

4    fast enough.

5         And to complicate matters more, 9/11.  And

6    in the aftermath of 9/11, the criminal justice law

7    enforcement funding in the United States was

8    reorganized, and the highest priority became

9    preventing another 9/11 attack.  Completely agree.

10        So our funding was reduced.  And the most

11   troublesome announcement and decision was to put a

12   moratorium on all new prison construction.  So we

13   had some funding available to build beds that were

14   already in the process, but we knew if this

15   continued, within two or three years, we would have

16   no additional new beds built and operated by the

17   Bureau of Prisons.

18        So my only vehicle to add beds was through

19   the private prison companies.

20        At that time, the dilemma was, in reframing

21   the funding priorities of the federal government,

22   they didn't in any way change the prosecutorial

23   habits of the United States attorneys in this

24   country.  So we continued to add 6,000 -- on

25   average, 6,500 inmates to the base of our population

1     a year.  That's the equivalent of 3 to 3-1/2

2     prisons.

3            Crowding was at a record high, and we

4     desperately needed those additional beds to manage

5     overcrowding, to reduce the incident of assaults and

6     disturbances and misbehavior, and to provide the

7     services we intended to provide in the way of care,

8     medical, mental health, program opportunities,

9     vocational opportunities to the inmates in our care.

10           Even with those additional beds, which at

11    the highest point was about 30,000 inmates in

12    private prisons, we were still 35 to 43 percent over

13    our rate of capacity, which meant thousands of

14    inmates in the Bureau of Prisons were being housed

15    three in a cell that was built for two.  In

16    long-term, that is very, very risky.

17           And so I desperately wanted them to succeed,

18    and I decided to meet with them twice a year.  I

19    seldom met with them other than that.  I allowed my

20    contracting staff and the staff that oversaw the

21    management of those private prisons to manage the

22    contracts just like we would with any other

23    contractor.

24           But I needed to hear the concerns, the

25    issues, the challenges they were encountering as

1    they were absorbing more and more of these non-U.S.

2    citizens into their prisons.

3          So I, along with a team of other executives

4    and support staff, would meet with them twice a

5    year.  We'd share with them population projections,

6    challenges we were encountering, gang management, an

7    array of topics but also offered them the

8    opportunity to share their concerns and challenges.

9          The meeting was open to every single private

10   prison provider because I wanted them to hear the

11   same message.  I wanted them to hear the same

12   issues.  I did not want -- meeting individually with

13   them, I believed, would have brought confusion and

14   misinterpretation.

15          And so it was my decision that we meet a

16   couple times a year and address issues of mutual

17   concern hoping that it would make them as successful

18   as they possibly could be.

19          To be honest with you, I had enough on my

20   plate.  I had a hundred -- another 175,000 inmates

21   in my care and custody of a variety of security

22   levels, some more challenging than others.  A lot

23   of -- a lot of introduction of gangs and other

24   challenges in our prisons.

25          And I just needed them to be successful such

1   told you about?

2   A      No.  Initially, they were interested in me

3   joining the company in any capacity that I was

4   interested in, full-time, part-time, contract

5   employee, board member.  And coincidentally, their

6   chief corrections officer retired and, at some

7   point, said they would be interested in me

8   considering that job as well.  So initially it was

9   pretty broad.

10          The chief corrections officer job was open,

11   would consider me as a board member, as a

12   consultant, either full-time or part-time.

13   Q      So at least as -- as they described it to

14   you, they were flexible in terms of whatever you

15   wanted to do for them?

16          MR. GLENNON:  Objection, vague.

17          THE WITNESS:  Yes.

18   BY MR. FORGE:

19   Q      Who was the outgoing chief corrections

20   officer?

21   A      Rick Seiter.

22   Q      Could you spell the last name?

23   A      I believe it's spelled S-E-I-T-E-R.

24   Q      Did you know Mr. Seiter?

25   A      I did.

1    Q      From what?

2    A      He had worked in the Bureau of Prisons.  I

3    didn't know him very well from that because he was

4    older than I was, and I was pretty low in the

5    organization at the time he was -- that I got to

6    know him.  And he retired -- I forget -- I don't

7    know exactly when but long before -- I think

8    probably around '94 or '95.  I can't say

9    specifically, but he retired sometime in the '9 --

10    in the mid '90s.

11    Q      What was your understanding of his last

12    position at the BOP?

13    A      As I recall, I think he retired as the

14    warden at -- at a prison in Illinois.

15    Q      And so eventually you -- the first position

16    you took with CCA was as chief corrections officer?

17    A      Yes.

18    Q      Who replaced you as director of BOP?

19    A      Charles Samuels.

20    Q      And had you known Mr. Samuels?

21    A      Yes.

22    Q      For approximately how long?

23    A      Probably close to 20 years.

24    Q      Do you consider him to be a friend?

25    A      A colleague.

1    Q      Never saw him socially?

2    A      No.

3    Q      Did you get along well with him?

4    A      Yes.

5    Q      Did he have a reputation for integrity at

6    the workplace?

7    A      Yes.

8              MR. GLENNON:  Objection, vague.

9    BY MR. FORGE:

10   Q      What I mean by that, did he have a

11   reputation as a man of high integrity at the

12   workplace?

13             MR. GLENNON:  The same objection.

14             THE WITNESS:  So, you know, I didn't

15   work with Charles for many years after I retired.  I

16   heard -- I have no questions about his integrity

17   while he was director of the Bureau of Prisons.

18   BY MR. FORGE:

19   Q      And when you -- well, you knew him for 20

20   years before you became director, right?

21   A      I did.

22   Q      And so throughout that time, did you have an

23   understanding of his, you know, reputation for

24   integrity within the BOP?

25             MR. GLENNON:  Objection, vague.

1          THE WITNESS:  I did.  I promoted him

2    several times.

3    BY MR. FORGE:

4    Q      And --

5    A      So -- so, obviously, I felt he was a person

6    of integrity.

7    Q      And you also felt that others regarded him

8    that way as well?

9          MR. GLENNON:  Same objection, calls for

10   speculation.

11         THE WITNESS:  Again, never heard any

12   questions about his integrity.

13   BY MR. FORGE:

14   Q      And, again, this is, you know, one of these

15   awkward types of evidentiary ways of phrasing the

16   question, Mr. Lappin.

17         But I just want to confirm that your

18   understanding of Mr. Samuels' reputation within the

19   BOP was that he was a man of high integrity; is that

20   correct?

21         MR. GLENNON:  Objection, vague.

22         THE WITNESS:  Yes.

23   BY MR. FORGE:

24   Q      Now, you started in July of 2011 as chief

25   corrections officer for CCA, correct?

1　A　　Yes.

2　Q　　What did that mean in terms of your

3　day-to-day responsibilities?

4　A　　Well, I was -- oversaw the day-to-day

5　operations; I over- -- I managed the vice presidents

6　in the operations department.  There were vice

7　presidents divided up again by region who oversaw

8　the operation of the prisons.  I did budget work,

9　proposed budgets, made budget adjustments, dealt

10　with day-to-day issues that -- that on occasion rose

11　to my level.

12　　　　Spent a lot of time with the folks who were

13　directly managing those prisons when need be and

14　certainly was responsive to their questions,

15　concerns, needs and so on and so forth.

16　　　　Oversaw the contracts for food service since

17　it was an outside contract, as well as a number of

18　other operational initiatives.

19　Q　　So approximately how many people ultimately

20　reported to you at CCA?

21　A　　So everyone that was in the operations

22　division reported -- technically reported to me, so

23　that were -- was all the field personnel and all of

24　the support staff at the FSC, you know, 12-, 13,000.

25　Q　　12-, 13,000?

1    A       Yeah, yes.

2    Q       Approximately how many prisoners in total?

3    A       It -- it varied.

4              MR. GLENNON:  Objection, vague.

5              THE WITNESS:  It varied over the time

6    as we added and ended contracts, but, you know, 60-,

7    65,000, thereabouts.

8    BY MR. FORGE:

9    Q       Just to address your counsel's objection,

10    that 60- to 65,000 inmates for whom you were

11    ultimately responsible as chief corrections officer,

12    correct?

13             MR. GLENNON:  Same objection.

14             THE WITNESS:  Yes.

15    BY MR. FORGE:

16    Q       What is your present status with CCA?

17    A       I'm a board member.

18    Q       Are you a voting board member?

19    A       I am.

20    Q       But you're not paid like the other board

21    members, are you?

22             MR. GLENNON:  Objection, vague.

23             THE WITNESS:  I'm paid -- I am paid a

24    cash -- I'm paid in cash, correct.

25

1    worse than CCA's failure to have a single

2    Spanish-speaking intelligence officer for the

3    intelligence section at Adams?

4           MR. GLENNON:  Objection, vague,

5    foundation.

6           THE WITNESS:  Repeat the question.

7    BY MR. FORGE:

8    Q      Sure.

9        In all of your career, can you identify for

10   me a single systemic failure in intelligence

11   gathering that was worse than CCA's failure to have

12   a single Spanish-speaking intelligence officer at

13   Adams?

14          MR. GLENNON:  Same objection.

15          THE WITNESS:  I don't -- I don't

16   consider it a failure.  I think -- I think it's not

17   uncommon, in my experience, 30-plus years, lots of

18   prisons with many Spanish-speaking inmates and

19   inmates from other countries, to have an

20   intelligence office that may not have a

21   Spanish-speaking member.

22          That has never, in my experience,

23   precluded us from gathering the intelligence we

24   needed to monitor the inmate population.

25

1    BY MR. FORGE:

2    Q      Can you identify for me a single BOP

3    facility with a -- where the majority of the

4    population was Spanish speaking, yet the BOP

5    facility lacked a single Spanish-speaking

6    intelligence officer?

7    A      There are no Bureau of Prisons -- at least

8    while I was director of Bureau of Prisons and prior,

9    there were no Bureau of Prisons facilities that

10   operated with a majority or 100 percent of their

11   facility being Spanish speaking.  Did not exist.

12   Q      Okay.

13   A      It didn't exist --

14         MR. GLENNON:  Hold on.  Hold on.  Hold

15   on, Jason.  Let him answer the question, please.

16         THE WITNESS:  It didn't exist because

17   they knew that a safer prison was one that had a

18   more balanced population, that is a mixture of

19   non-U.S. citizens, a mixture -- non-U.S. citizens

20   with U.S. citizens, a balance in the way of race,

21   age, and -- age, race, gangs, in the way of gangs.

22         So the Bureau operated internally a

23   balanced inmate population as best they could,

24   taking into consideration the number of non-U.S. and

25   U.S. citizens, the number of -- number of different

1  races at that facility, gang members, and a

2  distribution by age, because over the years, that

3  proved to be the safest operation in a correctional

4  setting.

5          So, no, I cannot identify a facility in

6  the Bureau of Prisons that --

7  BY MR. FORGE:

8  Q     Can you identify for me --

9          MR. GLENNON:  Hold on.  Hold on.  Hold

10  on, Jason.  I'm not sure he was done.

11          THE WITNESS:  I can't identify a

12  facility in the Bureau of Prisons that is --

13  replicates, that models what the private companies

14  were asked to manage, nor can I identify, can I --

15  do I recall every SIS office and the makeup of those

16  offices.

17          I -- even when I was the director of

18  Bureau of Prisons, I could not have done that.  Not

19  unlike CoreCivic.  We had facilities in the Bureau

20  of Prisons that it was extremely difficult to

21  recruit not only Spanish-speaking inmates but

22  minorities.

23          And we agreed that the best makeup of

24  the staffing is to have a balance within your

25  staffing that reflects the makeup of the inmate

1    population.  But that was not possible given the

2    fact that many prisons were located

3    geographically -- geographically in areas that

4    either didn't have many minorities or

5    Spanish-speaking inmates or, in some cases, didn't

6    have as many white employees.

7              So there's a -- there's a model here

8    that we preferred, but it couldn't be accomplished

9    given the geographic location and the availability

10   of those staff or potential staff in the community.

11   BY MR. FORGE:

12   Q      Can you identify for me a single BOP

13   facility in which the intelligence office did not

14   contain a single intelligence officer who spoke the

15   language spoken by a majority of the population at

16   that facility?

17             MR. GLENNON:  Objection, vague and

18   form.

19             THE WITNESS:  Reality is the -- at

20   those facilities, the majority of the population

21   spoke English.

22   BY MR. FORGE:

23   Q      I'm sorry, Mr. Lappin.  You were shaking

24   your head, but we can only capture verbal answers.

25   I'm going to repeat the question so you can actually

1    around this country -- and I'll just speak to the

2    Bureau of Prisons and CoreCivic -- with many

3    Spanish-speaking, not bilingual, Spanish-speaking

4    inmates with limited, if any, Spanish-speaking staff

5    and done so successfully.

6              So would it have been preferred?  Yes.

7              Can I say that -- that recommendation

8    alone led to the disturbance?  No.

9    BY MR. FORGE:

10   Q      I think maybe you're reading too much into

11   this.  What I -- what the statement was, and I asked

12   you whether you agreed or disagreed with it, is that

13   the lack of Spanish-speaking staff, experienced

14   staff, and experienced staff in the intelligence

15   office negatively affected the flow of communication

16   and intelligence gathering.

17            MR. GLENNON:  Object to form.

18   BY MR. FORGE:

19   Q      Now, what I was asking you is whether you

20   have any personal knowledge upon which you could

21   base a disagreement with that statement.

22   A      I disagree with that.

23            MR. GLENNON:  Objection, compound --

24   let me put my --

25            THE WITNESS:  Thank you.

1             MR. GLENNON:  -- objections in there,

2    Mr. Lappin, please.

3             Form and compound.

4             THE WITNESS:  I disagree with the

5    statement.

6    BY MR. FORGE:

7    Q      Okay.

8    A      I think based on my years of experience,

9    managing facilities in all different levels with all

10   different makeup of inmates, I have the credibility

11   to make that statement and disagree with it.

12   Q      So you don't think that the lack of a

13   Spanish-speaking intelligence officer for a majority

14   of a Spanish-speaking population would negatively

15   affect the intelligence-gathering operation?

16           I'm not saying destroy it; I'm saying, you

17   don't think that would have a negative impact on it?

18           MR. GLENNON:  Objection, form and

19   compound.

20           THE WITNESS:  I can never speak in

21   absolutes, so I -- again, it would be preferred.  It

22   could have a negative effect.

23           But I just have to tell you, inmates

24   come to staff all the time.  They love to tell on

25   other inmates.  How do you think most of the

1    information is gathered?

2              So typically, it's other inmates coming

3    to staff informing them about what's going on in the

4    inmate population.  And if they don't speak English,

5    they bring an English speaking interpreter with

6    them.

7              So that is by which the majority,

8    besides reading mail, listening to phone calls,

9    which is minimal, compared to the amount of

10    intelligence that is gathered by our staff on a

11    daily basis because other inmates come to them and

12    share with them their concerns.

13              Why?  Because they don't want to have a

14    disturbance.  They don't want to be locked down.

15    They want to continue to go to school.  They want to

16    continue to go to work.  They want to continue to

17    use the phone.  They want to continue to have

18    visits.

19              So as a consequence, many inmates, day

20    in and day out, come to us and inform us of what's

21    being discussed within the inmate population.

22              So that is the vehicle by which most of

23    the intelligence is gathered.  And my experience has

24    been that if they don't speak English, they bring

25    someone who can interpret for them and share that

 1    information with the employees of the Bureau of

 2    Prisons whether they're intelligence staff.

 3              In fact, most of that information flows

 4    up through other staff.  Inmates have work detail

 5    supervisors; they work in food service; they work in

 6    mechanical services; they have -- they have

 7    assignments in education.  Oftentimes, they're going

 8    to the staff they know well and share that

 9    intelligence, which then flows up to the

10     intelligence office.

11    BY MR. FORGE:

12    Q       You realize that Paul Kelly was stationed at

13    Adams -- Paul Kelly of the BOP was stationed at

14    Adams at the time of this riot and murder, right?

15    A       Who's Paul Kelly?

16    Q       You don't know who he is?

17    A       I don't.

18    Q       You don't know who the BOP SSIM was at Adams

19    at the time of this riot and murder?

20    A       I did not know --

21              MR. GLENNON:  Object to form.  Object

22    to form.

23              THE WITNESS:  I did not know the names

24    of all the staff at the facilities -- at the

25    BOP-contract facilities.  I did not know the names

1    of all the BOP staff.

2    BY MR. FORGE:

3    Q      At how many BOP-contract facilities did you

4    have a riot and a murder?

5            MR. GLENNON:  Object to form.

6            THE WITNESS:  We had a disturbance at

7    Adams, and we had, unfortunately, one homicide.

8    BY MR. FORGE:

9    Q      A murder, right?

10   A      Yes.

11           MR. GLENNON:  Object to form.

12           THE WITNESS:  Yes.

13   BY MR. FORGE:

14   Q      Right?

15           And you had a number of inmates that were

16   convicted of participating in a riot at that

17   facility, correct?

18           MR. GLENNON:  Same objection.

19           THE WITNESS:  Again, I -- I referred to

20   it as a disturbance, as they do in the after-action

21   report.  But, yes, there were convictions that

22   occurred.

23   BY MR. FORGE:

24   Q      Convictions for participating in a riot,

25   correct?

1          I, the undersigned, a Licensed Court

2   Reporter of the State of Tennessee, do hereby

3   certify:

4          That the foregoing proceedings were

5   taken before me at the time and place herein set

6   forth; that any witnesses in the foregoing

7   proceedings, prior to testifying, were duly sworn;

8   that a record of the proceedings was made by me

9   using machine shorthand, which was thereafter

10  transcribed under my direction; that the foregoing

11  transcript is a true record of the testimony given.

12          Further, that if the foregoing pertains

13  to the original transcript of a deposition in a

14  federal case, before completion of the proceedings,

15  review of the transcript [ X ] was [  ] was not

16  requested.

17          I further certify I am neither

18  financially interested in the action nor a relative

19  or employee of any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21  subscribed my name.

22  Dated: August 3, 2020

23  _____

24  Elisabeth A. Miller Lorenz
    RMR, CRR, LCR No. 66
25  Georgia CR No. 5266-8739-6377-3952

**www.aptusCR.com**

Case 3:16-cv-02267   Document 384-6   Filed 01/22/21   Page 34 of 34 PageID #: 18818