# EXHIBIT 6

Page 1

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE

3

4     NIKKI BOLLINGER GRAE, Individually

and on Behalf of All Others

5     Similarly Situated,

6          Plaintiff,          Civil Action No.

7     vs.                  3:16-cv-02267

8     CORRECTIONS CORPORATION OF

AMERICA, ET AL.,

9

Defendants.

10

_____

11

12     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

13

14     VIDEOTAPED DEPOSITION OF HARLEY G. LAPPIN

15

16     Conducted virtually via remote videoconference

17               October 29, 2020

18

19

20

21

22

23     Reported by:

Misty Klapper, RMR, CRR

24     Job No.: 10073532

25

1    APPEARANCES:
2    (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3    ON BEHALF OF PLAINTIFF:
4         JASON A. FORGE, ESQUIRE
        ROBBINS GELLER RUDMAN & DOWD LLP
5           655 West Broadway, Suite 1900
        San Diego, California 92101
6           (619) 231-1058
        E-mail: jforge@rgrdlaw.com
7
             AND
8
        KENNETH J. BLACK, ESQUIRE
9           ROBBINS GELLER RUDMAN & DOWD LLP
        One Montgomery Street, Suite 1800
10          San Francisco, California 94104
        (415) 288-4545
11          E-mail: kennybrgrdlaw.com
12
   ON BEHALF OF DEFENDANTS AND THE DEPONENT:
13
        BRIAN T. GLENNON, ESQUIRE
14          ERIC CHARLES PETTIS, ESQUIRE
        LATHAM & WATKINS, LLP
15          355 South Grand Avenue, Suite 100
        Los Angeles, California 90071
16          (213) 485-1234
        E-mail: brian.glennon@lw.com
17               eric.pettis@lw.com
18
19   ALSO PRESENT:  WILLIAM GEIGERT
20
21
22
23
24
25

1           P R O C E E D I N G S

2           VIDEO OPERATOR:  Good morning.  We

3      are now on the record.

4           My name is Bill Geigert and I am a

5      videographer with Aptus Court Reporting.

6      Today's date is October 29, 2020 and the

7      time is 10:43 a.m.

8           This deposition is being held via

9      remote Zoom in the matter of Nikki Bollinger

10      Grae versus Corrections Corporation of

11      America, et al.  The deponent today is

12      Harley Lappin.

13           All parties to this deposition are

14      appearing remotely and have agreed to the

15      witness being sworn in remotely.  All

16      appearances have been noted on the

17      stenographic record.

18           The court reporter is Misty Klapper

19      and she will now administer the oath to the

20      witness.

21           MS. REPORTER:  One moment.

22      Whereupon:

23           HARLEY G. LAPPIN,

24      was called for examination, and, after being duly

25      sworn, was examined and testified as follows:

1        MS. REPORTER:  Please proceed.

2       EXAMINATION BY COUNSEL FOR PLAINTIFF

3       BY MR. FORGE:

4      Q.     Good morning, Mr. Lappin.

5      A.     Good morning.

6      Q.     Mr. Lappin, that oath you just took,

7 what does it mean to you?

8      A.     Tell the truth, the whole truth and

9 nothing but the truth.

10      Q.     Now, you've provided sworn testimony

11 before Congress previously, correct?

12      A.     Yes.

13      Q.     You've provided sworn testimony in

14 other settings previously, correct?

15      A.     Yes.

16      Q.     Has that oath always meant the same

17 thing to you as you just told us it means to you

18 today?

19      A.     Yes.

20      Q.     So do you think you're entitled to

21 provide false testimony after taking that oath?

22      A.     No.

23      Q.     Do you think it's a crime to provide

24 false testimony after being sworn in as you were

25 today?

1      personally participated in a review of the

2      vocational programming at a CCA-run BOP prison?

3              MR. GLENNON:  Same objection.

4              THE WITNESS:  Did not participate

5         in a review of vocational training, which

6         was typically conducted with an education

7         review.

8              BY MR. FORGE:

9      Q.    Prior to going on CCA's payroll, were

10      you personally aware of the number of performance

11      deficiencies the BOP had found as to CCA?

12              MR. GLENNON:  Objection, vague,

13         foundation.

14              THE WITNESS:  I was generally aware

15         of deficiencies related to any of the

16         private contract facilities.  Typically

17         had a -- a overview by the assistant

18         director of both correctional programs and

19         administration and a program review

20         division that -- that compiled the

21         statistics of the deficiencies, types of

22         deficiencies, not unlike we did for our

23         own Bureau of Prisons facilities.

24              BY MR. FORGE:

25      Q.    When is the last time you received

1          from the BOP the statistics regarding the

2          deficiencies and types of deficiencies at BOP-run

3          facilities?

4                A.    Sometime prior to April of 2011.

5                Q.    When is the last time you received

6          from the BOP the statistics regarding

7          deficiencies and types of deficiencies that the

8          BOP found regarding CCA's BOP prisons?

9                A.    So I -- I did receive -- once I

10         arrived at CCA, we compiled our statistics based

11         on the reviews that occurred by the Bureau of

12         Prisons and by our own staff.  And so, again,

13         overseeing the correctional operations, I was

14         routinely briefed and we had rigorous discussions

15         about the numbers, types of deficiencies

16         identified by the BOP reviews, as well as

17         internal audits completed by CCA -- CCA auditors.

18               Q.    I wasn't asking you, sir, for the

19         statistics compiled by CCA regarding its own

20         deficiencies.  I was asking you as to when was

21         the last time you received from the BOP the

22         BOP-compiled statistics of the deficiencies and

23         types of deficiencies that the BOP found in CCA's

24         BOP-run facilities.

25                     MR. GLENNON:  Object to form.

1          THE WITNESS:  I -- I'm not sure

2     the --

3          MR. GLENNON:  Object -- Mr. Harley,

4     one second.

5          Just object to form.

6          THE WITNESS:  I'm -- I'm not sure

7     the bureau ever provided a cumulative

8     report on the types and numbers of

9     deficiencies, although we knew what they

10     were because we received the reports and

11     we would compile those for our own

12     internal review.

13          Now, if they did provide those

14     reports, they would have gone to our audit

15     division in CCA, who would have combined

16     those and we would have compared those

17     probably quarterly.

18          So we typically reviewed audit

19     results quarterly and at our operations

20     meetings.  So I -- but I don't recall

21     personally receiving a report from the

22     Bureau of Prisons, a summation of the

23     deficiencies that occurred at the -- as a

24     result of the Bureau of Prisons' audits of

25     our facilities.

1           Could have been a report, but it

2      would have gone to some staff in the audit

3      division and in operations, who would then

4      have combined that with our -- with our

5      review of audit deficiencies that we did

6      quarterly.

7           BY MR. FORGE:

8      Q.    So I think what you're saying is, in

9   response to my question, the last time you would

10   have received the BOP-compiled statistics of the

11   deficiencies and types of deficiencies that the

12   BOP found in CCA's BOP-run facilities would have

13   been prior to when you went on CCA's payroll,

14   correct?

15           MR. GLENNON:  Object to form,

16      foundation.

17           THE WITNESS:  A long question.

18      I'm -- I'm not sure I understand.

19           BY MR. FORGE:

20      Q.    Well, you said that -- you --

21      A.    But --

22      Q.     -- you earlier said that prior to

23   going on CCA's payroll, while you were still

24   employed by the BOP, you would receive as a BOP

25   employee BOP-compiled statistics regarding the

1      deficiencies and types of deficiencies that the

2      BOP found at CCA's BOP-run facilities, correct?

3          A.    As I recall, there was a report that

4      generated -- compiled the deficiencies identified

5      at audits carried out at bureau -- Bureau of

6      Prisons facilities as well as our private

7      contract facilities.

8               And, you know, I -- I don't recall

9      how often that was compiled, but it was one set

10     of statistics that we did review.  And that would

11     have been prior to my leaving the Bureau of

12     Prisons in 2011.

13         Q.    And that's all I'm trying to confirm.

14              You have not received those reports

15     regarding a for-profit prison, such as CCA, since

16     leaving the Bureau of Prisons in 2011, correct?

17              MR. GLENNON:  Objection, vague --

18              THE WITNESS:  Not --

19              MR. GLENNON:  -- form.

20              THE WITNESS:  Not to my knowledge,

21         no.

22              BY MR. FORGE:

23         Q.    It's -- it is -- so what I said is

24     correct?

25              MR. GLENNON:  Object to form.

1          THE WITNESS:  That is correct.

2          BY MR. FORGE:

3      Q.    Have you ever testified as an expert

4    before?

5          MR. GLENNON:  Objection, calls for

6      a legal conclusion.

7          THE WITNESS:  Yes.

8          BY MR. FORGE:

9      Q.    When?

10      A.    I believe it was -- I -- I'm -- I

11    testified as the Bureau of Prisons' expert on the

12    execution protocol, the federal execution

13    protocol carrying out the death penalty in the

14    Bureau of Prisons, probably around 2004 or 2005.

15    I -- I can't remember the date, but it was in the

16    aftermath of the first three federal executions

17    carried out by the Bureau of Prisons in 2001 and

18    2003.

19          So I -- I cannot remember the date.

20    I'm not sure I could remember the year.  I just

21    know that I testified extensively on the Federal

22    Bureau of Prisons' execution protocol and

23    procedures.

24      Q.    When you say you testified

25    extensively, in what forum did you testify

1      what was submitted or what was accepted.

2      So I -- I really -- I really don't know.

3      BY MR. FORGE:

4      Q.    Have you written any reports that set

5 forth any opinions that you may have reached in

6 this case?

7      A.    No.

8      Q.    Have you made any notes related to

9 any opinions you may have reached in this case?

10      A.    No.

11      Q.    Did you personally put in writing any

12 opinions that you may have reached in this case?

13      MR. GLENNON: Objection, vague,

14    form.

15      THE WITNESS: Could you repeat the

16    question?

17      BY MR. FORGE:

18      Q.    Yes.

19      Did you personally put in writing any

20 opinions you've reached in this case?

21      A.    No.

22      MR. GLENNON: Same objection.

23      THE WITNESS: No.

24      BY MR. FORGE:

25      Q.    Did you verbally dictate to anyone

1          the -- any opinions you may have reached in this

2          case?

3                    MR. GLENNON:  Same objections.

4                    THE WITNESS:  No.

5                    BY MR. FORGE:

6          Q.     Did anyone else tell you the opinions

7          they intend for you to give in this case?

8          A.     No.

9          Q.     Did anyone else inform you in any way

10         of the opinions they intend for you to give in

11         this case?

12                    MR. GLENNON:  Objection, vague,

13             form.

14                    THE WITNESS:  No.

15                    BY MR. FORGE:

16         Q.     Are you aware of any opinions that

17         you've reached in this case?

18         A.     I'm not sure I understand what you

19         mean by that.

20         Q.     Have you reached any opinions in this

21         case?

22         A.     I have my own opinions of this case.

23         And those are based on my experience and

24         oversight of the correctional programs or

25         correctional responsibilities at CCA.

1        Q.    Have you shared those opinions with

2    anyone?

3        A.    Only through this deposition.

4        Q.    Other than that, you have not shared

5    them with anyone?

6        A.    Well, I'm -- let's see here.

7            MR. GLENNON:  Mr. Lappin, you --

8            (Crosstalk)

9            MR. GLENNON:  Mr. -- Mr. Lappin,

10        you can answer to the extent it doesn't

11        disclose attorney/client privilege.

12            BY MR. FORGE:

13        Q.    No, I'm -- I'm asking if he shared

14    with anyone.  I'm not asking you to identify

15    anyone.  I'm just asking if you shared with

16    anyone.

17        A.    So I have had very little contact

18    with people other than my attorneys on this case.

19    This -- this all evolved after I retired from

20    the -- or after I left CCA and moved on to the

21    board.

22            So I have shared opinions about some

23    issues related to this case obviously that were

24    work related, but not specifically related to

25    this case.

1        So, I -- I mean, I can't deny we've

2        had conversations about issues related to

3        this case, such as in the aftermath of the

4        Yates memo or some other related issues, but

5        I can't -- don't recall having a -- a

6        conversation with anyone other than my

7        attorneys about -- specific to this case.

8        BY MR. FORGE:

9     Q.     Okay. Now, you said that -- that the

10   opinions you have in this case are based on your

11   experience and oversight of the correctional

12   programs or correctional responsibilities at CCA,

13   correct?

14     A.     Yes.

15     Q.     And your experience and oversight of

16   the correctional programs and correctional

17   responsibilities at CCA was primarily based on

18   communications with other CCA employees, correct?

19       MR. GLENNON: Objection, vague,

20       foundation.

21       THE WITNESS: In part. Granted,

22       I -- as the chief corrections officer, I

23       oversaw a lot of employees, many of whom I

24       relied heavily on for their supervision of

25       the programs and operations applicable to

1        carrying out a quality correctional

2        program.

3            I went out and observed.  I was out

4        in facilities myself, visited, engaged with

5        staff, observed the programs being provided.

6        So it was a combination of the input and the

7        dialogue that occurred between myself and my

8        subordinate supervisors, my vice presidents,

9        the managing directors, the wardens, the

10       associate wardens and line staff that I

11       engaged with over the course of my

12       responsibilities.

13           So I don't believe it was solely

14       based on just information I received from my

15       subject matter experts, but my observation

16       of those programs when I visited those

17       facilities, as well as the review of reports

18       from audits and other evaluations that were

19       conducted over the course of business.

20           BY MR. FORGE:

21       Q.    And by communications, I didn't mean

22       to limit you to just verbal communications.  I'm

23       including in that written communications.

24           So your communicate -- with that

25       understanding in mind, the communications with

1          other employees at CCA, those were the primary

2          source of information upon which you based any

3          opinions you may have formed in this case,

4          correct?

5                    MR. GLENNON:  Objection, vague,

6              form.

7                    THE WITNESS:  I am speaking to my

8              experience applicable to the day-to-day

9              operations.  If you're speaking to the

10              stock drop, completely out of my area of

11              expertise, knowledge.

12                    BY MR. FORGE:

13          Q.    No, I'm not -- I'm assuming you have

14       not rendered any opinion -- you have not -- I'm

15       assuming you have not made any opinions regarding

16       the stock drop, right?

17          A.    None.

18          Q.    Okay.  So that's --

19          A.    Other than -- other than my own.

20          Q.    Other than your own stock drop?

21          A.    Oh, only my own, you know, opinion

22       of, you know, why -- you know, again, as we

23       discussed the last time, first time I'd ever

24       worked for a private company.  It's the first

25       time I've worked with a company that had

1       stockholders and shareholders and so on and so

2       forth and so completely outside my area of

3       expertise.

4              And, granted, involved in some

5       discussions whenever there was a -- some

6       fluctuation in stock, but I was on the periphery.

7       I -- I was not in the -- in the -- in -- a

8       subject matter expert in any way on this issue.

9           Q.    And that's why we're -- we're -- so

10      when we're talking about any opinions you may

11      have formed in this case, I'm talking about

12      opinions that you described earlier regarding

13      corrections services or corrections programs at

14      CCA, okay?

15          A.    Yes.  So my opinions of -- of --

16          Q.    No, I asked you -- I'm not asking for

17      the opinions now.  I'm just asking you to -- if

18      you understand that's the -- those are the types

19      of opinions we're talking about.

20          A.    My opinions applicable to our level

21      of performance, quality of programs, my opinions

22      of the challenges we encountered, all of those

23      issues applicable to the day-to-day operations,

24      my opinions were generated by my communications

25      with my vice presidents, managing directors,

1        other supervisory and subject matter experts, as

2        well as my review of reports and documents and my

3        own observations that I made as I visited our

4        facilities throughout the book of business,

5        throughout the country.

6                    And -- and, I -- I should say,

7        included discussions with partners, without a

8        doubt, partners, my discussions with inmates.

9        All -- all of those interactions influenced

10        obviously my opinion of our performance, quality

11        of performance, the challenges we had.

12                    So many vehicles by which I was

13        gathering information that ultimately would

14        result in my opinion of -- of what we needed to

15        do and what we didn't need to do and -- and how

16        to carry out our day-to-day operations.

17        Q.    Given that broad array of vehicles,

18        to use your term, can you identify any specific

19        communications in particular that had a high

20        degree of influence over your opinions or do they

21        all kind of combine together?

22                    MR. GLENNON:  Objection, vague.

23                    THE WITNESS:  Yeah, I -- I can't --

24        it -- it really depended on the situation

25        and -- and what the issue was.  But I

1          the scale of what Oakdale and Atlanta were,

2          that there were hostages.  I just can't

3          recall them.

4               BY MR. FORGE:

5          Q.     And, again, I'm not asking you to

6     guess about anything today.  So I'm going to go

7     back to my question and then just confirm because

8     you said other than that.

9               Oakdale was not an exclusively low

10     security prisoner facility, correct?

11               MR. GLENNON:  Object to form.

12               THE WITNESS:  Too long ago.  I

13          don't recall.  I know it was a lower

14          security level.

15               BY MR. FORGE:

16          Q.     But your best recollection is that it

17     included some medium security prisoners, correct?

18               MR. GLENNON:  Object to form.

19               THE WITNESS:  Which is typical of

20          most low security prisons, including

21          those -- I mean, there are -- I don't know

22          of any facility, bureau or private, where

23          it is a hundred percent one security

24          level.

25               So even at our private facilities,

1          like Adams, there were some mediums in

2          there.  And they were -- they were allowed

3          to remain there.  So I -- I don't know of

4          any facility that was completely pure low,

5          medium or high.

6             BY MR. FORGE:

7          Q.    Can you identify a single medium

8     security level prisoner who continued to be

9     housed at Adams?

10         A.    Not specifically.

11         Q.    Okay.

12         A.    I'm speaking in -- in a

13    generalization that -- and not just applicable to

14    the private contract facilities.  I'm talking

15    about in the Bureau of Prisons' facilities.  I

16    can't think of a single facility, other than a

17    minimum security facility, where the entire

18    population is purely low, medium or high.

19             There was always a splattering of

20    mediums and some lows, some lows at mediums and

21    some highs at mediums and some mediums at high.

22    So there was -- the majority, vast majority were,

23    but virtually every facility had a splattering of

24    inmates from other security levels.

25             How do I know that?  I was a

1          designator for -- for several years.  I -- we

2          reviewed in the bureau where these discrepancies

3          occurred where we -- we -- we would say we've got

4          too many highs at this medium and we need to find

5          room at highs or we have too many mediums at this

6          low and we need to find room for four -- for more

7          mediums at the medium or high level.

8                   So this was -- this was part of the

9          day-to-day population management that occurred

10         throughout the Bureau of Prisons, no different

11         than the ongoing assessment of how many gangs

12         (sic) members were at facilities.  So gang

13         members are certainly different security levels.

14         That -- that -- that was a population management

15         procedure that was routinely monitored.

16                   So, again, I -- I can't think of a

17         single facility, bureau or otherwise, that the

18         Bureau of Prisons had responsibility for that

19         were purely low security inmates only.

20                   BY MR. FORGE:

21             Q.    Mr. Lappin, we -- we can go till

22         11:00 at night again today if that's your

23         preference, but -- and that's what we're going to

24         do if you continue to give long-winded speeches

25         that aren't responsive to a question.  I'm just

1          going to tell you what -- what just happened

2          here.

3                      I asked you a question and it was can

4          you identify a single medium security level

5          prisoner who continued to be housed at Adams.

6                      You answered not specifically.

7                      I then said okay, and then you went

8          on for literally minutes just talking without a

9          single question being put to you.

10                      So -- look, I appreciate you've got a

11          lot of things you'd like to say about prisons,

12          but I have to get through a certain amount of

13          material here today.  And if you don't allow me

14          to do it, I'm going to have to ask the judge to

15          give me more time to get through it, because I've

16          got, you know, certain questions I need to get

17          your answers on.

18                      And I would really appreciate it if

19          you would just respond to my questions.  You can

20          give your complete response, but it -- it's

21          going -- things will go a lot more smoothly if we

22          take the question-and-answer format as opposed to

23          just talk about whatever comes to mind.

24                      Okay?

25                      MR. GLENNON:  I'm going to object,

1      vague.

2          THE WITNESS:  You know, I -- I'm

3      not sure that -- again, I -- I wasn't the

4      one doing the calculations.  It was

5      outside of my area of expertise and

6      responsibility as far as the details of

7      the financial calculation.  So I -- I'm

8      not sure that some -- those -- those costs

9      were not included.

10          But the -- the -- a cost associated

11      with that, given my personal assessment of

12      the number of people and salaries, would be

13      a drop in the bucket compared to the overall

14      cost of the contract.

15          So don't know for sure if those costs

16      were included or not, but either way, it

17      would -- I am very confident, based on my

18      knowledge of how many people would fall into

19      that category, that the additional cost

20      would be insignificant, unlike if you

21      included the cost of retirement in the

22      Bureau of Prisons cost estimate, which is

23      not included.

24          So there are variations either way.

25      Again, I'm not the expert necessarily on

1          what was in the calculation or what should

2          or shouldn't be, but I -- if it were, I'm

3          confident the additional cost would be very,

4          very small.

5               BY MR. FORGE:

6          Q.    Got it.

7               So I -- I -- I appreciate you

8     clarifying that you're -- you're not the expert.

9     You're not an expert on necessarily what should

10         be in these cost comparison calculations,

11    correct?

12         A.    I -- I don't consider -- I -- I think

13    you've got other people that are -- have more

14    expertise in this area than me.

15         Q.    And, in fact, you don't know what --

16    exactly what components went into any prior cost

17    comparisons between CCA and the BOP, correct?

18              MR. GLENNON:  Objection --

19              THE WITNESS:  Well --

20              MR. GLENNON:  -- form, vague.

21              THE WITNESS:  -- I -- I know that

22         the -- the costs of the contract,

23         obviously, and associated expenses with

24         that I am -- believe we included the

25         expense associated with the staff in the

1          facilities.

2                  But, again, long -- a long time ago,

3          didn't do the calculation, obviously,

4          myself.  I don't know about the -- the

5          support staff in the central office, if

6          those costs were included or not.  But if

7          they were, given how few staff were in those

8          components, the costs spread over the

9          millions and millions and millions of

10          dollars and the up to 30,000 inmates would

11          be insignificant.

12                  BY MR. FORGE:

13          Q.    Again, you don't know what costs were

14     or were not included in any calculations that

15     you've previously considered, correct?

16          A.    No.

17                  MR. GLENNON:  Object -- object to

18          form.

19                  THE WITNESS:  No.

20                  BY MR. FORGE:

21          Q.    So no meaning it's correct you don't

22     know?

23                  MR. GLENNON:  Same objection.

24                  THE WITNESS:  I don't know exactly

25          what costs were included in that

1       calculation, but I know that our staff,

2       who have that expertise, are accessible

3       and on your -- on your list of people to

4       be deposed.

5       BY MR. FORGE:

6       Q.    Okay. But that's not you?

7       A.    That's correct.

8       MR. GLENNON: Object to form.

9       THE WITNESS: That is correct.

10       BY MR. FORGE:

11       Q.    And you don't know whether there was,

12       for example, any attempt to account for the fact

13       that BOP corrections officers have to have a

14       college degree or equivalent experience, whereas

15       CCA corrections officers do not? You don't know

16       if there was any attempt to put a financial

17       figure on that, do you, sir?

18       MR. GLENNON: Object to form.

19       THE WITNESS: So, a Bureau of

20       Prisons correctional officer does not

21       require a degree. The minimum

22       qualifications for a person considered for

23       employment in the Bureau of Prisons, at

24       least through the time I was in the

25       bureau, through and including the time as

1          director, was a high school diploma or

2          equivalent and three years of work

3          experience of any type.

4               BY MR. FORGE:

5          Q.    And that's -- that's back when you

6     were there, right?

7          A.    It was, and I am confident it remains

8     that way today.

9          Q.    But you don't know, because you

10    haven't been in the loop on BOP hiring policies

11    since you left there, correct?

12               MR. GLENNON:  Object to form,

13          foundation.

14               THE WITNESS:  Not specifically, but

15          I have talked to some of the staff about

16          their difficulty hiring employees

17          throughout the Bureau of Prisons, not

18          unlike CoreCivic.  And I can't imagine

19          that they would shrink the pool of

20          candidates by requiring a four-year degree

21          for a correctional officer.

22               BY MR. FORGE:

23          Q.    So, again, you're just talking about

24    your anecdotal conversations with people you

25    happen to have stayed in contact with, right?

1             MR. GLENNON:  Objection, vague,

2         form.

3             THE WITNESS:  Correct.

4             BY MR. FORGE:

5         Q.    So you haven't performed any sort of

6    statistical analysis comparing the value of the

7    qualifications of the average BOP corrections

8    officer to the value of the average

9    qualifications of a CCA corrections officer, have

10    you, sir?

11             MR. GLENNON:  Objection, vague,

12         form --

13             THE WITNESS:  No, I have not.

14             MR. GLENNON:  -- and vague.

15             Go ahead, Mr. Lappin.

16             THE WITNESS:  Sorry.

17             No, I have not.

18             BY MR. FORGE:

19         Q.    And you haven't even reviewed anybody

20    else's cost breakdowns of the BOP compared to CCA

21    in the year 2020, have you, sir?

22             MR. GLENNON:  Objection, form.

23             THE WITNESS:  No.

24             BY MR. FORGE:

25         Q.    And you have not done so in the year

```
 1                  CERTIFICATE OF NOTARY

 2              I, MISTY KLAPPER, the officer before

 3          whom the foregoing deposition was taken, do

 4          hereby certify that the witness whose

 5          testimony appears in the foregoing

 6          deposition was duly sworn by me; that the

 7          testimony of said witness was taken by me in

 8          shorthand and thereafter reduced to

 9          typewriting by me; that said deposition is a

10          true record of the testimony given by said

11          witness; that I am neither counsel for,

12          related to, nor employed by any of the

13          parties to the action in which this

14          deposition was taken; and, further, that I

15          am not a relative or employee of any

16          attorney or counsel employed by the parties

17          hereto, nor financially or otherwise

18          interested in the outcome of this action.

19                  Further, that if the foregoing pertains to

20          the original transcript of a deposition in a federal

21   case, before completion of the proceedings, review

22   of the transcript [ X ] was [  ] was not requested.

23          Dated: November 5, 2020

24                  _____
                    Misty Klapper, RMR, CRR
                    and Notary Public
25
```