# EXHIBIT 8

1          UNITED STATES DISTRICT COURT

2          MIDDLE DISTRICT OF TENNESSEE

3

4      NIKKI BOLLINGER GRAE, Individually
   and on Behalf of All Others

5      Similarly Situated,

6           Plaintiff,          Civil Action No.

7      vs.                  3:16-cv-02267

8      CORRECTIONS CORPORATION OF
   AMERICA, ET AL.,

9

        Defendants.

10

   _____

11

12

13

14        VIDEOTAPED DEPOSITION OF WILLIAM DALIUS

15

16      Conducted virtually via remote videoconference

17              October 28, 2020

18

19

20

21

22

23    Reported by:
   Misty Klapper, RMR, CRR

24      Job No.: 10073531

25

```
1        APPEARANCES:
2        (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3        ON BEHALF OF PLAINTIFF:
4             CHRISTOPHER HAMP LYONS, ESQUIRE
          ROBBINS GELLER RUDMAN & DOWD LLP
5              414 Union Street, Suite 900
          Nashville, Tennessee 37219
6              (615) 244-2203
          E-mail: clyons@rgrdlaw.com
7
                  AND
8
          KENNETH J. BLACK, ESQUIRE
9             ROBBINS GELLER RUDMAN & DOWD LLP
          Post Montgomery Center
10             One Montgomery Street, Suite 1800
          San Francisco, California 94104
11             (415) 288-4545
          E-mail: kennyb@rgrdlaw.com
12
13
14
15       ON BEHALF OF DEFENDANTS:
16            MILTON S. McGEE, III, ESQUIRE
          RILEY, WARNOCK & JACOBSON
17             1906 West End Avenue
          Nashville, Tennessee 37203
18             (615) 320-3700
          E-mail: tmcgee@rwjplc.com
19
                  AND
20
          MORGAN E. WHITWORTH, ESQUIRE
21             LATHAM & WATKINS, LLP
          505 Montgomery Street, Suite 2000
22             San Francisco, California 94111-2562
          (415) 391-0600
23             E-mail: morgan.whitworth@lw.com
24
25       ALSO PRESENT:  DeSHAWN WHITE, VIDEO OPERATOR
```

1              P R O C E E D I N G S

2              VIDEO OPERATOR:  Time on the record

3        is 10:30 a.m. Central Time.  Today's date

4        is October 28, 2020.  My name is DeShawn

5        White of Aptus Court Reporting.  The court

6        reporter today is Misty Klapper of Aptus

7        Court Reporting, located at 600 West

8        Broadway, Suite 300, San Diego,

9        California, 92101.

10              This begins the video-recorded

11        deposition of William Dalius, testifying in

12        the matter of Nikki Bollinger Grae versus

13        Corrections Corporation of America, et al.,

14        pending in the United States District Court,

15        Middle District of Tennessee, Case Number

16        3:16-cv-02267, taken by Zoom video remote

17        conferencing, physical recording in

18        Culpeper, Virginia.

19              The video and audio recordings will

20        take place at all times during this

21        deposition unless all counsel agree to go

22        off of the record.  The beginning and end of

23        each video recording will be announced.

24        Counsel appearances will be on a

25        stenographic record.

1                    The court reporter may now swear in

2            or affirm the deponent.

3                    MS. REPORTER:  One moment.

4        Whereupon:

5                        WILLIAM DALIUS,

6        was called for examination, and, after being duly

7        sworn, was examined and testified as follows:

8                    MS. REPORTER:  You may proceed.

9            EXAMINATION BY COUNSEL FOR PLAINTIFF

10                BY MR. LYONS:

11            Q.    Good morning, Mr. Dalius.  How are

12        you?

13            A.    Good morning.  Doing well.  How are

14        you?

15            Q.    Good.  Thanks.

16                So you -- you recall, I assume, that

17        you -- you had your deposition taken once in this

18        case already, right?

19            A.    That's correct.

20            Q.    And you were under oath in that

21        deposition, right?

22            A.    Correct.

23            Q.    The testimony you gave was -- was the

24        whole truth and nothing but the truth; is that

25        right?

1        but it would have been shortly after I went to

2        work for them.

3             Q.    Did you -- did you use that E-mail

4        address to do consulting work for your other

5        client?

6             A.    No.

7             Q.    So you had a separate E-mail address

8        you used for Keefe Group business?

9             A.    As far as I recall, that's correct.

10       I had a Perimeter Management E -- E-mail account.

11            Q.    But you -- you didn't use the

12       Perimeter Management E-mail account to consult

13       for CCA; is that right?

14            A.    I -- I probably used both.  Once they

15       set my account up, they asked that I utilize the

16       Core- -- or at the time CCA account, so I did.

17            Q.    Now, what was your salary when you

18       started at CCA?

19            A.    My -- when I was consulting or when I

20       went to work for them?

21            Q.    When you went -- when you became

22       employed by CCA.

23            A.    Oh, taxing my memory now.  I don't

24       know the exact number, but it was probably

25       with -- my -- my -- my salary was probably

1      140,000, 150, and then I had potential to make

2      bonuses and stock awards that could be added onto

3      that.

4          Q.    And did you, in fact, make or receive

5      a bonus?

6          A.    I -- I -- I imagine I -- I think I

7      did when I was eligible.  You've got to work a

8      year or whatever -- whatever the criteria was,

9      but I think the first year I was eligible I --

10     I -- I did and I received stock as well.

11         Q.    Did you receive stock when you joined

12     or after?

13         A.    No, after I earned it.  I had to earn

14     it as part of the cycle.

15         Q.    And then you -- you received raises

16     since -- after starting at CCA, right?

17         A.    I -- I changed jobs, yes, sir.

18         Q.    So your compensation stayed the same

19     the whole time you were in a -- a purchasing

20     role; is that right?

21         A.    Say that again, please.

22         Q.    Any -- well, first -- your first role

23     was -- was it managing director of purchasing; is

24     that right?

25         A.    That's correct.

1          Q.     And so your compensation stayed

2     the -- the same for the whole time you had that

3     role; is that right?

4          A.     That -- that's correct.

5          Q.     And then once you became -- well,

6     what was your next role?

7          A.     I was vice president of facility

8     operations, which is my current role.

9          Q.     And so you got a raise with that

10    role; is that right?

11         A.     Yes, sir.

12         Q.     And how much did you make when you

13    first became vice president of facility

14    operations?

15         A.     I think my base salary is around

16    220,000 and then again with potential for bonus

17    and stock options.

18         Q.     And what is it today?

19         A.     It's the same.

20         Q.     Same --

21         A.     It may have -- it may have got

22    percentage increase with inflation.

23         Q.     How much do you -- have you received

24    in bonuses since becoming vice president of

25    facility operations?

1        A.    I don't know the exact amount.  I'd

2    say a couple hundred thousand.

3        Q.    And how much have you received in --

4    in stock awards?

5        A.    Similar.

6        Q.    And are you holding all of the stock

7    awards that you received or you've sold some?

8        A.    I've not sold any.

9        Q.    And so when you say similar, it's --

10    you mean you have roughly couple hundred thousand

11    dollars' worth of CCA stock?

12        A.    I'd say that's in the ballpark, but

13    depending on -- you know, stock has gone down a

14    bit and gone up a bit, so it varies day by day,

15    depending on the rate.

16        Q.    Have you ever testified at trial on

17    behalf of CCA?

18        A.    No, sir.

19        Q.    Other than your deposition in this

20    case, how many times have you testified at

21    deposition?

22        A.    Several over my career.

23        Q.    At -- in your role at CCA.

24        A.    Oh.  That's -- that's the only one,

25    the last time I did it.

1        the -- the appropriations subcommittee, there

2        wouldn't be one, right?

3            A.    It would show up under Harley Lappin.

4            Q.    Got you.

5            A.    Or Kathleen Hawk.

6            Q.    Do you recall my colleague

7        Ms. Radcliffe asking you in your prior deposition

8        whether you had been asked to provide an expert

9        opinion in this case?

10           A.    Vaguely.

11           Q.    Do you recall that you said no?

12           A.    That would have been correct.

13           Q.    Since your prior deposition, have you

14       been asked to provide an expert opinion in this

15       case?

16           A.    If the court deems my testimony to be

17       expert, I can -- certainly with my background and

18       knowledge of 30-plus years correctional

19       experience could be potentially used as a expert

20       in this case, knowing prison operations,

21       financial operations.

22           Q.    When did you first discuss the

23       possibility of your testimony being potentially

24       used as an expert in this case?

25                 MR. MCGEE:  Bill, I just -- you can

1    answer the question.  To the extent that

2    the answer would reveal any communications

3    between you and your counsel, I would

4    advise you not to reveal the substance of

5    those communications.

6         So you -- you can answer --

7         THE WITNESS:  Yeah, so -- so --

8         MR. MCGEE:  -- the question from a

9    timing perspective, but not from

10    substance --

11         THE WITNESS:  It would have been --

12    it would have been recently, sir.

13         BY MR. LYONS:

14    Q.    Could you put a month on it?

15    A.    October.

16    Q.    What -- what expert opinion have you

17    been asked to provide in this case?

18    A.    I've not been asked to provide an

19    expert opinion, but I can provide an expert

20    opinion on both CoreCivic and Bureau of Prisons

21    facility operations, financial operations, things

22    of that matter, considering I've got 30-plus

23    years of correctional experience and obviously a

24    lot of financial experience being the CFO of --

25    of the Federal Bureau of Prisons managing a

1          $7 billion budget.

2                    MR. LYONS:  DeShawn, why don't we

3          go ahead and drop -- excuse me.

4                    Why don't we go ahead and drop the --

5          T1 into the chat box, please.

6                    THE WITNESS:  Can I take the other

7          one down?

8                    MR. LYONS:  Yes, that's fine.

9                    I think -- it looks like that's the

10         same link to tab 4, DeShawn.  Can you -- can

11         you try again with tab 1?

12                   THE WITNESS:  That's what I see as

13         well.

14                   VIDEO OPERATOR:  My apologies.  It

15         should be fixed now.

16                   MR. LYONS:  No problem.  That looks

17         right to me.

18                   MR. MCGEE:  Just so we're clear,

19         Chris, tab -- we should be looking at

20         Defendants' Disclosures Pursuant to the

21         Federal Rule of Procedure 26(a)(2)(C); is

22         that right?

23                   MR. LYONS:  That's right.

24                   MR. MCGEE:  Okay.  Thanks.

25

1           BY MR. LYONS:

2               Q.    Have you seen this document before,

3     Mr. Dalius?

4               A.    Can you just wait one second?  It

5     keeps pulling my prior --

6               Q.    Sure.

7                     If it helps, if you look in the chat

8     box, I think it's the link that -- if you click

9     on the link that ends in 10F.

10              A.    10F.

11              Q.    I don't know if you see that.

12      There's sort of two links there.

13              A.    Okay.  I do.

14              Q.    It's the second one.

15                    MR. MCGEE:  Bill, this document is

16          also in the -- in the binder that my -- my

17          office sent to you today.

18                    THE WITNESS:  I -- I think -- it --

19          it came up.  Thank you.

20                    MR. MCGEE:  Okay.

21                    THE WITNESS:  I'm -- I'm ready,

22          sir.

23                    BY MR. LYONS:

24              Q.    Okay.  So I think my first question

25      was have you seen this document before.

1            THE WITNESS:  Can you hear me now?

2            MR. MCGEE:  Yeah, that's -- that's

3      better, Bill.  I think it just glitched a

4      little bit, so if you want to make the

5      record clean, perhaps we could read back

6      the question and you could start your

7      answer over.

8            MR. LYONS:  Would you mind doing

9      that, please, Misty?

10            MS. REPORTER:  One moment.

11            (Thereupon, the record was read back

12             as requested.)

13            THE WITNESS:  So -- so you want me

14      to respond now?

15            BY MR. LYONS:

16      Q.    Yes, please.

17      A.    Okay.  I'm sorry.

18            I am not medically trained.  I've had

19      the opportunity when I was a warden at the Butner

20      medical complex to oversee medical operations at

21      a -- at -- at the facility where I was a warden

22      at.  So I dealt with a lot of medical issues

23      during that time, but I -- I'm not medically

24      trained.

25      Q.    Did you have medical professionals

1    who were responsible for the actual provision of

2    health care?

3        A.    Yes, sir.

4        Q.    Now, looking at that sentence we just

5    read in Exhibit 589, it says, Mr. Dalius is

6    expected to testify about the BOP's and

7    CoreCivic's operations.

8            For what period do you expect to

9    testify about the BOP's operations?

10       A.    Well, as I stated earlier, sir, I

11   worked for the BOP from 1985 to 2015.  Throughout

12   that time I had been a warden -- assistant

13   warden, warden, assistant director, deputy

14   assistant director.  So I held many roles over my

15   30-year career.

16            So I would base my testimony on my

17   30 years of experience in the BOP, holding and

18   assuming the -- the -- the many different roles

19   that I did.

20       Q.    So you would testify about the BOP's

21   operations during the time you worked there, so

22   1985 to 2015; is that right?

23       A.    That's correct.  And I can generally

24   speak about prison operations today because it

25   hasn't -- prison operations have not changed

Page 59

1      drastically.

2          Q.      And with respect to CCA's operations,

3      you first took an operational role at CCA in --

4      in -- was it July of 2017?

5          A.      It would have been August of 2000 --

6      you mean when I was a vice president?

7          Q.      Yeah.  When did you first take an

8      operation -- well, when did you -- well, your

9      first role at CCA was -- was purchasing, right?

10         A.      That's correct, which reported --

11     in -- in the operations division.

12         Q.      But you didn't have oversight of any

13     prisons in that role, right?

14         A.      Not specific oversight, though we

15     dealt with the, you know, purchasing for all the

16     facilities.

17         Q.      So when did you first have oversight

18     over CCA prisons?

19         A.      That would have been in 2017 when I

20     became vice president.

21         Q.      So for what period do you expect that

22     you would testify about CoreCivic's operations?

23         A.      Well, I've known about CoreCivic's

24     operations even when I worked at the BOP because

25     the -- we -- as -- as I indicated earlier, we

1    considered our private prisons as an extension of

2    BOP prisons.  So I was aware of CoreCivic

3    operations at that time.  And I became probably

4    more intimately aware with daily day-to-day

5    operations when I became a vice president at

6    CoreCivic.

7         Q.    Because you were not intimately aware

8    of day-to-day operations of CCA's prisons when

9    you were the CFO of the BOP, right?

10              MR. MCGEE:  Object to the form of

11         the question.

12              THE WITNESS:  No, sir.  We had

13         staff on-site at all the private

14         facilities that monitored the day-to-day

15         operations.  I would be notified if there

16         were big issues that occurred throughout

17         the facilities, whether it be a BOP

18         facility or a private facility.

19              BY MR. LYONS:

20         Q.    What do you recall about the big

21    issues that you were notified about that occurred

22    at CCA's facilities while you were CFO of the

23    BOP?

24         A.    I don't recall specifically issues,

25    but typically you would be notified of inmate

1              facility or a GEO facility, depending on

2              the magnitude of the issue.

3                    BY MR. LYONS:

4          Q.    Were you, in fact, notified of the

5      cure notice that was issued to -- to CCA with

6      respect to its Cibola prison?

7          A.    When did that occur, sir?

8          Q.    You're the witness, so -- it occurred

9      during your time as CFO.  Do -- but do you recall

10     that happening while you were there?

11         A.    I -- I don't recur (sic) specifically

12     that, no.

13         Q.    Let's see.  How is this?

14              Now, you see under the heading

15     number 2, Summary of Facts and Opinions, where it

16     says, Mr. Dalius may testify -- sorry.

17              You see -- you see the heading, first

18     of all?

19         A.    Yes, sir.

20         Q.    You see where it says, Mr. Dalius may

21     testify that CoreCivic's operational performance

22     was similar to and compared favorably with the

23     BOP's operational performance in the areas of

24     correctional facility management, oversight,

25     staffing, security and relating -- related

1      policies and procedures?

2              Do you see that?

3        A.    Yes, sir.

4        Q.    What's the analysis by which you

5      reached this conclusion?

6        A.    So CoreCivic runs safe, secure

7      prisons, just like the BOP does.  They -- they --

8      their operations are very similar to BOP

9      operations.  They -- they -- the -- probably the

10      major driving -- driver -- difference is the

11      cost.  It's cheaper for CoreCivic to do it than

12      it is for the Bureau of Prisons to do it.

13              But as far as actual prison

14      operations, CoreCivic runs very good prisons, as

15      does the BOP.

16        Q.    Is there some quantifiable objective

17      metric by which you compared the -- the CoreCivic

18      prisons and the BOP prisons?

19        A.    I wouldn't say there's quantifiable,

20      other than I've got 30 years of experience of

21      oversight of prisons, operating prisons.  In the

22      BOP I currently have oversight of 22 to 25

23      prisons in my current role.

24              So I -- I've -- I've been in

25      virtually the majority of the BOP prisons.  I've

1     seen how they operate.  I was an AW at a low

2     security prison that -- that managed criminal

3     aliens, just like CoreCivic does.  And I see very

4     similar operations in both -- both CoreCivic and

5     the Bureau of Prisons.  They both run very good

6     prisons.

7           Q.     But taken as a whole, looking at the

8     BOP body of prisons and the CCA-operated BOP

9     prisons, there are -- there are significant

10    differences between those sets of prisons, right?

11          A.     There are differences.  I would say

12    the CoreCivic prisons are more up to date, more

13    modern, more -- I'd -- I'd say clearly better

14    designs than the older -- because in the Bureau

15    of Prisons what they did with the low security

16    facilities, they were typically old medium secure

17    facilities that they managed down to low security

18    when populations grew.

19               So they're not very efficient.

20    They're not very modern, as -- as it compared to

21    the CoreCivic facilities, most of which are very

22    modern and to the new standards of constructing

23    prisons.

24          Q.     Most but not all of the CCA

25    facilities are --

1          A.    But the vast majority are.

2          Q.    But what about populations?  There

3    are significant differences between the -- the

4    BOP population and the CCA-operated BOP prison

5    population, right?

6          A.    It depends on the facility.  As I

7    indicated before, I was a assistant warden at

8    Fort Dix, New Jersey, where we had a predominant

9    criminal alien population, just like we manage in

10   the -- in the CoreCivic prisons and -- and all

11   the privatization prison include -- to include

12   GEO and MTC, with the exception of -- of the --

13   the District of Columbia inmates.

14             So, no, I -- I wouldn't say they're

15   totally different.  There -- there are similar

16   type prisons in the BOP as are operated by

17   CoreCivic.  And the -- the criminal alien

18   population is a very challenging population to

19   manage because you don't know where they're

20   coming from.  You don't know their background.

21   But you're -- you're dealing with individuals

22   that, you know, as -- as compared to U.S.

23   citizens, where we know a lot about them when --

24   when they come into incarceration.

25         Q.    So at Fort Dix you said it was a -- a

1      predominant criminal alien population.  Was it

2      exclusively criminal alien?

3          A.    No, predominant.  There were -- there

4      were some -- there were some low security U.S.

5      citizens in that facility as well.  It was a huge

6      prison.  It was over 5,000 inmates.  But the --

7      the -- I would say the bulk of the inmates were

8      criminal aliens.

9          Q.    Approximately what percentage were

10     criminal aliens?

11         A.    I -- I don't know the exact

12     percentage, but I would say probably 75 percent

13     maybe.

14         Q.    And in -- in the CCA-operated BOP

15     prisons, 100 percent of the population is

16     criminal aliens, right?

17         A.    That's correct.

18         Q.    So --

19         A.    I'm trying to -- I'm -- there's one

20     facility that was not, but it -- it was not a

21     CoreCivic facility.  There was one that had a

22     external camp.  You could not put criminal aliens

23     outside the fence.

24         Q.    And so all of those -- all the

25     criminal aliens in those prisons, they're all

1          Go ahead, Bill.

2          THE WITNESS:  So, yes, sir.  My --

3       it's not my general sense.  It's my

4       experience and knowledge of both CCA and

5       CoreCivic working for both components that

6       I'm able to do that.

7          BY MR. LYONS:

8       Q.    There's no specific metric that

9    you're using, right?

10      A.    No, just 34 years of experience.

11      Q.    So if you wanted to, like, put up a

12   chart to show the jury how CCA prisons compare to

13   BOP-operated prisons, there's no -- there's no

14   way you could put your analysis in a chart, is

15   there?

16          MR. MCGEE:  Object to the form of

17       the question.

18          THE WITNESS:  Again, sir, it would

19       depend on what analysis you're looking

20       for.  But if you're looking at overall

21       operational standards, the standards are

22       similar for both BOP and CoreCivic.

23          BY MR. LYONS:

24      Q.    Did you perform any sort of

25   statistical analysis comparing the CCA-operated

1        prisons to the BOP-operated prisons?

2            A.    No, sir.

3            Q.    Did you perform any written analysis

4        of the operational performance of CCA prisons

5        compared to BOP-operated prisons?

6            A.    Years ago, when I first -- when I was

7        a consultant, I prepared a financial analysis.

8            Q.    And was that analysis of operational

9        performance or of costs?

10           A.    Strictly costs.

11           Q.    Is there any sort of scoring system

12       that you could use or you have used, rather, to

13       compare the operational performance of CCA

14       prisons to BOP prisons?

15               MR. MCGEE:  Object to the form of

16           the question.

17               THE WITNESS:  There is no scoring

18           system that I have.

19               BY MR. LYONS:

20           Q.    Is there any system that you use to

21       compare CC -- CCA-operated prisons to

22       BOP-operated prisons that someone other than you

23       objectively could -- could test or verify your

24       conclusions?

25               MR. MCGEE:  Object to the form of

1        the question.

2             THE WITNESS:  My cost analysis was

3        very clear, which showed CoreCivic

4        operations are much cheaper than BOP

5        operations.

6             BY MR. LYONS:

7        Q.    I'm asking you about operational

8    performance.

9             Is there any -- is there any system

10   that somebody objective could use to compare

11   CCA's operational performance to -- you know, at

12   the CCA-operated BOP prisons to BOP's operational

13   performance at the BOP-operated prisons?

14            MR. MCGEE:  Object to the form of

15        the question.

16            THE WITNESS:  There's -- there --

17        there is nothing that I personally

18        developed.

19            BY MR. LYONS:

20       Q.    And nothing that you used either,

21   right?

22       A.    In my analysis of -- of -- I mean,

23   I -- I've used my -- as I indicated before, I can

24   walk in a prison and fairly quickly walk the

25   compound, get a feel for the compound, how safe

1    the compound is based on inmates communicating

2    with you and staff communicating with you, is the

3    place clean, does the food taste good.

4                I mean, those are the types of things

5    that I base my analysis on.

6          Q.     So if somebody else wanted to come in

7    and attempt to replicate your analysis, they

8    would have to walk in to the same places and just

9    see if they had the same feeling?

10               MR. MCGEE:  Object to the form of

11          the question.

12               THE WITNESS:  The answer to that

13          would be if you had somebody that's got

14          35 years in corrections, they could do the

15          similar thing that I do.  The -- the

16          difference being is the majority of the

17          folks that would -- could do that,

18          they're -- they're rare because I've got

19          the -- the -- the luxury of having a

20          financial background, as well as an

21          operations background, to be able to

22          evaluate facilities.

23               BY MR. LYONS:

24          Q.     To your knowledge, is there any

25    academic literature that supports assessing the

1    relative performance of a private prison operator

2    by trying to compare to -- to dissimilar BOP

3    facilities as opposed to comparing performance to

4    similarly -- similarly situated private

5    operators?

6         MR. MCGEE:  Object to the form of

7      the question.

8         THE WITNESS:  There was a --

9      when -- when the BOP initially got into

10      privatization, there was some study done

11      back either the late '80s or early '90s, I

12      don't remember who it was, and it

13      basically, I think, was inconclusive.

14      Basically saying that private prisons ran

15      as comparable to BOP prisons.

16         BY MR. LYONS:

17      Q.    Was it inconclusive or it -- or it

18    reached the conclusion that you just described?

19      A.    When I say inconclusive, I think

20    there were -- I -- again, I -- that was 30 years

21    ago, so I -- I'm -- I'm taxing my memory to go

22    back and figure out what the -- but that was a

23    study that was done years and years ago.

24      Q.    Who authored that study?

25      A.    I don't know the answer to that.

1          Q.    Is there any academic literature that

2      supports assessing the relative performance of a

3      for-profit prison operator by trying to

4      compare -- well, by ignoring all of the

5      unfavorable performance criteria we just

6      discussed, such as significant findings, riots,

7      repeat deficiencies?

8              Is there any academic literature that

9      supports comparing private to government prisons

10      without looking at all of those factors?

11              MR. MCGEE:  Object to the form of

12          the question.

13              THE WITNESS:  Not that I'm aware

14          of.

15              BY MR. LYONS:

16          Q.    To your knowledge, has anybody else

17      ever performed an analysis like -- like you have

18      apparently performed to compare operational

19      performance of private prisons and government

20      prisons?

21              MR. MCGEE:  Object to the form of

22          the question.

23              THE WITNESS:  I -- I don't know if

24          there's anybody else that's done that.

25

1          BY MR. LYONS:

2      Q.     Other than for -- for this case, do

3   you have any experience assessing the relative

4   performance of a for-profit prison operator by

5   trying to compare to BOP-operated prisons?

6          MR. MCGEE: Object to the form of

7     the question.

8         THE WITNESS: Just the cost

9    analysis that we had done and we did every

10    year.

11          BY MR. LYONS:

12      Q.     So not -- you don't have any

13   experience, other than for this case, comparing

14   the operational performance of CCA-operated

15   prisons or any private prison company-operated

16   prisons to BOP-operated prisons, right?

17          MR. MCGEE: Object to the form of

18     the question.

19         THE WITNESS: Other than ongoing

20    operational performance in the Bureau of

21    Prisons and program review teams and teams

22    that went out and assessed, but no -- no

23    third party that I'm aware of.

24          BY MR. LYONS:

25      Q.     And no -- no actual comparison by you

1      either, right?

2          A.    I have not done a comparison, other

3      than my being in and out of prisons and

4      understanding how prisons operate.

5          Q.    To your knowledge, are there any

6      classes that teach what you've done to compare

7      the operational performance of CCA to the

8      operational performance of BOP-operated prisons?

9      Are there any classes that teach that method as a

10      sound methodology?

11              MR. MCGEE:  Object to the form of

12          the question.

13              THE WITNESS:  Not that I'm aware

14          of.

15              BY MR. LYONS:

16          Q.    To your knowledge, are there any

17      textbooks or treatises that embrace your methods

18      as reliable?

19              MR. MCGEE:  Object to the form of

20          the question.

21              THE WITNESS:  Not that I'm aware

22          of, but there are a lot of criminal

23          justice classes out there I may use.

24              BY MR. LYONS:

25          Q.    To your knowledge, are there any --

1　　is there any publication that's ever published an

2　　article applying the methodology you used to

3　　compare CCA's operational performance to BOP's

4　　operational performance?

5　　　　　　MR. MCGEE:  Object to the form of

6　　　the question.

7　　　　　　THE WITNESS:  Not that I'm aware

8　　　of.

9　　　　　　BY MR. LYONS:

10　　　Q.　　To your knowledge, has any court ever

11　　ruled that the methodology you used to compare

12　　CCA's operational performance to the BOP's

13　　operational performance is admissible in

14　　evidence?

15　　　　　　MR. MCGEE:  Object to the form of

16　　　the question.

17　　　　　　THE WITNESS:  Not that I'm aware

18　　　of.

19　　　　　　BY MR. LYONS:

20　　　Q.　　So the methodology you used is --

21　　hasn't been tested by anybody else, has it?

22　　　　　　MR. MCGEE:  Object to the form of

23　　　the question.

24　　　　　　THE WITNESS:  I -- I don't know.

25　　　This is the first time I've testified.

1          BY MR. LYONS:

2          Q.     Did you consider any documents in

3     forming your opinions with respect to the

4     comparison of CCA's operational performance to

5     the BOP's operational performance?

6          A.     Not that I'm aware of.  I -- I mean,

7     I -- I -- again, I -- I -- I -- I base my

8     analysis of the operations on actual hands-on

9     being in the facilities, seeing what they're

10    doing, both in my previous 30 years in the Bureau

11    of Prisons and my four years at CoreCivic.  That

12    give -- gives me the ability to assess how

13    facilities are operating.

14         Q.     But so there's -- there's no document

15    that you could -- you could hand to me and say

16    look here, here's a document that shows that

17    CCA's operational performance was similar to and

18    compared favorably with the BOP's operational

19    performance, right?

20         A.     I -- I don't have a document.  The

21    BOP may have documents from their program reviews

22    where -- where they assess.  If you look at all

23    the BOP program reviews and the -- the reviews

24    that are done of the privatization companies,

25    they may have documents that would -- that would

1        give that comparison for you in addition to

2        having expertise review facilities.

3            Q.    So they may have those documents, but

4        you don't -- if they exist you don't have them,

5        right?

6            A.    I -- I would have any document --

7        or -- or I -- I would have had access to a

8        document.  I don't have any documents personally,

9        but at -- at CoreCivic I would have had access to

10        whatever reviews were done.

11            Q.    But you didn't actually, like, look

12        at those -- the types of documents that you're

13        describing to -- to perform some comparison of

14        CCA's operational performance to the BOP-operated

15        prisons' operational performance, did you?

16            A.    Not specifically.

17            Q.    Is there anything you're relying on

18        for that, other than your memory of the

19        performance of BOP prisons?

20                MR. MCGEE:  Object to the form of

21            the question.

22                THE WITNESS:  No, sir.  But

23            30 years of working in the BOP, I've --

24            I've had a lot of --

25                (Remote transmission interference)

1       whether contract performance complies with

2       contractual requirements outside of this

3       litigation?

4           A.    No, sir.

5           Q.    So what expertise do you have in

6       connection with judging whether contract

7       performance complies with contractual

8       requirements?

9           A.    Well, as --

10              MR. MCGEE:  Object to the form of

11          the question.

12              THE WITNESS:  As I've stated

13          earlier, I've got 30-plus years in the

14          Bureau of Prisons of overseeing

15          facilities.  I've got four years at

16          CoreCivic overseeing facilities.  I've

17          communicated with hundreds, maybe

18          thousands, of staff over the years in

19          correctional facilities, understand how

20          correctional operations work.

21              I used to train wardens in -- in --

22          in my previous roles in the BOP.  So I -- I

23          believe I've got the expertise to evaluate

24          correctional operations, both -- whether it

25          be BOP or CoreCivic.

1            BY MR. LYONS:

2            Q.    Did you -- did you train wardens as

3       to compliance with contractual requirements

4       between the BOP and CCA?

5            A.    I did not.  I trained wardens

6       specifically on cost-related items, budget-type

7       related items and any issues that they would

8       bring forward in questions.

9            Q.    Did you personally conduct contract

10      facility monitoring for the BOP?

11           A.    No, sir.  I had procurement staff

12      that monitored facilities in the prisons that

13      worked for me.

14           Q.    Are you -- are you better at judging

15      compliance with contractual requirements than the

16      procurement staff that monitored facilities in

17      the prisons?

18                MR. MCGEE:  Object to the form of

19           the question.

20                THE WITNESS:  I -- I don't know

21           that I'm better, but I've certainly got

22           the experience to monitor facility

23           operations, whether it be CoreCivic or

24           BOP.  Having been a warden, worked in

25           facilities, had oversight of

1       122 facilities, communicated with hundreds

2       of wardens throughout my career, I've got

3       a pretty good understanding of -- of

4       facility operations.

5              BY MR. LYONS:

6          Q.     So if I wanted to assess a private

7       prison operator's compliance with contractual

8       requirements, wouldn't it be a reasonable way to

9       do it to look at the actual reports generated by

10       the procurement staff that were involved in

11       contract facility monitoring?

12          A.     That would be one phase of a review.

13          Q.     What other phases would there be?

14          A.     Well, not only do you have

15       contracting staff, you've got operational staff

16       that are in the facilities.  You have people like

17       me that walk around the facilities, talk to

18       inmates, get inmate -- figure out the inmate

19       morale, staff morale, things like that that

20       occurred that are -- you're not going to find

21       in -- on many of the reports.

22          Q.     And who -- who made the actual

23       determination as to any particular private prison

24       whether or not a facility was being operated in

25       compliance with contractual requirements?

Page 117

1        A.    Ultimately the contracting officer.

2        Q.    Were you ever a contracting officer?

3        A.    I was in CoreCivic.

4        Q.    But not in the BOP, right?

5        A.    No, sir, I did not hold a warrant.

6        Q.    And in CoreCivic you didn't make the

7   determination as to whether CoreCivic was

8   complying with its contractual requirements, did

9   you?

10       A.    No, I was -- I did purchasing of

11   products and services.  But I supervised

12   procurement staff for 10 years in my previous

13   roles.

14       Q.    Now, the same sentence we were just

15   reading also says, Mr. Dalius may also testify

16   about CoreCivic's compliance with third-party

17   standards.

18            Do you see that?

19       A.    Yes, sir.

20       Q.    What third-party standards are you

21   referring to here?

22       A.    Things like ACA and PREA, like we

23   mentioned earlier.

24       Q.    And have those third parties, the ACA

25   or PREA or any others, given you authority to

1         Q.    Is there a document somewhere that

2    shows somebody telling you that we are awarding

3    this contract to GEO instead of CCA exclusively

4    because of the housing of multiple populations?

5         A.    I don't know the answer to that.

6    Could be.  Don't know.

7         Q.    And if Mr. Hininger told CCA's board

8    of directors that one of the two reasons that the

9    CCA proposal for requirement A was unsuccessful,

10   was -- in the past performance section of our

11   proposal, concerns about our performance in

12   medical services at our Cibola, New Mexico and

13   Eden, Texas facilities were raised, was he

14   misleading the CCA board of directors?

15            MR. MCGEE:  Object to the form of

16       the question.

17            THE WITNESS:  I -- I can't speak

18       for Mr. Hininger.  I'm not sure what he

19       told the board of directors.

20            BY MR. LYONS:

21       Q.    Looking back at Exhibit 589, the

22   penultimate sentence, you see it begins with

23   Mr. Dalius may also testify that CoreCivic

24   delivers comparable correctional services at a

25   lower cost than the BOP and describe the various

1       cost components supporting that opinion?

2               A.    Yes, sir, I see that.

3               Q.    Do you plan to give that testimony?

4               A.    Yes, sir.

5               Q.    What are the cost components you plan

6       to testify about in that regard?

7               A.    I -- I can tell you the major drivers

8       and the difference between cost between CoreCivic

9       and the BOP are the BOP does not include capital

10      expenditures.  So if they go build a $350 million

11      low security prison, that is not included in

12      their daily per capita that they publish to the

13      Congress.

14                    BOP pensions from retirees are not

15      included in the BOP per capita.  They -- they

16      average national -- what they would call

17      national-type expenses that are, like, phone and

18      postage and things that are captured nationally

19      and prorate that across the system.  So it

20      could -- could -- could be off a little bit by

21      those areas.  But the major drivers are the CapEx

22      things and any -- any -- when I say CapEx, the

23      construction of the facilities themselves is not

24      included, any major -- any major renovations over

25      $10,000 would not be included in their

1    per capita, whereas with CoreCivic, we have to

2    include those in our costs.  I mean, that's

3    what -- we've -- we've got to maintain -- we've

4    got to cover all of our cost of operations in

5    order to function.

6              So there -- there's -- there's a -- a

7    multitude of things that the BOP omits.  If they

8    have a riot in a facility, they take those

9    expenses out against that facility.  Say they had

10   a riot in a low security facility.  They would

11   exclude those.  If they've got a major medical

12   catastrophic -- say a guy had a heart attack,

13   went downtown and it cost 300,000 to fix the

14   heart attack or an inmate put on a med that cost

15   several hundred thousand, they -- they exclude

16   those costs.

17             And I know that because I developed

18   the per capita for the Bureau of Prisons when I

19   worked in budget execution.  So it's -- it's

20   it's really -- you can make an apples-and-apples

21   by adding those things back into BOP's

22   per capita, but the -- clearly the cost for

23   CoreCivic is much lower than it is for the BOP.

24        Q.    Are there any other cost components

25   that you plan to testify about?

1          A.     They would be the major components

2     that -- that have the biggest impact on -- on the

3     differences.

4          Q.     So any other components you don't

5     think would have a material impact?

6          A.     They would have the most material

7     impact.

8          Q.     Can you think of any others that

9     would have a material impact?

10          A.     Not as material as those, but the --

11     the pension and the -- the -- the construction of

12     the actual facilities and the repairs and

13     maintenance of anything over $10,000 are -- are

14     huge components of the cost factors.

15          Q.     And then what about on the CCA side

16     of the equation?  What costs do you include?

17          A.     Well, that's a given because BOP

18     knows exactly what they're paying for the

19     per diem.  So they're all -- they're all

20     included.  When we bid on a job, we've got to

21     include all of our costs.

22          Q.     So the only cost to the government of

23     CCA operating a BOP prison is a per diem that the

24     government pays to CCA; is that your testimony?

25          A.     That's correct.  That's correct.

William Dalius

Grae vs.
Corrections Corporation of America, et al.

```
 1                  CERTIFICATE OF NOTARY

 2              I, MISTY KLAPPER, the officer before

 3         whom the foregoing deposition was taken, do

 4         hereby certify that the witness whose

 5         testimony appears in the foregoing

 6         deposition was duly sworn by me; that the

 7         testimony of said witness was taken by me in

 8         shorthand and thereafter reduced to

 9         typewriting by me; that said deposition is a

10         true record of the testimony given by said

11         witness; that I am neither counsel for,

12         related to, nor employed by any of the

13         parties to the action in which this

14         deposition was taken; and, further, that I

15         am not a relative or employee of any

16         attorney or counsel employed by the parties

17         hereto, nor financially or otherwise

18         interested in the outcome of this action.

19              Further, that if the foregoing pertains to

20         the original transcript of a deposition in a federal

21    case, before completion of the proceedings, review

22    of the transcript [ X ] was [  ] was not requested.

23         Dated: November 4, 2020

24                             _____
                               Misty Klapper, RMR, CRR
                               and Notary Public
25
```

www.aptusCR.com