# EXHIBIT 9

1           UNITED STATES DISTRICT COURT

2           MIDDLE DISTRICT OF TENNESSEE

3                  - - -

4    NIKKI BOLLLINGER GRAE,           )
Individually and on Behalf of    )

5    All Others Similarly Situated,   )

                          )

6              Plaintiff,    )    Case No.

                      )

7        vs.                  )  3:16-cv-02267

                      )

8    CORRECTIONS CORPORATION OF      )
AMERICA, et al.             )

9                      )

         Defendants.    )

10    _____)

11

12

13              CONFIDENTIAL

14           FRIDAY, OCTOBER 23, 2020

15           VIDEOTAPED DEPOSITION OF

16           DONALD WILLIAM MURRAY, JR.

17           VIA REMOTE VIDEOCONFERENCE

18

19

20

21

22

23    Stenographically Reported by:
Victoria L. Valine, CSR, RMR, CRR, RSA

24    California CSR License No. 3036

25    Job No. 10073530

```
1              REMOTE APPEARANCES:
2
3     FOR PLAINTIFF:
4          ROBBINS GELLER RUDMAN & DOWD LLP
      Attorneys at Law
5           BY:  Kenneth J. Black, Esq.
           Willow E. Radcliffe, Esq.
6           Post Montgomery Center
      One Montgomery Street, Suite 1800
7           San Francisco, California  94104
      415.288.4545   FAX:  415.288.4534
8           kennyb@rgrdlaw.com
9          ROBBINS GELLER RUDMAN & DOWD LLP
      Attorneys at Law
10          BY:  Christopher M. Wood, Esq.
      414 Union Street, Suite 900
11          Nashville, Tennessee  37219
      800.449.4900   FAX:  615.252.3798
12          cwood@rgrdlaw.com
13    FOR DEFENDANTS:
14          LATHAM & WATKINS LLP
       Attorneys at Law
15           BY:  Brian T. Glennon, Esq.
           Eric C. Pettis, Esq.
16            355 South Grand Avenue, Suite 100
      Los Angeles, California 90071-1560
17            213.891.7786
      brian.glennon@lw.com
18
19
20
21    Videographer:  David Campbell
22
23      (All parties appeared remotely via videoconference.)
24
25
```

1        UNITED STATES DISTRICT COURT

2        MIDDLE DISTRICT OF TENNESSEE

3        - - -

4    NIKKI BOLLLINGER GRAE,      )
Individually and on Behalf of    )

5    All Others Similarly Situated,    )

                )

6        Plaintiff,    )    Case No.

                )

7     vs.            )   3:16-cv-02267

                )

8    CORRECTIONS CORPORATION OF      )
AMERICA, et al.          )

9             )

      Defendants.    )

10 _____)

11

       --o0o--

12

13       BE IT REMEMBERED, that on Friday, October 23,

14   2020, commencing at the hour of 10:42 a.m. Central

15   Daylight Time thereof, all parties appearing via Zoom

16   videoconference, before me, Victoria L. Valine,

17   Certified Shorthand Reporter of the State of California,

18   appeared

19       DONALD WILLIAM MURRAY, JR.

20   called as a witness by the Plaintiffs, who, being by me

21   remotely sworn, was thereupon examined and interrogated

22   as hereinafter set forth.

23        --o0o--

24      THE VIDEOGRAPHER:  The time on the record is

25   10:42 a.m. Central Time.  Today's date is

Page 8

1  October 23, 2020.

2  My name is David Campbell of Aptus Court

3  Reporting.

4  The Court Reporter today is Victoria Valine of

5  Aptus Court Reporting located at 600 West Broadway,

6  Suite 300, San Diego, California, 92101.

7  This begins the video recorded deposition of

8  Don Murray testifying in the matter of Nikki Bollinger

9  Grae versus Corrections Corporation of America, et al.

10  This is pending in the United States District Court

11  Middle District of Tennessee.  Case number

12  3:16-cv-02267.

13  This is a remote Zoom video deposition.  The

14  video and audio recordings will take place at all times

15  during this deposition unless all counsel agree to go

16  off the record.  The beginning and end of each video

17  recording will be announced.

18  At this time the attorneys will please

19  announce themselves for the record, after which the

20  Court Reporter will please swear in the witness and we

21  can proceed.

22  MR. BLACK:  Good morning.  This is Kenneth

23  Black from Robbins Geller Rudman & Dowd for the

24  plaintiffs.

25  MS. RADCLIFFE:  Good morning.  Willow

1   Radcliffe from Robins Geller Rudman & Dowd for the

2   plaintiff.

3       MR. GLENNON:  Good morning.  Brian Glennon and

4   Eric Pettis of Latham & Watkins on behalf of the

5   defendants and the witness.

6       CERTIFIED STENOGRAPHER:  Good morning.

7       My name is Victoria Valine.

8       I'm a Certified Shorthand Reporter with

9   California License No. 3036.  I also hold the National

10   Court Reporters Association's nationally recognized

11   certifications of Registered Merit Reporter and

12   Certified Realtime Reporter.

13       I am the deposition officer for today's

14   deposition.  This proceeding will be stenographically

15   reported by me.

16       All parties in today's deposition will be

17   appearing remotely to comply with the guidance of the

18   Centers for Disease Control in response to the COVID-19

19   pandemic occurring in our country at this time.

20       Before we proceed, I will ask counsel to

21   stipulate on the record that we are proceeding according

22   to Rule 30 of the Federal Rules of Civil Procedure, and

23   that this deposition officer may swear in the deponent

24   even though I am not in the physical presence of the

25   deponent, and that there is no objection to that at this

1    time, nor will there be an objection to it at a future

2    date.

3         Please indicate your agreement by stating your

4    name and agreement on the record, after which, I will

5    swear in the witness.

6         MR. BLACK:  This is Kenneth Black, so

7    stipulated and agreed to.

8         MR. GLENNON:  Brian Glennon, so stipulated.

9         CERTIFIED STENOGRAPHER:  Raise your right

10   hand, please.

11        Do you solemnly swear the testimony you are

12   about to give will be the truth, the whole truth, and

13   nothing but the truth, so help you God?

14        THE WITNESS:  I do.

15        CERTIFIED STENOGRAPHER:  Thank you.  Counsel,

16   you may proceed.

17                    EXAMINATION

18   BY MR. BLACK:

19     Q.   Good morning, Mr. Murray.

20        Thank you for being here this morning.  As we

21   just went over, my name is Kenny Black.  I'm here from

22   the law firm of Robbins Geller Rudman & Dowd.  I

23   represent the plaintiff in this matter.

24        Can you please state your full name, phone

25   number, and home address for the record?

1      A.  Sure.  Good morning Mr. Black.

2           My name is Donald William Murray, Jr.

3           My home address is ███████████,

4    Nashville, Tennessee 37204.

5           My telephone number is ███████████.

6      Q.  Thank you.  Mr. Murray, have you been deposed

7    before?

8      A.  In relation to this case or deposed generally?

9      Q.  Let's start have you been deposed before ever?

10     A.  Yes.

11     Q.  Okay.  About how many times?

12     A.  I don't know.  I would have to go back and

13   count, but a number of times.

14     Q.  Would you say more than ten?

15     A.  I would say probably 10 to 12 times would be

16   accurate.

17     Q.  Have you been deposed in this matter before?

18     A.  No, I have not.

19     Q.  Have you been deposed in a securities matter

20   before?

21     A.  No.

22     Q.  Have you been deposed as an expert witness

23   before?

24     A.  Um -- yes, I have.

25     Q.  Can you describe -- first, how many times have

1    know, treatment, and discussion with the Court.

2            Competency, responsibility, a number of those

3    issues that were asked -- posed to us as a result of

4    opinions we were asked to provide on behalf of what the

5    Court may wish to consider in better managing these

6    cases, and how best to classify them, and how best to

7    enroll them in treatment programs or -- and again

8    post-conviction dispensation in terms of how the courts

9    manage those cases.

10    Q.  Are you a medical doctor?

11    A.  No, sir, I'm not.

12    Q.  Can you describe your degree from the

13    University of West Virginia?

14    A.  Yes.  My degree there is an EDD, because my

15    degree granting institution largely granted an EDD in

16    that program of study.

17    Q.  And can you describe what an EDD is?

18    A.  It's considered a doctor of education.

19    Q.  And do you have a specialty within your doctor

20    of education?

21    A.  I have a very strong research background as

22    well in that particular area.  Adult learning is an area

23    that we have focused on.

24            I did a lot of work in an academic setting.

25    In fact, was an instructor of psychology at West

1    Virginia Wesleyan for a number of years.

2          Also taught a number of courses at West

3    Virginia University, as most research associates do.

4    And so the -- those are probably my key specialty areas

5    within that.

6       Q.   Okay.  And then after -- after your education,

7    you mentioned some jobs you had.

8          Can you describe the jobs you had -- or

9    list -- can you just list the jobs you had between --

10      A.   Sure.

11      Q.   -- education and the BOP?

12      A.   Certainly.

13         Between my educational completion of my

14   doctorate and when I first joined the Federal Bureau of

15   Prisons, is that the question, Mr. Black?

16      Q.   Yes, please.

17      A.   I was an assistant -- going to be an Assistant

18   Professor of Psychology at West Virginia Wesleyan and an

19   opportunity emerged at the Federal Bureau of Prisons at

20   the facility in Lake Placid, New York -- actually it was

21   in Ray Brook, New York which is approximately eight

22   miles from Lake Placid.

23         There was a staff clinical psychologist

24   entry-level position available.  I applied for that

25   position, decided to leave the academic setting and get

1    into a clinical setting and had this opportunity.

2       And so I left West Virginia Wesleyan to take

3    that staff clinical position at Ray Brook, New York.

4    Ray Brook, New York, incidentally was the site of the

5    former Olympic Village for the 1980 Winter Olympics, and

6    it was turned into a -- converted to a federal prison,

7    and we were among the first staff shortly thereafter to

8    open that facility, a medium security facility in

9    upstate New York.

10       I stayed there for -- I was promoted after a

11    year to the chief psychologist position, and then did a

12    lot of work in the substance abuse treatment unit, and

13    then moved into the chief's role at the facility -- a

14    small psychology department -- and we had, I think, a

15    total of three positions to manage slightly less than a

16    thousand inmate bed capacity facility.

17       In 1984, about a year and a half after being

18    promoted to the chief psychologist, I moved to

19    Seagoville, Texas -- which is a suburb of Dallas -- to a

20    similar, but somewhat larger facility, and assumed the

21    chief's role at that location, and stayed there for

22    approximately five years serving to provide oversight of

23    the department at that time.

24       After -- in 1989, again approximately five

25    years after moving to Texas, I was selected as the

1    national drug abuse program coordinator for the Federal

2    Bureau of Prisons -- excuse me -- and then relocated to

3    Washington, D.C. where I officed at 1st and D for

4    approximately just under three years.

5            That was a role in which basically I provided

6    a leadership to the new substance abuse treatment

7    efforts, basically agency-wide.  What we did at that

8    point was to develop a series of treatment initiatives

9    that were responsive to a significant substance abuse

10   problem that we noted was impacting -- not unlike today,

11   was impacting many of the offenders that were receiving

12   care in our custody.

13           I had a great privilege of leading that

14   initiative on behalf of the bureau, and did so for

15   approximately three years.  We developed a program of

16   intake screening, and then outpatient treatment so to

17   speak -- not outpatient where they walked out the gates

18   understand, but outpatient where they were not enrolled

19   in a formal dedicated residential drug abuse treatment

20   unit or RDAP program.

21           So we basically developed a RDAP program with

22   very detailed treatment protocols in place, relied on

23   individualized testing and specialty programming based

24   on the results of those testing.  And not making the

25   mistake that many other treatment programs, I believe,

1　had made in the past that, you know, all substance

2　abuses are the same and only one model works.

3　　　　So we really refined our approach to the

4　treatment work that we were doing, and I think our

5　treatment outcomes were very positive as a result of

6　that. So that was a wonderful period of time in terms

7　of the opportunities that I had to help lead the agency

8　in this important new direction from a treatment

9　perspective. And assured that the large number of

10　inmates in our care and custody were having an

11　opportunity to receive treatment.

12　　　　In 1990 -- I believe 1991 -- I'm sorry, I'd

13　have to refresh my dates, but late 1991 I had an

14　opportunity to move back to Texas in another position as

15　the regional psychology services administrator for the

16　south central region of the United States, where we had

17　approximately 20 different facilities in, I believe,

18　five or six different states.

19　　　　But my role and responsibilities were

20　different in the sense that I had total responsibility

21　for all psychological services and treatment provided to

22　include substance abuse programming for -- in -- as a

23　result of that position.

24　　　　I held that position until my retirement. My

25　wife was a native of Texas, and although we enjoyed our

1    to refresh my memory specifically, but I believe I saw

2    the opportunity posted, and decided to apply for the

3    opportunity.

4         I had just left the bureau -- or was

5    contemplating leaving the agency for a number of months,

6    having reached retirement eligibility.  So I began to

7    look at other, you know, opportunities both within the

8    private correction arena and other areas.

9      Q.  Had someone told you about the post or did you

10   find it on your own?

11     A.  I believe I found it on my own.

12     Q.  Who hired you at CCA?

13     A.  I was hired by Mr. Dennis Bradley who was the

14   vice president of the correctional programs division at

15   that time.

16     Q.  And did you apply to a specific position?

17     A.  Yes, I did.

18     Q.  And what was that position?

19     A.  It was the director of addictions treatment

20   for the company.

21     Q.  And that was the position you were hired to?

22     A.  Initially, that is correct, yes, sir.

23     Q.  And then you were promoted?

24     A.  Yes.  I was.

25     Q.  And you were promoted to quality assurance?

1      A.   Yes.

2      Q.   How did that happen?

3      A.   The company at the time had decided to make

4   some revisions, as many companies do periodically, to

5   the audit division and to the quality assurance

6   division.

7           Mike Quinlan, my former director at the Bureau

8   of Prisons, was aware that I was in the company at that

9   time.  He remembered the work that we did together,

10   specifically in standing up the initiative and the

11   national drug abuse program.  I think Mike had very

12   strong positive recollection of our work together, and

13   our work in helping to -- to move that forward and

14   develop it as a national initiative.

15           He saw the work that was going to be required

16   at CoreCivic, and the quality assurance division to be

17   something that would be enterprise-wide.  He knew I had

18   enterprise-wide experience in developing new initiatives

19   and programs.

20           And I think because a variety of my technical

21   skills and abilities, other reasons, perhaps,

22   Mr. Quinlan asked me to consider that opportunity, and I

23   did consider it, and I was -- and had the opportunity to

24   move in it initially on a temporary basis, and then

25   finally, you know, was given an opportunity, when the

1    position was posted, to apply for the job.

2         And I competed with a national search, and I

3    was given a -- and was selected as the managing director

4    for the quality assurance division after the national

5    search was completed.

6    Q.   How many managing -- managing directors are

7    there?

8    A.   Managing directors in CoreCivic, I would say

9    there are approximately 20 -- 18 to 20.

10        Again, I'd have to look at each divisional

11   roster and check the counts.  I believe there's probably

12   18 to 20 total.

13   Q.   And there's one managing director for quality

14   assurance?

15   A.   There's -- at the present time there's only a

16   vice president of quality assurance.  I have a senior

17   director that assists me, but there is not a managing

18   director at this time.

19   Q.   At the time you were hired as managing

20   director of quality assurance, were there other managing

21   directors of quality assurance?

22   A.   No, there were not.

23   Q.   Is it accurate then that you are the only

24   managing director of quality assurance that CoreCivic

25   has ever had?

Page 59

1     A.  I don't believe that is accurate.  Prior to my

2  moving into the role in 1985, there may have been

3  another managing director, perhaps others previously,

4  but I'm the only person to serve in the managing

5  director role under the revised and restructured

6  approach that we basically are continuing to use today

7  and have refined over the last 16 years, 15 years.

8     Q.  Are you also the only vice president of

9  quality assurance that CoreCivic has ever had?

10    A.  Yes.

11    Q.  Who hired --

12    A.  Excuse me.  Excuse me.  Let me -- let me

13  qualify that.

14      Was your question, am I the only vice

15  president of quality assurance?

16    Q.  Yes.

17    A.  That CoreCivic has ever had?

18    Q.  Yes.

19    A.  I believe Mr. Quinlan may have been the vice

20  president previously for a period of time, and I

21  assisted him in the managing director role.

22    Q.  Mr. Quinlan advised you to consider moving

23  into quality assurance; is that right?

24    A.  Yes.

25      MR. GLENNON:  Objection.  Foundation.

1   But we had a person that was responsible for the audit

2   tool development, and maintenance. We had an individual

3   that was RizePoint -- which is the internal audit system

4   that we utilize that's automated that managed that

5   system.

6        We had an ACA specialist that also reported to

7   us -- to me. We had several internal auditors,

8   several -- we've had a couple team leaders and several

9   internal auditors that reported up through the division.

10   I think in total there were approximately twenty -- 18

11   to 20 people.

12        We also had a number of contract auditors at

13   the time that would do specific audits in preparation

14   for evaluations, accreditations by the American

15   Correctional Association.

16        So internal, I would say, approximately 18 to

17   20 full-time people, and then there were a number of

18   part-time people total in the division.

19   Q. And who did -- when you became managing

20   director for quality assurance, you reported to

21   Mr. Quinlan, who did Mr. Quinlan report to?

22   A. Mr. Quinlan was an officer of the corporation

23   and reported, I believe, directly to the general counsel

24   of the corporation, and I believe that was Mr. Puryear.

25   Q. Okay. Are you now, as vice president --

1    actually, let me -- let me start at a different place.

2         How did you come to become vice president to

3    get promoted from managing director to vice president?

4         A.   I believe the executive group, and others

5    looked at my tenure with the corporation and my

6    contributions within the quality assurance division,

7    specifically, and I believe the manner in which we were

8    operating the division, the contributions that we were

9    bringing, I think, to the company from an enhanced

10    compliance approach, I believe was a significant part of

11    the decision for me to become promoted into the vice

12    presidential role.

13         I also believe that there was an increased

14    understanding, not just at CoreCivic, but the compliance

15    environment, generally speaking, within corrections has

16    become more challenging, more demanding, and the

17    importance of rigorous auditing, corrective action

18    plans, the importance of trying to provide the best

19    possible assurances and information available with

20    regard to a facility's operational performance in which

21    we have a lengthy tenure of doing in this company, and

22    some of the innovative work that we've been doing in

23    audit reporting, I think all that has compiled to -- was

24    combined to suggest that the role needed to be

25    recognized at the higher level.

1      Q.   Was there a vice president vacancy?

2      A.   There was not.

3      Q.   So you didn't replace someone; is that

4   correct?

5      A.   That is correct.  I did not.

6      Q.   It's -- do you have the same basic role, but

7   it's a promotion with more, you know, money and title?

8          MR. GLENNON:  Objection.  Vague.

9          THE WITNESS:  I do have the same role in many

10   respects.  However, I also am able to -- I actually

11   participate in more meetings now than I used to

12   previously with other members of the office and more

13   responsibilities from that perspective -- from a

14   governance perspective.

15   BY MR. BLACK:

16      Q.   As vice president do you report to

17   Mr. Quinlan?

18      A.   Mr. Quinlan is no longer with the company.

19          My direct supervisor is Mr. Carter, the

20   general counsel of the corporation, as was the case with

21   Mr. Quinlan.

22      Q.   Okay.  Do you attend disclosure committee

23   meetings?

24      A.   I do.

25      Q.   And you participate in disclosure committee

1    BY MR. BLACK:

2        Q.   Okay.  You said I believe I'm very familiar

3    with the documents that have been requested.  I'm very

4    familiar with the work products that we have produced.

5            How many documents are you very familiar with

6    that have been produced?

7        A.   Well, let me qualify my earlier response,

8    Mr. Black, if I could.

9            I'm familiar with the types of documents that

10   we generate as a division, if that's helpful to you in

11   clarifying my response.

12            The exact numbers on those pages, the exact

13   findings, you know, the exact dates, the areas that were

14   evaluated and audited, the precise outcomes of each of

15   those audits, the exact contents or types of rollup

16   reports that we do to senior management and to

17   leadership and to the operations executives to help

18   improve quality of operations, I would have to look at

19   each of those specifically.

20            But I'm very familiar with the types of

21   documents that we generate, and have been for some

22   period of time.  So it -- does that help clarify it for

23   you, sir?

24        Q.   I think it does.  Let me ask a different

25   question.

1      You're familiar with documents that have been

2  produced to plaintiff as a general matter; is that

3  right?

4    A.  Yes, sir --

5      MR. GLENNON:  Mr. Murray, if you could give me

6  a second to object.

7      I object to form.

8      You can go ahead.

9      THE WITNESS:  Yes, sir, I believe I am.

10  BY MR. BLACK:

11    Q.  Okay.  Are you familiar with them because you

12  have reviewed the documents that that -- as they have

13  been produced to plaintiffs?

14      MR. GLENNON:  Objection.

15      THE WITNESS:  Not specifically, Mr. Black.

16  Again, to clarify -- and I don't mean to overstate this,

17  but our division has generated the types of documents

18  that -- that I believe were requested, you know, to a

19  confident were requested that our division produces and

20  has produced for years, and so -- that we generate

21  routinely as a matter of our normal business practices,

22  our normal internal audit practices.

23      So again, these are -- these are typical

24  reports, typical rollup documents, typical heat maps,

25  typical charting.

1          So from that perspective, sir, I'm very

2     familiar with the information -- I should say the

3     processes and the document forms.  But I would have to

4     look at each document, per se, to bring context to it

5     and to bring a focused understanding and interpretation

6     of that.

7          MR. BLACK:  Thank you.

8     BY MR. BLACK:

9       Q.   That answered my question.

10          So you're familiar with, for example, audits

11     because you routinely generate and review audits; is

12     that right?

13       A.   Yes, sir.

14       Q.   But you don't know for sure whether or not

15     plaintiff received every audit that you generate and

16     review in the course of your business; is that correct?

17          MR. GLENNON:  Objection.  Vague.

18          THE WITNESS:  I -- I know that we would have

19     done everything requested, and that we would have

20     certainly produced it for review by our attorneys.

21          And, you know, beyond that, Mr. Black, I can't

22     tell you whether or not every document was -- I know we

23     produced everything, whether or not there were

24     objections provided by our counsel, I'm sorry, I just --

25     I don't know.

Page 94

1 and background, also as an expert.

2 BY MR. BLACK:

3  Q. Did you tell someone that these are the areas

4 you were prepared to testify to?

5   MR. GLENNON: I'm going to object and instruct

6 the witness not to answer unless he can do so without

7 revealing communications he had with counsel.

8   THE WITNESS: I believe that's privileged.

9 BY MR. BLACK:

10  Q. You believe that's privileged.

11   Did you tell anyone at CCA that -- that these

12 subject areas were the ones you were prepared to testify

13 to?

14   MR. GLENNON: Same objection. Any of the

15 non-employer stuff, Mr. Murray.

16 BY MR. BLACK:

17  Q. Mr. Murray, are you going to choose to not

18 answer this question?

19  A. I believe that's my understanding, not to

20 answer the question.

21  Q. Okay. Mr. Murray, do you see under summary of

22 facts and opinions there's a paragraph that goes from

23 page 6 to 7?

24  A. Yes, sir, I do.

25  Q. Okay. Can you read the first sentence,

1   please?

2     A.  "Dr. Murray may testify that CoreCivic's

3   operational performance was similar to and compared

4   favorably with BOP's operational performance in the

5   areas of correctional facility management, oversight,

6   staffing, security, and related policies and

7   procedures."

8     Q.  Okay.  Are you, in fact, prepared to testify

9   that CoreCivic's operational performance was similar to

10   and compared favorably with the BOP's operational

11   performance in the areas of correctional facility

12   management, oversight, staffing, security, and related

13   policies and procedures?

14     A.  Yes.

15     Q.  Okay.  In what ways are you prepared to so

16   testify?

17     A.  Well, mainly, Mr. Black, again it's a function

18   of my extensive experience in the corrections industry.

19   I have completed 38 years of service, 22 of which have

20   been in the Federal Bureau of Prisons, 16 years and

21   change here at CoreCivic.

22       And during that nearly four decades in the

23   corrections industry, government service and in private

24   sector, I've garnered quite a lot of information and

25   expertise across a variety of areas.

1          I've had the privilege of auditing facilities,

2    both while I was with the BOP, and auditing facilities

3    certainly in the leadership role -- management role here

4    at CoreCivic.

5          I frequently attend professional meetings, and

6    review information and standards from an ACA

7    perspective -- and ACA stands for the American

8    Correctional Association, by the way.

9          I attend the national commission on

10   correctional healthcare meetings, and participate in

11   those as well.

12         There is a large amount of information in

13   terms of standards for the industry in healthcare, and

14   very broadly in security and key operational areas that

15   we have within our facilities as managers and as

16   professionals -- correctional professionals.

17         I'm very familiar with Federal Bureau of

18   Prisons policies and procedures for more than two

19   decades.  I'm very familiar with the tools -- audit

20   tools that have been utilized by the Federal Bureau of

21   Prisons for many years and the updates to those that are

22   utilized in the customer facility and monitorings.

23         I'm very familiar with the information and

24   tools that we utilize to conduct that identical types of

25   evaluation in our facility operation.  I'm very familiar

1    with facility client surveys that we utilize that are

2    very similar to the Federal Bureau of Prisons climate

3    surveys of staff and detainees or inmates in our care

4    and custody as in their care and custody.

5         I'm very familiar with their procedures from

6    the perspective that we get updates from the Bureau of

7    Prisons that whenever we have a contractual modification

8    that we update our policies and procedures accordingly.

9         So from a variety of perspectives in terms of

10    my prior experience, more than two decades with the

11    Bureau of Prisons, from my experience hiring staff from

12    the Federal Bureau of Prisons that have left senior

13    management roles to include wardens positions, associate

14    wardens positions, to include healthcare services

15    administrators that have operated Federal Bureau of

16    Prisons healthcare divisions within facilities as audit

17    team members, I -- understanding many of the staffing

18    issues and concerns that impact not only the Bureau of

19    Prisons but staffing issues and concerns that impact

20    virtually most areas of corrections and how that's

21    certainly compounded in the health services areas and

22    other professional services such as mental health.

23         So I have many years of experience, and I'll

24    be relying on that very heavily in the formation of my

25    responses to any questions that might be posed in those

1    areas.

2       And I think as well that my attendance at

3    professional associations and meetings staying current

4    with the latest standards, and requirements, and

5    challenges, listening to my colleagues in the industry

6    both on the government services side, as well as on the

7    private sector side, the challenges that many of us

8    share together in the corrections industry, I believe

9    all of that provides me the opportunity to provide,

10    perhaps, a unique, professional input -- expert input in

11    response to these areas.

12     Q. Okay. So under this section, starting with

13    number 2, summary of facts and opinions, do you see that

14    there are five sentences in this paragraph going from

15    page 6 to 7?

16     A. Yes, sir, I do.

17     Q. On page 7, the second to last sentence begins,

18    "Dr. Murray may also testify about challenges to the

19    BOPs."

20       Can you read that sentence, please?

21     A. Yes, sir. "Dr. Murray may also testify about

22    challenges to the BOP's operational performance in areas

23    of correctional facility management, oversight,

24    training, security, and related policies and

25    procedures."

1      Q.   Okay.  Did you work at the BOP between 2012

2   and 2016?

3      A.  No, sir, I did not.

4      Q.   Visit any BOP-run facilities between 2012 and

5   2016?

6      A.  Only BOP facilities I visited during that

7   timeframe were ones that we operated at CoreCivic.

8      Q.  Okay.  So no then?

9         MR. GLENNON:  Objection.  Vague.  Form.

10         THE WITNESS:  The response would be no, sir.

11   BY MR. BLACK:

12      Q.  When was the last time you stepped foot in a

13   BOP-run facility?

14         MR. GLENNON:  Objection.  Vague.

15         THE WITNESS:  It was probably during a visit

16   at an ACA meeting, when one of the local BOP facilities

17   was up for tour.  But since joining CoreCivic, I have

18   not spent a substantial amount of time -- a very limited

19   amount of time, frankly, in BOP operated facilities.

20   BY MR. BLACK:

21      Q.  Can you remind me the last time you worked for

22   the BOP was?

23      A.  Yes, sir.  I left the Federal Bureau of

24   Prisons in August of 2004.

25      Q.   Does the BOP send you reports about its

1    BY MR. BLACK:

2        Q.   And sorry, Mr. Murray --

3            MR. GLENNON:  Hold on.  Hold on, Mr. Black.

4            Mr. Murray, were you finished with your

5    answer?

6            THE WITNESS:  Yes.  May I finish?

7            MR. BLACK:  Please continue, although I don't

8    believe you're answering the question.

9            MR. GLENNON:  He's allowed to answer it, and

10   then you can decide whether or not he's answered it.

11           You can finish.

12           THE WITNESS:  I believe that my substantial

13   experience while with the bureau, including my knowledge

14   of BOP's operational audit tools for CFM facilities, and

15   my experience in looking at the management requirements

16   and staffing issue that we all face, the security

17   challenges that we all face in managing certain types of

18   inmates, our policies and procedure, I feel comfortable

19   in providing a comparative analysis.

20   BY MR. BLACK:

21       Q.   Mr. Murray, how are you going to compare --

22   scratch that.

23           Between 2012 and 2016, what experience do you

24   have with the BOP's operational performance?

25           MR. GLENNON:  Objection.  Vague.

1      THE WITNESS: Well, it was very clear that, as

2   a part of the CFM audit tools produced by the Federal

3   Bureau of Prisons and from a quality control

4   perspective, that we also created internal audit tools

5   that we would utilize that not only included all the

6   areas that the BOP felt to be important, but areas that

7   we felt to be important as a company as well.

8      We would submit those tools to the BOP for

9   approval for utilization as a part of our quality

10   control procedures. So the Federal Bureau of Prisons

11   approved the work that we were doing, the information

12   that we provided them, and if there were any issues or

13   concerns with the quality of work, the quality of our

14   internal audits, the interviews that were conducted by

15   internal audit teams on-site during our facility

16   internal audits of BOP facilities, we would receive

17   feedback in that manner as well.

18      So I believe there's a number of ways to

19   compare our performance and the way the BOP was looking

20   at us and evaluating our performance with the bureau's

21   own performance.

22      If there had been significant concerns, I'm

23   certain that they would have let us know that.

24   BY MR. BLACK:

25      Q. Are you testifying that if the BOP had

1    concerns about their own facilities, they would have

2    told you about that?

3         THE WITNESS:  No, sir, but when they make

4    policy and procedural changes and modify, you know, a

5    contract, for example, it I may well be because there

6    are areas that they're experiencing in their own

7    populations.

8         For example, if you go to a revised audit tool

9    that they're using, and for example, there's an

10   increased focus on patients or inmates that have HIV,

11   and there's new procedures or there are new protocols

12   they would like for you to follow, the assumption very

13   logically is that this is what the Bureau of Prisons is

14   doing currently, and they've modified their practices

15   and of course we need to modify our practices to be

16   consistent with the Bureau of Prisons' practices.

17        It would be similarly true with Hep C or other

18   medical issues or concerns that they were seeing emerge

19   in their populations, that they would expect us to also

20   provide additional focus on.

21        If there are modifications to suicide

22   prevention policies and procedures and protocols --

23   which, by the way, the Bureau of Prisons approved all of

24   our policies and procedures, and I believe approved many

25   of the key staff as well as the background checks that

1   were required, the updates, and if there were additional

2   information that the bureau needed from us, we had a

3   partnership, and we would certainly expect that

4   information to flow to us to move to that performance to

5   help improve performance or at least achieve and

6   maintain performance that was expected by the bureau.

7        So granted I am inferring some information,

8   but I think reasonably and logically inferring based on

9   changes to the Bureau of Prisons' policies, procedures,

10   their CFM audit tools, communications that local

11   facility staff had with the senior secure institution

12   monitors that are on-site almost daily at BOP

13   facilities.

14        So there was a free exchange of information,

15   Mr. Black, back and forth.  Is that helpful?

16       MR. BLACK:  No.  That's nonresponsive.

17   BY MR. BLACK:

18    Q.   So this question asks about operational

19   performance.

20        Do you see that -- not question, this sentence

21   says, "Dr. Murray may testify about operational

22   performance."

23        Do you see the term operation performance in

24   there?

25    A.   Yes, sir, I do.

Page 113

1     Q.   Does it say that Dr. Murray is going to

2 testify that he can infer from BOP's auditing tools that

3 he is able to determine what the BOP's operational

4 performance was?

5      MR. GLENNON: Object to form. Harassing the

6 witness. Asked and answered.

7 BY MR. BLACK:

8     Q. So you can answer?

9     A. Oh. Okay. Mr. Black, I believe that if there

10 are policy and procedure changes made by the Bureau of

11 Prisons, they implement new policies and procedures for

12 the contract providers, I think it's only logical and

13 appropriate to assume that this is how they would like

14 us to perform operationally, and that's what we did,

15 sir.

16     Q. So you testified that you knew how the BOP

17 wanted you to perform?

18      MR. GLENNON: Object to form.

19      THE WITNESS: I'm sorry, Mr. Black, I believe

20 that it's very clear that in the statement of work and

21 in the manuals that were provided, that there were clear

22 expectations for us in terms of our performance based

23 on --

24 BY MR. BLACK:

25     Q. I'm not asking you whether there were

1    to whether or not there was a QAM vacancy at Eden at the

2    time.  So...

3    BY MR. BLACK:

4        Q.   The second half of the sentence says, "and

5    their health services department is very limited."

6         Do you see that?

7        A.  I do see that, yes.  Mmmm-hmmm.

8        Q.   To your knowledge, is that referring to the

9    lack of a doctor and also the absence of nurses and

10    other medical professionals?

11         MR. GLENNON:  Objection.  Vague.  Calls for

12    speculation.

13         THE WITNESS:  I -- I don't know that that's

14    the case.  Again, I would have to ask Ms. Jackson what

15    she was referring to, but it possibly related to their

16    staffing.

17    BY MR. BLACK:

18        Q.   Okay.  And this is the same facility that just

19    received a repeat, repeat deficiency from the BOP

20    pursuant to it's follow-up CFM; is that correct?

21         MR. GLENNON:  Foundation.

22         THE WITNESS:  I believe that's accurate, yes,

23    sir.  Mmmm-hmmm.

24    BY MR. BLACK:

25        Q.   Okay.  And as managing director and then vice

1    president of quality assurance, your expertise is in

2    oversight and staffing, is that accurate?

3            MR. GLENNON:  Objection.  Vague.

4            THE WITNESS:  Well, my expertise is in a

5    variety of areas, but most recently at CoreCivic,

6    certainly.  And internal audit processes, and evaluating

7    contract compliance, and making -- sharing that

8    information broadly as appropriate to help the facility

9    operate contractually and in a compliant manner.

10   BY MR. BLACK:

11       Q.   Would it be one of your responsibilities to

12   ensure that there were quality assurance managers at

13   facilities that needed them?

14           MR. GLENNON:  Objection.

15           CERTIFIED STENOGRAPHER:  Excuse me --

16           THE WITNESS:  My responsibilities include --

17           CERTIFIED STENOGRAPHER:  -- excuse me,

18   Mr. Glennon --

19           THE WITNESS:  -- helping facility wardens --

20           CERTIFIED STENOGRAPHER:  -- I didn't hear your

21   objection.

22           THE WITNESS:  -- hire quality assurance

23   managers, and when there are vacancies, we certainly do

24   just that.

25           We help in terms of the interview process to

1    the extent we can, recruiting and evaluating the best

2    candidates for those positions.  But the ultimate

3    authority for hiring is not a direct line or dark line

4    function to me directly or to the QA division at the

5    FSC.

6            The hiring authority, although I approve the

7    hires, the bottom line is that it's ultimately the

8    warden's responsibility locally and by our structure to

9    hire the local QAM, and they report directly to the

10   warden.

11   BY MR. BLACK:

12       Q.   Who -- whose responsibility is it at CCA, if

13   anyone, to punish wardens that fail to hire people that

14   need to be hired?

15           MR. GLENNON:  Objection.  Vague.  Foundation.

16           THE WITNESS:  Respectfully, Mr. Black, I don't

17   know that it's anyone's responsibility that's a

18   respective leader in our company to punish anyone in a

19   leadership role.  Our goal is to support our leaders and

20   give them the resources, support them in the resources

21   that they need to help operate their facilities.

22           So from a -- I -- I take issue with -- with

23   the question from a punishment perspective.  I don't

24   believe that's how we operate.  In fact, I know that's

25   not how we operate at the company.

STENOGRAPHIC SHORTHAND REPORTER'S CERTIFICATION

- - -

I, VICTORIA L. VALINE, CSR NO. 3036, RMR, CRR,
RSA, certify: That the foregoing proceedings were
remotely taken before me via videoconference at the time
herein set forth; at which time the witness was duly
sworn; that a record of the proceedings was made by me
using machine shorthand which was thereafter transcribed
under my direction; and that the transcript is a true
record of the testimony so given.

Further, that if the foregoing pertains to the
original transcript of a deposition in a federal case,
before completion of the proceedings, review of
transcript was requested.

The dismantling, unsealing, or unbinding of
the original transcript will render the Stenographer's
Certificate null and void.

I further certify that I am not financially
interested in the action, and I am not a relative or
employee of any attorney of the parties, nor of any of
the parties.

Dated this 30th day of October, 2020.



Victoria L. Valine, CSR License #3036