# EXHIBIT 10

1       IN THE UNITED STATES DISTRICT COURT

   FOR THE MIDDLE DISTRICT OF TENNESSEE

2

3

4    NIKKI BOLLINGER GRAE, Individually

and Behalf of All Others Similarly

5    Situated,

6                  Plaintiff,

vs.                    CASE NO.

7                       3:16-CV-02267

CORRECTIONS CORPORATION OF

8    AMERICA, et al.,

9                  Defendants.

10

11

12              CONFIDENTIAL

13        VIDEO DEPOSITION OF KIM WHITE

14            Nashville, Tennessee

15              November 15, 2019

16

17

18

19   Reported by:

20   Elisabeth A. Miller Lorenz

21   RMR, CRR, LCR No. 66

22

23   Job No.:  10061571

24

25

1    APPEARANCES:
2     For the Plaintiff:
3       ROBBINS GELLER RUDMAN & DOWD
     BY:  CHRISTOPHER WOOD
4       414 Union Street
     Suite 900
5       Nashville, Tennessee 37219
     615.252.3798
6       cwood@rgrlaw.com
7
8     For the Defendants:
9       RILEY, WARNOCK & JACOBSON
     BY:  TREY McGEE
10        1906 West End Avenue
     Nashville, Tennessee 37203
11        615.320.3700
     tmcgee@rwjplc.com
12
     LATHAM & WATKINS
13        BY:  MERYN CN GRANT
     355 South Grand Avenue
14        Los Angeles, California 90071-1560
     213.485.1234
15        meryn.grant@lw.com
16        LATHAM & WATKINS
     BY:  SARAH A. TOMKOWIAK
17        555 Eleventh Street, NW
     Suite 1000
18        Washington, D.C. 20004-1304
     202.637.2335
19        sarah.tomkowiak@lw.com
20
21     Also Present:
22     David Drumel, Videographer
23
24
25

1          P R O C E E D I N G S

2              THE VIDEOGRAPHER:  Good morning.  We're

3    now on the record.  Today's date is November 15th,

4    2019.  The time is approximately 9:34 a.m.

5              This is the video deposition of

6    Kim White being taken in the matter of Grae versus

7    Corrections Corporation of America, et al. pending

8    in the United States District Court for the Middle

9    District of Tennessee, Case No. 3:16-cv-02267.

10             We are here at Riley, Warnock &

11   Jacobson, 1906 West End Avenue in Nashville,

12   Tennessee.

13             My name is David Drumel.  I'm the

14   videographer.  The court reporter is

15   Elisabeth Lorenz.

16             Will counsel please identify yourselves

17   for the record at this time.

18             MR. WOOD:  Christopher Wood, Robbins

19   Geller Rudman & Dowd on behalf of the plaintiffs.

20             MS. TOMKOWIAK:  Sarah Tomkowiak of

21   Latham & Watkins on behalf of the defendants and the

22   witness.

23             MS. GRANT:  Meryn Grant also of

24   Latham & Watkins on behalf of the defendants and the

25   witness.

1             MR. McGEE:  Trey McGee, Riley,

2    Warnock & Jacobson on behalf of the witness and

3    defendants.

4             THE VIDEOGRAPHER:  Thank you.

5             Will the court reporter please swear in

6    the witness.

7                    * * *

8             KIM WHITE

9    was called as a witness, and after having been first

10   duly sworn, testified as follows:

11          E X A M I N A T I O N

12   BY MR. WOOD:

13   Q     Good morning, Ms. White.

14   A     Good morning.

15   Q     Have you had your deposition taken before?

16   A     Have I had depositions taken before?

17   Q     Uh-huh.

18   A     Yes.

19   Q     How many times have you had your deposition

20   taken?

21   A     Just a few.  I don't have a specific number,

22   but I've done it in the past.

23   Q     Were they related to your work at CoreCivic

24   or the Bureau of Prisons?

25   A     Related to work at the Bureau of Prisons.

1    currently live in Nashville?

2    A      I -- I do not.  I live in Williston,

3    Florida.

4    Q      Okay.  So -- and when -- when you -- did you

5    leave Nashville around the time you retired as EVP

6    of HR?

7    A      Yes, I did.

8    Q      Okay.  Got it.

9    A      Yeah.

10   Q      What do you do in your current role at

11   CoreCivic?

12   A      I -- well, as I mentioned, I'm a special

13   adviser, and the work that CoreCivic has had me do

14   over the last few months has been project based.

15   For instance, one of the projects I was working on

16   was women in leadership roles at CoreCivic.  So it's

17   that kind of part-time, piecemeal, project-based

18   work.

19   Q      Okay.

20   A      Yes.

21   Q      And -- but -- and you're still a CoreCivic

22   employee?

23   A      I am.

24   Q      Okay.  You worked for the Bureau of Prisons

25   between 2003 and 2012; is that right?

1    A       I was still employed by the Bureau of

2    Prisons during that time, but I actually started in

3    May of 1986.

4    Q       Okay.

5    A       I'm sorry, let me rephrase that, in

6    January 1986.

7    Q       Okay.

8    A       Yes.

9    Q       What -- do you recall the position that you

10   had at the Bureau of Prisons when you started in

11   1986?

12   A       I was a correctional officer.

13   Q       Okay.  And you -- when you left the

14   Bureau of Prisons in 2012 --

15   A       Yes.

16   Q       -- you were assistant director of human

17   resources management; is that right?

18   A       That is correct.

19   Q       And you were at the Bureau of Prisons the

20   whole time between 1996 and 2012?

21   A       That is correct.

22   Q       And you, I guess, progressed through the

23   ranks during that time?

24   A       I did.

25   Q       Okay.  When -- what were your

1    responsibilities as the assistant director of human

2    resources management?

3    A       Well, I was considered the chief human

4    resource officer for the Bureau of Prisons, so I was

5    responsible for hiring, firing, recruiting,

6    retaining, promotions, classifications of the

7    responsibilities, learning development, and kind of

8    all of the things -- things associated with a human

9    resource management of human capital.

10   Q       Who -- when you -- did you -- did you retire

11   from the Bureau of Prisons as that?

12   A       I did.

13   Q       Okay.  When you were -- immediately before

14   your retirement, who did you report to at the BOP?

15   A       I reported to the director of the Bureau of

16   Prisons, who was Harley Lappin.

17   Q       And was that your only direct report at the

18   time you left?

19   A       Do you mean superior?

20   Q       Yeah.

21   A       He was not.  He retired, came to CoreCivic,

22   then CCA.  And at that point, I reported to the new

23   director, who was Charles Samuels.

24   Q       Okay.  And Mr. Samuels was the director at

25   the time you left the BOP?

1   A      Correct.

2   Q      During the three years that -- approximately

3   that you were the assistant director for human

4   resources management --

5   A      Yes.

6   Q      -- was it just Mr. Lappin and Mr. Samuels

7   that you reported to?

8   A      Yes.

9   Q      Okay.  How many direct reports did you have

10  at the time of your retirement?

11  A      Subordinate?

12  Q      Uh-huh.

13  A      Oh, my goodness.  I don't remember.  There

14  were over 320 HR employees I was responsible for.

15  Q      Okay.

16  A      A number of deputy assistant directors and

17  other subordinates that were in managerial roles.

18  Q      Okay.  Did you have any interaction with --

19  when I say CoreCivic, I also -- right, they changed

20  their name, so --

21  A      Sure.

22  Q      -- CoreCivic, CCA, same thing.

23  A      Yes.

24  Q      Did you have any interaction with CoreCivic

25  in your role as associate director of human

1  Q      What about pro- -- so you were also regional

2  director of the Bureau of Prisons, right, between

3  2003 and 2009?

4  A      That's correct.

5  Q      In that role or any of your prior roles at

6  the Bureau of Prisons, did you have any interactions

7  with CoreCivic?

8  A      No, I did not.

9  Q      How did you come to work for CoreCivic in

10  2012?

11  A      I was contemplating leaving the Bureau of

12  Prisons, but I still really enjoyed the industry.  I

13  believe it's my calling, something I considered kind

14  of a mission field, if you will.

15        And I reached out to Mike Nalley, one of my

16  former colleagues, who was at the time working for

17  another private prisons company at the time, and

18  asked him if there were any opportunities in the

19  private prisons industry that I might -- that he

20  might know about that I could consider contemplating

21  for continued employment in the industry.

22        And he said he thought there were and that I

23  should reach out to Mr. Lappin about those

24  opportunities.

25  Q      And -- and then you reached out to

1    Mr. Lappin?

2    A    I did.

3    Q    Okay.  And you joined CoreCivic as -- is it

4    vice president of the correctional programming?

5    A    No.  I actually joined CCA at the time in

6    July of 2012.

7    Q    I'm sorry, as managing director of inmate

8    program?

9    A    Correct --

10   Q    Okay.

11   A    -- yes.

12   Q    And what were your responsibilities in that

13   position?

14   A    I was responsible for all of the

15   inmate-related programs within the facilities, which

16   included religious services, addictions treatment,

17   and education.  And I did have some oversight of the

18   security component at that time, but it was minimal.

19   I took on those responsibilities when I moved into

20   my next role.

21   Q    Okay.  And your next role in 2013 was vice

22   president of -- is it correctional programming?

23   A    That's -- that's correct, yes.

24   Q    How did your responsibilities change in that

25   position?

1    A      Well, it's a position of greater

2    responsibility, so I then became responsible for the

3    security component of the company, and I also was

4    responsible for the staffing component when it came

5    to how positions were leveraged in the facilities

6    and how they were positioned on rosters.

7    Q      And -- well, I guess what does correctional

8    programming mean?

9    A      Well, that's -- correctional programs

10   includes all of the inmate programs in the security

11   component of facilities.

12   Q      And what do you mean by inmate programs?

13   A      So every facility has either inmates or

14   detainees, and those programs I'm talking about

15   include education, addictions treatment, recreation,

16   religious services.

17          And there are subject matter experts who are

18   responsible for leveraging those programs in the

19   facilities, for providing resources, oversight,

20   guidance, and training to the people in the field

21   who actually carry out those duties.

22   Q      And is the security component that's -- is

23   that -- that's separate from programming?

24   A      It is separate from programs, but programs

25   and security are kind of tag team members.  We

1    provide for the experiences that inmates have,

2    getting education, getting prepared to go back home.

3         But obviously, security is a huge component

4    because we're responsible for ensuring the inmates

5    are safe, the staff, as well as the community.  So

6    they go hand in hand even those they're separate

7    entities.

8    Q      And with respect to the -- to security,

9    what -- what were your responsibilities?

10   A      I supervised the investigators who did

11   inmate-related investigations.  I supervised the

12   people who were responsible for managing, having

13   oversight of the security components at the

14   facilities.  So they were primary -- primarily

15   responsible for security, for providing training to

16   those at the field level, responsible for security.

17   Q      And this is for all of CoreCivic's prisons

18   around the country?

19   A      All of the CoreCivic facilities, yes.

20   Q      You were promoted to executive vice

21   president for human resources in 2013?

22   A      Correct.

23   Q      And I think, as we just talked about,

24   that -- you retired from that position in May of

25   this year?

1    A      May 4th.

2    Q      Okay.

3    A      No, May 3rd, two thousand -- 2019, yes.

4    Q      So you had a lot of responsibilities as

5    executive vice president of human resources.

6          How -- can you kind of break down what those

7    were?

8    A      Well, they were very similar to the ones I

9    described with the Bureau of Prisons.  I was the

10   chief human resource officer.  I was responsible for

11   hiring, firing, promotions, training, succession

12   planning, and everything related to the management

13   of human capital.  And that was for not only the

14   corporate office, but that included the facilities

15   as well.

16   Q      The -- so a warden at an individual facility

17   would also be responsible, right, for hiring and

18   firing decisions at his or her specific prison,

19   right?

20   A      Yes, that is correct.

21   Q      How -- how would you kind of characterize

22   your role in that versus a warden's role?

23   A      My role was primarily for the processes and

24   the procedures for all hiring.  It also included how

25   we'd classify positions, how those people then are

1    Exhibit 131.

2         MR. WOOD:  This is Bates

3    No. CoreCivic_0042160.

4    BY MR. WOOD:

5    Q      And take a moment, if you would, to

6    familiarize yourself with Exhibit 131.

7    A      Okay.

8    Q      Do you recognize Exhibit 131?

9    A      I do.

10   Q      And what do you recognize it to be?

11   A      A discussion between me and my staff

12   specifically about Adams and Cibola.

13   Q      And you see Mr. Beasley is -- at the bottom,

14   is communicating to some folks about a significant

15   finding at Adams and the cure notice at Cibola,

16   right?

17   A      Let me see if I can find Adams.  Oh, yes, I

18   see the cure notice reference too.  Yes, I do.

19   Q      And then Mr. Hininger forwards that to you

20   and a number of other people, right?

21   A      Yes, I'm included on that list.

22   Q      And then you respond to Mr. Churchill,

23   Ms. -- is it --

24   A      Carnaggio.

25   Q      Carnaggio?

1    A     Yes.

2    Q     Thank you.

3          And Mr. Elrod saying, We may, as I

4    suspected, need to add Adams to our list of what we

5    have been doing to fill vacancies/retention

6    enhancements.

7          Do you see that?

8    A     I do.

9    Q     What were you doing to fill vacancies and

10   retention enhancements in January 2015?

11   A     Everything we could imagine, which included

12   looking at different ways to advertise for the

13   positions, considering how we were sourcing

14   candidates for those positions.  We were looking at

15   different incentives we could use to attract and

16   retain candidates.

17          We were looking at exactly how we could

18   figure out what was going on in the culture of the

19   facility, if that was an issue.  We were looking at

20   basically everything and anything we could think of

21   in order to increase the likelihood of filling those

22   positions.

23   Q     And so your -- you're referring to a list --

24   you say to add Adams to the list of what we've been

25   doing.

1          So you were doing this at a number of

2     different facilities; is that correct?

3     A      That is correct.

4     Q      And was CoreCivic struggling in January of

5     2015 to fill vacancies and retain personnel?

6              MS. TOMKOWIAK:  Objection.

7              THE WITNESS:  We had locations where

8     vacancies were a concern, and we looked at those on

9     a weekly, monthly, sometimes even daily basis to

10     track and monitor what we were doing, what was

11     working, what was triggering people to leave, so

12     that -- I mean, from a human resource perspective,

13     that's my responsibility, kind of a primary

14     responsibility of any chief human resource officer.

15     BY MR. WOOD:

16     Q      And so as of January 2015, at least

17     according to your e-mail, you at least suspected

18     that you would need to devote some more efforts to

19     the Adams facility in that regard, right?

20     A      Yeah.

21              MS. TOMKOWIAK:  Objection.

22              THE WITNESS:  Yes.

23     BY MR. WOOD:

24     Q      And do you know what made you suspect that

25     this was something you would need to do as of

1   very remote -- remote parts of the United States, so

2   the number of potential candidates is relatively

3   limited.

4           The other thing is, it was during a

5   time in the country's history where the talent wars

6   were the most heated.  That means that every company

7   was looking for scarce candidates in order to

8   fulfill roles.

9           So there were instances where we had

10  more difficult challenges with certain marketplaces

11  than we did in others.  And, obviously, we would do

12  whatever we needed to do to -- to move the market.

13          But we found ourselves in many cases

14  not attracting people to the -- to our facility.  We

15  would extract them from other companies.

16          So we would look at, what's kind of the

17  general wage in that area?  Does it make sense to

18  look at doing something different?  Is it within our

19  practice to do it?  Is it legal to do it?  And,

20  again, that would be one option out of an arsenal of

21  options that we could consider.

22  BY MR. WOOD:

23  Q     But you're still, I guess, constrained by

24  budget and finance in terms of how much of an

25  incentive or compensation you could offer to people?

1    A      As with any company, I think companies have

2    a budget that they have to stay within, and that

3    budget can absorb the cost -- the increased cost of

4    salaries and wages, especially to meet market

5    demands.  But there is a limit that any company

6    would be faced with in respect to how much they

7    could leverage towards salaries in order to attract

8    and, I think more importantly, retain candidates.

9    Q      You -- you say in your e-mail, Exhibit 131,

10   the very latest e-mail at the top of the page, you

11   say, Good, just be on it as this thing is

12   snowballing.

13          What were you referring to there?

14   A      The snowballing part?

15   Q      Uh-huh, well, and the thing.

16          Like, what thing -- what thing, and what --

17   and what was snowballing?

18   A      Well, if I recall, the thing I was talking

19   about was the increased attention that we as HR

20   would be receiving based on the two facilities at

21   question.  Anytime facilities end up hitting the

22   radar screen of executives, especially if there was

23   anything associated with staffing, I know that I and

24   my staff are going to be asked a lot of questions.

25          So the snowballing was referencing, how many

1    questions are we going to be asked; what kinds of

2    things do we need to do to prepare for those

3    potential questions; and what do we need to do right

4    now in order to get that information to the people

5    who need it most.

6    Q      So you're referring to -- you're referring

7    to -- the thing that you're referring to -- well --

8    the thing that you're referring to is the -- the --

9    the staffing issues at -- or the issues at Adams and

10   Cibola?

11              MS. TOMKOWIAK:  Objection.

12              THE WITNESS:  What I'm referring to is

13   that -- the thing is what we were going to be not

14   only evaluated on but scrutinized by and how much

15   emphasis and attention was HR going to receive.

16   Because these two facilities had popped up on our

17   radar screen, we knew that there were going to be a

18   lot of questions about what, HR, are you doing about

19   your role in filling vacancies.  So that's the

20   thing.

21   BY MR. WOOD:

22   Q      But these were -- these facilities would

23   have been on -- well, is it the case that these

24   facilities were on your radar as having issues that

25   needed your attention as of January 2015?

1   A       But that, as you've asked, would be my best

2   guess.

3   Q       You -- in your e-mail at the top, you say,

4   I -- I don't like people crafting things, and I know

5   this is political.

6           What -- what do you mean by that?

7   A       Well, if -- as I'm sort of musing in my head

8   about what this might be referencing, if it was, in

9   fact, relative to the Leavenworth report, there were

10  ways in which the OIG viewed how our staffing was

11  done that didn't comport with the industry standards

12  and certainly did not comport with what we believed

13  the Marshals had agreed to and approved of.  And so

14  that's what I mean by crafting.

15          When people don't know our business and they

16  come up with recommendations that don't fit industry

17  standards, that's what I mean by crafting things.

18  Q       When you said -- you said, I know this is

19  political.

20          What -- what did you mean by that?

21  A       Well, that was editorializing because

22  sometimes I believe federal audits -- not all, maybe

23  not even any.

24          But sometimes you speculate that this is to

25  make a point for an agenda, not necessarily to

1    simple -- simply do a fair and impartial review.

2    Q      So kind of what point or agenda would be

3    advanced by this report?

4              MS. TOMKOWIAK:  Objection.

5              THE WITNESS:  I don't know.

6    BY MR. WOOD:

7    Q      Well, you say here that you know this is

8    political, and I think -- I mean, why did you say

9    that?

10             MS. TOMKOWIAK:  Objection.

11             THE WITNESS:  I really don't remember.

12   And some of it could have easily been frustration

13   and, again, editorializing not with any

14   foreknowledge.

15   BY MR. WOOD:

16   Q      But it was based on something, right?  I

17   mean, you have a long -- decades' long experience at

18   the BOP and in corrections, right?  You're an expert

19   in this stuff?

20   A      I am.

21   Q      And so you -- and you have opinions that may

22   be based on things you know for sure and things that

23   you think, right.  I mean, this is the way everyone

24   works.

25             And I'm just interested in what was behind

1    your -- your thought here that this particular

2    report -- you said, I know this is political.

3            MS. TOMKOWIAK:  Objection.

4            THE WITNESS:  What I would say to you

5    as a lifetime government employee, sometimes the

6    requests of political heads lead to certain reviews

7    that we think are to meet those agendas and not

8    necessarily a fair and impartial review.

9            And for career federal employees, given

10    the news we're seeing right now today, sometimes

11    that's our fallback position.  This is political.

12    BY MR. WOOD:

13    Q      Did you feel like Core- -- while you were at

14    CoreCivic, do you feel like CoreCivic was treated in

15    certain ways by the BOP or the OIG because of

16    political considerations?

17    A      You know, that would be hard to say.  If I

18    was a mind reader, I would be able to, you know,

19    give you a definitive answer.  I think that

20    CoreCivic and the entire industry of private

21    corrections periodically undergoes people who don't

22    support the business strategy.

23            But a partner being involved in that, I've

24    not seen any evidence of that.

25            The Office of Inspector General, I don't

www.aptusCR.com

1    I, the undersigned, a Licensed Court

2    Reporter of the State of Tennessee, do hereby

3    certify:

4           That the foregoing proceedings were

5    taken before me at the time and place herein set

6    forth; that any witnesses in the foregoing

7    proceedings, prior to testifying, were duly sworn;

8    that a record of the proceedings was made by me

9    using machine shorthand, which was thereafter

10   transcribed under my direction; that the foregoing

11   transcript is a true record of the testimony given.

12          Further, that if the foregoing pertains

13   to the original transcript of a deposition in a

14   federal case, before completion of the proceedings,

15   review of the transcript [ X ] was [ ] was not

16   requested.

17          I further certify I am neither

18   financially interested in the action nor a relative

19   or employee of any attorney or party to this action.

20          IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: December 3, 2019

23   _Elisabeth A Miller Lorenz_

24   _____
     Elisabeth A. Miller Lorenz

25   RMR, CRR, LCR No. 66

Kim White
Grae vs. Corrections
Corporation of America, et al.
Confidential
Case 3:16-cv-02267    Document 384-11    Filed 01/22/21    Page 24 of 24 PageID #: 18961