# EXHIBIT 11

Case 3:16-cv-02267 Document 384-12 Filed 01/22/21 Page 1 of 19 PageID #: 18962

1        UNITED STATES DISTRICT COURT
2         MIDDLE DISTRICT OF TENNESSEE
3
4      NIKKI BOLLINGER GRAE, Individually
   and on Behalf of All Others
5      Similarly Situated,
6            Plaintiff,      Civil Action No.
7      vs.                   3:16-cv-02267
8      CORRECTIONS CORPORATION OF
   AMERICA, ET AL.,
9
         Defendants.
10
   _____
11
12      CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
13
14         VIDEOTAPED DEPOSITION OF KIM WHITE
15
16      Conducted virtually via remote videoconference
17              October 30, 2020
18
19
20
21
22
23    Reported by:
   Misty Klapper, RMR, CRR
24      Job No.: 10073533
25

```
 1           UNITED STATES DISTRICT COURT
 2            MIDDLE DISTRICT OF TENNESSEE
 3
 4     NIKKI BOLLINGER GRAE, Individually
    and on Behalf of All Others
 5     Similarly Situated,
 6          Plaintiff,         Civil Action No.
 7     vs.                     3:16-cv-02267
 8     CORRECTIONS CORPORATION OF
    AMERICA, ET AL.,
 9
          Defendants.
10
    _____
11
12
13
14
15
16
17     Videotaped deposition of KIM WHITE, taken on behalf of
18     Plaintiff, via Zoom remote videoconference, beginning at
19     9:04 a.m. CST on Friday, October 30, 2020, before Misty
20     Klapper, RMR, CRR.
21
22
23
24
25
```

```
1    APPEARANCES:
2    (ALL APPEARANCES VIA ZOOM REMOTE VIDEOCONFERENCE)
3    ON BEHALF OF PLAINTIFF:
4         CHRISTOPHER M. WOOD, ESQUIRE
          ROBBINS GELLER RUDMAN & DOWD LLP
5         414 Union Street, Suite 900
          Nashville, Tennessee 37219
6         (615) 244-2203
          E-mail: cwood@rgrdlaw.com
7                 clyons@rgrdlaw.com
8
    ON BEHALF OF DEFENDANTS:
9
          SARAH TOMKOWIAK, ESQUIRE
10        LATHAM & WATKINS, LLP
          555 Eleventh Street, N.W., Suite 1000
11        Washington, D.C. 20004-1304
          (202) 637-2335
12        E-mail: sarah.tomkowiak@lw.com
13               AND
14        MERYN C.N. GRANT, ESQUIRE
          LATHAM & WATKINS, LLP
15        355 South Grand Avenue, Suite 100
          Los Angeles, California 90071
16        (213) 485-1234
          E-mail: meryn.grant@lw.com
17
18
19   ALSO PRESENT:  DAVID CAMPBELL, VIDEO OPERATOR
20
21
22
23
24
25
```

1 With that, will the court reporter
2 please swear in the witness and we can
3 proceed.
4 MS. REPORTER: One moment.
5 Whereupon:
6 KIM WHITE,
7 was called for examination, and, after being duly
8 sworn, was examined and testified as follows:
9 MS. REPORTER: Thank you very much.
10 You may proceed.
11 EXAMINATION BY COUNSEL FOR PLAINTIFF
12 BY MR. WOOD:
13 Q. Good morning, Ms. White.
14 A. Good morning.
15 Q. When -- at -- at your last deposition
16 you testified that you were still working for
17 CoreCivic.
18 Is that still the case today?
19 A. Yes, it is.
20 Q. And I believe you previously
21 testified that you were doing project-based work.
22 Is that -- is that accurate?
23 A. That is still accurate, yes.
24 Q. And what types of projects have you
25 done for CoreCivic this year?

1 documents did you look at?
2    A. So back in the early 2000s, there was
3 a congressman, whose name escapes me right now,
4 who asked for there to be a review of private
5 prisons versus federal prisons.
6       And the question was whether or not
7 operating prisons was inherently governmental.
8 The order was abbreviated to A-76. That order
9 pretty much asked the Bureau of Prisons -- and I
10 believe it was done -- it might have been done by
11 the Office of Inspector General, but ultimately
12 it reviewed whether or not those services should
13 be outsourced or whether or not they should be
14 kept within the Federal Government if they were
15 deemed inherently governmental.
16       So that report was very
17 comprehensive. It did a side-by-side comparison.
18 And then it also looked at at what level should
19 private prisons, at least for the Federal
20 Government, take on those responsibilities, what
21 level of inmate, if you will.
22       So that was one memorable document
23 that we looked at.
24       The CFMs were the primary documents
25 and those were the ones that were quality

1　　assurance reviews by our own staff out of the
2　　program review division.
3　　　　Q.　　Any other congressionally mandated
4　　documents that you relied on?
5　　　　A.　　That was the -- probably the most
6　　memorable during my tenure, but I do know that
7　　there was -- there might have been one other that
8　　just escapes me right now, but that was a huge
9　　evaluation, the one that I mentioned that took
10　　quite a few years to accomplish.  So that's the
11　　one that's the most memorable for me.
12　　　　Q.　　Right.  And I'm just trying to
13　　understand if there's any others that you can
14　　recall that you relied on.
15　　　　A.　　As I mentioned, I don't have it in my
16　　memory banks today, but I do remember there being
17　　at least one other.  I just can't remember the
18　　time frame or the purpose of that particular
19　　review.
20　　　　Q.　　You said you'd look at any report
21　　that came out that was unfavorable to the
22　　facility when it came to performance.
23　　　　　　And what are you referring to there?
24　　　　A.　　So I'm referring to primarily those
25　　reports that came out of our program review

1　　division that were the -- the contract facility
2　　management documents or the CFM.
3　　　　　So if there were any significant
4　　deficiencies, if there was ever any kind of
5　　disturbance at those facilities where there was
6　　an after-action review, if there was anything
7　　that was considered corrective action oriented
8　　during routine reviews by those facilities, all
9　　of those kinds of documents and discussions would
10　　happen within the executive team.
11　　　　Q.　You weren't responsible for hiring
12　　employees at private prisons while you were at
13　　the BOP, right?
14　　　　A.　No, I was not.
15　　　　Q.　And you weren't responsible for --
16　　you had no responsibility regarding medical care
17　　at private prisons while you were at the BOP,
18　　right?
19　　　　A.　No, I was not.
20　　　　Q.　You had no responsibility for issuing
21　　notices of concern to private prisons while you
22　　were at the BOP, right?
23　　　　A.　No, that was not within my purview.
24　　　　Q.　And you had no responsibility for
25　　deciding whether to issue a cure notice to a

1    private prison while you were at the BOP?
2         A.    No, I did not.
3         Q.    You were not responsible for deciding
4    whether to renew a contract with a private
5    prison, right?
6         A.    No, that was not my responsibility.
7         Q.    And you weren't responsible for
8    deciding whether to rebid a contract either,
9    right?
10        A.    Not directly, but if that was a point
11   of discussion before the executive team, as a
12   member of that team I would be involved in those
13   discussions.
14        Q.    But you weren't responsible for the
15   decision, right?
16        A.    I was not directly responsible for
17   the decision, no.
18        Q.    And you weren't responsible for
19   deciding whether to terminate the contract with a
20   private prison?
21        A.    Again, I might be a -- a part of a
22   conversation about it, but ultimately I was not
23   responsible for that final decision.
24        Q.    Once you left the BOP and joined CCA,
25   what information did you have at that point about

1    Q.   In terms of staffing, there are
2    differences in how CCA's BOP facilities were
3    staffed versus BOP facilities, right?
4    A.   In the types of positions a little
5    difference in the numbers.  That was more
6    indicative of the facility footprint, less about
7    the BOP versus CoreCivic.
8         So it's really hard to compare
9    because you have to look at a variety of things,
10   other than just the numbers.
11   Q.   It -- it -- it's the case, right,
12   that BOP correctional officers were paid more
13   than CCA correctional officers, right?
14   A.   That is correct.  In some
15   circumstances they were more closely aligned in
16   certain parts of the country, further apart in
17   other parts of the country.
18   Q.   Well, as a general matter, right, the
19   CCA correctional officers were paid less, right?
20   A.   Generally CCA pay for correctional
21   officers was closer to state-run operations
22   versus the BOP.
23   Q.   Have you ever done any analysis to
24   determine whether the lower pay of CCA
25   correctional officers at BOP facilities versus

1  the BOP impacted the way that those facilities
2  performed?
3      A.   We periodically do labor force
4  analyses to look at a number of things.  Pay
5  happens to be one of them.  But what we look at
6  beyond comparing one agency to another is what's
7  happening in the labor market; what does the
8  Bureau of Labor Statistics provide in respect to
9  kind of across the United States -- United States
10  comparison; what is the minimum wage for that
11  location; how does it compare to other
12  organizations or companies within that area.  And
13  then retention rate is evaluated -- what do you
14  call it -- applicant flow is looked at.
15          So there are a number of things that
16  we look at beyond just the pay-for-pay
17  comparison.
18      Q.   Right.  My -- my question was whether
19  you ever analyzed whether the differential in pay
20  between CCA and the BOP impacted the quality of
21  the services provided at a facility.
22      A.   I don't know that we did that kind of
23  very specific target analysis, but I do know that
24  we looked at a variety of different variables
25  when it came to pay and retention and our ability

1  to attract people to work in those positions.
2      Q.   Did CCA have a higher turnover in
3  terms of facility employees than the BOP?
4      A.   It really depended on the location.
5  There are certain locations in the Bureau of
6  Prisons that had exceedingly high turnover.
7  Those tended to be in the more urban areas.  And
8  there were facilities in CoreCivic that had
9  nearly zero turnover in areas primarily because,
10  again, the job market, sometimes leadership.  But
11  more often than not, if there was a labor force
12  or a labor market that was challenging, it would
13  be challenging for the partner as well as it
14  would be for us.
15      Q.   Well, CCA had challenges in -- in --
16  in retaining employees at some of its BOP
17  facilities, right?
18      A.   We had challenges in retaining
19  employees at the BOP in the state of Georgia,
20  Tennessee, Colorado and Oklahoma.  Those were the
21  kind of six markets where we were struggling.
22  And a lot of it had to do with the -- the market
23  of those locations.
24      Q.   And, I'm sorry, when you say the BOP
25  and the states of Georgia, Tennessee, Colorado

1  and Oklahoma, those are separate areas, right?
2      A.   Those are state partners where
3  CoreCivic is responsible for the facility and the
4  offenders.
5      Q.   In addition to challenges retaining
6  employees at BOP facilities, right?
7      A.   Correct.  That -- that is in addition
8  to.
9      Q.   Okay.  And what analysis did you do,
10 if any, to determine whether the challenges that
11 CCA had in retaining employees at its BOP
12 facilities impacted the performance of those
13 facilities?
14     A.   Well, we would look at quality
15 assurance reports.  We would look at the number
16 of grievances that might be filed.  We would look
17 at inmate grievances, because many times when you
18 have turnover and other issues, that tends to
19 impact operational exhaustion.
20          We would look at the -- the number of
21 injuries that might have been occurring at that
22 facility.  And those are just a few of the items
23 that we would look at.  We'd also look at
24 turnover.  We would look at the number of
25 candidates we were hiring, when they were leaving

1  the organization and we would try to line up all
2  those data points to determine if we could
3  either, A, predict what was going to occur or, B,
4  at least find out where the pinch points were so
5  we could target solutions for those particular
6  challenges.
7           So our -- our analysis was pretty
8  comprehensive and we included a variety of
9  different metrics and variables in those
10 analyses.
11     Q.   You would look at notices of concern,
12 right, in terms of the BOP facilities?
13     A.   We would look at quality assurance
14 outcomes.  We would look at -- and that includes
15 everything that's associated with that and all of
16 the other variables that I mentioned.  That would
17 be one of them that we would certainly add to the
18 variable pool.
19     Q.   So a -- a notice of concern would be
20 something you'd add to the variable pool?
21     A.   Yeah, notices of concern across the
22 company were not that many.  It was still fairly
23 unusual to get those.  But certainly if a notice
24 of concern came up, that would be one of those
25 variables that we would add to the conversation

1   and try to determine if staffing or turnover or
2   the lack of training or injuries or -- or
3   interpersonal conflict, whatever the case is, was
4   contributing to operational performance issues.
5   　　　　So it was a -- a very comprehensive
6   evaluation. And it was done on more than one
7   occasion.
8   　　Q.　And CFMs would be another thing that
9   you'd look at to determine whether -- to
10  determine whether challenges in retaining
11  employees were impacting performance of a
12  facility?
13  　　A.　Everything associated with an audit
14  or quality assurance review, whether it was an
15  external partner review, whether it was internal
16  QA reviews, all of that information would be
17  evaluated because all of those are associated
18  with operational performance.
19  　　Q.　So a CFM would be included, right?
20  　　A.　The outcome of CFMs certainly would
21  be included, both good and bad. So, yeah, that's
22  a form of an audit. So that would be among
23  audits that we would evaluate.
24  　　Q.　And a cure notice like the one at
25  Cibola, that would be something that you'd

1  last name is escaping me right now. But she was
2  having challenges trying to get women to work at
3  that facility since it was an all-female
4  facility.
5      So there were conversations, as I
6  testified to earlier, that we had specific to
7  staffing challenges.
8      Q.  But those were staffing challenges in
9  general that the -- the BOP or those specific
10  wardens were facing, or at least some of them.
11  And I just want to be clear, did -- did you have
12  conversations with anyone at the BOP specifically
13  about the BOP's concern, or lack thereof, with
14  respect to CoreCivic's staffing deficiencies?
15      A.  No, I did not.
16      Q.  Okay. If you'd turn to page 7 of
17  Exhibit 591.
18      A.  Okay.
19      Q.  There's a -- under Kim White there's
20  a section that kind of has a bit of your kind of
21  biography and it goes onto the top of page 8.
22      Would -- would you just read that
23  and -- and -- and confirm whether that's -- all
24  of that is accurate?
25      A.  Do you want me to start at Ms. White

1   holds a bachelor's degree?
2       Q.  Yes, please.  And you can just read
3   it to yourself and just confirm whether or not
4   this -- the paragraph is accurate.
5       A.  I mentioned to the attorneys
6   yesterday that I started as the head of HR in
7   November of 2013 as the senior vice president of
8   HR and then was in place promoted to the EVP of
9   HR in 2015.  So I was in HR from November 2013
10  through May of 2019.
11          That's the only little distinction I
12  see that I'd like to bring to your attention.
13      Q.  Okay.  So in that respect, it's just
14  slightly incomplete; is that right?
15      A.  Well, it's mentioned as you go
16  further into the paragraph, so it's more out of
17  sequence than it is incomplete.
18      Q.  Okay.  I guess it also doesn't
19  mention that you're currently employed by
20  CoreCivic either, right?
21      A.  Let me see.
22          No, it does not reflect my special
23  advisor role.
24      Q.  Okay.  And is that -- that's the
25  official title of your current role, special

1　　advisor?
2　　　A.　Special advisor to the CEO.  That is
3　　the current title.
4　　　Q.　Do you -- do you know if there are
5　　other special advisors to the CEO aside from you?
6　　　A.　Yes, one of -- one of the
7　　individuals -- and I can't believe I've forgot
8　　his name -- is one of the founders of the
9　　company.  Oh, goodness.  This is embarrassing.
10　　　Q.　Is it a Beasley?
11　　　A.　No.  He -- he is Jeb Beasley's
12　　father.  It's the other gentleman who had been
13　　with the Alabama Department of Corrections.
14　　　Q.　Is it Krantz?
15　　　A.　No.  No, no, no.  Krantz left.
16　　　Q.　Hutto?
17　　　A.　Don Hutto.  Thank you for that.  And
18　　please don't tell him I forgot his last name.
19　　　Q.　We'll mark this part.
20　　　A.　But, yes, Don Hutto is a special
21　　advisor.
22　　　Q.　Any other --
23　　　A.　There have -- there have been others,
24　　but -- I don't know what title Mike Nalley has,
25　　but Mike, I believe, does part-time work for the

```
 1                    CERTIFICATE OF NOTARY
 2              I, MISTY KLAPPER, the officer before
 3      whom the foregoing deposition was taken, do
 4      hereby certify that the witness whose
 5      testimony appears in the foregoing
 6      deposition was duly sworn by me; that the
 7      testimony of said witness was taken by me in
 8      shorthand and thereafter reduced to
 9      typewriting by me; that said deposition is a
10      true record of the testimony given by said
11      witness; that I am neither counsel for,
12      related to, nor employed by any of the
13      parties to the action in which this
14      deposition was taken; and, further, that I
15      am not a relative or employee of any
16      attorney or counsel employed by the parties
17      hereto, nor financially or otherwise
18      interested in the outcome of this action.
19              Further, that if the foregoing pertains to
20      the original transcript of a deposition in a federal
21 case, before completion of the proceedings, review
22 of the transcript [ X ] was [  ] was not requested.
23      Dated: November 6, 2020
                                        _____
24                                      Misty Klapper, RMR, CRR
                                        and Notary Public
25
```