UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:16-cv-02267 |
| | ) | Honorable Aleta A. Trauger |
| Plaintiff, | ) ) | PLAINTIFF'S OPPOSITION TO |
| vs. | ) ) | DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF SCOTT DALRYMPLE |
| CORRECTIONS CORPORATION OF AMERICA, et al., | ) ) ) | |
| Defendants. | ) ) | |

**[FILED UNDER SEAL]**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ...................................................................................1

II.  SUMMARY OF DALRYMPLE'S OPINIONS .........................................2

III. LEGAL STANDARD...........................................................................5

IV.  ARGUMENT .......................................................................................6

    A.   Dalrymple's Measure of Inflation at the Time of the Yates Memo Is Reliable ..............................................................................6

    B.   Dalrymple's Measure of the Inflation Removed by the Cibola Non-renewal Announcement Is Reliable .................................8

    C.   Dalrymple's Damages Model Is Conservative and Reliable ................................11

        1.   Dalrymple's Conclusion that the Corrective Disclosures Were Relevant to the Alleged Fraud Is Sufficient to Measure Inflation .............11

        2.   Dalrymple's Model Concerning Risk is Appropriate ...............................12

        3.   Dalrymple Did Not Ignore Other Causes of CCA's Stock Drop...............14

    D.   Dalrymple's Opinions Are Relevant to Loss Causation ........................................17

        1.   Dalrymple Did Not Equivocate About Loss Causation............................17

V.   CONCLUSION....................................................................................19

CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ................................................................18

*Andler v. Clear Channel Broad., Inc.*,
  670 F.3d 717 (6th Cir. 2012) ..............................................................5, 6

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988)...........................................................................2, 8

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010)...............................................18

*Daubert v. Merrill Dow Pharms., Inc.*,
  509 U.S. 579 (1993).................................................................................5

*Glickenhaus & Co. v. Household Int'l, Inc.*,
  787 F.3d 408 (7th Cir. 2015) ..................................................................7

*Grae v. Corr. Corp. of Am.*,
  329 F.R.D. 570.......................................................................................14

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)...........................................................................2, 8

*In re: BP p.l.c. Sec. Litig.*,
  2016 WL 3090779 (S.D. Tex. May 31, 2016) .................................13, 14

*In re Cardinal Health Inc. Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) .................................................19

*In re CoreCivic, Inc.*,
  2019 WL 4197586 (6th Cir. Aug. 23, 2019)...........................................6

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
  529 F. Supp. 2d 644 (S.D. Tex. 2006) ...................................................8

*In re Novatel Wireless Sec. Litig.*,
  2013 WL 12144150 (S.D. Cal. Oct. 25, 2013) .......................................7

*In re Royal Dutch/Shell Transp. Sec. Litig.*,
  404 F. Supp. 2d 605 (D.N.J. 2005) ......................................................16

4848-3591-0359.v1

*In re Scrap Metal Antitrust Litig.*,
    527 F.3d 517 (6th Cir. 2008) ...................................................................6

*Kaplan v. Rose*,
    49 F.3d 1363 (9th Cir. 1994),
    *overruled on other grounds by*
    *City of Dearborn Heights Act 345 Police & Fire Ret. Sys.*
    *v. Align Tech., Inc.*,
    856 F.3d 605 (9th Cir. 2017) ...................................................................9

*Kaur v. City of Lodi*,
    263 F. Supp. 3d 947 (E.D. Cal. 2017)...................................................11

*King Cnty., Washington v. IKB Deutsche Industriebank AG*,
    708 F. Supp. 2d 334 (S.D.N.Y. 2010).....................................................9

*Liberty Media Corp. v. Vivendi Universal, S.A.*,
    923 F. Supp. 2d 511 (S.D.N.Y. 2013)....................................................12

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018),
    *cert. denied*, _ U.S. _,
    139 S. Ct. 2741 (2019)...............................................................16, 18

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
    830 F.3d 376 (6th Cir. 2016) ......................................................... *passim*

*Pacheco v. Johnson*,
    2017 WL 3149580 (M.D. Tenn. July 25, 2017) .............................11, 18

*Ret. Sys. v. Wal-Mart Stores, Inc.*,
    278 F. Supp. 3d 1128 (W.D. Ark. 2017)................................................10

*Seto v. CSX Transp., Inc.*,
    2017 WL 4556723 (M.D. Tenn. July 6, 2017) .....................................18

*Stotts v. Heckler & Koch, Inc.*,
    299 F. Supp. 2d 814 (W.D. Tenn. 2004)..................................................6

*Williams v. Illinois*,
    567 U.S. 50 (2012) (plurality opinion) ..................................................11

4848-3591-0359.v1

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §27 ..................................................................................................................2, 16
    §78u-4(e)(1) ...........................................................................................................16

Federal Rules of Civil Procedure
    Rule 23(f) .................................................................................................................6

Federal Rules of Evidence
    Rule 702 ...................................................................................................................5

4848-3591-0359.v1

## I. INTRODUCTION[1]

Defendants' motion to exclude the testimony of Scott Dalrymple (ECF No. 339-1) ("Motion" or "Mot.") should be denied, as his opinions are firmly grounded in the facts of this case and are the product of reliable methods, principles and fundamental economic analysis. While Defendants may disagree with W. Scott Dalrymple's ("Dalrymple") opinions, nothing in their Motion comes close to suggesting that any of his opinions should be excluded. Instead, Defendants criticize Dalrymple for **not** engaging in the type of legally-impermissible so-called "analyses," proffered by their own expert, which are based on unreliable methods and improperly seek to opine on ultimate questions of fact reserved for the jury.

First, Dalrymple's method of measuring inflation by back casting from the relevant disclosures is "commonly accepted," "reasonable and logical," and supported by overwhelming case law approving similar measures of inflation in securities class actions. Defendants do not substantively engage **at all** with this method of calculating inflation, and the fact that they might disagree with Dalrymple's ultimate calculation and believe some lower level of inflation is more reasonable (something they have failed to reliably quantify or articulate), provides no basis whatsoever for exclusion.

Second, Dalrymple does not ignore the efficient market theory in calculating the inflation associated with the Cibola non-renewal. To the contrary, Dalrymple **proved** that the market for CCA's stock was efficient throughout the Class Period,[2] a conclusion Defendants have never once

---

[1] "Plaintiff" is Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the LongView Collective Investment Fund. "Defendants" are Corrections Corporation of America ("CCA" or the "Company") and "Individual Defendants" Damon T. Hininger ("Hininger"), David M. Garfinkle ("Garfinkle"), Todd Mullenger ("Mullenger") and Harley G. Lappin ("Lappin"). Following the filing of this action, Defendants rebranded CCA and now refer to it as CoreCivic.

[2] The "Class Period" is between February 27, 2012 and August 17, 2016, inclusive.

disputed and that they themselves rely on to support their contentions. Defendants' suggestion that the Cibola non-renewal had no impact on CCA's stock price cannot be squared with economic reality: the fact that a local publication may have reported on certain information about the non-renewal shortly before the Company's announcement with no statistically significant stock price reaction is entirely consistent with the semi-strong theory of market efficiency endorsed by the Supreme Court in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258 (2014).

Defendants' remaining challenges also lack merit. The fact that GEO's stock price also declined following the Yates Memo[3] says nothing about whether CCA committed fraud or failed to disclose the risks to its Federal Bureau of Prisons ("BOP") business. Nor does the fact that CCA's stock price may have increased after the 2016 presidential election (before it subsequently declined again as CCA lost more BOP contracts), have any relevance to Plaintiff's measure of damages beyond the Private Securities Litigation Reform Act of 1995's ("PSLRA") 90-day look back, which Dalrymple incorporates into his analysis. And while Dalrymple's opinions are relevant to loss causation, the fact that he did not improperly rely on biased analyst reports to reach factual or legal conclusions reserved solely for the trier of fact (as Defendants' expert Lucy P. Allen ("Allen") did) provides no basis whatsoever for exclusion, and is a strength, not a weakness, of his opinions.

The Motion should be denied in its entirety.

## II.     SUMMARY OF DALRYMPLE'S OPINIONS

Dalrymple was retained by Plaintiff's counsel to "analyze and quantify the effect of [P]laintiff's allegations that the Defendants engaged in a scheme to defraud investors and made materially false and misleading statements and omissions regarding CCA's business and operations

---

[3]     Sally Q. Yates, "Reducing our Use of Private Prisons," dated August 18, 2016 ("Yates Memo").

that led to artificially inflated share prices [during the Class Period]." DEx. 4, ¶1.[4] As a result of his analyses, Dalrymple concluded that, if the jury determines that information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' alleged fraud (a question solely for the trier of fact), CCA's stock price was inflated. *Id*., ¶¶10-11, 90-97; *see Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) ("'a misstatement or omission is the "proximate cause" of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions'").

First, Dalrymple concluded that the Yates Memo caused an $8.06 per share decline in CCA's stock price on August 18-19, 2020 (a so-called "abnormal return") following its release. *Id*., ¶¶54-59; *id*. at Ex. 2 (ECF Page No. 88). While the entirety of this decline was related to the Yates Memo, Dalrymple accounted for the possibility that the per-share inflation associated with CCA's failure to disclose the allegedly concealed risks which manifested through the Yates Memo could be less than the $8.06 per share decline directly observable upon the Yates Memo's publication. *Id*., ¶¶80-89; *id*. at Appx. D (ECF Page Nos. 75-86). This is because the publication of the Yates Memo might have caused **some** decline in CCA's stock price even if the alleged risks had **not** been concealed by Defendants, as the **probability** of such risks coming to fruition turned into **certainty**. *Id*.[5] By comparing the expected value of CCA's BOP contracts before and after the Yates Memo, Dalrymple was able to reliably quantify this amount, concluding that had the allegedly concealed risks been disclosed during the Class Period, the Yates Memo would have nevertheless caused a $1.44 per share decline in CCA's stock price. *Id*., ¶¶80-89; *id*. at Appx. D. Subtracting this amount from the $8.06 per share price decline, Dalrymple conservatively concluded that the risks allegedly

---

[4]    All "DEx. _" citations herein are to the Declaration of Morgan E. Whitworth in Support of Defendants' Motion to Exclude Testimony of Scott Dalrymple (ECF No. 340).

[5]    *See* ECF No. 143 at 12-13.

4848-3591-0359.v1

concealed through Defendants' fraud caused CCA's stock price to be inflated by $6.62 per share before the Yates Memo's publication. *Id*., ¶89.

Second, Dalrymple calculated that the release of CCA's 2Q16 earnings results, which included the Company's announcement that the BOP had elected not to renew the Company's contract to operate the Cibola facility in New Mexico, resulted in a $1.82 per share abnormal return in CCA's stock price on August 4, 2016. *Id*., ¶52-53; *id*. at Ex. 1 (ECF Page No. 87). Dalrymple concluded that a portion of this decline was attributable to factors unrelated to the Cibola non-renewal, such as CCA's contemporaneous announcement that its contract to operate the South Texas Family Residential Center on behalf of U.S. Immigration and Customs Enforcement was being renegotiated. *Id*., ¶¶60-69. Nevertheless, applying well-established valuation principles, Dalrymple isolated the inflation caused by Defendants' alleged failure to disclose the risks associated with the Cibola contact by multiplying the expected funds from operations ("FFO") associated with the Cibola contract before the August 4, 2016 disclosure, by CCA's stock price multiple. *Id*. After accounting for the possibility that the announcement of the Cibola contract loss might have caused some decline in CCA's stock price even if the alleged risks had not been concealed by Defendants (consistent with the approach to measuring inflation associated with the Yates Memo), Dalrymple concluded that the risks allegedly concealed through Defendants' fraud caused CCA's stock price to be inflated by an additional $0.32 a share prior to the disclosure of the Cibola contract loss. *Id*., ¶89.

Finally, Dalrymple concluded that the impact of the allegedly concealed risks on CCA's stock price would have been different before CCA converted to a real estate investment trust ("REIT") in February 2013. *Id.*, ¶¶91-97. Because CCA's pre-REIT corporate tax rate was higher, its pre-REIT earnings and value would have been lower, reducing the amount of inflation associated

with Defendants' fraud. Dalrymple therefore reduced his estimates of share price inflation by 35% prior to CCA's REIT conversion in February 2013. *Id.*

In sum, Dalrymple calculated the per share inflation associated with Defendants' alleged fraud as follows:

- $4.51 per share between the start of the Class Period and the time CCA converted into a REIT;

- $6.94 per share between the time CCA converted into a REIT and CCA's disclosure of the Cibola contract loss; and

- $6.62 per share between the time of CCA's disclosure of the Cibola contract loss and the publication of the Yates Memo.

*Id.*, ¶¶10-11, 90-97. Dalrymple also concluded that damages are calculable on a Class-wide basis, as it is a matter of simple computation to determine an individual Class member's damages by reference to the number of shares purchased and held through a corrective disclosure, and the per share inflation observable on the date(s) of purchase. *Id.*, ¶¶12, 98-100.

## III. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It requires that: (a) the expert's proffered opinion "help the trier of fact"; (b) the expert's proffered opinion be "based on sufficient facts or data"; (c) the expert's proffered opinion be "the product of reliable principles and methods"; and (d) the expert "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court has a gatekeeping function under Rule 702 that imposes the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

A court should not exclude expert testimony based on contentions about the strength of the factual bases for the expert's opinions. *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012). Instead, the jury should be provided the opportunity to weigh the expert's opinion

- 5 -

"informed by [the opposing party's] vigorous cross-examination." *Id.*; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529, 532 (6th Cir. 2008) (upholding the admission of expert testimony even though opposing parties argued it rested on a "'shaky'" factual foundation because the "credibility and accuracy" of expert testimony is properly reserved for the jury). As a result, "the rejection of expert testimony is the exception rather than the rule." *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004) (citing advisory's committee's note on 2000 amendments).

## IV. ARGUMENT

### A. Dalrymple's Measure of Inflation at the Time of the Yates Memo Is Reliable

Defendants contend that Dalrymple's measure of inflation at the time of the Yates Memo is unreliable because his estimate of $6.62 per share in inflation must include claims "unrelated to the BOP contracts at issue in the case," and that "some portion of the $6.62 is related to CoreCivic's non-BOP contracts." Mot. at 7. Unfortunately for Defendants, their objection is not to Dalrymple's opinions, but to fundamental principles of loss causation and proximate cause, which foreclose their contentions.

"'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*, 830 F.3d 376, 384 (6th Cir. 2016) ("*OPERS*").[6] There is no dispute that the ***entirety*** of CCA's $8.06 stock price decline on August 15-16, 2016, which caused economic harm to Plaintiff and the Class,

---

[6] The United States Court of Appeals for the Sixth Circuit cited *OPERS* in finding that "[o]ur case law supports the legal standard that [this Court] applied," when certifying this Class, and denying defendants' Fed. R. Civ. P. 23(f) petition. *In re CoreCivic, Inc.*, 2019 WL 4197586, at *1 (6th Cir. Aug. 23, 2019).

- 6 -

resulted from the Yates Memo. DEx. 4, ¶77; ECF No. 346-6 at 49:9-51:7.[7] Plaintiff has alleged, and submits the trier of fact will conclude, that Defendants' failure to disclose, and concealment of, the risks associated with CCA's BOP contracts as a result of its systemic performance deficiencies proximately caused the losses suffered by Plaintiff and the Class because the Yates Memo "was within the zone of risk concealed by the misrepresentations and omissions." *OPERS*, 830 F.3d at 384.

While Dalrymple conservatively discounted the $8.06 stock price decline to account for notion that "when an event constitutes both a harm in and of itself and the revelation of a concealed truth, the value of the company may suffer from both" (ECF No. 143 at 13), Defendants have not and cannot identify ***any*** basis for contending that the remaining $6.62 per share is not a reliable measure of inflation that was removed by the Yates Memo and fully recoverable by Plaintiff and the Class.[8]

Indeed, Defendants cite no authority ***whatsoever*** for this proposition, and courts routinely reject similar contentions. *E.g.*, *Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408, 415 (7th Cir. 2015) ("[t]he best way to determine the impact of a false statement is to observe what happens when the truth is finally disclosed and use that to work backward"); *In re Novatel Wireless Sec. Litig.*, 2013 WL 12144150, at *10-*11 (S.D. Cal. Oct. 25, 2013) (finding the "commonly accepted method to calculate the value line known as backcasting" was a "reasonable and logical" method to

---

[7]    CCA's stock price declined $9.65 on August 18, 2016, and increased $1.51 the next day on August 19, 2016. DEx. 4, ¶¶55, 59. Dalrymple calculated inflation using this 2-day window, rather than a 1-day window on August 16, 2018, which would have yielded a larger inflation calculation.

[8]    For this reason, Defendants' contention that "most, if not all, of the remaining $6.62 of inflation Mr. Dalrymple claims is ***unrelated*** to the BOP contracts at issue in the case" (Mot. at 7), makes no sense, as the Yates Memo only related to BOP contracts. In any event, it is also false. Dalrymple testified that it was not his opinion that the majority of inflation is related to non-BOP business. Ex. 2 at 155:16-155:24. As Dalrymple explained during his deposition, Allen's simplistic contention that just 7% of the $6.62 decline should be recoverable is unsupportable. DEx. 1 at 136:12-137:21.

assess the true value and artificial inflation in the stock price prior to the date of the corrective disclosure); *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 716 (S.D. Tex. 2006) (observing the "out-of-pocket measure . . . allows 'a purchaser to recover the difference between the purchase price and the true value of the securities absent the alleged fraud as measured by the correction in the market price following [a] curative disclosure'").

Far from "junk science," Dalrymple applied sound economic principles in a manner that has been routinely endorsed by courts across the country addressing identical questions in order to measure the inflation associated with Defendants' misconduct.

### B. Dalrymple's Measure of the Inflation Removed by the Cibola Non-renewal Announcement Is Reliable

Defendants assert that Dalrymple's measure of the inflation removed by the Cibola non-renewal announcement is unreliable, erroneously contending it is irreconcilable with the efficient market hypothesis, and arbitrarily contradicts Dalrymple's methodology for calculating damages associated with the Yates Memo. Mot. at 9-11.

First, the fact that there was no observable statistically significant price decline the day after the purported publication of news regarding the Cibola non-renewal does not mean that inflation was not removed from CCA's stock price by the time the Company itself announced the Cibola non-renewal on August 4, 2016. *See* Mot. at 9-11.[9] Contrary to Defendants' contentions, neither market efficiency, nor *Basic*, nor the Supreme Court's latest discussion of the efficient market hypothesis, dictate that all "news" from all sources is instantly and completely reflected in a company's stock price. *See Halliburton*, 573 U.S. at 271-72 ("'To recognize the presumption of reliance, the [*Basic*] Court explained, was not 'conclusively to adopt any particular theory of how quickly and completely

---

[9]    Defendants, **who took no affirmative Class-wide fact discovery whatsoever in this case**, have failed to introduce **any** admissible evidence demonstrating that the articles they contend were published on August 1-2, 2016, were actually published on those exact days, much less the reach or circulation of these local publications.

publicly available information is reflected in market price.'"). In fact, Dalrymple's analysis is fully consistent with market efficiency, as "[a]n efficient market will ignore . . . articles that did not appear in sufficiently circulated and credible sources." *Kaplan v. Rose*, 49 F.3d 1363, 1378 n.3 (9th Cir. 1994), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017).

Second, Dalrymple's inflation calculations are neither arbitrary nor inconsistent but grounded in valuation principles. As he explained, Dalrymple used FFO multiples to calculate the proportion of CCA's stock price decline on August 4, 2016, reasonably attributable to the Cibola non-renewal because, unlike with respect to the Yates Memo, the presence of confounding information regarding the renegotiation of the South Texas facility contract, among other things, required Dalrymple to disaggregate the August 4, 2016 stock price decline. DEx. 4, ¶¶60-69. In doing so, Dalrymple was merely required to "'ascribe some rough proportion of the whole loss to' [defendants' fraud]." *King Cnty., Washington v. IKB Deutsche Industriebank AG*, 708 F. Supp. 2d 334, 339 (S.D.N.Y. 2010). Here, Dalrymple did far more, providing a reliable analysis of the portion of CCA's August 4, 2016 price decline attributable to the Cibola non-renewal by applying bedrock and unassailable economic principles, consistent with standard valuation methods and techniques applied by analysts covering CCA at the time. DEx. 4, ¶¶60-69.

All else equal, "[t]he value of an asset or security is generally driven by the discounted value of future cash flows it is expected to generate." *Id.*, ¶35 n.61; Ex. 1 at 139:25-140:5.[10] It is undisputed that the Cibola non-renewal was expected to reduce CCA's future cash flows, and Defendants do not challenge Dalrymple's conclusions that "the Cibola contract had been expected to

---

[10] All "Ex. __" citations herein are to the Declaration of Christopher M. Wood in Support of Plaintiff's Opposition to Defendants' Motion to Exclude Testimony of Scott Dalrymple, filed concurrently herewith, unless otherwise indicated.

contribute $0.04 per share per year to FFO." DEx. 4, ¶63. Nor do they dispute that "analysts considered the loss of approximately $0.04 FFO per year into their valuations along with other revisions that CCA made to its guidance." *Id*. By calculating the proportion of the August 4, 2016 decline attributable to the Cibola non-renewal through valuing the expected reduction in future cash flows resulting therefrom, Dalrymple was simply applying fundamental valuation principles to undisputed facts.[11]

If anyone's contentions are "inconsistent and unreliable," it is Defendants, who contend that an announcement which caused securities analysts and the Company itself to reevaluate and ***reduce*** CCA's future earnings projections did ***not*** partially contribute to an undisputed stock price decline when it was announced by the Company. *See* Mot. at 12. This defies all logic, and is itself inconsistent with CCA trading in an efficient market, which Dalrymple independently corroborated and ***Defendants do not dispute***, but in fact themselves rely on, in advancing their own defenses. *See* Ex. 1 at 65:1-15.[12]

---

[11] Defendants' contention that courts "demand event studies from damages experts in securities class action[s]" (*see* Mot. at 11), is remarkable considering that their own damages expert, Allen, admitted that she failed to conduct an event study in reaching her own opinions. Ex. 1 at 151:7-12. In any case, Dalrymple did conduct an event study, and his FFO analysis was specifically designed to "'distinguish between the fraud-related and non-fraud related influences of the stock's price behavior'" (Mot. at 11), and provides a reliable estimate of the proportion of the August 4, 2016 decline associated with the Cibola non-renewal. Nothing more is required.

[12] Defendants' contention that "damages are not recoverable for securities fraud where the company's stock price did not react after the alleged corrective disclosure" (*see* Mot. at 10), is inaccurate. *E.g.*, *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, 278 F. Supp. 3d 1128, 1130-32 (W.D. Ark. 2017) (rejecting defendants' contention that a plaintiff is limited to a "market-price methodology in measuring damages to the class," and finding that plaintiff may measure damages through a "build-up method," which measures "'total loss to shareholders' by combining (1) direct costs resulting from a company's misconduct which were unknown to investors when they bought its stock, and (2) the company's reputational loss, an empirically derived multiple of direct costs.'"). In any case, Dalrymple's analysis does quantify the portion of CCA's stock price reaction on August 4, 2016, fairly attributable to the Cibola non-renewal announcement. DEx. 4, ¶¶60-69, 89; *id*. at Ex. 1 (ECF Page No. 87).

- 10 -

### C. Dalrymple's Damages Model Is Conservative and Reliable

#### 1. Dalrymple's Conclusion that the Corrective Disclosures Were Relevant to the Alleged Fraud Is Sufficient to Measure Inflation

Defendants contend that Dalrymple failed to form any "opinions as to whether the Yates Memo or the Cibola non-renewal announcement actually 'contain[ed] information relevant to' the challenged statements," contending that he "simply assumed, at the direction of counsel, that they did." Mot. at 12-13. Not so. Dalrymple did conclude that the Yates Memo and Cibola non-renewal related to the alleged fraud. DEx. 4, ¶¶80-89. And the fact that Dalrymple's opinions are predicated on the trier of fact determining "that information revealed through the corrective disclosures was within the zone of risk concealed through Defendants' allege fraud" (*id.*, ¶12), is a strength of his report, not a defect. *See* Mot. at 12-13.

Unlike Allen, who improperly intruded on the province of the jury by purporting to opine on questions for the trier of fact, Dalrymple appropriately cabined his opinions to be predicated on the jury finding that Defendants had indeed misled investors about the risks to CCA's BOP business which manifested through the Cibola non-renewal and the Yates Memo. As such, Dalrymple's calculations are not "'connected to [the underlying] data only by the *ipse dixit* of the expert.'" *See* Mot. at 13. They are connected to the facts by the jury's conclusions, as they should be. ECF No. 345 at 9 ("Whether Plaintiff can prove loss causation is ultimately a question for the jury, not an expert."); Mot. at 20 ("[L]oss causation is ultimately up to the trier of fact."); *Pacheco v. Johnson*, 2017 WL 3149580, at *2 (M.D. Tenn. July 25, 2017) ("[a]n expert cannot assert an opinion that resolves a question of law or an ultimate question of fact that is within the province of the jury"). Nothing more is required. *See Kaur v. City of Lodi*, 263 F. Supp. 3d 947, 978 (E.D. Cal. 2017) ("[H]elpful expert testimony is not restricted to opinions regarding factual matters that are undisputed.). *See Williams v. Illinois*, 567 U.S. 50, 57 (2012) (plurality opinion) ('Under settled

- 11 -

evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.'). In such a case, the expert's opinion is contingent upon a factfinder agreeing with the facts as the expert assumes them.").

### 2. Dalrymple's Model Concerning Risk is Appropriate

Defendants contend Dalrymple's inflation calculations are unreliable because he assumes an "all-or-nothing, binary condition such that inflation in the stock price was either $6.94 or $0," and that this "is not how investors treat risk in real life." Mot. at 14-15. Once again, Defendants' critiques are baseless.

Dalrymple was not required to account for every possible gradation of risk in reaching his conclusions. An almost identical contention was rejected by Judge Schiendlin in *Liberty Media Corp. v. Vivendi Universal, S.A.*, 923 F. Supp. 2d 511 (S.D.N.Y. 2013), when the defendants there claimed that the plaintiffs' expert's inflation calculation was unreliable because it assumed the same amount of inflation for dozens of different statements, many of which the jury concluded were not false. *Id*. at 525. The court explained that plaintiff's expert's theory was not tied to any one specific misstatement, but rather was calculated "by analyzing the declines in Vivendi's stock price on the nine days during which the market responded to the materialization of the hidden liquidity risk. Vivendi has offered no legal basis for concluding that this was an unacceptable approach." *Id*. Indeed, even if "it might in theory have been possible to offer a more precise causal analysis . . . the law does not require the use of such a fine-grained quantitative method." *Id*. at 525-26

Nor was Dalrymple required to assess "when CoreCivic entered this 'zone of risk.'" Mot. at 14. Again, this is a question for the trier of fact. ECF No. 345 at 9.[13] And regardless of how

---

[13] Dalrymple explained that his measure of inflation would apply anytime the jury found Defendants entered the zone of risk. DEx. 1 at 182:25-183:23. In any case, as explained in

Defendants think investors treat risk in real life (*see* Mot. at 15), Dalrymple's inflation calculation is consistent with Plaintiff's claims, as Defendants' liability for making false and misleading statements and omissions is also binary – either they were materially misleading, or they were not. *See* ECF No. 76 at 25, 30-36.[14] In other words, if the jury were to find that Defendants made inaccurate representations or omitted material information regarding CCA's BOP performance contracts, but that such omissions or misstatements did not rise to the level of being material, Plaintiff's claims would fail, and the fact that CCA's stock might have been marginally inflated by such misrepresentations (*i.e.*, at some level less than what Dalrymple calculated), would be moot.

*In re: BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *2 (S.D. Tex. May 31, 2016) supports Dalrymple's methodology. *See* Mot. at 15. In *BP*, the Court noted that "'when the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent.'" 2016 WL 3090779, at *33. In *BP*, the probability of the risk materializing was ***not*** 100% (plaintiffs only claimed it was "highly likely"), yet plaintiff's expert claimed as damages "100% of the stock price movement on the date of correction." *Id.* For obvious reasons, not least of which was the fact that "the Court warned

_____

Plaintiff's Opposition to Defendants' Motion for Summary Judgment ("MSJ Opp."), filed contemporaneously herewith, Plaintiffs theory is that Defendants' omissions were materially misleading throughout the entire Class Period.

[14] The fact that "the allegedly concealed risk Plaintiff complains of here could fluctuate over time" (Mot. at 14), is irrelevant because Mellendick testified, and Plaintiff will prove, that CCA's performance for the BOP "was largely deficient" ***throughout*** "the timeframe of this case," for example because "[f]rom the beginning of [the Adams] contract [in 2009], CCA struggled to provide acceptable performance in Health and Correctional Services" and "[f]rom the beginning of [the second Cibola] contract [in 2010], CCA struggled to provide acceptable performance in Health Services." ECF No. 336-3 at 5, 11, 15.

- 13 -

Plaintiffs of this very problem in its class certification memorandum and order," the Court found

plaintiffs' measure of damages unreliable. *Id*.[15]

Here, Dalrymple accounted for the ***exact*** defect identified by the *BP* court. DEx. 4 at Appx.

D (ECF Page Nos. 75-86). While Dalrymple found that the abnormal return associated with the

Yates Memo amounted to $8.06 per share, he does ***not*** calculate that 100% of this abnormal return

are damages. *Id*. Instead, Dalrymple dedicates over 12 pages in his report to explaining how he

valued inflation assuming Plaintiff would prove ***not*** that CCA was ***certain*** to lose its BOP business,

but rather that CCA was ***likely*** to lose such business. *Id*., ¶¶25-28. As a result, of the $8.06 per

share abnormal return associated with the Yates Memo, Dalrymple excludes $1.44 per share as

representing the decline associated with, as this Court put it, "the event," rather than the undisclosed

"possibility of [the] calamitous event." *Grae v. Corr. Corp. of Am.*, 329 F.R.D. 570, 579.

Defendants do not offer a plausible competing calculation of the inflation caused by Defendants'

undisclosed risk and their assertion that Dalrymple failed to account for the defect identified by this

Court in *BP* is categorically false.

### 3. Dalrymple Did Not Ignore Other Causes of CCA's Stock Drop

Defendants contend that Dalrymple failed to disaggregate confounding information which

contributed to the post-Yates Memo stock drop "besides its supposed revelation of [CCA's] poor

relationship with the BOP." Mot. at 15-16. These contentions are specious, as the entirety of the

post-Yates Memo stock drop relates to the Yates Memo, which is causally connected with

Defendants' fraud.

---

[15]  This Court made a functionally identical observation in its January 18, 2019 Order: "[E]ven
when the public is fully apprised of the possibility of some calamitous event, the value of an affected
company should still be expected to go down if the event actually occurs, because, at that point, the
relevant harm went from being a possibility to a certainty." ECF No. 143 at 13.

First, Defendants assert that because one of CCA's competitors, GEO, also declined following the Yates Memo, Dalrymple should have controlled for the decline in GEO's stock, contending that "something besides market recognition of CoreCivic's purportedly impaired BOP relationship [caused] both companies' stock prices to drop following the Yates Memo," which would require disaggregation. Mot. at 15-16.[16]

This makes no sense. Maybe, as Defendants suggest, GEO's stock price did decline because the market believed that it too would lose business in the wake of the Yates Memo. But there is no evidence whatsoever to suggest that the Yates Memo caused CCA's stock price to drop *further* than it otherwise would have dropped because of negative non-fraud related information. Indeed, contrary to Defendants' contentions, there are any number of reasons why CCA's and GEO's stock prices could have dropped by similar amounts in recognition of decreased expectations of future BOP revenues which would be consistent with the notion that CCA committed fraud while GEO did not.[17] Maybe unlike Hininger, Garfinkle, Mullenger and Lappin, GEO's executives did not have actual knowledge of disastrous conditions in their prisons which were causing inmates to die from medical neglect and caused a correctional officer to be murdered by an inmate. *See generally* MSJ Opp. Maybe GEO did not receive consistent complaints from the BOP regarding its failure to comply with contractual requirements, and therefore did not reasonably expect to lose such contracts. *Id*. Or maybe GEO committed fraud as well. Because there is no requirement that investors understand that they have been defrauded in order for a plaintiff to prove loss causation, the decline in GEO's stock price is simply irrelevant to determining inflation, loss causation and

---

[16]  It is undisputed that Dalrymple controlled for industry returns in conducting his event study. DEx. 4 at Ex. 1; Ex. 2 at 203:24-204:10.

[17]  In reality, the brunt of the Yates Memo was in fact borne by CCA alone, and not GEO. DEx. 4, ¶¶30-36; *id*. at Ex. 1. While CCA lost all but one of its BOP contracts in the years after the Yates Memo, GEO *gained* contracts with the BOP. *Id.*

- 15 -

damages, and it would have been an error for Dalrymple to include GEO's stock price in his event study. DEx. 4, ¶¶30-36; *id.* at Ex. 1; *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 754 (9th Cir. 2018), *cert. denied*, _ U.S. _, 139 S. Ct. 2741 (2019) ("A plaintiff may also prove loss causation by showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss.").[18]

Second, while Defendants criticize Dalrymple for "ignor[ing] the rebound in [CCA's] stock price after the 2016 presidential election" (Mot. at 17), they fail to establish why Dalrymple should have considered it in the first place. *See id.*, ¶¶24-29; *id.* at Ex. 1. Nor do Defendants cite any case law suggesting such a task is even permissible. To the extent Defendants contend that damages should be reduced by increases in CCA's stock price decline following the corrective disclosures, the PSLRA's 90-day lookback, and it alone, provides the statutory mechanism for calculating such an adjustment in damages. 15 U.S.C. §78u-4(e)(1). Dalrymple's analysis and calculations incorporates the limitations required by the PSLRA. *Id.*, ¶¶99-100. Nothing more is required, as the PSLRA "renders irrelevant to the calculation of damages any movement in the price of the security" after the end of the 90-day look-back period. *In re Royal Dutch/Shell Transp. Sec. Litig.*, 404 F. Supp. 2d 605, 609 (D.N.J. 2005).[19]

---

[18] Defendants' own expert did not control for GEO's stock price in her event study. ECF No. 99-3, ¶¶24-25. As Dalrymple testified, it would not be appropriate to include GEO's stock price in the event study, since it would improperly subject the results to idiosyncratic and company-specific movements in GEO's stock price. Dalrymple Dep. at 201:23-204:9. In his rebuttal report, Dalrymple also explained that GEO is an inappropriate benchmark in this matter and that Allen's superficial single-day comparison of CCA and GEO returns is uninformative. DEx. 2, ¶¶30-36.

[19] Defendants' contention that Dalrymple should have considered the so-called recovery in CCA's stock price is also impossible to apply in practice, even if it were legally permissible, because it contains no limiting principle. Should the trier of fact consider CCA's stock price behavior up until today, when CCA's stock trades at almost 50% below the lowest point it reached following the Yates Memo? Should these losses also be recoverable?

- 16 -

4848-3591-0359.v1

Case 3:16-cv-02267   Document 386   Filed 01/22/21   Page 21 of 28 PageID #: 19038

### D.    Dalrymple's Opinions Are Relevant to Loss Causation

#### 1.    Dalrymple Did Not Equivocate About Loss Causation

Defendants contend that Dalrymple provided inconsistent answers regarding whether he was opining on loss causation, and the Court should "not permit Mr. Dalrymple to flip flop again at trial and attempt to offer an opinion on loss causation."  Mot. at 18-19.  Defendants also contend that Dalrymple failed to "connect the risks supposedly concealed by Defendants' alleged fraud with the purported materialization of those risks," and yet again regurgitate their already rejected contentions that the Yates Memo cannot demonstrate loss causation.  *Id*. at 20-24.

As Dalrymple explained in his report, he "measured the loss caused by the materialization of the allegedly concealed risks by reference to the share price reactions corresponding to the corrective disclosures, adjusting for the impact of factors other than the revelation of allegedly concealed risks."  DEx. 4, ¶11.  He did not equivocate about this in deposition and Defendants' reference to excerpts from Dalrymple's deposition do not suggest otherwise and only demonstrate that Dalrymple has remained clear and consistent about which areas are and are not covered by his opinions.

While Dalrymple does not improperly attempt to resolve an ultimate question of fact, like Allen, his opinions are clearly relevant to loss causation.  For example, Dalrymple concluded (and Allen does not dispute) that the Yates Memo was the sole cause of CCA's stock price decline between August 18-19, 2016.  DEx. 4, ¶77.  Dalrymple concluded that the Cibola non-renewal accounted for $0.46 per share decline in CCA's stock price following its announcement.  *Id.*, ¶¶60-69, 89.  Dalrymple concluded that the information revealed through the Cibola non-renewal and the Yates Memo were related to Plaintiff's allegations that Defendants concealed the extent of the risks associated with its BOP contracts.  *Id.*, ¶¶17-34.  But it is unremarkable that Dalrymple has no opinion regarding whether Plaintiff's allegations are true or whether the declines in CCA's stock price were "'the result of fraud by the [D]efendants'" (Mot. at 18), as such a conclusion would be

- 17 -

improper for an expert to render. *Pacheco*, 2017 WL 3149580, at *2; *Seto v. CSX Transp., Inc*., 2017 WL 4556723, at *6 (M.D. Tenn. July 6, 2017); *see also* Mot. at 20 ("loss causation is ultimately up to the trier of fact").

Finally, Defendants baselessly criticize Dalrymple for failing to conduct the type of unscientific, irrelevant and excludible "analysis" they themselves attempt to proffer through Allen. Mot. at 20-24. For instance, Defendants contend Dalrymple should have reviewed analyst reports, as Allen did, to parrot speculation about the motivation for the Yates Memo, yet such an "analysis" would be wholly improper. ECF No. 345 at 11-12.[20] Indeed, "market commentary" about whether the Yates Memo "revealed any information that was concealed by Defendants' alleged misrepresentations," is a thinly veiled attempt to require a mirror disclosure to prove loss causation. Mot. at 21.[21] Courts repeatedly reject such a requirement. *See, e.g.*, *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 715-16 (E.D. Mich. 2010) (declining to "requir[e] an admission by the [d]efendants of illegal wrongdoing, and a revelation that their prior statements were actually

---

[20]  Defendants have never once explained: (i) what basis market analysts would have for discerning the intent behind the Yates Memo beyond rank speculation or simply parroting Defendants' misleading excuses; (ii) how the opinions of market analysts would be admissible (Defendants failed to take ***any class wide fact discovery in this case***); (iii) why a market analyst would have any basis to conclude one way or another what information Defendants had in their possession regarding undisclosed risks to BOP contracts prior to the Yates Memo; or (iv) why a market analyst's subjective belief about whether Defendants committed fraud is in any way relevant to this case.

[21]  The requirement Defendants seek to impose is irrelevant because, most fundamentally, market analysts would have no possible way of knowing whether Defendants knew, but failed to disclose, the extent of the risks associated with CCA's BOP contracts unless CCA disclosed this information, and in other words, admitted to fraud. *See, e.g.*, *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) ("If a fact-for-fact disclosure were required to establish loss causation, a defendant could defeat liability by refusing to admit the falsity of its prior misstatements."). As a result, even if Defendants were correct that "[n]one of the analyst reports published in the wake of the Yates Memo implied that [CCA] had misled investors with respect to the risk of losing its BOP contracts," such a showing would be meaningless as it would have no bearing on whether the Yates Memo was in fact the materialization of a risk, the extent of which Defendants fraudulently concealed. Mot. at 21. *See Mineworkers'*, 881 F.3d at 754 (market need not understand fraud had occurred for plaintiff to prove loss causation). To suggest that investors must understand they have been defrauded in order for a plaintiff to establish loss causation directly contradicts the Sixth Circuit's holding in *OPERS*.

- 18 -

false, before loss causation can be pled") (collecting cases); *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 760 (S.D. Ohio 2006) (similar). Nor were any of the risks concealed by Defendants' fraud, including specifically the risks to CCA's BOP relationship, revealed before the alleged corrective disclosures. *See* Mot. at 22; ECF No. 345 at 12-15. It should not escape the Court's attention that Defendants' own expert proposed this analysis herself, and yet dissembled by intentionally failing to analyze some of the most central statements at issue in the case. *Id.*

In short, Dalrymple's opinions are fully contained in his reports. Ex. 2 at 12:2-14:13. He does not intend to testify beyond the scope of his reports, and Defendants have failed to demonstrate any basis for excluding or limiting his opinions related to loss causation, or any other aspect of his report.

## V. CONCLUSION

Defendants' Motion should be denied in its entirety.

DATED: January 22, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

- 19 -

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
KENNETH J. BLACK
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
JASON A. FORGE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

- 20 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on January 22, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J. Black**
  kennyb@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **Meryn C.N. Grant**
  Meryn.Grant@lw.com

- **Dennis J. Herman**
  dherman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Faraz Mohammadi**
  faraz.mohammadi@lw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Sarah A. Tomkowiak**
  sarah.tomkowiak@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com,morgan-whitworth-8044@ecf.pacerpro.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,smorris@rgrdlaw.com,CWood@ecf.courtdrive.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,smorris@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)