UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

| | |
|---|---|
| NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>CORRECTIONS CORPORATION OF AMERICA, et al., )<br>)<br>Defendants. )<br>) | Civil Action No. 3:16-cv-02267<br><br>Honorable Aleta A. Trauger<br><br>PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DONNA MELLENDICK |

**[FILED UNDER SEAL]**

4810-7037-4358.v1

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ...................................................................................................1

II.   BACKGROUND ....................................................................................................2

      A.    Reliable Support for CCA's Failures and Deficiencies ...........................2

      B.    Mellendick's Qualifications and Thorough Analysis ...............................3

III.  LEGAL STANDARD..............................................................................................6

IV.   ARGUMENT ..........................................................................................................7

      A.    The Only Made-up Things Here Are Defendants' Arguments.................9

      B.    Honesty Is Not Disqualifying ................................................................10

      C.    Mellendick's Sources Are Unassailable and Her Opinions Objectively
            Supported...............................................................................................11

      D.    Defendants' Improperly Attempt to Reconstruct Mellendick's Opinion on
            CCA's Competitiveness..........................................................................14

V.    Mellendick's Opinion on the Disparity Between BOP Prisons and CCA's Prisons
      Is Relevant and Reliable (and Right)...........................................................15

VI.   CONCLUSION......................................................................................................18

4810-7037-4358.v1

# TABLE OF AUTHORITIES

Page

**CASES**

*Andler v. Clear Channel Broad., Inc.,*
670 F.3d 717 (6th Cir. 2012) ...................................................................7

*Barbourville Nursing Home v. United States HHS,*
174 F. App'x 932 (6th Cir. 2006) .....................................................12, 13

*Best v. Lowe's Home Ctrs., Inc.,*
563 F.3d 171 (6th Cir.2009) ..................................................................11

*Braun v. Wal-Mart, Inc.,*
2006 Minn. Dist. LEXIS 78 (D. Minn. Mar. 31, 2006) ..........................14

*Daubert v. Merrill Dow Pharm.,*
509 U.S. 579 (1993) ..........................................................................6, 12

*In re Scrap Metal Antitrust Litig.,*
527 F.3d 517 (6th Cir. 2008) ...................................................................7

*Jenson v. Eveleth Taconite Co.,*
130 F.3d 1287 (8th Cir. 1997) .................................................................7

*Johnson v. Manitowoc Boom Trucks, Inc.,*
484 F.3d 426 (6th Cir. 2007) .................................................................11

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) .................................................................................6

*McCullock v. H.B. Fuller Co.,*
61 F.3d 1038 (2d Cir. 1995) .....................................................................7

*Mohney v. USA Hockey, Inc.,*
138 F. App'x 804 (6th Cir. 2005) ..........................................................14

*Stotts v. Heckler & Koch, Inc.,*
299 F. Supp. 2d 814 (W.D. Tenn. 2004) ..................................................7

*TBL Collectibles, Inc. v. Owners Ins. Co.,*
285 F. Supp. 3d 1170 (D. Colo. 2018) ...................................................13

*United States v. Hankey,*
203 F.3d 1160 (9th Cir. 2000) .................................................................7

- ii -

*United States v. Joseph*,
542 F.3d 13 (2d Cir. 2008)........................................................................................7

*United States v. L.E. Cooke Co.*,
991 F.2d 336 (6th Cir. 1993) ...................................................................................11

*United States v. Long*,
328 F.3d 655 (D.C. Cir. 2003) ..................................................................................7

*Woods v. Lecureux*,
110 F.3d 1215 (6th Cir. 1997) .................................................................................18

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Evidence
Rule. 701 ...............................................................................................................8
Rule 702 .................................................................................................6, 7, 8, 11
Rule 704 ...............................................................................................................18

4810-7037-4358.v1

# I.  INTRODUCTION

For years, Defendants[1] concealed their deficient performance by corrupting the Federal Bureau of Prison's ("BOP") contracting and contract review process.  They did not achieve this corruption through overt bribes – though Hininger and Garfinkle approvingly discussed a scheme to disguise a $1 million "inducement" as a "fine" to avoid losing one of CCA's poorly performing prisons – but rather by using CCA as a golden goose for BOP officials to enjoy upon leaving the BOP.  In just a few years, CCA could pay former BOP officials more than what they had earned throughout their entire BOP careers.  This discouraged BOP employees from criticizing CCA, as such criticism could: (1) close the door to lucrative post-government opportunities; and (2) alienate former high-ranking BOP officials, who still had their connections within the BOP.

Nevertheless, many rank-and-file BOP employees performed their jobs conscientiously, which led to findings of unprecedented deficiencies and failures by CCA.  By December 2014, CCA's performance was so bad that its past performance at other prisons caused it to lose a new BOP contract despite being the lowest bidder.  Donna Mellendick ("Mellendick") was one of those conscientious BOP employees, and her decades of BOP experience include years as the head of the BOP division that monitored CCA's performance.  Plaintiff retained Mellendick to offer her opinions on: (1) the quality of CCA's performance; (2) whether and when CCA was unlikely to win a competitively bid BOP prison contract; and (3) whether the services CCA provided at its prisons were sufficiently like services at BOP facilities to allow an apples-to-apples cost comparison.  These topics are central to issues in dispute here and Mellendick's opinions, based on her specialized knowledge, experience and training are well-reasoned and well-supported.  Defendants' motion to exclude her testimony is just another attempt to game the system and silence their critics.

---

[1] Defendants include Corrections Corporation of America ("CCA"), now known as CoreCivic, Inc., Damon Hininger, David Garfinkle, Todd Mullenger and Harley Lappin.  Plaintiff is Lead Plaintiff and Class Representative Amalgamated Bank, as Trustee for the LongView Collective Investment Fund.

4810-7037-4358.v1

## II. BACKGROUND

### A. Reliable Support for CCA's Failures and Deficiencies

Defendants' own experts, D. Scott Dodrill ("Dodrill") and Lappin, have testified to CCA's unprecedented deficiencies and failures, including the following examples:

- Only low-security prison for BOP prisoners that allowed a riot in which prisoners took staff members hostage occurred at a CCA low-security prison. Ex. A at 66:4-11.[2]

- Only low-security prison for BOP prisoners that allowed a riot in which prisoners murdered a corrections officer was at a CCA low-security prison. *Id.* at 66:24-67:5; Ex. B at 96:7-97:1.

- Only prison for BOP prisoners without intelligence officers who spoke the native language of the majority of its inmates was a CCA-run prison. Ex. A at 81:23-82:4.

- Only known prison for BOP prisoners that incurred a triple Repeat Deficiency was a CCA-run prison (even though CCA ran only five BOP prisons versus 120 BOP-run prisons). *Id.* at 205:16-206:4.

- Only known prison for BOP prisoners that incurred a quadruple Repeat Deficiency was a CCA-run prison (even though CCA ran only five BOP prisons versus 120 BOP-run prisons). *Id.* at 204:2-25.

- Only known prison for BOP prisoners in which the BOP determined that an overdose of medications could have predisposed a prisoner to side effects and eventually a disease that killed the prisoner was a CCA-run prison. *Id.* at 187:10-23.

- Using video surveillance, BOP caught CCA staff not working when they were supposed to be working. *Id.* at 221:16-21.

- CCA hired less qualified corrections officers and provided worse compensation compared to the BOP. *Id.* at 141:21-142:18.

During the Class Period CCA's failures and deficiencies were catching up to Defendants so quickly that Hininger and Garfinkle openly and approvingly discussed a scheme to disguise as a

---

[2] All "Ex. __" citations herein are to the Declaration of Jason A. Forge in Support of Plaintiff's Opposition to Defendants' Motion to Exclude Testimony of Donna Mellendick, filed concurrently herewith, unless otherwise indicated.

"fine" what was, in fact, to be a $1 million "inducement" for the BOP to renew the contract at CCA's horrendous Cibola prison. Ex. C. Even Defendants' own experts rightly condemned such a scheme as unheard of, "illegal," and one for which Lappin testified that he "cannot think of a legitimate reason to do this." Ex. A at 211:3-16; Ex. D at 230:18-231:9.

CCA's failures and deficiencies caused it to lose a bid for a BOP contract worth tens of millions of dollars, despite being the lowest bidder. It was CCA's past performance at **other** facilities, particularly regarding the delivery of healthcare, that was the first of only two reasons for losing this lucrative contract despite being the low bidder. In other words, CCA's performance was so poor, the BOP chose to pay **more** to avoid having to rely on CCA. This was completely unprecedented according to Defendants' experts Dodrill and Lappin. Ex. A at 196:19-197:6; Ex. D at 255:21-256:17.

### B. Mellendick's Qualifications and Thorough Analysis

Beginning in the year 2000 through her retirement in 2015, Mellendick dedicated her BOP career to developing and implementing a plan to monitor and evaluate for-profit prison operators such as CCA. DEx. 1 at 1.[3] As the Program Review Branch Section Chief of the BOP's Program Review Division – the division responsible for overseeing for-profit prison operators – Mellendick personally oversaw and compiled the reviews that exposed CCA's deficient performance through her retirement. *Id*. at 1. The BOP's primary method of evaluation consisted of annual monitoring conducted by groups of subject-matter experts ("SMEs") who generated Contract Facility Monitoring ("CFM") Reports for each for-profit prison. *Id*. A CFM Report is the one BOP document that "outline[s] all areas of contract non-compliance identified by the CFM team of subject matter experts." *Id*. at 5. The CFM team members are not bureaucrats or political climbers.

---

[3] All "DEx. 1" citations herein are to the Declaration of Eric C. Pettis in Support of Defendants' Motion to Exclude Testimony of Donna Mellendick, Exhibit 1 (ECF No. 336-3).

They are the boots-on-the-ground specialists who travel to the prisons annually and personally inspect them. *Id*. at 1. Mellendick was the BOP's very first CFM Section Chief in 2002, and she served in that capacity for several years. *Id*.

In her report, Mellendick methodically documents all CFM Reports from CCA's three most problematic BOP prisons: Adams, Cibola and Eden. DEx. 1 at 11-17. In addition to tracking the hundreds of deficiencies (including repeat, double, triple, and quadruple Repeat Deficiencies) from the CFM Reports, Mellendick tracks the dozens of Notices of Concern ("NOCs") the BOP issued to these prisons, as well millions of dollars in deductions that the BOP imposed, the BOP's findings of CCA's systemic failures that contributed to the Adams riot and the murder of a corrections officer, and CCA's chronic staffing deficiencies, highlighted by an entire year when the nurses and nurse practitioners at Cibola had to work without the clinical guidance of a physician, as required. *Id*. As Mellendick notes, CCA's repetitive deficiencies were particularly problematic because they "demonstrate[] CCA's continued lack of commitment to correct these serious problems" (*id*. at 13), and "reflect[] a failure on the part of CCA to implement and maintain effective corrective action." *Id*. at 15. More specifically, Mellendick's report details CCA's chronically deficient delivery of Health Services, including multiple instances of mismanagement of inmates' conditions prior to death. *Id*. at 7-9, 11-13, 16, 22-23.

Mellendick documents several clear confirmations of CCA's deficient performance, including the following:

> (1) **The loss of the CAR XV Solicitation**. This was solicitation of two
> separate "Requirements" – "A" for a facility located in one of six specific states and
> "B" for a facility located anywhere in the continental United States. DEx. 1 at 18-19.
> CCA lost both, and for both awards, the BOP's Source Selection Authority ("SSA")

expressly commented that the BOP had serious concerns with the Quality of Service at the Cibola and Eden facilities, and that their failures in Health Services show a complete lack of quality control in this area, indicating CCA was failing in an integral part of operating a prison. *Id.* at 19. What was remarkable about this reality was that CCA's CAR XV bid was for their Northeast Ohio prison, not Cibola or Eden, yet CCA's past performance at Cibola and Eden was so bad, particularly regarding Health Services, that the BOP rejected CCA's bid. Still worse, CCA's poor past performance caused it to lose Requirement A, even though it was the lowest bidder. Two of Defendants' purported experts, including Lappin himself, both admitted that this was an unprecedented failure. Ex. A at 196:19-197:6; Ex. D at 255:21-256:17. The loss occurred on December 29, 2014, and to this day, Defendants continue to conceal from investors the two most important facts concerning this loss: (1) it was due to poor past performance at other facilities; and (2) CCA's past performance was so bad, it lost Requirement A despite being the lowest bidder.

(2)   **BOP's refusal to renew the Cibola contract**.  This major setback was a long time coming, as Cibola was plagued with serious repetitive deficiencies. DEx. 1 at 11-15.  It was so bad that Hininger and Garfinkle openly schemed about the possibility of "offer[ing] up voluntarily a deduction, up to $1 million," and they "could structure the $1.0 million 'fine' as a renewal inducement, which would be amortized over the renewal period." Ex. C.  Due to "CCA's inability to perform in the area of Health Services, the BOP determined it was not in the government's best interest to continue this contract.  Declining to exercise option years of a private

prison contract based on poor performance is an extremely rare occurrence in the BOP." DEx. 1 at 15.

(3) **CCA's failure to win a single competitively bid BOP prison contract since October 2011, about six months before the Adams riot and murder**. DEx. 1 at 21; Ex. D at 211:16-212:13.

Against this backdrop, Mellendick's opinions are admissible, as they are relevant and reliable.

## III. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. It requires that: (a) the expert's proffered opinion "help the trier of fact"; (b) the expert's proffered opinion be "based on sufficient facts or data"; (c) the expert's proffered opinion be "the product of reliable principles and methods"; and (d) the expert "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. The district court has a gatekeeping function under Rule 702 that imposes the task of "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrill Dow Pharm.*, 509 U.S. 579, 597 (1993).[4]

In addition to "'scientific'" expert knowledge, "'technical'" or "'other specialized'" knowledge may properly "become the subject of expert testimony." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999). Although *Daubert* enumerated certain factors that may be relevant to "scientific" expert knowledge, the Supreme Court has emphasized that the inquiry is a "'flexible one'"; and in cases where other types of "specialized" expert knowledge assist the finder of fact, "the relevant reliability concerns may focus upon personal knowledge or experience." *Id*. at 149-50.

---

[4] All citations and footnotes omitted and emphasis added unless otherwise indicated.

A court should not exclude expert testimony based on contentions about the strength of the factual bases for the expert's opinions. *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012). Instead, the jury should be provided the opportunity to weigh the expert's opinion "informed by [the opposing party's] vigorous cross-examination." *Id.*; *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-30 (6th Cir. 2008) (upholding the admission of expert testimony even though opposing parties argued it rested on a """shaky""" factual foundation because the "credibility and accuracy" of expert testimony is properly reserved for the jury). As a result, "the rejection of expert testimony is the exception rather than the rule." *Stotts v. Heckler & Koch, Inc.*, 299 F. Supp. 2d 814, 819 (W.D. Tenn. 2004) (citing Fed. R. Evid. 702 advisory's committee's note on 2000 amendments).

Courts throughout the country have rejected attempts like Defendants' to suppress soundly supported relevant and reliable opinions simply because no rote methodology exists for the subject areas of the opinions:

> Social science "research, theories and opinions cannot have the exactness of hard science methodologies," *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1297 (8th Cir. 1997), and "expert testimony need not be based on statistical analysis in order to be probative," *United States v. Long*, 328 F.3d 655, 668 (D.C. Cir. 2003). "[P]eer review, publication, potential error rate, etc. . . . are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it." *United States v. Hankey*, 203 F.3d 1160, 1169 (9th Cir. 2000). In such cases, the place to "quibble with [an expert's] academic training" is "on cross-examination" and goes to his "testimony's weight . . . not its admissibility." *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995).

*United States v. Joseph*, 542 F.3d 13, 21-22 (2d Cir. 2008) (alterations in original).

## IV. ARGUMENT

In plain defiance of the foregoing standards and in direct contradiction to their approach with their own expert, Defendants seek to exclude Mellendick because the analysis she performed and the opinions she rendered do not fit neatly into a rote numerical methodology. Defendants have no

- 7 -

legitimate basis for objecting to Mellendick's well-reasoned and well-supported opinions. Mellendick was integrally involved in creating and executing the BOP's system for overseeing and assessing the performance of for-profit prison operators, such as CCA. There may not be more than a handful of people in the entire country as qualified as she is to assess a for-profit prison operator's performance, including its performance relative to other for-profit prison operators. Even Defendants admit that Mellendick's name appears over 12,000 times in relevant documents in this case. *See* ECF No. 336-1 at 2. As such, Mellendick is both a percipient and expert witness in this case. Notwithstanding Defendants' assertion that she is limited to expert testimony (an assertion Defendants later reverse[5]), Plaintiff listed Mellendick in its initial disclosures months before fact discovery closed. Defendants simply chose not to depose her during fact discovery. Naturally, a critical aspect of assessing the performance of a for-profit prison is knowing what services it is supposed to provide. Prior to her 15 years of experience overseeing for-profit prisons, Mellendick spent over 15 years in BOP-operated facilities and BOP headquarters, including multiple management positions. As such, Mellendick is certainly qualified to compare the breadth of services for-profit prisons offer versus BOP-run prisons.

---

[5]     *Compare* ECF No. 336-1 at 2 ("Plaintiff is ***not*** offering Ms. Mellendick as a percipient witness, however" (emphasis in original)), *with id.* at 13 ("Plaintiff is permitted to call Ms. Mellendick as a percipient witness at trial and ask her about events for which she has personal knowledge if it so chooses (or even to testify as to whether CoreCivic lived up to her own standards, as a matter of personal opinion).")). This latter "concession" betrays a fundamental misunderstanding of the Federal Rules of Evidence. No witness, not Mellendick nor anyone else, is permitted to just jump on the stand and testify about "whether CoreCivic lived up to [their] own standards, as a matter of personal opinion." *See* Fed. R. Evid. 701 and 702. What does that even mean? What opinions are not "personal" to the person offering them? Do Defendants contend an otherwise unreliable subjective opinion is magically transformed into an admissible one if the witness simply qualifies it as "personal"? That is clearly not the law, and testimony about CCA's performance clearly requires specialized knowledge and experience, as well as consideration of all relevant material data, and proper disclosures. Mellendick checks all these boxes.

## A. The Only Made-up Things Here Are Defendants' Arguments

Defendants concede Mellendick's expertise (ECF No. 336-1 at 2) before resorting to a series of incredible arguments to suppress her testimony. For example, they assert that Mellendick's "Quality Opinion" is based upon a performance standard she invented that is inconsistent with the quality standards used in her field, including by the BOP." *Id.* at 3. This is plainly untrue, as Mellendick explicitly relies on the very same documents the BOP used to monitor CCA's performance, namely the CFM Reports and NOCs. Also untrue, or at least misleadingly incomplete, is Defendants' assertion that Mellendick "reviewed documents selected for her by counsel (based on unknown criteria)." *Id.* In fact, the very testimony Defendants relegate to a footnote exposes their sleight of hand, as Mellendick testified that only the "initial batch" of documents reviewed was selected by counsel, "and if there were any documents that I thought were missing, I worked through [counsel] to request them." *Id.* at 3 n.3. Of course, ***who*** selected the documents is irrelevant so long as Mellendick reviewed a materially complete set of data, which she certainly did. Mellendick reviewed every single CFM Report and NOC for all three of CCA's deficient prisons (DEx. 1 at 7-17), so there is no honest question as to the propriety or sufficiency of what she considered. She also reviewed every other critical document concerning CCA's performance, including the BOP's After-Action Report following CCA's Adams County riot and murder, the BOP's Source Selection Decision for CCA's unprecedented lost low-bid for the CAR XV contract due to poor past performance, and the Office of the Inspector General's ("OIG") December 2016 Audit of the BOP's contract with CCA for Adams. *Id.* at 3-5. Tellingly, Defendants fail to identify a single document that they contend Mellendick should have reviewed but did not, let alone one whose absence is disqualifying versus merely something that goes to the weight of Mellendick's testimony.

Defendants' unreasonableness continues with their criticism of Mellendick for assembling comprehensive chronologies that "were not based on any methodology beyond a review of

documents." ECF No. 336-1 at 9. This makes about as much sense as condemning a teacher for assembling an alphabetical class roll "not based on any methodology beyond a review of the students' names." Mellendick's chronologies organize by facility all the CFM Reports, NOCs and other major events (such as the unprecedented low-security prison riot and officer murder and the unprecedented lost contract bid due to deficient past performance at other prisons), which means she listed these CFM Reports, NOCs and events in temporal order. Again, there is no honest question as to the propriety or sufficiency of Mellendick's chronologies. Beyond blindly casting stones, Defendants offer nothing of substance to substantiate their attack on the completeness of Mellendick's chronologies – they fail to identify a single significant document or event that Mellendick omitted.

## B. Honesty Is Not Disqualifying

Next, Defendants accuse Mellendick of abandoning BOP standards for one "she came up with [on] her own" simply because she qualified her overall assessment of CCA's performance by appending the adverb "largely" to the BOP's routinely used "deficient" designation. *Id*. at 9-10. That is one adverb in one sentence of a 25+ page report that is supposed to disqualify Mellendick. It is readily apparent that Defendants are resorting to contrived technicalities to suppress substantively admissible testimony. In essence, Defendants are complaining that Mellendick is honest. She readily acknowledged that two of CCA's five prisons performed "well above satisfactory levels during the timeframe of this case." DEx. 1 at 18. She likewise acknowledged that CCA's other facilities were not deficient every single day of the Class Period.[6] Nor were they deficient in every performance category. Rather, CCA's overall performance, as Mellendick explained:

> Based on my review and analysis of the evidence in this case, it is my opinion
> the quality of CCA's performance in the majority of their BOP private prison

---

[6] The "Class Period" is between February 27, 2012 and August 17, 2016, inclusive.

contracts, for the timeframe of this case, was largely deficient, particularly with respect to their obligation to provide quality healthcare and a safe and secure environment to the inmate population.

*Id*. at 22.

While this candor from an expert is understandably disorienting to Defendants, whose experts have demonstrated that they will say just about anything without regard for facts or this Court's decisions, it is hardly cause for questioning the admissibility of Mellendick's testimony. There is ample objective support for Mellendick's opinion that CCA's performance was "largely deficient," as confirmed by the CFM Reports, CCA's unprecedented lost low-bid lost contract due to poor past performance, CCA's rare loss of the Cibola contract renewal due to performance issues and CCA's failure to win a single competitively bid BOP prison contract in over nine years and counting.

Moreover, the Sixth Circuit has previously acknowledged that "[a]dmissibility under Rule 702 does not require perfect methodology." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 181-82 (6th Cir.2009) (permitting testimony where physician "performed as a competent, intellectually rigorous treating physician in identifying the most likely cause of [plaintiff's] injury"). *See also Johnson v. Manitowoc Boom Trucks, Inc.*, 484 F.3d 426, 430 (6th Cir. 2007) (stating that the inquiry as to reliability is "very flexible"); *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993) ("[A]ny weaknesses in the factual basis of an expert witness' opinion, including unfamiliarity with standards, bear on the weight of the evidence rather than on its admissibility.").

### C. Mellendick's Sources Are Unassailable and Her Opinions Objectively Supported

Given the extensive and objective substantiation for Mellendick's opinions and her conceded expertise, it is just not honest for Defendants to try to cast them as the "*ipse dixit* of the expert." ECF No. 336-1 at 11. It is almost as if Defendants seek to use their motion to reconstruct reality.

- 11 -

CCA did incur hundreds of Deficiencies and dozens of Repeat Deficiencies. It did allow an unprecedented riot at a low-security prison involving both hostages and the murder of a corrections officer. It did lose a low-bid contract due to poor past performance. It did lose the Cibola contract renewal due to performance issues. And it has failed to win a single competitively bid BOP prison contract in over nine years and counting. Defendants have their own expert who plans to testify that all this somehow adds up to an acceptable quality level. And in a stark display of hypocrisy, in direct contrast to Defendants' arguments here, their expert repeatedly acknowledged that his "methodology" was completely made up by him and completely untested:

> Q.     As far as you know, you created it?
>
> [Dodrill]: As far as I know, yes.

Ex. A at 146:7-11.

> Q.     You have no knowledge of anyone ever testing the reliability of the methodology you used, correct?
>
> A.     Correct.

*Id*. at 146:19-22. So be it. Plaintiff will cross-examine Defendants' expert, just as Defendants can cross-examine Mellendick. Fearful of their ineffectiveness, Defendants are trying to exclude Melledick's expert testimony based on weight arguments while seeking to admit their own expert's testimony even though his opinions are far more vulnerable to the same kind of weight arguments. As such, Defendants' position is legally infirm and substantively hypocritical.

Defendants fail to cite a single analogous case in which a court rejected well-reasoned opinions from an expert who both sides admit is fully qualified. Although not a "*Daubert*" case, in *Barbourville Nursing Home v. United States HHS*, 174 F. App'x 932 (6th Cir. 2006), the Sixth Circuit reviewed whether substantial evidence supported the finding that a nursing facility failed to comply with standards for quality of care and patient safety sufficient to warrant the imposition of

"immediate jeopardy" sanctions. In upholding a finding of substantial non-compliance, the Sixth Circuit relied on the "expert observations and professional opinion testimony" of surveyors who attested to the severity of specific patient incidents involving the improper dressing of patient bandages. *Id*. at 942. Noting that the "concept of 'harm' includes pain," which is not readily quantifiable, the Sixth Circuit rejected the appellant's argument that the surveyors' expert testimony was faulty because they did not provide a "strict numeric standard" relating to the risk of patient harm. *Id*. at 943. Although *Barbourville* did not directly involve the admission of expert testimony, the Sixth Circuit clearly relied upon expert analysis of contemporaneous evidence just like Mellendick performed, and it did so over the defendant's argument that this lacked a numeric standard.

In contrast, the few cases Defendants cite bear no resemblance to the thoroughness of Mellendick's preparation and the reliability of her opinions, as hinted by Defendants' failure to provide a meaningful description of the facts of those cases. For example, Defendants cite *TBL Collectibles, Inc. v. Owners Ins. Co.*, 285 F. Supp. 3d 1170, 1179 (D. Colo. 2018) (ECF No. 336-1 at 8) without acknowledging that the expert at issue there was an attorney offered as a legal expert, and that the only opinions the court excluded were those that were: (1) irrelevant because they did not relate to what was at issue in the case; (2) usurped the court's role in instructing the jury on the law; and (3) "concern[ed] defendant's compliance with the 'Unfair Claims Practices Act'" without "specify[ing] the portions of the Act to which his . . . opinions pertain." *TBL Collectibles*, 285 F. Supp. 3d at 1180-86. As is apparent, these facts and circumstances have nothing to do with Mellendick's opinions, which she thoroughly substantiates with repeated references to specific findings. For example, she identifies numerous actual findings to support her opinion that CCA's performance was largely deficient "particularly with respect to their obligation to provide quality

- 13 -

healthcare and a safe and secure environment to the inmate population," including repeated mismanagement of inmates' care prior to death, lack of on-site physicians for a year in one prison and eight months in another, and an unprecedented riot and murder that CCA enabled through its incompetent intelligence operations. DEx. 1 at 7-23.

Defendants continue to place sound bites over substance with their citations to *Mohney v. USA Hockey, Inc.*, 138 F. App'x 804 (6th Cir. 2005) and *Braun v. Wal-Mart, Inc.*, 2006 Minn. Dist. LEXIS 78 (D. Minn. Mar. 31, 2006) (ECF No. 336-1 at 11). *Mohney* is inapt, as there, the expert "'performed mathematical calculations, [and] the Court . . . found these calculations and the methods employed to be suspect and unreliable.'" 138 F. App'x at 808. Here, in contrast, Defendants have failed to identify a single unreliable source on which Mellendick relied, a single significant source she failed to consider or a single established methodology she failed to employ. Likewise, *Braun* is inapt, as there the expert in question avoided an established procedure for using a survey to validate a study's conclusion – in that case the conclusion concerned the implications of inconsistencies between workers' punch-in/out times and cash register time records, but without a survey of randomly selected employees, there was no way to connect these discrepancies of off-the-clock work. 2006 Minn. Dist. LEXIS 78, at *4. Again, Defendants fail to identify any established methodology that Mellendick defied, let alone one that is so superior as to render inadmissible her methodical and comprehensive approach.

### D. Defendants' Improperly Attempt to Reconstruct Mellendick's Opinion on CCA's Competitiveness

The touchstone for Mellendick's opinion regarding CCA's diminished competitiveness is the BOP's December 2014 CAR XV awards' decision, which expressly rejected CCA's bids due to CCA's poor past "performance in medical services at our Cibola, NM and Eden, TX facilities." Ex. E. Still worse, CCA's poor past performance caused it to lose the first of the two CAR XV awards,

even though it was the lowest bidder. *Id*. Two of Defendants' purported experts, including Lappin himself, both admitted that this was an unprecedented failure. Ex. A at 196:19-197:6; Ex. D at 255:21-256:17. Once CCA reached the point where its poor past performance in other prisons' Health Services prevented it from securing a contract even as the low bidder, CCA had necessarily reached a point where it was unlikely to win a competitively bid BOP prison contract unless it improved. No expert is necessary to see that. But the BOP did not make this decision until December 2014, raising the question as to whether CCA's deficient provision of Health Services was a new phenomenon, a short-lived phenomenon or whether its performance in this critical area had not materially changed for over a year and never materially improved. As an expert with years of experience overseeing and assessing performance reports, including those pertaining to Health Services for for-profit prisons (primarily in CFMs and NOCs), Mellendick will be able to explain and show the jury the full range of time throughout which CCA's delivery of health services was just as deficient as it was in December 2014: April 2013 through the end of the Class Period in August 2016. DEx. 1 at 23-24. That is all the expertise Mellendick needs to support her opinion regarding CCA's non-competitiveness because the level of deficient Health Services that rendered CCA so non-competitive in December 2014, persisted throughout this period.

Once Mellendick's opinion is accurately described, it is easy to see the inapplicability of Defendants' arguments that she is not an expert in "making contract decisions." ECF No. 336-1 at 15.

## V. Mellendick's Opinion on the Disparity Between BOP Prisons and CCA's Prisons Is Relevant and Reliable (and Right)

With their last argument, Defendants again resort to trying to reconstruct Mellendick's opinion, which they label a "Cost Opinion." *Id*. at 17-19. In truth, it is the opposite of a "Cost Opinion," which underscores the absurdity of Defendants' criticisms that Mellendick "did not

- 15 -

attempt to make any such comparison" of costs between a BOP prison and a CCA prison. *Id*. at 17. As Mellendick carefully demonstrates, the services BOP prisons provide and the inmate populations they house are so vastly different than services and populations in CCA's prisons, an apples-to-apples costs comparison is impossible:

> The BOP mission is complex. Examples include:
>
> • BOP houses various security level inmates (minimum, low, medium, and high).
>
> • BOP has an Administrative Max facility (the most secure facility within the BOP) which houses inmates who have exhibited extremely violent or disruptive behaviors such as serious assaults or killings of staff or other inmates, inmates who are considered threats to the security of our nation, and domestic and international terrorists.
>
> • The BOP has numerous Metropolitan Detention Centers in major cities throughout the country housing inmates that are in pre-trial status or awaiting sentencing. All security levels are housed in these facilities.
>
> • The BOP has numerous Medical Centers throughout the country that provide significantly enhanced medical services for inmates whose functioning may be so severely impaired they require 24-7 medical attention.
>
> • Institutions for all security levels that solely house female inmates.
>
> • Institutions that solely house inmates with serious mental health issues.
>
> • Institutions that are dedicated to the management of sex offenders.
>
> Across all of these security levels and types of facilities, the BOP provides a vast array of programs such as drug treatment, residential drug treatment, a wide range of reentry programs to include placement in residential reentry centers prior to their release, behavior management, industries, GED, college level courses, apprenticeship programs, mental health management, various health clinics, etc.
>
> In contrast, the CCA facility contracts required them to house inmates who were male, low security (inmates with little to no current or history of serious violence or detainers), criminal aliens (non-U.S. citizens who will be deported back to their countries of birth upon their release), serving less than 90 months of their sentence. BOP designators would not designate inmates who were classified as medium or high security levels; sex offenders; had serious physical or mental health problems; presented serious correctional management issues; required drug

treatment; or other court-imposed programs to the BOP's private prisons. If any of these conditions presented themselves after an inmate's placement in a private prison, the BOP would transfer the inmate to an appropriate BOP-run institution. Because these inmates were not reentering the United States upon their release, contracts did not require much programming for this population.

In summary, this population requires a low level of correctional management, basic Health Services, no complex programming, and is viewed by the BOP as an easy-to-manage population. Despite being presented with a low-security-risk population, CCA was unable to successfully manage these inmates, resulting in dozens of Deficiencies and Repeat Deficiencies a major riot, disturbances, deaths of inmates, death of a staff member, and other serious issues.

In addition, as noted in the "OIG's Audit of the Federal Bureau of Prisons' Contract with CoreCivic, Inc. to Operate the Adams County Correctional Center in Natchez, Mississippi," published in December 2016, there are vast differences between BOP and CCA qualifications and incentives for correctional officers. The BOP requires entry-level correctional officers to have either a 4-year college degree or equivalent work experience, while CCA does not require education beyond high school. The OIG also found CCA pays substantially lower wages and offers less time off than the BOP and provides fewer career advancement opportunities. CCA's lower staff qualifications, incentives, and career advancement opportunities make it difficult for them to hire and maintain experienced and professional staff.

DEx. 1 at 25-26.

Of course, only someone with the kind of specialized knowledge and experience Mellendick has would know of these disparities, and there is no question as to their accuracy, as confirmed by the OIG's Audit and Defendants' own expert on quality, Dodrill, who admitted that "For an extremely pure apples to apples [comparison] you would have to go to other privates, unless you eliminate the differences between the two." Ex. A at 136:24-137:2. Dodrill also admitted that CCA hired less-qualified corrections officers and offered them worse benefits packages compared to the BOP. *Id.* at 141:21-142:18.

Against this backdrop, Mellendick's opinion regarding the impossibility of an apples-to-apples cost comparison is eminently reliable. In fact, it is so reliable, Defendants have no substantive answer to it, so they just want it suppressed. Of course, that is not the legal standard. Because Defendants' allegedly misleading statements include statements about CCA's value

compared to governmental prison operators (ECF No. 165 at 5), Mellendick's reliable testimony is clearly relevant. Therefore, it is admissible.

Defendants final erroneous contention is that Mellendick's reliable and relevant opinion "must also be excluded because she improperly 'tell[s] the jury what result to reach.'" ECF No. 336-1 at 19 (alteration in original). Here, Defendants misapprehend the law: "Rule 704 removes the 'general proscription against opinions on 'ultimate issues' and shift[s] the focus to whether the testimony is 'otherwise admissible.'" *Woods v. Lecureux*, 110 F.3d 1215, 1219 (6th Cir. 1997) (internal quotations omitted and alteration in original). Defendants' mistake is surprising not just because Rule 704 expressly rejects their contention, but also because Defendants cite the very case quoted in the preceding sentence, which sets forth this clear rule. ECF No. 336-1 at 19. It is also a surprising mistake because of its facial unreasonableness. If Defendants were accused of falsely representing that CCA had $1 billion in cash, and Plaintiff retained a forensic accountant to analyze financial records to determine that CCA had only $1 million in cash, Defendants' position would be that such testimony is inadmissible "ultimate issue" testimony and because an expert would be required to disprove such a representation, Defendants would be entitled to summary judgment. Clearly an absurd outcome, but that is effectively what Defendants urge here. Just because Plaintiff's claims extend beyond Defendants' cost-savings' statements does not render those statements expendable or Defendants' perversion of the law any more acceptable.

## VI. CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that Defendants' Motion to Exclude Testimony of Donna Mellendick should be denied in its entirety.

DATED: January 22, 2021                    Respectfully submitted,

_____
        s/ Jason A. Forge
        JASON A. FORGE

ROBBINS GELLER RUDMAN & DOWD LLP
JASON A. FORGE
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
jforge@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
DENNIS J. HERMAN
WILLOW E. RADCLIFFE
KENNETH J. BLACK
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

ROBBINS GELLER RUDMAN & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

Lead Counsel for Plaintiff

BARRETT JOHNSTON MARTIN
   & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)

Local Counsel

- 19 -

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on January 22, 2021, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Jason A. Forge
JASON A. FORGE

ROBBINS GELLER RUDMAN
   & DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-8498
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: jforge@rgrdlaw.com

# Mailing Information for a Case 3:16-cv-02267 Grae v. Corrections Corporation of America et al

### Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Kenneth J. Black**
  kennyb@rgrdlaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Christopher T. Cain**
  cain@scottandcain.com,ambrose@scottandcain.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Jason A. Forge**
  jforge@rgrdlaw.com

- **Brian T. Glennon**
  brian.glennon@lw.com

- **Michael Goldberg**
  michael@goldberglawpc.com

- **Marc Gorrie**
  mgorrie@pomlaw.com

- **Meryn C.N. Grant**
  Meryn.Grant@lw.com

- **Dennis J. Herman**
  dherman@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **James A. Holifield , Jr**
  aholifield@holifieldlaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,KennyB@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,adonovan@barrettjohnston.com,eseaborn@barrettjohnston.com,jmartin@rgrdlaw.com

- **Milton S. McGee , III**
  tmcgee@rwjplc.com,dgibby@rwjplc.com

- **Faraz Mohammadi**
  faraz.mohammadi@lw.com

- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,WillowR@ecf.courtdrive.com

- **Steven Allen Riley**
  sriley@rwjplc.com,dgibby@rwjplc.com

- **Brian Schall**
  brian@goldberglawpc.com

- **David J. Schindler**
  david.schindler@lw.com

- **Sarah A. Tomkowiak**
  sarah.tomkowiak@lw.com

- **Morgan E. Whitworth**
  morgan.whitworth@lw.com,morgan-whitworth-8044@ecf.pacerpro.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,smorris@rgrdlaw.com,CWood@ecf.courtdrive.com,willowr@rgrdlaw.com,e_file_sd@rgrdlaw.com,smorris@ecf.courtdrive.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- `(No manual recipients)`