# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF TENNESSEE

NIKKI BOLLINGER GRAE, Individually and on Behalf of All Others Similarly Situated,

Plaintiff,

vs.

CORRECTIONS CORPORATION OF AMERICA, et al.,

Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civil Action No. 3:16-cv-02267

Honorable Aleta A. Trauger

Magistrate Judge Jeffrey S. Frensley

## <u>DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO EXCLUDE TESTIMONY OF LUCY ALLEN</u>

# TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    LEGAL STANDARD..........................................................................................3

III.   ARGUMENT ......................................................................................................4

      A.    Ms. Allen's Loss Causation Opinions Are Relevant And Reliable ........................4

            1.    Ms. Allen Addresses The Relevant Issue:  Whether The Yates Memo Revealed Any "Fraud" ....................................................4

            2.    Ms. Allen's Opinions Are Not Legal Conclusions ....................................7

            3.    The Court Did Not Decide Whether Plaintiff Has Proven Loss Causation At The Class Certification Phase ....................................9

            4.    Ms. Allen's Loss Causation Opinions Are Based On Reliable Sources And Analysis ....................................................11

      B.    Ms. Allen Did Not Ignore The Complaint's "Central Thesis" .............................16

IV.   CONCLUSION.................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Ask Chemicals, LP v. Computer Packages, Inc.*,
593 F. App'x 506 (6th Cir. 2014) ............................................................................14

*Avomeen Holdings, LLC v. Thanedar*,
2019 WL 3491620 (E.D. Mich. Aug. 1, 2019) ........................................................19

*Babb v. Maryville Anesthesiologists P.C.*,
942 F.3d 308 (6th Cir. 2019) ...............................................................................3, 7

*Baker v. SeaWorld Entm't, Inc.*,
423 F. Supp. 3d 878 (S.D. Cal. 2019) ....................................................................14

*Berry v. City of Detroit*
25 F.3d 1342 (6th Cir. 1994) ...................................................................................8

*Biotechnology Value Fund, L.P. v. Celera Corp.*,
2015 WL 138168 (N.D. Cal. Jan. 9, 2015) .............................................................16

*Bondali v. Yum Brands, Inc.*,
620 F. App'x 483 (6th Cir. 2015) ...........................................................................19

*Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*,
853 F. Supp. 2d 181 (D. Mass. 2012), *aff'd sub nom.*, 752 F.3d 82 (1st Cir.
2014) ........................................................................................................................11

*In re Credit Suisse-AOL Sec. Litig.*,
253 F.R.D. 17 (D. Mass. 2008) ...............................................................................11

*Daffin v. Ford Motor Co.*,
458 F.3d 549 (6th Cir. 2006) ...................................................................................9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) .................................................................................................3

*In re Diamond Foods, Inc.*,
295 F.R.D. 240 (N.D. Cal. 2013) ............................................................................11

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) .................................................................................................4

*In re DVI, Inc. Sec. Litig.*,
2010 WL 3522090 (E.D. Pa. Sept. 3, 2010) .............................................................6

*EP Medsystems, Inc. v. EchoCath, Inc.*,
235 F.3d 865 (3d Cir. 2000)........................................................................8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011)....................................................................................9

*Fener v. Operating Engineers Construction Industry & Miscellaneous Pension
Fund (LOCAL 66)*,
579 F.3d 401 (5th Cir. 2009) .....................................................................8

*Galloway v. Big G. Exp., Inc.*,
590 F. Supp. 2d 989 (E.D. Tenn. 2008)....................................................6

*Hsu v. Puma Biotechnology, Inc. et al.*,
2018 WL 4956520 (C.D. Cal. Oct. 5, 2018)..............................................9

*Matter of J.M. by & through Mata v. Tennessee Dep't of Educ.*,
2018 WL 8693347 (M.D. Tenn. July 3, 2018) (Trauger, J.) ....................4

*Murphy v. Precision Castparts Corp.*,
2020 WL 4040827 (D. Or. July 17, 2020).................................................6

*In re Nat'l Prescription Opiate Litig.*,
2019 WL 3934597 (N.D. Ohio Aug. 20, 2019)..........................................6

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) .....................................................................4

*In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig.*,
2016 WL 8290089 (W.D. Tenn. Aug. 2, 2016)..........................................8

*In re Scrap Metal Antitrust Litig.*,
527 F.3d 517 (6th Cir. 2008) .....................................................................3

*Securities & Exchange Commission v. Bankatlantic Bancorp, Inc.*,
2013 WL 12009694 (S.D. Fla. Nov. 14, 2013)........................................16

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) .....................................................................5

*Smilovits v. First Solar, Inc.*,
2019 WL 7282026 (D. Ariz. Dec. 217, 2019) ...........................................9

*United States v. Akers*,
2020 WL 1923179 (E.D. Ky. Apr. 21, 2020) ............................................7

*United States v. Bonds*,
12 F.3d 540 (6th Cir. 1993) .......................................................................6

iii

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)............................................................................5

*In re Xerox Corp. Securities Litig.*,
    2009 WL 8556135 (D. Conn. Apr. 22, 2009)...............................................8

## STATUTES

15 U.S.C. § 78u-4(b)(1)-(2), (4) .........................................................................19

## RULES

Fed. R. Evid. 702 ..................................................................................................3

Fed. R. Evid. 704(a)...............................................................................................7

# I.    INTRODUCTION

After nearly three years of extensive discovery, Plaintiff has adduced no evidence substantiating any connection between deficiencies in quality or cost savings at CoreCivic, Inc. ("CoreCivic") and the Yates Memorandum ("Yates Memo"), nor any evidence suggesting Defendants knew that the policy change announced in the Yates Memo was a foreseeable risk of such purported deficiencies and/or that Defendants made any statements about the relationship with the Bureau of Prisons ("BOP") that they knew were false.  The reason is simple:  no such evidence exists.  Plaintiff's motion to exclude Defendants' loss causation expert, Ms. Lucy Allen, powerfully confirms this truth and provides a roadmap for understanding a fundamental and case-ending weakness in Plaintiff's claims.  Unable to find an expert willing to sponsor its speculative loss causation theory, Plaintiff resorts to baseless claims that Ms. Allen's loss causation opinions are irrelevant (because they supposedly attack the wrong theory and do not specifically rebut one challenged statement out of more than one hundred) and unreliable (because they are buttressed by securities analyst reports, among many other sources).  These arguments fail.[1]

First, Ms. Allen's opinions and analysis respond to the loss causation theory that Plaintiff pled in the Complaint, as well as the various permutations to that theory Plaintiff has proffered thereafter in a futile attempt to evade the conclusive evidence showing no loss causation.  Plaintiff's objection to Ms. Allen's opinion boils down to griping that she does not use the same legal jargon as Plaintiff to describe the Yates Memo (*i.e.*, as a "materialization of risk" rather than a "corrective disclosure").  But Plaintiff does not (and cannot) dispute that Ms. Allen thoroughly

---

[1] Plaintiff does not challenge Ms. Allen's qualifications.  Nor does Plaintiff challenge Ms. Allen's opinion that there is no loss causation and no damages associated with CoreCivic's August 3, 2016 announcement of the Cibola non-renewal.  Mem. in Supp. of Mot. to Exclude Test. of Lucy P. Allen at 6 n.5; ECF No. 345 ("Mem."); *see also* Decl. of Christopher M. Wood ("Wood Decl."), Ex. 1 ¶¶ 77–83, ECF No. 346-1 (Expert Report of Lucy P. Allen, Aug. 7, 2020) ("Allen Rpt.").

analyzed the Yates Memo in connection with the statements challenged in the Complaint.

Second, Plaintiff claims that Ms. Allen's loss causation opinions are inadmissible because they are "legal conclusion[s]" that are reserved for the jury. That is not true and certainly not a viable basis to exclude a loss causation opinion, as Plaintiff knows from the scores of times its counsel have sponsored similar loss causation expert opinions. Plaintiff does not cite a single case to the contrary.

Plaintiff's claim that Ms. Allen's opinions on loss causation are no longer relevant following the Court's class certification decision fares no better. The Court was very clear that it was not addressing the merits of Plaintiff's claims, as binding case law precluded it from doing so. Once again, Plaintiff does not cite a *single* case in support of its argument that the Court can decide loss causation on the merits prior to summary judgment, and it is the polar opposite of Plaintiff's position during the class certification phase.

Plaintiff's claim that Ms. Allen's loss causation opinions are based on unreliable sources—analyst reports—is equally baseless. Analyst reports are the *sine qua non* of evidence that loss causation experts consult to understand market reactions to specific disclosures—as both of Plaintiff's economic experts agree. Plaintiff's opposition to Ms. Allen's consideration of analyst reports has nothing to do with their reliability and everything to do with their content: a unanimous rejection of Plaintiff's theory.

Finally, Plaintiff suggests that Ms. Allen ignored the Complaint's "central thesis" because she did not specifically address *one* statement by CoreCivic's CEO out of the 135 statements that Plaintiff cites in the Complaint—a statement that was omitted from the section of Plaintiff's Complaint listing the statements being challenged as false or misleading. Plaintiff is wrong again. Ms. Allen in fact analyzed that single statement (along with over 100 others), and she says as much

in her reports.[2]  There simply is no credible dispute that Ms. Allen thoroughly analyzed the alleged connection between CoreCivic's statements about its quality and cost savings and the Yates Memo—which is the crux of Plaintiff's claim.

Unlike Plaintiff's expert, who failed to perform *any* analysis of loss causation, Ms. Allen submitted a thorough and well-supported report in support of Defendants' position that there is no loss causation and no damages attributable to the alleged misrepresentations.  Plaintiff's failure to bolster its own case with expert testimony is not grounds for throwing out Ms. Allen's relevant and reliable opinions.  Plaintiff's Motion to Exclude Expert Testimony of Lucy P. Allen is wholly without merit.

## II.  LEGAL STANDARD

Federal Rule of Evidence 702 permits "qualified" persons to testify as an "expert," and offer "reliable" opinion testimony on relevant matters within their expertise.  Fed. R. Evid. 702.  Testimony will be admitted if the witness is "qualified by 'knowledge, skill, experience, training, or education'"; the testimony is "relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue'"; and the testimony is "reliable" under the factors outlined in Fed. R. Evid. 702 and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) (affirming denial of motion to exclude testimony).  "[R]ejection of expert testimony is the exception, rather than the rule."  *Id.* at 530 (quoting Fed. R. Evid. 702 advisory committee's note to the 2000 amendment); *see also Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308,

---

[2] As discussed in greater detail in Section III.B., the statement at issue was from March 2016— approximately four months before the end of the Class Period and more than *four years* after the first alleged misstatement.  If Plaintiff contends that the "central thesis" of the Complaint consists of only one allegedly misleading statement that was not made until March 2016, then the Class Period must be dramatically reduced.

316 (6th Cir. 2019) (reversing district court that excluded expert's testimony in its entirety because "the district court used a sledgehammer, when the law required that it use only a scalpel"). Where the principle basis of a motion to exclude testimony is the moving party's disagreement with the expert's opinion, the motion should fail. *See Matter of J.M. ex rel. Mata v. Tenn. Dep't of Educ.*, No. 3:17-CV-00405, 2018 WL 8693347, at *3–4 (M.D. Tenn. July 3, 2018) (Trauger, J.) ("[T]he gatekeeping function established by *Daubert* was never 'intended to serve as a replacement for the adversary system.'" (citation omitted)).

## III.    ARGUMENT

### A.    Ms. Allen's Loss Causation Opinions Are Relevant And Reliable

#### 1.    Ms. Allen Addresses The Relevant Issue:  Whether The Yates Memo Revealed Any "Fraud"

Plaintiff argues that Ms. "Allen's opinion is [] improperly directed at a 'corrective disclosure' theory of loss causation, rather than the 'materialization of risk' theory at issue in this case.'" Mem. at 2.  Plaintiff's argument is pedantic—as Plaintiff notes just one page earlier, "[l]oss causation can take many forms" and the crux of the issue "is whether the information that caused the stock price declines . . . revealed something that was concealed by the alleged fraud . . . ." *Id.* at 1 (*citing Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342–43 (2005) (loss causation requires a "causal connection between the material misrepresentation and the loss")).  The distinction between a corrective disclosure theory of loss causation and a materialization of risk theory is *how* the fraud was revealed—*i.e.*, through an explicitly corrective statement or through an event—not *whether* it was revealed.  *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.* ("*OPERS*"), 830 F.3d 376, 384–85 (6th Cir. 2016) (collecting cases) ("[l]oss causation can be shown through a *corrective* disclosure" *or* through "'negative investor inferences,' drawn from a particular event or disclosure, [that] 'caused the loss and were a foreseeable materialization of the risk concealed

by [a] fraudulent statement'" (citation omitted)); *see also Singer v. Reali*, 883 F.3d 425, 446 (4th Cir. 2018) ("Importantly, the ultimate loss causation inquiry under either the corrective disclosure theory or the materialization of a concealed risk theory is the same:  whether a 'misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security.'" (citation omitted)); *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 261 (2d Cir. 2016) ("[O]ur past holdings do not suggest that 'corrective disclosure' and 'materialization of risk' create fundamentally different pathways for proving loss causation . . . .").  This Court repeatedly made this point in its class certification orders.  ECF No. 143 at 12 ("[S]ometimes a corrective disclosure—or the equivalent thereof—comes in the form of the real-world realization of the risk that a company's executive concealed or denied."); ECF No. 165 at 26 n.5 ("Even without an express acknowledgment of the defect by the company, the materialization of the risk would serve as the equivalent of a corrective disclosure . . . .").

Ms. Allen's opinions and analysis regarding the Yates Memo go to the core of the question—whether the economic evidence is consistent with Plaintiff's theory that CoreCivic's stock drop following the Yates Memo was caused by the market's learning that CoreCivic's statements about quality and cost savings were false—regardless of whatever doctrinal label Plaintiff seeks to apply to it.  It would be one thing if Ms. Allen analyzed different corrective disclosures or other events from those Plaintiff pled in the Complaint, but she did not; she devoted 36 pages of her report to analyzing all three categories of the alleged disclosures/materializations of risk that Plaintiff has identified throughout the litigation (the Department of Justice's review of the BOP's monitoring of private prisons ("OIG Review"), the Yates Memo, and the Cibola non-renewal).  Allen Rpt. ¶¶ 19–23, 27–37, 46–83.  And she did so based on her consideration of more than 500 analyst reports and nearly 100 produced documents, among numerous other sources cited

throughout her report. *Id.*, App. B. "[T]here must be a 'fit' between the inquiry in the case and the testimony," but only "expert testimony that does not relate to *any* issue in the case" should be excluded. *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993) (emphasis added); *see also In re Nat'l Prescription Opiate Litig.*, No. 1:17-MD-2804, 2019 WL 3934597, at *7 (N.D. Ohio Aug. 20, 2019); *Galloway v. Big G. Exp., Inc.*, 590 F. Supp. 2d 989, 996 (E.D. Tenn. 2008). And when assessing the relevance of loss causation opinions, courts admit opinions even if they do not "fit squarely" with plaintiffs' "theories specific to" each disclosure, so long as they are relevant to the "primary theory" of the alleged fraud. *Murphy v. Precision Castparts Corp.*, No. 3:16-CV-00521-SB, 2020 WL 4040827, at *22 (D. Or. July 17, 2020); *cf. In re DVI, Inc. Sec. Litig.*, No. 2:3-CV-05336, 2010 WL 3522090, at *9–10 (E.D. Pa. Sept. 3, 2010) (excluding expert opinion that "conflict[ed] with the substantive legal principles of loss causation").

Plaintiff also conspicuously fails to mention that it refused to tell Defendants the basis for its loss causation theory before Ms. Allen's expert report was due, and that its new theory is inconsistent with the initial theory pled in the Complaint. The Complaint alleged two dates on which "[t]he business conditions and risks concealed from investors . . . reached the market": August 11, 2016, when the OIG Review was released, and August 18, 2016 when, "citing the OIG report, the Yates Memorandum" was released. Consolidated Compl. ¶¶ 196–200 , ECF No. 57 ("Compl."). But at class certification, Plaintiff seemingly abandoned its original theory that the OIG Review was a corrective disclosure and replaced it with a claim based on CoreCivic's August 3, 2016 announcement that the BOP had declined to renew its contract at the Cibola facility. ECF No. 150 at 2, 12; *see also* ECF No. 121 at 5, 10–11. Plaintiff failed to clarify its causation theory through written discovery; while Judge Frensley ultimately ordered supplemental responses, *see* ECF No. 312 at 33–34, expert reports were due more than two months prior to the deadline for

Plaintiff to supplement, *see* ECF No. 258. In its current iteration, Plaintiff's loss causation theory is that Defendants represented that CoreCivic's "correctional services offered sufficient quality and cost savings that would result in government entities continuing to renew its contracts," but "these statements concealed the reality that [CoreCivic's] relationship with the BOP had deteriorated, putting their BOP contracts in jeopardy," because of deficiencies in quality and cost effectiveness at the BOP facilities." ECF No. 362-9 (Expert Report of W. Scott Dalrymple ¶¶ 17, 19, Aug. 7, 2020); ECF No. 150 at 4–6, 18. Ms. Allen's reports explicitly considered whether the revelation of new information about CoreCivic's allegedly deficient quality and cost savings, or the BOP's perception thereof, caused the industrywide stock drop that occurred when the Yates Memo was issued. Despite Plaintiff's evasiveness and shifting theories, Ms. Allen's opinions and analysis "fit" the latest causation theory in this case.

2. <u>Ms. Allen's Opinions Are Not Legal Conclusions</u>

Plaintiff suggests that Ms. Allen's loss causation opinions are inadmissible because they are "legal conclusion[s]" that are "ultimately a question for the jury." Mem. at 9. They are not. Under Rule 704, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). The Sixth Circuit recognizes that "there is a 'subtle,' but 'nonetheless important' distinction between 'opin[ing] on the ultimate question of liability' (impermissible), and 'stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue' (permissible)." *Babb*, 942 F.3d at 317–18 (reversing district court's exclusion of expert testimony based on finding that it was not relevant). "Thus, [the Sixth Circuit has] generally excluded expert testimony for stating a 'legal conclusion' *only* when the witness explicitly testifies, in 'specialized' legal terminology, that a defendant violated (or did not violate) the law." *Id.*; *accord United States v. Akers*, No. 7:19-

CR-7-REW-EBA, 2020 WL 1923179, at *2 (E.D. Ky. Apr. 21, 2020) (declining to exclude expert opinion as legal conclusion, observing that "an expert may supply all ingredients needed to allow the jury to come to the legal conclusion presented, essentially, all the steps but the terminal legal inference").

In the specific context of loss causation, courts often *require* expert testimony. *See Fener v. Operating Eng'rs Constr. Indus. & Miscellaneous Pension Fund (LOCAL 66)*, 579 F.3d 401, 409 (5th Cir. 2009) ("[T]he testimony of an expert—along with some kind of analytical research or event study, is required to show loss causation." (citations omitted)); *In re Regions Morgan Keegan Sec., Derivative, & ERISA Litig*., No. 07-2784, 2016 WL 8290089, at *5 (W.D. Tenn. Aug. 2, 2016) ("Proving loss causation in securities cases often involves a battle of experts." (citation omitted)). Perhaps unsurprisingly then, Plaintiff's argument that loss causation expert opinions are inadmissible legal conclusions has been considered and rejected before. *See, e.g.*, *In re Xerox Corp. Securities Litig*., No. 3:99CV02374 (AWT), 2009 WL 8556135, at *5 (D. Conn. Apr. 22, 2009) (holding that expert was permitted to provide opinion on loss causation, as a factual conclusion not a legal one, so long as that opinion was "supported by specific factual analysis"). And none of Plaintiff's cited cases support a different ruling here. *EP Medsystems, Inc. v. EchoCath, Inc.* was a pleading-stage decision, and thus did not even evaluate expert evidence. 235 F.3d 865, 884 (3d Cir. 2000) ("[W]e conclude that MedSystems has adequately *alleged* loss causation." (emphasis added)). *Berry v. City of Detroit* is equally inapposite, since it involved Section 1983 claims. 25 F.3d 1342, 1344 (6th Cir. 1994). *Berry* also reiterated that "an expert's

opinion may embrace an ultimate issue to be decided by the tier of fact," so long as that opinion is factual, as is Ms. Allen's opinion here.[3]

    3. <u>The Court Did Not Decide Whether Plaintiff Has Proven Loss Causation At The Class Certification Phase</u>

    Plaintiff claims that the Court "held" that the Yates Memo was a corrective disclosure and "found" that the OIG Review was not. Mem. at 4 (quoting ECF No. 143 at 13–14 and ECF No. 165 at 25–26 n.5, 32). Plaintiff also claims that the Court "categorically rejected" the possibility that the Yates Memo was perceived by investors to be a politically motivated policy shift. *Id*. at 9. Plaintiff does not cite a *single* case in support of its argument that the Court can decide loss causation on the merits prior to summary judgment, *see id*. at 9–11, and Plaintiff's current position is the polar opposite of its position during the class certification phase, *see* ECF No. 120 at 5–6, 11–14; ECF No. 150 at 2, 16–17. While the Court considered whether the Yates Memo and OIG Review *could* be corrective in connection with assessing whether the challenged statements had any price impact, the Court could not have (and did not) reach any determination of those questions on the merits. *See* ECF No. 143 at 13, 15; *see also* ECF No. 165 at 1 & n.1, 33 n.8. As Plaintiff wrote—repeatedly—at the time, "whether there was a causal connection between [the] price declines and Plaintiff's loss . . . . is a common question of loss causation that the Supreme Court has repeatedly held ***cannot*** be answered at class certification." ECF No. 120 at 5–6 (citing *Erica*

---

[3] Plaintiff's position in the instant motion is also contrary to its counsel's position in numerous prior cases where their experts have opined that a particular statement or event could "constitute a disclosure for purposes of proving loss causation." *See, e.g.*, *Hsu v. Puma Biotechnology, Inc. et al.*, No. SACV 15-00865 AG (JCGx), 2018 WL 4956520, at *4–5 (C.D. Cal. Oct. 5, 2018) (denying motion to exclude plaintiffs' loss causation expert who opined that stock price declines were caused by defendants' alleged fraud); *Smilovits v. First Solar, Inc.*, No. CV 12-0555-PHX-DGC, 2019 WL 7282026, at *5 (D. Ariz. Dec. 217, 2019) (denying motion to exclude Plaintiffs' loss causation expert who "conclude[d] that First Solar's alleged fraud caused its stock price to be artificially inflated and that corrective disclosures caused stock price declines resulting in investor losses").

9

Case 3:16-cv-02267   Document 390   Filed 01/22/21   Page 14 of 28 PageID #: 19548

*P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807–08 (2011); *Daffin v. Ford Motor Co.*, 458 F.3d 549, 553 (6th Cir. 2006) (whether the class can "win on the merits" is "not a factor" in class certification)); *see also* ECF No. 150 at 2, 16–17 ("[D]etermining whether an alleged price decline is 'corrective' . . . represent[s] [a] finding[] that the Supreme Court has held cannot form the basis for a decision to refuse to certify a class."). The parties and the Court recognized at the class certification phase that whether the Yates Memo could be "corrective" was relevant to price impact, but not suitable for disposition on the merits until summary judgment or trial.

Even if the law permitted it, the parties could not have meaningfully addressed the merits of loss causation during the class certification phase of the case, as no fact witnesses had been deposed, no BOP documents had been produced, and neither party had submitted expert reports on loss causation. As Plaintiff admits, "whether the corrective events were sufficiently connected to the fraud is determined based on factual evidence." Mem. at 2. Indeed, the Court made it clear on the very first page of its Class Certification Reconsideration Order that it was *not* addressing the merits of loss causation or any other element Plaintiff must eventually prove: "Because this matter is before the court only with regard to class certification, none of the factual assertions relevant solely to the merits of Amalgamated's claims has yet been contested." ECF No. 165 at 1 n.1. Instead, while the Court held that the Yates Memo "*could* serve the purpose of corrective disclosure" for purposes of demonstrating price impact, the Court recognized that "CoreCivic's argument . . . is not being offered as a substantive defense on the merits" and was "merely an ancillary component of its price impact analysis." ECF No. 143 at 13, 15; *see also* ECF No. 165 at 33 n.8 (withdrawing prior analysis of whether "the non-renewal of the Cibola contract could be treated as a corrective event" because "that issue should have been left for the merits stage of litigation").

Thus, it is clear that the Court expressly reserved ruling on the merits of Defendants' loss causation arguments. Indeed, Courts routinely certify plaintiff shareholder classes despite contrary expert testimony, yet still consider (and frequently find persuasive) the testimony of the same defense experts at summary judgment and trial. *See, e.g.*, *In re Credit Suisse-AOL Sec. Litig.*, 253 F.R.D. 17, 27 (D. Mass. 2008) (granting class certification over Defendants' expert testimony regarding market efficiency); *Bricklayers & Trowel Trades Int'l Pension Fund v. Credit Suisse First Bos.*, 853 F. Supp. 2d 181, 191, 195 (D. Mass. 2012) (granting summary judgment for Defendants on loss causation in the same case and relying in part on testimony from Defendants' same loss causation expert, despite disregarding her testimony at class certification), *aff'd*, 752 F.3d 82 (1st Cir. 2014); *In re Barclays Bank PLC Sec. Litig.*, 2017 WL 4082305, at *2 (S.D.N.Y. Sept. 13, 2017) (granting summary judgment for Defendants on loss causation and crediting testimony of Defendants' "negative loss causation expert," despite disregarding his testimony at class certification), *aff'd*, 756 F. App'x 41 (2d Cir. 2018). Plaintiff does not cite any case law to the contrary. In fact, Plaintiff's own authority only reinforces the well-established rule that class certification rulings are not binding decisions on the merits. *See In re Diamond Foods, Inc*., 295 F.R.D. 240, 251 (N.D. Cal. 2013) (explaining that, at class certification, the Court does not determine whether "plaintiff will ultimately prevail") (cited in Mem. at 2). Plaintiff's attempt to dissuade the Court from considering the merits at this stage of the case speaks volumes about Plaintiff's confidence in its arguments now that all the evidence has come into the record.

4.     <u>Ms. Allen's Loss Causation Opinions Are Based On Reliable Sources And Analysis</u>

a.     <u>There Is Nothing Wrong With Relying On Analyst Reports, But Ms. Allen's Opinions Are Based On Far More Robust Analysis</u>

Plaintiff claims that Ms. Allen's "opinion regarding what the market understood to have driven the Yates Memo" is "unreliable" because it is "based on nothing more than reading selected

analyst reports and parroting their statements." Mem. at 11. Plaintiff's argument is meritless.

First, Ms. Allen's opinions regarding the Yates Memo are based on a far more robust analysis than just "reading selected analyst reports." *Cf. id.* In addition to considering these analyst reports, Ms. Allen studied similar disclosures of negative information earlier in the Class Period, such as the Adams disturbance and the OIG Review, and determined that CoreCivic's stock price did not react. Allen Rpt. ¶¶ 26–40; 43–45. Ms. Allen also analyzed the text of the Yates Memo and the reports of Plaintiff's former economic expert, Dr. Stephen Feinstein, who claimed that the Yates Memo was corrective only because the OIG Review was based on old data. *Id.* ¶¶ 48–49, 51 & n.84. Ms. Allen further analyzed CoreCivic's risk disclosures, which explain that the type of information provided by the Yates Memo—political opposition to privatized corrections and changes in government policy affecting incarceration rates—were risks that could impact the Company's business. *Id.* ¶¶ 62–66. And Ms. Allen analyzed the stock price returns of the GEO Group ("GEO"), CoreCivic's only publicly traded competitor, and determined that the Yates Memo had the same or even greater impact on GEO. *Id.* ¶¶ 75–76. All of this analysis—in addition to her careful review of analyst reports—buttressed Ms. Allen's opinion that the Yates Memo did not reveal new information about CoreCivic's quality or cost-savings or their effect on CoreCivic's BOP business. Finally, Ms. Allen studied CoreCivic's stock reaction to the 2016 Presidential Election, which supports her opinion that changes in the political environment and associated risk to CoreCivic's business, rather than any new information regarding the alleged misrepresentations, caused the market reaction to the Yates Memo. *Id.* ¶¶ 69–70.[4]

---

[4] In the same vein, Ms. Allen reviewed news reports that CoreCivic's BOP facilities continued to have contracts renewed by federal government agencies, including the BOP, after the Class Period, which further supports her opinion that investors did not perceive the Yates Memo to reveal new information about the Department of Justice's dissatisfaction with CoreCivic's quality or cost. Allen Rpt. ¶ 74.

Second, there was nothing "selective" about Ms. Allen's review of analyst reports. Ms. Allen and her team systematically reviewed every single analyst report that they were able to locate during the relevant time period (more than 500), including all of the analyst reports that Plaintiff's experts identified. Allen Rpt., App. B (listing analyst reports); *see also id.* ¶¶ 9, 12. Plaintiff's assertion that Ms. Allen presented a "skewed selection of analyst reports," Mem. at 11, is not supported by any facts, documents, or testimony. Neither Plaintiff nor its experts have identified even a single analyst report that Ms. Allen allegedly failed to consider, let alone a report that contradicts her opinions.[5] Nor does Plaintiff offer any explanation for why Ms. Allen's reliance on analyst reports, among other sources, is not methodologically sound.

Third, Plaintiff's suggestion that analyst reports are an improper basis for a loss causation expert's opinion is baseless. *Both* of Plaintiff's economic experts—its current expert on damages and its original expert on market efficiency—agree that analyst reports are a critical source of information about the market's understanding of a company and key events. ECF No. 346-3, App. C ¶ 16 ("The analyst coverage of CCA during the Class Period demonstrates that newly available, value-relevant financial information was actively monitored and scrutinized by a network of investment professionals who quickly digested new information and disseminated their reactions to CCA investors."); ECF No. 93-3 ¶ 52 ("Securities analysts . . . . conduct research and provide valuation opinions, helping market participants acquire relevant information and understand the implications of that information for valuation and investment decisions" and thereby "facilitate the flow of information and the digestion of information within the marketplace."). Courts across the country concur: "[c]ontrary to Defendants' assertion that [the expert] simply lists and summarizes

---

[5] By contrast, Plaintiff's expert, Mr. Dalrymple, ignored dozens of analyst reports that contradict his opinions. *See* ECF No. 339-1 at 21–22.

these reports and articles, [his] opinion of *how* the market interpreted [Defendant's] statements . . . will assist the trier of fact in determining loss causation." *Baker v. SeaWorld Ent., Inc.*, 423 F. Supp. 3d 878, 901-02 (S.D. Cal. 2019) (also rejecting argument that Defendants' loss causation expert "did not fully understand the alleged misstatements" and holding that such "critiques go to the weight of [his] testimony, and not the admissibility"); *see also Hsu*, 2018 WL 4956520, at *4–5 (denying motion to exclude loss causation expert who "reached [ ]his conclusion" based on the "many analysts [who] were concerned about" matters alleged to be false or misleading).[6]

Finally (and tellingly), Plaintiff does not seek to exclude Ms. Allen's loss causation opinion as to the Cibola non-renewal, even though that opinion is also based on an analysis of when the market became aware of the alleged disclosure and whether there was an associated price impact. *See* Allen Rpt. ¶¶ 77–83. Nor does Plaintiff challenge Ms. Allen's reliance on analyst reports and other publicly available sources for that opinion (which unanimously confirm that the Cibola non-renewal was in fact disclosed to no price reaction). *See id*.

**b.** The Newspaper Articles Ms. Allen Supposedly Ignored Only Support Her Opinions

Plaintiff claims that Ms. Allen's opinion is unreliable because she supposedly "ignores the myriad national publications that reported on the Yates Memo and its conclusions regarding the lack of quality of private prisons without suggesting in any way it was political." Mem. at 12 (citing Wood Decl. Exs. 8–10). Plaintiff attacks a strawman. Ms. Allen does *not* opine that *every* publication attributed the Yates Memo to political considerations; rather, she notes that no analyst

---

[6] To the extent Plaintiff's objection to the analyst reports is based on their allegedly being hearsay, that objection fails. *Cf. Ask Chemicals, LP v. Comput. Packages, Inc.*, 593 F. App'x 506, 510-11 (6th Cir. 2014) ("'[A]n expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field.'" (citation omitted)).

suggested that the Yates Memo divulged new information about CoreCivic's quality or cost or that perceived shortcomings in CoreCivic's quality or cost motivated the policy change announced in the Yates Memo. Allen Rpt. ¶¶ 47–61.

Rather than contradict Ms. Allen's opinions, let alone render them "unreliable," Mem. at 12, the three newspaper articles Plaintiff submits as Exhibits 8–10 (ECF Nos. 346-8, 346-9, 346-10) *support* Ms. Allen's opinion that the Yates Memo provided no new information about CoreCivic's quality or cost savings. The *Washington Post* article Plaintiff submitted as Exhibit 8 states that, contrary to revealing new information about private prisons, "[t]he problems at private facilities *were hardly a secret*" prior to the Yates Memo. ECF No. 346-8 (emphasis added). The article also mentions an investigative report published in *The Nation* that Ms. Allen cites extensively in her Report. *Compare id.*, *with* Allen Rpt. ¶ 44, *and id.* Ex. 1. The *Wall Street Journal* article that Plaintiff submitted as Exhibit 9 did not indicate that the Yates Memo revealed anything about CoreCivic's costs or quality. Instead, it highlights that GEO's stock price dropped as much or more than CoreCivic's stock price, indicating that the Yates Memo affected the entire private prison industry and was not CoreCivic-specific news. ECF No. 346-9. And the *New York Times* article Plaintiff submitted as Exhibit 10 states, "[i]n announcing the policy shift, the Justice Department cited that decline [in the federal inmate population], as well as a critical recent report by the department's independent inspector general about safety and security problems in private prisons." ECF No. 346-10. The article also described the Yates Memo's "policy shift" as "part of a broad effort by the [Obama] administration to overhaul the criminal justice system." *Id.* None of these articles mentions the alleged "deterioration" of CoreCivic's relationship with the BOP or differentiates CoreCivic's BOP relationship from that of any of CoreCivic's competitors—which

is supposedly the "central thesis" of Plaintiff's claim—and all three articles discuss the OIG Review in detail. *See* ECF Nos. 346-8, 346-9, 346-10.

Plaintiff cites only two cases in support of its argument that Ms. Allen's opinion is unreliable. Mem. at 11. Both are easily distinguishable. In *Securities & Exchange Commission v. Bankatlantic Bancorp, Inc.*, the expert's opinion was that "several analysts thought that Bancorp was conservative in disclosing negative trends and addressing problem loans," but the expert did not actually opine on a disputed issue in the case. No. 12-60082-CIV-SCOLA/OTAZO-REYES, 2013 WL 12009694, at *8–9, 12 (S.D. Fla. Nov. 14, 2013). The expert also admitted that he had no "expertise in reading an analyst's report." *Id.* In *Biotechnology Value Fund, L.P. v. Celera Corp.*, the court prohibited two experts from testifying "on the issue of whether defendants' actual conduct was in compliance with industry standards," No. C 13-03248-WHA, 2015 WL 138168, at *2 (N.D. Cal. Jan. 9, 2015), but that is a far cry from Ms. Allen's opinion that analyst reports do not reflect market awareness of new information about CoreCivic's quality or cost savings.

### B.    Ms. Allen Did Not Ignore The Complaint's "Central Thesis"

Plaintiff claims that "because Allen did not analyze all of the alleged misrepresentations, let alone even acknowledge the 'central theory of liability,' her opinion is irrelevant and lacks any indicia of reliability." Mem. at 12. The basis for Plaintiff's argument seems to rest on the incorrect assumption that Ms. Allen failed to review a single statement out of the 135 statements cited in the Complaint; specifically, one letter to shareholders[7] from CoreCivic's CEO, Damon Hininger, that

---

[7] The letter (as excerpted by Plaintiff) reads, "Every day we remain focused on providing high-quality, safe and secure facilities that meet the needs of our government partners. By consistently doing so, we have experienced more than three decades of continued growth and contract retention rates in excess of 90 percent." Mem. at 13. The letter further stated that "CCA's value proposition to our government partners continue[d] to make [it] the premier provider in the industry and an ideal solution for correctional systems seeking new or replacement facilities. . . . We take pride in our strong record of operational excellence that has earned CCA the confidence of our government

16

was partially excerpted in just a single paragraph in the "Background" section of the Complaint, and not repeated in the section of the Complaint where Plaintiff listed the allegedly "fraudulent statements and omissions." Mem. at 12–14; Compl. ¶¶ 35, 115–69. Mr. Hininger sent this letter on March 30, 2016—approximately four months before the end of the Class Period and more than *four years* after the first alleged misstatement. Compl. ¶¶ 1, 35. This statement cannot possibly form the "central thesis" of the Complaint, which challenges more than 100 other statements about CoreCivic's quality and cost-effectiveness. *See id.* ¶¶ 115–69. In addition, there is no dispute that Mr. Hininger's statement did not even mention the BOP, much less CoreCivic's relationship with the BOP. *See id.* ¶ 35.

First, it is clear that Ms. Allen amply considered the "thesis" that Mr. Hininger's March 30, 2016 statement purportedly embodies: "that CCA's poor quality was impairing its relationship with the BOP." Mem. at 14. Ms. Allen analyzed numerous analyst reports published before and after the Yates Memo and determined that none of them contained even "a single statement by any analyst after the Yates Memo indicating that analysts were misled about CoreCivic's relationship with any government agency (including the BOP)." Rebuttal Report of Lucy P. Allen ¶ 35, Sept. 18, 2020, ECF No. 340-6 ("Allen Rebuttal Rpt."). Ms. Allen also analyzed the stock price of CoreCivic's competitor, GEO, who was *not* alleged to have experienced an "impaired" relationship with the BOP, yet whose stock price actually decreased *more* than CoreCivic's after the Yates Memo was released. Allen Rpt. ¶¶ 75–76; Allen Rebuttal Rpt. ¶ 36. And Ms. Allen noted that the BOP continued to renew contracts with CoreCivic after the Yates Memo. Allen Rpt.

---

partners. To maintain this confidence CCA is focused on our long-term performance. This requires we provide our facilities and staff with the necessary resources to operate the best corrections, detention and residential reentry facilities. It is only through our commitment to our long-term performance that CCA will drive future growth and increase shareholder value." Compl. ¶ 35.

¶ 74. All of this economic evidence supports Ms. Allen's opinion that the market did not understand the Yates Memo to have been caused by CoreCivic's allegedly impaired relationship with the BOP. Ms. Allen's reports also highlight the failure of Plaintiff's expert, Scott Dalrymple, to identify any evidence that supports Plaintiff's so-called "central thesis" of causation. Mr. Dalrymple did not perform any analysis of how this alleged misstatement was corrected by the Yates Memo. He does not identify a single statement by any analyst before or after the Yates Memo indicating that analysts were misled about CoreCivic's relationship with any government agency (including the BOP). And he cannot explain why GEO's stock price dropped more than CoreCivic's stock price on the release of the Yates Memo if the Yates Memo was due to the deterioration in CoreCivic's relationship with the BOP. *See* Allen Rebuttal Rpt. ¶¶ 32–36.[8]

Second, Plaintiff is wrong to suggest that Ms. Allen did not analyze the March 2016 statement from the Complaint's Background section. Appendix C of Ms. Allen's report lists all the alleged misrepresentations, including the source and date of each, as well as its corresponding citation to the Complaint. *See generally* Allen Rpt., App. C. On pages 23 and 24 of Appendix C, Ms. Allen quotes Mr. Hininger's March 30, 2016 statement and cites the relevant paragraph in the Complaint. *Id.* And in the body of her report, Ms. Allen states that she "reviewed . . . the alleged misrepresentations and omissions" to "analyze Plaintiffs' claim of loss causation and damages." *Id.* ¶ 12. She also testified to the same during her deposition, *ad nauseam*, despite Plaintiff's

_____

[8] As discussed in great detail in Defendants' Motion for Summary Judgment at 18-20, ECF No. 367, CoreCivic's witnesses (including former high ranking BOP officials) unanimously testified that they expected CoreCivic's contracts with the BOP to continue to be renewed throughout the Class Period—as, in fact, they were: the BOP exercised all but one of its options on CoreCivic's contracts during the Class Period, and there is no evidence that the BOP ever informed CoreCivic that its performance issues at Adams, Cibola, and Eden rendered it unlikely to be awarded contracts in the future. Instead, in every single Contractor Performance Assessment Report for every single CoreCivic BOP facility, the contracting officer indicated he or she would continue to award contracts to that facility. *Id.* at 27.

counsel's belabored efforts to adduce testimony that she had not in fact reviewed that single statement. *See* Decl. of Morgan E. Whitworth, Ex. 1 46:19-62:19 (Dep. Tr. of Lucy Allen, Oct. 14, 2020) (explaining that each of the alleged misrepresentations was considered and cited in her report and reflected in her analysis).[9]

As noted, Plaintiff identifies only this one supposedly "challenged" statement that Ms. Allen allegedly ignored, thereby conceding that she analyzed the remaining 100-plus statements in the Complaint. Mem. at 12–15. To the extent Plaintiff is attempting to use this single challenged statement as a proxy for a broader claim for liability throughout the Class Period, such an effort is not permitted by the securities laws—Plaintiff must show that *each* individual statement was false, made with scienter, and caused losses. *See* 15 U.S.C. § 78u-4(b)(1)–(2), (4) (requiring that Plaintiff prove falsity, scienter, and loss causation with respect to each act or omission alleged to violate the securities laws); *see also Bondali v. Yum Brands, Inc.*, 620 F. App'x 483, 491 (6th Cir. 2015) (explaining that the Sixth Circuit undertakes a "statement-by-statement analysis").

Third, even if it were true that Ms. Allen failed to consider one of the 135 challenged statements, such a "critique[] go[es] to the weight of [Ms. Allen's] testimony, and not the admissibility." *Baker*, 423 F. Supp. 3d at 916; *see also Avomeen Holdings, LLC v. Thanedar*, No. 17-CV-13703, 2019 WL 3491620, at *9 (E.D. Mich. Aug. 1, 2019) (denying in part motions to exclude expert testimony in securities class action because "[t]o the extent Plaintiff asserts that [the expert] ignored pieces of the factual record, it can address this on cross-examination"). Ms. Allen devoted approximately 30 pages of her opening report to analyzing and rebutting Plaintiff's

---

[9] In addition to being false, Plaintiff's claim that Ms. Allen's opinion is unreliable because she allegedly did not review one statement is also hypocritical—Plaintiff's expert admitted that he only "formed a general understanding of what the plaintiffs are alleging" but did not "analyze[] each of the statements individually." Dep. Tr. of W. Scott Dalrymple 116:17–24, ECF No. 340-1.

claims that the revelation of purportedly concealed information about CoreCivic's allegedly deficient quality and cost savings caused its stock price to drop after the Yates Memo—it is absurd for Plaintiff to argue that her analysis is not also relevant to the jury's consideration of whether CoreCivic's allegedly deficient quality and cost savings caused its relationship with the BOP to deteriorate, which *in turn* caused CoreCivic's stock price to drop after the Yates Memo.

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court deny Plaintiff's Motion to Exclude the testimony of Lucy Allen.


DATED:  January 22, 2021                    Respectfully submitted:

                                             /s/ *Steven A. Riley*
                                            Steven A. Riley (TN #6258)
                                            Milton S. McGee, III (TN #024150)
                                            RILEY WARNOCK & JACOBSON, PLC
                                            1906 West End Avenue
                                            Nashville, TN 37203
                                            T: (615) 320-3700
                                            F: (615) 320-3737
                                            sriley@rwjplc.com
                                            tmcgee@rwjplc.com

                                            David J. Schindler (admitted *pro hac vice*)
                                            Brian T. Glennon (admitted *pro hac vice*)
                                            Meryn C. N. Grant (admitted *pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            355 South Grand Avenue, Suite 100
                                            Los Angeles, CA 90071
                                            T: (213) 485-1234
                                            F: (213) 891-8763
                                            david.schindler@lw.com
                                            brian.glennon@lw.com
                                            meryn.grant@lw.com

                                            Morgan E. Whitworth (admitted *pro hac vice*)
                                            LATHAM & WATKINS LLP
                                            505 Montgomery Street, Suite 2000
                                            San Francisco, CA 94111
                                            T: (415) 391-0600
                                            F: (415) 395-8095
                                            morgan.whitworth@lw.com

Sarah A. Tomkowiak (admitted *pro hac vice*)
LATHAM & WATKINS LLP
555 Eleventh Street, NW, Suite 1000
Washington, DC 20004-1304
T: (202) 637-2335
F: (415) 637-2201
sarah.tomkowiak@lw.com

*Attorneys for Defendants Corrections Corporation of America, Damon T. Hininger, David M. Garfinkle, Todd J. Mullenger, and Harley G. Lappin*

21

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that service of the foregoing document was made upon the following Filing Users through the Electronic Filing System and via electronic mail:

Christopher Hamp Lyons
Christopher M. Wood
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union St. Suite 900
Nashville, TN 37219
clyons@rgrdlaw.com
cwood@rgrdlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
Marc C. Gorrie
POMERANTZ LLP
600 Third Ave., 20th Floor
New York, NY 10016
jalieberman@pomlaw.com
ahood@pomlaw.com
mgorrie@pomlaw.com

Jason A. Forge
ROBBINS GELLER RUDMAN
& DOWD LLP
655 W Broadway, Suite 1900
San Diego, CA 92101
jforge@rgrdlaw.com

Patrick V. Dahlstrom
POMERANTZ LLP
10 S. La Salle St., Suite 3505
Chicago, IL 60603
pdahlstrom@pomlaw.com

Dennis J. Herman
Willow E. Radcliffe
Kenneth J. Black
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery St, Suite 1800
San Francisco, CA 94104
dennish@rgrdlaw.com
willowr@rgrdlaw.com
kennyb@rgrdlaw.com

Paul Kent Bramlett
Robert P. Bramlett
BRAMLETT LAW OFFICES
40 Burton Hills Blvd., Suite 200
P.O. Box 150734
Nashville, TN 37215
pknashlaw@aol.com
robert@bramlettlawoffices.com

Jerry E. Martin
BARRETT JOHNSTON MARTIN &
GARRISON, LLC
Bank of America Plaza
414 Union St., Suite 900
Nashville, TN 37219
jmartin@barrettjohnston.com

Michael Goldberg
Brian Schall
GOLDBERG LAW PC
1999 Ave. of the Stars, Suite 1100
Los Angeles, CA 90067
michael@goldberglawpc.com
brian@goldberglawpc.com

James A. Holifield , Jr.
HOLIFIELD JANICH RACHAL &
ASSOCIATES, PLLC
11907 Kingston Pike, Suite 201
Knoxville, TN 37934
aholifield@holifieldlaw.com

Christopher T. Cain
SCOTT & CAIN
550 W Main Ave., Suite 601
Knoxville, TN 37902
cain@scottandcain.com

this 22nd day of January, 2021.

/s/ *Steven A. Riley*
Steven A. Riley