# EXHIBIT A

```
 1              UNITED STATES DISTRICT COURT

 2              MIDDLE DISTRICT OF TENNESSEE

 3      ---------------------------x
        NIKKI BOLLINGER GRAE,
 4      Individually and on Behalf
        of All Others Similarly       Civil Action No.
 5      Situated,                     3:16-cv-02267

 6              Plaintiffs,

 7         vs.

 8

        CORRECTIONS CORPORATION OF
 9      AMERICA, ET AL.,

10              Defendants.

11      ---------------------------x

12                              885 Third Avenue
                                New York, New York
13                              July 10, 2018
                                9:07 a.m.
14

15              ***CONFIDENTIAL***

16         VIDEOTAPED DEPOSITION of ELEANOR INNES,

17      30(b)(6) witness in the above-titled action, held at

18      the above time and place, before Eileen Mulvenna,

19      CSR/RMR/CRR, Certified Shorthand Reporter,

20      Registered Merit Reporter, Certified Realtime

21      Reporter, and Notary Public of the State of New

22      York.

23      Job No. 10044536

24

25
```

**www.aptusCR.com**

```
 1   A P P E A R A N C E S:

 2        ROBBINS GELLER RUDMAN & DOWD LLC
          Attorneys for Plaintiffs and the Witness
 3             414 Union Street, Suite 900
               Nashville, Tennessee  37219
 4        BY:   CHRISTOPHER WOOD, ESQ.
               cwood@grdlaw.com
 5
                   -and-
 6
          ROBBINS GELLER RUDMAN & DOWD LLC
 7             Post-Montgomery Center
               One Montgomery Street, Suite 1800
 8             San Francisco, California  94104
          BY:   WILLOW RADCLIFFE, ESQ.
 9             wradcliffe@grdlaw.com

10
          LATHAM & WATKINS LLC
11        Attorneys for CoreCivic and the individual
          defendants
12             355 South Grand Avenue
               Los Angeles, California  90071-1560
13        BY:   BRIAN T. GLENNON, ESQ.
               brian.glennon@lw.com
14
                   -and-
15
           LATHAM & WATKINS LLC
16             505 Montgomery Street, Suite 2000
               San Francisco, California  94111-6538
17        BY:   MORGAN E. WHITWORTH, ESQ.
               morgan.whitworth@lw.com
18
19        RILEY WARNOCK & JACOBSON PLC
          Attorneys for Defendants
20             1906 West End Avenue
               Nashville, Tennessee  37203
21        BY:   TREY McGEE, ESQ.
               tmcgee@rwjplc.com
22
23   A L S O   P R E S E N T:

24             ERIK DAVIDSON, VIDEOGRAPHER

25
```

www.aptusCR.com

1          IT IS HEREBY STIPULATED AND AGREED,

2    by and between the attorneys for the respective

3    parties herein, that filing and sealing be and the

4    same are hereby waived.

5

6          IT IS FURTHER STIPULATED AND AGREED

7    that all objections, except as to the form of the

8    question, shall be reserved to the time

9    of the trial.

10

11          IT IS FURTHER STIPULATED AND AGREED that

12   the within deposition may be signed and sworn to

13   before any officer authorized to administer an oath,

14   with the same force and effect as if signed and

15   sworn to before the officer before whom the

16   within deposition was taken.

17

18

19

20

21

22

23

24

25

www.aptusCR.com

```
 1            THE VIDEOGRAPHER:  We are now on the
 2    record.
 3            Today is Tuesday, July 10th, 2018, and
 4    the time is approximately 9:07 a.m.
 5            This is the videotaped deposition of
 6    Amalgamated Bank 30(b)(6) being taken in the
 7    matters of Nikki Bollinger Grae versus
 8    Corrections Corporation of America, et al.,
 9    pending in the United States District for the
10    Middle District of Tennessee, Case No.
11    3:16-cv-02267.
12            We are at 885 Third Avenue, New York,
13    New York.
14            My name is Erik Davidson of Aptus
15    Court Reporting.
16            At this time will counsel and all
17    parties present please identify themselves.
18            MR. GLENNON:  Brian Glennon of
19    Latham & Watkins on behalf of CoreCivic and
20    the individual defendants.
21            MR. WHITWORTH:  Morgan Whitworth from
22    Latham & Watkins on behalf of the defendants.
23            MR. McGEE:  Trey McGee, Riley
24    Warnock & Jacobson, on behalf of the
25    defendants.
```

www.aptusCR.com

1          MR. WOOD:  Christopher Wood, Robbins

2      Geller, on behalf of plaintiff and the

3      witness.

4          MS. RADCLIFFE:  Willow Radcliffe from

5      Robbins Geller Rudman & Dowd on behalf of the

6      witness and the plaintiff.

7          THE VIDEOGRAPHER:  Will the court

8      reporter please swear in the witness.

9  ELEANOR INNES,

10     having been duly sworn by Eileen Mulvenna,

11     a Notary Public of the State of New York,

12     was examined and testified as follows:

13  EXAMINATION

14  BY MR. GLENNON:

15          Q.     Good morning, Ms. Innes.

16          A.     Good morning.

17          Q.     I introduced myself at the outset of

18  the deposition briefly for the record, but just to

19  introduce myself more formally to you, I'm Brian

20  Glennon.  I'm with the law firm of Latham & Watkins.

21  I represent CoreCivic and the four individual

22  defendants.

23          To my left is my associate Morgan

24  Whitworth.  He's also with my firm.  And to his left

25  is Trey McGee.  He's our local counsel in Tennessee.

www.aptusCR.com

Confidential

Eleanor Innes - 30(b)(6)

Grae vs. Corrections
Corporation of America, et al.

```
 1                Thank you very much for taking the

 2    time to be with us this morning.

 3                Can we begin by having you spell your

 4    full name for the court reporter, please.

 5        A.    Eleanor Innes, E-L-E-A-N-O-R.  Innes,

 6    I-N-N-E-S.

 7        Q.    And, Ms. Innes, where do you presently

 8    reside?

 9        A.    In Jackson Heights, Queens in

10    New York.

11        Q.    Can I just get your address for the

12    record, please.

13        A.    8412 35th Avenue, Jackson Heights,

14    New York 11372.

15        Q.    Thank you.

16                Ms. Innes, have you been deposed

17    before?

18        A.    Yes.

19        Q.    I'll come back to that in a moment.

20                How many times?

21        A.    Once.

22        Q.    Once.  Okay.  I'll come back to that.

23                Just to ensure that we have a clean

24    transcript and that the deposition moves as

25    efficiently as possible, I'd like to begin by just
```

www.aptusCR.com

Case 3:16-cv-02267    Document 395-1    Filed 01/22/21    Page 7 of 35 PageID #: 19672

Confidential

Eleanor Innes - 30(b)(6)

Grae vs. Corrections
Corporation of America, et al.

```
 1              Amalgamated Bank, socially
 2   responsible.  We try to do good.  We try to invest
 3   for good.  We try to help those who are working with
 4   ESG factors and corporate governance factors.  And
 5   we also try to -- we were founded on the premise of
 6   helping the underbanked, those that the larger banks
 7   have overlooked.
 8        Q.     You mentioned, "ESG factors."  What
 9   does that mean?
10        A.     So environmental, social and
11   governance factors; companies that have better
12   environmental practices, have social programs, and
13   have better corporate governance.
14        Q.     Does your conception of being a
15   socially responsible bank affect your investment
16   decisions on behalf of your customers?
17        A.     No, they do not.
18        Q.     So in what way do you act on your
19   conception of social responsibility?
20        A.     So Amalgamated Bank as a socially
21   responsible bank, that is the retail commercial
22   side.  Amalgamated Bank, the trust department, which
23   is where I work in, as an ERISA fiduciary, we have
24   to do what's in the best interests of our clients.
25              And although we'll take into
```

1    certain -- certain of our investment strategies will

2    take into some ESG components, it's not the

3    overriding factor in how we invest.  There has to be

4    a financial thesis behind our investments versus

5    just investing for good.

6         **Q.     Does your conception of being socially**

7    **responsible affect your decisions to bring**

8    **litigation?**

9         A.     Not all litigation, but we do take

10   into account those practices that we value as a

11   socially responsible bank and having better

12   corporate governance for our firms and, therefore,

13   our clients' money.  So we do take that into account

14   when pursuing litigation.

15        **Q.     I'll move to your investment strategy.**

16        **Could you describe the governance of**

17   **the LongView funds?**

18        A.     Can you clarify "governance."

19        **Q.     Sure.**

20        **So you testified earlier about a trust**

21   **committee.  Does that trust committee oversee the**

22   **LongView funds?**

23        A.     Yes.

24        **Q.     And does the trust committee actively**

25   **manage the LongView funds?**

www.aptusCR.com

 1          A.      No.

 2          Q.      Who actively manages them?

 3          A.      So the investment management division

 4    of Amalgamated Bank manages those assets.  Just to

 5    clarify, some of our assets are not actively

 6    managed, they're passively managed.  So I just want

 7    to get away from the active management.

 8               But the investment management division

 9    is responsible for the investments, with the

10    oversight of the trust committee.

11          Q.      So in the same way that a company

12    might have corporate officers who direct the

13    day-to-day strategy of the company and a board?  Is

14    that sort of the similar construct?

15          A.      I believe so, yes.

16          Q.      So you brought up the difference

17    between actively versus passively managed funds.

18               Does Amalgamated offer actively

19    managed funds?

20          A.      Yes, we do.

21          Q.      And passively managed funds?

22          A.      Yes.

23          Q.      Would you -- are passively managed

24    funds the same as index funds?

25          A.      Broadly speaking, yes.

Case 3:16-cv-02267   Document 395-1   Filed 01/22/21   Page 10 of 35 PageID #: 19675

1          Q.        Does Amalgamated offer any alternative

2    investment funds, for example, private equity hedge

3    funds, currencies?

4          A.        Yes.  We do offer some broadly

5    termed -- depending on what your definition of

6    "alternative" is, yes, we do have some alternative

7    offerings.

8          Q.        So how would you define "alternative"?

9          A.        So in this case, we have a LongView

10   private equity fund that is closed, so no additional

11   assets are invested.  We have a workforce housing

12   fund, which is not your general equity or fixed

13   income investments; it's loans in addition to real

14   estate.  And we also have the LongView ultra real

15   estate fund.

16         Q.        Do you have any funds that you would

17   characterize as quantitative funds?

18         A.        Yes.

19         Q.        How would you define a quantitative

20   fund?

21         A.        Well, our quantitative funds use an

22   algorithm and also a quantitative model in order to

23   invest the assets.

24         Q.        Would you say that is separate and

25   apart from the passive and active funds?

1      A.      We consider those active.

2      Q.      Okay.  So I want to focus just on --

3  set aside the alternative funds and just focus on

4  the active funds, including the quantitative funds,

5  and the passive funds.

6              Are there restrictions or limitations

7  in the policies of those funds, for example,

8  shorting stocks?

9              MR. WOOD:  Objection to form.

10             THE WITNESS:  Generally speaking, we

11         are not allowed to short stocks in our quant

12         funds and our index funds.

13 BY MR. WHITWORTH:

14     Q.      For each of those funds -- I'm taking

15 them one by one to make it easier, starting with the

16 actively managed funds -- does Amalgamated -- does

17 Amalgamated manage its own active funds?

18     A.      No, we do not.

19     Q.      So Amalgamated relies on external

20 advisors for its active funds?

21     A.      We have a subadvisor for our active

22 funds.

23     Q.      Is the subadvisor -- is the subadvisor

24 a separate company from Amalgamated?

25     A.      Yes.

Case 3:16-cv-02267   Document 395-1   Filed 01/22/21   Page 12 of 35 PageID #: 19677

1    Q.    Does Amalgamated have subadvisors for

2    index funds?

3    A.    Yes.

4    Q.    Does Amalgamated manage its own index

5    funds?

6    A.    Yes.

7    Q.    So you have both?

8    A.    Yes.

9    Q.    Does Amalgamated manage its own quant

10   funds?

11   A.    No, we have a subadvisor on our quant

12   funds.

13   Q.    For the funds that Amalgamated manages

14   on its own, which I believe are just the passive

15   funds, how do you decide -- "you" being

16   Amalgamated -- which companies to invest in?

17            MR. WOOD:  Objection to form.

18            THE WITNESS:  To clarify, for -- we

19       have numerous index funds.  And we do have a

20       subadvisor on some of them and some of them

21       are internally managed.  Broadly speaking,

22       the -- can you just repeat that question.  I

23       got caught up.

24   BY MR. WHITWORTH:

25   Q.    Sure.

Confidential

Grae vs. Corrections
Eleanor Innes - 30(b)(6)                    Corporation of America, et al.

1        So focusing specifically on the

2   internally managed funds, how does Amalgamated

3   decide what to invest in?

4            MR. WOOD:  Objection to form.

5            THE WITNESS:  So depending on the

6        strategy of the underlying index, we will

7        invest in those securities held in the

8        specific index that the fund is trying to

9        reproduce.

10  BY MR. WHITWORTH:

11       Q.    Does Amalgamated make those decisions

12  automatically, for  lack of a better word, or is

13  there a person at the controls deciding how to

14  balance the fund to match the index?

15       A.    So I manage the internally -- I'm the

16  portfolio manager for the internally managed index

17  funds, and I will decide how to weight the

18  securities based on the benchmark that I'm trying to

19  reproduce.

20       Q.    Could you describe that process a

21  little bit.

22            What factors influence how you decide

23  to weight the securities based on the benchmark

24  you're trying to reproduce?

25       A.    So the fund will hold those securities

www.aptusCR.com

1          A.      If required, yes.

2          Q.      **When would it be required?**

3          A.      If there's a question that comes up

4    that we need to speak to the subadvisor about.  If

5    there's an issue with the day-to-day performance,

6    we'll give them a call.  If there's a large cash

7    flow from a client, we'll speak to them.  If there's

8    some unusual activity or something that happens in

9    the market, we might get on the phone to discuss it.

10         **Q.      So other than the regular monthly**

11   **reports and when issues crop up like you just**

12   **described, do you communicate with your subadvisors?**

13         A.      I do, to see how they are.

14         **Q.      Do you ever call them just to take**

15   **their temperature on the market or a particular**

16   **stock?**

17         A.      Not regularly, no.

18         **Q.      Do you or anyone at Amalgamated who is**

19   **tasked with overseeing the subadvisors have the**

20   **authority to overrule or otherwise change a**

21   **subadvisor's investment decision?**

22         A.      Yes.  As trustee of the LongView fund,

23   Amalgamated Bank has the ability to direct the

24   subadvisor.

25         **Q.      Can you think of an example of when**

1    that's happened?

2         A.    There have been times when we're

3    pursuing shareholder litigation and we may hold a

4    certain amount of shares in order to continue the

5    litigation.

6         **Q.    And other than yourself, are there**

7    **other Amalgamated officers or employees who are**

8    **responsible for the LongView fund?**

9              MR. WOOD:  Objection to form.

10             THE WITNESS:  Yes.

11   BY MR. WHITWORTH:

12        **Q.    Who are they?**

13        A.    Well, in the investment management

14   division, you have myself and Kimani Oliviera, who

15   is our fixed income portfolio manager.  I'll spell

16   his name.  It's K-I-M-A-N-I, Kimani.  Oliviera is

17   his last name.  O-L-I-E-V-E-R-A [sic].  He's our

18   fixed income portfolio manager.

19             Jim Lingberg, who's the chief trust

20   officer, has oversight.  He's our direct boss.

21             And then ultimately the trust

22   committee of the investment management division.

23        **Q.    Moving to your specific transactions**

24   **in CoreCivic stock, are the LongView family of funds**

25   **the only Amalgamated funds that owned CoreCivic**

www.aptusCR.com
Case 3:16-cv-02267   Document 395-1   Filed 01/22/21   Page 16 of 35 PageID #: 19681

1    stock during the class period?

2         A.      Can you just repeat the question.  I'm

3    sorry.  Thank you.

4                  (Record read.)

5         A.      Yes, they're the only Amalgamated

6    funds that would own the stock.

7         Q.      Could you please turn back to

8    Exhibit 3.  Those are -- these are the plaintiff's

9    responses to CoreCivic's interrogatories.

10                I'll direct your attention to page 5,

11   which is plaintiff's Response to Interrogatory

12   No. 3, and it carries over on to page 6.

13                (Reviewing.)

14        Q.      Do you see where plaintiff responded

15   "Certain of its funds that purchased and/or sold

16   CoreCivic securities are subadvised by Quantitative

17   Management Associates LLC ('QMA')?

18        A.      Yes.

19        Q.      What is QMA?

20        A.      Quantitative Management Associates is

21   an investment advisor out in Newark, New Jersey.

22   They are a subadvisor on the quantitative funds and

23   some of our index funds.

24        Q.      So it advises both quantitative funds

25   and the passive index funds?

1       A.     Not all of the passive index funds.

2       Q.     I see.

3             Did QMA make any decisions regarding

4  transactions in CoreCivic securities?

5       A.     Yes.

6       Q.     And do you see later in that

7  paragraph, where it says, "Plaintiff's primary

8  contact at QMA is Eileen Pinto"?

9       A.     No.

10      Q.     What is Eileen Pinto's role at QMA?

11      A.     She is our relationship manager.

12      Q.     Does she make investment decisions on

13  behalf of Amalgamated?

14      A.     No, she does not.

15      Q.     Do you know who makes investment

16  decisions on behalf of Amalgamated at QMA?

17             MR. WOOD:  Objection to form.

18             THE WITNESS:  It would be their -- for

19     the index funds, there is an index fund team.

20     And for the quant funds, there is a quant

21     team, investment management team.

22  BY MR. WHITWORTH:

23      Q.     Okay.  I want to focus a little bit on

24  the quant side of QMA's advisory services.

25             Do you know what information is

1    accounted for in the algorithm that the quant fund

2    uses?

3                    MR. WOOD:  Objection to form.

4    BY MR. WHITWORTH:

5          Q.        Let me back up.

6                    Are you -- how does the quant fund

7    make investment decisions?

8          A.        Well, broadly, the quant fund will --

9    has an investment universe.  And they will rank

10   those stocks based on different growth and value

11   characteristics in addition to fundamental

12   characteristics, such as corporate governance, the

13   quality and diversity of a company's board, public

14   filings, news headlines, conference call

15   information.

16                    They use certain characteristics like

17   price to book, PE ratios, growth ratios.  And then

18   those are -- those stocks are ranked by the quant

19   model and a portfolio is created based on other

20   parameters, such as a stock can't be plus or minus

21   1 percent over its benchmark weight, certain sector

22   weights are taken into account, liquidity measures

23   are taken into account, so the stock can easily be

24   traded.  But that's very broad.

25          Q.        So you'll have to bear with me.  I'm

1    just a lawyer here, not an investment manager.  If I

2    could ask you just a couple of follow-up questions

3    based on that.

4              So when you say the quant fund will

5    rank stocks based on those factors, does that mean

6    they create a program or an algorithm to account for

7    those factors?

8         A.     Yes, that's what the quant model will

9    do.  It will take all those factors into account --

10   all those data points into account to create factors

11   that they then create a portfolio.

12        Q.     How does the quant model account for a

13   company's public filings?

14        A.     So there are certain -- what they do

15   is they'll take a public filing and they will screen

16   scrape it, they call, or go through a transcript for

17   positive/negative words in order to rank a company

18   based on what they've said in their filings and

19   their conference calls.

20        Q.     So what kind of stuff might that pick

21   up on?

22        A.     That might pick up on, you know, if a

23   company's optimistic or if they've increased their

24   revenue projections or their earnings estimates or

25   if there's been any type of litigation brought

1    against them.  Or if there are news headlines that

2    are positive/negative for a company, it will pick up

3    those signals.

4           Q.    And just to clarify, there's not a

5    person reading those statements; it's just a model

6    that sort of --

7           A.    Yes, that is my understanding.

8           Q.    Does Amalgamated have any input into

9    designing the model?

10          A.    No, we do not.

11          Q.    Do you know how the model accounts for

12   news headlines?

13          A.    Just very broadly.

14          Q.    Is it sort of the same way?

15          A.    Meaning?

16          Q.    The same way it accounts for public

17   statements of the company and conference calls?

18          A.    Yes.  A news headline gets a

19   positive/negative ranking.

20          Q.    Does it evaluate the statement or the

21   news headline any further than positive or negative?

22          A.    Not that I know of.

23          Q.    So it doesn't evaluate it based on

24   degree, for instance, like degree of positivity or

25   negativity?

1          A.      No.

2          Q.      So it's possible that a company could

3    say, we've had slow growth at one of our factories,

4    and that might be accounted for in the same way as a

5    company restating its earnings?

6                  MR. WOOD:  Objection to form.

7                  THE WITNESS:  I'm not sure.

8    BY MR. WHITWORTH:

9          Q.      And I apologize if you said this and I

10   missed it, but when the model gets new input from,

11   say, a public statement or a news headline or some

12   other indicator that it considers, will it make a

13   trade based on that information automatically, or

14   will some person see what the model says and they go

15   make a trade?

16         A.      I believe it's a combination of the

17   two.

18         Q.      Okay.  Do you know -- can you describe

19   how that process works.

20         A.      Broadly speaking, so the model will

21   indicate to buy or sell a security, and then the

22   team will decide on how to implement that trade.

23   It's not an automatic process.

24         Q.      Do you know, ballpark is fine, what

25   percentage of the securities -- the CoreCivic

www.aptusCR.com

Confidential

Grae vs. Corrections
Corporation of America, et al.

Eleanor Innes - 30(b)(6)

1    securities that Amalgamated held either managed

2    by -- managed internally or managed by a subadvisor

3    or held in quant funds?

4         A.    No, I do not.

5         Q.    So I want to ask you about a few

6    specific transactions in CoreCivic stock, but not

7    too much on that.

8              First of all, did Amalgamated ever

9    purchase any CoreCivic security in order to

10   participate in this or any other lawsuit?

11        A.    No.

12        Q.    Did Amalgamated ever purchase any

13   CoreCivic security at the direction of an attorney?

14        A.    No.

15        Q.    So if you could look back, please, at

16   Exhibit 5.  And I note before we looked at the

17   certification, but now I want to look at Schedule A.

18              Do you recall this document was filed

19   in connection with Amalgamated's motion to be

20   appointed as lead plaintiff?

21        A.    Yes.

22        Q.    Do you recognize Schedule A?

23        A.    Yes.

24        Q.    Could you describe it.

25        A.    It has the buys and sells or

Case 3:16-cv-02267   Document 395-1   Filed 01/22/21   Page 23 of 35 PageID #: 19688

1    acquisitions and sales of the CCA's stock during the

2    class action period, I believe.

3           Q.      Do you know who prepared it?

4           A.      It was O'Neil Martin of our fund

5    accounting group.

6           Q.      And do you know how it was prepared?

7           A.      No.

8           Q.      Do you think it was based on some

9    computer-generated data report?

10          A.      I'm sure it came from our accounting

11   system.

12          Q.      Do you know whether this schedule

13   accounts for all transactions in CoreCivic

14   securities by any of the Amalgamated funds that held

15   them?

16          A.      I believe so, yes.

17          Q.      So there are no transactions in

18   CoreCivic securities during the class period that

19   are not listed in this document?

20          A.      That were done in the Amalgamated Bank

21   LongView funds --

22          Q.      Yes.

23          A.      -- correct.

24          Q.      And do you have any reason to doubt

25   the accuracy of any of the dates, quantities or

```
 1   prices listed in this document?

 2         A.     No.

 3         Q.     I know it's not obvious based on this

 4   document, but is it possible to determine which of

 5   these trades were made by quantitative funds?

 6         A.     No, based on this information.

 7         Q.     I'm sorry.  I -- putting aside this

 8   document for one second --

 9         A.     I'm sorry.

10         Q.     -- is it possible -- does Amalgamated

11   have accounting data or software that would make --

12   be able to tell us whether a particular trade was

13   made by a particular Amalgamated fund?

14         A.     Yes.

15         Q.     To your knowledge, were any of the

16   transactions listed here made for any reason other

17   than to track an index or pursuant to a quantitative

18   model?

19         A.     No.

20         Q.     Do you know whether any of the

21   CoreCivic transactions were short sales?

22         A.     None would be short sales.

23         Q.     You testified earlier that the quant

24   fund is permitted to engage in short selling; is

25   that correct?
```

www.aptusCR.com

1              MR. WOOD:  Objection to form.

2              THE WITNESS:  No, they're not allowed

3        to short sell.

4    BY MR. WHITWORTH:

5         Q.    **Which Amalgamated funds are allowed to**

6    **short sell?**

7         A.    None.  So if I misspoke -- none of our

8    funds are allowed to sell stock short.

9         Q.    **Do your funds engage in option**

10   **trading?**

11        A.    No.

12        Q.    **So none of these CoreCivic trades**

13   **would have been pursuant to option contracts?**

14        A.    No.

15        Q.    **If you look on the last page, the**

16   **bottom left of this document, do you see it says,**

17   **"Opening position of 38,479 shares"?**

18        A.    Yes.

19        Q.    **What does that refer to?**

20        A.    I'm speculating, but I believe that

21   would be the opening -- amount of shares we owned on

22   the start date of when we requested transactions.

23        Q.    **Okay.  Do you see -- I guess we'd call**

24   **them Footnotes A, B and D -- A saying "Shares that**

25   **were received in"; B, "Shares that were delivered**

www.aptusCR.com

1    out"; and D, "Stock dividend."

2              What are shares that are received in?

3    What does that refer to?

4         A.    Shares that were received in -- I'm

5    speculating because I don't know what happened on

6    each date, but these could be due to a portfolio

7    transition.  So if we have a client who would like

8    to transition their portfolio into one of our funds,

9    we'll do a stock transition into the fund versus

10   buying or selling.

11             Same thing that -- at times we have a

12   client that wants to pull their -- pull their

13   investment from the fund, so we may deliver out

14   stock for those purposes.  They want it in stock,

15   not cash.  That's one -- I can't think of another

16   reason why shares would be received or delivered --

17   received in or delivered out.

18             It could be due to a corporate action.

19   If there was a restructuring or a stock split,

20   they'll show up as shares received in and the old

21   shares delivered out.

22             On the stock dividend,

23   self-explanatory.

24        Q.    Okay.  So looking back at the opening

25   position, you testified that you thought, but it

www.aptusCR.com

1    would be speculation, that these shares would have

2    predated -- would have been purchased prior to the

3    date on which you requested this report?

4            A.      Yes.

5            Q.      I take it you don't know what date

6    these shares were purchased?

7            A.      No.  Personally, no.

8            Q.      Do you know when Amalgamated -- any

9    Amalgamated fund first purchased CoreCivic

10   securities?

11           A.      Off the top of my head, no.

12           Q.      So you don't know what information you

13   or any subadvisor might have relied on in purchasing

14   these 38,479 shares?

15                   MR. WOOD:  Objection to form.

16                   THE WITNESS:  I do not know now, no,

17           but it would be in conjunction with the

18           investment strategy of the fund.

19   BY MR. WHITWORTH:

20           Q.      Do you know whether any of these

21   38,479 shares were purchased or held in what you

22   termed an actively managed fund?

23           A.      They may have been held in the

24   LongView quantitative funds.

25           Q.      What about a non-quantitative actively

www.aptusCR.com
Case 3:16-cv-02267    Document 395-1    Filed 01/22/21    Page 28 of 35 PageID #: 19693

1   managed fund?

2           A.      We don't have any.

3           Q.      Are you alleging any claims against

4   CoreCivic in connection with these 38,479 shares?

5                   MR. WOOD:  Objection to form.

6                   THE WITNESS:  No, it would be during

7           the class action period.

8   BY MR. WHITWORTH:

9           Q.      Your claims would be limited to the

10  class action period, is that what you --

11          A.      Yes.

12          Q.      So if you look back at the first page

13  of this Schedule A, it looks like the first purchase

14  occurred on March 29, 2012; is that correct?

15          A.      Yes.

16          Q.      First purchase listed on this report,

17  I should clarify.

18          A.      Yes.

19          Q.      Do you know why Amalgamated or its

20  subadvisor decided to purchase CoreCivic stock at

21  that date?

22          A.      No.

23          Q.      And I know we ran through a lot of the

24  information that your funds and your subadvisors

25  might consider in connection with investments, but

Case 3:16-cv-02267    Document 395-1    Filed 01/22/21    Page 29 of 35 PageID #: 19694

```
 1   just to quickly do that with the same -- in

 2   connection with purchasing CoreCivic stock or

 3   selling CoreCivic stock, would your advisors

 4   consider -- let me break this up -- would your

 5   passively managed funds consider public filings in

 6   connection with CoreCivic stock transactions?

 7        A.    No.

 8        Q.    Would your passively managed funds

 9   consider analyst reports in connection with

10   CoreCivic stock transactions?

11        A.    No.

12        Q.    Public statements by the company?

13        A.    No.

14              MR. WOOD:  Objection to form.

15   BY MR. WHITWORTH:

16        Q.    Would your quantitative funds consider

17   public filings by CoreCivic in connection with

18   CoreCivic stock transactions?

19        A.    They could, yes.

20        Q.    And that would be as input to the

21   quantitative model; correct?

22        A.    Yes.

23        Q.    And the same thing for analyst

24   reports?

25        A.    Yes, if they're public information.
```

www.aptusCR.com

1    Q.    Did you ever correspond with anyone at

2    QMA specifically regarding CoreCivic securities?

3    A.    No.

4    Q.    Do you know whether anyone at

5    Amalgamated who is responsible for corresponding

6    with Eileen Pinto or QMA would have considered -- or

7    would have discussed CoreCivic securities?

8    A.    No.

9    Q.    So if you look at the end of the list

10   of CoreCivic purchases, is the last purchase in this

11   report July 29th, 2016?

12   A.    Yes.

13   Q.    Do you know whether CoreCivic -- or

14   excuse me -- whether any Amalgamated fund purchased

15   CoreCivic securities after this date?

16   A.    I do not know.

17   Q.    Do you know whether Amalgamated or any

18   Amalgamated fund purchased CoreCivic securities

19   after the end of the class period?

20   A.    I don't know.

21   Q.    Just for the record, that's August 17,

22   2016.

23         You don't know after that date?

24   A.    Not off the top of my head, no.

25   Q.    You testified earlier that Amalgamated

Case 3:16-cv-02267   Document 395-1   Filed 01/22/21   Page 31 of 35 PageID #: 19696

 1   will sometimes instruct its subadvisors to hold

 2   shares of companies they are pursuing litigation

 3   against.

 4               Do you recall that?

 5        A.     Correct.

 6        Q.     Do you know if that happened in this

 7   situation?

 8        A.     It has not.

 9        Q.     I asked you several questions about

10   the types of information Amalgamated or its

11   subadvisors might consider in connection with buying

12   CoreCivic stock.

13               Would those same answers apply to

14   decisions to sell CoreCivic stock?

15        A.     Yes.

16        Q.     And based on this document, you

17   couldn't tell me what factors influenced any

18   particular purchase or sale; correct?

19        A.     On this document, no.

20        Q.     Take a look -- I promise this is the

21   last specific transaction.

22               On May 10, 2013, it looks like

23   Amalgamated sold 30,500 shares of CoreCivic.

24        A.     Yes.

25        Q.     At a price of $38.68?

1          A.        Yes.

2          Q.        Do you know why Amalgamated sold

3   30,500 shares of CoreCivic stock on that date?

4          A.        No.

5          Q.        If you could just briefly scan the

6   quantities sold.

7                    Does this May 10 sale stand out for

8   being particularly large?

9          A.        It's the largest during this time

10  period.

11         Q.        So the last date on this document

12  showing CoreCivic stock sales is June 28, 2016.

13                   Do you know if there were any sales of

14  CoreCivic stock after that date?

15         A.        No.

16         Q.        And this Schedule A lists all

17  transactions that occurred during the class period;

18  correct?

19         A.        Yes.

20         Q.        So if the class period went until

21  August 17, 2016, and the last date of a CoreCivic

22  sale is June 28, 2016, is it fair to say that there

23  were no sales between June 28 and August 17, 2016?

24         A.        Based on this document, yes.

25         Q.        Do you recall earlier testifying about

1   the alleged corrective disclosures in this case?

2          A.    Can you clarify.

3          Q.    Sure.

4                The OIG report and the Yates

5   memorandum, do you remember those terms?

6          A.    Yes.

7          Q.    I'll represent to you that the OIG

8   report was released on August 11, 2016.

9          A.    Okay.

10         Q.    Were there any CoreCivic stock sales

11  between August 11, 2016, and the end of the class

12  period?

13         A.    I don't know.  If it's -- I don't

14  know.

15         Q.    Based on this document, are there any?

16         A.    Yeah, based on this document, there

17  are not.

18         Q.    Do you know how much CoreCivic stock

19  the Amalgamated funds hold today?

20         A.    No, I do not.

21         Q.    I want to talk a little bit about your

22  allegation of damages in this case.

23                MR. WHITWORTH:  I'm going to mark this

24         as Defendants' Exhibit 10.  This is a

25         document titled Movant's Purchases and

Case 3:16-cv-02267   Document 395-1   Filed 01/22/21   Page 34 of 35 PageID #: 19699

1              C E R T I F I C A T E

2

3   STATE OF NEW YORK      )

4                          ) ss:

5   COUNTY OF WESTCHESTER )

6

7              I, Eileen Mulvenna, CSR/RMR/CRR and a

8   notary public within and for the State of New York,

9   do hereby certify:

10             That I reported the proceedings in the

11  within-entitled matter, and that the within

12  transcript is a true record of such proceedings.

13             I further certify that I am not related by

14  blood or marriage to any of the parties in this

15  matter and that I am in no way interested in the

16  outcome of the matter.

17             Further, that if the foregoing pertains to

18  the original transcript of a deposition in a federal

19  case, before completion of the proceedings, review of

20  the transcript [X] was [ ] was not requested.

21             IN WITNESS WHEREOF, I have hereunto set my

22  hand this 10th day of July, 2018.

23

24             --------------------------------
               Eileen Mulvenna, CSR/RMR/CRR

25